# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

### CASE NO.: 2:14-md-02592-EEF-MBN

IN RE: XARELTO (RIVAROXABAN)        MDL NO. 2592
PRODUCTS LIABILITY LITIGATION

                                             SECTION: L

                                             JUDGE ELDON E. FALLON

                                             MAG. JUDGE NORTH

THIS DOCUMENT RELATES TO:
        14-01125

---

| | | |
|---|---|---|
| MARY ANN INGRAM, as Executrix | ) | |
| of the Estate and Personal Representative | ) | |
| of ADA ERLE CHURCH, deceased | ) | |
| | ) | |
|       PLAINTIFF, | ) | |
| | ) | Case No.: 2:14-cv-01125-MHT-WC |
| v. | ) | |
| | ) | |
| JANSSEN RESEARCH & DEVELOPMENT, | ) | |
| LLC f/k/a JOHNSON AND JOHNSON | ) | |
| PHARMACEUTICAL RESEARCH AND | ) | |
| DEVELOPMENT, LLC, JANSSEN ORTHO | ) | AMENDED COMPLAINT |
| LLC, JANSSEN PHARMACEUTICALS, INC. | ) | |
| f/k/a ORTHO-MCNEIL-JANSSEN | ) | JURY TRIAL DEMANDED |
| PHARMACEUTICALS, INC., JOHNSON | ) | |
| & JOHNSON COMPANY; BAYER | ) | |
| HEALTHCARE PHARMACEUTICALS, | ) | |
| INC., BAYER PHARMA AG, BAYER CORP., | ) | |
| BAYER HEALTHCARE LLC, BAYER | ) | |
| HEALTHCARE AG, BAYER AG, | ) | |
| and FICTITIOUS DEFENDANTS A-Z, | ) | |
| whose names are unknown to the Plaintiff | ) | |
| at this time and whose involvement are | ) | |
| detailed herein | ) | |
| | ) | |
|       DEFENDANTS. | ) | |

**AMENDED COMPLAINT**

Plaintiff, MARY ANN INGRAM, as Executrix of the Estate of ADA ERLE CHURCH and Personal Representative of ADA ERLE CHURCH, deceased, by and through her undersigned attorneys, upon information and belief, at all times hereinafter mentioned, alleges as follows:

**JURISDICTION AND VENUE**

1. This Court as jurisdiction over this action pursuant to 28 U.S.C. 1332, because the amount in controversy as to the Plaintiff exceeds $75,000,.00, exclusive of interest and costs, and because Defendants are incorporated and have their principal places of business in states other than the state in which the named Plaintiff resides. Defendants have significant contacts in the vicinage of Plaintiff's residence such that they are subject to the personal jurisdiction of the court in that vicinage. A substantial part of the events and omissions giving rise to Plaintiff's causes of action occurred in the vicinage of Plaintiff's residence, in Montgomery County, Alabama, as well as in this district. Pursuant to USC 1391(a), venue is proper in both districts. Pursuant to the Transfer Order of the Judicial Panel on Multidistrict Litigation, *In re: Xarelto (Rivaroxaban) Products Liab. Litig.,* 2014 WL 7004048 (J.P.M.L. June 12, 2014), venue is also proper in this jurisdiction pursuant to 28 U.S.C. 1407.

2. This action is brought on behalf of the Plaintiff, Mary Ann Ingram, as Executrix of the Estate of Ada Erle Church and as the Personal Representative of Ada Erle Church, deceased. Ada Erle Church, ingested Xarelto from approximately December 14, 2013 to December 20, 2013 and suffered bleeding and other complications which led to Ms. Church's death on December 26, 2013 in Montgomery County, Alabama. At the time of her death, Ms. Church resided in the State of Alabama.

3.      Defendants, JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a JOHNSON AND JOHNSON PHARMACEUTICAL RESEARCH AND DEVELOPMENT LLC, JANSSEN ORTHO LLC, JANSSEN PHARMACEUTICALS, I NC. f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., JOHNSON & JOHNSON COMPANY, BAYER HEALTHCARE PHARMACEUTICALS, INC., BAYER PHARMA AG, BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE AG, and BAYER AG (hereinafter collectively referred to as "Xarelto Defendants") designed, researched, developed, manufactured, tested, advertised, promoted, marketed, sold, and distributed pharmaceutical products including Xarelto.

4.      When warning of safety and risks of Xarelto, the Xarelto Defendants negligently and/or fraudulently represented to the medical and healthcare community, the Food and Drug Administration (hereinafter referred to as "FDA"), to Ms. Church and the public in general, that Xarelto had been tested and was found to be safe and/or effective for its indicated use.

5.      The primary purposes of Xarelto are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat Deep Vein Thrombosis (DVT) and Pulmonary Embolism, to reduce the risk of recurrence of DVT and/or PE and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

6.      Xarelto Defendants concealed their knowledge of Xarelto's defects from Ms. Church, the FDA, the public in general and/or the medical community specifically.

7.      These representations were made by Xarelto Defendants with the intent of defrauding and deceiving Ms. Church, the public in general, and the medical and healthcare community in particular, and were made with the intent of introducing the public in general, and the medical community in particular, to recommend, dispense and/or purchase Xarelto for use to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to

treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, all of which evinced a callous, reckless, willful, depraved indifference to health, safety and welfare of Ms. Church herein.

8.     Xarelto Defendants negligently and improperly failed to perform sufficient tests, if any, on humans using Xarelto during clinical trials, forcing Ms. Church, and Ms. Church's physicians, hospitals, and/or the FDA, to rely on safety information that applies to other non-valvular atrial fibrillation treatment and DVT/PE treatment and prophylaxis, which does not entirely and/or necessarily apply to Xarelto whatsoever. The Defendants have engaged in a deliberate course of action to pressure physicians, such as Ms. Church's physician, to prescribe drugs, including Xarelto for unapproved uses while concealing and downplaying their risks. The Defendants did not adequately test these drugs, did not adequately warn physicians, Ms. Church, the public and the FDA on the use of the drugs and of the lethal nature of Xarelto.

9.     As a result of the foregoing acts and omissions, Ada Erle Church was caused to suffer serious and dangerous side effects including life-ending bleeding and other severe and personal injuries which led to her death.  She endured physical pain and mental anguish. Ada Erle Church died due to Plaintiff's use of Xarelto.

10.     Defendants concealed their knowledge of the defects in their products from Ms. Church, and Ms. Church's physicians, hospitals, pharmacists, the FDA, and the public in general.

11.     Consequently, Plaintiff brings this action pursuant to Ala. Code 6-5-410 (1975) for the wrongful death of Ada Erle Church.

## PARTY PLAINTIFF

12.     Plaintiff, Mary Ann Ingram, and brings this action in that capacity and

as Executrix of the Estate and Personal Representative of Ada Erle Church, deceased (hereinafter "Ms. Church").

13.     The deceased, Ada Erle Church, was born on March 7, 1924.  She died December 26, 2013.

14.     Ms. Church first began using Xarelto on December 14, 2013 and used Xarelto as prescribed once a day until December 20, 2013 when she suffered life threatening bleeding and other conditions all of which contributed to her death on December 26, 2013.

15.     As a result of using Xarelto, Ms. Church died on December 26, 2013.

16.     The death of Ada Erle Church was caused by her ingestion of Xarelto.

17.     Upon information and belief, Defendant JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a JOHNSON AND JOHNSON PHARMACEUTICAL RESEARCH AND DEVELOPMENT LLC (hereinafter referred to as "JANSSEN R&D") is a limited liability company organized under the law of New Jersey, with a principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933.  Defendant JANSSEN R&D is the holder of the approved New Drug Application ("NDA") for Xarelto as well as the supplemental NDA. Defendant Janssen R&D's sole member is Janssen Pharmaceuticals, Inc., which is a Pennsylvania corporation with a principal place of business in New Jersey. Accordingly, Janssen R&D is a citizen of Pennsylvania and New Jersey for purposes of determining diversity.

18.     As part of its business, JANSSEN R&D is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto.

19.     Upon information and belief, Defendant JANSSEN R&D has transacted and conducted business in the State of Alabama.

20.     Upon information and belief, Defendant JANSSEN R&D has derived substantial revenue from goods and products used in the State of Alabama.

21.     Upon information and belief, Defendant, JANSSEN R&D, expected or should have expected its acts to have consequences within the United States of America and the State of Alabama and derived substantial revenue from its interstate commerce within the United States and the State of Alabama.

