# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUSIANA

| | | |
|---|---|---|
| IN RE: XARELTO | ) | MDL No. 2592 |
| (RIVAROXABAN) | ) | |
| PRODUCTS LIABILITY | ) | SECTION: L |
| LITIGATION | ) | JUDGE FALLON |
| | ) | MAG. JUDGE NORTH |
| PAUL J. IMOTICHEY | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| VS. | ) | COMPLAINT AND JURY DEMAND |
| | ) | |
| JANSSEN RESEARCH & | ) | Civil Action No.: 15-cv-771 L (5) |
| DEVELOPMENT, LLC F/K/A | ) | |
| JOHNSON AND JOHNSON | ) | |
| PHARMACEUTICAL | ) | |
| RESEARCH | ) | |
| AND DEVELOPMENT LLC; | ) | |
| JOHNSON & JOHNSON | ) | |
| COMPANY; JANSSEN | ) | |
| ORTHO, LLC; JANSSEN | ) | |
| PHARMACEUTICALS, INC. | ) | |
| F/K/A JANSSEN | ) | |
| PHARMACEUTICA INC., | ) | |
| F/K/A ORTHO-MCNEIL- | ) | |
| JANSSEN | ) | |
| PHARMACEUTICALS, | ) | |
| INC.; BAYER CORPORATION; | ) | |
| BAYER HEALTHCARE LLC; | ) | |
| AND BAYER HEALTHCARE | ) | |
| PHARMACEUTICALS INC.; | ) | |
| BAYER PHARMA AG, | ) | |
| | ) | |
| *Defendants.* | | |

## FIRST AMENDED COMPLAINT

Plaintiff PAUL J. IMOTICHEY (herein after "Plaintiff"), by and through Plaintiff's attorneys, brings this action for personal injuries against Defendants Janssen Research & Development, LLC f/k/a Johnson and Johnson Pharmaceutical Research and Development LLC; Johnson & Johnson Company; Janssen Ortho, LLC; Janssen Pharmaceuticals, Inc. f/k/a Janssen Pharmaceutica Inc., f/k/a Ortho-McNeil-Janssen Pharmaceuticals, Inc., Bayer Corporation, Bayer Healthcare LLC, Bayer Healthcare Pharmaceuticals Inc., and Bayer Pharma AG (collectively, "Janssen" or "Defendants"). Plaintiff alleges as follows:

## PARTIES

1.      Plaintiff PAUL J. IMOTICHEY, at all times relevant hereto, was, and currently is a resident and citizen of the State of Tennessee.  Plaintiff resides in Smyrna, Tennessee.

2.      Defendant, JANSSEN RESEARCH & DEVELOPMENT, LLC (hereinafter "Janssen R & D"), f/k/a JOHNSON AND JOHNSON PHARMACEUTICAL RESEARCH AND DEVELOPMENT LLC is a limited liability company organized, under the laws of New Jersey, with its principal place of business located at 920 U.S. Route 202, Raritan, New Jersey.  Said Defendant may be served through its registered agent for service of process, CT Corporation System, 116 Pine Street, Suite 320m Harrisburg, PA 17101.

3.     Defendant JOHNSON & JOHNSON (hereinafter "J&J"), is a fictitious name adopted by Defendant JOHNSON & JOHNSON COMPANY, a New Jersey corporation which has its principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933. Said Defendant may be served through its registered agent for service of process, CT Corporation System, 116 Pine Street, Suite 320m Harrisburg, PA 17101.

4.     Defendant JANSSEN RESEARCH & DEVELOPMENT, LLC is the holder of the approved New Drug Application ("NDA") for Xarelto® as well as the supplemental NDA.

5.     Defendant, JANSSEN ORTHO, LLC ("Ortho") is a Delaware limited liability company with a principal place of business in Puerto Rico. Ortho is a subsidiary of Johnson & Johnson.   Said Defendant may be served through its registered agent for service of process, CT Corporation System, 116 Pine Street, Suite 320m Harrisburg, PA 17101.

6.     Defendant, JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA     INC.,     f/k/a     ORTHO-MCNEIL     JANSSEN PHARMACEUTICALS, INC. ("Janssen"), at all relevant times at the time suit was commenced, a Pennsylvania corporation with a principal place of business at 1125 Trenton-Harbourton Road, Titusville, New Jersey 08560. Said Defendant may be served through its registered agent for service of process, CT Corporation

System, 116 Pine Street, Suite 320m Harrisburg, PA 17101.

7.    Defendant BAYER CORPORATION ("Bayer Corp") is, and at all times relevant was and remains, an Indiana corporation with its nerve center, headquarters and principal place of business at 100 Bayer Road Pittsburgh, Pennsylvania. Said Defendant may be served through its registered agent for service of process, Corporation Service Company, c/o Corporation Service Company, 2595 Interstate Drive, Suite 103, Harrisburg, PA 17110.

8.    Defendant, BAYER HEALTHCARE LLC ("Bayer HC") is a Delaware limited liability company with its principal places of business located at 100 Bayer Road, Pittsburgh, PA 15205 and 100 Global View Drive, Warrendale, Pennsylvania. Bayer HC's sole member is Defendant Bayer Corporation. Said Defendant may be served through its registered agent for service of process, Corporation Service Company, c/o Corporation Service Company, 2595 Interstate Drive, Suite 103, Harrisburg, PA 17110.

9.    Bayer HC is a subsidiary of Bayer AG and jointly developed Xarelto® with J&J and Janssen R & D. Bayer AG's cooperation partner, J&J and Janssen R & D, submitted the new drug application for Xarelto® to the FDA.

10.    Defendant, BAYER HEALTHCARE PHARMACEUTICALS INC. ("BHCP") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Montville, New Jersey. BHCP is

the U.S.-based pharmaceuticals operation of Bayer HC, a division of Bayer. BHCP is a subsidiary of Bayer and jointly developed, marketed and distributed Xarelto® with J&J and Janssen R & D. Said Defendant may be served through its registered agent for service of process, SOP Department, Corporation Service Company, Suite 400 2711 Centerville Road, Wilmington, DE 19808.

11.     Bayer AG's cooperating partner Johnson & Johnson and Janssen Research & Development submitted the new drug application to the FDA for Xarelto®.

