UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CASE NO.: 2:14-md-02592-EEF-MBN

| | |
|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | MDL NO. 2592 |
| | SECTION: L<br>JUDGE ELDON E. FALLON<br>MAG. JUDGE NORTH |

THIS DOCUMENT RELATES TO:
2:15-cv-00006-EEF-MBN

_____

| | | |
|---|---|---|
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | |
| EMMA PHILLIPS, | ) | AMENDED COMPLAINT |
|        Plaintiff, | ) | |
| | ) | CIVIL ACTION: 2:15-cv-00006 |
|    v. | ) | |
| | ) | |
| JANSSEN RESEARCH & DEVELOPMENT LLC | ) | |
| f/k/a JOHNSON AND JOHNSON | ) | |
| PHARMACEUTICAL RESEARCH AND | ) | |
| DEVELOPMENT LLC, JANSSEN ORTHO LLC, | ) | |
| JANSSEN PHARMACEUTICALS, INC. | ) | |
| f/k/a JANSSEN PHARMACEUTICA INC. | ) | |
| f/k/a ORTHO-MCNEIL-JANSSEN | ) | |
| PHARMACEUTICALS, INC., | ) | |
| JOHNSON & JOHNSON COMPANY | ) | |
| BAYER HEALTHCARE | ) | |
| PHARMACEUTICALS, INC., | ) | |
| BAYER PHARMA AG, | ) | |
| BAYER CORPORATION, | ) | |
| BAYER HEALTHCARE LLC, | ) | |
| BAYER HEALTH CARE AG, and BAYER AG, | ) | |
| | ) | |
| Defendants. | ) | |

_____

FIRST AMENDED COMPLAINT[1]

---

[1] This Complaint is Amended to add the heirs of the Plaintiff as she is now deceased and to add the defendant, Johnson and Johnson

Plaintiff, EMMA PHILLIPS', heirs Collins C. Phillips, Jr. and Lisa C. Phillips by and through the undersigned counsel, upon information and belief, at all times hereinafter mentioned, submits this First Amended Complaint and Demand for Jury Trial, to supplement and amend as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and because there is complete diversity of citizenship between Plaintiff and the Defendants.

2.     Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claim occurred in this District, and because Defendants conduct substantial business in this District.

3.     This Court has personal jurisdiction over the Defendants because they have done business in the State of Louisiana, have committed a tort in whole or in part in the State of Louisiana, have substantial and continuing contact with the State of Louisiana, and derive substantial revenue from goods used and consumed within the State of Louisiana. The Defendants actively sell, market and promote its pharmaceutical product Xarelto to physicians and consumers in this state on a regular and consistent basis.

## NATURE OF THE CASE

4.     Plaintiff, Emma Phillips, used Xarelto, also known as rivaroxaban, which is a medication used to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat deep vein thrombosis (hereinafter referred to as "DVT") and pulmonary embolism (hereinafter referred to as "PE"), to reduce the risk of

recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

5.     Defendants, JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a JOHNSON AND JOHNSON PHARMACEUTICAL RESEARCH AND DEVELOPMENT LLC, JANSSEN ORTHO LLC, JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA INC. f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., BAYER HEALTHCARE PHARMACEUTICALS, INC., BAYER PHARMA AG, BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE AG, and BAYER AG (hereinafter collectively referred to as "Defendants") designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Xarelto.

6.     When warning of safety and risks of Xarelto, Defendants negligently and/or fraudulently represented to the medical and healthcare community, the Food and Drug Administration (hereinafter referred to as the "FDA"), to Plaintiff and the public in general, that Xarelto had been tested and was found to be safe and/or effective for its indicated use.

7.     Defendants concealed their knowledge of Xarelto's defects, from Plaintiff, the FDA, the public in general and/or the medical community specifically.

8.     These representations were made by Defendants with the intent of inducing the public in general, and the medical community in particular, to recommend, dispense and/or purchase Xarelto for use to reduce the risk of stroke and systemic embolism in patients with non- valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement

surgery, all of which evinced a callous, reckless, willful, depraved indifference to health, safety and welfare of Plaintiffs decedent herein.

9.      Defendants negligently and improperly failed to perform sufficient tests, if any, on humans using Xarelto during clinical trials, forcing Plaintiffs mother, and Plaintiffs physicians, hospitals, and/or the FDA, to rely on safety information that applies to other non-valvular atrial fibrillation treatment and DVT/PE treatment and prophylaxis, which does not entirely and/or necessarily apply to Xarelto whatsoever.

10.     As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous side effects including inter alia uncontrolled internal bleeding and rectal bleeding.

11.     Defendants concealed their knowledge of the defects in their products from the Plaintiff and Plaintiffs physicians, hospitals, pharmacists, the FDA, and the public in general.

12.     Consequently, Plaintiff's heirs seek all damages recoverable as a matter of law as a result her use of the Xarelto.

## PARTY PLAINTIFF

13.      Plaintiff's, heirs, Collins C. Phillips, Jr. and Lisa C. Phillips, on behalf of their deceased mother, EMMA PHILLIPS, at all times relevant hereto, are citizens and residents of the State of Louisiana.

14.      Upon information and belief, EMMA PHILLIPS, was prescribed Xarelto in the State of Louisiana, on or around December 27, 2013, upon direction of her physician for the treatment of a previous stroke.

15.     Upon information and belief, Plaintiff began using Xarelto or around January 1, 2014 up until January 3, 2014.

16.     Upon information and belief, and as a direct and proximate result of the use of Defendants' defective product, Xarelto, plaintiff experienced massive internal and rectal bleeding on or about January 3, 2014. Plaintiff has suffered and incurred harm including severe pain and suffering, medical expenses and other economic and noneconomic damages.

17.     As a direct and proximate result of the use of Defendants' Xarelto, plaintiff suffered serious and dangerous side effects including but not limited to, life- threatening bleeding, as well as other severe and personal injuries, physical pain and extreme mental anguish, as well as, substantial financial expenses for hospitalization and medical care.

18.     As a direct and proximate result of Defendants' conduct, Plaintiff, suffered and incurred damages, including medical expenses and other economic and non-economic damages prior to her death on June 20, 2015.

