UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | * MDL NO. 2592 <br> * <br> * <br> * SECTION L <br> * <br> * JUDGE ELDON E. FALLON <br> * <br> * MAG. JUDGE NORTH <br> * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

THIS DOCUMENT RELATES TO: ALL ACTIONS

### DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR POSITION ON DOCUMENT PRODUCTION ISSUES

Defendants respectfully submit this brief in support of a February 26, 2016 document production deadline, as set out in section 2(e) of Defendants' proposed CMO 2.

### INTRODUCTION

The parties have made progress towards reaching an agreement on CMO 2, but an impasse remains with regard to Defendants' document production deadline. Plaintiffs ask for a January 15, 2016 deadline; Defendants propose February 26, 2016. Further, Defendants propose the creation of a modest infrastructure that will be needed for the document production to meet that date. Plaintiffs oppose any infrastructure. The question presented here is which approach is viable and fair.

Defendants recognize that the Court suggested a January 2016 completion date, but the Court has asked the parties to submit an order on consent, and Defendants cannot in good conscience consent to a January 2016 completion date knowing that even with their best efforts, they would be unable to meet that deadline. In Defendants' view, consent suggests a belief that compliance with a January 2016 deadline is feasible. We cannot mislead the Court by agreeing to do something beyond our capability. As explained below, and as is supported by the attached

1

declarations of Timothy S. Coon, a January 2016 deadline is simply not mathematically possible, particularly without the creation of a structure around the limitations that the Court adopted at the July 9, 2015 Case Management Conference ("CMC").

At the CMC, the Court limited discovery of the Defendants to 120 custodial files, 25 non-custodial files and the files of up to 40 detail representatives. The Court also indicated that there was a presumptive production target of 5 million pages a month. Based on file size estimates from this litigation and others, this could require the production of another 60 million pages of documents in addition to the over 30 million pages that Defendants already have produced. Under Plaintiffs' proposed January 15, 2016 deadline, Defendants would have just six months to produce those additional pages. In other words, Defendants would have to produce an average of over 10 million pages *per month* to comply. That is not viable. Defendants will use their best efforts to go beyond the Court's 5-million-page production target, but even that pace is, to Defendants' knowledge, already higher than any pharmaceutical MDL in history.

Defendants' proposal includes two provisions that make compliance with a February 26, 2016 completion date at least possible. First, it provides for six weeks more. Second, Defendants propose that CMO 2 include presumptive dates by which additional custodians for production be identified, provisions ensuring that the Court's order is not undermined by discovery requests launched by Plaintiffs from other venues, and safety valves for both sides if events make the assumptions underpinning the order untenable. By contrast, Plaintiffs propose a system that would allow them virtually unfettered discretion to identify large numbers of new document collections on a timeframe that would make that production impossible under the deadlines beings discussed. That is plainly unworkable.

The infrastructure that Defendants propose is consistent with the Federal Rules, which provide that district courts "*must* limit the frequency or extent of discovery" that would otherwise be allowed when "the burden or expense of the proposed discovery outweighs its likely benefit" in light of "the needs of the case, the amount in controversy, the party's resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(2)(C)(iii) (emphasis added); *see also* Amended Rule 26(b)(1) (expected to take effect on December 1, 2015 and expressly requiring that discovery be "proportional to the needs of the case"). If Plaintiffs want the early trial date that they seek, then the amount of discovery provided and the process by which it is provided must be tailored to fit their objective.

Defendants could consent to a schedule with a February 26, 2016 document production completion date if the Court adheres to the discovery limitations it laid out at the July 9, 2015 conference and creates the infrastructure described above that would govern the timing of the identification of any new custodians and ensure that the PEC does not undermine this Court's discovery obligations by taking different positions in other venues. Even at that, a February 26, 2016 cut-off will be very ambitious; that date leaves no margin for error, and in our experience, there are usually unanticipated and unavoidable complications in document productions. But at least it would be within the realm of possibility to comply if all went smoothly.

For those reasons, more fully explained below, the Court should allow Defendants until February 26, 2016, to complete document production.

