UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | MDL NO. 2592 |
| | SECTION L |
| | JUDGE ELDON E. FALLON |
| | MAG. JUDGE NORTH |

## DECLARATION OF TIMOTHY S. COON

1. I am a member of Eckert Seamans Cherin & Mellott LLC and am one of the attorneys representing the Bayer Defendants in this litigation. I am also working with counsel for the Janssen Defendants to plan and coordinate e-discovery and document production in this litigation for both sets of Defendants.

2. I have been a member of the bar since 1988. For the past 15 years I have focused my practice primarily on discovery-related matters in large scale litigation, with an emphasis on e-discovery and document production activities. I had primary responsibility for e-discovery and document production in many mass-tort, product liability, and commercial litigations including, as a few examples, the Yasmin/YAZ Products Liability Litigation (MDL 2100), Trasylol Products Liability Litigation (MDL 1928), Gadolinium Products Liability Litigation (MDL 1909), Combination Aspirin Sales and Marketing Practices Litigation (MDL 2023), and Baycol Products Liability Litigation (MDL 1431).

3. I offer this Declaration to provide information to the Court that Defendants believe must be considered in developing a case management order that establishes the scope of and deadlines for document discovery in this litigation.

4.   Plaintiffs have proposed that the Court issue a Case Management Order requiring Defendants to produce 200 custodial and noncustodial files, plus an undetermined number of sales representative files, by November 9, 2015. As described more fully below, it is physically and technically impossible to produce the volume of documents Plaintiffs want in four months. The volume of materials that Plaintiffs seek would take at least 12 months to collect, review, and produce, and would require a production rate far exceeding any prior MDL pharmaceutical litigation. An earlier date for completion of document production is possible only if fewer documents are produced.

5.   Defendants made two alternative proposals in their submission to the Court. Defendants proposed to produce a total of 120 custodial and noncustodial files by February 29, 2016, which itself would be a huge production of up to 40,000,000 of pages of documents, beyond the over 30,000,000 pages of documents already produced, for a total of approximately 70,000,000 pages. This proposal is to meet an August 2016 trial date. Alternatively, Defendants proposed a schedule to produce a total of 200 custodial and non-custodial files to match the number Plaintiffs proposed, but taking into account that it necessarily will take longer to produce another 80 files. With that schedule Defendants anticipate they would produce up to 65,000,000 pages of documents beyond what has already been produced, for a total of approximately 100,000,000 pages. Under either proposal, the production will be one of the largest in any pharmaceutical litigation and will be completed in a fraction of the amount of time normally allowed for document production of this magnitude.

**Defendants' Massive Document Production Efforts To Date**

6.   After litigation commenced and well before this MDL was even created, Defendants began collecting and preparing documents for production. Initial efforts focused on the Investigational New Drug Application and New Drug Applications files. These are massive files that contain critical information relating the issues and claims in this litigation. They contain all submissions to and correspondence with the FDA; internal contact reports regarding interactions with the FDA, and related meeting minutes and agendas; Chemistry, Manufacturing and Control information; hundreds of preclinical and clinical study protocols, reports and related documents; thousands of files of statistical data from Xarelto studies; numerous safety reports and data provided to the FDA; numerous documents relating to the submission and approval of proposed advertising and promotional materials; extensive medical literature on rivaroxaban and other anticoagulants; and a host of other categories of documents. The volume of this material was in excess of 28,000,000 pages of documents. It took over 5 months to collect, process and prepare the files for production, but by working proactively well in advance Defendants were able to produce these files and some other materials in April 2015, before Plaintiffs had even served a formal document request. In addition, Defendants identified and began collection and processing

of documents for dozens of employees who had significant involvement with Xarelto. Defendants have begun producing documents for many of those individuals.

7. Since the initial production of the IND and NDA files in April, Defendants have made several rolling productions of all or a substantial portion of the custodial files of 10 employees and other materials. Currently, over 80 custodial files are in the various phases of the collection, processing or review process, with current review efforts focused on certain custodial files that Plaintiffs requested be produced first. Many of these are truly massive files. For example, the Bayer Defendants' current review and production work on only four of the "priority" files requires review of approximately 600,000 documents, equivalent to millions of pages of materials. Many other custodial and non-custodial files have been identified by Defendants to be collected and processed for potential production, including a number of the files that Plaintiffs requested.

