UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | MDL NO. 2592 |
| | SECTION L |
| | JUDGE ELDON E. FALLON |
| | MAG. JUDGE NORTH |

## SUPPLEMENTAL DECLARATION OF TIMOTHY S. COON

1.  I offer this Supplemental Declaration to address issues relating to the scope of and deadline for document production following the discussion of these topics with the Court at the July 9, 2015 Status Conference. In summary, the points I address more fully below are:

(a) It will be impossible for Defendants to meet a January 15, 2016 deadline to complete document production with a scope of production consisting of 120 custodial files, 25 non-custodial files, and detail representative custodial files for trial pool cases.

(b) A deadline of February 26, 2016, while still requiring extraordinary effort from Defendants, would at least provide a better prospect of staying on schedule and would not interfere with a September 2016 trial.

(c) Whether the deadline is January or February, there is no possibility of meeting it unless the parties agree now on the specific files to be produced, or at least the substantial majority of them, and that they include a substantial number of the files that Defendants have already identified for production and have substantially worked on. There must also be a reasonable limit on the number of "new" files that can be requested by Plaintiffs going forward, and any "new" files need to be requested in sufficient time to process, review and produce them by the deadline.

## I. The January 19, 2016 document production cutoff
## Proposed by Plaintiffs will be impossible to meet.

2.     I stated in my earlier June 19, 2015 and July 6, 2015 Declarations that a document production of the size contemplated here, in the exceedingly short time frame under consideration, would be unprecedented in pharmaceutical litigation in my personal experience and to my knowledge. No information has been submitted by Plaintiffs to the contrary. We are embarking on a journey through uncharted waters.

3.     There are three principal reasons why Plaintiffs' proposed January 15, 2016 production cutoff date is impossible to meet.

>   (a)  First is the volume of the data that is expected to be reviewed: up to 185 custodial and non-custodial files, comprised of 120 general corporate custodial files, 25 non-custodial files, and as many as 40 detail representative custodial files, which collectively will likely require review of an estimated 60,000,000 pages documents beyond the more than the 37,000,000 pages already produced.
>
>   (b)  Second is the time frame. Under Plaintiffs' proposed cutoff date, Defendants have <u>less than six months</u> to complete production.
>
>   (c)  Third, Plaintiffs propose that they have the unilateral right to select the files to be produced and would have an undefined and unlimited time period to make their selections. Over 75% of the files have not been selected yet, even though Plaintiffs have received significant information on relevant custodians and other sources of documents that are responsive to their Request For Production. Each of these reasons independently makes it highly unlikely that document production can be completed within the time frame Plaintiffs seek. Together, they make it virtually certain.[1]

4.     The estimate that Defendants will have to produce 60,000,000 pages in addition to the 37,000,000 already produced is conservative. The average size of the 17 custodial and non-custodial files produced to date is approximately 478,000 pages, and several of these custodians still have material in process which is yet to be produced. Using this as an initial benchmark, 145 custodial and non-custodial files would equate to about 60,000,000 pages more to review beyond the files already produced. Beyond this, Defendants will need to produce a significant number of detail representative files for trial pool cases which could add as many as 40 additional custodial files. The volume of this detail representative production is not yet known, but it will be in addition to the 120 custodial files and 25 non-custodial files. Since, based on current file size, the 120 custodial files and 25 non-custodial files project mathematically to 60,000,000 pages more to review – and since the files of 40 detail representatives have to be

---

[1] I conclude it is impossible based on the information concerning the size of the files that have been produced or are under review in respect to Plaintiffs current file requests, and the other factors noted, such as the large number of files yet to be identified on dates yet to be determined. I have discounted very unlikely scenarios such as Plaintiffs deciding to seek only 80 custodial files rather than 120, or the trial pool cases having no detail representative files to produce.

added to that – my estimate of 60,000,000 million pages is if anything on the low side. At the extraordinary rate of 5,000,000 pages per month, the math shows that January 19 is unworkable. Defendants would need to produce up to 10,000,000 pages per month.[2]

5.      Part of this problem would be offset if Plaintiffs agreed to production of the files Defendants have identified which have responsive documents and data and that have substantially completed review, as part of the 120 custodial and non-custodial files to be produced. Indeed, inclusion of files already substantially reviewed is critical to achieving completion of production to meet a September 2016 trial date. However, even including those custodians, the material still to be reviewed and produced -- and for many sources still to be identified and collected -- will be massive such that a January 15 date is out of the question.

