# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | * <br> * <br> * <br> * <br> * <br> * | **MDL NO. 2592** <br><br> **SECTION L** <br><br> **JUDGE ELDON E. FALLON** <br><br> **MAG. JUDGE NORTH** |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**THIS DOCUMENT RELATES TO:**

MARY E. BOUNDS, JAMES N. JOHNSON, KENNETH KARL KAISER AND LINDA KAISER RILEY obo BOBBIE KAISER, WILLIAM KOUNS and BILLIE KOUNS, DOUGLAS ROBINSON, LINDA RUNYAN, KAREN HAMILTON AND RICHARD ROBINSON obo RICHARD T. ROBINSON, RANDALL SMITH and SUSAN SMITH IMOND WASHINGTON, and BETTY WILCOTS,

             **Plaintiffs**

             **v.**

JANSSEN RESEARCH & DEVELOPMENT, LLC f/k/a JOHNSON AND JOHNSON PHARMACEUTICAL RESEARCH AND DEVELOPMENT LLC, JANSSEN ORTHO, LLC, JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA, INC. f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., JOHNSON & JOHNSON COMPANY, BAYER HEALTHCARE PHARMACEUTICALS, INC., BAYER PHARMA AG, BAYER CORPORATION, BAYER HEALTHCARE, LLC, BAYER HEALTHCARE AG, AND BAYER AG,

             **Defendants**

**CASE NO. 2:15-cv-04144**

**SECTION L**

**JUDGE ELDON E. FALLON**

**MAG. JUDGE NORTH**

**JURY TRIAL DEMANDED**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## AMENDED JOINT COMPLAINT

1

Pursuant to Pretrial Order No. 11, Plaintiffs, by and through counsel, file this *Amended Joint Complaint* against Defendants to amend allegations as to the Defendants' connection to the states of Plaintiffs' vicinage, as follows:

## PLAINTIFF SPECIFIC ALLEGATIONS

Plaintiffs herein are: Mary E. Bounds; James N. Johnson; Kenneth Karl Kaiser and Linda Kaiser Riley obo Bobbie Kaiser; William Kouns and Billie Kouns; Douglas Robinson, Linda Runyan, Karen Hamilton, and Richard Robinson obo Richard T. Robinson; Randall Smith and Susan Smith; Imond Washington; and Betty Wilcots. Bobbie Kaiser and Douglas Robinson are referred to herein as "the Decedents."

1.  <u>Mary E. Bounds</u>

    a.  Plaintiff Mary E. Bounds ingested Xarelto from approximately December 10, 2014 to May 10, 2015, and suffered multiple gastrointestinal bleeds.  From May 10, 2015 to May 11, 2015, she was admitted to Lakeview Regional Medical Center in Covington, Louisiana for a gastrointestinal bleed. On May 13, 2015, she presented to the Emergency Department of Highland Community Hospital in Picayune, Mississippi for treatment of pelvic pain, and she was released. A few days later, Mary E. Bounds' Xarelto therapy was resumed. On May 20, 2015, Mary E. Bounds again presented to the Emergency Department of Highland Community Hospital, where she was treated for a gastrointestinal hemorrhage, and she was transfused three units of packed red blood cells. The Plaintiff Mary E. Bounds was then transferred to Forrest General Hospital in Hattiesburg, Mississippi. She was hospitalized at Forrest General Hospital from May 20, 2015 through May 26, 2015, and she

was diagnosed with rectal bleeding and acute on chronic blood loss anemia. She was later transfused an additional two units of packed red blood cells due to continuing anemia.  Plaintiff resides in Pearl River County in the state of Mississippi.  Plaintiff also asserts a claim for lost earnings.

2.   James N. Johnson

    a.   Plaintiff, James N. Johnson, ingested Xarelto from approximately September 25, 2013 to October 2, 2013 and suffered gross hematuria and acute blood loss anemia and had to undergo two transfusions as a direct result of Xarelto. James N. Johnson was admitted to Christus St. Michael's Health System located in Texarkana, TX, and was hospitalized there from October 2, 2013 through October 5, 2013. Plaintiff, James N. Johnson, resides in Hempstead County in the state of Arkansas.

3.   Kenneth Karl Kaiser and Linda Kaiser Riley obo Bobbie Kaiser

    a.   The Decedent, Bobbie Kaiser, ingested Xarelto from approximately September 22, 2014 to October 1, 2014 and suffered severe rectal bleeding on October 1, 2014 as a direct result of Xarelto. The Decedent, Bobbie Kaiser, ultimately died on October 25, 2014 of a cerebrovascular accident after anticoagulation was required to be held pending an endoscopy following the GI bleed caused by Xarelto.  The Decedent was admitted to Natchez Regional Medical Center located in Natchez, MS on October 1, 2014. She was also admitted for the acute cerebrovascular accident to Natchez Community Hospital in Natchez, MS on October 21, 2014. The Decedent, Bobbie Kaiser, was a resident of Adams County in the state of Mississippi. The Decedent, Bobbie Kaiser, is represented

herein by Plaintiffs, Linda Kaiser Riley and Kenneth Karl Kaiser, the co-executors of her estate.

b. Kenneth Karl Kaiser and Linda Kaiser Riley both bring wrongful death and survival action claims, along with claims for loss of consortium.

4. <u>William Kouns</u>

a. Plaintiff, William Kouns, ingested Xarelto from approximately June 18, 2014 to August 15, 2014, when he suffered an acute splenic rupture and spontaneous splenic hemorrhage, hemorrhagic (hypovolemic) shock, and acute blood loss anemia, resulting in a splenectomy with multiple transfusions as a direct result of Xarelto use. Plaintiff was admitted to Singing River Hospital located in Pascagoula, MS where he was hospitalized from August 15, 2014 through August 20, 2014. Plaintiff was unable to re-start anti-coagulation other than aspirin after the splenic hemorrhage on Xarelto.

The Plaintiff, William Kouns, was then hospitalized at Singing River Hospital from September 23, 2014 through September 25, 2014, where it was found that the Plaintiff, William Kouns, had developed an unruptured cerebral aneurysm, a large volume of bilateral pulmonary emboli, a left cephalic vein thrombus around his PICC line, and an infra-renal abdominal aortic aneurysm which had increased in size. The Plaintiff was transferred to the University of South Alabama Hospital for the cerebral aneurysm which required stent-assisted embolization, but was transferred back to Singing River Hospital from September 28, 2014 through September 30, 2014. He was then returned to the University of South Alabama Hospital on October 15, 2014 for the stent-

assisted embolization, and was hospitalized there from October 15, 2014 through October 18, 2014.

When anti-coagulation was discontinued after the splenic hemorrhage that was suffered while on Xarelto, and after the cerebral aneurysm developed, William Kouns was then re-admitted to Singing River Hospital from May 29, 2015 through May 30, 2015 for placement of an MRI-compatible dual chamber pacemaker in view of the potential for future MRIs of the brain. Plaintiff, William Kouns, resides in Jackson County in the state of Mississippi.

b.  In conjunction with Plaintiff Kouns' claim, Billie Kouns, spouse of William Kouns, asserts a claim for loss of consortium.

5.  <u>Douglas Robinson, Linda Runyan, Karen Hamilton, and Richard Robinson obo Richard T. Robinson</u>

a. Decedent, Richard T. Robinson, ingested Xarelto from approximately January 24, 2014 to May 13, 2014 and suffered a subdural hemorrhage on May 13, 2014 as a direct result of Xarelto.  Decedent, Richard T. Robinson, was brought to Mercy Hospital in Fairfield, Ohio, and then transferred and admitted to University of Cincinnati Medical Center located in Cincinnati, Ohio on May 13, 2014. Richard T. Robinson ultimately died due to his injuries on May 25, 2014. The Decedent, Richard Robinson, was a resident of Hamilton County in the state of Ohio. The Decedent, Richard T. Robinson, is represented herein by Douglas Robinson, the executor of his estate, Linda Runyan and Karen Hamilton, daughters of Richard T. Robinson, and Richard Robinson, the son of Richard T. Robinson.

b. Douglas Robinson, Linda Runyan, Karen Hamilton, and Richard Robinson are bringing wrongful death and survival action claims, along with their claims for loss of consortium.

6.   <u>Randall Smith</u>

a. Plaintiff, Randall Smith, ingested Xarelto from approximately July 24, 2014 to August 17, 2014 and suffered a gastrointestinal bleed and anemia on August 17, 2014 and had to undergo multiple transfusions as a direct result of Xarelto. Plaintiff was admitted to Memorial Hospital located in Gulfport, Mississippi. Plaintiff, Randall Smith, resides in Harrison County in the state of Mississippi.

a.   In conjunction with Plaintiff Randall Smith's claim, Susan Smith, spouse of Randall smith, asserts a claim for loss of consortium.

b.   Plaintiff, Randall Smith, also asserts a claim for lost wages.

7.   <u>Imond Washington</u>

Plaintiff, Imond Washington, ingested Xarelto from approximately August 29, 2014 to September 6, 2014. He suffered a gastrointestinal bleed on September 6, 2014 and had to undergo transfusions as a direct result of Xarelto.  Plaintiff was hospitalized at Wadley Regional Medical Center located in Texarkana, Texas from September 6, 2014 through September 21, 2014. After Xarelto was discontinued to the gastrointestinal bleed, it was discovered on September 18, 2014 that he had developed bilateral pulmonary emboli requiring placement of an IVC filter. Plaintiff, Imond Washington, resides in Lafayette County in the state of Arkansas.

8.      Betty Wilcots

   a.   Plaintiff, Betty Wilcots, ingested Xarelto from approximately October, 2013 to November 1, 2013 and she suffered a gastrointestinal bleed on November 1, 2013 as a direct result of Xarelto. Plaintiff was admitted to Good Shepherd Medical Center in Longview, TX from November 1, 2013 through November 13, 2013. As a result of the inability to reinstitute anticoagulation due to the recent gastrointestinal bleed, the Plaintiff, Betty Wilcots, suffered an acute non-hemorrhagic infarct on or about January 30, 2014 for which she was hospitalized from January 30, 2014 through February 3, 2014 at Good Shepherd Medical Center. The Plaintiff, Betty Wilcots, resides in Panola County in the state of Texas.

**PARTY DEFENDANTS**

1.   Upon information and belief, the Defendant JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a JOHNSON AND JOHNSON PHARMACEUTICAL RESEARCH AND DEVELOPMENT LLC (hereinafter referred to as "JANSSEN R&D") is a limited liability company organized under the laws of New Jersey, with a principal place of business in New Jersey. Defendant JANSSEN R&D's sole member is Janssen Pharmaceuticals, Inc. which is a Pennsylvania corporation with a principal place of business in New Jersey.  Accordingly, JANSSEN R&D is a citizen of Pennsylvania and New Jersey for purposes of determining diversity under 28 U.S.C. §1332. The Defendant JANSSEN R&D is the holder of the approved New Drug Application ("NDA") for Xarelto as well as the supplemental NDA.

2.   As part of its business, JANSSEN R&D is involved in the research, testing and development, and in the sales and/or marketing of pharmaceutical products including Xarelto.

7

3.      Upon information and belief, Defendant JANSSEN R&D has transacted and conducted business in the States of Arkansas, Mississippi, Ohio and Texas.

4.      Upon information and belief, Defendant, JANSSEN R&D has derived substantial revenue from good and products used in the States of Arkansas, Mississippi, Ohio and Texas.

5.      Upon information and belief, Defendant, JANSSEN R&D, expected or should have expected its acts to have consequence within the United States of America and the States of Arkansas, Mississippi, Ohio and Texas, and it derived substantial revenue from interstate commerce within the United States and the States of Arkansas, Mississippi, Ohio and Texas, more particularly.

