## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION** | **MDL No. 2592**<br><br>**SECTION: L**<br>**JUDGE FALLON**<br>**MAG. JUDGE NORTH** |
| **BRENDA PARTON,**<br><br>                  **Plaintiff,**<br>**vs.**<br><br>**JANSSEN RESEARCH & DEVELOPMENT, LLC f/k/a JOHNSON AND JOHNSON PHARMACEUTICAL RESEARCH AND DEVELOPMENT LLC., JANSSEN ORTHO, LLC, JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA INC., f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., JOHNSON & JOHNSON COMPANY, BAYER PHARMA AG, BAYER HEALTHCARE AG, BAYER CORPORATION, BAYER AG, BAYER HEALTHCARE LLC, and BAYER HEALTHCARE PHARMACEUTICALS INC.,**<br><br>                  **Defendants.** | **FIRST AMENDED COMPLAINT AND JURY DEMAND**<br><br>**This Document Relates to:**<br><br>*Parton v. Janssen Research & Development, LLC, et al; LAED USDC No. 2:15-cv-01219* |

## FIRST AMENDED COMPLAINT

Plaintiffs, by and through their undersigned counsel, hereby submits this Complaint and  herby allege:

## PARTIES

1.      Plaintiff Brenda Parton, at all times relevant hereto, was, and currently is,

1

a  resident and citizen of the State of Georgia. Plaintiff suffered damages as a direct result of her  ingestion of the pharmaceutical product Xarelto®.   (Hereinafter "Ingesting Plaintiff").

2.      Defendant, JANSSEN RESEARCH & DEVELOPMENT, LLC f/k/a JOHNSON  AND JOHNSON PHARMACEUTICAL RESEARCH AND DEVELOPMENT LLC (Hereinafter "Janssen R&D") is a  limited liability company organized, under the laws of New Jersey, with corporate headquarters   located at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey, 08933.  Defendant Janssen R&D is the holder of the approved New Drug Application ("NDA") for Xarelto® as well  as the supplemental NDA.

3.      Defendant, JANSSEN ORTHO, LLC (Hereinafter "Ortho")  is an  limited liability company  with a principal place of business at Bo. Mamey, Carr. 933 Km 0.1, Gurabo, Puerto Rico 00778-  9629. Ortho is a subsidiary of Johnson & Johnson. At all times  relevant hereto, Defendant Ortho   manufactures,  and  continues to  manufacture Xarelto®. At  all  times  relevant hereto, Defendant  Ortho  derived,  and continues  to derives,  substantial  revenue  from goods  and  products   disseminated  and used in the United States and in the State of Georgia.

4.      Defendant,  JANSSEN  PHARMACEUTICALS,  INC.  f/k/a  JANSSEN PHARMACEUTICA INC.,  f/k/a  ORTHO-MCNEIL-JANSSEN  PHARMACEUTICALS, INC. (Hereinafter "Janssen"), at all relevant times hereto was, and currently is still, a corporation,  under  the  laws  of  New Jersey  and  maintains  its  principal  place of business at 1125 Trenton-Harbourton Road, Titusville, New Jersey 08560. At all times relevant  to this Complaint, was engaged in the business of designing, testing, studying, researching, evaluating, endorsing, formulating, compounding, manufacturing, producing,

processing, assembling, inspecting, distributing, marketing, labeling, promoting, advertising, packaging, selling, prescribing, or otherwise placing Xarelto® in the stream of interstate commerce of the United States and the State of Georgia.

5.     Defendant Johnson & Johnson (Hereinafter "J&J") is a fictitious name adopted by Defendant Johnson & Johnson Company, a corporation organized under the laws of New Jersey with its principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933. J&J manufactures markets and sells a wide range of pharmaceutical products including Xarelto (rivaroxaban). J&J is and was at all relevant times involved in the research, development, packaging, labeling, sales, and/or marketing of pharmaceutical products including Xarelto®.

6.     Defendant Bayer Pharma AG f/k/a Bayer Schering Pharma AG (Hereinafter "Bayer Pharma" is a German corporation with its principal place of business in Leverkusen, Germany.  Bayer Pharma AG is and was at relevant times involved in the research, development packaging, labeling, testing manufacturing, sales, and/or marketing of pharmaceutical products including Xarleto®.

7.     Defendant Bayer HealthCare AG (Hereinafter "Bayer Healthcare") is a pharmaceutical company organized under the laws of Germany with its principal place of business located in Leverkusen, Germany. Bayer HealthCare AG is and was at relevant times involved in research, development, packaging, labeling, testing, manufacturing, sales, and/or marketing of pharmaceutical products including Xarelto®.

8.     Defendant BAYER CORPORATION (Hereinafter "Bayer Corp") is, and at all times relevant was, a corporation organized under the laws of the State of Indiana with its headquarters and principal place of business at 100 Bayer Road

Pittsburgh, Pennsylvania.

9.      Defendant, BAYER AG (Hereinafter "Bayer") is a foreign company with its principal place of business in Leverkusen, Germany, who licensed Xarelto®.

10.      Defendant, BAYER HEALTHCARE LLC (Herein after "Bayer HC") is a limited liability company with corporate communication headquarters located at 100 Bayer Road, Pittsburgh, PA  15205. Bayer HC's North American Headquarters are located at 100 Bayer Blvd, Whippany, NJ  07981. Bayer HC is a subsidiary of Bayer and jointly developed Xarelto® with J&J. Bayer's cooperation partner, J&J, submitted the new drug application for Xarelto® to the FDA.

11.      Defendant,  BAYER  HEALTHCARE  PHARMACEUTICALS  INC. (Hereinafter "BayerHC Pharma ") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 340 Changebridge Road, P.O. Box  1000, Montville, New Jersey 07045-1000. Bayer Pharma is the U.S.-based pharmaceuticals operation of Bayer HC, a division  of Bayer. Bayer Pharma is a subsidiary of Bayer and jointly developed Xarelto® with J&J. At all times relevant   to this Complaint, Bayer  Pharma was engaged in the business of designing, testing, studying, researching, evaluating, endorsing, formulating, compounding, manufacturing, producing, processing,  assembling,  inspecting,  distributing,  marketing,  labeling,  promoting, advertising, packaging, selling, prescribing, or otherwise placing Xarelto® in the stream of interstate commerce of the United States.

12.      Defendants Janssen R&D, Ortho, Janssen, J&J, Bayer Pharma, Bayer Healthcare, Bayer Corp, Bayer, and Bayer  HC Pharma shall be referred to herein individually by name or jointly as "Defendants."

