**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

---

| | |
|---|---|
| IN RE: XARELTO (RIVAROXABAN) ) | MDL NO. 2592 |
| PRODUCT LIABILITY LITIGATION ) | |
| ) | SECTION L |
| ) | JUDGE FALLON |
| ) | MAG. JUDGE NORTH |
| STEPHEN M. SPEARS, ) | |
| ) | |
| Plaintiff, ) | AMENDED COMPLAINT & JURY DEMAND |
| ) | |
| v. ) | Civil Action No.: 2:15-cv-5019-EEF-MBN |
| ) | |
| JANSSEN RESEARCH & DEVELOPMENT,) | |
| LLC, JOHNSON & JOHNSON COMPANY, ) | |
| JANSSEN ORTHO, LLC; ) | |
| JANSSEN PHARMACEUTICALS, INC., ) | |
| BAYER CORPORATION, BAYER AG, ) | |
| BAYER HEALTHCARE, LLC, ) | |
| BAYER HEALTHCARE ) | |
| PHARMACEUTICALS, INC., ) | |
| BAYER PHARMA AG, ) | |
| BAYER HEALTHCARE AG, ) | |
| FICTITIOUS DEFENDANTS 1-100, ) | |
| ) | |
| Defendants. ) | |

---

## AMENDED COMPLAINT

Plaintiff Stephen M. Spears ("Plaintiff"), by and through counsel, hereby amends his

Complaint to add Defendants Bayer Pharma AG and Bayer Healthcare AG to this action

pursuant to Federal Rule of Civil Procedure 15(a)(1)(B).  Plaintiff files this Amended Complaint

in the above-styled Eastern District of Louisiana pursuant to the Court's Stipulated PTO No. 9

addressing the direct filing of this action in MDL No. 2592, and hereby asserts the following

claims and causes of action against Defendants Janssen Research & Development, LLC, Johnson

& Johnson Company, Janssen Ortho, LLC, Janssen Pharmaceuticals, Inc., Bayer Corporation,

Bayer AG, Bayer Healthcare, LLC, Bayer Healthcare Pharmaceuticals, Inc., Bayer Pharma AG,

Bayer Healthcare AG, and Fictitious Defendants 1-100 for compensatory and punitive damages arising from ingestion of the pharmaceutical product Xarelto® and hereby alleges the following:

**PARTIES**

1.      Plaintiff Stephen M. Spears ("Plaintiff") was at all times relevant hereto a citizen of the State of Iowa.

2.      Plaintiff suffered damages as a result of ingestion of Xarelto®.

3.      Defendant, Janssen Research & Development, LLC ("Janssen R & D") f/k/a Johnson and Johnson Pharmaceuticals Research and Development LLC, is a limited liability company organized, under the laws of New Jersey, with its principal place of business located at 920 U.S. Route 202, Raritan, New Jersey.  Janssen R&D's sole principal or member is Centocor Research Development, Inc., ("Centocor") a Pennsylvania corporation with its principal place of business and nerve center located at 200 Great Valley Parkway, Malvern, Pennsylvania. Centocor is a subsidiary or division of Johnson & Johnson, and at all times relevant herein engaged in the research, design, marketing, sale, and distribution of Xarelto®.

4.      Defendant Johnson & Johnson ("J&J") is a fictitious name adopted by Defendant Johnson & Johnson Company, a New Jersey corporation which has its principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933.  At all times relevant herein, Defendant J&J was engaged in the business of designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and selling Xarelto®.

5.      Defendant Janssen R & D is the holder of the approved New Drug Application for Xarelto® as well as the supplemental NDA.  Janssen R & D, J&J and Centocor all transact substantial business throughout the United States, including the research, manufacture, sale, distribution and marketing of Xarelto® as set forth herein.

2

6.     Defendant, Janssen Ortho, LLC ("Ortho") is a Delaware limited liability company with its principal place of business in Puerto Rico.  Ortho is a subsidiary of J&J.  At all times relevant hereto, Defendant Ortho manufactures and continues to manufacture Xarelto®.

7.     Defendant, Janssen Pharmaceuticals, Inc. f/k/a Janssen Pharmaceuticals Inc., f/k/a Ortho-Mcneil-Janssen Pharmaceuticals, Inc. ("Janssen"), at all relevant times at the time suit was commenced, a Pennsylvania corporation with a principal place of business at 1125 Trenton-Harbourton Road, Titusville, New Jersey 08560. At all times relevant and material hereto, Janssen was a pharmaceuticals company involved in the manufacturing, research, development, marketing, distribution, sale, and release for use to the general public of pharmaceuticals including Xarelto®.

8.     Defendant Bayer Corporation ("Bayer Corp") is and at all times relevant was and remains an Indiana corporation with its nerve center, headquarters, and principal place of business at 100 Bayer Road Pittsburgh, Pennsylvania.  Bayer Corp. transacts substantial business including the research, manufacture, sale, distribution and marketing of Xarelto® throughout the United States as set forth herein.

9.     Defendant, Bayer AG ("Bayer AG") is a foreign company with its principal place of business in Leverkusen, North Rhine-Westphalia, Germany, which licensed Xarelto®. Pursuant to the Court's PTO No. 10, Bayer Pharma AG may be served upon their representative: Bayer Pharma AG, Attn. Eva Gardyan-Eisenlohr, General Counsel, Muellerstrasse 178, 13353 Berlin, GERMANY.

10.     Defendant, Bayer Healthcare, LLC ("Bayer HC") is a Delaware limited liability company formed and existing under and by the virtue of the laws of the State of Delaware, with its principal place of business located in the State of New Jersey.  Bayer Healthcare LLC's sole

member is Bayer Corporation, and is wholly owned by Bayer Corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205.

11.     Bayer HC is a subsidiary of Bayer and jointly developed Xarelto® with J&J and Janssen R&D.  Bayer HC transacts substantial business including the research, manufacture, sale, distribution and marketing of Xarelto® throughout the United States as set forth herein.

