## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: IN RE: XARELTO (RIVAROXABAN ) PRODUCTS LIABILITY LITIGATION ) ) | MDL No.2592 |
| THIS DOCUMENT RELATED TO: ) ) | Section: L JUDGE FALLON MAG. JUDGE NORTH |
| DONNA BLATCHER, KRYSTAL ) BLATCHER, BERTRAND WOODS, ) individually and on behalf of ) BERTRAND BLATCHER, JR., deceased ) ) | Civil Action No.: 2:15-cv- 00313 |
| Plaintiffs, ) ) | |
| v. ) ) | |
| JANSSEN RESEARCH & DEVELOPMENT, ) LLC f/k/a JOHNSON AND JOHNSON ) PHARMACEUTICAL RESEARCH AND ) DEVELOPMENT LLC; ) JANSSEN ORTHO LLC; ) JANSSEN PHARMACEUTICALS, INC. ) f/k/a JANSSEN PHARMACEUTICA INC. f/k/a) ORTHO-MCNEIL-JANSSEN ) PHARMACEUTICALS, INC.; ) JOHNSON & JOHNSON COMPANY ) BAYER HEALTHCARE ) PHARMACEUTICALS, INC.; ) BAYER PHARMA AG; ) BAYER CORPORATION; ) BAYER HEALTHCARE LLC; ) BAYER HEALTHCARE AG; and BAYER AG,) ) | |
| Defendants. ) | |

## FIRST AMENDED COMPLAINT

Now into Court, through undersigned counsel, come Plaintiffs, Donna Blatcher, Krystal

Blatcher and Bertrand Woods, individually, and on behalf of Bertrand Blatcher, Jr., deceased,

who files this First Amended Complaint with Jury Demand and alleges as follows:

## NATURE OF THE CASE

1.      This action is brought on behalf of Plaintiff, Bertrand Blatcher, Jr., who used Xarelto, also known as rivaroxaban. Xarelto is an anticoagulant medication approved by the Food and Drug Administration (hereinafter "FDA") to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat deep vein thrombosis (hereinafter "DVT") and pulmonary embolism (hereinafter "PE"), to reduce the risk of recurring DVT and/or PE, and to prevent the development of DVT in patients undergoing hip and knee replacement surgery.

2.      Defendants, JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a JOHNSON AND JOHNSON PHARMACEUTICAL RESEARCH AND DEVELOPMENT LLC, JANSSEN ORTHO LLC, JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA INC. f/k/a ORTHO-MCNEIL-JANSEEN PHARMACEUTICALS, INC., JOHNSON & JOHNSON COMPANY, BAYER HEALTHCARE PHARMACEUTICALS, INC., BAYER PHARMA AG, BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE AG, and BAYER AG (hereinafter collectively "Defendants") designed, developed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed Xarelto.

3.      Defendants negligently and/or fraudulently represented to the general public, including Plaintiff, the medical and healthcare community, and the FDA, that Xarelto had been tested and was found to be safe and/or effective for its indicated uses.

4.      Defendants concealed their knowledge regarding Xarelto's defects, from the general public, including Plaintiff, the medical and healthcare community, and the FDA.

5.      Defendants made these representations with the intent of defrauding and deceiving the general public, including Plaintiff, the medical and healthcare community, and the FDA, and with the intent of inducing the general public, including Plaintiff to purchase and/or ingest Xarelto, and the medical and healthcare community, to recommend, dispense, and/or prescribe Xarelto all of which evinced a callous, reckless, willful, depraved indifference to the health, safety and welfare of the general public, including Plaintiff herein.

6.      Defendants negligently and improperly failed to perform sufficient and adequate testing on humans using Xarelto during clinical trials as evidenced by the fact that Defendants have not developed an antidote to reverse internal bleeding caused by taking Xarelto. This inadequate testing evinced a callous, reckless, willful, depraved indifference to the health, safety and welfare of the general public, including Plaintiff herein.

7.      As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous side effects related to the use of Xarelto including, but not limited to, a life-threatening gastrointestinal bleed, physical pain, mental anguish and premature death.

8.      Therefore, Plaintiff seeks compensatory damages as a result of the damages sustained due to his use of Xarelto.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy as to Plaintiff exceeds $75,000.00, exclusive of interest and costs, and because there is complete diversity of citizenship between Plaintiff and Defendants.

10.     Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in this District, and because Defendants conduct substantial business in this District.

11.     This Court has personal jurisdiction over Defendants because they have done business in the State of Louisiana, have committed a tort in whole or in part in the State of Louisiana, have substantial and continuing contact with the State of Louisiana, and derive substantial revenue from goods used and consumed with the State of Louisiana. Defendants actively advertise, sell, market, distribute, and/or promote their pharmaceutical product Xarelto to physicians and consumers in the State of Louisiana on a regular and consistent basis.

## PARTIES

12.     Plaintiff, Donna Blatcher, is a citizen and resident of the State of Louisiana, and was a citizen and resident of the State of Louisiana at all times relevant to the allegations in this Complaint. Plaintiff, Donna Blatcher, falls within the appropriate class of survivors to make claims under Louisiana Civil Code articles 2315.1 and 2315.2.

13.     Plaintiff, Krystal Blatcher, is a citizen and resident of the State of Louisiana, and was a citizen and resident of the State of Louisiana at all times relevant to the allegations in this Complaint. Plaintiff, Krystal Blatcher, falls within the appropriate class of survivors to make claims under Louisiana Civil Code articles 2315.1 and 2315.2.

14.     Plaintiff, Bertrand Woods, is a citizen and resident of the State of Louisiana, and was a citizen and resident of the State of Louisiana at all times relevant to the allegations in this Complaint. Plaintiff, Bertrand Woods, falls within the appropriate class of survivors to make claims under Louisiana Civil Code articles 2315.1 and 2315.2.

15.     Decedent, Bertrand Blatcher, Jr., (hereafter "Plaintiff") was a citizen of the State of Louisiana, and was a citizen and resident of the State of Louisiana at all times relevant to the allegations in this Complaint. Plaintiff, upon information and belief, suffered severe personal injuries as a result of his use of Xarelto.

16.     Upon information and belief, Defendant JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a JOHNSON AND JOHNSON RESEARCH AND DEVELOPMENT LLC (hereinafter "JANSSEN R&D") is a limited liability company organized under the laws of New Jersey, with a principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933. Defendant JANSSEN R&D's sole member is Janssen Pharmaceuticals, Inc., which is a Pennsylvania corporation with a principal place of business at 1125 Trenton-Harbourton Road, Titusville, New Jersey 08560. Accordingly, JANSSEN R&D is a citizen of Pennsylvania and New Jersey for purposes of determining diversity under 28 U.S.C. § 1332. Defendant JANSSEN R&D is the holder of the approved New Drug Application ("NDA") for Xarelto as well as the supplemental NDA.

17.     As part of its business, Defendant JANSSEN R&D is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

18.     Upon information and belief, Defendant JANSSEN R&D has transacted and conducted business in the State of Louisiana.

19.     Upon information and belief, Defendant JANSSEN R&D has derived substantial revenue from goods and products used in the State of Louisiana.

20.     Upon information and belief, Defendant JANSSEN R&D, expected or should have expected its acts to have consequence within the United States and the State of Louisiana, and derived substantial revenue from interstate commerce within the United States and the State of Louisiana, more particularly.

21.     Upon information and belief, and at all relevant times, Defendant JANSSEN R&D, was in the business of and did design, develop, research, manufacture, test, advertise,

promote, market, sell, and/or distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurring DVT and/or PE, and to prevent the development of DVT in patients undergoing hip and knee replacement surgery.

22.     Upon information and belief, Defendant JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA INC. f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. (hereinafter "JANSSEN PHARM") is a Pennsylvania corporation, having its principal place of business at 1125 Trenton-Harbourton Road, Titusville, New Jersey 08560.

