# EXHIBIT A

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| *IN RE: XARELTO (RIVAROXABAN)*<br>*PRODUCTS LIABILITY LITIGATION* | MDL No. 2592<br><br>SECTION: L<br>JUDGE FALLON<br>MAG. JUDGE NORTH |
| LOUISIANA HEALTH SERVICE AND<br>INDEMNITY COMPANY d/b/a BLUE CROSS<br>AND BLUE SHIELD OF LOUISIANA, HMO<br>LOUISIANA, INC., and ALLIED SERVICES<br>DIVISION WELFARE FUND, on behalf of<br>themselves and all others similarly situated,<br><br>              Plaintiffs,<br><br>vs.<br><br>JANSSEN RESEARCH & DEVELOPMENT, LLC<br>f/k/a JOHNSON AND JOHNSON<br>PHARMACEUTICAL RESEARCH AND<br>DEVELOPMENT LLC, JANSSEN ORTHO, LLC,<br>JANSSEN PHARMACEUTICALS, INC. f/k/a<br>JANSSEN PHARMACEUTICA INC. f/k/a<br>ORTHO-MCNEIL-JANSSEN<br>PHARMACEUTICALS, INC., JOHNSON &<br>JOHNSON COMPANY, BAYER HEALTHCARE<br>PHARMACEUTICALS, INC., BAYER PHARMA<br>AG, BAYER CORPORATION, BAYER<br>HEALTHCARE LLC, BAYER HEALTHCARE AG<br>and BAYER AG,<br><br>              Defendants. | CIVIL ACTION<br>NO. 2:15-cv-03913-EEF-MBN<br><br>**FIRST AMENDED**<br>**CLASS ACTION COMPLAINT** |

## <u>FIRST AMENDED CLASS ACTION COMPLAINT</u>

Plaintiffs Louisiana Health Service and Indemnity Company d/b/a Blue Cross and Blue

Shield of Louisiana (hereinafter, "BCBSLA"), HMO Louisiana, Inc., and Allied Services

Division Welfare Fund (hereinafter, "ASD Fund") (collectively, "Plaintiffs"), on behalf of

themselves and all others similarly situated, by and through counsel, brings this class action against the Janssen Research & Development, LLC f/k/a Johnson and Johnson Pharmaceutical Research and Development, LLC, Janssen Ortho, LLC, Janssen Pharmaceuticals, Inc. f/k/a Janssen Pharmaceutica Inc., f/k/a Ortho-McNeil-Janssen Pharmaceuticals, Inc., Johnson & Johnson Company, Bayer Healthcare Pharmaceuticals Inc., Bayer Pharma AG, Bayer Corporation, Bayer Healthcare LLC, and Bayer Healthcare AG, and Bayer AG (hereinafter, "Defendants"), and allege the following upon information and belief and investigation of counsel:

## I.      NATURE OF THE ACTION

1.      For more than five decades, the blood thinner warfarin was the only option for millions of patients at risk for life-threatening blood clots. Now, manufacturers of competitor drugs aggressively market their products as a "one size fits all" drug.  These marketing efforts seek to exploit a niche in the market, but are redundant with the older, cheaper and safer therapies that are widely available.

2.      Defendants engaged in a deceptive scheme to market and promote Xarelto as an alternative to safer and less costly drugs such as warfarin, with simplicity at the heart of their marketing campaign.  This carefully-orchestrated scheme involved both material omissions, *i.e.*, deliberate concealment of material information and carefully crafted promotional programs, both of which were designed to induce consumers, physicians, healthcare providers and third-party payors to prescribe, use and/or purchase Xarelto.

3.      In reporting the U.S. Food and Drug Administration's (FDA) review of Xarelto, the FDA acknowledged Defendants' rhetoric about a benefit patients would enjoy from the drug's administration.  However, the FDA advised that while "it is convenient for patients to

dispense with the monthly monitoring required by warfarin, infrequent monitoring (perhaps at initiation and then yearly) to assure appropriate dosing of the drugs that prevent stroke and cause bleeding may improve outcomes and be acceptable to patients."[1]

4. Addressing the scientific evidence regarding the use of a blood test to improve patient safety, the FDA stated that "[the makers of Xarelto®] has not chosen to utilize this information. In fact, so far as we are aware, none of the other manufacturers/sponsors of other oral anticoagulants that inhibit single coagulation factors have chosen to utilize pharmacokinetic/pharmacodynamic information to explore adjusting dose to optimize safety and efficacy."[2] Defendants did not address or disclose the FDA's concerns to patients, their prescribing physicians and the medical community.

5. In short, had Defendants directed physicians to require a simple blood test for Xarelto users, they could have significantly improved patient safety. Yet such a disclosure would have lessened the gap created for a niche market for Xarelto; thus, Defendants were unwilling to make such a recommendation.

6. Instead, Defendants used the results of various studies such as the ROCKET AF study, the RECORD studies, and the EINSTEIN studies to promote Xarelto in their promotional materials, including the Xarelto website, which tout the positive results of all of these studies. However, Defendants' promotional materials fail to similarly highlight the increased risk of gastrointestinal bleeding and other bleeding events requiring transfusions demonstrated in these studies. Defendants not only overstated the efficacy of Xarelto, but also failed to adequately disclose to patients that there is no means to reverse the anticoagulation effects of Xarelto.

---

[1] FDA Summary Review Xarelto 11/4/11 pg. 9.
[2] FDA Summary Review Xarelto 11/4/11 pg. 9.

7.     Defendants knew that disclosing the drug's true risk and benefit profile to consumers and prescribing physicians would have drastically reduced the drug's revenue potential. So, instead of being honest and straightforward with consumers, prescribing physicians, and the medical community and allowing them to decide, for themselves, whether Xarelto was worth the risk, Defendants hid critical safety data, misled consumers and prescribing physicians and represented Xarelto as an safer and more effective anticoagulant.

8.     As a result of Defendants' aggressive marketing and promotion efforts, Xarelto garnered approximately $582,000,000.00 in global sales in its first year on the market. Then in 2013, sales for Xarelto reached approximately $2 billion for the fiscal year, thus reaching "blockbuster" status (as referred to in the pharmaceutical industry when sales clear the $1 billion threshold). Rather than issue proper warnings and provide accurate information about Xarelto's risks and benefits, Defendants chose instead to keep their deceptive propaganda and marketing machine running full steam ahead and never took any affirmative steps to correct the misinformation and deceptive advertising scheme that they had and continued to perpetrate, ensuring that they would continue to maximize the prescription and sale of Xarelto so long as consumers, third-party payors, prescribing physicians, healthcare providers, and the medical community remained unaware of Xarelto's true risks.

9.     By knowingly and actively promoting Xarelto as a safer and more effective anticoagulant without disclosing the drug's true risks, Defendants caused physicians to write prescriptions for Xarelto over safer, less costly medications, and caused Plaintiffs and members of the Class to pay for more Xarelto prescriptions than it would have absent Defendants' unlawful conduct.  Plaintiffs and members of the Class were denied the opportunity to make

fully informed decisions about whether and how to include Xarelto on their formularies and paid for more prescriptions than it would have absent Defendants' unlawful conduct.

10.     Defendants' omissions of, and deliberate misrepresentations related to, critical information regarding the use of Xarelto have caused financial harm to Plaintiffs and the Class, who hereby seek compensatory, punitive and statutory damages, injunctive relief to prevent Defendants from continuing their unlawful activities, reasonable attorneys' fees and such other just relief as the Court may award.

## II.      <u>PARTIES</u>

11.     Plaintiff Louisiana Health Service and Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana ("BCBSLA") is a domestic health insurance corporation licensed to conduct business in the state of Louisiana and is involved in the business of providing health benefits to covered lives.  BCBSLA provides insured benefits, third party administrative services and manages health care services for its insureds and members. At all relevant times, BCBSLA was authorized to issue policies of health insurance for its members.  Plaintiff BCBSLA has paid or incurred costs for prescriptions of Xarelto dispensed to covered lives in several states. These prescriptions would have been restricted or priced differently if the FDA, Plaintiff's PBM and/or prescribers had truthful and complete information about the drug.

12.     Plaintiff HMO Louisiana, Inc. is domestic health insurance corporation licensed to conduct business in the state of Louisiana and is involved in the business of providing health benefits to covered lives. HMO Louisiana, Inc. provides insured benefits, third party administrative services and manages health care services for its insureds and members. At all relevant times, HMO Louisiana, Inc. was authorized to issue policies of health insurance for its members.  Plaintiff HMO Louisiana, Inc. has paid or incurred costs for prescriptions of Xarelto

dispensed to covered lives in several states. These prescriptions would have been restricted or priced differently if the FDA, Plaintiff's PBM and/or prescribers had truthful and complete information about the drug.

13.    Plaintiff Allied Services Division Welfare Fund ("ASD Fund") is a health and welfare benefit fund with its principal place of business at 53 West Seegers Road, Arlington Heights, Illinois, 60005, and is involved in the business of providing health and pension benefits to covered lives. ASD Fund is a multi-employer employee welfare benefit plan, within the meaning of the Employee Retirement Income Security Act, 29 U.S.C. § 1001(2), and § 1002(37). Plaintiff ASD Fund has paid or incurred costs for prescriptions of Xarelto dispensed to covered lives in several states. These prescriptions would have been restricted or priced differently if the FDA, Plaintiff's PBM and/or prescribers had truthful and complete information about the drug.

14.    At all times relevant, Plaintiffs have paid and/or provided reimbursement for some or the entire purchase price for Xarelto during the Class Period. As a result of Defendants wrongful conduct alleged herein, Plaintiffs have been injured.

15.    Upon information and belief, Defendant JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a JOHNSON AND JOHNSON RESEARCH AND DEVELOPMENT LLC (hereinafter referred to as "JANSSEN R&D") is a limited liability company organized under the laws of New Jersey, with a principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933. Defendant JANSSEN R&D is the holder of the approved New Drug Application ("NDA") for Xarelto as well as the supplemental NDA.

16.    As part of its business, JANSSEN R&D is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

6

17.     Upon information and belief, Defendant JANSSEN R&D has transacted and conducted business in the State of Louisiana.

18.     Upon information and belief, Defendant JANSSEN R&D has derived substantial revenue from goods and products used in the State of Louisiana.

19.     Upon information and belief, Defendant JANSSEN R&D expected or should have expected its acts to have consequences within the United States of America and the State of Louisiana, and derived substantial revenue from interstate commerce within the United States and the State of Louisiana, more particularly.

20.     Upon information and belief, and at all relevant times Defendant JANSSEN R&D, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat Deep Vein Thrombosis ("DVT") and Pulmonary Embolism ("PE"), to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

21.     Upon information and belief, Defendant JANSSEN PHARMACEUTICALS, INC. f/k/a     JANSSEN     PHARMACEUTICA INC.     f/k/a     ORTHO-MCNEIL JANSSEN PHARMACEUTICALS, INC. (hereinafter referred to as "JANSSEN PHARM") is a Pennsylvania corporation, having a principal place of business at 1125 Trenton Harbourton Road, Titusville, New Jersey 08560.

22.     As part of its business, JANSSEN PHARM is involved in the research, development, sales, and marketing of pharmaceutical products, including Xarelto and rivaroxaban.

23.     Upon information and belief, Defendant JANSSEN PHARM has transacted and conducted business in the State of Louisiana.

24.     Upon information and belief, Defendant JANSSEN PHARM has derived substantial revenue from goods and products used in the State of Louisiana.

25.     Upon information and belief, Defendant JANSSEN PHARM expected or should have expected its acts to have consequences within the United States of America and the State of Louisiana, and derived substantial revenue from interstate commerce within the United States and the State of Louisiana, more particularly.

26.     Upon information and belief, and at all relevant times, Defendant JANSSEN PHARM was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

27.     Upon information and belief, Defendant JANSSEN ORTHO LLC (hereinafter referred to as "JANSSEN ORTHO") is a limited liability company organized under the laws of Delaware, having a principal place of business at Stateroad 933 Km 0 1, Street Statero, Gurabo, Puerto Rico 00778.  Defendant JANSSEN ORTHO is a subsidiary of Johnson & Johnson.

28.     As part of its business, JANSSEN ORTHO is involved in the research, development, sales, and marketing of pharmaceutical products, including Xarelto and rivaroxban.

29.     Upon information and belief, Defendant JANSSEN ORTHO has transacted and conducted business in the State of Louisiana.

30.     Upon information and belief, Defendant JANSSEN ORTHO has derived substantial revenue from goods and products used in the State of Louisiana.

31.     Upon information and belief, Defendant JANSSEN ORTHO expected or should have expected its acts to have consequences within the United States of America and the State of Louisiana, and derived substantial revenue from interstate commerce within the United States and the State of Louisiana, more particularly.

32.     Upon information and belief, and at all relevant times, Defendant, JANSSEN ORTHO, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

33.     Defendant JOHNSON & JOHNSON (hereinafter referred to as "J&J") is a fictitious name adopted by Defendant Johnson & Johnson Company, a New Jersey corporation which has its principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933.

34.     As part of its business, J&J, and its "family of companies," is involved in the research, development, sales, and marketing of pharmaceutical products, including Xarelto.

35.     Upon information and belief, Defendant     BAYER     HEALTHCARE PHARMACEUTICALS, INC. is, and at all relevant times was, a corporation organized under the laws of the State of Delaware, with its principal place of business in the State of New Jersey.

