**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: XARELTO (RIVAROXABAN)     )     MDL No. 2592
PRODUCTS LIABILITY LITIGATION  )
_____ )     SECTION:  L
                                )
                                )     JUDGE FALLON
THIS DOCUMENT RELATES TO:       )     MAG. JUDGE NORTH
ALL ACTIONS                     )
_____ )

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF**
**PLAINTIFFS' PROPOSED CMO3**

        To be an effective case management tool, a bellwether plan must be carefully

crafted with an eye towards identifying plaintiffs representative of the entire MDL

docket:

> If bellwether trials are to serve their twin goals as informative indicators of
> future trends and catalysts for an ultimate resolution, the transferee court
> and the attorneys must carefully construct the trial-selection process.
> Ideally, the trial-selection process should accurately reflect the individual
> categories of cases that comprise the MDL in toto, illustrate the likelihood
> of success and measure of damages within each respective category, and
> illuminate the forensic and practical challenges of presenting certain types
> of cases to a jury.  Any trial-selection process that strays from this path
> will likely resolve only a few independent cases and have a limited global
> impact.

Eldon E. Fallon *et al.*, *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L.

Rev. 2323, 2343 (2008) (hereinafter "*Bellwether Trials*").

        Plaintiffs propose a bellwether discovery pool plan that appropriately addresses

the need to obtain representative plaintiffs.  *See* Plaintiffs' Proposed CMO 3 (Exhibit A).

Plaintiffs' CMO3 meets the bellwether purpose by emphasizing the importance of a

census of the docket to identify major variables in order to determine case categories and

providing for party input in the random selection process to guard against the chance

selection of non-representative plaintiffs.  Most importantly, the Plaintiffs' proposed CMO 3 presents a straightforward and easy to implement bellwether discovery pool selection process that accomplishes the goal of identifying representative plaintiffs so that the bellwether plan conducted by this Court has meaning to the Court and the parties.

Such careful construction to identify representative plaintiffs as proposed by Plaintiffs must be contrasted with the complex and haphazard process proposed by Defendants.  Defendants' proposal – their unilateral refusal to waive *Lexecon* and their severe geographic restrictions upon the discovery pool – strays far from any path that can provide the Court and the parties with meaningful information about this diverse nationwide docket of thousands of cases.  The primary driver of the plan has nothing to do with representative plaintiffs but instead has everything to do with stacking the discovery pool deck with plaintiffs within the Fifth Circuit.  Frankly, the Defendants' proposal is not even an attempt to identify representative cases.  It is a simple cherry-picking of venues.

There should be no mistake.  The geographic limitations imposed by the Defendants plan are severe and will seriously impair the ability to identify representative cases.  By geographically limiting the potential bellwether pool as Defendants suggest, the Court will reduce, prior to any categories being determined, the pool of potential bellwether plaintiffs by as much as 85%.  According to the latest data from MDL Centrality, 2,835 individual plaintiffs have cases pending in this MDL.  Of these, 2,113 have submitted a Fact Sheet through MDL Centrality.  The total number of plaintiffs from the Eastern District of Louisiana, the State of Mississippi and the State of Texas is

only 331 – or 15.7% of cases that have submitted a Fact Sheet.[1]  *See* Table of MDL Centrality Data (attached as Exhibit B).  Such a broad exclusion of potential bellwether plaintiffs places the entire bellwether plan at risk much more so that the risk created by the Defendants' refusal to waive *Lexecon*.

As the Court has continually informed the parties, this case is a national litigation. Thousands of plaintiffs from every state in the country have either been transferred or directly filed into this MDL.  Given the breadth and diversity of the venues represented on the docket, the bellwether trials must be open to representative plaintiffs from all venues and not limited to cases primarily from the Fifth Circuit to accommodate the Defendants.  Whether the Defendants ultimately decide to waive or not waive *Lexecon*, the sole measure of an appropriate bellwether trial plan must always be representativeness.

