1               UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
2

3    ****************************************************************

4    IN RE:  XARELTO (RIVAROXABAN)
     PRODUCTS LIABILITY LITIGATION        CIVIL DOCKET NO. 14-MD-2592
5                                         SECTION L
                                          NEW ORLEANS, LOUISIANA
6                                         Friday, November 20, 2015
     THIS DOCUMENT RELATES TO             1:00 P.M.
7    ALL CASES

8
     ****************************************************************
9

10              TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS
              HEARD BEFORE THE HONORABLE ELDON E. FALLON
11                 UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19   OFFICIAL
     COURT REPORTER:    TERRI A. HOURIGAN, CRR, RPR
20                      CERTIFIED REALTIME REPORTER
                        REGISTERED PROFESSIONAL REPORTER
21                      500 POYDRAS STREET, ROOM B-275
                        NEW ORLEANS, LOUISIANA  70130
22                      (504) 589-7775
                        Terri Hourigan@laed.uscourts.gov
23

24   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
     PRODUCED BY COMPUTER.
25

```
 1    APPEARANCES:

 2

 3    FOR THE PLAINTIFFS'
      LIAISON COUNSEL:              HERMAN, HERMAN & KATZ
                                    BY:  LEONARD A. DAVIS, ESQ.
 4                                  820 O'KEEFE AVENUE
                                    NEW ORLEANS, LOUISIANA 70113
 5
                                    GAINSBURGH, BENJAMIN, DAVID,
 6                                  MEUNIER & WARSHAUER
                                    BY:  GERALD E. MEUNIER, ESQ.
 7                                  2800 ENERGY CENTRE
                                    1100 Poydras Street, Suite 2800
 8                                  New Orleans, Louisiana 70163

 9
      FOR THE PLAINTIFFS:           LEVIN, PAPANTONIO, THOMAS, MITCHELL
10                                  RAFFERTY & PROCTOR
                                    BY:  FRED LONGER, ESQ.
11                                  316 South Baylen Street, Suite 600
                                    Pensacola, Florida  32502
12
                                    BEASLEY, ALLEN, CROW, METHVIN
13                                  PORTIS & MILES
                                    BY:  ANTHONY BIRCHFIELD, JR., ESQ.
14                                  Post Office Box 4160
                                    Montgomery, Alabama 36103
15
                                    ROSS, FELLER & CASEY
16                                  BY:  MARK A. HOFFMAN, ESQ.
                                    1650 Market Street, Suite 3450
17                                  Philadelphia, Pennsylvania 19103

18                                  BARRIOS, KINGSDORF & CASTEIX
                                    BY:  DAWN M. BARRIOS, ESQ.
19                                  701 Poydras Street, Suite 3650
                                    New Orleans, Louisiana 70139
20

21    FOR THE DEFENDANTS'           IRWIN, FRITCHIE, URQUHART & MOORE
      LIAISON COUNSEL:              BY:  JAMES B. IRWIN, V, ESQ.
22                                  400 Poydras Street, Suite 2700
                                    New Orleans, Louisiana 70130
23

24

25
```

```
 1   APPEARANCES:

 2
     FOR THE DEFENDANTS:         CHAFFE MCCALL
 3                               BY:  JOHN F. OLINDE, ESQ.
                                 1100 Poydras Street
 4                               New Orleans, Louisiana 70163

 5                               DRINKER, BIDDLE & REATH
                                 BY:  SUSAN M. SHARKO, ESQ.
 6                               500 Campus Drive
                                 Florham Park, New Jersey  07932
 7
                                 KAYE SCHOLER
 8                               BY:  STEVEN GLICKSTEIN, ESQ.
                                 250 West 55th Street
 9                               New York, New York  10019

10
     SPECIAL MASTER:             BROWNGREER  (Via telephone)
11                               BY:  JACOB WOODY, ESQ.
                                 250 Rocketts Way
12                               Richmond, Virginia 23231

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1           **P-R-O-C-E-E-D-I-N-G-S**

2                November 20, 2015

3              (COURT CALLED TO ORDER)

4

5           THE CASE MANAGER:  All rise.

6           THE COURT:  Be seated, please.

7           Good afternoon, ladies and gentlemen.

8           Let's call the case.

9           THE CASE MANAGER:  *MDL No. 2592, In re: Xarelto*

10   *Products Liability Litigation.*

11           THE COURT:  Counsel, make your appearance for the

12   record, please.

13           MR. MEUNIER:  Gerry Meunier, co-liaison counsel for

14   plaintiffs.

15           MR. IRWIN:  Good afternoon, Your Honor, Jim Irwin for

16   defendants.

17           THE COURT:  Okay.  I met a moment ago with the liaison

18   lead counsel and discussed the proposed agenda.

19           We will take it in the order proposed.  Pretrial

20   orders, anything?

21           MR. MEUNIER:  Nothing new to report on pretrial orders,

22   Your Honor.

23           THE COURT:  Okay.  Case Management Order 2.

24           MR. MEUNIER:  Case Management Order 2 was entered

25   setting dates for a bellwether trial starting in February

1    of 2017.

2         The next prong of that approach will be the issues

3    raised in Case Management Order No. 3, which is to be argued

4    before the Court following this conference.

5         THE COURT:  Okay.  Counsel, contact information?

6         MR. MEUNIER:  We continue to be pleased to receive the

7    information called for under PTO4-A, and we appreciate counsel

8    doing that with respect to liaison counsel.

9         MDL centrality, Judge, you know, this is a new program

10   that the Court encouraged to be adopted.  And we believe after

11   a few kinks being worked out, it has become an effective tool

12   in the case.

13        We have heard, as Your Honor heard this morning from

14   Jake Woody on what the centrality program reveals in terms of

15   the number of fact sheets, and I will be happy to state those

16   numbers for the record.

17        THE COURT:  Let me hear from him.  Jake, are you on the

18   line?

19        MR. WOODY:  Yes, Your Honor.

20        THE COURT:  Do you want to speak up and give us a

21   report on what your figures are?

22        MR. WOODY:  Yes, certainly, Your Honor.

23        To date we have 2,357 plaintiff fact sheets submitted

24   through MDL centrality.

25        The last month at the last status conference we had

1  1870.  That is an increase of 487 fact sheets since the last

2  status conference.

3          There are 1,257 fact sheets in progress.  That brings

4  us to a total number of fact sheets in the system to 3,614.

5          I should also mention that 750 plaintiffs have been

6  able to amend their fact sheets after submitting an original.

7          You can amend a fact sheet as many times as necessary

8  to get the information that you want on the fact sheet.

9          Whenever there is an amendment, we retitle the document

10 and save all previous fact sheets in the system.

11         For instance, if you submitted a second amended fact

12 sheet, we would call it "second amended fact sheet" so it is

13 clear what happened with that fact sheet.

