# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | MDL No. 2592 |
| | SECTION L |
| THIS DOCUMENT RELATES TO ALL ACTIONS | JUDGE ELDON E. FALLON |
| | MAG. JUDGE NORTH |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' PROPOSED DEPOSITION PROTOCOL CONCERNING PERSONNEL FILES AND OTHER ISSUES

Pursuant to Federal Rule of Civil Procedure 26(c)(1), Defendants Bayer Corporation, Bayer Pharma AG (collectively, "Bayer"), Janssen Pharmaceuticals, Inc., Janssen Research & Development, LLC, and Janssen Ortho, LLC (collectively, "Janssen") submit this memorandum in opposition to Plaintiffs' demand for the sweeping production of personnel records of all their current and former employees whose depositions are noticed by Plaintiffs, and to address other proposals regarding the deposition protocol.

## INTRODUCTION

The PSC and Defendants agree that Plaintiffs are entitled to the custodial file of any employee who Plaintiffs seek to depose.  Plaintiffs, however, are seeking not only the files maintained by the employee, but also the employee's personnel file.  They do so with the following proposed language:  "The custodial file of any employee or former employee designated for deposition shall include the personnel file."  (Proposed Pretrial Order regarding Deposition Guidelines (attached as Exhibit A)).  The Court should reject Plaintiffs' sweeping request to obtain highly confidential, sensitive, and personal information regarding Defendants' employees absent a particularized showing, with respect to a particular employee, that information in that employee's "personnel file" is relevant to Plaintiffs' claims.

2612694-1
2614130-1

An employee's custodial and personnel files are very different.  The custodial file is maintained by the employee.  It consists of documents generated or received by the employee concerning the employee's work.  Non-privileged information concerning Xarelto in the employee's custodial file is plainly discoverable.

By contrast, the personnel file is NOT generated or maintained by the employee, but by a Defendant's Human Resources department (or its equivalent).[1]  The personnel file is likely to contain highly confidential evaluations of the employee by the Defendant.  Unauthorized and unsupervised disclosure to the employee could be potentially damaging to the employer-employee relationship if disclosed to the employee in litigation.  The personnel file also is likely to contain salary and other confidential financial information, information concerning any physical or mental health issues, and other "irrelevant but sensitive and potentially embarrassing information, for example, alimony and child support garnishment, tax records, and drug test results."  *Williams v. Roy O. Martin Lumber Co. LLC*, 51 Fed. Appx. 483, at *6 (5th Cir. 2002).  In light of the privacy concerns at stake and especially where, as here, discovery of non-party individual employees' personnel files is sought, the "court must balance the interests of the parties in obtaining relevant discovery against the privacy interest of individual non-parties."  *Poseidon v. Oil Pipeline Co., L.L.C.*, Nos. Civ. A. 00-760, Civ. A. 00-2154, Civ. A. 01-2642, 2002 WL 31098543, at *1 (E.D. La. Sept. 28, 2002).

As explained in Point I below, the PSC's sweeping request for production of personnel records of every Defendant witness fails this balancing test.  There has been no showing that information expected to be found in the personnel records of any particular Defendant's current

---

[1] Janssen's personnel files are not located in one central repository.  Certain information is maintained by Human Resources, but other information (*e.g.*, performance evaluations) is likely held by the individual's past and/or current supervisors.  Production of these materials will require collection of information from several different sources.

2

or former employee (much less every such employee whose deposition plaintiffs notice) is relevant to Plaintiffs' claims. Nor does the PSC's sweeping request address the legitimate and substantial privacy concerns that it raises, which require "protect[ion] [of] employees' privacy rights against needless discovery." *Williams*, 51 Fed. Appx. 483, at *6. There is nothing in the PSC's proposal to prevent the unnecessary disclosure of private and potentially sensitive information that may be contained in the personnel records of these non-party employees and that has no bearing on the issues raised by these cases. Confidentiality provisions, such as those contained in PTO 12, provide insufficient protection because some information in the personnel file is far too sensitive and potentially embarrassing when weighed against its minimal relevance to allow production without a particularized showing of need. This is especially true because PTO 12 permits disclosure of confidential performance evaluations to the employee, which could irreparably damage the employer-employee relationship. For those reasons, Plaintiffs should not be permitted to "rummage through these files" without a particularized showing that specific information contained in them is both relevant and that disclosure is necessary. *Id.*

As explained in Point II below, the PSC's attempt to obtain the personnel files of every defense witness should be denied for an additional reason as to the Bayer Defendants' German witnesses. Production of the personnel records of Bayer's German employees would violate German privacy laws that subject Bayer to criminal and civil liability for releasing personal data of its employees to third parties such as plaintiffs or their counsel. *See* Declaration of Dr. Henning Moelle, dated December 7, 2015 ("Moelle Dec."). Principles of international comity require this Court "to respect properly such interests [of foreign countries] in the course of deciding the appropriate discovery techniques to be applied." *In re Anschuetz & Co.*, 838 F.2d 1362, 1364 (5th Cir. 1988).

