UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | MDL No. 2592 |
| | SECTION L |
| THIS DOCUMENT RELATES TO ALL ACTIONS | JUDGE ELDON E. FALLON |
| | MAG. JUDGE NORTH |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO COMPEL**

Defendants Bayer Corporation, Bayer Pharma AG (collectively, "Bayer"), Janssen Pharmaceuticals, Inc., Janssen Research & Development LLC, and Janssen Ortho LLC (collectively, "Janssen") (together, "Defendants") respectfully submit this response to Plaintiffs' Motion to Compel (Doc. 1873).

**INTRODUCTION**

Plaintiffs seek immediate production of documents related to two separate reanalyses of the results of a Xarelto clinical trial called "ROCKET AF." The reanalyses were undertaken to account for the potential impact of problems with a medical device used in the trial. One of the reanalyses was undertaken by Defendants, and is part of an ongoing regulatory proceeding in Europe. The other was performed by the Duke Clinical Research Institute ("Duke"), which conducted the trial. As described below, Duke has submitted that analysis for publication, and it is under peer-review.

The Court should deny Plaintiffs' motion at this time to prevent either a chilling effect on the scientific peer-review process or undue influence over the pending regulatory proceedings. This temporary denial will only briefly delay disclosure. The European regulators have said that sometime in "the first quarter of 2016" they will conclude their evaluation of what effect, if any, the recall of the third-party device used in the ROCKET AF trial had on the underlying study

2623926-1

data.[1] As for the Duke analysis, Duke has stated in a press release that it "intends to publish a full description of this analysis and results as rapidly as possible."[2] Promptly, upon conclusion of the European regulatory proceeding and the peer-review process to which the scientific research is currently being subjected, Defendants will produce the requested documents.

## BACKGROUND

1. Plaintiffs seek to compel production of documents regarding two reanalyses of data from one of the Xarelto Phase III clinical trials, known as "ROCKET AF." The study provided the scientific support for Janssen's New Drug Application (NDA) No. 202439, which sought—and ultimately obtained—approval of rivaroxaban as a treatment option in the United States to reduce the risk of stroke and systemic embolism in patients with nonvalvular atrial fibrillation. Xarelto NDA No. 202439 Approval Letter, *available at* http://www.accessdata.fda.gov/drugsatfda_docs/appletter/2011/202439s000ltr.pdf.

2. ROCKET AF—which is short for "Rivaroxaban Once Daily Oral Direct Factor Xa Inhibition Compared with Vitamin K Antagonism for Prevention of Stroke and Embolism Trial in Atrial Fibrillation"—compared once-daily oral rivaroxaban with dose-adjusted warfarin for the prevention of stroke and systemic embolism in patients with nonvalvular atrial fibrillation. *Rivaroxaban versus Warfarin in Nonvalvular Atrial Fibrillation*, NEW ENGLAND

---

[1] Meeting Highlights from Dec. 14–17, 2015 CHMP Meeting (attached as Ex. 1), *available at* http://www.ema.europa.eu/ema/index.jsp?curl=pages/news_and_events/news/2015/12/news_detail_002445.jsp&mid=WC0b01ac058004d5c1.

[2] Press Release, Duke Clinical Research Institute, https://dcri.org/research/news/2015-news-archives/rocket-af-secondary-analysis (Dec. 7, 2015) (attached as Ex. 2).

2623926-1

JOURNAL OF MEDICINE (Sept. 8, 2011) (Pls.' Ex. A, Doc. 1873-2). Researchers from Duke oversaw the double-blinded study. *Id.*[3]

3. All participants in ROCKET AF were provided an FDA-approved blood monitoring device called INRatio, manufactured and sold by a company called HemoSense (now Alere).[4] The INRatio device measured the International Normalized Ratio (INR) for patients in the control arm of the study—*i.e.*, those patients who were taking warfarin. *See* n.4. The physicians for the patients in the control group used the INR reading to determine whether the amount of anticoagulant that the patient was receiving was sufficient to thin the blood to reduce the incidence of clots and strokes, without enhancing the patient's risk of major bleeding events. To preserve the blinded nature of the study, the patients in the rivaroxaban arm of ROCKET AF also were given INRatio devices, but for those patients the devices provided fictitious values that intentionally "mimic[ed] values obtained as if the subject were taking warfarin." *Id.* Rivaroxaban does not affect INR to a similar degree as warfarin. *See id.*

4. In September 2015, Defendants learned that Alere and FDA had initiated a Class I recall of the INRatio device.[5] Alere issued an Urgent Medical Device Correction letter, which

---

[3] The lead investigator for the Duke re-analysis is Dr. Robert M. Califf, a cardiologist and clinical trial expert who was recently nominated by President Obama to lead the FDA.

