UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  XARELTO (RIVAROXABAN) | * | MDL 2592 |
| PRODUCTS LIABILITY LITIGATION | * | |
| | * | SECTION L |
| THIS DOCUMENT RELATES TO: | * | |
| *ALL CASES* | * | JUDGE ELDON E. FALLON |
| | * | |
| | * | MAG. JUDGE NORTH |
| | * | |
| | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * *

### REDACTED VERSION OF THE PLAINTIFFS' STEERING COMMITTEE'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR ENTRY OF A PROPOSED ORDER REGARDING CONTACT WITH PHYSICIANS

The Plaintiffs' Steering Committee ("PSC") submits this response in opposition to Defendants' motion for entry of a proposed protective order regarding contact with physicians [Rec. Doc. 1844].  The Court should deny Defendants' motion, or alternatively, reaffirm its well-founded decision in *Vioxx*, which permits Plaintiffs' counsel to interview the treating and prescribing physician, provided the doctor is not a named Defendant in the litigation.[1]

## I.     INTRODUCTION

The Defendants' motion is nothing more than an overt attempt to restrict Plaintiff's communications  with  treating doctors for the purpose of further tilting a playing field in Defendants favor on an issue for which Plaintiffs have the burden of proof.  There is simply no need for the Court to "level the playing field" to  accommodate the  Defendants as they suggest since the field is already tilted

---

[1] *In re Vioxx Prods. Liab. Litig.* 230 F.R.D. 470, 472 (E.D.La. 2005).

in their favor.  Rather to level the field, the Court should maintain the clear directives established in *Vioxx*.

Since 2011, when Xarelto was approved, physicians have been saturated with Defendants' marketing and promotional material related to Xarelto, and as such have been well-exposed to the Defendants' version of the "facts." Defendants' army of sales representatives promoted the drug's safety and convenience (the "Xarelto Difference") to physicians.[2]  "The woodshed took on its current meaning of a place of punishment - where Paw could whop the errant son with Maw out of earshot - in 1907."[3] Defendants' pejorative use of this term is intended to unfairly conjure the specter of Plaintiffs' attorneys metaphorically and verbally beating treating physicians into submission out of the eyes of the court and defense counsel (at the woodshed). While dramatic, the Defendants' use of this pejorative literary device is inaccurate, speculative, and not reality-based; not a shred of evidence has been presented to support Defendants' contrived argument. Plaintiffs' counsel will (and are entitled to) engage in a truthful discussion with their client's physician regarding facts known to be relevant to their clients' claims. Such efforts at "enlightenment" are especially critical given that Defendants have consistently argued the importance of the learned intermediary doctrine on the one hand, while they attempt to deny Plaintiffs the ability to present the learned intermediary with information that was not previously disclosed, on the other hand. Defendants' motion is simply an attempt to preclude Plaintiffs from properly preparing the prescribing physician to testify by showing the doctor information that was not disclosed to the doctor.

If any Plaintiff's attorney would overreach by attempting to "woodshed" a doctor in the manner suggested by Defendants, cross-examination by Defendants' counsel would quickly expose the conduct

---

[2] *See example,* Exhibit "1," XARELTO_JANSSEN_009450324-09450332 **(FILED UNDER SEAL).**

[3] Saphire, William, On Language Woodshed Blues Kimble Mead, NY TIMES MAGAZINE, December 31, 1981.

and undermine the credibility of Plaintiff's counsel[4] and any such issue should be addressed on a case-by-case basis.

To the extent that the Defendants' motion generally acknowledges that Defense counsel should not be permitted to have *ex parte* communications with Plaintiffs' physicians, the PSC agrees. However, Defendants further suggest that an exception to this prohibition should be permitted where Defendants seek to retain Plaintiffs' prescribing/treating physicians as an expert after the doctor has been deposed as a fact witness. In light of the relationship of trust inherent in the patient/physician relationship and the risk of unauthorized disclosures of confidential medical and personal patient information, the Court should not permit this exception. Such an exception would only serve to chill the patient-doctor relationship and would directly impact the care provided to the plaintiff.

## II.   COUNTER-STATEMENT OF FACTS

The Defendants are among those few companies that comprise a group of the world's largest pharmaceutical manufacturers. Currently, and nearly every day for the last (5) years, they have engaged in extensive contact and communication with Plaintiffs' doctors about Xarelto. They have been doing so since 2011, when they began aggressively marketing and promoting Xarelto as a replacement for warfarin by emphasizing what they coined as the "Xarelto Difference."[5] The "Xarelto Difference," as touted by the Defendants, revolves around the cornerstone marketing message that Xarelto does not require routine blood testing[6] or other inconveniences like minor dietary restrictions, and it is taken once-a-day unlike its competition including Pradaxa.

---

[4] Defendants have cited no such example from Vioxx or in this litigation because NONE exist.

[5] *See* Exhibit "1."

[6] The 2005 Collaborative, Development and License Agreements ("CDLA") between Bayer Healthcare AG and Ortho-McNeil Pharmaceutical Inc. which is the initial agreement that between the parties defining their joint venture in connection with Xarelto is attached as Exhibit "2" **(FILED UNDER SEAL).** The CDLA, was entered into by the parties (6) six years before Xarelto's introduction to the market in the United States in 2011, █████ ████████████████████████████████████████████████ *Id.* at 1.105(d), p. 14. *See also*, the

3

Xarelto became a block-buster multi-billion dollar brand in a highly competitive and crowded anticoagulant market, through well-funded, sophisticated and extensive marketing and promotional campaigns using an army of greater than ███ sales representatives (*see* Defendants' slide below from the 2014 XARELTO Business Plan)[7] incentivized through ████████████████████ ███.[8]



_____

relevant pages of the 12/15/15 deposition of Keith Abrams, Vice President and Associate General Counsel for Bayer Corp., at 203:1-15 attached as Exhibit "3")**(FILED UNDER SEAL).**

[7] Exhibit "4," Slide 9, 2014 XARELTO Business Plan, XARELTO_JANSSEN_12288794 (highlighting added) **(FILED UNDER SEAL).**

[8] The 2005 CDLA and the various Specialty Market Agreements between the Defendants involving Xarelto

Defendants' sales reps were armed with the XARELTO-sample pack ("Provides an important **differentiation** opportunity"),[9] I-Pads,[10] laptops and promotional materials touting the "Xarelto Difference."[11] Rather than answer doctors questions, as set forth in Defendants' slide below,[12] Defendants trained Sales Representatives to respond with



[9] *See Id.* at 5.9, p. 25; Exhibit "5," Slide 22 in document XARELTO_JANSSEN_08739083 **(FILED UNDER SEAL).**

[10] *See* Exhibit "6," XARELTO_BPAG_00003711-3712 **(FILED UNDER SEAL).**

[11] The 2005 CDLA at 1.34 on page 6 (Exhibit "2"), defines a ▮▮▮▮▮:



*Id.*

[12] Exhibit "7," XARELTO ▮▮▮▮▮▮▮▮▮▮▮▮▮, XARELTO_JANSSEN_12140907 at Slide 4 **(FILED UNDER SEAL).**

[13] Exhibit "8," ▮▮▮▮▮▮▮ XARELTO_BHCP_02147419-02147436 at bates 02147425 **(FILED UNDER SEAL)**; Exhibit "7" ▮▮▮▮ XARELTO_JANSSEN_12140907 at Slide 4 (highlighting and red-circle added) **(FILED UNDER SEAL).**

