```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA


IN RE: XARELTO (RIVAROXABAN)      *    MDL 2592 "L"
PRODUCTS LIABILITY LITIGATION     *
                                  *
                                  *    February 23, 2016
                                  *
                                  *
                                  *    Judge Eldon E. Fallon
                                  *
THIS DOCUMENT RELATES TO          *
ALL CASES                         *    Mag. Judge Michael North
                                  *
*******************************************************************
```

**REPORTER'S OFFICIAL TRANSCRIPT OF THE MOTION HEARING**
**BEFORE THE HONORABLE ELDON E. FALLON,**
**UNITED STATES JUDGE.**

```
*******************************************************************
```

**APPEARANCES:**


FOR THE PLAINTIFFS:                 BEASLEY, ALLEN, CROW,
                                    METHVIN, PORTIS & MILES
                                    BY: ANDY BIRCHFIELD, ESQ.
                                    218 COMMERCE STREET
                                    MONTGOMERY, AL   36104



FOR THE DEFENDANTS:                 DRINKER BIDDLE & REATH
                                    BY: SUSAN M. SHARKO, ESQ.
                                    500 CAMPUS DRIVE
                                    FLORHAM PARK, NJ   07932



**REPORTED BY:**  Mary V. Thompson, RMR, FCRR
                  500 Poydras Street, Room B275
                  New Orleans, LA   70130
                  (504)589-7783


**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT PRODUCED BY COMPUTER.**

**P R O C E E D I N G S**

(Call to order of the court.)

THE COURT:  Be seated, please.

I have before me a motion regarding discussions with physicians in this matter.  These are doctors who are treaters of the individual plaintiffs in the case, and the issue is who can discuss the matter with them, and what areas should be discussed.

The complicating factor in this type of case is that the treaters in this type of fact pattern -- which is not unusual.  It's a fact pattern that exists in all cases involving a consumer product that the individual purchases or gets from or is prescribed by a doctor or someone.

That person who is the prescriber in this fact pattern -- it's a prescription drug so you can't get it over-the-counter, and you have to get a prescription for it. That prescriber is always a potential defendant in the case.  And generally, because he or she is a prescriber, the manufacturer's duty is to advise the prescriber.  In some instances, they must advise the consumers in some states, but generally, the learned intermediary rule is applicable in many instances, and therefore, the manufacturer only has to advise the prescriber.

So what the prescriber knew, what the prescriber could have known, should have known, might have known, must have known comes into play in these cases.  And the defendants are concerned that the plaintiffs, in talking to their treaters, can bring that

**OFFICIAL TRANSCRIPT**

1   up as gently as they wish to or as forcefully as they feel they

2   should.  In any event, put the prescriber on some sort of alert

3   that will encourage the prescriber to not -- to realize that they

4   really don't know or didn't know the full scope of the matter,

5   because they will have an interest or at least be a defendant.

6   This skews the information a little bit, defendants say.

7       Plaintiffs take the position that it's their doctor and

8   the defendants have had an opportunity to talk to their doctors

9   before they became a patient, they supplied them with all kinds

10  of information, "dear doctor letters" or whatever; and that the

11  plaintiffs haven't had a chance to discuss the full scope of that

12  situation with their own doctor, and therefore, they should have

13  an opportunity to do so.

14      The motion before me is determined to restrict that

15  line of communication by and between the parties and the

16  treaters, so I'll hear from the parties at this time.

17      Defendants made the motion.

18      MS. SHARKO:  Thank you, Judge.

19      Looking across the cases, I'm aware of only one pending

20  case where there is a physician defendant, and that's in

21  Pennsylvania.  It's kind of a unique case.  There are two

22  pharmaceutical company defendants.

