UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

_____

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) | ) | MDL NO. 2592 |
| PRODUCTS LIABILITY LITIGATION | ) | |
| | ) | SECTION:  L |
| MELODY ANN SCHMIDT | ) | JUDGE FALLON |
| | ) | MAG. JUDGE NORTH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| JANSSEN RESEARCH & DEVELOPMENT | ) | |
| LLC f/k/a JOHNSON AND JOHNSON | ) | |
| PHARMACEUTICAL RESEARCH AND | ) | |
| DEVELOPMENT LLC, JANSSEN ORTHO | ) | AMENDED COMPLAINT |
| LLC, JANSSEN PHARMACEUTICALS, | ) | AND JURY DEMAND |
| INC. f/k/a JANSSEN PHARMACEUTICA | ) | |
| INC. f/k/a ORTHO-MCNEIL-JANSSEN | ) | |
| PHARMACEUTICALS, INC., JOHNSON & | ) Civil Action No. 2:16-cv-00278 | |
| JOHNSON, BAYER  HEALTHCARE | ) | |
| PHARMACEUTICALS, INC., | ) | |
| BAYER PHARMA AG, BAYER | ) | |
| CORPORATION, BAYER HEALTHCARE | ) | |
| LLC, BAYER HEALTHCARE AG, and | ) | |
| BAYER AG, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| _____ | ) | |
| | ) | |

Plaintiff, Melody Ann Schmidt (*hereinafter* "Plaintiff"), by and through her

undersigned counsel, upon information and belief, at all times hereinafter mentioned,

alleges as follows:

**<u>BACKGROUND</u>**

1.      This is an action for damages suffered by Plaintiff as a direct and

proximate result of the Defendant's negligent and wrongful conduct in connection with

the design, development, manufacture, testing, packaging, promoting, marketing, distribution, labeling, and/or sale of the pharmaceutical product Xarelto (hereinafter referred to as "Xarelto" or "the subject product").

2.      At all times material hereto, Xarelto was designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by the Defendant herein.

**JURISDICTION AND VENUE**

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C.§1391, because the amount in controversy as to Plaintiffs exceeds $75,000.00, exclusive of interest and costs, and because Defendants are all incorporated and have their principal places of business in states other than the states in which Plaintiffs reside.

4.      This Court has supplemental jurisdiction over the remaining common law and state claims pursuant to 28 U.S.C. § 1367.

5.      Venue is proper in this Court pursuant to 28 U.S.C.§1391 because Defendants engaged in marketing, promoting, labeling, and distributing their product in each of the fifty States in the United States, and specifically including Plaintiff's state of citizenship and the state in which Plaintiff ingested Xarelto and suffered injury.

6. Additionally, venue is proper within this District pursuant to Pretrial Order #1, dated December 17, 2014 in MDL No. 2592, which allowed direct filing of Xarelto actions in this District.

**PARTY PLAINTIFF**

7.      Plaintiff Melody Ann Schmidt is a natural person, and citizen of the State of Michigan, residing in Marysville, Michigan.

## PARTY DEFENDANTS

8.     Upon information and belief, Defendant JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a JOHNSON AND JOHNSON RESEARCH AND DEVELOPMENT LLC (hereinafter referred to as "JANSSEN R&D") is a limited liability company organized under the laws of Louisiana, with a principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933. Defendant JANSSEN R&D's sole member is Janssen Pharmaceuticals, Inc., which is a Pennsylvania corporation with a principal place of business at 1125 Trenton-Harbourton Road, Titusville, New Jersey 08560. Accordingly, JANSSEN R&D is a citizen of Pennsylvania and New Jersey for purposes of determining diversity under 28 U.S.C. § 1332. Defendant JANSSEN R&D is the holder of the approved New Drug Application ("NDA") for Xarelto as well as the supplemental NDA.

9.     As part of its business, JANSSEN R&D is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and Rivaroxaban.

10.     Upon information and belief, Defendant JANSSEN R&D has transacted and conducted business in the State of Michigan.

11.     Upon information and belief, Defendant JANSSEN R&D has derived substantial revenue from goods and products used in the State of Michigan.

12.     Upon information and belief, Defendant, JANSSEN R&D, expected or should have expected its acts to have consequence within the United States of America and the State of Michigan, and derived substantial revenue from interstate commerce within the United States and the State of Michigan, more particularly.

13.     Upon information and belief, and at all relevant times, Defendant, JANSSEN R&D, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with nonvalvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

14.    Upon     information     and     belief,     Defendant     JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA INC. f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. (hereinafter referred to as "JANSSEN PHARM") is a New Jersey corporation, having a principal place of business at 1125 Trenton-Harbourton Road, Titusville, New Jersey 08560.

15.     As part of its business, JANSSEN PHARM is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

16.     Upon information and belief, Defendant, JANSSEN PHARM has transacted and conducted business in the State of Michigan.

17.     Upon information and belief, Defendant, JANSSEN PHARM, has derived substantial revenue from goods and products used in the State of Michigan.

18.     Upon information and belief, Defendant, JANSSEN PHARM, expected or should have expected its acts to have consequence within the United States of America and the State of Michigan, and derived substantial revenue from interstate commerce within the United States and the State of Michigan, more particularly.

19.     Upon information and belief, and at all relevant times, Defendant, JANSSEN PHARM, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with nonvalvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

20.     Upon information and belief, Defendant JANSSEN ORTHO LLC (hereinafter referred to as "JANSSEN ORTHO") is a limited liability company organized under the laws of Delaware, having a principal place of business at State road 933 Km 0 1, Street Statero, Gurabo, Puerto Rico 00778. Defendant JANSSEN ORTHO is a subsidiary of Johnson & Johnson. The only member of JANSSEN ORTHO LLC is OMJ PR Holdings, which is incorporated in Ireland with a principal place of business in Puerto Rico. Accordingly, JANSSEN ORTHO LLC is a citizen of Delaware, Ireland and Puerto Rico for purposes of determining diversity under 28 U.S.C. § 1332.

21.     As part of its business, JANSSEN ORTHO is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

22.     Upon information and belief, Defendant, JANSSEN ORTHO has transacted and conducted business in the State of Michigan.

