UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION

\* MDL NO. 2592

\* SECTION L
\*
\* JUDGE ELDON E. FALLON
\*
\* MAG. JUDGE NORTH

*************************************************  \*

THIS DOCUMENT RELATES TO:
   *All Cases*

## ORDER & REASONS

Before the Court is Defendants' Motion for Entry of a Proposed Order Regarding Contact with Physicians. R. Doc. 1844-1. Having reviewed the parties' briefs and the applicable law concerning *ex parte* physician contact as well as the retention of physician-experts, the Court now issues this Order & Reasons.

### I.     BACKGROUND

This matter arises from damages Plaintiffs claim to have suffered from the manufacture, sale, distribution, and/or use of the medication known as Xarelto, an anti-coagulant used for a variety of blood-thinning medical purposes. The Plaintiffs have filed suits in federal courts throughout the nation against Defendants, Bayer Corporation, Bayer HealthCare LLC, Bayer HealthCare Pharmaceuticals Inc., Bayer HealthCare AG, Bayer Pharma AG, and Bayer AG (collectively, Bayer), Janssen Pharmaceuticals, Inc., Janssen Research & Development, LLC, Janssen Ortho LLC, and Johnson & Johnson (collectively, Janssen).The Plaintiffs specifically allege that they or their family members suffered severe bleeding and other injuries due to Xarelto's allegedly inadequate warning label, as well as Xarelto's purported lack of reliance on regular blood monitoring.

The Judicial Panel on Multidistrict Litigation determined that the Plaintiffs' claims involved common questions of fact and that centralization under 28 U.S.C. § 1407 would serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation. Therefore, on December 12, 2014, the Judicial Panel on Multidistrict Litigation consolidated the Plaintiffs' Xarelto claims into a single multidistrict proceeding ("MDL 2592"). MDL 2592 was assigned to Judge Eldon E. Fallon of the United States District Court for the Eastern District of Louisiana to coordinate discovery and other pretrial matters in the pending cases. Subsequent Xarelto cases filed in federal court have been transferred to this district court to become part of MDL 2592 as "tag along" cases. The Court has appointed committees to represent the parties, and discovery has commenced.

## II.   DEFENDANTS' PROPOSED ORDER

On January 6, 2016, counsel for the Defendants filed a Motion for Entry of a Proposed Order Regarding Contact with Physicians. The "Woodshed Motion," as it has been jointly referred to by the parties, sets limits on *ex parte* communication between counsel for the parties and both prescribing and treating physicians.[1] The Defendants' request meaningfully departs from this Court's prior Pretrial Order concerning the same matter in the *Vioxx* litigation. *See generally In re Vioxx Prods. Liab. Litig.*, 230 F.R.D. 473 (Mar. 20, 2007).

The motion requests a pretrial order that, among other things:

---

[1] "Woodshedding" refers to the process of impermissibly coaching a witness or unfairly prejudicing a witness during *ex parte* communications with counsel. *See In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Products Liab. Litig.*, No. 3:09-MD-02100-DRH, 2011 WL 9996459, at *1, n.1 (S.D. Ill. Mar. 4, 2011). The word's more colloquial meaning suggests taking a naughty child out of earshot so that he or she may be scolded or physically reprimanded. *See Carothers v. Cty. of Cook*, 808 F.3d 1140, 1149 (7th Cir. 2015) (citing From the Horse's Mouth: Oxford Dictionary of English Idioms 387 (John Ayto ed., 3rd ed. 2009).

[2]

1. Permits *ex parte* communications between plaintiffs' counsel and prescribing or treating physicians regarding the physician's diagnosis and treatment of the plaintiff and plaintiff's medical condition;

2. Prohibits *ex parte* communications between defendants' counsel and prescribing or treating physicians regarding the physician's diagnosis and treatment of the plaintiff and the plaintiff's medical condition;

3. Prohibits *ex parte* communications by both plaintiffs' counsel and defendants' counsel with prescribing or treating physicians regarding liability issues or theories, defendants' conduct, product warnings, and documents produced by defendants or third parties;

4. Provides limited exceptions to the prohibitions in paragraphs (2) and (3) so that both parties can retain in good faith a reasonable number of physician-experts from among the MDL Plaintiffs' prescribing or treating physicians.

