# THE MULLIGAN LAW FIRM

3710 RAWLINS STREET, SUITE 901
DALLAS, TEXAS 75219
TELEPHONE: (214) 219-9779
TELECOPIER: (214) 520-8789
E-MAIL: office@mulliganlaw.com
WEB: www.mulliganlaw.com

April 1, 2016

Via CERTIFIED MAIL, RETURN RECEIPT REQUESTED

SOP Department
Corporation Service Company
Suite 400
2711 Centerville Road
Wilmington, DE 19808

**RE:** Streamlined Service of Process Under PTOs 10 and 11
Bundled Complaint: *Arrivo et al., et al. v. Janssen Research & Development LLC, et al.*, No. 2:16-cv-02422

Dear Sir or Madam:

Pursuant to PTOs 10 and 11, please find enclosed the following:

- A copy of the bundled complaint for the above-styled matter;
- A copy of the summons issued as to BHCP for the bundled complaint;
- A copy of the severance order for the bundled complaint; and
- A list of the individual actions with their civil action numbers for the bundled complaint.

I am simultaneously emailing a copy of each item listed above to xareltocomplaints@babc.com.

Very truly yours,

**The Mulligan Law Firm**

Charles G. Orr

encls.

c:  Ms. Lindy Brown (w/ encls, via email)

Patrick J. Mulligan, TX SBN 14651270
Charles G. Orr, TX SBN 00788148
**THE MULLIGAN LAW FIRM**
3710 Rawlins Street, #901
Dallas, TX  75219
Telephone: (214) 219-9779
Facsimile: (214) 520-8789

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | MDL No. 2592 |
| | |
| ANNABELLE ARRIVO, ON BEHALF OF PAUL ARRIVO, AN INCAPACITATED ADULT; | SECTION:  L JUDGE FALLON MAG. JUDGE NORTH |
| RALPH BARNES; | |
| STEPHANIE BEASLEY, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF JOHN BEASLEY; | BUNDLED JOINT COMPLAINT AND JURY DEMAND |
| JOSE BLATT; | |
| SALLY BOWLBY, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF GEORGE BOWLBY; | Civil Action No.: 2:16-cv-_____ |
| DORIS BRADLEY; | |
| WILLIAM BULLETT; | |
| PATSY CHAMBLESS; | |
| WAYNE CRAFT; | |
| RICHARD DUMMER, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF JOAN DUMMER; | |
| PAUL FERGUS, JR., INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF PAUL FERGUS, SR.; | |
| TOMMY FINCH, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF CLAUDETTE WILLIAMS; | |
| CHARLES FORBES; | |
| DOROTHY GAGE; | |
| LOIS GNADE, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF ROBERT GNADE; | |
| MAXINE HANSEN, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF JOE BOB HANSEN; | |
| THOMAS MCDUFFIE; | |
| CRAIG MONSON; | |

**COMPLAINT**                                                                                                  Page 1

JAMES PASCHALL, INDIVIDUALLY AND
ON BEHALF OF THE ESTATE OF LEATRICE
PASCHALL;
WANDA ROWE;
VELTA SALTER;
HUEY SEYFARTH;
DONALD STYLES;
MARY THOMPSON;
CAROL TRUSSELL;
DOUG WHITLOW; and
MILTON YANCEY,

         Plaintiffs,

         v.

JANSSEN RESEARCH & DEVELOPMENT
LLC f/k/a JOHNSON AND JOHNSON
PHARMACEUTICAL RESEARCH AND
DEVELOPMENT LLC; JANSSEN ORTHO
LLC; JANSSEN PHARMACEUTICALS, INC.
f/k/a JANSSEN PHARMACEUTICA INC.
f/k/a ORTHO-MCNEIL-JANSSEN
PHARMACEUTICALS, INC.; JOHNSON &
JOHNSON COMPANY; BAYER
HEALTHCARE PHARMACEUTICALS, INC.;
BAYER PHARMA AG; BAYER
CORPORATION; BAYER HEALTHCARE
LLC; BAYER HEALTHCARE AG; BAYER
AG; and DOES 1-50, Inclusive,

         Defendants.

---

Pursuant to Pretrial Orders 9 (Direct Filing) and 11 (Bundling of Complaints), Plaintiffs,

by and through counsel, file this Bundled Joint Complaint against Defendants, as follows:

# I.
## INTRODUCTION AND SUMMARY OF ACTION

1. This action is brought on behalf of Plaintiffs, who used Xarelto, also known as

rivaroxaban, to reduce the risk of stroke and systemic embolism in patients with non-valvular

atrial fibrillation. As a result of Xarelto use, Plaintiffs suffered injuries, including but not limited

**COMPLAINT**                                   Page 2

to gastrointestinal bleeding, for which they seek damages.

2.   Defendants, JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a JOHNSON AND JOHNSON PHARMACEUTICAL RESEARCH AND DEVELOPMENT LLC, JANSSEN ORTHO LLC, JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA INC. f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., BAYER HEALTHCARE PHARMACEUTICALS, INC., BAYER PHARMA AG, BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE AG, and BAYER AG (hereinafter collectively referred to as "Defendants") designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Xarelto.

3.   When warning of safety and risks of Xarelto, Defendants negligently and/or fraudulently represented to the medical and healthcare community, the Food and Drug Administration (hereinafter referred to as the "FDA"), to Plaintiffs and the public in general, that Xarelto had been tested and was found to be safe and/or effective for its indicated use.

4.   Defendants concealed their knowledge of Xarelto's defects, from Plaintiffs, the FDA, the public in general and/or the medical community specifically.

5.   These representations were made by Defendants with the intent of defrauding and deceiving Plaintiffs, the public in general, and the medical and healthcare community in particular, and were made with the intent of inducing the public in general, and the medical community in particular, to recommend, dispense and/or purchase Xarelto for use to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, all of which evinced a callous, reckless, willful, depraved indifference to health, safety and welfare of the Plaintiffs herein.

**COMPLAINT**                                                                                                          Page 3

6. Defendants negligently and improperly failed to perform sufficient tests, if any, on humans using Xarelto during clinical trials, forcing Plaintiffs, and Plaintiffs' physicians, hospitals, and/or the FDA, to rely on safety information that applies to other non-valvular atrial fibrillation treatment and DVT/PE treatment and prophylaxis, which does not entirely and/or necessarily apply to Xarelto whatsoever.

7. As a result of the foregoing acts and omissions, the Plaintiffs were caused to suffer serious and dangerous side effects including *inter alia* life-threatening bleeding, as well as other severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above named health consequences. Plaintiffs herein have sustained certain of the above health consequences due to Plaintiffs' use of Xarelto.

8. Defendants concealed their knowledge of the defects in their products from Plaintiffs, and Plaintiffs' physicians, hospitals, pharmacists, the FDA, and the public in general.

9. Consequently, Plaintiffs seek compensatory damages as a result of Plaintiffs' use of the Xarelto, which has caused Plaintiffs to suffer from life-threatening bleeding, as well as other severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above named health consequences.

## II.
## PLAINTIFF SPECIFIC ALLEGATIONS

10. Plaintiff ANNABELLE ARRIVO resides in Frankfort, Will County, Illinois 60423. She is suing on behalf of PAUL ARRIVO, an incapacitated adult. PAUL ARRIVO resides in

**COMPLAINT**                                                                                    Page 4

Frankfort, Will County, Illinois 60423.   ANNABELLE ARRIVO is the spouse of PAUL ARRIVO.   As a result of using Xarelto, PAUL ARRIVO suffered life-threatening bleeding and was caused to sustain severe and permanent injuries, pain, suffering, and emotional distress.   The injuries and damages sustained by PAUL ARRIVO were caused by Defendants' Xarelto.

11. Plaintiff RALPH BARNES resides in Ventura, Ventura County, California 93003.   As a result of using Xarelto, RALPH BARNES suffered life-threatening bleeding and was caused to sustain severe and permanent injuries, pain, suffering, and emotional distress.   The injuries and damages sustained by RALPH BARNES were caused by Defendants' Xarelto.

12. Plaintiff STEPHANIE BEASLEY resides in Adairsville, Bartow County, Georgia 30103. She is suing on her own behalf and on behalf of the ESTATE OF JOHN BEASLEY.   As a result of using Xarelto, JOHN BEASLEY suffered life-threatening bleeding and was caused to sustain severe and permanent injuries, pain, suffering, and emotional distress.   JOHN BEASLEY passed away on March 1, 2015.   At the time of his death, JOHN BEASLEY resided in Adairsville, Bartow County, Georgia 30103.   The injuries and damages sustained by JOHN BEASLEY were caused by Defendants' Xarelto.

13. Plaintiff JOSE BLATT resides in San Diego, San Diego County, California 92120.   As a result of using Xarelto, JOSE BLATT suffered life-threatening bleeding and was caused to sustain severe and permanent injuries, pain, suffering, and emotional distress.   The injuries and damages sustained by JOSE BLATT were caused by Defendants' Xarelto.

