**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE:  XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | MDL No. 2592 |
| | SECTION L |
| THIS DOCUMENT RELATES TO ALL ACTIONS | JUDGE ELDON E. FALLON |
| | MAG. JUDGE NORTH |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO CLARIFY OR, IN THE ALTERNATIVE, TO RECONSIDER AND MODIFY THE COURT'S ORDER REGARDING *EX PARTE* CONTACT WITH PHYSICIANS**

Defendants move the Court to clarify or reconsider certain aspects of the March 9, 2016 Order and Reasons regarding *ex parte* contact with Plaintiffs' physicians (R. Doc. 2676):  first, the conditions to be imposed upon physicians who choose to act as expert witnesses; and second, whether the Court intended to place restrictions upon the ability of defendant pharmaceutical companies (as opposed to defense counsel) to communicate with physicians.

The Order provides that "Defendants may engage in *ex parte* contacts [with a limited number of Plaintiffs' physicians] for the purpose of obtaining physician experts" subject to certain conditions.  Order at 17.  One condition is that "the physician may not accept the Defendants' offer until the physician has disclosed the scope of the proposed physician-expert arrangement to his or her current patients who are taking or have taken Xarelto."  *Id.* at 19.

Such a condition was not requested by the Plaintiffs, briefed or argued by the parties, or addressed in any of the cases cited by the litigants.  Defendants believe the condition to be unprecedented.  Because the Court has not had the benefit of briefing or argument on the

notification requirement, Defendants now seek leave to be heard.[1]

The Court included the notification provision in its Order after expressing concern that patients with Xarelto lawsuits pending may feel "betrayed " or "uncomfortable" if their physicians serve as defense experts. *Id.* at 17. Based on the Court's reasoning, Defendants believe the Court intended the notification requirement to apply ***only*** to Xarelto patients who have sued Defendants. Defendants therefore respectfully request the Court to amend its Order to make clear that the notification requirement is limited to plaintiff-patients. *See* Part I.

Plaintiffs instead contend that the Court intended to require prospective defense experts to notify ***all*** their Xarelto patients. If that broad reach was the Court's true intent, Defendants ask the Court to reconsider and modify its Order. Such a sweeping notice requirement far exceeds the Court's stated rationale, and would undermine physician relationships with patients who have not sued Defendants and potentially disrupt the treatment of those patients. *See* Part II.A. Moreover, the notice requirement would impose an undue burden that would deter most physicians from serving as defense experts, as explained in the accompanying affidavit of Dr. Arthur Schwartzbard. *See* Part II.B. This likely impact raises two constitutional concerns. First, this Court already has recognized that Defendants have a due process interest in retaining these physicians as experts, an interest that would be significantly impaired by the notification requirement. Second, compelling prospective defense experts to provide notice to all Xarelto patients would violate the First Amendment because Plaintiffs have adduced no evidence to justify compelling such speech. *See* Part II.C.

---

[1] By seeking clarification or reconsideration of one aspect of the Order, Defendants are not withdrawing, and expressly preserve for appeal, their objections to the Order insofar as it permits Plaintiffs' counsel but not Defendants' counsel to engage in *ex parte* communications with physicians.

Plaintiffs' interpretation of the Order also would upend discovery procedures established by Rule 26 and CMO 2.   Rule 26 requires only that testifying experts be disclosed.  Plaintiffs insist that *all* physicians serving as defense experts be required to notify their patients.  This would include consulting as well as testifying experts.  Absent a showing of exceptional circumstances, which Plaintiffs have not made and cannot make, they are not entitled to learn the identity of Defendants' consulting experts.  *See* Part III.A.  Moreover, Plaintiffs' interpretation of the Order conflicts with the schedule in CMO 2 to which Plaintiffs agreed.  CMO 2 provides that Plaintiffs disclose their testifying experts in September and Defendants disclose their testifying experts in October.  Plaintiffs improperly seek to use the Court's March 9 Order to learn the identity of all Defendants' experts months ahead of schedule.  *See* Part III.B.  Plaintiffs also have proposed limits on the number of physician experts that would prevent Defendants from contacting and retaining an adequate number retaining experts in different fields, and would impose such undue time commitments that many practicing physicians would be deterred from serving as Defense experts.  Defendants ask the Court to accept their more workable proposal. *See* Part III.C.

