# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) | § | MDL NO. 14-MDL-2592 |
| PRODUCTS LIABILITY LITIGATION | § | |
| | § | SECTION L-5 |
| | § | |
| | § | JUDGE ELDON E. FALLON |
| | § | |
| | § | MAG. JUDGE NORTH |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**THIS DOCUMENT RELATES TO:**

| | | |
|---|---|---|
| ROBERT MURPHY, Individually and | § | |
| as Legal Representative of the ESTATE OF | § | |
| KATHLEEN MURPHY, deceased; SCOTT | § | |
| MURPHY; CHRISTINE MURPHY; and | § | |
| BRIAN MURPHY, | § | |
| | § | |
| *Plaintiffs*, | § | |
| v. | § | |
| | § | |
| JEROME M.  KANE, MD; RELIANT | § | |
| REHABILITATION HOSPITAL MID- | § | |
| CITIES in its Assumed or Common Name; | § | |
| RELIANT REHABILITATION HOSPITAL | § | CIVIL ACTION NO.: |
| MID-CITIES, L.P. d/b/a RELIANT | § | 2:16-cv-01066-EEF-MBN |
| REHABILITATION HOSPITAL MID- | § | |
| CITIES; JOHNSON & JOHNSON; | § | |
| JANSSEN PHARMACEUTICALS, | § | |
| INC. f/k/a JANSSEN PHARMACEUTICA, | § | |
| INC. f/k/a ORTHO-MCNEIL-JANSSEN | § | |
| PHARMACEUTICALS, INC.;  JANSSEN | § | |
| RESEARCH AND DEVELOPMENT, LLC. | § | |
| f/k/a JOHNSON & JOHNSON | § | |
| PHARMACEUTICAL RESEARCH AND | § | |
| DEVELOPMENT, LLC; JANSSEN | § | |
| ORTHO, LLC; BAYER HEALTHCARE | § | |
| PHARMACEUTICALS, INC.; BAYER | § | |
| PHARMA AG; BAYER CORPORATION; | § | |
| BAYER HEALTHCARE LLC; BAYER | § | |
| HEALTHCARE AG and BAYER | § | |
| AG, | § | |
| | § | |
| *Defendants*. | § | |

## APPENDIX FOR PLAINTIFFS' MOTION FOR REMAND
## <u>AND  BRIEF IN SUPPORT OF THEREOF</u>

**EXHIBIT**                                                              **PAGES**

A.      Plaintiffs' Original Petition                                    2-23

B.      Notice of Removal                                                25-43

C.      Defendant Jerome M. Kane, M.D.'s Motion to Transfer             45-50
        Venue and Original Answer to Plaintiffs' Original
        Petition Subject Thereto

D.      Defendant Reliant Rehabilitation Hospital Mid Cities, LP        52-54
        d/b/a Reliant Rehabilitation Hospital Mid Cities' Original Answer

E.      Plaintiffs' Service of the Expert Report and C.V. of Todd J. Swick,   56-87
        M.D., Pursuant to Chapter 74.351, TEX. CIV. PRAC. & REM CODE

# EXHIBIT A

CAUSE NO. _____

| | | |
|---|---|---|
| ROBERT MURPHY, Individually and | § | IN THE DISTRICT COURT FOR |
| as Legal Representative of the ESTATE OF | § | |
| KATHLEEN MURPHY, deceased; SCOTT | § | |
| MURPHY; CHRISTINE MURPHY; and | § | |
| BRIAN MURPHY, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | |
| | § | |
| JEROME M. KANE, MD; RELIANT | § | DALLAS COUNTY, TEXAS |
| REHABILITATION HOSPITAL MID- | § | |
| CITIES in its Assumed or Common Name; | § | |
| RELIANT REHABILITATION HOSPITAL | § | |
| MID-CITIES, L.P. d/b/a RELIANT | § | |
| REHABILITATION HOSPITAL MID- | § | |
| CITIES; JOHNSON & JOHNSON; | § | |
| JANSSEN PHARMACEUTICALS, | § | |
| INC. f/k/a JANSSEN PHARMACEUTICA, | § | |
| INC. f/k/a ORTHO-MCNEIL-JANSSEN | § | |
| PHARMACEUTICALS, INC.; JANSSEN | § | |
| RESEARCH AND DEVELOPMENT, LLC. | § | |
| f/k/a JOHNSON & JOHNSON | § | |
| PHARMACEUTICAL RESEARCH AND | § | |
| DEVELOPMENT, LLC; JANSSEN | § | |
| ORTHO, LLC; BAYER HEALTHCARE | § | |
| PHARMACEUTICALS, INC.; BAYER | § | |
| PHARMA AG; BAYER CORPORATION; | § | |
| BAYER HEALTHCARE LLC; BAYER | § | |
| HEALTHCARE AG and BAYER | § | |
| AG, | § | |
| | § | |
| *Defendants.* | § | _____ JUDICIAL DISTRICT |

## PLAINTIFFS' ORIGINAL PETITION
## & REQUEST FOR DISCLOSURE

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW Robert Murphy, Individually and as Legal Representative of the Estate of

Kathleen Murphy, Deceased, Scott Murphy, Christine Murphy and Brian Murphy, Plaintiffs herein,

and file their Original Petition complaining of Jerome M. Kane, MD; Reliant Rehabilitation Hospital Mid-Cities; Reliant Rehabilitation Hospital Mid-Cities, L.P. d/b/a Reliant Rehabilitation Hospital Mid-Cities; Johnson & Johnson; Janssen Pharmaceuticals, Inc. f/k/a Janssen Pharmaceutica, Inc. f/k/a Ortho-McNeil-Janssen Pharmaceuticals, Inc.; Janssen Research and Development, LLC. f/k/a Johnson & Johnson Pharmaceutical Research and Development, LLC; Janssen Ortho LLC; Bayer Healthcare Pharmaceuticals, Inc.; Bayer Pharma Ag; Bayer Corporation; Bayer Healthcare LLC; Bayer Healthcare AG and Bayer AG, hereinafter referred to as Defendants, and for cause of action would respectfully show this Honorable Court the following:

## I.
### PARTIES

1.1     Plaintiff ROBERT MURPHY is a natural person residing in Pottsboro, Grayson County, Texas.  Mr. Murphy is the surviving spouse of Kathleen Murphy and the independent executor of the ESTATE OF KATHLEEN MURPHY.

1.2     Plaintiff SCOTT MURPHY is a natural person residing in Boulder, Boulder County, Colorado.  He is a surviving child of Kathleen Murphy.

1.3     Plaintiff CHRISTINE MURPHY is a natural person residing in Eau Claire, Eau Claire County, Wisconsin.  She is a surviving child of Kathleen Murphy.

1.4     Plaintiff BRIAN MURPHY is a natural person residing in Grapevine, Tarrant County, Texas.  He is a surviving child of Kathleen Murphy.

1.5     Defendant JEROME M. KANE, MD is a licensed physician who resides in Keller, Tarrant County, Texas.  Dr. Kane may be served with process by delivering a Citation with a copy of this Petition attached thereto, via certified mail, return receipt requested, to his residence, 796 Maplewood Drive, Keller, Texas 76248.

**Page 2 of 22**

3

1.6     Defendant RELIANT REHABILITATION HOSPITAL MID-CITIES is the assumed or common name of hospital located at 2304 State Highway 121, Bedford, Texas 76021. RELIANT REHABILITATION HOSPITAL MID-CITIES, LP is a Texas Limited Partnership whose principal office in the United States is located at 15851 Dallas Parkway, Suite 500, Addison, Texas 75001. At all times relevant to this cause of action, Reliant Rehabilitation Hospital Mid-Cities, LP owned and/or operated a hospital using the assumed or common name Reliant Rehabilitation Hospital Mid-Cities. This Defendant may be served with process by delivering a Citation with a copy of this Petition attached thereto, via certified mail, return receipt requested, to its registered agent, Reliant Hospital Partners, LLC at 1300 Lookout Drive, Suite 115, Richardson, Texas 75082.

1.7     Defendant JOHNSON & JOHNSON (hereinafter referred to as "J&J") is a New Jersey corporation which has its principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933 and does business in the State of Texas. As part of its business, J&J, and its "family of companies," is involved in the research, development, sales, and marketing of pharmaceutical products, including Xarelto. At all times relevant hereto, Defendant J&J was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant. This Defendant may be served with process by delivering a Citation with a copy of this Petition attached thereto, via certified mail, return receipt requested, to its registered agent, S.M. Rosenberg at One Johnson & Johnson Plaza, New Brunswick, NJ 08933.

1.8     Defendant   JANSSEN   PHARMACEUTICALS,   INC.   f/k/a   JANSSEN PHARMACEUTICA INC. f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. (hereinafter referred to as "JANSSEN PHARM") is a Pennsylvania corporation, having a principal

Page 3 of 22

4

place of business in New Jersey and doing business in the State of Texas. At all times relevant hereto, Defendant JANSSEN PHARM was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant. This Defendant may be served with process by delivering a Citation with a copy of this Petition attached thereto, via certified mail, return receipt requested, to its registered agent, C.T. Corporation System, 1999 Bryant Street, Suite 900, Dallas, Texas 75201.

1.9     Defendant JANSSEN RESEARCH & DEVELOPMENT, LLC f/k/a JOHNSON AND JOHNSON RESEARCH AND DEVELOPMENT, LLC (hereinafter referred to as "JANSSEN R&D") is a limited liability company organized under the laws of New Jersey, with a principal place of business in New Jersey and doing business in the State of Texas. Defendant JANSSEN R&D's sole member is Janssen Pharmaceuticals, Inc., which is a Pennsylvania corporation with a principal place of business in New Jersey. Defendant JANSSEN R&D is the holder of the approved New Drug Application ("NDA") for Xarelto as well as the supplemental NDA. At all relevant times, Defendant JANSSEN R&D was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant. This Defendant may be served with process by delivering a Citation with a copy of this Petition attached thereto, via certified mail, return receipt requested, to its registered agent, Johnson & Johnson, One Johnson & Johnson Plaza, New Brunswick, NJ 08933.

1.10    Defendant JANSSEN ORTHO LLC (hereinafter referred to as "JANSSEN ORTHO") is a limited liability company organized under the laws of Delaware, having a principal place of business in Puerto Rico and doing business in the State of Texas. Defendant JANSSEN ORTHO is a subsidiary of Johnson & Johnson. At all relevant times, Defendant, JANSSEN ORTHO, was

Page 4 of 22

5

in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant. This Defendant may be served with process by delivering a Citation with a copy of this Petition attached thereto, via certified mail, return receipt requested, to its registered agent, The Corporation Trust Company at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

1.11   Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. is, and at all relevant times was, a corporation organized under the laws of the State of Delaware, having a principal place of business in New Jersey and doing business in the State of Texas. Defendant manufactures, markets and/or sells products in the State of Texas including Dallas County, Texas. At all relevant times, Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant. This Defendant may be served with process by delivering a Citation with a copy of this Petition attached thereto, via certified mail, return receipt requested, to its registered agent for service, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Co., at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

1.12   Upon information and belief, Defendant BAYER PHARMA AG is a pharmaceutical company domiciled in Germany. Defendant BAYER PHARMA AG is formerly known as Bayer Schering Pharma AG and is the same corporate entity as Bayer Schering Pharma AG. Bayer Schering Pharma AG was formerly known as Schering AG and is the same corporate entity as Schering AG. Upon information and belief, Schering AG was renamed Bayer Schering Pharma AG effective December 29, 2006. Upon information and belief, Bayer Schering Pharma AG was renamed BAYER PHARMA AG effective July 1, 2011. At all relevant times, Defendant BAYER

Page 5 of 22

PHARMA AG was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant. This Defendant may be served with process by delivering a Citation with a copy of this Petition attached thereto, via certified or registered mail, return receipt requested, to its Chief Executive Officer, Andreas Fibig, at Mullerstrasse 178, Berlin 13353, Germany.

    1.13   Defendant BAYER CORPORATION is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205 which was doing business in the State of Texas. BAYER HEALTHCARE PHARMACEUTICALS, INC. is owned by Defendant BAYER CORPORATION. At all relevant times, Defendant BAYER CORPORATION was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant. This Defendant may be served with process by delivering a Citation with a copy of this Petition attached thereto, via certified mail, return receipt requested, to its registered agent for service, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Co., at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

    1.14.   Defendant BAYER HEALTHCARE LLC is a limited liability company duly formed and existing under and by the virtue of the laws of the State of Delaware and doing business in the Sate of Texas. BAYER HEALTHCARE LLC's sole member is Bayer Corporation, and is wholly owned by Bayer Corporation, which is an Indiana corporation. At all relevant times, Defendant BAYER HEALTHCARE LLC was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant. Defendant may be served with process by delivering a Citation with a copy of this Petition attached thereto, via certified mail, return receipt requested, to its registered agent for service, Corporation Service

Page 6 of 22

Company d/b/a CSC-Lawyers Incorporating Service Co., at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

1.15   Defendant BAYER HEALTHCARE AG is a company domiciled in Germany and is the parent/holding company of Defendants BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC, and BAYER PHARMA AG. Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG exercises control over Defendants BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC., and BAYER PHARMA AG. At all times relevant, BAYER HEALTHCARE AG was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant. Defendant may be served with process by delivering a Citation with a copy of this Petition attached thereto, via certified or registered mail, return receipt requested, to the Chairman of its Management Board, Werner Baumann at CHEMPARK Leverkusen, Zentraler Besucherempfang, Kaiser-Wilhelm-Allee, D-51368, Leverkusen, North Rhine-Westphalia Germany.

1.16   Defendant BAYER AG is a company that is domiciled and headquartered in Germany. At all times relevant, BAYER AG was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant. Defendant may be served with process by delivering a Citation with a copy of this Petition attached thereto, via certified or registered mail, return receipt requested, to the Chief Executive Officer, Marijin Dekkers at Building W 11, Leverkusen 51368, North Rhine, Westpahila, Germany.

1.17   Defendants Johnson & Johnson, Janssen Pharmaceuticals, Inc., Janssen Research & Development, LLC, Janssen Ortho LLC, Bayer Healthcare Pharmaceuticals, Inc., Bayer Pharma AG,

Bayer Corporation, Bayer Healthcare LLC, Bayer Healthcare AG, and Bayer AG, shall be referred to herein individually by name or jointly as the "Product Defendants."

1.18    At all times alleged herein, the Product Defendants include and included any and all parents, subsidiaries, affiliates, divisions, franchises, partners, joint venturers, and organizational units of any kind, their predecessors, successors and assigns and their officers, directors, employees, agents, representatives and any and all other persons acting on their behalf.

1.19    At all times herein mentioned, each of the Product Defendants were the agent, servant, partner, predecessors in interest, and joint venturer of each other and were at all times operating and acting with the purpose and scope of said agency, service, employment, partnership, joint enterprise and/or joint venture.

1.20    At all times relevant to this cause of action, all of the Product Defendants were conducting, and continue to conduct, business throughout the United States including the State of Texas. At all times relevant to this cause of action, each of the Product Defendants maintained, and continue to maintain, significant, systematic and continuous contacts throughout the State of Texas as the Product Defendants manufacture, market and/or sell products in the State of Texas including Dallas County, Texas. As part of their business, each of the Product Defendants are involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban. All of the Product Defendants have transacted and conducted business in the State of Texas.

1.21 Upon information and belief, all of the Product Defendants have derived substantial revenue from goods and products used in the State of Texas.

1.22    Upon information and belief, each and all of Product Defendants expected or should

Page 8 of 22

have expected its acts to have consequence within the United States of America and the State of Texas, and derived substantial revenue from interstate commerce within the United States and the State of Texas, more particularly.

## II.
### DISCOVERY CONTROL PLAN

2.1     Discovery in this matter is intended to be conducted under Level 3 of the Texas Rules of Civil Procedure.

## III.
### NOTICE

3.1     On October 14, 2014, the Plaintiffs' counsel mailed the Defendants, Jerome M. Kane, MD and Reliant Rehabilitation Hospital Mid-Cities, LP d/b/a Reliant Rehabilitation Hospital Mid-Cities, formal notice under § 74.051 of the Civil Practice and Remedies Code that Plaintiff intended to assert a health care liability claim arising out of the medical care rendered to Kathleen Murphy.

## IV.
### JURISDICTION, VENUE & TEXAS MEDICAL
### LIABILITY AND INSURANCE IMPROVEMENT ACT

4.1     Venue is proper as management of Defendant Reliant Rehabilitation Hospital Mid-Cities, LP maintains its principal place of business in Addison, Dallas County, Texas.  Since the decision makers for the Defendant corporation conduct the daily affairs of the organization from their office in Dallas County, Texas, jurisdiction is proper in this county.  The damages sought are within the jurisdictional limits of this Court.

4.2     The Plaintiffs aver and object that the non-economic, punitive and other damage limitation provisions contained in Chapter 74 and other provisions of the Texas Civil Practice & Remedies Code are unconstitutional under the United States Constitution and/or the Constitution of

Page 9 of 22

10

the State of Texas.

## V.
### FACTS

5.1     In September of 2013, Kathleen Murphy had a diagnosis of normal pressure hydrocephalus which was treated by the placement of an intracranial, intradural shunt.   On September 26, 2013, an occiptal ventriculopleural shunt was surgically placed in her skull.   On September 28, 2013, Mrs. Murphy was transferred to Reliant Rehabilitation Hospital Mid-Cities placed under the care of Jerome M. Kane, MD.   She was admitted for inpatient rehabilitation.   At the time of her admission, her blood pressure was 130/75, pulse was 80 and respirations 16.   Dr. Kane stated Mrs. Murphy was alert, cooperative and was an excellent candidate for rehabilitation. He noted she was very motivated, and that she should do well with therapy.

5.2     At the time of her admission to Reliant Rehabilitation Hospital Mid-Cities, Dr. Kane ordered that Mrs. Murphy be administered Xarelto 10mg once per day according to the standing order for DVT prophylaxis.   Mrs. Murphy received her first dose of Xarelto at 7:09 p.m. on September 29, 2013 and the medication was administered once per day until her discharge on October 3, 2013.

5.3     Mrs. Murphy's condition was noted to be improving until shortly after midnight on October 3, 2013.   At that time, she became nauseous and began vomiting.   As the day progressed, she became increasing confused and lethargic.   Paramedics were called and Mrs. Murphy was taken by ambulance to the emergency department at Texas Health Harris Methodist Hospital Fort Worth. A CT scan revealed that she had suffered a large, acute intraventricular hemorrhage with additional parenchymal hemorrhage surrounding the right occipital jejunostomy catheter.   The health care providers at Texas Health Harris Methodist Hospital Fort Worth were not initially aware that the

**Page 10 of 22**

11

rehabilitation center had placed her on Xarelto and subsequently openly questioned why that medication had been ordered for her care. Kathleen Murphy died on October 18, 2013 from hypoxic respiratory failure related to her intracranial hemorrhage.

5.4     Xarelto was introduced in the United States ("U.S.") on July 1, 2011, and is part of a class of drugs called New Oral Anticoagulants ("NOACs"). This class of NOACs, which also includes Pradaxa and Eliquis, is marketed as the next generation of blood-thinning drugs to replace warfarin (Coumadin); an established safe treatment for preventing stroke and systemic embolism for the past 60 years. Xarelto is an anticoagulant that acts as a Factor Xa inhibitor, and is available by prescription in oral tablet doses of 20mg, 15mg, and 10mg.

5.5     The use of Xarelto can cause major, life-threatening bleeding events. Importantly, Xarelto's significant risk of severe, and sometimes fatal, internal bleeding has no antidote to reverse its effects, unlike warfarin. Therefore, in the event of hemorrhagic complications, such as that suffered by Kathleen Murphy, there is no available reversal agent.

5.6     The FDA's adverse event data indicates staggering, serious adverse events that have been associated with Xarelto. In the year leading up to June 30, 2012, there were 1,080 Xarelto-associated "Serious Adverse Event" ("SAE") Medwatch reports filed with the FDA, including at least 65 deaths. Of the reported hemorrhage events associated with Xarelto, 8% resulted in death, which was approximately twofold the risk of a hemorrhage-related death with warfarin. At the close of the 2012 fiscal year, a total of 2,081 new Xarelto-associated SAE reports were filed with the FDA, its first full year on the market, ranking tenth among other pharmaceuticals in direct reports to the FDA. Of those reported events, 151 resulted in death.

## VI.
### CAUSE OF ACTION AGAINST JEROME M. KANE, MD - NEGLIGENCE

6.1     The negligence of Defendant Jerome M. Kane MD was a proximate cause of the injuries suffered by Kathleen Murphy, her untimely death and the resulting damages sustained by the Plaintiffs as described in this pleading.

