## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| TERRI GROOMS, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF VIRGINIA HARGRAVES, DECEASED, ALAN JUSTIN, MARTHA KEE, BEVERLY MILLER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF STEPHEN MILLER, DECEASED, AND TERESA WILLIAMS, | MDL No. 2592<br><br>SECTION: L<br><br>JUDGE: ELDON E. FALLON<br><br>MAG. JUDGE MICHAEL NORTH |
|         Plaintiffs, | Civil Action No.:_____ |
|    v. | |
| JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a JOHNSON AND JOHNSON PHARMACEUTICAL RESEARCH AND DEVELOPMENT LLC, JANSSEN ORTHO LLC, JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA INC. f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., JOHNSON & JOHNSON COMPANY, BAYER HEALTHCARE PHARMACEUTICALS, INC., BAYER PHARMA AG, BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE AG, and BAYER AG, | **COMPLAINT AND JURY TRIAL DEMAND** |
|         Defendants. | |

## JOINT COMPLAINT

Pursuant to Pretrial Order No. 11, Plaintiffs, by and through counsel, file this *Joint Complaint* against Defendants, as follows:

## JURISDICTION AND VENUE

1.     This Court has Federal subject matter jurisdiction over this action pursuant to 28

U.S.C. § 1332, in that in each of the constituent actions there is complete diversity among

Plaintiffs and the amount in controversy exceeds $75,000, exclusive of interest and costs, and

because there is complete diversity of citizenship between Plaintiffs and Defendants.

2.     This Court has personal jurisdiction over the Defendants pursuant to this Court's

Pre-Trial Order #9, dated March 24, 2015, permitting direct filing in this Court for consideration

for transfer into MDL No. 2592.

3.     The United States District Court of Kansas also has personal jurisdiction over the

Defendants as to the claims of the Kansas Decedent, Virginia Hargraves, because the Defendants

transact business in Kansas, the Defendants have committed a tort in whole or in part in the State

of Kansas, the Defendants have substantial and continuing contact with the State of Kansas, the

Defendants derive substantial revenue from goods used and consumed within the State of

Kansas, and the wrongs complained of arose in Kansas. The Defendants actively sell, market,

and promote their pharmaceutical product Xarelto to physicians and consumers in the State of

Kansas on a regular and consistent basis. Defendants have significant contacts in the vicinage of

the Kansas Decedent's residence such that they are subject to the personal jurisdiction of the

court in that vicinage.

4.     The United States District Court for the Western District of New York also has

personal jurisdiction over the Defendants as to the claims of the New York Plaintiff, Alan Justin,

because the Defendants transact business in New York, the Defendants have committed a tort in

whole or in part in the State of New York, the Defendants have substantial and continuing

contact with the State of New York, the Defendants derive substantial revenue from goods used

and consumed within the State of New York, and the wrongs complained of arose in New York. The Defendants actively sell, market, and promote their pharmaceutical product Xarelto to physicians and consumers in the State of New York on a regular and consistent basis. Defendants have significant contacts in the vicinage of the New York Plaintiff's residence such that they are subject to the personal jurisdiction of the court in that vicinage.

5.     The United States District Court of Arizona also has personal jurisdiction over the Defendants as to the claims of the Arizona Plaintiff, Martha Kee, because the Defendants transact business in Arizona, the Defendants have committed a tort in whole or in part in the State of Arizona, the Defendants have substantial and continuing contact with the State of Arizona, the Defendants derive substantial revenue from goods used and consumed within the State of Arizona, and the wrongs complained of arose in Arizona. The Defendants actively sell, market, and promote their pharmaceutical product Xarelto to physicians and consumers in the State of Arizona on a regular and consistent basis. Defendants have significant contacts in the vicinage of the Arizona Plaintiff's residence such that they are subject to the personal jurisdiction of the court in that vicinage.

6.     The United States District Court for the Southern District of Michigan also has personal jurisdiction over the Defendants as to the claims of the Michigan Decedent, Stephen Miller, because the Defendants transact business in Michigan, the Defendants have committed a tort in whole or in part in the State of Michigan, the Defendants have substantial and continuing contact with the State of Michigan, the Defendants derive substantial revenue from goods used and consumed within the State of Michigan, and the wrongs complained of arose in Michigan. The Defendants actively sell, market, and promote their pharmaceutical product Xarelto to physicians and consumers in the State of Michigan on a regular and consistent basis. Defendants

have significant contacts in the vicinage of the Michigan Decedent's residence such that they are subject to the personal jurisdiction of the court in that vicinage.

7.     The United States District Court for the Middle District of Georgia also has personal jurisdiction over the Defendants as to the claims of the Georgia Plaintiff, Teresa Williams, because the Defendants transact business in Georgia, the Defendants have committed a tort in whole or in part in the State of Georgia, the Defendants have substantial and continuing contact with the State of Georgia, the Defendants derive substantial revenue from goods used and consumed within the State of Georgia, and the wrongs complained of arose in Georgia. The Defendants actively sell, market, and promote their pharmaceutical product Xarelto to physicians and consumers in the State of Georgia on a regular and consistent basis. Defendants have significant contacts in the vicinage of the Georgia Plaintiff's residence such that they are subject to the personal jurisdiction of the court in that vicinage.

8.     The United States District Court for the Eastern District of Louisiana also has personal jurisdiction over the Defendants, because the Defendants transact business in Louisiana, the Defendants have committed a tort in whole or in part in the State of Louisiana, the Defendants have substantial and continuing contact with the State of Louisiana, the Defendants derive substantial revenue from goods used and consumed within the State of Louisiana, and the wrongs complained of arose in Louisiana. The Defendants actively sell, market, and promote their pharmaceutical product Xarelto to physicians and consumers in the State of Louisiana on a regular and consistent basis. Defendants have significant contacts in the vicinage of the Louisiana such that they are subject to the personal jurisdiction of the court in that vicinage.

9.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 and also under this Court's Pre-Trial Order #9, dated March 24, 2015, permitting direct filing in this

Court for consideration for transfer into MDL No. 2592. Pursuant to the Transfer Order of the Judicial Panel on Multidistrict Litigation, *In re Xarelto (Rivaroxaban) Products Liab. Litig.*, 2014 WL 7004048 (J.P.M.L. June 12, 2014), venue is also proper in this jurisdiction pursuant to 28 U.S.C. § 1407.

10.     Venue in this case is also appropriate in the United States District Court of Kansas pursuant to 28 U.S.C. § 1391 because the Kansas Decedent, Virginia Hargraves, purchased and used Xarelto and suffered from injuries from Xarelto in Kansas, and because the Defendants transact business in Kansas. A substantial part of the events and omissions giving rise to Plaintiff's causes of action occurred in the vicinage of the Decedent's residence, as well as in this district.

11.     Venue in this case is also appropriate in the United States District Court for the Western District of New York pursuant to 28 U.S.C. § 1391 because the New York Plaintiff, Alan Justin, purchased and used Xarelto and suffered from injuries from Xarelto in New York, and because the Defendants transact business in New York. A substantial part of the events and omissions giving rise to Plaintiff's causes of action occurred in the vicinage of the Plaintiff's residence, as well as in this district.

12.     Venue in this case is also appropriate in the United States District Court of Arizona pursuant to 28 U.S.C. § 1391 because the Arizona Plaintiff, Martha Kee, purchased and used Xarelto and suffered from injuries from Xarelto in Arizona, and because the Defendants transact business in Arizona. A substantial part of the events and omissions giving rise to Plaintiff's causes of action occurred in the vicinage of the Plaintiff's residence, as well as in this district.

13.     Venue in this case is also appropriate in the United States District Court for the Southern District of Michigan pursuant to 28 U.S.C. § 1391 because the Michigan Decedent, Stephen Miller, purchased and used Xarelto and suffered from injuries from Xarelto in Michigan, and because the Defendants transact business in Michigan. A substantial part of the events and omissions giving rise to Plaintiff's causes of action occurred in the vicinage of the Decedent's residence, as well as in this district.

14.     Venue in this case is also appropriate in the United States District Court for the Middle District of Georgia pursuant to 28 U.S.C. § 1391 because the Georgia Plaintiff, Teresa Williams, purchased and used Xarelto and suffered from injuries from Xarelto in Georgia, and because the Defendants transact business in Georgia. A substantial part of the events and omissions giving rise to Plaintiff's causes of action occurred in the vicinage of the Plaintiff's residence, as well as in this district.

15.     The Plaintiffs state that but for the Pretrial Order No. 9 permitting direct filing into the United States District Court for the Eastern District of Louisiana, the Kansas Plaintiff, Terri Grooms, would have filed suit in the United States District Court of Kansas, the New York Plaintiff, Alan Justin, would have filed suit in the United States District Court for the Western District of New York, the Arizona Plaintiff, Martha Kee, would have filed suit in the United States District Court of Arizona, the Michigan Plaintiff, Beverly Miller, would have filed suit in the United States District Court for the Southern District of Michigan, and the Georgia Plaintiff, Teresa Williams, would have filed suit in the United States District Court for the Middle District of Georgia. Therefore, these Plaintiffs respectfully request that at the time of the transfer of this action back to their respective trial courts for further proceedings, if any, that this case be transferred to the above referenced District Courts.

**NATURE OF THE CASE**

16.     Plaintiffs bring this case against Defendants for damages associated with ingestion of the pharmaceutical drug Xarelto, which was designed, manufactured, marketed, sold and distributed by Defendants.  Specifically, Plaintiffs and Decedents suffered various injuries, serious physical pain and suffering, life-threatening bleeding, medical, hospital and surgical expenses, and/or loss of consortium as a direct result of their use of Xarelto.

17.     Plaintiffs and Decedents used Xarelto also known as rivaroxaban to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat deep vein thrombosis (hereinafter referred to as "DVT") and pulmonary embolism (hereinafter referred to as "PE"), to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

18.     Defendants, JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a JOHNSON AND JOHNSON PHARMACEUTICAL RESEARCH AND DEVELOPMENT LLC, JANSSEN ORTHO LLC, JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA INC. f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., JOHNSON & JOHNSON COMPANY, BAYER HEALTHCARE PHARMACEUTICALS, INC., BAYER PHARMA AG, BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE AG, and BAYER AG (hereinafter collectively referred to as "Defendants") designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Xarelto.

19.     When warning of safety and risks of Xarelto, Defendants negligently and/or fraudulently represented to the medical and healthcare community, the Food and Drug Administration (hereinafter referred to as the "FDA"), to Plaintiffs and Decedents, and the public

in general that Xarelto had been tested and was found to be safe and/or effective for its intended use.

20.     Defendants concealed their knowledge of Xarelto's defects from Plaintiffs and Decedents, the FDA, the public in general and/or the medical community specifically.

21.     These representations were made by Defendants with the intent of defrauding and deceiving Plaintiffs and Decedents, the public in general, and the medical and healthcare community in particular, to recommend, dispense and/or purchase Xarelto for use to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, all of which evinced a callous, reckless, willful, depraved indifference to health, safety and welfare of the Plaintiffs and Decedents herein.

22.     Defendants negligently and improperly failed to perform sufficient tests, if any, on humans using Xarelto during clinical trials, forcing Plaintiffs, Decedents, and their physicians, hospitals, and/or the FDA, to rely on safety information that applies to other non-valvular atrial fibrillation treatment and DVT/PE treatment and prophylaxis, which does not entirely and/or necessarily apply to Xarelto whatsoever.

23.     Defendants concealed their knowledge of the defects in their products from the Plaintiffs, Decedents, and their physicians, hospitals, pharmacists, the FDA, and the public in general.

24.     As a result of the foregoing acts and omissions, the Plaintiffs and Decedents were caused to suffer serious and dangerous side effects including, life-threatening bleeding, multiple knee surgeries, as well as other severe and personal injuries which are permanent and lasting in

7

nature, death, physical pain and mental anguish, diminished enjoyment of life, expenses for hospitalization, the need for lifelong medical treatment, monitoring and/or medications, fear of developing any of the above named health consequences, and loss of earnings.

