# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | * | MDL DOCKET NO. 2592 |
| | * | SECTION L |
| | | JUDGE ELDON E. FALLON |
| | * | MAG. JUDGE NORTH |
| ****************************************************** | * | |
| THIS DOCUMENT RELATES TO: | * | |
| 2:15-cv-510-EEF-MBN | * | |
| _____ | * | |
| MORRISON M. DUBOIS, as EXECUTOR OF THE ESTATE OF BONNIE R. SEAL | * | AMENDED COMPLAINT |
| DUBOIS and WENDY JOHNSON, INDIVIDUALLY, AND ON BEHALF OF | * | CIVIL ACTION 2:15-cv-510 |
| THE WRONGFUL DEATH BENEFICIARIES OF BONNIE R. SEAL DUBOIS | * | |
| | * | |
| PLAINTIFFS | * | |
| VERSUS | * | |
| JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a JOHNSON AND JOHNSON | * | |
| PHARMACEUTICAL RESEARCH AND DEVELOPMENT LLC; JANSSEN ORTHO | * | |
| LLC; JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA INC. | * | |
| f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC.; JOHNSON & | * | |
| JOHNSON; BAYER HEALTHCARE PHARMACEUTICALS, INC.; BAYER | * | |
| PHARMA AG; BAYER CORPORATION; BAYER HEALTHCARE LLC; BAYER | * | |
| HEALTHCARE AG; and BAYER AG | * | |
| | * | |
| DEFENDANTS | * | |
| _____ | * | |

## FIRST AMENDED COMPLAINT[1]

### JURY TRIAL REQUESTED

COME NOW the Plaintiffs, Morrison M. Dubois, as Executor of the Estate of Bonnie R. Seal Dubois, and Wendy Johnson, Individually and on Behalf of the Wrongful Death Beneficiaries of Bonnie R. Seal Dubois, by and through the undersigned counsel, and file this Complaint against the Defendants Janssen Research & Development LLC f/k/a Johnson and Johnson Pharmaceutical Research and Development LLC; Janssen Ortho LLC; Janssen Pharmaceuticals, Inc. f/k/a Janssen Pharmaceutica Inc. f/k/a Ortho-McNeil-Janssen Pharmaceuticals, Inc.; Johnson & Johnson; Bayer Healthcare Pharmaceuticals, Inc.; Bayer Pharma AG; Bayer Corporation; Bayer Healthcare LLC; Bayer Healthcare AG; and Bayer AG, and in support thereof would show unto the Court as follows:

### JURISDICTION AND VENUE

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy as to the Plaintiffs exceeds $75,000.00, exclusive of interest and costs, and because there is complete diversity of citizenship between the Plaintiffs and the Defendants.

2.     Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claim occurred in this District, and because Defendants conduct substantial business in this District.

---

[1]     This Complaint is amended to add the defendant, Johnson & Johnson.

3.      This Court has personal jurisdiction over the Defendants because they have done business in the State of Mississippi, have committed a tort in whole or in part in the State of Mississippi, have entered a contract to be performed in part in Mississippi, have substantial and continuing contacts with the State of Mississippi, and derive substantial revenue from goods used and consumed within the State of Mississippi.   The Defendants actively sell, market and promote their pharmaceutical product Xarelto to physicians and consumers in this state on a regular and consistent basis.

4.      This Court has personal jurisdiction over the Defendants because they have done business in the State of Mississippi, have committed a tort in whole or in part in the State of Mississippi, have entered a contract to be performed in part in Mississippi, have substantial and continuing contacts with the State of Mississippi, and derive substantial revenue from goods used and consumed within the State of Mississippi.   The Defendants actively sell, market and promote their pharmaceutical product Xarelto to physicians and consumers in this state on a regular and consistent basis.

## **PARTY PLAINTIFFS**

5.      Plaintiff, Morrison M. Dubois, is the Executor of the Estate of the Plaintiff Decedent and is a citizen of Wiggins, Stone County, Mississippi, and brings this claim on Behalf of the Estate of Bonnie R. Seal Dubois.

6.      Plaintiff, Wendy Johnson, is the daughter and next of kin of the Plaintiff Decedent and is a citizen and resident of Lumberton, Lamar County, State of Mississippi. She brings this claim individually and on Behalf of the Wrongful Death Beneficiaries of Bonnie R. Seal Dubois.

7.     Plaintiff decedent, Bonnie R. Seals Dubois, was at all times relevant hereto, a citizen and resident of Wiggins, Stone County, State of Mississippi, who, upon information and belief, suffered injuries and damages as a result of her use of Xarelto.

8.     Upon information and belief, Plaintiff decedent was prescribed Xarelto for her heart condition in Forrest County, State of Mississippi, on or around June 10, 2014, upon direction of her physician.

9.     Upon information and belief, Plaintiff decedent first began using Xarelto on or about June 10, 2014.  Plaintiff decedent was hospitalized on August 6, 2014, for shortness of breath, cough, and yellowish phlegm.

10.    Upon information and belief, as a direct and proximate result of the use of Defendants' Xarelto, Plaintiff decedent experienced a hemorrhage for which she was hospitalized for six weeks at Forrest General Hospital.

11.    As a direct and proximate result of the use of Defendants' Xarelto, the Plaintiff decedent suffered serious and dangerous side effects including life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including, but not limited to, diminished enjoyment of life, shortened life expectancy, expenses for hospitalization and medical treatment, and loss of earnings.

## PARTY DEFENDANTS

12.    Upon information and belief, Defendant JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a JOHNSON AND JOHNSON PHARMACEUTCAL RESEARCH AND DEVELOPMENT LLC (hereinafter referred to as "JANSSEN R&D") is a limited liability company organized under the laws of New Jersey, with a principal place

4

of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933. Defendant JANSSEN R&D is the holder of the approved New Drug Application ("NDA") for Xarelto as well as the supplemental NDA.

13.     As part of its business, JANSSEN R&D is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

14.     Upon information and belief, Defendant JANSSEN R&D has transacted and conducted business in the State of Mississippi.

15.     Upon information and belief, Defendant, JANSSEN R&D has derived substantial revenue from good and products used in the State of Mississippi.

16.     Upon information and belief, Defendant, JANSSEN R&D, expected or should have expected its acts to have consequence within the United States of America and the State of Mississippi, and it derived substantial revenue from interstate commerce within the United States and the State of Mississippi, more particularly.

17.     Upon information and belief, and at all relevant times, Defendant, JANSSEN R&D, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat Deep Vein Thrombosis ("DVT") and Pulmonary Embolism ("PE"), to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

18.     Upon information and belief, Defendant JANSSEN PHARMACEUTICALS,

5

INC., f/k/a JANSSEN PHARMACEUTICA INC. f/k/a ORTHO-MCNEIL-JANSSEN

PHARMACEUTICALS, INC. (hereinafter referred to as "JANSSEN PHARM") is a

Pennsylvania corporation, having a principle place of business at 1125

Trenton-Harbourton Road, Titusville, New Jersey 08560.

19.    As part of its business, JANSSEN PHARM is involved in the research,

development, sales, and marketing of pharmaceutical products including Xarelto and

rivaroxaban.

20.    Upon information and belief, Defendant, JANSSEN PHARM has transacted

and conducted business in the State of Mississippi.

21.    Upon information and belief, Defendant, JANSSEN PHARM, has derived

substantial revenue from goods and products used in the State of Mississippi.

22.    Upon information and belief, Defendant, JANSSEN PHARM, expected or

should have expected its acts to have consequence within the United States of America

and the State of Mississippi, and derived substantial revenue from interstate commerce

within the United States and the State of Mississippi, more particularly.

23.    Upon information and belief, and at all relevant times, Defendant,

JANSSEN PHARM, was in the business of and did design, research, manufacture, test,

advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral

anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic

embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the

risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing

hip and knee replacement surgery.

24.     Upon information and belief, Defendant JANSSEN ORTHO LLC (hereinafter referred to as "JANSSEN ORTHO") is a limited liability company organized under the laws of Delaware, having a principal place of business at State Road 933 Km 0 1, Street Statero, Gurabo, Puerto Rico 00778. Defendant JANSSEN ORTHO is a subsidiary of Johnson & Johnson.

25.     As part of its business, JANSSEN ORTHO is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

26.     Upon information and belief, Defendant, JANSSEN ORTHO has transacted and conducted business in the State of Mississippi.

27.     Upon information and belief, Defendant, JANSSEN ORTHO, has derived substantial revenue from goods and products used in the State of Mississippi.

