**EXHIBIT I**

Case 2:14-md-02592-EEF-MBN   Document 3265-9   Filed 05/17/16   Page 2 of 11
Case 3:15-cv-03590-B   Document 1-17   Filed 11/05/15   Page 2 of 11   PageID 305
8:13-cv-00290-LSC-TDT   Doc # 1-10   Filed: 09/17/13   Page 2 of 11 - Page ID # 90

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

FILED
SEP 25 2001

MARGIE LOUIS, PEARLIE COX, MARY
DOTTOBEY, OTIS AARON, GLORIA LOTT,
EARL PIGG, MARION WEATHERS AND KATHY
ROBERTS

PLAINTIFFS

VS.                                         CIVIL ACTION NO. 5:00CV102LN

WYETH-AYERST PHARMACEUTICALS, INC. F/K/A
WYETH-AYERST LABORATORIES, A DIVISION OF
AMERICAN HOME PRODUCTS, INC.; WYETH
LABORATORIES, INC., A.H. ROBBINS COMPANY,
INC.; AMERICAN HOME PRODUCTS, INC.;
POLK'S DISCOUNT DRUGS, INC.; ECONOMY DRUG
STORE, INC.; BRANDON DISCOUNT DRUGS, INC.;
KING'S DISCOUNT DRUGS, INC.; FORREST BRADLEY,
JR.; SUSAN BOONE; CHRIS L. LUCKETT; LESTER A.
LALA; CHARLES CARTER, JR.; GINA SABBATINI;
SCOTT N. BOONE; VICTOR E. RUSSELL; JIMMY ROBINSON,
JR.; JEWELL K. NORMAN; MCR PHARMACEUTICALS INC.,
A/K/A AMERICAN PHARMACEUTICALS, INC, A/K/A
MCR/AMERICAN PHARMACEUTICALS, INC.; JONES
MEDICAL INDUSTRIES, A/K/A ARNAR PHARMACEUTICALS,
INC.; QUALITEST PRODUCTS, INC.; SIDMAK
PHARMACEUTICALS, INC.; ECM LABS MANUFACTURING,
INC.; FISONS CORPORATION; GATE PHARMACEUTICALS;
INTERNEURON PHARMACEUTICALS, INC.; MEDEVA
PHARMACEUTICALS, INC.; RUGBY LABORATORIES,
INC.; SMITHKLINE BEECHAM CORPORATION;
AND ECKERD CORPORATION

DEFENDANTS

### ORDER

This cause is before the court on the motion of plaintiffs to remand this case to the Circuit Court of Claiborne County, Mississippi. Defendants have responded in opposition to the motion and the court, having considered the memoranda of authorities submitted by the parties in the light of plaintiffs' complaint in this cause, concludes for reasons to follow that plaintiffs' motion should be denied.

Plaintiffs, like many others throughout this country, brought this action to recover damages for injuries they claim to have

Case 2:14-md-02592-EEF-MBN Document 3265-9 Filed 05/17/16 Page 3 of 10
Case 3:15-cv-03590-B Document 1-17 Filed 12/05/15 Page 3 of 11 PageID 306
8:13-cv-00290-LSC-TDT Doc # 1-10 Filed: 09/17/13 Page 3 of 11 - Page ID # 91

suffered as a result of their taking the diet drugs Pondimin, Redux (also known by fenfluramine and dexfenfluramine, respectively) and/or Phentermine. The plaintiffs herein, Mississippi residents, filed their suit in Mississippi state court, and in addition to suing the manufacturers of these drugs, all of which are of diverse citizenship from plaintiffs, and another diverse company, Eckerd Corporation, which is alleged to have distributed, marketed and promoted these drugs, plaintiffs sued a number of Mississippi pharmacies (Polk's Discount Drugs, Inc., Economy Drugs of Greenwood, Inc., Liberty Drug Store, Brandon Discount Drugs, Inc. and King's Discount Drugs) and a multitude of other Mississippi residents (Forest Bratley, Jr., Susan Bodne, Chris L. Luckett, Lester A. Lala, Charles Charter, Jr., Gina Savarini, Scott M. Boone, Victor E. Russell, Jimmy L. Robinson, Jr. and Jewell E. Norman) who were employed as sales representatives for one or another of the defendant drug companies. Defendants, contending that all of the Mississippi defendants were fraudulently joined, removed the case to this court on the basis of diversity of citizenship, following which plaintiffs filed their present motion to remand.

