## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | * * * * * * * | **MDL NO. 2592**<br><br>**SECTION L**<br><br>**JUDGE ELDON E. FALLON**<br><br>**MAG. JUDGE NORTH** |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| **THIS DOCUMENT RELATES TO:** | * * | |
| **CAROLYN PARKER,** | * * | |
| **Decedent,** | * * | |
| **v.** | * * | **CASE NO.: 2:15-cv-00511** |
| **JANSSEN RESEARCH & DEVELOPMENT, LLC** | * | **JUDGE: E. FALLON** |
| **f/k/a JOHNSON AND JOHNSON** | * | |
| **PHARMACEUTICAL RESEARCH AND** | * | **MAG. JUDGE: NORTH** |
| **DEVELOPMENT LLC, JANSSEN ORTHO, LLC,** | * | |
| **JANSSEN PHARMACEUTICALS, INC. f/k/a** | * | **JURY DEMAND** |
| **JANSSEN PHARMACEUTICA INC. f/k/a** | * | |
| **ORTHO-MCNEIL-JANSSEN** | * | |
| **PHARMACEUTICALS, INC., JOHNSON &** | * | |
| **JOHNSON COMPANY, BAYER HEALTHCARE** | * | |
| **PHARMACEUTICALS, INC., BAYER PHARMA** | * | |
| **AG, BAYER CORPORATION, BAYER** | * | |
| **HEALTHCARE, LLC, BAYER HEALTHCARE** | * | |
| **AG, and BAYER AG,** | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## FIRST AMENDED COMPLAINT

The Plaintiff, Beachman Williams ("Plaintiff"), a competent individual acting on behalf of himself and on behalf of Carolyn Parker ("Decedent") and the Estate of Carolyn Parker, by and through the undersigned counsel, upon information and belief at all times hereinafter aforementioned, amends the Complaint and alleges as follows:

1

# I.     PLAINTIFF/DECEDENT SPECIFIC ALLEGATIONS

Plaintiff herein is Beachman Williams, acting individually and obo Carolyn Parker. Carolyn Parker is referred to herein as "the Decedent."

1.  The Decedent, Carolyn Parker, was prescribed and ingested Xarelto for her afib from approximately about September 26, 2013 through January 28, 2014, upon direction of the Decedent's physician.  As a result of Xarelto, the Decedent, Carolyn Parker, suffered several bleeding events culminating in a severe gastrointestinal bleed for which she had to undergo several transfusions.

2.  The Decedent, Carolyn Parker, presented at the Emergency Department of Baton Rouge General Hospital on Bluebonnet Boulevard in Baton Rouge, Louisiana on or about October 1, 2013 for treatment of a nasal hemorrhage. The nasal hemorrhage was controlled medically, and the Decedent was not admitted to the hospital at that time. Carolyn Parker was continued on Xarelto.

3.  The Decedent, Carolyn Parker, then began experiencing spontaneous epistaxis without pre-existing trauma but with a moderate amount of bleeding on or about November 22, 2013. She presented to the Emergency Department of Baton Rouge General Medical Center in Baton Rouge, Louisiana twice on November 22, 2013, at which time she was treated for the nose bleed with localized pressure and removal of a 4 cm clot, and she was discharged. Carolyn Parker was continued on Xarelto after her treatment at Baton Rouge General Medical Center.

4.  The Decedent was then hospitalized at Field Memorial Community Hospital in Centerville, Mississippi on January 28, 2014.  She was diagnosed with an acute lower

gastrointestinal bleed and acute anemia, and she had to endure seven blood transfusions while hospitalized at Field Memorial Community Hospital from January 28, 2014 through January 30, 2014.

5.    On or about January 30, 2014, the Decedent was air evacuated and transported to Ochsner Northshore Hospital in Slidell, Louisiana, for a higher level of care and treatment for her acute lower gastrointestinal bleed and acute anemia. She endured a colonoscopy and an esophagogastroduodenoscopy which disclosed blood at the hepatic flexure and in the rectum, sigmoid colon, descending colon, and transverse colon. She remained hospitalized at Ochsner Northshore Hospital in Slidell, Louisiana until February 3, 2014.

6.    The Decedent ultimately died of her injuries on October 14, 2015 at Field Health Systems in Centreville, Wilkinson County, State of Mississippi. The Death Certificate lists the cause of death as cardiopulmonary arrest due to exsanguination, and her Hemoglobin and Hematocrit upon arrival at Field Health Systems was 6.6/21.4. Plaintiff hereby amends the original Complaint to substitute Beachman Williams as Plaintiff. Mr. Williams is the father of Carolyn Parker and the Administrator of her estate.

7.    The Decedent, Carolyn Parker, at all times relevant hereto, was a citizen and resident of Gloster, County of Amite, State of Mississippi, who, upon information and belief, suffered personal injuries and death as a result of her use of Xarelto.

8.    In conjunction with Carolyn Parker's death, Plaintiff Beachman Williams, the father of Carolyn Parker, asserts a claim for filial loss of consortium, as well as a claim for wrongful death and a survival action claim.

## II.   PARTY DEFENDANTS

9.   Upon information and belief, the Defendant JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a JOHNSON AND JOHNSON PHARMACEUTICAL RESEARCH AND DEVELOPMENT LLC (hereinafter referred to as "JANSSEN R&D") is a limited liability company organized under the laws of New Jersey, with a principal place of business in New Jersey. Defendant JANSSEN R&D's sole member is Janssen Pharmaceuticals, Inc. which is a Pennsylvania corporation with a principal place of business in New Jersey.  Accordingly, JANSSEN R&D is a citizen of Pennsylvania and New Jersey for purposes of determining diversity under 28 U.S.C. §1332.

10.   As part of its business, JANSSEN R&D is involved in the research, testing and development, and in the sales and/or marketing of pharmaceutical products including Xarelto.

11.   Defendant JANSSEN R&D is the holder of the approved New Drug Application ("NDA") for Xarelto, as well as the supplemental NDA.

12.   Upon information and belief, Defendant JANSSEN R&D has transacted and conducted business in the State of Mississippi.

13.   Upon information and belief, Defendant, JANSSEN R&D has derived substantial revenue from good and products used in the State of Mississippi.

14.   Upon information and belief, Defendant, JANSSEN R&D, expected or should have expected its acts to have consequence within the United State of America and the State of Mississippi, and it derived substantial revenue from interstate commerce within the United States and the State of Mississippi, more particularly.

15.   Upon information and belief, and at all relevant times, the Defendant, JANSSEN R&D, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant. The primary purposes of Xarelto are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat Deep Vein Thrombosis ("DVT") and Pulmonary Embolism ("PE"), to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

16.   Upon information and belief, the Defendant JANSSEN PHARMACEUTICALS, INC., f/k/a JANSSEN PHARMACEUTICA INC. f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. (hereinafter referred to as "JANSSEN PHARM") is a Pennsylvania corporation, having a principle place of business in New Jersey.

17.   As part of its business, JANSSEN PHARM is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto.

18.   Upon information and belief, the Defendant, JANSSEN PHARM has transacted and conducted business in the State of Mississippi.

19.   Upon information and belief, the Defendant, JANSSEN PHARM, has derived substantial revenue from goods and products used in the State of Mississippi.

20.   Upon information and belief, the Defendant, JANSSEN PHARM, expected or should have expected its acts to have consequence within the United State of America and the State of Mississippi, and it derived substantial revenue from interstate commerce within the United States and the State of Mississippi, more particularly.

21.   Upon information and belief, and at all relevant times, the Defendant, JANSSEN PHARM, was in the business of and did design, research, manufacture, test, advertise,

5

promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

22.    Upon information and belief, the Defendant JANSSEN ORTHO LLC (hereinafter referred to as "JANSSEN ORTHO") is a limited liability company organized under the laws of Delaware, having a principal place of business at Stateroad 933 Km 0 1, Street Statero, Gurabo, Puerto Rico 00778. Defendant JANSSEN ORTHO is a subsidiary of JOHNSON & JOHNSON. The only member of JANSSEN ORTHO LLC is OMJ PR Holdings, which is incorporated in Ireland with a principal of business in Puerto Rico. Accordingly, JANSSEN ORTHO LLC is a citizen of Delaware, Ireland, and Puerto Rico for purposes of determining diversity under 28 U.S.C. §1332.

23.    As part of its business, JANSSEN ORTHO is involved in the research, development, manufacturing, sales, and marketing of pharmaceutical products including Xarelto.

24.    Upon information and belief, the Defendant, JANSSEN ORTHO has transacted and conducted business in the State of Mississippi.

25.    Upon information and belief, the Defendant, JANSSEN ORTHO, has derived substantial revenue from goods and products used in the State of Mississippi.

26.    Upon information and belief, the Defendant, JANSSEN ORTHO, expected or should have expected its acts to have consequence within the United State of America and the State of Mississippi, and it derived substantial revenue from interstate commerce within the United States and the State of Mississippi, more particularly.

27.     Upon information and belief, and at all relevant times, the Defendant, JANSSEN

ORTHO, was in the business of and did design, research, manufacture, test, advertise,

promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant,

the primary purposes of which are to reduce the risk of stroke and systemic embolism in

patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of

recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip

and knee replacement surgery.

28.     The Defendant, JOHNSON & JOHNSON (hereinafter referred to as "J&J"), is a

fictitious name adopted by the Defendant JOHNSON & JOHNSON COMPANY, a New

Jersey corporation which has its principal place of business at One Johnson & Johnson

Plaza, New Brunswick, Middlesex County, New Jersey 08933.

29.     As part of its business, J&J and its "family of companies" are involved in the research,

development, sales, and marketing of pharmaceutical products, including Xarelto.

30.     Upon information and belief, the Defendant, J&J has transacted and conducted

business in the State of Mississippi.

31.     Upon information and belief, the Defendant, J&J, has derived substantial revenue from

goods and products used in the State of Mississippi.

32.     Upon information and belief, the Defendant, J&J, expected or should have expected its

acts to have consequence within the United State of America and the State of

Mississippi, and it derived substantial revenue from interstate commerce within the

United States and the State of Mississippi, more particularly.

33.     Upon information and belief, the Defendant BAYER HEALTHCARE

PHARMACEUTICALS, INC. is, and at all relevant times was, a corporation organized

under the laws of the State of Delaware, with its principal place of business in the State
of New Jersey.

34.   As part of its business, BAYER HEALTHCARE PHARMACEUTICALS, INC. is
involved in the research, development, sales, and marketing of pharmaceutical products
including Xarelto.

35.   Upon information and belief, the Defendant, BAYER HEALTHCARE
PHARMACEUTICALS, INC., has transacted and conducted business in the State of
Mississippi.

36.   Upon information and belief, the Defendant, BAYER HEALTHCARE
PHARMACEUTICALS, INC., has derived substantial revenue from goods and products
used in the State of Mississippi.

