UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | MDL No. 2592 |
| Shun Huey Tsao | SECTION: L<br>JUDGE FALLON<br>MAG. JUDGE NORTH |
| Plaintiff, | |
| v. | |
| JANSSEN RESEARCH & DEVELOPMENT, LLC f/k/a JOHNSON AND JOHNSON PHARMACEUTICALS RESEARCH AND DEVELOPMENT, LLC; JANSSEN ORTHO, LLC; JOHNSON & JOHNSON COMPANY; JANSSEN PHARMACEUTICALS, INC., f/k/a JANSSEN PHARMACEUTICA, INC., f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC.; BAYER HEALTHCARE PHARMACEUTICALS INC.; BAYER PHARMA AG; BAYER CORPORATION; BAYER HEALTHCARE LLC; BAYER HEALTHCARE AG; and BAYER AG, | COMPLAINT AND JURY DEMAND<br>Civil Action No._____ |
| Defendants | |

Plaintiff, by and through the undersigned counsel, hereby submits this Complaint

against Defendants Janssen Research & Development LLC f/k/a Johnson and Johnson

Pharmaceuticals Research and Development LLC; Janssen Ortho LLC, Janssen

Pharmaceuticals, Inc.,  f/k/a Janssen Pharmaceutica Inc. f/k/a Ortho-McNeil-Janssen

Pharmaceuticals, Inc.; Bayer Healthcare  Pharmaceuticals, Inc.; Bayer Pharma AG, Bayer

Corporation, Bayer Healthcare LLC; Bayer Healthcare  AG; and Bayer AG for equitable

relief, monetary restitution, and compensatory and punitive damages  arising from the injuries

suffered by Plaintiff as a result of his exposure to the prescription medication Xarelto and further alleges as follows.

### PARTIES

1.      Plaintiff Shun Huey Tsao ("Plaintiff"), at all times relevant hereto, was a citizen and resident of the State of Texas.

2.      Upon information and belief, Defendant JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a JOHNSON AND JOHNSON RESEARCH AND DEVELOPMENT LLC (hereinafter referred to as "JANSSEN R&D") is a limited liability company organized under the laws of New Jersey, with a principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933. Defendant JANSSEN R&D's sole member is Janssen Pharmaceuticals, Inc., which is a Pennsylvania corporation with a principal place of business at 1125 Trenton-Harbourton Road, Titusville, New Jersey 08560. Accordingly, JANSSEN R&D is a citizen of Pennsylvania and New Jersey for purposes of determining diversity under 28 U.S.C. § 1332. Defendant JANSSEN R&D is the holder of the approved New Drug Application ("NDA") for Xarelto as well as the supplemental NDA.

3.      As part of its business, JANSSEN R&D is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

4.      Upon information and belief, Defendant JANSSEN R&D has transacted and conducted business in the State of Texas.

5.      Upon information and belief, Defendant JANSSEN R&D has derived substantial revenue from good and products used in the State of Texas.

2

6.      Upon information and belief, Defendant, JANSSEN R&D, expected or should have expected its acts to have consequence within the United States of America and the State of Texas, and derived substantial revenue from interstate commerce within the United States and the State of Texas, more particularly.

7.      Upon information and belief, and at all relevant times, Defendant, JANSSEN R&D, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non- valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

8.      Upon information and belief, Defendant JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA INC. f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. (hereinafter referred to as ("JANSSEN PHARM") is a Pennsylvania corporation, having a principal place of business at 1125 Trenton-Harbourton Road, Titusville, New Jersey 08560.

9.      As part of its business, JANSSEN PHARM is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

10.      Upon information and belief, Defendant, JANSSEN PHARM has transacted and conducted business in the State of Texas.

11.      Upon information and belief, Defendant, JANSSEN PHARM, has derived substantial revenue from goods and products used in the State of Texas.

3

12.     Upon information and belief, Defendant, JANSSEN PHARM, expected or should have expected its acts to have consequence within the United States of America and the State of Texas, and derived substantial revenue from interstate commerce within the United States and the State of Texas, more particularly.

13.     Upon information and belief, and at all relevant times, Defendant, JANSSEN PHARM, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non- valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

14.     Upon information and belief, Defendant JANSSEN ORTHO LLC (hereinafter referred to as "JANSSEN ORTHO") is a limited liability company organized under the laws of Delaware, having a principal place of business at Stateroad 933 Km 0 1, Street Statero, Gurabo, Puerto Rico 00778. Defendant JANSSEN ORTHO is a subsidiary of Johnson & Johnson. The only member of JANSSEN ORTHO LLC is OMJ PR Holdings, which is incorporated in Ireland with a principal place of business in Puerto Rico. Accordingly, JANSSEN ORTHO LLC is a citizen of Delaware, Ireland and Puerto Rico for purposes of determining diversity under 28 U.S.C. § 1332.

15.     As part of its business, JANSSEN ORTHO is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

16.     Upon information and belief, Defendant, JANSSEN ORTHO has transacted

and  conducted business in the State of Texas.

17.     Upon  information  and  belief,  Defendant,  JANSSEN  ORTHO,  has  derived substantial revenue from goods and products used in the State of Texas.

18.     Upon information and belief, Defendant, JANSSEN ORTHO,  expected  or should  have  expected  its  acts  to  have  consequence  within  the  United  States of America and  the  State of Texas,  and  derived  substantial  revenue  from  interstate  commerce within the  United States and the  State of Texas more particularly.

19.     Upon information and belief, and at all relevant times, Defendant, JANSSEN ORTHO,  was  in  the  business  of  and  did  design,  research,  manufacture,  test,  advertise, promote,  market,  sell,  and  distribute  the  drug  Xarelto  for  use  as  an  oral  anticoagulant, the  primary purposes of which are to reduce the risk of stroke and systemic embolism in patients  with  non- valvular  atrial  fibrillation,   to  treat  DVT  and  PE,  to  reduce  the  risk  of recurrence of DVT and/or PE, and for prophylaxis of DVT  for patients undergoing hip and knee replacement surgery.

20.     Upon   information   and   belief,  Defendant  BAYER   HEALTHCARE PHARMACEUTICALS,  INC. is, and  at all relevant times was,  a corporation organized under the  laws of the State of Delaware, with its principal place of business in the State of New Jersey.

21.     Defendant  BAYER  HEALTHCARE  PHARMACEUTICALS,  INC.  was formerly known  as Berlex Laboratories, Inc., which was formerly known  as Berlex, Inc. and  BAYER  HEALTHCARE PHARMACEUTICALS,  INC. is  the  same corporate entity as Berlex, Inc. and Berlex  Laboratories, Inc.

