```
                   UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF LOUISIANA


IN RE: XARELTO (RIVOROXABAN)       *    MDL 2592  "L"
PRODUCTS LIABILITY LITIGATION      *
                                   *
                                   *    May 24, 2016
                                   *
                                   *
THIS DOCUMENT RELATES TO           *    Judge Eldon E. Fallon
CASE NO. 16-1066                   *
                                   *
                                   *    Mag. Judge Michael North
*******************************************************************
```

**REPORTER'S OFFICIAL TRANSCRIPT OF THE MOTION TO REMAND
BEFORE THE HONORABLE ELDON E. FALLON,
UNITED STATES JUDGE.**

*******************************************************************


**APPEARANCES:**

```
FOR THE PLAINTIFF:            LAW OFFICE OF BEN C. MARTIN
                              BY: BEN C. MARTIN
                              3219 MCKINNEY AVE, STE 100
                              DALLAS,TEXAS   75204



FOR THE DEFENDANTS:           KAY SCHOLER
                              BY: ANDREW SOLOW
                              250 W. 55TH ST.
                              NEW YORK, NY 10019




REPORTED BY:      Mary V. Thompson, RMR, FCRR
                  500 Poydras Street
                  Room B-275
                  New Orleans, LA   70130
                  (504) 589-7783
                  mary_v_thompson@laed.uscourts.gov
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING COMPUTER-AIDED TRANSCRIPTION SOFTWARE**

**P R O C E E D I N G S**

(Call to order of the court.)

THE COURT: Be seated, please.

Call the motion.

THE CASE MANAGER: Record Document No. 3035, Plaintiffs Robert Murphy, Scott Murphy, Christine Murphy, and Brian Murphy to remand case to the 68th Judicial District Court of Dallas County, Texas.

THE COURT: Counsel, make your appearances for the record. Would you come forward.

MR. SOLOW: While plaintiffs' counsel is making his way up here, Your Honor, Andrew Solow. I'll be arguing on behalf of the Bayer and Janssen defendants.

THE COURT: Okay.

MR. SOLOW: Thank you.

THE COURT: Your appearance for the record.

MR. MARTIN: Yes, Your Honor. My name is Ben Martin.

THE COURT: Okay.

MR. MARTIN: And I represent the plaintiff in this case.

THE COURT: Just by way of background, this is a remand motion filed in connection with the Xarelto case.

It appears that this results from a procedure received by Kathleen Murphy. She was placed in the hospital to have an implant of an intracranial and intradural shunt sometime in

**OFFICIAL TRANSCRIPT**

1  September of 2013.  She was then brought, following that
2  operation, to the Reliant Rehabilitation Hospital to rehabilitate
3  herself.  While there, her doctor, a Dr. Jerome Kane, prescribed
4  Xarelto according to standard orders.  She took her first dose of
5  Xarelto in September and continued receiving the medication until
6  she was discharged sometime in October of 2013.
7         Shortly after returning home, Ms. Murphy's condition
8  rapidly deteriorated and she was rushed to the hospital.  A CT
9  scan revealed that she had suffered a large acute
10 intraventricular hemorrhage with additional hemorrhages outside
11 of the area.  She passed away approximately two weeks later.
12        The Murphy plaintiffs, on her behalf and her relatives,
13 filed suit against Bayer and Janssen on a number of products
14 liability theories as well as strict liability, products
15 liability.
16        The plaintiffs also sued Dr. Kane, the treater, and
17 Reliant, the hospital.  The negligence there is negligent
18 prescribing of Xarelto but also prescribing any blood thinner in
19 a situation like this.  They claim that both sets of defendants
20 were negligent.
21        The case was filed in state court in Texas.  It was
22 removed to the federal court in Texas and then transferred to
23 this court.  The plaintiffs seek a remand at this time -- a
24 return, actually, to the Texas court so that they can be
25 remanded.  Bayer and Janssen resist the motion.

1  I'll hear from the parties at this time.  From the
2  plaintiff's standpoint.
3  MR. MARTIN:  Thank you, Your Honor.  The Court has
4  given, I believe, a correct and good recitation of the background
5  and the facts of this case, enough such that they will be enough
6  in order for the Court to look at this.
7  A little bit of further background.
8  This -- with respect to the decedent, she was given an
9  anticoagulant medication, an anticoagulant medication that
10 happened to be Xarelto, and that happened to be an anticoagulant
11 medication that did not have any reversal agent.
12 We have -- we have filed, within the responsibilities
13 that we have in Texas, and which this Court has as we filed it
14 here, an expert report under what is our Chapter 74 of the
15 medical malpractice law.  And Chapter 74 says that within
16 120 days one must file an expert report that outlines the breach
17 of the standard of care and causation.
18 And I will say this, Your Honor, that in Texas, our
19 Supreme Court is very strict, as are our courts of appeals --
20 very strict with respect to what is a responsible and good
21 Chapter 74 letter.  It's not -- it's not a two-sentence
22 certificate of merit.
23 And I have to point out to the Court -- at this point
24 in time we'll point out Exhibit B, I believe, in our briefing.
25 Exhibit B -- and I may have the exhibit incorrect.  I'm sorry,

**OFFICIAL TRANSCRIPT**

1  Your Honor.  It is actually Exhibit E.
2           Exhibit E is an 11-page report from a neurologist who
3  speaks very specifically as to the breach of the standard of care
4  and to the causation in this case as to the doctor and as to the
5  hospital.  And it is necessary in order to bring one of these
6  cases against the doctor and the hospital that we do have such a
7  report.
8           And I believe that it would be an incorrect statement
9  to say that, number one, we have not specifically pled specific
10 allegations against the healthcare providers in this case,
11 separate and distinct claims as to what occurred, separate and
12 distinct claims against them that the doctor failed to give a
13 proper treatment plan, that the doctor failed to follow the
14 standard of care in -- with respect to giving this medication
15 that had no antidote or reversal agent.
16          And any suggestion that all we have done in this case
17 is allege that the physician has -- was -- that we have alleged
18 against the product manufacturer that they failed to warn the
19 physician and that they indeed -- and that he indeed didn't heed
20 that warning, that that would be the only claim that we've made,
21 is absolutely incorrect.
22          I have looked at the law on this subject matter, and I
23 don't want to give -- spend time giving the Court a bunch of
24 boilerplate, but I think the Court is well aware that the
25 necessity for a fraudulent misjoinder case -- or a fraudulent

1  joinder, I'll start with that, is that there is no possibility of
2  recovery against these doctors or hospitals.
3           THE COURT:  How do you feel about the suggestion that
4  the case be severed but you stay here as a Xarelto
5  claimant against the defendants and you're back in state court
6  against the doctor?  How do you feel about that?
7           MR. MARTIN:  Your Honor, there are cases that support
8  strongly that that would not be a fair way to handle it, and I
9  believe that it would not be legally correct to handle it that
10 way.
11          In my most recent reply brief I've pointed out very
12 specifically as to why in a Texas case, where we have responsible
13 third-party law, how that would dovetail right into the cases
14 that discuss how we would have an empty chair in both cases.
15          If we -- if the Court severed this case and sent the
16 med malpractice case back for trial ultimately in Dallas, Dallas
17 state court, this -- we would be trying a case against the doctor
18 and -- the physician and the hospital with absolutely 100 percent
19 certainty it would be that the doctor would be blaming the
20 manufacturer, the empty chair.
21          THE COURT:  I see.  So you'd have an empty chair
22 problem.  Okay.  I got it.
23          MR. MARTIN:  Similarly --
24          THE COURT:  I got it.
25          MR. MARTIN:  So misjoinder -- and, again, the *Tascott*

