## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | **MDL No. 2592** |
| | **SECTION: L** |
| This Document Relates To: All Cases | **JUDGE FALLON** |
| | **MAG. JUDGE NORTH** |

### PSC'S RESPONSE TO DEFENDANT JANSSEN'S MOTION TO ENFORCE PRETRIAL ORDER NO. 12 AND FOR ENTRY OF A PROTECTIVE ORDER

PTO 12 does not confer a license to Janssen to mark all internal documents as "Protected" or "Highly Protected". In fact, PTO 12 expressly provides just the opposite: "This Protective Order ***does not confer blanket protections on all documents***, disclosures, or responses to discovery and the protection it affords extends ***only to specific information*** . . . ." PTO 12, ¶ 5. The party designating materials as "Protected" must do so only upon a ***good faith belief*** that any material is protected under FRCP 26(c)(1)(G). *Id*. at ¶¶ 6, 7. A party may also designate as "Protected Information – Highly Protected" any document which, if potentially disclosed, could result in substantial business harm "***so long as the material is also protected under Fed. R. Civ. P. 26(c)(1)(G).***"[1] *Id*. at ¶ 7. The burden to prove that any material is entitled to protection is on Janssen. *Id*. at ¶ 13. Any challenge "shall be decided on the merits pursuant to the applicable law," *id*. at ¶ 14, and the PSC may challenge a designation "***at any time***." *Id*. at ¶ 13.

In complete disregard of the provisions of PTO 12, Janssen has marked virtually all

---

[1] Under Fed. R. Civ. P. 26(c)(1)(G), a Court may protect a "trade secret or other confidential research, development, or commercial information . . . ."

substantive internally-created documents produced to date as "Protected" or "Highly Protected".[2] Even if the Court accepts the premise that Janssen had to do so in order to produce documents in a timely manner (a premise that the PSC rejects and a procedure expressly forbidden by PTO 12), the issue for the Court to decide in this motion is focused only on the challenged documents.[3] This is not a production issue; these documents have already been produced and used in depositions. The issue is whether the documents are entitled to continued protection under PTO 12 now that the PSC has mounted a challenge to a small subset of produced documents. Why Janssen marked the documents protected in the first instance is not a basis to support the continued protection. PTO 12 governs this dispute and all parties agreed to the pre-trial challenge process. Yet, Janssen argues that the Court should read into PTO 12 an umbrella of protection for all internally-created substantive communications until the time of trial.[4] Put another way, Janssen is either asking the Court to re-write PTO 12 or to ignore it.

Knowing that it cannot support its position under the terms of PTO 12, Janssen shifts the focus of its argument away from an individualized and specific showing as to each challenged document to speculation of a parade of horribles that would ensue if the documents did not remain protected. Janssen likewise seeks to avoid scrutiny of its abuse of PTO 12 by disparaging

---

[2] Janssen has produced 2,735,776 documents to date. It has marked 2,329,528 documents as "confidential" at some level, which amounts to 85.1% of the total. Additionally, Janssen has produced 1,241,437 emails to date and marked 1,134,026 emails as "confidential" at some level, which amounts to 91.3% of the total. However, when analyzing the substantive documents that were created internally, **nearly 100% of those documents have been marked protected in some way by Janssen.** In addition, Janssen has marked **100% of every deposition transcript of its employee witnesses as protected**, making no attempt at any colorable argument of those specific portions that should be protected.

[3] The challenged documents currently at issue are 160 Janssen exhibits and four deposition transcripts of Janssen custodians. Attached as Exhibits A-D (filed under seal) are the challenged deposition transcripts. Janssen has filed 157 exhibits under seal for the Court's inspection, and the PSC is attaching as Exhibits E-J the additional 6 documents that it still contests. Additionally, Janssen withdrew its designations but also later asserted protection on 2 documents, which the PSC has attached as Exhibits K-L. The PSC will address Bayer's improper designations in a separate response.

[4] Janssen removed the "protected" status only to documents created by or sent to third parties (but produced by Janssen in discovery) or as to non-substantive internal emails that forward attachments to others in which it retains the "protected" status on the substantive attachments. In short, Janssen asserts in its brief **that 100% of the substantive internal Janssen documents that are at issue are entitled to "protection" under PTO 12**.

2

the motive of the PSC, and by proposing that plaintiffs are not prejudiced by its wholesale use of confidentiality designations. Such assertions, besides lacking merit, are mere distractions in the present analysis. The issue before the Court is whether PTO 12 justifies the protected designations of specified documents; questions of "motive" or prejudice are simply not germane in resolving this issue.

Yet, the PSC can show prejudice in its pre-trial preparation. A number of treating physicians will not sign Exhibit A to PTO 12 and therefore cannot be shown important internal information that was withheld from the health care community, either during the preparation for their depositions or at their depositions. Some doctors are uncomfortable about signing a legal document, others get legal advice not to sign the document, and others express a professional obligation to other patients to share important safety information they learn about Xarelto as a reason not to sign the document.

In addition, there is ongoing regulatory review at the FDA and with regulators around the world investigating the impact of the recalled INRatio point-of-care device used in the ROCKET AF Study. Janssen continues to withhold important information about the performance characteristics of this device and its impact on the ROCKET AF Study from regulators, physicians, consumers and the public at large. Even as it challenges PSC motives, Janssen is effectively gaming the regulatory process, and the outcome of the ongoing regulatory investigations without complete and accurate information will prejudice the trial of individual plaintiffs (including the bellwether plaintiffs). Janssen is inappropriately using PTO 12 as a mechanism to prevent the PSC from providing the complete story to the FDA.

Knowing that it cannot make a showing that any of these documents are entitled to "trade secret" protection, Janssen deflects the focus by suggesting that the PSC is "trying the case in the

media", citing to the PSC's previous motion to provide information to the FDA. But what Janssen fails to tell the Court is that the PSC's previous motion was successful in requiring Janssen to provide information that it had previously withheld from the FDA. This previously undisclosed information prompted subsequent additional investigation by the FDA, as well as new investigations from regulators around the world. Based upon documents that the PSC has reviewed, Janssen and Bayer are still to this day withholding complete and accurate information about the impact of the defective INRatio device in the ROCKET AF Study.

Simply because The British Medical Journal (BMJ)[5], Project on Government Oversight (POGO)[6], and other media have a legitimate public interest in following this litigation about a drug that has caused tens of thousands of serious—and in some cases fatal—injuries and was approved without regulators' knowledge of critical information that was purposefully withheld by Janssen, this cannot be a basis to change the legal analysis here. Janssen's inappropriate designation of all internal substantive communications as "protected" trade secrets and its arguments in this motion is nothing more than a continued scheme of hiding critical information from regulators, physicians, patients and the public, all in an attempt to protect a multi-billion dollar drug that was rushed to market yet has been shown to be worst in its class. And this is not just the PSC's advocacy; credible medical and scientific experts have publicly made the same assessment. A timetable driven by corporate business interest (arguably at the expense of public health concerns) cannot suffice to ignore the provisions and intent of PTO 12.

