# EXHIBIT D

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | MDL No. 2592 |
| | SECTION L |
| THIS DOCUMENT RELATES TO ALL ACTIONS | JUDGE ELDON E. FALLON |
| | MAG. JUDGE NORTH |

DECLARATION OF GREGOR THÜSING

**BONN**
**FEDERAL REPUBLIC OF GERMANY**

I, **Gregor Thüsing**, declare under penalty of perjury, that:

## I. Qualifications of Author

1. Since October 2004, I am a jurist and professor at the University of Bonn and Director of its Institute for Labor and Employment Law and Law of Social Security. I studied at the University of Cologne, later working as a research assistant at the university's Institute for Labor and Commercial Law. I graduated Dr. iur. (equivalent to a Ph:D. in law) with a book on industrial action, followed with a LL.M. degree from Harvard Law School and admission to the New York bar. I published a post-doctoral thesis on the Comparative Law of Damages (,,Wertende Schadensberechnung"). Between April 2001 and October 2004, I was a professor at Bucerius Law School in Hamburg. I am a member of the board of the Deutsch-Amerikanische Juristenvereinigung (German-American Lawyers Association, see http://www.dajv.de) and the Gesellschaft für Datenschutz und Datensicherheit e.V., the biggest German data protection organization (s. www.gdd.de). I was an

independent expert in a hearing of the German parliament Deutscher Bundestag concerning the reform of German data protection in employment law (see https://www.bundestag.de/dokumente/textarchiv/2011/34437111_kw20_pa _inneres/205364).

2. Two of my main fields of work are employment law and data protection law. I have published more than 250 articles in German law reviews, several books and contributions to law journals. I have been quoted as a reference in decisions of the German Federal Labor Court (Bundesarbeitsgericht) and the constitutional court ("Bundesverfassungsgericht") more than 200 times, including the field of employee data protection. My publications include:

- Data Protection in the Employment Relationship: The German View, in: Blanpain (ed.), Protection of Employees' Personal Information and Privacy, 2014, S. 79 ff. (together with Johannes Traut and Gerrit Forst)
- Arbeitnehmerdatenschutz und Compliance, Beck-Verlag, 310 pages, 2010; 2nd ed. 2014 titled Beschäftigtendatenschutz und Compliance, 424 pages (editor and among others author) („Employee Data Protection and Compliance")
- European Labor Law, Hart Publishers /Nomos, 216 pages, 2013

**II. Factual Background**

3. The factual background of this opinion is described in an order of the court from May 11th 2016. The order specifically addresses the personnel files of deponents Frank Misselwitz and Dagmar Kubitza. The PSC seeks to compel Xarelto-related documents associated with

- these witnesses' performance reviews,
- self-reviews,
- annual compensation, incentives and bonuses,

or, in the alternative, to produce these documents to the Court for *in camera* inspection. I was told, that the documents involved are comparable to those of Theodore Spiro, which have already been disclosed and which I had the opportunity to look at.

### III. Questions to be answered

4. I was asked by Bayer Pharma AG to answer the following questions:

    1. What is the purpose of German and EU privacy law?

    2. Which general principles need to be considered when processing employee data?

    3. Are the documents sought by the PSC -- in particular, records from employee personnel files concerning compensation, incentive payments, bonuses, and Xarelto-related performance evaluations and self-evaluations -- protected personal data under German and EU privacy law?

    4. Do German and EU law permit transfer of the personnel files to the US for discovery in US litigation in the circumstances of this case, even if there is a confidentiality order in place?

    5. Does the German government actually enforce its privacy law?

**IV. Answers to the questions**

**Answer to Question No. 1: Purpose of German and EU privacy law**

5. In a nutshell, German data protection law is the legal response to the various threats posed to privacy[1] – no matter whether they originate from the state or an individual. It has a comparatively long history in Germany: It first received public attention in connection with profiling done to combat the "Rote Armee Fraktion (RAF)" left wing terrorists. This led to the adoption of the first law worldwide on data protection in the state of Hessen in 1970.[2] The first federal act on the protection of personal data, the Bundesdatenschutzgesetz [BDSG], dates back to 1977. Another step forward was the Volkszählungsurteil (Census case) of the Bundesverfassungsgericht (Federal Constitutional Court)[3] in 1983 which created the constitutional mandate for the protection of personal data. In this decision, the Constitutional Court held that the Grundgesetz (Basic Law, i.e. the German Constitution) does not only protect privacy as such but that the respect of a person's private life also encompasses the protection of personal data.[4] Thus the constitution mandates legal protection for personal data. Since 1995 with the adoption by the EU of the Directive 95/46/EC on the protection of individuals with regard to the processing of personal data and on the free movement of such data (Data Protection Directive) data protection law is harmonized by European law, its reform is no longer a purely national but rather primarily a European topic.

