## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | MDL No. 2592 |
| HARRY MICHAEL ALDERDICE, ON BEHALF OF THE ESTATE OF BARBARA ALDERDICE (deceased), MICHAEL BECKWITH, EULAH BLANK, JULIUS & GERTRUDE GUILLORY, VERNON VAUGHN, AND GARY & KAY WALKER, | SECTION: L JUDGE FALLON MAG. JUDGE SHUSHAN |
| Plaintiffs, | JURY TRIAL DEMANDED |
| v. | |
| JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a JOHNSON AND JOHNSON PHARMACEUTICAL RESEARCH AND DEVELOPMENT LLC, JANSSEN ORTHO LLC, JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA INC. f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., JOHNSON & JOHNSON, BAYER HEALTHCARE PHARMACEUTICALS, INC., BAYER PHARMA AG, BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE AG, and BAYER AG, | |
| Defendants. | |

## COMPLAINT

Plaintiffs, by and through their undersigned counsel, hereby amend their original

bundled Complaint to add Defendant Johnson & Johnson to this action pursuant to Federal Rule of Civil

Procedure 15(a)(2) and to substitute Harry Michael Alderdice as party plaintiff for Barbara Alderdice,

deceased, and add a corresponding survival action.  Plaintiffs file this Amended Complaint in the

Eastern District of Louisiana pursuant to the Court's Stipulated Pre-Trial Order No. 9 addressing the direct filing of this action in MDL No. 2592, and hereby asserts the following claims and causes of action against the Defendants:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy as to the Plaintiffs exceeds $75,000.00, exclusive of interest and costs, and because there is complete diversity of citizenship between the Plaintiffs and the Defendants.

2.      This Court has personal jurisdiction over the Defendants because they have done business in the State of Louisiana, have committed a tort in whole or in part in the State of Louisiana, have substantial and continuing contact with the State of Louisiana, and derive substantial revenue from goods used and consumed within the State of Louisiana.  The Defendants actively sell, market and promote its pharmaceutical product Xarelto to physicians and consumers in this state on a regular and consistent basis.

3.      Venue in this district is proper because the United States Judicial Panel on Multi-District Litigation issued a Transfer Order to centralize this litigation in the Eastern District of Louisiana, MDL 2592, and pursuant to Pre-Trial Order No.9 entered on March 24, 2015 in *In Re: Xarelto (Rivaroxaban) Products Liability Litigation.*

## NATURE OF THE CASE

4.     Plaintiffs used Xarelto, also known as rivaroxaban, which is a medication used to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat deep vein thrombosis (hereinafter referred to as "DVT") and pulmonary embolism (hereinafter referred to as "PE"), to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

5.     Defendants, JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a JOHNSON AND JOHNSON PHARMACEUTICAL RESEARCH AND DEVELOPMENT LLC, JANSSEN ORTHO

LLC, JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA INC. f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., BAYER HEALTHCARE PHARMACEUTICALS, INC., BAYER PHARMA AG, BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE AG, and BAYER AG (hereinafter collectively referred to as "Defendants") designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Xarelto.

6.     When warning of safety and risks of Xarelto, Defendants negligently and/or fraudulently represented to the medical and healthcare community, the Food and Drug Administration (hereinafter referred to as the "FDA"), to Plaintiffs and the public in general, that Xarelto had been tested and was found to be safe and/or effective for its indicated use.

7.     Defendants concealed their knowledge of Xarelto's defects from Plaintiffs, the FDA, the public in general, and/or the medical community specifically.

8.     These representations were made by Defendants with the intent of defrauding and deceiving Plaintiffs, the public in general, and the medical and healthcare community in particular, and were made with the intent of inducing the public in general, and the medical community in particular, to recommend, dispense and/or purchase Xarelto for use to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, all of which evinced a callous, reckless, willful, depraved indifference to health, safety and welfare of the Plaintiffs herein.

9.     Defendants negligently and improperly failed to perform sufficient tests, if any, on humans using Xarelto during clinical trials, forcing Plaintiffs, and Plaintiffs' physicians, hospitals, and/or the FDA, to rely on safety information that applies to other non-valvular atrial fibrillation treatment and

DVT/PE treatment and prophylaxis, which does not entirely and/or necessarily apply to Xarelto whatsoever.

10.    As a result of the foregoing acts and omissions, the Plaintiffs were and still are caused to suffer serious and dangerous side effects including, inter alia, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, expenses for hospitalization and medical treatment, and loss of earnings. Plaintiffs herein has sustained certain of the above health consequences due to Plaintiff's use of Xarelto.

11.    Defendants concealed their knowledge of the defects in their products from the Plaintiff, and Plaintiff's physicians, hospitals, pharmacists, the FDA, and the public in general.

12.    Consequently, Plaintiffs seek compensatory damages as a result of their use of the Xarelto, which has caused Plaintiffs to suffer from life-threatening bleeding, as well as other severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for medical treatment, monitoring and/or medications, and loss of earnings.

13.    The Consortium Plaintiffs seek compensatory damages as result of Plaintiffs' use of Xarelto and resulting injures. Consortium Plaintiffs have suffered damages and harm, including, but not limited to, emotional distress, medical expenses, other economic harm, as well as a loss of consortium, services, society, companionship, love and comfort.

## PLAINTIFF SPECIFIC ALLEGATIONS

14.    HARRY ALDERDICE, on behalf of the estate of BARBARA ALDERDICE (deceased), and Plaintiff Decedent BARBARA ALDERDICE, at all times relevant hereto, are citizens and residents of Maury County, Tennessee.

(a)    Upon information and belief, Plaintiff was prescribed and began using Xarelto on or around August 22, 2013, upon direction of her physician for the treatment

of Atrial Fibrillation.

    (b)    As a direct and proximate result of the use of Defendants' Xarelto, Plaintiff experienced dysfunctional internal bleeding on or about June 29, 2014, which was life-threatening and required blood transfusions and extensive hospitalization from the use of Xarelto.

15.    Plaintiff MICHAEL BECKWITH, at all times relevant hereto, is a citizen and resident of Allegheny County, Pennsylvania.

    (a)    Upon information and belief, Plaintiff was prescribed and began using Xarelto on or around June 20, 2013, upon direction of his physician for the treatment of DVT.

    (b)    As a direct and proximate result of the use of Defendants' Xarelto, Plaintiff experienced dysfunctional internal bleeding on or about July 18, 2013, which was life-threatening and required blood transfusions and extensive hospitalization from the use of Xarelto.

16.    Plaintiff EULAH BLANK, at all times relevant hereto, is a citizen and resident of Jefferson County, Louisiana.

    (a)    Upon information and belief, Plaintiff was prescribed and began using Xarelto on or around November 9, 2013, upon direction of her physician for the treatment of a cardiovascular problem.

    (b)    As a direct and proximate result of the use of Defendants' Xarelto, Plaintiff experienced dysfunctional internal bleeding on or about August 8, 2014, which was life-threatening and required blood transfusions and extensive hospitalization from the use of Xarelto.

17.    Plaintiff JULIUS GUILLORY and Consortium Plaintiff GERTRUDE GUILLORY, at all times relevant hereto, are citizens and residents of Alameda, California.

    (a)    Upon information and belief, Plaintiff was prescribed and began using Xarelto on or around May 17, 2013, upon direction of her physician for as prophylactic measure against the risk of thromboembolism.

    (b)    As a direct and proximate result of the use of Defendants' Xarelto, Plaintiff experienced dysfunctional internal bleeding on or about May 22, 2013.

18.    Plaintiff VERNON VAUGHN, at all times relevant hereto, is a citizen and resident of

Madison County, Illinois.

    (a)   Upon information and belief, Plaintiff was prescribed and began using Xarelto on or around July 5, 2013, upon direction of her physician for the treatment of a cardiovascular problem.

    (b)   As a direct and proximate result of the use of Defendants' Xarelto, Plaintiff experienced dysfunctional internal bleeding on or about July 9, 2013 and September 17, 2013, which was life-threatening and required blood transfusions and extensive hospitalization from the use of Xarelto.

19.    Plaintiff GARY WALKER and Consortium Plaintiff KAY WALKER, at all times relevant hereto, are citizens and residents of Hardin County, Illinois.

    (a)   Upon information and belief, Plaintiff was prescribed and began using Xarelto on or around August 19, 2013, upon direction of her physician for the treatment of a cardiovascular problem.

    (b)   As a direct and proximate result of the use of Defendants' Xarelto, Plaintiff experienced dysfunctional internal bleeding, epistaxis, and hematuria on or about August 26, 2013.

20.    As a direct and proximate result of the use of Defendants' Xarelto, Plaintiffs suffered serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including, diminished enjoyment of life, expenses for hospitalization and medical treatment, and loss of earnings.

21.    As a direct and proximate result of Plaintiffs' use of Xarelto and their resulting injures, Consortium Plaintiffs have suffered damages and harm, including, but not limited to, emotional distress, medical expenses, other economic harm, as well as a loss of consortium, services, society, companionship, love and comfort.

22.    The injuries and damages sustained by Plaintiffs and Consortium Plaintiffs were caused by Defendants' Xarelto.

## PARTY DEFENDANTS

23.    Upon information and belief, Defendant JANSSEN RESEARCH &

DEVELOPMENT LLC f/k/a JOHNSON AND JOHNSON RESEARCH AND DEVELOPMENT LLC (hereinafter referred to as "JANSSEN R&D") is a limited liability company organized under the laws of New Jersey, with a principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933. Defendant JANSSEN R&D's sole member is Janssen Pharmaceuticals, Inc., which is a Pennsylvania corporation with a principal place of business at 1125 Trenton-Harbourton Road, Titusville, New Jersey 08560. Accordingly, JANSSEN R&D is a citizen of Pennsylvania and New Jersey for purposes of determining diversity under 28 U.S.C. § 1332. Defendant JANSSEN R&D is the holder of the approved New Drug Application ("NDA") for Xarelto as well as the supplemental NDA.

24.     As part of its business, JANSSEN R&D is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

25.     Upon information and belief, Defendant JANSSEN R&D has transacted and conducted business in the States of California, Illinois, Louisiana, Pennsylvania, and Tennessee.

26.     Upon information and belief, Defendant JANSSEN R&D has derived substantial revenue from goods and products used in the States of California, Illinois, Louisiana, Pennsylvania, and Tennessee.

