1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF LOUISIANA
2
  ****************************************************************
3  IN RE:  XARELTO (RIVAROXABAN)        MDL 2592 "L"
   PRODUCTS LIABILITY LITIGATION
4
                                        AUGUST 4, 2016
5

6  THIS DOCUMENT RELATES TO             JUDGE ELDON E. FALLON
   ALL CASES
7
                                        MAG. JUDGE MICHAEL NORTH
8
  ****************************************************************
9
              TRANSCRIPT OF STATUS CONFERENCE
10     HEARD BEFORE THE HONORABLE ELDON E. FALLON
              UNITED STATES DISTRICT JUDGE
11

12  APPEARANCES:

13  FOR THE PLAINTIFFS'            MR. LEONARD A. DAVIS
    LIAISON COUNSEL:               Herman, Herman & Katz, LLC
14                                 820 O'Keefe Avenue
                                   New Orleans, LA  70113
15

16
                                   MR. GERALD EDWARD MEUNIER
17                                 Gainsburgh, Benjamin, David,
                                     Meunier & Warshauer
18                                 Energy Centre
                                   1100 Poydras Street
19                                 Suite 2800
                                   New Orleans, LA  70163-2800
20

21  PLAINTIFFS STATE              MS. DAWN BARRIOS
    LIAISON COMMITTEE             Barrios Kingsdorf &
22  CHAIR:                          Casteix, LLP
                                   701 Poydras Street
23                                 Suite 3650
                                   New Orleans, LA  70139
24

25

```
 1    FOR THE DEFENDANTS'          MR. JAMES B. IRWIN, V
      LIAISON COUNSEL:             Irwin Fritchie
 2                                     Urquhart & Moore, LLC
                                   400 Poydras Street
 3                                 Suite 2700
                                   New Orleans, LA  70130
 4

 5    FOR THE DEFENDANTS:          MS. SUSAN M. SHARKO
                                   Drinker, Biddle & Reath, LLP
 6                                 600 Campus Drive
                                   Florham Park, NJ  07932-1047
 7

 8                                 MR. STEVEN JAY GLICKSTEIN
                                   Kaye Scholer, LLP
 9                                 250 West 55th Street
                                   New York, NY  10019
10

11
      FOR THE MOVANT              MR. MARK LAMBERT
12    PORTOLA                     Cooley LLP
      PHARMACEUTICALS, INC.:      3175 Hanover Street
13                                Palo Alto, CA  94304-1130

14

15    FOR THE MOVANT              MR. DANIEL S. PARISER
      PHARMACEUTICAL RESEARCH     (Via telephone)
16    AND MANUFACTURERS OF        Arnold & Porter, LLP
      AMERICA:                    601 Massachusetts Avenue NW
17                                Washington, DC  20001

18

19
      Official Court Reporter:    Lanie M. Smith, RPR, CRR
20                                500 Poydras Street, B-275
                                  New Orleans, Louisiana 70130
21                                (504) 589-7782

22

23

24
             Proceedings recorded by mechanical stenography,
25    transcript produced via computer.
```

1                     **I N D E X**

2                                                    **PAGE NO.**

3     Pretrial Orders                                    5

4     Case Management Orders                             5

5     Bellwether Selections                             5

6     Counsel Contact Information Form                   7

7     Plaintiff Fact Sheets                             7

8     Defendant Fact Sheets                             7

9     Bundling of Complaints/Answers/Responsive Pleadings    7

10    Preservation Order                                8

11    Order Governing the Parties' Interactions with     8
      MDL Plaintiffs' Prescribing and Treating Physicians

12    Discovery                                          8

13    Discovery Issued to Third Parties                 10

14    State/Federal Coordination                        12

15    Matters Set for Hearing Following Status Conference   15

16    Next Status Conference                            15

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

(Call to order of the court.)

THE COURT:  Sorry about the inconvenience with this court.  We're redesigning downstairs to accommodate you-all for the trials.  We have some new equipment that's coming in, some state-of-the-art equipment.  We're updating it and we have a little better podium that's inlaid material so that it doesn't stick up and it should be finished this week.  They've been working on it for a couple of weeks.  But that's the reason we're here.

Let me hear from the parties.

MR. MEUNIER:  Good morning, Your Honor.  Jerry Meunier, co-liaison counsel for plaintiffs.

MR. IRWIN:  And Jim Irwin for defendants, Your Honor.

MR. MEUNIER:  I'm just being advised by my colleague Mr. Irwin that this is your law clerk Thomas' last day on the job.

THE COURT:  Right.  Thomas has been with us now from the beginning of this case.  You've tired out another law clerk.  Thomas is going to be moving to Washington for a couple of years with big justice.  He's going to be in the trial division there, and I look forward to him doing that work.  We

1    may see him down here because they try cases all over the

2    country.  So I know he'll be getting a great experience, and I

3    thank him for all of his work.  He started at the beginning of

4    this case and has done a yeoman's job.

09:30AM  5              (Applause.)

