UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | * | MDL 2592 "L" |
| | * | November 9, 2016 |
| THIS DOCUMENT RELATES TO ALL CASES | * | Judge Eldon E. Fallon |
| | * | Mag. Judge Michael North |

*****************************************************************

**REPORTER'S OFFICIAL TRANSCRIPT OF THE TELEPHONE STATUS CONFERENCE BEFORE THE HONORABLE ELDON E. FALLON, UNITED STATES JUDGE.**

*****************************************************************

**APPEARANCES:**

FOR THE PLAINTIFFS:

HERMAN HERMAN & KATZ
BY: LEONARD A. DAVIS,ESQ.
820 O'KEEFE AVE.
NEW ORLEANS, LA 70113

GAINSBURGH BENJAMIN DAVID
MEUNIER AND WARSHAUER
BY: GERALD E. MEUNIER, ESQ.
2800 ENERGY CENTRE
1100 POYDRAS ST., STE. 2800
NEW ORLEANS, LA 70163

LEVIN PAPANTONIO THOMAS MITCHELL
RAFFERTY & PROCTOR
BY: BRIAN H. BARR, ESQ.
316 SOUTH BAYLEN ST., STE. 600
PENSACOLA, FL 32502

**APPEARANCES CONTINUED:**

FOR THE PLAINTIFFS:	LEVIN FISHBEIN SEDRAN & BERMAN
	BY:  FRED S. LONGER, ESQ.
	510 WALNUT ST., STE. 500
	PHILADELPHIA, PA  19106

	BEASLEY, ALLEN, CROW
	METHVIN & MILES
	BY: ANTHONY BIRCHFIELD, ESQ.
	218 COMMERCE STREET
	MONTGOMERY, AL  36103


FOR THE DEFENDANTS:	IRWIN FRITCHIE URQUHART &
	MOORE
	BY: JAMES B. IRWIN, V, ESQ.
	TEXACO CENTER
	400 POYDRAS ST., STE. 2700
	NEW ORLEANS, LA  70130

	DRINKER BIDDLE & REATH
	BY: SUSAN M. SHARKO, ESQ
	500 CAMPUS DR.
	FLORHAM PARK, NJ  07932

	KAYE SCHOLER
	BY: STEVEN GLICKSTEIN, ESQ
	    ANDREW SOLOW, ESQ.
	250 WEST 55TH ST.
	NEW YORK, NY  10019

	CHAFFE MCCALL
	BY: JOHN F. OLINDE, ESQ.
	1100 POYDRAS STREET
	NEW ORLEANS, LA  7016


ALSO APPEARING:	Michael Kella
	Melissa Barkley (phonetic)
	Steve Hassink


REPORTED BY:  Mary V. Thompson, RMR, FCRR
	      United States District Court
	      500 Poydras, Room B275
	      New Orleans, LA  70130

**P R O C E E D I N G S**

THE COURT: Hello. Good afternoon, everyone. This is Judge Fallon.

03:31:47 Who is on the line for the plaintiffs?

MR. DAVIS: Hello, Judge. This is Lenny. You have Andy, Brian, Jerry, and Fred Longer.

THE COURT: Okay. For the defendants?

MS. SHARKO: For Janssen it is Susan Sharko.

03:32:10 And then, Judge, there are a number of other people on, including people who don't want to identify their clients. I just raise that so Your Honor can address it.

MR. GLICKSTEIN: Steve Glickstein and Andy Solow and John Olinde.

03:32:25 THE COURT: Who else is on?

MR. IRWIN: Jim Irwin, Your Honor.

THE COURT: All right, Jim.

Who else is on the line?

MR. KELLA: Michael Kella for a number of individual plaintiffs in the Xarelto matter. 03:32:38

MS. GREEN: Your Honor, this is Abby Green (phonetic). I also represent a plaintiff in this matter.

MS. BARKLEY: Melissa Barkley (phonetic). I'm with the Sanders Law Firm. We represent a number of clients as well.

03:32:55 THE COURT: Well, I think they have to know who you

03:33:14 03:33:33 03:33:56 03:34:12 03:34:29

represent. That's a fair thing. Everybody indicates who they represent on the case.

