UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) | ) | MDL No. 2592 |
| PRODUCTS LIABILITY LITIGATION | ) | |
| | ) | SECTION: L |
| | ) | JUDGE FALLON |
| | ) | MAG. JUDGE NORTH |
| DEBORAH PAIVA, Individually, | ) | |
| And as the Administrator of the Estate | ) | AMENDED COMPLAINT AND JURY |
| | ) | DEMAND |
| of EVELYN TRIPLETT, Deceased, | ) | |
| | ) | Civil Action No.: 2:15-cv-05815 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| JANSSEN RESEARCH & | ) | |
| DEVELOPMENT LLC | ) | |
| f/k/a JOHNSON AND JOHNSON | ) | |
| PHARMACEUTICAL RESEARCH | ) | |
| AND DEVELOPMENT LLC; | ) | |
| JANSSEN ORTHO LLC; | ) | |
| JANSSEN PHARMACEUTICALS, INC. | ) | |
| f/k/a JANSSEN | ) | |
| PHARMACEUTICA INC., | ) | |
| f/k/a ORTHO-MCNEIL-JANSSEN | ) | |
| PHARMACEUTICALS, INC.; | ) | |
| JOHNSON & JOHNSON COMPANY; | ) | |
| BAYER HEALTHCARE | ) | |
| PHARMACEUTICALS,INC.; | ) | |
| BAYER PHARMA AG; | ) | |
| BAYER CORPORATION; | ) | |
| BAYER HEALTHCARE LLC; | ) | |
| BAYER HEALTHCARE AG; and | ) | |
| BAYER AG, | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT**

Plaintiff Deborah Paiva, by her attorneys, **BURG SIMPSON ELDREDGE HERSH &**

**JARDINE, P.C.**, in her capacity as the Administrator of the Estate of Evelyn Triplett, Deceased,

upon information and belief, at all times hereinafter mentioned, alleges as follows:

## NATURE OF THE CASE

1.     This action is brought by Plaintiff Deborah Paiva, in her capacity as the

Administrator of the Estate of Evelyn Triplett, Deceased, who was prescribed and used Xarelto,

also known as rivaroxaban.  Xarelto is prescribed to reduce the risk of stroke and systemic

embolism in patients with non-valvular atrial fibrillation, to treat deep vein thrombosis

(hereinafter referred to as "DVT") and pulmonary embolism (hereinafter referred to as "PE"), to

reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients

undergoing hip and knee replacement surgery.

2.     Defendants, JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a JOHNSON

AND JOHNSON PHARMACEUTICAL RESEARCH AND DEVELOPMENT LLC, JANSSEN

ORTHO LLC, JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA

INC. f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., JOHNSON &

JOHNSON COMPNAY, BAYER HEALTHCARE PHARMACEUTICALS, INC., BAYER

PHARMA AG, BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER

HEALTHCARE AG, and BAYER AG (hereinafter collectively referred to as "Defendants")

designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed

Xarelto.

3.     When warning of safety and risks of Xarelto, Defendants negligently and/or

fraudulently represented to the medical and healthcare community, the Food and Drug

Administration (hereinafter referred to as the "FDA"), to Decedent and the public in general, that Xarelto had been tested and was found to be safe and/or effective for its indicated use.

4.      Defendants concealed their knowledge of Xarelto's defects from Decedent, the FDA, the public in general and/or the medical community specifically.

5.      These representations were made by Defendants with the intent of defrauding and deceiving Decedent, the public in general, and the medical and healthcare community in particular, and were made with the intent of inducing the public in general, and the medical community in particular, to recommend, dispense and/or purchase Xarelto for use to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, all of which evinced a callous, reckless, willful, depraved indifference to health, safety and welfare of the Decedent herein.

6.      Defendants negligently and improperly failed to perform sufficient tests, if any, on humans using Xarelto during clinical trials, forcing Decedent, and Decedent's physicians, hospitals, and/or the FDA, to rely on safety information that applies to other non-valvular atrial fibrillation treatment and DVT/PE treatment and prophylaxis, which does not entirely and/or necessarily apply to Xarelto whatsoever.

7.      As a result of the foregoing acts and omissions, Decedent was caused to suffer serious and dangerous side effects including *inter alia* life-threatening bleeding, as well as other severe and personal injuries, and ultimately her death, due to her use of Xarelto.

8.      Defendants concealed their knowledge of the defects in their products from Plaintiff and Plaintiff's physicians, hospitals, pharmacists, the FDA, and the public in general.

9.      Consequently, Plaintiff, as Administrator of the Estate of Evelyn Triplett, brings this action and seeks damages pursuant to the Colorado Wrongful Death Act, Colo. Rev. Stat. § 13-21-201, *et seq.*, and the Colorado Survival Statute, Colo. Rev. Stat. § 13-20-101, as a result of Decedent's use of Xarelto, which caused Decedent to suffer from life-threatening bleeding, as well as other severe and personal injuries, and ultimately death, and has also caused harm and damages to Plaintiff and Decedent's beneficiaries and next of kin.

## **PLAINTIFF**

10.      During her lifetime, Decedent Evelyn Triplett was a citizen of the United States of America, and a resident and citizen of the State of Colorado, at the time of her injuries and death.

11.      Plaintiff Deborah Paiva ("Plaintiff") is the surviving daughter of Evelyn Triplett. She is a citizen of the United States of America, and is currently a resident of Brighton, Colorado, located in Adams County, Colorado.

12.      Plaintiff Deborah Paiva is the duly appointed Administrator and Personal Representative of the Estate of Evelyn Triplett, Deceased.  Plaintiff brings this action in her capacity as the Administrator/Personal Representative of the Estate of Evelyn Triplett, Deceased, on behalf of herself and other beneficiaries who are entitled to recover under the Colorado Wrongful Death Act, Colo. Rev. Stat. § 13-21-201, *et seq.*, and the Colorado Survival Statute, Colo. Rev. Stat. § 13-20-101.

13.      Decedent Evelyn Triplett was born on January 22, 1933.

14.      Decedent Evelyn Triplett began using Xarelto on or about October 25, 2013 while for atrial fibrillation upon direction of her physician.  Plaintiff used Xarelto up through November 13, 2013.

15.    As a direct and proximate result of using Defendants' Xarelto, Decedent Evelyn Triplett suffered life-threatening bleeding in the form of a gastrointestinal bleed, which was diagnosed on November 14, 2013, caused her to be hospitalized, and caused her to sustain severe and permanent personal injuries, pain, suffering, and emotional distress.   As a result of her gastrointestinal bleed, Decedent Evelyn Triplett was unable to use any form of anticoagulation to treat the risk of stroke associated with her atrial fibrillation.   She then suffered an acute cerebral artery stroke on January 25, 2014, was hospitalized, and ultimately passed away due to the stroke on January 28, 2014.

16.    The injuries and damages sustained by Decedent Evelyn Triplett, as well as her death, were caused by Defendants' Xarelto.

17.    Prior to her death, Decedent endured conscious pain, mental anguish, and suffering until the time of her death.   As a result of her Death, Decedent's expectancy of enjoyment of life was cut short and she suffered certain economic losses.   Plaintiff and Decedent's next of kin have also endured mental anguish, as well as other economic and non-economic damages.

18.    As a direct and proximate result of the injuries sustained by, and the death of, Evelyn Triplett, Deceased, Plaintiff Deborah Paiva and Decedent Evelyn Triplett's next of kin and beneficiaries have suffered harm, losses, and damages, including but not limited to sorrow and mental anguish; a loss of solace, society companionship, comfort, guidance, kindly offices, and advice of Decedent; have incurred expenses, including funeral and/or burial expenses, related to Decedent Evelyn Triplett's injuries and death; and are entitled to recover all other economic damages, non-economic damages, and damages for physical impairment or disfigurement, as allowable under statute or common law and determined by a jury under the

Colorado Wrongful Death Act, Colo. Rev. Stat. § 13-21-201, *et seq.*, and the Colorado Survival Statute, Colo. Rev. Stat. § 13-20-101.

