UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | * * * | MDL 2592 |
| * * * * * * * * * * * * * * * * * * * * * | * * | SECTION L |
| THIS DOCUMENT RELATES TO: All Cases | * * * * * * * | JUDGE ELDON E. FALLON MAG. JUDGE NORTH |

**PLAINTIFFS' STEERING COMMITTEE'S MEMORANDUM IN SUPPORT OF MOTION TO COMPEL AND/OR FOR A PROTECTIVE ORDER TO REQUIRE COMPLETE DISCLOSURE OF DOCUMENTS**

**I.     INTRODUCTION**

Pursuant to Fed.R.Civ.P. 26(c) and 37(a), the Plaintiffs' Steering Committee ("PSC") moves to compel a complete document production response from Defendants Janssen Research & Development, LLC, Janssen Ortho, LLC, Janssen Pharmaceuticals, Inc., and Johnson & Johnson ("Janssen") and Bayer HealthCare Pharmaceuticals Inc. and Bayer Pharma AG ("Bayer") (collectively "the Defendants"). Plaintiffs are now faced with the impossible task of determining the substantive impact of a document production that has caused thousands of erroneous documents to be produced. Despite Defendants' being the sole cause of the error, Defendants have refused to provide Plaintiffs with the information needed to attempt to correct this massive error. Simply providing the Plaintiffs with a list of thousands of documents along with a corrected copy is not sufficient and does little to assist the Plaintiffs. Such a process will require the Plaintiffs to expend substantial time and money reading thousands of documents on a line-by-line basis to locate the error that was "corrected" and determine if such correction was substantive. Plaintiffs cannot be prejudiced in such a manner, and Defendants must be ordered to provide to Plaintiffs a

1

report detailing the errors that were identified and corrected. Plaintiffs should not have to spend their time trying to find Defendants' mistakes.

## II. FACTUAL BACKGROUND

Early in the history of MDL 2592, the parties worked cooperatively to implement various orders to establish the basic infrastructure for the litigation to proceed. Among the various orders, this Court issued PTO No. 21 regarding the document production protocol. This consent order allowed for the production of certain documents in both native and "tiff" format. Plaintiffs requested native format to assist in their review of documents for a number of reasons which included providing for more accurate targeted searches and to allow Plaintiffs to more easily understand issues like track changes within Word documents. Defendants initially refused to produce documents in native format and wanted solely to produce documents in "tiff" form with a few minor exceptions. The parties ultimately reached a compromise that provided for the production of native format files for several types of documents including Word files. Due to the Defendants' concerns pertaining to maintaining the integrity or authenticity of the native file and to ensure that Defendants' documents designated as protected maintain a confidentiality "stamp," the Defendants also agreed to produce the native format files in "tiff" form. Thus, Defendants ultimately produced to Plaintiffs both a native format file and a tiff format file. The only exception was for native format files that contained redactions. For those files, the Defendants only produced a "tiff" file.

Throughout the following months, the PSC allocated substantial assets in conducting a review of the Defendants' production. The Plaintiffs conducted a thorough review of the documents without any reason to suspect or believe that the "tiff" format files were not accurate. Given the Plaintiffs' belief in the integrity of the production, document reviewers that were reviewing entire custodial files, would initially review the "tiff" file and would only review the

native to assist in understanding a document when necessary.  This process was implemented in order to make the review process more efficient as the native file with track changes could only be viewed within Word itself which required the reviewer to open the file outside of the document review software.

As documents were being produced, Plaintiffs were taking the depositions of the Defendants' corporate witnesses.  Plaintiffs relied upon the reviews of individual deponents custodial files to determine areas of inquiry of the individual witnesses and to understand the particular witness's role and involvement.  As of this motion, Plaintiffs have no way in which to determine whether the documents that were reviewed to make such determinations were accurate.

In addition to ~45 individual fact witnesses that were deposed, on October 14, 2016, Plaintiffs produced their expert reports.  All of these reports were informed at some level by the review of potentially erroneous documents.  As trial preparation by this time was well under way, the PSC had scheduled numerous depositions of their experts.  Among these witnesses, Dr. Susan Parisian was scheduled and noticed to be deposed on November 18-19, 2016.

