# EXHIBIT D

```
 1                     UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2   ********************************************************************

 3
     IN RE:  XARELTO (RIVAROXABAN)        Docket No. MDL-2592
 4   PRODUCTS LIABILITY LITIGATION        Section "L"
                                          New Orleans, Louisiana
 5   THIS DOCUMENT RELATES TO:            Thursday, December 8, 2016
     ALL CASES
 6
     ********************************************************************
 7
               TRANSCRIPT OF TELEPHONE STATUS CONFERENCE PROCEEDINGS
 8          HEARD BEFORE THE HONORABLE ELDON E. FALLON
                      UNITED STATES DISTRICT JUDGE
 9


10
     APPEARANCES:
11
     FOR THE PLAINTIFFS'
12   LIAISON COUNSEL:               HERMAN HERMAN & KATZ
                                    BY:  LEONARD A. DAVIS, ESQ.
13                                  820 O'Keefe Ave.
                                    New Orleans, LA 70113
14

15                                  GAINSBURGH BENJAMIN DAVID
                                    MEUNIER & WARSHAUER
16                                  BY:  GERALD E. MEUNIER, ESQ.
                                    2800 Energy Centre, 1100 Poydras
17                                  New Orleans, LA 70163

18
                                    LEVIN PAPANTONIO
19                                  BRIAN H. BARR, ESQ.
                                    316 Baylen Street, Suite 600
20                                  Pensacola, FL 32502

21
                                    BEASLEY ALLEN CROW METHVIN
22                                  PORTIS & MILES
                                    BY:  ANTHONY BIRCHFIELD JR., ESQ.
23                                  P.O. BOX 4160
                                    MONTGOMERY, AL 36103
24

25
```

```
 1                                    LEVIN, FISHBEIN, SEDRAN & BERMAN
                                      BY:  FREDERICK S. LONGER, ESQ.
 2                                    510 Walnut St., Suite 500
                                      Philadelphia, PA 19106
 3

 4      FOR THE DEFENDANTS'
        LIAISON COUNSEL:              IRWIN FRITCHIE URQUHART & MOORE
 5                                    BY:  JAMES B. IRWIN, ESQ.
                                      400 Poydras St., Suite 2700
 6                                    New Orleans, LA 70130

 7
                                      DRINKER, BIDDLE & REATH
 8                                    BY:  SUSAN M. SHARKO, ESQ.
                                           JENNIFER LaMONT, ESQ.
 9                                    600 Campus Dr.
                                      Florham Park, NJ 07932-1047
10

11      FOR THE DEFENDANT BAYER
        HEALTHCARE PHARMACEUTICALS
12      INC. and BAYER PHARMA AG:     KAYE SCHOLER, LLP
                                      BY:  STEVEN J. GLICKSTEIN, ESQ.
13                                         ANDREW K. SOLOW, ESQ.
                                      250 West 55th Street
14                                    New York, New York 10019-9710

15
                                      CHAFFE McCALL, LLP
16                                    BY:  JOHN F. OLINDE, ESQ.
                                      1100 Poydras Street, Suite 2300
17                                    New Orleans, LA 70163

18
                                      ECKERT SEAMANS CHERIN & MELLOTT
19                                    BY:  TIMOTHY S. COON, ESQ.
                                      600 Grant St., 44th Floor
20                                    Pittsburgh, PA 15219

21
        Official Court Reporter:      Karen A. Ibos, CCR, RPR, CRR, RMR
22                                    500 Poydras Street, B-275
                                      New Orleans, Louisiana 70130
23                                    (504) 589-7776

24
           Proceedings recorded by mechanical stenography, transcript
25      produced by computer.
```

<u>P R O C E E D I N G S</u>

(THURSDAY, DECEMBER 8, 2015)

(TELEPHONE STATUS CONFERENCE PROCEEDINGS)

15:31:28   (OPEN COURT.)

15:31:28       THE COURT:  Good afternoon, everyone.  This is Judge
15:31:33   Fallon.  Who is on the line for the plaintiffs?

15:31:35       MR. BIRCHFIELD:  Andy Birchfield, your Honor.

15:31:41       MR. MEUNIER:  Jerry Meunier, Judge.

15:31:41       MR. DAVIS:  Lenny Davis.

15:31:43       MR. BARR:  Brian Barr, your Honor.

15:31:44       MR. LONGER:  Fred Longer, your Honor.

15:31:49       THE COURT:  Anyone else?  Defendants.

15:31:55       MR. COON:  Your Honor, this is Timothy Coon for Bayer.
15:31:57   And I just got an e-mail that other people who are joining for
15:32:01   defendants are having problems with the access code being
15:32:04   recognized.

15:32:07       MR. GLICKSTEIN:  Steve Glickstein, I am on.

15:32:13       MR. SOLOW:  We've just been able to get in.  This is Andy
15:32:17   Solow.

15:32:17       MS. SHARKO:  Susan Sharko.

15:32:19       MR. IRWIN:  Jim Irwin.

15:32:20       MR. OLINDE:  And John Olinde.

15:32:23       THE COURT:  Okay.  Anyone else?

15:32:23       MS. SHARKO:  (UNINTELLIGIBLE.)

15:32:23   1          THE COURT:  Susan, you're breaking up a little bit.

15:32:25   2          MR. BARR:  Okay.  Susan, you sound very far away.  I

15:32:39   3    don't know if you can call back in or get a better line.  We are

15:32:44   4    not hearing you that well.

15:32:46   5          MS. SHARKO:  I am much closer to the phone now.

15:32:48   6          THE COURT:  You're better now.  Okay.  What were you

15:32:51   7    saying?

15:32:52   8          MS. SHARKO:  My colleague Jennifer LaMont, who is

15:32:57   9    Tim Coon's counterpart for Janssen, was trying to dial in, she was

15:33:02  10    having trouble --

15:33:02  11          MS. LAMONT:  I am on, I am on.

