Case 2:14-md-02592-EEF-MBN Document 5103-8*SEALED Filed 01/20/17 Page 1 of 49

EXHIBIT 4

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  XARELTO          )
(RIVAROXABAN) PRODUCTS   )
LIABILITY LITIGATION     )  MDL No.:  2592
                         )  Section:  L
                         )  Judge Eldon E. Fallon
                         )  Mag. Judge North
                         )
THIS DOCUMENT RELATES    )
TO ALL CASES             )


PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW
VOLUME I

   Videotaped Deposition of LAURA M. PLUNKETT,
Ph.D., taken on Tuesday, December 6, 2016, in the
office of The Lambert Firm, A.P.L.C., 701 Magazine
Street, New Orleans, Louisiana 70130, commencing
at 8:02 a.m.




Reported by:
AURORA M. PERRIEN
CERTIFIED COURT REPORTER
REGISTERED PROFESSIONAL REPORTER

Protected - Subject to Further Protective Review

Page 4

```
 1              A P P E A R A N C E S
 2    REPRESENTING PLAINTIFFS:
 3          SCHLICHTER, BOGARD & DENTON, L.L.P.
            BY:  ROGER DENTON, ESQ.
 4          100 South 4th Street, Suite 1200
            St. Louis, Missouri 63102
 5          314.621.6115
            Rdenton@uselaws.com
 6
            GAINSBURGH, BENJAMIN, DAVID, MEUNIER &
 7          WARSHAUER, L.L.C., at times noted
            BY:  GERALD E. MEUNIER, ESQ.
 8          1100 Poydras Street, Suite 2800
            New Orleans, Louisiana 70163-2800
 9          504.522.2304
            Gmeunier@gainsben.com
10
11
      REPRESENTING BAYER HEALTHCARE PHARMACEUTICALS,
12    INC., and BAYER PHARMA AG:
13          KAYE SCHOLER, L.L.P.
            BY:  JEFFREY H. HOROWITZ, ESQ.
14          250 West 55th Street
            New York, New York 10019-9710
15          212.836.7572
            Jeffrey.horowitz@kayescholer.com
16
            BRADLEY, ARANT, BOULT, CUMMINGS, L.L.P.
17          BY:  LINDSEY C. BONEY, IV, ESQ.
            1819 Fifth Avenue North
18          Birmingham, Alabama 35203-2119
            205.521.8914
19          Lboney@bradley.com
20
21
22
23
24
25
```

USCA5 87

Protected - Subject to Further Protective Review

Page 5

```
 1    REPRESENTING JANSSEN PHARMACEUTICALS, INC.,
      JANSSEN RESEARCH & DEVELOPMENT, L.L.C., JANSSEN
 2    ORTHO, L.L.C.:
 3           IRWIN, FRITCHIE, URQUHART & MOORE, L.L.C.
             BY:  JAMES B. IRWIN, ESQ.
 4           400 Poydras Street, Suite 2700
             New Orleans, Louisiana 70130-3280
 5           504.310.2106
             Jirwin@irwinllc.com
 6
             IRWIN, FRITCHIE, URQUHART & MOORE, L.L.C.
 7           BY:  MEERA U. SOSSAMON, ESQ.
             400 Poydras Street, Suite 2700
 8           New Orleans, Louisiana 70130-3280
             504.310.2106
 9           Msossamon@irwinllc.com
10
11    ALSO PRESENT:
12           MELISSA BARDWELL, VIDEOGRAPHER
13
14
15
16
17
18
19
20
21
22
23
24
25
```

USCA5 88

Protected - Subject to Further Protective Review

Page 6

1                    S T I P U L A T I O N

2        It is stipulated by and among Counsel that

3    the videotaped deposition of LAURA M. PLUNKETT,

4    Ph.D., is being taken under the Federal Rules of

5    Civil Procedure for all purposes permitted under

6    the law.

7        The formalities of reading and signing are

8    not waived.

9        The formalities of sealing, certification

10   and filing are not hereby waived.  The party

11   responsible for services of the discovery material

12   shall retain the original.

13       All objections, except those as to the

14   form of the questions and/or the responsiveness of

15   the answers, are reserved until the time of the

16   trial of this cause.

17                    *   *   *   *   *

18            Aurora M. Perrien, Certified Court

19   Reporter, Registered Professional Reporter, in and

20   for the State of Louisiana, officiated in

21   administering the oath to the witness.

22

23

24

25

Page 12

1   at the -- the summary -- the section that

2   discusses the relationship between prothrombin

3   time and concentrations of rivaroxaban, and then

4   also some of the discussion of the -- of the issue

5   related to major bleeding or bleeding events in

6   the -- in the ROCKET trial.

7       Q.  Did you look at any new documents that

8   were not either listed in your report or in your

9   materials reviewed list?

10      A.  No.

11      Q.  In your meeting with plaintiff counsel

12  recently, which we'll talk about in a little bit,

13  did -- did they present you with any new documents

14  to look at or to discuss that were not contained

15  either in your report or in your list of materials

16  reviewed?

17      A.  I can't tell you if they weren't in my

18  list of material -- materials reviewed because I

19  didn't -- I didn't -- didn't look at that.  We did

20  discuss some of the -- some documents that I know

21  are in my list of materials reviewed that were not

22  cited in my report.  So there's some background --

23  there's some other documents that are -- I guess

24  have similar -- similar areas to what I've cited,

25  but I didn't cite.

Protected - Subject to Further Protective Review

1    Q.  And can you -- can you tell me as best as

2    you can remember what those documents were that

3    you reviewed with plaintiff counsel that are in

4    your materials reviewed but not specifically

5    decide -- cited in your report?

6    A.  I don't know all of them.  I can't recall

7    all of them as I sit here.  But certainly I know I

8    looked at some of the other Mueck documents,

9    M-U-E-C-K.  He has several.

10   Q.  Uh-huh.  Yeah.

11   A.  And I think I think I have four or five of

12   them in my materials reviewed list.  And I have

13   looked -- I -- I think I cite the 2014 article,

14   and I went back and looked at some of the other

15   papers that are essentially referred to in that

16   2014 article.

17   Q.  Were these pharmacokinetic and

18   pharmacodynamic-type documents that you were

19   looking at?

20   A.  Yes.  Because that's the area of -- if you

21   look at my opinions, you know, I focused on the

22   regulatory issues related around that -- those

23   particular points within the dataset and the

24   clinical data.

