# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

IN RE:  XARELTO (RIVAROXABAN)          MDL No. 2592
PRODUCTS LIABILITY LITIGATION

                                             SECTION L

THIS DOCUMENT RELATES TO:         JUDGE ELDON E. FALLON

Joseph J. Boudreaux, Jr., et al. v. Janssen et al.     MAGISTRATE NORTH
Case No. 2:14-cv-02720

Joseph Orr, Jr., et al. v. Janssen et al.
Case No. 2:15-cv-03708


## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE GROUND THAT FEDERAL LAW PREEMPTS PLAINTIFFS' DOSING, MONITORING, AND OTHER DESIGN-RELATED CLAIMS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF THE CASE.............................................................................................. 4

I.      Regulatory Framework and Background ....................................................... 4

        A.      The FDA Approval Process ................................................................ 4

        B.      FDA's Approval of Xarelto .............................................................. 6

II.     Plaintiffs' Dosing, Monitoring, and Other Design-Related Theories ................ 8

LEGAL FRAMEWORK ...................................................................................................... 9

ARGUMENT .................................................................................................................... 10

I.      Federal law preempts Plaintiffs' claim that Xarelto is unreasonably dangerous
        because the medicine's FDA-approved dosages are too high or should be reduced. ....... 10

        A.      Plaintiffs' dosing-related theories challenge Xarelto's FDA-approved
                design. ............................................................................................ 12

        B.      Plaintiffs' dosing-related theories are preempted by federal law, which
                categorically forbids Defendants to "independently" change Xarelto's
                design, including its FDA-approved dosages. ..................................... 12

                1.      Applicable FDA regulations prevent Defendants from
                        independently changing Xarelto's FDA-approved dosage. ..................... 13

                2.      Analogous cases make clear that because Defendants cannot
                        independently change Xarelto's FDA-approved dosage, Plaintiffs'
                        dosing-related theories are preempted. .................................... 15

                3.      The recent *Guidry* decision is both distinguishable and contrary to
                        Supreme Court precedent........................................................ 18

II.     Federal law preempts Plaintiffs' claim that Xarelto is unreasonably dangerous
        because it does not entail a requirement or recommendation that doctors monitor
        their patients' Xarelto-related coagulation parameters. .................................... 22

        A.      Plaintiffs' monitoring-related theories are inextricably intertwined with
                their dosing arguments, and are preempted for the same reasons........................ 23

i

B.     Plaintiffs' monitoring-related theories are preempted because Defendants cannot "independently" alter Xarelto's design or labeling to incorporate PT monitoring, as no PT test or assay has been cleared or approved for use in conjunction with Xarelto and any such use would require prior FDA authorization. ................................................................................................. 23

C.     Plaintiffs' monitoring-related theories are further preempted because "clear evidence" demonstrates that FDA would have rejected—and in fact did reject—a proposal to add PT-monitoring language to Xarelto's label. ............... 26

III.   Federal law preempts Plaintiffs' claim that Xarelto is unreasonably dangerous in the absence of a reversal agent. ........................................................................... 28

CONCLUSION ................................................................................................................. 30

# TABLE OF AUTHORITIES

## Cases

*Amos v. Biogen Idec Inc.*,
  28 F. Supp. 3d 164 (W.D.N.Y. 2014) ............................................................................... 10

*Barcal v. EMD Serono, Inc.*,
  No. 5:14-cv-01709, 2016 WL 1086028 (N.D. Ala. Mar. 21, 2016) .......... 6, 10, 18, 19, 21

*Batoh v. McNeil-PPC, Inc.*,
  No. 3:14-cv-01462, 2016 WL 922779 (D. Conn. Mar. 10, 2016) ............................ 10, 19

*Booker v. Johnson & Johnson*,
  54 F. Supp. 3d 868 (N.D. Ohio 2014) ....................................................................... 10, 18

*Brazil v. Janssen Research & Development LLC*,
  Civ. A. No. 4:15-CV-0204, 2016 WL 3748771 (N.D. Ga. July 11, 2016)..... 10, 18, 19, 21

*Bruesewitz v. Wyeth, Inc.*,
  561 F.3d 233 (3d Cir. 2009), *aff'd*, 131 S. Ct. 1068 (2011) ............................................. 6

*Christison v. Biogen Idec Inc.*,
  __ F. Supp. 3d __, 2016 WL 4223956 (D. Utah Aug. 5, 2016)....................................... 26

*Dobbs v. Wyeth Pharm.*,
  797 F. Supp. 2d 1264 (W.D. Okla. 2011) ....................................................................... 26

*Estate of Cassel v. Alza Corp.*,
  No. 12-CV-771-WMC, 2014 WL 856023 (W.D. Wis. Mar. 5, 2014) ............................ 10

*Fleming v. Janssen Pharmaceuticals, Inc.*,
  No. 2:15-cv-02799, 2016 WL 3180299 (W.D. Tenn. May 6, 2016) ............................... 10

*Freightliner Corp. v. Myrick*,
  514 U.S. 280 (1995).......................................................................................................... 9

*Geier v. American Honda Motor Co.*,
  529 U.S. 861 (2000)........................................................................................................... 9

*Guidry v. Janssen Pharmaceuticals, Inc.*,
  Civ. A. No. 15-4591, 2016 WL 4508342 (E.D. La. Aug. 29, 2016) ........................ 18–21

*Harris v. Merck & Co., Inc.*,
  Civ. A. No. 12-1446, 2012 WL 5384720 (W.D. La. Nov. 1, 2012) ................................ 12

*In re Celexa & Lexapro Mktg. & Sales Practices Litig.*,
  779 F.3d 34 (1st Cir. 2015) ............................................................................................. 10

*In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*,
    756 F.3d 917 (6th Cir. 2014) ....................................................................... 10

*In re Depakote*,
    87 F. Supp. 3d 916 (S.D. Ill. 2015) ............................................................ 26

*In re Fosamax Prods. Liab. Litig.*,
    951 F. Supp. 2d 695 (D.N.J. 2013) ............................................................ 26

*Lofton v. McNeil Consumer & Specialty Pharm.*,
    672 F.3d 372 (5th Cir. 2012) ....................................................................... 10

*Mutual Pharm. Co. v. Bartlett*,
    133 S. Ct. 2466 (2013) ........................................................................... passim

*Newman v. McNeil Consumer Healthcare*,
    No. 10-CV-01541, 2012 WL 39793 (N.D. Ill. Jan. 9, 2012) .......................... 27

*PLIVA, Inc. v. Mensing*,
    564 U.S. 604 (2011) ............................................................................... passim

*Rheinfrank v. Abbott Labs., Inc.*,
    No. 1:13-cv-144, 2015 WL 5836973 (S.D. Ohio Oct. 2, 2015) ................ 10, 26

*Seufert v. Merck Sharp & Dohme Corp.*,
    __ F. Supp. 3d __, 2016 WL 3369512 (S.D. Cal. May 11, 2016) .................. 27

*Theriot v. Danek Medical, Inc.*,
    168 F.3d 253 (5th Cir. 1999) ....................................................................... 11

*Thompson v. Allergan USA, Inc.*,
    993 F. Supp. 2d 1007 (E.D. Mo. 2014) ................................................... 10, 18

*United States v. Baxter Healthcare Corp.*,
    901 F.2d 1401 (7th Cir. 1990) ..................................................................... 13

*Utts v. Bristol-Myers Squibb Co.*,
    No. 1:16-cv-02899-DLC, 2016 WL 7429449 (S.D.N.Y. Dec. 23, 2016)......... 17–19

*Wollens v. Merck & Co., Inc.*,
    No. 12-1408, 2012 WL 6504210 (E.D. La. Dec. 13, 2012) ........................... 12

*Wyeth v. Levine*,
    555 U.S. 555 (2009) ............................................................................... passim

*Yates v. Ortho-McNeil-Janssen*,
    808 F.3d 281 (6th Cir. 2015) ................................................................. passim

**Constitution**

U.S. Const. art. VI cl. 2 ................................................................................................ 9

**Statutes**

21 U.S.C. § 355 ....................................................................................................... 13

21 U.S.C. § 355(a) ............................................................................................ 4, 5, 13

21 U.S.C. § 355(b) ................................................................................................... 20

21 U.S.C. § 355(b)(1) ............................................................................................ 4, 5

21 U.S.C. § 355(d) ..................................................................................................... 5

42 U.S.C. § 262(a) ................................................................................................... 30

42 U.S.C. § 262(j) .................................................................................................... 29

**Regulations**

21 C.F.R. § 201.57(a) ............................................................................................. 22

21 C.F.R. § 310.3 ..................................................................................................... 13

21 C.F.R. § 310.3(h)(5) ........................................................................................... 13

21 C.F.R. § 312.21 ..................................................................................................... 5

21 C.F.R. § 314.105 ............................................................................................. 5, 20

21 C.F.R. § 314.110(a) .............................................................................................. 5

21 C.F.R. § 314.3(b) ............................................................................................... 22

21 C.F.R. § 314.70(b) ............................................................................................. 13

21 C.F.R. § 314.70(b)(2)(i) ..................................................................... 14, 15, 16, 17

21 C.F.R. § 314.70(b)(2)(v)(A) ................................................................................. 6

21 C.F.R. § 314.70(b)(2)(v)(C) ............................................................................... 22

21 C.F.R. § 314.70(b)(i) .......................................................................................... 13

21 C.F.R. § 314.70(c)(6)(iii) ................................................................................. 6, 22

21 C.F.R. § 314.70(d)(2)(ix) ................................................................................... 22

2844773-1

21 C.F.R. § 320.21(c) ................................................................................................ 14

21 C.F.R. § 807.81(a)(3)(ii) ...................................................................................... 24

21 C.F.R. § 814.39(a) ................................................................................................ 25

**Other Authorities**

Drugs@FDA Glossary of Terms ................................................................................ 14

