# Exhibit 25

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1            UNITED STATES DISTRICT COURT
 2            EASTERN DISTRICT OF LOUISIANA
 3
 4   IN RE:  XARELTO (RIVAROXABAN)   MDL No. 2592
     PRODUCTS LIABILITY LITIGATION
 5                                   SECTION L
 6   _____ JUDGE FALLON
 7   THIS DOCUMENT RELATES TO:       MAG. JUDGE NORTH
 8   JOSEPH ORR, JR., AS LAWFUL
     SURVIVING SPOUSE OF SHARYN ORR
 9
     Case No. 2:15-CV-03708
10
11
12     PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW
13
14                  NOVEMBER 28, 2016
15
16                       - - -
17          Videotaped deposition of GIANLUCA CERRI,
     M.D., FACEP, FAAEM, held at Perry Dampf Dispute
18   Solutions, 721 Government Street, Baton Rouge,
     Louisiana, commencing at 9:58 a.m., on the above
19   date, before Leslie B. Doyle, Certified Court
     Reporter (#93096), Registered Professional Reporter,
20   Certified Realtime Reporter.
21
22                       - - -
23            GOLKOW TECHNOLOGIES, INC.
24        877.370.3377 ph|917.591.5672 fax
25              deps@golkow.com
```

Golkow Technologies, Inc.                                    Page 1

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1   A P P E A R A N C E S:
 2
 3   COUNSEL FOR THE PLAINTIFF:
 4       EMILY C. JEFFCOTT, ESQ.
            Email:  Ejeffcott@thelambertfirm.com
 5          Phone:  (504) 581-1750
         THE LAMBERT FIRM
 6       701 MAGAZINE STREET
         NEW ORLEANS, LOUISIANA  70130
 7
 8   - AND -
 9       ROGER C. DENTON, ESQ.
            Email:  Rdenton@uselaws.com
10          Phone:  (314) 621-6115
         SCHLICHTER, BOGARD & DENTON, LLP
11       100 S. 4TH STREET, SUITE 900
         ST. LOUIS, MISSOURI  63102
12
13   COUNSEL FOR THE JANSSEN DEFENDANTS:
14       JAMES B. IRWIN, ESQ.
            Email:  Jirwin@irwinllc.com
15       MEERA U. SOSSAMON, ESQ.
            Email:  Msossamon@irwinllc.com
16          Phone:  (504) 310-2100
         IRWIN, FRITCHIE, URQUHART & MOORE, LLC
17       400 POYDRAS STREET, SUITE 2700
         NEW ORLEANS, LOUISIANA  70130
18
19   COUNSEL FOR THE BAYER DEFENDANTS:
20       JEREMY S. BARBER, ESQ.
            Jbarber@wilkinsonwalsh.com
21       KIM CHANNICK, ESQ.
            Kchannick@wilkinsonwalsh.com
22          Phone:  (202) 847-4000
         1900 M STREET, NW, SUITE 800
23       WASHINGTON, D.C.  20036
24
25   ALSO PRESENT:  MELISSA BARDWELL, VIDEOGRAPHER
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1      Q.    And why did you decide to prepare this
2    list in the last seven days?
3      A.    I wanted to reflect the work that I have
4    done in terms of reaching out and finding out if
5    there is any other opinion that deviates from my
6    core beliefs.  In other words, if I went through the
7    literature and I found that there was a way to
8    monitor, an effective way, that is available
9    today -- I'm not talking about next year, the year
10   after, the year after that -- is an effective way,
11   there's something I don't know -- if there's an
12   effective way to measure, monitor and evaluate the
13   coagulation status on a patient taking Xarelto or an
14   effective way to reverse the medication, I would not
15   be here.
16           This is a very unpleasant situation just
17   to tell a medical opinion, which, at the end of the
18   day, after seven hours of grilling, it's still going
19   to be the same.  There's no way to measure it,
20   monitor, evaluate coagulation status at this point
21   in time, to me and the good people of Louisiana, and
22   to my understanding, to the good people in the
23   United States, the coagulation status on a patient
24   taking Xarelto, and there is no dedicated antidote
25   that fully reverse the drug.  If something like that

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  know, yes, your wife takes Xarelto, but might have
2  skipped a dose because the level is zero, we can
3  proceed with the operation; or, yes, your wife took
4  Xarelto, your level is high, but we have an antidote
5  which is going to slow down the progression of the
6  bleed and give her a chance to live.  Those are the
7  things that -- those are the things that we need in
8  order for this drug to meet its full potential.
9           Again, it's a great drug, yes.  If you
10 don't have an adverse reaction, it's fantastic, but,
11 unfortunately, when you do, there's nothing you can
12 do.  And I hate to say it again.  There's no lab
13 assay that tells me when the patient took the
14 medication, how much of the medication is in the
15 system, how the kidney dysfunction is affecting the
16 level of the medication in the blood.  These are all
17 serious consideration that, as human beings, we need
18 to come to grasp with and do something about.
19      Q.   Here's my question:  Please listen to it
20 carefully.  What do the medical records that you
21 reviewed say about the last time that Mrs. Orr took
22 a Xarelto pill?
23      A.   I don't recall.
24      Q.   I want you to go down for a few sentences
25 that starts off with the word "meanwhile" on that

1 doing. You are guessing.

2 My job in case of anticoagulation-induced
3 or related brain bleed is to arrest the bleed,
4 minimize, halt, reverse and deliver a viable patient
5 to a subspecialty to perform a potentially
6 life-saving procedure, which I cannot do with this
7 medication in the setting of a brain bleed yet.
8 Okay? When the antidote is available and a way to
9 monitor this drug, this is probably the preferred
10 drug to use. Until then, when the patient shows
11 up -- and they don't show up to see the
12 neurosurgeon. Okay? They show up to see me so that
13 I can maximize their chances to see an emergency --
14 to see a surgeon on call to perform a potentially
15 life-saving procedure. I cannot do that because
16 there's no antidote, and there's no assay to
17 quantify its activity. That's the only thing I can
18 tell you.

19 Then if you're telling me, well, just go
20 ahead and do nothing because this bleed looks bad,
21 if that's what you're saying -- and, of course,
22 again, if this was your wife, I think that probably
23 the tune would change a little bit. And I
24 understand you're doing the company's bidding;
25 you're doing your job. I'm not doing my job. I'm

