UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  XARELTO (RIVAROXABAN)           **MDL No. 2592**
PRODUCTS LIABILITY LITIGATION         **SECTION L**

THIS DOCUMENT RELATES TO:             **JUDGE ELDON E. FALLON**

*Joseph J. Boudreaux, Jr., et al. v. Janssen et al.*     **MAGISTRATE NORTH**
**Case No. 2:14-cv-02720**

*Joseph Orr, Jr., et al. v. Janssen et al.*
**Case No. 2:15-cv-03708**

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE GROUND THAT FEDERAL LAW PREEMPTS PLAINTIFFS' FAILURE-TO-WARN CLAIMS

Defendants Bayer HealthCare Pharmaceuticals Inc. and Bayer Pharma AG (collectively, "Bayer"), Janssen Pharmaceuticals, Inc. ("JPI") and Janssen Research & Development LLC ("JRD") (collectively, "Janssen"), Janssen Ortho, LLC and Johnson & Johnson respectfully submit this memorandum of law in support of their joint motion for partial summary judgment on the ground that federal law preempts Plaintiffs' failure-to-warn claims.

### INTRODUCTION

Plaintiffs' claims for alleged failure to warn, *see* La. Rev. Stat. § 9:2800.57, are based on the very same information that the U.S. Food and Drug Administration ("FDA") has considered, thoroughly vetted and analyzed, and rejected for inclusion in the Xarelto® label.  As a result, Plaintiffs' failure-to-warn claims are preempted by federal law.

Plaintiffs base their failure-to-warn claims on allegations that Xarelto's label failed to include, and that Defendants should have added, the following information: (1) language advising of problems with a medical device used to measure warfarin patients' coagulation parameters in ROCKET AF, the clinical trial that supported FDA's approval of Xarelto's atrial-

fibrillation indication; (2) a chart quantifying bleeding rates specifically among U.S. participants in the 14,000-patient ROCKET AF study before September 2015; and (3) a "black box" warning that Xarelto carries a risk of bleeding, a risk that the label already mentions more than 100 times and that is inherent in the use of any anticoagulant.

Federal law preempts Plaintiffs' warnings-based claims for two reasons: (1) because they would require Defendants to take action that they cannot lawfully take "independently," and (2) because "clear evidence" demonstrates that FDA would have rejected (and in fact did reject) the labeling changes that Plaintiffs now say state law required. Accordingly, Plaintiffs' failure-to-warn claims are barred as a matter of law, and Defendants are entitled to partial summary judgment.

**STATEMENT OF THE CASE**

Defendants tested and evaluated Xarelto in tens of thousands of patients through a comprehensive program of clinical trials. FDA exhaustively reviewed the data generated in those trials and engaged in a robust discussion about Xarelto's safety and efficacy, including its labeling. Indeed, in the process of considering whether to approve Xarelto for consumer use, FDA considered *the very same issues* that Plaintiffs have now made the focus of their failure-to-warn claims.

## I.    FDA approves Xarelto based on the 14,000-patient ROCKET AF clinical trial.

On November 4, 2011, FDA gave final approval for use of Xarelto in a 20 mg once-daily dose (15 mg for those with impaired renal function) in patients with non-valvular atrial fibrillation ("AFib") to reduce the risk of stroke and systemic embolism. Xarelto Label, approved November 4, 2011, available at: http://www.accessdata.fda.gov/drugsatfda_docs/label/2011/202439s000lbl.pdf (Ex. A); Center for Drug Evaluation and Research, NDA 202439–Rivaroxaban (Xarelto): Impact of use of the

2

INRatio® device in the ROCKET AF trial, September 26, 2016, ("FDA Reanalysis") at 1, 5 (Ex. B).  The primary clinical study that was submitted to FDA in connection with the New Drug Application for the atrial-fibrillation indication was ROCKET AF, "a randomized, double-blind, event driven, confirmatory trial of rivaroxaban vs. dose-adjusted warfarin."  FDA Reanalysis, at 5; *Boudreaux* Compl. ¶ 77 ("Approval of Xarelto for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation in the U.S. was based on a clinical trial known as [ROCKET AF].").  ROCKET AF was extensively reviewed by FDA prior to Xarelto's approval and, as explained below, was more recently the subject of a comprehensive post-approval review in 2016.  Among their claims here, Plaintiffs allege that the results of ROCKET AF were inaccurately or insufficiently described in Xarelto's label.

ROCKET AF involved approximately 14,000 patients from more than 1,100 study sites on six continents.  FDA Reanalysis, at 5.  The study was designed to test whether Xarelto was "non-inferior" to—*i.e.*, at least as good as—the existing anticoagulant warfarin in reducing the risk of stroke and systemic embolism in patients with AFib.  *Id.*  The trial's control group used warfarin, which requires frequent coagulation monitoring to enable necessary dose-adjustments. Warfarin patients' coagulation parameters are monitored through a blood test that measures prothrombin time ("PT"), which, for warfarin patients, has been standardized by use of the International Normalized Ratio ("INR").  The protocol for ROCKET AF required warfarin patients to undergo blood testing to ensure that their INR stayed within a certain range.  *Id.* at 9.

