# EXHIBIT B

Protected - Subject to Further Protective Review

```
 1       IN THE UNITED STATES DISTRICT COURT
 2     FOR THE EASTERN DISTRICT OF LOUISIANA
 3                    - - -
 4
      IN RE:  XARELTO          :   MDL NO. 2592
 5    (RIVAROXABAN) PRODUCTS   :
      LITIGATION               :   SECTION L
 6                             :
      THIS DOCUMENT RELATES    :   JUDGE ELDON
 7    TO ALL CASES             :   E. FALLON
                               :
 8                             :
                               :   MAG. JUDGE
 9                             :   NORTH
10
                    - - -
11
              December 15, 2016
12
                    - - -
13
              - PROTECTED -
14
   - SUBJECT TO FURTHER PROTECTIVE REVIEW -
15
16           Videotaped deposition of
   DAVID A. KESSLER, M.D., taken pursuant to
17 notice, was held at the law offices of
   Douglas & London, 59 Maiden Lane, New
18 York, New York, beginning at 8:39 a.m.,
   on the above date, before Michelle L.
19 Gray, a Registered Professional Reporter,
   Certified Shorthand Reporter,  Certified
20 Realtime Reporter and Notary Public.
21                  - - -
22         GOLKOW TECHNOLOGIES, INC.
      877.370.3377 ph | 917.591.5672 fax
23           deps@golkow.com
24
```

Protected - Subject to Further Protective Review

```
 1   APPEARANCES:
 2
 3       THE LAMBERT FIRM
         BY:  EMILY C. JEFFCOTT, ESQ.
 4       701 Magazine Street
         New Orleans, Louisiana 70130
 5       (504) 581-1750
         ejeffcott@thelambertfirm.com
 6
             - and -
 7
         SCHLICHTER, BOGARD & DENTON, LLP
 8       BY:  ROGER C. DENTON, ESQ.
         100 South Fourth Street
 9       Suite 1200
         St. Louis, Missouri 63102
10       (314) 621-6115
         rdenton@uselaws.com
11
             - and -
12
         DOUGLAS & LONDON, PC
13       BY:  LARA J. SAY, ESQ.
         59 Maiden Lane, 6th Floor
14       New York, New York 10038
         (212) 566-7500
15       lsay@douglasandlondon.com
16           - and -
17       LEVIN PAPANTONIO THOMAS
         MITCHELL RAFFERTY & PROCTOR, PA
18       BY:  NED McWILLIAMS, ESQ.
         (Via telephone)
19       316 South Baylen Street, Suite 600
         Pensacola, Florida 32502
20       (888) 435-7001
         nmcwilliams@levinlaw.com
21       Representing the Plaintiffs
22
23
24
```

Protected - Subject to Further Protective Review

```
 1      APPEARANCES:  (Cont'd.)
 2

 3      TUCKER ELLIS, LLP
        BY:  MICHAEL C. ZELLERS, ESQ.
 4      515 South Flower Street, 42nd Floor
        Los Angeles, California 90071
 5      (213) 430-3301
        Michael.zellers@tuckerellis.com
 6
            - and -
 7

        BARRASSO, USDIN, KUPPERMAN, FREEMAN
 8      & SARVER, LLC
        BY:  CELESTE COCO-EWING, ESQ.
 9      909 Poydras Street, Suite 2400
        New Orleans, Louisiana 70112
10      (504) 589-9700
        Ccoco-ewing@barrassousdin.com
11
            - and -
12

        DRINKER, BIDDLE & REATH, LLP
13      BY:  SEAN KENNEDY, ESQ.
        600 Campus Drive
14      Florham Park, New Jersey 07932
        (973) 549-7000
15      sean.kennedy@dbr.com
        Representing Janssen entities
16
17
18
19
20
21
22
23
24
```

