# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | MDL No. 2592 |
| | SECTION L |
| THIS DOCUMENT RELATES TO: | JUDGE ELDON E. FALLON |
| Joseph J. Boudreaux, Jr., et al. v. Janssen et al. Case No. 2:14-cv-02720 | MAGISTRATE NORTH |
| Joseph Orr, Jr., et al. v. Janssen et al. Case No. 2:15-cv-03708 | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR JOINT MOTION *IN LIMINE* TO EXCLUDE CERTAIN OPINIONS  OF SUZANNE PARISIAN, MD, UNDER FEDERAL RULE OF EVIDENCE 702**

## INTRODUCTION

Plaintiffs have designated Suzanne Parisian, MD, a pathologist by training who has not practiced medicine in decades, as a regulatory expert to offer testimony and opinions on a litany of topics that are not proper expert testimony.  Numerous courts have excluded Dr. Parisian's opinions—similar to those she seeks to offer in this litigation—because she presents purported testimony in the form of argument, "mind reading," and supposition beyond the scope of proper expert testimony.  For example, the United States District Court for the Southern District of Florida held:

> Plainly stated, Dr. Parisian is an advocate, presented with the trappings of an expert but with no expectation or intention of abiding by the opinion constraints of Rule 702.  She comes armed with a Report designed to be broad enough to allow her to gather and stack inference upon inference in order to offer her "takeaway" or "take home message" with respect to intent, knowledge, or

> causation in a manner unrelated to any regulatory expertise.  Her testimony is unreliable and would not be of assistance to the jury.

*In re Trasylol Prods. Liab. Litig.*, 709 F. Supp. 2d 1323, 1351 (S.D. Fla. 2010).[1]

Similar to her testimony in *In re Trasylol* and other litigations, Dr. Parisian has been asked by Plaintiffs to play the role of an ultimate arbiter of the facts and law, by telling the jury what the facts are, what inferences they should draw, what law they should apply, and what decision they should reach.  In particular, Dr. Parisian purposes to offer opinions, including but not limited to her view of the following:

(1)  FDA documents, company emails, and company documents related to the development and regulatory history of Xarelto®;

(2)  The knowledge, motive, intent, and state of mind of Defendants and the FDA;

(3)  The law and FDA regulations and what Dr. Parisian believes to be are Defendants' alleged violations of such law;

(4)  An alleged "fraud-on-the-FDA" by Defendants;

(5)  Medical causation and purported reasons for regulatory actions in connection with Xarelto;

(6)  The actions of foreign bodies that regulate pharmaceutical medications in other countries;

(7)  What is important to healthcare providers or patients in connection with prescribing decisions, including the relevance of prothrombin time ("PT") levels to healthcare providers who prescribe Xarelto; and

(8)  A safer alternative design to Xarelto.

---

[1] Other courts have excluded Dr. Parisian.  *See, e.g.*, *Danley v. Bayer (In re: Mirena IUD Prods. Liab. Litig.)*, 169 F. Supp. 3d 396, 475 (S.D.N.Y. 2016); *Rowland v. Novartis Pharm. Corp.*, 9 F. Supp. 3d 553 (W.D. Pa. 2014); *Bartoli v. Novartis*, No. 3:13–0724, 2014 WL 1515870 (M.D. Pa. Apr. 17, 2014); *Stambolian v. Novartis Pharm. Corp.*, No. CV 12-04378 BRO (FMOx), 2013 WL 6345566 (C.D. Cal. Dec. 6, 2013); *Pritchett v. I-Flow Corp.*, No. 09-cv-02433-WJM-KLM, 2012 WL 1059948 (D. Colo. Mar. 28, 2012); *Yeazel v. Baxter Healthcare Corp. (In re Heparin Prod. Liab. Litig.)*, Nos. 1:08hc600000, 1:09hc60186, 2011 WL 1059660 (N.D. Ohio Mar. 21, 2011); *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164 (S.D.N.Y. 2009); *Scroggin v. Wyeth (In re Prempro Prods. Liab. Litig.)*, 554 F. Supp. 2d 871 (E.D. Ark. 2008), *aff'd in part, rev'd on other grounds in part*, 586 F.3d 547 (8th Cir. 2009).

Dr. Parisian's 395-page report in this case follows her typical pattern. Because her opinions are, again, not proper subjects of expert testimony, are nothing more than a substitute for lawyer arguments, are barred by controlling law, invade the roles of this Court and the jury, are inconsistent with or irrelevant to the state laws at issue in this case, and are unduly prejudicial under Rule 403 of the Federal Rules of Evidence, Dr. Parisian's opinions should be excluded.

## LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence permits "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" to offer opinion testimony only if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 imposes a "basic gatekeeping obligation" on the trial court to ensure that an expert witness "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 152 (1999); *see also Black v. Food Lion, Inc*., 171 F.3d 308, 310–11 (5th Cir. 1999). Admissibility is determined by whether the witness's opinion "rests on a reliable foundation," i.e., "whether the reasoning or methodology underlying the testimony is scientifically valid"—and whether the opinion is "relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–93, 597 (1993); *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 274–75 (5th Cir. 1998). The proponent of expert testimony must demonstrate that the testimony satisfies these requirements. *Moore*, 151 F.3d at 276.

**ARGUMENT**

Absent the imposition of appropriate limitations, it is clear that Dr. Parisian will use her 395-page, 1,157-paragraph report to take on the role of judge and juror.  Dr. Parisian's opinions are inadmissible under Federal Rules of Evidence 401, 402, 403, 701, and 702, and the cases interpreting these Rules.

