# EXHIBIT B

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA


IN RE:  XARELTO (RIVAROXABAN)
PRODUCTS LIABILITY LITIGATION          MDL No. 2592
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~         SECTION L

THIS DOCUMENT RELATES TO ALL           Judge Eldon E. Fallon
CASES                                  Mag. Judge North


- PROTECTED -

- SUBJECT TO FURTHER PROTECTIVE REVIEW -



THURSDAY, DECEMBER 8, 2016

SUZANNE PARISIAN, M.D.



        Videotaped deposition of SUZANNE PARISIAN,
M.D., held at the law offices of Burg Simpson, 2398
East Camelback Road, Suite 1010, Phoenix, Arizona,
commencing at 9:13 a.m., on the above date, before
Sommer E. Greene, a Certified Court Reporter and
Certified Realtime Reporter.

Protected - Subject to Further Protective Review

Page 2

```
 1    APPEARANCES OF COUNSEL
 2
 3         For Plaintiffs:
 4
               LEVIN, FISHBEIN, SEDRAN & BERMAN
 5             MICHAEL M. WEINKOWITZ, ESQ.
               510 Walnut Street, Suite 500
 6             Philadelphia, Pennsylvania 19106
               215.592.1500
 7             Mweinkowitz@lfsblaw.com
 8
               SCHLICHTER, BOGARD & DENTON
 9             ASHLEY BRITTAIN-LANDERS, ESQ.
               100 South Fourth Street, Suite 1200
10             St. Louis, Missouri 63102
               314.621.6115
11             Abrittain@uselaws.com
12
13         For Janssen Defendants:
14             BARNES & THORNBURG, LLP
               JAMES F. MURDICA, ESQ.
15             One North Wacker Drive, Suite 4400
               Chicago, Illinois 60606
16             312.357.1313
               Jmurdica@btlaw.com
17
18             BARNES & THORNBURG LLP
               SARAH E. JOHNSTON, ESQ.
19             2029 Century Park East, Suite 300
               Los Angeles, California 90067
20             310.284.3880
               Sjohnston@btlaw.com
21
22
23
24
25
```

Protected - Subject to Further Protective Review

Page 3

```
 1   APPEARANCES CONTINUED
 2
 3        For Janssen Defendants:
 4
             DRINKER BIDDLE & REATH, LLP
 5           JULIE L. TERSIGNI, ESQ.
             600 Campus Drive
 6           Florham Park, NJ 07392
             973.549.7106
 7           Julie.tersigni@dbr.com
 8
          For Bayer Defendants:
 9
             BARTLIT, BECK, HERMAN, PALENCHAR
10           & SCOTT
             STEVEN E. DERRINGER, ESQ.
11           54 West Hubbard Street, Suite 300
             Chicago, Illinois 60654
12           312.494.4415
             Steven.derringer@bartlit-beck.com
13
14
          Also Present:
15
             Videographer, Cody Warren
16
17
18
19
20
21
22
23
24
25
```

Protected - Subject to Further Protective Review

Page 18

1 practitioner, you were not keeping yourself abreast of
2 the labeling on Coumadin. Correct?
3    A.    That's true.
4    Q.    Okay.
5    A.    That's why I said I would have referred those
6 patients to other people outside the clinic in which I
7 practiced.
8    Q.    What assay would you use to determine the
9 prothrombin time of an IV-heparinized patient?
10   A.    You would use the INR in terms of their values,
11 in terms of what their rates are, but I don't recall
12 offhand. I'm not the person, also, who would be
13 discussing it in this trial. I believe -- your case. I
14 have said in my report I rely on, I believe, Dr. Rinder
15 and other physicians that would be the ones talking about
16 the hematology.
17   Q.    Okay. And --
18   A.    As a pathologist, I mean, I know the difference
19 between a PT and aPTT hep test, different things, but I'm
20 not the one who would be talking about the clinical
21 management of those people, other than what's in the
22 label.
23   Q.    If I understand what you just said, you can't
24 answer the question about what assay you would use to
25 determine the prothrombin time of a heparinized patient

