# Exhibit 22

# FILED UNDER SEAL

Protected - Subject to Further Protective Review

```
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF LOUISIANA
 2

 3

     IN RE:  XARELTO            )
 4   (RIVAROXABAN) PRODUCTS     )
     LIABILITY LITIGATION       )   MDL No.:  2592
 5                              )   Section:  L
                                )   Judge Eldon E. Fallon
 6                              )   Mag. Judge North
                                )
 7   THIS DOCUMENT RELATES      )
     TO ALL CASES               )
 8

 9

10

11    PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW
12                       VOLUME I
13

14        Videotaped Deposition of LAURA M. PLUNKETT,
15   Ph.D., taken on Tuesday, December 6, 2016, in the
16   office of The Lambert Firm, A.P.L.C., 701 Magazine
17   Street, New Orleans, Louisiana 70130, commencing
18   at 8:02 a.m.
19

20

21

22

23
     Reported by:
24   AURORA M. PERRIEN
     CERTIFIED COURT REPORTER
25   REGISTERED PROFESSIONAL REPORTER
```

```
 1                  A P P E A R A N C E S
 2    REPRESENTING PLAINTIFFS:
 3           SCHLICHTER, BOGARD & DENTON, L.L.P.
             BY:  ROGER DENTON, ESQ.
 4           100 South 4th Street, Suite 1200
             St. Louis, Missouri 63102
 5           314.621.6115
             Rdenton@uselaws.com
 6
             GAINSBURGH, BENJAMIN, DAVID, MEUNIER &
 7           WARSHAUER, L.L.C., at times noted
             BY:  GERALD E. MEUNIER, ESQ.
 8           1100 Poydras Street, Suite 2800
             New Orleans, Louisiana 70163-2800
 9           504.522.2304
             Gmeunier@gainsben.com
10
11
      REPRESENTING BAYER HEALTHCARE PHARMACEUTICALS,
12    INC., and BAYER PHARMA AG:
13           KAYE SCHOLER, L.L.P.
             BY:  JEFFREY H. HOROWITZ, ESQ.
14           250 West 55th Street
             New York, New York 10019-9710
15           212.836.7572
             Jeffrey.horowitz@kayescholer.com
16
             BRADLEY, ARANT, BOULT, CUMMINGS, L.L.P.
17           BY:  LINDSEY C. BONEY, IV, ESQ.
             1819 Fifth Avenue North
18           Birmingham, Alabama 35203-2119
             205.521.8914
19           Lboney@bradley.com
20
21
22
23
24
25
```

```
 1   REPRESENTING JANSSEN PHARMACEUTICALS, INC.,
     JANSSEN RESEARCH & DEVELOPMENT, L.L.C., JANSSEN
 2   ORTHO, L.L.C.:
 3         IRWIN, FRITCHIE, URQUHART & MOORE, L.L.C.
           BY:  JAMES B. IRWIN, ESQ.
 4         400 Poydras Street, Suite 2700
           New Orleans, Louisiana 70130-3280
 5         504.310.2106
           Jirwin@irwinllc.com
 6
           IRWIN, FRITCHIE, URQUHART & MOORE, L.L.C.
 7         BY:  MEERA U. SOSSAMON, ESQ.
           400 Poydras Street, Suite 2700
 8         New Orleans, Louisiana 70130-3280
           504.310.2106
 9         Msossamon@irwinllc.com
10
11   ALSO PRESENT:
12         MELISSA BARDWELL, VIDEOGRAPHER
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Protected - Subject to Further Protective Review

