# Exhibit 23

# FILED UNDER SEAL

Protected - Subject to Further Protective Review

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF LOUISIANA
 3
 4      * * * * * * * * * * * * * * * * * * * * * *

                                    MDL 2592
 5                                  Section L
        IN RE: XARELTO              JUDGE ELDON E.
 6      (Rivaroxaban) PRODUCTS      FALLON
        LIABILITY LITIGATION        MAG. JUDGE
 7                                  MICHAEL B. NORTH
 8
 9      * * * * * * * * * * * * * * * * * * * * * *
10
11      PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW
12
13
                  VIDEOTAPED EXPERT DEPOSITION
14
                              OF
15
                  CINDY A. LEISSINGER, M.D.
16
            Taken on Tuesday, November 15, 2016
17
                  Commencing at 9:09 a.m.
18
                              At
19
                  THE LAMBERT LAW FIRM
20
                  701 Magazine Street
21
                  New Orleans, Louisiana
22
23
24
25
```

```
 1   APPEARANCES:

 2

 3   ATTORNEYS FOR PLAINTIFFS

 4

 5   LEVIN PAPANTONIO THOMAS MITCHELL
     RAFFERTY PROCTOR, P.A.
 6   316 South Baylen Street, Suite 600
     Pensacola, Florida  32502
 7   850.435.7000
     nmcwilliams@levinlaw.com
 8   BY:  NED MCWILLIAMS, ESQ.

 9

10   THE LAMBERT FIRM
     701 Magazine Street
11   New Orleans, Louisiana 70130
     504.581.1750
12   ejeffcott@thelambertfirm.com
     BY: EMILY C. JEFFCOTT, ESQ.

13

14   DOUGLAS & LONDON
     59 Maiden Lane, Sixth Floor
15   New York, New York  10038
     212.566-7500
16   lsay@douglasandlondon.com
     BY:  LARA J. SAY, ESQ.

17

18   ATTORNEYS FOR DEFENDANT BAYER

19

20   KAYE SCHOLER, LLP
     1999 Avenue of the Stars,
21   Suite 1600
     Los Angeles, California  90067-6048
22   310.788.1278
     pamela.yates@kayescholer.com
23   bert.slonim@kayescholer.com
     BY: PAMELA J. YATES, ESQ.
24       BERT L. SLONIM, ESQ.
25
```

```
 1   APPEARANCES (CONTINUED):

 2

 3   ATTORNEYS FOR DEFENDANT JANSSEN

 4

 5   VENABLE LLP
     750 East Pratt Street
 6   Suite 900
     Baltimore, Maryland 21202
 7   410.244.7655
     jmccauley@venable.com
 8   BY: JOHN A. MCCAULEY, ESQ.

 9

10   ATTORNEYS FOR DEFENDANT JANSSEN

11

12   BARRASSO USDIN KUPPERMAN FREEMAN & SARVER, L.L.C.
     909 Poydras Street
13   24th Floor
     New Orleans, Louisiana 70112
14   504.589.9733
     rsarver@barrassousdin.com
15   msharko@barrassousdin.com
     BY: RICHARD E. SARVER, ESQ.
16       MADISON A. SHARKO, ESQ.

17

18   VIDEOTAPED BY:
         MARK ANCALADE

19

20   REPORTED BY:
         Marybeth E. Muir, CCR, RPR
21       Certified Court Reporter
         In and for the State of
22       Louisiana and Registered
         Professional Reporter

