UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | MDL No. 2592 |
| | SECTION L |
| THIS DOCUMENT RELATES TO: | JUDGE ELDON E. FALLON |
| Joseph J. Boudreaux, Jr., et al. v. Janssen et al. Case No. 2:14-cv-02720 | MAGISTRATE NORTH |
| Joseph Orr, Jr., et al. v. Janssen et al. Case No. 2:15-cv-03708 | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR JOINT *DAUBERT* MOTION TO EXCLUDE OPINIONS AND TESTIMONY REGARDING THE EXPERTS' 20-SECOND PT CUT-OFF GUIDELINE IN THE ORR AND BOUDREAUX CASES**

As Defendants separately demonstrate in their *Daubert* Motion to Exclude Expert Opinions and Testimony Regarding Unapproved Dosing and Monitoring Regimens, the experts' theories about monitoring[1] are too unreliable to be admitted. Their monitoring opinions are untested, have no known error rate, are not peer reviewed, and are not generally accepted, and accordingly fail each and every factor that is used to determine reliability under *Daubert*. *See* Defs.' Joint *Daubert* Mot. to Exclude Expert Ops. & Testimony Regarding Unapproved Dosing & Monitoring Regimens. However, even if the Court were to determine that Plaintiffs' experts' monitoring opinions were reliable as a general matter, those opinions must be excluded in the Orr and Boudreaux cases, because Plaintiffs cannot demonstrate that those particular patients were at a "high risk" for bleeding on Xarelto®, or that the experts' proposed 20-second PT cut-off guideline "fits" the particular facts of those cases, as *Daubert* separately requires.

---

[1] *See, e.g.*, Backes Rep. at 12 (Exh. 1); Bussey Rep. at 1, 4 (Exh. 2); Cuculich Rep. at 4, 20, 22 (Exh. 3); Gerstman Rep. at 60–61 (Exh. 4); Gosselin Rep. at 33 (Exh. 5); Ix Rep. at 4, 14 (Exh. 6); Kessler Rep. at 17, 19, 21 (Exh. 7); Leissinger Generic Rep. at 2, 4, 10 (Exh. 8); Maggio Rep. at 2, 45 (Exh. 9); Parisian Rep. at 11 (Exh. 10); Plunkett Rep. at 6–7 (Exh. 11); Rinder Generic Rep. at 3 (Exh. 12); Rosing Rep. at 5, 21 (Exh. 13).

2845075-1

**STATEMENT OF FACTS**

Plaintiffs' experts opine that when a patient's PT exceeds 20 seconds, the patient should be switched to an alternative medication, or prescribed a lower, unapproved dose of Xarelto.  *See* Rinder Generic Rep. at 3 (Exh. 12) (discontinuation); Kessler Dep. 256:13–18; 316:23–318:1 (Exh. 14) (same); Rosing Rep. at 21 (Exh. 13) (lower dose or discontinuation); Plunkett Dep. 354:18–356:24 (Exh. 15) (lower dose).  The experts acknowledge, as they must, that their proposed 20-second PT cutoff requires two conditions: (1) the use of a specific PT reagent (meaning the particular agent used in the PT test to react with the patient's plasma sample), and (2) testing at a particular time after the last dose of Xarelto.  *See* Rosing Rep. at 21 (Exh. 13); Rinder Generic Rep. at 3 (Exh. 12).

Those requirements are due to the considerable variation among different PT reagents and the fact that the concentration of Xarelto in the blood varies over the course of the day (meaning that associated PT levels rise and fall during the dosing interval).  Plaintiffs' expert Dr. Jan Rosing, a professor emeritus of biochemistry, thrombosis, and hemostasis in Europe, accordingly explains that the proposed 20-second PT cut-off "*only holds* for a PT assay performed with [the] . . . Neoplastin®" reagent approximately "14 hours after rivaroxaban administration."  Rosing Rep. at 21 (Exh. 13) (emphasis added).  *See also* Rinder Generic Dep. 10:5–16 (Exh. 16) ("Q: And one of your opinions . . . is that patients who are taking Xarelto who have a PT of greater than 20 seconds should be discontinued from taking Xarelto; is that right?  A: With the caveat that this PT ideally should be using the Neoplastine reagent for that laboratory test and collected in the 13 to 15-hour window after dosing.").

