# Exhibit 7

# FILED UNDER SEAL

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

_____

IN RE: XARELTO (RIVAROXABAN)
PRODUCTS LIABILITY LITIGATION
_____

)   MDL No. 2592

)

)   Judge Eldon E. Fallon

)

**EXPERT REPORT**

**DAVID A. KESSLER, M.D.**

**TABLE OF CONTENTS**

I.       QUALIFICATIONS……………………………………………………………...5

II.      FDA REGULATIONS REQUIRE THAT A MANUFACTURER MUST IDENTIFY IN
         THE WARNINGS AND PRECAUTIONS SECTION ANY LABORATORY TEST
         HELPFUL IN RECOGNIZING PATIENTS WITH ADVERSE REACTIONS…………8

III.     SERIOUS BLEEDING IS AN ADVERSE EVENT ASSOCIATED WITH THE USE OF
         XARELTO…………………………………………………………………………...9

IV.      THERE IS VARIABILITY IN DRUG PLASMA CONCENTRATION LEVELS IN
         PATIENTS TAKING XARELTO………………………………………………………10

V.       THERE IS A RELATIONSHIP BETWEEN XARELTO PLASMA CONCENTRATION
         LEVELS AND PROTHROMBIN TIME (PT)…………………………………………..11

VI.      AS OF AUGUST 2011, THERE IS A RELATIONSHIP BETWEEN PT LEVELS AND
         THE RISK OF BLEEDING…...………………………………………………………15

VII.     MEASURING A PT LEVEL IN A XARELTO-TREATED PATIENT CAN BE
         HELPFUL IN IDENTIFYING PATIENTS AT RISK FOR SERIOUS ADVERSE
         EVENTS BASED UPON A PATIENT'S RESPONSE TO XARELTO………………..17

VIII.    THERE IS A LABORATORY TEST TO MEASURE PT LEVELS IN XARELTO-
         TREATED PATIENTS…………………………………………………………………..17

IX.      WHILE MEASURING A PT LEVEL IN A XARELTO-TREATED PATIENT CAN BE
         HELPFUL IN IDENTIFYING PATIENTS AT RISK FOR SERIOUS ADVERSE
         EVENTS BASED UPON A PATIENT'S RESPONSE TO XARELTO, IT DOES NOT
         ALLOW A PHYSICIAN TO TITRATE THE DOSE IN SUCH PATIENTS. RATHER,
         IT ALLOWS A PHYSICIAN AND A PATIENT TO DECIDE WHETHER THE
         PATIENT SHOULD CONTINUE XARELTO THERAPY……………………………19

X.       CHRONOLOGY OF FDA'S STATEMENTS INCLUDING LABEL NEGOTIATIONS
         BETWEEN FDA AND THE XARELTO SPONSORS…………………………………21

XI.      THE SPONSORS FAILED TO "IDENTIFY ANY LABORATORY TESTS HELPFUL
         IN FOLLOWING THE PATIENT'S RESPONSE OR IN IDENTIFYING POSSIBLE
         ADVERSE REACTIONS."……………………………………………………………...30

XII.     WHILE FDA'S STATEMENTS REGARDING PRECISION DOSING WITH THE
         NOVEL ORAL ANTICOAGULANTS HAVE VARIED OVER TIME, IT IS THE
         PURVEYOR OF A DRUG, NOT THE FDA, WHO HAS PRIMARY
         RESPONSIBILITY FOR THE SAFETY OF ITS PRODUCT…………………………31

XIII.    INFORMATION ABOUT LABORATORY TESTS THAT COULD BE HELPFUL IN
         IDENTIFYING PATIENTS AT INCREASED RISK OF BLEEDING FROM
         XARELTO USE WOULD BE USEFUL INFORMATION FOR PHYSICIANS IN
         CLINICAL DECISION-MAKING……………………………………………………...35

2

XIV.   MINIMIZING RISKS…………………………………………………………42

XV.    POST-MARKET EVIDENCE FURTHER INDICATES NEED TO IMPROVE SAFETY OF XARELTO FOR PATIENTS VIA A HELPFUL LABORATORY TEST…………43

XVI.   THE USE OF INRATIO IN THE ROCKET CLINICAL TRIAL………………………52

XVII.  CONCLUSIONS…………………………………………………………………...80

## APPENDICES

Appendix A    Curriculum Vitae

Appendix B    Prior Testimony & Expert Witness Fee

Appendix C    Published Articles on FDA Issues

Appendix D    Materials Provided

## SCHEDULES[1]

Schedule 1     Description of Approved Anticoagulant Drugs

Schedule 2     List of Indications for Xarelto

Schedule 3     Xarelto (Rivaroxaban) – The Product and Its Regulatory History

Schedule 4     Summary of All Xarelto Label Changes

Schedule 5     Summary of Label Changes Regarding Bleeding Risk

Schedule 6     Summary of Mechanism of Action for Xarelto

Schedule 7     Description of Clinical Trials for Xarelto

Schedule 8     Deposition Excerpts

Schedule 9     List of Advisory Committee Materials Concerning Xarelto

Schedule 10    Sponsors' Key Employees Cited in Report

Schedule 11    Chronology Based on Section X

Schedule 12    List of Bellwether Plaintiffs

---

[1] The schedules were prepared by legal staff at my direction and under my review.

Schedule 13    Data on Inter-patient Variability Associated with Approved Xarelto Indications

Schedule 14    Anticoagulants and the Clotting Cascade

Schedule 15    Description of Coagulation Testing Parameters

Schedule 16    The FDA Approval of New Drugs

Schedule 17    Chronology of INRatio Performance Issues in ROCKET

Schedule 18    Excerpts from FDA Reviews Concerning Dose Selection and Time in Therapeutic Range in ROCKET

Schedule 19    Post-Market Epidemiology Study Strengths and Limitations Identified by Study Authors

Schedule 20    Table 12 from FDA ROCKET AF Reanalysis Reviews

## I.    QUALIFICATIONS

1.      My name is David A. Kessler, M.D. I received my M.D. degree from Harvard

Medical School in 1979 and my J.D. degree from the University of Chicago Law School in 1978.

2.      I did my pediatrics training at Johns Hopkins Hospital.

3.      In 1990, I was appointed by President George H. W. Bush as Commissioner of the

United States Food and Drug Administration ("Commissioner") and was confirmed by the United

States Senate. I also served in that position under President William Jefferson Clinton until

February 1997.

4.      I have taught food and drug law at Columbia University Law School, and I have

testified many times before the United States Congress on food, drug, and consumer protection

issues under federal and state law. Over the last thirty years, I have published numerous articles in

legal, medical, and scientific journals on the federal regulation of food, drugs, and medical

devices. I have had special training in pharmacoepidemiology at Johns Hopkins Hospital. My

resume is attached as Appendix A. A list of cases in which I have appeared as an expert witness

in the last four years, and documentation of my expert witness fee, is attached as Appendix B.  A

list of my published articles relating to FDA issues, including devices and drugs, is attached as

Appendix C.

5.      As Commissioner, I had ultimate responsibility for implementing and enforcing

the United States Food, Drug, and Cosmetic Act (the "Act"). I was responsible for overseeing

five Centers within the FDA. They included, among others, the Center for Drug Evaluation and

Research, the Center for Devices and Radiological Health and the Center for Biologics

Evaluation and Research. In addition to those duties, I placed high priority on getting promising

therapies for serious and life-threatening diseases to patients as quickly as possible.  During my

tenure as Commissioner, the FDA announced a number of new programs including: the regulation of the marketing and sale of tobacco products to children; nutrition labeling for food; user fees for drugs and biologics; preventive controls to improve food safety; measures to strengthen the nation's blood supply; and the MEDWatch program for reporting adverse events and product problems involving both drugs and devices.  I created an Office of Criminal Investigation within the Agency to investigate suspected criminal violations of the Act, FDA regulations and other related laws.

6.      I am a senior advisor to TPG Capital, a leading global private equity firm, which owns pharmaceutical and biomedical companies. I served on the board of Aptalis Pharma. I currently serve on the boards of Stoke Pharmaceuticals, Tokai Pharmaceuticals and the medical device and biologics company Immucor, Inc.  In these advisory and fiduciary capacities, I have advised companies on the standards and duties of care within the pharmaceutical and medical device industry.  I also chaired the compliance committee of Aptalis Pharma, and currently chair the quality committee at Immucor, Inc., which involves ensuring compliance with the FDA's regulations and requirements.

7.      The documents provided to me by counsel, or that I accessed independently from various sources, including, but not limited to, the FDA's website, are attached as <u>Appendix D</u>. At my request, and subject to my directions and review, the attached Schedules were prepared by legal staff. Based on my review of the documents listed in <u>Appendix D</u>, and my training and experience, I have a number of opinions that are detailed below.

8.      It is my understanding that the cases identified in Footnote 2, *infra*, include, but are not limited to, the following claims as they relate to Xarelto[2]:

---

[2]  Xarelto is the brand name for the pharmaceutical drug rivaroxaban.

    a.   Louisiana Product Liability Act (La. R.S. 9:2800.51, *et seq.*)

    b.   Negligence;

    c.   Negligence – Failure to Warn;

    d.   Negligence – Negligent Design;

    e.   Negligent Misrepresentation;

    f.   Strict Products Liability;

    g.   Strict Products Liability – Failure to Warn;

    h.   Strict Product Liability – Design Defect;

    i.   Breach of Express Warranty;

    j.   Breach of Implied Warranty(ies);

    k.   Fraud;

    l.   Fraudulent Misrepresentation;

    m.   Fraudulent Concealment;

    n.   Fraud and Deceit;

    o.   Violation of Unfair Trade Practices and Consumer Protection Law §51:1401, *et. seq.*

    p.   Violation of Consumer Protection Laws;

    q.   Loss of Consortium

    r.   Redhibition (La. C.C. 2520, *et seq.*);

    s.   Punitive Damages[3]

9.    In this report, I use the term "sponsors" to refer to one or more of the following

corporate entities, including Janssen Research & Development, LLC f/k/a Johnson and Johnson

---

[3] *See* the following filed complaints for MDL 2592: Boudreaux, Joseph J., Jr., Case No. 2:14-cv-02720; Orr, Joseph, Jr., Case No. 2:15-cv-03708; Mingo, Dora, Case No. 2:15-cv-03469; and James Henry, Individually and as Executor of the Estate of William Henry, Case No. 2:15-cv-00224.

Pharmaceutical Research and Development LLC; Janssen Ortho, LLC; Janssen Pharmaceuticals, Inc. f/k/a Janssen Pharmaceutica Inc. f/k/a Ortho-McNeil-Janssen Pharmaceuticals, Inc.; Johnson and Johnson; Bayer Healthcare Pharmaceuticals, Inc.; Bayer Pharma AG f/k/a Bayer Schering Pharma AG; Bayer Corporation; Bayer Healthcare, LLC; Bayer Healthcare AG; and Bayer AG.

10.     The bellwether plaintiffs in this case are listed in Schedule 12.

11.     My opinions in this case focus on the responsibilities of drug companies, focusing on the regulatory interface between drug companies, the FDA, and physicians and patients as well as industry standards. These types of issues involve the intersection of science and regulation, including pharmacology, pharmacokinetics, and statistics.

## II.   FDA REGULATIONS REQUIRE THAT A MANUFACTURER MUST IDENTIFY IN THE WARNINGS AND PRECAUTIONS SECTION ANY LABORATORY TEST HELPFUL IN RECOGNIZING PATIENTS WITH ADVERSE REACTIONS

12.     In 1979, FDA promulgated a regulation which required manufacturers to: "identify any laboratory tests that may be helpful in following the patient's response or in identifying possible adverse reactions. If appropriate, information shall be provided on such factors as the range of normal and abnormal values expected in the particular situation and the recommended frequency with which tests should be done before, during, and after therapy."[4]

13.     The 1979 regulation required that such disclosures be in the Precautions section of the drug label.

14.     On January 24, 2006, FDA promulgated a regulation that merged the Warnings and Precaution section and slightly modified the above requirement to read:

> identify any laboratory tests helpful in following the patient's response or in identifying possible adverse reactions. If appropriate, information must be provided on such factors as the range of normal and abnormal values expected in

---

[4] 21 CFR §201.57(f)(3).

the particular situation and the recommended frequency with which tests should be performed before, during, and after therapy.[5]

15.     In my opinion, any laboratory test that is helpful in identifying patients at risk for serious adverse events based upon a patient's response to a drug should be disclosed in the Warnings and Precautions section of the drug label.

## III.   SERIOUS BLEEDING IS AN ADVERSE EVENT ASSOCIATED WITH THE USE OF XARELTO

16.     According to the Phase III pivotal clinical trial conducted by the sponsors, Xarelto was shown to result in 14.9 major or non-major clinically relevant bleeding events per 100 patient years.[6]

17.     According to FDA medical reviewers, "With respect to safety, the single issue weighing on the approval decision for rivaroxaban [Xarelto] is bleeding risk."[7]

18.     In my opinion, any laboratory tests that could be helpful in identifying patients at increased risk of bleeding from Xarelto use should be identified in the Warnings and Precautions section of the drug label.

---

[5] 21 CFR §201.57(c)(6)(iii).

[6] The hazard ratios (Xarelto vs. warfarin) for the incidence of pre-designated types of bleeding events in the ROCKET US population alone were as follows: Safety Endpoint, HR = 1.28 (1.09, 1.50; p=0.003); Major Bleeding, HR = 1.50 (1.14, 1.98; p=0.004); Hb drop, HR = 1.64 (1.19, 2.24; p=0.002); Transfusion, HR = 1.61 (1.12, 2.33; p=0.011); Critical site, HR = 0.85 (0.46, 1.59; p=0.614); Death, HR = 0.63 (0.23, 1.72; p=0.365); Non-major, HR = 1.20 (1.00, 1.45; p=0.049); Minimal, HR = 1.20 (0.79, 1.81; p=0.395). *See* FDA Briefing Document for the Cardiovascular and Renal Drugs Advisory Committee (CRDAC), dated 8 September 2011, Clinical Review, p. 228. In a letter dated January 28, 2014, FDA requested that the sponsors include a forest plot in the labeling that presented data on bleeding events in ROCKET, including the previous listed data for the US population. *See* XARELTO_JANSSEN_00000344. This forest plot and the relevant US population bleeding data is contained in the FDA approved Xarelto labeling as of September 2015. *See* US Xarelto Prescribing Information dated 9/2015, available at http://www.accessdata.fda.gov/drugsatfda_docs/label/2015/202439s015lbl.pdf.

[7] FDA Briefing Document for the Cardiovascular and Renal Drugs Advisory Committee (CRDAC), dated 8 September 2011, Clinical Review, p. 16.

9

## IV.  THERE IS VARIABILITY IN DRUG PLASMA CONCENTRATION LEVELS IN PATIENTS TAKING XARELTO

19.     The following inter-patient variability was observed in the pivotal Phase III trial supporting the atrial fibrillation indication[8,9,10]:

    a.  For the 20mg dose[11]:

        i.  The geometric mean AUC was 3,164 with a 5-95th percentile range of 1,860-5,434 mcg/h/L.

        ii.  The geometric mean $C_{trough}$ was 44 mcg/L with a 5th-95th percentile range of 12-137 mcg/L.

        iii.  The geometric mean $C_{max}$ was 249 mcg/L with a 5th-95th percentile range of 184-343 mcg/L.

    b.  For the 15mg dose[12]:

        i.  The geometric mean AUC was 3,249 with a 5-95th percentile range of 1929-5311 mcg/h/L.

        ii.  The geometric mean $C_{trough}$ was 57 mcg/L with a 5th-95th percentile range of 18-136 mcg/L.

        iii.  The geometric mean $C_{max}$ was 229 with the 5th-95th percentile range of 178-313 mcg/L.

---

[8] Mueck, W., et al. *Clinical Pharmacokinetic and Pharmacodynamic Profile of Rivaroxaban*. Clin Pharmacokinet (2014) 53:1-16.

[9] This section discusses the inter-patient variability in plasma drug concentration for a given dose of Xarelto. The sponsor's data also show that there is inter-patient variability in prothrombin time (PT) for a given dose of Xarelto (*see* Schedule 13, Box & Whiskers plots entitled "Prothrombin Time (Rivaroxaban Arm, ROCKET-AF) Week 12, 20-28 Hours Post 20mg Dose (N=293) and "Prothrombin Time (Rivaroxaban Arm, ROCKET-AF) Week 24, 20-28 Hours Post 20mg Dose (N=276)"). This variability between patients in PT with a given dose is expected given the variability between patients in concentration with a given dose and the relationship between drug concentration and PT, as discussed below. Simply put, at a given dose, there is variability in both drug plasma concentration and the effect of the drug, as measured by PT, because there is a linear correlation between drug plasma concentration and PT.

[10] See Schedule 13 for the inter-patient variability associated with other approved indications, as listed in Schedule 2.

[11] The 20mg qd dose is the recommended dose for a) stroke prevention in patients with non-valvular atrial fibrillation with CrCl >50 and b) the continued treatment of DVT/PE. For a discussion of FDA's concerns about dose selection, see Schedule 18.

[12] The 15mg qd dose is the recommended dose for a) stroke prevention in patients with non-valvular atrial fibrillation with CrCl <50 and b) the treatment of acute DVT/PE.

20.     Similar inter-patient variability data were provided by the sponsors in the Xarelto NDA that included the Exploratory Population Pharmacokinetic-Pharmacodynamic Analysis of Rivaroxaban Based on Data from Study 39039039AFL3001 JNJ-39039039 (BAY 59-7939, rivaroxaban) dated December 15, 2010.[13]

21.     According to these data, there is an approximately 10-fold difference in drug exposure between those patients who are at the 5% and the 95% trough level.[14]

22.     In my opinion, there is variability in drug plasma concentration levels in patients taking Xarelto.

## V.     THERE IS A RELATIONSHIP BETWEEN XARELTO PLASMA CONCENTRATION LEVELS AND PROTHROMBIN TIME (PT)

23.     According to Bayer's Dr. Wolfgang Mueck, et al., in an article titled *Clinical Pharmacokinetic and Pharmacodynamic Profile of Rivaroxaban* published in 2014: "Prolongation of the PT (using NeoPlastin)[15] was correlated with the rivaroxaban [Xarelto] plasma concentrations in a linear relationship (Fig. 4)."[16,17]

24.     Dr. Mueck's Figure 4[18] demonstrates this relationship:

---

[13] XARELTO_BPAG_00006581.

[14] *See* Deposition of Dr. Wolfgang Mueck, Feb. 25, 2016, 391:12-18.

[15] At all times in this report, references to PT levels refer to PT levels obtained using the NeoPlastin reagent.

[16] Mueck 2014.

