# Exhibit 10

# FILED UNDER SEAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | MDL No. 2592<br><br>Judge Eldon E. Fallon |

# Expert Report of Suzanne Parisian, MD

By: _Suzanne Parisian_       Date: _11/22/2016_

**Suzanne Parisian, MD**

**EXPERT REPORT**

**SUZANNE PARISIAN, M.D.**

**In RE: XARELTO (Rivaroxaban) Products Liability Litigation (MDL-2592)**

---

**Table of Contents**

---

I.   QUALIFICATIONS ......................................................................................................... 1

II.  OVERVIEW ................................................................................................................... 7

   A.  PURPOSE OF REVIEW ........................................................................................ 7

   B.  DEPOSITIONS REVIEWED ................................................................................. 8

   C.  RELIANCE LIST .................................................................................................. 9

   D.  PUBLICLY AVAILABLE FDA DOCUMENTS AND MEDICAL LITERATURE ...................... 9

III. OPINIONS .................................................................................................................... 9

   A.  OPINION 1 ........................................................................................................... 9

   B.  OPINION 2 ........................................................................................................... 9

   C.  OPINION 3 ......................................................................................................... 10

   D.  OPINION 4 ......................................................................................................... 10

   E.  OPINION 5 ......................................................................................................... 10

   F.  OPINION 6 ......................................................................................................... 11

   G.  OPINION 7 ......................................................................................................... 11

   H.  OPINION 8 ......................................................................................................... 11

   I.  OPINION 9 ......................................................................................................... 12

   J.  OPINION 10 ....................................................................................................... 12

   K.  OPINION 11 ....................................................................................................... 13

   L.  OPINION 12 ....................................................................................................... 13

   M.  OPINION 13 ....................................................................................................... 14

   N.  OPINION 14 ....................................................................................................... 14

   O.  OPINION 15 ....................................................................................................... 14

   P.  OPINION 16 ....................................................................................................... 15

IV. BAYER HEALTHCARE'S DEVELOPMENT OF BAY 59-7939 (RIVAROXABAN) ................. 15

a.    BAYER'S '*GO/NO-GO*' PLAN FOR BAY 59-7939 WAS AS A FIXED DOSE, NO MONITORING ORAL ANTICOAGULANT ........................................................... 15

b.    DEFENDANTS' PRECLINICAL INVESTIGATION OF '*HIGHLY POTENT*' FACTOR XA INHIBITOR AND USE OF PROTHROMBIN TIME (PT) FOR MONITORING THE ANTICOAGULANT EFFECT ............................................................................... 16

c.    IN 2002 BAYER SUBMITTED THE IND FOR BAY 59-7939 ................................ 20

d.    BAYER HAS ALWAYS MEASURED XARELTO'S ANTICOAGULATION EFFECT IN PATIENTS USING COMMON LAB TESTS (PT, aPTT, AND HEPTEST) .......................... 20

e.    BAYER 59- 7939 PHARMACODYNAMICS/PHARMACOKINETICS (PK/PD) PERMITTING MONITORING OF PLASMA CONCENTRATION BY ROUTINE CLOTTING TESTS ................................................................................................. 21

f.    BAYER WAS AWARE OF THE SLOW ABSORPTION ASSOCIATED WITH '*FLIP-FLOP*' PHARMACOKINETICS FOR BAY 59-7939 ............................................................. 22

g.    BAY 59-7939 "FLIP FLOP" PHARMACOKINETICS: A HIGHER DOSE IS LESS SAFE AND NOT MORE EFFECTIVE ................................................................................ 23

h.    BAYER PURSUES A CHRONIC ATRIAL FIBRILLATION INDICATION USING DATA FROM ITS OTHER CLINICAL STUDIES ................................................................ 25

i.    IN 2003 BAYER BEGINS TO PLAN FOR ROCKET-AF STUDY ........................ 26

j.    BAY 59-7939 BAYER SEEKS A UNITED STATES BUSINESS PARTNER FOR XARELTO'S SALES AND DEVELOPMENT IN UNITED STATES ............................. 28

k.    OCTOBER 2005: BAYER AND JANSSEN ("DEFENDANTS") ENTER INTO AGREEMENT FOR XARELTO DEVELOPMENT AND SALES IN THE UNITED STATES ................................................................................................................ 37

V.   FDA'S FIRST NDA APPROVAL (NDA 22-406) OF XARELTO (RIVAROXABAN) FOR VTE PREVENTION POST HIP/KNEE REPLACEMENT SURGERY MARKETING IN THE UNITED STATES ................................................................................................................ 39

a.    DEFENDANTS' VIEW OF XARELTO AS ONE OF SEVERAL NOACS RACING TO MARKET ...................................................................................................... 40

b.    DEFENDANTS SUBMIT XARELTO NDA 22-406 ON JULY 28, 2008 WHICH APPEARED TO BE MOVING DOWN THE 'TRACK' TO BE THE FIRST NOAC NDA APPROVAL ... 40

c.    DEFENDANTS "*PUSH BACK*" AGAINST FDA'S CONCERNS ABOUT FOUR-FOLD INCREASED BLEEDING RISK WITH DOUBLING OF DOSE OF XARELTO [Study 10942 (ODIXA-HIP)] ................................................................................................... 43

d.    DEFENDANTS PHASE II VTE-P SAFETY STUDIES WITH PK AND PREDICTIVE MODELING USING APPLIED LOGISTIC REGRESSION (STUDIES 10942, 10944, 10945 AND 11527) AND PK ANALYSIS PK 000131 (STUDIES 11527 AND 10944) .................. 48

e.    PK000131: DEFENDANTS' POPULATION PK, PD AND PK/PD ANALYSIS .................. 77

f.    FDA'S 2009 CLINICAL PHARMACOLOGY REVIEW ....................................... 85

g.  2010 FDA'S CLINICAL PHARMACOLOGY REVIEW ........................................................ 93

h.  XARELTO VTE-P FDA ADVISORY COMMITTEE MEETING MARCH 19, 2009 .......... 100

i.  DEFENDANTS INTERNALLY PROPOSE TO DRAFT A LABORATORY TESTS
SECTION FOR THE XARELTO LABEL, BUT ONLY AS A "*CONTINGENCY*" .............. 106

j.  RECORD INVESTIGATOR COMPLAINTS TRIGGER FDA'S INSPECTION AND
IDENTIFICATION OF '*UNRELIABILITY*' OF BAYER'S RECORD STUDIES ................. 109

k.  REVIEW OF XARELTO VTE-P NDA HALTED BY MULTIPLE ISSUES, INCLUDING
RECORD UNRELIABILITY, MANUFACTURING QUALITY ISSUES, LIVER TOXICITY
AND CONCERNS ABOUT DOSE ..................................................................................... 110

VI.  DEFENDANTS SUBMITTED 'COMPLETE RESPONSE' AND DRAFT XARELTO VTE-P
LABEL TO FDA ON DECEMBER 27, 2010 .................................................................... 119

a.  DEFENDANTS RECEIVE FDA'S LABEL COMMENTS ON JUNE 13, 2011 .................... 119

b.  DEFENDANTS' JUNE 16, 2011 RESPONSE PROPOSED SIGNIFICANT CHANGES TO
COUNTER FDA LABEL CHANGES, TO WHICH FDA PROVIDED FEEDBACK ON JUNE
24, 2011 ........................................................................................................................... 125

c.  DEFENDANTS PARTICIPATE IN A REQUESTED JUNE 23, 2011 TELECONFERENCE
WITH THE CLINICAL PHARMACOLOGY GROUP ON JUNE 23, 2011 (SECTIONS 7
AND 12 OF USPI) ............................................................................................................ 130

