## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  XARELTO (RIVAROXABAN)<br>PRODUCTS LIABILITY LITIGATION | MDL No. 2592 |
| | SECTION L |
| THIS DOCUMENT RELATES TO: | JUDGE ELDON E. FALLON |
| Joseph J. Boudreaux, Jr., et al. v. Janssen et al.<br>Case No. 2:14-cv-02720 | MAGISTRATE NORTH |
| Joseph Orr, Jr., et al. v. Janssen Research &<br>Development, LLC et al.<br>Case No. 2:15-cv-03708 | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR JOINT MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFFS' DESIGN-DEFECT CLAIMS UNDER THE LOUISIANA PRODUCT LIABILITY ACT**

The Boudreaux and Orr Plaintiffs' design-defect claims—in addition to being preempted by federal law[1]—fail under state law because they cannot establish that Xarelto® was designed in a manner that created an unreasonable risk of harm or that a different design would have resulted in a different outcome for Mr. Boudreaux or Mrs. Orr.  Under the Louisiana Products Liability Act ("LPLA"), a plaintiff proceeding on a design-defect claim must prove two separate elements: (1) that "[t]here existed an alternative design for the product that was capable of preventing the claimant's damage;" and (2) that "[t]he likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product."  La. Rev. Stat. Ann. § 9:2800.56.  Without proof of both elements, a design-defect plaintiff cannot establish liability, and his or her claim fails as a matter of law,

---

[1] See Defendants' Memorandum of Law In Support of Their Joint Motion for Partial Summary Judgment on Grounds that Federal Law Preempts Plaintiffs' Design Defect Claims.

making summary judgment proper.  *See, e.g.*, *Theriot v. Danek Med., Inc.*, 168 F.3d 253, 256 (5th Cir. 1999).

The Boudreaux and Orr Plaintiffs' design-defect claims fail as a matter under the LPLA because they cannot prove either essential element.

1.      ***Plaintiffs cannot prove that there was an existing alternative design capable of preventing their alleged injuries.***  Plaintiffs' own expert testimony forecloses their ability to prove the threshold element that "[t]here existed an alternative design" for Xarelto that was "capable of preventing" their alleged injuries.  Plaintiffs have presented two potential "alternative design" theories, but *both* fail for lack of a legally viable alternative design *and* for failure of proof that the substitute design would have prevented the alleged harm.

a.      Plaintiffs first allege that other prescription medications—such as warfarin, Pradaxa®, or Eliquis®—constitute safer "alternative design[s]."  But under analogous LPLA precedent, pointing to a separate product already available to plaintiffs' physicians is not a viable alternative-design theory.  *See, e.g.*, *In re Propulsid Prod. Liab. Litig.*, No. MDL 1355, 2003 WL 367739, at *3 (E.D. La. Feb. 18,2003) (Fallon, J.) (holding that plaintiff had "failed to prove the existence of an alternative design capable of preventing her damage" because expert testimony "show[ing] that there were alternative or different methods for treating her symptoms . . . is not sufficient to prove an alternative design" under the LPLA) (citing *Theriot*, 168 F.3d 253).  Moreover, and separately, Plaintiffs' experts admit that they cannot say that warfarin or any other anticoagulant would have prevented Mr. Boudreaux's or Mrs. Orr's injuries.  *See infra* at 14-15.  Under the LPLA's plain language and the implementing case law—which require proof that a proposed alternative design was "capable of preventing" the Plaintiff's injury—those admissions are dispositive, and foreclose Plaintiffs' claims.

2

**b.**     Plaintiffs' experts have separately proposed that Xarelto's design should "conceptually" be similar to warfarin's—namely, that it should have a lower cumulative daily dose or a different dosing regimen, and that it should incorporate a monitoring regimen and a reversal agent.   But Xarelto is a different medicine, with a different chemical composition and different mechanism of action.   Plaintiffs' proposed alternatives have not been tested and lack the LPLA-required specificity and supporting data that can only be developed through testing. Moreover, and separately, Plaintiffs' experts have admitted (again) that they have no evidence that another design would have prevented Plaintiffs' injuries.   *See infra* at 19-24.   Under the LPLA's plain language and the implementing case law—which require proof that a proposed alternative design was "capable of preventing" the Plaintiff's injury—that admission is dispositive.

2.     ***Plaintiffs cannot satisfy the risk-utility test.***   Plaintiffs' design-defect claims fail for the additional reason that plaintiffs have not met the LPLA's second, "risk-utility" component.   As their own experts acknowledge, they cannot prove that any risk avoided through use of an alternative design would have exceeded both the cost of switching to the alternative and the reduction in Xarelto's utility.   *See infra* at 27-28.   In the absence of proof that satisfies the LPLA's risk-utility test, Plaintiffs' design-defect claims fail as a matter of law.

3.     ***There is no claim under the LPLA for an alleged "failure to test."***   To the extent that Plaintiffs here are asserting "that [they] should be permitted to proceed to trial [because Defendants] cannot demonstrate that [they] adequately tested" Xarelto, the claim is foreclosed by binding precedent.   *Theriot*, 168 F.3d at 256.   As the Fifth Circuit has squarely held, "[t]here is no basis in the LPLA or case law for such a rule" and a district court thus does "not err in granting summary judgment" against such a claim.   *Id.*; *see also*, *e.g.*, *Linsley v. C.R. Bard, Inc.*,

No. Civ. A-98-2007, 2000 WL 343358, at *6 (E.D. La. Mar. 30, 2000) (granting summary judgment when plaintiff was "only left with the argument that Bard did not adequately test its product," which does not establish a claim under the LPLA).

For these reasons, Plaintiffs' design-defect claims fail as a matter of state law, and Defendants are entitled to summary judgment on those claims.

## FACTUAL BACKGROUND

### I.     Xarelto and the Anticoagulant Market

Xarelto is part of the class of medicines known as Novel Oral Anticoagulants ("NOACs"), which were developed as an alternative to warfarin.  Warfarin was initially used as a rat poison and was first marketed as an anticoagulation treatment for humans in 1954. Warfarin's anticoagulation effect must be actively and carefully monitored, and warfarin patients are dose-adjusted according to a test designed to monitor a coagulation measure called prothrombin time ("PT").  Warfarin also requires a reversal agent because it has a long half-life, which averages 40 hours, and has hundreds of food and drug interactions.

In the last several years, FDA has approved several NOACs, including Xarelto, Pradaxa®, and Eliquis®.  As a class, these medicines—as compared to warfarin—have fewer interactions with food and other medications, have a rapid onset and faster clearance rate, and do not require routine blood monitoring.  Although in the same class of medicines, NOACs are different not only from warfarin but also from one another—they help prevent blood clots through different processes and mechanisms of action.  For instance, whereas Xarelto and Eliquis inhibit clot formation by selectively blocking coagulation factor Xa, Pradaxa prevents clot formation by

directly inhibiting thrombin generation.[2]   The NOACs also have different approved dosing regimens and indications.   For instance, for the prevention of stroke in atrial fibrillation patients like Mr. Boudreaux and Mrs. Orr, FDA approved Xarelto for once-a-day use, whereas Pradaxa and Eliquis are taken twice daily.   Naturally, as their purpose is to impede blood clotting, *all* anticoagulation medicines—both the NOACs and warfarin—carry a risk of bleeding.

