# EXHIBIT F

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3

 4   IN RE:  XARELTO (RIVAROXABAN)  MDL No. 2592
     PRODUCTS LIABILITY LITIGATION

 5                                  SECTION L

 6   _____ JUDGE FALLON

 7   THIS DOCUMENT RELATES TO:     MAG. JUDGE NORTH

 8   JOSEPH ORR, JR., AS LAWFUL
     SURVIVING SPOUSE OF SHARYN ORR

 9
     Case No. 2:15-CV-03708

10

11

12     PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

13

14                   NOVEMBER 28, 2016

15

16                      - - -

17          Videotaped deposition of GIANLUCA CERRI,
     M.D., FACEP, FAAEM, held at Perry Dampf Dispute
18   Solutions, 721 Government Street, Baton Rouge,
     Louisiana, commencing at 9:58 a.m., on the above
19   date, before Leslie B. Doyle, Certified Court
     Reporter (#93096), Registered Professional Reporter,
20   Certified Realtime Reporter.

21

22                      - - -

23           GOLKOW TECHNOLOGIES, INC.

24       877.370.3377 ph|917.591.5672 fax

25              deps@golkow.com
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1   A P P E A R A N C E S:

 2

 3   COUNSEL FOR THE PLAINTIFF:
 4        EMILY C. JEFFCOTT, ESQ.
              Email:  Ejeffcott@thelambertfirm.com
 5          Phone:  (504) 581-1750
          THE LAMBERT FIRM
 6        701 MAGAZINE STREET
          NEW ORLEANS, LOUISIANA  70130
 7
 8   - AND -
 9        ROGER C. DENTON, ESQ.
              Email:  Rdenton@uselaws.com
10          Phone:  (314) 621-6115
          SCHLICHTER, BOGARD & DENTON, LLP
11        100 S. 4TH STREET, SUITE 900
          ST. LOUIS, MISSOURI  63102
12
13   COUNSEL FOR THE JANSSEN DEFENDANTS:
14        JAMES B. IRWIN, ESQ.
              Email:  Jirwin@irwinllc.com
15        MEERA U. SOSSAMON, ESQ.
              Email:  Msossamon@irwinllc.com
16          Phone:  (504) 310-2100
          IRWIN, FRITCHIE, URQUHART & MOORE, LLC
17        400 POYDRAS STREET, SUITE 2700
          NEW ORLEANS, LOUISIANA  70130
18
19   COUNSEL FOR THE BAYER DEFENDANTS:
20        JEREMY S. BARBER, ESQ.
              Jbarber@wilkinsonwalsh.com
21        KIM CHANNICK, ESQ.
              Kchannick@wilkinsonwalsh.com
22          Phone:  (202) 847-4000
          1900 M STREET, NW, SUITE 800
23        WASHINGTON, D.C.  20036
24
25   ALSO PRESENT:  MELISSA BARDWELL, VIDEOGRAPHER
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1                    INDEX OF EXAMINATIONS

2     EXAMINATION

3        BY MR. IRWIN...........................7

4     CERTIFICATE.......................315 - 316

5

6                         * * *

7

8                     INDEX OF EXHIBITS

9     EXHIBIT #1...............................12

10       LIST OF ARTICLES

11    EXHIBIT #2...............................47

12       EXPERT REPORT OF GIANLUCA CERRI, M.D.,

13       FACEP, FAAEM

14    EXHIBIT #3...............................93

15       4/24/15 NOMH NEUROSCIENCE CRITICAL CARE

16       MEDICAL RECORD

17       (SOrr-OMC-MD-000010 - 0022)

18    EXHIBIT #4..............................101

19       4/24/15 NOMH NEUROSCIENCE CRITICAL CARE

20       MEDICAL RECORD

21       (SOrr-OMC-MD-000231 - 0036)

