# EXHIBIT D

USCA5 4262

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2
       --------------------------------§
 3     IN RE:  XARELTO (RIVAROXABAN)   § MDL NO. 2592
       PRODUCTS LIABILITY LITIGATION   §
 4                                      § SECTION L
                                        §
 5     THIS DOCUMENT RELATES TO ALL     §
       CASES                            § MAG. JUDGE NORTH
 6                                      §
       _____
 7
        - - -
 8
 9                      - - -
10              DECEMBER 15, 2016
11                      - - -
12
               PROTECTED - SUBJECT TO FURTHER
13
                   PROTECTIVE REVIEW
14
                        - - -
15
16
          Videotaped deposition of JAMES A. REIFFEL,
17     M.D., held at Squire Patton & Boggs, 1900
       Phillips Point West, 777 South Flagler Drive,
18     West Palm Beach, Florida, commencing at 8:59
       a.m., on the above date, before Kelly J. Lawton,
19     Registered Professional Reporter, Licensed Court
       Reporter, and Certified Court Reporter.
20
                        - - -
21
               GOLKOW TECHNOLOGIES, INC.
22        877.370.3377 ph | 917.591.5672 fax
                   deps@golkow.com
23
24
25
```

```
 1    APPEARANCES:
 2        CHILDERS, SCHLUETER & SMITH, LLC
          BY:  C. ANDREW CHILDERS, ESQUIRE
 3        1932 North Druid Hills Road
          Suite 100
 4        Atlanta, Georgia 30319
          (404) 419-9500
 5        achilders@cssfirm.com
          Representing Plaintiffs
 6
 7
          SEDGWICK, LLP
 8        BY:  DAVID M. COVEY, ESQUIRE
          225 Liberty Street
 9        28th Floor
          New York, New York 10281
10        (212) 422-0202
          david.covey@sedgwicklaw.com
11        Representing Janssen
12
13        DRINKER, BIDDLE & REATH, LLP
          BY:  SUSAN M. SHARKO, ESQUIRE
14        600 Campus Drive
          Florham Park, New Jersey 07932
15        (973) 549-7350
          susan.sharko@dbr.com
16        Representing Janssen
17
18        BARTLIT, BECK, HERMAN, PALENCHAR & SCOTT, LLP
          BY:  JOHN S. PHILLIPS, ESQUIRE
19        1899 Wynkoop Street
          8th Floor
20        Denver, Colorado 80202
          (302) 592-3199
21        john.phillips@bartlit-beck.com
          Representing Bayer
22
23
     ALSO PRESENT:
24
          Anthony Barbaro, Videographer
25
```

Protected - Subject to Further Protective Review

```
 1                        - - -
                       I N D E X
 2                        - - -
 3    Testimony of:  JAMES A. REIFFEL, M.D.
 4       DIRECT EXAMINATION BY MR. CHILDERS............  7
 5       CROSS-EXAMINATION BY MR. COVEY................ 300
 6
 7                  E X H I B I T S
 8
 9    PLAINTIFF'S                                      PAGE
10    No. 1      Plaintiffs' Notice with Subpoena Duces   15
                 Tecum of Oral Videotaped Deposition of
11               James Reiffel, M.D.
12    No. 2      October 1st, 2016 and November 30th,     16
                 2016 Billing Invoices
13
      No. 3      12/8/16 Article - "Interpreted           56
14               Geographic Variations in Results of
                 Randomized Controls Trials" Published
15               in the New England Journal of Medicine
16    No. 4      2016 Study - "Globalization Of Heart     56
                 Failure Trials, No Turning Back on
17               This Paradigm" Published in the
                 European Heart Journal
18
      No. 5      Article - "The Effect of dabigatran      78
19               Plasma Concentrations and Patient
                 Characteristics on the Frequency of
20               Ischemic Stroke and Major Bleeding in
                 Atrial Fibrillation Patients"
21               Published in the Journal of the
                 American College of Cardiology, 2014
22
      No. 6      4/20/16 Article - "NOAC Monitoring,      85
23               Reversal Agents, and Post-Approved
                 Safety and Effectiveness Evaluation:
24               A Cardiac Safety Research consortium
                 Think Tank" Published in the American
25               Heart Journal
```

USCA5 4265

```
 1                    E X H I B I T S

 2     PLAINTIFF'S                                          PAGE

 3     No. 7      Advisory Committee Meeting for             130
                  Edoxaban PowerPoint Showing the
 4                Concentration Dependent Relationships
                  for Stroke/ SEE and Major Bleeds
 5
       No. 8      James Reiffel 2013 Letter to Annals of     137
 6                Internal Medicine
 7     No. 9      Excerpt of Xarelto Label                   173
 8     No. 10     James Reiffel Curriculum Vitae             176
 9     No. 11     Article - "The New Novel Oral              188
                  Anticoagulants in Patients With Atrial
10                Fibrillation:  Dogma, Dilemmas, and
                  Decisions on Dosing" Published in
11                Journal of Atrial Fibrillation Feb-Mar
                  2014, Vol 6, Issue 5
12
       No. 12     Article - "Does the FDA Owe Us an          196
13                Explanation" Published in Journal of
                  Atrial Fibrillation Oct-Nov 2015,
14                Volume 8, Issue 3
15     No. 13     Appendix B to James Reiffel's Report       204
16     No. 14     Article by David J. Graham - "Stroke,      205
                  Bleeding, and Mortality Risks in
17                Elderly Medicare Beneficiaries Treated
                  with dabigatran or rivaroxaban for
18                Nonvalvular Atrial Fibrillation"
                  Published by American Medical
19                Association Internal Medicine, 10/3/16
20     No. 15     11/15/2016 Report of James Reiffel         220
21     No. 16     Article - "Misleading Advertising by       262
                  Attorneys concerning NAOCs is
22                Adversely Costly to Our patents and
                  Our Society" Published in Journal of
23                Atrial Fibrillation, Feb-Mar 2016,
                  Volume 8, Issue 5
24
25
```

USCA5 4266

```
 1                    E X H I B I T S

 2    PLAINTIFF'S                                    PAGE

 3    No. 17     Article by Paul Burton - "A Medwatch    279
                 Review of Reported Events in Patients
 4               Who Discontinue rivaroxaban (Xarelto)
                 Therapy in Response to Legal
 5               Advertising" Published in 2016 Heart
                 Rhythm Society
 6
      No. 18     Heart Rhythm Society and Foundation     281
 7               FY15 Revenues from External Sources

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

USCA5 4267

Protected - Subject to Further Protective Review

```
1                        - - -

2              THE VIDEOGRAPHER:  We are now on the record.

3       My name is Anthony Barbaro.  I am the

4       videographer for Golkow Technologies.  Today's

5       date is December 15th, 2016, and the time is

6       8:59 a.m.

7              This video deposition is being held at

8       777 South Flagler Drive, West Palm Beach, Florida

9       33401, In Re:  Xarelto Products Liability

10      Litigation for the Court of the United States

11      District, Eastern District of Louisiana.

12             The deponent is Dr. James Reiffel.

13             Counsel, would you please introduce

14      yourselves.

15             MR. CHILDERS:  Andy Childers on behalf of the

16      PSC.

17             MR. COVEY:  David Covey from Sedgwick on

18      behalf of Janssen.

19             MS. SHARKO:  Susan Sharko, Drinker Biddle,

20      for Janssen.

21             MR. PHILLIPS:  John Phillips from Bartlit

22      Beck for Bayer.

23             THE VIDEOGRAPHER:  The court reporter is

24      Kelly J. Lawton, and she will now swear in the

25      witness.
```

USCA5 4268

Protected - Subject to Further Protective Review

```
 1              The COURT REPORTER:  Doctor, would you please

 2        raise your right hand?

 3              Do you swear or affirm the testimony you're

 4        about to give will be the truth, the whole truth,

 5        and nothing but the truth?

 6              THE WITNESS:  Yes, I do.

 7              MR. COVEY:  Before we begin, if this case was

 8        cross-noticed in Pennsylvania, I'll adopt what

 9        has been stated at all the other depositions in

10        terms of propriety or lack of propriety of

11        certain notices; and that in the spirit of

12        cooperation, we're here today with the doctor so

13        that his deposition can be conducted to the

14        extent permissible in both the MDL and in

15        Pennsylvania.

16              JAMES A. REIFFEL, M.D., called as a witness

17     by the Plaintiff, having been first duly sworn,

18     testified as follows:

19                      DIRECT EXAMINATION

20     BY MR. CHILDERS:

21        Q.   Doctor, how do you properly pronounce your

22     last name?

23        A.   Reiffel.

24        Q.   Reiffel.  Okay.

25        A.   It's E-I, like neighbor.
```

```
 1        Q.   I'm sorry?

 2        A.   E-I like neighbor.

 3        Q.   Oh, okay.

 4             I saw on your CV that you had served or

 5   you've given testimony in one prior case called

 6   Sanofi versus Glenmark Pharmaceuticals; is that

 7   right?

 8        A.   That was earlier this year, yes, sir.

 9        Q.   It looked to me that that was a patent

10   infringement case; is that right?

11        A.   That's correct.

12        Q.   What was your role in that case?

13        A.   I was asked to give my opinions about the

14   matters in that case as a -- basically a physician

15   consultant.

16        Q.   And that's what I mean.  What specifically

17   were you asked to give opinions about?

18        A.   Well, the case was a case where, if I

19   remember correctly, eight generic houses that were --

20   and brought suit to try to break a use patent that

21   Sanofi had for one of their drugs, Multaq, and I was

22   asked to discuss the material medically related to

23   Multaq, the trials that were done with it, that led

24   up to the particular use patent; and, in essence,

25   that that use could not have been foreseen prior to
```

Protected - Subject to Further Protective Review

```
1    doing the appropriate clinical trials.

2         Q.   Who hired you to testify in that case?

3         A.   Sanofi.

4         Q.   Did you participate in the clinical trials?

5         A.   I did.

6         Q.   Okay.  Which -- what were the names of those

7    trials?

8         A.   We participated in the ADONIS trial and the

9    ATHENA trial.

10        Q.   Okay.  And it looked like you gave your

11   deposition August 31st of this year.  Does that sound

12   about right?

13        A.   No.  That's when the decision was handed down

14   by the judge.

15        Q.   Okay.

16        A.   The deposition --

17        Q.   I misunderstood.

18        A.   The trial was some months earlier.  It was in

19   the spring.

20        Q.   Okay.  So the date that was on your CV is the

21   date that the trial was decided?

22        A.   If on my CV I have the date of August, that's

23   the date that -- that the judge gave the opinion.

24        Q.   Okay.

25        A.   Yeah, my deposition was in -- was in the
```

Protected - Subject to Further Protective Review

```
1    spring, I want to say May or June, in Delaware.

2        Q.   What was the decision rendered by the judge?

3        A.   It was in favor of Sanofi, that the patent

4    was valid.

5        Q.   Did you have to testify at trial also or just

6    at deposition?

7        A.   No, I testified at trial.

8        Q.   Oh, okay.  I'm sorry.  I misunderstood that,

9    too.

10            Did you give a deposition and testify?

11       A.   Yes.

12       Q.   Okay.  Were there any parts of your opinion

13   that you gave in your deposition that the judge did

14   not allow you to give at trial?

15       A.   No.

16       Q.   Okay.  Have you ever testified in any other

17   case?

18       A.   I have testified a couple of times in medical

19   malpractice cases.

20       Q.   Okay.  And when was the last one?

21       A.   A long time ago, maybe ten years.

22       Q.   Have you ever testified as a defendant in a

23   medical malpractice case?

24       A.   No, sir.  I haven't had one against me.

25       Q.   Okay.  So were you testifying as an expert
```

USCA5 4272

```
 1    witness in this case?

 2         A.   Yes.

 3         Q.   How many times have you been an expert

 4    witness in med mal -- medical malpractice cases?

 5         A.   Where I've gone to court?

 6         Q.   Where you've given any testimony.

 7         A.   Four or five, maybe.

 8         Q.   And have you testified on behalf of the

 9    plaintiffs ever in those cases?

10         A.   Yes.

11         Q.   Okay.  Have you testified ever on behalf of

12    the defendant doctors in those --

13         A.   Yes.

14         Q.   Do you know the breakdown?

15         A.   If I had to guess, 75/25, defendant.

16         Q.   Okay.  And how about testifying at trial?

17    Did you testify at trial in any of those cases?

18         A.   Well, that's what I thought you were asking

19    me.

20         Q.   Okay.  So those were trial testimony?

21         A.   Yes.

22         Q.   Four to five times?

23         A.   Yes.

24         Q.   How about depositions in cases?

25         A.   Maybe only two or three more than that.
```

```
 1        Q.    Okay.  Did any of those cases involve

 2   allegations that a medicine had caused harm to a

 3   plaintiff?

 4        A.    No, not that I recall.

 5        Q.    Do you recall the allegations in any of those

 6   cases?

 7        A.    Not specifically.  They were long enough ago.

 8        Q.    Okay.  Do you recall where any of those cases

 9   were pending?  Where did you go to testify at trial?

10        A.    I remember one in New York.  I think one was

11   in Pennsylvania.  Don't remember specifically the

12   others.

13        Q.    Okay.

14        A.    Again, this is over a span of more than

15   40 years.

16        Q.    I understand.  I just want to know as much as

17   you can remember.

18              Did any of those cases involve

19   anticoagulation?

20        A.    Not that I recall.

21        Q.    And I know you said you have not been sued in

22   a medical malpractice claim.  Have you ever been a

23   party to any litigation?

24        A.    Of any type?

25        Q.    Yes, sir.
```

USCA5 4274

Protected - Subject to Further Protective Review

```
1      A.   Yes.

2      Q.   Okay.  How many times?

3      A.   Once.

4      Q.   And what kind of case was it?

5      A.   Inheritance.

6      Q.   Inheritance?

7      A.   Uh-huh.

8      Q.   Okay.  So where was that case filed?

9      A.   New York.

10     Q.   And were you the plaintiff or the defendant

11  in that case?

12     A.   It had to do with my wife's mother's estate

13  of which my wife and I were involved with a suit

14  brought by her sister and brother-in-law.

15     Q.   Okay.  So they -- they initiated the suit?

16     A.   Absolutely.

17     Q.   Okay.  Did you testify in that case?

18     A.   I was deposed.  The case is not going to

19  trial.  It's been settled by -- by a judge.

20     Q.   When did that decision from the judge come?

21     A.   It's come in repeated steps, and it's a

22  long-involved story.

23     Q.   And we don't need to get into all the

24  details.  Just if --

25     A.   Within a couple -- I don't know, two years
```

USCA5 4275

Protected - Subject to Further Protective Review

1   ago, maybe.

2       Q.   Okay.  Do you recall when you were deposed?

3       A.   Not specifically.  Two, three years ago,

4   something in that ballpark.

5       Q.   Did that deposition take place in New York?

6       A.   Yes.

7       Q.   At your lawyer's office or somewhere else?

8       A.   No, somewhere -- it was somewhere else, in

9   White Plains.

10      Q.   Did you have an attorney representing you?

11      A.   Yeah, of course.

12      Q.   What was that attorney's name?

13           David Covey?

14      A.   No, it was not David -- it was not

15  David Covey.

16      Q.   I'm just kidding.

17      A.   Larry Blumberg.

18           And it was basically the -- the case more

19  involving my wife than myself.

20      Q.   Okay.  Okay.  Have you ever given testimony

21  in any other case other than the ones we've talked

22  about so far?

23      A.   No.

24      Q.   Have you ever been retained as an expert in

25  any other pharmaceutical-related case besides the

USCA5 4276

1    Sanofi case and the present litigation?

2        A.    Once.

3        Q.    Okay.  And what kind of case was that?

4        A.    A patent infringement case.

5        Q.    Who retained you?

6        A.    If I remember back then -- the companies have

7    gone through the iterations -- I think it was Sebi

8    Givi (phonetic).

9        Q.    How long ago was that?

10       A.    Sometime in the 1980s, if I remember

11   correctly.

12       Q.    Okay.  And you did not give testimony in that

13   case?

14       A.    It was settled before it ever went to trial.

15       Q.    But as far as a deposition -- when I say

16   "testimony," I mean a deposition, too.  Sorry.

17       A.    I don't recall giving a deposition.

18       Q.    I'm going to hand you what's been marked -- I

19   have marked as Exhibit 1, which is the notice of

20   deposition.

21           (Plaintiff's Exhibit No. 1 was marked for

22   identification.)

23           MR. CHILDERS:  Oh, you know what, can I have

24       one of those back, David?  I gave you all of

25       them.  Sorry.

```
1    BY MR. CHILDERS:

2        Q.    Have you seen Exhibit 1 before?

3        A.    I have not seen this document.

4        Q.    Okay.  Are you aware that certain materials

5    were requested that you bring with you today if they

6    hadn't already been produced?

7        A.    I was asked by counsel to bring my billing

8    records.

9        Q.    Okay.  And you brought two pages of billing

10   records?

11       A.    That's correct.  Those are --

12       Q.    I'm going to mark -- I'm sorry.

13       A.    Those are the only bills I have issued so

14   far.

15           MR. CHILDERS:  Okay.  And I'm going to mark

16       these as Exhibit 2, okay?

17           (Plaintiff's Exhibit No. 2 was marked for

18       identification.)

19   BY MR. CHILDERS:

20       Q.    It looks like an invoice from -- I'm going to

21   mark them collectively as Exhibit 2 -- an invoice

22   from October 1st, 2016, and another one from

23   November 30th, 2016.

24       A.    That's correct.

25       Q.    Okay.  And these are the only two bills that
```

```
 1    you said you have sent?

 2         A.    Those are the only two bills I've sent.

 3         Q.    I assume you have some time in December that

 4    you will be sending a bill for?

 5         A.    Including today, yes, sir.

 6         Q.    Right.

 7               And prior to today, this goes through the

 8    30th of November?

 9         A.    Correct.

10         Q.    Okay.  Are there any other materials that you

11    brought with you or gave to your counsel?

12         A.    I gave my counsel a couple of recent

13    reprints.

14         Q.    Was that today or --

15         A.    Today, this morning.

16         Q.    Which reprints were those?

17         A.    One from the New England Journal and one from

18    the European Heart Journal that I received --

19    actually, the European Heart Journal one came in the

20    mail to me yesterday and the New England Journal,

21    this past week.

22         Q.    Do you recall the titles of the articles?

23         A.    I do not recall the exact titles of the

24    articles.  They were related to multicenter or

25    multinational trials and geographical differences
```

USCA5 4279

1  across trials and interpreting trials of that nature.

2      Q.   Are those articles that you intend to rely on

3  for your opinions in this case?

4      A.   Among others, yes, sir.

5      Q.   And I have a list of quite a few others, but

6  just as far as those --

7      A.   Those -- those are two articles that have

8  come out to my attention subsequent to my report.

9      Q.   Okay.

10         MR. COVEY:  Andy, I'll be happy to provide

11     them to you at a break.  I just saw them.  I

12     haven't even read them, so . . .

13         MR. CHILDERS:  That's fine.  Anything else --

14     that's fine, David.

15  BY MR. CHILDERS:

16      Q.   Anything else besides those two articles and

17  these two pages of billing that you provided to your

18  counsel?

19      A.   No, sir.  I wasn't asked to provide anything

20  else.

21      Q.   Okay.  If you could look for me on this

22  particular document there, starting on the second

23  page, do you see it says Plaintiff's Exhibit A,

24  Subpoena Duces Tecum at the top?

25      A.   Yes.

Protected - Subject to Further Protective Review

```
 1        Q.    This is what we send with a list of things we
 2   asked for.  You may have seen one of these before.
 3              I just want to go through quickly and just
 4   see if you have previously given these documents to
 5   your counsel, other than the things we talked about
 6   that you gave them today; okay?
 7        A.    Sure.
 8        Q.    The first one is -- has A, B, C, D, and E.
 9        A.    Uh-huh.
10        Q.    Can you just look through those and let me
11   know if you've given all those items to your counsel,
12   to the extent they exist?
13        A.    A, B, C, D, and E, I -- I'm -- counsel has a
14   list of all of the materials I relied upon to make my
15   report.  They're all referenced in the report.
16        Q.    Okay.
17        A.    So there's nothing missing there.
18        Q.    Okay.
19        A.    Exhibits that will be used to summarize or
20   support, anything I have developed to date, but there
21   could well be more as I consider testimony and trial,
22   if there's something I think needs to be shown
23   graphically.  I haven't developed those at this
24   point.
25        Q.    Okay.
```

```
 1       A.    And a CV has been provided including all my
 2   publications, not just those in the past ten years.
 3   Other cases, you've got that information.  We just
 4   went over it.  And compensation, you just got my two
 5   billing invoices.
 6       Q.    Okay.
 7       A.    So everything to date.  That doesn't mean
 8   going forward I won't rely on additional new
 9   information, if such becomes available and relevant.
10       Q.    Okay.  Do you have any other documents -- if
11   you keep going down, there's 2, 3, 4, 5, all the way
12   through 15 -- you've given me your invoices, which is
13   No. 2.  Number 3, do you have any additional
14   materials in your file that weren't referenced in
15   your report?
16       A.    No.
17       Q.    Okay.
18       A.    Not that I'm aware of.
19       Q.    And the report, the list of documents -- and
20   we'll get to this in a little bit -- it looked to me
21   like there were two separate lists:  One that
22   included all the information that was specifically
23   referenced in the report; and then materials
24   considered, I think, you called it?
25       A.    Correct.  Materials that were provided to me
```

Protected - Subject to Further Protective Review

1    related to the case.

2        Q.    Okay.  So that was the question I was going

3    to ask.  The -- the -- do you know which materials

4    were given to you versus materials that you collected

5    on your own?

6        A.    I'd have to go over document by document.

7        Q.    Okay.  We'll -- we'll do some of that in a

8    little bit; okay?

9              Did you create any actual documents other

10   than your report?

11       A.    No.

12       Q.    Okay.  Did you provide your report from the

13   Sanofi case or copies of your transcripts to your

14   counsel?

15       A.    I wasn't asked to.

16       Q.    Okay.  If you look at No. 11 on here, would

17   you agree with me that your testimony and report in

18   that case would -- would be contained in this

19   request?

20       A.    I don't have a copy of my testimony in that

21   report -- in that case.

22       Q.    There is a transcript that was made; correct?

23       A.    Not that I have.

24       Q.    I'm not asking you that.

25              Is there a transcript that was made?  Was

USCA5 4283

```
 1    there a person sitting there, like this court

 2    reporter next to you, when you testified?

 3        A.   Yes.

 4        Q.   Okay.  And at trial, there was someone also

 5    taking down?

 6        A.   I believe so.

 7        Q.   Okay.

 8        A.   But I do not have, nor have I seen, those.

 9        Q.   Okay.  Did you ask Mr. Blumberg -- I'm sorry,

10    not Mr. Blumberg.

11             Who was the counsel who presented you at your

12    deposition -- or represented you at your deposition

13    in the Sanofi case?

14        A.   I don't remember his name offhand.

15        Q.   Do you recall the law firm name?

16        A.   I could look it up, but I -- but no.

17        Q.   What about at trial, do you recall --

18        A.   Same -- same person or persons.

19        Q.   Was it --

20        A.   I don't recall the name.

21        Q.   And it was a male attorney?

22        A.   Yes.

23        Q.   Okay.

24        A.   If it comes to me, I'll let you know.

25        Q.   Okay.  So I take it you haven't asked him for
```

USCA5 4284

Protected - Subject to Further Protective Review

```
 1    copies of your deposition or trial testimony
 2    transcripts?
 3        A.   No, sir.
 4        Q.   Okay.  Have you gotten any research grants
 5    relating to oral anticoagulants?
 6        A.   Yes.  Do -- do you mean active now or --
 7        Q.   No.
 8        A.   -- ever?
 9             Yes.
10        Q.   Okay.  Number 12 asks for documents
11    sufficient to identify the research grants you've
12    received involving the study of issues that relate to
13    or concern the subject matter of your testimony here.
14        A.   I don't have such documents.  At the time I
15    was a full-time employee of Columbia University, and
16    the grants went to Columbia.
17        Q.   Okay.  So Columbia -- Columbia got the
18    grants, but you would act on them?
19        A.   Correct.
20        Q.   Okay.  Can you tell me which grants you
21    recall Columbia receiving that you worked on?
22        A.   The RE-LY trial.
23        Q.   Okay.  Any others?
24        A.   No.
25        Q.   Did you have any involvement in the RECORD
```

USCA5 4285

Protected - Subject to Further Protective Review

```
 1    trial?

 2        A.   R-E-C-O-R-D?

 3        Q.   (Attorney nods.)

 4        A.   I was not an active participant in that

 5    trial.  I vaguely remember -- oh, Lord -- at some

 6    point early on talking to some of the folks involved

 7    in the trial, but I haven't done anything active on

 8    that trial.

 9        Q.   Did anybody at Columbia work on that trial?

10        A.   Not to my recollection.

11        Q.   So who were the people you would have talked

12    to about it?

13        A.   Some of the other investigators at national

14    meetings.  Eric Prystowsky --

15        Q.   Okay.

16        A.   -- if I remember correctly.

17        Q.   Okay.  13 asked for all --

18        A.   Well, let's be sure we're talking about the

19    same RECORD trial, because there's more -- I'm

20    talking about one related to it's an -- it's a

21    registry in Afib.  I'm not talking about the -- the

22    post-orthopedic surgical trial.  I had no involvement

23    in that.

24        Q.   Okay.  There are two different things called

25    RECORD?
```

1    A.   Yes.  And there may be even more than that.

2    Lots of times in trials get acronyms, and the same

3    acronym has been used more than once.

4    Q.   It's confusing.

5    A.   Well, you go to look up one in the medical

6    literature and some long list comes up and most of

7    them are not related to what you're looking for.

8    Q.   Okay.  So if there's any reference to you

9    with RECORD, it's not relating to rivaroxaban?

10   A.   That's totally correct.

11   Q.   Okay.  That's helpful.  Thank you.

12        13 asks for all articles and papers you've

13   written.  The listing that you have in your CV, is

14   that a complete listing?

15   A.   Yes, sir.

16   Q.   Okay.

17   A.   It's complete as of the date of the CV.

18   There are publications that are -- have been

19   submitted and are out for peer-review or are in

20   press.  There's nothing in my CV that gets listed

21   until it's published.

22   Q.   Gotcha.

23        I didn't see a date on your CV.  Is this one

24   of those things where you need to look at the last

25   article that's listed to figure that out, or do you

```
 1    know when it was --

 2         A.   I update -- I update it every time something

 3    new comes out --

 4         Q.   Okay.

 5         A.   -- or some new activity.  So --

 6         Q.   So if we look at the last --

 7         A.   -- I'd have to look at that to tell you the

 8    approximate date of that one.

 9         Q.   Okay.

10         A.   I usually do it monthly.

11         Q.   Okay.  Do you have any articles that are in

12    peer-review or awaiting to be printed that relate to

13    Xarelto?

14         A.   Probably.  So nothing specifically about

15    Xarelto but some related to anticoagulation --

16         Q.   Okay.

17         A.   -- that have been either submitted or are out

18    for peer-review or in press.

19         Q.   And specifically relating to NOACs?

20         A.   Well, there's one submitted related to time

21    and therapeutic range.  That refers mainly to

22    warfarin and the calculations.  I'm part of the

23    steering committee of the ORBIT-AF I and II

24    registries, and the ORBIT-AF II registry relates to

25    both nuance and atrial fibrillation and NOAC use
```

Protected - Subject to Further Protective Review

```
 1    among that population.  And that's ongoing and will
 2    lead to multiple publications out of that.
 3        Q.   Okay.
 4        A.   But I can't give you a list of which ones are
 5    specifically in press.  There's --
 6        Q.   But none that are specific just to Xarelto or
 7    comparing Xarelto specifically to something else?
 8        A.   No, sir.
 9        Q.   Okay.
10        A.   Not at this time.
11        Q.   Okay.  And you have -- have you -- I don't
12    think you have, but I just want to make sure.  I
13    didn't see any -- you don't have any case-specific
14    expert reports, and I mean like where you looked at
15    records for a particular case that's going to trial?
16        A.   No, sir.
17        Q.   Okay.  Who first contacted you --
18        A.   Are we done with this document?
19        Q.   Yes.
20             MR. CHILDERS:  And what I'll do is -- I'm
21        just going to fold these over.  One, okay?  I
22        mean, that's 2, but it's one document.
23    BY MR. CHILDERS:
24        Q.   Who first contacted you about being an expert
25    in this case?
```

Protected - Subject to Further Protective Review

```
 1        A.    I honestly don't remember which specific

 2   attorney first contacted me.

 3        Q.    What -- who's the first --

 4        A.    Susan would know.

 5        Q.    Well, I can't ask her those questions today.

 6   I can ask you just the best that you know.

 7              Who's the first attorney you remember talking

 8   to about this case?

 9        A.    Well, I've had e-mail correspondence with

10   Claire Noonan and Kim Moore.

11        Q.    Anybody else?  Sorry.  That was not a good

12   question.

13              So you have corresponded by e-mail with

14   Claire Noonan and Kim Moore?

15        A.    Mostly with them.

16        Q.    Okay.  Do you recall when you first started

17   communicating with those two people?

18        A.    Sometime in the latter part of the summer.

19        Q.    Latter part of summer of 2016?

20        A.    2016, yes.

21        Q.    Okay.  Prior to the summer -- latter part of

22   the summer of 2016, had you ever consulted for

23   Janssen?

24        A.    Yes.

25        Q.    Okay.  Can you tell me in what capacities
```

```
1    prior to this litigation you'd consulted with

2    Janssen?

3        A.   Yes, I can.

4        Q.   Will you do that for me, please?

5        A.   Yes, sir.  I'm responding to your specific

6    questions.

7        Q.   No, I gotcha.  David did a good job.

8             MR. COVEY:  It's always nice when someone

9        listens.

10            THE WITNESS:  I have worked with them in a

11       couple of capacities.

12   BY MR. CHILDERS:

13       Q.   Okay.

14       A.   Virtual -- virtually all in the educational

15   sphere.  By that, I mean I have worked with them on

16   their giving feedback on slide materials used in

17   professional education.  I have served as faculty on

18   some of their speaker training programs.  Those have

19   been the -- the major categories.

20            We were asked to participate, and did not do

21   so, in the ROCKET trial.

22       Q.   Why didn't you participate in ROCKET?

23       A.   Two reasons:  One, we were contacted after

24   the trial had been ongoing, and the contracting

25   process in the institutional review board process at
```

Protected - Subject to Further Protective Review

```
 1    Columbia is pretty onerous.  It usually takes a year.

 2    And we felt that by the time that was done, we

 3    wouldn't be able to enroll a meaningful number of

 4    patients.

 5            And two, we were involved in the RE-LY trial,

 6    and it would have meant diluting participation of

 7    patients in both trials and we were already ongoing

 8    for awhile in RE-LY and just thought it wasn't the

 9    right decision.

10            It had nothing to do with the trial design.

11    It had to do with the practicalities of it.

12        Q.   Okay.  Was that a determination that you made

13    or a group of people made?  Or how did that

14    determination happen, to not participate?

15        A.   I understand the question.

16            Both.

17        Q.   Okay.

18        A.   Predominantly me, but both.

19        Q.   Do you remember who you talk -- did you talk

20    with someone at Janssen or Bayer about the --

21        A.   Janssen.

22        Q.   Okay.  Do you recall who you talked with at

23    Janssen about participating --

24        A.   No.  That's a decade ago.  I don't remember

25    that.
```

USCA5 4292

```
 1      Q.   In the work that you told me you've done in
 2   the educational sphere with Janssen, you said you --
 3   you provided feedback on slide materials for
 4   physician education?
 5      A.   Correct.  And I've participated in speaker
 6   programs, but that wasn't so much advisory as it was
 7   medical education.
 8      Q.   And when you say in the "speaker program,"
 9   have you heard the term "speaker's bureau" before?
10      A.   Yes.
11      Q.   Is that you're talking --
12      A.   That's what I'm referring to, yes.
13      Q.   Okay.  Okay.  So are you currently a member
14   of a Janssen speaker's bureau?
15      A.   Yes.
16      Q.   Okay.  How long have you been a member of
17   Janssen's speaker's bureau?
18      A.   Sometime shortly after Xarelto was approved
19   in the U.S. market.
20      Q.   So maybe in 2011?
21      A.   '11 --
22      Q.   2012?
23      A.   -- '12, back there somewhere.
24      Q.   Okay.  Prior to that, Janssen didn't have
25   much involvement in cardiology; does that sound
```

```
 1   right?

 2       A.   Not to any extent that I was involved.

 3       Q.   Okay.  How about Bayer?  Have you ever been a

 4   member of a speaker's bureau for Bayer?

 5       A.   No.  My involvement with Xarelto has been

 6   through Janssen.

 7       Q.   And I don't mean just Xarelto.

 8       A.   No.

 9       Q.   I just mean any speaker's bureau.

10       A.   No, no.

11       Q.   Okay.  So since the time that you became a

12   member of the speaker's bureau for Janssen after the

13   Xarelto launch, to today, you've been consistently

14   considered a member of that speaker's bureau?

15       A.   To the best of my knowledge.  But that's

16   certainly not the only one I'm involved with.

17       Q.   I know.  I just want to ask about that right

18   now.

19       A.   Uh-huh.

20       Q.   Who do you interact with at Janssen in

21   relation to the speaker's bureau?

22       A.   Oh, that varies over time.

23       Q.   Okay.

24       A.   They keep shifting personnel.

25       Q.   How about currently, who do you communicate
```

USCA5 4294

Protected - Subject to Further Protective Review

```
1    with?

2         A.   I have to look at my records --

3         Q.   Okay.

4         A.   -- in all honesty.

5         Q.   Can you give me the names of any of the

6    people you do remember communicating with about

7    speaker's bureau that work for Janssen?

8         A.   It's -- it's hard to answer the question

9    because I don't think of them in terms of who works

10   at the speaker's bureau and who works internally on

11   educational programs.  And so --

12        Q.   Okay.  How about this:  Who do you talk with

13   at Janssen internally?

14        A.   Recently, nobody.

15        Q.   Okay.  Who have you talked with at Janssen

16   that you remember the names of?

17        A.   You asked me.  I don't remember the specific

18   names.

19        Q.   Of anybody?

20        A.   No, not off the top of my head.

21        Q.   Okay.

22        A.   I would -- if I gave you, I would be

23   misleading.

24        Q.   And I -- I just misunderstood.  I didn't -- I

25   thought you didn't know who they were right now.  And
```

USCA5 4295

Protected - Subject to Further Protective Review

```
 1    you don't remember the names of any that -- sitting

 2    here today --

 3         A.   Off the top of my head, I cannot give you a

 4    list of the names of the people, because I do not

 5    recall the specific people involved in that activity.

 6         Q.   Okay.

 7         A.   No.

 8         Q.   And I just want to make sure that we're not

 9    crossing paths here.

10         A.   Understood.

11         Q.   Do you recall the names of any person at

12    Janssen that you've communicated with at all in

13    relation to this educational sphere of activity that

14    you participated in?

15         A.   I do not recall the specific names.  If you

16    would like me to go on my phone contact list, I could

17    probably come up with some for you.  I am very good

18    at faces.  I am not great with names.

19         Q.   Fair enough.  I'm just trying to make sure I

20    understand.

21         A.   I understand.

22         Q.   Okay.

23         A.   And I'm giving you as honest an answers as I

24    can.

25         Q.   Right.  And it's not that you can't tell me
```

USCA5 4296

```
 1    all of them; you can't tell me any of them that

 2    was --

 3         A.    Off of the top of my head, no.

 4         Q.    Gotcha, gotcha.

 5               Okay.  Feedback on slide materials, can you

 6    recall what issues you've given feedback on that

 7    relate to slide materials for physician education?

 8         A.    Sure.

 9         Q.    Will you do that?

10         A.    Yes.  And I'm not being difficult.  I'm

11    thinking as you're asking me the question.

12         Q.    You're doing a good job.

13         A.    And it's -- the feedback I'm going to give

14    you is not specifically unique to Xarelto.  It's --

15    it's an issue I have in general.

16               I don't think -- let me put it a different

17    way.

18               When I give lectures in the continuing

19    medical education, the CME venue, the grand rounds at

20    hospitals, for example, if I were to talk about a

21    product or a class of products, I would talk about

22    the pharmacology of the drug; I would talk about

23    the -- the sphere in which it's anticipated to be

24    used; I would give background material on that

25    disease state; I would talk about the clinical trials
```

Protected - Subject to Further Protective Review

1    done to fill in a gap in that disease state for which

2    the drug may or may not prove effective.

3           I would then take the sum of that, which is,

4    in essence, what goes to the FDA, and say this is

5    what was submitted.  The FDA approved a product

6    within a particular indication.  And then I would

7    say, If you, as a physician, chose to use this

8    product, how would you use it effectively and safely?

9    To me, that's a logical sequence.

10          In the educational programs that relate to

11   the speaker's bureau and, therefore, relate to

12   materials that the company provides to their

13   speakers, they are -- they have to meet certain

14   guidelines by the FDA.  And the programs are all --

15   I'll put in quotes -- promotional.  And the FDA

16   requires of them what's called fair balance, and then

17   the FDA's term "fair balance" means that if I show

18   you something about efficacy, I have to be equally

19   emphatic about safety adverse effects.

20          It's got to be thorough.  It can't be biased.

21          And most of the companies have interpreted

22   that in a very conservative way.  And so many of the

23   times, the safety issues will be presented in a slide

24   three or four times and the precautions three or four

25   times, and the clinical data pretty limited.

Protected - Subject to Further Protective Review

```
 1            And because any of us has a limited attention

 2    span, they have repeatedly shrunk over time, as the

 3    package inserts have gotten longer, the background

 4    material, the pharmacology of the drugs.  And I think

 5    physicians have difficulty jumping back and forth

 6    when things are not presented to them in a logical

 7    order.

 8            So I've helped them or made suggestions to

 9    them about the background slide material, to some

10    extent about the sequencing in a way that I think the

11    audience better perceives or will retain information.

12            It may -- in some cases, it's the format of

13    the slide, the spacing.  We use the slide that can't

14    be read from the back of the room.  I think you ought

15    to reformat it.

16            So it's content, it's sequence, it's the

17    slide format itself, it's background material.  It

18    relates to making the programs more useful for the

19    audience.

20            And, frankly, when I give promotional

21    lectures, I give the same disclosures -- conflict of

22    interest disclosures that I give in the CME program.

23    It's not required by the FDA.  I think full

24    disclosure is appropriate.  I agree with those FDA

25    requirements.  I think that's -- that's appropriate.
```

```
 1    The audience should know why I'm doing something.  I

 2    don't work for the company.  I don't sell the drug

 3    I'm talking about.  My role is to improve medical

 4    care in everything I do, and that's my only interest.

 5            I hope that answered the question for you.

 6        Q.   That was helpful.  I may ask some follow-up

 7    questions, if that's okay.

 8        A.   By all means.

 9        Q.   Do you recall the last time you gave input on

10    a slide presentation for Janssen?

11        A.   I can't give you a specific date.  Certainly

12    sometime this past year.

13        Q.   Okay.  Do you recall the content or any of

14    the content of that slide presentation?

15        A.   Sure.

16        Q.   Can you tell me what you recall?

17        A.   Of the slide presentation?

18        Q.   Yes, sir.

19        A.   Yes.  To the best of my recollection, the

20    slide set, for example, for Xarelto, for atrial

21    fibrillation, which is what I talk about the most,

22    has a little bit of background material, not enough,

23    in my opinion.

24            It talks about the ROCKET trial, the design,

25    and the results of the trial, and then it goes into
```

USCA5 4300

1    significant detail in terms of items in the package

2    insert that's required by the FDA.  But not in that

3    sequence.

