### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | MDL No. 2592 |
| | SECTION L |
| THIS DOCUMENT RELATES TO: | JUDGE ELDON E. FALLON |
| Joseph J. Boudreaux, Jr., et al. v. Janssen et al. Case No. 2:14-cv-02720 | MAGISTRATE NORTH |

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT BASED ON THE LEARNED-INTERMEDIARY DOCTRINE

### INTRODUCTION

Plaintiffs' failure-to-warn claims are barred, as a matter of Louisiana law, by the learned-intermediary doctrine for two separate and independent reasons:  (1) Dr. Kenneth Wong, Plaintiff Joseph J. Boudreaux, Jr.'s prescribing physician, testified unequivocally that an additional or different warning regarding the risks associated with use of Xarelto® would not have changed his decision to prescribe Xarelto to treat Mr. Boudreaux's atrial fibrillation; and (2) the label for Xarelto is adequate as a matter of law because it has always prominently warned of the risk of bleeding and Dr. Wong unequivocally testified that he was aware of that risk.

This Court has explained that, "[f]or better or for worse, cases governed by the learned-intermediary doctrine often turn on the testimony of the prescribing physician, and on his or her speculation as to what may have been done differently in various hypothetical situations." *Allgood v. GlaxoSmithKline PLC*, No. 06-3506, 2008 WL 483574, at *6 n.6 (E.D. La. Feb. 20, 2008) (Fallon, J.).  Here, just as in *Allgood*, and this Court's similar decision in *Whitener v. PLIVA, Inc.*, No. 10-1552, 2014 WL 1276489 (E.D. La. Mar. 27, 2014) (Fallon, J.), *aff'd*, 606 F. App'x 762 (5th Cir 2015), the testimony of Dr. Wong, clearly demonstrates that a different warn-

ing would *not* have changed his decision to prescribe Xarelto.  Dr. Wong testified that even knowing everything he knows today—including the additional information that Plaintiffs now contend should have been included in Xarelto's labeling—he continues to believe that it was medically appropriate to prescribe Xarelto for Mr. Boudreaux, and that he would make the same decision again.  In other words, none of the information that Plaintiffs claim was improperly omitted from the label would change his opinions or his prescribing practices for Mr. Boudreaux. Indeed, Dr. Wong continues to prescribe Xarelto to his other patients today.  Accordingly, Plaintiffs cannot prove that any alleged failure to warn was the cause-in-fact or proximate cause of Mr. Boudreaux's injury.

Separately, in the particular circumstances of this case, summary judgment should be granted on Plaintiffs' failure-to-warn claims because, under analogous Fifth Circuit precedent, the warning contained in Xarelto's labeling was adequate as a matter of law.  The Xarelto label clearly, prominently, and repeatedly warned of the risks of bleeding, and Dr. Wong unequivocally testified that the information provided in the labeling was adequate to provide him with a reasonable understanding of those risks.

Because Plaintiffs' failure-to-warn claims are barred by the learned-intermediary doctrine, the Court should grant summary judgment on those claims.

## BACKGROUND

### I.    Plaintiffs' claims and Joseph J. Boudreaux, Jr.'s use of Xarelto

Plaintiffs Joseph J. Boudreaux, Jr. and Loretta Boudreaux filed this action alleging that Mr. Boudreaux developed a gastrointestinal bleed as a result of using Xarelto.  PFS, §I.C. at 2 (Exh. A).  Xarelto is an anticoagulant medication that was initially approved by the United States Food and Drug Administration ("FDA") in July 2011.  *See* Pls.' Complaint ("Compl."), ¶ 71,

Doc. 1, No. 14-cv-02720.  All such anticoagulants carry a risk of bleeding, (Wong Dep. 81:10–24 (July 11, 2016) (Exh. B)), and Xarelto's labeling, in particular, clearly and repeatedly warns of that risk, mentioning the terms "bleed" or "bleeding" more than 100 times.  *See, e.g.*, Aug. 2013 USPI Highlights of Prescribing Information: Warnings and Precautions (Exh. C) (warning of "serious or fatal bleeding"); *id*. at § 5.2 (Warnings and Precautions) (same); Medication Guide (Exh. D) (warning that "**Xarelto can cause bleeding** which can be serious, and rarely may lead to death").

