## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | MDL No. 2592 |
| | SECTION L |
| THIS DOCUMENT RELATES TO: | JUDGE ELDON E. FALLON |
| Joseph Orr, Jr., et al. v. Janssen et al. Case No. 2:15-cv-03708 | MAGISTRATE NORTH |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT BASED ON THE LEARNED-INTERMEDIARY DOCTRINE

### INTRODUCTION

Plaintiffs' failure-to-warn claims are barred, as a matter of Louisiana law, by the learned-intermediary doctrine for two separate and independent reasons: (1) Dr. Maurice "Edward" St. Martin, the decedent Sharyn M. Orr's prescribing physician, testified unequivocally that an additional or different warning regarding the risks associated with use of Xarelto® would not have changed his decision to prescribe Xarelto to treat Mrs. Orr's atrial fibrillation; and (2) the label for Xarelto is adequate as a matter of law because it has always prominently warned of the risk of bleeding and Dr. St. Martin unequivocally testified that he was aware of that risk.

This Court has explained that, "[f]or better or for worse, cases governed by the learned-intermediary doctrine often turn on the testimony of the prescribing physician, and on his or her speculation as to what may have been done differently in various hypothetical situations." *Allgood v. GlaxoSmithKline PLC*, No. 06-3506, 2008 WL 483574, at *6 n.6 (E.D. La. Feb. 20, 2008) (Fallon, J.).  Here, just as in *Allgood*, and this Court's similar decision in *Whitener v. PLIVA, Inc.*, No. 10-cv-1552, 2014 WL 1276489 (E.D. La. Mar. 27, 2014) (Fallon, J.), *aff'd*, 606 F. App'x 762 (5th Cir. 2015), the testimony of Dr. St. Martin clearly demonstrates that a

different warning would *not* have changed his decision to prescribe Xarelto.  In particular, Dr. St.

Martin testified:

> Q.     Under oath[,] Doctor, after what you have listened to about time in therapeutic range and monitoring and … everything else, does any of that change your view that your decision to convert [Mrs. Orr], change her over to Xarelto in February 2014, was a[ ]prudent decision?
>
> A.     No.
>
> …
>
> Q.     And in February of 2014, did you think you knew all of the essential information to make a proper risk and benefit decision –
>
> A.     Yes.
>
> Q.     -- in that regard?
>
> A.     Yes.
>
> Q.     And after you have listened to these I'm going to call them minutia … about time and therapeutic range, about EMA, INRs, about monitoring Xarelto, does any of that change your view –
>
> A.     No, it doesn't?
>
> Q.     -- that your decision, if you had to make it again today, you would still make back in February of 2014?
>
> A.     Yes.
>
> …
>
> Q.     But even with the benefit of hindsight today, you still believe that it was the correct prescribing decision?
>
> A.     Right.

> Q.      You would still make it today.  You would not change it?
>
> A.      Right.  Like many decisions we make in medicine.

St. Martin Dep. 299:14–301:4 (June 27, 2016) (Exh. A).

Thus, even knowing everything he knows today—including the additional information that Plaintiffs now contend should have been included in Xarelto's labeling—Dr. St. Martin continues to believe that it was medically appropriate to prescribe Xarelto to Ms. Orr and would make the same decision again.  None of the information that Plaintiffs claim was improperly omitted from the label would change his opinions or his prescribing practices for Mrs. Orr.  Indeed, Dr. St. Martin continues to prescribe Xarelto to his other patients today.  Accordingly, Plaintiffs thus cannot prove that the alleged failure to warn was the cause-in-fact or proximate cause of Mrs. Orr's injury and death.

Separately, in the particular circumstances of this case, summary judgment should be granted on Plaintiffs' failure-to-warn claims because, under analogous Fifth Circuit precedent, the warning contained in Xarelto's labeling was adequate as a matter of law.  The Xarelto label clearly, prominently, and repeatedly warned of the risks of bleeding, and Dr. St. Martin unequivocally testified that the information provided in the labeling was adequate to provide him with a reasonable understanding of those risks.

Because Plaintiffs' failure-to-warn claims are barred by the learned-intermediary doctrine, the Court should grant summary judgment on those claims.

## BACKGROUND

### I.      Plaintiffs' claims and Sharyn M. Orr's use of Xarelto

Plaintiffs Joseph Orr, Jr., Joseph Orr, III, Kelli Orr Walker, and Kim Orr Deagano filed this action individually and on behalf of the estate of Sharyn M. Orr, alleging that Mrs. Orr

3

developed an intracerebral hemorrhage and died as a result of her use of Xarelto.  PFS, §I.D.1 (Exh. B).

