UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  XARELTO (RIVAROXABAN) | * | MDL 2592 |
| PRODUCTS LIABILITY LITIGATION | * | |
| | * | SECTION L |
| THIS DOCUMENT RELATES TO: | * | |
| *ALL CASES* | * | JUDGE ELDON E. FALLON |
| | * | |
| | * | MAG. JUDGE NORTH |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * *

---

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION TO PRECLUDE SPECULATIVE EXPERT TESTIMONY
ABOUT POTENTIAL OUTCOMES FROM OTHER ANTICOAGULANTS**

---

## I.   INTRODUCTION

Bayer and Janssen have proffered expert reports presenting statements and opinions about what may or may not have happened to Mr. Boudreaux and/or Ms. Orr if they had been using an anticoagulant other than Xarelto.  This speculative theory has not been subjected to peer review or publication, and is untested, without any standards controlling its operation or general acceptance within the relevant scientific community.  Additionally, it will have no bearing on any matter of consequence to this litigation, but instead carries a great risk of undue prejudice.  As such, any testimony on this matter should be precluded.

## II.   FACTUAL BACKGROUND

At least two of Bayer's experts opine in their reports that it is impossible to know whether Mr. Boudreaux and/or Ms. Orr would have suffered the same consequences if they had been taking

1

a different anticoagulant, while one of Janssen's experts said in his report that Mr. Boudreaux likely would have had a GI bleed with any anticoagulant.[1]

More specifically, statements about the impossibility of knowing the consequences were made in the following three expert reports:

> **Expert Report for Vanessa Piazza, M.D. (*Boudreaux*) at 16:** "There is no way to rule out that Mr. Boudreaux would have experienced the same GI bleed if he was taking a different anticoagulant, such as warfarin or another NOAC."[2]

> **Expert Report for Vanessa Piazza, M.D. (*Orr*) at 18:** "As there have been no head to head comparisons of the NOACs in clinical trials, there is also no reliable evidence to suggest that use of a different NOAC would have avoided her ICH.  There is no way to rule out that Ms. Orr would have experienced the same ICH and same outcome if she was taking a different anticoagulant, such as warfarin or another NOAC."[3]

> **Report of Lionel A. Branch, Jr., M.D. (*Orr*) at 17:**  I agree with Mrs. Orr's doctors who stated that it is impossible to say that Mrs. Orr would have avoided her ICH or had a better outcome if she had taken a different anticoagulant.[4]

Essentially the opposite conclusion was made in the Expert Report of James William Smith. M.D. (*Boudreaux*)[5], in a statement that was, at best, equivocal:

> Mr. Boudreaux most likely would have had a GI bleed with any anticoagulant, including Coumadin or any of the other DOACs. Ms. Boudreaux could also have had the same GI bleed in the absence of any anticoagulant.

*Id.* at 23 ¶ 11.

---

[1] Additional defense expert reports include similar opinions.  A motion addressing such opinions by experts deposed after December 15, 2016 will be filed at a later time, in compliance with the deadline for motions relating to experts deposed after December 15, 2016.

[2] Attached as Exhibit 1.

[3] Attached as Exhibit 2.

[4] Attached as Exhibit 3.

[5] Attached as Exhibit 4.

III.    **ARGUMENT**

A.    **Speculation About What the Outcomes Would Have Been if a Different Anticoagulant had Been Used Should be Precluded Under *Daubert.***

1.    **The Law Prohibits the Presentation of Unreliable Expert Testimony.**

In the well-known trilogy of cases – *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993); *General Electric v. Joiner,* 522 U.S. 136 (1997); and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999) – the United States Supreme Court elucidated the standard of admissibility of expert testimony under Federal Rule of Evidence 702.

In *Daubert*, the Court emphasized the trial judge's role as gatekeeper in determining the admissibility of relevant and reliable expert testimony.  *Daubert,* 509 U.S. at 589.  The trial court must determine whether the proffered expert's testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline."  *Id*. at 592.  The Court explained that this standard is "flexible," and identified four specific factors that a trial court may consider in determining whether to admit expert testimony:

1.    whether the theory can be or has been tested;

2.    whether the theory has been subjected to peer review and publication;

3.    whether the theory has high known or potential rate of error, and whether there are standards controlling its operation; and

4.    whether the theory is generally accepted within the relevant scientific community.

*Id*. at 592-94.

