UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | * * * | MDL 2592 |
| | * | SECTION L |
| THIS DOCUMENT RELATES TO: *ALL CASES* | * * | JUDGE ELDON E. FALLON |
| | * * | MAG. JUDGE NORTH |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO PRECLUDE CERTAIN TESTIMONY FROM J. MICHAEL GAZIANO, MD, MPH**

**I.    INTRODUCTION**

Plaintiffs respectfully file this memorandum in support of their motion to exclude the opinion testimony of Defendants' expert, J. Michael Gaziano, MD, MPH, pursuant to Federal Rule of Evidence 702, with regard to certain subjects.[1]

Defendants have indicated that they intend to call Dr. Gaziano to provide expert testimony in this case on a variety of issues. Plaintiffs do not take issue with all of Dr. Gaziano's anticipated testimony. However, as detailed in this memorandum, Dr. Gaziano is not qualified under *Daubert* and the Federal Rules of Evidence to provide expert opinions regarding the adequacy of the Xarelto label or its dosing scheme, or anecdotal evidence from his practice regarding Time in Therapeutic

---

[1] Dr. Gaziano's Report is attached hereto as Exhibit 1.

Range ("TTR") for warfarin in comparison to NOACs.[2]  *See Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993).

## II. FACTUAL BACKGROUND

Defendants received Food and Drug Administration ("FDA") approval and marketed Xarelto to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat or reduce the risk of recurrence of deep vein thrombosis (DVT) and pulmonary embolism (PE), and for DVT prophylaxis for patients undergoing hip and knee replacement surgeries. Defendants marketed Xarelto as a new oral anticoagulant treatment alternative to warfarin (Coumadin), emphasizing the supposed benefits of Xarelto – the "Xarelto Difference" – namely, Defendants' contention that Xarelto does not require any monitoring with blood tests, allows for once-a-day dosing, and does not limit a patient's diet.

The Institute for Safe Medication Practices ("ISMP"), in its QuarterWatch publication for the first quarter of the 2012 fiscal year, noted that even during the approval process, FDA "[r]eviewers also questioned the convenient once-a-day dosing scheme [of Xarelto], saying blood level studies had shown peaks and troughs that could be eliminated by twice-a-day dosing."

Despite being aware of bleeding events associated with Xarelto – including thousands of Serious Adverse Event ("SAE") Medwatch reports filed with the FDA in 2012 alone, with more than 150 deaths – Defendants nonetheless failed to provide adequate disclosures or warnings in their label. Additionally, the Xarelto Medication Guide, prepared and distributed by Defendants and intended for U.S. patients, failed to instruct that: (1) measuring a patient's prothrombin time

---

[2] This is not the first time that Dr. Gaziano has attempted to provide testimony that is beyond his area of expertise. *See Monga v. Sec. Mut. Life Ins. Co. of N.Y.*, No. 2000/05164, 2002 WL 31777872, at *6 (N.Y. Sup. Ct. Oct. 10, 2002) (finding certain aspects of Dr. Gaziano's expert report to be "nonsensical," and determining the report to be "insufficient to defeat Plaintiff's motion for summary judgment") (internal quotations omitted).

would increase the safety of Xarelto without adding any adverse events; (2) the serious bleeding events may be irreversible, life-threatening and permanently disabling or fatal; and (3) that subsets of patients who had well-controlled warfarin in the ROCKET clinical trials demonstrated that warfarin performed significantly better than Xarelto.  *See* Xarelto Medication Guide (attached as Exhibit 2).  Plaintiffs have alleged that Defendants' label and prescribing information failed to properly instruct how to safely use Xarelto and other pertinent safety information.

## III.     STANDARD FOR THE ADMISSIBILITY OF EVIDENCE

In the well-known trilogy of cases – *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993); *General Electric v. Joiner,* 522 U.S. 136 (1997); and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999) – the United States Supreme Court elucidated the standard of admissibility of expert testimony under Federal Rule of Evidence 702.

In *Daubert*, the Court emphasized the trial judge's role as gatekeeper in determining the admissibility of relevant and reliable expert testimony.  *Daubert,* 509 U.S. at 589.  The trial court must determine whether the proffered expert's testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline." *Id*. at 592.  The Court explained that this standard is "flexible," and identified four specific factors that a trial court may consider in determining whether to admit expert testimony:

1. whether the theory can be or has been tested;

2. whether the theory has been subjected to peer review and publication;

3. whether the theory has high known or potential rate of error, and whether there are standards controlling its operation; and

4. whether the theory is generally accepted within the relevant scientific community.

*Id.* at 592-94.

