# EXHIBIT 3

# TO BE FILED UNDER SEAL

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF LOUISIANA

 3

 4    *  *  *  *  *  *  *  *  *  *  *  *  *  *

 5    IN RE:  XARELTO              * MDL 2592

 6    (RIVAROXABAN) PRODUCTS       *

 7    LIABILITY LITIGATION         * SECTION L

 8                                 *

 9    THIS DOCUMENT RELATES TO     * MAG. JUDGE NORTH

10    ALL CASES                    *

11    *  *  *  *  *  *  *  *  *  *  *  *  *  *

12                    - PROTECTED -

13      - SUBJECT TO FURTHER PROTECTIVE REVIEW -

14

15   VIDEOTAPED DEPOSITION OF JOHN MICHAEL GAZIANO, M.D.

16         ECKERT SEAMANS CHERIN & MELLOTT, LLC

17               Two International Place

18               Boston, Massachusetts

19         December 15, 2016            2:06 p.m.

20

21

22

23            Maryellen Coughlin, RPR/CRR

24

25
```

**Page 2**

```
 1  APPEARANCES:
 2  Representing the Plaintiffs:
 3     SEEGER WEISS LLP
 4     77 Water Street, 26th Floor
 5     New York, New York 10005
 6     BY: JEFFREY S. GRAND, ESQ.
 7     212.584.0700
        jgrand@seegerweiss.com
 8
 9  Representing Bayer:
10     THE PIORKOWSKI LAW FIRM
11     1155 F Street NW, Suite 200
12     Washington, DC 20004
13     BY: JOSEPH D. PIORKOWSKI, JR., ESQ.
14     202.223.5535
        jpiorkowski@lawdoc1.com
15
16  Representing Janssen:
17     DRINKER BIDDLE & REATH LLP
18     600 Campus Drive
19     Florham Park, New Jersey 07932
20     BY: JULIE L. TERSIGNI, ESQ.
21     973.549.7106
22     julie.tersigni@dbr.com
23
24
25
```

**Page 3**

```
 1              I N D E X
 2  EXAMINATION                  PAGE
 3  BY MR. GRAND                    4
 4  BY MR. PIORKOWSKI             234
 5  BY MR. GRAND                  243
 6
 7              EXHIBITS
 8  NO.   DESCRIPTION            PAGE
 9  1  Plaintiffs' Notice with Subpoena    6
10     Duces Tecum of Oral Videotaped
11     Deposition of John Michael
12     Gaziano, M.D.
13  2  Expert report of Dr. Gaziano      18
14  3  "Incidence and Determinants of   103
15     Traumatic Intracranial Bleeding
16     Among Older Veterans
17     Receiving Warfarin for Atrial
18     Fibrillation," Dodson et al
19  4  "Bleeding in patients with       225
20     atrial fibrillation treated with
21     dabigatran, rivaroxaban or
22     warfarin: A retrospective
23     population-based cohort study,"
24     Ellis et al
25
```

**Page 4**

```
 1           P R O C E E D I N G S
 2
 3        THE VIDEOGRAPHER:  We are now on
 4  the record.  My name is Kevin Pollard, and I'm a
 5  videographer for Golkow Technologies.  Today's
 6  date is December 15th, 2016, and the time is 2:04
 7  p.m.
 8        This video deposition is being held
 9  in Boston, Massachusetts in the matter of Xarelto
10  Products Liability Litigation.  The deponent is
11  John Michael Gaziano, M.D.  Counsel will be noted
12  on the stenographic record.  The court reporter
13  is Maryellen Coughlin and will now swear in the
14  witness.
15
16        JOHN MICHAEL GAZIANO, M.D.,
17  having been first duly sworn, was examined
18  and testified as follows:
19
20              EXAMINATION
21  BY MR. GRAND:
22     Q.    Good afternoon, Dr. Gaziano.  My
23  name is Jeffrey Grand.  I'm here to ask you some
24  questions today on behalf of the MDL plaintiffs.
25  I know you've been deposed before.  I'll just
```

**Page 5**

```
 1  sort of briefly refresh you on some of the ground
 2  rules to help us get through today as quickly as
 3  possible.
 4        First off, if you need a break at
 5  any time, just let me know, and I'll be happy to
 6  accommodate you.  I only ask that if we're -- if
 7  I'm in the middle of a question that you try to
 8  answer it first before you take a break.
 9        Second of all, because the court
10  reporter has to take everything down, we need to
11  give all our answers orally.  So I would ask that
12  we try to give yes and no answers or verbal
13  answers as best we can and try to avoid hand
14  gestures and nodding.
15        Finally, if there is -- because we
16  have a tendency to anticipate questions and
17  answers, I would ask that you let me finish my
18  question before you answer, and I will also do my
19  best to let you finish your answer before I ask
20  another question.  Fair enough?
21     A.    Yes.
22     Q.    Thanks.  First off, I guess we'll
23  mark as Gaziano 1 the depo notice that was served
24  in this case.
25  ////
```

Page 6

1    (Whereupon, Deposition Exhibit 1,
2    Plaintiffs' Notice with Subpoena Duces Tecum
3    of Oral Videotaped Deposition of
4    John Michael Gaziano, M.D.,
5    was marked for identification.)
6   BY MR. GRAND
7        Q.    Doctor, have you seen this before?
8        A.    Yes.
9        Q.    I know there's an understanding
10  amongst counsel with respect to materials to be
11  brought. I wanted to ask you specifically, if
12  you turn to the second page, about item number 1.
13       With respect to item 1(a), a list
14  of documents, materials containing the facts or
15  data relied upon by the witness in forming his or
16  her opinions, I know that that was -- that such a
17  list was included as an appendix to your report.
18       Do you have any additions or
19  changes to that list today?
20       A.    No, sir.
21       Q.    Okay. So fair enough that beyond
22  your own experience and training that the only
23  materials you relied upon in formulating your
24  opinions contained in your report are the items
25  on that list?

Page 7

1        A.    Yes, training, teaching, clinical
2   experience and research experience.
3        Q.    With respect to item number (c),
4   your current CV, that was also included as an
5   appendix to your report. Is that an updated CV?
6        A.    Yes, it was certainly updated at
7   the time of submission, but I think it's -- I
8   think it's dated 11/15/16.
9        Q.    Is there anything to add to it
10  between 11 --
11       A.    Nothing material. I imagine that
12  the publications are an ongoing activity, and my
13  assistant keeps those up-to-date quarterly, and
14  there may be a few publications that aren't
15  on the -- on the current CV.
16       Q.    Okay. And with respect to item
17  1(e), a statement of the compensation to be paid
18  for the witness's study and testimony in the
19  case, including the witness's invoices/bills for
20  the work performed to date, my understanding is
21  you have not yet billed defendant for your time
22  in this case?
23       A.    That is correct.
24       Q.    Okay. Without telling me the
25  substance of the conversation, can you tell me

Page 8

1   when you were first contacted by defendant to
2   work as an expert in this case?
3        A.    Oh, I can't give you an exact date.
4   I imagine it was over a year ago.
5        Q.    Okay. In fall of 2015, somewhere
6   in that ballpark?
7        A.    I would say it was -- it was
8   certainly before the first of the year, yeah.
9        Q.    Okay. And who contacted you?
10       A.    It was Mr. Piorkowski.
11       Q.    And following that, were you
12  contacted by phone, I assume?
13       A.    I believe so.
14       Q.    Okay. Following that initial call,
15  did you have meetings with Mr. Piorkowski?
16       A.    Yes, sir.
17       Q.    How many times have you met with
18  Mr. Piorkowski?
19       A.    I don't recall the precise number,
20  but it's been -- my guess would be about a
21  handful of meetings.
22       Q.    Less than ten?
23       A.    I would say yes, less than ten
24  face-to-face meetings.
25       Q.    More than five?

Page 9

1        A.    I wouldn't know for sure, but it's
2   in that range.
3        Q.    Okay. Other than Mr. Piorkowski,
4   who else was present at the meetings?
5        A.    So there have been -- there have
6   been various other attorneys but at the moment I
7   don't recall all of their names.
8        Q.    Okay. Were Janssen attorneys
9   present at the meetings?
10       A.    Yes, sir.
11       Q.    Okay. Were there any Bayer or
12  Janssen employees present at the meetings?
13       A.    I don't recall ever meeting with
14  Janssen or Bayer employees.
15       Q.    Okay. In preparation of your
16  report, did you have any discussions with Bayer
17  or Janssen employees?
18       A.    No, sir.
19       Q.    Were there any other Bayer or
20  Janssen experts present at the meeting?
21       A.    No, sir.
22       Q.    Have you had any conversations with
23  Bayer or Janssen experts in preparation of your
24  report?
25       A.    No, sir.

Page 10

```
 1    Q.   And included in the five to ten
 2  meetings that you had with Mr. Piorkowski, does
 3  that include preparation for your deposition
 4  today?
 5    A.   Yes, sir.
 6    Q.   Okay.  And when was the last time
 7  you met with Mr. Piorkowski to prepare for your
 8  deposition?
 9    A.   Last night.
10    Q.   And how long did that meeting last?
11    A.   I think it was about three hours.
12    Q.   And prior to that, when was the
13  last time you met with Mr. Piorkowski to prepare
14  for your deposition?
15    A.   We had no other face-to-face
16  meetings for preparation.
17    Q.   Did you have teleconferences?
18    A.   Yes, sir.
19    Q.   When was the last time you had a
20  teleconference to prepare for your deposition?
21    A.   Saturday.
22    Q.   And how long was that call?
23    A.   About the same.
24    Q.   With respect to preparation for
25  your deposition today, did you have any other
```

Page 11

```
 1  meetings or teleconferences with Mr. Piorkowski?
 2    A.   I don't believe so.
 3    Q.   Okay.  The other -- the other
 4  meetings you've referenced were in connection
 5  with preparation of your report, correct?
 6    A.   Preparation of the report and
 7  generally discussing the facts and science of
 8  the -- of the case.
 9    Q.   With respect to your report, how
10  did you -- what did you understand your charge to
11  be in connection with this case?
12    A.   Well, the nature of the opinions
13  that I was offering were with respect to the
14  totality of the evidence that's been published or
15  reported on rivaroxaban in its various clinical
16  indications in the context of the broader data
17  that's available on other NOACs and similar
18  agents that are used and nothing about any
19  particular clinical cases.
20    Q.   Just to make sure I understand,
21  your answer was your task in this case was to
22  evaluate the published or reported literature or
23  clinical trial results relating to rivaroxaban?
24    A.   Yeah, I think the term that I
25  prefer to use is the totality of evidence that
```

Page 12

```
 1  was -- that is available to me, some published
 2  and some unpublished.
 3    Q.   Okay.  So in your mind, the
 4  totality of the evidence only includes published
 5  data?
 6    A.   No, no.  That's what I'm saying, I
 7  think it includes both published and other
 8  reports that I suppose that they have been put in
 9  the public domain, but they're not published in
10  the academic sense of the word.
11    Q.   Well, there's evidence that is not
12  in the public domain that was also available to
13  you, though, correct, or could have been
14  available to you?
15         MR. PIORKOWSKI:  Object to form.
16    A.   Well, I'm just trying to -- I'm
17  trying to make a distinction.
18         I think -- I think most of what
19  I've seen was put in I imagine the public domain,
20  in, for example, an FDA report.  It's accessible,
21  but it's not, you know, published in a journal.
22         I don't recall, although it's
23  possible, but I don't recall seeing other things
24  that were not either published or placed in -- in
25  the public domain in that regard, as being part
```

Page 13