22.     Upon information and belief, and at all relevant times, Defendant, JANSSEN R&D, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purpose of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

23.     Upon information and belief, Defendant JANSSEN PHARMACEUTICALS, INC. f/k/a   JANSSEN   PHARMACEUTICA   INC,   f/k/a   ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. (hereinafter referred to as "JANSSEN PHARM") is a Pennsylvania corporation, having a principal place of business at 1125 Trenton-Harbourton Road, Titusville, New Jersey 08560.

24.     As part of its business, JANSSEN PHARM is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto.

25.     Upon information and belief, Defendant JANSSEN PHARM has transacted and conducted business in the State of Alabama.

26.     Upon information and belief, Defendant, JANSSEN PHARM, has derived substantial revenue from good and products used in the State of Alabama.

27.     Upon information and belief, Defendant, JANSSEN PHARM, expected or should have expected its acts to have consequences within the United States of America and the State of Alabama and derived substantial revenue from its interstate commerce within the United States and the State of Alabama.

28.     Upon information and belief, and at all relevant times, Defendant, JANSSEN PHARM, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purpose of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

29.     Upon information and belief, and at all relevant times, Defendant, JANSSEN ORTHO LLC (hereinafter referred to as "JANSSEN ORTHO") is a limited liability company organized under the laws of Delaware, having a principal place of business at State Road 933 Km 0 1, Street Statero, Gurabo, Puerto Rico, 00778.  Defendant JANSSEN ORTHO is a subsidiary of Johnson & Johnson. The only member of Janssen Ortho LLC is OMJ PR Holdings, which is incorporated in Ireland with a principal place of business in Puerto Rico. Accordingly, Janssen Ortho, LLC is a citizen of Delaware, Ireland and Puerto Rico for purposes of determining diversity.

30.     As part of its business, JANSSEN ORTHO is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto.

31.     Upon information and belief, Defendant JANSSEN ORTHO has transacted and conducted business in the State of Alabama.

32.     Upon information and belief, Defendant, JANSSEN ORTHO, has derived substantial revenue from good and products used in the State of Alabama.

33.     Upon information and belief, Defendant, JANSSEN ORTHO, expected or should have expected its acts to have consequences within the United States of America and the State of Alabama and derived substantial revenue from its interstate commerce within the United States and the State of Alabama.

34.     Upon information and belief, and at all relevant times, Defendant, JANSSEN ORTHO, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purpose of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery. Defendant Johnson & Johnson is a fictitious name adopted by Defendant Johnson & Johnson Company, a New Jersey corporation, which has its principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933. As part of its business, Johnson & Johnson and its "family of companies" is involved in the research, development, sales and marketing of pharmaceutical products, including Xarelto.

35.     Upon information and belief, and at all relevant times, Defendant, BAYER HEALTHCARE PHARMACEUTICALS, INC. is a limited liability company organized under the laws of Delaware, with its principal place of business in the State of New Jersey.

36.     Defendant, BAYER HEALTHCARE PHARMACEUTICALS, INC. was formerly known as Berlex Laboratories, Inc. which was formerly known as Berlex, Inc. and BAYER HEALTHCARE PHARMACEUTICALS, INC. is the same corporate entity as Berlex, Inc. and Berlex Laboratories, Inc.

37.     As part of its business, BAYER HEALTHCARE PHARMACEUTICALS, INC. is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto.

38.     Upon information and belief, Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC., has transacted and conducted business in the State of Alabama.

39.     Upon information and belief, Defendant, BAYER HEALTHCARE PHARMACEUTICALS, INC., has derived substantial revenue from good and products used in the State of Alabama.

40.     Upon information and belief, Defendant, BAYER HEALTHCARE PHARMACEUTICALS, INC., expected or should have expected its acts to have consequences within the United States of America and the State of Alabama and derived substantial revenue from its interstate commerce within the United States and the State of Alabama.

41.     Upon information and belief, and at all relevant times, Defendant, BAYER HEALTHCARE PHARMACEUTICALS, INC., was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purpose of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

42.     Upon information and belief, Defendant BAYER PHARMA AG is a pharmaceutical company domiciled in Germany.

43.     Defendant BAYER PHARMA AG is formerly known as Bayer Schering Pharma AG and is the same corporate entity as Bayer Schering Pharma AG.  Bayer Schering Pharma AG is formerly known as Schering AG and is the same corporate entity as Schering AG.

44.     Upon information and belief, Schering AG was renamed Bayer Schering Pharma AG effective December 29, 2006.

45.     Upon information and belief, Bayer Schering Pharma AG was renamed BAYER PHARMA AG effective July 1, 2011.

46.     As part of its business, BAYER PHARMA AG is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

47.     Upon information and belief, Defendant BAYER PHARMA AG has transacted and conducted business in the State of Alabama.

48.     Upon information and belief, Defendant, BAYER PHARMA AG, has derived substantial revenue from good and products used in the State of Alabama.

49.     Upon information and belief, Defendant, BAYER PHARMA AG, expected or should have expected its acts to have consequences within the United States of America and the State of Alabama and derived substantial revenue from its interstate commerce within the United States and the State of Alabama.

50.     Upon information and belief, and at all relevant times, Defendant, BAYER PHARMA AG, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purpose of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

51.    Upon information and belief, Defendant BAYER CORPORATION is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburg, Pennsylvania 15205.

52.    Upon information and belief, Defendant BAYER CORPORATION is the sole member of BAYER HEALTHCARE LLC, which owns 100% of Schering Berlin, Inc., which owns 100% of Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC.  As such, Defendant BAYER CORPORATION is a parent of Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. Defendant BAYER CORPORATION is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205.

53.    At relevant times, Defendant BAYER CORPORATION was engage in the business of researching, developing, designing, licensing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, its products, including the prescription drug Xarelto.

54.    At relevant times, Defendant BAYER CORPORATION conducted regular and sustained business in the State of Alabama, by selling and distributing its products in the State of Alabama and engaged in substantial commerce and business activity in the State of Alabama.

55.    Upon information and belief, Defendant BAYER HEALTHCARE LLC is a limited liability company duly formed and existing under and by the virtue of the laws of the State of Delaware, with its principal place of business located in the State of New Jersey.

56.    Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC has transacted and conducted business in the State of Alabama and derived substantial revenue from interstate commerce.  Defendant BAYER CORPORATION is the sole member of Defendant BAYER HEALTHCARE LLC and as such for purposes of establishing

diversity and citizenship, Defendant BAYER HEALTHCARE LLC is a citizen of Indiana and Pennsylvania.

57.     Upon information and belief, Defendant, BAYER HEALTHCARE LLC., expected or should have expected its acts to have consequences within the United States of America, in the State of Alabama and derived substantial revenue from interstate commerce.

58.     Upon information and belief, and at all relevant times, Defendant, BAYER HEALTHCARE LLC was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purpose of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

59.     Upon information and belief, Defendant BAYER HEALTHCARE AG is a company domiciled in Germany and is the parent/holding company and exercises control over Defendants BAYER HEALTHCARE CORPORATION, BAYER HEALTHCARE LLCE, BAYER HEALTHCARE PHARMACEUTICALS, INC., and BAYER PHARMA AG.

60.     Upon information and belief, and at all relevant times, Defendant, BAYER HEALTHCARE AG, has transacted and conducted business in the State of Alabama, and derived substantial revenue from its interstate commerce.

61.     Upon information and belief, Defendant, BAYER HEALTHCARE AG, expected or should have expected its acts to have consequences within the United States of America and the State of Alabama and derived substantial revenue from its interstate commerce.

62.     Upon information and belief, and at all relevant times, Defendant BAYER HEALTHCARE AG exercises dominion and control over Defendants BAYER CORPORATION,

12

BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC., and BAYER PHARMA AG.

63.     Upon information and belief, Defendant BAYER AG is a German chemical and pharmaceutical company that is headquartered in Leverkusen, North Rhine-Westphalia, Germany.

64.     Upon information and belief, BAYER AG is the third largest pharmaceutical company in the world.

65.     Upon information and belief, and at all relevant times, Defendant BAYER AG is the parent/holding company of all other named Xarelto Defendants.

66.     Upon information and belief, Defendant, BAYER AG expected or should have expected its acts to have consequences within the United States of America, in the State of Alabama and derived substantial revenue from interstate commerce.

67.     Upon information and belief, Defendant, BAYER AG, expected or should have expected its acts to have consequences within the United States of America and the State of Alabama and derived substantial revenue from its interstate commerce.

68.     Upon information and belief, and at all relevant times, Defendant, BAYER AG was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purpose of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

69.     Defendants Janssen Research & Development, LLC, Janssen Ortho, LLC, Janssen Pharmaceuticals, Inc., Johnson & Johnson, Bayer Healthcare Pharmaceuticals, Inc., Bayer Pharma

AG, Bayer Corporation, Bayer Healthcare, LLC, Bayer Healthcare AG, and Bayer AG, shall be referred to herein individually by name or jointly as "Xarelto Defendants" or "Defendants".