12.     Defendant BAYER PHARMA AG ("Bayer AG") is, and at all times relevant was and remains, a foreign corporation with its headquarters and principal place of business at 51268 Leverkusen, Germany. Said Defendant may be served by serving, Bayer Pharma AG, Attn: Eva Gardyan-Eisenlohr General Counsel, Muellerstrasse 178, 13353 Berlin Germany.

13.     Defendants Janssen R&D, J&J, Janssen Research & Development, LLC, Ortho, Janssen, Bayer Corp, Bayer HC, BHCP, and Bayer AG shall be referred to herein individually by name or jointly as "Defendants."

14.     At all times alleged herein, Defendants shall include any and all named or unnamed parent companies, parent corporations, subsidiaries, affiliates, divisions, franchises, partners, joint venturers, and any organizational units of any kind, their predecessors, successors, successors in interest, assignees, and their

officers, directors, employees, agents, representatives and any and all other persons acting on their behalf.

15.    At all times herein mentioned, each of the Defendants was the agent, servant, partner, predecessor in interest, aider and abettor, co-conspirator, and joint venturer of each of the remaining Defendants herein.

16.    At all times herein mentioned, each of the Defendants was the agent, servant, partner, predecessor in interest, aider and abettor, co-conspirator, and joint venturer of each of the remaining Defendants thereby operating and acting with the purpose and scope of said agency, service, employment, partnership, conspiracy and joint venture.

17.    At all times relevant and material hereto, Defendants were engaged in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, and or introducing into interstate commerce throughout the United States, either directly or indirectly, through third-parties, subsidiaries and/or related entities, the anti-coagulant pharmaceutical product Xarelto® which is also referred to as Rivaroxaban.

## JURISDICTION AND VENUE

18.    Jurisdiction is proper in this court pursuant to 28 USC §1332 for the reason that there is complete diversity of citizenship between Plaintiff and Defendants and the matter in controversy greatly exceeds the sum of seventy-five

thousand dollars ($75,000.00), exclusive of interest and costs.

20.    Venue of this case is proper in the Eastern District of Louisiana pursuant to a transfer order.

## FACTUAL BACKGROUND

## BACKGROUND OF THE CASE

21.    In 2013, Plaintiff was first prescribed and began taking Xarelto® upon direction of Plaintiff's physician as a blood thinner. Subsequently, as a direct result of Plaintiff's ingestion of Xarelto®, Plaintiff suffered a series of nose bleeds and bleeding events, including but not limited to a bleeding event which occurred on May 24, 2014 and required a three day hospitalization.

22.    Plaintiff suffered from a gastrointestinal bleed that resulted in significant damages as a result of his ingestion of Xarelto.

23.    As a direct result of being prescribed Xarelto® for this period of time, Plaintiff has suffered significant injuries, as those described above.

24.    As a proximate result of Defendants' acts and omissions, Plaintiff suffered the injuries described hereinabove due to Plaintiff's ingestion of Xarelto®. Plaintiff accordingly seeks damages associated with these injuries.

25.    Plaintiff would not have used Xarelto® had Defendants properly disclosed the risks associated with its use, as safer alternatives without the aforesaid risks were available.

26. Defendants, directly or by and through their agents, apparent agents, servants or employees designed, manufactured, marketed, advertised, distributed, promoted, labeled, tested and sold Xarelto® as an anti-coagulant primarily used to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat deep vein thrombosis ("DVT"), to treat pulmonary embolisms ("PE"), and/or to reduce the risk of recurrence of DVT and or PE.

27. Defendants applied for an initial NDA for Xarelto® in July of 2008.

28. Xarelto® which was approved by the Food and Drug Administration ("FDA") on July 1, 2011, reduces risk of blood clots, DVT, and PE following knee and hip replacement surgery. On November 4, 2011 Xarelto® was approved as an anti-coagulant primarily used to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation. On November 2, 2012, the FDA expanded the use of Xarelto® to the treatment of patients with DVT and PE as well as long-term treatment to prevent recurrence of the same.

29. According to the Defendants' marketing and informational materials, referenced in the paragraphs below, and widely disseminated to the consuming public, Xarelto® is the one of the first once-a day prescription blood thinners for patients with Afib not caused by a heart valve problem, that is proven to reduce the

risk of stroke without routine blood monitoring. [1]

30.    The Defendants state on their website, that Xarelto® has been proven to lower the chance of having a stroke if you have atrial fibrillation (Afib), not caused by a heart valve problem. Xarelto® is an anticoagulant, or blood-thinning medicine that works by helping to keep blood clots from forming. The Defendants further claim that Xarelto® has been prescribed to more than seven million people around the world to help treat or reduce their risk of dangerous clots and they further claim it "begins working a few hours after you start taking it, and keeps working for as long as take it." [2]

31.    Defendants declared that "Xarelto® is proven to help treat and prevent DVT and PE blood clots" and that Xarelto® "reduc[es] the risk of these dangerous clots [from] happening again." [3]

32.    Defendants claimed that patients with Afib, DVT, or PE taking Xarelto® do not need regular blood monitoring and there are no known dietary restrictions. In addition, patients with Afib only need to take Xarelto® once a day with an evening meal. [4]

---

[1] http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Enforcement ActivitiesbyFDA/WarningLettersandNoticeofViolationLetter/UCM3 57833.pdf

[2] http://www.xarelto-us.com/how-xarelto-works

[3] http://www.xarelto-us.com/dvt-pe/treatment-of-dvt-pe

[4] http://www.xarelto-us.com/dvt-pe/xarelto-difference# and http:// www.xarelto-us.com/how- xarelto-is-different

33.  Defendants also claimed that patients with Afib are 5 times more likely than a person without Afib to suffer from a stroke and that "disability is more likely to be severe" and "the outcome is almost twice as likely to be fatal" and "the chances of having another major stroke go up." [5]

34.  Rivaroxaban is an oxazolidinone derivative optimized for inhibiting both free Factor Xa and Factor Xa bound in the prothrombinase complex. It is a highly selective direct Factor Xa inhibitor with oral bioavailability and rapid onset of action.  Inhibition of Factor Xa interrupts the intrinsic and extrinsic pathways of the blood coagulation cascade, inhibiting both thrombin formation and development of thrombi. Rivaroxaban does not inhibit thrombin (activated Factor II).