## PARTY DEFENDANTS

19.     Upon information and belief, Defendant JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a JOHNSON AND JOHNSON RESEARCH AND DEVELOPMENT LLC (hereinafter referred to as "JANSSEN R&D") is a limited liability company organized under the Jaws of New Jersey, with a principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933. Defendant JANSSEN R&D is the holder of the approved New Drug Application ("NDA") for Xarelto as well as the supplemental NDA.

20.    As part of its business, JANSSEN R&D is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

21.    Upon information and belief, Defendant JANSSEN R&D has transacted and conducted business in the State of Louisiana.

22.    Upon information and belief, Defendant JANSSEN R&D has derived substantial revenue from good and products used in the State of Louisiana.

23.    Upon information and belief, Defendant, JANSSEN R&D, expected or should have expected its acts to have consequence within the United States of America and the State of Louisiana, and derived substantial revenue from interstate commerce within the United States and the State of Louisiana, more particularly.

24.    Upon information and belief, and at all relevant times, Defendant, JANSSEN R&D, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non- valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

25.    Upon information and belief, Defendant JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA INC. f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. (hereinafter referred to as "JANSSEN PHARM") is

a Pennsylvania corporation, having a principal place of business at 1125 Trenton-Harbourton Road, Titusville, New Jersey 08560.

26.     As part of its business, JANSSEN PHARM is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

27.     Upon information and belief, Defendant JANSSEN PHARM has transacted and conducted business in the State of Louisiana.

28.     Upon information and belief, Defendant, JANSSEN PHARM, has derived substantial revenue from goods and products used in the State of Louisiana.

29.     Upon information and belief, Defendant, JANSSEN PHARM, expected or should have expected its acts to have consequence within the United States of America and the State of Louisiana, and derived substantial revenue from interstate commerce within the United States and the State of Louisiana, more particularly.

30.     Upon information and belief, and at all relevant times, Defendant, JANSSEN PHARM, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non- valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

31.     Upon information and belief, Defendant JANSSEN ORTHO LLC (hereinafter referred to as "JANSSEN ORTHO") is a limited liability company organized under the laws of

Delaware, having a principal place of business at State Road 933 Km 0 1, Street Statero, Gurabo, Puerto Rico 00778. Defendant JANSSEN ORTHO is a subsidiary of Johnson & Johnson. The only member of JANSSEN ORTHO LLC is OMJ PR Holdings, which is incorporated in Ireland with a principal place of business in Puerto Rico. Accordingly, JANSSEN ORTHO LLC is a citizen of Delaware, Ireland and Puerto Rico for purposes of determining diversity under 28 U.S.C. § 1332.

32.     As part of its business, JANSSEN ORTHO is involved m the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

33.     Upon information and belief, Defendant JANSSEN ORTHO has transacted and conducted business in the State of Louisiana.

34.     Upon information and belief, Defendant, JANSSEN ORTHO, has derived substantial revenue from goods and products used in the State of Louisiana.

35.     Upon information and belief, Defendant, JANSSEN ORTHO, expected or should have expected its acts to have consequence within the United States of America and the State of Louisiana, and derived substantial revenue from interstate commerce within the United States and the State of Louisiana, more particularly.

36.     Upon information and belief, and at all relevant times, Defendant, JANSSEN ORTHO, was in the business of and did design, research, manufacture, test, adver1ise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non- valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence

of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

37.   Defendant Johnson & Johnson (hereinafter referred to as "J&J") is a fictitious name adopted by Defendant Johnson & Johnson Company, a New Jersey corporation which has its principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933.

38.   As part of its business, J&J, and its "family of companies," is involved in The research, development, sales, and marketing of pharmaceutical products, including Xarelto.

39.   Upon information and belief, Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. is, and at all relevant times, was a corporation organized under the laws of the State of Delaware, with its principal place of business in the State of New Jersey.

40.   Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. was formerly known as Berlex Laboratories, Inc., which was formerly known as Berlex, Inc. and BAYER HEALTHCARE PHARMACEUTICALS, INC. is the same corporate entity as Berlex, Inc. and Berlex Laboratories, Inc.

41.   As part of its business, BAYER HEALTHCARE PHARMACEUTICALS, INC. is involved in the research development, sales and marketing of pharmaceutical products including Xarelto and rivaroxaban.

42.   Upon information and belief, Defendant, BAYER HEALTHCARE PHARMACEUTICALS, INC., has transacted and conducted business in the State of Louisiana.

43.    Upon    information    and    belief,    Defendant,    BAYER    HEALTHCARE
PHARMACEUTICALS, INC., has derived substantial revenue from goods and products used
in the State of Louisiana.

44.    Upon    information    and    belief,    Defendant,    BAYER    HEALTHCARE
PHARMACEUTICALS,  INC.,  expected  or  should  have  expected  its  acts  to  have
consequence  within  the  United  States  of  America  and  the  State  of  Louisiana,  and  derived
substantial  revenue  from  interstate  commerce  within  the  United  States  and  the  State  of
Louisiana, more particularly.

45.    Upon  information  and  belief,  and  at  all  relevant  times,  Defendant,  BAYER
HEALTHCARE  PHARMACEUTICALS,  INC.,  was  in  the  business  of  and  did  design,
research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for
use as an oral anticoagulant,  the primary purposes of which  are to reduce the risk of stroke and
systemic embolism  in patients with non-valvular atrial fibrillation,  to treat DVT and PE, to
reduce  the  risk  of  recurrence  of  DVT  and/or  PE,  and  for  prophylaxis  of  DVT  for  patients
undergoing hip and knee replacement surgery.

46.    Upon    information    and    belief,    Defendant    BAYER    PHARMA    AG    is
a pharmaceutical company domiciled in Germany.

47.    Defendant  BAYER  PHARMA  AG  is formerly  known  as Bayer Schering
Pharma AG and is the same corporate entity as Bayer Schering Pharma AG. Bayer Schering
Pharma AG is formerly known as Schering AG and is the same corporate entity as Schering AG.