**ARGUMENT**

I.   **DESPITE DEFENDANTS' BEST EFFORTS, A JANUARY 2016 DEADLINE IS NOT FEASIBLE.**

Defendants have made not only a good faith, but a Herculean effort to get documents produced in this litigation as quickly and efficiently as possible. Indeed, even before Plaintiffs served discovery requests, Defendants spent more than five months collecting, reviewing, and producing documents contained in the companies' IND and NDA files—*i.e.*, the core documents produced in nearly every pharmaceutical litigation. That initial production totaled more than 28 million pages of documents. *See* July 6, 2015 Declaration of Timothy S. Coon ("July 6, 2015 Coon Decl.") (attached as Exhibit 1) ¶¶ 5–6; July 21, 2015 Supplemental Declaration of Timothy S. Coon ("July 21, 2015 Coon Decl.") (attached as Exhibit 2) ¶ 2. Moreover, Defendants early on began to identify, collect, and process documents for dozens of employees who have had significant involvement with Xarelto, and began to produce documents on a rolling basis for certain custodians and non-custodial databases. *See* July 6, 2015 Coon Decl. ¶¶ 6–7; July 21, 2015 Coon Decl. ¶¶ 4, 9. Today, Defendants have ramped up production to an average of 5 million pages per month—an average of 2.5 million pages each, for both Janssen and Bayer—a rate that Defendants are committed to sustaining or exceeding, subject to the occasional, unavoidable glitches that are sure to arise along the way. *See* July 6, 2015 Coon Decl. ¶ 9. That pace of five million pages per month is a pace that, to Defendants' knowledge, no other pharmaceutical MDL defendant has ever achieved. *See* July 6, 2015 Coon Decl. ¶ 9 & n.1; July 21, 2015 Coon Decl. ¶ 2.

That is no small feat. And it is no accident: Defendants have devoted unprecedented resources to producing documents expeditiously. As explained in the accompanying declarations of Timothy S. Coon, who has considerable experience with MDL document productions and

leads Defendants' document production efforts in this litigation, Defendants have amassed a document production team that, to their knowledge, is unparalleled in pharmaceutical litigation:

- They have hired over 320 lawyers whose sole job is to effectuate the document production in this case. This document production team, if it were a separate law firm, is the equivalent of a large law firm in the United States, all devoted to two clients and a single matter: document production in the Xarelto MDL. July 6, 2015 Coon Decl. ¶ 8; July 21, 2015 Coon Decl. ¶ 17.

- The 320 lawyers retained for the purpose of this document production understates the manpower devoted to the project. The number excludes the supervisory personnel at Defendants' outside law firms who oversee the project. The number also excludes the large number of professional document production personnel devoted to the project by Defendants' outside document production vendors. July 6, 2015 Coon Decl. ¶ 8; July 21, 2015 Coon Decl. ¶ 17.

- Just through May 2015, Defendants had already spent more than $7 million on document production alone and expect to spend tens of millions of more. July 6, 2015 Coon Decl. ¶ 8.

- With the enormous resources devoted by Defendants, they will be able to produce, on average, 5 million pages of documents per month—an average of 2.5 million pages per company. *To our knowledge, this level of effort and rate of production is unprecedented and has never been duplicated in any other pharmaceutical MDL. Id.* ¶ 9; July 21, 2015 Coon Decl. ¶ 2.

But despite the significant resources that Defendants have devoted to producing documents in this litigation, it simply is not possible to get all of the work done by the end of January 2016—much less by January 15, 2016, as Plaintiffs propose. It's not posturing; the math just doesn't work.

The Court concluded at the CMC that Defendants should produce documents from 120 corporate custodians, 25 non-custodial databases and departmental files, and up to 40 detail representatives—all of which is more than Defendants originally proposed. Defendants already have produced some custodial and non-custodial collections already (not including the NDA and INDs) and, based on the size of those productions, estimate that production of the remaining 128 custodial and non-custodial files will involve production of another approximately 60 million

pages of documents in addition to the 37 million pages that Defendants already have produced.[1] *See* July 21, 2015 Coon Decl. ¶¶ 3–4.  As a mathematical matter, producing those 60 million pages within the next six months would require Defendants to produce significantly more pages each month than the record average of five million pages that they are already producing.  *See id.* ¶ 4.  Defendants cannot reasonably add more staff and resources to the project; the time and effort needed to hire, train, and supervise new reviewers would divert time from managing the ongoing production, and would slow down rather than speed up the process.  *See* July 6, 2015 Coon Decl. ¶ 10; July 21, 2015 Coon Decl. ¶ 17.[2]

In short, it simply is not possible for Defendants to produce by the end of January 2016 all of the documents that the parties substantially agree should be produced.

## II. PLAINTIFFS' PROPOSED CMO 2 IS PARTICULARLY UNWORKABLE BECAUSE IT FAILS TO PROVIDE AN INFRASTRUCTURE TO GOVERN HOW OR WHEN THEY MUST IDENTIFY DOCUMENTS TO BE PRODUCED.