8. Defendants have dedicated enormous resources to produce documents to Plaintiffs. In my 15 years of experience in this area, the resources devoted to this project are unprecedented. Defendants currently have more than 250 people working on document collection, review and production – equivalent to a large law firm devoted entirely to producing documents for this litigation. A brief check of publicly available law firm ranking websites indicates Defendants' document review team would rank as being among the 175 largest "law firms" in the United States. In addition, several dozen more attorneys and e-discovery professionals are working on various tasks for this project including personnel with Defendants' Legal and IT departments, with the e-discovery vendor, and with the law firms managing and coordinating this project. This is in addition to the resources being devoted to the preparation of Defense Fact Sheets in each of the over 1,000 individual cases. There is, naturally, an enormous cost associated with the document review work. Through May, 2015, Defendants incurred costs for document production well in excess of $7,000,000. Their monthly expenditures will increase substantially going forward as Defendants have further increased their document team size in recent months.

9. Defendants are collectively targeting an average monthly production of approximately 5,000,000 pages per month (2,500,000 each for Janssen and Bayer). In my experience, that rate of production is extraordinary and unprecedented in an MDL pharmaceutical litigation. I have never been involved in any matter with a rate of production this large. The next largest matter I have worked on would be the Yasmin/YAZ litigation, in which the Bayer defendants' production rate averaged approximately 3,300,000 million pages per month over a production period of 30 months. I have never seen information suggesting that defendants in other pharmaceutical litigations made document productions at or above the production rate Defendants are targeting here. To the contrary, other pharmaceutical MDLs typically had far smaller document

3

productions than contemplated for this matter, and universally over much longer periods of time.[1]

10. Given the enormous size of the current project team, Defendants are effectively at the outer limit of their capacity to be able to efficiently oversee such a large staff and still maintain reasonable supervision and quality control. They cannot realistically devote "more" resources. If hypothetically Defendants were asked to hire even more reviewers than is presently contemplated, it would slow down rather than speed up the process because supervisors and senior personnel would have to divert time from managing the ongoing production work in order to hire and train the extra new reviewers. New reviewers are less productive and require substantially more oversight and quality control, which further diverts the attention of the most productive senior members of the team from other project tasks. Moreover, it is very difficult to maintain quality control with such a large and unwieldy staff which would result in the need to impose additional levels of quality control, which in turn would slow things down rather than speed them up. In other words, Defendants cannot just add additional reviewers, they would also need to substantially increase the size of their supervisory and senior QC staff as well, and divert resources from the current review work to get additional reviewers trained and efficiently reviewing documents. It would result in so many management and supervision issues that it would be impractical. Lastly, hypothetically adding additional new reviewers still would not allow Defendants to produce the scope of production requested by Plaintiffs within the time frame of 4 months that Plaintiffs have proposed to the Court.

**Plaintiffs' Unprecedented Document Production Proposal is Impossible to Comply With**

11. Plaintiffs' June 30, 2015 proposal for CMO 2 seeks production of 200 custodial and non-custodial files with a document production cutoff of November 9, 2015. There is no proposed limit on, or consideration of, the size of the files involved. At present, Plaintiffs have only identified 44 of the 150 custodial files that they apparently will request for production, and have not identified a single non-custodial file for production. In effect, Plaintiffs want this massive production to begin later in July or even August and end in early November. Based upon my 15 years of experience coordinating and managing document production in large scale

---

[1] In Trasylol for example, approximately 30 million pages of documents were produced by Bayer over a 3 year period. In the Ortho Evra® Litigation (MDL 1742), involving Janssen, 12 million pages were produced in a 33 month period. The Baycol litigation, involving Bayer, had the same volume produced over a similar time period. In the Combination Aspirin MDL, about 3 million pages were produced by Bayer in 20 months. I am also informed that it took 19 months in the ASR™ Hip Implant Litigation (MDL 2197) and Pinnacle Hip Implant Litigation (MDL 2244) to produce 60 million pages, an amount smaller than Plaintiffs seek here, and that in the Vioxx litigation the total production was approximately 28 million pages. Defendants here have already produced more than was produced Vioxx.