6.      Defendants have less than six months to complete production. As I previously indicated, the projection of 60,000,000 pages to be reviewed is if anything on the low side; even though the precise number cannot be known with exactness at this time, there can be no reasonable dispute that the number is huge. Simple logic dictates that decisions must be made now as to which files will be produced, particularly in light of Plaintiffs' proposal that they have the unilateral ability to determine the priorities of file production.

7.      If time for selection of files is open-ended, if the files to be produced do not include those that have already been substantially reviewed, and if Plaintiffs have the unilateral ability to dictate the priority in which files will be produced, Defendants will not be able to produce the target of 5 million pages per month and will not be able to meet a production deadline of even February 2016.

## II. A February 26, 2016 cutoff will be extremely difficult but affords a better prospect of staying on schedule for a September 2016 trial.

8.      Initially, the obvious point is that 6 weeks beyond Plaintiffs' proposed cutoff January 15 provides additional time to produce about 7.5 million pages at the targeted production rate of 5 million per month. It also provides a period of time, albeit very modest, to account for very significant and presently unknown factors that affect the amount of work required, including the size of the general files yet to be identified for production and the number and size of detail representative files to be produced. If Defendants need to review up to an additional 60 million pages, they cannot meet a deadline of February 26. But if part of this production consists of the 60 custodial and non-custodial files which are substantially reviewed already and can be produced reasonably soon, or at least a substantial portion of them, these files where work has

---

[2] In addition to producing their own files, Defendants will need to be involved in responding to at least some third party discovery that Plaintiffs seek. For example, Plaintiffs have served a subpoena on the FDA which calls for information submitted by the Janssen Defendants to the Agency. Accordingly, the Janssen Defendants must conduct the review of their responsive documents for Protected status prior to production to Plaintiffs. Similarly, future discovery by Plaintiffs of third parties may require Defendants to provide or assist in document production by the third party, as a matter of law or contract.

been substantially completed would account for part of the 60 million. The amount of new material still to be reviewed would be lower, and therefore affords the potential to complete production by February 26.

9.  Defendants have supplied Plaintiffs with substantial information regarding potential source files for production:

> (a) On April 30, Defendants provided initial witness disclosures identifying over 140 present or former employees having involvement in Xarelto, including their job titles and functional areas of responsibility. On the same date Defendants produced over a thousand pages of organizational charts.
>
> (b) Defendants' June 8 responses to Plaintiffs' First Request for Production also identified multiple non-custodial sources that contain information sought in the document requests.
>
> (c) Early in this litigation, Defendants investigated and identified a significant number of custodial and non-custodial sources in product development, preclinical and clinical testing, regulatory matters, marketing, sales, and other functions in respect to Xarelto. On June 27, Defendants provided information to Plaintiffs identifying over 120 custodial and 17 non-custodial files currently in the document review process, along with information on the size of the files and a description of the status of processing and review. That disclosure identified 60 custodial and non-custodial files that are responsive to Plaintiffs' Request For Production where review work was substantially complete and where production of these files could be made in the near term. These are responsive files that, while requiring some additional work, could mostly be produced in the next month or two.
>
> (d) Additionally, as of the present date Defendants have produced materials for 15 custodial and 2 noncustodial files plus the IND and NDA files and other early disclosure materials, collectively comprising over 37 million pages of documents and thousands of additional native files, that are central data sources for this litigation.