6.      Upon information and belief, and at all relevant times, the Defendant, JANSSEN R&D, was in the business of and did test, research, and develop, and did participate in the design, manufacture, advertising, promotion, marketing, sale, and distribution of the drug Xarelto for use as an oral anticoagulant.  The primary purposes of Xarelto are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

7.      Upon information and belief, the Defendant JANSSEN PHARMACEUTICALS, INC., f/k/a JANSSEN PHARMACEUTICA INC. f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. (hereinafter referred to as "JANSSEN PHARM") is a Pennsylvania corporation, having a principle place of business in New Jersey.

8.      As part of its business, JANSSEN PHARM was involved in the research, development, sales, manufacturing and marketing of pharmaceutical products including Xarelto.

9.      Upon information and belief, the Defendant, JANSSEN PHARM has transacted and conducted business in the States of Arkansas, Mississippi, Ohio and Texas.

10.      Upon information and belief, the Defendant, JANSSEN PHARM, has derived substantial revenue from goods and products used in the States of Arkansas, Mississippi, Ohio and Texas.

11.      Upon information and belief, the Defendant, JANSSEN PHARM, expected or should have expected its acts to have consequence within the United States of America and the States of Arkansas, Mississippi, Ohio and Texas, and it derived substantial revenue from interstate commerce within the United States and the States of Arkansas, Mississippi, Ohio and Texas, more particularly.

12.      Upon information and belief, and at all relevant times, the Defendant, JANSSEN PHARM, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

13.      Upon information and belief, the Defendant JANSSEN ORTHO LLC (hereinafter referred to as "JANSSEN ORTHO") is a limited liability company organized under the laws of Delaware, having a principal place of business at Stateroad 933 Km 0 1, Street Statero, Gurabo, Puerto Rico 00778. Defendant JANSSEN ORTHO is a subsidiary of JOHNSON & JOHNSON. The only member of JANSSEN ORTHO LLC is OMJ PR Holdings, which is incorporated in Ireland with a principal of business in Puerto Rico. Accordingly, JANSSEN ORTHO LLC is a

citizen of Delaware, Ireland, and Puerto Rico for purposes of determining diversity under 28 U.S.C. §1332.

14.     As part of its business, JANSSEN ORTHO is involved in the research, development, manufacturing, sales, and marketing of pharmaceutical products including Xarelto.

15.     Upon information and belief, the Defendant, JANSSEN ORTHO has transacted and conducted business in the States of Arkansas, Mississippi, Ohio and Texas.

16.     Upon information and belief, the Defendant, JANSSEN ORTHO, has derived substantial revenue from goods and products used in the States of Arkansas, Mississippi, Ohio and Texas.

17.     Upon information and belief, the Defendant, JANSSEN ORTHO, expected or should have expected its acts to have consequence within the United States of America and the States of Arkansas, Mississippi, Ohio and Texas, and it derived substantial revenue from interstate commerce within the United States and the States of Arkansas, Mississippi, Ohio and Texas, more particularly.

18.     Upon information and belief, and at all relevant times, the Defendant, JANSSEN ORTHO, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

19.     Upon information and belief, JOHNSON & JOHNSON (hereinafter referred to as "J&J") is a fictitious name adopted by the Defendant JOHNSON & JOHNSON COMPANY, a

New Jersey corporation which has its principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933.

20.     As part of its business, J&J and its "family of companies" are involved in the research, development, packaging, labeling, sales, and marketing of pharmaceutical products, including Xarelto.

21.     Upon information and belief, the Defendant, J&J has transacted and conducted business in the States of Arkansas, Mississippi, Ohio and Texas.

22.     Upon information and belief, the Defendant, J&J, has derived substantial revenue from goods and products used in the States of Arkansas, Mississippi, Ohio and Texas.

23.     Upon information and belief, the Defendant, J&J, expected or should have expected its acts to have consequence within the United States of America and the States of Arkansas, Mississippi, Ohio and Texas, and it derived substantial revenue from interstate commerce within the United States and the States of Arkansas, Mississippi, Ohio and Texas, more particularly.

24.     Upon information and belief, the Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. is, and at all relevant times was, a corporation organized under the laws of the State of Delaware, with its principal place of business in the State of New Jersey.

25.     As part of its business, BAYER HEALTHCARE PHARMACEUTICALS, INC. is involved in the research, manufacture, development, sales, and marketing of pharmaceutical products including Xarelto.

26.     Upon information and belief, the Defendant, BAYER HEALTHCARE PHARMACEUTICALS, INC., has transacted and conducted business in the States of Arkansas, Mississippi, Ohio and Texas.

27.     Upon information and belief, the Defendant, BAYER HEALTHCARE PHARMACEUTICALS, INC., has derived substantial revenue from goods and products used in the States of Arkansas, Mississippi, Ohio and Texas.

28.     Upon information and belief, the Defendant, BAYER HEALTHCARE PHARMACEUTICALS, INC., expected or should have expected its acts to have consequence within the United States of America and the States of Arkansas, Mississippi, Ohio and Texas, and it derived substantial revenue from interstate commerce within the United States and the States of Arkansas, Mississippi, Ohio and Texas, more particularly.

29.     Upon information and belief, and at all relevant times, the Defendant, BAYER HEALTHCARE PHARMACEUTICALS, INC., was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

30.     Upon information and belief, the Defendant BAYER PHARMA AG is a pharmaceutical company domiciled in Germany.

31.     The Defendant BAYER PHARMA AG is formerly known as Bayer Schering Pharma AG and is the same corporate entity as Bayer Schering Pharma AG. Bayer Schering Pharma AG is formerly known as Schering AG and is the same corporate entity as Schering AG.

32.     Upon information and belief, Schering AG was renamed Bayer Schering Pharma AG effective December 29, 2006.

33.     Upon information and belief, Bayer Schering Pharma AG was renamed BAYER PHARMA AG effective July 1, 2011.

34.     As part of its business, BAYER PHARMA AG is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto.

35.     Upon information and belief, the Defendant, BAYER PHARMA AG, has transacted and conducted business in the States of Arkansas, Mississippi, Ohio and Texas.

36.     Upon information and belief, the Defendant, BAYER PHARMA AG, has derived substantial revenue from goods and products used in the States of Arkansas, Mississippi, Ohio and Texas.

37.     Upon information and belief, the Defendant, BAYER PHARMA AG, expected or should have expected its acts to have consequence within the United States of America and the States of Arkansas, Mississippi, Ohio and Texas, and it derived substantial revenue from interstate commerce within the United States and the States of Arkansas, Mississippi, Ohio and Texas, more particularly.

38.     Upon information and belief, and at all relevant times, the Defendant, BAYER PHARMA AG, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

39.     Upon information and belief, the Defendant BAYER CORPORATION is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205.

40.     Upon information and belief, BAYER HEALTHCARE PHARMACEUTICALS, INC. is owned by Defendant BAYER CORPORATION.

41.     At relevant times, the Defendant BAYER CORPORATION was engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, its products, including the prescription drug Xarelto.

42.     At relevant times, the Defendant BAYER CORPORATION conducted regular and sustained business in the States of Arkansas, Mississippi, Ohio and Texas by selling and distributing its products in the States of Arkansas, Mississippi, Ohio and Texas, and it engaged in substantial commerce and business activity in the States of Arkansas, Mississippi, Ohio and Texas.

43.     Upon information and belief, the Defendant BAYER HEALTHCARE LLC is a limited liability company duly formed and existing under and by the virtue of the laws of the State of Delaware, with its principal place of business located in the State of New Jersey. BAYER HEALTHCARE, LLC'S sole member is Bayer Corporation, and it is wholly owned by Bayer Corporation, which is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205.  Accordingly, BAYER HEALTHCARE, LLC is a citizen of Delaware, New Jersey, Indiana and Pennsylvania for purposes of determining diversity under 28 U.S.C. §1332.

14

44.     Upon information and belief, at all relevant times, the Defendant BAYER HEALTHCARE LLC has transacted and conducted business in the States of Arkansas, Mississippi, Ohio and Texas, and it derived substantial revenue from interstate commerce.

45.     Upon information and belief, at all relevant times, the Defendant BAYER HEALTHCARE LLC expected or should have expected that its acts would have consequences within the United States of America and in the States of Arkansas, Mississippi, Ohio and Texas, and it derived substantial revenue from interstate commerce within the United States and the States of Arkansas, Mississippi, Ohio and Texas, more particularly.

46.     Upon information and belief, at all relevant times, the Defendant BAYER HEALTHCARE LLC was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

47.     Upon information and belief, the Defendant BAYER HEALTHCARE AG is a company domiciled in Germany and is the parent/holding company of Defendants BAYER CORPORATION,    BAYER    HEALTHCARE    LLC,    BAYER    HEALTHCARE PHARMACEUTICALS, INC, and BAYER PHARMA AG.

48.     Upon information and belief, at all relevant times, the Defendant BAYER HEALTHCARE AG has transacted and conducted business in the States of Arkansas, Mississippi, Ohio and Texas, and derived substantial revenue from interstate commerce within the United States and the States of Arkansas, Mississippi, Ohio and Texas, more particularly.

49.     Upon information and belief, at all relevant times, the Defendant BAYER HEALTHCARE AG expected or should have expected that its acts would have consequences within the United States of America, and in the States of Arkansas, Mississippi, Ohio and Texas, and it derived substantial revenue from interstate commerce within the United States and the States of Arkansas, Mississippi, Ohio and Texas, more particularly.

50.     Upon information and belief, at all relevant times, the Defendant BAYER HEALTHCARE AG exercises control over the Defendants BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC., and BAYER PHARMA AG.

51.     Upon information and belief, the Defendant BAYER AG is a German chemical and pharmaceutical company that is headquartered in Leverkusen, North Rhine-Westphalia, Germany.

52.     Upon information and belief, the Defendant BAYER AG is the third largest pharmaceutical company in the world.

53.     Upon information and belief, at all relevant times, the Defendant BAYER AG has transacted and conducted business in the States of Arkansas, Mississippi, Ohio and Texas, and it derived substantial revenue from interstate commerce within the United States and the States of Arkansas, Mississippi, Ohio and Texas, more particularly.

54.     Upon information and belief, at all relevant times, the Defendant BAYER AG expected or should have expected that its acts would have consequences within the United States of America, and in the States of Arkansas, Mississippi, Ohio and Texas, and it derived substantial revenue from interstate commerce within the United States and the States of Arkansas, Mississippi, Ohio and Texas, more particularly.

16

55.     Upon information and belief, at all relevant times, the Defendant BAYER AG was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

56.     Defendants Janssen Research & Development LLC, Janssen Ortho LLC, Janssen Pharmaceuticals, Inc., Johnson & Johnson, Bayer Healthcare Pharmaceuticals, Inc. Bayer Pharma AG, Bayer Corporation, Bayer Healthcare LLC, Bayer Healthcare AG, and Bayer AG, shall be referred to herein individually by name or jointly as "Defendants."

57.     At all times alleged herein, Defendants include and included any and all parents, subsidiaries, affiliates, divisions, franchises, partners, joint venturers, and organizational units of any kind, their predecessors, successors, and assigns and their officers, directors, employees, agents, representatives, and any and all persons acting on their behalf.

58.     At all times herein mentioned, each of the Defendants was the agent, servant, partner, predecessor in interest, and joint venturer of each of the remaining Defendants herein and was at all times operating and acting with the purpose and scope of said agency, service, employment, partnership and joint venture.

59.     At all times relevant, Defendants were engaged in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into the interstate commerce throughout the United States, either directly or indirectly through third parties, subsidiaries or related entities, the drug Xarelto.