13.      At all times herein mentioned, each of the Defendants was the agent,

servant, partner, predecessor in interest, aider and abettor, co-conspirator, and joint venture of each of the remaining Defendants herein.

14.     At all times herein mentioned, each of the Defendants was the agent, servant, partner, predecessor in interest, aider and abettor, co-conspirator, and joint venture of each of the remaining Defendants thereby operating and acting with the purpose and scope of said agency, service, employment, partnership, conspiracy and joint venture.

15.     At all times relevant and material hereto, Defendants were engaged in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, and or introducing into interstate commerce throughout the United States, and in the state of Georgia, either directly or indirectly, through third-parties, subsidiaries and/or related entities, the anti-coagulant pharmaceutical Xarelto®.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over Defendants and this action pursuant to 28 U.S.C § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants and because the amount in controversy between Plaintiff and Defendants exceeds $75,000, exclusive of interest and cost, and because, among other reasons, Defendants have significant contacts with this district by virtue of doing business within this judicial district.

17.     This Court has supplemental jurisdiction over any alleged common law or state claims pursuant to 28 U.S.C. § 1367.

18.     Venue is proper within this district, pursuant to 28 U.S Code § 1407 under which the Joint Panel on Multidistrict Litigation transferred venue of all Xarelto litigation to the Eastern District of Louisiana, MDL No. 2592, In re: Xarelto (Rivaroxaban) Products Liability Litigation.

## NATURE OF THE CASE – GENERAL ALLEGATIONS

19.     Defendants, directly or by and through their agents, apparent agents, servants or employees designed, manufactured, marketed, advertised, distributed, promoted, labeled, tested and  sold Xarelto® as an anti-coagulant primarily  used to reduce the risk of stroke and systemic  embolism in patients with non-valvular atrial fibrillation, to treat deep vein thrombosis ("DVT"), to  treat pulmonary embolisms ("PE"), and/or to reduce the risk of recurrence of DVT and or PE.

20.     Defendants applied for an initial NDA for Xarelto® in July of 2008.

21.     Xarelto® was approved by the Food and Drug Administration ("FDA") on July 1, 2011 reduces risk of blood clots, DVT, and PE following knee and hip replacement surgery. On  November 4, 2011 Xarelto was approved as an anti-coagulant primarily used to reduce the risk of  stroke and systemic embolism in patients with non-valvular atrial fibrillation ("AFib"). On November 2,  2012 the FDA expanded to the of Xarelto to the treatment of patients with DVT and PE as well as  long-term treatment to prevent recurrence of the same.

22.     According to the Defendants' marketing and informational materials, referenced in  the paragraphs below, and widely disseminated to the consuming public, "Xarelto® is the first  and only once-a day prescription blood thinner for patients with AFib not caused by a heart valve  problem, that is proven to reduce the risk of stroke – without routine blood monitoring."[1]

---

[1] http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Enforcement
ActiviesbyFDA/WarningLettersandNoticeofViolationLetterstoPharmaceuticalCompanies/
UCM3   57833.pdf

23.     As the Defendants state on their website, "XARELTO® has been proven to lower the chance of having a stroke if you have atrial fibrillation, not caused by a heart valve problem. XARELTO® is an anticoagulant, or blood-thinning medicine that works by helping to keep blood clots from forming." The Defendants further claim that "it's been prescribed to more than seven million people around the world to help treat or reduce their risk of dangerous clots" and that it "begins working a few hours after you start taking it, and keeps working for as long as take it."[2]

24.     Defendants further declare that "XARELTO® is proven to help treat and prevent DVT and PE blood clots" and that Xarelto® "reduc[es] the risk of these dangerous clots [from] happening again."[3]

25.     Defendants claim that patients with AFib, DVT, or PE taking Xarelto® do not need regular blood monitoring and there are no known dietary restrictions. In addition, patients with AFib only need to take Xarelto® once a day with an evening meal.[4]

26.     Defendants claim that patients with AFib are five (5) times more likely than a person without Afib to suffer from a stroke and that "disability is more likely to be severe" and "the outcome is almost twice as likely to be fatal" and "the chances of having another major stroke go up."[5]

27.     Rivaroxaban is an oxazolidinone derivative optimized for inhibiting both free Factor Xa and Factor Xa bound in the prothrombinase complex. It is a highly selective direct Factor Xa inhibitor with oral bioavailability and rapid onset of

---

[2] http://www.xarelto-us.com/how-xarelto-works

[3] http://www.xarelto-us.com/dvt-pe/treatment-of-dvt-pe

[4] http://www.xarelto-us.com/dvt-pe/xarelto-difference# and http://www.xarelto-us.com/how-   xarelto-is-different

[5] http://www.xarelto-us.com/knowing-your-stroke-risk

action. Inhibition of Factor Xa interrupts the intrinsic and extrinsic pathway of the blood coagulation cascade, inhibiting both thrombin formation and development of thrombi. Rivaroxaban does not inhibit thrombin (activated Factor II).

27.     Defendants routinely marketed Xarelto® as a "one size fits all" drug; In their fervent marketing of Xarelto, Defendants' misinformed patients, and their healthcare providers, as to the necessity to routinely monitor any patient requiring a blood thinning agent. In essence, the Defendants have created a new drug, Xarelto®, that is not better than warfarin from a safety perspective, and at best, perhaps slightly easier to use and administer. The idea of this apparent easier-to-use anticoagulant evidently appealed to physicians, who were subject to extreme marketing and promotion by the Defendants, but ignores patient safety.

28.     The Defendants' marketing materials suggest that Xarelto® represented a therapeutic simplification and therapeutic progress because it did not require patients to undergo periodic monitoring with blood tests and because there were no dietary restrictions.

29.     Defendants' boxed warning did not address the increased risk for serious and fatal bleeding, despite the fact that the information listed on their website originating from the Rocket AF clinical trial sponsored by Defendants state that in comparison to warfarin, patients taking Xarelto® have more gastrointestinal bleeds and need more transfusions. In spite of this reference regarding bleeds, the information is still wholly inadequate because, this information was not conveyed in the boxed warning on the Xarelto® label.[6]

---

[6] http://www.xareltohcp.com/reducing-stroke-risk/safety.html

30.     According to Institute for Safe Medication Practices, Quarter Watch Report, issued on October 3, 2012, the primary reported adverse event related to Xarelto® use "was not the well- understood risk of hemorrhage. Instead, the largest identifiable category was serious blood-clot-related injury—most frequently pulmonary embolism—the very events rivaroxaban is intended to prevent." This lack of efficacy for short term users of Xarelto® post hip and knee replacement surgery resulted in about 44% of the reported adverse effects from taking Xarelto®.