12.     Bayer Healthcare Pharmaceuticals, Inc. ("Bayer Pharma") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in New Jersey.  Bayer Pharma is the U.S.-based pharmaceuticals operation of Bayer HC, a division of Bayer.  Bayer Pharma is a subsidiary of Bayer and jointly developed, marketed and distributed Xarelto® with J&J and Janssen R&D.  At all times relevant and material herein, Bayer Pharma was a pharmaceuticals company involved in the manufacturing, distributing, sale and release for use to the general public of pharmaceuticals including Xarelto®.  Pursuant to the Court's PTO No. 10, BHCP may be served upon their Registered Agent: SOP Department, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

13.     Defendant, Bayer Pharma AG ("Bayer Pharma AG") is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.  Upon information and belief, Defendant, Bayer Pharm AG, has transacted and conducted business in the State of Iowa.

14.     Defendant, Bayer Healthcare AG ("Bayer Healthcare AG") is a company domiciled in Germany and is the parent/holding company of Defendants Bayer Corporation, Bayer Healthcare LLC, Bayer Healthcare Pharmaceuticals, INC, and Bayer Pharma AG.  Upon information and belief, at all relevant times, Defendant Bayer Healthcare AG has transacted and conducted business in the State of Iowa, and derived substantial revenue from interstate

commerce.

15.     Upon information and belief, at all relevant times, Defendant Bayer Healthcare AG exercises dominion and control over Defendants Bayer Corporation, Bayer Healthcare LLC, Bayer Healthcare Pharmaceuticals, Inc., and Bayer Pharma AG.

16.     Bayer's cooperation partner, J&J and Janssen R&D, submitted the New Drug Application for Xarelto® to the FDA.

17.     Defendants Janssen R&D, J&J, Ortho, Janssen, Bayer AG, Bayer Corp., Bayer HC, Bayer Pharma, Bayer Healthcare AG, Bayer Pharma AG, and Fictitious Defendants 1-100 shall be referred herein individually by name or jointly as "Defendants."

18.     At all times alleged herein, Defendants shall include any and all named or unnamed parent companies, parent corporations, subsidiaries, affiliates, divisions, franchises, partners, joint venturers, and any organizational units of any kind, their predecessors, successors, successors in interest, assignees, and their officers, directors, employees, agents, representatives and any and all other persons acting on their behalf.

19.     At all times herein mentioned, each Defendant was the agent, servant, partner, predecessor in interest, aider and abettor, co-conspirator, and joint venturer of each of the remaining Defendants herein.

20.     At all times herein mentioned, each Defendant was the agent, servant, partner, predecessor in interest, aider and abettor, co-conspirator, and joint venturer of each of the remaining Defendants thereby operating and acting with the purpose and scope of said agency, service, employment, partnership, conspiracy and joint venture.

21.     At all times relevant and material hereto, Defendants were engaged in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, and

or introducing into interstate commerce throughout the United States either directly or indirectly, through third-parties, subsidiaries and/or related entities, the anti-coagulant pharmaceutical Xarelto®.

## JURISDICTION AND VENUE

22. The Court has jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a) inasmuch as the amount in controversy exceeds $75,000.00, and Plaintiff is a citizen of a different state than Defendants.

23. Venue in this district is proper pursuant to the Court's PTO No. 9 pertaining to direct filing of Complaints subject to transfer to MDL No. 2592 in the United States District Court for the Eastern District of Louisiana. Upon completion of all pretrial proceedings in MDL No. 2592 and pursuant to 28 U.S.C. § 1404(a), this case is subject to transfer to the United States District Court, Northern District of Iowa, inasmuch as a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district, and Defendants are subject to that Court's personal jurisdiction.

24. This is an action for damages, exclusive of interest and costs, which exceeds the sum of seventy-five thousand dollars ($75,000.00).

## NATURE OF THE CASE

25. Defendants, directly or by and through their agents, apparent agents, servants or employees designed, manufactured, marketed, advertised, distributed, promoted, labeled, tested and sold Xarelto® as an anti-coagulant primarily used to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat deep vein thrombosis ("DVT"), to treat pulmonary embolisms ("PE"), and to reduce the risk of recurrence of DVT and/or PE.

26. Defendants applied for an initial NDA for Xarelto® in July of 2008.

27.     Xarelto® was approved by the Food and Drug Administration on July 1, 2011 to reduce the risk of blood clots, DVT, and PE following knee and hip replacement surgery. On November 4, 2011 Xarelto® was approved as an anti-coagulant primarily used to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation.    On November 2, 2012 the FDA expanded the use of Xarelto® to the treatment of patients with DVT and PE, as well as long-term treatment to prevent recurrence of the same.

28.     According to Defendants' marketing and informational materials referenced in the paragraphs below and widely disseminated to the consuming public, "Xarelto® is the first and only once-a-day prescription blood thinner for patients with AFib not caused by a heart valve problem, that is proven to reduce the risk of stroke -- without routine blood monitoring."

29.     As Defendants state on their website, "XARELTO® has been proven to lower the chance of having a stroke if you have atrial fibrillation (AFib), not caused by a heart valve problem.  XARELTO® is an anticoagulant, or blood-thinning medicine that works by helping to keep blood clots from forming." Defendants further claim that "it's been prescribed to more than seven million people around the world to help treat or reduce their risk of dangerous clots" and that it "begins working a few hours after you start taking it, and keeps working for as long as take it."

30.     Defendants further declare that "XARELTO® is proven to help treat and prevent DVT and PE blood clots" and that Xarelto® "reduc[es] the risk of these dangerous clots [from] happening again."

31.     Defendants claim that patients with AFib, DVT, or PE taking Xarelto® do not need regular blood monitoring and there are no known dietary restrictions.  In addition, patients with AFib only need to take Xarelto® once a day with an evening meal.

32.     Defendants claim that patients with AFib are 5 times more likely than a person without Afib to suffer from a stroke and that "disability is more likely to be severe" and "the outcome is almost twice as likely to be fatal" and "the chances of having another major stroke go up."