23.     As part of its business, Defendant JANSSEN PHARM is involved in the research, development, sales, and marketing of Xarelto and rivaroxaban.

24.     Upon information and belief, Defendant JANSSEN PHARM has transacted and conducted business in the State of Louisiana.

25.     Upon information and belief, Defendant JANSSEN PHARM, has derived substantial revenue from goods and products used in the State of Louisiana.

26.     Upon information and belief, Defendant JANSSEN PHARM, expected or should have expected its acts to have consequence within the United States and the State of Louisiana, and derived substantial revenue from interstate commerce within the United States and the State of Louisiana, more particularly.

27.     Upon information and belief, and at all relevant times, Defendant JANSSEN PHARM, was in the business of and did design, develop, research, manufacture, test, advertise, promote, market, sell, and/or distribute the drug Xarelto for use as an oral anticoagulant, the

primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurring DVT and/or PE, and to prevent the development of DVT in patients undergoing hip and knee replacement surgery.

28.     Upon information and belief, Defendant JANSSEN ORTHO LLC (hereinafter "JANSSEN ORTHO") is a limited liability company organized under the laws of Delaware, having a principal place of business at Stateroad 933 Km 0 1, Street Statero, Gurabo, Puerto Rico 00778. Defendant JANSSEN ORTHO is a subsidiary of Johnson & Johnson. The only member of JANSSEN ORTHO LLC is OMJ PR Holdings, which is incorporated in Ireland with a principal place of business in Puerto Rico. Accordingly, JANSSEN ORTHO LLC is a citizen of Delaware, Ireland and Puerto Rico for purposes of determining diversity under 28 U.S.C. § 1332.

29.     As part of its business, Defendant JANSSEN ORTHO is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

30.     Upon information and belief, Defendant JANSSEN ORTHO has transacted and conducted business in the State of Louisiana.

31.     Upon information and belief, Defendant JANSSEN ORTHO, has derived substantial revenue from goods and products used in the State of Louisiana.

32.     Upon information and belief, Defendant JANSSEN ORTHO, expected or should have expected its acts to have consequence within the United States and the State of Louisiana, and derived substantial revenue from interstate commerce within the United States and the State of Louisiana more particularly.

33. Upon information and belief, and at all relevant times, Defendant JANSSEN ORTHO, was in the business of and did design, develop, research, manufacture, test, advertise, promote, market, sell, and/or distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non- valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurring DVT and/or PE, and to prevent DVT in patients undergoing hip and knee replacement surgery.

34. Defendant Johnson & Johnson (hereinafter referred to as "J&J") is a fictitious name adopted by Defendant Johnson & Johnson Company, a New Jersey Corporation which has its principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933.

35. As part of its business, J&J, and its "family of companies," is involved in the research, development, sales and marketing of pharmaceutical products, including Xarelto.

36. Upon information and belief, and at all relevant times, Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. is a corporation organized under the laws of the State of Delaware, with its principal place of business in the State of New Jersey.

37. Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. was formerly known as Berlex Laboratories, Inc., which was formerly known as Berlex, Inc., and BAYER HEALTHCARE PHARMACEUTICALS, INC. is the same corporate entity as Berlex, Inc. and Berlex Laboratories, Inc.

38. As part of its business, Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

39. Upon information and belief, Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. has transacted and conducted business in the State of Louisiana.

40. Upon information and belief, Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. has derived substantial revenue from goods and products used in the State of Louisiana.

41. Upon information and belief, Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. expected or should have expected its acts to have consequence within the United States and the State of Louisiana, and derived substantial revenue from interstate commerce within the United States and the State of Louisiana, more particularly.

42. Upon information and belief, and at all relevant times, Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. was in the business of and did design, develop, research, manufacture, test, advertise, promote, market, sell, and/or distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurring DVT and/or PE, and to prevent the development of DVT in patients undergoing hip and knee replacement surgery.

43. Upon information and belief, Defendant BAYER PHARMA AG is a pharmaceutical company domiciled in Germany.

44. Defendant BAYER PHARMA AG is formerly known as Bayer Schering Pharma AG and is the same corporate entity as Bayer Schering Pharma AG. Bayer Schering Pharma AG is formerly known as Schering AG and is the same corporate entity as Schering AG.

45. Upon information and belief, Schering AG was renamed Bayer Schering Pharma AG effective December 29, 2006.

46.     Upon information and belief, Bayer Schering Pharma AG was renamed BAYER PHARMA AG effective July 1, 2011.

47.     As part of its business, Defendant BAYER PHARMA AG is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

48.     Upon information and belief, Defendant BAYER PHARMA AG, has transacted and conducted business in the State of Louisiana.

49.     Upon information and belief, Defendant BAYER PHARMA AG, has derived substantial revenue from goods and products used in the State of Louisiana.

50.     Upon information and belief, Defendant, BAYER PHARMA AG, expected or should have expected its acts to have consequence within the United States and the State of Louisiana, and derived substantial revenue from interstate commerce within the United States and the State of Louisiana, more particularly.

51.     Upon information and belief, and at all relevant times, Defendant BAYER PHARMA AG, was in the business of and did design, develop, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurring DVT and/or PE, and to prevent the development of DVT in patients undergoing hip and knee replacement surgery.

52.     Upon information and belief, Defendant BAYER CORPORATION is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205.

53.     Upon information and belief, Defendant BAYER CORPORATION is the sole member of BAYER HEALTHCARE LLC, which owns 100% of Schering Berlin, Inc., which owns 100% of Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. As such, Defendant BAYER CORPORATION is a parent of Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC.

54.     At all relevant times, Defendant BAYER CORPORATION was engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, its products, including the prescription drug Xarelto.

55.     At relevant times, Defendant BAYER CORPORATION conducted regular and sustained business in the State of Louisiana, by selling and distributing its products in the State of Louisiana and engaged in substantial commerce and business activity in the State of Louisiana.

56.     Upon information and belief, Defendant BAYER HEALTHCARE LLC is a limited liability company duly formed and existing under and by the virtue of the laws of the State of Delaware, with its principal place of business located in the State of New Jersey. BAYER HEALTHCARE LLC's sole member is BAYER CORPORATION, and is wholly owned by BAYER CORPORATION, which is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205. Accordingly, BAYER HEALTHCARE LLC is a citizen of Delaware, New Jersey, Indiana and Pennsylvania for purposes of determining diversity under 28 U.S.C. § 1332.

57.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC has transacted and conducted business in the State of Louisiana, and derived substantial revenue from interstate commerce.

58.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC expected or should have expected that its acts would have consequences within the United States and in the State of Louisiana, and derived substantial revenue from interstate commerce.

59.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC was in the business of and did design, develop, research, manufacture, test, advertise, promote, market, sell, and/or distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE to reduce the risk of recurring DVT and/or PE, and to prevent the development of DVT in patients undergoing hip and knee replacement surgery.

60.     Upon information and belief, Defendant BAYER HEALTHCARE AG is a company domiciled in Germany and is the parent/holding company of Defendants BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC, and BAYER PHARMA AG.

61.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG has transacted and conducted business in the State of Louisiana, and derived substantial revenue from interstate commerce.

62.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG expected or should have expected that its acts would have consequences

within the United States, and in the State of Louisiana, and derived substantial revenue from interstate commerce.

63.      Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG exercises dominion and control over Defendants BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC., and BAYER PHARMA AG.

64.      Upon information and belief, Defendant BAYER AG is a German chemical and pharmaceutical company that is headquartered in Leverkusen, North Rhine-Westphalia, Germany.

65.      Upon information and belief, Defendant BAYER AG is the third largest pharmaceutical company in the world.

66.      Upon information and belief, and at all relevant times Defendant BAYER AG is the parent/holding company of all other named Bayer Defendants.