36.     Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. was formerly known as Berlex Laboratories, Inc., which was formerly known as Berlex, Inc. and BAYER

HEALTHCARE PHARMACEUTICALS, INC., is the same corporate entity as Berlex, Inc. and Berlex Laboratories, Inc.

37.     As part of its business, BAYER HEALTHCARE PHARMACEUTICALS, INC. is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxban.

38.     Upon     information     and     belief,     Defendant     BAYER     HEALTHCARE PHARMACEUTICALS, INC. has transacted and conducted business in the State of Louisiana.

39.     Upon     information     and     belief,     Defendant     BAYER     HEALTHCARE PHARMACEUTICALS, INC. has derived substantial revenue from goods and products used in the State of Louisiana.

40.     Upon     information     and     belief,     Defendant     BAYER     HEALTHCARE PHARMACEUTICALS, INC. expected or should have expected its acts to have consequences within the United States of America and the State of Louisiana, and derived substantial revenue from interstate commerce within the United States and the State of Louisiana, more particularly.

41.     Upon information and belief, and at all relevant times, Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

42.     Upon information and belief, Defendant BAYER PHARMA AG is a pharmaceutical company domiciled in Germany.

43.     Defendant BAYER PHARMA AG is formerly known as Bayer Schering Pharma AG and is the same corporate entity as Bayer Schering Pharma AG. Bayer Schering Pharma AG was formerly known as Schering AG and is the same corporate entity as Schering AG.

44.     Upon information and belief, Schering AG was renamed Bayer Schering Pharma AG effective December 29, 2006.

45.     Upon information and belief, Bayer Schering Pharma AG was renamed BAYER PHARMA AG effective July 1, 2011.

46.     As part of its business, BAYER PHARMA AG is involved in the research, development, sales, and marketing of pharmaceutical products, including Xarelto and rivaroxaban.

47.     Upon information and belief, Defendant BAYER PHARMA AG has transacted and conducted business in the State of Louisiana.

48.     Upon information and belief, Defendant BAYER PHARMA AG has derived substantial revenue from goods and products used in the State of Louisiana.

49.     Upon information and belief, Defendant BAYER PHARMA AG expected or should have expected its acts to have consequences within the United States of America and the State of Louisiana, and derived substantial revenue from interstate commerce within the United States and the State of Louisiana, more particularly.

50.     Upon information and belief, and at all relevant times, Defendant BAYER PHARMA AG was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of

11

DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

51.     Upon information and belief, Defendant BAYER CORPORATION is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205.

52.     Upon information and belief, Defendant BAYER CORPORATION is the sole member of BAYER HEALTHCARE LLC, which owns 100% of Schering Berlin Inc., which owns 100% of Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. As such, Defendant BAYER CORPORATION is a parent of Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC.

53.     At all relevant times, Defendant BAYER CORPORATION was engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, its products, including the prescription drug Xarelto.

54.     At all relevant times, Defendant BAYER CORPORATION conducted regular and sustained business in the State of Louisiana, by selling and distributing its products in the State of Louisiana and engaged in substantial commerce and business activity in the State of Louisiana.

55.     Upon information and belief, Defendant BAYER HEALTHCARE LLC is a limited liability company duly formed and existing under and by the virtue of the laws of the State of Delaware, with its principal place of business located in the State of New Jersey.

56.     Upon information and belief, Defendant BAYER HEALTHCARE LLC has transacted and conducted business in the State of Louisiana, and derived substantial revenue

from interstate commerce. Defendant BAYER CORPORATION is the sole member of Defendant BAYER HEALTHCARE LLC.

57.     Upon information and belief, Defendant BAYER HEALTCHARE LLC expected or should have expected its acts to have consequences within the United States of America and the State of Louisiana, and derived substantial revenue from interstate commerce.

58.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

59.     Upon information and belief, Defendant BAYER HEALTHCARE AG is a company domiciled in Germany and is the parent/holding company of Defendants BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC, and BAYER PHARMA AG.

60.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG exercises control over Defendants BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC., and BAYER PHARMA AG.

61.     Upon information and belief, Defendant BAYER HEALTHCARE AG has transacted and conducted business in the State of Louisiana, and derived substantial revenue from interstate commerce.

62.     Upon information and belief, Defendant BAYER HEALTHCARE AG expected or should have expected its acts to have consequences within the United States of America and the State of Louisiana, and derived substantial revenue from interstate commerce.

63.     Upon information and belief, Defendant BAYER AG is a German chemical and pharmaceutical company that is headquartered in Leverkusen, North Rhine-Westphalia, Germany.

64.     Upon information and belief, Defendant BAYER AG is the third largest pharmaceutical company in the world.

65.     Upon information and belief, and at all relevant times Defendant BAYER AG is the parent/holding company of all other named Defendants.

66.     Upon information and belief, Defendant BAYER AG has transacted and conducted business in the State of Louisiana, and derived substantial revenue from interstate commerce.

67.     Upon information and belief, Defendant BAYER AG expected or should have expected its acts to have consequences within the United States of America and the State of Louisiana, and derived substantial revenue from interstate commerce.

68.     Upon information and belief, at all relevant times, Defendant BAYER AG was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

69.     Defendants Janssen Research & Development LLC, Janssen Ortho LLC, Janssen Pharmaceuticals, Inc., Johnson & Johnson, Bayer Healthcare Pharmaceuticals, Inc., Bayer

Pharma AG, Bayer Corporation, Bayer Healthcare LLC, Bayer Healthcare AG, and Bayer AG, shall be referred to herein individually by name or jointly as "Defendants."

70.     At all times alleged herein, Defendants include and included any and all parents, subsidiaries, affiliates, divisions, franchises, partners, joint venturers, and organizational units of any kind, their predecessors, successors and assigns and their officers, directors, employees, agents, representatives and any and all other persons acting on their behalf.

71.     At all times herein mentioned, each of the Defendants was the agent, servant, partner, predecessors in interest, and joint venturer of each of the remaining Defendants herein and was at all times operating and acting with the purpose and scope of said agency, service, employment, partnership, and joint venture.

72.     At all times relevant, Defendants were engaged in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce throughout the United States, either directly or indirectly through third parties, subsidiaries or related entities, the drug Xarelto.

### III.     JURISDICTION AND VENUE

73.     This Court has jurisdiction over this matter under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed class exceeds $5,000,000, and at least one member of the putative class is a citizen of a state different from that of one of the Defendants. Jurisdiction also rests under 28 U.S.C. § 1331 because Counts IX and X arise under the laws of the United States.

74.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction. This Court has personal jurisdiction over Defendants because Defendants conduct substantial business in this District, and some of the actions giving rise to the Complaint took place in this District.

75.     This Court has supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367.

76.     Venue is appropriate in this District under 28 U.S.C. §1391 because Defendants, as corporations, are deemed to reside in any judicial district in which it is subject to personal jurisdiction.  Additionally, Defendants transact business within this district, and the interstate trade and commerce described herein is carried out, in substantial part, in this District.

77.     Pursuant to the Transfer Order of the Judicial Panel on Multidistrict Litigation, *In re Xarelto (Rivaroxaba) Products Liab. Litig.,* 2014 WL 7004048 (J.P.M.L. June 12, 2014), venue is also proper in this jurisdiction pursuant to 28 U.S.C. § 1407.

## IV.     FACTUAL ALLEGATIONS

### A.     Background on Xarelto

78.     The drug warfarin, first marketed in 1954, is an anticoagulant that aids in the treatment of individuals who may be at an increased risk of developing deadly blood clots.

79.     Xarelto was introduced in the United States ("U.S.") on July 1, 2011, and is part of a class of drugs called New Oral Anticoagulants ("NOACs").

80.     This class of NOACs, which also includes Pradaxa and Eliquis, is marketed as the next generation of blood-thinning drugs to replace warfarin (Coumadin); an established safe treatment for preventing stroke and systemic embolism for the past 60 years.

81.     At all relevant times, Defendants were in the business of and did design, research, manufacture, test, advertise, promote, market, sell and distribute Xarelto to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

82.    Xarelto is an anticoagulant that acts as a Factor Xa inhibitor, and is available by prescription in oral tablet doses of 20mg, 15mg, and 10mg.

83.    Defendants applied for an initial NDA for Xarelto in July of 2008. On July 1, 2011, Defendants received FDA approval for Xarelto for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries (NDA 022406).

84.    Approval of Xarelto for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries was based on a series of clinical trials known as the Regulation of Coagulation in Orthopedic Surgery to Prevent Deep Venous Thrombosis and Pulmonary Embolism studies (hereinafter referred to as the "RECORD" studies). The findings of the RECORD studies showed that Xarelto was superior (based on the Defendants' definition), accompanied by similar rates of bleeding. However, the studies also showed a greater incidence with Xarelto of bleeding leading to decreased hemoglobin levels and transfusion of blood. (Lassen, M.R., et al. *Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Total Knee Arthroplasty.* N. Engl. J. Med. 2008; 358:2776-86; Kakkar, A.K., et al. *Extended duration rivaroxaban versus short- term enoxaparin for the prevention of venous thromboembolism after total hip arthroplasty: a double-blind, randomized controlled trial.* Lancet 2008; 372:31-39; Ericksson, B.I., et al. *Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Hip Arthroplasty.* N. Engl. J. Med. 2008; 358:2765-75.).

85.    Despite these findings, the RECORD studies were flawed in design and conducted in a negligent manner. In fact, FDA Official Action Indicated ("OAI")—rated inspections in 2009 disclosed rampant violations including, "systemic discarding of medical records," unauthorized unblinding, falsification, and "concerns regarding improprieties in randomization." As a result, the FDA found that the RECORD 4 studies were so flawed that they

were deemed unreliable. (Seife, Charles, *Research Misconduct Identified by US Food and Drug Administration,* JAMA Intern. Med (Feb. 9, 2015)).

86.    Nevertheless, Defendants received additional FDA approval for Xarelto to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation on November 4, 2011 (NDA 202439).

87.    Approval of Xarelto for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation in the U.S. was based on a clinical trial known as the Rivaroxaban Once Daily Oral Direct Factor Xa Inhibition Compared with Vitamin K Antagonism for Prevention of Stroke and Embolism Trial in Atrial Fibrillation study (hereinafter referred to as "ROCKET AF"). The study showed that Xarelto was non-inferior to warfarin for the prevention of stroke or systemic embolism in patients with non-valvular atrial fibrillation, with a similar risk of major bleeding. However, "bleeding from gastrointestinal sites, including upper, lower, and rectal sites, occurred more frequently in the rivaroxaban group, as did bleeding that led to a drop in the hemoglobin level or bleeding that required transfusion." (Patel, M.R., et al. *Rivaroxaban versus warfarin in Nonvalvular Atrial Fibrillation.* N. Engl. J. Med. 2011; 365:883-91).

88.    The ROCKET AF study compared warfarin to Xarelto. Thus, for the study to be well designed and meaningful, the warfarin study group would have to be well managed because warfarin's safety and efficacy is dose dependent. In other words, if the warfarin group was poorly managed, it would be easy for Xarelto to appear non-inferior to warfarin, which, in turn, would provide Defendants a study to "support" Xarelto's use.

89.     In fact, in the ROCKET AF study, the warfarin group was not well managed. The warfarin group in the ROCKET AF study was the worst managed warfarin study group in any previously reported clinical trial involving warfarin.

90.     The poor management of the warfarin group in the ROCKET AF study was not lost on the FDA, which noted "the data comparing [Xarelto] to warfarin are not adequate to determine whether [Xarelto] is as effective for its proposed indication in comparison to warfarin when the latter is used skillfully."[3]

91.     Public Citizen also noticed the poor control in the warfarin group. Public Citizen wrote the FDA, stating they "strongly oppose FDA approval... The 3 ROCKET AF trial conducted in support of the proposed indication had a suboptimal control arm..." http://www.citizen.org/documents/1974.pdf.

92.     Another problem with the ROCKET AF study was Xarelto's once-a-day dosing. The FDA clinical reviewers stated that "the sponsor's rationale for evaluating only once daily dosing during Phase 3 is not strong. Most importantly, there is clinical information from Phase 2 trials ... and from clinical pharmacology studies suggesting that twice daily dosing, which would produce lower peak blood levels and higher trough blood levels of [Xarelto], might have been associated with greater efficacy and/or a better safety profile."[4]

93.     Dr. Steven E. Nissen, more sharply, stated, "my concern was that the dose was selected more for a marketing advantage rather than for the scientific data that was available, and was a mistake..."[5]

94.     Furthermore, the FDA expressed desirability in monitoring Xarelto dosage within their NDA approval memo based on the ROCKET studies. The clinical pharmacology in these

---

[3] FDA Advisory Committee Briefing document. P. 10.
[4] FDA advisory Committee Briefing document p. 100.
[5] FDA Advisory Meeting Transcript p. 287.

studies demonstrated a linear correlation between rivaroxaban (Xarelto) levels and prothrombin time ("PT"); and subsequently a correlation between PT and the risk of bleeding. At this time, Defendants were aware of the correlation between Xarelto dosage and bleeding risks, but had "not chosen to utilize this information." (NDA 202439 Summary Review, p. 9). At all relevant times, Defendants' controlled the contents of their label as demonstrated by their decision to go forward without regard to the FDA's suggestion to utilize this information.