## I.     The Potential Geographic Limitation of the Bellwether Discovery Pool Created by Defendants' *Lexecon* Decision Threatens the Bellwether Process

The Court has stated from the beginning of this MDL that it intends to utilize bellwether trials as a case management tool.  The use of bellwether trials in large, nationwide MDLs has long been an effective management tool so long as the bellwether trial process is appropriately conducted.  However, discovery pools and bellwether trials are only useful if they are truly representative of the whole docket as set out in Plaintiffs' CMO 3.  *See, e.g., In re: Yasmin and Yaz Marketing, Sales Practices and Prod. Liab. Lit.*, 2010 WL 4024778 (S.D. Ill. 2010) *2 ("the most critical element of this plan and the purpose it seeks to serve is for the most representative cases to be selected and for no one

---

[1] According to the data reviewed by Plaintiffs as of November 3, 2015, 107 plaintiffs are from the Eastern District of Louisiana, 179 from the State of Texas, and 45 from the State of Mississippi.  While Defendants may argue that their proposal also allows for 12 plaintiffs from 4-12 states, the fact remains that the number of plaintiffs that would be eligible for selection into the discovery pool is materially restricted.

to lose sight of that objective.") There is little to be gained from the trial of non-representative cases applying the unique laws of a handful of jurisdictions.

The intent to implement bellwether trials in this litigation has thus far resulted in the entry of CMO 2.  CMO 2 sets forth the trial dates and the basic ground rules for the bellwether selection process.   The essential components provide that the bellwether discovery pool will consist of 40 plaintiffs:  20 plaintiffs selected by the parties and 20 plaintiffs selected through a random process.   Relevant to the present issue, the applicability of any geographic limitations, eligibility criteria, categories and the precise manner of random selection was deferred to later orders.

The principal subject of the present CMO 3 proposals from the parties relates primarily to the question of the appropriate geographic venue limits, if any, to be applied to the bellwether discovery pool – an issue inserted into this litigation solely by the Defendants.  If Defendants would consent to trying the bellwether trials in this Court, geography would not be presently debated or be considered in the selection of representative plaintiffs.  *See Bellwether Trials* at 2354 ("If litigants in cases transferred by the MDL Panel do not consent to trial, the universe of cases amenable to trial in an MDL is extremely limited in both number and applicable law.").  Rather than remedying the issue through a *Lexecon* waiver, Defendants urge the Court to accommodate their decision to impair the typical bellwether process by placing severe and unnecessary venue restrictions on the bellwether discovery pool.  By proceeding as such, Defendants are attempting to dictate terms that jeopardize the usefulness of the bellwether process. The Court should reject the Defendants' efforts.

II.     **Plaintiffs' Proposed CMO 3 is Consistent with the Central Principal of a Bellwether Discovery and Trial Plan as it is Designed to Identify Representative Plaintiffs from the Broadest Potential Pool of Plaintiffs**

Plaintiffs propose a bellwether selection process that is consistent with the principal purpose of a bellwether trial plan and the instructions from CMO 2.  Plaintiffs require the parties to identify representative cases across the MDL docket without imposing artificial geographic limitations for entry into the bellwether discovery pool. Further, the Plaintiffs' proposed CMO 3 implements a process for random selection that requires the input of counsel and does not depend solely on chance to identify representative cases.  Without some definition of "random" based upon input from the parties, random selection will be haphazard.

A.      *Significant Geographic Venue Limitations Should Not be Applied to Restrict Entry into the Bellwether Discovery Pool as Such Limitations Will Create Non-Representative Plaintiffs*

Under Plaintiffs' CMO 3, the Plaintiffs and Defendants are each allowed to select ten individual plaintiff cases that meet the eligibility criteria for entry into the bellwether discovery pool.  Other than a minor geographic limitation, the Plaintiffs' proposal allows the parties to make the selections of their choosing so long as the choices are consistent with the eligibility criteria to be determined by the parties and the selections are representative.   The one minor geographic limitation proposed by Plaintiffs as an accommodation to the Defendants' *Lexecon* decision requires each side to select at least two plaintiff cases that are properly venued in the Eastern District of Louisiana.  No other geographic limitation is necessary or appropriate.   Again, it makes little sense to significantly reduce the potential pool of bellwether plaintiffs based on venue this early in the litigation.

While each party is free to select more than two Eastern District plaintiffs, the required selection of two plaintiffs from each side will ensure that at least four discovery pool plaintiffs are venued within the Eastern District and can be tried without any additional effort from the Court or the parties.

As ordered by the Court in CMO 2, the remaining selections are to be based on some form of random selection.  As with the party selections, the Plaintiffs' proposal does not provide a geographic limitation on the randomly selected portion of the bellwether discovery pool.  Again, the Plaintiffs' proposal, like this litigation, is national in scope and allows for entry of any plaintiff that meets the eligibility criteria.