14         The defendants are also submitting defendant fact

15 sheets through MDL centrality.  To date we have 1,198 defendant

16 fact sheets submitted through the system.  That is the combined

17 total from both defendants.

18         We do also have fact sheets submitted from every state,

19 including Washington D.C., and Puerto Rico.

20         The state with the most fact sheets is Louisiana, with

21 203.  Texas has 190, and that is the second largest submission.

22 We do have 51 fact sheets from Mississippi, which I mentioned,

23 for purposes of the bellwether selection that the parties are

24 working through now.

25         We also, I do want to mention that the defendants

1  review each fact sheet, through MDL centrality.  They review

2  the answers and the supporting documents to make a

3  determination as to whether there are any petition fees.

4      The defendants do that through the system.  We are not

5  involved with it other than to engineer the system to allow

6  them to do these reviews.

7      And if they do find deficiencies on the fact sheet,

8  they submit weekly e-mails to plaintiff and the plaintiffs'

9  counsel to notify them that there is deficiency, and also tell

10  them exactly what the deficiency is, along with the

11  instructions on how to cure that deficiency.

12      Any time that a new document is uploaded by a plaintiff

13  in response to a deficiency notice or otherwise, or they amend

14  a plaintiff fact sheet, we send that new information to the

15  defendant.

16      So to respond to a deficiency notice, all of that needs

17  to happen is that you either upload a new document or you amend

18  the fact sheet with new information.  There is no need to

19  independently notify us or the defendants that you have

20  attempted to secure the deficiency, because we automatically

21  route that fact sheet to the defendants to review those

22  changes.

23      So, we have been working closely with both sides to

24  make all necessary information available.  We will continue to

25  do that going forward.

1        THE COURT:  Okay.  Just let me reinforce the importance

2  of fact sheets in this type of litigation; we don't have the

3  time and it's not efficient to go back and forth with

4  interrogatories.

5        We ask the parties to meet and confer about what type

6  of information they need, and then they prepare a fact sheet

7  and submit it to each side.

8        But it's important, from the plaintiffs' standpoint,

9  that they fill out the fact sheets.  The fact sheets are

10  important, not only for the purpose of getting information to

11  the defendant, but also getting on the bellwether discovery, as

12  well as the trial part of the case.  Also, it's an opportunity

13  for the Court to see who is serious about pursuing their

14  claims.

15        If the claims are not going to be filled out, if the

16  fact sheets are not going to be filled out, then I will be

17  dismissing the cases.  I will dismiss the case.

18        My intent is to dismiss the cases with prejudice, not

19  without prejudice.  I'm not going to do that Willy-nilly.  I'm

20  going to give everybody an opportunity to fill in the fact

21  sheets or explain why they haven't filled in the fact sheet, if

22  they haven't.  If they have a good reason, I will listen to it.

23  But if they just don't have that on their radar screen and they

24  are too busy with other things or something else, then I'm

25  going to have to dismiss the case.

1        Also, with the fact sheets, we find in some of these

2  types of cases, particularly with the pharmaceutical drug

3  cases, there are individuals who have made claims, but they

4  haven't taken the drug.  They may have taken another drug, and

5  they may be entitled to be in another MDL proceeding, but not

6  in this proceeding, and the fact sheets are helpful in

7  determining that aspect of the situation, so that those cases

8  can be moved out of the system.

9        The important thing that I want everybody to know is

10  it's important to fill out the fact sheets.  If you can't fill

11  them out, if you can't totally fill it out, fill out what you

12  can.  If you can't complete it, the parties will work with you

13  on completing it.  But we have got to get you into the system.

14  If not, you will have to leave this litigation.

15        MR. MEUNIER:  Thank you, Your Honor.

16        And under the discussion of the joint report, dealing

17  with plaintiff facts sheets in paragraph 6, we mentioned that

18  the defendants have submitted to us for consideration proposed

19  forms of orders to show cause in cases where the fact sheet has

20  not been timely submitted and in cases where the proof of use

21  of the product is not sufficiently documented by the fact

22  sheet.

23        We share the Court's concern, and certainly the

24  interest in having these fact sheets done properly and on time.

25        We simply ask that we be given some meet-and-confer

1    opportunity with defendants to perhaps shake those protocols so

2    that they allow for some opportunity for PSC to interface with

3    the plaintiffs' counsel and see if we can't fix whatever the

4    problem is.

5           So I think Mr. Davis and Ms. Sharko will be having

6    followup discussions about that.

7           THE COURT:  Good.

8           MR. MEUNIER:  It's also mentioned in this section on

9    fact sheets, Your Honor, that medical records in some cases are

10   obtained by the defendant using the authorizations provided

11   with a plaintiff fact sheet.  It may be in some of those cases

12   the plaintiffs' counsel themselves don't have those records or

13   have not ordered them.

14          So we're talking to the defendants about a suitable way

15   in which to get through their vendor, medical records they

16   obtain, simultaneously on it being received by defendants, and

17   we will continue to work on that.  I'm sure we will work

18   something out.

19          We also mentioned in the report that an issue has come

20   up about the appropriate deadline for the submission of the

21   defendant fact sheet, which is a deadline that depends on the

22   submission of plaintiff facts sheet.

23          In those cases, specifically where there is an

24   amendment or supplementation of plaintiff fact sheet, the

25   question is, is the clock still running from the original date

1    from the DFS or is there a new clock running?

2             I think, from our view, I think we have some agreement

3    on this, it may well depend on the nature of the amendment.  If

4    it's a technical amendment, or even an erroneous amendment,

5    that there shouldn't be any later deadline for the DFS.

6             On the other hand, if it's a substantive amendment, it

7    would make sense that the DFS not be done twice.

8             So we will again continue meet-and-confer discussions

9    and work something out on that.

10            There is nothing new to report on the defendant fact

11   sheets.

12            With respect to the bundling of complaints in

13   paragraph 8 of the report, just to report to the Court that

14   according to the Clerk's Office, 3,124 complaints have been

15   filed or transferred into the MDL as of this time.

16            There are pretrial orders now dealing with the

17   voluntary dismissal of complaints, and we encourage plaintiffs'

18   counsel to become familiar with those pretrial orders to the

19   extent that there are standards and protocols for plaintiffs'

20   counsel to follow in regard to the voluntary dismissal of

21   actions.

22            Under paragraph 9, Judge, there is reference to the

23   preservation orders.  And as you know, we have the

24   modifications of PTO-15 in that regard, dealing with electronic

25   information through the entry of PTO-15(b), which specifies and

1    addresses voicemail, instant messaging, and text messages.