**ARGUMENT**

I.   **PLAINTIFFS' UNQUALIFIED REQUEST FOR PERSONNEL RECORDS OF ANY CURRENT OR FORMER EMPLOYEE DESIGNATED BY PLAINTIFFS SHOULD BE DENIED**

Federal Rule of Civil Procedure 26(b) provides:  "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(1).[2]  This rule "should be firmly applied, and the district courts should not neglect their power to restrict discovery where 'justice requires [protection for] a party or person from annoyance, embarrassment, oppression, or undue burden or expense.'"  *Herbert v. Lando*, 441 U.S. 153, 177 (1979); *see also* Fed. R. Civ. P. 26(b)(2)(C)(i); 26(b)(2)(C)(iii); 26(c)(1).  Plaintiffs cannot show that the sweeping discovery they seek is relevant to their claims or proportional to the needs of the case, and, thus, fail to satisfy the requirements of this Rule.

Production of personnel records implicates significant privacy concerns.  As a result, courts routinely deny sweeping discovery of personnel records, instead, strictly limiting the scope of such discovery to only those records where the need for their production is clear.  For example, in *Williams v. Roy O. Martin Lumber Co. LLC*, 51 Fed. Appx. 483 (5th Cir. 2002), the Fifth Circuit affirmed the district court's exercise of its discretion in limiting discovery of personnel files to those records showing the treatment of other employees who engaged in the

---

[2] The recently amended language of Rule 26(b) became effective on December 1, 2015 and "shall govern in all proceedings in civil cases thereafter commended and, insofar as practicable, all proceedings then pending."  *See* Supreme Court's April 29, 2015 order available at http://www.supremecourt.gov/orders/courtorders/frcv15%28update%29_1823.pdf).

same conduct that plaintiff claimed formed the basis for his retaliatory discharge, *i.e.*, to records directly related to plaintiff's substantive claim.  As the Court explained:

> Williams apparently believes that he had an inviolable right to rummage through these files.  Not so.  Employee personnel files contain much irrelevant but sensitive and potentially embarrassing information, for example, alimony and child support garnishment, tax records, and drug test results.  [The defendant] understandably wanted to protect its employees' privacy rights against needless discovery.

*Id.* at *6.

"Discovery of the personnel files of non-party individual employees presents special concerns about the privacy rights of the individuals involved."  *Poseidon Oil Pipeline Co., L.L.C. v. Transocean Sedco Forex, Inc.*, Nos. Civ. A. 00-760, Civ. A. 00-2154, Civ. A. 01-2642, 2002 WL 31098543, at *1 (E.D. La. Sept. 28, 2002).  When considering such demands, the "court must balance the interests of the parties in obtaining relevant discovery against the privacy interests of individual non-parties."  *Id.* (denying motion to compel in part and limiting discovery of personnel files because "[m]uch personal information about the individuals contained in the requested personnel files is not relevant either to the claims and defenses asserted in, or to the subject matter of, this case"); *see also Fieldwood Energy, L.L.C. v. Diamond Servs. Corp.*, Civil Action No. 14-650, 2015 WL 1415501, at *1 (E.D. La. Mar. 27, 2015) (denying motion to compel production of personnel files "[g]iven the privacy rights of non-parties to lawsuits").

Courts outside this Circuit have reached the same conclusion.  In affirming a district court's decision to curtail discovery of personnel files, the Seventh Circuit has held that "privacy interests coupled with [the trial court's] determination to keep the trial focused squarely on [plaintiff's] claim, justified limiting counsel's ability to root through the personnel files."  *Gehring v. Case Corp.*, 43 F.3d 340, 342 (7th Cir. 1994); *see also Brunker v. Schwan's Home Serv., Inc.*, 583 F.3d 1004, 1010 (7th Cir. 2009) ("Magistrate judges and district courts have

5

broad discretion to limit a request for the discovery of personnel files in order to prevent the dissemination of personal or confidential information about employees.").  Similarly, in affirming a district court's denial of a motion to compel production of personnel files, the Tenth Circuit has held that "personnel files often contain sensitive personal information, . . . and it is not unreasonable to be cautious about ordering their entire contents disclosed willy-nilly." *Regan-Touhy v. Walgreen Co.*, 526 F.3d 641, 648 (10th Cir. 2008).