[4] *See* Johnson & Johnson Advisory Committee Advisory Committee Briefing Document at 53, *available at* http://www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/CardiovascularandRenalDrugsAdvisoryCommittee/UCM270797.pdf.

[5] *See, e.g.*, Project On Government Oversight, After Problems Revealed, FDA Seeks Solutions for Blood Testing Devices (Dec. 23, 2015), http://www.pogo.org/blog/2015/12/after-problems-revealed-fda-seeks-solutions.html; Project On Government Oversight, Leaders of Xarelto Clinical Trial Reaffirm Conclusions (Dec. 9, 2015) http://www.pogo.org/blog/2015/12/leaders-of-xarelto-clinical-trial-reaffirm-conclusions.html; Project On Government Oversight, European Regulator Investigating Trial Led by FDA Nominee (Nov. 30, 2015) http://www.pogo.org/blog/2015/11/regulator-investigating-clinical-trial-led-by-fda-nominee.html

explained that "[i]n certain cases," the INRatio device "may provide an INR result that is clinically significantly lower than a result obtained using a reference INR system (laboratory method)." *See* Ex. 3 (Alere Letter) at 1.

5. Upon learning of the recall, the Duke researchers who had overseen the ROCKET AF clinical trial began a "secondary analysis" of the ROCKET AF trial findings, to assess whether the recalled INRatio device had any effect on the clinical-trial results.[6] Duke has announced its bottom-line conclusion: The "findings from the analysis are consistent with the results from the original trial and do not alter the conclusions of ROCKET AF—rivaroxaban is a reasonable alternative to warfarin and is non-inferior for the prevention of stroke and systemic embolism with less intracranial hemorrhage and fatal bleeding." Ex. 2 (Duke Press Release). Duke has not yet published its findings or otherwise made publicly available its secondary analysis or results, but it has stated publicly that it "intends to publish a full description of this analysis and results as rapidly as possible." *Id.* Duke has agreed that Defendants may produce the results of its reanalysis after the publication peer-review process is complete. *See* Pls.' Ex. F (filed under seal) (Doc. 1873-7) at 8.

6. Defendants also promptly informed the relevant regulators in the United States (the FDA) and Europe (the EMA, or the European Medicines Agency), *inter alia*, of the recall and their own efforts to reassess the ROCKET AF data. Ultimately, the EMA's Committee for Medicinal Products for Human Use (CHMP) commenced formal review proceedings in the fourth quarter of 2015, and Defendants submitted their reanalysis.[7] The CHMP discussed the

---

[6] *See* Ex. 2.

[7] *See* Minutes of Oct. 19–22, 2015 CHMP Meeting, at 33 ¶ 9.1.7 (attached as Ex. 4) (noting start of proceeding); Minutes of Nov. 16–19, 2015 CHMP meeting, at 28 ¶ 9.1.1 (attached as Ex. 5) (noting Defendants' submission and the CHMP's request for supplementary information); Agenda of Dec. 14–17, 2015 CHMP Meeting, at 24 ¶ 9.1.1 (attached as Ex. 6) (noting that

4

matter at its regularly scheduled meeting on December 14–17, 2015, and its website provides the following report from that meeting:

> The CHMP is currently evaluating whether a defect with a blood clotting test device used in a study of the anti-clotting medicine Xarelto (rivaroxaban) had an impact on the study results. The study, called ROCKET-AF, was used to support the approval of Xarelto for patients with non-valvular atrial fibrillation (a type of irregular heartbeat). *The CHMP expects to conclude its assessment in the first quarter of 2016. Once finalized, the CHMP assessment report will be made public.*[8]

On December 4, 2015, Plaintiffs served discovery requests seeking Defendants' and Duke's reanalyses and their underlying data. In response, Defendants objected to producing these documents on the grounds that the EU regulatory proceeding and Duke's peer-review process remain pending. *See, e.g.,* Pls.' Ex. F (filed under seal) (Doc. 1873-7) (Janssen Resps.) at 8, 11–12. In their objections, Defendants stated their intention to produce the documents at the conclusion of the EU regulatory proceedings and the Duke peer-review process. *See id.; see also* Pls.' Br. 2 n.1, 5–6.