Defendants utilized their sales force to promote the benefits of Xarelto to physicians while not disclosing relevant safety information. Defendants controlled what information their sales force could and could not discuss with physicians. For example, in 2013, Sales Representatives were instructed to respond "on a reactive basis only" to safety data published by the Institute for Safe Medication Practices ("ISMP")[14] which reported that in the year leading up to June 30, 2012, there were 1,080 Xarelto-associated "Serious Adverse Event" ("SAE") Medwatch reports filed with the FDA, including at least 65 deaths.[15] The ISMP reported that of the reported hemorrhage events associated with Xarelto, 8% resulted in death, which was approximately two-fold the risk of a hemorrhage-related death with warfarin. At the close of the 2012 fiscal year, a total of 2,081 new Xarelto-associated SAE reports were filed with the FDA, its first full year on the market, ranking tenth among other pharmaceuticals in direct reports to the FDA.[16] Of those reported events, 151 resulted in death, as compared to only 56 deaths associated with warfarin. The ISMP referred to these SAE figures as constituting a "strong signal" regarding the safety of Xarelto, defined as "evidence of sufficient weight to justify an alert to the public and the scientific community, and to warrant further investigation."[17] The ISMP noted that even during the approval process, FDA "[r]eviewers also questioned the convenient once-a-day dosing scheme [of Xarelto], saying blood level studies had shown peaks and troughs that could be eliminated by twice-a-day dosing."[18] Defendants' reaction to this safety signal was to e-mail their sales force with instructions that Sales Representative should respond "on a reactive basis only" and attempt to limit its use by admonishing that it was ███████████████████████████████

---

[14] Exhibit "9," ISMP QuarterWatch dated October 3, 2012.

[15] Exhibit "10," XARELTO_JANSSEN-00316472-78 **(FILED UNDER SEAL).**

[16] *Id.*

[17] *Id.*

[18] *Id.*

████████ "[19] Sales Representatives were instructed '█████████████████████████████████

████████"[20]

As Defendants' slide below reveals,[21] Defendants directly communicated with Plaintiffs'

physicians using, ████████████████████████████████████████████[22] ███████████████

████████ for the purpose of convincing physicians that Xarelto, unlike Warfarin, can be safely

administered without monitoring the drug's degree of anticoagulation effect.

# REDACTED

---

[19] *Id.*

[20] Exhibit "10" at XARELTO_JANSSEN_00316476 **(FILED UNDER SEAL).**

[21] Exhibit "11," Slide 19, XARELTO_JANSSEN_08739083 **(FILED UNDER SEAL).**

[22] www.xareltohcp.com.

Defendants' multifaceted, surround-sound physician outreach to promote Xarelto utilized a variety of communication platforms as reflected in the Defendants' slide[23] below:



Defendants even created I-phone / I-pad and Android applications ("Apps"), the *XARELTO DocCenter*, for physicians to download to their phones for free.[24]

---

[23] Exhibit "11," Slide no. 66 in document XARELTO_JANSSEN_08750409 **(FILED UNDER SEAL)** and Exhibit "12," XARELTO_JANSSEN_08792158 **(FILED UNDER SEAL).**

[24] Exhibit "13" XARELTO_JANSSEN_10428488-89 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ **(FILED UNDER SEAL)**; Exhibit "14," XARELTO_JANSSEN-08679824-08679834 **(FILED UNDER SEAL).**

As reflected in Defendants' slide below,[25] in 2015 the Defendants increased their reach from greater than ███████████████████ healthcare professionals in peer-to-peer education through ████████████████████████████ ███████████████████



---

[25] Exhibit "15," XARELTO_JANSSEN_15479391 at Slide 4 **(FILED UNDER SEAL).** *See also* Exhibit "4," above,  Slide  9  "████████████████████"  from  the XARELTO_JANSSEN_12288794 (highlighting added) **(FILED UNDER SEAL).**

From 2013-2015, Defendants spent ███████ for the Xarelto Speakers Bureau[26] and as reflected in the Defendants' slide[27] below – it was money well spent:



---

[26] Exhibit "16," XARELTO_JANSSEN_08790434-39; Exhibit "12," XARELTO_JANSSEN_08792158-65 **(FILED UNDER SEAL);** Exhibit "17," XARELTO_JANSSEN_08819567-574 **(FILED UNDER SEAL).**

[27] Exhibit "18," Slide 10, XARELTO_JANSSEN_08861127 **(FILED UNDER SEAL).**

Defendants' sales personnel treat doctors and their office staff to free meals and other perks. They host doctors at training sessions, reimbursing their travel expenses. They hire doctors as consultants and/or lecturers and pay them fees.[28] According to Defendants' answer to the Defense Fact Sheets (DFS) produced thus far in this MDL, the Defendants have:

- paid in excess of ▮▮▮▮▮▮ to the Plaintiff's prescribing or treating physicians in speaker's bureau and/or consultants fees.[29]

- detailed the Plaintiffs' physicians in the 40 bellwether pool cases approximately ▮▮▮ times from August 1, 2011 to April 30, 2015 according to the call notes produced.[30] [31]

For example, in the bellwether pool case *Ibanez v. Janssen,*[32] the DFS reveals that Defendants have had extensive direct contact with two of Plaintiff's physicians, Dr. Peter Fail and Dr. Samuel J. Stagg.[33] In addition to sending both physicians "▮▮▮▮▮▮▮▮▮▮" the call-notes produced by Defendants reveal that ▮▮▮▮ sales representatives, detailed both physicians ▮▮ times between 2011 and 2015.[34] Additionally, as of the date that Defendants produced the DFS, they had paid Dr. Stagg ▮▮▮▮▮ in speakers' fees since December, 2012.[35]

---

[28] Exhibit "19," XARELTO JANSSEN 09745096-09747106 *Promotional Speaker Agreement* ▮▮▮▮▮▮▮▮▮▮▮ **(FILED UNDER SEAL).**

[29] *See* Exhibit "20" which is a report derived from MDL Centrality as of January 29, 2017 **(FILED UNDER SEAL).**

[30] *See* Exhibit "21" which is a summary of the relevant data from the 37 DFS produced in the 40 bellwether pool cases **(FILED UNDER SEAL).**

[31] *See* Exhibit "22" which are the sales representative call notes produced to date in the bellwether pool cases **(FILED UNDER SEAL).**

[32] *Harriet Ibanez and Mario Ibanez v. Janssen Research & Development LLC, et al.* ED.La. No. 2:14-cv-02669.

[33] Exhibit "23," *Ibanez* DFS **(FILED UNDER SEAL).**

[34] *Id.* **(FILED UNDER SEAL).**

[35] *Id.*

Before Defendants' Sales Representatives step-foot for the first time in a Plaintiffs' doctor's office they know if the physician favors Xarelto, Pradaxa, Warfarin or Eliquis. Defendants buy prescribing data from █████████████████████████ to:

- identify physicians to target;

- track prescriptions of Xarelto and competitors' drugs such as Pradaxa, Eliquis and Warfarin;

- develop and evaluate their marketing and promotional efforts including the effect of sales calls on physicians;

- tailor Xarelto sales pitches to individual physician;

- keep track of what tends influence the prescribing physicians' behavior; and,

- evaluate and compensate the sales representatives who receive bonuses and other financial incentives based on Xarelto sales.[36]

Moreover, the Defendants have spent untold dollars funding or sponsoring "papers" and "studies" regarding Xarelto, utilizing the same doctors who perform these "studies" to tout the drug at physician society meetings and medical educational seminars. Defendants' promotional campaigns were backed-up with massive direct-to-consumer advertising, market tested and designed to increase Xarelto prescriptions by driving home the "Xarelto Difference." All the while the Defendants' sales force has promoted the company-line, the real facts have been withheld, or worse intentionally concealed. Incredibly, after all of the contacts with Plaintiffs' physicians described above, Defendants now propose an order intended to prevent counsel for Plaintiffs from discussing, even once, the information not contained in the Defendants' marketing blitz.  For the reasons discussed below, the Defendants' motion should be denied.[37]

---

[36] Exhibit "24" is the ████ data that Defendants purchased and produced thus far in the 6 of the 40 bellwether pool cases. **(FILED UNDER SEAL).**