23      The issues presented by the motion are twofold.  The

24  first issue is whether the plaintiffs can take advocacy, that is

25  normally used in the courtroom, and discussion of issues, which

**OFFICIAL TRANSCRIPT**

1   normally occurs in the courtroom with both sides present, into
2   the examining room where only one side is present.
3           The second issue is whether the Court can impose a duty
4   of silence on a physician just because he or she has a patient
5   with an adverse event, and thereby remove him or her from a pool
6   of potential experts.
7           Turning to the first issue, our position is there
8   should be no *ex parte* advocacy.  There should be no use of
9   company documents, medical literature, or discussion of liability
10  theories in *ex parte* communications.
11          *Ex parte* communications should be limited to the care
12  and treatment of the patient.  That is, after all, what the
13  Hippocratic oath protects and that is what HIPAA protects.  And
14  HIPAA defines protective health information as individually
15  identifiable health information.
16          There are half a dozen cases that, in recent times,
17  have addressed the issue of whether you can take advocacy into
18  the examining room.  The decisions are split.
19          We think that the decisions rendered by the MDL courts
20  in *Ortho Evra*, *NuvaRing*, and *Chantix* are correct, and are the
21  precedent that should be followed.
22          Why?
23          First, the physician, as we all acknowledge, is a key
24  witness in the litigation; perhaps the most important witness in
25  terms of failure-to-warn issues.

**OFFICIAL TRANSCRIPT**

1      There should be a level playing field.  Neither party
2  should be able to lobby the doctor or discuss information related
3  to liability theories alone and in isolation.  That should be
4  done in the deposition room.  Documents can be brought.  The
5  doctor can be examined by both sides, and we can all hear what he
6  has to say, or she has to say.  And we can cross-examine the
7  witness.

8      Third, there's a public health issue here.  This is an
9  important medicine that's still on the market that provides a
10 substantial benefit to patients as an improvement over other
11 treatment modalities.  Discussions in the examining room on
12 issues of advocacy impact many patients; they don't simply impact
13 the patient who has a lawsuit.

14     And the fourth issue, which no one has really focused
15 on, which is somewhat perplexing, is many of these doctors have
16 more than one patient who is a plaintiff in litigation so how do
17 *ex parte* communications on advocacy or litigation issues, as
18 opposed to healthcare issues, impact those different patients?

19     Their lawyers have their own interests, their own
20 liability theories.  And we can see that through MDL Centrality
21 if you try and figure out how many doctors get hits on how many
22 cases.

23     Permitting the plaintiffs to discuss liability
24 theories, and not the defendants, in an *ex parte* context, we
25 submit, raises constitutional issues and due process issues.

**OFFICIAL TRANSCRIPT**

1    It's one thing to have a disparity where there's a compelling
2    state interest in protecting healthcare information, and so there
3    the courts have been justified in saying "Well, the plaintiff can
4    talk to the doctor about the patient's care *ex parte,* but the
5    defendant can't."

6         I don't actually think that rule is right, but lots of
7    courts have ruled on it, and each state has its own interest in
8    protecting that information at a high level or a low level.

9         But the advocacy that we're trying to deal with here,
10   the sharing of documents and litigation theories, that runs
11   across the parties; and it would be a due process issue to say
12   the plaintiffs can have those discussions with the doctors
13   *ex parte,* but the defendants can't.

14        Now, Your Honor could say, "Well, okay, both sides can
15   have *ex parte* discussions with doctors about issues unrelated to
16   patient care."  We think the better approach, and the
17   logistically easier approach, is to say this issue is off limits
18   to both sides except in the context of expert witnesses, which
19   I'll get to, and we deal with liability theories in the
20   deposition when both sides are present.

21        *Vioxx.*  Why is this different from *Vioxx*?

22        Several reasons.  The *Vioxx* opinions, as I read them,
23   didn't deal with the issue of advocacy in the examining room.
24   They dealt primarily with the discussion of healthcare
25   information and treatment.

**OFFICIAL TRANSCRIPT**

1    *Vioxx* was no longer on the market at the time those

2    decisions were rendered.

3         The procedural setting, I submit, probably played a

4    consideration.  Judge Higbee was ahead on a number of issues in

5    state court.  She had ruled that there could be no defense

6    *ex parte* discussions.  And Your Honor noted in an opinion, I

7    think -- and it's common sense, I think -- it was important that

8    you have the same rule in both of those proceedings.

9         Interestingly enough, Judge Higbee's jurisprudence has

10   evolved since then, and in her *Pelvic Mesh* opinion from

11   December 2013, she ruled that there couldn't be *ex parte*

12   communication by either side on liability issues.

13        THE COURT:  Before you go to the next thing, think out

14   loud with me about the question of dealing with the situation

15   with state courts, because we do have a number of state courts

16   involved in it.  And in these types of cases, there's an

17   opportunity to have different views expressed by different

18   judges.