23.     Upon information and belief, Defendant, JANSSEN ORTHO, has derived substantial revenue from goods and products used in the State of Michigan.

24.     Upon information and belief, Defendant, JANSSEN ORTHO, expected or should have expected its acts to have consequence within the United States of America and the State of Michigan, and derived substantial revenue from interstate commerce within the United States and the State of Michigan, more particularly.

25.     Upon information and belief, and at all relevant times, Defendant, JANSSEN ORTHO, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with nonvalvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

26.     Upon information and belief, Defendant JOHNSON & JOHNSON (hereinafter referred to as "J & J") is a corporation organized under the laws of New Jersey with its principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey  08933.

27.     As a part of its business, Defendant J & J is and at all relevant times was involved in the research, development, packaging, labeling, sales, and/or marketing of pharmaceutical products including Xarelto.  Defendant J & J manufactures, markets and sells a wide range of pharmaceutical products including Xarelto (rivaroxaban).

28.     Upon information and belief, Defendant J & J has transacted and conducted business in the State of Michigan.

29.     Upon information and belief, Defendant J & J has derived substantial revenue from goods and products used in the State of Michigan.

30.     Upon information and belief, Defendant J & J expected or should have expected its acts to have consequence within the United States of America and the State of Michigan, and derived substantial revenue from interstate commerce within the United States and the State of Michigan, more particularly.

31.     Upon information and belief, Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. is, and at all relevant times was, a corporation organized under the laws of the State of Delaware, with its principal place of business in the State of New Jersey.

32.     Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. was formerly known as Berlex Laboratories, Inc., which was formerly known as Berlex, Inc. and BAYER HEALTHCARE PHARMACEUTICALS, INC. is the same corporate entity as Berlex, Inc. and Berlex Laboratories, Inc.

33.     As part of its business, BAYER HEALTHCARE PHARMACEUTICALS, INC. is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

34.     Upon information and belief, Defendant, BAYER HEALTHCARE PHARMACEUTICALS, INC., has transacted and conducted business in the State of Michigan.

35.     Upon information and belief, Defendant, BAYER HEALTHCARE PHARMACEUTICALS, INC., has derived substantial revenue from goods and products used in the State of Michigan.

36.     Upon information and belief, Defendant, BAYER HEALTHCARE PHARMACEUTICALS, INC., expected or should have expected its acts to have

consequence within the United States of America and the State of Michigan, and derived substantial revenue from interstate commerce within the United States and the State of Michigan, more particularly.

37.    Upon information and belief, and at all relevant times, Defendant, BAYER HEALTHCARE PHARMACEUTICALS, INC., was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

38.    Upon information and belief, Defendant BAYER PHARMA AG is a pharmaceutical company domiciled in Germany.

39.    Defendant BAYER PHARMA AG is formerly known as Bayer Schering Pharma AG and is the same corporate entity as Bayer Schering Pharma AG. Bayer Schering Pharma AG is formerly known as Schering AG and is the same corporate entity as Schering AG.

40.    Upon information and belief, Schering AG was renamed Bayer Schering Pharma AG effective December 29, 2006.

41.    Upon information and belief, Bayer Schering Pharma AG was renamed BAYER PHARMA AG effective July 1, 2011.

42.    As part of its business, BAYER PHARMA AG is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

43.     Upon information and belief, Defendant, BAYER PHARMA AG, has transacted and conducted business in the State of Michigan.

44.     Upon information and belief, Defendant, BAYER PHARMA AG, has derived substantial revenue from goods and products used in the State of Michigan.

45.     Upon information and belief, Defendant, BAYER PHARMA AG, expected or should have expected its acts to have consequence within the United States of America and the State of Michigan, and derived substantial revenue from interstate commerce within the United States and the State of Michigan, more particularly.

46.     Upon information and belief, and at all relevant times, Defendant, BAYER PHARMA AG, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

47.     Upon information and belief, Defendant BAYER CORPORATION is a Pennsylvania corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205.

48.     Upon information and belief, Defendant BAYER CORPORATION is the sole member of BAYER HEALTHCARE LLC, which owns 100% of Schering Berlin, Inc., which owns 100% of Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. As such, Defendant BAYER CORPORATION is a parent of Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC.

49.     At relevant times, Defendant BAYER CORPORATION was engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, its products, including the prescription drug Xarelto.

50.     At relevant times, Defendant BAYER CORPORATION conducted regular and sustained business in the State of Michigan, by selling and distributing its products in the State of Michigan and engaged in substantial commerce and business activity in the State of Michigan.

51.     Upon information and belief, Defendant BAYER HEALTHCARE LLC is a limited liability company duly formed and existing under and by the virtue of the laws of the State of Delaware, with its principal place of business located in the State of New Jersey. BAYER HEALTHCARE LLC's sole member is Bayer Corporation, and is wholly owned by Bayer Corporation, which is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205. Accordingly, BAYER HEALTHCARE LLC is a citizen of Delaware, New Jersey, Indiana and Pennsylvania for purposes of determining diversity under 28 U.S.C. § 1332.

52.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC has transacted and conducted business in the State of Michigan, and derived substantial revenue from interstate commerce. Defendant BAYER CORPORATION is the sole member of Defendant BAYER HEALTHCARE LLC.

53.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC expected or should have expected that its acts would have

consequences within the United States of America and in the State of Michigan, and derived substantial revenue from interstate commerce.

54.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

55.     Upon information and belief, Defendant BAYER HEALTHCARE AG is a company domiciled in Germany and is the parent/holding company of Defendants BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC, and BAYER PHARMA AG.

56.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG has transacted and conducted business in the State of Michigan, and derived substantial revenue from interstate commerce.

57.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG expected or should have expected that its acts would have consequences within the United States of America, and in the State of Michgan, and derived substantial revenue from interstate commerce.

58.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG exercises dominion and control over Defendants BAYER

CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC., and BAYER PHARMA AG.

59.     Upon information and belief, Defendant BAYER AG is a German chemical and pharmaceutical company that is headquartered in Leverkusen, North Rhine-Westphalia, Germany.

60.     Upon information and belief, Defendant BAYER AG is the third largest pharmaceutical company in the world.

61.     Upon information and belief, and at all relevant times Defendant BAYER AG is the parent/holding company of all other named Defendants.