The present motion was argued as two separate, but related, requests by the Defendant: (1) Defendants' Proposal to Limit the Scope of *Ex Parte* Contact between Plaintiffs and Prescribing and Treating Physicians; and (2) Defendants' Proposal to Allow for the Retention of Physician-Experts Who Are or Were Prescribing or Treating Physicians of MDL Plaintiffs. The Court will discuss each in turn.

### III. DEFENDANTS' PROPOSAL TO LIMIT THE SCOPE OF *EX PARTE* CONTACT BETWEEN PLAINTIFFS AND PRESCRIBING AND TREATING PHYSICIANS

Defendants argue that the Court should exclude discussion of liability issues or theories from *ex parte* communications between Plaintiffs' counsel and prescribing and treating

[3]

physicians. In the alternative, Defendants contend that Defendants should also be allowed to engage in *ex parte* communications concerning liability.

### A. The Defendants' Motion

Defendants argue that *ex parte* contacts between Plaintiffs' counsel and prescribing or treating physicians should be limited to discussion of the plaintiff's diagnosis and treatment, because unscrupulous counsel will take the opportunity to influence the physicians' testimony on liability issues. For instance, Defendants fear that Plaintiffs' counsel will share Defendants' internal memoranda with the physicians without context. R. Doc. 1844-1 at 4. Defendants point to one example of woodshedding to support their concerns—a physician who testified that he was coached in the California ASR litigation. R. Doc. 1844-2 at 6–10.

Defendants contend that their request is meaningfully different than the issue presented to the Court in *Vioxx*. *See In re Vioxx*, 230 F.R.D. at 474. Defendants correctly state that they seek more limited relief than was sought in *Vioxx*, and argue that the factors weighing in favor of limiting *ex parte* conduct are stronger in the instant matter. In *Vioxx*, the Court addressed whether *ex parte* contact between Plaintiffs' counsel and a treating or prescribing physician was prudent. *See id.* The Court ultimately held that *ex parte* contacts by Plaintiffs' counsel should be allowed, largely based on the long-protected history of the physician/patient relationship. *See id.* at *3–4. Defendants' proposed order addresses a new issue—whether *ex parte* contact should be limited to issues of patient diagnosis and treatment, which are arguably more germane to the physician/patient relationship than liability theories.

Defendants also argue that they will face a greater burden than the Vioxx Defendants if Plaintiffs' counsel are allowed to discuss liability theories. Unlike *Vioxx*, Xarelto is still being prescribed by many physicians to treat serious medical conditions. Defendants argue that

woodshedded physicians will be deterred from prescribing Xarelto, and patients will be deprived of the benefits of the drug. R. Doc. 1844-1 at 6.

Defendants point to other courts which have placed similar restrictions on Plaintiffs' counsel's *ex parte* contacts with prescribing or treating physicians. Defendants cite two MDL courts that imposed these restrictions. *See In re Ortho Evra Prds. Liab. Litig.*, MDL Docket No. 1742, No. 1:06-40000, 2010 WL 320064, at *2 (N.D. Ohio Jan. 20, 2010); *In re Chantix Prods. Liab. Litig.*, No. 2:09-cv-2030-IPJ, 2011 WL 9995561, at *4 (N.D. Ala. June 30, 2011). *But see In re Yasmin and Yaz (Drospirenon) Mktg., Sales Practices & Products Liab. Litig.*, No. 3:09-MD-02100-DRH, 2011 WL 99964549, at *1–2 (S.D. Ill. Mar. 4, 2011) (rejecting the reasoning in *Ortho Evra* as unpersuasive). Defendants also refer to state courts that took the same position. *See In re Pelvic Mesh/Gynecare Litigation*, Docket No. ATL-L-6341-10, at 6 (N.J. Super. Ct. Law Div. Dec. 3, 2013); *In re Actos Prods. Liab. Cases*, No. BC411678 (Cal. Super. Ct. Mar. 20, 2015). Defendants argue that the Court should follow this purported trend.

### B. The PSC's Opposition

The PSC contends in response that Defendants fail to meet their "good cause" burden for seeking a protective order, because the Defendants' fears of woodshedding are allegedly supported by "neither an empirical nor even anecdotal" evidence. R. Doc. 2044-2 at 13. The PSC takes the position that the Defendants' request to level the playing field is disingenuous, because Defendants have already woodshedded prescribing and treating physicians through the use of advanced marketing techniques. *See* R. Doc. 2044-2 at 3–12, 15–18.