14. Plaintiff SALLY BOWLBY resides in Lakeside, San Diego County, California 92040. She is suing on her own behalf and on behalf of the ESTATE OF GEORGE BOWLBY.   As a result of using Xarelto, GEORGE BOWLBY suffered life-threatening bleeding and was caused to sustain severe and permanent injuries, pain, suffering, and emotional distress.   GEORGE

**COMPLAINT**

BOWLBY passed away on May 31, 2014. At the time of his death, GEORGE BOWLBY resided in El Cajon, San Diego County, California 92021. The injuries and damages sustained by GEORGE BOWLBY were caused by Defendants' Xarelto.

15. Plaintiff DORIS BRADLEY resides in Salisbury, Wicomico County, Maryland 21805. As a result of using Xarelto, DORIS BRADLEY suffered life-threatening bleeding and was caused to sustain severe and permanent injuries, pain, suffering, and emotional distress. The injuries and damages sustained by DORIS BRADLEY were caused by Defendants' Xarelto.

16. Plaintiff WILLIAM BULLETT resides in Pittsfield, Berkshire County, Massachusetts 01201. As a result of using Xarelto, WILLIAM BULLETT suffered life-threatening bleeding and was caused to sustain severe and permanent injuries, pain, suffering, and emotional distress. The injuries and damages sustained by WILLIAM BULLETT were caused by Defendants' Xarelto.

17. Plaintiff PATSY CHAMBLESS resides in Denison, Grayson County, Texas 75020. As a result of using Xarelto, PATSY CHAMBLESS suffered life-threatening bleeding and was caused to sustain severe and permanent injuries, pain, suffering, and emotional distress. The injuries and damages sustained by PATSY CHAMBLESS were caused by Defendants' Xarelto.

18. Plaintiff WAYNE CRAFT resides in Flemingsburg, Fleming County, Kentucky 41041. As a result of using Xarelto, WAYNE CRAFT suffered life-threatening bleeding and was caused to sustain severe and permanent injuries, pain, suffering, and emotional distress. The injuries and damages sustained by WAYNE CRAFT were caused by Defendants' Xarelto.

19. Plaintiff RICHARD DUMMER resides in Summerfield, Marion County, Florida 34491. He is suing on his own behalf and on behalf of the ESTATE OF JOAN DUMMER. As a result of using Xarelto, JOAN DUMMER suffered life-threatening bleeding and was caused to sustain

severe and permanent injuries, pain, suffering, and emotional distress.  JOAN DUMMER passed away on July 29, 2014.  At the time of her death, JOAN DUMMER resided in Summerfield, Marion County, Florida 34491.  The injuries and damages sustained by JOAN DUMMER were caused by Defendants' Xarelto.

20. Plaintiff PAUL FERGUS, JR., resides in Johns Creek, Fulton County, Georgia 30022. He is suing on his own behalf and on behalf of the ESTATE OF PAUL FERGUS, SR.  As a result of using Xarelto, PAUL FERGUS, SR., suffered life-threatening bleeding and was caused to sustain severe and permanent injuries, pain, suffering, and emotional distress.   PAUL FERGUS, SR., passed away on May 29, 2014.  At the time of his death, PAUL FERGUS, SR., resided in Johns Creek, Fulton County, Georgia 30022.  The injuries and damages sustained by PAUL FERGUS, SR., were caused by Defendants' Xarelto.

21. Plaintiff TOMMY FINCH resides in Montgomery, Montgomery County, Alabama 36116.  He is suing on his own behalf and on behalf of the ESTATE OF CLAUDETTE WILLIAMS.  As a result of using Xarelto, CLAUDETTE WILLIAMS suffered life-threatening bleeding and was caused to sustain severe and permanent injuries, pain, suffering, and emotional distress.  CLAUDETTE WILLIAMS passed away on May 29, 2014.  At the time of her death, CLAUDETTE WILLIAMS resided in Montgomery, Montgomery County, Alabama 36116.  The injuries and damages sustained by CLAUDETTE WILLIAMS were caused by Defendants' Xarelto.

22. Plaintiff CHARLES FORBES resides in Lawrenceville, Gwinnett County, Georgia 30043.  As a result of using Xarelto, CHARLES FORBES suffered life-threatening bleeding and was caused to sustain severe and permanent injuries, pain, suffering, and emotional distress.  The injuries and damages sustained by CHARLES FORBES were caused by Defendants' Xarelto.

**COMPLAINT**

23. Plaintiff DOROTHY GAGE resides in San Saba, San Saba County, Texas 76877. As a result of using Xarelto, DOROTHY GAGE suffered life-threatening bleeding and was caused to sustain severe and permanent injuries, pain, suffering, and emotional distress. The injuries and damages sustained by DOROTHY GAGE were caused by Defendants' Xarelto.

24. Plaintiff LOIS GNADE, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF ROBERT GNADE, resides in Fort Worth, Tarrant County, Texas 76177. She is suing on her own behalf and on behalf of the ESTATE OF ROBERT GNADE. As a result of using Xarelto, ROBERT GNADE suffered life-threatening bleeding and was caused to sustain severe and permanent injuries, pain, suffering, and emotional distress. ROBERT GNADE passed away on June 24, 2014. At the time of his death, ROBERT GNADE resided in Fort Worth, Tarrant County, Texas 76177. The injuries and damages sustained by ROBERT GNADE were caused by Defendants' Xarelto.

25. Plaintiff MAXINE HANSEN resides in Lubbock, Lubbock County, Texas 79423. She is suing on her own behalf and on behalf of the ESTATE OF JOE BOB HANSEN. As a result of using Xarelto, JOE BOB HANSEN suffered life-threatening bleeding and was caused to sustain severe and permanent injuries, pain, suffering, and emotional distress. JOE BOB HANSEN passed away on October 15, 2015. At the time of his death, JOE BOB HANSEN resided in Lubbock, Lubbock County, Texas 79423. The injuries and damages sustained by JOE BOB HANSEN were caused by Defendants' Xarelto.

26. Plaintiff THOMAS MCDUFFIE resides in Boulder City, Clark County, Nevada 89005. As a result of using Xarelto, THOMAS MCDUFFIE suffered life-threatening bleeding and was caused to sustain severe and permanent injuries, pain, suffering, and emotional distress. The injuries and damages sustained by THOMAS MCDUFFIE were caused by Defendants' Xarelto.

**COMPLAINT**

27. Plaintiff CRAIG MONSON resides in Birmingham, Shelby County, Alabama 35242. As a result of using Xarelto, CRAIG MONSON suffered life-threatening bleeding and was caused to sustain severe and permanent injuries, pain, suffering, and emotional distress. The injuries and damages sustained by CRAIG MONSON were caused by Defendants' Xarelto.

28. Plaintiff JAMES PASCHALL resides in Raleigh, Wake County, North Carolina 27613. He is suing on his own behalf and on behalf of the ESTATE OF LEATRICE PASCHALL. As a result of using Xarelto, LEATRICE PASCHALL suffered life-threatening bleeding and was caused to sustain severe and permanent injuries, pain, suffering, and emotional distress. LEATRICE PASCHALL passed away on May 12, 2014. At the time of her death, LEATRICE PASCHALL resided in Henderson, Vance County, North Carolina 27536. The injuries and damages sustained by LEATRICE PASCHALL were caused by Defendants' Xarelto.

29. Plaintiff WANDA ROWE resides in Hi Hat, Floyd County, Kentucky 41636. As a result of using Xarelto, WANDA ROWE suffered life-threatening bleeding and was caused to sustain severe and permanent injuries, pain, suffering, and emotional distress. The injuries and damages sustained by WANDA ROWE were caused by Defendants' Xarelto.

30. Plaintiff VELTA SALTER resides in Oklahoma City, Oklahoma County, Oklahoma 73170. As a result of using Xarelto, VELTA SALTER suffered life-threatening bleeding and was caused to sustain severe and permanent injuries, pain, suffering, and emotional distress. The injuries and damages sustained by VELTA SALTER were caused by Defendants' Xarelto.

31. Plaintiff HUEY SEYFARTH resides in Houston, Harris County, Texas 77059. As a result of using Xarelto, HUEY SEYFARTH suffered life-threatening bleeding and was caused to sustain severe and permanent injuries, pain, suffering, and emotional distress. The injuries and damages sustained by HUEY SEYFARTH were caused by Defendants' Xarelto.

**COMPLAINT**

32. Plaintiff DONALD STYLES resides in San Jose, Santa Clara County, California 95134. As a result of using Xarelto, DONALD STYLES suffered life-threatening bleeding and was caused to sustain severe and permanent injuries, pain, suffering, and emotional distress. The injuries and damages sustained by DONALD STYLES were caused by Defendants' Xarelto.

33. Plaintiff MARY THOMPSON resides in Boaz, Etowah County, Alabama 35956. As a result of using Xarelto, MARY THOMPSON suffered life-threatening bleeding and was caused to sustain severe and permanent injuries, pain, suffering, and emotional distress. The injuries and damages sustained by MARY THOMPSON were caused by Defendants' Xarelto.

34. Plaintiff CAROL TRUSSELL resides in Murchison, Henderson County, Texas 75778. As a result of using Xarelto, CAROL TRUSSELL suffered life-threatening bleeding and was caused to sustain severe and permanent injuries, pain, suffering, and emotional distress. The injuries and damages sustained by CAROL TRUSSELL were caused by Defendants' Xarelto.