Finally, the Court should clarify that the Order applies only to communications with counsel and does not bar communication between the defendant pharmaceutical companies and physicians.  Plaintiffs seek to add language to the Order that could create ambiguity on this point. The issue before this Court was communications between defense counsel and plaintiffs' physicians.  The record provides no basis for barring defendant pharmaceutical companies from communicating with physicians in the ordinary course of business.  Such a restraint would violate the First Amendment.  *See* Part IV.

Defendants therefore respectfully request the Court to clarify, or to reconsider and modify, its Order to limit the notification requirement to *Xarelto patients with lawsuits pending*, and then only after the October 28 deadline for disclosure of Defendants' testifying experts.  So limited, the notice can be provided by Defendants to Plaintiffs' counsel, thereby eliminating the confusion and burden that would result from requiring physicians to notify their patients.

**ARGUMENT**

**I.    The Court Should Clarify that the Notice Requirement Applies Only to Xarelto Patients Who Are Plaintiffs and Order that Notice Be Provided by Defendants' Counsel to Plaintiffs' Counsel.**

Defendants urge the Court to make clear that the scope of the patient notification requirement is limited to patients who are plaintiffs in Xarelto lawsuits.  This Court's March 9 Order explicitly states the Court's reason for creating a patient notification requirement, explaining that "service as a physician-expert, even in cases unrelated to the physician's patient, may complicate the relationship between the physician-expert and his or her patients" because [a] patient may feel betrayed, or at the very least uncomfortable, if his or her physician represents a company *that the patient is suing* in a products liability action."  Order at 17 (emphasis added).

Defendants do not concede that the record supports a finding that patients may be surprised or dismayed by the fact that a doctor who prescribed Xarelto would defend the medicine he or she prescribed.  But even if one were to accept that proposition, the rationale applies only to patients who are plaintiffs; if they have not sued Janssen or Bayer, they would have no reason to feel betrayed or uncomfortable if their physicians defend the product.  Indeed, patients who are not in litigation would expect their doctors to support the medicines they are prescribing.

4

There is a more practical and less burdensome way to provide notice to plaintiff-patients than requiring physician-experts to notify their Xarelto patients directly:  Defendants' counsel could notify Plaintiffs' counsel if Defendants retain a Plaintiff's physician as an expert.  Counsel – unlike doctors – know the identity of Plaintiffs.

Further, as explained below, communications about litigation should come from counsel, rather than doctors.  Communications between physicians and their patients are – and should remain – focused on health care.  Requiring physicians to communicate with plaintiffs about litigation issues would undermine the "special relationship which exists . . . between a patient and his or her doctor."  *In re Vioxx Prods. Liab. Litig.,* 230 F.R.D. 473, 476 (E.D. La. 2005).

This approach also would head off predictable future conflicts.  To illustrate, Defendants have determined that defense expert Dr. Sammy Khatib, the cardiologist/electrophysiologist who appeared before this Court on Science Day, has a patient who is a Xarelto plaintiff.  If Dr. Khatib were required to notify that Plaintiff, and the Plaintiff were to ask Dr. Khatib questions about the litigation (rather than about medical care), Plaintiffs are likely to soon be objecting to the procedure they now support.  Far better to leave communications about litigation to the litigators, and matters of medical care to doctors and their patients.

## II.   If the Court Intended To Require Notice to All Xarelto Patients, the Court Should Reconsider and Modify Its Order.

A requirement that prospective defense experts notify all Xarelto patients presents serious problems that the parties have not had the opportunity to address with the Court.  Rather than protecting the physician-patient relationship, requiring notice to non-plaintiff patients would undermine that relationship.  Providing such notice would unduly burden physicians to such an extent that they would be unlikely to serve as defense experts.  A broad notification requirement also presents constitutional problems.  Defendants therefore ask the Court to reconsider and

5

modify the Order.

**A. The sweeping notice requirement urged by Plaintiffs would harm physician-patient relationships and could lead patients to make unwise medical choices.**

In the briefing and argument that preceded entry of this Court's March 9 Order, plaintiffs never once suggested that prospective defense expert witnesses should be communicating directly with their Xarelto patients about the Xarelto litigation. That is not surprising since, to Defendants' knowledge, no court has ever imposed such a requirement.