6.2     At all times material, Defendant Kane violated the duty owed to Kathleen Murphy to exercise the ordinary care and diligence exercised by other healthcare providers in the same or similar circumstances. The breach of duty by Defendant Kane and/or his agents, employees, nursing staff, aides, health care providers, and/or representatives constitutes negligence which, taken separately and collectively, was a direct and proximate cause of Kathleen Murphy's injuries, untimely death and damages suffered by all Plaintiffs, herein.

6.3     Defendant Kane departed from the accepted standard of medical care in the following respects, among others:

(A)     prescribing Xarelto to Kathleen Murphy;

(B)     failing to accurately assess Kathleen Murphy's condition and create a proper medical care plan to meet her needs; and

(C)     failing to implement a proper care plan for Kathleen Murphy.

6.4     Plaintiffs would further show that the above actions and/or omissions constitute negligence on the part of the Defendant and that such negligence was a proximate cause of the injuries suffered by Kathleen Murphy, her untimely death and the damages resulting therefrom.

## VII.
### CAUSE OF ACTION AGAINST RELIANT REHABILITATION HOSPITAL MID-CITIES AND RELIANT REHABILITATION HOSPITAL MID-CITIES, LP d/b/a RELIANT REHABILITATION HOSPITAL MID-CITIES - NEGLIGENCE

7.1     The negligence of Defendants Reliant Rehabilitation Hospital Mid-Cities and Reliant

**Page 12 of 22**

Rehabilitation Hospital Mid-Cities, L.P. d/b/a Reliant Rehabilitation Hospital Mid-Cities (hereinafter referred to as the "Hospital Defendants") was a proximate cause of the injuries suffered by Kathleen Murphy, her untimely death and the resulting damages sustained by the Plaintiffs as described in this pleading.

7.2     At all times material, the Hospital Defendants violated the duty owed to Kathleen Murphy to exercise the ordinary care and diligence exercised by other healthcare providers in the same or similar circumstances. The breach of duty by the Hospital Defendants and/or their agents, officers, employees, nursing staff, aides, technicians, pharmacists, health care providers and/or representatives constitutes negligence which, taken separately and collectively, was a direct and proximate cause of Kathleen Murphy's injuries, untimely death and damages suffered by all Plaintiffs, herein.

7.3     The Hospital Defendants departed from the accepted standard of medical care in the following respects, among others:

(A)     utilizing Xarelto as part of a standard protocol for a prophylactic anti-coagulation to prevent the development of DVTs in all post-surgery patients;

(B)     administering Xarelto to Kathleen Murphy;

(C)     failing to implement a proper care plan for Kathleen Murphy; and,

(D)     failing to challenge Dr. Kane's order to administer Xarelto to Kathleen Murphy.

7.4     Plaintiffs would further show that the above actions and/or omissions constitute negligence on the part of the Hospital Defendants and that such negligence was a proximate cause of the injuries suffered by Kathleen Murphy, her untimely death and the damages resulting therefrom.

7.5     The Hospital Defendants are responsible for the negligent acts and/or omissions of

Page 13 of 22

14

their agents, officers, employees, nursing staff, aides, technicians, pharmacists and/or representatives who treated or cared for Kathleen Murphy which were a proximate cause of her injury, untimely death and the damages described herein under the theory of *respondeat superior*, apparent/ostensible agency, vice-principals, non-delegable duties, and ratification as those concepts are understood under Texas law.

## VIII.
### CAUSES OF ACTION AGAINST THE PRODUCT DEFENDANTS: JOHNSON & JOHNSON; JANSSEN RESEARCH AND DEVELOPMENT, LLC. F/K/A JOHNSON & JOHNSON PHARMACEUTICAL RESEARCH AND DEVELOPMENT, LLC; JANSSEN PHARMACEUTICALS, INC. F/K/A JANSSEN ORTHO, LLC; JANSSEN PHARMACEUTICA, INC. F/K/A ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC.; BAYER HEALTHCARE PHARMACEUTICALS, INC.; BAYER PHARMA AG; BAYER CORPORATION; BAYER HEALTHCARE, LLC; BAYER HEALTHCARE AG AND BAYER AG

### Strict Product Liability

8.1     It was entirely foreseeable and well-known to the Product Defendants that incidents involving Xarelto such as occurred herein would on occasion take place in the ordinary, anticipated and intended use of said anticoagulant.

8.2     The Product Defendants defectively designed, manufactured, assembled and marketed Xarelto and so are strictly liable for the Plaintiffs' damages.

8.3     Further, Xarelto is defective because the Product Defendants failed to provide adequate warnings and/or instructions regarding the defective conditions and/or the proper use of the drug.

### Breach of Implied Warranty

8.4     The Product Defendants breached the implied warranties of merchantability and fitness for a particular purpose, and so are liable to the Plaintiffs for violations of the Texas Business and Commerce Code §§ 2.314 and 2.315.

### Negligence

8.5     The negligence of the Product Defendants was a proximate cause of the injuries suffered by Kathleen Murphy, her untimely death and the resulting damages sustained by the Plaintiffs as described in this pleading.

8.6     The Product Defendants were negligent in the design, manufacture, assembly and marketing of Xarelto.

### Negligent Misrepresentation

8.7     From the time Xarelto was first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed, and up to the present, the Product Defendants made negligent misrepresentations to Plaintiffs, Plaintiffs' physicians and the general public, including but not limited to the misrepresentation that Xarelto was safe, fit and effective for human use. At all times mentioned, the Product Defendants conducted sales and marketing campaigns to promote the sale of Xarelto and deceived Plaintiffs, Plaintiffs' physicians and the general public as to the health risks and consequences of the use of Xarelto. The Product Defendants made the foregoing representations without any reasonable ground for believing them to be true. These representations were made directly by the Product Defendants, by sales representatives and other authorized agents of the Product Defendants, and in publications and other written materials directed to physicians, medical patients and the public, with the intention of inducing reliance and the prescription, purchase, and use of Xarelto. The representations by the Product Defendants were, in fact, false, in that Xarelto is not safe, fit and effective for human consumption as labeled, using Xarelto is hazardous to your health, and Xarelto has a serious propensity to cause serious injuries to users, including but not limited to the injuries suffered by Plaintiffs.

8.8     The foregoing negligent representations by Product Defendants, and each of them, were made with the intention of inducing the prescription, purchase, and use of Xarelto. If Kathleen Murphy, her physicians and healthcare providers had known the truth and the facts concealed by the Product Defendants, neither Mrs. Murphy nor her physicians and healthcare providers would have used Xarelto. The Product Defendants' misrepresentations were made and conducted by individuals and entities that were in a position to know all of the facts.

8.9     Prior to Kathleen Murphy's use of Xarelto and during the period in which she actually used Xarelto, the Product Defendants suppressed material information regarding the safety and efficacy of Xarelto, including information regarding increased adverse events, pre and post marketing deaths, and the high number of severe adverse event reports compared to other anticoagulants. Furthermore, The Product Defendants fraudulently concealed the safety information about the use of Xarelto. Xarelto has several well-known serious side-effects that are not seen in other anticoagulants.

8.10     These representations were made by said Product Defendants with the intent of inducing the public in general, and the medical and healthcare community in particular, to recommend, prescribe, dispense and/or purchase said product, Xarelto. At the time the aforesaid representations were made by the Product Defendants and, at the time Kathleen Murphy used Xarelto, she was unaware of the falsity of said representations and reasonably believed them to be true. In reliance upon said representations, Kathleen Murphy was induced to and did use Xarelto, thereby sustaining fatal personal injuries.

**Fraud**

8.11     The Product Defendants knew or should have known that Xarelto had a potential to,

Page 16 of 22

could, and would cause severe and grievous injury to the users of said product, and that it was inherently dangerous in a manner that exceeded any purported, inaccurate, and/or down-played warnings. The Product Defendants brought Xarelto to the market, and acted fraudulently to the detriment of the Plaintiffs.

8.12    At the time the Product Defendants concealed the fact that Xarelto was not safe, the Product Defendants were under a duty to communicate this information to Plaintiffs, physicians, the FDA, the healthcare community, and the general public in such a manner that they could appreciate the risks associated with using Xarelto. The Product Defendants, at all times relevant hereto, withheld information from the FDA which they were required to report.

8.13    Kathleen Murphy and her prescribing physicians relied upon the Product Defendants' outrageous untruths regarding the safety of Xarelto. Kathleen Murphy's prescribing physicians were not provided with the necessary information by the Product Defendants, to provide an adequate warning to the Plaintiffs.

8.14    As a direct and proximate result of Product Defendants' concealment of material life-altering information from Kathleen Murphy, her prescribing physicians and the Plaintiffs, the Product Defendants caused or contributed to Kathleen Murphy's death and the Plaintiffs' damages.

8.15    The Product Defendants had a duty to disclose material information about serious side-effects to consumers such as Kathleen Murphy, Kathleen Murphy's physicians and the Plaintiffs. The Plaintiffs aver that the Product Defendants fraudulently concealed information in Product Defendants' exclusive possession regarding the hazards associated with Xarelto, for the purpose of preventing consumers, such as Plaintiffs, from discovering these hazards. Additionally, by virtue of the Product Defendants' partial disclosures about the medication, in which the Product

Page 17 of 22

Defendants touted Xarelto as a safe and effective medication, the Product Defendants had a duty to disclose all facts about the risks associated with use of the medication, including the risks of increased potential for bleed and the lack of an effective counter-agent or antidote to help control such bleeding as described in this Petition. The Product Defendants intentionally failed to disclose this information for the purpose of inducing consumers, such as Kathleen Murphy and her physicians, to purchase Defendants' dangerous product.

8.16    Had Kathleen Murphy, her physicians and the Plaintiffs been aware of the hazards associated with Xarelto, Mrs. Murphy would not have consumed the product that led proximately to her death and the Plaintiffs' damages.

8.17    At all times relevant herein, Plaintiffs will show that the Product Defendants were acting through employees or agents who were within the course and scope of their employment or agency for one or more of the Product Defendants. The Product Defendants are, therefore, equally liable under the doctrine of *Respondeat Superior* and/or principles of agency for all of actions of its employees or agents.

8.18    The Product Defendants' acts and/or omissions were, separately and collectively with the acts and omissions of other Defendants named herein, a producing and/or proximate cause of the Plaintiffs' damages.

### IX.
### DAMAGES

9.1    Plaintiff Robert W. Murphy, Individually and as Legal representative of the Estate of Kathleen Murphy, Deceased; Scott Murphy; Christine Murphy and Brian Murphy bring this action pursuant to the Texas Wrongful Death Statute, Section 71.002 of the Texas Civil Practice & Remedies Code, and seek compensation for the following damages:

## A. Robert Murphy

9.2.     Kathleen Murphy was a loving and supportive wife to Robert Murphy and as a result

of her wrongful and untimely death he has suffered the following injuries and damages:

a.      The loss of his wife's companionship and society which includes the loss of the positive benefits flowing from the love, comfort, companionship and society that Robert Murphy in reasonable probability would have received from Kathleen Murphy had she lived;

b.      Grief, mental anguish, emotional pain, torment and suffering which Robert Murphy experienced because of the death of his wife, Kathleen Murphy;

c.      Pecuniary loss sustained by Robert Murphy as a result of the death of Kathleen Murphy meaning the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value, that Robert Murphy, in reasonable probability, would have received from Kathleen Murphy had she lived.

## B. Scott Murphy

9.3.     Kathleen Murphy was a loving and supportive mother to Scott Murphy and as a result

of her wrongful and untimely death he has suffered the following injuries and damages:

a.      The loss of his mother's companionship and society which includes the loss of the positive benefits flowing from the love, comfort, companionship and society that Scott Murphy in reasonable probability would have received from Kathleen Murphy had she lived;

b.      Grief, mental anguish, emotional pain, torment and suffering which Scott Murphy experienced because of the death of his mother, Kathleen Murphy;

c.      Pecuniary loss sustained by Scott Murphy as a result of the death of Kathleen Murphy, meaning the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value, that Scott Murphy, in reasonable probability, would have received from Kathleen Murphy had she lived.

## C. Christine Murphy

9.4.     Kathleen Murphy was a loving and supportive mother to Christine Murphy and as a

result of her wrongful and untimely death she has suffered the following injuries and damages:

Page 19 of 22

20

a.   The loss of her mother's companionship and society which includes the loss of the positive benefits flowing from the love, comfort, companionship and society that Christine Murphy in reasonable probability would have received from Kathleen Murphy had she lived;

b.   Grief, mental anguish, emotional pain, torment and suffering which Christine Murphy experienced because of the death of her mother, Kathleen Murphy;

c.   Pecuniary loss sustained by Christine Murphy as a result of the death of Kathleen Murphy, meaning the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value, that Christine Murphy, in reasonable probability, would have received from Kathleen Murphy had she lived.

**D. Brian Murphy**

9.5.   Kathleen Murphy was a loving and supportive mother to Brian Murphy and as a result of her wrongful and untimely death he has suffered the following injuries and damages:

a.   The loss of his mother's companionship and society which includes the loss of the positive benefits flowing from the love, comfort, companionship and society that Brian Murphy in reasonable probability would have received from Kathleen Murphy had she lived;

b.   Grief, mental anguish, emotional pain, torment and suffering which Brian Murphy experienced because of the death of his mother, Kathleen Murphy;

c.   Pecuniary loss sustained by Brian Murphy as a result of the death of Kathleen Murphy, meaning the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value, that Brian Murphy, in reasonable probability, would have received from Kathleen Murphy had she lived.

**E. Estate of Kathleen Murphy**

9.6   This action is also brought by the Plaintiffs on behalf of the Estate of Kathleen Murphy, Deceased, pursuant to the Texas Survival Statute, Section 71.021 of the Texas Civil Practice & Remedies Code, for the following injuries and damages:

a.   The conscious pain, suffering and agony of Kathleen Murphy prior to her death;

b.   The reasonable expense of the necessary medical and hospital care received by Kathleen Murphy for treatment of the injuries sustained as a result of the occurrence

Page 20 of 22

21

in question; and,

c.    The reasonable amount of expenses for the funeral and burial of Kathleen Murphy as were reasonably suited to her station in life.

9.7    Plaintiffs, therefore, seek compensation from the Court and jury for their actual damages, in an amount to be determined by the jury.

## X.
### EXEMPLARY DAMAGES

10.1    The actions of the Product Defendants when viewed objectively involved an extreme degree of risk, considering the probability and magnitude of potential harm to Kathleen Murphy and the Product Defendants had actual, subjective awareness of the risk, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of the Plaintiffs herein, and as such constitute gross negligence (malice) as the term is defined by Texas law and, therefore, Plaintiffs are entitled to exemplary damages.

## XI.
### RULE 47 STATEMENT

11.1    As required by Texas Rule of Civil Procedure 47(c), Plaintiffs' counsel states that Plaintiffs seek monetary relief over $1,000,000.00; however, the Plaintiffs recognize and appreciate that the amount of monetary relief actually awarded will ultimately be determined by the jury.

## XII.
### CLAIM FOR INTEREST

12.1    The Plaintiffs seek pre-judgment and post-judgment interest in accordance with the maximum legal interest rates allowable as interpreted under the laws of the State of Texas.

## XIII.
### INTENT TO USE DEFENDANTS' DOCUMENTS

13.1    Any document produced by each and every Defendant in response to written

**Page 21 of 22**

discovery will be used by Plaintiffs at any pretrial proceeding, hearing, or trial.

## XIV.
### REQUEST FOR DISCLOSURE

14.1    Pursuant to Rule 194 of the Texas Rules of Civil Procedure, each Defendant is

requested to disclose, within (50) days of service of this request, the information, or material

described in Rule 194.2(a)-(1).

## XV.
### JURY DEMAND

15.1    The Plaintiffs request that a jury be convened to try the factual issues in this cause.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs demand judgment against the

Defendants in an amount well in excess of the minimum jurisdictional amount of this Court, plus

prejudgment and post-judgment interest, costs of Court, and such further relief, general and special,

both at law or in equity, to which Plaintiffs may show themselves justly entitled.

Respectfully submitted,

**LAW OFFICES OF BEN C. MARTIN**

*/s/ Ben C. Martin*
Ben C. Martin
State Bar No. 13052400
Thomas Wm. Arbon
State Bar No. 01284275
Jacob A. Boyd
State Bar No. 24090004
3219 McKinney Avenue, Suite 100
Dallas, Texas 75204
(214) 761-6614
(214) 744-7590 (facsimile)
bmartin@bencmartin.com
tarbon@bencmartin.com
jboyd@bencmartin.com

**ATTORNEYS FOR PLAINTIFFS**

Page 22 of 22

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| ROBERT MURPHY, *et al.*, | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) CASE NO: _____ |
| JANSSEN RESEARCH & DEVELOPMENT | ) |
| LLC, *et al.*, | ) |
| | ) |
|     Defendants. | ) |
| | ) |

### NOTICE OF REMOVAL

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Defendants Bayer HealthCare Pharmaceuticals Inc., Bayer HealthCare LLC, Bayer Corporation, Janssen Research & Development, LLC, Janssen Ortho LLC, Janssen Pharmaceuticals, Inc., and Johnson and Johnson, (collectively "Removing Defendants"), pursuant to 28 U.S.C. §§ 1441 and 1446, file this Notice of Removal of this action from the District Court for Dallas County, Texas, 68th Judicial District, where it is currently pending, to the United States District Court for the Northern District of Texas, Dallas Division. As is addressed below, this Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity among all properly joined and served parties, and it is plain from the face of the Complaint that the Plaintiffs demand more than $75,000 for their alleged injuries. Petition ¶ 11.1 (included in Exhibit C). In support of this removal, Removing Defendants state as follows:

### INTRODUCTION

1.    Plaintiffs Robert Murphy, proceeding individually and as representative of the Estate of Kathleen Murphy, Scott Murphy, Christine Murphy, and Brian Murphy (collectively

"Plaintiffs"), initiated this action on September 24, 2015 by filing this Complaint in the District Court for Dallas County, Texas.  Plaintiffs filed suit against Bayer HealthCare Pharmaceuticals Inc., Bayer HealthCare LLC, Bayer Corporation, Bayer Pharma AG, Bayer HealthCare AG, Bayer AG, Janssen Research & Development, LLC, Janssen Ortho LLC, Janssen Pharmaceuticals, Inc., Johnson & Johnson, Jerome M. Kane, MD (hereinafter "Dr. Kane"), and Reliant Rehabilitation Hospital Mid-Cities (hereinafter "Reliant").   The state-court action is Cause No. DC-15-11796.  Copies of all pleadings, processes, and orders in the state-court action are attached hereto as Exhibit C.  Plaintiffs' Complaint alleges that Decedent Kathleen Murphy suffered a fatal intracranial hemorrhage as a result of her ingestion of the prescription drug Xarelto® manufactured or districted by some of the Defendants.   Ex. C, Complaint ¶ 5.3. Removing Defendants deny Plaintiffs' Allegations.

　　　　2.　　　　Plaintiffs' petition alleges product liability claims against the pharmaceutical defendants and purported medical malpractice claims against Dr. Kane and Reliant.

　　　　3.　　　　This is one of many product-liability lawsuits filed in federal and state courts around the country concerning Xarelto, a pharmaceutical product used to reduce the risk of stroke in patients with nonvalvular atrial fibrillation, treat deep vein thrombosis and pulmonary embolism, reduce the risk of recurrence of deep vein thrombosis and pulmonary embolism, and prevent blood clots following hip- and knee-replacement surgery.  On December 12, 2014, the Judicial Panel on Multidistrict Litigation concluded that centralization in a single federal-court forum was appropriate for these claims and issued an order establishing MDL Proceeding No. 2592, captioned *In re: Xarelto (Rivaroxaban) Products Liability Litigation*, in the Eastern District of Louisiana.  The MDL is for federal actions involving "allegations that plaintiffs suffered severe bleeding or other injuries as a result of taking Xarelto." JPML Transfer Order at

2

3 (Attached as Exhibit E). There are now more than 3000 cases pending in MDL NO. 2592. Removing Defendants will seek the inclusion of this action in the MDL and request that the action be stayed pending transfer by the JPML. *See, e.g., Barba v. Janssen Research & Dev.*, No. 8:15-cv-01548-JCG (C.D. Calif. Oct. 27, 2015), Doc. 17 (attached as Exhibit F) (staying the case and deferring ruling on remand motion pending decision on MDL transfer finding that stay "would serve the 'interests of judicial economy and efficiency'"); *Nash v. Janssen Research & Dev.*, No. 2:15-cv-03868-AB-E (C.D. Cal. June 4, 2015), Doc. 19 (Attached as Exhibit G) (staying the case rather than ruling on a motion to remand because "the Court thinks it appropriate to defer decision of the remand issue to the MDL judge, who will likely be fielding countless similar arguments of fraudulent joinder"); *see also* Transfer Order, MDL No. 2592, Doc. 447 (J.P.M.L. Aug. 10, 2015) (attached as Exhibit H) (transferring two Xarelto cases presenting questions of the improper joinder of parties to the MDL over the plaintiffs' objections).