25.     As a result of the foregoing acts and omissions, Plaintiffs and Decedents have suffered and incurred damages, including medical expenses; the loss of accumulations; and other economic and noneconomic damages.

26.     Consequently, Plaintiffs seek compensatory damages as a result of Plaintiffs' and Decedents' use of the Xarelto, which have caused Plaintiffs and Decedents to suffer from life-threatening bleeding, multiple knee surgeries, as well as other severe and personal injuries, which are permanent and lasting in nature, death, physical pain and mental anguish, including diminished enjoyment of life.

## PARTY PLAINTIFFS

Plaintiffs herein are:

27.     Terri Grooms, Individually and as Personal Representative of the Estate of Virginia Hargraves, Deceased

       a.      Decedent, Virginia Hargraves, was a resident of Topeka in Shawnee County, Kansas.

       b.      Decedent, Virginia Hargraves, on or about March 13, 2014, was prescribed Xarelto for the treatment of atrial fibrillation.

       c.      On April 21, 2014, Decedent, Virginia Hargraves, was admitted Stormont-Vail Healthcare in Topeka, Kansas, and was treated for rectal bleeding and acute blood loss anemia as a direct result of Xarelto. She underwent blood transfusion to treat her blood loss.

d.    Decedent, Virginia Hargraves, remained hospitalized at Stormont-Vail Healthcare in Topeka, Kansas, from April 21, 2014to April 30, 2014.

e.    Decedent, Virginia Hargraves, ultimately died due to her injuries on May 22, 2014.

f.    Decedent, Virginia Hargraves, is represented herein by her daughter, Plaintiff Terri Grooms, as the personal representative of her estate. Terri Grooms is a resident of Wichita in Sedgwick County, Kansas.

28.    Alan Justin

a.    Plaintiff, Alan Justin, is a resident of Elma in Erie County, New York.

b.    Plaintiff, Alan Justin, on or about February 22, 2013, was prescribed Xarelto for the treatment of atrial fibrillation.

c.    On April 30, 2013, Plaintiff, Alan Justin, was admitted to Mercy Hospital in Buffalo, New York, and was treated for upper gastrointestinal bleeding and anemia as a direct result of Xarelto. He underwent blood transfusion to treat his blood loss.

d.    Plaintiff, Alan Justin remained hospitalized at Mercy Hospital in Buffalo, New York, from April 30, 2013 to May 10, 2013.

e.    In conjunction with Plaintiff Alan Justin's claim, Pat Justin, spouse of Alan Justin, asserts a claim for loss of consortium.

29.    Martha Kee

a.    Plaintiff, Martha Kee, is a resident of Phoenix in Maricopa County, Arizona.

9

      b.      Plaintiff, Martha Kee, was prescribed Xarelto on or about October 28, 2014, for the treatment of atrial fibrillation.

      c.      On November 8, 2014, Plaintiff, Martha Kee, was admitted to West Valley Hospital in Goodyear, Arizona, and was treated for acute gastrointestinal bleeding and acute blood loss anemia as a direct result of Xarelto. She underwent blood transfusion to treat her blood loss.

      d.      Plaintiff, Martha Kee remained hospitalized at West Valley Hospital in Goodyear, Arizona, from November 8, 2014 to November 11, 2014.

30.      Beverly Miller, Individually and as Personal Representative of the Estate of Stephen Miller, Deceased

      a.      Decedent, Stephen Miller, was a resident of Chesterfield Township in Macomb County, Michigan.

      b.      Decedent, Stephen Miller, on or about August 16, 2013, was prescribed Xarelto for the treatment of DVT.

      c.      On September 5, 2013, Decedent, Stephen Miller, was admitted to McLaren Macomb, Mount Clemens Regional Medical Center in Mount Clemens, Michigan, and was treated for acute gastrointestinal bleeding and acute blood loss anemia as a direct result of Xarelto. He underwent blood transfusion to treat his blood loss.

      d.      Decedent, Stephen Miller, remained hospitalized at McLaren Macomb, Mount Clemens Regional Medical Center in Mount Clemens, Michigan, from September 5, 2013 to September 11, 2013.

e.  Decedent, Stephen Miller, ultimately died due to his injuries on October 1, 2013.

f.  Decedent, Stephen Miller, is represented herein by his spouse, Plaintiff Beverly Miller, as the personal representative of his estate. Beverly Miller is also a resident of Chesterfield Township in Macomb County, Michigan.

g.  Plaintiff, Beverly Miller also asserts a claim for loss of consortium.

31.  Teresa Williams

a.  Plaintiff, Teresa Williams, is a resident of Camilla in Mitchell County, Georgia.

b.  Plaintiff, Teresa Williams, was prescribed Xarelto on or about December 4, 2014 for DVT prophylaxis after knee replacement surgery.

c.  On December 22, 2014, Plaintiff, Teresa Williams, was admitted to Phoebe Putney Memorial Hospital in Albany, Georgia, and was treated for PE and bilateral DVT as a direct result of sudden discontinuation of Xarelto.

d.  Plaintiff, Teresa Williams remained hospitalized at Phoebe Putney Memorial Hospital in Albany, Georgia, from December 22, 2014 to December 25, 2014.

e.  In conjunction with Plaintiff Teresa William's claim, Freddy Williams, spouse of Teresa Williams, asserts a claim for loss of consortium.

## PARTY DEFENDANTS

32.  Upon information and belief, Defendant JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a JOHNSON AND JOHNSON RESEARCH AND

11

DEVELOPMENT LLC (hereinafter referred to as "JANSSEN R&D") is a limited liability company organized under the laws of New Jersey, with a principal place of business in New Jersey. Defendant JANSSEN R&D's sole member is Janssen Pharmaceuticals, Inc., which is a Pennsylvania corporation with a principal place of business in New Jersey. Accordingly, JANSSEN R&D is a citizen of Pennsylvania and New Jersey for purposes of determining diversity under 28 U.S.C. § 1332.

33.     As part of its business, JANSSEN R&D is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto.

34.     Defendant JANSSEN R&D is the holder of the approved New Drug Application ("NDA") for Xarelto as well as the supplemental NDA.

35.     Upon information and belief, Defendant JANSSEN R&D, has transacted and conducted business in the States of Kansas, New York, Arizona, Michigan, Georgia, and Louisiana.

36.     Upon information and belief, Defendant JANSSEN R&D, has derived substantial revenue from goods and products used in the States of Kansas, New York, Arizona, Michigan, Georgia, and Louisiana.

37.     Upon information and belief, Defendant, JANSSEN R&D, expected or should have expected its acts to have consequence within the United States of America and the States of Kansas, New York, Arizona, Michigan, Georgia, and Louisiana, and derived substantial revenue from interstate commerce within the United States and the States of Kansas, New York, Arizona, Michigan, Georgia, and Louisiana, more particularly.

38.     Upon information and belief, and at all relevant times Defendant JANSSEN R&D, was in the business of and did design, research, manufacture, test, advertise, promote,

market, sell, and distribute the drug Xarelto for use as an oral anticoagulant. The primary

purposes of Xarelto are to reduce the risk of stroke and systemic embolism in patients with non-

valvular atrial fibrillation, to treat Deep Vein Thrombosis ("DVT") and Pulmonary Embolism

("PE"), to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for

patients undergoing hip and knee replacement surgery.

39.     Upon information and belief, Defendant JANSSEN PHARMACEUTICALS,

INC. f/k/a JANSSEN PHARMACEUTICA INC. f/k/a ORTHO-MCNEIL-JANSSEN

PHARMACEUTICALS, INC. (hereinafter referred to as "JANSSEN PHARM") is a

Pennsylvania corporation, having a principal place of business in New Jersey.

40.     As part of its business, JANSSEN PHARM is involved in the research,

development, sales, and marketing of pharmaceutical products, including Xarelto.

41.     Upon information and belief, Defendant JANSSEN PHARM, has transacted and

conducted business in the States of Kansas, New York, Arizona, Michigan, Georgia, and

Louisiana.

42.     Upon information and belief, Defendant JANSSEN PHARM, has derived

substantial revenue from goods and products used in the States of Kansas, New York, Arizona,

Michigan, Georgia, and Louisiana.

43.     Upon information and belief, Defendant, JANSSEN PHARM, expected or should

have expected its acts to have consequence within the United States of America and the States of

Kansas, New York, Arizona, Michigan, Georgia, and Louisiana, and derived substantial revenue

from interstate commerce within the United States and the States of Kansas, New York, Arizona,

Michigan, Georgia, and Louisiana, more particularly.

13

44. Upon information and belief, and at all relevant times, Defendant JANSSEN PHARM was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

45. Upon information and belief, Defendant JANSSEN ORTHO LLC (hereinafter referred to as "JANSSEN ORTHO") is a limited liability company organized under the laws of Delaware, having a principal place of business at Stateroad 933 Km 0 1, Street Statero, Gurabo, Puerto Rico 00778. Defendant JANSSEN ORTHO is a subsidiary of Johnson & Johnson. The only member of JANSSEN ORTHO LLC is OMJ PR Holdings, which is incorporated in Ireland with a principal place of business in Puerto Rico. Accordingly, JANSSEN ORTHO LLC is a citizen of Delaware, Ireland and Puerto Rico for purposes of determining diversity under 28 U.S.C. § 1332.

46. As part of its business, JANSSEN ORTHO is involved in the research, development, sales, and marketing of pharmaceutical products, including Xarelto.

47. Upon information and belief, Defendant JANSSEN ORTHO, has transacted and conducted business in the States of Kansas, New York, Arizona, Michigan, Georgia, and Louisiana.

48. Upon information and belief, Defendant JANSSEN ORTHO, has derived substantial revenue from goods and products used in the States of Kansas, New York, Arizona, Michigan, Georgia, and Louisiana.

49.     Upon information and belief, Defendant, JANSSEN ORTHO, expected or should have expected its acts to have consequence within the United States of America and the States of Kansas, New York, Arizona, Michigan, Georgia, and Louisiana, and derived substantial revenue from interstate commerce within the United States and the States of Kansas, New York, Arizona, Michigan, Georgia, and Louisiana, more particularly.

50.     Upon information and belief, and at all relevant times, Defendant, JANSSEN ORTHO, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

51.     Defendant JOHNSON & JOHNSON (hereinafter referred to as "J&J") is a fictitious name adopted by Defendant Johnson & Johnson Company, a New Jersey corporation which has its principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933.

52.     Upon information and belief, Defendant J&J, has transacted and conducted business in the States of Kansas, New York, Arizona, Michigan, Georgia, and Louisiana.

53.     Upon information and belief, Defendant J&J, has derived substantial revenue from goods and products used in the States of Kansas, New York, Arizona, Michigan, Georgia, and Louisiana.

54.     Upon information and belief, Defendant J&J, expected or should have expected its acts to have consequence within the United States of America and the States of Kansas, New York, Arizona, Michigan, Georgia, and Louisiana, and derived substantial revenue from

15

interstate commerce within the United States and the States of Kansas, New York, Arizona, Michigan, Georgia, and Louisiana, more particularly.

55.     As part of its business, J&J, and its "family of companies," is involved in the research, development, sales, and marketing of pharmaceutical products, including Xarelto.

56.     Upon information and belief, Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. is, and at all relevant times was, a corporation organized under the laws of the State of Delaware, with its principal place of business in the State of New Jersey.

57.     As part of its business, BAYER HEALTHCARE PHARMACEUTICALS, INC. is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto.

58.     Upon information and belief, Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC., has transacted and conducted business in the States of Kansas, New York, Arizona, Michigan, Georgia, and Louisiana.

59.     Upon information and belief, Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC., has derived substantial revenue from goods and products used in the States of Kansas, New York, Arizona, Michigan, Georgia, and Louisiana.

60.     Upon information and belief, Defendant, BAYER HEALTHCARE PHARMACEUTICALS, INC., expected or should have expected its acts to have consequence within the United States of America and the States of Kansas, New York, Arizona, Michigan, Georgia, and Louisiana, and derived substantial revenue from interstate commerce within the United States and the States of Kansas, New York, Arizona, Michigan, Georgia, and Louisiana, more particularly.