28.     Upon information and belief, Defendant, JANSSEN ORTHO, expected or should have expected its acts to have consequence within the United States of America and the State of Mississippi and derived substantial revenue from interstate commerce within the United States and the State of Mississippi, more particularly.

29.     Upon information and belief, and at all relevant times, Defendant, JANSSEN ORTHO, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

7

30.     Upon information and belief, the Defendant, JOHNSON & JOHNSON (hereinafter referred to as "J&J") is a corporation organized under the laws of New Jersey with its principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933.

31.     As part of its business, Defendant J&J is and at all relevant times was, involved in the research, development, packaging, labeling, sales, and/or marketing of pharmaceutical products including Xarelto.   Defendant J&J manufactures, markets and sells a wide range of pharmaceutical products including Xarelto.

32.     Upon information and belief, Defendant J&J has transacted and conducted business in the State of Mississippi.

33.     Upon information and belief, Defendant J&J has derived substantial revenue from goods and products used in the State of Mississippi.

34.     Upon information and belief, Defendant J&J expected or should have expected its acts to have consequences within the United States of America and the State of Mississippi, and derived substantial revenue from interstate commerce within the United States and the State of Mississippi, more particularly.

35.     Upon information and belief, Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. is, and at all relevant times was, a corporation organized under the laws of the State of Delaware, with its principal place of business in the State of New Jersey.

36.     Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. was formerly known as Berlex Laboratories, Inc., which was formerly known as Berlex, Inc.

8

and BAYER HEALTHCARE PHARMACEUTICALS, INC. is the same corporate entity as Berlex, Inc. and Berlex Laboratories, Inc.

37.     As part of its business, BAYER HEALTHCARE PHARMACEUTICALS, INC. is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

38.     Upon information and belief, Defendant, BAYER HEALTHCARE PHARMACEUTICALS, INC., has transacted and conducted business in the State of Mississippi.

39.     Upon information and belief, Defendant, BAYER HEALTHCARE PHARMACEUTICALS, INC., has derived substantial revenue from goods and products used in the State of Mississippi.

40.     Upon information and belief, Defendant, BAYER HEALTHCARE PHARMACEUTICALS, INC., expected or should have expected its acts to have consequence within the United States of America and the State of Mississippi, and derived substantial revenue from interstate commerce within the United States and the State of Mississippi, more particularly.

41.     Upon information and belief, and at all relevant times, Defendant, BAYERHEALTHCARE PHARMACEUTICALS, INC., was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

9

42.     Upon information and belief, Defendant BAYER PHARMA AG is a pharmaceutical company domiciled in Germany.

43.     Defendant BAYER PHARMA AG is formerly known as Bayer Schering Pharma AG and is the same corporate entity as Bayer Schering Pharma AG. Bayer Schering Pharma AG is formerly known as Schering AG and is the same corporate entity as Schering AG.

44.     Upon information and belief, Schering AG was renamed Bayer Schering Pharma AG effective December 29, 2006.

45.     Upon information and belief, Bayer Schering Pharma AG was renamed BAYER PHARMA AG effective July 1, 2011.

46.     As part of its business, BAYER PHARMA AG is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

47.     Upon information and belief, Defendant, BAYER PHARMA AG, has transacted and conducted business in the State of Mississippi.

48.     Upon information and belief, Defendant, BAYER PHARMA AG, has derived substantial revenue from goods and products used in the State of Mississippi.

49.     Upon information and belief, Defendant, BAYER PHARMA AG, expected or should have expected its acts to have consequence within the United States of America and the State of Mississippi, and derived substantial revenue from interstate commerce within the United States and the State of Mississippi, more particularly.

50.     Upon information and belief, and at all relevant times, Defendant, BAYER PHARMA AG, was in the business of and did design, research, manufacture, test,

advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

51.     Upon information and belief, Defendant BAYER CORPORATION is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205.

52.     Upon information and belief, Defendant BAYER CORPORATION is the sole member of BAYER HEALTHCARE LLC, which owns 100% of Schering Berlin, Inc., which owns 100% of Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. As such, Defendant BAYER CORPORATION is a parent of Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC.

53.     At relevant times, Defendant BAYER CORPORATION was engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, its products, including the prescription drug Xarelto.

54.     At relevant times, Defendant BAYER CORPORATION conducted regular and sustained business in the State of Mississippi, by selling and distributing its products in the State of Mississippi and engaged in substantial commerce and business activity in the State of Mississippi.

55.     Upon information and belief, Defendant BAYER HEALTHCARE LLC is a limited liability company duly formed and existing under and by the virtue of the laws of the State of Delaware, with its principal place of business located in the State of New Jersey.

56.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC has transacted and conducted business in the State of Mississippi, and derived substantial revenue from interstate commerce. Defendant BAYER CORPORATION is the sole member Defendant BAYER HEALTHCARE LLC.

57.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC expected or should have expected that its acts would have consequences within the United States of America and in the State of Mississippi, and derived substantial revenue from interstate commerce.

58.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

59.     Upon information and belief, Defendant BAYER HEALTHCARE AG is a company domiciled in Germany and is the parent/holding company of Defendants BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC, and BAYER PHARMA AG.

12

60.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG has transacted and conducted business in the State of Mississippi, and derived substantial revenue from interstate commerce.

61.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG expected or should have expected that its acts would have consequences within the United States of America, and in the State of Mississippi, and derived substantial revenue from interstate commerce.

62.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG exercises dominion and control over Defendants BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC., and BAYER PHARMA AG.

63.     Upon information and belief, Defendant BAYER AG is a German chemical and pharmaceutical company that is headquartered in Leverkusen, North Rhine-Westphalia, Germany.

64.     Upon information and belief, Defendant BAYER AG is the third largest pharmaceutical company in the world.

65.     Upon information and belief, and at all relevant times, Defendant BAYER AG is the parent/holding company of all other named Defendants.

66.     Upon information and belief, at all relevant times, Defendant BAYER AG has transacted and conducted business in the State of Mississippi, and derived substantial revenue from interstate commerce.

67.     Upon information and belief, at all relevant times, Defendant BAYER AG expected or should have expected that its acts would have consequences within the

13

United States of America, and in the State of Mississippi, and derived substantial revenue from interstate commerce.

68.     Upon information and belief, at all relevant times, Defendant BAYER AG was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

## SUMMARY OF THE CASE

69.     This wrongful death and survival action is brought for Plaintiff decedent on behalf of the Estate of Bonnie R. Seals Dubois and on behalf of all wrongful death beneficiaries of Bonnie R. Seals Dubois.  Plaintiff decedent was prescribed and had been taking Xarelto for cardiac problems upon direction of the decedent's physician. As a result of Xarelto, the Plaintiff decedent, Bonnie R. Seals Dubois, suffered a severe gastrointestinal hemorrhage for which she was hospitalized and subsequently died on September 18, 2014.

70.     Defendants, JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a JOHNSON AND JOHNSON PHARMACEUTICAL RESEARCH AND DEVELOPMENT LLC; JANSSEN ORTHO LLC; JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA INC. f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC.; JOHNSON & JOHNSON; BAYER HEALTHCARE PHARMACEUTICALS, INC.; BAYER PHARMA AG; BAYER CORPORATION; BAYER HEALTHCARE LLC; BAYER

14

HEALTHCARE AG; and BAYER AG (hereinafter collectively referred to as "Defendants") designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Xarelto.

71.     When warning of safety and risks of Xarelto, Defendants negligently and/or fraudulently represented to the medical and healthcare community, the Food and Drug Administration (hereinafter referred to as the "FDA"), to Plaintiffs, the Plaintiff decedent's physician, and the public in general, that Xarelto had been tested and was found to be safe and/or effective for its indicated use.

72.     Defendants concealed their knowledge of Xarelto's defects from Plaintiffs, the FDA, the public in general and/or the medical community specifically.

73.     These representations were made by Defendants with the intent of defrauding and deceiving Plaintiffs, the public in general, and the medical and healthcare community in particular, and were made with the intent of inducing the public in general, and the medical community in particular, to recommend, dispense and/or purchase Xarelto for use to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat Deep Vein Thrombosis ("DVT") and Pulmonary Embolism ("PE"), to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, all of which evinced a callous, reckless, willful, depraved indifference to health, safety and welfare of the Plaintiffs and their decedent.

74.     Defendants negligently and improperly failed to perform sufficient tests, if any, on humans using Xarelto during clinical trials, forcing Plaintiff decedent, and Plaintiff decedent's physicians, hospitals, and/or the FDA, to rely on safety information that

applies to other non-valvular atrial fibrillation treatment and DVT/PE treatment and prophylaxis, which does not entirely and/or necessarily apply to Xarelto whatsoever.