The standard for evaluating claims of fraudulent joinder is, of course, well known by all of the parties, as well as by the court; and the court, having given due consideration to that standard on the basis of the complaint filed by plaintiffs in this cause, concludes that plaintiffs have no possibility of recovery against any of the nondiverse defendants.

3

AO 72A
(Rev. 8/82)

Case 2:14-md-02592-EEF-MBN Document 3265-9 Filed 05/17/16 Page 4 of 11
Case 3:15-cv-03590-B Document 1-17 Filed 12/05/15 Page 4 of 11 PageID 307
8:13-cv-00290-LSC-TDT Doc # 1-10 Filed: 09/17/13 Page 4 of 11 - Page ID # 92

The complaint filed by plaintiffs in this cause includes, so far as the court can tell, ten counts, numbered and headed as follows:

Count I: Strict Product Liability
Count II: Failure to Warn
Count IV: Negligence
Count I: Strict Product Liability (Defective Design) Against the ARP Defendants
Count II: Strict Product Liability (Failure to Warn) Against All Defendants
Count III: Negligence Against All Defendants
Count IV: Fraud and Misrepresentation Against All Defendants
Count V: Wantonness
Count VI: Fraud, Misrepresentation and Suppression
Count VI: Conspiracy

A premise of each count that can reasonably be construed as having been asserted against the resident pharmacy defendants[2] is knowledge on the part of these defendants of the dangers posed by

---

[2] It appears that plaintiffs may have taken two complaints from other cases and attempted to combine them into a single complaint, amending the content as needed for this case. That would explain why they have asserted their causes of action in this duplicate fashion, and why the complaint begins on page one, continues through page 19 (skipping page 18), and then picks up on a new and different page 2 and continues on through page 66, and contains two sections (each somewhat different) for each of the headings, "Parties", "Jurisdiction" and "General Allegations"/"Factual Allegations."

[3] Plaintiffs' claims of wantonness and conspiracy, while nominally asserted against "defendants", is clearly not directed toward the pharmacy defendants, as the substance of these counts utterly belies any conclusion that these defendants are a target of these counts. See Badon v. RJR Nabisco Inc., No. 98-30962, 2000 WL 1154246, at *7 (5th Cir. Aug. 16, 2000) (noting that "[w]hile the amended complaint does often use the word 'defendants,' frequently it is evident that such usage could not be referring to the Tobacco Wholesalers.").

3

Case 2:14-md-02592-EEF-MBN Document 3265-9 Filed 05/17/16 Page 5 of 11
Case 3:15-cv-03590-B Document 2-17 Filed 11/05/15 Page 5 of 11 PageID 308
8:13-cv-00290-LSC-TDT Doc # 1-10 Filed: 09/17/13 Page 5 of 11 - Page ID # 93

the subject drugs.³ Yet, and notwithstanding the fact that the complaint in places may allege or allude generally to knowledge possessed by the "defendants," it is plain that the complaint on the whole cannot reasonably and legitimately be construed as alleging any factual basis for the conclusion that any of the

---

³ Generally speaking, under Mississippi's Products Liability Act, Miss. Code Ann. § 11-1-63, liability of a product seller may be based on a theory of defective design or inadequacy of warning/failure to warn. Either theory requires proof of knowledge on the part of the seller. See Miss. Code Ann. § 11-1-63(f) ("In any action alleging that a product is defective because of its design . . . the manufacturer or product seller shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer or seller: (i) [t]he manufacturer or seller knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the danger for which recovery is sought. . . ."]; Miss. Code Ann. § 11-1-63(c)(i) ("In any action alleging that a product is defective because it failed to contain adequate warnings or instructions . . . the manufacturer or seller shall not be liable if the claimant does not prove by a preponderance of the evidence that at the time the product left the control of the manufacturer or seller, the manufacturer or seller knew or in light of reasonably available knowledge should have known about the danger that caused the damage for which recovery is sought. . . ."]. Thus, even if the "learned intermediary" doctrine, which is incorporated into the statute, see Miss. Code Ann. § 11-1-63(c)(ii), were not an impediment to recovery, the absence of an allegation that a defendant knew, or had reason to know, of the product defect dooms any claim for defective design or lack of adequate warning. Likewise, knowledge, or a reason to know, is also a necessary requisite for any claim of failure to warn or negligence that a plaintiff might undertake to assert extraneous to a claim under the Products Liability Act itself (assuming solely for the sake of argument that such a claim could exist). An essential element of a claim of fraud is knowledge of the falsity of the representation; and regarding any claim of omission of facts, a person obviously cannot disclose what he does not and cannot know.