37.   Upon information and belief, the Defendant, BAYER HEALTHCARE
PHARMACEUTICALS, INC., expected or should have expected its acts to have
consequence within the United State of America and the State of Mississippi, and it
derived substantial revenue from interstate commerce within the United States and the
State of Mississippi, more particularly.

38.   Upon information and belief, and at all relevant times, the Defendant, BAYER
HEALTHCARE PHARMACEUTICALS, INC., was in the business of and did design,
research, manufacture, test, advertise, promote, market, sell, and distribute the drug
Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the
risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to
treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for
prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

39.  Upon information and belief, the Defendant BAYER PHARMA AG is a pharmaceutical company domiciled in Germany.

40.  The Defendant BAYER PHARMA AG is formerly known as Bayer Schering Pharma AG and is the same corporate entity as Bayer Schering Pharma AG. Bayer Schering Pharma AG is formerly known as Schering AG and is the same corporate entity as Schering AG.

41.  Upon information and belief, Schering AG was renamed Bayer Schering Pharma AG effective December 29, 2006.

42.  Upon information and belief, Bayer Schering Pharma AG was renamed BAYER PHARMA AG effective July 1, 2011.

43.  As part of its business, BAYER PHARMA AG is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto.

44.  Upon information and belief, the Defendant, BAYER PHARMA AG, has transacted and conducted business in the State of Mississippi.

45.  Upon information and belief, the Defendant, BAYER PHARMA AG, has derived substantial revenue from goods and products used in the State of Mississippi.

46.  Upon information and belief, the Defendant, BAYER PHARMA AG, expected or should have expected its acts to have consequence within the United State of America and the State of Mississippi, and it derived substantial revenue from interstate commerce within the United States and the State of Mississippi, more particularly.

47.  Upon information and belief, and at all relevant times, the Defendant, BAYER PHARMA AG, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral

anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

48.   Upon information and belief, the Defendant BAYER CORPORATION is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205.

49.   Upon information and belief, BAYER HEALTHCARE PHARMACEUTICALS, INC. is owned by Defendant BAYER CORPORATION.

50.   At relevant times, the Defendant BAYER CORPORATION was engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, its products, including the prescription drug Xarelto.

51.   At relevant times, the Defendant BAYER CORPORATION conducted regular and sustained business in the State of Mississippi by selling and distributing its products in the State of Mississippi, and it engaged in substantial commerce and business activity in the State of Mississippi.

52.   Upon information and belief, the Defendant BAYER HEALTHCARE LLC is a limited liability company duly formed and existing under and by the virtue of the laws of the State of Delaware, with its principal place of business located at 100 Bayer Blvd., Whippany, New Jersey 07981-1544.

53.   Upon information and belief, from on or about early January 1, 2003 until on or about late December, 2014, BAYER HEALTHCARE, LLC'S sole member was Bayer Corporation, and it was wholly owned by Bayer Corporation, which is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205.

54.   Upon information and belief, from on or about early January, 2015 to on or about June 30, 2015, BAYER HEALTHCARE LLC's sole member was Bayer Medical Care, Inc., and it was wholly owned by Bayer Medical Care, Inc., which is a Delaware Corporation, with its principal place of business at 1 Medrad Dr., Indianola, Pennsylvania 15051.

55.   Upon information and belief, from on or about July 1, 2015 to the present, BAYER HEALTHCARE LLC's members are:

i.   Bayer Medical Care Inc., a Delaware corporation with its principal place of business in Pennsylvania;

ii.  NippoNex Inc., a Delaware corporation with its principal place of business in New York;

iii. Bayer West Coast Corporation, a Delaware corporation with its principal place of business in California;

iv.  Bayer Essure, Inc., a Delaware corporation with its principal place of business in California;

v.   Bayer Consumer Care Holdings, LLC, a limited liability company formed in Delaware with its principal place of business in New Jersey;

vi.  Dr. Scholl's LLC, a limited liability company formed in Delaware with its principal place of business in California;

11

vii. Coppertone LLC, a limited liability company formed in Delaware with its principal place of business in California;

viii. MiraLAX LLC, a limited liability company, formed in Delaware with its principal place of business in California; and,

ix. Bayer HealthCare U.S. Funding LLC, a limited liability company formed in Delaware with its principal place of business in Pennsylvania.

56.   Accordingly, BAYER HEALTHCARE, LLC is a citizen of Delaware, New Jersey, New York, Indiana, Pennsylvania and California for purposes of determining diversity under 28 U.S.C. §1332.

57.   Upon information and belief, at all relevant times, the Defendant BAYER HEALTHCARE LLC has transacted and conducted business in the State of Mississippi, and it derived substantial revenue from interstate commerce.

58.   Upon information and belief, at all relevant times, the Defendant BAYER HEALTHCARE LLC expected or should have expected that its acts would have consequences within the United State of America and in the State of Mississippi, and it derived substantial revenue from interstate commerce within the United States and the State of Mississippi, more particularly.

59.   Upon information and belief, at all relevant times, the Defendant BAYER HEALTHCARE LLC was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of

12

recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

60.   Upon information and belief, the Defendant BAYER HEALTHCARE AG is a company domiciled in Germany and is the parent/holding company of Defendants BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC, and BAYER PHARMA AG.

61.   Upon information and belief, at all relevant times, the Defendant BAYER HEALTHCARE AG exercises control over the Defendants BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC., and BAYER PHARMA AG.

62.   Upon information and belief, at all relevant times, the Defendant BAYER HEALTHCARE AG has transacted and conducted business in the State of Mississippi, and derived substantial revenue from interstate commerce within the United States and the State of Mississippi, more particularly.

63.   Upon information and belief, at all relevant times, the Defendant BAYER HEALTHCARE AG expected or should have expected that its acts would have consequences within the United State of America, and in the State of Mississippi, and it derived substantial revenue from interstate commerce within the United States and the State of Mississippi, more particularly.

64.   Upon information and belief, the Defendant BAYER AG is a German chemical and pharmaceutical company that is headquartered in Leverkusen, North Rhine-Westphalia, Germany.

13

65.   Upon information and belief, the Defendant BAYER AG is the third largest pharmaceutical company in the world.

66.   Upon information and belief, at all relevant times, the Defendant BAYER AG has transacted and conducted business in the State of Mississippi, and it derived substantial revenue from interstate commerce within the United States and the State of Mississippi, more particularly.

67.   Upon information and belief, at all relevant times, the Defendant BAYER AG expected or should have expected that its acts would have consequences within the United State of America, and in the State of Mississippi, and it derived substantial revenue from interstate commerce within the United States and the State of Mississippi, more particularly.

68.   Upon information and belief, at all relevant times, the Defendant BAYER AG was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

69.   Defendants Janssen Research & Development LLC, Janssen Ortho LLC, Janssen Pharmaceuticals, Inc., Johnson & Johnson, Bayer Healthcare Pharmaceuticals, Inc. Bayer Pharma AG, Bayer Corporation, Bayer Healthcare LLC, Bayer Healthcare AG, and Bayer AG, shall be referred to herein individually by name or jointly as "Defendants."

70.   At all times alleged herein, Defendants include and included any and all parents, subsidiaries, affiliates, divisions, franchises, partners, joint venturers, and organizational units of any kind, their predecessors, successors, and assigns and their officers, directors, employees, agents, representatives, and any and all persons acting on their behalf.

71.   At all times herein mentioned, each of the Defendants was the agent, servant, partner, predecessor in interest, and joint venturer of each of the remaining Defendants herein and was at all times operating and acting with the purpose and scope of said agency, service, employment, partnership and joint venture.

72.   At all times relevant, Defendants were engaged in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into the interstate commerce throughout the United States, either directly or indirectly through third parties, subsidiaries or related entities, the drug Xarelto.

## III.   JURISDICTION AND VENUE

73.   Federal subject matter jurisdiction in the constituent action is based upon 28 U.S.C. § 1332, in that in each of the constituent actions, there is complete diversity among the Plaintiff/Decedent and Defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs, and because there is complete diversity of citizenship between the Plaintiff/Decedent and Defendant.

74.   Defendants have significant contacts in the vicinage of Decedent's/Plaintiff's residence such that they are subject to the personal jurisdiction of the court in that vicinage.

75.   A substantial part of the events and omissions giving rise to Decedent's/Plaintiff's causes of action occurred in the vicinage of Decedent's/Plaintiff's residence, as well as in this district.  Pursuant to 28 U.S.C. § 1391(a), venue is proper in both districts.

76.   Pursuant to the Transfer Order of the Judicial Panel on Multidistrict Litigation, In re Xarelto (Rivaroxaban) Products Liab. Litig., 2014 WL 7004048 (J.P.M.L. June 12, 2014), venue is also proper in this jurisdiction pursuant to 28 U.S.C. § 1407.

77.   The Plaintiff states that but for the Order permitting direct filing into the United States District Court for the Eastern District of Louisiana pursuant to Pre-Trial Order #9, the Plaintiff, Beachman Williams, would have filed in the United States District Court for the Southern District of Mississippi, Western Division, where the original Complaint in this matter was filed.  Therefore, the Plaintiff, Beachman Williams, requests that at the time of the transfer of his action back to the trial court for further proceedings, if any, that his case be transferred to the above referenced District Court.

## IV.   **FACTUAL BACKGROUND**

### A. **Nature of the Case**

78.   The Plaintiff brings this case against the Defendants for damages associated with the Decedent's ingestion of the pharmaceutical drug Xarelto, which was designed, manufactured, marketed, sold and distributed by Defendants. Specifically, the Plaintiff and the Decedent suffered various injuries, serious physical pain and suffering, death, medical, hospital, surgical and funeral expenses, and loss of consortium as a direct result of the Decedent's use of Xarelto.

79.   At all relevant times, the Defendants were in the business of and did design, research, manufacture, test, advertise, promote, market, sell and distribute Xarelto to reduce the

risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

80. Xarelto was introduced in the United States ("U.S.") on July 1, 2011, and it is part of a class of drugs called New Oral Anticoagulants ("NOACS").

81. This class of NOACs, which also includes Pradaxa and Eliquis, is marketed as the next generation of blood-thinning drugs to replace warfarin (Coumadin), an established safe treatment for preventing stroke and systemic embolism for the past 60 years.

82. Xarelto is an anticoagulant that acts as a Factor Xa inhibitor, and is available by prescription in oral tablet doses of 20mg, 15mg, and 10mg.

83. The Defendants received FDA approval for Xarelto on July 1, 2011 for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries (NDA 022406).