22.     As part  of its business, BAYER  HEALTHCARE PHARMACEUTICALS,

INC. is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

23.     Upon information and belief, Defendant, BAYER HEALTHCARE PHARMACEUTICALS, INC., has transacted and conducted business in the State of Texas.

24.     Upon information and belief, Defendant, BAYER HEALTHCARE PHARMACEUTICALS, INC., has derived substantial revenue from goods and products used in the State of Texas.

25.     Upon information and belief, Defendant, BAYER HEALTHCARE PHARMACEUTICALS, INC., expected or should have expected its acts   to   have consequence within the United States of America and  the  State of Texas,  and  derived substantial   revenue  from interstate commerce within the United States and the State of Texas, more particularly.

26.     Upon information and belief, and at all relevant times, Defendant, BAYER HEALTHCARE PHARMACEUTICALS, INC., was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

27.     Upon information and belief, Defendant BAYER PHARMA AG is a pharmaceutical company domiciled in Germany.

28.     Defendant BAYER PHARMA AG is formerly known as Bayer Schering Pharma AG and is the same corporate entity as Bayer Schering Pharma AG. Bayer

6

Schering Pharma AG is formerly known as Schering AG and is the same corporate entity as Schering AG.

29.     Upon information and belief, Schering AG was renamed Bayer Schering Pharma AG effective December 29, 2006.

30.     Upon information and belief, Bayer Schering Pharma AG was renamed BAYER PHARMA AG effective July 1, 2011.

31.     As part of its business, BAYER PHARMA AG is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

32.     Upon information and belief, Defendant, BAYER PHARMA AG, has transacted and conducted business in the State of Texas.

33.     Upon information and belief, Defendant, BAYER PHARMA AG, has derived substantial revenue from goods and products used in the State of Texas.

34.     Upon information and belief, Defendant, BAYER PHARMA AG, expected or should have expected its acts to have consequence within the United States of America and the State of Texas, and derived substantial revenue from interstate commerce within the United States and the State of Texas, more particularly.

35.     Upon information and belief, and at all relevant times, Defendant, BAYER PHARMA AG, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients

7

undergoing hip and knee replacement surgery.

36.     Upon information and belief, Defendant BAYER CORPORATION is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205.

37.     Upon information and belief, Defendant BAYER CORPORATION is the sole member of BAYER HEALTHCARE LLC, which owns 100% of Schering Berlin, Inc., which owns 100% of Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. As such, Defendant BAYER CORPORATION is a parent of Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC.

38.     At all relevant times, Defendant BAYER CORPORATION was engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, its products, including the prescription drug Xarelto.

39.     At relevant times, Defendant BAYER CORPORATION conducted regular and sustained business in the State of Texas, by selling and distributing its products in the State of Texas and engaged in substantial commerce and business activity in the State of Texas.

40.     Upon information and belief, Defendant BAYER HEALTHCARE LLC is a limited liability company duly formed and existing under and by the virtue of the laws of the State of Delaware, with its principal place of business located in the State of New Jersey. BAYER HEALTHCARE LLC's sole member is Bayer Corporation, and is wholly owned by Bayer Corporation, which is an Indiana corporation with its principal place of

business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205. Accordingly, BAYER HEALTHCARE LLC is a citizen of Delaware, New Jersey, Indiana and Pennsylvania for purposes of determining diversity under 28 U.S.C. § 1332.

41.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC has transacted and conducted business in the State of Texas, and derived substantial revenue from interstate commerce. Defendant BAYER CORPORATION is the sole member of Defendant BAYER HEALTHCARE LLC.

42.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC expected or should have expected that its acts would have consequences within the United States of America and in the State of Texas, and derived substantial revenue from interstate commerce.

43.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

44.     Upon information and belief, Defendant BAYER HEALTHCARE AG is a company domiciled in Germany and is the parent/holding company of Defendants BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC, and BAYER PHARMA AG.

45.     Upon information and belief, at all relevant times, Defendant BAYER

HEALTHCARE AG has transacted and conducted business in the State of Texas, and derived substantial revenue from interstate commerce.

46.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG expected or should have expected that its acts would have consequences within the United States of America, and in the State of Texas, and derived substantial revenue from interstate commerce.

47.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG exercises dominion and control over Defendants BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC., and BAYER PHARMA AG.

48.     Upon information and belief, Defendant BAYER AG is a German chemical and pharmaceutical company that is headquartered in Leverkusen, North Rhine-Westphalia, Germany.

49.     Upon information and belief, Defendant BAYER AG is the third largest pharmaceutical company in the world.

50.     Upon information and belief, and at all relevant times Defendant BAYER AG is the parent/holding company of all other named Defendants.

51.     Upon information and belief, at all relevant times, Defendant BAYER AG has transacted and conducted business in the State of Texas, and derived substantial revenue from interstate commerce.

52.     Upon information and belief, at all relevant times, Defendant BAYER AG expected or should have expected that its acts would have consequences within the United States of America, and in the State of Texas, and derived substantial revenue from

interstate commerce.

53.     Upon information and belief, at all relevant times, Defendant BAYER AG was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

54.     Defendants Janssen Research & Development LLC, Janssen Ortho LLC, Janssen Pharmaceuticals, Inc., Bayer Healthcare Pharmaceuticals, Inc., Bayer Pharma AG, Bayer Corporation, Bayer Healthcare LLC, Bayer Healthcare AG, and Bayer AG, shall be referred to herein individually by name or jointly as "Defendants."

55.     At all times alleged herein, Defendants include and included any and all parents, subsidiaries, affiliates, divisions, franchises, partners, joint venturers, and organizational units of any kind, their predecessors, successors and assigns and their officers, directors, employees, agents, representatives and any and all other persons acting on their behalf.

56.     At all times herein mentioned, each of the Defendants was the agent, servant, partner, predecessors in interest, aider and abettor, co-conspirator and joint venturer of each of the remaining Defendants herein and was at all times operating and acting with the purpose and scope of said agency, service, employment, partnership, conspiracy and joint venture.

57.     At all times relevant, Defendants were engaged in the business of

developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce throughout the United States, either directly or indirectly through third parties, subsidiaries or related entities, the drug Xarelto.

## JURISDICTION AND VENUE

58.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy as to the Plaintiff exceeds $75,000.00, exclusive of interest and costs, and because complete diversity exists between the Plaintiff and the Defendants.

59.     Plaintiff is filing this Complaint as permitted by Case Management Order #9 issued by Judge Eldon E. Fallon of this Court. Plaintiff states that but for that Order permitting direct filing into  the Eastern District of Louisiana, Plaintiff would have filed in the Southern District of Texas. Therefore, Plaintiff respectfully requests that at the time of transfer of this action  back  to  the  trial  court  for  further  proceedings  their  case  be transferred to the Southern District of Texas as set forth in Case Management Order #9.