```
 1  case references misjoinder, and misjoinder would be a claim akin
 2  to the fact that the claims against the doctor were a sham.  And
 3  I would suggest to the Court that in absolutely no way in this
 4  particular case is this in any way a sham.
 5            And those will be our arguments, Your Honor.
 6            THE COURT:  Let me hear from your opponent and then
 7  I'll give you an opportunity to rebut in case you need to.
 8            MR. MARTIN:  Thank you.
 9            THE COURT:  Is there any question here about diversity?
10  I mean, he doesn't have diversity against the doctor and Reliant,
11  does he?
12            MR. SOLOW:  No.  That's correct, Your Honor.
13            THE COURT:  All right.
14            The only argument that I glean from your brief that at
15  least has some potential legs, other than what he says with the
16  empty chair, is the severance part, because there's no
17  question -- I mean, he has a viable claim against this doctor, it
18  seems to me, looking at that report.  I'm not saying he has a
19  home run, but at least he's got -- certainly he's not going to
20  get dismissed in Texas.  It looks to me like he's followed that
21  report.
22            Do you have, in Texas, any administrative hearing that
23  you have to go through before like in Louisiana?
24            MR. MARTIN:  No, Your Honor.  And, quickly, all we have
25  is the -- not all we have, but we have the Chapter 74.  That is
```