The regulators around the world who are currently investigating critical information about the defective INRatio device and its impact on the ROCKET AF Study should have the

---

[5] The BMJ, founded in 1840, is one of the oldest and most respected medical journals in the world.
[6] POGO is a "nonpartisan independent watchdog that champions good government reforms" by investigating "corruption, misconduct, and conflicts of interest [to] achieve a more effective, accountable, open, and ethical federal government." *Project on Government Oversight*, Our Mission, http://www.pogo.org/about/.

opportunity to consider this information. So should treating physicians of the plaintiffs before they testify in these cases. While the PSC understands why Janssen wants to delay the disclosure of information until trial—because it will deprive the regulators of critical information of the hidden flaws in the ROCKET AF Study and as a result will prejudice plaintiffs' pre-trial depositions, and ultimately the trial, and allow Janssen to continue to sell billions of dollars of Xarelto prescriptions —this clear motive of profits over public health cannot be the reason to ignore the provisions of PTO 12 and provide a mechanism for Janssen to withhold information from the FDA and the public.

## HISTORY OF DISCOVERY NEGOTIATIONS AND PTO 12

In response to the PSC's original discovery requests and proposed production deadlines, the Defendants asserted that it was "physically and technically impossible" to meet the PSC's proposed deadlines. Defendants gave several reasons for this assertion, including that they had employed the equivalent to a large law firm that was reviewing every document to make a determination whether a document should be designated as "Protected"—not just once, but also a second time by "senior personnel" to ensure proper designations of the protected status of documents. Coon Decl. at ¶ 8 ("Defendants currently have more than 250 people working on document collection, review and production – equivalent to a large law firm devoted entirely to producing documents for this litigation."). Ultimately the parties reached an agreement as to the volume of documents to be produced, a timeline for production, and importantly here, an express agreement in PTO 12 that wholesale designations of documents as "Protected" would be prohibited, that designations would be made in good faith and limited to only those documents containing trade secrets, and a pretrial procedure for challenging inappropriate designations. *See* PTO 12, ¶ 5 ("This Protective Order does not confer blanket protections on all documents,

disclosures, or responses to discovery . . . ."); ¶ 6, 7 ("In designating discovery materials . . . the Supplying Party shall do so in good faith consistent with the provisions of this Protective Order . . . ."); ¶ 6, 7 (designations are subject to protection "under Fed. R. Civ. P. 26(c)(1)(G)."); ¶ 13 ("Any party desiring to contest the designation of specific 'PROTECTED INFORMATION' may do so at any time . . . .").

While it is true Defendants have produced millions of documents, they have also marked virtually 100% of internally-created substantive documents with some type of "Protected" designation. The PSC first brought this to the Court's attention in its February 22, 2016 Motion to Challenge Confidentiality Designations (Doc. 2380-2), pointing out that important documents had been withheld from the FDA concerning the recalled INRatio point-of-care device used in the ROCKET AF Study. During that hearing, the Court expressed concerns about the over designation of documents as protected. ███████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████

However, Janssen's complete disregard to the "good faith" requirements of PTO 12 and its prohibition of wholesale designations have left the PSC and the Court with millions of documents with improper designations. The PSC appreciates that the Court cannot review every improperly designated document. So in an effort to provide some reasonable process, the PSC has begun the challenge process by focusing on the documents used as exhibits in the first 8 depositions, so that the Court would have context and testimony about the documents, could apply the terms of PTO 12 to those challenged documents, and then make rulings which would guide future challenges. The PSC is not "cherry picking" documents—it submitted all exhibits

used in the depositions, even those introduced by Defendants during their examinations.

### THE CURRENT SET OF CHALLENGED DOCUMENTS

On April 6, 2016, the PSC sent letters to Janssen and Bayer challenging 353 documents used as exhibits in the depositions of Michael Moye, Christopher Nessel, Sigmond Johnson, Wolfgang Mueck, Andrea Horvat-Broecker, Dagmar Kubitza, Andrea Derix, and Sanjay Jalota. *PSC Letter to Defs.*, Exhibit M (filed under seal). The PSC also challenged the designations that Janssen placed on *__entire__* deposition transcripts. *See id.* Janssen and Bayer responded on May 3, 2016. Janssen's response offered nothing but mere observations about what information the documents contain and failed to articulate any specific and particular harm that could ensue from the disclosure of the documents. *Janssen Resp. Letter to PSC*, Exhibit N (filed under seal).[7]

While during this process Janssen removed the protected status on 29 of the documents, its "good faith" rings hollow. All of these documents were either created by a third party, sent to a third party, published literature, or non-substantive internal emails. ***Janssen maintains the protected status of all internally-created substantive documents.*** Moreover, Janssen did not even address its umbrella designations on the entire deposition transcripts for Moye, Nessel, Johnson, and Jalota as it failed to address the deposition transcripts in its response letter. *See id*. What's more incredible, Janssen failed to address the issue of its umbrella designations on the four deposition transcripts in its motion. *See Janssen Def.'s Redacted Mem. in Supp. of Mot. to Enforce PTO 12 and for Entry of a Protective Order* at 6-22 (Doc. 3296-1). ***As to these four depositions, Janssen has waived any protection of their contents***. *See* PTO 12, ¶ 13. There still remain 160 Janssen exhibits in dispute for the Court's resolution.

---

[7] Additionally, Janssen "downgraded" certain documents from "highly protected" to "protected", which is of no moment. The documents are still protected from public disclosure.

## <u>LEGAL STANDARDS</u>

**I.   The Protective Order governs the standard for designating documents as confidential.**

The Fifth Circuit holds that the plain language of the Protective Order governs the designation process and confidentiality status of each document. *See Moore v. Ford Motor Co.*, 755 F.3d 802, 806 (5th Cir. 2014) ("Analysis [as to the confidential status of the disputed documents] begins with the plain language of the Protective Orders . . . ."). Therefore, the four corners of PTO 12 govern the Court's analysis and not the hyperbole of Janssen accusing the PSC of trying the case in the media.

Pursuant to PTO 12, a party may designate documents as "Protected Information" only if the party believes that such document "is subject to protection under Fed. R. Civ. P. 26(c)(1)(G) or other applicable law." *Id*. at ¶ 6. A party may also designate as "Protected Information – Highly Protected" any document which, if potentially disclosed, could result in substantial business harm "***so long as the material is also protected under Fed. R. Civ. P. 26(c)(1)(G)***."[8] *Id*. at ¶ 7. Finally, if portions of a deposition transcript contain protected information, those portions may be designated "Protected Information." *Id*. ¶ 15. Wholesale protection of entire deposition transcripts is not permitted under PTO 12.