6. Data protection law applicable in Germany can be derived from two sources: the law of the European Union and national German law. Data Protection law and the protection of privacy are deeply rooted in European law. The primary law of the European Union places great emphasis on the protection of citizens' privacy and personal data and mandates protection of personal data as can be gleaned from the Charter of Fundamental Rights. According to Art. 6 para. 1 of the Treaty of the European Union the Charter of Fundamental Rights is part of the primary law of the Union. Art. 8

---

[1] Cf. from a European point of view *Nick Platten*, Background to and History of the Directive, in: David Bainbridge, EC Data Protection Directive (1996), ch. 2.

[2] *Alexander Genz*, Datenschutz in Europa und den USA (2004), p. 9; also see http://www.iuscomp.org/gla/statutes/BDSG.htm (as at April 14th, 2014).

[3] Bundesverfassungsgericht (Constitutional Court, BVerfG), December 15th 1983, cases 1 BvR 209/83 et alia, see: BVerfGE 65, 1.

[4] This important case is summarized below (chapter IX).

of the EU Charter of Fundamental Rights contains an explicit guarantee of the protection of personal data. It reads as follows:

> **Article 8 Protection of personal data**
>
> 1. Everyone has the right to the protection of personal data concerning him or her.
>
> 2. Such data must be processed fairly for specified purposes and on the basis of the consent of the person concerned or some other legitimate basis laid down by law. Everyone has the right of access to data which has been collected concerning him or her, and the right to have it rectified.
>
> 3. Compliance with these rules shall be subject to control by an independent authority.

7. In accordance with these fundamental guarantees Directive 95/46/EC on the protection of individuals with regard to the processing of personal data and on the free movement of such data (**Data Protection Directive**) is the central instrument regulating the processing of personal data. The Data Protection Directive – and therefore also the German Federal Data Protection Act BDSG – applies to all automated processing of personal data with the exception of the fields which fall outside the scope of the law of the European Union – such as national security or defence – and processing by a natural person in the course of a purely personal or household activity. Thus the Directive regulates not only data processing by private citizens – in particular data processing in a commercial setting – but also data processing by state agents, for instance in the field of law enforcement or social security.

8. The structure of data protection law is simple and strict: <u>All processing of personal data has to be justified</u>.[5] As far as the national data protection law is concerned, this principle is enshrined in Section 4 (1) of the BDSG. According to this provision, "the collection, processing and use of personal data shall be lawful only if permitted or ordered by this Act or other law, or if the data subject has provided consent." The same principle applies to the law of the European Union (cf. Article 7 of the Data Protection Directive 95/46/EC). <u>Processing means the storage and modification of personal data as well as its transfer from one controller to another.</u>

---

[5] Cf. *Gola/Klug/Körffer*, in: Gola/Schomerus (ed.), Bundesdatenschutzgesetz, 12th edition 2015, Section 4 BDSG para 3.

9. This principle does not only apply to public bodies such as the police, but also restricts the use of personal data by private individuals like an employer. Hence, every employer has to justify all collection, processing, use and transfer of the employees' personal data. According to Section 4 (1) BDSG, there are three permissible grounds for justification:

- the processing is allowed under the BDSG,

- the processing is allowed under another applicable law addressing data protection issues, or

- the data subject (i.e. the employee) has given his or her consent. According to Section 4a (1) BDSG this consent can be withdrawn deliberately and must be given voluntarily. The employee has no duty to consent. [6]

10. Thus, it becomes clear, that the BDSG's aim is certainly not to block discovery. It is not a statute enacted to criminalize the provision of information in the course of legal proceedings outside of the jurisdiction of the statute (as the French statute in Societe Nationale Industrielle Areospatiale v. U.S. District Court), but a statute to protect the right of privacy irrespectively of a national or transnational context. In the words of the statute:

> **Section 1 BDSG: Purpose and scope**
>
> (1) The purpose of this Act is to protect the individual against his/her right to privacy being impaired through the handling of his/her personal data.

11. The aim of these rules is comparable e.g. with the HIPAA Privacy Rule establishing US national standards to protect individuals' medical records and other personal health information and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically. The Rule requires appropriate safeguards to protect the privacy of personal health information, and sets limits and conditions on the uses and disclosures that may be made of such information without patient authorization. The Rule also gives patients rights over their health information, including rights to examine and obtain a copy of their health

---

[6] Bundesarbeitsgericht (BAG), February 19th 2015, case 8 AZR 1011/13, para 30, see: MMR 2015, 544.

records, and to request corrections.[7] The U.S. Department of Health & Human Services summarizes the goals of the HIPAA Privacy Rule and the necessity of balancing the interests[8]:

> "A major goal of the Privacy Rule is to assure that individuals' health information is properly protected while allowing the flow of health information needed to provide and promote high quality health care and to protect the public's health and well being. The Rule strikes a balance that permits important uses of information, while protecting the privacy of people who seek care and healing."

12. All this is done by German and European data protection law – in a broader approach: not limited to health care, but all personal data. The rather narrow exceptions for discovery, which are part of the HIPAA Privacy Rule [(45 C.F.R. § 164.512(e)] are unknown to the German and European law.