27.     Upon information and belief, Defendant, JANSSEN R&D, expected or should have expected its acts to have consequence within the United States of America and the States of California, Illinois, Louisiana, Pennsylvania, and Tennessee, and derived substantial revenue from interstate commerce within the United States and the States of California, Illinois, Louisiana, Pennsylvania, and Tennessee, more particularly.

28.     Upon information and belief, and at all relevant times, Defendant, JANSSEN R&D, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell,

and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

29.    Upon information and belief, Defendant JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA INC. f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. (hereinafter referred to as "JANSSEN PHARM") is a Pennsylvania corporation, having a principal place of business at 1125 Trenton-Harbourton Road, Titusville, New Jersey 08560.

30.    As part of its business, JANSSEN PHARM is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

31.    Upon information and belief, Defendant, JANSSEN PHARM has transacted and conducted business in the States of California, Illinois, Louisiana, Pennsylvania, and Tennessee.

32.    Upon information and belief, Defendant, JANSSEN PHARM, has derived substantial revenue from goods and products used in the States of California, Illinois, Louisiana, Pennsylvania, and Tennessee.

33.    Upon information and belief, Defendant, JANSSEN PHARM, expected or should have expected its acts to have consequence within the United States of America and the States of California, Illinois, Louisiana, Pennsylvania, and Tennessee, and derived substantial revenue from interstate commerce within the United States and the States of California, Illinois, Louisiana, Pennsylvania, and Tennessee, more particularly.

34.    Upon information and belief, and at all relevant times, Defendant, JANSSEN PHARM, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and

distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

35.    Upon information and belief, Defendant JANSSEN ORTHO LLC (hereinafter referred to as "JANSSEN ORTHO") is a limited liability company organized under the laws of Delaware, having a principal place of business at Stateroad 933 Km 0 1, Street Statero, Gurabo, Puerto Rico 00778. Defendant JANSSEN ORTHO is a subsidiary of Johnson & Johnson. The only member of JANSSEN ORTHO LLC is OMJ PR Holdings, which is incorporated in Ireland with a principal place of business in Puerto Rico. Accordingly, JANSSEN ORTHO LLC is a citizen of Delaware, Ireland and Puerto Rico for purposes of determining diversity under 28 U.S.C. § 1332.

36.    As part of its business, JANSSEN ORTHO is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

37.    Upon information and belief, Defendant, JANSSEN ORTHO has transacted and conducted business in the States of California, Illinois, Louisiana, Pennsylvania, and Tennessee.

38.    Upon information and belief, Defendant, JANSSEN ORTHO, has derived substantial revenue from goods and products used in the States of California, Illinois, Louisiana, Pennsylvania, and Tennessee.

39.    Upon information and belief, Defendant, JANSSEN ORTHO, expected or should have expected its acts to have consequence within the United States of America and the States of California, Illinois, Louisiana, Pennsylvania, and Tennessee, and derived substantial revenue from interstate commerce within the United States and the States of California, Illinois, Louisiana, Pennsylvania, and Tennessee, more particularly.

40.    Upon information and belief, and at all relevant times, Defendant, JANSSEN ORTHO, was in the business of and did design, research, manufacture, test, advertise, promote,  market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the  primary  purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-  valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or  PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

41.    Upon information and belief, Defendant JOHNSON & JOHNSON (hereinafter referred to as "J&J) is a corporation organized under the laws of New Jersey with its principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933.

42.    As part of its business, Defendant J&J and its "family of companies" is involved in the research, development, sales, and marketing of pharmaceutical products, including Xarelto.

43.    Upon    information    and    belief,    Defendant    BAYER    HEALTHCARE PHARMACEUTICALS, INC. is, and at all relevant times was, a corporation organized under  the laws of the State of Delaware, with its principal place of business in the State of New Jersey.

44.    Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. was formerly  known as Berlex Laboratories, Inc., which was formerly known as Berlex, Inc. and BAYER HEALTHCARE PHARMACEUTICALS, INC. is the same corporate entity as Berlex, Inc. and  Berlex Laboratories, Inc.

45.    As part of its business, BAYER HEALTHCARE PHARMACEUTICALS, INC.  is involved in the research, development, sales, and marketing of pharmaceutical products  including Xarelto and rivaroxaban.

46.    Upon    information    and    belief,    Defendant,    BAYER    HEALTHCARE PHARMACEUTICALS, INC., has transacted and conducted business in the States of California, Illinois,

Louisiana, Pennsylvania, and Tennessee.

47.     Upon     information     and     belief,     Defendant,     BAYER     HEALTHCARE
PHARMACEUTICALS, INC., has derived substantial revenue from goods and products used in  the
States of California, Illinois, Louisiana, Pennsylvania, and Tennessee.

48.     Upon     information     and     belief,     Defendant,     BAYER     HEALTHCARE
PHARMACEUTICALS, INC., expected or should have expected its acts to have consequence  within
the  United  States  of  America  and  the  States  of  California,  Illinois,  Louisiana,  Pennsylvania,  and
Tennessee, and derived substantial revenue  from interstate commerce within the United States and the
States of California, Illinois, Louisiana, Pennsylvania, and Tennessee, more particularly.

49.     Upon  information  and  belief,  and  at  all  relevant  times,  Defendant,  BAYER
HEALTHCARE  PHARMACEUTICALS,  INC.,  was  in  the  business  of  and  did  design,  research,
manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an  oral
anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic  embolism
in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk  of recurrence of
DVT  and/or  PE,  and  for  prophylaxis  of  DVT  for  patients  undergoing  hip  and  knee  replacement
surgery.

50.     Upon information and belief, Defendant BAYER PHARMA AG is a  pharmaceutical
company domiciled in Germany.

51.     Defendant BAYER PHARMA AG is formerly known as Bayer Schering Pharma  AG and
is the same corporate entity as Bayer Schering Pharma AG. Bayer Schering Pharma AG  is formerly
known as Schering AG and is the same corporate entity as Schering AG.

52.     Upon information and belief, Schering AG was renamed Bayer Schering Pharma  AG
effective December 29, 2006.

53.    Upon information and belief, Bayer Schering Pharma AG was renamed BAYER PHARMA AG effective July 1, 2011.

54.    As part of its business, BAYER PHARMA AG is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

55.    Upon information and belief, Defendant, BAYER PHARMA AG, has transacted and conducted business in the States of California, Illinois, Louisiana, Pennsylvania, and Tennessee.

56.    Upon information and belief, Defendant, BAYER PHARMA AG, has derived substantial revenue from goods and products used in the States of California, Illinois, Louisiana, Pennsylvania, and Tennessee.

57.    Upon information and belief, Defendant, BAYER PHARMA AG, expected or should have expected its acts to have consequence within the United States of America and the States of California, Illinois, Louisiana, Pennsylvania, and Tennessee, and derived substantial revenue from interstate commerce within the United States and the States of California, Illinois, Louisiana, Pennsylvania, and Tennessee, more particularly.

58.    Upon information and belief, and at all relevant times, Defendant, BAYER PHARMA AG, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

59.    Upon information and belief, Defendant BAYER CORPORATION is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205.

60.    Upon information and belief, Defendant BAYER CORPORATION is the sole member

of BAYER HEALTHCARE LLC, which owns 100% of Schering Berlin, Inc., which owns 100% of Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. As such, Defendant BAYER CORPORATION is a parent of Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC.

61.    At relevant times, Defendant BAYER CORPORATION was engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, its products, including the prescription drug Xarelto.

62.    At relevant times, Defendant BAYER CORPORATION conducted regular and sustained business in the States of California, Illinois, Louisiana, Pennsylvania, and Tennessee, by selling and distributing its products in the States of California, Illinois, Louisiana, Pennsylvania, and Tennessee and engaged in substantial commerce and business activity in the States of California, Illinois, Louisiana, Pennsylvania, and Tennessee.

63.    Upon information and belief, Defendant BAYER HEALTHCARE LLC is a limited liability company duly formed and existing under and by the virtue of the laws of the State of Delaware, with its principal place of business located in the State of New Jersey. BAYER HEALTHCARE LLC's sole member is Bayer Corporation, and is wholly owned by Bayer Corporation, which is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205. Accordingly, BAYER HEALTHCARE LLC is a citizen of Delaware, New Jersey, Indiana and Pennsylvania for purposes of determining diversity under 28 U.S.C. § 1332.

64.    Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC has transacted and conducted business in the States of California, Illinois, Louisiana, Pennsylvania, and Tennessee, and derived substantial revenue from interstate commerce. Defendant BAYER CORPORATION is the sole member of Defendant BAYER HEALTHCARE LLC.

65.    Upon information and belief, at all relevant times, Defendant BAYER  HEALTHCARE LLC expected or should have expected that its acts would have consequences  within the United States of America and in the States of California, Illinois, Louisiana, Pennsylvania, and Tennessee, and derived substantial revenue  from interstate commerce.

66.    Upon information and belief, at all relevant times, Defendant BAYER  HEALTHCARE LLC was in the business of and did design, research, manufacture, test,  advertise,  promote,  market, sell, and distribute Xarelto for use as an oral anticoagulant, the  primary purposes of which are to reduce the risk of stroke and systemic embolism in patients  with non-valvular atrial fibrillation, to treat DVT and PE to reduce the risk of recurrence of DVT  and/or  PE,  and for  prophylaxis of  DVT for  patients undergoing  hip and knee  replacement  surgery.

67.    Upon information and belief, Defendant BAYER HEALTHCARE AG is a  company domiciled in Germany and is the parent/holding company of Defendants BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC, and BAYER PHARMA AG.

68.    Upon information and belief, at all relevant times, Defendant BAYER  HEALTHCARE AG has transacted and conducted business in the States of California, Illinois, Louisiana, Pennsylvania, and Tennessee, and derived  substantial revenue from interstate commerce.

69.    Upon information and belief, at all relevant times, Defendant BAYER  HEALTHCARE AG expected or should have expected that its acts would have consequences  within the United States of America, and in the States of California, Illinois, Louisiana, Pennsylvania, and Tennessee, and derived substantial revenue from interstate commerce.

70.    Upon information and belief, at all relevant times, Defendant BAYER  HEALTHCARE AG exercises  dominion  and  control  over  Defendants  BAYER  CORPORATION,  BAYER

HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC., and BAYER PHARMA AG.

71.    Upon information and belief, Defendant BAYER AG is a German chemical and pharmaceutical company that is headquartered in Leverkusen, North Rhine-Westphalia, Germany.

72.    Upon information and belief, Defendant BAYER AG is the third largest pharmaceutical company in the world.

73.    Upon information and belief, and at all relevant times Defendant BAYER AG is  the parent/holding company of all other named Defendants.