6              MR. MEUNIER:  I know I speak for all involved when I

7    say to Thomas good wishes; and as you leave for the nation's

8    capitol, you've done a capital job in this case.  We wish you

9    well.

09:30AM  10             Your Honor, we have a Joint Report to go through.  The

11   first matter to discuss is pretrial orders; but we simply

12   reference the one pretrial order which has been entered since

13   the last status conference and that is PTO 12A, Record

14   Doc. 3726.  It's indicated on Page 3 of the Joint Report and it

09:30AM  15  deals with disclosure of protected documents to prescribing and

16   treating physicians of bellwether plaintiffs.

17             Section 2 of the report on Page 5 addresses the

18   Case Management Orders 2, 3, 4 and 5 which have now been

19   entered by the Court.

09:31AM  20             And as Your Honor already has mentioned, pursuant

21   to CMO 5, which sets forth the process for selecting bellwether

22   trial cases, the parties have now had an opportunity to present

23   to Your Honor arguments as to why certain cases should be

24   removed from a selection process.  And now that that's been

09:31AM  25  done, as I appreciate it, the nominations of trial cases will

1    proceed this coming Monday; strikes will take place Tuesday;

2    and then on Wednesday Your Honor will make selections of the

3    cases that will be tried on the four bellwether trials set for

4    next year.

09:31AM  5          THE COURT:  As counsel mentioned, we have four

6    bellwether trials -- two in Louisiana and one in Mississippi

7    and one in Texas.  We will soon be finalizing those next week

8    and going forward with those.

9          I also need to talk with counsel to take care of

09:32AM  10   the possibility that during the process, if the past is any

11   indication, some of them can get right up to trial and, like

12   we've all been conscious of in other cases, they settle.  So

13   what do we do at that point?  So I want you to be thinking of

14   that.

09:32AM  15          There's a couple of ways of dealing with it.  We

16   can have some in reserve to fill in, or we can take the next

17   one up.  But we need some process involved in that type

18   situation so that we just don't exhaust ourselves on the

19   pretrial aspect of the bellwether case and then settle at the

09:32AM  20   courthouse gate and then what do we do at that point?

21          So I'm interested and I'm not going to make any

22   decision on it, but I want you-all to be thinking about it in

23   the event -- Yes, Susan?

24          MS. SHARKO:  We'll certainly talk to the plaintiffs

09:33AM  25   about it, but I don't see that there is any prospect of

1    settlement of this litigation.

2         THE COURT:  Okay.

3         MR. MEUNIER:  That move-up-in-line solution,

4    Your Honor, too, might be curtailed to some extent given that

09:33AM  5    the first two cases are Louisiana and the next two are not.

6         THE COURT:  Keep an eye on it in any event so that we

7    will at least think about it.  Okay.

8         MR. MEUNIER:  Nothing further to discuss in Section 3

9    of the report dealing with bellwether selections.

09:33AM  10         In Section 4, we mention the Counsel Contact

11   Information Form that is required; and Lenny Davis and I

12   continue to encourage counsel to please be diligent in filling

13   out those forms so that we can maintain an accurate inventory

14   of counsel.

09:33AM  15         Under Section 5, Plaintiff Fact Sheets,

16   Your Honor, as you know, we continue with a process, which I

17   think has proven helpful, whereby the untimeliness and/or

18   deficiency of Plaintiff Fact Sheets can be addressed first by

19   counsel once we get a list of cases from the defendant and then

09:34AM  20   that allows us to work on those issues among ourselves before

21   having to present them to the Court.  And, again, that process

22   is continuing.

23         Nothing further to report in the Defendant Fact

24   Sheet reference at Section 6.

09:34AM  25         Section 7 of the Joint Report at Page 8 refers to

1      the bundling of complaints.  And we simply want to remind all

2      plaintiffs' counsel who are new to the case that -- or may not

3      be new to the case or may be monitoring the case for the first

4      time -- that bundled complaints no longer are accepted as of

09:34AM   5      this past May 20.

6                  Section 8 of the report deals with preservation

7      orders; and, again, we continue to reference this in the Joint

8      Report, Judge, just to make sure that plaintiffs' counsel who

9      are new to the case become familiar with the provisions of

09:35AM  10      PTO 15B, which is Record Doc. 1477; and, in turn, remind their

11      plaintiff clients of the preservation obligations discussed in

12      that pretrial order.

13                  Section 9 of the report at Page 9 is the issue of

14      interactions with plaintiffs' prescribing and treating

09:35AM  15      physicians.  And I believe the only reason we continued to

16      reference this in the Joint Report this time, Judge, was

17      because of that new Pretrial Order 12A that I mentioned

18      earlier.  Otherwise, this may be one of those sections of the

19      report which can be deleted going forward so we can continue to

09:35AM  20      keep these joint reports more current.

21            THE COURT:  We'll certainly get involved in that if we

22      need to strike it.  Okay.