Let's start at the first one. Who was on after Jim Irwin representing plaintiffs, various plaintiffs? Who do you represent, a plaintiff that you represent?

MR. KELLA: This is Michael Kella, Your Honor. Would the names be best or case numbers?

THE COURT: No, names are fine.

MR. KELLA: I have Bernice Beeler, Spurgeon Clark, Lisa Granneman, Teresa Dietrick, Holly Graham, Norma Matthews, Roger Reed, Roger Roeper, Tilda Spaulding, and Raymond Yosten.

THE COURT: Okay. Thank you, Mike.

Who else is on the line?

MR. HASSINK: Your Honor, this is Steve Hassink from DLA Piper. I don't represent any parties to this case, but I've been asked to audit conferences in the Xarelto matter if that is okay with you.

THE COURT: Well, if you don't represent anybody, what are you -- what is the purpose of your auditing?

MR. HASSINK: Just to -- I've been assigned to keep track of the Xarelto MDL and monitor the docket and any -- really just any issues that come up. It's a general monitoring, Your Honor.

MS. SHARKO: This is Susan Sharko. My understanding is that DLA Piper is national counsel for Pfizer in the Elequis

03:34:53 03:35:13 03:35:33 03:35:47 03:36:02

soon-to-be MDL.

MR. HASSINK: That's correct, Your Honor.

THE COURT: Anybody have any position on that?

MS. SHARKO: I just -- this is Susan Sharko. I just question whether another pharmaceutical company should be listening to a discussion of discovery issues. It doesn't seem right to me. I realize the conference is on the record, however.

THE COURT: Yeah. The issue really is if I -- I'm trying to do this on the phone for you-all for the convenience of you, otherwise I would have to do it in open court. And if I have it in open court, then, of course, everybody is able to attend. I do have this being transcribed so it is, in effect, in open court.

I'm not going to -- I'm not going to entertain any comments from the people, but they have a right to participate or at least listen.

Anyone else?

MS. GREEN: Yes, Your Honor. This is Abby Green. I represent one of the plaintiffs. I understand this may just be a biweekly meeting that typically is just between the steering committees and so I'm fine to sign off.

THE COURT: All right. Okay.

MS. GREEN: Thank you.

THE COURT: All right. Is that it, then?

(No response.)

03:36:24 03:36:52 03:37:13 03:37:29 03:37:46

THE COURT: Okay, folks. We have a couple of discovery issues that I'm going to listen to. Just for background, we have these discovery meetings, telephone conferences, every two weeks to facilitate the development of the case. If a discovery issue comes up, then we talk about it and resolve it at these meetings. I think it's a more efficient way of doing it than waiting for the parties to make a motion formally.

Okay. We've got a couple of issues, as I understand it. Lenny has sent me a note, an e-mail, indicating that you have four issues that you wish to discuss.

The first one relates to the discovery responses provided by BHCP and BPAG as well as discovery responses provided by the JRD.

What's the situation there?

MR. MEUNIER: Your Honor, this is Jerry. I'll report on that.

We propounded some written discovery, interrogatories and requests for production, to both defendants asking for certain information that is under a collaborative agreement, a written agreement, that was executed between Bayer and Janssen, and the defense responded that the information we were seeking was irrelevant and privileged and they declined to answer beyond that.

We then had a telephone conference last Friday, November 4th, amongst counsel, had a meet-and-confer discussion

to see if we could resolve the matter. It did not resolve as a result of that conference. And so the intention of the PSC at this moment is to bring a motion to compel responses, and we will file that and set it for hearing before Your Honor at the next status conference, which is Tuesday, November 29th.

03:38:10

THE COURT: Yeah. With regard to relevance, I'm not really -- things at this stage are irrelevant for discovery. It's one thing for admission in evidence, but relevancy is so slight in these types of matters that relevance is not an issue.

03:38:34

Privilege, however, is always an issue. But with regard to privilege, I'll need a privilege log provided by the party who urges the privilege and also deposit *in camera* with the Court the documents that you claim are privileged. And I'll review those and then decide whether or not they are, in fact, privileged or not privileged.

03:38:58

MR. GLICKSTEIN: Your Honor, this is Steve Glickstein.

THE COURT: Go ahead, Steve.