### DEFENDANTS

19.     Upon information and belief, Defendant JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a JOHNSON AND JOHNSON RESEARCH AND DEVELOPMENT LLC (hereinafter referred to as "JANSSEN R&D") is a limited liability company organized under the laws of New Jersey, with a principal place of business in New Jersey. Defendant JANSSEN R&D's sole member is Janssen Pharmaceuticals, Inc., which is a Pennsylvania corporation with a principal place of business in New Jersey. Accordingly, JANSSEN R&D is a citizen of Pennsylvania and New Jersey for purposes of determining diversity under 28 U.S.C. § 1332.

20.     As part of its business, JANSSEN R&D is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto.

21.     Defendant JANSSEN R&D is the holder of the approved New Drug Application ("NDA") for Xarelto as well as the supplemental NDA.

22.     Upon information and belief, and at all relevant times Defendant JANSSEN R&D, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant. The primary purposes of Xarelto are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat Deep Vein Thrombosis ("DVT") and Pulmonary Embolism ("PE"), to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

23.     Upon information and belief, Defendant JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA INC. f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. (hereinafter referred to as "JANSSEN PHARM") is a Pennsylvania corporation, having a principal place of business in New Jersey.

24.     As part of its business, JANSSEN PHARM is involved in the research, development, sales, and marketing of pharmaceutical products, including Xarelto.

25.     Upon information and belief, and at all relevant times, Defendant JANSSEN PHARM was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

26.     Upon information and belief, Defendant JANSSEN ORTHO LLC (hereinafter referred to as "JANSSEN ORTHO") is a limited liability company organized under the laws of Delaware, having a principal place of business at Stateroad 933 Km 0 1, Street Statero, Gurabo, Puerto Rico 00778. Defendant JANSSEN ORTHO is a subsidiary of Johnson & Johnson. The only member of JANSSEN ORTHO LLC is OMJ PR Holdings, which is incorporated in Ireland with a principal place of business in Puerto Rico. Accordingly, JANSSEN ORTHO LLC is a citizen of Delaware, Ireland and Puerto Rico for purposes of determining diversity under 28 U.S.C. § 1332.

27.     As part of its business, JANSSEN ORTHO is involved in the research, development, sales, and marketing of pharmaceutical products, including Xarelto.

28.     Upon information and belief, and at all relevant times, Defendant, JANSSEN ORTHO, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

29.     Defendant Johnson & Johnson (hereinafter referred to as "J&J") is a fictitious name adopted by Defendant Johnson & Johnson Company, a New Jersey corporation which has its principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933.

30.     As part of its business, J&J, and its "family of companies," is involved in the research, development, sales, and marketing of pharmaceutical products, including Xarelto.

31.     Upon information and belief, Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. is, and at all relevant times was, a corporation organized under the laws of the State of Delaware, with its principal place of business in the State of New Jersey.

32.     As part of its business, BAYER HEALTHCARE PHARMACEUTICALS, INC. is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto.

33.     Upon information and belief, and at all relevant times, Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk

of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

34.    Upon information and belief, Defendant BAYER PHARMA AG is a pharmaceutical company domiciled in Germany.

35.    Defendant BAYER PHARMA AG is formerly known as Bayer Schering Pharma AG and is the same corporate entity as Bayer Schering Pharma AG. Bayer Schering Pharma AG was formerly known as Schering AG and is the same corporate entity as Schering AG.

36.    Upon information and belief, Schering AG was renamed Bayer Schering Pharma AG effective December 29, 2006.

37.    Upon information and belief, Bayer Schering Pharma AG was renamed BAYER PHARMA AG effective July 1, 2011.

38.    As part of its business, BAYER PHARMA AG is involved in the research, development, sales, and marketing of pharmaceutical products, including Xarelto.

39.    Upon information and belief, and at all relevant times, Defendant BAYER PHARMA AG was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

40.    Upon information and belief, Defendant BAYER CORPORATION is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205.

41.   Upon information and belief, BAYER HEALTHCARE PHARMACEUTICALS, INC. is owned by Defendant BAYER CORPORATION.

42.   At all relevant times, Defendant BAYER CORPORATION was engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, its products, including the prescription drug Xarelto.

43.   Upon information and belief, Defendant BAYER HEALTHCARE LLC is a limited liability company duly formed and existing under and by the virtue of the laws of the State of Delaware, with its principal place of business located at 100 Bayer Blvd, Whippany, New Jersey 07981-1544.

  a.   Upon information and belief, from on or about the early January 1, 2003 until on or about late December, 2014, BAYER HEALTHCARE LLC's sole member was Bayer Corporation, and is wholly owned by Bayer Corporation, which is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205.

  b.   Upon information and belief, from on or about early January, 2015 to on or about June 30, 2015, BAYER HEALTHCARE LLC's sole member was Bayer Medical Care, Inc., and is wholly owned by Bayer Medical Care, Inc., which is a Delaware Corporation, with its principal place of business at 1 Medrad Dr., Indianola, Pennsylvania 15051.

  c.   Upon information and belief, from on or about July 1, 2015 to the present, BAYER HEALTHCARE LLC's members are:

i.       Bayer Medical Care Inc., a Delaware corporation with its principal place of business in Pennsylvania;

ii.      NippoNex Inc., a Delaware corporation with its principal place of business in New York;

iv.      Bayer West Coast Corporation, a Delaware Corporation with its principal place of business in California; Bayer Essure Inc., a Delaware corporation with its principal place of business in California;

v.       Bayer Consumer Care Holdings, LLC, a limited liability company formed in Delaware with its principal place of business in New Jersey;

vi.      Dr. Scholl's LLC, a limited liability company, formed in Delaware with its principal place of business in California;

vii.     Coppertone LLC, a limited liability company, formed in Delaware with its principal place of business in California;

viii.    MiraLAX LLC, a limited liability company, formed in Delaware with its principal place of business in California; and, Bayer HealthCare U.S Funding LLC, a limited liability company a limited liability company,

11

formed in Delaware with its principal place of business in Pennsylvania.

ix.    Bayer HealthCare U.S Funding LLC, a limited liability company a limited liability company, formed in Delaware with its principal place of business in Pennsylvania.

Accordingly, BAYER HEALTHCARE LLC is a citizen of Delaware, New Jersey, New York, Indiana, Pennsylvania, and California for purposes of determining diversity under 28 U.S.C. § 1332.

44.    Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

45.    Upon information and belief, Defendant BAYER HEALTHCARE AG is a company domiciled in Germany and is the parent/holding company of Defendants BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC, and BAYER PHARMA AG.

46.    Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG exercises control over Defendants BAYER CORPORATION, BAYER

HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC., and BAYER PHARMA AG.

47.     Upon information and belief, Defendant BAYER AG is a German chemical and pharmaceutical company that is headquartered in Leverkusen, North Rhine-Westphalia, Germany.

48.     Upon information and belief, Defendant BAYER AG is the third largest pharmaceutical company in the world.

49.     Upon information and belief, at all relevant times, Defendant BAYER AG was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

50.     Defendants Janssen Research & Development LLC, Janssen Ortho LLC, Janssen Pharmaceuticals, Inc., Johnson & Johnson, Bayer Healthcare Pharmaceuticals, Inc., Bayer Pharma AG, Bayer Corporation, Bayer Healthcare LLC, Bayer Healthcare AG, and Bayer AG, shall be referred to herein individually by name or jointly as "Defendants."

51.     At all times alleged herein, Defendants include and included any and all parents, subsidiaries, affiliates, divisions, franchises, partners, joint venturers, and organizational units of any kind, their predecessors, successors and assigns and their officers, directors, employees, agents, representatives and any and all other persons acting on their behalf.