On the cusp of Dr. Parisian's deposition, November 16, 2016, Janssen issued a letter to the PSC via Roger Denton, and the Pennsylvania Mass Tort Co-Liaison Counsel via his Information Technology representative, Thomas Shrack.[1]  *See* November 16, 2016 Letter of Jennifer La Mont, attached hereto as Exhibit "A".  The letter disclosed an error with document XARELTO_JANSSEN_05852123 – a document specifically cited by the Defendants in response to interrogatories from the PSC.  Specifically, information pertaining to labeling discussions with the FDA was not accurately produced in the "tiff" file as the "tiff" file did not show language that had been stricken from the draft label.  Instead, the "tiff" file showed the relevant language was

---

[1] Mr. Shrack is not an attorney.

still within the draft and had not been deleted. Plaintiffs have since learned that Defendants discovered this error in their preparation for the deposition of Dr. Parisian. Without any reference to the fact that Dr. Parisian relied on an inaccurately produced document in her report and was about to be cross-examined on the matter, Janssen matter-of-factly mentioned that, "[i]t has come to our attention that there was a processing error on the tiff copy of XARELTO_JANSSEN_05852123,"[2] and that an overlay file would be produced that day to correct the problem. The problem with the document (which dealt with Xarelto prescribing information with track changes from the FDA) was that "not all of the track changes appeared in the tiff copy". *Id.* To downplay the significance of this substantive and materially different document, Janssen noted that "all of the track changes did appear on the native copy of XARELTO_JANSSEN_05852123." *Id.*[3] Despite their knowledge, the Defendants remained silent as to Dr. Parisian's reliance upon this erroneously produced document and left Plaintiffs completely in the dark to put together this puzzle before Defendants cross-examined Dr. Parisian.

The prejudicial impact of Janssen's letter was immediate and profound. Although many counsel had traveled across the country at great expense to participate in Dr. Parisian's deposition,

---

[2] Dr. Parisian's reliance was understandable as Janssen had specifically cited XARELTO_JANSSEN_05852123 in its earlier interrogatory answers.

[3] Once the document production protocol of PTO 21 was agreed to, the PSC accepted the integrity of Defendants' document production. Now that errors in the document production have come to light, the Defendants chastise plaintiffs for not adhering to their initial recommendation to only review native production. This transference of blame is unacceptable. The fault in Defendants' document production is not the result of any action on Plaintiffs' part. The buck starts and stops with the Defendants who insisted on tiff productions despite the potential for production error. *See In re Seroquel Prod. Liab. Litig.*, 244 F.R.D. 650, 654 (M.D. Fla. 2007) (Noting the advantages of native production includes "minimizing the potential problems of incompatibility among various computer systems, programs, and data, and minimizing problems with . . . data integrity[.]") (citations omitted).

once the PSC was able to solve the Defendants' puzzle, the PSC demanded the postponement of the deposition in order to address the "processing error." While Defendants initially resisted claiming that their error was essentially harmless, the deposition was ultimately postponed.

As a consequence, of Dr. Parisian's belief that the Defendants' produced (and actually cited in interrogatory responses) accurate documents, Dr. Parisian was required to re-write portions of her report, and her deposition was required to be rescheduled.[4] Of course, all of this additional expert time had to be paid for by the PSC. These matters were fully described in the November 22, 2016 letter of Brian Barr, attached hereto as Exhibit "B". Therein, the PSC requested that the Defendants destroy all prior copies of Dr. Parisian's October 12, 2016 draft report. Fearing that the processing error was systemic, the PSC also requested a full accounting of Defendants' understanding of their flawed document production.

As it turns out, Plaintiffs' fears were justified. The impact of the Defendants' production problem have far broader repercussions than just one document. On November 28, Janssen informed the PSC of its ongoing investigation into the production debacle. Acknowledging that its first disclosure "did not provide a more detailed explanation," Janssen stated its belief that "the issue stems from a problem with the third-party tiffing tool being used by our document vendor for the Xarelto document production, which resulted in track changes deletions and comments not showing up in some of the tiff copies of word documents containing track changes." *See* November 28, 2016 Letter of Jennifer La Mont, attached hereto as Exhibit "C". Janssen stated that it had begun a prioritized review of its entire document production beginning with "tiff copies of word documents with track changes" which were "used as exhibits in company witness depositions, cited by Bates number in the exert reports produced by Plaintiffs and Defendants, and

---

[4] Dr. Parisian's deposition ultimately took place on December 8-9, 2016.