15:33:05  12          MS. SHARKO:  Okay.  We're all here.

15:33:06  13          THE COURT:  Okay.  Folks, this is our monthly or weekly

15:33:10  14    or biweekly meeting.  So what's up?  Andy or Lenny?

15:33:20  15          MR. BARR:  Your Honor, it's Brian.  I believe there's two

15:33:23  16    issues for us to talk to you about.

15:33:26  17          THE COURT:  Okay.

15:33:28  18          MR. BARR:  We resolved the Pradaxa issue, you will be

15:33:31  19    getting a stipulation from us on that, we are just working out the

15:33:35  20    language.

15:33:35  21          THE COURT:  Great.

15:33:36  22          MR. BARR:  The second issue is the exhibit admissibility,

15:33:40  23    a request for admissions.  We have had some good talks with Steve

15:33:47  24    and with Susan on what I will call a bellwether exhibit process,

15:33:54  25    where we are going to look at some sample exhibits.  We don't

15:33:58  1    exactly have the process worked out, but I think we've made very

15:34:02  2    good progress and expect to have something ironed out for you

15:34:05  3    pretty quickly.

15:34:07  4              THE COURT:  Brian, let me just speak on that a little

15:34:09  5    bit.  This is what I found very helpful.  I prepare a chart and the

15:34:14  6    chart has the exhibit number and the next thing is a brief

15:34:22  7    description of the exhibit, just two words or three words or

15:34:26  8    whatever it is; then an objection, and the objection, I don't need

15:34:30  9    much in the objection, give me the number if you're dealing with

15:34:37  10   something, or a word or two, and then a response, and then I have a

15:34:44  11   Court ruling.  And some of the exhibits I'll be able to give you a

15:34:48  12   reading on, you know, of a hearsay exhibit or if it's authenticity

15:34:54  13   or something of that sort, 901 or something, I can rule on it.

15:34:59  14             As I mentioned to you, relevancy, I see that as a

15:35:04  15   contextual issue, and so I generally put an "R" by that meaning

15:35:08  16   reserved, my ruling.

15:35:10  17             The rulings that you need to know about is either

15:35:14  18   excluded or admissible; and the admissible ones, that means that

15:35:21  19   that's all you have to do is introduce it and say, Judge, this one

15:35:26  20   has been declared admissible and then I admit it.  And that way I

15:35:32  21   am able to keep a list of what's admitted.

15:35:34  22             Because, frankly, it's been my experience at some time

15:35:38  23   you've got 60 exhibits and really when it gets down to trial it's

15:35:44  24   only necessary to admit 30 of them.  So I don't want to admit 60 if

15:35:48  25   you're going to just be using 30.

15:35:51  1          The other thing I want your input on is the e-mails.

15:35:58  2     Usually what I do with e-mails is you either have to have drafted

15:36:02  3     it or received it.  And if you've drafted it, you can "why did you

15:36:08  4     draft it" or "what do you mean by it," that sort of thing.  But if

15:36:12  5     you received it, the question really is what did you do with it or

15:36:16  6     how did you respond, some action that you had.

15:36:20  7          But if nobody's drafted it and nobody has received it, I

15:36:26  8     don't see just putting in the e-mail and say, "What's that?"  I

15:36:31  9     don't see an e-mail really as business records.  I know people keep

15:36:35 10     them, but it's more out-of-court statements and it should be in

15:36:44 11     that way the way I see it.  Now, if you have some issues with it, I

15:36:48 12     certainly will listen to you on it; but generally with e-mails,

15:36:52 13     that's sort of the way I deal with them.

15:36:55 14          MR. BARR:  And, your Honor, following up on that, we can

15:36:58 15     have these arguments whenever the issue comes up, but in this case

15:37:03 16     e-mails are a large, large, large part of the production.  And from

15:37:09 17     what we've seen in the discovery, a lot of the decisions that were

15:37:12 18     made about the drug were made through e-mail.  And so I think there

15:37:18 19     is going to be a significant number of e-mails that are offered

15:37:22 20     into evidence.  I don't know that we have to address right now the

15:37:26 21     appropriate vehicle to get them in.

15:37:28 22          THE COURT:  No, we don't.  And that's why I wanted to at

15:37:32 23     least put it out there, because think about how you're going to

15:37:38 24     admit it; and it may be admissible other ways than just whether you

15:37:45 25     wrote it or whether you received.  I think if you're cc'd on it, I

15:37:50  1   think somebody can testify as to what they did with it when they

15:37:52  2   received it.  But to just show somebody an e-mail and say, "Now,

15:37:57  3   what is that e-mail?"  And have them read it, you know, I don't see

15:38:00  4   how that gets in.  You're going to have to get it in in some

15:38:05  5   fashion before you give it to a witness to read.

15:38:07  6           Okay.  All right.

15:38:14  7           MR. BARR:  Do you have anything you want to add on the

15:38:16  8   exhibits?

15:38:21  9           MR. GLICKSTEIN:  No.  The only thing I would say is the

15:38:23  10  concept is to try and find exhibits that represent different fact

15:38:31  11  patterns and maybe raise different types of issues, not a large

15:38:35  12  number of exhibits, and just see what the parties' disputes, if

15:38:42  13  any, are with respect to those categories, and then we can talk

15:38:45  14  about it, if there is a dispute, what to do about it.

15:38:51  15          THE COURT:  Right.

15:38:51  16          MR. BARR:  If we're moving off from that one, your Honor,

15:38:54  17  the next issue is the issue we raised with your Honor in chambers

15:38:58  18  at the last status conference, which was this issue with errors on

15:39:03  19  document production.  I believe Janssen and Bayer have a report

15:39:08  20  they want to give as to where we are.