25   Q.  Would that be a fair -- would it be a fair

Case 2:14-md-02592-EEF-MBN Document 5108-8 Filed 01/20/17 Page 8 of 49
Case 2:14-md-02592-EEF-MBN Document 5108-8 *SEALED* Filed 01/20/17 Page 8 of 49
Protected - Subject to Further Protective Review

Page 14

1    judgment to say that the core of your report and

2    opinions deals with pharmacokinetics and

3    pharmacodynamics?

4         A.   And regulatory issues regulated to those.

5    Because I talk about adequacy of the labeling.  So

6    it -- but yes.  Scientific basis within the

7    labeling that I'm talking about deal with either

8    pharmacokinetics or pharmacodynamic issues related

9    to Xarelto.

10        Q.   And do your labeling opinions deal with

11   the adequacy of labeling with respect to that

12   subject matter, pharmacokinetics and

13   pharmacodynamics?

14        A.   In general terms, yes.  Those would be --

15   I think I -- I give you very specific discussion

16   of -- of opinions.  I talk about the adequacy

17   related to discussion of -- or the lack of

18   discussion about the relationship with prothrombin

19   time as a -- as a measurement tool for --

20        Q.   Right.

21        A.   -- assuring safety.  I think I talk with

22   you about the -- at least in the original labels

23   the -- there's been some changes in 2015.  But in

24   2011, 2012, '13, '14, there was less information

25   provided about the clinical data having to do with

Protected - Subject to Further Protective Review

Page 23

1   prescription breached the standard of care?

2       A.  Well, I don't do standard of care.  I was

3   doing background information and then describing

4   the known relationship between lisinopril as dose

5   increases.  So this is -- it's a toxic -- was a

6   toxicity discussion, that if you give as an

7   initial dose 20 milligrams when the labeling tells

8   you to start at 5 or 10, that there's a reason why

9   you get a more severe toxic reaction in the

10  individual than you would if you had started at

11  the lower dose.

12      Q.  And you do not express medical malpractice

13  opinions because you're not a medical doctor; is

14  that correct?

15      A.  Well, I have worked on medical malpractice

16  cases.  But you're correct.  I don't do standard

17  of care because I'm not a physician.  That's true.

18      Q.  And when was your meeting with plaintiff

19  counsel?

20      A.  Yesterday.

21      Q.  And who was there?

22      A.  Mr. Denton and Ms. Jeffcott from the

23  Lambert Firm and then very, very late, Mr. Meunier

24  joined us.

25      Q.  And where did this --

Protected - Subject to Further Protective Review

1        MR. IRWIN:

2           (Tenders document.)

3        MR. DENTON:

4           Thank you.

5  BY MR. IRWIN:

6    Q.  And let's look at Appendix C, materials

7  reviewed.  Okay?

8        That's an 18-page list of materials

9  reviewed; is that correct?

10    A.  Yes.

11    Q.  And can you tell me which of these

12  materials were furnished to you by plaintiff

13  counsel and what --

14    A.  Anything -- oh.

15    Q.  Excuse me.

16        -- and which of them were collected by,

17  researched, or assembled by you?

18    A.  So anything with a Bates number would have

19  been provided by plaintiffs' counsel, so things

20  that have Xarelto in caps and then go from there.

21  Anything that is a published medical article, I --

22  I retrieved on my own.  And I retrieved the

23  approval package summary, all of the FDA reviews

24  that are on the web site for the two NDAs that I

25  cite, the original NDA for the -- the drug and

USCA5 94

Case 2:14-md-02592-EEF-MBN Document 5108-8 SEALED Filed 01/20/17 Page 11 of 49

Protected - Subject to Further Protective Review

Page 37

1  then the atrial fibrillation indication NDA.

2      Q.  Do you remember what the original

3  indication was for the first NDA?

4      A.  For deep vein thrombosis.  So -- and then

5  I also retrieved some of the 510k documents that

6  dealt with the in-ratio device.  They're listed on

7  Page 2, the -- with K numbers.

8      Q.  Do you say anything in your report about

9  the N -- the Alere device?

10     A.  No.  I did not -- I was not asked to

11  provide testimony and opinions related to the

12  performance of the device.

13     Q.  May I safely assume that you will not get

14  on the witness stand and express any opinions

15  about the Alere POC device?

16     A.  It's not planned at this time.  I can't

17  tell you what you won't ask me or Mr. Denton will

18  ask me.  But that isn't something -- if you read

19  my report, that's not something that I at this

20  point in time have formed specific opinions on

21  and -- and are ready to express at trial.

22     Q.  If you changed your approach and mind on

23  that, you would most certainly let us know so that

24  we would not get surprised; is that right?

25     A.  Absolutely.  Yes.

Protected - Subject to Further Protective Review

Page 40

1   I had retrieved on my own.

2       Q.  You were also provided a number of

3   internal documents with Bayer and Janssen Bates

4   numbers?

5       A.  Yes.

6       Q.  And those are listed on Pages 6 through

7   14?

8       A.  Yes.  But some are also listed before

9   that.  So --

10      Q.  Yes.

11      A.  -- Page 5 has -- and -- 5, 4, 3, and on

12  Page 2, there's also some of those.  Yes.

13      Q.  And with respect to Janssen, did you --

14  did you refer to any of those internal Janssen

15  documents in your report?

16      A.  I'd have to look.  I can't tell you off

17  the top of my head.

18      Q.  I wish --

19      A.  You want me --

20      Q.  I wish --

21      A.  -- to look?

22      Q.  -- you would.  Yeah.

23      A.  The only Janssen documents I believe I

24  referred to would be the labeling, which were not

25  protected confidential documents.

Protected - Subject to Further Protective Review

1   paragraphs -- when I'm citing internal company

2   documents, I might say "e.g.," which means that

3   there may be more than one document that I've

4   reviewed.  But certainly there are -- I know many

5   of those documents were relevant and I did rely on

6   them, but they weren't specifically cited.  And

7   when I say "rely," they gave me important

8   background information, for example, and maybe

9   context for information that I was reviewing, even

10  within the published medical literature.

11      Q.  As we look at this list from Page 7 to 14,

12  can you tell me what any of these documents say?

13      A.  No.  I'd have to pull them.  I -- I -- I

14  haven't memorized Bates numbers with content.  No.