FDA, CDER, Guidance for Industry, *Changes to an Approved NDA or ANDA*,
2004 WL 3199016 (April 2004) ...................................................................... 14

FDA Cross-Discipline Team Leader Review (NDA 202439) ...................................... 6

FDA, Orange Book ..................................................................................................... 14

FDA: Center for Devices and Radiological Health, Transcript,
*In Vitro Diagnostic Testing for Direct Oral Anticoagulants* (Oct. 26, 2015) ................. 23

FDA: Center for Drug Evaluation and Research, *ROCKET AF Reanalysis Reviews*
(Sept. 26, 2016) ................................................................................................ 1

Guidance for Industry and Food and Drug Administration Staff: In Vitro Companion
Diagnostic Devices (Aug. 6, 2014) ............................................................. 24, 25

PhRMA, Biopharmaceutical Research & Development: The Process Behind New
Medicines (2015) .............................................................................................. 4

Portola Pharmaceuticals, News Release: Portola Pharmaceuticals Receives Complete
Response Letter from FDA for Biologics License Application for AndexXa™
(Aug. 18, 2016) ............................................................................................... 29

vi

Defendants were not obligated to design Xarelto® to fit Plaintiffs' lawyers' post-hoc theories, and Plaintiffs cannot prove that if the medicine had been so designed, testing would have shown it to be safe and effective, or that FDA would have approved it. Plaintiffs' claims are simply a collateral attack on FDA's approval of Xarelto as designed, tested, and labeled, as well as the agency's expert—and recently reaffirmed—determination that Xarelto properly balances safety (in preventing excessive bleeding) and efficacy (in preventing strokes). Because federal law precludes that attack, the Court should grant Defendants partial summary judgment on the ground that federal law preempts Plaintiffs' dosing, monitoring, and other design-related claims.

### INTRODUCTION

This is not the typical pharmaceutical product-liability case. This litigation involves a product, Xarelto (rivaroxaban), that has been approved by health authorities around the globe, remains on the market as one of the world's most successful and innovative medicines, and continues to save lives every day. Indeed, FDA recently—and very publicly—reaffirmed Xarelto's favorable benefit-risk balance after considering some of the very same arguments and theories that Plaintiffs' lawyers and experts have advanced in this litigation. In particular, in September 2016, after conducting an independent re-analysis of the data underlying the ROCKET AF study that supported Xarelto's initial approval for treatment of patients with non-valvular atrial fibrillation ("AFib"), FDA reaffirmed "the conclusion [it] made in 2011 that the benefits of rivaroxaban in patients with [AFib] outweigh the risks ...." FDA: Center for Drug Evaluation and Research, *ROCKET AF Reanalysis Reviews* § 1.1, at 3 (Sept. 26, 2016) (Exh. 1). So FDA has endorsed Xarelto's safety and efficacy not just in the initial approvals for each of the medicine's five different indications, but now more recently, during the pendency of this litigation.

Nor are Plaintiffs' claims standard pharmaceutical-case fare. Perhaps most significantly, this is not a case in which a plaintiff alleges that a pharmaceutical company failed to warn about

1

the adverse event that he claims to have experienced. *See, e.g.*, *Wyeth v. Levine*, 555 U.S. 555, 558 (2009) (holding that manufacturer failed to warn that "IV push" method of injection could cause gangrene). Plaintiffs here do not seriously dispute that Xarelto's labeling warns about the risk of bleeding, which is associated with all anticoagulants. Nor could they, as Xarelto's label is replete with warnings that use of the drug may increase the "Risk of Bleeding," including "serious or fatal bleeding." *E.g.*, Aug. 2013 USPI (Exh. 2) & Feb. 2014 USPI (Exh. 3) Highlights of Prescribing Information, § 5.2 (Warnings and Precautions). Indeed, the word "bleed" or "bleeding" appears more than 100 times in Xarelto's label. In the same way, Xarelto's Medication Guide—a plain-English explanation of a medicine's most significant prescribing information—warns that "**Xarelto can cause bleeding** which can be serious, and rarely may lead to death." (Exh. 4).

In light of these clear and extensive warnings, Plaintiffs have cast their net more widely and turned to less traditional claims. As relevant here, Plaintiffs challenge Xarelto's FDA-approved dosages and the absence of a recommendation that doctors monitor their patients' Xarelto-related coagulation parameters for dose-adjustment purposes, as well as the lack of a reversal agent. Federal law preempts those claims.

**1.** Most prominently, Plaintiffs assert that Xarelto is defectively designed because the particular dosages approved by FDA for AFib patients—depending on renal function, either 15 or 20 mg "once daily with the evening meal"—render the medicine unreasonably dangerous. Specifically, Plaintiffs contend (1) that the cumulative daily dose should be lower than those approved by FDA, (2) that Xarelto should be dosed twice daily rather than once, as indicated by FDA, and (3) that doctors should be instructed to adjust the agency-approved doses according to the results of coagulation-monitoring tests. These dosing-related claims—all of which challenge Xarelto's FDA-approved design—are preempted by federal law.

2

Plaintiffs' design-defect arguments are both contrary to law and dangerous to public health. The governing law is clear.  Under applicable FDA regulations—and for that matter binding Supreme Court precedent—*no* manufacturer, "whether generic or brand-name," can change an approved medicine's design unilaterally, *i.e.*, without prior FDA approval.  *Mutual Pharm. Co. v. Bartlett*, 133 S. Ct. 2466, 2471 (2013).  Were it to do so, "the altered chemical would be a new drug" requiring new FDA approval.  *Id.* at 2475.  And yet that is *precisely* what Plaintiffs here would have Defendants do—in particular, by altering the dosages that FDA approved for Xarelto. Because Defendants cannot "independently" change agency-approved dosages—and indeed are flatly prohibited from doing so—Plaintiffs dosing-related claims are preempted.  *Id.* at 2470.

As a public-health matter, that *must* be the law.  Plaintiffs' contrary position threatens dangerous chaos.  Neither Congress nor FDA could possibly have intended a regime in which, despite the agency's years-in-the-making determination that a 15 or 20 mg once-daily dose of Xarelto for AFib patients appropriately balances the twin statutory objectives of safety and efficacy, Defendants could simply decide—on their own and without further authorization—that a different dosage would be better.  In Plaintiffs' world, a drug manufacturer could (and on pain of liability, *must*) unilaterally decide, and tell prescribing doctors, "If 20 mg is safe in preventing bleeds, surely 5 mg would be safer"—or, on the same logic as applied to drug efficacy, "If 20 mg is effective in preventing strokes, surely 80 mg would be more effective."  That cannot be right.

**2.**  Relatedly, Plaintiffs assert that Xarelto is unreasonably dangerous on the ground that, as designed, labeled, and approved by FDA, it does not specifically incorporate or entail a requirement that doctors monitor their patients' Xarelto-related coagulation parameters for dose-adjustment purposes—in particular, Plaintiffs say, through prothrombin time ("PT") monitoring.  That claim, too, is preempted for several reasons.  *First*, it is inextricably intertwined with—and thus

preempted for the same reasons as—Plaintiffs' dosing-related claims, inasmuch as the objective of Plaintiffs' proposed monitoring is to enable doctors to deviate from the FDA-approved dosages. *Second*, and in any event, Defendants cannot "independently" alter Xarelto's design or labeling to incorporate a PT-monitoring requirement or recommendation, as no PT test has been cleared or approved for use with Xarelto. And *finally*, "clear evidence" demonstrates that FDA would have rejected (and in fact did reject) an attempt to add PT-monitoring language to Xarelto's label.

**3.** Finally, Plaintiffs assert that Xarelto is defectively designed and unreasonably danger-ous because it was marketed (as its FDA-approved label unambiguously advises) without an anti-dote, or reversal agent. That claim, like Plaintiffs' contention that Xarelto should have been de-signed for use in conjunction with a PT-monitoring assay, is preempted for the simple reason that Defendants cannot "independently" develop and market (or alter Xarelto's design to incorporate) a reversal agent—which, as a separate drug product, requires separate FDA pre-approval.

## STATEMENT OF THE CASE

### I.    Regulatory Framework and Background

#### A.    The FDA Approval Process

Before a manufacturer can "introduce or deliver for introduction into interstate commerce" any new drug, it must submit to FDA a New Drug Application ("NDA"). 21 U.S.C. § 355(a). In the NDA, the manufacturer must describe the drug's composition, provide the data establishing the drug's safety and effectiveness, and propose labeling for the drug. *See id.* § 355(b)(1).

Obtaining an NDA is enormously expensive. The average cost of bringing a new medicine to market has more than doubled during the last decade, to approximately $2.6 billion. *See* PhRMA, Biopharmaceutical Research & Development: The Process Behind New Medi-cines 1 (2015), *available at* http://www.phrma.org/sites/default/files/pdf/rd_bro-chure_022307.pdf (Exh. 5). The drug-development process is not only costly but also "onerous

4

and lengthy." *Bartlett*, 133 S. Ct. at 2471. Getting a medicine from the chemistry lab to the pharmacy shelf takes 10 years on average, and only 12% of candidate medicines ultimately achieve approval. *See* PhRMA (Exh. 5), at 1, 19. The cost and labor involved in developing a new drug result, in large part, from the comprehensiveness of the clinical testing required and the rigor of FDA's review process. In order to obtain FDA approval of a new medicine, a manufacturer must conduct three separate testing "phases." Phase I is designed to assess the proposed drug's pharmacokinetics (*i.e.*, the way the human body affects the drug) and pharmacodynamics (*i.e.*, the way the drug affects the body) and to begin to test the range of possible doses. In Phase II, the manufacturer performs more sensitive dose-ranging studies to pinpoint the appropriate doses for particular uses of the medicine (or "indications") in particular patient populations. Finally, in Phase III, the manufacturer conducts large-scale clinical trials to confirm the safety and efficacy of those indications and doses. *See generally* 21 C.F.R. § 312.21.