```
 1            R E P O R T E R ' S   C E R T I F I C A T E
 2                This transcript is valid only for a
 3    transcript accompanied by my original signature and
 4    original required seal on this page.
 5                I, Leslie B. Doyle, Certified Court
 6    Reporter (LA Certificate #93096), in and for the
 7    State of Louisiana, as the officer before whom this
 8    testimony was taken, do hereby certify that GIANLUCA
 9    CERRI, M.D., FACEP, FAAEM, after having been duly
10    sworn by me upon authority of R.S. 37:2554, did
11    testify as herein before set forth in the foregoing
12    314 pages; that this testimony was reported by me in
13    the stenotype reporting method, was prepared and
14    transcribed by me or under my personal direction and
15    supervision, and is a true and correct transcript to
16    the best of my ability and understanding; that the
17    transcript has been prepared in compliance with
18    transcript format guidelines required by statute or
19    by rules of the board, that I have acted in
20    compliance with the prohibition on contractual
21    relationships, as defined by Louisiana Code of Civil
22    Procedure Article 1434 and in rules and advisory
23    opinions of the board.
24                I further certify that I am not related to
25    counsel or to the parties herein, nor am I otherwise
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1   interested in the outcome of this matter.

2       Signed this ___ day of _____, 2016.

3

4

5       _____

6       LESLIE B. DOYLE, RPR, RMR, RDR

    Certified Court Reporter

7       LA Certificate #93096

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25