ROCKET AF investigators measured warfarin patients' INR using a "point-of-care" device manufactured by HemoSense, Inc., now Alere, San Diego, Inc.  The device, called "INRatio," allowed investigators to obtain real-time measurements of warfarin users' coagulation parameters, rather than having to wait for laboratory test results.  *Id.* at 5.  Because

the device encrypted INR readings, it also allowed investigators to maintain the "double-blind" nature of the trial. *Id.* Warfarin users' INR measurements were taken at least every four weeks throughout the study to ensure that they remained in the target INR range of 2.0 to 3.0. *Id.* More formal laboratory tests also were performed on at least two separate occasions throughout the course of the trial. *Id.*

At the conclusion of ROCKET AF, Xarelto was determined to be non-inferior to—at least as good as—warfarin at reducing the risk of stroke and systemic embolism in patients with AFib. *Id.* at 1, 7.

## II.     FDA reanalyzes the ROCKET data and concludes that a recall of the INRatio device did not affect the study's findings or warrant mention in Xarelto's label.

In September 2015, years after Xarelto was approved for AFib patients, JRD learned that Alere had instituted a Class 1 recall of the INRatio devices. September 29, 2015 Letter from JRD to FDA, XARELTO_JANSSEN_16378492, at 4 (Ex. C). The recall notice stated that "[i]n certain cases," the device "may provide an INR result that is clinically significantly lower than a result obtained using a reference INR system (laboratory method)." FDA Reanalysis, at 13. Upon learning of the recall, JRD advised FDA that devices similar to those used in ROCKET AF had been recalled. September 29, 2015 Letter from JRD to FDA, at 4. FDA then "independently performed a variety of analyses intended to characterize the impact of use of the INRatio device on the safety and efficacy results of ROCKET." FDA Reanalysis, at 1.

On September 26, 2016, FDA issued a comprehensive, 74-page "ROCKET AF Reanalysis Review," which reaffirmed the ROCKET AF study's findings, Xarelto's positive benefit-risk profile, and the adequacy of the product labeling. FDA Reanalysis, *generally*. In particular, FDA stated:

> [T]he conclusion we made in 2011 that the benefits of rivaroxaban in patients with non-valvular atrial fibrillation outweigh its risks should not be changed.
>
> . . . .
>
> [N]o changes in rivaroxaban labeling to reflect the impact of use of the INRatio device in ROCKET are warranted. No other major regulatory action should be taken with respect to rivaroxaban.

*Id.* at 2–3. FDA further observed "that a labeling change to describe the modeling results would be very difficult to write in a concise manner and might be more likely to confuse than to edify, and is not warranted." *Id.* at 42. Shortly after publication of its official report, FDA posted a public statement on its official website stating:

> The Agency has determined that the effects on strokes or bleeding, including bleeding in the head were minimal. The FDA concludes that *Xarelto is a safe and effective alternative to warfarin in patients with atrial fibrillation*.

October 11, 2016 FDA Public Statement, "FDA analyses conclude that Xarelto clinical trial results were not affected by faulty monitoring device," available at: http://www.fda.gov/Drugs/DrugSafety/ucm524678.htm (Ex. D) (emphasis added).

## III.   After initially refusing proposals to include labeling language about discrete "subgroups," FDA approves the addition of subgroup language as part of an effort to "harmonize" all NOAC labels.

JRD provided to FDA the results of ROCKET AF, including data pertaining to discrete "subgroups," in New Drug Application 202439 (indication for atrial fibrillation). Then, as part of labeling discussions with FDA, JRD proposed in August 2011 to include in the label language about certain ROCKET AF subgroup data—in particular, that the efficacy of Xarelto in preventing strokes and embolism "was generally consistent across major subgroups." JRD's August 18, 2011 submission to FDA, XARELTO_JANSSEN_00023123 ("JRD's August 18, 2011 submission"), at 27 (Ex. E). FDA provided its own proposal referring to "US practice"; that proposal would have added language to the Clinical Trials section of the label that "[t]here is

insufficient experience with INR control more typical of US practice to say how XARELTO and warfarin compare in this setting." FDA's October 11, 2011 revision, XARELTO_JANSSEN_00001453 ("FDA's October 11, 2011 revision"), at 35 (Ex. F).[1] JRD then suggested different language, likewise referring to U.S. patients: "In ROCKET AF, the patients randomized to warfarin had a mean percentage time in the INR target range of 2.0 to 3.0 of 55% with limited number of patients with a time in range >70%. *In the US*, the mean target range was 63%." JRD's October 14, 2011 submission to FDA, XARELTO_JANSSEN_01249223, at 26 (Ex. G) (emphasis added). FDA subsequently concluded that none of these statements suggesting that there were differences in subgroup data should be included in the label. FDA's October 19, 2011 revision, XARELTO_JANSSEN_14159827 at 23 (Ex. H) (adopting JRD's original proposal stating "the efficacy of Xarelto was generally consistent across major subgroups"). Significantly, during FDA's internal labeling discussions, the Agency also considered and then expressly rejected the inclusion of a statement that "North American subjects on XARELTO experienced a higher annual bleeding rate compared to their warfarin treated counterparts than subjects from any other region":

---

[1] *See also, e.g.*, JRD's August 18, 2011 submission, at 26, 28 (JRD's proposal to add to "CLINICAL STUDIES," Section 14.2, Figure 1, summarizing data of adjudicated primary composite endpoints of stroke and non-CNS systemic embolism, including the North American region and stating "the efficacy of Xarelto was generally consistent across major subgroups" and proposing to add Figure 2 "Subgroup Analysis of Adjudicated Primary Composite Endpoints by Patient Baseline Characteristics Safety Population / On Treatment" summarizing a subgroup data analysis); FDA's October 11, 2011 revision, at 35 (FDA rejects these proposals).