Protected - Subject to Further Protective Review

```
 1        APPEARANCES:  (Cont'd.)
 2
          KAYE SCHOLER, LLP
 3        BY:  JEFFREY H. HOROWITZ, ESQ.
          250 West 55th Street
 4        New York, New York 10019
          (212) 836-7740
 5        jeffrey.horowitz@kayescholer.com
 6            - and -
 7        BRADLEY ARANT BOULT CUMMINGS, LLP
          BY:  LINDSEY C. BONEY, IV, ESQ.
 8        One Federal Place
          1819 Fifth Avenue North
 9        Birmingham, Alabama 35203
          (205) 521-8303
10        Lboney@bradley.com
          Representing Bayer Pharmaceuticals
11
12
13
          VIDEOTAPE TECHNICIAN:
14           Darnell Brown
15
16
17
18
19
20
21
22
23
24
```

Protected - Subject to Further Protective Review

1   Virginia mesh cases, are there any other
2   cases or litigations that you are aware
3   of in which a judge has limited or
4   excluded any testimony of yours?
5           A.   Not other than to the
6   general rule.  Of course, he can't
7   testify about legal conclusions.  Of
8   course, he can't testify about intent,
9   those kinds of things.  But those are
10  more motions in limine.
11          Q.   Do you recall litigations in
12  which those types of motion in limine
13  have been sustained as it results to your
14  limb?
15          A.   Usually -- it may -- yeah, I
16  don't want to use the word "sustained."
17  It may be, of course, he can't testify on
18  legal conclusions.  No one can testify on
19  legal conclusions.  If he does that, I'll
20  rule at the bench.  We'd have to go
21  through each one.
22               I mean, there's been -- my
23  qualifications have never been
24  challenged.  My expertise have never been

1  cardiology as part of my general
2  training. But, no, I did not -- I'm not
3  a specialist in cardiology.
4       Q.   Do you have experience
5  treating patients for atrial
6  fibrillation?
7       A.   It's not a disease. It's
8  not a general pediatric disease. So the
9  answer to that question is no.
10      Q.   Do you --
11      A.   I mean, other than as a
12 licensed physician. I'm licensed to
13 treat and -- I mean -- and I've read, but
14 pediatricians don't treat that disease.
15      Q.   Do you have hands-on
16 experience beyond your training in
17 prescribing and controlling warfarin,
18 including monitoring time and therapeutic
19 range?
20      A.   Not as the clinician, but --
21 but certainly -- I mean, at the
22 regulatory scientific interface. If you
23 wanted to discuss that, happy to discuss
24 it from the regulatory science

1  perspective.
2      Q.   Not at the patient level,
3  correct?
4      A.   Well, I'd like to think that
5  the regulatory science, FDA.  It's
6  just -- when you are at the FDA, you have
7  a lot of patients, it's like the whole
8  nation.
9      Q.   I asked you before if you
10 had ever prescribed a NOAC.  I think you
11 said no.  Let me ask you --
12     A.   But I was involved -- I've
13 been involved in NOAC cases.
14     Q.   Have you ever prescribed
15 Xarelto to a patient?
16     A.   Not to my knowledge, sir.
17     Q.   Have you ever performed a
18 medical-legal review of a Xarelto case,
19 aside from what you have been retained to
20 do in this case?
21     A.   Only in this matter.
22     Q.   Do you hold yourself out to
23 be an expert in pharmacokinetics?
24          MS. JEFFCOTT:  Objection to

1                     But the company had data
2      earlier on.  And certainly if you go back
3      to 6/12/2008 with regard to Bayer, that
4      there was a relationship between Xarelto
5      and plasma concentration levels and
6      prothrombin time.
7                     But you've got to go dig for
8      both of those.  It didn't -- it didn't
9      become apparent to FDA until August 2011.
10          Q.    Your testimony was a bit
11     different than the point I had understood
12     Section 6 was going to.
13                    What you just testified to,
14     I believe, is that it was known to Bayer
15     as of June of 2008 and to Janssen as of
16     December of 2010 that there is a
17     relationship or correlation between
18     prothrombin time and Xarelto plasma
19     concentration.
20                    Is that what you meant to
21     testify to?
22          A.    That's not exactly what I
23     think I said, nor would be accurate.
24                    What I am saying is there is