**I.      Dr. Parisian's recitation of the regulatory history of Xarelto and of internal documents of Defendants do not qualify as expert testimony.**

Plaintiffs intend to use Dr. Parisian to introduce Xarelto's regulatory history and to selectively read cherry-picked company documents of the defendants to the jury and to interpret them as support for Plaintiffs' proposed narrative of events.  *See generally* Parisian Report (Exh. A).  Nearly 200 pages of Dr. Parisian's report are dedicated exclusively to narrating the history of the development of Xarelto and its approval by the FDA.[2]  Even those sections that do not focus entirely on the regulatory history of Xarelto include lengthy and argumentative subsections dedicated to it.  For example, in the section of her report where Dr. Parisian discusses the ROCKET AF study, there are subheadings for "March 14, 2011 FDA Requested Clinical Information About INR POC for Rocket," "During the June 6, 2011 Meeting, FDA Discusses

---

[2]   For brevity, Defendants only highlight certain excerpts from Dr. Parisian's expert report or from her testimony to illustrate her improper opinions.  However, Defendants seek to preclude Plaintiffs from relying on any of the categories of testimony identified herein, even if the specific language from her expert report or the testimony from her deposition is not cited herein.  Sections of the report include "Bayer Healthcare's Development of BAY 59-7939 (Rivaroxaban)," "FDA's First NDA Approval (NDA-22406) of Xarelto (Rivaroxaban) for VTE Prevention Post Hip/Knee Replacement Surgery Marketing in the United States," "Defendants Submitted 'Complete Response' and Draft Xarelto VTE-P Label to FDA on December 27, 2010," "FDA's Summary Review and NDA Approval of Xarelto VTE-P Supports Defendants' Use of Neoplastin PT, APTT, and Heptest for Monitoring Xarelto's Activity," "NDA 022406 Xarelto VTE-P Was Conditionally Approved," "NDA 022406 Supplements," "NDA Supplements S-001, S-002, and S-003-[Einstein Studies]," "FDA and NDA 20-2439- Xarelto 'SPAF' Indication," "Regulatory Actions Regarding POC Devices for Monitoring Warfarin," and "Defendants Encourage Xarelto for Acute Coronary Syndrome (ACS) Despite the Increased Risk of Bleeding and FDA's Refusal to Approve the Indication (Twice)."  Parisian Report at i–v.

Concerns About Dose, TTR, Hypercoagulability Rebound at Switching, and Lack of Superiority to Warfarin," "FDA Referred to Xarelto Data as Not Establishing a 'Wide Therapeutic Index,'" "The September 8, 2011 FDA Cardiorenal Products Advisory Committee for Xarelto for SPAF Indication," "FDA Recommends 'Conditional' Approval of Xarelto SPAF with Same Post-Approval Commitments as Xarelto for VTE-P," and "FDA and Defendants Negotiate a Launch Label for the SPAF Indication." *Id.* at iv.  Other portions of the report also purport to provide her views on various documents, correspondence, and studies without any analysis or interpretation that requires any special knowledge beyond that which a jury already possesses.

It is improper to use an expert to introduce a medicine's regulatory history and to selectively share excerpts of documents to the jury and to interpret them as support for Plaintiffs' proposed narrative of the relevant events.  Dr. Parisian proposed to offer similar testimony in *In re Fosamax Products Liability Litigation*, 645 F. Supp. 2d at 192 (citations omitted), and the United States District Court for the Southern District of New York excluded them as follows:

> To the extent Merck's motion seeks to preclude Dr. Parisian from offering a narrative history of Fosamax, it is GRANTED in PART.  "[A]n expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence."  In detailing the factual basis for her opinions, Dr. Parisian's report presents a narrative of select regulatory events through the summary or selective quotation from internal Merck documents, regulatory filings, and the deposition testimony of Merck employees.  The Court agrees with Merck that, to the extent such evidence is admissible, it should be presented to the jury directly.  Dr. Parisian's commentary on any documents and exhibits in evidence will be limited to explaining the regulatory context in which they were created, defining any complex or specialized terminology, or drawing inferences that would not be apparent without the benefit of experience or specialized knowledge.  She will not be permitted to merely read, selectively quote from, or "regurgitate" the evidence.

*See also Danley*, 169 F. Supp. 3d at 475 ("In her report, Dr. Parisian writes at length about the regulatory history of Mirena and internal communications among Bayer personnel and between

5

Bayer and the FDA.  To the extent Dr. Parisian 'is simply rehashing otherwise admissible evidence about which [she] has no personal knowledge, such evidence—taken on its own—is inadmissible." (citations omitted)).  Numerous other courts have precluded Dr. Parisian's testimony on the same or similar grounds.  *Stambolian*, 2013 WL 6345566, at *10 ("Dr. Parisian is not permitted 'to read, selectively quote from, or "regurgitate" the evidence.'" (citation omitted)); *Pritchett*, 2012 WL 1059948, at *7 ("[T]he Court finds that portions of Dr. Parisian's testimony would improperly invade the province of the jury by regurgitating factual information that is better presented through introduction of documents or non-expert testimony.  The Court must recognize the inherent power of expert testimony in determining whether to allow an expert to summarize documents that the jury could just as easily summarize itself.  Allowing an expert witness to do so may imprint the documents with 'a tile favoring a litigation,' which hinders impartial adjudication of the merits instead of promoting it." (citations omitted)); *Yeazel*, 2011 WL 1059660, at *8 ("Dr. Parisian may not give a narrative history of Heparin contamination, which must be presented through direct evidence."); *In re Trasylol Prods. Liab. Litig.*, 709 F. Supp. 2d at 1347 ("Dr. Parisian's Report is replete with such improper references to Trasylol's regulatory history and Bayer's internal documents and FDA correspondence.  While Plaintiffs argued that the presentation of such facts is necessary, as they are connected to Dr. Parisian's opinions, Dr. Parisian's major role in this litigation appears to be that of Plaintiffs' advocate rather than expert.  Her expertise is not required to present the factual narrative to the jury. . . ."); *In re Prempro*, 554 F. Supp. 2d at 880–86 (ruling that Dr. Parisian "simply read and summarized the documents, as any layperson could have done" and that her testimony was improperly admitted).

As in other cases where she sought to render similar opinions, Dr. Parisian's regulatory history and selective interpretation of documents related to Xarelto is not expert testimony but is instead only seeks to further Plaintiffs' proposed narrative of the relevant events.  Accordingly, this Court should exercise its gatekeeping role to exclude this testimony.  *See, e.g.*, *Peters v. Five Star Marine Serv.*, 898 F.2d 448, 449 (5th Cir. 1990) (excluding expert testimony on the basis that it would not assist the trier of fact) ("The kind of testimony that the Captain was going to offer was. . . [on] the kind of things that you and I encounter in our normal everyday living . . . things you can handle without anybody giving opinions to you.  They are the kind of things within the knowledge of typical people, and that's why I ruled that the [expert] testimony was not going to be offered."); *In re Vioxx Products Liab. Litig.*, No. MDL 1657, 2006 WL 6624015, at *5 (E.D. La. Feb. 3, 2006) (Fallon, J.) ("Before the Court can embark on analysis of an expert's qualifications and the methodology used, the Court must first make a threshold determination under Rule 702 that the proffered expert testimony 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'  Fed. R. Evid. 702.  Under Rule 702, an expert must 'bring to the jury more than the lawyers can offer in argument.'" (quoting *Eymard v. Pan Am. World Airways*, 795 F.2d 1230, 1233 (5th Cir. 1986)).