Protected - Subject to Further Protective Review

Page 80

1 internally from the company.
2           For example, there is no section 5.2
3 internally.  The company proposed a 5.2, but it's not in
4 the label.  So there's not -- the word "adequate," it is
5 the approved label.  It's not necessarily an adequate
6 label.
7           MR. WEINKOWITZ:  Can you just put a belated
8 objection to form on that?
9     Q.    BY MR. MURDICA:  Okay.  So, Doctor, it's your
10 opinion that this current label of Xarelto as approved by
11 FDA is inadequate.  Correct?
12    A.    Well, now you've put the FDA in the middle of
13 this.
14          MR. WEINKOWITZ:  Object to form.
15          THE WITNESS:  This is not where I've talked
16 about.  I've talked about in terms of what the companies
17 knew.  This is -- in terms of the FDA, the FDA has
18 approved this label based on the information that comes
19 directly from the company.
20          So we're not saying anything about that the
21 FDA approved an inadequate label.  We're talking about
22 what Bayer and Janssen knew as to what should be in the
23 label.  So they're two different things.
24          This is the FDA-approved label based on the
25 information FDA has, and that's why I said before with an

Protected - Subject to Further Protective Review

Page 139

1  HemoSense device to the laboratory. So eventually the
2  FDA had that data.
3      Q.  As of today, is there any data from clinical
4  trials that Janssen or Bayer have that FDA does not, to
5  the best of your knowledge?
6      A.  I don't know of any.
7      Q.  Okay. Is there any data outside of clinical
8  trials, to your knowledge, that Janssen or Bayer have
9  that FDA does not have regarding Xarelto?
10            MR. WEINKOWITZ: Objection to the form.
11            THE WITNESS: I don't know of any. I
12  know --
13     Q.  BY MR. MURDICA: Okay.
14     A.  -- the ACS study was -- there was a loss of
15  data, and the company tried to find the data for that
16  study. I'm not sure how much more data they have.
17     Q.  Okay.
18     A.  I'm not aware of the documents I've reviewed
19  that there's been a loss of data.
20     Q.  From what you're aware of, Janssen and Bayer
21  don't have any data that FDA doesn't also have. Correct?
22     A.  Well, in the United States, because Bayer has
23  data outside the United States.
24     Q.  Okay.
25     A.  I don't know that FDA -- FDA had to ask for

Protected - Subject to Further Protective Review

Page 169

1  hearts and heart's anatomy, but I'm not the person going
2  to be talking about the cardiology.
3  　　Q.　　Maybe we'll do this an easier way.
4  　　　　　What don't you consider yourself an expert
5  in?  Can you name anything?
6  　　A.　　I have given you that I am not the expert going
7  to be talking about anything with medical causation for
8  any particular patient.
9  　　　　　I'm not going to be talking specifically
10 about the pharmacology, per se.  I believe there are
11 other people designated to talk specifically about the
12 pharmacology, and that would be -- I believe Dr. Plunkett
13 is one person who talks about pharmacology.  Another
14 person would be Dr. Bussey.  He talks about pharmacology.
15 I cited his report as being a person to discuss that.
16 　　　　　I would not be talking necessarily about
17 hematology from a clinical point of view, and Dr. Rinder
18 is talking about hematology from a clinical point of
19 view.
20 　　　　　There are going to be designated
21 cardiologists that are going to talk about that.
22 　　　　　So I think there -- I don't know if there's
23 a pathologist that's going to be talking about laboratory
24 assessment.  There may be in each individual clinical
25 case.

1  drugs --

2      Q.    You --

3      A.    -- with anticoagulant drugs.

4      Q.    You are not an expert on anticoagulant drugs.
5  Correct?

6      A.    I'm an expert in terms of the regulation and
7  the regulatory issues that are discussed in my report.  I
8  am not a prescriber of anticoagulant drugs.

9      Q.    Your experience with novel oral anticoagulants
10 is entirely due to litigation.  Correct?

11     A.    With those, yes.

12     Q.    Okay.  And the first time you ever worked on an
13 novel oral anticoagulant was in relation to dabigatran.
14 Correct?