```
 1              You're giving me a headache.
 2         MR. DENTON:
 3              -- to get the judge on the phone.
 4         MR. HOROWITZ:
 5              Okay.
 6         MR. DENTON:
 7              I'm sorry for giving you a headache.
 8   BY MR. HOROWITZ:
 9       Q.  So -- so --
10         MR. DENTON:
11              But I am going to object.
12   BY MR. HOROWITZ:
13       Q.  -- Dr. Plunkett, let's go back to my
14   questions.  I can't remember where I was.
15         But you never spoke to the ClinPharm
16   reviewer or the medical officers who reviewed
17   Xarelto about your opinions of Xarelto; correct?
18       A.  No.  I already answered that for you.
19       Q.  Okay.  And you've never offered these
20   opinions that you're offering in your report in
21   this litigation anywhere else other than in this
22   litigation.  Is that fair?
23       A.  At this point in time that is true.  Yes.
24       Q.  And you didn't hold these opinions -- I
25   think we talked about that -- before you were
```

1          With respect to your opinion specifically

2    about Xarelto in your opinion section, those were

3    opinions that you formed after you were hired and

4    -- to do your in-depth review by the plaintiffs'

5    lawyers.  Is that fair?

6              MR. DENTON:

7                   Object to the form.

8              THE WITNESS:

9                   Certainly they were formed after my

10             in-depth review.  That is true.

11   BY MR. HOROWITZ:

12       Q.   And the in-depth review occurred after you

13   spoke to Mr. McWilliams and he retained you for

14   this litigation?

15       A.   Yes.  That is true.

16       Q.   If you take a look at your report -- or

17   you may not need to look.  But I'll tell you what

18   I'm -- from my notes what I'm looking at.  It's

19   Page 1, Paragraph 1.  I just want to ask you about

20   this phrase.  You say "Integrative Biostrategies"

21   -- I know I'm skipping some things -- "works at

22   the interface of biological science, regulatory

23   affairs and business decisions to provide its

24   clients with science-based solutions."

25             Do you see that?

Protected - Subject to Further Protective Review

```
 1   article on in vitro assays?
 2        A.   On the use of the data.  But on the
 3   development of the assay?  I don't know.  Are you
 4   asking me like a general background article or --
 5   or my --
 6        Q.   Let me ask it again.
 7        A.   -- application?
 8        Q.   I don't care about general back -- because
 9   I know what you've done.  I -- I just have to ask
10   these questions to create a little bit of a
11   record.
12             But I'm going to limit it to say -- have
13   you ever published a peer-reviewed article on PT
14   assays or any assay related to anticoagulation?
15        A.   No.  I have not done that.
16        Q.   Do you have any peer-reviewed work or
17   publication on whether particular assays are
18   appropriate to measure rivaroxaban or any other
19   NOAC?
20        A.   Have I ever published that?  No.  I have
21   not.
22             MR. HOROWITZ:
23                It's -- why don't we -- it's just that
24        it's a good --
25             MR. DENTON:
```

1      A.   Well, there are in certain contexts, yes.
2           You can calculate a therapeutic index
3  based on the comparison of animal data, for
4  example, for looking at effective doses and toxic
5  doses.  You can -- you can calculate a therapeutic
6  index that's based on looking at the ED50 values
7  and then the TD1 value, and you can come up with a
8  calculation.  So yes, you -- you can do that.
9           But you have to have dose-response data to
10 be able to do that, and that's what's lacking in
11 this case.  We don't have dose-response data in
12 a-fib patients in order to calculate an exact
13 therapeutic index.
14     Q.   So you have not calculated an exact
15 therapeutic index?
16     A.   For -- for -- for this particular
17 indication, no, because I don't believe it can be
18 done based on the -- the data -- the clinical data
19 that you have, which is a single-dose study.
20     Q.   Do you agree that a patient can have a
21 bleed even if they have no rivaroxaban in their
22 blood?
23          MR. DENTON:
24               Object to the form.
25          THE WITNESS:

1    Q. Are you offering an opinion about the
2 plasma concentrations that define a therapeutic
3 range for rivaroxaban?
4    A. No. I have not formed opinion on the
5 exact concentrations, although I have formed some
6 opinions based on data for ROCKET, which shows you
7 what the variability is and what that variability
8 -- how that variability impacts the safety of the
9 drug. So I -- I formed opinions on plasma levels,
10 but not exactly in the way that you're asking me.
11    Q. Right. So could you answer my question
12 that I'm asking, which is: You are not offering
13 an opinion about the plasma concentrations that
14 define a therapeutic range for rivaroxaban. Is
15 that fair?
16    A. And my answer to --
17    MR. DENTON:
18        Object to the form.
19    THE WITNESS:
20        -- that question was: There is no
21    answer to that question because we don't
22    have the data to -- to define that.
23 BY MR. HOROWITZ:
24    Q. You don't know the boundaries of the
25 therapeutic range; right?