23

24

25
```

Protected - Subject to Further Protective Review

1    myself?  No.  But I have seen those presentations.

2        Q.  Right.  And -- and my question, to be fair,

3    was:  I wanted to know, before you met with the

4    lawyers, had you specifically looked at the

5    literature on the PK and PD for Xarelto?

6        A.  Only in context of these various meetings

7    where, you know, we would sit and discuss these

8    things.

9        Q.  All right.

10       Let's set aside the conferences where

11   presentations are made, maybe abstracts, et cetera,

12   et cetera, had you, before you met with the lawyers,

13   researched any of the PK/PD data for Xarelto?

14       A.  No.

15       Q.  Doctor, your report, I think, is marked as

16   Exhibit 5.  Do you have that front of you?

17       A.  I do.

18       Q.  By the way, did you bring any materials with

19   you here today?

20       A.  I did not.  Just got my report.  It's just

21   an identical copy, only not in color.

22       Q.  Okay.

23       Do you have any notes on the version you

24   brought today?

25       A.  I do not.

Protected - Subject to Further Protective Review

1    know, again, guessing -- I'm guessing, but...

2        Q.  So you have no idea?

3        A.  I know that it's many, but I don't have an

4    idea of the number.

5        Q.  All right.

6            Are you following the ongoing studies, the

7    real-world studies with Xarelto?

8        A.  I'm aware of some.

9        Q.  Would you say there's a lot of research

10   ongoing or just a few?

11       A.  I don't know.  I really don't know.

12       Q.  Have you discussed your opinion on Xarelto

13   with other doctors at Tulane?

14       A.  Yes.

15       Q.  Who?

16       A.  People I work with.  My other coagulation

17   folks at Tulane.  I work with Dr. Maissaa Janbain,

18   Dr. Tami Singleton, Dr. Marc Kahn.  We're the

19   group that does the most with hematology patients,

20   anticoagulant patients.

21       Q.  Have you expressed your views to doctors

22   outside of Tulane?

23       A.  Probably.

24       Q.  Have you published these views?

25       A.  No.

Protected - Subject To Further Protective Review

1    Q.  Presented them at a public forum?

2    A.  No, I have not.

3    Q.  I think you said that we don't have as much

4    data on apixaban, but you're starting to favor it a

5    little bit.  What about dabigatran?  Should

6    dabigatran be removed from the market?

7    A.  Where I practice or the patients I see, I

8    almost never see a patient on dabigatran.  So,

9    again, I'm sure there are numbers available that

10   tell you how many people in the US are on

11   dabigatran.  I effectively don't -- haven't for a

12   year or so seen anyone on dabigatran.

13       Do we need to take a deep breath and take a

14   hard look at all of these NOACs?  Yes, we do.  The

15   one thing that dabigatran has perhaps going for it

16   in a sense is we now have a reversal agent for it,

17   which we do not for the Xa inhibitors.  I think

18   there's certainly one in the pipeline, and I think

19   that's important, but right now we don't have one

20   ready to hand, you know, to grab off the shelf when

21   a patient presents having a serious life-threatening

22   bleed.  We do with dabigatran.

23       So should there be further analysis of --

24   you know, again, that at a regulatory level of all

25   of the NOACs?  In my opinion, that wouldn't be a

```
 1    bad idea.  But I'm really not here and not, you

 2    know, sufficiently well versed in all of the

 3    dabigatran literature to talk about dabigatran.

 4           I will say about apixaban, as a Xa

 5    inhibitor -- and dabigatran as well, but

 6    particularly apixaban was studied and has been

 7    released as a BID treatment, which makes a lot of

 8    sense for a drug that has a half-life generally less

 9    than 12 hours, right?

10           So when you look at Xarelto, the half-life

11    of Xarelto is -- the -- repeated through --

12    through all, you know, pharmacokinetic studies

13    is that in older populations that half-life goes up

14    to 13 hours, but is really nine to 13 hours, 10 to

15    13 hours, and in younger populations, much less,

16    six to nine hours.

17           So you're talking about groups of patients

18    who go on a drug, particularly on -- I'm kind of

19    segueing back to Xarelto.  So if you have somebody

20    -- and it's apparent that within the sort of

21    normal, accepted range of half-life is six hours.

22    If you have somebody with a six-hour half-life,

23    you give them a drug that goes up to a maximum,

24    say 100 percent, in their blood at the time they

25    take it, by the time they're due for the next dose,
```

```
 1   you know, you're already down to like less than 10

 2   percent of that drug in their system.

 3           So, again, we've already talked about the

 4   importance -- this is a narrow therapeutic -- this

 5   drug has a narrow therapeutic index.  You would want

 6   to get the safest, most consistent levels of that

 7   drug in a patient's body for the duration of

 8   time that they are on it.  Why would you, then,

 9   want it to be a once-a-day drug where by design

10   you have a wide swing in what the concentration of

11   that drug is in the blood from a maximum peak all

12   the way down in many patients on this drug to less

13   than 10 percent of what it was in a drug that we

14   know has all of these problems?