In the cases brought by the Orr and Boudreaux plaintiffs, however, there is no evidence that either Mrs. Orr or Mr. Boudreaux would have been identified as a patient at a high bleeding

risk under the monitoring regimens hypothesized by Plaintiffs' experts. Accordingly, Plaintiffs cannot demonstrate that their experts' monitoring opinions "properly can be applied to the facts in issue," *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993), such that there is "appropriate fit between the scientific testimony and the specific facts" of the Orr and Boudreaux cases, *In re Vioxx Prods. Liab. Litig.*, 414 F. Supp. 2d 574 (E.D. La. 2006) (citing *Daubert*, 509 U.S. at 593). The opinions therefore are inadmissible in those two cases.

## LEGAL STANDARD

Plaintiffs bear the burden of proving the relevance of the opinions set forth by their experts. *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 615 (E.D. La. 2003) (citing *Moore v. Ashland Chem., Inc.*, 151 F. 3d 269, 276 (5th Cir. 1998) (en banc). The opinions must "assist the trier of fact to understand the evidence or to determine a fact in issue." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002) (quoting *Daubert*, 509 U.S. at 591). Testimony that does not make any fact at issue more or less probable is irrelevant and unhelpful. *See id.* (affirming district court's exclusion of expert's testimony as to causation where expert could not conclude that more likely than not, a causal link existed between the alleged precipitating event and the injury).

Most importantly, the relevance inquiry requires the Court to assess "fit"—whether the expert's "reasoning or methodology properly can be applied to the facts in issue," *Daubert*, 509 U.S. at 593; *see also Vioxx*, 414 F. Supp. 2d at 579 (Expert testimony "is relevant only if . . . there is an appropriate fit between the scientific testimony and the specific facts of the case." (citing *Daubert*, 509 U.S. at 593)). Otherwise put, to admit a particular expert opinion there must be "a valid scientific connection to the pertinent inquiry" that the jury must undertake. *Daubert*, 509 U.S. at 591–92. "Where the opinion does not advance the question in dispute for which the opinion is proffered, then there is no 'fit' and the opinion should be excluded." *Johnson v. Louisville*

3

*Ladder*, No. 07-764-KD-M, 2008 WL 5122261, at *8 (S.D. Ala. Nov. 14, 2008) (citing *Daubert*, 509 U.S. at 591); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153–54 (1999) (affirming exclusion of expert and noting that "before the court was not the reasonableness *in general* of a tire expert's [methodology, but] . . . whether the expert could reliably determine the cause of *this* tire's separation.") (emphasis in original).

## ARGUMENT

**I.   There is no evidence that Mrs. Orr or Mr. Boudreaux were at a high bleeding risk under plaintiffs' experts' theories.**

Even accepting Plaintiffs' monitoring theory, there is no evidence that either Mrs. Orr or Mr. Boudreaux was at a high bleeding risk or was a candidate for the clinical adjustments that the experts propose. Neither Mrs. Orr nor Mr. Boudreaux had a PT test under the circumstances specified by Plaintiffs' experts—using the Neoplastin reagent 14 hours after the last dose of Xarelto. Thus, Plaintiffs' experts cannot assess whether a dose-adjustment or switching to a different anticoagulant would have lowered the risk of bleeding in either case.