[17] A document prepared by the sponsor, dated May 11, 2016, stated: "The relationship between PT and rivaroxaban plasma concentration when Neoplastin® Plus, STA Neoplastine®, or Innovin® is used as the reagent is linear and closely correlated." XARELTO_JANSSEN_24478012, p. 1.

[18] Mueck 2014.



**Fig. 4** Concentration–effect relationship for Factor Xa activity (**a**) and prothrombin time (**b**) in healthy male subjects receiving rivaroxaban [16]. Reproduced from Mueck et al. [16] with permission from Dustri-Verlag Dr. Karl Feistle © 2007

25.    According to sponsor data, the correlation coefficient between drug concentrations and PT (using NeoPlastin) was reported as r value = 0.98.[19]

26.    According to FDA medical reviewers, "With respect to the PK-PD relationship, there is a direct linear relationship between serum concentrations of rivaroxaban [Xarelto]

---

[19] XARELTO_BPAG_37307156, p. 15.

expected in human use at the doses used in ROCKET, as demonstrated by the results of PK study

10847 (PPK03-002), as seen in Figure 4 below:"[20]



27.    The FDA medical reviewers further questioned and, in turn, concluded: "Can

Prothrombin Time (PT) be used as a surrogate for PK? The PK data from 161 ROCKET patients

confirms the linear relationship between the plasma concentration of rivaroxaban [Xarelto], and

the PT, as demonstrated in Figure 6 below."[21,22]

---

[20] FDA Briefing Document for the Cardiovascular and Renal Drugs Advisory Committee (CRDAC), dated 8 September 2011, Clinical Review, p. 37.

[21] FDA Briefing Document for the Cardiovascular and Renal Drugs Advisory Committee (CRDAC), dated 8 September 2011, Clinical Review, p. 38.



Figure 6.  ROCKET prothrombin time vs. rivaroxaban plasma concentration

28.    A document created by the sponsors entitled "XARELTO® (rivaroxaban)

Coagulation Monitoring," dated May 11, 2016, stated the following:

- If assessment of rivaroxaban plasma concentrations is necessary, the PT was reported to be an appropriate coagulation test. The relationship between PT and rivaroxaban plasma concentration when Neoplastin® Plus, STA Neoplastine®, or Innovin® is used as the reagent is linear and closely correlated. The pharmacodynamics effects of rivaroxaban as measured by the PT are strongly affected by the type of PT reagent that is used.[23]

28.    The document goes on to state the following regarding prothrombin time:

PT is a widely used clotting test that measures extrinsic and final common pathways of coagulation cascade.

- There is a concentration-dependent relationship between rivaroxaban and prolongation of PT; however, there was considerable variability of PT measurements depending on the specific reagent used.

…

- In a human plasma study, STA Neoplastin Plus® was found to be the most precise method for determination of rivaroxaban.
- The higher cut-offs of rivaroxaban plasma concentrations correspond to values associated with a significant risk of bleeding.[24]

---

[23] XARELTO_JANSSEN_24478012 at p. 1, *internal citations removed*.

[24] XARELTO_JANSSEN_24478012 at p. 2-3, *internal citations removed*.

29.    In my opinion there is a relationship between Xarelto plasma concentration levels and prothrombin time.

## VI.    AS OF AUGUST 2011, THERE IS A RELATIONSHIP BETWEEN PT LEVELS AND THE RISK OF BLEEDING

30.    According to FDA's Stephen M. Grant, Deputy Division Director, Division of Cardiovascular and Renal Products, the Clinical Pharmacology and Clinical reviewers demonstrated "that there is also a correlation between PT and risk of bleeding."[25]

31.    According to FDA's clinical pharmacology review:

Major bleeding events increased with an increase in pre-dose PT [trough] over the observed range (per protocol, on treatment analysis set). Probability of major bleeding by pre-dose PT with rivaroxaban shown in (A) logistic regression model ($E_{max}$) and (B) Cox regression model with a plot indicating probability of an event within 1 year.[26]



**Figure 4**    Major bleeding events increased with an increase in pre-dose PT over the observed range (per-protocol, on treatment analysis set).  Probability of major bleeding by pre-dose PT with rivaroxaban shown in (A) logistic regression model ($E_{max}$) and (B) Cox regression model with a plot indicating probability of an event within 1 year. The PT measurements made either at week 12 or week 24, whichever was closer to the reported major bleeding event was used for the analysis. Majority of the PT measurements were made during 12-24 hours after the previous dose and is referred to as pre-dose PT.

---

[25] Center for Drug Evaluation and Research, Application Number 202439Orig1s000, Summary Review, Deputy Devision Director Decisional Memo, dated 04 November 2011, p. 9.

[26] Center for Drug Evaluation and Research, Application Number 202439Orig1s000, Clinical Pharmacology Review, dated 01/05/2011, p. 12, Section 3.3.

32.     Janssen's Dr. Troy Sarich testified:

*Q.     And are you aware, sir, that the FDA said that PT could be used as a surrogate marker for PK?*

*A.     I do recall they – they made that claim.*

*Q.     Do you agree or disagree with them in that?*

*A.     I – I don't agree. I don't think that that analysis was correct, and I don't think that their assessment was correct, and we spent a lot of time in the company and also working with external academic experts on this question. And – and I think as evidenced today by the fact that PT is not used by clinicians, it's just not helpful.*

*Q.     Okay. But had Janssen ever communicated to the FDA that PT would be a useful surrogate marker of PK?*
...
*A.     I – I don't recall exactly if we did. I think that we shared all the data we had on the various coagulation markers that are available. PT was one of those markers, which is prolonged by rivaroxaban. But I think we also pointed out that it's not – it's not a sensitive assay for rivaroxaban, so we didn't think the utility was very good.*

*Q.     But – but the assessment that you – that the FDA did that you disagree with, is that what they allegedly saw in the data, was that with increasing – or that there was a linear relationship between PK and PD, with PD being the pro – pro time, using the Neoplastine reagent, and that they also saw a correlation between increasing PT and bleed risk, right?*
...
*A.     They – they produced multiple assessments and, similar to our prior findings, yes, that PT is prolonged by rivaroxaban. The – the work they showed that PT is correlated to bleeding, we did not agree with that assessment or how they did the analysis.*
...
*Q.     And did you communicate that to the FDA, that you disagreed with their analysis?*

*A. Yes, we did.*
...
*Q.     Okay. So at the end of the day, the FDA and Janssen did not reach agreement on whether or not there is a relationship between PT and bleed risk?*

*A.     That's correct.*[27]

---

[27] Deposition of Dr. Troy Sarich, June 29, 2016, 51:12-53:20; 54:19-22; 59:22-60:2.

33.     In my opinion, as of August 2011, there is a relationship between PT levels and the risk of bleeding.[28, 29]

## VII.   MEASURING A PT LEVEL IN A XARELTO-TREATED PATIENT CAN BE HELPFUL IN IDENTIFYING PATIENTS AT RISK FOR SERIOUS ADVERSE EVENTS BASED UPON A PATIENT'S RESPONSE TO XARELTO

34.     As noted above:

a.  there is variability in drug plasma concentration levels in patients taking Xarelto;

b.  there is a relationship between Xarelto plasma concentration levels and PT; and

c.  there is a relationship between PT levels and the risk of bleeding.

35.     Therefore, in my opinion, measuring a PT level in a Xarelto-treated patient can be helpful in identifying patients at risk for serious adverse events based upon a patient's response to Xarelto.

## VIII.  THERE IS A LABORATORY TEST TO MEASURE PT LEVELS IN XARELTO-TREATED PATIENTS

36.     The sponsors used the Neoplastin PT test as a pharmacodynamic measurement in its clinical trials that studied Xarelto.[30]

---

[28] Contrary to this finding with respect to bleeding, according to FDA's medical reviewers, "no PT-dependent reduction in ischemic stroke is demonstrated over the range of PT data." FDA Ad. Comm. Briefing Doc., Clinical Review, p. 43.

[29] *See also* Nakano Y, et al. *Clinical usefulness of measuring prothrombin time and soluble fibrin levels in Japanese patients with atrial fibrillation receiving rivaroxaban*. J Cardiol (2014), http://dx.doi.org/10.1016/j.jjcc.2014.07.021 The conclusion stated as follows:

> In Japanese patients with non-valvular atrial fibrillation receiving rivaroxaban, a prolonged peak PT ($\geq$20 s) could indicate increased risk of bleeding, and both trough and peak SF levels were reduced relative to baseline. PT and SF are both valuable measures of coagulation status in patients receiving rivaroxaban, regardless of prior anticoagulant history.

[30] *See* Mueck 2014 at p. 13.

37.    Xarelto prolongs PT when using reagents such as NeoPlastin that are sensitive to Xarelto, including both Neoplastin Plus® (Diagnostic Stago, Asnieres-sur-Seine, France) and HemsIL RecombiPlasTin 2G (Instrumentation Laboratory, Bedford, MA, USA).[31]

38.    A Janssen document titled "XARELTO® (rivaroxaban) Coagulation Monitoring," dated May 11, 2016, stated the following:

> If assessment of rivaroxaban plasma concentrations is necessary, the PT was reported to be an appropriate coagulation test. The relationship between PT and rivaroxaban plasma concentration when Neoplastin® Plus, STA Neoplastine®, or Innovin® is used as the reagent is linear and closely correlated. The pharmacodynamics effects of rivaroxaban as measured by the PT are strongly affected by the type of PT reagent that is used.[32]

39.    The 510(k) applications for STA Neoplastine (K922565) and Neoplastin Plus (K922040) were cleared by FDA on December 7, 1992 and June 23, 1992, respectively.[33]

40.    On August 15, 2007, FDA issued a substantial equivalence determination decision summary for the application regarding HemosIL RecombiPlasTin 2G, which contained the following conclusion: "The submitted information in this premarket notification is complete and supports a substantial equivalence decision."[34]

41.    The 510(k) for the Dade Innovin II reagent (K935702) was cleared by the FDA on November 22, 1994,[35] and the Dade Innovin reagent (K94343) was approved on July 22, 1998.[36]

---

[31] Samama, M.M., et al. *Laboratory assessment of rivaroxaban: a review*. Thrombosis Journal 2013;11:11.

[32] XARELTO_JANSSEN_24478012 at p. 1, *internal citations removed*.

[33] http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm?ID=K922565; http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm?ID=K922040

[34] 510(k) Substantial Equivalence Determination Decision Summary Assay Only Template, 510(k) Number K070005, available at http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm?ID=K070005.

[35] http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm?ID=K935702.

[36] 510(k) Summary of Safety and Effectiveness, Dade® Innovin®, Prothrombin time assay, available at http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm?ID=K974343.

42.     The sponsor indicates that the number of Xarelto prescriptions in the U.S. exceeds twenty million.[37] Since the drug is widely prescribed, the laboratory tests would be frequently utilized, giving both physicians and clinical laboratories experience on how to interpret and use the test.

43.     In my opinion, while PT values change over the dosing interval, useful information can be obtained if the measurement is collected at the appropriate time (*e.g.*, peak, trough, etc.).

44.     In my opinion, there is a laboratory test to measure PT levels in Xarelto-treated patients.

## IX.  WHILE MEASURING A PT LEVEL IN A XARELTO-TREATED PATIENT CAN BE HELPFUL IN IDENTIFYING PATIENTS AT RISK FOR SERIOUS ADVERSE EVENTS BASED UPON A PATIENT'S RESPONSE TO XARELTO, IT DOES NOT ALLOW A PHYSICIAN TO TITRATE THE DOSE IN SUCH PATIENTS. RATHER, IT ALLOWS A PHYSICIAN AND A PATIENT TO DECIDE WHETHER THE PATIENT SHOULD CONTINUE XARELTO THERAPY

45.     On August 10, 2011, when discussing dose adjustment in a single patient, FDA's Medical Reviewer stated that: "Monitoring rivaroxaban therapy with sequential prothrombin times to optimize safety outcomes cannot be recommended due to a lack of information regarding:

  a.  Within-patient variability[38] of PT measurements on this drug in the setting of a short half-life and rapidly changing PD effects over each 24 hour period, and

      What action to recommend to the medical provider based on PT results, given that only a single dose was tested in ROCKET…."[39]

---

[37] https://www.xarelto-us.com/blood-thinner

[38] Within-patient, or intra-patient, variability is different from between patient, or inter-patient, variability.

[39] FDA Ad. Comm. Briefing Doc., Clinical Review, p. 44.

46.     Thus, the FDA has recognized that the sponsors have not collected enough data to allow a physician to titrate the dose in patients who may be at increased risk of bleeding.

47.     That same day, on August 10, 2011, the FDA's clinical pharmacology reviewers stated, "Major bleeding events increased with an increase in pre-dose PT [trough] over the observed range (per protocol, on treatment analysis set). Probability of major bleeding by pre-dose PT with rivaroxaban shown in (A) logistic regression model ($E_{max}$) and (B) Cox regression model with a plot indicating probability of an event within 1 year."[40, 41]



**Figure 4**     Major bleeding events increased with an increase in pre-dose PT over the observed range (per-protocol, on treatment analysis set).  Probability of major bleeding by pre-dose PT with rivaroxaban shown in (A) logistic regression model ($E_{max}$) and (B) Cox regression model with a plot indicating probability of an event within 1 year. The PT measurements made either at week 12 or week 24, whichever was closer to the reported major bleeding event was used for the analysis. Majority of the PT measurements were made during 12-24 hours after the previous dose and is referred to as pre-dose PT.

48.     On November 4, 2011, FDA's Deputy Division Director stated that, "The clinical pharmacology and clinical reviewers demonstrated that there is a linear correlation between rivaroxaban levels and prothrombin time (PT). They also demonstrated that there is also a correlation between PT and risk of bleeding. This applicant has not chosen to utilize this

---

[40] FDA Clinical Pharmacology Review, p. 12, Section 3.3.

[41] These data were available to the Sponsor no later than September 8, 2011, when this information became publicly available. In my opinion, these data constitute new information available to the Sponsor relating to the relationship between PT levels and risk of bleeding.

information… infrequent monitoring (perhaps at initiation and yearly thereafter) to assure appropriate dosing of drugs that prevent stroke and cause bleeding may improve outcomes and be acceptable to patients."[42,43]

49.      In my opinion, while measuring a PT level in a Xarelto-treated patient can be helpful in identifying patients at risk for serious adverse events based upon a patient's response to Xarelto, without additional adequate sponsor-generated clinical trial data exploring Xarelto dose adjustment based on bleeding risk (as measured by PT), measuring a PT level does not allow a physician to titrate the dose in such patients. Rather, it allows a physician and a patient to decide whether the patient should continue Xarelto therapy.

## X.   CHRONOLOGY OF FDA'S STATEMENTS INCLUDING LABEL NEGOTIATIONS BETWEEN FDA AND THE XARELTO SPONSORS.

50.      On October 1, 2005, the sponsors signed a Collaborative Development and License Agreement, which included a Marketing Plan. The "Product Positioning & Target Product Profile" section of that plan stated in part: "Compared to current and expected future

---

[42] Center for Drug Evaluation and Research, Application Number 202439Orig1s000, Summary Review, Deputy Devision Director Decisional Memo, dated 04 November 2011, p. 9.

[43] *See also* Lippi, G., et al. *Urgent monitoring of direct oral anticoagulants in patients with atrial fibrillation: a tentative approach based on routine laboratory tests*. J Thromb Thrombolysis DOI 10.1007/s11239-014-1082-5 (09 May 2014). The abstract states as follows:

> The number of patients diagnosed with atrial fibrillation who will be candidates for antithrombotic therapy with direct oral anticoagulants (i.e., dabigatran, rivaroxaban, apixaban and edoxaban) is exponentially arising worldwide, thus posing substantial economic and organization challenges for their urgent monitoring…Based on literature data, we have hence developed an algorithm based on first-line tests for urgent screening of the anticoagulant effect of direct oral anticoagulants, which entails activated partial thromboplastin time (aPTT) for dabigatran and prothrombin time (PT) for rivaroxaban…According to the literature data, this strategy appears suitable to reliably define the thrombotic or bleeding risk in an urgent setting, contextually saving precious laboratory resources.

agents, [Xarelto] provides an ideal balance of safety and efficacy with the convenience of oral

dosing and a predictable response and without the need for coagulation monitoring."[44]

51.    "When Janssen filed NDA 022406 in July 2008, Janssen included the following

paragraph in Section 12.2 of its proposed label:

> Dose-dependent inhibition of Factor Xa activity was observed in
> humans and the prothrombin time (PT), activated partial
> thromboplastin time (aPTT) and HepTest® are prolonged dose
> dependently. The relationship between PT and rivaroxaban plasma
> concentration is linear and closely correlated. If assessment of the
> pharmacodynamics effect of rivaroxaban is considered necessary in
> individual cases, PT (measured in seconds) is recommended. The
> Neoplastin® PT assay was measured in the RECORD program and the
> 5/95 percentiles for PT (Neoplastin®) 2 to 4 hours after tablet intake
> (i.e., at the time of maximum effect) ranged from 13 to 26 seconds. The
> International Normalized Ratio (IN) should not be used for measuring
> rivaroxaban pharmacodynamics effect.
>
> *See* XARELTO_JANSSEN_00047659."[45]

52.    An April 23, 2009 document entitled "The Xarelto USPI Labeling Contingency

Document" asked, "Will we need to add a new 5.4 laboratory test section like Lovenox?" The

document indicated that the company would include such language "only if section is

requested…"[46]

53.    "On May 27, 2009, the FDA issued a Complete Response letter for NDA 022406,

which included further comments on labeling. Janssen responded to the Complete Response

---

[44] XARELTO_BHCP_00015914, Exhibit E, p. 3.

[45] Defendant Janssen Research & Development, LLC's Responses to Plaintiffs' Interrogatories Pertaining to Defendants Affirmative Defense of Federal Preemption, at 8.

[46] XARELTO_JANSSEN_05911809.

letter on December 27, 2010. In this response, Janssen included the same proposed language in Section 12.2. *See* XARELTO_JANSSEN_00054178 and XARELTO_JANSSEN_00054184."[47]

54.     "In January 2011, Janssen submitted draft labeling for NDA 202439, which included the same language in Section 12.2. XARELTO_JANSSEN_00001707."[48]

55.     "On June 13, 2011, FDA responded and sent Janssen a revised label for NDA 022406 with the proposed PT language removed from Section 12.2. FDA proposes, 'The predictive value of these coagulation parameters for bleeding risk or efficacy has not been adequately studied.' XARELTO_JANSSEN_05852123 and XARELTO_JANSSEN_05852122."[49]

56.     "Janssen responded and accepted FDA's proposal to remove the majority of the PT language, except with respect to INR, on June 16, 2011 (NDA 022406). Janssen also proposed changing 'has not been adequately studied' to 'has not been established.' Here is the full text of Janssen's proposal: 'The predictive value of these coagulation parameters for bleeding risk or efficacy has not been established. The International Normalized Ratio (INR) should not be used for measuring rivaroxaban pharmacodynamics effect.' XARELTO_JANSSEN_01231195, XARELTO_JANSSEN_01231199."[50]

---

[47] Defendant Janssen Research & Development, LLC's Responses to Plaintiffs' Interrogatories Pertaining to Defendants Affirmative Defense of Federal Preemption, at 9.