VII.  FDA'S SUMMARY REVIEW AND NDA APPROVAL OF XARELTO VTE-P SUPPORTS
DEFENDANTS' USE OF NEOPLASTIN PT, APTT, AND HEPTEST FOR MONITORING
XARELTO'S ACTIVITY ................................................................................................. 138

VIII. NDA 022406 XARELTO VTE-P WAS CONDITIONALLY APPROVED .................................. 142

a.  COMMITMENT TO "*ENHANCED PHARMACOVIGILANCE PLAN*" TO STUDY RISKS OF
MAJOR BLEEDING AND UPDATE LABEL ..................................................................... 143

b.  PERFORM REQUIRED STUDIES FOR DOSING AND DOSING RECOMMENDATIONS
...................................................................................................................................... 144

c.  DEVELOP A 5MG DOSE TABLET FOR 'PROPER DOSE TITRATION'. ......................... 144

d.  DEFENDANT REQUESTED FDA CLARIFY WHAT WAS MEANT BY "ENHANCED
PHARMAOVIGILANCE" ................................................................................................. 144

e.  DEFENDANTS' "ENHANCED PHARMACOVIGILANCE PLAN" INCLUDED
DEVELOPMENT OF BLEEDING QUESTIONNAIRES TO OBTAIN COAGULATION
AND DOSING INFORMATION ........................................................................................ 145

f.  FDA HAS NOT TAKEN ACTION TO PREVENT/RESTRICT/HINDER DEFENDANTS
ADDING "PRIMARY PT LANGUAGE" TO ITS LABEL .................................................. 145

IX.  NDA 022406 SUPPLEMENTS .......................................................................................... 150

a.  EINSTEIN- TREATMENT OF DVT/ PE (STUDY 11702) .................................................. 150

b.  EINSTEIN EXTENSION AND THE REDUCTION IN THE RISK OF RECURRENCE OF
DVT AND PE COMPARED TO PLACEBO ...................................................................... 154

iii

X.   NDA SUPPLEMENTS S-001, S-002, and S-003-[EINSTEIN STUDIES] ..................................... 154

    a.   NDA SUPPLEMENT S-004......................................................................................... 154

    b.   NDA SUPPLEMENT S-007......................................................................................... 155

    c.   NDA SUPPLEMNT S-009 .......................................................................................... 155

    d.   NDA SUPPLEMENT S-010......................................................................................... 155

    e.   NDA SUPPLEMENT S-012......................................................................................... 155

    f.   NDA SUPPLEMENT S-105 CHANGES BEING EFFECTED (CBE) .................................. 155

XI.   FDA AND NDA 20-2439- XARELTO 'SPAF' INDICATION ..................................................... 156

    a.   DEFENDANTS MET WITH FDA TO DISCUSS THE DESIGN OF THE ROCKET AF
       CLINICAL STUDY FOR APPROVAL OF A SPAF INDICATION..................................... 156

    b.   AS EARLY AS 2006, FLAWS ARE APPARENT IN ROCKET AF DESIGN
       CONTRIBUTING TO 'SUBOPTIMAL PERFORMANCE OF WARFARIN' .................... 157

XII.   DEFENDANTS' ROCKET AF STUDY FOR SPAF INDICATION ............................................... 167

    a.   DEFENDANTS CHOSE TO INVESTIGATE A SINGLE 20 MG ONCE A DAY DOSE WITH
       NO DRUG MONITORING OR TITRATION................................................................. 170

    b.   CALCULATION OF MEDIAN TIME IN THERAPEUTIC RANGE (TTR) ......................... 173

    c.   ROCKET DID NOT INVESTIGATE COMBINED P-GP CYP3A4- PGP INHIBITORS AND
       INDUCERS, OR PROVIDE MEANS FOR ADEQUATE DRUG TITRATION TO REDUCE
       PATIENT RISKS AS REQUESTED BY FDA ................................................................ 174

    d.   CONCERNS ABOUT PREMATURE UNBLINDING AND SUBSEQUENT PROTOCOL
       CHANGES IN ROCKET ........................................................................................... 178

    e.   ROCKET AF Utilized Non-Inferiority Study Design ............................................... 180

    f.   MARCH 14, 2011 FDA REQUESTED CLINICAL INFORMATION ABOUT INR POC FOR
       ROCKET ................................................................................................................ 182

    g.   DURING THE JUNE 6, 2011 MEETING, FDA DISCUSSES CONCERNS ABOUT DOSE,
       TTR, HYPERCOAGUABILITY REBOUND AT SWITCHING, AND LACK OF
       SUPERIORITY TO WARFARIN ................................................................................ 183

    h.   FDA REFERRED TO XARELTO DATA AS NOT ESTABLISHING A '*WIDE
       THERAPEUTIC INDEX*' ......................................................................................... 184

    i.   THE SEPTEMBER 8, 2011 FDA CARDIORENAL PRODUCTS ADVISORY COMMITTEE
       FOR XARELTO FOR SPAF INDICATION .................................................................. 187

    j.   FDA RECOMMENDS 'CONDITIONAL' APPROVAL OF XARLETO SPAF WITH SAME
       POST-APPROVAL COMMITMENTS AS XARELTO FOR VTE-P ................................... 210

    k.   FDA AND DEFENDANTS NEGOTIATE A LAUNCH LABEL FOR THE SPAF
       INDICATION........................................................................................................... 212

l.    DEFENDANTS ENCOURAGE USE OF XARELTO IN PATIENTS WITH CONGESTIVE HEART FAIULE DESPITE KNOWING THEY DO NOT HAVE AN APPROVED INDICATION ................................................................................................................ 247

m.   DEFENDANTS ENCOURAGE XARELTO USE IN HOSPITALIZED MEDICALLY ILL PATIENTS DESPITE LACK OF AN FDA APPROVED INDICATION ............................. 251

XIII. POINT-OF-CARE INR MONITORING FOR ROCKET AF ........................................................ 254

a.    BACKGROUND HEMOSENSE/ALERE ............................................................... 254

b.    DEFENDANTS RECEIVE TWO FDA HEMOSENSE WARNING LETTERS DESCRIBING DEFECTIVE INRATIO DEVICE ........................................................................... 255

c.    OTHER HEMOSENSE INC. (ALERE) RECALLS ................................................. 258

d.    BRITISH MEDICAL JOURNAL (BMJ) UNCOVERS RECALLED INRATIO AS POC DEVICE USED IN ROCKET FOR APPROVAL OF XARELTO ....................................... 261

e.    DEFENDANTS' ROCKET AF TASK FORCE ........................................................ 263

f.    GROWING CONCERN AMONGST PHYSICIANS ABOUT FAULTY DEVICE USED IN ROCKET ........................................................................................................ 263

g.    FDA's JANUARY 2016 LETTER AND DEFENDANTS' FEBRUARY RESPONSE REGARDING USE OF THE INRATIO DEVICE IN ROCKET ........................................... 264

h.    DEFENDANTS DOWNPLAY THE SIGNIFICANCE OF THE FLAWS IN ROCKET TO PHYSICIANS ................................................................................................. 267

XIV. REGULATORY ACTIONS REGARDING POC DEVICES FOR MONITORING WARFARIN 272

a.    FDA 510(k) CLEARANCE OF HEMOSENSE ALERE INRATIO DEVICE ....................... 272

b.    FDA CONVENED A PUBLIC DOAC DIAGNOSTIC TESTING WORKSHOP OCTOBER 2015 ............................................................................................................ 274

c.    FDA OFFICIALLY CALLED FOR VOLUNTARY REMOVAL OF ALERE'S INRATIO SYSTEMS FROM THE UNITED STATES MARKET ................................................. 277

d.    FDA HARMONIZES NOAC LABELS ................................................................ 282

e.    EMA AND ALERE ........................................................................................ 283

XV. DEFENDANTS ENCOURAGE XARELTO FOR ACUTE CORONARY SYNDROME (ACS) DESPITE THE INCREASED RISK OF BLEEDING AND FDA'S REFUSAL TO APPROVE THE INDICATION (TWICE) .......................................................................................................... 286