## II.   Plaintiffs' Design Claims

Plaintiffs have asserted a number of claims that fundamentally attack the design of Xarelto.  *See* La. Rev. Stat. Ann. § 9:2800.56 (providing cause of action for claim that product is "unreasonably dangerous in design").   For starters, Plaintiffs (and their experts) contend that warfarin or another NOAC, and certain features of those medicines, would have been a safer treatment for Mr. Boudreaux and Mrs. Orr.  See Orr Compl. ¶ 78 ("Xarelto . . . is not better than warfarin from a safety perspective . . . ."); Boudreaux Compl. ¶ 82 ("[T]here is no antidote to Xarelto, unlike warfarin.").   In addition, they assert that Xarelto itself should have been differently designed.  In particular, they say:

1.   Xarelto's FDA-approved design is unreasonably dangerous because (a) the approved 15 or 20 mg cumulative daily dose for AFib patients is too high; (b) the medicine should be dosed twice daily rather than once, as indicated; and (c) doctors should be instructed to adjust patients' doses according to the results of blood-monitoring tests aimed at determining the concentration of Xarelto in patients' blood or their Xarelto-related coagulation parameters.

2.   Xarelto's FDA-approved design is unreasonably dangerous because it does not incorporate the use of a test or assay to monitor patients' prothrombin time ("PT") as a means of measuring their Xarelto-related coagulation parameters.

3.   Xarelto's FDA-approved design should have included a reversal agent.

---

[2] Warfarin, by contrast, is a highly variable Vitamin K antagonist, which impedes clotting by inhibiting the recycling of Vitamin $K_1$

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law." Fed. R. Civ. P. 56(a).   "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).   The moving party need not negate the elements of the opposing party's case; all the moving party needs to show is that the opposing party cannot satisfy an element of his or her claim. *Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 355 (5th Cir. 2010).   A fact is material only if its resolution would affect the outcome of the action. *Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009).   Alleged "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   "If the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, no genuine issue exists for trial." *Tolliver v. Naor*, No. 99-0586, 2001 WL 1360435, at *2 (E.D. La. Nov. 5, 2001) (Fallon, J.).

## ARGUMENT

By its terms, the LPLA "establishes the *exclusive* theories of liability for manufacturers for damage caused by their products." La. Rev. Stat. Ann. § 9:2800.52 (emphasis added). Accordingly, there is no claim under Louisiana law for defective design outside the scope of the LPLA—no claim for negligence, strict liability, etc. *See, e.g.*, *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 261-62 (5th Cir. 2002) (holding that the LPLA precludes intentional tort, negligence, and strict liability claims); *Grenier v. Med. Eng'g Corp.*, 99 F. Supp. 2d 759, 763 (W.D. La. 2000) ("Given the exclusivity of the LPLA, all causes of action inconsistent with it

must be dismissed."), *aff'd*, 243 F.3d 200 (5th Cir. 2001).

Plaintiffs have the burden to demonstrate liability under the LPLA on the basis of one of four statutory theories—that the product was unreasonably dangerous due to (1) its composition or construction, (2) its design, (3) the manufacturer's failure to provide adequate warning, or (4) the product's failure to conform to a manufacturer's express warranty.  *See* La. Rev. Stat. Ann. § 9:2800.54(B).  Each of these theories requires the plaintiff to prove that an alleged defect—as statutorily defined—proximately caused his or her alleged injuries when the product was used in a reasonably foreseeable manner.  *Id.* § 9:2800.54(A).

As relevant to this motion, when a plaintiff contends that a product was unreasonably dangerous because of a defect in *design*, he or she must establish the following two elements:

1)    There existed an alternative design for the product that was capable of preventing the claimant's damage; and

2)    The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product.  An adequate warning about a product shall be considered in evaluating the likelihood of damage when the manufacturer has used reasonable care to provide the adequate warning to users and handlers of the product.[3]

*Id.* § 9:2800.56.

Plaintiffs bear the burden of proving both of these required elements.  *See Roman v. W. Mfg., Inc.*, 691 F.3d 686, 700-701 (5th Cir. 2012).  Absent evidence to prove both, summary judgment against a design-defect claim is proper.  *See, e.g.*, *Wiley v. Gen. Motors Corp.*, 100

---

[3] Subsection (2)'s "warning" clause is not relevant here because there is no "warning" that would remedy the design-related problems that Plaintiffs allege—namely, that the 20 mg dose is too high, that Xarelto should be dosed twice daily rather than once as indicated, that doses should be adjusted according to the results of blood-monitoring tests, and that there is no reversal agent for Xarelto.  Those are "pure" design-defect claims, in the sense that the only "fix" for the alleged defects is a re-designed drug.

F.3d 953, 953 (5th Cir. 1996); *Ashley v. Gen. Motors Corp.*, 666 So. 2d 1320, 1322 (La. Ct. App. 1996).  To be clear, evidence is essential—settled Louisiana law confirms that an unreasonably dangerous design may not be presumed or inferred from the simple fact that an injury occurred. *See, e.g.*, *Krummel v. Bombardier Corp.*, 206 F.3d 548, 551 (5th Cir. 2000) (citing *McCarthy v. Danek Med., Inc.*, 65 F. Supp. 2d 410, 412 (E.D. La. 1999)); *Hinson v. Mentor Corp.*, 207 F. Supp. 2d 531, 536 (M.D. La. 2002).

Because Plaintiffs here have failed to prove either necessary element of the LPLA's design-defect standard, the Court should grant Defendants summary judgment on Plaintiffs design-defect claims.

## I.     Plaintiffs cannot establish that there existed an alternative design for Xarelto that was capable of preventing Mr. Boudreaux's and Mrs. Orr's injuries.

To prove the first element of a design-defect claim, a plaintiff must show *both* that "[t]here existed an alternative design for the product" *and* that the proposed alternative "was capable of preventing the claimant's damage."  La. Rev. Stat. An.. § 9:2800.56.  Plaintiffs here have put forward two alternative-design theories: (a) that warfarin or another NOAC would have been a safer substitute, and (b) that certain untested changes to Xarelto's own FDA-approved design would have made Xarelto safer.  Both of Plaintiffs' theories fail because none of their suggested substitutes is a legally viable "alternative design" under the LPLA, and because Plaintiffs' own experts concede that there is no evidence that any of the substitutes was "capable of preventing" Plaintiffs' alleged injuries.

### A.     Plaintiffs' separate-product alternative-design theory fails both as a matter of law and for lack of proof.

Plaintiffs contend that Xarelto is unreasonably dangerous because, they say, other anticoagulation medications are purportedly safer.  *See, e.g.*, Rinder Rep. at 3 (Exh.   G)

("Rivaroxaban is the least effective and least safe of all NOACs."); Leissinger Rep. at 16 (Exh. H) ("In addition to Xarelto's inferior performance with respect to bleeding when compared to warfarin in the U.S. patients of ROCKET, there is also emerging data demonstrating potentially inferior performance when compared to other NOACs.").  To the extent that Plaintiffs point to separately marketed products—*e.g.*, warfarin or other NOACs, like Pradaxa or Eliquis—as their preferred "alternatives," their argument fails as a matter of law.  Under the LPLA, a separate product cannot constitute the legally required alternative design.  *See, e.g.*, *Tassin v. Sears, Roebuck & Co.*, 946 F. Supp. 1241, 1247 (M.D. La. 1996) ("An alternative design is by definition a different method of configuring the product.").  Moreover, and in any event, Plaintiffs have offered no evidence that using another medicine—whether warfarin or another NOAC—would have prevented Mr. Boudreaux's or Mrs. Orr's injuries.