22    EXHIBIT #5..............................106

23       4/24/15 NOMH NEUROSCIENCE CRITICAL CARE

24       MEDICAL RECORD

25       (SOrr-OMC-MD-000031 - 0034)

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1    EXHIBITS (CONTINUED):

 2

 3    EXHIBIT #6.................................108

 4       4/24/15 NOMH NEUROSCIENCE CRITICAL CARE

 5       MEDICAL RECORD

 6       (SOrr-OMC-MD-002914 - 2917)

 7    EXHIBIT #7.................................111

 8       XARELTO LABEL REVISED 08/2016

 9    EXHIBIT #8.................................111

10       XARELTO LABEL REVISED 08/2016

11    EXHIBIT #9.................................114

12       ACADIAN AMBULANCE SERVICES PREHOSPITAL

13       CARE REPORT SUMMARY

14       (SOrr-AAS-000003 - 0007)

15    EXHIBIT #10................................172

16       TIMELINE

17    EXHIBIT #11................................180

18       DEFENDANTS' NOTICE WITH SUBPOENA DUCES

19       TECUM OF ORAL VIDEOTAPED DEPOSITION OF

20       GIANLUCA CERRI, MD, FACEP, FAAEM

21    EXHIBIT #12................................205

22       CHA2DS2-VASC CALCULATOR FOR ATRIAL

23       FIBRILLATION

24

25
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1   EXHIBITS (CONTINUED):

 2

 3   EXHIBIT #13.............................213

 4       SHARYN ORR WEIGHT/BLOOD PRESSURE

 5       FLUCTUATION CHRONOLOGY

 6   EXHIBIT #14.............................248

 7       4/24/15 NOMH NEUROSCIENCE CRITICAL CARE

 8       MEDICAL RECORD

 9       (SOrr-PPR-MD-000523)

10   EXHIBIT #15.............................299

11       GLASCOW COMA SCALE

12   EXHIBIT #16.............................302

13       MDCALC INTRACEREBRAL HEMORRHAGE (ICH)

14       SCORE

15                         - - -

16

17

18

19

20

21

22

23

24

25
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1                     PROCEEDINGS

 2              THE VIDEOGRAPHER:  We are now on the

 3         record.  My name is Melissa Bardwell,

 4         videographer here for Golkow Technologies.

 5         The date today is November 28th, 2016.

 6         The time is approximately 9:58 a.m.  This

 7         videotaped deposition in being held in

 8         Baton Rouge, Louisiana, taken in reference

 9         to the Xarelto (Rivaroxaban) Products

10         Liability Litigation.  The deponent today

11         is Dr. Gianluca Cerri.

12              Would counsel present introduce

13         themselves and state their affiliations

14         for the record?

15              MR. DENTON:  Thank you.  Roger Denton

16         and Emily Jeffcott for the plaintiffs.

17              MR. IRWIN:  Jim Irwin and Meera

18         Sossamon for Janssen.

19              MR. BARBER:  Jeremy Barber and Kim

20         Channick on behalf of Bayer.

21              THE VIDEOGRAPHER:  The court reporter

22         today is Leslie Doyle, and she will now

23         swear in the witness.

24                     * * *

25
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1                    GIANLUCA CERRI, M.D.,

 2         having been first duly sworn, was examined

 3                  and testified as follows:

 4                         EXAMINATION

 5  BY MR. IRWIN:

 6         Q.   Good morning, Doctor.

 7         A.   Good morning.

 8         Q.   My name is Jim Irwin.  You and I have not

 9  met until today; is that correct, sir?

10         A.   Not to my recollection.

11         Q.   You are a medical doctor?

12         A.   Yes, sir.

13         Q.   Would you state your name and address for

14  the record, please?