4         So for this fair balance concept, the slide

5    set very early, before you ever see the ROCKET trial,

6    it has an indication statement and then it's got a

7    safety section where it says Do Not Stop Prematurely

8    and -- if you use it in the setting of spinal

9    procedures.  All that comes before you ever see the

10   ROCKET data.

11        And frankly, those two things, the Do Not

12   Stop Prematurely, any anticoagulant -- and the

13   wording is now uniform across the NOACs sphere and

14   warfarin -- and the caution for spinal procedures is

15   repeated at least three and sometimes four times

16   throughout the slide set.

17        And so stuff is interspersed.  So there's the

18   ROCKET trial, there's efficacy data, there's bleeding

19   data, there's overall safety data.  And then all the

20   things about bleeding, there's no antidote at the

21   moment for what you can do if a patient bleeds.

22   Patients that shouldn't get it and the

23   contraindications and warnings and so on, down the

24   line.

25        Q.   Okay.  And what input did you -- do you

```
 1    recall giving about that slide set?

 2         A.   Oh, some of it may have been the spacing on a

 3    particular side.  Some of it may be the -- the

 4    sequence.  But, again, the -- as is common in many

 5    companies, the review process that they have

 6    internally is pretty conservative.  And again, the

 7    sequence I would like to see is -- is a more, in my

 8    thought and my mind, a more logical sequence for the

 9    audience to follow.

10         Q.   Okay.  What other companies are you on a

11    speaker's bureau for?

12         A.   Boehringer Ingelheim for dabigatran, Pfizer

13    and BMS for Eliquis, Daiichi Sankyo for edoxaban.

14    That's this past year.  I have been on others.  I

15    don't know how far back you want me to go.

16         Q.   Let -- let's start with those, and then --

17         A.   Okay.

18         Q.   -- I'm going to ask you some follow-ups;

19    okay?

20              Have you been on the Boehringer Ingelheim

21    speaker's bureau since prior -- were -- were you on

22    that speaker's bureau prior to the launch of Pradaxa?

23         A.   There wasn't a speaker's bureau prior to the

24    launch of Pradaxa.

25         Q.   Okay.  How -- how soon after the launch did
```

Protected - Subject to Further Protective Review

```
 1    you become a member?

 2         A.   Pretty -- pretty quickly, because as a RE-LY

 3    investigator -- I was an investigator in RE-LY -- you

 4    know, the -- the sense has been people who educate

 5    about a drug ideally should know something about a

 6    drug.  And at that point, the people who worked with

 7    the drug were investigators.

 8         Q.   Okay.  How about -- so for Pfizer/BMS, are

 9    you on the -- is it a single speaker's bureau or --

10         A.   Yes.

11         Q.   -- do they each have their own?

12         A.   No.  It functions as a single speaker's

13    bureau.

14         Q.   Okay.  And were you on that speaker's bureau

15    for either of those companies prior to the launch

16    of --

17         A.   No.

18         Q.   -- Eliquis?

19         A.   No, no, no.

20         Q.   I know you can anticipate my questions, but

21    we've got to --

22         A.   I was -- I was just responding quickly.

23         Q.   I know.

24              MR. COVEY:  Respond a little slower.

25              THE WITNESS:  Okay.
```

```
 1              MR. COVEY:  So he finishes his question.

 2              THE WITNESS:  Okay.

 3     BY MR. CHILDERS:

 4        Q.   Okay.  So since around the time of the launch

 5     of Eliquis, have you been on that speaker's bureau?

 6        A.   I don't remember if it was at the launch or

 7     six months later or --

 8        Q.   Okay.  And then Daiichi Sankyo -- I never

 9     pronounce that correctly, so I'm sorry if I got it

10     wrong.

11        A.   No, I think you got it right.

12        Q.   Had you been -- were you on a speaker's

13     bureau for them before edoxaban was approved?

14        A.   No.

15        Q.   How soon after the launch of edoxaban did you

16     become a speaker's bureau member?

17        A.   Probably a year.  And I have done the least

18     for them.

19        Q.   How do you pronounce their drug?

20        A.   Edoxaban?  Savaysa.

21        Q.   Savaysa.  I've heard it pronounced several

22     different ways, Savaysa, Savaysa --

23        A.   The only one I know --

24        Q.   Savaysa?

25        A.   -- is Savaysa.  But I guess if I were Russian
```

```
 1    or Hungarian, I guess I'd say it differently or

 2    something.

 3        Q.   Or if you're a doctor --

 4        A.   The accent --

 5        Q.   -- in New Orleans, you'd say --

 6        A.   Maybe.

 7             Well, how do you pronounce pecan?

 8        Q.   Which one?

 9        A.   Pecan.  In New York, it's pecan.

10        Q.   It's pecan in Georgia, too.

11        A.   Yeah, but not in New Orleans.

12        Q.   No, sir.

13        A.   I was corrected once in New Orleans,

14    actually, on a dinner cruise, and the captain came

15    and said we're going to have dessert upstairs.  It's

16    pecan pie.  If you're looking for the "pee-can", it's

17    two decks up.  And I have never forgotten that.

18        Q.   Okay.  Are you currently on all these four

19    speaker's bureaus?

20        A.   Yes, sir.

21        Q.   Okay.  Do you get paid anything to be on a

22    speaker's bureau?

23        A.   You get a stipend for the program.

24        Q.   So when you speak, you get a stipend?

25        A.   Correct.
```

Protected - Subject to Further Protective Review

```
 1        Q.   But there's not sort of a retainer, for lack

 2   of a better term?

 3        A.   No, sir.

 4        Q.   Okay.  Are you still in clinical practice?

 5   Do you still have a clinical practice?

 6        A.   I closed my private practice about three

 7   years ago -- three, three and a half years ago.

 8        Q.   Okay.  Do you see patients?

 9        A.   Only in the setting -- in the teaching

10   setting.  So if I'm on service, with a -- with the

11   residents or fellows; not in other settings.

12             I have to say that differently.

13             That's correct.  There are a long list of

14   friends and acquaintances in my community who come

15   and ask my advice frequently.

16        Q.   Lawyers get the same kind of thing.

17        A.   Yeah.  I don't see them in an office.

18        Q.   Okay.

19        A.   They're not charged, but there's a

20   substantial number.

21        Q.   Do you write prescriptions for those people?

22        A.   Sometimes.

23        Q.   Okay.  Do you currently prescribe NOAC drugs?

24        A.   Currently, meaning?

25        Q.   I don't mean this second.  I mean in this --
```

Protected - Subject to Further Protective Review

```
 1        A.    In this sphere of what I've -- yes.

 2        Q.    Okay.  Where do you do that?

 3        A.    I don't understand the question.

 4        Q.    Well, I know you don't have a clinical

 5    practice.  You see patients when you're teaching with

 6    residents --

 7        A.    Okay.

 8        Q.    -- or friends and family members.

 9        A.    So I'll give you a couple of settings, if --

10    if you will.

11            If I'm in a teaching setting, I don't write

12    the orders in that venue that -- excuse me -- the

13    interns or residents and fellows will write them, and

14    we'll talk as a group about what I think this patient

15    should or shouldn't have or what they did and whether

16    I think their decisions were right or not.  And NOACs

17    will come up in that venue.

18            If a patient calls for advice, oftentimes,

19    it's, This is what my doctor said.  This is the test

20    I did.  Would you look at the test?  This is what my

21    doctor suggests I do, and do you think that's

22    correct?  And in that setting, NOACs come up in the

23    discussion.

24            Often, I'm called by physicians.  I've got

25    such-and-such a patient; would you mind looking at
```

USCA5 4307

Protected - Subject to Further Protective Review

```
 1    his records or her records; or this is what I'm

 2    thinking of doing.  NOACs comes up in that setting.

 3          And not just NOACs, warfarin and certainly

 4    all the other things those patients take.

 5          And even in my practice before I closed it,

 6    which was about 95 percent consultative, I wrote

 7    relatively few prescriptions.  My approach was to

 8    tell physicians who sent me patients for consultation

 9    what I thought the patient had, what tests they

10    needed, what drugs they wanted.  But I tried not to

11    take over control of the patient from those referring

12    docs.  I'd rather educate the doc.  And so most of

13    the time, I suggested to he or her what I thought

14    their patient would do best on.

15          And so --

16    Q.    And then they would write the prescription?

17    A.    Correct.

18    Q.    Okay.

19    A.    So it would be -- for example, I've had reps

20    through the years say to me, you're not writing

21    so-and-so.  And the answer is, you can't tell what I

22    do by tracking prescriptions because I don't write a

23    lot of prescriptions, but I'm responsible for a lot

24    of prescriptions.  And the same thing goes now even

25    with the office closed.
```

Protected - Subject to Further Protective Review

```
1        Q.    So currently, are there any patients where we

2    would see, if we were to track prescriptions, a NOAC

3    drug and next to it, Dr. Reiffel?

4        A.    Probably only one or two.

5        Q.    Okay.  And would those be friends and family

6    members?

7        A.    (Witness nods.)

8        Q.    Okay.

9        A.    For the most part.  Or if somebody came to

10   me, said, My doc's out of town, and I have -- need a

11   refill.

12       Q.    Okay.  Any regular patients -- do you have

13   any regular patients other -- I mean, other than the

14   folks that you said give you calls?

15       A.    No.

16       Q.    Okay.

17       A.    Not now.

18       Q.    And when you were in practice, if I

19   understand you correctly, you wrote very few

20   prescriptions yourself.  You would advise other

21   physicians on what you thought.

22       A.    As best -- as best I could.  Now, there were

23   some physicians who said, I want you to manage this

24   or some patients who said, I want you to manage this.

25   And for them, I wrote prescriptions.
```

```
 1        Q.    Okay.  Can you give me a sort of a ballpark
 2   estimate on how many percentage-wise those patients
 3   would be?
 4        A.    Ten or 15 out of a hundred percent.
 5        Q.    Okay.  Have you ever written a prescription
 6   for Xarelto?
 7        A.    Yes.
 8        Q.    Have you ever written a prescription for
 9   Pradaxa?
10        A.    Yes.
11        Q.    Have you ever written a prescription for
12   Eliquis?
13        A.    Yes.
14        Q.    Have you ever written a prescription for
15   Savaysa?
16        A.    Yes.  But few.
17        Q.    Okay.
18        A.    Very few.
19        Q.    And then the history of NOACs -- this is
20   going to sound elementary, but --
21        A.    That's okay.
22        Q.    -- Pradaxa was first, then Xarelto, then
23   Eliquis, then Savaysa?
24        A.    Correct.
25        Q.    Correct?
```

Protected - Subject to Further Protective Review

```
 1              Did your prescribing of the NOAC drugs --
 2        A.    You're talking about the ones approved and
 3   available in the U.S.?
 4        Q.    Can you write prescriptions anywhere else?
 5        A.    No, but --
 6        Q.    Okay.  Just making sure.
 7        A.    -- there have been no other NOACs.
 8        Q.    Gotcha.
 9              And I don't -- I actually don't know the
10   answer to that.  Do you have a license in any other
11   countries besides the U.S.?
12        A.    No.
13        Q.    Okay.  Are you able in any way to write
14   prescriptions for drugs that aren't approved in the
15   United States, other than in a clinical trial
16   setting?
17        A.    No.
18        Q.    Okay.  So over the time period when the NOACs
19   were sort of rolled out over time, did you
20   prescribe -- your prescribing habits change as far as
21   which ones you -- let's start with that you wrote
22   prescriptions for more than the others, and then
23   we're going to get to that you advised people on.
24        A.    Okay.  So -- so I can only write
25   prescriptions for what was available.
```

Protected - Subject to Further Protective Review

```
 1        Q.    Right.

 2        A.    So, of course, since the choices have

 3   expanded, the number of drugs I prescribed has

 4   expanded, sequentially.

 5        Q.    Okay.  And would that be the same for the

 6   advice you give to physicians?

 7        A.    Of course.

 8        Q.    Okay.  How do you determine which particular

 9   NOAC you're going to either prescribe or advise a

10   prescription [sic] to prescribe to a patient, if you

11   decide that they should get a NOAC?

12        A.    In some circumstances for some patients,

13   there's not a dig difference.  And often, the

14   deciding factor is their coverage plan.

15            For some patients, there are very specific

16   reasons to recommend one over the other, and those

17   are medical decisions.  And then I'll make a specific

18   decision.

19        Q.    Okay.  Let's -- let's break those apart, talk

20   about each.

21        A.    Okay.

22        Q.    For patients -- if you have two patients

23   who -- or if you have a patient, excuse me, who is an

24   appropriate candidate in your mind for any of the

25   NOACs, it largely depends on what their health plan
```

USCA5 4312

Protected - Subject to Further Protective Review

1    is going to cover for them best; right?

2        A.   That is one factor.  If I deem that any of

3    the NOACs would be reasonable alternatives, then it

4    becomes a large factor, if not the deciding factor.

5        Q.   Because they need to be able to afford it in

6    order to take it; right?

7        A.   Pills never work in the bottle or in the

8    pharmacy.

9        Q.   Right.

10            Have you ever been -- were you ever involved

11   with Columbia's formulary?  Do you know what I'm

12   talking about?

13       A.   I know what you're talking about.  The

14   only -- I've never sat on their formulary committee.

15   The only involvement I've had with that committee is

16   they asked me -- two -- two settings.

17            One is they asked me to review when, from

18   time to time, the guidelines that they give to our

19   physicians, you know, this is what we would recommend

20   or this is the protocol we'd like to have followed.

21            And from time to time with cardiac drugs and

22   anticoagulants, they've asked me to look at that, and

23   there have been a couple of occasions.

24            The formulary committee will not add a new

25   drug to the formulary, unless somebody requests it of

USCA5 4313

Protected - Subject to Further Protective Review

```
1    them; not a company.  And there have been a couple of

2    circumstances when I have said, Based upon trial A,

3    B, C, D, or E, and the availability of the drug, I

4    think you should add it to either as an additional or

5    a replacement of something else on the formulary.

6        Q.   Have you done that in relation to any of the

7    NOAC drugs?

8        A.   I did it for -- when dabigatran first came

9    out, because it was the only NOAC out, and I thought

10   we needed it on the formulary.

11            I do not remember whether or not I did it

12   with Xarelto.  I was not -- I didn't do it for the

13   others.  Other people in the hospital had already

14   done that.

15       Q.   Okay.  Were you still -- did you still have a

16   clinical practice when Eliquis came out -- came on

17   the market?

18       A.   Yes, I believe so.

19       Q.   How about Savaysa?

20       A.   No.

21       Q.   Okay.

22            MR. COVEY:  Andy, I'm going to suggest a

23       break.  It doesn't have to be right now, but

24       sometime in the next five or ten minutes.

25            MR. CHILDERS:  Okay.
```

USCA5 4314

```
 1    BY MR. CHILDERS:

 2        Q.    Have you ever been involved in formulary

 3    issues for a health insurance company?

 4        A.    No.

 5        Q.    Okay.  The formulary -- the formulary at the

 6    hospital, that relates to inpatient medications?

 7        A.    Correct.

 8        Q.    Okay.  So if you're going to start a patient

 9    on a NOAC who's an inpatient, it has to be on the

10    hospital's formulary; right?

11        A.    There is a mechanism by which one can get a

12    non-formulary drug.  There's some forms to fill out

13    with justification and so forth.  So a hundred

14    percent would be the wrong answer to your question,

15    but most of the time, yes.

16        Q.    Okay.  Thanks for that clarification.

17        A.    Sure.

18        Q.    And then if you decide if the -- if the NOAC

19    is on the hospital's formulary, let's go with that.

20    Let's say they're all on the hospital's formulary.

21    And, in fact, it sounds like they are now, is that

22    right, at Columbia?

23        A.    I don't remember if Savaysa is or isn't, but

24    the others are, yes.

25        Q.    And you have a patient who you believe is
```

Protected - Subject to Further Protective Review

```
1    appropriate for any one of the four, then you turn

2    to -- to their health insurance to see what's going

3    to be most covered so that it's the least amount of

4    expense to them?

5         A.   So I -- I don't want you to be misled.

6    That's an important but not the sole factor.

7         Q.   No, I understand.  But that is --

8         A.   It is a -- it is a factor when -- when I

9    think they would be appropriate candidates for any of

10   them, but that's certainly not all the patients.

11        Q.   Right.  And I don't -- I'm trying to narrow

12   the scope of this question.

13        A.   Okay.

14        Q.   Other than their health insurance coverage,

15   what other factors would be at play if you have a

16   patient who is -- you think is appropriate for any

17   one of the four NOAC drugs?

18        A.   Well, to get to a patient who's appropriate

19   for any, I'd have to get through the factors that

20   would lead me to decide if there was one or two more

21   appropriate than the others.  So "any," it means

22   they've sort of going through a checklist, if you

23   will, and it's -- it's long.

24             What other drugs are they taking?

25             MR. CHILDERS:  Let's take a break, because I
```

USCA5 4316

```
 1        think we're getting into a little bit longer

 2        discussion than I expected.

 3            MR. COVEY:  Let's go off.

 4            THE VIDEOGRAPHER:  We're off the video record

 5        at 9:58.

 6            (Recess from 9:58 until 10:05 a.m.)

 7            MR. COVEY:  Dr. Reiffel mentioned that he had

 8        provided and reviewed and might find relevant two

 9        studies which were recently published.  I'm going

10        to hand those to counsel.

11            The first is from the New England Journal of

12        Medicine.  The date is December 8th, 2016, so

13        it's pretty recent.  It's one week ago.  And it's

14        entitled "Interpreted Geographic Variations in

15        Results of Randomized Controls Trials."  The lead

16        author is Yusuf, Y-U-S-U-F.

17            And the second article -- I'm trying to see

18        the date when the -- the second is a 2016 -- I

19        don't have the exact date -- article from the

20        European Heart Journal, and it's entitled

21        "Globalization Of Heart Failure Trials, No

22        Turning Back on This Paradigm" by Xammad,

23        X-A-M-M-A-D.

24            THE WITNESS:  That's an editorial.  You see

25        on the third page is the article that it refers
```

USCA5 4317

Protected - Subject to Further Protective Review

```
1        to, or the fourth -- the last page.

2            MR. COVEY:  So just -- so it's an editorial

3        that refers to an article also published in 2016

4        in the European Heart Journal called "Geographic

5        Variations in a PARADIGM-HF Heart Failure Trial"

6        by Kristensen.

7            Andy, good luck with them.  Have a nice

8        lunch.

9            THE WITNESS:  And I just got that journal

10       yesterday, so it's as recent as it gets.

11           MR. CHILDERS:  I'm going to mark them New

12       England Journal, 3, and European Heart Journal

13       as 4.

14           (Plaintiff's Exhibit No. 3 was marked for

15   identification.)

16           (Plaintiff's Exhibit No. 4 was marked for

17   identification.)

18           THE VIDEOGRAPHER:  We're now back on the

19       record at 10:10.

20   BY MR. CHILDERS:

21       Q.   All right.  Before we took a break, we were

22   talking about giving -- how you decide to give a

23   patient a particular NOAC.  And so it sounds like

24   there's quite a few things that go into your

25   decision-making process.
```

Protected - Subject to Further Protective Review

```
 1              So tell me how you -- tell me what you

 2     consider when you've decided you want to give a NOAC

 3     to a patient and then you're trying to figure out

 4     which one you think is the most appropriate.

 5        A.    So the things I consider -- and it's a fairly

 6     long list --

 7        Q.    Okay.

 8        A.    -- relate to has the patient had a past

 9     bleeding event, and if so, what kind?

10              Does the patient have upper GI disease and

11     symptoms, is he or her taking something for it, for

12     GERD, for example?

13              What underlying disorders does that patient

14     have?  And they all have some.  How severe are they?

15              What medications are they taking for those?

16     What doses are they taking for those?  What dosing

17     frequency are their other drugs?

18              If the drug has -- if any of those has a

19     potential for drug interactions, are there

20     alternatives to those drugs?

21              If the patient is taking medications only

22     once a day, I'm less inclined to give them something

23     that has to be taken twice a day.  If they're taking

24     medications that are twice a day, are there once a

25     day alternatives to those, and would the patient
```

Protected - Subject to Further Protective Review

1    prefer that?

2            What's the patient's diet like?

3            You hate to burden, for example, a diabetic

4    with yet more dietary restrictions, which is an

5    issue, for example, using warfarin.  It's a big

6    issue.

7        Q.   I would like to focus just on the NOACs, if

8    you can.

9        A.   I understand.

10       Q.   Okay.

11       A.   What do they do?  How much do they travel?

12   How many time zones are involved in, you know,

13   frequently in their daily activities?

14           Those are big issues.

15           Others are -- it relates to the underlying

16   disorders.  What's their CHA2D2-VASc score?  How high

17   is it?  How much do they resemble patients in the

18   clinical trials -- bless you -- versus they don't

19   resemble the clinical trial patients at all?

20           That's -- that's the list I can just come off

21   with -- off the top of my head with, but you can see

22   it's reasonably extensive.

23       Q.   Okay.  Well, let's start with the first one.

24   You said have they had a past bleeding event and what

25   kind.  How does that affect which particular NOAC

Protected - Subject to Further Protective Review

```
 1    they're going to -- you're going to recommend?

 2         A.    Okay.  So a patient's had repeated

 3    hemorrhoidal bleeds, nose bleeds, they had a bleeding

 4    ulcer five years ago that was felt to be related to

 5    overuse of nonsteroidal anti-inflammatories, which

 6    they're off now.  But they've got a prior bleeding

 7    history.  I'm a little more inclined to think about

 8    apixaban or edoxaban.

 9               And what's the renal function?  That's

10    another part of that -- that list.

11         Q.    A separate line item?

12         A.    A separate -- separate line item.

13         Q.    Okay.

14         A.    And -- and --

15         Q.    Okay.  That would be --

16         A.    -- and stability.  That's back on that first

17    list --

18         Q.    Okay.

19         A.    -- as I said, off the top of my head, and --

20    and now stable their underlying disorders.

21               So prior bleeding would push me towards

22    apixaban or edoxaban.

23         Q.    Okay.  And then you said, second was, did

24    they have any upper GI disease?

25         A.    Okay.  So these -- these, by the way, are not
```

USCA5 4321

Protected - Subject to Further Protective Review

```
 1    prioritized in any way.

 2        Q.   I know.  I just want to know how they

 3    influence --

 4        A.   Okay.  So the NOACs are remarkably

 5    well-tolerated.  The one that's got some side

 6    effects, other than bleeding concerns, is dabigatran,

 7    and it's mainly upper GI.  So if I have a patient

 8    that's already taking medications for their GERD, I'm

 9    not apt to pick dabigatran, which may make it worse.

10        Q.   Okay.

11        A.   Again, it's a tolerance issue.

12        Q.   Other --

13             MR. COVEY:  Sorry.

14             MR. CHILDERS:  It's okay.

15    BY MR. CHILDERS:

16        Q.   Other than avoiding dabigatran, would you

17    favor one of the other three in that patient?

18        A.   Not based upon that scenario alone.

19        Q.   Okay.  And then you said what underlying

20    disorders did they have, how severe are those

21    disorders, what meds, dose.  That's a fairly

22    complicated issue.

23             Are there certain disorders that would lead

24    you to favor one or more than one of the NOACs than

25    the others for a patient?
```

Protected - Subject to Further Protective Review

```
1        A.   Well, I'll give you some examples --

2        Q.   All right.

3        A.   -- but I can't make it exhaustive.

4        Q.   No problem.

5        A.   Heart failure --

6        Q.   Okay.

7        A.   -- is -- is one.

8             Bless you.

9             MR. COVEY:  Thanks.

10            THE WITNESS:  Heart failure, how stable is

11       it?  What's it due to, what's the underlying

12       disease?  Because heart failure can fluctuate in

13       certain scenarios more than others.  Worsening

14       heart failure impairs hepatic function, impairs

15       renal function, more the kidney, and that can

16       affect drug interactions.

17            And if I'm less convinced renal functions are

18       going to be stable, dabigatran becomes the lowest

19       on my list because it's so highly dependent upon

20       renal clearance.

21   BY MR. CHILDERS:

22       Q.   Okay.

23       A.   My practice is predominantly a -- Afib in

24   this space, less some DVT, unless they are

25   coexistent, pulmonary embolis, the cause of Afib.
```

USCA5 4323

```
1        Q.   Sure.

2        A.   So what drugs are they on for their atrial

3    fibrillation?  Do they have an alternative in terms

4    of not just rate control but control of the rhythm?

5    In heart failure, that list is extremely limited.  In

6    the absence of heart failure, that list is pretty

7    extensive.

8             So in the setting of heart failure, if I'm

9    treating their atrial fib with an antiarrhythmic

10   drug, it's either amiodarone or dofetilide, and

11   amiodarone has a lot of drug interactions.

12            So I might, under those circumstances, have

13   to think about what the data was in the clinical

14   trials to the extent that either we, the public, or

15   I, personally know was -- was amiodarone an issue in

16   the clinical trials in terms of the performance of

17   the drug?  Can I give them dofetilide as an

18   alternative?

19            Whereas if they're not in heart failure as a

20   cause of their atrial fibrillation, there's a much

21   longer list of drugs I can give, several of which do

22   not have drug interactions with any of the NOACs.

23   Those are part and parcel of those considerations.

24       Q.   So if a patient's on amiodarone and you

25   really don't have any other alternatives, which
```

Protected - Subject to Further Protective Review

```
 1    NOAC would you --

 2        A.   Well, I could -- I could switch them to

 3    dofetilide, if they haven't tried it or ranolazine

 4    off-label if they haven't tried it.

 5        Q.   Let's just say they have and they're on

 6    amiodarone, and they need to stay on it.

 7        A.   Well, then, we have a conversation, because

 8    it interacts potentially with all of them, do they

 9    want to have their Afib ablated?  You know, are there

10    ways I can get them off of amiodarone?  And if I

11    can't get them off of amiodarone, it makes me think

12    about the NOAC dosing.  Do I have alternates for

13    the -- the mid-range or not?

14        Q.   Okay.

15        A.   I'm a little less enthused with dabigatran

16    because of the absence of the 110 dose, which would

17    be useful in certain scenarios, which I've written

18    about and talked to the FDA about.

19        Q.   Yup.

20        A.   So all of those things come into play.  If a

21    patient is taking multiple drugs twice a day and is

22    perfectly content, then the once a day alternative

23    becomes less important.  If all their heart failure

24    drugs are or could be once a day -- ACE inhibitors

25    can be once a day; beta blockers can be once a day,
```

USCA5 4325

```
 1    for example, then I'm going to use a once-a-day drug

 2    and make their life more convenient.

 3           So that -- that's how the underlying stuff

 4    comes into place of play.  It's a patient-by-patient

 5    decision.

 6       Q.   Okay.  You mentioned also how much a person

 7    travels and how many time zones they may be in as a

 8    factor you consider.  Tell me how -- how that

 9    influences.

10       A.   It can be difficult to adhere to a medication

11    regimen if it's got to be taken at certain intervals

12    and you cross multiple time zones.  It's a little

13    easier, particularly if it's a business trip and

14    you're gone two or three days, it's a little easier

15    with a once-a-day drug.  You just say instead of

16    taking it at, you know, at eight o'clock, take it at

17    three o'clock or whatever, depending on the time

18    zone.  It gets much more complex if you're taking

19    drugs multiple times a day.

20       Q.   Okay.  We added renal function to the list.

21    Tell he how that -- if you've got a patient with

22    impaired renal function, are there NOACs that you

23    prefer that they go on?

24       A.   I'm a little less apt -- I'm much less apt to

25    use dabigatran and a little less apt to use apixaban.
```

```
 1    It relates to how much the drug has cleared renal and

 2    what dosing options I have and how stable their renal

 3    function is.

 4         Q.   Okay.  So dabigatran and apixaban would go

 5    lower on your list for a renally impaired patient?

 6         A.   Not everyone appreciates the apixaban issue,

 7    but there is one.

 8         Q.   They market the drug as being safer for renal

 9    patients.

10         A.   I know -- I know what they market the drug

11    as.  And if you look at their tables, they'll say the

12    renal excretion is 25 to 30 percent or so, but their

13    bioavailability is only 50 percent.  And so half of

14    what's absorbed is actually renally excreted.

15              I think in terms of patients and drugs, what

16    happens when the drug's in the body, not what happens

17    when it's sitting in a bottle before they've taken

18    it, a comment I'll make if we get there about

19    clinical trial interpretation, as well.

20         Q.   Tell me that again, sir.  So you said it's

21    more important to you what happens to the drug in the

22    body --

23         A.   Does the patient take the drug, does it get

24    into their system, and then what can I expect?

25         Q.   Okay.  So a patient takes a drug; that's
```

Protected - Subject to Further Protective Review

```
 1    easy.  They put in their mouth; they take it.

 2         A.    Right.

 3         Q.    Does it get in their system?  How do you --

 4    how do you figure it out?

 5         A.    A, by clinical trial data.

 6         Q.    Okay.

 7         A.    B, by known pharmacology data.

 8               And then depending upon the particular drug

 9    and the circumstance, by their clinical response.

10         Q.    Okay.  And then the third was what happens to

11    it -- I'm sorry, what?

12         A.    What -- what happens in the body.  So with

13    apixaban, if half of what you put in your mouth is

14    absorbed and half of that is renally excreted, when

15    you say what percentage of the original pill was

16    renally excreted, you say 25 percent.  That's where

17    they come up with the -- not very high.  But, in

18    fact, half of what's absorbed is renally excreted.

19    That's important when you're taking --

20         Q.    And what happens in the body -- sorry.  I

21    didn't mean --

22               MR. COVEY:  I don't think he was done with

23         his question.

24               MR. CHILDERS:  I just said some words and

25         didn't have a question.
```

```
 1              THE WITNESS:  No, I understand.  I wasn't
 2       responding to it.  I was still thinking.
 3    BY MR. CHILDERS:
 4       Q.   Did you have something you wanted to add to
 5    that last one?
 6       A.   No, not -- and the renal stuff goes back to
 7    drug interactions as well.
 8       Q.   Okay.  Okay.  You've never been employed by a
 9    pharmaceutical company; have you?
10       A.   Nope.
11       Q.   Okay.  You told us -- you told me you worked
12    as an investigator in the RE-LY trial?
13       A.   Correct.
14       Q.   What does that mean when you say you were an
15    investigator?  What was -- what were your duties?
16       A.   So when a clinical trial is done, the -- the
17    sponsor or the seer of the clinical research
18    organization will contact the physician or an
19    institution or a group within the institution and
20    say, here's a trial we are interested in performing.
21    Read about it.  If you want to know more and you have
22    some interest, we'll give you a more detailed
23    description of the trial, and we'll get an
24    investigator's brochure, which gives you all the
25    background known to date on the drug.
```

```
 1              Would you be willing to participate, to
 2      enroll patients in the trial?  Following to the
 3      letter of the protocol called for.
 4              If you're willing and interested in doing
 5      that, you then need to go through a contracting
 6      process.  And, again, if it's an outpatient group,
 7      they'll do it.  If it's an institution, like a
 8      hospital, there's usually an office that does it.
 9              And then it will have to go through an
10      institutional review board for patient safety issues.
11      And if they pass on that, the contract office says
12      yes, we're willing to sign the contract or we'll sign
13      it but only if the following changes are made, and
14      then there's hassling back and forth with the
15      companies.  As I said before, that could take, at
16      least at our institution, a year.
17              And the institution review board passes on it
18      and often has standard wording that they want in
19      patient consents.  It may or may not be the standard
20      wording from the company, and you go through those
21      negotiations.
22              When that's all done, so there's a -- then
23      you can enroll patients in the trial.  Enrolling
24      patients in the trial means identifying patients in
25      your institution who are patients that meet the
```

Protected - Subject to Further Protective Review

1    inclusion criteria of the trial and don't have one or

2    more of the exclusion criteria of the trial, who you

3    or someone else in the group sits down and talks with

4    and says we're interested in doing a trial.

5         This is what the trial's about.  This is why

6    you're doing it.  You have the right not to do it.

7    You have the right to withdraw any time you want.

8    Here's the consent form.  Take it home, read it, come

9    back, ask any questions you have.  If you're willing

10   to participate in the trial, just sign the consent

11   form, and we'll go from there.

12        And we give them a document that details what

13   the steps are, how often their visits will be, what

14   laboratory tests will be done at what visits, and so

15   forth.

16        And we, as investigators, have to see the

17   patients at all of the called-for visits, have to be

18   sure that the laboratory tests that are required were

19   obtained and that we see the results, that we or our

20   clinical research staff fills out the documented case

21   report forms, which ultimately go back to the

22   organization running the trial, which may be a

23   company, or it may be an intermediary, until the

24   trial is over.

25        Q.   Okay.

Protected - Subject to Further Protective Review

```
 1        A.   Or the patient withdraws.

 2        Q.   How long were you an investigator for the

 3   RE-LY trial?

 4        A.   A few years.  I can't tell you exactly.

 5        Q.   Do you know how many patients you enrolled

 6   into the trial?

 7        A.   Not off the top of my head.  That's a decade

 8   and a half ago.

 9        Q.   Any -- even a ballpark?  Dozens, hundreds?

10        A.   No, not -- not hundreds.

11        Q.   Okay.  Less than 100?

12        A.   Less than a hundred.

13        Q.   Okay.

14        A.   Yeah.

15        Q.   And you followed them for the prescribed time

16   that was in the trial?

17        A.   Correct.  Until the trial was completed.

18        Q.   Okay.  And have you worked on any other NOAC

19   drugs?

20        A.   As an investigator, no, sir.

21        Q.   In any fashion.

22        A.   No.

23        Q.   How about any other anticoagulant -- oral

24   anticoagulant trials?

25        A.   No.
```

Protected - Subject to Further Protective Review

```
 1        Q.    You published some papers in relation to the
 2   RE-LY trial as well; right?
 3        A.    Yes.
 4        Q.    Okay.  So did you in -- in addition to
 5   managing patients in the trial, did you help
 6   interpret the results of the trial?
 7        A.    I couldn't be part of the publication if I
 8   didn't look at and approve the data in that
 9   publication.  That's a requirement of all the
10   peer-reviewed journals.
11        Q.    But I still have to ask those kinds of
12   questions.
13        A.    Oh, I understand.  And I answered as
14   truthfully as I can.  So, yes.
15        Q.    Have you ever had a -- have you ever seen a
16   patient who had a bleed that you thought was related
17   to Pradaxa?
18        A.    I have to think back in the trial.
19        Q.    It doesn't have to be just in the trial.
20        A.    No, no, no, I understand.
21              Maybe one.
22        Q.    Okay.  Was that in the trial or not in the
23   trial?
24        A.    Not in the trial.
25        Q.    Okay.  Have you ever seen a patient who had a
```

USCA5 4333

1    bleed that you thought was related to Xarelto?

2         A.   Same answer, maybe one.

3         Q.   Same question for Eliquis.

4         A.   No.

5         Q.   Same question for Savaysa.

6         A.   No.  But I've had very few people on Savaysa.

7         Q.   All right.

8              Okay.  Is it your opinion that Xarelto is

9    superior to warfarin with respect to preventing

10   strokes?

11        A.   No.

12        Q.   And is it your belief that Xarelto is

13   superior to warfarin with respect to propensity to

14   cause bleeds?

15        A.   You're talking about all bleeding lumped

16   together?

17        Q.   Major bleeds.

18        A.   No.

19        Q.   Okay.  Do you have an opinion as to whether

20   Xarelto is a narrow- or wide-therapeutic index drug?

21        A.   Relatively speaking, I think all the

22   anticoagulants are or should be labeled

23   narrow-therapeutic index drugs.

24        Q.   So that would include warfarin and the NOACs?

25        A.   Yes.

```
1        Q.   Okay.  Generally speaking, with respect to

2   oral anticoagulants, do you agree that as the dose

3   increases, meaning as one's exposure to the drug

4   increases, the patient's risk of stroke decreases but

5   the risk of bleed increases?

6        A.   I'm hesitating because if you think about the

7   warfarin, for example, there's a sweet spot, right,

8   if you will, to use the term.

9        Q.   We can use that term.

10       A.   Where the stroke risk and the bleed risk are

11  low together, so -- and -- and the shape of the

12  curves isn't identical.  So the question is a little

13  too general.

14       Q.   Okay.  Do you agree as a general proposition

15  with anticoagulant drugs, as the dose increases, the

16  risk of bleed increases?

17       A.   It's not that simple.

18       Q.   Okay.  Tell me -- tell me why.

19       A.   Because most people don't bleed, regardless

20  of the dose, number one.

21       Q.   I understand that.  You understand my

22  question is risk of bleed?

23       A.   I do, I do.

24       Q.   Okay.

25       A.   I do.
```

Protected - Subject to Further Protective Review

```
 1      Q.   Okay.

 2      A.   As the dose increases, there can be

 3   substantial variability in the certain concentration,

 4   if you will, of the -- of the drug.  And bleeding

 5   risk is not -- has not been well-correlated with

 6   either the peak of the serum concentration or with

 7   the mean serum concentration over the dosing range.

 8           And you need a -- as I said in my report, you

 9   need a bleeding source.  Anticoagulants don't cause

10   bleeding.  And just because one bleeds, it doesn't

11   mean it's from the anticoagulant.  We know a lot of

12   people bleed not on an anticoagulant.

13           So there are a number of factors that come

14   into play in trying -- simultaneously in trying to

15   answer that question.

16      Q.   Okay.  So what we're talking about is simply

17   a risk of bleed, not that they actually have a bleed;

18   okay?

19      A.   So if -- if you take patients who are the

20   highest of several doses and lump them all together,

21   yes, you're more likely to see bleeding.  And if

22   they're at the lowest of all of the doses,

23   recognizing that -- and I'll use dabigatran as an

24   example -- with the renal function, the lowest dose,

25   75, has the same risk of bleeding as the 150 because
```

USCA5 4336

Protected - Subject to Further Protective Review

```
1    I'm giving it to a selective group of patients, those

2    with renal impairment, and the serum concentration --

3         Q.   Okay.

4         A.   -- it is dependent.  So it's not just the

5    dose.

6         Q.   I gotcha.  Let me ask it this way.

7         A.   Okay.

8         Q.   Do you agree, then, with respect to

9    anticoagulants that as the serum concentration

10   increases, the risk of bleed also -- the risk of

11   bleed also increases?

12        A.   The probability that you will see bleeding in

13   a group of patients increases.  I don't know that

14   that's the same as risk.

15        Q.   What would be different from that and risk of

16   bleed?

17        A.   Well, risk might be in an individual patient.

18   If you had --

19        Q.   Okay.

20        A.   -- if you were taking a lot of Advil, right,

21   I can give you a low dose and you could bleed.  So I

22   think about --

23        Q.   Okay.

24        A.   -- groups and probabilities.

25        Q.   All right.  So let me use your term.  As the
```

USCA5 4337

```
 1     serum concentration of any anticoagulant medication

 2     increases, the probability of bleed increases; do you

 3     agree with that?

 4          A.   As far as it goes for a group, but not for an

 5     individual patient.

 6          Q.   Right.

 7               And the only way that we can do any kind of

 8     testing that is reliable is to test a large group of

 9     people; right?

10          A.   You need to know not just the mean, which is

11     what your probability is based upon, but the

12     extremes.  So there are people, for example, who, if

13     you measure some coagulation parameter, it may be

14     extremely high on a low dose or barely above normal

15     on a high dose.  And that's why I keep trying to

16     separate the group probabilities from what happens in

17     given patients and practice.

18          Q.   The people that you just described that the

19     low dose could cause a high serum concentration, I

20     think that's what you're saying, or a high dose may

21     not cause a high serum concentration, those people

22     would be considered outliers from the rest of the

23     group that you're talking about?

24          A.   Well, to the extent the population behaves

25     like a bell-shaped curve, you're going to have five
```

Protected - Subject to Further Protective Review

 1    percent of both extremes.  So it's one in ten.