On January 7, 2014, Mr. Boudreaux presented to Ochsner St. Anne Medical Center with chest discomfort, shortness of breath, and "a new onset, irregular heart beat."  Wong Dep. 13:5–25.  At the time, Mr. Boudreaux was 72 years old and had a number of other health conditions, including congestive heart failure, chronic gout, hypertension, diabetes, and obesity. JBoudreaux-OStAGH-MD-02–06 (Exh. E); JBoudreaux-OStAGH-MD-07–12 (Exh. F).  Mr. Boudreaux was taking a variety of prescription medications to treat his health conditions, including aspirin, which increased his risk of bleeding.  PFS, §III.B. at 6; Wong Dep. 70:3–6.

Upon Mr. Boudreaux's admission to St. Anne, Dr. Kenneth Wong, a board-certified cardiologist, diagnosed him with atrial fibrillation.  Wong Dep. 13:16–14:3.  According to Dr. Wong, patients with atrial fibrillation "have a high risk of having clots in their heart, and … because of that they … have a high risk of stroke," which means they "need to [be] put … on blood thinners."  *Id.* 113:12–20.  Dr. Wong made a "specific recommendation, which … [was] to control the heart rate and try to get his heart rate rhythm to come back to normal and to put him on blood thinners at the time."  *Id.* 13:5–14:3.

Dr. Wong prescribed Xarelto to reduce the risk of stroke and other serious events associated with Mr. Boudreaux's atrial fibrillation.  *Id.* 14:1–21; 17:4–6; Compl. ¶ 4.  Xarelto is in a

class of drugs known as novel oral anticoagulants ("NOACs"). Wong Dep. 17:20–24. For several reasons, Dr. Wong considers NOACs to be "preferred to Coumadin," an older anticoagulant:

> No. 1 is that's more practical, that you don't have to monitor the level of anticoagulation. It's a standard dose.

> No. 2 is that then the patient can have a more liberal diet.

> No. 3, that a number of NOACs, not all of them, have shown superiority in prevention of strokes.

> And No. 4, in major bleed there has been – there is a reduction of major bleeds. Not necessarily all bleeds, but major bleeds. That's more or less the advantages of using the NOAC.

*Id.* 18:21–19:12. According to Dr. Wong, "[s]tatistically, all the NOACs prevent stroke and one way or another they are better than Coumadin," (*id.* 27:5–7), and "they all have less intracranial bleed than the Coumadin," (*id.* 32:2–3).

When deciding whether to prescribe Xarelto or some other NOAC, Dr. Wong evaluates a number of factors, including "kidney function, [the patient's] liver function, their coverage on their insurance plans, and the availability of samples." *Id.* 19:14–21. Although Dr. Wong typically will be "insistent on using [a] certain NOAC over others" if "there is a kidney problem or liver problem," Mr. Boudreaux did not have kidney or liver impairment, so in this instance "there was no . . . need to be so specific." *Id.* 21:21–22:5. In such situations, Dr. Wong's decision of which NOAC to prescribe comes down to "what it's going to cost the patient." *Id.* 21:2–6. That is because, according to Dr. Wong, "[patient] compliance is everything." *Id.* 58:3–17. And "compliance completely depends on the ability to buy the medication and to afford it, so that's a major determination." *Id.* 21:21–23.

Dr. Wong weighed the benefits of Xarelto against the risk of stroke associated with Mr. Boudreaux's atrial fibrillation and concluded that Xarelto was an appropriate medication. *Id.* 112:20–113:2 ("Q. You decided to prescribe Xarelto to Mr. Boudreaux because in your medical

judgment the benefits of Xarelto outweighed the risk, correct?  A. Correct.").  In choosing Xarelto over other NOACs, Dr. Wong emphasized that:

> [Mr. Boudreaux] needed a NOAC and the NOAC depends very much at that time on can the patient afford it, because that determines their compliance.  So based on that decision is where we go.  And there are other issues that decide on compliance, but the number one is . . . [whether] you will get a medication for $30 or $300 makes a big difference, right?  So that's the number one determinant, because they [were] all acceptable in my book [for Mr. Boudreaux].

*Id.* 23:12–21.   Mr. Boudreaux allegedly used Xarelto from January 8, 2014 until February 3, 2014.  PFS, §I.C. at 2.  On February 3, 2014, Mr. Boudreaux presented to the Ochsner St. Anne Medical Center with symptoms of weakness and fatigue and was diagnosed with a gastrointestinal bleed.  PFS, §I.D. at 2; Wong Dep. 52:7–9.  Mr. Boudreaux has since made a full recovery. *Id.*

## II.   Dr. Wong understood that Xarelto presented a risk of bleeding and, given Mr. Boudreaux's condition, would make the same treatment decision today.