Xarelto is in a class of medications known as novel oral anticoagulants ("NOACs"). Xarelto was initially approved by the United States Food and Drug Administration ("FDA") in July 2011.  *See* Pls.' Complaint ("Compl.") ¶ 66, Doc. 1, No. 15-cv-03708.  All NOACs, and, indeed, all anticoagulant medications, carry a risk of bleeding (*see* St. Martin Dep. 41:14–42:3, 260:6–8), and Xarelto's labeling, in particular, clearly and repeatedly warns of that risk, mentioning the terms "bleed" or "bleeding" more than 100 times.  *See, e.g.*, Feb. 2014 USPI Highlights of Prescribing Information: Warnings and Precautions (Exh. C) (warning of "serious or fatal bleeding"); *id.* at § 5.2 (Warnings and Precautions) (same); Medication Guide (Exh. D) (warning that "Xarelto can cause bleeding which can be serious, and rarely may lead to death").

Mrs. Orr's use of Xarelto began in February 2014, but her first use of NOACs dates back to April 2011.  On April 29, 2011, Mrs. Orr was diagnosed by her primary-care physician with new-onset atrial fibrillation.  SOrr-PPR-5131–5132 (Exh. E).  Mrs. Orr was referred to the Tulane Medical Center emergency room, where she was prescribed Pradaxa, a competitor NOAC to Xarelto, to reduce her risk of serious thrombotic events from her atrial fibrillation, such as stroke, venous thrombosis, or embolism.  SOrr-PPR-5315 (Exh. F); SOrr-PPR-3915–16 (Exh. G).

In August 2011, Mrs. Orr became a patient of Dr. St. Martin, a cardiologist at Ochsner Baptist Medical Center.  At that time, Mrs. Orr was 63 years old and suffered from a number of maladies in addition to atrial fibrillation, including congestive heart failure, hypertension, and diabetes.  St. Martin Dep. 97:3–98:8.  To treat these conditions, Mrs. Orr used and was prescribed many medications, both prescription and homeopathic, including aspirin.  PFS,

III.B.3; PFS III.B.4.  Given her medical history and various health conditions, Dr. St. Martin determined that Mrs. Orr's risk of a brain clot far outweighed the risk of bleeding from an anticoagulant and elected to keep her on Pradaxa.  St. Martin Dep. 99:10–20.

In February 2014, Dr. St. Martin switched Mrs. Orr from Pradaxa to Xarelto after she complained that Pradaxa was giving her indigestion.  *Id*. 161:24–162:8.  Dr. St. Martin testified that at the time, he was "sufficiently familiar with the risks and benefits of Xarelto" (*id.* 38:11–14), including that "Xarelto increases the risk of bleeding and can cause serious or fatal bleeding" (*id.* 41:6–13), that use of Xarelto with other anticoagulants such as aspirin (which Mrs. Orr was taking) could result in an increased bleeding risk (*id.* 48:22–50:3), and that "[t]here was no antidote, no reversal agent, to stop Xarelto's activity" (*id.* 44:4–14).  In prescribing Xarelto, Dr. St. Martin determined that the benefit of Xarelto in reducing Mrs. Orr's risk of stroke or other thrombotic event outweighed the risk of bleeding.  *See id*. 38:15–18 ("Q. And you made the decision that you thought that the benefits outweighed the risks in changing her from Pradaxa to Xarelto?  A. Yes."), 44:1–3 ("Q. And the facts are that the bleed is less likely than the stroke?  A. Exactly.  Yes.").  Dr. St. Martin initially prescribed a 20 mg dose of Xarelto to be taken once a day with the evening meal, but later reduced Mrs. Orr's prescribed Xarelto dosage to 15 mg/day in response to her deteriorating kidney function.  *Id*. 39:12–40:15, 130:3–13.  He did not discontinue Mrs. Orr's use of aspirin, after determining that "the benefits of Xarelto and aspirin outweighed the risks that [Mrs. Orr] might otherwise have."  *Id*. 49:22–50:3.

Mrs. Orr allegedly used Xarelto from February 19, 2014 until April 24, 2015.  Compl. ¶ 5.  On April 24, 2015 Mrs. Orr presented to the Ochsner Baptist Medical Center with symptoms including an altered mental state, prolonged headache, inability to form verbal responses, left sided facial asymmetry, and flaccidity of the left arm and leg.  She was diagnosed with an

intracerebral hemorrhage.  SOrr-PPR-533–538 (Exh. H).  Ms. Orr later passed away as a result of the hemorrhage.

## II.     Dr. St. Martin understood that Xarelto presented a risk of bleeding and, given Mrs. Orr's condition, would make the same treatment decision today.

Dr. St. Martin knew when he began treating Mrs. Orr for atrial fibrillation that serious and potentially fatal bleeding was an inherent risk of all anticoagulant medications.  *See* St. Martin Dep. 43:9–14, 104:8–20, 159:4–6.  The labeling in effect when Dr. St. Martin prescribed Xarelto repeatedly warned of an increased risk of bleeding, including an increased risk of bleeding in patients aged 65 or older and in patients using other anticoagulant medications such as aspirin.  *See, e.g.*, Feb. 2014 USPI Highlights of Prescribing Information: Warnings and Precautions; *id.* at § 5.2 (Warnings and Precautions); Medication Guide.  *See supra* at 4.  Dr. St. Martin read Xarelto's labeling and was aware that Xarelto, like all anticoagulants, carried a risk of intracerebral bleeding:

> Q.     [The label] talks about risk of bleeding, and I will read it and ask you a question.  "Xarelto increases the risk of bleeding and can cause serious or fatal bleeding."  You knew that when you prescribed [Mrs. Orr] Xarelto in February of 2014 and you had known that for a while, didn't you?
>
> A.     Yes.  Correct.