The *Joiner* Court added that a trial court need not accept testimony purely based on the *ipse dixit* of an expert's statement.  *Joiner,* 522 U.S. at 146.  In other words, an expert's testimony that something is the case does not thereby make it fact.  As this Court has observed, there must

not be "too great a gap" between the science and the opinion.  *In re Propulsid Prods. Liab. Litig.,* 261 F. Supp. 2d 603, 616 (E.D. La. 2003) (*citing Joiner*, 522 U.S. at 146).

In *Kumho Tire*, the Court noted that the Daubert factors do not constitute an exhaustive set, and that the trial court may consider other factors depending on the nature of the evidence presented.  *Kumho Tire*, 526 U.S. at 150-52.  The Court also noted that an expert's credentials alone are not sufficient to allow admission of that expert's testimony.  *Id.* at 153.

Finally, as this Court has properly observed:

> The party seeking to introduce the expert testimony bears the burden of demonstrating that the testimony is both relevant and reliable. The focus is not on the result or conclusion, but on the methodology.

*In re Chinese Manufactured Drywall Prods. Liab. Litig.,* MDL No. 2047, 2010 WL 8368083, at *3 (E.D. La. Feb. 17, 2007) (internal citations omitted).

The Federal Rules of Evidence have been amended to incorporate these jurisprudential principles into a district judge's determination of expert admissibility, stating that:

> A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if:
>
> (a)  the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)  the testimony is based on sufficient facts or data;
>
> (c)  the testimony is the product of reliable principles and methods; and
>
> (d)  the expert has reliably applied the principles and methods to the facts of the case.

*See* Fed. R. Evid. 702.

   2.  **Speculation About What the Outcome Would Have Been if a Different Anticoagulant had Been used Does not Qualify as Reliable Testimony Under _Daubert_.**

Only one of the three experts who opined on what might have happened to Mr. Boudreaux and/or Ms. Orr if another anticoagulant had been used has provided any basis for his opinion. That is Dr. Smith; however, the bases he cites also lack any modicum of reliability.

As stated throughout his report and Curriculum Vitae (attached collectively as Exhibit 4), Dr. Smith is an endocrinologist. He is not an epidemiologist, a biostatistician, a cardiologist, or a hematologist. _See_ Deposition of James Wayne Smith (Dec. 14, 2016), at 130:6-16.[6] He has never prescribed a NOAC, and he does not make judgments about the risks or benefits of using NOACs. _Id._ at 30:4-14, 129:6-14. He never even learned anything about NOACs in his training because NOACs weren't in existence when he was training. _Id._ at 130:19-24. Dr. Smith admitted that he is not an expert on the use of NOACs, or on when NOACs are used, or on the analysis of their risks and benefits. _Id._ at 31:14-20. He simply does not perform those duties. _Id._

In his practice, Dr. Smith does not normally evaluate the risk of bleeding based on a scale, and he did not do that in relation to Mr. Boudreaux's risk of bleeding. _Id._ at 79:21-80:3. Rather, his opinion on what might have happened without the use of Xarelto was based in large part on observing in his practice that bleeds can occur with or without anticoagulants. _Id._ at 83:1-15. He never conducted a study or tallied the number of bleeds patients experience while using one NOAC versus another. _Id._ at 124:19-125:21. The only tracking he did was over limited periods – one week or one month – and then all he tracked was the number of bleeds observed, and not the anticoagulants those patients may or may not have been taking at the time. _Id._ at 121:13-123:16. To him, "there just doesn't seem to be any one that causes more bleeding than the others." _Id._ at

---

[6] Attached as Exhibit 5.

120:22-25.  He said "[i]t would just be my feeling or – or memory," while admitting that he couldn't remember what his patients were taking at any point in time.  *Id.* at 123:11-16.

Dr. Smith also relied on the ROCKET AF study and six articles, *id.* at 125:22-126:11, but admitted that there is "a diversity of studies showing different results."  *Id.* at 153:1-3.  He also admitted that prior to this litigation, he never did a literature search on NOACs, *id.* at 29:11-14, or even sat down and read specific articles with respect to NOACs.  *Id.* at 30:15-18.  Additionally, he admitted that his search in this litigation was not an exhaustive search of literature on the various risk factors associated with the different NOACs, and that if one were to do an epidemiological review to make a determination about the relative risk factors, one would want to have as many articles available as possible.  *Id.* at 26:10-27:4.