The *Joiner* Court added that a trial court need not accept testimony purely based on the *ipse dixit* of an expert's statement. *Joiner,* 522 U.S. at 146. In other words, an expert's testimony that something is the case does not thereby make it fact. As this Court has observed, there must not be "too great a gap" between the science and the opinion. *In re Propulsid Prods. Liab. Litig.,* 261 F. Supp. 2d 603, 616 (E.D. La. 2003) (*citing Joiner*, 522 U.S. at 146).[3]

In *Kumho Tire*, the Court noted that the Daubert factors do not constitute an exhaustive set, and that the trial court may consider other factors depending on the nature of the evidence presented. *Kumho Tire*, 526 U.S. at 150-52. The Court also noted that an expert's credentials alone are not sufficient to allow admission of that expert's testimony. *Id*. at 153.

Finally, as this Court has properly observed:

> The party seeking to introduce the expert testimony bears the burden of demonstrating that the testimony is both relevant and reliable. The focus is not on the result or conclusion, but on the methodology.

*In re Chinese Manufactured Drywall Prods. Liab. Litig.,* MDL No. 2047, 2010 WL 8368083, at *3 (E.D. La. Feb. 17, 2007) (internal citations omitted).

The Federal Rules of Evidence have been amended to incorporate these jurisprudential principles into a district judge's determination of expert admissibility, stating that:

> A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

---

[3] In *Propulsid*, this Court found that the plaintiff's proffered expert testimony was inadmissible because of failure of the experts to comply with these well-established principles of law.

4

>       (c) the testimony is the product of reliable principles and methods; and
>
>       (d) the expert has reliably applied the principles and methods to the facts of the case.

*See* Fed. R. Evid. 702.

**IV.     ARGUMENT**

    **A.     Dr. Gaziano Should be Precluded From Testifying as a Labeling Expert.**

Bayer intends to offer Dr. Gaziano's testimony to the adequacy of the Xarelto label, despite the fact that Dr. Gaziano has admitted that he is not a labeling expert. As Dr. Gaziano conceded at his deposition in this case:

>       I didn't say I was an expert in label. I said I was an expert in being able to interpret the data in the label.

John Michael Gaziano, M.D., Xarelto Litigation Deposition Transcript (Dec. 15, 2016) (attached as Exhibit 3), at 33:4-6.

Similarly, less than two years ago, Dr. Gaziano testified in Yaz – within months of being retained by Defendants as an expert in this case – that he was not expert on labeling. The testimony could not have been clearer:

>       Q: Are you an expert on labeling?
>
>       A: No, sir.

John Michael Gaziano Yaz/Yasmin Litigation Deposition Transcript (June 12, 2015) (attached as Exhibit 4), at 57:19-20.

Nothing has changed over the intervening months. Since Dr. Gaziano's deposition in Yaz, he has not done anything that would make him an expert on labeling. *See* J. Michael Gaziano. MD, MPH, Curriculum Vitae ("Gaziano CV") (attached to Exhibit 1). His above-cited deposition

5

testimony in this matter, given only a month ago, confirms that he *still* does not hold himself out as a drug label expert.

Dr. Gaziano's opinion – "that the data that is contained in the Xarelto label is a reasonable reflection of the literature in the field" – appears to derive from no particular training or education, but rather is based solely on his own experience as a practitioner, his personal "reading of the label," and his "understanding of the literature." *See* Exhibit 3 at 34:9-13, 35:6-12. It clearly is *not* an opinion based on recognized industry or regulatory standards or principles. In other words, his opinion is based solely on his say-so, the very kind of *ipse dixit* criticized in *Joiner*.

Dr. Gaziano has neither followed nor studied the history of the Xarelto label; he "just [is] aware . . . that there were some changes." *Id.* at 234:6-10. As to his qualifications for rendering his thin opinion, he has never drafted a label for a pharmaceutical product. *Id.* at 33:14-16. He has never written about the drug labeling process. *Id.* at 36:17-22. He has never been asked by the FDA to consult on drug labeling, and he is only "vaguely" familiar with the federal regulations governing drug labeling. *Id.* at 33:17-22. Given the constellation of his admitted inexperience and background deficits, and the utter absence of any methodology in reaching his conclusions, Dr. Gaziano's testimony violates the fundamental *Daubert* principle that an expert's proffered testimony must have "a reliable basis in the knowledge and experience of [the relevant] discipline." *Daubert*, 509 U.S. at 592. *See also Joiner*, 522 U.S. at 146.