```
 1  of a report that was submitted to the FDA, for
 2  example.
 3    Q.   Okay.  I just -- I'm not trying to
 4  be dense.  I just want to understand.
 5         When you say totality of the
 6  evidence, you're not implying that you looked at
 7  all the evidence relating to rivaroxaban, are
 8  you?
 9    A.   No.  No, no, no, that's -- I think
10  that that's a fair distinction.  What I mean is
11  the breadth of the data that an epidemiologist or
12  clinician would, you know, have available or
13  that's been made available to understand the
14  specific question that I was focussing on was
15  the -- is the use of these drugs in a clinical
16  context.
17         So that means what I didn't explore
18  in excruciating detail are things like the years
19  of work that went into the development of the
20  drug or animal studies or things like that.  So
21  in I guess your -- it's fair to make that
22  distinction.
23    Q.   With respect to the materials you
24  reviewed, were those materials you requested, or
25  were those materials provided to you by counsel?
```

Case 2:14-md-02592-EEF-MBN Document 5123-11 Filed 01/20/17 Page 6 of 65
Case 2:14-md-02592-EEF-MBN Document 5127-11 Filed 01/20/17 Page 6 of 65
Protected – Subject to Further Protective Review

Page 14

1    A.    So there were materials that I
2  reviewed that are a combination of materials
3  provided by me or that I requested or that I was
4  aware of because of my role as a cardiologist in
5  the field, who, like all cardiologists, has to be
6  up-to-date on current practice, and this is an
7  area of important attention for our -- a large
8  number of our patients.
9    Q.    Do you have a -- in preparation of
10 your report, did you use a research assistant or
11 a research associate?
12   A.    No, sir, I did not.
13   Q.    Okay.  And in reviewing the list of
14 materials considered, I noticed the bulk of the
15 material is published literature, correct?
16   A.    Yes, sir.
17   Q.    Okay.  I noticed you also did
18 review the clinical study reports that were
19 submitted to the FDA --
20   A.    Yes, sir.
21   Q.    -- by defendants, correct?
22   A.    Correct.
23   Q.    Okay.  Other than the clinical
24 study reports, did you review any other internal
25 documents?

Page 15

1    A.    So I don't recall -- do you mean --
2  there's another category besides what was
3  submitted.  There's also internal FDA -- well,
4  there's FDA reports.  I guess they are -- they're
5  made public, but they're -- those are distinct
6  from the reports.  But I don't recall reviewing
7  other documents that were confidential that were
8  made available to me.
9    Q.    Did you review any internal
10 analyses done by Bayer or Janssen relating to
11 rivaroxaban other than those contained in the
12 clinical study reports?
13       MR. PIORKOWSKI:  Object to form.
14 Go ahead.
15   A.    I don't believe that I reviewed
16 others than that were provided.  I believe the
17 internal reanalysis that was done by the company
18 or companies was provided to the FDA, and I
19 believe the EMA as well, but I don't think that
20 it was -- that there were confidential analyses
21 that hadn't been provided.
22   Q.    Well, did you ask --
23   A.    No, I didn't.
24   Q.    Okay.  And when you said the
25 reanalysis, you're referring to the reanalysis of

Page 16

1  the ROCKET data, correct?
2    A.    Yes, sir.
3    Q.    Okay.  Other than the reanalysis of
4  the ROCKET data done by the company and the
5  analysis of Xarelto clinical data contained in
6  the clinical study reports, did you see any other
7  or did you request or see any other analyses
8  performed by Bayer or Janssen employees?
9        MR. PIORKOWSKI:  Object to form.
10   A.    Let me just take a glance through
11 the report.  I mean, I was provided --
12   Q.    Sure.
13   A.    -- quite a bit of information as I
14 was --
15       MR. PIORKOWSKI:  Can I ask a
16 clarifying question, Jeff?  Is that all right?
17 For purposes of your question, would you be
18 considering a briefing document that's in the
19 public domain prepared by Janssen to be in that
20 category?
21       MR. GRAND:  No.
22       MR. PIORKOWSKI:  Okay.
23       MR. GRAND:  Yes, I'm excluding --
24 Just to be clear, Doctor --
25   A.    Yes.

Page 17

1    Q.    -- 'cause I'm not trying to trick
2  anybody up.  I just want to understand what
3  you've looked at.
4    A.    Right.
5    Q.    I am not including any Bayer or
6  Janssen submissions to the FDA.
7        When I say -- my understanding is
8  you've reviewed submissions to the FDA made by
9  Bayer and Janssen at least with respect to
10 ROCKET, correct?
11   A.    Correct.
12   Q.    And my understanding is you've also
13 reviewed clinical study reports with respect to
14 rivaroxaban, correct?
15   A.    Correct.
16   Q.    So when I ask if you reviewed any
17 other internal analyses that may have been done
18 by Bayer or Janssen, I'm talking about really
19 anything other than those two categories I just
20 listed.
21   A.    Yeah, and I don't recall seeing
22 anything under -- outside of those -- those
23 general categories.  That would also include
24 published data in particular on things that
25 are -- that go beyond rivaroxaban.

Case 2:14-md-02592-EEF-MBN Document 5132-11 Filed 01/20/17 Page 7 of 65
Case 2:14-md-02592-EEF-MBN Document 5127-1 Filed 01/20/17 Page 7 of 65
Protected - Subject to Further Protective Review

Page 18

1      Q.    Okay. Thanks. I'm just marking
2 for the record a copy of your report. If you
3 feel more comfortable using the one you have,
4 feel free to. I just want to have it on the
5 record.
6      A.    Okay.
7         MR. GRAND: I'm assuming you two
8 don't need copies, but if you want one, I've got
9 it.
10         MR. PIORKOWSKI: So this was the
11 version that's as produced with the CV?
12         MR. GRAND: That was produced to
13 us.
14         MR. PIORKOWSKI: Okay. All right.
15         THE WITNESS: That looks like it's
16 identical. It's the same last page.
17         MR. GRAND: It probably is, but
18 I've tried to save paper.
19    (Whereupon, Deposition Exhibit 2,
20     Expert report of Dr. Gaziano,
21     was marked for identification.)
22 BY MR. GRAND
23      Q.    Did you review any emails
24 between -- strike that.
25         Excluding any emails that may

Page 19

1 have -- well, strike that.
2         Did you review any emails between
3 or among Bayer and Janssen employees regarding
4 rivaroxaban?
5      A.    I don't recall reviewing any.
6      Q.    Did you review any drafts of
7 published literature as opposed -- as opposed to
8 the published version of the literature?
9      A.    You mean prior to submission?
10      Q.    Yes.
11      A.    No, I don't recall reviewing any
12 drafts prior to submission.
13      Q.    Did you review any correspondence
14 between Bayer and Janssen -- Bayer or Janssen and
15 the FDA other than materials relating to the
16 ROCKET reanalysis?
17      A.    I don't believe so. I think that
18 the listed documents here are all -- I believe
19 that they're all public domain communications.
20         There's also a couple of press --
21 press pieces, but I don't, I don't -- I don't
22 believe so.
23      Q.    Okay. Did you review any internal
24 emails amongst Bayer or Janssen regarding the --
25 regarding Alere or the INRatio device?

Page 20

1      A.    No, sir.
2      Q.    Did you review any internal emails
3 amongst Janssen or Bayer employees regarding the
4 clinical trial design for any of the rivaroxaban
5 studies?
6      A.    No, sir.
7      Q.    May I ask why not?
8      A.    My -- the question posed to me was
9 to -- was an assessment of the evidence base that
10 was used to make recommendations for the drug's
11 clinical use, and the study report and the
12 randomized trial, as an experienced trialist,
13 provides -- provided me with sufficient
14 information such that I didn't require any
15 additional information to have a very good
16 understanding of the major and many of the minor
17 design elements in the study.
18      Q.    Are the opinions of the scientists
19 that work at Bayer and Janssen not relevant to
20 formulating your opinions?
21         MR. PIORKOWSKI: Object to form.
22      A.    Well, I don't know what the
23 opinions of the scientists are. The -- it is
24 clear when we publish a paper that the design
25 elements must be laid out for not only me as an

Page 21

1 expert but me as a, and everyone else, as a
2 clinician. And if I had questions about the
3 design, or if anyone did, then, you know, there's
4 a process for doing that as a clinician in a
5 letter to the editor. If I had questions about
6 design elements, I would have inquired, but I --
7 I'm sure that the -- that the opinions of Bayer
8 investigators, whatever they might be, might even
9 be varied, but the most important information is
10 the -- is the actual elements of the study design
11 and the actual results, and that's the basis that
12 myself as a clinician and myself as an expert can
13 provide a expert opinion on the clinical
14 questions that were posed.
15      Q.    How many hours -- I appreciate the
16 fact that you've not generated any invoices yet.
17         Can you tell me how many hours
18 you've spent preparing your report?
19      A.    Not without going back. I've kept
20 a log, but it's certainly -- it's in the tens of
21 hours range, and it's not hundreds of hours, but
22 it's in the tens of hours.
23      Q.    And in addition to what time you
24 spent with counsel on the telephone, how many
25 hours would you say you've spent preparing for

Protected - Subject to Further Protective Review

Page 22

1  this deposition?
2      A.    So I would say, you know, between
3  10 and 15.
4      Q.    And what is your -- what is your
5  hourly rate for report preparation?
6      A.    I charge $500 an hour for all
7  activities.
8      Q.    So regardless of whether
9  deposition, trial?
10     A.    Correct.
11     Q.    Okay.  Would you say you spent 40
12 to 50 hours preparing your report?
13          MR. PIORKOWSKI:  Object to form.
14 You're breaking out preparing his report from
15 preparation for deposition?
16          MR. GRAND:  Yes.
17     A.    Yeah, I couldn't tell you the exact
18 amount of hours, but I do intend to prepare an
19 invoice, and certainly, you know, that will be
20 provided.  But I can't give you an exact amount.
21 The best I could say is, you know, tens of hours
22 in previous -- in previous meetings and then in
23 report preparation, yes.
24     Q.    You knew you were going to be asked
25 about how many hours you spent on your report

Page 23

1  today, correct?
2      A.    Well, I didn't anticipate the
3  question and didn't come prepared to give you a
4  precise number.
5      Q.    Okay.  Well, you saw that that was
6  on the notice, correct?
7      A.    What I say on the notice was
8  invoices, and I've -- I've not provided any.
9      Q.    Okay.  You've testified as an
10 expert before, correct?
11     A.    I have.
12     Q.    Have you ever sat through a
13 deposition and not been asked about how many
14 hours you've spent working on a case?
15     A.    Yes.
16     Q.    Do you expect that you'll likely
17 bill between 50 to $100,000 for this case?
18     A.    I don't know the precise amount.
19 As I said, I've got quite a few hours in.
20     Q.    Well, with respect to the amount of
21 time you've put into this case, do you feel it's
22 comparable to the amount of time you put into the
23 case for YAZ?
24          MR. PIORKOWSKI:  Object to form.
25     A.    I would say that it's -- that

Page 24

1  played out over a longer period of time, and my
2  best guess was that it would be less than that.
3      Q.    Okay.  And this is not the first
4  time that you've been a -- served as an expert
5  consultant to Bayer, correct?
6      A.    That's correct.
7      Q.    Okay.  And you were a consultant to
8  Bayer for the YAZ litigation, correct?
9      A.    Yes, sir.
10     Q.    Okay.  And you gave a deposition in
11 that -- in that case, correct?
12     A.    Yes, sir.
13     Q.    Okay.  Do you recall that at the
14 time you were deposed you had billed about
15 $65,000 in that case?
16          MR. PIORKOWSKI:  Object to form.
17     A.    I didn't recall the precise amount,
18 but if that's what's in the deposition record, I
19 would have no reason to not believe that.
20     Q.    And prior to being an expert
21 consultant in the YAZ litigation for Bayer,
22 you've also served as a consultant to Bayer for
23 their ARRIVE trial, correct?
24     A.    Yes, sir.
25          MR. PIORKOWSKI:  Objection to being

Page 25

1  paid.
2      Q.    And for that they paid you
3  $250,000, correct?
4          MR. PIORKOWSKI:  Object to form.
5      A.    Yes, sir.  I've been a consultant
6  on that project for over ten years.
7      Q.    Are you still a consultant on that
8  project?
9      A.    Yes.  It's coming to a close, but
10 we're not quite done yet.
11     Q.    Okay.  Have you been at this point
12 paid more than $250,000?
13     A.    I do believe so, yes.
14     Q.    Okay.  Other than the YAZ
15 litigation, your work I believe on the steering
16 committee for the ARRIVE trial?
17     A.    Yes, sir.
18     Q.    And your work in this case, have
19 you done any other consultation for Bayer during
20 your career?
21     A.    I don't believe that there's
22 been -- I don't recall any other specific
23 consultation for Bayer.
24          Actually, I do recall one.  I was
25 on a one-time advisory board meeting about high

Page 26

1 blood pressure medication -- medications in
2 general.
3     Q.    Was that -- I'm sorry.
4     A.    It was a one day -- one-day
5 advisory board meeting.
6     Q.    And were you paid for that?
7     A.    Yes, sir.
8     Q.    Do you recall what you were paid?
9     A.    I don't recall the exact amount.
10 There was a -- there was a stipend for one day so
11 I could work.
12     Q.    Would it be fair to say that
13 between YAZ, the ARRIVE trial and your ongoing
14 work in this case that you will be approaching
15 $500,000 in compensation from Bayer?
16     MR. PIORKOWSKI: Object to form.
17     A.    I couldn't put a number on it. I
18 know that the two -- at this point, the two
19 largest chunks were for the ARRIVE and for YAZ
20 and then for this, but I don't think it would
21 amount to that much, but I couldn't give you an
22 exact number.
23     Q.    Okay. Well, at the time you were
24 deposed in YAZ, which was I believe two years
25 ago, you had been paid $250,000 for the ARRIVE

Page 27

1 trial.
2     A.    Yes, but that was the -- that was
3 the front-loaded compensation for the bulk of the
4 work for the whole duration of the trial.
5     Q.    Okay.
6     A.    So there's, you know, considerably
7 less compensation subsequent to that. All of the
8 committee members were given a contract for the
9 bulk of the work that it would take, all knowing
10 that the end date for the trial, which got
11 extended, was not certain. So that's the -- that
12 would be the majority of the pay that we received
13 for that consultation.
14     Q.    Okay, I understand that. But how
15 much more have you been paid above the 250?
16     A.    So it's only for, you know,
17 occasional meetings, compensated for meetings,
18 but it's not the -- the contract for the work
19 that was done on the ARRIVE trial was paid over
20 the first five years, and then we were not
21 compensate -- then that compensation ended.
22     Q.    Okay. And how many meetings have
23 you had since you were paid the original
24 $250,000?
25     A.    It's usually one or two a year.

Page 28

1     Q.    Okay. And what are you paid per
2 meeting?
3     A.    I believe we get somewhere in the
4 range of $3,000.
5     Q.    Okay. So would it be fair to say
6 you've been paid at least another 10 to $15,000?
7     A.    Yes.
8     Q.    Okay. So it's approximately
9 265,000?
10     MR. PIORKOWSKI: Object to form.
11     A.    I would say that it's -- my guess
12 is it would be in that range.
13     Q.    And do you recall previously
14 testifying you'd been paid $65,000 for YAZ?
15     A.    I don't recall, but I think that
16 that sounds about like the amount that I would
17 have testified to.
18     Q.    Okay. Do you anticipate in this
19 case that you would, should you come to trial,
20 you would bill another $65,000?
21     A.    Well, I think that the -- I would
22 say that it's a comparable type of work. I can't
23 anticipate what kind of additional work there
24 might need to be in preparation for trial, but
25 it's the same type of work.

Page 29

1     Q.    Okay. So that would add up to
2 approximately 2 to $395,000; is that right?
3     MR. GRAND: Object to form.
4     Q.    If we assume 265 for the ARRIVE
5 trial, 65 for YAZ and another 65 for this case,
6 that would be $395,000, correct?
7     A.    I think I agree with the math.
8     Q.    Okay. And prior to -- strike that.
9     Are you currently consulting with
10 Bayer on other product other than Xarelto?
11     A.    No, sir. Well, the ARRIVE trial
12 was --
13     Q.    Fair enough. What about Janssen?
14     A.    I'm sorry?
15     Q.    Do you consult with Janssen at all?
16     A.    No, sir.
17     Q.    And prior to -- prior to the YAZ
18 litigation, have you -- did you do any consulting
19 on pharmaceutical litigation?
20     A.    Yes.
21     Q.    Would that be in connection with
22 Vioxx?
23     A.    Yes, sir.
24     Q.    Okay. And Merck was the defendant
25 in that case, correct?

Page 30

1    A.    Correct.
2    Q.    And in that case, you were paid
3  over $100,000, correct?
4    A.    Correct.
5    Q.    And prior to that, were you a
6  litigation consultant in the ephedra litigation?
7    A.    Yes, sir.
8    Q.    And that was for the defendant,
9  correct?
10    MR. PIORKOWSKI:  Object to form.
11    A.    Yes, sir.
12    Q.    Okay.  Do you recall your
13  compensation in the ephedra litigation?
14    A.    No, I don't.
15    Q.    I appreciate it was some time ago.
16    A.    It was a long time ago.  It was
17  considerably less than the work that I had done
18  for Merck.  The Vioxx work spanned over four
19  years, and this was a much more limited activity.
20    Q.    And prior to PPA, did you work on
21  any other pharmaceutical litigation?
22    A.    I don't -- I don't recall.
23    Q.    And I noticed on your -- included
24  in your report you list a statement of litigation
25  consulting you've done, correct?

Page 31

1    A.    Correct.
2    Q.    Okay.
3    A.    Over the last, I believe, four
4  years.
5    Q.    Four years.  There were a number of
6  cases on that list.  Were those -- other than the
7  ones we've spoken about, were those medical
8  malpractice cases?  Could you describe the nature
9  of those cases?
10    A.    So they were all medical.  You
11  know, other than the ones I believe we've talked
12  about on that list, I believe they were all
13  medical malpractice.  Yes, they were.
14    Q.    And who do you -- who do you
15  generally represent in those cases?
16    MR. PIORKOWSKI:  Object to form.
17    A.    I've represented both defendants
18  and plaintiffs.
19    Q.    Okay, I want to sort of shift gears
20  a little bit and ask you some questions about
21  your CV and some of your past experience.
22    A.    Okay.
23    Q.    Do you -- do you hold yourself out
24  as an expert in drug labeling?
25    A.    I use drug labeling as a

Page 32

1  educational tool for myself and education of
2  young trainees.
3    Because I'm an expert in the type
4  of literature trials and other studies that go
5  into the -- into labeling, I do consider myself
6  more expert than the average physician or trainee
7  in interpreting what's the information that's in
8  a label.
9    Q.    Okay.  More expert than the average
10  physician?  Can you answer my question, which is
11  are you holding yourself out as an expert in
12  labeling?
13    MR. PIORKOWSKI:  Object to form.
14    A.    I don't know what you mean by hold
15  myself out.  I have an expertise in the kinds of
16  trials that -- the kinds of research that goes
17  into labeling and is often used for determining
18  clinical indications for drugs, and I teach and
19  lecture in the area of how those studies are
20  done, and that's not an expertise that's present
21  in the -- your average clinician.  So I do hold
22  myself out to be -- if hold myself out means -- I
23  have an expertise in randomized trials, which are
24  often the mainstay of the work in a label, more
25  so than the majority of clinicians that don't --

Page 33

1  that are not involved in research.
2    Q.    Okay.  When did you acquire
3  expertise in labeling?
4    A.    I didn't say I was an expert in
5  label.  I said I was an expert in being able to
6  interpret the data in the label.
7    Q.    Okay.  Is it your intention to
8  offer an expert opinion as to the adequacy of the
9  label in this case?
10    A.    So it's -- it's my opinion that the
11  data that is contained in the Xarelto label is a
12  reasonable reflection of the literature in the
13  field.
14    Q.    Okay.  Have you ever drafted a
15  label for a pharmaceutical product?
16    A.    No, sir.
17    Q.    Okay.  Have you ever been asked by
18  the FDA to consult on drug labeling?
19    A.    No, sir.
20    Q.    Are you familiar with the federal
21  regulations concerning drug labeling?
22    A.    Vaguely but not in excruciating
23  detail.
24    Q.    Okay.  What do you base your
25  labeling opinions on?

Protected - Subject to Further Protective Review

| Page 34 | Page 36 |
|---|---|

**Page 34**

1     A.    So I never said I have opinions on
2  labeling. I have opinions on what's in the
3  label, and what's -- what is contained in the
4  Xarelto label, I think, is an adequate reflection
5  of the literature that's been published on
6  Xarelto and a reasonable representation of that
7  labeling for a clinician to be able to use that
8  product.
9     Q.    Okay. Your opinion that the
10  Xarelto label is an adequate reflection of the
11  literature, what is that based on?
12     A.    It's based on the reading of the
13  label and my understanding of the literature.
14     Q.    Okay. Is that based on any set of
15  standards?
16        MR. PIORKOWSKI: Object to form.
17     A.    It's based on my expertise in being
18  able to interpret the literature and synthesize
19  it, as I've done in many forum, whether it be a
20  lecture or even a review, book chapter, paper.
21     Q.    Okay. So your opinion that the
22  label is adequate is based -- is not based on any
23  objective set of standards, correct?
24        MR. PIORKOWSKI: Object to form.
25     A.    You sort of mischaracterized what I

**Page 35**

1  said. I said that the label is an adequate
2  reflection of the literature on the topic and as
3  that literature is translated for a clinician to
4  use the -- use the information in clinical
5  practice.
6     Q.    And you're basing that on your own
7  experience?
8     A.    Yes, sir.
9     Q.    Okay. You're not basing that on
10  any FDA standards as to what should be contained
11  in the label, correct?
12     A.    Correct.
13     Q.    Okay. And you have no prior
14  experience in either consulting on or drafting
15  drug labeling, correct?
16     A.    That's correct, not specific.
17  Although, I have done studies that were pivotal
18  in acquiring labeling, so I have some
19  understanding of the process in how that -- the
20  literature gets translated from a study that I
21  conducted to a label.
22     Q.    Okay. When you say you've done
23  studies that were pivotal in acquiring label --
24  acquiring labeling, do you mean gaining approval
25  for an indication?

**Page 36**

1     A.    Yes, sir, I do, in gaining approval
2  for indication, and then it got translated into a
3  label, that's correct.
4     Q.    Okay. You didn't draft a label,
5  correct?
6     A.    No, sir.
7     Q.    Okay. And you had nothing to do
8  with that sponsor's negotiations with the FDA
9  about the label, correct?
10     A.    So I have been involved in
11  discussions on the design of a trial at the FDA
12  with the FDA, and I think that that probably
13  represents part of that process, not the specific
14  drafting of the language in the label but the
15  design of the study that was required by the FDA
16  to provide approval.
17     Q.    Have you ever written on drug
18  labeling?
19     A.    Written about the process of drug
20  labeling?
21     Q.    Yes.
22     A.    No, sir.
23     Q.    Okay. Do you understand that the
24  adequacy of the Xarelto label was a legal issue
25  in this case?

**Page 37**

1        MR. PIORKOWSKI: Object to form.
2     A.    I was not using the term in a legal
3  context, but in a clinical one, that it's -- I
4  think it's a -- maybe -- if that's a legally
5  charged word, I can use a different one. That I
6  think that it is a reasonable reflection of the
7  literature that provides information to a
8  clinician on the clinical application of that
9  drug.
10     Q.    In your report, you state that you
11  treat patients?
12     A.    Yes, sir.
13     Q.    Okay. How many patients do you see
14  a week?
15     A.    I'm responsible for a clinic that
16  generally has between 10 and 20 patients. I run
17  that clinic with two to four clinical fellows.
18     Q.    Okay. How many patients do you
19  personally see a week?
20     A.    Well, I'm responsible for all of
21  them, and I have communication with each of the
22  fellows about the patients, and I see a large
23  number of them.
24     Q.    Okay. Move to strike as
25  non-responsive.

Page 38

1    How many patients do you personally
2 see a week?
3    A.    So I guess it depends on what you
4 mean by see.  I'm responsible for all of these
5 patients while the fellows often begin the
6 encounter, and then, you know, we discuss the
7 case, and I may -- you know, in a new patient, I
8 will do my own examination.  I won't do my
9 examination in all cases in a returning patient,
10 but that patient is my responsibility.
11    So if seeing a patient in a
12 clinical sense means being responsible for that
13 patient, as opposed to the seeing a patient in
14 the lay sense of -- if it's seeing patients
15 walking in the hall, I see many, many, walking
16 through, so in the literal sense of seeing a
17 patient.  But if seeing means that you were
18 clinical responsible for those patients, I stand
19 by the answer that I provided you.
20    Q.    Is it fair to say that you don't
21 actually see patients yourself but you oversee
22 their care?
23    A.    No, that's not fair.  I see a large
24 number of the patients.  I don't see -- I don't
25 physically see all the patients.  I do discuss

Page 39

1 the case about the patients in various forms of
2 communication about all of them.
3    Q.    Okay.  And where do you see these
4 patients?
5    A.    I see these patients in preventive
6 cardiology.  It's an ambulatory clinic.
7    Q.    And where is that?
8    A.    That's at the Boston VA.
9    Q.    And when you say it's an ambulatory
10 clinic, can you describe what that means?
11    A.    What that means is that the
12 patients are not hospitalized in the facility.
13 They come in that morning and are seen by us, and
14 we may also refer them to other parts of the
15 hospital for diagnostic testing.  But unless
16 they're ill, they go home at the end of the
17 encounter or the end of the tests that we might
18 have scheduled for them.
19    Q.    And I just want to be clear, did
20 you describe it as a preventive?
21    A.    Preventive cardiology clinic.
22    Q.    Okay.  Can you describe what that
23 is, please?
24    A.    So what that is, is that's a clinic
25 where -- the majority of patients that we see are

Page 40

1 not acutely ill, although they can be, and if we
2 detect that there's an acute illness, then we get
3 them to the emergency room or to the cardiology
4 service or the inpatient service, but generally
5 speaking, these are patients that are not acutely
6 ill but have issues that we have to address over
7 a longer period of time, and the idea is to
8 prevent events from happening in people with
9 known disease or prevent the occurrence of that
10 disease in people without it who might have risk
11 factors.
12    Q.    So when you say they're not acutely
13 ill, I mean, how are they presented?  Are they
14 coming in for checkups, are they coming in for --
15    A.    So they can have -- they can
16 have --
17    MR. PIORKOWSKI:  Let him finish the
18 question, so you're not talking over each other.
19    A.    So they can have specific
20 complaints.  It could be a routine checkup, as
21 you say, with no complaints.  But we're following
22 the status of their disease or the status of
23 their risk factors, like their high cholesterol,
24 their blood pressure, their diabetes.  So they
25 might have no complaints.  Although, they may

Page 41

1 come in complaining of symptoms, and it's our job
2 to evaluate them.
3    And what I mean by them not being
4 acutely ill, is that we're not an emergency room
5 where patients are coming in on a frequent basis
6 with an acute serious complaint, although we do
7 have patients who do come in.  For instance, a
8 patient might come in and say, Doctor, I'm having
9 chest pain every time I walk, and I had some when
10 I came up the stairs, and to me that would be a
11 concerning acute situation where I would need to
12 get them to the emergency room or to the stress
13 lab or the cath lab.  But generally speaking,
14 they're not a patient that's coming in in
15 extremis.  They're a patient that's walking in,
16 that's the notion of the ambulatory, walking in,
17 and you know, they may or may not have complaints
18 to deal with.
19    Q.    Okay.
20    A.    But they're not generally acutely
21 ill, although we have to be on guard for
22 identifying those that are acutely ill and
23 directing them to the appropriate parts of the
24 hospital that would manage that acute process.
25    Q.    Okay.  So if -- if you determine

Page 42

1    someone's acutely ill or you determine that
2    somebody needs testing at the hospital, do you
3    sort of refer them to someone else within the
4    hospital and --
5        A.    Yes, but it's a referral that
6    we customize, and it may be us taking them to a
7    certain part of the hospital or us calling
8    upstairs, or one of our colleagues in the
9    cardiology service, and saying, I need an echo on
10   Mr. Smith. And if there's something wrong, you
11   know, I want to hear about it, and we might get
12   them admitted.
13           If they get admitted to the
14   hospital, we will follow up, but we are no
15   long -- there's an inpatient team. I am no
16   longer the responsible physician, but we stress
17   to the fellows that if you admit a patient you
18   better follow up with what happened to them, and
19   I expect that to be more than just a phone call
20   to the doctor taking care of them.
21       Q.    Okay. Do you prescribe
22   medications?
23       A.    Yes, sir.
24       Q.    And are you personally prescribing
25   them, or are you just overseeing what somebody

Page 43

1    else is prescribing?
2        A.    All of the above. I can prescribe
3    them. I can co-sign for a trainee prescribing
4    them. I can concur with, you know, what the
5    primary care physician has prescribed, or
6    disagree with for that matter and make a change.
7        Q.    And, again, this happens at the
8    Boston VA?
9        A.    Yes, sir.
10       Q.    Okay. Do you know what
11   anticoagulants are on the Boston VA's formulary?
12       A.    There's a variety of
13   anticoagulants. The fortunate thing is, is that
14   we can get any drug whether it's on formulary or
15   not.
16           The prominent one is Coumadin, is
17   the main anticoagulant that we use. We have a
18   variety of other oral anticoagulants and a
19   variety of subcutaneous ones that are also used,
20   and the formulary does change from time to time.
21       Q.    Okay.
22       A.    But we do -- there's not a drug
23   that we can't get access to, if we choose. We
24   have to make -- we have to put in a non-formulary
25   request. So we have the ability to request the

Page 44

1    use of any drug that's available in the United
2    States.
3        Q.    Okay. But the primary
4    anticoagulant there tends to be Coumadin?
5        A.    So I would say today the one that's
6    still used more than the others is Coumadin, yes,
7    sir.
8            Or more precisely, the generic,
9    whatever. You know, the generic warfarin.
10       Q.    When was the last time you say --
11   would you say you prescribed medication?
12       A.    Prescribed a medication?
13       Q.    Yeah.
14       A.    Oh, I would -- I would say -- as I
15   said, I'm -- when I co-sign a resident's note.
16   But, I mean, I would say it happens most weeks.
17   Because when I co-sign a resident or fellow's
18   note, they've -- they may have entered the
19   request for the statin or whatever it is. I
20   co-sign that note, and I am the official
21   prescriber.
22       Q.    Okay. I'd like to ask you about
23   some of the, I guess, positions you've listed in
24   your CV, so go to page 2 of your CV.
25       A.    Okay. What's the heading that you

Page 45

1    are looking at?
2        Q.    I'm actually looking at the second
3    line. It says "2009-." I'm assuming that means
4    to the current date.
5        A.    I'm sorry. You're on page 2, the
6    heading? Oh, there's no heading.
7        Q.    Yeah, there's no heading at the top
8    of the page.
9            I'm looking at the title professor
10   of medicine at HMS?
11       A.    Yes, sir.
12       Q.    That's an ongoing position?
13       A.    Yes, sir.
14       Q.    And what is HMS?
15       A.    Harvard Medical School.
16       Q.    And what classes are you currently
17   teaching at Harvard Medical School?
18       A.    I teach classes both at the medical
19   school and at the Harvard School of Public
20   Health, and they're both epidemiology. In one
21   case it's an introductory. The one that's taught
22   at Harvard, in the Catalyst program, is an
23   introductory survey course in epidemiology, and
24   the one at the Harvard School of Public Health is
25   an advanced upper level epidemiology class.

Page 46

1    Q.    Okay.  And how often do you teach
2  those classes?
3    A.    Those classes are both taught in
4  the summer, and most summers I teach both classes
5  but not every summer, just because of scheduling
6  conflicts.
7    Q.    And how often do those classes
8  meet?
9    A.    So the survey class is a one-week
10  intensive class where we're in the classroom --
11  I'm one of the organizers.  I don't teach every
12  hour of every day, but it lasts the full day for
13  five days.  It's a one-week survey course,
14  intensive survey course on epidemiology.
15    Q.    And I just want to make sure I'm
16  not confusing.  Is that different than the one
17  that you described that was an introductory
18  course?
19    A.    That is the introductory course.
20    Q.    Is the gist of that class to sort
21  of give physicians a background in epidemiology
22  so they can --
23    A.    Well, they don't have to be
24  physicians.  I think most of them are.  But it is
25  a survey course of the breadth of human -- human

Page 47

1  observational and interventional studies, from a
2  case report through the more sophisticated
3  observational studies, randomized trials, and
4  then more synthetic works like meta-analysis.
5    Q.    And is it designed to give them
6  tools to evaluate literature or?
7    A.    Yes, and I think that's a
8  collateral benefit.  The main thing here is that
9  these are people who are intending to become
10  researchers themselves.
11    Q.    Okay.  And then you said there was
12  another class?
13    A.    So the upper level course is part
14  of the Clinical Effectiveness Program, and that
15  is a course where the students -- I'm not
16  involved in the didactic.  The students are
17  taught how to write a grant, and then I am --
18  consultation to the students on -- the main
19  exercise of the course is actually writing a mini
20  grant, and so we go over their design and then
21  provide them with counseling, and then I am --
22  there's probably about 30 or 40 people helping
23  with that.  Of course, I'm one of the core
24  faculty that ends up grading those grants, those
25  mock grant applications when they come in.

Page 48

1    Q.    And how often is that class taught?
2    A.    So that class -- it's not a lot of
3  class time, so there's -- you know, my
4  involvement is, in class time, is not extensive.
5        We offer office hours at the
6  very -- they're in class all day getting their
7  didactics.  I offer office hours at the very end
8  of the day.  And then there's two days where
9  they're doing presentations that I'm involved in,
10  and then I'm involved in the detail grading of
11  the applications.
12    Q.    Okay.  And right -- right beneath
13  that on your resume, it shows 2010 to present day
14  adjunct professor at Boston University School of
15  Medicine?
16    A.    Yes, sir.
17    Q.    What classes do you teach there?
18    A.    I don't teach any classes.  I will
19  do occasional lectures over at the Boston
20  University School of Medicine when invited.  But
21  you don't have to teach classes at a medical
22  school to be on the faculty.  In this case, I
23  am a -- since I do clinical work and can have
24  Boston University medical students as part of the
25  team, that's in a clinical setting, then we are

Page 49

1  provided with an adjunct professorship as
2  teachers of the residents and fellows.
3    Q.    Okay.
4    A.    That's all clinical teaching.  It's
5  not a formal classroom.  Although, I do lecture,
6  you know, at their lunchtime lectures about
7  preventive cardiology from time to time.
8    Q.    When was the last time you did
9  that?
10    A.    It was certainly -- I imagine it
11  was this year, but I don't recall specifically.
12    Q.    Okay.  And the next section,
13  Appointments at Hospitals and Affiliated
14  Institutions.
15    A.    Mm-hmm.
16    Q.    The 1993 to the present day staff
17  physician at VA Boston Healthcare; is that the
18  clinic work that you were just --
19    A.    Yes.
20    Q.    -- telling me about?
21    A.    Yes, that's where I do that clinic
22  work, yes.
23    Q.    Okay.  And below that it says
24  associate physician at BWH?
25    A.    Yes, and that's essentially the

Page 50

1　same title as a staff physician.  Associate
2　physician's the word that they use.
3　　　Q.　Okay.  And you treat patients
4　there?
5　　　A.　Not so much anymore.  I don't -- I
6　use to.  I use to attend, but I don't attend as
7　much.  I use to treat patients on the inpatient
8　service at the Brigham.  I tend not to do as much
9　inpatient work at the Brigham or the VA anymore.
10　　　Q.　Okay.  When was the last time you
11　treated a patient at BWH?
12　　　A.　It's been a few years.  But I
13　have -- I run a division at the Brigham, but it
14　doesn't involve inpatient care.
15　　　Q.　Okay.  And the last -- the last
16　listing in that section, 2003 to present day
17　staff physician at Faulkner Hospital in Boston?
18　　　A.　Yes, sir.
19　　　Q.　Can you explain?  Do you treat
20　patients there?
21　　　A.　No, sir.  Again, the same thing.
22　So we -- the Brigham & Women's Hospital, has the
23　VA as one affiliate and has Faulkner Hospital as
24　another affiliate, and I run a division that has
25　people that see -- I do see patients at the

Page 51

1　crossroads division, called the division of
2　aging, and I oversee a clinical program that does
3　have involvement at the Faulkner Hospital, so I
4　have privileges at the Faulkner Hospital.  While
5　the geriatrics team that I'm responsible for in
6　the division of aging has had clinical activity
7　at the Faulkner Hospital for a number of years, I
8　don't see patients in that clinical activity, but
9　I do maintain a privilege appointment.
10　　　Q.　Okay.  Go down to the Major
11　Administrative Leadership Positions?
12　　　A.　Yes, sir.
13　　　Q.　Okay, so I see -- go down to 1996
14　to the current day.
15　　　A.　Mm-hmm.
16　　　Q.　There's both director of preventive
17　cardiology and director of preventive cardiology
18　fellowship for the VA Hospital?
19　　　A.　Yes, sir.
20　　　Q.　Can you explain that, please?
21　　　A.　So that's what we were talking
22　about.  That program that I run, I developed way
23　back in 1996, developed that clinical program,
24　and the fellows that I was talking about, we have
25　up to four fellows per year in this fellowship.

Page 52

1　It's a daughter program to the Brigham & Women's
2　cardiology program, but it's a specific
3　subspecialty of cardiology and preventive
4　cardiology.
5　　　Q.　And that fellowship, is that --
6　when you say you're teaching epidemiology, is
7　that really the bulk of it?  Does it come through
8　the -- does the bulk of that work come through
9　the fellowship?
10　　　A.　Well, the two things that -- in
11　that program, we teach clinical preventive
12　cardiology, and I was explaining that, early in
13　that clinical preventive cardiology setting.  We
14　also -- I forgot to mention I also do cover the
15　cardiac rehab service as a clinical activity,
16　too, and our fellows gain experience in those
17　areas in the clinical area.
18　　　　　And then we -- of course, we use
19　epidemiology trials in our clinical teaching all
20　the time, but those fellows are also involved in
21　research.  It's a one- or two-year fellowship
22　where they're learning clinical preventive
23　cardiology in the clinical settings that I
24　described, the preventive cardiology program, and
25　increasingly it will be in the cardiac rehab

Page 53

1　program as well where we're getting future
2　patients to exercise.  But they're also
3　involved -- they're all involved in a research
4　program, and they can be involved in formal
5　training at the school of public health because
6　they're gaining experience to become clinician
7　investigators.
8　　　Q.　Okay.
9　　　A.　And so I teach the more -- it's not
10　in a class.  Well, we do provide lectures in a
11　conference room, but it's not over at the medical
12　school or the public health school.  The main
13　thing that we provide for them is an opportunity
14　to be part of a team that's doing epidemiology
15　research.
16　　　Q.　Okay.  So while we're sort of on
17　the subject, can you describe the practice of
18　preventive -- preventive cardiology?
19　　　A.　Well, it was, you know, to some
20　degree what we already described, but the idea is
21　that patients at any stage of cardiovascular
22　disease, that can be from having no overt
23　disease, maybe they have some risk factors, maybe
24　they don't even have any risk factors but we're
25　going to try to get them to not develop any risk

Page 54

1 factors, all the way up through the spectrum of
2 patients who just had a heart attack or a stroke.
3 Yeah, that what prevention refers to is
4 preventing the next bad event that any patient
5 could have, and it might be the development of a
6 risk factor, like diabetes or high cholesterol or
7 hypertension, in a person who doesn't have those
8 yet. It could be the development of the disease,
9 like blocked arteries in your heart or your brain
10 giving you strokes or your legs giving you
11 claudication. Or it could be the prevention of
12 the next event in a patient who had a heart
13 attack. And so what we do is we do three parts.
14 We do a risk assessment. We inventory the risk
15 factors that they might have for which we have
16 the opportunity to modify, and then we build what
17 I call a prevention prescription for that
18 particular patient, and we try to prevent any
19 untoward events. And those events could be
20 anything from sudden death or a stroke from a
21 blood clot or a heart attack.
22 Q. And when you say a prevention
23 prescription, you're not just talking about
24 medications, correct?
25 A. That's correct.

Page 55

1 Q. You're also talking about diet?
2 A. Diet, exercise, weight management,
3 absolutely.
4 Q. Lifestyle changes?
5 A. Yeah, those are all in that.
6 Q. Okay. And down -- if you go down a
7 little bit further under Major Administrative
8 Leadership Positions, you've listed Project
9 Director, Physicians' Health Study Enrollment
10 Cohort.
11 I'm familiar with the Physicians'
12 Health Study, but perhaps not everyone that may
13 listen to this is, so could you describe what the
14 Physicians' Health Study is?
15 A. It's a large study that's been
16 going on for over 30 years now. Or, actually,
17 I'm sorry, we're approaching 30 years now, in --
18 oh, it is over 30 years. It was started in 1982,
19 before I arrived at the Brigham. I arrived at
20 the Brigham 1987, and in 1989, I began working
21 on the Physicians' Health Study, and then became
22 responsible for the study many years later.
23 It's a study of originally 22,000.
24 We later added 7,000 additional physicians. And
25 they were -- they were assembled for the purposes

Page 56

1 of a trial of aspirin and Beta-Carotene. We've
2 done additional trials in that population on
3 Vitamin E, Vitamin C and multivitamins. But we
4 keep the cohort together continuing to provide us
5 with health and information, and I think we've
6 published somewhere in the range of about 500
7 papers on the trials that I talked about and many
8 other epidemiology studies on risk factors for
9 many of the major chronic diseases that we get as
10 we age.
11 Q. In fact, many of the articles
12 listed in your CV are based out of the
13 Physicians' Health Study, correct?
14 A. Yes, sir. And we continue to
15 produce out of that cohort.
16 Q. Okay. And I see also you're listed
17 as co-director of cardiovascular epidemiology.
18 A. Yes, sir.
19 Q. And a little bit further down, from
20 1997 to the current day scientific director,
21 Massachusetts Veterans Epidemiology Research and
22 Information Center, MAVERIC?
23 A. Yes, sir.
24 Q. Can you explain what that is,
25 please?

Page 57

1 A. So that's an epidemiology center
2 that we applied for funding for in 1997 and has
3 continued to today, and it's a center that does
4 both randomized trials and observational studies,
5 most of the time but not exclusively, among
6 veterans and sometimes using the veterans
7 electronic health record data.
8 Q. Okay. And that's using the VA
9 database, essentially?
10 A. Well, there's many VA databases.
11 Q. Okay. When we turn the page, on
12 page 3, right before the section entitled
13 "National and International," do you see 2014 to
14 the current date co-course director, Introduction
15 to Human Investigation Epidemiology Module?
16 A. Yes.
17 Q. Is that the course you were
18 describing before?
19 A. It is, the introductory course.
20 Q. Okay. And in that section National
21 and International, from 2000 to the current
22 date you have co-chair, steering committee,
23 Million Veterans Program?
24 A. Yes, sir.
25 Q. Can you explain what that is,

Page 58

1  please?
2      A.    So that's a large -- a large cohort
3  of veterans that we're collecting questionnaire
4  data like we did in the Physicians' Health Study
5  and a biospecimen just like we did in the
6  Physicians'.  So it's actually a lot like the
7  Physicians' Health Study, only it's larger.
8      Q.    And underneath Committee Service
9  under the -- the first thing listed under 1998 to
10 current date, Normative Aging Study, Steering
11 Committee?
12     A.    Yes, sir, I believe that one's
13 probably a bit out of date.  That one probably
14 should have a -- I have not been actively
15 involved in that in the last few years.  That's
16 one that I should probably close out and update.
17         The study is still going on, but
18 there's really not much activity left, and it's a
19 study that started in the 1960s, and most of the
20 people are -- most of the participants are no
21 longer with us, and so it's not a -- but I've
22 never been told that I'm not -- no longer still
23 on the steering committee.  The activity, I
24 think, has slowed down to the point where it's
25 just not a very active, ongoing study anymore.

Page 59

1      Q.    Are these studies -- is that study
2  funded by the VA?
3      A.    Well, it's actually -- the nice
4  thing is that it's gotten a small amount of core
5  funding from the VA, but most of the funding has
6  been NIH funded.  We have a -- I work closely at