70.     At all times alleged herein, Defendants include and included any and all parents, subsidiaries, affiliates, divisions, successors and assigns and their officers, directors, employees, agents, representatives and any and all other persons acting on their behalf.

71.     At all times herein mentioned, each of the Defendants was the agent, servant, partner, predecessors in interest, and joint venture of each of the remaining Defendants herein and was at all times operating and acting with the purpose and scope of said agency, service, employment, partnership and joint venture. At all times relevant, Defendants were engaged in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce throughout the United States either directly or indirectly through third parties, subsidiaries or related entities, the drug Xarelto.

72.     Fictitious Defendants "A"-"Z" are those corporations, partnerships, sole proprietorships, or other business entities which designed, manufactured or distributed Xarelto and/or Amiodarone and those employees or persons acting as an agent, servant or employee of Defendants who participated in the manufacturing of, design of, marketing of or distribution of Xarelto.

## **GENERAL BACKGROUND**

### ***Background of Xarelto***

73.     At all relevant times, Xarelto Defendants were in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto and rivaroxaban to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial

fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

74.     Xarelto was introduced in the United States on July 1, 2011, and is part of a class of drugs called New Oral Anticoagulants ("NOACs"). This class of NOACs, which also includes Pradaxa and Eliquis, is marketed as the next generation of blood thinning drugs to replace warfarin (Coumadin); an established safe treatment for preventing stroke and systemic embolism for the past 60 years. Xarelto is an anticoagulant that acts as a Factor Xa inhibitor and is available by prescription in oral tablet doses of 20 mg, 15, mg and 10 mg. Xarelto Defendants received FDA approval of Xarelto, also known as rivaroxaban, on July 1, 2011 for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries (NDA 022406).

75.     Xarelto Defendants then received additional FDA approval for Xarelto to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation on November 4, 2011 (NDA202439).   Approval of Xarelto for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation in the U.S. was based on a clinical trial known as Rivaroxaban Once Daily Oral Direct Factor Xa Inhibition Compared with Vitamin K Antagonism for Prevention of Stroke and Embolism Trial in Atrial Fibrillation study (hereinafter referred to as "ROCKET AF").

76.     The Rocket AF study showed that Xarelto was non-inferior to warfarin for the prevention of stroke or systemic embolism in patients with non-valvular atrial fibrillation, with a similar risk of major bleeding. However, "bleeding from gastrointestinal sites, including upper, lower and rectal sites occurred more frequently in the rivaroxaban group, as did bleeding that led to a drop in the hemoglobin level or bleeding that required transfusion." (Patel, M.R., et al

Rivaroxaban versus warfarin in Nonvalvular Atrial Fibrillation, N. Engl., J. Med. 2011; 365: 883-91).

77.     The Rocket AF study compared warfarin to Xarelto. Thus, for the study to be well designed and meaningful, the warfarin study group would have to be well managed because warfarin's safety and efficacy is dose dependent. In other words, if the warfarin group was poorly managed, it would be easy for Xarelto to appear non-inferior to warfarin, which, in turn, would provide Defendants a study to "support" Xarelto's use.

78.     In fact, in the ROCKET AF study, the warfarin group was not well managed. The warfarin group in the ROCKET AF study was the worst managed warfarin study group in any previously reported clinical trial involving warfarin.

79.     The poor management of the warfarin group in the ROCKET AF study was not lost on the FDA, which noted "the data comparing Xarelto to warfarin are not adequate to determine whether Xarelto is as effective for its proposed indication in comparison to warfarin when the latter is used skillfully." FDA Advisory Committee Briefing document P. 10.

80.     Public Citizen also noticed the poor control in the warfarin group. Public Citizen wrote the FDA, stating they "strongly oppose FDA approval… The 3 ROCKET AF trial conducted in support of the proposed indication had a suboptimal control arm…" http://www.citizen.org/documents/1974.pdf.

81.     Another problem with the ROCKET AF study was Xarelto's once a day dosing. The FDA clinical reviewers stated that "the sponsor's rationale for evaluating only once daily dosing during Phase 3 is not strong. Most importantly, there is clinical information from Phase 2 trials…and from clinical pharmacology studies suggesting that twice daily dosing, which would produce lower peak blood levels and higher trough blood levels of Xarelto might have been

associated with great efficacy and/a better safety profile." FDA advisory Committee Briefing document p. 100.

82.     Dr. Steven E. Nissen, more sharply, stated "my concern was that the dose was selected more for a marketing advantage rather than for the scientific data that was available, and was a mistake…" FDA Advisory Meeting Transcript p. 287.

83.     Furthermore, the FDA expressed desirability in monitoring Xarelto dosage within their NDA approval memo based on the ROCKET studies. The clinical pharmacology in these studies demonstrated a linear correlation between Xarelto levels and prothrombin time and subsequently a correlation between PT and the risk of bleeding. At this time, Defendants were aware of the correlation between Xarelto dosage and bleeding risks, but had "not chosen to utilize this information." (NDA 202439 Summary Review, p. 9). At all relevant times, Defendants' controlled the contents of their label as demonstrated by their decision to go forward without regard to the FDA's suggestion to utilize this information.

84.     The additional indication for treatment DVT and/or PE and the reduction in recurrence of DVT and/or PE was added to the label on November 2, 2012.

85.     Defendants' promotional materials fail to highlight the increased risk of gastrointestinal bleeding and bleeding that required transfusion among other serious bleeding concerns. In the present case, Ms. Church after taking Xarelto bleed to such a degree that multiple blood transfusions were required, despite those transfusions, Ms. Church died.

86.     Defendants market Xarelto as a new oral anticoagulant treatment alternative to warfarin a long established safe treatment for preventing stroke and systemic embolism.

87.     Defendants market and promote Xarelto as a single daily dose pill that does not require the need to measure a patient's blood plasma levels, touting it more convenient than

warfarin, and does not limit a patient's diet. The single dose and no blood testing requirements or dietary constraints are marked by Defendants as the "Xarelto Difference". However, Xarelto's clinical studies show that Xarelto is safer and more effective when there is blood monitoring, dose adjustments and twice a day dosing.

88.      In its QuarterWatch publication for the first quarter of the 2012 fiscal year, the Institute for Safe Medication Practices (ISMP) noted that even during the approval process, FDA "reviewers also questioned the convenient once a day dosing scheme for Xarelto saying blood level studies had shown peaks and troughs that could be eliminated by twice a day dosing."

89.      The use of Xarelto without appropriate blood monitoring, dose adjustment and twice a day dosing can cause major, life threatening bleeding events and other complications, including death. Physicians using Xarelto have to be able to balance the dose so that the blood is thinned enough to reduce the risk of stroke, but not thinned so much as to increase the risk for a major bleeding event. The Defendants were aware of this risk and the need for blood monitoring but have failed to disclose this vital health information to patients, doctors and the FDA.

90.      Importantly, Xarelto's significant risk of severe, and sometimes fatal, internal bleeding has no antidote to reverse its effects unlike warfarin. Therefore in the event of hemorrhagic complications, there is no available reversible agent. The original US label approved when the drug was first marketed, did not contain a warning regarding the lack of antidote, but instead only mentioned this important information in the overdose section.

91.      The FDA's adverse event data indicates staggering, serious adverse events that have been associated Xarelto.

92.      In the year leading up to June 30, 2012, there were 1080 Xarelto associated "Serious Adverse Event"("SAE") Medwatch reports filed with the FDA, including at least 65 deaths. Of

the reported hemorrhage events associated with Xarelto, 8% resulted in death, which was approximately twofold the risk of a hemorrhage-related death with warfarin.

93.     At the close of 2012 fiscal year, a total of 2081 new Xarelto associated SAE reports were filed with the FDA, its first full year on the market, ranking tenth among other pharmaceuticals in direct reports to the FDA. Of those reported events, 151 resulted in death, as compared to only 56 deaths associated with warfarin.

94.     The ISMP referred to these SAE figures as constituting a "strong signal" regarding the safety of Xarelto, defined as "evidence of sufficient weight to justify an alert to the public and the scientific community, and to warrant further investigation."

95.     Of particular note, in the first quarter of 2013, the number of reported serious adverse events associated with Xarelto (680) overtook that of Pradaxa (528) another new oral anticoagulant, which had previously ranked as the number one reported drug in terms of adverse events in 2012.