35.  Defendants routinely marketed Xarelto® as a "one size fits all" drug. In their fervent marketing of Xarelto®, Defendants' misinformed patients, and their healthcare providers, as to the necessity to routinely monitor any patient requiring a blood-thinning agent. In essence, the Defendants have created a new drug, Xarelto®, that is not better than warfarin from a safety perspective, and at best, perhaps slightly easier to use and administer. The idea of this apparently easier-to-use anticoagulant evidently appealed to physicians, who were subject to extreme marketing and promotion by the Defendants, but ignored patient safety.

---

[5]  http://www.xarelto-us.com/knowing-your-stroke-risk

36.    The Defendants' marketing materials suggest that Xarelto® represented a therapeutic simplification and therapeutic progress because it did not require patients to undergo periodic monitoring with blood tests and because there were no dietary restrictions.

37.    Defendants' boxed warning did not address the increased risk for serious and fatal bleeding, despite the fact that the information listed on their website originating from the Rocket AF clinical trial sponsored by Defendants stated that in comparison to warfarin, patients taking Xarelto® have more gastrointestinal bleeds and need more transfusions. In spite of this reference regarding bleeds, the information is still wholly inadequate because, this information was not conveyed in the boxed warning on the Xarelto® label. [6]

38.    According to Institute for Safe Medication Practices, Quarter Watch Report, issued on October 3, 2012, the primary reported adverse event related to Xarelto® use

> "was not the well-understood risk of hemorrhage. Instead, the largest identifiable category was serious blood-clot-related injury — most frequently pulmonary embolism — the very events Rivaroxaban is intended to prevent."

This lack of efficacy for short term users of Xarelto® post hip and knee

---

[6] http://www.xareltohcp.com/reducing-stroke-risk/safety.html

replacement surgery resulted in about 44% of the reported adverse effects from taking Xarelto®.

39.    FDA clinical reviewers have stated that

"Rivaroxaban should not be approved unless the manufacturer conducts further studies to support the efficacy and safety of Rivaroxaban" and the FDA website notes that "[a]dverse event reports of thrombocytopenia and venous thromboembolic events were identified" in relationship to Xarelto®". [7]

However, this information was not portrayed in the warning section on the warning label. The lack of efficacy of the medication for patients taking Xarelto® post hip and knee surgery were not disclosed resulting in patients ingesting Xarelto® and physicians prescribing Xarelto® without sufficient information to make an accurate decision.

40.    Defendants fervently marketed Xarelto® using print advertisements, online marketing on their website, and video advertisements with no regard to the accuracy and repercussions of their misleading advertising in favor of increasing sales.

41.    In the January/February 2013 issue of WebMD magazine, Defendants placed a print advertisement that resulted in the Office of Prescription Drug Promotion (OPDP) of the U.S. Food and Drug Administration (FDA) sending an

---

[7] http://www.fda.gov/drugs/guidancecomplianceregulatoryinformation/surveillance/ucm204091.htm

untitled letter stating that their print advertisement was false or misleading because it minimizes the risks associated with Xarelto® and makes a misleading claim. Furthermore, the advertisement states "there are no dosage adjustments " in conflict with the product labeling approved by the FDA. [8]

42.    As a result of Defendants' intense marketing, approximately 130,000 U.S. prescriptions were written for Xarelto® in the first three months of 2012 resulting in large profits as Xarelto® costs approximately $3,000 a year versus $200 for generic warfarin. [9]

43.    As a result of Defendants' extreme marketing tactics, within the United Kingdom, Defendants also made 219 million Euros in sales from Xarelto®, more than three times as much as during the same period last year. [10]

44.    Due to the defective nature of Xarelto®, persons who were prescribed and ingested Xarelto®, for even a brief period of time, including the Plaintiff herein, were at increased risk for developing life-threatening bleeds. Due to the

---

[8] http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformatio n/EnforcementActivitiesbyFDA/ WarningLettersandNoticeofViolationLetter/UCM357 833.pdf, June 6, 2013 FDA Untitled Warning Letter

[9]  Ransdell Pierson. "Pradaxa and Xarelto: Top Heart Doctors Concerned Over New Blood Thinners" Huffpost Healthy Living. 14th June 2012.

[10]  Frank Siebelt, Hans Seidenstuecker, and Christoph Steitz. "Reports of side-effects from Bayer's Xarelto grow: Spiegel" http://www.reuters.com/article/2013/09/08/us-bayer-xarelto-idUSBRE9870AH20130908

flawed formulation of Xarelto®, which according to Defendants does not require regular blood monitoring or frequent doctor followup, raises concerns about the risk of stroke, bleeding, and blood clots if not taken properly or absorbed properly, particularly in patients with poor renal function. In addition, prominent U.S. cardiologists and health care professionals stress that Xarelto® has no known antidote for a bleeding emergency, as warfarin does.[11]

45.    Defendants' pharmaceutical product Xarelto® led to 968 suspected undesirable side-effects including 72 cases of death in Germany in just the first eight months of 2013. [12]

46.    In addition, The Institute for Safe Medication Practices reported that a clinical trial with 14,000 patients had shown that Rivaroxaban was no worse than warfarin.  But reviewers noted that warfarin had not been optimally used. If Rivaroxaban were really inferior to optimally used warfarin — but this was not proven, only suspected — its use could lead to increased death and injury. Reviewers also questioned the convenient once-a-day dosing scheme, saying blood level studies had shown peaks and troughs that could be eliminated by twice-a-day dosing. As with other anticoagulants, the rate of clinically relevant bleeding in

[11]  Ransdell Pierson. "Pradaxa and Xarelto: Top Heart Doctors Concerned Over New Blood Thinners" Huffpost Healthy Living. 14th June 2012.
[12]  Frank Siebelt, Hans Seidenstuecker, and Christoph Steitz. "Reports of side-effects from Bayer's Xarelto grow: Spiegel"
http://www.reuters.com/article/2013/09/08/us-bayer-xarelto-idUSBRE9870AH20130908

clinical studies was high — 15% per year of treatment. [13] In other words, the insufficient testing conducted and the deadly consequences of Xarelto® did not go unnoticed.

47.     Even more significantly, in the first quarter of 2012, The Institute for Safe Medication Practices identified 356 reports of serious, disabling, or fatal injury in which Rivaroxaban was the primary suspect drug. The report more than doubled from the previous quarter total of 128 cases. [14]   However, when the findings were discussed with Defendants, "the company told us that it had reviewed the same data and saw no signal of a safety issue that needed to be addressed." [15]   Defendants placed more value into ensuring that their profits would continue instead of working on minimizing the serious, disabling, or fatal injuries that were occurring due to the drug they were marketing and promoting.