48.    Upon  information  and  belief, Schering AG was renamed Bayer Schering Pharma
AG effective December 29, 2006.

49.    Upon information and belief, Bayer Schering Pharma AG was renamed BAYER PHARMA AG effective July 1, 2011.

50.    As part of its business, BAYER PHARMA AG is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

51.    Upon information and belief, Defendant, BAYER PHARMA AG, has transacted and conducted business in the State of Louisiana.

52.    Upon information and belief, Defendant, BAYER PHARMA AG, has derived substantial revenue from goods and products used in the State of Louisiana.

53.    Upon information and belief, Defendant, BAYER PHARMA AG, expected or should have expected  its acts to have consequence within the United States of America and the State of Louisiana,  and derived substantial  revenue from interstate commerce  within the United States and the State of Louisiana, more particularly.

54.    Upon information and belief, and at all relevant times, Defendant, BAYER PHARMA AG, was in the business of and did design, research, manufacture,  test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with  non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence  of DVT and/or PE, and for prophylaxis  of DVT for patients undergoing hip and knee replacement surgery.

55.    Upon information and belief, Defendant BAYER  CORPORATION  is an Indiana corporation  with its principal place of business at I 00 Bayer Road, Pittsburgh, Pennsylvania 15205.

56.    Upon information and belief, Defendant BAYER CORPORATION is the sole member of BAYER HEALTHCARE LLC, which owns 100% of Schering Berlin, Inc., which owns 100% of Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. As such, Defendant BAYER CORPORATION is a parent of Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC.

57.    At relevant times, Defendant BAYER CORPORATION was engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, its products, including the prescription drug Xarelto.

58.    At relevant times, Defendant BAYER CORPORATION conducted regular and sustained business in the State of Louisiana, by selling and distributing its products in the State of Louisiana and engaged in substantial commerce and business activity in the State of Louisiana.

59.    Upon information and belief, Defendant BAYER HEALTHCARE LLC is a limited liability company duly formed and existing under and by the virtue of the laws of the State of Delaware, with its principal place of business located in the State of New Jersey.

60.    Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC has transacted and conducted business in the State of Louisiana, and derived substantial revenue from interstate commerce.   Defendant BAYER CORPORATION is the sole member of Defendant BAYER HEALTHCARE LLC.

61.    Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC expected or should have expected that its acts would have consequences

within the United States of America and in the State of Louisiana, and derived substantial revenue from interstate commerce.

62.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

63.     Upon information and belief, Defendant BAYER HEALTHCARE AG is a company domiciled in Germany and is the parent/holding company of Defendants BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC, and BAYER PHARMA AG.

64.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG has transacted and conducted business in the State of Louisiana, and derived substantial revenue from interstate commerce.

65.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG expected or should have expected that its acts would have consequences within the United States of America, and in the State of Louisiana, and derived substantial revenue from interstate commerce.

66.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG exercises dominion and control CORPORATION, BAYER

HEALTHCARE     LLC, PHARMACEUTICALS, INC., and BAYER PHARMA AG. over Defendants BAYER HEALTHCARE.

67.     Upon information and belief, Defendant BAYER AG is a German chemical and pharmaceutical company that  is headquartered  in Leverkusen, North  Rhine-Westphalia, Germany.

68.     Upon information and belief, Defendant BAYER AG is the third largest pharmaceutical company in the world.

69.     Upon information and belief, and at all relevant times Defendant BAYER AG is the parent/holding company of all other named Defendants.

70.     Upon information and belief, at all relevant times, Defendant BAYER AG has transacted and conducted business in the State of Louisiana, and derived substantial revenue from interstate commerce.

71.     Upon information and belief, at all relevant times, Defendant BAYER AG expected or should have expected that its acts would have consequences within the United States of America, and in the State of Louisiana, and derived substantial revenue from interstate commerce.

72.     Upon information and belief, at all relevant times, Defendant BAYER AG was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

73.     At all relevant times, Defendants were in the business of and did design, research, manufacture, test, advertise, promote, market, sell and distribute Xarelto and rivaroxaban to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

74.     Defendants received FDA approval for Xarelto, also known as rivaroxaban, on or about July 1, 2011 for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries (NDA 022406).

75.     Defendants then received additional FDA approval for Xarelto to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation on or about November 4, 2011 (NDA 202439).

76.     The additional indication for treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE was added to the label on or about November 2, 2012.

77.     Defendants launched Xarelto in the United States (hereinafter referred to as the "U.S.") in or about 2011.

78.     Xarelto is an anticoagulant that acts as a Factor Xa inhibitor, and is available by prescription in oral tablet doses of 20mg, 15mg, and 1Om g.

79.     Approval of Xarelto for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries was based on a series of clinical trials known as the Regulation of Coagulation in 01thopedic Surgery to Prevent Deep Venous Thrombosis and Pulmonary Embolism studies (hereinafter referred to as the "RECORD" studies). The findings of the RECORD studies showed that rivaroxaban was superior to

enoxapann for thromboprophylaxis  after total knee and hip arthroplasty (based on the Defendants' definition),  accompanied  by similar rates of bleeding. However, the studies also showed a greater incidence with Xarelto of bleeding leading to decreased hemoglobin levels and transfusion  of  blood.  (Lassen,  M.R.,  et  al.  Rivaroxaban  versus  Enoxaparin  for Thromboprophylaxis after Total Knee Arthroplasty.  N.  Engl.  J.  Med.  2008;358:2776-86; Kakkar, A.K., et al. Extended duration rivaroxaban versus short-term enoxaparin for the prevention  of venous  thromboembolism  after  total  hip  arthroplasty:   a double-blind, randomised controlled trial. Lancet 2008;372:31-39;  Ericksson, B.I., et al. Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Hip Arthroplasty. N. Engl. J. Med. 2008;358:2765-75.)