Plaintiffs' proposal is problematic not only because it provides for a January 15, 2016 production deadline, but also because it lacks common-sense infrastructure necessary in a

---

[1] Defendants have endeavored to give their best estimates of anticipated file sizes—and, relatedly, when the total volume of documents could be produced—but these numbers are just that at this point: estimates.  Plaintiffs have asked the Court to require Defendants "to certify at the conclusion of the production of each custodial file production that all responsive documents within that custodian's custodial file have been produced," (Pls.' Proposed CMO 2 ¶ 3(d)), but Defendants cannot agree to that proposal at this time without better information about the size of the files of the particular custodians that Plaintiffs designate and the procedures that will be used. Again, Defendants will make best efforts to produce even more than their 5 million page per month average.

[2] In other words, the addition of more resources is not necessarily linear.  More reviewers would require Defendants "to substantially increase the size of their supervisory and senior QC staff as well, and divert resources from the current review work to get additional reviewers trained and efficiently reviewing documents." July 6, 2015 Coon Decl. ¶ 10; *see also* July 21, 2015 Coon Decl. ¶ 17.  That approach "would result in so many management and supervision issues that it would be impractical." July 6, 2015 Coon Decl. ¶ 10.

document production of this magnitude. The absence of such an infrastructure imposes additional, undue burdens on Defendants and will make the entire system topple.

Plaintiffs have agreed that certain discovery limits are essential to allow for a trial to proceed on a September 2016 schedule—in particular, both sides now agree about the number of files to be produced (*see* Pls.' Proposed CMO 2 § 3(a); Defs.' Proposed CMO 2 § 2(a))—but Plaintiffs refuse to provide for any rules to give structure to those agreed-upon limits. That is particularly problematic because if Defendants are reasonably going to be able to make even a February 26, 2016 deadline, there will need to be procedures in place that assure that Defendants will not be slowed down by late designation of custodians, changes in search terms, or shifting priorities.

      A.    **Plaintiffs' Proposal Fails To Address How Additional Custodians Will Be Selected.**

Given the tightness of the schedule, there need to be deadlines by which Plaintiffs are required to select which files they want produced, and limitations on the number of times they can change their mind or change their priorities. *See* July 6, 2015 Coon Decl. ¶¶ 21–27; July 21, 2015 Coon Decl. ¶¶ 5–7. Even with the agreed-upon limits described above, Plaintiffs seek an enormous amount of information: Defendants expect that the custodial files to be reviewed will contain, on average, the equivalent of about 500,000 pages of documents. *See* July 6, 2015 Coon Decl. ¶ 23; July 21, 2015 Coon Decl. ¶ 4. The step of identifying and collecting the source materials, processing the materials for review, and then creating the actual production set—*i.e.*, all of the pre-review sets—could take several weeks for each custodial file and non-custodial file set. *See* July 6, 2015 ¶ 21; July 21, 2015 Coon Decl. ¶ 10. Except on rare occasions, it simply is not possible to receive a request for a particular source file and then have it produced within 30 days. *See* July 6, 2015 Coon Decl. ¶ 21. In light of that reality, and to aid the expedited schedule

7

that is contemplated, Defendants have provided Plaintiffs with substantial information—and have already begun to process, without Plaintiffs' designation, the files of custodians who are the most knowledgeable about Xarelto—to try to assist them in understanding the enormous volume of material so that both sides can work quickly to identify and collect the necessary information. *See id.* ¶ 22; July 21, 2015 Coon Decl. ¶ 9.  But if Plaintiffs want to change or add to their source file requests over the course of the next few months as Defendants anticipate that they will—indeed, Plaintiffs have been significantly delayed in identifying additional custodians whose files they want produced—Defendants will have a difficult time complying with any document production deadline.  *See* July 6, 2015 Coon Decl. ¶ 25; July 21, 2015 Coon Decl. ¶ 10 & n.3. And, the PEC cannot actively undermine the feasibility of the production deadlines they propose in CMO 2 by seeking additional discovery in other venues, as one PEC firm has done in the Philadelphia Xarelto proceeding.  *See* July 21, 2015 Coon Decl. ¶ 14.