4

pharmaceutical litigation and based upon information concerning the scope of work that would be required. I am certain that producing this volume of material in less than 4 months is impossible. Plaintiffs have requested an enormous undertaking by Defendants to produce a massive amount of document discovery, but suggest a time frame in which it clearly and indisputably cannot be completed.

12. Many lawyers who have not been involved with or had to supervise a large scale document production are under a misimpression about how difficult and time consuming it is. Many have the erroneous belief that one can simply push a button or issue a search command and easily find and produce responsive documents. Nothing could be further from truth. In large pharmaceutical companies like Janssen and Bayer, there are literally billions of electronically stored documents, files and databases located on a variety of different computer systems, using different software, in the possession of different custodians or in some cases non-custodial departmental systems, and located in various locations in the U.S. and elsewhere in the world.

13. To understand why document production is so time consuming, labor intensive and expensive, it is useful to go through the steps necessary to produce documents. Document production in this matter will be primarily from electronic data sources. There are three basic phases of work required to prepare and produce documents: (a) collection and intake processing of source files identified for production, (b) review of the documents contained in those files, and (c) preparation of the production sets to be provided to opposing counsel.

14. **COLLECTION PHASE.** The collection phase begins with interviews of numerous company personnel to identify which custodians have relevant personal files and to identify relevant non-custodial files, where they are located and how to access them. This is a constant, iterative learning process, and we are still learning through continuing investigation. A large segment of the source files to be produced in this matter are the custodial files of employees. For purposes of further describing the general processes and work involved, I use a custodial file as an example although the description is applicable to many non-custodial files as well.

15. Collection of the custodian's data must be performed first. This involves several potential sources of data: the employee's email file including any archives, documents in the employee's files on the server network (referred to as a homeshare), documents on the employee's company-issued computer, and hard copy files (paper or electronic media) that the employee possesses. It takes time to identify and make duplicate copies of these materials. For example, arrangements must be made to copy the employee's computer while it is not in use. Paper files must be physically collected then sent to a vendor to be imaged into an electronic form, like a pdf. The German Bayer Defendants must also take additional steps to comply with German Data Privacy laws during the collection phase which adds additional time to the collection process. Further it must be kept in mind that this medicine is on the market and being actively studied and marketed, with new indications being the subject of on-going research. The majority of the custodians are constantly creating new documents.

5

16. **PROCESSING PHASE.** Once data is collected, it then must be processed and loaded to a database to be reviewed by attorneys. This involves staging and inventorying the materials, identifying and opening all zip files and similar document "containers", identifying and resolving any technical issues with the documents, generating hash values, and numerous other tasks. Then a search process must be applied to identify the documents that potentially relate to Xarelto from the millions of other documents relating to numerous other irrelevant topics that are also contained in the custodial files. An extensive search term list is applied to the prepared data and the documents or document families that contain a search "hit" are identified. Then the potentially responsive documents are further prepared and loaded into the review database. I am informed by Defendants' e-discovery vendor that an average time to prepare, process, search and load 100,000 documents for review is 3 to 4 days. This case will involve multiple millions of documents requiring such processing.

17. Of importance here is that the search term list is not even final. Defendants will shortly be responding to Plaintiffs' recent request to add more than 350 additional terms to the search list. Unfortunately, Plaintiffs' proposal is singularly unhelpful. Nearly all of the proposed additional terms would be applicable to every product of Defendants and would do nothing to help identify Xarelto documents from other materials (e.g. "case report form", "adverse event", "clinical study report"). Many other proposed search terms are just common business words that have the same deficiency in that they do nothing to identify a potential Xarelto document from a document on any other topic (e.g. "strategy", "asap", "cost of goods"). We hope to engage with Plaintiffs in a productive discussion about the proposed additional terms, but the point relevant here is that because the search term list is not yet final there will at least be a second round of search processing of custodial files, which will add more time to the overall production process.