10. Currently, only 44 of the 120 custodial files Plaintiffs may seek have actually been requested. That leaves nearly two-thirds still to be identified by Plaintiffs. I previously explained that it takes significant time to collect and process files and addressed the necessity for sufficient lead time to begin such work before review of the material can commence. (Coon July 6 Declaration ¶ 15-21). Nor have Plaintiffs identified any non-custodial files that they want, although they have received some non-custodial files containing information that was specifically requested in and/or directly responsive to their Request For Production. Prompt identification of files to be produced is critical. Plaintiffs' proposed CMO 2 does not address this and leaves it entirely open-ended.[3]

---

[3] The only exception is Plaintiffs' proposal to be able to decide by August 1 whether to "substitute" any of the 44 custodial files they did previously request. Defendants have been and are currently focusing review work on those files. If Plaintiffs do not want a particular file, they

11.   In all MDL pharmaceutical litigations I have been involved with, the defendants identified an initial group of custodial and non-custodial files for production that contain materials that the plaintiffs requested in their initial document requests. Additional files were subsequently identified for production as discovery progressed, either by the defendants in regard to a particular topic that was subject to a later discovery request, or through a request from the plaintiffs for a specific file. It is a logical process that has worked well and allows appropriate lead time, planning and scheduling. That is the process Defendants have already proposed here, but Plaintiffs seem to be resistant. Indeed, as I understand their proposed CMO 2, Plaintiffs desire unconstrained ability to select each file to be produced with an unlimited period to make selections, and Defendants would have no say in determining which files were responsive to Plaintiffs' Request For Production. In my experience this is totally foreign to how document production by a party works in litigation. In my experience in similar MDLs the responding party initially identifies and produces a group of relevant files, supplemented thereafter with other files in consultation with the requesting party.

12.   In contrast to Plaintiffs' proposal, Defendants have proposed the infrastructure and foundation that would be necessary to have any prospect of completing a document production by February 26:

> The 120 custodial files will include certain custodians specifically requested by Plaintiffs' in their May 8, 2015 letter, plus the custodial files already produced by Defendants.
>
> The balance of the custodial files to be produced would be selected by Plaintiffs from the list of custodial files identified by Defendants on June 27, 2015 as already in the production process. Further, a reasonable number of additional custodians (not to exceed 20) would be identified by Plaintiffs on a rolling basis between the date of the Order and August 31, 2015.
>
> The 25 non-custodial files will be divided reasonably between the Bayer Defendants and Janssen Defendants and would consist of the non-custodial files already produced by Defendants, the non-custodial files identified by Defendants as already in production process, and a reasonable number of additional non-custodial files to be identified by Plaintiffs on a rolling basis by August 31, 2015.

13.   Defendants cannot guarantee even under their proposed February 26 production cutoff that document production will be complete by that date. It is an enormous undertaking in a very short time period; a fraction of the time normally allotted to document production in MDL pharmaceutical litigation. Defendants will make best efforts, and while it will be difficult, a February 26 cutoff provides a better chance of completing this production. However, the identity and size of many of the files to be produced is unknown. The potential exists that requests will

---

should tell Defendants now, not two weeks from now, so Defendants are not wasting time and money on reviewing files Plaintiffs do not want and using up the very limited time they have to review and produce documents on something that won't be produced.

be made for files that will take more time to collect, review and produce than is available even under Defendants' proposed cutoff date. Therefore, we respectfully stress the importance of a "safety valve" provision in CMO 2 that allows for extension of the production cutoff should it become necessary. We believe the underpinning for such a provision is, at least in part, agreed to by the parties in that they have similar suggestions of bi-weekly status conferences to address the progress of, and issues arising in, document production.

14.    Moreover, it will be imperative that the MDL and Pennsylvania Plaintiffs cooperate in regard to document production requests. On July 20, 2015, I received a letter from the Pennsylvania plaintiffs' liaison counsel Michael Weinkowitz, who is also the designated federal-state liaison counsel in the MDL. That letter requested the production of 25 new custodial files and asked they "be prioritized for the next production". In a followup email to the MDL Plaintiffs and Mr. Weinkowitz, I indicated that I assumed these file requests were also made on behalf of the MDL PSC, and asked for Plaintiffs' position on coordinating the priority production of these files with the production of the 44 different files the MDL PSC previously requested on a priority basis. Both Mr. Weinkowitz and the MDL PSC replied and emphatically denied that this new file request was also on behalf of the MDL but rather purportedly relates to *forum non conveniens* motions pending in that proceeding. Moreover, they did not respond to my question on how to handle prioritization.