## JURISDICTION AND VENUE

60.     Federal subject matter jurisdiction in the constituent actions is based upon 28 U.S.C. § 1332, in that in each of the constituent actions there is complete diversity among Plaintiffs/Decedents and Defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs, and because there is complete diversity of citizenship between Plaintiffs and Defendants.

61.      Defendants have significant contacts in the vicinage of Decedents'/Plaintiff's residence such that they are subject to the personal jurisdiction of the court in that vicinage.

62.     A substantial part of the events and omissions giving rise to Decedents'/Plaintiffs' causes of action occurred in the vicinage of Decedents'/Plaintiffs' residence, as well as in this district.  Pursuant to 28 U.S.C. § 1391(a), venue is proper in both districts.

63.     Pursuant to the Transfer Order of the Judicial Panel on Multidistrict Litigation, In re Xarelto (Rivaroxaban) Products Liab. Litig., 2014 WL 7004048 (J.P.M.L. June 12, 2014), venue is also proper in this jurisdiction pursuant to 28 U.S.C. § 1407.

64.     The Plaintiffs state that but for the Order permitting direct filing into the United States District Court for the Eastern District of Louisiana pursuant to Pre-Trial Order #9, the Plaintiffs Mary E. Bounds, William Kouns, and Randall Smith would have filed in the United States District Court for the Southern District of Mississippi, Southern Division.  Therefore, the Plaintiffs Mary E. Bounds, William Kouns, and Randall Smith respectfully request that at the time of the transfer of their actions back to the respective trial courts for further proceedings, if any, that their cases be transferred to the above referenced District Court.

65.     The Plaintiffs state that but for the Order permitting direct filing into the United States District Court for the Eastern District of Louisiana pursuant to Pre-Trial Order #9, the Plaintiffs James N. Johnson and Imond Washington would have filed in the United States District Court for the Western District of Arkansas, Texarkana Division. Therefore, the Plaintiffs James N. Johnson and Imond Washington respectfully request that at the time of the transfer of their actions back to the respective trial courts for further proceedings, if any, that their cases be transferred to the above referenced District Court.

66.     The Plaintiffs state that but for the Order permitting direct filing into the United States District Court for the Eastern District of Louisiana pursuant to Pre-Trial Order #9, the Plaintiffs Kenneth Karl Kaiser and Linda Kaiser Riley obo Bobbie Kaiser would have filed in the United States District Court for the Southern District of Mississippi, Western Division. Therefore, the Plaintiffs Kenneth Karl Kaiser and Linda Kaiser Riley obo Bobbie Kaiser respectfully request that at the time of the transfer of their action back to the respective trial courts for further proceedings, if any, that their case be transferred to the above referenced District Court.

67.     The Plaintiffs state that but for the Order permitting direct filing into the United States District Court for the Eastern District of Louisiana pursuant to Pre-Trial Order #9, the Plaintiffs Douglas Robinson, Linda Runyan, Karen Hamilton, and Richard Robinson obo Richard T. Robinson would have filed in the United States District Court for the Southern District of Ohio, Western Division.  Therefore, the Plaintiffs Douglas Robinson, Linda Runyan, Karen Hamilton, and Richard Robinson obo Richard T. Robinson respectfully request that at the time of the transfer of their action back to the respective

trial courts for further proceedings, if any, that their case be transferred to the above referenced District Court.

68.     The Plaintiffs state that but for the Order permitting direct filing into the United States District Court for the Eastern District of Louisiana pursuant to Pre-Trial Order #9, the Plaintiff Betty Wilcots would have filed in the United States District Court for the Eastern District of Texas, Tyler Division.   Therefore, the Plaintiff Betty Wilcots respectfully requests that at the time of the transfer of this action back to the respective trial courts for further proceedings, if any, that this case be transferred to the above referenced District Court.

## FACTUAL BACKGROUND

A. **Nature of the Case**

69. The Plaintiffs bring this case against the Defendants for damages associated with their ingestion of the pharmaceutical drug Xarelto, which was designed, manufactured, marketed, sold and distributed by Defendants.

70. At all relevant times, the Defendants were in the business of and did design, research, manufacture, test, advertise, promote, market, sell and distribute Xarelto to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

71. Xarelto was introduced in the United States (hereinafter referred to as the "U.S.") on July 1, 2011, and it is part of a class of drugs called New Oral Anticoagulants ("NOACS").

72. This class of NOACs, which also includes Pradaxa and Eliquis, is marketed as the next generation of blood-thinning drugs to replace warfarin (Coumadin), an established safe treatment for preventing stroke and systemic embolism for the past 60 years.

73. Xarelto is an anticoagulant that acts as a Factor Xa inhibitor, and is available by prescription in oral tablet doses of 20mg, 15mg, and 10mg.

74. The Defendants received FDA approval for Xarelto on July 1, 2011 for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries (NDA 022406).

75. Approval of Xarelto for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries was based on a series of clinical trials known as the Regulation of Coagulation in Orthopedic Surgery to Prevent Deep Venous Thrombosis and Pulmonary Embolism studies (hereinafter referred to as the "RECORD" studies). The findings of the RECORD studies showed that Xarelto was superior (based on the Defendants' definition) to enoxaparin for thromboprophylaxis after total knee and hip arthroplasty, accompanied by similar rates of bleeding. However, the studies also showed a greater bleeding incidence with Xarelto of bleeding leading to decreased hemoglobin levels and transfusion of blood. (Lassen, M.R., et al. *Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Total Knee Arthroplasty*. N.Engl.J.Med. 2008; 358:2776-86; Kakkar, A.K., *et al. Extended duration rivaroxaban versus short-term enoxaparin for the prevention of venous thromboembolism after total hip arthroplasty: a double-blind, randomised controlled trial. Lancet 2008; 372:31-39; Ericksson, B.I., et al. Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Hip Arthroplasty*. N.Engl.J.Med. 2008; 358:2765-75.)

76. Despite these findings, the RECORD studies were flawed in design and conducted in a negligent manner. In fact, FDA Official Action Indicated ("OAI") – rated inspections in 2009 disclosed rampant violations including, "systemic discarding of medical records," unauthorized unblinding, falsification, and "concerns regarding improprieties in randomization." As a result, the FDA found that the RECORD 4 studies were so flawed that they were deemed unreliable. (Seife, Charles, *Research Misconduct Identified by US Food and Drug Administration*, JAMA Intern. Med (Feb. 9, 2015)).

77. Nevertheless, the Defendants received additional FDA approval for Xarelto to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation on November 4, 2011 (NDA 202439). Approval of Xarelto for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation in the U.S. was based on a clinical trial known as the Rivaroxaban Once Daily Oral Direct Factor Xa Inhibition Compared with Vitamin K Antagonism for Prevention of Stroke and Embolism Trial in Atrial Fibrillation study (hereinafter referred to as "ROCKET AF").

78. The ROCKET AF study showed that Xarelto was non-inferior to warfarin for the prevention of stroke or systemic embolism in patients with non-valvular atrial fibrillation, with a similar risk of major bleeding. However, "bleeding from gastrointestinal sites, including upper, lower, and rectal sites, occurred more frequently in the rivaroxaban group, as did bleeding that led to a drop in the hemoglobin level or bleeding that required transfusion." (Patel, M.R., et al. *Rivaroxaban versus Warfarin in Nonvalvular Atrial Fibrillation*. N.Engl.J.Med. 2011; 365:883-91.)

79. The ROCKET AF study compared warfarin to Xarelto. Thus, for the study to be well-designed and meaningful, the warfarin study group would have to be well-managed

because warfarin's safety and efficacy is dose dependent.  In other words, if the warfarin group was poorly managed, it would be easy for Xarelto to appear non-inferior to warfarin, which, in turn, would provide Defendants a study to "support" Xarelto's use.

80.     In fact, in the ROCKET AF study, the warfarin group was not well managed.  The warfarin group in the ROCKET AF study was the worst managed warfarin study group in any previously reported clinical trial involving warfarin.

81.     The poor management of the warfarin group in the ROCKET AF study was not lost on the FDA, which noted, "the data comparing [Xarelto] to warfarin are not adequate to determine whether [Xarelto] is as effective for its proposed indication in comparison to warfarin when the latter is used skillfully." FDA Advisory Committee Briefing document, p. 10.

82.     Public Citizen also noticed the poor control in the warfarin group. Public Citizen wrote the FDA, stating they "strongly oppose FDA approval…The 3 ROCKET AF trial conducted in support of the proposed indication had a suboptimal control arm…" http://www.citizen.org/documents/1974.pdf."

83.     Another problem with the ROCKET AF study was Xarelto's once-a-day dosing. The FDA clinical reviewers stated that "the sponsor's rationale for evaluating only once daily dosing during Phase 3 is not strong. Most importantly, there is clinical information from Phase 2 trials…and from clinical pharmacology studies suggesting that twice daily dosing, which would produce lower peak blood levels and higher trough blood levels of [Xarelto], might have been associated with greater efficacy and/or a better safety profile." FDA Advisory Committee Briefing document, p. 100.

84.     Dr. Steven E. Nissen more sharply stated, "my concern was that the dose was selected more for a marketing advantage rather than for the scientific data that was available, and [that] was a mistake…" FDA Advisory Meeting Transcript, p. 287.

85.     Furthermore, the FDA expressed desirability in monitoring Xarelto dosage within their NDA approval memo based on the ROCKET studies. The clinical pharmacology in these studies demonstrated a linear correlation between rivaroxaban (Xarelto) levels and prothrombin time ("PT"); and subsequently, a correlation between PT and the risk of bleeding.  At this time, Defendants were aware of the correlation between Xarelto dosage and bleeding risks, but had "not chosen to utilize this information." (NDA 202439 Summary Review, p. 9).  At all relevant times, Defendants controlled the contents of their label as demonstrated by their decision to go forward without regard to the FDA's suggestion to utilize this information.

86.     The additional indication for treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE was added to the label on November 2, 2012.

87.     Approval of Xarelto for the treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE in the U.S. was based on the clinical trials known as the EINSTEIN-DVT, EINSTEIN-PE, and EINSTEIN-Extension studies. The EINSTEIN-DVT study tested Xarelto versus a placebo, and merely determined that Xarelto offered an option for treatment of DVT, with an increased risk of bleeding events as compared to placebo. (The EINSTEIN Investigators. *Oral Rivaroxaban for Symptomatic Venous Thromboembolism*. N.Engl.J.Med. 2010; 363:2499-510). The EINSTEIN-Extension study confirmed that result. (Roumualdi, E., et al. *Oral rivaroxaban after symptomatic venous thromboembolism: the continued treatment study (EINSTEIN-Extension study)*. Expert Rev. Cardiovasc. Ther. 2011; 9(7):841-844). The EINSTEIN-PE study's findings showed that a Xarelto regimen was non-

inferior to the standard therapy for initial and long-term treatment of PE. However, the studies also demonstrated an increased risk of adverse events with Xarelto, including those that resulted in permanent discontinuation of Xarelto or prolonged hospitalization. (The EINSTEIN-PE Investigators. *Oral Rivaroxaban for the Treatment of Symptomatic Pulmonary Embolism*. N.Engl.J.Med. 2012; 366:1287-97.)

88.     The Defendants use the results of the ROCKET AF study, the RECORD studies, and the EINSTEIN studies to promote Xarelto in their promotional materials, including the Xarelto website, which tout the positive results of those studies. However, the Defendants' promotional materials fail to similarly highlight the increased risk of gastrointestinal bleeding and bleeding that required transfusion, among other serious bleeding concerns.

89.     The Defendants market Xarelto as a new oral anticoagulant treatment alternative to warfarin (Coumadin), a long-established safe treatment for preventing stroke and systemic embolism.

90.     The Defendants market and promote Xarelto as a single daily dose pill that does not require the need to measure a patient's blood plasma levels, touting it more convenient to warfarin and it does not limit a patient's diet. The single dose and no blood testing requirements or daily constraints are marketed by Defendants as the "Xarelto Difference."