31.     FDA clinical reviewers have stated that "rivaroxaban should not be approved unless the manufacturer conducts further studies to support the efficacy and safety of rivaroxaban" and the FDA website notes that "[a]dverse event reports of thrombocytopenia and venous thromboembolic events were identified" in relationship to Xarelto®".[7] However, this information was not portrayed in the warning section on the warning label. The lack of efficacy of the medication for patients taking Xarelto® post hip and knee surgery were not disclosed resulting in patients ingesting Xarelto® and physicians prescribing Xarelto® without sufficient information to make an accurate decision.

32.     Defendants frequently marketed Xarelto® using print advertisements, online marketing on their website, and video advertisements with no regard to the accuracy and repercussions of their misleading advertising in favor of increasing sales.

33.     In the January/February 2013 issue of *WebMD* magazine, Defendants placed a print advertisement that resulted in the Office of Prescription Drug Promotion (OPDP) of the U.S. Food and Drug Administration (FDA) to send an untitled letter stating that their print advertisement was "false or misleading because it minimizes the risks associated

---

[7] http://www.fda.gov/drugs/guidancecomplianceregulatoryinformation/surveillance/ucm204091.htm

with Xarelto® and makes a misleading claim." Furthermore, the advertisement states "there are **no dosage adjustments**" in conflict with the product labeling approved by the FDA.[8]

34.     As a result of Defendants' intense marketing, "[a]bout 130,000 U.S. prescriptions were written for Xarelto® in the first three months of 2012" resulting in large profits as Xarelto® costs approximately $3,000 a year versus $200 for generic warfarin.[9]

35.     As a result of Defendant's extreme marketing tactics, within the United Kingdom, Defendants also made 219 million Euros in sales from Xarelto®, more than three times as much as during the same period last year.[10]

36.     Due to the defective nature of Xarelto®, persons who were prescribed and ingested Xarelto®, for even a brief period of time, including the Ingesting Plaintiff herein, were at increased risk for developing life-threatening bleeds. Due to the flawed formulation of Xarelto®, which according to Defendants does not require regular blood monitoring or frequent doctor follow-up, raises concerns about the risk of stroke, bleeding, and blood clots if not taken properly or absorbed properly, particularly in patients with poor renal function. In addition, "[p]rominent U.S. [cardiologists and health care professionals] stress that neither new drug [Xarelto] has a known antidote

---

[8] http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/WarningLettersandNoticeofViolationLetterstoPharmaceuticalCompanies/UCM357 833.pdf, June 6, 2013 FDA Untitled Warning Letter

[9] Ransdell Pierson. "Pradaxa and Xarelto: Top Heart Doctors Concerned Over New Blood Thinners" *Huffpost Healthy Living.* 14th June 2012.

[10] Frank Siebelt, Hans Seidenstuecker, and Christoph Steitz. "Reports of side-effects from Bayer's Xarelto grow: Spiegel" http://www.reuters.com/article/2013/09/08/us-bayer-xarelto- idUSBRE9870AH20130908

for a bleeding emergency, as warfarin does."[11]

37.     Defendants' pharmaceutical Xarelto led to 968 suspected undesirable side-effects including 72 cases of death in Germany in just the first eight months of 2013.[12]

38.     In addition, The Institute for Safe Medication Practices reported that:

A clinical trial with 14,000 patients had shown that rivaroxaban was no worse than warfarin. [40] But reviewers noted that warfarin had not been optimally used. If rivaroxaban were really inferior to optimally used warfarin—but this was not proven, only suspected—its use could lead to increased death and injury. [41] Reviewers also questioned the convenient once-a-day dosing scheme, saying blood level studies had shown peaks and troughs that could be eliminated by twice-a-day dosing. … As with other anticoagulants, the rate of clinically relevant bleeding in clinical studies was high—15% per year of treatment. [13]

In other words, the insufficient testing conducted and the deadly consequences of Xarelto® did not go unnoticed.

39.     Even more significantly, in the first quarter of 2012, The Institute for Safe Medication Practices "identified 356 reports of serious, disabling, or fatal injury in which rivaroxaban was the primary suspect drug. The report more than doubled from the previous quarter total of 128 cases."[14]  However, when the findings were discussed with Defendants, "the company told us that it had reviewed the same data and saw no signal of a safety issue that needed to be addressed."[15] Defendants placed more value into ensuring that their profits would continue instead of working on minimizing the serious, disabling, or fatal injuries that were occurring due to the drug they were marketing and promoting.

40.     Defendants concealed their knowledge that Xarelto® can cause life

---

[11] Ransdell Pierson. "Pradaxa and Xarelto: Top Heart Doctors Concerned Over New Blood Thinners" *Huffpost Healthy Living.* 14th June 2012.
[12] Frank Siebelt, Hans Seidenstuecker, and Christoph Steitz. "Reports of side-effects from Bayer's Xarelto grow: Spiegel" http://www.reuters.com/article/2013/09/08/us-bayer-xarelto- idUSBRE9870AH20130908
[13] Institute for Safe Medication Practices, QuarterWatch Report, October 3, 2012
[14] *Id.*
[15] *Id.*

threatening, irreversible bleeds from the Ingesting Plaintiff, other consumers, the general public, and the medical community. Indeed, the Defendants did not properly warn of the irreversible nature of Xarelto® in the "Warnings and Precautions" section of the products warning label. The only warnings provided by Defendants were as follows:

----------------------------**WARNINGS AND PRECAUTIONS**----------------------------
- Risk of bleeding: XARELTO can cause serious and fatal bleeding. Promptly evaluate signs and symptoms of blood loss. (5.2)
- Pregnancy related hemorrhage: Use XARELTO with caution in pregnant women due to the potential for obstetric hemorrhage and/or emergent delivery. Promptly evaluate signs and symptoms of blood loss. (5.7)
- Prosthetic heart valves: XARELTO use not recommended (5.8)

41. Specifically, Defendants did not adequately inform consumers and the prescribing medical community about the risks of uncontrollable bleeds associated with Xarelto® usage, nor did Defendants warn or otherwise advise on how to intervene and stabilize a patient should a bleed occur.

42. As seen in the "Full Prescribing Information" provided by Defendants, Defendants reveal that they did not test for all the possible reversal agents for this dangerous drug since "[a] specific antidote for rivaroxaban is not available" and "[u]se of procoagulant reversal agents such as prothrombin complex concentrate (PCC), activated prothrombin complex concentrate (APCC), or recombinant factorVlla (rFVllA) may be considered but has not been evaluated in clinical trials." However, this is buried in small print.