33.     Rivaroxaban is an oxazolidinone derivative optimized for inhibiting both free Factor Xa and Factor Xa bound in the prothrombinase complex.  It is a highly selective direct Factor Xa inhibitor with oral bioavailability and rapid onset of action.  Inhibition of Factor Xa interrupts the intrinsic and extrinsic pathway of the blood coagulation cascade, inhibiting both thrombin formation and development of thrombi.  Rivaroxaban does not inhibit thrombin (activated Factor II).

34.     Defendants routinely marketed Xarelto® as a "one size fits all" drug. In their fervent marketing of Xarelto, Defendants misinformed patients and their healthcare providers as to the necessity to routinely monitor any patient requiring a blood thinning agent.  In essence, Defendants have created a new drug, Xarelto® that is not better than warfarin from a safety perspective, and at best, is only perhaps slightly easier to use and administer.  The idea of this apparently easier-to-use anticoagulant evidently appealed to physicians, who were subject to extreme marketing and promotion by Defendants, but ignores patient safety.

35.     Defendants' marketing materials suggest that Xarelto® represented a therapeutic simplification and therapeutic progress because it did not require patients to undergo periodic monitoring with blood tests and because there were no dietary restrictions.

36.     Defendants' boxed warning did not address the increased risk for serious and fatal bleeding, despite the fact that the information listed on their website originating from the Rocket AF clinical trial sponsored by Defendants, states that in comparison to warfarin, patients taking

Xarelto® have more gastrointestinal bleeds and need more transfusions. In spite of this reference regarding bleeds, the information is still wholly inadequate because, this information was not conveyed in the boxed warning on the Xarelto® label.

37.     According to Institute for Safe Medication Practices, QuarterWatch Report, issued on October 3, 2012, the primary reported adverse event related to Xarelto® use "was not the well- understood risk of hemorrhage.  Instead, the largest identifiable category was serious blood-clot- related injury--most frequently pulmonary embolism--the very events rivaroxaban is intended to prevent."  This lack of efficacy for short-term users of Xarelto® post hip and knee replacement surgery resulted in about 44% of the reported adverse effects from taking Xarelto®.

38.     FDA clinical reviewers have stated that "rivaroxaban should not be approved unless the manufacturer conducts further studies to support the efficacy and safety of Rivaroxaban" and the FDA website notes that "[a]dverse event reports of thrombocytopenia and venous thromboembolic events were identified" in relationship to Xarelto®."  However, this information was not portrayed in the warning section on the warning label.  The lack of efficacy of the medication for patients taking Xarelto® post hip and knee surgery were not disclosed resulting in patients ingesting Xarelto® and physicians prescribing Xarelto® without sufficient information to make an accurate decision.

39.     Defendants fervently marketed Xarelto® using print advertisements, online marketing on their website, and video advertisements with no regard to the accuracy and repercussions of their misleading advertising in favor of increasing sales.

40.     In the January/February 2013 issue of WebMD magazine, Defendants placed a print advertisement that resulted in the Office of Prescription Drug Promotion (OPDP) of the U.S. Food and Drug Administration (FDA) sending a letter stating that their print advertisement

was "false or misleading because it minimizes the risks associated with Xarelto® and makes a misleading claim." Furthermore, the advertisement states, "And there are no dosage adjustments" in conflict with the product labeling approved by the FDA.

41.     As a result of Defendants' intense marketing, "[a]bout 130,000 U.S. prescriptions were written for Xarelto® in the first three months of 2012" resulting in large profits.

42.     Due to the defective nature of Xarelto®, persons who were prescribed and ingested Xarelto®, for even a brief period of time, including the Plaintiff herein, were at increased risk for developing life-threatening bleeds.

43.     The flawed formulation of Xarelto® raises concerns about the risk of stroke, bleeding, and blood clots if not taken properly or absorbed properly, particularly in patients with poor renal function. In addition, "[p]rominent U.S. [cardiologists and health care professionals] stress that neither new drug [Xarelto] has a known antidote for a bleeding emergency, as warfarin does."

44.     Xarelto® led to 968 suspected undesirable side effects including 72 cases of death in Germany in just the first eight months of 2013.

45.     In addition, The Institute for Safe Medication Practices reported that: "A clinical trial with 14,000 patients had shown that rivaroxaban was no worse than warfarin. [40] But reviewers noted that warfarin had not been optimally used. If rivaroxaban were really inferior to optimally used warfarin--but this was not proven, only suspected--its use could lead to increased death and injury. [41] Reviewers also questioned the convenient once-a-day dosing scheme, saying blood level studies had shown peaks and troughs that could be eliminated by twice-a-day dosing…. As with other anticoagulants, the rate of clinically relevant bleeding in clinical studies was high--15% per year of treatment."

46.     In the first quarter of 2012, The Institute for Safe Medication Practices "identified 356 reports of serious, disabling, or fatal injury in which rivaroxaban was the primary suspect drug.  The report more than doubled from the previous quarter total of 128 cases."  However, when the findings were discussed with Defendants, "the company told us that it had reviewed the same data and saw no signal of a safety issue that needed to be addressed."  Defendants placed more value into ensuring that their profits would continue instead of working on minimizing the serious, disabling, or fatal injuries that were occurring due to the drug they were marketing and promoting.

47.     Defendants concealed their knowledge that Xarelto® can cause life threatening, irreversible bleeds from the Plaintiff, other consumers, the general public, and the medical community.  Defendants did not adequately warn of the irreversible nature of Xarelto® bleeding.  Specifically, Defendants did not adequately inform consumers and the prescribing medical community about the risks of uncontrollable bleeds associated with Xarelto® usage, nor did Defendants warn or otherwise advise on how to intervene and stabilize a patient should a bleed occur.

48.     Moreover, Defendants failed to adequately warn about the lack of an antidote to reverse uncontrolled bleeding caused by Xarelto®.   Defendants merely indicated that there was a risk for bleeding and sidestepped the important issue of reversing the effects of Xarelto® should a bleed occur.  Other safer alternatives to Xarelto® like Coumadin have an antidote that can reverse uncontrolled bleeding.

49.     Importantly, Xarelto® still does not have a "black box" warning informing patients or prescribing doctors that Xarelto® can cause irreversible bleeds. In fact, a label change

as recent as March 2014 still failed to contain a "black box" warning regarding irreversible bleeds.