67.      Upon information and belief, at all relevant times, Defendant BAYER AG has transacted and conducted business in the State of Louisiana, and derived substantial revenue from interstate commerce.

68.      Upon information and belief, at all relevant times, Defendant BAYER AG expected or should have expected that its acts would have consequences within the United States, and in the State of Louisiana, and derived substantial revenue from interstate commerce.

69.      Upon information and belief, at all relevant times, Defendant BAYER AG was in the business of and did design, develop, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation,

to treat DVT and PE, to reduce the risk of recurring DVT and/or PE, and to prevent the development of DVT in patients undergoing hip and knee replacement surgery.

70.     Defendants Janssen Research & Development LLC, Janssen Ortho LLC, Janssen Pharmaceuticals, Inc., Johnson & Johnson, Bayer Healthcare Pharmaceuticals, Inc., Bayer Pharma AG, Bayer Corporation, Bayer Healthcare LLC, Bayer Healthcare AG, and Bayer AG, shall be referred to herein individually by name or jointly as "Defendants."

71.     Defendants include any and all parents, subsidiaries, affiliates, divisions, franchises, partners, joint venturers, and organizational units of any kind, their predecessors, successors and assigns and their officers, directors, employees, agents, representatives, assigns and any and all other persons acting on their behalf.

72.     At all times herein mentioned, each of the Defendants was the representative, agent, servant, partner, predecessor or successor in interest, aider and abettor, co-conspirator and joint venturer of each of the remaining Defendants herein and was at all times operating and acting with the purpose and scope of said agency, service, employment, partnership, conspiracy and joint venture.

73.     At all times relevant, Defendants were engaged in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce throughout the United States, either directly or indirectly through third parties, subsidiaries or related entities, the drug Xarelto.

**FACTUAL BACKGROUND**

74.     At all times relevant to the allegations herein, Defendants designed, developed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed Xarelto for the purposes of reducing the risk of stroke and systemic embolism in patients with

non-valvular atrial fibrillation, treating DVT and PE, reducing the risk of recurring DVT and/or PE, and to prevent the development of DVT in patients undergoing hip and knee replacement surgery.

75.     Defendants introduced Xarelto into the United States market in 2011.

76.     Xarelto is an oral anticoagulant (blood thinner) that works by inhibiting Factor Xa in the bloodstream.

77.     Defendants first received FDA approval for Xarelto on July 1, 2011, specifically for preventing DVT in patients undergoing hip replacement or knee replacement surgeries.

78.     A series of clinical trials known as the Regulation of Coagulation in Orthopedic Surgery to Prevent Deep Venous Thrombosis and Pulmonary Embolism studies (hereinafter "RECORD" studies) led to Xarelto being approved for preventing DVT in patients undergoing hip replacement or knee replacement surgeries. However, the RECORD studies also indicated an increased incidence of serious bleeding associated with the use of Xarelto, causing decreased hemoglobin levels and blood transfusions. (Lassen, M.R., et al. *Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Total Knee Arthroplasty*. N.Engl.J.Med. 2008;358:2776-86; Kakkar, A.K., et al. *Extended duration rivaroxaban versus short-term enoxaparin for the prevention of venous thromboembolism after total hip arthroplasty: a double-blind, randomised controlled trial*. Lancet 2008;372:31-39; Ericksson, B.I., et al. *Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Hip Arthroplasty*. N.Engl.J.Med. 2008;358:2765-75.)

79.     Defendants next received FDA approval for Xarelto on November 4, 2011, for the purpose of reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation.

80.     A clinical trial known as the Rivaroxaban Once Daily Oral Direct Factor Xa Inhibition Compared with Vitamin K Antagonism for Prevention of Stroke and Embolism Trial in Atrial Fibrillation study (hereinafter "ROCKET AF" study) led to Xarelto being approved for the purpose of reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation. However, the ROCKET AF study also noted an increased incidence in bleeding from gastrointestinal sites associated with the use of Xarelto as compared to warfarin (Coumadin), an anticoagulant that has been on the market in the United States since the 1950s. The ROCKET AF study also noted an increased incidence in bleeding events in Xarelto users as compared to warfarin users leading to serious drops in hemoglobin levels and blood transfusions. (Patel, M.R., et al. *Rivaroxaban versus Warfarin in Nonvalvular Atrial Fibrillation*. N.Engl.J.Med. 2011;365:883-91.)

81.     Defendants last received FDA approval for Xarelto on November 2, 2012, for the general treatment of DVT and PE, and for the purpose of preventing recurring DVT and PE in patients.

82.     A set of clinical trials known as the **EINSTEIN-DVT**, **EINSTEIN-PE**, and **EINSTEIN-Extension** (hereinafter collectively "Einstein") studies led to Xarelto being approved for the purpose of the general treatment of DVT and PE and for preventing recurring DVT and PE. The **EINSTEIN-DVT** study tested Xarelto against a placebo, and merely determined that Xarelto offered an option for treatment of DVT, but demonstrated a clear increased risk of bleeding events as compared to placebo. (The EINSTEIN Investigators. *Oral Rivaroxaban for Symptomatic Venous Thromboembolism*. N.Engl.J.Med. 2010;363:2499-510). The **EINSTEIN-Extension** study confirmed that result. (Roumualdi, E., et al. *Oral rivaroxaban after symptomatic venous thromboembolism: the continued treatment study (EINSTEIN-*

*Extension study).* Expert Rev. Cardiovasc. Ther. 2011;9(7):841-844). The **EINSTEIN-PE** study showed that a rivaroxaban regimen was non-inferior to the standard therapy for initial and long-term treatment of PE. However, the study also demonstrated an increased risk of adverse events with Xarelto, including those that resulted in permanent discontinuation of Xarelto or prolonged hospitalization. (The EINSTEIN-PE Investigators. *Oral Rivaroxaban for the Treatment of Symptomatic Pulmonary Embolism.* N.Engl.J.Med. 2012;366:1287-97.).

83.     Defendants use the results of the **ROCKET AF**, **RECORD**, and **EINSTEIN** studies to market Xarelto in their promotional materials, including the Xarelto website, which tout the positive results of those studies. However, Defendants' promotional materials fail to similarly highlight the increased risk of gastrointestinal bleeding and bleeding requiring transfusion, among other serious bleeding concerns found by the studies.

84.     Defendants market Xarelto as a new oral anticoagulant treatment alternative to warfarin, a long-established safe treatment for preventing stroke and systemic embolism for 60 years. Defendants emphasize the supposed benefits and convenience of treatment with Xarelto over warfarin, which they refer to as the Xarelto Difference – namely, that Xarelto does not require periodic monitoring with blood tests and does not limit the patient's diet.

85.     However, the Institute for Safe Medication Practices ("ISMP") noted in its QuarterWatch publication for the first quarter of 2012, that even during the approval process, FDA "[r]eviewers also questioned the convenient once-a-day dosing scheme [of Xarelto], saying blood level studies had shown peaks and troughs that could be eliminated by twice-a-day dosing."

86.     Importantly, there is no antidote to Xarelto, unlike warfarin. Therefore, in the event of hemorrhagic complications like those suffered by Plaintiff, there is no available reversal

agent. The original U.S. label approved when the drug was first marketed in the U.S. did not contain a warning regarding the lack of antidote, but instead only mentioned this important fact in the overdosage section.

87.     Defendants spent significant money promoting Xarelto, which included at least $11,000,000.00 spent during 2013 alone on advertising in journals targeted at prescribers and consumers in the U.S. In the third quarter of the 2013 fiscal year, Xarelto was the number one pharmaceutical product advertised in professional health journals based on pages and dollars spent.

88.     As a result of Defendants' aggressive marketing efforts, Xarelto garnered approximately $582 million in global sales in its first full year on the market.