95.     The additional indication for treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE was added to the label on November 2, 2012.

96.     Approval of Xarelto for the treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE in the U.S. was based on the clinical trials known as the EINSTEIN-DVT, EINSTEIN-PE, and EINSTEIN-Extension studies. The EINSTEIN-DVT study tested Xarelto versus a placebo, and merely determined that Xarelto offered an option for treatment of DVT, with an increased risk of bleeding events as compared to placebo. (The EINSTEIN Investigators. *Oral Rivaroxaban for Symptomatic Venous Thromboembolism.* N.Engl.J.Med. 2010; 363:2499-510). The EINSTEIN-Extension study confirmed that result. (Roumualdi, E., et al. *Oral rivaroxaban after symptomatic venous thromboembolism: the continued treatment study (EINSTEIN-Extension study).* Expert Rev. Cardiovasc.Ther. 2011; 9(7):841-844). The EINSTEIN-PE study's findings showed that a Xarelto regimen was non-inferior to the standard therapy for initial and long-term treatment of PE. However, the studies also demonstrated an increased risk of adverse events with Xarelto, including those that resulted in permanent discontinuation of Xarelto or prolonged hospitalization. (The EINSTEIN- PE Investigators. *Oral Rivaroxaban for the Treatment of Symptomatic Pulmonary Embolism.* N.Engl.J.Med. 2012; 366:1287-97.)

97.     Defendants use the results of the ROCKET AF study, the RECORD studies, and the EINSTEIN studies to promote Xarelto in their promotional materials, including the Xarelto website, which tout the positive results of those studies. However, Defendants' promotional materials fail to similarly highlight the increased risk of gastrointestinal bleeding and bleeding that required transfusion, among other serious bleeding concerns.

98.     Defendants market Xarelto as a new oral anticoagulant treatment alternative to warfarin (Coumadin), a long-established safe treatment for preventing stroke and systemic embolism that has been on the market in the United States for the past 60 years. Defendants emphasize the supposed benefits of treatment with Xarelto over warfarin, which they refer to as the "Xarelto Difference" – namely, that Xarelto does not require periodic monitoring with blood tests and does not limit a patient's diet.

99.     However, in its QuarterWatch publication for the first quarter of the 2012 fiscal year, the Institute for Safe Medication Practices ("ISMP"), noted that, even during the approval process, FDA "[r]eviewers also questioned the convenient once-a-day dosing scheme [of Xarelto], saying blood level studies had shown peaks and troughs that could be eliminated by twice-a-day dosing."

100.    The use of Xarelto without appropriate blood monitoring, dose adjustment and twice a day dosing can cause major, life-threatening bleeding events. Physicians using Xarelto have to be able to balance the dose so that the blood is thinned enough to reduce the risk of stroke, but not thinned so much as to increase the risk for a major bleeding event. The Defendants were aware of this risk and the need for blood monitoring but have failed to disclose this vital health information to patients, physicians, the FDA and medical community.

101.    Importantly, Xarelto's significant risk of severe, and sometimes fatal, internal bleeding has no antidote to reverse its effects, unlike warfarin. Therefore, in the event of hemorrhagic complications, there is no available reversal agent. The original U.S. label, approved when the drug was first marketed, did not contain a warning regarding the lack of antidote, but instead only mentioned this important fact in the overdose section.

102.    The FDA's adverse event data indicates staggering, serious adverse events that have been associated with Xarelto.

103.    In the year leading up to June 30, 2012, there were 1,080 Xarelto-associated "Serious Adverse Event" ("SAE") Medwatch reports filed with the FDA, including at least 65 deaths. Of the reported hemorrhage events associated with Xarelto, 8% resulted in death, which was approximately twofold the risk of a hemorrhage-related death with warfarin.

104.    At the close of the 2012 fiscal year, a total of 2,081 new Xarelto-associated SAE reports were filed with the FDA, its first full year on the market, ranking tenth among other pharmaceuticals in direct reports to the FDA. Of those reported events, 151 resulted in death, as compared to only 56 deaths associated with warfarin.

105.    The ISMP referred to these SAE figures as constituting a "strong signal" regarding the safety of Xarelto, defined as "evidence of sufficient weight to justify an alert to the public and the scientific community, and to warrant further investigation."

106.    Of particular note, in the first quarter of 2013, the number of reported serious adverse events associated with Xarelto (680) overtook that of Pradaxa (528), another new oral anticoagulant, which had previously ranked as the number one reported drug in terms of adverse events in 2012.

107.     Moreover, in the first eight months of 2013, German regulators received 968 Xarelto-related averse event reports, including 72 deaths, as compared to a total of 750 reports and 58 deaths in 2012.

108.     Despite the clear signal generated by the SAE data, Defendants did not tell consumers, third-party payors, health care providers and the medical and scientific community about the dangers of Xarelto, nor did Defendants perform further investigation into the safety of Xarelto.

109.     Defendants' original, and in some respects, current labeling and prescribing information for Xarelto:

> (a) failed to investigate, research, study and define, fully and adequately, the safety profile of Xarelto;
>
> (b) failed to provide adequate warnings, about the true safety risks associated with the use of Xarelto;
>
> (c) failed to provide adequate warning regarding the pharmacokinetic and pharmacodynamic variability of Xarelto and its effects on the degree of anticoagulation in a patient;
>
> (d) failed to provide adequate warning that it is difficult or impossible to assess the degree and/or extent of anticoagulation in patients taking Xarelto;
>
> (e) failed to adequately disclose in the "Warnings" Section that there is no drug, agent or means to reverse the anticoagulation effects of Xarelto;
>
> (f) failed to advise prescribing physicians to instruct patients that there was no agent to reverse the anticoagulant effects of Xarelto;
>
> (g) failed to provide adequate instructions on how to intervene and/or stabilize a patient who suffers a bleed while taking Xarelto;
>
> (h) failed to provide adequate warnings and information related to the increased risks of bleeding events associated with aging patient populations of Xarelto users;

(i) failed to provide adequate warnings regarding the increased risk of gastrointestinal bleeds in those taking Xarelto, especially, in those patients with a prior history of gastrointestinal issues and/or upset stomach;

(j) failed to provide adequate warnings regarding the increased risk of suffering a bleeding event, requiring blood transfusions in those taking Xarelto;

(k) failed to provide adequate warnings regarding the need to assess renal functioning prior to starting a patient on Xarelto and to continue testing and monitoring of renal functioning periodically while the patient is on Xarelto;

(l) failed to provide adequate warnings regarding the need to assess hepatic functioning prior to starting a patient on Xarelto and to continue testing and monitoring of hepatic functioning periodically while the patient is on Xarelto;

(m) failed to include a "**BOXED WARNING**" about serious bleeding events associated with Xarelto;

(n) failed to include a "**BOLDED WARNING**" about serious bleeding events associated with Xarelto; and

(o) in the "Medication Guide" intended for distribution to patients to whom Xarelto has been prescribed, Defendants failed to disclose the need for blood monitoring or to patients that there is no drug, agent or means to reverse the anticoagulation effects of Xarelto and that if serious bleeding occurs, such irreversibility could have permanently disabling, life-threatening or fatal consequences.

110.    Despite the years since first marketing Xarelto in the U.S., Defendants modified the U.S. labeling and prescribing information for Xarelto, which included additional information regarding the use of Xarelto in patients taking certain medications. Despite being aware of: (1) serious, and sometimes fatal, irreversible bleeding events associated with the use of Xarelto; and (2) 2,081 SAE Medwatch reports filed with the FDA in 2012 alone, including at least 151 deaths, Defendants nonetheless failed to provide adequate disclosures or warnings in their label as detailed in paragraph 108 (a – o).

111.    Despite the wealth of scientific evidence, Defendants have ignored the increased risk of the development of the aforementioned injuries associated with the use of Xarelto, but

they have, through their marketing and advertising campaigns, urged consumers to use Xarelto without regular blood monitoring or instead of anticoagulants that present a safer alternative.

**B.      Misleading and Over-Promotion of Xarelto**

112.    Xarelto is the second most prescribed drug for treatment of atrial fibrillation, behind only Coumadin (warfarin), and achieved blockbuster status with sales of approximately $2 billion dollars in 2013.

113.    Defendants spent significant amounts of money in promoting Xarelto, which included at least $11,000,000.00 spent during 2013 alone on advertising in journals targeted at prescribers and consumers in the U.S. In the third quarter of fiscal 2013, Xarelto was the number one pharmaceutical product advertised in professional health journals based on pages and dollars spent.

114.    Defendants' aggressive and misrepresentative marketing of a "Xarelto Difference" lead to an explosion in Xarelto sales. The "Xarelto Difference," *i.e.*, was once a day dosing without blood monitoring. In fact, the "Xarelto Difference" was nothing more than a marketing campaign based on flawed science.

115.    As a result of Defendants' aggressive marketing efforts, in its first full year on the market, Xarelto garnered approximately $582 million in sales globally.

116.    Defendants' website for Xarelto claims that over seven million people worldwide have been prescribed Xarelto. In the U.S., approximately 1 million Xarelto prescriptions had been written by the end of 2013.

117.    During the Defendants' 2012 fiscal year, Xarelto garnered approximately $658 million in sales worldwide. Then, in 2013, sales for Xarelto increased even further to more than $1 billion, which is the threshold commonly referred to as "blockbuster" status in the

pharmaceutical industry. In fact, Xarelto sales ultimately reached approximately $2 billion for the 2013 fiscal year, and Xarelto is now considered the leading anticoagulant on a global scale in terms of sales.

118.     As part of their marketing of Xarelto, Defendants widely disseminated direct-to-consumer ("DTC") advertising campaigns that were designed to influence patients to make inquiries to their prescribing physicians about Xarelto and/or request prescriptions for Xarelto.

119.     In the course of these DTC advertisements, Defendants overstated the efficacy of Xarelto with respect to preventing stroke and systemic embolism, failed to disclose the need for dose adjustments, failed to disclose the need for blood monitoring, and failed to adequately disclose to patients that there is no drug, agent, or means to reverse the anticoagulation effects of Xarelto, and, that such irreversibility could have permanently disabling, life- threatening and fatal consequences.

120.     For example, according to the Defendants' marketing and informational materials referenced in the paragraphs below and widely disseminated to the consuming public, "Xarelto® is the first and only once-a day prescription blood thinner for patients with AFib not caused by a heart valve problem, that is proven to reduce the risk of stroke – without routine blood monitoring."[6]

121.     As the Defendants state on their website, "Xarelto® has been proven to lower the chance of having a stroke if you have atrial fibrillation (AFib), not caused by a heart valve problem. Xarelto® is an anticoagulant, or blood-thinning medicine that works by helping to keep blood clots from forming." The Defendants further claim that "it's been prescribed to more than seven million people around the world to help treat or reduce their risk of dangerous clots" and

---

[6] http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/WarningLettersandNoticeofViolationLetterstoPharmaceuticalCompanies/UCM357833.pdf

that it "begins working a few hours after you start taking it, and keeps working for as long as you take it."[7]

122.   Defendants further declare that "XARELTO® is proven to help treat and prevent DVT and PE blood clots" and that Xarelto "reduc[es] the risk of these dangerous clots [from] happening again."[8]

123.   Defendants claim that patients with AFib, DVT, or PE taking Xarelto do not need regular blood monitoring and there are no known dietary restrictions. In addition, patients with AFib only need to take Xarelto once a day with an evening meal.[9]

124.   Defendants claim that patients with AFib are 5 times more likely than a person without Afib to suffer from a stroke and that "disability is more likely to be severe" and "the outcome is almost twice as likely to be fatal" and "the chances of having another major stroke go up."[10]

125.   Defendants routinely market Xarelto as a "one size fits all" drug.   In their aggressive marketing of Xarelto, Defendants' misinformed patients and their healthcare providers as to the necessity to routinely monitor any patient requiring a blood thinning agent.

126.   Defendants' marketing materials suggest that Xarelto represented a therapeutic simplification and therapeutic progress because it did not require patients to undergo periodic monitoring with blood tests and because there were no dietary restrictions.

127.   Defendants' boxed warning did not address the increased risk for serious and fatal bleeding, despite contradictory evidence.  Information listed on Defendants' website (originating from the ROCKET AF clinical trial sponsored by Defendants) conceded that in comparison to

---

[7] http://www.xarelto-us.com/how-xarelto-works
[8] http://www.xarelto-us.com/dvt-pe/treatment-of-dvt-pe
[9] http://www.xarelto-us.com/dvt-pe/xarelto-difference# and http://ww.xarelto-us.com/how-xarelto-is-different
[10] http://www.xarelto-us.com/knowing-your-stroke-risk

warfarin, patients taking Xarelto were found to have more gastrointestinal bleeds and need more transfusions. In spite of this reference regarding bleeds, the information is still wholly inadequate because, this information was not conveyed in the boxed warning on the Xarelto label.[11]

128.    Defendants fervently marketed Xarelto using print advertisements, online marketing on their website, and video advertisements with no regard to the accuracy and repercussions of their misleading advertising in favor of increasing sales.