The commentary on the issue of random selection supports the proposition that the implementation of random selection must come from the entire case pool and not some limited geographical subset.  *See MDL Standards and Best Practices*, Duke Law Center for Judicial Studies at 19 (Sept. 11, 2014) ("the most popular methods are:  (1) random selection from the **entire case pool**…") (emphasis added).   "Under the random-selection option, the trial-selection pool is filled with a prearranged number of cases selected randomly from the **total universe** of cases in the MDL or from various logical subsets of that group."   *Bellwether Trials* at 2348 (emphasis added).   Importantly, geography is not a logical subset.  Only the categories of cases derived from the census are considered the appropriate subsets.  There is no precedent or authority to support the drastic limitations imposed by Defendants.

> B.      *An Appropriately Designed Bellwether Discovery and Trial Plan Begins by Identifying Categories Based on a Census of the Entire Docket*

The Plaintiffs' proposal respects the customary methodology of devising a bellwether discovery pool by establishing categories as determined by a census of the

docket.  To devise the categories, "the court and the attorneys should focus on those variables that can be easily identified, are substantively important, and provide clear lines of demarcation – i.e., the major variables." *Bellwether Trials* at 9.

The identification of categories is a critical first-step in the bellwether process. The bellwether process should generally proceed in three steps:  (1) the <u>entire universe</u> of cases that comprise the MDL should be catalogued and divided into categories; (2) only after determining and dividing the entire docket into categories the transferee court should the pool of representative cases for case-specific discovery be created; and, finally, (3) a methodology for selecting cases from the discovery pool for trial should be implemented.  *Bellwether Trials* at 2325-26.  At this point in this MDL, step one has yet to be conducted.  The importance of the first step is not trivial as without it the "court and the attorneys risk trying an anomalous case, thereby wasting substantial amounts of both time and money."  *Id.*

Without an understanding of the census, the parties do not yet know what the ultimate categories will be and whether the categories that are ultimately implemented will be consistent across venues.  Any limitation of venues could very well impair the ability to make sure that the major variables are appropriately represented in the discovery pool.  As such, it is premature at this moment to place the type of severe geographic venue limitations on the bellwether pool as proposed by the Defendants.

C.    *Limiting Entry into the Bellwether Discovery Pool from Primarily Three States under the Defendants' Plan Does Not Allow for Representative Plaintiffs*

In addition to the issues created in identifying a diverse group of plaintiffs with sufficient fact patterns to representative of the entire docket, the limitation of bellwether

discovery plaintiffs to essentially the applicable law of three states all within the Fifth Circuit creates another significant flaw to the type of severe geographic venue limitations within the Defendants' proposal.  The laws of the States of Louisiana, Mississippi and Texas are hardly representative of a national docket.  Certainly, the law of the States of Texas, Mississippi and Louisiana cannot be said to be a representative of the law of all states in the areas of strict liability, failure to warn, learned intermediary, punitive damages, caps on damages and other highly material issues in this litigation.

Without conducting a comparison survey of the laws of all 50 states, many aspects of Louisiana, Mississippi and Texas law are clearly anomalous.  For example, Louisiana Products Liability Act does not expressly allow for punitive damages.  The law of the State of Mississippi caps non-economic damages at $1 million, *see* Miss. Code Ann. § 11-1-60) and punitive damages are only available in "extreme" cases.  *See Jackson v. Johns-Manville Sales Corp.*, 781 F.2d 394, 403 (5th Cir. 1986).  The law of the State of Texas applies an onerous presumption of no liability in failure to warn pharmaceutical cases if the drug was FDA-approved while providing very limited means by which to rebut the presumption.  *See Lofton v. McNeil Consumer & Specialty Pharm., Inc.*, 672 F.3d 372 (5th Cir. 2012) (citing Tex. Civ. Prac. & Rem. Code  § 82.007(a)(1)).[2] Trying cases from states with such anomalous laws substantially limits the value of bellwether trials.

The problem created by a limited bellwether universe created due to the failure of a party to provide *Lexecon* waivers in the bellwether trial process was described by this

---

[2] The actual holding in Lofton finds that the primary means of rebutting the presumption is preempted under *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001).  *See Lofton*, 672 F.3d at 380-81. While Plaintiffs are not conceding the issue and certainly believe the Fifth Circuit incorrectly decided the issue, the point remains that Texas law is not representative.