2         There is an obligation here on the part of both

3    defendants and plaintiffs, and so I want to encourage

4    plaintiffs' counsel who may be monitoring today, to make sure

5    they become familiar with PTO-15 and 15(b), and that they make

6    appropriate contacts with their plaintiffs in order to know

7    that the right thing is being done under those preservation

8    orders.

9         Paragraph 10 deals with a proposal, a proposed order we

10   received November 15th from the defendants dealing with the

11   issue of plaintiff attorneys, having an opportunity to

12   communicate with a treating or prescribing physician in advance

13   of that physician's deposition, and to do so privately pursuant

14   to the waiver of the HIPPA privilege by the client.

15        I believe, where we stand on this is that there will be

16   competing versions of that protocol submitted to the Court.

17        I believe we will need your assistance, based on your

18   earlier experience with that issue.

19        THE COURT:  Yes.  Take a look at my orders in other

20   cases because I have dealt with that before.  I'm familiar with

21   the problem, but look at it.

22        It doesn't mean I have written it in stone, but at

23   least you will get some idea of the approach that I have used

24   in other cases.

25        MR. MEUNIER:  Thank you, Judge.

 1           On discovery, we do continue to have our bi-weekly

 2     telephone conferences with the Court.  I believe, since the

 3     next conference, though, was scheduled next Tuesday morning,

 4     that the parties feel that it's not necessary, since we have

 5     been able to go over some things with you today, and we can

 6     consider that it's postponed or canceled.

 7           THE COURT:  Okay.

 8           MR. MEUNIER:  On discovery, Judge, again, this is

 9     paragraph 11 of the report, we report that the 30(b)(6)

10     depositions of both the defendants, both J&J and Bayer have now

11     been calendered.  This is on corporate structure.

12           The 30(b)(6) deposition of Janssen and J&J will take

13     place in Princeton, New Jersey, on December 11th, 2015.

14           The 30(b)(6) deposition for corporate structure

15     purposes of Bayer, the Bayer defendants will take place on

16     December 15th, in Pittsburgh, Pennsylvania.

17           THE COURT:  Right.  We already know that so that I can

18     put that in my website.  I have got a little portion of the

19     website that has a calendar on it, so that people, at least,

20     know that that's been happening or will be happening.

21           MR. MEUNIER:  Judge, there is one other thing mentioned

22     in the joint report on the subject of discovery, and that is

23     so-called "dear doctor letters."

24           Again, I think we have had some meaningful

25     meet-and-confer discussions with the defendants and will

1    continue to do so, and hopefully work that out.

2          It has to do with the plaintiffs' ability to get the

3    dear doctor letters that may have been sent to a given

4    prescribing physician or treating physician.

5          THE COURT:  Yes.  Back in the day it was very hard to

6    get a hold on those, but with computers now, that information

7    is readily available, and it sometimes can be produced in a

8    format.  It's the same letter that is sent to a thousand

9    doctors, so that if you only have a thousand, you just need to

10   have that letter and an indication that these doctors received

11   it on such and such a date.

12         MR. MEUNIER:  On paragraph 12 of the report, this

13   references deposition guidelines.  There is still an effort

14   being made by the parties to come up with a joint order for the

15   Court that sets forth the protocol for the taking of

16   depositions.

17         At the same time, we have taken deposition testimony

18   already in the case and will in December, as I mentioned, with

19   the corporate structure.  We don't think those have been

20   impacted by there not being such an order.

21         We do perceive that there are several issues, though,

22   that may need the Court to attend to in order to get us through

23   to an order for the protocol.

24         And I believe Mr. Barr on our side, and Susan Sharko --

25   Susan?

 1          MS.  SHARKO:  Deirdre Kole.

 2          MR. MEUNIER:  Deirdre Kole is on the defense side.

 3          I think we will work on that.  I don't know that we

 4    have any specific idea when we will be at a point to submit

 5    competing orders but I sense it will be soon.

 6          THE COURT:  Yes.  Keep a flexible view of that, because

 7    you are going to find as you proceed with depositions, some

 8    other issues come up that need to be solved in some protocol

 9    fashion.

10          Some things that you thought needed to be solved in

11    protocol fashion, really they don't need to be.  So, some of

12    that may have to be amended as you move on, but let's try to

13    get one so that we all know the rules.

14          MR. MEUNIER:  Paragraph 13 deals with discovery to

15    third parties, Your Honor.

16          As you know, we have issued subpoenas to the FDA.  We

17    have issued one as well to Duke Clinical Research Institute.

18          We continue to have communication with the FDA about

19    the return on that subpoena.  We have received information from

20    the FDA under the subpoena, but there are internal

21    communications which we have yet to receive from the FDA, and

22    we are in contact with the agency and continue to work with

23    them on getting a full return as to that material.

24          I believe the same is true with respect to Duke.  We

25    have a subpoena issued.  We have been in communication with

1   them.  I think Mr. Davis has been active in that, and continues

2   to have discussion with them.

3        We have received some documents from Duke, but we don't

4   believe we have received all of the documents that are to be

5   produced under that subpoena.

6        The next item is state/federal coordination and

7   Ms. Barrios is here to report on that.

8        THE COURT:  Right.  Dawn, I sent you a copy of a letter

9   that I just roughed out, and if you have any input or

10  suggestions on it, someone mentioned that I should put the

11  website in and also in another area that --

12       MS. BARRIOS:  Yes, Your Honor.  Thank you for doing

13  that.  I think it's going to be very helpful.

14       I assume your stationary has your phone number on it,

15  so they know how to get in touch with you.

16       THE COURT:  Right.

17       MS. BARRIOS:  This might be a very picky point, but you

18  say that the cases here are for personal injury and wrongful

19  death.

20       I believe, but I'm not positive, there could be some

21  consumer class here as well.

22       THE COURT:  Okay.  I will make sure I put that in

23  there.

24       MS. BARRIOS:  Your Honor, I handed your law clerk the

25  Xarelto state court stats as of today.  I thank Ms. Sharko for

1    getting me that.

2         You will see from last time we were here, there were 55

3    more cases filed, but 77 more plaintiffs -- Xarelto users, and

4    there are 484 cases presently in state court.

5         THE COURT:  Where are the most in state court?

6         MS. BARRIOS:  Pennsylvania.

7         THE COURT:  Pennsylvania.

8         MS. BARRIOS:  The report from Pennsylvania, neither

9    lead counsel for the Pennsylvania action could be here today,

10   but he e-mailed me to tell me that the only thing that has

11   happened since last status conference was the judge denied the

12   defendant's form of non-*conveniens* motion.