Other courts also have denied discovery of personnel records in light of the important privacy interests at stake.  For example, in *In re Sunrise Secs. Litig.*, 130 F.R.D. 560, 580 (E.D. Pa. 1989), the court noted that "[s]trong public policy exists against disclosure of the personnel records . . . because disclosure would invade [the] employees' privacy, and firms might cease to frankly criticize and rate their own [employees'] performance, for fear that any written evaluations they make might be used against them or their employees in a lawsuit."  As a result, the court held that disclosure was permissible only "'if (1) the material sought is 'clearly relevant,' and (2) the need for discovery is compelling because the information sought is not otherwise readily obtainable.'"  *Id.* (citation omitted); *see also Santer v. Teachers Ins. & Annuity Ass'n*, 2008 WL 755774, at *8-*9 (E.D. Pa. Mar. 19, 2008) (denying discovery of employee evaluations in personnel files because "[t]he Court will not permit this type of blind document grab"); *In re Bancorp Sec. Litig.*, 134 F.R.D. 4, 12 (D. Me. 1991) ("General allegations of negligence do not suffice to render these records discoverable.  Plaintiffs must first make an initial, fact-specific showing" to justify discovery of personnel records); *New York Stock Exch., Inc. v. Sloan*, 1976 WL 837, at *1 (S.D.N.Y. Aug. 3, 1976) (denying discovery of personnel files because "[r]evealing the contents of [employee] evaluations, which were prepared without input by their subjects, and which are the kind of materials that employees justifiably expect to be kept

confidential, would invade the employees' privacy").  Nor has production of personnel files been the norm in other MDL litigations.

For example, the Special Discovery Master's decision in *In re: Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 12-md-02342, slip op. (E.D. Pa. Feb. 18, 2015) [Dkt. 1148] (attached as Exhibit B) is illustrative of the application of these authorities in the context of pharmaceutical products liability litigation.  There, the Special Discovery Master denied the plaintiffs' motion to compel the personnel file of a specific employee of the defendant, as well as the personnel files of every other defendant employee who plaintiffs had deposed or planned to depose.  *See id.* at 3.  The Special Discovery Master held that resolution of the motion "require[d] an individualized review of the circumstances related to the particular employees or ex-employees and of the issues to which the facts of their employment relate" to determine "[w]hether discovery of portions of their files that relate to particular issues is required . . . on a case by case basis."  *Id.* at 2.  He noted the policy concern "aris[ing] from a desire to protect the privacy of the employee, who may consider evaluative materials as well as personal information, such as health information, information about dependents, and personal financial information, to be sensitive."  *Id.* at 9.  Ultimately, while not excluding the possibility that plaintiffs might justify production of some specific employee's personnel file, the Special Discovery Master ruled that they had not done so with respect to the specifically identified employee at issue or with respect to the sweeping request for the employee files of every employee or former employee who they had deposed or desired to depose.  *Id.* at 11-12.  Similarly, on January 13, 2016, plaintiffs' request for the production of personnel files was denied by the Magistrate Judge

2614130-1

in *In re: Benicar (Olmesartan) Products Liability Litigation*, Civil No. 15-md-2606 (D.N.J.) (order forthcoming).[3]

Plaintiffs have failed to make any showing that their unqualified request for the personnel files of every Defendant employee or former employee to be deposed will produce information that is relevant, much less clearly relevant, to Plaintiffs' claims in this litigation.  Even if Plaintiffs could show that information in any particular employee's personnel file had some relevance to their claims, Plaintiffs cannot show that there is a compelling need for production of that information that outweighs the risks that production entails.  The production of information from the personnel files of an employee poses a risk both to the employee's privacy interests and to the employer-employee relationship.  As to the latter point, producing personnel files with confidential performance evaluations would chill honest and critical evaluations that are necessary to the employer's ability to conduct its business.  *See*, *e.g.*, *In re Sunrise Secs. Litig.*, 130 F.R.D. at 580.

Worse still, the unlimited nature of Plaintiffs' request fails to take any account of the legitimate privacy interests of the many non-party witnesses whose files Plaintiffs may seek to obtain.  PTO 12, which permits the parties to limit the disclosure of certain information, does not adequately protect the interests at stake here.  There is likely to be some information that is highly sensitive and irrelevant or only marginally relevant, which does not merit production even under the confidentiality provisions of PTO 12.  In addition, PTO 12 does not prevent disclosure

---

[3] In many other multidistrict litigations, including those involving Propulsid, Ortho Evra, and ASR hip implants, personnel files were neither sought nor produced.  Unlike the sweeping requests at issue here and in *In re Zoloft*, the discovery request at issue in *In re Trasylol Prods. Liab. Litig.*, No. 08-MD-1928, 2009 WL 936597 (S.D. Fla. Apr. 7, 2009) was directed to specific employees and limited in scope to a need demonstrated by plaintiffs.  *See In re Trasylol*, 2009 WL 936597, at *2 (request limited to information concerning a single employee's compensation and performance reviews relating to Trasylol).

of confidential performance evaluations to employees, disclosure of which, as established above, would likely harm the employment relationship.