7. Similarly, Janssen explained that responsive materials concerning the Alere INRatio device may be contained in the NDAs for Xarelto®, which were originally produced in April 2015 and supplemented in November 2015, as well as in the custodial files of individuals who worked on the ROCKET trial including Christopher Nessel, Sigmond Johnson, Sanjay Jalota, William Byra, Kimberly Schwabe, Paul Burton, Anne Vostaka and Peter DiBattiste. *See* Pls.' Ex. F (filed under seal) (Doc. 1873-7) (Janssen Resps.) at 7. Janssen further explained that, like Bayer, it would produce responsive documents concerning a "reanalysis of data from the

---

proceeding remains ongoing), *all available at* http://www.ema.europa.eu/ema/index.jsp?curl=pages/about_us/document_listing/document_listing_000378.jsp&mid=WC0b01ac0580028d2a#section1.

[8] Ex. 1 at 2 (emphasis added).

2623926-1

ROCKET trial performed by researchers at Duke Clinical Research Institute ("DCRI") and correspondence relating to that reanalysis" upon conclusion of the peer-review process, when the reanalysis is complete "so as to prevent misinterpretation of yet-to-be finalized results." *See id.* at 8. In order to fully comply with these document requests, Janssen will need to re-collect materials from approximately eight custodians and will likely need to re-update its recently updated NDA collection as well.[9]

8.      On January 11, 2016, Plaintiffs moved the Court to compel Defendants "to immediately produce documents related to the re-analysis of the Phase III clinical trial, ROCKET AF." Doc. 1873-1, at 1.

9.      On January 25, 2016, CHMP published the agenda for its January 25–28 meeting, which includes an update and discussion item pertaining to Xarelto and the ROCKET trial.[10]

**ARGUMENT**

This Court should deny Plaintiffs' Motion. Until the peer-review and foreign-regulatory processes regarding these reanalyses are complete, production would be unduly burdensome and would risk disrupting and interfering with those processes.

---

[9] New documents are created each day in this litigation where the medicine remains on the market. Plaintiffs should not be permitted to seek to re-depose defense witnesses based on the responses to this document demand. If plaintiffs are not ready to go forward with any depositions in light of the issues raised by this discovery request and this motion, the depositions should be adjourned and rescheduled. Defendants shall object to any such attempts for a second deposition.

[10] *See* Agenda of Jan. 25–28, 2016 CHMP Meeting, at ¶ 9.1.1, *available at* http://www.ema.europa.eu/docs/en_GB/document_library/Agenda/2016/01/WC500200185.pdf (Ex. 7).

**I.      A Reanalysis Of A Clinical Trial That Is Subject To An Ongoing Peer-Review Process Is Protected From Discovery For The Duration Of The Trial And Peer-Review Process.**

Where, as here, a party requests in discovery the data and analyses from ongoing scientific research, gathered by scientific researchers as part of an analysis of a clinical trial, and that analysis is subject to a peer-review process before being published, the data and analysis must be protected from disclosure until the trial and peer-review process are both complete. In the seminal decision on this issue, the Seventh Circuit identified the "danger of premature disclosure" in discovery of interim scientific data that are the subject of an ongoing trial or peer-review process. *See Dow Chemical Co. v. Allen*, 672 F.2d 1262, 1273 (7th Cir. 1982).

In *Dow Chemical*, the court considered a request for discovery of research notes, working papers, reports, and data related to ongoing animal toxicity studies that were in the peer-review process. The court refused to require production of the requested data, and identified the risks of premature disclosure:

> that public access to the research data would make the studies an unacceptable basis for scientific papers or other research; that peer review and publication of the studies was crucial to the researchers' credibility and careers and would be precluded by whole or partial public disclosure of the information; that loss of the opportunity to publish would severely decrease the researchers' professional opportunities in the future; and that even inadvertent disclosure of the information would risk total destruction of months or years of research.

*Id.* Separately, the Seventh Circuit reasoned that subjecting the requested documents to discovery would "threaten substantial intrusion into the enterprise of university research, and there are several reasons to think they are capable of chilling the exercise of academic freedom." *Id.* at 1276. Since *Dow Chemical*, courts have protected data underlying ongoing clinical trials and in-process peer-review research from disclosure in civil discovery. *See, e.g.*, *Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 566 (7th Cir. 1984); *Plough Inc. v. Nat'l Acad. of Scis.*,