[37] It is important to note that there is no basis for Defendants to assert that Xarelto is more ***effective*** than warfarin. FDA approval of Xarelto was based on a mere non-inferiority standard with respect to efficacy and safety as compared to warfarin, and thus no claims for superiority or greater efficacy can be made. In other words, if Xarelto is as effective with a safety profile that is no worse than warfarin, the ability to prescribe the drug without requiring blood monitoring will allow for approval. In fact, as this litigation will reveal, studies show that Xarelto

III.  **ARGUMENT**

   A.  **DEFENDANTS HAVE NOT SATISFIED THEIR BURDEN OF DEMONSTRATING THAT GOOD CAUSE EXISTS FOR THE PROTECTIVE ORDER THEY SEEK**

In an apparent attempt to avoid the burden they must satisfy under Fed. R. Civ. P. 26(c), Defendants have not labeled their motion a motion for protective order. However, without a doubt, Defendants' motion is seeking a protective order under Rule 26(c) which requires a showing of "good cause." It is incumbent upon the party requesting such relief to show the necessity of a protective order.[38] As set forth below, Defendants cannot meet their burden. Their entire argument is based on sheer speculation, unsupported contentions, and conclusions of counsel while ignoring that physicians have long been exposed to the Defendants' extensive promotion of Xarelto and Defendants' version of the "facts" promoting product safety and convenience through their sales force and other marketing.

   B.  **THE COURT SHOULD REJECT DEFENDANTS' BASELESS SPECULATION ABOUT UNFAIR "WOODSHEDDING"**

There is neither an empirical nor even anecdotal basis justifying the need for Defendants' motion.  Indeed, there are several principled bases for rejecting the Defendants' motion.

*First*, as stated above, Defendants do not provide a single example of "woodshedding" as that term is used in *Vioxx*. This Court rendered its decision in *Vioxx* over ten (10) years ago. Despite

---

is *less* efficacious compared to well-controlled warfarin. Without the claim of *greater* efficacy, the only distinction left for Defendants to make in the marketplace to gain a competitive advantage, is the alleged "convenience" of Xarelto. The crux of Plaintiffs' claims at this point in this litigation is that this alleged advantage of convenience and no need for monitoring is a *fallacy*. The pharmacokinetic profile of warfarin that requires blood level monitoring and titration for safe and effective use are equally present for Xarelto. Most notably, the inter-patient variability observed in Xarelto patients is similar to that observed in warfarin patients. Therefore, Xarelto patients are at risk of suffering excessive bleeding when they receive too much anticoagulant effect, and strokes when they receive too little. Thus, monitoring of the degree of anticoagulation of Xarelto and appropriate individualized dosing is critical for the safe and effective use of Xarelto.

[38] *In re Terra Int'l, Inc.*, 134 F.3d 302, 306 (5th Cir. 1998) ("Rule 26(c)'s requirement of a showing of good cause to support the issuance of a protective order indicates that [t]he burden is upon the movant to show the necessity of its issuance, which contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements.")(internal quotations omitted).

hundreds of physician depositions in *Vioxx* under the Court's order, there was never one instance of "woodshedding." Nothing has changed in the interim. In fact, as discussed below, numerous other courts in pharmaceutical and medical device cases have relied on, cited and followed this Court's *Vioxx* decision, which was well-reasoned then and remains correct today.

As noted above, the only example of so-called "woodshedding" that Defendants provide, occurred in the ASR litigation in state court by attorneys who do not have Xarelto cases on file in this MDL or the state court proceeding in Pennsylvania. Moreover, Defendants' argument that the Court should intervene to prevent Plaintiffs' counsel from speaking with Plaintiffs' physicians to avoid unfair "woodshedding" is without any legal basis, and is supported simply by the *ipse dixit* of counsel.  While Defendants' position may have superficial appeal to it, a closer examination reveals that it is flawed.

*Second*, if Defendants' reasoning is to be accepted, then no counsel should *ever* have *ex parte* communications with any witness other than their client because of the risk of biasing that witness. There is nothing special about Plaintiffs' physicians that make them particularly vulnerable to unfair "woodshedding." Why should there be limits on Plaintiffs' counsel's communications while Defendants' counsel are free to have *ex parte c*ommunications with other fact witnesses, including Defendants' employees and former employees outside the "control group," ex-employee sales representatives, or friends of the Plaintiffs?  If the fear of improper "woodshedding" was sufficient grounds to prevent *ex parte* contacts between a Plaintiff's counsel and her physicians, then by the same token Defendants' counsel should be precluded from *ex parte* contacts with witnesses upon whom they could exert influence.

*Third,* the law forbids *ex parte* contacts to protect confidential relationships and privileged communications from overreaching by opposing counsel. Where confidential communications or relationships are not at stake, as reflected in the one example from the *DePuy* state court litigation cited

14

in the Defendants' brief, vigorous cross-examination is sufficient to reveal improper "woodshedding." Any Plaintiffs' counsel (or Defendants' counsel) who overreaches in an attempt to "woodshed" a witness runs the risk of losing all credibility with the jury when opposing counsel cross-examines the witness about such coaching.

*Fourth*, the extraordinary exercise of judicial authority sought by Defendants requires this Court to make an underlying assumption which simply does not stand up to reason, practical experience or any evidence in the record. Specifically, Defendants raise the specter that well-informed and accurate testimony of well-educated and sophisticated witnesses will somehow be placed in jeopardy unless the Court acts to protect these witnesses against information Plaintiffs' counsel might share with them about Xarelto. It is however, a false specter that Defendants have conjured from whole-clothe in order to convince this Court to thwart Plaintiff's counsel's right to traditional case investigation and preparation. No showing whatsoever has been made in this record demonstrating that prescribing and treating physicians are likely to offer testimony under oath that is somehow lacking in an evidentiary sense on the basis that they have communicated with, or having received information from, Plaintiffs' counsel.

*Finally,* Defendants always have the option of seeking other relief from the Court on a case-by-case basis if they believe any counsel has overstepped the bounds of propriety. But the speculative possibility that one or more counsel *might* do so does not justify the unwarranted relief that Defendants seek.

**C.    DEFENDANTS' UNSUBSTANTIATED CLAIM THAT *EX PARTE* CONTACTS SKEW THE PLAYING FIELD IGNORES THAT THEY HAVE HAD VIRTUALLY UNLIMITED AND UNFETTERED ACCESS TO INFLUENCE <u>DOCTORS FOR NEARLY FIVE (5) YEARS</u>**

Defendants' argument that this Court must level the playing field to ameliorate some speculative disadvantage assumes that physicians are hearing only Plaintiffs' version of the facts and must be "isolated" from any exposure to the issues in this case.  This argument ignores that Defendants have had,

<u>and continue to have</u>, virtually unlimited and unfettered access to these doctors through their highly incentivized army of sales representatives. Defendants have used this access to promote Xarelto, to present one-sided and misleading information, and to deflect prescriber concerns about safety.

According to the DFS answered in this MDL, Defendants have paid at least in excess of ████████ to the Plaintiff's prescribing or treating physicians in speaker's bureau and/or consultants fees. Thus, while Defendants complain about the possibility that Plaintiffs' counsel may "woodshed" physicians, Defendants, through their sales representatives, are actively and currently "woodshedding." Defendants have used these opportunities to promote the "Xarelto Difference," to downplay safety concerns, and to tell their side of the Xarelto story about safety and superior convenience of once-a-day-dosing without the need for blood-monitoring. Although cliché, the idiom "People in Glass Houses Shouldn't Throw Stones" is apt when considering Defendants' unsupported allegations / fears of woodshedding in contrast to Defendants' actual training of their sales force to ████████ ████ physician questions and use ████████ to ████████ and persuade doctors that ████████████████████████ ████████████████████████████ ████ . .."[39]

---

[39] Exhibit "8," *supra.* ████████████ XARELTO_BHCP_02147419-02147436 at bates 02147425; Exhibit "9," *supra* **(FILED UNDER SEAL);** Exhibit "7," XARELTO ████████████████ ████████████ XARELTO_JANSSEN_12140907 at Slide 4 (highlighting and red-circle added) **(FILED UNDER SEAL).**

Since 2011, Defendants also have inundated physicians, patients, and the public with direct-to-consumer mass media advertising promoting the convenience, safety and efficacy of their drug starring celebrity spokesman:



Given this history, it is disingenuous for Defendants to argue that meetings between Plaintiffs' counsel and treating physicians would unfairly slant communications against Defendants. Defendants' concern that Plaintiffs will engage in what amounts to cherry-picking unfavorable corporate documents to show these doctors, without providing appropriate "context," is equally disingenuous. These doctors' primary source of information about Xarelto is from Defendants' "cherry-picked" information – information intended for the sole purpose of persuading doctors to prescribe the drug to their patients because of its convenience and superior safety profile.