19        And so if I take the position that they can't have

20   *ex parte* communications, but a state court says you can, does

21   that create a problem that the attorneys are caught betwixt and

22   between?  They can do it for the state judge, but not for the

23   federal judge, and they do it just in the state cases.  But it's

24   the same doctor who's handling both state and federal cases so he

25   gets woodshedded in the state, which happens to be applicable to

**OFFICIAL TRANSCRIPT**

1   the federal cases also, but he's doing it as a state court lawyer

2   who says, "I'm just talking to you about X-Y-and-Z case," and

3   then woodsheds him there, gives him advocacy, which is applicable

4   to the A-B-C case which is before the federal court.

5          And so that's a problem that exists in these cases.

6          There's also a question, as I see it, who determine

7   what is advocacy.  Good lawyers oftentimes cloak advocacy in such

8   wonderful clothing that you don't know it advocates.  It's the

9   Trojan Horse situation.  You think it's a horse, and all of a

10  sudden it's the whole army of the Aegeans, when you think about

11  it.  And that comes about in that type of situation, too.

12         So I have difficulty -- when I first looked at the

13  case, I looked around for some guidance, because you always do

14  that; and in many of these instances, I found myself with blank

15  slates and had to try to create something.  And we did it one way

16  in *Vioxx,* but I ran into just some practical problems, so I

17  looked at it a second way.

18         What's your thinking about opening it to everybody?

19         Now, I'm not saying that the defendants can talk about

20  private information.  The doctors have ethical -- HIPAA and other

21  reasons for not talking about private information, so they can't

22  talk about that if they don't have their client's permission.

23         But how about each side having a crack at the doctor?

24  And then during depositions, you clean it up by saying, "Did you

25  talk to the doctor?" and "What did you tell the doctor?"  And so

**OFFICIAL TRANSCRIPT**

1  forth and so on.  That's the way it generally happens in other

2  cases.

3          MS. SHARKO:  That would be one way to do it.

4          I think, though, that that will lead to more issues of

09:57:08  5  who said what to whom, and who is behaving appropriately, and who

6  isn't behaving appropriately, as compared to a bright-line rule

7  that says, "Look, you can't show the doctor company documents,

8  you can't discuss your liability issues, you can't give the

9  doctor medical literature."  And then we have to rely on people

09:57:31  10  to be professionals and to honor those rules.

11          And I think the guidelines set out in the *Ortho Evra*

12  opinion are pretty clear, and the guidelines in *Chantix* and in

13  *NuvaRing*.  You can't talk about liability.  And if people are

14  going to walk close to the line or try and disguise what they're

09:57:53  15  doing, I mean, shame on them.  But I think we have to assume that

16  people will be professional and follow the rules.

17          In terms of state courts, there are -- the MDL is far

18  out in front of the other state courts.  Your Honor has

19  established good relationships with Judge New, who right now is

09:58:12  20  really the only coordinating judge, and I would hope that

21  Judge New would follow what Your Honor did.  And the lawyers

22  would follow that.  And if they didn't, we'll have to deal with

23  that, and that will be a summer or a fall problem.

24          In terms of a doctor who has patients and some are in

09:58:35  25  federal court, some are in state court, that's an interesting

**OFFICIAL TRANSCRIPT**

1  question, but at this point it's really a hypothetical question.

2       And I would hope that if a lawyer had clients who were

3  plaintiffs in state court and plaintiffs in federal court, that

4  lawyer would follow the federal court rule, because that sets the

5  standard for what can be discussed with that doctor.

6       And the lawyer would not say, "Oh, well, today I'm

7  putting on my state court baseball cap, and I'm going to have

8  these discussions with the doctor."  I think that would be the

9  wrong thing to do, and I would like to believe that the plaintiff

10  lawyers here would not do something like that.

11       It's important to remember, as I said, that HIPAA

12  protects patient-specific information and the Hippocratic oath,

13  which was discussed in detail in Your Honor's *Vioxx* opinion,

14  deals with information of men, or women now, which on no account

15  must be spread abroad, private medical information.  These

16  principles, which underlie the practice of medicine, were never

17  intended to deal with litigation issues.  And as the Court said

18  in the *Chantix* opinion, they weren't intended by either party to

19  be a trial tactic.