62.     Upon information and belief, at all relevant times, Defendant BAYER AG has transacted and conducted business in the State of Michigan, and derived substantial revenue from interstate commerce.

63.     Upon information and belief, at all relevant times, Defendant BAYER AG expected or should have expected that its acts would have consequences within the United States of America, and in the State of Michigan, and derived substantial revenue from interstate commerce.

64.     Upon information and belief, at all relevant times, Defendant BAYER AG was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

## FACTUAL ALLEGATIONS

65.    This action is brought on behalf of Plaintiff, Melody Ann Schmidt. Plaintiff used Xarelto, an anti-coagulant, also known as rivaroxaban, which was indicated to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat deep vein thrombosis (*hereinafter* "DVT") and pulmonary embolism (*hereinafter* "PE"), to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

66.    Defendants, JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a JOHNSON AND JOHNSON PHARMACEUTICAL RESEARCH AND DEVELOPMENT LLC, JANSSEN ORTHO LLC, JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA INC. f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., JOHNSON & JOHNSON, BAYER HEALTHCARE PHARMACEUTICALS, INC., BAYER PHARMA AG, BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE AG, and BAYER AG (hereinafter collectively referred to as "Defendants") designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Xarelto.

67.    When warning of safety and risks of Xarelto, Defendants negligently and/or fraudulently represented to the medical and healthcare community, the Food and Drug Administration (*hereinafter* "FDA"), to Plaintiff and the public in general, that Xarelto had been tested and was found to be safe and/or effective for its indicated use.

68.    Defendants concealed their knowledge of Xarelto's defects from Plaintiff, the FDA, the public in general, and/or the medical community specifically.

69.     These representations were made by Defendants with the intent of defrauding and deceiving Plaintiff, the public in general, and the medical and healthcare community in particular, and were made with the intent of inducing the public in general, and the medical community in particular, to recommend, dispense and/or purchase Xarelto for use to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, all of which evinced a callous, reckless, willful, depraved indifference to the health, safety, and welfare of the Plaintiff herein.

70.     Defendants negligently and improperly failed to perform sufficient tests, if any, on humans using Xarelto during clinical trials, forcing Plaintiff, and Plaintiff's physicians, hospitals, and/or the FDA, to rely on safety information that applies to other non-valvular atrial fibrillation treatment and DVT/PE treatment and prophylaxis, which does not entirely and/or necessarily apply to Xarelto whatsoever.

71.     As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous side effects including inter alia life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life. Plaintiff herein has sustained certain of the above health consequences due to Plaintiff's use of Xarelto.

72.     Defendants concealed their knowledge of the defects in their products from the Plaintiff, and Plaintiff's physicians, hospitals, pharmacists, the FDA, and the public in general.

73.     Consequently, Plaintiff seeks compensatory damages as a result of Plaintiff's use of the Xarelto, which has caused Plaintiff to suffer from life-threatening bleeding, as well as other severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

<u>**CASE-SPECIFIC ALLEGIATIONS**</u>

74.     Plaintiff, Melody Ann Schmidt, is sixty (60) years old.

75.     Upon information and belief, Plaintiff was prescribed Xarelto in the State of Michigan, on or around February 16, 2015, upon direction of Plaintiff's physician for the treatment of atrial fibrillation.

76.     Upon information and belief, Plaintiff first began using Xarelto on or about February 16, 2015, and used Xarelto up through approximately June 22, 2015.

77.     Upon information and belief, as a direct and proximate result of the use of Defendants' Xarelto, Plaintiff experienced a severe gastrointestinal bleed on or about June 22, 2015 which continued until June 26, 2015, and suffered a life-threatening, irreversible bleed from the use of Xarelto, as well as severe pain and suffering.

78.     As a direct and proximate result of the use of Defendants' Xarelto, the Plaintiff suffered serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including, but not limited to, diminished enjoyment of life, shortened life expectancy, expenses for hospitalization and medical treatment, loss of earnings.

## FACTUAL BACKGROUND

79.    At all relevant times, Defendants were in the business of and did design, research, manufacture, test, advertise, promote, market, sell and distribute Xarelto and Rivaroxaban to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

80.    Defendants received FDA approval for Xarelto, also known as Rivaroxaban, on July 1, 2011 for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries (NDA 022406).

81.    Defendants then received additional FDA approval for Xarelto to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation on November 4, 2011 (NDA 202439).

82.    The additional indication for treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE was added to the label on November 2, 2012.

83.    Defendants launched Xarelto in the United States (*hereinafter* "U.S.") in 2011.

84.    Xarelto is an anticoagulant that acts as a Factor Xa inhibitor, and is available by prescription in oral tablet doses of 20mg, 15mg, and 10mg.

85.    Approval of Xarelto for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries was based on a series of clinical trials known as the Regulation of Coagulation in Orthopedic Surgery to Prevent Deep Venous Thrombosis and Pulmonary Embolism studies (hereinafter referred to as

16

the "RECORD" studies). The findings of the RECORD studies showed that rivaroxaban was superior to enoxaparin for thromboprophylaxis after total knee and hip arthroplasty (based on the Defendants' definition), accompanied by similar rates of bleeding. However, the studies also showed a greater incidence with Xarelto of bleeding leading to decreased hemoglobin levels and transfusion of blood. (Lassen, M.R., et al. *Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Total Knee Arthroplasty*. N.Engl.J.Med. 2008;358:2776-86; Kakkar, A.K., et al. *Extended duration rivaroxaban versus short-term enoxaparin for the prevention of venous thromboembolism after total hip arthroplasty: a double-blind, randomised controlled trial*. Lancet 2008;372:31-39; Ericksson, B.I., et al. *Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Hip Arthroplasty*. N.Engl.J.Med. 2008;358:2765-75.)