In support of its argument that Defendants lack good cause, the PSC notes that Defendants may obtain *ex parte* access to other fact witnesses, including Defendants' employees and former employees outside the "control group," ex-employee sales representative, and friends

[5]

of the Plaintiffs.  The PSC therefore avers that there is no meaningful way to distinguish between *ex parte* contact with these unregulated fact witnesses and prescribing or treating physicians, and that Defendants therefore lack good cause to impose restrictions on Plaintiffs' counsel.  R. Doc. 2044-2 at 14.  The PSC later adopts a somewhat inconsistent position, and argues that "Plaintiffs' Doctors Are Undeniably *the* Critical Fact Witnesses" pertaining to the learned intermediary doctrine, and that Plaintiffs' counsel are entitled to *ex parte* access due to the crucial importance of the physicians to the case.  R. Doc. 2044-2 at 19–21.

The PSC cites a significant body of case law, and denies that courts are trending towards imposing restrictions on *ex parte* contacts between plaintiffs' counsel and prescribing or treating physicians.  *See, e.g.*, *In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, No. 21-md-2327, 2015 U.S. Dist. LEXIS 139926 (S.D. W.Va. Oct. 13, 2015); *In re Zoloft (Sertraline Hydrocloride) Prods. Liab. Litig.*, No. 12-md-2342, slip op. (E.D. Pa. July 18, 2013).  The PSC also leans heavily on this Court's opinion in *Vioxx*, arguing that the Xarelto litigation does not call for a meaningfully different approach.  R. Doc. 2044-2 at 21–23.

### C.  The Defendants' Reply

Defendants timely reply with leave of Court.  R. Doc. 2286.  Defendants reiterate their fears that Plaintiffs' counsel will abuse the opportunity to conduct *ex parte* interviews concerning liability theories.  R. Doc. 2286 at 5–8.  Defendants also argue that treating Plaintiffs and Defendants differently concerning *ex parte* contacts raises issues of due process and equal protection.  R. Doc. 2286.  Lastly, Defendants articulate a compromise position, which would allow for both Plaintiffs and Defendants' counsel to engage in *ex parte* communications with treating or prescribing physicians concerning liability theories.  R. Doc. 2286 at 3–5.

### D. Discussion

#### i. Applicable Law

This Court has original jurisdiction over the present matter through diversity of citizenship, and the parties have asked the Court to rule on a non-outcome determinative matter pertinent to the procedural law of discovery practice. The Court will therefore apply federal law. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

The Federal Rules of Civil Procedure do not explicitly provide for informal discovery methods such as *ex parte* contacts, but federal courts have routinely recognized the propriety of allowing for *ex parte* interviews under many circumstances. *See Hickman v. Taylor*, 329 U.S. 495, 511–12 (1947) (noting in dicta that *ex parte* interviews with potential witnesses are part of "the historical and . . . necessary way in which lawyers act within the framework of our system of jurisprudence); *Patton v. Novartis Consumer Health, Inc.*, No. 4:02-CV-0047, 2205 WL 1799509, at *3 (S.D. In. July 25, 2005); ("[T]he right to conduct [*ex parte*] interviews is taken for granted as a matter of federal procedure."); *Johns v. U.S.*, No. Civ. A. 96-1058, 1997 WL 695608, at *4 (E.D. La. Nov. 1997). The matter is therefore within the scope of this Court's broad discretion over discovery. *See Beattie v. Madison County School Dist.*, 254 F.3d 595, 606 (quoting *Kelly v. Syria Shell Petroleum Dev., B.V.*, 213 F.3d 841, 855 (5th Cir. 2000) ("A district court has broad discretion in all discovery matters . . . .").

#### ii. Analysis

The Court finds that imposing restrictions on the substantive content of *ex parte* contacts between Plaintiffs' counsel and prescribing or treating physicians would be both unenforceable and unreasonable. Further, the Defendants' proposed compromise measure of allowing *ex parte* discussion of liability theories places an undue burden on the physician-patient relationship. The

Court therefore declines to deviate from the *ex parte* physician contact rules announced in *Vioxx*. *See In re Vioxx*, 230 F.R.D. at 477–78.