35. Plaintiff DOUG WHITLOW resides in Henrico, Henrico County, Virginia 23231. As a result of using Xarelto, DOUG WHITLOW suffered life-threatening bleeding and was caused to sustain severe and permanent injuries, pain, suffering, and emotional distress. The injuries and damages sustained by DOUG WHITLOW were caused by Defendants' Xarelto.

36. Plaintiff MILTON YANCEY resides in McDonough, Henry County, Georgia 30253. As a result of using Xarelto, MILTON YANCEY suffered life-threatening bleeding and was caused to sustain severe and permanent injuries, pain, suffering, and emotional distress. The injuries and damages sustained by MILTON YANCEY were caused by Defendants' Xarelto.

### III.
### DEFENDANTS

37. Upon information and belief, Defendant JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a JOHNSON AND JOHNSON RESEARCH AND DEVELOPMENT LLC (hereinafter

**COMPLAINT**

referred to as "JANSSEN R&D") is a limited liability company organized under the laws of New Jersey, with a principal place of business in New Jersey. Defendant JANSSEN R&D's sole member is Janssen Pharmaceuticals, Inc., which is a Pennsylvania corporation with a principal place of business in New Jersey. Accordingly, JANSSEN R&D is a citizen of Pennsylvania and New Jersey for purposes of determining diversity under 28 U.S.C. § 1332.

38. As part of its business, JANSSEN R&D is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto.

39. Defendant JANSSEN R&D is the holder of the approved New Drug Applicaton ("NDA") for Xarelto as well as the supplemental NDA.

40. Upon information and belief, and at all relevant times, Defendant JANSSEN R&D was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant. The primary purposes of Xarelto are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat Deep Vein Thrombosis ("DVT") and Pulmonary Embolism ("PE"), to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

41. Upon information and belief, Defendant JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA INC. f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. (hereinafter referred to as "JANSSEN PHARM") is a Pennsylvania corporation, having a principal place of business in New Jersey.

42. As part of its business, JANSSEN PHARM is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

43. Upon information and belief, and at all relevant times, Defendant JANSSEN PHARM,

was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

44. Upon information and belief, Defendant JANSSEN ORTHO LLC (hereinafter referred to as "JANSSEN ORTHO") is a limited liability company organized under the laws of Delaware, having a principal place of business at Stateroad 933 Km 0 1, Street Statero, Gurabo, Puerto Rico 00778. Defendant JANSSEN ORTHO is a subsidiary of Johnson & Johnson. The only member of JANSSEN ORTHO LLC is OMJ PR Holdings, which is incorporated in Ireland with a principal place of business in Puerto Rico. Accordingly, JANSSEN ORTHO LLC is a citizen of Delaware, Ireland, and Puerto Rico for purposes of determining diversity under 28 U.S.C. § 1332.

45. As part of its business, JANSSEN ORTHO is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

46. Upon information and belief, and at all relevant times, Defendant JANSSEN ORTHO was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

47. Defendant JOHNSON & JOHNSON ("J&J") is a fictitious name adopted by Defendant Johnson & Johnson Company, a New Jersey Corporation which has its principal place of

business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933.

48. As part of its business, J&J, and its "family of companies," is involved in the research, development, sales, and marketing of pharmaceutical products, including Xarelto.

49. Upon information and belief, Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. is, and at all relevant times was, a corporation organized under the laws of the State of Delaware, with its principal place of business in the State of New Jersey.

50. As part of its business, BAYER HEALTHCARE PHARMACEUTICALS, INC. is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto.

51. Upon information and belief, and at all relevant times, Defendant, BAYER HEALTHCARE PHARMACEUTICALS, INC., was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

52. Upon information and belief, Defendant BAYER PHARMA AG is a pharmaceutical company domiciled in Germany.

53. Defendant BAYER PHARMA AG is formerly known as Bayer Schering Pharma AG and is the same corporate entity as Bayer Schering Pharma AG. Bayer Schering Pharma AG is formerly known as Schering AG and is the same corporate entity as Schering AG.

54. Upon information and belief, Schering AG was renamed Bayer Schering Pharma AG

**COMPLAINT**                                                                              Page 13

effective December 29, 2006.

55. Upon information and belief, Bayer Schering Pharma AG was renamed BAYER PHARMA AG effective July 1, 2011.

56. As part of its business, BAYER PHARMA AG is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto.

57. Upon information and belief, and at all relevant times, Defendant, BAYER PHARMA AG, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

58. Upon information and belief, Defendant BAYER CORPORATION is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205.

59. Upon information and belief, BAYER HEALTHCARE PHARMACEUTICALS, INC. is owned by Defendant BAYER CORPORATION.

60. At relevant times, Defendant BAYER CORPORATION was engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, its products, including the prescription drug Xarelto.

61. Upon information and belief, Defendant BAYER HEALTHCARE LLC is a limited liability company duly formed and existing under and by the virtue of the laws of the State of Delaware, with its principal place of business located at 100 Bayer Blvd., Whippany, New Jersey

**COMPLAINT**                                                                       Page 14

07981-1544.

   a.  Upon information and belief, from on or about early January 2003, until on or about late December 2014, BAYER HEALTHCARE LLC was wholly owned by, and its sole member was, Bayer Corporation, which is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205.

   b.  Upon information and belief, from on or about early January 2015, until on or about June 30, 2015, BAYER HEALTHCARE LLC was wholly owned by, and its sole member was, Bayer Medical Care, Inc., which is a Delaware Corporation, with its principal place of business at 1 Medrad Dr., Indianola, Pennsylvania 15051.

   c.  Upon information and belief, from on or about July 1, 2015, to the present, BAYER HEALTHCARE LLC's members are:

      i.  Bayer Medical Care Inc., a Delaware corporation with its principal place of business in Pennsylvania;

      ii.  NippoNex Inc., a Delaware corporation with its principal place of business in New York;

      iii.  Bayer West Coast Corporation, a Delaware corporation with its principal place of business in California;

      iv.  Bayer Essure Inc., a Delaware corporation with its principal place of business in California;

      v.  Bayer Consumer Care Holdings, LLC, a limited liability company formed in Delaware with its principal place of business in New Jersey;

      vi.  Dr. Scholl's LLC, a limited liability company formed in Delaware with its

**COMPLAINT**

principal place of business in California;

vii.   Coppertone LLC, a limited liability company formed in Delaware with its principal place of business in California;

viii.   MiraLAX LLC, a limited liability company formed in Delaware with its principal place of business in California; and

ix.   Bayer HealthCare U.S. Funding LLC, a limited liability company formed in Delaware with its principal place of business in Pennsylvania.

Accordingly, BAYER HEALTHCARE LLC is a citizen of Delaware, New Jersey, New York, Indiana, Pennsylvania, and California for purposes of determining diversity under 28 U.S.C. § 1332.

62. Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

63. Upon information and belief, Defendant BAYER HEALTHCARE AG is a company domiciled in Germany and is the parent/holding company of Defendants BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC, and BAYER PHARMA AG.

64. Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG exercises dominion and control over Defendants BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC., and BAYER

**COMPLAINT**                                                                 Page 16

PHARMA AG.

65. Upon information and belief, Defendant BAYER AG is a German chemical and pharmaceutical company that is headquartered in Leverkusen, North Rhine-Westphalia, Germany.

66. Upon information and belief, Defendant BAYER AG is the third largest pharmaceutical company in the world.

67. Upon information and belief, at all relevant times, Defendant BAYER AG was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

68. Defendants Janssen Research & Development LLC, Janssen Ortho LLC, Janssen Pharmaceuticals, Inc., Johnson & Johnson, Bayer Healthcare Pharmaceuticals, Inc., Bayer Pharma AG, Bayer Corporation, Bayer Healthcare LLC, Bayer Healthcare AG, and Bayer AG shall be referred to herein individually by name or jointly as "Defendants."

69. At all times alleged herein, Defendants include and included any and all parents, subsidiaries, affiliates, divisions, franchises, partners, joint venturers, and organizational units of any kind, their predecessors, successors, and assigns, and their officers, directors, employees, agents, representatives, and any and all other persons acting on their behalf.

70. At all times relevant herein, each of the Defendants was the agent, servant, partner, predecessors in interest, and joint venture of each of the remaining Defendants herein, and was at all times operating and acting with the purpose and scope of said agency, service, employment,

**COMPLAINT**                                                                 Page 17

partnership, and joint venture.

71. At all rimes relevant, Defendants were engaged in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce throughout the United States, either directly or indirectly through third parties, subsidiaries, or related entities, the drug Xarelto.

72. Plaintiffs are unaware of the true names and capacities, whether individual, corporate, associate, or otherwise, of defendants DOES 1-50, inclusive, or any of them, and therefore sues these Defendants, and each of them, by such fictitious names.  Plaintiffs will seek leave of this Court to amend this complaint when the status and identities of these Defendants are ascertained.