Physicians and patients routinely communicate about medical – not legal – issues and, appropriately, their communications focus on the patient's diagnosis, treatment, and prognosis. Declaration of Arthur Z. Schwartzbard, M.D., ¶¶ 7-8. If physicians were required to notify their Xarelto patients about possible work as a defense expert, the line distinguishing between appropriate medical communications and legal issues would be blurred. Because physicians would not be serving as defense experts in their own patients' cases, Order at 17, the notice would require communications about nonmedical matters in cases in which the plaintiffs are not being treated by the physician-expert.

As Dr. Schwartzbard explains, "[p]atients have no context for interpreting such a notification requirement." *Id.* ¶ 9. Patients would want to know why they are receiving such a notice, *id.,* and it is likely that providing notice to patients who have been doing well on Xarelto would undermine their faith in their doctors' decision making:

> A notification requirement implicitly suggests to my patients that my objectivity and partiality in making an appropriate risk-benefit decision have been compromised, which is not true. I am not prescribing Xarelto for them because I am serving as an expert witness; rather, I am serving as an expert witness because I concluded, on the basis of my own independent medical judgment and experience, that Xarelto is an excellent product that is safe and effective. A notification requirement, however, could damage the physician-patient bond by undermining my patient's confidence in my judgment.

6

*Id. See also id.* ¶ 6.

Most disturbingly, the notice could lead some patients to discontinue their medicine, with potentially catastrophic results.  As Dr. Schwartzbard explains, "at least some patients will be left wondering why such notification is necessary if the product is, in fact, safe." *Id.* ¶ 10.  They may conclude that, "where there's smoke, there's fire." *Id.*  Physician experience with patient responses to lawyer advertising teaches "that patients often do not understand that, just because there are a large number of lawsuits, does not mean any of the claims actually has merit." *Id.* The notification requirement creates the risk that a patient will jump to the conclusion that the medicine is unsafe and stop taking it. *Id.*  Here, because Xarelto is indicated and prescribed as an anticoagulant, the potential risk of stopping the medication without a physician's direction or guidance is serious – a patient could have a stroke as a direct result of stopping the medicine. *Id.*

In short, rather than protecting the physician-patient relationship, requiring notice to Xarelto patients who have not filed suit would hurt that relationship and potentially result in medical harm to patients who misinterpret the notice.

**B.  A requirement that physicians notify Xarelto patients would unduly burden physicians and deter them from serving as defense experts.**

The idea of physicians providing notice to their patients sounds simple on its face.  But prospective expert witnesses have explained that the administrative burdens arising from such a requirement would preclude many physicians from serving as defense experts.

*First,* medical practices do not routinely maintain lists of patients who are taking or have taken a particular medication.  Schwartzbard Decl., ¶ 11.  When medical practices have attempted to identify every patient who has taken a particular medicine for product recalls, the undertaking "has been an extremely laborious and time-consuming process." *Id.*

*Second,* because a notice would frighten or confuse some patients, many physicians will

agree with Dr. Schwartzbard that "it would be important to notify each patient in person and to be prepared to answer each patient's questions." *Id.* ¶ 12. This necessary physician-patient communication would be time-consuming; Dr. Schwartzbard estimates that he would need about 40 hours to explain the notice for every 100 patients prescribed Xarelto. *Id.* These meetings would not be covered by insurance, *id.*, and could give rise to difficult questions regarding compensation of defense experts for meetings with patients, both those who have sued Defendants and those who are not involved in the Xarelto litigation.

     *Third*, physicians will be required to obtain authorization from their medical institutions and medical malpractice carriers before providing any notification. *Id.* ¶ 13. Malpractice carriers are unlikely to cooperate with a notice requirement:

> Insurance carriers will undoubtedly have significant concerns that such notifications will have the practical effect of inviting people who are having no problems and who are not involved with litigation to consult with lawyers. Given that the notification serves no bona fide medical purpose and could encourage patients to get involved in litigation, insurance carriers would have strong reasons to withhold authorization for such communication and demand instead that [physicians] decline to participate in litigation.

*Id.*

     In short, this Court already has concluded that "[d]isallowing testimony from the many competent, articulate physicians who have prescribed Xarelto would impose a significant burden on the Defendants," and deprive the Court and jury "of physician-experts with firsthand clinical experience with the drugs in question." Order at 17. That would be the unintended result of implementing the broad and unduly burdensome physician notification requirement urged by Plaintiffs.