4.     This Court has subject matter jurisdiction over this action because Dr. Kane and Reliant are improperly joined in an effort to manipulate federal subject-matter jurisdiction and prevent Removing Defendants from exercising their right to remove this action. As such, the claims against those defendants should be dismissed or severed pursuant to FRCP 21 and ignored for the purposes of the subject-matter jurisdiction analysis. *See, e.g., Smallwood v. Illinois Cent. R. Co.*, 385 F.3d 568, 573 (5th Cir. 2004).

5.     Once the Court severs the claims against Dr. Kane and Reliant there is complete diversity among the remaining parties, and it is clear that each of the plaintiffs seeks more than $75,000. *See* Petition ¶ 11.1. Accordingly, this Court has jurisdiction over all of the claims properly joined in this lawsuit.

3

## GROUNDS FOR REMOVAL

6.     This action may be removed under 28 U.S.C. § 1441(a) because this Court has original jurisdiction over this action under 28 U.S.C. §§ 1332(a)(1) and 1332(a)(2).  There is complete diversity of citizenship between all properly joined and served parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

## I.     Removing Defendants Have Satisfied The Procedural Requirements For Removal.

7.     Removal is timely because less than 30 days have passed since service of the Summons and Complaint on Removing Defendants.  *See* Returns of Service (included in Exhibit C).  Plaintiffs served Janssen Pharmaceuticals, Inc. of October 6, 2015.  Plaintiffs served Bayer Corporation and Bayer HealthCare Pharmaceuticals Inc. on October 8, 2015.  Plaintiffs served Bayer HealthCare LLC on October 9, 2015.  Plaintiffs served Johnson & Johnson and Janssen Research & Development, LLC on October 13, 2015.

8.     Pursuant to Local Rule 81, Removing Defendants are including an Index of Matters Being Filed as Exhibit D to this Notice. Removing Defendants are also including a Civil Cover Sheet and a Supplemental Civil Cover Sheet, both of which are being filed contemporaneously with this Notice.

9.     Defendants Bayer AG, Bayer HealthCare AG, and Bayer Pharma AG have not been served with process in this action and therefore their consent is not required.  28 U.S.C. § 1446(a)

10.     Because Dr. Kane and Reliant have been fraudulently joined, their consent to this removal is not required.  28 U.S.C. § 1441; *Ross v. CitiFinancial*, 344 F.3d 458, 462 (5th Cir. 2003).

4

11.     Pursuant to 28 U.S.C. § 1446(a) and Local Rule 81.1, copies of all state-court pleadings, including the Petition, are attached hereto as Exhibit C. The 68th District Court's Docket Sheet is also attached hereto as Exhibit B.

12.     A Notice of Related Case is attached as Exhibit A. In accordance with the Local Rule 3.1(c), Removing Defendants will file Certificates of Interested Parties immediately following the filing of this Notice of Removal.

13.     The United States District Court for the Northern District of Texas is within the county in which the state court action was pending and thus this Court is a proper forum for this action pursuant to 28 U.S.C. § 124(a) and 1441(a).

14.     No properly joined and served defendant is a citizen of the State of Texas, the State where this action was brought. *See* 28 U.S.C. § 1441(b).

15.     No previous application has been made for the relief requested herein.

16.     Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served on Plaintiffs' counsel and a copy is being filed with the Clerk of the Court for the District of Dallas County, Texas.

17.     If any question arises regarding the propriety of the removal of this action, the Removing Defendants respectfully request the opportunity to present a brief and oral argument in support of the position that this case is removable.

II.     <u>Removal Is Proper Because This Court Has Subject Matter Jurisdiction Pursuant To 28 U.S.C. §§ 1332 And 1441.</u>

18.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1441 because this is a civil action in which there is complete diversity of citizenship between all properly joined parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

**A.     There Is Complete Diversity Of Citizenship Between All Properly Joined And Served Parties.**

19.     At the time Plaintiffs commenced this civil action, and at all times since, Defendant Janssen Research & Development, LLC was and is a limited liability company whose sole member is (and was when the Petition was filed) Centocor Research & Development, Inc., a Pennsylvania corporation with its principal place of business in Pennsylvania.  Accordingly, Janssen Research & Development, LLC is a citizen of Pennsylvania for the purposes of diversity jurisdiction.  *See Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1080 (5th Cir. 2008) (holding that the citizenship of a limited liability company is determined by the citizenship of its members).

20.     At the time Plaintiffs commenced this civil action, and at all times since, Defendant Janssen Ortho, LLC was and is a limited liability company whose sole member is (and was when the Petition was filed) OMJ PR Holdings, a corporation incorporated in Ireland with a principal place of business in Puerto Rico.  Accordingly, Janssen Ortho, LLC is a citizen of Ireland and Puerto Rico for the purposes of diversity jurisdiction.  *See id., see also* 28 U.S.C. § 1332(c) (for the purposes of determining citizenship, "a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business."); *see also* 28 U.S.C. § 1332(e) (the word "States" as used in § 1332 includes the Commonwealth of Puerto Rico).

21.     At the time Plaintiffs commenced this civil action, and at all times since, Defendant Janssen Pharmaceuticals, Inc. was and is a Pennsylvania corporation with its principal place of business in New Jersey.  Accordingly, Janssen Pharmaceuticals, Inc. is a citizen of Pennsylvania and New Jersey for the purposes of diversity jurisdiction.  *See* 28 U.S.C. § 1332(c).

22.     At the time Plaintiffs commenced this civil action, and at all times since, Defendant Johnson & Johnson is, and was a New Jersey corporation which has its principal place of business in New Jersey. Accordingly, Johnson & Johnson is a citizen of New Jersey for purposes of diversity jurisdiction. *See id.*

23.     At the time Plaintiffs commenced this civil action, and at all times since, Defendant Bayer HealthCare Pharmaceuticals Inc. was and is a Delaware corporation with its principal place of business in New Jersey. Accordingly, Bayer Healthcare Pharmaceuticals Inc. is, and was when the Petition was filed, a citizen of Delaware and New Jersey for the purposes of diversity jurisdiction. *See id.*

24.     At the time Plaintiffs commenced this civil action, and at all times since, Defendant Bayer Corporation was and is an Indiana corporation with its principal place of business in Pennsylvania. Accordingly, Bayer Corporation is, and was when the Petition was filed, a citizen of Indiana and Pennsylvania for the purposes of diversity jurisdiction. *See id.*

25.     At the time Plaintiffs commenced this civil action, and at all times since, Defendant Bayer HealthCare LLC was and is a limited liability company whose current members are Bayer Medical Care Inc., NippoNex Inc., Bayer West Coast Corporation, Bayer Essure Inc., Bayer Consumer Care Holdings LLC, Dr. Scholl's LLC, Coppertone LLC, MiraLAX LLC, and Bayer HealthCare US Funding LLC. The citizenship of each of the members of Defendant Bayer HealthCare LLC for the purposes of determining diversity of citizenship is as follows:

> a.  Bayer Medical Care Inc. is a Delaware corporation with its principal place of business in Pennsylvania and, therefore, is a citizen of Delaware and Pennsylvania for purposes of determining diversity of citizenship. *See* 28 U.S.C. § 1332(c).

7

b.  NippoNex Inc. is a Delaware corporation with its principal place of business in New York and, therefore, is a citizen of Delaware and New York for purposes of determining diversity of citizenship. *See id.*

c.  Bayer West Coast Corporation is a Delaware corporation with its principal place of business in California and, therefore, is a citizen of Delaware and California for purposes of determining diversity of citizenship. *See id.*

d.  Bayer Essure Inc. is a Delaware corporation with its principal place of business in California and, therefore, is a citizen of Delaware and California for purposes of determining diversity of citizenship. *See id.*

e.  Bayer Consumer Care Holdings LLC is a limited liability company, the sole member of which is Bayer East Coast LLC, whose sole member is Bayer US Holding LP, a limited partnership in which Bayer World Investments B.V. is the sole General Partner and Bayer Solution B.V. is the sole limited partner. Both Bayer World Investments B.V. and Bayer Solutions B.V. are incorporated, and have their principal places of business, in the Netherlands. *See Carden v. Arkoma Assocs.*, 494 U.S. 185, 195–96 (1990) (the citizenship of a limited partnership is the citizenship of all members); *see also GMAC Commercial Credit*, 357 F.3d at 829.

f.  Dr. Scholl's LLC is a limited liability company, the sole member of which is Bayer Consumer Care Holdings LLC. Because Bayer Consumer Care Holdings LLC is a citizen of the Netherlands for purposes of determining diversity of citizenship, Dr. Scholl's LLC is also a citizen of the Netherlands for purposes of determining diversity of citizenship. *See GMAC Commercial Credit*, 357 F.3d at 829.

g.  Coppertone LLC is a limited liability company, the sole member of which is Bayer Consumer Care Holdings LLC. Because Bayer Consumer Care Holdings LLC is a citizen of the Netherlands for purposes of determining diversity of citizenship, Coppertone LLC is also a citizen of the Netherlands for purposes of determining diversity of citizenship. *See id.*

h.  MiraLAX LLC is a limited liability company, the sole member of which is Bayer Consumer Care Holdings LLC. Because Bayer Consumer Care Holdings LLC is a citizen of the Netherlands for purposes of determining diversity of citizenship, MiraLAX LLC is also a citizen of the Netherlands for purposes of determining diversity of citizenship. *See id.*

i.  Bayer HealthCare US Funding LLC is a limited liability company, the sole member of which is Bayer AG. Because Bayer AG is a German

8

corporation with its principal place of business in Germany, Bayer HealthCare Us Funding LLC is a citizen of Germany for purposes of determining diversity of citizenship. *See id.*

Therefore, because the members of Bayer HealthCare LLC are citizens of California, Delaware, New York, Pennsylvania, Germany, and the Netherlands, Bayer HealthCare LLC is also a citizen of California, Delaware, New York, Pennsylvania, Germany, and the Netherlands for purposes of determining diversity of citizenship. *See Harvey*, 542 F.3d at 1080.

26.     At the time Plaintiffs commenced this civil action, and at all times since, Defendant Bayer Pharma AG was and is a foreign corporation with its principal place of business in Germany. As such, for the purposes of diversity jurisdiction, Bayer Pharma AG is a citizen of a foreign state. *See* 28 U.S.C. § 1332(a)(3).

27.     At the time Plaintiffs commenced this civil action, and at all times since, Defendant Bayer HealthCare AG was and is a foreign corporation with its principal place of business in Germany. As such, for the purposes of diversity jurisdiction, Bayer HealthCare AG is a citizen of a foreign state. *See id.*

28.     At the time Plaintiffs commenced this civil action, and at all times since Defendant Bayer AG was and is a foreign corporation with its principal place of business in Germany. As such, for the purposes of diversity jurisdiction, Bayer AG is a citizen of a foreign state. *See id.*

29.     According to the Petition, Defendant Jerome M. Kane, MD is a citizen of Tarrant County, Texas. Petition ¶ 1.5. For the reasons set forth below, Dr. Kane was fraudulently joined to this action and thus his presence is disregarded for purposes of determining the propriety of removal.

9

33

30.     According to the Petition, Defendant Reliant Rehabilitation Hospital Mid-Cities is a Texas Limited Partnership with its principal office in Addison, Texas. For the reasons set forth below, Reliant was fraudulently joined to this action and thus his presence is disregarded for purposes of determining the propriety of removal.

31.     According to the Petition, Plaintiffs are citizens of Texas. *See* Petition ¶¶ 1.1–1.4.

> **1.     Removal is Proper Because the Non-Diverse Defendants were Fraudulently Joined as There is No Basis for the Claims Against Them.**

32.     It is well-established that the presence of a non-diverse defendant is disregarded when there is "no possibility of recovery by the plaintiff against an in-state defendant." *Smallwood v. Illinois Cent. R. Co.*, 385 F.3d 568, 573 (5th Cir. 2004). In light of the allegations of the Removing Defendants' alleged misrepresentations regarding the safety, fitness, and effectiveness of Xarelto from Plaintiffs' physicians, the Complaint fails to adequately state a claim against the non-diverse defendants. *See Chiles v. Am. Home Prods. Corp.*, No. 4:03-CV-802-A, slip op. at *4 (N.D. Tex. Sept. 26, 2003) (denying remand where plaintiffs alleged misrepresentation against a drug manufacturer that "negate[d] any possible liability of the physicians") (attached as Exhibit I); *see also Newton v. Wyeth, et al.*, No. 4:03-CV-776-A, 2003 WL 21747056, at *1–*2 (N.D. Tex. July 21, 2003) (holding same).

33.     This is precisely the reasoning set forth by another federal court in denying remand when confronted with allegations, as in this action, whose "main tenor" was that a prescription medication "was an unsafe drug and that the manufacturers concealed its risks from the public, physicians, and others." *In re Rezulin Prods. Liab. Litig.*, 2002 WL 31852826 (S.D.N.Y. Dec. 18, 2002). The court held that the physicians were fraudulently joined because:

> "In this context, an entirely conclusory allegation that the physicians failed to warn of the risks of Rezulin is insufficient. The pleadings shed no light on such matters as whether the

10

defendant physicians allegedly failed to warn of concealed risks, known risks, or both, and how and when the physicians came to be aware of any such risks.  Absent such information, plaintiffs cannot be said to have provided the defendant physicians adequate notice of the claims against them." *Id.*

34.   Relying on similar reasoning, other courts have reached the same conclusion. See, e.g., *Baisden v. Bayer Corp.*, 275 F. Supp. 2d  759, 763 (S.D. W. Va. 2003) (denying remand in action naming physician defendant where "gravamen of the malpractice case against [physician] is his failure to know what allegedly was deliberately hidden"); *Whatley v. Nastech Pharm. Co.*, No. 1:03cv162GR, slip op. at 5 (S.D. Miss. June 20, 2003) (attached as Exhibit J) (denying remand in action naming physicians; citing Rezulin with approval); *Welborn v. AstraZeneca Pharmaceuticals, LP*, No. 4:04CV191LN, slip op. at 4-5 (S.D. Miss. Jan. 28, 2005) (attached as Exhibit  K) (denying remand despite presence of non-diverse doctor because "plaintiff has alleged throughout his complaint that the manufacturer/seller misrepresented to physicians . . . that the drug was safe and effective, . . . and failed to disclose the risks of the drug to physicians"); *Smith v. Bayer Corp.* (In re: Baycol Prods. Litig.), Case No. 02-139, MDL No. 1431, slip op. at 4 (D. Minn. May 24, 2002) (attached as Exhibit  L) (ruling that pharmacy "cannot be held liable for failing to warn of unknown  risks"); *Omobude v. Merck & Co., Inc. et al.*, No. 3:03CV528LN, slip op. at 5, 8 (S.D. Miss. Oct. 3, 2003) (attached as Exhibit  M) (denying remand and reasoning that "where a plaintiff has specifically alleged facts from which one would necessarily infer that the defendant in question would not have known information otherwise alleged to have been misrepresented or concealed from him,  . . . to sustain his pleading burden, the plaintiff would have to plead at least some facts tending to show why or how the defendant knew or should have known of the information that has been misrepresented to or concealed from him."); *Brown et al. v. Bristol-Myers Squibb Co. et al.*, No. 4:02CV301LN, slip op. at 11-12 (S.D. Miss. Nov. 30, 2002) (attached as Exhibit  N) (denying remand and

11

reasoning that the allegation that plaintiff's doctor "did not fully disclose to her the specific risks associated" with the drug in question is "essentially meaningless" where the plaintiff "consistently and repeatedly allege[s] throughout the complaint that in the manufacturing defendants' aggressive marketing of Stadol, they failed to disclose all possible side effects associated with the use of Stadol, including, in particular, addiction, and specifically misrepresented the safety and effectiveness of Stadol"); *Porter et al. v. Merck & Co., Inc. et al.*, No. 4:03CV12LN, slip op. at 8 (S.D. Miss. June 17, 2003) (attached as Exhibit O) (denying remand and explaining that plaintiffs' "explicit, repeated and consistent charge that the manufacturer defendants concealed and misrepresented information about the subject drugs to physicians," coupled with the conclusory allegation that the doctors "knew or should have known, of the dangerous side effects of these medications," "strongly suggests to the court that the plaintiffs have sued the physicians only as a means of avoiding federal court."); *Flores v. Merck & Co., Inc.*, No. C-03-362, slip op. at 2 (S.D. Tex. Mar. 15, 2004) (attached as Exhibit P) (denying remand where allegations against the physician were conclusory and where plaintiffs "claim[ed] that [the manufacturer] 'failed to adequately and timely inform the health care industry of the risks of serious personal injury and death from Vioxx ingestion'"); *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 2002 WL 34418423, at *3 (W.D. Wash. Nov. 27, 2002) (denying remand in PPA litigation where "the complaint alleges that the manufacturer defendants concealed material facts regarding PPA through product packaging, labeling, advertising, promotional campaigns and materials, and other methods. This allegation directly undermines and contradicts the idea that [the pharmacy] had knowledge or reason to know of alleged defects"); *Louis v. Wyeth-Ayerst Pharms., Inc.*, No. 5:00CV102LN, slip op. at 4-5, 9 (S.D. Miss. Sept. 25, 2000) (attached as Exhibit Q) (denying remand because pharmacy

12

defendants lacked "knowledge or reason to know of any of the dangers associated with the product(s)").

35. Where, as here, a plaintiff alleges that pharmaceutical manufacturers, "recklessly, falsely and/or deceptively represented or knowingly omitted, suppressed or concealed facts of such materiality regarding the safety and efficacy of [the drug] from prescribing physicians," the plaintiff "do[es] not come close to alleging that [the non-diverse doctor] proximately caused their injuries or that he knew or should have known of the risks of [the drug]." *In re Rezulin Prods. Liab. Litig.*, 133 F. Supp. 2d 272, 295 (S.D.N.Y. 2001) (denying remand motion because non-diverse doctor was thus fraudulently joined).

36. As such, there is no reasonable basis to support plaintiffs' claims against Dr. Kane or Reliant. Plaintiffs' Petition fails to provide adequate notice to the non-diverse defendants of the claims asserted against them. Accordingly, the non-diverse defendants were fraudulently joined and their citizenship must be disregarded for the purposes of determining federal diversity jurisdiction.

**2. Removal is Proper Because the Non-Diverse Defendants were Fraudulently Misjoined and The Claims Against Them Should be Severed or Dropped.**

37. In addition to being fraudulently joined, the Physician Defendant is not a necessary or indispensible party to this products liability action. Accordingly, a federal court may sever (or drop) the claims against non-diverse parties and preserve federal jurisdiction over the claims against the diverse defendants. As other courts have held, "the joinder of the malpractice claim[s] with the others" in a product liability action was improper and the claims against the Physician Defendant should be severed from those against the Pharmaceutical Defendants. *In re Rezulin Prods. Liab. Litig.*, No. MDL 1348, 00 Civ. 2843(LAK), 2003 WL 21276425, at *1 (S.D.N.Y. June 2, 2003).

13

38.     Another federal district court, employing the doctrine of fraudulent misjoinder (sometimes referred to as, "procedural misjoinder"), severed and remanded the negligence and fraud claims against the non-diverse healthcare providers, while retaining federal jurisdiction over the products liability claims against the pharmaceutical defendant. *Stone v. Zimmer, Inc.*, Case No. 09-80252-CIV, 2009 WL 1809990, at *1 (S.D. Fla. June 25, 2009). The court reasoned that the plaintiff's claim against the plaintiff's doctor "sounds in medical malpractice, and would require evidence on medical care, treatment and services . . . ." *Id.* at *4. The court further reasoned and held that the plaintiff's claims against the defendant:

> [A]re product liability and general negligence claims based on alleged manufacturing and design defects, failure to properly warn and its alleged intentional misrepresentation of health risks associated with the Zimmer hip implant. These claims would require evidence on the development, manufacture and testing of [the plaintiff's] implant, along with evidence of [the defendant's] knowledge, warnings and representations regarding defective implants. Any liability that may be found against [the defendant] or [plaintiff's doctor] would not be a basis for liability as to the other, and separate liability as to each could be found.
>
> \*          \*          \*
>
> The joinder of the malpractice claim . . . with the product liability claim against [the defendant] is thus inappropriate because these claims do not both involve common questions of law or fact and do not assert joint, several or alternative liability 'arising out of the same transaction, occurrence or series of transactions or occurrences.'