61.     Upon information and belief, and at all relevant times, Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

62.     Upon information and belief, Defendant BAYER PHARMA AG is a pharmaceutical company domiciled in Germany.

63.     Defendant BAYER PHARMA AG is formerly known as Bayer Schering Pharma AG and is the same corporate entity as Bayer Schering Pharma AG. Bayer Schering Pharma AG was formerly known as Schering AG and is the same corporate entity as Schering AG.

64.     Upon information and belief, Schering AG was renamed Bayer Schering Pharma AG effective December 29, 2006.

65.     Upon information and belief, Bayer Schering Pharma AG was renamed BAYER PHARMA AG effective July 1, 2011.

66.     As part of its business, BAYER PHARMA AG is involved in the research, development, sales, and marketing of pharmaceutical products, including Xarelto.

67.     Upon information and belief, Defendant BAYER PHARMA AG, has transacted and conducted business in the States of Kansas, New York, Arizona, Michigan, Georgia, and Louisiana.

17

68.     Upon information and belief, Defendant BAYER PHARMA AG, has derived substantial revenue from goods and products used in the States of Kansas, New York, Arizona, Michigan, Georgia, and Louisiana.

69.     Upon information and belief, Defendant, BAYER PHARMA AG, expected or should have expected its acts to have consequence within the United States of America and the States of Kansas, New York, Arizona, Michigan, Georgia, and Louisiana, and derived substantial revenue from interstate commerce within the United States and the States of Kansas, New York, Arizona, Michigan, Georgia, and Louisiana, more particularly.

70.     Upon information and belief, and at all relevant times, Defendant BAYER PHARMA AG was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

71.     Upon information and belief, Defendant BAYER CORPORATION is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205.

72.     Upon information and belief, BAYER HEALTHCARE PHARMACEUTICALS, INC. is owned by Defendant BAYER CORPORATION.

73.     At all relevant times, Defendant BAYER CORPORATION was engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling,

marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, its products, including the prescription drug Xarelto.

74.     At all relevant times, Defendant BAYER CORPORATION conducted regular and sustained business in the States of Kansas, New York, Arizona, Michigan, Georgia, and Louisiana, by selling and distributing its products in the States of Kansas, New York, Arizona, Michigan, Georgia, and Louisiana and engaged in substantial commerce and business activity in the States of Kansas, New York, Arizona, Michigan, Georgia, and Louisiana.

75.     Upon information and belief, Defendant BAYER HEALTHCARE LLC is a limited liability company duly formed and existing under and by the virtue of the laws of the State of Delaware, with its principal place of business located at 100 Bayer Blvd, Whippany, New Jersey 07981-1544.

  a.     Upon information and belief, from on or about the early January 1, 2003 until on or about late December, 2014, BAYER HEALTHCARE LLC's sole member was Bayer Corporation, and is wholly owned by Bayer Corporation, which is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205.

  b.     Upon information and belief, from on or about early January, 2015 to on or about June 30, 2015, BAYER HEALTHCARE LLC's sole member was Bayer Medical Care, Inc., and is wholly owned by Bayer Medical Care, Inc., which is a Delaware Corporation, with its principal place of business at 1 Medrad Dr., Indianola, Pennsylvania 15051.

  c.     Upon information and belief, from on or about July 1, 2015 to the present, BAYER HEALTHCARE LLC's members are:

i.      Bayer Medical Care Inc., a Delaware corporation with its principal place of business in Pennsylvania;

ii.     NippoNex Inc., a Delaware corporation with its principal place of business in New Jersey;

iii.    Bayer West Coast Corporation, a Delaware Corporation with its principal place of business in California;

iv.     Bayer Essure Inc., a Delaware corporation with its principal place of business in California;

v.      Bayer Consumer Care Holdings, LLC, a limited liability company formed in Delaware with its principal place of business in New Jersey;

vi.     Dr. Scholl's LLC, a limited liability company, formed in Delaware with its principal place of business in California;

vii.    Coppertone LLC, a limited liability company, formed in Delaware with its principal place of business in California;

viii.   MiraLAX LLC, a limited liability company, formed in Delaware with its principal place of business in California; and,

ix.     Bayer HealthCare U.S Funding LLC, a limited liability company, formed in Delaware with its principal place of business in Pennsylvania.

Accordingly, BAYER HEALTHCARE LLC is a citizen of Delaware, New Jersey, Indiana, Pennsylvania, and California for purposes of determining diversity under 28 U.S.C. § 1332.

20

76.    Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC has transacted and conducted business in the States of Kansas, New York, Arizona, Michigan, Georgia, and Louisiana, and derived substantial revenue from interstate commerce. Defendant BAYER CORPORATION is the sole member of Defendant BAYER HEALTHCARE LLC.

77.    Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC expected or should have expected that its acts would have consequences within the United States of America and in the States of Kansas, New York, Arizona, Michigan, Georgia, and Louisiana, and derived substantial revenue from interstate commerce.

78.    Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

79.    Upon information and belief, Defendant BAYER HEALTHCARE AG is a company domiciled in Germany and is the parent/holding company of Defendants BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC, and BAYER PHARMA AG.

80.    Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG has transacted and conducted business in the States of Kansas, New York,

Arizona, Michigan, Georgia, and Louisiana, and derived substantial revenue from interstate commerce.

81.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG expected or should have expected that its acts would have consequences within the United States of America, and in the States of Kansas, New York, Arizona, Michigan, Georgia, and Louisiana, and derived substantial revenue from interstate commerce.

82.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG exercises control over Defendants BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC., and BAYER PHARMA AG.

83.     Upon information and belief, Defendant BAYER AG is a German chemical and pharmaceutical company that is headquartered in Leverkusen, North Rhine-Westphalia, Germany.

84.     Upon information and belief, Defendant BAYER AG is the third largest pharmaceutical company in the world.

85.     Upon information and belief, at all relevant times, Defendant BAYER AG has transacted and conducted business in the States of Kansas, New York, Arizona, Michigan, Georgia, and Louisiana, and derived substantial revenue from interstate commerce.

86.     Upon information and belief, at all relevant times, Defendant BAYER AG expected or should have expected that its acts would have consequences within the United States of America, and in the States of Kansas, New York, Arizona, Michigan, Georgia, and Louisiana, and derived substantial revenue from interstate commerce.

87.     Upon information and belief, at all relevant times, Defendant BAYER AG was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

88.     At all times alleged herein, Defendants include and included any and all parents, subsidiaries, affiliates, divisions, franchises, partners, joint venturers, and organizational units of any kind, their predecessors, successors and assigns and their officers, directors, employees, agents, representatives and any and all other persons acting on their behalf.

89.     At all times herein mentioned, each of the Defendants was the agent, servant, partner, predecessors in interest, and joint venturer of each of the remaining Defendants herein and was at all times operating and acting with the purpose and scope of said agency, service, employment, partnership, and joint venture.

## FACTUAL BACKGROUND

90.     At all relevant times, Defendants were in the business of and did design, research, manufacture, test, advertise, promote, market, sell and distribute Xarelto to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

91.     Xarelto was introduced in the United States ("U.S.") on July 1, 2011, and is part of a class of drugs called New Oral Anticoagulants ("NOACs").

23

92.     This class of NOACs, which also includes Pradaxa and Eliquis, is marketed as the next generation of blood-thinning drugs to replace warfarin (Coumadin); an established safe treatment for preventing stroke and systemic embolism for the past 60 years.

93.     Xarelto is an anticoagulant that acts as a Factor Xa inhibitor, and is available by prescription in oral tablet doses of 20mg, 15mg, and 10mg.

94.     Defendants received FDA approval for Xarelto on July 1, 2011 for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries (NDA 022406).

95.     Approval of Xarelto for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries was based on a series of clinical trials known as the Regulation of Coagulation in Orthopedic Surgery to Prevent Deep Venous Thrombosis and Pulmonary Embolism studies (hereinafter referred to as the "RECORD" studies).  The findings of the RECORD studies showed that Xarelto was superior (based on the Defendants' definition) to enoxaparin for thromboprophylaxis after total knee and hip arthroplasty, accompanied by similar rates of bleeding.  However, the studies also showed a greater bleeding incidence with Xarelto leading to decreased hemoglobin levels and transfusion of blood. (Lassen, M.R., et al. Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Total Knee Arthroplasty. N. Engl. J. Med. 2008; 358:2776-86; Kakkar, A.K., et al.  Extended duration rivaroxaban versus short-term enoxaparin for the prevention of venous thromboembolism after total hip arthroplasty:  a double-blind, randomized controlled trial. Lancet 2008; 372:31-39; Ericksson, B.I., et al. Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Hip Arthroplasty. N. Engl. J. Med. 2008; 358:2765-75.).

96.     Despite these findings, the RECORD studies were flawed in design and conducted in a negligent manner. In fact, FDA Official Action Indicated ("OAI") – rated inspections in 2009 disclosed rampant violations including, "systemic discarding of medical records," unauthorized unblinding, falsification, and "concerns regarding improprieties in randomization." As a result, the FDA found that the RECORD 4 studies were so flawed that they were deemed unreliable. (Seife, Charles, *Research Misconduct Identified by US Food and Drug Administration*, JAMA Intern. Med (Feb. 9, 2015)).

97.     Nevertheless, Defendants received additional FDA approval for Xarelto to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation on November 4, 2011 (NDA 202439). Approval of Xarelto for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation in the U.S. was based on a clinical trial known as the Rivaroxaban. Once Daily Oral Direct Factor Xa Inhibition Compared with Vitamin K Antagonism for Prevention of Stroke and Embolism Trial in Atrial Fibrillation study (hereinafter referred to as "ROCKET AF").

98.     The ROCKET AF study showed that Xarelto was non-inferior to warfarin for the prevention of stroke or systemic embolism in patients with non-valvular atrial fibrillation, with a similar risk of major bleeding. However, "bleeding from gastrointestinal sites, including upper, lower, and rectal sites, occurred more frequently in the rivaroxaban group, as did bleeding that led to a drop in the hemoglobin level or bleeding that required transfusion." (Patel, M.R., et al. Rivaroxaban versus warfarin in Nonvalvular Atrial Fibrillation. N. Engl. J. Med. 2011; 365:883-91.)

99.     The ROCKET AF study compared warfarin to Xarelto. Thus, for the study to be well designed and meaningful, the warfarin study group would have to be well managed because

warfarin's safety and efficacy is dose dependent. In other words, if the warfarin group was poorly managed, it would be easy for Xarelto to appear non-inferior to warfarin, which, in turn, would provide Defendants a study to "support" Xarelto's use.

100.    In fact, in the ROCKET AF study, the warfarin group was not well managed.  The warfarin group in the ROCKET AF study was the worst managed warfarin study group in any previously reported clinical trial involving warfarin.

101.    The poor management of the warfarin group in the ROCKET AF study was not lost on the FDA, which noted "the data comparing [Xarelto] to warfarin are not adequate to determine whether [Xarelto] is as effective for its proposed indication in comparison to warfarin when the latter is used skillfully."  FDA Advisory Committee Briefing document. P. 10.

102.    Public Citizen also noticed the poor control in the warfarin group. Public Citizen wrote the FDA, stating they "strongly oppose FDA approval... The 3 ROCKET AF trial conducted in support of the proposed indication had a suboptimal control arm..." http://www.citizen.org/documents/1974.pdf.

103.    Another problem with the ROCKET AF study was Xarelto's once-a-day dosing. The FDA clinical reviewers stated that "the sponsor's rationale for evaluating only once daily dosing during Phase 3 is not strong.  Most importantly, there is clinical information from Phase 2 trials ... and from clinical pharmacology studies suggesting that twice daily dosing, which would produce lower peak blood levels and higher trough blood levels of [Xarelto], might have been associated with greater efficacy and/or a better safety profile."  FDA advisory Committee Briefing document p. 100.