75.     As a result of the foregoing acts and omissions, the Plaintiff decedent was caused to suffer serious and dangerous side effects including cerebellar bleeding and temporary paralysis, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.   Plaintiff decedent herein has sustained the above health consequences due to her use of Xarelto.

76.     Defendants concealed their knowledge of the defects in their products from the Plaintiffs, and Plaintiff decedent's physicians, hospitals, pharmacists, the FDA, and the public in general.

77.     Consequently, Plaintiffs seek compensatory damages as a result of Plaintiffs' decedent's use of the Xarelto, which has caused Plaintiff decedent to suffer from bleeding, as well as other severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life and ultimately death.

## **FACTUAL BACKGROUND**

78.     Defendants, directly or by and through their agents, apparent agents, servants or employees designed, manufactured, marketed, advertised, distributed, promoted, labeled, tested and sold Xarelto as an anti-coagulant primarily used to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat deep vein thrombosis ("DVT"), to treat pulmonary embolisms ("PE"), and/or to reduce the risk of recurrence of DVT and or PE.

16

79.     Defendants applied for an initial NDA for Xarelto in July of 2008.

80.     Xarelto (also known as rivaroxaban) was approved by the Food and Drug Administration ("FDA") on July 1, 2011 to reduce risk of blood clots, DVT, and PE following knee and hip replacement surgery. On November 4, 2011 Xarelto was approved as an anticoagulant primarily used to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation On November 2, 2012 the FDA expanded the use of Xarelto to the treatment of patients with DVT and PE as well as long-term treatment to prevent recurrence of the same.

81.     According to the Defendants' marketing and informational materials, referenced in the paragraphs below, and widely disseminated to the consuming public, "Xarelto is the first and only once-a day prescription blood thinner for patients with AFib not caused by a heart valve problem, that is proven to reduce the risk of stroke — without routine blood monitoring."[2]

82.     As the Defendants state in their website, "XARELTO has been proven to lower the chance of having a stroke if you have atrial fibrillation (AFib), not caused by a heart valve problem. XARELTO is an anticoagulant, or blood-thinning medicine that works by helping to keep blood clots from forming." The Defendants further claim that "it's been prescribed to more than seven million people around the world to help treat or

---

[2]

http://wwvv.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Enforcement ActivitiesbyFDA/WarningLettersandNoticeofViolationLettersto Pharmaceutical Companies/UCM357833.pdf

reduce their risk of dangerous clots" and that it "begins working a few hours after you start taking it, and keeps working for as long as take it."[3]

83.     Defendants further declare that "XARELTO is proven to help treat and prevent DVT and PE blood clots" and that Xarelto "reduc[es] the risk of these dangerous clots [from] happening again."[4]

84.     Defendants claim that patients with AFib, DVT, or PE taking Xarelto do not need regular blood monitoring and there are no known dietary restrictions. In addition, patients with AFib only need to take Xarelto once a day with an evening meal.[5]

85.     Defendants claim that patients with AFib are 5 times more likely than a person without Afib to suffer from a stroke and that "disability is more likely to be severe" and "the outcome is almost twice as likely to be fatal" and "the chances of having another major stroke go up.[6]

86.     Xarelto (Rivaroxaban) is an oxazolidinone derivative optimized for inhibiting both free Factor Xa and Factor Xa bound in the prothrombinase complex. It is a highly selective direct Factor Xa inhibitor with oral bioavailability and rapid onset of action. Inhibition of Factor Xa interrupts the intrinsic and extrinsic pathway of the blood coagulation cascade, inhibiting both thrombin formation and development of thrombi.

---

[3]   http://vvww.xarelto-us.com/how-xarelto-works

[4]   http://www.xarelto-us.com/dvt-pe/treatment-of-dvt-pe

[5]   http://www.xarelto-us.com/dvt-pe/xarelto-differenceg and http://www.xarelto-us.com/howxarelto-is-different

[6]   http://vvww.xarelto-us.com/knowing-your-stroke-risk

Rivaroxaban does not inhibit thrombin (activated Factor II). Xarelto is an anticoagulant that acts as a Factor Xa inhibitor.

87.    Defendants routinely marketed Xarelto as a "one size fits all" drug; in their fervent marketing of Xarelto, Defendants' misinformed patients, and their healthcare providers, as to the necessity to routinely monitor any patient requiring a blood thinning agent. In essence, the Defendants have created a new drug, Xarelto, which is not better than Warfarin from a safety perspective, and at best, perhaps slightly easier to use and administer. The idea of this apparently easier-to-use anticoagulant evidently appealed to physicians, who were subject to extreme marketing and promotion by the Defendants, but it ignores patient safety.

88.    The Defendants' marketing materials suggest that Xarelto represented a therapeutic simplification and therapeutic progress because it did not require patients to undergo periodic monitoring with blood tests and because there were no dietary restrictions.

89.    Defendants' boxed warning did not address the increased risk for serious and fatal bleeding, despite the fact that the information listed on their website originating from the Rocket AF clinical trial sponsored by Defendants states that in comparison to warfarin, patients taking Xarelto have more gastrointestinal bleeds and need more transfusions. In spite of this reference regarding bleeds, the information is still wholly inadequate because this information was not conveyed in the boxed warning on the Xarelto label.[7]

---

[7]    http://www.xareltohcp.com/reducing-stroke-risk/safety.html

90.     According to Institute for Safe Medication Practices, Quarter Watch Report, issued on October 3, 2012, the primary reported adverse event related to Xarelto use "was not the well-understood risk of hemorrhage. Instead, the largest identifiable category was serious bloodclot-related injury—most frequently pulmonary embolism—the very events rivaroxaban is intended to prevent." This lack of efficacy for short term users of Xarelto post hip and knee replacement surgery resulted in about 44% of the reported adverse effects from taking Xarelto.

91.     FDA clinical reviewers have stated that "rivaroxaban should not be approved unless the manufacturer conducts further studies to support the efficacy and safety of rivaroxaban" and the FDA website notes that "[a]dverse event reports of thrombocytopenia and venous thromboembolic events were identified" in relationship to Xarelto".[8] However, this information was not portrayed in the warning section on the warning label. The lack of efficacy of the medication for patients taking Xarelto post hip and knee surgery were not disclosed resulting in patients ingesting Xarelto and physicians prescribing Xarelto without sufficient information to make an accurate decision.

92.     Defendants fervently marketed Xarelto using print advertisements, online marketing on their website, and video advertisements with no regard to the accuracy and repercussions of their misleading advertising in favor of increasing sales.

93.     In the January/February 2013 issue of WebMD magazine, Defendants placed a print advertisement that resulted in the Office of Prescription Drug Promotion

---

[8]   http://www.fda.gov/drugs/guidancecomplianceregulatoryinformation/surveillance/ucm204091.htm

(OPDP) of the U.S. Food and Drug Administration (FDA) sending an untitled letter stating that Defendants' print advertisement was "false or misleading because it minimizes the risks associated with Xarelto and makes a misleading claim." Furthermore, the advertisement states "there are no dosage adjustments" in conflict with the product labeling approved by the FDA.[9]

94.    As a result of Defendants' intense marketing, "[a]bout 130,000 U.S. prescriptions were written for Xarelto in the first three months of 2012" resulting in large profits as Xarelto costs approximately $3,000 a year versus $200 for generic Warfarin.[10]

95.    As a result of Defendant's extreme marketing tactics, within the United Kingdom, Defendants also made 219 million Euros from Xarelto sales, more than three times as much as during the same period the previous year.[11]

96.    Due to the defective nature of Xarelto, persons who were prescribed and ingested Xarelto, for even a brief period of time, including the decedent herein, were at increased risk for developing life-threatening bleeds. The flawed formulation of Xarelto, which according to Defendants does not require regular blood monitoring or frequent doctor follow-up, raises concerns about the risk of stroke, bleeding, and blood clots if not taken properly or absorbed properly, particularly in patients with poor renal function. In

---

[9]

http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Enforcement ActivitiesbyFDA/WarningLettersandNoticeofViolationLetterstoPhannaceuticalCompanies/UCM357833.pdf , June 6, 2013 FDA Untitled Warning Letter.

[10]    Ransdell Pierson. "Pradaxa and Xarelto: Top Heart Doctors Concerned Over New Blood Thinners" *Huffpost Healthy Living.* 14th June 2012.