⁴ They allege, for example, that the drugs "were marketed to be used in combination which was known to the Defendants to cause harmful side effects which outweighed any potential utility."

Case 2:14-md-02592-EEF-MBN   Document 3265-9   Filed 05/17/16   Page 6 of 11
Case 3:15-cv-03590-B   Document 1-17   Filed 11/05/15   Page 6 of 11   PageID 309
8:13-cv-00290-LSC-TDT   Doc # 1-10   Filed: 09/17/13   Page 6 of 11 - Page ID # 94

pharmacy defendants had any knowledge or reason to know of any of the dangers associated with the product(s) of which plaintiffs contend they were unaware. Quite to the contrary, the complaint, the major theme of which is the manufacturers' intentional concealment of the true risks of the drug(s), coupled with dissemination through various media of false and misleading information of the safety of the drug(s) at issue, belies any suggestion of knowledge, or reason to know by these resident defendants. According to the lengthy and extremely detailed factual allegations of the complaint, the product manufacturers had knowledge from numerous sources that the drug(s) at issue was unsafe, yet they, in the face of this knowledge, not only concealed this information, but affirmatively misrepresented to the FDA, to the public, to consumers, to the plaintiffs, to pharmacists, to dispensing entities, and even to AHP's own business partner, that the product(s) was safe.³ In the face of plaintiffs'

---

³ By way of example only, plaintiffs allege variously that: "Plaintiffs and/or their prescribing physicians, and other dispensing entities justifiably relied on and/or were induced by the misrepresentations and/or active concealment of Defendants to her detriment."

"These defendants, having undertaken the manufacturing, marketing, prescription dispensing, distributing and promotion of the diet drugs described herein owe a duty to provide the Plaintiffs, and physicians, regulators and others upon whom it was known by Defendants that the plaintiffs would rely, accurate and complete information regarding its products."

"AHP was put on notice . . . that the . . . labeling was probably inadequate and needed to be revised. . . . [D]espite this warning . . . no changes were made to the labeling between 1990 and mid-1996. . . . [AHP was

5

Case 2:14-md-02592-EEF-MBN Document 3265-9 Filed 05/17/16 Page 7 of 11
Case 3:15-cv-03590-B Document 1-17 Filed 11/05/15 Page 7 of 11 PageID 310
8:13-cv-00290-LSC-TDT Doc # 1-10 Filed: 09/17/13 Page 7 of 11 - Page ID # 95

motivated] to conceal the safety hazards of [its products).... [A]lthough an FDA official warned that there were too many adverse reaction reports ... and that he wanted AHP DEFENDANTS to discourage combination use; the Defendants did not actively discourage the use of Fen-Phen.

[AHP knew as early as 1991 that the warning on the Pondimin labeling from 1987 through 1995] was false and misleading ... [y]et.... AHP did nothing to strengthen the warning language about PPH. ... AHP deliberately chose not to make any change to the labeling in the summer or Fall of 1994, but chose to provide false and misleading information in its product labeling for Pondimin.

By [February of 1995], APH was already concerned the FDA might require to have a black box warning about PPH in the Redux labeling and it had conducted market research which showed that with a black box warning, Redux sales could only be a fraction of what AHP hoped for. [AHP] was fully aware that its warning about PPH in the Pondimin labeling was inadequate.