84. Approval of Xarelto for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries was based on a series of clinical trials known as the Regulation of Coagulation in Orthopedic Surgery to Prevent Deep Venous Thrombosis and Pulmonary Embolism studies (hereinafter referred to as the "RECORD" studies). The findings of the RECORD studies showed that Xarelto was superior (based on the Defendants' definition) to enoxaparin for thromboprophylaxis after total knee and hip arthroplasty, accompanied by similar rates of bleeding. However, the studies also showed a greater bleeding incidence with Xarelto leading to decreased hemoglobin levels and transfusion of blood. (Lassen, M.R., et al. *Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Total Knee Arthroplasty.*

17

N.Engl.J.Med. 2008; 358:2776-86; Kakkar, A.K., *et al. Extended duration rivaroxaban versus short-term enoxaparin for the prevention of venous thromboembolism after total hip arthroplasty: a double-blind, randomised controlled trial.* Lancet 2008; 372:31-39; Ericksson, B.I., et al. *Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Hip Arthroplasty.* N.Engl.J.Med. 2008; 358:2765-75.)

85.     Despite these findings, the RECORD studies were flawed in design and conducted in a negligent manner. In fact, FDA Official Action Indicated ("OAI") – rated inspections in 2009 disclosed rampant violations including, "systemic discarding of medical records," unauthorized unblinding, falsification, and "concerns regarding improprieties in randomization." As a result, the FDA found that the RECORD 4 studies were so flawed that they were deemed unreliable. (Seife, Charles, *Research Misconduct Identified by US Food and Drug Administration,* JAMA Intern. Med (Feb. 9, 2015)).

86.     Nevertheless, the Defendants received additional FDA approval for Xarelto to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation on November 4, 2011 (NDA 202439). Approval of Xarelto for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation in the U.S. was based on a clinical trial known as the Rivaroxaban Once Daily Oral Direct Factor Xa Inhibition Compared with Vitamin K Antagonism for Prevention of Stroke and Embolism Trial in Atrial Fibrillation study (hereinafter referred to as "ROCKET AF").

87.     The ROCKET AF study showed that Xarelto was non-inferior to warfarin for the prevention of stroke or systemic embolism in patients with non-valvular atrial fibrillation, with a similar risk of major bleeding. However, "bleeding from gastrointestinal sites, including upper, lower, and rectal sites, occurred more frequently

in the rivaroxaban group, as did bleeding that led to a drop in the hemoglobin level or bleeding that required transfusion." (Patel, M.R., et al. *Rivaroxaban versus Warfarin in Nonvalvular Atrial Fibrillation*. N.Engl.J.Med. 2011; 365:883-91.)

88.   The ROCKET AF study compared warfarin to Xarelto. Thus, for the study to be well-designed and meaningful, the warfarin study group would have to be well managed because warfarin's safety and efficacy is dose-dependent.  In other words, if the warfarin group was poorly managed, it would be easy for Xarelto to appear non-inferior to warfarin, which, in turn, would provide Defendants a study to "support" Xarelto's use.

89.   In fact, in the ROCKET AF study, the warfarin group was not well managed.  The warfarin group in the ROCKET AF study was the worst managed warfarin study group in any previously reported clinical trial involving warfarin.

90.   The poor management of the warfarin group in the ROCKET AF study was not lost on the FDA, which noted, "the data comparing [Xarelto] to warfarin are not adequate to determine whether [Xarelto] is as effective for its proposed indication in comparison to warfarin when the latter is used skillfully." FDA Advisory Committee Briefing document, p. 10.

91.   Public Citizen also noticed the poor control in the warfarin group. Public Citizen wrote the FDA, stating they "strongly oppose FDA approval…The 3 ROCKET AF trial conducted in support of the proposed indication had a suboptimal control arm…" http://www.citizen.org/documents/1974.pdf."

92.   Another problem with the ROCKET AF study was Xarelto's once-a-day dosing. The FDA clinical reviewers stated that "the sponsor's rationale for evaluating only once

daily dosing during Phase 3 is not strong. Most importantly, there is clinical information from Phase 2 trials…and from clinical pharmacology studies suggesting that twice daily dosing, which would produce lower peak blood levels and higher trough blood levels of [Xarelto], might have been associated with greater efficacy and/or a better safety profile." FDA Advisory Committee Briefing document, p. 100.

93.   Dr. Steven E. Nissen more sharply stated, "my concern was that the dose was selected more for a marketing advantage rather than for the scientific data that was available, and was a mistake…" FDA Advisory Meeting Transcript, p. 287.

94.   Furthermore, the FDA expressed desirability in monitoring Xarelto dosage within their NDA approval memo based on the ROCKET studies. The clinical pharmacology in these studies demonstrated a linear correlation between rivaroxaban (Xarelto) levels and prothrombin time ("PT"); and subsequently, a correlation between PT and the risk of bleeding.   At this time, Defendants were aware of the correlation between Xarelto dosage and bleeding risks, but had "not chosen to utilize this information." (NDA 202439 Summary Review, p. 9).   At all relevant times, Defendants controlled the contents of their label as demonstrated by their decision to go forward without regard to the FDA's suggestion to utilize this information.

95.   The additional indication for treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE was added to the label on November 2, 2012.

96.   Approval of Xarelto for the treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE in the U.S. was based on the clinical trials known as the EINSTEIN-DVT, EINSTEIN-PE, and EINSTEIN-Extension studies. The EINSTEIN-DVT study tested Xarelto versus a placebo, and merely determined that Xarelto offered

an option for treatment of DVT, with an increased risk of bleeding events as compared to placebo. (The EINSTEIN Investigators. *Oral Rivaroxaban for Symptomatic Venous Thromboembolism.* N.Engl.J.Med. 2010; 363:2499-510). The EINSTEIN-Extension study confirmed that result. (Roumualdi, E., et al. *Oral rivaroxaban after symptomatic venous thromboembolism: the continued treatment study (EINSTEIN-Extension study).* Expert Rev. Cardiovasc. Ther. 2011; 9(7):841-844). The EINSTEIN-PE study's findings showed that a Xarelto regimen was non-inferior to the standard therapy for initial and long-term treatment of PE. However, the studies also demonstrated an increased risk of adverse events with Xarelto, including those that resulted in permanent discontinuation of Xarelto or prolonged hospitalization. (The EINSTEIN-PE Investigators. *Oral Rivaroxaban for the Treatment of Symptomatic Pulmonary Embolism.* N.Engl.J.Med. 2012; 366:1287-97.)

97.   The Defendants use the results of the ROCKET AF study, the RECORD studies, and the EINSTEIN studies to promote Xarelto in their promotional materials, including the Xarelto website, which tout the positive results of those studies. However, the Defendants' promotional materials fail to similarly highlight the increased risk of gastrointestinal bleeding and bleeding that required transfusion, among other serious bleeding concerns.

98.   The Defendants market Xarelto as a new oral anticoagulant treatment alternative to warfarin (Coumadin), a long-established safe treatment for preventing stroke and systemic embolism.

99.   The Defendants market and promote Xarelto as a single daily dose pill that does not require the need to measure a patient's blood plasma levels, touting it to be more

convenient to warfarin and touting that it does not limit a patient's diet. The single dose and no blood testing requirements or daily constraints are marketed by Defendants as the "Xarelto Difference."

100.    However, Xarelto's clinical studies show that Xarelto is safer and more effective when there is blood monitoring, dose adjustments, and twice-a-day dosing.

101.    In its QuarterWatch publication for the first quarter of the 2012 fiscal year, the Institute for Safe Medication Practices ("ISMP") noted that, even during the approval process, FDA "[r]eviewers also questioned the convenient once-a-day dosing scheme [of Xarelto], saying blood level studies had shown peaks and troughs that could be eliminated by twice-a-day dosing."

102.    The use of Xarelto without appropriate blood monitoring, dose adjustment and twice a day dosing can cause major, life-threatening bleeding events. Physicians using Xarelto have to be able to balance the dose so that the blood is thinned enough to reduce the risk of stroke, but not thinned so much as to increase the risk for a major bleeding event.  The Defendants were aware of this risk and the need for blood monitoring but have failed to disclose this vital health information to patients, doctors and the FDA.

103.    Importantly, Xarelto's significant risk of severe, and sometimes fatal, internal bleeding has no antidote to reverse its effects, unlike warfarin. Therefore, in the event of hemorrhagic complications, there is no available reversal agent. The original U.S. label, approved when the drug was first marketed, did not contain a warning regarding the lack of antidote, but instead only mentioned this important fact in the overdose section.

104.    The FDA's adverse event data indicates staggering, serious adverse events that have been associated with Xarelto.

105.     In the year leading up to June 30, 2012, there were 1,080 Xarelto-associated "Serious Adverse Event" ("SAE") Medwatch reports filed with the FDA, including at least 65 deaths. Of the reported hemorrhage events associated with Xarelto, 8% resulted in death, which was approximately twofold the risk of a hemorrhage-related death with warfarin.

106.     At the close of the 2012 fiscal year, Xarelto's first full year on the market, a total of 2,081 new Xarelto-associated SAE reports were filed with the FDA, ranking tenth among other pharmaceuticals in direct reports to the FDA. Of those reported events, 151 resulted in death, as compared to only 56 deaths associated with warfarin.

107.     The ISMP referred to these SAE figures as constituting a "strong signal" regarding the safety of Xarelto, defined as "evidence of sufficient weight to justify an alert to the public and the scientific community, and to warrant further investigation."

108.     Of particular note, in the first quarter of 2013, the number of reported serious adverse events associated with Xarelto (680) overtook that of Pradaxa (528), another new oral anticoagulant, which had previously ranked as the number one reported drug in terms of adverse events in 2012.

109.     Moreover, in the first eight months of 2013, German regulators received 968 Xarelto-related adverse event reports, including 72 deaths, as compared to a total of 750 reports and 58 deaths in 2012.

110.     Despite the clear signal generated by the SAE data, the Defendants did not tell consumers, health care professionals and the scientific community about the dangers of Xarelto, nor did Defendants perform further investigation into the safety of Xarelto.