60.     This Court has personal jurisdiction over Defendants consistent with the United States  Constitution and MDL No. 2592 as Plaintiff's claims arise out of Defendants' transaction of business and  the  commission  of  tortious  acts  within  the  State  of  Texas., and  by virtue of Defendants' substantial, continuous and systematic contacts with the State of Texas and  the  State  of  Louisiana unrelated to  Plaintiff's claims.

61.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction in accordance with 28 U.S.C. § 1391(c) and because Defendants' conduct substantial business in this District.

## FACTUAL BACKGROUND

62.     At all relevant times, Defendants were in the business of and did design, research, manufacture, test, advertise, promote, market, sell and distribute Xarelto and rivaroxaban to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

63.     Defendants received FDA approval for Xarelto, also known as rivaroxaban, on July 1, 2011 for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries (NDA 022406).

64.     Defendants then received additional FDA approval for Xarelto to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation on November 4, 2011 (NDA 202439).

65.     The additional indication for treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE was added to the label on November 2, 2012.

66.     Defendants launched Xarelto in the United States ("U.S.") in 2011.

67.     Xarelto is an anticoagulant that acts as a Factor Xa inhibitor, and is available by prescription in oral tablet doses of 20mg, 15mg, and 10mg.

68.     Approval of Xarelto for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries was based on a series of clinical trials known as the Regulation of Coagulation in Orthopedic Surgery to Prevent Deep Venous Thrombosis and Pulmonary Embolism studies (hereinafter referred to as the "RECORD" studies). The findings of the RECORD studies showed that rivaroxaban was

superior to enoxaparin for thromboprophylaxis after total knee and hip arthroplasty (based on the Defendants' definition), accompanied by similar rates of bleeding. However, the studies also showed a greater incidence with Xarelto of bleeding leading to decreased hemoglobin levels and transfusion of blood. (Lassen, M.R., et al. *Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Total Knee Arthroplasty*. N.Engl.J.Med. 2008;358:2776-86; Kakkar, A.K., et al. *Extended duration rivaroxaban versus short-term enoxaparin for the prevention of venous thromboembolism after total hip arthroplasty: a double-blind, randomised controlled trial*. Lancet 2008;372:31-39; Ericksson, B.I., et al. *Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Hip Arthroplasty*. N.Engl.J.Med. 2008;358:2765-75.)

69.     Approval of Xarelto for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation in the U.S. was based on a clinical trial known as the Rivaroxaban Once Daily Oral Direct Factor Xa Inhibition  Compared with Vitamin K Antagonism for Prevention of Stroke and Embolism Trial in Atrial Fibrillation study (hereinafter referred to as "ROCKET AF"). The study's findings showed that rivaroxaban was noninferior to warfarin for the prevention of stroke or systemic embolism in patients with non-valvular atrial fibrillation, with a similar risk of major bleeding. However, "bleeding from gastrointestinal sites, including upper, lower, and rectal sites, occurred more frequently in the rivaroxaban group, as did bleeding that led to a drop in the hemoglobin level or bleeding that required transfusion." (Patel, M.R., et al. *Rivaroxaban versus Warfarin in Nonvalvular Atrial Fibrillation*. N.Engl.J.Med. 2011;365:883-91.)

70.     Approval of Xarelto for the treatment of DVT and/or PE and the reduction in

recurrence of DVT and/or PE in the U.S. was based on the clinical trials known as the EINSTEIN-DVT, EINSTEIN-PE, and EINSTEIN-Extension studies. The EINSTEIN-DVT study tested Xarelto versus a placebo, and merely determined that Xarelto offered an option for treatment of DVT, with obvious increased risk of bleeding events as compared to placebo. (The EINSTEIN Investigators. *Oral Rivaroxaban for Symptomatic Venous Thromboembolism*. N.Engl.J.Med. 2010;363:2499-510). The EINSTEIN-Extension study confirmed that result. (Roumualdi, E., et al. *Oral rivaroxaban after symptomatic venous thromboembolism: the continued treatment study (EINSTEIN-Extension study)*. Expert Rev. Cardiovasc. Ther. 2011;9(7):841-844). The EINSTEIN-PE study's findings showed that a rivaroxaban regimen was non-inferior to the standard therapy for initial and long-term treatment of PE. However, the studies also demonstrated an increased risk of adverse events with Xarelto, including those that resulted in permanent discontinuation of Xarelto or prolonged hospitalization. (The EINSTEIN- PE Investigators. *Oral Rivaroxaban for the Treatment of Symptomatic Pulmonary Embolism*. N.Engl.J.Med. 2012;366:1287-97.)

71.     Defendants use the results of the ROCKET AF study, the RECORD studies, and the EINSTEIN studies to promote Xarelto in their promotional materials, including the Xarelto website, which tout the positive results of those studies. However, Defendants' promotional materials fail to similarly highlight the increased risk of gastrointestinal bleeding and bleeding that required transfusion, among other serious bleeding concerns.

72.     Defendants market Xarelto as a new oral anticoagulant treatment alternative to warfarin (Coumadin), a long-established safe treatment for preventing stroke and

systemic embolism, in 60 years. Defendants emphasize the supposed benefits of treatment with Xarelto over warfarin, which they refer to as the Xarelto Difference – namely, that Xarelto does not require periodic monitoring with blood tests and does not limit a patient's diet.

73.     However, in its QuarterWatch publication for the first quarter of the 2012 fiscal year, the Institute for Safe Medication Practices ("ISMP") noted that, even during the approval process, FDA "[r]eviewers also questioned the convenient once-a-day dosing scheme [of Xarelto], saying blood level studies had shown peaks and troughs that could be eliminated by twice-a-day dosing."

74.     Importantly, there is no antidote to Xarelto, unlike warfarin. Therefore, in the event of hemorrhagic complications, there is no available reversal agent. The original U.S. label approved when the drug was first marketed in the U.S. did not contain a warning regarding the lack of antidote, but instead only mentioned this important fact in the overdosage section.

75.     Defendants spent significant money in promoting Xarelto, which included at least $11,000,000.00 spent during 2013 alone on advertising in journals targeted at prescribers and consumers in the U.S. In the third quarter of the 2013 fiscal year, Xarelto was the number one pharmaceutical product advertised in professional health journals based on pages and dollars spent.

76.     As a result of Defendants' aggressive marketing efforts, in its first full year of being on the market, Xarelto garnered approximately $582 million in sales globally.