```
09:56:27




09:56:43




09:57:03




09:57:19




09:57:33
```

1  our entryway into the courthouse.
2         THE COURT: Yeah, I got it. Okay.
3         MR. SOLOW: Your Honor, briefly, if I can answer your
4  question and just address our argument, there's three basic
5  records for the removal and for the case to remain here and to
6  oppose the remand.
7         One is the fraudulent joinder. I would just note that
8  I think the standard in the Fifth Circuit was slightly misstated
9  in the *Kling versus Chevron* case. It's a reasonable possibility
10 of recovery, and I think it's set forth in our papers.
11        But with all due respect to the expert report, I'm not
12 really sure that these claims -- there is a real possibility the
13 way it's pled. It is just a lot of repeating of the standard of
14 care, the only issue being that Xarelto didn't have a reversal
15 agent whereas laid forth right in the complaint -- and I can just
16 read, Your Honor, quickly a paragraph. And these are repeated
17 throughout.
18        Kathleen Murphy -- I'm at Paragraph 8.12.
19        At the time the product defendants concealed the fact
20 that Xarelto was not safe, the product defendants were under a
21 duty to communicate this information to plaintiffs, physicians,
22 the FDA, the health care community, and the general public in
23 such a manner that they could appreciate the risks associated
24 with Xarelto.
25        The complaint continues at 8.13.

**OFFICIAL TRANSCRIPT**

09:57:48  1  Kathleen Murphy and her prescribing physicians relied
2  upon the product defendants' outrageous untruths regarding the
3  safety of Xarelto.  Kathleen Murphy's prescribing physicians were
4  not provided with the necessary information by the product
5  defendants to provide an adequate warning to the plaintiffs.
6  So right then and there -- and it continues that the
7  direct and proximate cause is the manufacturer and the Bayer/
8  Janssen defendants' duties here.
9  So, Your Honor, I think under the *Kling versus Chevron*
09:58:05 10  standard in the Fifth Circuit, I'm not really sure we actually
11  have a reasonable possibility of success simply by pointing out
12  that there is no reversal agent.
13  Which leads me to Your Honor's question about
14  severance.
09:58:16 15  Your Honor, we have certainly provided you with case
16  law.  There's broad discretion in the Fifth Circuit.  And in
17  these type of cases in particular, the empty chair argument has
18  been raised and has been addressed.  We've looked at that and
19  cited to Your Honor the pelvic mesh cases, the *Yaz v Yasmin*
09:58:36 20  cases.  Certainly there's prejudice to the defendants of having
21  to proceed on two fronts when clearly the issue of whether there
22  is a reversal agent, and what that ultimately means, is front and
23  center here in this MDL as one of the PSC's lines of argument
24  attacking the product.
09:58:54 25  THE COURT:  The thing that I'm really struggling with

1  is that it seems to me that, aside from the empty chair, you're
2  going to be trying it twice whether it's severed or not severed.
3          I mean, even if it's severed, it seems to me that even
4  though Xarelto is not going to be a part of the case, you're
5  going to have to try it and Xarelto's people are obviously going
6  to be there.  And then when you come here, you're going to have
7  to be here.
8          MR. SOLOW:  Your Honor, if I can then go to my third
9  point which was not addressed in the reply brief or in oral
10 argument.  It's our point on a deferral on the ruling.
11         Your Honor again has broad discretion.  Judge Kaplan in
12 the Zyprexa litigation in his concurring opinion set forth, as a
13 former MDL judge himself, certainly there is a discretion here.
14         And Your Honor, I will point out, we heard from
15 BrownGreer that with the unbundling deadline coming in, we've now
16 exceeded over 10,000 claims here.  Certainly these issues are
17 front and center on what is being gone through some generic
18 discovery against these companies on the antidote issue as well
19 as the specific allegations of the defendants withholding
20 information and not sharing it with the medical community.
21         So Your Honor has also put forth, after much effort, a
22 bellwether plan, and we have 40 bellwether plaintiffs that are
23 being worked through and getting ready.  I think, Your Honor,
24 respectfully, with that deference, there are more important
25 issues right now in moving this case forward and getting that

1  generic discovery than to start remanding cases.
2         You have, candidly, Your Honor, more than one plaintiff
3  out there who may be a little upset by the fact that they're not
4  in the 40 bellwethers, and allowing a remand motion and then to
5  start hearing those now would create an incentive to flee the
6  MDL.
7         In our view, Your Honor, if you're not going to
8  sever -- and then we could always bring those cases back
9  together.  We had that issue in the Bair Hugger litigation -- at
10 least deferring the ruling until the end of generic discovery, we
11 think, Your Honor, would be the more prudent, advisable way to
12 go.
13        THE COURT:  Yeah.  One thing -- and I know the
14 plaintiffs can take the position that justice delayed is a
15 justice denied kind of thing, and that's a legitimate argument.
16 That to some extent, though, has to be weighed by the advantage
17 that the plaintiff would get with seeing a bellwether tried
18 before you try your particular case.  That's not a -- that's not
19 a small thing, and it's consistent with what he says.
20        I understand the issue.  I mean, I've got it.  I know
21 how you feel on it.
22        What about the delay?  How do you feel about that?
23        MR. SOLOW:  Your Honor, if I could just address that
24 before counsel does.
25        THE COURT:  Yeah.

**OFFICIAL TRANSCRIPT**