The Protective Order also expressly provides that umbrella protections will not be allowed. *Id*. at ¶ 5 ("This Protective Order does not confer blanket protections on all documents, disclosures, or responses to discovery and the protection it affords extends only to specific information . . . ."). The party designating documents as confidential must do so in good faith. *Id*. at ¶¶ 6, 7.

---

[8] Some information may be protected as between Defendants for legal or other reasons, but this has no bearing on the instant issue of whether the documents are afforded protection as trade secrets. Janssen and Bayer have also abused this designation, even marking documents sent to and from each other as "Defendant Restricted".

PTO 12 provides the mechanism for challenging a party's confidentiality designations. Accordingly, the receiving party may provide written challenge to any confidentiality designation at any time. *Id*. at ¶ 13. Certainly, this "any time" language contemplated challenges before trial. In the event the parties cannot stipulate to a designation of protected information within fourteen (14) days from receipt of the written challenge, the party asserting the protection has the burden to motion the Court to show each of its designations are warranted and should be maintained. *Id*. If a party fails to provide the court with an explanation that the contested documents are entitled to protection, the protected status of the documents is waived. *Id*.

## II.     Janssen carries the burden of demonstrating good cause for protection as to each of the challenged documents.

Janssen carries the burden of demonstrating that each of its documents is entitled to protection. PTO 12, ¶ 13. Under the Protective Order, documents are only afforded protection if they contain legitimate trade secrets under Rule 26(c)(1)(G). *Id*. at ¶¶ 6, 7. Even after a Protective Order is entered under Rule 26(c), a party must continue to demonstrate good cause for protection as to each of the documents issue. *Apalachicola Riverkeeper v. Taylor Energy Co., LLC*, 2015 U.S. Dist. LEXIS 106785 at *16-17 (E.D. La. Aug. 7, 2015)[9], *citing Campo v. Am. Corrective Counseling Servs., Inc.*, 2008 U.S. Dist. LEXIS 79706 at *8 (N.D. Cal. July 21, 2008) ("[w]hen a business is a party seeking protection, it will have to show that disclosure of a ***particular*** document would cause significant harm to its competitive and financial position.") (emphasis added); *In re Pradaxa (Dabigatran Etexilate) Products Liability Litigation*, 2014 U.S. Dist. LEXIS 10718 at *8, 11 (S.D. Ill. Jan. 29, 2014) (noting that Judge Herndon "painstakingly

---

[9] In *Apalachicola Riverkeeper*, the Court reviewed each of the twenty-two documents at issue that defendants designated pursuant to a protective order—which resembles PTO 12—and "[a]fter reviewing the documents, the Court concludes that only a portion of one document contains confidential information and every other document is not confidential . . . ." *Id*. at *17. The Court found that emails, a log of events, scientific reports that were "investigatory in nature," reports that contained information pertaining to studies, and a deposition transcript were all not confidential material. *See id*. at *17-26.

reviewed each of the [85] Challenged Documents and [found] that they lack confidentiality of any kind" because defendants failed to demonstrate good cause for preserving their designations when they asserted "generalized conclusory terms . . . .").

Janssen must provide evidence that it would suffer a clearly defined and serious injury should the documents be disclosed. *In re Pradaxa*, 2014 U.S. Dist. LEXIS at *8 ("To successfully carry the burden of establishing good cause, [Defendants] must demonstrate a particular need for protection."); *See also* 8 C. Wright & A. Miller, *Federal Practice and Procedure* § 2035 (3d ed. 2016) ("The courts have insisted on a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements, in order to establish good cause."); *Ryder v. Union Pac. R.R. Co.*, 2016 U.S. Dist. LEXIS 59182 at *9 (M.D. La. May 4, 2016), *citing In re Terra Int'l*, 134 F.3d 302, 306 (5th Cir. 1998) (establishing that good cause "contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements.").[10]

III.    **Louisiana follows the Uniform Trade Secrets Act in defining a trade secret.**

Louisiana has codified its definition of a trade secret in the Louisiana Uniform Trade Secrets Act (UTSA):

> "'Trade secret' means information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (a) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

___

[10] *See also Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) ("Good cause is established on a showing that disclosure will work a clearly defined and serious injury to the party seeking closure. ***The injury must be shown with specificity.***"); *Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995) ("'Good cause' is established when it is ***specifically demonstrated*** that disclosure will cause a ***clearly defined*** and serious injury. Broad allegations of harm, unsubstantiated by specific examples, however, will not suffice."); *Bianchi v. Tonigan*, 2012 U.S. Dist. LEXIS 168590 at *8 (N.D. Ill. Nov. 28, 2012) ("To successfully carry the burden of establishing good cause, a party must demonstrate a particular need for protection.").

La. Rev. Stat. Ann. § 51:1431(4).

Marketing strategies are not deemed to be trade secrets. *See SDT Indus. v. Leeper*, 793 So. 2d 327, 333 (La. Ct. App. 2001) (holding that where a company has marked as confidential certain internal business matters, including pricing and marketing strategies, "[t]he fact that these are 'confidential' to the company does not magically and automatically elevate them to the status of a 'trade secret' as defined by the [Louisiana UTSA]."). Additionally, information that is "stale" is not protectable as a trade secret. *See e.g. U.S. v. International Business Mach. Corp.*, 1975 U.S. Dist. LEXIS 12544 (S.D.N.Y. May 2, 1975) (holding that documents, including 15-year-old statistical tabulations, domestic sales figures, 12-year-old financial reports showing gross profits, a customer list, and an internal 5-year-old business planning report, should not be protected because "[n]one of this data is current; it reveals directly little, if anything at all, about [the corporation's] current operations."); *Rosenblatt v. Northwest Airlines, Inc.*, 1971 U.S. Dist. LEXIS 12150 at *4 (S.D.N.Y. Aug. 5, 1971) (denying the issuance of a protective order where the information sought to be protected was 1-year-old); *Garcia v. Peeples*, 734 S.W.2d 343, 348 (Tex. 1987) (finding the trial court abused its discretion by issuing an umbrella protective order where there was no evidence that the company would be harmed by the release of information that was "several years old."). The hazardous nature of a product also does not constitute a trade secret. *See In re Upjohn Co. Antibiotic Cleocin Prods. Liab. Litig.*, 1979 U.S. Dist. LEXIS 14991 at *3 (E.D. Mich. Jan. 18, 1979) ("It cannot be argued that in a typical case the hazardous nature of a substance is properly regarded as a trade secret.").