**Answer to Question 2: General Principles of Data Processing in an Employment Context**

13. In accordance with Directive 95/46/EC Germany has implemented section 32 (1) BDSG which is since 2009 the central regulation for the use of employee data:

> **Section 32 BDSG Data collection, processing and use for employment-related purposes**
>
> (1) Personal data of an employee may be collected, processed or used for employment-related purposes where necessary for hiring decisions or, after hiring, for carrying out or terminating the employment contract. Employees' personal data may be collected, processed or used to detect crimes only if there is a documented reason to believe the data subject has committed a crime while employed, the collection, processing or use of such data is necessary to investigate the crime and is not outweighed by the data subject's legitimate interest in excluding the collection, processing or use, and in particular the type and extent are not disproportionate to the reason.

---

[7] *See e.g.,* U.S. Department of Health and Human, Summary of HIPAA Privacy Rule, available at http://www.hhs.gov/ocr/privacy/hipaa/understanding/summary/index.html.

[8] http://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html.

(2) Sub-Section 1 shall also be applied when personal data are collected, processed or used without being processed by automatic procedures nor processed, used in or from a non-automated filing system, nor collected in such a filing system for the purpose of processing or use.

(3) The rights of participation of staff councils shall remain unaffected.

14. Since the enactment of this provision according to its clear wording the "necessity" of the data processing for the purpose of employment is required for justification, whereas before 2009 it was sufficient if a data process was useful ("dienlich").[9] The new sec. 32 (1) BDSG is patterned on the jurisdiction of the BAG, which already before this change of statutory law demanded the necessity, not only the usefulness, correcting the wording of the prior statute. Thereby the legislature emphasizes the importance of employee data. Section 32 (1) BDSG applies when an employer processes personal data of an employee for purposes of the employment contract. In its scope, personal data of an employee may only be collected, processed or used for employment-related purposes where necessary for hiring decisions or, after hiring, for carrying out or terminating the employment contract. If the employer processes data for other intentions Section 28 (1) No. 2 BDSG applies. Accordingly the collection, storage, modification or transfer of personal data or their use as a means of fulfilling one's own business purposes shall be admissible only in so far as this is necessary to safeguard justified interests of the controller of the filing system and there is no reason to assume that the data subject has an overriding legitimate interest in his data being excluded from processing or use.

15. As one can see, in any case the processing of data has to be "necessary". This means a weighing of the opposed interests of employer and employee. Those interests need to be named for every single processing of data. In general, a processing of data restrains an employee in its constitutional personal rights. For this reason there need to be employer´s interests such as the protection of his property or business to justify the data processing. If there are legitimate interests on both sides of the scale, these interests need to be balanced in a next step.

---

[9] Cf. to the history of sec. 32 BDSG *Simitis*, in: Simitis (ed.), BDSG, 8th edition 2014, Section 32 para 10.

16. <u>The same principle occurs when an employer is asked to transfer personal data of employees to a third party</u>. In that case there is a change in purpose, wherefore Section 28 (2) BDSG applies. <u>Section 28 (2) BDSG is the legal expression of the limitation of purpose rule.</u>[10] Changing the purpose leads to the necessity of a new justification, which is harder to substantiate than the originally data collection.

17. For any processing of data – irrespective of the ground of justification – Article 6 and 7 of the Directive contain the most important provisions in regard to the substantial standard of law. Article 6 establishes the principles relating to data quality:

**Article 6**

1. Member States shall provide that personal data must be:

(a) processed fairly and lawfully;

(b) collected for specified, explicit and legitimate purposes and not further processed in a way incompatible with those purposes. Further processing of data for historical, statistical or scientific purposes shall not be considered as incompatible provided that Member States provide appropriate safeguards;

(c) adequate, relevant and not excessive in relation to the purposes for which they are collected and/or further processed;

(d) accurate and, where necessary, kept up to date; every reasonable step must be taken to ensure that data which are inaccurate or incomplete, having regard to the purposes for which they were collected or for which they are further processed, are erased or rectified;

(e) kept in a form which permits identification of data subjects for no longer than is necessary for the purposes for which the data were collected or for which they are further processed. Member States shall lay down appropriate safeguards for personal data stored for longer periods for historical, statistical or scientific use.

2. It shall be for the controller to ensure that paragraph 1 is complied with.

---

[10] *Gola/Klug/Körffer,* in: Gola/Schomerus (ed..), Bundesdatenschutzgesetz, 12th edition 2015, Section 28 BDSG para 34 ff.

18. Most important of these principles is the principle enshrined in lit. b and c which may be summarily called the principle of purpose limitation. <u>Data may only be processed for specified purposes and only insofar as it is necessary to fulfil that purpose</u>. This obliges the person controlling the data processing (controller, Art. 2 lit. d of the Data Protection Directive) to reflect his processing activities and define the purposes clearly. This principle can also be found in the German BDSG in Section 28 (1) 2 and was one of the most import principles set up by the Federal Constitutional Court in the landmarking Census Case[11]. Because of the purpose limitation, any change in purpose needs to be justified:

**Section 28 BDSG: Collection and storage of data for own commercial purposes[12]**

(1) The collection, storage, modification or transfer of personal data or their use as a means of fulfilling one's own business purposes shall be admissible

   1. when needed to create, carry out or terminate a legal obligation or quasi-legal obligation with the data subject,

   2. in so far as this is necessary to safeguard justified interests of the controller of the filing system and there is no reason to assume that the data subject has an overriding legitimate interest in his data being excluded from processing or use,

   3. if the data are generally accessible or the controller of the filing system would be entitled to publish them, unless the data subject's legitimate interest in his data being excluded from processing        or use clearly outweighs the justified interest of the controller of the filing system.