74.    Upon information and belief, at all relevant times, Defendant BAYER AG has transacted and conducted business in the States of California, Illinois, Louisiana, Pennsylvania, and Tennessee, and derived substantial revenue from  interstate commerce.

75.    Upon information and belief, at all relevant times, Defendant BAYER AG  expected or should have expected that its acts would have consequences within the United States  of America, and in the States of California, Illinois, Louisiana, Pennsylvania, and Tennessee, and derived substantial revenue from interstate  commerce.

76.    Upon information and belief, at all relevant times, Defendant BAYER AG was in  the business of and did design, research, manufacture, test, advertise, promote, market, sell, and  distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce  the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for  patients undergoing hip and knee replacement surgery.

**FACTUAL BACKGROUND**

77.    At all relevant times, Defendants were in the business of and did design, research, manufacture, test, advertise, promote, market, sell and distribute Xarelto and rivaroxaban to  reduce

the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

78.  Defendants received FDA approval for Xarelto, also known as rivaroxaban, on July 1, 2011 for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries (NDA 022406).

79.  Defendants then received additional FDA approval for Xarelto to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation on November 4, 2011 (NDA 202439).

80.  The additional indication for treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE was added to the label on November 2, 2012.

81.  Defendants launched Xarelto in the United States (hereinafter referred to as the "U.S.") in 2011.

82.  Xarelto is an anticoagulant that acts as a Factor Xa inhibitor, and is available by prescription in oral tablet doses of 20mg, 15mg, and 10mg.

83.  Approval of Xarelto for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries was based on a series of clinical trials known as the Regulation of Coagulation in Orthopedic Surgery to Prevent Deep Venous Thrombosis and Pulmonary Embolism studies (hereinafter referred to as the "RECORD" studies). The findings of the RECORD studies showed that rivaroxaban was superior to enoxaparin for thromboprophylaxis after total knee and hip arthroplasty (based on the Defendants' definition), accompanied by similar rates of bleeding. However, the studies also showed a greater incidence with Xarelto of bleeding leading to decreased hemoglobin levels and transfusion of blood. (Lassen, M.R., et al. *Rivaroxaban versus Enoxaparin*

*for Thromboprophylaxis after Total Knee Arthroplasty*. N.Engl.J.Med. 2008;358:2776-86; Kakkar, A.K., et al. *Extended duration rivaroxaban versus short-term enoxaparin for the prevention of venous thromboembolism after total hip arthroplasty: a double-blind, randomised controlled trial*. Lancet 2008;372:31-39; Ericksson, B.I., et al. *Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Hip Arthroplasty*. N.Engl.J.Med. 2008;358:2765-75.)

84.   Approval of Xarelto for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation in the U.S. was based on a clinical trial known as the Rivaroxaban Once Daily Oral Direct Factor Xa Inhibition Compared with Vitamin K Antagonism for Prevention of Stroke and Embolism Trial in Atrial Fibrillation study (hereinafter referred to as "ROCKET AF"). The study's findings showed that rivaroxaban was noninferior to warfarin for the prevention of stroke or systemic embolism in patients with non-valvular atrial fibrillation, with a similar risk of major bleeding. However, "bleeding from gastrointestinal sites, including upper, lower, and rectal sites, occurred more frequently in the rivaroxaban group, as did bleeding that led to a drop in the hemoglobin level or bleeding that required transfusion." (Patel, M.R., et al. *Rivaroxaban versus Warfarin in Nonvalvular Atrial Fibrillation*. N.Engl.J.Med. 2011;365:883-91.)

85.   Approval of Xarelto for the treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE in the U.S. was based on the clinical trials known as the EINSTEIN-DVT, EINSTEIN-PE, and EINSTEIN-Extension studies. The EINSTEIN-DVT study tested Xarelto versus a placebo, and merely determined that Xarelto offered an option for treatment of DVT, with obvious increased risk of bleeding events as compared to placebo. (The EINSTEIN Investigators. *Oral Rivaroxaban for Symptomatic Venous Thromboembolism*. N.Engl.J.Med. 2010;363:2499-510). The EINSTEIN-Extension study confirmed that result. (Roumualdi, E., et al. *Oral rivaroxaban after symptomatic venous thromboembolism: the continued treatment study (EINSTEIN-Extension study)*.

Expert Rev. Cardiovasc. Ther.  2011;9(7):841-844). The EINSTEIN-PE study's findings showed that a rivaroxaban regimen was  non-inferior to the standard therapy for initial and long-term treatment of PE. However, the  studies also demonstrated an increased risk of adverse events with Xarelto, including those that  resulted in permanent discontinuation of Xarelto or prolonged hospitalization. (The EINSTEIN-  PE Investigators. *Oral Rivaroxaban for the Treatment of Symptomatic Pulmonary Embolism.*  N.Engl.J.Med. 2012;366:1287-97.)

86.     Defendants use the results of the ROCKET AF study, the RECORD studies, and  the EINSTEIN studies to promote Xarelto in their promotional materials, including the Xarelto  website, which tout the positive results of those studies. However, Defendants' promotional  materials fail to similarly highlight the increased risk of gastrointestinal bleeding and bleeding  that required transfusion, among other serious bleeding concerns.

87.     Defendants market Xarelto as a new oral anticoagulant treatment alternative to  warfarin (Coumadin), a long-established safe treatment for preventing stroke and systemic  embolism, in 60 years.  Defendants emphasize the supposed benefits of treatment with Xarelto over warfarin, which  they refer to as the Xarelto Difference – namely, that Xarelto does not  require periodic monitoring with blood tests and does not limit a patient's diet.

88.     However, in its QuarterWatch publication for the first quarter of the 2012 fiscal  year, the Institute for Safe Medication Practices ("ISMP") noted that, even during the approval  process, FDA "[r]eviewers also questioned the convenient once-a-day dosing scheme [of  Xarelto], saying blood level studies had shown peaks and troughs that could be eliminated by  twice-a-day dosing."

89.     Importantly, there is no antidote to Xarelto, unlike warfarin. Therefore, in the  event of hemorrhagic complications, there is no available reversal agent. The original U.S. label  approved when the drug was first marketed in the U.S. did not contain a warning regarding the  lack of antidote, but

instead only mentioned this important fact in the overdosage section.

90.     Defendants spent significant money in promoting Xarelto, which included at least $11,000,000.00 spent during 2013 alone on advertising in journals targeted at prescribers and consumers in the U.S. In the third quarter of the 2013 fiscal year, Xarelto was the number one pharmaceutical product advertised in professional health journals based on pages and dollars spent.

91.     As a result of Defendants' aggressive marketing efforts, in its first full year of being on the market, Xarelto garnered approximately $582 million in sales globally.

92.     Defendants' website for Xarelto claims that over seven million people worldwide have been prescribed Xarelto. In the U.S., approximately 1 million Xarelto prescriptions had been written by the end of 2013.

93.     During the Defendants' 2012 fiscal year, Xarelto garnered approximately $658 million in sales worldwide. Then, in 2013, sales for Xarelto increased even further to more than clear the $1 billion threshold commonly referred to as "blockbuster" status in the pharmaceutical industry, ultimately reaching approximately $2 billion for the fiscal year. Thus, Xarelto is now considered the leading anticoagulant on a global scale in terms of sales.

94.     As part of their marketing of Xarelto, Defendants widely disseminated direct-to-consumer advertising campaigns that were designed to influence patients, including Plaintiffs, to make inquiries to their prescribing physician about Xarelto and/or request prescriptions for Xarelto.

95.     In the course of these direct to consumer advertisements, Defendants overstated the efficacy of Xarelto with respect to preventing stroke and systemic embolism, failed to adequately disclose to patients that there is no drug, agent, or means to reverse the anticoagulation effects of Xarelto, and that such irreversibility could have permanently disabling, life-threatening and fatal consequences.

96.    On June 6, 2013, Defendants received an untitled letter from the FDA's Office of Prescription Drug Promotion (hereinafter referred to as the "OPDP") regarding its promotional material for the atrial fibrillation indication, stating that, "the print ad is false or misleading because it minimizes the risks associated with Xarelto and makes a misleading claim" regarding dose adjustments, which was in violation of FDA regulations. The OPDP thus requested that Defendants immediately cease distribution of such promotional material.

97.    Prior to Plaintiffs' prescriptions of Xarelto, Plaintiffs became aware of the promotional materials described herein.

98.    Prior to Plaintiffs' prescription of Xarelto, Plaintiffs' prescribing physician received promotional materials and information from sales representatives of Defendants that Xarelto was just as effective as warfarin in reducing strokes in patients with non-valvular atrial fibrillation, as well as preventing DVT/PE in patients with prior history of DVT/PE or undergoing hip or knee replacement surgery, and was more convenient, without also adequately informing prescribing physicians that there was no reversal agent that could stop or control bleeding in patients taking Xarelto.

99.    At all times relevant hereto, Defendants also failed to warn emergency room doctors, surgeons, and other critical care medical professionals that unlike generally-known measures taken to treat and stabilize bleeding in users of warfarin, there is no effective agent to reverse the anticoagulation effects of Xarelto, and therefore no effective means to treat and stabilize patients who experience uncontrolled bleeding while taking Xarelto.

100.   At all times relevant to this action, The Xarelto Medication Guide, prepared and distributed by Defendants and intended for U.S. patients to whom Xarelto has been prescribed, failed to warn and disclose to patients that there is no agent to reverse the anticoagulation effects of Xarelto and that if serious bleeding occurs, it may be irreversible, permanently disabling, and life-threatening.

101.   In the year leading up to June 30, 2012, there were 1,080 Xarelto-associated "Serious Adverse Event" ("SAE") Medwatch reports filed with the FDA, including at least 65 deaths. Of the reported hemorrhage events associated with Xarelto, 8% resulted in death, which was approximately twofold the risk of a hemorrhage-related death with warfarin.

102.   At the close of the 2012 fiscal year, a total of 2,081 new Xarelto-associated SAE reports were filed with the FDA in its first full year on the market, ranking tenth among other pharmaceuticals in direct reports to the FDA. Of those reported events, 151 resulted in death, as compared to only 56 deaths associated with warfarin.

103.   The ISMP referred to these SAE figures as constituting a "strong signal" regarding the safety of Xarelto, defined as "evidence of sufficient weight to justify an alert to the public and the scientific community, and to warrant further investigation."