23            MR. MEUNIER:  Your Honor, the discussion of discovery

24      in Section 10 of the Joint Report at Page 9 covers a couple of

09:36AM  25      things.  First, we do continue to have the telephone

1    conferences with Your Honor on a regular basis that allow us to

2    take up discovery issues and eliminate motion practice and I

3    think both sides feel that's continuing to be very helpful.

4         On the biological sample preservation, which is

09:36AM   5    discussed at the bottom of Page 9, top of Page 10, we mention

6    that the PSC has noticed a 30(b)(6) deposition of Janssen

7    regarding stored samples and I believe meet-and-confer

8    discussions about that issue are continuing.

9         MS. SHARKO:  Yes.

09:36AM  10         MR. MEUNIER:  We also mention here the German witness

11   personnel -- rather, the German personnel file ruling that the

12   Court made on May 16, 2016.  It's Record Doc. 3237.  And

13   following today's status conference in chambers, Mr. Barr, on

14   behalf of plaintiffs, and Mr. Glickstein, on behalf of Bayer,

09:37AM  15   will have further discussion with Your Honor about some of the

16   issues following up the effects of that ruling by Your Honor.

17        The only other thing, I think, that may need to

18   be mentioned in connection with discovery, Judge, is at the top

19   of Page 11 of the report, there is apparently a joint -- not

09:37AM  20   apparently.  There is now a collaborative joint effort on

21   discovery of certain marketing information from the defendants

22   which is coordinated between the PSC and the Pennsylvania state

23   court counsel.

24        And I only mention it because in the event that a

09:37AM  25   joint discovery request results in the need for Court

1   attention, this may be, in our view, the first opportunity for

2   you and the presiding judge in the Pennsylvania case to jointly

3   address whatever motions or briefing might be presented by the

4   parties.  It remains to be seen whether it's necessary, but I'm

09:38AM  5   just alerting the Court that it may come to that.

6              THE COURT:  Who's the judge there?

7              MS. BARRIOS:  Judge New.

8              MR. MEUNIER:  Your Honor, the next section of the

9   report, Section 11 at Page 11, refers to the third-party

09:38AM 10   discovery efforts and they involve the FDA, the DCRI.  I don't

11   think there's anything further or new to advise the Court about

12   in those respects.

13              The top of Page 12, there is reference to the PSC

14   attempt -- or not attempt -- the PSC's scheduling now of the

09:38AM 15   deposition of Robert Califf; and I understand that efforts are

16   underway to put that deposition on the calendar.

17              The further discussion of discovery, third-party

18   discovery refers to matters such as Alere, as to which we are

19   receiving documents and sharing with the defendants.

09:39AM 20              As the Court knows, we've had an issue with

21   respect to our subpoena to PhRMA; and that was the subject of a

22   prior hearing by Your Honor and a minute entry that was entered

23   by the Court July 28.  It's Record Doc. 3730 and

24   meet-and-confer discussions are continuing as guided by the

09:39AM 25   minute entry ruling of the Court.

1           Mr. Davis may have more to say about that.

2          MR. DAVIS:  Your Honor, you directed me to update the

3 Court at the status conference regarding PhRMA.  And as an

4 update to the Court, following the hearing last week --

09:39AM  5          THE COURT:  I think counsel for PhRMA is on the line

6 too.  So he'll listen.

7          MR. DAVIS:  I know they said they were going to be.

8          THE COURT:  Yes.  They're monitoring it.

9          MR. DAVIS:  We understand that Janssen shipped and

09:39AM 10 delivered documents to PhRMA's counsel.  We weren't copied on

11 those communications; but we understand that PhRMA did receive

12 the various Bates number examples that we spoke about at the

13 hearing.  And I think that was helpful.

14           We had a meet-and-confer by telephone on August

09:40AM 15 the 2nd and they expressed appreciation for being in town last

16 week and meeting face-to-face, having discussions and also

17 having looked at the documents.  What we understand is that

18 PhRMA is performing an investigation.  They are addressing

19 search terms at this time and taking what I'll call a

09:40AM 20 step-by-step approach and process to identify responsive

21 documents.

22           On August 3rd, we had additional communications

23 and PhRMA suggested search terms that we are looking at and

24 we'll have further communications with PhRMA's counsel.  So we

09:41AM 25 are speaking, and it's moving ahead.

1    THE COURT:  Okay.  I appreciate PhRMA's cooperation in

2  this.  It's not my intention to make life hard on them.  It's

3  just that if we can do it the easy way, I'm all in favor of

4  that and I appreciate their cooperation.  I look forward to

09:41AM 5  having their cooperation throughout this situation.

6    MR. DAVIS:  We appreciate their cooperation as well,

7  Your Honor.

8    MR. MEUNIER:  Judge, the only other thing to mention in

9  terms of third-party discovery today is the subject of a motion

09:41AM 10  which will be argued following the conference and that is the

11  PSC motion to compel the production of materials from Portola

12  Pharmaceuticals, Inc.  Counsel for Portola Pharmaceuticals is

13  in court today; and immediately following the conference, there

14  will be an argument on the PSC's motion to compel.

09:41AM 15    THE COURT:  Any report on the state cooperation?