MR. GLICKSTEIN: It is a bit more complicated than that. In this case even a privilege log would be difficult, and I'll tell you why. And I think relevance is an issue here.

03:39:15

THE COURT: All right.

MR. GLICKSTEIN: There's something called the CDLA which stands for the Collaborative Development and License Agreement. And under that agreement, as Your Honor knows, Bayer has developed Xarelto and Janssen has the U.S. marketing rights.

03:39:33

THE COURT: Right.

MR. GLICKSTEIN: And the agreement provides for the common defense of claims involving Xarelto, and, in addition, for some cross-indemnification. And the plaintiffs have the agreement between the parties which sets out that there are indemnification provisions and that the companies will cooperate in the defense.

The questions that the plaintiffs are asking are extremely broad, and they go to tell us about your joint defense, which, literally construed, it requires me to prepare a privilege log for every communication between Janssen's lawyers and Bayer's lawyers in this case because we'd be talking about hundreds of thousands --

THE COURT: Yeah --

MR. GLICKSTEIN: -- of communications between Susan Sharko and myself that --

THE COURT: Yeah, I've got it. I've got it. I've got it.

MR. GLICKSTEIN: So --

MR. MEUNIER: In the discussion we had Friday, we discussed the possibility of limiting the scope of what is made as a written request, and we will make it clear in our motion that we do not seek to have them divulge any of their work product or trial strategy here, et cetera.

But the agreement calls for the designation of a

controlling party, it calls for the designation of a party solely responsible with respect to the claims. And the alignment of interest here, and the relationships and rights and responsibilities of the defendants, both of whom are named as defendants as manufacturers, is relevant and certainly discoverable, as the Court said, whether it leads to admissible evidence or not.

03:41:24

So we will be careful in our motion not to ask for the divulgence of any strategic material. We really look at it more, Judge, as a factual outcome. Under the agreement a certain factual decision had to be made, a certain designation had to be made, and we're just asking what it was.

03:41:40

MR. GLICKSTEIN: Let me raise this as a practical way of dealing with this, Your Honor, because I think one of the -- one of the reasons that the -- perhaps that the meet-and-confer didn't result in an agreement is right now it's unclear precisely what the plaintiffs are asking for. And I think you would be able to deal with it better and we would be able to deal with it better if we had in writing a much more particularized request as well as the legal basis for the request that the plaintiffs are asking.

03:42:01

03:42:25

And Your Honor can then, I think, look at that request, our response, and make a determination about what, if anything, would be appropriate in terms of relevance and privilege log.

But I think without having your arms around it, and

03:42:46

03:43:05

given the sensitive subject matter and the potentially very large number of documents that would be involved, I think addressing this in the abstract rather than with Your Honor having something concrete in front of him is going to lead to a lot of -- really an impossible amount of work while we're doing expert --

THE COURT: Yeah.

Jerry, let's be specific on it. And send Steve a letter -- or Susan and Steve a letter saying what you need.

As I understand, you want to know who the party is that's been designated?

03:43:18

MR. MEUNIER: Correct.

THE COURT: And be specific on it.

But, I mean, he's not going to be able to give you his theory of liability and his work product that's resulted in the designation of it. And you may or may not have a right to do it. But let's just ask him in writing.

03:43:39

And, Steve, you respond in writing.

Both of you copy me on it and if it goes away, it goes away. If not, I'll weigh in.

03:43:56

MR. MEUNIER: All right, Your Honor. We'll try to get that done. Like I say, we'd like to bring it to you for a hearing on November 29th which means we have to file a motion by next Tuesday. So maybe between now and then I could be more specific and see where we are.

03:44:09

THE COURT: Yeah. Let's take a couple of days to write

03:44:23

03:44:45

03:45:05

03:45:32

03:45:59

the letter. Don't take longer than that. Say two days.

And then, Steve, you respond within the two-day period. If you need more time, we'll take more time.

But, I mean, I don't want this thing to delay and then all of a sudden on the eve of any motion we've got things that are not even in this focus.

MR. MEUNIER: Thank you, Judge.

THE COURT: The second relates to some discovery responses concerning the investigation of Alere. What is that about?

MR. DAVIS: Your Honor, this is Lenny.