52.     At all times herein mentioned, each of the Defendants was the agent, servant, partner, predecessors in interest, and joint venturer of each of the remaining Defendants herein

and was at all times operating and acting with the purpose and scope of said agency, service, employment, partnership, and joint venture.

53.     At all times relevant, Defendants were engaged in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce throughout the United States, either directly or indirectly through third parties, subsidiaries or related entities, the drug Xarelto.

## JURISDICTION AND VENUE

54.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy as to the Plaintiff exceeds $75,000.00, exclusive of interest and costs, and because Defendants are incorporated and have their principal places of business in states other than the state in which the named Plaintiff resides.

55.     Plaintiff is filing this Complaint directly in MDL No. 2592 by agreement of the Parties and as permitted by Pre-Trial Order No. 9 entered by Judge Eldon E. Fallon of this Court. Plaintiff states that but for Pre-Trial Order No. 9 allowing direct filing in MDL No. 2592, Plaintiffs would have filed in the United States District Court for the District of Colorado.

56.     Venue is proper in the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1391 (b)(2) and 1391(c)(2), because a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred within the District of Colorado, because the District of Colorado is the judicial district in which Plaintiff resides, and because Defendants are entities who are subject to the personal jurisdiction of Colorado courts with respect to the civil action in question.  Therefore, Plaintiff respectfully requests that, at the time of transfer of this action back to the trial court for further proceedings, Plaintiff's case be transferred to the United States District Court for the District of Colorado as ordered in Pre-Trial Order No. 9.

57.     This Court has personal jurisdiction over the Defendants consistent with the United States Constitution and MDL No. 2592 as Plaintiffs' claims arise out of Defendants' transaction of business and the commission of tortious acts throughout the United States and within the States of Colorado and Louisiana, and by virtue of Defendants' substantial, continuous, and systematic contacts with the States of Colorado and Louisiana unrelated to Plaintiffs' claims.

## FACTUAL BACKGROUND

58.     At all relevant times, Defendants were in the business of and did design, research, manufacture, test, advertise, promote, market, sell and distribute Xarelto and rivaroxaban to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

59.     Defendants received FDA approval for Xarelto, also known as rivaroxaban, on July 1, 2011 for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries (NDA 022406).

60.     Defendants then received additional FDA approval for Xarelto to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation on November 4, 2011 (NDA 202439).

61.     The additional indication for treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE was added to the label on November 2, 2012.

62.     Defendants launched Xarelto in the United States (hereinafter referred to as the "U.S.") in 2011.

63.     Xarelto is an anticoagulant that acts as a Factor Xa inhibitor, and is available by prescription in oral tablet doses of 20mg, 15mg, and 10mg.

64.     Approval of Xarelto for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries was based on a series of clinical trials known as the Regulation of Coagulation in Orthopedic Surgery to Prevent Deep Venous Thrombosis and Pulmonary Embolism studies (hereinafter referred to as the "RECORD" studies). The findings of the RECORD studies showed that rivaroxaban was superior to enoxaparin for thromboprophylaxis after total knee and hip arthroplasty (based on the Defendants' definition), accompanied by similar rates of bleeding. However, the studies also showed a greater incidence with Xarelto of bleeding leading to decreased hemoglobin levels and transfusion of blood. (Lassen, M.R., et al. *Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Total Knee Arthroplasty*. N.Engl.J.Med. 2008; 358:2776-86; Kakkar, A.K., et al. *Extended duration rivaroxaban versus short-term enoxaparin for the prevention of venous thromboembolism after total hip arthroplasty: a double-blind, randomised controlled trial*. Lancet 2008; 372:31-39; Ericksson, B.I., et al. *Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Hip Arthroplasty*. N.Engl.J.Med. 2008;358:2765-75.)

65.     Approval of Xarelto for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation in the U.S. was based on a clinical trial known as the Rivaroxaban Once Daily Oral Direct Factor Xa Inhibition Compared with Vitamin K Antagonism for Prevention of Stroke and Embolism Trial in Atrial Fibrillation study (hereinafter referred to as "ROCKET AF").  The study's findings showed that rivaroxaban was noninferior to warfarin for the prevention of stroke or systemic embolism in patients with non-valvular atrial fibrillation, with a similar risk of major bleeding. However, "bleeding from gastrointestinal sites,

including upper, lower, and rectal sites, occurred more frequently in the rivaroxaban group, as did bleeding that led to a drop in the hemoglobin level or bleeding that required transfusion." (Patel, M.R., et al. *Rivaroxaban versus Warfarin in Nonvalvular Atrial Fibrillation*. N.Engl.J.Med. 2011; 365:883-91.)

66.     Approval of Xarelto for the treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE in the U.S. was based on the clinical trials known as the EINSTEIN-DVT, EINSTEIN-PE, and EINSTEIN-Extension studies.   The EINSTEIN-DVT study tested Xarelto versus a placebo, and merely determined that Xarelto offered an option for treatment of DVT, with obvious increased risk of bleeding events as compared to placebo. (The EINSTEIN Investigators. *Oral Rivaroxaban for Symptomatic Venous Thromboembolism*. N.Engl.J.Med. 2010; 363:2499-510). The EINSTEIN-Extension study confirmed that result. (Roumualdi, E., et al. *Oral rivaroxaban after symptomatic venous thromboembolism: the continued treatment study (EINSTEIN-Extension study)*. Expert Rev. Cardiovasc. Ther. 2011;9(7):841-844). The EINSTEIN-PE study's findings showed that a rivaroxaban regimen was non-inferior to the standard therapy for initial and long-term treatment of PE. However, the studies also demonstrated an increased risk of adverse events with Xarelto, including those that resulted in permanent discontinuation of Xarelto or prolonged hospitalization. (The EINSTEIN-PE Investigators. *Oral Rivaroxaban for the Treatment of Symptomatic Pulmonary Embolism*. N.Engl.J.Med. 2012;366:1287-97.)

67.     Defendants use the results of the ROCKET AF study, the RECORD studies, and the EINSTEIN studies to promote Xarelto in their promotional materials, including the Xarelto website, which tout the positive results of those studies.   However, Defendants' promotional

materials fail to similarly highlight the increased risk of gastrointestinal bleeding and bleeding that required transfusion, among other serious bleeding concerns.

68.     Defendants market Xarelto as a new oral anticoagulant treatment alternative to warfarin (Coumadin), a long-established safe treatment for preventing stroke and systemic embolism, in 60 years.  Defendants emphasize the supposed benefits of treatment with Xarelto over warfarin, which they refer to as the Xarelto Difference – namely, that Xarelto does not require periodic monitoring with blood tests and does not limit a patient's diet.

69.     However, in its QuarterWatch publication for the first quarter of the 2012 fiscal year, the Institute for Safe Medication Practices ("ISMP") noted that, even during the approval process, FDA "[r]eviewers also questioned the convenient once-a-day dosing scheme [of Xarelto], saying blood level studies had shown peaks and troughs that could be eliminated by twice-a-day dosing."

70.     Importantly, there is no antidote to Xarelto, unlike warfarin.  Therefore, in the event of hemorrhagic complications, there is no available reversal agent.  The original U.S. label approved when the drug was first marketed in the U.S. did not contain a warning regarding the lack of antidote, but instead only mentioned this important fact in the "Overdosage" section of the label.

71.     Defendants spent significant money in promoting Xarelto, which included at least $11,000,000.00 spent during 2013 alone on advertising in journals targeted at prescribers and consumers in the U.S. In the third quarter of the 2013 fiscal year, Xarelto was the number one pharmaceutical product advertised in professional health journals based on pages and dollars spent.

72.     As a result of Defendants' aggressive marketing efforts, in its first full year of being on the market, Xarelto garnered approximately $582 million in sales globally.