5

cited by Bates number in the Janssen Defendants' answer to the preemption interrogatories." *Id.* Based on this metric, Janssen identified fourteen (14) total documents whose production was flawed. *Id.* Janssen further advised that it was continuing its efforts on an expedited basis to understand the extent of its production problem.

As the investigation continued, the extent of the problem rapidly expanded. On December 5, 2016, Janssen notified the PSC that Janssen's investigation had identified an additional 329 documents that were produced with errors in addition to the 14. At some date unknown to Plaintiffs, Bayer decided it needed to start investigating its document production. Thus, not only were the numbers of errors expanding exponentially, now both Defendants were investigating their productions. These investigations lead to the stunning revelation to the PSC on December 8, 2016, that the number of errors was in the multitude of thousands. The PSC's worst fears were realized -- the production problem was in fact systemic.

The true scope of the issue cannot possibly be understood at this point but the numbers are staggering. As of December 8, Janssen identified the following:

- 14 documents with errors that were used in depositions, relied upon by experts or cited in Janssen's interrogatory responses;
- 329 documents with errors for documents with track changes that were only produced in TIFF;
- ~8,800 documents with errors for documents produced in both native and TIFF (at the point of the report, Janssen had reviewed ~52,000 of 77,000 of these type documents thus it can be expected this number is only going to increase)

The disclosure from Bayer, whom the Plaintiffs were unaware was even investigating a potential issue until December 8, was even more stunning:

6

- 4 documents with errors that were used in depositions or relied upon by experts;

- 41 documents with errors for documents with track changes that were only produced in TIFF (at this point of Bayer's investigation, it had reviewed only ~1,400 of ~10,000 of these type documents);

- an unknown number of errors from 145,000 documents that were produced in both native and TIFF as Bayer has not even started reviewing this group of documents.

Plainly, the "processing error" of November 15, 2016 was just the tip of the iceberg.

But the problem with the Defendants' discovery of their production error extends far beyond the mere identification and substitution of corrected documents. The PSC, whose members were Court-appointed to protect the interests of all MDL plaintiffs, justifiably relied upon the integrity of the Defendants' document production when it conducted its initial review of documents. The PSC cannot realistically go back and reevaluate its assessment of the document production to find approaches to documents and legal theories previously passed over or not even considered because of a flawed misunderstanding caused by the systemic and fundamentally flawed document production of the Defendants. The plaintiffs in this MDL are entitled to a full and fair presentation of their claims. Serious concerns for due process now arise in light of a system implemented by Defendants which threatens to impair that presentation.

These matters were discussed with the Court in its regularly-held telephonic discovery conference of December 8, 2018. *See* Minute Entry of December 8, 2016 (Rec. Doc. 4717). At that time, due to the breadth of the still-unfolding production issue, the PSC requested a two-week pause to allow the parties to get to the bottom of the problem. The PSC contended, and still contends, that Plaintiffs are irreparably harmed by being obliged under the current schedule to continue with trial preparation, including expert discovery, in reliance on documents that may be

incomplete at best, and substantially misleading at worst.  Indeed, the Defendants 'erroneous document production continues to be investigated, and the extent of the errors thus remains unknown.  The Court declined the PSC request for a pause in the proceedings based in part on reassurances from the Defendants that many of the processing errors were insignificant, representing technical errors and not substantive errors, and that a full accounting could be completed by the December 20, 2016 Status Conference.  *See In re Xarelto (Rivaroxaban) Prod. Liab. Litig.*, MDL No. 2592, Transcript of Telephone Status Conference at 25-26 (E.D. La. Dec. 8, 2016) [attached hereto as Exhibit "D"].

In the aftermath of the December 8th conference, the PSC requested that Defendants provide on a rolling basis 1) those documents known to the Defendants to be inaccurate and produced with errors; 2) a report accompanying the document production that identifies what the production error is in each of the documents produced; and 3) a report categorizing the documents by the type of error to assist the Plaintiffs in identifying in substantive issues, *i.e.*, spelling errors or grammatical changes versus substantive changes.  To comply with the directives of the Court from the December 8th Discovery Conference, the Defendants will by necessity have to determine the inaccuracies in each of the documents they determine to have been defectively produced. Further, to actually correct the document, logic would explain that the error must be identified.