15:39:10  21          But from a 30,000-foot view at this point, the plaintiffs

15:39:15  22  are very concerned about this issue.  It has gone from our first

15:39:20  23  notice of the issue of November 16th of one document with an error

15:39:23  24  to now we are in excess of 9,000 documents.  Based upon the report

15:39:30  25  we got this morning, I think they are about halfway through their

15:39:34 1    review.  I am anticipating based upon the numbers I heard from Tim

15:39:38 2    and Jen this morning that we're going to be talking about errors in

15:39:43 3    the range of 20,000 documents.  So we're concerned.  And I guess,

15:39:51 4    Tim and Jen, if y'all want to give the report on what you found.

15:40:01 5         MS. SHARKO:  This is Susan, and Jen will give the report

15:40:04 6    for Janssen.  We appreciate that the plaintiffs are concerned.  We

15:40:09 7    gave them a lot of information a couple of hours ago, but Janssen

15:40:13 8    is wrapping up its investigation of this.  We jumped on it as soon

15:40:19 9    as we learned it, and it's important to put it in the context of

15:40:23 10   the millions of pages that have been produced and the fact that the

15:40:28 11   documents were also produced in native; so there are tons of

15:40:38 12   unerroneous, one of the better words, sets of documents, but Jen

15:40:40 13   can explain the details to your Honor.

15:40:43 14        MS. LaMONT:  Good afternoon, your Honor, Jennifer LaMont.

15:40:47 15   So we first learned about the document issue on November 15th with

15:40:52 16   one document that had been -- I'm sorry, I am hearing a beep.  Is

15:41:02 17   anybody still there?

15:41:03 18        THE COURT:  Go ahead.  Yes, we can hear you.

15:41:07 19        MS. LaMONT:  This one document that had been a word

15:41:11 20   document that had tracked changes in it that had been produced both

15:41:16 21   in native format and in TIFF format, and some of the strikes or

15:41:22 22   some of the deletions of text were not showing up in the TIFF

15:41:25 23   version of the document.  So we learned about that on

15:41:29 24   November 15th.

15:41:29 25        On November 16th in the morning I sent a letter to

15:41:33  1   plaintiff's counsel to let them know of the issue and that we were

15:41:36  2   looking into it.  And since then we continued to look into it.  And

15:41:41  3   as a priority we looked at all of the deposition exhibits that have

15:41:45  4   been used to date that are Janssen documents in the litigation.  We

15:41:50  5   looked at all of the Janssen documents that had been cited in

15:41:53  6   anybody's expert report.  We also looked at all of the documents

15:41:58  7   cited in our preemption interrogatories.  And in that review we

15:42:04  8   found 14 documents, including the first one that we found on

15:42:09  9   November 15th.

15:42:11  10        On November 18th we let plaintiff's counsel know about

15:42:13  11  that and produced replacement documents for those 14.

15:42:19  12        Since then we've broadened our review to look at other

15:42:26  13  documents.  Now, the vast majority of the word with track changes

15:42:30  14  documents have been produced natively and in TIFF.  There's no

15:42:33  15  problem with the native documents, we have seen no problem

15:42:37  16  whatsoever with the native documents.

15:42:39  17        A couple thousand were produced in TIFF only just because

15:42:44  18  they had redactions and that was the only way to do that, so we

15:42:47  19  looked at the redacted documents next because we were thinking that

15:42:52  20  those would be a priority since the native documents were correct.

15:42:56  21        We looked at about 5,800 redacted documents and we found

15:43:02  22  329 that had errors, and let plaintiff's counsel know about that

15:43:07  23  and produced replacement documents on this past Monday.

15:43:11  24        And now we're turning our attention to looking at the

15:43:16  25  remainder of the documents.  There are about 77,000 other word with

15:43:22  1    track changes documents produced by Janssen in the litigation

15:43:26  2    either in native and in TIFF, so plaintiff's counsel have the

15:43:30  3    native copies that are correct but we are going through them to see

15:43:34  4    which ones might have the error so that we can fix it.

15:43:38  5             We're in the middle of our review.  So far we've gotten

15:43:43  6    through 52,000 of them.  We found about 8,800 that have problems.

15:43:47  7    Now, the problems might range to something that might perhaps be

15:43:53  8    substantive, but we've seen a lot that aren't substantive, maybe

15:43:57  9    somebody's name that was spelled wrong and they redlined it and

15:44:01 10    fixed the name or fixed a bit of grammar.

15:44:04 11             There's also many duplicates of these documents produced

15:44:11 12    elsewhere in the litigation.  So that's where we are now, we have

15:44:14 13    25,000 left to look at, which we anticipate wrapping up in the next

15:44:20 14    two weeks of looking at that, and that would have been us looking

15:44:23 15    at the entire compilation of documents that could have been

15:44:28 16    affected by this problem.

15:44:29 17             And to put this all in perspective, Janssen has produced

15:44:33 18    2.8 million documents to date.  So while the 8,800 I understand

15:44:42 19    Brian is concerned about them, overall it's really a drop in the

15:44:46 20    bucket of the documents produced by Janssen in the litigation.

15:44:50 21             THE COURT:  Am I following you that the problem is in the

15:44:58 22    TIFF format and not in the native format?

15:45:01 23             MS. LaMONT:  That's correct, your Honor.

15:45:02 24             THE COURT:  So the plaintiffs have the native on all of

15:45:04 25    those documents that you're going through now?

15:45:08  1        MS. LaMONT:  Yes.

15:45:10  2        MR. BARR:  Your Honor, that's correct.  But the issue is

15:45:13  3   when we're doing our document reviews, there's no reason for us to

15:45:18  4   expect that there's going to be an error in the conversion from the

15:45:24  5   native to the TIFF.  And when you're using these document review

15:45:30  6   software programs, you usually are looking at the TIFF.  And the

15:45:33  7   reason you want the native is if you see something -- the TIFF is

15:45:37  8   going to be black and white.  And so if you see something in the

15:45:41  9   TIFF where you want -- it's difficult to follow these track

15:45:45 10   changes, as you know.  You open it up in the native so that you can

15:45:48 11   see the colors.