15      Q.  Do you know how many pages of documents

16  these -- these accounted for?

17      A.  Thousands of pages.

18      Q.  Thousands or tens of thousands?

19      A.  I -- I'm -- I'll just characterize it as

20  thousands.  I -- I -- I couldn't tell you an exact

21  number.  I haven't gone back and tried to account

22  by -- page by page for the number of document --

23  number of pages that are in each document.

24      Q.  Okay.  Number 5 on Exhibit A of Plunkett 5

25  is all documents were created by the witness.

Protected - Subject to Further Protective Review

Page 47

1    in the Xarelto litigation.

2            Did you do any research involving Xarelto?

3        A.  If by "research," you're talking about my

4    research to prepare my report, I brought you the

5    documents that I reviewed and relied upon.  And I

6    -- are you talking about something other than

7    that?

8        Q.  Have you done any research independent of

9    this litigation on Xarelto?

10       A.  Yes.  I have.

11       Q.  What did you do, and when did you do it?

12       A.  So maybe four years ago I researched all

13   of the oral anticoagulants for my ███████████████

██  ████████████████████████████████████████████████

██  ██████████████████████████████████████

16       Q.  And what was the result of that research?

17       A.  The result was I went and talked to the

18   physician about the -- her particular, who she

19   was, why he wanted to switch her, and who -- where

20   she was well-controlled, and looking at the risk

21   factors she had for use of these drugs.  ██████████

██  ████████████████████████████████████████████████

██  ████████████████████████████████████████████████

██  ███████████████████████  ████████████████████████

██  ██████████  ██████████████████████████████████████

Protected - Subject to Further Protective Review

Page 48

1 ███████████████████████████████████

██ ████████████████████████████████████

██ ████████████████████████████████████

4    Q.   And what did the doctor want to change her

5  to?

6         MR. DENTON:

7              You know, Jim, I -- I think it's

8         inappropriate to ask about medical private

9         family stuff.  I -- I just don't think

10        that's appropriate.  And I don't -- you

11        know, if -- if you want to ask her what

12        the research was, I think that's fair

13        game.  But to get into her mother --

14        mother-in-law's medical care and

15        conversations with their personal

16        physician is out of bounds, and I'm going

17        to tell her not to answer these questions.

18        MR. IRWIN:

19             Note my objection.

20  BY MR. IRWIN:

21    Q.   What was your recommendation as to what

22  should be done as to whether she should stay on

23  warfarin or go to a novel anticoagulant?

24    A.   Well, I didn't make a recommendation

25  because I'm not her physician.  I had a discussion

Protected - Subject to Further Protective Review

Page 49

1  with her physician about the choices. ████

██ █████████████████████████████████████████

██ ███████████████    ████████████████████████

██ █████████████    ██████████████████████████

██ █████████████████████████████████████

██ ███████████████████    ████████████████

██ ████████████████████████████████████

██ ████████████████████████████

9      Q.  And as a pharmacolist -- pharmacologist,

10  what was your opinion as to what was the proper

11  decision here?

12      A.  The proper decision was to -- to look at

13  her as an individual, which is what I felt the

14  doctor was not doing.  So it was -- I did not tell

15  him what to do.  I talked to him about the

16  pharmacology.  He actually was not that familiar

17  with these drugs, and he had -- was essentially

18  just -- when he had somebody like her, he was

19  making decisions based on the one that he had the

20  most experience with versus looking at her -- I

21  felt looking at her as an individual.  So that was

22  my concern.  And that's -- was the discussion that

23  I had with the -- with the physician.

24          But essentially she had to decide with her

25  doctor.  It was still her decision in the end,

Case 2:14-md-02592-EEF-MBN Document 5108-8 *SEALED* Filed 01/20/17 Page 17 of 49

Protected - Subject to Further Protective Review

Page 50

1    what -- what she decided she wanted to do.  But I

2    wanted the discussion to be more detailed than him

3    -- than her going in and just saying, Whatever you

4    want to do.

5        Q.  And did you keep any records of this

6    research you did on the NOACs?

7        A.  No records other than I had papers in my

8    files.  Because I had pulled some papers on all of

9    the drugs in order to talk with him.

10       Q.  And which drugs did you actually pull

11   papers on?

12       A.  ███████████████████████████████

██   █████████████████████████████

██   ████████████████████████████████████

██   ████████████  ████████████████████████  ██

██   ████████████████  ████████████████████

██   █████████

19   ██  █████████████████████████████████

██   █████████████████

██   ██  ██████████████████████████

██   █████████████████████████████████████

██   ████████████  I had not formed the opinions

24   related to the adequacy of the labeling at that

25   time.  But I certainly was looking specifically at

USCA5 101

Protected - Subject to Further Protective Review

Page 51

1   the pharmacology and who she was as an individual,

2   what was her physiology, and trying to allay her

3   fears about -- about changing to a new drug.  She

4   doesn't like change.

5       Q.  And did you form any opinions on the

6   pharmacology of those -- of those NOACs?

7       A.  General opinions.

8           But -- but it's things that -- that -- and

9   when I say "formed opinions," there -- there were

10  things I already knew about the drugs.  I was

11  familiar with these drugs from -- as a

12  pharmacologist, when new classes of drugs are

13  introduced, I read the medical literature.  So I

14  knew when these oral anticoagulants were coming

15  out, what -- what generally they were being used

16  for, the different targets, what the proposed

17  advantages and disadvantages were.

18  ██████████████████████████████

    ████████████████████████████████████████

    ██████      It wasn't looking at it as a -- as a

21  litigation concern, you know, whether or not

22  the -- the label was adequate for physicians to be

23  able to talk to their patients.  I was really just

24  looking at what was the drug, what -- what were

25  the -- what were the pharmacokinetics.  ████████

USCA5 102

Protected - Subject to Further Protective Review

Page 52



23          MR. DENTON:

24              Jim, now we're not going to talk about

25          her mother's -- her mother-in-law's

USCA5 103

Protected - Subject to Further Protective Review

Page 53

```
 1            medical care.  I -- that's out of bounds.
 2            It violates her mother's privacy.  And I'm
 3            going to object and instruct her not to
 4            share the specific treatment of her
 5            mother.
 6       MR. IRWIN:
 7            Note our objection.
 8  BY MR. IRWIN:
 9       Q.  Number 15 is copies of all affidavits,
10  report and sworn testimony, whether at deposition
11  or trial or otherwise, that relate or concern the
12  subject matter of your testimony in Xarelto.
13            I assume there is nothing responsive to
14  that?
15       A.  I have not brought any such documents.
16  And on sworn testimony, I don't have copies of
17  depositions.  Because typically I send -- I send
18  those back.  But I haven't brought any reports
19  from any of the other litigation that deal with,
20  for example, cardiovascular effects, things like
21  that.
22       Q.  Okay.  In what areas do you consider
23  yourself to be an expert?
24       A.  I'm a pharmacologist, toxicologist, human
25  health risk assessment, individual, and I also
```

Page 54

1   have expertise in the FDA regulation of -- of

2   products.  I also have expertise in the regulation

3   of products by other federal agencies that -- that

4   deal with toxicology, such as the Environmental

5   Protection Agency.

6       Q.  You're not an epidemiologist, are you?

7       A.  I don't have a degree.  But I have

8   expertise, and it's a tool I use every day in my

9   work.