If, after a thorough review of the manufacturer's testing data, FDA approves a new drug, its approval covers the medicine's design, manufacture, and labeling. *See* 21 U.S.C. § 355(b)(1); 21 C.F.R. § 314.105. Because a manufacturer may not distribute a drug unless FDA has found it to be safe and effective under the labeled conditions of use, the agency's review and approval of a drug's design and labeling are essential to the NDA process. *See* 21 U.S.C. § 355(a), (d). If FDA determines that any aspect of an NDA is deficient, it will notify the applicant of the deficiencies, which must be corrected before the application is resubmitted. *See, e.g.*, 21 C.F.R. § 314.110(a).

Following FDA approval, except in very narrow circumstances, no manufacturer can unilaterally change the product's design (including dosages) or labeling. Changes to a product's *labeling* require FDA's advance approval except in three enumerated instances, in which the applicable regulations permit the manufacturer that owns a medicine's NDA to make changes to that

2844773-1

product's label, subject to FDA's post-hoc review. *See* 21 C.F.R. § 314.70(b)(2)(v)(A) (requiring prior FDA authorization for "[c]hanges in labeling, except those described in paragraphs (c)(6)(iii), (d)(2)(ix), [and] (d)(2)(x)"); *see also Levine*, 555 U.S. at 573 ("The CBE regulation [*i.e.*, 21 C.F.R. § 314.70(c)(6)(iii)] permitted Wyeth to unilaterally strengthen its warning ….").

The regulations governing product *design* are even more stringent. *See, e.g.*, *Bruesewitz v. Wyeth, Inc.*, 561 F.3d 233, 246 n.8 (3d Cir. 2009) (noting "FDA's far-more extensive control and oversight of the approval of a drug's design and alteration"), *aff'd*, 131 S. Ct. 1068 (2011). Most notably for present purposes, a manufacturer can *never* unilaterally change a drug's design. *See, e.g.*, *Barcal v. EMD Serono, Inc.*, No. 5:14-cv-01709, 2016 WL 1086028, at *4 (N.D. Ala. Mar. 21, 2016) (observing that, as distinguished from FDA's labeling regulations, "no … process exists for [unilateral] changes" to a drug's design). Rather, "were [a pharmaceutical manufacturer] to change the composition of its [medicine], the altered chemical would be a new drug that would require its own NDA to be marketed in interstate commerce." *Bartlett*, 133 S. Ct. at 2475.

## B.   FDA's Approval of Xarelto

Defendants researched, tested, and evaluated Xarelto in tens of thousands of patients through an unprecedented program of clinical trials. FDA exhaustively reviewed the data generated in those trials and engaged in a robust intra-agency debate about Xarelto's safety and efficacy—and in particular, about the safety and efficacy of different dosages.

Indeed, during Xarelto's approval process, FDA wrestled with *the very same issues* that Plaintiffs now make the focus of this litigation. For instance, some at FDA voiced concern—as do Plaintiffs—about a once-daily 20 mg dose for AFib patients. *See* FDA Cross-Discipline Team Leader Review (NDA 202439), at 7, *available at* http://www.accessdata.fda.gov/drugsat-fda_docs/nda/2011/202439Orig1s000CrossR.pdf (Exh. 6). But other agency reviewers disagreed; they emphasized that although "[o]pinions have varied regarding whether or not it was sensible

6

for the applicant to have used the dose/dosing regimen that was used" in the clinical trials underlying the AFib application, there was no basis for concluding "that a different dose or dosing regimen would have provided a better balance of safety and efficacy." *Id.*

There was also debate within FDA about the utility of coagulation monitoring for the purpose of adjusting patient dosages. While some believed—as Plaintiffs now contend—that such monitoring was useful, others disagreed, observing that "at this time there is no . . . proven means to effectively monitor or adjust therapy in individual patients." *Id.* at 4. That discussion—about whether coagulation monitoring is possible for Xarelto (or other NOAC) patients and whether such monitoring would generate clinically useful information—remains ongoing among scientists, FDA, and other health authorities. *See, e.g.*, Robert Temple, *NOAC Dosing: Precision Dosing—Yes!* (presentation to Cardiac Safety Research Consortium; Dec. 3, 2015), *available at* http://cardiac-safety.org/wp-content/uploads/2015/12/S2_1a_Temple.pdf (Exh. 7); Lea Carrington, *In Vitro Diagnostic Testing for Direct Oral Anticoagulants*, at 5–6 (presentation to Center for Devices and Radiological Health public workshop; Oct. 26, 2015) (Exh. 8).

In any event, following this vigorous debate about the safety and efficacy of different dosages and the need for coagulation monitoring, FDA approved Xarelto for prescription to patients. As reflected in the operative label, FDA has approved Xarelto for multiple indications, each time at a specific dose and without a monitoring requirement or recommendation.[1] As particularly relevant to this case, FDA approved Xarelto for the "Reduction in Risk of Stroke in Nonvalvular Atrial Fibrillation." For AFib patients with normal renal function, like Mr. Boudreaux, FDA specified Xarelto's dosage as "20 mg once daily, with the evening meal"; for patients with impaired

---

[1] Indeed, Xarelto's label states that "[t]he anticoagulant effect of XARELTO cannot be reliably monitored with standard laboratory testing …." Aug. 2013 USPI §§ 5.7, 8.1; Feb. 2014 USPI §§ 5.7, 8.1. The August 2013 label was in effect when Mr. Boudreaux began to use Xarelto, and the February 2014 version was in effect when Mrs. Orr began to use the medicine. As relevant to this motion, the two are materially identical.

renal function, like Mrs. Orr, the agency specified "15 mg once daily with the evening meal":

| Indication | Dosage | |
|---|---|---|
| Reduction in Risk of Stroke in Nonvalvular Atrial Fibrillation (2.3) | CrCl >50 mL/min: | 20 mg once daily **with the evening meal** |
| | CrCl 15 to 50 mL/min: | 15 mg once daily **with the evening meal** |
| Treatment of DVT (2.4) Treatment of PE (2.4) | 15 mg twice daily with food, for first 21 days | |
| | **▼after 21 days, transition to ▼** | |
| | 20 mg once daily with food, for remaining treatment | |
| Reduction in the Risk of Recurrence of DVT and of PE (2.4) | 20 mg once daily with food | |
| Prophylaxis of DVT Following Hip or Knee Replacement Surgery (2.5) | Hip replacement: | 10 mg once daily for 35 days |
| | Knee replacement: | 10 mg once daily for 12 days |

Aug. 2013 USPI § 2.

## II.    Plaintiffs' Dosing, Monitoring, and Other Design-Related Theories

All of the claims in the *Boudreaux* and *Orr* cases fundamentally attack either Xarelto's FDA-approved design or its FDA-approved labeling. This motion addresses the following dosing, monitoring, and other design-related claims and theories, as articulated in the *Boudreaux* and *Orr* complaints and elaborated in Plaintiffs' expert reports:

1.    Xarelto is defectively designed on the grounds that—

   a.    the approved 15 or 20 mg daily dose for AFib patients is too high;

   b.    the medicine should be dosed twice daily rather than once, as indicated; and

   c.    doctors should be instructed to adjust patients' doses according to the results of blood-monitoring tests aimed at determining the concentration of Xarelto in patients' blood or their Xarelto-related coagulation parameters.

2.    Xarelto (a) is defectively designed on the ground that it does not specifically incorporate the use of a test or assay to monitor patients' prothrombin time ("PT") as a means of measuring their Xarelto-related coagulation parameters, or, relatedly, (b) is defective due to inadequate warning on the ground that its labeling does not instruct physicians to conduct PT monitoring.

3.    Xarelto is defectively designed on the ground that it does not specifically incorporate the use of an antidote or reversal agent.

2844773-1

Because federal law preempts Plaintiffs' dosing, monitoring, and other design-related claims, Defendants are entitled to partial summary judgment.

## LEGAL FRAMEWORK

Under the Supremacy Clause, federal law "shall be the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI cl. 2. "Accordingly, it has long been settled that state laws that conflict with federal law are 'without effect.'" *Bartlett*, 133 S. Ct. at 2473. It is likewise settled that common-law tort claims seeking damages are a form of state "law" subject to preemption. *See, e.g.*, *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881 (2000).

As relevant here, "state and federal law conflict"—and state law is preempted—"where it is 'impossible for a private party to comply with both state and federal requirements.'" *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 618 (2011) (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995)). The Supreme Court has established the standard for "impossibility" preemption in pharmaceutical cases in three recent decisions: *Levine*, 555 U.S. 555 (2009); *Mensing*, 564 U.S. 604 (2011); and *Bartlett*, 133 S. Ct. 2466 (2013).

These decisions explain that "[t]he question for 'impossibility' is whether the [defendant drug manufacturer] could *independently* do under federal law what state law requires of it." *Mensing*, 564 U.S. at 620 (emphasis added); *see also Bartlett*, 133 S. Ct. at 2470 (citing *Mensing*). And by "independently," the Supreme Court has made clear, it means "unilaterally." *Mensing*, 564 U.S. at 620 (citing *Levine*, 555 U.S. at 573, for the proposition that preemption turns on whether "the defendant could 'unilaterally' do what state law required"). Accordingly, "when a party cannot satisfy its state duties without the Federal Government's special permission and assistance,

which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes." *Mensing*, 564 U.S. at 623–24.

Under the *Levine-Mensing-Bartlett* trilogy, if the defendant manufacturer cannot "independently" and "unilaterally" do what a plaintiff's state-law claim would require—*i.e.*, take remedial action without obtaining FDA's prior approval or seeking FDA's help—the claim is preempted. Moreover, even if federal law permits the manufacturer to act independently, preemption nonetheless attaches if there is "clear evidence" that "FDA would not have approved" the change that the plaintiff's state-law claim would require. *Levine*, 555 U.S. at 571.[2]

## ARGUMENT

Federal law preempts Plaintiffs' dosing, monitoring, and other design-related claims because those claims would require Defendants to take actions that they cannot lawfully take "independently." Because preemption presents a pure question of law that is appropriately decided on summary judgment, *see, e.g.*, *Lofton v. McNeil Consumer & Specialty Pharm.*, 672 F.3d 372, 375 (5th Cir. 2012), this Court should grant Defendants' motion.