~~The risk of major bleeds was similar with XARELTO and warfarin across major subgroups defined by baseline characteristics, with the exceptions of race and region. There was a higher annual rate of major bleeding in Black subjects taking XARELTO compared their warfarin treated counterparts than in non-black subject groups (HR = 1.7, p interaction = 0.025). Likewise, North American subjects on XARELTO experienced a higher annual bleeding rate compared to their warfarin treated counterparts than subjects from any other region (HR = 1.4, p interaction = 0.008) The increases in major bleeding events with XARELTO in the categories of hemoglobin drop and/or transfusion were primarily from the gastrointestinal tract.~~ <u>Other Adverse Reactions</u>

FDA's October 11, 2011 revision, at 19.

So matters stood for more than two years.  Then, in January 2014, FDA undertook a class-wide effort "to harmonize the presentation of safety and efficacy data in the labels for *all* recently approved non-vitamin K-dependent oral anticoagulants (NOACs)"—not just Xarelto, but also Pradaxa® and Eliquis®.  January 28, 2014 letter from FDA XARELTO_JANSSEN_00000344 (Ex. I); September 10, 2015 letter from FDA, XARELTO_JANSSEN_11046462 ("September 10, 2015 letter from FDA"), at 1 (Ex. J).  For Xarelto, in particular, this class-wide "harmoniz[ation]" meant adding to the label additional data from ROCKET AF pertaining to various subgroups—*e.g.*, gender, weight, and others, including U.S. patients.  JRD responded to multiple inquiries from FDA over the course of the next year and a half, and on September 10, 2015, FDA approved the addition of a new chart in the label regarding bleeding risks of various subgroups of patients studied in ROCKET AF, including the U.S. subgroup.  September 10, 2015 letter from FDA, at 3.[2]  The chart, entitled "Risk of Major Bleeding Events by Baseline Characteristics in ROCKET AF – On Treatment Plus 2 Days," summarizes data that were indisputably derived from ROCKET AF, and thus were before FDA

---

[2] The chart also cautions, among other things, that subgroup information "should not be over-interpreted."  *See id.*

from the outset. *Id.* The chart was not based on any new or different study not previously considered by the Agency.

## ARGUMENT

The Supremacy Clause of the United States Constitution states "[t]his Constitution, and the laws of the United States which shall be made in pursuance hereof . . . shall be the supreme law of the land." U.S. Const. art. VI § 2. Accordingly, it has long been settled that state laws that conflict with federal law are "without effect." *Mutual Pharm. Co. v. Bartlett*, 133 S. Ct. 2466, 2473 (2013) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)). It is likewise settled that common-law tort claims seeking damages are a form of state "law" subject to preemption. *See, e.g.*, *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881 (2000). Where it is "impossible for a private party to comply with both state and federal requirements," state law claims are preempted. *Bartlett*, 133 S. Ct. at 2473 (internal quotations and citations omitted).

The Supreme Court has established the standard for "impossibility" preemption in three recent pharmaceutical cases: *Wyeth v. Levine*, 555 U.S. 555 (2009); *PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011); and *Bartlett*, 133 S. Ct. 2466. Under those decisions, it is "impossible" for the pharmaceutical manufacturer to comply with both federal and state law—and preemption attaches—in either of two instances.

*First*, because "[t]he question for 'impossibility' is whether the [manufacturer] could *independently* do under federal law what state law requires of it," preemption attaches "when a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency." *Mensing*, 564 U.S. at 620, 623–24; *see also Bartlett*, 133 S. Ct. at 2478 (citing *Mensing*). *Second*, and separately, even where a manufacturer *can* act independently—for instance, to change its label under the Changes Being Effected ("CBE") regulation at issue in *Levine*—the Supreme Court

has held that the claims are still preempted if there is "clear evidence" that FDA would not have approved a label change.  *See Levine*, 555 U.S. at 571.[3]

Federal law preempts each of Plaintiffs' failure-to-warn claims here, in some instances for multiple reasons.

First, federal law preempts Plaintiffs' claims that Xarelto's label fails to advise that FDA recalled the INRatio device used in the ROCKET AF trial because "clear evidence" shows that FDA would have rejected any attempt to add that information to the label.  Indeed, in a recent comprehensive post-hoc reanalysis of the ROCKET AF data in light of the recall, FDA expressly concluded that "[n]o changes in the rivaroxaban labeling to reflect the impact of the INRatio device are warranted."  FDA Reanalysis, at 2.

Second, Plaintiffs' claim that Xarelto's label failed (until September 2015) to include bleeding data specifically about U.S. patients in the ROCKET AF trial is preempted for three reasons: (a) FDA considered the ROCKET AF trial, including safety and efficacy data related to the U.S. subgroup, as part of the approval process for Xarelto, and concluded at the time that the label should not emphasize data from the U.S. subgroup; (b) JRD could not have