Protected - Subject to Further Protective Review

1    data that was available in Bayer's own
2    studies that when you look at it, both in
3    2008 and 2010, neither of which were
4    pointed out to FDA.
5                And, in fact, I would say,
6    if anything, if you read what was said,
7    the contrary impression was given as to
8    what kind of data is in both of these
9    studies.
10        Q.    What did the data in the
11   June 12, 2008, Bayer document state?
12        A.    Sure.
13        Q.    And if you could identify
14   the document.  I understand that you've
15   identified it by Bate number.  But if you
16   can tell us what the document is.
17        A.    Happy to -- happy to show
18   you.  So if you could turn to -- you
19   don't have it, but maybe others can pull
20   this up.
21                I am reading -- let's see if
22   there's a Bates number.  Yeah.  So I am
23   reading off XARELTO_BPAG_27674479 and
24   that's the first page.  And the title --

Protected - Subject to Further Protective Review

1           in the NDA.
2    BY MR. ZELLERS
3           Q.    And -- and that's how it was
4    identified, correct?
5           A.    Yes.
6           Q.    When did you become aware of
7    the significance of this document in your
8    review?
9           A.    I saw this document days
10   ago -- I saw this document a number of
11   days ago.  I was digging through the NDA.
12          Q.    Did you understand when you
13   saw this document some days ago that it
14   would cause you to amend your opinion as
15   stated in your report?
16          A.    No.
17                MS. JEFFCOTT:  Objection to
18          form.
19                THE WITNESS:  I -- I think
20          it -- your words, amend my
21          opinion.  It is perfectly
22          consistent with my -- my opinion.
23                What -- what is a little
24          striking though, okay, that I did

Protected - Subject to Further Protective Review

1    not see until yesterday, okay,
2    but, again it's cited in my --
3    cited in my report, the documents,
4    okay.  Just let -- let me finish.
5             If you look at the sponsor's
6    assertion in the ISS, right,
7    basically the conclusion that is
8    given to FDA is the data show that
9    there was considerable overlap of
10   prothrombin time values in
11   subjects experiencing bleeding
12   events compared with subjects who
13   are not experiencing bleeding
14   events.  That was what was stated
15   by the sponsor to FDA.  And now
16   I've seen that statement prior to
17   the last couple of days.
18             When you -- when you compare
19   that to what FDA wrote, FDA
20   basically took that whole
21   conclusion wholesale, some very --
22   variations, right, because it
23   takes -- I mean other -- what I
24   think is presentations that mask

1            the data.  FDA concludes there's
2       no significant difference in PT
3       values in subjects experiencing
4       bleeding events compared with
5       subjects who are not experiencing
6       bleeding events, and yet, here in
7       data that the company had
8       available, there's clear evidence
9       of a linear relationship.
10   BY MR. ZELLERS
11       Q.   A linear relationship
12   between what?
13       A.   PT and bleeding.  If you --
14       Q.   The document that you're
15   referring to is what?  Just give me a
16   Bates number or tell me -- just identify
17   the document, please.
18       A.   Well, I told you there were
19   two documents that -- that have this.
20            So you -- so I told you that
21   the -- well, let me actually give you
22   more appropriate statistical terminology.
23            There is a statistically
24   significant association between people

1  clinical pharm, even though it's in the
2  medical reviewer, yes.
3         Q.   Figure 10 shows that aspirin
4  use is a significant confounder in
5  interpreting the prothrombin time as it
6  relates to major bleeding, correct?
7         A.   Actually not.  Janssen
8  raised that question specifically and
9  asked that question to the clinical
10 pharmacologist.
11             And, again, if you look at
12 the response to FDA that aspirin was
13 not -- it was .0 -- 0.06, but it was not
14 statistically significant as a covariate.
15        Q.   Is aspirin a confounder with
16 respect to an analysis of prothrombin
17 time and major bleeding in the ROCKET
18 study?
19        A.   It was -- it was viewed --
20 it was calculated not to be statistically
21 significant.  That was a specific
22 question that Janssen raised with FDA.
23             FDA did view it, took it --
24 you know, assumed that it was a