## II.     Dr. Parisian's opinions as to what either the Defendants or FDA knew or intended are improper expert testimony.

Plaintiffs also call on Dr. Parisian to express opinions with respect to the "knowledge, motive, intent, or state of mind" of Defendants and the FDA.  She candidly acknowledges that she is not able to divine the intent of people from documents she has reviewed or on any other basis.  *See, e.g.*, Parisian Dep. (excerpts attached as Exh. B) 585:16–20 ("Q.  Do you intend to give any opinion about what Janssen or Bayer knew or what they were thinking?  A.  No.  And I said that in my report because to me that would be subjective information.  No, I don't know

what they were thinking."); *id.* at 571:3–5 ("I don't know what the company knows in terms of a subjective—I don't know what the company knows."); *id.* at 139:16 (conceding that she cannot determine whether certain facts are within the knowledge of the FDA).

Yet, despite this acknowledgement—and the law that clearly precludes it—Dr. Parisian's report repeatedly seeks to render opinions as to her perception and understanding of Defendants' or FDA's knowledge or intent. *See, e.g.*, Parisian Report at 45, ¶ 110 (noting that one employee's "strategy was for the group to . . . appear concerned"); *id.* at 109, ¶ 276 ("The Defendants did not intend to include the information in its draft label for FDA because it was its duty to provide an adequate and safe label, with adequate instructions for use and would increase the safety of XARELTO for the public."); *id.* at 111, ¶ 283 ("Therefore, FDA had serious concerns about the adequacy of the Good Manufacturing Practices and quality controls used by Bayer to manufacture XARELTO."); *id.* at 114, ¶ 297 ("[T]he quickest route to the US market for Janssen appeared to be to proceed with submitting its response and not waiting for ROCKET data to be available."); *id.* at 115, ¶ 302 ("The response from the FDA appeared to be encouraging . . . ."); *id.* at 370, ¶ 1083 ("There is a final January 10, 2012 email from Patricia Torr, Vice President of Marketing, to members of Janssen, 'Subject RE: LCM-J&J Pre-meeting,' her focus appears to be on the stalled medically ill clinical trial with rivaoxaban [sic] (MAGELLAN) for Janssen."); Parisian Dep. 80:21–23 ("We're talking about what Bayer and Janssen knew as to what should be in the label.").

Indeed, a number of her opinions include her unilateral and biased attempt to divine Defendants' knowledge. *See, e.g.*, Parisian Report at 9, § III.B. ("Defendants, from the dose ranging Phase IIb Study 11527 and Study 19044 (PK000131) with rivaroxaban plasma concentration measurements (PK), knew of the inter-individual variability and differences

8

(slow/fast) in patient absorption over time of a single dose of rivaroxaban."); *id.* at 11, § III.F. ("Defendants knew there was a relationship between XARELTO PT levels (as a measurement of anticoagulation effect) and bleeding risk, and PT could be used to identify patients at increased risk of bleeding."); *id.* at 15, § III.P. ("The Defendants' marketing plan was to provide a drug taken permanently by AF patients as more convenient than warfarin but with greater risk for bleeding and death for certain United States patient groups.").

These opinions are, by definition, inadmissible as either a recitation of an explicit acknowledgement on the part of the sponsors, in which case an expert is not needed, or an implied acknowledgment that relies on the expert making an assumption regarding Defendants' knowledge on the basis of other evidence. Either way, an expert may not opine on the subjective intent of, or comment on what a jury should infer from the evidence before it as to the knowledge of, a corporation or its agents. Similar testimony offered by Dr. Parisian in *In re Fosamax Products Liability Litigation*, 645 F. Supp. 2d 192, was held to be inadmissible. The Court ruled that:

> To the extent Merck's motion seeks to preclude Dr. Parisian from testifying as to the knowledge, motivations, intent, state of mind, or purposes of Merck, its employees, the FDA, or FDA officials, it is GRANTED. Dr. Parisian conceded at the hearing that her regulatory expertise does not give her the ability to read minds. Nevertheless, her report is replete with such conjecture. This is not a proper subject for expert or even lay testimony. *See In re Rezulin*, 309 F. Supp. 2d at 546 (stating that "the opinions of [expert] witnesses on the intent, motives, or states of mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise"); *In re Diet Drugs Prods. Liab. Litig.*, MDL No. 1203, 2000 WL 876900, at *9 (E.D. Pa. June 20, 2000) (same).

*See also, e.g.*, *Danley*, 169 F. Supp. 3d at 479 ("Defendants are correct that an expert's testimony on the 'intent, motives or states of mind of corporations, regulatory agencies and others' is inadmissible. . . . In her report, however, Dr. Parisian seems to impermissibly speculate on

Bayer's or the FDA's state of mind or intent.  For example, on page 33 of her report, Dr. Parisian

writes, '[T]he "project lead" seemed concerned about maintaining timelines rather than taking

the time necessary for addressing the safety of the United States Mirena user and providing an

adequate label.'  Dr. Parisian has no expertise in divining the concerns or motives of others, and

may not opine on such topics."); *Bartoli*, 2014 WL 1515870, at *6 ("Dr. Parisian may not testify

as to NPC's intent, motive, or bad faith.  As discussed above, 'intent is not a proper subject for

expert testimony.'" (citation omitted)); *In re C.R. Bard, Inc., Pelvic Repair Sys. Prods. Liab.

Litig.* ("*C.R. Bard, Inc.*"), 948 F. Supp. 2d 589, 628 (S.D.W. Va. 2013) ("Bard's knowledge,

intent, or motives are simply not appropriate subjects for expert testimony.  The documents and

testimony should be presented directly to the jury, not through an expert.  To the extent that Dr.

Kessler opines on Bard's knowledge, intent, or motives, such conclusions are factual inferences

for the jury to determine, not for an expert to opine."); *Pritchett*, 2012 WL 1059948, at *6–7

("[T]he Court agrees that Dr. Parisian is not qualified to testify regarding I-Flow's state of

mind. . . .  Her written opinion is riddled with conclusory statements about I-Flow's purported

knowledge and intent based on her review of documents or circumstances related to the FDA

process.  Inasmuch as these statements go beyond her qualifications, they are inadmissible.");

*Yeazel*, 2011 WL 1059660, at *6 ("Nor may [Dr. Parisian] testify concerning the state of mind,

intent, knowledge, purposes, or motivations of Defendants, its employees, or the FDA."); *In re

Rezulin Prods. Liab. Litig. (MDL No. 1348)*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004)

("Inferences about the intent or motive of parties or others lie outside the bounds of expert

testimony.").