15           MR. WEINKOWITZ:  I'm going to let -- here's
16 what I'm going to say:  I'm going to interrupt for a
17 moment.  PSC objects to questions about experts' work in
18 the Pradaxa litigation.

19           First, any question regarding the substance
20 of an expert's report or about the expert's opinion in
21 the Pradaxa litigation is not discoverable and falls
22 under the exclusion -- the direct exclusion under Federal
23 Rules of Civil Procedure, similarly adopted in
24 Pennsylvania litigation for experts.

25           Second, such opinions or work are derivative

```
 1     Q.    You haven't -- providing it as advice to
 2   members of FDA?
 3     A.    Uh-huh.
 4     Q.    When is the last time you gave advice to
 5   members of FDA?
 6     A.    When I was at the FDA.
 7     Q.    So more than two decades ago.  Right?
 8     A.    Well, 1995.
 9     Q.    Yeah.
10     A.    So that's where my training came from in that I
11   had to be able to review things, and that's why I put an
12   applicable regulation in everything I review, and that's
13   what I was supposed to do, the same methodology at the
14   FDA, and then the FDA would oftentimes take -- general
15   counsel primarily would take actions or, you know, take
16   what I said or take -- didn't take what I said in terms
17   of following up with regulatory actions.  So that's where
18   I learned to do that.
19     Q.    Do you believe that FDA is still following that
20   methodology that you were trained to use at FDA?
21     A.    Yes, they are --
22     Q.    Okay.
23     A.    -- in terms of medical officers.
24           Are you talking CDER?  My beginnings was at
25   CDRH when the one medical officer would have more
```

Protected - Subject to Further Protective Review

Page 245

1  as to PT relates to labeling?
2      A.   No, it relates to the company documents.
3  There's ...
4           Listen, I went back through the animal
5  studies and looked at PT.  PT was used through the animal
6  studies.  So there you have discussion of the use of PT.
7  You have discussion, internal documents, of the use of PT
8  for monitoring.  You have all this information -- it's
9  not just the label -- where the company is talking about
10 the use of PT.  They're talking about it in their
11 pushback information.
12          So there's a whole history that goes from
13 day one with Xarelto beginning with the animal studies
14 and the use of PT for monitoring plasma concentration
15 that's not captured in the information being provided to
16 the basic guy prescribing it to a patient, and that's
17 what the issue is is that I'm worried about patient
18 safety and that the physician doesn't have access to the
19 information that the company's been using internally to
20 develop Xarelto.
21     Q.   You don't have a substantive opinion on the
22 utility of that, though, a substantive medical opinion.
23 Correct?
24     A.   Yeah.
25     Q.   You defer to Dr. Rinder on that?

Protected - Subject to Further Protective Review

Page 246

```
 1    A.    No, no, no, I do.  You look at my opinion 11,
 2    and I say that this label is inadequate, and I use the
 3    word inadequate as a regulatory consultant looking at the
 4    data, and I say one of the things that's inadequate is
 5    that there's no information about the PT and the need to
 6    adjust a dose or discontinue the drug.  So I have
 7    opinions A through F --
 8    Q.    Okay.
 9    A.    -- that are based on all the documents reviewed
10    and the requirements that I list under there in terms of
11    an adequate label, adequate information that the company
12    needs.  So it is a regulatory opinion.
13    Q.    You know --
14    A.    It's not a clinic opinion because Dr. Rinder
15    actually takes care of clinical patients.
16    Q.    You know that FDA's current view is that
17    there's no clinically meaningful assay relating to PT in
18    measuring rivaroxaban concentration.  Correct?
19    A.    I know that's based on the company repeatedly
20    saying to it in documents.  The FDA asked about it.  The
21    company's repeated reply is -- Dr. Berkowitz's reply was
22    at the public meeting the same thing, that it's not --
23    there's no utility.  FDA keeps asking for it, and the
24    information doesn't support that.
25                In terms of the United States, just let the
```