```
 1              Object to the form.
 2          THE WITNESS:
 3              I have not formed that opinion.  No.
 4          But certainly I would agree with that.
 5          That is true.  I mean, I do think that the
 6          company -- the company could improve the
 7          patient safety by doing that study.  I
 8          think you have enough information current
 9          how -- currently, however, to support a --
10          information be included in the labeling
11          about the utility of the monitoring --
12   BY MR. HOROWITZ:
13       Q.  What --
14       A.  -- the fact that there was a linear
15   relationship in exposure response.
16       Q.  So you believe that we have enough
17   scientific evidence right now as we sit here now
18   to determine whether patient safety would be
19   improved through monitoring of rivaroxaban?
20       A.  I -- I -- I don't think that's what I've
21   said.  No.
22              What I told you was I have not formed the
23   opinion that we have the data to prove that
24   because the company hasn't done the study.
25   However, I do believe we have enough scientific
```

Protected - Subject to Further Protective Review

 1   data right now to justify putting information in
 2   the labeling for the physician.  And again, that's
 3   what -- that's one of the things I believe that
 4   FDA has pointed out in their statements as well
 5   within the -- within the document.  They -- they
 6   talk about the -- the reliability of that data and
 7   the fact that that data shows this effect, which
 8   means it could be put into the labeling if the
 9   company wanted to do that.
10           MR. HOROWITZ:
11               Objection.  Move to strike.
12               Nonresponsive.
13   BY MR. HOROWITZ:
14      Q.   What's the study that you're saying the
15   company hasn't done?  Can you describe it for me?
16      A.   It would be the study you just asked me
17   about.  It would be the idea they would -- they
18   would -- they would sign patients up and -- and
19   look at the -- look at the monitoring and whether
20   or not there was an effect to be able to change
21   the profile of bleeding risk within patients.
22      Q.   So --
23      A.   They could do it retrospectively from
24   looking back at the clinical data, comparison to
25   that trial, what that trial showed versus what

```
 1                  Well, that's something I haven't
 2          stated in my reports.  Let me think about
 3          what you're asking me.
 4                  Depends what you mean by "establish
 5          scientifically."  To a standard wherein
 6          you could make a specific claim within
 7          your label, you would have to do some type
 8          of scientific study.  To provide a label
 9          statement, though, about the utility of
10          prothrombin for exposure-response
11          monitoring, that data would not have to be
12          collected.  That study would not have to
13          be done.
14   BY MR. HOROWITZ:
15       Q.  Has there ever been a clinical trial that
16   you're aware of comparing safety outcomes in a
17   group that used rivaroxaban without monitoring to
18   a group that used rivaroxaban with monitoring?
19       A.  What was the first part of your question?
20   A safety outcome study or . . .
21       Q.  Yeah.
22           Has there ever been any clinical trial
23   comparing safety outcomes in a group that used
24   rivaroxaban without monitoring to a group that
25   used rivaroxaban with monitoring?
```

Protected - Subject to Further Protective Review

```
 1      A.   I don't believe I'm aware of one.  No.
 2      Q.   Okay.  And just so I understand, you don't
 3   agree that to establish scientifically that safety
 4   outcomes would in fact be improved through
 5   monitoring rivaroxaban.  Your view is you actually
 6   don't need to do that type of trial and compare
 7   outcomes in a group using monitoring to outcomes
 8   in a group not using monitoring?
 9           MR. DENTON:
10               I object --
11   BY MR. HOROWITZ:
12      Q.   No need to do that?
13           MR. DENTON:
14               I object to the form.  That's not what
15           she said.
16           THE WITNESS:
17               No.  I -- I agree.  I don't believe
18           that is what I said.
19               What I'm telling you is that you have
20           enough information already to know that
21           there's a reliable relationship between
22           exposure response by using PT.  And we
23           know that the -- know it deals with the
24           issue of -- of bleeds, because it's
25           talking about the -- that part of the
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  A. Okay.

2  Q. -- "result . . . compared to warfarin,

3  over-dosing with Xarelto poses a greater risk to

4  patient health."

5  Do you see that?

6  A. Yes.

7  Q. And is it your opinion that -- that

8  someone can actually overdose on Xarelto?

9  A. Well, overdosing as per having a -- too

10 high of a blood level and -- and bleeding, yes.