15           So, you know, do we need a hiatus where we

16   think about how we're dosing it, where we study

17   it?  I mean, we can't just -- you know, and I'm

18   certainly not sitting here and saying that I can

19   tell you how to fix Xarelto.

20           When you ask me, "Would you take it off

21   market?"  I just think smart people need to come

22   together and think about how to make this drug more

23   safe and more effective than what it is.

24           Fundamentally, it inactivates --

25   activates -- it inhibits activated X.  That's the
```

Protected - Subject To Further Protective Review

```
 1    anywhere else.  What I'm aware of is what's approved

 2    in this country.

 3         Q.  Okay.

 4             The approval in the United States, you will

 5    agree with me that there are at least different

 6    doses, right?

 7         A.  For different indications, yes.

 8         Q.  Okay.

 9             Doctor, you're familiar with patient

10    compliance, right?

11         A.  Very much so.

12         Q.  Very important, right?

13         A.  Extremely.  No drug works if it's not taken.

14         Q.  You got it.

15             And particularly in medicines that are taken

16    to be long-term, patient compliance -- I mean, there

17    is data out there showing that a once-a-day drug has

18    much better compliance than a twice-a-day or

19    three-times-a-day drug, right?

20         A.  There is.  I'm sure there's some data on

21    that, yes.

22         Q.  And so if -- in your developmental program,

23    if you have a twice-a-day arm in a study and a

24    once-a-day arm in a study, and you're seeing the

25    same safety and efficacy, but you know that based on
```

Protected - Subject To Further Protective Review

1      A.   Oh, it surely would be.

2      Q.   Right, because that would actually tell you

3   if the patients, at the high end or low end, are

4   experiencing either a lack of efficacy or a bleeding

5   risk, right?

6      A.   Yes.

7      Q.   Do you have that data?

8      A.   No.  Does anybody have that data?

9      Q.   I'm not here to answer questions, Doctor.

10   I'm only here to ask them.  I apologize.

11      A.   I would love to see that data.  And

12   actually, on Page 8 and 9, we actually include

13   graphs of that very -- those -- that very issue with

14   edoxaban and with dabigatran where -- where trough

15   levels are correlated to the probability of stroke

16   and probabil- -- and -- and, indeed, until we are

17   able to look at that kind of data, we are not really

18   able to understand what these minimally effective

19   doses are, et cetera.

20      Q.   Right.

21           And so the only way for you to have an

22   opinion to a reasonable degree of medical certainty

23   that BID dosing in an atrial fibrillation patient

24   versus OD dosing is safer and more effective would

25   be to actually have that data and make the

```
 1   comparison?

 2       A.  That's correct.

 3       Q.  And you're saying that you don't have that

 4   data, correct?

 5       A.  I'm saying that.

 6       Q.  Are there any corrections that you would

 7   like to make to your report as we sit here today?

 8       A.  I think I found a couple of typos, but other

 9   than that, I don't -- let me see.

10       Q.  Typos I'm fine with.

11       A.  Yeah.

12       Q.  Unless it's missing a "not" or a "does not"

13   or --

14           MR. MCWILLIAMS:  She said typo.

15       A.  There was one thing.  Hold on one second.  I

16   think it's misstated.  Let's see.  I cannot remember

17   exactly what it was.  I'm sorry, I can't -- there

18   was a place where -- where I was looking back at

19   some of the -- the -- either the PK or PD data and

20   saying that this was higher than a peak or trough.