Both patients did, however, have PT tests on the same day that they developed the bleeds that underlie their claims (when they were treated at the hospital). Mr. Boudreaux's PT was **13.6** seconds. 2/3/2014 Record (Exh. 17). Mrs. Orr's was even lower, just **11.4** seconds. 4/24/15 Record at 456 (Exh. 18). Neither had a PT result *anywhere close* to the 20-second mark that, according to Plaintiffs, has clinical significance. Applying Plaintiffs' experts' own PT theories, the available evidence does not indicate that Mrs. Orr or Mr. Boudreaux was at an increased bleeding risk.

Plaintiffs thus cannot meet their burden of demonstrating that their experts' monitoring opinions "properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 593. Those opinions should therefore be excluded in the Orr and Boudreaux cases. *See Johnson*, 2008 WL 5122261,

4

2845075-1

at *10 (excluding expert's opinion regarding defective ladder because "the factual circumstances depicted in [the expert's test] do not sufficiently 'fit' the facts of this case."); *Blanchard v. Eli Lilly & Co.*, 207 F. Supp. 2d 308, 321 (D. Vt. 2002) (excluding testimony about "causal connection in general between [medication] and suicide or violent behavior" due to lack of evidence regarding the medication's contribution "to the deaths in *this* case") (emphasis added).

## II. Dr. Rinder's last-minute opinion regarding Mr. Boudreaux's PT lacks any scientific basis and cannot salvage Plaintiffs' experts' monitoring theories.

Recognizing the absence of PT data showing that Mr. Boudreaux was at a high bleeding risk, Plaintiffs make an eleventh hour attempt to shoehorn the facts of Mr. Boudreaux's case into their monitoring theories. Plaintiffs' expert Dr. Rinder, for the first time at his deposition, opined that he could convert Mr. Boudreaux's measured PT of 13.6 seconds (supposedly using an Innovin reagent) to the equivalent value using the type of reagent that the experts recommend (Neoplastin). In particular, Dr. Rinder testified that Mr. Boudreaux's Innovin PT of 13.6 can be converted to a PT "between 21 and 25 [seconds] with different Neoplastine reagents." Rinder Boudreaux Dep. 160:5–7 (Exh. 19). This opinion lacks *any* basis and comes nowhere near meeting *Daubert*'s requirements for admissibility—it has not been tested, has no error rate, is not accepted in the scientific community, and was developed only to serve Plaintiffs' claims in the litigation.[2]

As an initial matter, Dr. Rinder's claim that he could convert Mr. Boudreaux's PT to a Neoplastin value was not included in his expert report but was revealed for the first time at his deposition. For this reason alone, it should be excluded. *See, e.g.*, *Hill v. Koppers Indus.*, 3:03-CV-60-P-D, 2009 WL 3246630, at *2–*3 (N.D. Miss. Sept. 30, 2009) (excluding expert reports and opinions that depositions had revealed and that were not disclosed in reports by deadline); *see*

---

[2] No expert has opined that Mrs. Orr's PT corresponds to a particular Neoplastin value.

*also Sobrino-Barrera v. Anderson Shipping Co.*, 495 F. App'x 430, 433 (5th Cir. 2012) (district court's exclusion of expert affidavit with a new opinion was within the court's discretion).

Worse, Dr. Rinder's supposed methodology has been rejected by both (1) Plaintiffs' own experts, and (2) the researcher on whom Dr. Rinder purportedly relied in forming his opinion. Specifically, Dr. Rinder said that his conversion methodology was based on a graph contained in a publication by a researcher named Jonathan Douxfils, which supposedly allowed Dr. Rinder to make an indirect comparison between Mr. Boudreaux's Innovin PT and a hypothetical Neoplastin reading. When asked about any calculations that would support his opinion, Dr. Rinder explained that he eyeballed the graph. He took no notes. The conversion was done "in his head":

> A. In my calculations, the prothrombin time with the Innovin of 13.6 corresponded to a prothrombin time between 21 and 25 with different Neoplastine reagents.
>
> Q. And have you – did you write those calculations out?
>
> A. I did not.
>
> Q. How – did you make any notes? It's not in your report. Where can we find your calculations?
>
> A. They're – they're in my head. I looked at the – I looked at the data and I examined the figure and that's where it looks like those – again, I said it's an indirect comparison, but from the graphs that I looked at, I think that the prothrombin time would fall in that range with different Neoplastine reagents.
>
> Q. And tell us the source of these graphs.
>
> A. I believe – I believe that is the Douxfils manuscript.