[48] Defendant Janssen Research & Development, LLC's Responses to Plaintiffs' Interrogatories Pertaining to Defendants Affirmative Defense of Federal Preemption, at 9.

[49] Defendant Janssen Research & Development, LLC's Responses to Plaintiffs' Interrogatories Pertaining to Defendants Affirmative Defense of Federal Preemption, at 9.

[50] Defendant Janssen Research & Development, LLC's Responses to Plaintiffs' Interrogatories Pertaining to Defendants Affirmative Defense of Federal Preemption, at 9.

57.    "On June 22, 2011, FDA returned comments in response to Janssen's June 16, 2011 submission (NDA 022406) and stated it disagreed with Janssen's proposal to retain the statement about INR. XARELTO_JANSSEN_00047264."[51]

58.    "Janssen responded to FDA (NDA 022406) on June 28, 2011 and stated in the comments section:

> For any specific level of warfarin anticoagulation, different commercially available PT assays will show varying prolongations measured in seconds. The conversion of PT results in seconds to INR values was developed to normalize these differences so that the INR value is the same regardless of the PT assay used. This INR conversion is specific for warfarin (and other VKA) and if applied to rivaroxaban actually increases conversion to assess rivaroxaban pharmacodynamic effects should not be done as the results will be more variable and potentially misleading (i.e., conversion could either increase or decrease apparent effect compared with PT in seconds). Additional details are provided below.
>
> The reagent used to perform the Prothrombin Time (PT), thromboplastin/tissue factor, is manufactured specifically for use in this test, and is refined to address the adjustment of vitamin K antagonist therapy. The reagents are produced by various commercial companies around the world, and as a result, the reagents vary in their sensitivity in this clotting assay. This leads to the situation where the plasma sample of a patient anticoagulated on warfarin may provide a PT of, for example, 17.0 seconds in one laboratory, but will not necessarily produce the same exact PT value in another laboratory. To accommodate for this, the INR was developed. While the INR does standardize the prothrombin time values obtained on the same plasma sample when tested in laboratories around the world, it is based on a World Health Organization standard plasma sample system of plasma drawn from patients who have been stably anticoagulated (usually for 2 weeks or longer) on a VKA like warfarin. Thus, when the INR is reported, it is reliable only for patients on a VKA. Moreover, the majority of laboratories today routinely only report out the calculated INR, not the actual PT value in seconds, the method and units used in the rivaroxaban pharmacodynamics studies. If prescribers of rivaroxaban are to use the pharmacodynamic information provided in this label to make clinical decisions, they must use the PT in seconds,

---

[51] Defendant Janssen Research & Development, LLC's Responses to Plaintiffs' Interrogatories Pertaining to Defendants Affirmative Defense of Federal Preemption, at 9.

not the INR which is based on plasma from patients anticoagulated with VKAs, and has no relation at all to the presence of rivaroxaban. Therefore it is important to warn the prescriber that "The International Normalized Ratio (INR) should not be used for measuring rivaroxaban pharmacodynamics effect. The Sponsor proposes to add the statement that "the Prothrombin Time could be used for estimating rivaroxaban pharmacodynamics effect" (although Sponsor does not recommend it due to the short half-life and fact that the effect varies with the various available thromboplastin/tissue factor reagents)."

XARELTO_JANSSEN_00047272."[52]

59.    "On July 1, 2011, NDA 022406 was approved by the Agency, and contained the following statements in Section 12.2 of the Approved Package Insert:

Dose-dependent inhibition of factor Xa activity was observed in humans and the Neoplastin prothrombin time (PT), activated partial thromboplastin time (aPTT) and HepTest are prolonged dose-dependently. Anti-factor Xa activity is also influenced by rivaroxban. There are no data on the use of the International Normalized Ratio (INR). The predictive value of these coagulation parameters for bleeding risk or efficacy has not been established.

XARELTO_JANSSEN_00047287."[53]

60.    "On July 12, 2011, Sanjay Jalota and Alla Rhoge (Janssen) had a call with Alison Blaus (FDA Project Manager) to obtain feedback from the FDA internal meeting held on July 12, 2011. On this call, 'Alison mentioned that NDA 22-406 approved label should be used as the basis for the updated label and the AFib specific information added to it.' *See* XARELTO_JANSSEN_00000200."[54]

---

[52] Defendant Janssen Research & Development, LLC's Responses to Plaintiffs' Interrogatories Pertaining to Defendants Affirmative Defense of Federal Preemption, at 9-10.

[53] Defendant Janssen Research & Development, LLC's Responses to Plaintiffs' Interrogatories Pertaining to Defendants Affirmative Defense of Federal Preemption, at 11.

[54] Defendant Janssen Research & Development, LLC's Responses to Plaintiffs' Interrogatories Pertaining to Defendants Affirmative Defense of Federal Preemption, at 11.

61.     On August 10, 2011, the FDA's clinical pharmacology reviewers stated, "Major

bleeding events increased with an increase in pre-dose PT [trough] over the observed range (per

protocol, on treatment analysis set). Probability of major bleeding by pre-dose PT with

rivaroxaban shown in (A) logistic regression model ($E_{max}$) and (B) Cox regression model with a

plot indicating probability of an event within 1 year."[55]



**Figure 4**     Major bleeding events increased with an increase in pre-dose PT over the observed range (per-protocol, on treatment analysis set).  Probability of major bleeding by pre-dose PT with rivaroxaban shown in (A) logistic regression model ($E_{max}$) and (B) Cox regression model with a plot indicating probability of an event within 1 year. The PT measurements made either at week 12 or week 24, whichever was closer to the reported major bleeding event was used for the analysis. Majority of the PT measurements were made during 12-24 hours after the previous dose and is referred to as pre-dose PT.

62.     "On Friday November 4, 2011, FDA provided final comments and a revised label

for NDA 202439. See XARELTO_JANSSEN_01499448. In this label, FDA struck the following

sentences from Section 12.2: 'There are no data on the use of the INR. The predictive value of

these coagulation parameters for bleeding risk or efficacy has not been established.' See

XARELTO_JANSSEN_08646664. From the time of the approval of NDA 202439 until May

2016, Section 12.2 stated:

> Dose-dependent inhibition of factor Xa activity was observed in
> humans and the Neoplastin prothrombin time (PT), activated partial

---

[55] FDA Clinical Pharmacology Review, p. 12, Section 3.3.

thromboplastin time (aPTT) and HepTest are prolonged dose-dependently. Anti-factor Xa activity is also influenced by rivaroxaban.

*See id.*; *see also* XARELTO_JANSSEN_23524564."[56]

63.    On November 4, 2011, FDA's Stephen M. Grant, Deputy Division Director, Division of Cardiovascular and Renal Products, stated that the Clinical Pharmacology and Clinical reviewers demonstrated "that there is also a correlation between PT and risk of bleeding."[57]

64.    On December 4 and 5, 2014, Dr. Temple gave a presentation entitled "Dose-Response – Anticoagulants," which stated:

> For the warfarin control we do not use a fixed dose. We titrate to desired INR. This is perhaps because we know blood levels can be very variable, but we also know that dose matters to outcome.
>
> …
>
> So, for the previous of standard of care, warfarin, we do not use a fixed dose, but always use a dose titrated to anticoagulant effect. Why are NOACs different? Maybe they shouldn't be.
>
> …
>
> People like to avoid monitoring, but dabigatran concentration response data suggests one blood level and adjustment could optimize stroke reduction and minimize bleeding.
>
> …
>
> It is possible that if blood levels were not too variable a single dose <u>could</u> get most people into proper range. We know that is not true for dabigatran and edoxaban, and we also know that apixaban and rivaroxaban did not reduce thromboembolic strokes compared to warfarin although they caused less bleeding. Coagulation measures might do as well as, or better than, blood levels. All of this is under

---

[56] Defendant Janssen Research & Development, LLC's Responses to Plaintiffs' Interrogatories Pertaining to Defendants Affirmative Defense of Federal Preemption, at 11-12.

[57] FDA Summary Review, p. 9.

active consideration. With steep dose-response for both benefit and risk, optimizing does or blood levels seems like a very good idea.[58]

65.     In July 2016, a published report[59] on the discussions held at the Cardiac Research Safety Consortium (CSRC) think tank meeting in February 2015 stated:

> The NOACs have reasonably predictable pharmacologic profiles, with well-defined relationships between plasma concentrations and anticoagulant effects and generally predictable blood levels based upon administered dose. As such, routine monitoring of coagulation tests has not been a requirement for therapy. Moreover, even without such monitoring, the NOACs performed well versus monitored warfarin in their pivotal trials, including reduced fatal and intracranial bleeding and, at least in AF trials, a 10% reduction in all-cause mortality. **Nonetheless, it is possible that they might have performed even better regarding thrombotic or bleeding events and stroke reduction if PK or PD monitoring were available.**[60]

66.     On February 3, 2015, Dr. Temple gave a presentation that stated:

> Not having the optimal dose at initial dosing is tolerable for many drugs. You can adjust up or down according to response. But here being too low leads to a stroke, a very bad outcome, and being too high leads to major bleeds, also bad, so that early optimization seems worthwhile…So, the NOACs are very good, but could probably be better.[61]

67.     On October 26, 2015, Drs. Jeffry Florian and Martin Rose of FDA, gave a presentation entitled "Correlation of Drug Levels and Outcomes in Phase III New Oral

---

[58] EMA EFPIA Workshop, Slides 4, 6, and 11.

[59] One of the authors of this report, Dr. Evardas Kaminskas, is an employee at the FDA Division of Hematology Products, CDER.

[60] Reiffel, et al. *NOAC monitoring, reversal agents, and post-approval safety and effectiveness evaluation: A cardiac safety research consortium think tank.* Am. Heart J 2016;177:74-86, *emphasis added, internal citations omitted.*

[61] Temple, R, M.D. "NOAC Dosing: Pharmacometric Guidance Regulatory Considerations." CSRC, Feb. 3, 2015, Slide 18.

Anticoagulant (NOAC) Trials," in which they stated: "Relationships identified between drug exposure/coagulation markers and major bleeding rate."[62]

68.     On December 3, 2015, at a follow-up CSRC meeting, organized debate occurred between FDA's Dr. Robert Temple and Bayer's Dr. Scott Berkowitz. Dr. Temple gave a presentation which stated:

> So, for the previous of standard of care, warfarin, we do not use a fixed dose but always use a dose titrated to anticoagulant effect. Why are NOACs different? Maybe they shouldn't be.
>
> …
>
> Blood Levels Can Help…How hard would it be to get one NOAC blood level (when monthly or greater levels are SOC for warfarin) if blood levels predicted outcome (which they appear to do)? It seems self-evidently worth it.[63]

In turn, Dr. Berkowitz gave a presentation entitled "Counterpoint: PK based dosing strategy is impractical and may not add value," which stated:

> Clinical value of a PK/PD measurement for NOAC dosing not proven nor as straightforward as with PT/INR for VKAs.
>
> …
>
> Value added (for the patient) by taking a measurement not clear…A drug plasma concentration level does not provide information about the overall status of hemostasis in the patient in conjunction with that level[64]

69.     On December 3, 2015, at the CSRC meeting, FDA's Dr. Jeffry Florian, Team Leader, Division of Pharmacometrics CDER/OTS/Office of Clinical Pharmacology, in a presentation entitled "Observations from Novel Oral Anticoagulation (NOAC) Trials for Stroke

---

[62] Florian, Jeffry, Ph.D. (CDER/OTS/OCP/DPM) & Rose, Martin, M.D. (CDER/OND/ODE1/DCRP). "Correlation of Drug Levels and Outcomes in Phase III New Oral Anticoagulant (NOAC) Trials." Oct. 26, 2015, Slide 13.

[63] NOAC Dosing Precision Dosing – YES!, Robert Temple, MD, CSRC Meeting, Dec. 3, 2015, Slides 5 and 12.

[64] Berkowitz, S., M.D. "Counterpoint: PK based dosing strategy is impractical and may not add value." 3 Dec. 2015, Slides 3 and 5.

Prevention in Atrial Fibrillation (SPAF)," presented Figure 4(A) Logistic Regression model demonstrating increased bleed risk with prolongation of PT found at p. 12 of the Clinical Pharmacology Review, dated August 10, 2011.[65]

70.     In my opinion, while FDA originally stated in June 2011 (in its review of the hip and knee replacement VTE prophylaxis indication) that the predictive value of coagulation parameters for the bleeding risk had not been adequately studied, beginning in August 2011 (in its Clinical Pharmacology review of the atrial fibrillation indication), the agency stated that there was a relationship between bleeding risk and PT. Since then, the agency has repeatedly and consistently cited that relationship.

71.     In my opinion, while the sponsors proposed that language suggesting that if "assessment of the pharmacodynamic effect of rivaroxaban is considered necessary in individual patients, PT (measured in seconds) is recommended"[66] be included in the Pharmacodynamics section of the label, they never offered language to include in the Warnings and Precautions section that suggested that measuring a PT level in a Xarelto-treated patient can be helpful in identifying patients at risk for serious adverse events based upon a patient's response to Xarelto.

72.     In my opinion, the sponsors acknowledged that information about measuring PT could be helpful in patient care decision-making.

## XI.     THE SPONSORS FAILED TO "IDENTIFY ANY LABORATORY TESTS HELPFUL IN FOLLOWING THE PATIENT'S RESPONSE OR IN IDENTIFYING POSSIBLE ADVERSE REACTIONS."

73.     As discussed in this report:

---

[65] Florian, Jeffry, Ph.D. "Observations from Novel Oral Anticoagulant (NOAC) Trials for Stroke Prevention in Atrial Fibrillation (SPAF)." CSRC NOAC Dosing Workshop, Dec. 3, 2015, Slide 10.

[66] XARELTO_JANSSEN_05911809, p. 15.

    a.   FDA regulations require that a manufacturer must identify in the Warnings and Precautions section any laboratory test helpful in recognizing patients with adverse reactions.

    b.   Serious bleeding is an adverse event associated with the use of Xarelto.

    c.   There is variability in drug plasma concentration levels in patients taking Xarelto.

    d.   There is a relationship between Xarelto plasma concentration levels and prothrombin time (PT). There is a relationship between PT levels and the risk of bleeding.

    e.   Measuring a PT level in a Xarelto-treated patient can be helpful in identifying patients at risk for serious adverse events based upon a patient's response to Xarelto.

    f.   There is a laboratory test to measure PT levels in Xarelto-treated patients.

74.    Therefore, in my opinion, based on the preceding sections, the sponsors failed to "identify any laboratory tests helpful in following the patient's response or in identifying possible adverse reactions."

## XII.    WHILE FDA'S STATEMENTS REGARDING PRECISION DOSING WITH THE NOVEL ORAL ANTICOAGULANTS HAVE VARIED OVER TIME, IT IS THE PURVEYOR OF A DRUG, NOT THE FDA, WHO HAS PRIMARY RESPONSIBILITY FOR THE SAFETY OF ITS PRODUCT.

75.    It is the purveyor of a drug that is responsible for the safety of the drug.

76.    A drug company has a responsibility, independent of what the FDA directs it to do, to alert physicians and patients to risks that were unknown to or poorly understood by the FDA, but that were known to the company. This duty predates by decades the advent of federal regulation of drugs.[67]

---

[67] *See, e.g.*, *Thomas v. Winchester*, 6 N.Y. 397 (1852).

77.     The FDA's regulation of a drug cannot anticipate and protect against all safety risks to individual consumers.  Even the most thorough regulation of a product may fail to identify potential problems presented by the product.

78.     As I have written and testified about before the United States Congress, the Federal Food, Drug and Cosmetic Act grants the FDA substantial authority over the approval, labeling, and promotion of pharmaceutical products.  But, in my opinion, nothing in the Act, or in the FDA's implementing regulations, relieves a manufacturer of its duty to act prudently in light of the company's internal knowledge about a product and its potential risks.

79.     It was my opinion while Commissioner of the FDA, and remains to this day, that the two systems of state consumer protection (including potential product liability) and federal food and drug regulation should and do operate in a complementary but independent manner.

80.     As the Supreme Court has recently ruled, generally, state law imposes responsibilities on pharmaceutical companies to create products that are "reasonably safe," a duty that can be satisfied by the "presence and efficacy of a warning to avoid an unreasonable risk of harm from hidden dangers or from foreseeable uses."[68]

81.     The Institute of Medicine and Government Accountability Office have noted that the FDA's ability to oversee drug safety has been constrained, especially during the post-approval portions of a drug's life.  Specifically, the Institute of Medicine, in its report titled, "The Future of Drug Safety: Promoting and Protecting the Health of the Public," has stated that, "the drug safety system is impaired by the following factors: serious resource constraints that weaken the quality

---

[68] *Mutual Pharm. Co., Inc. v. Bartlett*, 133 S.Ct. 2466, 2480 (2013).  (internal citations omitted).  *Hill v. Searle Laboratories*, 884 F.2d 1064, 1068 (8th Cir. 1989) ("FDA regulations are generally minimal standards of conduct…"); *Wells v. Ortho Pharm. Corp.*, 788 F.2d 741, 746 (11th Cir. 1986) ("An FDA determination that a warning is not necessary may be sufficient for federal regulatory purposes but still not be sufficient for state tort law purposes."); *Feldman v. Lederle Lab.*, 125 N.J. 117, 121 (N.J. 1991); *Vautour v. Body Masters Sports Indus., Inc.*, 147 N.H. 150, 153-54 (N.H. 2001).

and quantity of the science that is brought to bear on drug safety; an organizational culture in

CDER that is not optimally functional; and unclear and insufficient regulatory authorities

particularly with respect to enforcement." The report further stated, "the committee found that

FDA, contrary to its public health mission, and the pharmaceutical industry, contrary to its

responsibility to the users of its products (and its shareholders), do not consistently demonstrate

accountability and transparency to the public by communicating safety concerns in a timely and

effective fashion."[69]

82.    In its report titled "Drug Safety:  Improvement Needed in FDA's Postmarket

Decision-making and Oversight Process," the General Accounting Office stated:

> Two organizationally distinct FDA offices, the Office of New Drugs
> (OND) and the Office of Drug Safety (ODS), are involved in
> postmarket drug safety activities. OND, which holds responsibility for
> approving drugs, is involved in safety activities throughout the life cycle
> of a drug, and it has the decision-making responsibility to take
> regulatory actions concerning the postmarket safety of drugs. OND
> works closely with ODS to help it make postmarket decisions. ODS,
> with a primary focus on postmarket safety, serves primarily as a
> consultant to OND and does not have independent decision-making
> responsibility. ODS has been reorganized several times over the years.
> There has been high turnover of ODS directors in the past 10 years,
> with eight different directors of the office and its predecessors. In the
> four drug case studies GAO examined, GAO observed that the
> postmarket safety decision-making process was complex and
> iterative...FDA lacks clear and effective processes for making decisions
> about, and providing management oversight of, postmarket safety
> issues. The process has been limited by a lack of clarity about how
> decisions are made and about organizational roles, insufficient
> oversight by management, and data constraints.  GAO observed that
> there is a lack of criteria for determining what safety actions to take and
> when to take them.  Certain parts of ODS's role in the process are
> unclear, including ODS's participation in FDA's scientific advisory
> committee meetings organized by OND.  Insufficient communication
> between ODS and OND has been an ongoing concern and has hindered
> the decision-making process.  ODS does not track information about
> ongoing postmarket safety issues, including the recommendations that

---

[69] Institute of Medicine, "The Future of Drug Safety: Promoting and Protecting the Health of the Public," 2007, p.4; http://www.nap.edu/openbook.php?record_id=11750&page=4.