XVI. EUROPEAN MEDICINES AGENCY (EMA) AND DEFENDANTS' ACTIONS WITH XARELTO 294

a.    IN 2008, EMA REQUIRED DEFENDANTS TO DEVELOP AND VALIDATE COMMERCIAL LABORATORY METHODS FOR MONITORING XARELTO ............... 294

b.    DEFENDANTS WERE REQUIRED TO RESPOND TO EMA'S REQUESTS FOR XARELTO SAFETY AND EFFICACY INFORMATION ................................................. 300

XVII. THREE PUBLIC MEETINGS FOR DOACS AND TDM ............................................................ 334

  a. PUBLIC MEETING #1: FDA WORKSHOP REGARDING IN VITRO DIAGNOSTIC TESTING FOR DOACS ............................................................................ 334

  b. PUBLIC MEETING #2: EMA WORKSHOP ON THE ROLE OF PK/PD MEASUREMENTS AND DOACS ..................................................................... 352

  c. PUBLIC MEETING #3: CARDIAC SAFETY RESEARCH CONSORTIUM (CRSC) THINK TANK ON DECEMBER 3, 2015 ............................................ 359

XVII. HIGHLIGHTS OF ISSUES IN DEFENDANTS' MANAGEMENT OF CLINICAL TRIALS .... 363

  a. BAYER'S SLOPPINESS WITH RECORD 4 REPORTEDLY CREATED HUGE FINANCIAL LOSSES FOR JANSSEN AND TRIGGERED RE-NEGOTIATION OF THE COLLABORATION AGREEMENT WITH BAYER ............................................. 363

  b. AS EARLY AS 2008, DEFENDANTS WERE AWARE THE ROCKET 20 MG OD DOSE WAS "TOO HIGH" ......................................................................... 364

  c. DEFENDANTS DID NOT USE A LIFESCAN J&J POC INR DEVICE IN THE ROCKET CLINICAL TRIAL ............................................................................. 366

  d. THE CONVANCE RECHECK PROGRAM IN ROCKET ....................................... 366

  e. DEFENDANTS' PLANNED 'ROCKET II STUDY' TO FIND A SAFER DOSE NEVER OCCURRED ................................................................................... 368

XVIII. DEFENDANTS' MARKETING OVERSTATED BENEFITS AND DOWNPLAYED RISKS 374

  a. DEFENDANTS DISTRIBUTED FLAWED AND UNRELIABLE STUDIES TO EXPAND MARKETING CLAIMS AND SUPPORT XARELTO'S 'SUPERIORITY' ......................... 374

  b. DEFENDANTS MARKETED ROCKET AF TO CAPTURE A BILLION DOLLAR MARKET WITH CLAIMS OF "SUPERIOR PROTECTION", ONCE-A-DAY FIXED DOSE, NO MONITORING AND CONVENIENCE ................................................... 380

  c. DEFENDANTS USE ITS ROCKET STUDY AND INVESTIGATORS TO TELL PHYSICIANS THAT XARELTO IS 'SUPERIOR' TO WARFARIN BEFORE OBTAINING FDA APPROVAL ................................................................................... 381

  d. DEFENDANTS' STRATEGIC PLATFORM FOR LAUNCH WAS BASED ON CLAIMS OF SUPERIOR EFFICACY/SUPERIOR PROTECTION OF XARELTO COMPARED TO WARFARIN ............................................................................................. 382

  e. DEFENDANTS' MARKETING DOWNPLAYS THE INCREASED RISK FOR BLEEDING WITH XARELTO ..................................................................................... 383

  f. DEFENDANTS TARGET SPECIFIC PHYSICIAN GROUPS AND ATTEMPT TO OVERCOME BARRIERS FOR XARELTO PRESCRIBING ...................................... 384

  g. DEFENDANTS TARGET STABLE WARFARIN PATIENTS USING FEAR OF BLEEDING, NEED FOR CONSISTENT PROTECTION, AND CONVENIENCE ................................... 387

  h. DEFENDANTS SPECIFICALLY TARGETED ELIQUIS PATIENTS ................................ 388

  i. DEFENDANTS IMPLEMENTED AN AGGRESSIVE DCT MARKETING CAMPAIGN TO COMPETE WITH ELIQUIS ............................................................................. 389

    j.    DEFENDANTS PLAN TO SPECIFICALLY TARGET 2,400 ELIQUIS HIGH PRESCRIBERS ................................................................................................................ 389

XIX. DIRECT TO CONSUMER (DTC) MARKETING ......................................................... 390

    a.    DEFENDANTS TARGET STABLE WARFARIN PATIENTS ................................................ 390

    b.    THE USE OF CELEBRITY ENDORSEMENTS .................................................................. 393

    c.    FDA IDENTIFIES MISLEADING CLAIMS IN DTC ADVERTISING ................................. 394

I.    **QUALIFICATIONS**

1.  In August 1995, I founded MD Assist, Inc., a regulatory and medical consulting firm specializing in matters involving the regulation of products by the United States Food and Drug Administration ("FDA"). I received my medical degree from the University of South Florida in 1978 and Board Certification in Anatomic and Clinical Pathology in 1989. I also received a Masters in Biology from the University of Central Florida. I have been a general practitioner and President of Mountain Emergency Physicians. I am the author of FDA Inside and Out, published in May 2001, which is a text about the FDA's history and procedures.

2.  From 1991 to 1995, I served as a Commissioned Officer in the United States Public Health Service and achieved the rank of Lt. Commander. During that time, I was primarily assigned to the Center for Devices and Radiological Health ("CDRH") at the FDA. Concurrently, I was also assigned clinical responsibilities at the Armed Forces Institute of Pathology, Office of the Medical Examiner for the Armed Forces, Washington, D.C.

3.  From 1991 to 1993, I was a FDA Medical Officer in the Office of Health Affairs ("OHA"), a staff office within CDRH, FDA. In OHA, I provided regulatory support to both FDA's Office of Compliance and FDA's Office of Device Evaluation. My responsibilities in OHA included health hazard and health risk assessment, Safety Alerts and physician and layperson communications, review of adverse event reports ("AER") and medical literature and review of product labeling, promotions, advertising, and corporate records. As to compliance with the Food Drug and Cosmetic Act ("FDCA"), I was responsible for the review of mandatory adverse event reports submitted by manufacturers, as well as the review of reports voluntarily submitted directly to FDA by health care providers, patients and others. I presided over 162 health risk assessments convened to advise FDA on overall health risk issues for the public. Along with others, I made recommendations to FDA regarding regulatory actions that should be undertaken by FDA, health care providers, user groups and manufacturers to help protect the public's welfare. My assignment at OHA specifically included identification of safety issues. I participated in mandatory recalls and in an administrative hearing as FDA's expert witness.

4.  An example of a drug safety issue that I helped identify and manage for FDA as its medical officer involved ACE Inhibitors ("ACEI"). FDA had received adverse experience reports in its MedWatch databases of serious adverse events and deaths occurring in renal patients taking ACEI drugs for regulation of blood pressure. From reviewing the MedWatch AERs, the renal patients shared a common precipitating event - blood exposure to certain types of hemodialyzer membranes during a dialysis session shortly after taking a dose of ACEI. ACEI had been a class of drugs first approved by FDA for marketing in the 1980s. There had been relatively little safety information about these drugs and none regarding hemodialysis safety. When a patient would take an ACEI and then have their blood exposed to a specific type of membrane surface,

1

whether for hemodialysis or LDL apheresis, a sudden, life-threatening anaphylactoid reaction could be triggered.