1.    **Under the LPLA, a separate anticoagulation medicine is not a viable alternative design.**

Under Louisiana law, an "alternative design" must be a redesign *of the particular product at issue*—it cannot be an altogether different product with a purportedly safer design.  *See Theriot*, 168 F.3d at 255; *Tassin*, 946 F. Supp. at 1247.  Particularly with prescription medicines, "alternative methods of treatment are *not* alternative designs," because each medicine inherently has a different chemical composition, mechanism of action, and design.  *Hornbeck v. Danek Med., Inc.*, No. 99-30966, 2000 WL 1028981, at *1 (5th Cir. July 5, 2000); *see also Robertson v. AstraZeneca Pharms., LP*, No. 15-438, 2015 WL 5823326, at *4 (E.D. La. Oct. 6, 2015) ("[T]he existence of alternate products does not demonstrate the existence of a specific alternative design."); *In re Propulsid Prods. Liab. Litig.*, 2003 WL 367739, at *3 (holding that the existence of alternative or different methods of treatment is insufficient to prove an alternative design).

9

The Fifth Circuit's decision in *Theriot* is the seminal case.  There, the plaintiff alleged that pedicle screws that had been used to treat his back were defectively designed, and he asserted that a product without screws was a safer, alternative design.  168 F.3d at 255.  The court held that, as a matter of law, a separately marketed product without screws could not be considered an alternative design because it was an altogether different product.  *Id.*  Indeed, the court explained, the plaintiff's proposed alternatives were already available to his physician, who (for whatever reason) had chosen not to prescribe them.  *Id.*  Instead, the plaintiff's theory simply took "issue with the choice of treatment made by [the plaintiff's] physician, not with a specific fault of the pedicle screw sold by [the defendant]."  *Id.*  The court affirmed the dismissal of the plaintiff's claims for failure to plead a viable alternative design under the LPLA.  *Id.* at 256.

This Court has applied *Theriot* to reject a similar alternative-design theory.  In the *Propulsid* litigation, a plaintiff asserted that there were alternative methods for treating her gastrointestinal symptoms—including antacid products Reglan®, Prilosec®, Zantac®, and Prevacid®—but this Court held that "different methods of treating her symptoms" were "not sufficient to prove an alternative design under section 2800.56 of the LPLA."  2003 WL 367739, at *3; *see also McDowell v. Smith & Nephew Richards, Inc.*, No. 96-3436, 1999 WL 980159, at *1 (E.D. La. Oct. 27, 1999) (Fallon, J.) (applying *Theriot* to hold that plaintiff's design-defect claim concerning spinal screws failed as a matter of law because expert's testimony discussing spinal hooks as a substitute treatment was not evidence of alternative design); *Williams v. Danek Med. Inc.*, No. 93-1392, 1999 WL 639555, at *1 (E.D. La. Aug. 23, 1999) (Fallon, J.) (same).[4]

---

[4] *Crochet v. Bristol-Meyers Squibb*, No. 16-36, 2016 WL 3580670 (M.D. La. June 28, 2016), does not require a different result.  There, the plaintiff alleged in his complaint that the defendants had failed to consider the design of other drugs that could treat his condition and that would have arguably avoided his alleged injury.  *Id.* at *2-3.  At the pleadings stage, the court found those allegations sufficient to state a claim under the LPLA.  *Id.* at *3.  Notably, however, the court did not address *Theriot* or expressly conclude that an existing medication could constitute an

Other courts have likewise applied *Theriot* to reject alternative-design arguments that simply point to a separately marketed product. The recent decision in *Robertson v. AstraZeneca Pharm., LP*, No. CIV.A. 15-438, 2015 WL 5823326 (E.D. La. Oct. 6, 2015), is one on-point example. The court there rejected a plaintiff's claim that the prescription medication Seroquel® was defectively designed. 2015 WL 5823326, at *4. In so doing, the court held that the plaintiff's contentions—(1) that there were other "over the counter [sic] medications and prescription medications whose patents have expired that could have been manufactured and/or utilized to treat her symptoms" and (2) that Seroquel's manufacturer, AstraZeneca, itself sold "other products that could have been used to treat her symptoms"—"failed to demonstrate the existence of a specific alternative design." *Id.* Even at the pleadings stage, the court emphasized, those allegations were "insufficient *because the existence of alternate products does not demonstrate the existence of a specific alternate design*." *Id.* (emphasis added).[5]

Here, Plaintiffs point to warfarin as an alternative design both because it can be used in conjunction with a PT test to adjust dosages and because has a reversal agent. They also point to other NOACs that, they say, are safer than Xarelto. But just as in *Theriot*, *Propulsid*, and *Robertson*, all of these treatment options were available to Plaintiffs' prescribing physicians, who, for whatever reason, opted not to use them. Moreover, although warfarin, Pradaxa, and Eliquis are all anticoagulants, they help prevent clotting through different processes and

---

alternative design. Instead, the court focused on whether the allegations were specific enough to state a claim. *Id.*; *see also Guidry v. Janssen Pharms., Inc.*, No. 15-4591, 2016 WL 4508342, at *6-7 (E.D. La. Aug. 29, 2016) (addressing similar argument at pleadings stage, but not considering *Theriot*); *Hutto v. McNeil-PPC, Inc.*, 79 So. 3d 1199, 1215 (La. Ct. App. 2011) (implying indirectly that an alternative existing product may constitute an alternative design).

[5] *Hunt v. McNeil Consumer Healthcare*, 297 F.R.D. 268, 273 (E.D. La. 2014), which sanctioned as an "alternative design" an altogether different medication *that had not even been approved for use in the United States* is an outlier and should not be followed.

mechanisms of action than Xarelto; they are not (and do not even purport to be) alternative designs for Xarelto itself.  For instance, whereas Xarelto inhibits clot formation by selectively blocking coagulation factor Xa, *see* August 2013 U.S. Prescribing Information § 12.1 (Exh. I), warfarin is a highly variable Vitamin K antagonist, which impedes clotting by inhibiting the recycling of Vitamin $K_1$.  Likewise, Pradaxa works differently to prevent clot formation by directly inhibiting thrombin generation.  Although Eliquis is, like Xarelto, a factor Xa inhibitor, its active ingredient (apixaban) is a distinct chemical compound that differs from Xarelto's active ingredient, rivaroxaban, and the medications' absolute bioavailability differs, as well.[6]

As a matter of law, none of these separately marketed products can be the LPLA-required "alternative design" for Xarelto.

### 2. Plaintiffs cannot prove that substituting warfarin or another NOAC would have prevented Mr. Boudreaux's or Mrs. Orr's injuries.

In any event, Plaintiffs' design-defect claims that are based on the substitution of a different product fail for the additional—and independently sufficient—reason that their experts admit that there is no proof that any of those products would have prevented Mr. Boudreaux's or Mrs. Orr's injuries.  These admissions foreclose Plaintiffs' ability to carry their burden under the LPLA; so long as their experts acknowledge that there is no evidence that their suggested alternatives would have prevented Plaintiffs' injuries, their claims fail the LPLA's statutory test.