15         A.   Gianluca, G-I-A-N-L-U-C-A, Cerri,

16  C-E-R-R-I.  I reside at 11406 The Gardens, T-H-E

17  Gardens, G-A-R-D-E-N-S, Drive in Baton Rouge, 70810.

18         Q.   Have you ever given a deposition before?

19         A.   A long time ago.

20         Q.   Can you tell me a little bit about that?

21         A.   It pertained to a skull fracture, and it

22  was rendering my medical opinion on the events and

23  the facts.

24         Q.   Was that an individual that you had an

25  opportunity to treat?
```

```
1   article, if any, on this list, Cerri #1, supports

2   any of the specific opinions that you have rendered

3   in your report?

4        A.   I'm going to say it again, and I'll be

5   glad to go through every single article in details.

6   The articles support my personal expert medical

7   opinion on the subject.  Does that make sense?

8        Q.   Yes, but it doesn't answer my question.

9   Okay?

10       A.   Could you rephrase the question?

11       Q.   Sure.  Tell me what one of your specific

12  opinions is.

13       A.   My -- one of my opinions is that Xarelto

14  is a bad drug.  It's a bad drug because there's no

15  laboratory assay that allows me or any other medical

16  emergency physician to measure, monitor, evaluate

17  the drug and, therefore, implement life-saving

18  measures, as well as the lack of a reversal agent.

19  That is my expert medical opinion.

20       Q.   And which one of these articles supports

21  that opinion?

22       A.   I would have to read the article in-depth.

23  You gave me names of authors.  There's several

24  authors per article.  Each article adds and

25  substantiates precisely what I'm saying, and this is
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    questions?  Do you understand that?

2         A.   Yes, sir.

3         Q.   Then my question is simple.  Why didn't

4    you include this list in your expert report?

5         A.   I wasn't aware -- I wasn't aware that

6    that's the protocol.  But to be fair, this is

7    literature that I've been reading which substantiate

8    my personal findings.  I work in the emergency

9    department 20 days a month.  Okay?  When I have a

10   patient with a brain bleed due to Xarelto, or a GI

11   bleed, or whatever have you, secondary to Xarelto,

12   there's not a power plan I can trigger.  There's not

13   an order I can enter which allows me to measure,

14   monitor and evaluate the coagulation status for the

15   patient.  That's just the way it is.

16            This is beyond reading all these articles.

17   The issue is -- you're asking me what my opinion is,

18   and my opinion is, to date, I cannot order a test

19   that allows me to monitor, measure, evaluate the

20   drug, and there's not an antidote which fully

21   reverse the medication.  That is my expert medical

22   opinion.

23            This is what I've been reading since I was

24   asked if I would render my medical expert opinion.

25   My medical expert opinion is 100 percent independent

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1   of what I found on the Web.  What I found on the Web

2   tells me there's a lot of people like me that are

3   really baffled because they can't monitor, measure,

4   evaluate and reverse.  This -- you ask the same

5   question to these people, they'll tell you the same

6   thing.

7            No, I don't remember the exact material in

8   the articles, but they all concur that that's a

9   problem.  Some of these compare it with warfarin.

10  Some of this say, okay, well, you could do that, but

11  it's not a full anticoagulation reversal.  But to

12  say that this is the reason for which I'm giving my

13  medical opinion today...

14       Q.   Can you tell me which one of these

15  articles says that you cannot monitor Xarelto?

16       A.   Precisely, no.

17       Q.   Can you tell me which one of these

18  articles says that you cannot assay Xarelto?

19       A.   Basing -- basing myself on who wrote the

20  article, no.

21       Q.   What about the title of the article?

22       A.   Yes, I might be able to do that.

23       Q.   Well, why don't you look at the title of

24  these articles in Cerri #1, and tell me which ones

25  would answer that question.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1      Q.   And why did you decide to prepare this

2    list in the last seven days?