 2        Q.    Okay.

 3        A.    We've got, what, seven people in this room,

 4    so there's a probability that one of is going to be

 5    an outlier.  It's not a rare phenomenon.

 6        Q.    It's not a rare phenomenon to find an

 7    outlier?

 8        A.    Correct.

 9        Q.    Okay.  And in order to know who's an outlier,

10    you've got to be able to do some sort of testing on

11    that individual patient if you want to know

12    individually, is this person an outlier; correct?

13        A.    If you wanted to know on a particular test at

14    a particular point in time, yes, but the tests are

15    often time-dependant as to when you do them after a

16    dose.  So it's -- it's not as simple as some people

17    would like to believe.

18        Q.    But in order to determine which of the one --

19    seven of us is an outlier, you have to have some sort

20    of test?

21        A.    Correct.

22        Q.    Okay.  Without that test, it's just a guess;

23    right?

24        A.    For most tests, yes.

25        Q.    Okay.

USCA5 4339

Protected - Subject to Further Protective Review

```
 1        A.    There are some you can judge, some tests,

 2    some drugs, by genetics.  So if I knew your genetic

 3    makeup, I could predict that you would be an outlier

 4    or not with a particular drug.  But that's not true

 5    for most drugs in general practice.

 6        Q.    That's not true for anticoagulants; correct?

 7        A.    Well, it may be true of warfarin.

 8        Q.    Okay.  For the NOACs, that's not true?

 9        A.    Not yet.

10        Q.    Okay.  I'm going so ask you about a couple of

11    papers that you participated in; okay?

12        A.    Sure.

13              MR. COVEY:  Five?

14              MR. CHILDERS:  This will be Exhibit 5.  I'm

15        going to put the sticker up top so we can see it.

16        (Plaintiff's Exhibit No. 5 was marked for

17    identification.)

18    BY MR. CHILDERS:

19        Q.    This is a paper, the first author --

20        A.    Paul Reilly, correct.

21              MR. CHILDERS:  Sorry, I thought I had more

22        than that.

23              MR. COVEY:  I think you did.

24              MR. CHILDERS:  I think I have enough.

25              MR. COVEY:  Thanks.
```

```
 1   BY MR. CHILDERS:

 2       Q.   You know Dr. Reilly; correct?

 3       A.   I do.

 4       Q.   Okay.  And Dr. Reilly works for Boehringer?

 5   Do you say Boehringer or Boehringer Ingelheim?

 6       A.   I've heard it pronounced both ways.

 7   Boehringer is what I hear from the Germans when they

 8   come over, and Boehringer is what I hear in the

 9   States.

10       Q.   Okay.  And Dr. Reilly works for that company;

11   right?

12       A.   He does.

13       Q.   Okay.  And Thorsten Lehr worked for the

14   company at the time of this paper, too.  Do you know

15   him?

16       A.   I know the name.  I don't remember him

17   personally, but you can look in the bottom.  It tells

18   you who everybody is.

19       Q.   Right.

20            And then I didn't see your name, but I assume

21   you're included in the, on behalf of --

22       A.   On behalf of, yes.  I did not write this

23   paper.

24       Q.   Okay.  But it's listed on your CV as --

25       A.   On behalf of, that's correct.
```

USCA5 4341

```
1       Q.   Right.  Okay.

2            Did you get a chance to review the paper

3    before it was published?

4       A.   I had talked to Dr. Reilly about the contents

5    of the paper.

6       Q.   Anything that you told you thought -- you

7    thought needed to be changed?

8       A.   I honestly don't remember specifics.  And, in

9    fact -- no.

10      Q.   Okay.

11      A.   Not that I recall.

12      Q.   Okay.  I want to ask you about a couple of

13   sentences in this.  The title of the article, by the

14   way, is "the Effect of dabigatran Plasma

15   Concentrations and Patient Characteristics on the

16   Frequency of Ischemic Stroke and Major Bleeding in

17   Atrial Fibrillation Patients"; right?

18      A.   Uh-huh.

19      Q.   Okay.  And it's based on data that was

20   obtained in the RE-LY trial where you were a --

21      A.   Correct.

22      Q.   -- investigator?

23           If you go to the -- it's about the sixth page

24   in -- one, two, three four -- Page 326, if you look

25   at the top.
```

Protected - Subject to Further Protective Review

```
 1        A.   Uh-huh.

 2        Q.   There's a chart, Figure No. 2 -- I'm sorry,

 3   it's a figure, not a chart.

 4        A.   Uh-huh.

 5        Q.   And in this chart, it says:  Probability of

 6   Major Bleeding Event and Ischemic Stroke/SSE Versus

 7   Trough Plasma Concentration of dabigatran; correct?

 8        A.   Correct.

 9        Q.   And according to this chart, it shows that as

10   exposure to dabigatran increases, the risk of stroke

11   decreases but the risk of bleed increases; right?

12        A.   Correct.

13        Q.   And on this chart, the risk of stroke

14   decreases at a much slower rate than the risk of

15   bleed increases when you increase the plasma

16   concentration; correct?

17        A.   At the higher range of the plasma

18   concentrations, yes.

19        Q.   Right.

20             And then if you flip to the following page --

21   I highlighted this for you so it makes it easier for

22   us to all see it.

23        A.   Uh-huh.

24        Q.   The article says:  In some patients who are

25   at the extremes of the concentration range and have
```

USCA5 4343

Protected - Subject to Further Protective Review

```
 1    one or more risk factors such as old age, reduced

 2    creatinine clearance, or low body weight, better

 3    outcomes might be achieved by adjusting the dose.

 4         Do you see that?

 5    A.   I do.

 6    Q.   You agree with that statement; don't you?

 7    A.   It's a theoretical statement.  You can't

 8    disagree with it.

 9    Q.   You've written --

10    A.   They might be, but I think we'd have to show

11    whether that's true or not in a clinical trial.

12    Q.   And the data that you've reviewed from this

13    trial suggests to you that those people may have

14    better outcomes if you had an adjusted dose for

15    dabigatran; correct?

16    A.   So that depends upon the -- I -- I think it's

17    as a whole; as I said, it's theoretical.  It depends

18    upon the -- the characteristics of the curves, if you

19    made the adjustment.  If the troughs remained the

20    same and the peaks and means were different, there

21    may not be a difference in results.

22         One of the things that Paul Reilly and

23    colleagues have commented on is that the bleeding

24    risk with dabigatran is more closely related to the

25    trough levels than to the peak or the mean levels.
```

USCA5 4344

Protected - Subject to Further Protective Review

1    And so I would actually have to see, if, when

2    adjusted, the dose, in the circumstances, what the

3    curves look like.  I don't know what they'll look

4    like.

5        Q.   The modeling that was done by Dr. Lehr, did

6    you review that?

7        A.   I don't remember the modeling offhand.

8        Q.   Okay.

9        A.   I do remember -- I've got to find the other

10   figure -- talking to Dr. Reilly about Figure 1 in a

11   couple of different venues.  And we talked, again,

12   about the probabilities of bleeds related not just to

13   the trough concentration but to the age, and that

14   gets back to the issue of:  Is there a risk factor?

15   You know, what's causing the patient to bleed?  So

16   it's not just the -- the blood values.  And that's

17   the portion of the paper that he and I talked

18   together about the most.

19       Q.   That the blood value in combination with some

20   other factors --

21       A.   That's correct.

22       Q.   -- may increase the risk of bleed?

23       A.   That's correct.  It's not simply the serum

24   concentration.

25       Q.   Right.

```
 1            And, in fact, that's what he wrote here in
 2    the part that we looked at --
 3        A.   Correct.  Totally correct.
 4        Q.   -- is that the concentration range and one or
 5    more of the risk factors.
 6        A.   Correct.  And I agree with that.
 7        Q.   And the -- and you agree with the statement
 8    he put in the paper; right?
 9        A.   Yes.  Particularly since he used the word --
10    and I'll go back to where you highlighted.
11        Q.   The word "might"?
12        A.   Might.
13        Q.   Right.
14        A.   Yes.
15        Q.   That's all I'm asking.
16        A.   Okay.
17        Q.   Okay.
18        A.   Yes, said might.  It's a theory.  It needs to
19    be proven or disproven.
20        Q.   Right.
21            And how do you prove or disprove that kind of
22    a theory?
23        A.   By testing it in clinical practice.
24        Q.   Right.
25            Let me ask you, then, about another paper.
```

```
 1    This time you were the first author, and Dr. Reilly

 2    is one of the other authors?

 3        A.   Correct.

 4             MR. CHILDERS:  This will be Exhibit 6.

 5             (Plaintiff's Exhibit No. 6 was marked for

 6    identification.)

 7             THE WITNESS:  Can I give you this one back,

 8        or should I --

 9             MR. CHILDERS:  We'll just stick it right

10        here; okay?

11             THE WITNESS:  Okay.  Yeah, sure.

12             MR. CHILDERS:  That way, if we need to go

13        back to anything later --

14             THE WITNESS:  That's fine.

15             MR. CHILDERS:  I'm trying to keep them in

16        order, but I can't promise.

17             THE WITNESS:  That's why I'm giving it to you

18        to do with what you want.

19             MR. CHILDERS:  Great.

20    BY MR. CHILDERS:

21        Q.   This manuscript was published in April of

22    this year; correct?

23        A.   Correct.

24        Q.   In the American Heart Journal?

25        A.   Correct.
```

```
 1        Q.    Are you a reviewer or anything for the

 2   American Heart Journal?

 3        A.    Yes.  But not of a manuscript that we submit.

 4        Q.    I understand that.

 5        A.    Okay.

 6        Q.    But this is a journal -- you looked like you

 7   had a lot of journals, that you review articles.

 8        A.    I have.

 9        Q.    And this is one of them?

10        A.    Uh-huh.

11        Q.    Okay.  And then this article relates to a

12   couple of meetings that were held with the CSRC

13   members --

14        A.    This particular manuscript relates to a

15   particular meeting, correct.

16        Q.    Gotcha.

17        A.    It's a summary of that meeting.

18        Q.    Okay.  And you -- you were the lead author.

19   Does that mean you had responsibility for putting it

20   all together, or -- or tell me what was your role in

21   this particular article.

22        A.    So the CSRC, the Cardiac Safety Research

23   Consortium --

24              It's easier to say CSRC than all of that.

25        Q.    That's why I was saying that.
```

Protected - Subject to Further Protective Review

```
 1        A.   -- has had a series of meetings with the FDA

 2    in which the participants, which have FDA

 3    representatives, industry representatives, and

 4    academic representatives, helped the FDA wrestle with

 5    or consider issues that -- that they're trying to

 6    decide some action or choose inaction on.  This was

 7    one.  I was one of the industry -- one of the

 8    academic representatives present.

 9        Q.   Okay.

10        A.   And for each of these, one participant is

11    asked by the person who organized the meeting to be

12    the first author, to write the first draft of the

13    manuscript.  That's what I was asked to do for this.

14        Q.   Okay.

15        A.   Great read.

16        Q.   And I've -- I've highlighted several things,

17    as we go through it.  So we'll start on the first

18    page.  And I've highlighted them to draw your

19    attention to them, but certainly you can read and

20    look at anything else you want.  I just wanted to

21    make it easier for us.

22        A.   Sure.

23        Q.   Okay?

24             In addition to you, Paul Reilly and

25    Troy Sarich were participating; correct?
```

```
 1        A.    Correct.

 2        Q.    Paul Reilly, as we know, works for Boehringer

 3   Ingelheim?

 4        A.    Correct.

 5        Q.    And Troy Sarich works for Janssen; correct?

 6        A.    Correct.  In fact, in the appendix you'll see

 7   a list of all the people who participated.

 8        Q.    Great.

 9        A.    Yes.

10        Q.    But as far as these authors --

11        A.    Yes.  That's correct.

12        Q.    -- these folks signed off on it with you;

13   right?

14        A.    That's correct.

15        Q.    Okay.  And if you go to the page after this

16   one, there's a disclosures page.

17        A.    Correct.

18        Q.    It says that you're a consultant and/or a

19   speaker's bureau member for Boehringer Ingelheim,

20   Bristol-Myers Squibb, Daiichi Sankyo, Pfizer, and

21   Portola.

22        A.    Correct.

23        Q.    Do you see that?

24        A.    Yes.

25        Q.    Why is Janssen not listed?
```

```
 1        A.   That's a typo.  It was originally listed.

 2   That's a pure oversight.  This has gone through I

 3   can't tell you how many iterations and reviews by

 4   different people, and the final manuscript --

 5        Q.   That's not the final?

 6        A.   No, no, no.  The final manuscript went out

 7   through the New Clinical Research Institute.

 8        Q.   Okay.

 9        A.   And that's -- that's a typo, apparently.

10        Q.   Okay.  But it should say Janssen?

11        A.   Yes, absolutely.

12        Q.   Okay.  All right.  If we go to the following

13   page, the abstract tells us what the purpose of the

14   meeting was; right?

15        A.   I'd have to reread it to see if the

16   question -- whether the answer is what you would ask

17   me.

18        Q.   All right.  Well, let me ask you -- let me

19   ask you a different question.  I'll withdraw that and

20   let me ask a different question.

21        A.   Okay.

22        Q.   Do you see the sentence that starts with

23   "nonetheless"?

24        A.   Yes.

25        Q.   It says:  Nonetheless, the absence of the
```

Protected - Subject to Further Protective Review

```
 1    ability for clinicians to assess compliance or

 2    washout with a simple laboratory test (or to adjust

 3    dosing with a similar assessment) and the absence of

 4    an antidote to rapidly stop major hemorrhage or to

 5    enhance safety in the setting of emergent or urgent

 6    surgery/procedures have been limitations to greater

 7    NOAC usage and better thromboembolic prevention.

 8         Do you see that?

 9    A.   I do.

10    Q.   And you agree with that statement --

11    A.   I do.

12    Q.   -- because you wrote it; right?

13    A.   I do.

14    Q.   Okay.  If we turn to the following page,

15    there's another sentence that starts with the same

16    word, "nonetheless."

17         Do you see that?

18    A.   Uh-huh, I do.

19    Q.   And you wrote:  Nonetheless, clinicians and

20    patients have expressed concerns about some aspects

21    of NOAC therapy, including the absence of an antidote

22    to reverse their effects when desired (such as in the

23    presence of severe bleeding, trauma, or emergent

24    surgery or other interventional procedure), and the

25    inability to determine the extent of anticoagulation
```

USCA5 4352

Protected - Subject to Further Protective Review

```
 1    as one can with the INR for warfarin when

 2    documentation of washout or adherence is desired or

 3    to optimize the balance between stroke prevention and

 4    bleeding.

 5         Correct?

 6    A.   Correct.

 7    Q.   And, again, that's -- those are your words;

 8    right?  You're the author of this article.

 9    A.   Okay.  So this article is a consensus.  The

10    words were agreed upon by all of the authors and were

11    not necessarily the words as I wrote them.

12    Q.   That's a fair point.

13         You agreed with these words when you

14    published the paper; correct?

15    A.   I think it's a fair statement, yes.

16    Q.   Okay.  And then the following sentence says:

17    The former is being addressed by the development of

18    antidotes specific for these agents, while the latter

19    would require laboratory tests that are sensitive,

20    specific, standardized, and reproducible in their

21    ability to measure the plasma concentrations of the

22    NOACs and/or their anticoagulant activity.

23         Correct?

24    A.   That is correct.

25    Q.   Currently -- well, let's start with at the
```

USCA5 4353

```
 1    time you wrote this article, there weren't any

 2    sensitive, specific, standardized, and reproducible

 3    tests to measure plasma concentration of the NOACs;

 4    correct?

 5        A.   There still aren't.

 6        Q.   Right.  Well, I know, but sometimes we have

 7    to break questions out.

 8        A.   Correct.

 9        Q.   And my next question was:  There still aren't

10    any of those tests; right?

11        A.   Correct.

12        Q.   And the same question for measuring the

13    anticoagulant activity of those; right?

14        A.   Correct.

15        Q.   Okay.  Are there any tests that you can do to

16    measure plasma concentration of any of the NOACs?

17        A.   There are some laboratories, I believe, that

18    have offered measurements of dabigatran.  I don't

19    think that they're widely applicable or widely used.

20    I don't know about their accuracy.

21        Q.   Are you referring to hemoclot?  Does that

22    sound familiar to you?

23        A.   No.  I'm referring to plasma measurements in

24    dabigatran.

25        Q.   Okay.
```

```
1        A.    For the others, the answer is no.

2        Q.    All right.  And how about measuring

3   anticoagulant activity of any of the NOACs?  Any

4   testing that you know of that can do that?

5        A.    More reliability with dabigatran than

6   anything else.

7        Q.    And what test is that?

8        A.    So the thrombin time or the dilute thrombin

9   time, the ecarin clotting time have a pretty tight

10  linear relationship with dabigatran concentration and

11  anticoagulant effects and the APTT.

12       Q.    What does that stand for?

13       A.    It's the partial thromboplastin time.

14       Q.    Activated partial --

15       A.    Yes.

16             At the lower end, if -- if you're a value

17  that's at the lower end, you don't have much

18  dabigatran effect.

19             Those are pretty reliable.  There are none

20  that have been -- that meet the criteria as we stated

21  for the Xa inhibitors.

22       Q.    Okay.  Are there any tests that can help you

23  to determine plasma concentration or anticoagulant

24  activity for factor Xa inhibitors?

25       A.    As a group, yes.  In individual patients, not
```

```
1    reliably.

2        Q.   Okay.  Can you tell me what you mean by --

3        A.   Sure.

4        Q.   -- what you just said?

5        A.   So the prothrombin time --

6        Q.   PT?

7        A.   The PT.  Depending upon how it's run,

8    which -- which components are used, the Neoplastics

9    thrombin time -- prothrombin time.

10       Q.   The reagent that's used?

11       A.   That's correct.

12       Q.   Okay.  So if you have a PT where you use

13   Neoplastic, tell me what that --

14       A.    In patients taking rivaroxaban, as a group,

15   the PT will increase as the serum concentration

16   increases, as a group.  There's wide variability,

17   though.  And I'm sure you've seen the curves in the

18   FDA briefings where the highest value was actually

19   the low concentration, and the very low values were

20   present in high concentrations.

21            With edoxaban and apixaban, it's not very

22   sensitive at all, even in the Neoplastic reagent.  So

23   there is not, as this states, a reliable,

24   reproducible sensitive assay.

25            Moreover, for the same patient, the PT will
```

```
 1    vary depending upon when it's drawn after a dose.

 2    And that's not true with warfarin, because the

 3    half-life is so long.

 4            So, once again, if you tell me the ProTime is

 5    20 seconds or 10 second or 30 seconds, it doesn't

 6    help me very much in a given patient clinically.  We

 7    need something that's better than that to begin to

 8    use it clinically.

 9       Q.   What would you need to use it clinically?

10    What information would the test have to tell you?

11       A.   Ideally, I would have a test that was

12    abnormal within the defined range regardless of the

13    time I took it relevant to the last dose; that

14    translated into a clinically meaningful difference in

15    outcome and that was reliable from patient to patient

16    in the same patient across time.

17       Q.   When you say clin -- clinically meaningful

18    difference in outcome, are you meaning causes and

19    adverse effect on the patient?

20       A.   Or as -- is reliable as an indicator, for

21    example.  And I'll use the examples we talked about

22    here.

23            One is the compliance.  Patient comes in with

24    a stroke.  They had been given a prescription for a

25    NOAC.  It could be Xarelto or one of the others.
```

USCA5 4357

Protected - Subject to Further Protective Review

```
 1    Were they taking it?  Well, does it reflect, knowing

 2    the time after the dose, that the drug was taken in

 3    that time window?

 4            Washout.  The patient comes in not for

 5    emergent surgery; he's not bleeding out from an auto

 6    accident, but he needs something urgently.  Can I

 7    tell when enough of the drug has dissipated reliably

 8    to know I don't have an anticoagulant effect?  And

 9    that's where part of the problem comes in with the

10    ProTime; it's not reliable in that respect.

11        Q.   Okay.

12        A.   Those are two of several examples.

13        Q.   Okay.

14        A.   We need something that we can use reliably,

15    faithfully.  Otherwise, it's not valuable.  They may

16    tell you about group means; they may tell you about

17    group pharmacodynamics; but it's not clinically

18    useful.

19        Q.   I under -- I think I understand.  If you had

20    the test to do the things you just described for me,

21    that would be clinically useful for you?

22        A.   It would be.

23        Q.   Okay.  And it would -- if it's clinically

24    useful for you, it should be clinically useful for

25    any physician who's prescribing NOAC drugs; right?
```

USCA5 4358

Protected - Subject to Further Protective Review

```
 1        A.   Providing we had shown in a clinical setting,
 2   in a trial, that what we believed was true about it
 3   was, in fact, true.
 4        Q.   Yeah.
 5        A.   And we have often been misled between logic
 6   and beliefs and what outcomes are.
 7        Q.   Until you test it, you -- you don't know,
 8   though; right?
 9        A.   That's correct.  That's exactly correct.
10        Q.   Failing to test it doesn't tell you anything;
11   correct?
12        A.   Failing to test it doesn't tell you whether
13   the hypothesis is true or false.
14        Q.   Right.
15             If you'll turn to the next page.
16        A.   Sure.
17        Q.   I've highlighted the -- I think we just
18   discussed this, but I just want to make sure.  I
19   highlighted that:  As laboratory assessment specific
20   for each drug or its effect would be useful provided
21   that standardized test were available, a "think tank"
22   meeting utilizing the CSRC was held at FDA's campus
23   in Maryland on February 3rd, 2015, to address these
24   issues.
25             Right?
```

```
 1        A.    Correct.

 2        Q.    And that's what we just talked about?

 3        A.    Correct.

 4        Q.    Okay.  And you point out here, about a third

 5   of the time at this meeting, you were talking about

 6   monitoring for what we just discussed, and then the

 7   two-thirds, the rest, was about antidotes?

 8        A.    Correct.

 9        Q.    An antidote being something you can give a

10   patient to rapidly reverse the anticoagulant effect

11   of the medicine; right?

12        A.    Correct.

13        Q.    Okay.  The next page, the title is called

14   "PK/PD-Guided Dosing of NOAC's"; right?

15        A.    Correct.

16        Q.    Pharmacokinetic- and pharmacodynamic-guided

17   dosing of NOACs; that's what that means?

18        A.    Correct.

19        Q.    And the first sentence says:  The NOACs have

20   reasonably predictable pharmacologic profiles, with

21   well-defined relationships between plasma

22   concentrations and anticoagulant effects and

23   generally predictable blood levels based upon

24   administered dose.

25              Right?
```

Protected - Subject to Further Protective Review

```
 1        A.    Based upon groups of patients.  It doesn't
 2   say for the individual patients.
 3        Q.    And does it say "groups" or "individuals" at
 4   all in this sentence?
 5        A.    No.  You have to go to the references.
 6        Q.    Okay.  And the references are not ten
 7   articles?
 8        A.    Correct.
 9        Q.    Okay.  So from those ten articles, you have
10   support for the sentence that the NOACs have
11   well-defined relationships between plasma
12   concentration and anticoagulant effect; right?
13        A.    Correct.  For the groups of patients.
14        Q.    Okay.  And then the next sentence I
15   highlighted is, it states:  Nonetheless, it is
16   possible they might have performed even better
17   regarding thrombotic or bleeding events and stroke
18   reduction if PK or PD monitoring were available.
19              Right?
20        A.    Correct.
21        Q.    And that's what we just --
22        A.    I would double-highlight the word "might."
23        Q.    Right.
24              Again, don't know if we don't test it; right?
25        A.    Totally correct.
```

Protected - Subject to Further Protective Review

```
 1        Q.   But when the industry folks and the medicine

 2   folks who make up the CSRC got together, the

 3   consensus was this might help us if we had this

 4   information; right?

 5        A.   It might, correct.

 6        Q.   Didn't get together and say, this is a bad

 7   idea, we shouldn't even look into this; right?

 8        A.   That is correct.

 9        Q.   Okay.  Would you agree with me that this

10   group of people are experts in this issue?

11        A.   I would agree with you that there were

12   experts in the room pertaining to each of the

13   components.

14             What you don't know about this paper is in

15   the original draft, I wrote it as it were minutes of

16   the meeting, and you would see who wrote this section

17   and who wrote the next section and who wrote the next

18   section.

19             Then the group said, we don't want it written

20   that way.  Write it as a consensus so you can't tell

21   who wrote which section.

22        Q.   So it became a consensus statement?

23        A.   That's correct.

24        Q.   Okay.  I don't have the original draft.  Do

25   you --
```

USCA5 4362

Protected - Subject to Further Protective Review

```
 1        A.   No, I understand that.  I'm just sharing that

 2   with you.

 3        Q.   All I have is the one that you published.

 4        A.   Totally correct.

 5        Q.   And when you published it, you said, this is

 6   a consensus statement.

 7        A.   Totally correct.

 8        Q.   And by "consensus," you mean the majority of

 9   the people there agreed?

10        A.   Totally correct.

11        Q.   And that includes you?

12        A.   Totally correct.

13        Q.   Okay.  And those people are experts in this

14   issue; correct?

15        A.   As a group, correct.

16        Q.   Okay.

17        A.   Some in a particular section are more expert

18   than others.  That's all I was trying to clarify.

19        Q.   Fair enough.

20             Then the next part I've highlighted says:

21   Additionally, it would be clinically helpful to be

22   able to assess the presence and amount of circulating

23   drug or the magnitude of anticoagulant effect

24   present:  (a) if patient compliance or overdose is

25   questioned; (b) if emergent or urgent surgery or
```

```
 1    other intervention (including spinal procedures) is

 2    required or major trauma has occurred and/or if drug

 3    washout needs to be confirmed; or, (c) to guide

 4    dosing adjustments.

 5            Correct?

 6        A.   Correct.

 7        Q.   We've talked already about patient

 8    compliance.  You told us why that would be helpful.

 9        A.   Correct.

10        Q.   We talked about drug washout before surgery.

11        A.   Correct.

12        Q.   Right?

13            And then you agree, as well, that it would be

14    clinically helpful if you could assess the amount of

15    drugs circulating in a patient to help you guide

16    dosing adjustments; right?

17        A.   In some circumstances with some of the drugs.

18        Q.   Okay.  Well, this is specific to NOACs;

19    right?

20        A.   Well -- but the comment is even more specific

21    to some of the NOACs.

22        Q.   Tell me where in this sentence it's specific

23    to a particular NOAC.

24        A.   It doesn't say it in the sentence.  I'm

25    telling you the discussion that went into it.
```

USCA5 4364

Protected - Subject to Further Protective Review

```
 1        Q.    Okay.  All we can go by is what you've

 2   published for the world to read; okay?  I don't have

 3   the original paper.

 4        A.    You don't.  I'm trying to give you the

 5   background information.

 6        Q.    If you --

 7        A.    I'm willing to share with you what went into

 8   this.

 9        Q.    Fair enough.

10              Can you tell me why that wasn't included in

11   the paper, if this is specific to one or -- or less

12   than all of the NOACs.

13        A.    Because the group wanted to make it a

14   generalized statement.

15        Q.    The consensus of the group was not to contain

16   it to one NOAC; right?

17        A.    That's correct.

18        Q.    Okay.  And then that's how the paper was

19   published?

20        A.    That's correct.

21        Q.    Okay.  And then if you look, the following

22   sentence says:  With respect to the last -- meaning

23   to guide dosing adjustments -- assessment may be

24   particularly helpful in patients with varying or

25   progressive renal dysfunction; at extremes of body
```

```
 1    weight; when one or more drugs having pharmacokinetic

 2    interactions with a NOAC are co-administered; or in

 3    patients presenting with an acute ischemic stroke

 4    where thrombolytic therapy is being considered.

 5            Right?

 6        A.   Right.

 7        Q.   Did any of the NOAC prescribing instructions

 8    tell a physician that they need to adjust the dose

 9    based on body weight?

10        A.   No.

11        Q.   Okay.  That's something that apparently --

12        A.   Well --

13        Q.   --- is important for some patients?

14        A.   Well, that's not exactly -- that's not

15    exactly true.

16        Q.   Okay.  Tell me why.

17        A.   When using apixaban, for example, you drop

18    the dose based upon a combination of considerations,

19    including body weight --

20        Q.   Okay.

21        A.   -- age, and renal function.

22        Q.   Okay.  How about Xarelto?

23        A.   No.

24        Q.   How about dabigatran?

25        A.   No.
```

Protected - Subject to Further Protective Review

```
1        Q.   How about Savaysa?

2        A.   Don't believe so.  But you said any.

3        Q.   I know, I know.

4        A.   I'm responding.

5        Q.   Sometimes these questions build on

6   themselves.

7             And then you gave a table:  Possible uses of

8   NOAC monitoring are further summarized in Table 1;

9   right?

10            That table is on Page -- I wish these were

11  numbered.  They're not.

12       A.   We'll find it.

13       Q.   It's very close to the back, probably six

14  pages in from the back.  And it's highlighted.

15       A.   Okay.

16       Q.   There you go.

17       A.   Right.

18            MR. CHILDERS:  It's highlighted, David,

19  so . . .

20            MR. COVEY:  It's Figure 1?

21            MR. CHILDERS:  Table 1.

22            THE WITNESS:  Table 1.

23            MR. COVEY:  Okay.  Thank you.

24            THE WITNESS:  Correct.

25  ///
```

Protected - Subject to Further Protective Review

```
 1    BY MR. CHILDERS:

 2        Q.   Table 1 is called Possible Roles for NOAC

 3    Monitoring; right?

 4        A.   Yes.

 5        Q.   First bullet -- and it's got four bullet

 6    points?

 7        A.   Correct.

 8        Q.   First one says:  To assess/verify washout

 9    pre-procedure or to assess risk of bleeding if

10    emergency procedure is needed, and to perhaps assess

11    if an antidote should be available.

12             Right?

13        A.   Yes.

14        Q.   When it says "perhaps to assess if an

15    antidote should be available," is that -- is that

16    meaning for a specific patient or general -- is a

17    that --

18        A.   In a specific circumstance.

19        Q.   Okay.

20        A.   With a specific patient.

21        Q.   And when you says "should be available," I

22    guess I'm a little confused by that term.

23        A.   So --

24        Q.   Does that mean it should be used?

25        A.   No.  So -- so a patient comes in, they've
```

USCA5 4368

```
 1    taken a NOAC, they're bleeding, they're going to go

 2    to the emergency room, or they're not bleeding but

 3    they're going to have a surgical procedure that runs

 4    the risk of bleeding.  If you knew that their NOAC

 5    has washed out between the last dose and the time of

 6    the surgery and they bleed in the OR, giving them an

 7    antidote will do nothing.

 8            In contrast, if they need a procedure that

 9    can't be delayed and their NOAC levels are still high

10    and they bleed in the OR, you would give an antidote.

11        Q.   You have it in the OR ready?

12        A.   So you have it available.

13        Q.   Gotcha.

14        A.   That's what this refers to.

15        Q.   Okay.

16            The second bullet point is:  To assess dosing

17    compliance.

18            Do you see that?

19        A.   Yes.

20        Q.   Tell me what that means.

21        A.   The patient comes in with a stroke, and you

22    say, did the drug fail or did the patient fail?  If

23    they come in with a stroke and their levels are high,

24    the drug didn't work.

25        Q.   I gotcha.
```

```
 1            So that doesn't have to do with did they take

 2     the right doses?

 3     A.   No, sir.

 4     Q.   It's did they take it at all.

 5     A.   Correct.

 6     Q.   I gotcha.

 7            So the third bullet point says:  Possibly to

 8     assess/modify dosing if dose-confounders are present

 9     (especially if multiple), e.g., renal dysfunction,

10     P-gp and/or CYP3A4 inducers or inhibitors.

11            Right?

12     A.   That is what it says.  And I'll emphasize

13     possibly.  It's like the "might" before.  It's the

14     only one in this list that says possibly.

15     Q.   The other things it would be very helpful

16     for, this one --

17     A.   We believe so.

18     Q.   -- we just don't know, but we think it might

19     be helpful; right?

20     A.   Correct.

21     Q.   Okay.  But even though it would be helpful

22     for the first two, we don't have a test that can help

23     us with that right now; right?

24     A.   That is correct.

25     Q.   Okay.  And then the last one doesn't say
```

USCA5 4370

Protected - Subject to Further Protective Review

```
 1    possibly either; right?

 2        A.   Correct.

 3        Q.   It says:  To assess any possible role in an

 4    actively bleeding patient or to assess the

 5    feasibility of giving a thrombolytic to a patient

 6    with an acute ischemic stroke who's previously been

 7    prescribed a NOAC.

 8             Right?

 9        A.   Correct.

10        Q.   Tell me how you would use this test to

11    give -- to help you decide whether or not it's

12    feasible to give a thrombolytic to a patient.

13        A.   So a patient comes in with an acute stroke,

14    and the -- there's no evidence of NOAC activity,

15    however you decide to measure that, they can be given

16    a thrombolytic.  But if the NOAC is present, giving a

17    thrombolytic in that scenario increases the risk for

18    hemorrhagic conversion of the stroke and you couldn't

19    do it.

20        Q.   Okay.  And so at this point if a patient

21    comes into the hospital having an acute ischemic

22    stroke and you know they're prescribed a NOAC, you

23    can't give them a thrombolytic?

24        A.   Correct.

25        Q.   Okay.  But if --
```

Protected - Subject to Further Protective Review

```
 1        A.   Well, unless -- unless the patient is able to

 2   talk.  Not everybody with a stroke can't talk.  And

 3   says, you know, I took my last thrombolytic yesterday

 4   morning.

 5        Q.   You mean they took their last NOAC yesterday

 6   morning?

 7        A.   NOAC yesterday morning.

 8        Q.   What if they say, I took my last NOAC today?

 9        A.   Then the thrombolytic shouldn't be given.

10        Q.   If you could do a test to see if the NOAC

11   anticoagulant activity had ceased, you could give an

12   thrombolytic in that case; right?

13        A.   If the NOAC level had washed out, remembering

14   that half-lifes vary --

15        Q.   Sure?

16        A.   -- across patients.  So that's why we think

17   it could be useful.

18        Q.   This doesn't say "possibly" though; right?

19   This is --

20        A.   No.  That's correct.

21        Q.   So on this table, there are three specific

22   uses for NOAC monitoring that the consensus of the

23   CSRC folks was, this would be helpful?

24        A.   If we had a reliable test.

25        Q.   Right.  And then --
```

USCA5 4372

```
 1       A.   As we said -- we described that earlier.

 2       Q.   Correct.

 3            And then the third of the four possibilities,

 4  the consensus of the group was this might be helpful,

 5  but we haven't -- we don't have the testing to tell

 6  us one way or the other yet; right?

 7       A.   That's correct.

 8            THE VIDEOGRAPHER:  Do you want to go off the

 9       record real quick to change tapes?

10            MR. CHILDERS:  Sure.

11            MR. COVEY:  We can take a break for five.

12            MR. CHILDERS:  Sure.

13            THE VIDEOGRAPHER:  Off the record at 11:12.

14            (Recess from 11:12 until 11:26 a.m.)

15            THE VIDEOGRAPHER:  We're now back on the

16       record at 11:26.

17  BY MR. CHILDERS:

18       Q.   You were telling me a few minutes ago that

19  the consensus statement agreed to talk about all

20  NOACs in this paragraph that we just discussed but

21  that you thought it applied more to a subset of the

22  NOACs; is that accurate?

23       A.   It was one part of the statement.  I would

24  have to go back and find it.  I don't even know what

25  page you're on now.
```

Protected - Subject to Further Protective Review

```
 1        Q.    The PK/PD --
 2        A.    Okay.
 3        Q.    -- guided dosing.  Sorry.
 4              I think we're done with the chart, if that's
 5    all right with you, unless you have --
 6        A.    No, no, it's fine with me.
 7        Q.    Okay.
 8        A.    Yes.
 9        Q.    Which part?
10        A.    It was under, I guess, the statement after
11    (c) with respect to the last assessment, maybe.
12              Do you want me to go into more detail?
13        Q.    Which -- which NOACs did you originally think
14    that would be more applicable to?
15        A.    I think it's most applicable to dabigatran.
16        Q.    Okay.  Why?
17        A.    Because dabigatran is renally cleared, or 80
18    percent.  There's no hepatic metabolism.  There's no
19    alternate way to get rid of the drug.
20              And so, for example, if the patient's taking
21    150 milligrams twice a day of dabigatran, the
22    standard dose, that dose is given on the creatinine
23    clearances 30 and above.
24              And we know that dronedarone, for example,
25    can inhibit the p-gp and double the levels of
```

1   dabigatran.  We know that verapamil can inhibit the

2   p-gp.

3           And so supposing I have a patient with atrial

4   fibrillation who -- who is given dabigatran when

5   their heart failure is stable and their hypertension

6   is stable and their diabetes is stable and their

7   creatinine clearance is 80 CCs/min.  And as time goes

8   on, their creatinine clearances come from 80 to 70 to

9   65 to 50 and they've stopped responding to their

10  prior antiarrhythmic and their cardiologist gives him

11  or her dabigatran or amiodarone and they're using

12  verapamil for weight control.

13          I, as a clinician, might be more comfortable

14  using 110 milligrams twice a day instead of 150.

15  That's what they do in most of the world.  But we

16  don't have the 110 approved for Afib here.  It's only

17  recently been approved in the orthopedic area.  And

18  we have peers that have arbitrarily given 75 three

19  time as day, for example, to try to mimic the 110.

20          Well, it might be nice to know whether my

21  concerns of very high levels were reasonable enough.

22  Now, what the Xa inhibitors, they're all --

23      Q.   Can I stop you for just a second?

24      A.   Sure.

25      Q.   When you say it might be reasonable to know

1    if your concerns are -- I can't remember what you

2    said, but, Doctor, you mean a way to test to figure

3    out if the concern is --

4        A.   Correct.

5        Q.   Correct?  Okay.

6        A.   Correct.

7        Q.   Okay.  I'm sorry.  Go ahead.

8        A.   With the Xa inhibitors, which all have p-gp

9    interactions, p-gp is P, like a protein.  It leads to

10   renal clearance.  They're hepatically metabolized.

11   So if I inhibit p-gp with dabigatran, the levels go

12   up, and I have no way to adjust them.

13           If your liver function is normal and I

14   inhibit p-gp, you just metabolize more of the drug.

15           That's why the drug interactions become less

16   relative to dabigatran, of a concern.  I have to

17   inhibit both p-gp and hepatic function.  So in those

18   circumstances, I might be less concerned with the

19   other NOACs.

20           That's the point I was trying to get at

21   before.