At the time Dr. Wong began treating Mr. Boudreaux for atrial fibrillation, he knew that serious and potentially fatal bleeding was an inherent risk of all anticoagulant medications. Wong Dep. 81:10–15.  The labeling in effect when Dr. Wong prescribed Xarelto repeatedly warned of an increased risk of bleeding, including an increased risk of bleeding in patients aged 65 or older and in patients using medications such as aspirin. *See, e.g.*, Aug. 2013 USPI Highlights of Prescribing Information: Warnings and Precautions; *id.* at § 5.2 (Warnings and Precautions); Medication Guide.; *see supra* at 3.  Dr. Wong read Xarelto's labeling and was aware that Xarelto, like all anticoagulants, carried a risk of gastrointestinal bleeding.  Wong Dep. 36:19–37:18, 100:11–101:1, 23:25–24:8.  When asked about his understanding of the bleeding risk, Dr. Wong testified:

> Q.    And before you prescribed Xarelto to Mr. Boudreaux, did you understand that it could cause serious and fatal bleeding?

A.     Yes.

Q.     And this isn't in a black box, is it?

…

A.     No.

Q.     But you understood that Xarelto could cause serious and fatal bleeding even though the language is not printed in a black box, right?

A.     Right, yes.

*Id.* 98:14–25.

In prescribing Xarelto for Mr. Boudreaux, Dr. Wong followed the Xarelto label's direction to prescribers to weigh the risk of bleeding against the risk of thrombotic events, as reflected in the "CHADS-VASc" score. *Id.* 101:2–11, 81:21-24 ("Q. And when you are prescribing anticoagulants to patients like Mr. Boudreaux do you calculate their CHADS-VASc score?  A. Yes."), 84:9–17 (given CHADS-VASc score, an anticoagulation medication was appropriate). When asked to explain the label's direction "in [his] own words," Dr. Wong stated: "[I]f the risk of stroke is as high as [Mr. Boudreaux's] was, as indicated by the CHADS score, then we know—unless you have a major contraindication for bleeding then the benefits, the potential benefits far outweigh the risks." *Id.* 101:2–11.  Therefore, in undertaking a risk-benefit analysis to select an appropriate medicine, Dr. Wong believed that the benefits of Xarelto outweighed the risks. *Id.* 101:7–11, 97:17–21 ("Q. And is it fair to say that you only prescribe a medication after you have determined that the benefits outweigh the risks for that patient? A. Yes.").

When prescribing blood thinners to patients with atrial fibrillation, Dr. Wong typically tells patients that "they have the risk of bleeding," but he also "always" tells them that "generally 99 percent of the time we can take care of the bleeding, but if [they] have a stroke it's permanent and it's a lot more devastating." *Id.* 113:21–114:2.  When talking with patients who are resistant

to taking blood thinners, Dr. Wong said that he explains that "a stroke is irreversible most of the time," but "[i]f you stroke out, your life is going to be drastically changed if you are paralyzed," and that the risk of stroke must be weighed against the risk of bleeding.  *Id.* 155:13–156:2.

Dr. Wong's nurse, Veronica Theriot, educated Mr. Boudreaux about anticoagulants by discussing with him an anticoagulation therapy education "checklist."  *Id.* 116:13–121:9.  Nurse Theriot testified that she would have spent "at least thirty minutes to an hour" going over the checklist, (Theriot Dep. 99:8–11 (Sept. 14, 2016) (Exh. G)), which covered topics such as why the patient was being prescribed an anticoagulant, how the anticoagulant works, the risks of taking an anticoagulant, dosing instructions, instructions if bleeding should occur, and the possibility of internal bleeding, (*id.* 78:24–94:7).

When asked, "Knowing what you know today, do you still believe that it was medically appropriate to prescribe Xarelto to Mr. Boudreaux?," Dr. Wong responded, "Yes."   Wong Dep. 126:8–14.  Moreover, Dr. Wong testified that he continues to prescribe Xarelto to his current patients:

> Q.    When was the first time you prescribed Xarelto?
>
> A.    I can't remember, but shortly after it came out on the market.
>
> Q.    And have you continued to prescribe Xarelto?
>
> A.    Yes.
>
> Q.    And you continue to prescribe it today?
>
> A.    Yes.
>
> Q.    Your prescribing practices have not changed with respect to Xarelto?
>
> A.    Generally not.
>
> Q.    And do you agree that Xarelto is a useful and beneficial medication for atrial fibrillation patients because it reduces their risk of stroke?