St. Martin Dep. 41:6–13.

In prescribing Xarelto for Mrs. Orr, Dr. St. Martin followed the label's direction to prescribers to weigh the risk of bleeding against the risk of thrombotic events, as reflected in the "CHADS-VASc" score.  At the time of prescription, Mrs. Orr's CHADS-VASc score was five— she had congestive heart failure, hypertension, diabetes, was older than 65, and was female.  *Id*. 96:14–98:19.  As Dr. St. Martin explained, that meant that she "was most assuredly a candidate for an anticoagulant."  *Id*. 98:15–19; *see also id.* 96:17–22 ("A. Well, I think the most important

thing was that she had had the recent onset of atrial fibrillation. She had hypertensive heart disease with left atrial dilatation [sic] and diabetic. So she had a lot of risk factors for atrial thrombus and thromboembolism.").   In undertaking a risk-benefit analysis, Dr. St. Martin believed that the benefits of Xarelto in reducing Mrs. Orr's risk of stroke outweighed the risks associated with Xarelto use. *See id.* 38:15–18 ("Q. And you made the decision that you thought that the benefits outweighed the risks in changing her from Pradaxa to Xarelto?  A. Yes.").)

Dr. St. Martin generally tells his patients before prescribing an anticoagulant that "the risk of a bleed" from use of the blood thinner is less than "the risk of a clot" from untreated atrial fibrillation, which means by taking the anticoagulant, the patient is "much more likely to have prevented the stroke than to have caused the bleed." *Id.* 43:9–21.  As he elaborated:

> [W]hat I tell people with atrial fibrillation about anticoagulation in general is that the anticoagulant could cause bleeding, potentially fatal, but statistically it completely outs – the risk is outweighed by the fact that you are about four to five times more likely to have major bleeding or a fatal event if you are not anticoagulated if you have chronic atrial fibrillation.

*Id.* 99:10–20.  In his experience, once patients "hear the fact[]" that "the bleed is less likely than the stroke," they typically agree to the use of anticoagulants. *Id.* 43:24–44:3.[1]

During his deposition, Dr. St. Martin stood behind his decision to prescribe Xarelto. When asked whether there was "anything that you have seen or learned either during this deposition or anything that you saw or learned during your interviews with [Plaintiffs' counsel] or anything that you have read since February of 2014 … that makes you think that your decision to put [Mrs. Orr] on Xarelto was not prudent," Dr. St. Martin responded: "I have no reason to

---

[1] Mrs. Orr's husband, Plaintiff Joseph Orr, Jr., also testified that he would have expected Mrs. Orr to have read Xarelto's medication guide and to have understood the risk that "Xarelto can cause bleeding which can be serious and rarely may lead to death."   Orr, Jr. Dep. 217:10–220:8 (June 7, 2016) (Exh. I).

second guess it. No." *Id*. 162:17–163:7. Indeed, Dr. St. Martin continues to this day to prescribe Xarelto to his current patients. *See id.* 303:15–18.

Plaintiffs questioned Dr. St. Martin about several specific items that they claimed were improperly omitted from Xarelto's labeling, but Dr. St. Martin was unequivocal that none of those items would have made a difference to his treatment decisions. For instance, Plaintiffs contended that the label should have included U.S.-subgroup data from the ROCKET AF study, which they contend shows that warfarin users in the U.S. had fewer bleeds than those who took Xarelto, in contrast to the study's overall results, which purportedly showed bleeding rates to be "about the same" among Xarelto and warfarin users globally.[2] *See id.* 229:24–234:20. But Dr. St. Martin denied that data regarding the "U.S. cohort" in the ROCKET AF study caused him to "second guess" his decision to prescribe Xarelto. *See id.* 162:17–163:7. To the contrary, he made clear that in his "own personal experience," patients are "about equally well off" on Xarelto as they are on warfarin:

> Q.     As we have looked at all of these documents here today, it's pretty clear, isn't it, that there is no sufficient data by which to judge the risk benefits of Xarelto because they didn't study it, they didn't study Xarelto versus what you have in your clinic, which is well-controlled Coumadin patients, right? …
>
> A.     But I have seen enough patients on Xarelto and I have given it to enough people that I have seen with my own two eyes more benefit than risk. I have not done a statistical study on them as I'm a practitioner.
>
> Q.     So you think that your own personal experience in treating patients without the benefit of any kind of epidemiological assessment or statistical analysis you think that patients are better off on Xarelto than Warfarin?
>
> A.     No. I think they are about equally well off.

*Id*. 302:4–25.