Finally, and most importantly, Dr. Smith admitted that until there is a head-to-head study comparing anticoagulants with incredible amounts of patients to show any statistically significant differences, you can't say that one is better or worse than another.  *Id.* at 137:12-21, 153:3-11.  He was not aware of any such study being undertaken.  *Id.* at 138:12-14.  This is consistent with the position taken by another Janssen expert, Dr. Sammy Khatib, in his generic expert report:

> According to [Evidence Based Medicine ("EBM")], the best scientific evidence is considered to be randomized controlled clinical studies involving a number of participants demonstrated to quantify efficacy and risk.  Based on this understanding of EBM, in an individual patient scenario it is not possible to determine if outcomes would be different if a different anticoagulant was used unless this is specifically addressed in scientific research.  To do so would be to base any conclusions on speculation, and not scientific evidence.

Expert Report of Dr. Sammy Khatib (Generic) (attached as Exhibit 6), at 19.

Consequently, Dr. Smith's opinion should be barred because it meets none of the requirements for the admission of expert testimony under Federal Rule of Evidence 702 or *Daubert*

and its progeny.  It is not based on scientific, technical or other scientific knowledge, or on sufficient facts or data, or on reliable principles or methods.  It undisputedly has not been tested, or subjected to peer review, appropriate publication, or controlled studies.  It is not an opinion that has been or even could be generally accepted without appropriate testing.

Dr. Smith's opinion instead is based solely on subjective "feelings" and unsupported speculation, which flies in the face of *Daubert,* which was designed with an "aim . . . to exclude expert testimony based merely on subjective belief or unsupported speculation." *See Burst v. Shell Oil Co.,* 120 F. Supp. 3d 547, 550 (E.D. La. 2015) (citation omitted).  Testimony based on possibilities that *might* have existed as a result of anticoagulants that *could* have been used but were not used, rather than on what actually was used, lacks reliability and probative value.  *See generally Washington v. Armstrong World Indus., Inc.,* 839 F.2d 1121, 1122 (5th Cir. 1998) (expert testimony "based on possibilities that might exist . . . rather than specific findings or evaluations of test results that were available" was precluded as rank speculation).  As such, the testimony should be excluded on this basis, independent of the preclusion that already should occur as a result of its irrelevance.[7]

The opinions of Dr. Branch and Dr. Piazza on this subject are no more reliable.  As stated above, no bases for their opinions have been set forth, either in their reports or depositions.  There also is nothing in their backgrounds to suggest that they would be qualified to state such opinions, given that Dr. Branch is a neurologist and Dr. Piazza practices emergency medicine.  Likewise, there is nothing to suggest that they conducted tests or studies, or relied on tests or studies or

---

[7] Even the period covered by Dr. Smith's opinion is unreliable.  Dr. Smith testified that he will not state any opinions with regard to whether Mr. Boudreaux would have suffered an acute bleed in the period during which he used Xarelto, and that he instead will state that Mr. Boudreaux could suffer an acute bleed at any time, even without Xarelto.  *Id.* at 84:21- (84-85)

literature that would sufficiently support their conclusions about what would have happened to Mr. Boudreaux or Ms. Orr if they had been taking a different anticoagulant.  As such, their testimony on this matter likewise should be excluded on this independent basis.

**B.      Testimony About What May or May not Have Happened if
Another Anticoagulant had Been Used Should be Precluded as Irrelevant.**

The unreliability addressed above is sufficient on its own to preclude speculative testimony about what the outcomes would have been if a different anticoagulant had been used.  Independent of this, an entirely separate factor – irrelevance – likewise justifies preclusion of this expert testimony.

**1.      The Law Prohibits the Presentation of Irrelevant Evidence.**

Only evidence that is relevant is admissible at trial.  This is a basic tenet of the law, clearly set forth in Federal Rule of Evidence 402, and is, without question, the first and foremost gatekeeper mechanism for determining what can and cannot be presented at trial.  Any evidence that is not relevant must be precluded.

It does not matter if the evidence is presented by a lay witness or an expert witness. Irrelevant evidence does not become relevant or admissible simply because it is presented by an expert.  The United States Supreme Court made that clear in issuing its opinion in *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993):

> Rule 702 further requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.'   This condition goes primarily to relevance.   'Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.'

*Id.* at 591 (*quoting* 3 Weinstein & Berger 702-18).