  **B.**  **Dr. Gaziano Should be Precluded From Testifying About Xarelto Dosing.**

Bayer also plans to offer Dr. Gaziano's testimony regarding the dosing of Xarelto; but, again, his own testimony demonstrates that he is similarly unqualified to testify in this regard. Dr. Gaziano admitted in his deposition that he has not reviewed all of the Xarelto dosing studies, particularly the early dosing studies that led to Defendants' decision to use 15 and 20 mg doses for

clinical trials. *See* Exhibit 3 at 117:17-21, 124:6-19. He admits to not having reviewed any of Defendants' internal correspondence regarding dosing for the trials. *Id*. at 118:12-20. He further admits that he has not reviewed most rivaroxiban pharmacology papers, or any Bayer papers regarding rivaroxiban pharmacokinetic dosing models. *Id.* at 120:6-18, 126:11-18, 128:11-25, 234:23-235:5. He has not reviewed any of the correspondence between Janssen and the FDA regarding the blood "trough" levels that result from selected rivaroxiban dosing regimens. *Id.* at 151:6-16. Nor has he reviewed any internal correspondence within Bayer or Janssen, or correspondence with any consultants, regarding dose considerations. *Id.* at 118:12-20.

It is hardly surprising that Dr. Gaziano admits to having very limited experience regarding the dosing of Xarelto in particular, or NOACs in general. He has not reviewed the relevant literature pertinent to any opinion regarding Xarelto dosing. His opinions about Defendants' Xarelto dosing regiments do not reflect a reasonable degree of familiarity with the subject and do not rise to the level of reliability required under *Daubert*. *See Daubert*, 509 U.S. at 592-94.

### C. Dr. Gaziano Should be Precluded From Testifying About the TTR of Warfarin in Relation to NOACs.

Dr. Gaziano's deposition testimony reveals that his professional experience with anticoagulants, including NOACs, is too limited to qualify him as an expert. He stated at his deposition that he does not typically see GI bleeds in his own practice, and that his clinical practice is limited in that he does not treat emergent bleeding situations. *See* Exhibit 3 at 175:8-177:8. Additionally, he has not been directly involved in inpatient treatment at the hospitals where he is employed for at least several years. *Id.* at 50:3-51:4.

Despite this lack of experience with anticoagulants, including Xarelto, Dr. Gaziano testified that in his personal experience, the 55% TTR for warfarin attained during the ROCKET

clinical trial is indicative of "real world" results. *Id.* at 192:7-193:3. This testimony is unreliable for several reasons.

First, this testimony is based on his anecdotal clinical experience, which is impossible to verify. It is a classic instance of discarding methodology to offer a conclusion that cannot be scientifically tested. Second, as noted above, Dr. Gaziano's personal experience with patients has been extremely limited for the last several years. Third, the ROCKET TRR of 55% is unusually low by any standard, so low that the primary FDA reviewers cited this low percentage as *the* primary basis for the proposed denial of the Xarelto NDA.[4] *See* Center for Drug Evaluation and Research Summary Review, Nov. 4, 2011 (attached as Exhibit 5), at 2. Across a group of seven other clinical trials, the warfarin "real world" TTR range was found to be approximately 62-73%. *Ibid. See also* 9/8/11 FDA PowerPoint Presentation by Dr. Martin Rose, Sept. 8, 2011 (attached as Exhibit 6), at Slide 15.

In spite of these substantial results, Dr. Gaziano stated at his deposition that "about 50 percent is the range that we all carry around in our heads as a common understanding of how often your patients who are on Coumadin will be in the range." *See* Exhibit 3 at 193:2-6. Such statements demonstrate Dr. Gaziano's unreliable and inaccurate understanding of TRR, and highlight that he is not qualified to testify regarding TRR in this case.

## V.    CONCLUSION

For these reasons, Plaintiffs respectfully request that the opinion testimony of Dr. Gaziano on the above-described subjects be excluded.

---

[4] "The primary basis for recommending that this NDA not be approved relates to the adequacy of the international normalized ratio (INR) control among subjects randomized to warfarin in ROCKET. The mean time warfarin subjects in ROCKET spent in the therapeutic INR range (TTR) of 2.0 to 3.0 was 55%, lower than that attained in all other contemporary trials in which warfarin was a comparator." *Id.*

Dated: January 20, 2017

Respectfully submitted,
*/s/ Leonard A. Davis*
Leonard A. Davis, Esq. (Bar No. 14190)
**HERMAN, HERMAN & KATZ, LLC**
820 O'Keefe Avenue
New Orleans, LA 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Email: ldavis@hhklawfirm.com

Gerald E. Meunier (Bar No. 9471)
**GAINSBURGH BENJAMIN DAVID MEUNIER & WARSHAUER, LLC**
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
Email: gmeunier@gainsben.com

*Plaintiffs' Liaison Counsel*