7  the Brigham with a lot of colleagues at the
8  School of Public Health and a lot of the
9  grants -- we also had people at BU doing
10 NIH-funded work on that study.  It was a unique
11 study in its time, but again, it was small.  It
12 was about 3,000 people that were recruited in
13 middle age in the '60s, and they were watched to
14 age.  So I would say that over the years more of
15 the funding was -- it would be -- my best guess
16 would be that more of the funding came from the
17 NIH than the VA.
18     Q.    A little further down, there's -- I
19 guess towards the bottom of the page -- 2000 to
20 the current day.  It just says "Executive
21 Committee."  BWH.
22     A.    Oh, the preventive medicine
23 division.  I had an appointment with the
24 preventive medicine division, and people that are
25 associate professor or higher are invited to the

Page 60

1  periodic -- periodic executive committee
2  meetings.  It's, again, not an activity that is
3  frankly very active, that I'm very active in
4  right now.
5      Q.    What's the role of the executive
6  committee?
7      A.    So each division has a --
8  preventive medicine is one of the divisions of
9  the department of medicine.  It's where I -- I
10 still do work in that division 'cause that's
11 where the Physicians' Health Study is run out
12 of --
13     Q.    Okay.
14     A.    -- but you know, since I now have
15 my own division, I spend more of my time over in
16 the other division.  But since I have an
17 appointment in that division, formally I'm still
18 on that division's organizational chart and
19 organizational structure.
20     Q.    On page 4, there's an item listed,
21 from 1998, stroke advisory board for Merck.  Do
22 you see that?
23     A.    Mm-hmm, I do.
24     Q.    Can you describe what that was?
25     A.    I actually, honestly -- it's almost

Page 61

1  20 years ago.  I don't -- I don't recall.  Since
2  it's listed only as a one-time event, I imagine
3  that it was a single advisory board meeting, but
4  I don't recall the particulars.
5      Q.    Okay.  On page 5, you have 2006 to
6  the current date SP 560 BREATH Study Executive
7  Committee.  Could you explain what that is,
8  please?
9      A.    So that's a study that involved
10 patients with -- it's a cooperative study, you
11 know, the cooperative study program trial, in
12 patients with COPD, and it was introducing a
13 management scheme in the patients.  And it turns
14 out that the -- we were unable to recruit enough
15 patients given the complexity of the management
16 scheme.  I was on the executive committee
17 because, you know, because of my trial
18 experience.  And the cohort -- the investigator
19 in Seattle is still doing work in a cohort study,
20 the IRB is still open, but the study was
21 terminated a number of years ago, and they're
22 still publishing papers on the cohort, but the
23 trial was terminated prematurely because it
24 couldn't come to a useful end.  And so it still
25 has an open IRB, but I don't have -- it's been a

USCA5 1603

Case 2:14-md-02592-EEF-MBN Document 5123-11 Filed 01/20/17 Page 18 of 65
Case 2:13-md-02592-EEF-MBN Document 512311 Filed 01/20/17 Page 18 of 65
Protected - Subject to Further Protective Review

Page 62

1  couple of years since we've been -- that we've
2  been involved, my group here has been involved in
3  any of the activity.
4       Q.    Okay.  And two below that, 2012 to
5  present day, the CSP 588 REGROUP Executive
6  Committee?
7       A.    So that's an ongoing trial that
8  that I am on the executive or steering committee
9  for that is testing different ways of harvesting
10  veins in bypass patients.  Marco Zenati is the
11  principal investigator.  He's a colleague at the
12  VA.  He asked me to be one of the cardiologists
13  on the trial.  It's ongoing, in recruitment
14  phase.
15      Q.    And getting down to 2015.  So 2015
16  to the current date, Personalized Medicine
17  Initiative Advisory Panel, Washington DC.  Could
18  you explain what that is?
19      A.    Yes.  So that -- in early 2015, the
20  president in a -- in his state of the union
21  announced this initiative, and this initiative
22  was to develop a cohort of people that, state of
23  the art cohort, of people that provide
24  information over the web and then provide access
25  to their medical records and then provide a blood

Page 63

1  specimen to understand how genes affect health
2  and disease, and I was on the working group
3  advisory panel advising throughout 2015 and into
4  2016, but that's a -- that activity has ended, so
5  that should have a end date of 2016.  But it was
6  to advise the NIH in the setting up of this big
7  national cohort.  And they have since received
8  funding and are going to be recruiting a brand
9  new state of the art web-based cohort, and I'm no
10  longer involved in the advice or day-to-day
11  activity of that particular initiative.
12      Q.    Below that is the AHA -- AHA, I
13  assume that's American Heart Association?
14      A.    Yes, sir.
15      Q.    Institute of Precision
16  Cardiovascular Medicine Strategic Planning
17  Committee?
18      A.    Yes, sir, and that work is ongoing
19  and has evolved to -- what the AHA is doing is
20  trying to collect cohorts like the Physicians'
21  Health Study and the Framingham Heart Study data,
22  putting them in an enclave or computing
23  environment and trying to collect, you know,
24  genetic information that they -- that people have
25  within those cohorts, and then, you know, provide

Page 64

1  access to even some of these new or ongoing or
2  larger cohorts like this Precision Medicine
3  Initiative creating a computing environment that
4  will allow investigators to do the computing
5  heavy stuff that you have to have when you're
6  doing genetic work.
7       Q.    Mm-hmm.
8       A.    So the AHA has got a number of --
9  they're actually building their own cohort as
10  well.  They're doing some piloting, and that was
11  announced this fall at the AHA.
12      Q.    And below that is the INVESTED
13  trial steering committee.
14      A.    Yes, sir, the INVESTED trial is a
15  trial of -- a NIH-sponsored trial that is a trial
16  of individuals with heart failure or known
17  coronary disease to see if a high-dose flu
18  vaccine provides better protection than a
19  standard dose flu vaccine.
20      Q.    Better protection for what?
21      A.    From getting the flu.  There's a
22  reason to believe that people with chronic
23  diseases have a depressed immune function and
24  that you might need to -- when we get a flu shot,
25  we're given some proteins -- sorry, antigens that

Page 65

1  are from those flu viruses, and we have to mount
2  them an antibody response so when we see the real
3  flu virus we attack it immediately and it doesn't
4  cause an infection.  And the thinking is --
5  there's smaller studies that support this.
6  Thinking that if you have compromise of your
7  immune function, you might need a bigger dose of
8  those proteins to get the kind of immune response
9  that will protect you from getting the flu when
10  you see it from someone sneezing on the bus.
11      Q.    And below that under International,
12  1998 to 2009 Bayer International Aspirin Award
13  Selection Committee.
14      A.    Yes, sir.
15      Q.    Can you tell me what that is,
16  please?
17      A.    So there was this specific
18  committee that was designated by Bayer to select
19  at times a junior investigator and at times a
20  senior investigator for their -- recognizing them
21  for their work in the field of aspirin, and then
22  they were provided -- they were given a, I
23  believe in both cases a monetary award.
24      Q.    Okay.  Was the committee itself a
25  paid committee?

Page 66

1      A.    No, no.
2      Q.    Below that it says, Advisory Board,
3   International Aspirin Award.
4      A.    Yes, sir.
5      Q.    What is that?
6      A.    So that's a -- that's a
7   reconstitution, but it's an independent -- my
8   understanding is that it does get some funding
9   from Bayer, but it's an independent advisory
10  board that's based in the UK, and it has picked
11  up that mantle of -- it has a broader charge than
12  the Bayer investigator award.  It does provide an
13  award, again, for an investigator that has
14  either -- a young investigator or an older
15  investigator, but it also has an informational
16  arm where it tries to provide updates on the
17  literature on what's going on with aspirin.
18         For instance, what's hot lately is
19  that aspirin seems to have an affect to prevent
20  cancer, and it does get some funding from Bayer,
21  but you know, aspirin is a generic, so it
22  provides general information about aspirin to the
23  world.
24     Q.    Mm-hmm.  I want to ask you about
25  some of your editorial activities, which is on

Page 67

1   page 7 of your CV.
2      A.    Yes, sir.
3      Q.    You've listed yourself as an ad hoc
4   reviewer for many journals.
5      A.    Yes, sir.
6      Q.    How often are you reviewing
7   articles for these journals?
8      A.    So it varies quite a bit.  These
9   are journals over the years that I have edited
10  for, but as I took on heavy associate editor
11  responsibilities, I began turning down more and
12  more.  So I still do it.  I do it for the JAMA
13  network journals.  I do it when one of the
14  biggies calls, like the New England Journal of
15  Medicine, but I decline quite a few these days.
16     Q.    Okay.  Because being a reviewer is
17  time-consuming, isn't it?
18     A.    Being a reviewer is time-consuming.
19  Being a journal associate is much more
20  time-consuming, and it's a good enough excuse to
21  not do the individual journal reviews if you know
22  you have an editorial position in a journal.
23     Q.    Okay.  So just so I'm clear, for
24  the ad hoc -- for all the journals listed under
25  Ad Hoc Reviewer, directly beneath Editorial

Page 68

1   Activities --
2      A.    Mm-hmm.
3      Q.    -- that is infrequent?
4      A.    Yes.
5      Q.    Okay.  And if I want to think about
6   the sort of bulk of your editorial activities,
7   these would be found in the editorial positions
8   listed below?
9      A.    Yeah, for -- really, in only -- the
10  vast majority is with the JAMA and its network
11  journals.  And I should -- I'm glad we're going
12  through this because I should update.  Two of
13  these journals -- the International Review of
14  Thrombosis has just terminated its -- a lot of
15  the smaller journals are no longer with us.  And
16  so Current Cardiovascular Risk Reports and the
17  International Journal of Thrombosis recently
18  have -- are no longer in publication.
19     Q.    So can you describe your
20  responsibilities as associate editor for JAMA?
21     A.    So the associate editor for JAMA
22  is -- there's probably about 25 or 30 of us
23  associate editors, and we're all based in the
24  field.  The senior editors are based in Chicago.
25  And the associate editors have a specific area of

Page 69

1   expertise, and we're responsible for reviewing
2   the incoming papers, making a triage decision of
3   which ones should be rejected outright and which
4   ones should be sent out for review.  When they
5   come back for review, we make a decision of
6   whether or not they should be presented to the
7   committee.  If the committee -- if a
8   recommendation is that the paper might be
9   suitable for JAMA, we send it back out to the
10  authors with comments and it comes back, again,
11  back to the committee, for a second review, and
12  we make a determination of whether it's
13  publishable.  I think it's about 6 or 7 percent
14  of the papers that are published, you know,
15  ultimately -- I mean 6 or 7 percent of the papers
16  that are submitted ultimately make it to
17  publication.  Then it's our responsibility to
18  move it through the publication process, and at
19  times it can be quite laborious because it
20  requires that we work with the individual authors
21  to correct things or make things more readable or
22  legible or decide to move things to online and
23  out of the -- so there's a lot of that back and
24  forth that goes on in the editing, and then
25  ultimately we review the final version that's

Protected - Subject to Further Protective Review

Page 70

1  going to be published.
2      Q.    So I assume in your role you're
3  familiar with all the disclosure requirements and
4  the conflict of interest statements that are
5  required, correct?
6      A.    Yes.  Yes, I am.
7      Q.    I know you've listed at least in --
8  while not discussed in the body of your paper
9  very much, you have listed in your materials
10  considered the RECORD4 study, correct?
11      A.    Yes, I did, but in the general
12  context of what it contributes to our
13  understanding of the -- of the ROCKET studies.
14      Q.    Are you aware that the RECORD4 --
15  the data from the RECORD4 study was tossed by the
16  FDA?
17          MR. PIORKOWSKI:  Object to form.
18      A.    I don't know what you mean by
19  tossed by FDA, but I do -- I am aware of
20  discussions about some of the concerns that were
21  raised about some of the individual sites in
22  RECORD4.
23      Q.    Okay.  Well, you note in your paper
24  that REC- -- in your report that for that VTE
25  indication that -- new item RECORDs 1 through 3.

Page 71

1      A.    Correct, correct.
2      Q.    You are aware that they did submit
3  RECORDs 1 through 4 to the FDA, correct?
4      A.    Yes.
5      Q.    And were you aware that the FDA
6  deemed RECORD4 unreliable, the data from it?
7          MR. PIORKOWSKI:  Object to form.
8      A.    Well, I don't if they deemed it
9  unreliable or not.  You know, I didn't scrutinize
10  their particular.  It's my understanding that
11  they based their final decision on RECORDs 1
12  through 3, and at the time, I think that there
13  were some questions about RECORD4, but they felt
14  that RECORD1 through 3 was sufficient data.
15          It's often the case that the FDA
16  requires -- well, certainly less than four or
17  even less than three definitive studies to make a
18  determination about approval for a given
19  indication.
20      Q.    Well, the RECORD4 published
21  article, that was published in 2009, correct?
22      A.    I have no reason to doubt that
23  year.  I don't recall the exact year, but if
24  that's your recollection, that sounds about
25  right.

Page 72

1      Q.    Well, I'm going to represent to you
2  that the FDA deemed the RECORD4 data as being
3  unreliable in 2011.  If that -- and I appreciate
4  you have not reviewed that correspondence between
5  the FDA and Janssen.  But if the FDA had deemed
6  an entire arm of the RECORD study as unreliable,
7  do you think that should have been reported to
8  the journal that published the RECORD4 study?
9          MR. PIORKOWSKI:  Object to form.
10      A.    Well, those are usually -- the
11  truth is that those are usually very independent
12  activities.  So what the FDA determines about the
13  design upfront or their use of any trial results
14  in their determinations is completely independent
15  of the publication process.
16      Q.    I appreciate that.  I did note that
17  that took place two years apart from one another.
18      A.    Right.  So I think that the
19  publication was in 2009, and the FDA had some
20  discussions about the findings of the study in
21  2011.  Those would not have had any bearing on
22  the 2008 or '09 decision to publish.
23      Q.    You don't think the journal would
24  have wanted to know that the data had been deemed
25  unreliable, might want to issue a correction,

Page 73

1  perhaps?
2          MR. PIORKOWSKI:  Object to form.
3      A.    So the -- as I said, from a reg --
4  the regulatory processes that the FDA undergoes
5  are quite distinct from publishing, and I think
6  that they -- the process of publishing is one
7  that we are -- as an associate editor, we like as
8  much information as we have about the whole
9  process, but they are two independent processes,
10  and what the FDA does with a trial result may or
11  may not have any bearing on the publication.
12          As I said, they're independent
13  activities.  And you know, we've -- we've at
14  times published in JAMA very controversial
15  papers.  The job of the journal is to put the
16  data out there.  The job of the clinician is to
17  as best they can interpret that data.  The job of
18  the FDA is to make a very different decision.
19  And the decisions that the FDA makes are
20  generally a quite different and distinct process
21  from the decision that an editor makes to publish
22  a paper or not.  An editor may publish a paper,
23  you know, agnostic of their interpretation of the
24  findings, if you know what I mean.  If they think
25  it's an important paper to be published, you

Page 74

1  know, they -- the editor himself may have
2  personal views about it, but they may still feel
3  that the paper warrants the light of day, which I
4  completely agree with.  I think it's important --
5  transparency is one of the most important parts
6  of the generation of information.  So we will
7  publish a paper in its, you know, many bodies
8  around the globe.  You know, whether they be a
9  specialty society, a clinical group, a regulatory
10 body, may use that information in quite diverse
11 ways.  The job of a publisher is to -- is to
12 assist the process in the trial, in this case,
13 seeing the light of day.
14     Q.    Okay.  My question was, and I'll
15 just -- I'll rephrase it.  I would ask you, if
16 you shepherded an article through JAMA and you
17 believed it should be published and made a
18 recommendation that it be published and it was
19 subsequently published, if you then found out two
20 years later that the underlying data in that
21 article was deemed unreliable by the FDA, would
22 you want to know about it?
23         MR. PIORKOWSKI:  Object to form.
24     A.    So there's a lot there.  Many times
25 it -- I would be happy to know about it, but I

Page 75

1  may or may not agree with what the FDA has said.
2  I may or may not have -- I mean, as I said, you
3  know, knowledge is a good thing in general.
4  After a paper is published, there are often many,
5  many opinions about those papers.  You know,
6  would I want to see them all.  I can't always see
7  all of them.  I wouldn't necessarily deem any of
8  them necessarily uninteresting.  But the nature
9  of the interpretations of a study may or may not
10 have relevance to the publishing process.
11     Q.    Well, typically -- and this does
12 happen from time to time, doesn't it?  Move to
13 strike that.
14         There are occasions when after a
15 study has been published that the publisher will
16 learn information subsequently of the study, that calls into
17 question the conclusions of the study, correct?
18         MR. PIORKOWSKI:  Object to form.
19     A.    Correct.  Inclusions are often the
20 part that's most subject to interpretation but.
21     Q.    Well, even the data itself.
22     A.    Sure.
23     Q.    Okay.
24     A.    That's a -- those are just -- we
25 put those into sort of two different categories.

Page 76

1  I mean, a lot of people are going to have issues
2  with how someone, you know, interprets a finding.
3  You know, we do the best we can to try to have an
4  interpretation that is supported by the data, but
5  there will be differences of opinion.  But issues
6  around the quality or validity of the data is a
7  different kettle of fish.
8      Q.    Well, in that case, a journal can
9  print a correction, correct?
10     A.    If the journal thinks that there is
11 some element of the original paper that warrants
12 a correction, that's not an uncommon occurrence
13 and a correction can be published.
14     Q.    And sometimes an article gets
15 rescinded, correct?
16     A.    That's correct.
17     Q.    But a journal can't know about that
18 unless it's reported to them, correct?
19         MR. PIORKOWSKI:  Object to form.
20     A.    Well, I mean, there are many ways
21 that a journal becomes aware.  And our
22 published -- our senior editor is -- makes
23 himself widely available, and there are many ways
24 that information comes to a journal.  It can come
25 passively or it can come actively.  It can come

Page 77

1  in the form of, you know, a letter to the editor
2  for that matter.
3      Q.    Did you review the FDA audit for
4  the RECORDs -- RECORD4 study?
5      A.    I was --
6          MR. PIORKOWSKI:  Object to form.
7      A.    -- aware of some of the concerns
8  raised, but I did not for the purposes of this
9  report go in to any detail about the particulars
10 of the FDA's audit.
11     Q.    Did you read Janssen's audit of the
12 RECORD studies?
13     A.    I don't recall if I was provided
14 with Janssen's audit of the -- I do recall -- I
15 certainly could have because I do recall I will
16 say in vague terms the general issues that were
17 raised about some of the particular issues that
18 occurred at some of the sites.
19     Q.    Okay.  And do you know that
20 included falsification of data?
21         MR. PIORKOWSKI:  Object to form.
22     A.    As I said, I don't recall the
23 particulars, but I do recall some issues about
24 certain of the individual sites.
25     Q.    Okay.  Do you recall that there was

Page 78

1   hundreds of unreported adverse events?
2          MR. PIORKOWSKI: Object to form.
3          A.    I do recall a discussion about
4   adverse events becoming -- coming to light after
5   the publishing of the study.  That happens to be
6   a common occurrence in randomized trials.  It's
7   actually happened in most of my trials.  But I'm
8   not familiar with all the particulars of the
9   FDA's audit of that particular issue.
10         Q.    Are you aware the FDA found the
11  data from RECORD4 so unreliable it would not
12  permit Janssen to include any of the data in its
13  label?
14         MR. PIORKOWSKI: Object to form.
15         A.    Yeah, I'm sorry, I don't recall
16  the -- JAMA's particular rulings on the label
17  that arise from the RECORD series of studies.
18         Q.    In all fairness to you, I want to
19  correct you.  I think you just said JAMA's ruling
20  on the label.  It's FDA's ruling on the label.
21         A.    FDA's ruling.  I apologize.
22         MR. PIORKOWSKI: Which is probably
23  a good indication.  We've been going about an
24  hour forty, so.
25         MR. GRAND: That's fine.  Do you

Page 79

1   want to take a break?
2          MR. PIORKOWSKI: Yeah.  Are you
3   going to be okay, or do you --
4          THE WITNESS: Yeah, I think a quick
5   bio break, need that splash of coffee.
6          THE VIDEOGRAPHER: We are now off
7   the record.  The time is 3:48.
8          (A break was taken.)
9          THE VIDEOGRAPHER: We are now back
10  on the record.  The time is 4:03.
11  BY MR. GRAND
12         Q.    Doctor, I just want to sort of
13  close out the last subject we were talking about.
14         As an editor of a journal, you're
15  aware that doctors often rely on the articles
16  published by a journal, correct?
17         A.    Well, they will read the article
18  and put it in context, and I will tell you that
19  frankly sometimes the articles are incredibly
20  informative in a given area, and sometimes they
21  add very little.
22         Q.    And it's part of the rubric of
23  information that a doctor has at their
24  disposal --
25         A.    Yes, sir.

Page 80

1          Q.    -- when they're making a
2   prescribing decision, correct?
3          A.    Yes, sir.
4          Q.    And you know that sales
5   representatives from pharmaceutical companies
6   often carry reprints of articles when they're
7   detailing physicians, correct?
8          MR. PIORKOWSKI: Object to form.
9          A.    I believe sometimes they do carry
10  them.
11         Q.    So is your testimony that if a
12  concern had been raised about the integrity of
13  the underlying data of a published study that
14  that should not be reported to the journal that
15  published the study?
16         MR. PIORKOWSKI: Object to form.
17         A.    As a general rule, that's a pretty
18  broad -- a pretty broad statement.  There are any
19  and all manners of questions that are raised
20  about published studies, and frankly, some of
21  them are important and some of them are not.  And
22  so the key thing is that what's important to an
23  editor or not is really -- it depends on the
24  specifics.
25         Q.    But if it's not reported to the

Page 81

1   journal, the editor doesn't know what the
2   specifics are?
3          MR. PIORKOWSKI: Object to form.
4          A.    Well, that's not necessarily the
5   case.  I mean, editors are -- you know, work in
6   the environment, and editors become aware of
7   issues by any manner.  So it's not necessarily
8   through some -- necessarily through some formal
9   reporting process.
10         Q.    Did I say anything about a formal
11  reporting process?
12         A.    Well, you said reported to the
13  journal, but things don't have to be reported to
14  the journal for an editor to have a concern.
15         Q.    Okay.  If the authors of the study
16  become aware that the FDA has deemed an entire
17  study arm unreliable, do those authors have an
18  obligation to inform the journal that published
19  the original article of that determination?
20         MR. PIORKOWSKI: Object to form.
21         A.    There's no specific requirements.
22  As I mentioned, the FDA has full latitude to
23  interpret and use data how it sees fit, and
24  that's a process that's completely separate from
25  the publication process.  So I can't agree with a

Page 82

1 general statement that there's a
2 one-size-fits-all answer to that hypothetical,
3 generic question.
4     Q.    So you as an associate editor
5 wouldn't want to know?
6         MR. PIORKOWSKI: Object to form.
7     A.    So, you know, what I said as an
8 editor, we like to think of ourselves as, you
9 know, wanting to know everything we can know
10 about anything, but I don't think that there's
11 a -- I can't agree with the general statement
12 that you made.
13     Q.    As a prescribing physician, would
14 you want to know that a study that you read -- a
15 study that you read about in a medical journal
16 had been subsequently deemed -- the data had been
17 subsequently deemed unreliable by the FDA?
18         MR. PIORKOWSKI: Object to form.
19     A.    What's nice is I have full access
20 as a prescribing physician to the published
21 literature and to what the FDA deems appropriate
22 to put in the label, and that provides me with
23 the ability to make my own interpretation about
24 the clinical decision making regarding that drug.
25     Q.    Okay. Move to strike as

Page 83

1 non-responsive.
2         As a prescribing physician, would
3 you want to know that a study that you read, a
4 study that you read about in a medical journal
5 was subsequently deemed as unreliable -- the data
6 had been subsequently deemed as unreliable by the
7 FDA?
8         MR. PIORKOWSKI: Object to form.
9     A.    So I could imagine some situations
10 where I might want to know that information. I
11 could imagine in other situations where it might
12 not be relevant.
13     Q.    Well, the RECORDs 4 study -- the
14 RECORDs 4 study involved treatment for VTE
15 following knee surgery, correct?
16     A.    Yeah, I believe so, yes.
17     Q.    Okay. If you were a surgeon who
18 was performing that type of procedure and you'd
19 been prescribing Xarelto to your patients who
20 underwent that surgery, would you want to know
21 that the data from the RECORD4 study had been
22 deemed unreliable by the FDA?
23         MR. PIORKOWSKI: Object to form.
24     A.    So, I mean, I am a cardiologist,
25 and I am aware of the data on NOACs in general

Page 84

1 and the results of the first three RECORD studies
2 and aware of the results of the RECORD4 published
3 study and also aware of the concerns that were
4 raised. So I like to know everything there is
5 available about a drug in a certain clinical
6 situation and in those other situations.
7     Q.    Well, there would be no way for you
8 to know about it unless it was to report --
9 unless you were informed about it by the company
10 or by the journal that published the article,
11 correct?
12         MR. PIORKOWSKI: Object to form.
13     A.    No, that's not true. I mean, you
14 know, most of the -- as I mentioned, there's many
15 form to be available to us. A lot of the FDA's
16 activities are in the public domain. The experts
17 in the field when we go to conferences are aware
18 of the body of literature. And I was aware that
19 there was some concerns. I don't even recall --
20 prior to the discussions with Joe about this
21 particular litigation, I was aware of the RECORD
22 studies, and I was also aware of some concerns
23 over the RECORD4. So, I mean -- and I don't
24 recall if it was or wasn't, but I don't recall
25 specifically if there was a reporting by the

Page 85

1 investigators to the journal of the issues that
2 the FDA had or not. But I was aware of the
3 results of the first three studies and the
4 approval provided and the fact that there was a
5 fourth study and the fact there was some concerns
6 about the data in the fourth study.
7     Q.    How did you become aware there were
8 concerns about the fourth study?
9     A.    I don't recall. I just know that
10 there were -- there was a series of four studies
11 done. And I also -- the introduction of the
12 NOACs to the clinical setting was very important
13 for those of us in clinical practice because it
14 was really the first time in over 50 years that
15 there was an advance in this area. So, you know,
16 we were all watching the field carefully, and
17 because we saw at the various meetings, like the
18 American Heart Association or NHC that I go to,
19 we see the presentations of the early
20 pre-clinical studies, the clinical studies, the
21 biologic data, the -- we see the evolution. And
22 you know, I recall when these drugs -- not date
23 and time but, you know, over this period since I
24 think, you know, two thousand -- within the last
25 six -- five or six years, that these drugs were

USCA5609

Protected - Subject to Further Protective Review

Page 86

1  getting various approvals.
2        So I was, you know, aware of the
3  RECORD studies and aware of the approval.  I
4  don't recall exactly how I became aware that
5  there was some issues with some of the specific
6  site activity, but the interpretation of these
7  studies are things that are discussed, you know,
8  both in clinical forms, you know, at our local
9  hospitals and at national meetings.  And so I do
10 recall the approval, and I recall -- but it's a
11 remote recollection, and I can't tell exactly
12 what it was, but that there was -- that there was
13 some issues raised with some of the data in
14 RECORD4.
15       MR. PIORKOWSKI: Jeff, just for the
16 record, I think you said that RECORD4 was for
17 treatment of VTE after knee surgery which is not
18 correct. It's prophylaxis.  I just want to make
19 sure we're on the same page about that.
20       MR. GRAND: Yes, correct.  Sorry.
21 Prevention of VTE after knee surgery.
22       MR. PIORKOWSKI: I just want to
23 make sure the record is --
24       THE WITNESS: The clinical setting
25 is prophylaxis, but in that -- in the surgical

Page 87

1  setting.
2        MR. PIORKOWSKI: I don't think that
3  changes anything.
4        MR. GRAND: No, but thank you for
5  the clarification.
6        I want to talk about some of the
7  clinical projects you have listed in your CV.
8        You have it listed as Research
9  Investigations.
10    A.   So let me just see if I can.
11    Q.   It's page 33.
12    A.   That's helpful.  Thank you.  I'm
13 there.  Yes, sir.
14    Q.   Okay.  So research investigations,
15 this would include randomized controlled clinical
16 trials?
17    A.   It would include those.
18    Q.   To be fair, that's not the bulk of
19 your practice, though, correct, as a trialist?
20    A.   So it's rarely the -- so trials
21 are -- even a trialist, you know, can take a
22 decade to get one paper, whereas an observational
23 analysis we can do 20 a year.
24    Q.   Right.
25    A.   So generally speaking, in the

Page 88

1  evolution of the field as a population scientist,
2  the number of trial results that -- the
3  Physicians' Health Study, which I now run, is a
4  perfect example.  I'm guessing, but I would say
5  20, 30 of the 500 papers that we've published --
6  the approximately 500 publications that we've
7  published are the specific results of the trials,
8  you know, primary/secondary papers.
9     Q.   Mm-hmm.
10    A.   The other 470 are observational
11 studies, and that tends to be the mix.  But there
12 are trials, you know, certainly included in this
13 list of -- research investigations is the Harvard
14 term for original reports.
15    Q.   Okay.  And there's almost some I
16 would call them review articles in here as well?
17    A.   Yes, sir.  It's a separate -- they
18 require that we break out the papers from
19 original reports, you know, review papers, book
20 chapters, books.  There's different categories.
21    Q.   And just to be clear for anyone
22 who's reading this, a review paper tends to be a
23 summary or analysis of studies that have already
24 been conducted, correct?
25    A.   So a review is a synthesis of

Page 89

1  existing data, as opposed to an original report
2  meaning that there's new data in there.
3  Although, I would say that, you know, sometimes
4  there's new insights provided by the compilation
5  of that data.
6     Q.   Fair enough.  But when you say new
7  insights, you're not specifically talking about,
8  for instance, a pooled analysis or a
9  meta-analysis?
10    A.   Correct.  We would consider a
11 pooled analysis or a meta-analysis as a
12 generation of original -- of original new data --
13    Q.   Okay.
14    A.   -- to be put into the public
15 domain.
16    Q.   So the majority of these studies in
17 which you have authorship, they tend to be
18 observational studies, correct?
19    A.   Yes, sir.
20    Q.   Okay.  Can you -- have you
21 participated in any studies specifically designed
22 to evaluate the use of a medication for treatment
23 or prevention of stroke?
24    A.   Yes.
25    Q.   Okay.  Can you describe what those

Protected - Subject to Further Protective Review

Page 90

1  are or point out which ones those are?
2     A.    Well, I can begin with -- begin at
3  the beginning with the common ones, although we
4  do evaluate stroke in many of our vitamin trials.
5     Q.    Okay.  Yeah, I just want to be
6  clear.  I don't want to -- because I just don't
7  want you to -- I don't want to waste your time.
8     A.    Okay.
9     Q.    I probably asked an inartful
10  question.
11        So if your attorney will forgive
12  the preamble, I'd like to sort of explain what
13  I'm trying to get at, and maybe it will save us
14  both some time.
15        Many of the -- many of the studies
16  listed in here deal with the evaluation of
17  vitamins.  I've seen genetic factors, dietary
18  changes.  What I'm talking about with medications
19  are specifically, you know, a prescription
20  medication or aspirin, for example --
21     A.    Mm-hmm.
22     Q.    -- in the prevention or treatment
23  of stroke.
24     A.    Right, right.  So I don't -- I
25  think that sometimes the distinction is a little

Page 91

1  bit artificial because some -- in some
2  countries -- like, aspirin, for instance, is a
3  prescription in some countries and
4  over-the-counter in others.  And we did study --
5  in the vitamin trials, we did study stroke as an
6  important outcome, but certainly the aspirin
7  trials.  And we've done -- I've been involved in
8  follow-up of stroke outcomes from the original
9  Physicians' Health Study Aspirin Trial, the
10  Women's Health Study Aspirin Trial, and then the
11  Physicians' Health Study II Trial.  So we looked
12  at cardiovascular complications and cancer for
13  many of the vitamins.  And in the cardiovascular
14  domain, stroke was included as the composite
15  endpoint, and it was also looked at as a
16  secondary individual outcome because there was a
17  biologic possibility.
18        Let me think about some of the
19  other trials.  We're certainly looking at stroke
20  in some --
21     Q.    I don't want to interrupt you.  I
22  just want to -- before you move on to that, I
23  wanted to ask you about what you just referenced
24  specifically, which is -- I assume -- you noted
25  that for those studies that stroke was an outcome

Page 92

1  or a secondary outcome, but what was the
2  treatment being evaluated to prevent a stroke?
3     A.    So let me think if I can think of
4  the beginning chronologically.  Aspirin,
5  Beta-Carotene, Vitamin E, Vitamin C, multivitamin
6  were the kind of -- the collection of studies at
7  trials.  Now, there were many other studies where
8  we explored relationships sometimes of drugs, but
9  they were observational, sometimes of drugs to
10  stroke outcomes.
11     Q.    Okay.  So what you're describing
12  now are randomized controlled clinical trials?
13     A.    Randomized controlled trials.
14     Q.    Okay.
15     A.    Now, let me think about some of the
16  other ones that I've been involved in on the
17  steering committee.
18        Those are ones where I was sort of
19  a key player, not just a --
20        We are evaluating, as I mentioned,
21  in that INVESTED trial stroke as an outcome.  In
22  that -- the cardiovascular trial, total
23  cardiovascular events, including cardiovascular
24  death and stroke, is important in that trial of
25  the various bypass graft harvesting techniques.

Page 93

1  I'm sure that there are others.  I'd have to take
2  a little bit of time just to look through to find
3  specific trials that I've been involved with over
4  the years where stroke was a outcome.
5        MR. PIORKOWSKI:  Look at your CV.
6     Q.    What about afib?
7     A.    So we've published a lot with afib.
8  We've looked at the trial specific results for a
9  number of those interventions that I talked about
10  with afib as a primary outcome.  Well, of that
11  particular study.  Of that particular analysis.
12        Atrial fibrillation in the
13  Physicians' and Women's Health Study was one of
14  the outcomes that we collected information on.
15  It was not the primary outcome of the study, but
16  we published subsequent papers on the impact of
17  aspirin and those vitamins on atrial
18  fibrillation.
19        And let's see.  It was -- in that
20  diabetes drug trial that I spoke about earlier,
21  it was one of our components of our composite
22  primary, and we looked individually at stroke
23  outcomes in this anti-diabetic trial.
24        I don't believe in the
25  anti-diabetic trial -- we did look at syncope as

Page 94

1 a safety effect, but I don't recall whether we
2 broke that down as afib related or not.
3        I've been involved in a lot of
4 trials over the years. And the vast majority of
5 the cardiovascular trials that I've been involved
6 with, stroke is usually a component of the
7 composites, and we usually do secondary analysis
8 of the individual components of the composite
9 primary.
10    Q.    Did any of those trials focus --
11 would MI have been the primary focus?
12    A.    Well, for a lot of them -- for a
13 lot of them, it was total cardiovascular events,
14 and depending on the population of whether it's
15 men or women -- in men, particularly middle-aged
16 men, MI is a bigger component, but not in women.
17 So in the -- for instance, in the Women's Health
18 Study, our primary composite was cardiovascular
19 events, which is stroke, MI, cardiovascular
20 death. We had more strokes than myocardial
21 infarctions.
22    Q.    All right. And just I guess I want
23 to --
24        MR. PIORKOWSKI: Can I just make
25 sure, did we finish? 'Cause I think, Jeff, you

Page 95

1 changed your question in the middle, and I just
2 want to make sure.
3        THE WITNESS: There are some other
4 trials that are worth mentioning. We're doing
5 trials of fish oils and chocolate extract where
6 stroke is a component.
7        I have played a role in recruiting
8 sites for a trial of anti-inflammatory agents.
9 One is methotrexate and one is a novel drug where
10 stroke is also a component of the composite and a
11 secondary. I doubt that that is -- I mean,
12 without a careful look, I doubt that that's the
13 full breadth, but it's -- it's a -- I think more
14 of the trials that I'm involved with are in the
15 cardiovascular area, although it's not exclusive.
16 We also do look at cancer and other chronic
17 diseases. But I would say the majority of trials
18 that I've been involved in where cardiovascular
19 outcomes are the focus, or at least one of the
20 primary foci, stroke is either part of the
21 composite primary or a prespecified independent
22 secondary.
23    Q.    Okay.
24    A.    And the last thing I'll say is
25 that -- and that goes for the ARRIVE trial, too.

Page 96

1 It's also -- components of stroke are also
2 defined as prespecified safety components of some
3 of the studies I've been involved in. It would
4 break down stroke into its component types.
5    Q.    Okay. Yeah, so I guess my question
6 was not -- I appreciate that stroke would have
7 been a primary, secondary or composite endpoint
8 in many of those studies you've done, given that
9 you work in the treatment of cardiovascular --
10    A.    Right, and it was also the prime --
11 it was an important component or individual
12 prespecified safety outcome, particularly
13 hemorrhagic stroke, in many of our studies.
14        MR. PIORKOWSKI: Let him finish the
15 question.
16    Q.    My question is I'm trying to
17 determine which of those studies involved the
18 evaluation of a prescription medication for
19 prevention of stroke, that that was the primary
20 focus of the study.
21    A.    Yes, I would -- the -- aspirin is,
22 as I said, prescription, and it in this case was
23 used as a prescription drug, a doctor recommended
24 drug, even though -- in this country but not in
25 all countries. The diabetic drug was a

Page 97

1 prescription drug with stroke as an outcome.
2    Q.    Do you recall the name of that
3 drug, or is it --
4    A.    Yes, it's quick-release
5 bromocriptine. The device for the extraction of
6 the veins that I mentioned is a -- is a regulated
7 device. I mean, let's take a look at some of
8 the, just to jog my memory, you know, some of the
9 other steering committees that I've served on, to
10 see if I can -- I've done studies or have been a
11 consultant to studies in the lipid field, but I
12 just don't recall the -- I can't right now recall
13 the precise outcomes of those. I would say that
14 that's probably not a complete accounting just
15 because I've been involved in so many trials over
16 the years, but I can't recall all of the ones
17 that involved prescription and non-prescription
18 drugs.
19    Q.    Okay. Well, but the ones that I
20 guess immediately come to mind as evaluation of a
21 prescription medication in the treatment of
22 stroke include aspirin, the diabetes drug that
23 you were mentioning, and did you also say
24 something about lipid?
25    A.    So I've been, I've been -- I've

Page 98

1 consulted on some lipid trials, but I don't -- I
2 don't remember the outcomes of those, and what I
3 mean is not at a -- not a paid consultant but an
4 advisor to the group. We're designing one of
5 those right now. It's a new lipid lowering drug,
6 and I've been asked to provide a number of sites
7 for that particular trial.
8     Q.    Okay. Are there any studies that
9 you participated in that specifically evaluated
10 the use of anticoagulants to treat stroke or
11 afib?
12     A.    I don't believe I've been
13 intimately involved in any in trials. I may have
14 contributed patients from the clinic to other
15 peoples' trials, but I don't recall any trials
16 that I've been on, you know, executive or
17 steering committee.
18     Q.    Let me see if I could refresh your
19 recollection on the lipid study. Was it -- if
20 you look at page 41 of your list of publications,
21 I guess, it's item number 126. There's a study
22 that says "Lipid levels and risk of ischemic
23 stroke in women." Does that sound familiar?
24     A.    So I believe -- let me just get to
25 that one. 141. I'm sorry, which reference?

Page 99

1     MR. PIORKOWSKI: 126.
2     Q.    It's item number 126 on page 41?
3     A.    On page 41. So that was an
4 observational analysis.
5     Q.    Okay. Let me ask you something as
6 long as we're looking at these, 'cause I've
7 always been curious about it. The positioning of
8 your name amongst the list of authors -- I've
9 seen it a couple of different ways. If you're
10 the primary author, are you listed first or are
11 you listed last?
12     A.    It could be either.
13     Q.    It could be either?
14     A.    Mm-hmm.
15     Q.    And if you're in the middle, you're
16 not the primary author typically, correct?
17     A.    So the positioning -- you know, I
18 don't want to get into a long -- a long answer,
19 but it has a lot to do with your role and the
20 status of the person who's, you know, writing the
21 paper. If they're a junior person, you could
22 actually be the first author but you're
23 positioned second. So a second authorship is, if
24 you're doing that with a mentee, is often
25 considered, you know, you as the first author.

Page 100

1 The first author is the person who takes
2 responsibility for really directing the writing
3 of the paper. The last author or the
4 second-to-last author are the people who are
5 senior in the group, and often that means that
6 they, you know, maybe were the principal
7 investigator on the parent study or, you know,
8 built the research infrastructure for that study
9 to happen.
10     Q.    Okay. And I'm just -- and I'm just
11 trying to understand, and I do not mean this
12 disrespectfully at all --
13     A.    Sure.
14     Q.    -- because I've often looked at
15 your resume and said how can one person write so
16 many articles. And is -- your participation in
17 the writing of these articles would vary from
18 project to project, correct?
19     A.    Correct.
20     Q.    In some cases, you may have been
21 the primary author who did the laboring or
22 drafting it?
23     A.    Correct.
24     Q.    And there may be cases where it was
25 more limited to perhaps review comments?

Page 101

1     A.    Correct.
2     Q.    Okay.
3     A.    Again, I guess the senior author --
4 and it could be that you do the writing if you're
5 the back end, too. You can take a prominent role
6 but. What the back ends means is that you're the
7 senior person who's taking responsibility for the
8 work. And we will sometimes defer. You know,
9 I've been promoted to full professor since '09,
10 and I have a lot of junior colleagues for whom
11 it's good for them to assume that role, and so I
12 will defer. You know, it's called moving to the
13 middle.
14     Q.    Sure.
15     A.    And then at some point in your
16 career you even try to move off of papers, where
17 you've had some involvement, to allow the young
18 people to flourish and not to be seen as just
19 your protegee. There's actually quite a bit of
20 variability in a role that's not always a
21 one-to-one correlation exactly with your position
22 on the paper.
23     Q.    Okay. Thank you. I wanted to ask
24 you specifically since we had talked about
25 anticoagulants. There was an article, a recent

Page 102

1 article. My apologies. Let me just find it.
2     Okay. It's on page 69, and it's
3 item 380, and this was just published in April of
4 2016.
5     A.   In JAMA Cardiology, yes.
6     Q.   Yes. And it's "Incidence and
7 Determinants of Traumatic Intracranial Bleeding
8 Among Older Veterans Receiving Warfarin for
9 Atrial Fibrillation."
10     A.   Yes, sir.
11     Q.   Okay. What was your involvement in
12 this study?
13     A.   So I am the senior author on this
14 one, and this one is a paper that -- it just --
15 it's trying to identify in older patients -- the
16 risk of bleeding in older patients who are on