96.     Moreover, in the first eight months of 2013, German regulators received 968 Xarelto related adverse event reports including 72 deaths, as compared to a total of 750 reports and 58 deaths in 2012.

97.     Despite the clear signal generated by the SAE data, Defendants did not tell consumers, such as Ms. Church, health care professionals and the scientific community about the dangers of Xarelto, nor did Defendants perform further investigation into the safety of Xarelto.

98.     Approval of Xarelto for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries was based on a series of clinical trials known as the Regulation of Coagulation in Orthopedic Surgery to Prevent Deep Venous Thrombosis and Pulmonary Embolism studies (hereinafter referred to as the "RECORD" studies).  The findings of

the RECORD studies show that rivaroxaban was superior to enoxaparin for thromboprophylaxis after total knee and hip arthroplasty (based on the Xarelto Defendants' definition), accompanied by similar rates of bleeding.  However, the studies also showed a greater incidence with Xarelto of bleeding leading to decreased hemoglobin levels and transfusion of blood.  (Lassen, M.R., et al. *Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Total Knee Arthroplasty.* N.Eng.J.Med. 2008;358:2776-86; Kakkar, A.K., et al. *Extended duration rivaroxaban versus short-term enoxaparin for the prevention of venous thromboembolism after total hip arthroplasty: a double-blind, randomized controlled trial.*  Lancet 2008;372:31-39; Ericksson, B.I., et al. *Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Hip Arthroplasty.*  N.Eng.J.Med. 2008; 358:2765-75.)

99.    Approval of Xarelto for the treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE in the U.S. was based on the clinical trials known as the EINSTEIN-DVT, EINSTEIN-PE, and EINSTEIN-Extension studies.  The EINSTEIN-DVT study tested Xarelto versus a placebo, and merely determined that Xarelto offered an option for treatment of DVT, with obvious increased risk of bleeding events compared to placebo.  (The EINSTEIN Investigators.  *Oral Rivaroxaban for Symptomatic Venous Thromboembolism.*  N.Eng.J.Med. 2010; 363:2499-510).  The EINSTEIN-Extension study confirmed that result.  (Roumualdi, E., et al.  *Oral rivaroxaban after symptomatic venous thromboembolism: the continued treatment study (EINSTEIN-extension study).*  Expert Rev. Cardiovasc. Ther.  2011; 9(7):841-844).  The EINSTEIN-PE study's finding showed that a rivaroxaban regimen was non-inferior to the standard therapy for initial and long-term treatment of PE.  However, the studies also demonstrated an increased risk of adverse events with Xarelto or prolonged hospitalization.  (The EINSTEIN-PE

Investigators.  *Oral Rivaroxaban for the Treatment of Symptomatic Pulmonary Embolism.* N.Eng.J.Med. 2012; 366:1287-97.)

100.    Xarelto Defendants use the results of the ROCKET AF study, the RECORD studies, and the EINSTEIN studies to promote Xarelto in their promotional materials, including the Xarelto website, which tout the positive results of those studies.  However, Xarelto Defendants' promotional materials fail to similarly highlight the increased risk of gastrointestinal bleeding that required transfusions among other serious bleeding concerns.

101.    Xarelto Defendants market Xarelto as a new oral anticoagulant treatment alternative to warfarin (Coumadin), a long-established safe treatment for preventing stroke and systemic embolism, in 60 years.  Xarelto Defendants emphasize the supposed benefits of treatment with Xarelto over warfarin, which they refer to as the Xarelto Difference – namely, that Xarelto does not require periodic monitoring with blood tests and does not limit a patient's diet and the convenient once a day dosing.

102.    However, in QuarterWatch publication for the first quarter of the 2012 fiscal year, the Institute for Safe Medication Practices ("ISMP") noted that, even during the approval process, FDA "[r]eviewers also questioned the convenient once-a-day dosing scheme [of Xarelto], saying that blood level studies had shown peaks and troughs that could be eliminated by twice-a-day dosing."

103.    Importantly, there is no antidote to Xarelto, unlike warfarin.  Therefore, in the event of hemorrhagic complications, there is no available reversal agent.  The original U.S. label approved when the drug was first marketed in the U.S. did not contain a warning regarding the lack of antidote, but instead only mentioned this important fact in the over dosage section.

104.    Xarelto Defendants spent significant money in promoting Xarelto, which included at least $11,000,000.00 spent during 2013 alone on advertising in journals targeted at prescribers and consumers in the U.S.  In the third quarter of the 2013 fiscal year, Xarelto was the number one pharmaceutical product advertised in professional health journals based on pages and dollars spent.

105.    As a result of Xarelto Defendants' aggressive marketing efforts, in its first full year of being on the market, Xarelto garnered approximately $582 million in sales globally.

106.    Xarelto Defendants' website for Xarelto claims that over seven million people worldwide have been prescribed Xarelto.   In the U.S., approximately 1 million Xarelto prescriptions had been written by the end of 2013.

107.    During the Xarelto Defendants' 2012 fiscal year, Xarelto gained approximately $658 million in sales worldwide.  Then, in 2013, sales for Xarelto increased even further to more than clear the $1 billion threshold commonly referred to as "blockbuster" status in the pharmaceutical industry, ultimately reaching approximately $2 billion for the fiscal year.  Thus, Xarelto is now considered the leading anticoagulant on a global scale in terms of sales.

108.    As part of their marketing of Xarelto, Xarelto Defendants widely disseminated direct-to-consumer advertising campaigns that were designed to influence patients, including Ms. Church, to make inquiries to their prescribing physician about Xarelto and/or request prescriptions for Xarelto.

109.     In the course of these direct to consumer advertisements, Xarelto Defendants overstated the efficacy of Xarelto with respect to preventing stroke and systemic embolism, failed to adequately disclose to patients that there is no drug, agent, or means to reverse the anticoagulation effects of Xarelto, and that such irreversibility could have permanently disabling, life-threatening and fatal consequences.

110.    On June 6, 2013, Xarelto Defendants received an untitled letter from the FDA's Office of Prescription Drug promotion (hereinafter referred to as the "OPDP") regarding its promotional material for the atrial fibrillation indication, stating that, "the print ad is false or misleading because it minimizes the risks associated with Xarelto and makes a misleading claim "regarding dose adjustments, which was in violation of FDA regulations.   The OPDP thus requested that Xarelto Defendants immediately cease distribution of such promotional material.

111.    Prior to Ms. Church's prescription of Xarelto, prescribing physician received promotional materials and information from sales representatives of Xarelto Defendants that Xarelto was just as effective as warning in reducing strokes in patients with non-valvular atrial fibrillation, as well as preventing DVT/PE in patients with prior history of DVT/PE or undergoing hip or knee replacement surgery, and was more convenient, without also adequately informing prescribing physicians that there was no reversal agent that could stop or control bleeding in patients taking Xarelto.

112.    At all times relevant hereto, Xarelto Defendants also failed to warn emergency room doctors, surgeons, and other critical care medical professionals that unlike generally-known measures taken to treat and stabilize bleeding in users of warfarin, there is no effective agent to reverse the anticoagulation effects of Xarelto, and therefore no effective means to treat and stabilize patients who experience uncontrolled bleeding while taking Xarelto.

113.    At all times relevant to this action, The Xarelto Medication Guide, prepared and distributed by Xarelto Defendants and intended for U.S. patients to whom Xarelto has been prescribed, failed to warn and disclose to patients that there is no agent to reverse the anticoagulation effects of Xarelto and that if serious bleeding occurs, it may be irreversible, permanently disabling, and life-threatening. The Defendants failed to warn about the need for

blood monitoring, dose adjustments, twice a day dosing or adequately informing prescribing physicians that there was no reversible agent that could stop or control bleeding in patients taking Xarelto.

114.    At the close of the 2012 fiscal year, a total of 2,081 new Xarelto-associated SAE reports were filed with the FDA in its first full year on the market, ranking tenth among other pharmaceuticals in direct reports to the FDA.  Of those reported events, 151 resulted in death, as compared to only 56 deaths with warfarin.

115.    The ISMP referred to these SAE figures as constituting a "strong signal[]" regarding the safety of Xarelto, defined as "evidence of sufficient weight to justify an alert to the public and the scientific community, and to warrant further investigation."

116.    Of particular note, in the first quarter of 2013, the number of reported serious adverse events associated with Xarelto (680) overtook that of Pradaxa (528), another new oral anticoagulant, which had previously ranked as the number one reported drug in terms of adverse events in 2012.