48.     Defendants concealed their knowledge that Xarelto® can cause life threatening, irreversible bleeds from the Plaintiff, other consumers, the general public, and the medical community. Indeed, the Defendants did not properly warn of the irreversible nature of Xarelto® in the "Warnings and Precautions" section of the products warning label.   Specifically, Defendants did not adequately inform consumers and the prescribing medical community about the risks of

---

[13]   Institute for Safe Medication Practices, Quarter Watch Report, October 3, 2012
[14]   Id.
[15]   Id.

uncontrollable bleeds associated with Xarelto® usage, nor did Defendants warn or otherwise advise on how to intervene and stabilize a patient should a bleed occur.

49.    In the "Full Prescribing Information" provided by Defendants, Defendants reveal that they did not test for all the possible reversal agents for this dangerous drug since a specific antidote for Rivaroxaban is not available and use of procoagulant reversal agents such as prothrombin complex concentrate (PCC), activated prothrombin complex concentrate (APCC), or recombinant factor Vlla (rFVllA) "may be considered but has not been evaluated in clinical trials." However, this is buried in small print.

50.    Importantly, Xarelto® still does not have a "black box" warning informing patients or prescribing doctors now that Xarelto® can cause irreversible bleeds.

51. Even in the "Warnings and Precautions" section of the August 2013 Highlights of Prescribing Information, the irreversible nature of the medication Xarelto® was not revealed to patients or their prescribing doctors. Defendants merely indicated that there was a risk for bleeding and side-stepped the important issue of reversing the effects of Xarelto® should a bleed occur.

52.    Aside from the warning labels, Defendants did not issue a "Dear Doctor letter" that sufficiently outlined the dangers of administering Xarelto® to a patient.  In the September 2013 letter to healthcare professionals, Defendants did

not mention the lack of an antidote for Xarelto® should serious and fatal bleeding occur while a patient was taking the medication.

53.   The current warning is simply inadequate.   The Defendants have failed and continue to fail in their duties to warn and protect the consuming public, including the Plaintiff herein.

54.   Even if the warnings were sufficient, which Plaintiff strongly denies, Xarelto® still lacks any benefit sufficient to tolerate the extreme risk posed by the ingestion of this drug.   Xarelto® is quite simply dangerous and defective as formulated. The Defendants should withdraw Xarelto® from the market.

55.   Defendants willfully, wantonly and with malice withheld the knowledge of increased risk of irreversible bleeds in users of Xarelto® to prevent any chances of their product's registration being delayed or rejected by FDA.

56.   As the manufacturers and distributors of Xarelto®, Defendants knew or should have known that Xarelto® use was associated with irreversible bleeds.

57.   With the knowledge of the true relationship between use of Xarelto® and irreversible bleeds, rather than taking steps to pull the drug off the market, provide strong warnings, or create an antidote, Defendants promoted and continue to promote Xarelto® as a safe and effective treatment for A-fib.

58.   Xarelto® is estimated to be the 19th-best-selling drug in the world by 2018.   Worldwide sales of Xarelto® are expected to jump from $596 million in

2012 to $3.7 billion in 2018.

59.     While Defendants enjoy great financial success from their expected blockbuster drug, Xarelto®, they continue to place American citizens at risk of severe bleeds and death.

60.     Consumers, including Plaintiff, who have used Xarelto® to reduce the risk of stroke due to A-fib or to reduce the risk of blood clots, DVT and PE following knee or hip replacement surgery, have several alternative safer products available to treat the conditions and have not been adequately warned about the significant risks and lack of benefits, associated with Xarelto® therapy.

61.     Defendants, through their affirmative misrepresentations and omissions, actively concealed from Plaintiff and Plaintiff's physicians the true and significant risks associated with Xarelto® use.

62.     As a result of Defendants' actions, Plaintiff and Plaintiff's physicians were unaware, and could not have reasonably known or have learned through reasonable diligence, that Plaintiff would be exposed to the risks identified in this Complaint. The increased risks and subsequent medical damages associated with Plaintiff's Xarelto® use were the direct and proximate result of Defendants' conduct.

## EQUITABLE TOLLING OF APPLICABLE STATUTES OF LIMITATION AND DISCOVERY RULE

63.    Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

64.    The running of any statute of limitations has been tolled by reason of Defendants' fraudulent concealment. Defendants, through failing to disclose, for years, the truth about the safety and efficacy of Xarelto®, to Plaintiff's physicians and/or Plaintiff, and misrepresenting Xarelto® as safe and efficacious for its intended use, actively concealed from said individuals the true risks associated with the use of Xarelto® drug products.

65.     Plaintiff had no knowledge that Defendants were engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by the Defendants, the Plaintiff could not have reasonably discovered the wrongdoing at any time prior to the commencement of this action.

66.    Plaintiff and Plaintiff's physicians could not have possibly determined the nature, extent and identity of related health risks associated with Xarelto®. Plaintiff and Plaintiff's physicians reasonably relied on Defendants to disseminate truthful and accurate safety and efficacy information about its drug and warn of the side effects complained of herein.

67.    Furthermore, Defendants are estopped from relying on any statute of limitations because of their fraudulent concealment of the defective nature of Xarelto®. Defendants were under a duty to disclose the true character, quality, and

nature of Xarelto® because this was non-public information over which the Defendants have, and continue to have, exclusive control.  Plaintiff would further show that Plaintiff has filed this lawsuit within the applicable statutes of limitations based upon the discovery rule.  Plaintiff did not have knowledge of facts creating, or which in any reasonable person would create a suspicion of wrongdoing on the part of Defendants until the publicity on Xarelto and uncontrolled bleeding came to light in late 2014.

## CAUSES OF ACTION

## COUNT I

## STRICT LIABILITY-FAILURE TO WARN

68.     Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

69.     At all times relevant to this suit, Defendants engaged in the business of designing, manufacturing, testing, marketing, labeling and placing into the stream of commerce Xarelto® for sale to, and use by, members of the public.

70.     At all times relevant to this suit, the dangerous propensities of Xarelto® were known to Defendants, or were reasonably and scientifically knowable to them, through appropriate research and testing by known methods, at the time they distributed, supplied, or sold their respective product, and not known to ordinary physicians who would be expected to prescribe the drug for their

patients.

71.    The Xarelto® manufactured by Defendants reached Plaintiff without substantial change and was ingested as directed.