80.    Approval of Xarelto for reducing  the  risk  of  stroke  and  systemic  embolism in patients with non-valvular atrial fibrillation in the U.S. was based on a clinical trial known as the  Rivaroxaban   Once   Daily   Oral   Direct   Factor   Xa   Inhibition  Compared   with Vitamin   K Antagonism  for Prevention  of Stroke and Embolism  Trial  in Atrial Fibrillation study (hereinafter  referred  to  as  "ROCKET  AF").    The study's  findings showed that rivaroxaban was non inferior to warfarin for the prevention of stroke or systemic embolism in patients with non-valvular atrial fibrillation, with a similar risk of major bleeding. However, "bleeding  from gastrointestinal  sites, including  upper, lower, and  rectal sites, occurred  more frequently  in the  rivaroxaban  group, as did  bleeding  that  led  to  a drop  in the  hemoglobin level or bleeding that required  transfusion." (Patel, M.R., et al. Rivaroxaban versus Warfarin in Nonvalvular Atrial Fibrillation. N. Engl. J. Med. 2011; 365:883-91.)

81.    Approval of Xarelto for the treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE in the U.S.  was  based  on  the  clinical  trials  known  as  the

EINSTEIN-DVT, EINSTEIN-PE, and EINSTEIN-Extension studies. The EINSTEIN-DVT study tested Xarelto versus a placebo, and merely determined that Xarelto offered an option for treatment of DVT, with obvious increased risk of bleeding events as compared to placebo. (The EINSTEIN Investigators. Oral Rivaroxaban for Symptomatic Venous Thromboembolism. N. Engl. J. Med. 2010; 363:2499-510). The EINSTEIN-Extension study confirmed that result. (Roumualdi, E., et al. Oral rivaroxaban after symptomatic venous thromboembolism: the continued treatment study (EINSTEIN-Extension study). Expert Rev. Cardiovasc. Ther. 2011; 9(7):841-844). The EINSTEIN-PE study's findings showed that a rivaroxaban regimen was non-inferior to the standard therapy for initial and long-term treatment of PE. However, the studies also demonstrated an increased risk of adverse events with Xarelto, including those that resulted in permanent discontinuation of Xarelto or prolonged hospitalization. (The EINSTEIN- PE Investigators. Oral Rivaroxaban for the Treatment of Symptomatic Pulmonary Embolism. N. Engl. J. Med. 2012; 366:1287-97.)

82. Defendants use the results of the ROCKET AF study, the RECORD studies, and the EINSTEIN studies to promote Xarelto in their promotional materials, including the Xarelto website, which tout the positive results of those studies. However, Defendants' promotional materials fail to similarly highlight the increased risk of gastrointestinal bleeding and bleeding that required transfusion, among other serious bleeding concerns.

83. Defendants market Xarelto as a new oral anticoagulant treatment alternative to warfarin (Coumadin), a long-established safe treatment for preventing stroke and systemic embolism, in 60 years. Defendants emphasize the supposed benefits of treatment with Xarelto over warfarin, which they refer to as the Xarelto Difference - namely, that Xarelto does not require periodic monitoring with blood tests and does not limit a patient's diet.

84.     However, in its Quarter Watch publication for the first quarter of the 2012 fiscal year, the Institute for Safe Medication Practices ("ISMP") noted that, even during the approval process, FDA "[r]eviewers also questioned the convenient once-a-day dosing scheme [of Xarelto], saying blood level studies had shown peaks and troughs that could be eliminated by twice-a-day dosing."

85.     Importantly, there is no antidote to Xarelto, unlike warfarin.     Therefore, in the event of hemorrhagic complications, there is no available reversal agent.     The original U.S. label approved when the drug was first marketed in the U.S. did not contain a warning regarding the lack of antidote, but instead only mentioned this impm1ant fact in the over dosage section.

86.     Defendants spent significant money in promoting Xarelto, which included at least $11,000,000.00 spent during 2013 alone on advertising in journals targeted at prescribers and consumers in the U.S. In the third quarter of the 2013 fiscal year, Xarelto was the number one pharmaceutical product advet1ised in professional health journals based on pages and dollars spent.

87.     As a result of Defendants' aggressive marketing efforts, m its first full year of being on the market, Xarelto garnered approximately $582 million in sales globally.

88.     Defendants' website for Xarelto claims that over seven million people worldwide have been prescribed Xarelto. In the U.S., approximately I million Xarelto prescriptions had been written by the end of 2013.

89.     During the Defendants' 2012 fiscal year, Xarelto garnered approximately $658 million in sales worldwide. Then, in 2013, sales for Xarelto increased even further to more

than clear the $1 billion threshold commonly referred to as "blockbuster" status in the pharmaceutical industry, ultimately reaching approximately $2 billion for the fiscal year. Thus, Xarelto is now considered the leading anticoagulant on a global scale in terms of sales.

90.     As part of their marketing of Xarelto, Defendants widely disseminated direct-to-consumer advertising campaigns that were designed to influence patients, including Plaintiffs decedent, to make inquiries to their prescribing physician about Xarelto and/or request prescriptions for Xarelto.

91.     In the course of these direct to consumer advertisements, Defendants overstated the efficacy of Xarelto with respect to preventing stroke and systemic embolism, failed to adequately disclose to patients that there is no drug, agent, or means to reverse the anticoagulation effects of Xarelto, and that such irreversibility could have permanently disabling, life-threatening and fatal consequences.

92.     On June 6, 2013, Defendants received an untitled letter from the FDA's Office of Prescription Drug Promotion (hereinafter referred to as the "OPDP") regarding its promotional material for the atrial fibrillation indication, stating that, "the print ad is false or misleading because it minimizes the risks associated with Xarelto and makes a misleading claim" regarding dose adjustments, which was in violation of FDA regulations. The OPDP thus requested that Defendants immediately cease distribution of such promotional material.

93.     Prior to Plaintiff's prescription of Xarelto, she became aware of the promotional materials described herein.

94.     Prior to Plaintiff's prescription of Xarelto, her prescribing physician received promotional materials and information from sales representatives of Defendants that Xarelto

was just as effective as warfarin in reducing strokes in patients with non-valvular atrial fibrillation, as well as preventing DVT/PE in patients with prior history of DVT/PE or after undergoing hip or knee replacement surgery, and was more convenient, without also adequately informing prescribing physicians that there was no reversal agent that could stop or control bleeding in patients taking Xarelto.

95.    At all times relevant hereto, Defendants also failed to warn emergency room doctors, surgeons, and other critical care medical professionals that unlike generally-known measures taken to treat and stabilize bleeding in users of warfarin, there is no effective agent to reverse the anticoagulation effects of Xarelto, and therefore no effective means to treat and stabilize patients who experience uncontrolled bleeding while taking Xarelto.