To that end, Defendants have proposed a reasonable, common-sense process for when and how Plaintiffs can identify additional custodians.  *See* July 6, 2015 Coon Decl. ¶ 27; July 21, 2015 Coon Decl. ¶ 12.  Defendants have proposed, for example, that Plaintiffs identify which of the previously-identified custodians they will designate, in addition to selecting up to 20 additional custodians, on a rolling basis between entry of CMO 2 and August 31, 2015.  *See* Defs. Proposed CMO 2 § 2(b).  Defendants also have agreed to a "safety valve" through which Plaintiffs could exceed those limits for good cause and on motion to the Court.  *See id.*

Plaintiffs have ignored these procedures entirely.  That is a problem because Plaintiffs need to understand that Defendants' maximum capacity is 5 million pages per month—although Defendants certainly will endeavor and make a concerted effort to go beyond that target—and if they specify very large files that exceed that capacity without making compensating reductions,

the schedule cannot hold.  *See* July 6, 2015 Coon Decl. ¶¶ 25, 27; July 21, 2015 Coon Decl. ¶ 13.[3]

### B.   Plaintiffs' Proposal Fails To Address When And How Search Terms Must Be Identified.

Defendants will confer with Plaintiffs on amendments to the current search term list.  To the extent new search terms are added, this will require re-processing of the current files to check for possible additional documents.  Some of the terms Plaintiffs requested would greatly increase the number of documents to be reviewed by sweeping in large volumes of irrelevant documents.  For example, when targeted search terms like any document mentioning "Xarelto" or "riva" are already being applied, the addition of broad search terms that could pertain to any product—like "adverse event" or "clinical study report"—are not likely to find new documents but are likely to increase the defendants' work exponentially.  *See* July 6, 2015 Coon Decl. ¶ 17.  That is because the non-descriptive search will generate documents pertaining to every one of the defendants' products, immensely increasing the number of documents that have to be reviewed without effectively screening for Xarelto documents.  Plaintiffs' proposal wholly ignores this potential for delay.

### III.   ALTHOUGH STILL AMBITIOUS, A COMPLETE DOCUMENT PRODUCTION BY FEBRUARY 29, 2016 IS THEORETICALLY DOABLE.

Defendants could consent to a CMO that includes a February 26, 2016 completion date for the production of documents, although Defendants emphasize that their targets still remain estimates until they have more information about what files Plaintiffs will designate.  *See* July 21, 2015 Coon Decl. ¶¶ 5–8, 10, 13.  It is still possible to hold a September 12, 2016 trial with a

---

[3] Plaintiffs also propose that CMO 2 "shall not apply to any third-party discovery" (Pls.' Proposed CMO 2 § 4), but that is untenable because Plaintiffs ignore that Defendants will bear the burden of responding to most third-party discovery requests, which will slow down Defendants' own production.  *See* July 21, 2015 Coon Decl. ¶ 4 n.2.

February 26, 2016 completion date, and Defendants' Proposed CMO 2 suggests interim dates that would permit this.

### A. Completion Of Document Production By February 2016 Still Requires Creation Of An Infrastructure.

To be clear, even a February 26, 2016 deadline is very ambitious—and is based on estimates—but Defendants believe that it is theoretically possible to complete a document production by that date if Plaintiffs are required to take reasonable measures to limit and timely update their discovery requests and there is complete coordination with other jurisdictions. *See* July 21, 2015 Coon Decl. ¶¶ 5–8, 10. This of course assumes that Defendants will not be subject to conflicting or additional discovery demands in other jurisdictions—an assumption that has been called into question by a letter that a firm in the PEC sent Defendants on July 20, 2015, in connection with the Philadelphia Xarelto proceedings, seeking immediate production of dozens of new custodians. *See* July 21, 2015 Coon Decl. ¶ 14; *see also* Levin Fishbein Letter (attached as Exhibit 3). Plaintiffs contend that the discovery relates to a pending forum *non conveniens* motion in those cases. *See* July 21, 2015 Coon Decl. ¶ 14. Defendants believe the discovery has little to do with the pending motion and is improper under the procedures governing the Philadelphia proceeding. *See id.* Regardless, this episode reflects that any prospect of meeting the aggressive schedule contemplated here could be undermined by Plaintiffs—even if the Defendants had to produce only five of the custodians requested in the Pennsylvania letter, unless those custodians count towards the 120 total, the already precariously loaded apple cart collapses of its own weight.

### B. Plaintiffs' Arguments For A January 2016 Deadline Are Unavailing.

Plaintiffs offer several reasons why they think a January 15, 2016 document completion deadline is workable, but none of those arguments holds water.