18. **REVIEW PHASE.** Review of documents is done by a very large staff of attorneys. The attorney must review the document in its entirety to make a decision on relevance, Protected status, and whether redaction of certain information is required. Every page of every document must be evaluated for content that must be redacted, such as patient or reporter identities in adverse event reports and related documents, patient identities in clinical study documents, sensitive data like passwords or social security numbers, certain highly protected personal information that must be redacted under German data privacy laws, and other items that the parties have agreed will be redacted pursuant to PTO 20. If redactions are required, a tiff image of the document must be generated and then the reviewer must create the redactions manually on the tiff image. Similarly the whole document must also be reviewed for relevancy. A portion of the documents in every custodian file is inevitably determined to be irrelevant after review. This is, in part, because the search term list is designed to be broad enough to identify the relevant Xarelto documents. But by being broad, the search term list also picks up some non-relevant documents. More frequently, a document "family" has both irrelevant and non-relevant documents. An example is an email with two attachments, one attachment relating to Xarelto and one relating to an entirely different product. This is because the majority of the employees

whose files will be produced have functional responsibilities for many of Defendants' products and business activities, not just with respect to Xarelto. Their files contain highly sensitive and proprietary scientific and business information about products other than Xarelto which are not relevant to any issue in this litigation. Such documents include, for example, reports and plans concerning new products in development, current financial and marketing information about products other than Xarelto, confidential business, strategic and marketing plans about products other than Xarelto, and similar materials that are both competitively sensitive and irrelevant to the issues in this matter. Some employees send or receive personal emails from their business accounts. Other documents swept up in the processing may contain private information, such as relating to employee health or sensitive personnel matters. German Data Privacy laws are stringent in requiring Bayer to produce only the documents that are relevant to the legal issues in the matter, and a violation of those laws can subject Bayer to civil and criminal sanctions. But in all cases the reviewer must read all of the documents to ascertain relevancy. Even with a quick scan of a few seconds per page, the time to simply review the documents for relevancy will be enormous because it involves many tens of millions of pages.

19.     It is also important to consider that Defendants are in the highly regulated pharmaceutical industry and, accordingly, there is a significant level of involvement by legal counsel in many of Defendants' business activities, much more than in most other industries. The privilege review required before files can be produced is complex and involves significant volumes of documents to be analyzed. It is not unusual for 30% or more of the documents to be flagged for a second level privilege review. That entails a second review of a substantial portion of the documents. While many such documents are ultimately found not privileged, time spent on a second level privilege evaluation of the document, as well as further fact investigation on many potentially privileged documents, adds significantly to the overall document review time. After the privilege review, detailed privilege logs must be prepared and produced. Overlaid on all these activities is a robust quality control process that includes a continual second-level review by senior personnel of samples sets of the work product of the first-level reviewers to insure proper determinations are being made on relevancy, Protected status, redaction and privilege, and an ongoing feedback loop between the senior reviewers and first-level reviewers to advise and provide further guidance on these determinations.

20.     **PREPARATION FOR PRODUCTION.** After a file is reviewed, it must be prepared for production. This involves numerous steps including preparing production images, creating bates and protected status endorsements, creating load files and metadata files, and exporting the production set onto media for delivery to opposing counsel, again overlaid by a quality control process both by the e-discovery vendor and by the document review team. I am informed by Defendants' e-discovery vendor that it is necessary to allow at least 7 days to complete these activities for the average expected production set. There have been and will be numerous rolling productions by the Bayer and Janssen defendants.

21. **REQUIRED LEAD TIME.** Another factor important to the production process is lead times. As evident from the tasks described above, a substantial amount of work is involved from the time a file is first identified for production until the relevant, non-privileged documents are produced to Plaintiffs. Just the steps of identifying and collecting the particular source materials, intake processing to prepare the materials for review, and creating the actual production set can take several weeks. Then review time must be considered which, depending on the size of the file, could range from several days to several weeks. It is simply not possible to receive a request for a source file and then have it produced within 30 days, except on rare occasions. Even on those rare occasions, if the file is large and requested on a priority basis, review work must be diverted from other files.

22. Defendants have provided substantial information to Plaintiffs to try to assist them in understanding the enormous volume of material and amount of work that will be necessary to produce the scope of document production that they seek in this litigation. The critical disparity between Plaintiffs and Defendants is that Plaintiffs want a massive production in an extremely short and unprecedented time frame, but they give no realistic consideration to the amount of work and time necessary to accomplish the production. Defendants on the other hand are approaching the issue from a perspective that takes into account the work that will actually be required.