### III. Plaintiffs' Arguments In Support Of A January 2016 Deadline Are Flawed.

15.    In my prior Declaration I stated that the production effort and output in this case significantly exceeds that the Yasmin/YAZ MDL. Plaintiffs have tried to rebut that statement by arguing that in the Yasmin/YAZ litigation the Bayer defendants averaged 3.3 million pages of documents produced per month, and because there are two defendant groups in Xarelto the production rate should be double. That assertion is incorrect and based on misunderstanding of a significant difference between production methods in the two matters. In Xarelto, the plaintiffs have agreed that Defendants do not have to produce duplicates of a document already produced, which means that the 5 million pages produced a month will generally be unique documents. In Yasmin/YAZ, the defendants were required to produce duplicates of documents in different files, therefore if the same email was contained in 10 custodial files it was produced 10 times. The 3.3 million pages produced a month in Yasmin/YAZ did not consist of 3.3 million pages of unique documents, but instead contained a sizable number of duplicates that had already been reviewed and did not have to be re-reviewed when they were found in another file, for reasons explained in the footnote below.[4] Put another way, it is far more time consuming to produce 1,000,000 unique documents than it is to produce 670,000 unique documents and 330,000 duplicates.

---

[4] The production rate in Yasmin/YAZ includes both unique documents and duplicates produced. The work involved in producing duplicate copies of a document is far less than the work to review and produce a unique document. The duplicates do not need human review. Once one copy of the document is reviewed by an attorney, all the duplicates receive the same decisions on relevance, protected status, redaction, and privilege by operation of the computer system. However, because plaintiffs in Yasmin/YAZ insisted that they be produced, the duplicates are included in the pages counts relating to the 3.3 million pages produced on average per month.

Therefore, to fairly compare the Xarelto output with Yasmin/YAZ, you need to compare the volume of unique documents produced in Yasmin/YAZ to the production volume Defendants seek to achieve in this case.

16.     I have researched our data and determined that in Yasmin/YAZ, about 33% of the documents produced were duplicates. That means that approximately 2.2 million pages of <u>unique</u> documents were produced per month on average in Yasmin/YAZ. As stated in my July 6 Declaration, Defendants are collectively targeting an average production volume of 5 million pages per month. For the most part, these are unique documents due to the agreed de-duplication process for Xarelto.[5] Adjusting the Yasmin/YAZ production rate to unique documents (i.e. excluding the duplicates produced), the production rate Defendants are targeting in Xarelto is in fact double the rate that occurred in Yasmin/YAZ, which itself was extraordinary.

17.     Nor is just "throwing more people" into document review a solution. In consideration of the discussions with the Court at the last two status conferences, Defendants already took steps to increase the size of their document review staff. It has grown from 250 reviewers to 320. This increase was made to be able to meet the goal of producing an average of 5,000,000 pages of documents per month. However, as I previously described in my July 6 Declaration, adding more reviewers diverts the time of the most productive senior members of the team in order to train and closely supervise new team members. New reviewers are also initially much less productive than other more experienced team members. Moreover, the larger the team becomes, the more supervision is required, and at some point the supervision and management requirements become impractical and cumbersome. (Coon July 6 Declaration ¶ 10).

July 21, 2015

_____
Timothy S. Coon

---

[5] During processing, a software algorithm creates a unique hash value for each document, effectively a digital fingerprint. If the fingerprint matches between two documents, they are exact duplicates and only one is loaded for review. Occasionally, a non-substantive change might be made in the metadata of one of the documents and then the hash value would not match and both documents would be processed for review. Also, a stand-alone document may be an exact duplicate to an email attachment, but per agreement of the parties both will be produced so that the email family is relationship maintained. But the de-duplication process in Xarelto is robust and is removing the majority of duplicate documents.