91.     However, Xarelto's clinical studies show that Xarelto is safer and more effective when there is blood monitoring, dose adjustments, and twice a day dosing.

92.     In its QuarterWatch publication for the first quarter of the 2012 fiscal year, the Institute for Safe Medication Practices ("ISMP") noted that, even during the approval process, FDA "[r]eviewers also questioned the convenient once-a-day dosing scheme [of Xarelto], saying

blood level studies had shown peaks and troughs that could be eliminated by twice-a-day dosing."

93.     The use of Xarelto without appropriate blood monitoring, dose adjustment and twice a day dosing can cause major, life-threatening bleeding events. Physicians using Xarelto have to be able to balance the dose so that the blood is thinned enough to reduce the risk of stroke, but not thinned so much as to increase the risk for a major bleeding event.   The Defendants were aware of this risk and the need for blood monitoring but have failed to disclose this vital health information to patients, doctors and the FDA.

94.     Importantly, Xarelto's significant risk of severe, and sometimes fatal, internal bleeding has no antidote to reverse its effects, unlike warfarin. Therefore, in the event of hemorrhagic complications, there is no available reversal agent. The original U.S. label, approved when the drug was first marketed, did not contain a warning regarding the lack of antidote, but instead only mentioned this important fact in the overdose section.

95.     The FDA's adverse event data indicates staggering, serious adverse events that have been associated with Xarelto.

96.     In the year leading up to June 30, 2012, there were 1,080 Xarelto-associated "Serious Adverse Event" ("SAE") Medwatch reports filed with the FDA, including at least 65 deaths. Of the reported hemorrhage events associated with Xarelto, 8% resulted in death, which was approximately twofold the risk of a hemorrhage-related death with warfarin.

97.     At the close of the 2012 fiscal year, a total of 2,081 new Xarelto-associated SAE reports were filed with the FDA, in its first full year on the market, ranking tenth among other pharmaceuticals in direct reports to the FDA. Of those reported events, 151 resulted in death, as compared to only 56 deaths associated with warfarin.

98. The ISMP referred to these SAE figures as constituting a "strong signal" regarding the safety of Xarelto, defined as "evidence of sufficient weight to justify an alert to the public and the scientific community, and to warrant further investigation."

99. Of particular note, in the first quarter of 2013, the number of reported serious adverse events associated with Xarelto (680) overtook that of Pradaxa (528), another new oral anticoagulant, which had previously ranked as the number one reported drug in terms of adverse events in 2012.

100. Moreover, in the first eight months of 2013, German regulators received 968 Xarelto-related averse event reports, including 72 deaths, as compared to a total of 750 reports and 58 deaths in 2012.

101. Despite the clear signal generated by the SAE data, the Defendants failed to either alert the public, consumers, health care professionals and the scientific community about the dangers of Xarelto, nor did Defendants perform further investigation into the safety of Xarelto.

102. The Defendants' original and, in some respects, current labeling and prescribing information for Xarelto:

    a)  failed to investigate, research, study and define, fully and adequately, the safety profile of Xarelto;

    b)  failed to provide adequate warnings about the true safety risks associated with the use of Xarelto;

    c)  failed to provide adequate warning regarding the pharmacokinetic and pharmacodynamic variability of Xarelto and its effects on the degree of anticoagulation in a patient;

    d)  failed to disclose the need for dose adjustments;

    e)  failed to disclose the need for twice-daily dosing;

    f)  failed to warn about the need for blood monitoring;

g)  failed to provide adequate warning that it is difficult or impossible to assess the degree and/or extent of anticoagulation in patients taking Xarelto;

h)  failed to adequately disclose in the "Warnings" Section that there is no drug, agent or means to reverse the anticoagulation effects of Xarelto;

i)  failed to advise prescribing physicians, such as the Plaintiff's/Decedent's physician, to instruct patients that there was no agent to reverse the anticoagulant effects of Xarelto;

j)  failed to provide adequate instructions on how to intervene and/or stabilize a patient who suffers a bleed while taking Xarelto;

k)  failed to provide adequate warnings and information related to the increased risks of bleeding events associated with aging patient populations of Xarelto users;

l)  failed to provide adequate warnings regarding the increased risk of gastrointestinal bleeds in those taking Xarelto, especially, in those patients with a prior history of gastrointestinal issues and/or upset stomach;

m) failed to provide adequate warnings regarding the increased risk of suffering a bleeding event requiring blood transfusions in those taking Xarelto;

n)  failed to provide adequate warnings regarding the need to assess renal functioning prior to starting a patient on Xarelto and to continue testing and monitoring of renal functioning periodically while the patient is on Xarelto;

o)  failed to provide adequate warnings regarding the need to assess hepatic functioning prior to starting a patient on Xarelto and to continue testing and monitoring of hepatic functioning periodically while the patient is on Xarelto;

p)  failed to include a "**BOXED WARNING**" about serious bleeding events associated with Xarelto;

q)  failed to include a "**BOLDED WARNING**" about serious bleeding events associated with Xarelto; and

r)  failed to disclose to patients in the Defendants' "Medication Guide," intended for distribution to patients to whom Xarelto has been prescribed, the need for blood monitoring and failed to disclose that there is no drug, agent or means to reverse the anticoagulation effects of Xarelto and that if serious bleeding occurs, such irreversibility could have permanently disabling, life-threatening or fatal consequences.

28

103.    During the years since first marketing Xarelto in the U.S., the Defendants

modified the U.S. labeling and prescribing information for Xarelto, which included

additional information regarding the use of Xarelto in patients taking certain medications.

Despite being aware of: (1) serious, and sometimes fatal, irreversible bleeding events

associated with the use of Xarelto; and (2) 2,081 SAE Medwatch reports filed with the

FDA in 2012 alone, including at least 151 deaths, the Defendants nonetheless failed to

provide adequate disclosures or warnings in their label as detailed in Paragraph 102 (a –

r).

104.    As a direct and proximate result of the Defendants' aforesaid actions, the

Plaintiffs/Decedents suffered serious and dangerous side effects including life-threatening

bleeding, as well as other severe and personal injuries which were permanent and lasting in

nature, physical pain and mental anguish, including, but not limited to, diminished enjoyment of

life, shortened life expectancy in some cases leading to death, expenses for hospitalization and

medical treatment and in some cases funeral expenses, and any and all damages that are

reasonable in the premises.

105.    Despite the wealth of scientific evidence, the Defendants have ignored the

increased risk of the development of the aforementioned injuries associated with the use of

Xarelto, but they have, through their marketing and advertising campaigns, urged consumers to

use Xarelto without regular blood monitoring or instead of anticoagulants that present a safer

alternative.

### B.   Over-Promotion of Xarelto

106.    Xarelto is the second-most prescribed drug for treatment of atrial fibrillation, behind only Coumadin (warfarin), and it achieved blockbuster status with sales of approximately $2 billion dollars in 2013.

107.    The Defendants spent significant money in promoting Xarelto, which included at least $11,000,000.00 spent during 2013 alone on advertising in journals targeted at prescribers and consumers in the U.S. In the third quarter of the 2013 fiscal year, Xarelto was the number one pharmaceutical product advertised in professional health journals based on pages and dollars spent.

108.    The Defendants' aggressive and misrepresentative marketing of a "Xarelto Difference" lead to an explosion in Xarelto sales.  The "Xarelto Difference," *i.e.,* was once-a-day dosing without blood monitoring. In fact, the "Xarelto Difference" was nothing more than a marketing campaign based on flawed science.

109.    As a result of the Defendants' aggressive marketing efforts, in its first full year of being on the market, Xarelto garnered approximately $582 million in sales globally.

110.    The Defendants' website for Xarelto claims that over seven million people worldwide have been prescribed Xarelto. In the U.S., approximately 1 million Xarelto prescriptions had been written by the end of 2013.

111.    During the Defendants' 2012 fiscal year, Xarelto garnered approximately $658 million in sales worldwide. Then, in 2013, sales for Xarelto increased even further to more than clear the $1 billion threshold commonly referred to as "blockbuster" status in the pharmaceutical industry. In fact, Xarelto sales ultimately reached approximately $2 billion for the 2013 fiscal

year. Thus, Xarelto is now considered the leading anticoagulant on a global scale in terms of sales.

112.    As part of their marketing of Xarelto, the Defendants widely disseminated direct-to-consumer ("DTC") advertising campaigns that were designed to influence patients, including the Plaintiffs and the Decedents, to make inquiries to their prescribing physicians about Xarelto and/or request prescriptions for Xarelto.

113.    In the course of these DTC advertisements, the Defendants overstated the efficacy of Xarelto with respect to preventing stroke and systemic embolism, failed to disclose the need for dose adjustments, failed to disclose the need for blood monitoring, and failed to adequately disclose to patients that there is no drug, agent, or means to reverse the anticoagulation effects of Xarelto, and that such irreversibility could have permanently disabling, life-threatening and fatal consequences.

114.    On June 6, 2013, the Defendants received an untitled letter from the FDA's Office of Prescription Drug Promotion (hereinafter referred to as the "OPDP") regarding its promotional material for the atrial fibrillation indication, stating that, "the print ad is false or misleading because it minimizes the risks associated with Xarelto and makes a misleading claim" regarding dose adjustments, which was in violation of FDA regulations. The OPDP thus requested that the Defendants immediately cease distribution of such promotional material.

115.    Prior to the Plaintiffs'/Decedents' ingestion of Xarelto, the Plaintiffs/Decedents and/or the Plaintiffs'/Decedents' physicians became aware of the promotional materials described herein.

116.    Prior to the Plaintiffs'/Decedents' prescription of Xarelto, the Plaintiffs'/Decedents' prescribing physicians received promotional materials and information

from sales representatives of the Defendants claiming that Xarelto was just as effective as warfarin in reducing strokes in patients with non-valvular atrial fibrillation, as well as preventing DVT/PE in patients with prior history of DVT/PE or undergoing hip or knee replacement surgery, and was more convenient, without also requiring blood monitoring, dose adjustments, twice-a-day dosing, or adequately informing prescribing physicians that there was no reversal agent that could stop or control bleeding in patients taking Xarelto.

117.    At all times relevant hereto, the Defendants also failed to warn emergency room doctors, surgeons, and other critical care medical professionals that unlike generally-known measures taken to treat and stabilize bleeding in users of warfarin, there is no effective agent to reverse the anticoagulation effects of Xarelto, and therefore no effective means to treat and stabilize patients who experience uncontrolled bleeding while taking Xarelto.

118.    At all times relevant to this action, The Xarelto Medication Guide, prepared and distributed by the Defendants and intended for U.S. patients to whom Xarelto has been prescribed, failed to warn about the need for blood monitoring, dose adjustments, and twice-a-day dosing, and failed to disclose to patients that there is no agent to reverse the anticoagulation effects of Xarelto and that if serious bleeding occurs, it may be irreversible, permanently disabling, and life-threatening.

119.    Prior to applying to the FDA for and obtaining approval of Xarelto, the Defendants knew or should have known that consumption of Xarelto was associated with and/or would cause the induction of life-threatening bleeding, and Defendants possessed at least one clinical scientific study, which evidence Defendants knew or should have known was a signal that life-threatening bleeding risk needed further testing and studies prior to its introduction to the market.

32

120.    As a result of Defendants' claim regarding the effectiveness and safety of Xarelto, the Plaintiffs'/Decedents' medical providers prescribed and the Plaintiffs/Decedents ingested Xarelto.

**C.      The Plaintiffs'/Decedents' Use of Xarelto and Resulting Injuries**

121.    By reason of the foregoing acts and omissions, Plaintiffs/Decedents were caused to suffer from life-threatening bleeding, as well as other severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, expenses for hospitalization and medical treatment among any and all other damages.