43. Importantly, Xarelto® still does not have a "black box" warning informing patients or prescribing doctors know that Xarelto® can cause irreversible bleeds. In fact, the August 2013 Highlights of Prescribing Information only has a "black box" warning stating the following:

> **WARNING: (A) PREMATURE DISCONTINUATION OF XARELTO INCREASES THE RISK OF THROMBOTIC EVENTS, and (B) SPINAL/EPIDURAL HEMATOMA**
> *See full prescribing information for complete boxed warning*
>
> **PREMATURE DISCONTINUATION OF XARELTO INCREASES THE RISK OF THROMBOTIC EVENTS**
>
> Premature discontinuation of any anticoagulant, including XARELTO, increases the risk of thrombotic events. To reduce this risk, consider coverage with another anticoagulant if XARELTO is discontinued for a reason other than pathological bleeding or completion of a course of therapy (2.2, 2.6, 5.1, 14.1).
>
> **SPINAL/EPIDURAL HEMATOMA**
>
> Epidural or spinal hematomas have occurred in patients treated with XARELTO who are receiving neuraxial anesthesia or undergoing spinal puncture. These hematomas may result in long-term or permanent paralysis (5.2, 5.3, 6.2).
>
> Monitor patients frequently for signs and symptoms of neurological impairment and if observed, treat urgently. Consider the benefits and risks before neuraxial intervention in patients who are or who need to be anticoagulated (5.3).

44.     Even in the "Warnings and Precautions" section of the August 2013 Highlights of Prescribing Information, the irreversible nature of the medication Xarelto® was not revealed to patients or their prescribing doctors. Defendants merely indicated that there was a risk for bleeding and side-stepped the important issue of reversing the effects of Xarelto® should a bleed occur as seen below:

> --------------------------- **WARNINGS AND PRECAUTIONS**---------------------------
> - Risk of bleeding: XARELTO can cause serious and fatal bleeding. Promptly evaluate signs and symptoms of blood loss. (5.2)
> - Pregnancy related hemorrhage: Use XARELTO with caution in pregnant women due to the potential for obstetric hemorrhage and/or emergent delivery. Promptly evaluate signs and symptoms of blood loss. (5.7)
> - Prosthetic heart valves: XARELTO use not recommended (5.8)

45.     Aside from the warning labels, Defendants did not issue a Dear Doctor letter that sufficiently outlined the dangers of administering Xarelto® to a patient. In the September 2013 letter to healthcare professionals, Defendants do not mention the lack of an antidote in Xarelto®, should serious and fatal bleeding occur while a patient was taking Xarelto®.

46.     The current warning is simply inadequate. The Defendants have failed and

continue to fail in their duties to warn and protect the consuming public, including the Ingesting Plaintiff herein.

47.     Even if the warnings were sufficient, which Ingesting Plaintiff strongly denies, Xarelto® still lacks any benefit sufficient to tolerate the extreme risk posed by the ingestion of this drug. Xarelto® is quite simply dangerous and defective as formulated. The Defendants should withdraw Xarelto® from the market.

48.     Defendants willfully, wantonly and with malice withheld the knowledge of increased risk of irreversible bleeds in users of Xarelto® to prevent any chances of their product's registrations being delayed or rejected by FDA.

49.     As the manufacturers and distributors of Xarelto®, Defendants knew or should have known that Xarelto® use was associated with irreversible bleeds.

50.     With the knowledge of the true relationship between use of Xarelto® and irreversible bleeds, rather than taking steps to pull the drug off the market, provide strong warnings, or create an antidote, Defendants promoted and continue to promote Xarelto® as a safe and effective treatment for AFib

51.     Defendants' "Xarelto®…is estimated to be the 19th-best-selling drug in the world by 2018, according to the report. Worldwide sales of Xarelto® are expected to jump from $596 million in 2012 to $3.7 billion in 2018."[16]

52.     While Defendants enjoy great financial success from their expected blockbuster drug, Xarelto®, they continue to place American citizens at risk of severe bleeds and death.

53.     Consumers, including Ingesting Plaintiff, who have used Xarelto® to reduce the risk of stroke due to Afib or to reduce the risk of blood clots, DVT and PE

---

[16] http://www.drugwatch.com/2013/07/23/blood-thinner-growth-more-risk/

following knee or hip replacement surgery, have several alternative safer products available to treat  the conditions and have not been adequately warned about the significant risks and lack  of  benefits, associated with Xarelto® therapy.

54.     Defendants, through their affirmative misrepresentations and omissions, actively  concealed from Ingesting Plaintiff and Ingesting Plaintiff's physicians the true and significant risks  associated with Xarelto® use.

55.     As  a  result  of  Defendants'  actions,  Ingesting  Plaintiff  and  Ingesting Plaintiff's physicians were  unaware,  and  could  not  have  reasonably  known  or  have learned through reasonable diligence, that Ingesting Plaintiff would be exposed to the risks identified  in  this  Complaint.  The  increased  risks  and  subsequent  medical  damages associated with  Ingesting Plaintiff's Xarelto® use were the direct and proximate result of Defendants' conduct.

## FACTUAL ALLEGATIONS

56.     On  or  around  September  to  October  2013,  Ingesting  Plaintiff  was  first prescribed and  began  taking Xarelto® upon direction of Ingesting Plaintiff's physician for the  treatment  of  a  pulmonary  embolism  and/or  to  reduce  the  risk  of  recurrence  of  a pulmonary embolism.  Subsequently, as a direct result of Ingesting Plaintiff's ingestion of Xarelto®, Ingesting Plaintiff  suffered  severe  internal  bleeding  and  was  admitted  on September 6, 2014, to Rockdale Medical Center, in Conyers, Georgia.

57.     As  a  direct  result  of  being  prescribed  Xarelto®  for  this  period  of  time, Ingesting  Plaintiff has suffered significant injuries, such as those described above.

58.     As  a  proximate  result  of  Defendants'  acts  and  omissions,  Ingesting Plaintiff suffered  the  injuries  described  hereinabove  due  to  Ingesting  Plaintiff's ingestion  of  Xarelto®.  Ingesting Plaintiff accordingly seeks damages associated with these

injuries.

59.     Ingesting Plaintiff would not have used Xarelto® had Defendants properly disclosed the risks associated with its use.