50.     Aside from the warning labels, Defendants did not issue a "Dear Doctor" letter that sufficiently outlined the dangers of administering Xarelto® to a patient.  In the September 2013 letter to healthcare professionals, Defendants do not mention the lack of an antidote in Xarelto® should serious and fatal bleeding occur while a patient was taking Xarelto®.

51.     Defendants have failed and continue to fail in their duties to warn and protect the consuming public, including the Plaintiff.

52.     In addition to damages for Defendants' inadequate warnings, Xarelto® also lacks any benefit sufficient to tolerate the extreme risk posed by the ingestion of this drug.

53.     Xarelto® is unreasonably dangerous and defective as formulated thereby putting consumers including Plaintiff at an unreasonable risk of suffering needless injuries and death.

54.     Defendants willfully, wantonly, and with malice withheld the knowledge of increased risk of irreversible bleeds from users of Xarelto® to prevent any chances of their product's registrations being delayed or rejected by FDA.

55.     As the manufacturers and distributors of Xarelto®, Defendants should have known that Xarelto® was associated with irreversible bleeds.

56.     With the knowledge of the true relationship between use of Xarelto® and irreversible bleeds, rather than taking steps to pull the drug off the market, provide strong warnings, or create an antidote, Defendants promoted and continue to promote Xarelto® as a safe and effective treatment for AFib.

57.     While Defendants enjoy great financial success from the sales of Xarelto®, they continue to place American consumers at risk of severe bleeds and death.

58.     Consumers including Plaintiff who have used Xarelto® to reduce the risk of stroke due to Afib or to reduce the risk of blood clots have several alternative safer products available to treat the conditions and have not been adequately warned about the significant risks and lack of benefits associated with Xarelto® therapy.

59.     Defendants through their affirmative misrepresentations and omissions actively concealed from Plaintiff and Plaintiff's physicians the true and significant risks associated with Xarelto®.

60.     As a result of Defendants' actions, Plaintiff and Plaintiff's physicians could not have reasonably known or have learned through reasonable diligence that Plaintiff would be exposed to the risks identified in this Complaint.

## FACTUAL ALLEGATIONS

61.     On December 2, 2014, Plaintiff was first prescribed and began taking Xarelto® upon direction of Plaintiff's physician to treat atrial fibrillation.

62.     On February 1, 2014, Plaintiff was admitted to Unity Point Allen Hospital in Waterloo for treatment of acute gastrointestinal bleeding. Upon medical advice, Plaintiff stopped using Xarelto®.

63.     As a proximate result of Defendants' wrongful acts and omissions, Plaintiff suffered damages including medical expenses, pain and suffering, and lost enjoyment of life.

64.     Plaintiff would not have used Xarelto® had Defendants properly disclosed the risks associated with its use and disclosed that safer alternatives without the aforesaid risks were available.

**EQUITABLE TOLLING OF APPLICABLE STATUTES OF LIMITATION**

65.     Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

66.     The running of any statute of limitations has been tolled by reason of Defendants' fraudulent concealment. Defendants through failing to disclose for three (3) years the truth about the safety and efficacy of Xarelto® to Plaintiff's physicians and Plaintiff and misrepresenting Xarelto® as safe and efficacious for its intended use, actively concealed from said individuals the true risks associated with the use of Xarelto®.

67.     Plaintiff had no knowledge that Defendants were engaged in the wrongdoing alleged herein.  Because of the fraudulent acts of concealment of wrongdoing by Defendants, Plaintiff could not have reasonably discovered the wrongdoing at any time prior to the commencement of this action.

68.     Neither Plaintiff nor Plaintiff's physicians could have determined the nature, extent and identity of related health risks associated with Xarelto®.  Plaintiff and Plaintiff's physicians reasonably relied on Defendants to disseminate truthful and accurate safety and efficacy information about its drug and warn of the side effects complained of herein.

69.     Furthermore, Defendants are estopped from relying on any statute of limitations because of their fraudulent concealment of the defective nature of Xarelto®.  Defendants were under a duty to disclose the true character, quality, and nature of Xarelto® because this was nonpublic information over which Defendants have exclusive control, and because Defendants knew this information was not available to the Plaintiff or his physicians. In addition, Defendants are estopped from relying on any statute of limitations because of their concealment of these facts.

## COUNT I
## STRICT PRODUCTS LIABILITY - FAILURE TO WARN

Comes now Plaintiff and for Count I of this Complaint alleges:

70.     Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

71.     Defendants owed a duty of reasonable care to adequately warn of the risks associated with the use of Xarelto® to Plaintiff and the general public.

72.     Defendants knew or reasonably should have known that the warnings provided to users of Xarelto® regarding the risks associated with its use were incorrect and misleading in at least the following material respects:

      a.    Xarelto® was unaccompanied by proper warnings regarding all possible side effects associated with its use and the comparative severity, incidence, and duration of such adverse effects; and

      b.    Xarelto® was defective due to inadequate post-marketing warnings or instructions because Defendants failed to provide adequate warnings to users or consumers and continued aggressively to promote Xarelto® even after it should have known of the risks of injury from this drug; and

      c.    Xarelto® was unaccompanied by proper warnings regarding irreversible bleeding caused by Xarelto®, and Defendants continued to aggressively promote Xarelto® even after it should have known of the risk of irreversible bleeding from this drug; and

      d.    Defendants failed to warn that there were other drugs available that did not have the same risks as Xarelto®.

15

73.     By failing to warn Plaintiff and Plaintiff's physicians of the adverse health risks associated with Xarelto®, Defendants breached their duty to Plaintiff of reasonable care and safety.

74.     Defendants as manufacturers and distributers of Xarelto® are held to the level of knowledge of an expert in the field.

75.     Furthermore, Defendants should have known that warnings and other clinically relevant information and data, which they distributed regarding the risks of irreversible bleeds and other injuries and death associated with the use of Xarelto®, were inadequate.

76.     Plaintiff did not have the same knowledge as Defendants and no adequate warning or other clinically relevant information and data was communicated to Plaintiff or to Plaintiff's treating physicians.