89.     Defendants' website for Xarelto claims that over seven million people worldwide have been prescribed Xarelto. In the U.S., approximately 1 million Xarelto prescriptions were written by the end of 2013.

90.     During the Defendants' 2012 fiscal year, Xarelto garnered approximately $658 million in sales worldwide. Then, in 2013, sales for Xarelto increased even further and cleared the $1 billion threshold commonly referred to as "blockbuster" status in the pharmaceutical industry, ultimately reaching approximately $2 billion for the fiscal year. Thus, Xarelto is now considered the leading anticoagulant on a global scale in terms of sales.

91.     As part of their marketing of Xarelto, Defendants widely disseminated direct-to-consumer advertising campaigns that were designed to influence patients, including Plaintiff, to make inquiries to their prescribing physician about Xarelto and/or request prescriptions for Xarelto.

92.     In the course of these direct-to-consumer advertisements, Defendants overstated the efficacy of Xarelto with respect to preventing stroke and systemic embolism; improperly touted the benefits of Xarelto over warfarin; and failed to adequately disclose to patients that there is no drug, agent, or other means to reverse the anticoagulation effects of Xarelto, and that such irreversibility could have permanently disabling, life-threatening, and fatal consequences.

93.     For example, on June 6, 2013, Defendants received an untitled letter from the FDA's Office of Prescription Drug Promotion (hereinafter referred to as the "OPDP") regarding its promotional material for the atrial fibrillation indication, stating that, "the print ad is false or misleading because it minimizes the risks associated with Xarelto and makes a misleading claim" regarding dose adjustments, which was in violation of FDA regulations. The OPDP thus requested that Defendants immediately cease distribution of such promotional material.

94.     Prior to Plaintiff's prescription of Xarelto, Plaintiff's prescribing physician received promotional materials and information from Defendants' sales representatives that Xarelto was just as effective as warfarin in reducing strokes in patients with non-valvular atrial fibrillation, as well as preventing DVT/PE in patients with prior history of DVT/PE or undergoing hip or knee replacement surgery, and was more convenient, without also adequately informing prescribing physicians that there was no reversal agent that could stop or control bleeding in patients taking Xarelto.

95.     At all times relevant hereto, Defendants also failed to warn emergency room doctors, surgeons, and other critical care medical professionals that unlike generally-known measures taken to treat and stabilize bleeding warfarin users, there is no effective agent to reverse the anticoagulation effects of Xarelto, and therefore no effective means to treat and stabilize patients who experience uncontrolled bleeding while taking Xarelto.

96.     At all times relevant to this action, The Xarelto Medication Guide, prepared and distributed by Defendants and intended for U.S. patients to whom Xarelto has been prescribed, failed to warn and disclose to patients that there is no agent to reverse the anticoagulation effects of Xarelto and that if serious bleeding occurs, it may be irreversible, permanently disabling, and life-threatening.

97.     In the year leading up to June 30, 2012, there were 1,080 Xarelto-associated "Serious Adverse Event" ("SAE") Medwatch reports filed with the FDA, including at least 65 deaths. Of the reported hemorrhage events associated with Xarelto, 8% resulted in death, which was approximately twofold the risk of a hemorrhage-related death associated with warfarin.

98.     At the close of the 2012 fiscal year, a total of 2,081 new Xarelto-associated SAE reports were filed with the FDA in its first full year on the market, ranking tenth among other pharmaceuticals in direct reports to the FDA. Of those reported events, 151 resulted in death, as compared to only 56 deaths associated with warfarin.

99.     The ISMP referred to these SAE figures as constituting a "strong signal" regarding the safety of Xarelto, defined as "evidence of sufficient weight to justify an alert to the public and the scientific community, and to warrant further investigation."

100.    Of particular note, in the first quarter of 2013, the number of reported serious adverse events associated with Xarelto (680) overtook that of Pradaxa (528), another new oral anticoagulant, which had previously ranked as the number one reported drug in terms of adverse events in 2012.

101.    Moreover, on a global scale, in the first eight months of 2013, German regulators received 968 Xarelto-related adverse event reports, including 72 deaths, as compared to a total of 750 reports and 58 deaths in 2012.

102.     Despite the clear signal generated by the SAE data, Defendants failed to either alert the public and the scientific community, or perform further investigation into the safety of Xarelto.

103.     Defendants' original, and in some respects current, labeling and prescribing information for Xarelto:

     a.     failed to investigate, research, study and define, fully and adequately, the safety profile of Xarelto;

     b.     failed to provide adequate warnings about the true safety risks associated with the use of Xarelto;

     c.     failed to provide adequate warning regarding the pharmacokinetic and pharmacodynamic variability of Xarelto and its effects on the degree of anticoagulation in a patient;

     d.     failed to provide adequate warning that it is difficult or impossible to assess the degree and/or extent of anticoagulation in patients taking Xarelto;

     e.     failed to disclose in the "Warnings" Section that there is no drug, agent or means to reverse the anticoagulation effects of Xarelto;

     f.     failed to advise prescribing physicians, such as Plaintiff's physician, to inform patients that there was no agent to reverse the anticoagulant effects of Xarelto;

     g.     failed to provide adequate instructions on how to intervene and/or stabilize a patient who suffers a bleed while taking Xarelto;

     h.     failed to provide adequate warnings and information related to the increased risks of bleeding events associated with aging patient populations of Xarelto users;

     i.     failed to provide adequate warnings regarding the increased risk of gastrointestinal bleeds in those taking Xarelto, especially, in those patients with a prior history of gastrointestinal issues and/or upset;

     j.     failed to provide adequate warnings regarding the increased risk of suffering a bleeding event, requiring blood transfusions in those taking Xarelto;

k.      failed to provide adequate warnings regarding the need to assess renal functioning prior to starting a patient on Xarelto and to continue testing and monitoring of renal functioning periodically while the patient is on Xarelto;

l.      failed to provide adequate warnings regarding the need to assess hepatic functioning prior to starting a patient on Xarelto and to continue testing and monitoring of hepatic functioning periodically while the patient is on Xarelto;

m.      failed to include a "**BOXED WARNING**" about serious bleeding events associated with Xarelto;

n.      failed to include a "**BOLDED WARNING**" about serious bleeding events associated with Xarelto; and

o.      in the "Medication Guide" intended for distribution to patients to whom Xarelto has been prescribed, Defendants failed to disclose to patients that there is no drug, agent or means to reverse the anticoagulation effects of Xarelto and that if serious bleeding occurs, such irreversibility could have permanently disabling, life-threatening or fatal consequences.

104.    During the years since first marketing Xarelto in the U.S., Defendants modified the U.S. labeling and prescribing information for Xarelto, which included additional information regarding the use of Xarelto in patients taking certain medications. Despite being aware of: (1) serious, and sometimes fatal, irreversible bleeding events associated with the use of Xarelto; and (2) 2,081 SAE Medwatch reports filed with the FDA in 2012 alone, including at least 151 deaths, Defendants nonetheless failed to provide adequate disclosures or warnings in their label as detailed above.

105.    Prior to applying for and obtaining approval of Xarelto, Defendants knew or should have known that consumption of Xarelto was associated with and/or could cause the induction of life-threatening bleeding. Defendants possessed at least one clinical scientific study that indicated the threat of life-threatening bleeding risks, and Defendants knew or should have known that further testing and studies were needed prior to Xarelto's introduction to the market.

106.     Upon information and belief, despite evidence of life-threatening bleeding risks in clinical trials and other clinical evidence, Defendants failed to adequately conduct complete and proper testing of Xarelto prior to filing their New Drug Application for Xarelto.