129.    In the January/February 2013 issue of *WebMD* magazine, Defendants placed a print advertisement that compelled the FDA's Office of Prescription Drug Promotion ("OPDP") to send Defendants an untitled letter regarding its promotional material for the atrial fibrillation indication, stating that, "the print ad is false or misleading because it minimizes the risks associated with Xarelto and makes a misleading claim" regarding dose adjustments, which was in violation of FDA regulations.  The OPDP thus requested that Defendants immediately cease distribution of such promotional material.[12]

130.    As a result of Defendants' intense marketing, "[a]bout 130,000 U.S. prescriptions were written for Xarelto® in the first three months of 2012." This resulted in large profits as Xarelto costs approximately $3,000 a year versus $200 for generic warfarin.[13]

131.    As a result of Defendants' extreme and aggressive marketing tactics within the United Kingdom, Defendants also made 219 million Euros in sales from Xarelto, more than three times as much as during the same period the previous year.[14]

---

[11] http://www.xareltohcp.com/reducing-stroke-risk/safety.html

[12] http://fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/WarningLettersandNoticeofViolationLetterstoPharmaceuticalCompanies/UCM357833.pdf, June 6, 2013 FDA Untitled Warning Letter

[13] Ransdell Pierson. "Pradaxa and Xarelto: Top Heart Doctors Concerned Over New Blood Thinners" *Huffpost Healthy Living*. 14th June 2012.

[14] Frank Siebelt, Hans Seidenstuecker, and Christoph Steitz. "Reports of side-effects from Bayer's Xarelto grow: Spielgel" http://www.reuters.com/article/2013/09/08us-bayer-xarelto-idUSBRE9870AH20130908

132.    Due to the misleading advertising campaign and defective nature of Xarelto, persons who were prescribed and ingested Xarelto, for even a brief period of time, were at increased risk for developing life-threatening bleeds.  In consideration of the flawed formulation of Xarelto, "[p]rominent U.S. [cardiologists and health care professionals] stressed that neither new drug [Xarelto] has a known antidote for a bleeding emergency, as warfarin does."[15]

133.    Despite such findings, Defendants consistently marketed Xarelto as not requiring regular blood monitoring or frequent doctor follow-up, ignoring substantial concerns about the risk of stroke, bleeding, and blood clots if not taken properly or absorbed properly, particularly in patients with poor renal function.

134.    Prior concerns about Xarelto proved true, in the first quarter of 2012, The Institute for Safe Medication Practices "identified 356 reports of serious, disabling, or fatal injury in which rivaroxaban was the primary suspect drug.  The report more than doubled from the previous quarter total of 128 cases."[16]

135.    However, when these findings were discussed with Defendants, "the company told us that it had reviewed the same data and saw no signal of a safety issue that needed to be addressed."[17] Defendants placed more value into ensuring that their profits would continue instead of working on minimizing the serious, disabling, or fatal injuries that were occurring due to the drug they were marketing and promoting.

136.    Defendants concealed their knowledge that Xarelto can cause life threatening, irreversible bleeds from the patients, physicians, consumers, the general public, and the medical community.  Indeed, the Defendants did not properly warn of the irreversible nature of Xarelto in

---

[15] Ransdell Pierson. "Pradaxa and Xarelto: Top Heart Doctors Concerned Over New Blood Thinners" *Huffpost Healthy Living*. 14th June 2012.
[16] *Id.*
[17] *Id.*

the "Warnings and Precautions" section of the products warning label. The only warnings provided by Defendants were as follows:

---------------------------------WARNINGS AND PRECAUTIONS---------------------------------
- Risk of bleeding: XARELTO can cause serious and fatal bleeding. Promptly evaluate signs and symptoms of blood loss. (5.2)
- Pregnancy related hemorrhage: Use XARELTO with caution in pregnant women due to the potential for obstetric hemorrhage and/or emergent delivery. Promptly evaluate signs and symptoms of blood loss. (5.7)
- Prosthetic heart valves: XARELTO use not recommended (5.8)

Specifically, Defendants did not adequately inform consumers and the prescribing medical community about the risks of uncontrollable bleeds associated with Xarelto usage, nor did Defendants warn or otherwise advise on how to intervene and stabilize a patient should a bleed occur.

137.    Aside from the warning labels, Defendants did not issue a Dear Doctor letter that sufficiently outlined the dangers of administering Xarelto to a patient.  In the September 2013 letter to healthcare professionals, Defendants do not mention the lack of an antidote in Xarelto should serious and fatal bleeding occur while a patient was taking Xarelto.

138.    The current warning is simply inadequate. The Defendants have failed and continue to fail in their duties to warn and protect patients, consumers, medical community and general public.

139.    Even if the warnings were sufficient, which Plaintiffs herein strongly denies, Xarelto still lacks any benefit sufficient to tolerate the extreme risk and increased costs posed by the ingestion of this drug. Xarelto is quite simply dangerous and defective as formulated. The Defendants should withdraw Xarelto from the market.

140.    As the manufacturers and distributors of Xarelto, Defendants knew or should have known that Xarelto's use was associated with irreversible bleeds.

141.    With the knowledge of the true relationship between use of Xarelto and irreversible bleeds; rather than taking steps to pull the drug off the market, provide strong warnings, or create an antidote, Defendants promoted and continue to promote Xarelto as a safe and effective treatment.

142.    Upon information and belief, Defendants have also sought to induce physicians and others to prescribe Xarelto by providing them with various forms of remuneration, including payments disguised as grants or consulting fees, expensive meals, lavish entertainment, and other valuable goods and services.

143.    According to data released by the Centers for Medicare and Medicaid Services (http://cms.gov), Defendants augmented their false and misleading promotion efforts through extensive payments and gifts to physicians to induce them to prescribe Xarelto. The Defendants' marketing departments directed some of these inducements (such as research payments and consulting fees), while Defendants' sales representatives arranged for other inducements (such as food and beverage, travel and lodging, sponsored educational presentations, and promotional speaking engagements).

144.    Beginning in 2014, the federal government mandated that pharmaceutical and medical device manufacturers publicly report payments made to doctors and teaching hospitals. From the last five months of 2013 through September 2014, Defendants had spent $6.9 million in general payments, and $1.8 million in research payments.

145.    Defendants' "Xarelto®…is estimated to be the 19th-best-selling drug in the world by 2018, according to the report. Worldwide sales of Xarelto® are expected to jump from $596 million in 2012 to $3.7 billion in 2018."[18]

---

[18] http://www.drugwatch.com/2013/07/23/blood-thinner-growth-more-risk/

146.    While Defendants enjoy great financial success from their expected blockbuster drug, Xarelto, they continue to place American citizens at risk of severe bleeds and death.

147.    Purchasers, including Plaintiffs and Plaintiffs' members who have been prescribed and paid for Xarelto to reduce the risk of stroke due to Afib or to reduce the risk of blood clots, DVT and PE following knee or hip replacement surgery, have several alternative safer products available to treat the conditions and have not been adequately warned about the significant risks and lack of benefits associated with Xarelto therapy.

148.    Defendants, through their affirmative misrepresentations and omissions, actively concealed from the Plaintiffs, patients, prescribing physicians, pharmacy benefits managers, and the medical community, the true and significant risks associated with Xarelto use.

149.    As a result of Defendants' actions, Plaintiffs, patients, prescribing physicians, pharmacy benefits managers, and the medical community were unaware, and could not have reasonably known or have learned through reasonable diligence, that consumers would be exposed to the risks identified in this Complaint, and that those risks were the direct and proximate result of Defendants' acts, omissions, and misrepresentations.

C.    **Harm to Plaintiffs and the Class**

150.    Defendants' deceptive and misleading marketing scheme was calculated to ensure Xarelto was prescribed in great quantities by physicians for patients as a "one size fits all" drug and misinformed patients, and their healthcare providers, as to the necessity of routinely monitoring any patient requiring a blood thinning agent.

151.    Defendants knew that without their fraudulent scheme, consumers and third-party payors would not have paid for Xarelto instead of less-costly, but equally or more effective drugs already available such as warfarin. Defendants' promotion and marketing of Xarelto's safety and

effectiveness has been highly successful, resulting in Defendants receiving billions of dollars in profits, representing ill-gotten gains to which Defendants were not entitled.

152.    Upon information and belief, despite life-threatening bleeding findings in a clinical trial and other clinical evidence, Defendants failed to adequately conduct complete and proper testing of Xarelto prior to filing their New Drug Application for Xarelto.

153.    Upon information and belief, from the date Defendants received FDA approval to market Xarelto, Defendants made, distributed, marketed, and sold Xarelto without adequate warning to patients, prescribing physicians, healthcare providers, and third-party payors that Xarelto was associated with and/or could cause life-threatening bleeding, presented a risk of life-threatening bleeding in patients who used it, and that Defendants had not adequately conducted complete and proper testing and studies of Xarelto with regard to severe side-effects, specifically life-threatening bleeding.

154.    Upon information and belief, Defendants concealed and failed to completely disclose their knowledge that Xarelto was associated with or could cause life-threatening bleeding as well as their knowledge that they had failed to fully test or study said risk.

155.    Upon information and belief, Defendants ignored the association between the use of Xarelto and the risk of developing life-threatening bleeding.

156.    Upon information and belief, Defendants failed to warn patients and their healthcare providers regarding the need for blood monitoring, dose adjustments and failed to warn of the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening, associated with Xarelto.

157.   Defendants' failure to disclose information that they possessed regarding the failure to adequately test and study Xarelto for life-threatening bleeding risk further rendered warnings for this medication inadequate.

158.   Defendants' fraudulent concealment and misrepresentations were designed to prevent, and did prevent, the public and the medical community at large from discovering the risks and dangers associated with Xarelto.

159.   Plaintiffs' members were prescribed and began taking Xarelto at the direction of a physician.  Plaintiffs' members and their prescribing physicians would not have used Xarelto had Defendants properly disclosed the risks associated with its use.

160.   Plaintiffs contract with an outside vendor to provide pharmacy benefit management services for the drug component of their healthcare plans.  Plaintiffs paid or incurred costs for prescriptions of Xarelto dispensed to covered lives in several states.  These prescriptions would have been restricted and/or priced differently if the FDA, pharmacy benefit managers, and/or prescribers had truthful and complete information about the drug.

161.   Xarelto is now considered the leading anticoagulant on the market in terms of overall sales.  A one-month supply of Xarelto typically sells for between $340 and $400.[19] Consumers either paid for the drug completely out of pocket or paid their co-pay.  The typical third-party payor co-payment ranges from 70% to 80% of the total cost of the drug depending on the members' prescription co-pay plan. This payment represents a dramatic increase in third-party payors' costs when compared to other safer, less expense anticoagulants.  Previously, the most prevalent anticoagulant had been warfarin, which has a typical retail price for a one-month prescription of approximately $5 - $15,[20] of which the typical third-party payor co-payment

---

[19] http://www.goodrx.com/xarelto?drug-name=xarelto (last accessed on Aug. 26, 2015).
[20] http://www.goodrx.com/warfarin?drug-name=warfarin (last accessed on Aug. 26, 2015).

represents a much lower cost based on the members' co-pay plan.  Plaintiffs have paid and/or provided reimbursement for some or the entire purchase price for Xarelto over other readily available, safer, and less costly drugs such as Warfarin and other anticoagulants.  As a result of the fraudulent and/or misleading conduct of Defendants as alleged herein, consumers and third-party payors have paid for Xarelto in greater quantities and at higher prices than they would have but for Defendants' misconduct.

162.    Pharmacy Benefit Managers ("PBMs") prepare a "formulary," which is a list of the drugs that are approved for coverage by their third-party payor clients, such as Plaintiffs and other similar Class Members. In order for a drug to be listed on the formulary, it must be assessed by the PBM for clinical safety, efficacy and cost effectiveness.  Further, where a PBM finds that a drug has an advantage over competing drugs, that drug is given a preferred status on its formulary.

163.    The level of preference on the formulary corresponds with the amount that a plan participant must contribute as a co-payment when purchasing a drug – the higher the preference, the lower the co-payment, the more likely that drug will be purchased by a prescription plan's beneficiary in lieu of a cheaper or more cost effective alternative, and *vice versa*.  As such, the higher a drug's preference on the formulary, the more likely it is for a physician to prescribe that drug.  This system is well known to pharmaceutical manufacturers, including Defendants.

164.    Due to the large number of drugs purchased through third-party payors, it is vital to a drug manufacturer's economic interests to have its products listed on as many formularies as possible.

165.    By directly and falsely promoting Xarelto as safe and effective to prescribe as a "one size fits all" blood thinner, and by actively suppressing and failing to timely disclose

negative data and results of drug studies to avoid or dismiss any safety concerns raised by physicians and the medical community, Defendants influenced PBMs to place Xarelto on their formularies without any restrictions.

166.    Through Defendants' misleading drug labels and the adulterated clinical findings for Xarelto, Defendants falsely promoted Xarelto as safe and effective as a blood thinner without routine blood monitoring directly to PBMs in order to get Xarelto placed on, or placed more favorably than, its competitor drugs on the PBM formularies.