Court in the *Vioxx* MDL.   In that case, only 350 Louisiana plaintiffs filed their cases in the MDL, but 6,000 plaintiffs from other states filed their cases in other District Courts. *In re Vioxx Prods. Liab. Litig.*, 478 F. Supp. 2d 897, 903 (E.D. La. 2007).   If the parties in *Vioxx* had refused to waive *Lexecon*, "the total number of triable cases would have been approximately 350 and all would have been tried under Louisiana law, which does not allow for recovery of punitive damages."   *Bellwether Trials*, at 2354.   Your Honor concluded that "In litigation like the Vioxx MDL . . . as well as most modern MDLs which share a host of variables, a total universe of 350 cases, or a like number, all tried under a single state's substantive law would render the bellwether trials of limited value." *Id*.

All of the concerns expressed by this Court in the *Vioxx* MDL pertaining to an extraordinarily limited universe of potential bellwether plaintiffs are applicable in this case.   Without question, the type of unnecessary geographic limitations advocated by the Defendants will impair the bellwether process and severely hamper the potential for obtaining meaningful information.   Should the Court implement the Defendants' plan the potentially eligible pool of plaintiffs from which the discovery pool may be selected could be less than 350.   As was expressed by this Court in the *Vioxx* MDL, such a limited bellwether universe does not provide the diversity of factual scenarios necessary to give adequate meaning to the bellwether process.   Bellwether trials should be sufficiently diverse to be informative indicators of future trends and catalysts for the ultimate resolution of this litigation.

> **D.**     *Geographic Limitations are Inconsistent with the Burdensome Process of Requiring All Plaintiffs to Submit Substantial Documentation in the Form of Fact Sheets and Document Requests*

Not only are the geographic limitations factually and legally inconsistent with the concept of identifying representative plaintiffs, imposing such limitations runs counter to the processes implemented in this MDL.  Defendants have demanded and Plaintiffs have gone to great lengths to produce extensive information about all filed cases in order to determine appropriate categories, eligibility criteria, and evaluate potential bellwether cases.  Defendants demanded that every plaintiff who has filed a case in this MDL complete an extensive 24-page Fact Sheet that requires Plaintiffs to produce extensive medical records related to the claim, 24 separate categories of documents in the possession of the plaintiff, and medical authorizations allowing Defendants to obtain every plaintiff's medical records.  All of this was done so that the parties could evaluate all of the cases for bellwether trials.

In addition the information and documents provided as part of the Plaintiff Fact Sheet, the parties committed extensive time and expense to the development and implementation of MDL Centrality.  One of the primary reasons for committing this time and expense was to provide the parties with information, in an accessible and convenient format, pertaining to all cases filed in this MDL.  Much of this time and effort would be wasted if the Defendants' plan were implemented.

> **E.**     *Random Selection Must Include Party Input as Part of the Process to Avoid the Inclusion of Non-Representative Plaintiffs*

While the actual conduct of random selection was to be presented to the Court prior to December 18, 2015, in the view of the Plaintiffs the issues pertaining to geographic limitations cannot be addressed without a discussion of random selection.

Under Plaintiffs' proposed CMO 3, the parties must meet and confer and attempt to agree upon the case categories as determined by the census of the entire docket.  Once these categories are determined, the entire docket of eligible plaintiffs will be placed into the appropriate category and a randomly selected pool of at least 30 individual plaintiffs will be created.  From this pool, each side will be allowed to select ten cases for entry into the bellwether discovery pool.  Such a process as proposed by Plaintiffs strikes the appropriate balance between completely random selection and allowing for party input to achieve representativeness.

Random selection is not the preferred selection criteria by most MDL courts facing the issue of bellwether selection.  The preferred method of selecting potential bellwether plaintiffs is party selection as "[t]he attorneys are in the best position to know, or ascertain, the true census of the litigation."  *Bellwether Trials* at 2349.