13        THE COURT:  Okay.  Thank you very much, Dawn.

14        MR. MEUNIER:  Your Honor, the only remaining item on

15   today's agenda, Your Honor, is the next status conference.

16        THE COURT:  What is the one in December?

17        MR. MEUNIER:  December 21st at 9:00 a.m. is the next

18   conference.

19        THE COURT:  Okay.  The one in January is?

20        MR. MEUNIER:  January 22nd --

21        THE COURT:  22nd, I think you said?

22        THE LAW CLERK:  21st.

23        THE COURT:  21st or 22nd, what is it?

24        THE CASE MANAGER:  The 22nd.

25        MR. IRWIN:  I think it's December 21?

1           MR. MEUNIER:  December 21.

2           MR. IRWIN:  And January 22, 2016.

3           THE COURT:  Right, 2016, at nine o'clock.  So it will

4     be 8:30 for the pre-meeting and nine o'clock for the

5     conference.

6           MR. MEUNIER:  Thank you, Judge.

7           THE COURT:  Okay.  Anything else from anybody?

8           Steve?

9           MR. GLICKSTEIN:  Your Honor, I just want to wish my

10    good friend, Gerry Meunier, a happy birthday.

11          THE COURT:  Good.  Well, okay, happy birthday, Gerry.

12    We are all happy for you.

13          MR. MEUNIER:  Thank you.  That is not the most

14    boisterous birthday party I have had, but it is certainly one

15    of the better attended birthday parties.

16          MR. GLICKSTEIN:  You don't want us to sing.

17          THE COURT:  We have the other matter to discuss, and

18    that is proposed Case Management Order 3.

19          Are you all ready to talk about that?

20          MR. BIRCHFIELD:  Yes, Your Honor.

21          THE COURT:  Okay.  Andy, do you want to lead off?

22          MR. BIRCHFIELD:  Yes.  Andy Birchfield on behalf of the

23    PSC.

24          Your Honor, we want to thank you for the opportunity to

25    be heard on this issue of critical importance, not only to the

1    potential success of this MDL, but to future MDLs of similar

2    magnitude.

3         Before the Court are two competing case management

4    orders.  These case management orders address the bellwether

5    trial selection process.

6         In order to determine which of these orders is more

7    fitting, it's critical that we keep the purpose of bellwether

8    trials in focus.

9         The purpose of bellwether trials is to provide

10   meaningful information to the parties and to the Court.  The

11   twin goals of bellwether trials is to provide informative

12   indicators of future trends and to serve as catalysts for

13   ultimate resolution.

14        So when we look at these competing orders, we see that

15   it's important that the cases that are selected must be done in

16   a careful and deliberate manner.

17        Unless the cases are appropriately selected, the

18   benefit of the bellwether trials is lost.

19        Yes, there would remain, you know, some advantage to

20   going through the trial process and seeing how witnesses

21   perform under trial, and perhaps working up, you know, a trial

22   package, to some extent.  But if that is done in the context of

23   an ill-fitting plaintiff's case, the vast majority of the

24   benefits of those trials is forfeited.  They are forfeited at

25   great cost to both parties.

1          You know, before the Court, these competing orders are

2     the second prong of the bellwether process.

3          CMO-2 is the first prong, and that order has already --

4     has already been entered.

5          In the plaintiffs' view, CMO-2 took a major step

6     backwards from the goal of bellwether trials, the twin goals of

7     bellwether trials.  CMO-2 takes us a giant step away from that

8     goal.

9          THE COURT:  Two or three?

10          MR. BIRCHFIELD:  Two.  The CMO-2 that has already been

11     entered, we say has taken us a long way backwards from the

12     goals.

13          The competing orders, the plaintiffs' order, seeks to

14     ameliorate that damage to some measure.

15          The defendants' proposed order seeks to compound that

16     injury.

17          Before I move forward in supporting that position, I

18     want to be clear on one point:  The PSC today -- we are not

19     here asking the Court to vacate CMO-2.  We are not asking the

20     Court to strike the random selection provision.

21          The random selection that is included in CMO-2, it is a

22     knife wound to the heart of bellwether trials.  But we have

23     taken that wound, and we are moving forward.

24          We're still -- the defendants portray the -- this PSC

25     as having willingly agreed to, negotiated for, and stipulated

1       to this random selection provision.

2               That heightens the distrust that the many plaintiffs'

3       lawyers harbor toward MDL lawyers.

4               Yes, the random selection is a bitter pill, but we have

5       swallowed it, and we are not asking the Court to strike that

6       provision or to back away from it.

7               We are asking the Court not to compound that injury

8       further by adopting the defendants' proposed CMO-3.

9               In order for us to have a meaningful bellwether trial,

10      there are a large number of factors that must be -- that must

11      be considered -- that must be weighed; the proof of use, for

12      one.

13              You know, yes, you know, through the MDL centrality,

14      plaintiffs submit their fact sheets and they submit proof of

15      use.

16              They meet the minimum requirements, but what do we

17      know, you know, in working, you know, working these cases,

18      trying to select a meaningful case?

19              If a plaintiff submits three months of Xarelto proof of

20      use, but the month before the injury, he has moved to another

21      town, and that last month before the injury, we don't have a

22      proof of use yet.  And maybe, you know, the intake records at

23      the hospital just list an anticoagulant, it doesn't list

24      Xarelto.  So what happens?

25              That case is in the mix.  But if that case is selected

1    in a bellwether trial, then the focus becomes not on the merits

2    of the case, but it becomes whether or not this plaintiff

3    actually took the drug or not.

4          Well, the parties know that random selection does not

5    account for that.  The proof of use is one factor.  The

6    plaintiffs' counsel -- that is another factor.

7          Is the lawyer that actually represents the claim, you

8    know, the claimant, is that someone that will work with the

9    PSC?  Is it someone that will allow the PSC to try the case?

10   Is a trial lawyer who really knows how to work up a case or is

11   it a real estate lawyer who really couldn't even find his way

12   into a deposition room?

13         Yes, he may be the king of the real estate world, but

14   he's not really any help here.  The parties know that.  Random

15   selection doesn't account for that.

16         You look at the plaintiff, himself.  Is he a likable

17   plaintiff?  I mean, if we have got Pope Francis or Drew Brees

18   as a plaintiff, then what is going to happen?  The personality

19   is going to overwhelm the other issues in the case.

20         What if it's a four-time felon?  Then that is going to

21   overwhelm the issues of the case.  Those are extremes, and,

22   yes, they can be cut out at the end, but the party's

23   involvement in developing the pool should sift through those

24   issues.  And it's more than just those extremes.