There is no basis to permit Plaintiffs to "rummage through" the personnel files of every employee witness of each Defendant, which likely contain sensitive personal information without any showing of particularized need and any means to prevent disclosure of plainly irrelevant and sensitive information. *See Williams*, 51 Fed. App. 483, at *6. Even if Plaintiffs can establish that information in a particular deponent's personnel file is relevant to the Plaintiffs' claims and sufficiently probative to overcome the privacy rights of that non-party witness (which is not the case here), the Court should limit disclosure to the material relevant to the need demonstrated by the Plaintiff. *See, e.g.*, *Williams*, 51 Fed. Appx. 483, at *6; *Poseidon Oil Pipeline Co.*, 2002 WL 31098543, at *1.

Even if Plaintiffs could demonstrate a particularized need for information from a specific employee's personnel file, the Court should conduct an *in camera* review of any such files before their production to determine their relevance and probative value and to conduct the necessary balancing of the privacy interests at stake. *See, e.g.*, *Singleton v. RPM Pizza, Inc.*, No. Civ. A. 03-2219, 2004 WL 169802, at *1 (E.D. La. Jan. 26, 2004) ("it appears that *in camera* inspection of the documents would be appropriate to determine both their relevance and their need for confidentiality, if any"); *Lenihan v. Stewart Enters., Inc.*, No. Civ. A. 01-2895, 2002 WL 31427367, at *1 (E.D. La. Oct. 28, 2002) (same).[4]

---

[4] A New Jersey state court presiding over Vioxx litigation ordered a pharmaceutical manufacturer to produce personnel records of former and current employees or, if it objected, to produce them to the court for *in camera* inspection. *See In re Vioxx Litigation*, Order (Oct. 14, 2004 Sup. Ct. Atlantic County) (attached as Exhibit C.) That court also limited the use of any such records at depositions to those where the deponent was (i) the subject of the specific document, (ii) a superior of the person reviewed, or (iii) the author of the document. *See In re Vioxx Litigation*, Order (Apr. 21, 2005 Sup. Ct. Atlantic County) (attached as Exhibit D). This

Accordingly, the Court should issue a protective order precluding Plaintiffs from the sweeping discovery that they currently seek of the personnel files of Defendants' current and former employees.

## II.   COMPLYING WITH PLAINTIFFS' DEMAND FOR PERSONNEL RECORDS OF ANY CURRENT OR FORMER GERMAN BAYER EMPLOYEE WOULD VIOLATE GERMAN LAW

The broad discovery of confidential, personal information sought by plaintiffs should be curtailed to the extent that it entails German personnel records because German law prohibits Bayer from disclosing such information.[5]  As explained in the Declaration of Dr. Henning Moelle, "[u]nder German laws, data protection is recognized as a fundamental right and high-ranking legal principle."  Moelle Dec. ¶ 7 (attached as Exhibit E).  The German Constitution guarantees a "right to informational self-determination," which is "the right of every individual to determine the use of data that concern his or her person and includes the right to determine which personal data may be collected or used by whom for which purpose and under which conditions."  *Id.*  That right, guaranteed by the German Constitution, is codified in the Federal Data Protection Act ("Bundesdatenschutzgesetz" or "BDSG"), which may be invoked by any person whose personal data is processed in Germany regardless of that person's nationality, citizenship, or domicile.  *Id.* at ¶ 7-8.[6]  Violations of the BDSG subject the violator to

Court should not follow the New Jersey state court decision in the Vioxx litigation because it contains no discussion of the governing legal principles and no balancing of the need for the information against the privacy interests at stake.

[5] For the same reasons explained below, it would not be permissible to order Bayer to produce German personnel records for *in camera* review.