7

530 A.2d 1152, 1157 (D.C. Ct. App. 1987) (both denying civil discovery of non-final research or peer-review materials); *see also Application of R.J. Reynolds Tobacco Co.*, 518 N.Y.S.2d 729, 734 (N.Y. Sup. Ct. 1987) (finding that compliance with subpoenas to Mount Sinai medical center, American Cancer Society, and Dean of Yale University School of Medicine "would place an unreasonable burden upon the medical and scientific institutions involved and would unduly disrupt the ongoing research" and observing that interests in academic freedom "properly figure into the legal calculation of whether forced disclosure would be reasonable"). Indeed, the court overseeing the *Pradaxa* MDL applied *Dow Chemical* to reject a request very similar to Plaintiffs' here—the court protected from discovery interim scientific data before the completion and publication of the reanalysis because "[g]iving the plaintiffs a virtual place at the table as defendants conduct this re-examination could very well, if not almost guarantee, a stifling of the purpose of the re-examination." *In re Pradaxa Prods. Liab. Litig.*, MDL No. 2385, CMO 58, at 4 (S.D. Ill. Feb. 21, 2014); *see also id.* (noting that, with disclosure before reanalysis is complete, "an inherent conflict arises in the process that may well be counterproductive").

The disruption of an ongoing peer-review process implicates two concerns: (1) that the underlying data, inferences, and conclusions that have not yet been fully vetted may not be reliable, and (2) that disclosure could chill ongoing research, commentary, and peer scrutiny. In *Dow Chemical*, the Seventh Circuit emphasized the reliability concern, concluding that "there are hazards in relying on incomplete research," given that the whole purpose of the peer-review process is to identify and correct any deficiencies that may exist in preliminary assessments and data. 672 F.2d at 1274. These same concerns are commonly noted as reasons supporting the admissibility at trial of peer-reviewed scientific research on the ground that it *is* reliable. *Ellis v. Int'l Playtex, Inc.*, 745 F.2d 292, 302 (4th Cir. 1984) ("Publication and survival of peer review,

however, is one further indication that the reliability of the contested data far exceeds that normally accorded 'preliminary data' and 'speculation'.")  The importance of peer-reviewed, reliable scientific conclusions is so well-settled that it harkens all the way back to *Daubert* itself, where the Supreme Court observed that "submission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593 (1993).

The court in *R.J. Reynolds Tobacco Co.* specifically addressed the chilling effect of premature disclosure:

> While these medical investigations are still in progress, they should not be subjected to examination and criticism by people whose interests are arguably antithetical to the medical scientists.  It would have the effect of denying to these doctors the opportunity of first publication of their studies.  It could also have a chilling effect and discourage future scientific endeavors.

518 N.Y.S.2d at 733–34; *McMillan v. Togus Reg'l Office, Dep't of Veterans Affairs*, 294 F. Supp. 2d 305, 317 (E.D.N.Y. 2003), *aff'd*, 120 F. App'x 849 (2d Cir. 2005) (discussing chilling effect disclosure in litigation has on scientific research generally, and collecting cases).

Duke has submitted its reanalysis to peer-review, and the fact that the peer-review process is ongoing is reason enough to deny Plaintiffs' motion.  When, as here, the peer-review process is still underway, disclosure risks undermining scientific reliability and chilling in-progress scientific research.  Accordingly, Duke's findings should be protected from civil discovery until the peer-review process has concluded.

## II. Disclosures To Regulatory Authorities In Connection With Ongoing Regulatory Proceedings Must Be Protected From Discovery During The Pendency Of The Proceedings.

For similar reasons, disclosures to regulatory authorities for the purpose of ongoing regulatory investigations or proceedings must be protected from civil discovery until the

9

investigation or proceedings have concluded.  Premature disclosure risks disrupting the agency's decision-making process and interfering with review proceedings or ongoing investigations.  The public interest in robust and unimpeded regulatory investigation and analysis applies broadly to shield from disclosure information related to various kinds of ongoing governmental investigations.  *See, e.g.*, *United States v. Smith*, 985 F. Supp. 2d 506, 519–20, 531 (S.D.N.Y. 2013) (discussing both civil and criminal discovery, and observing that, "[a]s a general proposition, courts have repeatedly recognized that materials, including even judicial documents which are presumptively accessible, can be kept from the public if their dissemination might adversely affect law enforcement interests" (collecting cases)).

Accordingly, courts facing similar situations and requests have emphasized that premature disclosure could disrupt an agency's decision-making process.  *See, e.g.*, *In re LTV Sec. Litig.*, 89 F.R.D. 595, 619 (N.D. Tex. 1981) (holding that real-time discovery of results of ongoing securities investigation may "prematurely expose theories about past conduct on the part of individuals as well as avenues of investigation which are proposed for future witnesses," and that "such premature exposure could easily prejudice the Special Officer's ability to obtain spontaneous and complete testimony and thereby undermine the efficacy of the entire inquiry").