Plaintiffs contend, and will prove in these cases, that these Defendants promoted and sold Xarelto to these doctors without disclosing all of the safety information within their knowledge that bears on the products' safety and effectiveness, its risks, and the frequency, severity and duration of such risks. In addition, the Plaintiffs will prove that the primary clinical trial upon which the indication pertaining to atrial fibrillation was based was critically flawed. The Defendants' documents reflecting their knowledge of adverse events, the duration, frequency and severity of risks beyond what was disclosed in their warnings and promotional materials, and the knowledge of extraordinary defects in the manner in which the clinical trials were conducted, is the only "context" that these doctors are missing.

If the Defendants were merely concerned that confidential information might be disclosed, their concerns are baseless: there is a Protective Order in place in this MDL, and in the Pennsylvania state court proceeding that protect the confidential legitimate business interest of the Defendants.[40] In reality, confidentiality is not the concern. Instead, Defendants simply do not like the fact that the documents are being shown to doctors because the information contained therein is damaging to their litigation position and economic interests.[41]

---

[40] *See* MDL PTO-12 and PA CMO-5.

[41] Perhaps unwittingly the Defendants admit that part of their motivation in filing the instant motion involves their desire to maximize profits through future sales of Xarelto. *See* Defendants' Memorandum Regarding Contact with

**D.      PLAINTIFFS SHOULD NOT BE RESTRICTED IN THEIR ABILITY TO ADDRESS THE DEFENDANTS' FAILURE TO WARN, AND THE RELATED "LEARNED INTERMEDIARY" DOCTRINE, AS THE PLAINTIFFS' DOCTORS ARE UNDENIABLY *THE* CRITICAL FACT WITNESSES PERTAINING TO THESE ISSUES**

Plaintiffs' doctors are key fact witnesses in these cases. Their testimony not only relates to their knowledge regarding the Plaintiffs' medical conditions and/or diagnoses, but also is extremely probative as to what Defendants communicated to the Plaintiffs' doctors about the drug through their sales force, the internet, I-phone and I-Pad Apps (and the "banner ads" sent to the Physician's Apple or Android Device through the Apps), Speaker Events, Medical Journal Advertisements, Continuing Medical Education sponsored by Defendants, Product Theaters, Direct Mail and E-mail, and various other means.  Plaintiffs should not be restricted from asking these doctors what they were told (or perhaps not told) about Xarelto in the course of the Defendants' marketing efforts. Plaintiffs' doctors may have dealt with other patients who have experienced similar injuries from Xarelto. In the preparation of these cases, Plaintiffs should not be prevented from participating in discussions with these physicians concerning their knowledge about other drug-related injuries, and their communications with the Defendants relating to such injuries.

Moreover, Plaintiffs should not be restricted in their ability to rebut the Defendants' failure to warn arguments and the "learned intermediary" defense. The Plaintiffs' doctors are undeniably *the* key witnesses to address facts critical to these defenses. Under the learned intermediary doctrine, which is applied in most states, the Defendants will contend that the manufacturer's/seller's duty to warn generally runs to the doctor (the "learned intermediary") rather than the patient. In other words, the Defendants will argue that the prescribing doctor literally "stands in the shoes" of the Plaintiff for

---

Physicians (hereafter "Defendants' Brief") at p. 6 ("In addition to potentially skewing physicians' testimony in the litigation, a one-sided, not immediately rebuttable, advocate's presentation of the liability evidence could unfairly deter physicians from prescribing Xarelto® and deprive patients of the benefits that they could receive by taking the FDA-approved medication.").

purposes of determining whether an appropriate warning was provided.  The prescribing doctor is thus a critical witness for the Plaintiff in meeting his or her burden of proof.  Thus, what the doctor was told – or *not* told – by the Defendants, taking into account the Defendants' knowledge at the time, are important issues of fact.[42] Because the Defendants had or should have had knowledge regarding the dangers associated with the drug's once-a-day dosing and use without blood monitoring and they failed to disseminate this information to Plaintiffs' doctors, such information will bear on the failure to warn and the learned intermediary issues presented in most of these cases. Further, the actual limitations of ROCKET AF – which were undisputedly not disclosed to any prescribing physician – will bear on whether a doctor would have prescribed Xarelto had they known of this study's extraordinary flaws.[43] Likewise, what the particular Plaintiff's doctor would have done had he or she been made aware of all information known to the Defendants about dosing and blood monitoring (whether or not he or she would have still prescribed Xarelto or another anticoagulant in light of such information, or whether he or she would have provided this information to the patient) are necessary inquiries in these cases. The only way for Plaintiffs to meaningfully address these issues in preparation is to ask the doctors "did you know 'x' and 'y' that Defendants knew," and "would it have made any difference in how you treated this patient if you had been provided this information?" It is entirely appropriate, indeed necessary, for

---

[42] As set forth in *In re Avandia Marketing, Sales Practices and Prods. Liab. Litig.*, 817 F.Supp.2d 535, 547 (E.D.Pa.2011) "the adequacy of a warning [under several states' laws] is determined based on what a manufacturer knew or should have known about a given risk at the time a patient is prescribed the drug or the cause of action arose, and whether the label warned of that risk. A manufacturer is not excused if it remains purposefully ignorant of a particular risk.  The duty to warn is thus a continuing one, and obligates a manufacturer to conduct research and otherwise investigate risks associated with its products, and then update warnings as appropriate."

[43] *See Plaintiffs' Steering Committee's Reply To Defendants' Response To Motion To Compel Discovery* regarding the re-analyses of data from the Phase III Clinical Trial, ROCKET AF, that were required to assess the impact of a defective device used in the course of the ROCKET AF trial for critical monitoring of anticoagulation in the double blind study comparing patients treated with warfarin and rivaroxaban. It is doubtful that Defendants' Sales Representatives are actively notifying physicians that the INRatio® PT/NR Monitor system used in the ROCKET AF trial conducted was recalled in December of 2014 due to evidence that the system was registering INR ("International Normalized Ratio") results that were "clinically significantly lower" than results from screening with the use of laboratory methods.

Plaintiffs to address these important questions with Plaintiffs' treating physicians in preparing these cases.

### E.   THE MAJORITY OF WELL-REASONED OPINIONS SINCE THIS COURT'S DECISION IN *VIOXX* HAVE REJECTED THE BROAD PROHIBITIONS AND LIMITATIONS SOUGHT BY DEFENDANTS

Defendants suggest that since this Court's ruling in *Vioxx* there is some emerging trend to prohibit Plaintiff's counsel from having *ex parte* contacts with their clients' doctors, or to severely curtail the communications as the Defendants urge. However, nothing can be further from the truth, as set forth below.