20       So that's my argument on the first issue.  I submit

21  that advocacy should remain in the courtroom and that there

22  should be no *ex parte* discussion of liability theories by either

23  party.

24       THE COURT:  Okay.

25       MS. SHARKO:  Turning to the issue of using treating

**OFFICIAL TRANSCRIPT**

1   physicians as expert witnesses, we laid out in our order what we
2   thought was a reasonable approach to that.

3       Bleeding is an unavoidable side effect of Xarelto and
4   every anticoagulation medication.  To say that having a patient
5   who has this side effect disqualifies that doctor from ever being
6   an expert, really unfairly limits the potential pool of experts.
7   And it's important, at least to the defendants, to be able to
8   bring in real-world doctors, who treat patients as experts.

9       So you look at Dr. Khatib, who came in on Science Day
10  and talked about his passion for the medicine and how it works.
11  It turns out now that we've learned recently Dr. Khatib has
12  patients who have become plaintiffs.  Should the fact that those
13  people have had a side effect and have chosen to file a lawsuit
14  disqualify Dr. Khatib from testifying in any Xarelto case?

15      We submit that would be an unfair and wrong result.

16      We realize that, and we would not say we want
17  Dr. Khatib as our expert in the case involving his patient.  I
18  agree that wouldn't be the right thing to do, and we wouldn't do
19  that knowingly, but that shouldn't disqualify Dr. Khatib from
20  testifying in any other case.

21      This issue has been addressed by a couple courts.  And
22  there's one opinion that I didn't cite in our papers, and I
23  apologize for that.  I gave this cite to Brian yesterday so he
24  could read it before my argument.

25      I think it's a pretty important decision.

**OFFICIAL TRANSCRIPT**

1        It's *In Re:  Pelvic Mesh/GyneCare Litigation*.  It's the

2   New Jersey Appellate Division, 426 N.J. Super. 167; and then

3   43 A.3d 1211.  It's from June 2012.

4        And in this decision, the Court rejected the trial

5   court's ruling that if a doctor had a patient in the litigation,

6   that doctor could never be an expert across the entire

7   litigation.

8        And what the Court said was (as read):  Contrary to

9   binding precedence in this state, and the Code of Medical Ethics,

10  the trial court elevated a patient plaintiff's litigation

11  interest to an unprecedented level.  A physician's ethical duty

12  is to the, quote, unquote, medical interest of all the

13  physician's patients.  The quote, unquote, litigation interest of

14  a patient are not necessarily equivalent to the patient's, quote,

15  unquote, medical interests, and they do not define the

16  physician's duties to all patients.  Courts overstep their

17  legitimate powers if they impose a duty of silence upon

18  physicians to avoid taking substantive positions contrary to any

19  patient's interest in litigation.  Both sides in this litigation

20  should have the opportunity to present evidence from the most

21  qualified physicians who can serve as experts.  The trial court's

22  order unfairly impeded defendants' access to many of those

23  physicians and so must be reversed.

24        And that summarizes our position.  There it was echoed

25  by the MDL judge in the *Seroquel* case and reiterated in *Zimmer*.

**OFFICIAL TRANSCRIPT**

1  Plaintiffs' counsel should not be allowed to keep leading
2  physician experts from testifying for the defendants simply
3  because, through advertising, there's a large number of cases
4  solicited and aggravated in one forum -- aggregated in one forum.
5         THE COURT:  You're not talking about the case in which
6  the patient himself is in?  I mean, he can't --
7         MS. SHARKO:  Correct.
8         THE COURT:  Yeah, okay.
9         MS. SHARKO:  Thank you.
10         THE COURT:  Okay.  Thanks very much.
11         Andy.
12         MR. BIRCHFIELD:  Good morning, Your Honor.  Andy
13  Birchfield on behalf of the plaintiffs.
14         Your Honor, from the very inception of this MDL, from
15  the beginning meetings that we have had, the defendants have
16  drawn a spotlight on the learned intermediary.  And we
17  acknowledge that the learned intermediary is a key witness; is an
18  important aspect of the case.  It's not the only important aspect
19  of the case.
20         And so we understand, you know, the defendants'
21  exercising every prerogative to preserve the advantage that they
22  have with the learned intermediary, even exercising their
23  prerogatives to -- that end up turning the bellwether trial
24  process on its ear.
25         But to go to the place of casting this order that

**OFFICIAL TRANSCRIPT**

1  they're asking the Court to enter as necessary to preserve a
2  level playing field with the learned intermediary, that's beyond
3  the pale.