86. Approval of Xarelto for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation in the U.S. was based on a clinical trial known as the Rivaroxaban Once Daily Oral Direct Factor Xa Inhibition Compared with Vitamin K Antagonism for Prevention of Stroke and Embolism Trial in Atrial Fibrillation study (hereinafter referred to as "ROCKET AF"). The study's findings showed that rivaroxaban was noninferior to warfarin for the prevention of stroke or systemic embolism in patients with non-valvular atrial fibrillation, with a similar risk of major bleeding. However, "bleeding from gastrointestinal sites, including upper, lower, and rectal sites, occurred more frequently in the rivaroxaban group, as did bleeding that led to a drop in the hemoglobin level or bleeding that required transfusion." (Patel, M.R., et al. *Rivaroxaban versus Warfarin in Nonvalvular Atrial Fibrillation*. N.Engl.J.Med. 2011;365:883-91.)

87.     Approval of Xarelto for the treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE in the U.S. was based on the clinical trials known as the EINSTEIN-DVT, EINSTEIN-PE, and EINSTEIN-Extension studies. The EINSTEIN-DVT study tested Xarelto versus a placebo, and merely determined that Xarelto offered an option for treatment of DVT, with obvious increased risk of bleeding events as compared to placebo. (The EINSTEIN Investigators. *Oral Rivaroxaban for Symptomatic Venous Thromboembolism*. N.Engl.J.Med. 2010;363:2499-510). The EINSTEIN-Extension study confirmed that result. (Roumualdi, E., et al. *Oral rivaroxaban after symptomatic venous thromboembolism: the continued treatment study (EINSTEIN-Extension study)*. Expert Rev. Cardiovasc. Ther. 2011;9(7):841-844). The EINSTEIN-PE study's findings showed that a rivaroxaban regimen was non-inferior to the standard therapy for initial and long-term treatment of PE. However, the studies also demonstrated an increased risk of adverse events with Xarelto, including those that resulted in permanent discontinuation of Xarelto or prolonged hospitalization. (The EINSTEINPE Investigators. *Oral Rivaroxaban for the Treatment of Symptomatic Pulmonary Embolism*. N.Engl.J.Med. 2012;366:1287-97.)

88.     Defendants use the results of the ROCKET AF study, the RECORD studies, and the EINSTEIN studies to promote Xarelto in their promotional materials, including the Xarelto website, which tout the positive results of those studies. However, Defendants' promotional materials fail to similarly highlight the increased risk of gastrointestinal bleeding and bleeding that required transfusion, among other serious bleeding concerns.

89.     Defendants market Xarelto as a new oral anticoagulant treatment alternative to Warfarin (Coumadin), a long-established safe treatment for preventing stroke and systemic embolism, in 60 years. Defendants emphasize the supposed benefits of treatment with Xarelto over warfarin, which they refer to as the Xarelto Difference – namely, that Xarelto does not require periodic monitoring with blood tests and does not limit a patient's diet.

90.     However, in its QuarterWatch publication for the first quarter of the 2012 fiscal year, the Institute for Safe Medication Practices ("ISMP") noted that, even during the approval process, FDA "[r]eviewers also questioned the convenient once-a-day dosing scheme [of Xarelto], saying blood level studies had shown peaks and troughs that could be eliminated by twice-a-day dosing."

91.     Importantly, there is no antidote to Xarelto, unlike Warfarin. Therefore, in the event of hemorrhagic complications, there is no available reversal agent. The original U.S. label approved when the drug was first marketed in the U.S. did not contain a warning regarding the lack of antidote, but instead only mentioned this important fact in the overdosage section.

92.     Defendants spent significant money in promoting Xarelto, which included at least $11,000,000.00 spent during 2013 alone on advertising in journals targeted at prescribers and consumers in the U.S. In the third quarter of the 2013 fiscal year, Xarelto was the number one pharmaceutical product advertised in professional health journals based on pages and dollars spent.

93.     As a result of Defendants' aggressive marketing efforts, in its first full year of being on the market, Xarelto garnered approximately $582 million in sales globally.

94.     Defendants' website for Xarelto claims that over seven million people worldwide have been prescribed Xarelto. In the U.S., approximately 1 million Xarelto prescriptions had been written by the end of 2013.

95.     During the Defendants' 2012 fiscal year, Xarelto garnered approximately $658 million in sales worldwide. Then, in 2013, sales for Xarelto increased even further to more than clear the $1 billion threshold commonly referred to as "blockbuster" status in the pharmaceutical industry, ultimately reaching approximately $2 billion for the fiscal year. Thus, Xarelto is now considered the leading anticoagulant on a global scale in terms of sales.

96.     As part of their marketing of Xarelto, Defendants widely disseminated direct-to consumer advertising campaigns that were designed to influence patients, including Plaintiff, to make inquiries to their prescribing physician about Xarelto and/or request prescriptions for Xarelto.

97.     In the course of these direct to consumer advertisements, Defendants overstated the efficacy of Xarelto with respect to preventing stroke and systemic embolism, failed to adequately disclose to patients that there is no drug, agent, or means to reverse the anticoagulation effects of Xarelto, and that such irreversibility could have permanently disabling, life-threatening and fatal consequences.

98.     On June 6, 2013, Defendants received an untitled letter from the FDA's Office of Prescription Drug Promotion (hereinafter referred to as the "OPDP") regarding

its promotional material for the atrial fibrillation indication, stating that, "the print ad is false or misleading because it minimizes the risks associated with Xarelto and makes a misleading claim" regarding dose adjustments, which was in violation of FDA regulations. The OPDP thus requested that Defendants immediately cease distribution of such promotional material.

99.     Prior to Plaintiff's prescription of Xarelto, Plaintiff became aware of the promotional materials described herein.

100.     Prior to Plaintiff's prescription of Xarelto, Plaintiff's prescribing physician received promotional materials and information from sales representatives of Defendants that Xarelto was just as effective as warfarin in reducing strokes in patients with non-valvular atrial fibrillation, as well as preventing DVT/PE in patients with prior history of DVT/PE or undergoing hip or knee replacement surgery, and was more convenient, without also adequately informing prescribing physicians that there was no reversal agent that could stop or control bleeding in patients taking Xarelto.

101.     At all times relevant hereto, Defendants also failed to warn emergency room doctors, surgeons, and other critical care medical professionals that unlike generally-known measures taken to treat and stabilize bleeding in users of warfarin, there is no effective agent to reverse the anticoagulation effects of Xarelto, and therefore no effective means to treat and stabilize patients who experience uncontrolled bleeding while taking Xarelto.