The MDL precedent cited by the Defendants contains relatively little substantive analysis to support restricting Plaintiffs' access to physicians. Defendants cite *In re Ortho Evra* and *In re Chantix*, but neither of these MDL opinions provide an explicit rationale for excluding the discussion of liability theories from *ex parte* contacts between Plaintiffs' attorneys and prescribing or treating physicians. *See In re Ortho Evra*, 2010 WL 320064, at *2 (holding that *ex parte* contacts between Plaintiffs' counsel and physicians should be limited in scope, but providing little reasoning beyond expressing confidence in the "professional and capable" conduct of Plaintiffs' counsel); *In re Chantix*, 2011 WL 9995561, at *3–4 (holding the same, but providing little reasoning beyond noting that "what both the defendant and plaintiffs seek to obtain through *ex parte* communications can easily be gotten through depositions of these doctors"). The state court opinions are somewhat more detailed. *See In re Pelvic Mesh*, Docket No. ATL-L-6341-10, at 6; *In re Actos*, No. BC411678, at 12–14. However, the Court finds that the great weight of reasoning and persuasive authority supports the PSC's position. *See In re Ethicon* 2015 U.S. Dist. LEXIS 139926, at 3285–87; *In re Zoloft*, No. 12-md-2342, at 5–6; *In re Yasmin*, 2011 WL 9996459, at *12. The Court finds particularly persuasive the holding in *Kugel Mesh*. In *Kugel Mesh*, the Magistrate Judge reviewed four years of unregulated *ex parte* contacts between Plaintiffs' counsel and treating physicians, and concluded after evaluating Plaintiffs' alleged abuses that imposing additional restrictions would be "unnecessary and unworkable." *See In re Kugel Mesh*, MDL Docket No. 07-1842ML, at 3. The Magistrate Judge did, however,

require Plaintiffs' counsel to provide Defendants with information such as the identity of documents shown to the physician *ex parte*. *See id.* at 3–4.

Defendants take the position that *ex parte* discussions between Plaintiffs' counsel and prescribing or treating physicians should be sanitized from all advocacy concerning liability. But this is easier said than done—advocacy is in the eye of the beholder. The Court lacks the ability to surgically remove delicate insinuations from the individual sentences of Plaintiffs' counsel. The ability to subtly persuade is a core characteristic of the effective advocate. As foreshadowed in the Aeneid by Virgil[2] (a deft moralizer in his own right), a Trojan horse appears to be just a horse until the Achaeans emerge within the gates. Simply put, the Defendants' request to cleanse advocacy from Plaintiffs' *ex parte* physician contacts may not be easily detectable and is not enforceable, and this Court will not issue a pretrial order which is impossible to police. *See In re Kugel Mesh*, MDL Docket No. 07-1842ML, at 3 (finding that imposing substantive limitations on the *ex parte* contacts of Plaintiffs' counsel with physicians would be "difficult to police and may result in unproductive, side-litigation'"); *cf. In re Estate of Ferdinand Marcos Human Rights Litig.*, 94 F.3d 539, 545 (9th Cir. 1996) ("A court should not issue an unenforceable injunction."); *Refrigeration Eng'g Corp. v. Frick Co.*, 370 F. Supp. 702, 715 (W.D. Tex. 1974) ("Difficulty of enforcement is, in itself, often a sufficient reason for denying injunctive relief.").

The Defendants' request also places an unreasonable burden on Plaintiffs' counsel. The subject of this MDL, Xarelto, has produced both state and federal cases that are presided over by judges with different views on the scope of discovery. The dual nature of this litigation therefore

---

[2] Readers are often surprised to find that the *Iliad* contains no explicit reference to the famed Trojan Horse. But scholars note that Virgil subtly forecasts the ultimate fate of Troy—yet another example of a skilled communicator speaking between the lines. *See* George Fredric Franko, *The Trojan Horse at the Close of the* Iliad, 101.2 The Classical Journal 121, 121–23 (2005).

raises ethical complications for *ex parte* contact with such physicians, because an attorney may be beholden to the rules of both state and federal courts. Defendants argue that Plaintiffs' counsel should follow a federal MDL transferee court's limitations on *ex parte* discussion of liability theories, even when conducting interviews concerning state court cases subject to state privilege law and overseen by state court judges. While deference to the federal forum is appreciated, counsel who fail to pursue liability theories in *ex parte* interviews concerning state court cases where it is allowed under state procedure may subject themselves to a claim of malpractice. The Court finds it unrealistic to expect a state court lawyer to follow an MDL transferee court's instructions when the MDL court lacks jurisdiction, especially when doing so may subject the lawyer to liability. Therefore, the Defendants' request is unreasonable as well as unenforceable.[3]