## IV.
### JURISDICTION AND VENUE

73. This Court has subject matter jurisdiction over the parties pursuant to 28 U.S.C. § 1332(a) because Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and because Defendants are incorporated and have their principal place of business in states other than the state in which Plaintiffs reside.  Pursuant to Pre-Trial Order No. 9 (PTO-9), Plaintiffs are direct-filing this case in MDL No. 2:14-md-02592-EFF, *In Re: Xarelto (Rivaroxaban) Products Liability Litigation*. Pursuant to Pre-Trial Order No. 11, the claims of multiple plaintiffs are bundled in this Complaint.  Should any of the cases ever need to be transferred pursuant to 28 U.S.C. § 1404(a) and paragraph II.D of PTO-9, proper venue of the cases would lie in the United States District Courts for the respective counties in which Plaintiffs reside.  *See supra* section II (Plaintiff Specific Allegations).

## V.
### FACTUAL ALLEGATIONS

**COMPLAINT**

74. At all relevant times, Defendants were in the business of and did design, research, manufacture, test, advertise, promote, market, sell and distribute Xarelto and rivaroxaban to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

75. Defendants received FDA approval for Xarelto, also known as rivaroxaban, on July 1, 2011 for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries (NDA 022406).

76. Defendants then received additional FDA approval for Xarelto to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation on November 4, 2011 (NDA 202439).

77. The additional indication for treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE was added to the label on November 2, 2012.

78. Defendants launched Xarelto in the United States (hereinafter referred to as the "U.S.") in 2011.

79. Xarelto is an anticoagulant that acts as a Factor Xa inhibitor, and is available by prescription in oral tablet doses of 20mg, 15mg, and 10mg.

80. Approval of Xarelto for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries was based on a series of clinical trials known as the Regulation of Coagulation in Orthopedic Surgery to Prevent Deep Venous Thrombosis and Pulmonary Embolism studies (hereinafter referred to as the "RECORD" studies). The findings of the RECORD studies showed that rivaroxaban was superior to enoxaparin for thromboprophylaxis after total knee and hip arthroplasty (based on the Defendants' definition),

accompanied by similar rates of bleeding. However, the studies also showed a greater incidence with Xarelto of bleeding leading to decreased hemoglobin levels and transfusion of blood. (Lassen, M.R., et al. *Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Total Knee Arthroplasty.* N.Engl.J.Med. 2008;358:2776-86; Kakkar, A.K., et al. *Extended duration rivaroxaban versus short-term enoxaparin for the prevention of venous thromboembolism after total hip arthroplasty: a double-blind, randomised controlled trial.* Lancet 2008;372:31-39; Ericksson, B.I., et al. *Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Hip Arthroplasty.* N.Engl.J.Med. 2008;358:2765-75.)

81. Approval of Xarelto for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation in the U.S. was based on a clinical trial known as the Rivaroxaban Once Daily Oral Direct Factor Xa Inhibition Compared with Vitamin K Antagonism for Prevention of Stroke and Embolism Trial in Atrial Fibrillation study (hereinafter referred to as "ROCKET AF"). The study's findings showed that rivaroxaban was noninferior to warfarin for the prevention of stroke or systemic embolism in patients with non-valvular atrial fibrillation, with a similar risk of major bleeding. However, "bleeding from gastrointestinal sites, including upper, lower, and rectal sites, occurred more frequently in the rivaroxaban group, as did bleeding that led to a drop in the hemoglobin level or bleeding that required transfusion." (Patel, M.R., et al. *Rivaroxaban versus Warfarin in Nonvalvular Atrial Fibrillation.* N.Engl.J.Med. 2011;365:883-91.)

82. Approval of Xarelto for the treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE in the U.S. was based on the clinical trials known as the EINSTEIN-DVT, EINSTEIN-PE, and EINSTEIN-Extension studies. The EINSTEIN-DVT study tested Xarelto versus a placebo, and merely determined that Xarelto offered an option for treatment of DVT,

**COMPLAINT**

with obvious increased risk of bleeding events as compared to placebo. (The EINSTEIN Investigators. *Oral Rivaroxaban for Symptomatic Venous Thromboembolism*. N.Engl.J.Med. 2010; 363:2499-510). The EINSTEIN-Extension study confirmed that result. (Roumualdi, E., et al. *Oral rivaroxaban after symptomatic venous thromboembolism: the continued treatment study (EINSTEIN-Extension study)*. Expert Rev. Cardiovasc. Ther. 2011;9(7):841-844). The EINSTEIN-PE study's findings showed that a rivaroxaban regimen was non-inferior to the standard therapy for initial and long-term treatment of PE. However, the studies also demonstrated an increased risk of adverse events with Xarelto, including those that resulted in permanent discontinuation of Xarelto or prolonged hospitalization. (The EINSTEIN-PE Investigators. *Oral Rivaroxaban for the Treatment of Symptomatic Pulmonary Embolism*. N.Engl.J.Med. 2012:366:1287-97).

83. Defendants use the results of the ROCKET AF study, the RECORD studies, and the EINSTEIN studies to promote Xarelto in their promotional materials, including the Xarelto website, which tout the positive results of those studies. However, Defendants' promotional materials fail to similarly highlight the increased risk of gastrointestinal bleeding and bleeding that required transfusion, among other serious bleeding concerns.

84. Defendants market Xarelto as a new oral anticoagulant treatment alternative to warfarin (Coumadin), a long-established safe treatment for preventing stroke and systemic embolism, in 60 years. Defendants emphasize the supposed benefits of treatment with Xarelto over warfarin, which they refer to as the Xarelto Difference – namely, that Xarelto does not require periodic monitoring with blood tests and does not limit a patient's diet.

85. However, in its QuarterWatch publication for the first quarter of the 2012 fiscal year, the Institute for Safe Medication Practices ("ISMP") noted that, even during the approval process,

**COMPLAINT**

FDA "[r]eviewers also questioned the convenient once-a-day dosing scheme [of Xarelto], saying blood level studies had shown peaks and troughs that could be eliminated by twice-a-day dosing."

86. Importantly, there is no antidote to Xarelto, unlike warfarin. Therefore, in the event of hemorrhagic complications, there is no available reversal agent. The original U.S. label approved when the drug was first marketed in the U.S. did not contain a warning regarding the lack of antidote, but instead only mentioned this important fact in the overdosage section.

87. Defendants spent significant money in promoting Xarelto, which included at least $11,000,000.00 spent during 2013 alone on advertising in journals targeted at prescribers and consumers in the U.S. In the third quarter of the 2013 fiscal year, Xarelto was the number one pharmaceutical product advertised in professional health journals based on pages and dollars spent.

88. As a result of Defendants' aggressive marketing efforts, in its first full year of being on the market, Xarelto garnered approximately $582 million in sales globally.

89. Defendants' website for Xarelto claims that over seven million people worldwide have been prescribed Xarelto. In the U.S., approximately 1 million Xarelto prescriptions had been written by the end of 2013.

90. During the Defendants' 2012 fiscal year, Xarelto garnered approximately $658 million in sales worldwide. Then, in 2013, sales for Xarelto increased even further to more than clear the $1 billion threshold commonly referred to as "blockbuster" status in the pharmaceutical industry, ultimately reaching approximately $2 billion for the fiscal year. Thus, Xarelto is now considered the leading anticoagulant on a global scale in terms of sales.

91. As part of their marketing of Xarelto, Defendants widely disseminated direct-to-

consumer advertising campaigns that were designed to influence patients, including Plaintiffs, to make inquiries to their prescribing physician about Xarelto and/or request prescriptions for Xarelto.

92. In the course of these direct to consumer advertisements, Defendants overstated the efficacy of Xarelto with respect to preventing stroke and systemic embolism, failed to adequately disclose to patients that there is no drug, agent, or means to reverse the anticoagulation effects of Xarelto, and that such irreversibility could have permanently disabling, life-threatening and fatal consequences.

93. On June 6, 2013, Defendants received an untitled letter from the FDA's Office of Prescription Drug Promotion (hereinafter referred to as the "OPDP") regarding its promotional material for the atrial fibrillation indication, stating that, "the print ad is false or misleading because it minimizes the risks associated with Xarelto and makes a misleading claim" regarding dose adjustments, which was in violation of FDA regulations. The OPDP thus requested that Defendants immediately cease distribution of such promotional material.

94. Prior to Plaintiffs' prescriptions of Xarelto, Plaintiffs became aware of the promotional materials described herein.

95. Prior to Plaintiffs' prescription of Xarelto, Plaintiffs' prescribing physicians received promotional materials and information from sales representatives of Defendants that Xarelto was just as effective as warfarin in reducing strokes in patients with non-valvular atrial fibrillation, as well as preventing DVT/PE in patients with prior history of DVT/PE or undergoing hip or knee replacement surgery, and was more convenient, without also adequately informing prescribing physicians that there was no reversal agent that could stop or control bleeding in patients taking Xarelto.

**COMPLAINT**                                                                                    Page 23

96. At all times relevant hereto, Defendants also failed to warn emergency room doctors, surgeons, and other critical care medical professionals that unlike generally-known measures taken to treat and stabilize bleeding in users of warfarin, there is no effective agent to reverse the anticoagulation effects of Xarelto, and therefore no effective means to treat and stabilize patients who experience uncontrolled bleeding while taking Xarelto.