**C. The broad notification requirement urged by Plaintiffs would raise serious constitutional concerns.**

Beyond the considerations described above, a requirement that prospective expert physicians notify all Xarelto patients presents two constitutional problems.

*First*, this Court already has recognized that Defendants have a due process interest in being able to "present effective expert testimony." Order at 15; *see also id.* at 17 (recognizing Defendants' interests in "accessibility and fairness" in retaining experts). The Court incorporated numerous protections into its Order in an attempt to balance this due process concern with "a patient's right to safeguard both private medical information and the trusting character of the physician/patient relationship." *Id.* at 15. Extending a notice requirement to non-plaintiff patients upsets both sides of that balance. The burdens imposed on physicians would deprive Defendants of their needed expert advice and – rather than protecting the physician-patient relationship – an expansive notice requirement would undermine that relationship. In contrast, limiting notice to patients who have filed Xarelto lawsuits, along with the other protections built into the Court's Order, *id.* at 15-17, would achieve the balancing of interests sought by the Court.

*Second,* requiring physicians to provide notice to patients who are not plaintiffs violates the First Amendment. The Court cannot restrict or compel speech absent "a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101 (1981) (discussing First Amendment issue in connection with limitation on communication with class members). Such an order can be entered only as a narrow response to a demonstrated threat. *See* Manual for Complex Litigation § 21.12. An order limiting or compelling speech cannot be based on speculation; it must identify more than "the mere possibility of abuses" before curtailing First

Amendment rights.  *Gulf Oil,* 452 U.S. at 104.  Even where the record justifies some prohibition

on speech, compelling individuals to engage in "enforced speech . . . is rarely, if ever,

appropriate."  *Great Rivers Co-op. of S.E. Iowa v. Farmland Indus., Inc.*, 59 F.3d 764, 766 (8th

Cir. 1995) (citing *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n,* 475 U.S. 1, 9–10 (1986)).

These high standards may well explain why there is no precedent for an order requiring

doctors to notify their patients before becoming defense experts in someone else's case.

Plaintiffs never requested such an order; consequently, there is no evidence that would support

Plaintiffs' present position – that prospective defense experts who have treated MDL plaintiffs

should be compelled to notify all their Xarelto patients, including those who do not have Xarelto

lawsuits pending.  Nor can Plaintiffs adduce evidence to support such an order because, as

shown above, such a notice is far more likely to damage physician-patient relationships than

protect those relationships.  Here, the grounds given by the Court for a notice requirement –

concern with avoiding patient feelings of discomfort or betrayal – extend only to those patients

who also are Xarelto plaintiffs.  The sweeping notification requirement sought by Plaintiffs

cannot be squared with the First Amendment.

III.     **Notice Should Be Limited to Plaintiff-Patients of Testifying Physician-Experts and
         Should Be Provided By Counsel After the Deadline for Designating Defendants'
         Testifying Experts.**

Clarification or reconsideration of the Order also is required because the physician

notification requirement appears to conflict with Rule 26 and CMO 2.  Plaintiffs contend the

March 9 Order should be read to require notification of *all* of Defendants' potential physician-

experts, even those who are "not expected to be called as a witness at trial," and to require

notification of Defendants' potential physician-experts seven months ahead of schedule.  *But see*

Fed. R. Civ. P. 26(b)(4)(D) *and* CMO 2, ¶ 8(b) (establishing timetable and specifically providing

Rule 26 provisions apply to bellwether cases).   Defendants respectfully submit that the Court did

not intend a notification requirement to undo key provisions of the discovery plan painstakingly developed for this litigation by the Court and the parties.   Nor did the Court intend to restrict the number of physician-experts available to Defendants as severely as proposed by Plaintiffs.

**A.  The notification requirement should not include non-testifying experts.**

The March 9 Order currently does not mention the Rule 26(b)(4) distinction between experts expected to testify at trial and those not expected to testify.  If all prospective defense experts were required to provide notice to their patients, Plaintiffs would unfairly learn the identities of Defendants' consulting experts.