*Id.* (quoting Fed. R. Civ. P. 20(b)). Accord, *Sires v. Eli Lilly & Co.*, No. 5:05-cv-117-JMH, slip op. at 7 (E.D. Ky. May 24, 2005) (attached as Exhibit R) (claims against the manufacturer "do not arise out of the same transaction or occurrence as the claims against" the health care provider defendants; denying remand); *In re Zyprexa Prods. Liab. Litig.*, No. MDL 1596, 04-CV-1615, 2004 WL 2812095, at *1-2 (E.D.N.Y. Dec. 3, 2004) (severing claims against physicians); see also *Lee v. Mann*, No. LE-424-1, 2000 WL 724046, at *2 (Va. Cir. Ct. Apr. 5,

14

2000) (claims against pharmaceutical manufacturer and physician "do not arise out of the 'same transaction or occurrence'"; granting motion for severance).

39.     Here, as in the cases cited above, the claims against the Removing Defendants and the claims against the non-diverse defendants do not arise from "the same transaction or series of transactions." The claims that the Removing Defendants allegedly failed to adequately test their product and concealed or suppressed information, are independent and distinct from the claims against Dr. Kane. Accordingly, "[t]he joinder of the malpractice claim . . . with the product liability claim[s] . . . [is] inappropriate." *See Stone*, 2009 WL 1809990, at *4.

40.     Moreover, pursuant to Fed. R. Civ. P. 21, a federal court may perfect diversity by dropping a non-diverse and dispensable party. Federal courts have applied Rule 21 to circumstances similar to those in this case, where plaintiffs have brought claims of product liability and alleged medical malpractice against both an out-of-state pharmaceutical or medical device manufacturer and an in-state doctor or facility that treated a patient. *See, e.g., Varley v. Tampax, Inc.*, 855 F.2d 696 (10th Cir. 1988) (in action over death from toxic shock syndrome, district court abused discretion by failing to sever and remand malpractice claims against in-state doctor and hospital in order to preserve diversity jurisdiction over claims against manufacturer).

41.     This Court has the authority to drop the claims against an the in-state defendants under Rule 21. *See DeGidio v. Centocor, Inc.*, No. 3:09-CV-721, 2009 WL 1867676, at *2 (N.D. Ohio June 29, 2009) (severing and remanding non-diverse healthcare defendants). In determining whether to drop a non-diverse defendant under Rule 21, the Court must first determine whether, under Rule 19(a), a party is "necessary" to the case. *Id.* at *3. A party is necessary if "(1) complete relief cannot be given to existing parties in his absence; (2) disposition of his absence might impair his ability to protect his interest in the controversy; or (3)

15

39

his absence would expose existing parties to substantial risk of double or inconsistent obligations." Fed. R. Civ. P. 19(a). If the Court finds that the party is "necessary" to the action, then it must evaluate the factors under Rule 19(b) regarding whether the party is "indispensable," by considering whether "(1) a judgment rendered in the party's absence would prejudice the available party; (2) such prejudice could be lessened or avoided; (3) a judgment rendered in the party's absence would be adequate; and (4) the plaintiff has an adequate remedy if the action is dismissed for nonjoinder." Fed. R. Civ. P. 19(b); *Degidio*, 2009 WL 1867676 at * 3. Unless the in-state defendants are indispensable to plaintiffs' claims against the out of state defendants, the Court may sever and remand the claims of the in-state defendants in order to preserve diversity jurisdiction. See *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 832 (1989) ("[I]t is well settled that Rule 21 invests district courts with authority to allow a dispensable nondiverse party to be dropped at any time.").

42.     The resident defendants are not necessary or indispensable parties to the resolution of the claims against the Removing Defendants. See *Cooke-Bates v. Bayer Corp.*, No. 3:10-CV-261 2010 WL 3984830 at * 4 (E.D. Va. Oct. 8, 2010) ("The resolution of . . . the allegation that [the doctor] failed to follow-up on the decedent's complaints of leg pain that occurred after she began taking the [drug] likely [does] not result to a . . . determination of [the manufacturer's] liability."). The standard that will apply to the claims against Dr. Vazquez is whether he, as a physician, acted below the standard of care for a treating physician in prescribing and treating decedent for certain conditions. These claims have no connection to the design of the product or whether a manufacturer and seller of a prescription product is liable for alleged injuries to an individual. Nor is Dr. Vazquez a necessary party to the resolution of Plaintiffs' claims regarding the defect or adequacy of the warning against Removing Defendants

16

40

and Bayer Defendants, because he played no role in the design or the drafting of the FDA-approved warnings that accompanied the product.

43.     The resident defendants' presence should be disregarded and the complete diversity among plaintiffs and the diverse Removing Defendants (the true targets of this action) should be recognized.  If the Court concludes that the resident defendants were not fraudulently joined, then it should find that the claims against the resident defendants were fraudulently misjoined.  The Court should retain jurisdiction over the claims against Removing Defendants.

44.     Plaintiffs are not prejudiced by severance because they may seek complete relief on their medical malpractice claims against the resident defendants in state court, and on their claims against the Removing Defendants in this Court.  Purported joint tortfeasors are not necessary parties, particularly when their claims are based on different standards and alleged conduct that gives rise to the claims, and are not required to be joined together in the same lawsuit.  *Temple v. Synthes Corp., Ltd.*, 498 U.S. 5 (1990) (doctor and hospital were not necessary parties to claim against medical device manufacturer.).  Likewise the resident defendants are not prejudiced, because in the unlikely event they are found to be liable for damages, the severance and remand of their case will not prevent Plaintiffs from exercising their legal rights against the Removing Defendants. See *Dayton Ind. Sch. Dist. v. U.S. Mineral Prod. Co.*, 906 F.2d 1059, 1067-68 (5th Cir. 1990).

WHEREFORE, Removing Defendants respectfully remove this action from the District Court for Dallas County, Texas bearing Number DC-15-11796, to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.

Respectfully submitted,

**HARTLINE DACUS BARGER DREYER LLP**

By:     */s/ Darrell L. Barger*
        Darrell L. Barger
        State Bar No. 01733800
        Fed ID#: 646
        800 N. Shoreline Blvd.
        Suite 2000, North Tower
        Corpus Christi, Texas 78401
        (361) 866-8000 Telephone
        (361) 866-8039 Fax
        dbarger@hdbdlaw.com

**ATTORNEYS FOR REMOVING
DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all known counsel of record in this cause in accordance with the Federal Rules of Civil Procedure and the Northern District Local Rules on this 5th day of November, 2015.

**VIA CERTIFIED MAIL RRR**
Ben C. Martin
Thomas Wm. Arbon
Jacob A. Boyd
The Law Offices of Ben C. Martin
3219 McKinney Avenue, Suite 100
Dallas, Texas 75204

William C. Dunnill
Robert C. Murphy
Steed Dunnill Reynolds Murphy Lamberth LLP
1010 W. Ralph Hall Parkway, 2nd Floor
Rockwall, Texas 75032

Jonathan C. LaMendola
Cobb Martinez Woodward PLLC
1700 Pacific Avenue, Suite 3100
Dallas, Texas 75201

*/s/ Darrell L. Barger*
Darrell L. Barger

# EXHIBIT C

CAUSE NO. DC-15-11796

| | | |
|---|---|---|
| ROBERT MURPHY, Individually and as Legal Representative of the ESTATE OF KATHLEEN MURPHY, deceased; SCOTT MURPHY; CHRISTINE MURPHY; and BRIAN MURPHY, | § § § § § § § | IN THE DISTRICT COURT FOR |
| *Plaintiffs,* | § § | |
| v. | § § | |
| JEROME M. KANE, MD; RELIANT REHABILITATION HOSPITAL MID-CITIES in its Assumed or Common Name; RELIANT REHABILITATION HOSPITAL MID-CITIES, L.P. d/b/a RELIANT REHABILITATION HOSPITAL MID-CITIES; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA, INC. f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC.; JANSSEN RESEARCH AND DEVELOPMENT, LLC. f/k/a JOHNSON & JOHNSON PHARMACEUTICAL RESEARCH AND DEVELOPMENT, LLC; JANSSEN ORTHO, LLC; BAYER HEALTHCARE PHARMACEUTICALS, INC.; BAYER PHARMA AG; BAYER CORPORATION; BAYER HEALTHCARE LLC; BAYER HEALTHCARE AG and BAYER AG, | § § § § § § § § § § § § § § § § § § § § § § § § | DALLAS COUNTY, TEXAS |
| *Defendants* | § | 68th JUDICIAL DISTRICT |

## DEFENDANT JEROME M. KANE, M.D.'S MOTION TO TRANSFER VENUE AND ORIGINAL ANSWER TO PLAINTIFFS' ORIGINAL PETITION SUBJECT THERETO

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Jerome M. Kane, M.D., one of the Defendants in the above-entitled and

numbered cause, and makes and files this his Motion to Transfer Venue and Original Answer to

Plaintiffs' Original Petition and in support thereof would respectfully show unto the Court as follows:

I.

### Motion to Transfer Venue Based Upon Improper County and Convenience

Defendant asserts that venue is improper in Dallas County and venue is proper and more convenient in Tarrant County, Texas. All or a substantial part of the events giving rise to the claim occurred in Tarrant County, Texas. Dr. Kane resided within Tarrant County at the time the cause of action accrued and Defendant Reliant Rehabilitation Hospital Mid-Cities, which is the physical location of the incident made the basis of this lawsuit, is in Tarrant County. No Plaintiff resides in Dallas County and based upon information available at this time, it does not appear that any decision makers associated with the care and treatment at issue, reside in Dallas County. Defendant, therefore, prays that in the interest of justice and convenience, the Court transfer this cause of action from Dallas County to Tarrant County, the county of proper venue.

II.

### Special Exceptions

Defendant herein objects and specially excepts to paragraph XI, 6.1, 6.2, 6.3(a)(b)(c) and 6.4 to the extent that same are overly broad, vague and fail to set forth with any degree of specificity, those actions of negligence claimed against Dr. Kane. Accordingly, Defendant requests that these allegations be stricken and that Plaintiff be required to replead with sufficient specificity to place this Defendant on proper notice.

DEFENDANT JEROME M. KANE, M.D.'S MOTION TO TRANSFER VENUE AND ORIGINAL ANSWER TO PLAINTIFFS' ORIGINAL
PETITION SUBJECT THERETO                                                                                         Page 2
S:\DOCS\001\20622\Pldgs - Def\answer.docx

46

III.

## **Level 3 Discovery Control Plan**

Defendant asserts that discovery conducted under Level 3 is appropriate and Defendant's counsel will circulate a proposed Level 3 Discovery Control Plan complying with Rule 190.4 of the Texas Rules of Civil Procedure and will include a date for trial or for a conference to determine a trial setting; a discovery period in which either all discovery must be conducted or all discovery requests must be sent; appropriate limits on the amount of discovery; and deadlines for joining additional parties, amending or supplementing pleadings, and designating expert witnesses. If agreement can be reached on the discovery control plan, an Agreed Discovery Control Plan will be submitted to the Court.

IV.

## **General Denial**

This Defendant denies generally each and every, all and singular, material allegations contained in Plaintiffs' Original Petition and says that inasmuch as they are allegations of fact, the Plaintiffs' should be required to prove them to a jury by a preponderance of the evidence, if the Plaintiffs' can do so.

V.

1.     Defendant affirmatively asserts Chapter 33, *et seq* of the Texas Civil Practice & Remedies Code with regard to the right to make a settlement election in the event Plaintiffs' settle with one or more persons or entities. Defendant asserts the right to have the Court reduce the amount of damages to be recovered by the Plaintiffs by a percentage equal to the settling party's percentage of responsibility or the sum of the dollar amounts of all the settlements. This Defendant requests the right to make the election prior to submitting this case to a jury.

2.      Pursuant to Chapter 74 of the Texas Civil Practice & Remedies Code, including, but not limited to §74.301(a), Texas Civil Practices & Remedies Code, Defendant affirmatively asserts that the limit of civil liability for non-economic damages as to this Defendant shall be limited to an amount not to exceed $250,000 for each claimant.

3.      Pursuant to Chapter 304 of the Texas Civil Practice & Remedies Code, Defendant affirmatively asserts that the post-judgment interest rate is the prime rate as published by the Federal Reserve Bank of New York on the date of computation; or five percent a year if the prime rate as published by the Federal Reserve Bank of New York is less than five percent; or fifteen percent a year if the prime rate as published by the Federal Reserve Bank of New York is more than fifteen percent. Furthermore, post-judgment interest is compounded annually. Defendant further asserts that the pre-judgment interest rate is equal to the post-judgment interest rate applicable at the time of judgment, and that pre-judgment interest accrues on the amount of a judgment during the period beginning on the earlier of the 180th day after the date the defendant receives written notice of a claim or the date the suit is filed and ending on the date preceding the date judgment is rendered. Pre-judgment interest is computed as simple interest and does not compound. Furthermore, Defendant affirmatively asserts that pre-judgment interest may not be assessed or recovered on an award of future damages. Lastly, if judgment for plaintiff is equal to or less than the amount of a settlement offer of the defendants, pre-judgment interest does not accrue on the amount of the judgment during the period that the offer may be accepted. Defendant incorporates herein by reference as if fully set forth in §304.003(a) and (c), §§304.005, 304.006, 304.103, 304.104, 304.1045, and 304.105.

DEFENDANT JEROME M. KANE, M.D.'S MOTION TO TRANSFER VENUE AND ORIGINAL ANSWER TO PLAINTIFFS' ORIGINAL
PETITION SUBJECT THERETO                                                                                            Page 4
S:\DOCS\001\20622\Pldgs - Deflanswer.docx

48

4.      Defendant affirmatively asserts §74.303(e)(2) of the Texas Civil Practice & Remedies Code and requests that when the jury is charged after hearing the evidence in this case, the jury shall be instructed as follows:

> A finding of negligence may not be based solely on evidence of a bad result to the claimant in question, but a bad result may be considered by you, along with other evidence, in determining the issue of negligence. You are the sole judges of the weight, if any, to be given to this kind of evidence.

WHEREFORE, PREMISES CONSIDERED, Defendant prays that upon final trial and hearing hereof, Plaintiff take nothing against this Defendant by reason of this lawsuit, and that this Defendant go hence without delay and recover his costs, and for all such other and further relief, both at law and in equity, to which this Defendant may show himself to be justly entitled, and will ever pray.

Respectfully submitted,

STEED DUNNILL REYNOLDS
MUPRHY LAMBERTH LLP

By:      /s/ WILLIAM C. DUNNILL
         WILLIAM C. DUNNILL
         State Bar No. 00793655
         ROBERT P. MURPHY
         State Bar No. 24081768
         1010 W. Ralph Hall Parkway, 2nd Floor
         Rockwall, Texas 75032
         469/698-4200 / Fax: 469/698-4201

**ATTORNEYS FOR DEFENDANT,
JEROME M. KANE, M.D.**

DEFENDANT JEROME M. KANE, M.D.'S MOTION TO TRANSFER VENUE AND ORIGINAL ANSWER TO PLAINTIFFS' ORIGINAL PETITION SUBJECT THERETO                                                                                                      Page 5
S:\DOCS\001\20622\Pldgs - Def answer.docx

49

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing Answer has been forwarded to all counsel of record on this the 26th day October, 2015.

| | |
|---|---|
| Ben C. Martin<br>Thomas Wm. Arbon<br>Jacob A. Boyd<br>3219 McKinney Avenue, Suite 100<br>Dallas, Texas 75204<br>*Attorneys for Plaintiffs* | ☐ By certified mail, return receipt requested<br>☐ By courier receipted delivery<br>☐ By telephonic document transfer<br>☐ By hand delivery<br>☐ By first class mail<br>☒ Other: E-File |

/s/ WILLIAM C. DUNNILL
WILLIAM C. DUNNILL

DEFENDANT JEROME M. KANE, M.D.'S MOTION TO TRANSFER VENUE AND ORIGINAL ANSWER TO PLAINTIFFS' ORIGINAL
PETITION SUBJECT THERETO                                                                          Page 6
S:\DOCS\001\20622\Pldgs - Def\answer.docx

50

# EXHIBIT D

DALLAS COU
10/30/2015 5:05:0
FELICIA P
DISTRICT CI

CAUSE NO. DC-15-11796

| | | |
|---|---|---|
| ROBERT MURPHY, Individually and | § | IN THE DISTRICT COURT |
| as Legal Representative of the ESTATE | § | |
| OF KATHLEEN MURPHY, Deceased; | § | |
| SCOTT MURPHY; CHRISTINE | § | |
| MURPHY; and BRIAN MURPHY | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| JEROME M. KANE, M.D.; RELIANT | § | |
| REHABILITATION HOSPITAL MID- | § | |
| CITIES in its Assumed or Common Name; | § | |
| RELIANT REHABILITATION | § | |
| HOSPITAL MID-CITIES, LP. d/b/a | § | |
| RELIANT REHABILITATION | § | |
| HOSPITAL MID-CITIES; JOHNSON & | § | |
| JOHNSON; JANSSEN | § | |
| PHARMACEUTICALS, INC. f/k/a | § | |
| JANSSEN PHARMACEUTICA, INC. | § | |
| f/k/a ORTHO-MCNEIL-JANSSEN | § | |
| PHARMACEUTICALS, INC.; JANSSEN | § | |
| RESEARCH AND DEVELOPMENT, | § | |
| LLC f/k/a JOHNSON & JOHNSON | § | |
| PHARMACEUTICAL RESEARCH AND | § | |
| DEVELOPMENT, LLC; JANSSEN | § | |
| ORTHO, LLC; BAYER HEALTHCARE | § | |
| PHARMACEUTICALS, INC; BAYER | § | |
| PHARMA AG; BAYER CORPORATION; | § | |
| BAYER HEALTHCARE LLC; BAYER | § | |
| HEALTHCARE AG and BAYER AG | § | 68TH JUDICIAL DISTRICT |

## DEFENDANT'S ORIGINAL ANSWER

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Reliant Rehabilitation Hospital Mid-Cities, LP d/b/a Reliant Mid-Cities

Defendant and file its Original Answer and respectfully shows the Court as follows:

DEFENDANT'S ORIGINAL ANSWER/Page 1
Doc. #144285

# I.

## GENERAL DENIAL

Defendant generally denies each and every allegation contained in the Plaintiffs' Original Petition and demands strict proof thereof by preponderance of the credible evidence.

# II.

## AFFIRMATIVE DEFENSES

### A.    DAMAGE LIMITATIONS

Pleading further, Defendant would pray that in the event a verdict is returned against it, however unlikely, that the damages awarded be limited as set forth in Chapter 74 of the TEXAS CIVIL PRACTICE AND REMEDIES CODE.

### B.    LIMITATION ON EXEMPLARY DAMAGES

Pleading further, in the event Defendant is found liable for exemplary damages, and in the event a verdict is returned against it, Defendant affirmatively alleges that any such liability it may have is limited as set forth in the applicable provisions of Chapter 41, TEXAS CIVIL PRACTICE & REMEDIES CODE.

### C.    VICE PRINCIPAL DEFENSE

Defendant cannot be held to answer for punitive or exemplary damages for the acts or omissions of any employee or agent.

### D.    TEXAS CIVIL PRACTICE & REMEDIES CODE § 41.0105

Defendant invokes its right to have evidence regarding the amount billed and/or written off for medical expenses excluded pursuant to TEXAS CIVIL PRACTICE & REMEDIES CODE § 41.0105.

**WHEREFORE, PREMISES CONSIDERED,** Defendant prays that Plaintiffs take nothing by this suit, that Defendant recover its costs, and for such other and further relief to which Defendant may be justly entitled at law or in equity.

DEFENDANT'S ORIGINAL ANSWER/Page 2
Doc. #144285

Respectfully submitted,

**COBB MARTINEZ WOODWARD** Pllc
1700 Pacific Avenue, Suite 3100
Dallas, Texas  75201
(214) 220-5204
(214) 220-5254 (Fax)

By: */s/ Jonathan C. LaMendola*
    **JONATHAN C. LaMENDOLA**
    Texas Bar No. 00792637
    Email: jlamendola@cobbmartinez.com

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

    I hereby certify that a true and correct copy of the above and foregoing instrument has been forwarded to the following counsel of record either by hand-delivery, telefax, eservice, email, certified mail, return receipt requested and/or regular U.S. mail on this 30th day of October, 2015.