104.    Dr. Steven E. Nissen, more sharply, stated "my concern was that the dose was selected more for a marketing advantage rather than for the scientific data that was available, and was a mistake..."  FDA Advisory Meeting Transcript p. 287.

105.    Furthermore, the FDA expressed desirability in monitoring Xarelto dosage within their NDA approval memo based on the ROCKET studies.  The clinical pharmacology in these studies demonstrated a linear correlation between rivaroxaban (Xarelto) levels and prothrombin time ("PT"); and subsequently a correlation between PT and the risk of bleeding.  At this time, Defendants were aware of the correlation between Xarelto dosage and bleeding risks, but had "not chosen to utilize this information." (NDA 202439 Summary Review, p. 9).  At all relevant times, Defendants controlled the contents of their label as demonstrated by their decision to go forward without regard to the FDA's suggestion to utilize this information.

106.    The additional indication for treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE was added to the label on November 2, 2012.

107.    Approval of Xarelto for the treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE in the U.S. was based on the clinical trials known as the EINSTEIN-DVT, EINSTEIN-PE, and EINSTEIN-Extension studies.  The EINSTEIN-DVT study tested Xarelto versus a placebo, and merely determined that Xarelto offered an option for treatment of DVT, with an increased risk of bleeding events as compared to placebo.  (The EINSTEIN Investigators. Oral Rivaroxaban for Symptomatic Venous Thromboembolism. N.Engl.J.Med. 2010; 363:2499-510).  The EINSTEIN-Extension study confirmed that result. (Roumualdi, E., et al. Oral rivaroxaban after symptomatic venous thromboembolism: the continued treatment study (EINSTEIN-Extension study). Expert Rev. Cardiovasc. Ther. 2011; 9(7):841-844).  The EINSTEIN-PE study's findings showed that a Xarelto regimen was non-

inferior to the standard therapy for initial and long-term treatment of PE.  However, the studies also demonstrated an increased risk of adverse events with Xarelto, including those that resulted in permanent discontinuation of Xarelto or prolonged hospitalization.  (The EINSTEIN- PE Investigators.  Oral Rivaroxaban for the Treatment of Symptomatic Pulmonary Embolism. N.Engl.J.Med. 2012; 366:1287-97).

108.    Defendants use the results of the ROCKET AF study, the RECORD studies, and the EINSTEIN studies to promote Xarelto in their promotional materials, including the Xarelto website, which tout the positive results of those studies.  However, Defendants' promotional materials fail to similarly highlight the increased risk of gastrointestinal bleeding and bleeding that required transfusion, among other serious bleeding concerns.

109.    Defendants market Xarelto as a new oral anticoagulant treatment alternative to warfarin (Coumadin), a long-established safe treatment for preventing stroke and systemic embolism.

110.    Defendants market and promote Xarelto as a single daily dose pill that does not require the need to measure a patient's blood plasma levels, touting it more convenient than warfarin, and does not limit a patient's diet.  The single dose and no blood testing requirements or dietary constraints are marked by Defendants as the "Xarelto Difference."

111.    However, Xarelto's clinical studies show that Xarelto is safer and more effective when there is blood monitoring, dose adjustments and twice a day dosing.

112.    In its QuarterWatch publication for the first quarter of the 2012 fiscal year, the Institute for Safe Medication Practices ("ISMP"), noted that, even during the approval process, FDA "[r]eviewers also questioned the convenient once-a-day dosing scheme [of Xarelto], saying

blood level studies had shown peaks and troughs that could be eliminated by twice-a-day dosing."

113.     The use of Xarelto without appropriate blood monitoring, dose adjustment and twice a day dosing can cause major, life-threatening bleeding events.  Physicians using Xarelto have to be able to balance the dose so that the blood is thinned enough to reduce the risk of stroke, but not thinned so much as to increase the risk for a major bleeding event.  The Defendants were aware of this risk and the need for blood monitoring but have failed to disclose this vital health information to patients, doctors and the FDA.

114.     Importantly, Xarelto's significant risk of severe, and sometimes fatal, internal bleeding has no antidote to reverse its effects, unlike warfarin.  Therefore, in the event of hemorrhagic complications, there is no available reversal agent.  The original U.S. label, approved when the drug was first marketed, did not contain a warning regarding the lack of antidote, but instead only mentioned this important fact in the overdose section.

115.     The FDA's adverse event data indicates staggering, serious adverse events that have been associated with Xarelto.

116.     In the year leading up to June 30, 2012, there were 1,080 Xarelto-associated "Serious Adverse Event" ("SAE") Medwatch reports filed with the FDA, including at least 65 deaths. Of the reported hemorrhage events associated with Xarelto, 8% resulted in death, which was approximately twofold the risk of a hemorrhage-related death with warfarin.

117.     At the close of the 2012 fiscal year, a total of 2,081 new Xarelto-associated SAE reports were filed with the FDA, its first full year on the market, ranking tenth among other pharmaceuticals in direct reports to the FDA.  Of those reported events, 151 resulted in death, as compared to only 56 deaths associated with warfarin.

29

118.    The ISMP referred to these SAE figures as constituting a "strong signal" regarding the safety of Xarelto, defined as "evidence of sufficient weight to justify an alert to the public and the scientific community, and to warrant further investigation."

119.    Of particular note, in the first quarter of 2013, the number of reported serious adverse events associated with Xarelto (680) overtook that of Pradaxa (528), another new oral anticoagulant, which had previously ranked as the number one reported drug in terms of adverse events in 2012.

120.    Moreover, in the first eight months of 2013, German regulators received 968 Xarelto-related averse event reports, including 72 deaths, as compared to a total of 750 reports and 58 deaths in 2012.

121.    Despite the clear signal generated by the SAE data, Defendants did not tell consumers, health care professionals and the scientific community about the dangers of Xarelto, nor did Defendants perform further investigation into the safety of Xarelto.

122.    Defendants' original, and in some respects, current labeling and prescribing information for Xarelto:

(a)     failed to investigate, research, study and define, fully and adequately, the safety profile of Xarelto;

(b)     failed to provide adequate warnings, about the true safety risks associated with the use of Xarelto;

(c)     failed to provide adequate warning regarding the pharmacokinetic and pharmacodynamic variability of Xarelto and its effects on the degree of anticoagulation in a patient;

(d)     failed to disclose the need for dose adjustments;

(e)     failed to disclose the need to twice daily dosing;

(f)     failed to warn about the need for blood monitoring;

(g)    failed to provide adequate warning that it is difficult or impossible to assess the degree and/or extent of anticoagulation in patients taking Xarelto;

(h)    failed to adequately disclose in the "Warnings" Section that there is no drug, agent or means to reverse the anticoagulation effects of Xarelto;

(i)    failed to advise prescribing physicians, such as the Plaintiffs' and Decedents' physicians, to instruct patients that there was no agent to reverse the anticoagulant effects of Xarelto;

(j)    failed to provide adequate instructions on how to intervene and/or stabilize a patient who suffers a bleed while taking Xarelto;

(k)    failed to provide adequate warnings and information related to the increased risks of bleeding events associated with aging patient populations of Xarelto users;

(l)    failed to provide adequate warnings regarding the increased risk of gastrointestinal bleeds in those taking Xarelto, especially, in those patients with a prior history of gastrointestinal issues and/or upset stomach;

(m)    failed to provide adequate warnings regarding the increased risk of suffering a bleeding event, requiring blood transfusions in those taking Xarelto;

(n)    failed to provide adequate warnings regarding the need to assess renal functioning prior to starting a patient on Xarelto and to continue testing and monitoring of renal functioning periodically while the patient is on Xarelto;

(o)    failed to provide adequate warnings regarding the need to assess hepatic functioning prior to starting a patient on Xarelto and to continue testing and monitoring of hepatic functioning periodically while the patient is on Xarelto;

(p)    failed to include a "BOXED WARNING" about serious bleeding events associated with Xarelto;

(q)    failed to include a "BOLDED WARNING" about serious bleeding events associated with Xarelto; and

(r)    in the "Medication Guide" intended for distribution to patients to whom Xarelto has been prescribed, Defendants failed to disclose the need for

31

> blood monitoring or to patients that there is no drug, agent or means to reverse the anticoagulation effects of Xarelto and that if serious bleeding occurs, such irreversibility could have permanently disabling, life-threatening or fatal consequences.

123.    During the years since first marketing Xarelto in the U.S., Defendants modified the U.S. labeling and prescribing information for Xarelto, which included additional information regarding the use of Xarelto in patients taking certain medications. Despite being aware of: (1) serious, and sometimes fatal, irreversible bleeding events associated with the use of Xarelto; and (2) 2,081 SAE Medwatch reports filed with the FDA in 2012 alone, including at least 151 deaths, Defendants nonetheless failed to provide adequate disclosures or warnings in their label as detailed in Paragraph 122 (a – r).

124.    Despite the wealth of scientific evidence, Defendants have ignored the increased risk of the development of the aforementioned injuries associated with the use of Xarelto, but they have, through their marketing and advertising campaigns, urged consumers to use Xarelto without regular blood monitoring or instead of anticoagulants that present a safer alternative.

125.    By reason of the foregoing acts and omissions, the Plaintiffs and Decedents were caused to suffer from life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, death, physical pain and mental anguish, including diminished enjoyment of life.

126.    By reason of the foregoing acts and omissions, Plaintiffs and Decedents endured, suffered, and continue to suffer, emotional and mental anguish, loss of accumulations, medical expenses and other economic and non-economic damages as a result of the actions and inactions of the Defendants.

**FIRST CAUSE OF ACTION**
**AS AGAINST THE DEFENDANTS**
**(NEGLIGENCE)**

127.    Plaintiffs repeat, reiterate and reallege Paragraphs 1-126 of this Complaint inclusive, with the same force and effect as if more fully set forth herein.

128.    Defendants had a duty to exercise reasonable care in the design, manufacture, sale, labeling, warnings, marketing, promotion, quality assurance, quality control, and sale, distribution of Xarelto including a duty to assure that the product did not cause unreasonable, dangerous side effects.

129.    Defendants failed to exercise ordinary care in the design, manufacture, sale, labeling, warnings, marketing, promotion, quality assurance, quality control, and sale, distribution of Xarelto in that Defendants knew, or should have known, that the drugs created a high risk of unreasonable, dangerous side-effects and harm, including life-threatening bleeding, as well as other severe and personal injuries (including in some cases death) which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

130.    The negligence of the Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

a.    Manufacturing, producing, promoting, formulating, creating, and/or designing Xarelto without thoroughly testing it;

b.    Manufacturing, producing, promoting, formulating, creating, and/or designing Xarelto without adequately testing it;

c.    Not conducting sufficient testing programs to determine whether or not Xarelto was safe for use; in that Defendants herein knew or should have known that Xarelto was unsafe and unfit for use by reason of the dangers to its users;

33

d.      Selling Xarelto without making proper and sufficient tests to determine the dangers to its users;

e.      Negligently failing to adequately and correctly warn the Plaintiffs and Decedents, the public, the medical and healthcare profession, and the FDA of the dangers of Xarelto;

f.      Failing to provide adequate instructions regarding safety precautions to be observed by users, handlers, and persons who would reasonably and foreseeably come into contact with, and more particularly, use, Xarelto;

g.      Negligently advertising and recommending the use of Xarelto without sufficient knowledge as to its dangerous propensities;

h.      Negligently representing that Xarelto was safe for use for its intended purpose, when, in fact, it was unsafe;

i.      Negligently representing that Xarelto had equivalent safety and efficacy as other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

j.      Negligently designing Xarelto in a manner which was dangerous to its users;

k.      Negligently manufacturing, producing, and assembling Xarelto in a manner which was dangerous to its users;

l.      Concealing information from the Plaintiffs and Decedents in knowing that Xarelto was unsafe, dangerous, and/or non-conforming with FDA regulations;

m.      Improperly concealing and/or misrepresenting information from the Plaintiffs and Decedents, healthcare professionals, and/or the FDA, concerning the severity of risks and dangers of Xarelto compared to other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery; and,

n.      Placing an unsafe product into the stream of commerce.