[11]    Frank Siebelt, Hans Seidenstuecker, and Christoph Steitz. "Reports of side-effects from Bayer's Xarelto grow: Spiegel" http://www.reuters.com/article/2013/09/08/us-bayer-xarelto- idUSBRE9870AH20130908

addition, "[p]rominent U.S. [cardiologists and health care professionals] stress that neither new drug [Xarelto] has a known antidote for a bleeding emergency, as warfarin does."[12]

97.    Defendants' pharmaceutical Xarelto led to 968 suspected undesirable side-effects including 72 cases of death in Germany in just the first eight months of 2013.[13]

98.    In addition, The Institute for Safe Medication Practices reported that:

> A clinical trial with 14,000 patients had shown that rivaroxaban was no worse than warfarin. [40] But reviewers noted that warfarin had not been optimally used. If rivaroxaban were really inferior to optimally used warfarin—but this was not proven, only suspected—its use could lead to increased death and injury. [41] Reviewers also questioned the convenient once-a-day dosing scheme, saying blood level studies had shown peaks and troughs that could be eliminated by twice-a-day dosing. ... As with other anticoagulants, the rate of clinically relevant bleeding in clinical studies was high-15% per year of treatment."[14]

In other words, the insufficient testing conducted and the deadly consequences of Xarelto did not go unnoticed.

99.    Even more significantly, in the first quarter of 2012, the Institute for Safe Medication Practices "identified 356 reports of serious, disabling, or fatal injury in which rivaroxaban was the primary suspect drug. The report more than doubled from the

---

[12]    Ransdell Pierson. "Pradaxa and Xarelto: Top Heart Doctors Concerned Over New Blood Thinners" Huffpost Healthy Living. 14th June 2012.

[13]    Frank Siebelt, Hans Seidenstuecker, and Christoph Steitz. "Reports of side-effects from Bayer's Xarelto grow: Spiegel" http://www.reuters.com/artiele/2013/09/08/us-bayer-xareltoid USBRE9870AH20130908.

[14]    Institute for Safe Medical Practices, QuarterWatch Report, October 3, 2012.

previous quarter total of 128 cases."[15]   However, when the findings were discussed with Defendants, "the company told us that it had reviewed the same data and saw no signal of a safety issue that needed to be addressed."[16]   Defendants placed more value into ensuring that their profits would continue than on minimizing the serious, disabling, or fatal injuries that were occurring due to the drug they were marketing and promoting.

100.   In the year leading up to June 30, 2012, there were 1,080 Xarelto-associated "Serious Adverse Event" ("SAE") Medwatch reports filed with the FDA, including at least 65 deaths. Of the reported hemorrhage events associated with Xarelto, 8% resulted in death, which was approximately twofold the risk of a hemorrhage-related death with warfarin.

101.   At the close of the 2012 fiscal year, a total of 2,081 new Xarelto-associated SAE reports were filed with the FDA in its first full year on the market, ranking tenth among other pharmaceuticals in direct reports to the FDA. Of those reported events, 151 resulted in death, as compared to only 56 deaths associated with warfarin.

102.   The Institute for Safe Medical Practices ("ISMP") referred to these SAE figures as constituting a "strong signal" regarding the safety of Xarelto, defined as "evidence of sufficient weight to justify an alert to the public and the scientific community, and to warrant further investigation."

103.   Of particular note, in the first quarter of 2013, the number of reported serious adverse events associated with Xarelto (680) overtook that of Pradaxa (528),

---

[15]   *Id.*

[16]   *Id.*

another new oral anticoagulant, which had previously ranked as the number one reported drug in terms of adverse events in 2012.

104. Defendants concealed their knowledge that Xarelto can cause life threatening, irreversible bleeds from the Plaintiff decedent, other consumers, the general public, and the medical community. Indeed, the Defendants did not properly warn of the irreversible nature of Xarelto in the "Warnings and Precautions" section of the products warning label. The only warnings provided by Defendants were as follows:

_____**WARNINGS AND PRECAUTIONS**_____

Risk of bleeding: XARELTO can cause serious and fatal bleeding. Promptly evaluate signs and symptoms of blood loss. (5.2)

Pregnancy related hemorrhage: Use XARELTO with caution in pregnant women due to the potential for obstetric hemorrhage and/or emergent delivery. Promptly evaluate signs and symptoms of blood loss. (5.7)

Prosthetic heart valves: XARELTO use not recommended (5.8)

Specifically, Defendants did not adequately inform consumers and the prescribing medical community about the risks of uncontrollable bleeds associated with Xarelto usage, nor did Defendants warn or otherwise advise on how to intervene and stabilize a patient should a bleed occur.

105. As seen in the "Full Prescribing Information" provided by Defendants, Defendants reveal that they did not test for all the possible reversal agents for this dangerous drug since "[a] specific antidote for rivaroxaban is not available" and "[u]se of procoagulant reversal agents such as prothrombin complex concentrate (PCC), activated prothrombin complex concentrate (APCC), or recombinant factor VIIa (rFIIa) may be

24

> **WARNING: (A) PREMATURE DISCONTINUATION OF XARELTO INCREASES THE RISK OF THROMBOTIC EVENTS , and (B) SPINAL/EPIDURAL HEMATOMA**

considered but has not been evaluated in clinical trials." However, this is buried in small print.

106.   Importantly, Xarelto still does not have a "black box" warning informing patients or prescribing doctors know that Xarelto can cause irreversible bleeds. In fact, the August 2013 Highlights of Prescribing Information only has a "black box" warning stating the following:

> *See full prescribing information for complete boxed warning*
>
> **PREMATURE DISCONTINUATION OF XARELTO INCREASES THE RISK OF THROMBOTIC EVENTS**
> **Premature discontinuation of any anticoagulant, including XARELTO, increases the risk of thrombotic events.  To reduce this risk, consider coverage with another anticoagulant if XARELTO is discontinued for a reason other than pathological bleeding or completion of a course of therapy (2.2, 2.6, 5.1, 14.1).**
>
> **SPINAL/EPIDURAL HEMATOMA**
> **Epidural or spinal hematomas have occurred in patients treated with XARELTO who are receiving neuraxial anesthesia or undergoing spinal puncture.   These hematomas may result in long-term or permanent paralysis (5.2, 53, 6.2)**
> **Monitor patients frequently for signs and symptoms of neurological impairment and if observed, treat urgently.   Consider the benefits and risks before neuraxial intervention in patients who are or who need to be anticoagulated (5.3).**

107.   Even in the "Warnings and Precautions" section of the August 2013 Highlights of Prescribing Information, the irreversible nature of the medication Xarelto was not revealed to patients or their prescribing doctors. Defendants merely indicated that there was a risk for bleeding and side-stepped the important issue of reversing the effects of Xarelto should a bleed occur as seen below:

_____**WARNINGS AND PRECAUTIONS**_____

Risk of bleeding: XARELTO can cause serious and fatal bleeding. Promptly evaluate signs and symptoms of blood loss. (5.2)

Pregnancy related hemorrhage: Use XARELTO with caution in pregnant women due to the potential for obstetric hemorrhage and/or emergent delivery. Promptly evaluate signs and symptoms of blood loss. (5.7)

Prosthetic heart valves: XARELTO use not recommended (5.8)

108.   Aside from the warning labels, Defendants did not issue a Dear Doctor letter that sufficiently outlined the dangers of administering Xarelto to a patient. In the September 2013 letter to healthcare professionals, Defendants do not mention the lack of an antidote for Xarelto should serious and fatal bleeding occur while a patient was taking Xarelto.

109.   The current warning is simply inadequate. The Defendants have failed and continue to fail in their duties to warn and protect the consuming public, including the Plaintiffs herein.

110.   Even if the warnings were sufficient, which Plaintiffs strongly deny, Xarelto still lacks any benefit sufficient to tolerate the extreme risk posed by the ingestion of this drug. Xarelto is quite simply dangerous and defective as formulated. The Defendants should withdraw Xarelto from the market.

111.   Defendants willfully, wantonly and with malice withheld the knowledge of increased risk of irreversible bleeds in users of Xarelto to prevent any chances of their product's registrations being delayed or rejected by FDA.

112.   As the manufacturers and distributors of Xarelto, Defendants knew or should have known that Xarelto use was associated with irreversible bleeds.

26

113.    With the knowledge of the true relationship between use of Xarelto and irreversible bleeds, rather than taking steps to pull the drug off the market, provide strong warnings, or create an antidote, Defendants promoted and continue to promote Xarelto as a safe and effective treatment for AFib.