AHP DEFENDANTS believed it was in their best interest to have consumers uninformed about the deadly risk of PPH. ... The PHENTERMINE DEFENDANTS also sought to keep consumers and prescribing physicians uninformed about the true risk of PPH. ... Although [the risks of PPH] were known to phentermine manufacturers around the world, these manufacturers actively concealed this fact from prescribing physicians and consumers, including the Plaintiffs and their prescribing physicians, and misrepresented the risk of PPH by failing to place any such warning in the package insert. ... [B]y failing to disclose [the facts], the package insert for fenfluramine implicitly and falsely stated to the Plaintiffs' prescribing physicians that it could be prescribed in combination with phentermine.

[From 1993 through 1995] [the] AHP defendants received further information [about risks of valvular heart disease] - yet chose to ignore it. ... [T]he PHENTERMINE DEFENDANTS [also] began to receive reports [of] VHD. Defendants failed to obtain any more information about these reports. ... AHP DEFENDANTS did not even report many of these cases to FDA. AHP DEFENDANTS should have regarded the 1994-1995 reports of VHD as an early warning signal of what was likely to

6

Case 2:14-md-02592-EEF-MBN Document 3265-9 Filed 05/17/16 Page 8 of 11
Case 3:15-cv-03590-B Document 1-1 Filed 11/05/15 Page 8 of 11 PageID 311
8:13-cv-00290-LSC-TDT Doc # 1-10 Filed: 09/17/13 Page 8 of 11 - Page ID # 96

happen in the U.S. However, because of its desire to conceal safety problems and not derail the exponential growth of Pondimin or the pending approval of Redux . . . AHP DEFENDANTS chose . . . not to report the VHD problem [to FDA]. . . . AHP DEFENDANTS mischaracterized many of the reports as "non-serious" and did not report them to FDA, to the Plaintiffs, or to the Plaintiffs' prescribing physicians. . . .
AHP DEFENDANTS did not change the Pondimin labeling regarding PPH because to do so would have threatened its diet drug business.

[AHP marketing programs] contained false and misleading information and/or material omissions about the true risks . . . and the supposed benefits. . . . The text of one AHP document . . . falsely states "Redux is a safe and effective product." [AHP, through its sales force] fed false and misleading information and/or material omissions about the true risks . . . [to doctor advocates, whose job it was to promote AHP's products to other physicians].

The "best case" for the company's sales was if consumers were unaware of the risk of PPH and physicians chose not to enlighten them.

AHP DEFENDANTS [knew of problems] but decided to say nothing of those problems to physicians, patients or the FDA. . . . AHP DEFENDANTS withheld critical information from the FDA Advisory Committee, the Plaintiffs, and the Plaintiffs' physicians, about the risks of VHD.

AHP DEFENDANTS, knowing that its market research demonstrated that [a black box] warning would destroy sales, adamantly resisted the black box warning requested by FDA and any other restrictions on the use of Redux.

[An internal memo authored by an AHP executive stated] "[E]very attempt will be made to ensure that no 'Black Box' warnings, restrictions of use or negative statements find their way into the Redux labeling."
[After a leading researcher in the field of PPH appeared on the Today show expressing concerns, he was threatened by AHP's medical director and] never again spoke to the media about his concerns about the safety of Redux.

AHP made matters worse by having its paid consultants write an editorial minimizing the risk of PPH with diet drugs which was published in the New England Journal of

7

Case 2:14-md-02592-EEF-MBN Document 3265-9 Filed 05/17/16 Page 9 of 11
Case 3:15-cv-03590-B Document 1-17 Filed 11/05/15 Page 9 of 11 PageID 312
8:13-cv-00290-LSC-TDT Doc # 1-10 Filed: 09/17/13 Page 9 of 11 - PageID # 97

Medicine without the authors disclosing that they were paid consultants for the company. In addition, AHP DEFENDANTS sent out a misleading press release regarding the IPPHS study, which also tended to downplay the risk of PPH.

AHP did everything in its power to obscure the true scope of the problem from the Mayo Clinic, Interneuron, FDA and the public as long as it could.
... [R]ather than coming clean about the knowledge in its possession for about two years, AHP continued to withhold that information and feigned total surprise [when a Mayo Clinic physician reported to AHP that she had discovered VHD in a number of patients who had been using Fen-Phen].