111.    The Defendants' original and, in some respects, current labeling and prescribing information for Xarelto:

a)   failed to investigate, research, study and define, fully and adequately, the safety profile of Xarelto;

b)   failed to provide adequate warnings about the true safety risks associated with the use of Xarelto;

c)   failed to provide adequate warning regarding the pharmacokinetic and pharmacodynamic variability of Xarelto and its effects on the degree of anticoagulation in a patient;

d)   failed to disclose the need for dose adjustments;

e)   failed to disclose the need for twice-daily dosing;

f)   failed to warn about the need for blood monitoring;

g)   failed to provide adequate warning that it is difficult or impossible to assess the degree and/or extent of anticoagulation in patients taking Xarelto;

h)   failed to adequately disclose in the "Warnings" Section that there is no drug, agent or means to reverse the anticoagulation effects of Xarelto;

i)   failed to advise prescribing physicians, such as the Decedent's physicians, to instruct patients that there was no agent to reverse the anticoagulant effects of Xarelto;

j)   failed to provide adequate instructions on how to intervene and/or stabilize a patient who suffers a bleed while taking Xarelto;

k)   failed to provide adequate warnings and information related to the increased risks of bleeding events associated with aging patient populations of Xarelto users;

l)   failed to provide adequate warnings regarding the increased risk of gastrointestinal bleeds in those taking Xarelto, especially, in those patients with a prior history of gastrointestinal issues and/or upset stomach;

m)   failed to provide adequate warnings regarding the increased risk of suffering a bleeding event requiring blood transfusions in those taking Xarelto;

n)   failed to provide adequate warnings regarding the need to assess renal functioning prior to starting a patient on Xarelto and to continue testing and monitoring of renal functioning periodically while the patient is on Xarelto;

o) failed to provide adequate warnings regarding the need to assess hepatic functioning prior to starting a patient on Xarelto and to continue testing and monitoring of hepatic functioning periodically while the patient is on Xarelto;

p) failed to include a **"BOXED WARNING"** about serious bleeding events associated with Xarelto;

q) failed to include a **"BOLDED WARNING"** about serious bleeding events associated with Xarelto; and

r) failed to disclose to patients in the Defendants' "Medication Guide," intended for distribution to patients to whom Xarelto has been prescribed, the need for blood monitoring and failed to disclose to patients that there is no drug, agent or means to reverse the anticoagulation effects of Xarelto and that if serious bleeding occurs, such irreversibility could have permanently disabling, life-threatening or fatal consequences.

112.    During the years since first marketing Xarelto in the U.S., the Defendants modified the U.S. labeling and prescribing information for Xarelto, which included additional information regarding the use of Xarelto in patients taking certain medications. Despite being aware of: (1) serious, and sometimes fatal, irreversible bleeding events associated with the use of Xarelto; and (2) 2,081 SAE Medwatch reports filed with the FDA in 2012 alone, including at least 151 deaths, the Defendants nonetheless failed to provide adequate disclosures or warnings in their label as detailed in Paragraph 111 (a-r).

113.    As a direct and proximate result of the Defendants' aforesaid actions, the Decedent and the Plaintiff suffered serious and dangerous side effects including life-threatening bleeding, as well as other severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including, but not limited to, diminished enjoyment of life, shortened life expectancy leading to death, expenses for hospitalization and medical treatment and funeral expenses, loss of consortium, and any and all damages that are reasonable in the premises.

114.     Despite the wealth of scientific evidence, the Defendants have ignored the increased risk of the development of the aforementioned injuries associated with the use of Xarelto, but they have, through their marketing and advertising campaigns, urged consumers to use Xarelto without regular blood monitoring or instead of anticoagulants that present a safer alternative.

**B.     Over-Promotion of Xarelto**

115.     Xarelto is the second-most prescribed drug for treatment of atrial fibrillation, behind only Coumadin (warfarin), and it achieved blockbuster status with sales of approximately $2 billion dollars in 2013.

116.     The Defendants spent significant amounts of money in promoting Xarelto, which included at least $11,000,000.00 spent during 2013 alone on advertising in journals targeted at prescribers and consumers in the U.S. In the third quarter of fiscal 2013, Xarelto was the number one pharmaceutical product advertised in professional health journals based on pages and dollars spent.

117.     The Defendants' aggressive and misrepresentative marketing of a "Xarelto Difference" lead to an explosion in Xarelto sales.  The "Xarelto Difference," was once-a-day dosing without blood monitoring. In fact, the "Xarelto Difference" was nothing more than a marketing campaign based on flawed science.

118.     As a result of the Defendants' aggressive marketing efforts, in its first full year of being on the market, Xarelto garnered approximately $582 million in sales globally.

119.     The Defendants' website for Xarelto claims that over seven million people worldwide have been prescribed Xarelto. In the U.S., approximately 1 million Xarelto prescriptions had been written by the end of 2013.

120.     During the Defendants' 2012 fiscal year, Xarelto garnered approximately $658 million in sales worldwide. Then, in 2013, sales for Xarelto increased even further to more than $1 billion, which is the threshold commonly referred to as "blockbuster" status in the pharmaceutical industry. In fact, Xarelto sales ultimately reached approximately $2 billion for the 2013 fiscal year. Thus, Xarelto is now considered the leading anticoagulant on a global scale in terms of sales.

121.     As part of their marketing of Xarelto, the Defendants widely disseminated direct-to-consumer ("DTC") advertising campaigns that were designed to influence patients, including the Decedent, to make inquiries to their prescribing physicians about Xarelto and/or request prescriptions for Xarelto.

122.     In the course of these DTC advertisements, the Defendants overstated the efficacy of Xarelto with respect to preventing stroke and systemic embolism, failed to disclose the need for dose adjustments, failed to disclose the need for blood monitoring, and failed to adequately disclose to patients that there is no drug, agent, or means to reverse the anticoagulation effects of Xarelto, and that such irreversibility could have permanently disabling, life-threatening and fatal consequences.

123.     On June 6, 2013, the Defendants received an untitled letter from the FDA's Office of Prescription Drug Promotion (hereinafter referred to as the "OPDP") regarding its promotional material for the atrial fibrillation indication, stating that, "the print ad is false or misleading because it minimizes the risks associated with Xarelto and makes a misleading claim" regarding dose adjustments, which was in violation of FDA regulations. The OPDP thus requested that the Defendants immediately cease distribution of such promotional material.

124.     Prior to the Decedent's ingestion of Xarelto, the Plaintiff and/or the Decedent and/or the Decedent's physicians became aware of the promotional materials described herein.

125.     Prior to the Decedent's prescription of Xarelto, the Decedent's prescribing physician received promotional materials and information from sales representatives of the Defendants claiming that Xarelto was just as effective as warfarin in reducing strokes in patients with non-valvular atrial fibrillation, as well as preventing DVT/PE in patients with prior history of DVT/PE or undergoing hip or knee replacement surgery, and was more convenient, without also requiring blood monitoring, dose adjustments, twice-a-day dosing, or adequately informing prescribing physicians that there was no reversal agent that could stop or control bleeding in patients taking Xarelto.

126.     At all times relevant hereto, the Defendants also failed to warn emergency room doctors, surgeons, and other critical care medical professionals that unlike generally-known measures taken to treat and stabilize bleeding in users of warfarin, there is no effective agent to reverse the anticoagulation effects of Xarelto, and therefore no effective means to treat and stabilize patients who experience uncontrolled bleeding while taking Xarelto.

127.     At all times relevant to this action, The Xarelto Medication Guide, prepared and distributed by the Defendants and intended for U.S. patients to whom Xarelto has been prescribed, failed to warn about the need for blood monitoring, dose adjustments, and twice-a-day dosing, and failed to disclose to patients that there is no agent to reverse the anticoagulation effects of Xarelto and that if serious bleeding occurs, it may be irreversible, permanently disabling, and life-threatening.

128.    Prior to applying to the FDA for and obtaining approval of Xarelto, the Defendants knew or should have known that consumption of Xarelto was associated with and/or would cause the induction of life-threatening bleeding, and Defendants possessed at least one clinical scientific study, which evidence the Defendants knew or should have known was a signal that the life-threatening bleeding risk needed further testing and studies prior to its introduction to the market.

129.    As a result of the Defendants' claim regarding the effectiveness and safety of Xarelto, the Decedent's medical providers prescribed and the Decedent ingested Xarelto.

**C.     The Decedent's Use of Xarelto and Resulting Injuries**

130.    By reason of the foregoing acts and omissions, the Decedent was caused to suffer from life-threatening bleeding, as well as other severe and personal injuries (including wrongful death and survival action) which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, shortened life expectancy leading to death, expenses for hospitalization and medical treatment and funeral expenses, and loss of consortium, among any and all other damages.

131.    Upon information and belief, despite life-threatening bleeding findings in a clinical trial and other clinical evidence, the Defendants failed to adequately conduct complete and proper testing of Xarelto prior to filing their New Drug Application for Xarelto.

132.    Upon information and belief, from the date the Defendants received FDA approval to market Xarelto, the Defendants made, distributed, marketed and sold Xarelto without adequate warning to the Decedent's prescribing physicians or the Decedent that Xarelto was associated with and/or could cause life-threatening bleeding,

presented a risk of life-threatening bleeding in patients who used it, and that the Defendants had not adequately conducted complete and proper testing and studies of Xarelto with regard to severe side-effects, specifically, life-threatening bleeding.

133.    Upon information and belief, the Defendants concealed and failed to completely disclose their knowledge that Xarelto was associated with or could cause life-threatening bleeding as well as their knowledge that they had failed to fully test or study said risk.

134.    Upon information and belief, the Defendants ignored the association between the use of Xarelto and the risk of developing life-threatening bleeding.

135.    Upon information and belief, the Defendants failed to warn the Plaintiff, the Decedent, and the Decedent's healthcare providers regarding the need for blood monitoring and dose adjustments, and failed to warn of the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening associated with Xarelto.

136.    The Defendants' failure to disclose information that they possessed regarding the failure to adequately test and study Xarelto for life-threatening bleeding risk further rendered warnings for this medication inadequate.

137.    The Defendants' fraudulent concealment and misrepresentations were designed to prevent, and did prevent, the public and the medical community at large from discovering the risks and dangers associated with Xarelto, and prevented the Plaintiff and the Decedent from discovering, and/or with reasonable diligence of being able to discover, their causes of action.

138.    The Defendants' fraudulent representations and concealment evidence flagrant, willful, and depraved indifference to health, safety and welfare. The Defendants'

30

conduct showed willful misconduct, malice, fraud, wantonness, oppression, and that entire want of care that raises the presumption of conscious indifference to the consequences of said conduct.

139.    By reason of the foregoing acts and omissions, the Plaintiff and the Decedent suffered damages and harm, including, but not limited to, personal injury and death, medical expenses, funeral expenses, and other economic harm, as well as loss of consortium, services, society, companionship, love and comfort.

## V.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION AS AGAINST THE DEFENDANTS: STRICT PRODUCTS LIABILITY

140.    The Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein. The Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein. The Plaintiff pleads this cause of action in the broadest sense possible, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the resident state of the Plaintiff/Decedent regardless of whether arising under statute, common or civil law.

141.    At the time of the Plaintiff's and the Decedent's injuries, the Defendants' pharmaceutical drug Xarelto was defective and unreasonably dangerous to foreseeable consumers, including the Decedent.

142.    At all times herein mentioned, the Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, distributed, and/or have recently acquired the Defendants who have designed, researched, manufactured, tested,

advertised, promoted, marketed, sold and distributed Xarelto as hereinabove described that was used by the Decedent.

143.    The Defendants' Xarelto was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

144.    At those times, Xarelto was in an unsafe, defective, and inherently dangerous condition which was dangerous to users, and in particular, to the Decedent herein.

145.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by the Defendants was defective in design or formulation in that, when it left the hands of the Defendants, the manufacturers and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Xarelto.