77.     Defendants' website for Xarelto claims that over seven million people worldwide have been prescribed Xarelto. In the U.S., approximately 1 million Xarelto

prescriptions had been written by the end of 2013.

78.     During the Defendants' 2012 fiscal year, Xarelto garnered approximately $658 million in sales worldwide. Then, in 2013, sales for Xarelto increased even further to more than clear the $1 billion threshold commonly referred to as "blockbuster" status in the pharmaceutical industry, ultimately reaching approximately $2 billion for the fiscal year. Thus, Xarelto is now considered the leading anticoagulant on a global scale in terms of sales.

79.     As part of their marketing of Xarelto, Defendants widely disseminated direct-to- consumer advertising campaigns that were designed to influence patients, including Plaintiff, to make inquiries to their prescribing physician about Xarelto and/or request prescriptions for Xarelto.

80.     In the course of these direct to consumer advertisements, Defendants overstated the efficacy of Xarelto with respect to preventing stroke and systemic embolism, failed to adequately disclose to patients that there is no drug, agent, or means to reverse the anticoagulation effects of Xarelto, and that such irreversibility could have permanently disabling, life-threatening and fatal consequences.

81.     On June 6, 2013, Defendants received an untitled letter from the FDA's Office of Prescription Drug Promotion (hereinafter referred to as the "OPDP") regarding its promotional material for the atrial fibrillation indication, stating that, "the print ad is false or misleading because it minimizes the risks associated with Xarelto and makes a misleading claim" regarding dose adjustments, which was in violation of FDA regulations. The OPDP thus requested that Defendants immediately cease distribution of such promotional material.

82.     Prior to Plaintiff's prescription of Xarelto, Plaintiff became aware of the promotional materials described herein.

83.     Prior to Plaintiff's prescription of Xarelto, Plaintiff's prescribing physician received promotional materials and information from sales representatives of Defendants that Xarelto was just as effective as warfarin in reducing strokes in patients with non-valvular atrial fibrillation, as well as preventing DVT/PE in patients with prior history of DVT/PE or undergoing hip or knee replacement surgery, and was more convenient, without also adequately informing prescribing physicians that there was no reversal agent that could stop or control bleeding in patients taking Xarelto.

84.     At all times relevant hereto, Defendants also failed to warn emergency room doctors, surgeons, and other critical care medical professionals that unlike generally-known measures taken to treat and stabilize bleeding in users of warfarin, there is no effective agent to reverse the anticoagulation effects of Xarelto, and therefore no effective means to treat and stabilize patients who experience uncontrolled bleeding while taking Xarelto.

85.     At all times relevant to this action, The Xarelto Medication Guide, prepared and distributed by Defendants and intended for U.S. patients to whom Xarelto has been prescribed, failed to warn and disclose to patients that there is no agent to reverse the anticoagulation effects of Xarelto and that if serious bleeding occurs, it may be irreversible, permanently disabling, and life-threatening.

86.     In the year leading up to June 30, 2012, there were 1,080 Xarelto-associated "Serious Adverse Event" ("SAE") Medwatch reports filed with the FDA, including at least 65 deaths. Of the reported hemorrhage events associated with Xarelto,

8% resulted in death, which was approximately twofold the risk of a hemorrhage-related death with warfarin.

87.     At the close of the 2012 fiscal year, a total of 2,081 new Xarelto-associated SAE reports were filed with the FDA in its first full year on the market, ranking tenth among other pharmaceuticals in direct reports to the FDA. Of those reported events, 151 resulted in death, as compared to only 56 deaths associated with warfarin.

88.     The ISMP referred to these SAE figures as constituting a "strong signal" regarding the safety of Xarelto, defined as "evidence of sufficient weight to justify an alert to the public and the scientific community, and to warrant further investigation."

89.     Of particular note, in the first quarter of 2013, the number of reported serious adverse events associated with Xarelto (680) overtook that of Pradaxa (528), another new oral anticoagulant, which had previously ranked as the number one reported drug in terms of adverse events in 2012.

90.     Moreover, on a global scale, in the first eight months of 2013, German regulators received 968 Xarelto-related averse event reports, including 72 deaths, as compared to a total of 750 reports and 58 deaths in 2012.

91.     Despite the clear signal generated by the SAE data, Defendants failed to either alert the public and the scientific community, or perform further investigation into the safety of Xarelto.

92.     Defendants original, and in some respects current labeling and prescribing information for Xarelto:

> (a)     failed to investigate, research, study and define, fully and adequately, the safety profile of Xarelto;

(b)   failed to provide adequate warnings about the true safety risks associated with the use of Xarelto;

(c)   failed to provide adequate warning regarding the pharmacokinetic and pharmacodynamic variability of Xarelto and its effects on the degree of anticoagulation in a patient;

(d)   failed to provide adequate warning that it is difficult or impossible to assess the degree and/or extent of anticoagulation in patients taking Xarelto;

(e)   failed to disclose in the "Warnings" Section that there is no drug, agent or means to reverse the anticoagulation effects of Xarelto;

(f)   failed to advise prescribing physicians, such as the Plaintiff's physician, to instruct patients that there was no agent to reverse the anticoagulant effects of Xarelto;

(g)   failed to provide adequate instructions on how to intervene and/or stabilize a patient who suffers a bleed while taking Xarelto;

(h)   failed to provide adequate warnings and information related to the increased risks of bleeding events associated with aging patient populations of Xarelto users;

(i)   failed to provide adequate warnings regarding the increased risk of gastrointestinal bleeds in those taking Xarelto, especially, in those patients with a prior history of gastrointestinal issues and/or upset;

(j)   failed to provide adequate warnings regarding the increased risk of suffering a bleeding event, requiring blood transfusions in those taking Xarelto;

(k)   failed to provide adequate warnings regarding the need to assess renal functioning prior to starting a patient on Xarelto and to continue testing and monitoring of renal functioning periodically while the patient is on Xarelto;

(l)   failed to provide adequate warnings regarding the need to assess hepatic functioning prior to starting a patient on Xarelto and to continue testing and monitoring of hepatic functioning periodically while the patient is on Xarelto;

(m)   failed to include a "**BOXED WARNING**" about serious bleeding events associated with Xarelto;

(n)   failed to include a "**BOLDED WARNING**" about serious bleeding events associated with Xarelto; and

(o)   in the "Medication Guide" intended for distribution to patients to whom Xarelto has been prescribed, Defendants failed to disclose to patients that there is no drug, agent or means to reverse the anticoagulation effects of Xarelto and that if serious bleeding occurs, such irreversibility could have permanently disabling, life-threatening or fatal consequences.