```
                                                                    
 1              MR. SOLOW:  I would simply say, Your Honor, the proof
 2   is in the pudding.  If there's really a desire to move forward
 3   with the malpractice action, Your Honor could certainly sever the
 4   case now.  They could proceed with the malpractice claim whether
 5   we ultimately rejoin them together.  But the idea of prejudicing
 6   our clients to now have to proceed in Texas where there is no
 7   coordinated state court proceeding and not have the benefit of
 8   the MDL discovery certainly weighs in on that --
 9              THE COURT:  Yeah, I've got that.
10              MR. SOLOW:  -- but I'll let you ask questions of
11   counsel now.  Thank you, Your Honor.
12              THE COURT:  Yeah.
13              MR. MARTIN:  And then the manufacturers would
14   immediately be blamed in the trial of -- in -- the trial in the
15   court in Dallas against the doctor.  That's what would happen.
16              Your Honor, I believe that creating what appears to be
17   sort of a new -- to be a new precedent of if -- if this Court
18   were to create this rule that if -- we have an MDL.  If there is
19   an MDL, that that would essentially make a new rule that if
20   you've got an MDL, that we don't really need to follow the
21   fraudulent joinder law, that we don't really need to follow the
22   law on fraudulent misjoinder, neither of which are anywhere close
23   here, but that a new precedent would be added here that if -- and
24   cited constantly, that if you have a case that happens to have a
25   defendant in an MDL, you are cooked, whether it's a true
```

Timestamps: 10:02:23, 10:02:40, 10:02:52, 10:03:22, 10:03:49

1  malpractice case, a case against an insurance agent and an
2  insurance company, whether it has anything to do with that MDL.
3  That this -- that this litigant is going to be subjected, not to
4  1331 or the removal statutes and the cases that say just that,
5  but that in this case it's an impossibility for any argument to
6  be made on fraudulent joinder and fraudulent misjoinder.
7      I think that's a bad precedent, and I think that -- I
8  wonder whether or not truly that is a possibility legally.  But
9  it certainly is -- would be the first time that I know of that
10 any court in the Fifth Circuit would have established such a
11 ruling, and I don't think that that ought -- we ought to go into
12 that modality.
13     THE COURT:  Where are you with discovery in your case?
14     MR. MARTIN:  I am -- well, that expert report that you
15 have seen, Your Honor, that's the extent of discovery that has
16 been initiated.  If we are able to get this case back real fast,
17 then we'll -- we'll start the discovery process at that time and
18 can move along pretty quickly.
19     THE COURT:  What about trial dates?  What are you
20 looking at there?
21     MR. MARTIN:  I would ask the trial court to give us a
22 trial date within -- and I think we can get tried within one
23 year.  And the family of Ms. Murphy would have the ability to
24 have their already delayed -- with all due respect, not from this
25 Court's suggestion but already delayed, that -- I hope we can get

**OFFICIAL TRANSCRIPT**

1  that case, for the family, tried within a year, and I believe we
2  can.
3             THE COURT:  Okay.  Anything else anybody?
4             (No response.)
5             THE COURT:  I got the issue.  I understand it.  Let me
6  look at it again with your comments and all.  I appreciate you
7  coming over.
8             MR. MARTIN:  Thank you.
9             THE COURT:  All right.  Thank you.  Court will stand in
10 recess.
11                                      (Proceedings adjourned.)
12
13                        * * * *
14                      **CERTIFICATE**
15
16      I hereby certify this 31st day of May, 2016, that the
17 foregoing is, to the best of my ability and understanding, a true
18 and correct transcript of the proceedings in the above-entitled
19 matter.
20
21                                     */s/ Mary V. Thompson*
22                                    Official Court Reporter
23
24
25

**OFFICIAL TRANSCRIPT**