## ARGUMENT

**I.     PTO 12 is not an umbrella Protective Order covering all discovery material.**

The Eastern District of Louisiana recognizes three types of protective orders: (1) those that cover *all* discovery; (2) those that cover specifically identified information; and (3) those

that cover trade secrets. *Blanchard & Co. v. Barrick Gold Corp.*, 2004 U.S. Dist. LEXIS 5719 at *15 (E.D. La. Apr. 2, 2004). Here, PTO 12 is clearly not an umbrella protective order due to the express language of the Protective Order stating that only trade secrets are afforded protection. *See* PTO 12, ¶¶ 6, 7. To boot, the express language of the Protective Order affirmatively prohibits umbrella designations. *Id.* at ¶ 5 ("This Protective Order does not confer blanket protections on all documents, disclosures, or responses to discovery . . . ."). Thus, PTO 12 is not an umbrella protective order that allows for the designation of all discovery material. The Court should not stand for Janssen's blatant disregard of the proper scope of PTO 12—an order to which Janssen agreed and the Court endorsed when it entered PTO 12.

## II.     The Declaration of Angela Giusti's is woefully inadequate.

Janssen's "support" for trade secret protection of each challenged document is via a Declaration of Angela Giusti. The PSC took Ms. Giusti's deposition related to the organization of Janssen six months ago. She confessed her limited knowledge on substantive matters related to Xarelto and stated that she only spends about 10% of her time working on Xarelto. *See* Giusti Dep. 89:15, Dec. 11, 2015, Exhibit O (filed under seal). Ms. Giusti is not a doctor, scientist, regulatory specialist, pharmacovigilance expert, marketing specialist, or some other high-ranking employee of Janssen. Ms. Giusti is merely a coordinator of Xarelto meetings between Janssen and Bayer—and importantly here, she makes no substantive decisions related to Xarelto. In her depositions she also confirmed that the declaration she had signed was entirely drafted by counsel and that she did nothing to independently verify the facts to which she was attesting. *See* Giusti Dep. 146:7-147:1.

In regards to Ms. Giusti's instant Declaration to support the "trade secrets" of the challenged documents, the PSC believes the Declaration was prepared by counsel and that Ms.

Giusti signed the Declaration without independent knowledge of the averments made therein (she even admits to only looking at a "subset" of the challenged documents. ████████████████ ████████████████████████████████ If the Court is going to give this Declaration any weight, the PSC requests the opportunity to take Ms. Giusti's deposition to demonstrate to the Court that she has no particularized knowledge of the trade secret nature of these challenged documents, nor the claimed competitive harm. In short, a generalized Declaration from a person with limited to no knowledge about the substance of the documents, **who hasn't even reviewed most of the challenged documents**, is legally insufficient to support Janssen's motion for continued protection of its documents at issue.

In Giusti's declaration, she claims that she is "familiar with the types of research and clinical development, clinical trials, clinical testing, regulatory, pharmacovigilance, marketing and sales documents at issue here . . . ." Giusti Decl. ¶ 2. But consider what Ms. Giusti testified to in her deposition when asked about pharmacovigilance:



Giusti Dep. 85:20-86:4. Likewise, when asked multiple questions concerning the marketing and sales of Janssen, Ms. Giusti could not provide answers. For example:



Giusti Dep. 179:16-180:9.

These two examples show that Ms. Giusti knows nothing about the pharamcovigilince (or safety) of Xarelto nor anything about marketing and sales.[11] Her previous willingness to sign whatever declaration counsel provided to her to sign and doing no independent investigation into whether the document was accurate,[12] and her very limited role into substantive Xarelto matters, raises serious doubts that Ms. Giusit's Declaration has any probative value.

But even taking the Declaration at face value, it is still woefully lacking. Ms. Giusti only claims to have reviewed a "subset" of documents and doesn't even identify which documents comprise the "subset". Moreover, she only provides stereotyped conclusory statements of generalized harm should the documents be disclosed. *See infra* pp. 15-16. This Declaration is the only support for Janssen's trade secret protection and is insufficient to support its burden of proof. *In re Pradaxa*, 2014 U.S. Dist. LEXIS at *8 ("To successfully carry the burden of establishing good cause, [Defendants] must demonstrate a particular need for protection," which requires a "particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements.").

### III.    Janssen fails to meet its burden of demonstrating good cause for protecting each of the 160 exhibits and four deposition transcripts at issue.

Janssen has failed to meet its burden of showing good cause as to each of its confidentiality designations on the 160 exhibits and four deposition transcripts at issue. For one, Janssen has failed to provide the Court with good cause explanations on a document by document basis. Rather, Janssen simply provides the Court, as it did the PSC in its response letter (*Janssen Resp. Letter to PSC*, Exhibit N), with basic information as to what *some* of the

---

[11] There are many more examples of Ms. Giusti's limited knowledge of the substance of Xarelto. *See* Giusti Deposition Transcript attached hereto as Exhibit O (filed under seal) for the Court's review.
[12] ████████████████████████████████████████████████

exhibits contain. *See Janssen Def.'s Redacted Mem. in Supp. of Mot. to Enforce PTO 12 and for Entry of a Protective Order* at 6-10 (Doc. 3296-1). Thereafter, Janssen casually groups together certain documents to assert conclusory statements that it would generally be harmed if the documents were disclosed. *Id*. Janssen's effort does not satisfy its obligation to make a particularized showing of good cause as it pertains to each particular document, which includes both the exhibits and deposition transcripts at issue. *See Apalachicola Riverkeeper*, 2015 U.S. Dist. LEXIS at *10 ("After considering the parties' submissions and arguments during oral argument, the Court has narrowed down the issues to three main disputes: (3) whether *each* document is confidential under Rule 26(c).") (emphasis added).

In its written response to the PSC's letter challenging Janssen's designations, Janssen provides only naked conclusory statements that fall significantly short of demonstrating a specific and serious injury upon release of its designations. Examples of these blanket assertions are:



Continuing this trend, Janssen offers the same conclusory statements in its motion to the Court:





These conclusory statements are also mimicked in Angela Giusti's Declaration:



Arguing that the information is not publically available and internal does not by itself support proof of a trade secret. If this were the case, then essentially every e-mail or other document circulated among Janssen employees would fall into this definition—a definition not provided for in PTO 12 nor supported by the case law. If Janssen's plan was to mark all documents with protection and then argue none could be challenged until the time of trial, then there was no purpose for the extensive negotiation of PTO 12 and all of its provisions. Janssen could have had a machine label all documents protected and produce the documents much faster and in a higher volume.