In connection with the collection of personal data, the purposes for which the data are to be processed or used are to be stipulated in concrete terms.

(2) Transfer or use for another purpose shall be admissible:

   1. under the conditions given in sub-Section 1 first sentence No. 2 or No. 3,

   2. where necessary

      a) to protect the legitimate interests of a third party or

---

[11] Bundesverfassungsgericht (Constitutional Court, BVerfG), December 15th 1983, cases 1 BvR 209/83 et alia, see: BVerfGE 65, 1.

[12] For this and the following translations of the BDSG see the translation provided by the Language Service of the Federal Ministry of the Interior, http://www.gesetze-im-internet.de/englisch_bdsg/

b)  to avert threats to state or public security or to prosecute criminal offences, and there is no reason to believe that the data subject has a legitimate interest in excluding transfer or use, or

3.  if necessary in the interest of a research institute for the conduct of scientific research, if scientific interest in conduct of the research project substantially outweighs the interest of the data subject in excluding the change of purpose and if the research purpose cannot be attained by other means or can be attained thus only with disproportionate effort."

19. Art. 6 lit. a of the Directive also requires that processing must occur lawfully. Meant by this is that any processing needs an explicit legal basis – this is echoed by Section 4 of the BDSG (see above). The legal grounds for processing are enumerated in Art. 7 of the Data Protection Directive:

**Article 7**

Member States shall provide that personal data may be processed only if:

(a) the data subject has unambiguously given his consent; or

(b) processing is necessary for the performance of a contract to which the data subject is party or in order to take steps at the request of the data subject prior to entering into a contract; or

(c) processing is necessary for compliance with a legal obligation to which the controller is subject; or

(d) processing is necessary in order to protect the vital interests of the data subject; or

(e) processing is necessary for the performance of a task carried out in the public interest or in the exercise of official authority vested in the controller or in a third party to whom the data are disclosed; or

(f) processing is necessary for the purposes of the legitimate interests pursued by the controller or by the third party or parties to whom the data are disclosed, except where such interests are overridden by the interests for fundamental rights and freedoms of the data subject which require protection under Article 1 (1).

20. These alternatives are non-exclusive. Most important in the context of private processing is certainly lit. f, the balance of interest. All other variants enumerated in Art. 7 are no more than descriptions of particular cases in which the balance of interest may tip in favour of the controller.

21. How these general principles are applied is explained by the Article 29 Working Party on Personal Data Protection.[13] This committee has issued a working paper in 2009 on pre-trial discovery for cross border civil Litigation, highlighting the consequences of European data protection law for the limits of US pre-trial discovery[14] - the conclusions also are valid for German law. Some of its statements are important to our case:

- "There is a tension between the disclosure obligations under US litigation or regulatory rules and the application of the data protection requirements of the EU."

- "In order for the pre-trial discovery procedure to take place lawfully, the processing of personal data needs to be legitimate and to satisfy one of the grounds set out in Article 7 of the Data Protection Directive. In addition, for transfers to another jurisdiction the requirements of Article 26 would have to be met in order to provide a basis for such transfer."

- "There appear to be three relevant grounds, namely consent of the data subject, that the compliance with the pre-trial discovery requirements is necessary for compliance with a legal obligation under Article 7(c) or further purposes of a legitimate interest pursued by the controller or by the third party to whom the data are disclosed under Article 7(f)."

- "An obligation imposed by a foreign legal statute or regulation may not qualify as a legal obligation by virtue of which data processing in the EU would be made legitimate.... Compliance with the requirements of the litigation process may be found to be necessary for the purposes of a legitimate interest pursued by the controller or by the third party to whom

---

[13] The Article 29 Working Party, in which all 27 data protection authorities of the European Union are represented, was set up under the Directive 95/46/EC of the European Parliament and of the Council of 24 October 1995 on the protection of individuals with regard to the processing of personal data and on the free movement of such data. It has advisory status and acts independently. Although the opinions published by the Working Group are non-binding, they have a great influence on European and national legislation. For example, the opinion on the new EU-US-privacy-shield was discussed in European law literature and will most likely have a big influence on the outcome of the negotiations. For more information s. http://ec.europa.eu/justice/data-protection/article-29/index_en.htm.

[14] http://ec.europa.eu/justice/policies/privacy/docs/wpdocs/2009/wp158_en.pdf.

the data are disclosed under Article 7(f). This basis would only be acceptable where such legitimate interests are not "overridden by the interests for fundamental rights and freedoms of the data subject."