104.   Of particular note, in the first quarter of 2013, the number of reported serious adverse events associated with Xarelto (680) overtook that of Pradaxa (528), another new oral anticoagulant, which had previously ranked as the number one reported drug in terms of adverse events in 2012.

105.   Moreover, on a global scale, in the first eight months of 2013, German regulators received 968 Xarelto-related averse event reports, including 72 deaths, as compared to a total of 750 reports and 58 deaths in 2012.

106.   Despite the clear signal generated by the SAE data, Defendants failed to either alert the public and the scientific community, or perform further investigation into the safety of Xarelto.

107.   Defendants original, and in some respects current labeling and prescribing information for Xarelto:

        (a)   failed to investigate, research, study and define, fully and adequately, the safety profile of Xarelto;

        (b)   failed to provide adequate warnings about the true safety risks associated

with the use of Xarelto;

(c)    failed to provide adequate warning regarding the pharmacokinetic and pharmacodynamic variability of Xarelto and its effects on the degree of anticoagulation in a patient;

(d)    failed to provide adequate warning that it is difficult or impossible to assess the degree and/or extent of anticoagulation in patients taking Xarelto;

(e)    failed to disclose in the "Warnings" Section that there is no drug, agent or means to reverse the anticoagulation effects of Xarelto;

(f)    failed to advise prescribing physicians, such as the Plaintiff's physician, to instruct patients that there was no agent to reverse the anticoagulant effects of Xarelto;

(g)    failed to provide adequate instructions on how to intervene and/or stabilize a patient who suffers a bleed while taking Xarelto;

(h)    failed to provide adequate warnings and information related to the increased risks of bleeding events associated with aging patient populations of Xarelto users;

(i)    failed to provide adequate warnings regarding the increased risk of gastrointestinal bleeds in those taking Xarelto, especially, in those patients with a prior history of gastrointestinal issues and/or upset;

(j)    failed to provide adequate warnings regarding the increased risk of suffering a bleeding event, requiring blood transfusions in those taking Xarelto;

(k)    failed to provide adequate warnings regarding the need to assess renal functioning prior to starting a patient on Xarelto and to continue testing and monitoring of renal functioning periodically while the patient is on Xarelto;

(l)    failed to provide adequate warnings regarding the need to assess hepatic functioning prior to starting a patient on Xarelto and to continue testing and monitoring of hepatic functioning periodically while the patient is on Xarelto;

(m)    failed to include a "**BOXED WARNING**" about serious bleeding events associated with Xarelto;

(n)    failed to include a "**BOLDED WARNING**" about serious bleeding events associated with Xarelto; and

(o)    in their "Medication Guide" intended for distribution to patients to whom Xarelto has been prescribed, Defendants failed to disclose to patients that

there is no drug, agent or means to reverse the anticoagulation effects of Xarelto and that if serious bleeding occurs, such irreversibility could have permanently disabling, life-threatening or fatal consequences.

108.   During the years since first marketing Xarelto in the U.S., Defendants modified the U.S. labeling and prescribing information for Xarelto, which included additional information regarding the use of Xarelto in patients taking certain medications. Despite being aware of: (1) serious, and sometimes fatal, irreversible bleeding events associated with the use of Xarelto; and 2,081 SAE Medwatch reports filed with the FDA in 2012 alone, including at least 151 deaths, Defendants nonetheless failed to provide adequate disclosures or warnings in their label as detailed in Paragraphs 103 (a – o).

109.   Prior to applying for and obtaining approval of Xarelto, Defendants knew or should have known that consumption of Xarelto was associated with and/or would cause the induction of life-threatening bleeding, and Defendants possessed at least one clinical scientific study, which evidence Defendants knew or should have known was a signal that life-threatening bleeding risk needed further testing and studies prior to its introduction to the market.

110.   Upon information and belief, despite life-threatening bleeding findings in a clinical trial and other clinical evidence, Defendants failed to adequately conduct complete and proper testing of Xarelto prior to filing their New Drug Application for Xarelto.

111.   Upon information and belief, from the date Defendants received FDA approval to market Xarelto, Defendants made, distributed, marketed, and sold Xarelto without adequate warning to Plaintiffs' prescribing physicians or Plaintiffs that Xarelto was associated with and/or could cause life-threatening bleeding, presented a risk of life-threatening bleeding in patients who used it, and that Defendants had not adequately conducted complete and proper testing and studies of Xarelto with regard to severe side effects, specifically life-threatening bleeding.

112.   Upon information and belief, Defendants concealed and failed to completely  disclose its knowledge that Xarelto was associated with or could cause life-threatening bleeding  as well as its knowledge that they had failed to fully test or study said risk.

113.   Upon information and belief, Defendants ignored the association between the use  of Xarelto and the risk of developing life-threatening bleeding.

114.   Defendants' failure to disclose information that they  possessed regarding the  failure  to adequately test and study Xarelto for life-threatening bleeding risk further rendered  warnings for this medication inadequate.

115.   By reason of the foregoing acts and omissions, the Plaintiffs were caused to suffer  from life-threatening bleeding, as well as other severe and personal injuries which are permanent  and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life,  expenses for hospitalization and medical treatment, and loss of earnings.

116.   By reason of the forgoing acts and omissions, the Consortium Plaintiffs have suffered damages and harm, including, but not limited to, emotional distress, medical expenses,  other economic harm, as well as a loss of consortium, services, society, companionship, love and  comfort.

## FIRST CAUSE OF ACTION
## AS AGAINST THE DEFENDANTS
## (NEGLIGENCE)

117.   Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if  more fully set forth herein.

118.   Defendants had a duty to exercise reasonable care in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale and/or distribution of Xarelto  into the stream of commerce, including a duty to assure that the product would not cause users to  suffer unreasonable, dangerous side effects.

119. Defendants failed to exercise ordinary care in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Xarelto into interstate commerce in that Defendants knew or should have known that using Xarelto created a high risk of unreasonable, dangerous side effects, including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, expenses for hospitalization and medical treatment, and loss of earnings.

120. The negligence of the Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

    (a)    Manufacturing, producing, promoting, formulating, creating, and/or designing Xarelto without thoroughly testing it;

    (b)    Manufacturing, producing, promoting, formulating, creating, and/or designing Xarelto without adequately testing it;

    (c)    Not conducting sufficient testing programs to determine whether or not Xarelto was safe for use; in that Defendants herein knew or should have known that Xarelto was unsafe and unfit for use by reason of the dangers to its users;

    (d)    Selling Xarelto without making proper and sufficient tests to determine the dangers to its users;

    (e)    Negligently failing to adequately and correctly warn the Plaintiffs, the public, the medical and healthcare profession, and the FDA of the dangers of Xarelto;

    (f)    Failing to provide adequate instructions regarding safety precautions to be observed by users, handlers, and persons who would reasonably and foreseeably come into contact with, and more particularly, use, Xarelto;

    (g)    Failing to test Xarelto and/or failing to adequately, sufficiently and properly test Xarelto.

    (h)    Negligently advertising and recommending the use of Xarelto without sufficient knowledge as to its dangerous propensities;

(i)   Negligently representing that Xarelto was safe for use for its intended purpose, when, in fact, it was unsafe;

(j)   Negligently representing that Xarelto had equivalent safety and efficacy as other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

(k)   Negligently designing Xarelto in a manner which was dangerous to its users;

(l)   Negligently manufacturing Xarelto in a manner which was dangerous to its users;

(m)  Negligently producing Xarelto in a manner which was dangerous to its users;

(n)   Negligently assembling Xarelto in a manner which was dangerous to its users;

(o)   Concealing information from the Plaintiffs in knowing that Xarelto was unsafe, dangerous, and/or non-conforming with FDA regulations;

(p)   Improperly concealing and/or misrepresenting information from the Plaintiffs, healthcare professionals, and/or the FDA, concerning the severity of risks and dangers of Xarelto compared to other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

121.   Defendants under-reported, underestimated and downplayed the serious dangers of Xarelto.

122.   Defendants negligently compared the safety risk and/or dangers of Xarelto with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

123.   Defendants were negligent in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing and sale of Xarelto in that they:

(a)   Failed to use due care in designing and manufacturing Xarelto so as to avoid the aforementioned risks to individuals when Xarelto was used for treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

(b)   Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Xarelto;

(c)   Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Xarelto;

(d)   Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Xarelto;

(e)   Failed to warn Plaintiffs of the severity and duration of such  adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects;

(f)   Failed to conduct adequate testing, including pre-clinical and clinical testing and post-marketing surveillance to determine the safety of Xarelto;

(g)   Failed to warn Plaintiffs, prior to actively encouraging the sale of Xarelto, either directly or indirectly, orally or in writing, about the need for more comprehensive, more regular medical monitoring than usual to ensure early discovery of potentially serious side effects;

(h)   Were otherwise careless and/or negligent.

124.   Despite the fact that Defendants knew or should have known that Xarelto caused unreasonably dangerous side effects, Defendants continued and continue to market, manufacture, distribute and/or sell Xarelto to consumers, including the Plaintiffs.

125.   Defendants knew or should have known that consumers such as the Plaintiffs would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care, as set forth above.

126.   Defendants' negligence was the proximate cause of Plaintiffs' injuries, harm and economic loss, which Plaintiffs suffered.

127.   As a result of the foregoing acts and omissions, Plaintiffs were caused to suffer serious

and dangerous side effects including, life-threatening bleeding, as well as other severe  and  personal injuries which  are  permanent and lasting  in  nature,  physical  pain  and  mental  anguish, diminished enjoyment of life, expenses for hospitalization and medical treatment, and  loss of earnings.

128.   As a result of the  foregoing acts  and  omissions, Consortium Plaintiffs  have suffered damages and harm, including, but not limited to, emotional distress, medical  expenses, other economic harm, as well as a loss of consortium, services, society,  companionship, love and comfort.

129.   By reason  of  the  foregoing,  Plaintiffs  have  suffered  injuries  and  damages  as  alleged herein.

**SECOND CAUSE OF ACTION
AS AGAINST THE DEFENDANTS
(STRICT PRODUCTS LIABILITY)**

130.   Plaintiffs repeat, reiterate, and reallege each and  every allegation of this  Complaint contained in each of the foregoing paragraphs inclusive, with the  same force and effect as if  more fully set forth herein.

131.   At all times  herein  mentioned,  the  Defendants designed, researched,  manufactured, tested, advertised,  promoted,  marketed,  sold,  distributed,  and/or  have  recently   acquired  the Defendants who have  designed, researched, manufactured, tested, advertised,   promoted, marketed, sold and distributed Xarelto as hereinabove described that was used by the  Plaintiffs.