16    MS. BARRIOS:  Yes, Your Honor.

17    Good morning, Your Honor.  Dawn Barrios for the

18  State Liaison Committee.

19    Thomas, I also want to join Mr. Meunier and wish

09:42AM 20  you the best of luck.  And when you are as old as I am, you

21  will look back and see the first few years of litigation are

22  really your best years because that's where you're learning

23  everything, but we appreciate -- I especially appreciate all

24  the help that you've given me.

09:42AM 25    And, Your Honor, I handed Thomas three documents;

and I've previously provided it to the plaintiffs and the

defendants.  Prior to going through the general global list

that I usually provide the Court, there are two updates.

The first update is that California has now --

California has finally selected a judge for their JCCP, and

it's Judge Kenneth Freeman.  Judge Freeman has experience with

MDLs before.  I know that Judge Dougherty dealt with him in the

Actos MDL, and I mention that to you for whatever it's worth.

THE COURT:  Okay.

MS. BARRIOS:  Their first status conference is

September 12th and one of the matters he mentions in the order

is that he wants the parties there to get together to discuss

coordination of discovery with other proceedings.  So that's

very encouraging from my point of view.

The other matter --

THE COURT:  Do you have his telephone number for me?

MS. BARRIOS:  Your Honor, I actually have two telephone

numbers for him and I called both yesterday and didn't get it.

So before I provide it to you, I want to make sure that I have

the right number.

THE COURT:  Okay.

MS. BARRIOS:  But you should get that this week.

THE COURT:  Great.

MS. BARRIOS:  The other matter I wanted to report is

the Pennsylvania matter.  I've been given the information from

1    Mr. Gallucci who is co-lead counsel there and Judge New is

2    discussing with the parties the bellwether system and their

3    bellwether trial will not begin until after your four MDL

4    trials are done.

09:44AM   5        THE COURT:  Take a look at the bellwether selection

6    process; and if you're comfortable with it, talk to your judge

7    about it.  And you may want to tweak it a bit, but it's one way

8    of doing something.  If you need any information; and I can

9    help out in any way, get to me.

09:44AM   10        MR. GALLUCCI:  Thank you, Your Honor.

11        THE COURT REPORTER:  Can I get your name?

12        MR. GALLUCCI:  Daniel Gallucci.

13        MS. BARRIOS:  Your Honor, turning to the state court

14    stats, I see that there are 32 California cases now, although

09:44AM   15    on the JCCP order, there are only about six or seven; but

16    obviously others hadn't been transferred there yet.  And I

17    notice that I do have a telephone number for Judge Freeman

18    there, but I'm not sure that's the correct one because I hit a

19    wall yesterday trying to find that.

09:45AM   20            The other state that has a great number of cases

21    is Missouri.  They have a hundred Xarelto users as of this

22    time, and then Pennsylvania has 874 cases.  And on the last

23    page, we see that globally there are 1,077 state court cases

24    filed; and that the number of Xarelto users since our last

09:45AM   25    status conference has increased by 102.

 1          THE COURT:  So Pennsylvania has a thousand cases; is

 2   that it?

 3          MS. BARRIOS:  No, Your Honor.  I think it's 874.

 4          THE COURT:  Okay.

09:45AM  5          MS. BARRIOS:  But it's a thousand around the country.

 6          THE COURT:  Users.  Right.

 7          MS. BARRIOS:  If there's anything else, Your Honor --

 8          THE COURT:  No.  That's it for me.  Thanks very much,

 9   Dawn.  I appreciate your help.

09:46AM 10          MS. BARRIOS:  Thank you.

11          MR. MEUNIER:  Your Honor, I think all that remains is

12   the scheduling of the conferences.

13              The next is September 20th, and I think you have

14   to announce the October.

09:46AM 15          THE COURT:  Right.  What was it?

16          MR. MEUNIER:  We have October 25th at 9:00 A.M.,

17   Your Honor.

18          THE COURT:  September 20th is the next one at 9:00 A.M.

19   and October 25th at 9:00 A.M.

09:46AM 20          MR. MEUNIER:  Thank you, Judge.

21          THE COURT:  Thank you very much.  Anything else?

22              How about the motions?  Why don't we take the

23   motion now?

24          MR. DAVIS:  Your Honor, we have the Portola motion.

09:46AM 25   Leonard Davis on behalf of the PSC.

1          THE COURT:  Is counsel for the third party here?

2          MR. LAMBERT:  Yes, Your Honor.

3              Mark Lambert for Portola.

4          THE COURT:  Okay, Mark.

09:47AM  5          MR. DAVIS:  Your Honor, I'm going to assume that the

6 Court has read the briefing.

7          THE COURT:  Yes, I have.

8          MR. DAVIS:  And so I don't need to really be redundant.

9          THE COURT:  This is a third-party situation.  The

09:47AM 10 plaintiffs request information from the third party.  The third

11 party indicates that the information falls into two categories:

12 One is their communication with the defendant J&J or Bayer and

13 that they feel that the plaintiffs have access to that or

14 already have it because they're dealing with Bayer and J&J and

09:47AM 15 have gotten that information.