Back in August the PSC sent interrogatories pertaining to criminal or civil investigations relating to the use of the Alere INRatio point-of-care device. We received responses in October specifically from the defendant Janssen Research & Development, LLC to whom the interrogatories were directed.

We've had a meet-and-confer. We've actually spoken a couple of times with Janssen's counsel regarding that. And then on November -- in connection with the meet-and-confer, we wrote a letter and specifically asked that a question be addressed, and that question was has Janssen participated in or been the subject of an indictment, charge, subpoena, or provided information in any federal government investigation involving Alere, Inc. and the INRatio device. And it's really a straight-forward question, we believe, but the response that we got is that the law

03:46:19 department hasn't received anything.

And we got an answer from the law department but not from Janssen. And we think that if we get an answer specifically to the question that we posed, then we can determine do we need to compel further answers or is the issue moot, and we have been unable to get an answer to the question that was posed.

THE COURT: Susan, do you want to weigh in on that? Or Jim?

MS. SHARKO: Yes. I view this a little differently, Judge.

What's at issue here is apparently there is a Department of Justice investigation into the Alere company that made the device. That's what the discovery was directed to, what does Janssen know about the DOJ investigation of Alere.

The plaintiffs served discovery requests to Janssen and to Bayer. I'd heard nothing from the plaintiffs at all on this. I had no discussions with them until October 20th, when Lenny sent me a letter and it asked a question -- he asked that we answer a question that was not in the discovery requests. And earlier this week we sent him a letter in response answering that question, although it wasn't part of the discovery requests, and I've heard nothing further.

So we've had no substantive meet-and-confers about this at all, and I would submit that the answer we gave is satisfactory.

THE COURT: Well, let's first of all meet-and-confer, Susan and Lenny, within two days and see if there's an issue.

MR. DAVIS: Sure, we're happy to do that. But, Your Honor, you may recall that we did address it when Susan wasn't available. And Jim and I and others did address it then. We thought that they had a fair opportunity, but we're happy to do that. And we hope we get an answer to the question in the next two days.

THE COURT: All right. If not, we'll bring that at the same time as Jerry's thing, and I'll weigh in on it.

What about the bellwether plaintiffs' objections? Either Andy or Brian, do you have anything?

MR. GLICKSTEIN: Your Honor, this is our -- this is Steve on the defendants' discovery of the plaintiffs.

Your Honor may recall that when we were coming up with the fact sheets, one of the questions that the defendants had proposed to ask on the fact sheet was whether any third parties had any interest in the plaintiffs' claims, and at the time Your Honor ruled that you weren't going to put it on the fact sheet but when we got down to the actual trial plaintiffs, you would revisit the questions.

THE COURT: Yeah.

MR. GLICKSTEIN: We propounded discovery to the four trial plaintiffs asking whether any third parties had any interests in their claims. And it's relevant, Your Honor,

because -- for a number of reasons.

THE COURT: No, I've got that.

MR. GLICKSTEIN: First Rule 17 requires every claim to be brought by the real party in interest.

03:49:42 THE COURT: Right.

MR. GLICKSTEIN: There are co-provisions in Louisiana and other states that relate to when you can assign claims and what the rules are.

THE COURT: Right.

03:49:52 MR. GLICKSTEIN: And so that's the question.

THE COURT: I've got it.

Andy, do you have any response to that?

MR. BIRCHFIELD: Yes, sir, Your Honor.

I mean, what the defendants have asked for -- I mean, 03:50:03 they do ask if there's an assignment, but they ask if there is any -- if there's any third-party agreement, any lending agreement, that would fund this litigation by the plaintiff or by the plaintiff's counsel or by any member of the PSC. So if we have a -- if we have a line of credit, then that would be subject 03:50:30 to this request.

THE COURT: Yeah. I don't see that -- yeah. That may be broad, Steve.

But, look, we've got an issue in a lot of MDLs now, folks, and it looks to me always that sunlight is a good 03:50:46 disinfector. And I guess what I'm concerned about -- and I don't

know whether this is a concern or not, but at least I'd like to know if some third party, some company or somebody, has an interest in the litigation; has either bought it or has something on it. I think everybody ought to know that.