73.     Defendants' website for Xarelto claims that over seven million people worldwide have been prescribed Xarelto. In the U.S., approximately 1 million Xarelto prescriptions had been written by the end of 2013.

74.     During the Defendants' 2012 fiscal year, Xarelto garnered approximately $658 million in sales worldwide. Then, in 2013, sales for Xarelto increased even further to more than clear the $1 billion threshold commonly referred to as "blockbuster" status in the pharmaceutical industry, ultimately reaching approximately $2 billion for the fiscal year. Thus, Xarelto is now considered the leading anticoagulant on a global scale in terms of sales.

75.     As part of their marketing of Xarelto, Defendants widely disseminated direct-to-consumer advertising campaigns that were designed to influence patients, including Plaintiff, to make inquiries to their prescribing physician about Xarelto and/or request prescriptions for Xarelto.

76.     In the course of these direct to consumer advertisements, Defendants overstated the efficacy of Xarelto with respect to preventing stroke and systemic embolism, failed to adequately disclose to patients that there is no drug, agent, or means to reverse the anticoagulation effects of Xarelto, and that such irreversibility could have permanently disabling, life-threatening and fatal consequences.

77.     On June 6, 2013, Defendants received an untitled letter from the FDA's Office of Prescription Drug Promotion (hereinafter referred to as the "OPDP") regarding its promotional material for the atrial fibrillation indication, stating that, "the print ad is false or misleading because it minimizes the risks associated with Xarelto and makes a misleading claim" regarding

dose adjustments, which was in violation of FDA regulations. The OPDP thus requested that Defendants immediately cease distribution of such promotional material.

78.     Prior to Plaintiff's prescription of Xarelto, Plaintiff became aware of the promotional materials described herein.

79.     Prior to Plaintiff's prescription of Xarelto, Plaintiff's prescribing physician received promotional materials and information from sales representatives of Defendants that Xarelto was just as effective as warfarin in reducing strokes in patients with non-valvular atrial fibrillation, as well as preventing DVT/PE in patients with prior history of DVT/PE or undergoing hip or knee replacement surgery, and was more convenient, without adequately instructing prescribing physicians that patients should undergo blood testing and renal monitoring to minimize the risk of bleeding, without adequately informing prescribing physicians that there was no reversal agent that could stop or control bleeding in patients taking Xarelto, and without properly instructing doctors and patients on how to reduce the risk of bleeding.

80.     At all times relevant hereto, Defendants also failed to warn emergency room doctors, surgeons, and other critical care medical professionals that unlike generally-known measures taken to treat and stabilize bleeding in users of warfarin, there is no effective agent to reverse the anticoagulation effects of Xarelto, and therefore no effective means to treat and stabilize patients who experience uncontrolled bleeding while taking Xarelto.

81.     At all times relevant to this action, The Xarelto Medication Guide, prepared and distributed by Defendants and intended for U.S. patients to whom Xarelto has been prescribed, failed to warn and disclose to patients that there is no agent to reverse the anticoagulation effects

of Xarelto and that if serious bleeding occurs, it may be irreversible, permanently disabling, and life-threatening.

82.     In the year leading up to June 30, 2012, there were 1,080 Xarelto-associated "Serious Adverse Event" ("SAE") Medwatch reports filed with the FDA, including at least 65 deaths. Of the reported hemorrhage events associated with Xarelto, 8% resulted in death, which was approximately twofold the risk of a hemorrhage-related death with warfarin.

83.     At the close of the 2012 fiscal year, a total of 2,081 new Xarelto-associated SAE reports were filed with the FDA in its first full year on the market, ranking tenth among other pharmaceuticals in direct reports to the FDA. Of those reported events, 151 resulted in death, as compared to only 56 deaths associated with warfarin.

84.     The ISMP referred to these SAE figures as constituting a "strong signal[]" regarding the safety of Xarelto, defined as "evidence of sufficient weight to justify an alert to the public and the scientific community, and to warrant further investigation."

85.     Of particular note, in the first quarter of 2013, the number of reported serious adverse events associated with Xarelto (680) overtook that of Pradaxa (528), another new oral anticoagulant, which had previously ranked as the number one reported drug in terms of adverse events in 2012.

86.     Moreover, on a global scale, in the first eight months of 2013, German regulators received 968 Xarelto-related averse event reports, including 72 deaths, as compared to a total of 750 reports and 58 deaths in 2012.

87.     Despite the clear signal generated by the SAE data, Defendants failed to either alert the public and the scientific community, or perform further investigation into the safety of Xarelto.

88.     Defendants' original and in some respects current labeling and prescribing information for Xarelto:

a.      failed to investigate, research, study and define, fully and adequately, the safety profile of Xarelto;

b.      failed to provide adequate warnings about the true safety risks associated with the use of Xarelto;

c.      failed to provide adequate warning regarding the pharmacokinetic and pharmacodynamic variability of Xarelto and its effects on the degree of anticoagulation in a patient;

d.      failed to provide adequate warnings regarding the need to assess renal functioning prior to starting a patient on Xarelto and to continue testing and monitoring of renal functioning periodically while the patient is on Xarelto;

e.      failed to disclose in the "Warnings" Section that there is no drug, agent or means to reverse the anticoagulation effects of Xarelto;

f.      failed to advise prescribing physicians, such as the Plaintiff's physician, to instruct patients that there was no agent to reverse the anticoagulant effects of Xarelto;

g.      failed to provide adequate instructions on how to intervene and/or stabilize a patient who suffers a bleed while taking Xarelto;

h.      failed to provide adequate warnings and information related to the increased risks of bleeding events associated with aging patient populations of Xarelto users;

i.      failed to provide adequate warnings regarding the increased risk of gastrointestinal bleeds in those taking Xarelto, especially, in those patients with a prior history of gastrointestinal issues and/or upset;

j.      failed to provide adequate warnings regarding the increased risk of suffering a bleeding event requiring blood transfusions in those taking Xarelto;

k.      failed to provide adequate warnings regarding the need to assess renal functioning prior to starting a patient on Xarelto and to continue testing and monitoring of renal functioning periodically while the patient is on Xarelto;

l.     failed to provide adequate warnings regarding the need to assess hepatic functioning prior to starting a patient on Xarelto and to continue testing and monitoring of hepatic functioning periodically while the patient is on Xarelto;

m.     failed to include a "**BOXED WARNING**" about serious bleeding events associated with Xarelto;

n.     failed to include a "**BOLDED WARNING**" about serious bleeding events associated with Xarelto; and

o.     in their "Medication Guide" intended for distribution to patients to whom Xarelto has been prescribed, Defendants failed to disclose to patients that there is no drug, agent or means to reverse the anticoagulation effects of Xarelto and that if serious bleeding occurs, such irreversibility could have permanently disabling, life-threatening or fatal consequences.

89.    During the years since first marketing Xarelto in the U.S., Defendants modified the U.S. labeling and prescribing information for Xarelto, which included additional information regarding the use of Xarelto in patients taking certain medications. Despite being aware of: (1) serious, and sometimes fatal, irreversible bleeding events associated with the use of Xarelto; and (2) 2,081 SAE Medwatch reports filed with the FDA in 2012 alone, including at least 151 deaths, Defendants nonetheless failed to provide adequate disclosures or warnings in their label as detailed in Paragraphs 102 (a – o).

90.    Prior to applying for and obtaining approval of Xarelto, Defendants knew or should have known that consumption of Xarelto was associated with and/or would cause the induction of life-threatening bleeding, and Defendants possessed at least one clinical scientific study, which evidence Defendants knew or should have known was a signal that life-threatening bleeding risk needed further testing and studies prior to its introduction to the market.