Plaintiffs' requests for this information have been rebuffed by the Defendants.  In response to the PSC's requests, on December 13, 2016, Janssen provided a "partial list of the document produced both natively and in tiff which were affected by the tiff Word with track changes/comments document production issue."  *See* Dec. 13, 2016 Letter of Jennifer LaMont [attached hereto as Exhibit "E"].  Not only is this only a partial list but the notations of the errors are non-descriptive and merely state "missing strikethroughs" or "missing comments" without

8

specifically identifying the actual errors or where the errors occur in the documents. Defendants claim they are not keeping track of either the errors themselves (beyond simply noting the error type, i.e., a missed strike-through or missing comment box), the location of the error or any type of error category like spelling changes. Given the representations to the Court, Plaintiffs are surprised to say the least. When this matter was initially heard, counsel for defense attempted to minimize the impact of this issue and represented that "the problem might range to something that might perhaps be substantive, but we've seen a lot that aren't substantive, maybe somebody's name that was spelled wrong and they redlined it and fixed the name or fixed a bit of grammar." *See* December 8, 2016 Telephone Status Conference at 10. Plaintiffs are at a loss as to how the Defendants can make such a representation if they are not keeping track of the actual errors.

In fact, Plaintiffs are deeply concerned about Defendants' representations pertaining to the entire process they have implemented to remedy this catastrophe. To start, Defendants statements that they are not keeping track of the errors they are identifying is troubling. Defendants' process even if not by intentional design, has the effect of placing an extreme burden on Plaintiffs. Defendants' process would cause the Plaintiffs to have to go through the tens of thousands of documents that will have errors and page-by-page, line-by-line, attempt to identify what Defendants flagged as an error. Many of these errors are extraordinarily difficult to locate and this process would require substantial resources from the Plaintiffs and cost the Plaintiffs an inordinate expense to conduct this work in a timely fashion. It is completely inequitable for anyone but the Defense to pay for the cost of this mistake.

As the process was described to Plaintiffs, the Defendants have tasked their army of review lawyers to manually pull up the documents that Defendants believe to be the types of documents that could have been produced in error. Of course, Plaintiffs are being required to accept that

Defendants have identified all possible categories of document types for review. The review lawyers will then page-by-page compare the native file to the TIFF to try to identify an error. It is to be expected that errors will be missed. Once errors are identified, the document is sent on to be "re-tiffed" using a different software than the one that caused the error. Plaintiffs have some confusion as to whether all errors are identified in the document or whether the Defendants simply not a document has an error and quit reviewing once a single error is found. Defendants were unable to provide Plaintiffs with any assurance that the document, once re-tiffed, was now accurate. While Defendants did state they conduct some quality control, Defendants were unable to state that all errors in the documents were located or that there was even an effort to make sure all errors were corrected. It again sounds as if the Defendants are assuming the software conversion cannot cause an error – an assumption we now know is fundamentally flawed. In fact, when Plaintiffs specifically asked whether Defendants could simply say yes or no that the Defendants' process will result in accurate documents, the answer was no.

Plainly, Plaintiffs should not have the burden to locate the errors in the Defendants' document productions when that information is known to them. This production error is entirely the responsibility of the Defendants. They have put the integrity of the MDL discovery and trial activity at risk. They should not now be permitted to compound their error by playing a game of "hide-the-pea."[5]

---

[5]*See generally Bryan v. Riddel*, 875 P.2d 131, 136 (Ariz. 1994) ("Disclosure, like all discovery, is not a game. It should have as its goal the preparation of cases for trial or settlement. Neither the "new" rules nor the "old" were intended to be used as swords by overzealous litigators. Because the amended rules attempt to change a culture of advocacy in which "hiding the pea" has too frequently been the objective, courts must not tolerate their abuse.").

**III.    ARGUMENT**

Federal Rule of Civil Procedure 26 broadly empowers a District Judge to enter appropriate protective orders, etc.  *See* Fed.R.Civ.P. 26(c).  Moreover, Federal Rule of Civil Procedure 37(a) authorizes a motion to compel when incomplete disclosures are provided; and under this the Rule, evasive or incomplete answers "must be treated as a failure to disclose, answer, or respond."  *See* Fed.R.Civ.P. 37(a)(4).  The Defendants' failure to produce accurate and complete documents has cast doubt on the integrity of a substantial portion of their document production.  Defendants have been forced to admit that the "processing error" they acknowledged about one (1) document on November 15, has exploded into a crisis involving over 250,000 documents!, leaving still unanswered the fundamental question whether the error has caused substantive discrepancies in many or even most cases.  This similarly cannot be treated as a minor impact on the MDL.  Much effort has been spent by the PSC relying on the integrity of Defendants' initial productions when conducting their document review, in preparation for trial, and in preparing their experts to provide reports. To now find at the conclusion of discovery that the Defendants' document production was riddled with errors and inaccurate documents is extraordinarily prejudicial to the PSC, and even more so to all MDL plaintiffs.[6]  In similar instances, courts have not hesitated to impose sanctions