15:45:49 12        But what's happening here is when whatever vendor

15:45:55 13   software is being used, and we don't understand how this happened,

15:45:58 14   the native is being converted to the TIFF and it's either dropping

15:46:02 15   the strike outs; so when you look at the document in TIFF it looks

15:46:06 16   like that language is actually in the document, when instead it's

15:46:09 17   been deleted, and that could fundamentally change the meaning of

15:46:14 18   the document.

15:46:14 19        Apparently, also, it is dropping comments.  So if

15:46:18 20   somebody highlighted a paragraph and made a comment about what they

15:46:22 21   did or didn't like about that language, that's being dropped.  So

15:46:25 22   you don't really have a reason to suspect, you've got to go open up

15:46:30 23   the native; so the issue becomes a document you never really --

15:46:35 24   issues that were developed in the documents that we are not aware

15:46:38 25   of, and we are looking at a situation now where we have both sides

15:46:43  1   have submitted expert reports, we're in the middle of expert

15:46:47  2   discovery and we're three and a half months from trial.

15:46:51  3          And that's the real concern we have because -- it causes

15:46:56  4   us to question the validity of the production at this point.  And I

15:47:03  5   cut you off, Jen, but I'll let Tim say his part, I guess.

15:47:10  6          MR. BIRCHFIELD:  Judge, if I could, because the statement

15:47:13  7   that, well, accurate documents were also produced.  I mean, that's

15:47:21  8   not really the pertinent point here.  If we're looking at these

15:47:26  9   documents, if we have an e-mail and the e-mail says please see the

15:47:32 10   attached redline, you know, document and it references some

15:47:36 11   changes, well, if we opened up that TIFF, that TIFF image and there

15:47:41 12   were no redlines, then that would be a red flag to us, we would

15:47:44 13   know something was wrong there.  But that's not what would happen.

15:47:49 14          So if we get that e-mail that says see attached redline

15:47:54 15   document and we look at the TIFF image of that redline document, we

15:47:59 16   would see some redline changes.  We would not see the strike

15:48:04 17   throughs, we would not see the comment boxes, but we would see

15:48:07 18   redlines.  So there was no red flag.  There was nothing to, you

15:48:11 19   know, to alert us that, hey, there's a problem here.

15:48:17 20          So that's the major concern, the nature of the comments

15:48:23 21   and the nature of the strike throughs could fundamentally change

15:48:28 22   the meaning of the documents, that's what we're trying to get our

15:48:31 23   arms and our heads around.

15:48:35 24          THE COURT:  Well, I understand the issue and I think it

15:48:37 25   is an issue, but hopefully we will be able to solve it.  I think we

15:48:40  1   just have to work together on it and see how we can solve it.

15:48:44  2          Brian, you may have to, from the standpoint of getting

15:48:50  3   some comfort, you may have to do some kind of sampling to make sure

15:48:53  4   that you're comfortable, that all of the changes have been made.

15:49:00  5          I don't think it's any fault on the part of the

15:49:02  6   defendants, but some of these programs, and I've seen it sometimes

15:49:07  7   that TIFF's not picking up certain colors and that sort of thing,

15:49:13  8   it just happens that way.

15:49:15  9          But we just have to keep an eye on it.  We ought to talk

15:49:20  10  about that every week.

15:49:22  11         MR. BARR:  And I would actually, I kind of wish it was

15:49:26  12  not that we could take advantage of it, I kind of wish it was a

15:49:30  13  fault of somebody.  But the fact that it's coming from a vendor

15:49:33  14  software issue, that's what really causes the concern because that

15:49:39  15  makes it more across the board.

15:49:41  16         And as I gathered, we are two weeks from Janssen

15:49:44  17  completing their investigation.  Tim, you haven't talked about how

15:49:52  18  long it's going to take y'all to complete yours.

15:49:54  19         MR. COON:  Your Honor --

15:49:59  20         MR. SOLOW:  Tim, before you start.  Your Honor, this is

15:50:02  21  Andy Solow.  Before Tim starts, let me just introduce Tim's

15:50:04  22  comments.

15:50:05  23         Your Honor, as Tim will explain, we did not immediately

15:50:09  24  have -- weren't aware of this issue on our front, but Tim can kind

15:50:13  25  of explain it; and we did want to give you complete candor with the

15:50:17 1   issue, and we went ahead and gave a final report to Brian along the

15:50:23 2   lines of what Tim is going to explain now.  Go ahead, Tim.

15:50:25 3          MR. COON:  Your Honor, this is Tim Coon.  After, as Jen

15:50:32 4   LaMont explained, Janssen did a further investigation after

15:50:34 5   identifying the problem with the one document, and when they

15:50:38 6   started finding some other errors, we became aware of that and

15:50:45 7   investigated to see if it also affected Bayer documents and we

15:50:50 8   followed a similar process.

15:50:51 9          The first thing we did was look at all of the word

15:50:54 10  documents that had track changes or comments that were deposition

15:50:58 11  exhibits or referenced in any of the expert reports.

15:51:02 12         We found four documents with technical issues caused by

15:51:08 13  the software problem, one was the deletion track change issue

15:51:16 14  that's been described.  However, in that particular instance, the

15:51:19 15  native, a copy of the native document was actually used as the

15:51:24 16  deposition exhibit, so, arguably, it wouldn't have affected

15:51:28 17  anything in the deposition since the native was used.

15:51:31 18         There were three other documents and each of those were

15:51:34 19  missing comment boxes in the TIFF image.  All four of those

15:51:40 20  documents had several TIFF images, duplicate TIFF images produced.