10      Q.  You've never been trained in epidemiology,

11  have you?

12      A.  I've never been in a training program.

13  No.  But I have taken courses in epidemiology.

14      Q.  Have you ever been employed by the FDA?

15      A.  Not as an employee.  No.

16      Q.  Have you ever been asked by the FDA to

17  give opinions on labeling issues?

18      A.  Not by the FDA.  No.

19      Q.  Have you ever been hired by the FDA as a

20  consultant?

21      A.  No.

22      Q.  Have you ever been asked by the FDA to

23  review individual adverse event reports?

24      A.  No.

25      Q.  Have you ever been asked by the FDA to

USCA5 105

Protected - Subject to Further Protective Review

Page 55

1    review any sort of case reports?

2        A.   No.

3        Q.   Have you ever been asked by the FDA to

4    give any opinions on labeling?

5        A.   No.

6        Q.   Have you ever published anything in the

7    peer-reviewed literature regarding prescription

8    drug regulations?

9        A.   I have two book chapters that deal with

10   these issues, but certainly not -- I don't have a

11   -- an article in a journal.

12       Q.   Those book chapters are not peer-reviewed,

13   are they?

14       A.   Well, I consider them to be peer-reviewed

15   because they were reviewed by the editors, and the

16   editors in the two book chapters that I'm talking

17   about had specific expertise in the area that I

18   wrote in.

19       Q.   You know what a -- you know what a

20   peer-reviewed medical journal is, don't you?

21       A.   Yes.  And I -- that's why I answered the

22   question the way I did.

23       Q.   And so you have never published anything

24   in a peer-reviewed medical journal regarding

25   prescription drug regulations; is that correct?

Protected - Subject to Further Protective Review

Page 56

1    A.  That is correct.

2    Q.  Have you ever published anything in a

3  peer-reviewed medical journal regarding the FDA

4  approval process of prescription medications?

5    A.  No.

6    Q.  Have you ever sat in and participated on

7  any FDA committee?

8    A.  No.

9    Q.  Have you ever testified in front of the

10  FDA advisory committee?

11    A.  Advisory committee, no.  I've done

12  presentations before the FDA on behalf of my

13  clients, but not at an advisory committee meeting.

14    Q.  Has the FDA ever consulted with you on any

15  prescription label?

16    A.  No.

17    Q.  Do you hold any boarding or certification

18  or academic degree in regulatory affairs?

19    A.  No.  I have experience and training, but

20  not -- I don't hold a degree or a certification

21  such as the RAC certification.

22    Q.  Have you ever consulted with any

23  pharmaceutical company on the content of their

24  labeling?

25    A.  General terms, yes.

Protected - Subject to Further Protective Review

Page 57

1    Q.  Who?

2    A.  At -- at ENVIRON, when we were working

3    with our clients, the data that we were -- we were

4    often hired to look at science issues that related

5    to labeling.  So the issue there would be that we

6    had -- that we addressed with the companies was

7    whether or not the science issue we were

8    addressing would have an impact on their labeling.

9    Q.  Was this with and for any drug companies?

10    A.  Yes.  At ENVIRON -- at ENVIRON, yes,

11    because we worked with all of the -- well, not

12    all.  We worked with a lot of the major companies

13    through FDA regulatory attorneys.

14    Q.  What companies did you work for at

15    ENVIRON?

16    A.  The companies that I can -- that I can

17    list for you, many of them may not have the same

18    name.  I'll just warn you of that.  Because

19    there's been a lot of mergers in the industry.  So

20    we worked for Schering-Plough, for Merck, for

21    Abbott, for Eli Lilly, for Johnson & Johnson, for

22    maybe McNeil -- I'm not sure on McNeil -- for

23    Glaxo Wellcome at the time.  Those are the ones

24    off the top of my head.  And -- and then several

25    other companies that were smaller.  There was a

Golkow Technologies,  Inc - 877.370.3377

Protected - Subject to Further Protective Review

Page 76

1    A.  Now it is.  Yes.

2    Q.  And I see you billed Mr. McWilliams

3  through Integrative Biostrategies, LLC?

4    A.  Yes.  All of my work is through

5  Integrative Biostrategies, with the exception of

6  my patent work, where I work through a law firm.

7    Q.  And what is the percentage of Bio --

8  Integrative Biostrategies' income from serving as

9  an expert witness as compared to other work?

10    A.  I can't give you an exact figure.  But

11  it's about 50 percent of the -- of my income comes

12  through litigation, about 30 percent of my work

13  through litigation.

14    Q.  And how much of that litigation work is

15  plaintiff versus defendant work?

16    A.  Depends on the -- on the area of

17  litigation.  It -- it -- it varies by the area.

18    Q.  Against pharmaceutical companies or

19  involving prescription medicines, it's 100 percent

20  plaintiff work, isn't it?

21    A.  Currently, yes, it is.  That's true.

22    Q.  Why don't you take a look at Plunkett

23  No. 7, please, which is your expert report.  And

24  I'd like to ask you about your list of cases and

25  work that you've done, Appendix B, deposition and

Protected - Subject to Further Protective Review

Page 94

1   suing each other, so I -- I was providing

2   testimony on behalf of a drug company on toxicity

3   and risk.

4        Q.  And which -- which case is that?

5        A.  Oh, not Foley Mansfield.  I'm sorry.

6   That's the -- that's the Rodan & Fields.

7        Q.  So you went --

8        A.  There's another law -- there's another

9   firm.  Hold on.  Let me look.  Apologize.  There's

10  a case for Morgan, Lewis & Bockius.  And maybe it

11  was before this list goes for -- that far back.