**I.      Federal law preempts Plaintiffs' claim that Xarelto is unreasonably dangerous because the medicine's FDA-approved dosages are too high or should be reduced.**

Following careful deliberation about the safety and efficacy of different dosages, FDA approved Xarelto in particular strengths and doses for particular indications. As relevant to this

---

[2] Since *Bartlett* was decided in 2013, courts have overwhelmingly concluded that the *Levine-Mensing-Bartlett* "impossibility" analysis—focused on the permissibility of "independent," "unilateral" manufacturer action—applies equally to both brand-name and generic products and manufacturers. *See, e.g.*, *Yates v. Ortho-McNeil-Janssen*, 808 F.3d 281 (6th Cir. 2015); *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 779 F.3d 34 (1st Cir. 2015); *In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917 (6th Cir. 2014); *Brazil v. Janssen Research & Dev. LLC*, Civ. A. No. 4:15-CV-0204, 2016 WL 3748771 (N.D. Ga. July 11, 2016); *Fleming v. Janssen Pharm., Inc.*, No. 2:15-cv-02799, 2016 WL 3180299 (W.D. Tenn. May 6, 2016); *Barcal*, 2016 WL 1086028; *Batoh v. McNeil-PPC, Inc.*, No. 3:14-cv-01462, 2016 WL 922779 (D. Conn. Mar. 10, 2016); *Rheinfrank v. Abbott Labs., Inc.*, No. 1:13-cv-144, 2015 WL 5836973 (S.D. Ohio Oct. 2, 2015); *Booker v. Johnson & Johnson*, 54 F. Supp. 3d 868 (N.D. Ohio 2014); *Thompson v. Allergan USA, Inc.*, 993 F. Supp. 2d 1007 (E.D. Mo. 2014); *Amos v. Biogen Idec Inc.*, 28 F. Supp. 3d 164 (W.D.N.Y. 2014). *But see Estate of Cassel v. Alza Corp.*, No. 12-CV-771-WMC, 2014 WL 856023, at *5 (W.D. Wis. Mar. 5, 2014) (holding that *Bartlett* does not apply to brand-name drugs).

particular case, FDA approved Xarelto for the "Reduction in Risk of Stroke in Nonvalvular Atrial Fibrillation" and specified the appropriate dosing for patients with normal renal function (like Mr. Boudreaux) as "20 mg once daily, with the evening meal," and for patients with impaired renal function (like Mrs. Orr) as "15 mg once daily, with the evening meal."  Aug. 2013 USPI.

Plaintiffs nonetheless challenge Xarelto's design on three grounds, all of which relate to the medicine's FDA-approved dosages:

- *First*, Plaintiffs assert that the approved 20 mg daily dose for AFib patients is "too high." *See, e.g.*, Smart Rep. at 5 (Exh. 9) ("The dose of Xarelto currently marketed for atrial fibrillation is too high."); *id*. at 6 ("[The] 15/20 mg daily dose … is excessive."); Rosing Rep. at 21 (Exh. 10) (advocating "a reduction in the total daily dose"); Backes Rep. at 11 (Exh. 11) ("too high"); Parisian Rep. at 9, 10, 159, 365 (Exh. 12) ("too high").

- *Second*, Plaintiffs contend that Xarelto should be dosed twice daily rather than once, as indicated.  *See, e.g.*, Backes Rep. at 12 (advocating "multiple dosing (e.g. twice per day at 10 mg vs. OD at 20 mg), or development of a time-released formulation of Xarelto"); Cuculich Rep. at 14 (Exh. 13) ("twice-daily smaller dose" in place of approved "once-daily larger dose"); Rosing Rep. at 5 ("twice daily dosing" rather than "once daily dosing"); Gerstman Rep. at 64 (Exh. 14) (advocating "10 mg twice-daily rivaroxaban" dosing).

- *Third*, Plaintiffs assert that doctors should be instructed to adjust patients' doses according to the results of PT-monitoring tests designed to measure Xarelto-related coagulation parameters.  *See, e.g.*, Cuculich Rep. at 4 (advocating "a way to measure the plasma concentration or anticoagulant effect of the medication in a patient-specific way" for purpose of "dosing adjustment to tailor the perfect amount of anticoagulant effect while avoiding unnecessary bleeding"); Backes Rep. at 12 (similar); Bussey Rep. at 5 (Exh. 15) (similar); Gerstman Rep. at 60 (similar); Parisian Rep. at 9 (similar); Plunkett Rep. at 32 (Exh. 16) (similar); Rinder Rep. at 14 (Exh. 17) (advocating that "Xarelto should be discontinued in patients whose PT … is greater than 20 seconds"); Kessler Rep. at 80 (Exh. 18) (similar).

Plaintiffs' dosing-related claims challenge the FDA-approved design of Xarelto and are preempted by federal law, which strictly forbids Defendants to change Xarelto's design—including by altering or adjusting approved dosages—without FDA's prior authorization.[3]

---

[3] Some of Plaintiffs' experts fault Defendants for failing to "test" different doses during Xarelto's research-and-approval process.  *See, e.g.*, Parisian Rep. at 13–14; Plunkett Rep. at 6.  As the Fifth Circuit has expressly held, however, "[t]here is no basis in the LPLA or case law for" a claim that a drug or device manufacturer "cannot demonstrate that it adequately tested its product."  *Theriot v. Danek Med., Inc.*, 168 F.3d 253, 256 (5th Cir. 1999).

2844773-1

**A.    Plaintiffs' dosing-related theories challenge Xarelto's FDA-approved design.**

As an initial matter, there can be no doubt—and no one suggests otherwise—that Plaintiffs'

dosing-related claims are *design-defect* claims under Louisiana law.  All of those claims—that

Xarelto's cumulative daily dosages are too high, that the medicine should be dosed twice daily

rather than once, and that doses should be adjusted according to the results of coagulation-moni-

toring measurements—challenge Xarelto's design, as approved by FDA to treat specific indica-

tions.  *See Harris v. Merck & Co., Inc.*, Civ. A. No. 12-1446, 2012 WL 5384720, at *3 (W.D. La.

Nov. 1, 2012) (under Louisiana law, claim that "80 milligram dose [of prescription medication

Zocor®] was the cause of [plaintiff's] injuries and that other, smaller doses would have prevented

the injuries" challenged the medication's "dosage design" and thus a "design defect" claim); *Wol-*

*lens v. Merck & Co., Inc.*, No. 12-1408, 2012 WL 6504210, *2 (E.D. La. Dec. 13, 2012) (same).

The sole question (for purposes of this motion) is whether Defendants could have "independently"

changed Xarelto's FDA-approved dosages in the way that Plaintiffs' state-law claims would re-

quire.  Because the answer to that question is no, Plaintiffs' dosing-related claims are preempted.

**B.    Plaintiffs' dosing-related theories are preempted by federal law, which cate-
gorically forbids Defendants to "independently" change Xarelto's design, in-
cluding its FDA-approved dosages.**

Because the changes that Plaintiffs contend state law requires—reducing the 20 mg daily

dose to 10 mg, dosing Xarelto twice daily rather than once, and adjusting doses according to the

results of coagulation-monitoring measurements—would require prior FDA approval, Plaintiffs'

dosing-related claims are preempted.  As already explained, under *Levine*, *Mensing*, and *Bartlett*,

preemption depends on whether the defendant manufacturer can "independently" (or "unilater-

ally") take the action that a plaintiff's claim would require.  Here, the governing regulations make

clear that Defendants may *not* independently change Xarelto's FDA-approved dosages, and anal-

ogous decisions hold that, in that circumstance, claims like those here are preempted.

12

**1.      Applicable FDA regulations prevent Defendants from independently changing Xarelto's FDA-approved dosage.**

Under governing FDA regulations, a pharmaceutical company may not independently—*i.e.*, without prior FDA approval—alter a medicine's approved dosages.  Indeed, the parties apparently agree about this uncontroversial regulatory fact.  *See, e.g.*, Parisian Dep. at 57–59 (Exh. 19) (testifying that, whatever a manufacturer may be able to do to strengthen its warnings, it *cannot* unilaterally change "the dose itself" or "the approved dosage").

*First*, FDA regulations make clear that any change to a drug's approved dosages renders an existing drug a "new" product, requiring fresh agency approval.  Under the Food, Drug & Cosmetic Act, "[n]o person shall introduce or deliver for introduction into interstate commerce any *new drug*" without prior FDA authorization.  21 U.S.C. § 355(a) (emphasis added).  Significantly, the implementing regulations explicitly define a new or different dosage as a new drug: "The newness of a drug may arise by reason (among other reasons) of … [t]he newness of a dosage … even though such drug when used in other dosage … is not a new drug."  21 C.F.R. § 310.3(h)(5); *see U.S. v. Baxter Healthcare Corp.*, 901 F.2d 1401, 1411 (7th Cir. 1990) (Section 310.3 "addresses the factors that may make a substance a 'new drug' subject to approval under 21 U.S.C. § 355").