---

[3] Since *Levine*, *Mensing* and *Bartlett*, courts have overwhelmingly concluded that the "impossibility" analysis—focused on the permissibility of "independent," "unilateral" manufacturer action—applies equally to both brand-name and generic products and manufacturers.  *See, e.g.*, *Yates v. Ortho-McNeil-Janssen*, 808 F.3d 281 (6th Cir. 2015); *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 779 F.3d 34 (1st Cir. 2015); *In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917 (6th Cir. 2014); *Brazil v. Janssen Research & Dev. LLC*, Civ. A. No. 4:15-CV-0204-HLM, 2016 WL 3748771 (N.D. Ga. July 11, 2016); *Fleming v. Janssen Pharm., Inc*., No. 2:15-cv-02799-JPM-DKV, 2016 WL 3180299 (W.D. Tenn. May 6, 2016); *Barcal v. EMD Serono, Inc.*, No. 5:14-cv-01709-MHH, 2016 WL 1086028 (N.D. Ala. Mar. 21, 2016); *Batoh v. McNeil-PPC, Inc.*, 167 F. Supp. 3d 296 (D. Conn. 2016); *Rheinfrank v. Abbott Labs., Inc.*, No. 1:13-cv-144, 2015 WL 5836973 (S.D. Ohio Oct. 2, 2015); *Booker v. Johnson & Johnson*, 54 F. Supp. 3d 868 (N.D. Ohio 2014); *Thompson v. Allergan USA, Inc.*, 993 F. Supp. 2d 1007 (E.D. Mo. 2014); *Amos v. Biogen Idec Inc.*, 28 F. Supp. 3d 164 (W.D.N.Y. 2014).  Indeed, as a recent Third Circuit case makes clear, the fundamental principles recognized in *Mensing* and *Bartlett* apply even outside the pharmaceutical context.  *See Sikkelee v. Precision Airmotive Corp*., 822 F.3d 680, 703–04 (3d Cir. 2016) (applying *Mensing* and *Bartlett*, in aviation context, for the proposition that "where manufacturers are unable to simultaneously comply with both federal and state requirements, state law design defect claims are conflict preempted").  *But see Estate of Cassel v. Alza Corp.*, No. 12-CV-771-WMC, 2014 WL 856023, at *5 (W.D. Wis. Mar. 5, 2014) (holding that *Bartlett* does not apply to brand-name drugs).

"independently" added those data to the label, as they do not constitute "newly acquired information" within the meaning of the CBE regulation; and (c) "clear evidence" demonstrates that FDA would have rejected—and in fact, did reject—a proposal to include those subgroup data in Xarelto's label.

Third, federal law preempts Plaintiffs' claim that Xarelto's label should have included a "black box" warning because the governing regulations make clear—and Plaintiffs' regulatory expert concedes—that a pharmaceutical company cannot "independently" (*i.e.*, without advance FDA approval) add a boxed warning to a product's labeling, and because FDA never required JRD to adopt a black-box warning related to Xarelto's bleeding risks.

**I.      Plaintiffs' claim that the label fails to advise that FDA recalled the INRatio device used in the ROCKET AF study is preempted because there is "clear evidence" that FDA would not—and in fact refused to—adopt a label change regarding the recall.**

As set forth above, in September 2016, FDA released its 74-page "ROCKET AF Reanalysis Review," which concluded that the recall of the INRatio device did not impact the ROCKET AF study's findings of safety and reiterated Xarelto's positive benefit-risk profile and the adequacy of the product labeling.  As particularly relevant here, FDA stated:

> [T]he conclusion we made in 2011 that the benefits of rivaroxaban in patients with non-valvular atrial fibrillation outweigh its risks should not be changed.
> . . . .
>
> [N]o changes in rivaroxaban labeling to reflect the impact of use of the INRatio device in ROCKET are warranted.  No other major regulatory action should be taken with respect to rivaroxaban.

FDA Reanalysis, at 2, 3.

Despite FDA's robust analysis and conclusion, Plaintiffs' experts nonetheless opine that, following the INRatio recall, the Xarelto label should have been revised to include language that

the recall of the device had a negative impact on the results of ROCKET AF.[4]  Plaintiffs' claim is preempted by federal law.  Under *Levine*, FDA's reanalysis provides amply "clear evidence" that it would not have approved a label change related to the recall of the INRatio device.

Although the Supreme Court has not precisely defined "clear evidence," courts in various jurisdictions have articulated standards that resolve the issue here, and have recognized that clear evidence is an issue that the court should decide as a matter of law.  *See, e.g.*, *Seufert v. Merck Sharp & Dohme Corp.*, 187 F. Supp. 3d 1163, 1169 (S.D. Cal. 2016); *Cerveny v. Aventis, Inc.*, 155 F. Supp. 3d 1203, 1213 (D. Utah 2016), *appeal docketed*, No. 16-4050 (10th Cir. Apr. 12, 2016); *In re Incretin-Based Therapies Prods. Liab. Litig.*, 142 F. Supp. 3d 1108, 1120 (S.D. Cal. 2015), *appeal docketed*, No. 15-56997 (9th Cir. Dec. 31, 2015).

Clear evidence often exists in the form of FDA's rejection of a particular proposal to add language to a product's label, as it does here, with respect to the U.S.-subgroup issue addressed below, *see infra* at 17–19.  A rejected proposal, however, is not a necessary condition of clear evidence preemption.  Indeed, "[c]ourts have *universally* rejected the notion that *Levine* requires a showing that the manufacturer attempted to apply the warning suggested by the plaintiff but

---

[4] *See, e.g.*, Expert Report of Henry Rinder, MD at 3 (Ex. K) ("The management of Warfarin patients in ROCKET AF was conducted with a faulty international normalized ratio (INR) device, thereby undermining the reliability of ROCKET AF at best, and invalidating the study at worst."); Expert Report of Frank Smart, MD at 4 (Ex. L) ("The faulty device would make warfarin treated patients look worse than they actually were. So that the ROCKET-AF comparison between Xarelto treated patients and warfarin treated patients which suggested the two patient groups had equal risk of stroke reduction and an improved bleeding risk with Xarelto was inappropriate; and likely incorrect."); Expert Report of Bud Gerstman at 6 (Ex. M) ("The TTRs in ROCKET may actually be lower than has been reported because the devices used to measure INRs in the trial have since been proven to be unreliable."); Expert Report of Suzanne Parisian at 11-12 (Ex. N) ("Defendants failed as the ROCKET-AF sponsor to adequately identify a suitable point-of-care (POC) device for reliable management of warfarin and patient safety for the ROCKET trial beginning with the due diligence stage.  Defendants failed to validate the acceptable performance of the ALERE/HemoSense INRatio POC device. Defendants failed as IND and clinical trial sponsor to: 1) select a safe and effective device or method for determination of warfarin management; 2) adequately monitor the performance of the POC INRatio device during ROCKET worldwide; 3) implement back-up methods including laboratory testing to protect patient safety; 4) investigate and report adverse events and failures of the device to the appropriate Adverse Event database; 5) adequately instruct and provide an algorithm to investigators for warfarin management.").