1 covariate. But it was found not to be
2 significant.
3          And it says, basically --
4 let me just read you the answer to your
5 question.
6          The parameter of PT by
7 aspirin use interaction was of marginal
8 significance, was the FDA view of it.
9     Q.   Figure 10 is a diagram of
10 prothrombin time and percent with major
11 bleeding for both rivaroxaban patients
12 that are taking aspirin and for
13 rivaroxaban patients that are not taking
14 aspirin, correct?
15     A.   Yes.
16     Q.   The gray line to the bottom,
17 the dotted line, are the prothrombin
18 times without aspirin use?
19     A.   Right.
20     Q.   The blue line at the top are
21 with aspirin use; is that right?
22     A.   That's what the graph shows.
23     Q.   Looking above at Table 6, is
24 this a quartile analysis of the ROCKET

Protected - Subject to Further Protective Review

1  study data for major bleeding broken up
2  by quartiles of prothrombin time?
3       A.   Yes, it is.
4       Q.   This is a similar analysis
5  to the pooled analysis in the RECORD
6  study that you looked at earlier,
7  correct?
8       A.   Well, it is a quartile
9  analysis.
10      Q.   It's a quartile analysis
11 based on prothrombin time for patients
12 with major bleeding, correct?
13      A.   That's correct.
14      Q.   If we look at the quartile
15 analysis for critical organ bleeding,
16 there does not appear to be a
17 relationship based on the ROCKET study
18 data of critical organ bleeding by
19 prothrombin time quartile.  Do you agree?
20      A.   I don't see the statistics
21 on that.
22           FDA did conclude that there
23 was a -- they used the word
24 "correlation."  So you haven't given me

Protected - Subject to Further Protective Review

1   the statistics here.  So I don't want
2   to -- without that I'm not going to make
3   any judgments.
4          Q.   If you look at -- do you see
5   the column for critical organ bleed?
6          A.   I do see that.
7          Q.   Do you see the event rates
8   broken down by quartile of prothrombin
9   time?
10         A.   I do.
11         Q.   There does not appear to be
12  a trend toward increasing events by
13  quartile.  Would you agree?
14         A.   I mean, if you -- if you
15  cherry-pick the data that way, sure.
16         Q.   Let's look at one other
17  column then.
18              Let's look at the bleed
19  result in death.  We have a similar
20  finding where the event rate does not
21  increase based upon prothrombin time
22  quartile, correct?
23         A.   That's -- that's correct.
24  But, again, you're cherry-picking certain

Protected - Subject to Further Protective Review

1  secondary endpoints, and major bleeding
2  events, right, I mean, did increase.  So
3  just be careful.
4       Q.   The FDA concludes just above
5  Table 6, "It is reassuring that for the
6  overall population there does not appear
7  to be a shift from lesser severities
8  of" -- is that ISTH? -- "major bleeding,
9  i.e., hemoglobin drops and transfusions,
10 to the more severe forms, i.e., critical
11 organ bleeding and fatal bleeding as a
12 function of PT prolongation with
13 rivaroxaban, as could be seen in the FDA
14 analysis in Table 6."
15            Did I read that correctly?
16      A.   You read that correctly.
17 You read that exactly correctly.  Hold on
18 one second.
19      Q.   I don't have another
20 question pending.  Can I ask you another
21 question?
22      A.   Sure.  As long as I can
23 expand on my answer because your --
24      Q.   Well, my question was did I

Protected - Subject to Further Protective Review

```
 1
 2                    CERTIFICATE
 3
 4
 5            I HEREBY CERTIFY that the
    witness was duly sworn by me and that the
 6  deposition is a true record of the
    testimony given by the witness.
 7
              It was requested before
 8  completion of the deposition that the
    witness, DAVID A. KESSLER, M.D., have the
 9  opportunity to read and sign the
    deposition transcript.
10
11
                   _____
12                 MICHELLE L. GRAY,
                   A Registered Professional
13                 Reporter, Certified Shorthand
                   Reporter, Certified Realtime
14                 Reporter and Notary Public
                   Dated:  December 19, 2016
15
16
17            (The foregoing certification
18  of this transcript does not apply to any
19  reproduction of the same by any means,
20  unless under the direct control and/or
21  supervision of the certifying reporter.)
22
23
24
```