> For the same reason that multiple courts have excluded Dr. Parisian's opinions as to the

knowledge, motivation, intent, or state of mind of Defendants or the FDA, her opinions here are

inadmissible and should be excluded.  *See, e.g.*, *DePaepe v. General Motors Corp.*, 141 F.3d

715, 720 (7th Cir. 1998) (expert "lacked any scientific basis for an opinion about . . . motives");

*Fisher v. Haliburton,* No. CIV. A. H-05-1731, 2009 WL 5216949, at *2 (S.D. Tex. Dec. 21,

2009) ("'An expert's credentials do not place him in a better position than the [trier of fact] to

draw conclusions about a defendant's state of mind.'" (quoting *Marlin v. Moody Nat'l Bank*, 248

F. App'x 534, 541 (5th Cir. 2007))).

### III.   Dr. Parisian's conclusions and opinions about Defendants' alleged violations of law are improper.

It has been more than 20 years since Dr. Parisian has worked at the FDA.  Parisian Dep.

202:7–8.  Nevertheless, she repeatedly offers improper legal conclusions about the requirements

of the Federal Food, Drug, and Cosmetic Act and related regulations and whether Defendants'

conduct complied with federal regulatory law.[3]  In *Rowland*, the court ruled that Dr. Parisian

could not offer such opinions and explained that:

---

[3] *See, e.g.*, Parisian Report at 9, § III.A. ("Pharmaceutical manufacturers throughout the drug development process have a duty to define the pharmacologic properties of its drug for a therapeutic indication and to remain the knowledgable [sic] expert about the pertinent adverse effects.  Prescription drugs sold to the public are required to be adequately labeled and sold with recommendations for a safe and effective dose. . . . Despite the increased risk of XARELTO for major bleeding and death, and having received the FDA's multiple recommendations to modify and/or lower the dose based on patient risk including for SPAF , [sic] Defendants continue to sell XARELTO for SPAF at 20mg OD without providing adequate warnings for patients."); *id.* at 10, § III.B. ("Despite those many requests, Defendants continued to not adequately study the exposure-risk benefits of XARELTO."); *id.* at 11, § III.F. ("FDA's drug labeling requires a manufacturer to identify any laboratory tests helpful in following the patient's response or in identifying possible adverse reactions.  Defendants have not provided an adequate label with updated laboratory and risk information, Defendants proposed a Section 5 Laboratory Tests section (based on the Lovenox label) as a contingency if pushed by FDA for creation of such a section." (footnote omitted)); *id.* at 12, § III.H ("Defendants failed as the ROCKET-AF sponsor to adequately identify a suitable point-of-care (POC) device for reliable management of warfarin and patient safety for the ROCKET trial beginning with the due diligence stage. Defendants failed to validate the acceptable performance of the ALERE/HemoSense INRatio POC device. Defendants failed as IND and clinical trial sponsor to:  1) select a safe and effective device or method for determination of warfarin management; 2) adequately monitor the performance of the POC INRatio device during ROCKET worldwide; 3) implement back-up methods including laboratory testing to protect patient safety; 4) investigate and report adverse events and failures of the device to the appropriate Adverse Event database; 5) adequately instruct and provide an algorithm to investigators for warfarin management."); *id.* at 12, § III.J.a. ("Defendants failed to fulfill their duties as United States Pharmaceutical manufacturers when they did not provide truthful, accurate and full disclsoures [sic] for ROCKET and adverse events . . . ."); *id.* at 12, § III.J.b. ("Defendants failed to fulfill their duties as United States Pharmaceutical manufacturers when they did not provide truthful, accurate and full disclosure about ROCKET and associated adverse events . . . ."); *id.* at 13, § III.K. ("The XARELTO label is inadequate in the following ways . . . ."); *id.* at 13–14, § III.L. ("A United States pharmaceutical

> [S]ome Zometa courts have expressly excluded her opinion on whether NPC's specific conduct concerning Zometa complied with FDA regulations as an improper legal conclusion.  These courts have drawn an appropriate boundary for purposes of Rule 702, and the Court concludes that Dr. Parisian may testify generally about the FDA's regulation of pharmaceutical drugs and how the regulatory scheme operates, but may not offer a conclusion as to whether NPC complied with FDA regulations in its actions regarding Zometa.

9 F. Supp. 3d at 561–62 (footnote omitted); *see also Stambolian*, 2013 WL 6345566, at *9

("Defendant raises legitimate concerns about the risk of unfairly prejudicial or confusing

testimony.  It is not the role of Dr. Parisian to offer legal conclusions on any topic, including

whether Defendant was in regulatory compliance with the FDA."); *Yeazel*, 2011 WL 1059660, at

*8 ("As with Dr. Siporin, Dr. Parisian may not offer 'ultimate question' testimony that Baxter's

monitoring, quality control measures, or recalls were ineffective or inadequate.  Testimony

containing legal conclusions impermissibly 'convey[s] a witness' unexpressed, and perhaps

erroneous legal standards to the jury.'  'Moreover, testimony of an expert that constitutes mere

personal belief as to the weight of the evidence invades the province of the jury.'" (citations and

internal quotation marks omitted)); *C.R. Bard, Inc.*, 948 F. Supp. 2d at 629 ("In the Fourth

Circuit, 'opinion testimony that states a legal standard or draws a legal conclusion by applying

law to the facts is generally inadmissible.'  *United States v. McIver*, 470 F.3d 550, 562 (4th Cir.