Protected - Subject to Further Protective Review

Page 571

1 read or e-mails that you read from employees of either
2 Bayer or Janssen. Is that right?
3     A.    Factual information. I don't know what the
4 company knows in terms of a subjective -- I don't know
5 what the company knows. So the only thing you can rely
6 on and the only thing a regulatory expert relies on is
7 factual information. What did the company have in
8 possession, what were the e-mails saying. And so those
9 are the support as to what the company knew when, at what
10 time.
11     Q.    What expertise are you applying, ma'am, when
12 you're reading factual documents and then stating what
13 the company knew?
14     A.    Based on my training when I was with the FDA in
15 terms of a few of the mandatory recalls when the FDA went
16 out and brought in documents and had me do the exact same
17 process. Put together the history, put together what the
18 corporation is talking about -- sometimes I had
19 testimony, sometimes I had e-mails -- and tell the FDA as
20 to what the effect is on the public and what the company
21 did.
22     So I learned the expertise from the FDA in
23 terms of looking at data -- factual data and -- putting
24 together. And then also forensics actually helps do that
25 too in terms of looking at the medical record, looking at

Protected - Subject to Further Protective Review

Page 585

1  Q.  I'm sorry. Not correct or I am correct?
2  A.  Well --
3  Q.  I just want to make sure the record is clear.
4  A.  I think you may be correct. But if you look at
5  my report, never do I say this is what this person was
6  thinking when they wrote this e-mail. Any e-mail that I
7  cite or reference is put in a context of what the
8  requirements are in terms of what was being discussed in
9  that e-mail. Not what somebody was thinking.
10         And so if you have other people who can
11 refute what I wrote, that's fine. But I put it in a
12 context of how it fits into the regulatory scheme.
13 Q.  Is that your best effort in answering my
14 question?
15 A.  That is my best effort.
16 Q.  Do you intend to give any opinion about what
17 Janssen or Bayer knew or what they were thinking?
18 A.  No. And I said that in my report because to me
19 that would be subjective information. No, I don't know
20 what they were thinking.
21 Q.  Are there any FDA regulations that tell you
22 what Bayer or Janssen knew or was thinking?
23 A.  No. And that's not --
24         MR. WEINKOWITZ: Objection.
25         Go ahead.

Protected - Subject to Further Protective Review

Page 587

1  treatment that provides an important benefit that is a
2  benefit that's life-saving or that prevents irreversible
3  injury?
4              MR. WEINKOWITZ:  Objection to the form.
5              THE WITNESS:  Warfarin, yes.
6      Q.    BY MR. DERRINGER:  Yeah.  Do you agree that
7  Warfarin is used to prevent serious harm such as death or
8  irreversible morbidity?
9      A.    Yes, sir.
10     Q.    Do all anticoagulants have a risk of bleeding?
11     A.    Yes, sir.  That would -- yes, sir.
12     Q.    If you look at opinion 3, it's on page 10 of
13 your report in this matter.  You have that in front of
14 you?
15     A.    Yes, sir.  Opinion 3.
16     Q.    Opinion 3, that's right.
17     A.    I'm look -- yes.  I'm looking at 5.  Opinion 3,
18 yes, sir.
19     Q.    Okay.  You write that Xarelto, as sold by
20 defendants, has the highest risk of major bleeding among
21 the NOACS.
22              Do you see that?
23     A.    Yes.  And I unfortunately don't put a
24 reference, but that's from the medical literature where
25 they've done some comparisons in terms of the Xarelto.

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 588

1  Q.  So can you tell the jury what medical
2  literature specifically you're referring to there?
3  A.  Not offhand because I didn't put a -- no, I
4  cannot because I don't have a reference.
5  Q.  Do you acknowledge, Dr. Parisian -- well,
6  strike that.
7       Have you done anything to investigate the
8  issue of whether different NOACS are prescribed to
9  patient populations with different health
10 characteristics?  Do you understand my question?
11 A.  Yes.
12      MR. WEINKOWITZ:  Objection to the form.
13      THE WITNESS:  I believe you mean underlying
14 conditions in --
15 Q.  BY MR. DERRINGER:  Sure.
16 A.  -- terms of some people are more serious and
17 like the ROCKET study used a -- more serious patients in
18 terms of increased health risks than other patients.
19 Q.  Well, have you done anything to examine the
20 issue about whether, in clinical practice, certain NOACS
21 are prescribed to sicker patients compared to other
22 NOACS?
23 A.  No, I haven't.  And that would be in the
24 purview of a hematologist or someone take -- or
25 cardiologist, someone taking care of clinical patients.