11 Q. Okay.

12 A. And also the issue of what if somebody did

13 take multiple tablets by mistake and -- and shot

14 their blood level way up.

15 Q. Yeah.

16 A. About the -- it's the issue of no

17 antidote --

18 Q. Right.

19 A. -- the idea that you can't shut the --

20 the -- the response down.

21 Q. I got you.

22 So you -- it's your view that if somebody

23 takes a massive amount of Xarelto, either

24 intentionally or by accident, that they're going

25 to bleed?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1          MR. MEUNIER:
 2             Objection to form.
 3          THE WITNESS:
 4             No.  That's not what I said.  I said
 5          there's two situations:  overdosing as in
 6          for the individual, the dose is too high
 7          because of some -- some change in their
 8          physiology, for example.  So it could be
 9          the same 20-milligram dose but -- but when
10          they take it, because their physiology has
11          changed, they're overdosed internally, too
12          high of a blood level.  Or in -- or it
13          could be a situation where somebody
14          double-doses by mistake.
15             So either one, the issue is when
16          someone shows up with -- with a
17          overexposure -- maybe I should -- maybe it
18          was -- it would be more correct to use the
19          word "overexposure," but -- because I'm
20          not talking about just taking extra
21          tablets.  I'm talking about people that --
22          taking the same daily dose as they had
23          been taking but there's some change in
24          their physiology and now that level is --
25          is an overdose for them, essentially.
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1              Just like people with moderate -- the
2              moderate renal failure, the dose was
3              dropped to 15 because that helps control
4              the -- the risks.
5    BY MR. HOROWITZ:
6         Q.   In forming your opinion that you just gave
7    me about the risk of overdose with Xarelto and
8    that you wrote in your report, "over-dosing with
9    Xarelto poses a greater risk to patient health,"
10   did you review the literature to see what happens
11   to patients who actually do overdose on Xarelto?
12        A.   I have seen the literature on that.  And
13   that's an apples and oranges situation we can
14   discuss, if you'd like, about absorption
15   potential.
16             But yes, absolutely, I did look at -- and
17   I think I even have several of those in my list.
18   It's not in my report.  But I have it -- in my
19   reliance list, I think I have a couple of articles
20   that talk -- from poison control centers that talk
21   about high suicidal intent, things like that.
22        Q.   Well, let's take a look at three articles
23   real quick.  We can mark them again.  I'm going to
24   mark as Plunkett 21 [sic] -- I'm sorry -- "Lack of
25   significant bleeding despite large acute

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1                  C E R T I F I C A T E
 2      This certification is valid only for
 3   a transcript accompanied by my original signature
 4   and original seal on this page.
 5      I, AURORA M. PERRIEN, Registered Professional
 6   Reporter, Certified Court Reporter, in and for the
 7   State of Louisiana, as the officer before whom
 8   this testimony was taken, do hereby certify that
 9   LAURA M. PLUNKETT, PH.D., after having been duly
10   sworn by me upon the authority of R.S. 37:2554,
11   did testify as hereinbefore set forth in the
12   foregoing 168 pages; that this testimony was
13   reported by me in the stenotype reporting method,
14   was prepared and transcribed by me or under my
15   personal direction and supervision, and is a true
16   and correct transcript to the best of my ability
17   and understanding; that the transcript has been
18   prepared in compliance with transcript format
19   guidelines required by statute or by rules of the
20   board; and that I am informed about the complete
21   arrangement, financial or otherwise, with the
22   person or entity making arrangements for
23   deposition services; that I have acted in
24   compliance with the prohibition on contractual
25   relationships, as defined by Louisiana Code of
```

Case 2:14-md-02592-EEF-MBN   Document 5113-29   Filed 01/20/17   Page 18 of 18
PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1   Civil Procedure Article 1434 and in rules and
 2   advisory opinions of the board; that I have no
 3   actual knowledge of any prohibited employment or
 4   contractual relationship, direct or indirect,
 5   between a court reporting firm and any party
 6   litigant in this matter nor is there any such
 7   relationship between myself and a party litigant
 8   in this matter.  I am not related to counsel or to
 9   the parties herein, nor am I otherwise interested
10   in the outcome of this matter.
11
12
13
14
15               AURORA M. PERRIEN, CCR, RPR
16
17
18
19
20
21
22
23
24
25
```