21   Anyway, I think -- I think it was confused.  I think

22   it should have been the other, where I said it was

23   higher than the trough, and it should have been

24   higher than a peak.  But anyway, I can't find it

25   right now, I mean --
```

1     A.   Yeah.

2     Q.   You could dose adjust that atrial

3   fibrillation patient down because you're concerned

4   about the elevated PT level, right?

5     A.   That would be very difficult to do, because

6   I have no -- I don't know how to adjust Xarelto.

7     Q.   Sorry.  And, in fact, if you did dose adjust

8   based on that simple PT test, you could actually be

9   exposing that patient to a risk of stroke because

10  you're going below the efficacy level, correct?

11    A.   As I said, I would not.  I would not, at

12  this point, adjust down.  What I would do -- and I

13  think there -- you know, there are some reports of

14  this.  I believe there was a report from Japan in

15  which -- a relatively small study, but in which the

16  investigator used a -- a sensitive PT reagent and

17  was able to identify patients who had the highest

18  bleeding risk.

19         You know, I mean, I think there are ways we

20  could utilize this.  We certainly need more studies.

21  This -- this is an important point.  And we

22  definitely need more input from the manufacturer

23  on -- on how we can best do this.

24         But -- but to get to your point, I

25  personally would not adjust down this drug, because

1    Q.  It's in your list?

2    A.  Okay.

3    Q.  Have you seen data that actually is the

4  complete opposite to Nakano?

5    A.  Have I seen data -- no, I have not.

6    Q.  Did you look for data that is inconsistent

7  with Nakano?

8    A.  I looked for -- you know, I searched for

9  pharmacokinetic -- I mean, there is no way to

10  identify, pro or con, any particular opinion.  But I

11  did search for data on pharmacokinetics.  I did not

12  see -- if there was an article, I did not see it.

13    Q.  Okay.

14      Are you aware of any real world data -- and,

15  Doctor, what I mean there is the NOACs that are out

16  in the real world, so beyond the clinical trial

17  setting.

18      Are you aware of real-world data showing

19  that for one of the NOACs, doctors actually were

20  dose-adjusting down, and the incidence of stroke

21  increased significantly?

22    A.  I -- I haven't seen that paper.

23    Q.  And based on the science and what we know

24  now, in fact, you would not dose adjust down?

25    A.  No I -- as I said, I would not, because I

```
 1     don't have enough information that would reliably
 2     tell me what to do.
 3          Q.  Okay.
 4               You are aware that the manufacturers of the
 5     NOACs are working towards getting a factor Xa assay
 6     approved in this country?
 7          A.  I would certainly hope so.
 8          Q.  Well, I know you hope so.  But are you aware
 9     that they are?
10          A.  I have not asked an industry representative
11     that specific question, but I -- I would assume they
12     are, and I've seen mention of that, opinions.  But,
13     you know, like I said, I'm not privy to exactly what
14     they're doing.
15          Q.  Well, you were certainly shown some internal
16     Bayer and Janssen documents and -- to prepare your
17     report, right?
18          A.  I was.
19          Q.  Were you provided any documents showing what
20     the manufacturers are trying to do working towards a
21     factor Xa assay?
22               MR. MCWILLIAMS:  Object to form.
23          A.  I -- I don't recall seeing that specifically
24     mentioned.
25     BY MS. YATES:
```

Protected - Subject To Further Protective Review

1    stop everything.

2        Q.  So you're not saying it's a timeline of

3    first, reversal agent ordered and administered?

4        A.  Right.

5        Q.  And then you do the other standard operating

6    procedures for a bleed?

7        A.  No.  I think, as I said, you know, you're

8    doing multiple things at the same time.  You have a

9    team of people, yeah.

10       Q.  Right.  Okay.  We are on the same page.  It

11   just took me a while to not be too simple.

12           Your opinion that PT is a readily available

13   test for identifying Xarelto-treated patients, have

14   you published that opinion?

15       A.  I have not.

16       Q.  Have you tested whether it's reliable?

17       A.  I have not.

18           MR. MCWILLIAMS:  Object to form.

19   BY MS. YATES:

20       Q.  So you don't know your error rate?

21       A.  That's correct.

22       Q.  You don't know, sitting here today, how

23   unreliable using that PT test with an appropriate

24   reagent is?

25           MR. MCWILLIAMS:  Object to the form.

Protected - Subject To Further Protective Review

1   that the FDA had.

2       Q.  But you agree that Xarelto and the other

3   NOACs were approved without a requirement of

4   therapeutic drug monitoring?

5       A.  I do know that.

6       Q.  And you know that currently there is no

7   FDA-approved standardized test or device that can

8   measure the drug level of Xarelto in a patient's

9   blood or a surrogate blood test that can assess the

10  degree of anticoagulation with Xarelto use, correct?

11          MR. MCWILLIAMS:  Object to form.

12      A.  I know that there is no recommended

13  FDA-approved test to do that.

14      Q.  Well, there is no FDA-approved standardized

15  test to do it, right?

16      A.  Correct.

17      Q.  And you understand that the -- I'm just

18  going to call it PT test, prothrombin time.  You

19  also understand that the PT test has not been

20  approved by the FDA to measure the level of Xarelto

21  or the degree of anticoagulation, correct?

22          MR. MCWILLIAMS:  Object to form.

23      A.  Yes.  As far as I know, that's correct.

24      Q.  And there is no approved -- FDA-approved

25  assay that can measure drug level or degree of

1   anticoagulation for any of the NOACs, correct?

2       A.   That's --- I believe that's correct.

3       Q.   You agree that the FDA does not recommend or

4   require PT testing for Xarelto, correct?

5       A.   Correct.

6       Q.   In fact, are you aware of any drug

7   regulatory agency worldwide that recommends or

8   requires PT testing for Xarelto?

9       A.   Uhmm, right.  I can't speak -- I really

10  can't speak to that.  As far as I know, that's

11  correct.

12      Q.   You agree that there are no professional

13  medical societies that have issued medical practice

14  guidelines that recommend or require PT testing for

15  Xarelto, correct?

16      A.   As far as I know.  I don't -- you know, I

17  don't keep up with all the guidelines, but as far as

18  I know, I have not seen it.

19      Q.   And you are a member of several

20  organizations, right?

21      A.   I am.

22      Q.   Do they have any guidelines that you are

23  aware of recommending or requiring PT testing for

24  Xarelto?

25      A.   No, but they don't -- the societies that I

Protected - Subject To Further Protective Review

1    point.

2        Q.  So just so I'm clear, and -- and you're

3    telling us that -- strike that.

4            There are no patients in your practice who

5    are on Xarelto where you have continued to refill

6    that prescription that you are monitoring with

7    either a PT test or some other test?

8        A.  That's right.  I'm not currently doing it.

9        Q.  On your patients who you said failed

10   Xarelto, developed blood clots, did you file adverse

11   event reports?

12       A.  No, I didn't.

13       Q.  What about your patients on Xarelto who have

14   experienced bleeds, did you file adverse event

15   reports?

16       A.  I've not had any.

17           MR. MCCAULEY:  I'm sorry, I didn't hear that

18           last response.

19           THE WITNESS:  I said I have not had any

20           patients on Xarelto who have had bleeding.

21           MR. MCCAULEY:  Thank you very much.  Thank

22           you.

23   BY MS. YATES:

24       Q.  Doctor, let's go to Page 6 of your report.

25   And the heading is "Inter-patient Variability," and

Protected - Subject To Further Protective Review