Rinder Boudreaux Dep. 160:3–161:2 (Exh. 19).

Defendants are not aware of *anyone* who has ever claimed to be able to convert a patient's PT result between different reagents using Dr. Rinder's "methodology." For one, the Douxfils article that Dr. Rinder referenced does not say anything about converting PT patient values. *See* Douxfils J., et al., "Assessment of the Impact of Rivaroxaban on Coagulation Assays," *Thromb*

6

*Res* (2012) (Exh. 20). Rather, the article explains that PT values vary not just depending on the reagent used, but *also* (1) among laboratories (even using the same reagent) *and* (2) among individual lots of a given reagent. Accordingly, "a calibration for each lot on each instrument and in each laboratory" is needed to define "local" PT values that might have clinical significance. *Id.* at 9. Plaintiffs' own experts who have extensive experience with the use of coagulation assays agree. *See* Defs.' Joint *Daubert* Mot. to Exclude Expert Ops. & Testimony Regarding Unapproved Dosing & Monitoring Regimens at 10–13 (citing deposition testimony of Mr. Gosselin, Dr. Rosing, and Dr. Cuculich). For these reasons, any attempt to convert Mr. Boudreaux's Innovin PT reading—taken by his physicians at the hospital—to a hypothetical Neoplastin measurement would have to take into consideration the lot and the laboratory performing the test.[3]

Further, the expert who Plaintiffs retained to provide testimony in Boudreaux's case, Dr. Leissinger, rejects Dr. Rinder's contention that the degree to which Mr. Boudreaux was anticoagulated can be evaluated based on his PT reading. When asked if Mr. Boudreaux's PT of 13.6 seconds indicated that he was "overanticoagulated," Dr. Leissinger explained that the result *didn't "indicate a degree of anticoagulation,"* just that he had "an anticoagulant in his system." Leissinger Boudreaux Dep. 148:7–21 (Exh. 22) (emphasis added). *See also id.* at 192:1–11 ("Q: There's no evidence that Mr. Boudreaux was overanticoagulated; correct? . . . A: . . . We have no way to test. We have no way to know whether he was . . . overanticoagulated or – or precisely anticoagulated or not[.]").

---

[3] Dr. Rinder also ignored the methodology that Douxfils used to generate the PT data set forth in the publication. In particular, Douxfils used a "spiked plasma" methodology, meaning that Xarelto was added directly to plasma in the laboratory, as opposed to measuring PT from clinical or patient samples (from people like Mr. Boudreaux, actually taking Xarelto). Due to resulting differences, Douxfils writes that the "results should . . . be *validated* in patients receiving Xarelto®." Douxfils 2012 at 9 (Exh. 20) (emphasis added). Mr. Gosselin likewise explains that "it's not always the case where [results] can be mimicked between a contrived sample or a drug-enriched sample . . . versus a series of clinical samples." Gosselin Dep. 176:13–17 (Exh. 21). Dr. Rinder did not account for this acknowledged "limitation," *see* Douxfils 2012 at 9 (Exh. 20), when he relied on the PT data contained in the Douxfils publication.

2845075-1

Finally, Dr. Rinder's conversion methodology is improper because it was developed solely for this litigation and has never been presented or published in any other context, much less been subject to the scrutiny of professional peer review by experts in the field.