ODS staff make for safety actions. FDA faces data constraints in making postmarket safety decisions. There are weaknesses in the different types of data available to FDA, and FDA lacks authority to require certain studies and has resource limitations for obtaining data.[70]

83.     Generally, the FDA does not test drugs nor conduct clinical trials.  It can approve a company's drug application or take steps to withdraw a drug that is on the market.

84.     Once a drug is approved, the FDA's regulations make clear that a drug company has a duty to warn and modify labeling without delay when hazards emerge with one of its drugs.[71]  The regulations specifically authorize a drug company to make labeling changes, and take other steps to inform physicians and patients of emerging risks, without advanced approval from the FDA.  Such responsibility is intended to complement, not undercut, the FDA's job of protecting consumers from dangerous drugs.

85.     Drug companies have an obligation to revise a label "to include a warning about a clinically significant hazard as soon as there is reasonable evidence of a causal association with a drug; a causal relationship need not have not been definitely established."[72]

86.     Manufacturers have significant resources that are or should be committed to overseeing the safety of the drugs they market.  As a result, manufacturers invariably get safety information before the FDA does, and have access to information that is not available to the FDA. Company scientists and physicians also develop impressions and an understanding of a drug's potential safety profile that may be more informed than the FDA's.

---

[70] Drug Safety: Improvement Needed in FDA's Postmarket Decision-making and Oversight Process, GAO-06-402, March 31, 2006, Introduction page, http://www.gao.gov/new.items/d06402.pdf.

[71] 21 C.F.R. § 201.57(e) (1999).

[72] 21 C.F.R. § 201.57(c)(6), 21 C.F.R. § 314.70 (c)(6)(iii)(A)-(C). *See generally* Kessler D. A. and Vladeck D. C., "A Critical Examination of the FDA's Efforts to Preempt Failure-to-Warn Claims" (2007). *O'Neill Institute Papers*. Paper 2, for a discussion of manufacturers' responsibility to change the label in the face of new safety information.

87.     Thus, what a drug company knows about a drug and what the FDA knows may be different.

88.     The duties of a pharmaceutical company are based not only on the FDA's regulations and requirements, but also on the risks presented by a drug about which the company knew, should have known, or should have investigated.  BI's responsibility for the safety of its product and the adequacy of its warnings exists regardless of what the FDA did, did not do, and/or required of BI.

89.     As Commissioner of the FDA from 1990 through 1997, I can attest that the responsibility of drug sponsors have been in force for decades.

## XIII.   INFORMATION ABOUT LABORATORY TESTS THAT COULD BE HELPFUL IN IDENTIFYING PATIENTS AT INCREASED RISK OF BLEEDING FROM XARELTO USE WOULD BE USEFUL INFORMATION FOR PHYSICIANS IN CLINICAL DECISION-MAKING.

90.     In the Boudreaux matter (Case No. 2:14-cv-02720), the physician who prescribed Xarelto to the plaintiff testified as follows:

> Q.     If there were a simple blood test to determine the plasma concentration level for Xarelto that could significantly reduce the risk associated with the drug, would you want to know that?
>
> A.     In other words, let me just get that right. You wanted me -- you are asking me if there was a way to monitor the level that -- what was your question again?
>
> Q.     Well, let me back up. Do some patients respond to anticoagulants differently?
>
> A.     Yes.
>
> Q.     So some patients may take a pill and they may have a high response level, correct?
>
> A.     Yes. That applies to any drug, right?

*Q.      So if there were a way to identify high responders to Xarelto with a one-time blood test, would that be important for you to know?*

*A.      If there was a way to identify high dose responders? I would like to know if that affects the therapeutic -- what is the therapeutic range and how we are going to monitor before I kind of give a definite answer to that.*

*Q.      Knowing the therapeutic range is important, correct?*

*A.      If there's such a -- if it's very specific what is the therapeutic range then you would use the therapeutic range.*

*Q.      If such a one-time blood test were available, would you use it for patients that you were putting on Xarelto?*

*A.      So if there is a test that would tell you that some people are high responders, is that what you said?*

*Q.      Yes.*

*A.      Like they are very sensitive to it?*

*Q.      Yes.*

*A.      That they would be at risk for bleeding?*

*Q.      Yes.*

*A.      Or proven bleeding, that they are clearly at higher risk? Yes, of course, I would want to know that.*[73]

91.     In the Orr matter (Case No. 2:15-cv-03708), the physician who prescribed Xarelto to the plaintiff testified as follows:

*Q.      But, again, we have looked at the interpatient variability.  We have seen how high patients can be when they take Xarelto at steady-state and we have seen how low they can be, right?*

*A.      Right.*

*Q.      And knowing that the higher a patient is the more likely they are to bleed. If you could do a simple PT test and determine whether a patient was at the very*

---

[73] Deposition of Dr. Kenneth Wong, July 11, 2016, 43:5-46:4.

*high end and, therefore, much more likely to bleed, is that something that you would want to know?*

*A. It's something that I would want to know if the FDA had thought it was a good idea. I put a lot of faith in what the FDA allows the drug -- how it allows it to be used.*[74]

*…*

*Q. Do you think it would be acceptable to you and your patients to monitor Xarelto levels at initiation and then once a year afterwards to make sure they weren't too much or too low on Xarelto?*

*A. That's another hypothetical question. If I was going to try something like that, I don't know why I would wait a year for the second piece of data. I would say maybe initiation and then four to six weeks, and then if you were in the right ballpark, if you thought it was going to be stable, space it out.*

*Q. And if you did the initial, after they got to steady-state, and you did the initial test and they were up in the 95th percentile, what would you do?*

*A. You mean the 95th percent of being where they ought to be?*

*Q. When we looked at that scatter plot, the lowest was like .6 and the highest was well over 600. I'm saying if they are in the top of the class, what would you do?*

*A. If they were out of bounds, in other words?*

*Q. Right.*

*A. I would make an adjustment then.*

*Q. And you said you frequently talked with patients about the difference between Warfarin and the frequent monitoring --*

*A. Yes.*

*Q. -- and the Xarelto or Pradaxa where there is no monitoring, right?*

*A. Right.*

*Q. And in your experience, you know, having worked with these patients for a long time, I think you also said you tell them the benefit is if you do the Warfarin, you do the testing, you know where you are?*

*A. Yes.*

*Q. Whereas when you do Xarelto, Pradaxa, no testing, you don't know, right?*

---

[74] Deposition testimony of Dr. Maurice St. Martin, June 27, 2016, 196:24-197:14.

> A.    Right.
>
> Q.    Do you think that they would find it to be a happy medium to do this infrequent testing on Xarelto or Pradaxa to find out where they are?
>
> A.    From the patients that I deal with, and I've got a lot of long chronic patients that I really have got a close relationship to, I think they would go with anything suggested.
>
> Q.    If you knew that there was a way to monitor Xarelto levels in your patient and do it infrequently, was that something that you would suggest to them?
>
> A.    I would have to see it studied and see all the data, but if it turned out to be a good thing to do, I would certainly suggest it.  Yes.
>
> Q.    I think what you said that we know is the higher the prothrombin time, the more likely they are to bleed, right?
>
> A.    That's correct.
>
> Q.    What other data would you need other than knowing kind of what the ballpark is to keep them in?
>
> A.    The outcome of the patient.  In other words, if you want us to initiate a new way to use the drug, I would say you want the data on the measurement you want and then you want the data of how that measurement benefited or harmed or did nothing for the patient.  The outcome data too.
>
> Q.    But you know if you keep the patient from being at the very high range of the PT that you are protecting them from bleeds, right?
>
> A.    You generally would think that.[75]

92.    In the Mingo matter (Case No. 2:15-cv-03469), the physician who prescribed

Xarelto to the plaintiff testified as follows:

> Q.    So if you could monitor Xarelto at initiation to see the effect that it was having on a patient's blood to ensure that the patient had the right dose, do you believe that would result in better outcomes for patients?
>
> A.    If the manufacturer of the drug and the  FDA recommends that we as physicians do this, yes.[76]

---

[75] Deposition testimony of Dr. Maurice St. Martin, June 27, 2016, 225:13-228:9.

[76] Deposition of Dr. Renie Armstrong Jordon, August 12, 2016, 94:5-11.

…

Q.      So, Doctor, when you prescribed Xarelto to Ms. Mingo in January of 2015, it was your understanding that the anticoagulation effect of Xarelto on Ms. Mingo's blood could not be monitored; is that correct?

A.      That's my understanding, yes.

Q.      And the label in effect at that time for Xarelto specifically stated that the anticoagulation effect of Xarelto could not be monitored; is that correct?

A.      That's my understanding, yes.

Q.      But Janssen had information suggesting that the anticoagulation effect of Xarelto could actually be monitored; is that right?

A.      In some fashion, yes.

…

Q.      Doctor, when you prescribed Xarelto to Ms. Mingo in January of 2015, would you have liked to have known that it was possible to monitor the anticoagulation effect of Xarelto? Is that information that you would've liked to have had?

A.      Yes.

Q.      And if you would have known that, if you knew that it was possible to monitor the anticoagulation effect of Xarelto for Ms. Mingo, is that something you would have wanted to do?

A.      Yes.

Q.      Would it have been beneficial -- would it have been beneficial to you to monitor the effect it was having on her right after she initiated the drug?

A.      Yeah.[77]

…

Q.      So, Doctor, if after you prescribed Xarelto to her on the 23rd, --

A.      Uh-huh (affirmative response).

---

[77] Deposition of Dr. Renie Armstrong Jordon, August 12, 2016, 99:23-102:1.

39

*Q.      -- if you knew that there was a test that you could have ran the next day that would have shown you the effect that Xarelto was having on her blood, you would have ran that test, correct?*

*A.      Correct.*

*Q.      And if that test showed that Xarelto was causing her blood to become too anticoagulated, would you have made some kind of adjustment to her dosage or her medication?*

*A.      Yes, I would.*[78]

93.      In the Henry matter (Case No. 2:15-cv-00224), the primary physician who

prescribed Xarelto to the plaintiff testified as follows:

*Q.      Looking back, considering the flat efficacy curve between 9 or 10 and 30 seconds on the prothrombin time scale, looking at the increased risk as the prothrombin time increases and considering that Mr. Henry was also on aspirin, would you agree that it would have been safer for Mr. Henry with respect to bleeds for him to be on the lower part of the prothrombin scale versus the higher part?*

*A.      Yes, I would. And, again, it goes back to the fact that that was not really offered as a way to track this. We were not really -- nobody was ever told that there was a way to track it.*

*Q.      And I'm not being critical at all of you or your colleagues, Dr. McCain. I'm just -- I'm just asking what you would have liked to have known --*

*A.      Uh-huh.*

*Q.      -- and we'll get -- and then we'll get into the monitoring and how you could have checked. But that's not what I -- I'm not going there at all.*

*A.      Okay.*

*Q.      I'm just asking you as a doctor treating your patients, if you had been given this information, would you have concluded, it's better for Mr. Henry to be on the lower part of this scale than the upper part?*

---

[78] Deposition of Dr. Renie Armstrong Jordon, August 12, 2016, 106:12-25.

A.      Correct. If we -- if the medical community -- if we as physicians had known that there was a way to track this, a correlation, it would have been -- that would have been beneficial.

Q.      And if there were a test that were available to tell you where your patient was on this scale, and that it was something that was relatively affordable, is that something that you as a physician, knowing what you know now, would want to utilize in your patients to see where they were on the scale?

A.      It would be. I would also want to know that it affected their outcomes. I would want to know that the added testing cost, what have you, would affect that patient's long-term outcomes.[79]

...

Q.      Are you familiar with ordering prothrombin time testing?

A.      Yes.

Q.      Is that something that you have the ability to do any day of the week when you're in the office?

A.      Yes.

Q.      ...Back when you were taking care of Mr. Henry, did anybody at Bayer or Janssen ever inform you that you could order a prothrombin time using one of these sensitive assays that are identified in this article to check levels of Mr. Henry's Xarelto and see where he was on those curves?

A.      No.

Q.      Is that something that you would have liked for them to have told you, for Mr. Henry and for your other patients?

A.      It might have been useful. It would have been useful. It would be useful.[80]

94.      In my opinion, based in part on the above testimony, information about laboratory tests that could be helpful in identifying patients at increased risk of bleeding from Xarelto use would be useful information for physicians in clinical decision-making.

---

[79] Deposition of Dr. David B. McCain, July 1, 2016, 138:3-140:2.

[80] Deposition of Dr. David B. McCain, July 1, 2016, 162:17-163:13.

## XIV.   MINIMIZING RISKS.

95.     With regard to anticoagulants, generally speaking, the same mechanism of action responsible for conferring the benefit is also responsible for conferring the risk of bleeding.

96.     A drug company has the responsibility to take steps to minimize the risks associated with a drug, and provide information to doctors and patients so that they, too, can take steps to minimize the risks associated with the drug.

97.     In addition to the requirement to "identify any laboratory tests helpful in following the patient's response or in identifying possible adverse reactions," according to the Act, all manufacturers need to provide physicians with "adequate directions for use."[81]

98.     Drug companies have a responsibility to provide information to physicians so that they can use the drug safely.

99.     The FDA places great emphasis on a "serious adverse reaction that can be prevented or reduced in frequency or severity by appropriate use of the drug (e.g., patient selection, careful monitoring, avoiding certain concomitant therapy, addition of another drug or managing patients in a specific manner, avoiding use in a specific clinical situation)."[82]

100.    In my opinion, a reasonably prudent drug manufacturer, who knows that certain patients are at an increased risk of serious adverse events relative to others, would inform prescribers of that fact.

101.    In my opinion, based on the reasons cited above, the sponsors did not adequately notify physicians that some patients are at higher risk than others (*i.e.*, inter-patient variability).

---

[81] 21 U.S.C. §352(f)(1).

[82] Guidance of Industry, Warnings and Precautions, Contraindications, and Boxed Warning Sections of Labeling for Human Prescription Drug and Biological Products – Content and Format, October 2011, p. 11.

102.   In my opinion, based on the reasons cited above, the sponsors did not adequately instruct physicians how to identify those patients (*i.e.*, PT).

103.   In my opinion, based on the reasons cited above, the sponsors did not adequately instruct physicians on how to clinically manage the information (*e.g.*, titrate, discontinue, additional warnings).

## XV.   POST-MARKET EVIDENCE FURTHER INDICATES NEED TO IMPROVE SAFETY OF XARELTO FOR PATIENTS VIA A HELPFUL LABORATORY TEST

### A.  Post-Market Epidemiology[83]

104.   In an observational, nationwide cohort study assessing real-world safety, effectiveness, and persistence associated with rivaroxaban and warfarin in non-valvular AF patients by Laliberte, et al.,[84] rivaroxaban and warfarin did not differ significantly in real-world rates of composite stroke and systemic embolism and bleeding (major, intracranial or GI bleeding). In addition, rivaroxaban was associated with significantly fewer venous thromboembolism events in comparison to warfarin, as well as significantly better treatment persistence. A total of 14,616 warfarin patients and 3,654 rivaroxaban patients were included in the study using healthcare claims from Symphony Health Solutions' Patient Transactional Datasets (study period: May 2011 – July 2012). The results of the study were as follows:

> No significant differences were observed for bleeding and composite stroke and systemic embolism outcomes, although rivaroxaban users were associated with significantly fewer VTE events (hazard ratio [HR] = 0.36, 95% confidence interval [CI]: 0.24-0.54, p<0.0001) compared to warfarin users. Rivaroxaban was also associated with a significantly lower risk of treatment non-persistence (HR = 0.66; 95% CI: 0.60-0.72, p<0.0001).

---

[83] For a discussion of the strengths and limitations of each of these studies, see Schedule 19.

[84] Laliberte, et al., Real-world comparative effectiveness and safety of rivaroxaban and warfarin in nonvalvular atrial fibrillation patients, *Current Medical Research & Opinion*, 2014; 30(7):1317-1325.

43

105.    In a retrospective, propensity matched cohort study of new users of

dabigatran, rivaroxaban, and warfarin by Abraham, et al.,[85] the risk of gastrointestinal bleeding

related to novel oral anticoagulants was similar to that for warfarin. Using a large database of

administrative claims data of privately insured and Medicare Advantage enrollees (study period:

November 1, 2010 – September 30, 2013), the participants of the study consisted of new users of

warfarin, dabigatran, and rivaroxaban. Specifically, the results of the study were as follows:

> The incidence of gastrointestinal bleeding associated with dabigatran
> was 2.29 (95% confidence interval 1.88 to 2.79) per 100 patient years
> and that associated with warfarin was 2.87 (2.41 to 3.41) per 100
> patient years in patients with atrial fibrillation. In non-atrial fibrillation
> patients, the incidence of gastrointestinal bleeding was 4.10 (2.47 to
> 6.80) per 100 patient years with dabigatran and 3.71 (2.16 to 6.40) per
> 100 patient years with warfarin. With rivaroxaban, 2.84 (2.30 to 3.52)
> gastrointestinal bleeding events per 100 patient years occurred in atrial
> fibrillation patients (warfarin 3.06 (2.49 to 3.77)/100 patient years) and
> 1.66 (1.23 to 2.24) per 100 patient years in non-atrial fibrillation
> patients (warfarin 1.75 (1.25 to 1.99)/100 patient years). In propensity
> score matched models, the risk of gastrointestinal bleeding with novel
> oral anticoagulants was similar to that with warfarin in atrial fibrillation
> patients (dabigatran *v* warfarin, hazard ratio 0.79 (0.61 to 1.03);
> rivaroxaban *v* warfarin, 0.93 (0.69 to 1.25)) and in non-AF patients
> (dabigatran *v* warfarin, hazard ratio 1.14 (0.54 to 2.39); rivaroxaban *v*
> warfarin, 0.89 (0.60 to 1.32)). The risk of gastrointestinal bleeding
> increased after age 65, such that by age 76 the risk exceeded that with
> warfarin among atrial fibrillation patients taking dabigatran (hazard
> ratio 2.49 (1.61 to 3.83)) and patients with and without atrial fibrillation
> taking rivaroxaban (2.91 (1.65 to 4.81) and 4.58 (2.40 to 8.72),
> respectively).