5.  As the only FDA medical officer involved in this safety issue, I reviewed both drug and device adverse event reports, reviewed medical literature, performed a health risk assessment as described per 21 CFR Part 7, and, ultimately, made a clinical recommendation to FDA to a reasonable degree of medical certainty. Health care providers needed to be quickly informed by FDA of the ACEI membrane association. FDA and the pharmaceutical and medical device industries needed help to identify the etiology of the reaction. Physicians needed recommendations as to emergency treatment. No other FDA medical officer was assigned involvement in the work-up or handling of this drug/device safety issue. Working with an FDA epidemiologist, I helped design and issue FDA's epidemiologic study to quickly obtain additional data for FDA and the involved industries. The epidemiologic study was in the form of a questionnaire contained in FDA's Safety Alert and was designed to help capture the overall risk to the public; to raise awareness of the issue for medical providers; to define the pharmacological mechanisms involved; and to trigger the appropriate label changes for both the involved drugs and devices in order to protect the public. As a result, I helped draft the current ACEI class drug warning about the risks of membrane surface exposure and anaphylactoid reaction.

6.  From March 1993 to December 1993, I was a Medical Officer in the Office of Device Evaluation ("ODE"), Division of Reproductive Abdominal, Ear, Nose and Throat, and Radiology Devices, FDA. From January 1993 through June 1995 I was one of two Chief Medical Officers in ODE. ODE, in contrast to OHA, is primarily responsible for pre-marketing evaluation of new product applications and clinical trials that support safety and effectiveness, which, if proven, allow a company to begin marketing within the United States. In ODE, I participated in the review of proposed clinical trials, the review of pre-marketing applications (including review of animal toxicology and biocompatibility data), and training new medical officers and scientific reviewers in application, clinical trial, and labeling evaluation. I was the primary reviewing medical officer in charge of pre-marketing approval applications required for adherence to drug guidances published by FDA's Center for Drug Evaluation and Research's ("CDER") and for presentation at the FDA Advisory Panel with members from CDRH and CDER. I was a primary author for FDA's guidance for Hemodialyzer Reuse labeling. I consulted as a medical officer on INDs for combination products including drugs and biologics. While in ODE, I conducted an additional 100 health risk assessments and was required to train medical officers as to methods for health risk assessments, health hazard evaluations, annual report requirements, adverse event reporting, and labeling review.

7.  I was an initial instructor in FDA's Staff College for training FDA reviewers in the design and evaluation of clinical data in investigational and pre-marketing applications. I had primary responsibility for review of marketing applications and labeling and was required to teach medical officers the process for evaluation and review required by

2

FDCA directed to product marketing. I was also charged with training medical officers on the process for health risk assessment and health evaluation per 21 CFR Part 7.

8. Regarding post-market surveillance of marketed products, I participated with FDA's District Offices, Office of General Counsel, and the Office of Compliance in the review of manufacturing records, product labeling, product complaints and adverse event reports submitted to FDA. I was the primary clinician involved in several of FDA's Major Corporate-Wide Actions for which I received various citations and honors for my services to FDA. My awards have included Department of Health and Human Services and Food and Drug Administration Employee of the Month.

9. I was sent by FDA to serve as an official Agency representative at medical meetings and seminars and to help identify and monitor conduct of manufacturers for potential deviations from regulations governing prohibited and promotional activities. At those events, I was required to provide official guidance as to FDA's interpretation of Food and Drug Laws as they pertain to all medical products and the roles of manufacturers and health care providers.

10. While at FDA, I helped draft Agency documents, guidance documents for the industry outlining the requirements for obtaining FDA's marketing approval and the FDA Safety Alerts directed to healthcare providers and their patients. I also provided FDA's comments for voluntary warnings, physician and user notifications, and voluntary industry standards. I was one of FDA's liaisons with the National Institutes of Health ("NIH") for issues involving ENT, renal, respiratory, and women's health. I was also FDA's first liaison for the Office of Alternative Medicine. In that position, I was required to provide support to the Health Care Financing Agency regarding FDA's approval of products and issues involving hemodialysis. As part of my work, I was assigned responsibility for product adverse event reporting to the Department of Defense and Veterans Administration.

11. One of my assigned responsibilities at FDA, based on my clinical training and experience, was to review facts contained in product marketing applications, clinical trials, medical literature, reports of post-marketing experience, and available manufacturing documents gathered by FDA or provided to FDA by the manufacturer or other regulatory agencies. I then used those facts and documents to (a) make a clinical determination for FDA pursuant to the FDCA to a reasonable degree of medical certainty, and (b) recommend the courses of action available to FDA to protect the public health. I was also required by FDA to advise and train other FDA employees regarding the review of facts of a case or issue and the requirements of the FDCA, and how to make a determination to a reasonable degree of medical certainty regarding the clinical impact of the Agency's actions to the public. The health risk assessment process is further described in 21 CFR Part 7. During my tenure at FDA, I reviewed hundreds of marketing applications for safety and efficacy as well as proposed draft labeling. In this capacity, I worked with industry scientists and academic clinical investigators for the evaluation, marketing and labeling review of new products. I organized national conferences with industry representatives and physicians to discuss

3

and obtain expert consensus regarding the development of new products and labeling as well as evaluating existing products on the market for safety and efficacy.

12. At the Armed Forces Institute of Pathology, Office of the Medical Examiner, I was required, again based on my clinical training and experience in pathology, to take all available facts surrounding a patient's death and any involved adverse events and (a) make a final determination, to a reasonable degree of medical certainty, as to the cause of death, and (b) to recommend the next steps that should be taken by the military or another agency of the federal government. In that capacity as a Medical Examiner, I provided support to the various legal staff of the armed services, as well as to the FBI and CIA.[1]

13. Since leaving FDA, and founding MD Assist, Inc., I continue to provide regulatory information to individuals, manufacturers, and organizations regarding FDA's requirements, related to AER, labeling, and postmarket issues. I have consulted on premarket applications and safety issue for devices, biologics and drugs. In 1997, I was requested by FDA to participate in a panel of outside experts convened to comment on changes proposed in requirements for medical device labeling. I have consulted with manufacturers and lectured at conferences and seminars regarding FDA, pre-market clearance, design of clinical trials, product labeling, Corrective and Preventive Action ("CAPA"), and Good Manufacturing Practices (GMP).

14. In August of 1995, after leaving the FDA, I founded and remain President of MD Assist, Inc. ("MDA"), a regulatory and medical consulting firm specializing in matters involving the FDA, regulation of medical products and issues regarding public health. At MDA, I continue to use my medical and FDA-acquired training and skills to help design and market new medical products; present marketing applications to FDA; design, conduct and review clinical studies; create and evaluate marketing applications; draft product labeling; investigate potential adverse events; review biocompatibility data; and instruct about the requirements of the FDA.

15. I have helped manufacturers, primarily startup companies, with initial product design, clinical investigation, labeling and marketing of new drugs and devices intended to be implanted in the central nervous system (brain, spine or ear), as well as urological, gynecological, and gastrointestinal tracts, or to be used as a treatments or diagnostic tools for the mouth or lungs or eyes. I have consulted with industry entities regarding clinical and laboratory investigation, review of data, labeling, financing, marketing, and insurance reimbursement of products, including drugs, devices, biologics, and combination products intended for treatment or diagnosis of cancer, pulmonary disease, or infection.