The LPLA's plain language adopts a clear requirement—as an indispensable element of the design-defect cause of action—that the plaintiff prove that his or her proposed alternative design could have avoided the alleged injury.  Echoing the LPLA's plain language, courts

---

[6] There is one commonality among NOAC products Xarelto, Pradaxa, and Eliquis: Although all have labels that clearly warn about the risk of bleeding, all have been targeted in litigation brought by many of the same plaintiffs' attorneys and supported by many of the same expert witnesses.

applying the Act have consistently held that the statutory lodestar is whether there existed an alternative design that was "capable of preventing" the plaintiff's injuries.  Absent evidence of an alternative that could have prevented the plaintiff's injuries, summary judgment is proper. *See, e.g.*, *Grenier*, 99 F. Supp. 2d at 764 (granting summary judgment on the basis of lack of evidence of injury-preventing alternative design); *accord Seither v. Winnebago Indus., Inc.*, 853 So. 2d 37, 41 (La. Ct. App. 2003).[7]  This Court granted summary judgment in *Propulsid* for this very reason, holding that there was "no proof that anything would have prevented or cured plaintiffs' condition," but instead "only speculation," which "is not enough to sustain the plaintiff's burden of proof."  2003 WL 367739, at *3.

*Kirby v. Langston's Furniture & Appliance, Inc.*, 631 So. 2d 1301 (La. Ct. App. 1994), is illustrative of LPLA cases holding summary judgment to be proper where a plaintiff provides no substantial evidence that the plaintiff's suggested alternative would have prevented the his injury.  There, the plaintiff was injured by a lawnmower blade and suggested a blade designed with a "deadman's switch" as an alternative. *Id.* at 1303.  "Significantly," however, the plaintiff's expert "did not offer the opinion that the deadman's switch, with its three to five second delay in stopping the [lawnmower] blade, would have prevented or diminished plaintiff's injury." *Id.* at 1304.  The failure to proffer that testimony was decisive:

> Because the plaintiff's fall and injury occurred before the blade's spinning action would have stopped, even had the mower been equipped with a deadman's switch, the installation of the switch could not have prevented [the plaintiff's] injury.  [The plaintiff's expert], in fact, did not offer the opinion that installation of the switch would have prevented the injury.

---

[7] Indeed, under the LPLA, injury-prevention is so essential to a design-defect plaintiff's claim that when the plaintiff offers expert testimony that does not meet it—*e.g.*, testimony that a suggested alternative simply would have been better—the testimony is subject to exclusion on the ground that it is not even relevant. *See, e.g.*, *Sittig v. Louisville Ladder Grp. LLC*, 136 F. Supp. 2d 610, 619 (W.D. La. 2001) (granting motion in limine to exclude plaintiffs' expert testimony, and reasoning that "neither Dr. Scott nor Dr. George will testify that the 3/4" extension of the ladder guide would have prevented plaintiff's accident as required by the quoted statute governing design defect liability.").

*Id.*  Further, the defense experts' uncontroverted testimony "establishe[d] that the deadman's switch (or, indeed, any safety device [then] available in the riding mower market) would not have prevented plaintiff's injury."  *Id.*  Accordingly, the court entered summary judgment in favor of the manufacturer. *Id.* at 1305.[8]

Here, plaintiffs have failed to prove—as required by the LPLA's plain language—that there existed an alternative design that would have avoided their injuries.  Indeed, their own experts' testimony demonstrates just the opposite.

One of the case-specific causation experts in the Boudreaux case, Dr. Leissinger, testified as follows:

> Q.    . . . My question is really very specific.  Can you say to a reasonable degree of medical certainty that Mr. Boudreaux would not have bled had he been on another anticoagulant?
>
> . . . .
>
> THE WITNESS:  So again, I . . . I cannot comment on whether he may have bled or may not have bled on any other - -
>
> Q.    You just - -
>
> A.    - - drug.

Leissinger Dep. 178:8-21 (Dec. 8, 2016) ("Leissinger Boudreaux Dep.") (Exh. A).  Another of the case-specific experts in the Boudreaux case similarly testified:

> Q.    Isn't it just speculation to say whether or not another anticoagulant other than Xarelto would or would not have caused a bleed in Mr. Boudreaux?
>
> . . . .

---

[8]  It will be no answer for Plaintiffs to cite cases applying the *pre*-LPLA standard under which a design-defect claim could survive summary judgment if a plaintiff established simply that the proposed alternative reduced or minimized the risk of harm.  *See, e.g., Cappo v. Savage Indus., Inc.*, 691 So. 2d 876, 879 (La. Ct. App. 1997) (applying pre-LPLA standards).

A.    Yeah, I mean it's - - yes, I would agree it's speculation.

Winstead Dep. 223:13-19 (Dec. 12, 2016) (Exh. B).

So too, in the Orr case, the case-specific experts acknowledged the absence of any evidence that some other product would have prevented Mrs. Orr's injury. For instance, Dr. Liechty testified as follows:

> Q.    So you could not say to a reasonable degree of medical certainty that Mrs. Orr's hemorrhage would have been avoided or that her outcome would have been any different on Pradaxa or Eliquis rather than Xarelto, could you?
>
> A.    I could not.  No.

Liechty Dep. 377:9-14 (Dec. 3, 2016) (Exh. C).

Because separate products are not viable alternative designs, and because Plaintiffs cannot prove in any event that those other products would have prevented Plaintiffs' injuries, their design-defect claims fail as a matter of law.

### B.    Plaintiffs' Xarelto-specific alternative-design theories fail both as a matter of law and for lack of proof.

Plaintiffs' suggested alterations of Xarelto's own design—*e.g.*, different doses, dosing schedules, PT monitoring, a reversal agent (similar to warfarin)—likewise fail to satisfy the LPLA's "alternative design" requirement as it has been interpreted and implemented in the case law.

As an initial matter, Plaintiffs do not dispute that Xarelto is a safe medicine for some people.  In fact, Plaintiffs' experts concede that Xarelto is "safe"—they just think it could have been even "safer."  *See, e.g.*, Maggio Dep. 317:4–7 (Dec. 4, 2016) (Exh. D) ("I would agree that . . . the drug should have been approved and that the . . . potential benefits outweigh potential risks."); Backes Dep. 200:08-204:1 (Nov. 17, 2016) (Exh. J) (testifying that Xarelto is not "unsafe and [in]effective in the majority of individuals" and should not "be removed from the

market," but that coagulation monitoring could "increase the safety of th[e] drug" in some individuals and make it "safer"); Plunkett Dep. 342:15–343:15 (Dec. 6 & 7, 2016) (Exh. K) (declining to testify that Xarelto is "absolutely unsafe" but asserting that monitoring would "improve patient safety"); Cerri Dep. 240:4-7 (Nov. 28, 2016) (Exh. F) (testifying that Xarelto is "a great drug" but that it could be made "safer" through monitoring and incorporation of a reversal agent).

To be clear, under the LPLA, an assertion that a medicine should be made safer is insufficient to satisfy Plaintiffs' burden.  Defendants are not obligated to make Xarelto "risk-free"—no prescription medicine is risk-free, and all medicines by their very nature carry risks. "Manufacturers who design reasonably safe products, even if those products were not the best or safest possible, cannot be held liable under Louisiana law." *Dixon v. Home Depot U.S.A.*, No. 13-2776, 2015 WL 4479682, at *2 (W.D. La. July 21, 2015).  Put differently, under the LPLA, "[i]t would be impermissible, . . ., for [a plaintiff] to insinuate that, even if [a product] was a reasonably safe product, [a manufacturer was] nonetheless required under Louisiana law to produce a [product] that was safer or better." *Id.*; *see also, e.g.*, *Crowe v. Winn-Dixie of La. Inc.*, 2009-0647, 2010 WL 502782, at *3-4 (La. Ct. App. Feb. 12, 2010) (affirming summary judgment because of fatal deficit of proof on alternative design where plaintiff asserted "that an alternative design would have been better").