3      A.   I wanted to reflect the work that I have

4    done in terms of reaching out and finding out if

5    there is any other opinion that deviates from my

6    core beliefs.  In other words, if I went through the

7    literature and I found that there was a way to

8    monitor, an effective way, that is available

9    today -- I'm not talking about next year, the year

10   after, the year after that -- is an effective way,

11   there's something I don't know -- if there's an

12   effective way to measure, monitor and evaluate the

13   coagulation status on a patient taking Xarelto or an

14   effective way to reverse the medication, I would not

15   be here.

16          This is a very unpleasant situation just

17   to tell a medical opinion, which, at the end of the

18   day, after seven hours of grilling, it's still going

19   to be the same.  There's no way to measure it,

20   monitor, evaluate coagulation status at this point

21   in time, to me and the good people of Louisiana, and

22   to my understanding, to the good people in the

23   United States, the coagulation status on a patient

24   taking Xarelto, and there is no dedicated antidote

25   that fully reverse the drug.  If something like that

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    existed, I wouldn't be here.  I wouldn't put myself

2    through this misery.

3         Q.   And did you think it was important to

4    prepare this list?

5         A.   I just didn't want you to think that I

6    just fell off the sky and did not do any sort of

7    investigation, so as to be here wasting your time,

8    showing up, telling you, look, there's no way I can

9    measure, monitor, evaluate this drug, there's no way

10   I can revert it, and then you pull out an article

11   that says, look, you do, and there isn't.

12        Q.   What made you think that I would think

13   that?

14        A.   You are the defendant of a drug that kills

15   people.  Your job is to defend the drug

16   manufacturer, and you're good at it.  That's what

17   you're here to do.  Okay?  His job is to represent

18   this poor gal, which, although not my patient, I've

19   seen die many, many, many times.  Okay?

20             My mother is not on Xarelto.  She'll never

21   be on Xarelto until I can tell what the activity of

22   the drug is, until I know that if she's dry and her

23   kidney functions are somehow bumped, the half-life

24   is not going to be for long, until I know that there

25   is something that gives her a fighting chance not to

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    but that would have developed later on.  So most

2    likely, when the headache initiated was when the

3    bleeding might have started.

4              Do you disagree with that?

5              MS. JEFFCOTT:  Objection; asked and

6         answered.  We've been through this umpteen

7         different ways.  He's not going to give an

8         opinion there.

9    BY MR. IRWIN:

10        Q.   Do you disagree with that?

11        A.   Here's what I agree with.  I agree that I

12   didn't read anybody else's opinion which would

13   interject a bias pertaining what it is that I can

14   give to this case.  What I can give to this case is

15   the fact that, as an emergency room physician, when

16   a brain bleed develops, whether traumatic,

17   hypertensive, intraventricular, intraparenchymal,

18   meningeal, variceal, et cetera, et cetera, et

19   cetera, unfortunately, if the patient is on Xarelto,

20   the tools I have at my disposal to detect, monitor,

21   assess and manage, are zero.  By the way, you can

22   take that to the bank.  Zero percentage of what I

23   can do for a patient to reverse coagulation in the

24   setting of a Xarelto bleed.  I'm not saying Xarelto

25   caused bleed.  And by the way, Xarelto causes

1    bleeds.  I'm talking if you got a bleed and you're

2    on Xarelto, again, excuse my French, you're shit out

3    of luck.  Most likely, you will die.

4            So it's a great drug.  If you want to take

5    the odds, take Xarelto.  Until then, until we have a

6    way to effectively monitor and reverse the drug,

7    there's other alternatives which are safer.  Safer.

8        Q.  I read you earlier some testimony by

9    Dr. Bui on another subject.  Here's what he said on

10   this issue.

11       A.  The neurosurgeon?

12       Q.  Yes, sir.

13       A.  What did he say about what can be done

14   pertaining presentation in the emergency department,

15   what it is that he can -- that he can teach me to do

16   pertaining better serving the patients that I

17   actually refer to him with brain bleeds while

18   concomitantly taking Xarelto?  Because I want to

19   make it clear as well that I'm not saying that the

20   Xarelto caused the bleed.  I'm saying that, if

21   there's a brain bleed -- and I'll be glad to address

22   all of the other conditions which are actually

23   manageable while on Xarelto in the setting of a

24   bleed.  But when you bleed in the box and you're on

25   Xarelto -- and I'm not saying Xarelto caused the

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    Q.   I'm just asking the question.  Do you

2    agree with that?