22       Q.   Okay.  That's helpful.  Thank you.

23       A.   Sure.

24       Q.   The following page, if we can go over to the

25   next, about mid-way down, it's called current

```
 1    monitoring possibilities and their limitations.

 2        A.   Uh-huh.

 3        Q.   Right?

 4             MR. COVEY:  You're going to have to give me a

 5        second.  Without page numbers here, I'm a little

 6        lost.  This is not after Table 1?

 7             THE WITNESS:  No, no.  Go back.

 8             MR. CHILDERS:  No, no.

 9             MR. COVEY:  Got it.  Thank you.

10             MR. CHILDERS:  Okay.

11    BY MR. CHILDERS:

12        Q.   Now, I've highlighted where it says:  For the

13    factor -- factor Xa inhibitors, anti-Xa activity is

14    linear over a wide range of drug levels and may be

15    used for drug quantification.

16             Tell me what that means.

17        A.   If you measure Xa levels, you inhibit them,

18    active Xa, with the drug so that as the drug levels

19    go up, the Xa effect goes down.  That's what that

20    means.

21        Q.   It means there's a linear correlation between

22    more -- more --

23        A.   Over a wide range -- over a wide range of

24    levels.

25        Q.   Right.
```

```
 1        A.   Yes.

 2        Q.   Okay.  And then it says in italics:  However,

 3   there is not a uniform standardized anti-Xa test that

 4   is useful for all of the oral factor Xa inhibitor

 5   drugs.

 6             Right?

 7        A.   That's a true statement.

 8        Q.   And does that mean there's just not one test

 9   you can use for all of them, or there's not any test

10   that's useful for any of them?

11             Do you see the difference?

12        A.   I see the difference.

13        Q.   Okay.

14        A.   That's getting a little bit outside my range

15   of expertise.  My understanding from the presentation

16   here and from what I've read --

17        Q.   Okay.

18        A.   -- is that there's no single anti-Xa

19   measurement that is sensitive regardless of the drug

20   that's used.

21             For example -- and -- and, by the way, may

22   not be necessary.  For example, we've used low

23   molecular weight heparin for years, years now,

24   decades.  Unmonitored, it affects Xa, as well.  You

25   can measure the effect.  But it's not done
```

Protected - Subject to Further Protective Review

```
 1   clinically.

 2        Q.   How do you measure that?

 3        A.   By a particular anti-Xa measurement.  But

 4   it's not -- we don't use it clinically.  I can't

 5   remember the last time I saw it done.  And the tests

 6   used for that are not sensitive across the NOACs.

 7        Q.   Okay.

 8        A.   But you'd -- you'd have to go to an expert in

 9   clinical laboratory testing to get more level of

10   detail.

11        Q.   Okay.

12        A.   And, again, this was a consensus written by

13   some of the people who -- who gave their

14   presentations, and this was a section written

15   primarily by the person who gave the presentation.

16        Q.   Okay.  Well, then let's turn to the following

17   page.  This is the same -- the same section at the

18   top.

19        A.   Uh-huh.  Uh-huh.

20        Q.   I just want to ask you the last sentence.

21   The consensus from this group in your paper was:

22   New, widely available, reproducible, and

23   cost-effective possibly drug -- cost-effective

24   tests -- excuse me -- possibly drug-specific, are

25   needed.
```

```
1       A.    Uh-huh.

2       Q.    Right?

3       A.    Correct.

4       Q.    It wasn't that they may be needed; it's they

5    are needed; correct?

6       A.    When I went back to the table you looked at

7    before, the three of the four, we felt clinically

8    they would be useful.  It wasn't a possibility.

9       Q.    Okay.

10      A.    And for those three of the four, yes, we

11   thought that they would be needed.

12            It's worth pointing out here, though, that

13   the FDA hasn't necessarily agreed with that.  They

14   have not gone forward and required such tests be

15   developed or required that the drugs be tested

16   against them.

17            So this was the opinion of the -- of the

18   consensus, but the FDA hasn't gone on there, to the

19   best of my knowledge.

20      Q.    And you understand that a pharmaceutical

21   company can develop a product without being told they

22   have to by the FDA; right?

23      A.    Correct.

24      Q.    In fact, most of the drugs, if not all of the

25   drugs in the NOAC class, were developed because the
```

Protected - Subject to Further Protective Review

```
 1    companies wanted to; right?

 2        A.   Correct.

 3        Q.   Okay.  And so whether or not FDA has told a

 4    company, you need to go make this test, doesn't

 5    dictate whether the company can; right?

 6        A.   Correct.

 7        Q.   In fact, two of the company -- two of the

 8    people who co-authored this article with you, one

 9    works for Bayer --

10        A.   That's correct.

11        Q.   -- and one works for Janssen?

12        A.   That's correct.

13        Q.   So they all agreed with this.

14        A.   Yep.

15        Q.   Right?

16        A.   Correct.

17        Q.   Okay.  The next section you call -- is called

18    Do We Need to Monitor NOACs to Improve Benefit-Risk,

19    When Might We Use Monitoring, and What Monitoring

20    Tests Might We Consider.

21             Right?

22        A.   Uh-huh.

23        Q.   You've got -- this -- this largely deals with

24    the RE-LY trial; right?  In fact --

25        A.   The next section.
```

```
 1        Q.   -- it might be all RE-LY trial?

 2        A.   Yes.

 3        Q.   The section under here?

 4        A.   Yes.

 5        Q.   And in -- and in that trial, according to

 6   what you have written here is, if you turn to the

 7   following page, the term that you used for us -- with

 8   us a little bit earlier was sweet spot?

 9        A.   Uh-huh.

10        Q.   And that based on the RE-LY data, there

11   seemed to be a sweet spot for dabigatran where stroke

12   prevention was optimized and there was very little

13   benefit -- stroke prevention benefit from going any

14   higher than that; right?

15        A.   Correct.  We briefly looked at the curve

16   earlier in the Paul Reilly paper.

17        Q.   Right.

18             And what you wrote was that that sweet spot

19   for dabigatran appeared to be between 50 and 150

20   nanograms per milliliter; right?

21        A.   Correct.

22        Q.   And that once you get -- when you're in that

23   sweet spot, the bleeding risk is fairly low but then

24   continues to rise when you get beyond it?

25        A.   Uh-huh.
```

Protected — Subject to Further Protective Review

```
 1        Q.    Right?

 2        A.    Yes.

 3        Q.    And then the sentence -- the last sentence

 4   that's highlighted there says:  Thus, there is a

 5   clear possibility that dosage adjustment to attain a

 6   level of 50-150 ng/ml could give optimal rates for

 7   bleeding or ischemic stroke.

 8             Right?

 9        A.    It's certainly possible.

10        Q.    Now, this is the first time I'm seeing you --

11   the term "a clear possibility" as -- as opposed to a

12   "possibility" or a "might."  Is there some reason the

13   word "clear" is here but not in the other parts of

14   the paper?

15        A.    I don't recall which one of the authors put

16   it in.

17        Q.    Okay.  The data that this is available for

18   dabigatran as it relates to plasma concentration is

19   more extensive -- from the RE-LY trial, is more

20   extensive than the plasma concentration data that's

21   available to you from the -- from the ROCKET trial?

22   Sorry.  Correct?

23        A.    Best of my knowledge, yes.

24        Q.    Okay.  And so because you have more

25   information -- or not -- let's not just say that.
```

Protected - Subject to Further Protective Review

1    Let me -- let me start over.

2          In utilizing that -- that additional -- more

3    information you have from RE-LY, you and the other

4    folks on the committee were able to come up with a

5    consensus statement that there may be -- that there's

6    a clear possibility of a sweet spot for dabigatran;

7    right?

8        A.    Correct.

9        Q.    But you didn't have enough data to say one

10   way or the other about that for rivaroxaban; correct?

11       A.    That's correct.  And to my recollection,

12   there was less individual variability in the serum

13   concentration with dabigatran, providing renal

14   function was stable.  And that's a big factor.  It's

15   that individual variation that makes one less able to

16   utilize some value on a test.

17       Q.    Okay.

18       A.    If you don't know how to -- how to apply it

19   clinically.

20          And, by the way, when we talk about

21   variation, I told you something earlier when you

22   asked me about narrow therapeutic index.

23          The definitions for narrow therapeutic index,

24   I said relatively.  When the FDA uses it, it's quite

25   often used in terms of the generic approval.  So for

USCA5 4384

Protected - Subject to Further Protective Review

```
 1    warfarin, to approve a drug generically, the serum

 2    concentrations have to be 90 to 110 percent; around

 3    those, you see.  For -- for virtually every other

 4    drug I know, it's 80 to 125 percent.

 5            But clinicians often use a definition beyond

 6    that, which is what I was getting at, and that is if

 7    the recurrence of a condition can be serious or

 8    life-threatening because you give too little of a

 9    drug or the adverse effects could be serious or

10    life-threatening because you give too much of a drug,

11    that, to, me, is a narrow therapeutic range, even

12    though that's not the same definition used for

13    generic approval.

14            That's where I was getting at, so . . .

15        Q.   Okay.  So --

16        A.   I want you to understand.  I want to give you

17    clear answers to each of these, as clear as I can.

18        Q.   Absolutely.  And I appreciate you clarifying

19    that.

20            As you practice in your clinical practice,

21    you view all the NOACs and warfarin as

22    narrow-therapeutic index drugs?

23        A.   From a clinical standpoint, yes.

24        Q.   Because if you give too little, you don't get

25    the effect you need; if you don't get too much, you
```

USCA5 4385

1    might have adverse signs?

2        A.   I view the same, and have published this --

3        Q.   Right.

4        A.   -- with antiarrhythmics, not just

5    anticoagulants.

6        Q.   Well, I just want to make sure we --

7        A.   And for that matter, anti-seizure drugs.

8        Q.   Right.

9             So as a clinician, the guy who's prescribing

10   the drugs, or at least advising on how they should be

11   prescribed, your view is that they're all

12   narrow-therapeutic index drugs?

13       A.   Clinically, yes.

14       Q.   Okay.  Can you turn to the following page,

15   just above where it says Adjusted Dose NOACs.

16       A.   Uh-huh.

17       Q.   There's a sentence that says:  The need for a

18   prospective study and other key issues with this

19   approach will be further discussed and examined in a

20   follow-up CSRC think tank meeting in December of

21   2015.

22       A.   Correct.

23       Q.   Were you at that meeting?

24       A.   No.

25       Q.   Okay.  Do you know what was discussed?

Protected - Subject to Further Protective Review

```
 1        A.    I was not at that meeting, I couldn't make

 2    the date, and it hasn't been published yet.

 3        Q.    Okay.

 4        A.    So, no, I don't.

 5        Q.    Okay.

 6        A.    As you can see from this meeting, the date of

 7    publication was long after the meeting.  To get it

 8    through all of the authors and get their input

 9    repeated, it's not prompt.  So --

10        Q.    Okay.

11        A.    -- this is not even a year ago.

12        Q.    Okay.  Then down toward the bottom of this

13    page Under Adjusted NOACs, it says:  Target -- the

14    target levels (therapeutic range) for each NOAC and

15    each risk profile would need to be defined.  Should

16    the target be optimized for bleeds or for strokes?

17    It does not seem possible to do both unless settle --

18    settling for a range as is the case with INRs for

19    warfarin.

20              Correct?

21        A.    That is correct based upon the sum of the

22    clinical trials across all of the NOACs.

23        Q.    And so the consensus --

24        A.    At that time.

25        Q.    Has that changed?  Has that consensus
```

USCA5 4387

Protected - Subject to Further Protective Review

1   changed?

2       A.   Well, in one the -- in one of the FDA

3   documents, there's a figure that's a modification of

4   the old warfarin figure, but we have not seen an

5   identical figure for the NOACs.  So to my knowledge,

6   that statement remains true.

7       Q.   That if you wanted to optimize a NOAC for a

8   bleed and for stroke, you would need to set a range

9   similar to the INR range?

10      A.   Were it possible.

11      Q.   Right.

12      A.   You've already seen in the Paul Reilly paper

13  that because age and renal function changes things,

14  it may not be possible to do that across all the

15  NOACs.

16      Q.   But it may be; correct?  Don't know until we

17  try.

18      A.   Don't know.

19      Q.   Okay.  And then the next paragraph down says:

20  Although no supportive data from a randomized

21  controlled trial of fixed versus adjusted dose NOAC

22  treatment are available (though they would be

23  desirable), there was no consensus at the meeting to

24  do such a trial at this time.  In contrast, there was

25  a strong sense that reliable monitoring tests

Protected - Subject to Further Protective Review

```
 1    applicable to assess compliance, anticoagulation

 2    status, and possibly dose-adjustment should be

 3    pursued with FDA guidance.

 4          Do you see that?

 5    A.    Yes, I do.

 6    Q.    So the consensus was randomized control trial

 7    fixed versus adjusted-dose NOACs would be desirable?

 8    A.    Correct.

 9    Q.    Has anybody started doing any of those

10    trials?

11    A.    Not that I know of.

12    Q.    And this -- this meeting was almost two years

13    ago?

14    A.    Correct.

15    Q.    Okay.  And also, the consensus was that there

16    was a strong sense that reliable monitoring tests

17    applicable to assess compliance, anticoagulation

18    status, and possibly dose-adjustment should be

19    pursued with FDA guidance; correct?

20    A.    Correct.

21    Q.    Have any of -- have any of the companies

22    involved in this CSRC paper here begun testing to --

23    to find a reliable monitoring test to do this?

24    A.    I don't -- I don't know the answer to that.

25    Q.    Okay.  So --
```

```
 1       A.    That's -- it would be internal within the

 2    companies.

 3             I would -- go back, though, to the first part

 4    of the sentence, in terms of would be desirable.

 5    There become some ethical issues in doing studies

 6    like that.  When you've got NOACs that are out there,

 7    including Xarelto, that are already better in many

 8    respects than warfarin and none in theory or in

 9    others, how do you say to a patient, I want to do a

10    trial and I'm not going to give you the best of

11    what's out there?

12             It's the reason with the NOAC trials they

13    were not tested against placebo; they were tested

14    against warfarin.

15             And so to design and fund and support and get

16    investigators to buy into that kind of trial would be

17    a logistical nightmare.

18       Q.    Has anybody asked you to try to put one of

19    those together?

20       A.    No.

21       Q.    Okay.  Do you know if anybody's working on

22    it?

23       A.    To my knowledge, no.  In large part for that

24    reason.

25       Q.    Do you know that to be a fact?
```

```
 1        A.   No.  That's my belief.

 2        Q.   Okay.  But you've not discussed actually

 3   trying to put a trial together with anybody; right?

 4        A.   I have not.

 5        Q.   Okay.  Similar -- similar data from what you

 6   had in RE-LY as far as the pharmacokinetic,

 7   pharmacodynamic effect -- let me -- let me start that

 8   over.  Sorry.  That was a poor question.

 9        A.   That's okay.  Are we still on this paper, or

10   are we --

11        Q.   No.

12        A.   We're done with this?

13        Q.   We're done with that for now.

14        A.   Okay.

15        Q.   Very good paper, though.  I enjoyed reading

16   it.

17        A.   Thank you.  Well, I can only take credit for

18   part of it.  Everyone who presented is part of the

19   author of this.

20        Q.   Right.

21        A.   With the exception of Bob Temple, who

22   presented, but he took so long in getting responses

23   back that we gave up.

24        Q.   And Bob Temple is with the FDA?

25        A.   Yes.
```

Protected - Subject to Further Protective Review

```
 1        Q.    Okay.

 2        A.    He doesn't use, you know, review and track

 3   changes.  It's all handwritten.  After one iteration

 4   with him, we decided we would just run the final by

 5   him, to which he agreed.

 6        Q.    So edoxaban is a factor Xa inhibitor; right?

 7        A.    It is, yes.

 8        Q.    Okay.  Do you agree that the data from the

 9   clinical trial for edoxaban showed that as exposure

10   to edoxaban increased, the risk of bleed increased?

11        A.    The probability of bleeding increased.

12   That's my recollection.

13        Q.    Sorry.

14        A.    That's okay.

15        Q.    The probability.  And I -- I remember you

16   saying that.

17        A.    That's fine.  That's my recollection.  I

18   can't -- I don't remember the specific chart or

19   figure that -- that shows that, off the top of my

20   head.

21        Q.    I will show you that chart so that we can --

22        A.    Sure.

23        Q.    -- make sure we're all on the same page.

24              MR. CHILDERS:  This is Exhibit 7.

25              (Plaintiff's Exhibit No. 7 was marked for
```

Protected - Subject to Further Protective Review

```
 1    identification.)

 2    BY MR. CHILDERS:

 3         Q.   You see this is from an advisory committee

 4    meeting for edoxaban.  And this is not the entirety

 5    of the PowerPoint, but I provided for you the chart

 6    that showed the concentration dependent relationships

 7    for stroke/SEE and major bleeds.

 8              Do you see that?

 9         A.   What -- well, I see what the figure is.  It

10    was probably taken from a slide.  I also see analysis

11    showing for typical patient.  And I don't know the

12    data from which this was obtained and whether this is

13    theoretical or based upon a particular patient.  This

14    is out of context.

15         Q.   Okay.  Well, assume for me that this is the

16    data that was presented to the FDA as being

17    representative of the data collected in the study --

18         A.   Okay.

19         Q.   -- for a typical patient.  You can do that,

20    because you're an expert.  You're allowed to

21    hypothesize.

22         A.   I can do it because it's similar to the

23    dabigatran curves we looked at before.

24         Q.   Right.

25              And that's -- you anticipated my questions.
```

Protected - Subject to Further Protective Review

```
 1    Very similar to what we saw with dabigatran; correct?

 2        A.   Correct.

 3        Q.   Do you agree that this type of curve is also

 4    the case for Xarelto?

 5        A.   Yes.  With some caveats.

 6        Q.   Where are the caveats?

 7        A.   And -- and I don't know -- and that's why I'm

 8    a little hesitant taking this out of context.

 9             Aspirin use, for one.  When you look at

10    Xarelto and its effects on the ProTime, for example,

11    as the dose goes up in the absence of aspirin, the

12    ProTime changes very gradually, one of the problems

13    we have an issue with individual patients.

14             You know, as I remember the Xarelto data, if

15    you changed the ProTime from 10 to 40 or 50 seconds,

16    the bleeding rate in ROCKET only went up about one

17    percent.  It was much steeper with aspirin.

18             So I don't know what the concomitant

19    conditions are that generated this curve.  And so I

20    have a lot of trouble extrapolating from one drug

21    taken from I don't know what data source to another

22    drug under different circumstances.  I can't do it.

23        Q.   So if you see that it's got a list -- it says

24    29.2 percent?

25        A.   Correct.
```

Protected - Subject to Further Protective Review

```
1      Q.    Okay.  So if you had those same stats --

2      A.    Right.

3      Q.    -- would you expect the curve -- curve to

4   look the same or similar for Xarelto?

5      A.    Not necessarily, because the renal function

6   contributions are different.

7      Q.    Okay.

8      A.    And I don't know what the aspirin interaction

9   was with edoxaban versus with Xarelto.

10     Q.    What's the difference in the renal function

11  contribution between those two factor Xa inhibitor

12  drugs?

13     A.    Well, with edoxaban, for example, when the

14  drug's approved only in patients who has -- who have

15  creatinine clearances under 95.  In patients who have

16  creatinine clearances over, the drug was worse than

17  warfarin.

18     Q.    Okay.

19     A.    And that is not the same issue with the other

20  NOACs, including Xarelto.  So there's a -- there's a

21  significant difference in the way the drug was

22  handled with renal function change during the study

23  was different.  So you could change the -- the dosing

24  in -- in the engaged study.  That wasn't done in

25  ROCKET.
```

Protected - Subject to Further Protective Review

```
 1              And I think you're trying to compare apples

 2     to oranges, and I won't do it.

 3         Q.   Okay.  Would you agree with me generally

 4     speaking that if there's a dose -- or "dose" is the

 5     wrong word -- concentration response relationship

 6     between Xarelto and strokes and bleeds?

 7         A.   There's --

 8              MR. COVEY:  Andy, I'm going to object --

 9              MR. CHILDERS:  Poor question.

10              MR. COVEY:  -- to the form as I read it

11         because I think -- and you don't have a monitor

12         there.  Can I read the question to you, or --

13              MR. CHILDERS:  I can ask it again.

14              MR. COVEY:  Thank you.

15              MR. CHILDERS:  Hopefully I'll fix it.

16     BY MR. CHILDERS:

17         Q.   Would you -- do you agree with me that there

18     is a concentration response relationship between

19     Xarelto and possibility -- probability, excuse me, of

20     strokes and bleeds?

21         A.   Yes, for bleeds, within the limitations I

22     gave you earlier.

23         Q.   Yes.

24         A.   For strokes, with most of the drugs, when you

25     get higher and higher for the progressive decrease in
```

USCA5 4396

```
1    strokes, the degree of change gets less and less.

2        Q.   Okay.

3        A.   So it's not linear.

4        Q.   Okay.  But as far as being too low of a

5    concentration, that would affect --

6        A.   Yes.

7        Q.   -- stroke prevention of the drug; right?

8        A.   I believe that's true.

9        Q.   Okay.  And that type of concentration

10   response is similar to warfarin in that if you're

11   low, you don't have the stroke prevention you want;

12   if you're too high, you have a higher risk -- higher

13   possibility of bleed?

14       A.   Not exactly, because we don't measure

15   warfarin concentrations.  We measure INRs, which is

16   not the same thing.

17       Q.   We don't have an INR test for Xarelto; right?

18       A.   That's correct.  But I don't know whether

19   that statement would be true for warfarin.

20       Q.   Okay.  Substitute the word "INR" for

21   "concentration."

22       A.   For warfarin --

23       Q.   Yeah.

24       A.   -- there is an INR range that we target.

25       Q.   Sweet spot, right, that was your word?
```

USCA5 4397

Protected - Subject to Further Protective Review

```
 1        A.   If you will.  Well, I've taken it out of

 2    other people's writings in that sense.

 3             There's a range with warfarin where we try to

 4    target in the nonvalvular Afib patients without

 5    mechanical heart valves, because it shifts with

 6    mechanical valves.

 7        Q.   Right.

 8        A.   But that may be independent of warfarin

 9    concentration, and part of the -- the thing that

10    makes these complex is the serum concentrations don't

11    tell the whole story, just like the purported

12    half-life doesn't tell the whole story.

13        Q.   Did you tell me earlier that -- that

14    prothrombin time cannot be used to measure Xarelto

15    concentrations?

16        A.   I told you in a given patient, it can't be

17    used reliably.

18        Q.   Okay.

19        A.   I said for a patient character -- population

20    characteristics, there are relationships.

21        Q.   Can you use it at all for individual

22    patients?

23        A.   I don't think it's -- well, let me think

24    about how to phrase that.  It depends upon why.  So

25    there's circumstances where it might be helpful and
```

```
 1    circumstances where it wouldn't be helpful.

 2        Q.    When would it be helpful?

 3        A.    It's not a yes or no or -- answer.

 4        Q.    All right.  Well, let me -- let me show you

 5    something and see if you agree with what you wrote

 6    previously.

 7        A.    Sure.

 8              We're done with this one?

 9              MR. CHILDERS:  I'm going to put the

10        sticker --

11              Yes.

12              I'm going to put the sticker on the back,

13        because there's no good spot for it on the front.

14              THE WITNESS:  I don't want to get these out

15        of order for you.

16              MR. CHILDERS:  This is Exhibit No. 8.

17              (Plaintiff's Exhibit No. 8 was marked for

18    identification.)

19              MR. COVEY:  Thank you.

20    BY MR. CHILDERS:

21        Q.    Do you recall writing a letter to the editor

22    of Annals of Internal Medicine?

23        A.    Yes.

24        Q.    Okay.  And you wrote in that letter:  The

25    authors indicated that adherence cannot be assessed
```

```
 1    for NOACs.  That is wrong.  Prothrombin times can be

 2    used to determine whether a patient is receiving a

 3    factor Xa inhibitor, and activated partial

 4    thromboplastin times, ecarin clotting times, and

 5    thrombin times can be used similarly for dabigatran.

 6    These tests are not used to guide dosing but can

 7    assess adherence and washout.

 8         Correct?

 9    A.   That is the wording I used, yes.

10    Q.   And so at least in 2013, you wrote that you

11    can use prothrombin time to assess adherence and

12    washout for factor Xa inhibitors; right?

13    A.   Can we put this in context?

14    Q.   First let me just get an answer to my

15    question.  That's what you wrote in 2013?

16    A.   That is what the words in this letter say,

17    yes.

18    Q.   And those -- these are not -- this is not a

19    consensus statement.  This is a letter --

20    A.   That's correct.

21    Q.   -- you wrote.

22    A.   That's correct.  But you need to hear it in

23    context.

24    Q.   Okay.  Give me the context.

25    A.   So I don't go around writing a lot of letters
```

Protected - Subject to Further Protective Review

```
 1    to a lot of journals.  I'm too busy for that.  But

 2    when I see an article that is blatantly misleading,

 3    blatantly biased, blatantly omits data, I want to

 4    call attention to that.  And that's why I wrote this

 5    article, the letter.

 6           Now, letters, when you write them to a

 7    journal, have strict wording limits.  They don't give

 8    a space to expand, to individualize.  So I made a

 9    statement to catch attention, to point out to the

10    authors that they omitted something significant.

11           Were the space available, were the Annals to

12    have let me expand, I would have said in some

13    patients, in some circumstances.

14      Q.   You couldn't add --

15      A.   No.

16      Q.   -- in some patients, in some circumstances --

17      A.   No.

18      Q.   -- six words to this?

19      A.   No.  I was up against the word limit.

20      Q.   Okay.

21      A.   Even in manuscripts, they now have word

22    counts and word limits, and you can be surprised how

23    hard it is to comply with them.

24      Q.   How many words were you allowed to write?

25      A.   Offhand, I don't remember.  But I do remember
```

USCA5 4401

Protected - Subject to Further Protective Review

```
 1    that being an issue.

 2        Q.   So I want to make sure I understand.  Your

 3    testimony is the six words that you just said to me

 4    were six over the limit that you were allowed to

 5    write?

 6        A.   To my recollection, yes.

 7        Q.   Okay.

 8        A.   They were words I took out.  Were they the

 9    only words I took out?  No, I don't think so.

10        Q.   So there was a draft of this that had those

11    words in it?

12        A.   Or to some extent.

13        Q.   Do you keep drafts?

14        A.   No.

15        Q.   You would have sent a draft to the -- to

16    the -- to the publication before you took it out;

17    right?

18        A.   No, no, no.  I would send them a letter

19    within their word limit requirements.

20        Q.   Are those words important, those six words

21    that you left out?

22        A.   Not in terms of the purpose of this letter.

23        Q.   Who reads this magazine?

24        A.   Internists.

25        Q.   So to these internists, you wanted to tell
```

Protected - Subject to Further Protective Review

```
 1   them that prothrombin time can be used to determine

 2   whether a patient's receiving a factor Xa inhibitor

 3   and to assess adherence and washout for those

 4   patients; right?  That's what you told them?

 5       A.   Recognizing that they're trained physicians

 6   and they know to go to the literature and expand upon

 7   that; recognizing that they know that letters have

 8   limits.

 9            If I were a physician reading this and I knew

10   nothing more about this, I would say, hmm, that's

11   interesting.  Let me do a literature search on it and

12   see.  And as soon as I do a MEDLINE search, I would

13   find out all the limitations.  I wouldn't guide my

14   practice simply by one paragraph in a letter.

15       Q.   What about those doctors who call you for

16   advice on how to prescribe NOACs to their patients?

17   If they see this, should they not rely on it as being

18   true?

19       A.   If they saw it, they would probably call me

20   and say, what do you mean by that.

21       Q.   It seems pretty clear; doesn't it?

22       A.   No.

23       Q.   It's not clear.

24       A.   That's what I'm telling you.

25       Q.   Okay.  Okay.
```

USCA5 4403

```
1      A.    I don't think you can judge medical practice

2    based upon one paragraph in a letter of limited

3    length that's calling attention to the limitations of

4    the article to which the letter referred.  This

5    wasn't meant to guide practice throughout all time

6    for all physicians.

7      Q.    What was meant by this was to point out that

8    the authors didn't -- of the article that you were

9    writing about didn't tell their readers that you can

10   use prothrombin time to determine whether a patient's

11   receiving a factor Xa inhibitor, to assess adherence,

12   and to assess washout; right?

13     A.    At the time this was written, Savaysa wasn't,

14   to my recollection out, so we were talking about

15   Xarelto and apixaban.

16     Q.    Uh-huh.

17     A.    It doesn't say, nor did I have room to say,

18   depending upon the reagent used to test, depending

19   upon the time after the dose to test.  I mean,

20   there -- there's a lot more to it.  I don't have the

21   room or the luxury in this letter to put in all those

22   caveats.  It basically is to say to the authors, you

23   are wrong in saying there's no test.

24           Now, if you want more information about it,

25   if you're a physician, go look it up, or call me or
```

```
 1    write me.  Happy to share it with them.

 2         Q.   Under your potential conflicts of interest,

 3    you've got Consultancy:  Boehringer Ingelheim and

 4    Janssen; right?

 5         A.   Uh-huh.

 6         Q.   And those are -- is that speaker's bureau or

 7    something else?

 8         A.   Both.

 9         Q.   What else did you do for Janssen besides

10    speaker's bureau?  Is that --

11         A.   As I said, just helping them with slide

12    development.

13         Q.   Okay.  That's the consulting that you're --

14         A.   Correct.

15         Q.   Okay.  Payment for lectures including service

16    on speakers bureau, you have Boehringer, Janssen,

17    Pfizer, and Bristol-Myers.  You told us --

18         A.   Correct.

19         Q.   -- about those before; right?

20         A.   Correct.

21         Q.   And payment for development of educational

22    presentations, you have Boehringer, Janssen, and

23    Sanofi?

24         A.   Right.

25         Q.   Right?
```

Protected - Subject to Further Protective Review

```
 1              So what part of the consulting is outside of

 2     developing the educational presentations and being on

 3     the speaker's bureau?

 4          A.   At that time?

 5          Q.   Yes, 2013.

 6          A.   So the ORBIT registry is funded, in large

 7     part, by Janssen.

 8          Q.   Did they pay you?

 9          A.   I get paid through the DCRI for work I do on

10     ORBIT.

11          Q.   And you are --

12          A.   And they pay DCR --

13          Q.   -- a consultant for DCRI?

14          A.   They pay DCRI and DCRI uses not only the

15     people housed at Duke but different outside people

16     for different projects.

17          Q.   Like a contracts arrangement, for lack of a

18     better term?

19          A.   For lack of a better term, yes.

20          Q.   You're not a DCRI employee?

21          A.   I am not.

22          Q.   Okay.

23          A.   But, for example, when I attend a DCRI

24     steering committee meeting, that time is paid for.  I

25     don't get a check from Janssen; I get it from DCRI,
```

Protected - Subject to Further Protective Review

```
 1   but I know that the funds come from Janssen.

 2        Q.    So that's why you put that on there?

 3        A.    Yes, sir.

 4        Q.    Who else funds DCRI for the ORBIT-AF?

 5        A.    I'm not sure.

 6        Q.    Well, wouldn't you have to put all them in,

 7   too?

 8        A.    I put in what I know.  I don't think there's

 9   any other pharmaceutical companies involved.

10        Q.    Just Bayer?

11        A.    Do I know if they're getting any funds, for

12   example, from the NIH or from private foundations?

13   No, I don't.

14        Q.    Would that be a disclosure you have to make?

15        A.    No, it wouldn't.

16        Q.    Okay.  So --

17        A.    Because it would be of no relationship to

18   this response.

19        Q.    What's the ORBIT trial looking at -- or

20   registry, excuse me, what's it looking at?

21        A.    So the ORBIT registry, there's ORBIT I and

22   ORBIT II, and it's looking at clinical practice in

23   this country in patients with atrial fibrillation

24   largely related to anticoagulant management and

25   outcomes.
```

```
 1        Q.    And Bristol-Myers and Pfizer don't contribute

 2   money to that?

 3        A.    No.

 4        Q.    Okay.  They should though, huh?  They're big

 5   companies.

 6        A.    Not up to me to determine what a company

 7   funds.

 8              MR. COVEY:  Let's go off the record for a

 9        second.

10              THE VIDEOGRAPHER:  Off the record at 12:04.

11              (Recess from 12:04 until 12:04 p.m.)

12              THE VIDEOGRAPHER:  We're back on the record

13        at 12:04.

14              THE WITNESS:  Do you want this letter back?

15              MR. CHILDERS:  No.  Just leave it there for

16        now.

17              THE WITNESS:  Okay.

18   BY MR. CHILDERS:

19        Q.    So despite what this letter says, your

20   testimony is you can't use PT to do these things?

21        A.    My testimony is that you can use the

22   prothrombin time with the right reagent more so --

23   more reliably, but not entirely, with rivaroxaban

24   than apixaban, providing you know why you're using it

25   and at what time after the dose.  We've already --
```

```
 1    I've given you clear examples earlier about where it
 2    might help.
 3              The problem is that a normal prothrombin time
 4    doesn't tell me the patient hasn't taken the drug or
 5    a high one doesn't tell me that the concentration is
 6    high.  That's why we make comments for populations
 7    that aren't necessarily applicable to specific
 8    patients and specific circumstances at specific
 9    times.  And physicians know that.
10        Q.   Okay.  Do you agree that the PK data that was
11    collected in ROCKET confirms the linear relationship
12    between plasma concentration of rivaroxaban and PT?
13        A.   For the population as a whole, but not for
14    specific patients.  So there's a difference between
15    saying there's a population linear relationship.  And
16    I can use that information in practice.  They're two
17    different statements.
18              I'm a clinician taking care of patients.  I
19    told you earlier, my goal in everything I do
20    professionally is to improve patient care.  And so
21    I'm always concerned not just with populations but
22    how can I use it in a given patient in my office in
23    my practice.
24        Q.   Okay.  Do you agree that PT can be used as a
25    surrogate for PK in the range of plasma rivaroxaban
```

```
 1    concentration?

 2         A.   Only in judging population characteristics.

 3         Q.   But not for --

 4         A.   Not for an individual patient.

 5         Q.   Can't use it clinically; is that right?  Is

 6    that what you're saying?

 7         A.   I think you have to use it clinically knowing

 8    the limitations.

 9              For example, a patient comes in on

10    rivaroxaban, not taking warfarin, has an urgent

11    procedure.  Somebody draws a prothrombin time and

12    it's elevated.  His liver function or her liver

13    function is normal.  So it's not abnormal because of

14    the liver.  I'm going to assume, knowing the

15    population characteristics, that there's a Xarelto

16    effect on board, there's a risk of bleeding in the

17    OR.

18              If that prothrombin time is normal, knowing

19    not only the population characteristics but the

20    range, I can't say for certain that there isn't

21    Xarelto effect, and the surgeon needs to be

22    appropriately warned, and, therefore, have, right

23    now, IV Factor PCC available, for example.

24              Next year, God willing, the Portola antidote,

25    andexanet.
```

Protected - Subject to Further Protective Review

```
 1              Bless you.

 2              MR. COVEY:  Thank you.

 3    BY MR. CHILDERS:

 4       Q.   When you say "next year, God willing," is it

 5    your understanding that is supposed to come out or be

 6    approved for use next year?

 7       A.   If you take away the word "supposed to," we

 8    anticipated that it was going to be approved last

 9    August.  It turned out that they got a complete

10    response letter requiring some additional information

11    and some review of their manufacturing process.

12              I know they're anticipating that their

13    response to that letter and their review will be

14    acceptable within the next year.  But "supposed" to

15    and "hopefully" are two different phenomenons.

16              MR. COVEY:  To clarify, you're talking about

17       Portola --

18              THE WITNESS:  Portola's product, andexanet,

19       yes.

20    BY MR. CHILDERS:

21       Q.   And that would be a good development, in your

22    opinion.  I think you said God willing; right?

23       A.   Just as Praxbind was for Pradaxa.

24       Q.   And Praxbind --

25       A.   Which bears no relationship to my having to
```

```
 1    measure the ProTime.  It eliminates that need.

 2         Q.    Right.

 3               Well, you don't want to give Praxbind to a

 4    patient who has no Pradaxa on board; do you?

 5         A.    No.  Although it will cause no harm.

 6         Q.    Do you know that to be the case?

 7         A.    I do.

 8         Q.    Do you know if there are still ongoing trials

 9    related to Praxbind?

10         A.    I know there are ongoing trials but not in

11    their normal volunteers.  Those are completed.

12         Q.    Okay.

13         A.    To the best of my knowledge.

14         Q.    Do you know if Praxbind was approved on the

15    accelerated approval process?

16         A.    I do.  That's why there's an ongoing trial.

17         Q.    Okay.

18         A.    But not in normal volunteers.

19         Q.    Have you read any literature relating to the

20    effectiveness of Praxbind?

21         A.    I have.

22         Q.    What does it say?

23         A.    Praxbind -- so there's two sets of data.  One

24    set of data with Praxbind relates to -- actually,

25    there's three sets, there's normal volunteers -- and
```

Protected - Subject to Further Protective Review

1    looks at the effects some coagulation.

2         And then there's the ongoing trial divided

3    into two groups:  Patients who are bleeding and

4    patients who are going to have an urgent procedure.

5    In the normal volunteers, it normalizes with APTT as

6    a surrogate or a thrombin and dabigatran

7    concentrations within a couple minutes, very quickly.

8    And they stay down for up to 24 hours, at which point

9    you can re-dose, if you had to.

10        I know in their ongoing -- excuse me --

11   trial, the first 90 or so patients have been

12   published in the New England Journal.  Clinically

13   significant bleeding in those patients who had gotten

14   Praxbind was not a problem in the urgent procedures.

15   And in those who bled, it rapidly reversed the ---

16   the bleeding.

17        Now, not as rapidly as reversal of the

18   anticoagulant blood test, because you still have a

19   bleeding source.  It goes back to what I said to you

20   earlier, anticoagulants don't cause bleeding.  You

21   need a bleeding source.  So the bleeding didn't stop

22   as soon as you gave Praxbind.  The effect of

23   dabigatran goes away.  You still have to treat the

24   bleeding source.

25        And that was evident because I think the

Protected - Subject to Further Protective Review

```
 1    average bleeding time, if I remember -- this is not

 2    something I looked at recently -- it still was about

 3    four hours in those patients who required some

 4    surgical repair.

 5         Q.   Is your opinion that Praxbind is -- is a good

 6    drug to have on the market?

 7         A.   Yes.

 8         Q.   And it's helpful in patients on Pradaxa who

 9    are in need of surgery or have life-threatening

10    bleeds?

11         A.   Correct.  Those are the indications for it.

12         Q.   No such drug exists to be used with Xarelto;

13    correct?

14         A.   No such drug exists on the marketplace for

15    Xarelto.

16         Q.   Praxbind was made by Boehringer Ingelheim;

17    right?

18         A.   Correct.

19         Q.   Is Janssen developing an antidote for

20    Xarelto?

21         A.   Not that I'm aware of.  Portola is.

22         Q.   Any of the NOAC -- any of the factor Xa

23    inhibitors to try and develop an antidote for their

24    drugs?

25         A.   I don't see why they would, knowing that
```

Protected - Subject to Further Protective Review

 1    Portola has already invested time and money in an

 2    agent that's effective.

 3           And there's another small company,

 4    Parosphere, that's developing one that works across

 5    the board.

 6           So why would I want to develop yet another

 7    one?  It takes years and money to do that.

 8    Q.   I didn't ask you that.  All I asked is:  Are

 9    any of them doing it?

10    A.   To the best of my knowledge, no.  I gave you

11    the reasons for my understanding.

12    Q.   Did any of them try to do it before Portola

13    started?