…

A.      Yes.

*Id.* 95:15–96:10.

In his testimony, Dr. Wong specifically addressed particular items that Plaintiffs have said were improperly omitted from Xarelto's labeling, and explained that none of them would have made a difference to his treatment decisions.  For instance, he testified that the U.S.-subgroup data from the ROCKET AF study, which showed bleeding results specifically among U.S. participants in the trial and which was added to the label in September 2015, would not have changed either his decision to prescribe Xarelto to Mr. Boudreaux or his risk-benefit discussion.  *Id.* 112:11–113:2 (Q. If [U.S. subgroup data] had been available to you at the time you prescribed [Xarelto] to Mr. Boudreaux, it would not have altered your discussion with Mr. Boudreaux about Xarelto?  A. No.").  When asked to explain the U.S.-subgroup data "in [his] own words," Dr. Wong testified that "[i]t's just a purely statistic number" and agreed that the results could have been a function of chance.  *Id.* 110:20–111:16, 183:19–184:7.  Furthermore, when asked, "Have your risk benefit discussions changed as a result of this subgroup data in the label for any of your patients?," Dr. Wong responded, "No."  *Id.* 112:16–19.

Dr. Wong also testified that he knew that there was no scientifically sound way to monitor Xarelto-related coagulation parameters, but that it did not affect his prescribing decision.  Under questioning by Plaintiffs' counsel, Dr. Wong acknowledged that he "would want to know" if there were a "test that would tell you that some people are high responders," and thus "would be at risk for bleeding."  *Id.* 45:17–46:4.  However, he also testified that he was not aware of any FDA-approved assay to measure Xarelto-related coagulation parameters.  *Id.* 147:11–14.  Specifically, Dr. Wong explained that the prothrombin-time ("PT") test has not been approved by the FDA as an assayed measure of Xarelto's anticoagulation intensity.  *Id.* 146:24–

8

147:7. He also rejected the notion that PT testing would have provided any clinically useful information for Mr. Boudreaux, because Mr. Boudreaux's PT was tested when he was admitted to the hospital for the bleeding event, and it was only slightly elevated. *Id.* 147:15–148:2, 148:3–10 ("Q. So even if PT were an appropriate test to use, there is no evidence here that Mr. Boudreaux's PT was particularly elevated, is there, at the time of his bleeding event? . . . A. No."). Dr. Wong further explained that while he believed there might be a PT equivalent test to measure the patients' "levels" of Xarelto, he doubted the utility of any such test because "there [is] no study to show that monitoring that level was going to decrease the risk of bleeding." *Id.* 46:5–25. Finally, when asked to explain his understanding of the portion of the Xarelto label stating that "[t]he anticoagulant effect of Xarelto cannot be monitored with standard laboratory testing," Dr. Wong testified: "I believe that what is standard is the key here, cannot be monitored with standard lab testing. I think there are some labs that can monitor this, but it's not a standard, available – regular available study." *Id.* 38:1–39:3.

*   *   *

In summary: Dr. Wong understood the risks associated with using Xarelto, but given the gravity of Mr. Boudreaux's condition, he concluded that the Xarelto's benefits outweighed those risks. Even knowing all he knows today—including the information that Plaintiffs now say should have been included in Xarelto's labeling—he would make the same treatment decision. No further disclosure—no different label—would have changed Dr. Wong's decision to prescribe Xarelto to Mr. Boudreaux.

## ARGUMENT

### I.      Standard for summary judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law."  Fed. R. Civ. P. 56(a).  "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  The moving party need not negate the elements of the opposing party's case; it is enough to show that the opposing party cannot satisfy an element of his or her claim.  *Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 355 (5th Cir. 2010).  A fact is material only if its resolution would affect the outcome of the action.  *Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009).  Alleged "[f]actual disputes that are irrelevant or unnecessary will not be counted."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   Summary judgment is required if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to his or her case on which he or she bears the burden of proof at trial.  *Celotex Corp.*, 477 U.S. at 322.