---

[2] The U.S.-subgroup data was added to Xarelto's label in September 2015. *See* St. Martin Dep. 61:8–62:21, Exh. 13.

Plaintiffs' counsel also questioned Dr. St. Martin about whether he was aware that a faulty blood-monitoring device was used in the ROCKET AF trial. *See id.* 272:22–284:6. Again, Dr. St. Martin made clear that knowing this fact would not have altered his prescribing decision (*see id.* 299:14–20), given that an independent study concluded that the faulty blood monitor "didn't make any difference" to the outcome of the ROCKET AF trial (*id.* 85:24–86:11).

Plaintiffs also contend that Xarelto's label should have included data indicating that there is high interpatient variability with respect to Xarelto concentration, with certain patients demonstrating great sensitivity to the drug. *See id.* 182:3–188:13. Dr. St. Martin admitted that he was previously unaware of the high interpatient variability with respect to Xarelto concentration (*id.* 182:24–183:2), but disputed the clinical relevance of Xarelto concentration and its correlation to anticoagulant effect (*see id.* 184:8–11, 190:9–191:17 ("I don't know what to expect from the serum levels. I have never been into measuring or known anybody into measuring the serum levels.")). More importantly, as Dr. St. Martin testified, there was no evidence that Mrs. Orr was an outlier with respect to her sensitivity to Xarelto (*see id.* 30:11–31:7, 51:3–18); thus, knowing that there was high interpatient variability with respect to Xarelto concentration would not have had any clinical significance in Mrs. Orr's case.

Another of Plaintiffs' contentions is that the label should have recommended that physicians prescribe a twice-daily dosing regimen rather than a once-daily dosing regimen. Although Dr. St. Martin admitted that he would want to know if it was in fact both safer and equally as effective to administer Xarelto twice a day (*id.* 215:11–24), he correctly recognized that "[t]he clinical benefit of … [a] twice daily regiment cannot be derived from the existing data" (*id.* 28:12–19).

Finally, Plaintiffs questioned Dr. St. Martin about whether Xarelto's label should have informed practitioners that a patient's prothrombin time ("PT") potentially could be used to monitor Xarelto's anticoagulative effect.  *See id.* 194:19–197:14, 227:11–228:18.  The label instead asserts that "[t]he anticoagulant effect of Xarelto cannot be reliably monitored with standard laboratory testing."  *Id.* 194:12–22.  Dr. St. Martin admitted that he would be interested in a "simple easy test" to determine the anticoagulant effect of Xarelto in a given patient (*id.* 314:1–7), but he made clear that he would utilize such a test only if it had been studied and approved by the FDA and was supported by sound data.  *Id.* 197:5–14 ("Q. … If you could do a simple PT test and determine whether a patient was at the very high end and, therefore, much more likely to bleed, is that something that you would want to know?  A. It's something that I would want to know if the FDA had thought it was a good idea.  I put a lot of faith in what the FDA allows the drug – how it allows it to be used."), 227:11–17 ("Q. If you knew that there was a way to monitor Xarelto levels in your patient and do it infrequently, was that something that you would suggest to them?  A. I would have to see it studied and see all the data, but if it turned out to be a good thing to do, I would certainly suggest it.").  As Dr. St. Martin correctly recognized, such an FDA-approved, well-studied test to measure the anticoagulative effect of Xarelto simply does not exist.  *Id.* 295:11–296:11.  Although there could be some loose correlation in certain circumstances between PT and Xarelto *concentration*, there is no test that has ever been found to be "predictive for [Xarelto's] *bleeding risk*."  *Id.* 316:16–23 (emphasis added), 316:24–317:3 ("Q. So these are nice tests, I guess, but they don't tell you anything about what the result will be in terms of a bleeding risk to the patient, do they?  A. Right.").[3]  Indeed,

---

[3] Moreover, several of Plaintiffs' experts have conceded that "there is no such as PT/INR, which can be used to monitor, measure and evaluate coagulation status with Xarelto."  *See* Defendants'

Dr. St. Martin had never even heard of anyone attempting to monitor Xarelto patients.  *See id*. 294:22–296:11.

In any event, Dr. St. Martin rejected the notion that a PT test would have provided any clinically useful information about Mrs. Orr, because her PT was within the normal range:

> Q.     Here is Exhibit 49.  You can see this is the lab report.
>
> A.     Okay.  So this is from when she got out of what we call the main campus. …
>
> Q.     If you look at the bottom, do you see they did a lab on her prothrombin time --
>
> A.     Right.
>
> Q.     -- and her INR [*i.e.*, a normalized PT measure]?
>
> A.     Perfectly normal.
>
> Q.     So what is all of that stuff about – two hours we went through listening to time in therapeutic range and all those percentages.  What does that have to do with Mrs. Orr?
>
> A.     It's hard to say it has anything to do with Mrs. Orr.