Evidence is relevant if it has a tendency to make a fact of consequence to the litigation more or less probable than it would be without the evidence. Fed. R. Evid. 401.  Relevant evidence

8

need not be conclusive of an ultimate issue, nor make one proposition appear more or less probable, but it must at least advance the inquiry. *Thompson v. City of Chicago,* 472 F.3d 444, 453 (7th Cir. 2006) (citations omitted); *Kalo v. Comm'r,* No. 97-1416, 1998 U.S. App. LEXIS 12570, at *14 (6th Cir. June 9, 1998) (citation omitted).

However, even relevant evidence can be excluded "if its probative value is substantially outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.  A trial court has broad discretion in assessing the probative value of evidence and determining if it is significantly outweighed by the risk of undue prejudice.  *See Sprint v. Mendelsohn,* 552 U.S. 379, 384 (2008); *Verzwyvelt v. St. Paul Fire & Marine Ins. Co.,* 175 F. Supp. 2d 881, 888 (W.D. La. 2001), *citing United States v. Johnson,* 558 F.2d 744, 746 (5th Cir. 1977).

Relevant evidence should be excluded if its probative value is substantially outweighed by a danger of unfair prejudice.  *United States v. Duncan,* 919 F.2d 981, 987 (5th Cir. 1990), *citing* Fed. R. Evid. 403. "The less probative a piece of evidence is, and thus the less the benefit to the truth-determining function of the jury of admitting it at trial, and the more trial time the presentation of the evidence would consume and the likelier the evidence would be to confuse the jurors by distracting them from more probative evidence, the stronger the argument for exclusion." *United States v. Seals,* 419 F.3d 600, 613 (7th Cir. 2005) (citations omitted).

### 2. Speculation About What the Outcome Would Have Been if a Different Anticoagulant had Been Used will Have no <u>Bearing on Plaintiffs' Actual Injury.</u>

Plaintiffs need only show that their injuries were proximately caused by their use of Xarelto.  The evidence that Defendants hope to assert – that Plaintiffs would have had to take a

different anticoagulant, and that different anticoagulant might have caused a major bleeding event – is an attempt to create a new burden on Plaintiffs.  There is no support – by rule, case law, or otherwise – for placing such an additional burden on Plaintiffs.  To the contrary, there is support for precluding statements about what might have happened in an alternate universe because "such a hypothetical counter factual situation is not sufficient to meet the causation requirement."  *See Sweeney v. Chertoff,* 178 F. App'x 354, 358 (5th Cir. 2006). As such, gratuitous statements such as these, about what can or cannot be said about what would or would not have happened with use of a different anticoagulant, are irrelevant, and should be precluded under Rule 402.

This case is about the bleeds suffered by Mr. Boudreaux and Ms. Orr due to Xarelto – not some other bleed that may or may not have occurred if they had taken some other anticoagulant with different warnings, risks and benefits.  Allowing Defendants' experts to speculate on what may have occurred on a different drug will create a trial within the trial on the warnings, risks and benefits of all anticoagulants that could have been prescribed.  This trial should be limited to Plaintiffs' use of Xarelto.

Even if this evidence were relevant in some way, and it is not, it should be excluded under Rule 403, because it will do nothing more than unduly prejudice Plaintiffs, cause unnecessary confusion, mislead the jury, waste the Court's time, and result in undue delay.  Bayer's own experts have confirmed that assessing what would have happened with a different anticoagulant would involve speculation, and courts have found that "speculative blaming intensifies the grave risk of jury confusion, and it invites the jury to render its findings based on emotion or prejudice."  *See United States v. Settle,* 267 Fed App'x 395, 398 (5th Cir. 2008).

## IV.    <u>CONCLUSION</u>

For these reasons, Plaintiffs respectfully request that all experts, including Dr. Branch, Dr.

Piazza, and Dr. Smith, be precluded from testifying about whether the outcome would have been

different and/or would have been worse for Mr. Boudreaux and/or Ms. Orr if a different

anticoagulant, or no anticoagulant, had been used.

Respectfully submitted,

Dated:  January 20, 2017

*/s/ Leonard A. Davis*
Leonard A. Davis, Esq. (Bar No. 14190)
***HERMAN, HERMAN & KATZ, LLC***
820 O'Keefe Avenue
New Orleans, LA  70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Email: ldavis@hhklawfirm.com

Gerald E. Meunier (Bar No. 9471)
***GAINSBURGH BENJAMIN DAVID MEUNIER
& WARSHAUER, LLC***
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA  70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
Email: gmeunier@gainsben.com

***Plaintiffs' Liaison Counsel***