17 atrial fibrillation. The idea is to understand
18 the biology of bleeding in older patients who are
19 exclusively on warfarin.
20     Q.   Mm-hmm. Okay. But you actually
21 comment on NOACs in this article as well,
22 correct?
23     A.   Well, we don't -- there's not
24 enough data in the database to say -- to provide
25 any original -- any meaningful original data.

Page 103

1     The primary analyses are confined
2 to the risk of bleeding in people of an older age
3 who have afib who are on warfarin.
4     Q.   You don't recall whether you make
5 specific comments in this article on whether use
6 of NOACs might be preferable to warfarin?
7     A.   Actually, I don't. I don't recall.
8 This paper took us a little while to get
9 published, having gone to several journals and
10 then finding its way into JAMA Cardiology, and I
11 don't recall the specific discussion about NOACs.
12 My main contribution was teaching Dr. Dodson how
13 to use an existing, an existing dataset.
14     Q.   Can we pull up Dodson 2016. I'll
15 mark this as 3.
16     (Whereupon, Deposition Exhibit 3,
17     "Incidence and Determinants of Traumatic
18     Intracranial Bleeding Among Older Veterans
19     Receiving Warfarin for Atrial Fibrillation,"
20     Dodson et al," was marked
21     for identification.)
22 BY MR. GRAND
23     Q.   So I've marked as Gaziano 3 an
24 article published in JAMA entitled "Incidence and
25 Determinants of Traumatic Cranial Bleeding Among

Page 104

1 Older Veterans Receiving Warfarin for Atrial
2 Fibrillation." And you said you were the leader
3 author on this?
4     A.   No. The lead author is John
5 Dodson.
6     Q.   Did you say primary author?
7     A.   That's -- lead and primary are the
8 same. They're used interchangeably.
9     Q.   Okay. Sorry, I just misheard you.
10     Now, this study took place -- I
11 guess the core analysis was March 2014 to May
12 2015, and there was an additional ad hoc analysis
13 performed through December 2015, correct?
14     A.   I don't recall exactly when the
15 analysis --
16     Q.   If you look on the first page under
17 Design, Setting, and Participants. Do you see
18 it?
19     A.   So where are you in the paper?
20     Q.   I'm just at the first page under
21 Design Setting and Participants --
22     A.   Yes.
23     Q.   -- in the abstract section.
24     A.   Oh, yes, yes.
25     Q.   Okay. So I was just verifying when

Page 105

1 this -- when this was performed, when this
2 research was performed?
3     A.   Yes, I think that would be about
4 right.
5     Q.   Okay. So it looks like there was
6 analysis occurring through December 2015,
7 correct?
8     A.   Correct.
9     Q.   Okay. And if you look at I guess
10 the second-to-last page where the Conclusions
11 section is.
12     A.   You mean the word that starts at
13 the end, "Conclusions."
14     Q.   Right. If you look at the
15 paragraph before it, the column to the left,
16 there's a sentence beginning with the word
17 "Fifth." Do you see that?
18     A.   In the paragraph that starts with
19 "In summary"?
20     Q.   No, the paragraph that starts
21 with -- I'm talking about preceding the
22 Conclusions section.
23     A.   Oh.
24     Q.   If you look at the column on the
25 left, there's a sentence that begins "Fifth."

Page 106

1    A.    Yes.
2    Q.    Do you see that?
3    A.    Yes.
4    Q.    It says, "Fifth our study period
5 predated the common use of direct oral
6 anticoagulants."
7    A.    Yes.
8    Q.    Are you referring to NOAC, sir?
9    A.    I believe Dodson was probably
10 referring to -- yes, to that class of drugs.
11    Q.    Okay.  "These medications are
12 increasingly used for stroke prevention in AF and
13 may have a different risk-benefit profile from
14 that of warfarin in older adults."  Did I read
15 that correctly?
16    A.    Yes, you did.
17    Q.    "For example, the reliable effect
18 of these medications" -- and you're referring to
19 NOACs there, correct?
20    A.    I believe so, yes.
21    Q.    -- "taken regularly, would obviate
22 the labile INR variable, which we found to be
23 significantly associated with bleeding risk."
24    A.    Yes.
25    Q.    "Therefore, we believe that the

Page 107

1 comparative risk of direct oral anticoagulants
2 versus warfarin, in the context of traumatic
3 intracranial bleeding among older adults in
4 clinical practice, warrants further investigation
5 and future observational studies."
6         Did I read that correctly?
7    A.    You did.
8    Q.    Okay.  Now, this was not published
9 until March 9th, 2016, correct?
10    A.    Correct.
11    Q.    And you don't disclose in this
12 article that you were a consultant for Bayer on
13 NOACs, do you?
14         MR. PIORKOWSKI:  Object to form.
15    A.    I don't know.  This is an article
16 about the biologic risk factors that -- the sum
17 and substance of the analysis are the biologic
18 factors of individuals that predict bleeding risk
19 in older adults who happen to be on warfarin.
20    Q.    Right.
21    A.    We alluded to the fact that we need
22 more research in some of the novel agents, but
23 this is -- this is not a study of novel oral
24 anticoagulants.
25    Q.    Okay.  But did -- the NOAC is

Page 108

1 referred to as having a reliable effect, correct?
2    A.    Well, all it said was that the
3 NOACs might have a different effect than warfarin
4 in older patients with respect to the particular
5 biologic factors that predict bleeding in older
6 adults.  You know, the biology might be different
7 and they warrant additional study.
8    Q.    Well, it says, "The reliable effect
9 of these medications, taken regularly, would
10 obviate the labile INR variable, which we found
11 to be significantly associated with bleeding
12 risk."
13    A.    Yeah, so all that -- all that says
14 is that INR, and we've known this for years, this
15 is nothing new, that INR lability for warfarin
16 isn't a predictor of bleeding risk, and we've
17 known that for years, and the NOACs don't have
18 the requirement to test INR, and the NOACs don't
19 have that same characteristic.  So that's what
20 that sentence says, is that the NOACs are
21 different.  All it states is that the NOACs are
22 different in the biology with respect to INR.
23    Q.    Isn't this sentence suggesting that
24 NOACs would be preferable to warfarin because you
25 don't have to worry about INR?

Page 109

1    A.    No.
2         MR. PIORKOWSKI:  Object to form.
3    Q.    No?
4    A.    No, it doesn't -- it doesn't
5 suggest that.  You're reading into it.  All it's
6 saying -- when it refers to the effect of these
7 medications, what it's basically saying is that
8 these drugs act differently, and they are not
9 dependent on measurement of INR, and the biology
10 of these drugs -- all it says is the biology of
11 these drugs are different, something that's, you
12 know, generally accepted common knowledge about
13 NOACs.  That for warfarin bleeding is related to
14 the amount that the INR bounces around.  For
15 NOACs, that's not the case.  That's a common --
16 common knowledge fact.
17    Q.    Dr. Krumholz reported being a
18 recipient of research agreements for Medtronic
19 and Johnson & Johnson, correct?  If you look at
20 the Conflict of Interest Disclosures.
21    A.    Yes.
22    Q.    You didn't think you should report
23 that you were a litigation consultant for Bayer?
24    A.    Well, I will say that at the time
25 that this paper was submitted and published that

Page 110

1    I had had discussions with Joe about not having
2    the time necessarily to play an active role in
3    this litigation.  I don't recall the exact time.
4    But the focus of this paper was not NOACs.  The
5    focus of this paper was biologic things like
6    anemia, heart failure that predict bleeding on
7    patients who are on warfarin.  It doesn't study
8    the NOACs.  I don't -- as I mentioned earlier
9    today, that Joe and I in late 2015, after all
10   these analyses were done, we began discussions
11   about whether or not I will play a role, and I
12   will tell you that I at that time work was quite
13   busy and had indicated to him that I may not have
14   that much time to give.  I don't recall the
15   precise date in which I was, you know, named as
16   a -- I'd say I would be happy to have
17   discussions, had not received any funding from
18   him.  And in my assessment, my involvement with a
19   NOAC at that stage was not relevant to the
20   biologic question that we asked here.  I don't --
21   I can't speak to Harlan Krumholz's specific
22   relationships.  Some people list all
23   relationships in all papers.  The requirement is
24   that we will list -- we list relationships that
25   have a direct impact on the analysis of the

Page 111

1    study, and certainly at the time that these
2    analyses were done, early in 2015 and refined in
3    late in 2015, I stand by my assessment that
4    the -- that the biology of things like dementia,
5    anemia and depression as predictors of bleeding
6    risk in an older individual on warfarin is not
7    relevant to the discussions that I was having
8    about my involvement in this litigation.
9        Q.   Thank you.  I'm going to ask you
10   about some of the opinions contained in your
11   report.  Do you want to stop?
12        MR. PIORKOWSKI:  We don't need to
13   take a break, but let's just go off the record
14   for a minute so we can get this in.
15        MR. GRAND:  Yeah, that would make
16   sense.
17        THE VIDEOGRAPHER:  We are now off
18   the record.  The time is 4:49.
19        (A break was taken.)
20        THE VIDEOGRAPHER:  We are now back
21   on the record.  The time is 4:54.
22   BY MR. GRAND
23        Q.   One other question before we get to
24   some of the specific opinions in your report.  In
25   your list of committees -- have you ever served

Page 112

1    on a FDA advisory committee for -- the
2    cardiorenal committee?
3        A.   No, not formally.  I did say that I
4    went to the FDA but for, you know, representing a
5    pharmaceutical company to help design a trial,
6    but no, I've never sat on that, the cardiorenal
7    committee.
8        Q.   Okay, I'm looking specifically at
9    page 3 of your report, the section Quality of
10   Research Data.
11        I wanted to ask you -- the first
12   sentence you say, "As a preventive cardiologist,
13   epidemiologist, and trialist."  We talked about
14   this a little bit before.  I just want to
15   understand how you define trialist.
16        A.   So it's one who -- one who conducts
17   trials.
18        Q.   Okay.
19        MR. PIORKOWSKI:  Jeff, can I just
20   ask an administrative question?  When you're
21   projecting something, is that a split screen, or
22   is the screen only on the document or how's that
23   working?
24        THE VIDEOGRAPHER:  It's a split
25   screen.  The document is big and the witness is

Page 113

1    down at the bottom.
2        MR. PIORKOWSKI:  All right.
3    BY MR. GRAND
4        Q.   The last sentence of that
5    paragraph, you note, "I am also extensively
6    involved in evaluating basic research, such as
7    pharmacology studies, that seek to identify
8    biologic mechanisms and potential effects of
9    drugs that may have clinical significance for
10   cardiovascular risk."
11        Did I read that correctly?
12        A.   Yes.
13        Q.   What extensive involvement are you
14   referring to here?
15        A.   So when we do -- when we do --
16   these are observational studies where we're
17   looking at -- for chronic disease in general, we
18   look at what effects a pharmacologic agent might
19   have on any number of outcomes.  So the idea is
20   to sort of understand the biology of the drug.
21        I had some background as a basic
22   scientist in a basic science lab, so I understand
23   a lot about the mechanisms in biology, and we
24   apply that to drugs that are commonly used.  Go
25   into a large database, usually a health system

Page 114

1 database like a Medicare database or the Brigham
2 database or the FDA database, to see if there's
3 cardiovascular risk associated with that
4 particular drug or is it -- or perhaps with that
5 drug as it interacts with other, say, biologic
6 characteristics of an individual.
7     Q.    Okay.  I guess what I'm hung up on
8 is "extensively involved in evaluating basic
9 research such as pharmacology studies," and I
10 didn't really see that in your CV, that you're
11 evaluating pharmacology studies.
12     MR. PIORKOWSKI:  Object to form.
13 You can answer.
14     A.    So the idea -- embedded -- it's the
15 one thing that I teach our residents, that
16 embedded in every one of these many observational
17 studies is an understanding.  I always have them
18 put a section in the paper.  I say what's the --
19 what's the underlying mechanism, what's the
20 biology.  So I -- and not everybody does this.
21 Some people just, you know, state the epi facts.
22 I think that that's an incomplete -- as an
23 epidemiologist, I think it's -- when we publish a
24 study on an observational database, I think it's
25 incumbent upon us to dig deeper and to study the

Page 115

1 pharmacology, if it's a drug, or the biology or,
2 if it's a vitamin, the science, the animal
3 studies or whatever, and see if there's anything
4 that's relevant to our interpretation of the
5 findings.  Because when you interpret a
6 finding -- biologic plausibility is one of the
7 key things that, you know, some of the early
8 epidemiologists at Oxford told us.  You know,
9 we're -- I don't want to get too deep, but we're
10 detectives, and an epidemiologist's job is to
11 first assume that an association is either due to
12 chance, bias, confounding before you make a
13 conclusion that there might be a causal
14 relationship, and you have to not make a
15 conclusion on an observational study of
16 causality.  Biologic plausibility is one of the
17 factors that can help us come to that conclusion
18 and help us interpret.  So I'm very strict with
19 my trainees you must -- that you must know
20 something.  I hate epidemiologists that publish
21 an association without digging into what's the
22 biology.  When it refers to a drug, that
23 pharmacology is part of that biologic totality of
24 evidence, if you know what I mean.
25     Q.    Right.  Biologic plausibility is

Page 116

1 one of the Bradford factors.
2     A.    Exactly.  That's who I was
3 referring to, some of the Oxford great
4 grandfathers of Doll and Hill.
5     Q.    Okay.  So when you're describing
6 extensive involvement, what you're, if I can
7 paraphrase, and correct me if I'm wrong, what
8 you're saying is that before you embark on these
9 studies you do research into, biologically, the
10 underlying mechanism of action?
11     A.    Yes, that's why I said evaluating.
12 I don't generate -- well, I, you know, you
13 contributed to other scientists who do generate.
14 I don't generate original basic research, but I
15 extensively evaluate the basic research, and it
16 doesn't have to happen before.  It can be, you
17 know, after we've had the finding and we're
18 writing the paper.
19     Q.    Okay.  And with -- now, I believe
20 you said earlier, at least with respect to your
21 involvement in this case, that you did not review
22 underlying pharmacology studies or animal studies
23 or lab studies for rivaroxaban?
24     A.    So it is part -- I do under- -- I
25 have a general epidemiologist's, probably a

Page 117

1 little better than the general public's, working
2 knowledge of the mechanism.  So I, you know, have
3 a sufficient understanding of, for instance, the
4 inhibition of Factor Xa, a little bit about
5 the -- some of the, some of the rudimentary
6 pharmacologic X's, like, for instance, the peaks
7 and troughs that you get.  But for the purposes
8 of rendering my opinion -- those are important in
9 some of the design elements of a study, does the
10 design -- is the design supported by the biology.
11 So the biology could be about dose or dosing
12 frequency or whatever it is.  So I have a
13 probably better than average working knowledge of
14 that kind of work in this particular field, but I
15 didn't go to excruciating detail in the specifics
16 of the pharmacology of rivaroxaban, for instance.
17     Q.    And you have not reviewed all the
18 dosing studies, correct?
19     A.    Correct.  But I am familiar with
20 some of the general principles that went into the
21 dosing of the various NOACs.
22     Q.    Okay.
23     A.    But I did not in detail review the
24 totality of evidence on -- you know, the biology
25 and the preclinical studies.

Page 118

1    Q.    Okay.  And you're not rendering an
2  opinion on dosing, are you, in connection with
3  your testimony in this case?
4    A.    I have some opinions about the dose
5  chosen and used in and the results of the
6  particular doses that's been used in the -- in
7  the randomized trials, but I'm not rendering an
8  opinion about the pharmacology per se, you know,
9  that led to some of those decisions, but I do
10  have opinions about the doses chosen for the
11  trials.
12    Q.    Okay.  Did you review any of the --
13  any of the internal discussions about Bayer and
14  Janssen about dosing for the trials?
15    A.    No, sir.
16    Q.    Okay.  Did you review any of their
17  emails with outside discussions?  I mean, I'm
18  sorry, with outside consultants regarding the
19  dosing for the trials?
20    A.    No, sir, I did not.
21    Q.    Okay.  Did you review any emails
22  between Janssen employees and Robert Califf?
23    A.    No, sir, I did not.
24    Q.    And you did not review all the
25  dosing studies for Xarelto, correct?

Page 119

1    A.    Correct.
2        MR. PIORKOWSKI:  The dose findings
3  studies?  Is that what you're talking about?
4        MR. GRAND:  Yes, dose finding
5  studies.
6    A.    Yes, I did not review them all, but
7  I'm -- you know, I'm aware of some of them
8  have -- as I said, as this field has evolved,
9  I've -- you know, we've all kind of -- as part of
10  the education of myself as both a cardiologist
11  and epidemiologist, I am aware of some of that
12  literature, but I did not review it in detail
13  specifically for the crafting of my report.
14    Q.    In the next section you lay out
15  four different types -- you describe four
16  different types of studies, correct?
17    A.    Correct.
18    Q.    And that's -- randomized,
19  controlled clinical trials is listed first, human
20  observational studies, such as cohort or
21  case-control epidemiology studies.
22    A.    Yes, sir.
23    Q.    Basic research, which includes
24  human physiologic and animal studies, in vitro,
25  experiments, and pharmacology and

Page 120

1  pharmacokinetics studies in which the effects of
2  the drugs are examined in short-term studies in
3  human volunteers.
4        Did I read that correctly?
5    A.    Yes.
6    Q.    And in addition to the dosing
7  studies, did you look at any of the
8  pharmacokinetic studies or analyses that were
9  undertaken by Bayer or Janssen with respect to
10  dosing?
11    A.    Again, I didn't look specifically
12  for the preparation of the report.  I'm familiar
13  with some of the pharmacology of each of the
14  NOACs for, you know, my general cardiology
15  knowledge in understanding how these drugs should
16  be used and whether they were used in a way, in
17  the various trials, in a way that's consistent
18  with what the pharmacokinetics would suggest.
19    Q.    Did you read any of the
20  correspondence between Janssen and the FDA
21  regarding dosing for the various rivaroxaban
22  trials?
23    A.    You know, I don't recall if I saw
24  specific communication.  I know there was in
25  the -- there were discussions of dose in the

Page 121

1  design, you know, aspects of the trial, but I
2  don't think that I saw any specific
3  correspondence specific to the discussion about
4  the doses that were going on, outside of the
5  study protocol and the -- and the study report.
6    Q.    Are you rendering opinions
7  regarding the dosage of Xarelto outside the
8  context of for treatment of non-valvular afib?
9        MR. PIORKOWSKI:  Object to form.
10    A.    Well, I have in my report provided
11  opinions regarding the supportive nature of the
12  other trials of rivaroxaban in the interpretation
13  of the ROCKET trial.  And in -- many of those
14  cases, while the starting dose was a little bit
15  different, the maintenance dose was similar.  So
16  in my mind, you know, the issues of dose are
17  relevant to my ability to be able to use the
18  totality of trial data on rivaroxaban to help me
19  better interpret ROCKET.
20    Q.    Okay.  So your opinion is that the
21  dose of rivaroxaban was appropriate in the ROCKET
22  trial, correct?
23    A.    So my opinion was that ROCKET was a
24  well-designed study of the 20 milligram, or 15
25  milligram in the case of renal failure dose, that

Page 122

1 was similar to doses used in other trials for
2 which there was sufficient support to indicate
3 that that would be a acceptable dose to test in
4 the afib situation.
5     Q.   Okay.  When you say acceptable dose
6 to test, is that different from what the best
7 dose to test would be?
8     A.   So, I mean -- and I'm not rendering
9 an opinion on the best dose.  I'm not rendering
10 an opinion on the fact that a lot of work went
11 into coming up with a dose that was felt
12 acceptable to be tested and that had been tested
13 in certain trials in other situations and that
14 the logic behind the discussion in the protocol
15 and the experience that led to some of the power
16 calculations, for instance, on the effect size,
17 was sufficient to warrant the study of that dose
18 in patients with atrial fibrillation.
19     Q.   Okay, but your opinion is not that
20 that's what the dose should be or that's what the
21 safest dose would have been?
22     A.   So you can't -- in my opinion, you
23 know, you can't -- I -- regardless of what other
24 literature there might be on the pharmacology of
25 the drug, the only way for us to really make a

Page 123

1 determination that a different dose would be
2 better or worse would be to do a head-to-head
3 comparison like we've done in statin trials.
4        The work that went up to the choice
5 of that dose for this particular study is, in my
6 mind, sufficient and adequate to support the test
7 that was undertaken, and the test results warrant
8 that dose being applied in clinical settings.  To
9 be able to say from a clinical perspective as a
10 clinician and as an epidemiologist that there is
11 a better dose or there's a worse dose would
12 require a head-to-head comparison of multiple
13 doses, which hasn't been done yet.
14     Q.   Well, not by this manufacturer,
15 correct?
16     A.   Not by this manufacturer for this
17 drug.
18     Q.   Right.  Other manufacturers of
19 NOACs have done different dose regimens, compared
20 them, correct?
21        MR. PIORKOWSKI: Object to form.
22     A.   That's correct, others have in some
23 cases.  In other cases, they've chosen -- each
24 drug has been chosen with slightly different, in
25 some cases complicated, dosing regimens, and it

Page 124

1 seems to me that each dosing regimen was
2 supported by the literature at that point.  The
3 afib trials and the more chronic trials in my
4 knowledge for rivaroxaban have not been clinical
5 comparisons of various doses.
6     Q.   Okay.  You have not reviewed the
7 dosing studies in rivaroxaban, correct?
8     A.   What I will say is that I have
9 looked at some of the early biology, some of
10 which is, you know, early dosing information, as
11 a clinician, to understand, you know, how these
12 drugs work.
13        As I said earlier, I didn't review
14 specific -- the specific totality of preclinical
15 studies that were a part of the contribution to
16 the design decision to choose the 20 milligram
17 and 15 milligram dosing regimen for rivaroxaban
18 and some of the other trials.  I mean, sorry,
19 ROCKET and some of the other trials.
20     Q.   Okay.  So your statement that it
21 was an appropriate dose to test is based on prior
22 clinical trial results?
23     A.   No, it's based on -- what I said is
24 for writing my report I didn't do an excruciating
25 in-depth review of all of the preclinical studies

Page 125

1 or a significant number of them, but I've also
2 stated that I have followed this field as a
3 cardiologist and epidemiologist for a number of
4 years and am aware of some of the information
5 around things like renal clearance, liver
6 clearance, half-life, those kinds of things.
7 Those are pharmacology studies.  And I'm aware of
8 that literature and aware of some of those
9 comparisons between the NOACs, and then also
10 aware of some of the earlier clinical trials, and
11 the decision to design a study for comparison of
12 the 20 milligram dose with the 15 milligram dose
13 regimen, which is a -- what's clinical useful is
14 that it's a simple dosing regimen, and in my
15 estimation, one of the more simple dosing
16 regimens for the NOACs.  And that's also a
17 consideration when you take a drug from testing
18 to practice, you want to have -- so yet again
19 another one of the many considerations, the
20 pharmacology, the previous preclinical trials,
21 the previous clinical work and then the
22 applicability of an intervention all goes into
23 the decision making about choosing a drug to
24 study, and to me, the logic behind the choice of
25 the 20 milligram dose to study in this particular

USCA5 619

Page 126

1 situation seems appropriate.
2 Q. Based on your limited review?
3 MR. PIORKOWSKI: Object to form.
4 A. Based on my -- based on my clinical
5 experience, research experience, teaching
6 experience and --
7 Q. Sorry. Go on.
8 A. -- and review of the literature
9 that I've done that has not been the extensive
10 review of all of the pharmacology data.
11 Q. Well, with respect to pharmacology,
12 you have not looked at the totality of the data,
13 have you?
14 A. That's correct, I've not looked at
15 every pharmacology paper on rivaroxaban.
16 Q. You haven't actually looked at
17 quite a few, correct?
18 A. That's correct.
19 Q. And you haven't looked at any of
20 the pharmacokinetic analyses or projections with
21 respect to dosing, have you?
22 MR. PIORKOWSKI: Object to form.
23 A. No, no. Actually, I think that
24 over the years I've actually followed this field
25 and have looked at some of the -- and

Page 127

1 particularly in some of the -- this is what I --
2 as I mentioned, as an epidemiologist with an
3 interest in mechanism, when a paper is published
4 and there's references within that paper, I would
5 go to some of those references in the paper and
6 take a look at some of the pharmacology
7 information to make a -- to understand the kinds
8 of things that I think are important in making
9 some of these dosing decisions.
10 As I mentioned, the type of
11 clearance, the rate of absorption, the absorption
12 with food, the half-life of the drugs. Those are
13 all pharmacology information informed by
14 pharmacology studies that I have at times looked
15 at.
16 I've not done for the purposes of
17 writing this report an extensive review of the
18 majority of pharmacology papers, but over the
19 years, I have developed enough of an
20 understanding about the general pharmacology of
21 each of the NOACs. I can't specifically -- I
22 can't provide you with all the details chapter
23 and verse by memory, but I think it's incumbent
24 upon us just to, if we're going to be -- begin to
25 using these to interpret the trials, to have some

Page 128

1 sense of some of that information.
2 Q. Okay. You haven't looked at any of
3 the -- any of the pharmacokinetic models that
4 were published by Bayer?
5 A. Yeah, I don't know what you mean.
6 When you say I haven't looked at any, I don't
7 know that I can say I haven't looked at any of
8 the pharma -- if the pharmacokinetic models are
9 in some of those papers that I told you that I
10 reviewed, then I --
11 Q. There's papers devoted to
12 pharmacokinetic models for rivaroxaban.
13 A. But there's also -- I'm sure that
14 there's -- I've actually looked at a number of
15 review articles on the NOACs in general, and
16 there's often a section on the -- on the biology
17 and pharmacokinetics of these drugs, and it's my
18 strong suspicion that those -- that there's a
19 synthesis of some of those things that you talk
20 about in those review articles.
21 Q. None of the -- none of the modeling
22 articles that were published by Bayer are listed
23 in your list of materials considered, are they?
24 MR. PIORKOWSKI: Object to form.
25 A. That's correct.

Page 129

1 Q. Okay. And you didn't look at any
2 of the unpublished models that were done by Bayer
3 or Janssen, correct?
4 MR. PIORKOWSKI: Objection.
5 A. That's correct, and that we can say
6 with much more certainty, that I -- what I know
7 about the pharmacology is based on the published
8 literature in the course of, you know, my
9 clinical practice.
10 Q. Okay. Getting back to these, the
11 type of -- the categories of evidence you've
12 listed.
13 The fourth one was listed as
14 synthetic works, including meta-analyses,
15 systemic reviews -- sorry, systematic reviews and
16 other analyses that combine data from individual
17 studies.
18 Did I read that correct?
19 A. Yes.
20 Q. Now, you don't list here, but you
21 do, I think, talk about later in your report
22 about descriptive studies.
23 A. So those are included within human
24 observational studies.
25 Q. Okay. So you didn't include that

Page 130

1 in this?
2     A.    Yes.
3     Q.    Okay. I just want to be clear on
4 that.
5     And is it your intention that this
6 sort of reflects the sort of hierarchy of
7 evidence?
8     MR. PIORKOWSKI: Object to form.
9     A.    It's a term often used, and I think
10 that sometimes people are very concrete about
11 that. The utility of any one of these tools can
12 be high depending entirely on the question.
13     And just to give you a very brief
14 example, trials for certain things are much
15 better than observational studies for certain
16 things. On the one hand, an observational study,
17 for instance, about smoking, was the optimal way
18 to study smoking because we wouldn't have
19 randomized people to smoking or not. So there's
20 a case where you might say for a certain type of
21 question a randomized trial is better. But we
22 got the answer better and faster and with
23 definitive causation from an observational study.
24 So it really depends on the type of question that
25 you're asking to -- so I wouldn't define a

Page 131

1 concrete hierarchy that in all -- in all cases
2 that this brand is better than that brand.
3     Q.    Okay. And that was actually -- you
4 pre-empted my next question, which is there's
5 generally -- is there general agreement that
6 randomized, controlled clinical trials tend to be
7 the highest form of evidence?
8     A.    So they're more precise, and they
9 better answer certain questions. However,
10 they're not -- they're not optimal or, in some
11 cases, provide little information on other
12 questions.
13     Q.    Mm-hmm. And even -- even
14 descriptive studies can provide valuable
15 information, correct?
16     A.    Well, all studies can in certain
17 situations provide valuable information. You
18 just have to be very careful about the pitfalls
19 of all of the study types as you interpret them.
20     Q.    The FDA has pulled drugs off the
21 market just based on case studies, correct?
22     MR. PIORKOWSKI: Object to form.
23     A.    I imagine that case series that
24 they may have. I actually think that the case
25 reporting mechanism for the FDA has enormous

Page 132

1 problems because of a denominator issue.
2     Q.    You're talking about adverse event
3 reporting?
4     A.    Adverse events are a form of case
5 reports, and descriptive studies have an enormous
6 number of potential problems, and so it's
7 actually, in my mind, very rare that you would
8 rely upon it for a causal interpretation.
9 However, the FDA is not me, they're not
10 epidemiologists, and they can choose to, based on
11 evidence that I might not deem causal, to make a
12 decision that's not, in my opinion -- they can
13 even make a decision that's not supported by the
14 literature as far as I'm concerned. You know
15 what I mean?
16     Q.    Yes. A little further down in the
17 page you note, "Randomized, double-blinded,
18 placebo-controlled clinical trials are often the
19 most reliable type of scientific evidence and are
20 often therefore referred to as the gold
21 standard."
22     Did I read that correctly?
23     A.    Yes, and the context here is in
24 particular when we're studying big effects of
25 drugs or devices for which randomized trials can

Page 133

1 be done.
2     Q.    Right. In fact, it's not -- often
3 you can't do a placebo-controlled trial, correct?
4     A.    No, no, there's many cases where
5 you can't. I'd say that, you know, that you
6 often can't do a placebo-controlled trial for a
7 certain --
8     Q.    So you're not treating someone who
9 needs treatment, correct?
10     A.    Well, that's one issue. Sometimes
11 they're also just logistically not possible, I
12 mean.
13     Q.    I want to ask you actually about
14 the term gold standard, which you've seen a lot
15 in -- which I've seen a lot in medical articles,
16 particularly with refers -- with reference to
17 types of treatment.
18     Is it fair to say that gold
19 standard is a flexible and moving target?
20     MR. PIORKOWSKI: Object to form.
21     A.    Yeah, I mean, I think -- I think --
22 generically, I think people would like to think
23 of gold standard as the thing to which other
24 things are referenced to. I mean, I think,
25 it's -- that's where it comes from, that the

Case 2:14-md-02592-EEF-MBN Document 5131-1 Filed 01/20/17 Page 36 of 65
Case 2:14-md-02592-EEF-MBN Document 5131-1 Filed 01/20/17 Page 36 of 65

Protected - Subject to Further Protective Review

## Page 134

1 currencies are measures to their net value in
2 gold. But I think that what you imply is just
3 the opposite, that they're -- that rarely is
4 there something that's so statistic that you
5 could say that it's an immutable in medicine.
6 Q. Well, because medicine -- medicine
7 changes --
8 A. Absolutely. Absolutely, but even
9 in a single point in time. You know, something
10 that is used more often than others in a
11 particular patient's case while -- even if it
12 works in 99 percent of the others, it might not
13 be good for a particular patient. So I think
14 that if people use it in a concrete sense,
15 because we have to personalize medicine, then you
16 might not be practicing good medicine.
17 Q. I want to turn to page 6 of your
18 report?
19 A. Okay.
20 Q. In the third paragraph you note,
21 "Meta-Analyses are only as good as the underlying
22 data and can generate misleading results if
23 analyses are dominated by unreliable or biased
24 data or include studies that do not belong in a
25 combined analysis."

## Page 135

1 Are you referring to heterogeneity
2 in that last phrase?
3 A. Well --
4 MR. PIORKOWSKI: Object to form.
5 Go ahead.
6 A. -- that's one of -- I'm not
7 referring to any particular technique to assess
8 the reliability or unreliability. That's one --
9 that's one measure that people use, but there's
10 other -- many other measures. I mean, you can
11 choose to exclude a trial because the design was
12 whacky, and you've not gotten to the stage of
13 applying a statistical analysis to it. You might
14 determine it's unreliable merely by its design.
15 Q. What factors should be considered
16 when deciding whether data or studies should be
17 combined? You know, whether it's a pooled
18 analysis or meta-analysis.
19 A. I mean, it's entirely dependent on
20 the question that you're asking.
21 Q. Well, let's use anticoagulants as
22 an example. There's some pooled data on --
23 there's some pooled data on anticoagulants,
24 correct?
25 A. Yes, there is.

## Page 136

1 Q. Okay. If you want to do
2 comparisons between one NOAC or a NOAC versus
3 warfarin or multiple NOACs versus warfarin, what
4 are some of the factors you should be considering
5 before you pool that data?
6 A. Yeah. Well, that's even -- so
7 pooling is usually a term referred to taking the
8 data and putting it together somehow with some of
9 the analyses which are even more fraught, more
10 problematic. It's also a synthetic work. It's a
11 different exercise where you're comparing --
12 you're not pooling the data. You're actually
13 indirectly comparing each other through a common
14 comparator. Those are really problematic. But
15 the technique that you're going to use is really
16 predicated on the question that you -- the
17 specific question that you're attempting to ask
18 and the characteristics of the data that you have
19 at your disposal. I mean, there's some people
20 that will even pool randomized trials and
21 observational studies into the same analysis. In
22 some cases, that might be a good thing. In some
23 cases, it might not be a good thing. Those
24 network comparisons are extremely problematic,
25 and I think by and large -- by and large are

## Page 137

1 unreliable. Largely because the trials are so
2 different that it makes that indirect comparison
3 extremely problematic.
4 Q. Okay. Well, some of the
5 differences could include patient
6 characteristics, correct?
7 A. Whenever you're -- absolutely,
8 that's one thing to consider whenever you're
9 trying to synthesize data.
10 Q. The other can be the length of the
11 study, correct?
12 A. Sure.
13 Q. The other could be follow-up
14 period?
15 A. Those are -- those are
16 characteristics of studies that you would
17 consider when you're trying to pool data.
18 Systematically review them means that you don't
19 pool them but you just interpret them each them
20 individually. Yeah, these are factors you can
21 consider.
22 Q. Endpoints?
23 A. Mm-hmm.
24 Q. Safety and efficacy endpoints,
25 correct?

Case 2:14-md-02592-EEF-MBN Document 5123-11 Filed 01/20/17 Page 37 of 65
Case 2:14-md-02592-EEF-MBN Document 5123-11 Filed 01/20/17 Page 37 of 65
Protected - Subject to Further Protective Review

Page 138

1    MR. PIORKOWSKI: You need to say
2 yes or no.
3    A.    Yes, those are factors that you can
4 consider in a particular analysis.
5    Q.    And just to make sure I understand
6 your prior answer better, can -- how -- in your
7 mind, how do you distinguish between a pooled
8 analysis versus a meta-analysis?
9    A.    So those words are -- you know,
10 those are often used interchangeably, and there's
11 various ways to pool the data, and people have
12 different definitions of meta-analyzing the data,
13 too.
14    You can keep the results separate
15 and just interpret each study and see if there's
16 a consistency in interpretation from study to
17 study, and some people would consider that a
18 bringing the data together. The idea -- I think
19 the general concept of pooling.
20    In a more technical sense, you can
21 take the individual estimates from each study,
22 and you can pool those, and there's a way to --
23 different ways to weight each study, based on its
24 size or based on the confidence of the finding.
25    Then there's another way. Is that

Page 139

1 if you get the raw data, if you feel comfortable,
2 again, many challenges with doing this, you can
3 take all the data and put it into one single
4 database, and each person's individual data
5 creating a line of data that includes, you know,
6 their age and their whatever, you know, whether
7 they were on the drug or off the drug or
8 whatever, and try to analyze it as one big pool
9 of data.
10    So there are very many different
11 strategies for bringing together the data. I
12 think in -- I think that some people think of
13 pooling the data as a term of epidemiology art of
14 being the latter thing, although there are people
15 that would use the term for collecting the data
16 in the other ways, too.
17    Q.    Can you describe what heterogeneity
18 is and what the test -- there's a test for it,
19 correct?
20    A.    There is indeed, yes. So
21 heterogeneity in the statistical sense, which I
22 think is what you're referring to, is when you
23 have those results -- when we're talking about
24 the intermediate strategy -- where you're looking
25 at -- you're intending to pool the summary

Page 140

1 statistics from each study, not the individual
2 results. 'Cause once you put them all in one
3 database, you've made the assumption that there's
4 enough homogeneity that they should all be living
5 together.
6    Heterogeneity refers to the degree
7 to which the results from these individual
8 studies are different from each other, and there
9 is a statistical test to determine whether
10 there's heterogeneity or not. And just -- again,
11 I won't go any deeper than you need -- you want
12 me to go, but just one problem with that test is
13 that sometimes, when there's very few studies,
14 you just don't have enough power to say whether
15 they're heterogenous or not. I mean, if you only
16 have two studies, there might not be enough --
17 they might be vastly different. And if you had
18 20 studies that had that same range of results,
19 you might see the statistical heterogeneity, but
20 you might apply a heterogeneity test and say,
21 oops, I didn't get a result. So people play
22 loose with the statistics. But the idea is to
23 apply a statistical test to those summary results
24 and provide some information to the reader about
25 whether or not those studies are so different

Page 141

1 that they shouldn't be combined.
2    Q.    All right. Turn to page 10 of your
3 report --
4    A.    Yes, sir.
5    Q.    -- the section Treatments.
6    A.    Mm-hmm.
7    Q.    You note that warfarin has been the
8 standard of care for decades, correct?
9    A.    It has been the most common drug
10 used orally for the treatment of a number of
11 conditions that require anticoagulation since the
12 1950s.
13    Q.    Now, the next paragraph -- I think
14 it's the second-to-last sentence -- you note,
15 "Warfarin's effect must be continuously monitored
16 with blood testing, and the dose must be
17 adjusted."
18    How does that play out in practice?
19 How often does a patient have to have their INRs
20 measured?
21    MR. PIORKOWSKI: Object to form.
22 Go ahead.
23    A.    Unfortunately, there isn't a rule.
24 It really has to be tailored, and the tailoring
25 involves a number of factors. Biologically, some

---

**Page 142**

1 patients just vary more than others, so testing
2 has to be more frequent. Other patients are just
3 not as consistent about taking the meds. Another
4 factor that goes into this is, you know, how
5 people -- how well people control their diet.
6 Another factor that goes into it is how easy it
7 is for them to either get to a test or a test to
8 get to them. So you have to take all these
9 factors into account.
10        And when we start someone on
11 Coumadin, we usually begin with more frequent
12 checks. It can be, in the hospital, daily, then
13 we move to, perhaps in an outpatient setting, two
14 or three times a week, then we might move to
15 weekly, and we might move to even monthly for a
16 stable patient. But in some patients we may --
17 you might, you might continue with more frequent
18 in some patients and not move to the monthly.
19     Q.    Okay.
20     A.    But it's extremely variable from
21 patient to patient. And there might be times in
22 which you're required to go back to more frequent
23 ones. So, for instance, if a patient gets sick.
24 I mean, there are conditions that can affect the
25 bouncing around of the INR. It might be a new

---

**Page 143**

1 medication that someone is starting. It might be
2 a condition that they have that you might have to
3 increase the frequency again, and then you may
4 get lucky and be able to go back down to -- so
5 it's incredibly variable.
6     Q.    So when you say continuously,
7 that's more or less a general statement, correct?
8     A.    Yes. It means that as long as the
9 patient is on warfarin, we don't give it blindly,
10 they must be monitored for the continuum of the
11 time that they're on it, but the frequency -- the
12 frequency with which that they're on that
13 continuum is variable.
14     Q.    Okay. If a patient's warfarin is
15 well managed, is there any reason for them to
16 switch to a NOAC?
17        MR. PIORKOWSKI: Object to form.
18     A.    There certainly can be, yes.
19     Q.    What?
20     A.    Well, I mean, I can give you some
21 examples of patients -- again, one of the things
22 is that we try to tailor to every patient. A
23 couple examples where a patient who is, quote,
24 well managed, it might be a hardship. There's a
25 quality of life issue. It might be that the

---

**Page 144**

1 patients are becoming more ill and less stable.
2 It might be that patients are getting placed on
3 more meds, and the more meds you're on the
4 challenges there are. Taking Coumadin is a
5 challenge. You know, there's a large number of
6 ways that it -- doses that it's produced in. I
7 sometimes give patients a couple of bottles of
8 different doses, and they have to split pills.
9 So there are many challenges with it. Even if
10 they're able to figure it out, it can -- there
11 are sometimes when it might be advisable to
12 switch them from Coumadin, where they manage to
13 have stable -- I assume you mean by INR --
14     Q.    Mm-hmm.
15     A.    -- that it might be particularly
16 inconvenient for a patient.
17        There are also certain changes in
18 peoples' clinical status and other medications
19 that they're taking that it might become more
20 problematic to stay on warfarin.
21     Q.    Okay. Now, at least at the time of
22 the ROCKET study, rivaroxaban was the only
23 once-a-day NOAC, correct?
24     A.    Correct.
25     Q.    And its competitors at the time

---

**Page 145**

1 were twice a day, correct?
2     A.    Correct.
3     Q.    In the following paragraph you
4 note, "One of the" --
5        MR. PIORKOWSKI: Which page are
6 you, Jeff?
7        MR. GRAND: I'm sorry. We're still
8 on page 10.
9        MR. PIORKOWSKI: Okay.
10        MR. GRAND: I'm looking at the
11 third full paragraph down.
12        MR. PIORKOWSKI: Okay.
13 BY MR. GRAND
14     Q.    In the middle of paragraph you
15 write, "One of the major advantages of NOACs is
16 that they do not provide as variable an effect as
17 warfarin and do not need to be monitored with
18 blood testing."
19        Can you explain what you mean by
20 variable effect as warfarin?
21     A.    Yes. So warfarin -- one of the key
22 hallmarks of warfarin is that the effects -- it
23 does need to be monitored, and more than any
24 other drug I can recall, we have to change the
25 dose, and that's what I mean by the variable

---

Page 146

1  effect.
2        The range in which we have a good
3  effect and optimal risk of warfarin is a window,
4  and keeping people in that window can be
5  challenging. So you have -- since the effect can
6  vary by some of the things we've already talked
7  about, you have to change the dose.
8        With the NOACs you don't have to
9  have that variability. There's -- for
10 rivaroxaban, for example, there's one dose. You
11 give people 20 milligrams, and you don't have to
12 be changing it all the time.
13    Q.    Do you believe that rivaroxaban has
14 a narrow therapeutic range?
15    A.    So I think that the -- that the
16 term narrow, I don't know whether we would apply
17 that to warfarin or rivaroxaban. All drugs have
18 a range with which -- within which there is a
19 tested beneficial effect that exceeds its risks.
20 And I know we know a lot more about the range of
21 warfarin doses where we begin to exceed -- you
22 know, when we get way up in the INR range, we
23 know that the risks begin to, you know, outweigh
24 the benefits, and you know, there's much more
25 serious concern when someone's INR is at six, for

Page 147

1  instance. I don't have as much information
2  about, you know, when someone takes three times
3  their recommended dose of rivaroxaban.
4        What I do know about is -- what
5  I've got most of the clinical data on is the risk
6  to benefit of the particular doses that have been
7  tested, but I can't tell you what the risk to