117.    Xarelto Defendants original and in some respects current labeling and prescribing information for Xarelto:

a.      failed to investigate, research, study and define, fully and adequately, the safety profile of Xarelto;

b.      failed to provide adequate warnings about the true safety risks associated with the use of Xarelto;

c.      failed to provide adequate warning regarding the pharmacokinetic and pharmacodynamics variability of Xarelto and its effects on the degree of anticoagulation in a patient;

d.      failed to disclose I the "Warnings" Section that there is no drug, agent or means to reverse the anticoagulation effects of Xarelto;

e.      failed to advise prescribing physicians, such as the Plaintiff's physician, to instruct patients that there was no agent to reverse the anticoagulant effects of Xarelto;

f.      failed to provide adequate instructions on how to intervene and/or stabilize a patient who suffers a bleed while taking Xarelto;

g.      failed to provide adequate warnings and information related to the increased risks of bleeding events associated with aging patient populations of Xarelto users;

h.      failed to provide adequate warnings regarding the increased risk of gastrointestinal bleeds in those taking Xarelto, especially, in those patients with a prior history of gastrointestinal issues and/or upset;

i.      failed to provide adequate warnings regarding the increased risk of suffering a bleeding event requiring blood transfusions in those taking Xarelto;

j.      failed to provide adequate warnings regarding the need to assess renal functioning prior to starting a patient on Xarelto and to continue testing and monitoring of renal functioning periodically while the patient is on Xarelto;

k.      failed to provide adequate warnings regarding the need to assess hepatic functioning prior to starting a patient on Xarelto and to continue testing

and monitoring of hepatic functioning periodically while the patient is on

Xarelto;

l.      failed to include a **"BOXED WARNING"** about serious bleeding events

associated with Xarelto;

m.      failed to include a **"Bolded Warning"** about serious bleeding events

associated with Xarelto;

n.      failed to include proper warnings concerning Xarelto and its use with other

medications, including Amiodarone; and

o.      In their "Medication Guide" intended for distribution to patients whom Xarelto has

been prescribed, Xarelto Defendants failed to disclose to patients that there is not

drug, agent or means to reverse the anticoagulation effects of Xarelto and that if

serious bleeding occurs, such irreversibility could have permanently disabling, life-

threatening or fatal consequences.

118.    During the years since first marketing Xarelto in the U.S., Xarelto Defendants

modified the U.S. labeling and prescribing information for Xarelto, which included additional

information regarding the use of Xarelto in patients taking certain medications.  Despite being

aware of: (1) serious, and sometimes fatal, irreversible bleeding events associated with the use of

Xarelto; and (2) 2,081 SAE Medwatch reports filed with the FDA in 2012 alone, including at least

151 deaths, Xarelto Defendants nonetheless failed to provide adequate disclosures or warnings in

their label as detailed in Paragraphs 98 (a-n).

119.    Prior to applying for and obtaining approval of Xarelto, Xarelto Defendants knew

or should have known that consumption of Xarelto was associated with and/or would cause the

inductions of life-threatening bleeding, and Xarelto Defendants possessed at least one clinical

scientific study, which evidence Xarelto Defendants knew or should have known was a signal that life-threatening bleeding risk needed further testing and studies prior to its introduction to the market.

120.    Upon information and belief, despite life-threatening bleeding findings in a clinical trial and other clinical evidence, Xarelto Defendants failed to adequately conduct complete and proper testing of Xarelto prior to filing their New Drug Application for Xarelto.

121.    Upon information and belief, from the date Xarelto Defendants received FDA approval to market Xarelto, Xarelto Defendants made, distributed, marketed and sold Xarelto without adequate warning to Ms. Church's prescribing physicians or Ms. Church that Xarelto was associated with and/or could cause life-threatening bleeding, presented a risk of life-threatening bleeding in patients who used it, and that Xarelto Defendants had not adequately conducted complete and proper testing and studies of Xarelto with regard to severe side effects, specifically life-threatening bleeding.

122.    Upon information and belief, Xarelto Defendants concealed and failed to completely disclose its knowledge that Xarelto was associated with or could cause life-threatening bleeding as well as its knowledge that they had failed to fully test or study said risk.

123.    Upon information and belief, Xarelto Defendants ignored the association between the use of Xarelto and the risk of developing life-threatening bleeding.

124.    Xarelto Defendants' failure to disclose information that they possessed regarding the failure to adequately test and study Xarelto for life-threatening bleeding risk further rendered warnings for this medication inadequate.

125.    By reason the foregoing acts and omissions, Ada Erle Church died.

126. Upon information and belief, despite life-threatening bleeding findings in a clinical trial and other clinical evidence, Defendants failed to adequately conduct complete and proper testing of Xarelto prior to filing their New Drug Application for Xarelto. Upon information and belief, from the date Defendants received FDA approval to market Xarelto, Defendants made, distributed, marketed and sold Xarelto without adequate warning to Plaintiff's prescribing physicians or Plaintiff that Xarelto was associated with and/or could cause life-threatening bleeding, other complications and death and that Defendants had not adequately conducted complete and proper testing and studies of Xarelto with regard to severe side-effects, specifically life-threatening bleeding.

127. Upon information and belief, Defendants concealed and failed to completely disclose their knowledge that Xarelto was associated with or could cause life-threatening bleeding as well as their knowledge that they had failed to fully test or study said risk.

128. Upon information and belief, Defendants ignored the association between the use of Xarelto and the risk of developing life threatening bleeding and other resulting complications which could and did in this instance lead to the user's death. Upon information and belief, Defendants failed to warn Plaintiff and her healthcare provider regarding the need for blood monitoring, dose adjustments and failed to warn of the risk of serious bleeds that may be irreversible, permanently disabling and life threatening, associated with Xarelto. Defendants' failure to disclose information that they possessed regarding the failure to adequately test and study Xarelto further rendered warnings for this medication inadequate. Defendants' fraudulent concealment and misrepresentations were designed to prevent and did prevent the public and medical community at large from discovering the risks and dangers associated with Xarelto and Plaintiff from discovering and/or with reasonable diligence being able to discover, their causes of

action. Defendants' fraudulent representations and concealment of evidence flagrant, willful, and depraved indifference to health, safety, and welfare. Defendants' conduct showed willful misconduct, malice, fraud, wantonness, oppression, and that entire want of care that raises the presumption of conscious indifference to the consequences of said conduct. By reason of the foregoing acts and omissions, Plaintiff died.

## FIRST CAUSE OF ACTION
### (NEGLIGENCE)

129.    Ms. Church repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect if more fully set herein.

130.    Defendants had a duty to exercise reasonable care in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale and/or distribution of Xarelto into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

131.    Defendants failed to exercise ordinary care in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Xarelto into interstate commerce in that Defendants knew or should have known that using Xarelto created a high risk of death, and unreasonable, dangerous side effects, including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

132.    The negligence of the Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

a.      Manufacturing, producing, promoting, formulating, creating, and/or designing Xarelto without thoroughly testing it;

b.      Manufacturing, producing, promoting, formulating, creating, and/or designing Xarelto without adequately testing it;

c.      Not conducting sufficient testing programs to determine whether or not Xarelto was safe for use; in that Defendants herein knew or should have known that Xarelto was unsafe and unfit for use by reason of the dangers to its users;

d.      Selling Xarelto without making proper and sufficient tests to determine the dangers to its user;

e.      Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and healthcare profession, and the FDA of the dangers          of Xarelto;

f.      Failing to provide adequate instructions regarding safety precautions to be observed by users, handlers, and persons who would reasonably and foreseeably come into contact with, and more particularly, use, Xarelto;

g.      Failing to test Xarelto and/or failing to adequately, sufficiently and properly test Xarelto;

h.      Negligently advertising and recommending the use of Xarelto without sufficient knowledge as to its dangerous propensities;

i.      Negligently representing that Xarelto was safe for use for its intended purpose, when, in fact, it was unsafe;

j.      Negligently representing that Xarelto had equivalent safety and efficacy

as other forms of treatment for reducing the risk of stroke and systemic

embolism in patients with non-valvular atrial fibrillation, reducing the

recurrence of DVT and/or PE, and for prophylaxis of DVT for patients

undergoing hip and knee replacement surgery;

k.      Negligently designing Xarelto for a manner which was dangerous to its

users;

l.      Negligently manufacturing Xarelto for a manner which was dangerous to

its users;

m.      Negligently producing Xarelto for a manner which was dangerous to its

users;

n.      Negligently assembling Xarelto for a manner which was dangerous to its

users;

o.      Concealing information from the Plaintiff in knowing that Xarelto was

unsafe, dangerous, and/or non-conforming with FDA regulations;

p.      Improperly concealing and/or misrepresenting information from the

Plaintiff, healthcare professionals, and/or the FDA, concerning the

severity of risks and dangers of Xarelto compared to other forms of

treatment for reducing the risk of stroke and systemic embolism in

patients with non-valvular atrial fibrillation, reducing the risk of

recurrence of DVT and/or PE, and for prophylaxis of DVT for patients

undergoing hip and knee replacement surgery.