72.    Defendants marketed Xarelto® in multiple ways, including but not limited to, direct-to-consumer advertisements, which were misleading in that Defendants overstated the safety and efficacy of Xarelto® and understated its risks.

73.    The Xarelto® was defective and unreasonably dangerous in that the labeling was insufficient to adequately warn physicians and users of the increased risk of excessive and/or uncontrollable bleeding.

74.    As a direct and proximate result of the actions and inactions of the Defendants as set forth above, Plaintiff was exposed to Xarelto® and suffered personal injuries, economic and non-economic damages including pain and suffering.

75.    Defendants' actions and omissions as identified in this Complaint show that Defendants acted maliciously and/or intentionally disregarded Plaintiff's rights so as to warrant the imposition of punitive damages.

## COUNT II

## STRICT PRODUCTS LIABILITY – DESIGN DEFECT

76.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

77.   Defendants are the manufacturers, designers, distributers, sellers and suppliers of Xarelto®, who sold Xarelto® in the course of business.

78.   The Xarelto® manufactured, designed, sold, marketed, distributed, supplied and/or placed in the stream of commerce by Defendants was expected to and did reach the consumer without any alterations or changes.

79.   The Xarelto® administered to Plaintiff was defective in design or formulation in at least the following respects:

a.   when it left the hands of the Defendants, this drug was unreasonably dangerous to an extent beyond  that which  could reasonably be contemplated by Plaintiff or Plaintiff's physicians;

b.   any benefit  of this drug was  outweighed  by the serious  and undisclosed  risks  of  its  use  when prescribed  and  used  as  the Defendants intended;

c.   the dosages and/or formulation of Xarelto® sold by the Defendants was unreasonably dangerous;

d.   there are  no  patients  for  whom  the  benefits  of  Xarelto® outweighed the risks;

e.   the product was not made in accordance with the Defendants' specifications or performance standards;

f.   there  are  no  patients  for  whom  Xarelto®  is  a  safer  and  more

efficacious drug than other drug products in its class; and/or

    g.  there were safer alternatives that did not carry the same risks and dangers that Defendants' Xarelto® had.

80.    The Xarelto® administered to Plaintiff was defective at the time it was distributed by the Defendants or left their control.

81.    The foreseeable risks associated with the design or formulation of the Xarelto® include, but are not limited to, the fact that the design or formulation of Xarelto® is more dangerous than a reasonably prudent consumer would expect when used in an intended or reasonably foreseeable manner, and/or did not have the claimed benefits.

82.    The defective and unreasonably dangerous design and marketing of Xarelto® was a direct, proximate and producing cause of Plaintiff's injuries and damages. Under strict products liability theories set forth in Restatement (Second) of Torts, Defendants are liable to Plaintiff for all damages claimed in this case.

83.    As a direct, legal, proximate, and producing result of the defective and unreasonably dangerous condition of Xarelto®, Plaintiff suffered personal injuries, economic and non-economic damages, including pain and suffering.

84.    Defendants' actions and omissions as identified in this Complaint show that Defendants acted maliciously and/or intentionally disregarded

Plaintiff's rights so as to warrant the imposition of punitive damages.

## COUNT III

## NEGLIGENCE

85.    Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein.

86.    Defendants owed a duty to the general public, and specifically to the Plaintiff, to exercise reasonable care in the design, study, development, manufacture, promotion, sale, marketing and distribution of their prescription medications, including the Xarelto® at issue in this lawsuit. Defendants failed to exercise reasonable care in the design of Xarelto® because as designed, Xarelto® was capable of causing serious personal injuries such as those suffered by Plaintiff during foreseeable use. Defendants also failed to exercise reasonable care in the marketing of Xarelto® because they failed to warn, that as designed, Xarelto® was capable of causing serious personal injuries such as those suffered by Plaintiff during foreseeable use.

87.    Defendants breached their duty and were negligent including, but not limited to, the following actions, misrepresentations, and omissions toward Plaintiff:

    a.    failing to use due care in developing, testing, designing, and manufacturing Xarelto® so as to avoid the aforementioned risks to

individuals when Xarelto® was being used for treatment;

b.      failing to accompany their product with proper or adequate warnings, or labeling regarding adverse side effects and health risks associated with the use of Xarelto® and the comparative severity and duration of such adverse effects;

c.      in disseminating information to Plaintiff and Plaintiff's physicians that was negligently and materially inaccurate, misleading, false, and unreasonably dangerous to patients such as Plaintiff;

d.      failing to accompany their products with proper or adequate rate of incidence or prevalence of irreversible bleeds;

e.      failing to provide warnings or other information that accurately reflected the symptoms, scope, and severity of the side effects and health risks;

f.      failing to conduct adequate pre-clinical and clinical testing and post-marketing surveillance to determine the safety of Xarelto®;

g.      failing to warn Plaintiff, the medical and healthcare community, and consumers that the product's risk of harm was unreasonable and that there were safer and effective alternative medications available to Plaintiff and other consumers;

h.      failing to provide adequate training or information to medical

care providers for appropriate use and handling of Xarelto® and patients taking Xarelto®;

i.     failing to adequately test and/or warn about the use of Xarelto®, including, without limitation, the possible adverse side effects and health risks caused by the use of Xarelto®;

j.     failing to design and/or manufacture a product that could be used safely due to the lack of a known reversal agent or antidote;

k.     in designing, manufacturing, and placing into the stream of commerce a product which was unreasonably dangerous for its reasonably foreseeable use, which Defendant knew or should have known could cause injury to Plaintiff;

l.     failing to remove Xarelto® from the market when Defendants' knew or should have known of the likelihood of serious side effects and injury to its users;

m.     failing to adequately warn users, consumers and physicians about the severity, scope and likelihood of bleeds and related dangerous conditions to individuals taking Xarelto®; and

n.     representing to physicians, including but not limited to Plaintiff's prescribing physicians, that this drug was safe and effective for use.

88.    The Xarelto® that injured Plaintiff was in substantially the same condition when Plaintiff ingested it as it was in when it left the control of Defendants. Defendants' Xarelto's ® ability to cause serious personal injuries and damages, such as those suffered by Plaintiff, was not due to any voluntary action or contributory negligence of Plaintiff. Plaintiff consumed the Xarelto® as directed and without change in its form or substance.

89.    Defendants' failure to exercise reasonable care in the design, dosing information, marketing, warnings, and/or manufacturing of Xarelto® was a proximate cause of Plaintiff's injuries and damages.