96.    At all times relevant to this action, The Xarelto Medication Guide, prepared and distributed by Defendants and intended for U.S. patients to whom Xarelto has been prescribed, failed to warn and disclose to patients that there is no agent to reverse the anticoagulation effects of Xarelto and that if serious bleeding occurs, it may be irreversible, permanently disabling, life-threatening and/or fatal.

97.    In the year leading up to or about June 30, 2012, there were 1,080 Xarelto- associated "Serious Adverse Event" ("SAE") Medwatch reports filed with the FDA, including at least 65 deaths. Of the reported hemorrhage events associated with Xarelto, 8% resulted in death, which was approximately two fold the risk of a hemorrhage-related death with warfarin.

98.    At the close of the 2012 fiscal year, a total of 2,081 new Xarelto-associated SAE reports were filed with the FDA in its first full year on the market, ranking tenth among

other pharmaceuticals in direct reports to the FDA. Of those reported events, 151 resulted in death, as compared to only 56 deaths associated with warfarin.

99.     The ISMP referred to these SAE figures as constituting a "strong signal" regarding the safety of Xarelto, defined as "evidence of sufficient weight to justify an alert to the public and the scientific community, and to warrant further investigation."

100.    Of particular note, in the first quarter of 2013, the number of reported serious adverse events associated with Xarelto (680) overtook that of Pradaxa (528), another new oral anticoagulant, which had previously ranked as the number one reported drug in terms of adverse events in 2012.

101.    Moreover, on a global scale, in the first eight months of 2013, German regulators received 968 Xarelto-related averse event reports, including 72 deaths, as compared to a total of 750 reports and 58 deaths in 2012.

102.    Despite the clear signal generated by the SAE data, Defendants failed to either alert the public and the scientific community, or perform further investigation into the safety of Xarelto.

103.    Defendants original, and in some respects current labeling and prescribing information for Xarelto:

(a) failed to investigate, research, study and define, fully and adequately, the safety profile of Xarelto;

(b) failed to provide adequate warnings about the true safety risks associated with the use of Xarelto;

(c) failed to provide adequate warning regarding the pharmacokinetic and pharmacodynamic variability of Xarelto and its effects on the degree of anticoagulation in a patient;

(d) failed to provide adequate warning that it is difficult or impossible to assess the degree and/or extent of anticoagulation in patients taking Xarelto;

(e) failed to disclose in the "Warnings" Section that there is no drug, agent or means to reverse the anticoagulation effects of Xarelto;

(f) failed to advise prescribing physicians, such as the Plaintiffs mother's physician, to instruct patients that there was no agent to reverse the anticoagulant effects of Xarelto;

(g) failed to provide adequate instructions on how to intervene and/or stabilize a patient who suffers a bleed while taking Xarelto;

(h) failed to provide adequate warnings and information related to the increased risks of bleeding events associated with aging patient populations of Xarelto users;

(i) failed to provide adequate warnings regarding the increased risk of gastrointestinal bleeds in those taking Xarelto, especially, in those patients with a prior hertory of gastrointestinal issues and/or upset;

(j) failed to provide adequate warnings regarding the increased risk of suffering a bleeding event, requiring blood transfusions in those taking Xarelto;

(k) failed to provide adequate warnings regarding the need to assess renal functioning prior to starting a patient on Xarelto and to continue testing and monitoring of renal functioning periodically while the patient is on Xarelto·

(l) failed to provide adequate warnings regarding the need to assess hepatic functioning prior to starting a patient on Xarelto and to continue testing and monitoring of hepatic functioning periodically while the patient is on Xarelto;

(m) failed to include a "BOXED WARNING" about serious bleeding events associated with Xarelto;

(n) failed to include a "BOLDED WARNING" about serious bleeding events associated with Xarelto; and

(o) in their "Medication Guide" intended for distribution to patients to whom Xarelto has been prescribed, Defendants failed to disclose to patients that there is no drug, agent or means to reverse the anticoagulation effects of Xarelto and that if serious bleeding occurs, such irreversibility could have permanently disabling, life-threatening or fatal consequences.

104.    During the years since first marketing Xarelto in the U.S., Defendants modified the U.S. labeling and prescribing information for Xarelto, which included additional information regarding the use of Xarelto in patients taking certain medications. Despite being aware of: (I) serious, and sometimes fatal, irreversible bleeding events associated with the use of Xarelto; and (2) 2,081 SAE Medwatch reports filed with the FDA in 2012 alone, including at least 151 deaths, Defendants nonetheless failed to provide adequate disclosures or warnings in their label as detailed in Paragraphs 101 (a-o).

105.    Prior to applying for and obtaining approval of Xarelto, Defendants knew or should have known that consumption of Xarelto was associated with and/or would cause the induction of life-threatening bleeding, and Defendants possessed at least one clinical scientific study, which evidence Defendants knew or should have known was a signal that life- threatening bleeding risk needed further testing and studies prior to its introduction to the market.

106.    Upon information and belief, despite life-threatening bleeding findings in a clinical trial and other clinical evidence, Defendants failed to adequately conduct and complete proper testing of Xarelto prior to filing their New Drug Application for Xarelto.

107.    Upon information and belief, from the date Defendants received FDA approval to market Xarelto, Defendants made, distributed, marketed, and sold Xarelto without adequate warning to Plaintiff's mother's prescribing physicians or Plaintiff's decedent that Xarelto was associated with and/or could cause life-threatening bleeding, presented a risk of life- threatening bleeding in patients who used it, and that Defendants had not

adequately conducted complete and proper testing and studies of Xarelto with regard to severe side effects, specifically life-threatening bleeding.

108.   Upon information and belief, Defendants concealed and failed to completely disclose their knowledge that Xarelto was associated with or could cause life-threatening bleeding as well as their knowledge that they had failed to fully test or study said risk.

109.   Upon information and belief, Defendants ignored the association between the use of Xarelto and the risk of developing life-threatening bleeding.