First, Plaintiffs suggest that the YAZ/Yasmin litigation shows how documents can be produced more quickly, but document production in the YAZ/Yasmin litigation traveled under a different procedure that makes the total number of documents produced seem higher. *See* July 21, 2015 Coon Decl. ¶¶ 15–16 & n.4. Any difference is artificial. Here, the parties have agreed to a de-duplication procedure that should substantially eliminate the production of duplicate documents; in YAZ/Yasmin, the parties did not have the same agreement and, as a result, approximately 33% of the documents produced were duplicates. *See id.* Because duplicate documents lead to faster review, the true rate of production in the YAZ/Yasmin litigation was approximately 2.2 million pages of unique documents per month—less than half of what Defendants are averaging in this litigation. *See id.* ¶ 16.

Second, Plaintiffs contend that Defendants' proposed schedule does not leave enough time between the completion of document discovery and the completion of discovery pool depositions. Plaintiffs want a 56-day interval between the two dates, compared to the 31-day interval that Defendants suggest. *Compare* Pls.' Proposed CMO 2 §§ 3(d), 5(f) (proposing January 15, 2016 for document production, and March 11, 2016 for the completion of all discovery pool depositions), *with* Defs.' Proposed CMO 2 §§ 2(e), 3(f) (proposing February 26, 2016 for document production, and March 28, 2016 for the completion of all discovery pool depositions). This is not a substantial difference. It can be addressed by appropriate prioritization of custodians for production by Plaintiffs and good-faith discussions between the parties. If any documents produced in the late stages of document production materially alter any deposition that has been taken, then Plaintiffs can seek leave to reopen any deposition. Such a need is highly unlikely to arise. Moreover, Defendants note that, to the extent the Court wants to provide Plaintiffs with more time to take depositions after final completion of document

production, the fair solution is for CMO 2 to provide for a reasonable amount of time to complete document discovery *and* to take all depositions. Moving the date for the first trial just one month—to October 17, 2016—would allow the Court to accommodate both Defendants' concerns about having enough time to produce documents and Plaintiffs' concerns about having enough time to complete fact depositions. No one could seriously argue that the deferring the first trial one extra month would prejudice anyone. So, if the Court determines that the points raised by both sides have merit, the fairest and best solution is for CMO 2 to satisfy both sides' legitimate concerns, especially when both can be accommodated with only a one-month adjournment.

## CONCLUSION

Defendants understand the Court's desire to move this MDL along expeditiously and to try a case by September 2016. Such a schedule is not possible without a reasonable document-production schedule and an accompanying document-production infrastructure. Defendants respectfully ask this Court to adopt the document production cut-off date, provisions concerning how documents will be selected for production, and strong, enforceable requirements for cooperation on discovery outside of the MDL, as embodied in Defendants' draft CMO 2.

KAYE SCHOLER LLP

By: /s/ *William Hoffman*
    William Hoffman
    Steven Glickstein
    KAYE SCHOLER LLP
    The McPherson Building
    901 Fifteenth Street, NW
    Washington, DC 20005
    Telephone: (202) 682-3550
    Facsimile: (202) 414-0355
    william.hoffman@kayescholer.com

DRINKER BIDDLE & REATH LLP

By: /s/ *Susan M. Sharko*
    Susan M. Sharko
    DRINKER BIDDLE & REATH LLP
    600 Campus Drive
    Florham Park, NJ 07932-1047
    Telephone: (973) 549-7000
    Facsimile: (973) 360-9831
    susan.sharko@dbr.com

ECKERT SEAMANS CHERIN & MELLOTT, LLC

By: /s/ *Timothy S. Coon*
    Timothy S. Coon
    ECKERT SEAMANS CHERIN & MELLOTT, LLC
    600 Grant Street, 44th Floor
    Pittsburgh, PA 15219
    Telephone: (412) 566.1214
    Facsimile: (412) 566-6099
    tcoon@eckertseamans.com

        IRWIN FRITCHIE URQUHART & MOORE LLC

        By: /s/ *James B. Irwin*
            James B. Irwin
            Kim E. Moore
            IRWIN FRITCHIE URQUHART & MOORE LLC
            400 Poydras Street
            Suite 2700
            New Orleans, LA 70130
            Telephone: (504) 310-2100
            Facsimile: (504) 310-2120
            jirwin@irwinllc.com

        CHAFFE MCCALL L.L.P.

        By: /s/ *John F. Olinde*
            John F. Olinde
            CHAFFE McCALL L.L.P.
            1100 Poydras Street
            Suite 2300
            New Orleans, LA 70163
            Telephone: (504) 585-7241
            Facsimile: (504) 544-6084
            olinde@chaffe.com

        *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on July 21, 2015, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre-Trial Order No. 17.

        */s/ James B. Irwin*

        **James B. Irwin**