23. The volume of documents Plaintiffs seek is enormous. Based on current information, I expect that the custodial files to be reviewed will contain, on average, approximately 50,000 documents (on average, the equivalent of about 500,000 pages). There is a reasonable likelihood that the average number of documents per file will ultimately be larger. Many of the custodial files currently collected for review exceed this average, with a significant number each having 3 to 4 times this amount. For 150 custodial files, this means that Defendants would likely need to review approximately 7,500,000 documents, and potentially more, in less than four months.[2] Given the expected average document size, this means about 75,000,000 pages of documents for custodial files alone. In addition, Defendants would be required to produce 50 non-custodial files. While the overall volume is not yet known, it will be a very large amount of documents and data. Also within the document production deadline, Defendants will need to produce sales representative files for the trial pool cases. While that number is also not presently known, it could be as many as 50 additional custodial files. Altogether, the scope of production Plaintiffs propose may require Defendants to collect, process and review over 10,000,000 documents, which based on my experience in similar cases, would translate to more than 100,000,000 pages.

---

[2] I have examined the production indices for the Yasmin/YAZ litigation. In Yasmin/YAZ, the defendants produced 133 general corporate custodial files. Here, Plaintiffs want 150, even more than in Yasmin/YAZ, and they want them produced in a time period of 4 months, not the 30 months it took in Yasmin/YAZ.

24.     Another significant problem with Plaintiffs' proposed November 9 cutoff date is that the 150 custodial and 50 non-custodial files that Plaintiffs will want produced have not all been identified. At present, Plaintiffs have specifically identified and requested 44 custodial files. Defendants are working on those files and started producing them in early June. However, that leaves a large number yet to be identified for production. Defendants do not raise this point as a criticism of Plaintiffs. Defendants appreciate that Plaintiffs need reasonable time to review the 33+ million pages of regulatory files, custodial files, and other information that Defendants have already produced to identify additional custodial or non-custodial files they may want.

25.     However, to meet a production cutoff of November 9, 2015 as Plaintiffs propose, not only would Plaintiffs need to drastically reduce the number of files demanded, but Plaintiffs' selection of the files to be produced would have to be immediate to provide sufficient lead time for Defendants to collect, process and produce files as explained in paragraph 21 above. Defendants cannot be given lists of many new custodians in August or September and be expected to produce the files before November 9. That would potentially lead to two scenarios, neither of which is desirable. In one scenario, Plaintiffs could not request files for new sources that they identify as fact discovery proceeds and matures, a situation that Defendants expect Plaintiffs would find unacceptable. In another scenario, months from now Plaintiffs will demand new files. The collection and review process would need to begin anew, requiring the whole pretrial schedule to be re-worked and extended. Defendants' proposal on document production lessens the potential for these problems.

26.     If the only objective is to have an extremely short deadline for document production, then Plaintiffs must be willing to radically reduce the scope of the document discovery they seek, something Plaintiffs have not been willing to do. Conversely, if Plaintiffs truly need the massive production they have proposed, then a reasonable time is necessary to accomplish it. The central problem with Plaintiffs' proposal is that it requests a production deadline in this case that is unreasonable short - less than one-fifth the time that was needed to complete a massive production of comparable size as that made in the Yasmin/YAZ litigation.

27.     Unlike Plaintiffs' proposal, Defendants' proposals take into account the work required. Under Defendants' Proposal A, Plaintiffs would still receive 120 custodial and non-custodial files (plus relevant sales representative files) by February 29, 2016 in order to meet an August 2016 trial date. Under Defendants' Proposal B, Plaintiffs would receive the 200 custodial and non-custodial files they seek (plus relevant sales representative files). Production would be extended to July 31, 2016, for a January 2017 trial date, in order to have sufficient time to produce this massive amount of discovery. Under both Proposal A and B, Defendants have allowed for some switching of requested files or identification of new files to be produced while Plaintiffs obtain more information from their review of the productions Defendants have already made and through on-going discovery. Switching or identification of new custodians is more limited under Proposal A due to the shorter time frame to complete production. Defendants' proposals are ambitious and will require production of a massive volume of documents in a time

9

frame that is unprecedented. But Defendants' proposals at least take into account the volume of material and amount of work involved. Plaintiffs' proposal does not.

July 6, 2015

_____
Timothy S. Coon