122.    Upon information and belief, despite life-threatening bleeding findings in a clinical trial and other clinical evidence, the Defendants failed to adequately conduct complete and proper testing of Xarelto prior to filing their New Drug Application for Xarelto.

123.    Upon information and belief, from the date the Defendants received FDA approval to market Xarelto, the Defendants made, distributed, marketed and sold Xarelto without adequate warning to the Plaintiffs'/Decedents' prescribing physicians or the Plaintiffs/Decedents that Xarelto was associated with and/or could cause life-threatening bleeding, presented a risk of life-threatening bleeding in patients who used it, and that the Defendants had not adequately conducted complete and proper testing and studies of Xarelto with regard to severe side effects, specifically, life-threatening bleeding.

124.    Upon information and belief, the Defendants concealed and failed to completely disclose their knowledge that Xarelto was associated with or could cause life-threatening bleeding as well as their knowledge that they had failed to fully test or study said risk.

33

125.    Upon information and belief, the Defendants ignored the association between the use of Xarelto and the risk of developing life-threatening bleeding.

126.    Upon information and belief, the Defendants failed to warn the Plaintiffs/Decedents and the Plaintiffs'/Decedents' healthcare providers regarding the need for blood monitoring, dose adjustments, and failed to warn of the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening, associated with Xarelto.

127.    The Defendants' failure to disclose information that they possessed regarding the failure to adequately test and study Xarelto for life-threatening bleeding risk further rendered warnings for this medication inadequate.

128.    The Defendants' fraudulent concealment and misrepresentations were designed to prevent, and did prevent, the public and the medical community at large from discovering the dangers associated with Xarelto, and prevented the Plaintiffs/Decedents from discovering, and/or with reasonable diligence of being able to discover, their causes of action.

129.    The Defendants' fraudulent representations and concealment evidence flagrant, willful, and depraved indifference to health, safety and welfare. The Defendants' conduct showed willful misconduct, malice, fraud, wantonness, oppression, and that entire want of care that raises the presumption of conscious indifference to the consequences of said conduct.

130.    By reason of the foregoing acts and omissions, the Plaintiffs/Decedents suffered damages and harm, including, but not limited to, personal injury, medical expenses, and other economic harm, as well as, where alleged, loss of consortium, services, society, companionship, love and comfort.

## FIRST CAUSE OF ACTION AS AGAINST THE DEFENDANTS: STRICT PRODUCTS LIABILITY

131.    The Plaintiffs repeat, reiterate and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein. The Plaintiffs plead this cause of action in the broadest sense possible, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the resident state(s) of the Plaintiffs/Decedents regardless of whether arising under statute, common or civil law.

132.    At the time of the Plaintiffs'/Decedents' injuries, the Defendants' pharmaceutical drug Xarelto was defective and unreasonably dangerous to foreseeable consumers, including the Plaintiffs/Decedents.

133.    At all times herein mentioned, the Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, distributed, and/or have recently acquired the Defendants who have designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed Xarelto as hereinabove described that was used by the Plaintiffs/Decedents.

134.    The Defendants' Xarelto was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

135.    At those times, Xarelto was in an unsafe, defective, and inherently dangerous condition which was dangerous to users, and in particular, the Plaintiffs/Decedents herein.

136.     The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by the Defendants was defective in design or formulation in that, when it left the hands of the Defendants, the manufacturers and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Xarelto.

137.     The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by the Defendants was defective in design and/or formulation, in that, when it left the hands of the Defendants, the manufacturers, and/or suppliers, it was unreasonably dangerous, and it was more dangerous than an ordinary consumer would expect.

138.     At all times herein mentioned, Xarelto was in a defective condition and unsafe, and the Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendants.

139.     The Defendants knew, or should have known, that at all times herein mentioned, their Xarelto was in a defective condition, and was and is inherently dangerous and unsafe.

140.     At the time of the Plaintiffs'/Decedents' use of Xarelto, Xarelto was being used for the purposes and in a manner normally intended, namely to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and/or for prophylaxis of DVT for patients undergoing hip or knee replacement surgery.

141.     The Defendants, with this knowledge, voluntarily designed their Xarelto in a dangerous condition for use by the public, and in particular the Plaintiffs/Decedents.

142.    The Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

143.    The Defendants created a product unreasonably dangerous for its normal, intended use.

144.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by the Defendants was manufactured defectively in that Xarelto left the hands of the Defendants in a defective condition and was unreasonably dangerous to its intended users.

145.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by the Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Xarelto was manufactured.

146.    The Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed a defective product which created an unreasonable risk to the health of consumers and to the Plaintiffs/Decedents in particular, and, the Defendants are therefore strictly liable for the injuries sustained by the Plaintiffs/Decedents, and thus the Defendants are strictly liable to the Plaintiffs/Decedents.

147.    The Plaintiffs/Decedents could not, by the exercise of reasonable care, have discovered Xarelto's defects herein mentioned and perceived its danger.

148.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by the Defendants was defective due to inadequate warnings or instructions, as the Defendants knew or should have known that the product created a risk of serious and dangerous side effects including, life-threatening bleeding,

as well as other severe and personal injuries which are permanent and lasting in nature and the Defendants failed to adequately warn of said risk.

149.     The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by the Defendants was defective due to inadequate warnings and/or inadequate testing.

150.     The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by the Defendants was defective due to inadequate post-marketing surveillance and/or warnings because, after the Defendants knew or should have known of the risks of serious side effects including life-threatening bleeding, as well as other severe and permanent health consequences from Xarelto, they failed to provide adequate warnings to users or consumers of the product, and continued to improperly advertise, market and/or promote their product, Xarelto.

151.     The Xarelto ingested by the Plaintiffs/Decedents was in the same or substantially similar condition as it was when it left the possession of the Defendants.

152.     The Plaintiffs/Decedents did not misuse or substantially alter the Defendant's Xarelto.

153.     By reason of the foregoing, the Defendants have become strictly liable in tort to the Plaintiffs/Decedents for their injuries and their damages in the following ways:

    a.  Xarelto, as designed, manufactured, sold and supplied by the Defendants, was defectively designed and placed into the stream of commerce by the Defendants in a defective and unreasonably dangerous condition;

    b.  The Defendants failed to properly market, design, manufacture, distribute, supply and sell Xarelto;

    c.  The Defendants failed to warn and place adequate warnings and instructions on Xarelto;

d.  The Defendants failed to adequately test Xarelto;

e.  The Defendants failed to provide timely and adequate post-marketing warnings and instructions after they knew of the risk of injury associated with the use of Xarelto; and,

f.  A feasible alternative design existed that was capable of preventing the injuries of the Plaintiffs/Decedents.

154.  By reason of the foregoing, the Defendants have become strictly liable to the Plaintiffs for the manufacturing, marketing, promoting, distribution, and selling of the defective product, Xarelto.

155.  The Defendants' defective design, manufacturing defect, and inadequate warnings of Xarelto were acts that amount to willful, wanton, and/or reckless conduct by the Defendants.

156.  That said defects in the Defendants' drug Xarelto were a substantial factor in causing the Plaintiffs'/Decedents' injuries and the Plaintiffs'/Decedents' damages.

157.  As a direct and proximate result of the Defendants' aforesaid actions, the Plaintiffs/Decedents suffered, and in some cases may continue to suffer, serious and dangerous side effects including life-threatening bleeding, as well as other severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including, but not limited to, diminished enjoyment of life, shortened life expectancy in some cases leading to death, expenses for hospitalization and medical treatment and in some cases funeral expenses, and any and all damages that are reasonable in the premises.

158.  The Defendants' conduct, as described above, was extreme and outrageous.  The Defendants risked the lives of the consumers and users of their products, including the Plaintiffs/Decedents, with knowledge of the safety and efficacy problems and suppressed

39

this knowledge from the general public.  The Defendants made conscious decisions not to re-design, re-label, warn or inform the unsuspecting consuming public.  The Defendants' outrageous conduct warrants an award of punitive damages.

## SECOND CAUSE OF ACTION AS AGAINST THE DEFENDANTS: MANUFACTURING DEFECT

159.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead this Count in the broadest sense available under the law, to include pleading same pursuant to all substantive law that applies to this case, as may be determined by choice of law principles, regardless of whether arising under statute and/or common law.

160.    Xarelto was designed, manufactured, marketed, promoted, sold, and introduced into the stream of commerce by Defendants.

161.    When it left the control of Defendants, Xarelto was expected to, and did reach Plaintiffs/Decedents without substantial change from the condition in which it left Defendants' control.

162.    Xarelto was defective when it left Defendants' control and was placed in the stream of commerce, in that there were foreseeable risks that exceeded the benefits of the product and/or that it deviated from product specifications and/or applicable federal requirements, and posed a risk of serious injury and death.

163.    Specifically, Xarelto was more likely to cause serious bleeding that may be irreversible, permanently disabling, and life-threatening than other anticoagulants.

164.    Plaintiffs/Decedents used Xarelto in substantially the same condition it was in when it left the control of Defendants and any changes or modifications were foreseeable by Defendants.

165.     Plaintiffs/Decedents and their healthcare providers did not misuse or materially alter their Xarelto.

166.     As a direct and proximate result of the Defendants' aforesaid actions, the Plaintiffs/Decedents suffered, and in some cases may continue to suffer, serious and dangerous side effects including life-threatening bleeding, as well as other severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including, but not limited to, diminished enjoyment of life, shortened life expectancy in some cases leading to death, expenses for hospitalization and medical treatment and in some cases funeral expenses, and any and all damages that are reasonable in the premises.

## THIRD CAUSE OF ACTION AS AGAINST THE DEFENDANTS: DESIGN DEFECT

167.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead this Count in the broadest sense available under the law, to include pleading same pursuant to all substantive law that applies to this case, as may be determined by choice of law principles, regardless of whether arising under statute and/or common law.

168.     Xarelto was not merchantable and/or reasonably suited to the use intended, and its condition when sold was the proximate cause of the injuries sustained by Plaintiffs/Decedents.

169.     Defendants placed Xarelto into the stream of commerce with wanton and reckless disregard for public safety.

170.     Xarelto was in an unsafe, defective, and inherently dangerous condition.

171.     Xarelto contains defects in its design which render the drug dangerous to

consumers, such as Plaintiffs/Decedents, when used as intended or as reasonably foreseeable to Defendants. The design defects render Xarelto more dangerous than other anticoagulants and cause an unreasonable increased risk of injury, including but not limited to life-threatening bleeding events.

172.     Xarelto was in a defective condition and unsafe, and Defendants knew, had reason to know, or should have known that Xarelto was defective and unsafe, even when used as instructed.

173.     The nature and magnitude of the risk of harm associated with the design of Xarelto, including the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening is high in light of the intended and reasonably foreseeable use of Xarelto.

174.     The risks of harm associated with the design of Xarelto are higher than necessary.

175.     It is highly unlikely that Xarelto users would be aware of the risks associated with Xarelto through either warnings, general knowledge or otherwise, and Plaintiffs/Decedents specifically were not aware of these risks, nor would they expect them.

176.     The design did not conform to any applicable public or private product standard that was in effect when Xarelto left the Defendants' control.

177.     Xarelto's design is more dangerous than a reasonably prudent consumer would expect when used in its intended or reasonably foreseeable manner. It was more dangerous than Plaintiffs/Decedents expected.

178.     The intended or actual utility of Xarelto is not of such benefit to justify the risk of bleeding that may be irreversible, permanently disabling, and life-threatening.

179.     At the time Xarelto left Defendants' control, it was both technically and economically feasible to have an alternative design that would not cause bleeding that may be irreversible, permanently disabling, and life-threatening or an alternative design that would have substantially reduced the risk of these injuries.