## EQUITABLE TOLLING OF APPLICABLE STATUTES OF LIMITATION

60.     Ingesting Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

61.     The running of any statute of limitations has been tolled by reason of Defendants' fraudulent concealment. Defendants, through failing to disclose, for three years, the truth about the safety and efficacy of Xarelto®, to Ingesting Plaintiff's physicians and/or Ingesting Plaintiff, and misrepresenting Xarelto® as safe and efficacious for its intended use, actively concealed from said individuals the true risks associated with the use of Xarelto® drug products.

62.     Ingesting Plaintiff had no knowledge that Defendants was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by the Defendants, the Ingesting Plaintiff could not have reasonably discovered the wrongdoing at any time prior to the commencement of this action.

63.     Ingesting Plaintiff, nor Ingesting Plaintiff's physicians, could not have possibly determined the nature, extent and identity of related health risks associated with Xarelto®. Ingesting Plaintiff and Ingesting Plaintiff's physicians reasonably relied on Defendants to disseminate truthful and accurate safety and efficacy information about its drug and warn of the side effects complained of herein.

64.     Furthermore, Defendants are estopped from relying on any statute of limitations because of their fraudulent concealment of the defective nature of Xarelto®. Defendants were under a duty to disclose the true character, quality, and nature of

Xarelto® because this was non-public information over which the Defendants have, and continue to have, exclusive control, and because Defendants knew this information was not available to the Ingesting Plaintiff or their physicians. In addition, the Defendants are estopped from relying on any statute of limitations because of their concealment of these facts.

65.     **WHEREFORE**, Ingesting Plaintiff prays for judgment against Defendants, jointly and severally, in an amount, which will compensate the Plaintiff for their injuries.

## COUNT I: STRICT PRODUCTS LIABILITY

66.     Ingesting Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

67.     At all times relevant and material hereto, Defendants were engaged in the business of designing, manufacturing, testing, marketing, and placing into the stream of commerce pharmaceuticals, including the Xarelto at issue in this lawsuit, for the sale to, and use by, members of the public. The Xarelto® manufactured by Defendants reached Ingesting Plaintiff without substantial change and was ingested as directed. The Xarelto® was defective and unreasonably dangerous when it entered into the stream of commerce and when used by Ingesting Plaintiff.

68.     Defendants, as manufacturers and distributers of pharmaceutical drugs, are held to the level of knowledge of an expert in the field, and further, Defendants knew or should have known that warnings and other clinically relevant information and data which they distributed regarding the risks of irreversible bleeds and other injuries and death associated with the use of Xarelto® were inadequate.

69.     Ingesting Plaintiff did not have the same knowledge as Defendants and no

adequate  warning or other clinically relevant information and data was communicated to Ingesting Plaintiff or to Ingesting Plaintiff's treating physicians.

70.     Defendants had a continuing duty to provide consumers, including Ingesting Plaintiff, and Ingesting Plaintiff's physicians, with warnings and other clinically relevant  information and data regarding the risks and dangers associated with Xarelto®, as it became or  could have become available to Defendants.

71.     Defendants marketed, promoted, distributed and sold an unreasonably dangerous and defective prescription drug, Xarelto®, to health care providers empowered to prescribe and  dispense Xarelto® to consumers, including Ingesting Plaintiff, without adequate warnings and  other clinically relevant information and data. Through both omission and affirmative  misstatements, Defendants misled the medical community about the risk and benefit balance of  Xarelto®, which resulted in injury to Ingesting Plaintiff.

72.     Despite the fact that Defendants knew or should have known that Xarelto® caused  unreasonable and dangerous side effects, they continued to promote and market Xarelto® without  stating that there existed safer and more or equally effective alternative drug products and/or  providing adequate clinically relevant information and data.

73.     Defendants knew or should have known that consumers, Ingesting Plaintiff specifically, would foreseeably and needlessly suffer injury or death as a result of Defendants' failures.

74.     Defendants failed to provide timely and adequate warnings to  physicians, pharmacies, and consumers, including Ingesting Plaintiff and to Ingesting Plaintiff's intermediary  physicians, in the following ways:

a. Defendants failed to include adequate warnings and/or provide adequate clinically relevant information and data that would alert Ingesting Plaintiff and Ingesting Plaintiff's physicians to the dangerous risks of Xarelto® including, among other things, irreversible bleeds;

b. Defendants failed to provide adequate post-marketing warnings andinstructions after the Defendants knew or should have known of the significant risks of, among other things, irreversible bleeds;

c. Defendants continued to aggressively promote and sell Xarelto®, even after they knew or should have known of the unreasonable risks of irreversible bleeds from this drug.

75.   Defendants had an obligation to provide Ingesting Plaintiff and Ingesting Plaintiff's physicians with adequate clinically relevant information and data and warnings regarding the adverse health risks associated with exposure to Xarelto®, and/or that there existed safer and more or equally effective alternative drug products.

76.   By failing to provide Ingesting Plaintiff and Ingesting Plaintiff's physicians with adequate clinically relevant information and data and warnings regarding the adverse health risks associated with exposure to Xarelto®, and/or that there existed safer and more or equally effective alternative drug products, Defendants breached their duty of reasonable care and safety.

77.   Defendants' actions described above were performed willfully, intentionally, and with reckless disregard of the life and safety of the Ingesting Plaintiff and the general public.

78.   As a direct and proximate result of the actions and inactions of the Defendants as set forth above, Ingesting Plaintiff was exposed to Xarelto® and suffered the

injuries and damages set forth hereinabove.

79.     As to **Count I- Strict Products Liability**, Ingesting Plaintiff reserves its rights to amend this cause of action, or seek a court order to apply any applicable law of the Ingesting Plaintiff's home state.

## COUNT II: NEGLIGENCE

80.     Ingesting Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

81.     Defendants owed a duty to the general public, and specifically to the Ingesting Plaintiff, to exercise reasonable care in the design, study, development, manufacture, promotion, sale, marketing and distribution of their prescription medications, including the Xarelto® at issue in this lawsuit. Defendants failed to exercise reasonable care in the design of Xarelto® because as designed, Xarelto was capable of causing serious personal injuries such as those suffered by Ingesting Plaintiff during foreseeable use. Defendants also failed to exercise reasonable care in the marketing of Xarelto® because they failed to warn, that as designed, Xarelto® was capable of causing serious personal injuries such as those suffered by Ingesting Plaintiff during foreseeable use.