77.     Defendants had a continuing duty to provide consumers including Plaintiff and Plaintiff's physicians with warnings and other clinically relevant information and data regarding the risks and dangers associated with Xarelto® as it became or could have become available to Defendants.

78.     Defendants marketed, promoted, distributed and sold an unreasonably dangerous and defective prescription drug to health care providers empowered to prescribe and dispense Xarelto® to consumers, including Plaintiff, without adequate warnings and other clinically relevant information and data. Through both omission and affirmative misstatements, Defendants misled the medical community about the risk and benefit balance of Xarelto®, which resulted in injury to Plaintiff.

79.     Despite the fact that Defendants should have known that Xarelto® caused unreasonable and dangerous side effects, they continued to promote and market Xarelto®

16

without stating that there existed safer and more or equally effective alternative drug products and providing adequate clinically relevant information and data.

80.     Defendants knew or should have known that consumers including Plaintiff would foreseeably and needlessly suffer injury as a result of Defendants' failures.

81.     Defendants failed to provide timely and adequate warnings to physicians, pharmacies, and consumers including Plaintiff and to Plaintiff's intermediary physicians in the following ways:

>       a.      Defendants failed to include adequate warnings and provide adequate clinically relevant information and data that would alert Plaintiff and Plaintiff's physicians to the dangerous risks of Xarelto® including, among other things, irreversible bleeds;

>       b.      Defendants failed to provide adequate post-marketing warnings and instructions after Defendants should have known of the significant risks of, among other things, irreversible bleeds;

>       c.      Defendants continued to aggressively promote and sell Xarelto® even after they should have known of the unreasonable risks of irreversible bleeds from this drug.

82.     Defendants had an obligation to provide Plaintiff and Plaintiff's physicians with adequate clinically relevant information and data and warnings regarding the adverse health risks associated with exposure to Xarelto® and that there existed safer and more or equally effective alternative drug products.

83.     By failing to provide Plaintiff and Plaintiff's physicians with adequate clinically relevant information and data and warnings regarding the adverse health risks associated with

exposure to Xarelto® and that there existed safer and more or equally effective alternative drug products, Defendants breached their duty of reasonable care and safety.

84.     Defendants' failure to exercise reasonable care in the design, dosing information, marketing, warnings, and/or manufacturing of Xarelto® was a proximate cause of Plaintiff's damages.

85.     As a direct and proximate result of the actions and inactions of Defendants as set forth above, Plaintiff was exposed to Xarelto® and suffered damages.

## COUNT II
## STRICT PRODUCTS LIABILITY – DESIGN DEFECT

Comes now Plaintiff and for Count II of this Complaint alleges:

86.     Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

87.     At all times material to this lawsuit, Defendants were engaged in the business of designing, manufacturing, testing, marketing, distributing and selling Xarelto® for the sale to, and use by, members of the public.  Xarelto® reached Plaintiff without substantial change and was ingested as directed.  Xarelto® was defective and unreasonably dangerous when it entered into the stream of commerce and was used by Plaintiff.

88.     Defendants sold the Xarelto® ingested by Plaintiff.

89.     Defendants owed a duty to the general public and specifically to Plaintiff to exercise reasonable care in the design, study, development, manufacture, promotion, sale, marketing, and distribution of Xarelto®.  Defendants failed to exercise reasonable care in the design of Xarelto®, because as designed Xarelto was capable of causing serious personal injuries during foreseeable use.  Defendants also failed to exercise reasonable care in the marketing of

Xarelto® because they failed to warn, that, as designed, Xarelto® was capable of causing serious personal injuries such as those suffered by Plaintiff during foreseeable use.

90.     Xarelto® was defective due to inadequate post-marketing warnings and instruction because Defendants should have known of the risk and danger of serious bodily harm and or death from the use of Xarelto® but failed to provide an adequate warning to patients and prescribing physicians of the product knowing the product could cause serious injury or death.

91.     The Xarelto® ingested by Plaintiff was defective and, because of its defects, was unreasonably dangerous to persons who might reasonably be expected to require its use.  In addition, this drug was dangerous to the extent beyond that which could reasonably be contemplated by Plaintiff.  Any benefit of Xarelto® was far outweighed by the serious and undisclosed risks of its use; other drugs performed the same function without the increased risks of Xarelto®.

92.     The Xarelto® ingested by Plaintiff was defective at the time it was distributed by Defendants and left their control.

93.     Plaintiff was a person who would reasonably be expected to use Xarelto®.

94.     Defendants' failure to exercise reasonable care in the design, dosing information, marketing, warnings, and/or manufacturing of Xarelto® was a proximate cause of Plaintiff's damages.

95.     As a direct and proximate result of the actions and inactions of Defendants as set forth above, Plaintiff was exposed to Xarelto® and suffered damages.

## COUNT III NEGLIGENCE

Comes now Plaintiff and for Count III of this Complaint alleges:

96.     Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

97.     At all times relevant and material hereto, Defendants owed a duty to Plaintiff of reasonable care and safety.

98.     Defendants owed a duty to the general public and specifically to Plaintiff to not introduce a drug into the market or continue a previous tender of a drug, including the Xarelto® at issue in this lawsuit, that was unreasonably dangerous and capable of causing serious personal injuries such as those suffered by Plaintiff during foreseeable use.

99.     Defendants' duties included but were not limited to carefully and properly designing, testing, manufacturing, licensing, packaging, promoting, advertising, selling, and/or distributing Xarelto® into the stream of commerce and providing warnings with regard to this drug.