107.     Upon information and belief, from the date Defendants received FDA approval to market Xarelto, Defendants made, distributed, marketed, and sold Xarelto without adequate warning to Plaintiff or Plaintiff's prescribing physicians that Xarelto was associated with and/or could cause life-threatening bleeding, presented a risk of life-threatening bleeding in patients who used it, and that Defendants had not adequately conducted complete and proper testing and studies of Xarelto with regard to severe side effects, specifically life-threatening bleeding.

108.     Upon information and belief, Defendants concealed and failed to completely disclose their knowledge that Xarelto was associated with and could cause life-threatening bleeding, as well as their knowledge that they had failed to fully test or study that risk.

108.     Upon information and belief, Defendants ignored the association between the use of Xarelto and the risk of developing life-threatening bleeding.

109.     Defendants' failure to disclose information that they possessed regarding their lack of adequate testing and study of Xarelto for the risk of life-threatening bleeding further rendered warnings inadequate.

110.     By reason of the foregoing acts and omissions, Plaintiff was caused to suffer a gastrointestinal bleed and death.

111.     By reason of the foregoing acts and omissions, Plaintiffs have suffered damages and harm, including, but not limited to, pain and suffering, emotional distress, medical expenses, other economic harm, and premature death.

## CASE SPECIFIC FACTUAL BACKGROUND

112.     Plaintiff began using Xarelto on or about October of 2014. When Plaintiff used Xarelto, it remained in substantially the same condition as when it left Defendants' control.

113.     Plaintiff's physician would not have prescribed Xarelto to Plaintiff if he knew of the true risks associated with the use of Xarelto.

114.     Plaintiff would not have elected to use Xarelto if he knew of the true risks associated with the use of Xarelto. In other words, Plaintiff would not have elected to use Xarelto if he knew the true risk of internal bleeding and stroke associated with the use of Xarelto.

115.     Upon information and belief, on or about October of 2014, Plaintiff suffered a gastrointestinal bleed and was hospitalized. Plaintiff suffered a gastrointestinal bleed because Xarelto was negligently and defectively designed. Defendants knew that Xarelto was negligently and defectively designed when it left Defendants' control, and Defendants knew that it caused internal bleeding at a higher rate than other blood thinners on the market. Defendants did not disclose these facts to Plaintiff or Plaintiff's physician.

116.     Through no fault of his own, and no fault of her health care providers, Plaintiff suffered from a gastrointestinal bleed. The gastrointestinal bleed caused pain and suffering, mental anguish, financial loss and premature death to Plaintiff.

117.     As a direct and proximate result of the use of Defendants' Xarelto, Plaintiff suffered serious and dangerous side effects including but not limited to, a gastrointestinal bleed, as well as other severe and personal injuries which are permanent and lasting in nature, including premature death.

118.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and incurred damages, including medical expenses and other economic and non-economic damages.

**CAUSES OF ACTION**
**COUNT I: NEGLIGENCE**

119.    Plaintiff hereby incorporates by reference the allegations of this Complaint contained in each of the preceding paragraphs as if fully stated herein.

120.    Defendants had a duty to exercise reasonable care in the designing, developing, researching, manufacturing, marketing, supplying, promoting, packaging, sale and/or distribution of Xarelto into the stream of commerce, including but not limited to a duty to assure that the product would not cause users to suffer unreasonable and dangerous adverse side effects, to properly warn of all risks, and to comply with federal requirements.

121.    Defendants failed to exercise ordinary care in the designing, developing, researching, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Xarelto into interstate commerce in that Defendants knew or should have known that using Xarelto could cause significant bodily harm, including but not limited to physical injuries of a permanent and disabling nature, physical pain and mental anguish, diminished enjoyment of life, hospitalization and other medical expenses, and loss of earnings, and was therefore not safe for consumer use.

122.    Defendants' negligent acts and/or omissions include, but are not limited to:

    a.    Producing, manufacturing, formulating, designing, and/or advertising Xarelto without sufficiently, thoroughly, and/or adequately testing it;

    b.    Selling Xarelto to the general public without performing sufficient/adequate testing to determine the full range of dangers to consumers;

c.      Failing to warn Plaintiff, the general public, healthcare providers, and the FDA of the dangers associated with using Xarelto;

d.      Failing to provide adequate instructions regarding safety precautions to be observed by users, handlers, and persons who would reasonably and foreseeably come into contact with and/or use Xarelto;

e.      Failing to test Xarelto and/or failing to adequately, sufficiently and properly test Xarelto;

f.      Failing to develop or supply a drug, agent or means to reverse the anticoagulation effects of Xarelto;

g.      Negligently advertising and recommending the use of Xarelto to Plaintiff, the general public, and healthcare providers without sufficient knowledge as to its dangerous propensities;

h.      Negligently representing that Xarelto was safe for use for its intended purpose, when, in fact, it was unsafe;

i.      Negligently representing that Xarelto was equally as safe and effective as other available forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurring DVT and/or PE, and to prevent the development of DVT in patients undergoing hip and knee replacement surgery;

j.      Negligently designing Xarelto in a manner which was dangerous to users, including Plaintiff;

k.      Negligently manufacturing Xarelto in a manner which was dangerous to users, including Plaintiff;

l.      Negligently producing Xarelto in a manner which was dangerous to users, including Plaintiff;

m.      Negligently assembling Xarelto in a manner which was dangerous to users, including Plaintiff;

n.      Knowingly concealing that Xarelto was unsafe, dangerous, and/or non-conforming with FDA regulations from Plaintiff, the general public, and healthcare providers;

o.      Improperly concealing and/or misrepresenting information regarding the risks and dangers posed by using Xarelto compared to other available forms of treatment for reducing the risk of stroke and systemic embolism

in patients with non-valvular atrial fibrillation, reducing the risk of recurring DVT and/or PE, and for preventing the development of DVT in patients undergoing hip and knee replacement surgery.

123.    Despite the fact that Defendants knew or should have known that Xarelto posed a serious risk of bodily harm to consumers, Defendants continued to manufacture and market Xarelto for use by consumers and continued to fail to comply with federal requirements.

124.    Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described above, including the failure to comply with federal requirements.

125.    It was foreseeable that Defendants' product, as designed, would cause serious injury to consumers, including Plaintiff.

126.    As a direct and proximate result of Defendants' negligence, Plaintiff suffered serious physical injury, harm, damages, economic loss, and premature death.

127.    Defendants' conduct evidences a flagrant disregard of human life so as to warrant the imposition of punitive damages. This conduct includes but is not limited to: failing to adequately design, test, and manufacture Xarelto; continuing to market and distribute Xarelto when Defendants knew or should have known of the serious health risks it posed to consumers; and failing to comply with federal requirements.

128.    Defendants' actions and omissions as alleged in this Complaint demonstrate a flagrant disregard for human life, and willful and wonton conduct, which warrants the imposition of punitive damages.

129.    As a result of the foregoing negligent misrepresentations by Defendants, Plaintiff suffered injuries and damages as alleged herein.

## COUNT II: NEGLIGENT MISREPRESENTATION

130.    Plaintiff hereby incorporates by reference the allegations of this Complaint contained in each of the preceding paragraphs as if fully stated herein.

131.    From the time Xarelto was first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed, and up to the present, Defendants made misrepresentations to Plaintiff, the general public, healthcare providers, and the FDA, including but not limited to the misrepresentation that Xarelto was safe, fit, and effective for human use. Defendants conducted marketing campaigns to promote the sale of Xarelto and willfully deceived Plaintiff, the general public, healthcare providers, and the FDA, regarding the possible health risks and consequences associated with using Xarelto.

132.    Defendants made the foregoing misrepresentations without having reasonable grounds for believing them to be true. These misrepresentations were made directly by Defendants, sales representatives, and other authorized agents of Defendants, in publications and other written materials that were directed to Plaintiff, the general public, and healthcare providers, with the intention of inducing reliance on the misrepresentations, thereby promoting the prescription, purchase, and use of Xarelto.