167.    Patients, physicians, PBMs, third-party administrators, pharmacy and therapeutic committees, and third-party payors detrimentally relied on Defendants' misrepresentations of Xarelto's safety.  Physicians detrimentally relied on Defendants' misrepresentations of Xarelto's safety and efficacy in prescribing the drugs for their patients. Patients detrimentally relied on Defendants' misrepresentations of Xarelto's safety and efficacy in purchasing the drugs. PBMs, third-party administrators, and pharmacy and therapeutic committees detrimentally relied on Defendants' misrepresentations of Xarelto's safety and efficacy when approving and/or placing the drugs on formularies.  Third-party payors detrimentally relied on Defendants' misrepresentations of Xarelto's safety and efficacy in reimbursing and/or paying for prescriptions of Xarelto's for their members and has suffered actual damages.

168.    Defendants' failure to adequately inform consumers, prescribing physicians, third-party payors and those in the medical community of the negative data and study results indicating that Xarelto was not proven as safe and effective for use as a blood thinner without routine blood monitoring because it carried an undisclosed and increased risk of bleeding and other serious adverse events. Their false and misleading promotion of Xarelto's® safety over other safer, less expensive treatments such as Warfarin and other anticoagulants, caused patients

and third-party payors to pay for Xarelto in greater quantities and at higher prices than they would have but for Defendants' misconduct.

## V.     CLASS ACTION ALLEGATIONS

169.     Plaintiffs bring this action on behalf of themselves and, under Fed. R. Civ. P. 23(a) and 23(b)(3) as a representatives of the proposed Class defined as follows:

> "All persons or entities in the United States and its territories (other than governmental entities), who purchased, paid, and/or reimbursed, in whole or in part, for Xarelto during the period from July 1, 2011 through the present (the "Class Period")."

170.     The following persons or entities are excluded from the proposed Class:

a.     Defendants and their officers, directors, management, employees, subsidiaries, or affiliates;

b.     All persons or entities who purchased Xarelto for purposes of resale or directly from Defendants or their affiliates;

c.     All federal or state governmental entities;

d.     Any co-conspirators; and

e.     The judges in this case and any members of their immediate families.

171.     The Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the prerequisites of numerosity, commonality, typicality, and adequacy.

172.     Numerosity – Federal Rule of Civil Procedure 23(a)(1).  Members of the Class are so numerous that joinder is impracticable. Plaintiffs believe the Class includes thousands of consumers and third-party payors.

173.     Commonality – Federal Rule of Civil Procedure 23(a)(2). Questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.  Specifically, Defendants' misconduct was directed at all members of the Class, their members, their PBMs, and respective prescribing physicians. Thus, all members of

the Class have common questions of fact and law, *i.e.*, whether Defendants engaged in a comprehensive program and well-orchestrated scheme of deceptive and misleading marketing in promoting the use of Xarelto.  This and other common questions of law and fact include, but are not limited to:

a. Whether Plaintiffs and members of the Class paid more for Xarelto than for other equally or more effective drugs that were available at a cheaper price;

b. Whether Defendants engaged in a conspiracy to promote the sales of and suppress adverse information about Xarelto;

c. Whether, in marketing and selling Xarelto, Defendants failed to disclose the dangers and health risks of ingesting the drug;

d. Whether Defendants failed to warn adequately of the adverse effects of Xarelto for treatment as an anticoagulant without the need for routine blood monitoring;

e. Whether Defendants misrepresented in their advertisements, promotional materials and other materials, among other things, the safety and lack of dangers and health risks of Xarelto;

f. Whether Defendants knew or should have known that the ingestion of Xarelto would place ingesting patients at increased risk for developing life-threatening bleeds;

g. Whether Defendants manufactured, marketed, distributed, and sold Xarelto notwithstanding their knowledge of the drug's dangerous nature;

h.     Whether Defendants knowingly omitted, suppressed and/or concealed material facts about the unsafe and defective nature of Xarelto from government regulators, healthcare professionals, third-party payors, the medical community and/or the consuming public;

i.     Whether Defendants engaged in misleading and/or deceptive scheme of improperly marketing and selling Xarelto for treatment of indications for which the drug was not lawfully approved;

j.     Whether Defendants engaged in a pattern or practice that directly caused Plaintiffs and members of the Class to pay for Xarelto prescriptions that were non-medically necessary uses;

k.     Whether Defendants engaged in deceptive and/or misleading activity that directly caused Plaintiffs and members of the Class to pay for Xarelto prescriptions that were for non-FDA approved uses;

l.     Whether Defendants engaged in deceptive and/or misleading activity that directly caused Plaintiffs and members of the Class to pay more for Xarelto prescriptions than for other efficacious drugs that were available at a cheaper price;

m.     Whether Defendants engaged in deceptive and/or misleading activity with the intent to defraud Plaintiffs and members of the Class;

n.     Whether Defendants are liable to Plaintiffs and members of the Class for damages for conduct actionable under RICO;

o.      Whether Defendants are is liable to Plaintiffs and members of the Class for damages for conduct actionable under various state Consumer Protection Statutes; and

p.      Whether Defendants unjustly enriched themselves by its acts and omissions, at the expense of Plaintiffs and members of the Class.

The common questions of law and fact identified above are common to the Class and predominate over questions affecting only individual members.

174.   Typicality – Federal Rule of Civil Procedure 23(a)(3). Plaintiffs' claims are typical of the claims of the Class because its claims arise from the same course of conduct by Defendants, *i.e.*, false, misleading, false and deceptive marketing in promoting use of Xarelto. As a result, Plaintiffs and members of the Class have been injured as a result of the Defendants' wrongful conduct described herein.

175.   Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4). Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiffs are coincident with, and not antagonistic to, those of the other Class Members. Plaintiffs are represented by counsel with experience in the prosecution of class action litigation, and with particular experience with pharmaceutical litigation. Accordingly, the interests of the Class will be adequately protected and advanced.

176.   Adjudicating the claims of the members of the Class as a class action is superior to any other available methods because it allows for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitious litigation and will permit a large number of similarly situated persons to adjudicate their common claims

in a single forum simultaneously, efficiently, and without the duplication of effort and expense that would result from prosecuting numerous individual actions.

177.     Proceeding as a class action is a superior method for fairly and efficiently adjudicating this controversy. There are no known circumstances presenting difficulties in management that would preclude maintenance as a class action. Furthermore, any potential difficulties in maintaining this action as a class action are greatly outweighed by the benefits of proceeding through the class mechanism – *i.e.*, providing persons and entities a method for pursuing claims that would not be practicable if pursued on an individual basis.

## VI.     CLAIMS FOR RELIEF

### COUNT I - FRAUDULENT MISREPRESENTATION

178.     Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

179.     From the time Xarelto was first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed, and up to the present, Defendants made misrepresentations to Plaintiffs, its members, medical providers and the general public, including but not limited to the misrepresentation that Xarelto was safe, fit and effective for human use. At all times mentioned, Defendants conducted sales and marketing campaigns to promote the sale of Xarelto and willfully deceived Plaintiffs, its members, medical providers and the general public as to the health risks and consequences of the use of Xarelto.

180.     Defendants made representations without any reasonable ground for believing them to be true. These representations were made directly by Defendants, by sales representatives and other authorized agents of Defendants, and in publications and other written

materials directed to physicians, medical patients, PBMs, third-party payors and the public, with the intention of inducing reliance and the prescription, purchase, and/or use of Xarelto.

181.    Defendants had actual knowledge of facts that their representations in the package insert, the PDR monograph, and other literature were false and misleading.  Defendants had an absolute duty to disclose the true facts regarding the safety of Xarelto to physicians, their patients and the medical community. Defendants negligently failed to fulfill that duty. Furthermore, Defendants had a duty to ensure that they had a reasonable basis for making the representations described above, to exercise reasonable care in making those representations, to accurately make those representations, and to not make misrepresentations concerning Xarelto.  Defendants failed to fulfill their duty in all of these respects.

182.    Important information regarding the risk of Xarelto was in the exclusive control of Defendants and was exclusively known by Defendants.  In the furtherance of Defendants' own interests, Defendants disseminated false information regarding Xarelto to physicians and Plaintiffs' members and did so knowing that the safety of Xarelto depended on the accuracy of that information. Further, Defendants knew and expected that recipients of that information would rely on the information, that the recipients would take action based upon the information, that individuals would be put in peril by such actions, and that those individuals would suffer physical and economic harm as a result.

183.    Defendants fraudulently, negligently, falsely and/or deceptively represented or knowingly omitted, suppressed or concealed facts of such materiality regarding the risk-benefit profile and lack of efficacy of Xarelto.

184.    Defendants remained silent and/or offered misleading information despite the knowledge of the growing public acceptance of misinformation and misrepresentations regarding

both the risk-benefit profile and lack of efficacy of Xarelto. Defendants remained silent because the prospect of huge profits – too the significant detriment of Plaintiffs and members of the Class.

185.    Defendants were otherwise careless, fraudulent, negligent, grossly negligent, and acted with willful and wanton disregard for the rights of Plaintiffs and members of the Class in the representations regarding the risk-benefit profile and lack of efficacy of Xarelto.

186.    Defendants failed to use reasonable care or competence in obtaining and communicating such information to physicians, patients, PBMs, third-party payors and the public, and said information was, in fact, false and/or omitted material facts.

187.    The material misrepresentations and omissions of Defendants were likely to induce a reasonable person to manifest their assent without being fully informed of all the facts.

188.    The representations by Defendants, and each of them, were made with the intention of inducing reliance and the prescription, purchase, and use of Xarelto. Plaintiffs and members of the Class justifiably relied upon the information provided by Defendants to their economic detriment.

189.    In reliance on the misrepresentations by the Defendants, the Plaintiffs approved the use of and payment for claims related to Xarelto. If Plaintiffs had known the truth and the facts concealed by the Defendants, Plaintiffs would not have paid for and/or reimbursed for prescriptions of Xarelto.

190.    As a result of Defendants' fraud and misrepresentations, Plaintiffs and members of the Class have suffered economic loss and damages as alleged herein.

## COUNT II - FRAUDULENT CONCEALMENT

191.    Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

192.    At all times during the course of dealing between Defendants and Plaintiffs, Plaintiffs' members and/or their healthcare providers, and/or the FDA, Defendants misrepresented the safety of Xarelto for its intended use.

193.    Defendants knew or were reckless in not knowing that its representations were false.

194.    In representations to Plaintiffs, Plaintiffs' members and their healthcare providers, and/or the FDA, Defendants fraudulently concealed and intentionally omitted the following material information:

      a.    that Xarelto was not safe;

      b.    that the risks of adverse events with Xarelto were high;

      c.    that the risks of adverse events with Xarelto were not adequately tested and/or known by Defendants;

      d.    that the Defendants were aware of dangers in Xarelto, in addition to and above and beyond those associated with alternative medications;

      e.    that Xarelto was defective, and that it caused dangerous side effects;

      f.    that patients needed to be monitored more regularly than normal while using Xarelto;

      g.    that Xarelto was manufactured negligently;

      h.    that Xarelto was manufactured defectively;

      i.    that Xarelto was manufactured improperly;

      j.    that Xarelto was designed negligently;

      k.    that Xarelto was designed defectively; and

l.      that Xarelto was designed improperly.

195.   Defendants were under a duty to disclose to Plaintiffs, Plaintiffs' members and their physicians, healthcare providers, and/or the FDA the defective nature of Xarelto, including but not limited to the increased risk of bleeding events.

196.   Defendants had sole access to material facts concerning the defective nature of the product and its propensity to cause serious and dangerous side effects, and hence, cause damage to persons who used Xarelto, including the Plaintiffs' members, in particular.

197.   Defendants' concealment and omissions of material facts concerning, *inter alia*, the safety of Xarelto were made purposefully, willfully, wantonly, and/or recklessly, to mislead Plaintiffs, Plaintiffs' members, their physicians and healthcare providers into detrimental reliance on misleading information, the continued use of Xarelto, and the ongoing prescribing, dispensing and purchasing of their product.

198.   Defendants knew that Plaintiffs, Plaintiffs' members, their physicians, healthcare providers, and/or the FDA had no way to determine the truth behind Defendants' concealment and omissions, and that these included material omissions of facts surrounding Xarelto, as set forth herein.

199.   Plaintiffs, Plaintiffs' members, their physicians, and/or healthcare providers reasonably relied on Defendants' information that negligently, fraudulently and/or purposefully did not include facts that were concealed and/or omitted by Defendants.

200.   As a result of Defendants' fraudulent concealment and omissions of material facts concerning the true risk-benefit profile and safety of Xarelto, Plaintiffs and members of the Class have suffered economic loss and damages as alleged herein.

## COUNT III - FRAUD AND DECEIT

201.    Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

202.    Defendants conducted research and used Xarelto as part of their research, and subsequently distributed false information assuring the public, the Plaintiffs, Plaintiffs' members, their physicians, healthcare providers, and/or the FDA that Xarelto was safe and effective for use.

203.    Defendants had a duty when disseminating information to the public to disseminate truthful information and a parallel duty not to deceive the public and Plaintiffs, Plaintiffs' members, healthcare providers, PBMs and/or the FDA.

204.    The information distributed by Defendants intentionally included representations that Defendants' drug Xarelto carried the same risks, hazards, and/or dangers as other alternative medications.

205.    Upon information and belief, Defendants intentionally suppressed, ignored and disregarded test results not favorable to the Defendants, and results that demonstrated that Xarelto was not safe and effective as advertised.