The vast majority of courts implement a process whereby the parties are responsible for making the selection.  As was stated by Judge Herndon in the Yaz MDL, "most modern plans seem to disfavor random selection in order to have better control over the representative characteristics of the cases selected."  *In re: Yasmin and Yaz*, 2010 WL 4024778 at *2 (citing *Bellwether Trials* at 2349-51) (Judge Herndon went on to find that "the process that will provide the best sampling of cases will be one that allows both sides of this litigation to have a role in selecting cases, along with a veto process in the later stages of the litigation, in case advocacy has trumped altruism and both sides have decided to ignore my efforts at objectivity").  *See also, In re:  Testosterone Replacement Therapy*, (N.D. Ill. 2015) (each side to select 8 cases within 2 different categories for a total of 32 cases in the discovery pool) (attached as Exhibit C); *In re:*

11

*Fresenius Granuflo/Naturalyte Dialysate Prod. Liab. Lit*., (D. Mass. 2014) (each side to designate 10 cases for a total of twenty cases in the bellwether discovery pool) (attached as Exhibit D); *In re: Pradaxa Prod. Liab. Lit*., (S.D. Ill. 2013) (each side to select 8 cases from various categories for a total of 16 cases in the discovery pool) (attached as Exhibit E); *In re Tylenol*, (E.D. Pa. 2013) (each side to designate three cases for a total of 6 cases to undergo core case-specific discovery) (attached as Exhibit F); *In re: Ethicon, Inc., Pelvic Repair System*, (S.D. W.Va. 2013) (each side to designate 15 cases for a total of 30 cases in the Discovery Pool) (attached as Exhibit G); *In re: Actos Prod. Liab. Lit.*, (W.D. La. 2013) (each side to designate 5 plaintiffs to participate in discovery) (attached as Exhibit H); *In re: Yasmin and Yaz,* 2010 WL 4024778 (S.D. Ill. 2010) (attached as Exhibit I) (ordering that each side shall select 12 plaintiff for entry into the bellwether discovery pool); *In re: Chinese-Manufactured Dry Wall*, (E.D. La. 2009) (each side to select 10 cases for the initial discovery pool) (attached as Exhibit J).

While Plaintiffs continue to believe that random selection is not an appropriate methodology to obtain representative plaintiffs, Plaintiffs are not re-arguing this issue at present. Still, there can be no question that the use of random selection inserts significant risk into the bellwether process as random selection cannot "guarantee that the cases selected to fill the trial-selection pool will adequately represent the [categories]. Because the primary goal in filling the trial-selection pool is to narrow the field of potential bellwether cases to those that are representative, a selection method that may potentially frustrate this purpose by permitting unrepresentative cases to serve as bellwether trials should be rejected." *Bellwether Trials* at 2348.

A further concern regarding purely random selection without input from the parties pertains to the willingness of various plaintiffs' counsel to coordinate with the PSC.  In a pure random selection, the PSC is offered no input into the selection of the plaintiff.  Thus, it is possible that a plaintiff will be selected who is represented by counsel who will not allow the PSC to assist in the trial of the case.  Should that occur, the results of such a trial would provide little insight to the PSC as leadership would not have been involved in such a trial.  By allowing the parties to select from a randomly created pool based upon categories, such potential problems can be alleviated as the PSC would determine prior to making a selection that such counsel was willing to coordinate with the PSC.

Given the significant risks created by pure random selection, the Plaintiffs' plan incorporates party selection to guard against this risk and requires the parties to affirmatively select the discovery pool plaintiffs from a randomly created national pool. While a pool of potential discovery pool plaintiffs are created at random based upon a census of the docket, the parties will still play an important role in ensuring the only representative cases are selected for further discovery as "allowing the attorneys to fill the trial-selection pool will likely be the best, if not the only feasible, option."  *Bellwether Trials* at 2349.

## III.    Implementation of Plaintiffs' CMO 3 – Use of Census Data

A review of the census data to this point is helpful to understand the effectiveness of the Plaintiffs' proposal.   This data is generated from MDL Centrality based upon submitted Plaintiff Fact Sheets.  As of this filing, approximately 2,835 individual cases are pending in this MDL.  Of these, approximately 2,113 have submitted a Plaintiff Fact