25         We know that there are -- there are some people that

1    are very likable and there are other people that even their

2    mama doesn't love them.  They may love them, she has to do

3    that, but may not like them -- may not like the way he walks,

4    the way he holds his head, you know, just walking into the

5    room, people don't like him.

6         That takes away from the meaningfulness of a bellwether

7    trial.

8         What about the prescribing physician?  The prescribing

9    physician, I mean, if it's the highest prescriber of Xarelto in

10   the country and the highest-paid consultant for the defendants,

11   that is an important factor.

12        If it's the rare breed of a prescribing doctor that

13   will not even see a sales rep, that is an important factor that

14   the parties know.  The parties can learn that, but random

15   selection doesn't account for that.

16        What about the sales rep?  I mean, the sales rep, is he

17   one that knows this doctor, is in there every week, you know,

18   what are the messages that he is conveying?  Is he available?

19   Is he no longer with the company?  You know, all of those are

20   factors that play into whether or not you have a meaningful

21   bellwether trial or not.

22        Those factors are notable by the parties, but they are

23   not accounted for in random selection.

24        In order for -- in order for us to have a meaningful

25   bellwether case, we have to take all of these factors, you

1    know, into consideration plus about a half dozen more, and we

2    need to weigh those.

3         With a pool, and right now we're looking at a pool of

4    potentially 2200 cases, and that will be divided -- it will be

5    divided into four to six categories, based on injuries, and so

6    that pool shrinks there.

7         You weigh in each of these factors, if you look at that

8    size of pool.  If you are looking at a pool for each of those

9    categories of 400 to 600 cases, can you walk through all of

10   these factors?  You are not going to find one that meets them

11   all, but can you weigh each of those and reach a bellwether

12   plaintiff that will provide a meaningful result.

13        But the defendants -- the defendants do not want us --

14   their proposal does not allow us to look at that size of pool.

15   The defendants' proposal takes that pool and it reduces it to

16   15 percent of that -- 15 percent.  Fifteen percent of the cases

17   are the cases that are currently filed with fact sheets in

18   Louisiana and Mississippi and Texas.

19        It is important that we look at these categories.  I

20   mean, the MDL centrality, and the plaintiffs' fact sheets,

21   those are effective tools in helping us to identify those

22   categories, but they should not drive -- beyond developing and

23   establishing the categories -- they should not drive the

24   selection of the discovery pool cases and ultimately the

25   bellwether trials.

1            Another, you know, very important factor that the

2     parties should weigh in finding a meaningful bellwether case is

3     state law.  How does the state law apply, you know, in this

4     case?

5            Is it -- what is the state law on the learning

6     intermediary?  What does directive consumer advertising -- how

7     does that play into this case

8            There are a number of factors of state court law that

9     will impact the meaningfulness of the case.

10           Are there certain, you know, marketing messages that

11    will not come into play based on the facts of a particular

12    plaintiff's case?  Those are factors that the parties in a

13    deliberative process can sift through.

14           But, random selection wipes that all away.

15           But here is the worst part, and the factor of state law

16    is a good pivot point for us to shift from CMO-2 and the random

17    selection, because random selection just takes all of those

18    factors away.  You know, for half of our pool, we don't even

19    get the benefit of going through that process because half of

20    the cases, 20 of the 40, are selected by random selection under

21    CMO-2.

22           But the worst part of the state law is what would be,

23    as the defendants include in their proposed CMO-3, is that the

24    only cases that would be tried are cases from Louisiana,

25    Mississippi, and Texas.

1            Well, Louisiana law -- Louisiana law does not allow for

2      punitive damages.  In all of the pharmaceutical cases that I

3      have been a part of, this case is chief among them in

4      warranting punitive damages.  It's a major coup for the

5      defendants that half of the bellwether trials, the two in

6      Louisiana, will not be exposed to punitive damages.

7            Then Mississippi:  Mississippi has a cap on noneconomic

8      damages.  The patient population for Xarelto is an elderly

9      population.  You are dealing mostly with retired people, and

10     they suffer a catastrophic injury, many of them have, but

11     they -- but they don't have economic damages.  The economic

12     damages are just a small part.  The real injury is the

13     noneconomic damages.

14            So the defendants, by limiting the cases, the trial to

15     Mississippi, say, you know, that is off the table.

16            And then Texas, you know, Texas, the current state of

17     the law, Texas does not allow a failure to warrant a claim.

18            Yes, in these drug cases there are, you know, there are

19     other claims, but the heart and soul of a pharmaceutical case

20     is the failure to warrant claim.  Well, that is off the table

21     for any of the Texas cases.

22            So the defendants' plan by, you know, one limiting the

23     pool, the trial pool, to these three states, shrinks the pie.

24     It slices that pie so thin that we cannot get a meaningful

25     bite.  We cannot -- the chances of getting a meaningful

bellwether case from the plan that the defendants have proposed
is near nil.  So, that is where we are.

So what we would propose, Your Honor, we have taken the
core CMO-2, and we see that the first two trials are going to
be in Louisiana.

The Court says that the next two cases will be in Texas
and Mississippi, unless there are good reasons otherwise.  So
what we would ask the Court to do is open up the pool.

The plaintiffs, in order to get -- in order to get four
bellwether cases, we only get ten picks.  We get ten picks.  So
we can do a very careful vetting through all of those factors
that I have described and a bunch more, and we can come up with
ones that we believe would provide meaningful results.

And we know from experience, that as we go through the
discovery process, and we take depositions that some of us --
we're going to find out things that would make those cases
inappropriate.

So, if we open it up, if we open up the selection
process to the universe -- to the universe of the 2200 or
2300 cases that are currently eligible, and by the way, Your
Honor, that is still just a small slice.  I mean, by our rough
survey of cases that are currently represented by lawyers but
are unfiled, that is about 80 percent.  So only 20 percent of
the cases are on file, to start with.

So we got a significant number of cases that are yet to

1  come in, that they will not be eligible for this.  So, we're

2  fishing in a smaller pool to start with.

3      The defendants want to reduce that pool even further to

4  15 percent of its current size, and say find a bellwether case,

5  because they know it's next to impossible that we will be able

6  to do that, certainly with those three states.

7      We have heard the Court -- we have heard the Court that

8  the Court wants to try cases in Mississippi and Texas.  We do

9  think -- we agree that there is a tremendous benefit from

10 having cases with different jury pools.

11     And so, trying the cases in Texas and Mississippi, that

12 is fine.  We hope that those cases would not be limited to

13 Texas or Mississippi plaintiffs.  But we understand the Court's

14 position.