[6] After its enactment, the BDSG was amended to conform to the EU Data Protection Directive of 1995.  *Id.* at ¶ 9.  So "the BDSG reflects the significance of data protection under the German Constitution and the EU Data Protection Directive."  *Id.*

2614130-1

administrative or criminal penalties, including fines and imprisonment for up to two years, and to civil liability.  *See id.* at ¶ 11

Under the BDSG, "the collection, processing and use of personal data" is prohibited unless specifically prescribed or permitted by the BDSG or other German law or with the consent of the data subject.  *Id.* at ¶ 10 (quoting § 4(1) BDSG).  "Personal data" is broadly defined to include "any information concerning the personal or material circumstances of an identified or identifiable individual."  *Id.* at ¶ 12 (quoting § 3(1) BDSG).  This includes, for example, an individual's address, date of birth, sex, nationality, ethnicity, physical characteristics, religion, political beliefs, health, education, employment, club memberships, professional associations, and any information about family members, friends or lifestyle, regardless of whether the information was collected for business or private purposes.  *See id.* at ¶ 13.  Thus, the BDSG plainly encompasses Bayer's personnel records which "are, by their very nature, a compilation of personal data about the employees to [whom] they relate," and which also may "contain personal data of other individuals," such as the name of the person to whom the employee reports or who has communicated with the employee on behalf of the employer. *Id.* at ¶ 14.[7]

Moreover, the production of personnel records contemplated by plaintiffs would involve Bayer's "processing" and transfer of personal data within the meaning of the BDSG.  The processing of data refers to the recording and storage of data, as well as the transfer of data either directly to a third party or by permitting the third party to inspect or retrieve the data.  *Id.* at ¶ 16 (quoting § 3(4) BDSG).  A transfer plainly would occur if Bayer produced personnel records to plaintiffs, their counsel, or the Court.  *See id.*

---

[7] The BDSG applies regardless of whether the personnel records are stored electronically or in hard copy.  *See id.* at ¶ 15.

Under the BDSG, Bayer may produce personnel records only with the consent of the data subjects or if a statutory exception mandates or permits.  *See id.* at ¶ 17.  The consent of the data subject is effective only "when based on the data subject's free decision," which "means that the data subject must have a real opportunity to withhold his consent without suffering any disadvantage, or to withdraw his consent if he changes his mind later."  *Id.* at ¶¶ 18-19 (quoting § 4a(1) BDSG).[8]  Notably, a German employer, such as Bayer, cannot request that its employees consent to production of their personal data or that they refrain from withdrawing their consent once given.  *See id.* at ¶ 19.

Moreover, nothing in the BDSG or German law mandates that Bayer produce personal data for litigation in the United States.  *See id.* at ¶ 20.  The operation of law foreign to Germany, including the Federal Rules of Civil Procedure, does not render Bayer's processing of personal data mandatory within the meaning of the BDSG.  *See id.*

Thus, the only exception potentially applicable in these circumstances allows for the processing of personal data "as far as necessary to safeguard the legitimate interests of the controller [if] there is no reason to assume that the data subject has an overriding legitimate interest in ruling out the possibility of processing or use."  *Id.* at ¶ 22 (quoting § 28(1)(2) BDSG).  Although disclosure in defense of a legal claim may constitute a legitimate Bayer interest (*id.* at ¶¶ 24-25), the employees' overriding legitimate interest in protecting the privacy of their personal data precludes disclosure.  Five factors collectively support the conclusion that "the constitutional rights of the data subjects" outweigh Bayer's interest in disclosure and, therefore,

---

[8] For certain "special categories of personal data," including "information on racial or ethnic origin, political opinions, religious or philosophical beliefs, trade-union membership, health or sex life," the BDSG requires that consent must be specific to those categories of data.  *Id.* at ¶ 18 (quoting §§ 4a(3), 3(9) BDSG).

that "Bayer would violate the [BDSG] if it disclosed the Personnel Records sought in plaintiffs' discovery request." *Id.* at ¶¶ 26-27.

- First, "the employees to which the Personnel Records relate as well as the other employees whose personal data is contained in the Personnel Records . . . are foreign to the U.S. litigation, and have no direct genuine interest in the disclosure of their personal data for the purpose of the litigation." *Id.* at ¶ 28.

- Second, 'German courts as well as the German [legislature] have expressed the high importance which must be placed to the protection of an employee's personal data and to the need to strictly limit their use for purposes outside the employment relationship." *Id.* at ¶ 29.  German courts have been particularly vigilant in protecting disclosure of personnel records, which "merit particular protection" because "[t]he personal data contained in Personnel Records are entrusted to an employer by the employee under the implicit proviso that such data are used for the purposes of the employment relationship and subject to strict confidentiality standards only." *Id.* at ¶ 30.

- Third, plaintiffs' request for "'personnel' files without any limitation as to their potential relevance to the subject matter of the litigation" is contrary to "German data protection law [which] is governed by the principles of data reduction and data economy," requiring "'as little personal data as possible' shall be collected, processed and used." *Id.* at ¶ 33 (quoting § 3a BDSG).

- Fourth, in contrast to a request for the discovery of business records, which generally contain limited personal data, personnel records contain "a massive compilation of personal data of the employee" whose "constitutional right to informational self-determination would be significantly undermined by the sheer mass of personal data

which were processed and transferred to the USA if Bayer made the Personnel Records available for discovery as requested by plaintiffs." *Id.* at ¶ 35.