Indeed, these interests are so compelling that courts will often protect interim regulatory filings—and their underlying data—from disclosure even *after* the regulatory process has concluded and the final versions of documents have been published.  For example, in *Plough Inc. v. Nat'l Acad. of Scis.*, 530 A.2d 1152 (D.C. Ct. App. 1987), the court shielded from disclosure preliminary data and drafts from a study of the National Academy of Sciences that validated a government study related to the drug at issue.  The court observed that "[e]ven limited disclosure of the preliminary conclusions, hypotheses, thoughts and ideas ventured by Committee members

prior to their being tested and criticized would not only embarrass those members, it would discourage members of NAS committees in the future from expressing themselves freely during their deliberations, and might cause some potential volunteers to refrain from participating in NAS studies altogether." *Id.* at 1157–58.

Similarly, in the *Fosamax* litigation, the trial court (relying on both *Dow Chemical* and *Plough*) refused to compel the testimony of a physician who had participated in a drug-safety report concerning Fosamax that was issued by the National Academy of Sciences. *See In re Fosamax Prods. Liab. Litig.*, MDL No. 1789, 2009 WL 2395899, at *5 (S.D.N.Y. Aug. 4, 2009). The court acknowledged the "gravity of th[e] type of potential chilling effect" identified in *Plough* and reasoned that to compel testimony about "internal committee matters" related to the drug-safety report would "chill the crucial atmosphere of candor." *Id.* at *4–5; *cf. also Farnsworth v. Procter & Gamble Co.*, 758 F.2d 1545, 1546 (11th Cir. 1985) (refusing to compel Center for Disease Control to release confidential identifying data from investigation and study related to product in lawsuit because of similar concerns about academic freedom and confidentiality).

Defendants here are not asking the Court to go that far. The EMA has announced that it will publicize its assessment report related to the reanalyses upon conclusion of the CHMP proceedings. *See* Ex. 1 (CHMP Meeting Highlights). That squares with the EMA's express policy of maintaining the confidentiality of data underlying its review proceedings while those proceedings are ongoing, lest premature disclosure "undermine the decision-making process." EMA Policy No. 0043, Access to Documents (related to medicinal products for human and veterinary use) (Nov. 30, 2010), at 4 ("With regard to the interest not to undermine the decision-making process, the Agency shall only release final documents once the concerned procedure has

been finalized.").[11]  In any event, once those proceedings are complete, Defendants intend to produce the documents that they submitted to the EMA.  That time is coming soon, given the CHMP's statement that proceedings are expected to conclude "in the first quarter of 2016" and the fact that the proceeding is an agenda item on the CHMP's next scheduled meeting.  *See supra* ¶¶ 7, 9.  But until the CHMP proceedings are finished—in deference to those ongoing proceedings and the EMA's policy against interim disclosure—Defendants' disclosures must be protected from discovery.

## CONCLUSION

In light of the foregoing concerns, and Defendants' willingness to produce the requested information at the conclusion of the currently ongoing regulatory proceedings and peer-review process, Defendants submit that an orderly process of production and update is the most appropriate and efficient way to handle Plaintiffs' requests.  Accordingly, Plaintiffs' Motion to Compel should be denied.

KAYE SCHOLER LLP

By: /s/ *William Hoffman*
Steven Glickstein
William Hoffman
KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Telephone: (212) 836-8485
Facsimile: (212) 836-6485
William.Hoffman@kayescholer.com

*Co-Lead Defense Counsel*

---

[11]  *Available at* http://www.ema.europa.eu/docs/en_GB/document_library/Other/2010/11/WC500099473.pdf.

12

2623926-1

DRINKER BIDDLE & REATH LLP

By: /s/ *Susan M. Sharko*
Susan M. Sharko
DRINKER BIDDLE & REATH LLP
*A Delaware Limited Liability Partnership*
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
Facsimile: (973) 360-9831
susan.sharko@dbr.com

*Co-Lead Defense Counsel*

IRWIN FRITCHIE URQUHART & MOORE LLC
By: /s/ *James B. Irwin*
James B. Irwin
Kim E. Moore
IRWIN FRITCHIE URQUHART
& MOORE LLC
400 Poydras Street
Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
Facsimile: (504) 310-2120
jirwin@irwinllc.com

*Defendants' Co-Liaison Counsel*

CHAFFE MCCALL L.L.P.

By: /s/ *John F. Olinde*
John F. Olinde
CHAFFE McCALL L.L.P.
1100 Poydras Street
Suite 2300
New Orleans, LA 70163
Telephone: (504) 585-7241
Facsimile: (504) 544-6084
olinde@chaffe.com

*Defendants' Co-Liaison Counsel*

2623926-1

## CERTIFICATE OF SERVICE

I hereby certify that on January 26, 2016, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

*/s/ John F. Olinde*

2623926-1