Over a decade ago this Court determined that Plaintiffs and their counsel should have access to Plaintiffs' prescribing and treating physicians. There is no reason to diverge from this Court's precedent setting opinion in *Vioxx*. This Court in *Vioxx* initially entered an order that "put Plaintiffs and Defendants on an equal footing with respect to interviewing the prescribing physicians," but then modified the order, after noting that it otherwise could "have a destructive effect on the efficient handling of [the] litigation and become problematic to both sides as well as to the Court."[44] In modifying the earlier order this Court cited "the time honored doctor-patient confidential relationship which has been recognized and protected in both Western and Eastern civilization for over 2000 years."[45][46]

---

[44] *Vioxx, supra.* 230 F.R.D. at 475.

[45] *Id.* at 476.

[46] In many states the physician-patient relationship is a fiduciary one that merits close protection, is not waived with the filing of a personal injury suit and hence *ex parte* communications by defense counsel with treating physicians are prohibited. A non-exhaustive list of examples includes: Arizona--*Duquette v. Superior Court for the County of Maricopa*, 778 P.2d 634, 642 (Ariz. Ct. App. 1989); Arkansas-*Kraemer v. Patterson*, 29 S.W.3d 684, 690 (Ark. 2000); Florida--*Acosta v. Richter*, 671 So. 2d 149, 156-57 (Fla. 1996); Illinois--*Petrillo v. Syntex Lab., Inc.*, 499 N.E.2d 952, 971 (Ill. App. Ct. 1986); Indiana--*Becker v. Plemmons*, 598 N.E.2d 564, 569 (Ind. Ct. App. 1992); Louisiana--*Sloan v. Mouton*, 82 So. 3d 364, 375-77 (La. Ct. App. 2011); Mississippi--*Scott ex rel. Scott v. Flynt*, 704 So. 2d 998, 1007 (Miss. 1996); New Mexico--*Smith v. Ashby*, 743 P.2d 114, 115-16 (N.M. 1987); North Carolina--*Crist v. Moffatt*, 389 S.E.2d 41, 47 (N.C. 1990); Pennsylvania - *Alexander v. Knight*, 177 A.2d 142 (Pa. Super. 1962)(that physicians' fiduciary duty owed to their patient's more than just medical care for which payment is extracted, there is a duty to aid the patient in litigation and to refuse the affirmative assistance to the patient's antagonist in the litigation) Utah--*Sorenson v. Barbuto*, 177 P.3d 614, 621 (Utah 2008); *Washington-*

In so doing in *Vioxx*, this Court recognized that the parties were not similarly situated with respect to Plaintiffs' physicians and permitted Plaintiffs ready access, while limiting Defendants' access. Significantly, this Court had originally imposed parallel restrictions on the parties, but, upon reconsideration determined that its original decision required modification favoring plaintiffs' access to doctors.  As this Court explained:

> The Court, upon further reflection, now feels that the just option in this case is to protect the relationship between a doctor and patient by restricting defendants from conducting ex parte communications with Plaintiffs' treating physicians but allowing Plaintiffs' counsel to engage in *ex parte* interviews with those doctors who have not been named as defendants. This approach appears, at first glance, to be one sided and unfair. However, in actuality and as a practical matter, it is not. This modification does not leave the Defendants without any access to information. The Defendants still are entitled to all of the medical records of the Plaintiffs as well as the Plaintiff Profile Forms setting forth each Plaintiff's detailed medical history. The Defendants can also continue to exercise their right to depose the Plaintiffs' treating physicians or confer with them in the presence of Plaintiffs' counsel. Furthermore, as a practical matter, the Defendants already have information, including documentation, regarding what its representatives told the treating physicians about Vioxx. Therefore, the Defendants do not need the doctors to tell them in ex parte conferences what they already know.[47]

There is no reason for this Court to alter this well-reasoned approach now, especially in light of its express adoption by other courts.[48]

---

-*Loudon v. Mhyre*, 756 P.2d 138, 142 (Wash. 1988); West Virginia-- *State ex rel. Kitzmiller v. Henning*, 437 S.E.2d 452, 456 (W. Va. 1993).

[47] *Id.* at 477.

[48] *See, e.g.,* Exhibit "25," *In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.,* No. 08-md-2004, slip op. at 2 (M.D. Ga. May 28, 2015) (allowing *ex parte* communications between Plaintiffs' counsel and her treating physicians, while expressly adopting the rationale of this Court in *Vioxx*);  "Exhibit "26," *In re Nuvaring Prods. Liab. Litig.,* No. 4:08-md-1964, 2009 WL 77542  at *1 (E.D. Miss, Mar. 20, 2009)(in denying Defendants' motion for a protective order to permit Defendants to have *ex parte* contacts with Plaintiffs' healthcare providers, the court stated " am in complete agreement with United States Judge Eldon Fallon's ultimate decision on facing a similar motion in *In re Vioxx*......" ); Exhibit "27," *In re Kugel Mesh Hernia Repair Patch Litig.,* 2008 WL 2420997, at *1 (D.R.I. Jan. 22, 2008 (D.R.I. Jan. 22, 2008) (allowing Plaintiffs' counsel to have *ex parte* contacts with treating physicians, and noting he was "particularly guided by Judge Fallon's treatment of this issue in the Vioxx MDL.")(this was a decision by the Magistrate Judge that was later challenged by defense counsel and supported by the District Court Judge").

The MDL court in *Kuegel-Mesh* declined a request made four years later to limit approved topics for future *ex parte* communications to those involving the Plaintiff's care, saying such limitations were "unnecessary and workable," and citing, *inter alia,* the difficulties associated with policing limits, the potential for unproductive side-litigations that could result from attempts to police, and the ability to explore improprieties and biases in depositions.[49]

Many other courts have conducted their own analyses and have similarly concluded that the limits suggested by Defendants should not be imposed on *ex parte* communications between Plaintiffs' counsel and treating physicians. For instance, in the *Levaquin MDL,*[50] the court reasoned:

> Defendants argue that Plaintiffs' counsel should not be able to discuss the scientific literature, product labels, or Plaintiffs' theories of liability with the physician. To determine what information the provider does and did possess concerning the treatment of a plaintiff, . . . , some discussion of the physician's knowledge of the risks of Levaquin, and when and how they became aware of those risks is appropriate. Clearly delineating the line between this proper questioning and what Defendants characterize as "woodshedding" or "lobbying" is difficult because some discussion of the scientific literature, product labels, or Plaintiffs' theories of liability may be necessary. The Court, moreover, is confident that Plaintiffs' counsel knows which conduct amounts to "woodshedding" or would be unfairly discriminatory and that the Court would not tolerate such conduct. The Court will, therefore, deny Defendants' motion.[51]

Likewise, in the *Yaz/Yasmin MDL,*[52] the court allowed Plaintiffs' counsel to have *ex parte* communications with treating physicians, which could involve showing the physicians documents and

---

[49] *Id.* at 3. To encourage openness and avoid the waste of deposition time, however, the court directed Plaintiff's counsel, at least 48 hours before a physician's deposition, to identify information about each meeting with the physician, including the date, the approximate duration, the location, the participants, and the materials shown or provided. *Id.* at 3-4.

[50] Exhibit "28," *In re Levaquin Prods. Liab. Litig,* No. 08-md-1943, 2012 U.S. Dist. LEXIS 116088 (D. Minn. Aug. 17, 2012).

[51] *Id.* at *2-3.

[52] Exhibit "29," *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices and Prods. Liab. Litig.,* 09-md-2100, 2011 U.S. Dist. WL 996549 (S.D. Ill. Mar. 4, 2011).

asking how these documents might have changed their prescribing or treatment decisions.[53] The court

indicated that such documents could include research documents, scientific studies and related materials;

Defendants' internal documents; documents identified as confidential; and product warnings or labels.[54]

It is instructive to note that notwithstanding mention of Judge New on page 6 of their brief, Defendants

failed to mention that in the *Yaz/Yasmin* consolidated Pennsylvania litigation, Judge New entered an

order similar to Judge Herndon's order in the MDL.[55]

Similarly, in the *Ethicon Mesh MDL*,[56] the court allowed Plaintiffs' counsel *ex parte* contacts

with treating physicians with relatively minor limitations[57] and prohibited Defense counsel from doing

so. In holding that all other topics were appropriate for discussion other than the few minor ones that

were prohibited,[58] the court listed some of the "several reasons that a limitation on the scope of topics

---

[53] *Id.* at *4.