4       I mean, in the discovery that we have so far,
10:05:38   5  Your Honor, we know that out of the -- out of the plaintiffs'
6  doctors, that they have paid more than $4.6 million in consulting
7  fees and speaker fees to those very doctors.

8       When we look at the 40 -- the 40 plaintiffs that are in
9  the bellwether pool, those 40 plaintiffs, the doctors that have
10:06:04   10  prescribed the medicine and treated them, they have been detailed
11  by representatives of the defendants over 4300 times.

12       And these -- you know, these are not just, you know,
13  individuals that just drop by and leave a sample.  These are
14  highly trained -- highly trained -- representatives.  We have
10:06:26   15  submitted, in our briefs and in the supporting documents, the
16  information that shows how sophisticated the training is for
17  these representatives and the workshops that they go through.
18  The training is -- it's extensive.

19       And they're trained to address, you know, the issues
10:06:47   20  that these doctors will face.  Issues that would raise concerns
21  in their minds that may limit or cause hesitation in prescribing
22  this drug; things that they may hear from their competitors.
23  They're trained to deflect those and to keep on their selling
24  message.  I mean, this is a -- it is a highly sophisticated group
10:07:07   25  of over 2,000 detail representatives that the defendants are

**OFFICIAL TRANSCRIPT**

1   sending in to the doctors offices every day.

2       THE COURT:  What's your view, I'll ask counsel, of

3   having everybody -- each side having the ability to talk about

4   liability issues?

10:07:27

5       Of course, the defendants can't talk about the specific

6   treatment, because the doctors are restricted in their ethics as

7   well as HIPAA, but they would be able to visit them, if they

8   wish, if the doctor allows it, and talk about liability issues

9   just as you would.

10:07:51

10      MR. BIRCHFIELD:  Yes.  Your Honor, I think that there

11  is a clear difference regarding the plaintiffs speaking with

12  their doctor in that privileged relationship.

13      The Court -- Your Honor started in the *Vioxx*

14  litigation, and you said there are several reasons for courts to

10:08:07

15  prohibit or place constraints on a defendant's *ex parte*

16  interviews of a plaintiff physician.  Such *ex parte*

17  communications raise issues of privacy, HIPAA, and physician-

18  patient privileges.

19      And, you know, that is a position that has been echoed

10:08:22

20  in court after court.  They recognize that there is a -- there is

21  a special relationship between a patient and their doctor.  We,

22  as plaintiff counsel -- we -- we're standing in the shoes of

23  those plaintiffs.  Those doctors -- those doctors have been

24  hearing the defense theory of the case for five years now, since

10:08:45

25  the drug went on the market, and so they have been inundated with

**OFFICIAL TRANSCRIPT**

1   that.  It's only appropriate that we be able to -- we be able to

2   meet with them, if they are willing to meet with us, and have a

3   discussion about what we know through discovery or things that

4   were not shared with them.

10:09:05   5   And the Courts have -- and Ms. Sharko said that there

6   were several courts that have -- that have gone in the direction

7   that they have suggested.  And she mentioned the *Chantix* case,

8   and she mentioned *Ortho Evra*.  The *Chantix* case, if you look at

9   that opinion, the language there and the reasoning is following

10:09:30   10   Your Honor's position in *Vioxx*, the second *Vioxx* opinion, and

11   then it just turns.  And it really doesn't follow there, so I

12   can't explain that one.

13   In *NuvaRing*, you know, the Court went through the

14   rationale and landed at the same place Your Honor did, but then

10:09:50   15   noted that the -- you know, that the plaintiffs' counsel had

16   agreed to the limitation of only discussing the medical condition

17   of the plaintiffs.

18   I don't understand the facts of that case to know why

19   the plaintiffs would have agreed to that, but that is not

10:10:08   20   support -- that's not legal support for Your Honor to enter the

21   restrictions, the extreme restrictions, the defendants are

22   seeking here, of keeping plaintiffs' counsel from talking to

23   plaintiffs' doctors about the theories of the case.