102.     At all times relevant to this action, The Xarelto Medication Guide, prepared and distributed by Defendants and intended for U.S. patients to whom Xarelto has been prescribed, failed to warn and disclose to patients that there is no agent to

reverse the anticoagulation effects of Xarelto and that if serious bleeding occurs, it may be irreversible, permanently disabling, and life-threatening.

103.    In the year leading up to June 30, 2012, there were 1,080 Xarelto-associated "Serious Adverse Event" ("SAE") Medwatch reports filed with the FDA, including at least 65 deaths. Of the reported hemorrhage events associated with Xarelto, 8% resulted in death, which was approximately twofold the risk of a hemorrhage-related death with warfarin.

104.    At the close of the 2012 fiscal year, a total of 2,081 new Xarelto-associated SAE reports were filed with the FDA in its first full year on the market, ranking tenth among other pharmaceuticals in direct reports to the FDA. Of those reported events, 151 resulted in death, as compared to only 56 deaths associated with warfarin.

105.    The ISMP referred to these SAE figures as constituting a "strong signal" regarding the safety of Xarelto, defined as "evidence of sufficient weight to justify an alert to the public and the scientific community, and to warrant further investigation."

106.    Of particular note, in the first quarter of 2013, the number of reported serious adverse events associated with Xarelto (680) overtook that of Pradaxa (528), another new oral anticoagulant, which had previously ranked as the number one reported drug in terms of adverse events in 2012.

107.    Moreover, on a global scale, in the first eight months of 2013, German regulators received 968 Xarelto-related adverse event reports, including 72 deaths, as compared to a total of 750 reports and 58 deaths in 2012.

108.    Despite the clear signal generated by the SAE data, Defendants failed to either alert the public and the scientific community, or perform further investigation into the safety of Xarelto.

109.    Defendants original, and in some respects, current labeling and prescribing information for Xarelto:

(a)    failed to investigate, research, study and define, fully and adequately, the safety profile of Xarelto;

(b)    failed to provide adequate warnings about the true safety risks associated with the use of Xarelto;

(c)    failed to provide adequate warning regarding the pharmacokinetic and pharmacodynamics variability of Xarelto and its effects on the degree of anticoagulation in a patient;

(d)    failed to provide adequate warning that it is difficult or impossible to assess the degree and/or extent of anticoagulation in patients taking Xarelto;

(e)    failed to disclose in the "Warnings" Section that there is no drug, agent or means to reverse the anticoagulation effects of Xarelto;

(f)    failed to advise prescribing physicians, such as the Plaintiff's physician, to instruct patients that there was no agent to reverse the anticoagulant effects of Xarelto;

(g)    failed to provide adequate instructions on how to intervene and/or stabilize a patient who suffers a bleed while taking Xarelto;

(h)　　failed to provide adequate warnings and information related to the increased risks of bleeding events associated with aging patient populations of Xarelto users;

(i)　　failed to provide adequate warnings regarding the increased risk of gastrointestinal bleeds in those taking Xarelto, especially, in those patients with a prior history of gastrointestinal issues and/or upset;

(j)　　failed to provide adequate warnings regarding the increased risk of suffering a bleeding event, requiring blood transfusions in those taking Xarelto;

(k)　　failed to provide adequate warnings regarding the need to assess rental functioning prior to starting a patient on Xarelto and to continue testing and monitoring of rental functioning periodically while the patient is on Xarelto;

(l)　　failed to provide adequate warnings regarding the need to assess hepatic functioning prior to starting a patient on Xarelto and to continue testing and monitoring of hepatic functioning periodically while the patient is on Xarelto;

(m)　　failed to include a "**BOXED WARNING**" about serious bleeding events associated with Xarelto;

(n)　　failed to include a "**BOLDED WARNING**" about serious bleeding events associated with Xarelto; and

(o)　　in their "Medication Guide" intended for distribution to patients to whom Xarelto has been prescribed, Defendants failed to disclose to patients that there is no drug, agent or means to reverse the anticoagulation effects of Xarelto and that if serious bleeding occurs, such irreversibility could have permanently disabling, life-threatening or fatal consequences.

110.    During the years since first marketing Xarelto in the U.S., Defendants modified the U.S. labeling and prescribing information for Xarelto, which included additional information regarding the use of Xarelto in patients taking certain medications. Despite being aware of: (1) serious, and sometimes fatal, irreversible bleeding events associated with the use of Xarelto; and (2) 2,081 SAE Medwatch reports filed with the FDA in 2012 alone, including at least 151 deaths, Defendants nonetheless failed to provide adequate disclosures or warnings in their label as detailed in Paragraphs 104 (a – o).

111.    Prior to applying for and obtaining approval of Xarelto, Defendants knew or should have known that consumption of Xarelto was associated with and/or would cause the induction of life-threatening bleeding, and Defendants possessed at least one clinical scientific study, which evidence Defendants knew or should have known was a signal that life-threatening bleeding risk needed further testing and studies prior to its introduction to the market.

112.    Upon information and belief, despite life-threatening bleeding findings in a clinical trial and other clinical evidence, Defendants failed to adequately conduct complete and proper testing of Xarelto prior to filing their New Drug Application for Xarelto.

113.    Upon information and belief, from the date Defendants received FDA approval to market Xarelto, Defendants made, distributed, marketed, and sold Xarelto without adequate warning to Plaintiff's prescribing physicians or Plaintiff that Xarelto was associated with and/or could cause life-threatening bleeding, presented a risk of life-threatening bleeding in patients who used it, and that Defendants had not adequately

conducted complete and proper testing and studies of Xarelto with regard to severe side effects, specifically life-threatening bleeding.

114.    Upon information and belief, Defendants concealed and failed to completely disclose its knowledge that Xarelto was associated with or could cause life-threatening bleeding, as well as its knowledge that they had failed to fully test or study said risk.

115.    Upon information and belief, Defendants ignored the association between the use of Xarelto and the risk of developing life-threatening bleeding.

116.    Defendants' failure to disclose information that they possessed regarding the failure to adequately test and study Xarelto for life-threatening bleeding risk further rendered warnings for this medication inadequate.

117.    By reason of the foregoing acts and omissions, the Plaintiff was caused to suffer from life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, shortened life expectancy, expenses for hospitalization and medical treatment, and loss of earnings.