Furthermore, physicians are learned professionals who have devoted themselves to the sciences. These individuals cannot be analogized to the cowed, reprimanded children referenced in the "woodshed" idiom. *See Carothers v. Cty. of Cook*, 808 F.3d 1140, 1149 (7th Cir. 2015) (citing From the Horse's Mouth: Oxford Dictionary of English Idioms 387 (John Ayto ed., 3rd ed. 2009). And to suggest that highly trained physicians would be unduly influenced by the comments of Plaintiffs' counsel fails to account for the healthy skepticism which exists between the members of these professions. The Court cannot conclude based on Defendants'

---

[3] The Court finds unpersuasive Defendants' argument that allowing Plaintiffs' one-sided access to prescribing or treating physicians raises questions of due process and equal protection. R. Doc. 2286 at 2. Inequities are present in every litigation, and "[t]he court is hard-pressed to construct a completely level playing field." *In re Ethicon, Inc.*, 2015 U.S. Dist. LEXIS 139926, at *3287. Further, as noted *supra*, most if not all of the prescribing and treating physicians in this litigation were exposed to the Defendants' position concerning the safety of Xarelto prior to using it in a medical setting. The PSC's logic is unpersuasive insofar as it suggests that two wrongs make a right, but the facts do suggest that the intensive marketing of Xarelto eliminates any potential for a disparity in *ex parte* access to trigger a constitutional violation.

sparse anecdotal evidence that physicians are a vulnerable or dishonest population. Assuming otherwise would disserve the medical profession.

Defendant's proposed compromise, allowing both parties to engage in *ex parte* contact concerning liability theories, places an undue burden on the physician-patient relationship. While it is clearly difficult for Plaintiffs to discuss treatment and care without discussing issues of causation and liability, the Court finds that it would be even more difficult for Defendants to surgically separate discussion of liability from a physician's understanding of his treatment of individual patients. *See In re Seroquel Prods. Liab. Litig.*, No. 6:06-md-1769-Orl-22DAB, 2008 WL 821889, at *4 (M.D. Fla. Mar. 21, 2008) (expressing unease with "the potential for misuse of [*ex parte* physician contact by Defendants], the danger of inappropriate communications and the possibility of conflicts and complexities as the cases develop and the varying roles of physicians intertwine"). Even if the Court did not have this practical concern, the Defendants' suggestion imposes an unfair burden on a sensitive, protected relationship. *See In re Vioxx*, 230 F.R.D. at 476 (finding that allowing defense counsel access to treating physicians "without the approval of the patient, other than in a deposition or a court order, would be in direct conflict with the time honored doctor-patient confidential relationship which has been recognized and protected in both Western and Eastern civilization for over 2000 years"). The physician-patient relationship is based on mutual trust, and *ex parte* contacts between physicians and defendants such as Bayer and J&J undermine that relationship. No patient wants to hear that his or her doctor engaged in unsupervised discussions with a person that the patient sued. This may lead the patient to be less forthcoming with doctors who have spent years developing a relationship of trust and confidence.

The ompromise measure is also unappealing because it undercuts thousands of valuable physician-patient bonds in an effort to stamp out the mere potential for abuse. Defendants' counsel only cites one *bona fide* example of woodshedding by pointing to the California ASR litigation. *See* R. Doc. 1844-1 at 4. The Court also finds it noteworthy that the defendants in *Kugel Mesh* were unable to provide substantial evidence of woodshedding after four years of unregulated *ex parte* contacts between plaintiffs' counsel and treating physicians. *See In re Kugel Mesh*, MDL Docket No. 07-1842ML, at 3; c*f. In re Ethicon, Inc.*, 2015 U.S. Dist. LEXIS 139926, at *3287 ("[P]lacing a blanket restriction on every Plaintiff's attorney, which governs his or her communications with every treating physician, is akin to using a sledgehammer to crack a nut.").