97. At all times relevant to this action, The Xarelto Medication Guide, prepared and distributed by Defendants and intended for U.S. patients to whom Xarelto has been prescribed, failed to warn and disclose to patients that there is no agent to reverse the anticoagulation effects of Xarelto and that if serious bleeding occurs, it may be irreversible, permanently disabling, and life-threatening.

98. In the year leading up to June 30, 2012, there were 1,080 Xarelto-associated "Serious Adverse Event" ("SAE") Medwatch reports filed with the FDA, including at least 65 deaths. Of the reported hemorrhage events associated with Xarelto, 8% resulted in death, which was approximately twofold the risk of a hemorrhage-related death with warfarin.

99. At the close of the 2012 fiscal year, a total of 2,081 new Xarelto-associated SAE reports were filed with the FDA in its first full year on the market, ranking tenth among other pharmaceuticals in direct reports to the FDA. Of those reported events, 151 resulted in death, as compared to only 56 deaths associated with warfarin.

100.    The ISMP referred to these SAE figures as constituting a "strong signal []" regarding the safety of Xarelto, defined as "evidence of sufficient weight to justify an alert to the public and the scientific community, and to warrant further investigation."

101.    Of particular note, in the first quarter of 2013, the number of reported serious adverse events associated with Xarelto (680) overtook that of Pradaxa (528), another new oral

anticoagulant, which had previously ranked as the number one reported drug in terms of adverse events in 2012.

102.     Moreover, on a global scale, in the first eight months of 2013, German regulators received 968 Xarelto-related averse event reports, including 72 deaths, as compared to a total of 750 reports and 58 deaths in 2012.

103.     Despite the clear signal generated by the SAE data, Defendants failed to either alert the public and the scientific community, or perform further investigation into the safety of Xarelto.

104.     Defendants original and in some respects current labeling and prescribing information for Xarelto:

(a) failed to investigate, research, study and define, fully and adequately, the safety profile of Xarelto;

(b) failed to provide adequate warnings about the true safety risks associated with the use of Xarelto;

(c) failed to provide adequate warning regarding the pharmacokinetic and pharmacodynamic variability of Xarelto and its effects on the degree of anticoagulation in a patient;

(d) failed to disclose in the "Warnings" Section that there is no drug, agent or means to reverse the anticoagulation effects of Xarelto;

(e) failed to advise prescribing physicians, such as the Plaintiffs' physicians, to instruct patients that there was no agent to reverse the anticoagulant effects of Xarelto;

(f) failed to provide adequate instructions on how to intervene and/or stabilize a patient who suffers a bleed while taking Xarelto;

**COMPLAINT**

(g) failed to provide adequate warnings and information related to the increased risks of bleeding events associated with aging patient populations of Xarelto users;

(h) failed to provide adequate warnings regarding the increased risk of gastrointestinal bleeds in those taking Xarelto, especially, in those patients with a prior history of gastrointestinal issues and/or upset;

(i) failed to provide adequate warnings regarding the increased risk of suffering a bleeding event requiring blood transfusions in those taking Xarelto;

(j) failed to provide adequate warnings regarding the need to assess renal functioning prior to starting a patient on Xarelto and to continue testing and monitoring of renal functioning periodically while the patient is on Xarelto;

(k) failed to provide adequate warnings regarding the need to assess hepatic functioning prior to starting a patient on Xarelto and to continue testing and monitoring of hepatic functioning periodically while the patient is on Xarelto;

(l) failed to include a "BOXED WARNING" about serious bleeding events associated with Xarelto;

(m) failed to include a "Bolded Warning" about serious bleeding events associated with Xarelto; and

(n) in their "Medication Guide" intended for distribution to patients to whom Xarelto has been prescribed, Defendants failed to disclose to patients that there is no drug, agent or means to reverse the anticoagulation effects of Xarelto and that if serious bleeding occurs, such irreversibility could have permanently disabling, life-threatening or fatal consequences.

105.    During the years since first marketing Xarelto in the U.S., Defendants modified

**COMPLAINT**

the U.S. labeling and prescribing information for Xarelto, which included additional information regarding the use of Xarelto in patients taking certain medications. Despite being aware of: (1) serious, and sometimes fatal, irreversible bleeding events associated with the use of Xarelto; and (2) 2,081 SAE Medwatch reports filed with the FDA in 2012 alone, including at least 151 deaths, Defendants nonetheless failed to provide adequate disclosures or warnings in their label as detailed in Paragraphs 98 (a – n).

106.    Prior to applying for and obtaining approval of Xarelto, Defendants knew or should have known that consumption of Xarelto was associated with and/or would cause the induction of life-threatening bleeding, and Defendants possessed at least one clinical scientific study, which evidence Defendants knew or should have known was a signal that life-threatening bleeding risk needed further testing and studies prior to its introduction to the market.

107.    Upon information and belief, despite life-threatening bleeding findings in a clinical trial and other clinical evidence, Defendants failed to adequately conduct complete and proper testing of Xarelto prior to filing their New Drug Application for Xarelto.

108.    Upon information and belief, from the date Defendants received FDA approval to market Xarleto, Defendants made, distributed, marketed, and sold Xarelto without adequate warning to Plaintiffs' prescribing physicians or Plaintiffs that Xarelto was associated with and/or could cause life-threatening bleeding, presented a risk of life-threatening bleeding in patients who used it, and that Defendants had not adequately conducted complete and proper testing and studies of Xarelto with regard to severe side effects, specifically life-threatening bleeding.

109.    Upon information and belief, Defendants concealed and failed to completely disclose its knowledge that Xarelto was associated with or could cause life-threatening bleeding as well as its knowledge that they had failed to fully test or study said risk.

**COMPLAINT**                                                          Page 27

110. Upon information and belief, Defendants ignored the association between the use of Xarelto and the risk of developing life-threatening bleeding.

111. Defendants' failure to disclose information that they possessed regarding the failure to adequately test and study Xarelto for life-threatening bleeding risk further rendered warnings for this medication inadequate.

112. By reason of the foregoing acts and omissions, Plaintiffs were caused to suffer from life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above named health consequences.

113. Plaintiffs endured the mental anguish and psychological trauma of living with the knowledge that Plaintiffs had suffered serious and dangerous side effects including, *inter alia* life-threatening bleeding, as well as other severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of redeveloping cancer.

114. By reason of the foregoing, Plaintiffs were severely and permanently injured, and in some instances suffered sudden death, as a result of use of Defendants' Xarelto drug.

## VI.
## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### NEGLIGENCE
### (Against All Defendants)

115. Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

**COMPLAINT**

Page 28

116.    Defendants had a duty to exercise reasonable care in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale and/or distribution of Xarelto into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

117.    Defendants failed to exercise ordinary care in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Xarelto into interstate commerce in that Defendants knew or should have known that using Xarelto created a high risk of unreasonable, dangerous side effects, including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of redeveloping cancer.

118.    The negligence of the Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

(a) Manufacturing, producing, promoting, formulating, creating, and/or designing Xarelto without thoroughly testing it;

(b) Manufacturing, producing, promoting, formulating, creating, and/or designing Xarelto without adequately testing it;

(c) Not conducting sufficient testing programs to determine whether or not Xarelto was safe for use; in that Defendants herein knew or should have known that Xarelto was unsafe and unfit for use by reason of the dangers to its users;

(d) Selling Xarelto without making proper and sufficient tests to determine the dangers to its users;

**COMPLAINT**                                                                    Page 29

(e) Negligently failing to adequately and correctly warn Plaintiffs, the public, the medical and healthcare profession, and the FDA of the dangers of Xarelto;

(f) Failing to provide adequate instructions regarding safety precautions to be observed by users, handlers, and persons who would reasonably and foreseeably come into contact with, and more particularly, use, Xarelto;

(g) Failing to test Xarelto and/or failing to adequately, sufficiently and properly test Xarelto.

(h) Negligently advertising and recommending the use of Xarelto without sufficient knowledge as to its dangerous propensities;

(i) Negligently representing that Xarelto was safe for use for its intended purpose, when, in fact, it was unsafe;

(j) Negligently representing that Xarelto had equivalent safety and efficacy as other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

(k) Negligently designing Xarelto in a manner which was dangerous to its users;

(l) Negligently manufacturing Xarelto in a manner which was dangerous to its users;

(m) Negligently producing Xarelto in a manner which was dangerous to its users;

(n) Negligently assembling Xarelto in a manner which was dangerous to its users;

(o) Concealing information from Plaintiffs in knowing that Xarelto was unsafe, dangerous, and/or non-conforming with FDA regulations;

(p) Improperly concealing and/or misrepresenting information from Plaintiffs, healthcare professionals, and/or the FDA, concerning the severity of risks and dangers of Xarelto

**COMPLAINT**

compared to other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

116.     Defendants under-reported, underestimated and downplayed the serious dangers of Xarelto.

117.     Defendants negligently compared the safety risk and/or dangers of Xarelto with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

118.     Defendants were negligent in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing and sale of Xarelto in that they:

(a) Failed to use due care in designing and manufacturing Xarelto so as to avoid the aforementioned risks to individuals when Xarelto was used for treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

(b) Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Xarelto;

(c) Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Xarelto;

(d) Failed to accompany their product with accurate warnings regarding the risks of all

possible adverse side effects concerning Xarelto;

(e) Failed to warn Plaintiffs of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects;

(f) Failed to conduct adequate testing, including pre-clinical and clinical testing and post-marketing surveillance to determine the safety of Xarelto;

(g) Failed to warn Plaintiffs, prior to actively encouraging the sale of Xarelto, either directly or indirectly, orally or in writing, about the need for more comprehensive, more regular medical monitoring than usual to ensure early discovery of potentially serious side effects;

(h) Were otherwise careless and/or negligent.