A party is required to disclose the identity of non-testifying experts only upon a showing of "exceptional circumstances."  *Cooper v. Revere Life Ins. Co.*, No. CIV. A. 96-2266, 1997 WL 289706, at *1 (E.D. La. May 28, 1997) (citing *Ager v. Jane C. Stormont Hosp. & Training Sch. for Nurses*, 622 F.2d 496, 502–03 (10th Cir. 1980); *In re Sinking of Barge "Ranger I"*, 92 F.R.D. 486, 488 (S.D. Tex. 1981); 8 Wright & Miller, Federal Practice and Procedure § 2032 at 448–50 (2d ed.)); *see* 8A Wright & Miller, Federal Practice and Procedure § 2032 (3d ed.) (same). Plaintiffs have not made any showing of the exceptional circumstances required to provide a basis for overriding Rule 26 and allowing them to discover the identity of Defendants' consulting experts.

Furthermore, at this early stage, Defendants do not know who their physician-experts will be, much less which physicians may be testifying experts and which may be consulting experts. Because there has been no showing of exceptional circumstances that would entitle Plaintiffs to learn the identities of Defendants' consulting experts, any notification requirement should apply only to patients of testifying experts.

11

**B.  Defense testifying experts should be disclosed per the schedule in CMO 2.**

CMO 2 requires Plaintiffs to disclose their testifying experts by September 30, 2016.

CMO 2, ¶ 8(a).  Defendants' testifying expert disclosures are due a month later on October 28,

2016.  *Id.* ¶ 8(b).  Plaintiffs seek to override these deadlines by requiring prospective defense

experts to notify patients before even setting to work on this litigation; Plaintiffs thereby would

learn the identity of defense experts months before Plaintiffs' disclosures are due.

Where, as here, an important discovery order has been entered after significant

deliberation and painstaking negotiations between the parties, that discovery order should be

changed only on a showing of good cause.  *S&W Enters., L.L.C. v. SouthTrust Bank of Ala., NA*,

315 F.3d 533, 536 (5th Cir. 2003).  Since good cause has not been established here, there has not

been (nor can there be) any showing that justifies revealing the identity of Defendants' experts

months before Plaintiffs, who have the burden of proof, are required to disclose their testifying

experts.

**C.  The Plaintiffs Seek To Unduly Restrict the Number of Defendants' Physician-Experts.**

In addition to disregarding Rule 26 and CMO 2, Plaintiffs seek to impose unreasonable

restrictions on the number of physician-experts available to Defendants.  Although there are 40

cases in the discovery pool, Plaintiffs want Defendants to be able to contact only 20 potential

physician-experts and to retain only 12 of them.

The Plaintiffs in the pool have treaters in various subspecialties and massive medical

records.  The vendor already has collected some 200,000 pages of records for the 40 plaintiffs

and is not close to being finished.

The limitations proposed by Plaintiffs would not allow Defendants access to enough

experts in enough specialties to consult on and testify in these cases.  Moreover, the sharp

restrictions proposed by plaintiffs would deter many practicing physicians from serving as defense experts, as set forth in Dr. Schwartzbard's declaration.

Defendants instead propose that they be allowed to contact up to 40 prospective physician-experts and retain up to 20. This would allow Defendants access to physicians with different areas of expertise.

## IV. The Order Applies to Communication with Counsel for the Parties, Not the Parties' Employees.

Finally, Defendants respectfully request clarification that the Order was directed at communications between **counsel** and treating or prescribing physicians and was **not** intended to restrict Defendants' employees' contact with physicians during the ordinary course of business. Though it is clear from the record that neither the parties nor the Court contemplated such a restriction, in recent negotiations, Plaintiffs have insisted on including in the PTO implementing the Order the following sentence: "Defendants shall not direct any communications specifically toward MDL Plaintiff's prescribing or treating physicians." This sentence directly contradicts the language immediately preceding it, which is intended to preserve Defendants' constitutional right to engage in its ordinary course of business. Plaintiffs' proposed language, unsupported by law, is especially ironic given that Plaintiffs cited to Defendants' business communications as justification for an order permitting Plaintiffs' counsel to woodshed physicians. *See* Plaintiffs' Opposition to Motion for Entry of Order Regarding Contact with Physicians, R. Doc. 2062, at 4-12, 15-18.

Defendants therefore are forced to seek confirmation from the Court that the intended purpose of the Order is to govern *ex parte* communications between defense **counsel** and Plaintiffs' treating or prescribing physicians, **not** to impede Defendants' ability to engage in its ordinary course of business – a result which would be unduly burdensome and would exceed the

13

boundaries of what is constitutionally permitted.