    Ben C. Martin
    Thomas Wm. Arbon
    Jacob A. Boyd
    Law Offices of Ben C. Martin
    3219 McKinney Avenue, Suite 100
    Dallas, TX 75204

    */s/ Jonathan C. LaMendola*
    **JONATHAN C. LaMENDOLA**

DEFENDANT'S ORIGINAL ANSWER/Page 3
Doc. #144285

# EXHIBIT E



LAW OFFICES OF
BEN C. MARTIN
3219 McKINNEY AVENUE, SUITE 100
DALLAS, TEXAS 75204

BEN C. MARTIN
  BOARD CERTIFIED:
  PERSONAL INJURY TRIAL LAW
  CIVIL TRIAL LAW
  TEXAS BOARD OF LEGAL SPECIALIZATION

THOMAS WM. ARBON
  BOARD CERTIFIED:
  PERSONAL INJURY TRIAL LAW
  TEXAS BOARD OF LEGAL SPECIALIZATION

TELEPHONE
(214) 761-6614

FACSIMILE
(214) 744-7590

February 18, 2016

*VIA HAND-DELIVERY &*
*CM/RRR 7014 0150 0001 9960 0742*

William C. Dunnill, Esq.
Robert P. Murphy, Esq.
STEED DUNNILL REYNOLDS MURPHY LAMBERTH, LLP
1010 W. Ralph Hall Pkwy., 2ⁿᵈ Floor
Rockwall, TX 75032

*VIA HAND-DELIVERY &*
*CM/RRR 7014 0150 0001 9960 0759*

Jonathan C. LaMendola, Esq.
COBB MARTINEZ WOODWARD, PLLC
1700 Pacific Avenue, Suite 3100
Dallas, TX 75201

*VIA HAND-DELIVERY &*
*CM/RRR 7014 0150 0001 9960 0766*

Gregory P. Blaies, Esq.
Grant D. Blaies, Esq.
BLAIES & HIGHTOWER, LLP
421 W. Third Street, Suite 900
Fort Worth, TX 76102

Re:    Cause No. DC-15-11796; *Robert Murphy, et al. v. Jerome M. Kane, M.D., et al.,* In
the 68ᵗʰ Judicial District Court, Dallas County, Texas; currently in *MDL Docket No.
2592, In Re: Xarelto (Rivaroxaban) Products Liability Litigation; United States
District Court for the Eastern District of Louisiana*

Cause No. DC-15-15172; *Robert Murphy, et al. v. Mehul Patel, M.D.;* In the 134ᵗʰ
Judicial District Court, Dallas County, Texas

February 18, 2016
Page 2

---

Dear Counsel:

    Enclosed please find the expert report and curriculum vitae of Todd J. Swick, M.D. pursuant to Chapter 74.351, TEX. CIV. PRAC. & REM. CODE.

Yours very truly,

Thomas Wm. Arbon

TWA/jg

Enclosures

cc:    Darrell L. Barger, Esq.
       J. Reid Simpson, Esq.
       HARTLINE DACUS BARGER DREYER, LLP
       800 North Shoreline, Suite 2000, N. Tower
       Corpus Christi, TX 78401

       Daryl Daly, Esq.
       Susan Sharko, Esq.
       DRINKER BIDDLE & REATH, LLP
       600 Campus Drive
       Florham Park, NJ 07932-1047

       F.M. Haston, III, Esq.
       BRADLEY ARANT BOULT CUMMINGS, LLP
       1819 Fifth Avenue North
       Birmingham, AL 35203

       Terry Lueckenhoff, Esq.
       John E. Galvin, Esq.
       FOX GALVIN, LLC
       One S. Memorial Drive, 12th Floor
       St. Louis, MO 63102

February 18, 2016
Page 3

---

Gerald E. Meunier, Esq.
GAINSBURGH BENJAMIN DAVID MEUNIER & WARSHAUER, LLC
2800 Energy Centre
1100 Poydras Street
New Orleans, LA 70130

Leonard A. Davis, Esq.
HERMAN, HERMAN & KATZ, LLC
820 O'Keefe Avenue
New Orleans, LA 70113

James B. Irwin, Esq.
IRWIN FRITCHIE URQUHART & MOORE, LLC
400 Poydras Street, Suite 2700
New Orleans, LA 70130

**𝒯𝑜𝑑𝑑 𝒥. 𝒮𝓌𝒾𝒸𝓀, 𝑀.𝒟.**     Fellow of the American Academy of Neurology
Fellow of the American Academy of Sleep Medicine

Sleep Medicine/Neurology

February 17, 2016

Thomas Wm. Arbon
Law Offices of Ben C. Martin
3219 McKinney Avenue, Suite 100
Dallas, Texas 75204

   Re: *Kathleen Murphy, deceased*

Dear Mr. Arbon:

   Thank you for asking me to review the medical history surrounding the above referenced individual and her development of altered mental status and subsequent death. I have reviewed the following medical records and death certificate of Ms. Kathleen Murphy:

   1. Texas Health Fort Worth Hospital; Admission September 26, 2013 through September 28, 2013
   2. Reliant Rehabilitation Hospital Mid Cities; Admission September 28, 2013 through October 3, 2013
   3. Texas Health Fort Worth Hospital; Admission October 3, 2013 through October 18, 2013 (death).
   4. Death certificate of Kathleen Murphy

   As you know, my name is Todd J. Swick. I am over the age of eighteen (18) years and am a resident of Houston in Harris County, Texas (please see my attached Curriculum Vitae for additional qualifications and experience). I am a board certified neurologist (American Board of Psychiatry and Neurology) and have been in private practice in Houston, Texas for the past thirty-six years. I am a Clinical Assistant Professor of Neurology in Health Sciences Center-Houston, School of Medicine. As such, I care for patients with neurologic diseases not unlike those that Ms. Murphy had at the time of her admission to Texas Health Fort Worth Hospital as well as her condition that necessitated her readmission. As evident from my curriculum vitae I have been practicing neurology for >35 years in Houston and I have been Chief of Staff of two hospitals. As chief of staff I frequently had to review charts and provide guidance on standards of care in cases involving neurology and occasionally in general medicine and internal medicine. Training of ancillary staff including nurses, technicians and aids was also part of my job as chief of staff. I have also taught medical students, interns, residents and fellows in neurology as part of my duties that accompanied my academic appointment. As a result of this experience I am familiar with the level of knowledge that any licensed physician would have with regard to the proper standard of care for a post-operative patient who has had surgery performed on her brain like

59

February 17, 2016
Re: Kathleen Murphy
Page 2 of 12

Ms. Murphy.  As noted, my duties included overseeing all participants in the health care arena including nurses and nursing students. As such, I am very aware of the standard of care expected of nurses caring for post-operative patients who have had surgery performed on their brain like Mrs. Murphy.

I see and treat patients in both my office and in the hospital.  I currently have staff privileges at Memorial Hermann Memorial City Medical Center, a 426 bed hospital in Houston, Texas, and North Cypress Medical Center, a 175 bed hospital also in Houston, Texas. This means that as part of my practice I routinely prescribe medications, issue treatment orders, examine and evaluate hospitalized patients who have neurological conditions like Mrs. Murphy.  Throughout my career I have worked and consulted with other medical specialists regarding the care and treatment of patients similar to Mrs. Murphy, including neurosurgeons, other neurologists, internal medicine physicians, physical medicine/rehabilitation physicians, physical and occupational therapists. I regularly interact with the internists, hospitalists and nursing staff who attend to my patients while they are in the hospital. I am very familiar with the standard of care that is expected of the neurology specialist, internist, hospitalist and nursing staff that are called upon to examine and treat a patient suffering from normal pressure hydrocephalus who is recovering from surgery which included the placement of a right occipital ventriculopleural shunt, like Mrs. Murphy.  I have supervised the care of many patients who, like Mrs. Murphy, where being transitioned from an acute care hospital to a rehabilitation setting and then on to their home or community based care.

To prepare this report, I have reviewed the medical information listed above regarding Kathleen Murphy's medical condition, diagnoses and treatment.  This provided the underlying facts regarding her health, course of care, the treatment provided by Dr. Kane, Dr. Patel and the nurses at Reliant Rehabilitation Hospital Mid-Cities (Reliant) and the outcome of that treatment. I then evaluated the care provided by Dr. Kane, Dr. Patel and the nurses at Reliant with regard to the accepted standard of care and made determinations as to whether these health care providers met the standard of care and whether Mrs. Murphy suffered any injury as a result of the care that was provided by Dr. Kane, Dr. Patel and or the nurses employed by Reliant. This is the method that is commonly used to determine whether the conduct of a physician or a nurse met or fell below the standard of care and is the same method that would be used in the context of a hospital's peer review process.  The care and treatment of Kathleen Murphy that is the basis of this report would be the same for any physician or nurse regardless of specialty or setting.

As result of my medical training and clinical experience, I am I am also aware of the effects of many of the drugs used to treat patients in a hospital and/or rehabilitation setting, including those prescribed for the prevention of deep vein thrombosis and pulmonary emboli.  I have diagnosed and treated many patients who have experienced intracranial hemorrhage while on anti-coagulant medications. I understand the nature of such medications and I am very aware of the indications and contraindications for the use of such medications in patients who have a neurological condition and have undergone recent brain surgery.

February 17, 2016
Re: Kathleen Murphy
Page 3 of 12

In the course of this report when I make reference to the "nurses employed by Reliant" I mean the nurses (Director of Nursing, Registered Nurses, and Licensed Vocation Nurses) employed by Reliant who participated Kathleen Murphy's care during her admission from September 28, 2013 through October 3, 2013 or had supervision over the care she received, including Chinyere Osondu, LVN, Lloyd Esene, RN and Laquita Johnson, LVN, the nurses who administered the Xarelto to Ms. Murphy.

I have never been convicted of a crime and I am fully competent to make this declaration. I am licensed to practice medicine in the State of Texas. As such I am qualified by training and experience to comment on the care provided to Ms. Murphy as well as the pathogenesis of the neurologic condition that ultimately led to her death.

The records that I reviewed (as listed above) contain the data that experts, such as myself, would reasonable rely upon to form opinions as to the health of a patient, the care a patient received and whether that care met the standard of care expected of her health care providers.

Ms. Murphy was admitted to Texas Health Fort Worth Hospital on September 26, 2013 by her neurosurgeon, Dr. Atif Haque. Surgery was performed on the day of admission by Dr. Haque; assisted by Dr. William Witham, a cardiovascular surgeon, for placement of a revised right occipital ventriculopleural shunt to treat her previously diagnosed normal pressure hydrocephalus. She had prior frontal lobe shunts (on a bilateral basis) which subsequently developed erosions through the skin necessitating previous shunt revisions. The distal portion of her prior shunts were placed into the atrium of her heart because pre-existing abdominal adhesions precluded the placement of the distal portion of the shunt in the abdomen. As such the shunt revision performed on September 26 involved placing the distal end of the shunt into the intra-pleural space in her chest (this is why Dr. Haque was assisted by Dr. Witham). The surgery was uneventful and Ms. Murphy was transferred to the post anesthesia care unit (PACU) at about 10:34. A CT scan of her head was performed on September 26, 2013 at 10:59, after the surgery. The study revealed the placement of a right frontal VP shunt with its tip in the frontal horn of the right lateral ventricle and stable enlargement of the lateral and third ventricles. This enlargement is consistent with her normal pressure hydrocephalus and is not a sign of any complication occurring during the surgical procedure that would lead to a bleed or increase in intracranial pressure. There was no sign of hemorrhage or edema reported in the post-surgery CT scan.

A chest x-ray done post operatively was negative for pneumothorax (a potential complication of intra-pleural placement of the distal end of the shunt).

Her post-operative medications included bronchodilators, topical and intravenous antibiotics, antacid, a cholesterol lowering drug, an antidepressant, a drug for dementia, opiate pain medication, laxatives, blood pressure medications, a proton pump inhibitor to reduce stomach acidity, an antiemetic, and fluids. On September 27, 2013 Dr. Witham, the

February 17, 2016
Re: Kathleen Murphy
Page 4 of 12

cardiovascular surgeon who assisted Dr. Haque, identified "some bruising to chest wall in the area of the tunneling".

Later that day Ms. Murphy was seen by Dr. Daud Ashai, a pulmonary/internal medicine specialist. He was consulted after a chest X-Ray showed "a small pleural effusion". He started her on steroids, IV furosemide, continued her diabetes medication and ordered a repeat chest X-Ray for the following morning.

The following day the chest x-ray showed improvement and Ms. Murphy was then transferred to Reliant on September 28, 2013.

Dr. Hague's discharge instructions stated "DO NOT (emphasis by way of capitalization was noted on the instruction sheet) take any blood thinners (i.e. Plavix, Lovenox, Coumadin/warfarin, aspirin, Lodine) or NSAIDs (i.e. Advil/ibuprofen, Aleve, etc.) until cleared by your doctor."

The admission history and physical at Reliant was performed by Dr. Jerome Kane.  In his history, Dr. Kane states that Ms. Murphy had an occipitoplueral shunt put in by Dr. Haque in the past week. Dr. Kane also noted in his "recommendations" that: "The patient is alert, cooperative. An excellent candidate hopefully to get to supervision level in 2 weeks to return home. . . Will give low-dose Xarelto® for DVT prophylaxis."

On September 29, 2013 Ms. Murphy was seen by Dr. Mehul Patel for "medical management of her hypothyroidism, hypertension, diabetes, COPD, hypercholesterolemia, dementia, gastroesophageal reflux disease in a patient who is admitted with debility [Sic] due to normal pressure hydrocephalus." Dr. Patel's consultation note demonstrates he was aware of the fact that Ms. Murphy was recovering from the surgical revision of her shunt and was to receive DVT prophylaxis, "as per rehab protocol." The following day, Dr. Patel, in his progress note, reiterated that Ms. Murphy was on "DVT and gastrointestinal prophylaxis. As per rehab protocol."

The medication record reflects Xarelto® 10 mg was administered to Ms. Murphy by Chinyere Osondu, LVN at 08:55 on September 30, 2013, by Lloyd Esene, RN at 07:40 on October 1, 2013, by Chinyere Osondu, LVN at 09:27 on October 2, 2013 and by Laquita Johnson, LVN at 09:37 on October 3, 3013. The amount of Xarelto® that was administered to Ms. Murphy from October 1, through 3, 2013 was sufficient to trigger a cerebral hemorrhage given her history of recent brain surgery.

On October 3, 2013, Dr. Patel noted that Ms. Murphy "had a rough night". She was vomiting "all night long" and refused her medications that morning. Her blood pressure "was extremely high today morning [Sic]" It was also noted that her husband claimed she was increasingly becoming confused, pointing out that she was unable to tell where she was and what her full name was. He indicated this "had never happened before". The progress note goes on to describe generalized 4 limb weakness, "no new focal neurologic deficit" and then states: "The

February 17, 2016
Re: Kathleen Murphy
Page 5 of 12

patient is slightly weaker in the right grip" and having "difficulty in following the instructions [Sic]". The note goes on to state "the patient has developed extensive ecchymosis of the skin of neck, back, front of the chest through which the peritoneal shunt has been passed."

The assessment was because of increasing confusion, nausea and vomiting which led to Ms. Murphy being sent back to Harris Fort Worth emergency room for "further evaluation".

Dr. Kane, on October 3, 2013, wrote in his progress note: "The patient today, developed mild confusional problems...the patient will be sent for a CT scan given hydrocephalus, looking for shunt failure versus infection versus of bleeding [Sic]. The patient on low-dose DVT prophylaxis [Sic]". She was then transferred to Texas Health Fort Worth Hospital.

CT scan of the head done at Texas Health Fort Worth Hospital on October 3, 2013 showed a large amount of acute intraventricular hemorrhage, with additional parenchymal hemorrhage surrounding the right occipital ventriculostomy catheter. There was also an increase in ventricular size. These findings are consistent with the development of an intracranial hemorrhage as a result of the administration of Xarelto®.

Following the CT scan, Ms. Murphy underwent placement of an external ventricular drain (EVD). On October 6, 2013 she underwent intraventricular administration of TPA via the EVD to try to lyse the ventricular clot. She subsequently developed seizures and was started on the anticonvulsant, Keppra®.

On October 10, 2013 the EVD was clamped and then removed the following day. Her mental status continued to deteriorate and she then developed aspiration pneumonia with hypoxemia. Aspiration pneumonia occurs when food, saliva, liquids or gastric contents resulting from vomiting are breathed into the lungs. Her vomiting was caused by increased intracranial pressure as a result of the intracerebral/intraventricular hemorrhage. She continued to decline and the family opted for palliative care. Ms. Murphy expired on October 18, 2013.

In summary, Ms. Murphy was admitted to Texas Health Fort Worth Hospital on September 26, 2013 for an elective revision of her previously failed ventriculo-venous shunts to treat her previously diagnosed "normal pressure hydrocephalus". This was successfully carried out and she was then transferred to Reliant. Upon admission she was started on Xarelto® for "DVT prophylaxis".

I have provided care to patients who were on anticoagulants and I am aware of the clinical uses and effects of these medications. Any physician or nurse, at a minimum, must know and understand the increased risk of cerebral hemorrhage presented by the administration of anticoagulant like Xarelto to a patient recovering from brain surgery. Xarelto® [rivaroxaban] (is a new generation oral anticoagulant or NOAC) that differs from warfarin (a vitamin K antagonist) by direct inhibition of proteins of the coagulation cascade. Rivaroxaban works through inhibiting factor Xa. There is no available reversal agent for rivaroxaban at this time. The only NOAC reversal

February 17, 2016
Re: Kathleen Murphy
Page 6 of 12

agent that is FDA approved is idarucizumab (Praxbind®) which is only for dabigatran (Pradaxa®), another NOAC and this was only approved in October 2015. Warfarin is reversible by the oral or intravenous administration of Vitamin K.

Ms. Murphy upon admission to Reliant was started on Xarelto® "for DVT prophylaxis" in spite of clear post-operative instructions written by her neurosurgeon NOT to use any blood thinners, of which Xarelto® is clearly one. This, in reasonable medical probability was the causative factor in her development of an intracerebral hemorrhage that directly resulted in her death.

The physicians who were charged with her care at Reliant, Dr. Kane and Dr. Patel, knew, or should have known that an anticoagulant (either oral or parenteral) should not be used in a patient who has undergone instrumentation within the cerebral cortex (e.g., placement of an intra-ventricular shunt tube) unless there is an overwhelming reason to use a blood thinner, i.e. clot in the atrium with cerebral emboli, an active deep vein thrombus with pulmonary emboli, etc. **"Routine prophylaxis"** is NOT considered a reason for use of an anticoagulant in a patient with such recent intracerebral instrumentation.

Neurology is the medical specialty concerned with the diagnosis and treatment of disorders of the nervous system, which includes the brain, the spinal cord and the nerves. Normal pressure hydrocephalus is a neurological condition caused by an abnormal buildup of cerebrospinal fluid in the brain's ventricles, or cavities. It occurs if the normal flow of cerebrospinal fluid throughout the brain and spinal cord is impeded in some way. This causes the ventricles to enlarge, putting pressure on the brain. It is normally treated through the placement of a shunt into a ventricle in the brain which directs the excess fluid into the patient's abdomen or venous system. As a physician charged with the care of a patient admitted for rehabilitation, the standard of care required Dr. Kane to be able to be able to identify and avoid any treatment or medication that was likely to put Ms. Murphy's life at risk and properly respond to any potential threat to her.

A "hospitalist" is a physician who specializes in the care and treatment of patients who are hospitalized. In general, "hospitalists" are made available to provide prompt and complete attention to all of the patient care needs including, diagnosis, treatment and the performance of medical procedures that are within their scope of practice. Hospitalists are to collaborate, communicate and coordinate with all of the physicians and healthcare personnel caring for the hospitalized patient. By the nature of his or her practice, a hospitalist is called upon to provide care to patients suffering from a wide variety of ailments, injuries and physical conditions and so must be able to recognize any and all improperly prescribed treatments and/or medications that have been prescribed for their patients. By assuming care of Ms. Murphy, a post-operative patient who had recently undergone invasive brain surgery, Dr. Patel is held to a standard of care which would require him to be able to identify and avoid any treatment or medication that is likely to put her life at risk and properly respond to any potential risk to her health.

February 17, 2016
Re: Kathleen Murphy
Page 7 of 12

At the time Dr. Kane and Dr. Patel assumed responsibility for Mrs. Murphy's care, her underlying neurological condition had been diagnosed and treated by the proper medical specialists. The standard of care that applied to Drs. Kane and Patel at the time of her admission to the Reliant Rehabilitation Hospital Mid-Cities was the same for both physicians as their care at this time was to support her in her recovery and address her post-operative needs. In that capacity and under the circumstances relevant to Mrs. Murphy's case, the standard of care required of both Dr. Kane and Dr. Patel, included:

1. Performing a comprehensive assessment of the patent's physical mental and psychological needs on initial admission. This included a review of any and all orders and discharge instructions provided by the physicians who were transferring her into their care;

2. Making sure the patient received appropriate, individualized medical care and treatment;

3. Implementing any care and treatment ordered by the physicians transferring the patient into their care, or consulting and conferring with the transferring physicians regarding any orders or instructions which they questioned or were inconsistent with or would conflicted in any way with the care plan Drs. Kane and/or Patel had developed for the patient;

4. Developing, documenting, implementing and monitoring the efficacy of a comprehensive care plan to intended to achieve the highest practical physical and mental well-being consistent with the patient's condition and revising the care plan as needed;

5. Recognizing and avoiding any medications, treatments or other factors which could negatively affect the health, safety or recovery of the of the patient;

6. If the physician was not able or willing to meet the standard of care, the standard of care requires the physician to refrain for taking the patient under his care so that alternative appropriate care and treatment can be provided.