131.     Defendants under-reported, underestimated and downplayed the serious dangers of Xarelto.

132.     Defendants negligently compared the safety risk and/or dangers of Xarelto with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

133.     Defendants were negligent in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing and sale of Xarelto in that they:

   a.    Failed to use due care in designing and manufacturing Xarelto so as to avoid the aforementioned risks to individuals when Xarelto was used for treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

   b.    Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Xarelto;

   c.    Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Xarelto;

   d.    Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Xarelto;

   e.    Failed to warn Plaintiffs and Decedents of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects;

   f.    Failed to conduct adequate testing, including pre-clinical and clinical testing and post-marketing surveillance to determine the safety of Xarelto;

   g.    Failed to warn Plaintiffs and Decedents, prior to actively encouraging the sale of Xarelto, either directly or indirectly, orally or in writing, about the

35

need for more comprehensive, more regular medical monitoring than usual
to ensure early discovery of potentially serious side effects;

h.    Were otherwise careless and/or negligent.

134.    Despite the fact that Defendants knew or should have known that Xarelto caused

unreasonable, dangerous side-effects which many users would be unable to remedy by any

means, Defendants continued to market Xarelto to consumers, including the medical community,

Plaintiffs and Decedents.

135.    Defendants knew or should have known that consumers such as the Plaintiffs and

Decedents would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary

care as described above, including the failure to comply with federal requirements.

136.    It was foreseeable that Defendants' product, as designed, would cause serious

injury to consumers, including Plaintiffs and Decedents.

137.    As a direct and proximate result of Defendants' negligence, Plaintiffs and

Decedents suffered serious physical injury, harm, damages and economic loss and will continue

to suffer such harm, damages and economic loss in the future.

138.    As a result of the foregoing acts and omissions, the Plaintiffs and Decedents did

require more health care and services and did incur medical, health, incidental and related

expenses.

139.    Defendants' conduct, as described above, was extreme and outrageous.

Defendants risked the lives of the consumers and users of their products, including Plaintiffs and

Decedents, with the knowledge of the safety and efficacy problems and suppressed this

knowledge from the general public. Defendants made conscious decisions not to redesign, re-

label, warn or inform the unsuspecting consuming public.  Defendants' outrageous conduct

warrants an award of punitive damages.

**SECOND CAUSE OF ACTION**
**AS AGAINST THE DEFENDANTS**
**(STRICT PRODUCTS LIABILITY)**

140.    Plaintiffs repeat, reiterate and reallege Paragraphs 1-126 of this Complaint

inclusive, with the same force and effect as if more fully set forth herein.

141.     At all times herein mentioned, the Defendants designed, researched,

manufactured, tested, advertised, promoted, marketed, sold, distributed, and/or have recently

acquired the Defendants who have designed, researched, manufactured, tested, advertised,

promoted, marketed, sold and distributed Xarelto as hereinabove described that was used by the

Plaintiffs and Decedents.

142.    Defendants' Xarelto was expected to and did reach the usual consumers, handlers,

and persons coming into contact with said product without substantial change in the condition in

which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

143.    At those times, Xarelto was in an unsafe, defective, and inherently dangerous

condition, which was dangerous to users, and in particular, the Plaintiffs and Decedents herein.

144.    The Xarelto designed, researched, manufactured, tested, advertised, promoted,

marketed, sold and distributed by Defendants was defective in design or formulation in that,

when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the

benefits associated with the design or formulation of Xarelto.

145.    The Xarelto designed, researched, manufactured, tested, advertised, promoted,

marketed, sold and distributed by Defendants was defective in design and/or formulation, in that,

37

when it left the hands of the Defendants, manufacturers, and/or suppliers, it was unreasonably

dangerous, and it was more dangerous than an ordinary consumer would expect.

146. At all times herein mentioned, Xarelto was in a defective condition and unsafe,

and Defendants knew or had reason to know that said product was defective and unsafe,

especially when used in the form and manner as provided by the Defendants.

147. Defendants knew, or should have known that at all times herein mentioned, their

Xarelto was in a defective condition, and was and is inherently dangerous and unsafe.

148. At the time of the Plaintiffs' and Decedents' use of Xarelto, Xarelto was being

used for the purposes and in a manner normally intended, namely to reduce the risk of stroke and

systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of

recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee

replacement surgery.

149. Defendants, with this knowledge, voluntarily designed their Xarelto in a

dangerous condition for use by the public, and in particular the Plaintiffs and Decedents.

150. Defendants had a duty to create a product that was not unreasonably dangerous

for its normal, intended use.

151. Defendants created a product unreasonably dangerous for its normal, intended

use.

152. The Xarelto designed, researched, manufactured, tested, advertised, promoted,

marketed, sold and distributed by Defendants was manufactured defectively in that Xarelto left

the hands of Defendants in a defective condition and was unreasonably dangerous to its intended

users.

153.   The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Xarelto was manufactured.

154.   Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed a defective product which created an unreasonable risk to the health of consumers and to the Plaintiffs and Decedents in particular; and Defendants are therefore strictly liable for the injuries sustained by the Plaintiffs and Decedents.

155.   The Plaintiffs and Decedents could not, by the exercise of reasonable care, have discovered Xarelto's defects herein mentioned and perceived its danger.

156.   The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate warnings or instructions, as the Defendants knew or should have known that the product created a risk of serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature and the Defendants failed to adequately warn of said risk.

157.   The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate warnings and/or inadequate testing.

158.   The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate post-marketing surveillance and/or warnings because, after Defendants knew or should have known of the risks of serious side effects including, life-threatening bleeding, as well as other severe and permanent health consequences from Xarelto, they failed to provide adequate warnings to users or

consumers of the product, and continued to improperly advertise, market and/or promote their product, Xarelto.

159.    The Xarelto ingested by Plaintiffs and Decedents was in the same or substantially similar condition as it was when it left the possession of Defendants.

160.    Plaintiffs and Decedents did not misuse or materially alter their Xarelto.

161.    By reason of the foregoing, Defendants have become strictly liable in tort to the Plaintiffs and Decedents for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Xarelto.

162.    Defendants' defective design, manufacturing defect, and inadequate warnings of Xarelto were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

163.    That said defects in Defendants' drug Xarelto were a substantial factor in causing Plaintiffs' and Decedents' injuries.

164.    As a result of the foregoing acts and omissions, the Plaintiffs and Decedents were caused to suffer serious and dangerous side effects including but not limited to, life-threatening bleeding, multiple knee surgeries, as well as other severe and personal injuries which are permanent and lasting in nature, death, physical pain and mental anguish, diminished enjoyment of life, financial expenses for hospitalization and medical care, the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above named health consequences.

165.    By reason of the foregoing, Plaintiffs and Decedents have suffered injuries and damages as alleged herein.

## THIRD CAUSE OF ACTION
## AS AGAINST THE DEFENDANTS
## (BREACH OF EXPRESS WARRANTY)

166.     Plaintiffs repeat, reiterate and reallege Paragraphs 1-126 of this Complaint inclusive, with the same force and effect as if more fully set forth herein.

167.      Defendants expressly warranted that Xarelto was safe and effective to members of the consuming public, including Plaintiffs and Decedents.

168.     Xarelto does not conform to these express representations because Xarelto is not safe and has numerous serious side effects, many of which were not accurately warned about by Defendants.  As a direct and proximate result of the breach of said warranties, Plaintiffs and Decedents suffered and/or will continue to suffer severe and permanent personal injuries, harm and economic loss.

169.     Plaintiffs and Decedents did rely on the express warranties of the Defendants herein.

170.     Defendants did not disclose the material risks that Xarelto could cause serious bleeding that may be irreversible, permanently disabling, and life-threatening.  The representations were not justified by the performance of Xarelto.

171.     Members of the medical community, including physicians and other healthcare professionals, relied upon the representations and warranties of the Defendants for use of Xarelto in recommending, prescribing, and/or dispensing Xarelto.

172.     Defendants expressly warranted Xarelto was safe and effective to use without the need for blood monitoring and dose adjustments.

173.     Defendants expressly represented to Plaintiffs and Decedents, their physicians, healthcare providers, and/or the FDA that Xarelto was safe and fit for use for the purposes

41

intended, that it was of merchantable quality, that it did not produce any dangerous side effects in excess of those risks associated with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, that the side effects it did produce were accurately reflected in the warnings and that it was adequately tested and fit for its intended use.

174. Defendants knew or should have known that, in fact, said representations and warranties were false, misleading and untrue in that Xarelto was not safe and fit for the use intended, and, in fact, produced serious injuries to the users that were not accurately identified and represented by Defendants.

175. As a result of the foregoing acts and omissions, the Plaintiffs and Decedents were caused to suffer serious and dangerous side effects including but not limited to, life-threatening bleeding, multiple knee surgeries, as well as other severe and personal injuries which are permanent and lasting in nature, death, physical pain and mental anguish, diminished enjoyment of life, financial expenses for hospitalization and medical care, the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above named health consequences.

176. As a result of the foregoing acts and omissions, Plaintiffs and Decedents have suffered and incurred damages, including medical expenses; the loss of accumulations; and other economic and non-economic damages.

177. As a result of the foregoing acts and omissions, the Plaintiffs and Decedents did require more health care and services and did incur medical, health, incidental and related expenses.

178.    By reason of the foregoing, Plaintiffs and Decedents have suffered injuries and damages as alleged herein.

**FOURTH CAUSE OF ACTION**
**AS AGAINST THE DEFENDANTS**
**(BREACH OF IMPLIED WARRANTIES)**

179.    Plaintiffs repeat, reiterate and reallege Paragraphs 1-126 of this Complaint inclusive, with the same force and effect as if more fully set forth herein.

180.    At all times herein mentioned, the Defendants manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted and sold Xarelto and/or have recently acquired the Defendants who have manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted and sold Xarelto, to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

181.    At the time Defendants marketed, sold, and distributed Xarelto for use by Plaintiffs and Decedents, Defendants knew of the use for which Xarelto was intended and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

182.    Xarelto was designed, manufactured, marketed, promoted, sold, and introduced into the stream of commerce by Defendants.

183.    The Defendants impliedly represented and warranted to the users of Xarelto and their physicians, healthcare providers, and/or the FDA that Xarelto was safe and of merchantable quality and fit for the ordinary purpose for which said product was to be used.

184.     That said representations and warranties aforementioned were false, misleading, and inaccurate in that Xarelto was unsafe, unreasonably dangerous, improper, not of merchantable quality, and defective.

185.     Plaintiffs and Decedents, and/or members of the medical community and/or healthcare professionals, did rely on said implied warranty of merchantability of fitness for a particular use and purpose.

186.     Plaintiffs, Decedents, and their physicians and healthcare professionals reasonably relied upon the skill and judgment of Defendants as to whether Xarelto was of merchantable quality and safe and fit for its intended use.

187.     Xarelto was injected into the stream of commerce by the Defendants in a defective, unsafe, and inherently dangerous condition and the products and materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

188.     The Defendants herein breached the aforesaid implied warranties, as their drug Xarelto was not fit for its intended purposes and uses.

189.     As a result of the foregoing acts and omissions, the Plaintiffs and Decedents were caused to suffer serious and dangerous side effects including but not limited to, life-threatening bleeding, multiple knee surgeries, as well as other severe and personal injuries which are permanent and lasting in nature, death, physical pain and mental anguish, diminished enjoyment of life, financial expenses for hospitalization and medical care, the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above named health consequences.

190.    As a result of the foregoing acts and omissions, Plaintiffs and Decedents have suffered and incurred damages, including medical expenses; the loss of accumulations; and other economic and noneconomic damages.

191.    As a result of the foregoing acts and omissions, the Plaintiffs and Decedents did require more health care and services and did incur medical, health, incidental and related expenses.