114.    Defendants' "Xarelto ...is estimated to be the 19th-best-selling drug in the world by 2018, according to the report. Worldwide sales of Xarelto are expected to jump from $596 million in 2012 to $3.7 billion in 2018."[17]

115.    While Defendants enjoy great financial success from their expected blockbuster drug, Xarelto, they continue to place American citizens at risk of severe bleeds and death.

116.    Consumers, including Plaintiff decedent, Bonnie R. Seals Dubois, who have used Xarelto to reduce the risk of stroke due to atrial fibrillation or to reduce the risk of blood clots, DVT and PE following knee or hip replacement surgery, have several alternative safer products available to treat the conditions and have not been adequately warned about the significant risks and lack of benefits, associated with Xarelto therapy.

117.    Defendants, through their affirmative misrepresentations and omissions, actively concealed from Plaintiff decedent and her physicians the true and significant risks associated with Xarelto use.

118.    As a result of Defendants' actions, Plaintiff decedent and her physicians were unaware, and could not have reasonably known or have learned

---

[17]    http://wvvw.drugwatch.com/2013/07/23/blood-thinner-growth-more-risk/

through reasonable diligence, that Plaintiff decedent would be exposed to the risks identified in this Complaint. The increased risks and subsequent medical damages associated with Plaintiff decedent's Xarelto use were the direct and proximate result of Defendants' conduct.

119.    Upon information and belief, Plaintiff decedent first began using Xarelto on or about June 10, 2014.   Plaintiff decedent was hospitalized on August 6, 2014, for shortness of breath, cough, and yellowish phlegm.

120.    As a direct and proximate result of the use of Defendants' Xarelto, Plaintiff  decedent experienced a hemorrhage for which she was hospitalized for six weeks at Forrest General Hospital.

121.    As a direct and proximate result of the use of Defendants' Xarelto, the Plaintiff decedent suffered serious and dangers side effects including bleeding, as well as other severe personal injuries, including physical pain and mental anguish, loss of enjoyment of life, expenses for hospitalization and medical treatment, loss of earnings, and ultimately death.

## FIRST CAUSE OF ACTION AS AGAINST THE DEFENDANTS (NEGLIGENCE)

122.    Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

123.    Defendants had a duty to exercise reasonable care in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale and/or distribution of Xarelto into the stream of commerce, including a duty to

assure that the product would not cause users to suffer unreasonable, dangerous side effects.

124.   Defendants failed to exercise ordinary care in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Xarelto into interstate commerce in that Defendants knew or should have known that using Xarelto created a high risk of unreasonable, dangerous side effects, including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

125.   The negligence of the Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

   a) Manufacturing, producing, promoting, formulating, creating, and/or designing Xarelto without thoroughly testing it;

   b) Manufacturing, producing, promoting, formulating, creating, and/or designing Xarelto without adequately testing it;

   c) Not conducting sufficient testing programs to determine whether or not Xarelto was safe for use, in that Defendants herein knew or should have known that Xarelto was unsafe and unfit for use by reason of the dangers to its users;

   d) Selling Xarelto without making proper and sufficient tests to determine the dangers to its users;

   e) Negligently failing to adequately and correctly warn the Plaintiff decedent, the public, the medical and healthcare profession, and the FDA of the dangers of Xarelto;

   f) Failing to provide adequate instructions regarding safety precautions to be followed by users, handlers, and persons who would

reasonably and foreseeably come into contact with, and more particularly, use, Xarelto;

g) Failure to test Xarelto and/or failing to adequately, sufficiently and properly test Xarelto;

h) Negligently advertising and recommending the use of Xarelto without sufficient knowledge as to its dangerous propensities;

l) Negligently representing that Xarelto was safe for use for its intended purpose, when, in fact, it was unsafe;

j) Negligently representing that Xarelto had equivalent safety and efficacy as other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

k) Negligently designing Xarelto in a manner which was dangerous to its users;

l) Negligently manufacturing Xarelto in a manner which was dangerous to users;

m) Negligently producing Xarelto in a manner which was dangerous to its users;

n) Negligently assembling Xarelto in a manner which was dangerous to its users;

o) Concealing information from the Plaintiff decedent in knowing that Xarelto was unsafe, dangerous, and/or non-conforming with FDA regulations;

p) Improperly concealing and/or misrepresenting information from the Plaintiff decedent, healthcare professionals, and/or the FDA, concerning the severity of risks and dangers of Xarelto compared to other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

q) Defendants under-reported, underestimated and downplayed the serious dangers of Xarelto;

30

r)   Defendants negligently compared the safety risk and/or dangers of
     Xarelto with other forms of treatment for reducing the risk of stroke
     and systemic embolism in patients with non-valvular atrial fibrillation,
     reducing the risk of recurrence of DVT and/or PE, and for prophylaxis
     of DVT for patients undergoing hip and knee replacement surgery;

s)   Defendants were negligent in the designing, researching, supplying,
     manufacturing, promoting, packaging, distributing, testing,
     advertising, warning, marketing and sale of Xarelto in that they:

     1.   Failed to use due care in designing and manufacturing Xarelto so
          as to avoid the aforementioned risks to individuals when Xarelto
          was used for treatment for reducing the risk of stroke and
          systemic embolism in patients with non-valvular atrial fibrillation,
          reducing the risk of recurrence of DVT and/or PE, and for
          prophylaxis of DVT for patients undergoing hip and knee
          replacement surgery;

     2.   Failed to accompany their product with proper and/or accurate warnings
          regarding all possible adverse side effects associated with the use of
          Xarelto;

     3.   Failed to accompany their product with proper warnings regarding all
          possible adverse side effects concerning the failure and/or malfunction
          of Xarelto;

     4.   Failed to accompany their product with accurate warnings regarding the
          risks of all possible adverse side effects concerning Xarelto;

     5.   Failed to warn Plaintiff decedent of the severity and duration of such
          adverse effects, as the warnings did not accurately reflect the
          symptoms, or severity of the side effects;

     6.   Failed to conduct adequate testing, including pre-clinical and clinical
          testing and post-marketing surveillance to determine the safety of
          Xarelto;

     7.   Failed to warn Plaintiff decedent, prior to actively encouraging the sale
          of Xarelto, either directly or indirectly, orally or in writing, about the need
          for more comprehensive, more regular medical monitoring than usual to
          ensure early discovery of potentially serious side effects;

     8.   Were otherwise careless and/or negligent.

126.    Despite the fact that Defendants knew or should have known that Xarelto caused unreasonably dangerous side effects, Defendants continued and continue to market, manufacture, distribute, and/or sell Xarelto to consumers, including the Plaintiff decedent.

127.    Defendants knew or should have known that consumers such as the Plaintiff decedent would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care, as set forth above.

128.    Defendants' negligence was the proximate cause of Plaintiffs and Plaintiff decedent's injuries, harm and economic loss, which Plaintiffs and Plaintiff decedent suffered.

129.    As a direct and proximate result of the use of Defendants' Xarelto, the Plaintiffs' decedent suffered serious and dangers side effects including bleeding, as well as other severe personal injuries, including physical pain and mental anguish, loss of enjoyment of life, expenses for hospitalization and medical treatment, loss of earnings, and ultimately death.

<u>SECOND CAUSE OF ACTION AS AGAINST THE DEFENDANTS</u>
<u>(STRICT PRODUCTS LIABILITY)</u>

130.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

131.    At all times herein mentioned, the Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, distributed, and/or have recently acquired the Defendants who have designed, researched, manufactured, tested,

advertised, promoted, marketed, sold and distributed Xarelto as hereinabove described that was used by the Plaintiff decedent.

132.   That Xarelto was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

133.   At those times, Xarelto was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, the Plaintiff decedent herein.

134.   The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Xarelto.

135.   The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective in design and/or formulation, in that, when it left the hands of the Defendants, manufacturers, and/or suppliers, it was unreasonably dangerous, and it was more dangerous than an ordinary consumer would expect.

136.   At all times herein mentioned, Xarelto was in a defective condition and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendants.

137.    Defendants knew, or should have known, that at all times herein mentioned, their Xarelto was in a defective condition, and was and is inherently dangerous and unsafe.

138.    At the time of the Plaintiff decedent's use of Xarelto, Xarelto was being used for the purposes and in a manner normally intended.

139.    Defendants with this knowledge voluntarily designed its Xarelto in a dangerous condition for use by the public, and in particular the use by the Plaintiff decedent.

140.    Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

141.    Defendants created a product unreasonably dangerous for its normal, intended use.

142.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was manufactured defectively in that Xarelto left the hands of Defendants in a defective condition and was unreasonably dangerous to its intended users.

143.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Xarelto was manufactured.