Worried about a leak of information to the general public and prescribing physicians, AHP DEFENDANTS tried to keep [or its business partner] in the dark about the Mayo Clinic findings. ... AHP [attempted] to conceal information about the VHD problem from even its own business partner for as long as possible.

AHP DEFENDANTS continued their policy of hiding information about the risk of VHD even up to the day that FDA told the company that it should take Pondimin and Redux off the market.

[Pursuant to a conspiracy between] AHP DEFENDANTS and ECKERD, false and fraudulent information was provided to pharmacists, consumers, and prescribing physicians about the risks and supposed benefits of these drugs. Upon information and belief, and in furtherance of the conspiracy, AHP Defendants and Eckerd supplied false and misleading marketing and promotional material and programs to unsuspecting pharmacists and prescribing physicians. ... Eckerd [agreed that it would] take "no action, including but not limited to telephone calls or written communication to physician providers or Pharmacies regarding specific prescriptions, that [would] adversely affect utilization" [of AHP's products]....
Upon information and belief, [certain "patient education programs" and "provider education programs" worked on by Eckerd and Wyeth-Ayerst jointly] provided false and misleading information about [the drugs].
Eon agreed and conspired with various pharmacies and/or AHP Defendants to ensure that the off-label combination use of these drugs could be timely provided to consumers, pharmacists, and prescribing physicians who were deliberately misled as to the safety and efficacy of these drugs.

8

Case 2:14-md-02592-EEF-MBN   Document 3265-9   Filed 05/17/16   Page 10 of 11
Case 3:15-cv-03590-B   Document 1-17   Filed 11/09/15   Page 10 of 11   PageID 313
8:13-cv-00290-LSC-TDT   Doc # 1-10   Filed: 09/17/13   Page 10 of 11 - Page ID # 98

specific allegations of concerted, unabated fraud and concealment by the manufacturer defendants from virtually everyone, including pharmacists, no factual basis can be drawn from plaintiffs' complaint for their entirely general and conclusory charge that these "defendants" knew or had reason to know of the risks. Even assuming, then, for the sake of argument, that under Mississippi law, there exists the possibility that a viable cause of action could be maintained against a pharmacist who had knowledge of risks associated with a particular drug or drugs which he failed to disclose to his customer, the plaintiffs herein have failed to properly plead such a claim.⁴ Accordingly, the court concludes that the pharmacy defendants have indeed been fraudulently joined.

The court also concludes, for the reasons assigned by Judge William H. Barbour in *Beatrice Johnson et al. v. Parke-Davis, A*

---

Eon agreed and conspired with other manufacturers to ensure that an adequate supply of phentermine could be delivered to consumers, pharmacists, and prescribing physicians who were deliberately misled as to the safety and efficacy of these drugs, and to the dangers of prescribing phentermine in combination with fenfluramine. . . . In furtherance of this conspiracy, prescribing physicians, consumers, and pharmacists were fed false and misleading information about fen-phen and Redux. . . .

⁴ *See Badon v. RJR Nabisco Inc.*, 2000 WL 1159424, No. 98-30942, at *7 (5ᵗʰ Cir. Aug. 15, 2000) (noting that plaintiffs' conspiracy allegations were "entirely general" and did not allege "any particular or specific activity, agreement, or state of mind on the part of either the in-state distributor defendants . . . while as to the other defendants the amended complaint is replete with innumerable specific allegations of particular, identified activities. . . .").

9

Case 2:14-md-02592-EEF-MBN Document 3265-9 Filed 05/17/16 Page 11 of 11
Case 3:15-cv-03590-B Document 2-17 Filed 11/05/15 Page 11 of 11 PageID 314
8:13-cv-00290-LSC-TDT Doc # 1-10 Filed: 09/17/13 Page 11 of 11 - Page ID # 99

*Division of The Warner-Lambert Co., et al.*, No. 3:00CV315BN (S.D. Miss. July 21, 2000) (involving the drug Rezulin), that the sales representative defendants have also been fraudulently joined.

Accordingly, for the foregoing reasons, it is ordered that plaintiffs' motion to remand is denied.

SO ORDERED this 25th day of September, 2000.

_____
UNITED STATES DISTRICT JUDGE

10

\*\* TOTAL PAGE.11 \*\*
\*\* TOTAL PAGE.11 \*\*