146.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by the Defendants was defective in design and/or formulation, in that, when it left the hands of the Defendants, manufacturers, and/or suppliers, it was unreasonably dangerous, and it was more dangerous than an ordinary consumer would expect.

147.    At all times herein mentioned, Xarelto was in a defective condition and unsafe, and the Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendants.

148.    The Defendants knew, or should have known, that at all times herein mentioned, their Xarelto was in a defective condition, and was and is inherently dangerous and unsafe.

149.    At the time of the Decedent's use of Xarelto, Xarelto was being used for the purposes and in a manner normally intended, namely to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and/or for prophylaxis of DVT for patients undergoing hip or knee replacement surgery.

150.    The Defendants, with this knowledge, voluntarily designed their Xarelto in a dangerous condition for use by the public, and in particular the Decedent.

151.    The Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

152.    The Defendants created a product unreasonably dangerous for its normal, intended use.

153.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by the Defendants was manufactured defectively in that Xarelto left the hands of the Defendants in a defective condition and was unreasonably dangerous to its intended users.

154.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by the Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Xarelto was manufactured.

155.   The Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed a defective product which created an unreasonable risk to the health of consumers and to the Decedent in particular, and, the Defendants are therefore strictly liable for the injuries sustained by the Plaintiff and the Decedent, and thus the Defendants are strictly liable to the Plaintiff.

156.   The Plaintiff and the Decedent could not, by the exercise of reasonable care, have discovered Xarelto's defects herein mentioned and perceived its danger.

157.   The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by the Defendants was defective due to inadequate warnings or instructions, as the Defendants knew or should have known that the product created a risk of serious and dangerous side effects including life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature and the Defendants failed to adequately warn of said risk.

158.   The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by the Defendants was defective due to inadequate warnings and/or inadequate testing.

159.   The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by the Defendants was defective due to inadequate post-marketing surveillance and/or warnings because, after the Defendants knew or should have known of the risks of serious side effects including life-threatening bleeding, as well as other severe and permanent health consequences from Xarelto, they failed to provide adequate warnings to users or consumers of the product, and continued to improperly advertise, market and/or promote their product, Xarelto.

160.    The Xarelto ingested by the Decedent was in the same or substantially similar condition as it was when it left the possession of the Defendants.

161.    The Decedent did not misuse or substantially alter the Decedent's Xarelto.

162.    The Defendants are strictly liable to the Plaintiff/Decedent for the Plaintiff's/Decedent's injuries and the Plaintiff's damages in the following ways:

a.  Xarelto, as designed, manufactured, sold and supplied by the Defendants, was defectively designed and placed into the stream of commerce by the Defendants in a defective and unreasonably dangerous condition;

b.  The Defendants failed to properly market, design, manufacture, distribute, supply and sell Xarelto;

c.  The Defendants failed to warn and place adequate warnings and instructions on Xarelto;

d.  The Defendants failed to adequately test Xarelto;

e.  The Defendants failed to provide timely and adequate post-marketing warnings and instructions after they knew of the risk of injury associated with the use of Xarelto; and,

f.  A feasible alternative design existed that was capable of preventing the injuries of the Plaintiff and the Decedent.

163.    By reason of the foregoing, the Defendants have become strictly liable to the Plaintiff for the manufacturing, marketing, promoting, distribution, and selling of the defective product, Xarelto.

164.    The Defendants' defective design, manufacturing defect, and inadequate warnings of Xarelto were acts that amount to willful, wanton, and/or reckless conduct by the Defendants.

165.    The said defects in the Defendants' drug Xarelto were a substantial factor in causing the Plaintiff's and the Decedent's injuries and the Plaintiff's damages.

166.    As a direct and proximate result of the foregoing acts and omissions, Defendants'

aforesaid actions, the Plaintiff and Decedent were caused to suffer serious and dangerous side effects including but not limited to life-threatening bleeding, as well as other severe and personal injuries which were permanent and lasting in nature and death, physical pain and mental anguish, including, but not limited to, diminished enjoyment of life, shortened life expectancy leading to death, financial expenses for hospitalization and medical treatment and funeral expenses, loss of consortium, and any and all damages that are reasonable in the premises.

167.    The Defendants' conduct, as described above, was extreme and outrageous.  The Defendants risked the lives of the consumers and users of their products, including the Decedent, with knowledge of the safety and efficacy problems and suppressed this knowledge from the general public.  The Defendants made conscious decisions not to re-design, re-label, warn or inform the unsuspecting consuming public.    The Defendants' outrageous conduct warrants an award of punitive damages.

**SECOND CAUSE OF ACTION AS AGAINST THE DEFENDANTS: MANUFACTURING DEFECT M.S. Code §11-1-63, *et seq.***

168.    The Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein. The Plaintiff pleads this Count in the broadest sense available under the law, to include pleading same pursuant to all substantive law that applies to this case, as may be determined by choice of law principles, regardless of whether arising under statute and/or common law.

169.    Xarelto was designed, manufactured, marketed, promoted, sold, and introduced into the stream of commerce by the Defendants.

170.    When it left the control of Defendants, Xarelto was expected to, and did

reach the Decedent without substantial change from the condition in which it left the Defendants' control.

171.     Xarelto was defective when it left the Defendants' control and was placed in the stream of commerce, in that there were foreseeable risks that exceeded the benefits of the product and/or that it deviated from product specifications and/or applicable federal requirements, and it posed a risk of serious injury and death.

172.     Specifically, Xarelto was more likely to cause serious bleeding that may be irreversible, permanently disabling, and life-threatening than other anticoagulants.

173.     The Decedent used Xarelto in substantially the same condition it was in when it left the control of Defendants and any changes or modifications were foreseeable by Defendants.

174.     The Decedent and her healthcare providers did not misuse or materially alter her Xarelto.

175.     As a direct and proximate result of the use of Xarelto and Defendants' aforesaid actions, the Plaintiff/Decedent suffered serious physical injury and death, harm, damages and economic loss, and the Plaintiff /Decedent suffered such harm, damages and economic loss and dangerous side effects including life-threatening bleeding, as well as other severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including, but not limited to, diminished enjoyment of life, shortened life expectancy leading to death, expenses for hospitalization and medical treatment and funeral expenses, loss of consortium, and any and all damages that are reasonable in the premises.

## THIRD CAUSE OF ACTION AS AGAINST THE DEFENDANTS:
## DESIGN DEFECT

176.    The Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein. The Plaintiff pleads this Count in the broadest sense available under the law, to include pleading same pursuant to all substantive law that applies to this case, as may be determined by choice of law principles, regardless of whether arising under statute and/or common law.

177.    Xarelto was not merchantable and/or reasonably suited to the use intended, and its condition when sold was the proximate cause of the injuries sustained by the Plaintiff and the Decedent.

178.    The Defendants placed Xarelto into the stream of commerce with wanton and reckless disregard for public safety.

179.    Xarelto was in an unsafe, defective, and inherently dangerous condition.

180.    Xarelto contains defects in its design which render the drug dangerous to consumers, such as the Decedent, when used as intended or as reasonably foreseeable to the Defendants. The design defects render Xarelto more dangerous than other anticoagulants and cause an unreasonable increased risk of injury, including but not limited to life-threatening bleeding events.

181.    Xarelto was in a defective condition and unsafe, and Defendants knew, had reason to know, or should have known that Xarelto was defective and unsafe, even when used as instructed.

182.    The nature and magnitude of the risk of harm associated with the design of Xarelto, including the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening, is high in light of the intended and

reasonably foreseeable use of Xarelto.

183.     The risks of harm associated with the design of Xarelto are higher than necessary.

184.     It is highly unlikely that Xarelto users would be aware of the risks associated with Xarelto through either warnings, general knowledge or otherwise, and t h e Plaintiff/Decedent  specifically were not aware of these risks, nor would they expect them.

185.     The design did not conform to any applicable public or private product standard that was in effect when Xarelto left the Defendants' control.

186.     Xarelto's design is more dangerous than a reasonably prudent consumer would expect when used in its intended or reasonably foreseeable manner. It was more dangerous than Plaintiff and Decedent expected.

187.     The intended or actual utility of Xarelto is not of such benefit to justify the risk of bleeding that may be irreversible, permanently disabling, and life-threatening.

188.     At the time Xarelto left Defendants' control, it was both technically and economically feasible to have an alternative design that would not cause bleeding that may be  irreversible, permanently disabling, and life-threatening or an alternative design that would have substantially reduced the risk of these injuries.

189.     It was both technically and economically feasible to provide a safer alternative  product that would have prevented the harm suffered by the Plaintiff and Decedent.

190.     The Defendants' conduct was extreme and outrageous. The Defendants risked the lives of consumers and users of their products, including the Decedent, with

the knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. The Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. The Defendants' outrageous conduct warrants an award of punitive damages.

191.     The unreasonably dangerous nature of Xarelto caused serious harm to the Plaintiff and the Decedent.

192.     As a direct and proximate result of the Decedent's use of Xarelto which was designed, manufactured, marketed, promoted, sold and introduced into the stream of commerce by the Defendants, the Plaintiff and the Decedent suffered serious physical injury, harm and death, damages and economic loss, and the Plaintiff/Decedent suffered such harm, damages and economic loss, serious and dangerous side effects including life-threatening bleeding, as well as other severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including, but not limited to, diminished enjoyment of life, shortened life expectancy leading to death, expenses for hospitalization and medical treatment and funeral expenses, loss of consortium, and any and all damages that are reasonable in the premises.

193.     The Plaintiff pleads this Count in the broadest sense available under the law, to include pleading same pursuant to all substantive law that applies to this case, as may be determined by choice of law principles regardless of whether arising under statute and/or common law.

## FOURTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS: FAILURE TO WARN

194.     The Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein. The Plaintiff pleads this Count in

the broadest sense possible, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the Plaintiff's and Decedent's resident State.

195.     The Defendants had a duty to warn the Plaintiff and the Decedent and the Decedent's healthcare providers regarding the need for blood monitoring, dose adjustments, twice-daily dosing, and they failed to warn of the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening associated with Xarelto.

196.     The Defendants knew, or in the exercise or reasonable care should have known, about the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening.

197.     The Defendants failed to provide warnings or instructions that a manufacturer exercising reasonable care would have provided concerning the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening, in light of the likelihood that their product would cause these injuries.

198.     The Defendants failed to update warnings based on information received from product surveillance after Xarelto was first approved by the FDA and marketed, sold, and used in the United States and throughout the world.

199.     A manufacturer exercising reasonable care would have updated its warnings on the basis of reports of injuries to individuals using Xarelto after FDA approval.

200.     When it left the Defendants' control, Xarelto was defective and unreasonably dangerous for failing to warn of the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening.

201.     The Decedent used Xarelto for its approved purpose and in a manner

normally intended and reasonably foreseeable by the Defendants.