93.     During the years since first marketing Xarelto in the U.S., Defendants modified the U.S. labeling and prescribing information for Xarelto, which included additional information regarding the use of Xarelto in patients taking certain medications. Despite being aware of: (1) serious, and sometimes fatal, irreversible bleeding events associated with the use of Xarelto; and (2) 2,081 SAE Medwatch reports filed with the FDA in 2012 alone, including at least 151 deaths, Defendants nonetheless failed to provide adequate disclosures or warnings in their label as detailed in Paragraph 91 (a – o).

94.     Prior to applying for and obtaining approval of Xarelto, Defendants knew or should have known that consumption of Xarelto was associated with and/or would cause the induction of life-threatening bleeding, and Defendants possessed at least one clinical scientific study, which evidence Defendants knew or should have known was a signal that life-threatening bleeding risk needed further testing and studies prior to its introduction to the market.

95.     Upon information and belief, despite life-threatening bleeding findings in a clinical trial and other clinical evidence, Defendants failed to adequately conduct complete and proper testing of Xarelto prior to filing their New Drug Application for Xarelto.

96.     Upon information and belief, from the date Defendants received FDA

approval to market Xarelto, Defendants made, distributed, marketed, and sold Xarelto without adequate warning to Plaintiff's prescribing physicians or Plaintiff that Xarelto was associated with and/or could cause life- threatening bleeding, presented a risk of life-threatening bleeding in patients who used it, and that Defendants had not adequately conducted complete and proper testing and studies of Xarelto with regard to severe side effects, specifically life-threatening bleeding.

97.     Upon information and belief, Defendants concealed and failed to completely disclose its knowledge that Xarelto was associated with or could cause life-threatening bleeding as well as its knowledge that they had failed to fully test or study said risk.

98.     Upon information and belief, Defendants ignored the association between the use of Xarelto and the risk of developing life-threatening bleeding.

99.     Defendants' failure to disclose information that they possessed regarding the failure to adequately test and study Xarelto for life-threatening bleeding risk further rendered warnings for this medication inadequate.

100.    By reason of the foregoing acts and omissions, the Plaintiff was caused to suffer from life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, expenses for hospitalization and medical treatment, and loss of earnings.

101.    By reason of the forgoing acts and omissions, Plaintiff' has suffered damages and harm, including, but not limited to, emotional distress, medical expenses, other economic harm.

## CASE- SPECIFIC INFORMAITON

102.     Upon information and belief, on approximately 02/06/2014, Plaintiff's physician discussed prescribing Xarelto to Plaintiff, including the risks and benefits of Xarelto. Because Defendants did not disclose the true risks of internal bleeding and stroke associated with the use of Xarelto to Plaintiff's physician, nor did Defendants disclose the true risks of internal bleeding and stroke in the information given to Plaintiff, it was impossible for Plaintiff's physician to adequately discuss the true risks and benefits of Xarelto with Plaintiff. Consequently, it was impossible for Plaintiff to learn of the true risks associated with Xarelto.

103.     Plaintiff, after a consultation with his physician, began using Xarelto on or about 02/06/2014. The Xarelto used by Plaintiff remained in substantially the same condition between when it left Defendants' control. Plaintiff's physician would not have prescribed Xarelto to Plaintiff if he knew of the true risks associated with the use of Xarelto. In other words, Plaintiff's physician would not have prescribed Xarelto to Plaintiff if he knew the true risks associated with the use of Xarelto

104.     Plaintiff would not have elected to use Xarelto if he knew of the true risks associated with the use of Xarelto. In other words, Plaintiff would not have elected to use Xarelto if he knew the true risk of internal bleeding and stroke associated with the use of Xarelto.

105.     Upon information and belief, on approximately 02/07/2014, Plaintiff suffered gastrointestinal bleeding and was hospitalized. Plaintiff suffered gastrointestinal bleeding because Xarelto was negligently and defectively designed. Defendants knew that Xarelto was negligently and defectively designed when it left Defendants' control, and Defendants knew that it caused gastro- intestinal bleeding at a higher rate than other blood

23

thinners on the market. Defendants did not disclose these facts to Plaintiff's physician or Plaintiff.

106.     Through no fault of his own, and no fault of his health care providers, on approximately 02/07/2014, Plaintiff suffered gastrointestinal bleeding. The gastrointestinal bleeding caused  pain and suffering, financial loss and caused permanent injury to Plaintiff.

107.     As a direct and proximate result of the use of Defendants' Xarelto, Plaintiff suffered serious and dangerous side effects including but not limited to, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care.

108.     As a direct and proximate result of Defendants' conduct, Plaintiff has suffered  and incurred damages, including medical expenses and other economic and non-economic damages.

## CAUSES OF ACTION

### COUNT I
### STRICT PRODUCTS LIABILITY - MANUFACTURING DEFECT

109.     Plaintiff incorporates each paragraph of this Complaint as if set forth fully here, and further allege as follows.

110.     Xarelto was designed, manufactured, marketed, promoted, sold, and introduced into the stream of commerce by Defendants.

111.     When it left the control of Defendants, Xarelto was expected to, and did reach Plaintiff without substantial change from the condition in which it left Defendants' control.

112.     Xarelto was defective when it left Defendants' control and was placed in the

stream of commerce, in that there were foreseeable risks that exceeded the benefits of the product and/or that it deviated from product specifications and/or applicable federal requirements, and posed a risk of serious injury and death.

113.     Specifically, Xarelto was more likely to cause serious bleeding that may be irreversible, permanently disabling, and life-threatening than other similar medications.

114.     Plaintiff used Xarelto in substantially the same condition it was in when it left control of Defendants and any changes or modifications were foreseeable by Defendants.

115.     Plaintiff and his healthcare providers did not misuse or materially alter the Xarelto.

116.     As a direct and proximate result of the Plaintiff's use of Xarelto, Plaintiff suffered serious physical injury, harm, damages and economic loss, and will continue to suffer such harm, damages and economic loss in the future.

117.     Defendants are strictly liable to Plaintiff for designing, creating, manufacturing, distributing, selling, and placing Xarelto into the stream of commerce, and for all damages caused to Plaintiff by his use of Xarelto because the product was defective.

118.     Defendants' actions and omissions as alleged in this Complaint constitute a flagrant disregard for human life, so as to warrant the imposition of punitive damages.

WHEREFORE, Plaintiff respectfully requests an award of compensatory damages, in addition to all costs, interest and fees, including attorneys' fees, to which they are entitled under law and such other relief as this Honorable Court deems appropriate.

## COUNT II
## STRICT PRODUCTS LIABILITY - DESIGN DEFECT

119.     Plaintiff incorporates each paragraph of this Complaint as if set forth fully

here, and further alleges as follows.