Because Janssen cannot support its trade secrets designations it shifts the focus to a generalized argument of potential economic harm (albeit through a Declarant without knowledge of sales and marketing). Perhaps Janssen may lose market share if the truth was provided to the FDA, physicians, consumers and the public about the safety issues with Xarelto. However, financial injury in the market place or fear of embarrassment does not meet the high burden of

16

showing good cause for protecting the important documents at issue. *See Pamlab, LLC v. Brookstone Pharms., LLC*, 2010 U.S. Dist. LEXIS 120303 at *12 (E.D. La. Oct. 22, 2010) (granting Plaintiffs' motion to remove the highly confidential designation from Defendants' discovery responses because Defendants "have argued that disclosure of their admissions will embarrass them and injure their economic livelihood. As the case law demonstrates, however, such a generic allegation does not meet the standard to keep documents under seal and confidential under Rule 26(c). [E]mbarrassment or some generically-alleged financial injury in the economic market does not overcome the strong presumption in favor of disclosure . . . ."); *See also Cipollone*, 1986 U.S. Dist. LEXIS 17820 at *12-13 (D.N.J. Nov. 12, 1986) ("In essence, defendants now argue that if the truth be known and discovery disclosed it might prove embarrassing and affect the market price of defendants' stock. Such a sweeping allegation, however, does not reach the level of specificity that the Third Circuit has emphasized is required by Rule 26(c)."). Vague assertions of injury to reputation or client relationships are also insufficient to show good cause. *Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 484 (3d Cir. 1995) ("General allegations of injury to reputation and client relationships or embarrassment that may result from dissemination of privileged documents is insufficient" to find good cause).

Moreover, the hazardous nature of a drug is not a trade secret. *See In re Upjohn Co. Antibiotic Cleocin Prods. Liab. Litig.*, 1979 U.S. Dist. LEXIS at *3 ("It cannot be argued that in a typical case the hazardous nature of a substance is properly regarded as a trade secret. Indeed, it might well result in a violation of medical ethics if a court were to require an expert acquainted with the hazards or potential hazards of a drug to conceal that knowledge from the public in general or particular patients."). This same rationale applies here. The hazardous nature of Xarelto, which hundreds of thousands of individuals consume *on a daily basis*, is not a trade

secret. Quite the contrary, the hazardous nature of Xarelto is a matter of grave public concern to individuals and the medical community at large. Factual information as to how Xarelto was filtered through the regulatory doors and the dangerous nature of the anticoagulant are matters that cannot be concealed from the public. Truthful information that was once hidden from regulatory officials cannot be concealed any longer. There are too many lives at stake to hold otherwise. There exists no good cause for hiding these important documents from the public.

Additionally, Janssen has failed to even address the issue of its blanket designations on the full deposition transcripts of its custodians. *See Janssen Def.'s Redacted Mem. in Supp. of Mot. to Enforce PTO 12 and for Entry of a Protective Order* (Doc. 3296-1). Janssen provided literally no explanation (specific or general) of good cause for protecting the deposition transcripts. *Id*. Consequently, under PTO 12, Janssen has made no application to this Court within the requisite timeframe for an order preserving its designations for good cause. And the PSC contends that Janssen should not now be allowed to make such an application. Janssen has waived its ability to preserve its designations on the four deposition transcripts at issue.

Furthermore, Janssen's assertion that the PSC has "cherry-picked" documents is another attempt to redirect the Court's analysis. Janssen is the one claiming protection to all substantive documents, so it is the one in a unique position to be able to withdraw improper designations of any document it wishes and cure any asserted "cherry-picking". In this regard, Janssen is in the unique position to provide any documents it feels will cure any "out of context" snapshots of information. In objecting that the PSC has "cherry-picked" documents for the Court to consider, Janssen seeks to impose an insurmountable burden on the Court and thereby disable any practicable enforcement of PTO 12. Well aware that Your Honor could not possibly review each and every document improperly designated under the Order, Janssen would seek to prevail by

18

default, based on the fallacy that if *all* improper designations cannot be reviewed, then *none* should be reviewed. The documents at issue are either properly designated for good cause or they are not. This is the only issue before the Court.

**IV.    Janssen's improper designations are prejudicial to the PSC and a fair trial.**

To be clear, there is no burden on the PSC to show that it is prejudiced by the improper designations. Janssen offers no case law to support this notion, and none exists. The issue before the Court is whether Janssen has carried its burden to show good cause why the challenged documents are trade secrets.

Yet the PSC can show prejudice. A number of treating physicians will not sign Exhibit A to PTO 12 and therefore cannot be shown important internal information that was withheld from the health care community, either during the preparation for their depositions or at their depositions. Some doctors are uncomfortable about signing a legal document, others get legal advice not to sign the document, and others express a professional obligation to other patients to share important safety information they learn about Xarelto. Why should a doctor from California (or anywhere) sign a legal document subjecting himself or herself to the jurisdiction of this Court to simply review documents that should not be designated as trade secrets? Why would a lawyer providing advice to a treating doctor allow his or her client to sign such a document? Or why would a doctor agree not to share important safety information learned from a review of these documents with other patients who are using Xarelto? The documents at issue are not trade secrets that involve the design of studies, the planning of future studies, patent information, customer lists, or future marketing plans. The documents are internal documents related to a study that was completed in 2010 and published to the entire world, albeit a study with significant flaws that have been hidden from the public.

In addition, the PSC is prejudiced in another very real way. There is *ongoing* regulatory

review at the FDA and with regulators around the world investigating the impact of the recalled INRatio point-of-care device used in the ROCKET AF Study. Janssen *continues* to withhold important information about the performance characteristics of this device and its impact on the ROCKET AF Study from regulators, physicians, consumers and the public at large. The outcome of the ongoing regulatory investigations without complete and accurate information will prejudice the trial of individual plaintiffs (including the bellwether plaintiffs). Janssen is gaming the regulatory process and is inappropriately using PTO 12 as a mechanism to prevent the PSC from providing the complete story to the FDA.

**V.      The PSC's motive is irrelevant—while Janssen's motive is clearly improper.**

The PSC's motive in challenging Janssen's blanket designations at issue is wholly irrelevant. *In re Pradaxa*, 2014 U.S. Dist. LEXIS at *9-10 ("[Defendant] spends a great deal of time trying to discern the 'real motive' behind the plaintiffs' decision to contest the subject designations. [] The Court fails to see the significance of this position. ***The plaintiffs are not under a duty to establish an appropriate motive*.**"). The only issue before this Court is whether Janssen has carried its burden of proof that each document is entitled to trade secret protection. The documents are either properly designated or they are not.