- "Clearly the interests of justice would be served by not unnecessarily limiting the ability of an organization to act to promote or defend a legal right. The aim of the discovery process is the preservation and production of information that is potentially relevant to the litigation. The aim is to provide each party with access to such relevant information as is necessary to support its claim or defense, with the goal of providing for fairness in the proceedings and reaching a just outcome. <u>Against these aims have to be weighed the rights and freedoms of the data subject who has no direct involvement in the litigation process and whose involvement is by virtue of the fact that his personal data is held by one of the litigating parties and is deemed relevant to the issues in hand, e.g. employees and customers</u>."

- "Article 6 of the Directive provides that personal data must be processed fairly and lawfully, collected for specified, explicit and legitimate purposes and not used for incompatible purposes. The personal data must be adequate relevant and not excessive in relation to the purposes for which they are collected and/or further processed."[15]

**Answer to Question 3: Special protection of Employee Data / Personnel Records**

22. Thus, the protection of personal data is taken serious in the European and German legal system. In addition, personnel records as a collection of employee data are protected even stricter than other less sensitive data. Addressing the applicable German data protection law, the Bundesarbeitsgericht has decided in many cases, that an employer generally has to keep personnel records confidential.[16] Indeed, data like performance reviews or self-reviews are of special fragility to the employee. It tells you much more than he might be willing to disclose: whether he is a good employee, highly respected by his employer, or somebody, his employer would like to dismiss. The interest of confidentiality is significant. In addition, the Bundesarbeitsgericht held that an employer infringes the right for privacy of his employee if he gives away personnel records to a third party without his knowledge.

---

[15] All underlining not in the original.

[16] Bundesarbeitsgericht (BAG), April 4th 1990, case 5 AZR 299/89, see: NZA 1990, 933; September 12th 2006, case 9 AZR 271/06, see: BAGE 119, 238; *Gola*, RDV 2008, 137.

"The employer infringes the employee´s right for privacy, if he discloses personnel records to a third party without the data subject´s knowledge. This is, e.g., the case, if the employment contract and a loan agreement are shown to another employer, the employee wants to apply to."[17]

23. As one commentator says: Due to the special protection of personnel records the transferring to third parties has to be reduced to the indispensable – an even stricter criterion than for employee data in general:

"Personnel files are to keep confidential both in the establishment as vis-a-vis third parties. The disclosure has to be limited to the indispensable"[18]

24. Indeed, how far employee data protection is stressed by the German courts can be illustrated by recent examples of court decisions in a pure national context: The Bundesgerichtshof, the German Federal Court of Justice, ruled last year that a hospital operator is not obliged to reveal the private address of an employed physician to a patient, even if the patient wishes to file a lawsuit against the physician in connection with the patient´s treatment.[19] The private address of an employee is certainly by far less sensitive than the personnel files, and the interest in suing somebody certainly weightier than any interest in a litigation, where the employee is not a party.

**Applicability of German and European privacy law for the sought documents**

25. Generally, personnel records of employees clearly fall within the definition of sec. 3 (1) BDSG, which states the general definition of personal data.

---

[17] Translation provided by myself. In the original: „1. Der Arbeitgeber verletzt das allgemeine Persönlichkeitsrecht des Arbeitnehmers, wenn er dessen Personalakten einem Dritten ohne Wissen des Betroffenen zugänglich macht. Das ist zB dann der Fall, wenn der Arbeitsvertrag und ein Personalkreditvertrag einem anderen Arbeitgeber gezeigt werden, bei dem sich der Arbeitnehmer bewerben will." (BAG, December 18th 1984, case 3 AZR 389/83, see: NZA 1985, 811).

[18] Translated by me, cf. *Herfs-Röttgen*, Rechtsfragen rund um die Personalakte, NZA 2013, 478, 480: "Personalakten sind sowohl innerhalb des Betriebs als auch gegenüber außenstehenden Dritten vertraulich zu behandeln. Der Zugriff ist auf das unbedingt erforderliche Maß zu beschränken"; cf. *Poeche* , in: Küttner, Personalbuch, 23rd edition, 2016, Personalakte, para 9.

[19] Bundesgerichtshof (BGH), January 20th 2015, case VI ZR 137/14, see: NJW 2015, 1525.

**Section 3 (1) BDSG**

"Personal data" means any information concerning the personal or material circumstances of an identified or identifiable individual (the data subject).

26. This definition is a rather broad one.[20] Any information that can be related to an individual person is covered.[21] Therefore the documents containing specific information about the concerned employee, just like compensations, performance evaluations and self-evaluations, undoubtedly are protected by German and EU privacy law. Having reviewed the documents of Theodore Spiro, they contain personal data within the meaning of Section 3 (1) BDSG and - as he is an employee - especially "personal data of an employee" in the sense of Section 32 (1) BDSG.

27. Because Bayer is a German company, located in Germany, German data protection law applies to the transfer of personnel records from Germany to the US. Accordingly to Section 4b BDSG the applicability of German law depends on the location of the controller.[22] Because of the applicability of German law there can be no overriding through regulation of other countries.[23] Therefore the transfer of data to the US has to meet European and German data protection standards.[24]

28. Hence, Bayer Pharma AG has to fulfill the standards of the Directive 95/46/EC as implemented by the German BDSG when requested to transfer employee data for litigation purposes. The following considerations determine the necessary balancing of interests in this litigation.