132.   Xarelto was expected to and did reach  the usual consumers, handlers, and  persons coming into contact with said product without substantial change in the condition in  which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

133.   At those  times, Xarelto was  in  an  unsafe,  defective,  and  inherently  dangerous condition, which was dangerous to users, and in particular, the Plaintiffs herein.

134.   The Xarelto designed, researched, manufactured,  tested, advertised, promoted, marketed, sold and distributed by Defendants was defective in design or formulation in that,  when

it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Xarelto.

135.   The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective in design and/or formulation, in that, when it left the hands of the Defendants, manufacturers, and/or suppliers, it was unreasonably dangerous, and it was more dangerous than an ordinary consumer would expect.

136.   At all times herein mentioned, Xarelto was in a defective condition and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendants.

137.   Defendants knew, or should have known that at all times herein mentioned, their Xarelto was in a defective condition, and was and is inherently dangerous and unsafe.

138.   At the time of the Plaintiffs' use of Xarelto, Xarelto was being used for the purposes and in a manner normally intended, namely to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

139.   Defendants with this knowledge voluntarily designed its Xarelto in a dangerous condition for use by the public, and in particular the Plaintiffs.

140.   Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

141.   Defendants created a product unreasonably dangerous for its normal, intended use.

142.   The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was manufactured defectively in that Xarelto left the hands of Defendants in a defective condition and was unreasonably dangerous to its intended users.

143.   The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants reached their intended users in the same defective  and unreasonably dangerous condition in which the Defendants' Xarelto was manufactured.

144.   Defendants designed, researched, manufactured, tested, advertised, promoted,  marketed, sold and distributed a defective product which created an unreasonable risk to the  health of consumers and to the Plaintiffs in particular; and Defendants are therefore strictly liable  for the injuries sustained by the Plaintiffs.

145.   The Plaintiffs could not, by  the exercise of reasonable care, have discovered  Xarelto's defects herein mentioned and perceived its danger.

146.   The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate warnings or instructions, as the Defendants knew or should have known that the product created a risk of  serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature and the Defendants failed to  adequately warn of said risk.

147.   The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate warnings and/or inadequate testing.

148.   The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate post-marketing surveillance and/or warnings because, after Defendants knew or should have known of the risks  of serious side effects including, life-threatening bleeding, as well as other severe and permanent  health consequences from Xarelto, they failed to provide adequate warnings to users or  consumers of the

product, and continued to improperly advertise, market and/or promote their product, Xarelto.

149. By reason of the foregoing, the Defendants have become strictly liable in tort to the Plaintiffs for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Xarelto.

150. Defendants' defective design, manufacturing defect, and inadequate warnings of Xarelto were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

151. That said defects in Defendants' drug Xarelto were a substantial factor in causing Plaintiffs' injuries. As a result of the foregoing acts and omissions, Plaintiffs were caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, expenses for hospitalization and medical treatment, and loss of earnings.

152. As a result of the foregoing acts and omissions, Consortium Plaintiffs have suffered damages and harm, including, but not limited to, emotional distress, medical expenses, other economic harm, as well as a loss of consortium, services, society, companionship, love and comfort.

153. By reason of the foregoing, Plaintiffs have suffered injuries and damages as alleged herein.

**THIRD CAUSE OF ACTION
AS AGAINST THE DEFENDANTS
(BREACH OF EXPRESS WARRANTY)**

154. Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

155. Defendants expressly warranted that Xarelto was safe and well accepted by users.

156. Xarelto does not conform to these express representations because Xarelto is not safe and has numerous serious side effects, many of which were not accurately warned about by Defendants.

As a direct and proximate result of the breach of said warranties, Plaintiffs suffered and/or will continue to suffer severe and permanent personal injuries, harm and economic loss.

157.    Plaintiffs did rely on the express warranties of the Defendants herein.

158.    Members of the medical community, including physicians and other healthcare professionals, relied upon the representations and warranties of the Defendants for use of Xarelto in recommending, prescribing, and/or dispensing Xarelto.

159.    The Defendants herein breached the aforesaid express warranties, as their drug Xarelto was defective.

160.    Defendants expressly represented to Plaintiffs, Plaintiffs' physicians, healthcare providers, and/or the FDA that Xarelto was safe and fit for use for the purposes intended, that it was of merchantable quality, that it did not produce any dangerous side effects in excess of those risks associated with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, that the side effects it did produce were accurately reflected in the warnings and that it was adequately tested and fit for its intended use.

161.    Defendants knew or should have known that, in fact, said representations and warranties were false, misleading and untrue in that Xarelto was not safe and fit for the use intended, and, in fact, produced serious injuries to the users that were not accurately identified and represented by Defendants.

162.    As a result of the foregoing acts and omissions, Plaintiffs were caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished

enjoyment of life, expenses for hospitalization and medical treatment, and  loss of earnings.

163.   As a result of the foregoing acts and omissions, Consortium Plaintiffs  have suffered damages and harm, including, but not limited to, emotional distress, medical  expenses, other economic harm, as well as a loss of consortium, services, society,  companionship, love and comfort.

164.   By reason of the foregoing, Plaintiffs have suffered injuries and damages  as alleged herein.

## FOURTH CAUSE OF ACTION
## AS AGAINST THE DEFENDANTS
## (BREACH OF IMPLIED WARRANTIES)

165.   Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if  more fully set forth herein.

166.   At all times herein mentioned, the Defendants manufactured, compounded,  portrayed, distributed, recommended, merchandized, advertised, promoted and sold Xarelto  and/or have recently acquired the Defendants who have manufactured, compounded, portrayed,  distributed, recommended, merchandized, advertised, promoted and sold Xarelto, to reduce the   risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat  DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for   patients undergoing hip and knee replacement surgery.

167.   At the time Defendants marketed, sold, and distributed Xarelto for use by  Plaintiff, Defendants knew of the use for which Xarelto was intended and impliedly warranted  the product to be of merchantable quality and safe and fit for such use.

168.   The Defendants impliedly represented and warranted to the users of Xarelto and  their physicians, healthcare providers, and/or the FDA that Xarelto was safe and of merchantable  quality and fit for the ordinary purpose for which said product was to be used.

169.   That said representations and warranties aforementioned were false, misleading,  and inaccurate in that Xarelto was unsafe, unreasonably dangerous, improper, not of merchantable quality, and defective.

170.   Plaintiffs, and/or members of the medical community and/or healthcare  professionals did rely on said implied warranty of merchantability of fitness for a particular use  and purpose.

171.   Plaintiffs and Plaintiffs' physicians and healthcare professionals reasonably relied  upon the skill and judgment of Defendants as to whether Xarelto was of merchantable quality  and safe and fit for its intended use.

172.   Xarelto was injected into the stream of commerce by the Defendants in a  defective, unsafe, and inherently  dangerous condition and the products and materials were  expected to and did reach users, handlers, and persons coming into contact with said products  without substantial change in the condition in which they were sold.

173.   The Defendants herein breached the aforesaid implied warranties, as their drug  Xarelto was not fit for its intended purposes and uses.

174.   As a result of the foregoing acts and omissions, Plaintiffs were caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe  and  personal injuries which  are  permanent and lasting  in  nature, physical pain and  mental  anguish, diminished enjoyment of life, expenses for hospitalization and medical treatment, and  loss of earnings.

175.   As a result of the foregoing acts and omissions, Consortium Plaintiffs  have suffered damages and harm, including, but not limited to, emotional distress, medical  expenses, other economic harm, as well as a loss of consortium, services, society,  companionship, love and comfort.

176.   By reason of the foregoing, Plaintiffs have suffered injuries and damages  as  alleged herein.

## FIFTH CAUSE OF ACTION
## AS AGAINST THE DEFENDANTS
## (FRAUDULENT MISREPRESENTATION)

177.   Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

178.   The Defendants falsely and fraudulently represented to the medical and healthcare community, and to the Plaintiffs, and/or the FDA, and the public in general, that said product, Xarelto, had been tested and was found to be safe and/or effective to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

179.   That representations made by Defendants were, in fact, false.

180.   When said representations were made by Defendants, they knew those representations to be false and it willfully, wantonly, and recklessly disregarded whether the representations were true.

181.   These representations were made by said Defendants with the intent of defrauding and deceiving the Plaintiffs, the public in general, and the medical and healthcare community in particular, and were made with the intent of inducing the public in general, and the medical and healthcare community in particular, to recommend, prescribe, dispense and/or purchase said product, Xarelto, for use to reduce the risk of stroke and systemic embolism in patients with non- valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, all of which evinced a callous, reckless, willful, depraved indifference to the health, safety and welfare of the Plaintiffs herein.

182.   At the time the aforesaid representations were made by the Defendants and, at the time the Plaintiffs used Xarelto, the Plaintiffs were unaware of the falsity of said representations and

reasonably believed them to be true.

183.   In reliance upon said representations, the Plaintiffs were induced to and did use Xarelto, thereby sustaining severe and permanent personal injuries.

184.   Said Defendants knew and were aware or should have been aware that Xarelto had not been sufficiently tested, was defective in nature, and/or that it lacked adequate and/or sufficient warnings.

185.   Defendants knew or should have known that Xarelto had a potential to, could, and would cause severe and grievous injury to the users of said product, and that it was inherently dangerous in a manner that exceeded any purported, inaccurate, and/or down-played warnings.

186.   Defendants brought Xarelto to the market, and acted fraudulently, wantonly and maliciously to the detriment of the Plaintiffs.

187.   As a result of the foregoing acts and omissions, Plaintiffs were caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, expenses for hospitalization and medical treatment, and loss of earnings.

188.   As a result of the foregoing acts and omissions, the Consortium Plaintiffs have suffered damages and harm, including, but not limited to, emotional distress, medical expenses, other economic harm, as well as a loss of consortium, services, society, companionship, love and comfort.

189.   By reason of the foregoing, Plaintiffs have suffered injuries and damages as alleged herein.

**SIXTH CAUSE OF ACTION**
**AS AGAINST THE DEFENDANTS**
**(FRAUDULENT CONCEALMENT)**

190.   Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint

contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

191.   At all times during the course of dealing between Defendants and Plaintiffs, and/or Plaintiffs' healthcare providers, and/or the FDA, Defendants misrepresented the safety of Xarelto for its intended use.