16              The other information, they feel has to do with a

17 new drug that they are designing that might be in competition

18 with Xarelto and they're resisting disclosing that information

19 on the proprietary patent basis and have some difficulty doing

09:48AM 20 that.

21              That's the two categories.

22          MR. DAVIS:  That's correct, Your Honor.  I can cut

23 through it, but I think I ought to give just a little bit of an

24 explanation.

09:48AM 25              On May 3rd, as you know, the subpoena and

1    deposition notice was issued.  It basically asked for some

2    specific information from Portola which was involved with Bayer

3    and J&J for Factor Xa inhibitor antidote and Andexanet Alfa,

4    which were reversals and things like that and I think

09:48AM  5    Your Honor has that.

6            We had multiple meet-and-confers -- May, June,

7    July -- and we've had several discussions with counsel for

8    Portola specifically to address the collaboration agreement

9    which they did provide copies which was of assistance and they

09:48AM  10   also provided names of individuals.  They identified 11 Janssen

11   folks that they had dealt with primarily, 10 Bayer folks and 11

12   people within Portola.  So we know that the universe isn't

13   huge.  We know that at this point.  They then, after a

14   meet-and-confer, sent us formal objections.

09:49AM  15           In the course of the discussions, we identified

16   what we had received in the productions from Bayer and Janssen;

17   and the Court is well aware we're on a fast pace here.  We're

18   limited with discovery from the defendants, and we're

19   proceeding as fast as we can.  But we were able to identify 654

09:49AM  20   e-mails with Portola's, what I'll call, e-mail exchange.  So

21   that's what we have.

22           Portola, in the course of the meet-and-confers,

23   asked us to provide them with the search terms that we provided

24   to J&J which we just didn't think was appropriate, quite

09:50AM  25   frankly.  This is a third party.  We thought it was different,

1    and it really was up to Portola because they weren't the

2    manufacturers of the drug.  They really did something else, and

3    they had collaboration at all times.  They had been in

4    communications at all times, especially with J&J.

09:50AM  5    Specifically, they made objections to two things:  Relevance

6    and proportionality.

7           And I understand their argument, quite frankly,

8    with respect to the trade secret.  We can deal with that and

9    that's something that we've always been able to deal with and

09:50AM  10   as the Court is well aware, early in this litigation, we dealt

11   with that with respect to a confidentiality order and we have a

12   heightened provision in there for highly restrictive.  But this

13   Court dealt with those issues in other litigation, even in

14   Vioxx, as the Court is well aware; and there have been what

09:51AM  15   I'll call practical approaches to deal with issues like this.

16          For instance -- and we have no problem limiting

17   the number of people who will review particular materials,

18   giving added protection so that those concerns on trade secrets

19   aren't out in the public.  That's something we certainly can

09:51AM  20   do.  We know under the collaborative agreement, the study data

21   is jointly owned by Bayer and Janssen.  So we have pursued our

22   discovery to Bayer and Janssen.  That's not what we're looking

23   for here.  We're looking for what Portola did, and they have a

24   lot of internal information that J&J and Bayer probably doesn't

09:51AM  25   have or may not have.  I don't know.  But when we got that

1    limited number of e-mails, we are concerned; and certainly we

2    have a right to get discovery from a third person.  We

3    certainly have the right under the rules to take the 30(b)(6)

4    deposition.  But weaning in and honing in on the documents

09:52AM  5    before that deposition and narrowing this really makes some

6    sense which is what we have attempted to do; but, quite

7    frankly, we've been met with objections.

8              And what we've been told is, "Go look at what you

9    have, and then tell us."  And "We're not going to be able to

09:52AM 10   give you anything because it's half of our business, and we

11   really think that it's not something that we need to do."

12             Judge, I can get into the relevance.  I can talk

13   about the two different drugs and what Portola did.  It's in

14   our reply brief.  I'm happy to do that.  I don't know that I

09:52AM 15   need to.  Roger Denton is here if we need to get into that

16   specific, but we have a drug that's still on the market and

17   there's an ongoing obligation to warn here and I can go through

18   that.

19             THE COURT:  Let me hear what the other side says and

09:53AM 20   then I'll get back to you and you can respond if need be.

21             MR. DAVIS:  Okay.  Thank you.

22             THE COURT:  Okay.  We're talking primarily, as I

23   understand it, first of all, let's put the trade secrets for a

24   moment in the background.

09:53AM 25             The documents that they're talking about is that

1  you have been working on -- you, Portola -- has been working on

2  an antidote.  We know that there's an issue that -- at least

3  that plaintiff raises and says there's an issue -- of an

4  antidote.  And there's no antidote for this particular drug so

09:53AM  5  that if somebody starts to bleed, you get in the hospital as

6  quickly as you can.  You can't just take a vitamin K pill or

7  shot or something of that sort.  So they have been working with

8  you on producing or constructing an antidote and there's

9  communications back and forth and the plaintiffs feel they need

09:54AM  10  that information.