03:51:20 I am not interested -- and, Steve, I hope you're not interested -- in whether or not Andy has a line of credit for his law firm. I mean, that's the nature of the way you practice and certainly the way the plaintiffs practice. I mean, these things cost a lot of money, and oftentimes you need a line of credit to 03:51:44 pay for the depositions that you're taking. But that's something that the law firm is responsible for, not some company that buys claims.

You know, I can see an interest -- and I think you're right, that we ought to know who's the real party in interest and 03:52:09 whether or not there's any hedge funds involved in this or other lending sources that have targeted this particular case.

MR. GLICKSTEIN: Or would exercise any control over the litigation.

THE COURT: Yeah. A line of credit doesn't do that. 03:52:29 And a bank loan, that's not a line of credit but it's from a bank that the law firm does business with and it finances or helps them finance their costs.

MR. GLICKSTEIN: So I think with that guidance we can probably have another discussion with the plaintiffs and see if 03:52:50 we can work something out.

THE COURT: Yeah.

Andy, I don't want it to be the whole group of plaintiffs now. I don't think that that's appropriate for 14- or 15,000 individuals to have to respond, but I think it's a fair issue with the people who are going to trial.

And I'm interested in hedge funds or sources that have targeted this particular case and has some lien on the case or has some control of the case or asks that they be consulted when decisions are made regarding the case. That's something that I ought to know about as well as you-all ought to.

MR. BIRCHFIELD: We're talking about if the individual bellwether plaintiff has assigned control or given, as you just described, influence to a third party, that's what's discoverable, not financing or lines of credit for the plaintiff's firm? We're talking about for the individual plaintiff?

THE COURT: Yeah, I don't see that that's discoverable.

Steve, get with Andy and focus on it.

I really want to know if there's somebody outside that has control over the case. Because if they do, then I want them inside. When the case gets tried or the case gets evaluated, everybody ought to be in that has anything to say about it.

But we're not talking about lines of credit and bank loans and things of that sort to law firms.

MR. BIRCHFIELD: Okay.

THE COURT: Okay. We've got a fourth issue, expert deposition schedules. Is that yours, Steve?

MR. BARR: Your Honor, this is Brian. I can probably speak to this.

03:54:59 THE COURT: Go ahead, Brian.

MR. BARR: We have submitted to you an agreed-upon record. If you remember, the last time we talked there were some issues with Dr. Lensing and how that tied in to the Mingo case.

THE COURT: Yeah.

03:55:13 MR. BARR: And so we proposed to you a revised schedule on both Mingo and Henry since those are the third and fourth trials where we handle how the expert issues are dealt with, the motion practice, et cetera. So that's all that is.

If you notice in there, there is a section that 03:55:35 basically informs the Court that we're still trying to work on the precise discovery that may or may not still be needed on Dr. Lensing himself. We're hopeful that we're going to be able to work that out. I think we are getting a little closer, but we're not there yet. But I'm not sure it's ripe to put that 03:55:58 issue in front of you just yet.

THE COURT: Okay.

Anything else we need to talk about?

MR. DAVIS: Judge, it's not on the agenda, but I want to bring up an issue. I know we have a call next week scheduled. 03:56:14 Just as a heads up, we'll be dealing with the request for

admissions on authenticity and business records that we spoke about at the last conference and we'll have that issue.

THE COURT: Okay. Let's discuss that with opposing counsel and whoever it is that -- Susan, Jim, or Steve -- and see what the situation is so that the issue is sharpened a little bit.

03:56:35

MR. DAVIS: Will do.

THE COURT: All right. Anything else from anybody?

(No response.)

03:56:47

THE COURT: Susan, it's the first time I'm talking with you since your tragedy -- not tragedy but death in the family, and I express my condolences to you.

MS. SHARKO: Thank you very much. I appreciate it.

THE COURT: All right, folks, I'll hear from you next time.

03:57:05

(Proceedings adjourned.)

* * * *

**CERTIFICATE**

**I hereby certify this 15th day of November, 2016, that the foregoing is, to the best of my ability and understanding, a true and correct transcript of the proceedings in the above-entitled matter.**

***/s/ Mary V. Thompson***

**Official Court Reporter**