91.    Upon information and belief, despite life-threatening bleeding findings in a clinical trial and other clinical evidence, Defendants failed to adequately conduct complete and proper testing of Xarelto prior to filing their New Drug Application for Xarelto.

92.     Upon information and belief, from the date Defendants received FDA approval to market Xarelto, Defendants made, distributed, marketed, and sold Xarelto without adequate warning to Plaintiff's prescribing physicians or plaintiff that Xarelto was associated with and/or could cause life-threatening bleeding, presented a risk of life-threatening bleeding in patients who used it, and that Defendants had not adequately conducted complete and proper testing and studies of Xarelto with regard to severe side effects, specifically life-threatening bleeding.

93.     Upon information and belief, Defendants concealed and failed to completely disclose its knowledge that Xarelto was associated with or could cause life-threatening bleeding as well as its knowledge that they had failed to fully test or study said risk.

94.     Upon information and belief, Defendants ignored the association between the use of Xarelto and the risk of developing life-threatening bleeding.

95.     Defendants' failure to disclose information that they possessed regarding the failure to adequately test and study Xarelto for life-threatening bleeding risk further rendered warnings for this medication inadequate.

## **FACTUAL ALLEGATIONS SPECIFIC TO PLAINTIFF**

96.     By reason of the foregoing acts and omissions, Decedent Evelyn Triplett began taking Xarelto on October 25, 2013 upon direction of her physician for the treatment of atrial fibrillation.

97.     By reason of the foregoing acts and omissions, Decedent was caused to suffer life-threatening bleeding in the form of a gastrointestinal bleed, as well as other severe and personal injuries, was hospitalized for those injuries on November 14, 2013 and January 25, 2014, and then ultimately suffered death on January 28, 2014.

98.     Specifically, as a direct and proximate result of the use of Defendants' Xarelto, Decedent was hospitalized and was diagnosed with life-threatening bleeding and other severe and personal injuries on November 14, 2013, and was hospitalized for five days.  Due to her bleeding injury, she was unable to use any form of anticoagulation to treat the risk of stroke associated with her atrial fibrillation.  She then suffered and was hospitalized for an acute cerebral artery stroke on January 25, 2014, was hospitalized for 3 days, and ultimately died on January 28, 2014 due to her injuries.

99.     Prior to and at the time of Decedent's use of Xarelto, Defendants knew or should have known that the use of Xarelto created a significantly increased risk of serious personal injury, including serious and life-threatening irreversible bleeding, compared to other available anticoagulant medication.

100.    Despite the fact that Defendants knew or should have known of the serious increased risk of injury and in particular life-threatening irreversible bleeding associated with Xarelto, Defendants failed to adequately warn Decedent and her health care providers of this risk before she used the product.

101.    Had Defendants properly disclosed the risks associated with Xarelto, Decedent would have avoided the risk of life-threatening irreversible bleeding by either not using Xarelto at all, or by closely monitoring the degree to which the drug was adversely affecting her health at the outset of her use of Xarelto and throughout her use of Xarelto.

102.    As a direct and proximate result of the foregoing acts and omissions, Decedent was caused to suffer serious and dangerous side effects including *inter alia* life-ending bleeding, physical pain, and conscious suffering prior to her death.  As a result of her death, Decedent's expectancy of enjoyment of life was cut short and there has been suffered certain economic

losses.  Plaintiff and other next of kin have also suffered mental anguish, emotional distress, and other economic and non-economic damages; all consequences due to Decedent's use of Xarelto.

103.    Specifically, Plaintiff Deborah Paiva and Decedent's next of kin and beneficiaries have suffered harm and losses, including but not limited to sorrow and mental anguish; a loss of solace, society, companionship, comfort, guidance, kindly offices, and advice of Decedent; economic expenses for the care and treatment of Decedent; reasonable funeral and burial expenses; and all other economic damages, non-economic damages, and damages for physical impairment or disfigurement, as allowable under statute or common law and determined by a jury.

104.    Consequently, Plaintiff on behalf of herself and Decedent's next of kin and beneficiaries seek compensatory damages as a result of Decedent's use of Xarelto, which has caused Decedent's wrongful death, loss of enjoyment of life, medical and funeral expenses, and other economic damages.

105.    Decedent's claims for personal injuries survive her death, and Decedent's beneficiaries are also entitled to such damages through Decedent's estate.

## **FIRST CAUSE OF ACTION**

### **Strict Product Liability**
### **Defective Manufacturing**

106.    Plaintiff incorporates by reference herein each of the allegations heretofore set forth in this Complaint as though fully set forth herein and further alleges as follows.

107.    Defendants are the manufacturers, designers, distributors, sellers, or suppliers of the prescription drug Xarelto.

108.    The Xarelto manufactured, designed, sold, distributed, supplied, and/or placed in the stream of commerce by Defendants was defective in its manufacture and construction, in that

the Xarelto materially deviated from its design specifications or performance standards such that it was unreasonably dangerous, was not reasonably safe in its manufacture and construction, was not fit for the ordinary purpose for which it was intended, and/or did not meet the reasonable expectations of an ordinary consumer.

109.   The Xarelto manufactured, designed, sold, distributed, supplied, and/or placed in the stream of commerce by Defendants was defective in its manufacture and construction as described herein at the time it left the Defendants' control.

110.   As a direct and proximate result of Decedent's use of Xarelto as manufactured, designed, sold, supplied, and introduced into the stream of commerce by Defendants, Decedent suffered personal injury, economic and non-economic damages, and death.

111.   Accordingly, Plaintiff Deborah Paiva, as the Administrator of the Estate of Evelyn Triplett, Deceased, claims economic and non-economic compensatory damages for the injury and harm ultimately resulting in Evelyn Triplett's death, including but not limited to the conscious pain and suffering, mental anguish and emotional distress, physical injury and bodily impairment endured by Decedent prior to her death, as well as medical expenses, loss of enjoyment of life, and other economic losses.

112.   Additionally, as a result of Decedent's use of Xarelto, Plaintiff Deborah Paiva, Individually and as the Administrator of the Estate of Evelyn Triplett, Deceased, claims economic and non-economic compensatory damages for the wrongful death of Decedent, including but not limited to the loss of Decedent, pecuniary losses, mental anguish, emotional distress, and loss of support, services, society, companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education.

## SECOND CAUSE OF ACTION

**Strict Product Liability**
**Design Defect**

**113.**     Plaintiff incorporates by reference herein each of the allegations heretofore set forth in this Complaint as though fully set forth herein and further alleges as follows.

**114.**     Defendants are the manufacturers, designers, distributors, sellers, and/or suppliers of Xarelto.

**115.**     The Xarelto manufactured, designed, sold, distributed, supplied, and/or placed into the stream of commerce by Defendants was expected to and did reach the consumer without any alterations or changes.

**116.**     The Xarelto manufactured, designed, sold, distributed, supplied, and/or placed in the stream of commerce by Defendants was defective in its design or formulation because it was unreasonably dangerous in that, when it left the hands of Defendants, the product was unsafe for normal or anticipated handling and consumption.

**117.**     The Xarelto manufactured, designed, sold, distributed, supplied, and/or placed in the stream of commerce by Defendants was also defective in its design or formulation because the foreseeable risks of the product as designed outweighed its benefit or utility and/or it did not meet the reasonable expectations of an ordinary consumer.

**118.**     Specifically the Xarelto manufactured, designed, sold, distributed, supplied, and/or placed in the stream of commerce by Defendants was not reasonably safe for normal or anticipated use or consumption, because the product failed to perform as safely as an ordinary consumer would expect when used in a reasonably foreseeable manner, and/or the risk of harm inherent in the design outweighed the burdens faced by the Defendants to design a product that did not carry those risks and would not have harmed Plaintiff.