---

[6] Delay from defective electronic discovery productions is recognized as being prejudicial. *See In re Phenylpropanolamine (PPA) Prod. Liab. Litig.,* 460 F.3d 1217, 1236-37 (9th Cir. 2006) ("Prejudice from unreasonable delay is presumed. Failure to produce documents as ordered is sufficient prejudice, whether or not there is belated compliance. * * * The risk of prejudice is exacerbated where each delay potentially effects the discovery and remand schedule in hundreds of other cases.") (citations omitted).  This is especially the case when trial dates are looming. *See Residential Funding Corp. v. DeGeorge Financial Corp.,* 306 F.3d 99, 112 (2nd Cir. 2002) ("[A]s a discovery deadline or trial date draws near, discovery conduct that might have been considered 'merely' discourteous at an earlier point in the litigation may well breach a party's duties to its opponent and to the court.... [When defendant] had repeatedly missed deadlines to produce the e-mails-[defendant] was under an obligation to be as co-operative as possible. Viewed in that light, [defendant's] 'purposefully sluggish' acts- articularly its as yet- unexplained refusal to answer basic technical questions about the tape until prompted to do so by the District Court-may well have constituted sanctionable misconduct in their own right.").

on the malfeasant party or compelled more accurate productions. *See Serequil,* 244 F.R.D. at 655 (sanctions were warranted for defendant's failure to produce "usable" or "reasonably accessible" documents); *HM Elecs., Inc. v. R.F. Techs., Inc.*, No. 12CV2884-BAS-MDD, 2015 WL 4714908, at *27 (S.D. Cal. Aug. 7, 2015), *vacated in part on other grounds*, 171 F. Supp. 3d 1020 (S.D. Cal. 2016) (defendants sanctioned for post-discovery document dump which defendant attempted to excuse "because the ESI vendor accidentally failed to export all of the data to be produced," because delay was prejudicial to plaintiff).

## IV.  CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion to Compel and/or for a Protective Order and order the Defendants to produce corrected documents as they become available and identify the errors in each document that were corrected. In addition, Defendants should present a designee most knowledgeable about the document production error and the efforts of the Defendants to rectify the problem.  Plaintiffs further request any additional relief this Court deems just and proper, including alteration of existing deadlines, taxation of costs, appointment of a special master to oversee document review and categorizing of errors, etc.

DATE:	December 14, 2016	Respectfully submitted,

/s/ Leonard A. Davis
Leonard A. Davis, Esq. (Bar No. 14190)
HERMAN, HERMAN & KATZ, LLC
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
FAX: (504) 561-6024
Email: ldavis@hhklawfirm.com

Gerald E. Meunier (Bar No. 9471)
GAINSBURGH      BENJAMIN      DAVID
MEUNIER &WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
PH: (504) 522-2304
FAX: (504) 528-9973
Email: gmeunier@gainsben.com

*Plaintiffs' Liaison Counsel*

## **CERTIFICATE OF CONFERENCE**

In accordance with Federal Rule of Civil Procedure 37, the undersigned counsel hereby certifies that counsel for the PSC have attempted in good faith to amicably resolve the issues in this motion, but were unable to do so.

DATE:	December 14, 2016	Respectfully submitted,

/s/ Leonard A. Davis
Leonard A. Davis, Esq. (Bar No. 14190)
HERMAN, HERMAN & KATZ, LLC
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
FAX: (504) 561-6024
Email: ldavis@hhklawfirm.com

Gerald E. Meunier (Bar No. 9471)
GAINSBURGH   BENJAMIN   DAVID
MEUNIER &WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
PH: (504) 522-2304
FAX: (504) 528-9973
Email: gmeunier@gainsben.com

*Plaintiffs' Liaison Counsel*