15:51:47 21  It did have the correct images.

15:51:49 22         After completing that part of the investigation, we then

15:51:53 23  turned to the documents that were produced as TIFF only because

15:51:58 24  they had redactions.  Unfortunately, Bayer has more of those,

15:52:02 25  there's about 10,000 of those.

15:52:06 1          As of yesterday evening we had completed review of

15:52:09 2     approximately 1,400; and of those 1,400, we found 41 with errors.

15:52:16 3     We have a large team looking at these documents and expect to

15:52:20 4     complete it over this weekend so that we will know where we're at

15:52:26 5     on Monday, and we will be getting replacement images out to the

15:52:31 6     plaintiffs for anything that had an error.

15:52:34 7          THE COURT:  All right.  I think that we're going to have

15:52:38 8     to -- let's make sure we have enough forces on that chore so that

15:52:42 9     we can speed it up.  Because, frankly, it seems like that it may

15:52:46 10    have an effect on both sides.  I mean, you've got to know what's in

15:52:51 11    the documents yourself if your people have been using them and

15:52:55 12    testifying about them, because they're going to have testified to

15:53:00 13    inaccuracies.  So you have a dog in this fight, too.  So both sides

15:53:07 14    I think have some very strong interest in getting this done as

15:53:11 15    quickly as possible.

15:53:13 16         MR. BARR:  Your Honor, I would like to follow-up with one

15:53:15 17    thing Tim said.  Tim, that gets you through the documents that were

15:53:18 18    just produced in TIFF.  You also have, as I understand it, 145,000

15:53:24 19    documents that were produced in native and TIFF.  When can we

15:53:29 20    expect a report on those?

15:53:31 21         MR. COON:  As we discussed in our call this morning,

15:53:34 22    that's something we wanted to talk with you given the volume of

15:53:38 23    those maybe doing some sampling.  We wanted to talk with you about

15:53:43 24    the processing.

15:53:44 25          But if we needed to review all of those, we have a

15:53:48  1    sizable team.  We estimate it would take about three weeks.  So the

15:53:54  2    team would be -- the team is going to be completing the TIFF only

15:53:58  3    documents by the end of this weekend, that is the goal, and then it

15:54:04  4    would be about three more weeks to get through 145,000 documents

15:54:08  5    because you have to do a side-by-side visual comparison of the

15:54:13  6    entire document.

15:54:14  7         MR. BARR:  Your Honor, from the perspective of

15:54:16  8    plaintiffs, and I hate to even suggest this, but we believe that we

15:54:24  9    have an obligation to these 15,000, 16,000 plaintiffs that you've

15:54:30 10    appointed us to lead this litigation on and all of their counsel to

15:54:34 11    get to the bottom of this issue.  We believe that that is going to

15:54:40 12    require some discovery on it.  I mean, it leads to the vendor just

15:54:47 13    to figure out the scope of the problem.

15:54:51 14         Given what we're hearing and the fact that we're looking

15:54:56 15    at, you know, a conclusion hopefully of the investigation in two to

15:54:59 16    three weeks, what the plaintiffs would suggest at this point is

15:55:04 17    that we hit the pause button for a couple weeks and let's figure

15:55:10 18    out, try and figure out what the real scope of this issue is

15:55:15 19    because, you know, we're reacting to information we got today, but

15:55:21 20    I have concerns with -- I mean, we have an expert deposition nearly

15:55:26 21    going on every day from here until the end of December, and we

15:55:32 22    could ultimately be spending a significant amount of time deposing

15:55:36 23    experts, both them deposing ours and us deposing theirs, with a bad

15:55:44 24    document set.  Or at the very least facts that weren't discovered

15:55:49 25    because of errors in the production.

15:55:53   1          And we think it makes some sense at this point to

15:55:58   2     everybody take a breath, let's figure out what the issue is before

15:56:02   3     we just continue headlong into discovery with all of the

15:56:05   4     depositions and everything we have going.

15:56:08   5          THE COURT:  Can you deal with the depositions by using

15:56:11   6     native formats since that seems to be the accurate document?  Is

15:56:17   7     that doable?

15:56:19   8          MR. BARR:  Well, I mean, at this point, I don't know of

15:56:23   9     the 8,800 -- what I am aware of right now are the 14 from Janssen

15:56:30  10     and the 300 and something.  I don't know which documents the 8,800

15:56:34  11     are and I also don't know which documents that Bayer has.  So it

15:56:41  12     would be a guess on our part to figure out which documents we're

15:56:45  13     talking about; that's one of the problems we're having is we don't

15:56:50  14     know what documents we're talking about.

15:57:00  15          MR. GLICKSTEIN:  Your Honor, If I can address that for

15:57:00  16     Bayer at least.

15:57:00  17          THE COURT:  Yes, go ahead.

15:57:01  18          MR. GLICKSTEIN:  So, your Honor, first of all, it's

15:57:03  19     certainly obviously not our plan here to cause any prejudice to the

15:57:06  20     plaintiffs.  As I think we tried to show your Honor, Janssen was on

15:57:10  21     top of this issue and immediately notified plaintiffs and brought

15:57:14  22     it to the Court's attention with letters.

15:57:19  23          We are trying to do the exact same thing.  From the

15:57:22  24     standpoint for Bayer, we have a larger volume of documents that we

15:57:26  25     have we need to get into this native plus TIFF image.  My concern,

15:57:31  1   your Honor, is if we were to hit the pause button right now, it's

15:57:35  2   really at this point in time incalculable how we could get this

15:57:43  3   train back on the rails again.