12  It may have been earlier in 2011.  So no, I don't

13  have one on this list, I don't believe.

14       Q.  So I'll just restate my question to be

15  clear.

16           On this list of 61 cases, now 62 with the

17  case you added or 61 entries here, there's not a

18  single one where you testified on behalf of a drug

19  company and against a plaintiff; is that correct?

20           MR. DENTON:

21               Object to the form.

22           THE WITNESS:

23               Well, I would -- I would argue that

24           not all 61 are drug cases.  But certainly

25           I would agree of the subset that are drug

Case 2:14-md-02592-EEF-MBN Document 5108-8-SEALED Filed 01/20/17 Page 27 of 49

Protected - Subject to Further Protective Review

Page 95

 1          cases, they have been -- I have -- I have

 2          been testifying on behalf of plaintiffs

 3          against different -- on -- on different

 4          issues where the drug company was being

 5          sued.  Yes.  That is true.

 6   BY MR. IRWIN:

 7      Q.  One hundred percent of the time; correct?

 8      A.  In these -- in this particular time

 9   period, yes.

10      Q.  There's some other matters you testified

11   that you have done product stewardship over the

12   years.  What is that?

13      A.  You -- are you asking me that I have

14   worked in the area of product stewardship?

15      Q.  Yeah.  Yes, ma'am.

16      A.  So my definition of product stewardship

17   would be looking at -- working on regulatory

18   issues that have to -- that deal with products as

19   they have -- after they have been marketed.  So it

20   would -- might not be a drug.  It could be a drug.

21   I have worked on drug product stewardship, but

22   also on a variety of different types of consumer

23   products as well.  So it's the idea of what is the

24   -- the duty of different manufacturers for

25   different type of products once the product has

USCA5 111

Protected - Subject to Further Protective Review

Page 152

1          by a compound.

2     BY MR. HOROWITZ:

3          Q.  So some of your work over your years in

4     consulting with respect to pharmacology has

5     touched on atrial fibrillation.  Is that fair?

6          A.  That's true.  As one of a variety of

7     different types of arrhythmias.

8          Q.  And you talked about the fact that you are

9     not a medical doctor.  I don't need to ask you

10    that question again.  But I do want to ask you

11    some other questions surrounding that.  Okay?

12         A.  Okay.

13         Q.  So is it fair to say you've never treated

14    a patient for atrial fibrillation?

15         A.  Yes.  That's true.

16         Q.  You've never treated a patient who has had

17    a stroke?

18         A.  No.  I have not.

19         Q.  You've never treated a patient who has had

20    venous thromboembolism such as DVT or PE?

21         A.  No.  I have not.

22         Q.  You've never treated a patient with

23    internal bleeding?

24         A.  No.  I have not.

25         Q.  And of course you've never prescribed an

Protected - Subject to Further Protective Review

Page 153

1    anticoagulant?

2         A.   No.  I have not done that.

3         Q.   And of course that means you've never

4    prescribed Xarelto?

5         A.   That is correct.

6         Q.   You've never assessed a patient's bleeding

7    risk in the context of anticoagulation therapy?

8              MR. DENTON:

9                   Object to the form.

10             THE WITNESS:

11                  Not as in making a patient decision.

12             No.  But certainly when you look at the

13             clinical data for -- for drugs, the issue

14             is looking at the risk of -- of bleeding,

15             for example, or the risk of stroke.  So I

16             have looked at it in that sense within the

17             data, a dataset.  But I have not made a

18             patient decision or looked at a patient's

19             risk.  No.

20   BY MR. HOROWITZ:

21        Q.   Are you talking about datasets you've

22   looked at for purposes of preparing your expert

23   report in this case?

24        A.   Yes.  Some of the -- some of the ROCKET

25   data.  Yes.

Protected - Subject to Further Protective Review

Page 154

1    Q.  Okay.  And so again, that's in the context

2  of litigation?

3    A.  Yes.

4    Q.  You've never experience [sic] in balancing

5  a patient's risk -- a particular patient's risk of

6  a stroke against the risk of a bleed?

7    A.  Again, in the context of the datasets,

8  yes, looking at patients overall, but not a

9  specific patient.  Because I don't -- I'm not a

10  physician.  I do not treat patients.

11    Q.  So it's fair to say that you're not

12  somebody who on a day-to-day basis, like the

13  doctors who prescribe this drug, have to face that

14  task of balancing a particular patient's risk of a

15  stroke against the risk of a bleed when

16  prescribing one of these drugs?

17    A.  Not as a physician.  Yes.  And my only

18  venue into that was looking specifically at risks

19  in my mother-in-law, but that's a different issue.

20  You're talking about patient decisions.

21    Q.  Right.

22    A.  No.  I do not do that.

23    Q.  I just need to ask you.  Because when you

24  -- but are you relying upon -- because it's a

25  different animal, in my view, as a lawyer.

Protected - Subject to Further Protective Review

Page 155

1       Are you relying upon your conversation
2   with your mother-in-law's doctor and the research
3   that you did surrounding that for purposes of
4   forming your opinions in this case?
5       A.  I don't think I relied on it for purposes
6   of forming my opinions in this case.  But
7   certainly it's part of my experience, because I've
8   had that conversation with a doctor and I have
9   made a judgment about what I believed his
10  knowledge was, for example, or lack of knowledge
11  about the pharmacology of the drugs.  But other
12  than that, it's not something that I have -- I
13  don't think I've expressed an opinion like that
14  specifically in my report here.
15      Q.  When was that conversation and the --
16      A.  It would have been -- I said five.  It may
17  have only been three years ago.  I don't recall
18  the exact date.  It's been several years ago.
19      Q.  And specifically now, what was the -- the
20  -- what'd you look at?  What did you -- what did
21  you do when you said you did some research?  What
22  did you go look at to -- to get up to speed?
23      A.  Well, I was familiar with my -- my
24  mother-in-law's medical history already.  So I
25  essentially made a list of the things -- the drugs

Protected - Subject to Further Protective Review

Page 308

1   familiar with this.

2       Q.  Well, you keep saying that.  But you're

3   the one who cited the bioequivalence slide deck;

4   right?