*Second*, and to the same effect, the regulations specify that any "major change" to a medicine's approved application requires FDA's prior approval; a manufacturer may not effectuate such a change independently.  21 C.F.R. § 314.70(b).  The regulations go on to define "major change" to include "any change in the drug substance, drug product, production process, quality controls, or facilities that has a substantial potential to have an adverse effect on the identity, *strength*, quality, purity, or potency of the drug product as these factors may relate to the safety or effectiveness of the drug product."  21 C.F.R. § 314.70(b)(i) (emphasis added).  The changes that Plaintiffs advocate—reducing the once-daily dose, requiring per-dose pills with half the approved

amount of the active ingredient, or dose-adjusting pursuant to the results of coagulation-monitor-ing tests—directly affect Xarelto's FDA-approved "strength" for particular patients. *See* FDA, Orange Book, Preface, http://fda.gov/Drugs/DevelopmentApprovalProcess/ucm079068.htm (Exh. 20) ("*Strength* refers to the amount of drug substance (active ingredient) contained in, delivered, or deliverable from a drug product."); Drugs@FDA Glossary of Terms, http://www.fda.gov/drugs/informationondrugs/ucm079436.htm (Exh. 21) ("The *strength* of a drug product tells how much of the active ingredient is present in each dosage."). Indeed, reducing a medication's FDA-ap-proved dose would be the quintessential "strength"-altering change. Plaintiffs' proposed changes fall squarely within the definition of "major change." *Accord* FDA, CDER, Guidance for Industry, *Changes to an Approved NDA or ANDA*, 2004 WL 3199016, at *10 (April 2004) (defining "major change" as any change "that may affect … characteristics … of the dose delivered to the patient").[4]

In the same vein, FDA regulations further specify that "major changes" include "changes in the qualitative or *quantitative formulation* of the drug product, including inactive ingredients, or in the specifications provided in the approved NDA." 21 C.F.R. § 314.70(b)(2)(i) (emphasis added). By altering or adjusting the FDA-indicated dosages, the changes that Plaintiffs advocate would undoubtedly alter the "quantitative formulation of the drug product"—and, indeed, would alter the medicine's *active* ingredients. Those changes thus qualify (doubly) as "major changes" requiring prior FDA approval. *See also* 21 C.F.R. § 320.21(c) (requiring "supplemental applica-tion to FDA," supported by "evidence," for any "propose[d]" change "in product formulation or dosage strength, beyond the variations provided for in the approved application").[5]

---

[4] Notably, this Guidance explains that it "ha[s] binding effect" to the extent that it "adjusts reporting categories"—*i.e.*, qualifies a change as a "major change"—under 21 C.F.R. § 314.70. 2004 WL 3199016, at *2 n.a1; *id.* at *3.

[5] Information on FDA's Drugs@FDA website confirms that when manufacturers intend to market new or different dosage strengths for approved medications, they seek FDA's advance authorization, *see* Exh. 22 (approval letters for new doses of various medications), and that when they fail to do so, FDA threatens enforcement action, *see* Exh. 23 (warning letters concerning promotional materials touting "unapproved dosing regimens" for various mediations).

Accordingly, the governing regulations make clear that Defendants cannot "independently" change Xarelto's FDA-approved dosages, as Plaintiffs' claims would require.

> **2.     Analogous cases make clear that because Defendants cannot independently change Xarelto's FDA-approved dosage, Plaintiffs' dosing-related theories are preempted.**

In *Bartlett*, the Supreme Court dealt specifically with the preemption of state design-defect claims. Although the case before it involved a generic company, the Court emphasized that the governing regulation (quoted above)—and thus the operative legal rule—applies to both brand-name and generic manufacturers: "Once a drug—*whether generic or brand-name*—is approved, the manufacturer is prohibited from making any major changes to the 'qualitative or quantitative formulation of the drug product … or in the specifications provided in the approved application.'" 133 S. Ct. at 2471 (quoting 21 C.F.R. § 314.70(b)(2)(i)) (emphasis added). That rule applies here precisely. Defendants were "prohibited from making" the very sorts of design changes that Plaintiffs advocate. Accordingly, Plaintiffs' dosing-related claims are preempted under *Bartlett*.

The Sixth Circuit's post-*Bartlett* decision in *Yates v. Ortho-McNeil-Janssen*, 808 F.3d 281 (6th Cir. 2015), is on point. The court there found that federal law preempted (just like here) a *dosing-related* design-defect claim against a *brand-name drug manufacturer*. The plaintiff in *Yates* claimed that the manufacturer should have designed its birth-control patch with .6 mg rather than .75 mg of estrogen. The Sixth Circuit rejected two separate design-defect theories.

*First*, as to the plaintiff's claim that the manufacturer should have reduced the dosage *after* the FDA had approved the .75 mg patch, the Sixth Circuit held (echoing *Bartlett*) that the claim was "clearly preempted by federal law" because "FDA regulations provide that once a drug, whether generic or brand-name, is approved, the manufacturer is prohibited from making any major changes to the 'qualitative or quantitative formulation of the drug product, including inactive ingredients, or in the specifications provided in the approved application.'" *Id*. at 298 (quoting 21

C.F.R. § 314.70(b)(2)(i)).   "Based on the plain meaning of the regulation," the court wrote, the manufacturer "could not have altered the dosage of estrogen in [the patch] without submission to the FDA and the agency's 'approval *prior to* distribution of the product made using the change.'" *Id*. (quoting 21 C.F.R. § 314.70(b)(2)(i) (emphasis in *Yates*)).   The court found it "clear" that "changing the dosage level of the active ingredient [in the patch] constitute[d] a 'major change,' such that prior FDA approval is necessary."  *Id*. (quoting 21 C.F.R. § 314.70(b)(2)(i)'s statement that "'major changes' include 'changes in the qualitative or *quantitative formulation* of the drug product'") (emphasis in *Yates*).   "Quite simply," the Sixth Circuit concluded, "federal law prohibited defendants from decreasing the dosage of estrogen post-approval."  *Id*.

*Second*, the *Yates* court rejected on several grounds the plaintiff's alternative claim that the brand-name manufacturer should have altered the patch's estrogen dosage *before* FDA approval— *i.e.*, should have brought a lower-dose product to market in the first instance.  As an initial matter, the Sixth Circuit found the claim "too attenuated."  *Id*.   While it is true that nothing in federal law prevented the manufacturers from designing a lower-dose patch, the court said it would still "have to speculate" (1) that "the FDA would have approved the alternate design," which controls "the ultimate availability" of the drug for use; (2) that the plaintiff "would have selected" it; and (3) that "this alternate design would not have caused [the plaintiff] to suffer" an injury.  *Id*. at 299. This, the court said, was "several steps too far."  *Id*.   Separately, because "the ultimate availability" of any differently designed drug would be "contingent upon whether the FDA would approve the alternate design," the Sixth Circuit held the plaintiff's claim foreclosed under the rationale of *Mensing* that preemption attaches where a manufacturer could not act unilaterally, but rather only "ask for the FDA's help."  *Id*. at 299–300 (quoting *Mensing*, 564 U.S. at 619).   Finally, the court ruled that the plaintiff's "pre-approval" theory was incompatible with *Bartlett*, which rejected the

contention that a manufacturer could comply with its state and federal law duties by "pull[ing the drug] from the market."  133 S. Ct. at 2470.  The Sixth Circuit held:  "In contending that defendants' pre-approval duty would have resulted in a birth control patch with a different formulation, [plaintiff] essentially argues that defendants should never have sold the FDA-approved formulation of [the patch] in the first place.  We reject this never-start-selling rationale for the same reasons the Supreme Court in *Bartlett* rejected the stop-selling rationale …."  808 F.3d at 300.

Even more recently, and more closely on point, the court in *Utts v. Bristol-Myers Squibb Co.*, No. 1:16-cv-02899-DLC, 2016 WL 7429449 (S.D.N.Y. Dec. 23, 2016), held that federal law preempted bleeding-based design-defect claims concerning Eliquis®, a brand-name medication in the same "NOAC" class as Xarelto.  Echoing *Bartlett* and *Yates*, the *Utts* court held that federal law clearly preempted any contention that the manufacturers should have changed Eliquis' agency-approved design because under 21 C.F.R. § 314.70(b)(2)(i), "[t]he defendants had no ability to alter [the drug's] composition without prior approval of the FDA."  2016 WL 7429449, at *12.  The *Utts* court likewise rejected the plaintiffs' assertion "that the defendants had a *pre-approval* duty to submit a differently designed drug for FDA approval" in the first instance.  *Id*. (emphasis added).  Just like the Sixth Circuit in *Yates*, the *Utts* court held that the plaintiffs' alleged "pre-approval duty" impermissibly required it to "speculate" that "FDA would have approved the alternate design; that [the patient] would have been prescribed this alternately designed Eliquis; and that this alternate design would not have caused [the patient] to suffer severe internal bleeding."  *Id*.  And as in *Yates*, the court further rejected the plaintiffs' pre-approval claim as inconsistent with *Mensing*'s rejection of "Mouse Trap" causal theories and *Bartlett*'s condemnation of the "stop selling" (and by extension, "should never have sold") rationale.  *Id*.

So too, the court in *Thompson v. Allergan USA, Inc.*, 993 F. Supp. 2d 1007 (E.D. Mo.

2014), held that federal law preempted a dosing-related claim against a brand-name pharmaceutical company. The plaintiff there accused an eye-drop manufacturer of "overfilling" its dispensers, thereby forcing consumers to purchase more medication than they needed. The court agreed with the manufacturer's contention that the plaintiff's claims were preempted because it was "unable to reduce the amount of medicine in each … vial without prior FDA approval." *Id*. at 1011. In so holding, the court emphasized *Bartlett*'s statement that "[o]nce a drug—whether generic or brand-name—is approved, the manufacturer is prohibited from making any major changes to the 'qualitative or quantitative formulation of the drug product … or in the specifications provided in the approved application.'" *Id*. at 1013 (quoting 21 C.F.R. § 314.70(b)(2)(i)).