that the labeling was ultimately rejected by the FDA." *Cerveny*, 155 F. Supp. 3d at 1218–19 (emphasis added).  To the contrary, the case law demonstrates that the clear evidence standard is also met, and preemption applies, where, as here, FDA engages in an independent, post hoc review of a particular issue and thereafter expressly declines to change the product labeling to address it.  *See, e.g.*, *Seufert*, 187 F. Supp. 3d at 1170, 1177; *In re Incretin*, 142 F. Supp. 3d at 1132 n. 18 (emphasizing that "the FDA's own review of a safety signal" can give rise to "clear evidence" and finding the standard met based on FDA's comprehensive review of the risk and its corresponding inaction despite those reviews).

The *Seufert* decision is on point.  There, just like here, FDA had "independently undert[aken] comprehensive evaluations of a safety signal arising from postmarketing reports"— in that case, "of pancreatitis and pancreatic cancer in patients using incretin-based drugs"—and concluded that the risks were "adequately reflected in the product information and labeling." 187 F. Supp. 3d at 1165.  There, just like here, FDA subsequently published its conclusions.  *Id.* at 1167.  The court held that, in light of the fact that "FDA has reviewed, independently investigated, and commented publicly on the specific issue implicated by Plaintiffs' claims" and yet declined to require a label change, the "clear-evidence" standard was met and the plaintiffs' claims were preempted.  *Id.* at 1177; *see also id.* at 1174 n.16 ("[W]hat the FDA believed and publicly expressed regarding pancreatic cancer risk is the best indicator of what the FDA would have done in response to a manufacturer submitted CBE.").

Here, as in *Seufert*, FDA has already undertaken an extensive investigation of, and published findings concerning, the INRatio-related issue that Plaintiffs now assert warrants a label change.  *See id.* at 1171, 1177.  In its 74-page reanalysis, FDA concluded, flatly contrary to Plaintiffs' current contention, that "no changes in rivaroxaban labeling to reflect the impact of

use of the INRatio device in ROCKET are warranted" and that no further regulatory action is necessary.  FDA Reanalysis, at 3.  FDA's unambiguous judgment—rendered after the fact—supplies the required "clear evidence," and Plaintiffs' INRatio-related claim is preempted.[5]

## II.   Plaintiffs' claim that the label failed to include U.S.-subgroup data is preempted for multiple reasons.

Several of Plaintiffs' experts opine that the U.S.-subgroup information that was added to the Xarelto label in September 2015 as part of FDA's effort to harmonize the various NOAC labels should have been added to Xarelto's label earlier.  *See, e.g.*, Expert Report of Dr. Cindy Leissinger, MD at 3 (Ex. O) ("Prior to September 2015, the label failed to properly inform physicians of the increased bleeding risk seen in U.S. patients on the registration trial for atrial fibrillation."); Smart Rep. at 6–7 (same); Rinder Rep. at 4 (same).  That claim is preempted for several independent reasons:  (1) because FDA had and extensively considered the very same ROCKET AF data during the approval process for Xarelto; (2) because the data does not constitute "newly acquired information" under the CBE regulation; and (3) because "clear evidence" demonstrates that FDA would have rejected—and in fact did reject—proposed label changes to emphasize U.S. subgroup information.

---

[5] To the extent Plaintiffs contend that Defendants should be held liable for allegedly failing to share with FDA at an earlier date certain data related to use of the INRatio device in ROCKET, any such claim is preempted under *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 343, 349–50 (2001), which held that federal law preempts any state-law claim that is premised on the notion that the defendant misled FDA or violated FDA regulations.  *See also Lofton v. McNeil Consumer & Specialty Pharm.*, 672 F.3d 372, 380 (5th Cir. 2012) ("In cases like this, where the FDA has not found fraud, the threat of imposing state liability on a drug manufacturer for defrauding the FDA intrudes on the competency of the FDA and its relationship with regulated entities.  Under such circumstances *Buckman* found a violation of the Supremacy Clause.").

**A.      FDA considered U.S. subgroup data from ROCKET AF as part of the approval process, and JRD could not have "independently" changed the Xarelto label to include those data, which were not "newly acquired information" within the meaning of the CBE regulation.**

JRD could not have independently added U.S.-subgroup data from ROCKET AF to Xarelto's labeling before September 2015 because U.S.-subgroup data was considered by FDA as part of the approval process, and those data, which remain unchanged, are not "newly acquired information."