2006).  Dr. Kessler's expert report seeks to draw various legal conclusions, which is properly the

---

manufacturer has a duty to exercise reasonable care to avoid foreseeable injury to the users of its products.  Further, a manufacturer has a duty to adequately test its products commensurate with the dangers involved and to minimize the risk of foreseeable injury.  Defendants failed to exercise reasonable care and adequately test its products in that Defendants failed to conduct any dose-ranging studies in patients with atrial fibrillation to determine the safest effective dose.  As a result, despite being aware of Xarelto's pharmacological profile that indicated either a lower dose or a twice-daily dose would place patients at a lower bleed risk while maintaining a level of Xarelto to effectively reduce the risk of stroke, Defendants failed to conduct any testing in the ROCKET AF study of either a lower dose or twice daily dosing.  Defendants also failed to voluntarily update its labeling to provide adequate instructions for use and warnings to ensure the safety of patients."); *id.* at 15, § III.P. ("Defendants acted unscientifically by persisting in pursuit of a marketing goal from 2002 to sell a once-a-day, direct oral anticoagulant (DOAC) tablet, requiring no monitoring or laboratory testing despite the foreseeable risks for bleeding and potential harm for patients.").

jury's role. . . .   The questions of whether Bard's Avaulta products were not reasonably safe, for example, or whether Bard failed to warn, are questions for the jury, not for Dr. Kessler.").

Dr. Parisian's purported opinions in this case also improperly attempt to explain the law and alleged violations of the law.  Accordingly, Dr. Parisian's testimony as to legal conclusions should be excluded.  *See, e.g.*, *S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003) ("[E]xpert testimony on legal matters is not admissible. Matters of law are for the trial judge, and it is the judge's job to instruct the jury on them." (internal quotation marks omitted)); *Bammerlin v. Navistar Int'l Transp. Corp.*, 30 F.3d 898, 900 (7th Cir. 1994) ("The meaning of federal regulations is not a question of fact, to be resolved by the jury after a battle of experts. It is a question of law, to be resolved by the court.").

## IV.   Dr. Parisian's opinions as to whether Defendants should have submitted information to FDA and whether Defendants misled FDA are also improper.

Dr. Parisian also purports to opine that Defendants misled FDA or violated FDA regulations by allegedly withholding information from the agency, i.e., committed "fraud-on-the-FDA."  *See, e.g.*, Parisian Report at 46, ¶ 115 ("This information does not appear to have been discussed with FDA at the TC, and supports the risk of bleeding based on PT prolongation, drug concentration and need for therapeutic drug monitoring."); *id.* at 140, ¶ 399 ("The history of use of XARELTO as a [novel oral anticoagulant] outside the United States was apparently available to Defendants since at least 2008, but had not been provided to FDA in the original NDA until FDA specifically requested such information in its 2009 Information Request.").  In fact, a number of her opinions are based on her allegation that Defendants improperly withheld information from or misled the FDA.  *See id.* at 10, § III.D. ("Defendants obtained FDA's approval for the SPAF indication based on the ROCKET trial, which utilized a faulty investigational INR point-of-care (POC) device for the management of the warfarin patients.");

*id.* at 12, § III.J.a. ("Defendants failed to fulfill their duties as United States Pharmaceutical manufacturers when they did not provide truthful, accurate and full disclsoures [sic] for ROCKET and adverse events associated by . . . [f]ailing to adequately report, investigate, and document erroneous/discrepant INR readings occurring during ROCKET to the clinical trial database and reports for regulatory agencies, (including the FDA)."); *id.* at 12, § III.J.b. ("Defendants failed to fulfill their duties as United States Pharmaceutical manufacturers when they did not provide truthful, accurate and full disclosure about ROCKET and associated adverse events requested of them by by [sic] FDA . . . [f]ailing to identify and report erroneous/discrepant INR values and associated adverse events (including but not limited to the Covance Recheck Program) in response to the FDA's March 2011 Information [sic] Request [and] [f]ailing to report discrepant INR values in response to the January 12, 2016 FDA Information Request [and] [f]ailing to inform FDA about the CoVance Recheck program in response to the January 12, 2016 FDA Information Request.").

It is improper for an expert to opine that a defendant acted illegally or misrepresented the facts. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350–51 (2001) ("State-law fraud-on-the-FDA claims inevitably conflict with the FDA's responsibility to police fraud consistently with applicants to fear that their disclosures to the FDA, although deemed appropriate by the Administration, will later be judged insufficient in state court.").

Even if those issues were relevant, the party asserting those matters would be required to present the relevant facts through competent evidence and then argue to a jury that is properly instructed on the law by the Court that the actions were misleading or inconsistent with the relevant law. *See, e.g.*, *C.R. Bard, Inc.*, 948 F. Supp. 2d at 629 ("Dr. Kessler's expert report also seeks to state legal standards, which is properly the court's role. The court will instruct the jury

14

on Bard's duties and obligations under state law."). The party, however, cannot simply have an expert act as an advocate by telling the jury to find that the defendants violated the law.

Any opinion that the defendants allegedly committed fraud on the FDA or violated the law is both irrelevant and not the subject of expert testimony. Accordingly, Dr. Parisian's opinions in this regard should be excluded. *Cf., e.g.*, *Lofton v. McNeil Consumer & Specialty Pharm.*, 672 F.3d 372, 379–380 (5th Cir. 2012) (holding that federal law preempted a plaintiff's claim because the Texas statute at issue required the plaintiff "to prove fraud-on-the-FDA to recover for failure to warn").

## V.    Dr. Parisian is not qualified to offer any opinions on issues such as medical or regulatory causation, and her opinions on such topics are not reliable.

Dr. Parisian is not qualified to offer any opinions on issues such as medical causation or the reasons for regulatory decisions, and any opinions she would seek to offer on such topics are not reliable. Dr. Parisian conceded that she cannot offer "substantive medical opinions" and that she defers to another one of Plaintiffs' experts, Henry Michael Rinder, MD, who "actually takes care of patients." Parisian Dep. 245:21–246:15; *see also id.* 169:3–8 ("I have given you that I am not the expert [who is] going to be talking about anything with medical causation for any particular patient.").

She nevertheless states a number of medical opinions in her report. *See, e.g.*, Parisian Report at 9, § III.A. ("Without providing monitoring recommendations or the ability for a physician to adjust a patient's dose, certain patients were placed at increased risk of major bleeding without additional benefit."); *id.* at 10, § III.C. ("XARELTO as sold by Defendants has the highest risk of major bleeding among the [novel oral anticoagulants].");[4] *id.* at 11, § III.E. ("Defendants' actions have placed United States atrial fibrillation patients at increased risk for

---

[4] This opinion should also be excluded for the independent reason that Dr. Parisian could not cite any support for it during her deposition. Parisian Dep. 587:19–588:4.

bleeding from too high exposure to XARELTO."); *id.* at 14, § III.M. ("Defendants' failure to test either a lower dose pill or twice-daily dose as initially planned but not investigated, for ROCKET II, and make such a lower dose pill or twice-daily dose available for use renders Xarelto unreasonably dangerous as designed.").