1    surveillance pharmacovigilance.
2        Q.    Can you cite any evidence that the severity and
3    frequency of bleeding risk seen in post-marketing data is
4    greater than what was seen in clinical trials and what's
5    reported in the labeling?
6        A.    No.  But it's just a fact that the person who's
7    reading about bleeding with an anticoagulant has no idea
8    what the severity and the frequency in what's -- in terms
9    of characterizing the adverse reactions to a physician.
10       Q.    Has any physician told you that they are
11   unaware of the severity and frequency of bleeding risk
12   with Xarelto?
13       A.    I haven't seen depositions from physicians.  So
14   let the physicians speak for themselves in terms of the
15   potential bleeding risk for their patient.  They will be
16   asked, I'm sure, what the severity and frequency and if
17   they were aware of that.  So in terms of that information
18   should have come from their enhanced pharmacovigilance in
19   terms of what's the severity, what's the frequency.
20   Because you just don't say there's bleeding.  I mean,
21   every anticoagulant bleeds.  But is there a potential
22   increased risk of bleeding and so that would be something
23   captured and meaningful to a physician in a label.
24              MR. WEINKOWITZ:  Before you go to your next
25   question, why don't we go off the record and just

Protected - Subject to Further Protective Review

Page 747

```
 1      A.      -- I agree.
 2      Q.      You don't hold yourself out as an expert in the
 3   laws or regulations governing prescription medications in
 4   Europe.  Correct?
 5      A.      That's correct.  That's why I'm saying I'm not
 6   giving the information as a regulatory expert.  It's only
 7   notice as to what information was available and what was
 8   being discussed.
 9      Q.      You're not an expert in the laws or regulations
10   concerning the European review and approval process for
11   prescription medications.  Correct?
12      A.      That's true.
13      Q.      You're not an expert in the laws and
14   regulations that apply to European labeling for
15   pharmaceutical products.  Correct?
16      A.      That would be true.  I'm not a regulatory
17   expert for Europe or Canada.
18      Q.      All of those answers you just gave about
19   Europe, not being an expert in the laws and regulations
20   and regulatory frameworks, that is also true with Canada.
21   Right?
22      A.      Yes.  And that's why I'm saying it was not
23   given as a regulatory expert.  It was only for notice of
24   information that was available to both companies at
25   different times.
```

```
 1                  CERTIFICATE OF REPORTER
 2    STATE OF ARIZONA     )
                           )
 3    COUNTY OF MARICOPA   )
 4
 5          I, Sommer E. Greene, a Certified Reporter in the
      State of Arizona, do hereby certify that the foregoing
 6    deposition was taken before me in the County of Maricopa,
      State of Arizona; that an oath or affirmation was duly
 7    administered to the witness, SUZANNE PARISIAN, M.D.,
      pursuant to A.R.S. 41-324(B); that the questions
 8    propounded to the witness and the answers of the witness
      thereto were taken down by me in shorthand and thereafter
 9    reduced to typewriting; that the transcript is a full,
      true and accurate record of the proceeding, all done to
10    the best of my skill and ability; and that the
      preparation, production and distribution of the
11    transcript and copies of the transcript comply with the
      Arizona Revised Statutes and ACJA 7-206(j)(1)(g)(1) and
12    (2).
              The witness herein, SUZANNE PARISIAN, M.D.,
13    has requested signature.
              I FURTHER CERTIFY that I am in no way related
14    to any of the parties nor am I in any way interested in
      the outcome hereof.
15
16            IN WITNESS WHEREOF, I have set my hand in my
      office in the County of Maricopa, State of Arizona, this
17    10th of December, 2016.
18
19
                              _____
20                            Sommer E. Greene, RPR, CRR
                              Certified Reporter 50622
21
22
23
24
25
```