```
 1               C E R T I F I C A T E

 2

 3        Certification is valid only for a transcript

 4   accompanied by my original signature and

 5   Original required seal on this page.

 6

 7        I, Marybeth E. Muir, Certified Court

 8   Reporter in and for the State of Louisiana, and

 9   Registered Professional Reporter, as the officer

10   before whom this testimony was taken, do hereby

11   certify that CINDY A. LEISSINGER, M.D., after

12   having been duly sworn by me upon authority of R.S.

13   37:2554, did testify as hereinbefore set forth in

14   the foregoing 353 pages; that this testimony was

15   reported by me in the stenotype reporting method,

16   was prepared and transcribed by me or under my

17   personal direction and supervision, and is a true

18   and correct transcript to the best of my ability and

19   understanding; that the transcript has been prepared

20   in compliance with transcript format guidelines

21   required by statute or by rules of the board, and

22   that I am informed about the complete arrangement,

23   financial or otherwise, with the person or entity

24   making arrangements for deposition services; that I

25   have acted in compliance with the prohibition on
```

Protected - Subject To Further Protective Review

```
1    contractual relationships, as defined by Louisiana
2    Code of Civil Procedure Article 1434 and in rules
3    and advisory opinions of the board; that I have no
4    actual knowledge of any prohibited employment or
5    contractual relationship, direct or indirect,
6    between a court reporting firm and any party
7    litigant in this matter nor is there any such
8    relationship between myself and a party litigant in
9    this matter.  I am not related to counsel or to the
10   parties herein, nor am I otherwise interested in the
11   outcome of this matter.
12
13
          This 16th day of November, 2016.
14
15
16
17
18                   _____

                     MARYBETH E. MUIR, CCR, RPR
19
20
21
22
23
24
25
```