For all of these reasons, Dr. Rinder's untimely PT conversion opinion flunks every *Daubert* criterion. His "reasoning [and] methodology underlying the testimony is [not] scientifically valid." *Daubert*, 509 U.S. at 592–93. There is obviously no error rate associated with Dr. Rinder's attempt to eyeball graphs and draw conclusions entirely "in his head." *See, e.g.*, *Watkins v. Telsmith, Inc.*, 121 F. 3d 984, 989 (5th Cir. 1997) (courts may consider the known or potential error rate of the expert's theory or technique when evaluating reliability under *Daubert*). His method is not accepted in the scientific community, not even among Plaintiffs' other experts. *See id.* (courts may consider general acceptance in the relevant scientific community when evaluating reliability). And his method was not developed in any other setting, or for any other reason, than to support a claim in this litigation. *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 166 F. Supp. 3d 654, 661–62 (E.D. La. Feb. 22, 2016) ("Courts have also considered whether experts are 'proposing to testify about matters growing naturally and directly out of research they have conducted . . . or whether they have developed their opinions expressly for purposes of testifying[.]'") (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995)).

In sum, the "trial court must act as a 'gatekeeper' to exclude 'junk science' that does not meet Rule 702's reliability standards[.]" *Hickey v. Gusman*, No. 10-CV-4410, 2011 WL 6180050, at *3 (E.D. La. Dec. 13, 2011) (citing *Kumho Tire Co.*, 526 U.S. at 147–48; *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *Daubert*, 509 U.S. at 592–93). It is hard to imagine an opinion less reliable than this one.

2845075-1

## CONCLUSION

For all of the reasons stated above, pursuant to Federal Rule of Evidence 702 and *Daubert*, the Court should exclude any expert testimony and opinions regarding the use of monitoring Xarelto in the cases brought by the Orr and Boudreaux Plaintiffs.

Respectfully submitted,

DRINKER BIDDLE & REATH LLP

By: /s/ *Susan M. Sharko*
Susan M. Sharko
Drinker Biddle & Reath LLP
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
susan.sharko@dbr.com

Rodney M. Hudson
DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105-2235
Telephone: (415) 591-7500
Rodney.hudson@dbr.com

Chanda A. Miller
Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone: (215) 988-2500
Chanda.Miller@dbr.com

ARNOLD & PORTER KAYE SCHOLER LLP

By: /s/ *William Hoffman*
William Hoffman
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
william.hoffman@apks.com

Andrew K. Solow
Steven Glickstein
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Telephone: (212) 836-8485
andrew.solow@apks.com
steven.glickstein@apks.com

BRADLEY ARANT BOULT CUMMINGS LLP

By: */s/ Kevin C. Newsom*
Kevin C. Newsom
Lindsey C Boney IV
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place, 1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8803
knewsom@bradley.com

2845075-1

| | |
|---|---|
| IRWIN FRITCHIE URQUHART & MOORE LLC | CHAFFE MCCALL L.L.P. |
| By: /s/ *James B. Irwin*<br>James B. Irwin<br>Kim E. Moore<br>Irwin Fritchie Urquhart & Moore LLC<br>400 Poydras Street, Suite 2700<br>New Orleans, LA 70130<br>Telephone: (504) 310-2100<br>jirwin@irwinllc.com | By: /s/ *John F. Olinde*<br>John F. Olinde<br>Chaffe McCall L.L.P.<br>1100 Poydras Street, Suite 2300<br>New Orleans, LA 70163<br>Telephone: (504) 585-7241<br>olinde@chaffe.com |
| *Attorneys for Defendants Janssen Pharmaceuticals, Inc., Janssen Research & Development, LLC, and Janssen Ortho LLC, and Johnson & Johnson* | *Attorneys for Bayer HealthCare Pharmaceuticals Inc. and Bayer Pharma AG* |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 20th day of January, 2017, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs by operation of the court's electronic filing system and a copy of the proposed documents to be placed under seal sent to Plaintiffs' Liaison Counsel by email transmission.

                                                           /s/      John F. Olinde

2845075-1