106.    In a propensity-matched, nationwide cohort study comparing dabigatran or

---

[85] Abraham, et al., Comparative risk of gastrointestinal bleeding with dabigatran, rivaroxaban, and warfarin: population based cohort study, *BMJ*, 2015; 350:h1857, doi: 10.1136/bmj.h1857.

rivaroxaban to vitamin K antagonists (VKA) in new users with nonvalvular atrial fibrillation by Maura, et al.,[86] the findings suggest that physicians should exercise caution when initiating either NOAC (dabigatran or rivaroxaban) or VKA in patients with nonvalvular atrial fibrillation. The population was comprised of 19,713 VKA new users, 8,443 dabigatran new users, and 4,651 rivaroxaban new users, and all dabigatran- and rivaroxaban-treated patients were matched to 16,014 and 9,301 VKA-treated patients, respectively (using 1:2 matching on the propensity score). Specifically, the results of the study were as follows:

> Among dabigatran-, rivaroxaban- and their VKA matched-treated patients, 55 and 122 and 31 and 68 bleeding events and 33 and 8 and 12 and 28 arterial thromboembolic events were observed during follow-up, respectively. After matching, no statistically significant difference in bleeding (HR=0.88 [0.64-1.21]) or thromboembolic (HR=1.10 [0.72-1.69]) risk was observed between dabigatran and VKA new users. Bleeding (HR=0.98 [0.64-1.51]) and ischemic (HR=0.93 [0.47-1.85]) risks were comparable between rivaroxaban and VKA new users.

107.    In a population based, retrospective cohort study by Chang, et al.[87]

comparing the safety of dabigatran or rivaroxaban to warfarin in terms of gastrointestinal bleeding, the study authors concluded that "[a]lthough rates of gastrointestinal bleeding seem to be similar in this commercially insured sample of adults in the United States, we cannot rule out as much as a 50% increase in the risk of gastrointestinal bleeding with dabigatran compared with warfarin or a more than twofold higher risk of bleeding with rivaroxaban compared with warfarin." The study comprised a population of 46,163 patients, including 4,907 patients using dabigatran, 1,649 patients using rivaroxaban, and 39,607 patients using warfarin. Specifically, the results of the study were as follows:

---

[86] Maura, et al., Comparison of the short-term risk of bleeding and arterial thromboembolic events in nonvalvular atrial fibrillation patients newly treated with dabigatran or rivaroxaban versus Vitamin K antagonists: A French nationwide propensity-matched cohort study, *Circulation*, 2015, doi:10.11/61/CIRCULATIONAHA.115.015710.

[87] Chang, et al., Risk of gastrointestinal bleeding associated with oral anticoagulants: population based retrospective cohort study, *BMJ*, 2015; 350:h1585, doi:10.1136/bmj.h1585.

Dabigatran users tended to be older (dabigatran *v* rivaroxaban *v* warfarin: 62.0 *v* 57.6 *v* 57.4 years) and more likely to be male (69% *v* 49% *v* 53%). The rate of gastrointestinal bleeding was highest among dabigatran users and lowest among rivaroxaban users (dabigatran *v* rivaroxaban *v* warfarin: 9.01 *v* 3.41 *v* 7.02 cases per 100 person years). After adjustment for potentially confounding covariates, there was no evidence of a stastically significant difference in the risk of gastrointestinal bleeding between dabigatran and warfarin users (adjusted hazard ratio 1.21, 95% confidence interval 0.96 to 1.53) or between rivaroxaban and warfarin users (0.98, 0.36 to 2.69).

108.     In a prospective cohort study evaluating the effectiveness and safety of rivaroxaban compared to warfarin or dabigatran in routine care nonvalvular atrial fibrillation (AF) patients by Gorst-Rasmussen, et al.,[88] rivaroxaban was associated with similar or lower stroke rates, but higher bleeding and mortality rates. The study consisted of AF patients, identified using nationwide health registries (study period: February 2012 – August 2014) who were new users of rivaroxaban 15 mg or 20 mg, dabigatran 110 mg or 150 mg, or warfarin. The results of the study were as follows:

Rivaroxaban users (R15: n=776; R20: n=1629) were older and with more comorbidities than warfarin (n=11045) and dabigatran users (D110:n-3588; D150: n=5320). Rivaroxaban 15-mg users had the overall highest crude mortality rate. After propensity adjustment, rivaroxaban had lower stroke rates vs. warfarin. The bleeding rate was similar to warfarin and moderately higher vs. dabigatran (R15 vs. D110 HR: 1.28, 95%CI:0.82-2.01; R20 vs. D150 HR: 1.81, 95%CI: 1.25-2.62). The mortality rate was higher vs. dabigatran (R15 vs. D110 HR: 1.43, 95%CI: 1.13-1.81; R20 vs. D150 HR: 1.52, 95%CI: 1.06-2.19).

109.     In a retrospective cohort study comparing the major bleeding risk among

---

[88] Gorst-Rasmussen, et al., Rivaroxaban versus warfarin and dabigatran in atrial fibrillation: comparative effectiveness and safety in Danish routine care, *Pharmacoepidemiology and Drug Safety*, 2016, doi:10.1002/pds.4034.

new users of apixaban, warfarin, dabigatran, and rivaroxaban with nonvalvular atrial fibrillation

by Lip, et al.,[89] patients initiated on rivaroxaban or warfarin were associated with a significantly

greater risk of major bleeding compared to patients initiated on apixaban. In addition, patients

initiated on apixaban were associated with significantly lower risk of major bleeding compared

to patients initiated on warfarin. Using the Truven MarketScan® Commercial and Medicare

supplemental US database (study period: January 1, 2013 - December 31, 2013), there were

29,338 newly anticoagulated patients with non-valvular atrial fibrillation: 2,402 initiated on

apixaban (8.19%); 4,173 initiated on dabigatran (14.22%); 10,050 initiated on rivaroxaban

(34.26%); and 12,713 initiated on warfarin (43.33%). The results of the study were as follows:

> After adjusting for baseline characteristics, initiation on warfarin [adjusted HR
> (aHR): 1.93, 95% confidence interval (CI): 1.12-3.33, P=.018] or rivaroxaban
> (aHR: 2.19, 95% CI: 1.26-3.79, P=.005) had significantly greater risk of major
> bleeding vs apixaban. Dabigatran initiation (aHR: 1.71, 95% CI: 0.94-3.10,
> P=.079) had a non-significant major bleeding risk vs apixaban. When
> compared with warfarin, apixaban (aHR: 0.52, 95% CI: 0.30-0.89, P=.446) had
> a non-significant major bleeding risk vs warfarin.

110.    In a study comparing major bleeding risk among new users of apixaban,

warfarin, dabigatran, and rivaroxaban with non-valvular atrial fibrillation by Lip, et al.,[90] patients

initiated on apixaban and dabigatran were associated with significantly lower risk of major

bleeding compared to patients initiated on warfarin. In addition, patients initiated on rivaroxaban

were associated with significantly higher risk of major bleeding compared to patients initiated on

apixaban. Using the Truven MarketScan® Commercial and Medicare supplemental US database

(study period: January 1, 2012 - December 31, 2014), there were 45,361 newly anticoagulated

---

[89] Lip, et al., Major bleeding risk among non-valvular atrial fibrillation patients initiated on apixaban, dabigatran, rivaroxaban or warfarin: a "real-world" observational study in the United States, *International Journal of Clinical Practice*, 2016; 70:752-763.

[90] Lip, et al., Real-world comparison of major bleeding risk among non-valvular atrial fibrillation patients initiated on apixaban, dabigatran, rivaroxaban, or warfarin: a propensity score matched analysis, Thrombosis and Haemostasis, 2016 Aug 19;116(5).

patients with nonvalvular atrial fibrillation: 15,461 initiated on warfarin (34.1%); 7,438 initiated on apixaban (16.4%); 17,801 initiated on rivaroxaban (39.2%); and 4,661 initiated on dabigatran (10.3%). The results of the study were as follows:

> Compared to matched warfarin initiators, apixaban (HR: 0.53; 95% CI: 0.39-0.71) and dabigatran (HR: 0.69; 95% CI: 0.50-0.96) initiators had a significantly lower risk of major bleeding. Patients initiating rivaroxaban (HR: 0.98; 95% CI: 0.83-1.17) had a non-significant difference in major bleeding risk compared to matched warfarin patients. When comparisons were made between NOACs, matched rivaroxaban patients had a significantly higher risk of major bleeding (HR: 1.82; 95% CI: 1.36-2.43) compared to apixaban patients. The differences for apixaban-dabigatran and dabigatran-rivaroxaban matched cohorts were not statistically significant.

111.    In an observational, nationwide cohort study comparing new users of dabigatran, rivaroxaban, apixaban, and warfarin with non-valvular atrial fibrillation by Larsen, et al.,[91] no significant difference was found between the novel oral anticoagulants (NOACs) and warfarin for ischemic stroke. In addition, the risks of death and bleeding (including major bleeding) were significantly lower for apixaban and dabigatran compared to warfarin. Using three (3) Danish nationwide databases (study period: August 2011-October 2015), there were 61,678 patients with nonvalvular atrial fibrillation naïve to oral anticoagulants: 35,436 warfarin patients (57%); 12,701 dabigatran 150 mg patients (21%); 7,192 rivaroxaban 20 mg patients (12%); and 6,349 apixaban 5 mg patients (10%). The study results were as follows:

> When the analysis was restricted to ischaemic stroke, NOACs were not significantly different from warfarin. During one year follow-up, rivaroxaban was associated with lower annual rates of ischaemic stroke or systemic embolism (3.0% v 3.3%, respectively) compared with warfarin: hazard ratio 0.83 (95% confidence interval 0.69 to 0.99). The hazard ratios for dabigatran and apixaban (2.8% and 4.9% annually, respectively) were non-significant compared with warfarin. The annual risk of death was significantly lower with apixaban (5.2%) and dabigatran (2.7%) (0.65, 0.56 to 0.75 and 0.63, 0.48 to 0.82, respectively) compared with warfarin (8.5%), but not with rivaroxaban

---

[91] Larsen, et al., Comparative effectiveness and safety of non-vitamin K antagonist oral anticoagulants and warfarin in patients with atrial fibrillation: propensity weighted nationwide cohort study, *BMJ*, 2016:353:i3189.

(7.7%). For the combined endpoint of any bleeding, annual rates for apixaban (3.3%) and dabigatran (2.4%) were significantly lower than for warfarin (5.0%) (0.62, 0.51 to 0.74). Warfarin and rivaroxaban had comparable annual bleeding rates (5.3%).

112.    In a retrospective cohort study of first-time users by FDA's Office of

Surveillance and Epidemiology CDER FDA, David J. Graham, MD, MPH, et al.[92] comparing

risks of major extracranial bleeding (including major gastrointestinal bleeding) in patients with

atrial fibrillation taking rivaroxaban 20 mg once daily and dabigatran 150 mg twice daily,

treatment with Xarelto was associated with statistically significant increases in ICH and major

extracranial bleeding, including major gastrointestinal bleeding, as compared to dabigatran. The

study included a total of 52,240 dabigatran-treated patients and 66,651 rivaroxaban-treated

patients (15,524 and 20,199 person-years of on-treatment follow-up, respectively). A total of

2,537 primary outcome events occurred. The results of the study were as follows:

> Rivaroxaban use was associated with a statistically nonsignificant reduction in thromboemoblic stroke (HR, 0.81; 95% CI, 0.65-1.01; P=.07; AIRD = 2.3 excess cases/1000 person-years), statistically significant increases in ICH (HR, 1.65; 95% CI, 1.20-2.26; P=.002; AIRD = 2.3 excess cases/1000 person-years) and major extracranial bleeding (HR, 1.48; 95% CI, 1.32-1.67; P<.001; AIRD = 13.0 excess cases/1000 person-years), including major gastrointestinal bleeding (HR, 1.40; 95% CI, 1.23-1.59; P<.001; AIRD = 9.4 excess cases/1000 person-years), and with a statistically nonsignificant increase in mortality (HR, 1.15; 95% CI, 1.00-1.32; P =.051; AIRD − 3.1 excess cases/1000 person-years). In patients 75 years or older with CHADS$_2$ score greater than 2, rivaroxaban use was associated with significantly increased mortality compared with dabigatran use. The excess rate of ICH with rivaroxaban use exceeded its reduced rate of thromboembolic stroke.

113.    In a nationwide cohort study by Halvorsen, et al.[93] evaluating bleeding risk

in patients with atrial fibrillation prescribed dabigatran, rivaroxaban or apixaban compared to

warfarin, the risk of gastrointestinal bleeding was higher with rivaroxaban compared to warfarin.

---

[92] Graham, et al., Stroke, bleeding, and mortality risks in elderly medicare beneficiaries treated with dabigatran or rivaroxaban for nonvalvular atrial fibrillation, *JAMA*, 2016, doi:10.1001/jamainternmed.2016.5954.

[93] Halvorsen, et al., A nationwide registry study to compare bleeding rates in patients with atrial fibrillation being prescribed oral anticoagulants, *European Heart Journal*, 2016.

In addition, apixaban and dabigatran were associated with a lower risk of major or CRNM bleeding compared to warfarin. The study consisted of a total of 32,675 patients with atrial fibrillation: 11,427 warfarin patients; 7,925 dabigatran patients; 6,817 rivaroxaban patients; and 6,506 apixaban patients. The results of the study were as follows:

> After a median follow-up of 173 days (25[th]-75[th] percentile 84, 340), 2,081 (6.37%) patients experienced a first major or CRNM bleeding. Using a Cox proportional hazard model adjusting for baseline characteristics, use of apixaban (HR 0.70, 95% CI 0.61-0.80, P<0.001) and dabigatran (HR 0.74, 95% CI 0.66-0.84, P<0.001) were associated with a lower risk of major or CRNM bleeding compared to warfarin whereas use of rivaroxaban was not (HR: 1.05, 95% CI 0.95-1.17, P=0.400). Use of dabigatran and rivaroxaban were associated with higher risk for gastrointestinal bleeding, while use of apixaban and dabigatran were associated with lower risk for intracranial bleeding, compared to warfarin.

### B.  INRatio

114.    Due to issues concerning the reliability of the INRatio test that was utilized to titrate warfarin dosage levels in the treatment arm of the ROCKET trial,[94] FDA, among others, undertook a reanalysis of the ROCKET trial.

115.    FDA's Reanalysis of the ROCKET trial, while concluding that there was no change in the overall risk-benefit conclusion[95] of Xarelto, did find that the risk of major bleeding events increased 7 to 10% compared to the original ROCKET results.[96, 97]

---

[94] See Section XVI for a more detailed discussion of the chronology of events surrounding the INRatio device.

[95] According to the FDA Reviewers:

> FDA used two mathematical modeling approaches to estimate the clinical outcomes results that might have occurred in ROCKET if a more accurate INR assay had been used to guide warfarin dosing, i.e., one that reported results similar to the laboratory-based assay at Duke…
>
> Each of these analyses predicted a small decrease in the expected rate of major bleeding in the warfarin arm compared to the observed rate of 3.45 events per 100 patient years in ROCKET (reductions in the three models ranged from 7%-10% of the observed rate)….
>
> Overall, these estimated reductions in the rates of bleeding events in the warfarin arm were small enough so that the benefits of rivaroxaban would still outweigh its risks if efficacy were not affected. Notably, two of these three analyses also estimated the rate of ischemic stroke, and one estimated the rate of the primary efficacy endpoint of total stroke + systemic embolism. Both these

## C. Summary

116.     In my opinion, some observational data and the FDA's ROCKET Reanalysis support a conclusion that serious adverse events associated with Xarelto therapy include a significant risk of major bleeds relative to other oral anticoagulants. These findings further support the need of the manufacturer to identify a helpful laboratory test to minimize serious adverse events associated with the use of their product.

---

models predicted that the rate of ischemic stroke would be increased in the warfarin arm, resulting in an expected improvement of the efficacy of rivaroxaban relative to warfarin….

The information summarized above indicates that it is quite likely that patients in the warfarin arm of ROCKET unintentionally received higher doses of warfarin than they would have received if the INRatio device had provided results similar to those provided by the laboratory-based device at Duke. However, the effects of this increased intensity of anticoagulation on clinical outcomes were likely to have been quite modest. It seems very unlikely that if the device had performed similarly to the INR assessment device at Duke, the benefit/risk profile of rivaroxaban compared to warfarin would have been notably different from the profile based on the observed results of ROCKET. Accordingly, the conclusion we made in 2011 that the benefits of rivaroxaban in patients with non-valvular atrial fibrillation outweigh its risks should not be changed.

Recommendations: 1) No changes in rivaroxaban labeling to reflect the impact of use of the INRatio device in ROCKET are warranted. No other major regulatory action should be taken with respect to rivaroxaban. 2) Our conclusions regarding the issues addressed by this review should be communicated to the public in a suitable manner, but not through any changes in labeling.

In regard to the Reviewers' rationale for the recommendations, the FDA provided:

Accordingly, the reviewers see no need for regulatory action at this time. We think that a labeling change to describe the modeling results would very difficult to write in a concise manner and might be more likely to confuse than to edify, and is not warranted. FDA might make a brief announcement regarding our conclusions and make this review or a summary of it available to the public online. A publication of our analyses in a journal might be desirable. If others think it is important to change labeling, we might add a simple statement that FDA has reviewed the INR and outcomes information in ROCKET and determined that the effect of use of the INRatio device on outcomes in ROCKET was too small to affect our prior conclusion that the benefits of rivaroxban outweigh its risks relative to warfarin.

*See* FDA ROCKET AF Reanalysis Reviews, NDA 202439, Sept. 26, 2016, at pp. 1-3, 42.