---

[1] While a medical examiner at the AFIP, I determined that a cause of civilian patient deaths occurring in military hospitals, to a reasonable degree of medical certainty, appeared to have been associated with an unanticipated drug/device effect. I reported my findings as a MedWatch report to FDA. As an AFIP Medical Examiner, I was able to trigger FDA to investigate a major drug regulatory safety action which resulted in the protection of public health.

16. As stated above, I am the author of <u>FDA Inside and Out</u>, which I published in May 2001. It is a textbook about the history and rules and regulations of the FDA. The book has been used as a graduate school textbook at universities in courses teaching about the FDA. As of January 2011, it is currently listed as a library reference book about the FDA at 71 libraries, including for the FDA Biosciences Library, Center for Disease Control and Prevention (CDC), Harvard, Massachusetts Institute of Technology, University of Maryland, United States Naval Academy, Quintiles, Armed Forces Medical Library, and the British Library. I have lectured to industry about all aspects of FDA and its requirements. I have also lectured about the FDA and the drug and device approval process to medical students, graduate students and law students.

17. Since 1997, I have been involved in providing support for litigation. My primary role in litigation utilizes the same methodology and role I have for consulting for industry on FDA issues. I review and evaluate corporate documents and statements, medical and scientific literature, relevant FDA documents in terms of the Food Drug and Cosmetic Act and implementing regulations. Just as I began to do for the FDA, I discuss the FDA's relevant requirements in terms of history, procedures, role and the role and requirements of manufacturers. I then relate the actions of a company (or companies) for the products involved in terms of known and knowable information and regulatory requirements based on my training and experience. As I first did for the FDA, I utilize a review of FDA's documents, manufacturer's documents, scientific and medical literature product history, adverse event reports, pre-clinical and clinical information to formulate risk versus benefit opinions made to a degree of reasonable and professional certainty regarding the documented actions of a manufacturer in terms of duties, obligations and compliance with the Act and implementing regulations.

18. Based on the work I have done, using the methodology I was first trained to use at FDA for clinical review and health risk assessment, as well as my scientific and medical education, professional training, and experience, I have reached the following opinions regarding the actions of the Bayer Healthcare, Inc.  and Janssen Pharmaceutical Inc., a subsidiary Johnson & Johnson Company ("Defendants") with joint development, testing and marketing of XARELTO (Rivaroxaban) in the United States for reduction of the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation (SPAF) (approved November 4, 2011). The documents reviewed for both Defendants are the same general types of documents I would have reviewed at the FDA, including the medical literature, adverse events reports, complaints, marketing application documents, and communications with FDA.

19. My expert opinions are based on my medical background, training , both clinical and beginning with FDA  and the same methodology of review and analysis used in my regulatory practice.  In terms of the report design, the opinions with the relevant regulations are then followed by the BASES OF OPINIONS. Each opinion is made to a reasonable degree of medical, scientific and professional certainty regarding the shared regulatory responsibilities and actions of Defendants for United States sales of XARELTO (rivaroxaban). XARELTO is a direct Factor Xa inhibitor and belongs to the drug class commonly referred to as the new (or novel) oral anticoagulants, but officially

titled by the FDA as a class of "*Non-Vitamin K dependent Oral Anticoagulants*" (NOAC) (as well as the larger class of "Direct Oral Anticoagulants" or "DOAC"). The class of NOAC drugs was developed by sponsors to provide physicians and patients with alternative options for oral anticoagulation therapy to Coumadin (warfarin sodium)[2] (a synthetic vitamin-K dependent oral anticoagulant approved in 1954), the

---

[2] Warfarin, known by brand name Coumadin was introduced in 1948 as a pesticide against rats and mice. (i.e. rodenticide often called "coumarins"- produce life-threatening bleeding in rodents) . Warfarin is a synthetic derivative of dicumarol a mycotoxin anticoagulant discovered in spoiled sweet clover-based animal feeds. The name warfarin stems from its discovery at the University of Wisconsin- "*WARF*" as the Wisconsin Alumni Research Foundation, and the "*arin*" is from the link to coumarin. In the 1950s it was found to be effective and relatively safe for preventing thrombosis (blood clots) and thromboembolism. It was approved as a drug in 1954 and is the most widely prescribed oral anticoagulant in North America. The shortcomings of treatment are that it interacts with other medications and some foods (particularly green leafy vegetables that contain large amounts of vitamin K1. Its activity has to be monitored by periodic blood testing for the determination of international normalized ration (INR) and prescription of dosing. A high INR predisposes patients to increased risk of bleeding, while an INR in the therapeutic target range (TTR) ensures an adequate yet safe dose. An INR below the TTR increases supports a low dose of warfarin and an increased risk of thromboembolic events. The action of warfarin requires two to three days before remaining active clotting factors have time to naturally disappear. A single dose of warfarin is active for 2 to 5 days. The pharmacologic action of warfarin can be reversed by administration of vitamin K1. Warfarin is contraindicated in pregnancy since it passes through the placental and can cause bleeding in the fetus. Coumarins are known teratogens that cause birth defects.

Newer **Point of Care** (POC) testing has been available for the patient's monitoring of INR daily in terms of the warfarin dose. POC involves a simple finger stick. Patients are making increasing use of self-testing and home monitoring of oral anticoagulation. International guidelines on home testing were published in 2005. A 2006 systematic review and meta-analysis of 14 randomized trials showed home testing led to a reduced incidence of complications (thrombosis and major bleeding) and improved the time in TTR. POC is now reimbursed by Medicare. However, FDA held a Public Workshop in 2016 on March 18, 2016 to present new data regarding the risk of "POC Prothrombin Time/International Normalized Ratio Devices for Monitoring Warfarin Therapy." To improve the clinical management of warfarin and to aid with the development of safe and effective POC and patient self-testing PT/INR devices.

When a physician begins warfarin therapy (warfarnization) for a patient, the doctor will aim to reach a INR of 2-3 in most cases. A target INR may be 2.5-3.5 (or even 3.0-4.5) in patients with one or more mechanical heart valves. The first three days of "warfarinization" the levels of protein C and protein S (anticoagulation factors) will drop faster than procoagulation proteins (factor II, Vii, IX and X) producing an imbalance towards increased clotting. Therefore, bridging anticoagulant therapies (usually heparin) are often used to reverse this temporary hypercoagulable (clot prone) state. The maintenance dose of warfarin for a patient can fluctuate significantly depending on the amount of vitamin K1 in the diet. Foods high in vitamin K1 are parsley, cilantro, dill, cruciferous vegetables such as cabbage, broccoli and the darker lettuces and leafy green vegetables. Certain vegetable oils can be high in vitamin K1. Therefore, the dose of warfarin will continue to require monitoring and adjustment.

Warfarin is best as an anticoagulant in areas of "*slowly running blood*"- such as the veins and blood pooled behind artificial heart valves and natural valves as well as pooled blood in dysfunction cardiac atria. It is prescribed to prevent/treat/reduce clots in patients with atrial fibrillation (AFib), artificial heart valves, DVT and PE- with risks of clots in *veins*. It is also used in patients with antiphospholipid syndrome, and will occasional be prescribed post myocardial infarction (MI) but is considered less effective preventing a new clot in coronary arteries. Prevention of clotting in arteries is usually done by prescription of antiplatelet drugs which act by a different mechanism. Approved drug alternatives to warfarin (promoted without a need for drug monitoring or dose titration)- ie convenience for the patient- are Pradaxa (dabigatran), Eliquis (apixaban), edoxaban, Xarelto (rivaroxaban) – approved for use in patients with non-valvular AFib. Xarelto is approved for its effects in the veins for prevention/treatment/ reduction of DVT and PE.

6

current gold standard for oral anticoagulation for patients with risk of thrombosis and thromboembolism.

20. This export report is intended to be no unsupported opinions offered about the 'state of mind' or 'intent' of either of the Defendants regarding its actions for development, approval and commercialization of XARELTO in the United States.