Even beyond that, Plaintiffs' various suggestions of ways to improve Xarelto's design fail because they are merely hypothetical, conceptual suggestions that plaintiffs have not tested, as required by the LPLA, and because—again—plaintiffs have no evidence that even as "redesigned," Xarelto could have prevented Mr. Boudreaux or Mrs. Orr's injuries.

1.  **Under the LPLA, an untested "conceptual" improvement to Xarelto is not a viable alternative design.**

Under the LPLA, a design-defect plaintiff must *both* (1) identify a reasonably specific alternative design of the challenged product *and* (2) support that specific alternative with data (developed through testing) concerning its risks and benefits.  It is not sufficient for a plaintiff to "speculat[e]" about possible alternatives or offer untested and unengineered "concepts."  *Moore v. BASF Corp.*, No. 11-1001, 2012 WL 6025917, at *4 (E.D. La. Dec. 4, 2012), *aff'd' Moore v. Int'l Paint, L.L.C.*, 547 F. App'x 513 (5th Cir. 2013); *Seither*, 853 So. 2d at 41.  Rather, the LPLA requires specificity and reliable, concrete data validating the alternative design.  *See, e.g.*, *Crowe*, 2010 WL 502782, at *3 (affirming summary judgment where expert "did not refer to a specific alternative design that existed at the time the [product left the manufacturer's] control" and failed to present any "technical drawings, calculations, scientific study, photographs, publications, or evidence of any kind, as to the [al]luded to alternative design"); *Seither*, 853 So. 2d at 41 (finding that "there was no valid alternative design presented" where the plaintiff "presented merely a concept that was untested, unengineered, and not presented to the jury in any fashion more than mere speculation").

More specifically, courts have held that the LPLA requires a design-defect plaintiff to provide data, developed through testing, to support *both* the feasibility and injury-prevention aspects of his specific alternative design.  *See, e.g.*, *Glascock v. Med. Depot, Inc.*, No. 11-305-JJB, 2013 WL 361002, at *4 (M.D. La. Jan. 29, 2013), *aff'd*, 539 F. App'x 589 (5th Cir. 2013) (collecting cases applying Louisiana law concerning testing-and-data requirements).  The plaintiff *must* come forward with data developed through testing, and that data *must* provide "evidence concerning the frequency and costs of accidents like [the plaintiff's], the extent to which the alternative design would prevent or reduce accidents like [the plaintiff's], and the

effect [the plaintiff's] alternative design would have on the [the product's] utility." *Gray v. Indus. Plant Maint.*, No. 01-1167, 2004 WL 1661209, at *6 (E.D. La. July 23, 2004). Without reliable evidence to support use of an alternative design with the particular plaintiff, the design-defect claim fails as a matter of law. *See id.*; *Glascock*, 2013 WL 361002, at *5.

Plaintiffs' showing here comes up well short. To be sure, they have suggested "concepts," *Moore*, 2012 WL 6025917, at *4—*e.g.*, a lower-dose or more frequently administered pill, dose adjustments pursuant to the results of PT testing, or creation of a reversal agent—but they have not tested or demonstrated the viability of any of those alternatives for Xarelto. As explained in detail in Defendants' *Daubert*-based motion to exclude Plaintiffs' expert opinions concerning alternative dosing and monitoring regimens, Plaintiffs cannot demonstrate scientifically that their proposed alternative designs would provide both equally effective stroke prevention and less risk for atrial fibrillation patients.[9] Without such evidence, plaintiffs' suggestions about conceptual alternatives to the FDA-approved design of Xarelto are "speculat[ive]"—and thus, as a matter of law, are insufficient to satisfy the LPLA. *See Moore*, 2012 WL 6025917, at *4 (rejecting expert testimony concerning chemical compounds in paint, which "identified as an alternative design the use of the same components, run through a purification process to study and remove contaminants," because the expert "provided no specifics about the method for such a process other than to testify that 'you can go through different distillation processes and chemical additions to expel the benzene out before using the product'"); *see also Seither*, 853 So. 2d at 41 (finding that although plaintiff's expert had presented a mock-up of a van at trial, "his design criteria were not outlined, there were no

---

[9] *See* Defendants' Memorandum in Support of Their *Daubert* Motion To Exclude Expert Opinions and Testimony Regarding Unapproved Dosing and Monitoring Regimens at 10–22 (hereinafter "Monitoring & Dosing *Daubert* Motion").

engineering drawings produced, he did not establish any dimensions, and he had done no analysis or testing").[10]

Accordingly, Plaintiffs' experts' suggestions—lower doses, twice-daily doses, adjusted doses, PT monitoring, reversal agent, etc.—are not based on reliable scientific evidence and lack the LPLA-required specificity, testing, and evidentiary support.

### 2. Plaintiffs cannot prove that a differently designed Xarelto would have prevented Mr. Boudreaux's or Mrs. Orr's injuries.

In addition to demonstrating, with testing and data, that an alternative design was appropriate and feasible, Plaintiffs must prove that the alternative was "capable of preventing" the injuries that they allegedly sustained. As explained below, a number of plaintiffs' experts have candidly admitted the use of their suggested hypothetical alternatives might *not* have prevented Mr. Boudreaux's and Mrs. Orr's alleged injuries.

### a. Plaintiffs' experts concede that they have no reliable evidence that a lower Xarelto dose or different dosing regimen would have prevented Mr. Boudreaux's or Mrs. Orr's injuries.

Plaintiffs' experts concede that a twice-daily dose or lower total dose of Xarelto might not have prevented the alleged injuries. A few examples—

- Dr. Maggio admits that plaintiffs "don't have data to address . . . experimentally" whether "an alternative dose . . . would reduce bleeds without increasing stroke" risks and, indeed, that "it's possible that bleeding would be worse with a twice-daily [dosing] regimen." Maggio Dep. 49:13-20, 233:18-24.

- Dr. Rosing acknowledges that he does not "have any evidence about any patients' [sic] bleeding outcome on a different dose," Rosing Dep. 52:14-20 (Dec. 9, 2016) (Exh. E), and that he cannot offer an opinion on how much lower the dose should be, because any such testimony would be only his "personal opinion" and "not based on scientific evidence," *id.* 40:17–41:3.

---

[10] Indeed, as explained Defendants' *Daubert* brief, as a matter of *federal* law, alternative-design evidence that amounts to nothing more than "conceptual suggestions" is not even admissible. *See* Monitoring & Dosing *Daubert* Motion at 20–21 (quoting *Guy v. Crown Equipt. Corp.*, 394 F.3d 320, 327 (5th Cir. 2004)).

- Dr. Leissinger agrees that "the only way . . . to have an opinion to a reasonable degree of medical certainty that BID dosing in an atrial fibrillation patient versus OD dosing is safer and more effective would be to actually have that data and make that comparison." Leissinger Dep. 106:21–107:2 (Nov. 15, 2016) ("Leissinger Generic Dep.") (Exh. L).  Of course, she "do[es]n't have that data," *id.* 107:3–5, as a twice-daily dosing schedule has not been tested in atrial fibrillation patients.