3    A.   I agree that Kcentra, at this point in

4    time, in spite of not being an antidote, is the best

5    thing we got to give someone a fighting chance.  Do

6    I think it reverse -- no, it's not about me

7    thinking.  Do the study conclusively show in an

8    evidence way -- pattern that it actually works to

9    reverse the bleed conclusively so that this kind of

10   interaction would not -- would not take place?  No.

11   That's why it's not on the label, because it's not a

12   perfect reversal agent, and the studies are mixed on

13   how much it actually does.  But, unlike you, I will

14   administer the medication if it provides the patient

15   even one fighting chance.  Okay?

16   Q.   Is PCC in the label?

17   A.   Is PCC in this label?

18   Q.   Yes.

19   A.   I don't believe so.  Is it in the label?

20   Show it to me.

21   Q.   No, I got my answer.  Let me read you

22   this.

23   A.   Oh, okay.  The answer is no, for the

24   record.  It's not, 100 percent.

25   Q.   Although NOACs are as effective as, if not

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    more effective, than warfarin for the treatment and

2    prevention of thromboembolism, the major advance in

3    the care of patients is their improved safety

4    profile with respect to serious bleeding,

5    particularly intracranial hemorrhage --

6         A.   I agree 100 percent.  Don't have to even

7    hear that.

8         Q.   -- and reduction in mortality in patients

9    with AFib.

10        A.   I agree 100 percent.  Have I not -- review

11   the tape, Your Honor.  Have I not stated that it's

12   the best commercially available anticoagulants?  It

13   is.  It really is, after the point that you get a

14   brain bleed, at which point in time there's no

15   antidote, and there's no way to monitor it, to

16   reverse it, and then people die.  They don't have

17   the same chances of these other medications.

18             So, again, if I ask any of you at this

19   table, would you take a medication such as Coumadin,

20   by which you cannot eat turnip greens, and every

21   two, three weeks you've got to check an INR to make

22   sure it's not too high or too low and probably you

23   have to adjust the dose, which may cause you to have

24   a little bit higher chance of getting a brain bleed,

25   but when the brain bleed actually happens, if it

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1              R E P O R T E R ' S   C E R T I F I C A T E

2              This transcript is valid only for a

3    transcript accompanied by my original signature and

4    original required seal on this page.

5              I, Leslie B. Doyle, Certified Court

6    Reporter (LA Certificate #93096), in and for the

7    State of Louisiana, as the officer before whom this

8    testimony was taken, do hereby certify that GIANLUCA

9    CERRI, M.D., FACEP, FAAEM, after having been duly

10   sworn by me upon authority of R.S. 37:2554, did

11   testify as herein before set forth in the foregoing

12   314 pages; that this testimony was reported by me in

13   the stenotype reporting method, was prepared and

14   transcribed by me or under my personal direction and

15   supervision, and is a true and correct transcript to

16   the best of my ability and understanding; that the

17   transcript has been prepared in compliance with

18   transcript format guidelines required by statute or

19   by rules of the board, that I have acted in

20   compliance with the prohibition on contractual

21   relationships, as defined by Louisiana Code of Civil

22   Procedure Article 1434 and in rules and advisory

23   opinions of the board.

24             I further certify that I am not related to

25   counsel or to the parties herein, nor am I otherwise

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    interested in the outcome of this matter.

2           Signed this ___ day of _____, 2016.

3

4

5           _____

6           LESLIE B. DOYLE, RPR, RMR, RDR

            Certified Court Reporter

7           LA Certificate #93096

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25