14    A.   I have no idea.

15    Q.   Do -- have you ever heard of them saying,

16    hey, you know what, we started this, but then Portola

17    jumped on it?

18    A.   To the best of my knowledge, no.  Again,

19    Portola is also developing a factor Xa inhibitor and

20    have been for years, and I'm sure each company knows

21    what the other is doing.

22    Q.   So Portola is developing the antidote and

23    it's also -- before the -- they're developing the

24    antidote, excuse me, before they even bring their

25    factor Xa inhibitor to the market?

USCA5 4415

```
 1      A.   That's correct.

 2           MR. CHILDERS:  All right.  Do you want to

 3      take a break for lunch?

 4           MR. COVEY:  Sure.

 5           MR. CHILDERS:  Okay.

 6           THE WITNESS:  And it may or may not get to

 7      the market.

 8           THE VIDEOGRAPHER:  Off the record at 12:12.

 9           (Recess from 12:12 until 12:51 p.m.)

10           THE VIDEOGRAPHER:  We're now back on the

11      record at 12:51.

12      BY MR. CHILDERS:

13      Q.   Doctor, I think before we took a break, you

14      were telling me that clinically for an individual

15      patient, PT is not, in your opinion, reliable for

16      measuring Xarelto anticoagulant effects.

17      A.   I think that's correct.

18      Q.   Okay.

19      A.   That doesn't make it not clinically useful.

20      Q.   How --

21      A.   There are circumstances where you can't rely

22      on it.

23      Q.   How would it be clinically useful?

24      A.   Well, I think the example I -- I gave you

25      before, or something like it, somebody comes in,
```

Protected - Subject to Further Protective Review

```
1    needs an urgent procedure, the ProTime is elevated
2    and they're on Xarelto.  There's no other reason for
3    the elevation.  Then you'd know the stylatic
4    coagulant effect on board.
5         Q.   Are there other clinically helpful uses?
6         A.   I gave you a couple of examples before.
7              The problem is is that knowing the ProTime
8    is -- pick your number, 20, 30, 40 seconds -- that
9    doesn't tell you the patient's going to bleed.  And
10   if it's 10, 20, it doesn't tell you the patient's not
11   on Xarelto with a significant concentration.
12             So you have to pick and choose when you think
13   it may be clinically useful and when the number won't
14   be of value.  That's in contrast to doing a -- a
15   white blood count, which will tell you nothing.  I
16   mean --
17        Q.   Okay.
18        A.   -- there are times and places.
19        Q.   So if assessment of the plasma concentration
20   of rivaroxaban in an individual patient is clinically
21   necessary, would PT be an appropriate test for that?
22        A.   Since rivaroxaban concentrations are not
23   commercially available in any lab that I've used or
24   know about, it would be an alternative that might be
25   useful but with all the caveats we -- we went
```

USCA5 4417

Protected - Subject to Further Protective Review

1  through.

2        However, we're talking about -- the examples

3  I've talked about are those circumstances where

4  somebody comes in needing a procedure and they've

5  just had a stroke and they want to know about

6  compliance.  If you're talking about routine clinical

7  practice, you don't need it.  The results of ROCKET

8  were done without that.

9     Q.   But if you did need to assess the plasma

10 concentrations, would PT be an appropriate test for

11 that?

12    A.   I don't have an alternative at the moment to

13 attempt to use.

14    Q.   So does that mean, yes, it would be

15 appropriate?

16    A.   In the right circumstance, it would be

17 appropriate to get it.  How I interpret it may be

18 dependent upon the value.

19    Q.   Okay.  I think I understood.  If it's high,

20 then it's indicative of Xarelto being on board; but

21 if it's low, it may not tell you anything?

22    A.   That's correct, assuming the right reagent

23 and I know how long after the dose the test was

24 drawn.

25    Q.   Which reagent would you -- do you believe

Protected - Subject to Further Protective Review

```
 1    needs to be used in order to make the PT test

 2    valuable?

 3        A.   Well, again, my understanding has been the

 4    neoplastic, but now you're outside my range of

 5    expertise.  I certainly couldn't tell you all the

 6    possible reagents.  You need a clinical laboratory

 7    director to do that.

 8        Q.   Okay.  Have you ever asked Janssen if you

 9    could use PT in your clinical practice to assess the

10    plasma concentration of Xarelto in an individual

11    patient?

12        A.   No.

13        Q.   Where do you get the information from -- that

14    you have about the use of PT for an individual

15    patient on Xarelto?

16        A.   Looking at the materials in the literature,

17    looking, for example, at some of the figures in the

18    FDA briefing documents, and knowing from that type of

19    material that the ProTime can be elevated by Xarelto,

20    and knowing how I would interpret such a test in a

21    particular circumstance.  So, you know, literature

22    and experience together.

23        Q.   Okay.  If you saw an elevated PT in a patient

24    where you decided you wanted to do a plasma -- to try

25    to assess their plasma concentration of Xarelto,
```

```
1    would you, in your mind, correlate that with an

2    increased probability of a bleed in that patient?

3         A.   In patients who have elevated ProTimes,

4    regardless of whether it's from a drug or liver

5    dysfunction, if there's a bleeding source, there's a

6    greater likelihood of bleeding.

7         Q.   So the probability of bleed is higher if you

8    have a higher PT?

9         A.   Well, the possibility is higher.  I don't

10   know about probability.  I've seen a lot of people

11   40-plus years of using warfarin whose PT and INRs are

12   enormous and they haven't bled.  I've seen people

13   come in in practice, for example, on warfarin with

14   INRs of ten and they haven't bled.  And my experience

15   in that circumstance is if they didn't bleed on the

16   way up, they usually don't bleed on the way down,

17   either.

18        So you need a bleeding source.  It comes back

19   to that.  You can't just say probability or

20   possibility based simply on the laboratory number.

21        Q.   Well, do you do that with warfarin?  Do you

22   say in your INR is over four or five, you've got a

23   risk of bleed, we need to lower it?

24        A.   I don't say we need to lower it.  I say we

25   need to have a discussion with the patient; if you
```

Protected - Subject to Further Protective Review

```
 1    have been signs of bleeding, I need to know about it.

 2    There are recommendations in the literature by

 3    different organizations for what to do with

 4    particular values of warfarin and whether or not you

 5    just watch them or whether or not you give them

 6    Vitamin K.

 7            But, as I said, I have not seen a patient, if

 8    the INR went up and they didn't bleed but they bled

 9    on the way down.  If they didn't bleed, I usually

10    just watch them.

11        Q.   But you want to get them back into the sweet

12    spot; correct?

13        A.   It may simply be time and then change the

14    dose.

15        Q.   But if they're at a number that's outside,

16    above the sweet spot --

17        A.   With warfarin, I don't want to keep them at

18    that elevated number.

19        Q.   Because?

20        A.   I like to get them back to the -- there are

21    guidelines that say the range is, the range should

22    be.  That's how you should dose it.  We don't have

23    such guidelines for the NOACs, and the clinical

24    trials with the NOACs were done without blood test

25    monitoring.  And we know from the clinical trials
```

Protected - Subject to Further Protective Review

1    that ROCKET, for example, non-inferior to warfarin,

2    right, both in terms of major bleeds and in terms of

3    strokes with less risk of critical organ bleeds or

4    fatal bleeds.  And they did that without monitoring.

5         So I don't feel the same compulsion about

6    measuring something with a Xa, including Xarelto,

7    that I do with warfarin.

8    Q.   I understand.  My question to you relates to

9    warfarin; okay?

10   A.   Okay.

11   Q.   And I want -- let me finish my question

12   before you answer.

13   A.   Sure.

14   Q.   If you have a warfarin patient and their INR

15   is above the sweet spot, say it's six, would you say

16   that that patient --

17   A.   Bless you.

18   Q.   -- is at an increased risk of bleed because

19   their INR is higher?

20   A.   That patient, not necessarily.  If you take

21   all patients with a high INR, then there's a greater

22   likelihood that some of them will bleed than if their

23   INR's lower.

24        Would I leave the patient at that INR of six?

25   No.

Protected - Subject to Further Protective Review

```
 1      Q.   Why not?

 2      A.   Because the guidelines say proper medicine

 3   recommendations are that you use an INR from two to

 4   three is your target.

 5      Q.   And why --

 6      A.   So I adjust the dose accordingly.

 7      Q.   Why is three the top target?

 8      A.   Because the possibility of bleeding, as a

 9   group, goes up when INRs get higher than 3.5 to 4,

10   really; 3 to 3.5 is probably irrelevant.

11      Q.   And that's -- what I'm saying, if it's a six,

12   as a group, you know that that patient in that group

13   would be at a higher risk of bleed; right?

14      A.   The probability of seeing a bleed would be

15   greater than if it were lower.

16      Q.   And that's why you want to get your patient

17   back into the guideline range, 2 to 3; right?

18      A.   Because I can't tell which patient with that

19   level of INR will, in fact, bleed.

20      Q.   Same with a NOAC.  You can't tell which

21   patient with a high PT is going to bleed, either; can

22   you?

23      A.   No.

24      Q.   It's the same concept; isn't it?

25      A.   Except that we don't have clinical trial
```

USCA5 4423

Protected - Subject to Further Protective Review

```
 1    experience to back it up.

 2        Q.    Right.

 3        A.    And we don't have a target guideline.  So

 4    it's not the same thing.

 5        Q.    Well, it's the same thing in that if your PT

 6    is elevated, just as if your INR is elevated, you

 7    have an increased risk of bleed, but you don't know

 8    which patient is actually going to have a bleed;

 9    right?

10        A.    Let me rephrase it, if you will.

11              If you have a patient on an anticoagulant --

12        Q.    Yes.

13        A.    -- whatever the measure of that anticoagulant

14    is, the greater the anticoagulant effect; given a

15    bleeding source, the greater the likelihood there

16    will be a clinically significant bleed.  But it takes

17    the source, and it doesn't matter whether I'm

18    measuring concentration or some surrogate.

19        Q.    A patient can have an INR of six for weeks,

20    and then all of a sudden start bleeding because a

21    bleed starts; right?

22        A.    Correct.

23        Q.    But before that, even though their INR was

24    six, they didn't have a bleed?

25        A.    Correct.
```

USCA5 4424

```
 1        Q.    Same with any oral anticoagulants; correct?

 2        A.    Correct.

 3        Q.    Okay.  And that's why you monitor the INR;

 4   isn't it, partially?  One is to make sure they're

 5   therapeutic and prevented from stoke, and the other

 6   is to make sure they're not over-anticoagulated and

 7   try to prevent them from having an unnecessary bleed?

 8        A.    You're try to maximize the efficacy and

 9   minimize the risk.

10        Q.    And that's a good idea for any drug; isn't

11   it, maximize the efficacy and minimize the risk?

12        A.    Yes.  Except that for over 95 percent of the

13   drugs on the market, we do not monitor anything.  You

14   take aspirin; we don't monitor it.  Because in

15   clinical practice, monitoring has not been shown to

16   be necessary or beneficial.

17        Q.    How long has aspirin been on the market?

18        A.    Longer than I've been alive.

19        Q.    Okay.  How many patients have taken aspirin?

20        A.    Millions and millions and millions.

21        Q.    More than have taken NOACs?

22        A.    Absolutely.

23        Q.    Okay.

24        A.    But I think with a few million prescriptions

25   for the NOACs already, we have a pretty good idea
```

1    what to expect with them.

2        Q.   Have many studies have been done on bleeding

3    as it compares from one NOAC to the other, actual

4    events of bleeding?

5            MR. COVEY:  Are you talking head to head,

6        just to --

7            THE WITNESS:  I was going to ask the

8        question.

9            MR. COVEY:  I'm sorry.

10   BY MR. CHILDERS:

11       Q.   Have any studies been done to say, we're

12   going to compare the -- the reported events of

13   bleeding with this NOAC versus the reported events of

14   bleeding with this NOAC?

15       A.   There have been no head-to-head prospective

16   trials.

17       Q.   That's not what I asked you.

18       A.   But what you're asking me is have there been

19   any reports from any observational sources.  The

20   answer is yes, but they're all biased.

21       Q.   You cited any in your --

22       A.   I think I cite --

23       Q.   -- report?

24       A.   Most of the references, if I remember the

25   number, under 48; 48, A, B, C, D, E, so forth.

```
1      Q.    And all the way up to FF; right?

2      A.    Something like that.  I -- I looked as

3   thoroughly as I could at the literature.

4      Q.    And when you they're biased, what do you mean

5   by that?

6      A.    So when you do an observational study where

7   the patients aren't randomized prior to receiving the

8   drug, there are many sources of bias.  The biggest

9   one probably -- or one of the biggest is why a

10  physician chose a particular drug in a particular

11  patient.

12           So, for example, in my experience, when I ask

13  peers out in the practice, you know, why -- why did

14  you give Drug A to this patient and Drug B to that

15  patient?  To a large extent, it's dependant upon how

16  similar my patient was to the clinical trial

17  patients.

18           Xarelto, in ROCKET, given to a much sicker

19  population of patients than any of the other NOACs

20  were in their trials.  So in clinical practice, if I

21  make my selection, I'm going to give Xarelto to the

22  sicker patients.  And I know bleeding risk, for

23  example, goes up as the CHA2DS2 -- or CHA2DS2-VASC

24  score goes up.  It's not just stroke.

25           And I now do a comparison, say, oh,
```

Protected - Subject to Further Protective Review

```
 1    dabigatran had less bleeding than rivaroxaban, but I

 2    didn't give them to the same patients.  That's a bias

 3    that you can't overcome statistically with any kind

 4    of matching that you want to do.

 5          And so it's not the same as a head-to-head

 6    trial, and I don't put any confidence in it unless

 7    every one of the reports shows exactly the same

 8    thing.

 9    Q.   You don't put any confidence in it; is that

10    what you said?

11    A.   No, sir.

12    Q.   Okay.  Not even -- it doesn't influence your

13    opinion at all?

14    A.    In a single report?  No.  I take them as a

15    constellation.  If they all went in the same

16    direction, I think you can judge from truth.  And

17    we've -- we've said that in press in publications

18    related to clinical trials.  But for any single

19    report by itself, no.

20    Q.   Okay.  But if you take them together and you

21    start seeing a pattern, does that influence your

22    opinions?

23    A.   So long as it represented a cross selection

24    of populations.  But if the same bias were true in

25    all of them, I would expect pretty similar results in
```

USCA5 4428

Protected - Subject to Further Protective Review

```
 1    all of them.  So I don't just read abstracts and

 2    conclusions.  I read the total report.

 3        Q.   Do you agree that for Xarelto, the risk or

 4    probability of major bleeding is dependant on PT?

 5        A.   Do I believe the risk of major bleeding is

 6    dependant on the ProTime?

 7        Q.   Yes.

 8        A.   There's group data -- we keep talking about

 9    this over and over -- that says there's a greater

10    likelihood of higher concentrations and bleeding the

11    higher the ProTime for the group, but not for the

12    individual.

13        Q.   Okay.  I understand.

14             So taken as a group, you could say that there

15    is a higher risk, but when you apply that to an

16    individual patient, you -- you can't say it that same

17    way?

18        A.   Correct.

19        Q.   Okay.  Can you do that with warfarin?  Can

20    you take that -- you know that there's a higher risk

21    over a certain number -- level INR, can you then

22    apply that to an individual patient?

23        A.   I have a greater comfort level doing that

24    with warfarin because of much greater experience,

25    many more trials specifically looking at that issue.
```

Protected - Subject to Further Protective Review

```
1        Q.    And coming up with a sweet spot; right?

2        A.    Correct.

3        Q.    Okay.  And that has not been done, to your

4    knowledge, for any of the factor Xa inhibitors?

5        A.    Using ProTimes?

6        Q.    Using anything.

7        A.    That's correct.  Again, in the clinical

8    trials done without using any of those monitoring

9    have come up, just as ROCKET did, just as RE-LY did,

10   just as ARISTOTLE did, have come up looking in all

11   respects as good or better than warfarin with

12   monitoring.  So I haven't felt compelled -- I haven't

13   precluded using a NOAC because of the absence of

14   monitoring.  I already have a great level of comfort

15   using them despite the absence of monitoring.

16       Q.    My question was simply:  There hasn't been a

17   test, hasn't been study done to make that

18   determination for any of the factor Xa inhibitors;

19   right?

20       A.    In clinical trials, no, that's correct.

21       Q.    Okay.  Have you reviewed the ROCKET data as

22   it relates to bleeding events in U.S. patients versus

23   non-U.S. patients?

24       A.    I believe I've seen that data, yes, sir.

25       Q.    Are you familiar with that?
```

```
 1        A.    I think so.

 2        Q.    Okay.  You agree with me that in the ROCKET

 3   trial, Xarelto caused more bleeds than warfarin in

 4   U.S. patients?

 5        A.    Not exactly.

 6        Q.    Why not?

 7        A.    You're looking at the major bleed numbers in

 8   a subgroup of a subgroup without considering the

 9   other factors.  And if you look at the way it's

10   worded and presented in the package insert, there's a

11   big caveat underneath the forest plot.  It says that

12   these numbers should not be over-interpreted because

13   they're not considered in conjunction with the other

14   factors.

15        For example, if you go to ROCKET and you look

16   at the online supplement, the online supplement has

17   major bleeds in North America -- not just the U.S. --

18   was greater.  That was, if I remember, Figure 4.  But

19   if you go to Figure 5, if I remember it right, when

20   they looked at the entire safety set, which was not

21   just major bleeds but MIs and death, it was better in

22   North America.

23        When you look at serious bleeds defined as

24   critical or fatal or even four units of transfusion,

25   it was not greater in the Xarelto than warfarin in
```

Protected - Subject to Further Protective Review

1    the U.S. population.

2         And there are reasons for that, I think, that

3    we can delve into, if you want.

4    Q.   Do you agree with me that the current Xarelto

5    label forest plot says that there was a 50 percent

6    higher bleed rate in the United States patients

7    than -- on Xarelto than the patients that were on

8    warfarin for major bleed?

9    A.   The forest plot, and you look at the numbers

10   around it, makes it look that way.  But, again, I

11   point to the caveat underneath.

12   Q.   I'm only asking you about what the forest

13   plot actually says.

14   A.   No, I understand.  But look at the whole

15   figure.  There are many, many issues that come to

16   play in -- in whether that's valid and reliable and

17   useful or not.

18   Q.   Okay.  That information, you know because you

19   were on the speaker's bureau from early on for

20   Xarelto.  That information about the U.S. patients

21   was not included in the label until September of

22   2015; right?

23   A.   '15 or '16, but, yes, the last iteration.

24   Q.   It wasn't there in --

25   A.   Wasn't there in '14.

Protected - Subject to Further Protective Review

```
1        Q.    Right.

2        A.    Correct.

3        Q.    Okay.  You've told me --

4        A.    But the online supplement was published

5    originally, which didn't separate the U.S.  It had

6    North America.

7        Q.    But as far as the label that actually went

8    along with the product, that wasn't in there until

9    September 2015?

10        A.    That wasn't in there until the FDA went

11    through a process of what they used harmonization of

12    all the NOAC labels.

13        Q.    Correct.

14             And on the other NOAC labels, does it show

15    that the U.S. patients had higher incidents of

16    bleeds -- major bleed than the warfarin patients?

17        A.    There was a same trend in that the bleeding

18    rates, as I remember the -- for example, the edoxaban

19    label forest plot were higher in the U.S. than the

20    non-U.S. patients.  Not higher than warfarin, but

21    higher than the others.

22             And this -- the geography comes into play,

23    but so do many other factors.  The -- the percentage

24    of patients in the U.S., for example, in ROCKET, who

25    previously were on warfarin before enrolling in
```

Protected - Subject to Further Protective Review

```
 1    ROCKET was about 90 percent.  I -- I believe that's a

 2    big factor in -- in this issue, personally, from my

 3    experience.

 4        Q.   Forest plots for the other three NOACs did

 5    not show that those NOACs had a higher bleed event

 6    rate -- major bleed event rate than warfarin;

 7    correct?

 8        A.   That's correct.

 9        Q.   Okay.

10        A.    In different populations of patients.  The

11    patient population was very different in ROCKET, and

12    I don't want you to over-extrapolate.

13        Q.   They all had nonvalvular atrial fibrillation?

14        A.   They all had nonvalvular atrial fibrillation,

15    but they had different ages, different percentage of

16    heart failure and so forth, all of which come into

17    play in bleeding risk.

18        Q.   And that same bleeding risk exists on the

19    warfarin side of the equation as it does on the NOAC

20    side of the equation; right?

21        A.   That's correct.  Which -- but it comes into

22    play in terms of the prior use of warfarin,

23    90 percent.

24        Q.   Okay.  If your bleeding risk is higher

25    because you have all those comorbidities, it doesn't
```

USCA5 4434

Protected - Subject to Further Protective Review

```
 1    matter if you're on warfarin or Xarelto, you have

 2    that same underlying risk from those -- from those

 3    comorbidities?

 4         A.   From the comorbidities?

 5         Q.   Right.

 6         A.   Yes, to the extent that their potential drug

 7    interactions don't come into play.

 8         Q.   Okay.  And those were accounted for in the

 9    ROCKET data; right?  That's why the label tells you,

10    be careful with certain drugs?

11         A.   That's why it says be careful with certain

12    drugs, but not in that forest plot.

13         Q.   Okay.  I'm going to show you Exhibit 9, and I

14    will tell you, this is the current label, but it's

15    only a couple of pages of it.  It's not the whole

16    thing.

17              (Plaintiff's Exhibit No. 9 was marked for

18    identification.)

19    BY MR. CHILDERS:

20         Q.   You've told me many, many times today that

21    the anticoagulants do not cause bleeds; right?

22         A.   I said if you have a bleeding source.

23         Q.   You said --

24         A.   In the absence of a bleeding source,

25    anticoagulants should not cause bleeding, other than
```

USCA5 4435

Protected - Subject to Further Protective Review

```
 1    aspirin.

 2        Q.   Okay.  If you look for me on the third page

 3    here, do you agree with me at least that the label

 4    for Xarelto says, under risk of bleeding:  Xarelto

 5    increases the risk of bleeding and can cause serious

 6    or fatal bleeding?

 7        A.   I do.

 8        Q.   Okay.  And that's the label -- that's been in

 9    the label since day one?

10        A.   It's in the slides that we show when

11    educating physicians.

12        Q.   Okay.

13        A.   And when I educate physicians and use this, I

14    say they can use serious and fatal bleeding.  All

15    anticoagulants can, in patients who have a bleeding

16    source.

17        Q.   That's not what this says.

18        A.   It's what I say when I educate physicians,

19    because that's what it is in reality.

20        Q.   But in the label --

21        A.   I know what the label says.

22        Q.   Let me just ask you my question.

23             In the label, it doesn't say those extra

24    words that you say to the people that you're

25    educating?
```

Protected - Subject to Further Protective Review

```
 1      A.   That's correct.

 2      Q.   Okay.  Sorry, I'm a little out of order here.

 3   I was trying to find --

 4      A.   No, that's okay.

 5           This is the same wording that's in all of the

 6   anticoagulant labels.

 7      Q.   Right.  They all say --

 8      A.   It's the harmonization.

 9      Q.   They all -- well, this is before

10   harmonization.

11      A.   I understand.  But that same wording is, in

12   essence, in all of them.

13      Q.   And that same wording was there before there

14   was harmonization?

15      A.   That's correct.

16      Q.   Okay.  That was there from the day Xarelto

17   went on the U.S. market?

18      A.   And it was in the Pradaxa label the day it

19   went on the market.

20      Q.   You didn't need to harmonize when there was

21   only one NOAC; correct?

22      A.   That's correct.

23      Q.   And they didn't -- they didn't harmonize when

24   there were only two NOACs?

25      A.   But they used the same terminology when there
```

Protected - Subject to Further Protective Review

```
1    are only two.

2        Q.   Gotcha.

3        A.   And as I said before when I described the

4    slide sets, it's in the slide sets three or four

5    times.  The FDA wants to be sure the physicians

6    understand there's a risk.

7             MR. COVEY:  Do you want to take a second,

8        Andy?

9             MR. CHILDERS:  I'll find it.  I'll do

10       something --

11            I want to mark your CV.  And I apologize, I

12       only brought a couple of these because it's so

13       big that I didn't want to kill that many trees.

14            And you -- I don't know if you already have

15       one or not, but I'm going to mark it as Exhibit

16       10.

17            THE WITNESS:  I have it, but I don't have it

18       with me.

19            MR. CHILDERS:  I have one other one.  Sorry

20       about that.

21            (Plaintiff's Exhibit No. 10 was marked for

22    identification.)

23    BY MR. CHILDERS:

24       Q.   I wanted to ask you about some of these

25    things.  Some of them we've already gone over; okay?
```

USCA5 4438

```
 1        A.    Sure.

 2        Q.    As I understand, you were -- you were in

 3   the RE-LY trial as an investigator?

 4        A.    Correct.

 5        Q.    The ROCKET-AF that you describe in your CV,

 6   that is not a Janssen --

 7        A.    Correct.

 8        Q.    -- study.

 9              Okay.  Under the section -- there weren't --

10   I'm sorry, Page 10.  You have page numbers.  That

11   makes it easy.  Thanks.

12              I want to ask you about a couple of things.

13        A.    Thank my first secretary.  Different ones

14   picked this up at different times.  You'll see the

15   spacing change and what-have you.  I don't have the

16   patience to go through and change it.

17        Q.    The Item -- Item 37, it says presentation on

18   rivaroxaban on the Doctors Channel, 2014.

19        A.    Uh-huh.

20        Q.    What -- what did you do there?  What was

21   that?

22        A.    I was interviewed.

23        Q.    Okay.  Who interviewed you?  Do you remember?

24        A.    I don't remember who the interviewer was, no.

25        Q.    And at that point, you were on -- you were on
```

Protected - Subject to Further Protective Review

```
 1    the speaker's bureau for Janssen?

 2        A.   Correct.

 3        Q.   Do you recall if you told the viewers that

 4    you were on the speaker's bureau for Janssen in that

 5    article -- in that interview?

 6        A.   As I said before, I tend to give disclosure

 7    whenever I do anything.

 8        Q.   Whether it's writing a letter to the editor

 9    or giving a presentation, you want people to know

10    that you have some affiliation with the company?

11        A.   Uh-huh.

12        Q.   Is there any circumstance where you wouldn't

13    do that?

14        A.   Only if -- in a letter, for example, there

15    was no room.  In fact, I said before -- you asked me

16    before, do I review for journals.  They ask upfront

17    in their review, do you have a conflict?  So lots of

18    times, we won't review because of conflicts.

19    Wherever practical and feasible, yes.

20        Q.   Okay.  Do you recall what you told the

21    viewers on the Doctors Channel about rivaroxaban?

22        A.   Specifically, no.

23        Q.   Do you know if that was --

24        A.   It was -- as best as I remember, it was a

25    question-and-answer format.
```

Protected - Subject to Further Protective Review

```
 1        Q.   Do you have a CD or a DVD of that somewhere?

 2        A.   Nope.  No, I do not.

 3        Q.   All right.  39, we talked already.  You are a

 4   member of the CSR -- CSRC?

 5        A.   Correct.

 6        Q.   And you've had multiple meetings.  You didn't

 7   go to the last one; is that right?

 8        A.   I didn't go to the one in December '15.  The

 9   last one was, in fact, last week --

10        Q.   Oh.

11        A.   -- in Washington, and I was at it --

12        Q.   That's when we were there at the same time.

13        A.   Yes, sir.

14        Q.   I was not at that.

15        A.   No, sir.

16        Q.   They haven't invited me to attend those yet.

17        A.   Nope.

18        Q.   All right.  Number 45, Interviewed with

19   Jerry West by 30 TV and radio shows --

20        A.   Right, in September.

21        Q.   -- for Atrial Fibrillation Awareness Month.

22   That was this year?

23        A.   Yes, sir.

24        Q.   So you and Jerry West, the basketball player?

25        A.   Yes, sir.
```

Protected - Subject to Further Protective Review

```
 1      Q.   Went on 30 different shows and talked about

 2   atrial fibrillation?

 3      A.   It was a question-and-answer format.  We were

 4   in one studio, and the TV and radio programs were

 5   around the country called in.  And they were either

 6   radio or TV broadcast live.

 7      Q.   So it was like one after the other, or was it

 8   one and it got shown on multiple --

 9      A.   No, it was one after the other.  It was an

10   all-day event.

11           September, the last few years, have been

12   atrial fibrillation awareness month, and I've done

13   this previously; not with him.  So this wasn't the --

14   the first time.

15      Q.   Have you done it with any other celebrities?

16      A.   If you're talking about Jerry West, no.

17   There are lots of celebrities in the medical world.

18      Q.   I'm sorry, any non-medical --

19      A.   No, sir.  Not that I recall.

20      Q.   You were the medical celebrity, and he was

21   the sports celebrity?

22      A.   He was the sports celebrity because he's got

23   Afib.  He talked about Afib from the patient's

24   standpoint, and I talked about Afib from the

25   physician's standpoint.
```

```
1        Q.   Okay.  Did you know Jerry West is a Xarelto

2    paid spokesperson?

3        A.   I have learned that, yes, from watching the

4    TV commercials.

5        Q.   Did you know that when you did these

6    interviews with him?

7        A.   I did.

8        Q.   Did you get paid to do these interviews?

9        A.   No.

10        Q.   Do you know if he got paid to do the

11    interviews?

12        A.   I have no idea.

13        Q.   In the interviews, did he reveal to anybody

14    that he was paid by Janssen to be a spokesperson?

15        A.   That he was paid by Janssen?

16        Q.   Right.

17        A.   I honestly don't remember whether he said

18    that or not.  He -- he certainly has -- that

19    disclosure's been made, best of my knowledge, on the

20    TV interviews when he's been -- you know, just like

21    Arnold Palmer and so forth.

22        Q.   Well, those are commercials.

23        A.   Correct.

24        Q.   So clearly, they're getting paid for that.

25        A.   Correct.
```

```
 1              I do not -- I don't recall whether that
 2     question ever came up.
 3         Q.    And these 30 TV and radio interviews, did you
 4     or Jerry talk specifically about Xarelto?
 5         A.    We talked about -- he talked about what he
 6     was taking.
 7         Q.    Did he say he was taking Xarelto?
 8         A.    I believe so.
 9         Q.    Did he --
10         A.    I -- I talked about anticoagulation in
11     general, including Xarelto.
12         Q.    Did you talk about any of the other NOAC
13     drugs?
14         A.    I believe so, yes.
15         Q.    Okay.  Did you keep a DVD of any of those
16     interviews?
17         A.    No.
18         Q.    Was anybody else there besides you and
19     Jerry West and the person interviewing you?
20         A.    Well, the person interviewing us was remote.
21         Q.    Okay.
22         A.    Some TV studio or radio studio.  Yeah, there
23     was a producer, a director, an AV person, the guy who
24     controlled the -- the mics, changed the batteries.
25         Q.    Was anybody from Janssen there?
```

Protected - Subject to Further Protective Review

```
1        A.    Not that I remember seeing, no.

2        Q.    Okay.

3        A.    In fact, when I walked in the room, I needed

4     to be sure I was in the right place because I didn't

5     recognize anybody.

6        Q.    So you didn't recognize Jerry West?

7        A.    The other people besides Jerry.

8              MR. COVEY:  Touche.

9              THE WITNESS:  Yes.

10    BY MR. CHILDERS:

11       Q.    You know he's the --

12       A.    I know.

13       Q.    -- basketball logo?

14       A.    I know he is.

15       Q.    The logo --

16       A.    He is, of the NBA.

17       Q.    The actual logo --

18       A.    Yes.

19       Q.    -- of Jerry West.

20       A.    The silhouette.

21             MR. COVEY:  He ran a 75-foot foot shot

22       against the Knicks in the playoffs in either '69

23       or '70 that broke my heart.

24             MR. CHILDERS:  I didn't have a heart problem

25       to be broken at that point.
```

```
 1              THE WITNESS:  He's also an incredibly nice

 2       guy, but that's beside the point.

 3              MR. CHILDERS:  He seems like it.

 4   BY MR. CHILDERS:

 5       Q.   Okay.  And then on Page 24 -- I'm going to

 6   skip around, try to hit a couple --

 7       A.   That's fine.  24.

 8       Q.   Number 146 and 148 are papers that would

 9   relate to the RE-LY study?

10       A.   Yes.

11       Q.   Okay.  Did you -- you included those because

12   it's four of the RE-LY investigators, or were you

13   actually one of the writers of the articles?

14       A.   I'd have to look at the individual reference,

15   because the way this is written is the first three,

16   et al, and I don't remember which papers I was part

17   of the et al and which patient papers it was for the

18   committee.

19       Q.   There was some of the RE-LY related papers

20   that you were on the -- you were actually listed?

21       A.   I believe so, but I'd have to look.

22   There's -- there's a lot of papers in this CV.

23       Q.   I know.

24       A.   And I don't remember each and every one of

25   them over the course of years.
```

```
1        Q.    I do not find that hard to believe.  There

2   are quite a few.

3              Okay.  151, the RECORD AF study, again,

4   that is --

5        A.    That's not.

6        Q.    -- not --

7        A.    That's correct.

8        Q.    -- Janssen.  In fact --

9        A.    It's other --

10        Q.    -- it's not all caps, so that seems --

11        A.    It's -- it's an observational registry.  It's

12   yet another observational registry.

13        Q.    Okay.

14        A.    That predated ORBIT and that was after the

15   AFFECTS registry, which is also listed in here

16   someplace.

17        Q.    Yeah, I saw that, too.

18              And then the following page, 25, looks like

19   number 157, 158, 162, 163, those are all RE-LY

20   related papers?

21        A.    Yes.

22        Q.    Okay.  And you don't recall whether or not

23   you would have been anything -- if you would have

24   been named specifically as an author?

25        A.    The more recent ones, no.
```

USCA5 4447

```
 1        Q.    Okay.  The next page, number 166, 167, 169,

 2    176, and 177, again, all RE-LY related?

 3        A.    They're -- they're all RE-LY.  Part of the

 4    issue in terms about being an author, some of the

 5    folks listed, I work with or I see regularly at

 6    meetings, and a lot of the time, we have discussions

 7    about the context.  But that doesn't necessarily make

 8    me listed as an -- as an author.

 9             So, for example, Mike Ezekowitz, who I work

10    with and see many, many times a year, we'll talk

11    about some of these issues.  He'll run stuff by.  But

12    not the final paper.  Not the paper as it's being

13    written, I should say.  I see the final.

14             So my input can vary --

15        Q.    Right.

16        A.    -- in a lot of these, in a lot of ways.

17        Q.    The one at the bottom, 177, that lists just

18    you as author -- or -- and it's a letter?

19        A.    Correct.

20        Q.    Do you recall what that letter -- what the

21    content of that letter was?

22        A.    No.  I'd have to look at it.

23        Q.    Okay.  Do you remember specifically having

24    responded to an article that related to risk of

25    bleeding with two different doses of dabigatran?
```

USCA5 4448

```
 1      A.   That letter -- and I'd have to see it -- may

 2   have been the one I wrote in response to an article

 3   written by three of the FDA reviewers that approved

 4   dabigatran 150 and turned down the 110.  And they

 5   said that they couldn't, in their minds, conceive of

 6   any circumstance where the 110 would be reasonable to

 7   use.

 8      Q.   That's not something you agree with; right?

 9      A.   It's not something I agree.  It's not

10   something most of the world agrees with.

11      Q.   And you've written a few different --

12      A.   In fact, I gave you an example earlier today.

13      Q.   Right.

14           And you've written for a few different

15   publications specifically about that; haven't you?

16      A.   Yes.

17      Q.   Okay.  Page 28, Number 192, that's the Reilly

18   paper we looked at earlier?

19      A.   Correct.

20      Q.   Okay.  Page 30, Number 212, that's the CSRC

21   paper we looked at?

22      A.   Yes.

23      Q.   Okay.  Page 41, Number 151, that was the

24   letter to the editor we looked at?

25      A.   Correct.
```

Protected - Subject to Further Protective Review

```
 1      Q.   Okay.  The following page, Number 155,

 2   article --

 3      A.   Correct.

 4      Q.   -- that you wrote called "The New Novel Oral

 5   Anticoagulants in Patients With Atrial Fibrillation:

 6   dogma, Dilemmas, and Decisions on Dosing."

 7           Right?

 8      A.   Right.

 9      Q.   And that talks about all three of the -- I'm

10   sorry, are there four NOACs? -- all four of the

11   NOACs?

12      A.   As I recall, yes.  But I would like to see it

13   if you want to ask me specifics.

14      Q.   Okay.  I'll mark it before I hand it to you.

15      A.   Sure.

16           MR. CHILDERS:  It's going to be Exhibit 11.

17           (Plaintiff's Exhibit No. 11 was marked for

18   identification.)

19   BY MR. CHILDERS:

20      Q.   Sorry.

21           This is the article that we're talking about?

22      A.   Uh-huh.

23      Q.   It's a picture of you at the bottom?

24      A.   It is.

25      Q.   And this is a guest editorial; right?
```

Protected - Subject to Further Protective Review

```
 1        A.   Correct.

 2        Q.   In the Journal of Atrial Fibrillation?

 3        A.   Correct.

 4        Q.   Are you on the review committee for that

 5   publication?

 6        A.   I'm on their editorial board.

 7        Q.   Okay.  Why is it a guest editorial if you're

 8   on the editorial board?  Maybe I don't know how that

 9   works.

10        A.   So there's -- the way -- each journal is

11   different.  The way this one works is there's a --

12   the editor in chief, that's Andrea Natale, and an

13   associate editor and then some other people on the

14   editorial board.

15             If Natale writes the editorial, it will come

16   under his banner.  If somebody else writes an

17   editorial, it's a guest editorial, meaning he didn't

18   do it.  Most of the articles are not editorials.

19   They only have them on -- in some issues.

20        Q.   Okay.  And this one was specifically about

21   dosing, right, for NOACs?

22        A.   NOACs.

23        Q.   And you called it:  Dogma, Dilemmas and

24   Decisions on Dosing?

25        A.   Correct.
```

1    Q.    And then you -- you actually have separate

2    sections for dabigatran, rivaroxaban, and edoxaban --

3    apixaban and edoxaban; right?

4    A.    Correct.

5    Q.    Okay.  If you would look on the bottom of --

6    on Page 2 on the bottom of the first column, this is

7    under the dabigatran section.  You wrote:  It is my

8    sincere hope that the FDA will reconsider their prior

9    adverse determination regarding the 110-milligram

10   b.i.d. dose, which I believe was wrong, such that our

11   patients will be the better for it.  In this regard,

12   the FDA certainly could do some -- do so utilizing

13   pharmacokinetic modeling in the same manner as they

14   used to approve the 75-milligram b.i.d. dose.  If

15   only they would.

16        Notably, the 110-milligram b.i.d. dose was

17   not approved by the FDA despite non-inferior efficacy

18   versus warfarin plus less bleeding while rivaroxaban

19   was approved with both similar efficacy and bleeding

20   versus warfarin.

21        Correct?

22   A.    Correct.

23   Q.    So correct me if I'm wrong, but what you're

24   saying here is the 110-milligram dose seemed to

25   perform better than -- of dabigatran seemed to

Protected - Subject to Further Protective Review

1    perform better in its clinical that rivaroxaban did,

2    but the FDA didn't approve it and did approve

3    rivaroxaban?

4         A.   No, that's not what I was saying.

5         Q.   So what are you saying?

6         A.   I didn't compare RE-LY and ROCKET at all.

7    What I was saying is the FDA -- and I've said it in

8    other publications.