### II.     Plaintiffs' failure-to-warn claims are barred under the learned-intermediary doctrine.

All of Plaintiffs' failure-to-warn claims, however framed, are subsumed under the Louisiana Product Liability Act ("LPLA") and fail as a matter of law under the learned-intermediary doctrine as applied by Louisiana courts.  *See* La. Stat. Ann. § 9:2800.52 ("This Chapter establishes the exclusive theories of liability for manufacturers for damage caused by their products. A claimant may not recover from a manufacturer for damage caused by a product on the basis of

any theory of liability that is not set forth in this Chapter."); *Grenier v. Med. Engr. Corp.*, 99 F. Supp. 2d 759, 763 (W.D. La. 2000), *aff'd*, 243 F.3d 200 (5th Cir. 2001) (dismissing common law claims that are covered by the LPLA).[1]

In Louisiana, a manufacturer of a prescription medicine has no duty to warn a patient directly regarding the potential risks associated with use of the medicine. *See Stahl v. Novartis Pharma. Corp.*, 283 F.3d 254, 265 (5th Cir. 2002); *Mikell v. Hoffman-LaRoche, Inc.*, 649 So. 2d 75, 80 (La. Ct. App. 1994). Rather, Louisiana courts apply the learned-intermediary doctrine, which provides that a drug manufacturer discharges its duty to consumers by reasonably informing prescribing physicians of a medicine's risks. *Id.* "The doctor acts as an informed intermediary. The decision to use the drug in a particular circumstance rests with the doctor and the patient, not with the manufacturer." *Calhoun v. Hoffman LaRoche* at 768 So. 2d 57, 61 (La. App. 1st Cir. 2000) (citing *Cobb v. Syntex Labs., Inc.,* 444 So. 2d 203, 205 (La. App. 1st Cir. 1983)).

To prove a failure-to-warn claim under the LPLA, *see* La. Rev. Stat. § 9:280057.57, in a case involving a prescription medicine, a plaintiff must prove: (1) that the defendant failed to warn the physician of a risk associated with the use of the product that was not otherwise known to the physician and (2) that the failure to warn the physician was both a cause-in-fact and the proximate cause of the plaintiff's injury. *See Stahl*, 283 F.3d at 265–66; *Zachary v. Dow Corn-*

---

[1] A number of Plaintiffs' claims are premised on an alleged failure to warn. *See* Compl. ¶113 (Count I, LPLA) ("Defendants failed to use reasonable care to provide an adequate warning of such characteristics and its danger to users and handlers of the product, thereby rendering the product unreasonably dangerous"); ¶ 123 (f) (Count II, Negligence); ¶114 (Count III, Strict Liability); ¶157 (Count IV, Express Warranty under LPLA) ("The Xarelto. . . was defective due to inadequate warnings or instructions"); ¶163 (Count V, Implied Warranty); ¶171 (Count VI, Fraudulent Misrepresentation); ¶184 (Count VII, Fraudulent Concealment); ¶195 (Count VIII, Negligent Misrepresentation); ¶204 (Count IX, Fraud and Deceit); ¶234 (Count X, Louisiana Consumer Protection Statute); ¶242 (Count XI, Loss of Consortium); ¶248 (Count XII, Redhibition). Plaintiffs have agreed to dismiss all separately pled claims that are not covered by the LPLA.

*ing Corp.*, 884 F. Supp. 1061, 1065 (M.D. La. 1995); *Willet v. Baxter Int'l, Inc.,* 929 F.2d 1094, 1098 (5th Cir. 1991).  If the plaintiff fails to carry his or her burden to sustain either of these elements, summary judgment is appropriate.  *Id.*; *see also Ferguson v. Proctor & Gamble Pharm.*, 353 F. Supp. 2d 674, 679 (E.D. La. 2004).

To prove "warnings causation," a Louisiana plaintiff alleging an inadequate prescription-drug warning must show that the allegedly defective warning itself—in addition to the medication—proximately caused his injury.  *Stahl*, 283 F.3d at 260–61 (citing La. Rev. Stat. § 9:2800.54).  In particular, the plaintiff must "show that a proper warning would have changed the decision of the treating physician; but for the inadequate warning, the treating physician would not have used or prescribed the product."  *Zachary,* 884 F. Supp. at 1065; *see also Wheat v. Pfizer, Inc.*, 31 F.3d 340, 343 (5th Cir. 1994); *Willett*, 929 F.2d at 1098.  If the plaintiff fails to sustain this burden, then, as a matter of law, he fails to meet the burden of proving causation.  *Willett*, 929 F.2d at 1099.

For the reasons set forth below, Plaintiffs cannot prevail on their failure-to-warn claims because (1) Dr. Wong's testimony clearly reveals that a different warning would not have changed his decision to prescribe Xarelto to Mr. Boudreaux, and (2) Xarelto's labeling clearly, prominently, and repeatedly warned of the specific injury that Mr. Boudreaux allegedly suffered, and Dr. Wong unequivocally testified that the warning was sufficient to provide him with a reasonable understanding of the risks involved.