*Id*. 297:2–19.  Plaintiffs do not dispute that Mrs. Orr's PT was normal and thus cannot dispute that a PT test would have been irrelevant to Dr. St. Martin's prescribing decision.  *See* Liechty Dep. 260:16–262:6 (Dec. 3, 2016) (Exh. J) ("Q. And you said she had normal bleeding parameters.  And by that, you're referring to PT tests; right?  A. Right.  Like they would stop her Xarelto -- they -- she had a number of -- of coag panels drawn throughout the years leading up to this and all.  And she -- she -- she was never, you know, that out of whack. …  I don't remember her ever having a PT[] or anything that was really out of -- out of line.  I thought her PTs all looked -- you know, a high -- high normal, but relatively normal. …  Q. -- the lowest PT that's

---

Joint Motion to Exclude Expert Opinions and Testimony Regarding Unapproved Dosing and Monitoring Regimens.

11

ever recorded for Mrs. Orr occurred on the night she had her intracerebral hemorrhage; right?  A.

Twelve, I believe.  Q. I think it was even lower than that.  A. Or maybe -- maybe it was … But

it's -- it's essentially normal.").

*   *   *

In sum, Dr. St. Martin understood the risks associated with using Xarelto, but given the

gravity of Mrs. Orr's condition, he concluded that Xarelto's benefits outweighed those risks.  As

already noted, he testified:

> Q.      Under oath[,] Doctor, after what you have listened to about time in therapeutic range and monitoring and … everything else, does any of that change your view that your decision to convert [Mrs. Orr], change her over to Xarelto in February 2014, was a[ ]prudent decision?
>
> A.      No.
>
> …
>
> Q.      And in February of 2014, did you think you knew all of the essential information to make a proper risk and benefit decision –
>
> A.      Yes.
>
> Q.      -- in that regard?
>
> A.      Yes.
>
> Q.      And after you have listened to these I'm going to call them minutia … about time and therapeutic range, about EMA, INRs, about monitoring Xarelto, does any of that change your view –
>
> A.      No, it doesn't?
>
> Q.      -- that your decision, if you had to make it again today, you would still make back in February of 2014?
>
> A.      Yes.
>
> …

> Q.     But even with the benefit of hindsight today, you still believe that it was the correct prescribing decision?
>
> A.     Right.
>
> Q.     You would still make it today.  You would not change it?
>
> A.     Right.  Like many decisions we make in medicine.

St. Martin Dep.  299:14–301:4.  No further disclosure, different label, or any of the information that Plaintiffs now say should have been disclosed would have changed Dr. St. Martin's decision to prescribe Xarelto to Mrs. Orr.

## ARGUMENT

### I.     Standard for summary judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law."  Fed. R. Civ. P. 56(a).  "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  The moving party need not negate the elements of the opposing party's case; it is enough to show that the opposing party cannot satisfy an element of his or her claim.  *Bayle v. Allstate Ins. Co.*, 615 F.3d 350,355 (5th Cir. 2010).  A fact is material only if its resolution would affect the outcome of the action.  *Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009).  Alleged "[f]actual disputes that are irrelevant or unnecessary will not be counted."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is required if the nonmovant fails to make a showing

sufficient to establish the existence of an element essential to his or her case on which he or she

bears the burden of proof at trial.  *Celotex Corp.*, 477 U.S. at 322.

## II.     Plaintiffs' failure-to-warn claims are barred under the learned intermediary doctrine.

All of Plaintiffs' claims for failure to warn are subsumed under the Louisiana Product

Liability Act ("LPLA") and fail as a matter of law under the learned intermediary doctrine as

applied by Louisiana courts.  *See* La. Stat. Ann. § 9:2800.52 ("This Chapter establishes the

exclusive theories of liability for manufacturers for damage caused by their products. A claimant

may not recover from a manufacturer for damage caused by a product on the basis of any theory

of liability that is not set forth in this Chapter."); *Grenier v. Med. Engr. Corp.*, 99 F. Supp. 2d

759, 763 (W.D. La. 2000), *aff'd*, 243 F.3d 200 (5th Cir. 2001) (dismissing common law claims

that are covered by the LPLA).[4]

In Louisiana, a manufacturer of a prescription medicine has no duty to warn a patient

directly regarding the potential risks associated with the use of the medicine.  *See Stahl v.

Novartis Pharma. Corp.*, 283 F.3d 254, 265 (5th Cir. 2002); *Mikell v. Hoffman-LaRoche, Inc.*,

649 So. 2d 75, 80 (La. Ct. App. 1994).  Rather, Louisiana courts apply the learned-intermediary

doctrine, which provides that a drug manufacturer discharges its duty to consumers by

reasonably informing prescribing physicians of a medicine's risks.  *Id.*  "The doctor acts as an