8  benefit is for when someone takes 1 milligram of
9  rivaroxaban or 200 milligrams. So I can't give
10 you the same kind of curve that I can draw for
11 warfarin which exists. It doesn't exist. But
12 what we do know is what the risk and benefit is
13 for the drugs that have been -- the doses that
14 have been studied clinically.
15    Q.    Well, those studies haven't been
16 done, correct, for rivaroxaban?
17    MR. PIORKOWSKI: Object to form.
18    A.    So there have not been clinical
19 studies that compare different doses, if that's
20 what you mean.
21    Q.    You're aware that even taken as
22 directed there's a certain percentage of patients
23 who are hyper-responders to rivaroxaban, correct?
24    MR. PIORKOWSKI: Object to form.
25    A.    What do you mean by

Page 148

1  hyper-responder?
2    Q.    People who have a much higher level
3  of riva- -- a much higher concentration of
4  rivaroxaban in their blood and their clotting
5  times will be greatly prolonged, as compared to
6  another person of similar characteristics taking
7  the same exact dose.
8    MR. PIORKOWSKI: Object to form.
9    A.    Yeah, I think that's -- that's a
10 sort of a standard -- a standard understanding of
11 just about every drug that I know of. You take a
12 statin, you give two people the same dose, their
13 biologic effects will be a little bit different,
14 or in some cases a lot different.
15    Q.    And for those people, the ability
16 to measure the amount of rivaroxaban in the blood
17 would be useful, correct?
18    MR. PIORKOWSKI: Object to form.
19    A.    That hasn't been -- that hasn't
20 been proven that that would be useful. To say
21 something is useful, it has to have been --
22 that's a high bar. It has to have been studied,
23 and it has to have demonstrated that those in
24 whom it was tested generated data that was better
25 clinically than those who wasn't, and I'm not

Page 149

1  aware of it, that that study's been done.
2    Q.    Have you looked at any internal
3  Janssen documents that discuss that issue?
4    A.    No, I haven't. I am aware of -- as
5  I talked about, my -- my above average, but not
6  extensive, discussion of the pharmacologic data,
7  that there's, like any drug, and because I'm
8  interested in these drugs as an important part of
9  our armamentarium in managing these patients,
10 that there are absorbance differences, that there
11 are biological differences in the level of
12 rivaroxaban, that there's clearance differences
13 between these drugs. What -- what I'm fairly
14 confident in saying is that there's not clinical
15 evidence that measuring those kinds of things
16 inform our clinical decision making.
17    Q.    Have you seen clinical evidence
18 that suggests that rivaroxaban has a higher
19 incidence of major bleeding than other NOACs?
20    MR. PIORKOWSKI: Object to form.
21 Go ahead.
22    A.    I've seen evidence on all three
23 sides of that equation, that it's got more, it's
24 got less, it's got the same, and that my general
25 interpretation of the totality of clinical

Case 2:14-md-02592-EEF-MBN Document 5123-11 Filed 01/20/17 Page 40 of 65
Case 2:13-md-02592-EEF-MBN Document 513-11 Filed 01/20/17 Page 40 of 65
Protected - Subject to Further Protective Review

Page 150

1 evidence on the NOACs is that they're more alike
2 than they are different. With the exceptions of
3 some of the particulars about how they're used in
4 a given patient, like dyspepsia and renal failure
5 in once a day versus twice a day. There are --
6 in that case, there are some meaningful
7 differences, but I think that in terms of their
8 efficacy and safety, they're more alike than
9 different.
10     Q.    Well the twice a day NOACs have
11 higher trough levels, correct, than rivaroxaban?
12     A.    So comparing trough and -- I
13 actually don't know. The specific -- in my mind,
14 that's irrelevant to the clinical -- the clinical
15 utility of a drug. I mean, some drugs have a
16 very narrow range of peak and trough and are
17 wonderful drugs, and some drugs have very wide
18 differences in the peak and trough and are also
19 very effective. But I think that -- the statins
20 are a good example. The pharmacokinetics of the
21 statins are actually quite different, but the
22 nice thing about them is they seem to work,
23 somewhat interchangeably, again some differences
24 in tolerability and things like that. But it's
25 not a fact that provides us much insight in

Page 151

1 talking about the clinical utility of the drugs.
2 What's clinical useful is that -- is to look at
3 the individual trials that study the particular
4 dosing of the individual agents and what's its
5 efficacy.
6     Q.    Did you review any of the
7 correspondence between Janssen and the FDA
8 regarding the trough levels of rivaroxaban?
9     A.    Not specific communication about
10 that in particular. As I mentioned, you know, I
11 believe that there was in -- you know, in the
12 design studies and the study reports, there's a
13 general discussion about the 20 milligram dose,
14 which includes a variety of information, but I
15 did not review specific communications about
16 trough levels.
17     Q.    You are aware that the FDA
18 recommended a twice a day dose, correct?
19         MR. PIORKOWSKI: Object to form.
20     A.    I'm not sure I would have
21 characterized it that way. I am aware that there
22 was dialogue, as there often is, and I've been
23 personally privy to those kinds of discussions.
24 As there always is, there's dialogue back and
25 forth. I am aware that the FDA approves the

Page 152

1 trial protocol at the current dose.
2     Q.    Are you assuming that the FDA had
3 the power to demand a twice a day dose be
4 studied?
5     A.    I wasn't assuming that at all. All
6 I said was there was a dialogue and that the FDA
7 accepted the protocol that was submitted by the
8 company.
9     Q.    Okay. Well, you actually said
10 approved. Now you're saying accepted. It is
11 accepted, correct?
12     A.    I apologize 'cause I know some of
13 those words have, you know, legal meaning that
14 I'm -- that's not my -- not my strength.
15         What I meant was that the FDA was
16 given an opportunity to -- as always the case for
17 a drug that's going for an indication, the FDA
18 makes comments on and then provides an
19 acceptability. If they don't accept it, the
20 company doesn't go -- the company doesn't go
21 forward with the study, because there's no
22 utility in providing the FDA with a result that
23 they felt was not acceptable test. I don't know
24 what the -- I don't even know what the legal
25 ramifications. The FDA can say this is not

Page 153

1 acceptable, and then the company can choose to do
2 a study. I would think that they wouldn't do
3 that. But generally my understanding is that
4 they've come to an agreement that this -- that
5 the protocol is acceptable and that then the
6 company proceeds with the study.
7     Q.    Sometimes they come to an agreement
8 that you proceed at your own risk, and we'll see
9 what the results are, correct?
10     A.    Yes, that is correct. And in this
11 case, they proceeded. That was my understanding,
12 that the discussion was resolved. But in any
13 event, they proceeded with the study, and the
14 company felt it was acceptable to provide
15 approval for the drug based on the study as
16 conducted and the results as submitted.
17     Q.    Okay. Would you agree that there
18 would be less variability in the blood
19 concentration of rivaroxaban in patients who are
20 taking 10 milligrams twice a day versus a patient
21 taking 20 milligrams once a day?
22         MR. PIORKOWSKI: Object to form.
23     A.    No, I wouldn't agree wholesale in
24 clinical practice with that statement. In some
25 cases, depending on the half-life, you actually

Page 154

1  get very little change in the peaks and troughs.
2  And even split a pill and take it every hour
3  or -- but as long as you're taking it
4  commensurate with the biology of that particular
5  drug, you may or may not get much difference in
6  the steady state peaks and troughs. However,
7  once you go from a once a day to a twice a day,
8  you add -- you add a second human component which
9  is the decreased compliance. So while in a very
10 controlled study with 10 participants that you're
11 paying to take it exactly the way you want to,
12 you might get one result. When you move that out
13 to the general public who forgets to take their
14 evening dose, and you've taken a morning dose
15 that's half of what the comparison person might
16 be taking, that person actually might have wider
17 swings than the person in real life who's taking
18 it once a day.
19     Q.    You're speculating on that,
20 correct?
21     A.    No. Well, that's, that's a -- the
22 translation of -- what I was talking about with
23 peak and trough effects, if you increase the
24 frequency of dosing and the original dosing
25 interval was acceptable to give you one set of

Page 155

1  ranges, the biology is that you might not have
2  much of an impact on the peak and trough. It's a
3  pretty well-known fact that if you give someone a
4  drug once a day and compare it with someone who's
5  taking it twice a day, and the person who's
6  taking it twice a day takes it sporadically, you
7  could predict what the -- what the steady state
8  effects might be on the peaks and troughs if
9  someone is erratically taking their medication.
10     Q.    Okay. I'm asking you, though,
11 about rivaroxaban specifically, not generally any
12 drugs. I'm asking you if you would agree that
13 there would be less variability in the blood
14 concentrations of rivaroxaban in patients taking
15 Xarelto twice a day 10 milligrams versus 20
16 milligrams once a day.
17     A.    So I would -- to answer that -- to
18 precisely answer that question, I would have to
19 look and see to what extent there is literature
20 that supports that, and then I could give you a
21 definitive answer. I think what I answered is
22 that, you know, hypothetical that's possible.
23 It's also possible that it might not have a huge
24 impact on that. I think that's -- in my mind,
25 that's irrelevant to the clinical question

Page 156

1  because it wouldn't change how we would interpret
2  the clinical studies, which were a single dose
3  given. We can't -- based on any hypothetical or
4  real biology, we can't change the clinical
5  practice. We have the drug studied as it was.
6  So it wouldn't impact how I think about the
7  drug's clinical effect.
8      Q.    Well, with respect to efficacy, the
9  dose response for Xarelto was flat, correct?
10     MR. PIORKOWSKI: Object to form.
11     A.    I don't -- we don't have data on
12 that. We've talked about this before. We don't
13 have a study that shows three doses and look what
14 the efficacy was at this dose, that dose and that
15 dose, and that's the only way we can answer that
16 question.
17     Q.    Are you saying that there's no
18 studies that show that the efficacy flattens out
19 as you go higher and higher in dose for Xarelto?
20     A.    What do you mean -- what do you
21 mean by efficacy?
22     Q.    Anticoagulation.
23     A.    So that's -- there's not, you know.
24 You mean --
25     MR. PIORKOWSKI: Object to form.

Page 157

1      A.    You mean anticoagulation in terms
2  of some biologic assay? I mean, when I -- when I
3  talk about clinical efficacy, I'm talking about
4  who lives, who dies, who gets strokes, who
5  doesn't get strokes, and that's the only
6  information --
7      Q.    Do you have any understanding that
8  the 30 milligram dose isn't going to prevent any
9  more strokes than the 20 milligram dose?
10     MR. PIORKOWSKI: Object to form.
11     A.    We don't have information 'cause we
12 don't have clinical trials on that.
13     Q.    Have you looked at any studies, any
14 of the dosing studies?
15     A.    As I said, I've looked at the
16 dosing studies, but the clinical -- in general.
17 I've not in excruciating detail. But the dosing
18 studies wouldn't give me any information on the
19 clinical utility of a 30 milligram dose. You'd
20 have to do a trial.
21     Q.    Let me rephrase this. The
22 anticoagulant effect of Xarelto at 30 milligrams
23 is not any greater than it is at 20 milligrams.
24     MR. PIORKOWSKI: Object to form.
25     Q.    Do you understand that?

USCA5 7627

Page 158

1    A.    No, I don't understand that.  I
2  don't buy -- I don't buy the premise of the
3  question.
4    Q.    Okay.  That's fine.  We'll move on.
5          With respect to safety, the risk of
6  a bleed does increase as you continue to increase
7  the dosage, though, correct?
8    A.    I don't think we have enough data
9  to say that either.
10   Q.    Okay.  Would you agree that the
11 lack of a reversal agent is a disadvantage for
12 Xarelto compared to warfarin or Pradaxa?
13   A.    I will tell you that I wouldn't
14 agree with the statement, and the main reason is,
15 is that it's an incredibly rare event that we use
16 any reversibility agents.  We've got one for
17 warfarin, and you know, in the last -- I've got a
18 lot of patients who have afib and are on
19 warfarin.  I can't remember the last time I used
20 one.
21         So the true safety impact question
22 of having a reversal drug hasn't been answered
23 because it requires -- requires two things.  One
24 is it requires extensive use of it so that we can
25 then answer the second question, just what

Page 159

1  clinical untoward effects were prevented by using
2  the reversal agent.  We just don't have that
3  information to say.
4          And since it's, as I said, it's a
5  rare event, the utility of a reversal agent or
6  the -- I mean the presence of a reversal drug or
7  the absence of a reversal drug doesn't have, in
8  my mind, significant impact to our knowledge on
9  the comparative safety of the various drugs.
10         And I think that that actually --
11 the best evidence of that is that we compared in
12 a large number of trials NOACs in general with --
13 when they first came out on the market and when
14 they were first being studied in trials, where
15 there was no reversal agent for any of them, with
16 Coumadin that has a reversal agent for it, and
17 that the safety was either non-inferior or
18 superior.
19         So in my mind, the general premise
20 that a reversing agent is required or would yield
21 greater safety is not supported by the current
22 literature.
23   Q.    Okay.  Who's the "we" you just
24 referred to?  You said, "We compared in large
25 number of trials NOACs in general when they first

Page 160

1  came out on the market."
2    A.    So when I say "we," I mean we in
3  the medical community.
4    Q.    You haven't done any studies on
5  that, correct?
6    A.    No, sir.  No, I have not.
7    Q.    Okay.
8    A.    What I mean is the collective we of
9  the medical community.  The medical community has
10 studied a large number of comparisons of drugs at
11 a time when there were not reversal agents
12 compared with a drug commonly used who did have a
13 reversal agent, and it turned out that the number
14 of safety events in the ones that didn't have a
15 reversal agent tended to be lower such that they
16 met -- the met line variant tended to be lower,
17 and in some cases meaningful so, or were
18 superior.  So the premise that the presence of a
19 reversal agent provides greater safety is not
20 supported by the current literature.
21   Q.    Okay.  What studies are you
22 referring to?
23   A.    So I'm referring to the trials of
24 NOACs comparing to Coumadin, to warfarin.
25   Q.    Are they listed in your report?

Page 161

1    A.    So a lot of them are.
2    Q.    Okay.
3    A.    Yeah, a lot of them are.
4    Q.    Okay.
5    A.    What I'm talking about is the
6  collective wisdom of those trials says that in
7  each case, and then collectively as they were
8  pooled, in each case -- and, actually, the pool
9  data supports the notion that the safety and
10 efficacy collectively of NOACs is superior
11 despite the fact that when most of those studies
12 were done there was no reversal agent.  So the
13 literature as it stands supports the counter
14 argument.
15   Q.    Many of those studies show a higher
16 risk of major bleeding with Xarelto compared to
17 the other NOACs, correct?
18         MR. PIORKOWSKI:  Object to form.
19   A.    So many of them -- yet again, I
20 think you have to be very, very careful when
21 you're comparing.  I wouldn't draw that
22 conclusion.
23         The first thing is that 'cause
24 things don't go in the same direction.  I think
25 it's very challenging, as we talked about

Page 162

1  earlier, to compare Xarelto given to one patient
2  population with dabigatran or Eliquis or whatever
3  it is given to another population.  So comparing
4  the bleeding rates is tough.  The other thing is
5  that what's interesting is that while total
6  bleeding rates in some of those comparisons go
7  one way, the most important are that the serious
8  bleeding rates would go in the opposite
9  direction.  So I don't know what to make of that.
10  And the best thing I can say is that there's just
11  not enough data, nor is there enough of a body of
12  information, nor are there any head-to-head
13  comparisons to make a statement about the
14  comparative bleeding risk of the various NOACs.
15      Q.    Okay.  So are you -- are you
16  amending your earlier statement that all these
17  studies showed that NOACs were superior?
18      A.    So I would like to see where I said
19  that, because what I intended to say is that they
20  were not inferior or superior collectively.  And
21  in the cases where they were not inferior, they
22  tended to show fewer events, but that's -- that's
23  the consistent message from the NOAC data in
24  general.  And when you pool the NOAC data, that
25  tends to be what we see.  But if I said that they

Page 163

1  were superior -- I'd like to see where it was.
2  Because if I said they were superior in all
3  cases, I would like to correct that.
4      Q.    Okay.  Well, my original question
5  to you is would you agree that the lack of a
6  reversal agent is a disadvantage for Xarelto when
7  compared to warfarin or Pradaxa, and you gave me
8  an answer about all NOACs.
9      A.    So the answer is the same.  I was
10  giving you the justification for my answer that
11  is, no, that is not a basis for picking one NOAC
12  over another.
13      Q.    Would you agree that -- strike
14  that.
15          If you turn to page 11 of your
16  report --
17      A.    Yes, sir.
18      Q.    -- where you talk about some of
19  the -- I guess this is in the Evidence on
20  Rivaroxaban section.  We've already discussed the
21  RECORD studies.  I'm going to ask you some
22  questions about the EINSTEIN studies.
23      A.    Okay.
24      Q.    First of all, did you read the
25  report that was submitted by Dr. Furberg on the

Page 164

1  EINSTEIN studies?
2          MR. PIORKOWSKI:  Yeah, his report
3  was prepared before we received Dr. Furberg's
4  report.
5          MR. GRAND:  I know that.  I'm just
6  asking have you --
7      A.    I don't believe that I've had a
8  chance to read it.
9      Q.    Okay.  Were you aware that
10  Dr. Furberg reviewed the underlying data and
11  found that a large number of major bleeds were
12  not reported in the EINSTEIN study?
13      A.    Again, I did not review his report.
14  So my interpretation of the EINSTEIN studies is
15  not based on his report.  It's based on the
16  published results.
17      Q.    Well, the published results are
18  based on, in part, on the number of bleeds that
19  were reported, correct?
20      A.    Correct.
21      Q.    And if there were differences in
22  the number of bleeds, it could impact the
23  ultimate conclusions of the report, correct?
24      A.    Well, it could --
25          MR. PIORKOWSKI:  Object to form.

Page 165

1      A.    -- but you know, I think that if
2  it's -- I think, in the conduct of trials, we
3  often publish a report because we have
4  requirements to get the data out before all the
5  trials are in, and if the additional studies were
6  randomly distributed in the two groups, it could
7  have no impact whatsoever.  So the mere fact that
8  some events were missing, which is usually the
9  case by the time we report a study -- in my
10  experience in studies, it's rare that we don't
11  find a few more events that occurred in the
12  window at some period out, just given the lag
13  that it takes to collect the data.
14      Q.    Okay.
15      A.    And as long as those events are
16  evenly distributed in the groups, it could have
17  no impact at all.
18      Q.    Okay.  Just to be clear, I'm not
19  talking about late reported events.  I'm talking
20  about events that were reported but were not
21  adjudicated according to the study, the
22  definitions of those events.
23      A.    Okay.
24      Q.    So they were essentially
25  misreported as no bleeds or minor bleeds when in

Page 166

1 fact they were major bleeds according to the
2 protocol definitions.
3        MR. PIORKOWSKI: I'm going to
4 object, and if you want to ask him questions
5 about Dr. Furberg's report, then he should have
6 an opportunity to review Dr. Furberg's report.
7        MR. GRAND: Well, he's actually,
8 frankly, already had an opportunity to review it.
9        MR. PIORKOWSKI: No, he hasn't.
10        MR. GRAND: Well, he should have.
11        MR. PIORKOWSKI: No.
12        MR. GRAND: It's been out for a
13 month, so. The fact that he came to a deposition
14 in which he read about EINSTEIN but didn't bother
15 to read the plaintiffs' report is -- that's not
16 my problem. You can say you don't know --
17        MR. PIORKOWSKI: We disagree, but
18 if you're going to -- if you're going to ask him
19 questions about Dr. Furberg's report, I'd ask you
20 to provide him with Dr. Furberg's report because
21 you're making representations about what he's
22 saying, and he has no basis for interpreting
23 those.
24 BY MR. GRAND
25        Q.    Well, I'm not -- I'm not asking you

Page 167

1 to accept the veracity of what I'm saying to you.
2 I'm asking you because you had suggested that
3 there's some unreported events in every trial,
4 and it doesn't effect -- it doesn't effect the
5 outcome.
6        A.    Yes, I thought that's what you were
7 referring to.
8        Q.    No, I'm referring to events that
9 could effect the outcome.
10        A.    No, no, but those events may --
11 equally may not affect the outcome of the trial.
12        Q.    If they were equally distributed?
13        A.    If they were equally distributed.
14 And adjudication is a on -- continue to be,
15 adjudication getting ready for trial, and it's a
16 challenging undertaking, and there are, even
17 amongst adjudicators, there are often difference
18 of opinions on the confirmation or the grading of
19 the seriousness of an event. And, again, if --
20 adjudicators are usually blind. No. As a matter
21 of rule, they're blind to the treatment effects,
22 and so their determination of the seriousness --
23 sometimes they don't agree, and they have to come
24 to an agreement. Sometimes they remain without
25 consistent agreement, and then, in that case, you

Page 168

1 may want to do a sensitivity analysis to
2 determine if there was in fact a impact. But if
3 the adjudication was done in a blinded fashion,
4 whether or not, you know, one is called serious
5 or not serious may not necessarily. And in most
6 cases because that blinded review and the
7 determination wouldn't have been related to the
8 treatment, it's likely not to have an effect,
9 although it could if it was a biased process by
10 some as yet undetermined. So it's not -- it's
11 not a foregone conclusion that events that were
12 either discovered after the report was filed, as
13 I was talking about, or re-adjudicated after that
14 it necessarily impacts the results.
15        Q.    In a study like this, an
16 adjudicator could likely tell what the -- what
17 drug a patient was given by their course of
18 treatment following the event, correct?
19        A.    Maybe yes, maybe no. I mean, it
20 depends entirely on how the blinding was done.
21 If the blinding was done like it was in ROCKET,
22 where you were given actually two drugs, it's
23 quite possible that you don't -- there's no
24 information contained in the medical report.
25        The second issue is, is that

Page 169

1 depending on what the protocol for adjudication
2 was, there is -- there are -- there are methods
3 to blind what happens to the patient after in
4 terms of treatment.
5        The last issue is that a lot of
6 times at the time of an event, there are
7 sensoring events, and patients, you know, leave
8 the study, and so all that really matters is what
9 happened up until the event occurred, and it
10 doesn't matter subsequent to that.
11        Q.    You don't know one way or the other
12 with respect to --
13        A.    No, I don't, I don't, but I'm just
14 saying that the one-size-fits-all hypothetical
15 that you provided is not necessarily the case.
16        Q.    Okay. What was the -- how is
17 non-inferior -- how is non-inferiority determined
18 in the EINSTEIN study?
19        A.    So, generally speaking, and I have
20 to go to the particulars of the assumptions in
21 the protocol, generally speaking non-inferiority
22 is determined by a boundary beyond which you
23 would say that the drugs were not the same, and
24 that's one of the things that the FDA often has
25 some strong opinions about, how much of a

USCA5 9630

Page 170

1  difference will we accept and still say that
2  there is no difference, and it's a range around
3  an acceptable event.  So I don't know the
4  particular parameters that went into the
5  non-inferiority.  I just vaguely recall, looking
6  at the statistical analysis of these studies,
7  that the description of the statistical analysis
8  plan seemed to be adequate, but I can't give you
9  the particular assumptions that went into
10 the non-inferiority -- the particular
11 non-inferiority analysis.
12     Q.    Do you have any opinions as to
13 whether -- I'm struggling to find the right
14 word. -- whether the standard for
15 non-inferiority that was used in EINSTEIN was
16 appropriate for a trial such as this?
17     A.    So, you know, in my review of
18 EINSTEIN in the context of looking at it for
19 consistency so I can better interpret the ROCKET
20 study, I was not alarmed by the statistical
21 analysis plan that included the general
22 discussion of the inferiority assumptions.
23     Q.    Okay.  And you reviewed the
24 statistical analysis plan for EINSTEIN?
25     A.    That was contained in the

Page 171

1  published -- the discussion of the statistical
2  analysis in general terms with the basic
3  assumptions are in the -- I did not review the
4  entire study protocol.
5     Q.    Okay.  And you didn't review any of
6  the correspondence between Bayer and the FDA or
7  Janssen and the FDA regarding how non-inferiority
8  was defined in those studies?
9     A.    Correct, I did not review any
10 specific correspondence on that topic.
11    Q.    Okay.  I'm going to ask you some
12 questions about ROCKET, particularly the ITT
13 analysis.
14    A.    Okay.
15    Q.    For safety endpoints, you typically
16 always need to do an ITT analysis, correct?
17    A.    So I believe -- I don't remember
18 whether it was in the general or in the
19 specific -- that, you know, there are some
20 cases -- ITT is often provided as the primary
21 analysis for efficacy or safety.  However, there
22 are cases where an ITT analysis is not the most
23 conservative way, and that -- the distinction is
24 the drug's -- the longevity of the drug's impact
25 and the compliance within the study.  So -- and

Page 172

1  the sensoring rules, 'cause you can imagine a
2  case where a per protocol analysis may be a more
3  conservative way to assess a risk than, say, a
4  ITT analysis, a safety analysis, and this is a
5  discussion you just have to have with the FDA
6  when you're designing a study.
7          And I'll give you an example.  If a
8  drug has an immediate effect and once you stop
9  taking the drug there's no more effect, then you
10 can -- you can imagine, and the patients are
11 followed after.  If there's a high degree of
12 non-compliance in the study and there's a lot of
13 person time after the person has stopped taking
14 the drug but is continuing on the ITT analysis to
15 be followed, that there will be significant
16 amount of person time when the patient is not on
17 the drug, and so the safety analysis -- and
18 therefore not at risk but is being counted as
19 person years for the safety analysis.  So you can
20 get a misleadingly low safety analysis.  For that
21 reason -- and you can't predict that without
22 knowing some of these things beforehand about the
23 compliance level.  So for that reason, I always
24 think it's important to present both analyses.
25 You prespecify the assumptions, and that's a

Page 173

1  discussion to have with the FDA, on which is
2  going to be your primary analysis.  You also set
3  sensoring rules that make sense for looking at
4  safety.  And what's challenging sometimes is that
5  safety and efficacy sometimes play out on two
6  different time frames.
7          And I don't want to get into any
8  more detail than you need, but just to give you
9  an example of that, statins can take two or three
10 years to have an effect, and after you stop the
11 statin, you can continue to get a beneficial
12 effect because you've lowered the lipids and
13 you've prevented -- see, two or three years later
14 after you've stopped the drug, you can still be
15 getting some beneficial effect.  So for the
16 efficacy, you would want to use -- look at ITT.
17          However, when you're taking a
18 statin, the risk is only while you're taking it,
19 you know, the risk of rhabdomyolysis or liver
20 function abnormalities.  So it might be a case
21 where the safety analysis you might sensor
22 differently, and you might have a different
23 weighting of the per protocol versus the ITT
24 analysis.
25          So those are things that you have

USCA5 3631

Case 2:14-md-02592-EEF-MBN Document 5127-11 Filed 01/20/17 Page 46 of 65
Case 2:14-md-02592-EEF-MBN Document 5127-11 Filed 01/20/17 Page 46 of 65
Protected - Subject to Further Protective Review

Page 174

1  to have a careful discussion about with the FDA.
2      Q.    Okay.  Now, you talk a bit about
3  the Alere INRatio device.
4      A.    Yes, sir.
5      Q.    Okay.  What is your experience
6  using point-of-care devices?
7      A.    So I will tell you personally I
8  don't have a lot of personal experience, and it's
9  for two reasons.  One is that we have a Coumadin
10  clinic.  I've been very fortunate that all the
11  hospitals that I've worked at, and I've been only
12  practicing in Boston, but all the hospitals I've
13  practiced at there's a specific Coumadin clinic.
14  So I don't do the testing.
15      Q.    Okay.
16      A.    I will often have the consultation.
17  In some of those cases -- in some of the clinics,
18  they are -- there's a variable amount of
19  point-of-care work being done.  In the VA, where
20  I do most of my preventive cardiology work, we
21  use the labs, and we use VNAs or local what we
22  call See Box, so that it's actually more lab
23  testing than point-of-care testing.  So I don't
24  have as much in -- I have -- to tell you the
25  honest truth, I don't have personal experience

Page 175

1  much at all, except when the patients are in the
2  hospital and I'm attending on the wards and me
3  and the residents are doing the drawing.  I mean
4  not a physical drawing but ordering the test.
5  And so it's all -- it's all indirect, and I will
6  tell you frankly we don't have as much indirect
7  experience with the point-of-care.
8      Q.    Before I follow up with that I want
9  to actually ask you about something you said
10  earlier which is in your experience having to
11  give a reversal agent in response to I guess a
12  warfarin bleed was extremely -- you said it was
13  extremely rare.
14      A.    Right.
15      Q.    Okay.  Given the circumstances
16  under which you see your outpatients, how often
17  would you ever be treating a major bleed?
18      A.    It's a -- you know, fortunately,
19  it's a rare event, too.  I mean, we see that even
20  in the high risk populations, you know, 3 percent
21  per year.  I mean, my patients -- I will tell you
22  my patients who are under Coumadin -- who are on
23  Coumadin have shown up in the middle of the night
24  with bleeding events, and these are patients that
25  are under my care, but I'm not the doctor that

Page 176

1  sees that patient in the emergency room, if you
2  know what I mean.
3      Q.    Okay, that's -- that's what I was
4  asking.
5      A.    But in those patients -- but I --
6  we didn't talk about it because I'm doing less of
7  it, but I have over the last 25 years extensive
8  inpatient experience where I am that guy who has
9  admitted the patients, and the times when we need
10  to give a reversal agent to a patient is a pretty
11  rare event.  We use the reversal agent but not in
12  a safety way.  You know, sometimes Mr. Smith is
13  having a procedure the next day, and we want to
14  give him what we call Micro-K.
15      Q.    Right.
16      A.    We give him a tiny dose because we
17  want his INR below 1.5 so the dentist can pull
18  his teeth the next morning, but that's not really
19  the lifesaving use of a reversal agent.  It's a
20  rare event that we're giving vitamin K to have an
21  acute event.
22      Q.    Well, I would assume given how
23  recently they came to market and given the way
24  your actual care of patients has changed over the
25  years, you probably haven't ever had to treat a

Page 177

1  person -- you haven't ever had to consider giving
2  a reversal agent to someone under NOAC yet, have
3  you?
4      A.    As I said, given the fact that I'm
5  not doing as much inpatient work, I don't -- in
6  the last few years, I haven't been the guy who
7  does the reversal agent --
8      Q.    Right.
9      A.    -- for Coumadin or for NOAC.
10      Q.    Right.  So I guess that's my point,
11  is you don't -- you don't have a lot of recent
12  experience either way with administering --
13      A.    That's correct, and nor does
14  anybody because we just don't use them very
15  often.  But I was -- your question previously was
16  directed towards my use of the drug and
17  consideration of a reversal agent as a -- as a
18  component of my decision making for the drug, and
19  because it's a rare event and because the data
20  that I pointed to, which is the collective data
21  on NOACs versus warfarin, who does have a
22  reversal agent, suggests that the NOACs are even
23  more safe than the one who has a reversal agent,
24  that there's not a body of literature that
25  supports that that's a significant factor in the

USCA5 7632

Page 178

1 choice of a NOAC.
2 Q. Okay. For the ROCKET study, would
3 you agree that the ITT analysis is the best
4 evaluation of safety in that study?
5 MR. PIORKOWSKI: Object to form.
6 A. I actually like looking at both,
7 and I always like to look at the consistency. I
8 think that sometimes to -- that what the ITT
9 analysis does is it decreases the likelihood that
10 the answer we're going to get is a biased one.
11 However, as I mentioned before, it may not be the
12 best representation of the effect. And if we can
13 convince ourselves that when we looked at the per
14 protocol analyses that the results are not
15 biased, it may gave you, the per protocol
16 analysis -- in some cases, the per protocol
17 analysis I think for efficacy may give you more
18 information about the true effect, although we
19 have to be more skeptical about interpreting it,
20 and we -- unfortunately, we sometimes sacrifice
21 what might be the more true biologic effect of a
22 drug so that we're sure that we're not biasing
23 the results, and so the ITT is often chosen for
24 that reason.
25 MR. PIORKOWSKI: Why don't we --

Page 179

1 we've been going more than an hour and a half,
2 and apparently the food order got messed up, so
3 we're going to have to replace it.
4 MR. GRAND: Okay.
5 MR. PIORKOWSKI: So why don't we --
6 if we can take five.
7 MR. GRAND: Sure.
8 THE WITNESS: A bio break would be
9 good.
10 THE VIDEOGRAPHER: We are now off
11 the record. The time is 6:24.
12 (A break was taken.)
13 THE VIDEOGRAPHER: We are now back
14 on the record. The time is 6:40.
15 BY MR. GRAND
16 Q. Doctor, you don't consider yourself
17 an expert on point-of-care devices, correct?
18 MR. PIORKOWSKI: Object to form.
19 A. No, not in the workings of the
20 devices, no.
21 Q. Nor in the regulation of such
22 devices?
23 A. No, not on the regulation. I know
24 enough about them to understand their clinical
25 utility because, as I mentioned, they are used in

Page 180

1 some of our patients, but it's not an area --
2 it's not an area that I research. But I am
3 sufficiently expert on the -- on how they're used
4 and the comparisons to make a clinical
5 determination of the potential utility. I think
6 they are useful in clinical practice. It's not a
7 specific area that I research, but I am expert
8 enough on them to be able to understand their
9 position in the clinical care of the patients
10 that I take care of.
11 Q. Did you read any of the defense
12 expert reports on the -- on the point-of-care
13 device used in the ROCKET trial?
14 A. Yes, sir.
15 Q. Which ones did you read?
16 A. I think it was mentioned in two or
17 three.
18 MR. PIORKOWSKI: Defense expert
19 reports?
20 MR. GRAND: Yes, defense expert
21 reports.
22 A. Oh. No, no, no. I'm sorry. I
23 don't believe I did.
24 Q. So you didn't read a report by
25 Marcia Zuker?

Page 181

1 A. I don't believe so.
2 Q. Okay.
3 A. Yeah, sorry about the confusion. I
4 was referring to plaintiffs' experts.
5 Q. I'm sure I wasn't clear enough
6 probably.
7 If the -- for the warfarin patients
8 in the ROCKET study, if the INR reported on the
9 point-of-care devices was 10 to 13 percent lower
10 than the lab results, or the actual INR levels
11 according to the lab results, could that have
12 pushed some points out of therapeutic range for
13 warfarin?
14 MR. PIORKOWSKI: Object to form.
15 A. Well, it is possible. However,
16 when we do any comparison, you have to ask
17 yourself of that 10 to 13 percent that was seen
18 in the paired comparisons how much of that's real
19 and how much of that is error in the lab. And
20 the -- if you were to do the same test, the lab
21 test twice, you would see differences, and
22 that's -- that's what we call, you know, random
23 drift, because every study has a coefficient of
24 variation, a variability.
25 In this particular case, only 4

Page 182

1 percent of the people were consistently different
2 when the point-of-care was compared to the lab.
3 So my suspicion is that the true difference --
4 one of you asked is it would have an impact, is
5 it really or not, and so I would guess the
6 majority of that difference was actually not
7 real, that it's actually much smaller than that.
8           In either event, it would be a
9 modest change, and yes, it could put some people
10 that were in a -- near the boundary of the upper
11 range over that boundary, but probably not in a
12 clinically meaningful way.  And as a clinician,
13 when I see someone who's just outside the upper
14 border or just under the lower border, in some
15 cases you won't react to that.
16           So, you know, I agree with the
17 assessment of, in this case, the FDA that thought
18 that those modest changes were not out of the
19 range of what you might see when you do test,
20 retest, and probably didn't have any clinically
21 meaningful effect on the study results or on the
22 clinical effect for any particular patient.
23      Q.    Did you -- did you read any of the
24 plaintiffs' expert reports on the ROCKET study?
25      A.    You know, I believe I might have

Page 183

1 seen one of the plaintiffs' reports.  I don't
2 think I was given very many of the plaintiffs --
3      Q.    Let me strike that, actually,
4 because you're right they're listed in his
5 report.  If you look at the very last page of
6 your materials considered.
7           MR. PIORKOWSKI:  Last two pages.
8      Q.    Yeah, the last two pages.  You'll
9 see --
10      A.    Yes.
11      Q.    -- expert report of Bud Gerstman?
12      A.    Yes, sir.
13      Q.    Expert report of Edward Peters?
14      A.    Yes.
15      Q.    And expert report of Henry Bussey?
16      A.    Yes.  I apologize.  I keep
17 confusing the terms.
18      Q.    It's a long day.  That's fine.
19      A.    Yes, I did see those three reports.
20      Q.    Did you look at their analysis --
21 well, strike that.
22           I believe it was Dr. Gerstman who
23 did an analysis that looked at patients who
24 actually suffered bleeding events who had
25 point-of-care device -- point-of-care

Page 184

1 measurements as well as lab readings within -- I
2 think within a narrow time period from when the
3 event -- from when the readings were taken.
4      Q.    Did you look at that at all?
5      A.    I did, yes.
6      Q.    And what is your view -- what
7 opinions do you have about that analysis?
8      A.    I thought it was -- it was based on
9 very small numbers and not informative.
10      Q.    What do you mean by the fact that
11 it was based on very small numbers?
12      A.    So the proportion of people for
13 which there were data proximate to their events
14 for which there were paired values was a small
15 proportion of the total.  And as such, that
16 represents a subgroup analysis, and subgroup
17 analyses are fraught with problems.  You can see
18 results that are the same as or deviate from the
19 main effects of the study in meaningless ways
20 when you look at subgroup analyses.  And when the
21 subgroup is particularly -- that's particularly
22 the case when the subgroup is small, and the best
23 example of that was when Dr. Richard Peto look at
24 astrological sign and the effects of aspirin in
25 the ISIS-2 trial showing that very effect, that

Page 185

1 you can actually get meaningless deviations from
2 the parent study when you look at something as
3 biologically implausible as the astrologic sign
4 that a patient was born under.  So you have to be
5 very, very cautious when you look at subset of
6 patients and compare that results to the parent
7 result.  So I don't think that that analysis was
8 particularly informative.
9           I personally believe that the
10 analyses that were conducted that took into
11 account the large -- the broader population,
12 looking at individuals who might have had -- that
13 might have been impacted by the device or making
14 some mathematical corrections, as the FDA did, to
15 the overall results to see what the impact of
16 that modest change might have had on the
17 overall -- on the assumption, which I think is
18 wrong, that the real difference was as large as
19 10 to 13 percent are much more meaningful in
20 interpreting the impact that the device had on
21 the overall results.
22      Q.    So you think the assumption that
23 the real difference was as large as 10 to 13
24 percent is wrong?
25      A.    Yes, and I explained that in my

Case 2:14-md-02592-EEF-MBN Document 5123-11 Filed 01/20/17 Page 49 of 65
Case 2:13-md-02592-EEF-MBN Document 513-11 Filed 01/20/17 Page 49 of 65
Protected - Subject to Further Protective Review

Page 186

1 last -- an answer or two ago. That's based on
2 the fact that there are differences in using the
3 exact same test at different points of time on
4 the exact same specimen will give you a
5 difference, a percentage difference, and we do
6 have some information to that effect that there
7 was a consistent difference in about a third of
8 that 10 to 13 percent, 4 percent. So I think
9 that the real difference is much smaller than the
10 10 to 13 percent because you would expect, and
11 it's acceptable when we do lab testing and many
12 tests. We accept a test/retest as not being
13 meaningful in the range of 10 percent.
14     Q.    Do you believe that the actual
15 results that were reviewed by Dr. Gerstein were
16 consistent with any of the -- any of the
17 projections done by the FDA?
18         MR. PIORKOWSKI:  Gerstman?
19         MR. GRAND:  Gerstman, yes.
20     A.    What do you mean consistent with?
21 I mean, I think that Gerstman's results are on
22 a -- if I'm remembering the particulars of the
23 analysis that I thought was not meaningful or
24 based on a small subset so.  I do believe that
25 they were consistent with the main results and

Page 187

1 interpretation.  That they deviated from the main
2 results doesn't consider the imprecision of the
3 particular analysis in being able to see any
4 meaningful difference between results of the
5 parent study.  So I would say that it's a
6 misinterpretation of the utility of Gerstman's
7 approach.
8     Q.    Well, he reviewed patients who
9 actually suffered events while on warfarin who
10 had incorrect INR readings, correct?
11         MR. PIORKOWSKI:  Object to form.
12     A.    Yeah, so that's, you know, a small
13 number of cases, where, as I've said, first of
14 all, is that the degree to which there's, quote,
15 incorrectness in the -- this -- we've already
16 talked about is an erroneous assumption, and the
17 analysis as a whole is a subgroup of the total.
18     Q.    I understand it's a subgroup
19 analysis.  That's not what I'm asking.
20         He did look at a small number of
21 cases where the point-of-care device was
22 inconsistent with the lab result and those people
23 had -- those people suffered events, correct?
24     A.    Correct, but what's missing in his
25 analysis is there was also probably more events

Page 188

1 in people -- I don't understand what the meaning
2 of that is when there were probably more events
3 in people on warfarin who had con- -- paired
4 results that were consistent with each other.
5 It's not a meaningful comparison.  It doesn't
6 give you any real knowledge.
7     Q.    Well, it's meaningful to a patient
8 who may have suffered an event when they might
9 not have suffered the event if they had had an
10 accurate INR reading.
11         MR. PIORKOWSKI:  Object to form.
12     A.    But you can't make that statement.
13 You can't make that statement based on his
14 analysis.  You have no idea whether the patient
15 would or would not have had a bleed based on the
16 correctness or incorrectness.  You can't make
17 that statement.
18     Q.    The patients did have a bleed.
19     A.    More patients had a bleed that had
20 concordant results, 'cause there were 90 percent
21 of the people who had concordant results.  So
22 what are you saying?  You can't infer causality
23 on his case -- his case series.
24         So if I say -- I've got more
25 evidence that more patients had strokes than had

Page 189

1 consistent results.  Is that evidence that having
2 consistent results caused strokes?  No, it's not.
3 And there's actually more evidence on that silly
4 hypothesis than there is the one that he's
5 putting forward, that the difference in the
6 results contributed to those strokes.  It's
7 flawed thinking.  'Cause I can provide you with
8 more cases of individuals who had strokes who had
9 exactly the same results.  So you can't draw a
10 conclusion by those case series.  It's just
11 absolutely flawed logic.
12     Q.    Did you review any internal --
13 internal analyses of the ROCKET study that were
14 not provided to the FDA?
15     A.    I don't believe I did.
16     Q.    Okay.  On page 13 of your report, I
17 guess the second full paragraph down, you write,
18 "When the sponsors became aware of the concern
19 over the device, years after completion of the
20 ROCKET AF trial, a number of steps were taken to
21 evaluate the impact of the device issue on the
22 results of ROCKET.  In September 2015, however,
23 Janssen apparently became aware of the recall
24 notice and its potential applicability to the
25 INRatio devices used in the ROCKET AF trial."

Case 2:14-md-02592-EEF-MBN Document 5123-11 Filed 01/20/17 Page 50 of 65
Case 2:14-md-02592-EEF-MBN Document 513-11 Filed 01/20/17 Page 50 of 65
Protected - Subject to Further Protective Review

Page 190