133.     Defendants under-reported, underestimated and downplayed the serious dangers of Xarelto.

134.     Defendants negligently compared the safety risk and/or dangers of Xarelto with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

135.     Defendants were negligent in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing and sale of Xarelto in that they:

a.     Failed to use due care in designing and manufacturing Xarelto so as to avoid the aforementioned risks to individuals when Xarelto was used for treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

b.     Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Xarelto;

c.     Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or function of Xarelto;

d.     Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects of Xarelto;

e.      Failed to warn Plaintiff of the severity and duration of such adverse

effects, as the warnings given did not accurately reflect the symptoms, or

severity of the side effects;

f.      Failed to conduct adequate testing, including pre-clinical and clinical

testing and post-marketing surveillance to determine the safety of Xarelto;

g.      Failed to warn Ms. Church prior to actively encouraging the sale of

        Xarelto, either directly or indirectly, orally or in writing about the need for

more comprehensive, more regular medical monitoring than usual to

ensure early discovery of potentially serious side effects;

h.      Were otherwise careless and/or negligent.

136.    Despite the fact that Defendants knew or should have known that Xarelto caused

unreasonable dangerous side effects, Defendants continued to market, manufacture, distribute

and/or sell Xarelto to consumers, including Ms. Church.

137.    Defendants knew or should have known that consumers such as Ms. Church would

foreseeably suffer injury as well as a result of Defendants' failure to exercise ordinary care, as set

forth above.

138.    Defendants' negligence was the proximate cause of Ms. Church's death.

139.    As a result of the foregoing acts and omissions, Ms. Church died.

140.    By reason of the foregoing, Plaintiff demands against the Defendants the sum of

FIFTEEN MILLION DOLLARS ($15,000,000.00)

## SECOND CAUSE OF ACTION
### (AELMD)

141.    Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

142.    At all times herein mentioned, the Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, distributed, and/or have recently acquired the Defendants who have designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed Xarelto as hereinabove described that was used by Ms. Church.

143.    That Xarelto was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

144.    At those times, Xarelto was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, Ms. Church.

145.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Xarelto.

146.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by the Defendants was defective in design and/or formulation, in that, when it left the hands of the Defendants, manufacturers and/or suppliers, it was unreasonably dangerous, and it was more dangerous than an ordinary consumer would expect.

147.    At all times herein mentioned, Xarelto was in a defective condition and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendants.

148.    Defendants knew, or should have known at all times herein mentioned its Xarelto was in a defective condition, and was and is inherently dangerous and unsafe.

149.    At the time of Ms. Church's use of Xarelto, Xarelto was being used for the purposes of and in a manner normally intended, namely to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

150.    Defendants with this knowledge voluntarily designed its Xarelto in a dangerous condition for use by the public, and in particular, Ms. Church.

151.    Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

152.    Defendants created a product unreasonably dangerous for its normal, intended use.

153.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was manufactured defectively in that Xarelto left the hands of Defendants in a defective condition and was unreasonably dangerous to its intended users.

154.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Xarelto was manufactured.

155.    Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed a defective product which created an unreasonable risk to the health

of consumers and to Ms. Church in particular, and Defendants are therefore strictly liable for the injuries sustained by Ms. Church.

156. Ms. Church could not, by the exercise of reasonable care, have discovered Xarelto's defects herein mentioned and perceived its danger.

157. The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate warnings or instructions as the Defendants knew or should have known that the product created a risk of serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature and the Defendants failed to adequately warn of said risk.

158. The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate warnings and/or inadequate testing.

159. The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate post-marketing surveillance and/or warnings because, after Defendants knew or should have known of the risks of death, serious side effects including life-threatening bleeding, as well as other severe and permanent health consequences from Xarelto, they failed to provide adequate warnings to users or consumers of the product, and continued to improperly advertise, market and/or promote their product, Xarelto.

160. By reason of the foregoing, the Defendants have violated Alabama Extended Liability Doctrine for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Xarelto.

161.     Defendants' defective design, manufacturing defect, and inadequate warnings of Xarelto were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

162.     That said defects in Defendants' drug Xarelto were a substantial factor in causing Ms. Church's death.

163.     By reason of the foregoing, Plaintiff has been damaged as against the Defendants in the sum of FIFTEEN MILLION DOLLARS ($15,000,000.00).

## THIRD CAUSE OF ACTION
## (BREACH OF EXPRESS WARRANTY)

164.     Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

165.     Defendants expressly warranted that Xarelto was safe and well accepted by users.

166.     Xarelto does not conform to these express representations because Xarelto is not safe and has numerous side effects, many of which were not accurately warned about by Defendants.  As a direct and proximate result of the breach of said warranties, Ms. Church died.

167.     Defendant expressly warranted that Xarelto was safe and well accepted by users.

168.     Xarelto does not conform to these express representations because Xarelto is not safe and has numerous side effects, many of which were not accurately warned about by Defendants.  As a direct and proximate result of the breach of said warranties, Ms. Church died.

169.     Ms. Church did rely on the express warranties of the Defendants herein.

170.     Members of the medical community, including physicians and other healthcare professionals, relied upon the representations and warranties of the Defendants for use of Xarelto in recommending, prescribing, and/or dispensing Xarelto.

171.     The Defendants herein breached the aforesaid express warranties, as their drug Xarelto was defective.

172.     Defendants expressly represented to Ms. Church, her physicians, healthcare providers and/or the FDA that Xarelto was safe and fit for use for the purposes intended, that it was of merchantable quality, that it did not produce any dangerous side effects in excess of those risks associated with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, that the side effects it did produce were accurately reflected in the warnings and that it was adequately tested and fit for its intended use.

173.     Defendants knew or should have known that, in fact, said representations and warranties were false, misleading and untrue in that Xarelto was not safe and fit for the use intended, and, in fact, produced serious injuries to the users that were not accurately identified and represented by Defendants.

174.     As a result of the foregoing acts and omissions, Ms. Church died.

175.     By reason of the foregoing, Plaintiff has been damaged as against the Defendants in the sum of FIFTEEN MILLION DOLLARS ($15,000,000.00).

<u>**FOURTH CAUSE OF ACTION**</u>
<u>**(BREACH OF IMPLIED WARRANTIES)**</u>

176.     Plaintiff, repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

177.    At all times herein mentioned, the Defendants manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted and sold Xarelto and/or have recently acquired the Defendants who manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted and sold Xarelto, to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

178.    At the time Defendants marketed, sold, and distributed Xarelto for use by Ms. Church, Defendants knew of the use for which Xarelto was intended and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

179.    The Defendants impliedly represented and warranted to the users of Xarelto and their physicians, healthcare providers, and/or the FDA that Xarelto was safe and of merchantable quality and fit for the ordinary purpose for which said product was to be used.

180.    The said representations and warranties aforementioned were false, misleading, and inaccurate in that Xarelto was unsafe, unreasonably dangerous, improper, not for merchantable quality, and defective.

181.    Ms. Church, and/or members of the medical community and/or healthcare professionals did rely on said implied warranty of merchantability of fitness for a particular use and purpose.

182.    Ms. Church and her physicians and healthcare professionals reasonably relied upon the skill and judgment of Defendants as to whether Xarelto was of merchantable quality and safe and fit for its intended use.

183.     Xarelto was injected into the stream of commerce of the Defendants in a defective, unsafe, and inherently dangerous condition and the products and materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

184.     The Defendants herein breached the aforesaid implied warranties, as their drug Xarelto was not fit for its intended purposes and uses.

185.     As a result of the foregoing acts and omissions, Ms. Church died.

186.     By reason of the foregoing, Plaintiff has been damaged as against the Defendants in the sum of FIFTEEN MILLION DOLLARS ($15,000,000.00).

## FIFTH CAUSE OF ACTION AS
## (FRAUDULENT MISREPRESENTATION)

187.     Plaintiff, repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

188.     The Defendants falsely and fraudulently represented to the medical and healthcare community, and to the Plaintiff, and/or the FDA, and the public in general, that said product, Xarelto, has been tested and was found to be safe and/or effective to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee surgery.

189.     The representations made by Defendants were, in fact, false.

190.     When said representations were made by Defendants, they knew those representations to be false and it willfully, wantonly and recklessly disregarded whether the representations were true.