90.    Plaintiff seeks all damages to which Plaintiff may be justly entitled.

91.   Defendants' conduct as described above, including but not limited to their failure to adequately test Xarelto®, to provide adequate warnings, and their continued manufacture, sale and marketing of the product when they knew or should have known of the serious health risks it created, evidences actions and/or intentional disregard of the rights of Plaintiff so as to warrant the imposition of punitive damages.

## COUNT IV

## NEGLIGENT MISREPRESENTATION AND/OR FRAUD

92.    Plaintiff hereby incorporates by reference all of the above allegations as if fully set forth herein.

93.    Defendants represented that Xarelto® was just as safe or safer and as effective or more effective than other anticoagulation alternatives and had additional benefits compared to other anticoagulation medications available on the market.

94.    Defendants made these misrepresentations and actively concealed adverse information at a time when the Defendants knew, or should have known, that Xarelto® had defects, dangers, and characteristics that were other than what Defendants had represented to Plaintiff and the health care industry generally. Specifically, Defendants misrepresented to and/or actively concealed from Plaintiff and the consuming public, among other things, that:

    a. Xarelto® had statistically significant increases in irreversible bleeds and other side effects which could result in serious, permanent injury or death;

    b.  Xarelto® had not been fully or adequately tested;

    c.  Xarelto® does not have any known reversal agents;

    d. Xarelto® bleeds cannot be stopped or controlled by any effective medical processes or medical intervention;

    e.  failed to warn that it is difficult or impossible to assess the degree and/or extent of anticoagulation in patients taking Xarelto®; and

    f.   Xarelto® was not as safe as blood thinners such as warfarin.

95.   Defendants negligently and/or intentionally misrepresented or omitted this information in their product labeling, promotions and advertisements and instead labeled, promoted and advertised their product as safer and more effective than other types of anticoagulation alternatives and understated the risk of excessive and/or uncontrollable bleeding associated with Xarelto®.

96.   The aforementioned misrepresentations were untrue and misleading.

97.   Defendants knew or should have known that these representations were false and made the representations with the intent that Plaintiff  and/or Plaintiff's prescribing physicians would rely on them, leading to the use of Xarelto®.

98.   At the time of Defendants' fraudulent misrepresentations, Plaintiff and/or Plaintiff's prescribing physicians were unaware of the falsity of the statements being made and believed them to be true. Plaintiff and/or Plaintiff's prescribing physicians justifiably relied on and/or were induced by the misrepresentations and/or active concealment and relied on the absence of safety information, which Defendants did suppress, conceal or failed to disclose, to Plaintiff's detriment.

99.   As a direct and proximate result of the fraudulent acts and omissions, suppression and misrepresentation of Defendants, Plaintiff suffered personal injuries, economic and non-economic damages, including pain and suffering.

100. Defendants' actions and omissions as identified in this Complaint demonstrate malicious actions and/or intentional disregard of Plaintiff's rights so as to warrant the imposition of punitive damages.

## COUNT V

## BREACH OF EXPRESS WARRANTY

101.   Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein.

102.   Defendants expressly warranted, through their direct-to-consumer marketing, label, and sales representatives that Xarelto® was a safe and effective prescription blood thinner. The safety and efficacy of Xarelto® constitutes a material fact in connection with the marketing, promotion, and sale of Xarelto®.

103.   Xarelto® materially failed to conform to those express representations because it caused serious injury to consumers when taken in recommended dosages.

104.   As a direct, foreseeable, and proximate result of Defendants' breach of warranty, Plaintiff has suffered grievous bodily injury and consequent economic and other loss, as described above.

105.   Defendants' actions and omissions as identified in this Complaint demonstrate malicious actions and/or intentional disregard of Plaintiff's rights so as to warrant the imposition of punitive damages.

## COUNT VI

## BREACH OF IMPLIED WARRANTY

106.   Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein.

107.   Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and/or otherwise released into the stream of commerce Xarelto®, in the course of same, directly advertised or marketed the product to the FDA, health care professionals and consumers, including Plaintiff, or persons responsible for consumer.

108.   Defendants impliedly warranted their Xarelto® product, which they manufactured and/or distributed and sold, and which Plaintiff purchased and ingested, to be of merchantable quality and fit for the common, ordinary, and intended uses for which the product was sold.

109.   Defendants breached their implied warranties of the Xarelto® product sold to Plaintiff because this product was not fit for its common, ordinary, and intended use.

110.   As a direct, foreseeable and proximate result of Defendants' breaches of implied warranties, Plaintiff suffered grievous bodily injury and consequential economic and other losses, as described above, when Plaintiff ingested Xarelto®, in reasonable reliance upon the implied warranties, leading to Plaintiff's injuries.

111.   Defendants' actions and omissions as identified in this Complaint demonstrate malicious actions and/or intentional disregard of Plaintiff's rights so as to warrant the imposition of punitive damages.

## COUNT VII

## NEGLIGENCE *PER SE* -

## DEFENDANTS' VIOLATION OF 21 USC 331(a) & 352

112.   Plaintiff hereby incorporates by reference all of the above allegations as if fully set forth herein.

113.   As part of their duty to exercise reasonable care, Defendants were obligated to follow public laws and regulations enacted and promulgated to protect the safety of persons such as Plaintiff, including 21 U.S.C. §§ 331(a) & 352, and other statutes and regulations, which make it unlawful  to  misbrand prescription drug products.

114.  The labeling, including package inserts, for Xarelto® failed to conform to the requirements of 21 U.S.C. § 352, including subsections (a), (c), and (t), and the requirements of 21 C.F.R. § 201.100(c)(1), and, therefore, violated 21 U.S.C. § 331(a), which prohibits the introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded.

115.  Specifically, the product label and package insert for Xarelto® is

misbranded within the meaning of 21 U.S.C. § 352(a) and (f) because it was false and misleading and failed to give adequate warnings and directions for use by physicians who prescribe Xarelto®.

116.   Xarelto® is misbranded pursuant to 21 U.S.C. § 352 because words, statements, or other information required by or under authority of chapter 21 U.S.C. § 352 are not prominently placed thereon with such conspicuousness and in such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use.

117.   Xarelto® is misbranded pursuant to 21 U.S.C. § 352 because the labeling does not bear adequate directions for use, and/or the labeling does not bear adequate warnings against use where its use may be dangerous to health or against unsafe dosage or methods or duration of administration or application, in such manner and form as are necessary for the protection of users.