110.   Defendants' failure to disclose information that they possessed regarding the failure to adequately test and study Xarelto for life-threatening bleeding risk further rendered warnings for this medication inadequate.

111.   By reason of the foregoing acts and omissions, Plaintiff was caused to suffer from uncontrolled internal and rectal bleeding.

112.   By reason of the foregoing acts and omissions, Plaintiff has suffered injuries including pain and suffering, emotional and mental anguish, medical expenses, and other economic and non-economic damages as a result of the actions and inactions of the Defendants.

## FIRST CAUSE OF ACTION
## CONSTRUCTION OR COMPOSITION DEFECT NDER LA. R.S. 9:2800.55
## (PRODUCTS LIABILITY)

113.   Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

114.   At all times material to this action, Defendants were engaged in the business of designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling Xarelto.

115.   At all times material to this action, Xarelto was expected to reach, and did reach, consumers in the State of Louisiana and throughout the United States, including Plaintiffs decedent herein without substantial change in the condition in which it was sold.

116.   At all times material to this action, Xarelto was designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by Defendants in a defective and unreasonably dangerous condition at the time it was placed in the stream of commerce in ways which include, but are not limited to, one or more of the following particulars:

a.   When placed in the stream of commerce, Xarelto contained manufacturing defects which rendered the subject product unreasonably dangerous;

b.   The subject product's manufacturing defects occurred while the product was in the possession and control of the Defendants;

c.   The subject product was not made in accordance with the Defendants' specifications or performance standards; and

d.   The subject product's manufacturing defects existed before it left the control of the Defendants.

117.   The subject product manufactured and/or supplied by Defendants was defective in construction or composition in that, when it left the hands of Defendants, it deviated in a material way from Defendants' manufacturing performance standards and/or it differed from otherwise identical products manufactured to the same design formula. In particular,

the product is not safe, has numerous and serious side effects and causes severe and permanent injuries and/or death.   The product was unreasonably dangerous in construction or composition as provided by La. R.S. 9:2800.55.

118.   As a result of the foregoing acts and omissions, Plaintiffs decedent was caused to suffer serious and dangerous side effects including but not limited to, life-threatening bleeding, as well as other severe and personal injuries and caused her to sustain financial expenses for hospitalization and medical care.

119.   As a result of the foregoing acts and omissions, Plaintiffs decedent suffered and died, and incurred both general and special damages, including medical expenses and other economic and non-economic damages.

## SECOND CAUSE OF ACTION
## DESIGN DEFECT UNDER LA. R.S. 9:2800.56
## (PRODUCTS LIABILITY)

120.   Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

121.   Xarelto is defective in its design or formulation in that it is not reasonably fit, suitable, or safe for its intended purpose and/or its foreseeable risks exceed the benefits associated with its design and formulation.   The subject product was unreasonably dangerous in design as provided by La. R.S. 9:2800.56.

122.   At all times material to this action, Xarelto was expected to reach, and did reach, consumers in the State of Louisiana and throughout the United States, including Plaintiff herein, without substantial change in the condition in which it was sold.

123.    At    all    times    material    to    this    action,    Xarelto    was    designed,
developed,  manufactured,  tested,  packaged,  promoted,  marketed, distributed,  labeled, and/or
sold  by Defendants   in a defective and unreasonably  dangerous condition  at the time it was
placed in the stream of commerce in ways which include, but are not limited to, one or more of
the following particulars:

a.    When  placed  in  the  stream  of  commerce,  Xarelto  contained  unreasonably
dangerous  design  defects  and  was  not  reasonably  safe  as  intended  to  be  used,
subjecting  Plaintiffs decedent  to  risks that  exceeded  the  benefits  of  the subject
product, including but not limited to permanent personal injuries and/or death;

b.    When  placed  in  the  stream  of  commerce,  Xarelto  was  defective  in  design
and  formulation,   making  the  use  of  Xarelto  more dangerous  than  an  ordinary
consumer  would  expect,  and  more  dangerous  than  other  risks  associated  with
the  other medications and similar drugs on the market;

c.    Xarelto's design defects existed before it left the control of the Defendants;

d.    Xarelto was insufficiently tested;

e.    Xarelto caused harmful side effects that outweighed any potential utility; and

f.    Xarelto  was  not  accompanied  by  adequate  instructions  and/or  warnings
to fully   apprise   consumers, including   Plaintiff's decedent  herein,  of   the
full nature   and extent  of  the risks  and side effects  associated  with its use,
thereby  rendering Defendants liable to Plaintiff.

124.    The  Xarelto  designed,  researched, manufactured, tested,  advertised,  promoted,
marketed,  sold  and  distributed by Defendants was  defective in design  and/or  formulation, in
that, when  it left the hands  of  the  Defendants, manufacturers, and /or suppliers, it was
unreasonably dangerous, and it was more dangerous than an ordinary  consumer would expect.

125.    At  all  times  herein  mentioned,  Xarelto  was  in  a  defective  condition  and
unsafe, and Defendants knew  or had  reason  to  know  that  said  product  was  defective  and
unsafe, especially when used in the form and manner  as provided  by the Defendants.

126.    Defendants knew, or should have known that at all times herein mentioned, their Xarelto was in a defective condition, and was and is inherently dangerous and unsafe.

127.    At the time of Plaintiff's use of Defendants' defective product, Xarelto was being used for the purposes and in a manner normally intended , namely to reduce the risk of stroke and systemic embolism in patients with non valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

128.    Defendants, with this knowledge, voluntarily designed Xarelto in a dangerous condition for use by the public, and in particular the Plaintiff's decedent.

129.  Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

130.  Defendants created a product unreasonably dangerous for its normal, intended use.

131.   The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was manufactured defectively in that Xarelto left the hands of Defendants in a defective condition and was unreasonably dangerous to its intended users.

132.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Xarelto was manufactured.

133.     In addition,  at the time  the subject  product  left the control  of the Defendants,  there  were  practical  and  feasible  alternative  designs  that  would  have  prevented  and/or  significantly reduced the risk of Plaintiff's injuries without impairing the reasonably  anticipated  or intended  function  of the  product.   These  safer  alternative  designs were  economically  and  technologically  feasible,  and would  have  prevented or significantly reduced the risk of  Plaintiff's injuries without substantially  impairing the product's  utility.