180.     It was both technically and economically feasible to provide a safer alternative product that would have prevented the harm suffered by Plaintiffs/Decedents.

181.     Defendants' conduct was extreme and outrageous. Defendants risked the lives of consumers and users of their products, including Plaintiffs/Decedents, with the knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

182.     The unreasonably dangerous nature of Xarelto caused serious harm to Plaintiffs/Decedents.

183.     As a direct and proximate result of the Defendants' aforesaid actions, the Plaintiffs/Decedents suffered, and in some cases may continue to suffer, serious and dangerous side effects including life-threatening bleeding, as well as other severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including, but not limited to, diminished enjoyment of life, shortened life expectancy in some cases leading to death, expenses for hospitalization and medical treatment and in some cases funeral expenses, and any and all damages that are reasonable in the premises.

## FOURTH CAUSE OF ACTION AS AGAINT THE DEFENDANTS:
## FAILURE TO WARN

184.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead this Count in the broadest sense possible, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the Plaintiffs'/Decedents' resident States.

185.    Defendants had a duty to warn Plaintiffs/Decedents and their healthcare providers regarding the need for blood monitoring, dose adjustments, twice daily dosing and failed to warn of the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening, associated with Xarelto.

186.    Defendants knew, or in the exercise or reasonable care should have known, about the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening.

187.    Defendants failed to provide warnings or instructions that a manufacturer exercising reasonable care would have provided concerning the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening, in light of the likelihood that its product would cause these injuries.

188.    Defendants failed to update warnings based on information received from product surveillance after Xarelto was first approved by the FDA and marketed, sold, and used in the United States and throughout the world.

189.    A manufacturer exercising reasonable care would have updated its warnings on the basis of reports of injuries to individuals using Xarelto after FDA approval.

190.    When it left Defendants' control, Xarelto was defective and unreasonably dangerous for failing to warn of the risk of serious bleeding that may be

irreversible, permanently disabling, and life-threatening.

191.     Plaintiffs/Decedents used Xarelto for its approved purpose and in a manner normally intended and reasonably foreseeable by the Defendants.

192.     Plaintiffs/Decedents and Plaintiffs'/Decedents' healthcare providers could not, by the exercise of reasonable care, have discovered the defects or perceived their danger because the risks were not open or obvious.

193.     Defendants, as the manufacturers and distributors of Xarelto, are held to the level of knowledge of an expert in the field.

194.     The warnings that were given by Defendants were not accurate or clear, and were false and ambiguous.

195.     The warnings that were given by the Defendants failed to properly warn physicians of the risks associated with Xarelto, subjecting Plaintiffs/Decedents to risks that exceeded the benefits to the Plaintiffs/Decedents. Plaintiffs/Decedents, individually and through their physicians, reasonably relied upon the skill, superior knowledge and judgment of the Defendants.

196.     Defendants had a continuing duty to warn Plaintiffs/Decedents and their prescriber of the dangers associated with its product.

197.     Had Plaintiffs/Decedents or their healthcare providers received adequate warnings regarding the risks associated with the use of Xarelto, they would not have used it or they would have used it with blood monitoring.

198.     The Plaintiffs'/Decedents' injuries (including and in some cases death), were the direct and proximate result of Defendants' failure to warn of the dangers of Xarelto.

199.        Defendants' conduct, as described above, was extreme and outrageous. Defendants risked the lives of consumers and users of their products, including Plaintiffs/Decedents, with knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

200.        As a direct and proximate result of the Defendants' aforesaid actions, the Plaintiffs/Decedents suffered, and in some cases may continue to suffer, serious and dangerous side effects including life-threatening bleeding, as well as other severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including, but not limited to, diminished enjoyment of life, shortened life expectancy in some cases leading to death, expenses for hospitalization and medical treatment and in some cases funeral expenses, and any and all damages that are reasonable in the premises.

## FIFTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS: NEGLIGENCE

201.        The Plaintiffs repeat, reiterate and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein. The Plaintiffs plead this cause of action in the broadest sense possible, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the resident state(s) of the Plaintiffs/Decedents, regardless of whether arising under statute, common or civil law.

202.        The Defendants had a duty to exercise reasonable care in the design, manufacture, sale, labeling, warnings, marketing, promotion, quality assurance, quality

control, and/or distribution of Xarelto, including a duty to assure that the product would

not cause users to suffer unreasonable, dangerous side effects.

203.    The Defendants failed to exercise ordinary care in the design, manufacture,

sale, labeling, warnings, marketing, promotion, quality assurance, quality control and

distribution of Xarelto  in that the Defendants knew or should have known that using

Xarelto created a high risk of unreasonable, dangerous side effects, including, life-

threatening bleeding, dangerous side effects and harm, as well as other severe and

personal injuries which were permanent and lasting in nature, physical pain and mental

anguish, including diminished enjoyment of life.

204.    The Defendants, their agents, servants, and/or employees, were negligent in

the design, manufacture, sale, labeling, warnings, marketing, promotion, quality

assurance, quality control, and distribution of Xarelto in that, among other things, they:

a)  Manufactured, produced, promoted, formulated, created, tested, and/or
    designed Xarelto without thoroughly testing it and without due care;

b)  Failed to analyze pre-marketing test data of Xarelto;

c)  Failed to conduct sufficient post-marketing and surveillance of Xarelto;

d)  Failed to accompany Xarelto with proper warnings regarding all possible adverse
    side effects associated with its use, and the comparative severity and duration of
    such adverse side effects. The warnings given did not accurately reflect the
    symptoms, scope or severity of the side effects; the warnings given did not warn
    the Plaintiffs/Decedents, or the Plaintiffs'/Decedents' health care providers
    regarding the need for blood monitoring and dose adjustments, and failed to warn
    of the risk of serious bleeding that may be irreversible, permanently disabling, and
    life-threatening associated with Xarelto;

e)  Failed to provide adequate training and instruction to medical care providers for
    the appropriate use of Xarelto;

f)  Falsely and misleadingly overpromoted, advertised and marketed Xarelto as set
    forth herein including overstating efficacy, minimizing risk and stating that blood
    monitoring and dose adjustments were not necessary for safe and effective use to

influence patients, such as the Plaintiffs/Decedents, to purchase and consume Xarelto;

g) Manufactured, produced, promoted, formulated, created and/or designed Xarelto without thoroughly testing it;

h) Manufactured, produced, promoted, formulated, created and/or designed Xarelto without adequately testing it;

i) Did not conduct sufficient testing programs to determine whether or not Xarelto was safe for use; in that the Defendants herein knew or should have known that Xarelto was unsafe or unfit for use by reason of the dangers to its users;

j) Sold Xarelto without making proper and sufficient tests to determine the dangers to its users;

k) Negligently failed to adequately and correctly warn the Plaintiffs/Decedents, the Plaintiffs'/Decedents' physicians, the public, the medical and healthcare profession, and the FDA of the dangers of Xarelto;

l) Failed to provide adequate instructions regarding safety precautions to be followed by users such as the Plaintiffs,/Decedents, and persons who would reasonably and foreseeably come into contact with, and more particularly, use, Xarelto;

m) Failed to test Xarelto and/or failing to adequately, sufficiently and properly test Xarelto;

n) Negligently advertised and recommended the use of Xarelto without sufficient knowledge as to its dangerous propensities;

o) Negligently represented that Xarelto was safe for use for its intended purpose, when, in fact, it was unsafe;

p) Negligently represented that Xarelto had equivalent safety and efficacy as other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, for reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

q) Negligently designed Xarelto in a manner which was dangerous to its users;

r) Negligently manufactured Xarelto in a manner which was dangerous to users;

s) Negligently produced Xarelto in a manner which was dangerous to its users;

48

t)   Negligently assembled Xarelto in a manner which was dangerous to its users;

u)   Concealed information from the Plaintiffs/Decedents, in knowing that Xarelto was unsafe, dangerous, and/or non-conforming with FDA regulations;

v)   Improperly concealed and/or misrepresented information from the Plaintiffs/Decedents, the Plaintiffs'/Decedents' physicians, healthcare professionals, and/or the FDA, concerning the severity of risks and dangers of Xarelto compared to other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, for reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

w)  Placed an unsafe product into the stream of commerce.

205.     The Defendants under-reported, underestimated and downplayed the serious dangers of Xarelto.

206.     The Defendants negligently compared the safety risk and/or dangers of Xarelto with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, for reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

207.     The Defendants were negligent in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing and sale of Xarelto in that they:

1.   Failed to use due care in designing and manufacturing Xarelto so as to avoid the aforementioned risks to individuals when Xarelto was used for treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, for reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

2.   Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Xarelto;

3. Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Xarelto;

4. Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Xarelto;

5. Failed to warn the Plaintiffs/Decedents of the severity and duration of such adverse effects, as the warnings did not accurately reflect the symptoms, or severity of the side effects;

6. Failed to conduct adequate testing, including pre-clinical and clinical testing and post-marketing surveillance to determine the safety of Xarelto;

7. Failed to warn the Plaintiffs/Decedents, prior to actively encouraging the sale of Xarelto, either directly or indirectly, orally or in writing, about the need for more comprehensive, more regular medical monitoring than usual to ensure early discovery of potentially serious side effects;

8. Were otherwise careless and/or negligent.

208. Despite the fact that the Defendants knew or should have known that Xarelto caused unreasonable, dangerous side effects which many users would be unable to remedy by any means, the Defendants continued to market Xarelto to consumers, including the Plaintiffs/Decedents and the medical community.

209. The Defendants knew or should have known that consumers such as the Plaintiffs/Decedents would foreseeably suffer injury as a result of the Defendants' failure to exercise ordinary care, as set forth above.

210. It was foreseeable that Defendants' product, as designed, would cause serious injury to consumers, including the Plaintiffs/Decedents.

211. As a direct and proximate result of the Defendants' aforesaid actions, the Plaintiffs/Decedents suffered, and in some cases may continue to suffer, serious and dangerous side effects including life-threatening bleeding, as well as other severe and

personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including, but not limited to, diminished enjoyment of life, shortened life expectancy in some cases leading to death, expenses for hospitalization and medical treatment and in some cases funeral expenses, and any and all damages that are reasonable in the premises.

212.     The Defendants' conduct was extreme and outrageous. The Defendants risked the lives of consumers and users of their products, including the Plaintiffs, with the knowledge of the safety and efficacy problems and suppressed this knowledge from the general public.  The Defendants made conscious decisions not to re-design, re-label, warn or inform the unsuspecting consuming public. The Defendants' outrageous conduct warrants and award of punitive damages.

### SIXTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS: BREACH OF EXPRESS WARRANTY

213.     The Plaintiffs repeat, reiterate and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein. The Plaintiffs plead this cause of action in the broadest sense possible, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the resident state(s) of the Plaintiffs/Decedents, regardless of whether arising under statute, common or civil law.

214.     The Defendants expressly warranted that Xarelto was safe and effective to members of the consuming public, including the Plaintiffs/Decedents. The Defendants expressly warranted that Xarelto was safe and effective to use without the need for blood monitoring and dose adjustments.

51

215.     The Defendants expressly warranted that Xarelto was a safe and effective product

to be used as a blood thinner, and did not disclose the material risks that Xarelto could

cause serious bleeding that may be irreversible, permanently disabling, and life-

threatening. The representations were not justified by the performance of Xarelto.

216.     The Defendants expressly represented to the Plaintiffs/Decedents and the

Plaintiffs'/Decedents' physicians, healthcare providers, and/or the FDA that Xarelto was

safe and fit for use for the purposes intended, that it was of merchantable quality, that it

did not produce any dangerous side effects in excess of those risks associated with other

forms of treatment for reducing the risk of stroke and systemic embolism in patients with

non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for

prophylaxis of DVT for patients undergoing hip and knee replacement surgery, that the

side effects it did produce were accurately reflected in the warnings and that it was

adequately tested and fit for its intended use.