82.     Defendants breached their duty and were negligent in , but not limited to, the following actions, misrepresentations, and omissions toward Ingesting Plaintiff:

a. Failing to use due care in developing, testing, designing, and manufacturing Xarelto® so as to avoid the aforementioned risks to individuals when Xarelto® was being used for treatment;

b. Failing to accompany their product with proper or adequate warnings, or labeling regarding adverse side effects and health risks associated with the

use  of Xarelto® and the comparative severity and duration of such adverse effects;

c.  In disseminating information to Ingesting Plaintiff and Ingesting Plaintiff's physicians that was negligently and materially inaccurate, misleading, false, and  unreasonably dangerous to patients such as Ingesting Plaintiff;

d.  Failing to accompany their products with proper or adequate rate of incidence or  prevalence of irreversible bleeds;

e.  Failing to provide warnings or other information that accurately reflected the  symptoms, scope, and severity of the side effects and health risks;

f.  Failing to conduct adequate pre-clinical and clinical testing and post-marketing  surveillance to determine the safety of Xarelto®;

g.  Failing to warn Ingesting Plaintiff, the medical and healthcare community, and  consumers that the product's risk of harm  was  unreasonable  and  that there  were  safer and effective alternative medications available to Ingesting Plaintiff  and other consumers;

h.  Failing to provide adequate training or information to medical care providers for  appropriate use and handling of Xarelto® and patients taking Xarelto®;

i.  Failing to  adequately  test  and/or  warn  about  the  use  of  Xarelto®, including,  without limitations, the  possible  adverse  side  effects  and  health risks caused by  the use of Xarelto®;

j.  Failing to design and/or manufacture a product that could be used safely due to  the lack of a known reversal agent or antidote;

k.  In  designing,  manufacturing,  and  placing  into  the  stream  of  commerce  a product  which  was  unreasonably  dangerous  for  its  reasonably  foreseeable

use, which Defendant knew or should have known could cause injury to Ingesting Plaintiff;

l. Failing to remove Xarelto® from the market when Defendants' knew or should have known of the likelihood of serious side effects and injury to its users;

m. Failing to adequately warn users, consumers and physicians about the severity, scope and likelihood of bleeds and related dangerous conditions to individuals taking Xarelto®; and

n. Representing to physicians, including but not limited to Ingesting Plaintiff's prescribing physicians, that this drug was safe and effective for use.

83.    The Xarelto® that injured Ingesting Plaintiff was in substantially the same condition when Ingesting Plaintiff ingested it as it was in when it left the control of Defendants. Defendants' Xarelto®'s ability to cause serious personal injuries and damages, such as those suffered by Ingesting Plaintiff, was not due to any voluntary action or contributory negligence of Ingesting Plaintiff. Ingesting Plaintiff consumed the Xarelto® as directed and without change in its form or substance.

84.    Defendants' failure to exercise reasonable care in the design, dosing information, marketing, warnings, and/or manufacturing of Xarelto® was a proximate cause of Ingesting Plaintiff's injuries and damages.

85.    Ingesting Plaintiff seeks all damages to which Plaintiff may be justly entitled.

86.    The Ingesting Plaintiff's injuries and damages are severe and permanent, and will continue into the future. As a result, the Ingesting Plaintiff seeks actual and punitive damages from the Defendants.

87.    As to **Count II-Negligence**, Ingesting Plaintiff reserves its rights to

amend this cause of action or seek a court order to apply any applicable law of the Ingesting Plaintiff's home state.

## COUNT III: NEGLIGENCE- FAILURE TO WARN

88.     Ingesting Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

89.     Xarelto® was defective and unreasonably dangerous when it left the possession of the Defendants in that it contained warnings insufficient to alert patients and prescribing physicians of the dangerous risks and reactions associated with Xarelto®, including but not limited to the prevalence of irreversible bleeding, and other serious injuries and side effects despite the Defendant's knowledge of the increased risk of these injuries over other anticoagulation therapies available.

90.     Xarelto® was defective due to inadequate post-marketing warnings and instruction because Defendants knew or should have known of the risk and danger of serious bodily harm and or death from the use of Xarelto® but failed to provide an adequate warning to patients and prescribing physicians of the product, knowing the product could cause serious injury and or death.

91.     Ingesting Plaintiff was prescribed and used Xarelto® for its intended purpose.

92.     Ingesting Plaintiff could not have known about the dangers and hazards presented by Xarelto®.

93.     The warnings that were given by the Defendants were not accurate, clear, compete, and/or were ambiguous.

94.     The warnings, or lack thereof, that were given by the Defendants failed to properly warn prescribing physicians of the risk of irreversible bleeding and other serious injuries and side effects, and failed to instruct prescribing physicians to test and monitor

for the presence of the injuries for which Plaintiff and others had been placed at risk.

95.     The warnings that were given by the Defendants failed to properly warn Ingesting Plaintiff and prescribing physicians of the prevalence of irreversible bleeds.

96.     The Ingesting Plaintiff, individually and through their prescribing physicians, reasonably relied upon the skill, superior knowledge, and judgment of the Defendants. The Defendants had a continuing duty to warn the Ingesting Plaintiff and prescribing physicians of the dangers associated with Xarelto®. Had Ingesting Plaintiff received adequate warnings regarding the risks of Xarelto®, they would not have used Xarelto®.

97.     As a direct and proximate result of Xarelto®'s defective and inappropriate warnings, Plaintiff has suffered severe physical injuries and damages as described above.

98.     As a direct and proximate result of the wrongful acts of the Defendants, Ingesting Plaintiff suffered severe and irreparable bodily injury; suffered and will continue to suffer great pain of body and mind; suffered and will continue to suffer great embarrassment and humiliation; suffered and will continue to suffer permanent impairment to Ingesting Plaintiffs' earnings capacity; incurred and will continue to incur expenses for medical treatment of Ingesting Plaintiffs' injuries; suffered and will continue to suffer the loss of enjoyment of life and have been otherwise damaged to be further shown by the evidence.

99.     For the above reasons, the Defendants are strictly liable under product liability law without regard to proof of negligence or gross negligence.

**100.**     As to **Count III-Negligence- Failure to Warn**, Ingesting Plaintiff reserves its rights to amend this cause of action or seek a court order to apply any applicable law of the Ingesting Plaintiff's home state.

## COUNT IV: NEGLIGENCE – UNREASONABLE MARKETING OF A DANGEROUS  DRUG AND UNREASONABLE FAILURE TO REMOVE THE DRUG FROM THE  MARKET

101.    Ingesting Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

102.    Defendants owed a duty to the general public, and specifically to the Ingesting Plaintiff, to not introduce a drug into the market, or continue a previous tender of a drug, including the Xarelto® at issue in this lawsuit, that was unreasonably dangerous for any person to use it and was capable of causing serious personal injuries such as those suffered by Ingesting Plaintiff during foreseeable use.