100.    Defendants breached their duty of care and were negligent by, but not limited to, the following actions, misrepresentations, and omissions toward Plaintiff:

     a.     Failing to exercise reasonable and ordinary care in that the drug Xarelto® was so unreasonably dangerous and defective in design that it never should have been on the market or taken by anyone;

     b.     Failing to exercise reasonable and ordinary care in the design, research, development, manufacture, sale, testing and or distribution of Xarelto®.

     c.     Tendering into the market a drug that Defendants knew or should have known was so dangerous that it shouldn't have been used by anyone.

     d.     Violating its duty of care in design by tendering into the market a drug that it knew or should have known should not have been used by anyone.

     e.     Violating its duty of care in design in marketing by tendering into the market a drug that should not have been used by anyone.

f.   Violating its duty of care in design by placing an unsuitable product into the market for public consumption.

g.   Failing to use ordinary care in designing, testing, and manufacturing Xarelto® so as to avoid the high risk to users of unreasonable, dangerous side effects, some of which are fatal;

h.   Failing to accompany Xarelto® with adequate warnings that would alert doctors, consumers, and other users to the potential adverse side effects associated with the use of this drug and the nature, severity, and duration of such adverse effects;

i.   Failing to conduct adequate pre-clinical testing and post-marketing surveillance to determine the safety and side effects of Xarelto®;

j.   Defendants were otherwise careless or negligent.

101.   The Xarelto® that injured Plaintiff was in substantially the same condition when Plaintiff ingested it as it was in when it left the control of Defendants.  Xarelto®'s ability to cause serious personal injuries and damages such as those suffered by Plaintiff was not due to any contributory negligence of Plaintiff. Plaintiff consumed the Xarelto® as directed and without change in its form or substance.

102.   Although Defendants should have known that Xarelto® caused unreasonably dangerous side effects which many users would be unable to remedy by any means, Defendants continued to market this drug to doctors when there were safer and less expensive alternatives available.

103.   In addition, Defendants had a legal duty to comply with the U.S. Food, Drug and Cosmetic Act, U.S. Code § 21 USC § 301 and. regulations promulgated thereunder.

104.    Defendants negligently violated the laws and regulations of the United States including, but not limited to the following: 21 CFR § 330.10(a)(4)(v) (Labeling); 21 CFR § 369.10 (Labeling); 21 CFR §§ 201.56 and 201.57 (d), (e) and (f) (Labeling); 21 CFR 1.21 (a) (Labeling); 21 CFR 600.80 (Post-marketing Reporting of Adverse Experiences); 21 CFR § 314. 50 (Post Marketing Reports of Adverse Drug Experiences), as well as regulations relating to the promotion of drugs for unlabeled uses.  The violations of those and other statutes and regulations constitute negligence *per se*.

105.    Defendants owed a duty to the general public and specifically to Plaintiff to exercise reasonable care in the design, study, development, manufacture, promotion, sale, marketing and distribution of Xarelto® at issue in this lawsuit.  Defendants failed to exercise reasonable care in the design of Xarelto® because as designed Xarelto was capable of causing serious personal injuries such as those suffered by Plaintiff during foreseeable use.  Defendants also failed to exercise reasonable care in the marketing of Xarelto® because they failed to warn, that as designed Xarelto® was capable of causing serious personal injuries such as those suffered by Plaintiff during foreseeable use.

106.    Defendants breached their duty and were negligent in, but not limited to, the following actions, misrepresentations, and omissions toward Plaintiff:

   a.   Failing to use due care in developing, testing, designing, and manufacturing Xarelto® so as to avoid the aforementioned risks to individuals when Xarelto® was being used for treatment;

   b.   Failing to accompany their product with proper or adequate warnings or labeling regarding adverse side effects and health risks associated with the

use of Xarelto® and the comparative severity and duration of such adverse effects;

c.     In disseminating information to Plaintiff and Plaintiff's physicians that was negligently and materially inaccurate, misleading, false, and unreasonably dangerous to patients such as Plaintiff;

d.     Failing to accompany their products with proper or adequate rate of incidence or prevalence of irreversible bleeds;

e.     Failing to provide warnings or other information that accurately reflected the symptoms, scope, and severity of the side effects and health risks;

f.     Failing to conduct adequate pre-clinical and clinical testing and post-marketing surveillance to determine the safety of Xarelto®;

g.     Failing to warn Plaintiff, the medical and healthcare community, and consumers that the product's risk of harm was unreasonable and that there were safer and effective alternative medications available to Plaintiff and other consumers;

h.     Failing to provide adequate training or information to medical care providers for appropriate use and handling of Xarelto® and patients taking Xarelto®;

i.     Failing to adequately test and warn about the use of Xarelto® including the possible adverse side effects and health risks caused by the use of Xarelto®;

j.     Failing to design and manufacture a product that could be used safely due to the lack of a known reversal agent or antidote;

k.      In designing, manufacturing, and placing into the stream of commerce a product which was unreasonably dangerous for its reasonably foreseeable use, which Defendant should have known could cause injury to Plaintiff;

l.      Failing to remove Xarelto® from the market when Defendants should have known of the likelihood of serious side effects and injury to its users;

m.      Failing to adequately warn users, consumers, and physicians about the severity, scope and likelihood of bleeds and related dangerous conditions to individuals taking Xarelto®; and

n.      Representing to physicians including Plaintiff's prescribing physicians that this drug was safe and effective for use.

107.     The Xarelto® that injured Plaintiff was in substantially the same condition when Plaintiff ingested it as it was when it left the control of Defendants.  Xarelto®'s ability to cause serious personal injuries and damages such as those suffered by Plaintiff was not due to any contributory negligence of Plaintiff.  Plaintiff consumed the Xarelto® as directed and without change in its form or substance.

108.     Defendants' failure to exercise reasonable care in the design, dosing information, marketing, warnings, and manufacturing of Xarelto® was the proximate cause of Plaintiff's damages.

109.     As a direct and proximate result of the actions and inactions of Defendants as set forth above, Plaintiff was exposed to Xarelto® and suffered damages.

## COUNT IV NEGLIGENCE - FAILURE TO WARN

Comes now Plaintiff and for Count IV of this Complaint alleges:

110.     Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

111.    Defendants owed a duty to warn of any dangerous defects or side effects; a duty to assure their product did not cause users unreasonable and dangerous risks, reactions, and side effects; and a duty to provide adequate post market surveillance and warnings as it learned of Xarelto®'s substantial dangers.

112.    Xarelto® was defective due to inadequate post-marketing warnings and instruction because Defendants knew or should have known of the risk and danger of serious bodily harm and or death from the use of Xarelto®, but failed to provide an adequate warning to patients and prescribing physicians of the product, knowing the product could cause serious injury and or death.