133.    The representations by Defendants were false, in that Xarelto is not safe, fit, and effective for human consumption, using Xarelto is hazardous to the health, and Xarelto has a propensity to cause serious injuries to users, including but not limited to injuries like those suffered by Plaintiff such as cerebral bleeding.

134.    Defendants' misrepresentations were made with the intention of inducing reliance on the misrepresentations, thereby promoting the prescription, purchase, and use of

Xarelto. Plaintiff was induced to purchase and use Xarelto in reliance on Defendants' misrepresentations.

135.    Plaintiff would not have used Xarelto if he had known the true facts concealed by Defendants regarding the dangers associated with using Xarelto. Plaintiff's reliance upon Defendants' misrepresentations was justified because such misrepresentations were made and conducted by individuals and entities that were in a position to know the true facts.

136.    As a result of the foregoing negligent misrepresentations by Defendants, Plaintiff suffered injuries and damages as alleged herein.

## COUNT III: FRAUD AND DECEIT

137.    Plaintiff hereby incorporates by reference the allegations of this Complaint contained in each of the preceding paragraphs as if fully stated herein.

138.    As a result of Defendants' research and testing, or lack thereof, Defendants blatantly and intentionally distributed false information, including but not limited to assuring Plaintiff, the general public, healthcare providers, and the FDA, that Xarelto was safe and effective for use as a means to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurring DVT and/or PE, and to prevent the development of DVT in patients undergoing hip and knee replacement surgery.

139.    Defendants intentionally omitted certain results of testing and research to Plaintiff, the general public, healthcare providers, and the FDA, regarding the serious and dangerous health and safety risks associated with the use of Xarelto.

140.    Defendants had a duty to disseminate truthful information to the general public, including Plaintiff, and a parallel duty not to deceive the general public and Plaintiff, as well as Plaintiff's respective healthcare providers and the FDA.

141.    The information distributed by Defendants to Plaintiff, the general public, healthcare providers, and the FDA, which included reports, press releases, advertising campaigns, television commercials, print ads, magazine ads, billboards, and other commercial media, contained material misrepresentations of facts and/or omissions.

142.    The information distributed by Defendants to Plaintiff, the general public, healthcare providers, and the FDA, intentionally included misrepresentations that Xarelto was safe and effective for use to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurring DVT and/or PE, and to prevent the development of DVT in patients undergoing hip and knee replacement surgery.

143.    The information distributed by Defendants to Plaintiff, the general public, healthcare providers, and the FDA, intentionally included representations that the use of Xarelto carried the same risks, hazards, and/or dangers as other available forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurring DVT and/or PE, and to prevent the development of DVT in patients undergoing hip and knee replacement surgery.

144.    The information distributed by Defendants to Plaintiff, the general public, healthcare providers, and the FDA, intentionally included false representations that Xarelto was not injurious to the health and/or safety of its intended users.

145.    The information distributed by Defendants to Plaintiff, the general public, healthcare providers, and the FDA, intentionally included false representations that Xarelto was only as potentially injurious to the health and/or safety of its intended users, as other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular

atrial fibrillation, reducing the risk of recurring DVT and/or PE, and to prevent the development of DVT in patients undergoing hip and knee replacement surgery.

146.     Defendants' representations were all false and misleading.

147.     Upon information and belief, Defendants intentionally suppressed, ignored and disregarded test results not favorable to Defendants, and results demonstrating that Xarelto was not safe as a means of treatment and/or was not as safe as other means of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurring DVT and/or PE, and to prevent the development of DVT in patients undergoing hip and knee replacement surgery.

148.     Defendants intentionally made material representations to Plaintiff, the general public, healthcare providers, and the FDA regarding Xarelto's purported safety, including but not limited to representations that there were no serious and dangerous health and safety concerns associated with the use of Xarelto.

149.     Defendants intentionally made false representations to Plaintiff, the general public, healthcare providers, and the FDA, regarding Xarelto's purported safety, including but not limited to representing that Xarelto is a safe means of reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurring DVT and/or PE, and to prevent the development of DVT in patients undergoing hip and knee replacement surgery.

150.     Defendants' purpose in making these false representations was to deceive and defraud Plaintiff, the general public, healthcare providers, and the FDA, to gain the confidence of the general public, Plaintiff, healthcare providers, and the FDA, to promote Xarelto's purported quality and fitness for use by consumers, and to induce Plaintiff, the general public, and

healthcare providers, to purchase, request, dispense, prescribe, recommend, and/or continue to use Xarelto.

151.    Defendants made the aforementioned false claims and false representations with the intent of convincing Plaintiff, the general public, healthcare providers, and the FDA, that Xarelto was fit and safe for use as treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurring DVT and/or PE, and to prevent the development of DVT in patients undergoing hip and knee replacement surgery, and did not pose risks, dangers, or hazards above and beyond those identified and/or associated with other available forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurring DVT and/or PE, and to prevent the development of DVT in patients undergoing hip and knee replacement surgery.

152.    Defendants made false claims and representations in documents submitted to the general public, Plaintiff, healthcare providers, and the FDA, that Xarelto did not pose serious health and/or safety risks.

153.    Defendants made claims and representations in documents submitted to the general public, Plaintiff, healthcare providers, and the FDA, that Xarelto did not pose health and/or safety risks greater than other available forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurring DVT and/or PE, and to prevent the development of DVT in patients undergoing hip and knee replacement surgery.

154.    Defendants' representations were false when made and/or were made with a pretense of actual knowledge when such knowledge did not actually exist, and/or were made recklessly and without regard to the actual facts.

155.    Defendants' representations were made with the intention of deceiving and defrauding the general public, Plaintiff, healthcare providers, and/or the FDA, and were made in order to induce Plaintiff and healthcare providers to rely upon those misrepresentations, and caused Plaintiff and healthcare providers to purchase, use, rely on, request, dispense, recommend, and/or prescribe Xarelto.

156.    Defendants recklessly, intentionally, and falsely misrepresented the dangerous and serious health and safety concerns associated with the use of Xarelto to Plaintiff, the general public, and healthcare providers, for the purpose of promoting and profiting from a product known to be dangerous and defective and/or not as safe for use as other available forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurring DVT and/or PE, and to prevent the development of DVT in patients undergoing hip and knee replacement surgery.

157.    Defendants willfully and intentionally failed to disclose material facts regarding the dangerous and serious health and safety concerns associated with the use of Xarelto.

158.    Defendants willfully and intentionally failed to disclose the truth, failed to disclose material facts, and made false representations with the purpose and design of deceiving and lulling Plaintiff, as well as her respective healthcare providers, into a sense of security so that Plaintiff would rely on the representations made by Defendants, and purchase, use and rely on Xarelto and/or that Plaintiff's healthcare providers would dispense, prescribe, and/or recommend the same.

159.     Defendants, through their public relations efforts, which included but were not limited to the public statements and press releases, knew or should have known that the general public, including Plaintiff, as well as Plaintiff's respective healthcare providers, would rely upon the information being disseminated.

160.     Defendants utilized direct to consumer adverting to market, promote, and/or advertise Xarelto.

161.     Plaintiff and/or Plaintiff's respective healthcare providers did in fact rely on and believe Defendants' representations to be true at the time they were made, and relied upon those representations as well as Defendants' superior knowledge of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurring DVT and/or PE, and to prevent the development of DVT in patients undergoing hip and knee replacement surgery, and were thereby induced into purchasing, using and relying on Xarelto.

162.     At the time the representations were made, Plaintiff and/or Plaintiff's respective healthcare providers did not know the truth with regard to the dangerous and serious health and safety concerns associated with the use of Xarelto.