206.    It was the purpose of Defendants in making these representations to deceive and defraud the public, the FDA, and/or the medical community, to gain the confidence of the public, healthcare providers, the FDA, PBMs, Plaintiffs, Plaintiffs' members and their physicians, to falsely ensure the quality and fitness for use of Xarelto and induce the public, and/or the Plaintiffs, Plaintiffs' members and their physicians to purchase, request, dispense, prescribe, recommend, and/or continue to use Xarelto.

207.   Defendants made claims and representations in its documents submitted to the FDA, to the public, to healthcare providers, PBMs, Plaintiffs, Plaintiffs' members and their physicians that Xarelto did not present health and/or safety risks greater than alternative forms of medication such as warfarin. These materially false representations were intended by Defendants to induce and mislead physicians to prescribe Xarelto instead of alternative, cheaper treatment options with more favorable risk-benefit profiles.

208.   As alleged above, these representations and others made by Defendants were false when made, and/or were made with a pretense of actual knowledge when knowledge did not actually exist, and/or were made recklessly and without regard to the actual facts.

209.   Defendants, through their public relations efforts (which included but were not limited to the public statements and press releases) knew or should have known that the public, healthcare providers, PBMs, Plaintiffs, Plaintiffs' members and their physicians would rely upon the information being disseminated.

210.   Defendants utilized direct to consumer advertising to market, promote, and/or advertise Xarelto.  Plaintiffs, Plaintiffs' members and their physicians, PBMs and healthcare providers did in fact rely on and believe the Defendants' representations to be true at the time they were made and relied upon the representations and were thereby induced to purchase, prescribe, or use Xarelto.

211.   At the time the representations were made, the Plaintiffs, Plaintiffs' members and their physicians, PBMs and healthcare providers did not know the truth with regard to the dangerous and serious health and/or safety concerns of Xarelto.

212.   Plaintiffs, Plaintiffs' members and their physicians, PBMs and healthcare providers did not at that time discover the true facts with respect to the dangerous and serious

health and/or safety concerns, or the false representations of Defendants.  Neither could the Plaintiffs, Plaintiffs' members and their physicians, PBMs and healthcare providers have discovered with reasonable diligence the true facts of the dangerous nature of Xarelto.

213.    Had the Plaintiffs, Plaintiffs' members and their physicians, PBMs and healthcare providers known the true facts with respect to the dangerous and serious health and/or safety concerns of Xarelto, Plaintiffs and Plaintiffs' members would not have purchased, used and/or relied on Defendants' drug Xarelto.

214.    Defendants' aforementioned conduct constitutes fraud and deceit, and was committed and/or perpetrated willfully, wantonly and/or purposefully on the Plaintiffs, Plaintiffs' members and their physicians, PBMs and healthcare providers.

215.    In reasonable reliance upon these material misrepresentations of Defendants, physicians were in fact induced to prescribe, and Plaintiffs and members of the Class were induced to purchase Xarelto instead of alternative, cheaper treatment option.

216.    As a direct and proximate consequence of Defendants' fraudulent misrepresentations and material omissions, Plaintiffs and members of the Class were damaged by:

      a.   failing to receive full value for their direct or indirect payment of money for Xarelto;

      b.   incurring personal debt and/or out-of-pocket expenditures to purchase Xarelto;

      c.   payment for Xarelto on behalf of purchasers; and

      d.   foregoing safe and effective alternative treatment options in reliance upon Defendants' misrepresentations that Xarelto was effective and had a positive risk-benefit profile.

217.    As a result of the foregoing acts and omissions concerning the true risk-benefit profile and safety of Xarelto, Plaintiffs and members of the Class have suffered economic loss and damages as alleged herein.

## COUNT IV - VIOLATION OF ILLINOIS CONSUMER PROTECTION ACT
### (Ill. Consumer Fraud and Deceptive Bus. Practices Act, 815 Ill. Comp. Stat. 505/1, et. seq.)

218.    Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

219.    Plaintiff ASD Fund brings this Count pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et. seq*.

220.    The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2, makes it unlawful to engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce; including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact.

221.    A business practice is unfair under Illinois law when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

222.    Defendants' deceptive and unlawful marketing practices within the State of Illinois offend public policy and are fundamentally immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.  Defendants' comprehensive deceptive marketing program for Xarelto combined with its misleading drug labels, misled consumers and third-party payors about Xarelto's safety and efficacy. This conduct offends any notion of public policy and is truly unethical because it effectively promotes the use of a drug with known side

effects but whose efficacy is lacking.  Such conduct is particularly egregious when it is directed at a class of people who are particularly vulnerable to malicious and predatory marketing schemes.

223.    As described herein, Defendants deliberately engaged in deceptive and unlawful marketing in violation of 815 Ill. Comp. Stat. 505/2 by representing to Illinois consumers, prescribing healthcare providers and third-party payors through deceptive promotion and the misleading drug labels, that Xarelto was safe and effective in treating patients for the purposes described above.  These representations were materially false and misleading.

224.    In addition, Defendants have committed, *inter alia*, the following unlawful and deceptive marketing practices pursuant to 815 Ill. Comp. Stat. 510/2:

a.    510/2(5): Defendants knowingly represented, through deceptive promotion and drug labels, that Xarelto had a specific characteristic, use, or benefit that it did not have, *i.e.,* that Xarelto was safe and effective for the treatment of patients as described above.

b.    510/2(7): Defendants knowingly represented, through deceptive promotion and misleading drug labels, that Xarelto was of a particular quality or standard, *i.e.,* capable of effectively treating patients as described above, when in truth, Defendants knew or should have known that Xarelto was not more effective at treating patients than, older, less expensive alternatives.

c.    510/2(9): Defendants advertised and sold Xarelto indicating, through deceptive promotion and misleading drug labels, that Xarelto would be

more efficiently treat patients than warfarin, when Defendants never intended to provide a product that would perform as advertised.

d.   510/2(12): Defendants, through deceptive promotion and misleading drug labels, engaged in a practice that was misleading, false, or deceptive when it represented to Illinois consumers, prescribing healthcare providers and third-party payors such as Plaintiffs that Xarelto was clinically more effective for treating patients than warfarin. These deceptive acts had a likelihood of confusing or misleading Illinois consumers, prescribing healthcare providers, third-party payors and the medical community.

225.   The facts Defendants misrepresented were material to Plaintiff ASD Fund and members of the Class decisions about whether to purchase Xarelto, in that they concerned facts that would have been important to a reasonable consumer in making a decision whether to purchase Xarelto.

226.   Defendants' misrepresentations and deceptive acts and omissions were likely to mislead reasonable consumers acting under the circumstances such as Plaintiff ASD Fund.

227.   Defendants intended that Plaintiff ASD Fund, Plaintiff's members and their physicians, PBMs and healthcare providers would rely on their materially deceptive practices and that Plaintiffs and members of the Class would purchase or pay for Xarelto as a consequence of the deceptive practices.

228.   As a proximate result of Defendants' deceptive and unlawful marketing practices, Plaintiff ASD Fund and members of the Class have suffered damages by purchasing or reimbursing for prescriptions of Xarelto that they would not have paid had Defendants not engaged in unfair and deceptive conduct in violation of 815 Ill. Comp. Stat. 505/1, *et. seq.*

229.     As a direct and proximate result of Defendants' wrongful conduct as alleged herein, Plaintiffs and members of the Class are entitled to compensatory damages, treble damages, attorneys' fees and costs of this suit.

### COUNT V - VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
*(Louisiana Unfair Trade Practices and Consumer Protection Law, LSA-R.S. 51:1401, et. seq.)*

230.     Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

231.     Plaintiffs BCBSLA and HMO Louisiana, Inc. bring this Count individually and not on behalf of a Class pursuant to Louisiana Unfair Trade Practices and Consumer Protection Law ("LUPTA"), R.S. 51:1401, *et seq*.

232.     Defendants had a statutory duty to refrain from unfair or deceptive acts or practices in the manufacture, promotion, and sale of Xarelto to Plaintiffs BCBSLA and HMO Louisiana, Inc. The direct and proximate result of Defendants' misrepresentations, unlawful schemes and courses of conduct was the inducement of Plaintiffs BCBSLA and HMO Louisiana, Inc. to purchase, reimburse or pay for Xarelto.

233.     Defendants intended that Plaintiffs BCBSLA and HMO Louisiana, Inc. rely on their materially deceptive practices to purchase Xarelto as a consequence of the deceptive practices, including Defendants' misrepresentations and omissions of material fact by representing to consumers, prescribing healthcare providers and third-party payors through deceptive promotion and the misleading drug labels, that Xarelto was safe and effective in treating patients for the purposes described above.  These representations were materially false and misleading.

234.    Defendants' deceptive representations and material omissions to Plaintiffs BCBSLA and HMO Louisiana, Inc. were, and are unfair and deceptive acts and practices.

235.    The facts Defendants misrepresented were material to Plaintiffs BCBSLA and HMO Louisiana, Inc. and its decision about whether to purchase Xarelto, in that they concerned facts that would have been important to a reasonable consumer in making a decision whether to purchase Xarelto.

236.    Defendants' misrepresentations and deceptive acts and omissions were likely to mislead reasonable consumers acting under the circumstances such as Plaintiffs BCBSLA and HMO Louisiana, Inc.

237.    Plaintiffs BCBSLA and HMO Louisiana, Inc. were deceived by Defendants' misrepresentations.

238.    Defendants intended that Plaintiffs BCBSLA and HMO Louisiana, Inc., Plaintiffs' members and their physicians, PBMs and healthcare providers would rely on their materially deceptive practices and that Plaintiffs BCBSLA and HMO Louisiana, Inc. would purchase or pay for Xarelto as a consequence of the deceptive practices.

239.    As a proximate result of Defendants' deceptive and unlawful marketing practices, Plaintiffs BCBSLA and HMO Louisiana, Inc. have suffered damages by purchasing and/or reimbursing for prescriptions of Xarelto that it would not have paid had Defendants not engaged in unfair and deceptive conduct in violation of LUTPA, R.S. 51:1401, *et seq.*

240.    As a direct and proximate result of Defendants' wrongful conduct as alleged herein, Plaintiffs BCBSLA and HMO Louisiana, Inc. have suffered an ascertainable loss and is entitled to compensatory damages, treble damages, attorneys' fees and costs of this suit.

## COUNT VI – VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT
### *(New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, et seq.)*

241.     Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

242.     Plaintiffs bring this Count pursuant to the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, *et seq.*

243.     At all relevant times, the New Jersey Consumer Fraud Act has prohibited consumer fraud in connection with the sale or advertisement of merchandise:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice; provided, however, that nothing herein contained shall apply to the owner or publisher of newspapers, magazines, publications or printed matter wherein such advertisement appears, or to the owner or operator of a radio or television station which disseminates such advertisement when the owner, publisher, or operator has no knowledge of the intent, design or purpose of the advertiser. (*see* N.J.S.A. § 56:8-2)

244.     Pursuant to the N.J.S.A., Defendants had a statutory duty to refrain from unfair or deceptive acts or practices in the manufacture, promotion, and sale of Xarelto to Plaintiffs and members of the Class. The direct and proximate result of Defendants' misrepresentations, unlawful schemes and courses of conduct was the inducement of Plaintiffs and members of the Class to purchase, reimburse or pay for Xarelto.

245.     Defendants intended that Plaintiffs and members of the Class rely on their materially deceptive practices to purchase Xarelto as a consequence of the deceptive practices, including Defendants' misrepresentations and omissions of material fact by representing to

consumers, prescribing healthcare providers and third-party payors through deceptive promotion and the misleading drug labels, that Xarelto was safe and effective in treating patients for the purposes described above.  These representations were materially false and misleading.

246.   In addition, Defendants have committed, *inter alia*, the following unlawful and deceptive marketing practices with respect to the true nature of Xarelto:

      a.    Defendants knowingly represented, through deceptive promotion and drug labels, that Xarelto had a specific characteristic, use, or benefit that it did not have, *i.e.,* that Xarelto was safe and effective for the treatment of patients as described above.

      b.    Defendants knowingly represented, through deceptive promotion and misleading drug labels, that Xarelto was of a particular quality or standard, *i.e.,* capable of effectively treating patients as described above, when in truth, Defendants knew or should have known that Xarelto was not more effective at treating patients than, older, less expensive alternatives.

      c.    Defendants advertised and sold Xarelto indicating, through deceptive promotion and misleading drug labels that Xarelto would be more efficiently treat patients than warfarin, when Defendants never intended to provide a product that would perform as advertised.

      d.    Defendants, through deceptive promotion and misleading drug labels, engaged in a practice that was misleading, false, or deceptive when it represented to consumers, prescribing healthcare providers and third-party payors such as Plaintiffs that Xarelto was clinically more effective for treating patients than warfarin. These deceptive acts had a likelihood of

confusing or misleading consumers, prescribing healthcare providers, third-party payors and the medical community.

e.   Defendants omitted material information known to them in order to induce Plaintiffs and members of the Class to purchase and/or reimburse for Xarelto.

247.   Defendants' deceptive representations and material omissions to Plaintiffs and members of the Class were, and are unfair and deceptive acts and practices.

248.   The facts Defendants misrepresented were material to Plaintiffs and members of the Class decisions about whether to purchase Xarelto, in that they concerned facts that would have been important to a reasonable consumer in making a decision whether to purchase Xarelto.

249.   Defendants' misrepresentations and deceptive acts and omissions were likely to mislead reasonable consumers acting under the circumstances such as Plaintiffs.