Sheet through MDL Centrality.  The data from MDL Centrality shows some obvious major variables amongst the majority of cases pending on the docket.  Some iteration of these variables will likely be part of the categories ultimately implemented.  The major variables appear to be the indication for which the plaintiff was on Xarelto and the length of time the plaintiff was hospitalized.[3]

| Reason for Prescription from I.C. on the PFS | MDL Centrality Data as of November 3, 2015 across all venues |
|---|---|
| Fact Sheets Submitted | 2113 |
| Reducing the risk of stroke and systemic embolism in patients with nonvalvular atrial fibrillation (AF) | 1041 |
| Treatment and/or Reduction of the Risk of a DVT or PE | 451 |
| Prophylaxis of a DVT or PE following Hip or Knee Surgery | 85 |
| Other | 484 |
| Blank | 52 |

Across the docket, 1,041 plaintiffs (49%) indicated they were prescribed Xarelto to reduce the risk of a stroke due to nonvalvular atrial fibrillation ("AFIB"); 451 (21%) for the reduction of risk of a DVT or PE ("DVT/PE"); 85 (4%) to reduce the risk of a DVT or PE following hip or knee surgery.[4]  Accordingly, this data indicates that the majority of cases fall within either the AFIB or DVT/PE indication.  Given that each of these indications were supported by a different clinical trial, the liability case is likely to be slightly different for these two groups of plaintiffs.  Further, given that only 4% of the Plaintiffs were on the drug for the third primary indication, the AFIB and DVT indications are two variables that are likely to be major categories.

The other primary category is likely to be based upon the injury or damage.  91% of Plaintiffs have indicated they were hospitalized due to Xarelto.  *See* Exhibit 2.  Thus, the question of hospitalization itself is not a significant variable.  Further, 84% of the plaintiffs indicate their injury is some type of a bleeding event.  *See* Exhibit 2.  Given this

---

[3] Plaintiffs are using length of hospitalization as a variable as 91% of the plaintiffs have thus far indicated they were hospitalized.  *See* Exhibit 2.

[4] 23% indicated "other" with 2% not answering this question.  At this point, there is no evidence to suggest that there is a significant amount of off-label use of Xarelto thus it is likely that the 25% of plaintiffs who answered "other" or left this question blank are in equal proportions to those who provided an affirmative answer.  *See* Exhibit 2.

data, it is apparent that these two issues do not meet the definition of major variables but are instead more likely to be eligibility criteria.  The primary distinguishing characteristic is thus likely to be the extent of the damage, i.e., death or time in the hospital.

With this data in mind and for purposes of illustration if the above were to form the basis of the categories, Plaintiffs' proposal would place all of the eligible plaintiffs into one of six categories as divided between indication and extent of injury as follows[5]:

A1:  AFIB + Death

B1:  DVT/PE + Death

A2:  AFIB + 3 or more days hospitalization

B2:  DVT/PE + 3 or more days hospitalization

C1:  AFIB + 2 or less days hospitalization

C2:  DVT/PE + 2 or less days hospitalization.

Applying Paragraph 1(d) of the Plaintiffs' proposed CMO 3, five cases from each of these six categories will be selected randomly from the entire docket of eligible cases. From this randomly created pool of 30 plaintiffs, each side would be allowed to select 10 plaintiffs.  This provides the parties with 30 randomly selected cases from which 20 must be included in the discovery pool.[6]  Twenty (20) out of the thirty (30) random selections would be included in the bellwether thereby limiting any party's ability to game the system.  The primary purpose in allowing the parties to make selections is to allow for

---

[5] Plaintiffs have not tested the census data on the appropriate division point on the extent of injury variables.  Most notably, the length of hospital stay variable will likely vary depending upon a further review of the data from MDL Centrality.

[6] Under the Plaintiffs' proposal, the minimum number of cases to be selected from each category is five and the minimum number of cases to be randomly chosen is thirty.  Depending upon the ultimate number of categories, these numbers could be adjusted to make sure representative cases are selected.

the type of attorney input that would essentially remove anomalous or otherwise problematic cases from the bellwether pool.

Such a sensible, category based approach quickly falls apart under the Defendants' proposal. Using the same data above as applied to the Defendants' plan, the Plaintiffs cannot discern a straightforward process whereby the types of categories described above can be applied to the geographic limits proposed by the Defendants. The end result is that rather than placing the categories in a position of primacy, the Defendants' plan places venue as the preeminent variable.