15     So, we understand that if we go forward, and we only

16 put up, you know, if we pick out of our ten picks, if we only

17 pick one Mississippi or one Texas, or if we don't pick any,

18 then it's certain the defendants' pick is going to be chosen.

19     So, we have -- we're in a place where the only way --

20 the only way for us to have even a semblance of a meaningful

21 bellwether process, is to open the pool up to all eligible

22 candidates.

23     Let us come forward.  We will certainly look at Texas

24 and Mississippi cases, but at the end of the day, if we come

25 forward, you know, and say, Judge, these are the best that we

1   have got, these are the best bellwether -- these are the only

2   ones that will provide us meaningful information, and we're

3   committed -- we are committed to finding meaningful plaintiffs.

4        There are serious injury cases out there.  You know, a

5   number of these cases that we have looked at, we say are

6   outliers.  A 50 year-old goes in for a hip implant.  He is put

7   on Xarelto for prophylactic purposes following the surgery.  He

8   has a major bleed, and as a result of that bleed, the doctor

9   gives him an experimental antidote that he has a catastrophic

10  reaction to.

11       The injuries there -- the injuries there are enormous.

12  But that would not be a meaningful case.  It would be a good

13  case for the plaintiffs, but it's not meaningful.

14       We are committed to providing the Court with meaningful

15  selections.

16       The defendants have stated in their papers, that they

17  will likely present the ten weakest cases.  But, we're not.

18  We're not going out to find the ten strongest, we're going to

19  offer the Court the ten most meaningful.

20       Allow us -- allow us the opportunity to find those ten

21  most meaningful, among the entire population.

22       It's like a baseball arbitration.  We know that if we

23  come forward with, you know, with an outlier case, that it's

24  going to be rejected by the Court.  So we have that protection

25  in place.

1          THE COURT:  All right.

2          MR. BIRCHFIELD:  Your Honor, we believe that the advent

3     of bellwether trials in MDLs was a giant step forward in the

4     evolution of MDLs.  We are committed to try MDL cases, if

5     they're meaningful.  That is what we are after.  That's what we

6     are pursuing.

7          THE COURT:  Okay.

8          MR. BIRCHFIELD.  But if the playing field is tilted so

9     heavily in the defendants' favor that the bellwether trials

10    cannot be meaningful, then perhaps the Court should abandon the

11    bellwether trial process and just focus on the pretrial

12    process, allow the PSC and others to get the data points in

13    state court venues.

14         We don't want that.  We want a meaningful process, but

15    it takes cooperation from both sides.

16         THE COURT:  Yes.

17         MR. BIRCHFIELD:  If we don't have that, then we're

18    afraid it will be meaningless.

19         THE COURT:  I hear you.  Let me tell you this:

20    Nationwide, the biggest criticism with bellwethers is that the

21    plaintiffs pick their best cases and the defendants pick their

22    best cases.

23         When plaintiffs win, the defendants say, what did you

24    expect, you picked the five cases that there are only five in

25    it, and you picked the best five in the whole 3,000 or 4,000.

1        When the defense wins, you say you picked the worst

2   cases.  It's the ugliest goat in the island, and you picked

3   them.  And that is a big criticism.

4        The other criticism is that the defendants don't know

5   the cases as well as the plaintiffs know them.

6        Therefore, the defendants are at a disadvantage because

7   they don't know which cases to pick.  They haven't discovered

8   anything.

9        So what I have tried to do in this case is to create a

10   discovery pool which takes into consideration that the

11   plaintiffs ought to pick their best cases, and will pick their

12   best cases.

13        The defendants will pick their best cases, and then

14   there are some just other cases that are picked randomly to

15   offset those two parts.

16        I can't expect the plaintiff to pick the worst case

17   that they have.  It just doesn't happen.  It's not realistic.

18        I can't expect the defendants to pick the worst case

19   that they have.  That is just not realistic.  Even if they say,

20   well, we want to see what the juries are going to say, they are

21   never going to pick the worst case.  You are never going to

22   pick the worst case.

23        So I tried to balance that with some random selection.

24   But the random selection is an attempt to get a census of the

25   whole litigation, a grouping that mimics the whole litigation,

1    and it's a better chance to get that than it is by having each

2    side pick their best cases.

3         If there are five bellwether cases, and each of you all

4    pick -- or six bellwether cases, and each of you pick three,

5    and you have got 3,000 cases out there, that may not give you

6    anything about the whole census of the litigation.

7         And when you get down to looking at it, if you are

8    going to just focus on what juries are giving you or have

9    deprived you of, it's not going to be helpful at all to you,

10   because it's not representative of the whole group.

11        So I have tried to create the discovery pool by some

12   method which takes into consideration those biases and

13   neutralizes the biases by having random selection.

14        Now, I assume the random selection is going to pick

15   some that are your best cases and some that are the defendants'

16   best cases.  That's what random does, generally.  It randomly

17   selects them.  It doesn't mean it's not going to be

18   representative.

19        It's more -- this way of selecting it, is going to be

20   when you come down to the discovery pool, that's going to be

21   more realistic of what that out there -- the whole census of

22   the litigation looks like, than if you give each side an

23   opportunity to pick their best cases.

24        So, but the point is, is that you have a discovery

25   pool.  The discovery pool is 40 cases.  Each side gets to drill

1    down that discovery pool to find out the best they can about

2    those cases.

3         And then you pick your -- we haven't decided the method

4    of going about picking bellwethers, but from that discovery

5    pool, you get to pick your best cases or a representative case

6    or something of that sort.

7         Now from the standpoint of where you pick them, we have

8    got a situation with *Lexecon*.   *Lexecon*, the Supreme Court said,

9    a transferee judge cannot try cases that are not directly filed

10   in the transferee court, unless the parties agree.

11        If they don't agree, it doesn't matter whether or not

12   you should try a case filed in New York or whatever.  The truth

13   of the matter is I'm going to send them up there.

14        After I'm finished with my discovery responsibilities,

15   I think a transferee judge ought to be able to give you all an

16   opportunity to see what the discovered case looks like, and

17   then what the trial case looks like.

18        But after I'm finished with that, I'm not going to hold

19   these cases.  I don't believe in that.  I'm going to just send

20   them back to wherever they came from, and let you try them.

21        But before I send them back, I feel obligated to give

22   you an opportunity, both sides, to discover it, to look at the

23   cases.  This is an opportunity to do it efficiently, so that

24   you don't have to do it in 50 states.  Every state in the union

25   is represented in this litigation.

1       If you start taking depositions in state court, the

2   transactional costs for both sides is going to just -- and the

3   efficiency, it's going to take a couple of decades to do what

4   we can do in about two years here or three years at the most to

5   discover the case to give you some idea of what the case --

6   what the census of the case is there and the issues.