- Fifth, personnel records contain "highly personal and particularly sensitive" information such as health information, performance reviews, disciplinary notices, self-evaluations, and compensation records. *Id.* at ¶ 36.

Moreover, confidentiality provisions such as those contained in PTO 12 that apply only after processing and transfer of personal data are insufficient to accommodate the privacy interests of Bayer employees in light of the broad scope and the nature of the requested information. *Id.* at ¶ 6. Because "there clearly is 'reason to assume' that the employees have an overriding interest that their Personnel Records are not processed and transferred as sought by plaintiffs even if their personal data should be protected under a confidentiality order after any such processing and transfer has taken place," the BDSG prohibits Bayer from producing the Personnel Records. *Id.* at ¶ 37.

As the U.S. Supreme Court has emphasized, "American courts, in supervising pretrial proceedings, should exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position," and "take care to demonstrate due respect for any special problem confronted by the foreign litigant on account of its nationality or the location of its operations, and for any sovereign interest expressed by a foreign state." *Societe Nationale Industrielle Aerospatiale v. United States District Court for the Southern Dist. of Iowa*, 482 U.S. 522, 546 (1987); *see also In re Anschuetz & Co.*, 838 F.2d 1362, 1364 (5th Cir. 1988) (where "sensitive interests of sovereign powers are involved . . . it would be a serious mistake for the district court not to respect properly such interests in the course of deciding the appropriate discovery techniques to be applied").

14

Although, the Court did not "articulate specific rules to guide this delicate task of adjudication," it suggested that the five factors listed in the Restatement (Third) of Foreign Relations are suited to the task. *Societe Nationale*, 482 U.S. at 546. Those factors are:

> (1) the importance to the . . . litigation of the documents or other information requested; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means of securing the information; and (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

*Id.* at 545 n.28; *see also* Restatement (Third) of Foreign Relations Law § 442(1)(c).

Applying those principles, numerous courts have declined to compel production of personal data where such production would violate the BDSG. For example, in *In re Baycol Prods. Litig.*, MDL No. 1431 (MJD/JGL), 2003 WL 22023449, at *6 (D. Minn. Mar. 21, 2003), the court denied a motion to compel Bayer to produce performance evaluations of its German employees because "Germany's interest in protecting the privacy of such information outweighs the Plaintiffs' claimed interests in this litigation." As the court explained: "Plaintiffs have made no showing of the importance of this information or even of the specificity of their request for the information. Nor can Plaintiffs show that they cannot otherwise obtain the information they need, as they may ask the Bayer A.G. employees for the information they seek in depositions." *Id.*; *see also In re Vitamins Antitrust Litig.*, No. 99-197 TFH, 2001 WL 1049433, at *9 (D.D.C. June 20, 2001) (denying motion to compel production of documents "[g]iven that the German defendants do appear to have some legitimate privacy law concerns and that the Protective Order in this case may not be sufficiently detailed to shield them from criminal liability in their own country"); *Salerno v. Lecia, Inc.*, No. 97-CV-973 (SH), 1999 WL 299306, at *3 (W.D.N.Y. Mar. 23, 1999) (denying motion to compel production of personnel and severance records, which

would violate the BDSG); *Volkswagen A.G. v. Valdez*, 909 S.W.2d 900, 903 (Tex. 1995) (reversing discovery order requiring German company to produce its current corporate telephone directory, production of which would violate the BDSG); *Gerling Global Reinsurance Corp. of Am. v. Quackenbush*, Nos. Civ. S-00-0506, Civ. S-00-0613, Civ. S -00-0779, Civ. S-00-0875 WBSJFM, 2000 WL 777978, at *10 (E.D. Cal. June 9, 2000) (granting preliminary injunction against enforcement of statute regulating insurance companies, in part, because compliance might require German insurers to violate the BDSG).

As in the foregoing cases, the Restatement factors weigh overwhelmingly against production of personnel records.  As in *Baycol*, plaintiffs' request for personnel records lacks even a basic theory of relevance, provides no specificity, and targets information created and maintained in Germany.  Moreover, because of its vagueness, it is impossible to tell whether the information sought is obtainable through other means.  And while compliance with the request would undermine important German interests in the protection of personal information, non-compliance would have no similar effect on U.S. interests because, as explained above, U.S. law recognizes the significant privacy concerns implicated by blanket requests for personnel records. Indeed, as explained above, the Court should issue a protective order based on U.S. law.

Accordingly, this Court should issue a protective order for the additional reason that German law prohibits the broad disclosure of the personnel records of Bayer's German employees sought by plaintiffs.