[54] *Id.* at *4-5. The court imposed only the following limitations: (1) Plaintiffs' counsel could not show notes, highlights, added redactions, or any other markings that would direct attention to a particular portion of the document; (2) Plaintiffs' counsel had to identify the documents that had been shown at least 72 hours prior to the physician's deposition; and (3) Plaintiffs' counsel had to comply with the confidentiality order that already was in place.

[55] Exhibit "30," CMO-39 (Governing Healthcare Provider Depositions) in *In re Yaz, Yasmin, Ocella, Gianvi Products Liability Litigation*, Sept. Term 2009, Court of Common Pleas, Philadelphia County (New, J.). Additionally, in the Pennsylvania state court *Phen-Fen* litigation, the Defendant filed a motion similar to that filed by Defendants herein, which was styled a "Motion to Preclude Inappropriate Communication with and Influencing of Treating Physicians." In denying that motion, the court noted that it was not empowered to limit plaintiffs' access to their doctors, and further that there was no factual support for the Defendant's allegation of any improper influence. (Exhibit "31"). In February 2012, the Defendant in the *Phen-Fen* state court litigation moved yet again to limit the scope of Plaintiff's counsel's communications with their clients' doctors, and again, the court denied the motion. (Exhibit "32").

[56] Exhibit "33," *In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig* No. 12-md-2327, 2015 U.S. Dist. LEXIS 139926 (S.D. W.Va. Oct. 13, 2015).

[57] The prohibitions that were placed restricted showing: (1) notations, underlines, or highlights; (2) medical literature, expert testimony, or materials prepared by or on behalf of counsel, since the physicians were not experts; and (3) materials or information already ruled to be inadmissible. *Id.* at *3290.

[58] Plaintiffs' counsel also could not imply that the physician might be joined as a defendant, unless there was a good faith factual basis for that, or discuss products not implanted in the patient at issue. *Id.* at *3290-91. Plaintiffs' counsel also were required, at least 48 hours before a deposition, to identify the documents discussed or provided to the physician, if those documents were likely to be used at the deposition. *Id.* at *3291.

covered in *ex parte* meetings is not necessary or appropriate."[59] "First… there is no statute or rule supporting such a limitation…. Second, limiting Plaintiffs' counsel to discussing only Plaintiffs' care and treatment unfairly restricts counsels' case preparation."[60] The court further noted that "[t]reating physicians are crucial fact witnesses on a variety of disputed matters, including matters not directly related to the treatment of a specific patient," and listed as examples the physicians' training and experience, their contacts with the defendants' representatives, the nature and adequacy of the instructions provided, and the effect different or additional information may have had on their treatment decisions.[61] The court pointed to the "legitimate right to collect information pertinent to the claims and defenses and prepare its case for trial." [62]

Although the *Ethicon* court acknowledged there are some disadvantages in only allowing one party to have *ex parte* communications with a witness, the court observed that these disadvantages were overcome by the ethical obligations of counsel:

> [T]here are disparities in every litigation. The court is hard-pressed to construct a completely level playing field. Moreover, attorneys, as officers of the court, have ethical rules that they must follow, which include a prohibition on *improperly* influencing witnesses. The court must presume that attorneys will abide by their ethical obligations; when they do not, there are sanctions that can be imposed to address the specific malfeasance. However, placing a blanket restriction on every Plaintiff's attorney, which governs his or her communications with every treating physician, is akin to using a sledgehammer to crack a nut.[63]

---

[59] *Id.* at *3285.

[60] *Id.*

[61] *Id.* at *3286

[62] *Id.*

[63] *Id.* at *3287. The court also dismissed the notion that physicians would be readily and improperly swayed during their *ex parte* communications with Plaintiffs' counsel:

> Taken as a group, physicians are not known to be especially vulnerable to intimidation or suggestion. They are well-educated, intelligent individuals who, for the most part, are neither new to the litigation arena, nor overly impressed with lawyers. To the contrary, most physicians are suspicious of lawyers; particularly, when it comes to legal actions involving patient care. All of them will have had experience with [the products at issue], and that experience will already

The court in the *Ethicon Mesh MDL* also cited *Kugel Mesh's* reference to the difficulties in policing and the potential side-litigations involved with attempts to police.[64] Finally, the court noted the ability of Defendant's counsel to explore the contacts at deposition, and impeach credibility based on influence, bias, or personal interest.[65]

The court in the *Bard Mesh MDL* considered the Defendant's request to enter an order limiting *ex parte* communications between the Plaintiffs' counsel and the Plaintiffs' treating physicians to those communications related to the Plaintiffs' care and treatment at issue.[66] In support of its argument to restrict such *ex parte* communications, Bard argued that allowing Plaintiffs' counsel to discuss general causation issues and alleged corporate misconduct with Plaintiffs' treating physicians "improperly allows the plaintiffs to lobby their theories of liability and causation."[67] In response, the Plaintiffs pointed out that (1) no statute or rule authorizes the proposed restrictions on *ex parte* communications with treating physicians, (2) for years Bard's sales representatives had significant and repeated *ex parte* contact with the physicians and surgeons in connection with the sale and implanting of Bard's products, and (3) under the learned intermediary doctrine, what the physician was told or not told by the sales representatives is significant, so *ex parte* discussions with Plaintiffs' treating physicians about internal

---

have shaped their perceptions. . . . [T]he court has no reason to believe that Plaintiffs' treating physicians will be particularly susceptible to lobbying by Plaintiffs' counsel.  However, if inappropriate 'woodshedding' occurs, Ethicon's counsel will have the opportunity to fully demonstrate it to the jury.  If it is egregious, Ethicon will have the right to seek sanctions.

*Id.* at *3289-90.

[64] *Id.*

[65] *Id.* at *3288.

[66] *See* Exhibit "34," *Bard Mesh MDL supra.*, PTO #48, at p.1, where the court incorporated into the order the offer by Plaintiffs' counsel to disclose at least 48 hours before a deposition the documents produced by the defendants that they planned to use during the deposition.  *Id.* at 4.

[67] *Id.* at 2.

corporate documents and statements by sales representatives is fertile ground for *ex parte* discussions.[68]

The court denied Bard's motion, holding:

> After due consideration of the parties' arguments and the cases cited by them, the court declines to impose limits on plaintiffs' counsel's ex parte communications with plaintiffs' treating physicians. Neither a statute nor a rule suggests that such limits are appropriate; in fact it is accepted that attorneys are expected to prepare their witnesses for the rigors of giving testimony. As this MDL develops, it becomes more apparent that the plaintiffs are pursuing multiple theories, including those of negligent design and negligent failure to warn. It is important to develop the facts as to what the defendants knew about their products' effects on women's pelvic organs and when they knew those facts. Contents of corporate documents and statements of sales representatives to treating physicians and surgeons are appropriate areas of inquiry as to whether full disclosure would have changed a doctor's mind about implanting a pelvic mesh product. The court accepts the plaintiffs' offer to disclose to defense counsel those documents produced by the defendants which plaintiffs' counsel intends to use in questioning plaintiffs' treating physicians or surgeons, and to make the disclosures at least 48 hours in advance of each deposition of a treating physician or surgeon.[69]

Likewise, in the *Zoloft MDL,* the Special Discovery Master, in an opinion approved by the District Court,[70] declined to uniformly prohibit *ex parte* communications between Plaintiffs' Counsel and treating physicians. In so ruling, he commented on the character of the members of the various leadership groups, many of whom also are members of the leadership group now before this Court, and the ability to address problems later if problems arose:

> I am not persuaded by the idea that the restrictions proposed by Pfizer are necessary to prevent abusive contacts. I am not a participant in the Court's designation of Liaison Counsel and the Plaintiffs' Steering and Executive Committees.  But I do assume that the court evaluated the experience, records and character of the lawyers whom it chose. Plaintiffs' attorneys in this case have not been shown to be anything other than honorable and respectful of ethical and legal restrictions on what they may do. I do not understand Pfizer to be saying otherwise. If developments show that restrictions should be imposed,

---

[68] *Id.* Notwithstanding its objections, Plaintiffs were willing to compromise and give Bard 48 hours' notice of their intention to use the Defendants' documents at depositions of treating physicians.