24   Your Honor, if the Court -- I do think that if the

10:10:29   25   Court were to say that defense counsel can have *ex parte*

**OFFICIAL TRANSCRIPT**

1   communications with the plaintiffs' doctors across the board, I
2   think that presents some very challenging issues, particularly in
3   state courts.

4       I mean, there are states that say it is -- just it's
5   outlawed.  A defense lawyer cannot meet with the plaintiff's
6   counsel -- I mean with the plaintiff's doctor in this state.

7       And the defendants cite Louisiana law to say, "Hey, you
8   know, we have a right under Louisiana law," but I think that is
9   a -- I think that misconstrues the state of Louisiana law.

10      Louisiana law acknowledges that, once you file a
11  lawsuit, you've waived the patient privileges, but it limits that
12  to formal discovery processes, like a deposition.  That's because
13  there is a -- there's a difference in the relationship between a
14  plaintiff and a doctor.

15      And the defendants have taken the position and have
16  asked the Court to recognize that learned intermediaries are key
17  witnesses, and so both sides should have the same access, no
18  advocacy.

19      Well, there are other key witnesses in this litigation,
20  and in every litigation.  There are -- there are a number of
21  employees within the company at various levels of management that
22  are key witnesses.  Does the fact that they are key witnesses --
23  does that mean that they can't meet with them and share their
24  theory of the case or that we must have access?  There's no
25  preparation, and you just go into a deposition and hear what they

1  have to say.

2       Your Honor, I don't think that the defendants' position

3  here of taking the extreme measure of saying plaintiffs' lawyers

4  cannot meet with their clients' doctors in an unfettered

10:12:30  5  manner -- other than, you know, our rules of professional

6  conduct.  I mean, we are limited in what we can do.

7       I think it's also important, Your Honor, to note that,

8  you know, we're talking about learned intermediaries.  We're not

9  talking about, you know, shrinking violets or someone that is

10:12:51  10  easily swayed.

11       The MDL court in the *Ethicon* MDL followed Your Honor's

12  position in *Vioxx,* and he noted this.  He said (as read):  Taken

13  as a group, physicians are not known to be especially vulnerable

14  to intimidation or suggestion.  They are well-educated,

10:13:11  15  intelligent individuals who, for the most part, are neither new

16  to the litigation arena nor overly impressed with lawyers.  To

17  the contrary, most physicians are suspicious of lawyers,

18  particularly when it comes to legal actions involving patient

19  care.

10:13:25  20       So, you know, giving us access, saying that we can meet

21  if the doctor will meet with us, certainly does not say -- does

22  not lend itself to assuming that that doctor is going to be

23  swayed by the lawyer -- encounter with the lawyer.

24       Your Honor, I think if we're going to have a -- we

10:13:49  25  cannot achieve a level playing field.  We can't.  I mean, if you

**OFFICIAL TRANSCRIPT**

1    were to say that the average meeting from the defense with these

2    doctors in the bellwether pool is over 100 detailed meetings, we

3    can't ever meet that many times.  We can never match the money

4    that they have plied in these relationships.  We cannot do that.

5          But we're asking you, you know, to please do not -- do

6    not accept the defendants' invitation to restrict our access to

7    our plaintiffs' physicians.

8          THE COURT:  Talk to me about the next one, about the

9    treating docs.  Why should they be experts in other cases?

10         MR. BIRCHFIELD:  Your Honor, the cases that the

11   defendants cite in this regard, they're -- they present a unique

12   set of circumstances.

13         Each of the cases discusses the unfairness of the

14   defendants being presented with a too-narrow pool of experts.

15   And in the last case that Ms. Sharko cited and read to

16   Your Honor, in that case there was a certification from the

17   defendants about the narrow pool of experts.

18         In the *Seroquel* case there were 3100 plaintiffs in the

19   state, in the MDL home state of Florida, you know, that would

20   have been disqualified by applying this rule.

21         In the *Zimmer* case, the implant case, there was

22   evidence that there are only about 250 of these -- of implanting

23   physicians across the country, and so if you exclude the

24   implanting physicians that are involved in litigation, then the

25   defendants would not have anybody.  They wouldn't have anybody

**OFFICIAL TRANSCRIPT**

1  with experience to call as experts in this case.