## COUNT I
## PRODUCT LIABILITY – DEFECTIVE DESIGN

118.    Plaintiff repeats and incorporates by reference all other paragraphs of the Complaint as if fully set forth herein.

119.    At all times material to this action, the Defendant was responsible for designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling Xarelto.

120.    The subject product is defective and unreasonably dangerous to consumers.

121.    Xarelto is defective in its design or formulation in that it is not reasonably fit, suitable, or safe for its intended purpose and/or its foreseeable risks exceed the benefits associated with its design and formulation.

122.    At all times material to this action, Xarelto was expected to reach, and did reach, consumers throughout the United States, including Plaintiff herein, without substantial change in the condition in which it was sold.

123.    At all times material to this action, Xarelto was designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by Defendant in a defective and unreasonably dangerous condition at the time it was placed in the stream of commerce in ways which include, but are not limited to, one or more of the following particulars:

a.      When placed in the stream of commerce, Xarelto contained unreasonably dangerous design defects and was not reasonably safe as intended to be used, subjecting Plaintiff to risks that exceeded the benefits of the subject product.

b.     When placed in the stream of commerce, Xarelto was defective in design and formulation, making the use of Xarelto more dangerous than an ordinary consumer would expect, and more dangerous than other risks associated with the other anticoagulants on the market;

c.     The subject product's design defects existed before it left the control of the Defendant;

d.     Xarelto was insufficiently tested;

e.     Xarelto caused harmful side effects that outweighed any potential utility; and

f.     Xarelto was not accompanied by adequate instructions and/or warnings to fully apprise consumers, including Plaintiff herein, of the full nature and extent of the risks and side effects associated with its use, thereby rendering Defendant liable to Plaintiff.

124.   In addition, at the time the subject product left the control of the Defendant, there were practical and feasible alternative designs, which would have prevented and/or significantly reduced the risk of Plaintiff's injuries without impairing the reasonably anticipated or intended function of the product. These safer alternative designs were economically and technologically feasible, and would have prevented or significantly reduced the risk of Plaintiff's injuries without substantially impairing the product's utility.

125.   As a direct and proximate result of the subject product's defective design, Plaintiff suffered severe and permanent physical injuries. Plaintiff has endured substantial pain and suffering. Plaintiff has incurred significant expenses for medical care and

treatment, and will continue to incur such expenses in the future. Plaintiff has suffered and will continue to suffer economic loss, and has otherwise been physically, emotionally and economically injured. Plaintiff's injuries and damages are permanent and will continue into the future. The Plaintiff seeks actual and punitive damages from the Defendant as alleged herein.

WHEREFORE, Plaintiff demands judgment against Defendant for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## COUNT II
## PRODUCT LIABILITY – MANUFACTURING DEFECT

126.    Plaintiff repeats and incorporates by reference all other paragraphs of the Complaint as if fully set forth herein.

127.    At all times material to this action, Defendant was engaged in the business of designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling Xarelto.

128.    At all times material to this action, Xarelto was expected to reach, and did reach, consumers throughout the United States, including Plaintiff herein without substantial change in the condition in which it was sold.

129.    At all times material to this action, Xarelto was designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by Defendant in a defective and unreasonably dangerous condition at the time it was placed in the stream of commerce in ways which include, but are not limited to, one or more of the following particulars:

a.      When placed in the stream of commerce, Xarelto contained manufacturing defects which rendered the product unreasonably dangerous;

b.      The subject product's manufacturing defects occurred while the product was in the possession and control of the Defendant;

c.      The subject product was not made in accordance with the Defendant's specifications or performance standards; and

d.      The subject product's manufacturing defects existed before it left the control of the Defendant.

130.    As a direct and proximate result of the subject product's manufacturing defects, Plaintiff suffered severe and permanent physical injuries. Plaintiff has endured substantial pain and suffering. Plaintiff has incurred significant expenses for medical care and treatment, and will continue to incur such expenses in the future. Plaintiff has lost past earnings and has suffered a loss of earning capacity. Plaintiff has suffered and will continue to suffer economic loss, and has otherwise been physically, emotionally and economically injured. Plaintiff's injuries and damages are permanent and will continue into the future. The Plaintiff seeks actual and punitive damages from the Defendant as alleged herein.

WHEREFORE, Plaintiff demands judgment against Defendant for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## COUNT III
## PRODUCT LIABILITY - FAILURE TO WARN

131.    Plaintiff repeats and incorporates by reference all other paragraphs of the Complaint as if fully set forth herein.

132.    Xarelto is a defective and, therefore, unreasonably dangerous product because its labeling fails to adequately warn consumers and prescribers of, among other things, the risk of life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

133.    Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce the pharmaceutical, Xarelto, and in the course of same, directly advertised or marketed the product to consumers or persons responsible for consumers, and therefore had a duty to warn of the risks associated with the use of Xarelto.

134.    Xarelto was under the exclusive control of Defendant and was unaccompanied by appropriate warnings regarding all of the risks associated with its use. The warnings given did not accurately reflect the risk, incidence, symptoms, scope or severity of such injuries to the consumer or physicians. The promotional activities of Defendant further diluted or minimized the warnings given with the product.

135.    Defendant downplayed the serious and dangerous side effects of Xarelto to encourage sales of the product; consequently, Defendant placed its profits above its customers' safety.

136.    Xarelto was defective and unreasonably dangerous when it left the possession of Defendant in that it contained warnings insufficient to alert Plaintiff to the dangerous risks and reactions associated with it. Even though Defendant knew or should have known of the risks and reactions associated with Xarelto, Defendant still failed to

provide warnings that accurately reflected the signs, symptoms, incident, scope, or severity of the risks associated with the product.

137.    Plaintiff used Xarelto as intended and as indicated by the package labeling or in a reasonably foreseeable manner.

138.    Plaintiff could not have discovered any defect in Xarelto through the exercise of reasonable care.

139.    Defendant, as manufacturers of pharmaceutical drugs, are held to the level of knowledge of an expert in the field and, further, Defendant had knowledge of the dangerous risks and side effects of Xarelto.

140.    Plaintiff did not have the same knowledge as Defendant and an adequate warning was communicated to Plaintiff's physician(s).