Avoiding extreme measures is especially prudent where the potential for abuse can be largely mitigated through cross-examination. In essence, Defendants' compromise suggests that if Plaintiffs are allowed to woodshed, then Defendants should be allowed to woodshed as well. But two wrongs do not make a right. The Court notes that nothing prevents Defendants from scheduling depositions, or from discovering the nature of Plaintiffs' *ex parte* contacts if they stray beyond the bounds of the physician-patient privilege. The Court finds this remedy more appropriate than imposing a burden on the physician-patient relationship. The Defendants' proposed compromise measure is therefore unpersuasive.

However, because the Court prescribes a strong dose of cross-examination as the cure for Defendants' perceived ills, the Court finds it appropriate to facilitate the discovery of the character of Plaintiffs' *ex parte* contacts with treating physicians. The Court follows Magistrate Judge Almond's opinion in *Kugel Mesh*, MDL Docket No. 07-1842ML, at 3, and orders that Plaintiffs' counsel shall document the following regarding *ex parte* meetings with treating

physicians: (1) the date(s); the approximate duration; the location; the participants; and the identity of the documents, photographs, or other materials that were shown or provided to the treating physician by Plaintiffs' counsel in connection with the meeting. Plaintiffs' counsel shall provide such information to Defendants at least forty-eight hours prior to the treating physician's deposition.

## IV. DEFENDANTS' PROPOSAL TO ALLOW FOR THEIR RETENTION OF PHYSICIAN-EXPERTS WHO ARE OR WERE PRESCRIBING OR TREATING PHYSICIANS OF MDL PLAINTIFFS BUT ONLY IN CASES IN WHICH THEIR PATIENTS ARE NOT PARTIES

Notwithstanding any limitations placed on *ex parte* communications with physicians, Defendants assert that both Plaintiffs and Defendants would benefit from the ability to retain physician-experts who have prescribed Xarelto. The present litigation involves thousands of plaintiffs, and many potential physician-experts would be de facto disqualified if the prescribing and treating physicians of MDL Plaintiffs could not be contacted *ex parte* by Defendants regarding their retention as physician-experts.

### A. The Defendants' Motion

Defendants propose distinct safeguards for *ex parte* contact with potential physician-experts for Defendants. Defendants assert that Plaintiffs should be permitted to engage in *ex parte* contact with a reasonable number of MDL Plaintiffs' prescribing or treating physicians, but that the internal documents of Defendants or third parties should not be disclosed to the physician-expert until after either deposition or the expression of a good faith interest by the physician in serving as an expert witness. R. Doc. 1844-1 at 10. The physician-expert would also be restricted from testifying as to the care and treatment of any Xarelto Plaintiffs. For their

part, Defendants contend that they should be allowed to engage in *ex parte* contact for the purpose of obtaining physician-experts, provided that the physician is not used as an expert in a case where the physician's present or former patient is the named Plaintiff (or if the case is brought in a representative capacity, is the individual who allegedly was treated with Xarelto and is the subject of that case). R. Doc. 1844-1 at 10. These potential defense experts would also be barred from discussing their care or treatment of any MDL Plaintiff.

The Defendants cite multiple cases where MDL courts have granted limited exceptions to orders prohibiting *ex parte* communication with physicians to allow for the retention of experts. *See, e.g.*, *In re Zimmer NextGen Knee Implant Prods. Liab. Litig.*, 890 F. Supp. 2d 896, 906 (N.D. Ill. 2012); *In re Seroquel*, 2008 WL 821889, at *3–4. Defendants also aver that this exception would not swallow the more general rule disallowing *ex parte* contact for five reasons: (1) the physician-expert must express a *bona fide* interest in being considered as a retained expert before any substantive *ex parte* discussions concerning liability could begin; (2) the physician-patient relationship will remain protected, because Defendants' counsel may not have *ex parte* discussions about the physician-expert's treatment of Xarelto plaintiffs; (3) the physician-expert may not be used as an expert in the case where that physician's present or former patient is the named plaintiff (or otherwise the subject of the case); (4) internal company documents may not be shown to an MDL Plaintiff's physician before the physician has been deposed as a fact witness; and (5) Defendants' choices of physician-experts will be protected from disqualification if a plaintiff's counsel cherry-picks a new Xarelto Plaintiff based on whether the Defendants' physician-expert treated that client. R. Doc. 1844-1 at 11–12.