119.    Despite the fact that Defendants knew or should have known that Xarelto caused unreasonably dangerous side effects, Defendants continued and continue to market, manufacture, distribute and/or sell Xarelto to consumers, including Plaintiffs.

120.    Defendants knew or should have known that consumers such as Plaintiffs would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care, as set forth above.

121.    Defendants' negligence was the proximate cause of Plaintiffs' injuries, harm and economic loss which Plaintiffs suffered and/or will continue to suffer.

122.    As a result of the foregoing acts and omissions, Plaintiffs were caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

**COMPLAINT**

123.    As a result of the foregoing acts and omissions, Plaintiffs required more health care and services and did incur medical, health, incidental and related expenses.

124.    In performing the foregoing acts and omissions, Defendants acted despicably, fraudulently, and with malice and oppression so as to justify an award of punitive and exemplary damages.

### SECOND CAUSE OF ACTION
### STRICT PRODUCTS LIABILITY
### (Against All Defendants)

125.    Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

126.    At all times herein mentioned, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, distributed, and/or have recently acquired Defendants who have designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed Xarelto as hereinabove described that was used by Plaintiffs.

127.    Xarelto was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by Defendants.

128.    At those times, Xarelto was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, Plaintiffs herein.

129.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Xarelto.

130.    The Xarelto designed, researched, manufactured, tested, advertised, promoted,

**COMPLAINT**

marketed, sold and distributed by Defendants was defective in design and/or formulation, in that, when it left the hands of the Defendants manufacturers and/or suppliers, it was unreasonably dangerous, and it was more dangerous than an ordinary consumer would expect.

131.    At all times herein mentioned, Xarelto was in a defective condition and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by Defendants.

132.    Defendants knew, or should have known that at all times herein mentioned its Xarelto was in a defective condition, and was and is inherently dangerous and unsafe.

133.    At the time of Plaintiffs' use of Xarelto, Xarelto was being used for the purposes and in a manner normally intended, namely to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

134.    Defendants with this knowledge voluntarily designed its Xarelto in a dangerous condition for use by the public, and in particular Plaintiffs.

135.    Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

136.    Defendants created a product unreasonably dangerous for its normal, intended use.

137.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was manufactured defectively in that Xarelto left the hands of Defendants in a defective condition and was unreasonably dangerous to its intended users.

138.    The Xarelto designed, researched, manufactured, tested, advertised, promoted,

**COMPLAINT**

marketed, sold and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which Defendants' Xarelto was manufactured.

139.    Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed a defective product which created an unreasonable risk to the health of consumers and to Plaintiffs in particular, and Defendants are therefore strictly liable for the injuries sustained by Plaintiffs.

140.    Plaintiffs could not, by the exercise of reasonable care, have discovered Xarelto's defects herein mentioned and perceived its danger.

141.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate warnings or instructions as Defendants knew or should have known that the product created a risk of serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature and Defendants failed to adequately warn of said risk.

142.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate warnings and/or inadequate testing.

143.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate post-marketing surveillance and/or warnings because, after Defendants knew or should have known of the risks of serious side effects including, life-threatening bleeding, as well as other severe and permanent health consequences from Xarelto, they failed to provide adequate warnings to users or consumers of the product, and continued to improperly advertise, market and/or promote their

**COMPLAINT**                                                    Page 35

product, Xarelto.

144.     By reason of the foregoing, Defendants have become strictly liable in tort to Plaintiffs for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Xarelto.

145.     Defendants' defective design, manufacturing defect, and inadequate warnings of Xarelto were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

146.     The defects in Defendants' drug Xarelto were a substantial factor in causing Plaintiffs' injuries.

147.     As a result of the foregoing acts and omissions, Plaintiffs were caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

148.     As a result of the foregoing acts and omissions, Plaintiffs required more health care and services and did incur medical, health, incidental and related expenses.

149.     In performing the foregoing acts and omissions, Defendants acted despicably, fraudulently, and with malice and oppression so as to justify an award of punitive and exemplary damages.

### THIRD CAUSE OF ACTION
### BREACH OF EXPRESS WARRANTY
#### (Against All Defendants)

150.     Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

151.     Defendants expressly warranted that Xarelto was safe and well accepted by users.

**COMPLAINT**

152.    Xarelto does not conform to these express representations because Xarelto is not safe and has numerous serious side effects, many of which were not accurately warned about by Defendants. As a direct and proximate result of the breach of said warranties, Plaintiffs suffered and/or will continue to suffer severe and permanent personal injuries, harm and economic loss.

153.    Plaintiffs did rely on the express warranties of Defendants herein.

154.    Members of the medical community, including physicians and other healthcare professionals, relied upon the representations and warranties of Defendants for use of Xarelto in recommending, prescribing, and/or dispensing Xarelto.

155.    Defendants herein breached the aforesaid express warranties, as their drug Xarelto was defective.

156.    Defendants expressly represented to Plaintiffs, their physicians, healthcare providers, and/or the FDA that Xarelto was safe and fit for use for the purposes intended, that it was of merchantable quality, that it did not produce any dangerous side effects in excess of those risks associated with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, that the side effects it did produce were accurately reflected in the warnings and that it was adequately tested and fit for its intended use.

157.    Defendants knew or should have known that, in fact, said representations and warranties were false, misleading and untrue in that Xarelto was not safe and fit for the use intended, and, in fact, produced serious injuries to the users that were not accurately identified and represented by Defendants.

158.    As a result of the foregoing acts and omissions, Plaintiffs were caused to suffer

**COMPLAINT**

serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

159.     As a result of the foregoing acts and omissions, Plaintiffs required more health care and services and did incur medical, health, incidental and related expenses.

160.     In taking the actions and omissions that caused these damages, Defendants were guilty of malice, oppression and fraud, and Plaintiffs are therefore entitled to recover punitive damages.

### FOURTH CAUSE OF ACTION
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Against All Defendants)

161.     Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

162.     At all times herein mentioned, Defendants manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted and sold Xarelto and/or have recently acquired Defendants who have manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted and sold Xarelto, to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

163.     At the time Defendants marketed, sold, and distributed Xarelto for use by Plaintiffs, Defendants knew of the use for which Xarelto was intended and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

**COMPLAINT**

164.    Defendants impliedly represented and warranted to the users of Xarelto and their physicians, healthcare providers, and/or the FDA that Xarelto was safe and of merchantable quality and fit for the ordinary purpose for which said product was to be used.

165.    These representations and warranties aforementioned were false, misleading, and inaccurate in that Xarelto was unsafe, unreasonably dangerous, improper, not of merchantable quality, and defective.

166.    Plaintiffs, and/or members of the medical community and/or healthcare professionals, did rely on said implied warranty of merchantability of fitness for a particular use and purpose.

167.    Plaintiffs and Plaintiffs' physicians and healthcare professionals reasonably relied upon the skill and judgment of Defendants as to whether Xarelto was of merchantable quality and safe and fit for its intended use.

168.    Xarelto was injected into the stream of commerce by the Defendants in a defective, unsafe, and inherently dangerous condition and the products and materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

169.    Defendants herein breached the aforesaid implied warranties, as their drug Xarelto was not fit for its intended purposes and uses.

170.    As a result of the foregoing acts and omissions, Plaintiffs were caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

**COMPLAINT**

171.    In taking the actions and omissions that caused these damages, Defendants were guilty of malice, oppression and fraud, and Plaintiffs are therefore entitled to recover punitive damages.

## FIFTH CAUSE OF ACTION
## FRAUDULENT MISREPRESENTATION
### (Against All Defendants)

172.    Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

173.    Defendants falsely and fraudulently represented to the medical and healthcare community, and to Plaintiffs, and/or the FDA, and the public in general, that said product, Xarelto, had been tested and was found to be safe and/or effective to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

174.    The representations made by Defendants were, in fact, false.

175.    When these representations were made by Defendants, they knew those representations to be false and it willfully, wantonly and recklessly disregarded whether the representations were true.

176.    These representations were made by Defendants with the intent of defrauding and deceiving Plaintiffs, the public in general, and the medical and healthcare community in particular, and were made with the intent of inducing the public in general, and the medical and healthcare community in particular, to recommend, prescribe, dispense and/or purchase said product, Xarelto, for use to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for

**COMPLAINT**

prophylaxis of DVT for patients undergoing hip and knee replacement surgery, all of which evinced a callous, reckless, willful, depraved indifference to the health, safety and welfare of Plaintiffs.

177.    At the time the aforesaid representations were made by Defendants and, at the time Plaintiffs used Xarelto, Plaintiffs were unaware of the falsity of said representations and reasonably believed them to be true.

178.    In reliance upon these representations, Plaintiffs were induced to and did use Xarelto, thereby sustaining severe and permanent personal injuries, including but not limited to sudden death.