The focus of the briefing by both parties, and at oral argument, was on what *counsel* could do and say.  As a counterbalance to their request that this Court prohibit *ex parte* communications by *plaintiffs' counsel* with treating and prescribing physicians, Defendants proposed restrictions on the ability of *defense counsel* to communicate with the physicians in connection with expert retention.  No one asked, nor could they ask, that the Order regulate communications by defendant employees in the regular course of business with health care providers.

That the Order is intended to address communications between *counsel* for the parties and physicians, and not to prohibit Defendants' employee communications with physicians in the ordinary course of business, is in keeping with the reasoning of the Court, in this and prior MDLs, as well as jurisprudence in both Louisiana and nationwide, which focus the issue of *ex parte* communications with physicians on contact with *counsel*, not with the parties themselves. *See* Hon. Eldon E. Fallon, *Louisiana Practice:  Trial Handbook for Louisiana Lawyers* § 19:12, *Existence of physical/health care provider-patient privilege* (3d ed.); *Coutee v. Beurlot*, 964 So. 2d 304, 307-08 (La. 2007); *In re Zimmer NexGen Knee Implant Prods. Liab. Litig.*, 890 F. Supp. 2d 896, 900 (N.D. Ill. 2012).  Defendants respectfully submit that such restriction on Defendants' ordinary course of business was not intended by the Court, nor is such an extreme measure warranted in this litigation; further it would be unconstitutional.  *Gulf Oil,* 452 U.S. at 101, 104; *Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653 (2011); *Gulf Oil,* 452 U.S. at 101, 103-04; *see also* Manual for Complex Litigation § 21.12.

A. **Plaintiffs' characterization of the Order as restricting communications between Defendants' employees and physicians would be an unconstitutional restriction of free speech.**

Any court order barring Defendants' detail representatives from calling on physicians who have a patient involved in litigation, as Plaintiffs' proposed language could be interpreted as doing, would be unconstitutional. *Sorrell* makes clear that speech in aid of pharmaceutical marketing is a form of protected expression. As the Court there observed, a "consumer's concern for the free flow of commercial speech often may be far keener than his concern for urgent political dialogue[,]" a principle that has "great relevance in the fields of medicine and public health, where information can save lives." 131 S. Ct. at 2664 (citation omitted). Under *Sorrell*, any government restriction on pharmaceutical marketing is subject to heightened scrutiny at least equal to the intermediate level scrutiny described in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980). For such a restriction to be valid it must directly advance a substantial public interest and be no more restrictive than reasonably necessary to advance that interest. *Id.* at 564. If off-label promotion is so protected, *see Caronia v. United States*, 703 F.3d 149, 169 (2d Cir. 2012), on-label detailing pursued in the ordinary course of defendants' business is entitled to at least an equal level of protection.

If applied to bar Defendants' detail representatives from making calls on physicians treating plaintiffs, the Court's Order cannot withstand constitutional scrutiny. Whatever the merits of this lawsuit, Xarelto is not Vioxx. Xarelto remains a widely-used medication with potentially life-saving applications. Physicians have a right to hear information about it. Their patients – particularly patients who are not plaintiffs and might benefit from being treated with Xarelto – have a vital interest in their physicians having unfettered access to this information. And Defendants have a right to convey this information.

15

In contrast, it is difficult to articulate any legitimate interest served by banning communication to doctors of truthful information about an FDA-approved prescription medication that might benefit their patients.  It does not appear that any court has ever ordered that a physician's ears be closed to information that might aid a patient out of concern for another patient's litigation interest.  To the extent any government interest would be served, it would appear to be on speculation that hearing information about Xarelto in the ordinary course of marketing might impact the opinion of a physician who might be called to testify as a witness.  To the extent the information is truthful, this would not even count as harm, let alone harm sufficiently substantial to justify prior restraint of protected speech.  Moreover, Plaintiffs will be able to explore in discovery and cross-examination at trial any communications that Plaintiffs believe affected a physician's views.