On its website, Reliant represents itself to be a hospital that specializes in the rehabilitation of patients suffering from illness, such as a stroke or other neurological disorder, or injury such as a fractured hip or brain injury. As such, the nurses employed by Reliant, including Chinyere Osondu, LVN, Lloyd Esene, RN and Laquita Johnson, LVN, should have proper education, training and experience as to be able to adequately care for a patient such as Mrs. Murphy who had a neurological disorder and was recovering from brain surgery. The standard of care for the nurses employed by Reliant, including Chinyere Osondu, LVN, Lloyd Esene, RN and Laquita Johnson, LVN, was to properly support Mrs. Murphy in her recovery and address her post-operative needs. In that capacity and under the circumstances relevant to Mrs. Murphy's

February 17, 2016
Re: Kathleen Murphy
Page 8 of 12

case, the standard of care required that Chinyere Osondu, LVN, Lloyd Esene, RN, Laquita Johnson, LVN, and all other the nurses whose names or initials appear in the record as having participated in the care of Mrs. Murphy while she was admitted to the facility from September 28, 2013 to October 3, 2013, included:

1. Performing a comprehensive nursing assessment of the patent's physical mental and psychological needs on initial admission. This included reviewing of any and all orders and instructions provided by the physicians who were transferring her into their care;

2. Make sure the patient received appropriate, individualized nursing care and treatment;

3. Implementing the care and treatment ordered by the attending physicians, with the obligation to advise and confer with the treating physicians or the nursing staffs' supervisors regarding any conflicting orders or instructions from the physicians or any orders which they reasonably believe to be capable of adversely affecting the patient's health, safety or recovery;

4. Knowing and understanding the uses, effects and contraindications for any medication they administer;

5. Bringing to the attention of their nursing chain of command any orders or treatment plan which may place the individual patient's health at risk and refraining from implementing any such order or treatment plan;

6. If the employees, nurses and staff employed by Reliant Rehabilitation were not capable or willing to meet the standard of care, the standard of care required nurses employed by Reliant to refrain from taking the patient into their care so that alternative appropriate care and treatment could be provided.

In my opinion, Dr. Kane, Dr. Patel and the nurses at Reliant, including Chinyere Osondu, LVN, Lloyd Esene, RN and Laquita Johnson, LVN, failed to meet the standard of care required of each of them and their failure to meet the standard of care was a cause of the intracranial bleed suffered by Kathleen Murphy and her death. I

More specifically, it is my opinion that Dr. Dr. Kane and Dr. Patel:

1. Failed to properly assess Kathleen Murphy's physical mental and psychological needs on initial admission. They both failed to consider the fact she had recently undergone brain surgery and had an intra-ventricular shunt tube placed within her cerebral cortex and that her neurosurgeon, Dr. Hague had given express post-operative instructions that Mrs. Murphy was not to take any blood thinners.

66

February 17, 2016
Re: Kathleen Murphy
Page 9 of 12

2. Failed to make sure Mrs. Murphy received appropriate, individualized medical care
and treatment. Mrs. Murphy presented to Reliant with a very clear and specific
condition which removed her from the class of patients who would benefit from "DVT
prophylaxis" utilizing the blood thinner Xarelto "as per rehab protocol." The fact Mrs.
Murphy had recently under gone brain surgery disqualified her from receiving any
blood thinners absent some overwhelming medical need such as the presence of clot
in the atrium with cerebral emboli or an active deep vein thrombosis with pulmonary
emboli. Mrs. Murphy did not present to Dr. Kane or Dr. Patel with any such
conditions. Based upon the diagnosis and assessments performed on Ms. Murphy
prior to her transfer to from Texas Heath Fort Worth and when admitted to Reliant,
there was no medical reason to administer a blood thinner given her individual
condition.

3. Failed to implement the care plan and treatment ordered by Dr. Haque, the physician
who transferred Mrs. Murphy into their care, and did not consult or confer with Dr.
Hague regarding the decision to place her on Xarelto for DVT prophylaxis per rehab
protocol. The lack of consultation with Dr. Hague is made evident by his 10/4/2013
progress note in which he states: "It seems the underlying cause for her (thus far)
near-catastrophic intraventricular hemorrhage and neurological decline is the
initiation of anticoagulation (Xarelto) at her rehab facility just a few days after her
shunt was placed. Neither her husband nor I were asked about initiation or made
aware of it being started." Based upon the records provided, it was not until
10/4/2013 that the physicians treating Mrs. Murphy were informed that she had been
given Xarelto while she was a patient at Reliant.

4. Failed to develop and implement a comprehensive care plan intended to achieve the
highest practical physical and mental well-being consistent with Mrs. Murphy's
condition. Mrs. Murphy was prescribed and administered the blood thinner Xarelto
as part of a rehab protocol for DVT prophylaxis. Dr. Kane and Dr. Patel knew or should
have known that anticoagulants such as Xarelto should not be used in a patient like
Kathleen Murphy who has undergone instrumentation within the cerebral cortex (e.g.
placement or an intra-ventricular shunt tube) unless there is an overwhelming reason
to use a blood thinner. Mrs. Murphy did not present with any condition which
justified the use of a blood thinner.

5. Dr. Kane and Dr. Patel failed to recognize and avoid prescribing a medication that had
a high risk of negatively affecting the health, safety or recovery of Kathleen Murphy.
Routine prophylaxis is not considered a reason for the use of an anticoagulant such as
Xarelto® in a patient like Kathleen Murphy who was recovering from invasive brain
surgery.

6. If Dr. Kane or Dr. Patel did not have the basic medical knowledge necessary to properly
care for Mrs. Murphy who had recently undergone surgery that included

instrumentation within her cerebral cortex (e.g. placement or an intra-ventricular shunt tube) or were not willing to treat her in a manner consistent with the appropriate the standard of care,  the standard of care required Dr. Kane and Dr. Patel to refrain for taking Kathleen Murphy patient under his care so that alternative appropriate care and treatment could  be provided aby another physician.

It is also my opinion that the nurses employed by Reliant, including Chinyere Osondu, LVN, Lloyd Esene, RN and Laquita Johnson, LVN:

1. Failed to properly assess Kathleen Murphy's physical mental and psychological needs from a nursing perspective, on her initial admission.  The nurses administering the Xarelto® did not recognize the significance of the fact Mrs. Murphy had recently undergone brain surgery and had an intra-ventricular shunt tube placed within her cerebral cortex or that her neurosurgeon, Dr. Hague had given express post-operative instructions that Mrs. Murphy was not to take any blood thinners.

2. Failed to make sure Mrs. Murphy received appropriate, individualized nursing care and treatment.  Mrs. Murphy presented to Reliant with a very clear and specific condition which removed her from the class of patients who would benefit from "DVT prophylaxis" utilizing the blood thinner Xarelto "as per rehab protocol."  Any nurse who is working in a facility that provides post-operative care to patients who have neurological conditions and/or brain injuries should know that. The fact Mrs. Murphy had recently under gone brain surgery disqualified her from receiving any blood thinners absent some overwhelming medical need such as the presence of clot in the atrium with cerebral emboli or an active deep vein thrombosis with pulmonary emboli. As Mrs. Murphy did not present to Reliant with a history or diagnosis of any such conditions, Chinyere Osondu, LVN, Lloyd Esene, RN and Laquita Johnson, LVN, the nurses who received the order to administer Xarelto knew or should have known the blood thinner should not be given in light of her individual condition.

3. Implemented a care plan and administered a blood thinner when such orders were in conflict with the discharge instructions given by Dr. Haque, the physician who transferred Mrs. Murphy into their care, and did not consult or confer with Dr. Kane, Dr. Patel, Dr. Hague or their nursing supervisors regarding the order to give her Xarelto for DVT prophylaxis per rehab protocol. The nurses employed by Reliant, including Chinyere Osondu, LVN, Lloyd Esene, RN and Laquita Johnson, LVN, knew or should have known that anticoagulants such as Xarelto® should not be given to a patient like Kathleen Murphy who had undergone a recent brain surgery unless there is an overwhelming reason to use a blood thinner.  Mrs. Murphy did not present with any condition which justified the use of a blood thinner and  Chinyere Osondu, LVN, Lloyd Esene, RN and Laquita Johnson, LVN, should have questioned that order and refrained from administering the Xarelto®.

4. Failed to bring to the attention of their nursing chain of command the order for the prophylactic use of Xarelto® in Mrs. Murphy's case as that order placed her health at risk and failed to refrain from administering Xarelto® when Chinyere Osondu, LVN, Lloyd Esene, RN and Laquita Johnson, LVN, knew or should have known that routine prophylaxis is not considered a reason for the use of an anticoagulant such as Xarelto® in a patient like Kathleen Murphy who was recovering from brain surgery.

5. If the nurses employed by Reliant including Chinyere Osondu, LVN, Lloyd Esene, RN and Laquita Johnson, LVN, did not have the basic knowledge necessary to properly care for Mrs. Murphy, who had recently undergone surgery that included instrumentation within her cerebral cortex (e.g. placement or an intra-ventricular shunt tube), or these nurses were not willing to treat her in a manner consistent with the appropriate the standard of care, including questioning the order to administer Xarelto®, consulting with Dr. Kane and Dr. Patel about the order, bringing the order to the attention of their nursing chain of command and refraining from administering the medication,  the standard of care required these  nurses to refrain for taking Kathleen Murphy under their care so that alternative appropriate care and treatment could be provided by other nurses or another facility.

Thus within reasonable medical probability, Ms. Murphy's catastrophic neurologic intraventricular hemorrhage was the direct result of the improper and negligent administration of the oral anticoagulant, Xarelto®. Anticoagulants (blood thinners) are not to be used in patients who have undergone recent (within 1-2 weeks) of invasive intracerebral instrumentation (i.e. placement of an intraventricular shunt tube) because when the tube is inserted through the brain tissue there is invariably disruption of the brain's small arteries and veins that crisscross throughout the brain matrix causing small areas of bleeding. In the face of an anticoagulant this bleeding can expand and result in a major intracerebral-intraventricular hemorrhage. This is why Dr. Haque specifically stated that she was not to receive any blood thinners (anticoagulants).

My practice includes the diagnosis and treatment of patients who have suffered intracranial hemorrhages and increased intracranial pressure.  The events resulting from Ms. Murphy's cerebral hemorrhage included progressive cerebral edema and loss of cerebral function.  The intracranial hemorrhage put pressure on her brain and her brain cells were damaged.  As the brain cells deteriorated, the normal neural control of all body functions began to fail with the final physiologic event of respiratory failure (previously compromised by the development of aspiration pneumonia) and cessation of breathing. This is the final cause of death as per Ms. Murphy's death certificate.

In reasonable medical probability, the administration of the blood thinner, Xarelto® so soon after her brain surgery was a direct cause of Ms. Murphy's intraventricular hemorrhage and that hemorrhage was a direct cause of her respiratory failure and death.  According to the medical records I have reviewed, including in the assessments by Dr. Kane, Patel and Hague as

February 17, 2016
Re: Kathleen Murphy
Page 12 of 12

well as the testing performed, her condition prior to the administration of the anticoagulant Xarelto was stable and improving. But for the administration of Xarelto®, Ms. Murphy would not have suffered the aforementioned chain of events and would not have died on October 18, 2013. No other causes for her intracranial bleed and subsequent death, such as trauma, an aneurysm, an embolism or progression of her hydrocephalus, are supported by the medical record.

As a neurologist with over thirty-five years of experience, I have cared for thousands of critical patients with hydrocephalus (both acute and chronic) and have taken care of patients who developed a wide range of neurologic complications, including acute intracerebral and intraventricular hemorrhage as the cause of their death. As such I am able through my training and clinical experience to opine as to the chain of events that ultimately led to Ms. Murphy's death.

All my observations are based on reasonable medical probability and I reserve the right to amend and/or change any of my opinions based on new or additional information that is provided to me.

Sincerely yours,

Todd J. Swick, M.D., FAAN
Diplomate, American Board of Psychiatry and Neurology (Adult Neurology)

TJS: ts
T: 2/17/16

<u>CURRICULUM VITAE</u>

January 11, 2016

| | |
|---|---|
| <u>NAME:</u> | Todd J. Swick, M.D. |

<u>OFFICE ADDRESS:</u>    7500 San Felipe, Suite 525,    Houston, Texas 77063
21216 Northwest Frwy, #510,   Cypress, Texas 77429

<u>OFFICE PHONE:</u>    (713) 465-9282 (Houston Office)
(713) 465-7066 (Research Number)
(832) 678-2971 (Cypress Office)

<u>OFFICE FAX:</u>    (713) 465-9248
(713) 467-2954 (Research)

<u>E-mail:</u>    tswick@houstonsleepcenter.com
<u>URL Site:</u>    www.sleepandneurology.com

<u>BIRTHDATE:</u>    February 8, 1950

<u>PLACE OF BIRTH:</u>    New York City

<u>CITIZENSHIP:</u>    U.S.A.

<u>EDUCATION:</u>    9/68 - 6/71 - State University of New York at Stony Brook;
B.S.; Cum Laude
8/71 - 6/74 - State University of New York at Stony Brook;
M.D.

<u>INTERNSHIP/RESIDENCY:</u> 7/74 - 6/75    Long Island Jewish-Hillside Medical Center;
Straight Medical Internship (Chief of Service- Edward Meilman, MD)
7/75 - 6/77    Long Island Jewish-Hillside Medical Center;
Resident in Neurology (Chief of Service-Morton Nathanson, MD)
7/77 - 6/78    Long Island Jewish-Hillside Medical Center;
Chief Resident in Neurology (Chief of Service-Morton Nathanson, MD)

<u>BOARD STATUS:</u>    Board Certified - Neurology - American Board of Psychiatry and Neurology, April 1982.
Certified MRI/CT Neuroimaging – American Society of Neuroimaging
February 1998.
Board Certified - American Board of Sleep Medicine, April 2002.
Board Certified - American Board of Psychiatry and Neurology- Subspeciality of Sleep
Medicine, November 2007.

<u>TYPE OF PRACTICE:</u>    7/78 -11/79    Private Practice - Neurology;
New Hyde Park, New York

11/79 - 5/80    Staff Physician; Ambulatory Care Division -
University Hospital; SUNY at Stony Brook,
Stony Brook, New York

7/80 – 1/02    Private Practice; Diagnostic Neurology Clinic
of Houston, P.A., Houston, Texas

2/02- Present  Private Practice; Todd J. Swick, P.A.
Houston, Texas

| | | |
|---|---|---|
| 8/05- Present | Neurology and Sleep Medicine Consultants of Houston, Houston, Texas |
| 1/83 – 5/00 | Medical Director, Sleep Disorders Center, Spring Branch Medical Center, Houston, Texas |
| 1/87 - 12/87 | Vice Chief of Staff, Sam Houston Memorial Hospital Houston, Texas |
| 1/88 - 12/88 | Chief of Staff, Sam Houston Memorial Hospital Houston, Texas |
| 7/94 - 6/96 | Chief of Staff Elect, Spring Branch Medical Center Houston, Texas 77055 |
| 7/96 – 6/98 | Chief of Staff, Spring Branch Medical Center Houston, Texas 77055 |
| 1/94-6/2000 | Member of Board of Trustees, Spring Branch Medical Center Houston, Texas 77055 |
| 8/99-11/2011 | The Houston Sleep Center, The Institute of Sleep Medicine, Inc. Houston, Texas 77063 |
| 1/06-7/06 | Medical Director, The Sleep Disorders Laboratory, College Station Medical Center, College Station, Texas 77845 |
| 4/06-1/07 | Section Chief, Division of Sleep Medicine, Department of Neurology, Methodist Neurological Institute, Houston, Texas 77030 |
| 4/06-1/07 | Co-Director, Sleep Disorders Center, Sleep Medicine Section, The Methodist Neurological Institute, Houston, Texas 77030 |
| 1/07-Present | Medical Director, The Sleep Center at North Cypress Medical Center, North Cypress Medical Center, Cypress, Texas 77429 |
| 12/11-Present | Medical Director, Apnix Sleep Diagnostics, Memorial and Katy Sleep Centers, Houston, TX |
| 5/14- 6/2015 | Medical Director, American Sleep and Breathing Academy Ogden, Utah |

**LICENSURE:**

| | |
|---|---|
| 10/75 | New York #125775 |
| 3/80 | Arizona # 11801 |
| 6/80 | Texas #F7939 |

**ACADEMIC POSITIONS:**

| | |
|---|---|
| 7/77-6/78 | Assistant Clinical Professor in the Institute of Advanced Psychological Studies, Adelphi University, Garden City, NY |
| 12/77-9/79 | Assistant Instructor in Medicine, School of Medicine, State University of New York at Stony Brook, Stony Brook, NY |
| 10/79-5/80 | Instructor in Medicine, School of Medicine, State University of New York at Stony Brook, Stony Brook, NY |

12/84-Present Clinical Assistant Professor of Neurology, University of Texas
Medical School, Health Sciences Center at Houston,
Houston, Texas

## PROFESSIONAL SOCIETIES:

Fellow - American Academy of Neurology
Fellow - American Academy of Sleep Medicine
American Academy of Sleep and Breathing
American Medical Association
Texas Neurologic Society
Houston Neurological Society
Harris County Medical Society
Sleep Research Society
Southern Sleep Society
American Society of Neuroimaging
American Clinical Neurophysiology Society

## PROFESSIONAL COMMITTEES/ACTIVITIES and AWARDS:

American Academy of Sleep Medicine- National Standards of Practice Committee;
June 2005-June 2007.

National Medical Advisory Board, Narcolepsy Network 129 Waterwheel Lane, North
Kingston, RI 02852; June 2013-Present

Vanda Pharmaceuticals, FDA New Drug Application Advisory Committee
Washington, D.C.; November 2013.

National Medical Director, Member of the Medical Advisory Board and Member of
Executive Committee, American Sleep and Breathing Academy, Ogden, UT; May
2014-2015

Reviewer, Sleep Medicine, Elsevier Publishers, Editor-In-Chief: S. Chokroverty,
January 2013-Present.