192.    By reason of the foregoing, Plaintiffs and Decedents have suffered injuries and damages as alleged herein.

**FIFTH CAUSE OF ACTION**
**AS AGAINST THE DEFENDANTS**
**(DESIGN DEFECT)**

193.    Plaintiffs repeat, reiterate and reallege Paragraphs 1-126 of this Complaint inclusive, with the same force and effect as if more fully set forth herein.

194.    Xarelto was not merchantable and/or reasonably suited to the use intended, and its condition when sold was the proximate cause of the injuries sustained by Plaintiffs and Decedents.

195.    Defendants placed Xarelto into the stream of commerce with wanton and reckless disregard for public safety.

196.    Xarelto was in an unsafe, defective, and inherently dangerous condition.

197.    Xarelto contains defects in its design which render the drug dangerous to consumers, such as Plaintiffs and Decedents, when used as intended or as reasonably foreseeable to Defendants.  The design defects render Xarelto more dangerous than other anticoagulants and cause an unreasonable increased risk of injury, including but not limited to life-threatening bleeding events.

45

198.    Xarelto was in a defective condition and unsafe, and Defendants knew, had reason to know, or should have known that Xarelto was defective and unsafe, even when used as instructed.

199.    The nature and magnitude of the risk of harm associated with the design of Xarelto, including the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening is high in light of the intended and reasonably foreseeable use of Xarelto.

200.    The risks of harm associated with the design of Xarelto are higher than necessary.

201.    It is highly unlikely that Xarelto users would be aware of the risks associated with Xarelto through either warnings, general knowledge or otherwise, and Plaintiffs and Decedents specifically were not aware of these risks, nor would they expect them.

202.    The design did not conform to any applicable public or private product standard that was in effect when Xarelto left the Defendants' control.

203.    Xarelto's design is more dangerous than a reasonably prudent consumer would expect when used in its intended or reasonably foreseeable manner. It was more dangerous than the Plaintiffs and Decedents expected.

204.    The intended or actual utility of Xarelto is not of such benefit to justify the risk of bleeding that may be irreversible, permanently disabling, and life-threatening.

205.    At the time Xarelto left Defendants' control, it was both technically and economically feasible to have an alternative design that would not cause bleeding that may be irreversible, permanently disabling, and life-threatening or an alternative design that would have substantially reduced the risk of these injuries.

206.    It was both technically and economically feasible to provide a safer alternative product that would have prevented the harm suffered by Plaintiffs and Decedents.

46

207.    Defendants' conduct was extreme and outrageous. Defendants risked the lives of consumers and users of their products, including Plaintiffs and Decedents, with the knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

208.    The unreasonably dangerous nature of Xarelto caused serious harm to Plaintiffs and Decedents.

209.    As a direct and proximate result of the Plaintiffs' and Decedents' use of the Xarelto, which was designed, manufactured, marketed, promoted, sold, and introduced into the stream of commerce by Defendants, Plaintiffs and Decedents suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

## SIXTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS (FRAUDULENT MISREPRESENTATION)

210.    Plaintiffs repeat, reiterate and reallege Paragraphs 1-126 of this Complaint inclusive, with the same force and effect as if more fully set forth herein.

211.    The Defendants falsely and fraudulently represented to the medical and healthcare community, and to the Plaintiffs and Decedents, and/or the FDA, and the public in general, that said product, Xarelto, had been tested and was found to be safe and/or effective to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

212.    That representations made by Defendants were, in fact, false.

213.    When said representations were made by Defendants, they knew those representations to be false and it willfully, wantonly and recklessly disregarded whether the representations were true.

214.    These representations were made by said Defendants with the intent of defrauding and deceiving the Plaintiffs and Decedents, the public in general, and the medical and healthcare community in particular, and were made with the intent of inducing the public in general, and the medical and healthcare community in particular, to recommend, prescribe, dispense and/or purchase said product, Xarelto, for use to reduce the risk of stroke and systemic embolism in patients with nonvalvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, all of which evinced a callous, reckless, willful, depraved indifference to the health, safety and welfare of the Plaintiffs and Decedents herein.

215.    At the time the aforesaid representations were made by the Defendants and, at the time the Plaintiffs and Decedents used Xarelto, the Plaintiffs and Decedents were unaware of the falsity of said representations and reasonably believed them to be true.

216.    In reliance upon said representations, the Plaintiffs and Decedents were induced to and did use Xarelto, thereby sustaining severe and permanent personal injuries.

217.    Said Defendants knew and were aware or should have been aware that Xarelto had not been sufficiently tested, was defective in nature, and/or that it lacked adequate and/or sufficient warnings.

218.    Defendants knew or should have known that Xarelto had a potential to, could, and would cause severe and grievous injury to the users of said product, and that it was inherently dangerous in a manner that exceeded any purported, inaccurate, and/or down-played warnings.

219.    Defendants brought Xarelto to the market, and acted fraudulently, wantonly and maliciously to the detriment of the Plaintiffs and Decedents.

220.    As a result of the foregoing acts and omissions, the Plaintiffs and Decedents were caused to suffer serious and dangerous side effects including but not limited to, life-threatening bleeding, multiple knee surgeries, as well as other severe and personal injuries which are permanent and lasting in nature, death, physical pain and mental anguish, diminished enjoyment of life, financial expenses for hospitalization and medical care, the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above named health consequences.

221.    As a result of the foregoing acts and omissions, Plaintiffs and Decedents have suffered and incurred damages, including medical expenses; the loss of accumulations; and other economic and noneconomic damages.

222.    As a result of the foregoing acts and omissions, the Plaintiffs and Decedents did require more health care and services and did incur medical, health, incidental and related expenses.

## SEVENTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS (FRAUDULENT CONCEALMENT)

223.    Plaintiffs repeat, reiterate and reallege Paragraphs 1-126 of this Complaint inclusive, with the same force and effect as if more fully set forth herein.

224.    At all times during the course of dealing between Defendants and Plaintiffs and Decedents, and/or their healthcare providers, and/or the FDA, Defendants misrepresented the safety of Xarelto for its intended use.

49

225.    Defendants knew or were reckless in not knowing that its representations were false.

226.    In representations to Plaintiffs and Decedents, and/or their healthcare providers, and/or the FDA, Defendants fraudulently concealed and intentionally omitted the following material information:

(a)    that Xarelto was not as safe as other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

(b)    that the risks of adverse events with Xarelto were higher than those with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

(c)    that the risks of adverse events with Xarelto were not adequately tested and/or known by Defendants;

(d)    that Defendants were aware of dangers in Xarelto, in addition to and above and beyond those associated with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

(e)    that Xarelto was defective, and that it caused dangerous side effects, including but not limited to life-threatening bleeding, as well as other severe and permanent health consequences, in a much more and significant rate than other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

(f)    that patients needed to be monitored more regularly than normal while using Xarelto;

(g)    that Xarelto was manufactured negligently;

50

(h)     that Xarelto was manufactured defectively;

(i)     that Xarelto was manufactured improperly;

(j)     that Xarelto was designed negligently;

(k)     that Xarelto was designed defectively; and

(l)     that Xarelto was designed improperly.

227.    Defendants were under a duty to disclose to Plaintiffs and Decedents, and their physicians, hospitals, healthcare providers, and/or the FDA, the defective nature of Xarelto, including but not limited to the heightened risks of life-threatening bleeding.

228.    Defendants had sole access to material facts concerning the defective nature of the product and its propensity to cause serious and dangerous side effects, and hence, cause damage to persons who used Xarelto, including the Plaintiffs and Decedents, in particular.

229.    Defendants' concealment and omissions of material facts concerning, inter alia, the safety of Xarelto was made purposefully, willfully, wantonly, and/or recklessly, to mislead Plaintiffs and Decedents, and their physicians, hospitals and healthcare providers into reliance, continued use of Xarelto, and actions thereon, and to cause them to purchase, prescribe, and/or dispense Xarelto and/or use the product.

230.    Defendants knew that Plaintiffs and Decedents, and their physicians, hospitals, healthcare providers, and/or the FDA, had no way to determine the truth behind Defendants' concealment and omissions, and that these included material omissions of facts surrounding Xarelto, as set forth herein.

231.     Plaintiffs and Decedents, as well as their doctors, healthcare providers, and/or hospitals, reasonably relied on facts revealed which negligently, fraudulently and/or purposefully did not include facts that were concealed and/or omitted by Defendants.

232.     As a result of the foregoing acts and omissions, the Plaintiffs and Decedents were caused to suffer serious and dangerous side effects including but not limited to, life-threatening bleeding, multiple knee surgeries, as well as other severe and personal injuries which are permanent and lasting in nature, death, physical pain and mental anguish, diminished enjoyment of life, financial expenses for hospitalization and medical care, the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above named health consequences.

233.     As a result of the foregoing acts and omissions, Plaintiffs and Decedents have suffered and incurred damages, including medical expenses; the loss of accumulations; and other economic and noneconomic damages.

234.     As a result of the foregoing acts and omissions, the Plaintiffs and Decedents did require more health care and services and did incur medical, health, incidental and related expenses.

**EIGHTH CAUSE OF ACTION AS
AGAINST THE DEFENDANTS
(NEGLIGENT MISREPRESENTATION)**

235.     Plaintiffs repeat, reiterate and reallege Paragraphs 1-126 of this Complaint inclusive, with the same force and effect as if more fully set forth herein.

236.     From the time Xarelto was first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed, and up to the present, Defendants made

misrepresentations to Plaintiffs and Decedents, their physicians and the general public, including but not limited to the misrepresentation that Xarelto was safe, fit and effective for human use.

237.    The Defendants made the foregoing representations without any reasonable ground for believing them to be true.  These representations were made directly by Defendants, by sales representatives and other authorized agents of Defendants, and in publications and other written materials directed to physicians, medical patients and the public, with the intention of inducing reliance and the prescription, purchase, and use of Xarelto.

238.    The representations by the Defendants were in fact false, in that Xarelto is not safe, fit and effective for human consumption as labeled, using Xarelto is hazardous to your health, and Xarelto has a serious propensity to cause serious injuries to users, including but not limited to the injuries suffered by Plaintiffs and Decedents.

239.    The foregoing representations by Defendants, and each of them, were made with the intention of inducing reliance and the prescription, purchase, and use of Xarelto.

240.    In reliance on the misrepresentations by the Defendants, Plaintiffs and Decedents were induced to purchase and use Xarelto. If Plaintiffs and Decedents had known the truth and the facts concealed by the Defendants, Plaintiffs and Decedents would not have used Xarelto. The reliance of Plaintiffs and Decedents upon Defendants' misrepresentations was justified because such misrepresentations were made and conducted by individuals and entities that were in a position to know all of the facts.

241.    Defendants breached their duty in representing Xarelto's serious side effects to the medical and healthcare community, to the Plaintiffs and Decedents, the FDA and the public in general.

242.     As a result of the foregoing acts and omissions, the Plaintiffs and Decedents were caused to suffer serious and dangerous side effects including but not limited to, life-threatening bleeding, multiple knee surgeries, as well as other severe and personal injuries which are permanent and lasting in nature, death, physical pain and mental anguish, diminished enjoyment of life, financial expenses for hospitalization and medical care, the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above named health consequences.

243.     As a result of the foregoing acts and omissions, Plaintiffs and Decedents have suffered and incurred damages, including medical expenses; the loss of accumulations; and other economic and noneconomic damages.

244.     As a result of the foregoing acts and omissions, the Plaintiffs and Decedents did require more health care and services and did incur medical, health, incidental and related expenses.

## NINTH CAUSE OF ACTION AS
## AGAINST THE DEFENDANTS
## (FRAUD AND DECEIT)

245.     Plaintiffs repeat, reiterate and reallege Paragraphs 1-126 of this Complaint inclusive, with the same force and effect as if more fully set forth herein.