144.    Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed a defective product which created an unreasonable risk to the health of consumers and to the Plaintiff decedent in particular;

34

and Defendants are therefore strictly liable for the injuries and damages sustained by the Plaintiffs and Plaintiff decedent.

145.    The Plaintiff decedent could not, by the exercise of reasonable care, have discovered Xarelto's defects herein mentioned and perceived its danger.

146.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate warnings or instructions, as the Defendants knew or should have known that the product created a risk of serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature and the Defendants failed to adequately warn of said risk.

147.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate warnings and/or inadequate testing.

148.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate post-marketing surveillance and/or warnings because, after Defendants knew or should have known of the risks of serious side effects including, life-threatening bleeding, as well as other severe and permanent health consequences from Xarelto, they failed to provide adequate warnings to users or consumers of the product, and continued to improperly advertise, market and/or promote their product, Xarelto.

149.    By reason of the foregoing, the Defendants have become strictly liable in tort to the Plaintiffs for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Xarelto.

35

150.    Defendants' defective design, manufacturing defect, and inadequate warnings of Xarelto were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

151.    That said defects in Defendants' drug, Xarelto, was a substantial factor in causing Plaintiff decedent's injuries and death.

152.    As a direct and proximate result of the use of Defendants' Xarelto, the Plaintiff decedent suffered serious and dangers side effects including bleeding, as well as other severe personal injuries, including physical pain and mental anguish, loss of enjoyment of life, expenses for hospitalization and medical treatment, loss of earnings, and ultimately death.

**THIRD CAUSE OF ACTION AS AGAINST THE DEFENDANTS**
**(MISSISSIPPI PRODUCT LIABILITY ACT)**

153.    Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

154.    Plaintiff decedent's injuries were caused by a characteristic of Xarelto that renders the product unreasonably dangerous because Plaintiff decedent's injuries arose from a reasonably anticipated use of the product by the decedent, Bonnie R. Seals Dubois.

155.    That at the time Xarelto left the Defendants' control, the product deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the Defendants and as such was unreasonably dangerous in construction or composition.

156.    That Xarelto was unreasonably dangerous in design in that at the time when Xarelto left the Defendants' control, there existed an alternative design for the product that was capable of preventing the Plaintiff decedent's injuries; and the likelihood that Xarelto's design would cause the Plaintiff decedent's injuries and the gravity of those injuries and damages outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product.

157.    That Xarelto had an inadequate warning because at the time it left Defendants' control, the product possessed a characteristic that may cause damage and the Defendants failed to use reasonable care to provide an adequate warning of such characteristics and its danger to users and handlers of the product, thereby rendering the product unreasonably dangerous.

158.    That the unreasonably dangerous characteristics of Xarelto were beyond that which would be contemplated by the ordinary user such as Bonnie R. Seals Dubois with the ordinary knowledge common to the community as to the product's characteristics and were beyond the characteristics contemplated by her physicians.

159.    That in the alternative, the Defendants, after Xarelto left its control, acquired knowledge of a characteristic of the product that may cause damage and the danger of such characteristic, or they would have acquired such knowledge had they acted as a reasonably prudent manufacturer, and therefore Defendants are liable unto Plaintiffs as a result of their subsequent failure to use reasonable care to provide an adequate warning of such a characteristic and its dangers to users of the product such as Bonnie R. Seals Dubois.

160.    That Xarelto was unreasonably dangerous because it did not conform to an express warranty made by the Defendants about the product and the express warranty induced the decedent Bonnie R. Seals Dubois to use the product (and her physician to prescribe the product) and the Plaintiffs and Plaintiff decedent's damages and Plaintiffs decedent's injuries were proximately caused because the express warranty was untrue.

161.    That at the time Xarelto left the Defendants' control, the Defendants, in light of then existing reasonably available scientific and technological knowledge, knew of the design characteristic that caused the damage and the danger of such characteristic.

162.    That at the time Xarelto left the Defendants' control, the Defendants, in light of then existing reasonably available scientific and technological knowledge, knew of the existing technologically and economically safer alternative design characteristic that caused the damage and the danger of such characteristic.

163.    As a direct and proximate result of the use of Defendants' Xarelto, the Plaintiff decedent suffered serious and dangers side effects including bleeding, as well as other severe personal injuries, including physical pain and mental anguish, loss of enjoyment of life, expenses for hospitalization and medical treatment, loss of earnings, and ultimately death.

## FOURTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS
## (BREACH OF EXPRESS WARRANTY)

164.    Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

165.    Defendants expressly warranted that Xarelto was safe and well accepted by users.

166.    Xarelto does not conform to these express representations because Xarelto is not safe and has numerous serious side effects, about many of which Defendants did not warn. As a direct and proximate result of the breach of said warranties, Plaintiff decedent suffered severe and permanent personal injuries, harm and economic loss and death.

167.    Plaintiff decedent and her physician did rely on the express warranties of the Defendants herein.

168.    Members of the medical community, including physicians and other healthcare professionals, relied upon the representations and warranties of the Defendants for use of Xarelto in recommending, prescribing, and/or dispensing Xarelto.

169.    The Defendants herein breached the aforesaid express warranties, as their drug Xarelto was defective.

170.    Defendants expressly represented to Plaintiff decedent, Plaintiff decedent's physicians, healthcare providers, and/or the FDA that Xarelto was safe and fit for use for the purposes intended, that it was of merchantable quality, that it did not produce any dangerous side effects in excess of those risks associated with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, that the side effects it did produce were accurately reflected in the warnings, and that it was adequately tested and fit for its intended use.

171.    Defendants knew or should have known that, in fact, said representations and warranties were false, misleading, and untrue in that Xarelto was not safe and fit for the use intended, and, in fact, produced serious injuries to the users that were not accurately identified and represented by Defendants.

172.    As a direct and proximate result of the use of Defendants' Xarelto, the Plaintiff decedent suffered serious and dangers side effects including bleeding, as well as other severe personal injuries, including physical pain and mental anguish, loss of enjoyment of life, expenses for hospitalization and medical treatment, loss of earnings, and ultimately death.

## FIFTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS
## (BREACH OF IMPLIED WARRANTIES)

173.    Plaintiffs repeat, reiterate, and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

174.    At all times herein mentioned, the Defendants manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted and sold Xarelto and/or have recently acquired the Defendants who have manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted and sold Xarelto, to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

175.   At the time Defendants marketed, sold, and distributed Xarelto for use by Plaintiffs decedent, Defendants knew of the use for which Xarelto was intended and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

176.   The Defendants impliedly represented and warranted to the users of Xarelto and their physicians, healthcare providers, and/or the FDA that Xarelto was safe and of merchantable quality and fit for the ordinary purpose for which said product was to be used.

177.   That said representations and warranties aforementioned were false, misleading, and inaccurate in that Xarelto was unsafe, unreasonably dangerous, improper, not of merchantable quality, and defective.

178.   Plaintiff decedent, and/or members of the medical community and/or healthcare professionals did rely on said implied warranty of merchantability of fitness for a particular use and purpose.

179.   Plaintiff decedent and her physicians and healthcare professionals reasonably relied upon the skill and judgment of Defendants as to whether Xarelto was of merchantable quality and safe and fit for its intended use.

180.   Xarelto was injected into the stream of commerce by the Defendants in a defective, unsafe, and inherently dangerous condition and the products and materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

181.   The Defendants herein breached the aforesaid implied warranties, as their drug Xarelto was not fit for its intended purposes and uses.

41

182.   As a result of the foregoing acts and omissions, the Plaintiff decedent was caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, shortened life expectancy, expenses for hospitalization, loss of earnings and death.

## SIXTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS (FRAUDULENT MISREPRESENTATION)

183.   Plaintiffs repeat, reiterate and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

184.   The Defendants falsely and fraudulently represented to the medical and healthcare community, and to the Plaintiff decedent, and/or the FDA, and the public in general, that said product, Xarelto, had been tested and was found to be safe and/or effective to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

185.   The representations made by Defendants were, in fact, false.

186.   When said representations were made by Defendants, they knew those representations to be false and they willfully, wantonly and recklessly disregarded whether the representations were true.

187.   These representations were made by said Defendants with the intent of defrauding and deceiving the Plaintiff decedent, the public in general, and the medical and healthcare community in particular, and were made with the intent of inducing the public in

general, and the medical and healthcare community in particular, to recommend, prescribe, dispense and/or purchase said product, Xarelto, for use to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, all of which evinced a callous, reckless, willful, depraved indifference to the health, safety and welfare of the Plaintiff decedent herein.