202. The Plaintiff, the Decedent, and the Decedent's healthcare providers could not, by the exercise of reasonable care, have discovered the defects or perceived their danger because the risks were not open or obvious.

203. The Defendants, as the manufacturers and distributors of Xarelto, are held to the level of knowledge of an expert in the field.

204. The warnings that were given by the Defendants were not accurate or clear, and were false and ambiguous.

205. The warnings that were given by the Defendants failed to properly warn physicians of the risks associated with Xarelto, subjecting the Plaintiff and the Decedent to risks that exceeded the benefits to the Decedent. The Plaintiff and the Decedent, individually and through the Decedent's physicians, reasonably relied upon the skill, superior knowledge and judgment of the Defendants.

206. The Defendants had a continuing duty to warn the Plaintiff, the Decedent, and the Decedent's prescriber of the dangers associated with their product.

207. Had the Decedent or the Decedent's healthcare providers received adequate warnings regarding the risks associated with the use of Xarelto, the Decedent would not have used it or she would have used it with blood monitoring.

208. The Plaintiff's/Decedent's injuries (including death) were the direct and proximate result of the Defendants' failure to warn of the dangers of Xarelto.

209. The Defendants' conduct, as described above, was extreme and outrageous. The Defendants risked the lives of consumers and users of their products, including the Decedent, with knowledge of the safety and efficacy problems and suppressed this

knowledge from the general public. The Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. The Defendants' outrageous conduct warrants an award of punitive damages.

210.        As a direct and proximate result of the Defendants' aforesaid actions, the Plaintiff/Decedent suffered serious and dangerous side effects including life threatening bleeding, as well as other severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including, but not limited to, diminished enjoyment of life, shortened life expectancy leading to death, expenses for hospitalization and medical treatment and funeral expenses, loss of consortium, and any and all damages that are reasonable in the premises.

## FIFTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS: NEGLIGENCE

211.        The Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein. The Plaintiff pleads this Count in the broadest sense available under the law, to include pleading same pursuant to all substantive law that applies to this case, as may be determined by choice of law principles, regardless of whether arising under statute and/or common law. Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein. The Plaintiff pleads this cause of action in the broadest sense possible, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the resident state of the Plaintiff/Decedent, regardless of whether arising under statute, common or civil law.

212.        The Defendants had a duty to exercise reasonable care in the design,

manufacture, sale, labeling, warnings, marketing, promotion, quality assurance, quality control, and/or distribution of Xarelto, including a duty to assure that the product would not cause unreasonable, dangerous side effects to users.

213.     The Defendants failed to exercise ordinary care in the design, manufacture, sale, labeling, warnings, marketing, promotion, quality assurance, quality control and distribution of Xarelto, in that the Defendants knew, or should have known, that the drugs created a high risk of unreasonable, dangerous side-effects and harm, including, life-threatening bleeding, dangerous side effects and harm, as well as other severe and personal injuries (including death) which were permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

214.     The Defendants, their agents, servants, and/or employees, were negligent in the design, manufacture, sale, labeling, warnings, marketing, promotion, quality assurance, quality control, and distribution of Xarelto in that, among other things, they:

a)  Failed to use due care in designing and manufacturing and testing Xarelto so as to avoid the aforementioned risks to individuals; Manufactured, produced, promoted, formulated, created, tested, and/or designed Xarelto without thoroughly testing it and without due care;

b)  Failed to analyze pre-marketing test data of Xarelto;

c)  Failed to conduct sufficient post-marketing and surveillance of Xarelto;

d)  Failed to accompany Xarelto with proper warnings regarding all possible adverse side effects associated with its use, and the comparative severity and duration of such adverse side effects. The warnings given did not accurately reflect the symptoms, scope or severity of the side effects; the warnings given did not warn the Plaintiff/Decedent and the Decedent's health care providers regarding the need for blood monitoring, dose adjustments, and failed to warn of the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening associated with Xarelto;

e)  Failed to provide adequate training and instruction to medical care providers for the appropriate use of Xarelto;

f) Falsely and misleadingly overpromoted, advertised and marketed Xarelto as set forth herein including overstating efficacy, minimizing risk and stating that blood monitoring and dose adjustments were not necessary for safe and effective use to influence patients, such as the Decedent, to purchase and consume such product;

g) Manufactured, produced, promoted, formulated, created and/or designed Xarelto without thoroughly testing it;

h) Manufactured, produced, promoted, formulated, created and/or designed Xarelto without adequately testing it;

i) Did not conduct sufficient testing programs to determine whether or not Xarelto was safe for use; in that the Defendants herein knew or should have known that Xarelto was unsafe and unfit for use by reason of the dangers to its users;

j) Sold Xarelto without making proper and sufficient tests to determine the dangers to its users;

k) Negligently failed to adequately and correctly warn the Plaintiff/Decedent, the Decedent's physicians, the public, the medical and healthcare profession, and the FDA of the dangers of Xarelto;

l) Failed to provide adequate instructions regarding safety precautions to be observed by users such as the Decedent, handlers and persons who would reasonably and foreseeably come into contact with, and more particularly, use, Xarelto;

m) Failed to test Xarelto and/or failed to adequately, sufficiently and properly test Xarelto;

n) Negligently advertised and recommended the use of Xarelto without sufficient knowledge as to its dangerous propensities;

o) Negligently represented that Xarelto was safe for use for its intended purpose, when, in fact, it was unsafe;

p) Negligently represented that Xarelto had equivalent safety and efficacy as other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, for reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

q) Negligently designed Xarelto in a manner which was dangerous to its users;

r) Negligently manufactured Xarelto in a manner which was dangerous to users;

45

s) Negligently produced Xarelto in a manner which was dangerous to its users;

t) Negligently assembled Xarelto in a manner which was dangerous to its users;

u) Concealed information from the Plaintiff/Decedent, in knowing that Xarelto was unsafe, dangerous, and/or non-conforming with FDA regulations;

v) Improperly concealed and/or misrepresented information from the Plaintiff/Decedent, healthcare professionals, the Decedent's physicians, and/or the FDA, concerning the severity of risks and dangers of Xarelto compared to other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, for reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

w) Placed an unsafe product into the stream of commerce.

215.   The Defendants under-reported, underestimated and downplayed the serious dangers of Xarelto.

216.   The Defendants negligently compared the safety risk and/or dangers of Xarelto with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, for reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

217.   The Defendants were negligent in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing and sale of Xarelto in that they:

a. Failed to use due care in designing and manufacturing Xarelto so as to avoid the aforementioned risks to individuals when Xarelto was used for treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, for reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

b. Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Xarelto;

46

c. Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Xarelto;

d. Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Xarelto;

e. Failed to warn the Plaintiff/Decedent of the severity and duration of such adverse effects, as the warnings did not accurately reflect the symptoms, or severity of the side effects;

f. Failed to conduct adequate testing, including pre-clinical and clinical testing and post-marketing surveillance to determine the safety of Xarelto;

g. Failed to warn the Plaintiff/Decedent, prior to actively encouraging the sale of Xarelto, either directly or indirectly, orally or in writing, about the need for more comprehensive, more regular medical monitoring than usual to ensure early discovery of potentially serious side effects;

h. Were otherwise careless and/or negligent.

218.    Despite the fact that the Defendants knew or should have known that Xarelto caused unreasonable, dangerous side-effects which many users would be unable to remedy by any means, the Defendants continued to market Xarelto to consumers, including and the medical community and the Decedent.

219.    The Defendants knew or should have known that consumers such as the Decedent would foreseeably suffer injury as a result of the Defendants' failure to exercise ordinary care, as set forth above, including the failure to comply with federal requirements.

220.    It was foreseeable that Defendants' product, as designed, would cause serious injury to consumers, including the Decedent.

221.    As a direct and proximate result of the Defendants' negligence, the Plaintiff/Decedent suffered serious physical injury, harm and death, damages and economic loss and Plaintiff/Decedent suffered such harm, damages and economic loss and dangerous side effects including life-threatening bleeding, as well as other severe

and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including, but not limited to, diminished enjoyment of life, shortened life expectancy leading to death, expenses for hospitalization and medical treatment and funeral expenses, loss of consortium, and any and all damages that are reasonable in the premises.

222.     The Defendants' conduct was extreme and outrageous. The Defendants risked the lives of consumers and users of their products, including the Decedent, with the knowledge of the safety and efficacy problems and suppressed this knowledge from the general public.   The Defendants made conscious decisions not to re-design, re-label, warn or inform the unsuspecting consuming public. The Defendants' outrageous conduct warrants an award of punitive damages.

## SIXTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS: BREACH OF EXPRESS WARRANTY

223.     The Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein. The Plaintiff pleads this Count in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the Plaintiff's and the Decedent's resident state. Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein. The Plaintiff pleads this cause of action in the broadest sense possible, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the resident state of the Plaintiff/Decedent, regardless of whether arising under statute, common or civil law.

224.     The Defendants expressly warranted that Xarelto was safe and effective to members of the consuming public, including the Decedent.

225.     The Defendants expressly warranted that Xarelto was a safe and effective product to be used as a blood thinner, and did not disclose the material risks that Xarelto could cause serious bleeding that may be irreversible, permanently disabling, and life-threatening. The representations were not justified by the performance of Xarelto.

226.     The Defendants expressly warranted that Xarelto was safe and effective to use without the need for blood monitoring and dose adjustments.

227.     The Defendants expressly represented to the Plaintiff/Decedent, the Decedent's physicians, healthcare providers, and/or the FDA that Xarelto was safe and fit for use for the purposes intended, that it was of merchantable quality, that it did not produce any dangerous side effects in excess of those risks associated with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, for reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, that the side effects it did produce were accurately reflected in the warnings, and that it was adequately tested and fit for its intended use.

228.     The Defendants knew or should have known that, in fact, said representations and warranties were false, misleading, and untrue in that Xarelto was not safe and fit for the use intended, and, in fact, it produced serious injuries to the users that were not accurately identified and represented by the Defendants.

229.     Xarelto does not conform to these express representations because Xarelto is not safe and has numerous serious side effects, including death.

230.     The Plaintiff/Decedent and the Decedent's health care providers reasonably relied on these express representations of the Defendants herein.

231.     The Defendants herein breached their express warranty in one or more of the following ways:

> A. Xarelto as designed, manufactured, sold and/or supplied by the Defendants, was defectively designed and placed into the stream of commerce by the Defendants in a defective and unreasonably dangerous condition;
>
> B. The Defendants failed to warn and/or place adequate warnings and instructions on Xarelto;
>
> C. The Defendants failed to adequately test Xarelto; and;
>
> D. The Defendants failed to provide timely and adequate post-marketing warnings and instructions after they knew the risk of injury from Xarelto.

232.     The Plaintiff/Decedent reasonably relied upon the Defendants' warranty that Xarelto was safe and effective when the Decedent purchased and used the medication.