120.     Xarelto was not merchantable and/or reasonably suited to the use intended, and its condition when sold was the proximate cause of the injuries sustained by Plaintiff.

121.     Defendants placed Xarelto into the stream of commerce with wanton and reckless disregard for the public safety.

122.     Xarelto was defective in design in that, when it left Defendants' control, the foreseeable risks of the product exceeded the benefits associated with its design, and it was more dangerous than an ordinary consumer or ordinary healthcare provider would expect.

123.     The foreseeable risks associated with Xarelto's design include the fact that its design is more dangerous than a reasonably prudent consumer or healthcare provider would expect when used in an intended or reasonably foreseeable manner.

124.     Xarelto was in an unsafe, defective, and inherently dangerous condition, which was unreasonably dangerous to its users and in particular, Plaintiff.

125.     Xarelto was in a defective condition and unsafe, and Defendants knew, had reason to know, or should have known that Xarelto was defective and unsafe, even when used as instructed.

126.     The nature and magnitude of the risk of harm associated with the design of Xarelto, including the risk of serious bleeding that may be irreversible, permanently disabling, and life- threatening is high in light of the intended and reasonably foreseeable use of Xarelto.

127.     The risks of harm associated with the design of Xarelto are higher than necessary.

128.     It is highly unlikely that Xarelto users would be aware of the risks associated

with Xarelto through either warnings, general knowledge or otherwise, and Plaintiff specifically was not aware of these risks.

129.    The design did not conform to any applicable public or private product standard that was in effect when Xarelto left the Defendants' control.

130.    Xarelto's design is more dangerous than a reasonably prudent consumer would expect when used in its intended or reasonably foreseeable manner as a blood thinner. It was more dangerous than Plaintiff expected.

131.    The intended or actual utility of Xarelto is not of such benefit or to justify the risk of bleeding that may be irreversible, permanently disabling, and life-threatening.

132.    At the time Xarelto left Defendants' control, it was both technically and economically feasible to have an alternative design that would not cause bleeding that may be irreversible, permanently disabling, and life-threatening or an alternative design that would have substantially reduced the risk of these injuries.

133.    It was both technically and economically feasible to provide a safer alternative product that would have prevented the harm suffered by Plaintiff.

134.    The unreasonably dangerous nature of Xarelto caused serious harm to Plaintiff.

135.    As a direct and proximate result of the Plaintiff's use of the Xarelto, which was designed, manufactured, marketed, promoted, sold, and introduced into the stream of commerce by Defendants, Plaintiff suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

WHEREFORE, Plaintiff respectfully requests an award of compensatory damages, in

addition to all costs, interest and fees, including attorneys' fees, to which they are entitled under law and such  other relief as this Honorable Court deems appropriate.

## COUNT III
## STRICT PRODUCTS LIABILITY - FAILURE TO WARN

136.     Plaintiff incorporates each paragraph of this Complaint as if set forth fully here, and further alleges as follows.

137.     Defendants had a duty to warn Plaintiff and his healthcare providers of the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening associated with Xarelto.

138.     Defendants knew, or in the exercise or reasonable care should have known, about the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening.

139.     Defendants failed to provide warnings or instructions that a manufacturer exercising reasonable care would have provided concerning the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening, in light of the likelihood that its product would cause these injuries.

140.     Defendants failed to update warnings based on information received from product surveillance after Xarelto was first approved by the FDA and marketed, sold, and used in the United States and throughout the world.

141.     A manufacturer exercising reasonable care would have updated its warnings on the basis of reports of injuries to individuals using Xarelto after FDA approval.

142.     When it left Defendants' control, Xarelto was defective and unreasonably dangerous for failing to warn of the risk of serious bleeding that may be irreversible,

permanently disabling, and life- threatening.

143.    Plaintiff used Xarelto for its approved purpose and in a manner normally intended and reasonably foreseeable by the Defendants.

144.    Plaintiff and Plaintiff's healthcare providers could not, by the exercise of reasonable care, have discovered the defects or perceived their danger because the risks were not open or obvious.

145.    Defendants, as the manufacturers and distributors of Xarelto, are held to the level of knowledge of an expert in the field.

146.    The warnings that were given by Defendants were not accurate or clear, and were false and ambiguous.

147.    The warnings that were given by the Defendants failed to properly warn physicians of the risks associated with Xarelto, subjecting Plaintiff to risks that exceeded the benefits to the Plaintiff. Plaintiff, individually and through his physician, reasonably relied upon the skill, superior knowledge and judgment of the Defendants.

148.    Defendants had a continuing duty to warn Plaintiff and his prescriber of the dangers associated with its product.

149.    Had Plaintiff or his healthcare providers received adequate warnings regarding the risks associated with the use of the Xarelto, he would not have used it.

150.    As a direct and proximate result of the Plaintiff's use of Xarelto and Plaintiff's reliance on Defendants' representations regarding the character and quality of the product and Defendants' failure to comply with federal requirements, Plaintiff suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

WHEREFORE, Plaintiff respectfully requests an award of compensatory damages, in addition to all costs, interest and fees, including attorneys' fees, to which they are entitled under law and such other relief as this Honorable Court deems appropriate.

## COUNT IV
## NEGLIGENCE

151.    Plaintiff incorporates each paragraph of this Complaint as if set forth fully here, and further alleges as follows.

152.    Defendants had a duty to exercise reasonable and ordinary care in the design, manufacture, sale, testing, quality assurance, quality control, labeling, marketing, promotions, and distribution of Xarelto into the stream of commerce, including a duty to assure that its product did not pose an undue risk of bodily harm and adverse events, and to properly warn of all risks, and comply with federal requirements.

153.    Defendants failed to exercise reasonable and ordinary care in the design, manufacture, sale, testing, quality assurance, quality control, labeling, marketing, promotions and distribution of Xarelto into the stream of commerce in that Defendants knew or should have known that the product caused significant bodily harm and was not safe for use by consumers. Specifically, Defendants failed to properly and thoroughly:

>    (a)    Manufacturing, producing, promoting, formulating, creating, and/or designing Xarelto without thoroughly testing it;

>    (b)    Manufacturing, producing, promoting, formulating, creating, and/or designing Xarelto without adequately testing it;

>    (c)    Not conducting sufficient testing programs to determine whether or not Xarelto was safe for use; in that Defendants herein knew or should have known that Xarelto was unsafe and unfit for use by reason of the dangers to its users;

>    (d)    Selling Xarelto without making proper and sufficient tests to determine the dangers to its users;

(e)     Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and healthcare profession, and the FDA of the dangers of Xarelto;

(f)     Failing to provide adequate instructions regarding safety precautions to be observed by users, handlers, and persons who would reasonably and foreseeably come into contact with, and more particularly, use, Xarelto;

(g)     Failing to test Xarelto and/or failing to adequately, sufficiently and properly test Xarelto.