The only motives that truly matter are those of Janssen. It is clear that Janssen does not want the regulators, physicians, consumers or the public to know of the hidden flaws in the ROCKET AF Study. It's apparent that Janssen wants to get through the current world-wide regulator crisis it faces without the regulators having complete and accurate information about the impact of the defective INRatio device on the ROCKET AF Study. Janssen is also fearful that previously unknown safety information about Xarelto will become public and this will have a negative impact on its market share. But Janssen must offer a reason for its protected designations that is based on law, and not simply concerns for its continued marketing and profit.

Janssen's motive is clear: profits and shareholder value win out over patient safety.

**VI.    Janssen's designations violate the presumption of public disclosure of documents containing vital information affecting the global health and safety of the public.**

Indeed, there is a strong presumption favoring public disclosure of non-confidential pre-trial materials that have the ability to inform the public on matters affecting the health and safety of individuals. All discovery materials are presumed open to the public until a party comes forward with good cause to support a protective order. Janssen as failed to do so with respect to the challenged documents.

**a.    There is a strong presumption of public disclosure of information concerning a dangerous health risk that affects millions world-wide.**

In *Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1179 (6th Cir. 1983), the Sixth Circuit held that internal documents reflecting important health and safety information of the tobacco industry should not be protected because "[s]imply showing that the information would harm the company's reputation is not sufficient to overcome the strong common law presumption in favor of public access . . ." to the records.[13] The Court noted:

> "The natural desire of parties [is] to shield prejudicial information contained in judicial records from competitors and the public. This desire, however, cannot be accommodated by courts without seriously undermining the tradition of an open judicial system. Indeed, common sense tells us that the greater the motivation a corporation has to shield its operations, the greater the public's need to know. **In such cases, a court should not [protect] records unless public access would reveal legitimate trade secrets, a recognized exception to the right of public access to judicial records.**"

*Id*. at 1180.

---

[13] *See also Pamlab*, 2010 U.S. Dist. LEXIS at *8 (E.D. La. Oct. 22, 2010) ("Courts have recognized that the public has a common law right to judicial records and proceedings . . . ."); *Blanchard*, 2004 U.S. Dist. LEXIS at *19 (E.D. La. Apr. 2, 2004) ("[C]overing *all* discovery materials . . . robs the public documents of their public character.") (emphasis in original).

Similarly, in *Cipollone v. Liggett Group, Inc.*, 1985 U.S. Dist. LEXIS 17806 (D.N.J. July 17, 1985), another case involving the tobacco industry, the court was faced with the issue of whether discovery documents revealing information affecting the health and safety of millions of individuals should remain under a protective order. The court held that good cause did not exist for protecting the documents. *Id.* at 587. The Court reasoned:

> "Not all information obtained through the discovery process should be available for publication beyond the litigation itself. However, before disclosure is limited or prohibited, a need for such restriction must be established. The burden of establishing such need should fall upon the party asserting it. To conclude otherwise would unduly restrict the free flow of information mandated by the first amendment. **In a case such as this in which the public has a substantial interest, the court is reluctant to inhibit such disclosure absent a showing that there is good cause to do so. What are the risks of smoking; what the tobacco industry knew of those risks; and what action it took or did not take with that knowledge are matters of great public concern.** ***It is difficult to envision that any of those matters involve 'secrets' in the traditional sense, worthy of protection against public scrutiny***. Indeed they may be secrets in the sense that the industry would prefer them to remain confidential, but not in the sense that their concealment from the press and public would be consistent with the first amendment.
>
> Litigants are entitled to prove that information released through the compulsion of discovery proceedings should not be made public, and they are afforded the opportunity to do so. **However, absent such a showing, information gleaned through discovery should be made available, particularly when the subject matter pertains to issues which affect the health and well-being of millions of persons."**

*Id.*[14] The same rationale applies in the instant MDL context. This MDL consists of thousands of

---

[14] On mandamus review, the Third Circuit stated that the determination of whether to issue a protective order does not require First Amendment analysis since the primary standard is whether good cause has been shown. *See Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1121 (3d. Cir. 1986); *But see Anderson v. Cryovac, Inc.*, 805 F.2d 1, 6-7 (1st Cir. 1986) (affirmatively disagreeing with the Third Circuit's opinion in *Cipollone*, 785 F.2d 1108 and

individuals from all over the nation in which the overarching issues surround their health and well-being. Xarelto remains on the market and is widely prescribed, so the information contained in the documents at issue here also affects the health and well-being of the public at large. It is a matter of great public concern about what are the risks of Xarelto, what Defendants knew of those risks, and what action Defendants did or did not take with that knowledge. In fact, since the FDA has been provided some of the internal documents, it has already undertaken an investigatory follow-up of the safety and efficacy of the drug. Likewise, regulators from other countries, including Japan, Canada, and Australia, are opening up their own investigations of Xarelto's safety and efficacy. Therefore, the goals of transparency and openness are very strong in this MDL context involving a vast public health concern.

Janssen also takes a shot at the PSC about trying this case in the press. But it is Janssen who is inundating the public with false claims about the safety of Xarelto and also trying to control the public narrative about Xarelto. For example, Janssen cites an article about lawyer advertisements and negative media reports that caused patients to discontinue Xarelto. *Janssen Def.'s Redacted Mem. in Supp. of Mot. to Enforce PTO 12 and for Entry of a Protective Order* at 5 (Doc. 3296-1). However, Janssen does not tell the Court that this article was written by Janssen.[15] *Id*. Not only was the article funded by Janssen, it was prompted by the marketing

---

holding that "[F]irst Amendment considerations cannot be ignored in reviewing discovery protective orders."). On remand, the District Court emphasized its prior rationale and held, again, that good cause did not exist to protect the documents at issue. *See Cipollone*, 1986 U.S. Dist. LEXIS at *2 (D.N.J. Nov. 12, 1986) ("Discovery may well reveal that a product is defective and its continued use dangerous to the consuming public. The public disclosure of that information will certainly embarrass that party and cause it financial loss. **It is inconceivable to this court that under such circumstances the public interest is not a vital factor to be considered in determining whether to further conceal that information and whether a court should be a party to that concealment.**"); *See also Culinary Foods v. Raychem Corp.*, 1993 U.S. Dist. LEXIS 11085 at *3 (N.D. Ill. Aug. 9, 1993) (holding that "although we make no finding as to whether [Defendant's] products are dangerous and whether [Defendant] knew of the dangers and either failed to take action or attempted to conceal the information, we agree that such information, if found, is not entitled to Rule 26(c) protection. [] Although the information regarding the hazards of products and the corporation's knowledge of the information may be embarrassing and incriminating, this alone is insufficient to bar public disclosure.").

[15] Burton, Paul, et. al., A Medwatch Review of Reported Events in Patients Who Discontinued Rivaroxaban

department at Janssen.[16] In addition, Janssen has spent and continues to spend hundreds of millions of dollars in T.V. and other promotional materials touting the safety and efficacy of Xarelto, all reaching the public and potential jurors. Janssen has also issued press releases claiming that the defective INRatio device had no impact on the Rocket AF Study results, while at the same time hiding information from the regulators investigating this very issue.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████ This internal admission completely contradicts the public narrative in the press release.