**Answer to Question No. 4: Balancing the Interests in the Concrete Case**

---

[20] Article 29 Data Protection Working Party, Opinion 4/2007 on the processing of personal data in the employment context, p. 6, available at: ec.europa.eu/justice/policies/privacy/docs/2007/wp136_en.pdf.

[21] See *Simitis* in: Simitis (ed.), BDSG, 8th edition 2014, Section 3 para 5.

[22] *Simitis* in: Simitis (ed.), BDSG, 8th edition 2014, Section 4b para 8.

[23] Prevailing opinion, see *Lux/Glienke*, US-Discovery versus deutsches Datenschutzrecht, RIW 2010, 603, 606; *Spies/Schröder*, Auswirkungen der elektronischen Beweiserhebung (eDiscovery) in den USA auf deutsche Unternehmen, MMR 2008, 275, 278; therefore wrong interpretation: *Lux/Glienke*, US-Discovery versus deutsches Datenschutzrecht RIW 2010 403, 405.

[24] See *Simitis* in: Simitis (ed.), BDSG, 8th edition 2014, Section 4b para 8; *Rath/Klug*, e-Discovery in Germany, K & R 2008, 594, 596.

29. Based on these general observations I agree with the conclusion of the declaration of *Henning Moelle*, executed on December 7th 2015, already presented to the court, that also according to my opinion Bayer Pharma AG is not allowed to disclose the personal files of Frank Misselwitz and Dagmar Kubitza. To reason this, I state my main conclusions as follows:

**The necessity of the data has to be proven *in concreto***

30. Because of the substantial protection of employee data, a processing of data is lawful if there are concrete indications that the data is "necessary" for a certain purpose. As the working party says, it is required "in any case, in which it is relied on the processing that takes place is actually 'necessary for' the achievement of the objective in question rather than merely incidental to its achievement".[25] According to this principle, one can state that the more indirect a nexus between the datum and the purpose is, the lesser the interest has to be weighted. Therefore, it is an important aspect, that the employee is only a third party to suit.[26] Indeed, according to Art. 8.2.E directive 95/46/EG (= sec. 28 (6) No. 3 BDSG), the collection, processing and use even of special types of personal data is justified, where "processing is necessary for the establishment, exercise or defense of a legal claim". The Working party comments on this justification:

> "This has some relevance in the employment context particularly in relation to claims made by workers against their employer perhaps on the grounds of unfair dismissal, e.g. transfer of workers' data to lawyers and courts. It is however limited to actual and really prospective claims. It would not justify the processing of sensitive data of all workers on the basis that one day one of them or a third party might make a legal claim."[27]

31. Thus – the typical case is a legal proceeding that involves the employee himself. If there is a concrete claim, the employer is entitled to process even sensitive data in the sense of Section 3 (9) of

---

[25] 'Working pater No. 48, http://ec.europa.eu/justice/data-protection/article-29/documentation/opinion-recommendation/files/2001/wp48_en.pdf.

[26] Cf. *Spies/Schröder*, Auswirkungen der elektronischen Beweiserhebung (eDiscovery) in den USA auf deutsche Unternehmen, MMR 2008, 275, 280, emphasizing, that an employee – other than the company – did not chose to enter the US market, thereby assuming the risk of US discovery.

[27] Working paper 8, http://ec.europa.eu/justice/policies/privacy/docs/wpdocs/2001/wp48en.pdf.

those employees taking part in an actual or really prospective lawsuit. Here it is different. The interest in disclosure has to override two interests: The interest of the collector to respect the aims and goals of national data protection law and the interest of the employee who is not a party to the litigation - and therefore this interest has less weight than an interest of Bayer Pharma AG itself, where the employee is party to the litigation. There may be cases, where disclosure is justified by a legitimate interest of the litigation party even in the light of German data protection law,[28] but it always has to respect overriding interests of the data subject, i.e. the employee. The lesser the nexus between the actual use of the data and the original purpose of filing, and the lesser the employee has to do with this actual use, the more sensitive the data is, the weightier have to be considered his interests.

32. As already pointed out "An obligation imposed by a foreign legal statute ... may not qualify as a legal obligation by virtue of which data processing in the EU would be made legitimate".[29] As the BDSG offers possibilities to justify a disclosure of information to third parties, the controller cannot exculpate in Germany with the mere fact of an US pre-trial motion. Otherwise, they could easily undermine the level of data protection established by German (and European) legislation. Even legal obligations established in another EU or EEA member states are deemed not to qualify as relevant justification according to the BDSG.[30] Bayer Pharma AG is a German company and has to comply with German law – irrespective of the expectations of foreign legal statutes. Thus, section 1 (3) BDSG states that only other legal provisions of the Federation are precedent to the BDSG – evidently US law is not such regulation of the German Federation:

**Section 1 BDSG**

---

[28] Compare *Brisch/Laue*, E-Discovery und Datenschutz, RDV 2010, 1, 5, who suppose in the case of US discovery a legitimate, overriding interest of the controller if a direct interest can be assumed –without special reference to employee data.