192.   Defendants knew or were reckless in not knowing that its representations were false.

193.   In representations to Plaintiffs, and/or Plaintiffs' healthcare providers, and/or the FDA, Defendants fraudulently concealed and intentionally omitted the following material information:

(a)   that Xarelto was not as safe as other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

(b)   that the risks of adverse events with Xarelto were higher than those with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

(c)   that the risks of adverse events with Xarelto were not adequately tested and/or known by Defendants;

(d)   that Defendants were aware of dangers in Xarelto, in addition to and above and beyond those associated with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

(e)   that Xarelto was defective, and that it caused dangerous side effects, including but not limited to life-threatening bleeding, as well as other severe and permanent health consequences, in a much more and significant rate than other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

(f)   that patients needed to be monitored more regularly than normal while

using  Xarelto;

(g)    that Xarelto was manufactured negligently;

(h)    that Xarelto was manufactured defectively;

(i)    that Xarelto was manufactured improperly;

(j)    that Xarelto was designed negligently;

(k)    that Xarelto was designed defectively; and

(l)    that Xarelto was designed improperly.

194.  Defendants were  under  a  duty  to  disclose  to  Plaintiffs,  and  Plaintiffs'  physicians,
hospitals, healthcare providers, and/or the FDA the defective nature of Xarelto, including but not  limited
to the heightened risks of life-threatening bleeding.

195.   Defendants had sole access to material facts concerning the defective nature of the  product
and its propensity to cause serious and dangerous side effects, and hence, cause damage  to persons who
used Xarelto, including the Plaintiffs, in particular.

196.   Defendants'  concealment  and  omissions  of  material  facts  concerning,  *inter alia*,  the
safety of Xarelto was made purposefully, willfully, wantonly, and/or recklessly, to mislead  Plaintiffs,
and Plaintiffs' physicians, hospitals and healthcare providers into reliance, continued  use of Xarelto,
and actions thereon, and to cause them to purchase, prescribe, and/or dispense  Xarelto and/or use the
product.

197.  Defendants  knew  that  Plaintiffs,  and  Plaintiffs'  physicians,  hospitals,  healthcare
providers, and/or the FDA had no way to determine the truth behind Defendants' concealment  and
omissions, and that these included material omissions of facts surrounding Xarelto, as set  forth herein.

198.   Plaintiffs, as well as Plaintiffs' doctors, healthcare providers, and/or hospitals  reasonably
relied on facts revealed which negligently, fraudulently and/or purposefully did not  include facts that

were concealed and/or omitted by Defendants.

199.   As a result of the foregoing acts and omissions, Plaintiffs were caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe  and  personal injuries which  are  permanent and lasting  in  nature,  physical  pain and  mental  anguish, diminished enjoyment of life, expenses for hospitalization and medical treatment, and  loss of earnings.

200.   As a result of the foregoing acts and omissions, Consortium Plaintiffs  have suffered damages and harm, including, but not limited to, emotional distress, medical  expenses, other economic harm, as well as a loss of consortium, services, society,  companionship, love and comfort.

201.   By reason of the foregoing, Plaintiffs have suffered injuries and damages as alleged herein.

**SEVENTH CAUSE OF ACTION
AS AGAINST THE DEFENDANTS
(NEGLIGENT MISREPRESENTATION)**

202.   Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if  more fully set forth herein.

203.   Defendants had a duty to represent to the medical and healthcare community, and  to the Plaintiffs, the FDA, and the public in general that said product, Xarelto, had been tested and  found to be safe and effective to reduce the risk of stroke and systemic embolism in patients with  non-valvular  atrial fibrillation, to reduce  the  risk of  recurrence  of  DVT and/or PE,  and  for  prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

204.   The representations made by Defendants were, in fact, false.

205.   Defendants failed to exercise ordinary care in the representation of Xarelto, while involved in its manufacture, sale, testing, quality assurance, quality control, and/or distribution of  said product into interstate commerce, in that Defendants negligently misrepresented Xarelto's  high risk of unreasonable, dangerous side effects.

206.   Defendants breached their duty in representing Xarelto's serious side effects to the medical and healthcare community, to the Plaintiffs, the FDA and the public in general.

207.   As a result of the foregoing acts and omissions, Plaintiffs were caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe  and personal injuries which are permanent and lasting in nature, physical pain and mental  anguish, diminished enjoyment of life, expenses for hospitalization and medical treatment, and  loss of earnings.

208.   As a result of the foregoing acts and omissions, Consortium Plaintiffs have suffered damages and harm, including, but not limited to, emotional distress, medical  expenses, other economic harm, as well as a loss of consortium, services, society,  companionship, love and comfort.

209.   By reason of the foregoing, Plaintiffs have suffered injuries and damages as  alleged herein.

### EIGHTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS (FRAUD AND DECEIT)

210.   Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if  more fully set forth herein.

211.   Defendants conducted research, or lack thereof, and used Xarelto as part of their  research.

212.   As a result of Defendants' research and testing, or lack thereof, Defendants  blatantly and intentionally distributed false information, including but not limited to assuring the  public, the Plaintiffs, Plaintiffs' doctors, hospitals, healthcare professionals, and/or the FDA that  Xarelto was safe and effective for use as a means to reduce the risk of stroke and systemic  embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT  and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

213.   As a result of Defendants' research and testing, or lack thereof, Defendants  intentionally

omitted certain results of testing and research to the public, healthcare  professionals, and/or the FDA, including the Plaintiffs.

214.   Defendants had a duty when disseminating information to the public to disseminate truthful information and a parallel duty not to deceive the public and the Plaintiffs, as  well as Plaintiffs' respective healthcare providers and/or the FDA.

215.   The information distributed to the public, the FDA, and the Plaintiffs, by Defendants, including but not limited to reports, press releases, advertising campaigns, television  commercials, print ads, magazine ads, billboards, and all other commercial media contained  material representations of fact and/or omissions.

216.   The information distributed to the public, the FDA, and the Plaintiffs, by Defendants intentionally included representations that Defendants' drug Xarelto was safe and  effective for use to reduce the risk of stroke and systemic embolism in patients with non-valvular  atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT  for patients undergoing hip and knee replacement surgery.

217.   The information distributed to the public, the FDA, and the Plaintiffs, by  Defendants intentionally included representations that Defendants' drug Xarelto carried the same  risks, hazards, and/or dangers as other forms of treatment for reducing the risk of stroke and  systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of  recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee  replacement surgery.

218.   The information distributed to the public, the FDA, and the Plaintiffs, by Defendants intentionally included false representations that Xarelto was not injurious to the health and/or safety of its intended users.

219.   The information distributed to the public, the FDA, and the Plaintiffs, by Defendants

intentionally included false representations that Xarelto was as potentially injurious to the health and/or safety of its intended users, as other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

220.   These representations were all false and misleading.

221.   Upon information and belief, Defendants intentionally suppressed, ignored and disregarded test results not favorable to the Defendants, and results that demonstrated that Xarelto was not safe as a means of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, and/or was not as safe as other means of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

222.   Defendants intentionally made material representations to the FDA and the public, including the medical profession, and the Plaintiffs, regarding the safety of Xarelto, specifically but not limited to Xarelto not having dangerous and serious health and/or safety concerns.

223.   Defendants intentionally made material representations to the FDA and the public in general, including the medical profession, and the Plaintiffs, regarding the safety of Xarelto, specifically but not limited to Xarelto being a safe means of reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

224.   It was the purpose of Defendants in making these representations to deceive and defraud the public, the FDA, and/or the Plaintiffs, to gain the confidence of the public, healthcare

professionals, the FDA, and/or the Plaintiffs, to falsely ensure the quality and fitness  for use of Xarelto and induce the public, and/or the Plaintiffs to purchase, request, dispense,  prescribe, recommend, and/or continue to use Xarelto.

225.   Defendants made the aforementioned false claims and false representations with  the intent of convincing the public, healthcare professionals, the FDA, and/or the Plaintiffs that  Xarelto was fit and safe for use as treatment for reducing the risk of stroke and systemic  embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT  and/or PE,  and for prophylaxis of DVT for patients undergoing  hip and knee replacement  surgery.

226.   Defendants made the aforementioned false claims and false representations with  the intent of convincing the public, healthcare professionals, the FDA, and/or the Plaintiffs that  Xarelto was fit and safe for use as treatment for reducing the risk of stroke and systemic  embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT  and/or PE,  and for prophylaxis of DVT for patients undergoing hip and knee replacement  surgery, and did not pose risks, dangers, or hazards above and beyond those identified and/or  associated with other forms of treatment for reducing the risk of stroke and systemic embolism in   patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE,   and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

227.   That Defendants made claims and representations in its documents submitted to  the FDA, to the public, to healthcare professionals, and the Plaintiffs that Xarelto did not present  serious health and/or safety risks.

228.   That Defendants made claims and representations in its documents submitted to  the FDA, to the public, to healthcare professionals, and the Plaintiffs that Xarelto did not present  health and/or safety risks greater than other oral forms of treatment for reducing the risk of stroke  and  systemic

embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

229.   That these representations and others made by Defendants were false when made, and/or were made with a pretense of actual knowledge when knowledge did not actually exist, and/or were made recklessly and without regard to the actual facts.

230.   That these representations and others, made by Defendants, were made with the intention of deceiving and defrauding the Plaintiffs, including Plaintiffs' respective healthcare professionals and/or the FDA, and were made in order to induce the Plaintiffs and/or Plaintiffs' respective healthcare professionals to rely upon misrepresentations and caused the Plaintiff to purchase, use, rely on, request, dispense, recommend, and/or prescribe Xarelto

231.   That Defendants, recklessly and intentionally falsely represented the dangerous and serious health and/or safety concerns of Xarelto to the public at large, and the Plaintiffs in particular, for the purpose of influencing the marketing of a product known to be dangerous and defective and/or not as safe as other alternatives, including other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

232.   That Defendants willfully and intentionally failed to disclose the material facts regarding the dangerous and serious safety concerns of Xarelto by concealing and suppressing material facts regarding the dangerous and serious health and/or safety concerns of Xarelto.

233.   That Defendants willfully and intentionally failed to disclose the truth, failed to disclose material facts and made false representations with the purpose and design of deceiving and lulling the Plaintiffs, as well as their respective healthcare professionals into a sense of security so that Plaintiffs

would rely on the representations made by Defendants, and purchase, use and rely on Xarelto and/or that Plaintiffs' respective healthcare providers would dispense, prescribe, and/or recommend the same.

234.   Defendants, through their public relations efforts, which included but were not limited to the public statements and press releases, knew or should have known that the public, including the Plaintiffs, as well as Plaintiffs' respective healthcare professionals would rely upon the information being disseminated.