11                   What do you say?

12             MR. LAMBERT:  Your Honor, I think that our key issue

13  from the beginning has been grappeling with a subpoena that is

14  truly a blunderbuss subpoena.  It's all documents that relate

09:54AM  15  to 11 different descriptions of what we're doing with

16  Andexanet Alfa.  And so because that's such a vast subpoena, we

17  think it's out of line with the restated rules and because this

18  is a unique situation where as a third party we have extensive

19  written collaboration agreements with parties that have

09:54AM  20  significant information-sharing provisions, when we look at the

21  proportionality aspects and when we look at the plaintiffs' or

22  the subpoenaing parties' obligations to minimize burdens on the

23  third parties, we wanted to see a lot more assurance that

24  documents that we think are sufficient to show the kinds of

09:55AM  25  things that they want to look into -- the data about the

1    effectiveness and the safety of this antidote drug, where it is

2    in its regulatory approval process, whether it works or not --

3    those kinds of things are fully in the possession of the

4    defendants because we're contractually obligated to provide

09:55AM  5    those documents to them and we have and we think that that

6    creates a unique situation where the subpoenaing party and, in

7    fact, the defendants are in a unique position to help minimize

8    the burdens on us so that if more is needed on us, it can be

9    focused, it can be perhaps articulated in documents sufficient

09:55AM  10   to show some aspect that isn't covered by what the defendants

11   already have.

12           And our difficulty in the meet-and-confer process

13   is that as much as we tried to give the plaintiffs the names of

14   the Portola personnel who interact with the defendant personnel

09:56AM  15   and the names of the defendant personnel who we're aware of who

16   are on other ends of those interactions so that they could take

17   up with the defendants any deficiencies in prior party

18   discovery relating to Portola documents, that they could.  But

19   we just didn't see any action on that front; and, in fact, we

09:56AM  20   asked for a meet-and-confer with both sides -- both the

21   defendants and the plaintiffs.  That e-mail request was never

22   responded to.

23           So what we're really concerned with on the

24   Andexanet Alfa is finding a scope where -- as we've tried,

09:56AM  25   nothing has changed on the document request.  "The all

1    documents relating to" has not been distilled down or

2    compromised down to "documents sufficient to show" various

3    criteria.  We've got no movement on that; and, in fact, the

4    motion to compel is really "Comply with the subpoena as

09:57AM  5    written," which we think is inappropriate.

6                    And then on --

7            THE COURT:  Yes.  I hear you on that, and I think

8    that's significant.  I do think that the materials are

9    relevant.  I think the plaintiffs have a right to it.  I think

09:57AM  10   we have to come up with some procedure that's sensible to get

11   it trimmed down.  I don't think a subpoena "Give me all the

12   information" is very helpful.  It's kind of like an

13   interrogatory "Tell me everything that you know about

14   something."  It just doesn't work.  So we've got to figure a

09:57AM  15   way.  One way might be a 30(b)(6) deposition of somebody who

16   has knowledge of this type of information and then drill him

17   down to find out what the documents are and where they are

18   located or some method that Portola knows what documents you're

19   looking for as opposed to just a general comment that runs them

09:58AM  20   all around the place to try to fix it.

21           MR. LAMBERT:  And I think that -- I do believe that if

22   we could look at the document requests that are in the document

23   subpoena and look at them from the standpoint of a document

24   sufficient to show, we could provide them with the data.

09:58AM  25   Again, this is setting aside our belief and our certainty that

1    the defendants have the data.

2         But if we can tailor things down to documents

3    sufficient to show aspects of the Andexanet that are of

4    interest, we think we could make some progress on that.

09:58AM  5    THE COURT:  We may have to do this in stages, Lenny.

6    You may have to do one subpoena for some specific information

7    or a specific person and then another subpoena if you're taking

8    that 30(b)(6) and there's other documents and you've got them

9    listed, then another subpoena if necessary.

09:59AM 10    MR. DAVIS:  Your Honor, we're happy to go take -- we

11    will go take a 30(b)(6) to get the lay of the land, so to say,

12    and understand who has knowledge and what documents exist and

13    go through that and take that as the first step and then go to

14    the next step to address the documents and then the next step

09:59AM 15    if we need a deposition of whoever it is as we set forth and

16    break it up in pieces.  We can do that.

17         There's also another way that may be unorthodox

18    that we're willing to do; but I don't know if counsel for

19    Portola is willing to do that.  We're willing to sit

09:59AM 20    face-to-face.  We're willing to let you bring the documents up,

21    you look at them, you preserve your right to privilege and all

22    of that and we can talk to various search terms that you may

23    want to run, things like that.  We're willing to sit and do

24    that to try to get through it because we know we are on a time

09:59AM 25    crunch.

1       THE COURT:  Yes.

2       MR. DAVIS:  So we'll do it however Portola really wants

3  to do that.

4       THE COURT:  Also I think that J&J may have a dog in

5  this fight and you may know some information.  And there's no

6  sense in him producing documents if you've already produced the

7  document.  It seems to me that maybe you ought to have the

8  three people at a table.