119.    At the time of Decedent's use of Xarelto, Xarelto was being used for the purpose and in a manner normally intended to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

120.    Decedent was prescribed and used Xarelto for the specific purpose of treatment of atrial fibrillation.

121.    At the time Defendants manufactured, designed, distributed, sold, and/or supplied Xarelto into the stream of commerce, safer, more practical, alternative methods for treating atrial fibrillation were available.

122.    For example, alternative methods of treating atrial fibrillation include, but are not limited to, the use of Coumadin or warfarin or other blood thinning medications, which do not present such a significant increased risk of life-threatening bleeding events and have reversal agents in the event of a bleeding event.

123.    The Xarelto manufactured, designed, sold, distributed, supplied, and/or placed in the stream of commerce by Defendants was not reasonably safe in its design as described herein at the time it left Defendants' control.

124.    As a direct and proximate result of Decedent's use of Xarelto as manufactured, designed, sold, supplied, and/or introduced into the stream of commerce by Defendants, and as a direct and proximate result of the defective nature of Defendants' Xarelto, Decedent suffered personal injury, economic and non-economic damages, and death.

125.    Accordingly, Plaintiff Deborah Paiva, as the Administrator of the Estate of Evelyn Triplett, Deceased, claims economic and non-economic compensatory damages for the injury and harm ultimately resulting in Evelyn Triplett's death, including but not limited to the

conscious pain and suffering, mental anguish and emotional distress, physical injury and bodily impairment endured by Decedent prior to her death, as well as medical expenses, loss of enjoyment of life, and other economic losses.

126.    Additionally, as a result of Decedent's use of Xarelto, Plaintiff Deborah Paiva, Individually and as the Administrator of the Estate of Evelyn Triplett, Deceased, claims economic and non-economic compensatory damages for the wrongful death of Decedent, including but not limited to the loss of Decedent, pecuniary losses, mental anguish, emotional distress, and loss of support, services, society, companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education.

### THIRD CAUSE OF ACTION

**Strict Product Liability**
**Defect Due to Inadequate Warnings or Instructions**

127.    Plaintiff incorporates by reference herein each of the allegations heretofore set forth in this Complaint as though fully set forth herein and further alleges as follows.

128.    Defendants at all material times were under a duty to use reasonable care in providing adequate warnings and instructions that accompanied Defendants' Xarelto product they manufactured, supplied, or otherwise placed in the stream of commerce. Defendants breached that duty by failing to provide adequate warnings or instructions concerning the significant risks of injury posed by Xarelto.

129.    The Xarelto manufactured and/or supplied by Defendants was not reasonably safe due to inadequate warnings or instructions because Defendants knew or should have known that the product was unreasonably dangerous to consumers in that it created a significant risk of serious bodily harm and death to reasonably foreseeable consumers, such as Decedent, and Defendants were capable of, but failed to adequately warn or instruct consumers and/or their

healthcare providers of such risk.  Defendants failed to act as a reasonably prudent manufacturer would and failed to take reasonable care to inform consumers or their medical providers of the dangers posed by Xarelto.

130. The Xarelto manufactured and/or supplied by Defendants was also defective due to inadequate post-marketing warnings or instructions, because, after Defendants knew or should have known of the significant risk of serious bodily harm and death from the use of Xarelto, Defendants failed to provide adequate warnings to consumers and/or their health care providers of the product, knowing the product could cause serious injury and death.

131. The Xarelto manufactured and/or supplied by Defendants was defective due to inadequate pre-market and post-market warnings or instructions, because the Xarelto was not reasonably safe to ordinary consumers as described herein, and such dangers were not known to consumers and their health care providers and/or exceeded the reasonable expectations of ordinary consumers, and Defendants failed to provide adequate warnings to meet consumers' expectations about the safety profile and side effects of Xarelto.

132. As a direct and proximate result of Decedent's reasonably anticipated use of Xarelto as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by Defendants, Plaintiff suffered serious personal injury, economic and non-economic damages, and will continue to suffer such harm, damages and losses in the future.

133. Accordingly, Plaintiff Deborah Paiva, as the Administrator of the Estate of Evelyn Triplett, Deceased, claims economic and non-economic compensatory damages for the injury and harm ultimately resulting in Evelyn Triplett's death, including but not limited to the conscious pain and suffering, mental anguish and emotional distress, physical injury and bodily

impairment endured by Decedent prior to her death, as well as medical expenses, loss of enjoyment of life, and other economic losses.

134.    Additionally, as a result of Decedent's use of Xarelto, Plaintiff Deborah Paiva, Individually and as the Administrator of the Estate of Evelyn Triplett, Deceased, claims economic and non-economic compensatory damages for the wrongful death of Decedent, including but not limited to the loss of Decedent, pecuniary losses, mental anguish, emotional distress, and loss of support, services, society, companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education.

## FOURTH CAUSE OF ACTION

### Negligence

135.    Plaintiff incorporates by reference herein each of the allegations heretofore set forth in this Complaint as though fully set forth herein and further alleges as follows.

136.    Defendants are the manufacturers, designers, distributors, sellers, and/or suppliers of Xarelto.

137.    The Xarelto manufactured, designed, sold, distributed, supplied, and/or placed in the stream of commerce by Defendants was expected to and did reach the consumer without any alterations or changes.

138.    Defendants had a duty to exercise reasonable care in the manufacture, design, sale, distribution, supply, marketing, and/or placement of Xarelto into the stream of commerce, including a duty to ensure that their product did not pose a significant increased risk of unreasonable, dangerous side-effects, and a duty to adequately warn of the risks and dangers of Xarelto.

139.    Defendants failed to exercise reasonable care in the design, formulation, manufacture, sale, testing, quality assurance, quality control, labeling, marketing, promotion, and distribution of Xarelto into interstate commerce in that Defendants knew, or should have known, that using Xarelto created high risk of unreasonable, dangerous side effects, including life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring, and/or medications.

140.    The negligence of the Defendants, their agents, servants, and/or employees included, but was not limited to, the following acts and/or omissions:

    a.    Manufacturing, producing, promoting, formulating, creating, and/or designing Xarelto without thoroughly testing it;

    b.    Manufacturing, producing, promoting, formulating, creating, and/or designing Xarelto without adequately testing it;

    c.    Not conducting sufficient testing programs to determine whether or not Xarelto was safe for use; in that Defendants herein knew or should have known that Xarelto was unsafe and unfit for use by reason of the dangers to its users;

    d.    Selling Xarelto without making proper and sufficient tests to determine the dangers to its users;

    e.    Negligently failing to adequately and correctly warn Decedent, the public, the medical and healthcare profession, and the FDA of the dangers of Xarelto;

    f.    Failing to provide adequate instructions regarding safety precautions to be observed by users, handlers, and persons who would reasonably and foreseeably come into contact with, and more particularly, use, Xarelto;

    g.    Failing to test Xarelto and/or failing to adequately, sufficiently and properly test Xarelto.

    h.    Negligently advertising and recommending the use of Xarelto without sufficient knowledge as to its dangerous propensities;

i.      Negligently representing that Xarelto was safe for use for its intended purpose, when, in fact, it was unsafe;

j.      Negligently representing that Xarelto had equivalent safety and efficacy as other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

k.      Negligently designing Xarelto in a manner which was dangerous to its users;

l.      Negligently manufacturing Xarelto in a manner which was dangerous to its users;

m.      Negligently producing Xarelto in a manner which was dangerous to its users;

n.      Negligently assembling Xarelto in a manner which was dangerous to its users;

o.      Concealing information from the Decedent in knowing that Xarelto was unsafe, dangerous, and/or non-conforming with FDA regulations;

p.      Improperly concealing and/or misrepresenting information from the Decedent, healthcare professionals, and/or the FDA, concerning the severity of risks and dangers of Xarelto compared to other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

141.     Defendants under-reported, underestimated and downplayed the serious dangers of Xarelto.

142.     Defendants negligently compared the safety risk and/or dangers of Xarelto with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

143.    Defendants failed to exercise reasonable care in the labeling of Xarelto and failed to provide to consumers and/or their health care providers adequate warnings of the increased risk of bodily injury or death due to the use of Xarelto.