15:57:44  4          As Brian said, we are in the middle of expert discovery

15:57:49  5   right now.  There are depositions going every day through the

15:57:53  6   holidays, if not multiple depositions.  And certainly, you know,

15:57:58  7   Brian and the PSC have their obligations, and certainly can reserve

15:58:03  8   all of that, and if it turns out that there is actually

15:58:08  9   (UNINTELLIGIBLE) missing here, I'm sure we'll all figure out a way

15:58:11 10   of resolving that.

15:58:12 11          So where we're at right now, your Honor, with that

15:58:14 12   discovery done and the vast bulk of these experts being medical

15:58:18 13   experts, to stop everything now, there are documents and I don't

15:58:26 14   want to discount that it may come to fruition, but there is no

15:58:29 15   evidence now that plaintiffs have passed over documents in their

15:58:34 16   review.

15:58:34 17          And I will note, your Honor, that if you recall back to

15:58:38 18   the beginning of the litigation, this is even before I joined the

15:58:41 19   litigation, it was the plaintiffs who wanted native only and the

15:58:45 20   defense were the ones who wanted TIFF images for the integrity of

15:58:49 21   the documents.  While ironic now, your Honor, it is interesting to

15:58:53 22   hear the plaintiffs saying that while their argument for native was

15:58:58 23   that they wanted to review it, that they're now claiming they were

15:59:03 24   reviewing it in TIFF.  So I do think we should, obviously working

15:59:06 25   with the plaintiffs, try and get all of these documents reviewed

15:59:10  1    and to them and then we can assess what needs to be done and, if

15:59:14  2    necessary, redone.

15:59:14  3         But to stop now in the middle of everything, I don't see

15:59:18  4    realistically how we could ever keep the trial schedule, let alone

15:59:22  5    the trial schedule shortly thereafter.  As it is we have expert

15:59:26  6    depositions counting through the holidays, it would just be a

15:59:31  7    nightmare to try to reschedule everything.

15:59:37  8         MR. BIRCHFIELD:  Your Honor, this is Andy Birchfield.

15:59:40  9    Your Honor, you know from the very beginning the PSC, we've pushed

15:59:46 10    for early trial settings and an aggressive schedule.  We think that

15:59:53 11    that is critical, it's important to the litigation.  And so it's a

16:00:01 12    tremendous moment that we say we need a pause.

16:00:05 13         But the challenge that we have is that the error in the

16:00:10 14    production may fundamentally change the complex of some of the

16:00:16 15    issues in this case, and it is problematic for us to go forward

16:00:22 16    with expert depositions not knowing whether these issues may be

16:00:28 17    fundamentally changed or not, or our understanding of these issues.

16:00:33 18    That's the reason that we say we need the pause to be able to get

16:00:40 19    our heads around what's happened here.  And what is -- what, if

16:00:47 20    anything, you know, changes as a result of the error in the

16:00:50 21    production.

16:00:53 22         MR. MEUNIER:  Your Honor, this is Jerry, if I may just

16:00:55 23    quickly add to what Andy said.

16:00:57 24         The multiple layers of duty that are unique to us and not

16:01:00 25    to the defendant's side, we not only have duties to thousands of

16:01:04 1   plaintiffs in the MDL and post MDL as a trial package matter,

16:01:08 2   that's a court appointed duty, we not only have duties to these

16:01:12 3   experts whose reputations and credibility are at issue, we have

16:01:16 4   duties even to private counsel who later would stand to criticize

16:01:22 5   us for continuing to develop a work product for the common benefit

16:01:26 6   knowing that there is a potential defect in the work product.

16:01:30 7        So I think it is a big deal to derail the schedule, but I

16:01:36 8   think it's an even bigger deal from the plaintiff's standpoint to

16:01:39 9   just act as if we have a hope that none of this will matter and go

16:01:46 10  forward.

16:01:46 11       THE COURT:  Okay.  I understand everybody's position.

16:01:51 12  What about is it possible that we can clear the documents that are

16:01:54 13  going to be used with the expert before the expert's deposition?

16:02:01 14  Do you all know which documents, or are you keeping that close to

16:02:05 15  the vest until you show the expert?  What's happening there?

16:02:10 16       MS. SHARKO:  We know that the documents used as exhibits

16:02:17 17  in deposition are approximately 1,600 have all been cleared, and if

16:02:24 18  there was an issue -- if there wasn't a small number, they've been

16:02:27 19  replaced.  So to the extent that there are issues, they are in

16:02:32 20  documents which have never been used for any purpose in the

16:02:35 21  litigation.

16:02:37 22       MR. BARR:  And, your Honor, just to follow-up on that.

16:02:41 23  They may not have been used because they didn't appear to be

16:02:43 24  relevant.  From what I am seeing, just to put a little meat on the

16:02:47 25  bone here, from what I've seen in a lot of these documents we're

16:02:52  1    talking about, it's the types of regulatory documents going back

16:02:55  2    and forth between the defendants and the FDA.  And, I mean, there's

16:03:01  3    significant discussions in there that your concept and

16:03:05  4    understanding of those discussions could substantially change.  And

16:03:11  5    in a failure to warn case, that's critical.

16:03:17  6         I don't know if there's a way -- I mean, they certainly

16:03:20  7    know which documents our experts have relied upon and they

16:03:29  8    apparently cleared those.  Now we have to take their word for that

16:03:30  9    because we have no way to investigate that independently.  But what

16:03:35 10    we don't know, and, look, Andy's right, Andy Solow that we don't

16:03:41 11    have evidence that we missed a document.  But we wouldn't have

16:03:46 12    evidence.  We don't know what we don't know at this point.  It's a

16:03:53 13    critical issue.  And, you know, look, there is nobody more than the

16:04:00 14    plaintiffs that want to stick to this schedule.