5       A.  Yes.

6           And I'm -- I'm -- I'm trying to give you

7   some idea of the way that different contexts will

8   define it.  In the regulatory definition, the only

9   one I can find is this one within the

10  bioequivalence section.  Bioequivalence

11  definitions, however, are not necessarily apples

12  and oranges to Xarelto.

13          But I have no problem.  I absolutely agree

14  that it is defined there.  And I have cited it for

15  you here as well.  The reason I cited it is I

16  thought this slide deck and this -- this

17  discussion, which was right around the time that

18  the drug was approved, was pertinent to the

19  thinking of the FDA at the time that this drug --

20  the drug application was being reviewed.

21          MR. HOROWITZ:

22              Objection.  Move to strike.

23          Nonresponsive.

24  BY MR. HOROWITZ:

25      Q.  Is it fair to say that you do not cite 21

Protected - Subject to Further Protective Review

Page 349

1          I haven't formed that opinion, that

2          it's -- because I do believe it can be

3          monitored safely if monitoring is done.

4    BY MR. HOROWITZ:

5      Q.  No.  That's not my question.

6      A.  I -- I answered the question first.  I

7    said I haven't formed that opinion, but I do

8    believe that the drug can be used safely as long

9    as there is the understanding that monitoring

10   would definitely improve patient safety.  I do

11   believe the labeling should be changed.

12          MR. HOROWITZ:

13          Objection.  Move to strike.

14   BY MR. HOROWITZ:

15     Q.  My question is:  Do you believe that

16   Xarelto should not be on the market in the absence

17   of a monitoring requirement?

18          MR. DENTON:

19          Object to the form.

20          THE WITNESS:

21          I haven't formed the opinion as you

22          state it.  But I guess that would be the

23          ultimate conclusion since I believe that

24          the labeling should be changed.

25          So the issue would be -- giving

Protected - Subject to Further Protective Review

Page 350

1         physicians that information may be enough.

2         If you tell physicians that there is a --

3         in -- in the labeling, that there is an

4         important tool of monitoring, regardless

5         of whether you make a statement on the

6         label, You must monitor, I believe

7         physicians would do that.

8    BY MR. HOROWITZ:

9        Q.  And by "monitor," you're referring to

10   using the PT assay as a means to measure

11   anticoagulation activity or plasma concentration?

12       A.  It's understanding -- yes.  It's

13   understanding where the patient falls in terms of

14   exposure response.

15       Q.  Is it your view that FDA never should have

16   approved Xarelto in the absence of a monitoring

17   recommendation?

18       A.  I --

19           MR. DENTON:

20               Object to the form.

21           THE WITNESS:

22               -- have not formed that opinion.

23   BY MR. HOROWITZ:

24       Q.  You simply aren't opining one way or the

25   other?

USCA5 118

Protected - Subject to Further Protective Review

Page 358

1    safety is number one.

2      Q.  Is it your -- I've let you do this a few

3    times, so I have to ask you this question.

4         Are you -- are you intending to opine as

5    to what the company knew and didn't know and what

6    the company was aware and not aware of and what

7    the company's state of mind was?

8      A.  I don't think I can tell you what the

9    company's state of mind was.  But I can tell you

10   what they knew if I have a document that shows

11   it's their data.  So yes, if I am asked a question

12   about what did the company know, if I can point to

13   a document which is their own data submitted as

14   part of the NDA, then they know that.  Yes.  So I

15   think that's an appropriate "knew."

16        Would I try to opine that they should have

17   known if I don't have a document to point to?  No.

18   I don't intend to do that.

19     Q.  And you agree, though, that you can't talk

20   about the company's state of mind; right?

21     A.  No.  I tend not to talk about state of

22   mind.  Usually documents will speak for themselves

23   on that issue.

24     Q.  Right.  Fair enough.

25        With respect to -- how often are you

Protected - Subject to Further Protective Review

Page 546

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  XARELTO              )
(RIVAROXABAN) PRODUCTS  )
LIABILITY LITIGATION    )   MDL No.:  2592
                        )   Section:  L
                        )   Judge Eldon E. Fallon
                        )   Mag. Judge North
                        )
THIS DOCUMENT RELATES   )
TO ALL CASES            )


PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW
VOLUME II


    Videotaped Deposition of LAURA M. PLUNKETT,
Ph.D., taken on Wednesday, December 7, 2016, in
the office of The Lambert Firm, A.P.L.C., 701
Magazine Street, New Orleans, Louisiana 70130,
commencing at 8:34 a.m.


Reported by:
AURORA M. PERRIEN
CERTIFIED COURT REPORTER
REGISTERED PROFESSIONAL REPORTER

Protected - Subject to Further Protective Review

Page 550

```
 1              A P P E A R A N C E S
 2   REPRESENTING PLAINTIFFS:
 3          GAINSBURGH, BENJAMIN, DAVID, MEUNIER &
            WARSHAUER, L.L.C.
 4          BY:  GERALD E. MEUNIER, ESQ.
            1100 Poydras Street, Suite 2800
 5          New Orleans, Louisiana 70163-2800
            504.522.2304
 6          Gmeunier@gainsben.com
 7
 8   REPRESENTING BAYER HEALTHCARE PHARMACEUTICALS,
     INC., and BAYER PHARMA AG:
 9
            KAYE SCHOLER, L.L.P.
10          BY:  JEFFREY H. HOROWITZ, ESQ.
            250 West 55th Street
11          New York, New York 10019-9710
            212.836.7572
12          Jeffrey.horowitz@kayescholer.com
13          BRADLEY, ARANT, BOULT, CUMMINGS, L.L.P.
            BY:  LINDSEY C. BONEY, IV, ESQ.
14          1819 Fifth Avenue North
            Birmingham, Alabama 35203-2119
15          205.521.8914
            Lboney@bradley.com
16
17
18
19
20
21
22
23
24
25
```

USCA5 121

Protected - Subject to Further Protective Review

Page 551

1    REPRESENTING JANSSEN PHARMACEUTICALS, INC.,
     JANSSEN RESEARCH & DEVELOPMENT, L.L.C., JANSSEN
2    ORTHO, L.L.C.:
3           IRWIN, FRITCHIE, URQUHART & MOORE, L.L.C.
            BY:  JAMES B. IRWIN, ESQ.
4           400 Poydras Street, Suite 2700
            New Orleans, Louisiana 70130-3280
5           504.310.2106
            Jirwin@irwinllc.com
6
            IRWIN, FRITCHIE, URQUHART & MOORE, L.L.C.
7           BY:  MEERA U. SOSSAMON, ESQ.
            400 Poydras Street, Suite 2700
8           New Orleans, Louisiana 70130-3280
            504.310.2106
9           Msossamon@irwinllc.com
10
11   ALSO PRESENT:
12          MARK ANCALADE, VIDEOGRAPHER
13
14
15
16
17
18
19
20
21
22
23
24
25