*Yates*, *Utts*, and *Thompson* reflect a larger consensus. A number of other post-*Bartlett* decisions have likewise held that federal law preempts design-defect claims against brand-name manufacturers. *See, e.g.*, *Brazil v. Janssen Research & Dev. LLC*, Civ. A. No. 4:15-CV-0204, 2016 WL 3748771, at *10 (N.D. Ga. July 11, 2016) ("[a]ny claim … that [the manufacturer] should change the formulation of [the drug] is preempted"); *Barcal*, 2016 WL 1086028, at *3–5 (federal law preempted any claim that "would essentially require [the manufacturer] to redesign" an FDA-approved drug); *Batoh v. McNeil-PPC, Inc*., No. 3:14-cv-01462, 2016 WL 922779, at *16–17 (D. Conn. Mar. 10, 2016) (federal law preempted claim alleging that manufacturer "could have altered the chemical composition" of its drug); *Booker v. Johnson & Johnson*, 54 F. Supp. 3d 868, 873 (N.D. Ohio 2014) ("it was impossible for [the manufacturers] to comply with both [their] state-law obligation to alter the drug's composition, and [their] federal-law duty not to do so").

### 3.    The recent *Guidry* decision is both distinguishable and contrary to Supreme Court precedent.

*Guidry v. Janssen Pharmaceuticals, Inc*., Civ. A. No. 15-4591, 2016 WL 4508342 (E.D. La. Aug. 29, 2016) (Feldman, J.), which seems to approve of the sort of "pre-approval" claim that

18

*Yates* and *Utts* rejected, does not require a different result.  As an initial matter, unlike *Yates* and this case, *Guidry* was decided on the pleadings rather than on summary judgment.  *Compare Utts*, 2016 WL 7429449, at *12 (dismissing design-defect claims, even on the pleadings, "with prejudice, and without leave to amend").  Moreover, again unlike *Yates* and this case, *Guidry* did not involve dosing-related claims, which go to the heart of the medicine's design.

In any event, *Guidry* is wrong on the merits for at least four reasons.  *First*, by the *Guidry* court's own admission, its decision was result-oriented.  The court there said that it viewed the preemption issue as presenting a "fundamental public policy question[]" and that it sought to avoid any "result" whereby "Louisiana plaintiffs will have no remedy against a drug manufacturer for a defect in a drug's design."  2016 WL 4508342, at *14.  That was improper; preemption presents a pure question of law, governed by statutory and regulatory language, and the Supreme Court's preemption decisions make clear that public-policy considerations are for the political branches, not courts, to consider.  *See, e.g.*, *Bartlett*, 133 S. Ct. at 2480; *Mensing*, 564 U.S. at 625–26.[6]

*Second*, with respect to the governing "impossibility" issue, the *Guidry* court asked and answered the wrong question:  "Can a drug manufacturer independently *design* a reasonably safe drug in compliance with its state-law duties before seeking FDA approval?  The answer is yes." 2016 WL 4508342, at *15 (emphasis added).  But a manufacturer accomplishes no public-health objective by merely "designing" a different medicine; the manufacturer must be able to *market* that medicine for consumer use.  And as the *Guidry* court acknowledged, drug manufacturers "cannot independently *sell* pharmaceutical products without FDA approval."  *Id*. (emphasis added).

---

[6] In any event, it is incorrect that design-defect preemption forecloses all remedies against brand-name drug manufacturers.  Under *Levine*, where a manufacturer can "unilaterally" change its label pursuant to the "changes being effected" (or "CBE") regulation, failure-to-warn claims are not preempted.  *See Brazil*, 2016 WL 3748771, at *10–11 (finding design-defect claims against brand-name manufacturer preempted but failure-to-warn claims viable where CBE procedure available); *Barcal*, 2016 WL 1086028, at *3–5 (same); *Batoh*, 2016 WL 922779, at *17 (same).

The *Guidry* court sought to finesse this problem by "assum[ing] that the FDA would approve a safer, alternative design of a drug that it has already approved."  2016 WL 4508342, at *15.  But Supreme Court precedent expressly forbids that assumption, holding that preemption applies where the manufacturer can only "propose[]" a different product and must ultimately seek a federal agency's "permission" or "help" to discharge its state-law duty.  *Mensing*, 564 U.S. at 619, 623–24.  That is particularly true where, as the Supreme Court recognized, the drug-approval process is so "onerous and lengthy," *Bartlett*, 133 S. Ct. at 2471, and agency approval is contingent not (as the *Guidry* court incorrectly assumed) exclusively on a particular medicine's safety profile, but rather on the agency's expert assessment that the drug strikes the proper balance between safety *and* efficacy, *see* 21 C.F.R. § 314.105; *see also* 21 U.S.C. § 355(b).  *Cf. Bartlett*, 133 S. Ct. at 2475 ("In the drug context, either increasing the 'usefulness' of a product or reducing its 'risk of danger' would require redesigning the drug ….").

*Third*, the *Guidry* court improperly found "guidance" about preemption of *design-defect* claims in the Supreme Court's statement in *Levine*—declining to find all *failure-to-warn* claims preempted—that FDA's labeling regulations do not "'establish[] both a floor and a ceiling.'"  2016 WL 4508342, at *14 (quoting *Levine*, 555 U.S. at 573–74).  The Supreme Court's floor-ceiling metaphor cannot be so wrenched out of context.  As an initial matter, the Court's decision makes clear that the metaphor pertains to "obstacle" preemption, not to the separate issue (presented here) of "impossibility" preemption.  *Cf. Levine*, 555 U.S. 563–64 (distinguishing impossibility preemption and obstacle preemption as "two separate [conflict] preemption" theories).  More importantly, the *reason* that *Levine* held that compliance with FDA's *labeling* regulations does not necessarily preempt failure-to-warn claims is that those regulations *do not even purport to establish a "ceiling."*  Rather, as the Supreme Court repeatedly emphasized, in the circumstances presented there

the "changes being effected" (or "CBE") regulation—which applies uniquely to labeling changes—expressly "permitted Wyeth to unilaterally strengthen its warning."  555 U.S. at 573. That one fact—the CBE regulation's authorization of independent manufacturer action—dictated the outcome.  *See, e.g.*, *id.* at 562, 563, 568, 571, 572 (emphasizing that no-preemption decision turned on CBE's unique unilateral-change authorization).  Because "no such process exists for changes to" a drug's design, *Barcal*, 2016 WL 1086028, at *4—put simply, because there is no CBE option for design changes—neither *Levine*'s holding nor its floor-ceiling metaphor applies in the design-defect context.  *Cf. Bartlett*, 133 S. Ct. at 2471.

*Finally*, *Guidry*'s rationale proves too much.  Not only does it render FDA's approval of a prescription medicine essentially meaningless, but it would gut the Supreme Court's impossibility jurisprudence.  Under the *Guidry* court's reasoning, neither design-defect nor failure-to-warn claims would *ever* be preempted, as a plaintiff can always assert that the manufacturer could have (at least in theory) designed and sought approval of a "safer" medicine.  *See Brazil*, 2016 WL 3748771, at *11 (holding that "pre-approval" design-defect theory "makes little sense in the face of the Supreme Court's precedents," which have "repeatedly characterized the state tort law at issue in this case as a duty to make changes or as a remedial effort"); *see also Fleming v. Janssen Pharm., Inc.*, No. 2:15-cv-02799, 2016 WL 3180299, at *5 (W.D. Tenn. May 6, 2016) (rejecting "pre-approval" theory).

\* \* \*

Because Defendants cannot "independently" make the dosing changes that Plaintiffs contend state law requires—reducing the 15 or 20 mg dose, dosing Xarelto twice daily rather than once, and adjusting doses according to the results of coagulation-monitoring measurements—

Plaintiffs' dosing-related design-defect claims are preempted.[7]

## II.    Federal law preempts Plaintiffs' claim that Xarelto is unreasonably dangerous because it does not entail a requirement or recommendation that doctors monitor their patients' Xarelto-related coagulation parameters.

Several of Plaintiffs' experts opine that Xarelto is unreasonably dangerous either because its design does not incorporate a means for physicians to monitor their patients' prothrombin time ("PT") as a measure of Xarelto-related coagulation parameters or, relatedly, because its label does not instruct physicians to conduct PT monitoring.[8]  *See, e.g.*, Rinder Rep. at 4 ("The Rivaroxaban label is inadequate [because it] fails to inform physicians, like myself, of … the utility of using a PT measurement to identify those patients at highest risk of bleeding."); Parisian Rep. at 13 (same); Kessler Rep. at 82 (same); Cuculich Rep. at 3 (same); Leissinger Rep. at 2 (Exh. 24) (same).[9]

---

[7] *Bartlett* left open the possibility that a manufacturer may in certain circumstances be able to discharge its design-defect obligations by strengthening its warning label. *See* 133 S. Ct. at 2479.  That option is not available here for two reasons.  As an initial matter, there is no "warning" that would remedy the dosing-related problems that Plaintiffs allege—that the 20 mg dose is too high, that Xarelto should be dosed twice daily rather than once as indicated, and that doses should be adjusted according to the results of coagulation-monitoring tests.  Those are "pure" design-defect claims, in the sense that the only "fix" for the alleged defects is a differently designed drug.

Moreover, and in any event, even if Plaintiffs could re-characterize their dosing-related claims in failure-to-warn (rather than design-defect) terms, they would be preempted because applicable FDA regulations make clear, in multiple respects, that Defendants could not "independently" make any change to Xarelto's label that purported to alter or adjust approved dosages.  *First*, although the regulations permit a manufacturer to unilaterally add or strengthen an instruction about "dosage and administration"—*e.g.*, to address whether Xarelto should be taken with food, how to handle switching to or from Xarelto, what to do about a missed dose, *see* 21 C.F.R. § 314.70(c)(6)(iii)—they prohibit (as Plaintiffs' experts acknowledge, *see* Parisian Dep. at 59) manufacturers from making any labeling change that "involve[s] a change in the *dosage strength*"—which, as already explained, Plaintiffs' claims would.  21 C.F.R. § 314.70(d)(2)(ix) (emphasis added).  *Second*, any dosing-related labeling change would necessitate a change to the "Highlights" section of Xarelto's label, *see id.* § 201.57(a), which (as Plaintiffs' experts acknowledge, *see* Parisian Dep. at 50, 56) would require prior FDA approval, *see* 21 C.F.R. § 314.70(b)(2)(v)(C).  *Finally*, FDA regulations specify that any labeling change that "propos[es]" to "[r]evise the dose or dose regimen" of an approved drug must be accomplished through an "[e]fficacy supplement," which cannot be accomplished unilaterally but rather requires prior agency authorization.  *Id.* § 314.3(b).