Under federal law, FDA "will approve an [application for the sale of a medicine] . . . conditioned upon the applicant incorporating the specified labeling changes exactly as directed, and upon the applicant submitting to FDA a copy of the final printed labeling prior to marketing."  21 C.F.R. § 314.105(b).  The labeling must include "a summary of the essential scientific information needed for the safe and effective use of the drug."  21 C.F.R. § 201.56(a)(1), (d)(1).  FDA then considers all of the submitted material to ensure, "based on a fair evaluation of all material facts," that the proposed label is not "false or misleading in any particular."  21 U.S.C. § 355(d)(7); 21 C.F.R. § 314.125(b)(6).  After approval, the manufacturer may distribute the drug without violating federal law as long as it uses the FDA-approved label. *See* 21 U.S.C. §§ 331(c); 333(a); 352(a), (c).  Once a medicine is approved for sale based on the then-existing clinical studies and scientific evidence, the CBE regulation permits a pharmaceutical manufacturer "to add or strengthen" a warning in its labeling, but *only* if the change is based on "newly acquired information."  21 C.F.R. § 314.70(c)(6)(iii).  Information that FDA had and considered during the approval process—like the subgroup data at issue here—is, by definition, *not* "newly acquired information."[6]

---

[6] In *Levine*, the Supreme Court held that the particular label change proposed by the plaintiff could have been independently adopted by the defendant under the CBE regulation.  However, the change there was not based on a study previously considered by FDA as part of the approval process.  As used in the CBE regulation, "newly

The First Circuit's decision in *In re Celexa*, 779 F.3d 34 (1st Cir. 2015), illustrates why federal law preempts Plaintiffs' claims based on the ROCKET AF subgroup data. There, the plaintiffs alleged that FDA had initially approved Lexapro® based on "questionable" data from clinical studies available at the time, and that two articles published post-approval constituted "newly acquired information" warranting a label change. *Id.* at 38, 42. The First Circuit rejected plaintiffs' argument and held that, although the CBE regulation applies in "virtually all situations in which new information indicates new or greater risks, or misleading claims of efficacy," a failure-to-warn claim must be premised on the failure of a pharmaceutical manufacturer "to respond to information ***not considered by the FDA***." *Id.* at 41 (emphasis added); *see also id.* at 43 (holding the claims were preempted because the plaintiffs "ma[de] no claim . . . that this information was unknown to the FDA prior to label approval"). Under the circumstances presented, there was "no precedent . . . that would have allowed [the defendant manufacturer] to use the CBE procedure to alter the FDA label in the manner that plaintiffs allege is necessary so as to render it not 'misleading.'" *Id.* at 43.

The court in *In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices & Products Liability Litigation*, 185 F. Supp. 3d 761 (D.S.C. 2016), recently applied *Celexa* to find that state-law claims based on studies already considered by FDA were not based on "newly acquired information" under the CBE regulation, and thus were preempted in circumstances nearly identical to those here. *See id.* at 769 ("[A]ny claim that a drug label should be changed based on information previously submitted to the FDA is preempted because the CBE regulation

---

acquired information" means "data, analyses, or other information *not previously submitted to the Agency*, which may include (but is not limited to) data derived from new clinical studies, reports of adverse events, or new analyses of previously submitted data (e.g., meta-analyses) if the studies, events or analyses reveal risks of a different type or greater severity or frequency than previously included in submissions to FDA." 21 C.F.R. § 314.3(b) (emphasis added).

cannot be used to make a label change based on such information."). There, the plaintiffs alleged that the Lipitor® label did not accurately describe the product's efficacy for use in women based on a particular clinical study—called ASCOT—that had been submitted to and considered by FDA during the approval process. *See id.* at 769 ("[T]he FDA approved the Lipitor label based on the ASCOT trial and data."). The court held that the plaintiffs' claim that "Lipitor's label should have included different statements about Lipitor[] . . . based on the ASCOT data" was preempted because "neither Plaintiffs nor their experts have identified any . . . 'new analyses' of the ASCOT data that should have caused Defendant to change its label." *Id.* at 769–70 ("The only 'new analysis' of ASCOT efficacy data mentioned by Plaintiffs' experts is Dr. Wells' analysis, which was conducted as part of this litigation.").[7]

Even more recently, the court in *Utts v. Bristol-Myers Squibb Co.*, --- F. Supp. 3d ---, No. 1:16-cv-05668-DLC, 2016 WL 7429449 (S.D.N.Y. Dec. 23, 2016), held, at the pleadings stage, that federal law likely preempted failure-to-warn claims concerning Eliquis®, a brand-name medication in the same "NOAC" class as Xarelto. The plaintiffs there contended that the Eliquis label failed to disclose certain purported deficiencies in a study called ARISTOTLE, which the product's manufacturers had "presented to the FDA as part of their NDA submission." *Id.* at *2, 10. The court held, however, that none of the information to which the plaintiffs pointed, including "side effects experienced by study participants," constituted "'newly acquired information' such that [the manufacturers] could, pursuant to the CBE regulation, act independently of the FDA to update the Eliquis label . . . ." *Id.* at *1, 11. Although the court—in

---

[7] When FDA has already considered a particular safety issue based on the same studies that were subject to the FDA's decision to approve the product and its labeling, the Agency's decision is not "new" information and cannot be the basis of a state court claim. *Cf. In re Incretin*, 142 F. Supp. 3d at 1131 ("A reevaluation of scientific data or a judicial challenge to the accuracy of the FDA's conclusions would disrupt the 'delicate balance of statutory objectives.'").

ruling on a Rule 12(b)(6) motion, rather than a summary judgment motion—granted the plaintiffs leave to attempt to replead a viable failure-to-warn claim, it expressed its view that, as a matter of law, any such claim "appear[ed] to be preempted" under *Celexa* and the newly-acquired-information requirement.  *Id.* at *10.