Dr. Parisian also offers purported "regulatory" opinions based on medical issues that she likewise is not qualified to render.  *See, e.g.*, Parisian Dep. 246:1–12 ("You look at my opinion 11, and I say that this label is inadequate, and I use the word inadequate as a regulatory consultant looking at the data, and I say one of the things that's inadequate is that there's no information about the PT and the need to adjust a dose or discontinue the drug. . . .  So it is a regulatory opinion.").

Many of her opinions include or are based on similar "regulatory" conclusions relating to medical causation and issues specific to anticoagulant treatment.  For example, in "Opinion 1" (Parisian Report at 9), Dr. Parisian opines that "[w]ithout providing monitoring recommendations or the ability for a physician to adjust a patients' dose, certain patients were placed at increased risk of major bleeding without additional benefit."  Parisian Report at 9, § III.A. (citing 21 C.F.R. § 201.57).  In "Opinion 2" (Parisian Report at 9–10), Dr. Parisian opines that "the inter-individual variability and difference (slow/fast) in patient absorption over time of a single dose of rivaroxaban . . ., along with a narrow therapeutic window (bounded on one hand by a risk of major bleeding and the other side by loss of efficacy) should have placed a reasonable [novel oral anticoagulant] manufacturer on notice to carefully study, identify and develop recommendations for therapeutic drug monitoring ('TDM') and proper dose titration in specific populations, and situations, at increased risk (and when 'one side does not fit all')."  *Id.* at 9–10, § III.B. (citing 21 C.F.R. § 201.57).  In "Opinion 7" (Parisian Report at 11), Dr. Parisian

opines that "[m]easurement of PT (using Neoplastin Plus or another appropriately sensitive reagent) in XARELTO patients can be helpful in identifying patients at increased risk for serious adverse events based upon a patients' anticoagulant response to XARELTO." *Id.* at 11, § III.G. (citing 21 C.F.R. § 201.57).  In "Opinion 10" (Parisian Report at 12) Dr. Parisian opines that Defendants did not adequately identify and/or report a number of "associated adverse events." *Id.* at 12, § III.J.  In "Opinion 14," "Opinion 15," and "Opinion 16" (Parisian Report at 14–15), Dr. Parisian opined that Defendants did not account for certain "risks" of XARELTO in their communications with patients and/or physicians.  *Id.* at 14–15, §§ III.N., III.O., III.P.

Dr. Parisian cannot disguise these (or other) medical causation opinions as regulatory opinions to avoid the rules governing the admission of expert testimony—and her own admission that she is not going to offer medical causation opinions.  In *Danley*, 169 F. Supp. 3d at 475, plaintiffs sought to introduce the testimony of Dr. Parisian that defendants had access to information that supported a label change to reflect the complained of risks.  The court excluded those opinions:

> Defendants argue that Dr. Parisian lacks the expertise to opine on medical causation related to Plaintiffs' theory of secondary perforation—that a Mirena can migrate out of the uterus unrelated to insertion—and other scientific issues related to the Mirena IUD.  (Ds' Parisian Mem. 6–10.)  Dr. Parisian is a medical doctor, but she has no expertise or special skills related to the uterus or IUDs, nor is she a gynecologist.  (Parisian Dep. at 49:21–50:9, 103:24–104:23.)  Because she does not have specialized expertise in this area, she will not be permitted to testify or give an opinion that a Mirena can perforate the uterus unrelated to insertion—which she asserted implicitly in her report and which she discussed during her deposition.  *See Dura Auto. Sys.*, 285 F.3d at 614 ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty.  That would not be responsible science.").  Dr. Parisian's relevant experience and expertise are in the field of FDA regulations, and her testimony will thus be limited to that field.

> Although seemingly more regulatory in nature, Dr. Parisian's testimony related to "causal association"—as this term is used pursuant to 21 C.F.R. § 201.57(c)(6)(i)—is also inadmissible because Plaintiffs have not "sufficiently differentiate[d]" testimony related to causal association from general medical causation. *Rowland*, 9 F. Supp. 3d at 562 (excluding Dr. Parisian from offering "causation testimony of any kind"); *see Dopson–Troutt v. Novartis Pharm. Corp.*, No. 06–CV–1708, 2013 WL 1344755, at *3 (M.D. Fla. Apr. 2, 2013) (excluding Dr. Parisian from offering opinions regarding "causal association" because Plaintiffs did not "meaningfully distinguish" it from medical causation). Defendants' motion with respect to testimony relating to medical causation or regulatory causation is granted.

*Id.* at 476 (footnotes omitted); *see also Bartoli*, 2014 WL 1515870, at *6 ("[A]s to causation, Dr. Parisian may not testify. Dr. Parisian is not an expert in ONJ, and does not currently treat patients. Plaintiff admits as much. Dr. Parisian is not qualified to give causation evidence of any kind." (citation omitted)); *Rowland*, 9 F. Supp. 3d at 562 ("Dr. Parisian will not be permitted to offer causation testimony of any kind, including 'regulatory causation' or 'causal association' opinions related to compliance with 21 C.F.R. § 201.57."); *Stambolian*, 2013 WL 6345566, at *9 ("Dr. Parisian is not permitted to testify to things outside of her expertise. This includes testimony that may be couched as regulatory causation but in actuality speaks to medical causation. Dr. Parisian is not qualified to testify to the causal connection between Aredia® and Zometa® and osteonecrosis of the jaw."); *Yeazel*, 2011 WL 1059660, at *8 ("I also concur with those courts' findings that Dr. Parisian is not qualified to offer testimony as to medical or physiological causation issues. Although she is a medical doctor, she is not an epidemiologist, immunologist, or hematologist, and therefore, does not have the necessary background and training to offer opinions concerning adverse reactions and deaths caused by contaminated Heparin.").