[96] The 7 to 10% range in FDA's Reanalysis comes from FDA's results derived from multiple approaches utilized by FDA. (See FDA Reanalysis of ROCKET AF, at p. 2). *See also* Schedule 20 for Table 12 from FDA ROCKET AF Reanalysis Reviews.

[97] According to the expert report of Dr. B. Burt Gerstman, Professor of Epidemiology and Biostatistics at San Jose State University, who performed a similar analysis and found that the increase was statistically significant (RR: 1.12; 95% CI 1.04-1.21). It has always been my common practice to rely on other statisticians for statistical analysis.

## XVI.    THE USE OF INRATIO IN THE ROCKET CLINICAL TRIAL

117.    Xarelto sponsors utilized a Point-of-Care (POC) device in the ROCKET clinical trial that was subsequently recalled.[98]

118.    The Alere, formally known as HemoSense, INRatio INR Monitor POC device was used to monitor INR Levels in ROCKET patients.[99]

119.    On January 22, 2007, Janssen's Dr. William Byra circulated in an email to colleagues at Janssen an October 4, 2005 FDA Warning Letter sent to the manufacturer of the INRatio device stating: "Our review indicates that your firm has information indicating that INRatio devices were generating clinically significant erroneous values."[100]

120.    On October 17, 2007, Janssen's Dr. Christopher Nessel and colleagues received an email from Dr. Jonathan P. Paccini at DCRI, with the subject line "POC / SAE," stating:

> I received a number of helpline calls this morning regarding a ROCKET patient at site #11008 (PI Luten, SC Shannon Douglas).
>
> Apparently, this patient was warfarin naïve and was being titrated on study drug, when he presented with hematuria. His POC in the office was 2.9. Four hours later, he developed severe epistaxis which required hospitalization. He had an "unblinded" INR > 10. He received 4 units of FFP and IV vitamin K. ENT packed his nose and called me. I spoke with the ENT team, and helped them formulate a plan. I also asked them to keep the INR and other info to themselves due to the blind, but the study MD had already tracked down the information.
>
> The study PI, study coordinator, and family are very upset. The PI has concern that the POC device is defective, since there was a 7 unit different in the INR between the POC and serum assay within 4 hours. Apparently, they had a previous episode of what they considered "bad POC data," though on hearing the prior case, it sounded more like the usual travails of starting warfarin/study drug...[101]

---

[98] XARELTO_BHCP_07995641.

[99] XARELTO_BHCP_07995641.

[100] XARELTO_JANSSEN_04962074, 04962075.

[101] XARELTO_JANSSEN_03933641.

121.    This bleeding event was recorded in the patient's case file as a Serious Adverse Event by the investigator to be reviewed by the ROCKET Independent Data Monitoring Committee (IDMC), was reviewed by Jonathan Piccini, a member of the Executive Committee, on February 19, 2009, and was reported as a Serious Adverse Event to the FDA by the sponsor on July 14, 2009. These reports did not disclose evidence of device malfunction.[102,103]

122.    On October 19, 2007, Dr. Paccini sent another email to his colleagues at DCRI, which was then forwarded to Dr. Nessel and other Janssen colleagues, with a subject line of "Another POC problem," which stated:

> I just got off the phone with another troubling helpline call. Rhonda Olmstead (SC in Lincoln, NE – site #1028) called me regarding a patient with AF and diabetes who came into clinic on 10/17 with a POC INR of 1.7. The patient's warfarin was changed from 2 mg 5 days a week with 2.5 Tu/Th to a new regiment [sic] of 2.5 daily. 48 hours later the patient had an appt with his PCP for diabetes, etc. His PMD checked a lab INR and unfortunately communicated the result to the ROCKET cardiologist. The lab INR was >6 [~48 hrs after the POC]. The [sic] called because she thought the patient need [sic] to be treated as if he was formally unblinded. We reviewed the difference, but she remains concerned (as am I) about the INR discordance…[104]

123.    On October 29, 2007, Janssen's Catherine Vanden Boom sent an email to colleagues regarding "ROCKET – INR Draft Proposal" attaching two documents entitled "ROCKET INR Education" and "Covance INR QC Proposal DRAFT1."[105]

124.    The "ROCKET Proposal for QC Checks of HemoSense Device" stated:

> **Issue:** The ROCKET study lacks a mechanism to check the accuracy of the HemoSense device. Although rare, a few investigator sites have expressed concern regarding the accuracy of the Point of Care (POC)

---

[102] XARELTO_JANSSEN_00020831.

[103] XARELTO_JANSSEN_18681720 at XARELTO_JANSSEN_18681922.

[104] XARELTO_JANSSEN_11444538.

[105] XARELTO_JANSSEN_04961856.

device. In addition, the unblinded INR monitor could also request a QC check.

**Draft Proposal:** QC checks of the HemoSense device (i.e., concurrent INR testing) could be triggered by investigator (e.g., investigator contacts Parexel or the DCRI hotline) or by the unblinded monitor (UM). At this time, it is felt that a "random" surveillance of sites is not necessary since the device has been validated by the manufacturer and approved by the FDA. The site would be responsible for obtaining a blood sample for PT as well as the standard INR reading through the HemoSense device. The PT blood samples would then be shipped to Covance for analysis. The report would only be available to the unblinded monitor.[106]

125.    The "ROCKET Proposal for Additional Education on HemoSense Deivce," dated October 26, 2007, identified the issue as follows: "There is concern on the part of DCRI, Parexel and the investigator sites with the accuracy of the POC device. In addition, the unblinded monitor has suggested site education on the INR shamming."[107]

126.    On January 23, 2008, Janssen's Kimberly Schwabe sent an email to colleagues, including Drs. Byra and Nessel, regarding "ROCKET INVESTIGATOR 972022 SUBJECT #103804," which included the following email from Parexel's Daniel Smutek:

I have had a question from Israeli CRA this morning.

Q: The patient has a minor bleeding from mucosas and skin. The POC INR was 2.0 and then for some reason somebody (maybe other clinic) decided to perform unblinded INR which was 10.0.

A: The safest is to interrupt study drug temporarily, and put the patient on open label warfarin on LMWH for some time (or without anticoagulation on the discretion of the investigator)…[108]

---

[106] XARELTO_JANSSEN_04961857.

[107] XARELTO_JANSSEN_04961858.

[108] XARELTO_JANSSEN_07545439, p. 6.

127.    This bleeding event was recorded in the patient's case file as a Serious Adverse Event by the investigator to be reviewed by the ROCKET Independent Data Monitoring Committee (IDMC), was first reviewed by a member of the Executive Committee on February 13, 2009, and was submitted to the FDA as a Suspect Adverse Reaction Report on March 12, 2008. These reports did not disclose evidence of device malfunction.[109, 110]

128.    On January 28, 2008, Dr. Byra sent an email to Bernard Chalecki, the unblinded INR monitor for ROCKET, regarding "FW: RocketAF_090003_104237_SAE," which forwarded the following conversation between Sunerli Hande and Zuzana Capkova:

> Patient 104237 visited the emergency room of Yesilyurt Hospital yesterday evening they had tested the INR and the result was: **6.66**.
> Then the doctors of that hospital forwarded the patient to our site, this morning before our investigators notice of the event they had performed another INR test and the result was: **6.28**.
> Then PI called and informed me and I had advised him to perform blinded INR test and the result was: **1.7**.
>
> So PI got confused because of the huge difference of the test results.
> For now I had told PI to hold on the study drug for at least one day according to your advice.
> I am waiting your feedback for further actions.[111]

129.    This event of discrepant INRs was not reported as a Serious Adverse Event in the study, though the relevant hospitalization was recorded in the patient's case file by the investigator and submitted to the FDA as a Suspect Adverse Reaction Report on March 12, 2008. These reports did not disclose evidence of device malfunction.[112,113]

---

[109] XARELTO_JANSSEN_00019462.

[110] XARELTO_JANSSEN_07233841, at XARELTO_JANSSEN_18681895.

[111] XARELTO_JANSSEN_14557758 at p. 3.

[112] XARELTO_JANSSEN_00020185.

[113] XARELTO_JANSSEN_07234059, at XARELTO_JANSSEN_18681902.

130.     In a letter to ROCKET investigators dated February 21, 2008, Dr. Nessel

explained a new procedure involving a "special kit for collecting single samples for a SPECIAL

BLINDED INR" that was "designed to assist investigators who believe that a subject's INR

values obtained with the HemoSense point of care (POC) device are greatly different from what

was expected."[114]

131.     The letter further instructed investigators to "collect venous blood in the tub

provided and…send the frozen specimen…to Covance in the container provided. Perform a POC

INR reading at the same time so that a comparison can be made…The unblinded INR monitor

for the ROCKET study will receive the results and the site will be contacted."[115]

132.     Regarding this new program, Dr. Nessel testified as follows:

> Q.     So, sir, you – but you understand, sir, that one – you sent out the letter in
> Feb. 8, 2008, to every site around the country, around the world, because you
> know they had concerns about the accuracy of this device. And you set up a whole
> special separate program where Bud Chalecki [the unblinded INR monitor]
> would get sent the results of the CoVance unblinded lab samples. You know about
> that, don't you?
> …
> Sir?
> …
> A.     So there were rare and isolated questions brought to the attention of the
> sponsor about the performance of the device. The sponsor proactively put in
> measures. We called it the CoVance recheck system where patients who presented
> at an office clinic would have a point-of-care INR test done and then a laboratory
> test done and sent to CoVance central laboratories.[116]

133.     Janssen's Dr. Peter DiBattiste testified regarding the Covance Recheck Program

as follows:

> Q.     But the principal reason was to enact -- to use this program whenever the
> POC generated a result that was greatly different from what was expected?

---

[114] XARELTO_JANSSEN_07050218.

[115] XARELTO_JANSSEN_07050218.

[116] Deposition of Dr. Christopher Nessel, Feb. 16, 2016, 169:4-170:9.

*A.      Yeah. My understanding is, as we have discussed, that it was put in place to -- to -- as part of the investigation that we referred to in prior documents, to provide an opportunity for investigators when they suspected that they might have a result that they didn't think was accurate, to validate it.[117]*

134.    Janssen's Dr. William Byra testified regarding the Covance Recheck Program as follows:

*Q.      As of February 2008, this was available for any investigator or any monitor that had any issue or any question about one of these 320,000 lab tests that were taken; is that right?*

*A.      Yes.*

*Q.      All right. Before February of 2008, if an investigator had a question about an INR reading or test, what was their procedure to follow?*

*A.      If there was a question we would – we would discuss it with them, and then I would notify Mr. Chalecki of the issue and – and see if he could, just from looking at it, determine what was going on. And if we couldn't, we at that point would send a new device to the investigator.*

*Q.      The procedure was formalized as of February 2008?*

*A.      Yes.*

*Q.      Okay.*
*...*

*Q.      Mr. Chalecki had access to the actual lab value as well as the point-of-care reading; is that right?*

*A.      That's correct. He could, you know, check it just by – go on his computer and check the lab value.*

*Q.      He was unblinded. He knew whether a patient was taking warfarin or whether a patient was receiving rivaroxaban?*

*A.      Yes.[118]*

---

[117] Deposition of Dr. Peter DiBattiste, April 12, 2016, 217:16-218:8.

[118] Deposition of Dr. William Byra, April 6, 2016, 742:19-745:19.

135.    Dr. DiBattiste testified as follows:

> Q.    Well, what was the protocol -- and we'll get into the CoVance recheck program more, but what was the -- so if -- if Mr. Chalecki saw a paired sample and he saw that the lab INR was three units higher than the device INR, what was he supposed to do? How -- how does one address that issue -- that circumstance?
>
> A.    My understanding -- so -- so you are talking specifically about the CoVance program?
>
> Q.    Yes, sir.
>
> A.    So my understanding was that he needed to get back to the site and let them know that the results were either generally consistent or inconsistent, in which case they would be encouraged, I believe, to -- to recheck the value.[119]

136.    Dr. Nessel further testified:

> Q.    Okay. And that secondly, with respect to the CoVance recheck program, with respect to the CoVance recheck program –
>
> A.    Yeah.
>
> Q.    Where Mr. Chalecki would have access to split samples, one – one analyzed by a central lab CoVance and the other analyzed by the INRatio device, correct?
>
> A.    Yes.
>
> Q.    How – how many times was that conducted?
>
> A.    A hundred and – about 140.[120]

137.    On March 14, 2011, FDA's Alison Blaus sent an email to Janssen's Alla Rhoge and Sanjay Jalota, with a subject line of "NDA 202439 – Clinical IR" that stated a number of requests regarding the INRatio device in ROCKET, including "any available information on the performance characteristics of the device(s) beyond the information found in labeling."[121]

---

[119] Deposition of Dr. Peter DiBattiste, April 12, 2016, 194:2-20.

[120] Deposition of Dr. Christopher Nessel, February 16, 2016, 218:24-219:13.

[121] XARELTO_JANSSEN_04932509.

138.     Regarding that request on March 14, 2011, Dr. Byra testified as follows:

> Q.     *[You] didn't provide the CoVance recheck program in response to that e-mail, right?*
>
> A.     *No.*[122]

139.     The INRatio device was subject to an FDA Class I recall on December 5, 2014, which stated: "The Alere INRatio Monitor System may provide an INR result that is lower than expected result [sic] obtained using a laboratory INR method."[123]

140.     In a report dated February 5, 2016, the  EMA stated that "on September 9, 2015,[124] [Janssen Research & Development, LLC] became aware through a 3rd party that the recall notice of the Alere INRatio device might be applicable to the HemoSense INRatio devices used in the ROCKET AF trial program as well…[The sponsors] informed the respective Health Authorities per local regulations and practices in their respective territories…in parallel, as soon as the applicability of the device recall was confirmed by Alere."[125]

141.     EMA subsequently investigated the impact of the INRatio device on the ROCKET trial, and requested additional analyses from the sponsor.[126]

142.     In its assessment report, EMA stated:

> The preliminary data provided on INR values estimated simultaneously on weeks 12 and 24 with the two methods (POC device vs. laboratory testing) indicate that discrepancies of potential clinical relevance were rather frequently observed (approximately in 35% of the estimations).

---

[122] Deposition of Dr. William Byra, April 5, 2016, 335:11-14.

[123] FDA Class I Recall Notice, "Alere San Diego, Inc., Alere INRatio and INRatio2 PT/INR Monitor System (Professional and Prescription Home Use) – Falsely Low INR Test Results," dated Dec. 5, 2014.

[124] However, Janssen internal documents indicate that Alla Rhoge, Associate Direct, Regulatory Leader, received an email pertaining to the Alere INRatio recall in December 2014. *See, e.g.,* XARELTO_JANSSEN_14522268.

[125] EMA CHMP Assessment report dated 5 February 2016, pp. 5-6. It is my understanding that when the sponsors purchased the INRatio devices and testing strips for use in ROCKET, HemoSense Inc. was the manufacturer, but was subsequently purchased by a company now known as Alere.

[126] EMA CHMP Assessment report dated 5 February 2016, p. 3.

The majority of these discrepancies were related to a lower device INR value compared with Lab INRs. Cross tabulations are requested for the number of test results with Lab INR vs. POC INR for the following four categories: INR<2, 2-3, >3-4 and > 4.[127]

143.     The EMA assessment report presented the following information[128]:

**Table 1: TSIINR23ZYa:** Cross Tabulation of Lab INR vs Device Based INR at Week 12 for Warfarin Subjects
(Study 39039039AFL3001:   Safety Analysis Set)
Visit Name: WEEK 12

| | --- Lab INR --- | | | | |
| | <2 | 2 - 3 | >3 - 4 | >4 | Total |
| | n (%) | n (%) | n (%) | n (%) | n (%) |
|---|---|---|---|---|---|
| **Device INR** | 1356 (23.5) | 2405 (41.7) | 1238 (21.5) | 767 (13.3) | 5766 (100) |
| <2 | 1239 (21.5) | 604 (10.5) | 54 ( 0.9) | 47 ( 0.8) | 1944 (33.7) |
| 2 – 3 | 96 ( 1.7) | 1740 (30.2) | 793 (13.8) | 172 ( 3.0) | 2801 (48.6) |
| >3 – 4 | 8 ( 0.1) | 50 ( 0.9) | 358 ( 6.2) | 291 ( 5.0) | 707 (12.3) |
| >4 | 13 ( 0.2) | 11 ( 0.2) | 33 ( 0.6) | 257 ( 4.5) | 314 ( 5.4) |

Note: Percentages calculated with the total number of subjects.

144.     The EMA assessment report concluded:

The manufacturer of the point of care INR device (Alere Inc.TM) has identified that the device in certain clinical conditions gave inappropriately low INR values. The device was used for titration of the warfarin doses in the rocket AF study. The MAH of Xarelto was requested to provide clarification and further information in order to assess the potential impact on the pivotal Rocket AF study results supporting the indication for rivaroxaban in the prevention of thromboembolism in non-valvular atrial fibrillation (The "Rocket AF" study). All requested analyses have been provided.

The inappropriately low INR values observed with the device as indicated in the device correction notice of Alere were in some instances reported to be clinically relevant leading to increases of anti-vitamin K agents with resulting increased bleeding tendency. Thus it was considered relevant to further investigate the impact of potentially inaccurate device INR estimations, that could have had on the study results. A major concern would be that the described deficiencies could lead to an increased bleeding rate in the control arm of the trial (warfarin) which would potentially hamper the interpretations of the

---

[127] EMA CHMP Assessment report dated 5 February 2016, p. 21.

[128] EMA CHMP Assessment report dated 5 February 2016, p. 28.

differences between treatment arms. The investigations performed and possible conclusions that can be made from them are summarised below[.]

Numerous extensive sensitivity analyses have been performed in order to estimate the potential impact on the study outcome.

The MAH initially performed three sensitivity analyses were based on the information provided by the INR device manufacturer (Alere) and taking both chronic and acute clinical conditions into account. Patients who were judged to have had any recall related clinical condition ahead of any endpoint event are excluded in the second of these sensitivity analyses which resulted in an exclusion of approximately 31% of the patients. The first and third sensitivity analyses are focussing [sic] on the time periods when such events occurred and fewer patients are excluded in these analyses. In all three analyses minor changes in the hazard ratios between the rivaroxaban and warfarin study arms were observed as compared to the original analyses. For the sensitivity Analysis 2 considered to be the most conservative analysis of the three analyses provided, warfarin was almost nominally statistically significantly better than rivaroxaban for the principal safety endpoint, major or clinically relevant bleedings (p = 0.092, HR: 1.08 (CI: 0.99, 1.17)).