21. I have attached a copy of my most recent Curriculum Vitae attached as APPENDIX A and a list of my last four years of deposition and court testimony as APPENDIX B.  I am charging $500/hour for review and $1000/hour for deposition or court testimony.

## II.    OVERVIEW

### A.  PURPOSE OF REVIEW

22. I have attempted to focus my Expert Report specifically on FDA-related regulatory issues for XARELTO, which was approved by FDA (NDA 22439) in November 2011 for stroke prevention in patients with atrial fibrillation, and its subsequent marketing in the United States.  The regulatory discussion must also include Defendants' conduct and findings in its other FDA approved indications for XARELTO beginning July 1, 2011: 1) Deep Vein Thrombosis (DVT) and Pulmonary Embolism (PE) prophylaxis in patients undergoing orthopedic hip or knee replacement surgeries ("VTE-P")(NDA 22406 July 1, 2011- 10mg immediate release); and 2) treatment of DVT and/or PE and reduction in recurrence of DVT and/or PE ("VTE-T") and commitment to the  Pediatric Research Equity Act (PREA) to develop pediatric indications (NDA 22406-Supplement S-001, S-002, and S-003 approved November 2, 2012 ).

23. The regulatory discussion also must include FDA's denial of the NDA for the indication of Acute Coronary Syndrome ("ACS") based on its flawed ATLAS clinical studies (*see* FDA Advisory Panel Meeting May 23, 2012),[3] and the January 2014 Advisory Panel meeting to review approval of the 2.5 mg dose for AC, which was also subsequently denied.[4]  In terms of showing the corporate histories of both sets of Defendants,[5] and poor attention and control of its clinical studies, there must be a description of FDA's identification of inadequacies and shortcomings in the conduct of Defendants' clinical studies and audits including RECORD 4, EINSTEIN, ATLAS,

---

The common side effect of warfarin is hemorrhage (bleeding). The risk of bleeding is small but definite (a median annual rate of **1-3%** has been reported."  [see Holbrook, et al. *Evidence-based management of anticoagulant therapy: Antithrombotic Therapy and Prevention of Thrombosis*, 9th ed: American College of Chest Physicians Evidence-Based Clinical Practice Guidelines. Chest (2012) 141(2 Suppl): e152S-84S. PMC 3278055. PMID 22315259] The most catastrophic risk of warfarin bleeding is in the brain (intracerebral hemorrhage/hemorrhagic stroke) and the spinal cord.  The risk of bleeding greatly increases once the patient's INR is > 4.5.

[3] XARELTO_BPAG_02515034; XARELTO_BPAG_02515046.

[4] XARELTO_BPAG_00055741.

[5] Bayer Healthcare Pharmaceuticals, Inc, Bayer Pharma AG, Bayer Corporation, Bayer Healthcare LLC, Bayer Healthcare AG, and Bayer AG ("Bayer"); Janssen Research & Development LLC, Janssen Ortho LLC, Jansen Pharmaceuticals Inc., Johnson & Johnson("Janssen"); also referred to herein as "Defendants" or "Sponsor(s)".

MAGELLAN, CHF, as well as ROCKET.  These studies and FDA's actions with Defendants for approval and denial of indications are provided to show the interaction history with FDA and the Defendants' internal corporate histories, knowledge and notice about the performance dose-response risks of XARELTO in terms of major bleeding risk and its subsequent failure to adequately label and warn physicians and patients.

24. The United States regulatory discussion must also touch upon various interactions between Defendants and the European Union's European Medicines Agency (EMA) for XARELTO as it relates to sales in the United States.  The EMA is included to again provide corporate actions and notice to Defendants, and also to contrast Defendants' actions with different regulatory bodies in terms of FDA, again as related to United States physicians and the safety of their patients.

25. Sanjay Jalota, of Janssen's Regulatory Affairs, who interacted with FDA, testified that Bayer conducted RECORD (1-4) for the hip and knee indication, EINSTEIN for the DVT/PE indication, and MAGELLAN for the proposed medically ill patients indication; and Janssen conducted ROCKET for the atrial fibrillation (AFib) indication and ATLAS for the proposed Acute Coronary Syndrome (ACS) indication.[6]  Neither the medically ill indication nor the ACS indication resulted in FDA approval.  Through an October 1, 2005 Collaboration Agreement[7] with Bayer, the developer of rivaroxaban, Janssen became involved in the worldwide development and United States sales of XARELTO.  Bayer retained responsibility for XARELTO manufacturing and marketing outside the United States and for overseeing drug safety throughout the world including the United States.

## B.  DEPOSITIONS REVIEWED

26. I have reviewed the following Bayer corporate depositions and exhibits:
Dr. Andrea Derix (Vol I&II); Dr. Tomasz Dyszynski; Dr. Martin Homering (Vol I&II); Dr. Andrea Horvat-Broecker; Dr. Dagmar Kubitza (Vol I&II); Dr. Frank Misselwitz; Dr. Wolfgang Mueck(Vol I&II); Dr. Theodore Spiro (Vol I&II); Dr. Juergen Weber (Vol I&II); Dr. Stefan Willmann; Dr. Martin van Eickels; Dr. Bernard Glombitza; Mr. Andy Hargreaves.

27. I have reviewed the following Janssen corporate depositions and exhibits:
Dr. Paul Burton (Vol I,&II) ; Dr. William Byra (Vol I&II) ; Dr. Peter DiBattiste (Vol I&II); Susan Geiger; Paul Herman (Vol I&II); Sanjay Jalota (Vol I&II); Sigmond Johnson (Vol I&II); Andrea Kollath (Vol I&II) ; Kenneth Todd Moore; Michael Moye (Vol I&II) ; Dr. Christopher Nessel (Vol I&II) ;  Dr. Gary Peters; Alla Rhoge; Gregg Ruppersberger (Vol I&II); Troy Sarich; Nauman Shah; Elizabeth Wood; Christopher Major; Kimberly Nessel; Bernadette O'Brien; Purve Patel; Anne Vosatka; Dr. Shujian Wu; and Dr. Zhong Yuan.

---

[6] Jalota depo 3/3/16, p. 81: L 1-24; Jalota depo 3/4/16, p. 683: L 1-9.
[7] Derix Exhibit 73

## C.  RELIANCE LIST

28. I have also reviewed additional documents as cited within my report, and/or listed on my Reliance List (APPENDIX C).

## D.  PUBLICLY AVAILABLE FDA DOCUMENTS AND MEDICAL LITERATURE

29. I have also obtained public FDA documents from FDA's website, including FDA's Advisory Panel and Public Workshop transcripts and briefing materials, and CDER's published XARELTO NDA 202439 and NDA 022406, including accompanying review materials, labels, and notifications.

## III.  OPINIONS

All opinions set forth in my report are stated to a reasonable degree of medical certainty. I reserve the right to modify or supplement this report and my opinions.

## A.  OPINION 1

Pharmaceutical manufacturers throughout the drug development process have a duty to define the pharmacologic properties of its drug for a therapeutic indication and to remain the knowledgeable expert about the pertinent adverse effects.  Prescription drugs sold to the public are required to be adequately labeled and sold with recommendations for a safe and effective dose.  Before FDA's NDA approval of XARELTO for stroke and systemic embolism prevention for patients with nonvalvular Atrial Fibrillation (SPAF), Defendants already had a 'consensus'[8] internally that the 20mg/15mg OD dose for AF patients was too high.  Without providing monitoring recommendations or the ability for a physician to adjust a patient's dose, certain patients were placed at increased risk of major bleeding without additional benefit.  Despite the increased risk of XARELTO for major bleeding and death, and having received the FDA's multiple recommendations to modify and/or lower the dose based on patient risk including for SPAF ,Defendants continue to sell XARELTO for SPAF at 20mg OD without providing adequate warnings for patients.