- Dr. Plunkett admits that it is "a possibility" based on FDA reviewer simulations that "a twice-daily regimen would actually cause more bleeding than a once-daily regimen." Plunkett Dep. 595:15-24.

- Dr. Backes concedes that he "do[es]n't have any clinical outcome data to support the contention that a time-release dosing regimen would improve safety or efficacy," that he just "put that in [his report] as a suggestion."  Backes Dep. 205:19-24.

Without evidence that a lower dose or twice daily dosing would have avoided the particular Plaintiffs' injuries, Plaintiffs' design-defect claims based on an alternative dose or dosing regimen fail as a matter of law under the LPLA.

> **b.     Plaintiffs' experts concede that they have no reliable evidence that a PT-monitoring regime would have prevented Mr. Boudreaux's or Mrs. Orr's injuries.**

Plaintiffs' experts also concede that their proposed PT monitoring regimens might not have prevented the alleged injuries.  *See, e.g.*, Maggio Dep. 21:12-16 (admitting that Plaintiffs do not "have any data that shows that in fact patient safety would be improved . . . through monitoring of rivaroxaban"); Rinder Dep. 253:11–22 (Dec. 14 & 15, 2016) (Exh. M) (conceding that he has "*not* seen data developed that would [enable him] to make a knowledgeable decision" about whether, "to a reasonable degree of medical certainty," he believes "that as a Xarelto patient's PT increases, he or she is at a greater risk of a fatal bleed.") (emphasis added).

In particular, the case-specific experts in the Boudreaux and Orr matters concede that the PT-monitoring theory is speculative.  With respect to Mr. Boudreaux, Dr. Leissinger testified that PT monitoring *could not have been used* as part of his Xarelto therapy:

A: . . . [W]e cannot adequately monitor patients on Xarelto.

20

Q: So you could not have used PT to monitor Mr. Boudreaux.  Fair?

. . . .

THE WITNESS: With our current knowledge and lack of validation studies, we really can't. . . .

Q: So in 2014, when Mr. Boudreaux was prescribed Xarelto, you could not have used PT to monitor him?

. . .

THE WITNESS: I agree with that.

Leissinger Boudreaux Dep. 214:22–216:4.  Nor could Dr. Leissinger say whether Mr. Boudreaux was exposed to more anticoagulant than necessary, as Plaintiffs claim would be possible to determine with PT monitoring:

Q.      There's no evidence that Mr. Boudreaux was overanticoagulated; correct?

. . . .

A.      We have no way of testing.  We have no way to monitor.  We have no way to test.  We have no way to know whether he was anti - - overcoagulated or - - or precisely anticoagulated or not, which is the problem with Xarelto.

Lessinger Boudreaux Dep. 192:1-11.[11]

In the same way, Mrs. Orr's case-specific expert, Dr. Cerri—who believes that Xarelto is "the best anticoagulant that is commercially available"—explicitly rejects Plaintiffs' claim that PT monitoring would, in fact, make Xarelto safer for atrial fibrillation patients.  He says:

---

[11] Although there is no PT-monitoring test designed or approved for use with Xarelto, another of Mr. Boudreaux's experts, Dr. Rinder, speculated—based on calculations that he performed in his head, and did not document in writing—that a PT test could have identified Mr. Boudreaux as an individual susceptible to bleeding on Xarelto. But, as explained in Defendants' *Daubert* motion, Dr. Rinder's calculations—which he performed solely for purposes of this litigation—have not been peer-reviewed, published, or shown with to be reliable or clinically significant.  His opinions should be excluded and, in any event, are insufficient to satisfy Plaintiffs' burden that a PT test would have made a difference or that Mr. Boudreaux's physician would have prescribed a lower dose than the 20 mg dose approved by the FDA.

"There's not an order I can enter which allows me to measure, monitor and evaluate the coagulation status for the patient . . . [or] the drug, . . ."  Cerri Dep. 24:12–20; *see also id.* at 16:11–19 (acknowledging that "there's no laboratory assay that allows me or any other medical emergency physician to measure, monitor, [or] evaluate the drug" in a way that would facilitate clinical decisions based on those measurements).  Nor did Dr. Cerri offer any testimony about how a PT test would have affected his treatment of Mrs. Orr.

Without evidence that monitoring Mr. Boudreaux's and Mrs. Orr's PT levels would have prevented their injuries, Plaintiffs' design-defect claims based on PT monitoring fail as a matter of law under the LPLA.

**c.**   **Plaintiffs' experts concede that they have no reliable evidence that the availability of a reversal agent would have prevented Mr. Boudreaux's or Mrs. Orr's injuries.**

Plaintiffs' experts in both cases admit that there is no evidence to suggest that a reversal agent for Xarelto would have prevented Mr. Boudreaux's or Mrs. Orr's injuries.

One of the case-specific experts in the Boudreaux matter, Dr. Lessinger, testified, "I don't know" whether "a reversal agent would not have made a difference" for Mr. Boudreaux.  Leissinger Boudreaux Dep. 154:5-21.  Another, Dr. Winstead, was more definitive: "I agree that in this particular case that an antidote *would have served no purpose*."  Winstead Dep. 114:21-22 (emphasis added).  And with good reason:  Mr. Boudreaux's gastrointestinal bleed had ceased by the time he was examined by his treating physician, so a reversal agent would have been clinically unnecessary.  Masri Dep. 167:19- 168:18 (July 18, 2016) (Exh. N).

The expert testimony in the Orr matter also fails the LPLA test.  One of the case-specific experts in the Orr matter, Dr. Cerri, testified that Mrs. Orr "would have had a fighting chance if [a reversal agent] was administered," but he could not say to any degree of medical certainty that a reversal agent (even if one existed) could have prevented her injuries.  Cerri Dep. 31:8-18.

22

Another expert, Dr. Liechty, testified that "the ability to reverse the anticoagulant would probably be something to consider at least" in terms of whether another treatment option could have prevented Mrs. Orr's injuries.  Liechty Dep. 378:6-18.  Dr. Liechty acknowledged that there is no reversal agent designed or approved for use with Xarelto, but he speculated that, based on his experience with the reversal agent for warfarin, had Mrs. Orr been given a hypothetical Xarelto reversal agent, she would have had a 60% greater chance of survival.  *See* Liechty Rep. at 11 (Exh. O).  Yet, Dr. Liechty's willingness to speculate about the effect of a hypothetical, non-existent reversal agent is telling, and he agreed that even in the case of warfarin, the agent "isn't much of a reversal agent."  Liechty Dep. 382:18-383:4.  In particular, he testified:

> Q.     So do you have . . . any basis for your opinion to say that Mrs. Orr would have had a better outcome on warfarin compared to Xarelto?
>
> A.     Well, my basis is that I - - I think - - I think that she would have had things in place so CJ [Dr. Cuong Bui] could have intervened sooner, potentially.
>
> Q.     A reversal agent, namely?
>
> A.     A PCC [prothrombin complex concentrate (*i.e.*, a reversal agent)].
>
> Q.     Okay.  Do you remember - -
>
> A.     Vitamin K is no use in an acute setting.  I mean, . . . it's an adjunct.  But it's - -
>
> Q.     It just takes too long?
>
> A.     Well, a week.
>
> Q.      Yeah.  So - -
>
> A.     She didn't have a week.