9         Q.   Right.

10        A.   The FDA needs to be a little more

11   transparent.  And what I said was if in ROCKET

12   non-inferiority across the board was considered

13   acceptable, then one might believe you could use the

14   same criteria here.

15            The problem here, and the FDA said -- we

16   talked before about the letter that the committee

17   wrote.  The FDA said the reason that they did not was

18   twofold, in large part:  One, on the 150 b.i.d. was

19   not only superior to warfarin; it was superior to the

20   110.  Two, they've said that in general, physicians

21   in this country do not tend to dose escalate.  And

22   they were concerned that physicians would use the 110

23   rather than the 150, thereby depriving the patients

24   of the dose that was superior.

25            We don't have that same phenomenon in ROCKET.

USCA5 4453

Protected - Subject to Further Protective Review

```
 1    My concern here was, as I said before, that there are

 2    patients for whom, if you start to add on things:

 3    Renal dysfunction, multiple drug interactions, it

 4    might be nice to have the intermediate dose, which is

 5    what happens in the rest of the world.

 6            What I've written more recently than this,

 7    specifically, is that if the FDA's concern was that

 8    physicians wouldn't dose escalate, what they could

 9    have done, my opinion, should have done, was mandate

10    the 150 as the starting dose, and down titrate in

11    certain circumstances, or consider it, the same as

12    they do for a drug called Tykosyn, which is an

13    antiarrhythmic which comes in multiple doses but they

14    mandate starting at the highest dose.

15            I was picking here on the FDA.  I think they

16    need to be more consistent, or at least more

17    transparent.

18       Q.   And what you're pointing out here is that

19    they were inconsistent in approving rivaroxaban as

20    not-inferior but not approving the 110-milligram dose

21    of dabigatran as non-inferior?

22       A.   What I was pointing out was if they used

23    non-inferiority for riva, they could have used it for

24    dabigatran in specific circumstances when one would

25    have to down track titrate.
```

Protected - Subject to Further Protective Review

```
 1      Q.   Right.

 2      A.   Not as an across the board generality.

 3      Q.   Right.

 4      A.   But they -- they've been nonconsistent in

 5   their application.

 6      Q.   Right.

 7           And in that application, using

 8   non-inferiority, they didn't -- they approved

 9   rivaroxaban but didn't approve the 110-milligram

10   dabigatran dose; right?

11      A.   That's correct, they did not.

12      Q.   Okay.  And then on the rivaroxaban section

13   toward the bottom, you have written:  Whether the use

14   of 15 mg rather than 20 mg daily would be appropriate

15   if a mild to moderate dual inhibitor was

16   co-administered has not been studied and is not noted

17   in the package insert.

18           Right?

19      A.   Correct.

20      Q.   But that's something you were concerned

21   about; right?

22      A.   It's a statement I made vis-à-vis one might

23   want to or could study a broader use of the doses.

24      Q.   And you went on to say:  Similarly, the --

25   similarly, the package insert does not discuss why
```

1    the dose must be taken with the evening meal for AF

2    but with any meal for the non-AF indication.

3            Right?

4        A.   Correct.

5        Q.   Have you since come to learn why the package

6    insert says that?

7        A.   In fact, I knew then why.  The FDA almost

8    always, when they approve a drug or a dose for

9    clinical use, follows the way it was given in the

10    clinical trial based upon their approval.

11           In ROCKET, Xarelto was given with the evening

12    meal.  So the FDA said, all right, for NV-AF, take it

13    with the evening meal.  That's no more -- no more

14    complex than that.  In fact, you can take it with any

15    meal that's substantial in calories and fat.

16        Q.   That was my next question.

17           So it doesn't really have to be taken with

18    the dinner meal.  That's just because it was in the

19    clinical trial.

20        A.   But the package insert says it because that's

21    how it was in the trial.

22        Q.   Right.

23           And then you wrote:  While these dosing

24    differences reflect the dosing regimens used in the

25    specific pivotal trials that led to the specific

Protected - Subject to Further Protective Review

```
 1    indications approved, a rationale for maintaining the

 2    differences in clinical practice should be provided,

 3    in my opinion, if there is a sound

 4    clinical/physiological rationale.

 5              Right?

 6       A.   Right.

 7       Q.   And that hadn't been provided at that point;

 8    correct?

 9              MR. COVEY:  I'm going to object to the form.

10       I'm not sure who you're referring to.  That's my

11       objection.

12              THE WITNESS:  The package insert does not

13       provide it.

14    BY MR. CHILDERS:

15       Q.   Okay.  And then you go on to say:  Moreover,

16    it should be simple enough to do a pharmacokinetic

17    study of giving the drug with a substantial breakfast

18    versus the evening meal to determine if the -- if it

19    different dosing-meal patterns should be continued.

20    However, I have not seen any public mention of such a

21    study.

22              Right?

23       A.   Correct.  My knowledge is that, in fact,

24    there is such information.  It has not been

25    published, to my knowledge, as a separate study, and
```

USCA5 4457

Protected - Subject to Further Protective Review

```
 1    to my knowledge, the company hasn't asked the FDA to

 2    change that part of the package insert.

 3         Q.   So as of now, the package insert still tells

 4    people, take it with evening meal --

 5         A.   The package insert says to take it with the

 6    evening meal, which is somewhat arbitrary.  And most

 7    of my peers tell them to take it with food.

 8         Q.   Gotcha.

 9              And that's because of the bioavailability of

10    the drug?

11         A.   At the 20-milligram and 15-milligram dose,

12    yes.

13         Q.   Okay.  You've got another article here more

14    recent, number 163 -- we're done with that -- called

15    "Does the FDA Owe Us an Explanation"?

16         A.   Right.

17         Q.   Is that the newer one that you were talking

18    about just a second ago?

19         A.   I think so.

20              MR. CHILDERS:  Okay.  I'm going the mark that

21         as Exhibit No. 12.

22              (Plaintiff's Exhibit No. 12 was marked for

23         identification.)

24    BY MR. CHILDERS:

25         Q.   You know what, let me ask you a question
```

Protected - Subject to Further Protective Review

```
 1    before we get to that --

 2         A.   Sure.

 3         Q.   -- on 11.

 4              I don't see any place on this guest editorial

 5    where there's any disclosure of potential conflicts

 6    of interest.  Is that not something that they do for

 7    guest editorials?

 8         A.   Apparently not.  They have it on my profile

 9    at the Journal.

10         Q.   In the magazine that comes out?

11         A.   I don't know if it's in the mag -- the

12    Journal has it.

13         Q.   Okay.  But if I was just to buy this --

14         A.   You wouldn't know.

15         Q.   Okay.

16         A.   That's correct.

17         Q.   Okay.  And at that time -- let me ask you a

18    question.

19              And at that time, you were a consultant for

20    all the companies that you talked about their drugs;

21    right?

22         A.   That's correct.

23         Q.   Okay.

24         A.   But I was not in this promoting a particular

25    NOAC over another.  I was simply sharing the dosing
```

Protected - Subject to Further Protective Review

```
 1    issues and concerns that I had for which my working

 2    with or for a company, frankly, was not particularly

 3    relevant.

 4        Q.    Whether you were advocating for a particular

 5    drug or not doesn't have anything to do with whether

 6    or not you should disclose conflict; does it?

 7        A.    No.  But it's the Journal's policy --

 8        Q.    Right.

 9        A.    -- as to what's published.

10        Q.    So if you have any conflicts relating to the

11    subject matter you're writing about, you're supposed

12    to tell people.  In fact, you told us earlier, that's

13    your habit.

14        A.    That is my habit, yes, sir.

15        Q.    Okay.  Let me hand you Exhibit 12, which

16    is --

17        A.    Same journal.

18        Q.    -- same journal.

19        A.    Right.

20        Q.    First question:  This one has a disclosure

21    section; right?  Right on the front page.  Do you see

22    that?  It doesn't have your picture, but it says

23    "disclosures" at the very bottom.

24        A.    Yes, I see that.

25        Q.    It says "none"; right?
```

```
 1         A.    That's correct.

 2         Q.    You were consulting for all four of the NOAC

 3    manufacturers at the time that you wrote this?

 4         A.    That's correct.

 5         Q.    Why would this not tell the reader that?

 6         A.    Because the purpose of this article was not

 7    to in any way promote the NOACs for use.  It was

 8    critical of the FDA, and I did not have a conflict

 9    relating to the topic of this manuscript, which was

10    criticism of the FDA.  I was using the material in

11    this as examples, but the target of this was the FDA.

12         Q.    Okay.

13         A.    It wasn't the use of any particular drug.

14         Q.    You talk about RE-LY trial in this -- in this

15    article, specifically talk about the RE-LY trial?

16         A.    Yes.

17         Q.    You specifically mention the drug apixaban?

18         A.    I don't remember -- apixaban?

19         Q.    Do you see that?

20         A.    Show me where.  I'd have to re-read it.

21               Yes.

22         Q.    You specifically mention the drug

23    rivaroxaban?

24         A.    Yes.

25         Q.    But you don't tell the readers that you
```

USCA5 4461

Protected - Subject to Further Protective Review

```
 1    consult for the companies who make those drugs?

 2        A.   Because I was not writing anything to support

 3    their use.  I was being critical of the FDA.

 4        Q.   Okay.  And then if you look on the second

 5    column there, it says -- on this page.  You say:  At

 6    least with dabigatran, plasma concentrations

 7    correlate reasonably well with anticoagulant activity

 8    and a potentially useful target range is known.

 9             Right?

10        A.   Right.

11        Q.   That's the 50- to 150-milligram --

12        A.   Right.

13        Q.   -- sweet spot?

14        A.   Yup.

15        Q.   This is the major -- sorry.

16             This is the major role ex-U.S.

17             What does that mean?  I didn't quite

18    understand that.

19        A.   I've got to go back to the rest of the

20    paragraph.

21        Q.   Okay.

22        A.   Let me read it for a minute.

23             Okay.  It refers to the preceding sentence:

24    It would seem prudent to have approved the 110 b.i.d.

25    dose for such occasions.
```

USCA5 4462

Protected - Subject to Further Protective Review

```
 1          Q.    Okay.  And they do that outside of the U.S.?

 2          A.    The 110 is available in most of the world.

 3          Q.    75-milligram, they don't even know what that

 4    is in other parts of the world; correct?

 5          A.    No, they know what it is because they read

 6    about it.

 7          Q.    But they don't have it; right?

 8          A.    That's correct.

 9          Q.    Okay.  Then you say:  If the FDA was

10    concerned about physicians not using the more

11    effective 150-milligram b.i.d. dose in most patients,

12    as was suggested in a report by some review committee

13    members, then a down-titration algorithm as is

14    required for --

15          A.    Dofetilide, that's what Tikosyn is.  Just

16    what I told you a few minutes ago.

17          Q.    -- could have been mandated, in which case,

18    for most patients, the 150 mg b.i.d. dose would be

19    the required starting dose with down titration to the

20    110 mg b.i.d. dose requiring specific parameters to

21    be present.

22          A.    That's correct.

23          Q.    And in this -- in that situation, would you

24    envision using some sort of coagulation testing to

25    determine, yes, you need the 150 or no, you do not --
```

USCA5 4463

Protected - Subject to Further Protective Review

```
 1        A.    Not necessarily in the patients, but perhaps

 2    in the approval of it.

 3              So, for example, if in the RE-LY trial, for

 4    example, all the patients who were taking amiodarone

 5    or verapamil had levels at the higher end of the

 6    range that were seen, as an example, in the setting

 7    of renal dysfunction.  The FDA could use

 8    pharmacokinetic modeling and say, well, what dose

 9    would put them in the middle of the range, exactly

10    the same as they used to approve the 75.

11              That doesn't mean I would use it in patients.

12    With the 75, we don't measure dabigatran

13    concentrations.  We have clinical circumstances under

14    which to use it.  No more, no less.

15        Q.    So if you wrote that in parentheses here at

16    the end of the sentence, you say:  such as renal

17    dysfunction plus concomitant g-pg --

18        A.    Right.

19        Q.    -- inhibitory medications plus elevated

20    plasma dabigatran --

21        A.    That would be for the FDA.  Remember who I'm

22    writing this for.

23        Q.    Okay.  It looked to me like you were writing

24    it for use in patients.

25        A.    No.
```

USCA5 4464

```
1      Q.    Is that not right?

2      A.    No.   I'm writing it for the FDA.

3      Q.    Okay.

4      A.    This article is basically saying to the FDA,

5   I don't think that you have been sufficiently

6   consistent.  I don't think you have given physicians

7   the dosing tools that -- that we could have because

8   most of the world has.  And if you've got doubts

9   about it, here are ways in which you can generate it,

10  just like the down titration for Tikosyn.

11         In fact, the 110 is on the market now.  That

12  is the dose used in orthopedics.  One of my concerns,

13  knowing that that was coming, is that it will not be

14  used off label without guidance.

15     Q.    Is that happening, to your knowledge?

16     A.    I think some physicians are doing it, just as

17  I said before.  Some were using 75 t.i.d. or 75 for

18  150 alternate.  I've written about that as well.  I

19  don't think that's the best way to do it.

20         But this manuscript was written using the FDA

21  as a target, not clinical practice.

22         MR. CHILDERS:  This is what I was looking

23     for.

24         MR. COVEY:  Got it?  Finally.  So that was

25     filler for the last half hour?
```

Protected - Subject to Further Protective Review

```
 1              MR. CHILDERS:  No.

 2              THE WITNESS:  Does he tap dance, too?

 3              MR. CHILDERS:  I have no skills whatsoever.

 4        I'm sorry.

 5              MR. COVEY:  He and I don't -- fortunately or

 6        unfortunately, this is, like, our seventh dance.

 7              THE WITNESS:  Okay.

 8    BY MR. CHILDERS:

 9        Q.   I wanted to ask you some about your

10    Appendix B to your report.  We're going to get to

11    that in just a minute, but this is the part you

12    attached to it and said these are the materials

13    considered; okay?

14        A.   Yes, okay.

15              MR. CHILDERS:  This is going to be

16    Exhibit 11.

17              MR. COVEY:  13.

18              MR. CHILDERS:  13.

19              MR. COVEY:  You're welcome.

20              MR. CHILDERS:  Thanks, Dave.

21              (Plaintiff's Exhibit No. 13 was marked for

22    identification.)

23    BY MR. CHILDERS:

24        Q.   A couple of things I want to ask you about in

25    here.  On page 1, Number 6, the Graham article.
```

USCA5 4466

```
 1      A.   Yes.

 2           MR. CHILDERS:  Okay.  I want to mark that as

 3      Exhibit 14.

 4           THE WITNESS:  Sure.

 5           (Plaintiff's Exhibit No. 14 was marked for

 6      identification.)

 7      BY MR. CHILDERS:

 8      Q.   This is something you considered in your

 9      report; right?

10      A.   One of the ones I listed, yes.

11      Q.   And, in fact, you also listed it not only

12      here but also in that 48 --

13      A.   48 something, something, correct.

14      Q.   -- A through FF?

15      A.   That's correct.

16      Q.   This is a very recent article.  I think it

17      came out in October; right?

18      A.   Yes.

19      Q.   October 3rd, 2016.  And this is written by

20      David Graham, who works for FDA; right?

21      A.   Uh-huh.

22      Q.   And then a bunch of other folks who all work

23      not for industry; right?

24      A.   I don't know all of them.

25      Q.   Have you read this article before?
```

```
 1       A.   I have.

 2       Q.   Did you notice that none of them worked for

 3  any of the companies who make Janssen -- I'm sorry,

 4  that make dabigatran or rivaroxaban?

 5       A.   I did not specifically look at that, no.

 6       Q.   Okay.  All right.  And in this, this was a

 7  retrospective --

 8       A.   Correct.

 9       Q.   -- study where they looked at Medicare

10  patients; right?

11       A.   Correct.

12       Q.   And they tried to match them up using certain

13  characteristics; right?

14       A.   They tried, yes, sir.

15       Q.   They did the best they could; right?

16       A.   Don't know that.

17       Q.   You would assume that if they got published

18  in JAMA, they did the best they could?

19       A.   Don't know that.

20       Q.   Are you -- are you a reviewer for JAMA?

21       A.   Not recently, to my recollection.

22       Q.   Have you ever been?

23       A.   I would have to look at my CV.  It's

24  40 years.  I don't remember.

25       Q.   The CV weighs like a hundred pounds.  Do I
```

```
 1   really have to pick it back up?

 2        A.   I'll look for it.

 3        Q.   I'm joking.

 4        A.   I honestly don't remember.

 5        Q.   All right.  So in this particular

 6   retrospective study, they looked at 52,240 dabigatran

 7   patients and 66,651 rivaroxaban patients; right?

 8        A.   That's what it says.

 9        Q.   And these were patients who were new to

10   treatment; right?

11        A.   I'd have to re-read the paper, but let's see.

12   The abstract in patients who initiated therapy, yes.

13             It doesn't tell me they were necessarily new

14   to treatment.  They could have switched from

15   warfarin.

16        Q.   New to the treatment that they're --

17        A.   Correct.

18        Q.   -- looking at?

19        A.   Correct.

20        Q.   New to dabigatran or new to rivaroxaban?

21        A.   Correct.

22        Q.   Okay.  And in looking at -- and what they

23   were looking for was number of strokes, bleeds, and

24   mortality risks in those patients; correct?

25        A.   Uh-huh.
```

```
 1          Q.   And in doing that, the conclusions they came

 2     to were that treatment with rivaroxaban,

 3     20 milligrams once daily was associated with

 4     statistically significant increases in intracranial

 5     hemorrhage and major extracranial bleeding, including

 6     major gastrointestinal bleeding, compared with

 7     dabigatran 150 milligrams twice daily; right?

 8          A.   That's what it says.

 9          Q.   And when you reviewed this article, did you

10     look at the whole thing?

11          A.   I've read the whole thing several times.

12          Q.   Okay.  And if you look to the second page,

13     there's a place called Key Points; it's a little box

14     up at the top?

15          A.   Yes.

16          Q.   And it says:  Question, How does rivaroxaban

17     compare with dabigatran for stroke, bleeding, and

18     mortality risks in patients with atrial fibrillation?

19          And the findings, they wrote were:  In a

20     new-user cohort study of 118,891 patients,

21     rivaroxaban treatment was associated with

22     significantly increased intracranial hemorrhage and

23     major extracranial bleeding, including major

24     gastrointestinal bleeding, and nonsignificantly

25     reduced risk of thromboembolic stroke and increased
```

```
 1    risk of mortality.  The absolute increase in

 2    intracranial hemorrhage with rivaroxaban treatment

 3    exceeds its reduced rate of thromboembolic stroke.

 4         Right?

 5    A.   That's what it says there.

 6    Q.   Does it say something else somewhere else?

 7    A.   Yes.

 8    Q.   Okay.  Tell me where.

 9    A.   The study was observational and may be

10    subject to residual confounding by unmeasured

11    factors.  This could lead to biased estimate of risk.

12    Q.   Right.

13    A.   And I said to you before, bias is a

14    significant issue.  If the rivaroxaban patients got

15    Xarelto because they were sicker patients, not -- not

16    simply by virtue of the concomitant disorders but by

17    their severity of disorders, which their propensity

18    matching doesn't adjust for.  And you would expect

19    higher event rates.

20    Q.   And when you say that, you mean they may have

21    both had diabetes but one had worse diabetes than the

22    other?

23    A.   That's correct.

24    Q.   And that could have been for the dabigatran

25    patients could have had worse diabetes; right?
```

Protected - Subject to Further Protective Review

```
 1      A.   It could have been either way.

 2      Q.   Right.

 3      A.   I don't know.

 4      Q.   Right.

 5      A.   That's why I said earlier, I do not put an

 6   awful lot of faith in single papers.  That's why I

 7   reviewed as many papers as I did.

 8      Q.   Sure.

 9      A.   You've just picked out one of a whole batch.

10      Q.   Well, we're not done.

11      A.   Okay.  Good.

12      Q.   If you look to the page -- it's number E7 on

13   the bottom.

14      A.   Oh, I opened it right up.

15      Q.   This paragraph.  And I'm sorry I didn't

16   highlight this one for you.

17      A.   That's okay.

18      Q.   It says:  Our findings suggest that

19   standard-dose rivaroxaban produced a greater

20   anticoagulant effect than standard-dose dabigatran.

21           Right?

22      A.   That's what it says.

23      Q.   That's all I'm asking you.  Isn't that what

24   it says?

25      A.   That is what it says.
```

USCA5 4472

```
1        Q.    And then it says:  While plasma half-lives of

2   dabigatran and rivaroxaban are approximately

3   12 hours, dabigatran is dosed twice daily and

4   rivaroxaban only once daily.

5              And that's true; correct?

6        A.    That's true.

7        Q.    Once-daily dosing of rivaroxaban would be

8   expected to achieve higher peak and lower trough

9   serum concentrations than twice-daily administration

10  of the same total daily dose.

11             Do you see that?

12       A.    Yeah.  That's true.

13       Q.    And then it goes on to say:  Reduction of the

14  once-daily dose or adoption of a twice-daily regimen

15  right reduce the excess bleeding and subgroup

16  mortal -- mortality risk that we observed.

17             Do you see that?

18       A.    I do see it.

19       Q.    Does that make sense?

20       A.    I don't believe it.

21       Q.    Does it make sense?

22       A.    No.

23       Q.    That doesn't make sense at all?

24       A.    No.

25       Q.    Okay.  Why not?
```

Protected - Subject to Further Protective Review

```
 1       A.   Because as far as we know and so far as
 2   they've been tested with dabigatran and edoxaban, the
 3   trough values relate to bleeding.  And the b.i.d.
 4   dose with higher trough may, in fact, yield increased
 5   bleeding.
 6       Q.   Okay.
 7       A.   Okay?  So just because it's written doesn't
 8   make it true.
 9       Q.   I didn't ask you if it was true.  I just
10   asked you if it made sense.  And you're telling me it
11   doesn't make sense?
12       A.   I'm telling you, to me, it doesn't make
13   sense.  It would have -- it would require a clinical
14   trial to prove it or disprove it.  I have concerns
15   that it's not true.
16       Q.   Any of the NOACs been compared head-to-head?
17       A.   No.
18       Q.   Why not?
19       A.   Why not?  Because the NIH hasn't done the
20   study.
21       Q.   Why hasn't Janssen done the study?
22       A.   Can't afford to.
23       Q.   Do you know how much money Janssen makes?
24       A.   I have no idea how much money they make.
25       Q.   Plenty.
```

USCA5 4474

```
1        A.    There's no way.  Do you know how big and how

2    long a trial that would have to be?

3        Q.    I don't.  How long and big would it have to

4    be?

5        A.    Well, if you look at the comparisons to

6    warfarin and you've drugs where event rates are less,

7    it would probably be in the hundreds of thousands of

8    patients over five years.  One of the limitations

9    here, which they say, is it's only four months.

10   That's not going to get you what you want.  I don't

11   think any single company could afford to do the

12   trial.  It's not just Janssen.  None of them are

13   doing it.

14       Q.    Right.

15             The second page of your materials considered,

16   you list some depositions you reviewed.

17       A.    Yes.

18       Q.    I saw -- I thought I saw some reference to

19   one or two of these in your report.  Did you -- if

20   they weren't referenced in your report specifically,

21   did you utilize them for anything else?

22       A.    No.

23       Q.    Okay.  And then you've got a section called

24   expert reports, and you have six.  Those are

25   plaintiff experts; right?
```

```
1        A.   As of the time I did the report, yes, sir.

2        Q.   Have you looked at more of them since?

3        A.   I looked at one recently.

4        Q.   Do you remember --

5        A.   Cuculich maybe.

6        Q.   Cuculich?

7        A.   Yeah.  I don't know how he pronounces it.

8        Q.   I think it's Cuculich.

9             MR. COVEY:  Yeah.  That's the way I

10        pronounced it when I questioned him and he didn't

11        correct me, and he would have if I was wrong.

12   BY MR. CHILDERS:

13        Q.   Okay.  So in addition to these six, you think

14   you looked at Cuculich's report, as well?

15        A.   Yes.

16        Q.   Okay.  In looking at those reports, did you

17   make any notes on I agree or I disagree, this or

18   that?

19        A.   Did I make any notes?  You mean in the

20   report?

21        Q.   I don't know.  Wherever you might have said,

22   hey, I need to make a note that I disagree with this

23   or I agree with this thing that this other expert

24   said.

25        A.   At the time, the ones I read online, no.  The
```

Protected -- Subject to Further Protective Review

1    ones I read in paper, minimal.  I don't make a habit

2    of making notes --

3        Q.   Okay.

4        A.   -- on the reports.

5        Q.   Do you remember anything specifically?

6        A.   I remember using them in terms of concepts in

7    generating my report.  I wasn't asked to critique and

8    return them, so to speak.

9        Q.   Okay.  Do you recall anything that you agreed

10   with in any of those reports?

11       A.   I recall believing that many of them had

12   substantial biases or limitations.

13       Q.   Many of the reports did?

14       A.   Yes.

15       Q.   As opposed to your report with no biases or

16   limitations?

17       A.   Yes.

18       Q.   Okay.  And anything -- my question:  Is there

19   anything you remember agreeing with in the reports?

20       A.   I'd have to look at the individual reports to

21   answer the question.

22       Q.   Understood.

23       A.   I'm sure there were lots of things I agreed

24   with in -- in the reports.

25       Q.   But nothing that you, sitting here today

Protected - Subject to Further Protective Review

```
1    without looking at them, remember?

2        A.   If I agreed with something, it wouldn't

3    register as a concern.  I remember more the things I

4    disagreed with or questioned.

5        Q.   Okay.  Why don't you tell me what you

6    remember disagreeing with.

7        A.   Well, for example, as I remember Dr. Kessler

8    says you can use the ProTimes in clinical -- one of

9    his two or three pages of summary.  And you've

10   already heard me say I disagree with that.

11       Q.   I didn't understand what you just said there.

12       A.   That you can use ProTimes --

13       Q.   Oh, ProTimes.

14       A.   -- for clinical practice and they should be

15   monitored during care.

16            I remember in Cuculich, I was absolutely

17   astonished by the number of mistakes in the report

18   and distortions.  He has the graph of the strokes

19   coming down and the bleeds going up, and he said it

20   was adapted from the 2006 ACC/AHA and ESC reference.

21   I went back to that reference, and, in fact, his

22   graph is not the graph that's in there.  The curves

23   are distorted.  I said to myself, how can somebody do

24   that?  Those are the kinds of things that stuck in my

25   mind.
```

USCA5 4478

Protected - Subject to Further Protective Review

```
 1        Q.    Okay.  Anything else that sticks in your

 2   mind?

 3        A.    Off the top of my head, no.  A lot of it was

 4   sort of confirmatory of the discussions that the FDA

 5   advisory committee reports.

 6        Q.    But you confirmed that that's what was in the

 7   reports?

 8        A.    I went back -- yeah, I read those reports.

 9        Q.    Right.

10              And when you looked at the expert reports and

11   when they cited the advisory committee, did you find

12   them to be correct or --

13        A.    Yes.

14        Q.    Okay.

15        A.    And one of -- one of the others was, you

16   know, Bob Calif, who presented the ROCKET data, was

17   this is the correct data, da da da da da da, and, you

18   know, then it changes to another position.  Now he's

19   with the FDA.  I didn't go back and compare

20   statements at different points in time, but I made

21   notes that he was in different circumstances at

22   different times.

23              If you were to ask me about his comments

24   what-have you at different times, it would ring a

25   bell to say, oh, take it in context.
```

Protected - Subject to Further Protective Review

```
1      Q.   Okay.

2           THE VIDEOGRAPHER:  We're going to need to

3      change again.

4           MR. CHILDERS:  Sure.

5           MR. COVEY:  We need to change.  We'll take

6      five minutes?

7           THE VIDEOGRAPHER:  Off the record at

8      2:02 p.m.

9           (Recess from 2:02 until 2:16 p.m.)

10          THE VIDEOGRAPHER:  We're now back on the

11     record at 2:16.

12  BY MR. CHILDERS:

13     Q.   We were looking at your materials

14  considered -- if I can find it -- and I wanted to ask

15  you, because this is different from the materials

16  that are cited in -- some of it's the same, but some

17  of it's different from what's cited in your report.

18          Were these materials that were provided to

19  you or that you found on your own or some

20  combination?

21     A.   A combination.

22     Q.   Do you know -- are you able to tell me which

23  ones you found on your own?

24     A.   No, because some may have been both.

25     Q.   Okay.
```

```
 1        A.    Like Greg Lipstone and Graham, I knew about.

 2        Q.    Okay.  You knew about or you think you had in

 3   the file?

 4        A.    No, I'd -- I'd looked through them.  I'd seen

 5   them.

 6        Q.    Okay.

 7        A.    I wouldn't necessarily have them in a paper

 8   file.

 9              And one of the advantages of the university

10   is I can go on MEDLINE anytime I want and pull this

11   stuff up, much as you guys can with legal documents.

12   So I don't necessarily keep them.  Just -- you know,

13   paper takes room.

14        Q.    I know.

15              All right.  I assume --

16        A.    It's a mixture.

17        Q.    I assume you were given the deposition and

18   the expert reports?

19        A.    The ones that are listed, yes.

20        Q.    Yes.

21              And then on their other documents considered,

22   were those -- if they have a website address, does

23   that mean you went and found them?

24        A.    The FDA's?  No.  They were provided.

25        Q.    Okay.  And the e-mails and the internal
```

Protected - Subject to Further Protective Review

```
 1    documents, I assume those were provided?

 2         A.    Provided.

 3         Q.    Okay.  Is everything on that -- in that

 4    section stuff that was provided to you, the other

 5    documents considered?

 6         A.    Yes.

 7         Q.    Okay.

 8              (Plaintiff's Exhibit No. 15 was marked for

 9    identification.)

10    BY MR. CHILDERS:

11         Q.    This is Exhibit 15.

12         A.    That looks thicker than my CV.

13         Q.    That's because it's got your CV in it.  This

14    is the report.

15              MR. CHILDERS:  I don't have any other copies.

16              MR. COVEY:  Is that 15 or 14?

17              MR. PHILLIPS:  Graham was 14.

18              MR. CHILDERS:  Graham was 14.

19              MR. COVEY:  That's correct.  Thank you very

20         much.

21              MR. CHILDERS:  I'm pretty certain David has a

22         copy.

23              MR. COVEY:  I do.

24              MR. CHILDERS:  I'm hoping Susan has a copy.

25              MR. COVEY:  I don't want a copy.
```

```
 1    BY MR. CHILDERS:

 2        Q.   This is the entirety of the report, so is

 3    going to -- this also includes your CV and includes

 4    your materials considered; okay?

 5        A.   Sure.

 6        Q.   That copy is for the record.  I don't know if

 7    you have a copy that you prefer to use when we -- the

 8    last deposition I did, the witness had her own copy

 9    that she wanted to use.

10        A.   I brought nothing with me.

11        Q.   Okay.

12        A.   I figured whatever you wanted me to see,

13    you'd have.

14        Q.   Sometimes that's a good assumption; sometimes

15    not.

16             All right.  So this is the report that you

17    wrote for the Xarelto MDL litigation; correct?

18        A.   Correct.

19        Q.   It's dated 11/15/2016; right?

20        A.   Yes.

21        Q.   Okay.  I think you told me you were first

22    contacted in the summer of 2016?

23        A.   Late summer sometime, yeah.

24        Q.   And then do you remember when you started

25    working on this report, like actually putting it
```

USCA5 4483

Protected - Subject to Further Protective Review

```
 1    together?

 2        A.    It would have to be October sometime.

 3        Q.    Okay.  All right.

 4        A.    This was too long for me just to sit and

 5    write it in one bite.

 6        Q.    It's too long for me to sit down and read in

 7    one bite.

 8        A.    I'm sure, so . . .

 9        Q.    Okay.  I want -- I'm not going to go through

10    this page-by-page with you.  I'm going to ask you

11    about certain parts of it; okay?

12        A.    Sure.  Of course.

13        Q.    Let's start with Page 24.

14        A.    24?

15        Q.    Yes, sir.

16        A.    24.  Okay.

17        Q.    And would you agree with me on Page 24 at the

18    top, you're talking about time and therapeutic range

19    for patients on warfarin?

20        A.    Let me just read it for a second.

21        Q.    Sure.

22        A.    Yes.

23        Q.    And you state the average time that the INR

24    remains in the target therapy range of 2.0 to 3.0,

25    which we call TTR, in a typical patient in
```

USCA5 4484

Protected - Subject to Further Protective Review

1    community-based practices has varied markedly across

2    patients in practices in clinical reports, such as

3    around -- from around 25 percent to 65 percent, with

4    an average somewhere in the 50 percent range, even in

5    the current era.

6         Right?

7    A.   Right.

8    Q.   When you say "community-based practices," you

9    are -- are you excluding Coumadin clinic patients?

10   A.   I'm excluding academic medical centers.  I'm

11   excluding, as a rule, you know, tightly-controlled

12   clinical trials.  Some of them have Coumadin clinics.

13   Some practices are large enough to do it; some don't.

14   Q.   Okay.  So --

15   A.   For example, if I remember this last

16   reference, 24A, which I think is an ORBIT

17   reference --

18   Q.   I think Pokorney is the author.

19   A.   Yes.  It's an ORBIT reference, and it's

20   Sean Pokorney.  The ORBIT registry used practices all

21   across the country:  Some were big, some were small,

22   some had Coumadin clinics; some didn't.

23   Q.   And they had -- they found different results

24   in patients who were going to anticoagulation clinics

25   or Coumadin clinics versus patients who were in

Protected - Subject to Further Protective Review

```
 1    community clinics; right?

 2         A.   I don't remember that specifically in the

 3    paper, but that's often but, not always, the case.

 4    There are some -- there are some clinical practices

 5    where the -- the anticoagulation run by single docs

 6    or a couple of docs just as good as any Coumadin

 7    clinic.

 8         Q.   Do you recall in Pokorney that the study

 9    actually said the median TTR was 68 percent?  Do you

10    recall that?

11         A.   No.

12         Q.   If it says that, would your statement in this

13    report be incorrect?

14         A.   I don't remember it being that.

15         Q.   I'm not asking that.  I'm saying if the

16    article, the Pokorney article, actually says that the

17    median time of therapeutic range that they found was

18    68 percent, would you agree with me that this

19    information that you have in your report is

20    incorrect?

21         A.   I need to see the article in context, because

22    I don't know whether that statement came out of in a

23    particular subgroup.  My recollection, it was in the

24    50s.

25         Q.   And if your recollection is wrong and it was
```

USCA5 4486

Protected - Subject to Further Protective Review

1   in the 60s, then that part of your report is

2   incorrect; right?

3       A.   Only from that single reference.

4       Q.   Okay.  How about the reference prior to that,

5   24, which is a Baker case called "Meta-Analysis to

6   Assess the Quality of Warfarin Control in Atrial

7   Fibrillation Patients in the United States."  Do you

8   recall --

9       A.   Those numbers came from that paper.

10      Q.   In that paper, do you also recall that they

11  found patients who were at anticoagulation clinics,

12  that their time of therapeutic range was 63 percent,

13  not 50 percent?

14      A.   I don't remember specifically where the

15  65 percent end of that reference came from.

16      Q.   Okay.

17      A.   But I know if you look at publication, after

18  publication, after publication, after publication in

19  clinical practice, the averages are in the 50s, at

20  best.

21      Q.   But in the two that you've cited here, we --

22  we need to look to them to find out what they say;

23  right?

24      A.   Correct -- correct.

25      Q.   And if they say something different than what

Protected - Subject to Further Protective Review

```
 1    is --

 2         A.   I don't think they will.

 3         Q.   But if they did, then your report would be

 4    inaccurate; right?

 5         A.   I don't think they did.

 6         Q.   I understand that.

 7              If they say -- if Pokorney, for instance,

 8    says the median TTR was 68 percent, that's high?

 9         A.   Then I would not have used the reference or

10    written it this way.

11         Q.   Okay.  And if you did, and what I'm saying is

12    correct, then that would have been a mistake in your

13    report?

14         A.   I would be surprised.

15         Q.   Surprised about making that mistake; right?

16         A.   I would be surprised if it says that, and I

17    wrote the report this way.

18         Q.   Okay.  All right.  I'm asking about Page 43.

19         A.   43, sure.

20         Q.   We're talking about blood test guidance for

21    Xarelto dosing.

22         A.   Uh-huh.

23         Q.   And we've talked about that some already

24    today.

25         A.   We have.
```

USCA5 4488

```
1        Q.   And then the second full sentence you wrote:

2   It is a reasonable question to ask theoretically, but

3   it cannot be presumed to be factually true without a

4   prospective blinded trial to test it.

5             Right?

6        A.   Right.

7        Q.   So you agree that's a reasonable question for

8   a clinician to ask?

9        A.   It's a reasonable question for anybody to

10  ask.

11       Q.   And at this point, to your knowledge, Janssen

12  hasn't undertaken any study to try to answer that

13  question; right?

14       A.   To my knowledge, no, that hasn't been

15  studied, not only by Janssen but by any of the NOAC

16  manufacturers.

17       Q.   Well, this is specific to Xarelto, the

18  question -- this part of your report.

19       A.   That -- that's -- that's correct.  But I

20  would remind you that even without it, ROCKET shows

21  Xarelto to be at least as good as warfarin, and in

22  some respects, better.  So there hasn't been

23  necessarily the incentive.

24       Q.   On the part of the company?

25       A.   Or the FDA to suggest it.
```

Protected - Subject to Further Protective Review

```
1        Q.    The FDA can't do any of its own studies;

2   right?

3        A.    No.  But it can suggest it.

4        Q.    Okay.  Further down, two sentences down, you

5   wrote:  Similar -- similarly, none of the NOAC trials

6   had any analyses planned to assess the relationship

7   of either efficacy or safety outcomes to the PK

8   curves of the drugs studied.

9              Correct?

10       A.    Correct.

11       Q.    Just decided that that was not going to be

12  part of the studies; right?

13       A.    Correct.

14       Q.    Accordingly, we have not proven, for example,

15  if stroke reduction or bleeding is related to the

16  peak level achieved with a dose, the trough level

17  achieved with a dose, or the mean concentration

18  present during a dosing interval during these NOAC

19  trials, other than perhaps bleeding risk and trough

20  levels with dabigatran.

21             Right?

22       A.    That's correct.  And I said earlier,

23  subsequent to this report, I became aware that the

24  same is true with edoxaban.

25       Q.    Okay.  And in the edoxaban trial, is it true
```

USCA5 4490

Protected - Subject to Further Protective Review

```
 1    that they also collected more of the PK data -- PK

 2    and PD data than was collected in the ROCKET trial

 3    for individual patients?

 4         A.   I believe that's true.

 5         Q.   Okay.  And is it fair for me to say that the

 6    edoxaban trial and the dabigatran trials for AF, they

 7    actually collected data that allows us to look at

 8    this issue, whereas that kind of data wasn't

 9    collected sufficient -- in sufficient enough numbers

10    in Xarelto or Eliquis trials to do the same?

11         A.   It's not just in those trials.  You know,

12    this kind of data comes about when you pool all the

13    studies done with particular drugs.

14         Q.   Okay.  I gotcha.

15              So was PK/PD data collected in the RECORD

16    trials that would allow us to make these kinds of --

17         A.   I don't know what was collected in the RECORD

18    trials.  I was not part of that trial.

19         Q.   Okay.  Have you looked at the data?

20         A.   I've not looked at details.  I've looked at

21    the RECORD trial superficially but not in the same

22    level of detail.

23         Q.   Okay.  When you say other than perhaps

24    bleeding risk in trough levels with dabigatran, is

25    that the information we were talking about with the
```

USCA5 4491

Protected - Subject to Further Protective Review

1    sweet spot earlier?