    **A.**    **Because Dr. Wong clearly testified that a different label would not have changed his decision to prescribe Xarelto to Mr. Boudreaux, Plaintiffs cannot prove causation.**

To establish causation based on an alleged failure to warn, "the plaintiff must show that a proper warning would have changed the decision of the treating physician, i.e. that but for the inadequate warning, the treating physician would not have used or prescribed the product." *Fer-*

*guson,* 353 F. Supp. 2d at 678 (citing *Willett,* 929 F.2d at 1099); *Oliver v. Pharmacia & Upjohn Co., LLC,* CIV.A. 06-5737, 2008 WL 4691626, at \*7 (E.D. La. Oct. 22, 2008) (maintaining an order granting summary judgment in part because the prescribing physicians continued to prescribe the medication even after a stronger warning was put in place).

   This Court's decision in *Allgood,* 2008 WL 483574, at \*4, is on point.  There, this Court granted summary judgment on a plaintiff's failure-to-warn claims because the prescribing physician's testimony "clearly reveal[ed] that stronger warnings concerning the risk of suicide would not have changed his decision to prescribe Paxil in this case."  *Id.* at \*4.  *See also Whitener,* 2014 WL 1276489, at  \*6 (granting summary judgment for defendants because it was "clear … that [the doctor] relied principally on his own experience"—not any alleged off-label promotion— and "even knowing everything he knows today, he would have still prescribe [the medication] to [plaintiff]").

   Like the prescriber testimony in *Allgood,* Dr. Wong's testimony clearly shows that a different warning would not have altered his decision to prescribe Xarelto to Mr. Boudreaux.  When asked whether "knowing what [he] know[s] today," he "still believe[s] that it was medically appropriate to prescribe Xarelto to Mr. Boudreaux," Dr. Wong testified—unequivocally—"Yes." Wong Dep. 126:8–14.  When asked whether he continues to prescribe Xarelto today, Dr. Wong again answered, "Yes."  *Id.* 95:15–96:10.  Dr. Wong also testified that his prescribing practices "generally [have] not" changed with respect to Xarelto.  *Id.*  And when asked whether he still believes that "Xarelto is a useful and beneficial medication for atrial fibrillation patients because it reduces their risk of stroke," Dr. Wong answered, "Yes."  *Id.*  Dr. Wong's testimony clearly demonstrates that he stands by his prescribing decision—even after meeting with Plaintiffs'

counsel, who provided him with "handouts about the Xarelto package insert" before his deposition. *Id.* 61:6–63:21.

Dr. Wong was asked by plaintiff's counsel to answer a hypothetical question about whether the U.S.-subgroup data from the ROCKET AF trial, which were added to the label in September 2015, would have altered his prescribing decision. Notably, though, when asked to explain "in [his] own words" what the U.S.-subgroup data meant, Dr. Wong responded that "[i]t's just a purely statistic number," and he agreed that the data could have been a function of chance. *Id.* 110:20–111:16, 183:19–184:7. And when asked, "have your risk benefit discussions changed as a result of this subgroup data in the label for any of your patients?," Dr. Wong responded, "No." *Id*. 112:16–19. *Compare Allgood*, 2008 WL 483574, at *6 (deferring to physician's testimony given "in his own words").

Likewise, Dr. Wong was asked by Plaintiff's counsel to answer questions about a hypothetical blood test to monitor the level of Xarelto in the blood. Although Dr. Wong acknowledged that he "would want to know" if there were a test that would show whether certain patients "would be at risk for bleeding," (Wong Dep. 45:17–46:4), he explained that no such test exists. He testified that he is not aware of any FDA-approved assay to measure Xarelto-related coagulation parameters. *Id.* 147:11–14. He also agreed that the PT test has not been approved by the FDA as an assayed measure of Xarelto's anti-coagulation intensity. *Id.* 146:24–147:7. What is more, he rejected the utility of PT testing for Mr. Boudreaux, in particular, because his PT was tested when he was admitted to the hospital for the bleeding event, and it was only slightly elevated. *Id.* 147:15–148:2, 148:3–10 ("Q. So even if PT were an appropriate test to use, there is no evidence here that Mr. Boudreaux's PT was particularly elevated, is there, at the time of his bleeding event? . . . A. No."). While Dr. Wong testified that he believed there might be a PT-

equivalent test to measure the patients' "levels" of Xarelto, he also explained that "there [is] no study to show that monitoring that level was going to decrease the risk of bleeding," and thus any such test "did not seem to be relevant." *Id.* 46:5–25.   Dr. Wong further testified that he fully understood the label's statement that "[t]he anticoagulant effect of Xarelto cannot be monitored with standard laboratory testing nor readily reversed." *Id.* 38:1–9.   He explained: "I believe that what is standard is the key here, cannot be monitored with standard lab testing.  I think there are some labs that can monitor this, but it's not a standard, available – regular available study." *Id.* 38:1–39:3.