---

[4]  A number of Plaintiffs' claims are premised on an alleged failure to warn.  *See* Compl. ¶ 113 (Count I) (Strict Products Liability – Failure to Warn); ¶ 131 (Count II) (Strict Products Liability – Design Defect);  ¶ 143 (Count III) (Negligence);  ¶ 162 (Count IV) (Negligence – Failure to Warn);  ¶ 179 (Count V) (Negligence – Negligent Design); ¶ 189 (Count VI) (Negligent Misrepresentation); ¶ 198 (Count VII) (Breach of Warranty – Breach of Express Warranty); ¶ 205 (Count VIII) (Breach of Warranty – Breach of Implied Warranty); ¶ 212 (County IX) (Fraud); ¶ 224 (Count X) (Violation of Consumer Protection Laws); ¶ 231 (Count XI) (Punitive Damages)).  Plaintiffs have agreed to dismiss all separately pled claims that are not covered by the LPLA.

informed intermediary.  The decision to use the drug in a particular circumstance rests with the doctor and the patient, not with the manufacturer." *Calhoun v. Hoffman LaRoche Inc.*, 768 So. 2d 57, 61 (La. App. 1st Cir. 2000) (citing *Cobb v. Syntex Labs., Inc.,* 444 So. 2d 203, 205 (La. App. 1st Cir. 1983)).

To prove a failure-to-warn claim under the LPLA, *see* La. Rev. Stat. § 9:280057.57, in a case involving a prescription medicine, a plaintiff must prove: (1) that the defendant failed to warn the physician of a risk associated with the use of the product that was not otherwise known to the physician and (2) that the failure to warn the physician was both a cause-in-fact and the proximate cause of the plaintiff's injury.  *See Stahl*, 283 F.3d at 265–66; *Zachary v. Dow Corning Corp.*, 884 F. Supp. 1061, 1065 (M.D. La. 1995); *Willet v. Baxter Int'l, Inc.,* 929 F.2d 1094, 1098 (5th Cir. 1991).  If the plaintiff fails to carry his or her burden to sustain either of these elements, summary judgment is appropriate.  *Id.*; *see also Ferguson v. Proctor & Gamble Pharm.*, 353 F. Supp. 2d 674, 679 (E.D. La. 2004).

To prove "warnings causation," a Louisiana plaintiff alleging an inadequate prescription-drug warning must show that the allegedly defective warning itself—in addition to the medication—proximately caused his injury.  *Stahl*, 283 F.3d at 260–61 (citing La. Rev. Stat. § 9:2800.54).  In particular, the plaintiff must "show that a proper warning would have changed the decision of the treating physician; but for the inadequate warning, the treating physician would not have used or prescribed the product."  *Zachary,* 884 F. Supp. at 1065; *see also Wheat v. Pfizer, Inc.*, 31 F.3d 340, 343 (5th Cir. 1994); *Willett*, 929 F.2d at 1098.  If the plaintiff fails to sustain this burden, then, as a matter of law, he fails to meet the burden of proving causation. *Willett*, 929 F.2d at 1099.

For the reasons set forth below, Plaintiffs cannot prevail on their failure-to-warn claims because (1) Dr. St. Martin's testimony clearly reveals that a different warning would not have changed his decision to prescribe Xarelto to Mrs. Orr, and (2) Xarelto's labeling clearly, prominently, and repeatedly warned of the specific injury that Mrs. Orr allegedly suffered, and Dr. St. Martin unequivocally testified that the warning was sufficient to provide him with a reasonable understanding of the risks involved.

### A.    Because Dr. St. Martin clearly testified that a different label would not have changed his decision to prescribe Xarelto to Mrs. Orr, Plaintiffs cannot prove causation.

To establish causation based on an alleged failure to warn, "the plaintiff must show that a proper warning would have changed the decision of the treating physician, i.e. that but for the inadequate warning, the treating physician would not have used or prescribed the product." *Ferguson*, 353 F. Supp. 2d at 678 (citing *Willett*, 929 F.2d at 1099); *Grenier*, 99 F. Supp. 2d at 767 (granting summary judgment where plaintiffs "submitted no proof to show how [the prescribing physician] would have reacted given a warning of the possibility or frequency [of the undisclosed risk]"); *Oliver v. Pharmacia & Upjohn Co., LLC*, CIV.A. 06-5737, 2008 WL 4691626, at *7 (E.D. La. Oct. 22, 2008) (maintaining an order granting summary judgment in part because the prescribing physicians continued to prescribe the medication even after a stronger warning was put in place).

This Court's decision in *Allgood*, 2008 WL 483574, at *4, is on point.  There, this Court granted summary judgment on a plaintiff's failure-to-warn claims because the prescribing physician's testimony "clearly reveal[ed] that stronger warnings concerning the risk of suicide would not have changed his decision to prescribe Paxil in this case."  *Id*.; *see also Whitener*, 2014 WL 1276489, at *6 (granting summary judgment for defendants because it was clear that

"even knowing everything he knows today, [the prescribing physician] would have still prescribe [the medication] to [plaintiff]").