```
1       What are you basing these
2  statements on?
3       A.    So those are based on -- you mean
4  the dates, what am I basing that on?
5       Q.    Yes.
6       A.    On discussions with, with -- on the
7  timing of the -- I was, I was presented the
8  information about when, the timing, through
9  discussions with Mr. Piorkowski.
10      Q.    Okay.  So you haven't done any
11 independent investigations with respect to the
12 timing of when Janssen knew anything?
13      MR. PIORKOWSKI:  And for the
14 record, you really shouldn't have any references
15 to communications that we had.
16      THE WITNESS:  Oh.
17      MR. GRAND:  Yeah, just to be clear,
18 I wasn't trying to elicit it.
19      MR. PIORKOWSKI:  No, and I
20 understand that.
21      A.    Yes, but the -- I didn't look
22 specifically at the -- at the chronology of the
23 analysis.  I was made aware of the general story
24 that Alere had issued their recall, and it was
25 around that time, and that it was at that time
```

Page 191

```
1  that the company became aware of --
2       Q.    Okay.
3       A.    -- the problem, the potential
4  problem with the Alere device, and that it could
5  have covered some of the time period that the
6  device was used in the study.
7       Q.    Okay.  Did you read any of the
8  employees' definitions -- depositions who were
9  involved --
10      A.    No, sir.
11      Q.    -- in the decisions regarding the
12 Alere device?
13      A.    No, sir.
14      Q.    Okay.  And did you read any of the
15 internal -- internal emails between Janssen
16 employees regarding the Alere device?
17      A.    No, sir.
18      Q.    Page 13, a little bit further down
19 there's a -- I guess the second paragraph from
20 the bottom.  It begins with "To investigate this
21 question."
22      Do you see that?
23      A.    I do.
24      Q.    Okay.  Strike that.  I just
25 answered my own question.
```

Page 192