40

191.     These representations were made by said Defendants with the intent of defrauding and deceiving the Plaintiff, the public in general, and the medical and healthcare community in particular, and were made with the intent of inducing the public in general, and the medical and healthcare community in particular, to recommend, prescribe and/or purchase said product, Xarelto, for use to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, all of which evinced a callous, reckless, willful, depraved indifference to the health, safety and welfare of the Plaintiff herein.

192.     At the time the aforesaid representations were made by the Defendants and, at the time the Plaintiff used Xarelto, Ms. Church was unaware of the falsity of said representations and reasonably believed them to be true.

193.     In reliance upon said representations, Ms. Church was induced to and did use Xarelto, thereby causing and/or contributing to her death.

194.     Said Defendants knew and were aware or should have been aware that Xarelto had not been sufficiently tested, was defective in nature, and/or that it lacked adequate and/or sufficient warnings.

195.     Defendants knew or should have known that Xarelto had a potential to, could, and would cause severe and grievous injury to the users of said product, and that it was inherently dangerous in a manner that exceeded any purported, inaccurate, and/or down-played warnings.

196.     Defendants brought Xarelto to the market, and acted fraudulently, wantonly and maliciously to the detriment of Ms. Church.

197.     As a result of the foregoing acts and omissions, Ms. Church died.

198.    By reason of the foregoing, Plaintiff has been damaged as against the Defendants in the sum of FIFTEEN MILLION DOLLARS ($15,000,000.00).

**SIXTH CAUSE OF ACTION AS
(FRAUDLENT CONCEALMENT)**

199.    Plaintiff, repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

200.    At all times during the course of dealing between Defendants and Ms. Church, and/or Ms. Church's healthcare providers, and/or the FDA, Defendants misrepresented the safety of Xarelto for its intended use.

201.    Defendants knew or were reckless in not knowing that its representations were false.

202.    In representations to Ms. Church, and/or Ms. Church's healthcare providers, and/or the FDA, Defendants fraudulently concealed and intentionally omitted the following material information:

a.    that Xarelto was not safe as other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

b.    that the risks of adverse events with Xarelto were high than those with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the

risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for

patients undergoing hip and knee replacement surgery;

c.        that the risks of adverse events with Xarelto were not adequately tested

and/or known by Defendants;

d.        that Defendants were aware of dangers in Xarelto, in addition to and

above and beyond those associated with other forms of treatment for

reducing the risk of stroke and systemic embolism in patients with non-

valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or

PE, and for prophylaxis of DVT for patients undergoing hip and knee

replacement surgery;

e.        that Xarelto was defective, and that it caused dangerous side effects,

including but not limited to life-threatening bleeding, as well as other

severe and permanent health consequences, in a much more and

significant rate than other forms of treatment for reducing the risk of

stroke and systemic embolism in patients with non-valvular atrial

fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for

prophylaxis of DVT for patients undergoing hip and knee replacement

surgery;

f.        that patients needed to be monitored more regularly than normal while

using Xarelto;

g.        that Xarelto was manufactured negligently;

h.        that Xarelto was manufactured defectively;

i.        that Xarelto was manufactured improperly;

j.      that Xarelto was designed negligently;

k.      that Xarelto was designed defectively; and

l.      that Xarelto was designed improperly.

203.    Defendants were under a duty to disclose to Ms. Church, and Ms. Church's physicians, hospitals, healthcare providers, and/or the FDA the defective nature of Xarelto, including but not limited to the heightened risks of life-threatening bleeding.

204.    Defendants had sole access to material facts concerning the defective nature of the product and its propensity to cause serious and dangerous side effects, and hence, causing damage to persons who used Xarelto, including Ms. Church, in particular.

205.    Defendants' concealment and omissions of material facts concerning, inter alia, the safety of Xarelto was made purposefully, willingly, wantonly, and/or recklessly, to mislead Ms. Church, and Ms. Church's physicians, hospitals and healthcare providers into reliance, continued use of Xarelto, and actions thereon, and to cause them to purchase, prescribe, and/or dispense Xarelto and/or use the product.

206.    Defendants knew that Ms. Church, and Ms. Church's physicians, hospitals, healthcare providers, and/or the FDA had no way to determine the truth behind the Defendants' concealment and omissions, and that these included material omissions of facts surrounding Xarelto, as set forth herein.

207.    Ms. Church, and Ms. Church's doctors, healthcare providers, and/or hospitals reasonably relied on facts revealed which negligently, fraudulently, and/or purposefully did not include facts that were concealed and/or omitted by Defendants.

208.    As a result of the foregoing acts and omissions, Ms. Church died.

209.    By reason of the foregoing, Plaintiff has been damaged as against the Defendants in the sum of FIFTEEN MILLION DOLLARS ($15,000,000.00).

## SEVENTH CAUSE OF ACTION AS
## (NEGLIGENT MISREPRESENTATION)

210.    Plaintiff, repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

211.    Defendants had a duty to represent to the medical and healthcare community, and to Ms. Church, the FDA and the public in general that said product, Xarelto, had been tested and found to be safe and effective to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

212.    The representations made by Defendants were, in fact, false.

213.    Defendants failed to exercise ordinary care in the representation of Xarelto, while involved in its manufacture, sale, testing, quality assurance, quality control, and/or distribution of said product into interstate commerce, in the Defendants negligently misrepresented Xarelto's high risk of unreasonable, dangerous side effects.

214.    Defendants breached their duty in representing Xarelto's serious side effects to the medical and healthcare community, to Ms. Church, the FDA and the public in general.

215.    As a result of the foregoing acts and omissions, Ms. Church died.

216.    By reason of the foregoing, Plaintiff has been damaged as against the Defendants in the sum of FIFTEEN MILLION DOLLARS ($15,000,000.00).

## EIGHTH CAUSE OF ACTION AS
## (FRAUD AND DECEIT)

217.    Plaintiff, repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

218.    Defendants conducted research and used Xarelto as part of their research.

219.    As a result of Defendants' research and testing, or lack thereof, Defendants blatantly and intentionally distributed false information, including but not limited to assuring the public, Ms. Church, Ms. Church's doctors, hospitals, healthcare professionals, and/or the FDA that Xarelto was safe and effective for use as a means to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

220.    As a result of Defendants' research and testing, or lack thereof, Defendants intentionally omitted certain results of testing and researching to the public, healthcare professionals, and/or the FDA, including Ms. Church.

221.    Defendants had a duty when disseminating information to the public to disseminate truthful information and a parallel duty not to deceive the public and Ms. Church, as well as Ms. Church's respective healthcare providers and/or the FDA.

222.    The information distributed to the public, the FDA, and Ms. Church by Defendants, including but not limited to reports, press releases, advertising campaigns, television commercials, print ads, magazine ads, billboards, and all other commercial media contained material representations of fact and/or omissions.

223.    The information distributed to the public, the FDA, and Ms. Church by Defendants intentionally included representations that Defendants' drug Xarelto was safe and effective for use

to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

224.    The information distributed to the public, the FDA, and Ms. Church by Defendants intentionally included representations that Defendants' drug Xarelto carried the same risks, hazards, and/or dangers as other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

225.    The information distributed to the public, the FDA, and Ms. Church by Defendants intentionally included false representations that Xarelto was not injurious to the health and/or safety of its intended users.

226.    The information distributed to the public, the FDA, and Ms. Church by Defendants intentionally included false representations that Xarelto was as potentially injurious to the health and/or safety of its intended as other forms of treatment reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

227.    These representations were all false and misleading.

228.    Upon information and believe, Defendants intentionally suppressed, ignored and disregarded test results not favorable to the Defendants, and results that demonstrated that Xarelto was not safe as a means of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, and/or was not as safe as other means of treatment for reducing the risk of stroke and systemic embolism in

47

patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

229.    Defendants intentionally made material representations to the FDA and the public including the medical profession, and Ms. Church, regarding the safety of Xarelto, specifically but not limited to Xarelto not having dangerous and serious health and/or safety concerns.

230.    Defendants intentionally made material representations to the FDA and the public including the medical profession, and Ms. Church, regarding the safety of Xarelto, specifically but not limited to Xarelto being a safe means of reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

231.    That it was the purpose of Defendants in making these representations to deceive and defraud the public, the FDA, and/or Ms. Church, to gain the confidence of the public, healthcare professionals, the FDA, and/or Ms. Church, to falsely ensure the quality and fitness for use of Xarelto and induce the public, and/or Ms. Church to purchase, dispense, prescribe, recommend and/or continue to use Xarelto.