118.   Xarelto® is misbranded pursuant to 21 U.S.C. § 352 because it is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof.

119.   Because the Defendants each had a statutory duty under 21 U.S.C. § 352 (a) and (f) not to misbrand Xarelto®, and because each of them violated this duty, they were guilty of negligence per se.

120.   Xarelto® is further misbranded pursuant to 21 C.F.R.   §   201.56

because the labeling was not updated as new information became available that caused the labeling to become inaccurate, false, or misleading.

121.   Defendants also violated 21 C.F.R. § 201.57 because they failed to identify specific tests needed for selection or monitoring of patients who took the prescription drug Xarelto®.

122. Defendants violated 21 C.F.R. § 201.57 because the safety considerations regarding Xarelto® are such that the drug should be reserved for certain situations, and the Defendants failed to state such information.

123.   Xarelto® is mislabeled pursuant to 21 C.F.R. § 201.57 because the labeling fails to describe serious adverse reactions and potential safety hazards, limitations in use imposed by it, and steps that should be taken if they occur.

124.   Xarelto® is mislabeled pursuant to 21 C.F.R. § 201.57 because the labeling was not revised to include a warning as soon as there was reasonable evidence of an association of a serious hazard with the drug (i.e., irreversible bleeding).

125. Xarelto® is mislabeled pursuant to 21 C.F.R. § 201.57 because the labeling does not state an upper limit dosing beyond which safety and effectiveness have not been established.

126.   Xarelto® violates 21 C.F.R. § 210.122 because the labeling and packaging materials do not meet the appropriate specifications.

127.   Xarelto® violates 21 C.F.R. § 310.303 in that it is not safe and effective for its intended use.

128.   Defendants violated 21 C.F.R. §§ 310.305 & 314.80 by failing to report adverse events associated with Xarelto® as soon as possible or at least within 15 days of the initial receipt by the Defendants of the adverse drug experience.

129.   Defendants violated 21 C.F.R. §§ 310.305 & 314.80 by failing to conduct an investigation of each adverse event associated with Xarelto®, evaluate the cause of the adverse event, submit follow-up reports within the prescribed 15 calendar days of receipt of new information or as requested by the FDA, and keep records of the unsuccessful steps taken to seek additional information regarding serious, unexpected adverse drug experiences.

130.   Defendants violated 21 C.F.R. § 314.80 by failing to provide periodic reports to the FDA containing (a) a narrative summary and analysis of the information in the report and an analysis of the 15-day Alert reports submitted during the reporting interval, (b) an Adverse Reaction Report for each adverse drug experience not already reported under the Post marketing 15-day Alert report, (c) a history of actions taken since the last report because of adverse drug experiences (for example, labeling changes or studies initiated) and/or (d) a copy of the published article from scientific or medical journals along with one or more

15-day Alert reports based on information from the scientific literature.

131.   Defendants violated 21 C.F.R. § 312.32 because they failed to review all information relevant to the safety of Xarelto® or otherwise received by Defendants from sources, foreign or domestic, including information derived from any clinical or epidemiological investigations, animal investigations, commercial marketing experience, reports in the scientific literature, and unpublished scientific papers, as well as reports from foreign regulatory authorities that have not already been previously reported to the agency by the sponsor.

132.   Defendants failed to meet the standard of care set by the above statutes and regulations, which were intended for the benefit of individual consumers such as the Plaintiff, making Defendants liable to Plaintiff, and further, because each of them violated the above referenced duties required by these statutes and regulations, they are guilty of negligence per se.

133.   Defendant's failure to adequately warn about the magnitude of the risk associated with use of Xarelto® constitutes negligence *per se*.   This negligence *per se* proximately caused injury to Plaintiff as described more fully herein.

## **COUNT VIII**

## **FRAUDULENT CONCEALMENT**

134.  Plaintiff hereby incorporates by reference all of the above allegations

as if fully set forth herein.

135. At all times during the course of dealings between Defendants and Plaintiff, and/or Plaintiff's healthcare providers, and/or the FDA, Defendants misrepresented the safety of Xarelto® for its intended use.

136. Defendants knew or were reckless in not knowing that their representations were false.

137. In representations to Plaintiff, and/or Plaintiff's healthcare providers, and/or the FDA, Defendants fraudulently concealed and intentionally omitted the following material information:

a. that Xarelto® was not as safe or effective as other forms of anticoagulation medication for atrial fibrillation patients;

b. that Defendants failed to investigate, research, study and consider, fully and adequately, patient weight as a variable factor in establishing recommended dosages of Xarelto®;

c. that Defendants failed to investigate, research, study and define, fully and adequately, the safety profile of Xarelto®;

d. that Defendants failed to provide adequate warnings that there was no drug, agent or means to reverse the anticoagulation effects of Xarelto®;

e. that Defendants failed to  include an adequate warning about serious bleeding events associated with Xarelto®;

f.  that Defendants failed to warn it is difficult or impossible to assess the degree and/or extent of anticoagulation in patients taking Xarelto®;

g.  that Defendants failed to adequately instruct physicians on how to intervene and/or stabilize a patient who suffers a bleed while taking Xarelto®;

h.  that it is critical to fully assess renal functioning prior to starting a patient on Xarelto® and to continue testing and monitoring of  renal functioning periodically while the patient is on Xarelto®;

j.  that there is an increased risk of bleeding events associated with aging patient populations of Xarelto® users;

k.  that there is an increased risk of gastrointestinal bleeds in those taking Xarelto®, especially, in those patients with a prior history of gastrointestinal issues and/or upset;

l.  that Xarelto® was defective, and that it caused dangerous side effects, including but not limited to higher incidence of excessive and/or uncontrollable bleeding;

m. that Xarelto® was manufactured negligently;

m. that Xarelto® was manufactured defectively;

n.  that Xarelto® was manufactured improperly;

o.  that Xarelto® was designed negligently;

p.  that Xarelto® was designed defectively; and

q.  that Xarelto® was designed improperly.

138.  Defendants were under a duty to disclose to Plaintiff, and Plaintiff's physicians, hospitals, healthcare providers, and/or the FDA the defective nature of Xarelto®, including but not limited to the heightened risks of excessive and/or uncontrollable bleeding.