134.     The Plaintiff could  not,  by  the  exercise  of  reasonable  care,  have  discovered  Xarelto's  defects herein mentioned and perceived its danger.

135.     Said  defects  in  Defendants'  drug  Xarelto  were  a  substantial  factor  in  causing Plaintiff's injuries.

136.     As  a  result  of  the  foregoing  acts  and  omissions,  Plaintiff  was caused  to  suffer  serious  and  dangerous  side  effects  including  but  not  limited  to,  life- threatening  bleeding,  as  well  as  other  severe  and  personal  injuries physical  pain and mental  anguish,  and financial  expenses  for hospitalization and medical  care.

137.     As a result of the foregoing acts and omissions, Plaintiff suffered and incurred  damages, including medical  expenses  and  other  economic  and  non- economic damages.

### THIRD CAUSE OF ACTION
### INADEQUATE WARNING UNDER LA. R.S. 9:2800.57
### (PRODUCTS LIABILITY)

138.     Plaintiff  repeats,  reiterates  and  re-alleges  each  and  every  allegation  of this  Complaint  contained  in  each  of  the  foregoing  paragraphs  inclusive,  with  the  same force  and effect as if more fully set forth herein.

139.    Xarelto was defective and unreasonably dangerous when it left the possession of the Defendants in that it contained warnings insufficient to alert consumers, including Plaintiff and her health care providers, of the dangerous risks and reactions associated with the subject product, including but not limited to its propensity to cause permanent physical injuries and fatal side effects, notwithstanding the Defendants' knowledge of an increased risk of these injuries and fatal side effects. Thus, the subject product was unreasonably dangerous because an adequate warning was not provided as provided pursuant to La. R.S. 9:2800.57.

140.    The subject product manufactured and supplied by Defendants was defective due to inadequate post-marketing warning or instruction because, after Defendants knew or should have known of the risk of serious bodily harm from the use of the subject product, Defendants failed to provide an adequate warning to consumers and/or their health care providers of the defects of the product, and/or alternatively failed to conform to federal and/or state requirements for labeling, warnings and instructions, or recall, while knowing that the product could cause serious injury.

141.    Plaintiff was prescribed and used the subject product for its intended purpose.

142.    Plaintiff could not have discovered any defect in the subject product through the exercise of reasonable care.

143.    The Defendants, as manufacturers and/or distributors of the subject prescription product, are held to the level of knowledge of an expert in the field.

144.    The warnings that were given by the Defendants were not accurate, clear and/or were ambiguous.

145.    The warnings that were given by the Defendants failed to properly warn physicians of the increased risks of permanent physical injuries and fatal side effects.

146.    Plaintiff, individually and through her prescribing physician(s), reasonably relied upon the skill, superior knowledge and judgment of the Defendants.

147.    The Defendants had a continuing duty to warn Plaintiff and her treating physicians of the dangers associated with the subject product.

148.    Had Plaintiff and/or her treating physicians received adequate warnings regarding the risks of the subject product, she would not have used it.

149.    As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous side effects including but not limited to, life-threatening bleeding, as well as other severe and personal injuries and caused her to sustain financial expenses for hospitalization and medical care.

150.    As a result of the foregoing acts and omissions, Plaintiff suffered and incurred damages, including medical expenses and other economic and non-economic damages.

**FOURTH CAUSE OF ACTION**
**BREACH OF EXPRESS WARRANTY UNDER LA. R.S. 9:2800.58**
**(PRODUCTS LIABILITY)**

151.    Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

152.    At all times herein mentioned, the Defendants manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted and sold Xarelto and/or have recently acquired the Defendant who have manufactured, compounded, portrayed,

distributed, recommended, merchandized, advertised, promoted and sold Xarelto, to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

153.   Defendants expressly represented to Plaintiff, other consumers, and the medical community that Xarelto was safe and fit for its intended purposes, was of merchantable quality, did not produce any dangerous side effects, and had been adequately tested.

154.   Xarelto does not conform to Defendants' express representations because it is not safe, has numerous and serious side effects and causes severe and permanent injuries and death.

155.   At the time of the making of the express warranties, Defendants knew or should have known of the purpose for which the subject product was to be used and warranted the same to be, in all respects, fit, safe, and effective and proper for such purpose.    The subject product was unreasonably dangerous because it failed to    conform to an express warranty of the defendants as provided by La. R.S. 9:2800.58.

156.   At the time of the making of the express warranties, Defendants knew or should have known that, in fact, said representations and warranties were false, misleading, and untrue in that the subject product was not safe and fit for its intended use and, in fact, produces serious injuries and/or death to the user.

157.   At all relevant times Xarelto did not perform as safely as an ordinary consumer and the medical community would expect, when used as intended or in a reasonably foreseeable manner.

158.    Plaintiff, other consumers, and the medical community relied upon Defendants' express warranties.

159.    Members of the medical community, including physicians and other healthcare professionals, relied upon the representations and warranties of the Defendants for use of Xarelto in recommending, prescribing, and/or dispensing Xarelto.

160.    The Defendants herein breached the aforesaid express warranties, as their drug Xarelto was defective.

161.    Defendants expressly represented to Plaintiff and her physicians, healthcare providers, and/or the FDA that Xarelto was safe and fit for use for the purposes intended, that it was of merchantable quality, that it did not produce any dangerous side effects in excess of those risks associated with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, that the side effects it did produce were accurately reflected in the warnings and that it was adequately tested and fit for its intended use.

162.    Defendants knew or should have known that, in fact, said representations and warranties were false, misleading and untrue in that Xarelto was not safe and fit for the use intended, and , in fact, produced serious injuries and/ or death to the users that were not accurately identified and represented by Defendants.

163.    As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous side effects including but not limited to, life-threatening bleeding,

as well as other severe and personal injuries and caused her to sustain financial expenses for hospitalization and medical care.

164.    As a result of the foregoing breaches, Plaintiff suffered and incurred damages, including medical expenses and other economic and non-economic damages.

## FIFTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY AND FITNESS

165.    Plaintiff  repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

166.    The Defendants impliedly represented and warranted to the users of Xarelto and their physicians, healthcare providers, and/or the FDA that Xarelto was safe and of merchantable quality and fit for the ordinary purpose for which said product was to be used.

167.    At all relevant times, Defendants knew of the use for which Xarelto was intended and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

168.    Defendants were aware that consumers, including Plaintiff, would use Xarelto in the manner intended.

169.    Plaintiff and the medical community reasonably relied upon the judgment and sensibility of Defendants to sell Xarelto only if it was indeed of merchantable quality and safe and fit for its intended use.

170.    Defendants breached the implied warranty to consumers, including Plaintiff, as Xarelto was not of merchantable quality or safe and fit for its intended use.

171.    Consumers, including Plaintiff and the medical community, reasonably relied upon Defendants' implied warranty for Xarelto.

172.   Xarelto reached consumers, including Plaintiff, without substantial change in the condition in which it was manufactured and sold by Defendants.

173.   That said representations and warranties aforementioned were false, misleading, and inaccurate in that Xarelto was unsafe, unreasonably dangerous, improper, not of merchantable quality, and defective.

174.   Plaintiff and her physicians and healthcare professionals reasonably relied upon the skill and judgment of Defendants as to whether Xarelto was of merchantable quality and safe and fit for its intended use.

175.   Xarelto was injected into the stream of commerce by the Defendants in a defective, unsafe, and inherently dangerous condition and the products and materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

176.   The Defendants herein breached the aforesaid implied warranties, as their drug Xarelto was not fit for its intended purposes and uses.

177.   As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous side effects including but not limited to, life-threatening bleeding, as well as other severe and personal injuries, pain and suffering and caused her to sustain financial expenses for hospitalization and medical care.

178.   As a result of the foregoing acts and omissions, Plaintiff suffered and incurred damages, including medical expenses and other economic and non-economic damages.

## SIXTH CAUSE OF ACTION
## REDHIBITION

179.   Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

180.   The subject product contains a vice or defect which renders it useless or its use so inconvenient that buyers would not have purchased it.

181.   Defendants sold and promoted Xarelto, which Defendants placed into the stream of commerce.   Under Louisiana law, the seller warrants the buyer against redhibitory defects, or vices, in the thing sold. La. C.C. art. 2520.   The subject product, sold and promoted by Defendants, possesses a redhibitory defect because it was not manufactured and marketed in accordance with industry standards and/or is unreasonably dangerous, as described above, which renders the subject product useless or so inconvenient that it must be presumed that a buyer would not have bought the subject product had he known of the defect.   Pursuant to La. C.C. art. 2520, Plaintiff is entitled to obtain a rescission of the sale of the subject product.

182.   The subject product alternatively possesses a redhibitory defect because the subject product was not manufactured and marketed in accordance with industry standards and/or is unreasonably dangerous, as described above, which diminishes the value of the subject product so that it must be presumed that a buyer would still have bought it but for a lesser price. In this instance, Plaintiff is entitled to a reduction of the purchase price.

183.   Defendants are liable as bad faith sellers for selling a defective product with knowledge of the defect, and thus, are liable to Plaintiff for the price of the subject product, with interest from the purchase date, as well as reasonable expenses occasioned by the

sale of the subject product, and attorneys' fees.   As the manufacturer of the subject product, under Louisiana law, Defendants are deemed to know that Xarelto possessed a redhibitory defect.  La. C.C. art. 2545.

184.    As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous side effects including but not limited to, life-threatening bleeding, as well as other severe and personal injuries and caused her to sustain financial expenses for hospitalization and medical care.

185.    As a result of the product's redhibitory defects, Plaintiff suffered and incurred damages, including medical expenses and other economic and non-economic damages.

186.    By reason of the foregoing, Plaintiff suffered injuries and damages as alleged herein and incurred attorneys' fees which she is entitled to recover from Defendants.

## SEVENTH CAUSE OF ACTION
## BREACH OF WARRANTY OF FITNESS FOR ORDINARY USE

187.    Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

188.    In addition to warranting against redhibitory defects, Defendants warranted that the subject produce is reasonably fit for its ordinary and intended use.  La. C.C. art. 2524.

189.    The subject product is not safe, has numerous and serious side effects and causes severe and permanent injuries and death.   As a result, Defendants' drug is unfit and inherently dangerous for ordinary use.

190.   As a direct and proximate result of Defendants' actions, Plaintiff sustained  serious, significant  and  permanent  injuries.    In addition, Plaintiff was required to incur substantial medical and hospital expenses.

191.   Plaintiff's direct  medical  losses  and  costs  included  care  for hospitalization, physician care, monitoring,  treatment,  medications and supplies.

192.   By  reason  of  the  foregoing,  Plaintiff  has  suffered  injuries  and  damages  as alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, the heirs of Plaintiff, EMMA PHILLIPS, Collins C. Phillips, Jr. and Lisa C. Phillip,s demand judgment against the Defendants on each of the above-referenced claims and Causes of Action, as follows:

1.   Awarding   compensatory   damages   in   excess   of   the   jurisdictional minimum for this Court;

2.   Awarding  economic  damages  in  the  form  of  medical  expenses,  out  of pocket expenses, and other economic  damages  in an amount to be determined at  trial of this action;

3.   Pre-judgment interest;

4.   Post-judgment interest;

5.   Awarding Plaintiff reasonable attorneys' fees;

6.   Awarding Plaintiff the costs of these proceedings; and

7.   Such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff, EMMA PHILLIPS', heirs Collins C. Phillips, Jr. and Lisa C. Phillips are entitled

to and hereby demands trial by jury as to all issues.


July 1, 2015


Respectfully submitted,
/s/ Anthony D. Irpino

_____
ANTHONY D. IRPINO (#24727)
LOUISE C. HIGGINS (#31780)
PEARL A. ROBERTSON (#34060)
Irpino Law Firm
2216 Magazine St.
New Orleans, Louisiana 70130
Telephone: (504) 525-1500
Facsimile: (504) 525-1501
airpino@irpinolaw.com
lhiggins@irpinolaw.com
probertson@irpinolaw.com

ATTORNEYS FOR PLAINTIFFS