217.     The Defendants knew or should have known that, in fact, said representations and

warranties were false, misleading, and untrue in that Xarelto was not safe and fit for the

use intended, and, in fact, it produced serious injuries to the users that were not accurately

identified and represented by the Defendants.

218.     Xarelto does not conform to these express representations because Xarelto is not

safe and has numerous serious side effects.

219.     The Plaintiffs/Decedents and the Plaintiffs'/Decedents' health care providers

reasonably relied on the express warranties of the Defendants herein.

220.     The Defendants herein breached the aforesaid express warranties in one or more

of the following ways:

a.      Xarelto as designed, manufactured, sold and/or supplied by the Defendants, was defectively designed and placed into the stream of commerce by the Defendants in a defective and unreasonably dangerous condition;

b.      The Defendants failed to warn and/or place adequate warnings and instructions on Xarelto;

c.      The Defendants failed to adequately test Xarelto;

d.      The Defendants failed to provide timely and adequate post-marketing warnings and instructions after they knew the risk of injury from Xarelto.

221.    The Plaintiffs/Decedents reasonably relied upon the Defendants' warranty that Xarelto was safe and effective when the Plaintiffs/Decedents purchased and used the medication.

222.    The Defendants herein breached the aforesaid express warranties as their drug was defective.

223.     As a direct and proximate result of the Defendants' aforesaid actions, the Plaintiffs/Decedents suffered, and in some cases may continue to suffer, serious and dangerous side effects including life-threatening bleeding, as well as other severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including, but not limited to, diminished enjoyment of life, shortened life expectancy in some cases leading to death, expenses for hospitalization and medical treatment and in some cases funeral expenses, and any and all damages that are reasonable in the premises.

224.    The Defendants' conduct, as described above, was extreme and outrageous.  The Defendants risked the lives of the consumers and users of their products, including the

Plaintiffs/Decedents, with knowledge of the safety and efficacy problems and suppressed this knowledge from the general public.  The Defendants made conscious decisions not to re-design, re-label, warn or inform the unsuspecting consuming public.  The Defendants' outrageous conduct warrants an award of punitive damages.

## SEVENTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS: BREACH OF IMPLIED WARRANTIES

225.     The Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein. The Plaintiffs plead this cause of action in the broadest sense possible, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the resident state(s) of the Plaintiffs/Decedents, regardless of whether arising under statute, common or civil law.

226.     At the time Defendants marketed, distributed and sold Xarelto to Plaintiffs/Decedents, Defendants warranted that Xarelto was merchantable and fit for the ordinary purposes for which it was intended.

227.     Members of the consuming public, including Plaintiffs/Decedents, were intended third party beneficiaries of the warranty.

228.     Xarelto was not merchantable and fit for its ordinary purpose, because it has a propensity to lead to the serious personal injuries described in this Complaint.

229.     The Plaintiffs/Decedents reasonably relied on Defendants' representations that Xarelto was safe and free of defects and was a safe means of reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

230.       The Defendants' breach of the implied warranty of merchantability was the direct and proximate cause of the Plaintiffs'/Decedents' injuries.

231.       At all times herein mentioned, the Defendants manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted and sold Xarelto and/or have recently acquired the Defendants who have manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted and sold Xarelto, to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

232.       At the time the Defendants marketed, sold, and distributed Xarelto for use by the Plaintiffs/Decedents, the Defendants knew of the use for which Xarelto was intended and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

233.       That said representations and warranties aforementioned were false, misleading, and inaccurate in that Xarelto was unsafe, unreasonably dangerous, improper, not of merchantable quality, not fit for its ordinary purpose and defective because it has a propensity to lead to serious personal injuries as described in this Complaint.

234.       The Defendants' breach of the implied warranty of merchantability was the direct and proximate cause of the Plaintiffs'/Decedents' injuries for which the Plaintiffs/Decedents are now entitled to recover.

235.       As a direct and proximate result of the Defendants' aforesaid actions, the Plaintiffs/Decedents suffered, and in some cases may continue to suffer, serious and

dangerous side effects including life-threatening bleeding, as well as other severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including, but not limited to, diminished enjoyment of life, shortened life expectancy in some cases leading to death, expenses for hospitalization and medical treatment and in some cases funeral expenses, and any and all damages that are reasonable in the premises.

236.    The Defendants' conduct, as described above, was extreme and outrageous.  The Defendants risked the lives of the consumers and users of their products, including the Plaintiffs/Decedents, with knowledge of the safety and efficacy problems and suppressed this knowledge from the general public.  The Defendants made conscious decisions not to re-design, re-label, warn or inform the unsuspecting consuming public.  The Defendants' outrageous conduct warrants an award of punitive damages.

**EIGHTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS: NEGLIGENT MISREPRESENTATION**

237.    The Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein. The Plaintiffs plead this cause of action in the broadest sense possible, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the resident state(s) of the Plaintiffs/Decedents, regardless of whether arising under statute, common or civil law.

238.    From the time Xarelto was first tested, studied, researched, evaluated, endorsed, manufactured, marketed, and distributed, and up to the present, Defendants made misrepresentations to the Plaintiffs/Decedents, the Plaintiffs'/Decedents' physicians, and

the general public, including but not limited to the misrepresentation that Xarelto was safe, fit and effective for human use.  At all times mentioned, the Defendants conducted sales and marketing campaigns to promote the sale of Xarelto and willfully deceived the Plaintiffs, the Decedents, the Plaintiffs'/Decedents' physicians, and the general public  as to the health risks and consequences of the use of Xarelto.

239.　　The Defendants made the foregoing representations without any reasonable ground for believing them to be true. These representations were made directly by the Defendants, by sales representatives and other authorized agents of the Defendants, and in publications and other written materials directed to physicians, medical patients, and the public, with the intention of inducing reliance and the prescription, purchase, and use of Xarelto.

240.　　The representations made by the Defendants were, in fact, false in that Xarelto is not safe, fit and effective for human consumption as labeled, using Xarelto is hazardous to one's health, and Xarelto has a serious propensity to cause severe injuries to users, including but not limited to the injuries suffered by the Plaintiffs/Decedents for which the Plaintiffs/Decedents are now entitled to recover.

241.　　The foregoing representations by the Defendants, and each of them, were made with the intention of inducing reliance and the prescription, purchase, and use of Xarelto.

242.　　In reliance upon the misrepresentations by the Defendants, the Plaintiffs/Decedents were induced to purchase and use Xarelto. If the Plaintiffs/Decedents had known the truth and the facts concealed by the Defendants, the Plaintiffs/Decedents would not have used Xarelto.  The reliance of the Plaintiffs/Decedents upon the Defendants' misrepresentations was justified because such

misrepresentations were made and conducted by individuals and entities that were in a position to know all of the facts.

243.     As a direct and proximate result of the Defendants' aforesaid actions, the Plaintiffs/Decedents suffered, and in some cases may continue to suffer, serious and dangerous side effects including life-threatening bleeding, as well as other severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including, but not limited to, diminished enjoyment of life, shortened life expectancy in some cases leading to death, expenses for hospitalization and medical treatment and in some cases funeral expenses, and any and all damages that are reasonable in the premises.

## NINTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS: FRAUD AND DECEIT

244.     The Plaintiffs repeat, reiterate and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein. The Plaintiffs plead this cause of action in the broadest sense possible, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the resident state(s) of the Plaintiffs/Decedents, regardless of whether arising under statute, common or civil law.

245.     Prior to the Plaintiffs'/Decedents' use of Xarelto and during the period in which the Plaintiffs/Decedents actually used Xarelto, the Defendants fraudulently suppressed, ignored and disregarded material information regarding the safety and efficacy of Xarelto, including information regarding increased adverse events, pre- and post-marketing deaths, and a high number of severe adverse event reports compared to other anticoagulants and the need for blood monitoring and dose adjustments for the safe and

effective use of Xarelto. Furthermore, the Defendants fraudulently concealed the safety information about the use of Xarelto. As described above, Xarelto has several well-known, serious side effects that are not seen in other anticoagulants. The Plaintiffs believe that the fraudulent misrepresentation described herein was intentional to keep the sales volume of Xarelto strong.

246.     The Defendants falsely and fraudulently represented to the public the Plaintiffs/Decedents, the Plaintiffs'/Decedents' doctors, hospitals, healthcare professionals, and/or the FDA that Xarelto had been tested and was found to be safe and effective to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

247.     The Defendants made these representations with the intent of defrauding and deceiving the FDA and the public in general, including the medical profession and the Plaintiffs/Decedents, regarding the safety of Xarelto, to recommend, prescribe, dispense, and/or purchase Xarelto for use to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, all of which evinced a callous, reckless, willful, depraved indifference to the health, safety and welfare of the Plaintiffs/Decedents.

248.     The Defendants' advertisements regarding Xarelto falsely and misleadingly stated that blood monitoring and dose adjustments were not necessary for safe and effective use of this drug, misrepresentations that the Defendants knew to be false, for the purpose of

fraudulently inducing consumers, such as the Plaintiffs/Decedents, to purchase such product. The Plaintiffs/Decedents relied on these material representations when deciding to purchase and consume Xarelto.

249.     The Defendants had a duty when disseminating information to the public to disseminate truthful material information about serious side effects and a parallel duty not to deceive the public and the Plaintiffs/Decedents, as well as the Plaintiffs'/Decedents' respective healthcare providers and/or the FDA.

250.     Additionally, by virtue of the Defendants' partial disclosures about the medication, in which the Defendants touted Xarelto as a safe and effective medication, the Defendants had a duty to disclose all facts about the risks associated with the use of this medication, including the risks described in this Complaint.  The Defendants intentionally failed to disclose this information for the purpose of inducing consumers, such as the Plaintiffs/Decedents, to purchase the Defendants' dangerous product.

251.     That at the time the aforesaid representations were made by the Defendants and at the time the Plaintiffs/Decedents used Xarelto, the Plaintiffs/Decedents, and/or the Plaintiffs'/Decedents' respective healthcare providers, did not know the truth with regard to the dangerous and serious health and/or safety concerns of Xarelto and were unaware of the falsity of said representations and reasonably believed them to be true.

252.     That the Plaintiffs/Decedents, and/or the Plaintiffs'/Decedents' respective healthcare professionals, did in fact rely on and believe the Defendants' representations to be true at the time they were made and relied upon the representations as well as the superior knowledge of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, for reducing the risk of recurrence of DVT

60

and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, and were thereby induced to purchase, use and rely on Defendants' drug Xarelto.

253.     The Defendants knew and were aware, or should have been aware, that Xarelto had not been sufficiently tested, was defective in nature, and/or that it lacked adequate and/or sufficient warnings.

254.     The Defendants knew or should have known that Xarelto had a potential to, could, and would cause severe and grievous injury to the users of Xarelto, and that it was inherently dangerous in a manner that exceeded any purported, inaccurate, and/or down-played warnings.

255.     The Defendants brought Xarelto to the market and acted fraudulently, wantonly, and maliciously to the detriment of the Plaintiffs/Decedents.

256.     The Defendants fraudulently concealed the safety issues associated with Xarelto including the need for blood monitoring and dose adjustments in order to induce physicians to prescribe Xarelto and for patients, including the Plaintiffs/Decedents, to purchase and use Xarelto.

257.     At the time that the Defendants concealed the fact that Xarelto was not safe, the Defendants were under a duty to communicate this information to the Plaintiffs'/Decedents' physicians, the Plaintiffs/Decedents, the FDA, the healthcare community, and the general public in such a manner that they could appreciate the risks associated with using Xarelto.