103.    Defendants breached their duty of care and were negligent by, but not limited to, the following actions, misrepresentations, and omissions toward Ingesting Plaintiff:

a.   Failing to exercise reasonable and ordinary care in that the drug Xarelto® was so unreasonably dangerous and defective in design that it never should have been on the market or taken by anyone;

b.   Failing to exercise reasonable and ordinary care in the design, research, development, manufacture, sale, testing and or distribution of the drug Xarelto®.

c.   Tendering into the market a drug which Defendants knew or should have known was so dangerous that it shouldn't have been taken by anyone.

d.   Violating its duty of care in design by tendering into the market a drug which it knew or should have known should not have been taken by anyone.

    e.  Violating its duty of care in design in marketing by tendering into the market a drug which it knew or should have known should not have been taken by anyone.

    f.  Violating its duty of care in design by placing an unsuitable product into the market for public consumption.

104.   The Xarelto® that injured Ingesting Plaintiff was in substantially the same condition when Ingesting Plaintiff ingested it as it was in when it left the control of Defendants. Xarelto®'s ability to cause serious personal injuries and damages such as those suffered by Ingesting Plaintiff was not due to any voluntary action or contributory negligence of Ingesting Plaintiff. Ingesting Plaintiff consumed the Xarelto® as directed and without change in its form or substance.

105.   Defendants' violation of its duty of care resulted in an untenably dangerous product being placed into the marketplace which was a proximate cause of Ingesting Plaintiff's injuries and damages.

106.   Ingesting Plaintiff seeks all damages to which Ingesting Plaintiff may be justly entitled.

107.   The Ingesting Plaintiff's injuries and damages are severe and permanent, and will continue into the future. As a result, the Ingesting Plaintiff seeks actual and punitive damages from the Defendants.

108.   As to **Count IV- Negligence, Unreasonable Marketing of a Dangerous Drug and Unreasonable Failure to Remove the Drug from the Market**, Ingesting Plaintiff reserves its rights to amend this cause of action or seek a court order to apply any applicable law of the Ingesting Plaintiff's home state.

## COUNT V: BREACH OF WARRANTY - BREACH OF EXPRESS WARRANTY

109.   Ingesting Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

110.   Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and/or otherwise released into the stream of commerce Xarelto®, in the course of same, directly advertised or marketed the product to the FDA, healthcare professionals and consumers, including Ingesting Plaintiff, or persons responsible for consumer.

111.   Xarelto® materially failed to conform to those representations made by Defendants in package inserts, and otherwise, concerning the properties and effects of Xarelto®, respectively manufactured and/or distributed and sold by Defendants, and which Ingesting Plaintiff purchased and ingested in direct or indirect reliance upon these express representations. Such failures by Defendants constituted a material breach of express warranties made, directly or indirectly, to Ingesting Plaintiff concerning Xarelto® sold to Ingesting Plaintiff.

112.   As a direct, foreseeable, and proximate result of Defendants' breaches of express warranties, Ingesting Plaintiff suffered grievous bodily injury and consequent economic and other loss, as described above, when Ingesting Plaintiff's physician, in reasonable reliance upon such express warranties, prescribed for Ingesting Plaintiff the use of Xarelto®. Ingesting Plaintiff purchased and ingested Xarelto® as prescribed and instructed by Ingesting Plaintiff's physician, leading to Ingesting Plaintiff's injuries.

113.   The Ingesting Plaintiff's injuries and damages are severe and permanent, and will continue into the future. As a result, the Ingesting Plaintiff seeks actual and

punitive damages from the Defendants.

114.     As to **Count V- Breach of Warranty, Breach of Express Warranty**, Ingesting Plaintiff reserves its rights to amend this cause of action or seek a court order to apply any applicable law of the Ingesting Plaintiff's home state.

## COUNT VI: BREACH OF WARRANTY – BREACH OF IMPLIED WARRANTY

115.     Ingesting Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

116.     Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and/or otherwise released into the stream of commerce Xarelto®, in the course of same, directly advertised or marketed the product to the FDA, health care professionals and consumers, including Ingesting Plaintiff, or persons responsible for consumer.

117.     Defendants impliedly warranted their Xarelto® product, which they manufactured and/or distributed and sold, and which Ingesting Plaintiff purchased and ingested, to be of merchantable quality and fit for the common, ordinary, and intended uses for which the product was sold.

118.     Defendants breached their implied warranties of the Xarelto® product sold to Ingesting Plaintiff because this product was not fit for its common, ordinary, and intended use.

119.     As a direct, foreseeable and proximate result of Defendants' breaches of impliedwarranties, Ingesting Plaintiff suffered grievous bodily injury and consequential economic and other losses, as described above, when Ingesting Plaintiff ingested Xarelto®, in reasonable reliance upon the implied warranties, leading to Ingesting

28

Plaintiff's injuries.

120.    The Ingesting Plaintiff's injuries and damages are severe and permanent, and will continue into the future. As a result, the Ingesting Plaintiff seeks actual and punitive damages from the Defendants.

121.    As to **Count VI- Breach of Warranty, Breach of Implied Warranty**, Ingesting Plaintiff reserves its rights to amend this cause of action or seek a court order to apply any applicable law of the Ingesting Plaintiff's home state.

## COUNT VII: FRAUD

122.    Ingesting Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

123.    Defendants, having undertaken the manufacturing, marketing, dispensing, distribution and promotion of Xarelto® described herein, owed a duty to provide accurate and complete information regarding these products.

124.    The Defendants knew or should have known, that Xarelto® was unreasonably dangerous and defective, and caused serious, at times fatal, irreversible bleeds.

125.    Despite their knowledge, the Defendants omitted material facts in the disclosures they made to the public, the medical community and to consumers, including the Ingesting Plaintiff and prescribing physicians, concerning the use and safety of Xarelto®.

126.    The Defendants made untrue, deceptive, and/or misleading representations of material facts, and omitted and/or concealed material facts from the public, including the Ingesting Plaintiff and prescribing physicians, concerning the use and safety of Xarelto®.

127.    The Defendants' practices relating to their promotion of Xarelto® created and/or reinforced a false impression as to its safety.

128.    The Defendants' practice of promoting Xarelto® placed and continues to place all  consumers of Xarelto® at risk for serious injury resulting from its potentially lethal side effects.

129.    The Defendants' statements and omissions were made with the intent that the Plaintiff, and Plaintiff's prescribing physician, would rely on them.