113.    Plaintiff was prescribed and used Xarelto® for its intended purpose.

114.    Plaintiff could not have known about the dangers and hazards presented by Xarelto®.

115.    The warnings that were given by Defendants were not accurate, clear, complete, and/or were ambiguous.

116.    The warnings, or lack thereof, that were given by Defendants failed to properly warn prescribing physicians of the risk of irreversible bleeding and other serious injuries and side effects, and failed to instruct prescribing physicians to test and monitor for the presence of the injuries for which Plaintiff and others had been placed at risk.

117.    The warnings that were given by Defendants failed to properly warn Plaintiff and prescribing physicians of the prevalence of irreversible bleeds.

118.    Plaintiff, individually and through his prescribing physicians, reasonably relied upon the skill, superior knowledge, and judgment of Defendants. Defendants had a continuing duty to warn Plaintiff and Plaintiff's prescribing physicians of the dangers associated with

Xarelto®. Had Plaintiff received adequate warnings regarding the risks of Xarelto®, Plaintiff would not have used Xarelto®.

119.   Defendants breached their duty of reasonable care to Plaintiff in the following material respects:

a.   Xarelto® was unaccompanied by proper warnings regarding all possible side effects associated with its use and the comparative severity, incidence, and duration of such adverse effects; and

b.   Xarelto® was defective due to inadequate post-marketing warnings or instructions, because Defendants failed to provide adequate warnings to users or consumers and continued aggressively to promote Xarelto®, even after Defendants knew or should have known of the risks of injury from this drug; and

c.   Xarelto® was unaccompanied by proper warnings regarding irreversible bleeding caused by Xarelto® and Defendants continued to aggressively promote Xarelto®, even after Defendants knew or should have known of the risk of irreversible bleeding from this drug; and

d.   Defendants failed to warn that there were other drugs available that did not have the same risks as Xarelto®.

120.   Defendants knew or should have known that Xarelto® caused unreasonably dangerous risks and side effects of which the general public would not be aware.  Defendants nevertheless advertised, marketed, and promoted their product knowing there were safer products on the market.

121.    Defendants knew that Xarelto® was defective and unreasonably dangerous when it left the possession of Defendants in that it contained warnings insufficient to alert patients and prescribing physicians of the dangerous risks and reactions associated with Xarelto®, including but not limited to the prevalence of irreversible bleeding, and other serious injuries and side effects despite Defendants' knowledge of the increased risk of these injuries over other anticoagulation therapies available.

122.    Defendants' failure to exercise reasonable care in the design, dosing information, marketing, warnings, and/or manufacturing of Xarelto® was a proximate cause of Plaintiff's injuries and damages.

123.    As a direct and proximate result of the actions and inactions of Defendants as set forth above, Plaintiff was exposed to Xarelto® and suffered the injuries and damages set forth hereinabove.

## COUNT V NEGLIGENCE - NEGLIGENT DESIGN

Comes now Plaintiff and for Count V of this Complaint alleges:

124.    Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

125.    Defendants designed, produced, manufactured and injected into the stream of commerce Xarelto®, which Defendants knew would be used by Plaintiff and other consumers.

126.    At the time Xarelto® was manufactured and sold to Plaintiff by Defendants, it was defective in design and unreasonably dangerous thereby subjecting users to risks of blood clots and irreversible bleeding which exceeded the benefits of the products, and for which other safer products were available.

127.    Alternatively, when Xarelto® was manufactured and sold to Plaintiff by Defendants, the product was defective in design and formulation thereby making use of the product more dangerous than other drugs for its intended use.

128.    The Xarelto® sold to Plaintiff reached Plaintiff without substantial change. Plaintiff was unaware of the danger of the product until after its use.  Plaintiff ingested the Xarelto® without making any changes or alterations.

129.    In designing and testing Xarelto®, Defendants failed to exercise the ordinary care that a careful and prudent drug manufacturer would exercise in the same or similar circumstances.

130.    As a direct and proximate result of the negligent design of Xarelto®, Plaintiff has suffered damages.

131.    Defendants' conduct was done with conscious disregard for the safety of users of Xarelto® including Plaintiff thereby justifying an award of punitive damages.

## COUNT VI
## NEGLIGENT MISREPRESENTATION

Comes now Plaintiff and for Count VI of this Complaint alleges:

132.    Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

133.    Defendants should have known that there were dangerous side effects resulting from the use of Xarelto®.

134.    Defendants reasonably should have known that consumers such as Plaintiff would not have known about the increased risk of irreversible bleeds among other things associated with Xarelto®.

135.    Defendants, armed with the knowledge stated in the preceding paragraphs, proceeded with the design, production, manufacture, promotion, advertising, and sale of Xarelto® without adequate warning of the side effects and dangerous risks to the consuming public including Plaintiff.

136.    Defendants negligently represented to Plaintiff the safety and effectiveness of Xarelto® and concealed material information including adverse information regarding the safety and effectiveness of Xarelto®. The misrepresentations and/or material omissions made by or perpetuated by Defendants are as follows:

  a. Defendants failed to conduct sufficient testing which if properly performed would have shown that Xarelto® had serious side effects;

  b. Defendants failed to include adequate warnings with Xarelto® that would alert users to the potential risks and serious side effects of Xarelto® as well as the limited benefits and the approved uses;

  c. Defendants failed to warn Plaintiff that use of Xarelto® carried a risk of death or permanent injury from irreversible bleeding, and other serious side effects; and/or

  d. Defendants failed to advise the FDA, the health care industry, and the public about the adverse reports it had received regarding Xarelto®.

137.    Defendants made the misrepresentations and omissions with the intent that Plaintiff and the consuming public rely upon such information or the absence of such information in selection of Xarelto®.

138.    Plaintiff justifiably relied on and was induced by Defendants' misrepresentations all to Plaintiff's detriment.

139.    As a direct and proximate result of the dangerous and defective condition of Xarelto®, Plaintiff was injured, suffered pain and suffering, loss of the capacity to enjoy life, and medical expenses.