163.     Plaintiff did not discover the true facts with respect to the dangerous and serious health and safety concerns associated with the use of Xarelto, nor Defendants' false representations regarding same, nor could Plaintiff with reasonable diligence have discovered the true facts.

164.     Plaintiff would not have purchased or used Xarelto if Plaintiff had known the true facts regarding the dangerous and serious health and safety concerns associated with the use of Xarelto.

165.    Defendants' conduct was fraudulent and deceitful, and was committed willfully, wantonly and/or purposefully to induce Plaintiff.

166.    As a result of the foregoing acts and omissions, Plaintiff suffered serious and dangerous side effects including life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, expenses for hospitalization, medical treatment, and premature death.

167.    As a result of Defendants' fraudulent and deceitful conduct, Plaintiff suffered injuries and damages as alleged herein.

## COUNT IV: FRAUDULENT CONCEALMENT

168.    Plaintiff hereby incorporates by reference the allegations of this Complaint contained in each of the preceding paragraphs as if fully stated herein.

169.    At all times during the course of dealing between Defendants and the general public, Plaintiff, healthcare providers, and the FDA, Defendants misrepresented that Xarelto was safe for its intended use.

170.    Defendants knew or were reckless in not knowing that their representations were false.

171.    Defendants fraudulently concealed and intentionally omitted the following material information in their representations to the general public, Plaintiff, healthcare providers, and the FDA:

      a.     that Xarelto was less safe than other available forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurring DVT and/or PE, and to prevent the development of DVT in patients undergoing hip and knee replacement surgery;

      b.     that the risk of adverse events associated with the use of Xarelto was higher than the risk associated with other available forms of treatment for

reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurring DVT and/or PE, and to prevent the development of DVT in patients undergoing hip and knee replacement surgery;

c.  that the risks of adverse events associated with the use of Xarelto was not adequately tested and/or known by Defendants;

d.  that Defendants were aware there were dangers associated with the use of Xarelto that exceeded dangers posed by other available forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurring DVT and/or PE, and to prevent the development of DVT in patients undergoing hip and knee replacement surgery;

e.  that Xarelto was defective, and that it caused dangerous side effects, including but not limited to life-threatening bleeding, as well as other severe and permanent health consequences, at a higher rate than other available forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurring DVT and/or PE, and to prevent the development of DVT in patients undergoing hip and knee replacement surgery;

f.  that there is no drug, agent or means to reverse the anticoagulation effects of Xarelto;

g.  that patients needed to be monitored while using Xarelto;

h.   that Xarelto was manufactured negligently;

i.  that Xarelto was manufactured defectively;

j.  that Xarelto was manufactured improperly;

k.   that Xarelto was designed negligently;

l.  that Xarelto was designed defectively; and

m.  that Xarelto was designed improperly.

172.  Defendants were under a duty to disclose to the general public, Plaintiff, healthcare providers, and the FDA, the defective nature of Xarelto, including but not limited to the heightened risks of life-threatening bleeding.

173.    Defendants had sole access to material facts concerning the defective nature of Xarelto and its propensity to cause serious and dangerous side effects, and hence, cause damage to persons who used Xarelto, including Plaintiff.

174.    Defendants' concealment of material facts concerning the defective nature of Xarelto and its propensity to cause serious and dangerous side effects was made purposefully, willfully, wantonly, and/or recklessly, to mislead the general public, Plaintiff, and healthcare providers into using, purchasing, prescribing, and/or dispensing Xarelto.

175.    Defendants knew that the general public, Plaintiff, healthcare providers, and the FDA had no way to determine the truth behind Defendants' concealment of material facts regarding the defective nature of Xarelto and its propensity to cause serious and dangerous side effects.

176.    Plaintiff, as well as Plaintiff's healthcare providers, reasonably relied on Defendants' representations which negligently, fraudulently, and/or purposefully concealed and omitted key facts regarding the defective nature of Xarelto and its propensity to cause serious and dangerous side effects.

177.    As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, expenses for hospitalization, medical treatment, and premature death.

178.    As a result of Defendants' fraudulent and deceitful conduct, Plaintiff suffered injuries and damages as alleged herein.

## COUNT V: BREACH OF EXPRESS WARRANTY

179.    Plaintiff hereby incorporates by reference the allegations of this Complaint contained in each of the preceding paragraphs as if fully stated herein.

180.    Defendants expressly warranted that Xarelto was a safe and effective product to be used as an anticoagulant. Defendants did not disclose the material risks that Xarelto could cause serious bleeding that may be irreversible, permanently disabling, and/or life-threatening. The representations regarding Xarelto's purported safety were not justified by the performance of Xarelto.

181.    Members of the consuming public, including consumers like Plaintiff and his healthcare provider(s), were intended beneficiaries of the warranty.

182.    Plaintiff and his healthcare provider(s) reasonably relied on Defendants' express representations pertaining Xarelto's purported safety.

183.    Xarelto did not conform to Defendants' express representations regarding its purported safety because it caused serious injury to Plaintiff when used as recommended and directed, and these risks were not disclosed to Plaintiff or her healthcare provider(s).

184.    As a direct and proximate result of Defendants' breach of warranty, Plaintiff suffered serious physical injury, harm, damages, economic loss, and premature death.

## COUNT VI: BREACH OF IMPLIED WARRANTY

185.    Plaintiff hereby incorporates by reference the allegations of this Complaint contained in each of the preceding paragraphs as if fully stated herein.

186.    When Defendants designed, developed, manufactured, marketed, sold, and/or distributed Xarelto for use by consumers like Plaintiff, Defendants knew of the use for which Xarelto was intended and impliedly warranted the product to be of merchantable quality and safe

for such use, and that its design, manufacture, labeling, and marketing complied with all applicable federal requirements.

187.    Plaintiff and his physicians reasonably relied upon Defendants' representations regarding Xarelto's purported merchantable quality and that it was safe for its intended use, and upon Defendants' implied warranty, including that Xarelto was in compliance with all federal requirements.

188.    Contrary to Defendants' implied warranty, Xarelto was not of merchantable quality or safe for its intended use, because the product was defective, as described herein, and it failed to comply with federal requirements.

189.    As a direct and proximate result of Defendants' breach of warranty, Plaintiff suffered serious physical injury, harm, damages, economic loss, and premature death.

## COUNT VII: STRICT PRODUCTS LIABILITY

190.    Plaintiff hereby incorporates by reference the allegations of this Complaint contained in each of the preceding paragraphs as if fully stated herein.

191.    At all times herein mentioned, the Defendants designed, developed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed Xarelto that was used by Plaintiff.

192.    Xarelto was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and/or marketed by the Defendants.

193.    At those times, Xarelto was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, Plaintiff herein.

194.    The Xarelto designed, developed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Xarelto.

195.    The Xarelto designed, developed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed by Defendants was defective in design and/or formulation, in that, when it left the hands of the Defendants it was unreasonably dangerous, and it was more dangerous than an ordinary consumer would expect.

196.    At all times herein mentioned, Xarelto was in a defective condition and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendants.

197.    Defendants knew, or should have known that at all times herein mentioned, their Xarelto was in a defective condition, and was and is inherently dangerous and unsafe.

198.    At the time of Plaintiff's use of Xarelto, Xarelto was being used for the purposes and in a manner normally intended, namely to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurring DVT and/or PE, and to prevent the development of DVT for patients undergoing hip and knee replacement surgery.

199.    Defendants with this knowledge voluntarily designed its Xarelto in a dangerous condition for use by the public, and in particular Plaintiff.

200.    Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

201.    Defendants created a product unreasonably dangerous for its normal, intended use.

202.    Defendants designed, developed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed a defective product which created an unreasonable risk to the health of consumers and to Plaintiff in particular; and Defendants are therefore strictly liable for the injuries sustained by Plaintiff.

203.    Plaintiff could not, by the exercise of reasonable care, have discovered Xarelto's defects herein mentioned and perceived its danger.