250.   Plaintiffs were deceived by Defendants' misrepresentations.

251.   Defendants intended that Plaintiffs, Plaintiffs' members and their physicians, PBMs and healthcare providers would rely on their materially deceptive practices and that Plaintiffs and members of the Class would purchase or pay for Xarelto as a consequence of the deceptive practices.

252.   As a proximate result of Defendants' deceptive and unlawful marketing practices, Plaintiffs and members of the Class have suffered damages by purchasing or reimbursing for prescriptions of Xarelto that they would not have paid had Defendants not engaged in unfair and deceptive conduct in violation of N.J.S.A. § 56:8-1, *et seq.*

253.   As a direct and proximate result of Defendants' wrongful conduct as alleged herein, Plaintiffs and members of the Class have suffered an ascertainable loss and are entitled to compensatory damages, treble damages, attorneys' fees and costs of this suit.

## COUNT VII - VIOLATIONS OF OTHER STATE CONSUMER PROTECTION STATUTES

254.   Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

255.   Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent act or practices in violation of the state consumer protection statutes listed below. The direct and proximate result of Defendants' misrepresentations, unlawful schemes and courses of conduct was the inducement of Plaintiffs and members of the Class to purchase, reimburse or pay for Xarelto.

256.   The actions and failures to act of Defendants (including the false and misleading representations and omissions of material facts regarding the true safety and risk-benefit profile of Xarelto and the above described course of fraudulent conduct and fraudulent concealment) constitute acts, uses, or employment by Defendants of unconscionable commercial practices, deception, fraud, misrepresentations and the knowing concealment, suppression or omission of material facts with the intent that others rely upon such concealment, suppression, or omission of material facts in connection with the sale of merchandise of Defendants, all in violation of the consumer protection statutes.

257.   Defendants unfairly, unconscionably, and deceptively advertised, labeled, marketed, represented and sold Xarelto to Plaintiffs and members of the Class without disclosing the true risks and lack of safety and efficacy, through their comprehensive and deceptive promotion program, combined with its misleading drug labels.

258.    Because Defendants unfairly, unconscionably, and deceptively advertised, labeled, marketed, represented and sold Xarelto, Defendants knew that Xarelto had a specific characteristic, use or benefit that it did not have, *i.e.,* that Xarelto was not a more effective or safer treatment than older, cheaper treatment options.

259.    Physicians relied upon Defendants' misrepresentations and omissions in prescribing Xarelto to patients.  Defendants' misrepresentations and omissions caused Plaintiffs and members of the Class to pay for Xarelto.

260.    Defendants intended that Plaintiffs, physicians, consumers, third-party payors, PBMs, and the medical and scientific community would rely on their materially deceptive practices; and that Plaintiffs and members of the Class would purchase or pay for Xarelto as a consequence of the deceptive practices, including Defendants' misrepresentations and omissions of material fact to develop a niche market.  Defendants' deceptive representations and material omissions to Plaintiffs and members of the Class were and are unfair and deceptive acts and practices.  Plaintiffs and members of the Class were deceived by Defendants' misrepresentations.

261.    Defendants' actions, as complained of herein, constitute unfair, unconscionable, deceptive or fraudulent acts, or trade practices in violation of state consumer protection statutes.

262.    As a proximate result of Defendants' misrepresentations, Plaintiffs and members of the Class have suffered an ascertainable loss, in an amount to be determined at trial, in that they paid millions of dollars for Xarelto that they would not have paid had Defendants not engaged in unfair and deceptive conduct. This injury is of the type the state consumer protection statutes were designed to prevent and directly results from Defendants' unlawful conduct.

263.    Under the statutes listed herein to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices, Defendants are the supplier, manufacturer, advertiser, and seller that are subject to liability for unfair, deceptive, fraudulent and unconscionable consumer sales practices.

264.    By engaging in the foregoing conduct, Defendants have violated the following state Unfair and Deceptive Trade Practices and Consumer Fraud laws:

a.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq.*;

b.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1522, *et seq.*;

c.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ARK. CODE ANN. § 4-88-101, *et seq.*;

d.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*;

e.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or have made false representations in violation of COLO. REV. STAT. § 6-1-105, *et seq.*;

f.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of CONN. GEN. STAT. § 42-110b, *et seq.*;

g.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of DEL. CODE ANN. tit. 6, § 2511, *et seq.*;

h.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of D.C. CODE ANN. § 28-3901, *et seq.*;

i.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq.*;

j.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of GA. CODE ANN. §10-1-392, *et seq.*;

k.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of HAW. REV. STAT. § 480, *et seq.*;

l.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of IDAHO CODE § 48-601, *et seq.*;

m.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of IND. CODE ANN. § 24-5-0.5-1, *et seq.*;

n.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, *et seq.*;

o.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of KY. REV. STAT. ANN. § 367.110, *et seq.*;

p.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 5 Me. Rev. Stat. § 207, *et seq.*;

q.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MD. COM. LAW CODE § 13-101, *et seq.*;

r.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, *et seq.*;

s.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445.901, *et seq.*;

t.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 8.31, *et seq.*;

u.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MO. REV. STAT. § 407.010, *et seq.*;

v.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code § 30-14-101, *et seq.*;

w.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*;

x.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*;

y.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A: 1, *et seq.*;

z.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M Stat.§ 57-12-1, *et seq.*;

aa. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*;

bb. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*;

cc. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. CENT. CODE § 51-15-01, *et seq.*;

dd. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Stat. § 1345.01, *et seq.*;

ee. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Okla. Stat. 15 § 751, *et seq.*;

ff. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of OR. REV. STAT. § 646.605, *et seq.*;

gg. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of PA. CONS. STAT. § 201-1, *et seq.*;

hh. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. GEN LAWS § 6-13.1-1, *et seq.*;

ii. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, *et seq.*;

jj. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, *et seq.*;

kk. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, *et seq.*;

ll. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code § 17.41, *et seq.*;

mm.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code § 13-11-1, *et seq.*;

nn. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 9 Vt. § 2451 *et seq.*;

oo. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, *et seq.*;

pp. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wash. Rev. Code § 19.86.010, *et seq.*;

qq. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of West Virginia Code § 46A-6-101, *et seq.*;

rr. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of WIS. STAT § 100.18, *et seq.*; and

ss. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of WYO. STAT. ANN § 40-12-101, *et seq.*

265.    As a direct and proximate result of Defendants' wrongful conduct as alleged herein, Plaintiffs and members of the Class are entitled to compensatory damages, treble damages, attorneys' fees and costs of this suit.

**COUNT VIII - VIOLATIONS OF UNIFORM DECEPTIVE TRADE PRACTICES ACTS**

266.    Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

267.    Plaintiffs assert this claim for violations of the Uniform Deceptive Trade Practices Act ("UDTPA"), which prohibits "[r]epresenting that goods … have sponsorship, approval, characteristics, … uses, [or] benefits … that they do not have," on behalf of a subclass composed of all Class Members who reside in the twenty-two states who have enacted these provisions of the UDTPA.

268.    Defendants engaged in deceptive trade practices in violation of the twenty-two state consumer protection statutes that incorporate the provisions of the UDTPA quoted above, by, *inter alia*, (a) failing to timely alert the public regarding known safety issues with Xarelto; and (b) deliberately misrepresenting the safety of Xarelto relative to other products; and (c) actively concealing, and causing others to conceal, information about the true safety of the Xarelto.

269.    Defendants have violated the deceptive trade practices statutes of the following states that incorporate the provisions of the UDTPA quoted above, as follows:

a.      Defendants have engaged in deceptive trade practices in violation of Ala. Code § 8-19-5, *et seq.;*

b.      Defendants have engaged in deceptive trade practices in violation of Alaska Stat. § 45.50.471, *et seq.;*

c.      Defendants have engaged in deceptive trade practices in violation of Cal. Civ. Code § 1770 *et seq.;*

d.      Defendants have engaged in deceptive trade practices in violation of 6 Del. C. § 2532, *et seq.;*

e.      Defendants have engaged in deceptive trade practices in violation of Ga. Code Ann. §§ 10-1-372, *et seq.* 10-1-393, and 26-2-29 *et seq.;*

f.      Defendants have engaged in deceptive trade practices in violation of Haw. Rev. Stat. § 481A-3, *et seq.;*

g.      Defendants have engaged in deceptive trade practices in violation of Idaho Code § 48-603 *et seq.;*

h.      Defendants have engaged in deceptive trade practices in violation of 815 Ill. L.C.S. § 510/2 *et seq.;*

i.      Defendants have engaged in deceptive trade practices in violation of 10 Me. Rev. Stat. Ann. § 1212, *et seq.;*

j.      Defendants have engaged in deceptive trade practices in violation of Mich. Comp. L. Ann. § 445.903 *et seq.;*

k.      Defendants have engaged in deceptive trade practices in violation of Minn. Stat. Ann. § 325D.44 *et seq.;*

l.      Defendants have engaged in deceptive trade practices in violation of Miss. Code Ann. § 75-24-5 *et seq.;*

m.      Defendants have engaged in deceptive trade practices in violation of Neb. Rev. Stat. §§ 81-2,285 *et seq.;*, 87-302 *et seq.;*

n.      Defendants have engaged in deceptive trade practices in violation of N.H. Rev. Stat. § 358-A:2 *et seq.;*

o.   Defendants have engaged in deceptive trade practices in violation of N.M. Stat. Ann. § 57-12-2 *et seq.;*

p.   Defendants have engaged in deceptive trade practices in violation of Ohio Rev. Code § 4165.02 *et seq.*;

q.   Defendants have engaged in deceptive trade practices in violation of Or. Rev. Stat. § 646.608 *et seq.*;

r.   Defendants have engaged in deceptive trade practices in violation of 10 Penn. Stat. § 162.15 *et seq.* and 73 Penn. Stat. § 201-2 *et seq.*;

s.   Defendants have engaged in deceptive trade practices in violation of R.I. Gen. Laws § 6-13-1.1 *et seq.*;

t.   Defendants have engaged in deceptive trade practices in violation of Tenn. Code Ann. § 47-18-104 *et seq.*;

u.   Defendants have engaged in deceptive trade practices in violation of Tex. Bus. & Comm. Code § 17.46, *et seq.*;

v.   Defendants have engaged in deceptive trades practices in violation of Utah Code § 13-11a-3 *et seq.*;

w.   Defendants have engaged in deceptive trade practices in violation of W.Va. Code § 46A-6-102 *et seq.*;

270.   To this date, Defendants continue to engage in the foregoing unlawful practices in violation of the UDTPA and the deceptive trade practices statutes of the above-referenced states that incorporate the UDTPA.

271.   As a direct and proximate result of Defendants' wrongful conduct as alleged herein, Plaintiffs and members of the Class are entitled to compensatory damages, treble damages, attorneys' fees and costs of this suit.

**COUNT IX - VIOLATION OF 18 U.S.C. § 1962 (C)**

272.   Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

273.   Defendants are "persons" within the meaning of 18 U.S.C. §1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

274.   The J&J and Janssen family of companies (Janssen R&D, J&J, Ortho, and Janssen) associated with or combined with the Bayer family of companies (Bayer Corp., Bayer AG, Bayer Healthcare, and Bayer Pharma) for the common purpose of engaging in a course of racketeering conduct - specifically the development of a market for Xarelto through fraudulent means and sell Xarelto at a premium price over other safer, less expensive drugs.

275.   This association in fact enabled Defendants to fraudulently market and promote Xarelto as scientifically superior to warfarin and other less expensive drugs and ultimately develop a niche market for Xarelto without disclosing the true risks of Xarelto.

276.   Defendants fostered their enterprise through the deceptive marketing practices outlined above to increase the number of people and associations using Xarelto instead of the readily available, safer, more effective, and less costly drugs.

277.   Defendants created and maintained their enterprise through a systematic pattern of racketeering activity, including deceptive or fraudulent marketing activity and improper inducements to physicians, and exploited a niche in the market with a competitor drug that was redundant with older, cheaper pharmaceutical therapies that were widely available.

278.   Defendants received substantial revenue from their scheme, and these revenues were far greater than they would have been had the fraudulent acts not been undertaken. The distinct entities identified above each profited from the exercise of the enterprise.

279.   The behavior of the Defendants, as distinct entities acting in concert, constituted an ongoing pattern of activity that affected interstate commerce, because, *inter alia*, the

fraudulent activities described herein led to the marketing and sale of Xarelto to thousands of individuals and entities throughout the United States.

280.    Defendants conducted and participated in the affairs of their deceptive marketing enterprise through patterns of racketeering activity that included acts indictable under 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud) and § 1952 (use of interstate facilities to conduct unlawful activity).

281.    Defendants' use of the mails and wires to perpetuate their fraud involved thousands of communications, including but not limited to:

   a.    communications with and among enterprise participants that led to the suppression and failure to timely disclose negative data and results of drug studies that called into question the safety and efficacy of Xarelto;

   b.    communications with and among the enterprise participants that fraudulently misrepresented the efficacy and safety of Xarelto amongst themselves and others;

   c.    communications with patients and Class Members, including Plaintiffs, inducing payments for Xarelto by misrepresenting the safety and efficacy of Xarelto;

   d.    receiving the proceeds in the course of and resulting from Defendants' improper scheme;

   e.    transmittal and receipt of monies from consumers and third-party payors;

   f.    communications with and among the enterprise participants to conceal the fraud occurring by virtue of failing to disclose the results of negative studies;

   g.    communications with and among the enterprise participants to develop and implement the promotional strategy;

   h.    communications with and among the enterprise participants to develop and implement the publications strategy;

   i.    communications with and among the enterprise participants for the purpose of inducing doctors to become high prescribers through various forms of illegal remuneration; and

j.      transmittal and receipt of payments in exchange for, directly or indirectly, activities in furtherance of the Xarelto deceptive marketing scheme.