Even worse, most of the states allowed to be part of the discovery pool under the Defendants' plan do not even have enough plaintiffs to permit one plaintiff from each category. All but two states under the Defendants' proposal will consist of four or less plaintiffs. Without at least 6 plaintiffs in a particular state, all of the categories would not be included.[7]

The plan proposed by the Defendants is truly unprecedented. Plaintiffs have been unable to locate a single order from any MDL that implements a bellwether selection process even remotely similar to that proposed by Defendants. Certainly, some MDLs have implemented random selection. However, Plaintiffs have yet to identify any court that has implemented random selection through a limited number of venues.

---

[7] Further, Plaintiffs do not understand the purpose of having a process that is based on the selection of states rather than plaintiffs. The purpose of bellwether trials is not to find representative states – the purpose is to identify representative plaintiffs. The random insertion of plaintiffs from states chosen by the parties does nothing to advance the goals of a bellwether process.

IV.   **The Court Will Have Representative Bellwether Cases to Try Under the Plaintiffs' Plan**

The Plaintiffs understand that the Court is concerned about the prospect of the bellwether discovery pool consisting of cases that can be tried by this Court.  Under the Court's plan as set out in CMO 2, the first two trials will occur in the Eastern District of Louisiana.  Due to the Defendants' present position on *Lexecon*, this means that the first two plaintiffs should be properly venued in the Eastern District.  Plaintiffs address this concern by requiring that a minimum number of plaintiffs properly venued in the Eastern District be selected into the pool so that the first two trials will be able to be tried.

The third and fourth trial are addressed by Paragraph 2 of CMO 2 which provides: "The Court's selection of the locations for the third and fourth trials is subject to change, in the discretion of the Court, if (a) the Court is not able to obtain a temporary assignment to try a case in another district pursuant to 28 USC 292, (b) the parties agree to waive *Lexecon* permitting the trial of a non-Louisiana plaintiff's case in the Eastern District of Louisiana, or (c) the Court determines after input from the parties that trial of a plaintiff's case in another venue is more appropriate."  The location of the third and fourth trial has not been set in stone, and the Court has accounted for the possibility of trials of plaintiffs venued from a district other than one in Mississippi and Texas.

While the ability to try third and fourth case is important, it should not be the primary driver of the plan.  The primary driver has to be the identification of representative plaintiffs for all trials.  Without question, Plaintiffs' plan will provide the Court with cases to try.  At the very least, four of the forty cases in the bellwether pool will be properly venued in the Eastern District and can be tried in this Court.  If the

remaining cases cannot be tried in this Court, the Court can seek a temporary assignment to try these case in the appropriate venue.

As the Court is well aware, the typical tool employed by transferee courts in the face of parties that are unwilling to waive *Lexecon* is to conduct the case in the district where the case was either originally filed or where venue would otherwise be proper.  *See MDL Standards and Best Practices* at 18.   Certainly, this option is inconvenient.  However, the Court has indicated (and Defendants even propose) that such measures will be employed in this matter.   Given that the bellwether trial plan already anticipates the need to seek a temporary assignment, it makes little sense to apply a geographic limitation at this stage.   After all, transferring the resources of this Court to another district is inconvenient no matter the district to which the Court must move.

While Defendants have tried to make much of the difficulty of obtaining a temporary assignment outside of the Fifth Circuit, such assignments are routinely granted.  In fact, the only circuit that would seem to disfavor such an assignment is the 9th Circuit.  *See In re Motor Fuel Temperature Sales Practices Litig.*, 711 F.3d 1050 (9th Cir. 2013).   No other Circuit has adopted such a view.   *See MDL Standards and Best Practices* at 18.

The Plaintiffs understand that the Defendants may maintain their *Lexecon* position.  However, no such decision must be made now.  At this point in the litigation, the parties have not conducted the appropriate census to define the categories of plaintiffs and attempt to agree upon eligibility criteria.  Given that these pivotal first steps have yet to occur, the decision to geographically limit entry into the bellwether discovery pool is premature.  Once the bellwether discovery pool is set, perhaps Defendants worst fears

will not be realized and the decision will be made to agree to waive *Lexecon* so that cases may be tried in this Court without having to seek a temporary assignment. Further, by deciding the geographic limitations now, we could be making the category process impossible. The better course is to keep the pool open.

Plaintiffs enter such a process fully understanding that, should Defendants be unwilling to waive *Lexecon* and the Court cannot obtain transfers, Plaintiff nominated cases may not be able to be tried if they are not located within the Eastern District of Louisiana or some other district for which the Court can obtain a temporary assignment. This is a risk the Plaintiffs understand and are willing to undertake in an effort to achieve representative cases.