7       And then if you try several of those cases, you will

8   get some idea as to how the witnesses perform; you will get

9   some idea as to the costs; you will get some idea of logistics;

10  you will get some idea about how to try the case; and you will

11  also get some input from juries.

12      I'm not quite sure the latter is the most significant.

13  It may well be the least significant of the whole thing,

14  because in the past, or in many instances, people have picked

15  the best cases and the other side has said, well, what do you

16  expect?

17      You have got your best case out of the whole 3,000 or

18  4,000, and you picked the one case that is on all fours, so it

19  has no meaning; we discount it.

20      And, the same way with the loss, you picked the worst

21  case.  The guy was in jail 20 years.  Nobody likes him, and he

22  lost the case.

23      So, you know, I hear you, but I think we have to be

24  realistic on it, and from the standpoint of whether or not we

25  ought to try cases in other places, I think *Lexecon* has done

1    that.

2         Now the defendants say, they are agreeable to trying

3    them not only in Louisiana cases, but also Mississippi cases

4    and Texas cases.  They don't have to do that.  They could say,

5    I just want to try Louisiana cases; otherwise, send them back,

6    and then you are stuck with just Louisiana cases.

7         So, at least this gives you something -- the discovery

8    pool, I think, the defendants ought to take the opportunity in

9    the discovery pool to discover cases that are outside the Fifth

10   Circuit, because this is an opportunity for them to do so.

11        And I think that their program allows that, but, you

12   know, you have talked to me.

13        Let me hear from the defendants.  Any response from

14   defendants?

15        MR. BIRCHFIELD:  Your Honor, may I address something?

16        THE COURT:  Sure, yeah.

17        MR. BIRCHFIELD:  The plaintiffs' plan addresses your

18   chief concern about the plaintiffs picking their best and the

19   defendants picking the worst.

20        We have been in that place and that is a plan that is

21   offered, where the first pick goes to the plaintiff, the second

22   pick goes to the defendant.  But, that is not the system that

23   we have proposed in our order.

24        Our order that we have proposed would say, we will

25   offer to the Court the cases that we say are most meaningful.

1    So we put out the best case, then you are going to say, that's

2    not typical because we have MDL centrality that gives us a

3    picture of the universe, you know, what is the average, you

4    know, stay in the hospital.  What is the average type injury.

5         So the Court has that tool to look at and say, you are

6    putting up a 60-day hospitalization case, that is an outlier,

7    so the Court doesn't pick that.

8         So the parties, you know, are not in a place where it

9    would be wise to pick their best cases.  That is what -- the

10   key difference here, is the defendants want to take the pool

11   that we could select from and slice it up into such fine parts

12   that we can't really look for the most meaningful cases.  That

13   is the key difference.

14        THE COURT:  Well, the whole purpose of the pool is to

15   design some method of creating that pool which replicates --

16   images the whole litigation.

17        And the way to do that, is to pick -- have plaintiffs

18   pick, defendants pick, and random pick.  And then hopefully, in

19   that method, that discovery pool will be more representative of

20   the entire litigation.

21        You drill down in that discovery pool, and from that

22   discovery pool, then you make your picks as to the bellwether

23   trials.

24        But the only way to find out the whole discovery pool

25   is to take every case, discover every case, and then you would

1    know, but that is not really realistic in many cases.

2           Now maybe in 2,000 or 3,000 cases, maybe you can do it

3    that way, but it will take you ten years to do it.

4           So what I'm trying to do is to create that -- the

5    litigation census in microcosm, so that we can get a smaller

6    group that represents the big group.

7           It will have in it the best cases for the plaintiff,

8    and the best cases for the defendant, and a random sample that

9    will have all over the place, some for plaintiffs, some for

10   defendants, some not representative at all.

11          And then you will have a bellwether of 40 -- then you

12   will have a discovery pool of 40 cases.  From that 40 cases,

13   you pick four.

14          I don't know of a better way of doing it.

15          MR. BIRCHFIELD:  It's a critical issue, Your Honor, and

16   we thank you for opportunity to be heard.

17          THE COURT:  Sure, I appreciate it.

18          Steve?

19          MR. GLICKSTEIN:  Good afternoon, Your Honor.  Steve

20   Glickstein for the defendants.

21          I think any discussion of CMO-3 has to start with

22   CMO-2.  And we heard Mr. Birchfield say that from the

23   plaintiffs' perspective, CMO-2 was a major step backward.

24          That took me a little bit aback because I spent weeks,

25   if not months, negotiating CMO-2 with the plaintiffs' side and

1   we came up with the stipulated order.

2          And as happens with all stipulations, you get some that

3   things you like, and you have to give up some things that you

4   wish you could have had, but you can't, in order to reach an

5   agreement.

6          And, the fact that 20 of the 40 discovery pool

7   plaintiffs would be randomly selected, was a compromise between

8   the party's conflicting positions.

9          You know, in June -- June 22nd of this year, it's

10  Document 1035 in this MDL, Your Honor's initial ruling was that

11  there were going to be 50 discovery pool plaintiffs, and all of

12  them were going to be randomly selected.

13         And over the course of negotiations between the

14  parties, some in-chamber conferences with Your Honor, the

15  party's positions became refined.

16         The plaintiffs, I'm sure, would have preferred no

17  random.  We would have preferred all random, but we settled on

18  half, and that is the deal.

19         Since it's in CMO-2, then CMO-3 has to operate in good

20  faith to implement that provision, not marginalize the

21  agreement that the parties had reached.

22         Similarly, you know, the parties had concerns about

23  where the cases were going to be tried, but we reached the

24  stipulation.

25         The stipulation was the first two trials are going to

1    be in the Eastern District of Louisiana with no right to seek a

2    change of venue with respect to those first two trials.

3         The third and fourth trial, were going to be in

4    Mississippi and Texas, respectively, with a limited right under

5    certain circumstances to seek a change of venue upon a showing

6    that there is good reason to do so.

7         But we're not at that point yet.

8         So, the parties have an obligation to propose a case

9    management order which gives CMO-2 some possibility of success.

10        That means providing the Court with sufficient choices

11   in Louisiana, so that it can find representative plaintiffs to

12   try the first two cases in -- providing enough choices in

13   Mississippi so that the third trial, if it stays there, the

14   Court will have sufficient choices to pick a representative

15   case there, and the same with respect to Texas.

16        So we're not -- we do not disagree with the plaintiffs

17   that the goal here is to get a good cross-section and

18   representative fact patterns.