## III.     OTHER ISSUES REGARDING THE DEPOSITION PROTOCOL

There are several other issues regarding the deposition protocol that require the Court's attention.  Those issues are described below.

16

**Whether Time Spent Reading Documents Counts Against Deposition Time Limits**

Plaintiffs propose excluding any time spent by a witness reading exhibits that counsel proffers from the agreed time limits in the deposition.  Plaintiffs appear to be concerned that defendants will "filibuster" through reading at the depositions.  Plaintiffs' position is both unsupported by the rules and unnecessary.

The federal rules establish a presumptive seven-hour limit on fact depositions.  Federal Rule of Procedure 30(d)(1).[9]  The rules do not provide for time-outs from that limit to allow witnesses to read exhibits.  Defendants are not aware of any multidistrict litigation where such deposition time-outs have been required.  Nor are defendants aware of any litigation where the filibustering that haunts plaintiffs has been a problem that was brought to the attention of a Court.

When a witness is provided with an exhibit during a deposition, he or she should be afforded the opportunity to review the document about which counsel plans to pose questions. The documents at issue may be from years ago or on topics about which the witnesses may need to refresh their recollections by review of the exhibit prior to questioning.  If a concern arises at the depositions, plaintiffs can bring a concrete example to the Court.  Defendants do not expect that such a problem will arise and are fully aware that the Court will not brook any gamesmanship at the depositions.  Accordingly, the Court should not include any rule concerning document reading in the deposition protocol.

---

[9] The Advisory Committee has noted, "[O]verlong depositions can result in undue costs and delays in some circumstances. This limitation contemplates that there will be reasonable breaks during the day for lunch and other reasons, and that the only time to be counted is the time occupied by the actual deposition." Advisory Committee Note, Federal Rule of Procedure 30(d)(1).

2614130-1

**Amount of Time To Be Provided For Translation**

This issue relates only to depositions of Bayer witnesses who will testify in their native language.  Bayer has agreed to allow a 75% increase of the agreed two day limit for depositions agreed to in the protocol.  Plaintiffs demand a full doubling of the length of the depositions — seeking a 100% increase in the agreed time.

Bayer and the Court have the benefit of experience in evaluating the parties' current dispute concerning the additional amount of time allowed plaintiffs to question witnesses requiring translation at their deposition.  Bayer's position of allowing up to 75% additional time for translated deposition is well-supported by extensive experience in recent federal-state coordinated litigation proceedings.  In many prior litigations, Bayer witnesses have required the use of translation in providing legal testimony at deposition.  Most recently, this occurred in *In re Yasmin & Yaz (Drospirenone) Marketing, Sales Practices and Products Liability Litigation*, MDL 2100 (S.D. Ill.) ("the Yasmin/Yaz litigation").

In the Yasmin/Yaz litigation, Judge David R. Herndon entered Case Management Order No. 28 (attached as Exhibit F) governing deposition protocol.  As in the present case, the parties agreed upon a two-day timeframe default rule for the depositions of Bayer witnesses.  As in the present case, depositions were coordinated with a parallel proceeding in the Philadelphia Court of Common Pleas ("PCCP").  Unlike the present case, the parties also agreed depositions would be extended up to 75% additional time from the two-day default rule for depositions requiring translation.  *See* Exh. F at 6 (¶ D.3).  Other courts also have agreed that 75% additional time for depositions requiring translation is an appropriate standard.  *See, e.g.*, *In re Yasmin/Yaz*, CMO at 13 (¶ D.5); *In re Pradaxa (Dabigatran Etexilate) Prods. Liab. Litig.*, MDL 2385, CMO 6 at ¶ 15

(S.D. Ill.) (attached as Exh. G); *id.* CMO 8 at 13 ¶ D.5 (attached as Exh. H); *In re Nat'l Hockey League Players' Concussion Injury Litig.*, MDL 2551, CMO 6  (D. Minn.) (attached as Exh. I).

In the Yasmin/Yaz litigation, a total of 13 depositions occurred that required translation. The Yasmin/Yaz litigation was no less complicated scientifically, factually, or legally than the present litigation.  In each of those 13 depositions, counsel from both the MDL and the PCCP (as well as other coordinated proceedings on occasion) were provided adequate time to question witnesses.  Indeed, all parties were provided adequate time to question these witnesses over the course of 40 deposition days using the 75% additional time allowance.

Plaintiffs may claim that, logistically, allowing 100% additional time is inconsequential as it would not require any additional time for counsel to travel, since these depositions will occur in Amsterdam.  That argument misses the point.  The additional time is simply unnecessary and inefficient as demonstrated by the parties' experience in the Yasmin/Yaz litigation.  Finishing the deposition in the midst of the fourth deposition day will allow the witness to return to their home that day, sparing them an additional night in Amsterdam.