[69] *Id.* at 3-4.

[70] Exhibit "35," Special Discovery Master's Report and Recommendation *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.,* No. 12-md-2342, slip op.  (E.D. Pa. July 18, 2013) and Exhibit "36," PTO No. 28 adopting and approving the latter. Zoloft, like Xarelto and Yaz/Yasmin, remains on the market once again disproving the Defendants' argument that Plaintiffs should not be permitted to present documents to physicians during their *ex parte* interviews.

the Court has appointed me to consider them upon presentation of those developments by either side.[71] As safeguards, Plaintiffs' counsel had to identify all documents given to the physician, within the earlier of one week after it was given or three days before the deposition.[72]

More recently, in the *Mentor ObTape Transobturator Sling MDL*, another MDL proceeding involving a pelvic mesh device, the court denied a defense motion seeking to limit the scope of Plaintiffs' pre-deposition meetings with their treating physicians.  This motion was nearly identical to the present motion.[73] The MDL court in *Mentor ObTape* expressly adopted the court's reasoning in the *Bard MDL* on this issue, stating "[t]he Court finds their rationale persuasive and adopts it."[74] It is instructive to note here that Mentor Worldwide, LLC, the defendant in the *Mentor ObTape MDL*, is a wholly-owned subsidiary of Johnson & Johnson, one of the Defendants herein. Defendants' failure to mention this recent MDL order is inexplicable.

The above authority, including this Court's own opinion in *Vioxx,* demonstrate that Defendants' request may properly be denied.[75]  Plaintiffs are ready to abide by this Court's directives expressed in *Vioxx.*

### F.   THE CASES CITED BY THE DEFENDANTS REFLECT THAT THE MINORITY VIEW IS NOT WELL-REASONED, AND SHOULD BE REJECTED

In the face of the well-reasoned opinions above, Defendants cite to a handful of cases that have imposed the type of restrictions they seek. For instance, Defendants cite to Judge Katz's opinion in

---

[71] Exhibit "35," at 5

[72] *Id.* at 5-6.

[73] Exhibit "25" is the 5/28/15 order in *In re Mentor ObTape Transobturator Sling Products Liability.* MDL 2004 (M.D. GA).

[74] *Id.* at 2.

[75] A 2003 article in the American Journal of Trial Advocacy noted that "[n]ationally, the clear majority view is that such *ex parte* communications are disfavored in the law." D. Wirtes, et al., *An Important Consequence of HIPAA: No More Ex Parte e*, thirty-six states either banned *ex parte* interviews by defense counsel or had placed "such significant restrictions on them that they cannot truly be called *ex parte* communications." *Id.* (collecting citations).

*Ortho Evra*[76] and Judge Johnson's opinion in *Chantix*.[77] Both are inconsistent with this Court's ruling in *Vioxx* and should be rejected as persuasive authority.

For example, as recognized in *Zoloft*, the ruling in *Chantix* "reflects a great deal of ambivalence about every point touched upon."[78] After discussing the "wisdom" of this Court's "words in a factually similar situation" in *Vioxx*, Judge Johnson inexplicably limited Plaintiffs' counsels' communications with physicians to the individual care of the individual Plaintiffs.[79] Judge Johnson without citation to any authority whatsoever, prohibited plaintiffs' counsel from "discussing defendant's internal documents with plaintiffs' health care providers outside of a deposition or other on the record setting."[80] These unexplained restrictions were not contained in the order issued by this Court in *Vioxx* upon which Judge Johnson purportedly relied. Similarly, Judge Katz's opinion in *Ortho Evra* is based upon the same type of flawed reasoning and was specifically rejected as persuasive authority by Judge Herndon in the *Yasmin/Yaz* MDL litigation.[81]

The *Actos* case relied upon by the Defendants is clearly distinguishable from the instant litigation since there was a record of plaintiffs' counsel providing treating physicians with confidential documents in advance of their depositions and before these physicians had been designated as expert witnesses.[82]

---

[76] Exhibit "37," *In re Ortho Evra Prods. Liab. Litig.,* MDL Docket No. 1742, 2010 WL 320064 (N.D.Ohio 2010).

[77] Exhibit "38," *In re Chantix (Varenicline) Prod. Liab. Litig.*, MDL No. 2092, 2011 WL 9995561 (N.D.Ala. 2011).

[78] Exhibit "35".

[79] *Id.* at 7.

[80] *Id.*

[81] *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Products Liab. Litig.*, No. 3:09-MD-02100-DRH, 2011 WL 9996459, at *1 (S.D. Ill. Mar. 4, 2011).

[82] *See In re Actos Prods. Liab. Cases*, No. BC411687, at p. 11 (Cal.Super. Ct. Mar. 20, 2015) ("There is significant history leading up to the Defendants' filing of the instant motion, which will not be repeated here (it is discussed more thoroughly supra and is set forth in the papers). The major points, however, are these. Plaintiffs' counsel have been providing Plaintiffs' treating physicians (including Dr. David Chappell in the *Rohyans* case) with various documents (deemed "confidential") outside of the normal discovery process, and in anticipation of their depositions.") (attached as Exhibit "E" to Defendants' Brief).

Thus, the court concluded that, "[b]y providing the confidential literature to the treating physicians on an *ex parte* basis, Plaintiffs, in effect, would circumvent the specific requirements under the Code of Civil Procedure for expert witness designations."[83] There are no analogous facts in the instant litigation that justify an order limiting matters that can be discussed or shared with plaintiffs' prescribing and treating physicians.[84]

Cleary, despite Defendants' suggestion to the contrary, there is not some emerging trend to prohibit Plaintiff's counsel's *ex parte* contacts or to severely curtail the communications that can occur. This Court's revised opinion in *Vioxx* reflects the better-reasoned approach which gives due deference to the sanctity of the physician-patient relationship while reserving the court's ability to address any future instances of abuse in the unlikely event they ever occur.

For the reasons set forth above, Defendants' efforts to impose limitations on *ex parte* communication between Plaintiffs' counsel and Plaintiffs' prescribing and treating physicians should be rejected and the Court should not permit Defendants to engage in *ex parte* communications with these professionals.

### G.   DEFENDANTS SHOULD NOT BE PERMITTED TO RETAIN PLAINTIFFS' PRESCRIBING AND/OR TREATING PHYSICIANS AS EXPERT WITNESSES

To the extent that Defendants request permission to retain Plaintiffs' prescribing and treating physicians as experts, this request must be denied. It is totally inconsistent with the inherent level of

---

[83] *Id*. at 13.

[84] Defendants' reliance on *Gaus v. Novartis Pharmaceutical Corp.*, Docket No. L-704-07-MT (*In re Aredia and Zometa Litig.*, Case No. 278) (N.J.Super. Ct. Law Div. Oct. 29, 2009) (attached as Exhibit "C" to Defendants' Brief) is also misplaced. The *Gaus* court had determined it was appropriate to restrict the Defendants' right to engage in *ex parte* interviews with plaintiffs' physicians under New Jersey law in light of the unique factual circumstances of the mass tort litigation before the court and the concern that the court would lack the resources to oversee the inevitable motions for protective orders. Since the court had determined it would not allow Defendants to interview prescribing and treating physicians, the court further determined it would not allow either party to engage in such interviews based on "fairness" concerns. *Id*. at 18.

trust and confidence in the patient/physician relationship and risks unauthorized disclosures of confidential patient information.