2        There has been no such showing, you know, in this case

3  that the defendants would be unable to obtain experts from folks

4  that have experience with Xarelto.  That's because the evidence

5  that we have so far, you know, is back from three years ago, and

6  it shows that there are over 17,000 cardiologists and primary

7  care physicians that are prescribing Xarelto.  There is no

8  limited pool.

9        But, you know, one -- one suggestion, Your Honor, to --

10  if there is a concern about the defendants being able to draw an

11  expert maybe from the local pool, if we could just -- I would

12  suggest we limit that to disqualifying from the 40 bellwether

13  plaintiffs.  Those are the cases that are in play at the moment.

14        So if there are -- you know, if there are physicians

15  that have treated plaintiffs that are outside of that 40 pool,

16  then those would be open, but don't allow the defendants to

17  approach -- further approach the physicians of our 40 bellwether

18  plaintiffs and offer them the opportunity to be an expert in a

19  position that is adverse to their patient's case.  It's not

20  necessary here.  In each of the cases that the defendants rely,

21  it was a necessity because of the limited pool, but that does not

22  come into play here.

23        THE COURT:  Okay.  All right.

24        MR. BIRCHFIELD:  Thank you, Your Honor.

25        THE COURT:  Any response?

**OFFICIAL TRANSCRIPT**

10:16:03

10:16:25

10:16:49

10:17:13

10:17:26

1        MS. SHARKO:  Just briefly.

2        Doctors get their information from many, many sources,

3   not just the defendants' marketing materials.  The marketing

4   efforts by the defendants are not the mouthpiece for the lawyers.

5   The products liability lawyers have no control or right of

6   control over what's done in the marketing to the doctors in an

7   effort to educate them about the medicine.

8        The training of the marketing people is extensive --

9   Mr. Birchfield is correct -- and that's because it's a highly

10  regulated area by the FDA.  If you say the wrong thing, you can

11  get in trouble with the company, you can get in trouble with the

12  FDA, so of course it's regulated.

13       And if we're talking about dollars spent, as we noted

14  in our brief, the plaintiffs spend on advertising -- what

15  plaintiff lawyers spend on advertising has reached new limits in

16  this litigation, over $80 million.  There is a constant barrage

17  of advertising in all media.  It's led to adverse events.

18       That's, I guess, a subject for another day, but I

19  submit the decision by the Court should not be controlled by or

20  even consider what's done in the marketing.

21       THE COURT:  I think --

22       MR. BIRCHFIELD:  Your Honor, may I respond to that last

23  point?

24       THE COURT:  Sure.  Okay.

25       MR. BIRCHFIELD:  Ms. Sharko raised the $80 million that

**OFFICIAL TRANSCRIPT**

1    has been spent, she contends, on advertising by lawyers.  But

2    that information -- that came from Mr. Moye's deposition last

3    week.  And he said, "Look, this was something that was rehearsed

4    with the defendants.  I don't know where -- I don't know the

5    source of that information."

6            That was information that was given to him; he doesn't

7    know the source.

8            But yet, you know, to toss out that number in isolation

9    is terribly misleading, because what we are up against -- that's

10   $80 million total that they contend -- and I'm not sure how

11   reliable it is.

12           But what we do know is the defendants' budget is

13   $200 million per year -- per year -- for the marketing campaign

14   of Xarelto.  We cannot -- we cannot compare.  Again, it's not a

15   level playing field.  We're playing catch-up, and we ask the

16   Court not to handcuff us.

17           THE COURT:  Okay.  I got the feeling from both sides.

18   I understand your positions.  Let me look it over.  I'm not going

19   to just go off the deep end and just start speaking on it, but

20   let me look it over again and see how these matters have

21   developed in the litigation.

22           We were one of the first to view these matters early

23   on, and you have the benefit of my thinking early on, but let me

24   see where the cases have gone and I'll look it over again.

25           All right, thank you very much.  I appreciate it.

**OFFICIAL TRANSCRIPT**

(Proceedings adjourned.)

\* \* \* \*

CERTIFICATE

I hereby certify this 24th day of February, 2016, that the foregoing is, to the best of my ability and understanding, a true and correct transcript of the proceedings in the above-entitled matter.

/s/ Mary V. Thompson
_____
Official Court Reporter

**OFFICIAL TRANSCRIPT**