141.    Defendant had a continuing duty to warn consumers, including Plaintiff and Plaintiff's physicians, and the medical community of the dangers associated with Xarelto, and by negligently and/or wantonly failing to adequately warn of the dangers associated with its use, Defendant breached its duty.

142.    Although Defendant knew, or was reckless in not knowing, of the defective nature of Xarelto, they continued to design, manufacture, market, and sell Xarelto without providing adequate warnings and instructions concerning the use of Xarelto so as to maximize sales and profits at the expense of the public health and safety, in knowing, conscious, and deliberate disregard of the foreseeable harm caused by Xarelto.

143.    As a direct and proximate result of one or more of these wrongful acts or omissions of the Defendant, Plaintiff suffered profound injuries, required and continues

to require medical treatment, and incurred and continues to incur medical and hospital expenses.

144.   As a direct and proximate result of the subject product's defective and inappropriate warnings, Plaintiff suffered severe and permanent physical injuries. Plaintiff has endured substantial pain and suffering. Plaintiff has incurred significant expenses for medical care and treatment, and will continue to incur such expenses in the future. Plaintiff has lost past earnings and has suffered a loss of earning capacity. Plaintiff has suffered and will continue to suffer economic loss, and has otherwise been physically, emotionally and economically injured. Plaintiff's injuries and damages are permanent and will continue into the future. The Plaintiff seeks actual and punitive damages from the Defendant as alleged herein.

WHEREFORE, Plaintiff demands judgment against Defendant for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## COUNT IV
## PRODUCT LIABILITY – BREACH OF IMPLIED WARRANTY

145.   Plaintiff repeats and incorporates by reference all other paragraphs of the Complaint as if fully set forth herein.

146.   The Defendant designed, manufactured, marketed, distributed, supplied and sold the subject product for the prevention of pregnancy.

147.   At the time that the Defendant manufactured, marketed, distributed, supplied, and/or sold Xarelto, they knew of the use for which the subject product was

intended and impliedly warranted it to be of merchantable quality and safe and fit for such use.

148.    Plaintiff, individually and through Plaintiff's prescribing physician, reasonably relied upon the skill, superior knowledge and judgment of the Defendant.

149.    Plaintiff was prescribed, purchased, and used the subject product for its intended purpose.

150.    Due to the Defendant's wrongful conduct as alleged herein, Plaintiff could not have known about the nature of the risks and side effects associated with the subject product until after Plaintiff used it.

151.    Contrary to the implied warranty for the subject product, Xarelto was not of merchantable quality, and was not safe or fit for its intended use and purpose, as alleged herein.

152.    As a direct and proximate result of the Defendant's breach of implied warranty, Plaintiff suffered severe and permanent physical injuries. Plaintiff has endured substantial pain and suffering. Plaintiff has incurred significant expenses for medical care and treatment, and will continue to incur such expenses in the future. Plaintiff has lost past earnings and has suffered a loss of earning capacity. Plaintiff has suffered and will continue to suffer economic loss, and has otherwise been physically, emotionally and economically injured. Plaintiff's injuries and damages are permanent and will continue into the future. The Plaintiff seeks actual and punitive damages from the Defendant as alleged herein.

WHEREFORE, Plaintiff demands judgment against Defendant for compensatory,

treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## COUNT V
## PRODUCT LIABILITY – NEGLIGENCE

153.     Plaintiff repeats and incorporates by reference all other paragraphs of the Complaint as if fully set forth herein.

154.     At all times material hereto, the Defendant had a duty to exercise reasonable care to consumers, including Plaintiff herein, in the design, development, manufacture, testing, inspection, packaging, promotion, marketing, distribution, labeling, and/or sale of Xarelto.

155.     The Defendant breached its duty of reasonable care to Plaintiff in that it negligently designed, developed, manufactured, tested, inspected, packaged, promoted, marketed, distributed, labeled, and/or sold the subject product.

156.     Plaintiff's injuries and damages alleged herein were and are the direct and proximate result of the carelessness and negligence of the Defendant as follows:

a.     In its design, development, research, manufacture, testing, packaging, promotion, marketing, sale and/or distribution of the subject product;

b.     In its failure to warn or instruct, and/or adequately warn or adequately instruct, users of the subject product, including Plaintiff herein, of said product's dangerous and defective characteristics;

c.     In its design, development, implementation, administration, supervision and/or monitoring of clinical trials for the subject product;

d.      In its promotion of the subject product in an overly aggressive, deceitful and fraudulent manner, despite evidence as to the product's defective and dangerous characteristics due to its propensity to cause serious injury and/or death;

e.      In representing that the subject product was safe for its intended use when, in fact, the product was unsafe for its intended use;

f.      In failing to perform appropriate pre-market testing of the subject product;

g.      In failing to perform appropriate post-market testing of the subject product; and

h.      In failing to perform appropriate post-market surveillance of the subject product.

157.    The Defendant knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of the Defendant's failure to exercise reasonable and ordinary care.

158.    As a direct and proximate result of Defendant's carelessness and negligence, Plaintiff suffered severe and permanent physical injuries. Plaintiff has endured substantial pain and suffering. Plaintiff has incurred significant expenses for medical care and treatment, and will continue to incur such expenses in the future. Plaintiff has lost past earnings and has suffered a loss of earning capacity. Plaintiff has suffered and will continue to suffer economic loss, and has otherwise been physically, emotionally and economically injured. Plaintiff's injuries and damages are permanent and will continue into the future. The Plaintiff seeks actual and punitive damages from the Defendant as alleged herein.

WHEREFORE, Plaintiff demands judgment against Defendant for compensatory,

treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## COUNT VI
## BREACH OF EXPRESS WARRANTY

159.    Plaintiff repeats and incorporates by reference all other paragraphs of the Complaint as if fully set forth herein.

160.    Defendant expressly warranted that Xarelto was safe and fit for use by consumers and users including Plaintiff for its intended purpose, that it was of merchantable quality, that it did not produce any dangerous side effects, and that it was adequately tested and fit for its intended use.

161.    At the time of the making of the express warranties, Defendant knew or should have known of the purpose for which Xarelto was to be used and warranted the same to be, in all respects, fit, safe, and effective and proper for such purpose.