### B. The PSC's Opposition

The PSC opposes the Defense's proposal, arguing that allowing the Defendants to employ physician-experts with ties to Xarelto Plaintiffs would undermine the patient/physician relationship and risk unauthorized disclosures of confidential patient information. R. Doc. 2062 at 30–31. The PSC cites *Kugel Mesh*, and avers that courts have recognized that the risk of unauthorized disclosure of patient information is too great to allow Defendants to employ a treating or prescribing physician as a physician-experts. *See In re Kugel Mesh*, 2008 R.I. Super. LEXIS 101 (R.I. Super. Ct. Aug. 26, 2008). The PSC also notes that the *Kugel Mesh* court found that the defendants' request may have been for "impermissible reasons." *Id.* at *4.

### C. The Defendants' Reply

The Defendants' timely reply. R. Doc. 2286 at 10. The Defendants reiterate the arguments in their motion. Defendants also contend that *Kugel Mesh* was wrongly decided, and based on an unwarranted mistrust of counsel. R. Doc. 2286 at 10.

### D. Discussion

The present issue requires the Court to balance the due process concerns raised by the inability to present effective expert testimony, and a patient's right to safeguard both private medical information and the trusting character of the physician/patient relationship. In essence, accessibility and fairness must be balanced against the potential for misuse and manipulation.

There is no federal rule to guide the Court. The Supreme Court in *Ake v. Oklahoma*, 470 U.S. 68 (1985), held that a capital defendant had a right to expert assistance, but *Ake*'s extensive dicta regarding the significance of expert testimony to due process provides little guidance in the context of a products liability MDL. MDL courts as well as courts generally involved in products liability litigation have noted that there is a strong interest in preserving a defendant's access to qualified physician experts. "A prohibition on . . . contacting and retaining physicians has the potential to deprive [Defendant] of a fair opportunity to present its defense". *In re*

*Seroquel Products Liab. Litig.*, No. 606MD-1769-ORL-22DAB, 2008 WL 821889, at *4 (M.D. Fla. Mar. 21, 2008); *see also In re Zimmer NexGen Knee Implant Prod. Liab. Litig.*, 890 F. Supp. 2d 896, 910 (N.D. Ill 2012) (expressing a concern in a products liability MDL that a complete ban on *ex parte* communication would exclude "some of the most qualified experts" from serving as physician-experts for the defense); *In re Pelvic Mesh/Gynecare Litig.,* 426 N.J. Super. 167, 195, 43 A.3d 1211, 1227 (App. Div. 2012) ("Both sides in this litigation should have the opportunity to present evidence from the most qualified physicians who can serve as experts."); *cf. Doe v. Eli Lilly & Co.*, 99 F.R.D. 126, 128 (D.D.C. 1983) ("As a general proposition . . . no party to litigation has anything resembling a propriety right to any witness's evidence."). At least one MDL court has recognized a right to "search for and hire local physicians to serve as viable testifying expert witnesses." *In re Seroquel*, 2008 WL 821889, at *3–4.

But there is also significant precedent indicating practical concern with *ex parte* contact with treating and prescribing physicians in MDLs. This Court in *Vioxx* recognized the responsibility of an MDL court to be sensitive to the physician/patient relationship when considering a request for *ex parte* physician contact. *See In re Vioxx Prods. Liab. Litig.*, 230 F.R.D. at 475, 477. Other courts have followed this reasoning in the context of requests for *ex parte* contact with physicians for the purpose of retaining physician-experts. For instance, in the *Seroquel* MDL, the magistrate acknowledged "the potential for misuse of [*ex parte* physician contact], [as well as] the danger of inappropriate communications and the possibility of conflicts and complexities as the cases develop and the varying roles of physicians intertwine." *In re Seroquel*, 2008 WL 821889, at *4. Another court employed stronger language, characterizing a request for *ex parte* contact to develop physician-experts as a "Scout's Honor" promise that was

"utterly disingenuous." *In re Kugel Mesh*, 2008 R.I. Super. LEXIS 101 (R.I. Super. Ct. Aug. 26, 2008).