179.    Defendants knew and were aware or should have been aware that Xarelto had not been sufficiently tested, was defective in nature, and/or that it lacked adequate and/or sufficient warnings.

180.    Defendants knew or should have known that Xarelto had a potential to, could, and would cause severe and grievous injury to the users of said product, and that it was inherently dangerous in a manner that exceeded any purported, inaccurate, and/or down-played warnings.

181.    Defendants brought Xarelto to the market, and acted fraudulently, wantonly and maliciously to the detriment of Plaintiffs.

182.    As a result of the foregoing acts and omissions, Plaintiffs were caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

183.    In taking the actions and omissions that caused these damages, Defendants were

**COMPLAINT**

guilty of malice, oppression and fraud, and Plaintiffs are therefore entitled to recover punitive damages.

### SIXTH CAUSE OF ACTION
### FRAUDULENT CONCEALMENT
### (Against All Defendants)

184.  Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

185.  At all times during the course of dealing between Defendants and Plaintiffs, and/or Plaintiffs' healthcare providers, and/or the FDA, Defendants misrepresented the safety of Xarelto for its intended use.

186.  Defendants knew or were reckless in not knowing that its representations were false.

187.  In representations to Plaintiffs, and/or Plaintiffs' healthcare providers, and/or the FDA, Defendants fraudulently concealed and intentionally omitted the following material information:

(a) that Xarelto was not as safe as other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

(b) that the risks of adverse events with Xarelto were higher than those with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

(c) that the risks of adverse events with Xarelto were not adequately tested and/or known

**COMPLAINT**

by Defendants;

(d) that Defendants were aware of dangers in Xarelto, in addition to and above and beyond those associated with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

(e) that Xarelto was defective, and that it caused dangerous side effects, including but not limited to life-threatening bleeding, as well as other severe and permanent health consequences, in a much more and significant rate than other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

(f) that patients needed to be monitored more regularly than normal while using Xarelto;

(g) that Xarelto was manufactured negligently;

(h) that Xarelto was manufactured defectively;

(i) that Xarelto was manufactured improperly;

(j) that Xarelto was designed negligently;

(k) that Xarelto was designed defectively; and

(l) that Xarelto was designed improperly.

188.     Defendants were under a duty to disclose to Plaintiffs, and Plaintiffs' physicians, hospitals, healthcare providers, and/or the FDA the defective nature of Xarelto, including but not limited to the heightened risks of life-threatening bleeding.

189.     Defendants had sole access to material facts concerning the defective nature of the

**COMPLAINT**

product and its propensity to cause serious and dangerous side effects, and hence, cause damage to persons who used Xarelto, including Plaintiffs, in particular.

190.      Defendants' concealment and omissions of material facts concerning, *inter alia*, the safety of Xarelto was made purposefully, willfully, wantonly, and/or recklessly, to mislead Plaintiffs, and Plaintiffs' physicians, hospitals and healthcare providers into reliance, continued use of Xarelto, and actions thereon, and to cause them to purchase, prescribe, and/or dispense Xarelto and/or use the product.

191.      Defendants knew that Plaintiffs, and Plaintiffs' physicians, hospitals, healthcare providers, and/or the FDA had no way to determine the truth behind Defendants' concealment and omissions, and that these included material omissions of facts surrounding Xarelto, as set forth herein.

192.      Plaintiffs, as well as Plaintiffs' doctors, healthcare providers, and/or hospitals, reasonably relied on facts revealed which negligently, fraudulently and/or purposefully did not include facts that were concealed and/or omitted by Defendants.

193.      As a result of the foregoing acts and omissions, Plaintiffs were caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

## SEVENTH CAUSE OF ACTION
### NEGLIGENT MISREPRESENTATION
#### (Against All Defendants)

194.      Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

**COMPLAINT**                                                    Page 44

195.    Defendants had a duty to represent to the medical and healthcare community, and to Plaintiffs, the FDA and the public in general that said product, Xarelto, had been tested and found to be safe and effective to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

196.    The representations made by Defendants were, in fact, false.

197.    Defendants failed to exercise ordinary care in the representation of Xarelto, while involved in its manufacture, sale, testing, quality assurance, quality control, and/or distribution of said product into interstate commerce, in that Defendants negligently misrepresented Xarelto's high risk of unreasonable, dangerous side effects.

198.    Defendants breached their duty in representing Xarelto's serious side effects to the medical and healthcare community, to Plaintiffs, the FDA and the public in general.

199.    As a result of the foregoing acts and omissions, Plaintiffs were caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

### EIGHTH CAUSE OF ACTION
### FRAUD AND DECEIT
### (Against All Defendants)

120.    Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

121.    Defendants conducted research and used Xarelto as part of their research.

122.    As a result of Defendants' research and testing, or lack thereof, Defendants

**COMPLAINT**

blatantly and intentionally distributed false information, including but not limited to assuring the public, Plaintiffs, Plaintiffs' doctors, hospitals, healthcare professionals, and/or the FDA that Xarelto was safe and effective for use as a means to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

123.     As a result of Defendants' research and testing, or lack thereof, Defendants intentionally omitted certain results of testing and research to the public, healthcare professionals, and/or the FDA, including Plaintiffs.

124.     Defendants had a duty when disseminating information to the public to disseminate truthful information and a parallel duty not to deceive the public and Plaintiffs, as well as Plaintiffs' respective healthcare providers and/or the FDA.

125.     The information distributed to the public, the FDA, and Plaintiffs by Defendants, including but not limited to reports, press releases, advertising campaigns, television commercials, print ads, magazine ads, billboards, and all other commercial media contained material representations of fact and/or omissions.

126.     The information distributed to the public, the FDA, and Plaintiffs by Defendants intentionally included representations that Defendants' drug Xarelto was safe and effective for use to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

127.     The information distributed to the public, the FDA, and Plaintiffs, by Defendants intentionally included representations that Defendants' drug Xarelto carried the same risks,

**COMPLAINT**

hazards, and/or dangers as other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

128.    The information distributed to the public, the FDA, and Plaintiffs, by Defendants intentionally included false representations that Xarelto was not injurious to the health and/or safety of its intended users.

129.    The information distributed to the public, the FDA, and Plaintiffs, by Defendants intentionally included false representations that Xarelto was as potentially injurious to the health and/or safety of its intended as other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

130.    These representations were all false and misleading.

131.    Upon information and belief, Defendants intentionally suppressed, ignored and disregarded test results not favorable to Defendants, and results that demonstrated that Xarelto was not safe as a means of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, and/or was not as safe as other means of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

**COMPLAINT**

132.    Defendants intentionally made material representations to the FDA and the public, including the medical profession, and Plaintiffs, regarding the safety of Xarelto, specifically but not limited to Xarelto not having dangerous and serious health and/or safety concerns.

133.    Defendants intentionally made material representations to the FDA and the public in general, including the medical profession, and Plaintiffs, regarding the safety of Xarelto, specifically but not limited to Xarelto being a safe means of reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

134.    It was the purpose of Defendants in making these representations to deceive and defraud the public, the FDA, and/or Plaintiffs, to gain the confidence of the public, healthcare professionals, the FDA, and/or Plaintiffs, to falsely ensure the quality and fitness for use of Xarelto and induce the public, and/or Plaintiffs to purchase, request, dispense, prescribe, recommend, and/or continue to use Xarelto.

135.    Defendants made the aforementioned false claims and false representations with the intent of convincing the public, healthcare professionals, the FDA, and/or Plaintiffs that Xarelto was fit and safe for use as treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

136.    Defendants made the aforementioned false claims and false representations with the intent of convincing the public, healthcare professionals, the FDA, and/or Plaintiffs that

**COMPLAINT**

Xarelto was fit and safe for use as treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, and did not pose risks, dangers, or hazards above and beyond those identified and/or associated with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

137.    Defendants made claims and representations in its documents submitted to the FDA, to the public, to healthcare professionals, and Plaintiffs that Xarelto did not present serious health and/or safety risks.

138.    Defendants made claims and representations in its documents submitted to the FDA, to the public, to healthcare professionals, and Plaintiffs that Xarelto did not present health and/or safety risks greater than other oral forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

139.    These representations and others made Defendants were false when made, and/or were made with a pretense of actual knowledge when knowledge did not actually exist, and/or were made recklessly and without regard to the actual facts.

140.    These representations and others, made by Defendants, were made with the intention of deceiving and defrauding Plaintiffs, including their respective healthcare professionals and/or the FDA, and were made in order to induce Plaintiffs and/or her respective healthcare professionals to rely upon misrepresentations and caused Plaintiffs to purchase, use,

**COMPLAINT**

rely on, request, dispense, recommend, and/or prescribe Xarelto.

141.   Defendants, recklessly and intentionally falsely represented the dangerous and serious health and/or safety concerns of Xarelto to the public at large, Plaintiffs in particular, for the purpose of influencing the marketing of a product known to be dangerous and defective and/or not as safe as other alternatives, including other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

142.   Defendants willfully and intentionally failed to disclose the material facts regarding the dangerous and serious safety concerns of Xarelto by concealing and suppressing material facts regarding the dangerous and serious health and/or safety concerns of Xarelto.