A bedrock principle of First Amendment law is that banning speech must be the last, not first resort.  *Thompson v. Western States Med. Ctr.*, 535 U.S. 357, 373 (2002).  The predicate for permitting plaintiffs' counsel to hold *ex parte* communications with plaintiffs' physicians is the assumption that plaintiffs' counsel will not abuse this access, and that vigorous cross-examination will suffice to uncover such abuse if it occurs.  Given the less restrictive alternative of reliance on cross-examination to discover the content and effect of what was said, a ban of such marketing simply cannot be justified under *Sorrell*, *Thompson* and *Central Hudson*.

**B. The Court's reasoning and parties' briefing, in this and prior MDLs, reveals that the proper focus is on communications with counsel for the parties, not the parties themselves.**

Reading the Court's Order as a whole and the parties' briefing on the issue makes clear that the intent of the Order was to govern communications between counsel and the physician, not Defendants' employees and the physician.  This is further supported by this Court's own precedent in the *Vioxx* MDL.  This Court's March 9 Order describes the *Vioxx* Order as one

16

governing *defense counsel* access to treating physicians – *see* R. Doc. 2676 at 11, citing *Vioxx* as

"finding that allowing *defense counsel* access to treating physicians" would conflict with doctor-

patient privilege. (Emphasis added). This is despite the fact that, as in the Order here, the

express language of the *Vioxx* Order restricts "defendants" from conducting *ex parte*

communications with Plaintiffs' treating physicians rather than "defense counsel." *Compare In*

*re Vioxx Products Liab. Litig.*, 230 F.R.D. 473, 477 (E.D. La. 2005) *with* R. Doc. 2676 at 18-19.

And in both cases, the parties' briefing focused on policy governing *counsel* contact with treating

physicians. *See* parties' briefing in *Vioxx* (emphasis added):

- Plaintiff's briefing on *Ex Parte* Contacts with Physicians, R. Doc. 301 in MDL 1657 at p. 9, focusing on HIPAA prohibitions against "ex parte interview of a plaintiff's doctors by defense *counsel*."

- Defendant's briefing on *Ex Parte* Contacts with Physicians, R. Doc. 300 in MDL 1657 at n.2, collecting cases where defense *counsel* was permitted ex parte contact with plaintiff's treating physicians.

*Compare* with parties' briefing in the present litigation (emphasis added):

- "To the extent that the Defendants' motion generally acknowledges that *Defense counsel* should not be permitted to have *ex parte* communications with Plaintiffs' physicians, the PSC agrees." Plaintiffs' Opposition Brief on *Ex Parte* Communications with Physicians, R. Doc. 2062 at 3.

- "If the Court does not limit plaintiffs' *ex parte* communications with doctors, it should not limit defense *counsel's ex parte* communications with doctors." Defendants' Reply Brief on *Ex Parte* Communications With Physicians, R. Doc. 2286 at p. 3.

- *See also* Defendant's Memorandum in Support of Motion for Order Regarding Ex Parte Contact with Physicians, R. Doc. 1844-1 at p. 1, requesting Order that governs *ex parte* communications between *counsel* for the parties and plaintiffs' prescribing or treating physicians.

Accordingly, Defendants respectfully submit that what was contemplated by both the parties and

the Court in the present Order is the governance of *defense counsel's ex parte* communications

with the plaintiff's treating and prescribing physicians. Plaintiffs' proposed language does

nothing to serve this purpose.

2667894-1

**C.   The policy considerations underlying restrictions on *ex parte* communications with treating physicians focus on contacts with counsel.**

Both jurisprudence and legal scholars focus the analysis of when *ex parte* contacts are permitted on contacts with ***defense counsel***, not the party itself.  *See* e.g. John Jennings, *The Physician-Patient Relationship: The Permissibility of Ex Parte Communications Between Plaintiff's Treating Physicians and Defense Counsel*, 59 Mo. L. Rev. 441, 454 (1994); J. Christopher Smith, *Recognizing the Split: The Jurisdictional Treatment of Defense Counsel's Ex Parte Contact with Plaintiff's Treating Physician*, 23 J. Legal Prof. 247, 251, 255 (1999) (citing concern about physician's lack of legal training as grounds for prohibiting *ex parte* communications with defense counsel); Scott Aripoli, *Hungry Hungry HIPAA: Has the Regulation Bitten Off More Than It Can Chew by Prohibiting Ex Parte Communication with Treating Physicians?*, 75 UMKC L. Rev. 499, 512 (2006); *see also In re Zimmer NexGen Knee Implant Products Liab. Litig.*, 890 F. Supp. at 900 (entering defendants' proposed Order governing defense counsel communications with plaintiffs' physicians); *Coutee,* 964 So. 2d at 307-08; Fallon, *Louisiana Practice Trial Handbook* § 19:12 (collecting cases where counsel engaged in *ex parte* communications with plaintiff's treating physician).