2014 Robert Clark, MD, Clinician of The Year Award, National Narcolepsy Network,
Denver, CO, October 2014.

## ADVISORY BOARD MEMBERSHIP:

Jazz Pharmaceuticals, Palo Alto, CA.
Merck Pharmaceuticals, North Wales, PA
Vanda Pharmaceuticals, Washington, DC
XenoPort Pharmaceuticals, Santa Clara, CA
UCB, Inc., Smyrna, GA
Sunovion Pharmaceuticals, Marlborough, MA
Narcolepsy Network, National Medical Advisory Board, North Kingston, RI

## PUBLICATIONS:

Nathanson M, Swick TJ: Persistent Brainstem Reflexes During
Prolonged Electro-Cerebral Silence. XI World Congress of Neurology 1977,
Exerpta Medica

Todd J. Swick, M.D.                                                          Page 3 of 17

Swick, TJ, Chisholm, R.: Bilateral Rhythmic Synchronous Movements of the Lower Extremities in Sleep – A Form of Epilepsy?  International Conference on Sleep in the Diseased Brain - Current Opinion in Neurology. 1994

Swick, TJ. The Neurology of Sleep. In Neurologic Clinics, Vol 23, ed. Fayle, RW. Saunders, Philadelphia, 967-989, 2005

Xyrem International Study Group. Further evidence supporting the use of sodium oxybate for the treatment of cataplexy: a double-blind, placebo-controlled study in 28 patients. Sleep Medicine, 2005; 6 (5): 415-421

Xyrem International Study Group. A double-blind, placebo-controlled study demonstrates sodium oxybate is effective for the treatment of excessive daytime sleepiness in narcolepsy. J Clin Sleep Med 2005; 1(4): 391-397

Kushida CA, Littner MR, Hirshkowitz M, Morgenthaler TI, Alessi CA, Bailey D, Boehlecke B, Brown TM, Coleman J, Friedman L, Kapen S, Kapur VK, Kramer M, Lee-Chiong T, Owens J, Pancer JP, Swick TJ, Wise MS. Practice Parameters for the Use of Continuous and Bilevel Positive Airway Pressure Devices to Treat Adult Patients With Sleep-Related Breathing Disorders. Sleep. 2006; 29(3): 375-380

Morgenthaler TI, Kapen S, Lee-Chiong t, Alessi C, Boehlecke B, Brown T, Coleman J, Friedman L, Kapur V, Owens J, Pancer J, Swick T. Practice Parameters for the Medical Therapy of Obstructive Sleep Apnea. Sleep. 2006; 29(8): 1031-1035

Swick T. The Nightly Administration of Sodium Oxybate Is Associated with Significant Improvements in Nocturnal Sleep Quality, Pain and Fatigue in Patients with Fibromyalgia. Abstract/Poster presentation, 58th American Academy of Neurology Meeting, April 2006, San Diego, CA

Morgenthaler TI, Kapur VK, Brown T, Swick TJ, Alessi C, Aurora N, Boehlecke B, Chesson AL, Friedman L, Maganti R, Owens J, Pancer J, Zak R. Practice Parameters for the Treatment of Narcolepsy and Other Hypersomnias of Central Origin. Sleep. 2007; 30(12): 1705-1711

Morgenthaler TI, Aurora N, Brown T, Zak R, Alessi C, Boehlecke B, Chesson AL, Friedman L, Kapur V, Maganti R, Owens J, Pancer J, Swick T. Practice Parameters for the Use of Autotitrating Continuous Positive Airway Pressure Devices for Titrating Pressures and Treating Adult Patients with Obstructive Sleep Apnea Syndrome: An Update for 2007. Sleep. 2008; 31 (1): 141-147

Ondo WG, Perkins T, Swick T, Hull KL, Jimenez JE, Garris TS, Pardi D. Sodium Oxybate for Excessive Daytime Sleepiness in Parkinson Disease. Arch Neur. 2008; 65(10); 1337-1340

Swick TJ, Alvarez-Horine S, Zheng Y, Guinta D, Inhaber N, Holman, A, Smith TR, Russell IJ. Impaired Sleep and Daytime Functioning at Baseline in Subjects with Fibromyalgia: A 14-Week Randomized, Double-Blind, Placebo Controlled Trial of Sodium Oxybate (Abstract). Sleep. 2009; 32; A330

Swick TJ, Alvarez-Horine S, Zheng Y, Rothman J., Inhaber N, Holman A, Smith TR, Russell IJ. Sodium Oxybate Improves Pain, Fatigue, and Sleep in Fibromyalgia: Results from a 14-week Randomized, Double-Blind, Placebo Controlled Trial (Abstract). Sleep. 2009; 32; A321

Todd J. Swick, M.D.                                             Page 4 of 17

Wang YG, Swick TJ, Carter LP, Thorpy MJ, Benowitz NL. Safety overview of postmarketing and clinical experience of sodium oxybate (Xyrem®): abuse, misuse, dependence, and diversion. *J Clin Sleep Med 2009*; 5(4): 365-371

Russell JI, Holman AJ, Swick TJ, Alvarez-Horine S, Wang YG, Guinta; Sodium Oxybate reduces pain, fatigue, and sleep disturbance and improves functionality in fibromyalgia: results from a 14-week, randomized, double-blind, placebo-controlled study. *Pain.* 2011; 152(5): 1007-1017

Swick TJ. The Neurology of Sleep. In Sleep Medicine Clinics, Vol 6, No. 1, ed. Strickgold, R. Saunders, Philadelphia, 1-14, 2011

Swick TJ. Sodium Oxybate: a potential new pharmacological option for the treatment of fibromyalgia syndrome. Ther Adv Musculoskel Dis. 2011; 3(4): 167-178

Swick TJ. The Neurology of Sleep-2012. In Sleep Medicine Clinics, Vol 7, No. 3, ed. Strickgold, R. Saunders, Philadelphia, 399-415, 2012

Swick TJ. Parkinson's disease and sleep/wake disturbances. Parkinson's Dis 2012:205471

Roth, T, Dauvilliers, Y, Mignot, M, Montplaisir, J, Paul, J, Swick, T, Zee, P. *Disrupted nighttime sleep in narcolepsy.* J Clin Slp Med 2013; 9(9): 955-965

Swick TJ, Friedman JH, Chaudhuri KR, Surmann E, Boroojerdi B, Moran K, Ghys L, Trenkwalder, C. Associations between Severity of Motor Function and Nonmotor Symptoms in Parkinson's disease: A Post Hoc Analysis of the RECOVER study. Eur Neuro. 2014; 71:140-147.

Swick TJ, Sliman JA, Dressman MA, Xiao C, Licamele L, Baroldi P, Polymeropoulos MH. *Tasimelteon, a dual melatonin agonist for the treatment of Non-24 Hour Disorder: Pooled safety analysis in placebo controlled randomized trials.* (Abstract) American Psychiatric Association, New York, New York 2014.

Black J, Swick T, Feldman N, Doekel Jr. R, Khayrallah M, Bream G, Ruoff, C. *Efficacy and Safety of Oral ADX-N05 for the Treatment of Excessive Daytime Sleepiness in Adults with Narcolepsy: Results of a Randomized, Double-Blind, Placebo-Controlled Trial.* (Abstract) APSS [Sleep] (2014) Minneapolis, MN.

Lee DO, Swick T, Poxceta S, Jaros M, Kim R, Shang G. *Sleep Pain, and International Restless Legs Scale Outcomes as Predictors of Response on the Patient-Rated Clinical Global Impression-Improvement Scale In Patients with Moderate-to-Severe Primary RLS Treated with Gabapentin Enacarbil: Pooled Analyses from 2 Randomized Trials.* (Abstract) APSS [Sleep] (2014) Minneapolis, MN.

Mamelak M, Swick T, Emsellem H, Montplaisir J, Lai C, Black J. *A 12-week open label, multicenter study evaluating the safety of sodium oxybate (SXB) in patients with narcolepsy.* (Abstract) APSS [Sleep] (2014) Minneapolis, MN.

Bogan R, Swick T, Mamelak M, Ristanovic R, Lai C, Black J, Villa K, Montplaisir J. Evaluation of Quality-of-Life in Patients with Narcolepsy Treated with Sodium Oxybate: Use of the 36-Item Short-Form Health Survey in a Clinical Trial. (Abstract) APSS [Sleep], Seattle, WA, 2015.

Black J, Bassetti C, Bogan R, Lai C, Swick T. Sodium Oxybate Treatment in Patients with Narcolepsy Stratified by the Presence of Cataplexy: Retrospective Subgroup Analysis of a Randomized Clinical Trial. (Abstract) APSS, [Sleep] Seattle, WA, 2015.

Black J, Swick T, Feldman NT, Doekel R, Khayrallah M, Bream G, Ruoff R. Efficacy and Safety of Oral JZP-110 for the tteatment of Excessive Daytime Sleepiness in Adults with Narcolepsy: Results of a Phase 2b, Randomized, Double-Blind, Placebo-Controlled Trial. (Abstract) Canadian Sleep Society Conference, Toronto, Canada, September 2015.

Swick, TJ. *Treatment paradigms for cataplexy in narcolepsy: past, present and future.* Nature and Sci of Sleep. 2015, 7:159-169.

Scrima L and Swick T. Narcolepsy. In: *Synposis of Sleep Medicine.* Pandi-Perumal SR Editor, CRC Informa Press, London, Chaper 7, 2016 (In Press).

Swick TJ and Ondo, WG. Sleep in Parkinson's Disease. In: *Dopamine and Sleep: Molecular, Functional and Clinical Aspects.* Monti JM, Pandi-Perumal SR and Chokroverty S; Editors; Elsevier, Philadelphia, 2016 (In Press).

<u>INVITED LECTURES:</u>

Introduction to Sleep Disorders
Sam Houston Memorial Hospital
General Staff Meeting, February 1983

Sleep Apnea Syndrome
Department of Anesthesia Grand Rounds
Baylor College of Medicine, January 1984

Clinical Sleep Disorders
Memorial Northwest Hospital
CME Luncheon Lecture Series, August 1985

Pain Mechanisms and Management
Spring Branch Memorial Hospital
Medical Education Lecture, May 1986

Magnetic Resonance Imaging - Principles and Applications
Western Branch - Harris County Medical Society
Program director, October 1986

Sleep Disorders Medicine
La Universidad Autonomia de Guadalajara School of Medicine,
Continuing Medical Education. Jalisco, Mexico, August 1987

Osler Institute
Neurology - Neurosurgery Board Review Course
Faculty - Neurological Aspects of Sleep Disorders
Houston Texas, March 1991

Mind Matters Seminars
Sleep Disorders
Houston, San Antonio, Galveston, Texas May 1992

Bilateral Rhythmic Synchronous Movements of the Lower Extremities in Sleep - A
Form of Epilepsy?
International Conference on Sleep in the Diseased Brain
Jerusalem, Israel, March 13-18, 1994

Sleep Disorders in Critical Care Settings
Houston Critical Care Conference
Houston, Texas, November 2000

Narcolepsy -- Into the New Millenium
Grand Rounds, Department of Neurology UT School of Medicine,
Houston, Texas, November 2000

Sleep Disorder for Neurologists
Department of Neurology, University of Texas School of Medicine-
Houston, Texas, Spring 2001

Movement Disorders in Sleep
The Southern Sleep Society Annual Meeting, March 2001

Degenerative Neurologic Diseases and Sleep
The Southern Sleep Society, March 2003

The Physiologic Consequences of Snoring and Sleep Apnea
Houston Critical Care Conference, November 2003

New Advancements in Narcolepsy
Grand Rounds, Scott and White Clinic, Temple, Texas
Texas A&M University School of Medicine, November 2003

A Problem Based Sleep Medicine Course for the Primary Care Practitioner,
Co-Director: The Houston Sleep Consortium, September 2004

Efficacy of Sodium Oxybate for the Treatment of Excessive Sleepiness in Patients with
Narcolepsy. Investigator Meeting, Jazz Pharmaceuticals, January 2006

The Neurology of Sleep: Advances in Neurology
Methodist Neurological Institute, January 2006

A Problem Based Sleep Medicine Course for the Primary Care Practitioner, Second
Annual Course,
Co-Director: The Houston Sleep Consortium, February 2006.

Sleep and the Law: "But Officer I Was Asleep!"
Association of Professional Sleep Societies, Annual Meeting, June 2007

Advances in Understanding and Treatment of Narcolepsy
Methodist Neurological Institute 3rd Annual Advances in Neurology, September 2007

A Problem Based Sleep Medicine Course for the Primary Care Practitioner,
Pain and Sleep: A Bi-Directional Relationship
The Houston Sleep Education Consortium, February 2008

Clinical Experience with Sodium Oxybate in Narcolepsy and Fibromyalgia: Clinical Trials and Clinical Practice Perspectives.
Investigator Meeting, Jazz Pharmaceuticals, March 2008

Problem based Sleep Medicine Course to Enhance Your Clinical Practice: Establishing a Differential Diagnosis and Treatment Plan, Chronic Pain and Sleep Disorders.
The Houston Sleep Education Consortium, March 2009

Problem Based Sleep Medicine Course to Enhance Your Clinical Practice: Establishing a Differential Diagnosis and Treatment Plan
The Houston Sleep Education Consortium, February 2010

Problem Based Sleep Medicine Course to Enhance Your Clinical Practice: Establishing a Differential Diagnosis and Treatment Plan
The Houston Sleep Education Consortium, February 2011

Parasomnias: Things that Go Bump In The Night. Texas Medical Association Annual Meeting; Section on Psychiatry, June 2011.

National Experts Panel on Narcolepsy.  Disturbed Nocturnal Sleep; Jazz Pharmaceuticals, Minneapolis, MN, June 2011.

Excessive Somnolence and Excessive Quantity of Sleep: Prevalence, Comorbidity and Mortality. Patients with Hypersomnia in a Dedicated Sleep Practice. Stanford Sleep Epidemology Research Center.  April 2012.

Problem Based Sleep Medicine Course to Enhance Your Clinical Practice: Establishing a Differential Diagnosis and Treatment Plan
The Houston Sleep Education Consortium, February 2012

Physician Fatigue. Physician Health and Rehabilitation Training Session and Retreat, Texas Medical Association Committee on Physician Health and Rehabilitation Annual Retreat 2012, Moody Gardens, Galveston, Texas Feb 2012.

Basics of Narcolepsy. National Narcolepsy Network Annual Conference, October 2012, Cleveland, OH.

Comorbidity of Sleep Disorders and Mortality: Excessive Sleepiness & Hypersomnolence Issues. Comorbidities of Hypersomnolence: Chicken or Egg? Stanford Sleep Epidemiology Research Center.  August 2013.

Advancements in Narcolepsy: Pathophysiology and Etiology.  National Narcolepsy Network Annual Conference, October 2013, Atlanta, GA.

Problem Based Sleep Medicine Course to Enhance Your Clinical Practice: Establishing a Differential Diagnosis and Treatment Plan.
The Houston Sleep Education Consortium, 10th Annual Course, January 2014

Sleep Medicine Lecture Series-Introduction to clinical sleep medicine, neuroanatomy, physiology, pathophysiology and treatment. Houston Methodist Hospital, Department of Neurology, Houston, TX 2014-2015.

Sleep and Pain: A Bi-Directional Relationship. American Sleep and Breathing Academy, Annual Meeting, Scottsdale, AZ, May 2014.

Clinical Decision-Making in Narcolepsy Management; State-of-the Art. APSS National Meeting, Minneapolis, MN, June 2014.

Unmasking Narcolepsy: Diagnostic and Therapeutic Strategies. American Association of Sleep Technologists Fall Course, Darien, IL September 19, 2014.

Keynote Address, "Narcolepsy 101". National Narcolepsy Network Annual Conference, October 2014, Denver, CO.

Invited Sleep Specialist-The Whitney Reyolds Show, PBS; Chicago, IL concerning sleep apnea, drugs and athletics, November 2014.

American Association for Respiratory Care, National Meeting: The role of the RRT/CRT/RPSGT/RST in the Changing Health Care Environment, Las Vegas, NV, December 2014.

The Orexin System, Texas Neurologic Society, Fort Worth, Texas, February 2015.

2015-Narcolepsy and Central Hypersomnias (Past, Present nd Future). The Houston Sleep Education Consortium-Problem Based Sleep Medicine Course. Houston, Texas March 2015.

Narcolepsy Case Studies and PSG/MSLT Evaluation of Excessive Daytime Hypersomnolence. American Association of Sleep Technologists Annual National Meeting, Seattle, WA, June 7, 2015.

Diabetes and Metabolic Dysfunction and their relationship to sleep disorders. Board of Registered Sleep Technologists, Annual Meeting, Dallas, Texas, September 19, 2015.

Update on medical therapy for narcolepsy. National Narcolepsy Network Annual Conference, Denver, CO; October 10, 2015.

Practical Insights in Sleep Medicine: Advancing the Clinical Approach to Recognizing, Diagnosing, and Managing Excessive Daytimne Sleepiness and/or Cataplexy in Narcolepsy. Live, National Closed Circuit Tevelesion Presentation, New York City, NY, October 2015.

Sleep Medicine and the Training of Sleep Specialists in the USA. Neurology/Psychology Chinese Sleep Disorders Association Meeting, Beijing, China November 2015.

Elements of a Comprehensive Sleep Disorders Center, Sino-American Private Sleep Center Seminar, Beijing, China, November 2015.

Sleep Medicine Lecture Series-Introduction to Clinical Sleep Medicine, neuroanatomy, physiology, pathophysiology and treatment. Houston Methodist Hospital-Neurological Institute, Department of Neurology, Houston, TX 2015-2016.

## HOSPITAL STAFF APPOINTMENTS:

Memorial Hermann-Memorial City Medical Center
Houston, Texas 77024                    Courtesy Staff

North Cypress Medical Center
Cypress, Texas 77429                    Active Staff

Todd J. Swick, M.D.

**Research Studies Conducted:**

1. A Phase 3, Randomized, Double-Blind, Placebo-Controlled, Parallel-Group Study to Assess the Efficacy and Safety of (study drug) treatment in Children and Adolescents with Excessive Daytime Sleepiness Associated with Obstructive Sleep Apnea/Hypopnea Syndrome, Cephalon, Principal Investigator, 2004-2006

2. A Phase 3, Randomized, Double-Blind, Placebo-Controlled, Parallel-Group Study to Assess the Efficacy and Safety of (study drug) treatment in Children and Adolescents with Excessive Daytime Sleepiness Associated with Narcolepsy, Cephalon, Principal Investigator, 2004-2006

3. A 1- year Open Label, Flexible-Dosage Extension Study to Assess the Safety and Continued Effectiveness of (study drug) Treatment in Children and Adolescents With Excessive Sleepiness Associated with Narcolepsy or Obstructive Sleep Apnea, Cephalon, Principal Investigator, 2004-2006

4. A Prospective, 26-Week, Open-label, Single-arm, Multi-center Study Evaluating the Efficacy and Safety of Exelon® (rivastigmine tartrate) 3-12 mg/day in Patients with Mild to Moderate Alzheimer's Disease Who Are Responding Poorly to Aricept® (donepezil) Treatment, Principal Investigator, 2003-2004

5. A Multi-center, Randomized, Double-Blind, Active and Placebo-Controlled 5-Way Crossover Study of the Safety and Efficacy of Study Drug, Zolpidem, and Placebo in Primary Insomnia, Pfizer, Principal Investigator, 2003-2004

6. A Phase III, Randomized, Double-Blind, Placebo-Controlled, Outpatient, Safety and Efficacy Study of Study Drug in Adults with Chronic Insomnia, Takeda of North America, Principal Investigator, 2002-2004

7. A Phase III, Randomized, Double-Blind, Placebo-Controlled, Outpatient, Safety and Efficacy Study of Study Drug in Elderly Subjects with Chronic Insomnia, Takeda of North America, Principal Investigator, 2002-2004

8. A Phase III, Long Term Study, Open-Label, Fixed-Dose Study to Determine the Safety of Long Term Administration of Study Drug in Subjects with Chronic Insomnia, Takeda of North America, Principal Investigator, 2002-2004

9. Comparison of Efficacy and Safety of Zolpidem-MR 6.25 mg and Placebo in Elderly Patients with Primary Insomnia. A Double-Blind, Randomized, Placebo-Controlled, Parallel-Group Study, Sanofi-Synthelabo Inc., Principal Investigator, 2002-2004

10. A Multi-center, Open label, Phase IV Study to Assess the Tolerability, Safety, and Effectiveness of Switching from Carbamazepine Immediate Release and Liquid Formulations to Carbatrol® Extended Release Capsules in Epilepsy Subjects within a Community Based Population, Shire Inc, Principal Investigator, 2002-2003

11. Comparison of Efficacy (PSG) and Safety of Zolpidem-MR 12.5 mg and Placebo in Patients with Primary Insomnia, A Double-Blind, Randomized, Placebo-Controlled, Parallel-Group Study, Sanofi-Synthelabo Inc., Principal Investigator, 2002-2003

12. Open-Label, Multi-Center Safety Trial Studying the Effects of Orally Administered Xyrem® (Sodium Oxybate), Orphan Medical Inc., Principal Investigator, 2002-2004

13. A Randomized, Double-Blind, Placebo-Controlled, Parallel-Group, Multi-Center Trial Comparing the Effects of Orally Administered Xyrem® (sodium oxybate) with Placebo for the Treatment of Narcolepsy, Orphan Medical Inc., Principal Investigator, 2002-2004

14. Long Term, Open-Label, Multi-Center Extension Trial of Xyrem® (sodium oxybate) Oral Solution for the Treatment of Narcolepsy, Orphan Medical Inc., Principal Investigator, 1999- 2003

15. Randomized Double-Blind, Double-Dummy, Placebo-Controlled, Parallel-Group, Multi-Center Trial Comparing the Effects of Orally Administered Xyrem® (sodium oxybate) and Modafinil with Placebo in the Treatment of Daytime Sleepiness in Narcolepsy, Orphan Medical Inc., Principal Investigator, 2003-2004

16. An Open-Label, Multi-Center Trail to Evaluate the Effect of Concomitant Anti-Epileptic Drugs (AEDs) on the Tolerability of Topamax® (Topiramate) in Subjects with Partial Epilepsy, Ortho-McNeil, Principal Investigator, 1999 – 2000

17. Open-Label, Multi-Center, Six Month Trial of Xyrem® (sodium oxybate) Oral Solution for the Treatment of Narcolepsy in Study Drug Naive Patients, Orphan Medical Inc., Principal Investigator, 1998-2001

18. Lamictal® in Combination with Newer and Older Antiepileptic Drugs and as Monotherapy: A Practical Clinical Assessment of Tolerability and Clinical Effectiveness, Glaxo Wellcome, Principal Investigator, 1995-1996

19. Evaluation of the Hypnotic properties of Zolpidem MR 12.5 mg and Zolpidem 10mg Marketed product compare to Placebo in Patients with Primary Insomnia, A Double-Blind, Randomized, Placebo-Controlled, Three Way Cross-Over Study. Sanofi-Synthelabo, Principal Investigator.