246.     Prior to Plaintiffs and Decedents' use of Xarelto and during the period in which Plaintiffs and Decedents actually used Xarelto, Defendants fraudulently suppressed material information regarding the safety and efficacy of Xarelto, including information regarding increased adverse events, pre and post marketing deaths, and the high number of severe adverse event reports compared to other anticoagulants and the need for blood monitoring and dose adjustments for the safe and effective use of Xarelto.  Furthermore, Defendants fraudulently

concealed the safety information about the use of Xarelto.  As described above, Xarelto has several well-known serious side-effects that are not seen in other anticoagulants.  Plaintiffs and Decedents believe that the fraudulent misrepresentation described herein was intentional to keep the sales volume of Xarelto strong.

247.    Defendants had a duty when disseminating information to the public to disseminate truthful information and a parallel duty not to deceive the public and the Plaintiffs and Decedents, as well as their respective healthcare providers and/or the FDA.

248.    The information distributed to the public, the FDA, and the Plaintiffs and Decedents, by Defendants, including but not limited to reports, press releases, advertising campaigns, television commercials, print ads, magazine ads, billboards, and all other commercial media contained material representations of fact and/or omissions.

249.    The Defendants falsely and fraudulently represented to the medical and healthcare community, and to Plaintiffs and Decedents, the FDA, and the public in general, that said product, Xarelto, had been tested and was found to be safe and/or effective to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

250.    These representations were made by said Defendants with the intent of defrauding and deceiving the Plaintiffs and Decedents, the public in general, and the medical and healthcare community in particular, and were made with the intent of inducing the public in general, and the medical and healthcare community in particular, to recommend, prescribe, dispense and/or purchase said product, Xarelto, for use to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE,

and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, all of which evinced a callous, reckless, willful, depraved indifference to the health, safety and welfare of the Plaintiffs and Decedents herein.

251.    At the time the aforesaid representations were made by the Defendants and, at the time the Plaintiffs and Decedents used Xarelto, the Plaintiffs and Decedents were unaware of the falsity of said representations and reasonably believed them to be true.

252.    In reliance upon said representations, Plaintiffs and Decedents were induced to and did use Xarelto, thereby sustaining severe and permanent personal injuries.

253.    Said Defendants knew and were aware, or should have been aware, that Xarelto had not been sufficiently tested, was defective in nature, and/or that it lacked adequate and/or sufficient warnings.

254.    Defendants knew or should have known that Xarelto had a potential to, could, and would cause severe and grievous injury to the users of said product, and that it was inherently dangerous in a manner that exceeded any purported, inaccurate, and/or down-played warnings.

255.    Defendants brought Xarelto to the market, and acted fraudulently, wantonly and maliciously to the detriment of Plaintiffs and Decedents.

256.    Defendants fraudulently concealed the safety issues associated with Xarelto including the need for blood monitoring and dose adjustments in order to induce physicians to prescribe Xarelto and for patients, including Plaintiffs and Decedents, to purchase and use Xarelto.

257.    At the time Defendants concealed the fact that Xarelto was not safe, Defendants were under a duty to communicate this information to Plaintiffs and Decedents, physicians, the

56

FDA, the healthcare community, and the general public in such a manner that they could appreciate the risks associated with using Xarelto.

258.    Defendants, at all times relevant hereto, withheld information from the FDA which they were required to report.

259.    Plaintiffs and Decedents and their prescribing physicians relied upon the Defendants' outrageous untruths regarding the safety of Xarelto.

260.    Plaintiffs' and Decedents' prescribing physicians were not provided with the necessary information by the Defendants, to provide an adequate warning to the Plaintiffs and Decedents.

261.    Xarelto was improperly marketed to the Plaintiffs and Decedents and their prescribing physicians as the Defendants did not provide proper instructions about how to use the medication and did not adequately warn about Xarelto's risks.

262.    As a direct and proximate result of Defendants' malicious and intentional concealment of material life-altering information from Plaintiffs and Decedents, and their prescribing physicians, Defendants caused or contributed to Plaintiffs' and Decedents' injuries and deaths.

263.    It is unconscionable and outrageous that Defendants would risk the lives of consumers, including the Plaintiffs and Decedents.  Despite this knowledge, the Defendants made conscious decisions not to redesign, label, warn or inform the unsuspecting consuming public about the dangers associated with the use of Xarelto.  Defendants' outrageous conduct rises to the level necessary that the Plaintiffs and Decedents should be awarded punitive damages to deter Defendants from this type of outrageous conduct in the future and to discourage Defendants from placing profits above the safety of patients in the United States of America.

264.     Defendants' advertisements regarding Xarelto falsely and misleadingly stated that blood monitoring and dose adjustments were not necessary for safe and effective use of the drug, misrepresentations Defendants knew to be false, for the purpose of fraudulently inducing consumers, such as Plaintiffs and Decedents, to purchase such product.  Plaintiffs and Decedents relied on these material misrepresentations when deciding to purchase and consume Xarelto.

265.     Defendants had a duty to disclose material information about serious side-effects to consumers such as Plaintiffs and Decedents.

266.     The Plaintiffs and Decedents did not discover the true facts with respect to the dangerous and serious health and/or safety concerns, and the false representations of Defendants, nor could the Plaintiffs and Decedents with reasonable diligence have discovered the true facts.

267.     That had the Plaintiffs and Decedents known the true facts with respect to the dangerous and serious health and/or safety concerns of Xarelto, Plaintiffs and Decedents would not have purchased, used and/or relied on Defendants' drug Xarelto.

268.     That the Defendants' aforementioned conduct constitutes fraud and deceit, and was committed and/or perpetrated willfully, wantonly and/or purposefully on the Plaintiffs and Decedents.

269.     As a result of the foregoing acts and omissions, the Plaintiffs and Decedents were caused to suffer serious and dangerous side effects including but not limited to, life-threatening bleeding, multiple knee surgeries, as well as other severe and personal injuries which are permanent and lasting in nature, death, physical pain and mental anguish, diminished enjoyment of life, financial expenses for hospitalization and medical care, the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above named health consequences.

270.    As a result of the foregoing acts and omissions, Plaintiffs and Decedents have suffered and incurred damages, including medical expenses; the loss of accumulations; and other economic and noneconomic damages.

271.    As a result of the foregoing acts and omissions, the Plaintiffs and Decedents did require more health care and services and did incur medical, health, incidental and related expenses.

272.    By reason of the foregoing, Plaintiffs and Decedents have suffered injuries and damages as alleged herein.

**TENTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS**
**(VIOLATION OF THE KANSAS CONSUMER PROTECTION ACT, Kan. Stat. Ann. §**
**50-623.46, et seq., THE NEW YORK CONSUMER PROTECTION ACT, N.Y. Gen. Bus.**
**L. § 349, et seq., THE ARIZONA CONSUMER FRAUD ACT, Ariz. Rev. Stat. Ann. § 44-**
**1522, et seq., THE MICHIGAN CONSUMER PROTECTION ACT, Mich. Comp. Laws.**
**Ann. § 445.901, et seq., THE GEORGIA FAIR BUSINESS PRACTICES ACT, Ga. Code**
**Ann. § 10-1-391, et seq., AND THE LOUISIANA UNFAIR TRADE PRACTICES AND**
**CONSUMER PROTECTION LAW, La. R.S. § 51:1401, et seq.)**

273.    Plaintiffs repeat, reiterate and reallege Paragraphs 1-126 of this Complaint inclusive, with the same force and effect as if more fully set forth herein.

274.    The Plaintiffs and Decedents used Xarelto and suffered ascertainable losses as a result of the Defendant's actions in violation of the aforementioned consumer protection laws.

275.    The Defendants violated the Kansas Consumer Protection Act, Kan. Stat. Ann. § 50-623.46, *et seq*., the New York Consumer Protection Act, N.Y. Gen. Bus. L. § 349, *et seq*., the Arizona Consumer Fraud Act, Ariz. Rev. Stat. Ann. § 44-1522, *et seq*., the Michigan Consumer Protection Act, Mich. Comp. Laws. Ann. § 445.901, *et seq*., the Georgia Fair Business Practices Act, Ga. Code Ann. § 10-1-391, *et seq*.,  and the Louisiana Unfair Trade Practices and Consumer

59

Protection Law, La. R.S. § 51:1401, *et seq*., through their use of false and misleading

misrepresentations or omissions of material fact relating to the safety of Xarelto.

276.    The Defendants uniformly communicated the purported benefits of Xarelto while

failing to disclose the serious and dangerous side effects related to the use of Xarelto and of the

true state of Xarelto's regulatory status, its safety, its efficacy, and its usefulness. The Defendants

made these representations to physicians, the medical community at large, and to patients and

consumers, such as the Plaintiffs and Decedents, in the marketing and advertising campaign

described herein.

277.    Defendants used unfair methods of competition or deceptive acts or practices that

were proscribed by law, including the following:

        a.    Representing that goods or services have characteristics, ingredients, uses, benefits, or quantities that they do not have;

        b.    Advertising goods or services with the intent not to sell them as advertised; and,

        c.    Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

278.    Defendants have a statutory duty to refrain from making false or fraudulent

representations and/or from engaging in deceptive acts or practices in the sale and promotion of

Xarelto.

279.    Had the Defendants not engaged in the deceptive conduct described herein, the

Plaintiffs and Decedents would not have purchased and/or paid for Xarelto, and would not have

incurred related medical costs. Specifically, the Plaintiffs and Decedents, their physicians and

staff were misled by the deceptive conduct described herein.

280.     The Defendants' deceptive, unconscionable, false, misleading, and/or fraudulent representations and material omissions to patients, physicians, and consumers, including the Plaintiffs and Decedents of material facts relating to the safety of Xarelto constituted unfair trade practices in violation of the state consumer protection statutes listed above.

281.     The Defendants uniformly communicated the purported benefits of Xarelto while failing to disclose the serious and dangerous side effects related to the use of Xarelto and the true state of Xarelto's regulatory status, its safety, its efficacy, and its usefulness. The Defendants made these representations to physicians, the medical community at large, and to patients and consumers, such as Plaintiffs and Decedents in the marketing and advertising campaign described herein.

282.     The Defendants' conduct in connection with Xarelto was also impermissible and illegal in that it created a likelihood of confusion and misunderstanding because the Defendants misleadingly, falsely and/or deceptively misrepresented and omitted numerous material facts regarding, among other things, the utility, benefits, costs, safety, efficacy, and advantages of Xarelto.

283.     Defendants' conduct as described above was a material cause of Plaintiffs' and Decedents' decision to purchase Xarelto.

284.     By reason of wrongful acts engaged in by the Defendants, the Plaintiffs and Decedents suffered ascertainable loss and damages for which the Plaintiffs and Decedents are now entitled to recover.

285.     As a direct and proximate result of Defendants' wrongful conduct, the Plaintiffs and Decedents were damaged by paying in whole or in part for Xarelto and for their medical treatment. Plaintiffs and Decedents are now entitled to recover those damages.

61

286.    As a direct, foreseeable and proximate cause of Defendants' conduct in violation of the consumer protection statutes of the States of Kansas, New York, Arizona, Michigan, Georgia, and Louisiana, the Plaintiffs and Decedents suffered damages, including personal injuries, economic damages, and non-economic damages.  Defendants' conduct was further wanton, egregious, and reckless so as to warrant the award of punitive damages.

287.    By reason of the foregoing, Plaintiffs and Decedents have suffered injuries and damages as alleged herein.

### ELEVENTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS (LOSS OF CONSORTIUM)

288.    Plaintiffs repeat, reiterate and reallege Paragraphs 1-126 of this Complaint inclusive, with the same force and effect as if more fully set forth herein.

289.    Plaintiffs plead this Count in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the laws of the Plaintiffs' resident States.

290.    At all relevant times hereto, where applicable, Plaintiff Alan Justin had a spouse, Pat Justin who has suffered injuries and losses as a result of the Plaintiff's injuries from Xarelto.

291.    For the reasons set forth herein, Plaintiff's spouse, Pat Justin has necessarily paid and has become liable to pay for medical aid, treatment, monitoring, medications, and other expenditures and will necessarily incur further expenses of a similar nature in the future as a proximate result of Defendants' misconduct.