188.   At the time the aforesaid representations were made by the Defendants and, at the time the Plaintiff decedent used Xarelto, the Plaintiff decedent and her physicians were unaware of the falsity of said representations and reasonably believed them to be true.

189.   In reliance upon said representations, the Plaintiff decedent was induced to and did use Xarelto, thereby sustaining severe and permanent personal injuries while her physician was induced to and did prescribe Xarelto.

190.   Said Defendants knew and were aware or should have been aware that Xarelto had not been sufficiently tested, was defective in nature, and/or that it lacked adequate and/or sufficient warnings.

191.   Defendants knew or should have known that Xarelto had a potential to, could, and would cause severe and grievous injury to the users of said product, and that it was inherently dangerous in a manner that exceeded any purported, inaccurate, and/or down-played warnings.

192.   Defendants brought Xarelto to the market, and acted fraudulently, wantonly and maliciously to the detriment of the Plaintiffs and Plaintiff decedent.

43

193.   As a result of the foregoing acts and omissions, the Plaintiff decedent was caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, shortened life expectancy, expenses for hospitalization, loss of earnings and death.

## SEVENTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS
## (FRAUDULENT CONCEALMENT)

194.   Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

195.   At all times during the course of dealing between Defendants and Plaintiff decedent, and/or healthcare providers of the Plaintiff decedent, and/or the FDA, Defendants misrepresented the safety of Xarelto for its intended use.

196.   Defendants knew or were reckless in not knowing that its representations were false.

197.   In representations to the Plaintiff decedent, and/or her healthcare providers, and/or the FDA, Defendants fraudulently concealed and intentionally omitted the following material information:

      a)     that Xarelto was not as safe as other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

      b)     that the risks of adverse events with Xarelto were higher than those with other forms of treatment for reducing the

44

risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

c)     that the risks of adverse events with Xarelto were not adequately tested and/or known by Defendants;

d)     that Defendants were aware of dangers of Xarelto, in addition to and above and beyond those associated with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

e)     that Xarelto was defective, and that it caused dangerous side effects, including but not limited to life-threatening bleeding, as well as other severe and permanent health consequences, at a much more and significant rate than other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

f)     that patients had to be monitored more regularly than normal while using Xarelto;

g)     that Xarelto was manufactured negligently;

h)     that Xarelto was manufactured defectively;

i)     that Xarelto was manufactured improperly;

j)     that Xarelto was designed negligently;

k)     that Xarelto was designed defectively; and

l)     that Xarelto was designed improperly.

45

198.   Defendants were under a duty to disclose to Plaintiff decedent, and her physicians, hospitals, healthcare providers, and/or the FDA the defective nature of Xarelto, including but not limited to the heightened risks of life-threatening bleeding.\

199.   Defendants had sole access to material facts concerning the defective nature of the product and its propensity to cause serious and dangerous side effects, and hence, cause damage to persons who used Xarelto, including the Plaintiff decedent, in particular.

200.   Defendants' concealment and omissions of material facts concerning, *inter alia*, the safety of Xarelto were made purposefully, willfully, wantonly, and/or recklessly, to mislead Plaintiff decedent, and Plaintiff Decedent's physicians, hospitals and healthcare providers into reliance, continued use of Xarelto, and actions thereon, and to cause her them to purchase, prescribe, and/or dispense Xarelto and/or use the product.

201.   Defendants knew that Plaintiff decedent and her physicians, hospitals, healthcare providers, and/or the FDA had no way to determine the truth behind Defendants' concealment and omissions, including material omissions of facts surrounding Xarelto, as set forth herein.

202.   Plaintiff decedent, as well as her doctors, healthcare providers, and/or hospitals reasonably relied on facts revealed which negligently, fraudulently and/or purposefully did not include facts that were concealed and/or omitted by Defendants.

203.   As a result of the foregoing acts and omissions, the Plaintiff decedent was caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature,

physical pain and mental anguish, diminished enjoyment of life, shortened life expectancy, expenses for hospitalization, loss of earnings and death.

## EIGHTH CAUSE OF ACTION AS AGAINST   THE DEFENDANTS
## (NEGLIGENT MISREPRESENTATION)

204.   Plaintiffs repeat, reiterate, and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

205.   Defendants had a duty to make correct representations to Plaintiff decedent, her physicians, the FDA, the medical community and the public. Defendants represented to the medical and healthcare community, and to the Plaintiff decedent, the FDA, and the public in general that said product, Xarelto, had been tested and found to be safe and effective to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

206.   The representations made by Defendants were, in fact, false.

207.   Defendants failed to exercise ordinary care in the representation of Xarelto, while involved in its manufacture, sale, testing, quality assurance, quality control, and/or distribution of said product into interstate commerce, in that Defendants' negligently misrepresented Xarelto's high risk of unreasonable, dangerous side effects.

208.   Defendants breached their duty in representing Xarelto's serious side effects to the medical and healthcare community, to the Plaintiff decedent, the FDA and the public in general.

209.   As a result of the foregoing acts and omissions, the Plaintiff decedent was caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, shortened life expectancy, expenses for hospitalization, loss of earnings and death.

## NINTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS
## (FRAUD AND DECEIT)

210.   Plaintiffs repeat, reiterate and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

211.   Defendants' conducted research, or lack thereof, used Xarelto as part of their research.

212.   As a result of Defendants' research and testing, or lack thereof, Defendants blatantly and intentionally distributed false information, including but not limited to assuring the public, the Plaintiff decedent, her doctors, hospitals, healthcare professionals, and/or the FDA that Xarelto was safe and effective for use as a means to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

213.   As a result of Defendants' research and testing, or lack thereof, Defendants intentionally omitted certain results of testing and research to the public, healthcare professionals, and/or the FDA, including the Plaintiff decedent.

214.   Defendants had a duty when disseminating information to the public to disseminate truthful information and a parallel duty not to deceive the public and the Plaintiff decedent, as well as Plaintiff decedent's respective healthcare providers and/or the FDA.

215.   The information distributed to the public, the FDA, the Plaintiff decedent and her physicians by Defendants, including but not limited to reports, press releases, advertising campaigns, television commercials, print ads, magazine ads, billboards, and all other commercial media contained material representations of fact and/or omissions.

216.   The information distributed to the public, the FDA, the Plaintiff decedent and her physicians by Defendants intentionally included representations that Defendants' drug Xarelto was safe and effective for use to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

217.   The information distributed to the public, the FDA,   the Plaintiff decedent and her physicians by Defendants intentionally included representations that Defendants' drug Xarelto carried the same risks, hazards, and/or dangers as other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

218.   The information distributed to the public, the FDA, the Plaintiff decedent and her physicians by Defendants intentionally included false representations that Xarelto was not injurious to the health and/or safety of its intended users.

49

219.    The information distributed to the public, the FDA,   the Plaintiff decedent and her physicians by Defendants intentionally included false representations that Xarelto was as potentially injurious to the health and/or safety of its intended users, as other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

220.    These representations were all false and misleading.

221.     Upon information and belief, Defendants intentionally suppressed, ignored and disregarded test results not favorable to the Defendants and results that demonstrated that Xarelto was not safe as a means of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, and/or was not as safe as other means of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

222.    Defendants intentionally made material representations to the FDA and the public, including the medical profession, and the Plaintiff decedent, regarding the safety of Xarelto, specifically but not limited to Xarelto not having dangerous and serious health and/or safety concerns.

223.    Defendants intentionally made material representations to the FDA and the public in general, including the medical profession, and the Plaintiffs decedent, regarding the safety of Xarelto, specifically but not limited to Xarelto being a safe means of reducing

50

the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

224.   That it was the purpose of Defendants in making these representations to deceive and defraud the public, the FDA, the Plaintiff decedent and/or her physicians, to gain the confidence of the public, healthcare professionals, the FDA, and/or the Plaintiff decedent, to falsely ensure the quality and fitness for use of Xarelto and induce the public and/or the Plaintiff decedent to purchase, request and/or continue to use Xarelto and the healthcare professionals to dispense, prescribe, and/or recommend Xarelto.

225.   Defendants made the aforementioned false claims and false representations with the intent of convincing the public, healthcare professionals, the FDA, and/or the Plaintiff decedent that Xarelto was fit and safe for use as a treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

226.   Defendants made the aforementioned false claims and false representations with the intent of convincing the public, healthcare professionals, the FDA, and/or the Plaintiff decedent that Xarelto was fit and safe for use as treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, and it did not pose risks, dangers, or hazards above and beyond those identified and/or associated with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with

51

non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

227.   That Defendants made claims and representations in its documents submitted to the FDA, to the public, to healthcare professionals, and to the Plaintiff decedent that Xarelto did not present serious health and/or safety risks.