233.     The Defendants herein breached the aforesaid express warranties as their drug was defective.

234.     The Plaintiff's/Decedent's injuries and the Decedent's death were the direct and proximate result of the Defendants' breach of their express warranty.

235.     As a direct and proximate result of the Defendants' aforesaid actions, the Plaintiff/Decedent suffered serious and dangerous side effects including life-threatening bleeding and death, as well as other severe and personal injuries which were permanent

and lasting in nature, physical pain and mental anguish, including, but not limited to, diminished enjoyment of life, shortened life expectancy leading to death, expenses for hospitalization and medical treatment and funeral expenses, loss of consortium, and any and all damages that are reasonable in the premises.

236.     The Defendants' conduct, as described above, was extreme and outrageous.  The Defendants risked the lives of the consumers and users of their products, including the Decedent, with knowledge of the safety and efficacy problems and suppressed this knowledge from the general public.  The Defendants made conscious decisions not to re-design, re-label, warn or inform the unsuspecting consuming public.  The Defendants' outrageous conduct warrants an award of punitive damages.

### SEVENTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS: BREACH OF IMPLIED WARRANTIES

237.     The Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein. The Plaintiff pleads this Count in the broadest sense available under the law, to include pleading same pursuant to all substantive law that applies to this case, as may be determined by choice of law principles, regardless of whether arising under statute and/or common law. Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein. The Plaintiff pleads this cause of action in the broadest sense possible, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the resident state of the Plaintiff/Decedent, regardless of whether arising under statute, common or civil law.

238.     At the time Defendants marketed, distributed and sold Xarelto to the Decedent, the Defendants warranted that Xarelto was merchantable and fit for the ordinary purposes for which it was intended.

239.     Members of the consuming public, including consumers such as the Decedent, were intended third party beneficiaries of the warranty.

240.     Xarelto was not merchantable and fit for its ordinary purpose because it has a propensity to lead to the serious personal injuries described in this Complaint.

241.     The Plaintiff/Decedent reasonably relied on Defendants' representations that Xarelto was safe and free of defects and was a safe means of reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

242.     The Defendants' breach of the implied warranty of merchantability was the direct and proximate cause of the Plaintiff's/Decedent's injuries, including Decedent's death.

243.     At all times herein mentioned, the Defendants manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted and sold Xarelto and/or have recently acquired the Defendants who have manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted and sold Xarelto, to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

244.      At the time the Defendants marketed, sold, and distributed Xarelto for use by the

Decedent, the Defendants knew of the use for which Xarelto was intended and impliedly

warranted the product to be of merchantable quality and safe and fit for such use.

245.      That said representations and warranties aforementioned were false, misleading,

and inaccurate in that Xarelto was unsafe, unreasonably dangerous, improper, not of

merchantable quality, not fit for its ordinary purpose and defective because it has a

propensity to lead to serious personal injuries as described in this Complaint.

246.      Defendants' breach of the implied warranty of merchantability was the direct and

proximate cause of the Plaintiff's/Decedent's injuries for which the Plaintiff is now

entitled to recover.

247.      As a direct and proximate result of the Defendants' aforesaid actions, the

Plaintiff/Decedent suffered, and in some cases may continue to suffer, serious and

dangerous side effects including life-threatening bleeding and death, as well as other

severe and personal injuries which were permanent and lasting in nature, physical pain

and mental anguish, including, but not limited to, diminished enjoyment of life,

shortened life expectancy leading to death, expenses for hospitalization and medical

treatment and funeral expenses, and any and all damages that are reasonable in the

premises.

248.      The Defendants' conduct, as described above, was extreme and outrageous.  The

Defendants risked the lives of the consumers and users of their products, including the

Decedent, with knowledge of the safety and efficacy problems and suppressed this

knowledge from the general public.  The Defendants made conscious decisions not to

re-design, re-label, warn or inform the unsuspecting consuming public. The Defendants' outrageous conduct warrants an award of punitive damages.

## EIGHTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS: NEGLIGENT MISREPRESENTATION

249.     The Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein. The Plaintiff pleads this Count in the broadest sense available under the law, to include pleading same pursuant to all substantive law that applies to this case, as may be determined by choice of law principles, regardless of whether arising under statute and/or common law. The Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein. The Plaintiff pleads this cause of action in the broadest sense possible, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the resident state of the Plaintiff/Decedent, regardless of whether arising under statute, common or civil law.

250.     From the time Xarelto was first tested, studied, researched, evaluated, endorsed, manufactured, marketed, and distributed, and up to the present, the Defendants made misrepresentations to the Plaintiff/Decedent, the Decedent's physicians, and the general public, including but not limited to the misrepresentation that Xarelto was safe, fit and effective for human use.  At all times mentioned, the Defendants conducted sales and marketing campaigns to promote the sale of Xarelto and willfully deceived the Plaintiff, the Decedent, the Decedent's physicians, and the general public  as to the health risks and consequences of the use of Xarelto.

251.     The Defendants made the foregoing representations without any reasonable ground for believing them to be true. These representations were made directly by the Defendants, by sales representatives and other authorized agents of the Defendants, by sales representatives and other authorized agents of the Defendants, and in publications and other written materials directed to physicians, medical patients, and the public, with the intention of inducing reliance and the prescription, purchase, and use of Xarelto.

252.     The representations by the Defendants were in fact false, in that Xarelto is not safe, fit and effective for human consumption as labeled, using Xarelto is hazardous to one's health, and Xarelto has a serious propensity to cause severe injuries to users, including but not limited to the injuries suffered by the Plaintiff/Decedent for which the Plaintiff is now entitled to recover.

253.     The foregoing representations by the Defendants, and each of them, were made with the intention of inducing reliance and the prescription, purchase, and use of Xarelto.

254.     In reliance on the misrepresentations by the Defendants, the Decedent was induced to purchase and use Xarelto. If the Plaintiff/Decedent had known the truth and the facts concealed by the Defendants, the Decedent would not have used Xarelto.  The reliance of the Plaintiff/Decedent upon the Defendants' misrepresentations was justified because such misrepresentations were made and conducted by individuals and entities that were in a position to know all of the facts.

255.     As a result of the foregoing negligent misrepresentations by the Defendants, the Plaintiff and the Decedent suffered injuries including death and damages as alleged herein.

256.     As a direct and proximate result of the Defendants' aforesaid actions, the Plaintiff/Decedent suffered serious and dangerous side effects including life-threatening bleeding and death, as well as other severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including, but not limited to, diminished enjoyment of life, shortened life expectancy leading to death, expenses for hospitalization and medical treatment and funeral expenses, loss of consortium and any and all damages that are reasonable in the premises.

## NINTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS: FRAUD AND DECEIT

257.     The Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein. The Plaintiff pleads this Count in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the Plaintiff's/Decedent's resident state. The Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein. The Plaintiff pleads this cause of action in the broadest sense possible, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the resident state of the Plaintiff/Decedent, regardless of whether arising under statute, common or civil law.

258.     Prior to the Decedent's use of Xarelto and during the period in which the Decedent actually used Xarelto, the Defendants fraudulently suppressed material information regarding the safety and efficacy of Xarelto, including information regarding increased adverse events, pre- and post-marketing deaths, and a high number of severe adverse event reports compared to other anticoagulants and the need for blood monitoring

56

and dose adjustments for the safe and effective use of Xarelto. Furthermore, the Defendants fraudulently concealed the safety information about the use of Xarelto. As described above, Xarelto has several well-known, serious side effects that are not seen in other anticoagulants. The Plaintiff believes that the fraudulent misrepresentation described herein was intentional to keep the sales volume of Xarelto strong.

259.     The Defendants falsely and fraudulently represented to the medical and healthcare community, and to the Plaintiff/Decedent, the FDA, and the public in general, that said product, Xarelto, had been tested and was found to be safe and effective to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

260.     These representations were made by said Defendants with the intent of defrauding and deceiving the Plaintiff/Decedent, the public in general, and the medical and healthcare community in particular and the Plaintiff/Decedent, and were made with the intent of inducing the public in general, and the medical and healthcare community in particular, to recommend, prescribe, dispense, and/or purchase said product, Xarelto, for use to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, all of which evinced a callous, reckless, willful, depraved indifference to the health, safety and welfare of the Decedent.

261.    At the time the aforesaid representations were made by the Defendants and at the time the Decedent used Xarelto, the Plaintiff/Decedent were unaware of the falsity of said representations and reasonably believed them to be true.

262.    In reliance upon said representations, the Decedent was induced to and did use Xarelto, thereby sustaining severe and permanent personal injuries including death.

263.    The Defendants knew and were aware, or should have been aware, that Xarelto had not been sufficiently tested, was defective in nature, and/or that it lacked adequate and/or sufficient warnings.

264.    The Defendants knew or should have known that Xarelto had a potential to, could, and would cause severe and grievous injury to the users of said product Xarelto, and that it was inherently dangerous in a manner that exceeded any purported, inaccurate, and/or down-played warnings.

265.    The Defendants brought Xarelto to the market and acted fraudulently, wantonly, and maliciously to the detriment of the Plaintiff/Decedent.

266.    The Defendants fraudulently concealed the safety issues associated with Xarelto including the need for blood monitoring and dose adjustments in order to induce physicians to prescribe Xarelto and for patients, including the Decedent, to purchase and use Xarelto.

267.    At the time that the Defendants concealed the fact that Xarelto was not safe, the Defendants were under a duty to communicate this information to the Plaintiff/Decedent, physicians, the FDA, the healthcare community, and the general public in such a manner that they could appreciate the risks associated with using Xarelto.

268.     The Defendants, at all times relevant hereto, withheld information from the FDA which they were required to report.

269.     The Plaintiff/Decedent and the Decedent's prescribing physicians relied upon the Defendants' outrageous untruths regarding the safety of Xarelto.

270.     The Decedent's prescribing physicians were not provided with the necessary information by the Defendants  to provide an adequate warning to the Plaintiff and the Decedent.

271.     Xarelto was improperly marketed to the Decedent and the Decedent's prescribing physicians as the Defendants did not provide proper instructions about how to use the medication and did not adequately warn about Xarelto's risks.

272.     As a direct and proximate result of the Defendants' malicious and intentional concealment of material life-altering information from the Plaintiff, the Decedent, and the Decedent's prescribing physicians, the Defendants caused or contributed to the Plaintiff/Decedent's injuries and the Decedent's death.

273.     It is unconscionable and outrageous that the Defendants would risk the lives of consumers, including the Decedent. Despite this knowledge, the Defendants made conscious decisions not to redesign, label, warn or inform the unsuspecting consuming public about the dangers associated with the use of Xarelto. The Defendants' outrageous conduct rises to the level necessary that the Plaintiff should be awarded punitive damages to deter the Defendants from this type of outrageous conduct in the future and to discourage the Defendants from placing profits above the safety of patients in the United States of America.