(h)     Negligently advertising and recommending the use of Xarelto without sufficient knowledge as to its dangerous propensities;

(i)     Negligently representing that Xarelto was safe for use for  its intended purpose, when, in fact, it was unsafe;

(j)     Negligently representing that Xarelto had equivalent safety and efficacy as other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

(k)     Negligently designing Xarelto in a manner which was dangerous to its  users;

(l)     Negligently manufacturing Xarelto in a manner which was dangerous to it users;

(m)     Negligently producing Xarelto in a manner which was dangerous to its users;

(n)     Negligently assembling Xarelto in a manner which was dangerous  to its users;

(o)     Concealing information from the Plaintiff in knowing that Xarelto was unsafe, dangerous, and/or non-conforming with FDA regulations;

(p)     Improperly concealing and/or misrepresenting information from the Plaintiff, healthcare professionals, and/or the FDA, concerning the severity of risks and dangers of Xarelto compared to other forms of

treatment for reducing the risk of stroke and systemic embolism in patients with non- valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

154.     Despite the fact that Defendants knew or should have known that their product posed a serious risk of bodily harm to consumers, Defendants continued to manufacture and market Xarelto for use by consumers and continued to fail to comply with federal requirements.

155.     Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described above, including the failure to comply with federal requirements.

156.     It was foreseeable that Defendants' product, as designed, would cause serious injury to consumers, including Plaintiff.

157.     As a direct and proximate result of Defendants' negligence, Plaintiff suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

158.     Defendants' conduct as described above, including but not limited to their failure to adequately design, test, and manufacture, as well as its continued marketing and distribution of the Xarelto when they knew or should have known of the serious health risks it created and the failure to comply with federal requirements, evidences a flagrant disregard of human life so as to warrant the imposition of punitive damages.

159.     Defendants' actions and omissions as alleged in this Complaint demonstrate a flagrant disregard for human life, and willful and wonton conduct, which warrants the imposition of punitive damages.

WHEREFORE, Plaintiff respectfully requests an award of compensatory damages, in

addition to all costs, interest and fees, including attorneys' fees, to which they are entitled under law and such other relief as this Honorable Court deems appropriate.

## COUNT V
## BREACH OF EXPRESS WARRANTY

160.    Plaintiff incorporates each paragraph of this Complaint as if set forth fully here, and further alleges as follows.

161.    Defendants expressly warranted that Xarelto was a safe and effective product to be used as a blood thinner, and did not disclose the material risks that Xarelto could cause serious bleeding that may be irreversible, permanently disabling, and life-threatening. The representations were not justified by the performance of Xarelto.

162.    Members of the consuming public, including consumers such as Plaintiff, and his healthcare providers, were intended third party beneficiaries of the warranty.

163.    Plaintiff and his healthcare providers reasonably relied on these express representations.

164.    The Xarelto manufactured and sold by Defendants did not conform to these express representations because it caused serious injury to the Plaintiff when used as recommended and directed, and these risks were not disclosed to Plaintiff or his healthcare providers.

165.    As a direct and proximate result of Defendants' breach of warranty, Plaintiff suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

WHEREFORE, Plaintiff respectfully requests an award of compensatory damages, in addition to all costs, interest and fees, including attorneys' fees, to which they are entitled under law and such other relief as this Honorable Court deems appropriate.

## COUNT VI
## <u>BREACH OF IMPLIED WARRANTY</u>

166.    Plaintiff incorporates each paragraph of this Complaint as if set forth fully here, and further alleges as follows.

167.    When Defendants designed, manufactured, marketed, sold, and distributed their Xarelto for use by the Plaintiff, Defendants knew of the use for which it was intended and impliedly warranted the product to be of merchantable quality and safe for such use and that its design, manufacture, labeling, and marketing complied with all applicable federal requirements.

168.    Plaintiff and his physicians reasonably relied upon the Defendants' representations of the product's merchantable quality and that it was safe for its intended use, and upon Defendants' implied warranty, including that it was in compliance with all federal requirements.

169.    Contrary to such implied warranty, Xarelto was not of merchantable quality or safe for its intended use, because the product was defective, as described herein, and it failed to comply with federal requirements.

170.    As a direct and proximate result of Defendants' breach of warranty, the Plaintiff suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

WHEREFORE, Plaintiff respectfully requests an award of compensatory damages, in addition to all costs, interest and fees, including attorneys' fees, to which they are entitled under law and such other relief as this Honorable Court deems appropriate.

## COUNT VII
## <u>FRAUD</u>

34

171.     Plaintiff incorporates by reference here each of the allegations set forth in this Complaint as though set forth fully herein.

172.     Defendants, from the time they first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed Xarelto, and up to the present, willfully deceived Plaintiff by concealing from him, his physicians and the general public, the true facts concerning Xarelto, which the Defendants had a duty to disclose.

173.     At all times herein mentioned, Defendants conducted a sales and marketing campaign to promote the sale of Xarelto and willfully deceived Plaintiff, Plaintiff's physicians and the general public as to the benefits, health risks and consequences of using Xarelto. Defendants knew of the foregoing, that Xarelto is not safe, fit and effective for human consumption, that using Xarelto is hazardous to health, and that Xarelto has a serious propensity to cause serious injuries to its users, including but not limited to the injuries Plaintiff suffered.

174.     Defendants concealed and suppressed the true facts concerning Xarelto with the intent to defraud Plaintiff, in that Defendants knew that Plaintiff physicians would not prescribe Xarelto, and Plaintiff would not have used Xarelto, if they were aware of the true facts concerning its dangers.

175.     As a result of Defendants' fraudulent and deceitful conduct, Plaintiff suffered injuries and damages as alleged herein.

WHEREFORE, Plaintiff respectfully requests an award of compensatory damages, in addition to all costs, interest and fees, including attorneys' fees, to which they are entitled under law and such  other relief as this Honorable Court deems appropriate.

## COUNT VIII
## <u>NEGLIGENT MISREPRESENTATION</u>

176.     Plaintiff incorporates by reference herein each of the allegations set forth in this Complaint as though fully set forth herein.

177.     From the time Xarelto was first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed, and up to the present, Defendants made misrepresentations to Plaintiff, Plaintiff's physicians and the general public, including but not limited to the misrepresentation that Xarelto was safe, fit and effective for human use. At all times mentioned, Defendants conducted sales and marketing campaigns to promote the sale of Xarelto and willfully deceived Plaintiff, Plaintiff's physicians and the general public as to the health risks and consequences of the use of Xarelto.