There is no doubt that Janssen is talking to the media about Xarelto. For example, Dr. DiBattiste, a very high ranking physician working on Xarelto and a member of Janssen's media relations team, met with a reporter responsible for the New York Times article which Janssen complains only had one-sided, cherry-picked information. *See* DiBattiste Dep. 96:9-99:1, April 12, 2016, Exhibit Q (filed under seal).

Janssen's accusation of the PSC's improper motives, or "trying the case in the media", is outrageous given its own conduct and influence on the public perception of Xarelto. Janssen is spending hundreds of millions of dollars in spinning its narrative of the safety of Xarelto to the public. Xarelto has the worst safety and efficacy profile of any anticoagulant on the market, yet has the highest market share compared to its competitors Pradaxa and Eliquis. This is proof positive that Janssen's marketing and promotional spin has a huge influence on the perception of physicians and consumers. Why would any doctor or patient use Xarelto when all the

---

(XARELTO) Therapy in Responses to Legal Advertising, *Heart Rhythm Case Reports* (forthcoming 2016), http://www.heartrhythmcasereports.com/article/S2214-0271(16)00014-2/abstract?cc=y=.
[16] Burton, Paul, et. al., A Medwatch Review of Reported Events in Patients Who Discontinued Rivaroxaban (XARELTO) Therapy in Responses to Legal Advertising, *Heart Rhythm Case Reports* (forthcoming 2016), http://www.heartrhythmcasereports.com/article/S2214-0271(16)00014-2/abstract?cc=y=.

alternatives provide better protection and cause fewer injuries? The answer is clear: by flooding the public with its spin about Xarelto, Janssen is altering the true facts about Xarelto.

Indeed, the PSC does not argue that the public has a right to access materials that are genuinely trade secrets. To this point, Janssen takes a misstep in its absolute assertion that there is no right of the public to access any pre-trial discovery. The PSC has not challenged actual trade secret documents. There are certain documents, such as the design of future studies, future marketing plans, and contracts between Janssen and Bayer that are ongoing, that may qualify as trade secrets. But, as is the case with these documents, Janssen has not met its burden of showing good cause to protect these documents. The public has a right to access discovery materials and records containing information affecting the global health and safety of millions of individuals. *See Citizens First Nat'l Bank v. Cincinnati Ins. Co.*, 178 F.3d 943, 945-46 (7th Cir. 1999) ("Most cases endorse a presumption of public access to discovery materials . . . and therefore require the district court to make a determination of good cause before he may enter the [protective] order.") *and supra* note 14 and accompanying text.

**b.  Global health regulators are currently investigating Xarelto's safety and efficacy in an effort to protect the public.**

Our Supreme Court has recognized the important role that state tort suits play in uncovering unknown drug hazards, noting that state tort suits "can serve as a catalyst" by exposing unknown dangers of drugs to the FDA. *Bates v. Dow Agrosciences, LLC*, 544 U.S. 431, 451 (2005). The Supreme Court has also acknowledged that the FDA has limited resources to monitor the 11,000 drugs on the market, and that there is widespread agreement that the FDA lacks the resources for postmarketing drug safety. *Wyeth v. Levine*, 555 U.S. 555, 578-79 (2009). The PSC's efforts in pursuing this principle have provided the FDA with safety information relating to Xarelto that would otherwise remain hidden from the agency. Because of the PSC's

efforts, the FDA now has access to some of the information that was withheld during the approval process, and is now undertaking a further investigation of Xarelto's safety and efficacy. Likewise, this information has prompted regulators in other nations to open up their own investigations of Xarelto. The FDA should have all the accurate and complete information.

On January 12, 2016, the FDA asked the Defendants seven direct questions relating to its ongoing investigation into the impact of the use of a defective INRatio device in the ROCKET AF clinical trial. *1/12/16 FDA Information Request*, <u>Exhibit R</u> (filed under seal). On February 5, 2016, Janssen provided written responses to the FDA's questions that were inaccurate, incomplete, and/or otherwise wholly misleading. *2/5/16 Janssen Response to FDA Information Request*, <u>Exhibit S</u> (filed under seal). For example, in response to the FDA's request for reports of serious adverse events relating to the device used during the trial, Janssen failed to provide numerous instances of adverse events involving the INRatio device generating clinically relevant erroneous results. *Id*. Similarly, when the FDA asked Janssen to elaborate on the role and responsibilities of a safety investigator in ROCKET, Janssen omitted the fact that this individual had been specifically tasked with investigating suspected instances of INRatio device malfunctions, that a special safety program—called the Covance Recheck Program—had been established to investigate instances of suspected device malfunction, and that the safety program had indeed confirmed the device was malfunctioning in a large number of patients. *Id*. It was then that the PSC felt compelled to take appropriate action. On February 22, 2016, the PSC sought permission of the Court to provide this important evidence to the FDA. *See Plaintiffs' Steering Committee's Mot. to Challenge Confidentiality Designations and for Relief From Pretrial Order No. 12 (Stipulated Protective Order)*, Feb. 22, 2016 (Doc. 2380-2).

On March 8, 2016, Janssen responded that the issue was largely moot as on the day prior

(March 7, 2016), it had provided the majority of the items identified by the PSC to the FDA. *See Defs.' Opp'n to the PSC's Mot. to Challenge Designations and Relief from Pretrial Order No. 12*, Mar. 8, 2016 (Doc. 2642). Janssen's response revealed publicly for the first time the existence of the Covance Recheck Program, that the program had been utilized by more than 140 investigators around the world, and that the program had confirmed the device was malfunctioning. Perhaps the most troubling is the fact that Janssen's March 7, 2016 submission to the FDA revealed that this program, and its results, had never previously been shared with the FDA, despite the fact that the FDA had specifically asked for this type of information during its review and before approval of the drug in March 2011.

After the FDA confirmed that it had previously been unaware of the Covance Recheck Program and the data it generated, the FDA propounded *another* information request on Janssen on April 4, 2016 seeking a detailed explanation of the program, its purpose, its operational details, and information on who was in possession of information relating to the program, including the ROCKET Executive Committee and the ROCKET study's Data and Safety Monitoring Board (DSMB)—the independent group of doctors responsible for ensuring patient safety. *4/4/16 FDA Information Request*, Exhibit T (filed under seal). Amazingly, in its April 18, 2016 response to the FDA, Janssen confirmed that this safety program and the data it generated had previously been withheld from not only the FDA but also the ROCKET Executive Committee and the trial's DSMB. *4/18/16 Janssen Response to FDA Information Request*, Exhibit U (filed under seal). Janssen's April 2016 submission also makes clear that the Covance Recheck Program data is more troubling than initially suspected. ██████████████

███████████████████████████████████

█████████████████████████ It has now been confirmed that Janssen

withheld all of this information from its collaboration partner, Bayer, and as a result the European Medicines Agency (EMA) was not provided this important safety information until May 17, 2016—after it had completed its assessment. *See* Weber Dep. 17:21-19:19, May 19, 2016, Exhibit V (filed under seal).