[29] This statement of the Working Party is shared also by all commentators, the Andrea Patzak et al., Cross Border Data Transfer in E-Discoveries in the U.S. and the European and German Privacy Laws, 1 Computer L. Rev. Int'l 13, 14 (2011); *Oliver Förster and Osama Almughrabi*, Managing the Conflict Between U. S. E-Discovery and the German Data Protection Act 36 Hastings Int'l & Comp. L. Rev. 111 (in an article also quoted by the court in its motion); *Burianski/Reindl*, Truth or Dare? The conflict between E-discovery in International Arbitration and German Data Protection Rules, SchiedsVZ 2010, 187; *Simitis*, in: Simitis (ed.), Bundesdatenschutzgesetz, 8th edition 2014, Section 4b para 97.

[30] *Burianski/Reindl*, Truth or Dare? The conflict between E-discovery in International Arbitration and German Data Protection Rules, SchiedsVZ 2010, 187, 192.

(3) In so far as other legal provisions of the Federation are applicable to personal data, including their publication, such provisions shall take precedence over the provisions of this Act.

33. At the same time the right for privacy of the concerned employee needs to be respected. The requested personnel record contains various sensitive data which are only entrusted by the employee to the employer for employment purposes. Litigation is no such employment purpose. This change of purpose, which would lie in a use in the trial, cannot be justified: Especially for fragile data collections about one person, the limitation of purpose is an important principle in European data protection law. The change in purpose and controller in the course of a transfer of a personnel record obviously sets up intense new risks for the employee´s right to privacy. He cannot influence the further use of his personal data as it is once transferred for litigation uses to the plaintiffs. Also the fact that the first step might be only the *in camera* review does not mitigate the intrusion to the right of privacy, as once the court would decide, that the information should be disclosed, the employee cannot prevent this next step.

34. The interest of confidentiality due to the sensitivity of personnel records is multiplied by the risks caused by the litigation purpose. The plaintiffs are interested in impeaching the witness. No one likes, if somebody is calling into question one's credibility. Such intended use increases the employee´s interest in keeping discretion. As the trial may be become public at one point, the employee could see himself in the situation of justifying his working behavior against a third party, he has never worked for and did not give his consent to use his personnel record, or even the public. In the end the employee might be pilloried for his everyday working behavior. Or even the mere fact, that others get to know, what he earns, might be something, he legitimately wants to prevent. One has also to keep in mind that the concerned employee did not work under the scope of US legislation, wherefore his personnel record has no immediate relation to this legal system.[31]

35. As the result of balancing the interests, <u>under the current circumstances I come to the conclusion, that there seems to be no concrete, sufficient case-related interest in disclosing personnel records of current or former employees of Bayer Pharma AG, if its aim is just the</u>

---

[31] *Spies/Schröder*, Auswirkungen der elektronischen Beweiserhebung (eDiscovery) in den USA auf deutsche Unternehmen, MMR 2008, 275, 280.

evaluation of the credibility, bias or motivation of the witness, the vague possibility of impeaching the credibility of witnesses or speculative other similar remote aims. The possible loss of control over personal data as well as the principle of compliance with applicable law overrides the counter balancing interest.

**Answer to Question No. 5: Enforcement of Privacy Law by German Authorities**

36. If Bayer Pharma AG discloses personnel records as requested based on US law and this disclosure would be illegal under applicable German data protection law, Bayer Pharma AG is jeopardized by danger of criminal sanctions by German authorities. An – according to German standards - illegal disclosure of protected data, puts Bayer Pharma AG in the risk of sanctions as e.g. administrative fines up to € 300,000 for every single breach of the BDSG (sec. 43, 44 BDSG) and claims for damages (sec. 7 BDSG).[32] In addition, single advisors or board members who are concerned with the unlawful processing of data can be criminally convicted.[33]

37. Every German state has its own Commissioner for Data Protection and Freedom of Information with an own administration.[34] Those Commissioners are in charge for imposing fines against private controllers. Before imposing fines, they observe private data controllers and investigate if companies made themselves suspicious of violation of data protection law. Another task is to advise data controllers. Regularly the Commissioners publish opinions on recently discussed data protection issues. In course of the verdict of the ECJ about the Safe-Harbour-treaty between the US and the EU[35], which was a basis for transferring data from European countries to the US, the Commissioner of Schleswig-Holstein has threatened private data controllers with sanctions when transferring data to the US:

> "The ULD will examine whether orders against private bodies must be issued and on which basis data transfers to the United States must be suspended or banned. Furthermore, we must examine whether private bodies have committed an offence

---

[32] See *Burianski/Reindl*, Truth or Dare? The conflict between E-discovery in International Arbitration and German Data Protection Rules, SchiedsVZ 2010, 187, 196.

[33] E.g. BGH, June 4th 2013, case 1 StR 32/13, see: BGHSt 58, 268.

[34] https://www.datenschutzbeauftragter-info.de/datenschutzbeauftragte-von-bund-und-laendern/.