235.   Defendants utilized direct to consumer adverting to market, promote, and/or advertise Xarelto.

236.   The Plaintiffs and/or Plaintiffs' respective healthcare professionals did in fact rely on and believe the Defendants' representations to be true at the time they were made and relied upon the representations as well as the superior knowledge of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, and were thereby induced to purchase, use and rely on Defendants' drug Xarelto.

237.   At the time the representations were made, the Plaintiffs and/or Plaintiffs' respective healthcare providers did not know the truth with regard to the dangerous and serious health and/or safety concerns of Xarelto.

238.   The Plaintiffs did not discover the true facts with respect to the dangerous and serious health and/or safety concerns, and the false representations of Defendants, nor could the Plaintiffs with reasonable diligence have discovered the true facts.

239.   Had the Plaintiffs known the true facts with respect to the dangerous and serious health and/or safety concerns of Xarelto, Plaintiffs would not have purchased, used and/or relied on Defendants' drug Xarelto.

240.   That the Defendants' aforementioned conduct constitutes fraud and deceit, and was committed and/or perpetrated willfully, wantonly and/or purposefully on the Plaintiffs.

241.   As a result of the foregoing acts and omissions, Plaintiffs were caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe  and personal injuries which  are  permanent and lasting  in  nature,  physical  pain  and  mental  anguish, diminished enjoyment of life, expenses for hospitalization and medical treatment, and  loss of earnings.

242.   As  a  result  of  the  foregoing  acts  and  omissions,  Consortium  Plaintiffs  have  suffered damages and harm, including, but not limited to, emotional distress, medical expenses, other economic harm, as well as a loss of consortium, services, society, companionship, love and comfort.

243.   By  reason  of  the  foregoing,  Plaintiffs  have  suffered  injuries  and  damages  as  alleged herein.

<strong><u>NINTH CAUSE OF ACTION<br>AS AGAINST THE DEFENDANTS<br>(VIOLATION OF CALIFORNIA CONSUMER PROTECTION LAW)</u></strong>

244.   Plaintiffs hereby incorporate by reference all of the above allegations as if fully set forth herein.

245.    Defendants  researched,  developed,  designed,  tested,  manufactured,  inspected,  labeled, distributed, marketed, promoted, sold, and/or otherwise released into the stream of commerce Xarelto®, in the course of same, directly advertised or marketed the product to the FDA, health care professionals and consumers, including Plaintiff, or persons responsible for consumer.

246.    Plaintiff purchased and used Xarelto® for personal use and thereby suffered ascertainable losses as a result of Defendants' actions in violation of consumer protection laws, including the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750 et. seq. which include the following violations:

(a)   representing  that  goods  or  services  have  characteristics,  ingredients,  uses, benefits or qualities that they do not have;

(b)    advertising goods or services with the intent not to sell them as advertised;

(c)    representing that goods have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities which they do not have;

(d)    failing to disclose information concerning goods which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed;

(e)    unconscionable actions and courses of action; and

(f)    engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

247.    Defendants uniformly communicated the purported benefits of Xarelto® while failing to disclose the serious and dangerous side-effects related to Xarelto® and of the true state of Xarelto®, the regulatory status, its safety, its efficacy and its true usefulness. Defendants made these representations to physicians, the medical community at large and to patients and consumers, such as Plaintiff, in their marketing and advertising.

248.    Defendants' conduct in connection with Xarelto® was also impermissible and illegal in that it created a likelihood of confusion and misunderstanding because Defendants misleadingly, falsely and/or deceptively misrepresented and omitted numerous material facts regarding the utility, benefits, costs, safety, efficacy and advantages of Xarelto®.

249.    As a direct, proximate and foreseeable result of Defendants' statutory violations, Plaintiff suffered the injuries and consequential economic and other losses, as described above, when Plaintiff ingested Xarelto®.

## **TENTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS**

## (VIOLATION OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE PRACTICES ACT)

250.    Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

251.    Defendants have a statutory duty to refrain from making false or fraudulent representations and/or from engaging in deceptive acts or practices in the sale and promotion of Xarelto pursuant to the Illinois Consumer Fraud & Deceptive Practices Act, 815 ILCS 505/1 et seq. (hereinafter "the Act"), which prohibits "the use of any deception, fraud, false pretense, false promise, misrepresentation or concealment, suppression or omission of any material fact…in the conduct of any trade or commerce" and declares such acts or practices as unlawful.

252.    Defendants engaged in unfair, deceptive, false and/or fraudulent acts and/or practices in violation of the Act through its false and misleading promotion of Xarelto designed to induce Plaintiff to purchase and use Xarelto.

253.    Defendants' conduct as described herein constituted unfair and deceptive acts and practices, including, but not limited to:

(a)    Publishing instructions and product material containing inaccurate and incomplete factual information;

(b)    Engaging in fraudulent or deceptive conduct that creates a likelihood of Misrepresenting the nature, quality, and characteristics about the product; and

(c)    confusion or misunderstanding.

254.    Defendants misrepresented the alleged benefits of Xarelto, failed to disclose material information concerning known side effects of Xarelto, misrepresented the quality of Xarelto, and otherwise engaged in fraudulent and deceptive conduct which induced Plaintiff to purchase and use

Xarelto.

255.    Defendants uniformly communicated the purported benefits of Xarelto while failing to disclose the serious and dangerous side-effects related to the use of Xarelto, its safety, its efficacy, and its usefulness. Defendants made these representations to physicians, the medical community at large, and to patients and consumers such as Plaintiff in the marketing and advertising campaign described herein.

256.    Defendants' conduct in connection with Xarelto was impermissible and illegal in that it created a likelihood of confusion and misunderstanding, because Defendants misleadingly, falsely and or deceptively misrepresented and omitted numerous material facts regarding, among other things, the utility, benefits, costs, safety, efficacy and advantages of Xarelto.

257.    Defendants' conduct as described above was a material cause of Plaintiff's decision to purchase Xarelto.

258.    As a direct, foreseeable and proximate cause of Defendants' conduct in violation of the Act, Plaintiff suffered damages, including personal injuries, economic damages, and noneconomic damages. Defendants' conduct was further wanton, egregious, and reckless so as to warrant the award of punitive damages.

259.    250. As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, expenses for hospitalization and medical treatment, and loss of earnings.

260.    As a result of the foregoing acts and omissions, Consortium Plaintiffs have suffered damages and harm, including, but not limited to, emotional distress, medical expenses, other economic harm, as well as a loss of consortium, services, society, companionship, love and comfort.

252. By reason of the foregoing, Plaintiffs have suffered injuries and damages as alleged herein.

## ELEVENTH CAUSE OF ACTION
## AS AGAINST THE DEFENDANTS
## (VIOLATION OF LOUISIANA CONSUMER PROTECTION LAWS)

261.   Plaintiffs repeat, reiterate, and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

262.   Plaintiff purchased and used Xarelto® for personal use and thereby suffered ascertainable losses as a result of Defendants' actions in violation of the Louisiana consumer protection laws, La. Rev. Stat. Ann. §§ 51:1401 *et seq*.

263.   Unfair methods of competition or deceptive acts or practices that were proscribed by law, including the following:

(a)   Representing that goods or services have characteristics, ingredients, uses benefits or quantities that they do not have;

(b)   Advertising goods or services with the intent not to sell them as advertised; and

(c)   Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

264.   Defendants violated consumer protection laws through their use of false and misleading misrepresentations or omissions of material fact relating to the safety of Xarelto®.

265.   Defendants uniformly communicated the purported benefits of Xarelto® while failing to disclose the serious and dangerous side-effects related to the use of Xarelto® and of the true state of Xarelto® regulatory status, its safety, its efficacy, and its usefulness. Defendants made these representations to physicians, the medical community at large, and to patients and consumers such as Plaintiff in the marketing and advertising campaign described herein.

266.   Defendants' conduct in connection with Xarelto® was also impermissible and illegal in

that it created a likelihood of confusion and misunderstanding, because Defendants misleadingly, falsely and or deceptively misrepresented and omitted numerous material facts regarding, among other things, the utility, benefits, costs, safety, efficacy and advantages of Xarelto®.

267.     As a result of these violations of consumer protection laws, Plaintiff incurred and will incur; serious physical injury, pain, suffering, loss of income, loss of opportunity, loss of family and social relationships, and medical, hospital and surgical expenses and other expense related to the diagnosis and treatment thereof, for which Defendants are liable.

**TWELFTH CAUSE OF ACTION**
**AS AGAINST THE DEFENDANTS**
**(VIOLATION OF PENNSYLVANIA CONSUMER PROTECTION LAWS)**

268.     Plaintiffs repeat, reiterate, and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

269.     Plaintiff purchased and used Xarelto® for personal use and thereby suffered ascertainable losses as a result of Defendants' actions in violation of the Pennsylvania consumer protection laws, 73 Pa. Stat. §§ 201-1 *et seq*.

270.     Unfair methods of competition or deceptive acts or practices that were proscribed by law, including the following:

(a)     Representing that goods or services have characteristics, ingredients, uses benefits or quantities that they do not have;

(b)     Advertising goods or services with the intent not to sell them as advertised; and

(c)     Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

271.     Defendants violated consumer protection laws through their use of false and misleading misrepresentations or omissions of material fact relating to the safety of Xarelto®.

272.     Defendants uniformly communicated the purported benefits of Xarelto® while failing to disclose the serious and dangerous side-effects related to the use of Xarelto® and of the true state of Xarelto® regulatory status, its safety, its efficacy, and its usefulness. Defendants made these representations to physicians, the medical community at large, and to patients and consumers such as Plaintiff in the marketing and advertising campaign described herein.

273.     Defendants' conduct in connection with Xarelto® was also impermissible and illegal in that it created a likelihood of confusion and misunderstanding, because Defendants misleadingly, falsely and or deceptively misrepresented and omitted numerous material facts regarding, among other things, the utility, benefits, costs, safety, efficacy and advantages of Xarelto®.

274.     As a result of these violations of consumer protection laws, Plaintiff incurred and will incur; serious physical injury, pain, suffering, loss of income, loss of opportunity, loss of family and social relationships, and medical, hospital and surgical expenses and other expense related to the diagnosis and treatment thereof, for which Defendants are liable.