9       MR. DAVIS:  And we're limited, quite frankly --

10       THE COURT:  Let's hear from Susan.

11       MS. SHARKO:  So if the plaintiffs and Portola are going

12  to share documents informally, I submit that Janssen and Bayer

13  should be present and should have the opportunity to see those

14  documents.

15       THE COURT:  Yes, I think that's fair.  I think you

16  ought to.  And give them some input.  If there's a document

17  that they already have, tell them they already have it.  They

18  don't have to submit it.

19       MS. SHARKO:  So we've produced many, many, many

20  millions of pages of documents.  So the odds that someone can

21  look at a screen and say, "Oh, you have that" is slim.

22       THE COURT:  I understand that.

23       MS. SHARKO:  It's important to note that we heavily --

24  we and Bayer had long, long negotiations with the plaintiffs

25  about the scope and format and how discovery would proceed.  So

1    I definitely think this should not serve as an opportunity to

2    now reopen or redo the discovery process that we discussed.

3         MR. DAVIS:  We're not looking to reopen or do that.

4         THE COURT:  I don't want to do that.

10:01AM 5         MR. DAVIS:  But we're limited because they're all

6    marked "confidential" so I can't share them with anybody, and

7    that's a problem because the defendants decided on that.

8         THE COURT:  How do we do that?

9         MR. LAMBERT:  The question that has not been

10:01AM 10   answered -- perhaps it's a question to both the plaintiffs and

11   maybe even more to the defendants -- is have the defendants

12   produced the information that we provide to them under these

13   collaboration agreements?  If the answer is "no," then that

14   should happen before Portola is asked to shoulder the burdens

10:01AM 15   of basically a party; and it seems like a question that could

16   be answered pretty quickly.

17         Defendants, have you produced the documents that

18   Portola gave to you under the collaboration agreements?  If

19   "yes," then they should be produced.

10:02AM 20         MS. SHARKO:  I don't think it's appropriate now for a

21   third party, Portola, to be coming in and directing discovery

22   requests to us or adding to our discovery burden.  We worked

23   out discovery with the plaintiffs, and they're the people at

24   issue in the case.

10:02AM 25         If Mr. Davis has documents that he wants to share

1    with counsel for Portola, it's the same thing that happened

2    last week.  Just tell me what they are, and we'll see if we can

3    resolve it.  We resolved the PhRMA issue in less than 24 hours

4    after it was raised.  I had PhRMA sign off on the protective

10:02AM    5    order, and I immediately gave them the four documents at issue.

6             MR. DAVIS:  But, Your Honor, that's precisely the

7    issue.  And, as you know, the negotiation with defendants early

8    on for limited amount didn't preclude us from third parties for

9    this exact reason; and that's why we need to go to the third

10:03AM   10    parties to do this and it's a making of the defendants quite

11    frankly.  And so I'm not looking to create more work, that's

12    for sure.  We've got plenty and we've got a short time frame

13    here, but I've got to be able to get it and so I'm put in the

14    box is what happens here.

10:03AM   15             Now, separate and apart from that, what I just

16    heard, is another issue which is I don't know what may be

17    internal in Portola that's not shared; and I have to be mindful

18    of that.  So I've got to make sure that I've covered what I

19    need to do in order to protect the plaintiffs here and the

10:03AM   20    clients.

21             THE COURT:  Yes.  But we've got to figure a way of just

22    drilling down a little bit.  You can't ask Portola to give me

23    all documents concerning everything that you've ever done from

24    day one with J&J or with Bayer.  That's just too broad of a

10:04AM   25    scope.  They'll spend the rest of their life trying to find

1    documents, a sheet of paper here or an e-mail here or whatever

2    it is, because the relationship goes on for a year or two or

3    three or four and everybody starts to make comments about it

4    and they're in different groupings and there's no end to it.

10:04AM    5    The proportionality comes into play here.  They've got to know

6    what information you need.  I don't know how we do that and

7    you-all know --

8             MR. DAVIS:  That's why I suggested maybe we sit and

9    look at these things, but I can't have the defendants filtering

10:04AM   10    what we're going to get.  I mean, I certainly don't want a

11    repeat --

12             THE COURT:  I agree with that.

13             MR. DAVIS:  -- I don't want to repeat productions.

14    That's not in anyone's best interest; and, Lord knows, we don't

10:04AM   15    want to be doing that.

16             THE COURT:  We don't have time for that.

17             MR. DAVIS:  Right.

18             MR. LAMBERT:  Your Honor, there was a mention made of

19    Portola's concerns about trade secret information, confidential

10:05AM   20    information.  With respect to information that we've provided

21    to the defendants under the collaboration agreements, we

22    believe that the Court's existing discovery protective order is

23    adequate.

24             With respect to information that we have not

10:05AM   25    provided to them, we might want to negotiate a more heightened

1    protective order that is along the lines of an attorneys' eyes

2    only or experts' eyes only kind of basis.  We think we can

3    solve that problem.