144.    Defendants were negligent in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing and sale of Xarelto in that they:

    a.    Failed to use reasonable care in designing and manufacturing Xarelto so as to avoid the aforementioned risks to individuals when Xarelto was used for treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

    b.    Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Xarelto;

    c.    Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Xarelto;

    d.    Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Xarelto;

    e.    Failed to warn Decedent of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects;

    f.    Failed to conduct adequate testing, including pre-clinical and clinical testing and post-marketing surveillance to determine the safety of Xarelto;

    g.    Failed to warn Decedent, prior to actively encouraging the sale of Xarelto, either directly or indirectly, orally or in writing, about the need for more comprehensive, more regular medical monitoring than usual to ensure early discovery of  potentially serious side effects;

    h.    Were otherwise careless and/or negligent.

145.    Despite the fact that Defendants knew or should have known that Xarelto caused unreasonable, dangerous side effects, as described herein, Defendants continued to manufacture and market Xarelto for use by consumers including Decedent, even though there were safer alternative methods of reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

146.    Defendants knew or should have known that consumers, such as Decedent would foreseeably suffer injury as a result of Defendants' failure to exercise reasonable care as described above.

147.    As a direct and proximate result of Decedent's reasonably anticipated use of Xarelto as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by Defendants, Decedent suffered serious personal injury, economic and non-economic damages, and death.

148.    As a result of the foregoing acts and omissions, the Decedent was caused to suffer serious and dangerous side effects, including life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and death.

149.    Accordingly, Plaintiff Deborah Paiva, as the Administrator of the Estate of Evelyn Triplett, Deceased, claims economic and non-economic compensatory damages for the injury and harm ultimately resulting in Evelyn Triplett's death, including but not limited to the conscious pain and suffering, mental anguish and emotional distress, physical injury and bodily impairment endured by Decedent prior to her death, as well as medical expenses, loss of enjoyment of life, and other economic losses.

150.    Additionally, as a result of Decedent's use of Xarelto, Plaintiff Deborah Paiva, Individually and as the Administrator of the Estate of Evelyn Triplett, Deceased, claims economic and non-economic compensatory damages for the wrongful death of Decedent, including but not limited to the loss of Decedent, pecuniary losses, mental anguish, emotional distress, and loss of support, services, society, companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education.

## FIFTH CAUSE OF ACTION

### Breach of Express Warranty

151.    Plaintiff incorporates by reference here each of the allegations heretofore set forth in this Complaint as though fully set forth here and further alleges as follows.

152.    Defendants expressly warranted to Decedent and Decedent's physicians, by and through statements made by Defendants or their authorized agents or sales representatives, orally and in publications, package inserts and other written materials intended for physicians, medical patients and the general public, that Xarelto was safe, effective, well-accepted, fit, and proper for its intended use by consumers.

153.    Specifically, Defendants expressly represented to Decedent, her physicians, healthcare providers, and/or the FDA that Xarelto was safe and fit for use for the purposes intended, they it was of merchantable quality, and that it specifically did not present any unreasonably dangerous side effects—in particular serious, life-threatening, irreversible bleeding events—in excess of those risks associated with other forms of anticoagulation and/or treatment for reduction of stroke and systemic embolism in patients with non-valvular atrial fibrillation,

reduction of the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery. Defendants instead represented that the side effects presented by Xarelto were accurately reflected in the warnings and that it was adequately tested and fit for its intended use.

154.    Decedent purchased and used Xarelto, and Decedent's physician prescribed Xarelto, relying on the skill, judgment, representations, and express warranties of Defendants.

155.    Contrary to Defendants' express warranties, Defendants' Xarelto did not conform to these express representations and warranties, because Xarelto caused serious unreasonably dangerous injury as described herein to consumers such as Decedent who used the product when taken in the recommended dosages.

156.    As a direct and proximate result of Defendants' breach of express warranty, Decedent suffered personal injury, economic and non-economic damages, and death

157.    Accordingly, Plaintiff Deborah Paiva, as the Administrator of the Estate of Evelyn Triplett, Deceased, claims economic and non-economic compensatory damages for the injury and harm ultimately resulting in Evelyn Triplett's death, including but not limited to the conscious pain and suffering, mental anguish and emotional distress, physical injury and bodily impairment endured by Decedent prior to her death, as well as medical expenses, loss of enjoyment of life, and other economic losses.

158.    Additionally, as a result of Decedent's use of Xarelto, Plaintiff Deborah Paiva, Individually and as the Administrator of the Estate of Evelyn Triplett, Deceased, claims economic and non-economic compensatory damages for the wrongful death of Decedent, including but not limited to the loss of Decedent, pecuniary losses, mental anguish, emotional

distress, and loss of support, services, society, companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education..

## SIXTH CAUSE OF ACTION

### Breach of Implied Warranty

159.   Plaintiff incorporates by reference here each of the allegations heretofore set forth in this Complaint as though fully set forth herein and further alleges as follows.

160.   At the time Defendants manufactured, marketed, sold, and distributed Xarelto, Defendants knew of the use of which Xarelto was intended and impliedly warranted to Decedent and to her physicians that Xarelto was of merchantable quality and safe for use as directed.

161.   Decedent was unskilled in the research, design, and manufacture of Xarelto and reasonably relied on the skill, judgment and implied warranty of Defendants in deciding to use Xarelto.

162.   Contrary to their implied warranty, Defendants' product Xarelto was not of merchantable quality or safe, because it was unreasonably dangerous to consumers, was not fit for the ordinary purposes for which it is used, and because the product failed to conform with the promises and affirmations of fact made on the label.

163.   As a direct and proximate result of Defendants' breach of warranty, Decedent suffered personal injury, economic and non-economic damages, and death.

164.   Accordingly, Plaintiff Deborah Paiva, as the Administrator of the Estate of Evelyn Triplett, Deceased, claims economic and non-economic compensatory damages for the injury and harm ultimately resulting in Evelyn Triplett's death, including but not limited to the conscious pain and suffering, mental anguish and emotional distress, physical injury and bodily

impairment endured by Decedent prior to her death, as well as medical expenses, loss of enjoyment of life, and other economic losses.

165.   Additionally, as a result of Decedent's use of Xarelto, Plaintiff Deborah Paiva, Individually and as the Administrator of the Estate of Evelyn Triplett, Deceased, claims economic and non-economic compensatory damages for the wrongful death of Decedent, including but not limited to the loss of Decedent, pecuniary losses, mental anguish, emotional distress, and loss of support, services, society, companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education.

## SEVENTH CAUSE OF ACTION

### Negligent Misrepresentation

166.   Plaintiff incorporates by reference herein each of the allegations heretofore set forth in this Complaint as though fully set forth herein and further alleges as follows.

167.   Defendants are the manufacturers, designers, distributors, sellers, and/or suppliers of Xarelto, and, while engaged in the course of such business, made representations to Decedent and her physicians regarding the character and/or quality of Xarelto for guidance in their decision to select Xarelto for Decedent's use.

168.   From the time Xarelto was first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed, and up to the present, Defendants made misrepresentations to Decedent, Decedent's physicians and the general public, including but not limited to the misrepresentation that Xarelto was safe, fit and effective for human consumption.

169.     At all times mentioned, Defendants conducted a sales and marketing campaign to promote the sale of Xarelto and willfully deceive Decedent, Decedent's physicians and the general public as to the health risks and consequences of the use of the abovementioned product.

170.     The Defendants made the foregoing representation without any reasonable ground for believing them to be true. These representations were made directly by Defendants, by sales representatives and other authorized agents of Defendants, and in publications and other written materials directed to physicians, medical patients and the public, with the intention of inducing reliance and the prescription, purchase and use of the subject product.