16:04:02 15         We are prejudiced both ways on this.  We're either going

16:04:06 16    forward without knowing the full truth of the accuracy of our

16:04:10 17    production, or we're possibly moving the trial dates.  Those are

16:04:17 18    both bad results for us and that's why we don't come to this

16:04:21 19    lightly.  But we do think it makes some sense given that we were

16:04:26 20    given the scope of this issue this morning.  I mean, before this

16:04:30 21    morning we thought we were dealing with a couple of hundred

16:04:33 22    documents, not that big of a deal.  But now we know we're talking

16:04:36 23    about thousands.

16:04:40 24         MR. GLICKSTEIN:  Your Honor, I have a perspective on

16:04:42 25    this.

16:04:42 1          THE COURT:  Go ahead, Steve.

16:04:44 2          MR. GLICKSTEIN:  I've heard your Honor in many, many

16:04:50 3   cases say that we ought not to deal with worst case situations

16:05:00 4   unless and until we know that the worst case actually exists.  And

16:05:07 5   to be sure, I want to emphasize that I understand Brian's concerns

16:05:13 6   and Jerry's concerns and Andy's concerns and Lenny's concerns, and

16:05:18 7   they are as your Honor said also the defendant's concerns.  We take

16:05:24 8   pride in doing a good job and producing documents that are correct

16:05:30 9   and accurate.

16:05:33 10          On the other hand, we do know that the overwhelming

16:05:38 11  majority of documents that we are talking about, they were produced

16:05:43 12  in both native and in TIFF and the natives are correct.  And so we

16:05:49 13  have to do -- both sides have to do some assessment that really

16:05:55 14  can't be done on the phone today about how significant this has

16:06:01 15  really affected anyone's efforts, if at all.

16:06:08 16          We do know that the plaintiffs asked for the documents in

16:06:12 17  native so they could be searched in native, I think I heard Brian

16:06:16 18  say that in fact maybe they have been searching them in TIFF, I

16:06:24 19  think, rather than -- the searchs have to go, just as the

16:06:28 20  defendants have to go back and make sure about the accuracy of all

16:06:34 21  of the TIFF images and compare it to the natives, the plaintiffs

16:06:38 22  have to go back and see, you know, the extent to which searchs were

16:06:46 23  conducted in native versus TIFF; because if the searchs were

16:06:50 24  conducted in native, then obviously this problem is more

16:06:56 25  theoretical than real.

16:06:57 1          So what I would suggest is that you neither accept nor

16:07:04 2  reject the plaintiff's request at this point.  I understand the

16:07:09 3  plaintiff's request, but I think, you know, a week from today we're

16:07:14 4  going to know a lot more than we know today, and that we ought to

16:07:20 5  at least keep the theoretical possibility of maintaining the trial

16:07:25 6  date and not discombobulate all of the experts' schedules and make

16:07:32 7  it impossible to try the cases when and/or if a week from now your

16:07:39 8  Honor, I think, would be able to much more intelligently assess and

16:07:43 9  the parties would be able to much more intelligently assess where

16:07:49 10 things stand and whether that kind of draconian remedy is really

16:07:55 11 needed.

16:07:57 12         And so I don't think you should deny their request

16:07:59 13 outright, but I think if it was held in abeyance for a week we

16:08:05 14 would be able to better assess where we are.

16:08:10 15         MR. BARR:  Your Honor, just to follow-up on that quickly.

16:08:12 16 One, I think Steve misunderstands how searchs are done and how our

16:08:18 17 document review is done, but we don't have to get into that.

16:08:21 18 There's a reason we wanted the native, it makes searchs easier to

16:08:25 19 do.  But the review can still be done in TIFF.  And if the

16:08:29 20 documents are produced accurately, it's not an issue; and there is

16:08:33 21 no reason to assume it would have been an issue.

16:08:35 22         But as far as Steve's position that in a week we'll know

16:08:40 23 more.  Well, in a week I still won't have a report on the 8,000,

16:08:45 24 almost 9,000 that Janssen has identified, 145,000 that Bayer is

16:08:50 25 going through.  And for me to conduct the type of investigation

16:08:57  1    that Janssen is doing, I mean, we've all seen in the affidavits

16:09:00  2    what they did in the document review process, they're talking about

16:09:02  3    they have teams of hundreds of lawyers and would be whatever

16:09:07  4    largest law firm in the country with their document review.

16:09:10  5         Well, we don't have that asset.  My assets are out

16:09:15  6    defending and take expert depositions.  So I don't have this 200

16:09:22  7    army of lawyers that I can just say, "Y'all go digging into the

16:09:27  8    document database and do this comparison."  So we're really

16:09:30  9    operating in an extraordinary disadvantage here.  Not only do we

16:09:34  10   not know the scope of the problem and it's not our investigation,

16:09:38  11   we don't have a real way to investigate it until they tell us

16:09:42  12   what's going on and identify the documents for us.

16:09:51  13        MR. BIRCHFIELD:  And Steve's proposal sounds nice, but he

16:09:55  14   is asking you to deny our request for a week.  And, meanwhile, I

16:10:00  15   don't have the schedule in front of me, but it's in the

16:10:02  16   neighborhood of five or six experts will be taken in the interim

16:10:07  17   and that would be experts that would be taken without the benefit

16:10:11  18   of discovery.  I mean, that's the essence of what we're dealing

16:10:16  19   with because the production that we're looking at we don't know if

16:10:21  20   there are fundamental flaws in that or not.

16:10:25  21        THE COURT:  I understand everybody's position, really I

16:10:28  22   do.  Look, we've got to have a plan B because I am not really in

16:10:33  23   favor of just stopping everything.  But if we're just going to have

16:10:38  24   to use -- if something comes up during that period of time, you may

16:10:43  25   have to take the deposition of somebody over again.  And the fact

16:10:47  1    that you've taken them doesn't mean that you can't take them again

16:10:52  2    if there's some problem with it.