USCA5 122

Protected - Subject to Further Protective Review

Page 552

1                   S T I P U L A T I O N
2       It is stipulated by and among Counsel that
3    the videotaped deposition of LAURA M. PLUNKETT,
4    Ph.D., is being taken under the Federal Rules of
5    Civil Procedure for all purposes permitted under
6    the law.
7       The formalities of reading and signing are
8    not waived.
9       The formalities of sealing, certification
10   and filing are not hereby waived.  The party
11   responsible for services of the discovery material
12   shall retain the original.
13      All objections, except those as to the
14   form of the questions and/or the responsiveness of
15   the answers, are reserved until the time of the
16   trial of this cause.
17                *   *   *   *   *
18              Aurora M. Perrien, Certified Court
19   Reporter, Registered Professional Reporter, in and
20   for the State of Louisiana, officiated in
21   administering the oath to the witness.
22
23
24
25

USCA5 123

Protected - Subject to Further Protective Review

1  of plasma concentration, then you would have

2  expected these patients to bleed?

3      A.  Not necessarily.  That's not necessarily

4  true.

5          There's some -- there's some

6  considerations for these massive overdoses about

7  the -- well, one of your cases they used charcoal

8  to remove the -- the drug.  So in that case, you

9  -- you're not even -- it's main -- you don't

10  really even know how big the dose really was

11  because they did it within three house, so a lot

12  of the drug may not have actually been absorbed at

13  that point.  Absorption is -- is different.  You

14  get much lower absorption of the drug with very,

15  very high doses.  So there's changes.  There's

16  differences.

17          But again, I don't disagree.  But I still

18  believe that the higher doses of the drug and

19  higher blood levels indicate a increased risk of

20  bleed.  But not everybody will bleed.  I don't

21  disagree with that either.

22      Q.  And with respect to the clinical analysis

23  of the individual patients, you're not a medical

24  doctor; correct?

25      A.  I'm not a medical doctor.  No.

Protected - Subject to Further Protective Review

Page 611

1    Q.  And you don't make diagnoses or treat

2    these conditions yourself; correct?

3    A.  No.  I do not do that.

4    Q.  And -- we'll leave it there.

5         Let's go to Paragraphs -- oh, I'm -- yeah,

6    Paragraph 29.  Do you -- or -- I mean, let me ask

7    you generally.  Maybe we can shortcut this.

8         But are you going to offer the opinion

9    that relative -- well, let me ask it this way:

10   Are you going to offer the opinion that the

11   highest level of interpatient variability among

12   the various NOACs is rivaroxaban, that rivaroxaban

13   has the highest among the various NOACs?

14   A.  I don't think I formed that opinion.  I --

15   I talk about -- in this paragraph about there are

16   differences among them, and I'm talking about how

17   those differences can be important to making a

18   choice.  But no, I don't think I've formed the

19   opinion at this point that you're describing for

20   me.

21   Q.  Is it fair to say then that you have not

22   formed an opinion, using your phraseology, to a

23   reasonable degree of scientific certainty, that

24   Xarelto has the highest interpatient variability

25   of all the NOACs?

Case 2:14-md-02592-EEF-MBN Document 5108-5 *SEALED* Filed 01/20/17 Page 42 of 49

Protected - Subject to Further Protective Review

```
                                                    Page 646

 1        Q.   Okay.

 2        A.   Yes.

 3        Q.   And then let's take -- let's take a quick

 4   look at labeling.  If you flip over to Page 7.  At

 5   the bottom bullet point on Page 7, I want to kind

 6   of go through the same exercise, Dr. Plunkett.  I

 7   want to try to understand what your concerns about

 8   the labeling were.  I thought I identified three.

 9   And let me see if you can help me understand.

10             Number 1, you thought the labeling was

11   inadequate because of a lack of description.  And

12   we'll ask you -- I'll ask you what you mean by

13   this:  of interpatient variability?

14        A.   Yes.  There was more to it.  I say "in

15   . . . pharmacokinetics and pharmacodynamics . . .

16   characteristic of" use of "Xarelto."

17        Q.   Okay.

18        A.   Yes.

19        Q.   Would it be fair to categorize that as a

20   -- for purposes of us discussing it as

21   interpatient variability?

22        A.   I actually use that term here.

23        Q.   Okay.

24        A.   I call it "inter-individual."  And I'm

25   pointing out to interpatient because that's where
```

Protected - Subject to Further Protective Review

Page 647

 1    the variability shows up, when you get to patient

 2    populations.

 3         Q.  Understood.

 4              And then another area that you think was

 5    inadequately labeled was the failure of the

 6    labeling to disclose a linear correlation between

 7    rivaroxaban and PT time; is that right?

 8         A.  Yes.  In -- as a marker for drug --

 9         Q.  Okay.

10         A.  -- a drug exposure monitoring.

11         Q.  So do I have that generally right?

12         A.  Yes.  You have that generally right.

13         Q.  Okay.  And then another was -- and I

14    didn't understand this one.  I thought I did the

15    first two.  Limitations or inadequacies if you

16    would -- inadequacies, if you will, regarding

17    exposure-response relationship.

18         A.  So you want me to explain that to you?

19         Q.  Please.  Yeah.

20         A.  So I'm -- and this -- this -- this section

21    or this -- this opinion that I'm -- I'm fleshing

22    out is I'm describing for you -- the doctors

23    should need to be told about what the ROCKET data

24    itself showed as far as the relationship between

25    prothrombin time and bleeding risk.  And I

USCA5 127

Protected - Subject to Further Protective Review

Page 648

1    think --

2        Q.   Okay.

3        A.   -- that's what this sentence says.   It

4    says --

5        Q.   Okay.

6        A.   -- that there was an exposure-response

7    relationship shown in that trial between PT and

8    major bleeding, which is a safety issue.   As we

9    know, there's a warning for bleeding within the

10   label.