[8] To be clear, by "monitoring," Plaintiffs' experts refer to regular clinic visits to measure pharmacological parameters to assess either (1) the pharmacodynamic effect of Xarelto on the patient, *i.e.*, the extent to which the patient is anticoagulated, or (2) the pharmacokinetic response of the drug, *i.e.*, the concentration of Xarelto in a patient's blood. The experts assert that this routine monitoring is necessary to keep patients within Xarelto's "therapeutic range," which refers to the spread of concentration values in which a medicine is both safe and efficacious.

[9] Notably—and inconsistently—other of Plaintiffs' experts believe that there is "*no way* to measure, monitor, evaluate coagulation status" for Xarelto. Cerri Dep. at 30 (Exh. 25) (emphasis added); *see also, e.g.*, Leissinger Boudreaux Dep. (Dec. 8, 2016) at 214–16 (Exh. 26) (agreeing that "when Mr. Boudreaux was prescribed Xarelto, you could not have used PT to monitor him").

For several independent reasons, any claim based on that theory—whether understood as a challenge to Xarelto's design or its labeling—is preempted.

### A. Plaintiffs' monitoring-related theories are inextricably intertwined with their dosing arguments, and are preempted for the same reasons.

As an initial matter, Plaintiffs' PT-monitoring argument does not stand alone, but rather is part and parcel of their dosing claims, for the simple reason that the supposed purpose of measuring PT is to provide information for use in adjusting patients' Xarelto doses. *See supra* at 11. Because Plaintiffs' PT-related argument serves only to support their dosing-related claims, it is preempted along with (and for the same reasons as) the dosing claims.

### B. Plaintiffs' monitoring-related theories are preempted because Defendants cannot "independently" alter Xarelto's design or labeling to incorporate PT monitoring, as no PT test or assay has been cleared or approved for use in conjunction with Xarelto and any such use would require prior FDA authorization.

Although some of Plaintiffs' experts seem to contend that Xarelto is unreasonably dangerous unless used in conjunction with a PT-monitoring test designed to equip doctors to adjust patients' doses, they concede—as they must—that FDA has not approved any PT-monitoring assay for use with Xarelto. *See, e.g.*, Rinder Dep. at 247–49 (Exh. 27); Plunkett Dep. at 403–04 (Exh. 28); Leissinger Generic Dep. (Nov. 15, 2016) at 184–85 (Exh. 29); Gosselin Dep. at 305–07 (Exh. 30); Cerri Dep. at 147, 268; Bussey Dep. at 257 (Exh. 31); Ix Dep. at 316 (Exh. 32).[10] Several of Plaintiffs' experts focus on the Neoplastin® PT assay. *See, e.g.*, Cuculich Rep. at 4; Rinder Rep. at 14; Kessler Rep. at 11; Gosselin Rep. at 22 (Exh. 34); Leissinger Rep. at 10. But Neoplastin, an *in vitro* diagnostic ("IVD") product regulated as a Class II medical device, is neither designed

---

[10] *See also* FDA: Center for Devices and Radiological Health, Transcript, *In Vitro Diagnostic Testing for Direct Oral Anticoagulants* at 9 (Oct. 26, 2015) (Exh. 33) ("Importantly, the DOAC drugs were approved without a requirement for monitoring. So currently, manufacturers are developing devices to assess the effect or concentration of direct oral anticoagulants. *There are currently no cleared or approved devices that measure that.*") (Lea Carrington, Director, Division of Immunology and Hematology Devices) (emphasis added); Carrington presentation (Exh. 8) at 5 (same).

nor approved to monitor anticoagulation attributable to Xarelto or any other Factor Xa inhibitor. To the contrary, Neoplastin's label states that PT "is commonly used for monitoring vitamin K antagonist therapy." Neoplastin October 2013 USPI § 2 (Exh. 35). Unlike "coumadin" (warfarin)—which the Neoplastin label specifically references—Xarelto is *not* a vitamin K antagonist, but rather a direct Factor Xa inhibitor. Notably, the Neoplastin label explains in its "Limitations" section that the PT test is "insensitive" to certain "anti-Xa" levels. *Id*. § 11. Plaintiffs have not pointed to—nor are Defendants aware of—any other PT test that has been approved or cleared by FDA for use in monitoring Xarelto- or Factor-Xa-related coagulation parameters.

To the extent that Plaintiffs contend that Xarelto is unreasonably dangerous because it should have been *designed* for use in conjunction with Neoplastin or any other PT-monitoring assay, that claim is preempted. Setting aside the question whether PT-monitoring assays are even a scientifically reliable means of monitoring Factor-Xa activity or Xarelto concentration,[11] because neither Neoplastin nor any other PT-monitoring assay has been cleared or approved by FDA for use in conjunction with Xarelto, any recommendation for such use would require fresh agency approval. *See* Guidance for Industry and Food and Drug Administration Staff: In Vitro Companion Diagnostic Devices ("IVD Guidance") at 10 (Aug. 6, 2014) (Exh. 36) ("If an IVD diagnostic device is already legally marketed and the IVD diagnostic device manufacturer intends to market its device for a new use as an IVD companion diagnostic device for a novel therapeutic product, FDA would likely consider the new use of the IVD diagnostic device with the novel therapeutic product as a new use for the device that would require an additional premarket submission."); *see also* 21 C.F.R. § 807.81(a)(3)(ii) (requiring new approval for any new "intended use" of FDA-

---

[11] *See* Defs.' Joint *Daubert* Mot. To Exclude Expert Opinions And Testimony Regarding Unapproved Dosing And Monitoring Regimens, also filed today.

cleared device); *id.* § 814.39(a) (same, for approval of a supplement for a new indication for pre-viously approved device).  Because Defendants cannot "independently" alter Xarelto's design to require coagulation monitoring through Neoplastin or any other PT-related test or assay—as such a change would require advance FDA approval—any claim based on their failure to do so is preempted.  *See Bartlett*, 133 S. Ct. at 2470; *Mensing*, 564 U.S. at 620.

Likewise, to the extent that Plaintiffs contend that Xarelto is unreasonably dangerous be-cause its *label* fails to instruct doctors to monitor Xarelto-related coagulation parameters using Neoplastin or any other PT-monitoring assay, that claim is preempted.  Setting aside the absurdity of faulting Defendants for failing to recommend an *unapproved* use of a PT assay, any change to Xarelto's label to add a PT-monitoring recommendation would itself require advance FDA author-ization.  FDA has addressed this issue specifically:  "When an IVD companion diagnostic device has been approved or cleared for use with one therapeutic product"—as, for instance, Neoplastin has been for warfarin—"and evidence becomes available that use of the same device is essential for the safe and effective use of a different therapeutic product"—as Plaintiffs here claim for Xarelto—"the IVD companion diagnostic device labeling should be expanded through approval or clearance of a new premarket submission (PMA or 510(k) as appropriate) or PMA supplement … to include the new therapeutic product."  IVD Guidance (Exh. 36), at 12.  In addition, FDA has clarified that in that circumstance "[l]abeling of the therapeutic product should also be amended through submission of a supplement."  *Id.*  Because Defendants cannot "independently" alter Xarelto's labeling to require coagulation monitoring through Neoplastin or any other PT-related test or assay—as such a change would require advance FDA approval—any claim based on their failure to do so is preempted.  *See Bartlett*, 133 S. Ct. at 2470; *Mensing*, 564 U.S. at 620.

C.     **Plaintiffs' monitoring-related theories are further preempted because "clear evidence" demonstrates that FDA would have rejected—and in fact did reject—a proposal to add PT-monitoring language to Xarelto's label.**

Plaintiffs' monitoring-related claims are preempted for an additional (and independent) reason:  Even if Defendants could have independently added a PT-related instruction, "clear evidence" demonstrates that FDA would have rejected—and in fact did reject—it.

In *Levine*, the Supreme Court held that the claim before it was not preempted because the CBE regulation "permitted Wyeth to unilaterally strengthen its warning" to add a statement about the risk of the injury that the plaintiff there had suffered.  555 U.S. at 573.  The Court also observed, however, that even where a manufacturer can independently change its label without prior FDA approval, federal law will preempt any state-law claim based on the manufacturer's failure to do so if there is "clear evidence that the FDA would not have approved [the] change."  *Id*. at 571.

Post-*Levine* cases have explained the "clear evidence" standard.  As particularly relevant here, those cases demonstrate that the standard is met, and preemption applies, where FDA rejects a specific proposal to add a warning that is substantially similar to the warning that a plaintiff advocates.  *See, e.g.*, *Christison v. Biogen Idec Inc.*, __ F. Supp. 3d __, 2016 WL 4223956, at *27–28 (D. Utah Aug. 5, 2016) (emphasizing the FDA's rejection of manufacturer's proposed labeling change); *Rheinfrank v. Abbott Labs.*, 119 F. Supp. 3d 749, 766 (S.D. Ohio 2015) (emphasizing that manufacturer attempted to strengthen its warning label and the FDA twice denied the request); *In re Depakote*, 87 F. Supp. 3d 916, 922 (S.D. Ill. 2015) (same); *In re Fosamax Prods. Liab. Litig.*, 951 F. Supp. 2d 695, 703–04 (D.N.J. 2013) (explaining that manufacturer "submitted a label change and the FDA rejected it"); *Dobbs v. Wyeth Pharm.*, 797 F. Supp. 2d 1264, 1274–75 (W.D. Okla. 2011) (noting FDA's rejection of manufacturer's attempts to strengthen warning labels).