Just so here.  FDA thoroughly considered ROCKET AF, and there were no "newly acquired" data that prompted the Agency to request that certain ROCKET AF subgroup information be added to the label.  Rather, FDA requested the addition of the subgroup data to the label in September 2015 simply as part of a class-wide agency initiative "aimed to harmonize the presentation of safety and efficacy data in the labels for all recently approved non-vitamin K-dependent oral anticoagulants."  September 10, 2015 letter from FDA, at 1.  Far from "new," the subgroup data were not new at all; they were taken straight from ROCKET AF's findings, which had long before been submitted to FDA as part of the initial New Drug Application in 2011. Accordingly, any claim regarding the failure to include U.S.-subgroup information from ROCKET AF in the Xarelto label before September 2015 is preempted because JRD, having no "newly acquired information," could not have "independently" or "unilaterally" made the change before FDA required it.  *Celexa*, 779 F.3d at 43.

**B.**  **"Clear evidence" shows that FDA would have rejected—and in fact did reject—an effort to add U.S.-subgroup data to the Xarelto label.**

Plaintiffs' claims challenging JRD's supposed failure to include subgroup data are preempted for another, independent reason: because "clear evidence" demonstrates that FDA would not have approved the inclusion of subgroup data prior to its approval of the September 2015 class-wide "harmoniz[ation]" initiative.  *See Levine*, 555 U.S. at 571 (holding that even where a manufacturer can unilaterally change its label, as through the CBE procedure, impossibility preemption nonetheless applies if "clear evidence" shows that FDA would have

subsequently disallowed the change).  As already noted, post-*Levine* cases have explained the operation of the clear-evidence rule.  As particularly relevant here, those cases demonstrate that the clear-evidence standard is met, and preemption applies, where FDA rejects a specific proposal to add a warning that is substantially similar to the warning that a plaintiff asserts should have been included.  *See, e.g., Christison v. Biogen Idec Inc.*, --- F. Supp. 3d ---, No. 2:11-cv-01140-DN-DBP, 2016 WL 4223956, at *27–28 (D. Utah Aug. 5, 2016) (emphasizing FDA's rejection of manufacturer's proposed labeling change); *Rheinfrank v. Abbott Labs.*, 119 F. Supp. 3d 749, 766 (S.D. Ohio 2015) (emphasizing that the manufacturer attempted to strengthen its warning label and FDA twice denied the request); *In re Depakote*, 87 F. Supp. 3d 916, 922 (S.D. Ill. 2015) (same); *In re Fosamax (Alendronate Sodium) Prods. Liab. Litig.*, 951 F. Supp. 2d 695, 703–04 (D.N.J. 2013) (explaining that manufacturer "submitted a label change and the FDA rejected it"); *Dobbs v. Wyeth Pharm.*, 797 F. Supp. 2d 1264, 1274–75 (W.D. Okla. 2011) (noting FDA's rejection of manufacturer's attempts to strengthen warning labels).

To be clear, it is not necessary that FDA reject the precise phraseology that a plaintiff advocates after the fact in litigation; rather, it is sufficient that FDA reject the substance of a plaintiffs' proposed warning.  *See, e.g., Levine*, 555 U.S. at 572 (considering whether FDA considered the "kind of warning" that plaintiff seeks); *Mensing*, 564 U.S. at 637 (Sotomayor, J., dissenting) (observing that clear-evidence standard is met when FDA has "considered whether to request enhanced warnings in light of the evidence on which a plaintiff's claim rests but . . . decided to leave the warnings as is"); *Seufert*, 187 F. Supp. 3d. at 1172–1173 (rejecting plaintiff's argument that FDA must reject and comment on "specific proposed warning language"); *Newman v. McNeil Consumer Healthcare*, No. 10-CV-01541, 2012 WL 39793, at *7 (N.D. Ill. Jan. 9, 2012) ("FDA should not have to reject every possible formulation of a

particular warning in order for there to be clear evidence of rejection.").  As the United States explained the issue to the Supreme Court: "[FDA] could not reasonably be expected to *expressly* reject every possible variant of approved labeling as part of its decisional process.  Indeed, it would underestimate the post hoc imagination of lawyers to think such an exhaustion of potential variants by the manufacturer or the agency is even possible."  Brief for the United States as Amicus Curiae Supporting Pet'r at 25, *Levine*, 555 U.S. 555 (No. 06-1249), 2008 WL 2308908 at *25.

Here, the evidence indisputably shows that FDA considered language, either as proposed by JRD or of its own accord, regarding both the safety and efficacy of Xarelto as reflected in subgroup data from ROCKET AF.  In particular, as relevant here, FDA rejected:

- A proposal to include a statement that "North American subjects on Xarelto experienced higher annual bleeding rate compared to their warfarin treated counterparts than subjects from any other region."  FDA's October 11, 2011 revision, at 19.

- Language that TTR measurements were 65% for the U.S. subgroup, as compared to 55% worldwide.  JRD's October 14, 2011 submission, at 26.

FDA's rejection of this specific language is "clear evidence" that the Agency would not have approved Plaintiffs' proposed subgroup-related label changes.

Plaintiffs' entire claim turns on FDA's decision in 2015—as part of an effort to "harmonize" labeling for *all* NOAC products—to include a chart summarizing and categorizing the same subgroup data that had been studied in ROCKET AF and supplied to the Agency at the outset of the approval process.  FDA's "harmoniz[ation]" project cannot bear the weight that Plaintiffs' attribute to this post hoc administrative decision to include additional (but long extant) information about ROCKET AF in the label.  Both because the U.S.-subgroup data were not

"new" and because FDA rejected several proposals to include those data earlier, federal law preempts Plaintiffs' claim that Defendants should be held liable for failing to do so.

## IV.   Federal law preempts plaintiffs' claim that Xarelto's label is inadequate because it does not contain a "black box" warning about bleeding risks.