Here, Dr. Parisian has no expertise or special skills related to novel oral anticoagulants or Xarelto nor is she a practicing physician, cardiologist or hematologist. *See, e.g.*, Parisian Dep. 171:9–11 ("Q.  Your experience with novel oral anticoagulants is entirely due to litigation. Correct?  A.  With those, yes."); *id.* at 245:21–246:15 (testifying that she is not going to give "substantive medical opinions"); *id.* 18:8–16 (testifying that she would rely on another expert for issues relating to hematology); *id.* 169:16–17 (testifying that she would not speak about hematology from a clinical point of view).  Because she does not have any specialized expertise in the medical areas at issue in this case, she is not qualified to offer any medical causation opinions.  Similarly, she is not qualified to offer testimony related to any purported causal connection between certain risks and Xarelto or opinions regarding why regulators acted in a certain manner.  The distinction between medical causation and regulatory causation is simply too narrow, especially in light of her complete lack of expertise in the area of causation.  Thus, Dr. Parisian's testimony relating to medical causation or regulatory causation should be excluded.  *See, e.g.*, *In re Chinese Manufactured Drywall Prods. Liab. Litig.*, 2015 WL 3603624, at *3 (E.D. La. June 5, 2015) (Fallon, J.) ("Mr. Inglas is qualified to give an expert opinion within the scope of his experience as a building engineer. . . .  However, Mr. Inglas has little or no training in statistical analysis, thus he is not qualified to testify regarding the validity or accuracy *vel non* of the statistical analysis of Plaintiff's damages"); *Plunkett v. Merck & Co. (In re Vioxx Prods. Liab. Litig.)*, 401 F. Supp. 2d 565, 587 (E.D. La. 2005) (Fallon, J.) (holding that a professor of preventive medicine and pharmacoepidemiology is qualified to testify as to whether short-term use of Vioxx increases risk of adverse cardiovascular risks and whether Vioxx accelerates atherosclerosis, but holding that the expert is not qualified to testify regarding

what doctors should prescribe to patients, the specific cause of a patient's death, or the expert's disapproval of actions taken by the FDA).

**VI.**   **Dr. Parisian is not qualified to offer any opinions as to foreign regulatory schemes or actions, and any opinions she would seek to offer on such topics are not reliable.**

By her own admission, Dr. Parisian is not qualified to offer any opinions on issues that relate to foreign regulatory matters.  Parisian Dep. 747:9–17 ("Q.  You're not an expert in the laws or regulations concerning the European review and approval process for prescription medications.  Correct?  A.  That's true.  Q.  You're not an expert in the laws and regulations that apply to European labeling for pharmaceutical products.  Correct?  A.  That would be true.  I'm not a regulatory expert for Europe or Canada.").

She nevertheless devotes an entire section of her report to "European Medicines Agency (EMA) and Defendants' Actions with Xarelto."  Parisian Report at 294–333, §XVI.  Dr. Parisian also references foreign regulatory issues throughout her report.  *See, e.g.*, Parisian Report at 269, ¶ 798 ("There was no mention by Dr. Patel of any future plans by Defendants to update its United States produce insert *or EMA product labeling* . . . ." (emphasis added)); *id.* at 283–86, ¶¶ 847–864 (discussing a "specific regulatory procedure" initiated by EMA and interpreting EMA documents and communications).  In addition, one of her opinions is based entirely on a foreign regulatory scheme.  *See id.* at 13, § III.K.d. (opining that the Xarelto label is inadequate because "[i]t does not have the same plasma concentration information and the commercial use of anti-factor XA calibrators and control required in the European label").

Dr. Parisian should not be permitted to offer any opinion on or interpretation of foreign regulatory matters.  In *Danley*, 169 F. Supp. 3d at 477–78, the court excluded those opinions:

> Dr. Parisian will not be allowed to opine on foreign regulatory issues.  Dr. Parisian is admittedly not an expert in the laws of foreign jurisdictions, and therefore is not qualified to testify on those subjects.  (Parisian Dep. at 124:23–126:8.)  There

is no reason to believe that the regulatory framework of Canada or Germany is similar to the FDA's system.  Moreover, Dr. Parisian's report and proposed testimony in this area is a recitation of reports and regulatory actions, with little or no analysis, which is not proper expert testimony because it is not helpful to the trier of fact. *See In re Trasylol Prods. Liab. Litig.*, 709 F. Supp. 2d 1323, 1336 (S.D. Fla. 2010) (finding Dr. Parisian's testimony on "foreign regulatory matters" inadmissible); *In re Rezulin*, 309 F. Supp. 2d at 553 (finding that plaintiffs' experts are not "appropriate vehicles" for introduction of evidence related to foreign regulatory actions because subject of that testimony is a lay matter).  If Plaintiffs wish to submit evidence to show that Bayer was on notice of adverse events they may do so, if the evidence proves to be otherwise admissible, but not through Dr. Parisian.  And if Dr. Parisian wants to refer to the fact of a particular foreign regulatory action as evidence of information available to Defendants on the basis of which a regulatory obligation in the U.S. was triggered, she may do so.  But she may neither summarize foreign regulatory history nor imply that an action required abroad was necessarily required in the U.S.  Defendants' motion to preclude opinions on foreign regulatory issues is granted.

Here, Dr. Parisian has no expertise or special skills related to foreign regulatory matters, and she is therefore not qualified to offer any opinions related to them.  Thus, Dr. Parisian's testimony relating to foreign regulatory matters should be excluded.

## VII.   Dr. Parisian is not qualified to offer any opinions as to what is important to healthcare providers or to patients.

Dr. Parisian also seeks to opine as to what information would be helpful to healthcare providers and patients and how a healthcare provider might use additional risk information relating to anticoagulant therapy when making a clinical decision to prescribe Xarelto.  *See, e.g.*, Parisian Report at 11, § III.G. ("Measurement of PT (using Neoplastin Plus or another appropriately sensitive reagent) in XARELTO patients can be helpful in identifying patients at increased risk for serious adverse events based upon a patients' anticoagulant response to XARELTO.  Obtaining PT allows a physician in clinical decision-making to determine if

XARELTO is the appropriate drug for a patient and to decide whether the patient should continue on XARELTO therapy.").

However, Dr. Parisian is not a practicing physician; she is not a cardiologist or hematologist; she does not prescribe or research anticoagulants generally or Xarelto specifically. *See, e.g.*, Parisian Dep. 171:9–11 ("Q.  Your experience with novel oral anticoagulants is entirely due to litigation.  Correct?  A.  With those, yes."); *id.* at 245:21–246:15 (testifying that she is not going to give "substantive medical opinions"); *id.* at 18:8–16 (testifying that she would rely on another expert for issues relating to hematology); *id.* at 169:16–17 (testifying that she would not speak about hematology from a clinical point of view).  In addition, she has not discussed the use of Xarelto with any practicing physician or with any patient.  *See id.* at 690:10–23 (testifying that she has never discussed bleeding risks of Xarelto with physicians).