As can be seen in Table 2, the pattern of bleeding components was different between rivaroxaban and warfarin with death due to bleeding, critical organ bleeding and intracranial haemorrhage being nominally in favor of rivaroxaban. This differential pattern remained unchanged in the sensitivity analyses cited above. (table 8). There was no indication that the most serious bleeding events on warfarin were related to recall related clinical conditions or events.

There are uncertainties related to the sensitivity analyses above discussed. In particular the available information is probably somewhat limited e.g. fibrinogen levels have not been measured regularly and is rarely measured in clinical routine. The analyses were based on the assumption that INR values are only affected in case of recall related conditions. This issue was addressed by additional analyses.

In a second step, these additional sensitivity analyses were provided upon request from CHMP. These analyses were focussing [sic] on the paired samples that were taken simultaneously at weeks 12 and 24 of the trial. In addition to the Alere device estimated INR, a laboratory prothrombin time measurement was made. The primary intention of this exercise was to evaluate the potential impact of rivaroxaban on prothrombin time during the Rocket AF trial. In retrospect, however, in view of the INR device issue under discussion, an INR ratio could be

calculated allowing comparisons of the INR values as estimated by the two methods. (INR device and INR laboratory values calculated from the two sampling time points at week 12 and week 24).

The MAH has, as requested, provided Bland-Altman plots comparing the estimations made by the two methods (INR device and INR calculation based on the laboratory values). From visual impression of the Bland-Altman plots, it indicates that the majority of discrepancies were related to lower device based INR value as compared to the Lab INR value. This was also further elucidated when looking at the cross tabulations made based on clinically relevant INR categories which showed that 34% (1961 out of 5766) of the measurements has a lower device INR compared with lab INR (discordant values).The reverse, that the device INR was higher compared with the Lab INR, was observed in only 4% of the measurements (discordant values). However, consistency,( i.e. that the measurements fell in the same INR category), was observed in 62% of the instances ( concordance), The subjects with and without concordance whether further investigated to explore the impact of the device values. The principal safety endpoint event rates for subjects with and without concordance at Week 12 and at Week 24 were dissimilar (12.9/100 pt-yrs vs 14.0/100 pts-yrs, and 12.6/100 pt-yrs vs 13.6/100 pts-yrs, respectively), although closer with and without concordance at both week 12 & 24 (12.2/100 pt-yrs vs 12.9/100 pts-yrs, respectively). Based on these analyses modified event rates in the warfarin arm were calculated and compared with the observed event rates in the rivaroxaban arm. The impact on the originally reported Hazard Rate Ratios was small as seen in table 8.

Theoretically, the differences observed could, on group level, depend on higher warfarin doses than necessarily needed in patients with discrepancy. However, the differences above discussed are rather small, and when taking also efficacy data in these analyses into account it appears reasonable to conclude that the characteristics and risks in these non-randomised groups differ from the overall study population. This is further supported by the additional analyses provided by the MAH where a very similar pattern for the safety end-points is observed in the rivaroxaban patients and where doses were not adjusted. Furthermore, when looking at the patients who have no paired samples it becomes even more apparent that the sensitivity analyses reflect subsets of patients that are not representative for the over-all study population.

The CHMP acknowledges that there are also limitations related to the above analyses as they only represent two specific time points during treatment approximately 11.000 out of 160.000 INR measurements which were performed during the study.

A single lab INR cannot be regarded as a true "golden standard". However, there is since long an awareness of the important influence different thromboplastins with different sensitivity have on the size of the prothrombin time prolongation. The INR calculations compensate for these differences. Among the frequently used routine coagulation tests laboratory INR testing is probably one of the best standardised methodologies. Point of care devices for INR estimations are generally speaking probably somewhat less well standardized however, they have important feasibility advantages together with sufficient reliability which could justify their use preferable in clinical studies or in clinical routine for individual patients. There is also available extensive external evidence, important to take into consideration when evaluating the bleeding events in the Rocket AF trials. The incidences and the characteristics of bleedings induced by rivaroxaban in comparison with warfarin were characterised in other large clinical trials supportive of the indication for secondary prevention of DVT/PE. The Alere INR device was not used in these studies. When looking at the characteristics of the study populations in the DVT/PE prevention studies and the doses of rivaroxaban used , they are rather similar to the Rocket AF trial. The targeted INR was also identical. Therefore, the DVT/PE prevention studies are considered relevant for external validation purposes. It can be noted that in the pooled analyses of the DVT and PE studies, the major and clinically relevant bleedings were numerically fewer and major bleedings significantly fewer in the rivaroxaban arm (HR 0.93, 95% CI 0.81;1.06 and HR 0.55, CI 0.34, 0,79, respectively). The bleeding characteristics were similar to those observed in the Rocket AF trial.

The bleeding rates and the bleeding characteristics in the warfarin arm in the Rocket trial is also within the expected range as the one described in the literature. Furthermore the analyses of the components of the primary safety endpoint, critical organ bleeding, fatal bleeding, ICH, clearly favoured the rivaroxaban group as did all-cause mortality. These differences remained largely unaffected in the sensitivity analyses performed and taking also the size of the differences into account they are considered to be robust. They are also consistent with the bleeding pattern seen for the other available oral Xa-inhibitors.

The conclusions derived from the Rocket AF trial are supported by the performed sensitivity analyses and by external evidence from large trials in other therapeutic areas comparing the efficacy and safety of rivaroxaban vs warfarin. The incidence of major and clinically relevant bleedings among the warfarin treated patients in the Rocket AF trial compares also well with the bleeding incidences observed in recently performed trials in AF populations. Incidences of major bleedings in

warfarin arms in the dabigatran, apixaban and edoxaban pivotal trials in atrial fibrillation were 3.6, 3.1 and 3.4%, respectively, as compared to 3.5% in the Rocket AF trial.

It is agreed with the MAH that further analyses are not expected to provide additional information of substantial value.

In conclusion, the CHMP considered that there is sufficient evidence to conclude that the benefit/risk balance remains unchanged and favourable for treatment with rivaroxaban in the prevention of thromboembolism in non-valvular atrial fibrillation.

The CHMP also considered that the information provided in the SmPC is currently appropriate and does not warrant any amendment. The modified calculated INR values discussed in this report should be viewed as informative for the assessment of the INR values provided by the faulty device. Taking into account the extent of the potential impact of the modified INR values and the limitations of the post hoc sensitivity analyses, it is considered that an update in the SmPC section 5.1 is not relevant and would provide more confusion to the prescriber.[129]

145.   In a ROCKET Task Force meeting on September 22, 2015, Bayer's Dr. Berkowitz referred to the sensitivity analyses submitted to EMA as "fishing expeditions" that hold "almost no weight" and "can easily be turned to say what one does or does not want to hear."[130]

146.   Correspondences between the sponsors and FDA occurred concerning the FDA and the sponsors' investigations into the impact of the malfunction in the ROCKET trial, with the sponsor's responses submitted on the follow dates: September 29, 2015; October 15, 2015; November 16, 2015; December 14, 2015; December 21, 2015; December 23, 2015; January 21,

---

[129] EMA CHMP Assessment report dated 5 February 2016, pp. 38-41.

[130] XARELTO_BHCP_07993872.

2016; February 1, 2016; February 5, 2016; March 7, 2016; March 22, 2016; April 1, 2016; April 18, 2016; May 6, 2016; and May 13, 2016.[131]

147.    As part of IND 75238, on January 12, 2016, FDA's Dr. Norman L. Stockbridge, Director, Division of Cardiovascular & Renal Products, Office of Drug Evaluation I, CDER, submitted an Information Request to Janssen's Purve Patel, Director, Global Regulatory Affairs, that referred to Janssen's IND for Xarelto and to "amendments dated 29 September, 15 October, 16 November, and 14 December 2015."[132]

148.    FDA noted that those amendment submissions "contained information related to the potential impact of the recall of the Alere INRatio Monitor System, which was the Point of Care (POC) Device utilized to measure INR in the Phase 3 ROCKET-AF study. The submission also contained various sensitivity analyses conducted by you [Janssen] as well as those requested by the European Medicines Agency (EMA)."[133]

149.    The Information Request further stated, "Upon review of the above submissions, we have the following comments and requests for additional information. Please note that these requests are not clinical hold issues. However, response to them is requested."[134]

150.    The first request included in the January 12, 2016 Information Request was as follows: "1. Please provide reports of any serious adverse event reports mentioning the INRatio device in ROCKET-AF." [135]

151.    Regarding that request, Dr. DiBattiste testified as follows:

---

[131] XARELTO_JANSSEN_24277161 at p. 3.

[132] XARELTO_JANSSEN_18501728, p. 1.

[133] XARELTO_JANSSEN_18501728, p. 1.

[134] XARELTO_JANSSEN_18501728, p. 1.

[135] XARELTO_JANSSEN_18501728, p. 1.

> *Q.      You said you were made aware that there were some patients around whom concerns existed and that there were adverse bleeding events. Would you agree that those are exactly the type of situations in patients that the FDA was seeking information about in their January 12, 2016, information request?*
>
> *A.      Possibly.*[136]

152.    On February 5, 2016, in response to that first FDA information request dated

January 12, 2016, the sponsors stated the following:

> There are 7,518 SAEs in the Bayer Global Pharmacovigilance Safety Database for the ROCKET AF Study. Janssen Global Medical Safety Data Analysis Group performed a search and identified 69 of the 7,518 (0.9%) SAE cases in which the narrative contained any of the following keywords:
>
> * Hemosense
> * INRatio
> * Point of care
> * POC
> * Device[137]

153.    Regarding the particular incident discussed in paragraphs 120-121,[138] Dr.

DiBattiste testified:

> *Q.      You would agree with me that's pretty much exactly what the FDA was asking for, right?*
>
> *A.      That's the topic.*
> *...*
>
> *Q.      Separate and apart from this being an adverse event report, you agree that this type of information, this narrative, is exactly the type of information that the FDA was asking for on January 12, 2016, when they were conducting their investigation into this topic?*
>
> *A.      I would say that if this were in an adverse event report, then I would say that the answer to that is yes.*[139]

---

[136] Deposition of Dr. Peter DiBattiste, April 12, 2016, 162:2-10.

[137] XARELTO_JANSSEN_16397478, p. 3.

[138] *See* XARELTO_JANSSEN_03933641.

154.    The above response did not include the four instances of suspected device malfunction discussed above in paragraphs 120-129.

155.    The January 12, 2016 FDA Information Request also included the following request:

> 5. Please provide a summary report of information collected by the unblinded physician, if available and elaborate on the role and responsibilities of the unblinded physician that monitored the warfarin patients. Please explain whether the unblinded physician had access to the laboratory-based INR determination performed as part of the PK-PD substudy in ROCKET-AF and when.[140]

156.    On February 5, 2016, in response to that FDA information request dated January 12, 2016, the sponsors stated the following:

> The ROCKET AF study utilized an unblinded INR monitor (Bernard Chalecki)…His primary responsibility on the ROCKET AF study was to monitor trends among POC device INR values and to identify any overt aberrations (e.g., persistently high INRs)…Mr. Chalecki would have the ability to contact either the investigator or the Sponsor's medical monitor to discuss (in a blinded manner) any concerns about the INR. Likewise, the Sponsor's medical monitor could contact the unblinded INR monitor.
>
> At his discretion, the unblinded INR monitor had the ability to contact an unblinded physician, Dr. Stephanie Perry, a hematologist from Duke University Medical Center…She was available on an as needed basis to discuss issues about INRs…Finally, the unblinded physician did not have access to the laboratory-based INR determinations performed as part of the PK-PD substudy in ROCKET-AF.[141]

157.    Regarding the sponsor's above response to the FDA Information Request, Dr. Nessel testified as follows:

---

[139] Deposition of Dr. Peter DiBattiste, April 12, 2016, 165:8-166:16.

[140] XARELTO_JANSSEN_18501728, p. 1.

[141] XARELTO_JANSSEN_16397478, p. 7-8.

> Q.     Sir, do you believe that this response, the FDA information request, with respect to the roles and responsibilities of Mr. Chalecki, is full and complete?
>
> A.     Well --
>
> Q.     Either you do or you don't.
>
> A.     Let me put a finer point on it. A summary of the report of information, the roles and responsibilities, so yes, it is a full and complete report of the roles and responsibilities of the unblinded physician.
>          It is a full and complete explanation or answer to whether the physician had access to unblinded INR determinations, performed as part of the PK-PD substudy. It is an accurate response to the FDA's question.
>
> Q.     Is it true that one of the roles and responsibilities of Mr. Chalecki was to compare INR values generated by the INRatio device with split samples analyzed by other methods?
>
> A.     That was part of his --
>
> Q.     Responsibilities?
>
> A.     -- responsibilities, yes.
>
> Q.     So then why is that responsibility not included in this information request, sir?
>
> A.     I believe it is subsumed in -- his primary responsibility, it stated, on the ROCKET-AF study was to monitor trends, et cetera.[142]
> …
> Q.     The CoVance recheck fell under the rubric -- the roles and responsibilities of Mr. Chalecki, correct?
>
> A.     Yes.[143]

158.    This response does not mention the unblinded monitor's role and responsibility with respect to the Covance recheck program, specifically. As noted above in paragraphs 130-136, Mr. Chalecki had access to both the POC and lab values for the samples taken per the Covance Recheck Program instructions.

---

[142] Deposition of Dr. Christopher Nessel, Feb. 16, 2016, 167:13-169:3.

[143] Deposition of Dr. Christopher Nessel, Feb. 16, 2016, 173:18-22.

159.    Further, in response to FDA's January 12, 2016 Information Request, specifically request number five (5), the sponsors did not provide a summary report of information collected by the unblinded physician, if available.

160.    Janssen's Dr. Byra created a spreadsheet[144] containing, among other data, the following information regarding patients enrolled in the ROCKET trial:

  a.  Patient 104078, on June 19, 2008, "[s]ome discrepancy."

  b.  Patient 104078, on July 3, 2008, "INRs are discrepant by 1. Site to receive new devices and strips."

  c.  Patient 106080, on August 13, 2008, "[b]linded INR not consistent with HemoSense."

  d.  Patient 110000, on October 23, 2008, "[d]iscrepancy exists, but the subject still within target range."

  e.  Patient 102310, on February 27, 2008, "INR high from Covance replace machines."

  f.  Patient 113483, on March 12, 2009, "INR higher than expected and subject may be taking exogenous warfarin."

  g.  Patient 111178, on July 28, 2009, "INRs discrepant."

  h.  Patient 108508, on April 23, 2009, "blinded INR higher (2.0) than POC device."

  i.  Patient 112708, on May 15, 2009, "INR discrepant with POC."

---

[144] *See* Deposition of Dr. William Byra, Apr. 6, 2016, 744:16-24:

*Q. What is Exhibit 51?*

*A. This is a spreadsheet that I – I kept when we started the CoVance recheck system.*

*Q. Who prepared Exhibit 51?*

*A. I did.*

*Q. Are the comments and the notes yours in Exhibit 51?*

*A. Yes.*

j.  Patient 106355, on February 8, 2010, "INR is 2 units higher than POC."[145]

161.  The information cited in the prior paragraph was provided to Dr. Byra by Mr.

Chalecki, the unblinded monitor. Dr. Byra testified as follows:

> Q.      And I think we've talked about the 340,000 INRs that were taken during
> the course of the study. And was it Mr. Galecki's responsibility to review all of
> those INRs?
>
> A.      Chalecki.
>
> Q.      Chalecki. I'm sorry.
>
> A.      He would look at them. And, again, there weren't 340,000 all in one day.
> But he would go down the -- his spreadsheet that he created and would call if
> there were anything unusual that he would see.[146]
> …
>
> Q. The comments in the far right-hand corner of the document [Exhibit Byra 51,
> XARELTO_JANSSEN_18512019], where do those comments come from?
>
> A. It was -- the comments came from either e-mails or conversations from Mr.
> Chalecki or whatever was the final outcome of -- that's this particular sample
> and what was done with it.[147]

162.  According to Dr. DiBattiste, the sponsor did not provide the information

referenced in paragraph 160 to the FDA:

> Q.      And how about the data generated as part of that program? When, if
> ever, was that communicated to the FDA?
>
> A.      Never. We haven't seen it yet. And, in fact, it hasn't been formally
> transferred to us from CoVance yet after all the quality checks.
>          So -- so I would say never.

---

[145] XARELTO_JANSSEN_18512019

[146] Deposition of Dr. William Byra, April 6, 2016, 636:16-637:4.

[147] Deposition of Dr. William Byra, April 6, 2016, 745:1-8.

*Q.     Okay. Both Dr. Byra and Dr. Nessel testified that they had seen -- they had a spreadsheet of the 140-some-odd instances it was used, and they reported that discrepancies were observed, I think 14 -- 14 -- in 14 instances.*

*A.     Right. So --*

*Q.     Does that sound familiar?*

*A.     Well, it sounds somewhat familiar, but I can tell you that we are getting the formal quality control results from CoVance, but we don't have them yet.*
*So what they have is, I guess, case-by-case reporting from -- from Bud [Chalecki]. But -- but I think that the full dataset, again, because the program did not uncover anything that we thought was material to the results of the trial, or apparently even mentioned here is --[148]*

163.    Federal law and FDA policy emphasize the importance of applicants not omitting

any material fact in submissions to FDA (see FDA's Application Integrity Policy and 18 US

Code 1001).

164.    On March 7, 2016, Janssen's Ms. Patel sent a letter to FDA's Dr. Stockbridge

regarding INRatio, which she stated the following:

> A number of lawsuits have been filed in federal court by plaintiffs' lawyers against Janssen Pharmaceuticals, Inc. and Janssen Research & Development, LLC (collectively, "Janssen") and Bayer Healthcare Pharmaceuticals Inc. and Bayer Pharma AG (collectively, "Bayer"), alleging that their clients have experienced bleeding events due to ingestion of the anticoagulant medicine, XARELTO®. As part of that litigation, as is now customary, over 50 million pages of internal e-mails, study and regulatory documents have been produced. These plaintiffs' lawyers have requested permission from the Court to provide certain internal Janssen and Bayer documents, including internal communications among colleagues relating to INR monitoring in the ROCKET AF study, to the Agency. For transparency, enclosed are the documents that the plaintiffs' lawyers have petitioned to share with the Agency.
>
> …
>
> The documents at issue consist of the following:
>
> 1. Janssen and Bayer internal communications discussing INR issues (Attachments 2-7)

---

[148] Deposition of Dr. Peter DiBattiste, April 12, 2016, 157:51-159:2.

These communications reflect contemporaneous e-mail discussions at Janssen and Bayer regarding consideration of INR issues when they arose.