**Applicable Regulations:** 21 USC§ 331(a)(b); 21 USC§ 352(a)(f)(1)(2), (n); 21 CFR§ 201.57; 21 CFR§ 314.50

## B.  OPINION 2

Defendants, from the dose ranging Phase IIb Study 11527 and Study 19044 (PK000131) with rivaroxaban plasma concentration measurements (PK), knew of the inter-individual variability and differences (slow/fast) in patient absorption over time of a single dose of rivaroxaban.  Such information, along with a narrow therapeutic window (bounded on one hand by a risk of major bleeding and the other side by loss of efficacy) should have placed a reasonable NOAC manufacturer on notice to carefully study, identify and develop recommendations for therapeutic drug monitoring ("TDM") and proper dose

---

[8] Burton Exhibit 55

titration in specific populations, and situations, at increased risk (and when "one size does not fit all"). Defendants have been informed by the FDA (as well as the EMA and other health authorities) and physicians that to improve patient safety, there must be methods for periodic monitoring of anticoagulation effect, dose titration and updating the label. Despite those many requests, Defendants continued to not adequately study the exposure-risk benefits of XARELTO.

**Applicable Regulations:** 21 USC§ 331(a)(b); 21 USC§ 352(a)(f)(1)(2), (n); 21 CFR §201.57; 21CFR§ 314.80; 21 CFR §312

## C.  OPINION 3

XARELTO as sold by Defendants has the highest risk of major bleeding among the NOACs. The FDA Medical Officer Reviews indicated that XARELTO should be reserved by physicians to a second or third choice of anticoagulant for AF and that there was no reason to switch a patient successfully managed with warfarin to XARELTO. However, XARELTO has become the most frequently prescribed NOAC in the United States for SPAF and now has surpassed warfarin prescritions for AF patients. Defendants market XARELTO aggressively as a once a day drug and overstate unsupported benefits.

**Applicable Regulations**: 21 USC 331(a)(b); 21 USC 352(a)(f)(1)(2), (n); 21 CFR 201.57

## D.  OPINION 4

Defendants obtained FDA's approval for the SPAF indication based on the ROCKET trial, which utilized a faulty investigational INR point-of-care (POC) device for the management of the warfarin patients. The flaw in the POC device generated lower INRs for the warfarin patients, thereby increasing the bleeding risk for warfarin patients, and contributing to the finding of non-inferiority (not superiority) for the safety of XARELTO. Moreover, the poor INR control seen in the warfarin treatment group was a symptom of the poor quality and oversight for the investigation. Further, Defendants obtained NDA approval of VTE prevention in hip/knee surgeries using portions of its flawed RECORD studies. The DVT/PE prevention indication was also granted as a supplemental NDA based on the original VTE prevention indication using the flawed RECORD studies. The proposed ACS indication was denied twice based on significant flaws and loss of patient data with Defendant's ATLAS studies. Such a history of poor control of the performance and oversight of its international clinical trials undermines the reliability of XARELTO placingpatients at increased risk of bleeding.

**Applicable Regulations:** 21 CFR§ 812; 21 CFR§ 314.50

## E.  OPINION 5

As early as 2008, the 20mg OD dose for Xarelto for the SPAF indication (i.e., 15/20mg OD) was shown to be too high and carried an increased risk of bleeding. Defendants planned for a ROCKET II study with lower and BID dosing, but it was halted shortly after receipt of comments by Marketing advising not to pursue the study based on

potential harm to sales .  ROCKET II was to be performed to optimize dose and help reduce the risk of bleeding. Defendants' actions have placed United States atrial fibrillation patients at increased risk for bleeding from too high exposure to XARELTO.

**Applicable Regulations: 21 USC§ 352(a)(f)(f)(2); 21 CFR§ 314.70**

## F.  OPINION 6

FDA's drug labeling requires a manufacturer to identify any laboratory tests helpful in following the patient's response or in identifying possible adverse reactions. Defendants have not provided an adequate label with updated laboratory and risk information, Defendants proposed a Section 5 Laboratory Tests section (based on the Lovenox label) as a contingency[9] if pushed by FDA for creation of such a section. Using common laboratory studies, Defendants identified and utilized rivaroxaban's linear concentration-effect relationship for a biomarker of anticoagulant effect and reflection of plasma concentration at Cmax and Ctrough (by PT max and PT trough).  According to Bayer's Dr.  Mueck (2014), prolongation of the PT (using Neoplastin) was correlated with the rivaroxaban plasma concentrations in a linear relationship.[10] Defendants knew there was a relationship between XARELTO PT levels (as a measurement of anticoagulation effect) and bleeding risk, and PT could be used to identify patients at increased risk of bleeding.

**Applicable Regulations:** 21 USC§ 352(a)(f)(f)(2), 21 CFR§ 1.21, 21 CFR§ 201.57

## G.  OPINION 7

Measurement of PT (using Neoplastin Plus or another appropriately sensitive reagent) in XARELTO patients can be helpful in identifying patients at increased risk for serious adverse events based upon a patients' anticoagulant response to XARELTO.  Obtaining PT  allows a physician in clinical decision-making to determine if XARELTO is the appropriate drug for a patient and to decide whether the patient should continue on XARELTO therapy.

**Applicable Regulations:** 21 USC§ 352(a)(f)(f)(2), 21 CFR§ 1.21, 21 CFR§ 201.57

## H.  OPINION 8

Defendants failed as the ROCKET-AF sponsor to adequately identify a suitable point-of-care (POC) device for reliable management of warfarin and patient safety for the ROCKET trial beginning with the due diligence stage. Defendants failed to validate the acceptable performance of the ALERE/HemoSense INRatio POC device. Defendants failed as IND and clinical trial sponsor to: 1)  select a safe and effective device or method for determination of warfarin management; 2) adequately monitor the performance of the POC INRatio device during ROCKET worldwide; 3) implement back-up methods

---

[9] XARELTO_JANSSEN_05911809.
[10] Mueck, et al. Clinical Pharmacokinetic and Pharmacodynamic Profile of Rivaroxaban, *Clin Pharmacokinet* (2014) 53:1-16.

including laboratory testing to protect patient safety; 4) investigate and report adverse events and failures of the device to the appropriate Adverse Event database; 5) adequately instruct and provide an algorithm to investigators for warfarin management. Such actions by Defendants in the role of sponsor of a worldwide pivotal clinical study, served to underestimate the true bleeding risk for AF patients on XARELTO as compared to warfarin.

**Applicable Regulations:** 21 USC§ 352(a)(f)(f)(2), 21 CFR§ 312

## I.   OPINION 9

At the ROCKET TASK FORCE meeting held in September 2015, Defendants acknowledged the following: a flaw in the algorithm associated with incorrect readings with the INRatio device.; that 3400 devices used in ROCKET were included in Alere's recall in December 2014; 32% of POC values were greater than .5 units different from paired lab values; and that INRs of 3.1 to 12.2 fell below the lab measurements and had the risk for overanticoagulation and fatal bleeding. [9]

**Applicable Regulations:** 21 CFR§ 820; 21 USC 331(a)(b; 21 CFR§ 314.50

## J.   OPINION 10

a.  Defendants failed to fulfill their duties as United States Pharmaceutical manufacturers when they did not provide truthful, accurate and full disclsoures for ROCKET and adverse events associated by:

- Failing to adequately report, investigate, and document erroneous/discrepant INR readings occurring during ROCKET to the clinical trial database and reports for regulatory agencies, (including the FDA).