> Q.     Do you recall reviewing the medical records in Mrs. Orr's case and seeing that PCC and FFP [fresh frozen plasma] were discussed as potential reversal options for her?
>
> A.     I do recall seeing that.  Yes.  I . . . don't remember if she received them.  I don't . . .
>
> Q.     Those are the same reversal agents or same potential reversal agents you just identified for me as option for warfarin-related ICH [Intra-cranial hemorrhage], if that's what Mrs. Orr had been taking; right?
>
> A.     Right.

*Id.* 388:8-389:10.  Dr. Liechty testified that use of these agents, which were already available and considered by Mrs. Orr's treating physicians, could "have potentially opened the door for [the physician] to intervene sooner. That - - that's all." *Id.* 390:4-6. Yet speculation that a reversal agent for another product might have been useful had the other product been prescribed initially is insufficient to satisfy Plaintiffs' burden.   And there is no reliable evidence that a hypothetical, non-existent Xarelto-specific reversal agent would have made a difference.

Without evidence that the availability of a reversal agent for Xarelto would have prevented Mr. Boudreaux's and Mrs. Orr's injuries, plaintiffs' design-defect claims based on a reversal agent fail as a matter of law under the LPLA.

For all of these reasons, Plaintiffs cannot prove, as required by the LPLA, that "there existed an alternative design for the product that was capable of preventing" Mr. Boudreaux's and Mrs. Orr's injuries.  Accordingly, Plaintiffs design-defect claims fail as a matter of law.

## II.     Plaintiffs cannot satisfy the LPLA's risk-utility test.

Finally and separately, Plaintiffs' design-defect claims fail because they have offered no evidence to satisfy the essential risk-utility aspect of the LPLA's unreasonable dangerousness standard.  Under the LPLA:

> Plaintiffs' burden of proof requires them "to show not only that there was an alternative, safer design, but also that the risk avoided by using the alternative design (magnitude of damage discounted by the likelihood of its occurrence) would have exceeded the burden of switching to the alternative design (added . . . costs and loss of product utility)."

*Thompson v. Nissan N. Amer.*, 429 F. Supp. 2d 759, 776 (E.D. La. 2006) (quoting *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 181 (5th Cir. 1990)).

To prove a safer alternative design involving complex products or medicines, the plaintiffs must offer expert testimony that "[t]he likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product." La. Rev. Stat. Ann. § 9.2800.56; *Lavespere*, 910 F.2d at 184; *Graham v. Hamilton*, No. 3:11-609, 2012 WL 1252590, at *6-7 (W.D. La. Apr. 12, 2012); *Grenier*, 99 F. Supp. 2d at 764; *Johnson v. Black & Decker U.S., Inc.*, 701 So.2d 1360, 1363 (La. Ct. App. 1997); *see also Krummel*, 206 F.3d at 551 (same analysis applies to labeling).

When "[t]estimony relating to the creation and testing of an alternative design would require sophisticated knowledge of, *inter alia*, aspects [of] biochemistry, physics, and [a particular medical technology]," expert qualifications are essential. *Grenier*, 99 F. Supp. 2d at 764. The failure of a plaintiff to offer expert testimony as to the impact of the proposed alternative design on the availability of the product or its utility and the associated burdens with adopting a proposed alternative design is sufficient for a court to grant summary judgment. *See, e.g., Roman*, 691 F.3d at 701 (finding that failing to address the burdens or adverse effects on utility of the proposed changes renders evidence "insufficient as a matter of law to support a finding of design defect") (internal quotations omitted); *Moore*, 2012 WL 6025917, at *5 (granting summary judgment for defendants where plaintiffs failed to conduct any risk-utility

analysis); *Thompson*, 429 F. Supp. 2d at, 778-79 (same); *Scordill v. Louisville Ladder Grp., LLC*, No. 02-2565, 2003 WL 22427981, at *10 (E.D. La. Oct. 24, 2003) (same).

Time and again, courts evaluating design-defect claims under the LPLA have rejected them on summary judgment when plaintiffs fail to offer evidence sufficient to satisfy the risk-utility test. *See, e.g.*, *Lawrence v. Gen. Motors Corp.*, 73 F.3d, 587, 588-90 (5th Cir. 1999) (reversing a jury verdict and entering judgment as a matter of law in favor of vehicle manufacturer on the ground that plaintiff's expert did not elaborate on the likelihood of avoiding car accident through alternative design and did not address the burdens or adverse utility effects of alternative design of vehicle component); *Lavespere*, 910 F.2d at 183-84 (affirming summary judgment on design-defect claim on ground that plaintiff introduced no evidence of the extent of the risk that the alternative design would have avoided, the reduction in the frequency of similar accidents, the burden of switching to the alternative design, the costs that the manufacturer would incur if it used the alternative design, or the economic consequences and problems generated by rendering the machine unfit some possible uses); *McFarlin v. New Hampshire Ins. Co.*, No. CV 12-3033, 2016 WL 3645200, at *5 (W.D. La. June 30, 2016) (granting summary judgment on design-defect claim on ground that a proper-risk utility analysis under the LPLA includes more than simply cost assessment and "also questions the riskiness of the product to begin with and whether that risk so outweighed the burden of implementation of an alternative design as to mandate the use of the alternative design"); *Scordill*, 2003 WL 22427981, at *10 (granting summary judgment against design-defect claim on ground that plaintiffs had presented "no evidence as to the increased cost of manufacturing the proposed alternative design, no evidence as to the effect of the risk that the alternative design would have avoided, and no evidence of the alternative design's potential effect on product utility"); *Thompson*, 429 F. Supp.

2d at 776-79 (granting summary judgment dismissing a design-defect claim concerning the fuel-system design of a vehicle, where plaintiffs failed to address the adverse effects of their purported safer design on the utility of the vehicle).

Because Plaintiffs have not demonstrated, with the required evidence, that Xarelto fails (and that their proposed alternative satisfies) the risk-utility calculus, their design-defect claims are barred as a matter of law under the LPLA.  As explained in detail elsewhere, Plaintiffs' experts have not come forward with the evidence or data necessary to weigh the benefits and risks of an alternative design under the risk-utility analysis.  *See* Monitoring & Dosing *Daubert* Motion at 10–22. Plaintiffs have presented no evidence about (1) the new risks that design changes to the product might cause (such as an increased risk of stroke from a lower dosage); (2) the adverse effects of the delay in waiting on Xarelto to be redesigned to accommodate other doses or dosing regimens, or for use in conjunction with a PT test or reversal agent; (3) the manufacturing costs involved in implementing such changes; or (4) the effects of any proposed alternative design on the utility of Xarelto.  *See, e.g.*, Maggio Dep. 21:12-16 (admitting that plaintiffs do not "have any data that shows that in fact patient safety would be improved . . . through monitoring of rivaroxaban"); *id*. 49:13-20 (admitting that Plaintiffs "don't have data to address . . . experimentally" whether "an alternative dose . . . would reduce bleeds without increasing stroke" risks; Backes Dep. 204:3-206:18 (admitting that there is no data to support the contention that twice-daily dosing or a time-release dosing regimen would improve safety or efficacy, and admitting that he is not certain that a time release formulation is even feasible); *id*. 284:16-25 (admitting that there is insufficient data to determine proper dosing adjustments based on prothrombin time); Rosing Dep. 33:20-34:3 (admitting that he does not know "from a study" whether "lower doses [of Xarelto would be] as effective"); *id*. 36:9-14 (acknowledging that

"there is no proof" that "a different dose of rivaroxaban would have been as safe and as effective as the approved doses"); *id.* 38:14-39:1 ("agree[ing]" that there is no "data that establishes to a reasonable degree of scientific certainty, that twice daily instead of once-daily rivaroxaban reduces major bleeding while maintaining ischemic stroke prevention"); Cuculich Dep. 219:17-220:22 (Dec. 2, 2016) (Exh. P) (testifying that while he advocates using a Neoplastin reagent to monitor Xarelto concentration, he has not asked his hospital to obtain the Neoplastin reagent because it would be too expensive for many of his patients and insurance would likely not cover the cost); Leissinger Generic Dep. 106:21-107:5 (admitting that there is insufficient data regarding twice-daily versus once-daily dosing in patients with atrial fibrillation to make a determination regarding which would be safer and more effective); *id.* 187:10-16 (acknowledging that, due to lack of data, she "can't possibly know" whether monitoring would improve the safety and efficacy of Xarelto).