2        A.   It's to look at whether the outcomes, be it

3    stroke or bleeds, correlate best with peak, with

4    median, with trough, with area under the curve with

5    any of those parameters.

6        Q.   Okay.

7        A.   I don't know any data that shows that strokes

8    only occur with a level below X or that bleeds only

9    occur with a level above Y.

10        Q.   Tell me what you mean other than, perhaps,

11    bleeding risk and trough levels with dabigatran then.

12        A.   You saw in the Reilly paper earlier, we

13    specifically plotted bleeding and trough levels, and

14    there's -- there's another piece of data with

15    dabigatran, the same thing, and more recently there's

16    a piece of data with edoxaban, that bleeding

17    correlated better with trough levels than with peak

18    levels or mean levels throughout the dosing.  And

19    there are reasons that -- that will explain that.

20        Q.   Okay.  That's what you meant by that

21    statement?

22        A.   Yes.

23        Q.   And so do we need -- would it be more

24    complete if you added that same information for

25    edoxaban?

```
1        A.    If I wrote the report today, I would add that

2    to the end of the sentence, yes, sir.

3        Q.    Okay.  How recently has that edoxaban

4    information become available?

5        A.    It's -- I don't remember how recently it

6    became available.  It's when I came across it.

7        Q.    Fair enough.  When -- when did you find it?

8        A.    Within the last month.

9        Q.    Okay.  Page 51.

10       A.    It's like fast-forwarding through a recorded

11   program on TV.  This is good.

12             MR. COVEY:  It's just the highlights.

13             THE WITNESS:  Yes.

14   BY MR. CHILDERS:

15       Q.    You're talking about additional clinical

16   trials and postmarket data.

17       A.    Yes.

18       Q.    And what you say is that:  There is

19   substantial and growing data from other clinical

20   trials as well as "real-world" post-market experience

21   with Xarelto in both AF and VTE populations that is

22   highly consistent with and supportive of the Xarelto

23   data from ROCKET AF.

24             Correct?

25       A.    Right.
```

Protected - Subject to Further Protective Review

```
 1       Q.    And at the end, you cite some sources;

 2   correct?

 3       A.    Right.

 4       Q.    I'm going to ask you about one of those,

 5   which is 48b.

 6             We're getting into the 48 now.

 7       A.    You can tell I was -- you've gotten to the

 8   number, I wasn't going to go back and reorder the

 9   list of references and make some mistakes.  It was

10   easier just to do it this way.

11             MR. COVEY:  48, single B?

12             THE WITNESS:  Yes.

13   BY MR. CHILDERS:

14       Q.    That particular author, I can't tell if it's

15   the same person or a different person.  It seems like

16   the same article's referenced with the X-I-U-O-X-I

17   name and also a Y-I-O, I think, name or Y-O.  Do you

18   know if that's the same person?

19       A.    No.

20       Q.    Okay.

21       A.    Y is his first name.

22       Q.    Yao X or Xiuoxi Y?

23       A.    I don't know how he pronounces it, but Y is

24   his first name.

25       Q.    Okay.  So when he see him in 48r -- because
```

```
 1    that's the same article -- it says Yao instead of the

 2    X.  Yao is his first name?

 3        A.   Okay.  That's just my mistake.  I didn't

 4    realize I did it twice.  Yeah, same guy.

 5        Q.   I think the difference is one of them was the

 6    online and one of them was the actual print.  That's

 7    how I took it.

 8        A.   They're both the same.

 9        Q.   Okay.

10        A.   Because the reference is E, which is going to

11    be online.

12        Q.   Okay.

13        A.   I just duplicated the reference.

14        Q.   Okay.  No problem.  Same guy?

15        A.   Yeah.

16        Q.   In that article, isn't it true that they

17    found that dabigatran and apixaban had lower risk of

18    bleeding compared to warfarin but Xarelto had the

19    same risk of bleeding as compared to warfarin?  Do

20    you recall that?

21        A.   You'd have to pull the article out.  That

22    sounds familiar and has the same bias issue as the

23    Graham issue.  They were not randomized patients

24    upfront, so I don't know what to do with the data.

25             I use it here as another piece of evidence.
```

Protected - Subject to Further Protective Review

```
 1    There's not a single reference that I could find

 2    where rivaroxaban was compared to warfarin, whether

 3    it was a clinical trial, whether it was a

 4    post-marketing observation, where warfarin had less

 5    bleeding than Xarelto.  Not one.

 6        Q.   Gotcha.

 7             But my question relates to -- this article

 8    didn't just look at Xarelto --

 9        A.   That's correct.

10        Q.   -- it looked at dabigatran and apixaban --

11        A.   Again, with the selection bias of which

12    patients got which drug.

13        Q.   Right.  And --

14        A.   You know, again, if you give apixaban to

15    people where there's been bleeding before because

16    it's -- a clinical trial is known to have less

17    bleeding and you get less bleeding, no surprise; it

18    supports the clinical trial.

19        Q.   And that's, in fact, what they found in this

20    particular article; correct?

21        A.   But no surprise.

22        Q.   Didn't ask you if it was a surprise.  That's

23    what they found; right?

24        A.   If you pull the article out for my reference.

25    To my recollection, yes, but --
```

```
 1        Q.   Okay.

 2        A.   -- out of context, I'm always going to leave

 3   a little hesitancy.

 4        Q.   Well, I'm asking -- I didn't bring them with

 5   me.

 6        A.   I understand.

 7        Q.   Because you've cited them, and so I wanted to

 8   ask you.

 9        A.   And I haven't read them in over a month.

10        Q.   No problem.

11             If that's what it says, that doesn't surprise

12   you; right?

13        A.   No, no.

14        Q.   In fact, a lot of the studies that you cited

15   say that same thing; don't they?

16        A.   A lot of the studies are similar with the

17   similar biases, but not all of them say the same

18   thing.

19        Q.   A lot of them said that the risk of bleed on

20   Xarelto, as compared to warfarin, was more than the

21   risk of bleed on apixaban or dabigatran as compared

22   to warfarin?

23        A.   That may be.  And it's the same selection

24   issue.  None of them said the risk of bleeding in

25   riva was more than warfarin.
```

Protected - Subject to Further Protective Review

```
 1        Q.   Do you recall one that said the risk of bleed
 2   was higher in rivaroxaban patients compared to
 3   warfarin if the patients were over the age of 75?
 4        A.   I'd have to look at that one in particular.
 5        Q.   Okay.  And I'll cite you to Abraham.  It's
 6   48 in your study -- I mean, in your report, excuse
 7   me.
 8             Compared the risk of gastrointestinal
 9   bleeding --
10        A.   Okay.  So that's GI bleeding.
11        Q.   Uh-huh.  Do you recall in that article they
12   found that if the patient was over 75, the risk of
13   bleed compared to warfarin was higher in the NOAC
14   patients?
15        A.   Just as it has been with dabigatran in the
16   clinical trials, and this is a subgroup of a
17   subgroup.
18        Q.   But that -- do you recall that they said
19   that?
20        A.   I don't honestly recall, but --
21        Q.   Okay.
22        A.   -- I'm not going to argue with you about it.
23        Q.   Okay.  And would that also be a not
24   surprising result?
25        A.   Since we know in clinical trials it occurred
```

USCA5 4498

Protected - Subject to Further Protective Review

```
 1    with dabigatran, it wouldn't be a total surprise.

 2         Q.   But what about with --

 3         A.   But I wouldn't take it out of context.

 4         Q.   And the context being what?

 5         A.   A subgroup of a subgroup.

 6         Q.   That's what --

 7         A.   In a non-prospectively randomized trial.

 8         Q.   Sure.

 9              Patients over the age of 75 are more likely

10    to have atrial fibrillation than patients under the

11    age of 75; right?

12         A.   They're more likely to have a lot of things,

13    and there are physicians -- for example, if you look

14    at anticoagulation trials with warfarin, the absence

15    of use or underdosing is greater in patients as they

16    get over the age of 70.

17              So if I'm looking at a trial and I'm trying

18    to make a comparison and I'm reluctant to give

19    warfarin or full-dose warfarin or an INR of the

20    2.5 rather than 2.0 to 2.5 range and I'm comparing it

21    to full-dose rivaroxaban, I'm going to bias it

22    against rivaroxaban.

23         Q.   For giving them a lower dose of warfarin?

24         A.   I'm going to see more bleeds with

25    rivaroxaban.  If I'm selecting my patients so that,
```

USCA5 4499

Protected - Subject to Further Protective Review

```
 1   okay, over 75, that's a cut point.  What about over

 2   80 or 85?  What if the riva average age was 82 and

 3   the warfarin average age was 76?  75 encompasses all

 4   of them.

 5          But I'm not as apt -- as apt to select

 6   warfarin in the older of those.  So if I look at the

 7   data this way, it -- you're going to see more bleeds

 8   on rivaroxaban.

 9          That's the problem with these kinds of

10   trials.  Unless you're prospectively randomized

11   subgroup powered to look at them, don't

12   over-interpret them.

13   Q.   So why do you have 50 of them cited in your

14   report?

15   A.   Because when I put all of them together -- I

16   made the comment before.  You can get similar

17   messages.  When you look at all of them put together,

18   one after, another after, another and say is there

19   any signal across all of these that rivaroxaban

20   causes more bleeding than warfarin, the answer is no.

21          So they're supportive of ROCKET, of J-ROCKET,

22   of XANTUS, of EINSTEIN, of -- same direction.

23   Q.   And if they also gave you a signal that there

24   was less bleeding on patients taking apixaban or

25   dabigatran than on patients taking warfarin, that's
```

Protected - Subject to Further Protective Review

1    not a signal that you would follow?

2        A.   It's a signal if the patients were the same,

3    and my bias is, knowing from what I know from my

4    experience in clinical practice, that physicians have

5    been giving riva to the sicker patients, I can't

6    interpret the data the same way.

7        Q.   Okay.  Tell me how you have come to that

8    conclusion that, from your experience, physicians --

9    and I assume you mean across the country -- are

10   giving riva to sicker patients than they are giving

11   apixaban or dabigatran.

12       A.   Because when we do educational symposium,

13   we'll often either, one, have a Q and A session

14   afterwards or we'll use an audience -- audience

15   response system and we'll ask questions, the latter

16   not being in promotional programs but being in CME

17   programs.

18            And we'll say, here's a patient; here's a

19   patient; here's a patient.  Here are their

20   characteristics.  Would you give all the NOACs to

21   each of these, or would you preferentially pick one

22   or the other?  And if they preferentially pick one or

23   the other, the next question is why?  Was it based on

24   clinical trials, was it based on your experience, was

25   it based on cost?  And you build up a picture, and

Protected - Subject to Further Protective Review

```
1    I've done that in many programs.

2         Q.   How many?

3         A.   Dozens.

4         Q.   How many physicians were there and gave you

5    answers to let you come up with this --

6         A.   Anywhere from 30 to several hundred.

7         Q.   Have you kept any sort of record of those

8    answers?

9         A.   No.

10        Q.   How do we test that theory?

11        A.   You put together a panel of several hundred

12   physicians and you ask the question.

13        Q.   And if I did that, you're telling me that

14   they would say, the sickest patients, they give

15   Xarelto to, but the --

16        A.   You --

17        Q.   -- other --

18        A.   You --

19        Q.   -- patients, they give --

20        A.   You --

21        Q.   -- apixaban, dabigatran -- hang on -- or

22   edoxaban?

23        A.   You would see that trend, yes.

24        Q.   Okay.  Is there any report that you've seen

25   published anywhere that gives that information?
```

USCA5 4502

```
1        A.   No.  But I haven't looked for it.

2        Q.   And you haven't practiced in a clinical

3    practice in how long?

4        A.   Three years.

5        Q.   Okay.

6        A.   But I've taught throughout this period of

7    time.

8        Q.   And you've taught -- and where have you

9    taught your CMEs?

10       A.   Where have I taught them?

11       Q.   Yes.

12       A.   It's in this CV.  At almost every major

13   center around the country.

14       Q.   Okay.

15       A.   The last one being Westchester Medical Center

16   in October of this year.  I'm doing one at the Heart

17   Rhythm Society coming up in May.  I do them regularly

18   at Columbia.

19       Q.   And you're telling us that in each of those,

20   you put up this slide to say here are the

21   characteristics, which NOAC --

22       A.   I didn't say I've done it in each of them.  I

23   said when I have done it.

24       Q.   Okay.  How many times have you done that?

25       A.   Dozens.
```

Protected - Subject to Further Protective Review

```
 1        Q.    Okay.  And --

 2        A.    Through the years.

 3        Q.    Well, then, NOACs -- the four NOACs have

 4   altogether been on the market for, what, a year, year

 5   and a half?

 6        A.    Correct.  So some of them have been for two

 7   or three.

 8        Q.    And so the patients who were started on

 9   Pradaxa, didn't matter how sick they were; right?

10   Either they got it or they didn't get it?

11        A.    When it was the only one out there, correct.

12        Q.    And when Xarelto came out, did you switch

13   your sickest patients over to Xarelto from Pradaxa?

14        A.    Me, personally?

15        Q.    Yes.

16        A.    I go by the clinical -- I told you before how

17   I make a selection.  One is by did they match the

18   clinical trial criteria?  Two is did I think they'll

19   tolerate the Pradaxa versus Xarelto?  Is there a GI

20   issue?  Three, what's their renal function?  Four,

21   what are the other drugs that they're on?  But all

22   things being equal, we allocate it to the sicker

23   patients because that's where we have the most

24   experience.

25        Q.    The sicker patients who were already on
```

```
1    Pradaxa, did you switch them to Xarelto when Xarelto
2    came out?
3        A.   Don't remember having that discussion with
4    most of them, but with some of them, yes, the same
5    thing as I do with warfarin.  I've had patients who
6    have been on warfarin, and I said, we've got some new
7    choices.  Here are the pros and cons.  You help
8    decide.
9        Q.   Do you do that with all of your
10   anticoagulation -- oral anticoagulant patients
11   whenever a new NOAC comes out, let's do a new
12   assessment, see if this one is better?
13       A.   If there is a significant difference between
14   them.  So that I -- did I do it with Savaysa when
15   Savaysa came out?  No, I didn't.
16       Q.   How about with Eliquis?
17       A.   When Eliquis came out, yes.
18       Q.   Okay.
19       A.   Because I said, Eliquis in its clinical
20   trial -- and this was mainly to the dabigatran
21   patients -- had less bleeding.  Now, you're doing
22   fine, you've had no bleeding, do you want to switch?
23   Same twice a day.  Some patients said yes; some
24   patients said no.
25       Q.   Did you switch any Xarelto patients to
```

Protected - Subject to Further Protective Review

```
 1    Eliquis?

 2         A.    Don't remember.

 3         Q.    Okay.  All right.  So Page 60, I think, is

 4    where you've -- before Page 60 you went over in

 5    detail some of the studies, and then on Page 60, you

 6    said:  Beyond the above, there are still more

 7    additional retrospective database analyses,

 8    meta-analyses, and the like that have attempted to

 9    further assess either rivaroxaban vs warfarin or NOAC

10    vs warfarin or NOAC vs NOAC efficacy and/or safety.

11         Right?

12         A.    Right.

13         Q.    And that's 48h through 48ff?

14         A.    Right.

15         Q.    Okay.  And then you talk about Peacock a

16    little bit about that.

17         A.    Right.

18         Q.    Right?

19         And that's one of the ones that's included,

20    ff?

21         A.    Right.

22         Q.    Can you tell me, other than timing of when it

23    came out, why you didn't talk about the Graham study

24    in this -- in any specificity?

25         A.    I -- I specifically listed Peacock being both
```

USCA5 4506

```
 1    recent and very large.  There were ten million

 2    electronic medical records.

 3        Q.    Okay.

 4        A.    And somebody who I know is a clinician, those

 5    are the big reasons.  I didn't belabor the rest of

 6    them simply because this would have been another

 7    50 pages.

 8        Q.    Okay.

 9        A.    And it wasn't going to change anything I

10    wrote.

11        Q.    Okay.  If we could --

12        A.    And Graham's listed among the references.

13        Q.    I know.  He's in there.

14              That's my question was, why wasn't -- why

15    didn't you break that one out?  And I just didn't

16    know if you had a reason or not.

17        A.    Well, then I would have had -- no, I would

18    have had to break out all of them.  I mean, just the

19    practicality was that they all gave the same message,

20    and my message wasn't whether dabigatran was less

21    than riva or riva was less than apixaban.

22              That wasn't the question, because those are

23    bias issues.  I was looking to see whether there was

24    a signal anywhere that riva caused more bleeding than

25    warfarin.
```

Protected - Subject to Further Protective Review

```
 1      Q.   Okay.

 2      A.   And the answer was no.

 3      Q.   Okay.  I understand.

 4      A.   Okay.

 5      Q.   If we look at Page 110 --

 6      A.   Ooh, I almost turned to it.

 7      Q.   -- this is -- this is your listing, and it

 8   goes up to 113, I think, because that the rest of the

 9   48 --

10      A.   Right.

11      Q.   I just want to ask you some questions about

12   some of them in particular and ask if you recall

13   this.  I already asked you about Abraham, 48i, on

14   Page 110; remember?

15      A.   Uh-huh.

16      Q.   The Lip study, 48m, I think you said you were

17   already familiar with Lip?

18      A.   Yeah, they -- it wasn't sent to me.

19      Q.   Okay.

20      A.   I know Greg.

21      Q.   And that study is called "Real-World

22   Comparison of Major Bleeding Risk Among Non-Valvular

23   Atrial Fibrillation Patients Initiated on Apixaban,

24   Dabigatran, Rivaroxaban, Or Warfarin:  a Propensity

25   Score Matched Analysis."
```

USCA5 4508

Protected - Subject to Further Protective Review

```
 1        A.    Right.

 2        Q.    Right?  Is Dr. Lip a good doctor?  You know

 3    him; right?

 4        A.    Yeah, I guess so.  He's an expert in the

 5    field.

 6        Q.    Okay.  Do you recall from this particular

 7    article that Mr. Lip wrote:  That compared to

 8    apixaban, rivaroxaban significantly increased the

 9    risk of bleed?

10        A.    It was associated with a higher incidence of

11    bleeding.

12        Q.    In fact, he called it a significantly

13    increased risk; right?

14        A.    That's a statistical assessment, not

15    necessarily a clinical assessment, but that's --

16        Q.    It's an important statistical assessment,

17    right, when you say "significant"?

18        A.    It means it reached the p-value of .05 or

19    less.

20        Q.    So it wasn't just a chance in that case;

21    right?

22        A.    That's a different question.  You can have

23    chance findings that are statistical significant.  So

24    that's a whole separate -- separate question.

25              Once again, I was looking at and referenced
```

Protected - Subject to Further Protective Review

```
 1    it, mainly looking at the rivaroxaban/warfarin

 2    signal, and also you noticed the propensity score

 3    match.  Propensity score matching is far from

 4    perfect.  It's an attempt when you have populations

 5    that weren't prospectively randomized to try to look

 6    at similar patients, but they can't get down to the

 7    level of detail that one really needs.

 8         Q.   Okay.

 9         A.   So you take them with a grain of salt.

10         Q.   Well, you take them with enough to put them

11    in your references here; right?

12         A.   Because I was trying to be more thorough than

13    some of the experts that I received that

14    cherry-picked articles.

15         Q.   48o, Halvorsen.  Do you know Dr. Halvorsen?

16         A.   I do not know Dr. Halvorsen.

17         Q.   And that article is called, "A Nationwide

18    Registry Study to Compare Bleeding Rates in Patients

19    With Atrial Fibrillation Being Prescribed Oral

20    Anticoagulants."

21              Right?

22         A.   Uh-huh.

23         Q.   And that's from the European Heart Journal?

24         A.   Uh-huh.

25         Q.   And did you tell us -- you pulled an article
```

Protected - Subject to Further Protective Review

```
 1    for us today that came --

 2         A.    Yeah.  I get the Europe Heart Journal.

 3         Q.    Do you recall in that study Dr. Halvorsen

 4    found that apixaban and dabigatran lowered the risk

 5    of major bleed as compared to warfarin but that

 6    rivaroxaban had the same risk of major bleed compared

 7    to warfarin?

 8         A.    Once again, it's the same bias issue.

 9         Q.    Do you recall that, though, in the article?

10         A.    I article that message in several of these,

11    but I can't -- I can't get over the issue of if you

12    don't give the drugs to the same patients and you

13    consistently give riva to a different subset --

14         Q.    And when you looked at these articles, did

15    any -- did any even one of these articles tell you

16    that the patient populations, when they looked at all

17    the background information about the patients, that

18    they were in any way different from one another

19    when -- when you compared the riva patients to the

20    dabi patients to the apixaban patients?

21         A.    They can't.

22         Q.    Why not?

23         A.    Because none of the articles -- if you go to

24    any article in -- you want to pull up and you look at

25    the baseline demographics, heart failure, yes or no.
```

Protected - Subject to Further Protective Review

```
 1      Okay.  How severe is the heart failure?  How many

 2      drugs are they on?  What drugs are they on?  What

 3      doses of the drugs are they on?  What was their renal

 4      function at the time?  There are so many variables

 5      that you can't match with propensity matching.  We

 6      have an abstract submitted to the Heart Rhythm

 7      Society's meeting next spring specifically on that

 8      subject.

 9              That's the problem.  You can attempt to do

10      things statistically, but anything short of

11      prospective randomization in a large-sized population

12      comes with caveats that I'm trying to share with you.

13         Q.   And I'm trying to find out if there's

14      anything other than you've heard it at these CMEs you

15      went to that says in any of these studies or anywhere

16      else -- hang on.

17         A.   I'm listening.

18         Q.   -- that patients that are getting rivaroxaban

19      are across the board sicker than the patients who are

20      getting the other NOAC drugs?

21         A.   In most of these articles, you won't be able

22      to tell.

23         Q.   In any of them, can you say that?

24         A.   I'd have to go back and reread those

25      specifically with that in mind.
```

USCA5 4512

Protected - Subject to Further Protective Review

```
1       Q.   Sitting here today, can you tell me one that

2   you know says that?

3       A.   Off the top of my head, no.

4       Q.   Okay.  This is the only time I get to ask you

5   questions, you understand that, until trial?

6       A.   You can ask me at the trial.

7       Q.   Okay.  But sitting here today, you can't tell

8   me there's one that would support that statement that

9   you've made over and over again that --

10      A.   I can tell you from my 40-plus years of

11  experience in looking at this kind of material in

12  doing peer reviews of these kinds of articles.

13      Q.   Do any of the articles have a section that

14  says caveat or something along those lines --

15      A.   Ah, yes.

16      Q.   Hold on.  Let me finish.

17           That say caveat, the riva patients were way

18  sicker than the other patients?

19      A.   You pulled that a few minutes ago, the Graham

20  article.

21      Q.   Right.

22      A.   And I read you from the limitations.

23      Q.   Uh-huh.

24      A.   Right?  Confounding variables not measured;

25  that's one of them.
```

Protected - Subject to Further Protective Review

```
 1        Q.    Does it say that we found the riva patients
 2   were sicker?
 3        A.    No.  They didn't look for it that way.
 4        Q.    It says so we don't know; right?
 5        A.    That's correct.
 6        Q.    Okay.  But you're telling us today, you do
 7   know that the riva patients are sicker, by and large,
 8   than the other patients?
 9        A.    What I'm telling you from my experience,
10   talking to peers, not necessarily the people who
11   wrote these papers, that there's a selection bias in
12   how they utilize the drugs when they have to choose
13   amongst them.
14              What I'm telling you is I looked at these
15   articles specifically looking at riva versus
16   warfarin.  My purpose, my intent in this report was
17   not comparing rivaroxaban to the other NOACs.
18        Q.    Okay.  Sorry, I --
19        A.    That's why I can't give you more details.
20        Q.    All I can ask you for is what you remember.
21              If you would go back to Page 111.
22        A.    111.  Okay.  111.  Yup.
23        Q.    48s is an article by someone named
24   Dr. Noseworthy.
25        A.    Noseworthy.
```

USCA5 4514

1      Q.   Do you know that doctor?

2      A.   I know who he is.  I don't know him well.

3      Q.   And it's called "Direct Comparison of

4   Dabigatran, Rivaroxaban, and Apixaban for

5   Effectiveness and Safety in Non-Valvular Atrial

6   Fibrillation."

7           Right?

8      A.   Uh-huh.

9      Q.   So correct me if I'm wrong, but the title of

10   that article makes me think he's trying to compare

11   those three drugs; right?

12      A.   That's what the title makes you think.

13      Q.   Right.

14           And it's not a head-to-head prospective

15   study; right?

16      A.   Right.

17      Q.   So he had to use other information in order

18   to make that; right?

19      A.   Correct.

20      Q.   Are you familiar with the publication Chest?

21      A.   Yes.

22      Q.   Is it a good article -- is it a good

23   magazine?

24      A.   It's a reasonable peer-reviewed journal, yes.

25      Q.   Do you get it?

Protected - Subject to Further Protective Review

```
 1        A.   No, I don't get it.

 2        Q.   Are you on the board?

 3        A.   Of Chest?

 4        Q.   Yes.

 5        A.   No.

 6        Q.   Are you on the advisory committee or

 7   anything?

 8        A.   Nothing for Chest.

 9        Q.   Do you recall in that article that

10   Dr. Noseworthy found that apixaban had a lower

11   bleeding risk as compared to warfarin, but

12   rivaroxaban had an increased bleeding risk compared

13   to warfarin?

14        A.   I don't remember that specifically.

15        Q.   That would be contrary to what you said you

16   were looking for; right?

17        A.   That would be contrary as one article.

18        Q.   Okay.

19        A.   And I said to you earlier that when you're

20   looking at this kind of thing, I look at the bulk of

21   the evidence.  Is there a direction -- directional

22   similarity across the board?  I -- I wouldn't rely on

23   any one article one way or the other.  That's why I

24   put so many in here.

25        Q.   If there's one article, though, that seems to
```

USCA5 4516

1    say rivaroxaban increased the bleeding risk as

2    compared to warfarin and that is contrary to your

3    opinions in this case, wouldn't it be more fair for

4    you to include an analysis of that particular study

5    as opposed to sticking it in the "there's some other

6    studies out there" part?

7         A.   No.

8         Q.   Okay.

9         A.   Because I used the bulk of evidence.  In

10   fact, this is in here to show you I didn't

11   cherry-pick.  I could have left this reference out.

12        Q.   Or you could have talked about it in your

13   report with some detail; right?

14        A.   I said -- as I said, if you wanted another

15   50 pages.  I wasn't going to do that.

16        Q.   Okay.

17        A.   I said the rates and pattern -- the bulk of

18   it.  I will not belabor the others; suffice it say

19   given the limitations, the bulk of it,

20   direction-wise.  I didn't quote each and every

21   article.

22        Q.   No.  But you had, I don't know, what, 20 or

23   so pages of specifics about certain articles before

24   we got to that point.  And then you said see the

25   rest; right?

```
 1        A.   The ones I showed -- showed you didn't

 2    compare multiple NOACs.  I could have put in here, as

 3    a way of summarizing, a big table; right?  And the

 4    table would have been riva, more bleeds than

 5    warfarin, same bleeds as warfarin, less bleeds as

 6    warfarin.  And that would be the only one sticking

 7    out as more in a bunch of 50.  Then you'd say that

 8    sticks out like a sore thumb; it's irrelevant.

 9        Q.   What about the Lip study, Number 48u?  "Major

10    Bleeding Risk Among Non-Valvular Atrial Fibrillation

11    Patients Initiated on Apixaban, Dabigatran,

12    Rivaroxaban, Or Warfarin:  a Real-World Observational

13    Study in the United States."

14             Do you recall that article?

15        A.   Which one are we on now?

16        Q.   48u.

17        A.   U.  I'm on the wrong page.

18        Q.   That's a different article from the Lip study

19    that we saw from the thrombosis and hemostasis.  This

20    is in the International Journal of Clinical Practice;

21    right?

22        A.   Uh-huh.  And a lot of overlap of the same

23    patients.

24        Q.   Do you recall in that article that Dr. Lip

25    found apixaban had a lower bleeding risk than
```

```
 1    warfarin but that rivaroxaban had a significantly

 2    greater bleed risk than warfarin?

 3        A.   With overlap of the same patients.  That's

 4    one of the issues about these studies.

 5        Q.   Okay.

 6        A.   They go to the same sources.

 7        Q.   It's not just the Noseworthy article that

 8    found that; right?

 9        A.   You've got to look at the population from

10    which the data comes.

11        Q.   Okay.

12        A.   And, again, I would like to see that article.

13    I don't have it with me.  You don't have it with you.

14        Q.   That's because I didn't write a report about

15    it.

16        A.   Understood.  And I didn't specify it in the

17    report, either.

18        Q.   Correct.

19        A.   I just put it in to be thorough.

20        Q.   All right.  Let's go back to the -- yeah,

21    let's go back to here.  I'm going to ask you about

22    Page 99.

23        A.   99.  Okay.

24        Q.   Actually, the sentence I want to ask you

25    about starts on Page 98.
```

```
1        A.    Okay.

2        Q.    At the bottom it says:  For those patients

3   who could not tolerate Pradaxa or those who are

4   unable or unwilling to take medications more than

5   once a day, Xarelto was the only feasible NOAC

6   choice; and, with great convenience, fewer drug

7   interactions, and lesser fatal bleeding or

8   intercranial hemorrhage yet non-inferiority to

9   warfarin with respect to stroke and systemic embolism

10  and overall major bleeding, Xarelto offered patients

11  substantial benefit regarding a therapeutic

12  anticoagulant option with greater likelihood of

13  regimen adherence.

14             Right?

15       A.    Right.

16       Q.    And you cite -- No. 63, you cite the Yao

17  article; is that right?  Same guy, Yao X, and it's

18  called -- Page 115.  63, it's called:  "Effect of

19  Adherence to Oral Anticoagulants on Risk of Stroke

20  and Major Bleeding Among Patients With Atrial

21  Fibrillation."

22             Right?

23       A.    Uh-huh.

24       Q.    And in that paper, isn't it true Dr. Yao

25  found the highest adherence for any of the NOACs was
```

Protected - Subject to Further Protective Review

```
 1     with apixaban?

 2          A.   No.

 3          Q.   He didn't?

 4          A.   I don't believe so.  I believe he found the

 5     high adherence with rivaroxaban once a day.

 6          Q.   If he found that apixaban was the highest

 7     adherence as far as the NOACs, that would surprise

 8     you?

 9          A.   It would.

10          Q.   Okay.  And that wouldn't support this

11     statement; right?

12          A.   Well, this statement is based largely on my

13     experience.

14          Q.   Well, you cite Yao's article; right?

15          A.   I cite it to support some of the statements

16     in here.  But if you go back to where this came from,

17     again, in context:  I now prescribe NOACs, including

18     Xarelto, in preference and have done so since 2010.

19     When Xarelto was released, it was the only one -- and

20     on and on and on.

21          Q.   It's not the only one at the time that

22     Dr. Yao wrote his article that you cited?

23          A.   I cite it to support some of the data in

24     here.

25          Q.   Okay.
```

Protected - Subject to Further Protective Review

```
 1        A.   There is more than one.  There are more than

 2   one.

 3        Q.   You only cited one article for that.

 4        A.   I understand that.  There are many more I

 5   could cite that look at compliance with once-a-day

 6   versus twice-a-day drugs.

 7        Q.   But not that look at NOAC compliance;

 8   correct?

 9        A.   This is one --

10        Q.   The only one you cited?

11        A.   Well, I now know of another.

12        Q.   Which one is that?

13        A.   It's in press.  I can't give it to you yet.

14        Q.   The ones that you can tell me about, this is

15   the only one; right?

16        A.   That's the one that I've seen.

17        Q.   And according to your recollection, it said

18   the highest adherence was with riva, not that the

19   highest adherence was --

20        A.   That's my recollection, yes.

21        Q.   Okay.  If, in fact, it says the highest

22   adherence was with apixaban, that would surprise you

23   because apixaban is twice a day; right?

24        A.   That's correct.

25        Q.   Okay.  And if you get a higher adherence to a
```

1    NOAC that's twice a day than you do with one that's

2    once a day, doesn't that take away in some respect

3    the preference you might get for a once-a-day drug

4    for a patient?

5         A.   The once-a-day is one of several factors.

6    This is not the first one I gave you before.

7         Q.   I understand that.  But you talked about it

8    very specifically in --

9         A.   It's one of many factors.  I just don't

10   believe that's the case.  I think it's -- you're

11   asking me a hypothetical question that I don't

12   believe is true.

13        Q.   You don't believe it's true that that study

14   found apixaban to be higher?

15        A.   I don't believe so.

16        Q.   Okay.

17        A.   Not to my recollection, at least.

18        Q.   Understood.

19             And then the next sentence, you say:

20   Although patients on a NOAC, including Xarelto, may

21   bleed, they do so at less risk of fatal or vital

22   organ bleeding than they would on warfarin, and at

23   least risk -- I'm sorry -- at less risk of fatality

24   or severe chronic disability than would occur from a

25   stoke if an at-risk AF patient avoided

Protected - Subject to Further Protective Review

```
 1    anticoagulation out of a fear of bleeding, which has

 2    been a consequence I and others have seen and written

 3    about in this era of misleading attorney advertising.

 4         Do you see that?

 5    A.   I do.

 6    Q.   And you cite two articles for that, right, 64

 7    and 65?

 8    A.   I do.  That is correct.

 9    Q.   And you wrote one of those articles; right?

10    A.   That's correct.

11    Q.   And it's not an article.  It's a guest

12    editorial; right?

13    A.   Correct.

14    Q.   Back in the Journal of Atrial Fibrillation?

15    A.   Correct.

16    Q.   Would you agree with me that that article

17    specifically is about NOAC use?

18    A.   Correct.

19    Q.   And that article was published in the

20    February/March 2016 issue of this magazine; right?

21    A.   Sounds about right.

22    Q.   I'll hand you Exhibit 16.

23         (Plaintiff's Exhibit No. 16 was marked for

24    identification.)

25         THE WITNESS:  Yes, sir.
```

USCA5 4524

```
 1   BY MR. CHILDERS:

 2       Q.   So let me ask you this question:  Why would

 3   you not tell the people reading this article that you

 4   are a consultant for every single one of the NOAC

 5   companies that you write about in this article?

 6       A.   Okay.  So I'm going to give you the same

 7   answer I gave you before about the FDA one.  This

 8   article was not written to be about the use of NOACs,

 9   number one.

10            Number two, the journal could put them in.

11   They have it in listing.

12            Number three, anyone who looks me up in the

13   literature will find that disclosure repeatedly.

14            This was an editorial related to advertising

15   by peers of yours that have adverse consequences, and

16   my call to the government, not to the legal -- not to

17   the lawyers' ability to advertise; that's fine.  But

18   to the fact that when physicians lecture, when

19   pharmaceutical companies do direct-to-consumer

20   advertising, they have to give fair balance of all of

21   the adverse things, to the fact that we take

22   compliance training.

23            Every one of the companies that sponsor

24   promotional programs gets compliance training so that

25   we are consistent with FDA regulations.  And one of
```

Protected - Subject to Further Protective Review

```
 1    the compliance training statements, and I'll

 2    paraphrase it, is the greatest risk to

 3    direct-to-consumer advertising is providing

 4    incomplete or misleading information.

 5            And that's exactly what has happened in this

 6    sphere.  And I think there ought to be federal

 7    regulations.

 8            Attorneys who advertise for patients ought to

 9    give both sides of the story, not just small sound

10    bytes that are misleading or out of context.

11       Q.   Okay.  So --

12       A.   That was the purpose of this editorial.

13       Q.   And in this editorial, when they asked you

14    for disclosures, you wrote none; right?

15       A.   I have no issueless in terms of you guys.

16    And again, I'm using NOACs as an example.

17       Q.   So when you're talking --

18       A.   I'm not promoting the NOACs.

19       Q.   When you're asking the government to restrict

20    in its own way advertising that would be relating to

21    lawsuits being filed against the companies that you

22    consult for, you don't think that that would require

23    disclosure of that information?

24       A.   I would apply this to any of the pharma

25    companies for any products.  I'm using NOACs as an
```

USCA5 4526

Protected - Subject to Further Protective Review

1    example.  I'm not -- this article was not out there

2    to promote NOACs.  And again, the Journal could have

3    put it in.  They have my disclosures.

4        Q.   Did you look at this before it was printed?

5        A.   I looked at what I submitted.  They don't

6    show me the print version.

7        Q.   Do you not include on the disclosures what

8    information you want to include?

9        A.   The Journal has my disclosures.

10       Q.   That's not my question.  Is there a place

11   when you submit it for you to specifically include

12   your own disclosures?

13       A.   It depends on the journal and the type of

14   article in the journal.

15       Q.   Well, if it's the --

16       A.   I honestly --

17       Q.   Hold on.

18            If it's the Journal of Atrial Fibrillation

19   and there is a specific spot for disclosures, doesn't

20   it include a place for you to submit on your own what

21   you think should be included there?

22       A.   I would have to go back online and look to

23   see what they requested.  I might have put on record,

24   and they decided to phrase it this way.

25       Q.   When this article came out, did you call the

1    editor and say, hey, switch that; this is an online

2    article.  Switch that so it makes sure to tell people

3    that I am a consultant for every one of the companies

4    that I'm saying that these lawsuits are being filed

5    against should have the advertising restricted?

6        A.   I did not call the editors and ask them to do

7    it.

8        Q.   Okay.

9        A.   My concern, as I said before, was the purpose

10   for this editorial was not to -- to promote NOACs.

11   It was using them as an example.

12       Q.   Okay.

13       A.   And I could have just as well written it

14   about other drugs as well.

15       Q.   But you didn't?

16       A.   I didn't because this is the current batch of

17   TV ads I see.

18       Q.   Okay.

19       A.   Had I written it two years ago, it might have

20   been about a different product.

21       Q.   Is there anything in the ads that you

22   reference in this article that tells a patient to

23   stop taking their medication?