It is absolutely clear from Dr. Wong's testimony, taken as a whole, that a different warning would not have changed his prescribing decision.  Instead, Dr. Wong knew that Xarelto, like all anticoagulants, carried an increased risk of serious bleeding, including gastrointestinal bleeding.  *Id.* 100:11–101:1.  He nonetheless prescribed Xarelto for Mr. Boudreaux because his "risk of stroke," "as indicated by the CHADS score," was "high," and thus, "the potential benefits far outweigh[ed] the risks." *Id.* 101:2–11.  He chose Xarelto specifically because "[patient] compliance is everything," (*id.* 58:3–17), and "compliance completely depends on the ability to buy the medication and to afford it, so that's a major determination," (*id.* 21:21–23).  Just as in *Allgood* and *Whitener*, where the prescribing decision did not rest on the alleged wrongful conduct, it is clear that Dr. Wong's prescribing decision had nothing to do with any alleged inadequacy in the label.

Where "[p]laintiffs have submitted no proof to show how [the prescribing physician] would have reacted given a warning of the possibility or frequency [of an undisclosed risk or instruction]," summary judgment is appropriate.  *See Grenier*, 99 F. Supp. 2d at 766.  Here, there is no causal connection between the alleged failure to warn and Mr. Boudreaux's injury.  Dr. Wong

knew of the bleeding risk and relied on his independent medical judgment in prescribing Xarelto and still would have prescribed Xarelto today. Accordingly, the Plaintiffs cannot satisfy their burden of proof, and Defendants are entitled to summary judgment.

> **B.     Because the Xarelto label clearly warned of the risk of bleeding, and Dr. Wong unequivocally testified that he was aware of the risk of bleeding, the label was adequate as a matter of law.**

Defendants are further entitled to summary judgment for a related, but separate, reason: Xarelto's label is adequate as a matter of law because it clearly warns of the risk of bleeding, and Dr. Wong unequivocally testified that he was aware of that risk.

Under Fifth Circuit precedent, when, as here, "a particular adverse effect is clearly and unambiguously mentioned in a warning label and the prescribing physician unequivocally states that he or she was adequately informed of that risk by the warning, the manufacturer has satisfied its duty to warn under the learned intermediary doctrine." *Stahl*, 283 F.3d at 268. In that circumstance, the doctor's testimony that the labeling clearly informed him of the "specific ailment suffered by the plaintiff" is sufficient to render the label "adequate as a matter of law." *Id.* at 267; *see also Jackson v. Johnson & Johnson*, No. 10-cv-1113, 2012 WL 2428262, at *3–4 (W.D. La. June 25, 2012) (label that "warned of serious and occasionally fatal reactions of a kind at issue in [the] case" was "adequate as a matter of law" (emphasis omitted)).

As already explained, the label for Xarelto clearly, prominently, and repeatedly warns of the very risk that Plaintiffs allege came to pass: bleeding. Not only does the label unequivocally state that "XARELTO increases the risk of bleeding and can cause serious or fatal bleeding," it mentions the terms "bleed" or "bleeding" more than 100 times and further explains that patients over 65 and those taking concomitant medications also were at an increased risk. *See supra* at 3.

Dr. Wong confirmed that he reviewed Xarelto's label and that it properly warned him of all relevant risks associated with the medicine.  In particular, he testified:

> Q.      I'm going to mark as Exhibit 12 the August 2013 prescribing information for Xarelto. (Exhibit No. 12 marked for identification.).  Now, Doctor, I will represent to you that this was the prescribing information that was in effect when you prescribed Xarelto to Mr. Boudreaux in January of 2014. Okay?
>
> A.      Okay.
>
> Q.      And I will just refer you to the first page.  Do you see where it says Warnings and Precautions?
>
> A.      Yes.
>
> Q.      And it states: Risk of bleeding.  Xarelto can cause serious and fatal bleeding.  Promptly evaluate signs and symptoms of blood loss.  Did I read that correctly?
>
> A.      Yes.
>
> Q.      And before you prescribed Xarelto to Mr. Boudreaux, did you understand that it could cause serious and fatal bleeding?
>
> A.      Yes.