Like the prescriber in *Allgood*, Dr. St. Martin's testimony clearly shows that a different warning would not have altered his decision to prescribe Xarelto to Mrs. Orr.  When asked whether there was "anything that you have seen or learned either during this deposition or anything that you saw or learned during your interviews with [Plaintiffs' counsel] or anything that you have read since February of 2014 … that makes you think that your decision to put [Mrs. Orr] on Xarelto was not prudent," Dr. St. Martin responded: "I have no reason to second guess it.  No."  St. Martin Dep. 162:17–163:7.  Indeed, Dr. St. Martin continues to this day to prescribe Xarelto to his current patients.  *Id.* 303:15–18.

Plaintiffs' counsel specifically questioned Dr. St. Martin about several items that they contend should have been included in Xarelto's label, but Dr. St. Martin denied that any item would have altered his prescribing decision.  For instance, Dr. St. Martin was asked by Plaintiffs' counsel to answer questions about a hypothetical blood test to monitor the level of Xarelto in the blood.  Although Dr. St. Martin acknowledged that he would be "interested" in a "simple easy test" to determine the anticoagulant effect of Xarelto (*id.* 314:1–7), he made clear that he would only utilize such a test if it was well-studied, supported by sound data, and FDA-approved.  *See supra* at 10.  As Dr. St. Martin explained, no such test exists; although there is some correlation between a patient's PT and the patient's Xarelto concentration, there is no test that has ever been found to be "predictive for [Xarelto's] bleeding risk."  *Id.*  What is more, Dr. St. Martin rejected the utility of PT testing for Mrs. Orr, because, as Plaintiffs concede, her PT was normal.  *See supra* at 11.

17

Plaintiffs' counsel also questioned Dr. St. Martin about the purportedly high interpatient variability with respect to Xarelto concentration.  *See id.* 182:24–183:2.  Dr. St. Martin acknowledged that he was previously unaware of this purported variability, but disputed its clinical relevance and correlation to Xarelto's anticoagulant effect.  *See supra* at 9.  More importantly, he made clear that knowing about Xarelto's high interpatient variability with respect to concentration would not have impacted his prescribing decisions in Mrs. Orr's case, because there was no evidence that Mrs. Orr's Xarelto concentration was high.  *Id.*

Plaintiffs' counsel also asked Dr. St. Martin a series of questions regarding the U.S.-subgroup data from the ROCKET AF trial, which were added to the label in September 2015 and which purportedly show that U.S. warfarin patients had fewer bleeds than U.S. Xarelto patients. Dr. St. Martin made clear that regardless of these purported U.S.-subgroup results, in his personal experience, patients are "about equally well off" on Xarelto as they are on warfarin.  He explicitly denied that data regarding the "U.S. cohort" in the ROCKET AF study caused him to "second guess" his decision to prescribe Xarelto.  *See supra* at 8.  He similarly denied that information regarding the faulty blood monitor utilized in the ROCKET AF study would have led him to change his prescribing decision for Mrs. Orr.  *See supra* at 9.

Thus, just as in *Allgood* and *Whitener*, it is absolutely clear from Dr. St. Martin's testimony, taken as a whole, that a different warning would not have changed his prescribing decision.  Dr. St. Martin knew that Xarelto, like all anticoagulants, carried an increased risk of serious bleeding, including gastrointestinal bleeding.  St. Martin Dep. 41:6–13.  He nonetheless prescribed Xarelto for Mrs. Orr because her risk of stroke as indicated by her CHADS-VASc score was high and, in his independent medical judgment, "the benefits outweighed the risks in changing her from Pradaxa to Xarelto."  *Id.* 38:15–18, 96:14–98:19.  None of the information

18

that Plaintiffs' claim was improperly omitted from Xarelto's label would have changed Dr. St. Martin's prescribing decision.  To the contrary, he testified repeatedly that even with the benefit of hindsight, he would still prescribe Xarelto to Mrs. Orr today.  *See id.* 162:17–163:7, 299:14–301:4.

There is thus no causal connection between the alleged failure to warn and Mrs. Orr's injury and death.  Defendants are entitled to summary judgment.

> **B.**     **Because the Xarelto label clearly warned of the risk of bleeding, and Dr. St. Martin unequivocally testified that he was aware of the risk of bleeding, the label was adequate as a matter of law.**

Defendants are further entitled to summary judgment for a related, but separate, reason: Xarelto's label is adequate as a matter of law because it clearly warns of the risk of bleeding and Dr. St. Martin unequivocally testified that he was aware of that risk.

Under Fifth Circuit precedent, when, as here, "a particular adverse effect is clearly and unambiguously mentioned in a warning label and the prescribing physician unequivocally states that he or she was adequately informed of that risk by the warning, the manufacturer has satisfied its duty to warn under the learned intermediary doctrine."  *Stahl*, 283 F.3d at 268.  In that circumstance, the doctor's testimony that the labeling clearly informed him of the "specific ailment suffered by the plaintiff" is sufficient to render the label "adequate as a matter of law."  *Id*. at 267; *see also Jackson v. Johnson & Johnson*, No. 10-cv-1113, 2012 WL 2428262, at *3–4 (W.D. La. June 25, 2012) (label that "warned of serious and occasionally *fatal* reactions of a kind at issue in [the] case" was "adequate as a matter of law" (emphasis in original)).