```
1       MR. PIORKOWSKI:  Those are the best
2  questions.
3       MR. GRAND:  Yeah, when I withdraw
4  it before anyone has to answer.
5       Okay, and again, I just -- strike
6  that.
7       Independent of any issues with the
8  point-of-care device and the ROCKET study, would
9  you agree that the time within therapeutic range
10 for the warfarin patients was low.
11      A.    No.
12      Q.    Is it your opinion that that
13 percentage is what you would expect in real world
14 setting?
15      A.    Oh, it's better than real world
16 setting.  The median is 58 percent.  The median
17 is a 55 percent mean time in therapeutic range,
18 and 58 percent median.  Median is actually a
19 better representation 'cause the value is skewed,
20 and with a skewed value, a very high -- a few
21 high values can bring the mean up, but the mean
22 level of 58 percent is actually better than what
23 we tend to see in clinical practice.
24      Q.    And what are you basing that on?
25      A.    Well, I'm basing it on my
```

Page 193

```
1  understanding of the literature over, you know,
2  my clinical practice on patients' time in
3  therapeutic range who are on Coumadin.
4       Q.    Okay, let's break that down.  I
5  think you said a lot of things there.  Are you
6  basing that on medical literature?
7       A.    Yes, sir.
8       Q.    Okay.  Is any of that medical
9  literature cited in your report?
10      A.    I believe there's reference to some
11 of that literature in the report, but I also have
12 elicited -- but I also have a general knowledge
13 that I have accumulated over 25 years of
14 practicing cardiology on how often patients are
15 in therapeutic range in clinical practice.
16      Q.    You keep a database that tracks
17 what percentage of time they're in therapeutic
18 range?
19      A.    No, not a formal database.  I keep
20 that understanding in my head as a number that's
21 important for us to practice medicine.  It's --
22 generally speaking, the literature supports a
23 number from about 40 to 70 percent with some
24 variability in the practices.
25      The collective information in the
```

Page 194

1  United States, and then there's data from other
2  countries, too, it's about 50 -- about 50 percent
3  is a range that we all carry around in our heads
4  as a common understanding of how often your
5  patients who are on Coumadin will be in the
6  range.
7      Q.    Okay.  Who's "we" that we all carry
8  around in our heads?
9      A.    I'm talking about clinicians,
10 clinicians.
11     Q.    Okay.  So all the clinicians
12 believe that the time in therapeutic range for
13 their warfarin patients is between 40 to 70
14 percent?
15         MR. PIORKOWSKI:  Object to form.
16     A.    I'll correct that.  I'll say that
17 my, my impression of the literature, and I'm not
18 alone, but my impression of the literature is
19 that in the general range of 40 to 70 percent.
20 I've seen studies where depending on the clinic
21 it's lower and depending on the clinic or the
22 approach it's higher.  But in general practice,
23 my, my understanding of the literature is it's
24 somewhere in that range of 40 to 70 percent is
25 what you see in clinical practice.

Page 195

1      Q.    Okay.  Literature -- are you
2  talking about literature of clinical studies?
3      A.    That's -- the collective wisdom
4  that's in the medical literature is -- we
5  translate that to clinical practice.  Now, I
6  won't cite you study, chapter and verse any more
7  than I'll say that a simple fact like the fact
8  that atrial fibrillation rises with age is a
9  common knowledge notion or that heart attacks are
10 caused by cholesterol.  I couldn't give you, you
11 know, the specific citations that lead to that
12 assumption, but the collective literature on
13 cholesterol and heart attacks, or smoking and
14 heart attacks for that matter, tell me and many
15 cardiologists that smoking causes heart attacks.
16 That's a common knowledge understanding.
17         And I have an understanding from my
18 clinical practice of how often we are able to get
19 patients in atrial fibrillation, or this is
20 actually, perhaps, a little better when we're
21 talking about valvular patients because we follow
22 them a little bit more carefully, but for afib
23 patients, it's in that general range of 40 to 70
24 percent.
25     Q.    Other than taking your word for it,

Page 196

1  is there anything I could do to validate what
2  your patients and your practice time within
3  therapeutic range is for warfarin?
4      A.    What my patients or the patients in
5  general at the institutions that I work you
6  could -- you could look at -- I don't know that
7  we've done a specific study, but if you wanted
8  to, you could pull the data on all the INRs that
9  have been drawn on either all the patients that
10 go to the clinic like I send my patients or all
11 of my patients within that clinic over the last
12 20 years and look at the time that they spend in
13 that therapeutic range.
14     Q.    Okay.  But you haven't done that
15 yourself?
16     A.    No, no, but I read the literature.
17     Q.    Okay.  But you're speculating about
18 patients in your own practice, correct?
19     A.    Well, yes.
20         MR. PIORKOWSKI:  Object to form.
21     A.    We run a Coumadin clinic, and
22 there's been QA assessment of that clinic.  I've
23 not done those analyses, but there's been a QA
24 assessment, a quality assurance assessment of
25 how -- over a period of time.  I don't have any

Page 197

1  of that data on my fingertips.
2         However, the clinic is set up
3  consistent with -- by the hematology group that
4  runs it -- consistent with the general medical
5  literature in the field about how you should run
6  a Coumadin clinic and how you make the
7  adjustments, and my clinical experience of
8  patients that I see -- when I see them, I look at
9  their INRs, and my clinical experience supports
10 the notion that our clinic generally fits that
11 broad range where I know that general clinics
12 are, in that 40 to 70 percent range.
13     Q.    So with respect to the statement in
14 your report or the statement you just gave me,
15 there's nothing I can look to that proves that
16 other than your assessment of the general
17 literature and your feelings about what's going
18 on in your practice?
19     A.    Well, I mean, they're not feelings.
20 They're, you know, educated assessments.  There
21 are things we could do.  I mean, if you like, I
22 can, I can -- if you want me to specifically
23 address the question about what -- do a review of
24 the literature on what the range of time in
25 therapeutic range is in clinical practice in

USCA5 637

Page 198

1 various settings around the world, I'd be happy
2 to provide you with that, but I would be
3 surprised if it deviated from the result that I
4 gave you, which is 40 to 70 percent. There are
5 things you could do. You could Goggle it and
6 find some review papers, if you wanted to.
7     Q.    Sir, my point is, is that you're
8 giving me -- to support your opinions, you're
9 providing me with anecdotal information about
10 your personal practice, which I would have no way
11 of being able to verify --
12     A.    No, but you asked me --
13     Q.    -- 'cause I don't have HIPAA
14 release forms from your patients.
15        MR. PIORKOWSKI: Object to form.
16     A.    So you asked two questions. First
17 you asked what's my sense of what's in the
18 literature, which we talked about first, and then
19 you asked specific questions about my clinic, how
20 would you go about doing it. I explained how you
21 would go about doing it. I answered the
22 question. I didn't purport to know that number
23 specifically. You asked me specifically how I
24 would go about assessing what my patients are,
25 and I told you how I could do that.

Page 199

1     Q.    I asked you how you knew, sir, not
2 how you would go about it.
3     A.    No, I think at one point you asked
4 me how I would go about, you know, assessing it,
5 and I will tell you that the Coumadin clinic has
6 undergone periodic quality assessments, and they
7 are up to the general standard, and I see enough
8 patients to have more than a feeling, to have an
9 estimation of how likely they are, and my
10 educated assessments of the patients in my clinic
11 are that they are managed consistently with what
12 the literature says is generally the averages
13 that we see in other similar clinics, which is in
14 my estimation not as good as I think it could be
15 were it to be optimized by other means, but that
16 it is in that 40 to 70 percent range by my
17 experience. I see enough Coumadins that it's
18 more than just a feeling. I mean, sorry, enough
19 INRs.
20     Q.    So if I read your report correctly,
21 one of the advantages you believe rivaroxaban has
22 to Coumadin is you got one dose once a day,
23 you're getting better protection, correct?
24        MR. PIORKOWSKI: Object to form.
25     A.    Well, as I have stated, I've stated

Page 200

1 that it's not inferior or superior, depending on,
2 you know, which outcome we're talking about, such
3 that it's a more convenient drug that gives you
4 at least as good or better efficacy and safety.
5     Q.    If warfarin were better controlled,
6 would it be -- wouldn't it be providing better?
7 Wouldn't it be superior if you didn't have these
8 time within therapeutic range issues?
9        MR. PIORKOWSKI: Object to form.
10     A.    You mean if I could hypothetical
11 somehow change the world and make it such that
12 patients could do better? I mean, the truth is
13 the effect that patients in my clinic get is
14 comparable to what patients around the globe get,
15 except -- except for a very few specialized
16 patients that could -- that are monitored even
17 more closely, which is not terrible practical in
18 most clinics. It's theoretically possible, but
19 it would still have to be proven in an
20 interventional study, but theoretically you could
21 postulate that and then set up an experiment.
22        I would say if you were to do that
23 experiment, even if you proved that you could,
24 you know, optimize it, I don't think it would
25 translate to clinical practice, given the 50 --

Page 201

1 60, 60 years of experience we've had with this
2 drug. We've not been able to do much better than
3 we do right now just because of the challenges of
4 taking it.
5     Q.    Okay. Did you read the FDA's
6 concerns about the time within the therapeutic
7 range in the ROCKET study?
8     A.    Yes, sir.
9     Q.    And you just disagree with them on
10 that?
11        MR. PIORKOWSKI: Object to form.
12     A.    I'm not sure I disagree with them.
13 The drug was approved. They understood all of
14 the issues with the time in therapeutic range.
15        In my assessment, the time in
16 therapeutic range within the range in the study
17 was not a predictor of the effect of rivaroxaban
18 done by -- best assessed by the quartile analyses
19 by time in therapeutic range. So there's not a
20 support for the premise that you just made that
21 if we optimized time in therapeutic range that
22 the results of the study would somehow have been
23 different, that the actual data supports the
24 opposite. So I agree with the FDA that the
25 ROCKET study was sufficient. The results of the

Page 202

1  ROCKET study and the interpretation of the ROCKET
2  study was sufficient to deem rivaroxaban as an
3  acceptable alternative to warfarin for the
4  treatment of afib in patients without valvular
5  disease.
6      Q.   What do you mean by you said the
7  results showed just the opposite?
8      A.   So what I mean is that the opposite
9  of your -- and perhaps I'm misinterpreting the
10  implication, but that there's a notion that if
11  the time in therapeutic range was somehow
12  different than it were -- than it was, which I
13  think is not the best test because we should be
14  testing things against the real world, in my
15  opinion, although there's I know a reasonable
16  debate on how you test the efficacy of any drug.
17  There's one camp that it should be tested against
18  real world because you'll be able to generalize
19  results. The other is you should test against
20  optimum so that you would understand the biologic
21  effects. When it comes to making clinic
22  decisions, I adhere to the former.
23      But the notion that better TTR
24  would have given you a different result, I
25  believe -- I thought that's what you were

Page 203

1  referring to, and I disagree with that assumption
2  because the data doesn't support that.
3      Q.   Why doesn't the data support that?
4      A.   Because if you look at the analysis
5  by quartile time in therapeutic range, you get no
6  difference in the results of rivaroxaban. So if
7  the assumption were true, within the study you
8  should see a different efficacy of rivaroxaban
9  across the quartiles of time in therapeutic
10  range, and that's not the case.
11      So I agree with the FDA's
12  interpretation of the data at large, the study is
13  sufficient and that the assumptions that it's
14  hypothetical plausible but needs to be tested is
15  not supported by the actual data from the study.
16      Q.   Okay. Thank you. Did you do
17  anything to investigate how many patients in the
18  ROCKET study actually needed to have their
19  warfarin adjusted during the course of the study?
20      A.   No. You mean the precise number of
21  patients? I assumed -- I would assume that
22  virtually all of them would have had to have had
23  their -- just at some time or another would have
24  had to have an adjustment in the warfarin dose,
25  but I would imagine it would be a very large

Page 204

1  number, but I don't know specifically. What I do
2  know is that the end result of that process was
3  that a time in therapeutic range of 58 percent
4  was above what we see in clinical practice, so it
5  wasn't -- it was pretty good.
6      Q.   Okay. On page 16 I want to ask you
7  about one of your comments, and this relates to
8  what we've been talking about with just sort of
9  real world approach versus -- I guess the other
10  option would have been to sort of set some sort
11  of algorithm for INR levels.
12      A.   So that's -- that's one approach.
13      Q.   Okay. Well, it's one approach that
14  you discuss --
15      A.   Mm-hmm.
16      Q.   -- as an alternative to real
17  world -- real world results.
18      A.   Mm-hmm.
19      Q.   And you state, "Plaintiffs' experts
20  appear to be contending that the approach used by
21  Janssen was unacceptable, but for the reasons
22  noted by the Division Director, plaintiffs'
23  expert's personal opinions on this issue is out
24  of step with the prevailing view of the
25  scientific community."

Page 205

1      What prevailing view are you
2  talking about?
3      A.   So, you know, in many cases,
4  studies are criticized for creating an artificial
5  background to which the new drug is studied, and
6  there is, I think, a prevailing, but I did -- I
7  did state that there are reasonable opinions on
8  both sides, but by prevailing, I mean -- I would
9  say that more trialists in the community are
10  increasingly concerned about the generalizability
11  of the trial results. And one of the major
12  criticisms that we all make of each others trials
13  is that the trial was either designed and
14  included a subset of the patients or was
15  structured in a way that would not be a fair
16  comparison of clinical practice, such that we
17  don't know what to do with the results, and
18  that's a consistent criticism that we always ask
19  about, as an editor, when I see a trial coming
20  in, what does this mean for the patients. And so
21  there is a push, and there has been for a decade
22  or so, to design trials that are inclusive and
23  generalizable in terms of females, various
24  populations, real world clinical situations so
25  that the results can be translated. So -- and I

Case 2:14-md-02592-EEF-MBN Document 5127-1 Filed 01/20/17 Page 54 of 65
Case 2:11-md-02502-EEF-MBN Document 5121-11 Filed 01/20/17 Page 54 of 65
Protected - Subject to Further Protective Review

Page 206

1  think that that's a -- that's a dominant view.
2         Now, I do believe that there is a
3  time and place for the more biologically oriented
4  study that compares an optimal new drug to an
5  optimal old therapy. I think that provides, in
6  some cases, valuable information.
7         However, when we're trying to make
8  a clinical decision, I think that there is a
9  prevailing tendency to try to make a trial with a
10  generalizable clinical result. And so comparing
11  a control group to an artificial algorithm that
12  is not used in practice, in my estimation, when
13  you're trying to make a clinical decision, is not
14  as advisable, in some cases. I will grant that
15  there are some situations. And that there are
16  many of us that are in that camp.
17     Q.    Okay. Now, are you speaking -- I
18  just want to be clear 'cause I'm hearing some
19  things from you which is making me think of the
20  whole concept of enrichment, but I don't think
21  that's what you were talking about specifically,
22  right? You're talking about the -- you're
23  talking about the TTR issue?
24     A.    I was talking about both.
25     Q.    Okay.

Page 207

1     A.    So both issues I think are
2  important. We're increasingly, as editors, as
3  trial designers at the NIH, we're increasingly
4  being told I want a study that gives me a
5  clinical result. I don't want a study that gives
6  me a biologic result that may or may not -- may
7  be good to learn something about the drug and
8  maybe can be -- maybe can be positioned as
9  somehow being superior, but it's in such a narrow
10  range that we don't know what to do about it.
11  And so I gave you two big examples. One is the
12  treatment comparison. It should be a comparison
13  of what's happening in the world. And another is
14  the population, is it diverse, does it include
15  women, things like that.
16     Q.    Mm-hmm.
17     A.    Do you know what I mean?
18     Q.    Right. And you described the
19  ROCKET patient population as an enriched
20  population?
21     A.    Well, the nice thing about the
22  ROCKET study and the nice thing about the general
23  construct of the totality of evidence on NOACs is
24  that we're beginning to see these drugs used in
25  broad populations. Now, this is a population

Page 208

1  that from a degree -- I want to make sure that
2  we're talking about the same thing. It's a sick
3  population, which is often another admonition.
4         When a study is done in a very well
5  population, then we don't really get a safety
6  assessment. So we often will start -- this is
7  exactly what we did with aspirin. We started
8  with the sickest patients, the guys who were
9  having heart attacks, and we give aspirin. Then
10  we move to people who had cardiovascular disease
11  but without, and then we move to people who
12  are -- we move down the risk spectrum. That
13  gives you a nice -- if the population is, as the
14  study designed, it gives you a nice first
15  assessment of the safety concerns because the --
16  you know, often the safety concerns are related
17  to the sickness of the population. So I think it
18  was nice that rivaroxaban chose that end of the
19  spectrum. It's also nice that there are other
20  studies like the surgical patients who by virtue
21  of being deemed well enough to undergo orthopedic
22  surgery were not as sick, and that would give
23  results that are consistent.
24     Q.    Do you believe the ROCKET
25  population was an enriched population?

Page 209

1     A.    So what do you mean by enriched?
2         MR. PIORKOWSKI: Object to form.
3     Q.    Well, you used the word in your
4  report. You tell me what you meant by it.
5     A.    So it was a -- well, I just want to
6  make sure that we're speaking in the same terms.
7  This was a population that if you were to compare
8  it to some other of the other afib, non-valvular
9  disease patients --
10     Q.    Sicker.
11     A.    They were sicker. They had --
12  there was one other study, I can't remember which
13  one, that had a 57 percent heart failure. This
14  was 60 percent. So there's some comparability.
15  But it had more hypertension and more diabetes
16  and more heart failure, so it was a sicker
17  population. It also had a large number of
18  patients with prior strokes, and I was very
19  pleased to see that because we want to make sure
20  that the -- that's where it was really enriched,
21  with people that had prior stroke and TIA. It's
22  useful because we do want to make sure that the
23  biologic -- these are people who are prone to
24  strokes, and I don't agree with this assumption,
25  but some people say that if you have a stroke on

Page 210

1 Coumadin you didn't benefit from it, and it might
2 be -- you might want to switch drugs. I don't
3 believe that. I believe that it reduces the
4 risk. It doesn't prevent it. So you can still
5 be getting some benefit even though you had a
6 prior stroke.
7        But it's nice to see prior stroke
8 and not prior stroke individuals in the same
9 study. So to the extent that you can see if
10 there is a modification of the effect of the
11 drug, it's useful. I think in that regard, it
12 provided us with good information in the -- both
13 ends of that very important risk spectrum.
14    Q.    Okay. I appreciate the
15 thoroughness of your answer. I'm asking you
16 whether your opinion is, is that the ROCKET
17 population was an enriched population?
18    A.    So it was a population -- just so
19 we can understand what it means, it's a
20 population that had a lot of individuals with
21 comorbidities, and it had more individuals than
22 some of the other studies with prior stroke. And
23 if we can agree that that's what enriched means,
24 then the answer is yes.
25    Q.    Okay. The FDA has published

Page 211

1 guidelines on using enriched populations in
2 studies, correct?
3    A.    I don't know what you're referring
4 to specifically.
5    Q.    Okay. I believe you cite to them
6 in your report. If you look at your list of
7 materials --
8        MR. PIORKOWSKI: You mean like
9 general guidance, as opposed to --
10        MR. GRAND: Yeah. Did I say
11 guidelines? I meant there's a guidance document
12 on using enriched populations in clinical trials.
13    A.    Yeah, there was -- there's some
14 general information. I will tell you that I'm
15 not -- I'm not a firm believer in sticking to a
16 hard and fast rule. I think there are some
17 situations where you would want to increase the
18 number of sick people in the population. There
19 are actually situations where you wouldn't. And
20 so -- for instance, the Physicians' Health Study
21 was a non-enriched population, completely
22 non-enriched. We excluded people that had
23 cancer, heart attacks, strokes before, and that
24 was because the question that we were answering
25 required that. So there's a case where guidance

Page 212

1 or not, we chose to choose that particular
2 population. In other cases, it makes sense. So,
3 again, it's an individual case by case.
4        If I would have a particular -- so
5 the general guidance to me is not as meaningful
6 as the particular question you're answering if I
7 had any, as we've done, in the -- and we were
8 cited by the FDA as having an optimal design for
9 a diabetes trial, that included the broadest
10 spectrum of diabetics from those on oral agents
11 all the way up to insulin. And so -- but what
12 you must have is a justification for the
13 particular population that you're studying, and I
14 think that that was -- the justification in my
15 mind, in the documents that I read, was
16 sufficient for the ROCKET study and for the other
17 studies of rivaroxaban.
18    Q.    And if you were seeking approval
19 for a new indication, you should not be relying
20 solely on data from an enriched population to get
21 approval, should you?
22    A.    It all --
23        MR. PIORKOWSKI: Object to form.
24    A.    It all depends on what drug, what
25 situation. You know, if I -- if I wanted to seek

Page 213

1 an approval for aspirin in the case of myocardial
2 infarction, I would enrich it with people who
3 have myocardial infarction. I wouldn't include
4 people who don't have it. If I was seeking for
5 one -- a general indication for people who don't
6 have myocardial infarction, I would enrich it.
7        So, again, it depends entirely on
8 the question that I'm asking and the indication
9 that I'm seeking, and they're going to decide on
10 how to apply those results and the narrowness or
11 the broadness of the indication they'll give me,
12 but there are situations where I will go one end
13 of the spectrum, and there's situations I'll go
14 another end of the spectrum.
15    Q.    Does non-inferior mean the same
16 thing as safe and effective?
17    A.    I think that that's a reasonable
18 translation of a technical term to a more
19 generally understandable term. Yes, I would say
20 that that's a -- that's a reasonable translation.
21 Non-inferior means there wasn't -- in terms of
22 that one particular outcome, there wasn't a
23 clinically meaning difference so that I can say
24 it was similar to. And if it's both safe -- if
25 it's non-inferior in terms of the efficacy

Page 214

1 outcome and non-inferior in terms of the safety
2 outcome, then I think you can translate that to
3 say it is as safe and as effective.
4     Q.    Do you know how non-inferiority was
5 defined in the ROCKET study?
6     A.    There is a -- there was a -- I saw
7 several. I saw the briefing documents, the study
8 reports and the -- and there is a discussion of
9 it, I believe, even in the statistical analysis,
10 which is always a cursory assumption, but they
11 did describe the particular parameters, and they
12 were looking for what I think is a reasonable
13 margin for a one-sided alpha of .025, and then
14 they went on to say that if they met
15 non-inferiority they would look at a superiority
16 analysis. The analysis, which is cursorily
17 described here and in more detail described in
18 the protocol documents, to me seems like a
19 reasonable inferiority approach, and I think that
20 it was acceptable to the FDA as well.
21     Q.    Okay. I want to ask you about some
22 of the other studies you reference in your
23 report. So if you turn to page 19.
24     A.    Mm-hmm, yes.
25     Q.    Believe it or not, we're winding

Page 215

1 down here.
2     You reference -- okay, I'm going to
3 draw your attention to, I guess, the first full
4 paragraph on page 19. It says, "While the
5 collective trial data suggest similarities
6 between NOACs, all of which act through
7 inhibition of the clotting cascade, there have
8 been some who have attempted to use the clinical
9 trial data to make comparisons of the various
10 NOACs with each other," and you reference Baker
11 Rasmussen and Schneeweiss. I'm sure I'm
12 mispronouncing that, those studies.
13     You write, "This can only be
14 accomplished by the selection of trials in which
15 the same clinical question was assessed. The
16 above-mentioned papers have reported indirect
17 comparisons of the various NOACs in the setting
18 of non-valvular AF."
19     Can you elaborate on your I guess
20 I'll call it criticism of these studies?
21     A.    So the main criticism is just the
22 flaws in the general approach that we've talked
23 about earlier today that you can compare the
24 results of one drug compared to the same
25 comparator in two different trial settings as

Page 216

1 a -- as if it were a replacement for a
2 head-to-head comparison of the two drugs, and
3 that's a -- that's a completely flawed
4 assumption, and that's the premise of these
5 between study comparisons.
6     The other way that we talked about
7 that I think is more viable is looking for
8 consistency or heterogeneity, and that was --
9 there were other studies that looked at that
10 approach which showed fairly consistent results
11 with return -- with respect to the same outcomes.
12     So the general criticism of these
13 studies is the overall approach of trying to make
14 meaningful comparisons in the extremely
15 hypothesis generating realm of indirect
16 comparisons between arms of studies that had
17 different patient populations, different control
18 groups to get some information about the
19 comparison of the drugs.
20     Q.    Okay. So the Baker study, that was
21 published in 2012, correct?
22     A.    I believe so.
23     Q.    And that study concluded that
24 apixaban had a lot of risk of major and GI
25 bleeding versus el- -- sorry, versus Pradaxa and

Page 217

1 Xarelto, correct?
2     A.    I believe that was the conclusion.
3 If you want to get any more particular -- any
4 more specific, I'd have to look at that, and
5 that's in contradiction with what, you know, some
6 of the meta -- the meta-analysis suggests that
7 there's really a comparable effect of all of
8 these drugs.
9     Q.    I understand that there's
10 disagreement amongst studies. I'm just asking
11 you about this one.
12     A.    Fair enough.
13     Q.    That was published in
14 "Circulation"?
15     A.    I believe that's right.
16     Q.    And there was no industry funding
17 for that document. I mean for that study.
18 Correct?
19     A.    I don't recall the funding, but
20 I -- you know, I don't --
21     Q.    I'm happy to --
22     A.    If the funding -- I wouldn't want
23 to say that I agree or disagree when I don't have
24 the facts, but I have no reason to -- I don't
25 have an opinion on whether or not it was funded,

Protected - Subject to Further Protective Review

Page 218

1 but I'm happy to look at it and see if I agree
2 with that statement.
3      Q.    Well, let me ask you about that,
4 sir, generally.  You've seen published literature
5 regarding influence of industry funding on study
6 results, correct?
7      A.    I've seen literature on the topic.
8      Q.    Did you check -- when you were
9 reviewing these articles, did you check as to
10 which studies have been -- had no industry
11 funding versus which studies had --
12      A.    I generally glance at the funding
13 statement.  I just don't recall for the
14 particular Baker paper what their funding
15 statement was.  So to answer your question
16 specifically, I just didn't have a clear enough
17 recollection.
18      Q.    Okay.  Would it surprise you that
19 the studies you were most critical of are all
20 independent studies and the studies you endorse
21 are the Bayer studies?
22          MR. PIORKOWSKI:  Object to form.
23      A.    I don't know what independent
24 means.  I know -- I know some of these people
25 personally, and I know they have perspectives and

Page 219

1 biases.  We all do.  I know some of their
2 particular biases.  And so I think that all
3 authors of papers have biases and preconceived
4 notions and world views, and the most important
5 thing is just to be transparent.  But I don't --
6 I don't think that wholesale I would make a
7 blanket assessment or make a blank statement that
8 studies funded one way are all "X" and studies
9 funded another way are all "Y."  Every author has
10 a perspective.
11      Q.    I wasn't suggesting that you
12 should.  I was saying in your own assessment, in
13 your report the studies you were most critical of
14 are the studies that received no industry
15 funding --
16          MR. PIORKOWSKI:  Object to form.
17      A.    Yeah, I --
18      Q.    -- and the ones that you find most
19 informative are the ones that are funded by Bayer
20 or Janssen.
21          MR. PIORKOWSKI:  Object to form.
22      A.    I don't know -- without -- I mean,
23 I've reviewed an awful lot of studies, and
24 without doing a tallying of that -- I mean, I
25 have -- I have -- I believe there's strengths and

Page 220

1 weaknesses of all the studies that I've
2 discussed.  And I've, you know, reviewed an awful
3 lot of studies, so I can't make a quantitative
4 statement that the studies that I viewed
5 favorably were funded one way, and studies that I
6 viewed at another were funded another way without
7 doing a careful tabulation to the veracity of
8 that statement.
9      Q.    Okay.  And you're familiar that
10 typically was -- for an industry supported study
11 where they're supplying funding, they typically
12 have a right to review and provide input.  I'm
13 not suggesting final editorial decisions, but
14 they have a right to review and have input on
15 draft manuscripts, correct?
16          MR. PIORKOWSKI:  Object to form.
17      A.    Sometimes they do.  Sometimes they
18 don't.  That's not our -- that's not our policy.
19 We are -- we don't -- we often maintain our
20 independence, and we will provide for information
21 a draft of the paper before we submit, but we
22 don't -- we don't provide an open opportunity to
23 have editorial purview over any aspects of the
24 trial.  We maintain complete independence.
25 Regardless of the sponsor.  And many sponsors,

Page 221

1 whether it's a government sponsor or a foundation
2 or a -- or industry will have perspectives, and I
3 have had disagreements of opinion.  But when I
4 publish a paper with my name on it, it represents
5 my opinions and not the opinions of others,
6 regardless of where the funding comes from.
7      Q.    I wasn't suggesting otherwise.  In
8 the section Observational Studies, you note,
9 Several observational studies explored the use of
10 NOACs in real world circumstance.  There are a
11 number of observational studies that have
12 demonstrated safety and efficacy of NOACs in
13 general and rivaroxaban in particular that are
14 consistent with the data from trials, and you
15 cite Camm, Ageno and Tamayo.
16          And the Ageno study concluded that
17 rivaroxaban was superior to the standard of care.
18 Do you recall that?
19      A.    I believe that was their
20 conclusion.
21      Q.    And that study was funded by Bayer
22 and Janssen, correct?
23      A.    I have no reason to doubt it if
24 it's stated in the document.  I don't recall
25 specifically that it was funded that way, but I

USCA5 1643

Page 222

1 have no reason to doubt it.
2     Q.    And -- oh, I'm sorry.  In the Camm
3 study -- the Camm study wasn't a comparative
4 study at all, correct?
5     A.    Well, I thought that the Camm
6 study -- it was my recollection that it was
7 a study of the use of the drug in real world
8 populations.
9     Q.    It just followed the use of
10 rivaroxaban in real world populations?
11     A.    Yes.
12     Q.    But it didn't compare rivaroxaban
13 to warfarin or any other NOAC, correct?
14     A.    I believe so, yes.
15     Q.    And it just concluded that the
16 rates of stroke and bleeding were low?
17     A.    Yes, and in the range that you
18 might expect in a population being treated with
19 an anticoagulant.  And therefore, the conclusion
20 that I drew was that it's consistent with the
21 trial data.
22     Q.    And the Tamayo study that you cite
23 was similar, correct?
24         MR. PIORKOWSKI:  Object to form.
25     Q.    Similar in that it also tracked

Page 223

1 rivaroxaban in a real world population.
2     A.    Yes, sir.
3     Q.    And that study just concluded that
4 bleeding -- major bleeding was rare?
5     A.    Yes, but and it gave -- it gave its
6 assessment of what that meant, what rare meant.
7 And as I said, it was consistent with what was
8 seen, interestingly enough, in not only the
9 rivaroxaban studies but in some of the other NOAC
10 trials as well.
11     Q.    Okay.  And that was also funded by
12 Janssen?
13     A.    I don't recall that, but if it
14 states it clearly on the paper, I have no reason
15 to doubt it.
16     Q.    Now you also cite some studies
17 where you say the results were inconsistent.  I'm
18 sorry, that's a statement not a question.  But if
19 you look at the next paragraph where you discuss
20 the Ellis and Maura studies.
21         MR. PIORKOWSKI:  Object to the form
22 of the question.
23     A.    Yes.
24     Q.    Okay.  And you write there, "There
25 are some studies suggesting no real differences

Page 224

1 between the NOACs" --
2     A.    Yes, sir.
3     Q.    -- correct?
4     A.    Mm-hmm.  While others suggest that
5 there could be differences between various
6 agents.
7     Q.    And there's the Ellis study, and
8 that was a comparison between rivaroxaban and
9 dabi- --
10     A.    Dabigatran.
11     Q.    Thank you.  And it showed that they
12 were both comparable to warfarin with respect to
13 their bleeding rates, correct?
14     A.    I believe so.
15     Q.    Okay.  And that was also an
16 industry funded study?
17     A.    Again, I don't recall, but I have
18 no reason to doubt it if it's stated clearly in
19 the paper.
20     Q.    Now, what was the method used on
21 this study?  How was this analysis done?
22     A.    So it would be helpful to look
23 specifically.
24     Q.    I'm happy to give you a copy.  I'm
25 not trying to trick you.  I thought you had them

Page 225

1 in your binder.
2     A.    I didn't.  I only have the trial.
3 I don't have the observation studies with me.
4     Q.    Gotcha.  We are going to mark this
5 as Gaziano 4, and this is the Ellis study 2016.
6     (Whereupon, Deposition Exhibit 4,
7     "Bleeding in patients with atrial
8     fibrillation treated with dabigatran,
9     rivaroxaban or warfarin: A retrospective
10     population-based cohort study,"
11     Ellis et al, was marked
12     for identification.)
13     A.    Okay, yes, I have a general sense
14 of the -- of the methods.
15     Q.    Well, I just want to ask you a more
16 general question, which is you believe all these
17 studies suffer from the same sort of reliability
18 issues?
19         MR. PIORKOWSKI:  Object to form.
20     A.    Well, I believe that particularly
21 when you're looking at the comparative effects
22 between drugs, there are some real problems with
23 observational studies, especially as new drugs
24 come on the market, because the first adopters of
25 new drugs are often quite different than the

Protected - Subject to Further Protective Review

Page 226

1  people that are stably on the old drug. And in
2  many cases, it's people who have had a problem
3  with the old drug who are the first ones to move
4  to a new drug. And people that have had a
5  problem with one drug might also have a similar
6  problem with the next drug. So that it creates a
7  special kind of compounding that we call
8  compounding by indication. I think that's the
9  case for all of these studies.
10        So you have to review all of these
11 studies cautiously, and the retrospective nature
12 of these studies is -- it doesn't allow you for
13 even measurement of some of the things that you
14 might want to be able to adjust for.
15     Q.    So you're saying that those are --
16 that's a type of confounding you can't make an
17 adjustment for?
18     A.    Well, you can try, but in all
19 observational studies, confounding is a paramount
20 concern, and residual confounding means that you
21 tried to adjust for it but you couldn't make it
22 all go away, and that can be a problem in
23 observational studies.
24        So any time you interpret an
25 observational study, you have to be cautious of

Page 227

1  how you interpret it. That's not to say that it
2  cannot provide you with some information, but you
3  just have to be very cautious how you're
4  interpreting it.
5      Q.    In that statement you just made
6  regarding patients who are the first to be
7  switched to a newer therapy are likely to have
8  had problems with their old therapy --
9      A.    Well, that's a possibility.
10     Q.    Okay. What do you base that on?
11 Is this something --
12     A.    So if that's a standard -- a
13 standard -- we do -- I do, you know, a fair --
14 with these various databases that I was talking
15 about I do -- with these various databases that
16 we talked about before, I've done this kind of
17 work on a repeated basis, and what you see is
18 characteristics of individuals who are new
19 adopters of a drug are different than patients
20 who are not, and one explanation for the fact
21 that they're different is that when the new drug
22 is an alternative to the old therapy, a plausible
23 explanation is that the first people to move to a
24 new drug or the population is at least enriched
25 with some people who have moved from the old drug

Page 228

1  to the new drug because they had a problem with
2  the old drug, because the first people we move
3  are not the ones that are doing well on the old
4  drug.
5      Q.    Mm-hmm.
6      A.    The opportunity for movement of a
7  patient who's having a problem with a drug to a
8  new drug is greater for you, so. That's a
9  well-known fact in pharmacoepidemiology, and you
10 know, it was the -- the term coined to deal -- to
11 describe that was called confounding by
12 indication, meaning indication for the drug, was
13 different than the indication for the people who
14 were on the stable doses of the old drug.
15     Q.    Okay. On page 20 of your report, I
16 guess the fourth new paragraph down that begins
17 with "Studies that summarize or pool trial data."
18 Do you see that?
19     A.    Yes, I do.
20     Q.    Okay. The second-to-the-last
21 sentence of that paragraph states, The pool trial
22 data suggests that NOACs are as -- as a class are
23 as safe and effective -- are a safe and effective
24 alternative to warfarin.
25     A.    Yes.

Page 229

1      Q.    What pooled studies are you
2  referring to?
3      A.    So there is a meta-analysis that
4  pooled the data, and I'm fairly certain it's
5  included in one of ours -- one of my lists of the
6  papers, but I don't recall the specific author,
7  but it was a meta-analysis that actually took the
8  major NOAC trials and pooled the data and did an
9  assessment of heterogeneity and suggested --
10 actually, I was conservative in my statement that
11 it was safe and effective, but actually suggested
12 that the collective experience was that they were
13 superior in terms of efficacy and safety. But
14 the reason that I was cautious about not
15 over-interpreting that result is because the
16 confidence bound is narrow, but it's a pooled
17 analysis, and you have to be cautious, more
18 cautious in interpreting a pooled analysis than
19 if it was a -- if it's a pooled analysis of
20 50,000 people from four or five different trials,
21 which is -- which is the one I'm referring to,
22 that's different than a randomized trial of
23 50,000 people. And so the fact that it even
24 showed collective superiority and
25 non-heterogeneity I was interpreting more

USCA5 645

Page 230

1  cautiously. But if there is a meta-analysis, if
2  we need to identify the specific one, I would be
3  happy to try to do that for you.
4      Q.    No, I just want to make sure it's
5  included in your -- in your list?
6      A.    I believe it is, but I will make
7  sure.
8      Q.    Yeah. No, no need to make sure. I
9  was just -- I'm just asking 'cause I want to make
10 sure that I have it, 'cause you typically have
11 cited your --
12     A.    Right.
13     Q.    -- the articles, the primary
14 articles. I just want to make sure it wasn't
15 something I missed.
16          On page 21, you have a discussion
17 of the guidelines on NOACs?
18     A.    Yes, sir.
19     Q.    Did you have a role in -- I'm
20 sorry, strike that.
21          Do you sit on any committees on AHA
22 or ACC?
23     A.    I do sit on some AHA committees but
24 not on any guideline writing committees.
25     Q.    Okay. So you wouldn't have any

Page 231

1  role in setting forth any guidelines or position
2  papers from these organizations?
3      A.    That's correct. I don't believe --
4  I know none with respect to specific medications.
5  I'm on committees about particular kinds of
6  research, and they do make statements, but
7  they're not -- they're not clinical guidelines.
8          MR. GRAND: I'm almost done if
9  you --
10         MR. PIORKOWSKI: Oh. Our food's
11 here.
12         MR. GRAND: Oh. Well, you want me
13 to just finish up, 'cause --
14         THE WITNESS: Let's just finish up,
15 and then we could either eat here or go.
16         MR. PIORKOWSKI: Yeah. I'm going
17 to probably have a few questions but not more
18 than five minutes. You're close to --
19         MR. GRAND: Yeah.
20         On page 22 of your report -- I'm
21 going to actually draw your attention to the last
22 paragraph on page 22 which runs up into the top
23 of 23.
24     A.    Okay.
25     Q.    You note that, "The labeling of

Page 232

1  rivaroxaban under the supervision of the FDA
2  clearly conveys the important safety and efficacy
3  information."
4          Did I read that correctly?
5      A.    Yes, sir.
6      Q.    And when you say important safety
7  and efficacy information, you mean important to
8  you?
9      A.    So I do mean important to me, and
10 as a teacher of clinicians, I think the
11 information that needs to be known -- I will tell
12 you that my opinion generally of labels include
13 more information, that some of which is of less
14 utility, but the -- and particularly subgroup
15 analyses that seem to find their way into results
16 that perhaps to some give it more weight, but
17 that the -- the key efficacy and safety
18 information derived from the rivaroxaban studies
19 in my opinion is contained in the FDA-approved
20 labeling.
21     Q.    But you're not basing -- you're
22 basing that statement on your own practice and
23 experience. You're not basing that on any
24 objective guidelines or any regulatory guidelines
25 for labeling, correct?

Page 233

1      A.    That's correct.
2      Q.    Okay. At the top of page 23, you
3  note, "There have not been any mandates regarding
4  changing the labeling of rivaroxaban."
5      A.    That's correct. I think there have
6  been -- what I meant to indicate is that there
7  weren't any changes for cause as if there was,
8  you know, a new, you know, detected efficacy or
9  safety issue. I understand there were changes in
10 the labeling, but I think that there was some
11 changes that were made as a process of trying to
12 make the NOAC labeling similar.
13     Q.    Harmonization?
14     A.    Harmonization, exactly. So I know
15 changes happen, but what I was indicating here
16 was there weren't any mandated changes that the
17 FDA required because of new information that
18 suggested like in some other -- other drugs that
19 there was a unexpected harmful signal that
20 appeared from -- in the, you know, surveillance
21 of the drugs as they moved into market.
22     Q.    You have not reviewed any of the
23 correspondence between Janssen and the FDA
24 regarding the labeling?
25     A.    That's correct --

Protected - Subject to Further Protective Review

Page 234

1  Q.   Okay.
2  A.   -- I have not.
3  Q.   And you have not reviewed drafts of
4  labeling?
5  A.   That's correct.
6  Q.   Okay.  And you have not tracked the
7  history of the labeling changes from its first
8  approval up to the current date, correct?
9  A.   That's correct.  I just am aware
10 that there -- that there were some changes.
11 Q.   Okay.  Thank you for your time.  I
12 have no further questions.
13 A.   You're welcome.
14
15          EXAMINATION
16 BY MR. PIORKOWSKI:
17 Q.   Let me see if I can finish.
18 Dr. Gaziano, Mr. Grand had asked you a series of
19 questions about what you reviewed in the realm of
20 pharmacology studies, pharmacokinetic studies.
21 Do you recall those questions?
22 A.   Yes, sir.
23 Q.   Okay.  And as I understood your
24 testimony, you said you did not conduct a
25 comprehensive review of the pharmacokinetic and

Page 235

1  pharmacodynamic studies?
2  A.   Yes.
3  Q.   And you did not comprehensively
4  look at the dose finding studies?
5  A.   That's true.
6  Q.   Okay.  In response to his
7  questions, though, about the definition of
8  non-inferiority, you referred to a couple of
9  other documents that you looked at.
10         Do you remember that testimony?
11 A.   Yes, sir.
12 Q.   Okay.  One of the documents you
13 referred to was the clinical study report?
14 A.   Yes.
15 Q.   Okay.  Is the clinical study report
16 one of the documents that you considered as a
17 part of forming your opinions?
18 A.   Yes.
19 Q.   Okay.  And can you just very
20 briefly explain what the clinical study report
21 is?
22 A.   So the clinical study report is a
23 actually quite comprehensive document that
24 describes the many aspects of the design
25 rationale conduct of a randomized trial and

Page 236

1  contains many of the processes, decision-making
2  processes, and a summarization of the rationale,
3  including elements of the data --
4  Q.   Okay.
5  A.   -- the literature that went into
6  the decision-making process.
7  Q.   Does the clinical study report
8  include or does it not include discussions of
9  issues concerning pharmacokinetics and dose
10 selection?
11 A.   Absolutely.  It has headings with
12 quite a bit of information about
13 pharmacokinetics, pharmacodynamic, clearance,
14 dose issues that go into it, and that's why I did
15 report that I had looked at -- looked at those,
16 as well as some of those studies in my clinical
17 context, but I had not done a complete assessment
18 of the original reports of those kinds of
19 studies, but that there was a lot of that data
20 contained in the documents that had been provided
21 the FDA.
22 Q.   Is the -- if you look at your
23 materials considered list, there's also a
24 document there called FDA Draft Briefing
25 Documents, dated 2011.

Page 237

1  A.   Yes.
2  Q.   And what's your understanding of
3  what that document is?
4  A.   So, again, these are documents
5  prepared with an extensive amount of information
6  about some of the similar things that we just
7  talked about, and I believe this one was in
8  preparation for a specific meeting.
9  Q.   And who prepares the FDA Draft
10 Briefing Document?
11 A.   So my understanding is that the --
12 that the -- in preparation for these meetings,
13 there is a great deal of information provided by
14 the company, but that it's not exclusive.
15 There's other documents that are provided.
16 Q.   Do you know who prepares the FDA
17 Briefing Document?  Is it the company, or is it
18 the FDA?
19 A.   I don't know specifically who the
20 author of the document was.  I know that the
21 information -- there was a lot of information
22 that, you know, obviously came from the company
23 in the document.
24 Q.   Was there information concerning
25 the background in terms of the pharmacokinetics

USCA5 7647

Page 238

1  of the drug?
2      A.    Yes, there was.  What I mean is I
3  don't know who compiles these documents to give
4  to the advisory board, but I know that there's a
5  lot of pharmacokinetic assessments that comes
6  from the company.
7      Q.    Let me also ask you to turn to the
8  fourth page of your materials considered list,
9  and just direct your attention to one paper
10  that's on there where the last author is Kubitza.
11     A.    I'm sorry, what page of the --
12     Q.    The fourth page of your list.
13     A.    The fourth page of the list.  Okay,
14  let me work my way.  One, two, three, four, yes.
15  Yes.
16     Q.    There's an article there called
17  Kubitza, "Evidence-based development and
18  rationale for once-daily rivaroxaban dosing
19  regimens across multiple indications"?
20     A.    Yes.
21     Q.    Is that a paper that you reviewed
22  as a part of your --
23     A.    Actually, that's a paper that I
24  reviewed in some detail to understand the
25  rationale behind the dose that was chosen for the

Page 239

1  various rivaroxaban trials.
2      Q.    Okay.  I want to direct your --
3      A.    And it contains within it
4  references to the body of literature on the
5  topic.
6      Q.    Okay.  I want to direct your
7  attention back to those -- there was a discussion
8  you had with Mr. Grand about page 16 of your
9  report, and he read to you the last sentence
10  where it says, "Plaintiffs' experts appear to be
11  contending that the approach used by Janssen was
12  unacceptable."  Do you recall that discussion?
13     A.    Um --
14     Q.    Page 16.  It's the -- kind of
15  the second to last paragraph.
16     A.    Yes.
17     Q.    Okay.  Earlier in this paragraph,
18  you were -- I'm just going to read this in, and
19  tell me if I read this correctly.  It says, "In
20  recommending approval of Xarelto for atrial
21  fibrillation/stroke prevention indication, the
22  FDA Division Director specifically addressed this
23  point:  Quote, Prior to the approval of
24  dabigatran, there were frequent discussions
25  within FDA about the advisability of conducting

Page 240

1  real world trials versus trials in which the
2  warfarin dose was optimized by adjusting it
3  centrally using an algorithm.  Some thought real
4  world trials were more likely to provide
5  information about the actual risks and benefits
6  of new therapies when introduced into practice.
7  Others thought new drugs should be demonstrated
8  to be at least similar to outcomes to warfarin
9  when warfarin was optimally managed.  We never
10  concluded that either approach was unacceptable
11  (or even that one approach was preferable) so the
12  approach taken by this applicant was acceptable,
13  end quote?"
14         Now, is it your understanding that
15  the FDA there, the FDA Division Director, was
16  saying that there's one approach that was
17  preferable, that both approaches were acceptable,
18  or that neither approach was acceptable?
19     A.    So it's my understanding that this
20  was a reflection of that debate that we had
21  earlier today that there are -- there is
22  information that can be derived from both
23  approaches, and that the particular approach --
24  there's utility in both approaches.  They answer
25  slightly different questions, and that the

Page 241

1  approach taken by -- in this case, this applicant
2  I believe was the sponsors of the rivaroxaban
3  trials, that that approach was acceptable.
4      Q.    And what do you understand
5  Dr. Gerstman's position to be with respect to
6  this debate?
7      A.    So, I mean, I think that
8  Dr. Gerstman in addition to some of the other
9  plaintiffs' experts was that this was an inferior
10  approach, and so much so that the results were
11  not valid or should be disregarded.  It's an
12  opinion that I wholeheartedly disagree with.
13     Q.    So in Dr. Gerstman's opinion or
14  your understanding of Dr. Gerstman's opinion, the
15  only way to do it is the way he was proposing to
16  do it?
17     A.    Well, that's -- my impression is
18  that he felt that they -- while the FDA considers
19  utility in both approaches, that Gerstman
20  considers utility only in the approach that was
21  not chosen for the rivaroxaban.
22     Q.    And what do you mean when you say
23  that the plaintiffs' expert's personal opinions
24  are out of step with the prevailing view of the
25  scientific community?

Page 242

1    A.    So that was our discussion today
2  that the -- and we had this very discussion
3  with -- about our diabetes trial with the FDA,
4  that while there is utility in both approaches,
5  they answer different questions.  One is a
6  biologic question, addressing a question about
7  the biologic differences between comparing two --
8  the biology of two drugs given under optimal
9  conditions.  And while that gives you biologic
10 information, it doesn't give you as useful
11 clinical information.  And if the question
12 answered is a biologic one, then that's a fine,
13 useful approach.  However, if the question
14 answered is a clinical question, clinicians
15 favor, and us editors favor, a result that's
16 generalizable to a clinical situation, and the
17 approach that compares to a real world has
18 greater generalizability.
19    Q.    Hold on one second.  Almost done.
20 You were also asked about some of the background
21 history concerning the INRatio recall that's on
22 page 13 of your report.  Do you recall that?
23    A.    Yes.
24    Q.    And I believe you cited our
25 conversation as the source of information.  Do

Page 243

1  you recall that?
2    A.    Yes.
3    Q.    Do you -- do you --
4    A.    But primarily about the timing of
5  the notification because that's not something
6  that was publicly available other than --
7    Q.    Do you know whether the FDA's
8  re-evaluation includes the historical information
9  about those dates?
10    MR. GRAND:  Objection.
11    A.    I don't.  I know I reviewed them,
12 and they certainly may have, but I just don't
13 recall specifically where the information that --
14 about the chronology.  I like to be precise when
15 I'm talking about particular events, and so I
16 like to have a figure about the chronology.  I
17 just don't recall exactly where that information
18 came from, but I'm sure I saw that document.
19    Q.    Okay.
20
21        FURTHER EXAMINATION
22 BY MR. GRAND:
23    Q.    Just a couple follow-up points.  On
24 your list of materials considered, and I believe
25 counsel was just asking you about it, you

Page 244

1  included the clinical study report for the ROCKET
2  AF trial, correct?
3    A.    Yes.
4    Q.    And you have that listed as being
5  3,241 pages?
6    A.    Yes.
7    Q.    Okay.  Did you review all 3,241
8  pages?
9    A.    I did not read every page.
10    Q.    And would it surprise you to know
11 that the complete clinical study report is many,
12 many more pages than that?
13    A.    No, it would not surprise me.
14    Q.    You have an understanding that
15 clinical study reports typically tend to be
16 hundreds of thousands of pages?
17    A.    Yes, yes.  I have actually
18 contributed to them, in particular for this one
19 drug that we were developing, and I rely on the
20 primary documents rather than a lot of the
21 supporting documentation.
22    Q.    Okay.  And the beginning of every
23 clinical study report typically has a summary of
24 all the data which is typically, I don't know,
25 between 100 and 300 pages, correct?

Page 245

1    A.    Correct.
2    Q.    And is that what you reviewed?
3    A.    Well, I reviewed -- you know, I
4  reviewed elements of it, and where I felt I
5  needed more, I -- the nice thing is these
6  documents have a contents, which I can do a
7  focussed review, but I wouldn't want to
8  characterize it as restricting it to the first
9  hundred pages or so of the document.
10    Q.    Okay.  You did not review the
11 appendices that included all of the pharmacology
12 studies and the dosing studies and the
13 pharmacokinetic studies, correct?
14    A.    That's correct, I did not review
15 the individual studies that would have been
16 included in the appendix.
17    Q.    Okay.  And I just want to clarify.
18 Counsel asked you some questions about the FDA
19 brief -- draft briefing document.
20    A.    Yes, sir.
21    Q.    Okay.  You understand that that's a
22 document that's prepared in anticipation of the
23 advisory committee meetings, correct?
24    A.    Yes, sir.
25    Q.    Okay.  And you know that the

Page 246

1 sponsor prepares a document?
2     A.     So I know that the sponsor
3 contributes a lot to the discussion, but I don't
4 know how -- exactly how the data -- the documents
5 get assembled and sent to each of the committee
6 members.
7     Q.     Okay.  Do you have an understanding
8 that the FDA prepares its own document?
9     A.     I'm aware that they provide a
10 package of information to the members of the
11 committee that includes information that came
12 from the sponsor, and it also includes
13 information that contains some assessments, you
14 know, by the FDA or by their designees.
15     Q.     And it will typically include
16 analyses and opinions based -- for medical
17 officers who reviewed the application, correct?
18     A.     Yes.
19     Q.     Okay.  And there will be -- there's
20 a pharmacological assessment, typically?
21     A.     Yes, that's my understanding.
22     Q.     Okay.  There's also an assessment
23 of the study data that was --
24     A.     Right.
25     Q.     -- presented?

Page 247

1          Okay.  Do you understand that the
2 FDA briefing document is a distinct document from
3 a document provided by the sponsor in
4 anticipation of the advisory committee meeting?
5     A.     Well, my understanding is that --
6 and I may get the terms wrong, but that there is
7 a package of materials that is provided to the
8 members of the committee that includes the
9 information that came from the company, plus
10 information from other sources, and it's my
11 understanding that it's the FDA's responsibility
12 to compile that, but I don't know all the
13 particulars of how those documents are assembled.
14 I do know that the company contributes certain
15 things and that there are other documents that
16 are included.
17     Q.     Okay.  And so the documents
18 cited -- strike that.  No further questions.
19          MR. PIORKOWSKI:  Okay.
20          THE VIDEOGRAPHER:  This concludes
21 today's deposition.  The time is 8:12, and we're
22 off the record.
23          (Deposition concluded at 8:12 p.m.)
24
25

Page 248

1          C E R T I F I C A T E
2     I, Maryellen Coughlin, RPR/CRR and
3 notary public in the Commonwealth of
4 Massachusetts, do hereby certify that the
5 foregoing is a true and accurate transcript of
6 my stenographic notes of the deposition of JOHN
7 MICHAEL GAZIANO, M.D., who appeared before me,
8 satisfactorily identified himself, and was by me
9 duly sworn, taken at the place and on the date
10 hereinbefore set forth.
11     I further certify that I am neither
12 attorney nor counsel for, nor related to or
13 employed by any of the parties to the action in
14 which this deposition was taken, and further
15 that I am not a relative or employee of any
16 attorney or counsel employed in this case, nor
17 am I financially interested in this action.
18     THE FOREGOING CERTIFICATION OF THIS
19 TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF
20 THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT
21 CONTROL AND/OR DIRECTION OF THE CERTIFYING
22 REPORTER.
23
24     MARYELLEN COUGHLIN, RPR/CRR
25

Page 249

1          INSTRUCTIONS TO WITNESS
2
3
4          Please read your deposition over
5 carefully and make any necessary corrections.
6 You should state the reason in the appropriate
7 space on the errata sheet for any corrections
8 that are made.
9          After doing so, please sign the
10 errata sheet and date it.  It will be attached to
11 your deposition.
12          It is imperative that you return
13 the original errata sheet to the deposing
14 attorney with thirty (30) days of receipt of the
15 deposition transcript by you.  If you fail to do
16 so, the deposition transcript may be deemed to be
17 accurate and may be used in court.
18
19
20
21
22
23
24
25

Page 250