232.    Defendants made the aforementioned false claims and false representations with the intent of convincing the public, healthcare professionals, the FDA, and/or Ms. Church that Xarelto was fit and safe for use as treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery

233.    Defendants made the aforementioned false claims and false representations with the intent of convincing the public, healthcare professionals, the FDA, and/or Ms. Church that Xarelto was fit and safe for use as treatment for reducing the risk of stroke and systemic embolism

in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, and did not pose risks, dangers, or hazards above and beyond those identified and/or associated with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

234.     The Defendants made claims and representations in its documents submitted to the FDA, to the public, to healthcare professionals, and Ms. Church that Xarelto did not present serious health and/or safety risks.

235.     The Defendants made claims and representations in its documents submitted to the FDA, to the public, to healthcare professionals, and Ms. Church that Xarelto did not present serious health and/or safety risks greater than other oral forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

236.     That these representations and other made by Defendants were false when made, and/or were with a pretense of actual knowledge when knowledge did not actually exist, and/or were made recklessly and without regard to the actual facts.

237.     That these representations and others, made by Defendants, were made with the intention of deceiving and defrauding Ms. Church, including her respective healthcare professionals and/or the FDA, and were made in order to induce Ms. Church and/or her respective healthcare professionals to rely upon misrepresentations and caused Ms. Church to purchase, use, rely on, request, dispense, recommend, and/or prescribe Xarelto.

238.    That Defendants, recklessly and intentionally falsely represented the dangerous and serious health and/or safety concerns of Xarelto to the public at large, Ms. Church, in particular, for the purpose of influencing the marketing of a product known to be dangerous and defective and/or not as safe as other alternatives, including other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

239.    That Defendants willfully and intentionally failed to disclose the material facts regarding the dangerous and serious safety concerns of Xarelto by concealing and suppressing material facts regarding the dangerous and serious health and/or safety concerns of Xarelto.

240.    That Defendants willfully and intentionally failed to disclose the truth, failed to disclose material facts and made false representations with the purpose and design of deceiving and lulling Ms. Church, as well as her respective healthcare professionals into a sense of security so that Ms. Church would rely on the representations and purchase, use and rely on Xarelto and/or that Ms. Church's respective healthcare providers would dispense, prescribe, and/or recommend the same.

241.    Defendants, through their public relations efforts, which included but were not limited to the public statements and press releases, knew or should have known that the public, including Ms. Church, as well as Ms. Church's respective healthcare professionals would rely upon the information being disseminated.

242.    Defendants utilized direct to consumer advertising to market, promote, and/or advertise Xarelto.

243.     That Ms. Church and/or her respective healthcare professionals did in fact rely on and believe the Defendants' representations to be true at the time they were made and relied upon the representations as well as the superior knowledge of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, and were thereby induced to purchase, use and rely on Defendants' drug Xarelto.

244.     That at the time the representations were made, Ms. Church and/or her respective healthcare professionals did not know the truth with regard to the dangerous and serious health and/or safety concerns of Xarelto.

245.     That Ms. Church did not discover the true facts with respect to the dangerous and serious health and/or safety concerns, and the false representations of Defendants, nor could Ms. Church with reasonable diligence have discovered the true facts.

246.     That Ms. Church did not discover the true facts with respect to the dangerous and serious health and/or safety concerns of Xarelto, Ms. Church would not have purchased, used and/or relied on Defendants' drug Xarelto.

247.     That the Defendants' aforementioned conduct constitutes fraud and deceit, and was committed and/or perpetrated willfully, wantonly and/or purposefully on Ms. Church.

248.     As a result of the foregoing acts and omissions, Ms. Church died.

249.     By reason of the foregoing, Plaintiff has been damaged as against the Defendants in the sum of FIFTEEN MILLION DOLLARS ($15,000,000.00).

## NINTH CAUSE OF ACTION
## (WRONGFUL DEATH)

250.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth at length herein. Plaintiff pleads this Count in the broadest sense, pursuant to all laws that may apply.

251.    Plaintiff brings this claim on behalf of the Estate of Ada Erle Church and for the benefit of the Plaintiff Decedents' lawful beneficiaries.

252.    As a direct and proximate result of the conduct of the Defendants and the defective nature of Xarelto as outlined above, Plaintiff Decedent suffered bodily injury resulting in pain and suffering, disability, disfigurement, mental anguish, loss of capacity of the enjoyment of life, shortened life expectancy, expenses for hospitalization, medical and nursing treatment, funeral expenses and death.

253.    As a direct and proximate cause of the conduct of Defendants, Plaintiff Decedent's beneficiaries have incurred hospital, nursing and medical expenses, and estate administration expenses as a result of Decedent's death. Plaintiff brings this claim on behalf of Decedent's lawful beneficiaries for these damages and for all pecuniary losses under applicable state statutory and/or common laws.

## TENTH CAUSE OF ACTION
## (VIOLATION OF CONSUMER PROTECTION LAWS/CONSUMER FRAUD LAWS)

254.    Plaintiff incorporates all preceding and succeeding paragraphs of this Complaint as if fully set forth herein.

255.    Plaintiff used Xarelto and suffered ascertainable losses as a result of Defendants' actions in violation of the applicable consumer protection laws.

256.    Defendants used unfair methods of competition or deceptive acts or practices that were prescribed by law, including the following:

a.      Representing that goods or services have characteristics, ingredients, uses, benefits, or qualities that they do not have;

b.      Advertising goods or services with the intent not to sell them as advertised, and

c.      Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

257.    Defendants violated consumer protection laws through their use of false and misleading misrepresentations or omissions of material fact relating to the safety of Xarelto.

258.    Defendants uniformly communicated the purported benefits of Xarelto while failing to disclose the serious and dangerous side effects related to the use of Xarelto while failing to disclose the serious and dangerous side effects related to the use of Xarelto and of the true state of Xarelto's regulatory status, its safety, its efficacy, and its usefulness. Defendants made these representations to physicians, the medical community at large and to patients and consumers, such as Plaintiff, in the marketing and advertising campaign described herein.

259.    Defendants' conduct in connection with Xarelto was also impermissible and illegal in that it created a likelihood of confusion and misunderstanding because Defendants misleading, falsely and/or deceptively misrepresented and omitted numerous material facts regarding among other things, the utility, benefits, costs, safety, efficacy and advantages of Xarelto.

260.    As a result of these violations of consumer protection laws, Plaintiff died and whose Estate and decedents incurred certain other debts and damages, for which Defendants are liable.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands judgment against the Defendants on each of the above-referenced claims and Causes of Action and as follows:

1.      Awarding compensatory damages to Plaintiff as allowed by law;

2.      Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff in an amount sufficient to punish Defendants and deter future similar conduct;

3.      Awarding Plaintiff reasonable attorneys' fees;

4.      Awarding Plaintiff the costs of these proceedings;

5.      Post-judgment and prejudgment interest; and

5.      Such other and further relief as this Court deems just and proper.


Dated: June 3, 2015                    By:          /s/ Jamie A. Johnston
                                                    Jamie A. Johnston (JOH164)
                                                    Jamie A. Johnston, P.C.
                                                    401 Madison Avenue
                                                    Montgomery, Alabama 36104
                                                    Telephone: 334-263-2560
                                                    Facsimile: 334-264-2658
                                                    Email: jamie@jjohnstonpc.com


## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues.


Dated: June 3, 2015                    By:          /s/ Jamie A. Johnston
                                                    Jamie A. Johnston (JOH164)
                                                    Jamie A. Johnston, P.C.
                                                    401 Madison Avenue
                                                    Montgomery, Alabama 36104
                                                    Telephone: 334-263-2560
                                                    Facsimile: 334-264-2658
                                                    Email: jamie@jjohnstonpc.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the above and foregoing Amended Complaint has contemporaneously with or before filing been served on all parties or their attorneys in a manner authorized by FRCP 5(b)(2), Local Rule 5.1 of the Eastern District of Louisiana and via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre-Trial Order No. 17.

**Defense Lead Counsel:**
Susan Sharko, Esq.
Susan.sharko@dbr.com

Steven Glickstein, Esq.
sglickstein@kayescholer.com

**Plaintiffs' Lead Counsel:**
Brian Barr, Esq.
bbarr@levinlaw.com

Andy Birchfield, Esq.
Andy.Birchfield@BeasleyAllen.com

**Defendants' Liaison Counsel:**
James Irwin, Esq.
jirwin@irwinllc.com

John Olinde, Esq.
olinde@chaffe.com

**Co-Plaintiffs' Liaison Counsel:**
Gerald Meunier, Esq.
gmeunier@gainsben.com

Leonard Davis, Esq.
ldavis@hhklawfirm.com

Dated: June 3, 2015

*/s/* Jamie Johnston
OF COUNSEL