139.  Defendants had sole access to material facts concerning the defective nature of the product and its propensity to cause serious and dangerous side effects, and hence, cause damage to persons who used Xarelto®, including the Plaintiff, in particular.

140.  Defendants' concealment and omissions of material facts concerning, *inter alia*, the safety of Xarelto® was made purposefully, willfully, wantonly, and/or recklessly, to mislead Plaintiff, and Plaintiff's physicians, hospitals and healthcare providers into reliance, continued use of Xarelto®, and actions thereon, and to cause them to purchase, prescribe, and/or dispense Xarelto® and/or use the product.

141.  Defendants knew that Plaintiff and Plaintiff's physicians, hospitals, healthcare providers, and/or the FDA had no way to determine the truth behind Defendants' concealment and omissions, and that these included material

omissions of facts surrounding Xarelto®, as set forth herein.

142. Plaintiff, as well as Plaintiff's doctors, healthcare providers, and/or hospitals reasonably relied on facts revealed which negligently, fraudulently and/or purposefully did not include facts that were concealed and/or omitted by Defendants.

143. As a result of the foregoing acts and omissions the Plaintiff was and still is caused to suffer and/or is at a greatly increased risk of serious and dangerous side effects including, *inter alia*, excessive and/or uncontrollable bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

144. As a result of the foregoing acts and omissions the Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental and related expenses. Plaintiff further alleges that Plaintiff will in the future be required to obtain further medical and/or hospital care, attention, and services.

145. By reason of the foregoing, Plaintiff has been damaged.

## COUNT IX

## DECEPTIVE TRADE PRACTICES

146. Plaintiff hereby incorporates by reference all of the above allegations

as if fully set forth herein.

147.   Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and/or otherwise released into the stream of commerce Xarelto®, in the course of same, directly advertised or marketed the product to the FDA, health care professionals and consumers, including Plaintiff, or persons responsible for consumer.

148. Plaintiff purchased and used Xarelto® for personal use and thereby suffered ascertainable losses as a result of Defendants' actions in violation of consumer protection laws, including the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750 et. seq. which include the following violations:

a. representing that goods or services have characteristics, ingredients, uses, benefits or qualities that they do not have;

b. advertising goods or services with the intent not to sell them as advertised;

c. representing that goods have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities which they do not have;

d. failing to disclose information concerning goods which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been

disclosed;

    e.  unconscionable actions and courses of action; and

    f.  engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

149.  Defendants uniformly communicated the purported benefits of Xarelto® while failing to disclose the serious and dangerous side-effects related to Xarelto® and of the true state of Xarelto®, the regulatory status, its safety, its efficacy and its true usefulness.  Defendants made these representations to physicians, the medical community at large and to patients and consumers, such as Plaintiff, in their marketing and advertising.

150.  Defendants' conduct in connection with Xarelto® was also impermissible and illegal in that it created a likelihood of confusion and misunderstanding because Defendants misleadingly, falsely and/or deceptively misrepresented and omitted numerous material facts regarding the utility, benefits, costs, safety, efficacy and advantages of Xarelto®.

151.  As a direct, proximate and foreseeable result of Defendants' statutory violations, Plaintiff suffered the injuries and consequential economic and other losses, as described above, when Plaintiff ingested Xarelto®.

## PUNITIVE DAMAGES

152. Plaintiff hereby incorporates by reference all of the above allegations as

if fully set forth herein.

153. At all material times, the Defendants knew or should have known that Xarelto® was inherently dangerous.

154. Despite their knowledge, the Defendants continued to aggressively market Xarelto® to consumers, including Plaintiff, without disclosing its dangerous side effects when there existed safer alternative products.

155. Despite Defendants' knowledge of Xarelto®'s defective and unreasonably dangerous nature, Defendants continued to test, design, develop, manufacture, label, package, promote, market, sell and distribute it so as to maximize sales and profits at the expense of the health and safety of the public, including the Plaintiff, in conscious disregard of the foreseeable harm caused by Xarelto®.

156.   Defendants' conduct was intentional and/or wanton.

157.   Defendants' conduct as described above, including, but not limited to, their failure to adequately test their product, to provide adequate warnings, and their continued manufacture, sale, and marketing of their products when they knew or should have known of the serious health risks created, evidences a flagrant disregard of human life as to warrant the imposition of punitive damages as the acts or omissions were committed with knowing, conscious and deliberate disregard for the rights and safety of consumers, including Plaintiff.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for relief as follows:

1.    Actual damages as alleged, jointly and/or severally against Defendants, in excess of $75,000.00;

2.    Medical expenses and other economic damages in an amount to be determined at trial of this action;

3.    Pain and suffering;

4.    Punitive damages alleged against Defendants, including Plaintiff's attorney fees, in excess of $75,000.00;

5.    Prejudgment interest at the highest lawful rate allowed by law;

6.    Interest on the judgment at the highest legal rate from the date of judgment until collected; attorneys' fees, expenses, and costs of this action; and

7. Such further relief as this Court deems necessary, just and proper.

Dated:  June 5, 2015

Respectfully submitted,

**Hilliard Munoz Gonzales LLP**

ATTORNEYS FOR PLAINTIFF

By: /s/ T. Christopher Pinedo
Robert C. Hilliard
Texas State Bar No. 09677700
Federal Bar No. 5912
Catherine Tobin
Texas State Bar No. 24013642
Federal Bar No. 25316

John Martinez
Texas State Bar No. 24010212
Federal Bar No. 23612
T. Christopher Pinedo
Texas State Bar No. 00788935
Federal Bar No. 17993

719 S. Shoreline, Suite 500
Corpus Christi, Texas 78401
361-882-1612 Telephone
361-882-3015 Facsimile

## <u>JURY TRIAL DEMANDED</u>

Plaintiff demands a jury trial.


DATED: <u>June 5, 2015</u>

Respectfully submitted,

**Hilliard Munoz Gonzales LLP**

ATTORNEYS FOR PLAINTIFF

By: /s/ T. Christopher Pinedo
Robert C. Hilliard
Texas State Bar No. 09677700
Federal Bar No. 5912
Catherine Tobin
Texas State Bar No. 24013642
Federal Bar No. 25316
John Martinez
Texas State Bar No. 24010212
Federal Bar No. 23612
T. Christopher Pinedo
Texas State Bar No. 00788935
Federal Bar No. 17993

719 S. Shoreline, Suite 500
Corpus Christi, Texas 78401
361-882-1612 Telephone
361-882-3015 Facsimile