258.     The Defendants, at all times relevant hereto, withheld information from the FDA which they were required to report.

259.     The Plaintiffs'/Decedents' prescribing physicians and the Plaintiffs/Decedents
relied upon the Defendants' outrageous untruths regarding the safety of Xarelto.

260.     The Plaintiffs'/Decedents' prescribing physicians were not provided with the
necessary information by the Defendants to allow them to provide an adequate warning
to the Plaintiffs and the Decedents.

261.     Xarelto was improperly marketed to the Plaintiffs/Decedents and the
Plaintiffs'/Decedents' prescribing physicians as the Defendants did not provide proper
instructions about how to use the medication and did not adequately warn about Xarelto's
risks.

262.     The Defendants widely advertised and promoted Xarelto as a safe and effective
medication and/or as a safe and effective means of reducing the risk of stroke and
systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE,
to reduce the recurrence of DVT and/or PE, and for prophylaxis of DVT for patients
undergoing hip and knee replacement surgery.

263.     The Defendants' advertisements regarding Xarelto falsely and misleadingly stated
that blood monitoring and dose adjustments were not necessary for safe and effective use
of the drug, misrepresentations the Defendants knew to be false, for the purpose of
fraudulently inducing consumers, such as the Plaintiffs/Decedents, to purchase such
product.  The Plaintiffs/Decedents relied on these material misrepresentations when
deciding to purchase and consume Xarelto.

264.     The Defendants had a duty to disclose material information about serious side-
effects to consumers such as the Plaintiffs/Decedents.

265.    Additionally, by virtue of the Defendants' partial disclosures about the medication, in which the Defendants touted Xarelto as a safe and effective medication, the Defendants had a duty to disclose all facts about the risks associated with use of the medication, including the risks described in this Complaint.  The Defendants intentionally failed to disclose this information for the purpose of inducing consumers, such as the Plaintiffs/Decedents, to purchase the Defendants' dangerous product.

266.    Had the Plaintiffs/Decedents been aware of the hazards associated with Xarelto, the Plaintiffs/Decedents and the Plaintiffs'/Decedents' physicians would have employed appropriate blood monitoring, consumed a different anticoagulant with a better safety profile, or not have consumed the product that lead proximately to Plaintiffs'/Decedents' injuries.

267.    Had the Plaintiff's/Decedents and the Plaintiffs'/Decedents' physicians known the true facts with respect to the dangerous and serious health and/or safety concerns of Xarelto, the Plaintiffs/Decedents would not have purchased, used and/or relied on the Defendants' drug Xarelto and instead they would have consumed a different anticoagulant with a better safety profile, or the Plaintiffs/Decedents would have employed appropriate blood monitoring.

268.    Upon information and belief, the Plaintiffs/Decedents aver that Defendants actively and fraudulently concealed information in Defendants' exclusive possession regarding the hazards associated with Xarelto, for the purpose of preventing consumers, such as the Plaintiffs/Decedents, from discovering these hazards.

269.     The Defendants' aforementioned conduct constitutes fraud and deceit, and was committed and/or perpetrated willfully, wantonly and/or purposefully on the Plaintiffs/Decedents.

270.     As a direct and proximate result of the Defendants' aforesaid actions, including the Defendants' malicious and intentional concealment of material, life-altering information from the Plaintiffs/Decedents and the Plaintiffs'/Decedents' prescribing physicians, the Plaintiffs/Decedents suffered serious and dangerous side effects including life-threatening bleeding, as well as other severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including, but not limited to, diminished enjoyment of life, shortened life expectancy, expenses for hospitalization and medical treatment, and any and all damages that are reasonable in the premises.

### TENTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS: VIOLATION OF CONSUMER PROTECTION LAWS/CONSUMER FRAUD LAWS

271.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead this Count in the broadest sense available under the law, to include pleading same pursuant to all substantive law that applies to this case, as may be determined by choice of law principles, regardless of whether arising under statute and/or common law.

272.     Plaintiffs/Decedents used Xarelto and suffered ascertainable losses as a result of Defendants' actions in violation of the consumer protection laws.

273.     Defendants used unfair methods of competition or deceptive acts or practices that were proscribed by law, including the following:

      a.   Representing that goods or services have characteristics, ingredients,

uses, benefits, or quantities that they do not have;

    b.  Advertising goods or services with the intent not to sell them as advertised; and,

    c.  Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

274.    Defendants violated consumer protection laws through their use of false and misleading misrepresentations or omissions of material fact relating to the safety of Xarelto.

275.    Defendants violated consumer protection laws of various states, including the states of residence of Plaintiffs/Decedents noted above.

276.    Defendants uniformly communicated the purported benefits of Xarelto while failing to disclose the serious and dangerous side effects related to the use of Xarelto and of the true state of Xarelto's regulatory status, its safety, its efficacy, and its usefulness. Defendants made these representations to physicians, the medical community at large, and to patients and consumers, such as Plaintiffs/Decedents, in the marketing and advertising campaign described herein.

277.    Defendants' conduct in connection with Xarelto was also impermissible and illegal in that it created a likelihood of confusion and misunderstanding, because Defendants misleadingly, falsely and or deceptively misrepresented and omitted numerous material facts regarding, among other things, the utility, benefits, costs, safety, efficacy and advantages of Xarelto.

278.    As a result of these violations of consumer protection laws, Plaintiffs/Decedents have incurred and will incur; serious physical injury (including in some cases death), pain, suffering, loss of income, loss of opportunity, loss of family

and social relationships, and medical, hospital and surgical expenses and other expense related to the diagnosis and treatment thereof including in some cases funeral expenses, for which Defendants are liable.

## ELEVENTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS: LOSS OF CONSORTIUM

279.     The Plaintiffs repeat, reiterate and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein. The Plaintiffs plead this cause of action in the broadest sense possible, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the resident state(s) of the Plaintiffs/Decedents, regardless of whether arising under statute, common or civil law.

280.     The Plaintiffs, Kenneth Karl Kaiser and Linda Kaiser Riley are children of the deceased, Bobbie Kaiser.

281.     By reason of the foregoing Kenneth Karl Kaiser and Linda Kaiser Riley have been caused the loss of their mother's companionship, service, love, affection and society.

282.     The Plaintiff, Billie Kouns, is the spouse of the Plaintiff, William Kouns.

283.     By reason of the foregoing, Mr. Kouns' spouse, Billie Kouns, has been caused the loss of her husband's companionship, service, love, affection, and society.

284.     As a result of the damages sustained by the Plaintiff, William Kouns, as set forth above, the Plaintiffs sustained damage to their marital relationship and have suffered great emotional pain and mental anguish.

285.     The Plaintiffs, Douglas Robinson, Linda Runyan, Karen Hamilton and Richard Robinson are children of the deceased, Richard T. Robinson.

286.     By reason of the foregoing, Douglas Robinson, Linda Runyan, Karen Hamilton and Richard Robinson, have been caused the loss of their father's companionship, service, love, affection and society.

287.     The Plaintiffs, Susan Smith, is the spouse of the Plaintiff, Randall Smith.

288.     By reason of the foregoing, Mr. Smith's spouse, Susan Smith, has been caused the loss of her husband's companionship, service, love, affection, and society.

289.     As a result of the damages sustained by the Plaintiff, Randall Smith, as set forth above, the Plaintiffs sustained damage to their marital relationship and have suffered great emotional pain and mental anguish.

## TWELTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS: WRONGFUL DEATH

290.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.  Plaintiffs plead this Count in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the Plaintiffs'/Decedents' resident States.

291.     Plaintiffs, Kenneth Karl Kaiser and Linda Kaiser Riley bring this claim on behalf of themselves and/or the Estate of Bobbie Kaiser and for the benefit of the Decedent's lawful beneficiaries.

292.     Plaintiffs, Douglas Robinson, Linda Runyan, Karen Hamilton, and Richard Robinson bring this claim on behalf of themselves and/or the Estate of  Richard T. Robinson and for the benefit of the Decedent's lawful beneficiaries.

293.     As a direct and proximate result of the conduct of the Defendants and the defective nature of Xarelto as outlined above, Decedents suffered bodily injury resulting in pain and suffering, disability, disfigurement, mental anguish, loss of capacity of the

enjoyment of life, shortened life expectancy, expenses for hospitalization, medical and nursing treatment, loss of earnings, loss of ability to earn, funeral expenses and death.

294.     As a direct and proximate cause of the conduct of Defendants, Decedents' beneficiaries have incurred hospital, nursing and medical expenses, funeral and/or estate administration expenses as a result of Decedents' deaths. Plaintiffs bring this claim on behalf of Decedents' lawful beneficiaries for these damages and for all pecuniary losses under applicable state statutory and/or common laws.

## THIRTEENTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS: SURVIVAL ACTION

295.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead this Count in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the Plaintiffs'/Decedents' resident States.

296.     As a direct and proximate result of the conduct of Defendants, where appropriate, Plaintiffs/Decedents, prior to their death, were obligated to spend various sums of money to treat his or her injuries, which debts have been assumed by the Estate. As a direct and proximate cause of the aforesaid, Decedents were caused pain and suffering, mental anguish and impairment of the enjoyment of life, until the date of his or her death; and, as a direct and proximate result of the aforesaid, Decedents suffered a loss of earnings and earning capacity. Plaintiffs bring this claim on behalf of Decedents' estates under applicable state statutory and/or common laws.

297.     As a direct and proximate result of the conduct of Defendants,

Plaintiffs/Decedents and their spouses and heirs, including domestic partners, until the time of Decedents' deaths, suffered a disintegration and deterioration of the family unit and the relationships existing therein, resulting in enhanced anguish, depression and other symptoms of psychological stress and disorder.

298.     As a direct and proximate result of the aforesaid, and including the observance of the suffering and physical deterioration of Decedents until the date of their deaths, Plaintiffs have and will continue to suffer permanent and ongoing psychological damage which may require future psychological and medical treatment. Plaintiffs' spouses or heirs, including domestic partners, as Administrators or beneficiaries of the estate of the Decedents, bring the claim on behalf of the estate for damages under applicable statutory and/or common laws, and in their own right.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs demand judgment against the Defendants on each of the above-referenced claims and Causes of Action and as follows:

1. Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, including, but not limited to, all damages sustained as a result of the Plaintiffs'/Decedents' severe bleeding events and the survival and wrongful death actions, and other non-economic damages in an amount to be determined at trial of this action;

2. Damages for loss of care, comfort and society and companionship in an amount within the jurisdiction of this Court;

3. The full refund of all purchase costs the Plaintiffs/Decedents paid for Xarelto;

4. Awarding economic damages in the form of medical expenses, out of pocket expenses, administrative expenses, and other economic damages, including, but not limited to, all damages sustained as a result of Plaintiffs'/Decedents' severe bleeding events, in an amount to be determined at trial of this action;

5. Exemplary/Punitive damages for the wanton, willful, fraudulent, reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiffs/Decedents in an amount sufficient to punish Defendants and deter future similar conduct;

6. Prejudgment interest;

7. Post judgment interest;

8. Awarding Plaintiffs reasonable attorneys' fees;

9. Awarding Plaintiffs  the costs of these proceedings; and

10. Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all claims so triable in this action.

Date: September 29, 2015.

Respectfully Submitted,

/s/ Mekel Alvarez
Morris Bart (LA Bar #02788)
Mekel Alvarez (LA Bar #22157)
Morris Bart, LLC
909 Poydras Street, 20th Floor
New Orleans, LA 70112
Telephone: 504-525-8000
Facsimile: 504-599-3392
morrisbart@morrisbart.com
malvarez@morrisbart.com

**COUNSEL FOR PLAINTIFFS**