130.    The Ingesting Plaintiff purchased and used Xarelto® for personal, family or household purposes and suffered ascertainable losses of money as a result of the Defendants' use or  employment of the methods, acts, or practices.

131.    As a direct and proximate result of the Defendants' acts of fraud, the Ingesting  Plaintiff suffered irreparable injuries.

132.    Ingesting Plaintiff endured substantial pain and suffering. As a result, the Ingesting  Plaintiff has incurred significant expenses for medical care and will continue to be economically  and emotionally harmed in the future.

133.    The Ingesting Plaintiff's injuries and damages are severe and permanent, and will  continue into the future. As a result, the Ingesting Plaintiff seeks actual and punitive damages from  the Defendants.

134.     As to **Count VII-Fraud,** Ingesting Plaintiff reserves its rights to amend this cause  of action or seek a court order to apply any applicable law of the Ingesting Plaintiff's home state.

## COUNT VIII:

## VIOLATION OF CONSUMER PROTECTION LAWS

135.    Ingesting Plaintiff incorporates by reference each and every paragraph of this  Complaint as if fully set forth herein and further alleges as follows:

136.    Ingesting Plaintiff purchased and used Xarelto® for personal use and

thereby  suffered ascertainable losses as a result of Defendants' actions in violation of the consumer  protection laws.

137.    Unfair methods of competition or deceptive acts or practices that were proscribed by  law, including the following:

a.   Representing that goods or services have characteristics, ingredients, uses benefits or quantities that they do not have;

b.   Advertising goods or services with the intent not to sell them as advertised; and

c.   Engaging in fraudulent or deceptive conduct that creates a likelihood of  confusion or misunderstanding.

138.    Defendants violated consumer protection laws through their use of false and  misleading misrepresentations or omissions of material fact relating to the safety of Xarelto®.

139.    Defendants uniformly communicated the purported benefits of Xarelto® while  failing to disclose the serious and dangerous side-effects related to the use of Xarelto® and of the  true state of Xarelto® regulatory status, its safety, its efficacy, and its usefulness. Defendants made  these representations to physicians, the medical community at large, and to patients and consumers  such as Ingesting Plaintiff in the marketing and advertising campaign described herein.

140.    Defendants' conduct in connection with Xarelto® was also impermissible and illegal  in that it created a likelihood of confusion and misunderstanding, because Defendants misleadingly,   falsely and or deceptively misrepresented and omitted numerous material facts                regarding, among other things, the utility, benefits, costs, safety, efficacy and advantages of  Xarelto®.

141.     As a result of these violations of consumer protection laws, Ingesting Plaintiff has  incurred and will incur; serious physical injury, pain, suffering, loss of income, loss of opportunity,  loss of family and social relationships, and medical, hospital and surgical expenses and other  expense related to the diagnosis and treatment thereof, for which Defendants are liable.

142.     As to **Count XIII-Violation of Consumer Protection Law,** Ingesting Plaintiff  reserves its rights to amend this cause of action or seek a court order to apply any applicable law of  the Ingesting Plaintiff's home state.

<u>**COUNT IX:**</u>
<u>**DAMAGES- COMPENSATORY AND PUNITIVE**</u>

134.     Ingesting Plaintiff  incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

135.     Ingesting Plaintiff is entitled to punitive damages because Defendants' actions were  reckless and without regard for the public's safety. Defendants mislead both the medical community and the public at large, including Ingesting Plaintiff and Ingesting Plaintiff's physicians, by making false representation about and concealing pertinent information regarding  Xarelto®. Defendants downplayed, understated and disregarded its knowledge of the serious and  permanent side effects associated with the use of Xarelto® despite information demonstration the  product was unreasonably dangerous.

136.     As a proximate result of Defendants' acts and omissions, Ingesting Plaintiff suffered  internal and gastrointestinal bleeding, all resulting from Ingesting Plaintiff's ingestion of Xarelto®.

137.     As a result of Ingesting Plaintiff's injuries, the Ingesting Plaintiff has

endured  substantial pain and suffering; has incurred significant expenses for medical care, and will remain   economically challenged and emotionally harmed.

138.    Ingesting Plaintiff has suffered and will continue to suffer economic loss, and have  otherwise been emotionally and economically injured.

139.    Defendants'' actions were performed willfully, intentionally, and with reckless  disregard for the rights of Plaintiff and the public.

140.    Ingesting Plaintiff's injuries and damages are severe, permanent and will continue  into the  future. As a  result, Ingesting Plaintiff  seeks actual and punitive  damages from the  Defendants.

141.    Defendants'  conduct was committed with knowing, conscious and deliberate  disregard for the rights and safety of consumers, including the Ingesting Plaintiff, thereby entitling  the Ingesting Plaintiff to punitive damages in an amount appropriate to punish the Defendants and  deter them from similar conduct in the future.

142.    As to **Count IX- Damages, Compensatory and Punitive**, Ingesting Plaintiff  reserves its rights to amend this cause of action or seek a court order to apply any applicable law of  the Ingesting Plaintiff's home state.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Ingesting Plaintiff prays for relief against Defendants as follows:

1.      For judgment for damages sufficient to compensate for damages, including but not  limited to past, present, and future economic expenditures in connection with the injuries sustained by  Ingesting Plaintiff as a result of ingesting Defendants' Xarelto® drug product;

2.      For compensatory damages according to proof, including lost wages, pain,

suffering and mental anguish;

    3.      For punitive damages, in an amount to be awarded as provided by law;

    4.      For reasonable costs, including attorney's fees as permitted by law; and

    5.      For all other just and proper relief.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all counts and as to all issues.


Dated: October 1, 2015


           **WIGGINS, CHILDS PANTAZIS, FISHER, & GOLDFARB, LLC**


           BY: _/s/ Dennis G. Pantazis_____
               Dennis G. Pantazis
               D.G. Pantazis, Jr.
               Patrick L. Pantazis
               **Wiggins, Childs, Pantazis, Fisher, Goldfarb, LLC**
               The Kress Building
               301 19th Street North
               Birmingham, Alabama 35203
               Telephone: 205-314-0500
               Email: dgp@wigginschilds.com

               Andrew A. Lemmon
               650 Poydras Street
               Suite 2335
               New Orleans, LA  70130
               504-581-5644
               Fax: 985-783-1333

               Robert M. Foote
               Kevin Noll
               **Foote, Mielke, Chavez & O'Neil, LLC**
               10 West State Street
               Suite #200
               Geneva, Illinois 60134
               Tel. No. 630-232-7450
               Email: rmf@fmcolaw.com


               *Attorneys for Plaintiff*