## COUNT VII
## BREACH OF WARRANTY - BREACH OF EXPRESS WARRANTY

140.    Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

141.    Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold and otherwise released Xarelto® into the stream of commerce.

142.    Xarelto® materially failed to conform to those representations made by Defendants in package inserts, and otherwise, concerning the properties and effects of Xarelto® respectively manufactured and distributed and sold by Defendants, and which Plaintiff purchased and ingested in direct or indirect reliance upon these express representations. Such failures by Defendants constitute a material breach of express warranties made to Plaintiff concerning Xarelto®.

143.    Defendants breached these express warranties in that Xarelto® was unsafe in light of the risk of life-threatening side effects associated with its use including irreversible bleeds.

144.    Plaintiff relied on Defendants' express warranties to Plaintiff's detriment.

145.    As a direct, foreseeable, and proximate result of Defendants' breaches of express warranties, Plaintiff suffered damages when Plaintiff's physician, in reasonable reliance upon such express warranties, prescribed Xarelto® for Plaintiff. Plaintiff purchased and ingested Xarelto® as prescribed and instructed by Plaintiff's physician thereby leading to Plaintiff's injuries.

146.     As a direct and proximate result of Defendants' breach of express warranties, Plaintiff was exposed to Xarelto®, and Plaintiff suffered damages.

## COUNT VIII
## BREACH OF WARRANTY - BREACH OF IMPLIED WARRANTY

147.     Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

148.     Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold and/or otherwise released Xarelto® into the stream of commerce.

149.     Defendants impliedly warranted their Xarelto®, which they manufactured and/or distributed and sold, and which Plaintiff purchased and ingested, to be of merchantable quality and fit for the common, ordinary, and intended uses for which the product was sold.

150.     Defendants breached their implied warranties of Xarelto® sold to Plaintiff because this product was not fit for its common, ordinary, and intended use.

151.     As a direct, foreseeable and proximate result of Defendants' breaches of implied warranties, Plaintiff was exposed to Xarelto® and suffered damages.

## COUNT IX
## FRAUD

152.     Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

153.     Defendants, having undertaken the manufacturing, marketing, dispensing, distribution and promotion of Xarelto® described herein owed a duty to provide accurate and complete information regarding these products.

154.     Defendants knew or should have known that Xarelto® was unreasonably dangerous and defective and caused serious or fatal irreversible bleeds.

155.    Despite their knowledge, Defendants omitted material facts in the disclosures they made to the public, the medical community and to consumers including Plaintiff and Plaintiff's prescribing physicians concerning the use and safety of Xarelto®.

156.    Defendants made untrue, deceptive, and/or misleading representations of material facts, and omitted and/or concealed material facts from the public including Plaintiff and Plaintiff's prescribing physicians concerning the use and safety of Xarelto®.

157.    Defendants' practices relating to their promotion of Xarelto® created and reinforced a false impression as to its safety.

158.    Defendants' practice of promoting Xarelto® placed all consumers of Xarelto® at risk for serious injury resulting from its potentially lethal side effects.

159.    Defendants' statements and omissions were made with the intent that Plaintiff and Plaintiff's prescribing physician would rely on them.

160.    As a direct and proximate result of Defendants' acts of fraud, Plaintiff suffered damages.

## COUNT X:
## VIOLATION OF CONSUMER PROTECTION LAWS

161.    Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

162.    Plaintiff purchased and used Xarelto® for personal use and thereby suffered ascertainable losses as a result of Defendants' actions in violation of the Iowa consumer protection law.

163.    Unfair methods of competition or deceptive acts or practices that were proscribed by law, including the following:

    a.      Representing that goods or services have characteristics, ingredients, uses benefits or quantities that they do not have;

    b.      Advertising goods or services with the intent not to sell them as advertised; and

    c.      Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

164.    Defendants violated consumer protection laws through their use of false and misleading misrepresentations or omissions of material fact relating to the safety of Xarelto®.

165.    Defendants uniformly communicated the purported benefits of Xarelto® while failing to disclose the serious and dangerous side effects related to the use of Xarelto® and of the true state of Xarelto® regulatory status, its safety, its efficacy, and its usefulness. Defendants made these representations to physicians, the medical community at large, and to patients and consumers such as Plaintiff in the marketing and advertising campaign described herein.

166.    Defendants' conduct in connection with Xarelto® was also impermissible and illegal in that it created a likelihood of confusion and misunderstanding, because Defendants misleadingly, falsely and or deceptively misrepresented and omitted numerous material facts regarding the utility, benefits, costs, safety, efficacy and advantages of Xarelto®.

167.    As a result of these violations of consumer protection laws, Plaintiff incurred physical injury, pain, suffering, and medical expenses related to diagnosis and treatment for which Defendants are liable.

## COUNT XI: PUNITIVE DAMAGES

168.    Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

169.    Plaintiff is entitled to punitive damages because Defendants' actions were reckless and without regard for the public's safety. Defendants mislead both the medical community and the public at large including Plaintiff and Plaintiff's physicians by making false representations about and concealing pertinent information regarding Xarelto®. Defendants downplayed, understate, and disregarded their knowledge of the serious and permanent side effects associated with the use of Xarelto® despite information demonstrating the product was unreasonably dangerous.

170.    Defendants' actions were performed willfully, intentionally, and with reckless disregard for the rights of Plaintiff and the public.

171.    Defendants continued to promote the safety of Xarelto® while providing to consumers no warnings or insufficient warnings about the risk of irreversible bleeding associated with it even after Defendants knew of that risk.

172.    Defendants' conduct was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers including Plaintiff thereby entitling Plaintiffs to punitive damages in an amount appropriate to punish Defendants and deter them from similar conduct in the future.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants for all damages allowable by law together with prejudgment interest.

Respectfully Submitted,

**THE KELLY FIRM**

_____
F. Dulin Kelly, TN BPR No. 04085
Clinton L. Kelly, TN BPR No. 16171
629 East Main Street
Hendersonville, Tennessee 37075
Telephone:  (615) 824-3703
Facsimile:   (615) 824-2674
dulin@kellyfirm.org
clint@kellyfirm.org

*Counsel for Plaintiff*