204.    The Xarelto designed, developed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed by Defendants was defective due to inadequate warnings or instructions, as the Defendants knew or should have known that the product created a risk of serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature and the Defendants failed to adequately warn of said risk.

205.    Xarelto as designed, developed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed by Defendants was defective due to inadequate warnings and/or inadequate testing.

206.    Xarelto as designed, developed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed by Defendants was defective due to inadequate post-marketing surveillance and/or warnings because, after Defendants knew or should have known of the risks of serious side effects including, life-threatening bleeding, as well as other severe and permanent health consequences from Xarelto, they failed to provide adequate

warnings to users or consumers of the product, and continued to improperly advertise, market and/or promote their product, Xarelto.

207.    By reason of the foregoing, the Defendants have become strictly liable in tort to Plaintiff for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Xarelto.

208.    Defendants' defective design, manufacturing defect, and inadequate warnings of Xarelto were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

209.    The defects in Defendants' drug Xarelto were a substantial factor in causing Plaintiff's injuries.

210.    As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, diminished enjoyment of life, expenses for hospitalization, and premature death.

## COUNT VIII: LOUISIANA PRODUCTS LIABILITY ACT

211.    Plaintiff hereby incorporates by reference the allegations of this Complaint contained in each of the preceding paragraphs as if fully stated herein.

212.    At all times material to this action, Defendants were engaged in the business of designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling Xarelto.

213.    At all times material to this action, Xarelto was expected to reach, and did reach, consumers in the State of Louisiana and throughout the United States, including Plaintiff herein without substantial change in the condition in which it was sold.

214.    At all times material to this action, Xarelto was designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by Defendants in a defective and unreasonably dangerous condition at the time it was placed in the stream of commerce in ways which include, but are not limited to, one or more of the following particulars:

a.     When placed in the stream of commerce, Xarelto contained manufacturing defects which rendered the subject product unreasonably dangerous;

b.     Xarelto's manufacturing defects occurred while the product was in the possession and control of Defendants;

c.     Xarelto was not made in accordance with Defendants' specifications or performance standards; and

d.     Xarelto's manufacturing defects existed before it left the control of Defendants.

215.    The subject product manufactured and/or supplied by Defendants was defective in construction or composition in that, when it left the hands of Defendants, it deviated in a material way from Defendants' manufacturing performance standards and/or it differed from otherwise identical products manufactured to the same design formula. In particular, the product is not safe, has numerous and serious side effects and causes severe and permanent injuries. The product was unreasonably dangerous in construction or composition as provided by La. R.S. 9:2800.55.

216.    The subject product manufactured and/or supplied by Defendants was defective in design in that, an alternative design exists that would prevent serious side effects and severe and permanent injury. In particular, the development of a drug, agent or means to reverse the anticoagulation effects of Xarelto. The product was unreasonably dangerous in design as provided by La. R.S. 9:2800.56.

217.   The subject product manufactured and/or supplied by Defendants was unreasonably dangerous because Defendants did not provide an adequate warning about the product. At the time the subject product left Defendants' control, it possessed a characteristic that may cause damage, and Defendants failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product. The product is not safe, has numerous and serious side effects, causes severe and permanent injuries, and has no reversal agent. The product was unreasonably dangerous because of inadequate warning as provided by La. R.S. 9:2800.57.

218.   The subject product manufactured and/or supplied by Defendants was unreasonably dangerous because it did not conform to an express warranty made by Defendants regarding the product's safety and fitness for use. Defendants' express warranty regarding the subject product induced Plaintiff to use the product, and Plaintiff's damage was proximately caused because Defendants' express warranty was untrue. The product was unreasonably dangerous because of nonconformity to express warranty as provided by La. R.S. 9:2800:58.

219.   As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous side effects including but not limited to, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization, medical care, and premature death.

220.   As a result of the foregoing acts and omissions, Plaintiff has suffered and incurred damages, including medical expenses and other economic and non-economic damages.

221.   By reason of the foregoing, Plaintiff has suffered injuries and damages as alleged herein.

## COUNT IX: WRONGFUL DEATH

222.    Plaintiff hereby incorporates by reference the allegations of this Complaint contained in each of the preceding paragraphs as if fully stated herein.

223.    As a result of the foregoing, on November 8, 2014, Plaintiff-decedent, Bertrand Blatcher, Jr., died from complications proximately related to the Defendant's Xarelto.

224.    Plaintiff-decedent, Bertrand Blatcher, Jr., left heirs, next-of-kin and/or distributes surviving who, by reason of the Plaintiff-decedent's death have suffered a pecuniary loss including, but not limited to support, income, services and guidance of the Plaintiff-decedent, Bertrand Blatcher, Jr., and were all permanently damaged thereby.

225.    At all times herein mentioned, the actions of the named Defendants and their agents, servants, and /or employees, were wanton, grossly negligent, reckless and demonstrated a complete disregard and reckless indifference to the safety and welfare of the general public and to the decedent in particular.

226.    As a result of the foregoing acts and omissions the Plaintiff-decedent did require more health care and services and did incur medical, health, incidental and related expenses.

## COUNT X: SURVIVAL ACTION

227.    Plaintiff hereby incorporates by reference the allegations of this Complaint contained in each of the preceding paragraphs as if fully stated herein.

228.    As a result of the foregoing acts and omissions, Plaintiff-decedent, prior to his death, was obligated to spend various sums of money to treat his injuries, which debts have been assumed by Plaintiffs. As a direct and proximate cause of the foregoing acts and omissions, Plaintiff-decedent was caused pain and suffering, mental anguish and impairment of the

enjoyment of life, until the date of his death; and as a direct and proximate cause of the foregoing acts and omissions, Plaintiff-decedent suffered a loss of earnings and earning capacity.

229.    As a result of the foregoing acts and omissions, Plaintiff-decedent and his heirs, until the time of his death, suffered a disintegration and deterioration of the family unit and the relationships existing therein, resulting in enhanced anguish, depression and other symptoms of psychological stress and disorder.

230.    As a result of the foregoing acts and omissions, and including the observance of the suffering and physical deterioration of Plaintiff-decedent until the date of his death, Plaintiff has and will continue to suffer permanent and ongoing psychological damage which may require future psychological and medical treatment. Plaintiff falls within the appropriate class of survivors who may bring this claim under Louisiana Civ. Code article 2315.1.

## **PRAYER FOR RELIEF**

Plaintiff respectfully requests judgment against Defendants on each of the above counts as follows:

(a)    Compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life,  and other noneconomic damages in an amount to be determined at trial of this action;

(b)    Economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages, including, but not limited to, all damages sustained as a result of the injury in an amount to be determined at trial of this action;

(c)    Punitive and exemplary damages for the wanton, willful, fraudulent, and reckless acts of Defendants who demonstrated a complete disregard and reckless indifference for the

safety and welfare of the general public and Plaintiff, in an amount sufficient to punish Defendants and deter future similar conduct;

(d)     Pre-judgment and post-judgment interest as provided by law;

(e)     Plaintiff's attorney fees;

(f)     Plaintiff's costs of the proceedings; and

(g)     Such other and further relief as this Court deems just and proper.

## **<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff hereby demands a trial by jury on all counts and as to all issues and allegations presented herein.

DATED: October 9, 2015                              Respectfully Submitted,


s/Merritt E. Cunningham
Michael G. Stag LSBA No. 23314
Merritt E. Cunningham, LSBA No. 32843
SMITH Stag, LLC
365 Canal Street
New Orleans, LA 70130
PHONE: (504) 593-9600
FAX: (504) 593-9601
Email: mstag@smithstag.com,
ssmith@smithstag.com, and
mcunningham@smithstag.com

COUNSEL FOR PLAINTIFFS