282.    Defendants knew that without their fraudulent scheme, consumers and third-party payors would not have paid for Xarelto instead of other safer, less expensive drugs.  At all times during the fraudulent scheme, Defendants and the fraud participants had a legal and ethical obligation of candor and honest dealing with consumers, PBMs, third-party payors, physicians, and the medical community.

283.    Defendants' scheme was calculated to ensure that Xarelto was prescribed in great quantities by physicians in place of other safer, less expensive alternatives with the knowledge of and active suppression of studies indicating safety concerns.

284.    The conduct of the Defendants' marketing scheme described above constituted "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Defendants' decisions and activity in connection with the Xarelto marketing scheme to routinely conduct its transactions in such a manner constitutes a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

285.    The above-described racketeering activities amounted to a common course of conduct intended to deceive and harm the FDA, physicians, the public, healthcare providers, PBMs, Plaintiffs and members of the Class. Each such racketeering activity was related, had similar purposes, involved similar or the same participants, had similar methods of commission, and had similar results affecting the same or similar victims, including Plaintiffs and members of the Class.

286.     Plaintiffs and members of the Class have been injured in their property by reason of these violations in that Plaintiffs and members of the Class paid millions of dollars for Xarelto that they would not have paid had Defendants not engaged in this pattern of racketeering activity.

287.     The injuries to Plaintiffs and members of the Class were directly and proximately caused by Defendants' racketeering activity.

288.     By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are liable to Plaintiffs and members of the Class for three times the damages sustained, plus the costs of this suit, including reasonable attorneys' fees.

289.     By reason of the foregoing, and as a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiffs and members of the Class have suffered damages. Plaintiffs and the Class are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

**COUNT X - VIOLATION OF 18 U.S.C. § 1962 (D)**

290.     Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

291.     Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provision of subsection (a), (b), or (c) of this section."

292.     Defendants have violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the promotion of Xarelto as described previously through a pattern of racketeering activity.   The Defendants conspired with, *inter alia*, each other, publicists, sales representatives, medical professionals, academics and other intermediaries to promote Xarelto and suppress information about the harms known to result from Xarelto use.

293.   Defendants' and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiffs and members of the Class.

294.   The nature of the above-described acts by Defendants and their co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § l962(c), but they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.

295.   As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § l962(c), Plaintiffs and members of the Class have been and are continuing to be injured in their business or property as set forth more fully above.

296.   Defendants sought to and have engaged in the commission of and continue to commit overt acts, including the following unlawful racketeering predicate acts:

  a.   Multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 and 1342;

  b.   Multiple instances of mail fraud violation of 18 U.S.C. §§ 1341 and 1346;

  c.   Multiple instances of wire fraud violations of 18 U.S.C. §§ 1341 and 1346;

  d.   Multiple instances of unlawful activity in violation of 18 U.S.C. § 1952.

297.   Defendants' violations of the above federal laws and the effects thereof detailed above are continuing and will continue.  Plaintiffs and members of the Class have been injured in their property by reason of these violations in that Plaintiffs and members of the Class have made

paid hundreds of millions of dollars for Xarelto that they would not have made had Defendants not conspired to violate 18 U.S.C. § 1962(c).

298.    Injuries suffered by Plaintiffs and members of the Class were directly and proximately caused by Defendants' racketeering activity as described above.

299.    Patients, physicians, PBMs, third-party administrators, pharmacy and therapeutic committees, and third-party payors, including Plaintiffs and members of the Class, directly relied on the racketeering activities of the Defendants. Plaintiffs and members of the Class, both directly and indirectly, relied on the representations as to the efficacy and safety of Xarelto as promoted by Defendants.  Because Defendants controlled all knowledge of the tests upon which the claims of Xarelto's efficacy and safety were based, Plaintiffs and members of the Class, as well as others in the medical and consuming public were obligated to rely on Defendants' representations about Xarelto. Further, Defendants perpetuated this reliance by taking the steps itemized above to suppress the dissemination of any critical information about Xarelto.

300.    By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are liable to Plaintiffs and the Class for three times the damages Plaintiffs and members of the Class have sustained, plus the cost of this suit, including reasonable attorney's fees.

301.    By reason of the foregoing, and as a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiffs and members of the Class have suffered damages. Plaintiffs and members of the Class are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

## COUNT XI - REDHIBITION

302.    Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

70

303.     Plaintiffs BCBSLA and HMO Louisiana, Inc. bring this Count pursuant to Louisiana Civil Code Articles 2520 *et seq.*

304.     Defendants' drug Xarelto contained a vice or defect that rendered it either absolutely useless or its use so inconvenient and imperfect that it must be supposed that the buyers would not have purchased it had they known of the vice.

305.     The Defendants impliedly or expressly represented that Xarelto would not cause the adverse health effects described above.  The presence of the unsafe characteristics of Xarelto is an absolute vice as provided by Louisiana Civil Code Articles 2520 *et seq.* regarding redhibition, rendering the Defendants liable in redhibition.

306.     Where the Defendants knew of the vice as described above and failed to declare it to Plaintiffs BCBSLA and HMO Louisiana, Inc., Plaintiffs' members, prescribing physicians and the medical community, Defendants are liable for all damages including reasonable attorneys' fees as provided by Louisiana Civil Code Articles 2525 and 1953 *et seq.*

## COUNT XII – SUBROGATION

307.     Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

308.     Plaintiffs BCBSLA and HMO Louisiana, Inc. bring this Count under theories of contractual and/or equitable subrogation.

309.     Throughout the relevant period, Plaintiffs BCBSLA and HMO Louisiana, Inc. provided a full spectrum of health benefit products, including but not limited to managed-care products, third-party administration services, and indemnity products, to both groups and individuals, on both an insured and an employer funded basis. Each of these products was provided to members who have been injured by Defendants' product, Xarelto.

310.   The damages sustained by Plaintiffs BCBSLA and HMO Louisiana, Inc. include, but are not limited to, damages for all benefits paid or provided to plan members or insureds, said damages being incurred as a result of the plan member or insured being injured by or seeking treatment as a proximate result of the use of Xarelto.

311.   Plaintiffs BCBSLA and HMO Louisiana, Inc. provided these and other benefits to their insureds and plan members not as volunteers, but, pursuant to their obligations under the contractual agreements specifying the respective rights and obligations of Plaintiffs BCBSLA and HMO Louisiana, Inc. and their members and/or insureds.  These agreements specifically grant Plaintiffs BCBSLA and HMO Louisiana, Inc. broad subrogation and reimbursement rights.

312.   Plaintiffs BCBSLA and HMO Louisiana, Inc. provided benefits to their plan members and insureds either under contractual provisions granting each of them subrogation and reimbursement rights or are subject to equitable subrogation under the substantive law of the jurisdictions in which they are located and in which the Defendants have sold their product.

313.   Plaintiffs BCBSLA, HMO Louisiana, Inc. and members of the Class provided benefits to their plan members and insureds either under contractual provisions granting each of them subrogation and reimbursement rights or are subject to equitable subrogation under the substantive law of the jurisdictions in which they are located and in which the Defendants have sold Xarelto.

314.   Plaintiffs BCBSLA and HMO Louisiana, Inc. have contractual and equitable rights of subrogation and reimbursement against the Defendants herein to recover damages to the extent of health benefits paid or provided on behalf of Xarelto users related to the wrongful conduct of the Defendants as alleged herein.

315.    As a result of their subrogation and reimbursement rights, Plaintiffs BCBSLA and HMO Louisiana, Inc. are entitled to recover damages, as alleged, on the preceding counts.

### COUNT XIII – UNJUST ENRICHMENT

316.    Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

317.    Defendants, having undertaken the manufacturing, marketing, dispensing, distribution and promotion of Xarelto described herein, owed a duty to provide accurate and complete information regarding their product.

318.    The misrepresentations and non-disclosures by Defendants of the material facts detailed above allowed Defendants to be unjustly enriched at the expense of Plaintiffs and members of the Class.

319.    Plaintiffs having purchased and/or reimbursed payments with respect to its members' prescriptions for Xarelto have unjustly enriched Defendants.

320.    In order to maintain sales and profits, Defendants knowingly and intentionally withheld material facts that would have informed Plaintiffs and the medical community that Xarelto's risks outweighed its benefits and that it should not have been a covered prescription medication available to plan members.  The cumulative effect of Defendants' conduct directed at Plaintiffs, Plaintiffs' members, physicians, PBMs, and consumers was to artificially create a demand for Xarelto. Defendants' false advertisements and promotional efforts were disseminated for the purposes of unfairly gaining consumer market share through unfair and deceptive conduct.

321.    Defendants have unjustly retained financial benefits at the expense of Plaintiffs, the putative Class Members, and the general public. Defendants' unjust enrichment has caused

damage to Plaintiffs and members of the Class because Defendants have retained the financial benefits from the sale of Xarelto which Defendants knew increased the risk of the serious adverse events described herein but was no more effective than widely available, cheaper therapies.

322.    As a result of the conduct described above, Defendants have been and continue to be unjustly enriched at the expense of Plaintiffs and members of the Class. Specifically, Defendants have unjustly enriched by the receipt of millions of dollars and profits through the unlawful promotion of and/or wrongful collection of payments for Xarelto and continued to do so to the detriment of Plaintiffs and members of the Class.

323.    As a direct and proximate result of the Defendants' acts, omissions and conduct as set forth above, Plaintiffs and members of the Class are entitled to an award of a refund, restitution, and incidental economic losses, including the purchase price paid for the drug Xarelto.

## VII.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs Louisiana Health Service and Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana, HMO Louisiana, Inc., and Allied Services Division Welfare Fund, individually and on behalf of the Class described herein, respectfully pray for the following relief:

A.    Certification of this action as a class action, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), appointment of Plaintiffs as a representatives of the Class, and appointment of Plaintiffs' counsel as Class Counsel;

B.    Enter joint and several judgments against Defendants in favor of Plaintiffs and the Class.

C.    A finding that Defendants' wrongful conduct alleged herein violated the consumer fraud and protection statutes and deceptive trade practices statutes set forth above, and an award for all measures of damages

allowable under such statutes, in an amount to be determined at trial, plus costs of suit, including reasonable attorneys' fees and litigation expenses;

D.    Grant Plaintiffs and the Class' subrogation claim, recovery in the amount of payments for the medical care of their insured treatments for injuries caused by Xarelto ingestion, such amount to be determined at trial and as provided by applicable law;

E.    Grant Plaintiffs and the Class equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment;

F.    Grant Plaintiffs and the Class an award for damages and, where applicable, treble, multiple, punitive, and/or other damages, in a such amount to be determined at trial and as provided by applicable law;

G.    Grant Plaintiffs and the Class pre-judgment and post-judgment interest on all damages;

H.    Grant Plaintiffs and the Class costs of suit, including reasonable attorneys' fees and litigation expenses as provided by law; and

I.    Grant Plaintiffs and the Class all such other and further relief as necessary to correct Defendants' unlawful conduct, and as the Court deems just and proper under the circumstances.

## <u>JURY DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs respectfully requests a trial by jury on all issues so triable.

Dated: October 7, 2015

Respectfully submitted:

*/s/ James R. Dugan, II*
James R. Dugan, II (LSBA# 24785)
Douglas R. Plymale (LSBA# 28409)
David B. Franco (TXSBA# 24072097)
Lanson Bordelon (LSBA# 34251)
THE DUGAN LAW FIRM, APLC
One Canal Place
365 Canal Street, Suite 1000
New Orleans, Louisiana 70130
Telephone: (504) 648-0180
Facsimile: (504) 648-0181

Email: jdugan@dugan-lawfirm.com
Email: dplymale@dugan-lawfirm.com
Email: dfranco@dugan-lawfirm.com
Email: lbordelon@dugan-lawfirm.com

Thomas M. Sobol
Hagens Berman Sobol Shapiro, LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Telephone: (617) 475-1950
Facsimile: (617) 482-3003
Email: tom@hbsslaw.com

***Attorneys for All Plaintiffs and the Proposed Class***

And

Charles A. O'Brien (LSBA #10143)
Blue Cross And Blue Shield of Louisiana
5525 Reitz Avenue
P.O. Box 98029
Baton Rouge, Louisiana 80809
Telephone: (225) 295-24454
Facsimile: (225) 297-2760

***Attorney for Plaintiffs Louisiana Health Service
and Indemnity Company d/b/a Blue Cross and
Blue Shield of Louisiana and HMO Louisiana,
Inc.***

Art Sadin (TXSBA #17508)
SADIN LAW FIRM, P.C.
121 E. Magnolia Street, Suite 102
Friendswood, Texas 77546
Telephone: (281) 648-7711
Facsimile: (281) 648-7799
Email: asadin@sadinlawfirm.com

***Attorney for Plaintiff Allied Services Division
Welfare Fund***