## V. Conclusion

The Plaintiffs propose a bellwether selection process that will allow for the selection of representative plaintiffs – a critical component of bellwether trials. Further, the Plaintiffs plan does not rely solely upon luck to achieve such a result but rather provides for the input of counsel to assist the Court in selecting representative cases. The Plaintiffs' proposed order accomplishes this task by ensuring the bellwether discovery pool is open to plaintiffs from all states and provides the parties with meaningful input into the selection of both discovery and trial plaintiffs.

Plaintiffs submit that their proposed CMO 3 be adopted.

Respectfully submitted,

*/s/ Leonard A. Davis*

_____

Leonard A. Davis, Esq. (Bar No. 14190)
**HERMAN, HERMAN & KATZ, LLC**
820 O'Keefe Avenue
New Orleans, LA  70113
PH:  (504) 581-4892
FAX:  (504) 561-6024
Email:  ldavis@hhklawfirm.com


Gerald E. Meunier (Bar No. 9471)
**GAINSBURGH    BENJAMIN    DAVID
MEUNIER & WARSHAUER, LLC**
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA  70163-2800
PH:  (504) 522-2304
FAX: (504) 528-9973
Email:  gmeunier@gainsben.com

**Plaintiffs' Liaison Counsel**

## PLAINTIFFS' STEERING COMMITTEE

| | |
|---|---|
| Andy D. Birchfield, Jr. (Co-Lead Counsel)<br>234 Commerce Street<br>Post Office Box 4160<br>Montgomery, Alabama 36103-4160<br>Phone: (334) 269-2343<br>Fax: (334) 954-7555<br>Email: Andy.Birchfield@BeasleyAllen.com | Bradley D. Honnold<br>11150 Overbrook Rd., Ste. 200<br>Leawood, KS 66211<br>Phone: (913) 266-2300<br>Fax: (913) 266-2366<br>Email: bhonnold@bflawfirm.com |
| Brian H. Barr (Co-Lead Counsel)<br>316 Baylen Street, Suite 600<br>Pensacola, FL 32502<br>Phone: (850) 435-7045<br>Fax: (850) 436-6044<br>Email: bbarr@levinlaw.com | Frederick Longer<br>510 Walnut Street, Suite 500<br>Philadelphia, PA 19106<br>Phone: (215) 592-1500<br>Fax: (215-592-4663<br>Email: flonger@lfsblaw.com |
| Russell T. Abney<br>2100 RiverEdge Parkway,<br>Suite 720<br>Atlanta, Georgia 30328<br>Email: rabney@lawyerworks.com | Jeffrey S. Grand<br>550 Broad Street, Suite 920<br>Newark, NJ 07102<br>Phone: (973) 639-9100<br>Fax: (973) 639-9393<br>Email: jgrand@seegerweiss.com |
| Dr. Mark Alan Hoffman<br>1650 Market Street, Suite 3450<br>Philadelphia, PA 19103<br>Phone: (215) 574-2000<br>Fax: (215) 574-3080<br>Email: mhoffman@rossfellercasey.com | Roger C. Denton<br>100 S. 4th Street<br>St. Louis, MO 63102<br>Phone: (314) 621-6115<br>Email: rdenton@uselaws.com |
| Michael Goetz<br>201 N. Franklin St., 7th Floor<br>Tampa, FL 33602<br>Phone: (813) 221-6581<br>Fax: (813) 222-4737<br>Email: MGoetz@ForThePeople.com | Dianne M. Nast<br>1101 Market Street, Suite 2801<br>Philadelphia, Pennsylvania 19107<br>Phone: (215) 923-9300<br>Email: dnast@nastlaw.com |
| Neil D. Overholtz<br>17 E. Main Street , Suite 200<br>Pensacola, Florida 32501<br>Phone: (850) 916-7450<br>Fax: (850) 916-7449<br>Email: noverholtz@awkolaw.com | Ellen Relkin<br>700 Broadway<br>New York, New York 10003<br>Phone: (212) 558-5500<br>Fax: (212) 344-5461<br>Email: Erelkin@weitzlux.com |

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on November 4, 2015, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre-Trial Order No. 17.

*/s/ Leonard A. Davis*
**Leonard A. Davis**