19        The question is what is the best way to go about doing

20   that.  And, I don't think that as Your Honor has indicated in

21   his comments to Mr. Birchfield, I don't think you can do that

22   by limiting narrowly, as the plaintiffs propose to do, the

23   choices that are available in the trial venues.

24        It's hard to see how you are going to come up with

25   better plaintiffs for the first two trials, or more

1    representative plaintiffs for the first two trials, if you have

2    got four picks from Louisiana as the plaintiffs propose, or 20

3    picks as the defendants propose, which was an adoption of a

4    suggestion that Your Honor made in chambers on September 17th.

5        Similarly, it's hard to see how Your Honor is going to

6    have adequate choice in Mississippi or Texas, if the plaintiffs

7    propose none of the party's selections have to be from those

8    states and there is no requirement that any random selection be

9    in those states.

10        So our goal is, in fact, to provide the Court with more

11    choices, it is to find the best four cases to try, but the way

12    to do that is to provide the Court with more choices in the

13    trial venues that the parties have stipulated to.

14        We recognize, of course, the value in having a

15    discovery pool that is broader than those three states.

16        And the compromise that Your Honor initially proposed

17    on September 17th was that there ought to be 12 plaintiffs from

18    other states, six chosen -- six from states chosen by

19    plaintiffs, six from states chosen by defendants.

20        You are going to get 15 states under the defendants'

21    proposal, the three trial venues, plus 12 others.

22        And so you are going to get a fair cross-section

23    geographically of the country of various state laws without

24    overly inhibiting Your Honor's choices for actually trying the

25    cases.

1        You know, as I'm listening to Mr. Birchfield describe,

2   you know, what goes in to making a good case, well, you know,

3   you want the perfect testimony on proof of use, and, you know,

4   the best counsel, and, you know, a plaintiff who is not too

5   likable and too unlikable, and a prescribing physician who is

6   somewhere in the middle of the road, and sales reps who are

7   somewhere the middle of the road.

8        I mean, that is not really how cases work.  As Your

9   Honor indicated, there is a variety.

10       THE COURT:  Yes.

11       MR. GLICKSTEIN:  There is a cross-section.  Some

12   cases -- and the idea is to get enough different fact patterns

13   so that counsel can intelligently evaluate all the combinations

14   and permutations.  And Your Honor can evaluate all the

15   combinations and permutations and see how different fact

16   patterns impact the strength or weakness of a case.

17       It's also very important to remember, and I think Your

18   Honor made this distinction as well, that we're talking about

19   now picking the discovery pool.  We're not talking about

20   picking the four bellwether plaintiffs.

21       The defendants' and the plaintiffs' proposal are

22   actually identical with respect to how you are going to get

23   down from 40 to four, which that the parties are going to

24   propose a mechanism to give Your Honor choices, and then Your

25   Honor is going to select who are going to be the trial

1  plaintiffs.

2       The only difference is we want Your Honor to have more

3  choices in the trial venues, because that's going to assist

4  both the parties and courts to make sure that the trials are

5  truly representative.

6       THE COURT:  Okay.  All right.  I understand the issue.

7       I appreciate both of you all.

8       I will put out my order probably today or Monday, as

9  soon as I can, because we have got to get on with this, folks.

10      We have got to know what the discovery pool is going to

11  be made of, so you can deal with the selection process.

12      As I'm saying, what I'm trying to do here, we have got

13  right now about 3,000 cases.  There maybe 6,000 cases when all

14  of them come in.

15      What I'm trying to do is to see whether or not we can

16  create a microcosm of that census, and how you do that.

17      One way of doing it is to have the parties pick the

18  cases.

19      What happens in the real world is that they pick their

20  best cases.  They don't pick the worst cases; they pick the

21  best cases.

22      From the defendants' standpoint they don't know what

23  cases to pick because it's not -- that is not their clients;

24  they haven't taken any depositions yet.

25      So you have to have some mechanism for getting a

1    bellwether discovery pool so that each side has an opportunity

2    to discover that pool.

3            But that pool has to represent the entire census,

4    otherwise, it's of no value.

5            So you can't have that discovery pool created by the

6    parties because you are going to only have the five -- the ten

7    best cases or 20 best cases for the plaintiffs, and the 20 best

8    cases for the defendants.

9            And when you get down to picking them, it's not going

10   to be representative of the 3,000 cases.  The 40 cases will

11   only be the best cases that each side has picked.

12           So from that bellwether pool of discovery pool, you are

13   going to be picking your bellwether cases and you are going to

14   replicate that.

15           So the bellwether cases are going to be meaningless

16   because every time the plaintiff wins, the defendants are going

17   to say, you picked the best case.  Every time the defendant

18   wins, the plaintiff is going to say, you picked the best case,

19   so it's not as helpful.

20           So I'm trying to create a discovery pool that

21   replicates the whole litigation.

22           The way of doing it is either do all random selection,

23   but that doesn't -- that's not the best way, I don't believe.

24   I think you have to have plaintiff input, defendant input, and

25   random selection.  That's what I have tried to do in this case.

1          The problem that we have is with *Lexecon,* and *Lexecon*

2     says, okay, that is fine, do whatever you want to do with

3     bellwether pools, but when you get down to selecting cases, the

4     parties have to -- well, that's a problem.

5          So we're trying to struggle with that problem, and the

6     defendants have agreed to do three states rather than one

7     state.

8          But that doesn't mean that you won't have an

9     opportunity to try cases in other places, because I'm going to

10    be sending them back after the bellwether system.

11         If it works, fine, if it doesn't, you all will be

12    dealing with this in other jurisdictions, not mine.

13         But I appreciate your views, and thank you for your

14    comments.

15         MR. BIRCHFIELD:  Thank you, Judge.

16         MR. GLICKSTEIN:  Thank you, Your Honor.

17         THE COURT:  We will be in recess.

18         THE CASE MANAGER:  All rise.

19

20                         *     *     *

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2

3          I, Terri A. Hourigan, Certified Realtime Reporter,

4     Official Court Reporter for the United States District Court,

5     Eastern District of Louisiana, do hereby certify that the

6     foregoing is a true and correct transcript to the best of my

7     ability and understanding from the record of the proceedings in

8     the above-entitled and numbered matter.

9

10

11                              *s/Terri A. Hourigan*

12                              Terri A. Hourigan, CRR, RPR
                                Certified Realtime Reporter
13                              Registered Professional Reporter
                                Official Court Reporter
14                              United States District Court
                                Terri_Hourigan@laed.uscourts.gov

15

16

17

18

19

20

21

22

23

24

25