**Notice of Attendees and Examiners**

The proposed Deposition Guidelines include a notice requirement for attendance of depositions.  Plaintiffs wish to notify Defendants two days before a deposition of the expected number of attendees; Defendants request that Plaintiffs provide two weeks' notice to ensure that adequate arrangements may be made to accommodate all attendees.  In addition to the number of attorneys, Defendants have requested that Plaintiffs identify the attorneys who will attend and specifically identify which attorneys will question the witness.  Plaintiffs are not willing to provide this information to defense counsel.

Such information is routinely exchanged in this type of litigation.  In the *Propulsid* MDL, the Deposition Guidelines provided that this information would be divulged at the time the deposition was noticed.  Those Guidelines state, "Each deposition notice shall include . . . **the name of the primary examiner designated by the party noticing the deposition**, and the date, time and place of the deposition."  *In Re: Propulsid Products Liability Litigation*, MDL 1355, PTO 7 re: Deposition Guidelines at A.3.  Similarly, the Deposition Guidelines from the *Vioxx* MDL provide, "Three (3) days before a deposition requested or noticed by Plaintiffs or Defendants, Liaison Counsel for the noticing party shall give other Liaison Counsel notice of the identity of the attorney(s) who may examine the deponent."  *In Re: Vioxx. Products Liability Litigation* MDL 1657, Rec. Doc. 7634 [Amended PTO 9 re: Deposition Guidelines] at II.A.

Here, Plaintiffs' counsel's refusal to disclose the identity of the examining attorneys is at odds with other similar, litigations and the professional courtesy typically afforded in these settings.  This Court has urged, "that professionalism and courteous cooperation permeate this proceeding."  (Rec. Doc. 2, PTO 1, at p. 2).  Toward that end, Defendants request that Plaintiffs identify the attendees and questioning attorneys sufficiently in advance of the deposition to facilitate proper accommodations.

**Document Authentication**

The parties agree that a process to address the authenticity of exhibits used during depositions may be helpful.  The dispute arises as to what that process should be and how and when it should be implemented.  The parties' respective proposals are set forth in the Guidelines submitted herewith.  Defendants submit that, at the conclusion of Defendants' depositions, the parties should conduct a meet and confer to determine whether or not there are any objections as to the authenticity of any exhibits used during depositions.  Conducting the meet and confer at

2614130-1

that time will streamline the process as the parties will have an inventory of the entire universe of deposition exhibits — including those used at several depositions — and can take a consistent and efficient approach to all of them at once.  Plaintiffs' proposal — by which they seek to have Defendants waive authenticity objections not raised within 20 days of a specific deposition — is a piecemeal process, which will lack the consistency and uniformity that Defendants seek to achieve with their proposal.

## CONCLUSION

For the foregoing reasons, the Court should enter a protective order precluding the sweeping production of the personnel files of all of Defendants' current and former employees who plaintiffs depose, and should rule consistent with the Defendants' proposals on the other issues.

## CERTIFICATION

As required by Federal Rule of Civil Procedure 26(c)(1) counsel for Defendants certify that they have conferred with opposing counsel in a good-faith effort to resolve these matters without Court action.

Dated: January 15, 2016                               Respectfully submitted,

KAYE SCHOLER LLP

By: /s/ Steven Glickstein
Steven Glickstein
William Hoffman
KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Telephone: (212) 836-8485
Facsimile: (212) 836-6485
sglickstein@kayescholer.com

*Co-Lead Defense Counsel*

21

DRINKER BIDDLE & REATH LLP

By: /s/ Susan M. Sharko
Susan M. Sharko
DRINKER BIDDLE & REATH LLP
*A Delaware Limited Liability Partnership*
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
Facsimile:  (973) 360-9831
susan.sharko@dbr.com

*Co-Lead Defense Counsel*

IRWIN FRITCHIE URQUHART & MOORE LLC

By: /s/ James B. Irwin
James B. Irwin
Kim E. Moore
IRWIN FRITCHIE URQUHART
& MOORE LLC
400 Poydras Street
Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
Facsimile:  (504) 310-2120
jirwin@irwinllc.com

*Defendants' Liaison Counsel*

CHAFFE MCCALL L.L.P.

By: /s/ John F. Olinde
John F. Olinde
CHAFFE MCCALL L.L.P.
1100 Poydras Street
Suite 2300
New Orleans, LA 70163
Telephone: (504) 585-7241
Facsimile: (504) 544-6084
olinde@chaffe.com

*Defendants' Co-Liaison Counsel*

22

2614130-1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 15, 2016, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

*/s/ John F. Olinde*

2614130-1