Defendants' suggestions that such disclosures will not occur are disingenuous at best.  As the court in the *Kugel Mesh* consolidated state-court action,[85] recognized, when faced with the same request and an assurance by Defendants that they would not inquire about *individual* cases.[86] Such a proposal is "utterly disingenuous":

> In order to provide helpful information to Defendants regarding the physician's experience with the Kugel Patch, the physician will likely have to disclose information about individual cases. Even despite Defendants 'Scout's Honor' promise not to inquire as to individual cases, the risk of unauthorized disclosure greatly outweighs the benefit of such communication. This information may prove highly prejudicial to the Plaintiffs, and presents a conflict should these physicians be called to testify at trial…. Furthermore, this Court notes that there is a level of trust inherent in a patient/physician relationship. The patient is entitled to the assurance that his or her physician will not discuss his or her medical situation, however generically, with representatives of the opposition. This trust is of particular significance where the patient's medical situation is at the heart of his or her suit.[87]

The court additionally said it was "disingenuous" for the Defendants to argue that the sheer number of Plaintiffs in the matter would preclude them from retaining any consultants or experts that were not treating physicians of a Plaintiff in the litigation, saying it had "observe[d] that the root of this argument is either a plea to allow *ex parte* contact for impermissible reasons, or else is a request that the Court simplify the Defendants' task in obtaining consulting physicians. The potential inconvenience of determining whether a physician has treated one of the Plaintiffs is significantly outweighed by

---

[85] *In re Kugel Mesh*, 2008 R.I. Super. LEXIS 101 (R.I. Super. Ct. Aug. 26, 2008).

[86] *Id.* at *4.

[87] *Id.* at *5-6.

Plaintiffs' right to confidentiality in their medical matters."[88] This Court should reject the Defendants' similar arguments for the same reasons.[89]

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, the PSC respectfully requests that this Court deny Defendants' motion and enter an order reaffirming this Court's well-founded decision in *Vioxx*, which permits Plaintiffs' counsel to interview the prescribing physician, provided the doctor is not a named Defendant in the litigation.

<div style="margin-left: 45%;">

Respectfully submitted,

*/s/ Leonard A. Davis*
Leonard A. Davis, Esq. (Bar No. 14190)
***HERMAN, HERMAN & KATZ, LLC***
820 O'Keefe Avenue
New Orleans, LA  70113
PH:  (504) 581-4892
FAX:  (504) 561-6024
Email:  ldavis@hhklawfirm.com

</div>

Dated:  February 1, 2016

---

[88] *Id.* at *8-9.  *See also In re Kugel Mesh Hernia Repair Litig.*, No. 07-md-1842, 2008 WL 4372809, at *2 (D.R.I. Sept. 19, 2008) (adopting the same prohibitions and precluding Defendants' counsel from having *ex parte* communications with any treating physician – for any purpose – and explicitly ruling that Defendants may not retain any treating physician as a consulting expert).

[89] The additional authority relied on by Defendants to retain Plaintiffs' prescribing and treating physicians as expert witnesses is distinguishable from the instant litigation. For instance, *In re Zimmer NexGen Knee Implant Products Liab. Litig.*, 890 F. Supp. 2d 896, 906 (N.D. Ill. 2012), is distinguishable since the court granted the motion in part because there were only 250 physicians nationwide who had experience surgically implanting knees and six of physicians the Defendants proposed contacting had contracted with the Defendants to assist in the development of the medical devices at issue in the case. The court also specifically precluded the Defendants from contacting more than "twenty-five prospective expert witnesses who are also treating physicians of Plaintiffs whose cases are consolidated in this MDL." *Id.* at 906. Likewise, the decision in *In re Seroquel Products Liab. Litig.*, 2008 WL 821889, at *3 (M.D. Fla. Mar. 21, 2008), is also distinguishable since the court was heavily influenced by the fact that more than "3,100 physicians [in the State of Florida] have already been identified as treating physicians for Plaintiffs, which limits the local pool of physicians available to serve as experts significantly." Finally, the one page order the Defendants cite in *In re Prempro Prods. Liab. Litig.*, No. 4:03-cv-1507-WRW (E.D. Ark. Dec. 7, 2005), is totally devoid of any factual context making it impossible to evaluate whether it has any application on the facts of this case. In light of this unpersuasive authority, it is respectfully submitted that the Court should deny the Defendants' request that they be permitted to retain Plaintiffs' physicians as experts.

Gerald E. Meunier (Bar No. 9471)
*GAINSBURGH BENJAMIN DAVID MEUNIER*
*& WARSHAUER, LLC*
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
PH: (504) 522-2304
FAX: (504) 528-9973
Email: gmeunier@gainsben.com

*Plaintiffs' Liaison Counsel*

**PLAINTIFFS' STEERING COMMITTEE**

| | |
|---|---|
| Andy D. Birchfield, Jr. (Co-Lead Counsel)<br>234 Commerce Street<br>Post Office Box 4160<br>Montgomery, Alabama 36103-4160<br>Phone: (334) 269-2343<br>Fax: (334) 954-7555<br>Email: Andy.Birchfield@BeasleyAllen.com | Bradley D. Honnold<br>11150 Overbrook Rd., Ste. 200<br>Leawood, KS 66211<br>Phone: (913) 266-2300<br>Fax: (913) 266-2366<br>Email: bhonnold@bflawfirm.com |
| Brian H. Barr (Co-Lead Counsel)<br>316 Baylen Street, Suite 600<br>Pensacola, FL 32502<br>Phone: (850) 435-7045<br>Fax: (850) 436-6044<br>Email: bbarr@levinlaw.com | Frederick S. Longer<br>510 Walnut Street, Suite 500<br>Philadelphia, PA 19106<br>Phone: (215) 592-1500<br>Fax: (215-592-4663<br>Email: flonger@lfsblaw.com |
| Russell T. Abney<br>2100 RiverEdge Parkway,<br>Suite 720<br>Atlanta, Georgia 30328<br>Email: rabney@lawyerworks.com | Jeffrey S. Grand<br>550 Broad Street, Suite 920<br>Newark, NJ 07102<br>Phone: (973) 639-9100<br>Fax: (973) 639-9393<br>Email: jgrand@seegerweiss.com |
| Dr. Mark Alan Hoffman<br>1650 Market Street, Suite 3450<br>Philadelphia, PA 19103<br>Phone: (215) 574-2000<br>Fax: (215) 574-3080<br>Email: mhoffman@rossfellercasey.com | Roger C. Denton<br>100 S. 4th Street<br>St. Louis, MO 63102<br>Phone: (314) 621-6115<br>Email: rdenton@uselaws.com |
| | |

| | |
|---|---|
| Michael Goetz<br>201 N. Franklin St., 7th Floor<br>Tampa, FL 33602<br>Phone: (813) 221-6581<br>Fax: (813) 222-4737<br>Email: MGoetz@ForThePeople.com | Dianne M. Nast<br>1101 Market Street, Suite 2801<br>Philadelphia, Pennsylvania 19107<br>Phone: (215) 923-9300<br>Email: dnast@nastlaw.com |
| Neil D. Overholtz<br>17 E. Main Street , Suite 200<br>Pensacola, Florida 32501<br>Phone: (850) 916-7450<br>Fax: (850) 916-7449<br>Email: noverholtz@awkolaw.com | Ellen Relkin<br>700 Broadway<br>New York, New York 10003<br>Phone: (212) 558-5500<br>Fax: (212) 344-5461<br>Email: Erelkin@weitzlux.com |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 1, 2016, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre-Trial Order No. 17.


*/s/ Leonard A. Davis*
**LEONARD A. DAVIS**