162.    At the time of the making of the express warranties, Defendant knew or should have known that, in fact, said representations and warranties were false, misleading, and untrue in that Xarelto was not safe and fit for its intended use and, in fact, produces serious injuries to the user.

163.    Members of the medical community, including, but not limited to, Plaintiff's physicians, reasonably relied upon the skill and judgment of Defendant, and upon said express warranties, in prescribing, recommending and/or dispensing Xarelto.

164.    Plaintiff relied on the Defendant's express warranties.

165.    Defendant breached said express warranties, in that Xarelto was not safe and fit for its intended use and, in fact, causes debilitating and potentially lethal side effects with greater frequency than safer alternative methods of anticoagulation.

166.    As a direct and proximate result of the Defendant's breach of express warranty, Plaintiff suffered severe and permanent physical injuries. Plaintiff has endured substantial pain and suffering. Plaintiff has incurred significant expenses for medical care and treatment, and will continue to incur such expenses in the future. Plaintiff has lost past earnings and has suffered a loss of earning capacity. Plaintiff has suffered and will continue to suffer economic loss, and has otherwise been physically, emotionally and economically injured. Plaintiff's injuries and damages are permanent and will continue into the future. The Plaintiff seeks actual and punitive damages from the Defendant as alleged herein.

WHEREFORE, Plaintiff demands judgment against Defendant for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## COUNT VII
## CONSUMER FRAUD

167.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

168.    Defendant engaged in consumer-oriented, commercial conduct by selling and advertising the subject product.

169.    Defendant misrepresented and omitted material information regarding the subject product by failing to disclose known risks.

170.    Defendant's misrepresentations and concealment of material facts constitute unconscionable commercial practices, deception, fraud, false pretenses, misrepresentation, and/or the knowing concealment, suppression, or omission of materials facts with the intent that others rely on such concealment, suppression, or omission in connection with the sale and advertisement of the subject product, in violation of the New Jersey Consumer Fraud Act.

171.    The consumer fraud statutes protect consumers from deceptive, fraudulent, and unconscionable trade and business practices. Defendant violated these statutes by knowingly and falsely representing that the subject product was fit to be used for the purpose for which it was intended, when Defendant knew it was defective and dangerous, and by other acts alleged herein.

172.    Defendant engaged in the deceptive acts and practices alleged herein in order to sell the subject product to the public, including Plaintiff.

173.    As a direct and proximate result of Defendant's violations of the Consumer Fraud Act, Plaintiff has suffered damages, for which Plaintiff is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

WHEREFORE, Plaintiff demands judgment against Defendant for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## COUNT VIII
## PUNITIVE DAMAGES UNDER COMMON LAW,
## PUNITIVE DAMAGES ACT and PRODUCT LIABILITY ACT

174.   Plaintiff repeats and incorporates by reference all other paragraphs of the Complaint as if fully set forth herein.

175.   At all times material hereto, the Defendant knew or should have known that the subject product was inherently more dangerous than alternative methods of anticoagulation.

176.   At all times material hereto, the Defendant attempted to misrepresent and did misrepresent facts concerning the safety of the subject product.

177.   Defendant's misrepresentations included knowingly withholding material information from the medical community and the public, including Plaintiff herein, concerning the safety of the subject product.

178.   At all times material hereto, the Defendant knew and recklessly disregarded the fact that Xarelto causes debilitating and potentially lethal side effects with greater frequency than safer alternative methods of anticoagulation.

179.   Notwithstanding the foregoing, the Defendant continued to aggressively market the subject product to consumers, including Plaintiff herein, without disclosing the aforesaid side effects when there were safer alternative methods of anticoagulation.

180.   The Defendant knew of the subject product's defective and unreasonably dangerous nature, as set forth herein, but continued to design, develop, manufacture, market, distribute and sell it so as to maximize sales and profits at the expense of the health and safety of the public, including Plaintiff herein, in conscious and/or negligent disregard of the foreseeable harm caused by Xarelto.

181. Defendant intentionally concealed and/or recklessly failed to disclose to the public, including Plaintiff herein, the potentially life threatening side effects of Xarelto in order to ensure continued and increased sales.

182. The Defendant's intentional and/or reckless failure to disclose information deprived Plaintiff of necessary information to enable Plaintiff to weigh the true risks of using the subject product against its benefits.

183. As a direct and proximate result of the Defendant's conscious and deliberate disregard for the rights and safety of consumers such as the Plaintiff, Plaintiff suffered severe and permanent physical injuries. Plaintiff has endured substantial pain and suffering. Plaintiff has incurred significant expenses for medical care and treatment, and will continue to incur such expenses in the future. Plaintiff has lost past earnings and has suffered a loss of earning capacity. Plaintiff has suffered and will continue to suffer economic loss, and has otherwise been physically, emotionally and economically injured. Plaintiff's injuries and damages are permanent and will continue into the future.

184. The aforesaid conduct of Defendant was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers, including Plaintiff herein, thereby entitling the Plaintiff to punitive damages in an amount appropriate to punish the Defendant and deter it from similar conduct in the future.

WHEREFORE, Plaintiff demands judgment against Defendant for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against each of the Defendant as follows:

a.      Awarding actual damages to the Plaintiff incidental to Plaintiff's purchase and use of Xarelto in an amount to be determined at trial;

b.      Awarding treble and/or punitive damages to the Plaintiff;

c.      Awarding pre-judgment and post-judgment interest to the Plaintiff;

d.      Awarding the costs and the expenses of this litigation to the Plaintiff;

e.      Awarding reasonable attorneys' fees and costs to the Plaintiff as provided by law; and

Granting all such other relief as the Court deems necessary, just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues.

Dated: March 7, 2016

Respectfully submitted,

By:    */s/ Ethan L. Shaw*
        Ethan L. Shaw
        John P. Cowart
        Matthew J. Riley
        SHAW COWART, L.L.P.
        1609 Shoal Creek Boulevard
        Suite 100
        Austin, Texas  78701
        Telephone:  (512) 499-8900
        Facsimile:  (512) 320-8906
        elshaw@shawcowart.com
        jcowart@shawcowart.com
        mriley@shawcowart.com

        *Attorneys for the Plaintiff*