The Court recognizes the dangers of inappropriate *ex parte* contacts, but also recognizes the significance of the at-issue due process interests in accessibility and fairness. Several thousand Xarelto Plaintiffs are currently in the present litigation, and several hundred more submit Plaintiff Fact Sheets each month for review by the Defendants. Disallowing testimony from the many competent, articulate physicians who have prescribed Xarelto would impose a significant burden on the Defendants. The Court, and ultimately the jury, would also be deprived of physician-experts with firsthand clinical experience with the drugs in question. On the other hand, the Court is aware that service as a physician-expert, even in cases unrelated to the physician's patients, may complicate the relationship between the physician-expert and his or her patients. A patient may feel betrayed, or at the very least uncomfortable, if his or her physician represents a company that the patient is suing in a products liability action. Courts must be sensitive when considering *ex parte* contacts that may jeopardize the physician-patient relationship. *See In re Vioxx*, 230 F.R.D. at 476–77.

In an effort to balance these competing interests, the Court finds that Defendants may engage in *ex parte* contacts for the purpose of obtaining physician-experts, but the physician may not serve as an expert in a trial involving his or her patient, or discuss the diagnosis or treatment of any patient currently or formerly in his or her care who has taken Xarelto. Additionally, the physician may not serve as a physician-expert until he or she has disclosed the proposed arrangement with Defendants to all of his or her current patients who have taken or are taking Xarelto. This limitation will hopefully protect the values of trust, candor, and honesty which are at the heart of the physician-patient relationship. *See id.* Patients must be candid and forthright

if they hope to be accurately diagnosed, and physician-experts must do the same if they hope to be trusted.

The Court finds persuasive Defendants' assertion that the PSC's proposal of *de facto* excluding all physicians who have treated Xarelto plaintiffs would create a moving target. Plaintiffs' counsel may tactically bring lawsuits for Xarelto plaintiffs whose doctors are currently physician-experts, and this would potentially exclude defense experts at various phases of trial preparation. Further, given that Xarelto is still on the market and that new claims are being filed each day, it is far from improbable that these Xarelto patients may bring suits during key phases of the litigation and disqualify physician-experts through no calculated malicious efforts. Therefore, once retained, a physician-expert may not be disqualified due to the entry of a Xarelto plaintiff into state or federal litigation.

Perhaps the equities would lean in favor of Plaintiffs if the Defendants requested an unlimited number of contacts, or if Defendants were unwilling to submit to the Court's prophylactic measures. But this is not the issue before the Court. The Defendants have requested a reasonable number of *ex parte* contacts with potential physician-experts, and the Court is inclined to grant their proposed order subject to the following conditions:

1. All *ex parte* contacts by Defendants must be limited to non-substantive discussions until the prescribing or treating physician has affirmatively expressed a *bona fide* interest in being considered as a retained expert.

2. The Defendants are limited to a number of *ex parte* contacts to be determined by the Court after hearing from the parties.

3. The Defendants shall not retain physician-experts who are prescribing or treating physicians of plaintiffs in the discovery pool.

4. The Defendants shall not communicate with a physician-expert who has acted as a prescribing or treating physician of Xarelto about any of his or her patients who have taken Xarelto.

5. The Defendants shall not use a physician as a consulting or testifying expert in a case where that physician's present or former patient is a plaintiff in that case.

6. Once a good-faith interest in serving as a physician-expert has been established, the physician may not accept the Defendants' offer until the physician has disclosed the scope of the proposed physician-expert arrangement to his or her current patients who are taking or have taken Xarelto.

Plaintiffs may attack at trial the testimony of treating and prescribing physicians who have also served as physician-experts for the Defense. Cross-examination continues to be the most potent tool for diagnosing a failure to sustain credibility.

## V. CONCLUSION

For the aforementioned reasons, **IT IS ORDERED** that Defendants' Motion for Entry of a Proposed Order Regarding Contact with Physician Defendants is hereby **GRANTED IN PART AND DENIED IN PART**. The motion is **GRANTED** insofar as it requests that Defendants may engage in a limited number of *ex parte* contacts for the purpose of retaining physician-experts, subject to the Court's enumerated conditions. The motion is **DENIED** insofar as the Defendants' proposed pretrial order conflicts with the principles enumerated in this Order.

**IT IS FURTHER ORDERED** that the Defendants shall refrain from engaging in any *ex parte* contacts with prescribing or treating physicians until this Order & Reasons is implemented through the entry of a pretrial order.

**IT IS FURTHER ORDERED** that the parties shall meet and confer and submit a proposed pretrial order which appropriately heeds this Court's holding.

New Orleans, Louisiana, this 9th day of March, 2016.

_____
UNITED STATES DISTRICT JUDGE