143.   Defendants willfully and intentionally failed to disclose the truth, failed to disclose material facts and made false representations with the purpose and design of deceiving and lulling Plaintiffs, as well as their respective healthcare professionals into a sense of security so that Plaintiffs would rely on the representations and purchase, use and rely on Xarelto and/or that Plaintiffs' respective healthcare providers would dispense, prescribe, and/or recommend the same.

144.   Defendants, through their public relations efforts, which included but were not limited to the public statements and press releases, knew or should have known that the public, including Plaintiffs, as well as Plaintiffs' respective healthcare professionals would rely upon the information being disseminated.

145.   Defendants utilized direct to consumer adverting to market, promote, and/or advertise Xarelto.

**COMPLAINT**

146.     Plaintiffs and/or their respective healthcare professionals did in fact rely on and believe Defendants' representations to be true at the time they were made and relied upon the representations as well as the superior knowledge of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, and were thereby induced to purchase, use and rely on Defendants' drug Xarelto.

147.     At the time the representations were made, Plaintiffs and/or their respective healthcare providers did not know the truth with regard to the dangerous and serious health and/or safety concerns of Xarelto.

148.     Plaintiffs did not discover the true facts with respect to the dangerous and serious health and/or safety concerns, and the false representations of Defendants, nor could Plaintiffs with reasonable diligence have discovered the true facts.

149.     Had Plaintiffs known the true facts with respect to the dangerous and serious health and/or safety concerns of Xarelto, Plaintiffs would not have purchased, used and/or relied on Defendants' drug Xarelto.

150.     Defendants' aforementioned conduct constitutes fraud and deceit, and was committed and/or perpetrated willfully, wantonly and/or purposefully on Plaintiffs.

151.     As a result of the foregoing acts and omissions, Plaintiffs were caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of redeveloping cancer.

**COMPLAINT**

152.     In taking the actions and omissions that caused these damages, Defendants were guilty of malice, oppression and fraud, and Plaintiffs are therefore entitled to recover punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

A.  Judgment in favor of Plaintiffs and against all Defendants, for damages in such amounts as may be proven at trial;

B.  Compensation for both economic and non-economic losses, including but not limited to medical expenses, loss of earnings, disfigurement, pain and suffering, mental anguish and emotional distress, in such amounts as may be proven at trial;

C.  Punitive and/or exemplary damages in such amounts as may be proven at trial;

D.  Attorneys' fees and costs;

E.  Pre- and post-judgment interest; and

F.  Any and all further relief, both legal and equitable, that the Court may deem just and proper.

DATED:  March 23, 2016              THE MULLIGAN LAW FIRM


                                    By:    /s/ Charles G. Orr
                                           Charles G. Orr
                                           Attorney for Plaintiffs

**COMPLAINT**                                                          Page 52

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of Louisiana

| | |
|---|---|
| ANNABELLE ARRIVO, ON BEHALF OF PAUL ARRIVO, AN INCAPACITATED ADULT; <br><br> _____ <br> *Plaintiff(s)* <br> v. <br> Janssen Research & Development, et al. <br><br> _____ <br> *Defendant(s)* | ) ) ) ) ) ) ) ) ) ) ) ) ) |

Civil Action No.  2:16-cv-02422 L (5)

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Bayer Healthcare Pharmaceuticals, Inc.
　　　　SOP Department
　　　　Corporation Service Company
　　　　2177 Centerville Road, Suite 400
　　　　Wilmington, DE 19808

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it)—or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3)—you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiffs attorney, whose name and address are:　Charles G. Orr
　　　　　　　　　　　　　　　The Mulligan Law Firm
　　　　　　　　　　　　　　　3710 Rawlings Street, Suite 901
　　　　　　　　　　　　　　　Dallas, TX 75219

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

William W. Blevins
Name of clerk of court

*Deputy clerk's signature*

Date:　**Mar 29 2016**

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.  2:16-cv-02422

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed  R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____

O I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

O I left the summons at the individual's residence or usual place of abode with *(name)* _____

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ , a person of suitable age and discretion who resides there,

on *(date)* _____ 'and mailed a copy to the individual's last known address; or

O I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ on *(date)* _____ ; or

O I returned the summons unexecuted because _____ ; or

O Other *(specify)*:


My fees are $ _____ for travel and $ _____ for services, for a total of $ _____0.00_____


I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                                 *Server's signature*

                                        _____
                                                 *Printed name and title*


                                        _____
                                                 *Server's address*

Additional information regarding attempted service, etc:

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

IN RE: XARELTO (RIVAROXABAN)  PRODUCTS    *   **MDL NO. 2592**
LIABILITY LITIGATION

       *   **SECTION L**
       *
       *   **JUDGE ELDON E. FALLON**
       *
       *   **MAG. JUDGE NORTH**

***********************************************   *

**THIS DOCUMENT RELATES TO**

*Arrivo v. Janssen Research & Development, LLC, et al.*, 16-2422

### ORDER

A Joint Complaint has been filed in the aforementioned case in *In re: Xarelto (Rivaroxaban) Products Liability Litigation*, MDL No. 2592.  Pursuant to Pre-Trial Order No. 11 (Rec. Doc. 893), **IT IS ORDERED** that this complaint is **SEVERED** into separate, individual cases for each group of related plaintiffs. Plaintiffs are hereby directed to file separate, short form complaints for each case in accordance with Pre-Trial Order No. 11, paragraph 1 (c) (Rec. Doc. 893).

New Orleans, Louisiana, this 28th day of March, 2016.

UNITED STATES DISTRICT JUDGE

PTO 11 Bundle for Service of Process
Bayer HealthCare Pharmaceuticals Inc.

STYLE AND CIVIL ACTION NUMBER OF BUNDLED COMPLAINT:

- *Annabelle Arrivo, on Behalf of Paul Arrivo, an Incapacitated Adult, et al. v. Janssen Research & Development LLC, et al.*, No. 2:16-cv-02422

STYLE AND CIVIL ACTION NUMBER OF EACH SEVERED CASE:

- *Ralph Barnes v. Janssen Research & Development LLC, et al.*, No. 2:16-cv-02583

- *Stephanie Beasley, Individually and on Behalf of the Estate of John Beasley v. Janssen Research & Development LLC, et al.*, No. 2:16-cv-02586

- *Jose Blatt v. Janssen Research & Development LLC, et al.*, No. 2:16-cv-02609

- *Sally Bowlby, Individually and on Behalf of the Estate of George Bowlby v. Janssen Research & Development LLC, et al.*, No. 2:16-cv-02610

- *Doris Bradley v. Janssen Research & Development LLC, et al.*, No. 2:16-cv-02611

- *William Bullett v. Janssen Research & Development LLC, et al.*, No. 2:16-cv-02612

- *Patsy Chambless v. Janssen Research & Development LLC, et al.*, No. 2:16-cv-02613

- *Wayne Craft v. Janssen Research & Development LLC, et al.*, No. 2:16-cv-02614

- *Richard Dummer, Individually and on Behalf of the Estate of Joan Dummer v. Janssen Research & Development LLC, et al.*, No. 2:16-cv-02615

- *Paul Fergus, Jr., Individually and on Behalf of the Estate of Paul Fergus, Sr. v. Janssen Research & Development LLC, et al.*, No. 2:16-cv-02616

- *Tommy Finch, Individually and on Behalf of the Estate of Claudette Williams v. Janssen Research & Development LLC, et al.*, No. 2:16-cv-02617

- *Charles Forbes v. Janssen Research & Development LLC, et al.*, No. 2:16-cv-02684

- *Dorothy Gage v. Janssen Research & Development LLC, et al.*, No. 2:16-cv-2688

- *Lois Gnade, Individually and on Behalf of the Estate of Robert Gnade v. Janssen Research & Development LLC, et al.*, No. 2:16-cv-02689

- *Maxine Hansen, Individually and on Behalf of the Estate of Joe Bob Hansen v. Janssen Research & Development LLC, et al.*, No. 2:16-cv-02690

- *Thomas McDuffie v. Janssen Research & Development LLC, et al.*, No. 2:16-cv-02692

- *Craig Monson v. Janssen Research & Development LLC, et al.*, No. 2:16-cv-02694

- *James Paschall, Individually and on Behalf of the Estate of Leatrice Paschall v. Janssen Research & Development LLC, et al.*, No. 2:16-cv-02696

- *Wanda Rowe v. Janssen Research & Development LLC, et al.*, No. 2:16-cv-02698

- *Velta Salter v. Janssen Research & Development LLC, et al.*, No. 2:16-cv-02701

- *Huey Seyfarth v. Janssen Research & Development LLC, et al.*, No. 2:16-cv-02702

- *Donald Styles v. Janssen Research & Development LLC, et al.*, No. 2:16-cv-02703

- *Mary Thompson v. Janssen Research & Development LLC, et al.*, No. 2:16-cv-02704

- *Carol Trussell v. Janssen Research & Development LLC, et al.*, No. 2:16-cv-02705

- *Doug Whitlow v. Janssen Research & Development LLC, et al.*, No. 2:16-cv-02706

- *Milton Yancey v. Janssen Research & Development LLC, et al.*, No. 2:16-cv-02707