Likewise, in its March 9 Order, the Court expresses concern over preserving the doctor-patient relationship, noting that Defendants may schedule depositions, take discovery, or engage in a "strong dose of cross-examination" rather than engaging in *ex parte* communications with Plaintiffs' physicians – all actions to be undertaken by ***defense counsel*** to cure any perceived disadvantage in the litigation by the restriction on *ex parte* communications.  The Order does ***not*** address the harm caused by prohibiting company employees from communicating with physicians – such as (a) impeding Defendants' legal duty to follow up on adverse event reports, (b) barring Defendants' from answering physician questions about Xarelto, or (c) banning

18

communications related to research – because such restriction *is not intended*.  Further, such a prohibition on the Defendants' ordinary course of business would be tantamount to an injunction, which is not warranted on the present facts, and has not been briefed by the parties.  *See In re Chinese Manufactured Drywall Prods. Liab. Litig.*, 759 F. Supp. 2d 822, 853 (E.D. La. 2010), citing *Ridgely v. Fed. Emergency Mgmt. Agency*, 512 F.3d 727, 734 (5th Cir.2008) (injunctive relief is an extraordinary remedy that requires balancing of harms).  Such an order would deprive prescribing doctors of helpful training, information related to research, and product detailing.  Further, it could deny these physicians access to samples of the medicine, which are often useful to both the physicians and the patients in their care – all for the sake of ostensibly protecting the small group of patients pursuing the present litigation.   Such an outcome is contrary to public policy.  *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 300 (1981) ("Protection of the health and safety of the public is a paramount governmental interest . . . .").  Therefore, Defendants respectfully submit that the Order is intended to govern *ex parte* communications between counsel and treating or prescribing physicians, and is not intended to restrict Defendants' ability to conduct it ordinary course of business during the pendency of this litigation.

* * *

In sum, Defendants respectfully suggest that the superficially simple notification requirement in the March 9 Order will, if implemented, open a "Pandora's Box."  The Court should clarify, or reconsider and modify the notification requirement so that it is limited to those patients of prospective testifying physician-experts who have Xarelto lawsuits pending.  That notice should be given by Defense Counsel to Plaintiffs' Counsel, and then only after the October 28 deadline for disclosure of Defendants' testifying experts.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to clarify or, in the alternative to reconsider and modify, the Order.

Respectfully submitted,

KAYE SCHOLER LLP

By:  */s/ Steven Glickstein*
Steven Glickstein
William Hoffman
Andrew K. Solow
KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Telephone: (212) 836-8485
Facsimile: (212) 836-6485
sglickstein@kayescholer.com

*Co-Lead Defense Counsel*


DRINKER BIDDLE & REATH LLP

By:  */s/ Susan M. Sharko*
Susan M. Sharko
DRINKER BIDDLE & REATH LLP
*A Delaware Limited Liability Partnership*
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
Facsimile: (973) 360-9831
susan.sharko@dbr.com

*Co-Lead Defense Counsel*

2667894-1

IRWIN FRITCHIE URQUHART & MOORE LLC

By: */s/ James B. Irwin*
James B. Irwin (LA Bar #7172)
Kim E. Moore (LA Bar # 18653)
IRWIN FRITCHIE URQUHART
& MOORE LLC
400 Poydras Street
Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
Facsimile: (504) 310-2120
jirwin@irwinllc.com

*Defendants' Co-Liaison Counsel*


CHAFFE MCCALL L.L.P.

By: */s/ John F. Olinde*
John F. Olinde (LA Bar # 1515)
CHAFFE McCALL L.L.P.
1100 Poydras Street
Suite 2300
New Orleans, LA 70163
Telephone: (504) 585-7241
Facsimile: (504) 544-6084
olinde@chaffe.com

*Defendants' Co-Liaison Counsel*


## CERTIFICATE OF SERVICE

I hereby certify that on April 6, 2016, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

*/s/      John F. Olinde*

2667894-1