20. A Dose-Ranging Placebo-Controlled Study of the study drug at doses of 0.5mg, 2mg, and 8mg for 12 weeks in patients with Mild-Moderate Alzheimer's Disease, Sanofi-Synthelabo, Principal Investigator, 2003-2004

21. A 9-11 Week, Multi-Center, Randomized, Double-Blind, Placebo controlled, Parallel Group Study to Determine the Effects of Adjunctive levetiracetam on the Sleep Architecture of Adult Subjects (18-45 years of age) with Partial Onset Epilepsy Receiving a First Generation Anti-epileptic, UCB Pharma, Principal Investigator, 2004-2005

22. A 12-Week, Randomized, Double-Blind, Placebo-Controlled, Parallel-Group Study to Evaluate the Efficacy and Safety of the study drug (150 mg/day) as Treatment for Adults With Residual Excessive Sleepiness Associated With Obstructive Sleep Apnea/Hypopnea Syndrome, Cephalon, Principal Investigator, 2004-2005

23. A 12-Week, Randomized, Double-Blind, Placebo-Controlled, Parallel-Group Study to Evaluate the Efficacy and Safety of the study drug (150 and 250 mg/day) as Treatment for Adults With Excessive Sleepiness Associated With Narcolepsy, Cephalon, Principal Investigator, 2004-2005

24. A Phase II, Eight Week, Multi-Center, Open Label Trial of Xyrem® (Sodium Oxybate) for Excessive Daytime Sleepiness and Nocturnal Sleep Disturbance in Patients with Mild to Moderate Parkinson's Disease, Orphan Medical, Participating Investigator, 2004-2007

25. Axert® 12.5mg Time vs. Intensity – Migraine Study (AIMS) An Open-Label Multicenter Trial to Evaluate the Efficacy of Axert® 12.5mg Intervention at Onset of Migraine Pain, Ortho-McNeil, Principal Investigator, 2004

26. A 12-Month, Open-Label, Flexible-Dosage (100 to 250 mg/day) Extension Study of the Safety and Efficacy of study drug in the Treatment of Patients With Excessive Sleepiness Associated With Narcolepsy, Obstructive Sleep Apnea/Hypopnea Syndrome or Chronic Shift Work Sleep Disorder (With an Open-Ended Extension Period), Cephalon, Principal Investigator, 2004-2006

27. Evaluation of the long-term efficacy and safety of study drug, compared to placebo, when both are administered over a long-term period "as needed", in patients with chronic primary insomnia. (A randomized, double-blind, placebo-controlled, parallel group, multicentre, phase IIIb clinical study), Sanofi-Synthelabo, Principal Investigator, 2004-2006

28. Randomized, Double-Blind, Placebo-Controlled, Parallel-Group, Multi-Center Trial Comparing the Effects of Orally Administered Xyrem® (sodium oxybate) with Placebo for Treatment of Fibromyalgia, Orphan Medical, Inc., Principal Investigator, 2004-2005

29. A Double-Blind, Randomized, Placebo-Controlled, Multicenter, 30 – Night Polysomnographic Study of Study Drug in Elderly Patients with Primary Insomnia, Merck, Principal Investigator, 2004-2007

30. A Double-Blind, Randomized, Placebo-Controlled, Multicenter, 30 – Night Polysomnographic Study of Study Drug in Adult Patients with Primary Insomnia, Merck, Principal Investigator, 2004-2006

31. A Multi-Center, Randomized, Double-Blind and Placebo-Controlled 5-Way Crossover Study of the Safety and Efficacy of Study Drug, Zolpidem, and Placebo in Primary Insomnia, Pfizer, Principal Investigator, 2004-2005

32. A Study to Define the Non-Restorative Sleep Population, Pfizer, Principal Investigator, 2004-2005

33. An international prospective observational registry in subjects for atherothrombotic events. Sanofi-Synthelabo/BMS, Principal Investigator, 2004-2008

34. A Phase III, Randomized, Double-Blind, Placebo-Controlled, parallel-Group, multicenter Study to Assess the Long Term Efficacy and Safety of Doxepin HCL in Primary Elderly Insomnia Patients with Sleep Maintenance Difficulties, Principal Investigator, Somaxon, 2006

35. A randomized, multicenter, double-blind, placebo-controlled, 18-month study of the efficacy of study drug in patients with mild-to-moderate dementia of the Alzheimer's type, Sanofi-Synthelabo, Principal Investigator, 2005-2008

36. A randomized, double-blind, placebo-controlled, parallel group phase 2 study to evaluate the safety and efficacy of study drug in subjects with mild-moderate Alzheimer's Disease, Astellas Pharma, Principal Investigator, 2005-2006

37. A Double-Blind, Randomized, Placebo-Controlled Study of the Efficacy, Safety and Tolerability of 8 Week Treatment of Rozerem™ 8 mg (QHS) in Sleep Disturbed, Community Dwelling, Mild to Moderately Severe Alzheimer's Disease Subjects, Takeda, Principal Investigator, 2006-2007

38. Health Care Utilization in Migraine, Pfizer, Principal Investigator, 2006-2007

39. Efficacy, safety, and tolerability of zolpidem in the treatment of children aged 6 to 17 years with ADHD-associated insomnia. multicenter, randomized, double-blind, placebo-controlled study, Sanofi-Aventis, Sub-Investigator, 2006

40. Study Drug Dose-Range Finding Trial: A 16-Week, Randomized, Double-Blind, Placebo, and Pregabalin Controlled, Multi-Center Trial of Study Drug in Patients with Postherpetic Neuralgia (PHN), Pfizer, Principal Investigator, 2006-2007

41. A Phase 2, Double-Blind, Randomized, Placebo-Controlled, Parallel-Group, Multicenter Proof-of-Concept Study to Evaluate the Safety and Efficacy of Rozerem™ Taken in Combination with Gabapentin for the Treatment of Subjects with Chronic Insomnia, Takeda, Principal Investigator, 2006

42. Randomized, Multinational, Multicenter, Double-Blind, Placebo-Controlled, Two-Arm Parallel Group Trial of Study Drug, 20 mg QD for Reducing the Risk of Major Cardiovascular Events in Abdominally Obese Patients with Clustering Risk Factors, Sanofi-Aventis, Principal Investigator, 2006-2009

43. A Randomized, Double-Blind, Placebo-Controlled, Safety and Efficacy Study of Xyrem® (Sodium Oxybate) in Subjects with Fibromyalgia, Jazz Pharmaceuticals, Principal Investigator, 2006-2008

44. An Open-Label Extension Trial Assessing the Safety and Tolerability of Study Drug in Patients with Postherpetic Neuralgia (PHN), Pfizer, Principal Investigator, 2006-2007

45. A Phase 2, Double-Blind, Randomized, Placebo-Controlled, Parallel-Group, Multicenter, Proof-of-Concept Study to Evaluate the Safety and Efficacy of Ramelteon Taken in Combination with Doxepin for the Treatment of Subjects with Chronic Insomnia, Takeda, Principal Investigator, 2006-2007

46. Acute Migraine Therapy & Patient Reported Outcomes, GlaxoSmithKline, Principal Investigator, 2006

47. A Long-Term, Open-Label Safety and Efficacy Study of Xyrem® (sodium oxybate) in Subjects with Fibromyalgia, Jazz Pharmaceuticals, Principal Investigator, 2007-2009

48. A Prospective, 5-Week, Open-Label, Randomized, Multi-Center, Parallel-Group Study with a 20-Week, Open-Label Extension Evaluating the Tolerability and Safety of Switching from Donepezil to Rivastigmine Patch Formulation in Patients with Probable Alzheimer's Disease, Novartis, Principal Investigator, 2007-2008

49. Phase 3B, Multicenter, Multinational, Double-Blind, Placebo-Controlled, 2-Arm Trial to Evaluate the Effect of the 24-Hour Transdermal Delivery of Rotigotine on the Control of Early Morning Motor Function, Sleep Quality, Nocturnal Symptoms, and Non-Motor Symptoms in Subjects with Idiopathic Parkinson's Disease, Schwarz Pharma, Principal Investigator, 2007

50. Randomized, Double Blind, Placebo-Controlled Study to Assess Whether the Administration of Ramelteon Could Facilitate the Discontinuation of Zolpidem (Ambien®) Greater Than or Equal to 10 mg Therapy in Subjects with Chronic Insomnia, Takeda, Principal Investigator, 2007-2008

51. A Phase II Randomized, Double-blind, Double-dummy, Placebo and Comparator-Controlled, Parallel-Group, Multi-Center Study to Investigate the Safety and Efficacy of a Single Dose of Study Drug Administered to Subjects with Narcolepsy, Alza Corporation, Principal Investigator, 2007-2008

52. A Multicenter, Multinational, Phase 3B, Open-Label Extension Trial to Evaluate the Long-Term Effect of the 24-Hour Transdermal Delivery of Rotigotine on Motor Function, Sleep Quality, and Nocturnal and Non-Motor Symptoms in Subjects With Idiopathic Parkinson's Disease, Schwarz Pharma, Principal Investigator, 2007

53. Study Drug Dose-Ranging Trial: A Randomized, Double-Blind, Parallel Group, Placebo-Controlled, Multicenter Outpatient Trial of Study Drug in Adults with Primary Insomnia, Pfizer, Principal Investigator, 2007-2008

54. A Randomized, Double-Blind, Placebo-Controlled, Parallel-Group Study to Evaluate the Efficacy and Safety of Armodafinil at a Target Dose of 200mg/day as Treatment for Adults With Excessive Daytime Sleepiness Associated With Obstructive Sleep Apnea/Hypopnea Syndrome With Comorbid Major Depressive Disorder or Dysthymic Disorder, Cephalon, Principal Investigator, 2008-2009

55. A Randomized, Double-Blind, Placebo-Controlled, Safety and Efficacy Study of Xyrem® (Sodium Oxybate) in Subjects with Fibromyalgia, Jazz Pharmaceuticals, Principal Investigator, 2008-2009

56. A 14-Week, Randomized, Double-Blind, Placebo-Controlled, Multi-Center Study of Study Drug Administered Once Daily (Q.D.) in Patients with Fibromyalgia, Pfizer, Principal Investigator, 2008-2009

57. A Survey to Assess the Impact of Neuropathic Pain Treatment, GlaxoSmithKline, Sub-Investigator, 2008-2009

58. A Phase 2, 26-Week, Multicenter, Randomized, Double-Blind, Placebo-Controlled, Parallel Group Study to Evaluate the Efficacy and Safety of Study Drug in Subjects with Alzheimer's Disease Receiving a Stable Dose of Donepezil, Epix Pharmaceuticals, Sub-Investigator, 2008-2009

59. A Phase 2, Multicenter, Randomized, Double-Blind, Placebo-Controlled, Parallel Group Study to Evaluate the Efficacy and Safety of Study Drug as Monotherapy in Subjects with Alzheimer's Disease, Epix Pharmaceuticals, Sub-Investigator, 2008-2009

60. A Multicenter, Randomized, Placebo-Controlled, "Factorial" Design, 12-Month Study to Evaluate the Efficacy and Safety of Study Drug 25 mg/day and 50mg/day Co-Administered with All Registered Atorvastatin Strengths Ranging from 10 mg to 80 mg in Patients with Primary Hypercholesterolemia, Sanofi-Aventis, Principal Investigator, 2008-2009

61. Chronic Migraine Treatment Trial, National Institute of Neurological Disorders and Stroke, NIH, Sub-Investigator, 2009

62. A Randomized Double Blind Placebo Controlled Four Week Study of the Efficacy and Safety of Three Doses (0.05 mg, 0.1 mg, 0.25 mg) of Study Drug tablets vs. Placebo in Idiopathic Restless Legs Syndrome, Neurogen, Principal Investigator, 2009

63. A 12-Week, Randomized, Double-Blind, Placebo-Controlled, Parallel-Group, Fixed-Dosage Study to Evaluate the Efficacy and Safety of Armodafinil (50, 150, and 250 mg/day) as Treatment for Patients With Excessive Sleepiness Associated With Mild or Moderate Closed Traumatic Brain Injury, Cephalon, Principal Investigator, 2009

64. Sample Collection And Submission To The NINDS Repository, Blood Draw, National Institute of Neurological Disorders and Stroke, NIH, Sub-Investigator, 2009

65. A Phase 2, 26-Week, Multicenter, Randomized, Double-Blind, Placebo-Controlled, Parallel Group Study to Evaluate the Efficacy and Safety of Study Drug in Subjects with Alzheimer's Disease Receiving a Stable Dose of Donepezil, Epix Pharmaceuticals, Principal Investigator, 2009

66. A Phase 2, Multicenter, Randomized, Double-Blind, Placebo-Controlled, Parallel Group Study to Evaluate the Efficacy and Safety of Study Drug as Monotherapy in Subjects with Alzheimer's Disease, Epix Pharmaceuticals, Principal Investigator, 2009

67. Chronic Migraine Treatment Trial, National Institute of Neurological Disorders and Stroke, NIH, Principal Investigator, 2009

68. Content Validation of the Visual Analogue Scale in Fibromyalgia, Jazz Pharmaceuticals, Principal Investigator, 2009-2010

69. A 12-Month, Open-Label Study to Evaluate the Safety, Tolerability, and Efficacy of Armodafinil (150 and 250 mg/day) as Treatment for Patients With Excessive Sleepiness Associated With Mild or Moderate Closed Traumatic Brain Injury, Cephalon, Principal Investigator, 2009

70. Effects of Pregabalin on Sleep Maintenance in Subjects with Fibromyalgia Syndrome and Sleep Maintenance Disturbance: A Randomized Placebo-Controlled 2-Way Crossover Polysomnography Study, Pfizer, Principal Investigator, 2009-2010

71. A Randomized Phase 2, Double-Blind, Placebo-Controlled, Multi-Center Crossover Study of Study Drug as a Daily Treatment for Excessive Daytime Sleepiness (EDS) Associated with Narcolepsy, Pfizer, Principal Investigator, 2009-2010

72. A Randomized Double-Blind, Placebo-Controlled, 3-Way Crossover, Multicenter Polysomnography Study of Pregabalin and Pramipexole in Adults with Restless Legs Syndrome, Pfizer, Principal Investigator, 2009-2010

73. A Phase IIb, Multicenter, Randomized, Double-Blind, Placebo-Controlled, 2-Period Adaptive Crossover Polysomnography Study to Evaluate the Safety and Efficacy of Study Drug in Patients with Primary Insomnia, Merck, Principal Investigator, 2009-2010

74. Randomized, Double-Blind, 12-Month Study of Pregabalin in Subjects with Restless Legs Syndrome, Pfizer, Principal Investigator, 2010

75. A Randomized, Placebo-Controlled, Double-Blind, Fixed-Dose Study of the Efficacy and Safety of Eszopiclone in Children (6 to 11 years) and Adolescents (12 to 17 years) with Attention Deficit/Hyperactivity Disorder-Associated Insomnia, 2010

76. Safety and Tolerability Study Comparing Sodium Oxybate Given as an Oral Solution to a Single-Blinded Combination of Oral Tablets Plus Oral Solution in Subjects with Fibromyalgia, Jazz Pharmaceuticals, Sub-Investigator, 2010

77. A Randomized, Multicenter, Double-blind, Parallel-Group Trial to Assess the Analgesic Efficacy and Safety of a New Analgesic Compared with Placebo in Subjects with Painful Diabetic Peripheral Neuropathy, Grunenthal, Sub-Investigator, 2010

78. A Multicenter, Randomized, Double-Mask, Placebo-Controlled, Parallel Study To Investigate the Efficacy and Safety of 20 mg Tasimelteon Versus Placebo on Totally Blind Subjects with N24HSWD Followed by an OLE Phase, Principal Investigator, Vanda Pharma, 2010-2012.

79. Efficacy and safety of eslicarbazepine acetate (BIA 2-093) as adjunctive therapy for refractory partial seizures in a double blind, randomized, placebo-controlled, parallel-group, multicentre clinical trial, Sunovion / Bial, Principal Investigator, 2011-2012.

80. Extended Release Amantadine Safety and Efficacy Study in Levodopa-Induced Dyskinesia, Adamas, Principal Investigator, 2011-2012.

81. Sepracor 093-045/ Double-Blind, Randomized, Historical Control Study of the Safety and Efficacy of Eslicarbazepine Acetate Monotherapy in Subjects with Partial Epilepsy Not Well Controlled by Current Antiepileptic Drugs, 2011-2013.

82. A Randomized Withdrawal Study to Demonstrate the Maintenance of Effect of 20 mg Tasimelteon in the Treatment of N24HSWD, Vanda Pharmaceuticals, 2011-2012.

83. An Open-Label Extension Safety Study of a 24-Month 20mg dose regimen of Tasimelteon for the Treatment of NON-24-Hour Sleep-Wake Disorder (N24HSWD) in Blind Individuals with No Light Perception who have enrolled in other Tasimelteon Clinical Trials, Vanda Pharmaceuticals, 2012-2014.

84. Phase 1, Randomized, Open-Label Study to Characterize the Pharmacokinetics, Pharmacodynamics, and Safety of Single and Multiple Doses of Armodafinil (50, 100, and 150 mg/day) in Children and Adolescents with Excessive Sleepiness Associated with Narcolepsy, Teva, 2012–2014.

85. Twelve-week, Double-Blind, Placebo-Controlled, Randomized, Parallel-Group, Multi-Center Study of the Safety and Efficacy of ADX-N05 in the treatment of Excessive Daytime Sleepiness in subjects with Narcolepsy, Aerial, 2012–2013.

86. A Multi-center, Randomized, Double-blind, Placebo-controlled Study Evaluating the Safety and Efficacy of Fixed-dose Once-daily Oral Aripiprazole in Children and Adolescents with Tourette's Disorder, Otsuka, 2012 – 2014.

87. A Randomized, Double-Blind, Placebo-Controlled, Fixed-Dose, Parallel-Group Study to Compare the Efficacy, Tolerability, and Safety of 3 Doses of Gabapentin Enacarbil (GSK1838262) With Placebo in the Treatment of Subjects With Moderate-to-Severe Primary Restless Legs Syndrome (RLS), XenoPort, 2012 – 2014.

88. A Multicenter, Multinational, Double-Blind, Placebo-Controlled, Three-Arm, Phase 4 Study to Evaluate the Efficacy of Rotigotine on Parkinson's Disease Associated Apathy, Motor Symptoms and Mood. UCB Biosciences Study, Protocol PD0005-Bright, April 2013-2014.

89. A Double-Blind, Placebo Controlled, Randomized, 3-Period, 3-Treatment Crossover Study to Evaluate the Effect of Multiple Oral Dose Administration of SEP-363856 in Male and Female Adult Subjects with Narcolepsy/Cataplexy. (SEP 361-108) Sunovion Pharmaceuticals, July 2014-July 2015.

90. A Randomized, Double-Blind, Placebo-Active-Controlled Study of DS-5565-A-E309 for Pain Associated with Fibromyalgia. Daiichi Sankyo Pharma Development. August 2014-Present.

91. An Open-Label Extension Study of DS-5565-A-E312 for 52 Weeks in Pain Associated with Fibromyalgia. Daiichi Sankyo Pharma Development. August 2014-Present.

92. An Open-Label, Multi-Center Study of the pharmacokinetics and safety of Xyrem in Pediatric Subjects with Narcolepsy, Phase 2 Study Number 13-005. Jazz Pharmaceuticals, September 2014-Present.

93. An Open-Label Safety Study of USL261 of Adolescent and Adult Subjects with Seizure Clusters, Upsher-Smith, January 2015-July 2015.

94. A Twelve-week, Double-blind, Placebo-controlled, Randomized, Parellel-group, Multicenter Study of the Safety and Efficacy of JZP-110 in the Treatment of Excessive Sleepiness in Subjects with Narcolepsy, JZP-110-14-002, Jazz Pharmaceuticals, March 2015-Present.

95. A Twelve-week, Double-blind, Placebo-controlled, Randomized, Parellel-group, Multicenter Study of the Safety and Efficacy of JZP-110 in the Treatment of Excessive Sleepiness in Subjects with Obstructive Sleep Apnea, JZP-110-14-003, Jazz Pharmaceuticals, March 2015-Present.

96. A Long-Term, Open-Label Safety and Maintenance of Efficacy of JZP-110 in the Treatment of Excessive Sleepiness in Subjects with Narcolepsy or Obstructive Sleep Apnea, JZP-110-14-005, Jazz Pharmaceuticals, March 2015-Present.

97. A Multi-Center, Randomized, Double-Masked, Placebo-Controlled, Parellel Study to investigate the Efficacy and Safety of Multiple Doeses of Tasimelteon and Matching Placebo in travelers with Jet Lag Disorder, VP-VEC-162-3106, Vanda Pharmaceuticals, October 2015-Present.