292.    For the reasons set forth herein, Plaintiff's spouse, Pat Justin has suffered and will continue to suffer the loss of her loved one's support, companionship, services, society, love and affection.

293.     Plaintiff's spouse, Pat Justin alleges that her marital relationship was impaired and depreciated, and the marital association between husband and wife has been altered.

294.     Plaintiff's spouse, Pat Justin has suffered great emotional pain and mental anguish.

295.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff's spouse, Pat Justin has sustained and will continue to sustain severe physical injuries, severe emotional distress, economic losses and other damages for which she is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.  Defendants are liable to Plaintiff's spouse, Pat Justin jointly and severally for all general, special and equitable relief to which Plaintiff's spouse, Pat Justin is entitled by law.

296.     At all relevant times hereto, where applicable, Plaintiff Stephen Miller had a spouse, Beverly Miller who has suffered injuries and losses as a result of the Plaintiff's injuries from Xarelto.

297.     For the reasons set forth herein, Plaintiff's spouse, Beverly Miller has necessarily paid and has become liable to pay for medical aid, treatment, monitoring, medications, and other expenditures and will necessarily incur further expenses of a similar nature in the future as a proximate result of Defendants' misconduct.

298.     For the reasons set forth herein, Plaintiff's spouse, Beverly Miller suffered and will continue to suffer the loss of her loved one's support, companionship, services, society, love and affection.

299.     Plaintiff's spouse, Beverly Miller alleges that her marital relationship was impaired and depreciated, and the marital association between husband and wife had been altered.

63

300.    Plaintiff's spouse, Beverly Miller suffered great emotional pain and mental anguish.

301.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff's spouse, Beverly Miller has sustained and will continue to sustain severe physical injuries, severe emotional distress, economic losses and other damages for which she is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.  Defendants are liable to Plaintiff's spouse, Beverly Miller jointly and severally for all general, special and equitable relief to which Plaintiff's spouse, Beverly Miller is entitled by law.

302.    At all relevant times hereto, where applicable, Plaintiff Teresa Williams had a spouse, Freddy Williams who has suffered injuries and losses as a result of the Plaintiff's injuries from Xarelto.

303.    For the reasons set forth herein, Plaintiff's spouse, Freddy Williams has necessarily paid and has become liable to pay for medical aid, treatment, monitoring, medications, and other expenditures and will necessarily incur further expenses of a similar nature in the future as a proximate result of Defendants' misconduct.

304.    For the reasons set forth herein, Plaintiff's spouse, Freddy Williams has suffered and will continue to suffer the loss of his loved one's support, companionship, services, society, love and affection.

305.    Plaintiff's spouse, Freddy Williams alleges that his marital relationship was impaired and depreciated, and the marital association between husband and wife has been altered.

306.    Plaintiff's spouse, Freddy Williams has suffered great emotional pain and mental anguish.

307.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff's spouse, Freddy Williams has sustained and will continue to sustain severe physical injuries, severe emotional distress, economic losses and other damages for which he is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial. Defendants are liable to Plaintiff's spouse, Freddy Williams jointly and severally for all general, special and equitable relief to which Plaintiff's spouse, Freddy Williams is entitled by law.

### TWELFTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS (WRONGFUL DEATH)

308.    Plaintiffs repeat, reiterate and reallege Paragraphs 1-126 of this Complaint inclusive, with the same force and effect as if more fully set forth herein.

309.    Plaintiffs plead this Count in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the laws of the Plaintiffs' resident States.

310.    Plaintiff, Terri Grooms brings this claim, where appropriate, on behalf of the Estate and for the benefit of the Decedent, Virginia Hargraves' lawful beneficiaries.

311.    Defendants had a duty to exercise reasonable care in designing, manufacturing, and/or testing Xarelto, and/or placing Xarelto into the stream of interstate commerce within the United States, including a duty to assure that Xarelto was safe for its intended use by consumers such as Decedent, and that it did not cause consumers to suffer a risk of physical harm or death due to a design defect when used as instructed by Defendant.

312.    As a direct and proximate and legal result of Defendant's failure to provide timely and appropriate warnings to the public, physicians, and patients, including Decedent, and as a direct and legal result of the negligence, carelessness, other wrongdoing and actions or omissions

of Defendant described herein, Decedent suffered from rectal bleeding and acute blood loss anemia, and untimely died.

313.   As a further direct and proximate cause and legal result of the acts or omissions of Defendant described herein, Plaintiff, Terri Grooms suffered and will continue to suffer mental pain and suffering, and loss of Decedent, Virginia Hargraves' financial benefits, services, society, companionship, comfort and care.  Plaintiff may also recover for any medical and/or funeral expenses paid by them due to the injury and resulting death of Decedent.

314.   As a further direct and proximate cause and legal result of the acts or omissions of Defendant, Decedent, Virginia Hargraves was forced to undergo medical treatment and the estate of Decedent incurred reasonable and necessary medical and/or funeral expenses.

315.   Plaintiff, Beverly Miller brings this claim, where appropriate, on behalf of the Estate and for the benefit of the Decedent, Stephen Miller's lawful beneficiaries.

316.   Defendants had a duty to exercise reasonable care in designing, manufacturing, and/or testing Xarelto, and/or placing Xarelto into the stream of interstate commerce within the United States, including a duty to assure that Xarelto was safe for its intended use by consumers such as Decedent, and that it did not cause consumers to suffer a risk of physical harm or death due to a design defect when used as instructed by Defendant.

317.   As a direct and proximate and legal result of Defendant's failure to provide timely and appropriate warnings to the public, physicians, and patients, including Decedent, and as a direct and legal result of the negligence, carelessness, other wrongdoing and actions or omissions of Defendant described herein, Decedent suffered from acute gastrointestinal bleeding and acute blood loss anemia, and untimely died.

318.    As a further direct and proximate cause and legal result of the acts or omissions of Defendant described herein, Plaintiff, Beverly Miller suffered and will continue to suffer mental pain and suffering, and loss of Decedent, Stephen Miller's financial benefits, services, society, companionship, comfort and care.  Plaintiff may also recover for any medical and/or funeral expenses paid by them due to the injury and resulting death of Decedent.

319.    As a further direct and proximate cause and legal result of the acts or omissions of Defendant, Decedent, Stephen Miller was forced to undergo medical treatment and the estate of Decedent incurred reasonable and necessary medical and/or funeral expenses.

## THIRTEENTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS (SURVIVAL ACTION)

320.    Plaintiffs repeat, reiterate and reallege Paragraphs 1-126 of this Complaint inclusive, with the same force and effect as if more fully set forth herein.

321.    Plaintiffs plead this Count in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the laws of the Plaintiffs' resident States.

322.    As a direct and proximate result of the conduct of Defendants, where appropriate, Decedent, Virginia Hargraves prior to her death, was obligated to spend various sums of money to treat her injuries, which debts have been assumed by the Estate.  As a direct and proximate cause of the aforesaid, Decedent was caused pain and suffering, mental anguish and impairment of the enjoyment of life, until the date of her death; and, as a direct and proximate result of the aforesaid, Decedent suffered a loss of earnings and earning capacity. Plaintiff, Teri Grooms brings this claim on behalf of Decedent's estate under applicable state statutory and/or common laws.

323.     As a direct and proximate result of the conduct of Defendants, Decedent, Virginia Hargraves, and her spouse and heirs, until the time of Decedent's death, suffered a disintegration and deterioration of the family unit and the relationships existing therein, resulting in enhanced anguish, depression and other symptoms of psychological stress and disorder.

324.     As a direct and proximate result of the aforesaid, and including the observance of the suffering and physical deterioration of Decedent, Virginia Hargraves until the date of her death, Plaintiff, Terri Grooms has and will continue to suffer permanent and ongoing psychological damage which may require future psychological and medical treatment.  Plaintiff, Terri Grooms, as the personal representative of the Decedent, brings the claim on behalf of the estate for damages under applicable statutory and/or common laws, and in her own right.

325.     As a direct and proximate result of the conduct of Defendants, where appropriate, Decedent, Stephen Miller prior to his death, was obligated to spend various sums of money to treat his injuries, which debts have been assumed by the Estate.  As a direct and proximate cause of the aforesaid, Decedent was caused pain and suffering, mental anguish and impairment of the enjoyment of life, until the date of his death; and, as a direct and proximate result of the aforesaid, Decedent suffered a loss of earnings and earning capacity. Plaintiff, Beverly Miller brings this claim on behalf of Decedent's estate under applicable state statutory and/or common laws.

326.     As a direct and proximate result of the conduct of Defendants, Decedent, Stephen Miller, and his spouse and heirs, until the time of Decedent's death, suffered a disintegration and deterioration of the family unit and the relationships existing therein, resulting in enhanced anguish, depression and other symptoms of psychological stress and disorder.

327.     As a direct and proximate result of the aforesaid, and including the observance of the suffering and physical deterioration of Decedent, Stephen Miller until the date of his death, Plaintiff, Beverly Miller has and will continue to suffer permanent and ongoing psychological damage which may require future psychological and medical treatment.  Plaintiff, Beverly Miller, as the personal representative of the Decedent, brings the claim on behalf of the estate for damages under applicable statutory and/or common laws, and in her own right.

### FOURTEENTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS (PUNITIVE DAMAGES ALLEGATIONS)

328.     Plaintiffs repeat, reiterate and reallege Paragraphs 1-126 of this Complaint inclusive, with the same force and effect as if more fully set forth herein.

329.     The acts, conduct, and omissions of Defendants, as alleged throughout this Complaints were willful and malicious.  Defendants committed these acts with a conscious disregard for the rights of Plaintiffs and Decedents and other Xarelto users and for the primary purpose of increasing Defendants' profits from the sale and distribution of Xarelto.  Defendants' outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against Defendants in an amount appropriate to punish and make an example of Defendants.

330.     Prior to the manufacturing, sale, and distribution of Xarelto, Defendants knew that Xarelto was in defective conditions as previously described herein and knew that those who were prescribed the medication would experience and did experience severe physical, mental, and emotional injuries.  Further, Defendants, through their officers, directors, managers, and agents, knew that the medication presented a substantial and unreasonable risk of harm to the public, including Plaintiffs and Decedents, and as such, Defendants unreasonably subjected consumers of said drugs to risk of injury or death from using Xarelto.

331.    Despite its knowledge, Defendants, acting through its officers, directors and managing agents for the purpose of enhancing Defendants' profits, knowingly and deliberately failed to remedy the known defects in Xarelto and failed to warn the public, including Plaintiffs and Decedents, of the extreme risk of injury occasioned by said defects inherent in Xarelto. Defendants and their agents, officers, and directors intentionally proceeded with the manufacturing, sale, and distribution and marketing of Xarelto knowing these actions would expose persons to serious danger in order to advance Defendants' pecuniary interest and monetary profits.

332.    Defendants' conduct was despicable and so contemptible that it would be looked down upon and despised by ordinary decent people, and was carried on by Defendants with willful and conscious disregard for the safety of Plaintiffs and Decedents, entitling Plaintiffs and Decedents to exemplary damages.

333.    WHEREFORE, Plaintiffs respectfully request an award of punitive damages, in addition to all costs, interest and fees, including attorneys' fees, to which they are entitled under law and such other relief as this Honorable Court deems appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against the Defendants on each of the above-referenced claims and Causes of Action and as follows:

1.    Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2.    Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

3.      Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiffs in an amount sufficient to punish Defendants and deter future similar conduct;

4.      Prejudgment interest;

5.      Postjudgment interest;

6.      Awarding Plaintiffs reasonable attorneys' fees;

7.      Awarding Plaintiffs the costs of these proceedings; and

8.      Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby request a trial by jury of all issues triable by jury.

Date: April 20, 2016

/s/ Sandy Liebhard
Sandy Liebhard, Esq.
Melissa Mendoza, Esq.
Bernstein Liebhard LLP
10 East 40th Street
New York, New York 10016
liebhard@bernlieb.com
mmendoza@bernlieb.com
Phone: (212) 779-1414
Fax:    (212) 779-3218
*Attorneys for the Plaintiffs*