228.   That Defendants made claims and representations in its documents submitted to the FDA, to the public, to healthcare professionals, and to the Plaintiff decedent that Xarelto did not present health and/or safety risks greater than other oral forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

229.   That these representations and others made by Defendants were false when made, and/or were made with a pretense of actual knowledge when knowledge did not actually exist, and/or were made recklessly and without regard to the actual facts.

230.   That these representations and others made by Defendants were made with the intention of deceiving and defrauding the Plaintiffs decedent and her healthcare professionals and/or the FDA, and were made in order to induce the Plaintiff decedent and/or her respective healthcare professionals to rely upon misrepresentations, and they caused the Plaintiff decedent to purchase, use, and/or request Xarelto and caused her healthcare professionals to dispense, recommend, and/or prescribe Xarelto.

231.   That Defendants, recklessly and intentionally falsely represented the dangerous and serious health and/or safety concerns of Xarelto to the public at large, the Plaintiff decedent and her physicians in particular, for the purpose of influencing the

52

marketing of a product known to be dangerous and defective and/or not as safe as other alternatives, including other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

232.   That Defendants willfully and intentionally failed to disclose the material facts regarding the dangerous and serious safety concerns of Xarelto by concealing and suppressing material facts regarding the dangerous and serious health and/or safety concerns of Xarelto.

233.   That Defendants willfully and intentionally failed to disclose the truth, failed to disclose material facts and made false representations with the purpose and design of deceiving and lulling the Plaintiff decedent, as well as her healthcare professionals, into a sense of security so that Plaintiff decedent would rely on the representations made by Defendants, and purchase, use and rely on Xarelto and/or that her respective healthcare providers would dispense, prescribe, and/or recommend the same.

234.   Defendants, through their public relations efforts, which included but were not limited to the public statements and press releases, knew or should have known that the public, including the Plaintiff decedent, as well as her respective healthcare professionals would rely upon the information being disseminated.

235.   Defendants utilized direct to consumer adverting to market, promote, and/or advertise Xarelto.

236.   That the Plaintiff decedent and/or her respective healthcare professionals did in fact rely on and believe the Defendants' representations to be true at the time they

were made and relied upon the representations as well as the superior knowledge of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, and were thereby induced to purchase, use and rely on Defendants' drug Xarelto.

237.   That at the time the representations were made, the Plaintiff decedent and/or her respective healthcare providers did not know the truth with regard to the dangerous and serious health and/or safety concerns of Xarelto.

238.    That the Plaintiff decedent did not discover the true facts with respect to the dangerous and serious health and/or safety concerns, and the false representations of Defendants, nor could the Plaintiff decedent with reasonable diligence have discovered the true facts.

239.   That had the Plaintiff decedent known the true facts with respect to the dangerous and serious health and/or safety concerns of Xarelto, Plaintiff decedent would not have purchased, used and/or relied on Defendants' drug Xarelto.

240.   That the Defendants' aforementioned conduct constitutes fraud and deceit, and was committed and/or perpetrated willfully, wantonly and/or purposefully on the Plaintiff decedent.

241.   As a result of the foregoing acts and omissions, the Plaintiff decedent was caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, shortened life expectancy, expenses for hospitalization, loss of earnings and death.

54

## TENTH CAUSE OF ACTION: LOSS OF CONSORTIUM

242.    Plaintiffs repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

243.    Morrison M. Dubois is the spouse of the decedent, Bonnie R. Seals Dubois, and as such lived and cohabited with her.

244.    By reason of the foregoing, Plaintiff decedent's spouse and their community necessarily paid and have become liable to pay for medical aid, treatment, attendance, and for medications, and will necessarily incur further expenses of similar nature in the future.

245.    By reason of the foregoing, Plaintiff, Morrison M. Dubois, has been caused the loss of the companionship, service and society of his spouse.

246.    As a result of the injuries sustained by decedent, Bonnie R. Seal Dubois, as set forth above, Plaintiff, Morrison M. Dubois, sustained damage to his marital relationship.

## ELEVENTH CAUSE OF ACTION: VIOLATION OF UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW 51:1401, et seq.

247.    Plaintiffs repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

248.    Defendants have a statutory duty to refrain from unfair trade practices in the design, development, manufacture, promotion and sale of Xarelto.

249.   Had the Defendants not engaged in the deceptive conduct described herein, Plaintiff decedent would not have purchased and/or paid for Xarelto, and would not have incurred related medical costs. Specifically, Plaintiff decedent, her physician, and her physician's staff were misled by the deceptive conduct described herein.

250.   Defendants' deceptive, unconscionable, and/or fraudulent representations and material omissions to patients, physicians and consumers, including Plaintiff decedent, constituted unfair trade practices in violation of the state consumer protection statute listed above.

251.   Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, substantial sums of money from Plaintiff decedent for Xarelto that she would not have paid had Defendants not engaged in unfair trade practices.

252.    Plaintiff decedent was injured by the cumulative and indivisible nature of Defendants' conduct. The cumulative effect of Defendants' conduct directed at patients, physicians and consumers was to create a demand for and sell Xarelto. Each aspect of Defendants' conduct combined to artificially create sales of Xarelto.

253.   The medical community relied upon Defendants' misrepresentations and omissions in determining to use Xarelto.

254.   By reason of wrongful acts engaged in by Defendants, Plaintiffs and Plaintiff decedent suffered ascertainable loss and damages.

255.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and Plaintiff decedent were damaged by paying in whole or in part for Xarelto and for her medical treatment.

56

256.   As a direct and proximate result of Defendants' violations of unfair trade practices, Plaintiffs and Plaintiff decedent have sustained economic losses and other damages for with they are entitled to statutory and compensatory damages and attorneys' fees, in an amount to be proven at trial.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demands judgment against the Defendants on each of the above-referenced claims and Causes of Action as follows:

1.   Compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, including, but not limited to, all damages sustained as a result of her hemorrhage, and other noneconomic damages in an amount to be determined at trial of this action;

2.   Economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages, including, but not limited to, all damages sustained as a result of her hemorrhage, in an amount to be determined at trial of this action;

3.   Plaintiffs demand all remedies and damages provided by the Mississippi Wrongful Death and Survival laws as set forth in Mississippi Code Annotated § 11-7-13 (1972 as amended), and any other applicable laws of the State of Mississippi, as follows:

(a)   Funeral and burial expenses of the decedent;

(b)   The value of loss of support and services of Bonnie R. Seal Dubois, deceased;

(c)   The loss of love, support, affection, consortium, society, and companionship of decedent suffered by Plaintiffs;

57

(d)     Loss of support and earnings of Bonnie R. Seal Dubois, deceased;

(e)     Damages for conscious pain, suffering and mental stress that Bonnie R. Seal Dubois, deceased, experienced;

(f)     The loss of love of life or hedonic value of life that Bonnie R. Seal Dubois would have enjoyed; and

(g)     The present net cash value of Bonnie R. Seal Dubois's future income from her labor if she had survived.

4.     Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiffs in an amount sufficient to punish Defendants and deter future similar conduct; and

5.     Plaintiffs also seek to recover prejudgment interest; post-judgment interest until the judgment is collected in full; PlaintiffsPlaintiffs' reasonable attorneys' fees; the costs of these proceedings; and such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demands a jury trial on all claims so triable in this action.

Respectfully submitted, this the 11th day of May, 2016.

**MORRISON M. DUBOIS, AS EXECUTOR OF THE ESTATE OF BONNIE R. SEAL DUBOIS, AND WENDY JOHNSON, INDIVIDUALLY, AND ON BEHALF OF THE WRONGFUL DEATH BENEFICIARIES OF BONNIE R. SEAL DUBOIS,**
**Plaintiffs**

BY: /s/ James R. Reeves, Jr.
        JAMES R. REEVES, JR. (MSB #9159)
        MATTHEW G. MESTAYER (MSB #9646)
        Reeves & Mestayer, PLLC
        P. O. Drawer 1388
        Biloxi, MS 39533
        Phone: 228/374-5151
        Fax: 228/374-6630
        Email: jrr@rmlawcall.com
                mgm@rmlawcall.com
        COUNSEL FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Amended Complaint has contemporaneously with or before filing been served on all parties or their attorneys in a manner authorized by FRCP 5(b)(2), Local Rule 5.1 of the Eastern District of Louisiana and via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pretrial Order No. 17.

/s/ James R. Reeves, Jr.
JAMES R. REEVES, JR.

59