274.     The Defendants' fraud also acted to conceal their malfeasance which actions tolled the Plaintiff's statute of limitations because only the Defendants knew of the true dangers associated with the use of Xarelto as described herein. The Defendants did not disclose this information to the Plaintiff, the Decedent, the Decedent's prescribing physicians, the healthcare community and the general public.  Without full knowledge of the dangers of Xarelto, the Decedent and the Plaintiff could not evaluate whether a person who was injured by Xarelto had a valid claim.

275.     The Defendants widely advertised and promoted Xarelto as a safe and effective medication and/or as a safe and effective means of reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

276.     The Defendants' advertisements regarding Xarelto falsely and misleadingly stated that blood monitoring and dose adjustments were not necessary for safe and effective use of the drug, misrepresentations the Defendants knew to be false, for the purpose of fraudulently inducing consumers, such as the Decedent, to purchase such product.  The Decedent relied on these material misrepresentations when deciding to purchase and consume Xarelto.

277.     The Defendants had a duty to disclose material information about serious side-effects to consumers such as the Decedent.

278.     Additionally, by virtue of the Defendants' partial disclosures about the medication, in which the Defendants touted Xarelto as a safe and effective medication, the Defendants had a duty to disclose all facts about the risks associated with use of the

medication, including the risks described in this Complaint.  The Defendants

intentionally failed to disclose this information for the purpose of inducing consumers,

such as the Decedent, to purchase the Defendants' dangerous product.

279.    Had the Plaintiff/Decedent been aware of the hazards associated with Xarelto, the

Decedent and the Decedent's physicians would have employed appropriate blood

monitoring, consumed a different anticoagulant with a better safety profile, or would not

have consumed the product that lead proximately to Plaintiff's/Decedent's injuries and

Decedent's death.

280.    Upon information and belief, the Plaintiff/Decedent avers that Defendants

actively and fraudulently concealed information in Defendants' exclusive possession

regarding the hazards associated with Xarelto, for the purpose of preventing consumers,

such as the Decedent, from discovering these hazards.

281.    As a direct and proximate result of the Defendants' aforesaid actions,  the

Plaintiff/Decedent suffered serious and dangerous side effects including life-threatening

bleeding and death, as well as other severe and personal injuries which were permanent

and lasting in nature, physical pain and mental anguish, including, but not limited to,

diminished enjoyment of life, shortened life expectancy leading to death, expenses for

hospitalization and medical treatment, loss of consortium and any and all damages that

are reasonable in the premises.

## TENTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS:
## VIOLATION OF CONSUMER PROTECTION LAWS/CONSUMER FRAUD LAWS
### Including M.S. Code §75-24-5, *et seq.*

282.    The  Plaintiff  incorporates  by  reference  each  preceding  and  succeeding

paragraph as though set forth fully at length herein. The Plaintiff pleads this Count in

the broadest sense available under the law, to include pleading same pursuant to all substantive law that applies to this case, as may be determined by choice of law principles, regardless of whether arising under statute and/or common law.

283.     The Decedent used Xarelto and suffered ascertainable losses as a result of Defendants' actions in violation of the consumer protection laws.

284.     The Defendants used unfair methods of competition or deceptive acts or practices that were proscribed by law, including the following:

    a.  Representing that goods or services have characteristics, ingredients, uses, benefits, or quantities that they do not have;

    b.  Advertising goods or services with the intent not to sell them as advertised; and,

    c.  Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

285.     The Defendants violated consumer protection laws through their use of false and misleading misrepresentations or omissions of material fact relating to the safety of Xarelto.

286.     The Defendants violated consumer protection laws of various states, including the state of residence of Plaintiff/Decedent noted above.

287.     The Defendants uniformly communicated the purported benefits of Xarelto while failing to disclose the serious and dangerous side effects related to the use of Xarelto and of the true state of Xarelto's regulatory status, its safety, its efficacy, and its usefulness. The Defendants made these representations to physicians, the medical community at large, and to patients and consumers, such as the Decedent, in the marketing and advertising campaign described herein.

288.     The Defendants' conduct in connection with Xarelto was also impermissible

and illegal in that it created a likelihood of confusion and misunderstanding, because Defendants misleadingly, falsely and or deceptively misrepresented and omitted numerous material facts regarding, among other things, the utility, benefits, costs, safety, efficacy and advantages of Xarelto.

289.     As a result of these violations of consumer protection laws, Plaintiff/Decedent have incurred and Plaintiff/Decedent suffered serious physical injury (including death), pain, suffering, loss of opportunity, loss of family and social relationships, and medical, hospital and surgical expenses and other expense related to the diagnosis and treatment thereof including funeral expenses, for which Defendants are liable.

## ELEVENTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS: LOSS OF CONSORTIUM

290.     The Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein. The Plaintiff pleads this Count in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the Plaintiff's/Decedent's resident state. The Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein. The Plaintiff pleads this cause of action in the broadest sense possible, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the resident state(s) of the Plaintiff/Decedent, regardless of whether arising under statute, common or civil law.

291.     At all relevant times hereto, the Decedent had a family member (hereinafter referred to as "Family Member Plaintiff") who has suffered injuries and losses as a result of the Decedent's injuries and death from Xarelto.

292.     The Plaintiff and Family Member Plaintiff, Beachman Williams, is the father of the Decedent, Carolyn Parker, and is the Administrator of her Estate.

293.     For the reasons set forth herein, Family Member Plaintiff has necessarily paid and has become liable to pay for medical aid, treatment, monitoring, medications, and other expenditures and will necessarily incur further expenses of a similar nature in the future as a proximate result of the Defendants' misconduct.

294.     For the reasons set forth herein, Family Member Plaintiff, Beachman Williams, has suffered and will continue to suffer the loss of his loved one's support, companionship, services, society, love and affection.

295.     Family Member Plaintiff, Beachman Williams, has suffered great emotional pain and mental anguish.

296.     As a direct and proximate result of the Defendants' wrongful conduct, Family Member Plaintiff, Beachman Williams, suffered severe physical injuries, severe emotional distress, economic losses and/or other damages for which he is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.  The Defendants are liable to Family Member Plaintiff, Beachman Williams, jointly and severally for all general, special and equitable relief to which Family Member Plaintiff, Beachman Williams, is entitled by law.

297.     By reason of the foregoing, Beachman Williams has been caused the loss of his daughter's companionship, service, love, affection and society.

## TWELTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS:
## WRONGFUL DEATH including M.S. Code §11-7-13, *et seq.*

298.     The Plaintiff incorporates by reference each preceding and succeeding

paragraph as though set forth fully at length herein. The Plaintiff pleads this Count in

the broadest sense, pursuant to all laws that may apply pursuant to choice of law

principles, including the law of the Plaintiff's/Decedent's resident State.

299.     The Plaintiff, Beachman Williams, brings this claim on behalf of himself and/or

the Estate of Carolyn Parker and for the benefit of the Decedent's lawful beneficiaries.

300.     As a direct and proximate result of the conduct of the Defendants and the

defective nature of Xarelto as outlined above, Plaintiff/Decedent suffered bodily injury

resulting in pain and suffering, disability, disfigurement, mental anguish, loss of

capacity of the enjoyment of life, shortened life expectancy, expenses for

hospitalization, medical and nursing treatment, funeral expenses and death.

301.     As a direct and proximate cause of the conduct of Defendants, Decedent's

beneficiaries have incurred hospital, nursing and medical expenses, funeral and/or

estate administration expenses as a result of Decedent's death. The Plaintiff brings

this claim on behalf of Decedent's lawful beneficiaries for these damages and for all

pecuniary losses under applicable state statutory and/or common laws.

## THIRTEENTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS:
## SURVIVAL ACTION including M.S. Code §15-1-55, *et seq.*

302.     The Plaintiff incorporates by reference each preceding and succeeding

paragraph as though set forth fully at length herein. The Plaintiff pleads this Count in

the broadest sense, pursuant to all laws that may apply pursuant to choice of law

principles, including the law of the Plaintiff's/Decedent's resident State.

303.     As a direct and proximate result of the conduct of Defendants, Decedent, prior to her death, was obligated to spend various sums of money to treat her injuries, which debts have been assumed by the Estate. As a direct and proximate cause of the aforesaid, the Decedent was caused pain and suffering, mental anguish and impairment of the enjoyment of life, until the date of her death. The Plaintiff brings this claim on behalf of the Decedent's estate under applicable state statutory and/or common laws.

304.     As a direct and proximate result of the conduct of the Defendants, Plaintiff/Decedent and the Decedent's heirs, until the time of the Decedent's death, suffered a disintegration and deterioration of the family unit and the relationships existing therein, resulting in enhanced anguish, depression and other symptoms of psychological stress and disorder.

305.     As a direct and proximate result of the aforesaid, and including the observance of the suffering and physical deterioration of the Decedent until the date of her death, the Plaintiff has and will continue to suffer permanent and ongoing psychological damage which may require future psychological and medical treatment. Plaintiff and the Decedent's heirs, as Administrator and/or beneficiaries of the estate of the Decedent, bring the claim on behalf of the estate for damages under applicable statutory and/or common laws, and in their own right.

## DEMAND FOR JURY TRIAL

Plaintiff demands that all issues of fact of this case be tried to a properly impaneled jury to the extent permitted under the law.

## PRAYER FOR RELIEF

**WHEREFORE,** the Plaintiff demands judgment against the Defendants on each of the above-referenced claims and Causes of Action and as follows:

1. Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, including, but not limited to, all damages sustained as a result of the Decedent's severe bleeding events and the survival and wrongful death actions, and other non-economic damages in an amount to be determined at trial of this action;

2. Damages for loss of care, comfort and society and companionship in an amount within the jurisdiction of this Court;

3. Awarding economic damages in the form of medical expenses, out of pocket expenses, administrative expenses, and other economic damages, including, but not limited to, all damages sustained as a result of Decedent's severe bleeding events and funeral expenses, in an amount to be determined at trial of this action;

4. Exemplary/Punitive damages for the wanton, willful, fraudulent, reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and of the Plaintiff/Decedent in an amount sufficient to punish Defendants and deter future similar conduct;

5. Prejudgment interest;

6. Post judgment interest;

7. Awarding Plaintiff reasonable attorneys' fees;

8. Awarding Plaintiff the costs of these proceedings; and

9.  Such other and further relief as this Court deems just and proper.

Date: May 16, 2016.

Respectfully Submitted,

/s/ Mekel Alvarez
Morris Bart (LA Bar #02788)
Mekel Alvarez (LA Bar #22157)
Morris Bart, LLC
909 Poydras Street, 20th Floor
New Orleans, LA 70112
Telephone: 504-525-8000
Facsimile: 504-599-3392
morrisbart@morrisbart.com
malvarez@morrisbart.com

**COUNSEL FOR PLAINTIFF**