178.     The Defendants made the foregoing representation without any reasonable ground for believing them to be true. These representations were made directly by Defendants, by sales representatives and other authorized agents of Defendants, and in publications and other written materials directed to physicians, medical patients and the public, with the intention of inducing reliance and the prescription, purchase and use of the subject product.

179.     The representations by the Defendants were in fact false, in that Xarelto is not safe, fit and effective for human consumption, using Xarelto is hazardous to health, and Xarelto has a serious propensity to cause serious injuries to users, including but not limited to the injuries suffered by Plaintiff.

180.     The foregoing representations by Defendants, and each of them, were made with the intention of inducing reliance and the prescription, purchase and use of Xarelto.

181.     In reliance of the misrepresentations by the Defendants, and each of them,

Plaintiff was induced to purchase and use Xarelto. If Plaintiff had known of the true facts and the facts concealed by the Defendants, Plaintiff would not have used Xarelto. The reliance of Plaintiff upon Defendants' misrepresentations was justified because such misrepresentations were made and conducted by individuals and entities that were in a position to know the true facts.

182.     As a result of the foregoing negligent misrepresentations by Defendants, Plaintiff suffered injuries and damages as alleged herein.

WHEREFORE, Plaintiff respectfully requests an award of compensatory damages, in addition to all costs, interest and fees, including attorneys' fees, to which they are entitled under law and such other relief as this Honorable Court deems appropriate.

## COUNT IX
## VIOLATION OF CONSUMER PROTECTION LAWS

183.     Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

184.     Plaintiff purchased and used Xarelto® for personal use and thereby suffered ascertainable losses as a result of Defendants' actions in violation of the consumer protection laws.

185.     Unfair methods of competition or deceptive acts or practices that were proscribed by law, including the following:

(a)     Representing that goods or services have characteristics, ingredients, uses, benefits or quantities that they do not have;

(b)     Advertising goods or services with the intent not to sell them as advertised; and

(c)     Engaging in fraudulent or deceptive conduct that creates a likelihood

of confusion or misunderstanding.

186.    Defendants violated consumer protection laws through their use of false and misleading misrepresentations or omissions of material facts relating to the safety of Xarelto®.

187.    Defendants uniformly communicated the purported benefits of Xarelto® while failing to disclose the serious and dangerous side-effects related to the use of Xarelto® and of the true state of Xarelto®'s regulatory status, its safety, its efficacy, and its usefulness. Defendants made these representations to physicians, the medical community at large, and to patients and consumers such as Plaintiff in the marketing and advertising campaign described herein.  Plaintiff and his physician justifiably relied on these representations to Plaintiff's detriment.

188.    Defendants' conduct in connection with Xarelto® was also impermissible and illegal in that it created a likelihood of confusion and misunderstanding, because Defendants misleadingly, falsely and/or deceptively misrepresented and omitted numerous material facts regarding, among other things, the utility, benefits, costs, safety, efficacy and advantages of Xarelto®.

189.    As a result of these violations of consumer protection laws, Plaintiff incurred and will incur serious physical injury, pain, suffering, and medical, hospital and surgical expenses and other expense related to the diagnosis and treatment thereof, for which Defendants are liable.

WHEREFORE, Plaintiff respectfully requests an award of compensatory damages, in addition to all costs, interest and fees, including attorneys' fees, to which they are entitled under law and such  other relief as this Honorable Court deems appropriate.

## PUNITIVE DAMAGES ALLEGATIONS

190.     Plaintiff incorporates by reference each of the allegations set forth in this Complaint as though fully set forth herein.

191.     The acts, conduct, and omissions of Defendants, as alleged throughout this Complaint were willful and malicious. Defendants committed these acts with a conscious disregard for the rights of Plaintiff and other Xarelto users and for the primary purpose of increasing Defendants' profits from the sale and distribution of Xarelto. Defendants' outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against Defendants in an amount appropriate to punish and make an example of Defendants.

192.     Prior to the manufacturing, sale, and distribution of Xarelto, Defendants knew that Xarelto was in a defective condition as previously described herein and knew that those who were  prescribed the medication would experience and did experience severe physical, mental, and emotional injuries. Further, Defendants, through their officers, directors, managers, and agents, knew that the medication presented a substantial and unreasonable risk of harm to the public, including Plaintiff and as such, Defendants unreasonably subjected consumers of said drugs to risk of injury or death from using Xarelto.

193.     Despite its knowledge, Defendants, acting through its officers, directors and managing agents for the purpose of enhancing Defendants' profits, knowingly and deliberately failed to remedy the known defects in Xarelto and failed to warn the public, including Plaintiff, of the extreme risk of injury occasioned by said defects inherent in Xarelto. Defendants and their agents, officers, and directors intentionally proceeded with the

manufacturing, sale, and distribution and marketing of Xarelto knowing these actions would expose persons to serious danger in order to advance Defendants' pecuniary interest and monetary profits.

194.     Defendants' conduct was despicable and so contemptible that it would be looked down upon and despised by ordinary decent people, and was carried on by Defendants with willful and conscious disregard for the safety of Plaintiff, entitling Plaintiff to exemplary damages.

WHEREFORE, Plaintiff respectfully requests an award of punitive damages, in addition to all costs, interest and fees, including attorneys' fees, to which Plaintiff is entitled under law and such other relief as this Honorable Court deems appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment for damages against Defendants for all damages allowable by law against Defendants together with interest, costs, and attorney's fees, including but not limited to those damages provided pursuant to applicable law, set forth below, and requests a trial by jury of all issues so triable, to wit:

1. For judgment for damages sufficient to compensate for damages, including but not limited to past, present, and future economic expenditures in connection with the injuries sustained by Plaintiff as a result of ingesting Defendants' Xarelto®;

2. Medical expenses due to the Plaintiff's injury, past and future;

3. Conscious physical pain and suffering, past and future;

4. Mental anguish, past and future;

5. Physical impairment, past and future;

6. Pre and post-judgment interest at the lawful rate;

7.   Punitive damages; and

Such other applicable damages as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

The Plaintiff hereby demands a trial by jury on all counts and as to all issues.

Respectfully submitted this 25th day of May 2016

By:_____
Ken Soh
Kirklin Soh L.L.P.
12600 N Featherwood Dr, Suite 225
Houston, TX 77034
Telephone: (281) 922-6202
Facsimile: (281) 922-6240
ksoh@kirklinsoh.com
*Attorneys for Plaintiff*