If it weren't for the PSC's efforts in seeing this important information disclosed to the FDA, the agency (and other regulators around the world)[17] would still be left in the dark about this pivotal safety program and data affecting the approval of Xarelto. There is no doubt that this data undermines the integrity of the ROCKET clinical trial and thus, the integrity of Xarelto. As evidenced by the effects of the PSC's efforts in properly disclosing this relevant and truthful information, including the fact that the FDA and other international health regulators are opening up their own investigations of the drug, it's clear that the documents at issue are a matter of great public concern. It is no wonder that there is tremendous public interest in this information as there are thousands upon thousands of individuals—consumers, regulators, physicians, and the like—who are affected by Xarelto. Hiding information from regulators and the public that impact the health and safety of thousands world-wide is completely contrary to the long-standing principle of public disclosure of information concerning a global health and safety issue. And continued protection of these challenged documents—which keeps them away from the regulators—is contrary to the principles set forth in *Wyeth v. Levine*. The Court should recognize the importance of these documents and the public's right of access to this significant and potentially life-saving information.

---

[17] The EMA was deprived of the same information as was the FDA while it was forming its own conclusions about Xarelto's efficacy. *See* Jurgen Weber Dep. 17:21-19:19 (confirming that the Covance Recheck data was not provided to the EMA as part of their review process and that the program and data had been hidden from Bayer—Janssen's co-development partner for Xarelto).

## CONCLUSION

As part of the case management architecture of this MDL, PTO 12 strikes an important balance between litigation and commercial interests; but to be workable in practice, this balance depends on the parties' good faith and their respect for the Order's disclosure objectives, as well as its protections. Janssen has demonstrated no good cause to maintain the current status of its designations on the challenged documents. Instead of demonstrating any specific and substantial harm that would arise upon the disclosure of the documents at issue, Janssen offers only bare-bone conclusory statements for a witness with no particular knowledge that it would be "competitively disadvantaged." Such boilerplate statements do not satisfy Janssen's burden of demonstrating good cause for protecting each document at issue. Any rationale stemming from fear that Janssen will be projected in a negative light should have nothing to do with this Court's analysis. Janssen's wholesale designations not only violate the letter and spirit of PTO 12, they trample on the long-standing principle of public disclosure of information concerning a wide-spread health and safety issue that impacts the public at large. If not for the efforts of the PSC in properly disclosing relevant and important information relating to Xarelto, health regulators around the world would remain oblivious as to the true safety concerns of the drug. Therefore, for the foregoing reasons, the Court should evaluate that the designations of Janssen's 160 exhibits, and deny the motion for protective order as to the four deposition transcripts that Janssen made no attempt to support in its brief. Those depositions should be unsealed in the Court record.

Dated:          June 6, 2016

Respectfully submitted,

*/s/ Leonard A. Davis*

_____
Leonard A. Davis, Esq. (Bar No. 14190)
**HERMAN, HERMAN & KATZ, LLC**
820 O'Keefe Avenue
New Orleans, LA  70113
PH:  (504) 581-4892
FAX:  (504) 561-6024
Email:  ldavis@hhklawfirm.com

Gerald E. Meunier (Bar No. 9471)
**GAINSBURGH BENJAMIN DAVID MEUNIER & WARSHAUER, LLC**
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA  70163-2800
PH:  (504) 522-2304
FAX: (504) 528-9973
Email:  gmeunier@gainsben.com


**Plaintiffs' Liaison Counsel**

30

### PLAINTIFFS' STEERING COMMITTEE

Andy D. Birchfield, Jr. (Co-Lead Counsel)
234 Commerce Street
Post Office Box 4160
Montgomery, Alabama 36103-4160
Phone: (334) 269-2343
Fax: (334) 954-7555
Email: Andy.Birchfield@BeasleyAllen.com

Brian H. Barr (Co-Lead Counsel)
316 Baylen Street, Suite 600
Pensacola, FL 32502
Phone: (850) 435-7045
Fax: (850) 436-6044
Email: bbarr@levinlaw.com

Russell T. Abney
2100 RiverEdge Parkway,
Suite 720
Atlanta, Georgia 30328
Email: rabney@lawyerworks.com

Dr. Mark Alan Hoffman
1650 Market Street, Suite 3450
Philadelphia, PA 19103
Phone: (215) 574-2000
Fax: (215) 574-3080
Email: mhoffman@rossfellercasey.com

Michael Goetz
201 N. Franklin St., 7th Floor
Tampa, FL 33602
Phone: (813) 221-6581
Fax: (813) 222-4737
Email: MGoetz@ForThePeople.com

Neil D. Overholtz
17 E. Main Street , Suite 200
Pensacola, Florida 32501
Phone: (850) 916-7450
Fax: (850) 916-7449
Email: noverholtz@awkolaw.com

Bradley D. Honnold
11150 Overbrook Rd., Ste. 200
Leawood, KS 66211
Phone: (913) 266-2300
Fax: (913) 266-2366
Email: bhonnold@bflawfirm.com

Frederick Longer
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
Fax: (215-592-4663
Email: flonger@lfsblaw.com

Jeffrey S. Grand
77 Water Street
New York, NY 10005
Phone: (212) 584-0700
Fax: (212) 584-0799
Email: jgrand@seegerweiss.com

Roger C. Denton
100 S. 4th Street
St. Louis, MO 63102
Phone: (314) 621-6115
Email: rdenton@uselaws.com

Dianne M. Nast
1101 Market Street, Suite 2801
Philadelphia, Pennsylvania 19107
Phone: (215) 923-9300
Email: dnast@nastlaw.com

Ellen Relkin
700 Broadway
New York, New York 10003
Phone: (212) 558-5500
Fax: (212) 344-5461
Email: Erelkin@weitzlux.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2016 a copy of the above and foregoing Response To Defendant Janssen's Motion To Enforce Pretrial Order No. 12 and For Entry Of A Protective Order has contemporaneously with or before filing been served on all parties or their attorneys in a manner authorized by FRCP 5(b)(2), Local Rule 5.1 of the Eastern District of Louisiana and via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre-Trial Order No. 17.


*/s/ Leonard A. Davis*

**Leonard A. Davis**