[35] EuGH, October 6th 2015, case C-362/14, see: NJW 2015, 3151.

due to the transmission of data to a third country without an adequate level of data protection."[36]

38. In addition to the State Commissioners, the Federal Republic of Germany also has an elected Commissioner for Data protection, at the moment Andrea Voßhoff[37], as well as the EU, which has named its own European Data Protection Supervisor, Giovanni Buttarelli.[38] Their main task is to advise controllers, encourage data protection legislation and ensure a high standard of data protection.

39. Sanctions are indeed imposed by the State Commissioners against controllers. There has been a change in handling violations of data protection law since 2009, when the BDSG was revised. The Commissioner of Berlin publicly stated: "Imposing fines is one instrument to protect the right for privacy. We will use it more frequently in the future".[39] He added that his administration will give up on the rather restrictive use of fines.[40] The State Commissioners turned rhetoric into action, what the following examples of rigorous use of fines in the last years may illustrate:

- On December 29, 2014, the Commissioner for Data Protection and Freedom of Information of the German state Rhineland-Palatinate issued a press release stating that it imposed a fine of €1,300,000 on the insurance group Debeka. According to the Commissioner, Debeka was fined due to its lack of internal controls and its violations of data protection law. Debeka sales representatives allegedly bribed public sector employees during the eighties and nineties to obtain address data of employees who were on path to become civil servants. Debeka purportedly wanted this address data to market insurance contracts to these employees. The Commissioner asserted that the action against Debeka is intended to emphasize that companies must handle personal data in a compliant manner.

---

[36] https://www.datenschutzzentrum.de/artikel/981-.html.

[37] http://www.bfdi.bund.de/DE/BfDI/DieBfDI/bfdi-node.html.

[38] https://secure.edps.europa.eu/EDPSWEB/edps/lang/en/EDPS/cache/offonce.

[39] BBDI, Jahrbuch 2009, p. 86. Translation provided by myself, in the original: "Das Bußgeldverfahren ist ein Instrument zum Schutz der informationellen Selbstbestimmung. Wir werden dieses Instrument zukünftig stärker nutzen."

[40] BBDI, Jahrbuch 2009, p. 86.

The fine was accepted by Debeka after sanctions against individual board members where threatened[41] and to avoid lengthy court proceedings.[42]

- In July 2012 the Commissioner for data protection and freedom of information of the German state Hamburg sanctioned Europcar with a fine of €54,000 for illegal collection of personal data. Europcar was tracking its hire cars in order to control customer's compliance with contractual obligations without informing customers of the GPS detection.[43]

- 30 November 2010: Klaus Treschan, former chief of Deutsche Telekom Group Security, sentenced to imprisonment for three and a half years. His use of telephone connection data of journalists, unionists and supervisory board members was a breach while the sentence reflects three additional charges of bad faith and fraud.[44]

- 23 November 2010: fine of €200,000 imposed on Hamburger Sparkasse for illegally allowing its customer service representatives access to customers' bank data, and for profiling its customers.[45]

- October 2009: €1,123,503.50 fine imposed on Deutsche Bahn AG by data protection authority of Berlin for several breaches of data protection law. In a nutshell, Deutsche Bahn AG secretly aligned personal data of a big number of employees and their relatives with lists of suppliers.[46]

- September 2008: The data protection authorities of 12 German states imposed fines against the supermarket chain LIDL for several breaches of German data protection law totaling € 1,462,000. LIDL was systematically monitoring employees regarding their private life and financial situation.[47]

40. But the controller is not only jeopardized by federal sanctions. Data protection, especially in the employment context, is an issue with special attention of the German society. Fines imposed by the

---

[41] http://daserste.ndr.de/panorama/aktuell/Debeka-Vorstand-droht-Millionen-Bussgeld,beamte141.html.

[42] https://www.datenschutz.rlp.de/de/presseartikel.php?pm=pm2014122901.

[43] https://www.datenschutz-hamburg.de/news/detail/article/unzulaessige-gps-ortung-von-mietwagen.html.

[44] https://www.datenschutzbeauftragter-info.de/telekom-bespitzelungsaffaere-bgh-bestaetigt-haftstrafe-fuer-ehemaligen-abteilungsleiter/.

[45] https://www.datenschutz-hamburg.de/news/detail/article/iv-7-kreditwirtschaft-23-taetigkeitsbericht-20102011.html.

[46] http://www.spiegel.de/international/germany/letter-from-berlin-spy-scandal-rattles-deutsche-bahn-top-managers-a-607206.html.

[47] https://www.datenschutzzentrum.de/presse/20080911-bw-lidl-bussgeldverfahren.pdf.

Data Commissioner are discussed in the press, do cast a poor light on the affected companies and cause severe reputation damages. Therefore, e.g., in course of the Deutsche Bahn data scandal the chairman Helmut Mehdorn resigned, after criminal investigations by the public prosecutors had started.[48]

     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on June 6th, 2016.

Gregor Thüsing

---

[48] https://de.wikipedia.org/wiki/Hartmut_Mehdorn.