<u>THIRTEENTH CAUSE OF ACTION</u>
<u>AS AGAINST THE DEFENDANTS</u>
<u>(VIOLATION OF TENNESSEE CONSUMER PROTECTION LAWS)</u>

275.     Plaintiffs repeat, reiterate, and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

276.     Plaintiff purchased and used Xarelto® for personal use and thereby suffered ascertainable losses as a result of Defendants' actions in violation of the Tennessee consumer protection laws, Tenn. Code Ann. §§ 47-18-101 *et seq*.

277.     Unfair methods of competition or deceptive acts or practices that were proscribed by law, including the following:

(a)  Representing that goods or services have characteristics, ingredients, uses benefits or quantities that they do not have;

(b)  Advertising goods or services with the intent not to sell them as advertised; and

(c)  Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

278.  Defendants violated consumer protection laws through their use of false and misleading misrepresentations or omissions of material fact relating to the safety of Xarelto®.

279.  Defendants uniformly communicated the purported benefits of Xarelto® while failing to disclose the serious and dangerous side-effects related to the use of Xarelto® and of the true state of Xarelto® regulatory status, its safety, its efficacy, and its usefulness. Defendants made these representations to physicians, the medical community at large, and to patients and consumers such as Plaintiff in the marketing and advertising campaign described herein.

280.  Defendants' conduct in connection with Xarelto® was also impermissible and illegal in that it created a likelihood of confusion and misunderstanding, because Defendants misleadingly, falsely and or deceptively misrepresented and omitted numerous material facts regarding, among other things, the utility, benefits, costs, safety, efficacy and advantages of Xarelto®.

281.  As a result of these violations of consumer protection laws, Plaintiff incurred and will incur; serious physical injury, pain, suffering, loss of income, loss of opportunity, loss of family and social relationships, and medical, hospital and surgical expenses and other expense related to the diagnosis and treatment thereof, for which Defendants are liable.

**FOURTEENTH CAUSE OF ACTION**
**AS AGAINST THE DEFENDANTS**
**STRICT LIABILITY- FAILURE TO WARN**

282.  Plaintiffs repeat and re-allege the allegations of the prior paragraphs as if set forth at length

herein.

283.   Defendants have engaged in the business of selling, distributing, supplying, manufacturing, marketing, and/or promoting Xarelto, and through that conduct has knowingly and intentionally placed the same into the stream of commerce with full knowledge that it reaches consumers such as Plaintiffs who ingested it.

284.   Defendants did in fact sell, distribute, supply, manufacture, and/or promote Xarelto to Plaintiffs and to their prescribing physicians. Additionally, Defendant expected the Xarelto that it was selling, distributing, supplying, manufacturing, and/or promoting to reach - and Xarelto did in fact reach - prescribing physicians and consumers, including Plaintiffs and their prescribing physicians, without any substantial change in the condition of the product from when it was initially distributed by Defendant.

285.   At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendant and ingested by Plaintiffs.  The defective condition of Xarelto was due in part to the fact that it was not accompanied by proper warnings regarding the possible side effect of life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature and the Defendants failed to  adequately warn of said risk.

286.   This defect caused serious injury to Plaintiffs, who used Xarelto in its intended and foreseeable manner.

287.   At all times herein mentioned, Defendant had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that Xarelto did not cause users to suffer from unreasonable and dangerous side effects.

288.   Defendant so negligently and recklessly labeled, distributed, and promoted Xarelto that it

was dangerous and unsafe for the use and purpose for which it was intended.

289.   Defendant negligently and recklessly failed to warn of the nature and scope of the side effects associated with Xarelto, namely life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature and the Defendants failed to adequately warn of said risk.

290.   Defendant was aware of the probable consequences of the aforesaid conduct.  Despite the fact that Defendant knew or should have known that Xarelto caused serious injuries, it failed to exercise reasonable care to warn of the dangerous side effect of developing life-threatening bleeding from Xarelto use, even though this side effect was known or reasonably scientifically knowable at the time of distribution. Defendant willfully and deliberately failed to avoid the consequences associated with its failure to warn, and in doing so, Defendant acted with a conscious disregard for the safety of Plaintiffs.

291.   Plaintiffs could not have discovered any defect in the subject product through the exercise of reasonable care.

292.   Defendant, as the manufacturer and/or distributor of the subject product, is held to the level of knowledge of an expert in the field.

293.   Plaintiffs reasonably relied upon the skill, superior knowledge, and judgment of Defendants.

294.   Had Defendants properly disclosed the risks associated with Xarelto, Plaintiffs would have avoided the risk of life-threatening bleeding and other serious injuries by either not using Xarelto at all or by taking other action, including increased monitoring, to prevent the injuries plaintiffs ultimately sustained.

295.   As a result of the foregoing acts and omissions, Plaintiffs were caused to sufferer serious and dangerous side effects including, life-threatening bleeding, as well as other severe  and person

injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, shortened life expectancy, expenses for hospitalization, and loss of earnings.

296.   As a result of the foregoing acts and omissions, Consortium Plaintiffs have suffered damages and harm, including, but not limited to, emotional distress, medical expenses, other economic harm, as well as a loss of consortium, services, society, companionship, love, and comfort.

297.   By reason of the foregoing, Plaintiffs have suffered injuries and damages as alleged herein.

**FIFTHEENTH CAUSE OF ACTION**
**AS AGAINST THE DEFENDANTS**
**(NEGLIGENT FAILURE TO WARN)**

298.   Plaintiffs hereby incorporate by reference as if fully set forth herein, each and every allegation contained in the paragraphs above.

299.   Defendant owed Plaintiffs a duty to warn of any dangerous defects or side effects; a duty to assure its product, Xarelto, did not cause users unreasonable and dangerous risks, reactions, or side effects; and a duty to provide adequate post market surveillance and warnings as it learned of Xarelto's substantial dangers.

300.   Defendant breached its duty of reasonable care to Plaintiff in that Defendant failed to:

   a)   Conduct sufficient testing which, if properly performed, would have shown that Xarelto had serious side effects, including higher risks of life-threatening bleeding and other risks; and/or

   b)   Include adequate warnings with Xarelto that would alert users to the potential risks and serious side effects the drug; and/or

   c)   Warn the Plaintiffs that use of Xarelto carried a risk of life-threatening bleeding and related problems; and/or

    d)  Advise the FDA, the health care industry, and the public about the adverse reports it had received regarding Xarelto; and/or

    e)  Other appropriate warnings.

301.   Defendant should have known that Xarelto caused unreasonably dangerous risks and serious side effects of which the general public would not be aware.  Defendant nevertheless advertised, marketed and promoted its product without adequately warning plaintiffs and their physicians and healthcare providers of the unreasonable risk of life-threatening bleeding associated with use of Xarelto.

302.   As a result of the foregoing acts and omissions, Plaintiffs were caused to sufferer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and person injuries which are permanent and lasting in nature, physical pain and  mental anguish, diminished enjoyment of life, shortened life expectancy, expenses for hospitalization, and loss of earnings.

303.   As a result of the foregoing acts and omissions, Consortium Plaintiffs have suffered damages and harm, including, but not limited to, emotional distress, medical expenses, other economic harm, as well as a loss of consortium, services, society, companionship, love, and comfort.

304.   By reason of the foregoing, Plaintiffs have suffered injuries and damages as alleged herein.

## SIXTEENTH CAUSE OF ACTION
## AS AGAINST THE DEFENDANTS
## (LOSS OF CONSORTIUM)

305.   Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if  more fully set forth herein.

306.   Plaintiffs BARBARA & HARRY ALDERDICE, JOHN & GERTRUDE GUILLORY, AND GARY & KAY WALKER, respectively, were at all times  relevant, and continue to be, husband and wife.

307.   Plaintiffs have suffered injuries and damages as alleged herein. Consortium Plaintiffs were

married to the respective Plaintiffs at the time of their injuries from Xarelto, and continue to be married to the respective Plaintiffs after they sustained those injuries described herein.

308.   As a direct and proximate result of the injuries and injurious consequences suffered by Plaintiffs, Consortium Plaintiffs have suffered damages and harm, including but not limited to emotional distress, medical expenses and other economic harm, as well as lost consortium of their respective spouses, which includes society, services, love, comfort, companionship, and sexual gratification and affection, and will suffer a loss of these services in the future.

## SEVENTEENTH CAUSE OF ACTION
### (SURVIVAL ACTION)

309.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead this Count in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the Plaintiffs' resident State.

310.   As a direct and proximate result of the conduct of Defendants, where appropriate, Plaintiff Decedent, prior to her death, was obligated to spend various sums of money to treat her injuries, which debts have been assumed by the Estate. As a direct and proximate cause of the aforesaid, Decedent was caused pain and suffering, mental anguish and impairment of the enjoyment of life, until the date of her death; and, as a direct and proximate result of the aforesaid, Decedent suffered a loss of earnings and earning capacity. Plaintiff brings this claim on behalf of Decedent's estate under applicable state statutory and/or common laws.

311.   As a direct and proximate result of the conduct of Defendants, Plaintiff Decedent and her spouse and heirs, until the time of Decedents' deaths, suffered a disintegration and deterioration of the family unit and the relationships existing therein, resulting in enhanced anguish, depression and other symptoms of psychological stress and disorder.

As a direct and proximate result of the aforesaid, and including the observance of the suffering and

physical deterioration of Plaintiff Decedent until the date of her deaths, Plaintiffs have and will continue to suffer permanent and ongoing psychological damage which may require future psychological and medical treatment. Plaintiff's spouse or heirs, as Administrators or beneficiaries of the estate of the Decedent, bring the claim on behalf of the estate for damages under applicable statutory and/or common laws, and in their own right.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against the Defendants on each of the above-referenced claims and Causes of Action and as follows:

1.      Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2.      Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determined at trial of this action;

3.      Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiffs in an amount sufficient to punish Defendants and deter future similar conduct;

4.      Prejudgment interest;

5.      Postjudgment interest;

6.      Awarding Plaintiffs reasonable attorneys' fees;

7.      Awarding Plaintiffs the costs of these proceedings; and

8.      Such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand trial by jury as to all issues.

Respectfully Submitted:

Dated: <u>August 2, 2016</u>

BROWN AND CROUPPEN, P.C.

_____

SETH SHARROCK WEBB, # 51236
211 N. Broadway, Suite 1600
St. Louis, Missouri  63102
314-421-0216
314-421-0359 facsimile
sethw@getbc.com
**ATTORNEY FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United

States District Court for the Eastern District of Louisiana by using the CM/ECF system.  Notice of this

filing was sent to all parties by operation of the Court's electronic filing system and MDL Centrality.

<u>/s/ Seth S. Webb</u>
Seth S. Webb
Attorney for Plaintiffs