4            There is one issue that we, frankly, didn't meet

10:05AM  5    and confer about because there wasn't a document request for

6    these documents and those are the ones that pertain to

7    Betrixaban.  In the document subpoena, there were 11

8    categories.  None of them addressed Betrixaban.  We saw it

9    mentioned in plaintiffs' motion for the first time -- in their

10:05AM 10    four-page motion; and we relegated our attention to it into a

11    footnote because there's no document request for it.

12           We explained that to the extent they're after

13    that, that is information of a different kind from the

14    standpoint of if they're looking for all documents, it still

10:06AM 15    has the same burdensomeness and proportionality problems.

16    Plus, since it is being developed as, frankly, a competitor

17    drug to Rivaroxaban, that is drug development information that

18    would be very perilous for us to place in access to defendants

19    other than their trial counsel.

10:06AM 20           But, honestly, we don't see a call to produce any

21    Betrixaban documents because they haven't been requested in the

22    document subpoena.

23       MR. DAVIS:  I think it's in there.  I was trying to

24    thumb through it; but, if not, I can certainly get them another

10:06AM 25    subpoena if that's what they want.  I mean, we can address that

1    issue.

2           THE COURT:  With that, I could do it a couple of ways.

3    One, if you-all can agree on some small number of eyes on it --

4    trial counsel or whatever it is.  If you can't, then I have to

10:07AM  5    take a look at the documents so it's *in camera* and if I feel

6    there they're too sensitive or too whatever it is, I won't

7    disclose it.  But I can't make that decision without at least

8    looking at them.  So if you-all can't agree, then what I'm

9    going to require is that you file them *in camera* so I can look

10:07AM  10    at them.

11           Before I make a decision, I'll let you know and

12    counsel know so that if you have any interest in taking it

13    further, you have that opportunity before I disclose the

14    documents.

10:07AM  15           MR. LAMBERT:  Okay.

16           THE COURT:  Let's do this:  Why don't you-all get

17    together.  I would like to hear from you both by the end of

18    tomorrow to see whether or not we've made any progress; and, if

19    not, then I'll have to come up with some method.

10:08AM  20           I don't think relevancy is an issue in this

21    situation.  I think the documents are relevant to the claims

22    and defenses so I think we're dealing primarily, if not

23    exclusively, with proportionality and proportionality comes

24    down to maybe fine-tuning the information that's required or

10:08AM  25    some method of collecting it that's easier than looking

throughout the whole company.  I know you've got 200 employees

or whatever it is.  It's not thousands of employees like we're

used to.  But in any event, proportionality is the issue here.

         MR. LAMBERT:  Just for the record, this is a company

that is developing new drugs, innovative drugs.  We don't have

a drug on the market yet and litigation -- certainly products

liability litigation -- is not part of what we do.  So it's a

substantial burden on the company.

              And I would hope that defendants would

participate in some of these talks with plaintiffs because I

think that our interest as a third party and the uniqueness of

the situation where there is a record and clarity, that

tremendous amounts of information have been placed into the

possession of the defendants.  That is a way to help reduce the

burdens on us --

         THE COURT:  I don't have any problems with that except

that it's clear that the defendants are not going to have a

veto power in that type of situation.  I'll listen to them, but

I think that they have an interest and I would encourage them

to participate in the discussion until we get it resolved.

         MR. DAVIS:  We're prepared after the conference today

to meet and sit down and address the issue.

         THE COURT:  Okay.

         MR. LAMBERT:  Your Honor, just to --

         THE COURT:  I'll hear from you by tomorrow, Lenny.

1    MR. DAVIS:  Yes, we'll get back to you.

2    MR. LAMBERT:  I will be happily leaving on a family

3    vacation tomorrow morning.  I have time to stay and discuss

4    these issues now.  I'll be gone for a week, but then I'm back

10:10AM  5    and happy to advance the process.

6    MR. DAVIS:  Enjoy your vacation.

7    THE COURT:  Maybe you can go with them.

8    MR. LAMBERT:  If we can work the time zones, I'm happy

9    to get on the phone from the beach.

10:10AM  10    MR. DAVIS:  Your family will love you, I'm sure.

11    MR. LAMBERT:  They will love me for it.

12    MR. DAVIS:  I have one other thing.  I just want to

13    thank Thomas.  We appreciate all the efforts and your work

14    throughout the period that you were here.  Thank you, and good

10:10AM  15    luck.

16    THE COURT:  Okay.  Folks, anything else?  Thank you

17    very much.

18    THE COURTROOM MANAGER:  All rise.

19    (WHEREUPON, the proceedings were adjourned.)

20    REPORTER'S CERTIFICATE

21    I, Lanie M. Smith, CRR, RPR, Official Court
Reporter, United States District Court, Eastern District of
22    Louisiana, do hereby certify that the foregoing is a true and
correct transcript, to the best of my ability and
23    understanding, from the record of the proceedings in the
above-entitled and numbered matter.

24

_____/s/ Lanie M. Smith_____
25    Official Court Reporter