171.     The representations by the Defendants were in fact false, in that Xarelto is not safe, fit and effective for human consumption, using Xarelto is hazardous to health, and Xarelto has a serious propensity to cause serious injuries to users, including but not limited to the injuries suffered by Decedent.

172.     Defendants' representations were made negligently and/or with the intention of inducing reliance and the prescription, purchase, and use of Xarelto.

173.     In reliance on Defendants' misrepresentations, Decedent was induced to purchase and use Xarelto. If Decedent had known of the true facts and the facts concealed by the Defendants, Decedent would not have used Xarelto, or at least would have closely monitored the effects of Xarelto at the outset and during her use of Xarelto. The reliance of Decedent upon Defendants' misrepresentations was justified because such misrepresentations were made and conducted by individuals and entities that were in a position to know the true facts.

174.     As a direct and proximate result of Defendants' negligent misrepresentations, Decedent suffered personal injury, economic and non-economic damages, and death.

175.    Accordingly, Plaintiff Deborah Paiva, as the Administrator of the Estate of Evelynn Triplett, Deceased, claims economic and non-economic compensatory damages for the injury and harm ultimately resulting in Evelynn Triplett's death, including but not limited to the conscious pain and suffering, mental anguish and emotional distress, physical injury and bodily impairment endured by Decedent prior to her death, as well as medical expenses, loss of enjoyment of life, and other economic losses.

176.    Additionally, as a result of Decedent's use of Xarelto, Plaintiff Deborah Paiva, Individually and as the Administrator of the Estate of Evelynn Triplett, Deceased, claims economic and non-economic compensatory damages for the wrongful death of Decedent, including but not limited to the loss of Decedent, pecuniary losses, mental anguish, emotional distress, and loss of support, services, society, companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education.

## EIGHTH CAUSE OF ACTION

### Fraud

177.    Plaintiff incorporates by reference herein each of the allegations heretofore set forth in this Complaint as though fully set forth herein and further alleges as follows.

178.    Defendants, from the time they first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed Xarelto, and up to the present, willfully deceived Decedent by concealing from them, Decedent's physicians and the general public, the true facts concerning Xarelto, which the Defendants had a duty to disclose.

179.    At all times herein mentioned, Defendants conducted a sales and marketing campaign to promote the sale of Xarelto and willfully deceive Decedent, Decedent's physicians and the general public as to the benefits, health risks, and consequences of using Xarelto.

Defendants knew that Xarelto is not safe, fit, or effective for human consumption, that using Xarelto is hazardous to health, and that Xarelto has a serious propensity to cause serious injuries to its users, including but not limited to the injuries Decedent suffered.

180.    Specifically, Defendants knew that Xarelto significantly increases the risk of severe, life-threatening bleeding events, and that Xarelto is not a safe and effective medication for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

181.    Defendants concealed and suppressed the true facts concerning Xarelto with the intent to defraud Decedent, in that Defendants knew that Decedent's physicians would not prescribe Xarelto, and Decedent would not have used Xarelto, if they were aware of the true facts concerning its dangers.

182.    Defendants' fraudulent representations concerning the purpose for which Xarelto should be used and the safety of Xarelto were material representations.

183.    Defendants knew their representations concerning the purpose for which Xarelto should be used and the safety of Xarelto were false.

184.    Nevertheless, Defendants made such representations to Decedent and her physicians with the intent to defraud Decedentand her physicians and with the intent of inducing their reliance upon such false representations.

185.    Decedent and her physicians justifiably relied on Defendants' material representations to Decedent's detriment.

186.    As a direct and proximate result of Defendants' fraudulent conduct, Decedent suffered personal injury, economic and non-economic damages, and death.

43

187.    Accordingly, Plaintiff Deborah Paiva, as the Administrator of the Estate of Evelynn Triplett, Deceased, claims economic and non-economic compensatory damages for the injury and harm ultimately resulting in Evelynn Triplett's death, including but not limited to the conscious pain and suffering, mental anguish and emotional distress, physical injury and bodily impairment endured by Decedent prior to her death, as well as medical expenses, loss of enjoyment of life, and other economic losses.

188.    Additionally, as a result of Decedent's use of Xarelto, Plaintiff Deborah Paiva, Individually and as the Administrator of the Estate of Evelynn Triplett, Deceased, claims economic and non-economic compensatory damages for the wrongful death of Decedent, including but not limited to the loss of Decedent, pecuniary losses, mental anguish, emotional distress, and loss of support, services, society, companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education.

### NINTH CAUSE OF ACTION

**Wrongful Death and Survival Claims**
**Colorado Wrongful Death Act, Colo. Rev. Stat. § 13-21-201, *et seq.*, and Colorado Survival Statute, Colo. Rev. Stat. § 13-20-101**

189.    Plaintiff incorporates by reference herein each of the allegations heretofore set forth in this Complaint as though fully set forth herein and further alleges as follows.

**190.**    As a result of Defendants' claims regarding the effectiveness and safety of Xarelto, Decedent Evelyn Triplett's medical provider prescribed and Evelyn Triplett began using Xaretlo on approximately October 25, 2013.  She used Xarelto until November 13, 2013, and was diagnosed with a gastrointestinal bleed on November 14, 2013.  As a result of her gastrointestinal bleed, Decedent Evelyn Triplett was unable to use any form of anticoagulation to treat the risk of stroke associated with her atrial fibrillation.  She then suffered an acute cerebral

artery stroke on January 25, 2014 that ultimately resulted in her wrongful death on January 28, 2014.

191.    Accordingly, Plaintiff Deborah Paiva, as the Administrator of the Estate of Evelynn Triplett, Deceased, claims economic and non-economic compensatory damages for the injury and harm ultimately resulting in Evelynn Triplett's death, including but not limited to the conscious pain and suffering, mental anguish and emotional distress, physical injury and bodily impairment endured by Decedent prior to her death, as well as medical expenses, loss of enjoyment of life, and other economic losses.

192.    Additionally, as a result of Decedent's use of Xarelto, Plaintiff Deborah Paiva, Individually and as the Administrator of the Estate of Evelynn Triplett, Deceased, claims economic and non-economic compensatory damages for the wrongful death of Decedent, including but not limited to the loss of Decedent, pecuniary losses, mental anguish, emotional distress, and loss of support, services, society, companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment against Defendants on each of the above-referenced claims and Causes of Action and as follows:

1.    For any other causes of action and/or claims as may be compensable under local laws and/or statutes as may apply under the laws in the jurisdiction and venue applicable in this case;

2.    Awarding compensatory damages in excess of the jurisdictional minimum of this Court to Plaintiff for past and future damages, including but not limited to pain and suffering for

severe and permanent personal injuries sustained by Decedent, medical expenses, health care costs, and medical monitoring, together with interest and costs as provided by law;

3.      Awarding all applicable statutory damages of the state whose laws govern this action;

4.      Awarding Plaintiffs reasonable attorneys' fees;

5.      Awarding Plaintiffs the costs of these proceedings;

6.      Plaintiff further reserves the right to amend her Complaint to allege claims for and request punitive and/or exemplary damages in an amount sufficient to impress upon Defendants the seriousness of their conduct and to deter similar conduct in the future; and

7.      For such further relief as this Court deems necessary, just, and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues.

Dated:  November 14, 2016              Respectfully submitted,

_/s/ Seth A. Katz_
Seth A. Katz
**BURG SIMPSON**
**ELDREDGE HERSH & JARDINE, P.C.**
40 Inverness Drive East
Englewood, Colorado 80112
Tel:  (303) 792-5595
Fax:  (303) 708-0527
skatz@burgsimpson.com

**Attorneys for Plaintiff**