16:10:54  3           But I don't know at this point whether I can say that

16:10:57  4    there is a problem or is not a problem.  There's a blip on the

16:11:00  5    screen that gives everybody concern.  But if it gives us concern

16:11:04  6    for me to stop the train at this point, we'll never go forward with

16:11:10  7    it.  I am not going to be able to clear four months for you all as

16:11:16  8    I did before.  I have other cases.

16:11:18  9           You've got this case, I have a bunch of other cases,

16:11:22 10    criminal as well as civil.  And it's filled in those days.  I'll

16:11:26 11    have to push it back a year or two and that's not a good situation

16:11:32 12    for either one of you all.  So we're going to just have to go on.

16:11:37 13    I'll take another look at it, if it creates a real problem, a

16:11:43 14    tangible problem, but at this point we're not even sure it's a

16:11:47 15    tangible problem.  We know it may or may not be.

16:11:50 16           There are obviously problems with the documents, but the

16:11:53 17    problem with the document may simply be that a person's name is

16:11:56 18    spelled wrong or something is marked that has absolutely nothing to

16:12:03 19    do with it.  I would think there may be some of those, if not a lot

16:12:07 20    of those.

16:12:08 21           So I suggest that the way it's handled in the meantime is

16:12:14 22    that you use natural format by deposing the experts; and if

16:12:21 23    possible, let everybody know which documents you're more likely to

16:12:24 24    use with that expert to cleanse those documents immediately.  And

16:12:29 25    we'll just have to take it a step at a time.

16:12:32  1          I suspect we're going to be talking about this for the

16:12:36  2     next couple of months, if not longer.  And we may have to stop the

16:12:40  3     train, we may have to interfere with everything and just throw the

16:12:45  4     whole thing away.  But you're looking at a year or so from now.  I

16:12:50  5     am not going to be able to just say, okay, just the next four

16:12:53  6     months because I've already docketed cases for those months.  And

16:12:57  7     oftentimes they're criminal cases that I can't move without

16:13:00  8     releasing the parties, it's a speedy trial that I am dealing with.

16:13:04  9     So it's a little more complicated from my standpoint than maybe

16:13:10 10     from yours.

16:13:12 11          MR. BIRCHFIELD:  It's very complicated, your Honor.  But

16:13:15 12     one of the problems or the potential is that our experts, I mean,

16:13:21 13     if there are fundamental changes and they've given a deposition,

16:13:25 14     then they become damaged goods.  I mean, there is that real

16:13:30 15     potential that they become damaged goods.  The defendants have used

16:13:36 16     the -- we produced the valid document, you know, we produced it the

16:13:40 17     right way three times, why didn't you find that, why didn't you

16:13:44 18     find it then.  It's a complex issue for us.

16:13:49 19          THE COURT:  I see that, Andy, I see that, and we may have

16:13:52 20     to deal with it in some way.  I may have to instruct the jury as to

16:13:57 21     what's happened if that's a problem, or not allow cross on that

16:14:03 22     issue.  I may have to do some creative ways of doing it.

16:14:09 23          But at this point I don't think we ought to just stop

16:14:14 24     everything, because as someone said, it's going to be hard to get

16:14:17 25     it started again.  And not only that, but it's going to be hard to

16:14:21  1   get you trial dates set up before a long period of time.  And

16:14:26  2   that's something that we've got to deal with.  We're just going to

16:14:31  3   have to move forward.

16:14:31  4        And I'll visit it again.  And if it's a real problem that

16:14:35  5   either one of you, either side, can show that it's a physical

16:14:40  6   problem as opposed to it may be, then we'll have to take another

16:14:46  7   look at it.  But at this point we're in that area that something

16:14:51  8   may happen.  We can't deal with "something may happen."

16:14:57  9        MR. BARR:  Your Honor, I guess what I would ask, because

16:15:00 10   plaintiffs are kind of operating in the dark at this point with

16:15:03 11   what we're aware of, I would ask that we put firm deadlines on them

16:15:08 12   getting us a report on the problems here, because this can't be

16:15:14 13   some loose "I may have something done in two or three weeks."

16:15:16 14        THE COURT:  I agree with that.

16:15:18 15        MR. BARR:  We have to know what we're dealing with.

16:15:22 16        MR. MEUNIER:  Judge, we have a conference on

16:15:24 17   December 20th, maybe that can be a fair deadline for the completion

16:15:29 18   of the investigation.

16:15:30 19        THE COURT:  When is our next meeting, in two weeks?

16:15:33 20        MR. MEUNIER:  It should be Tuesday, December 20th; not

16:15:36 21   next Tuesday but the Tuesday after.

16:15:38 22        THE COURT:  That's the monthly status conference.

16:15:42 23        MR. MEUNIER:  We don't have anymore discovery calls.

16:15:44 24        THE COURT:  All right.  Let's see where we are at that

16:15:49 25   point.  That's okay.  Let's get something done at that time.  We're

16:15:59  1    going to have to put all of the horses on this situation, Susan and

16:16:06  2    Steve, and let's see what we can do with it.  I'll have to revisit

16:16:11  3    it again at the status conference and see where we go with this.

16:16:14  4          But let's continue on with the depositions, Folks.

16:16:21  5          MR. MEUNIER:  All right, your Honor.

16:16:22  6          THE COURT:  Thank you very much.  Thank you.  Bye-bye.

       7       (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

       8

       9                        * * * * * *

      10

      11                   REPORTER'S CERTIFICATE

      12

      13          I, Karen A. Ibos, CCR, Official Court Reporter, United

      14    States District Court, Eastern District of Louisiana, do hereby

      15    certify that the foregoing is a true and correct transcript, to the

      16    best of my ability and understanding, from the record of the

      17    proceedings in the above-entitled and numbered matter.

      18

      19

      20          _____/s/ Karen A. Ibos_____

      21          Karen A. Ibos, CCR, RPR, CRR, RMR

      22          Official Court Reporter

      23

      24

      25