11       Q.   And the -- the discussion about

12   interpatient variability, is that discussion set

13   forth primarily in Paragraph 52 of your report?

14       A.   Let me look.   Are you asking me if that's

15   the only paragraph?

16       Q.   I used the word "primarily."

17       A.   Okay.   I would say that it's primarily

18   that paragraph and then paragraphs -- also 56.

19       Q.   Okay.

20       A.   And we discussed another one yesterday, I

21   thought, as well.   Let me look.

22       Q.   And the issue about the label not

23   adequately describing the linear correlation with

24   rivaroxaban blood levels as a surrogate marker, is

25   that paragraph primarily described in

Protected - Subject to Further Protective Review

Page 683

1    marker" -- "marker for drug blood level."

2           Is that a concept that should have been in

3    the labeling, in your opinion?

4       A.  Yes.  And I think that's what I'm telling

5    you in my report.  And I think there's -- you went

6    over this earlier.  There's three things that --

7    concepts that I think were important to provide

8    physicians with in order for them to be able to

9    use the drug effectively and safely.

10      Q.  You know that labeling -- labeling of the

11   -- any pharmaceutical product that goes to the

12   market is the responsibility of the sponsor;

13   correct?

14      A.  Yes.

15      Q.  Meaning here it's the responsibility of

16   Janssen to properly -- properly label its

17   medicine; correct?

18      A.  Yes.

19      Q.  But it's also well-known that the FDA has

20   the final say and control over that language;

21   correct?

22      A.  Are you asking me --

23           MR. MEUNIER:

24                Objection to form.

25           THE WITNESS:

USCA5 129

Case 2:14-md-02592-EEF-MBN Document 5108-8 *SEALED* Filed 01/20/17 Page 46 of 49

Protected - Subject to Further Protective Review

Page 684

```
 1              If -- if what you're -- if it -- I
 2          would say yes if what you're -- you're
 3          asking me is that the FD -- it's a
 4          back-and-forth negotiation.  And yes, FDA
 5          approves the final printed labeling.  Yes.
 6          That is true.
 7   BY MR. IRWIN:
 8      Q.  And --
 9      A.  But it is a negotiative process.
10      Q.  But the back and forth will also -- will
11   often be revealed in correspondence between the
12   company and the FDA when the company may propose
13   some language and the FDA may strike it.  The FDA
14   may propose some language, and the company may try
15   to suggest to the FDA some edits to that language.
16   That's the back and forth you're talking about?
17      A.  Well, that's one of the back-and-forths.
18   That -- I think what you're talking about
19   there you typically see at approval.  So there's
20   draft labeling that's sent in with the NDA.  And
21   there's always a back and forth on that.  I mean,
22   I -- that's -- I would not be -- I -- I mean, I'd
23   be surprised if there wasn't.
24              But then there can be -- after the drug is
25   approved, there's different ways that information
```

USCA5 130

Case 2:14-md-02592-EEF-MBN Document 5108-5 *SEALED* Filed 01/20/17 Page 47 of 49

Protected - Subject to Further Protective Review

Page 689

```
 1      Q.  All right.
 2      A.  -- since I don't recall this one.  Okay.
 3   Page 29, I'm there.
 4      Q.  Under Section 12.2, Pharmacodynamics, do
 5   you see that?
 6      A.  Yes.
 7      Q.  You can see the red language -- the
 8   redlining that was added there by the sponsor.  Do
 9   you see that?
10      A.  Well, I can't confirm that this was added
11   by the sponsor because you haven't told me which
12   version -- there's not a cover memo, is there,
13   that tells me this was an FDA -- there's usually a
14   memo that tells me this is FDA's comments.  This
15   says "comments," but I don't know which one it's
16   from too.  So . . .
17      Q.  I want you to assume for my question that
18   we will prove that the redlining -- the red line
19   -- red language that you see in that paragraph,
20   12.2, was language authored by the sponsor,
21   Janssen.  Okay?
22      A.  I can assume that.  Absolutely.
23      Q.  All right.
24      A.  That's fine.
25      Q.  And then I want you to further assume that
```

USCA5 131

Case 2:14-md-02592-EEF-MBN Document 5108-5 Filed 01/20/17 Page 48 of 49

Protected - Subject to Further Protective Review

Page 690

1    the strike-through was done by the FDA in response

2    to that proposed language by Janssen.  Okay?

3        A.  I can assume that.

4        Q.  All right.  I want you to read the

5    strike-through, beginning with the words "The

6    relationship."

7        A.  "The relationship between PT and

8    rivaroxaban plasma concentration is linear and

9    closely correlated."

10       Q.  Okay.  Stop.

11           That was some of the language that you

12   thought should have been put in the label;

13   correct?

14       A.  I didn't say that -- that sentence, but

15   that's the concept.  Yes.  I thought there should

16   be a concept of that within the label.

17       Q.  Actually, it's almost word for word what

18   we just read from your bullet point, isn't it?

19       A.  I don't think I -- I don't think I said

20   "closely correlated," actually.

21       Q.  Well, let's read what you said --

22       A.  I think I said "linear" and "correlated."

23       Q.  Let's read what you said in the bullet

24   point for the record.  You said, "Second, the

25   label does not adequately describe the

USCA5 132

Protected - Subject to Further Protective Review

Page 691

1    pharmacodynamics" -- this is under the

2    pharmacodynamics section; correct?

3        A.   It is.

4        Q.   "The label does not adequately describe

5    that the pharmacodynamics measurement tool,

6    prothrombin time, is linearly correlated with

7    rivaroxaban blood levels and can be used as a

8    surrogate marker for drug" level blood -- "drug

9    blood level."

10            That's what you wrote in your summary of

11   your opinion; correct?

12       A.   That is correct.

13       Q.   Why don't you continue reading with the

14   next sentence.

15       A.   "If assessment of the pharmacodynamic

16   effect of rivaroxaban is considered necessary in

17   individual cases, PT (measured" of -- "in seconds)

18   is recommended.  The Neoplastin PT assay was

19   measured in the RECORD program and the median

20   (with 5," slash, "95 percentiles)," close quotes,

21   "for PT," in quotes, "(Neoplastin)," end quote,

22   "2 to 4 hours after tablet intake (i.e., at the

23   time of maximum effect) was 18," in parens, "(13

24   to 26,)" end parens, "seconds.  The International

25   Normalized Ratio," parens, "(INR)," close parens,

USCA5 133