To be clear, it is not necessary that FDA reject the precise phraseology that a plaintiff

advocates in litigation; rather, it is sufficient that FDA rejected the substance of a plaintiff's proposed warning. *See, e.g.*, *Levine*, 555 U.S. at 572 (relevant question whether FDA considered the "kind of warning" that plaintiff seeks); *Mensing*, 564 U.S. at 637 (Sotomayor, J., dissenting) (observing that clear-evidence standard is met when FDA has "considered whether to request warnings in light of the evidence on which a plaintiff's claim rests but … decided to leave the warnings as is"); *Seufert v. Merck Sharp & Dohme Corp.*, __ F. Supp. 3d __, 2016 WL 3369512, at *6–7 (S.D. Cal. May 11, 2016) (rejecting plaintiff's argument that FDA must reject "specific proposed warning language"); *Newman v. McNeil Consumer Healthcare*, No. 10-CV-01541, 2012 WL 39793, at *7–8 & n.8 (N.D. Ill. Jan. 9, 2012) ("FDA should not have to reject every possible formulation of a particular warning in order for there to be clear evidence of rejection.").

Here, there is overwhelmingly "clear evidence" that FDA would have rejected any attempt to change Xarelto's label to instruct doctors to measure PT as a means of monitoring patients' coagulation levels.  Indeed, Janssen, as the company vested with U.S. regulatory responsibility for Xarelto, specifically (and repeatedly) proposed to include language about PT monitoring, ***but FDA rejected it***.  In particular, when Janssen filed NDA 022406 (for the orthopedic surgery indication) in July 2008, it included the following PT-related language in its proposed label:

> The relationship between PT and rivaroxaban plasma concentration is linear and closely correlated.  If assessment of the pharmacodynamic effect of rivaroxaban is considered necessary in individual cases, PT (measured in seconds) is recommended.  The Neoplastin® PT assay was measured in the RECORD program and the 5/95 percentiles for PT (Neoplastin®) 2 to 4 hours after tablet intake (i.e., at the time of maximum effect) ranged from 13 to 26 seconds.

XARELTO_JANSSEN_00047659 (p. 16–17) (Exh. 37); *see* XARELTO_JANSSEN_00054184 (p. 12) (Exh. 38) (again proposing same PT-related language).  In January 2011, when it submitted draft labeling for NDA 202439 (for the AFib indication), Janssen again included the same language.  *See* XARELTO_JANSSEN_00001707 (p. 10) (Exh. 39).

But in June 2011, FDA responded with a revised label for NDA 022406 that *struck the PT-related language* and replaced it with, "The predictive value of these coagulation parameters for bleeding risk or efficacy has not been adequately studied." XARELTO_JANSSEN_05852123 (p. 29) (Exh. 40); *see also* XARELTO_JANSSEN_05852122 (Exh. 41) (email attaching FDA red-line). After some additional back-and-forth, FDA approved NDA 022406 without the language referring to (1) the "relationship between PT and rivaroxaban plasma concentration," (2) the use of the "Neoplastin® PT assay" to "measure[] PT and thus "assess[ ] the pharmacodynamic effect of rivaroxaban," or (3) the "5/95 percentiles for PT." July 2011 USPI § 12.2 (Exh. 42). FDA subsequently required Janssen to use the same language in the AFib label. *See* XARELTO_JANSSEN_00000200 (Exh. 43).[12]

"Clear evidence" preemption plainly applies here. Plaintiffs contend now, after the fact, that Defendants should have included an instruction about PT monitoring in Xarelto's label. During the approval process, Janssen tried to do just that, but FDA refused. The evidence of impossibility—and thus preemption—could not be much clearer.

## III.    Federal law preempts Plaintiffs' claim that Xarelto is unreasonably dangerous in the absence of a reversal agent.

Several of Plaintiffs' experts contend that Xarelto is unreasonably dangerous because it was marketed without an antidote, or reversal agent. *See, e.g.*, Liechty Rep. at 8 (Exh. 44) (asserting that the lack of a reversal agent "represents a significant hazard and danger with Xarelto use"); Cerri Rep. at 6 (Exh. 45) ("Using Xarelto puts these patients at great risk because there [is] … no

---

[12] FDA ultimately approved the following language for Section 12.2, which has to this day remained unchanged: "Dose-dependent inhibition of factor Xa activity was observed in humans and the Neoplastin® prothrombin time (PT), activated partial thromboplastin time (aPTT) and HepTest® are prolonged dose-dependently. Anti-factor Xa activity is also influenced by rivaroxaban." *E.g.*, Aug. 2013 USPI § 12.2; Feb. 2014 USPI § 12.2.

reversal agent to treat emergent conditions."); Leissinger Generic Dep. (Nov. 15, 2016) at 52 (noting the lack of a reversal agent as one of the reasons patients should be taken off of Xarelto). Federal law preempts that claim for the same reason that it preempts Plaintiffs' contention that Xarelto should have designed for use with a PT-monitoring test or assay—namely, that Defendants cannot "independently" (*i.e.*, without prior FDA approval) develop and market a reversal agent, or change Xarelto's design to incorporate the use of such an agent. *See supra* at 23–25.

FDA approved Xarelto as safe and effective—and as an important addition to the anticoagulant market—despite the absence of a reversal agent, and without any requirement that Xarelto be marketed or used in conjunction with such an agent. Indeed, the FDA-approved labeling explicitly warns that "[a] specific antidote for rivaroxaban is not available." Aug. 2013 USPI § 5.2 (Risk of Bleeding); *see also* § 10 (Overdosage) (same). Although a third party, Portola Pharmaceuticals, is currently working to develop a rivaroxaban-specific reversal agent, Plaintiffs and their experts have acknowledged—as they must—that no such agent has been approved by FDA for use in the United States. *See* Portola Pharmaceuticals, News Release: Portola Pharmaceuticals Receives Complete Response Letter from FDA for Biologics License Application for AndexXa™ (Aug. 18, 2016), *available at* http://investors.portola.com/phoenix.zhtml?c=198136&p=irol-newsroomArticle&ID=2196085 (Exh. 46); Parisian Dep. at 480 (noting that the "FDA has not approved any potential [reversal agents]").

Defendants cannot "independently" market a reversal agent, or alter Xarelto's design to incorporate the use of such an agent because, as a separate product, the reversal agent would require separate FDA approval. The particular rivaroxaban-specific reversal agent currently in development qualifies as a "biologic." 42 U.S.C. § 262(j); Portola (Exh. 46). Under federal law, a

29

manufacturer seeking to market a brand-name biologic must first submit to FDA a Biologic License Application, which FDA may approve only upon a determination that the product is "safe, pure, and potent." *Id.* § 262(a). Because Defendants cannot "independently" market a reversal agent or change Xarelto's design to incorporate the use of such an agent—as such a change requires advance FDA approval—any claim based on their failure to do so is preempted. *See Bartlett*, 133 S. Ct. at 2470; *Mensing*, 564 U.S. at 620.

## CONCLUSION

FDA approved Xarelto at specific doses because, after a careful study of the results of data developed in exhaustive clinical trials, the agency found those doses to be safe and effective for the indicated uses. As recently as September 2016, FDA reiterated its determination that Xarelto has a favorable risk-benefit balance. Plaintiffs position boils down to an assertion that FDA was (and still is) wrong. Their claims are nothing less than a thinly veiled—and impermissible—effort to second-guess the agency's expert conclusion. Worse, Plaintiffs ask this Court to endorse a chaotic and dangerous regime in which individual manufacturers can—and on pain of after-the-fact tort liability, *must*—unilaterally change patients' FDA-approved doses (either up or down), manipulate FDA-approved dosing schedules, and instruct doctors to adjust doses according to the results of unapproved monitoring devices. Plaintiffs' freewheeling position would turn responsible drug regulation on its head.

Because federal law preempts Plaintiffs' dosing, monitoring, and other design-related claims, the Court should grant Defendants summary judgment on those claims.

2844773-1

Respectfully submitted,

DRINKER BIDDLE & REATH LLP

By: /s/ Susan M. Sharko
Susan M. Sharko
Drinker Biddle & Reath LLP
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
susan.sharko@dbr.com

Rodney M. Hudson
DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105-2235
Telephone: (415) 591-7500
rodney.hudson@dbr.com

Chanda A. Miller
Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone: (215) 988-2500
chanda.miller@dbr.com

IRWIN FRITCHIE URQUHART & MOORE LLC

By: /s/ James B. Irwin
James B. Irwin
Kim E. Moore
Irwin Fritchie Urquhart & Moore LLC
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
jirwin@irwinllc.com

*Attorneys for Defendants Janssen Pharmaceuticals, Inc., Janssen Research & Development, LLC, and Janssen Ortho LLC, and Johnson & Johnson*

ARNOLD & PORTER KAYE SCHOLER LLP

By: /s/ William Hoffman
William Hoffman
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
william.hoffman@apks.com

Andrew K. Solow
Steven Glickstein
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Telephone: (212) 836-8485
andrew.solow@apks.com
steven.glickstein@apks.com

BRADLEY ARANT BOULT CUMMINGS LLP

By: /s/ Kevin C. Newsom
Kevin C. Newsom
Lindsey C Boney IV
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place, 1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8803
knewsom@bradley.com

CHAFFE MCCALL L.L.P.

By: /s/ John F. Olinde
John F. Olinde
Chaffe McCall L.L.P.
1100 Poydras Street, Suite 2300
New Orleans, LA 70163
Telephone: (504) 585-7241
olinde@chaffe.com

*Attorneys for Bayer HealthCare Pharmaceuticals Inc. and Bayer Pharma AG*

31

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 20th day of January, 2017, the foregoing plead-ing was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to Liaison Counsel for Plaintiffs by operation of the court's electronic filing system and a copy of the proposed documents to be placed under seal sent to Plaintiffs' Liaison Counsel by email transmission.

*/s/      John F. Olinde*

2844773-1