Several of Plaintiffs' experts opine that Defendants failed to adequately warn of the bleeding risks associated with Xarelto because the product's label does not include a "black-box" warning.  *See, e.g.*, Expert Report of Henry I. Bussey, Pharm.D. at 1, 8, 15 (Ex. P); Expert Report of Philip S. Cuculich, MD at 3, 12 (Ex. Q); Leissinger Rep. at 2, 18; Rinder Rep. at 4, 19. But the same risk of bleeding is mentioned in numerous instances, more than 100 times, elsewhere in the label.  Moreover, as one of Plaintiffs' regulatory experts has expressly and correctly conceded, a pharmaceutical company is forbidden from unilaterally adding a black-box warning to its product's label.  *See* Parisian Dep. at 57:5–14 (Ex. R) (Q: "[W]e have agreement that [a black-box warning] cannot be changed without a prior approval supplement.  Correct?" A: "It has – that's correct. . . . FDA has to pass on this . . . to remove it or put a new black-box warning.").  Because the governing regulations prohibit manufacturers from adding black-box warnings without FDA's prior approval, Plaintiffs' claims are preempted.

The governing FDA regulations permit a manufacturer to add a black box warning to its product's label *only* if specifically required to do so by FDA.  In particular, the regulations state that "[s]pecial problems, particularly those that may lead to death or serious injury, may be required by the Food and Drug Administration to be placed in a prominently displayed box" and that "[i]f a boxed warning is required, its location will be specified by the Food and Drug Administration."  21 C.F.R. § 201.80(e); *see also* 21 C.F.R. § 201.57(c)(1) ("Certain contraindications or serious warnings, particularly those that may lead to death or serious injury, may be required by the FDA to be presented in a box." (applying rule to prescription drugs

approved after June 30, 2001, pursuant to 21 C.F.R. § 201.56(b))).

Notably, during the notice-and-comment period for this rule, FDA clarified its view that only the Agency can institute black-box warnings. When asked specifically "whether a manufacturer may include a boxed warning without prior FDA approval," the Agency responded with an emphatic "no," explaining that black-box warnings "are permitted only when specifically required by FDA." 44 Fed. Reg. 37434, 37448 (June 26, 1979). The reason for that limitation, FDA said, was "to ensure the significance of boxed warnings in drug labeling." *Id.*; *see also* 51 Fed. Reg. 43900, 43902 (Dec. 5, 1986) ("[T]he agency has the authority to require a 'boxed' warning on prescription drug packages for special problems, particularly those that may lead to death or serious injury. . . . The agency's policy is to use restraint in requiring warnings to be boxed because overuse of the box will ultimately lead to reducing its effect."); *In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, 817 F. Supp. 2d 535, 553 n.97 (E.D. Pa. 2011) (rejecting a claim that the manufacturer should have added a boxed warning because "a boxed warning can be added only with prior FDA approval"). *Cf. Ackerman v. Wyeth Pharms.*, 526 F.3d 203, 211 n.12 (5th Cir. 2008) (noting that "Wyeth was forbidden from providing a 'black box' warning because '[t]o ensure the significance of boxed warnings in drug labeling, they are permitted in labeling only when specifically required by the FDA'" (alternation in original)).

Because federal law forbade Defendants from "independently" adding a black-box warning to Xarelto's label without prior FDA approval, and because FDA did not require the risk of bleeding to be included in the black-box warning, any claim arising out of their failure to do so is preempted. *See Bartlett*, 133 S. Ct. at 2470; *Mensing*, 564 U.S. at 620.

**CONCLUSION**

For all of these reasons, federal law preempts Plaintiffs' failure-to-warn claims.  This Court should grant Defendants' summary judgment motion.

Respectfully submitted,

DRINKER BIDDLE & REATH LLP

By: /s/ Susan M. Sharko
Susan M. Sharko
Drinker Biddle & Reath LLP
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
susan.sharko@dbr.com

Rodney M. Hudson
DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105-2235
Telephone: (415) 591-7500
Rodney.hudson@dbr.com

Chanda A. Miller
Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone: (215) 988-2500
Chanda.Miller@dbr.com

IRWIN FRITCHIE URQUHART & MOORE LLC

By: /s/ James B. Irwin
James B. Irwin
Kim E. Moore
Irwin Fritchie Urquhart & Moore LLC
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
jirwin@irwinllc.com

*Attorneys for Defendants Janssen Pharmaceuticals, Inc., Janssen Research & Development, LLC, and Janssen Ortho LLC, and Johnson & Johnson*

ARNOLD & PORTER KAYE SCHOLER LLP

By: /s/ William Hoffman
William Hoffman
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
william.hoffman@apks.com

Andrew K. Solow
Steven Glickstein
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Telephone: (212) 836-8485
andrew.solow@apks.com
steven.glickstein@apks.com

BRADLEY ARANT BOULT CUMMINGS LLP

By: /s/ Kevin C. Newsom
Kevin C. Newsom
Lindsey C Boney IV
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place, 1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8803
knewsom@bradley.com

CHAFFE MCCALL L.L.P.

By: /s/ John F. Olinde
John F. Olinde
Chaffe McCall L.L.P.
1100 Poydras Street, Suite 2300
New Orleans, LA 70163
Telephone: (504) 585-7241
olinde@chaffe.com

*Attorneys for Bayer HealthCare Pharmaceuticals Inc. and Bayer Pharma AG*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on January 20, 2017, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre-Trial Order No. 17.

*/s/ James B. Irwin*
**James B. Irwin**