Thus, Dr. Parisian is wholly unqualified to opine on matters relating to what is important to healthcare providers.  *See, e.g.*, *Rowland*, 9 F. Supp. 3d at 562 (excluding Dr. Parisian's testimony because "testimony as to what prescribing oncology physicians would have done had they received different warnings for Zometa.  Such testimony would require an impermissible degree of speculation from Dr. Parisian, as she is not an oncologist."); *Stambolian*, 2013 WL 6345566, at *10 ("The Court finds it appropriate to exclude Dr. Parisian's testimony on matters that are outside the scope of her knowledge, such as the actions oncologists would have taken with adequate labeling.").  Accordingly, her testimony about what information is important for doctors or for patients should be excluded.

**VIII.  Dr. Parisian is not qualified to offer any opinions on purported safer alternative designs to Xarelto, and any opinions she would seek to offer on such topics are not reliable.**

Dr. Parisian is not qualified to offer any opinion as to a safer alternative design for Xarelto.  Nevertheless, in "Opinion 13" (Parisian Report at 14), Dr. Parisian opines that "a safer

alternative design existed; primarily, a lower dose pill with periodic laboratory testing that would reduce the risk of bleeding."   Parisian Report at 14, § III.M. ("[A] safer alternative design existed; primarily, a lower dose pill with periodic laboratory testing that would reduce the risk of bleeding.").

Dr. Parisian should not be permitted to offer any opinion as to a safer alternative design for Xarelto.  In *Danley*, 169 F. Supp. 3d at 475, the court excluded those opinions:

> Dr. Parisian is also not qualified to opine on potential alternative, safer designs for Mirena, including the Skyla IUD or an IUD described in a patent application.   Opinion Four in Dr. Parisian's report is therefore wholly inadmissible.  Dr. Parisian is not an engineer, nor has she ever designed IUDs, nor does she have any particular expertise in IUDs.  (Parisian Dep. at 53:7–11.) Dr. Parisian is an expert in the field of FDA regulations, and her testimony will be thus limited to that field.  Defendants' motion with respect to proposed testimony by Dr. Parisian regarding safer alternatives to Mirena is granted.

*Id.* at 478 (footnote omitted).

Here, Dr. Parisian is not qualified to opine as to safer alternative designs, even if a lower dose of the same medicine constitutes a safer alternative design, which it does not, because she does not have any expertise or special skills with respect to Xarelto.  She is not a practicing physician, she is not a cardiologist or hematologist, and she does not prescribe or research anticoagulants generally or Xarelto specifically.  *See, e.g.*, Parisian Dep. 171:9–11 ("Q.  Your experience with novel oral anticoagulants is entirely due to litigation.  Correct? A.  With those, yes."); *id.* at 245:21–15 (testifying that she is not going to give "substantive medical opinions"); *id.* at 18:8–16 (testifying that she would rely on another expert for issues relating to hematology); *id.* at 169:16–17 (testifying that she would not speak about hematology from a clinical point of view).

Accordingly, Dr. Parisian's testimony relating to a safer alternative design should be excluded.

## IX.    Dr. Parisian's opinions should be excluded as unfairly prejudicial, confusing, and misleading to the jury.

To the extent that the Court determines that any of Dr. Parisian's opinions are relevant, such opinions still should be precluded under Rule 403 of the Federal Rules of Evidence.  Under Rule 403, relevant evidence may nonetheless be excluded where it "threaten[s] 'confusion of the issues, or mislead[s] the jury'" such that "'the probability that the proof and the answering evidence that it provokes may create a side issue that will unduly distract the jury from the main issues.'"  *Moore v. Ashland Chem.*, 126 F.3d 679, 692 (5th Cir. 1997) (quoting McCormick, MCCORMICK ON EVIDENCE § 185(West 2d ed. 1972)), *vacated on other grounds on rehr'g*, 151 F.3d 269 (5th Cir. 1998).  The majority of Dr. Parisian's opinions are nothing more than her recitations of documents already in evidence, her personal beliefs regarding the evidence, her speculation as to the knowledge and intent of Janssen and the FDA, and her view of what the law is or should be.  Any probative value of such testimony is substantially outweighed by the danger of confusing and misleading the jury, particularly considering the volume of irrelevant testimony and opinions that surround the handful of potentially admissible opinions.  If Dr. Parisian is permitted to give this sweeping testimony about what the law supposedly required, and whether Defendants complied with the law as Dr. Parisian sees it, her incompetent opinions inevitably will override this Court's instructions on the law—which is the only proper source of the law for the jury to follow.

## CONCLUSION

For all the foregoing reasons, the Court should grant Defendants' motion *in limine* and preclude Dr. Parisian from offering the above-referenced improper opinions.

Respectfully submitted,

DRINKER BIDDLE & REATH LLP

By: /s/ *Susan M. Sharko*
Susan M. Sharko
DRINKER BIDDLE & REATH LLP
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
susan.sharko@dbr.com

Rodney M. Hudson
DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105-2235
Telephone: (415) 591-7500
rodney.hudson@dbr.com

Chanda A. Miller
DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone: (215) 988-2500
chanda.miller@dbr.com

IRWIN FRITCHIE URQUHART & MOORE LLC

By: /s/ *James B. Irwin*
James B. Irwin
Kim E. Moore
IRWIN FRITCHIE URQUHART & MOORE LLC
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
jirwin@irwinllc.com

*Attorneys for Defendants Janssen
Pharmaceuticals, Inc., Janssen Research &
Development, LLC, and Janssen Ortho LLC,
and Johnson & Johnson*

ARNOLD & PORTER KAYE SCHOLER LLP

By: /s/ *William Hoffman*
William Hoffman
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
william.hoffman@apks.com

Andrew K. Solow
Steven Glickstein
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Telephone: (212) 836-8485
andrew.solow@apks.com
steven.glickstein@apks.com

BRADLEY ARANT BOULT CUMMINGS LLP

By: /s/ *Kevin C. Newsom*
Kevin C. Newsom
Lindsey C Boney IV
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place, 1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8803
knewsom@bradley.com

CHAFFE MCCALL L.L.P.

By: /s/ *John F. Olinde*
John F. Olinde
CHAFFE MCCALL L.L.P.
1100 Poydras Street, Suite 2300
New Orleans, LA 70163
Telephone: (504) 585-7241
olinde@chaffe.com

*Attorneys for Bayer HealthCare
Pharmaceuticals Inc. and Bayer Pharma AG*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on January 20, 2017, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre-Trial Order No. 17.

*/s/ James B. Irwin*
**James B. Irwin**