…

2. Covance Recheck Program in ROCKET AF (Attachments 8-9)

The Covance Recheck Program in ROCKET was an external comparison on the INR levels from the POC device to standard laboratory-based assessments. It was implemented to give assurance to investigators who had not used a POC device before that the INR level readings were corrected by re-checking them at a lab (Covance). All investigators had access to the program and were so notified in a letter (Attachment 9). The program was instituted in response to questions that were received from investigators who were accustomed to getting INRs from the labs.

There were 142 inquiries from investigators who availed themselves of the recheck program in a study of more than 14,000 patients over three years. Most of the time, the values from the POC device and the lab re-check were consistent. There were just 16 instances identified from the 142 inquiries where the value from the POC device and lab were recorded as inconsistent. There were also instances where the device appeared to not be working or the investigator got an error message. Those patients went to the lab and the unblinded monitor provided the necessary code for the dose adjustment. On a few occasions, sites were sent raw devices.

3.   Internal Emails Discussing Adverse Events During Study (Attachments 10-16)

In accordance with the Agency's reporting requirements, adverse event reports were submitted in connection with the ROCKET AF study. Of the documents at issue, three involved serious adverse events (Attachments 11, 12 and 15), all of which were reported (CIOMS attached). In addition, Attachment 15 was also included as a narrative in the Clinical Study Report for the ROCKET study…Moreover, Janssen specifically addressed the question of serious adverse events mentioning the INRatio device posed in FDA's Information Request from January 12, 2016 and provided the corresponding CIOMS reports in its February 5, 2016 submission.

Many of these communications do not involve incidents that fit within the definition of adverse events under the federal regulations;

72

> thus, they have not previously been submitted to the Agency (Attachments 10, 13, 14 and 16). These discussions address potential discrepancies with the monitoring device or other issues…
>
> …
>
> 4. Emails About the HemoSense Warning Letters and Alere Recall (Attachments 18-20)
>
> …
>
> 5. "Helpline and HemoSense Update" (Attachments 21 and 22)[149]

165.    In a presentation dated March 23, 2016, FDA Center for Devices and Radiological Health, in analyzing the performance of the INRatio device in ROCKET, stated that "discrepant low values that might cause a warfarin increase occurred at an alarming rate in the ROCKET AF trial."[150]

166.    On April 4, 2016, FDA's Dr. Stockbridge sent an Information Request letter to Janssen's Ms. Patel, which stated:

> [W]e make reference to your 18 March 2011 submission to NDA 202439 that responded to our 14 March 2011 information request during the NDA review of the ROCKET AF trial.
>
> We have the following comments and requests for additional information…
>
> > 1. Please describe the purpose of the Covance Recheck Program in the ROCKET AF trial. Please describe how it operated and provide any trial documents describing its operations. Please provide all data collected by the Covance Recheck Program as well as analyses of these data performed by you or by others on your behalf. Please describe all entities with access to data or analyses based on data from the Covance Recheck Program. In particular please indicate if the data and/analyses [sic] were

---

[149] XARELTO_JANSSEN_18681716.

[150] ALRX_00001447.

provided to the ROCKET AF Data Monitoring Committee and/or any members of the Executive Committee.[151]

167.    On April 18, 2016, the sponsor submitted its "Response to FDA Request for Information Regarding the Alere INRatio Monitor System Recall" that stated the following in response to the above detailed request:

> The Covance Recheck Program (hereafter Program) served several purposes. During the conduct of the ROCKET AF study, it became apparent that investigators who were accustomed to prescribing warfarin may be uncomfortable when blinded to both the treatment assignment (i.e., rivaroxaban or warfarin) and the actual INR. By "checking" the INR and speaking to the Sponsor or a Helpline clinician, the Program could provide reassurance to these investigators. Further, the Sponsor became aware of rare and isolated incidents of clinically unexpected INR values rendered by the point-of-care device. The Sponsor investigated these matters and, although for most cases investigated, problems other than device performance were identified, realized that it would be desirable to create a mechanism that would provide non-random checks of point-of-care device values via a central laboratory. Importantly, however, this had to be accomplished while maintaining the integrity of the study blind.
>
> …
>
> The results of both tests (i.e., point-of-care and central laboratory) were reported only to Mr. Bernard Chalecki, the unblinded INR monitor. The unblinded monitor would compare the results and advise the Sponsor's study responsible physician and/or the enrolling site (See Attachment 1- "Blinded INRs from Covance as of June 4, 2010"). To maintain the study blind, the unblinded INR monitor would only provide general information about the results, depending upon the value returned by Covance, the value generated by the POC device and the treatment to which the subject was assigned…
>
> …
>
> Covance received a total of 149 samples (rivaroxaban - 78; warfarin - 71). There were 136 INRs (rivaroxaban - 73; warfarin - 63) performed for 131 unique subjects (rivaroxaban - 71; warfarin - 60). Of the 136 samples run, 53 were solely for the purpose of obtaining an INR (See below and Attachment 2 Data Outputs, Tables 1, 2). Of the remaining

---

[151] XARELTO_JANSSEN_22661447.

83 samples, 55 Covance INRs were concordant with the result from the device (See Attachment 2 Data Outputs, Tables 3, 4);
19 were not concordant (See Attachment 2 Data Outputs, Tables 5, 6). To be consistent with previous analyses, the ISO acceptance criteria were used to ascertain concordance between the Covance and point-of-care INR values…

…

During the conduct of the study, only the unblinded INR monitor had access to the data generated by the Program. The data from the Program were not disclosed to the trial's Independent Data Monitoring Committee or any members of the Executive Committee. No formal analyses of the data were planned during the conduct of the trial. In fact, these data were not analyzed until receipt of this information request.[152]

168.    On April 15, 2016, Jannsen's Ms. Patel sent an email to colleagues, including Drs. DiBattiste and Nessel, regarding "DRAFT FDA Response" that stated: "We searched the terms Covance, Recheck, Unscheduled INR, INR CK, and special blinded INR and did not find reference to this program in the original NDA submission."[153]

169.    On May 27, 2016, FDA requested "revised labeling that describes the impact of using the INRatio device in ROCKET AF on the efficacy (in section 14) and the safety (in section 6) of rivaroxaban in the treatment of patients with atrial fibrillation."[154]

170.    In response, the sponsors stated their position "that a revision to the product labeling is not warranted."[155]

171.    On June 14, 2016, FDA's Dr. William H. Maisel wrote to Alere, Inc.'s Ms. Melissa D. Guerdan, Sr. Vice President, Global Quality & Regulatory:

---

[152] XARELTO_JANSSEN_22661455, p. 3-5.

[153] XARELTO_JANSSEN_23097568.

[154] XARELTO_JANSSEN_24277161, p. 12.

[155] XARELTO_JANSSEN_24277161.

75

In response to your request, received by email May 23, 2016, and by letter dated June 1, 2016, I have reviewed the decision by the Office of In Vitro Diagnostics and Radiological Health (OIR) that Alere should conduct a voluntary recall of the Alere INRatio PT/INR Monitoring System ("INRatio System") due to product performance concerns.[156]

172.     Dr. Maisel further wrote:

After reviewing the information in your email dated May 23, 2016, your letter dated June 1, 2016 and the documents attached and referenced therein, and the administrative file, and after meeting with Alere on June 3, 2016, I have concluded that there is a reasonable probability that the use of, or exposure to, the Alere INRatio System will cause serious adverse health consequences or death…Because this is a serious public health matter, CDRH may pursue additional actions, as necessary, to protect the public health.[157]

173.     Finally, Dr. Maisel stated:

The decision is based, in part, on the following:

1) FDA has received more than 100 MDRs from January 2015 to April 2016 related to the INRatio System, including reports of serious injuries and one death. Included among these reports are dozens of cases of discrepant INRs where the INRatio INR value differs substantially when compared with a contemporaneous reference INR.

2) INRatio performed poorly in ROCKET-AF. Although Alere contends that continuous improvements have been made to the INRatio System rendering ROCKET-AF performance "irrelevant" to the currently marketed system, Alere has not submitted performance data that validates the claim that the currently released and marketed device (or the device with software version 1.12) has sufficiently mitigated the risk of discrepant low values.[158]

---

[156] ALRX_00002510, p. 1.

[157] ALRX_00002510, p. 2.

[158] ALRX_00002510, p. 2.

174.    On July 13, 2016, FDA spokeswoman Deborah Kotz stated, "Our analyses so far indicate that effects on strokes or bleeding, including bleeding in the head, were minimal."[159]

175.    Regarding the FDA investigation, Dr. Peter DiBattiste testified:

> *Q. So to the best of your knowledge, has this – has this issue been resolved from the FDA, or is there review still ongoing?*
> *…*
> *A. I have nothing to indicate that the review is complete. So my assumption is that it is ongoing…*[160]

176.    In my opinion, the sponsors failed to meet their duty of a reasonably prudent drug manufacturer by:

    a.    Failing to report discrepant INR values, and associated adverse events, in response to the March 14, 2011 and January 12, 2016 FDA Information Requests.

    b.    Failing to inform FDA about the Covance recheck program in response to the March 14, 2011 and January 12, 2016 Information Requests.

177.    In my opinion, a reasonable and prudent manufacturer, asked by FDA, as part of an IND application process, to provide a summary of information collected by an unblinded physician would have provided such information. Such information was important to FDA because FDA was investigating the impact of the use of a recalled POC device in the ROCKET clinical trial, which evaluated the safety and efficacy of Xarelto.

178.    In my opinion, the sponsors did not disclose to FDA, physicians, or patients that the company was in possession of information indicating that "discrepancies of potential clinical relevance were rather frequently observed (approximately in 35% of the estimations) [in ROCKET]."[161]

---

[159] Hilzenrath, D.S. FDA Says Faulty Devices Had "Minimal" Impact on Trial Led by NewBoss. Project on Government Oversight. July 13, 2016, http://www.pogo.org/blog/2016/07/fda-faulty-devices-had-minimal-impact.html

[160] Deposition of Dr. Peter DiBattiste, July 20, 2016, 820:18-821:3.

[161] EMA CHMP Assessment report dated 5 February 2016, p. 21.

179.     As reported by the sponsor, FDA's Dr. Temple "volunteered his opinion that the problem should not have created bias in favor of riva efficacy thought it might have impacted bleed rates."[162] In response, Dr. DiBattiste stated, "I completely agree with Bob [Temple]'s perspective on the potential impact of the INR device issue on efficacy and safety."[163] In my opinion, an impact on "bleed rates" could affect the safety, and risk/benefit, equation of Xarelto by FDA, physicians, and patients.

180.     In a July 6, 2016 reply to a letter to the editor of the NEJM, regarding an article entitled "Point-of-Care Warfarin Monitoring in the ROCKET AF Trial," members of the ROCKET AF Executive Committee, Steering Committee, and Investigators stated as follows: "However, we acknowledge the limitations of these analyses. To be fully informative, we would need to provide paired central-laboratory and point-of-care INR values throughout the trial, and these values are not available."

181.     In addition, as discussed above, the EMA also identified limitations in the analyses performed by the sponsor to assess the impact of the INRatio device on ROCKET.[164]

182.     On September 26, 2016, the FDA issued its ROCKET AF Reanalysis Reviews. In the 'Summary and Recommendations' section of the review, FDA provided:

> … Janssen and FDA independently performed a variety of analyses intended to characterize the impact of use of the INRatio device on the safety and efficacy results of ROCKET.

> … FDA used two mathematical modeling approaches to estimate the clinical outcomes results that might have occurred I ROCKET if a more accurate INR assay had been used to guide warfarin dosing, i.e., one that [] reported results similar to the laboratory-based assay at Duke… Each of these analyses predicted a small decrease in the expected rate of major bleeding in the

---

[162] XARELTO_JANSSEN_18607702.

[163] XARELTO_JANSSEN_18607702.

[164] EMA CHMP Assessment report dated 5 February 2016, pp. 38-41

warfarin arm compared to the observed rate of 3.45 events per 100 patient years in ROCKET (reductions in the three models ranged from 7% to 10% of the observed rate)…. Overall, these estimated reductions in the rates of bleeding events in the warfarin arm were small enough so that the benefits of rivaroxaban would still outweigh its risks if efficacy were not affected. Notably, two of these three analyses also estimated the rate of ischemic stroke, and one estaimted the rate of the primary efficacy endpoint of total stroke + systemic embolism. Both these models predicted that the rate of ischemic stroke would be increase in the warfarin arm, resulting in an expected <u>improvement</u> of the efficacy of rivaroxaban relative to warfarin.

The information summarized above indicates that it is quite likely that patients in the warfarin arm of ROCKET unintentionally received higher doses of warfarin than they would have received if the INRatio device had provided results similar to those provided by the laboratory-based device at Duke. However, the effects of this increased intensity of anticoagulation on clinical outcomes were likely to have been quite modest. It seems very unlikely that if the device had performed similarly to the INR assessment device at Duke, the benefit/risk profile of rivaroxaban compared to warfarin would have been notably different from the profile based on the observed result of Srocket. Accordingly, the conclusion we made in 2011 that the benefits of rivaroxaban in patients with non-valvular atrial fibrillation outweigh its risks should not be changed.

183. The FDA's 'Recommendations' were as follows: "(1) No changes in rivaroxban labeling to reflect the impact of use of the INRatio device in ROCKET are warranted. No other major regulatory action should be taken with respect to rivaroxban; (2) Our conclusions regarding the issues addressed by this review should be communicated to the public in a suitable manner, but not through any changes in labeling."

184. In regard to the FDA's recommendation regarding labeling, the FDA added:

We think that a labeling change to describe the modeling results would [be] very difficult to write in a concise manner and might be more likely to confuse than to edify, and is not warranted. FDA might make a brief announcement regarding our conclusions and make this review or a summary of it available to the public online. A publication of our analyses in a journal might be desirable. If others think it is important to change labeling, we might add a simple statement that FDA has reviewed the INR and outcomes information in ROCKET and determined that the effect of use of the INRatio device on outcomes in ROCKET was too small to affect our prior conclusion that the benefits of rivaroxaban outweigh its risks relative to warfarin.

79

IV.    **CONCLUSIONS**[165]

**In my opinion:**

185.    Any laboratory test that is helpful in identifying patients at risk for serious adverse events based upon a patient's response to a drug should be disclosed in the Warnings and Precautions section of the drug label.

186.    Any laboratory tests that could be helpful in identifying patients at increased risk of bleeding from Xarelto use should be identified in the Warnings and Precautions section of the drug label.

187.    There is variability in drug plasma concentration levels in patients taking Xarelto.

188.    There is a relationship between Xarelto plasma concentration levels and PT.

189.    As of August 2011, there is a relationship between PT levels and the risk of bleeding.

190.    Measuring a PT level in a Xarelto-treated patient can be helpful in identifying patients at risk for serious adverse events based upon a patient's response to Xarelto.

191.    There is a laboratory test to measure PT levels in Xarelto-treated patients.

192.    While measuring a PT level in a Xarelto-treated patient can be helpful in identifying patients at risk for serious adverse events based upon a patient's response to Xarelto, without additional adequate sponsor-generated clinical trial data exploring Xarelto dose adjustment based on bleeding risk (as measured by PT), measuring a PT level does not allow a physician to titrate the dose in such patients. Rather, it allows a physician and a patient to decide whether the patient should continue Xarelto therapy.

193.    While FDA originally stated in June 2011 (in its review of the hip and knee replacement VTE prophylaxis indication) that the predictive value of coagulation parameters for

---

[165] This list is not meant to be an all-inclusive list. For a full list of opinions, please see the entire report.

the bleeding risk had not been adequately studied, beginning in August 2011 (in its Clinical Pharmacology review of the atrial fibrillation indication), the agency stated that there was a relationship between bleeding risk and PT. Since then, the agency has repeatedly and consistently cited that relationship.

194.    While the sponsors proposed language suggesting that if "assessment of the pharmacodynamic effect of rivaroxaban is considered necessary in individual patients, PT (measured in seconds) is recommended"[166] be included in the Pharmacodynamics section of the label, they never offered language to include in the Warnings and Precautions section that suggested that measuring a PT level in a Xarelto-treated patient can be helpful in identifying patients at risk for serious adverse events based upon a patient's response to Xarelto.

195.    The sponsors acknowledged that information about measuring PT could be helpful in patient care decision-making.

196.    Based on the preceding sections, the sponsors failed to "identify any laboratory tests helpful in following the patient's response or in identifying possible adverse reactions."

197.    Nothing in the Act, or in the FDA's implementing regulations, relieves a manufacturer of its duty to act prudently in light of the company's internal knowledge about a product and its potential risks.

198.    The two systems of state consumer protection (including potential product liability) and federal food and drug regulation should and do operate in a complementary but independent manner.

199.    The two systems of state consumer protection (including potential product liability) and federal food and drug regulation should and do operate in a complementary but independent manner.

---

[166] XARELTO_JANSSEN_05911809, p. 15.

200.    Based in part on the above testimony, information about laboratory tests that could be helpful in identifying patients at increased risk of bleeding from Xarelto use would be useful information for physicians in clinical decision-making.

201.    While Xarelto was shown to be non-inferior to Warfarin with regard to safety and efficacy in clinical study populations, the sponsors failed to inform physicians and patients that certain individual patients taking Xarelto were at a demonstrable increased risk for serious adverse reactions.

202.    A reasonably prudent drug manufacturer, who knows certain patients are at an increased risk of serious adverse events relative to others, would inform prescribers of that fact.

203.    Based on the reasons cited above, the sponsors did not adequately notify physicians that some patients are at higher risk than others (*i.e.*, inter-patient variability).

204.    Based on the reasons cited above, the sponsors did not adequately instruct physicians how to identify those patients (*i.e.*, PT).

205.    Based on the reasons cited above, the sponsors did not adequately instruct physicians on how to clinically manage the information (*e.g.*, titrate, discontinue, additional warnings).

206.    The sponsors failed to meet their duty of reasonably prudent drug manufacturers by:

   a.  Failing to report discrepant INR values, and associated adverse events, in response to the January 12, 2016 FDA Information Request.

   b.  Failing to inform FDA about the Covance recheck program in response to the January 12, 2016 Information Request.

207.    A reasonable and prudent manufacturer, asked by FDA, as part of an IND application process, to provide a summary of information collected by an unblinded physician would have provided such information. Such information was important to FDA because FDA was investigating the impact of the use of a recalled POC device in the ROCKET clinical trial, which evaluated the safety and efficacy of Xarelto.

208.    The sponsors did not disclose to FDA, physicians, or patients that the company was in possession of information indicating that "discrepancies of potential clinical relevance were rather frequently observed (approximately in 35% of the estimations) [in ROCKET]."[167]

209.    The POC device used in the ROCKET AF trial malfunctioned, raising questions regarding the validity of the trial.

David A. Kessler, M.D.

10/13/2016

Date

---

[167] EMA CHMP Assessment report dated 5 February 2016, p. 21.