- Failing to adequately report erroneous/discrepant INR values and associated adverse events for ROCKET to the IDMC and Executive Committee.

b.  Defendants failed to fulfill their duties as United States Pharmaceutical manufacturers when they did not provide truthful, accurate and full disclosure about ROCKET and associated adverse events requested of them by by FDA:

- Failing to identify and report erroneous/discrepant INR values and associated adverse events (including but not limited to the Covance Recheck Program) in response to the FDA's March 2011 Infornation Request.

- Failing to report discrepant INR values in response to the January 12, 2016 FDA Information Request.

---

[9] Nessel Exhibit 40

- Failing to inform FDA about the CoVance Recheck program in response to the January 12, 2016 FDA Information Request.

**Applicable Regulations**: 21 CFR §314.80; 21 CFR§ 314.81, 18 USC § 1001

## K. OPINION 11

The XARELTO label is inadequate in the following ways:

a. Xarelto has a comparable risk of major bleeding to that of warfarin. However, in contrast to the warfarin label, the Xarelto label does not contain a black box warning about the risk of major bleeding. By including a black box warning about bleeding risk in one product's label and not the other's, it improperly suggests to physicians and patients that one is safer than the other when it is not supported by substantial evidence.

b. It does not contain the distribution of patient PK values observed in the clinical trial program. Because the range and distribution of observed exposures was large, and due to the relationship between exposure and outcomes, this is important information for physicians.

c. There is no recommendation for physicians to measure the levels of XARELTO or the drug effect (e.g., PT Neoplastin) in a patient's blood in order to adjust the dose and/or discontinue the drug to avoid unnecessary risk.

d. It does not have the same plasma concentration information and the commercial use of anti-factor XA calibrators and control required in the European label. Defendants have also failed to provide data on the correlation between plasma concentrations, major bleeding, and efficacy.

e. It fails to include adequate instructions on helpful laboratory testing (e.g,. prothrombin time).

f. It fails to provide physicians with the severity and frequency of post-marketing bleeding risk reported.

**Applicable Regulations:** 21 USC§ 352(a)(f)(1)(2); 21 CFR§ 314.70

## L. OPINION 12

A United States pharmaceutical manufacturer has a duty to exercise reasonable care to avoid foreseeable injury to the users of its products. Further, a manufacturer has a duty to adequately test its products commensurate with the dangers involved and to minimize the risk of foreseeable injury.
Defendants failed to exercise reasonable care and adequately test its products in that Defendants failed to conduct any dose-ranging studies in patients with atrial fibrillation to

13

determine the safest effective dose. As a result, despite being aware of Xarelto's pharmacological profile that indicated either a lower dose or a twice-daily dose would place patients at a lower bleed risk while maintaining a level of Xarelto to effectively reduce the risk of stroke, Defendants failed to conduct any testing in the ROCKET AF study of either a lower dose or twice daily dosing. Defendants also failed to voluntarily update its labeling to provide adequate instructions for use and warnings to ensure the safety of patients.

**Applicable Regulations:** 21 USC§ 331(a)(b); 21 USC §352(a)(f)(1)(2)(n); 21 CFR §314.50; 21 CFR§ 201.57; 21 CFR §314.70

## M. OPINION 13

Defendants' failure to test either a lower dose pill or twice-daily dose as initially planned but not investigated, for ROCKET II, and make such a lower dose pill or twice-daily dose available for use renders Xarelto unreasonably dangerous as designed. Further, a safer alternative design existed; primarily, a lower dose pill with periodic laboratory testing that would reduce the risk of bleeding.

**Applicable Regulations:** 21 CFR§ 314.50; 21 CFR§ 314.70; 21 USC §352(a)(f)(1)(2)(n)

## N. OPINION 14

Defendants' engaged in direct-to-consumer (DTC) marketing by TV, internet, placement in doctor's offices, third party support groups, to specifically target patients that were well managed on warfarin and encourage a switch to XARELTO[10].  Patients were encouraged to ask physicians for XARELTO for the lifestyle convenience, but Defendants failed to inform patients or physicians of the potential increased risks for major bleeding and lack of a reversal agent.

**Applicable Regulations**: 21 USC§ 352(a)(f)(f)(2), 21 CFR 202.1; 21 CFR 1.21, 21 CFR 201.57

## O. OPINION 15

Defendants' sales representatives actively promoted XARELTO for unapproved clinical indications by use of publications by Defendants' Research and Development department. These publications were not balanced or accurate, and overstated benefits without adequately providing risks to health care providers. The publications were distributed by Janssen to support claims like 'superiority' or unapproved efficacy of Xarelto for expanded, unapproved indications, for example ACS, medically ill patients, and congestive heart failure. Also, Defendants' EINSTEIN studies were used to support superiority of XARELTO compared to warfarin for ROCKET.  Futher, sales representatives circulated the May 9, 2009 Lancet article by Turpie, et al. regarding the

---

[10] Herman Exhibit 5

RECORD 4 study with no correction or update for physicians, or Lancet, indicating that the FDA concluded that the entire RECORD 4 study was flawed and unreliable. [11] This article was further revised in 2013, yet still not corrected, to help with sales.

**Applicable Regulations:** 21 CFR§ 314.70; 21 USC 331(a)(b); 21 CFR 201.128; 21 CFR 202.1

## P.  OPINION 16

Defendants acted unscientifically  by persisting in pursuit of a marketing goal from 2002[12] to sell a once-a-day, direct oral anticoagulant (DOAC) tablet, requiring no monitoring or laboratory testing despite the foreseeable risks for bleeding and potential harm for patients.. The Defendants' marketing plan was to provide a drug taken permanently by AF patients as more convenient than warfarin but with greater risk for bleeding and death for certain United States patient groups. Defendants continue to make these Xarelto marketing claims as a once a day single dose or "one size fits all" without adequate warnings and dose information and despite the contrary science for rivaroxaban seen throughout its development, recommendations of physicians and experts, and the post-market reports of increased life-threatening bleeding risks for patients.

**Applicable Regulations:** 21 CFR§ 314.50; 21 CFR§ 314.70; 21 USC §352(a)(f)(1)(2)(n); 21 USC §331(a)(b); 21 CFR§ 1.21

## IV.    BAYER HEALTHCARE'S DEVELOPMENT OF BAY 59-7939 (RIVAROXABAN)

### a.  BAYER'S '*GO/NO-GO*' PLAN FOR BAY 59-7939 WAS AS A FIXED DOSE, NO MONITORING ORAL ANTICOAGULANT

30. In June 25, 2002, Bayer created a "*Go-No-Go*" plan for the development of BAY 59-7939, a factor Xa inhibitor, as to acceptable versus not acceptable findings in Phase I to Phase IIa testing, Phase IIa to Phase IIb testing, and finally Phase IIb to Phase III testing. For the Phase I to Phase IIa period, a "NO GO" with development would be "toxicity, lack of dose-response, intolerable high inter- and intra-individual variations." Specific criteria for stopping development (NO-GO): "Impossible to reach inhibition of factor Xa activity in plasma of 70% in peak or 30% in trough by three times a day (tid) dosing." The "GO" criteria for that phase included the definition of a dose response; inter- and intra-individual variations were low; and the drug allowed for unmonitored dosing.  At the Phase II a to Phase IIb stage the "NO GO" criteria were: toxicity, lack of dose-response, too narrow a therapeutic window, and more than tid dosing required.  Specific NO-GO criteria also included all the doses tested were shown to be inferior to enoxaparin (Lovenox).  The GO criteria included the clinically effective dose did not cause major bleeding >4%.  For the later Phase IIb to Phase III, the "NO GO" Specific criteria included: Therapeutic index too narrow, unable to go for "fixed, unmonitored

---

[11] Burton Exhibit 17
[12] Derix Exhibit 73