Nor is there is any evidence that any of these new, supposed alternative design features for Xarelto—which FDA approved without *any* of them—could have been demonstrated through rigorous clinical trials to be safe and effective, or that FDA would have approved such a redesigned medicine. *Cf. Yates v. Ortho-McNeil-Janssen Pharms., Inc.*, 808 F.3d 281, 299 (6th Cir. 2015) (finding assumption that FDA would have approved lower-dose estrogen patch "attenuated" and unsupported); *Utts v. Bristol-Myers Squibb Co.*, No. 1:16-cv-02899-DLC, 2016 WL 7429449, at *12 (S.D.N.Y. Dec. 23, 2016) (finding assumption that FDA would have approved re-designed anticoagulant "speculat[ive]").

In the absence of proof that the supposed benefits associated with Plaintiffs' proposed alternative designs, and their feasibility based on the existing state of scientific and medical

knowledge, outweigh the costs and burdens associated with the change, Plaintiffs have failed to

offer sufficient evidence under the LPLA's risk-utility analysis.

**III.    There is no claim for failure to test.**

Several of Plaintiffs' experts allege that Defendants did not conduct the clinical trials that

would have assessed their alleged proposed alternative designs.  *See* Gertsman Rep. at 56–57

(Exh. Q); Maggio Rep. 42–43 (Exh. R); Parisian Rep. 10–11, 14 (Exh. S); Backes Rep. 11 (Exh.

T); Plunkett Rep. 30–31 (Exh. U).  Those allegations fall flat because it is well established that

Louisiana law does not recognize a "failure to test" claim.

The LPLA "establishes the exclusive theories of liability for manufacturers for damage

caused by their products."  La. Rev. Stat. Ann. § 9:2800.52.  Under binding Fifth Circuit

precedent, the LPLA does not authorize an independent claim based on an alleged failure to test

products.  Thus, in *Theriot*, the Fifth Circuit affirmed summary judgment in favor of a medical-

device manufacturer where the plaintiff claimed that the manufacturer had not properly tested the

device and thus had not adequately warned the plaintiff's doctor of alleged risks associated with

the device.  168 F.3d at 256.  As the Court explained, the plaintiff there (like the Plaintiffs'

experts here) was "arguing that he should be permitted to proceed to trial if [the manufacturer]

cannot demonstrate that it adequately tested its product."  *Id.*  The Fifth Circuit held that "[t]here

is no basis in the LPLA or case law for such a rule and . . . therefore conclude[d] that the district

court did not err in granting summary judgment."  *Id.*; *see also*, *e.g.*, *Linsley*, 2000 WL 343358,

at *6 (granting summary judgment when plaintiff was "only left with the argument that Bard did

not adequately test its product," which does not establish a claim under the LPLA).

Under the LPLA, a product manufacturer may be held "to a claimant for damage

proximately caused by a characteristic of the product that renders the product unreasonably

dangerous . . . ."  La. Rev. Stat. Ann. § 9:2800.54(A).  But where a plaintiff has not done any testing to verify his theory, and where there is no evidence of what the plaintiff's proposed testing would have revealed or how the results could have avoided his injuries, the plaintiff can show causation under a "failure to test" theory.  *See, e.g.*, *In re Chinese Manufactured Drywall Prods. Liab. Litig.*, No. 09-6687, 2010 WL 8368083, at *3–4 (E.D. La. Feb. 17, 2010) (granting motion to exclude expert testimony concerning a proposed system for reducing the gases released by drywall on the ground that the system had not been tested, peer reviewed, and had no known error rate); *see also In re C.R. Bard, Inc. Pelvic Repair Sys. Prods. Liab. Litig.*, MDL No. 2187, 2013 WL 3821280, at *5 (S.D. W. Va. July 23, 2013) ("Bard only has a duty to warn of any defects of which it had actual or constructive knowledge, and therefore, evidence that testing would have shown certain defects is a necessary prerequisite to establish that Bard had constructive knowledge of the defects."); *In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 950, 964 (D. Minn. 2009) (excluding expert testimony about what testing would have shown on the ground that the testing could not have been completed before the plaintiffs' alleged injuries).

To the extent that Plaintiffs are pursuing a failure-to-test theory, either as an independent claim or as support for a design-defect or failure-to-warn claim, the theory is foreclosed by Fifth Circuit precedent.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment on Plaintiffs' Design Defect Claims under the LPLA should be granted.

Respectfully submitted,

DRINKER BIDDLE & REATH LLP

By: /s/ *Susan M. Sharko*
Susan M. Sharko
Drinker Biddle & Reath LLP
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
susan.sharko@dbr.com

Rodney M. Hudson
DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105-2235
Telephone: (415) 591-7500
Rodney.hudson@dbr.com

Chanda A. Miller
Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone: (215) 988-2500
Chanda.Miller@dbr.com

IRWIN FRITCHIE URQUHART & MOORE LLC

By: /s/ *James B. Irwin*
James B. Irwin
Kim E. Moore
Irwin Fritchie Urquhart & Moore LLC
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
jirwin@irwinllc.com

*Attorneys for Defendants Janssen*
*Pharmaceuticals, Inc., Janssen Research &*
*Development, LLC, and Janssen Ortho LLC,*
*and Johnson & Johnson*

ARNOLD & PORTER KAYE SCHOLER LLP

By: /s/ *William Hoffman*
William Hoffman
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
william.hoffman@apks.com

Andrew K. Solow
Steven Glickstein
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Telephone: (212) 836-8485
andrew.solow@apks.com
steven.glickstein@apks.com

BRADLEY ARANT BOULT CUMMINGS LLP

By: /s/ *Kevin C. Newsom*
Kevin C. Newsom
Lindsey C Boney IV
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place, 1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8803
knewsom@bradley.com

CHAFFE MCCALL L.L.P.

By: /s/ *John F. Olinde*
John F. Olinde
Chaffe McCall L.L.P.
1100 Poydras Street, Suite 2300
New Orleans, LA 70163
Telephone: (504) 585-7241
olinde@chaffe.com

*Attorneys for Bayer HealthCare*
*Pharmaceuticals Inc. and Bayer Pharma AG*

## <u>CERTIFICATE OF SERVICE</u>

       The undersigned hereby certifies that on January 20, 2017, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre-Trial Order No. 17.

                                          */s/ James B. Irwin*
                                          **James B. Irwin**