24       A.   No.  But there's nothing in the ads that says

25   do not stop taking your medication without checking

USCA5 4528

Protected - Subject to Further Protective Review

```
 1     with your physician.

 2         Q.   You've never seen that in a lawyer ad, that

 3     they actually say, Don't stop taking your

 4     medication --

 5         A.   I have --

 6         Q.   Hold on.

 7              -- don't stop taking your medication without

 8     consulting your physician?

 9         A.   I have not seen that consistently.  And let

10     me finish my sentence, if you don't mind.

11         Q.   Well, I was asking the question first.

12         A.   Well, I was --

13         Q.   Go ahead.

14              MR. COVEY:  What was your answer?

15              THE WITNESS:  From the prior one, I have not

16         seen anything in the ads saying that the risk of

17         fatal or intercranial hemorrhage with the

18         standard of care is greater.  I have not seen

19         anything in the ads that if you discontinue your

20         drugs, you are at a higher risk of stroke.  I've

21         not seen anything in the ads that say you were

22         given these drugs for a reason, that reason to

23         prevent DVT/PE stroke and that bleeding is a risk

24         of all anticoagulants.

25              That's the fair balance piece that's missing.
```

Protected - Subject to Further Protective Review

```
 1        That's the fair balance that I think you should

 2        be held to.

 3   BY MR. CHILDERS:

 4        Q.   Based on what?

 5        A.   Based upon the harm that comes to patients

 6   from incomplete information.  As I said in the

 7   article, we've seen patients refuse to take an

 8   anticoagulant or switch back to warfarin.

 9        Q.   Okay.

10        A.   And you can predict from the clinical trials

11   what those consequences are.

12        Q.   Let me ask you about that.

13             The second sentence in this says:

14   Consequence of such advertisements, many patients

15   have discontinues NOAC therapy or -- or have refused

16   to start it.

17             Have your patience, any of your patients,

18   told you that they were going to not -- they were

19   refusing to go start a NOAC or that they actually

20   stopped taking a NOAC because they saw an

21   advertisement?

22        A.   Yes.

23        Q.   When?

24        A.   I've had discussion --

25        Q.   Sorry.
```

```
 1      A.   When specifically?  I can't tell you when
 2  specifically.  Subsequent to seeing some of the ads.
 3  Not just Xarelto.  The ads have played for Pradaxa.
 4  The ads that played for Eliquis.
 5           I have had patients call me and say, I saw
 6  this ad; I'm going to stop the drug.  And we had to
 7  go back through the discussions that we had in the
 8  beginning.
 9           Everything I said in here is true.
10      Q.   Well, I want to --
11      A.   Everything is on my experience.
12      Q.   And I want to explore that with you.
13      A.   Sure.
14           MR. COVEY:  With one caveat, the obvious one,
15      patient confidentiality.
16           THE WITNESS:  Absolutely.
17           MR. COVEY:  Ask any questions you want, but
18      let's not mention any names.
19  BY MR. CHILDERS:
20      Q.   When -- tell me the specific occasions you
21  remember one of your patients stopping their NOAC
22  therapy because they saw a lawyer ad.
23      A.   Specific occasions.  A -- give you a specific
24  occasion.
25           In fact, it was in Pennsylvania.  I was in
```

Protected - Subject to Further Protective Review

```
 1    Pennsylvania with a friend who's a patient of another
 2    physician, and we had this discussion.  He happens to
 3    be on apixaban, saw one of these ads, and said to me,
 4    I'm going off this drug.  And I said, no, you need to
 5    continue it.  Have the discussion with your
 6    physician.  Remember why you were given this drug.
 7    Remember what happened to you before.  But his
 8    initial reaction was, I'm going off the drug.
 9         Q.   Did he go off the drug?
10         A.   Not after our discussion.
11         Q.   Did he tell you, I'm going to stop the drug,
12    or did he say, I'm thinking about going off?
13         A.   He said, I'm going to stop the drug.
14         Q.   Okay.
15         A.   Specifically in response to watching one of
16    these ads.
17         Q.   Were you sitting with him then when he saw
18    the ad?
19         A.   No.  He told me about it.
20         Q.   How long -- how long prior to when he told
21    you this had he seen that?
22         A.   Can't answer the question.
23         Q.   You don't know if it was a week or a month
24    before?
25         A.   I do not know.
```

USCA5 4532

Protected - Subject to Further Protective Review

```
 1        Q.    Okay.  But at the time he saw you, he hadn't

 2   stopped taking the medicine?

 3        A.    No.

 4        Q.    Okay.  And he never stopped taking the

 5   medicine?

 6        A.    Subsequent to our conversation, no.

 7        Q.    And he talked to his doctor about it; right?

 8        A.    Subsequent to our conversation, yes.

 9        Q.    And never stopped taking it, to your

10   knowledge?

11        A.    To my knowledge, no.

12        Q.    Okay.

13        A.    But you asked me can I recall --

14        Q.    Sure.

15        A.    -- a specific circumstance.  There have been

16   more than one circumstance.

17        Q.    I know, because in your article --

18        A.    That's the most recent.

19        Q.    In your article, you say on more than one

20   occasion.  So I want to know how many occasions and

21   specifically what you remember about each.

22        A.    I don't think I can give you every occasion.

23   I certainly don't write them all down.

24        Q.    I want you to give me as many as you can

25   remember.  You've got your friend that you told us
```

USCA5 4533

```
 1    about in Pennsylvania.

 2         A.   Correct.

 3         Q.   Who else?

 4         A.   A dabigatran patient.

 5         Q.   What state?

 6         A.   New York.  Who had been on it for a few

 7    years, a former -- former patient, saw the ad and

 8    called me.  I had put him on Pradaxa.  And said, I've

 9    been on Pradaxa, I saw this ad, I'm stopping it.  I

10    don't remember if he said he's stopping it or he

11    stopped it.  And I said, You can't do that and here's

12    why.

13         Q.   And so did he continue taking the Pradaxa

14    after you talked --

15         A.   He went back to his physician.

16         Q.   Okay.  And they discussed what was best for

17    him?

18         A.   Yes.

19         Q.   Did he have a stroke?

20         A.   Did he have a stroke?  No, because he didn't

21    stay off for long.

22         Q.   Did the friend in Pennsylvania, did he have a

23    stroke?

24         A.   He did not.

25         Q.   Okay.  Any other occasions you remember
```

USCA5 4534

```
 1    besides the Pennsylvania friend and the dabigatran

 2    patient?

 3         A.   Others that I have heard about from my peers.

 4         Q.   I'm only asking about the ones that you

 5    experienced because you said "I have encountered such

 6    a patient on more than one occasion."  That's what

 7    you wrote in this article.

 8         A.   That's correct.

 9         Q.   Beyond those two that you've told us about,

10    are there any others?

11         A.   There are others that I have discussed with

12    their physicians who have done this.

13         Q.   Okay.  Tell me -- tell me about them.

14         A.   In a number of the educational venues, this

15    has come up.

16         Q.   Okay.  Well, I want to know about the ones

17    you're talking about in this article, because you

18    very specifically wrote, "I have encountered such a

19    patient on more than one occasion."

20         A.   Well, I just gave you two.

21         Q.   Okay.  Any others?

22         A.   Off the top of my head?  I can't remember

23    specifics.

24         Q.   Are there more than those?

25         A.   Specific patients, I do not honestly recall
```

Protected - Subject to Further Protective Review

```
 1      at this point in time --

 2           Q.   Okay.

 3           A.   -- the specific discussions with specific

 4      patients.

 5           Q.   And do you recall any of the patients that

 6      you referenced in his article when you say, "I have

 7      encountered such a patient on more than one

 8      occasion," did any of them actually stop taking their

 9      medication?

10           A.   In the patients I encountered via discussions

11      with other physicians, yes.

12           Q.   I'm not talking about that.

13           A.   My patients, no.

14           Q.   Okay.

15           A.   But I've had patients who've refused to

16      start.

17           Q.   And in those patients, I think you wrote

18      about them in the last sentence; right?  It's that

19      paragraph:  It takes considerable effort to make them

20      understand both the benefits and the risks of NOAC

21      therapy, and in particular, the overall

22      antithrombotic and mortality benefits to them of

23      being on NOAC therapy despite the risk of a bleed.

24                Right?

25           A.   Correct.
```

USCA5 4536

```
 1      Q.   So once you go through that considerable

 2   effort, did they agree to take the NOAC?

 3      A.   Not all of them.  Some stayed on aspirin.

 4      Q.   Okay.  Did any of them say, I'll take

 5   warfarin instead?

 6      A.   Don't recall.

 7      Q.   Did any of them say, I want a drug where I

 8   actually know what level of this anticoagulant I have

 9   in my system?

10      A.   No.

11      Q.   Did any of them say, I want a drug where I

12   know you can reverse it if I start bleeding?

13      A.   No.

14      Q.   You've never had a patient say that to you?

15      A.   Not in this context.

16      Q.   Have you ever had a patient say that to you

17   that you told them you wanted them to be on a NOAC?

18      A.   Yes.

19      Q.   And they said, I'd rather be on a drug that I

20   know you can stop?

21      A.   Ah, and then we have another discussion.

22      Q.   Okay.  But have they said that?

23      A.   I was responding in terms of this context.

24      Q.   Okay.  Have you ever had a patient not in

25   this article --
```

```
 1        A.    Yeah.

 2        Q.    -- who you said, I want to give you a NOAC;

 3   and they said, I want to take a drug where you can

 4   give me a blood test and I know how it's affecting

 5   me?

 6        A.    That's not the question you asked me a minute

 7   ago.

 8        Q.    That's why I'm asking you a different

 9   question.

10        A.    Okay.  Well, the one --

11        Q.    Because I don't want it restricted to this

12   article.

13        A.    No, no, no.  It wasn't restricted to this

14   article.  You asked me about reversing.

15        Q.    That's a separate issue that we're going to

16   go --

17              MR. COVEY:  He'll probably get to it.

18        Just --

19              THE WITNESS:  I thought that was the

20        preceding question.

21              MR. COVEY:  Let me make sure we're all on the

22        same page.  Either --

23              MR. CHILDERS:  I'm going to withdraw the

24        question.

25              MR. COVEY:  That's good.
```

```
 1              MR CHILDERS:  I'm going to withdraw every

 2       pending question that may be pending.

 3              MR. COVEY:  That's fine.

 4              THE WITNESS:  We'll start over.

 5   BY MR. CHILDERS:

 6       Q.   Have you ever had a patient who said to you,

 7   I want -- for my anticoagulant, I want a drug that I

 8   know you can give me a blood test and I know what my

 9   level is?

10       A.   Not after we've had the discussion about the

11   choices.

12       Q.   Okay.  They said that, you talked to them

13   about it, and then they said, okay, fine, I'll take a

14   NOAC?

15       A.   We've usually discussed it before that

16   question comes up.

17       Q.   Well, has the question ever come up from a

18   patient?

19       A.   No.  Because the way I have the discussion

20   with the patients is, you have atrial fibrillation;

21   you have X factors.  This is the CHA2DS2-VASC score.

22   This is what you have.  Here's the risk of stroke or

23   embolism.  The contrasting risk is bleeding.  Here's

24   the numbers.  Here's the survival data.

25              Now, before anticoagulation, I can reduce
```

```
 1    that risk.  And I can give you warfarin; here's all

 2    the pros and cons and inconveniences.  Here's the

 3    NOAC; here's the pros, the cons and the

 4    inconveniences.  I can reverse warfarin with Vitamin

 5    K.  It takes an average of 12 to 18 hours in those

 6    people who come in bleeding with an elevated INR, to

 7    get the INR down by half, which is, in fact, longer

 8    than the washout time of the NOACs.  So that I don't

 9    believe Vitamin K is an issue in terms of reversal.

10          Now we've got Pradaxa more recently, since

11    I'm out of practice, but in terms of teaching, in

12    terms of the decisions of patients on the teaching

13    service where we can reverse it with Praxbind.  And

14    we've seen our Pradaxa use go up accordingly.

15       Q.   What about Kcentra?  Have you ever used

16    Kcentra to reverse warfarin in a patient?

17       A.   I have not personally had to, but I've seen

18    patients in our service who have.

19       Q.   How fast does that work?

20       A.   Slowly, but faster than fresh frozen plasma.

21       Q.   Faster than Vitamin K?

22       A.   It depends how much you give and what their

23    INR was.  There's no fixed time curve.  If a patient

24    coming in bleeding with an INR -- INR rating, it's

25    going to take longer to reverse with Kcentra than if
```

USCA5 4540

Protected - Subject to Further Protective Review

```
 1    their INR was three.

 2         Q.   So if you have a patient whose biggest

 3    concern is reversal, would you put them on Pradaxa?

 4         A.   Today?

 5         Q.   Today.

 6         A.   Yes.

 7         Q.   Okay.

 8         A.   All other things being equal.

 9         Q.   Sorry.  All other things being equal, right.

10              All right.  The other article you cited was

11    by Dr. Burton; right?

12         A.   And Burton and Peacock, if I remember.

13         Q.   Burton and Peacock.

14         A.   Same Peacock we talked about before.

15              (Plaintiff's Exhibit No. 17 was marked for

16    identification.)

17    BY MR. CHILDERS:

18         Q.   Exhibit 17, which the article you cited,

19    right, by Dr. Burton and Dr. Peacock?

20         A.   Uh-huh.

21         Q.   Dr. Burton -- Burton works for Janssen;

22    right?

23         A.   Yes, to my recollection.

24         Q.   Well, if you look under funding sources --

25         A.   Yes.
```

Protected - Subject to Further Protective Review

```
 1        Q.   -- toward the bottom, doesn't it say

 2   Dr. Burton works for Janssen Pharmaceuticals?

 3        A.   Yes.  I said that, to my recollection, yes.

 4        Q.   And Dr. Peacock is a paid consultant for

 5   Janssen; correct?

 6        A.   He is a consultant for them, yes.  He's been

 7   on speaker's bureau stuff, yes.  That's how I met

 8   him.

 9        Q.   What does it say down there, Dr. Peacock is a

10   paid consultant --

11        A.   Consultant, right.

12        Q.   -- for Janssen; right?

13        A.   Yes, sir.

14        Q.   So the two people who wrote this article are

15   either an employee of Janssen or a paid consultant

16   for Janssen; right?

17        A.   Right.

18        Q.   Okay.  And this is an article that appeared

19   in the Heart Rhythm Society's online journal; right?

20        A.   What's it called?

21        Q.   Heart Rhythm case reports.  You're familiar

22   with that organization?

23        A.   I am.

24        Q.   And you know -- I'm sure you know -- that

25   every year the Heart Rhythm Society and foundation
```

1    has to disclose where their revenues come from;

2    right?

3        A.    I hadn't thought about it.

4        Q.    Have you ever gone on their website and

5    looked up their revenue sources?  Okay.  Well, this

6    is available on their website.

7        A.    Okay.

8        Q.    If you look on Page 2 --

9        A.    Yup.

10            MR. COVEY:  Did you want to mark this?

11            MR. CHILDERS:  Oh, I sure did.  I'm sorry,

12        what did I mark that, 18?

13            MR. COVEY:  This should be 18.

14            MR. CHILDERS:  Yeah, this is Exhibit 18.

15            MR. COVEY:  Yep.

16            (Plaintiff's Exhibit No. 18 was marked for

17        identification.)

18    BY MR. CHILDERS:

19        Q.    Do you see on the second page --

20        A.    Yup.

21        Q.    -- there are one, two, three, four, five,

22    six, seven, eight, nine entries for money they got

23    from Janssen?

24        A.    Yeah, I do.

25        Q.    And if you add them all up -- and you can

```
 1    check my math -- they add up to $254,786.

 2         A.    Okay.

 3         Q.    And if you go two pages over, you see Janssen

 4    again.

 5         A.    Yeah.

 6         Q.    $3,800.

 7         A.    Yeah.

 8         Q.    And if you turn two more pages, you see

 9    Janssen Pharmaceuticals and Janssen Scientific

10    Affairs; right?

11         A.    Yeah.

12         Q.    $750 each.

13         A.    Yeah.

14         Q.    And then if you turn to the last page, you

15    see Janssen, $20,000; right?

16         A.    Yeah.

17         Q.    So if my math is correct, Janssen provided

18    over $280,000 in support to this particular

19    foundation in 2015; is that right?

20         A.    That's what it looks like.

21         Q.    Okay.

22               MR. CHILDERS:  Can we take another break?

23               MR. COVEY:  Sure.

24               THE VIDEOGRAPHER:  Off the record at 3:23.

25               (Recess from 3:23 until 3:38 p.m.)
```

Protected - Subject to Further Protective Review

```
 1              THE VIDEOGRAPHER:  We're now back on the

 2       record at 3:38.

 3   BY MR. CHILDERS:

 4       Q.   Can we go back to your report --

 5       A.   Oh, sure.

 6       Q.   -- on Page 14?

 7       A.   14?

 8       Q.   Yeah.

 9       A.   Going backwards.

10       Q.   We're jumping around a little bit.

11       A.   Whatever.  14.  Yes, sir.

12       Q.   The bottom, you talk about -- you talk about

13   risks and benefits of anticoagulants?

14       A.   Yes.

15       Q.   Anticoagulation therapies, I'm sorry.

16       A.   Right.

17       Q.   The second sentence says:  In general, these

18   risks are overshadowed -- sorry, let me start again.

19            As noted above, the risk of anticoagulant

20   therapy is primarily bleeding.

21            Right?

22       A.   Uh-huh.

23       Q.   In general, these risks are overshadowed by

24   the benefits of SSE prevention in AF, or fatal PE

25   prevention in VTE patients when anticoagulation is
```

USCA5 4545

 1    used according to guideline indications.

 2           Right?

 3      A.   Right.

 4      Q.   Do you agree with me that there are some

 5    specific patients in which the risk of bleed

 6    outweighs the risk of anticoagulation even though

 7    they have atrial fibrillation?

 8      A.   I can think of selective circumstances where

 9    that might be true.

10      Q.   That's all I'm asking.

11      A.   (Nodding head.)

12      Q.   Okay.  Go to Page 22 for me.

13           Okay.  Very last line says -- and it goes

14    over to the next page:  In my practice, each time a

15    warfarin patient begins or discontinues a

16    prescription medication or an over-the-counter agent,

17    I have them recheck their anticoagulation status

18    (blood test and follow-up contact with me).

19           Right?

20      A.   Correct.

21      Q.   You can't do that with Xarelto; can you?

22      A.   I don't need to with Xarelto.

23      Q.   Well, there's some medications that -- that

24    are known to interfere with the way that Xarelto

25    works; correct?

```
 1        A.   Interfere with the way it works?  No.

 2        Q.   Okay.  Why are there some medications that

 3   are listed on the label as being medications that

 4   should not be taken or that need to be taken with

 5   caution with Xarelto?

 6        A.   Because they can change the Xarelto

 7   metabolism/renal excretion and change the Xarelto

 8   concentration within its efficacy and potentially

 9   bleeding risks.

10        Q.   Inartfully --

11        A.   Are very limited.

12        Q.   Inartfully, that's what I meant by

13   "interfere," so . . .

14        A.   Okay.

15        Q.   So there are medications that can do what you

16   just said; right?

17        A.   Yes.

18             MR. COVEY:  Whatever that was, yes.

19   BY MR. CHILDERS:

20        Q.   And you can't currently check a patient's

21   anticoagulation status when they go on one of those

22   medications to see how it's doing any of those things

23   to their body along with Xarelto?

24        A.   I don't need to, based upon what we know at

25   the moment.  Because in ROCKET, we didn't do it; the
```

Protected - Subject to Further Protective Review

```
 1    drugs were used, and there was no separate adverse

 2    signal that we've seen in any of the information I've

 3    been given so far.

 4        Q.   If you have a patient who is on Xarelto --

 5        A.   Yes.

 6        Q.   -- then they start also taking aspirin, do

 7    you need -- do you know how that's affecting their

 8    anti -- the anticoagulant effect that they're --

 9        A.   Yeah.  It increases the bleeding risk.

10        Q.   By how much?

11        A.   Well, it depends what parameter you look at.

12    For example, if I look at it in the clinical -- if I

13    look at in the pivotal NOAC/warfarin trials -- and

14    I'm including Xarelto in this -- we know that in

15    those patients who were on aspirin -- and some

16    patients have to be --

17            MR. CHILDERS:  Bless you.

18        A.   -- the bleeding risk -- gazuntite -- the

19    bleeding risk was higher, but the risk/benefit ratio

20    remained in favor over the NOAC.  I don't know that I

21    can give you a number.

22            If I look at the ProTime, the ProTime

23    bleeding risk curve is much, much steeper if you're

24    on aspirin than if you're not on aspirin.  So how

25    much depends what the parameters we're looking at.
```

Protected - Subject to Further Protective Review

1      Q.   If you have a patient in your practice on

2    Xarelto who then started on aspirin, do you give them

3    a PT test to see?

4      A.   No.

5      Q.   Do you give them any test to see if

6    they're -- what specific elevation they may have in

7    the bleeding probability?

8      A.   No.  But the bulk of this that you just read

9    to me or had me read with you wasn't referring to

10   aspirin.  It was referring to the almost a thousand

11   drugs --

12     Q.   Okay.

13     A.   -- that have a PK interaction, not a PD

14   interaction.

15     Q.   How about you have a patient on Xarelto who

16   is put on carbamazepine, how does that affect their

17   Xarelto level?

18     A.   It can induce metabolism in p-gp renal

19   excretion; in theory, make the levels go down.  So

20   the answer is use a different drug, a different

21   antiseizure drug.

22     Q.   Or an -- or a different NOAC?

23     A.   That one is a concern with all the NOACs, so

24   I would use a different --

25     Q.   Okay.

USCA5 4549

```
1       A.   -- neurological drug.

2       Q.   Like what?  You would leave that up to the

3  neurologist?

4       A.   I would have the neurologist pick one.  I'm

5  not going to pick the drug for him.

6       Q.   Does it interfere with phenytoin?  Does

7  phenytoin interfere with Xarelto, in the way that

8  I --

9       A.   Yes.

10      Q.   -- say "interfere"?

11      A.   Yes.

12      Q.   Okay.

13      A.   But there are a lot newer seizure agents that

14  I don't use, and I would say to them, which one has

15  the least impact on 3a4 and p-gp?

16      Q.   And what if they're on an antiseizure

17  medication and amiodarone and they're on Xarelto, how

18  does that affect it?

19      A.   Well, they go in opposite directions.  Now

20  I'm less concerned.  Amio raises it, but seizure

21  drugs lower them.

22      Q.   Okay.  What if they're on amiodarone -- or

23  what if they're on Xarelto and then need to be on

24  amiodarone?

25      A.   So in all of the NOAC trials -- and this
```

Protected - Subject to Further Protective Review

1    includes ROCKET -- there were patients taking

2    amiodarone, and we didn't see the signal, to my

3    knowledge, in any of the data that's been analyzed.

4    I know for a fact, for example, in RE-LY, that there

5    wasn't excess bleeding.

6           So some of these are cautions, and it doesn't

7    say don't use them with amiodarone.  It says if renal

8    function's impaired, you know, think twice about it.

9    Maybe you should pick a different drug, or maybe you

10   follow the patient a little more closely.

11      Q.   Okay.

12      A.   Maybe you remind the patient if there's some

13   bleeding signs or symptoms, you know, get a hold of

14   me now.

15      Q.   In any of those circumstances, there's no

16   testing you can do to see what effect that drug is

17   having on the anticoagulation?

18      A.   No.  Nor was it done in the clinical trials.

19      Q.   And I'm just asking if there is any test.

20      A.   No.

21      Q.   Okay.

22      A.   Not that would alter the dosing.

23      Q.   Well, that would even tell you anything;

24   correct?

25      A.   Well, if I saw -- if I did a ProTime and it

USCA5 4551

Protected - Subject to Further Protective Review

```
 1   was elevated, it wouldn't tell me to change the dose.

 2       Q.   Because the company hasn't told you there's

 3   any way to do that; right?

 4       A.   Nor have the clinical trials.  It's not the

 5   company.

 6       Q.   Well, who ran the clinical trials?

 7       A.   Who ran the clinical trials?

 8       Q.   Was that not -- was that not --

 9       A.   That's joint.

10       Q.   -- funded by Janssen?

11       A.   Funded by, yes.

12       Q.   Okay.  Sorry.

13       A.   But "run" is another story.  None of us --

14       Q.   Who paid for it?

15       A.   Janssen.

16       Q.   Okay.

17       A.   But that doesn't determine whether we do the

18   trial and what we do in the trial, per se.  There's a

19   steering committee for those things.

20       Q.   Anybody from Janssen on the steering

21   committee?

22       A.   Don't recall what it was in ROCKET, because I

23   wasn't on it.

24       Q.   In RE-LY, was anybody from Boehringer on the

25   steering committee?
```

USCA5 4552

Protected - Subject to Further Protective Review

```
1       A.   Yes.

2       Q.   That would be -- you would expect somebody

3   from the company to be on the steering committee;

4   right?

5       A.   They haven't been in all the trials I've

6   done.  They have been in some.

7       Q.   Okay.  You don't know if they were or not in

8   ROCKET?

9       A.   Didn't -- don't remember.

10      Q.   Okay.  Page 81.  This is in the discussion

11  you had about the INRatio device.

12           Have you ever used the INRatio device in your

13  practice?

14      A.   No.

15      Q.   Did you ever use any point of care device in

16  your practice?

17      A.   No.

18      Q.   Why not?

19      A.   I've had one or two patients, literally one

20  or two, do home testing.

21      Q.   Did they use something other than INRatio?

22      A.   Best of my knowledge, they did not use

23  INRatio.

24      Q.   So in this page, there's a sentence that

25  starts, "It would seem."
```

USCA5 4553

Protected - Subject to Further Protective Review

```
 1              Do you see --

 2        A.   I'll find it.

 3        Q.   Yeah.

 4        A.   Yes.

 5        Q.   It says:  It would seem unlikely that results

 6     in the remaining 10% would substantially alter the

 7     results seen in the overall trial.  And,

 8     discrepancies present at week 12 or week 24 were

 9     often not present at both weeks 12 and 24.  The

10     concordance of the point of care and lab INR data

11     obtained at 20 -- at 12 and 24 weeks and

12     inconsistency of discordance in the minority of

13     subjects who had any discordance supports the

14     efficacy and safety outcomes of the overall ROCKET AF

15     conclusions.

16              Right?

17        A.   Right.

18        Q.   In your review of the INRatio related

19     information, were there any patients who had bleeds

20     after having a falsely low INR reading at the point

21     of care device?

22        A.   I remember there was one patient who had a --

23     was hospitalized, I believe, with bleeding and had an

24     INR in the hospital somewhere around then.  Yeah.

25     But they're -- they're pretty much outliers.
```

USCA5 4554

1    Q.    Any of the -- any others?

2    A.    Well, that's the one that sticks in my mind.

3    There may have been others.

4    Q.    Do you recall if any other patients who had

5    falsely low INR readings with the point of care

6    device died from a bleed -- a bleed-related event?

7    A.    Don't recall.

8    Q.    Okay.  Would that information be important to

9    you, to your opinions in this case?

10    A.    My opinions in this case are based upon all

11    of the review of the Alere data that I've quoted in

12    here and all of the analyses done to try to deal with

13    it, and the fact -- let's make one thing very clear.

14          The Alere device and the TTRs have been used

15    as a point of criticism.  They said warfarin wasn't

16    used effectively in this trial.  Well, if warfarin

17    wasn't used effectively in this trial, then how do

18    you get bleeding rates in this trial in warfarin,

19    despite a sicker population, totally compatible with

20    the bleeding rates in the other pivotal trials?  You

21    can't.  You can't.  It's impossible, unless warfarin

22    was, in fact, managed well, and that, to me, makes

23    this -- the Alere device issue is a nonissue.

24    Q.    Let me make sure I understood that.

25          So regardless of what the time of therapeutic

Protected - Subject to Further Protective Review

```
 1    range was, you don't think that was accurate --

 2        A.    No, it was not.

 3        Q.    -- what was reported?

 4             So you think what's reported in the trial is

 5    inaccurate a number for the time of therapeutic

 6    range?

 7        A.    I think it's an artifact based upon the way

 8    it's calculated, and it's an artifact made worse by

 9    things that happened in the real world, that the

10    method doesn't consider in its calculation.

11        Q.    Okay.  And, in fact, I think you just said it

12    would be impossible in this population to not have

13    more bleeding events; is that what you said?

14        A.    What I said is in a sicker population, you

15    would expect more bleeding events.  And I've said

16    that several times.  So when the major bleeding event

17    rate, if I remember correctly, in ROCKET, in

18    warfarin, was 3.6 percent per year; and in RE-LY,

19    ARISTOTLE and ENGAGE, only one was higher than that.

20    That says warfarin had to be managed well -- I'm

21    sorry, only one was lower than that.

22             Warfarin had to be managed well.  If warfarin

23    was poorly managed on the side of too much bleeding,

24    which was what the Alere implications are.  The Alere

25    implications were that the measured INR was
```

Protected - Subject to Further Protective Review

1    13 percent lower than the truth, so people were given

2    more warfarin, which would have given more than they

3    needed, you'd expect more bleeds.

4           But they didn't have more bleeds, despite the

5    fact they were sicker patients.  Well, that tells me

6    this is a -- a nonissue.

7        Q.   Do you think the 55 percent TTR is an

8    inaccurate number in this study?

9        A.   I think it's an artifact of the way it's

10   calculated and the way the populations are managed in

11   the real world, yes.

12       Q.   Not a number that we can rely on?

13       A.   Not on a number you can rely on in any really

14   true clinically meaningful way.

15          And let me expand on that, if you don't mind.

16          TTR tells you, by the way they calculate it,

17   the time and range.  If 80 percent of patients --

18   this is theoretical -- had INRs below 2, and

19   20 percent were 2 to 3, your TTR would be 20 percent.

20   If 80 percent had INRs above 3, 20 percent were 2 to

21   3, your TTR would be 20 percent.  But the

22   implications of those would be vastly different;

23   right?

24          The higher ones would have a greater risk of

25   bleed; the lower would have a great risk of stroke.

USCA5 4557

1    And the TTR would tell you nothing about that.

2          So then if -- if I have a TTR number and I

3    know nothing about the extremes and I don't have

4    confidence that the TTR, in fact, accurately

5    represents the time and range, it's a worthless

6    number.

7    Q.   Do you think that it's a worthless number in

8    the ROCKET trial?

9    A.   I think the way it was calculated and the way

10   it's been used, yes.

11   Q.   Who did that calculation?

12   A.   It's the way the trial was designed using the

13   Rosenthal method.

14   Q.   What about in the RE-LY trial?  Do you think

15   the TTR was useful, accurate?  I don't know whatever

16   words --

17   A.   I -- I had the same reservations about TTR in

18   general.  Except that in RE-LY, they did a modified

19   version, which was different in some respects.

20         And the other big difference is Rosenthal is

21   extremely dependant upon how often you check the

22   INRs.  And the time that INRs were rechecked is

23   different across different geographies.  And the

24   geographical representation, as I said in my report,

25   from trial to trial varied.  So that if geography

Protected - Subject to Further Protective Review

```
 1    affects the time of rechecks and your geography is

 2    different from trial to trial, how can I possibly

 3    begin to compare the TTRs?  I can't.  And people who

 4    try to do it just miss the point.

 5        Q.    What's the point?

 6        A.    The point is it's a poor man's attempt as a

 7    surrogate for how well warfarin is given.  But most

 8    of the people don't understand the intricacies, don't

 9    consider the variabilities that go into play.

10           I know from my own experience, clinical

11    practice.  I've got patients, for example, in RE-LY

12    where they went home on -- and we knew that, if they

13    were warfarin or dabigatran, that was an open-label

14    trial -- the patient goes home on warfarin, comes

15    back a month later, the INR's changed.

16           Well, what's different?  Oh, well, I decided

17    to go on a diet.  My doctor gave me an all-vegetable

18    diet and cut down my fats.  Nice to know that now.

19    But that changed the INR within days.

20           Or my doctor changed me from branded Coumadin

21    to warfarin.  It's cheaper.  And we had them on

22    branded Coumadin.  And the warfarin generic isn't

23    identical, necessarily.  Oh, it would have been nice

24    to know it.  I would have checked your INR sooner.

25           All of these things happen in the real world.
```

Protected - Subject to Further Protective Review

```
 1    They're not discussed in the clinical trial

 2    calculations of TTR, but, in fact, they affect TTR.

 3         Q.   How would you calculate them -- those things

 4    into the clinical trial data?

 5         A.   I would -- if I were to design a trial and

 6    I --

 7         Q.   If you were to -- to fix the problems in --

 8         A.   If I were to design a clinical trial, number

 9    one; number two, where I thought TTR was meaningful;

10    and three, I was going to use it, I would mandate the

11    frequency of checks, and I would require the patients

12    call me anytime another drug was started or stopped

13    or diet was changed, the same as I do in clinical

14    practice.

15             But that's not how the trials are done, and

16    it's almost impossible to do that across the wide

17    geographical distribution.  A lot of country's

18    patients don't have ready access.  They can't see

19    their doctor every week for an INR check.  It's just

20    not practical.

21             So it's a problem using TTRs.

22         Q.   So how would you fix it?

23         A.   I wouldn't use TTR, or, as I said, I would

24    mandate every week.  And if you can't do it, too bad,

25    then you're not in the trial.
```

USCA5 4560

Protected - Subject to Further Protective Review

```
 1      Q.   Okay.  That's what I was asking.

 2      A.   Okay.

 3      Q.   So you would make them check it every week?

 4      A.   If I wanted an accurate reflection, yes.

 5      Q.   Okay.  Unfortunately, nobody ever asked you

 6    that question when they were designing these trials.

 7      A.   No, they did not.

 8           THE WITNESS:  Was that a cough or a sneeze?

 9           MR. COVEY:  Actually, they've all been

10      coughs, and I'm so much better than I was at any

11      time in the last ten days, so . . .

12           THE WITNESS:  That, I know.

13           MR. COVEY:  People still try not to sit next

14      to me on planes if there are open seats.

15           MR. CHILDERS:  I don't think I have any more

16      questions for you.

17           MR. COVEY:  Okay.  Good.  We're going to

18      take-

19           THE WITNESS:  Okay.

20           MR. COVEY:  Andy, We're going to take five

21      minutes to see whether I have one or two.  It

22      won't be more than --

23           MR. CHILDERS:  We're going to find out where

24      Dr. Reiffel grew up.

25           MR. COVEY:  Right.
```

USCA5 4561

```
 1              THE VIDEOGRAPHER:  Off the record at 3:57.

 2              (Recess from 3:57 until 4:02 p.m.)

 3              THE VIDEOGRAPHER:  We're now back on the

 4         record at 4:02 p.m.

 5              MR. COVEY:  So if anybody who's listening,

 6         this is the other voice.  I'm David Covey.  I

 7         represent Janssen.

 8                        CROSS-EXAMINATION

 9    BY MR. COVEY:

10         Q.   Doctor, Counsel didn't take you through

11    materials which are in your CV, but your speciality

12    in medicine is what?

13         A.   Cardiology and electrophysiology.

14         Q.   And how do you define electrophysiology?

15         A.   Electrophysiology as the branch of cardiology

16    that deals with the electrical properties of the

17    heart.

18         Q.   And are you board-certified?

19         A.   Yes.

20         Q.   And what -- those would only be medical

21    areas; correct?

22         A.   Yes.

23         Q.   And what are those areas?

24         A.   Internal medicine, clinical cardiology, and

25    I've been board-certified in clinical cardiac
```

USCA5 4562

Protected - Subject to Further Protective Review

```
 1   electrophysiology, as well.

 2        Q.   Thank you.

 3             Counsel asked you about therapeutic index for

 4   the NOACs and I think for warfarin.  And at least in

 5   the notes that I was taking, I think you gave an

 6   answer that, relatively speaking, the NOACs have a

 7   therapeutic index in a certain range?

 8             I just wanted to ask you:  Therapeutic index

 9   for medications, is that something that typically is

10   within the purview of pharmacologists?

11        A.   Yes.

12        Q.   And pharmacokinetics and pharmacodynamics are

13   also the bread and butter trade of pharmacologists?

14        A.   Clinical pharmacologists, yes.

15        Q.   Are you familiar with the definitions or

16   standards that pharmacologists or specialists in

17   those areas apply to determine whether a medication

18   has a narrow- or a wide- or a moderate-therapeutic

19   index?

20        A.   Probably not all of them, as I suggested

21   before, for approval of generics is a range, I know.

22   And as a clinician, we use definitions of adverse

23   effects that are serious or life-threatening from too

24   much or too little, but they may not meet the same

25   guidelines that other use in their own purviews.
```

Protected - Subject to Further Protective Review

```
1              MR. COVEY:  Thanks.  I appreciate it.

2              THE WITNESS:  That was quick.

3              MR. CHILDERS:  Thanks a lot.

4              THE VIDEOGRAPHER:  The time is 4:04 p.m.

5        This marks the end of the deposition.  Going off

6        the record.

7              (Whereupon, the deposition concluded at

8     4:04 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

USCA5 4564

```
 1                  C E R T I F I C A T E

 2

 3          I, KELLY J. LAWTON, Registered Professional

 4   Reporter, Licensed Court Reporter, and Certified

 5   Court Reporter, do hereby certify that, pursuant to

 6   notice, the deposition of JAMES A. REIFFEL, M.D. was

 7   duly taken on December 15, 2016, at 8:59 p.m. before

 8   me.

 9          The said JAMES A. REIFFEL, M.D. was duly

10   sworn by me according to law to tell the truth, the

11   whole truth and nothing but the truth and thereupon

12   did testify as set forth in the above transcript of

13   testimony.  The testimony was taken down

14   stenographically by me.  I do further certify that

15   the above deposition is full, complete, and a true

16   record of all the testimony given by the said

17   witness.

18

19          _____

20          KELLY J. LAWTON, RPR, LCR, CCR

21

22          (The foregoing certification of this

23   transcript does not apply to any reproduction of the

24   same by any means, unless under the direct control

25   and/or supervision of the certifying reporter.)
```

Protected - Subject to Further Protective Review

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully

 5     and make any necessary corrections.  You should state

 6     the reason in the appropriate space on the errata

 7     sheet for any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10     and date it.  It will be attached to your deposition.

11

12          It is imperative that you return the original

13     errata sheet to the deposing attorney within thirty

14     (30) days of receipt of the deposition transcript by

15     you.  If you fail to do so, the deposition transcript

16     may be deemed to be accurate and may be used in

17     court.

18

19

20

21

22

23

24

25
```

USCA5 4566

Protected - Subject to Further Protective Review

```
 1                   - - - - - -

 2                  E R R A T A

 3                   - - - - - -

 4    PAGE    LINE    CHANGE

 5    _____   _____   _____

 6      REASON: _____

 7    _____   _____   _____

 8      REASON: _____

 9    _____   _____   _____

10      REASON: _____

11    _____   _____   _____

12      REASON: _____

13    _____   _____   _____

14      REASON: _____

15    _____   _____   _____

16      REASON: _____

17    _____   _____   _____

18      REASON: _____

19    _____   _____   _____

20      REASON: _____

21    _____   _____   _____

22      REASON: _____

23    _____   _____   _____

24      REASON: _____

25
```

USCA5 4567

Protected - Subject to Further Protective Review

```
 1                  ACKNOWLEDGMENT OF DEPONENT

 2

 3           I, JAMES A. REIFFEL, M.D., do hereby

 4    acknowledge that I have read the foregoing pages, 1

 5    to 307, and that the same is a correct transcription

 6    of the answers given by me to the questions therein

 7    propounded, except for the corrections or changes in

 8    form or substance, if any, noted in the attached

 9    Errata Sheet.

10

11

12    _____      _____

13    JAMES A. REIFFEL, M.D.                        DATE

14

15

16

17

18    Subscribed and sworn to before me this

19    ____ day of _____, 20___.

20    My Commission expires: _____

21

22    _____

      Notary Public

23

24

25
```

USCA5 4568

Protected - Subject to Further Protective Review

```
 1                          LAWYER'S NOTES

 2     PAGE     LINE

 3     _____    _____    _____

 4     _____    _____    _____

 5     _____    _____    _____

 6     _____    _____    _____

 7     _____    _____    _____

 8     _____    _____    _____

 9     _____    _____    _____

10     _____    _____    _____

11     _____    _____    _____

12     _____    _____    _____

13     _____    _____    _____

14     _____    _____    _____

15     _____    _____    _____

16     _____    _____    _____

17     _____    _____    _____

18     _____    _____    _____

19     _____    _____    _____

20     _____    _____    _____

21     _____    _____    _____

22     _____    _____    _____

23     _____    _____    _____

24     _____    _____    _____

25
```

USCA5 4569