Wong Dep. 97:22–98:17.  Dr. Wong further testified that he understood that Xarelto could cause serious and fatal bleeding even though the language is not contained in a "black box."  *Id.* 98:14–25, 100:11–101:1.

In deciding on an appropriate dose, Dr. Wong explained that he was aware that the label indicated slightly different doses depending on patients' creatinine clearance and that he tested Mr. Boudreaux's kidney function for dosing purposes:

> Q.      Now, if you turn to Section 2, you see the Dosage and Administration?
>
> A.      Yes.

> Q.    And you see that there are two options for patients with atrial fi-
> brillation.  They can be prescribed either the 20-milligram dose or the 15-
> milligram dose with the evening meal, correct?
>
> A.    Yes.
>
> Q.    And depends on what dose you get is what your creatinine clear-
> ance level is; is that right?
>
> . . . .
>
> Q.    So patients that have a creatinine clearance of 15 to 50, which is a
> moderate renal impairment?
>
> A.    Yes.
>
> Q.    They are supposed to get the lower dose of Xarelto, correct?
>
> A.    Yes.
>
> Q.    Now, when you prescribed Xarelto to Mr. Boudreaux, I think we
> said earlier he had normal kidney function, right?
>
> A.    Yes.
>
> Q.    So he was correctly prescribed the 20-milligram dose of Xarelto,
> correct?
>
> A.    Yes.

Wong Dep. 99:1–100:10.  Based on this testimony, it is clear that the instructions for dosing

based on kidney function, as approved by FDA, properly advised Dr. Wong on dose selection.

The evidence is clear and undisputed that Dr. Wong knew and understood the risk of

bleeding and properly tested Mr. Boudreaux's kidney function to select an appropriate dose.  In-

deed, Dr. Wong's nurse communicated this risk to Mr. Boudreaux, as evidenced by the anticoag-

ulation therapy education "checklist," which both Nurse Theriot and Mr. Boudreaux signed.  *See*

*McCarthy v. Danek Medical, Inc.*, 65 F. Supp. 2d 410, 413 (E.D. La. 1999) (granting summary

judgment on plaintiff's failure to warn claim where "there is no factual dispute that the risk asso-

ciated with the [medical device] were know by [the physician] and were disclosed to plaintiff, who acknowledged same on the informed consent form").   Accordingly, in the circumstances of this case, this Court should find that the label for Xarelto was adequate as a matter of law.  *See Stahl*, 283 F.3d at 267; *Jackson*, 2012 WL 2428262, at *3–4.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment should be granted.

Respectfully submitted,

DRINKER BIDDLE & REATH LLP

By: */s/ Susan M. Sharko*
Susan M. Sharko
Drinker Biddle & Reath LLP
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
susan.sharko@dbr.com

Rodney M. Hudson
DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105-2235
Telephone: (415) 591-7500
Rodney.hudson@dbr.com

Chanda A. Miller
Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone: (215) 988-2500
Chanda.Miller@dbr.com

ARNOLD & PORTER KAYE SCHOLER LLP

By: */s/ William Hoffman*
William Hoffman
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
william.hoffman@apks.com

Andrew K. Solow
Steven Glickstein
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Telephone: (212) 836-8485
andrew.solow@apks.com
steven.glickstein@apks.com

IRWIN FRITCHIE URQUHART & MOORE LLC

By: /s/ *James B. Irwin*
James B. Irwin
Kim E. Moore
Irwin Fritchie Urquhart & Moore LLC
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
jirwin@irwinllc.com

*Attorneys for Defendants Janssen Pharmaceuticals, Inc., Janssen Research & Development, LLC, and Janssen Ortho LLC*

BRADLEY ARANT BOULT CUMMINGS LLP

By: /s/ *Kevin C. Newsom*
Kevin C. Newsom
Lindsey C Boney IV
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place, 1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8803
knewsom@bradley.com

CHAFFE MCCALL L.L.P.

By: /s/ *John F. Olinde*
John F. Olinde
Chaffe McCall L.L.P.
1100 Poydras Street, Suite 2300
New Orleans, LA 70163
Telephone: (504) 585-7241
olinde@chaffe.com

*Attorneys for Bayer HealthCare Pharmaceuticals Inc. and Bayer Pharma AG*

## **CERTIFICATE OF SERVICE**

      The undersigned hereby certifies that on January 20, 2017, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre-Trial Order No. 17.

*/s/ James B. Irwin*
**James B. Irwin**