As already explained, the label for Xarelto clearly, prominently, and repeatedly warns of the very risk that Plaintiffs allege came to pass: potentially fatal bleeding.  Not only does the label unequivocally state that "XARELTO increases the risk of bleeding and can cause serious or

19

fatal bleeding," it mentions the terms "bleed" or "bleeding" more than 100 times and further explains that patients over 65 and those taking concomitant medications were at an increased risk. *See supra* at 4. Dr. St. Martin confirmed that he reviewed Xarelto's label and that it properly warned him of all relevant risks associated with the medicine, including the risk "serious or fatal bleeding." In particular, he testified:

> Q. 5.2 [of the label] at the very bottom. It talks about risk of bleeding, and I will read it and ask you a question. 'Xarelto increases the risk of bleeding and can cause serious or fatal bleeding.' You knew that when you prescribed Xarelto in February of 2014 and you had known that for a while, didn't you?
>
> A. Yes. Correct.

St. Martin Dep. 41:6–13.[5] He further testified:

> Q. Were you satisfied that you knew or were fully informed, either by the packaging, the labeling, discussions with your colleagues and CME, that you were fully informed of the risks and benefits of Xarelto?
>
> A. Yes. Yes.

*Id.* 162:4–11. Dr. St. Martin further explained that he was aware that the label indicated slightly different doses depending on a patient's creatinine clearance and that he shifted Mrs. Orr to the 15 mg dose in response to her deteriorating kidney function, as directed by the label. *Id.* 40:10–15.[6]

---

[5] Dr. St. Martin also was aware that Mrs. Orr had an increased risk of bleeding if used with certain other medications, such as aspirin. *Id.* 49:12–50:3 ("Q. But when you put her on rivaroxaban, Xarelto, you were aware that she was also on aspirin? A. Yes. Yes. Q. And the label here says 'avoid concurrent use of Xarelto with other anticoagulants due to increased bleeding risks unless the benefit outweighs the risk.' Did you see that? A. Uh-huh (affirmative). Yes. Q. Were you satisfied that having her on Xarelto and aspirin given her medical condition. A. Yes. Q. That still the benefits of Xarelto and aspirin outweighed the risks that she might otherwise have? A. Yes. Yes.")

[6] Defendants have filed a separate motion for summary judgment on grounds that prior FDA approval was required to change the dose of Xarelto and the FDA previously reviewed and considered all relevant information and approved Xarelto for sale without a different dose, or monitoring or a reversal agent. See Defendants' Memorandum of Law In Support of Their Joint

The evidence is thus clear and undisputed that Dr. St. Martin knew and understood the risk of bleeding and selected an appropriate dose based on Mrs. Orr's kidney function. Accordingly, in the circumstances of this case, this Court should find that the label for Xarelto was adequate as a matter of law.  *See Stahl*, 283 F.3d at 267; *Jackson*, 2012 WL 2428262, at *3–4.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment should be granted.

Respectfully submitted,

DRINKER BIDDLE & REATH LLP

By: /s/ *Susan M. Sharko*
Susan M. Sharko
Drinker Biddle & Reath LLP
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
susan.sharko@dbr.com

Rodney M. Hudson
DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105-2235
Telephone: (415) 591-7500
Rodney.hudson@dbr.com

Chanda A. Miller
Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone: (215) 988-2500
Chanda.Miller@dbr.com

ARNOLD & PORTER KAYE SCHOLER LLP

By: /s/ *William Hoffman*
William Hoffman
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
william.hoffman@apks.com

Andrew K. Solow
Steven Glickstein
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Telephone: (212) 836-8485
andrew.solow@apks.com
steven.glickstein@apks.com

---

Motion for Partial Summary Judgment on Grounds that Federal Law Preempts Plaintiffs' Design Defect Claims.

IRWIN FRITCHIE URQUHART & MOORE LLC

By: /s/ James B. Irwin
James B. Irwin
Kim E. Moore
Irwin Fritchie Urquhart & Moore LLC
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
jirwin@irwinllc.com

*Attorneys for Defendants Janssen*
*Pharmaceuticals, Inc., Janssen Research &*
*Development, LLC, and Janssen Ortho LLC,*
*and Johnson & Johnson*

BRADLEY ARANT BOULT CUMMINGS LLP

By: /s/ Kevin C. Newsom
Kevin C. Newsom
Lindsey C Boney IV
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place, 1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8803
knewsom@bradley.com

CHAFFE MCCALL L.L.P.

By: /s/ John F. Olinde
John F. Olinde
Chaffe McCall L.L.P.
1100 Poydras Street, Suite 2300
New Orleans, LA 70163
Telephone: (504) 585-7241
olinde@chaffe.com

*Attorneys for Bayer HealthCare*
*Pharmaceuticals Inc. and Bayer Pharma AG*

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 20, 2017, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre-Trial Order No. 17.

*/s/ James B. Irwin*
**James B. Irwin**