```
 1       - - - - - -
             E R R A T A
 2       - - - - - -

 3

 4  PAGE  LINE  CHANGE

 5  ____  ____  _____

 6      REASON: _____

 7  ____  ____  _____

 8      REASON: _____

 9  ____  ____  _____

10      REASON: _____

11  ____  ____  _____

12      REASON: _____

13  ____  ____  _____

14      REASON: _____

15  ____  ____  _____

16      REASON: _____

17  ____  ____  _____

18      REASON: _____

19  ____  ____  _____

20      REASON: _____

21  ____  ____  _____

22      REASON: _____

23  ____  ____  _____

24      REASON: _____

25
```

Page 252

```
 1           LAWYER'S NOTES

 2  PAGE  LINE

 3  ____  ____  _____

 4  ____  ____  _____

 5  ____  ____  _____

 6  ____  ____  _____

 7  ____  ____  _____

 8  ____  ____  _____

 9  ____  ____  _____

10  ____  ____  _____

11  ____  ____  _____

12  ____  ____  _____

13  ____  ____  _____

14  ____  ____  _____

15  ____  ____  _____

16  ____  ____  _____

17  ____  ____  _____

18  ____  ____  _____

19  ____  ____  _____

20  ____  ____  _____

21  ____  ____  _____

22  ____  ____  _____

23  ____  ____  _____

24  ____  ____  _____

25  ____  ____  _____
```

Page 251

```
 1
 2        ACKNOWLEDGMENT OF DEPONENT
 3
 4        I,_____, do
 5   hereby certify that I have read the
 6   foregoing pages, and that the same is
 7   a correct transcription of the answers
 8   given by me to the questions therein
 9   propounded, except for the corrections or
10   changes in form or substance, if any,
11   noted in the attached Errata Sheet.
12
13
14   _____
15   JOHN MICHAEL GAZIANO, M.D.        DATE
16
17
18   Subscribed and sworn
     to before me this
19   _____ day of _____, 20_____.
20   My commission expires:_____
21
     _____
22   Notary Public
23
24
25
```