Case 2:14-md-02592-EEF-MBN   Document 5127-12 SEALED   Filed 01/20/17   Page 1 of 130

# EXHIBIT 4

# TO BE FILED UNDER SEAL

USCA5 652

```
00001
 1                UNITED STATES DISTRICT COURT
 2                SOUTHERN DISTRICT OF ILLINOIS
 3                      No. 3:09-md-02100-DRH-PMF
 4                      MDL No. 2100
 5       ***********************************
 6       IN RE:  YAZ/YASMIN/OCELLA PRODUCT    Hon. David R. Herndon
 7       LIABILITY LITIGATION
 8       ***********************************
 9       This Document Relates to All Cases
10       ***********************************
             HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
11                   CONFIDENTIALITY REVIEW
12               VIDEOTAPED DEPOSITION OF
13             JOHN MICHAEL GAZIANO, M.D.
14
15               Friday, June 12th, 2015
16                    10:07 a.m.
17
18       Held At:
19               Eckert Seamans Cherin & Mellott, LLC
20               Two International Place
21               Boston, Massachusetts
22
23
24       REPORTED BY:
25       Maureen O'Connor Pollard, RMR, CLR, CSR


00002
 1       APPEARANCES:
 2
 3       FOR THE PLAINTIFFS:
 4           MARK NIEMEYER, ESQUIRE
 5           MICHAEL KRUSE, ESQUIRE
 6               NIEMEYER GREBEL KRUSE
 7               10 South Broadway, Suite 1125
 8               St. Louis, Missouri 63102
 9               314-241-1919
10               niemeyer@ngklawfirm.com
11               kruse@ngklawfirm.com
12
13
14       FOR THE DEFENDANT BAYER:
15           DIANA DAVIS, ESQUIRE
16           JOSEPH D. PIORKOWSKI, JR., ESQUIRE
17               THE PIORKOWSKI LAW FIRM
18               1155 F Street NW, Suite 200
19               Washington, DC 20004
20               202-223-5535
21               ddavis@lawdoc1.com
22
```

```
23
24
25
```

00003
```
 1    APPEARANCES (Continued):
 2
 3    FOR THE DEFENDANTS TEVA PHARMACEUTICALS USA and
 4    BARR LABORATORIES:
 5         PRENTISS W. HALLENBECK, JR., ESQUIRE
 6              ULMER & BERNE LLP
 7              600 Vine Street, Suite 2800
 8              Cincinnati, Ohio 45202
 9              513-698-5000
10              phallenbeck@ulmer.com
11
12
13    FOR PLAINTIFF JENNIFER REAGH in the Pennsylvania
14    State Court Litigation:
15         DAVID C. DeGREEFF, ESQUIRE
16              WAGSTAFF & CARTMELL, LLP
17              4740 Grand Avenue
18              Kansas City, Missouri 64112
19              816-701-1100
20              ddegreeff@wcllp.com
21
22    Videographer:  Christopher Coughlin
23
24
25
```

00004
```
 1                     INDEX
 2    EXAMINATION                            PAGE
 3    JOHN MICHAEL GAZIANO, M.D.
 4     BY MR. NIEMEYER                         7
 5     BY MS. DAVIS                          186
 6     BY MR. NIEMEYER                       222
 7
 8
 9          E X H I B I T S
10    NO.        DESCRIPTION                 PAGE
11    1    Copy of 4/1/05 Nutraquest trial
           transcript......................... 63
12
      2    Three invoices.................... 74
13
      3    Dr. Gaziano's Expert Report on ATE... 96
14
      4    Yaz Product Monograph from Canada,
```

15          Revised 2/3/14.......................102
16    5     Document titled Summary of Product
            Characteristics....................120
17
      6     Mircette label......................129
18
      7     Yaz '06 Physician Labeling..........142
19
      8     Yaz 2012 labeling...................143
20
      9     Plaintiffs' Notice of Videotaped
21          Deposition of Michael Gaziano........181
22   10     Document titled Combined Hormonal
            Contraceptives (CHCs) and the Risk
23          of Cardiovascular Disease
            Endpoints..........................192
24
25


00005
 1
     11     Lidegaard, et al article titled
 2          Thrombotic Stroke and Myocardial
            Infarction with Hormonal
 3          Contraception.......................205
 4   12     Yasmin label........................207
 5   13     Yaz label...........................209
 6   14     9/13/11 Long-term Active
            Surveillance Study for Oral
 7          Contraceptives (LASS), Final Study
            Report..............................217
 8
     15     European Active Surveillance Study
 9          (EURAS-OC) Final Study Report.......218
10   16     12/8/11 Background Document for
            Joint Meeting of Advisory
11          Committee for Reproductive Health
            Drugs and the Drug Safety and Risk
12          Management Advisory Committee.......219
13
14
15
16
17
18
19
20
21
22
23
24

25

00006
```
  1               P R O C E E D I N G S
  2
  3               THE VIDEOGRAPHER:  We are now on the
  4     record.  My name is Chris Coughlin, and I'm a
  5     videographer for Golkow Technologies.
  6               Today's date is June 12th, 2015.  The
  7     time is 10:07 a.m..
  8               This video deposition is being held in
  9     Boston, Massachusetts, In Re the
 10     Yaz/Yasmin/Ocella Products Liability Litigation,
 11     in the United States District Court, Southern
 12     District of Illinois, MDL Number 2100,
 13     3:09-md-2100-DRH-PMF.
 14               The deponent is John Michael Gaziano.
 15               Will counsel please identify
 16     yourselves for the record.
 17               MR. NIEMEYER:  Mark Niemeyer for the
 18     Plaintiffs.
 19               MR. KRUSE:  Michael Kruse for the
 20     Plaintiffs.
 21               MR. HALLENBECK:  Prentiss Hallenbeck
 22     for Barr Laboratories, Incorporated and Teva
 23     Pharmaceuticals USA, Incorporated.
 24               MS. DAVIS:  Diana Davis on behalf of
 25     the Bayer Defendants.
```

00007
```
  1               THE VIDEOGRAPHER:  The court reporter
  2     is Maureen Pollard, and she will now swear the
  3     witness.
  4               Those appearing by phone will appear
  5     on the stenographic record.
  6
  7               JOHN MICHAEL GAZIANO, M.D.,
  8     having been first duly identified and sworn, was
  9     examined and testified as follows:
 10               DIRECT EXAMINATION
 11     BY MR. NIEMEYER:
 12        Q.    Tell us your name.
 13        A.    John Michael Gaziano.
 14        Q.    And are you a physician?
 15        A.    Yes, sir.
 16        Q.    Are you a board certified
 17     cardiologist?
 18        A.    Yes, sir.
 19        Q.    And do you see cardiology patients?
 20        A.    Yes, sir.
```

USCA5 656

```
21        Q.     How long have you been seeing
22   cardiology patients?
23        A.     Since my residency in 1987.
24        Q.     And do you -- since that time, have
25   you been treating some of those patients for
```

00008
```
 1   stroke?
 2        A.     Yes, sir.
 3        Q.     For ischemic stroke?
 4        A.     Yes, sir.
 5        Q.     And have you been treating some of
 6   those patients for myocardial infarction?
 7        A.     Yes, sir.
 8        Q.     Is that another name for a type of
 9   heart attack?
10        A.     Yes, sir.
11        Q.     If you would, for the jury, could you
12   describe the way or ways in which a stroke
13   occurs when it is related to a thromboembolism?
14        A.     So the term thromboembolism refers to
15   a blood clot that forms, it can either form in
16   the artery itself that is causing an obstruction
17   of blood flow, or it can form upstream and find
18   its way to the point at which it causes a
19   blockage.
20              For a stroke, there are several types
21   of mechanisms that will result in an occlusive
22   blood clot, and what I mean is a blood clot that
23   blocks an artery that prevents blood flow to a
24   certain area downstream from the blockage.
25              So there can be a long-standing
```

00009
```
 1   process in the artery itself that causes damage
 2   to the artery and buildup of plaque on the
 3   artery wall.  That plaque on the artery wall can
 4   be disrupted somehow, it can have a little tear
 5   in it, a crack, an abrasion.  That abrasion
 6   causes a thrombus to form.  Thrombus is another
 7   name for a clot.  That clot can grow, it may
 8   grow large enough to occlude the artery.
 9              A second way that that can happen is
10   that atherosclerotic process, particularly for a
11   stroke, can happen in a larger artery further
12   upstream.  And one of the common places for that
13   to happen is in the carotid artery.  It's an
14   artery in your neck.  And for some reasons,
15   there are -- certain arteries that are more
16   prone to get these kinds of buildup of
```

USCA5 657

```
17   atherosclerotic plaques, and the carotid is one
18   of them.
19              If an atherosclerotic blockage buildup
20   occurs in that area, it can also have a little
21   tear or a crack in it and a blood clot can form
22   there.  That blood clot can break off and go
23   floating upstream until it finds its way
24   downstream into a smaller artery and can block
25   the flow.  That is what we call an embolic event
```

00010
```
 1   that happens from something downstream -- I'm
 2   sorry, from something upstream.
 3              There are other ways that a blood clot
 4   can find its way into an artery in the brain and
 5   cause a stroke.
 6              A patient can develop a blood clot in
 7   the heart, in the wall of the heart.  A common
 8   reason that that might happen is if there is
 9   valve disease or atrial fibrillation where
10   particularly the upper chambers of the heart
11   become dilated, and blood can pool and create a
12   tendency toward small blood clots from forming.
13   If it breaks off and happens to find its way up
14   to the brain, that can be a cause of stroke.
15              There's another cause of a stroke that
16   is less common, but it can be caused by a blood
17   clot that forms in a vein, and blood clots that
18   form in a vein can occur in an abnormal vein or
19   a normal vein, for that matter.  But if a blood
20   clot forms in a vein, most of the time that
21   blood clot stays where it is, but if it does
22   break off it's usually filtered by the link.
23              In rare cases where there's a
24   passageway from one side of the heart to the
25   other, an abnormal passageway, that clot can
```

00011
```
 1   flow from the right side of the heart to the
 2   left side of the heart and then out to the aorta
 3   and can find its way to virtually anywhere, but
 4   if it finds its way up to the brain, it can
 5   cause a stroke.
 6              There are a few other more rare causes
 7   of stroke.
 8        Q.    You know what, that's -- I think
 9   that's sufficient right there.  I want you to
10   give complete answers, but I think we covered
11   what I needed.
12        A.    Okay.  Great.
```

```
13        Q.    Everything that you just described,
14   each of the different kind of instances, would
15   all those be properly called ischemic strokes?
16        A.    Yes.  They can all cause lack of
17   oxygen to the brain as a result of lack of blood
18   flow and cause an ischemic stroke.
19        Q.    And each instance that you just
20   described, the stroke was in some way related to
21   the formation of a clot, whether the clot be
22   formed and stay in a specific location, or the
23   clot be formed and move to a different location,
24   is that fair?
25        A.    Yes, generally speaking in each of
```

00012
```
 1   those instances a clot is part of the process.
 2        Q.    Okay.  Tell me, how does ingestion of
 3   a combined oral contraceptive by a female
 4   patient increase her risk for ischemic stroke?
 5            MS. DAVIS:  Objection to form.
 6        A.    Well, I think it's clear that oral
 7   contraceptives can change certain parameters
 8   that affect certain types of clots, particularly
 9   the venous clots.  But the ingestion of an oral
10   contraceptive could have several effects that we
11   can speculate on the specifics of which are
12   responsible.  But it's clear that exogenous
13   hormones do increase the tendency to form clots,
14   particularly on the venous side.  Their role in
15   -- particularly mechanistic role which in
16   forming really a different kind of clot which is
17   on the arterial side is less clear, but there is
18   likely to be some tendency toward clot
19   formation, as I said particularly on the venous
20   side.
21   BY MR. NIEMEYER:
22        Q.    And even though you mentioned a few
23   times it's particularly on the venous side, is
24   it true that combined oral contraceptives which
25   you labeled as exogenous hormones --
```

00013
```
 1        A.    Right.
 2        Q.    -- do increase the risk for clotting
 3   in the arterial system as well?
 4        A.    Well, there is an association with
 5   venous thromboembolic events and arterial
 6   thromboembolic events with all exogenous
 7   hormones.  It's not entirely clear what the
 8   mechanisms are for each of these somewhat
```

USCA5 659

```
 9    distinct activities.
10         Q.    Okay.  And I think I heard it in
11    there, but are you saying that there's an
12    association between combined oral contraceptives
13    and clotting in the arterial system?
14         A.    I'm not saying that.  I'm saying that
15    events are associated.  If you remember, on the
16    arterial side, arterial thromboembolic events
17    primarily are a result of a complex process that
18    involves atherogenesis, meaning the development
19    of atherosclerotic plaque, and so it's not
20    entirely clear what mechanisms exogenous
21    hormones night be playing on the arterial side.
22               On the venous side, clots can form
23    largely in a normal vessel.  It's likely to be a
24    different pathobiology.  What we do know is that
25    there are associations with exogenous hormones,
```

00014
```
 1    and both arterial and venous thromboembolic
 2    events.  What we can't say precisely -- really
 3    in both cases we can't say precisely exactly
 4    what the mechanisms are.  Those two mechanisms
 5    are distinct.
 6         Q.    And exogenous female hormones, does
 7    that include estrogen?
 8         A.    Yes.
 9         Q.    Okay.  Now, in one of the examples, or
10    one of the instances you gave, you mentioned a
11    clot forming on -- in the venous system and
12    moving over to the arterial system.  And I can't
13    remember whether you mentioned or not, but does
14    that go by way of a patent foramen ovale, or
15    PFO?
16         A.    A PFO is one of those abnormal -- one
17    type of those abnormal passages that are in the
18    dividing boundary between the right and the left
19    heart.  If it forms abnormally -- there are
20    several types, but a patent foramen ovale is one
21    type of a hole in the divider, what we call the
22    septum between the chambers, that can allow
23    blood from the right side of the heart get over
24    to the left side of the heart under certain
25    circumstances.
```

00015
```
 1         Q.    And in what percentage of the female
 2    population do we see the existence of a PFO?
 3         A.    So the precise estimate is not
 4    entirely clear, but it's not a completely rare
```

USCA5 660

5    phenomenon.  About 5 percent is what's quoted.
6    The reason it's not completely known is that
7    there's not great tests screening all people, we
8    tend to see it on people who are getting studied
9    with an echo, and that tends not to be
10   representative of the completely normal
11   population.  But somewhere in that range of
12   about 5 percent.
13       Q.   Okay.  And I think you testified on
14   this a little bit, but just tell us again how a
15   thromboembolic stroke occurs when a PFO is
16   present and the clot passes from the venous side
17   to the arterial side.
18         MS. DAVIS:  Objection to form.
19      A.   So a lot of things have to line up for
20   a stroke to happen.  There's -- a clot can form
21   in a vein, as I mentioned it could be a vein
22   that's damaged or a vein that's normal, and then
23   a small piece of that clot can break off.  And
24   the vast majority of the blood goes through the
25   lungs.  In the normal person, all the blood goes

00016
1    through the lungs.  In a person with a patent
2    foramen ovale or some other passageway, under
3    certain circumstances when the pressure
4    differences permit, so it's a relatively rare
5    state, but it can occur that that blood clot
6    happens to be in the right side of the heart
7    when the pressure is a little bit higher on the
8    right side than the left, which is an unusual
9    circumstance, but it can happen when you're
10   straining or something like that, and then that
11   clot has to be near that opening and has to find
12   its way across into the left side of the heart,
13   and then it moves its way out into the main
14   pumping artery, which is the aorta, and then it
15   has to by chance find its way up to one of the
16   arteries that's supplying the brain, and then be
17   of -- significant in terms of its size to block
18   an artery that will prevent blood flow to a
19   section of the brain that is large enough for
20   that to be noticed.  Very tiny clots might have
21   no effect, because once you get down into the
22   tree, there's cross-bridging and cross-linking
23   that allow blood to move its way around a clot.
24        But a clot of the right size under the
25   right circumstances can slip across to the left

USCA5 661

Case 2:14-md-02592-EEF-MBN Document 5127-12 SEALED Filed 01/20/17 Page 11 of 130

```
 1    side of the heart and find its way up to the
 2    brain.  It could find its way other places and
 3    it might not be noticed.
 4        Q.    And could it also find its way other
 5    places and be noticed as a peripheral ATE?
 6            MS. DAVIS:  Objection to form.
 7        A.    It can, it can.  And we really don't
 8    know how often that happens.  It can find its
 9    way to a kidney, it can find its way to a muscle
10    scan, whatever.
11            There are certain tissues that have
12    more redundant vascular supply, so if that blood
13    clot finds its way to certain tissues it will
14    have no material consequence at all.
15            The brain -- as the tree branches,
16    certain areas don't have lots of redundancy and
17    so you can get a clot that prevents blood flow
18    to a certain area, and if it's large enough
19    that's one that, for obvious reasons, in the
20    brain will get a little bit of a malfunction in
21    the brain, it could be a sensory affect, a
22    visual affect, slurred speech, whatever it is,
23    that's why we can sometimes pick those up a
24    little bit easier.
25        Q.    Okay.  And just before we leave here,


00018
 1    what is a peripheral ATE?
 2        A.    So peripheral just really means
 3    something that's not central.  And there's a
 4    little bit of difference in some of the
 5    terminology.  There are some people who think
 6    that the heart is central to the circulatory
 7    system, so atherosclerosis in the heart is
 8    central atherosclerosis.  And atherosclerosis,
 9    we use the word peripheral vascular disease, is
10    anywhere that's not central in the heart.  So it
11    could be -- a carotid artery you could consider
12    a peripheral event, or something in a kidney
13    artery or an artery of your legs are places
14    where we often get peripheral events.
15    Peripheral just means distant from the center.
16        Q.    Okay.  And just tell us, what does ATE
17    stand for?
18        A.    ATE is an arterial thromboembolic
19    event.
20        Q.    And is a TIA -- what's a TIA?
21        A.    So a TIA can be a type of ATE.  And
22    the reason I say can be is because there's --
23    sometimes it's difficult to discern the precise
24    cause of a TIA.  So a TIA is -- we worry about a
```

25    TIA because it might be a warning sign that --


00019
 1    it could be due to a small clot that dissolves
 2    completely and there's no residual effect, but
 3    it could also be due to other things like a
 4    vascular spasm, migraine headache, people who
 5    are prone to migraine headache, sometimes it's
 6    difficult to discern.  So a TIA can be a kind of
 7    an ATE, although there are some other potential
 8    causes of a transient event in the brain that --
 9    that's what the T stands for -- that resolves
10    completely, and there's usually not anything on
11    a CAT scan that shows up that tells us that
12    there was any damage.
13         Q.    So just for the record, what does TIA
14    stand for?
15         A.    Transient ischemic attack.
16         Q.    Okay.  Let's go back to the PFO
17    situation.  And tell me, how are you able to
18    ascertain whether or not a particular clot that
19    caused an ATE passed through the PFO and
20    originated on the venous side?
21         A.    It's often -- you try to make the best
22    inferences you can, but you often can't be
23    certain.  If a person has an event on the
24    arterial side, and you can't identify a known
25    other cause, then you may start looking.  So you


00020
 1    can do an echo.  If you see a PFO, it doesn't
 2    mean that that was the cause.
 3         The two places we might -- the first
 4    thing we would do is we would search.  If
 5    someone had a peripheral event, whether it's a
 6    clot in their finger, again small ones we often
 7    don't -- we may not see it, or if they have a
 8    stroke, where we would begin to look is we
 9    would -- first we understand the person's
10    background, are they at risk for having
11    atherosclerosis.  We might look in the carotid
12    artery with an ultrasound to see if there's a
13    block in the carotid artery.
14         If we don't see anything, we might
15    look for a PFO or some other reason in the
16    heart.  As I mentioned, there are other reasons
17    of the heart.  A person could have atrial
18    fibrillation and have a big dilated -- or have a
19    bowel disease and have a big dilated heart, so
20    it may be a reason that a clot came from the

USCA5 663

```
21     heart, it didn't come from the venous side.
22              We might, in the right patient, if
23     they've got swelling in their legs, we might go
24     looking for a venous clot.  That's more helpful
25     if you find something.
```

00021
```
 1              Unfortunately, if you see a PFO, you
 2     can't be sure that this -- that that was the
 3     cause of the embolus.  Because a small embolus,
 4     as I said, could come from somewhere within the
 5     vascular tree, it could come from upstream, it
 6     could come from somewhere in the heart, or it
 7     can come from somewhere in the venous system and
 8     make its way across.
 9              So it's sort of a diagnosis you make
10     inferences about, but it's often not certain.
11        Q.    And I take it from what you said that
12     one of the ways that you draw an inference is
13     that if you are able to find a different clot in
14     the venous system, a DVT for example, then often
15     the inference is made by the physician that the
16     arterial clot might have been one that passed
17     through the PFO?
18              MS. DAVIS:  Objection to form.
19        A.    Right.  You would have to have both
20     circumstances.  I mean you can have a venous
21     clot if you go looking.  Actually, if we look,
22     we'll find them in a lot of -- if you look at
23     people just coming off a long airline, you'll
24     find them incidentally.  People don't notice
25     them.  So you may find one.
```

00022
```
 1              If you find one in the setting of a
 2     PFO, and you've not found any other reason for a
 3     peripheral clot, then it makes the inference a
 4     little bit stronger.
 5        Q.    Okay.  What is a paradoxical embolism?
 6        A.    So that's exactly what we're talking
 7     about.  That's another word for an embolus that
 8     comes from the right side of the heart.  And the
 9     paradox is that it made its way to the left side
10     of the heart.  Because the lungs are designed to
11     filter those out, that's the way the system is
12     engineered.  It's engineered that -- we will all
13     develop small clots in our legs from time to
14     time.  The system is designed to handle that.
15     The lung will filter out small clots, but no
16     consequences whatsoever, they'll just filter
```

USCA5 664

Case 2:14-md-02592-EEF-MBN Document 5127-12 SEALED Filed 01/20/17 Page 14 of 130

```
17        them out and then they'll dissolve them.
18             But one that doesn't go through the
19        lung system and get filtered out and
20        paradoxically finds its way over to the left
21        side of the heart is called a paradoxical
22        embolus.
23             Q.     And so does a paradoxical embolus
24        start, for lack of a better term, on the venous
25        side of the circulatory system?
```

```
00023
1              A.     If you're -- as I said, we often do
2         this by probabilities and inference.
3              Q.     Sure.
4              A.     But the definition of a paradoxical
5         embolus is one that started somewhere on the
6         right and made itself to the left.  But we will
7         use those terms, whether you use the word
8         paradoxical embolus or venous embolus that came
9         through via right-left shunt, the meaning is all
10        the same, it's usually done by guesswork.
11             Q.     Okay.  And if there are combined oral
12        contraceptives that are identified to have a
13        greater potential for association with venous
14        thromboembolism, would you expect those combined
15        oral contraceptives to generate excess
16        thrombotic stroke via paradoxical embolism?
17             MS. DAVIS:  Objection to form.
18             A.     Not to any material effect, because --
19        not to any material or measurable effect at all,
20        because by far the vast majority of strokes are
21        caused by other things.  Paradoxical embolus is
22        a relatively rare occurrence, so I wouldn't
23        anticipate there to be any material impact on
24        the risk of stroke.
25        BY MR. NIEMEYER:
```

```
00024
1              Q.     And I guess I'm asking a more narrow
2         question, and that is, even if it's rare, even
3         if the event is rare, you know, that a venous
4         clot passes over and causes a stroke on the
5         arterial side, would you agree that if a
6         combined oral contraceptive is found to increase
7         the risk for venous thromboembolism, it would
8         then by definition also increase the risk,
9         however slightly, for a paradoxical embolism
10        related stroke?
11             MS. DAVIS:  Objection to form.
12             A.     Not to be difficult at all, but when
```

USCA5 665

Case 2:14-md-02592-EEF-MBN   Document 5127-12 - SEALED   Filed 01/20/17   Page 15 of 130

13   we talk about increased risk we're usually
14   talking about within our ability to measure
15   that, and we as a clinician talk about -- when
16   we talk about a risk to a patient.  So I would
17   never discuss that as a risk to a patient
18   because whether -- whether or not there's a
19   theoretical risk -- risk when we're talking
20   about it in clinical terms, it has to be
21   something that's measurement and real, and I
22   would say that the risk would be so trivial not
23   as to consider it in the lexicon of a discussion
24   of risk.
25            I wouldn't know -- probably an

00025
1   infinitesimally small effect of any kind that
2   wouldn't have any real impact on the drug's
3   overall risk of arterial events, so that it
4   wouldn't even enter into the discussion.
5        Q.    Describe, if you would, if I use the
6   term sequelae, what does that mean?
7        A.    Sequelae?
8        Q.    Yes, better.
9        A.    My Latin goes way back.  But sequelae
10   means a sequence, sequence of events, a
11   chronology of events.
12        Q.    And when somebody talks about the
13   sequelae of a disease or disease process or
14   injury, what does that mean?
15        A.    So what we're usually talking about is
16   the chronological events along the pathway of
17   the disease.  The sequelae would be the effects
18   downstream of a given disease process.
19        Q.    Okay.  So tell us, if you would, the
20   potential sequelae for an ischemic stroke.
21        A.    So it can -- so here I believe you're
22   talking about the sequelae with the stroke being
23   the starting point.
24        Q.    Yes, sir.
25        A.    Is that right?  Okay.  Great.

00026
1            So a stroke can be -- can range from
2   benign and inconsequential to catastrophic and
3   fatal, and the full range is represented in
4   strokes.  It turns out that when we do autopsies
5   on patients, particularly if we do autopsies on
6   patients that might be at high risk for embolic
7   events like atrial fibrillation, we find strokes
8   at high degree there were never noticed.  And

```
 9    that may be -- in that particular high risk
10    population, I believe the study I'm referring to
11    was done in people with Afib with valve disease,
12    about 40 percent of them had strokes that they
13    had no idea had occurred.
14              So that tells us that the sequelae of
15    a stroke can range from essentially nothing, and
16    the way we would think about that if it was in a
17    small and in an unimportant area, or it happened
18    in an area where there was some downstream
19    regrowth or re-engineering of the brain, which
20    can happen, then the patient may notice nothing,
21    there may be no clinical sequelae of that kind
22    of a stroke.
23              On the other hand, a stroke can have
24    the consequences of being fatal.  It can
25    cause -- it can hit a certain part of the brain
```

00027
```
 1    with a vital life function, like breathing, and
 2    the patient can die because of it.
 3              Now, it turns out that that's more the
 4    case for the bleeding type of strokes, they're
 5    often more fatal than the ischemic ones.  And
 6    then the full range of things in-between, it can
 7    leave someone with loss of function, motor
 8    function, like of function of an arm, loss of
 9    sensory function, loss of vision.  It all
10    depends entirely on where the stroke is, and how
11    big the stroke is, and how important that part
12    of the brain where the stroke is, and what it's
13    responsible for.
14        Q.    Could an ischemic stroke result in
15    paralysis?
16        A.    It can.
17        Q.    Can an ischemic stroke result in
18    aphasia?
19        A.    It can.
20        Q.    Neurocognitive impairment?
21        A.    Yes.
22        Q.    Headache?
23        A.    Headache is not the most common one.
24    Certainly it's -- I would say it's not a common
25    consequence either acutely or chronically.  A
```

00028
```
 1    lot of times strokes are not painful in the --
 2    most people who have a stroke don't feel
 3    anything in the head, they feel the downstream
 4    consequences of the loss of those nerves.
```

USCA5 667

5          So I guess certain kind of strokes
6    acutely can cause some discomfort if they're
7    near the parts of the brain that have pain
8    fibers, but the lining of the brain.  But again,
9    bleeding strokes sometimes do have, you know,
10   extreme headaches with them.  Ischemic ones tend
11   not to.
12       Q.    What about an ischemic stroke later,
13   could you have headaches or recurring headaches
14   because you had an ischemic stroke?
15          MS. DAVIS:  Objection to form.
16       A.    Well, I won't say that anything is not
17   possible.  I would say that's certainly not very
18   common, and I have not seen patients with
19   ischemic strokes that have chronic headaches.
20   BY MR. NIEMEYER:
21       Q.    And do subsequent complications of
22   ischemic stroke include dementia?
23          MS. DAVIS:  Objection to form.
24       A.    You can get specific cognitive
25   changes.  We often don't refer to those specific


00029
1    changes as dementia.  Dementia we usually refer
2    to as a more global process.
3          Now, it turns out that there is
4    probably a form of dementia that can occur with
5    many, many, many, many, many strokes.  That case
6    that I talked to you about earlier, the person
7    with atrial fibrillation who wasn't treated who
8    we did autopsies on and found 40 percent of them
9    had strokes, some of them had multiple infarcts.
10   So when you have many strokes, that you begin to
11   affect the function of the brain globally, we
12   have a term called multi-infarct dementia.
13          But typically we don't use the term
14   dementia for a single stroke.  We refer to the
15   specific cognitive impairments that that stroke
16   caused, and usually those are apparent at the
17   outset, and they can actually -- any of these
18   things, paralysis or anything, can get better
19   over time because of the plasticity of the
20   brain.  But dementia is not a term that we
21   usually use to refer to it.  We usually
22   discretely describe the deficit that's caused by
23   the stroke.  Dementia tends to imply a more
24   global function with a chronicity and a
25   progression to it.


00030

```
 1        Q.     Tell me about some of the specific
 2   deficits that you're talking about, what you
 3   might see as a result of an ischemic stroke.
 4        A.     So we talked about some of them.
 5   Paralysis, can't use your left arm, can't use
 6   your right arm.  Slurred speech.  Those are --
 7   expressive aphasia, you can't understand things,
 8   you can't remember things.  But again, it all
 9   depends on which part of the brain is affected.
10   And any part of the brain can be affected.
11              So as a neurologist carefully describe
12   what the deficits are in a -- often using some
13   very fancy terms for it, like aphasia, but it
14   can be any number of discrete deficits.
15        Q.     And the process of an ischemic stroke,
16   by definition does that mean that there is some
17   portion of the brain that is killed or dead
18   or --
19              MS. DAVIS:  Objection to form.
20        A.     Yes, both a heart attack and a stroke
21   are -- in the brain and the heart are tissues
22   that -- unlike some other tissues where you can
23   do just fine without a little piece of your
24   liver, you can do just fine without a little
25   piece of a kidney because the rest of it does
```

00031
```
 1   the job just as well as that part, the brain has
 2   specific functions, and so what happens is that
 3   if there's not enough oxygen for a period of
 4   time, the cells in that -- some of the cells in
 5   that area can die.  And then there's an outer --
 6   an outer zone where there's swelling and where
 7   you get a little -- they don't function quite as
 8   well, and that comes back.
 9              But in the core, in the area where
10   there is lack of oxygen, some of those cells
11   die.  Two things can happen; the cells can
12   regenerate, certain types of cells in the brain
13   can regenerate, others can't, and then other
14   parts of the brain can take over those function.
15   But the pathology of the process is that some of
16   the cells downstream to the blockage die or
17   become extremely dysfunctional.
18        Q.     I think you just said that this, but
19   some of those do not have the potential to come
20   back to life, they remain dead?
21        A.     That's correct.
22        Q.     Now, in the situation of a myocardial
23   infarction, first if you would describe for us
24   how a myocardial infarction occurs -- you know
```

USCA5 669

```
25     what?  Let me strike that.
```

00032
```
 1             Are all myocardial infarctions related
 2     to a thromboembolism?
 3        A.    So I would have to say no.
 4        Q.    Okay.  Great.  I'll stop you there and
 5     say, tell us, if you would, how an MI,
 6     myocardial infarction, occurs when it's related
 7     to a thromboembolism.
 8        A.    Okay.  Because there's a few
 9     congenital situations where an artery can be
10     compressed by the heart muscle or something like
11     that that's not in that category.
12             But the ones that are caused by a
13     thromboembolism, by far and away, even more than
14     in the brain, the vast majority of all heart
15     attacks are caused by progressive
16     atherosclerosis in the arteries of the heart,
17     meaning that there's buildup of fat on certain
18     of the larger arteries that supply the heart.
19     And it's not a symmetrical -- often not a
20     symmetrical buildup.
21             The artery itself -- another key
22     feature of that atherosclerotic process is
23     throughout the whole system, the inside lining,
24     the lining of the heart has several functions,
25     and one of its functions is to prevent clots
```

00033
```
 1     from forming.  And because there's always this
 2     balance between clot formation and clot
 3     dissolving in our system -- we want to form
 4     clots when we need to when we have a cut, we
 5     want to dissolve them when we don't want them to
 6     form.
 7             The inside lining in a patient that
 8     has a lot of risk factors will become
 9     dysfunctional in a number of ways, one of them
10     being this ability to prevent clots from
11     forming, one of them being the ability to
12     prevent fat from sneaking through the artery
13     wall, and also in our ability to regulate the
14     artery.  This applies to stroke, too.
15             But the main cause of a thromboembolic
16     stroke -- I'm sorry, heart attack, the main
17     cause of a heart attack is that a plaque
18     buildup, a fatty buildup causes instability, a
19     crack forms, blood clot forms there.  The blood
20     clot might not grow, in which case the plaque
```

USCA5 670

```
21     just gets a little bit bigger, and maybe that
22     person starts getting a little chest pain when
23     they climb stairs but it's not a complete
24     occlusion, or it may grow to cause a blood clot.
25     It is possible that blood clots can form, really
```

00034
```
 1     it's more extreme patients with clotting
 2     abnormalities, in other places, and for some
 3     reason it's just less -- the embolic events, the
 4     blood clots coming from somewhere else and
 5     finding their way into the coronary circulation
 6     seem to be less of a common event than, say,
 7     than for a stroke.  But the vast majority of
 8     them are caused by what we would call an
 9     in situ, in the artery itself, formation of a
10     clot.
11         Q.    And for those MIs that are in some
12     form symptomatic, what are the residual, or the
13     sequelae, that you see potentially in a heart
14     attack?
15         A.    Okay.  So again, we can have the full
16     range from 0 to death, no sequelae to death.
17     And we do have silent heart attacks that people
18     don't notice.  We have heart attacks that people
19     thought were indigestion, and they don't go into
20     the doctor.  But then we see it when we do an
21     echo or we do an EKG, we see a heart attack
22     occurred.  And the sequelae of those -- of a
23     smaller event are really inconsequential.
24             The other extreme is a heart attack
25     that causes so much damage to the heart that the
```

00035
```
 1     heart either stops pumping or it causes a fatal
 2     abnormal heart rhythm which essentially causes
 3     the heart to stop pumping and the patient
 4     collapses and dies.
 5             And in the middle are people that have
 6     damage to the heart muscle.  There can be some
 7     compensation by other parts of the heart, but
 8     there can be functional limitations to that
 9     heart muscle which could be minimal to severe.
10         Q.    And if you have moderate to severe
11     limitations of your heart, how does that
12     manifest itself in your day-to-day activities?
13             MS. DAVIS:  Objection to form.
14         A.    So if you have moderate to severe
15     damage to the heart muscle, which could be the
16     consequences of a massive heart attack, you
```

17  could feel that in a number of ways.  The
18  ability for you to increase your delivery of
19  blood when you need to exercise can be limited,
20  so you can feel tired or feel short of breath
21  when you try to exert yourself.  If it becomes
22  quite extreme, you can begin to even have those
23  symptoms with minimal activity, or even at rest.
24  And in some cases it causes fluid buildup in the
25  lungs, we call that heart failure.  It can cause

00036
 1  fluid buildup in the legs.
 2          So for a severe damage to the heart
 3  muscle, you can begin to have both functional
 4  limitations, particularly when you try to do
 5  things, and symptoms and signs like swelling of
 6  your feet.
 7      Q.    Now, in any of your patients, have you
 8  diagnosed a paradoxical embolism?
 9      A.    I will tell you that I don't know that
10  I can recall a heart attack case.  There's an
11  awful lot of heart attacks that was caused by a
12  paradoxical embolus.  I've seen the occasional
13  stroke case that we made some inferences about
14  the paradoxical inference -- paradoxical
15  embolus.  But it's -- for whatever reason it
16  just seems to be a rarer event.
17      Q.    I'm sorry, somewhere in there did you
18  say that you have treated patients for whom you
19  have diagnosed a paradoxical embolism in the
20  stroke context?
21      A.    So I don't recall specifics, but I do
22  recall searching for a possible one, it's
23  usually negative, but we've had cases where
24  someone has had a stroke event and there was no
25  explanation for it, and they happened to have a

00037
 1  patent foramen ovale, so we listed that as a
 2  possible explanation.
 3      Q.    So you have listed paradoxical
 4  embolism as a possible explanation for some of
 5  your stroke patients?
 6      A.    Yes.  And usually when we do, we list
 7  it as one of several possible limitation --
 8  possible explanation.
 9      Q.    Now, have you ever had a female
10  patient who has had an ischemic stroke or a
11  myocardial infarction who has also been taking
12  combined oral contraceptives at the same time?

```
13        A.    So I certainly have had females that
14   have been on replacement hormones, which is a
15   different ball game, in the older category.  My
16   practice tends to be older patients.  I can't
17   recall a time when a heart attack or a stroke
18   occurred in a young female, but I can't rule out
19   the possibility that at some point during my
20   career that could have occurred.
21        Q.    And if that did occur or would have
22   occurred, would you have advised that female
23   patient to discontinue the combined oral
24   contraceptive if she had an ischemic stroke or a
25   myocardial infarction?
```

00038
```
 1             MS. DAVIS:  Objection to form.
 2        A.    So again, I don't remember any
 3   specific patients, but that decision would be a
 4   much more complex one.  It would most logically
 5   involve a primary care doctor and/or a
 6   gynecologist, because in any patient there are
 7   risks and benefits, and there are some patients,
 8   for whatever reason, it's important for them not
 9   to become pregnant and there may be risks
10   associated with that.  And so that decision has
11   to weigh all those balancing effects.
12             So it's not likely that I would have
13   been the sole person responsible for a decision
14   about oral contraceptives following a
15   cardiovascular event.
16   BY MR. NIEMEYER:
17        Q.    Do you agree that that's something
18   that the person's treating team should consider,
19   whether or not to advise a patient who is on
20   combined oral contraceptives to discontinue
21   those in the situation where there's been an
22   ischemic stroke or an MI?
23             MS. DAVIS:  Objection to form.
24        A.    So I would agree that the combined
25   team, and typically there's one person that
```

00039
```
 1   would take a lead on certain decisions, that we
 2   would consider any and all factors, and do a
 3   risk/benefit analysis for any of those type of
 4   decisions.
 5   BY MR. NIEMEYER:
 6        Q.    Would you say that more than half of
 7   the patient population that you treat is over
 8   the age of 65?
```

USCA5 673

```
 9        A.    I would say that's fair.  I mean the
10   cardiovascular disease, we have been fortunate
11   enough to delay to much older times, although I
12   do -- I run a preventive cardiology program so I
13   see a lot of people with risk factors before
14   they have heart disease.  I would say that
15   that's probably typical of most cardiologists'
16   practices, that -- I can't give you exact
17   proportion, but a significant portion of them
18   are over 65.
19        Q.    Would you agree that
20   thrombotic-related disease is the number one
21   cause of mortality in the western world?
22             MS. DAVIS:  Objection to form.
23        A.    I'm just -- just to clarify,
24   thrombotic disease, we would include stroke,
25   myocardial infarction, cardiovascular -- sudden
```

00040
```
 1   cardiovascular death, as a good number of those
 2   are caused by thrombotic events.  I would say
 3   that in the western world it is the -- combined,
 4   those are the major category of cause of death.
 5   BY MR. NIEMEYER:
 6        Q.    Okay.  Now, does the risk of ATE
 7   increase with Yasmin or Yaz use?
 8             MS. DAVIS:  Objection to form.
 9        A.    So whenever we talk about risk we
10   always have to talk about relative to what.  And
11   so I think we probably should be clear about
12   what we're talking about, what is the comparison
13   group.
14   BY MR. NIEMEYER:
15        Q.    And so I'm saying generally or versus
16   non-users, would you -- does the risk of ATE
17   increase with Yaz or Yasmin use?
18        A.    I think that, as we're aware, with all
19   exogenous hormones, there is an increased risk
20   in arterial events compared to non-use.
21        Q.    And what is the numerical value or
22   range of the increase in risk for Yaz and Yasmin
23   users and arterial thrombotic events versus
24   non-users?
25             MS. DAVIS:  Objection to form.
```

00041
```
 1        A.    So for ATE?
 2   BY MR. NIEMEYER:
 3        Q.    Yes, sir.
 4        A.    So there's really not much good data
```

```
 5      that gives us a precise quantitative estimate.
 6      There's very few studies that have compared Yaz
 7      and Yasmin to non-use, so the estimates that we
 8      have are quite unstable and uncertain.  They
 9      appear to be comparable, or perhaps even a
10      little less based on some of the literature than
11      some of the other OCs when you look at
12      comparisons with non-use, but there really is
13      very limited data to give you a precise
14      estimate.
15         Q.    What about -- what if we expand it to
16      all combined oral contraceptives currently
17      available, are you able to quantify it then,
18      that is the increased risk of ATE?
19         A.    Currently available, I would say that
20      we would have to give a range.  But the data
21      might suggest a range somewhere between, say,
22      1-and-a-half-fold and 3-fold, somewhere in that
23      range of relative risk.  There's -- it's really
24      almost impossible to give a precise number given
25      the very few numbers of events in the studies.
```

```
00042
 1               If you look at all current, I'm just
 2      trying to wrack my brain now because I hadn't
 3      reviewed the entirety of the literature on the
 4      currently available ones, because some of the
 5      literature is colored by data, in my mind, data
 6      that goes back to '60s, '70s and '80s when we
 7      began to see them and we began to realize that
 8      there was some excess risk of VTE and ATE for
 9      all female hormones that are taken exogenously.
10      When we look -- so it's a little bit hard for me
11      to take some of those older studies.
12               And then as the epidemiology evolves
13      over the decades, it includes -- it begins to
14      include some of the current ones, but also
15      includes some of the older ones.  Some of the
16      older ones with a higher estrogen use had a
17      higher risk.  So I have to give you answer in
18      sort of a broad range.
19               I'm familiar with one study that's in
20      our package that does some comparison, and the
21      ranges are from below 1-fold, I believe it might
22      be worth even just taking a look at that paper,
23      up to 2 or 3-fold risk when you're looking at
24      some of the individual risks compared to
25      non-use.  But again, it's only one study and
```

00043

Case 2:14-md-02592-EEF-MBN Document 5127-12 SEALED Filed 01/20/17 Page 25 of 130

1  some of those categories are relatively small
2  numbers.  So there's some degree of uncertainty
3  with the current ones.
4       Q.    We may pull that out a little bit
5  later.  But with all the qualifications you
6  gave, it's your estimate that the range of
7  increase is roughly between 1.5-fold to 3-fold?
8       A.    I might even actually -- if I might
9  be -- as I think about it, if we're talking
10  about the confidence bounds, it would be
11  somewhere between 1 and 3 is the range that we
12  see for -- in that one particular study, that we
13  see for a number of the currently used oral
14  contraceptives.
15       Q.    And does the risk of ATE increase with
16  age?
17       A.    Yes.  It's one of the most potent risk
18  factors.
19       Q.    And are you able to explain to the
20  jury at what levels the risk of ATE is thought
21  to increase with age?
22            MS. DAVIS:  Objection to form.
23       A.    So the risk -- age is the most potent
24  risk factor in and of itself, and the risk is a
25  non-linear risk.  The risk is very low in 20 and


00044
1  30 somethings, and as we talked about, rises to
2  a much more common event in people's seventh,
3  eighth, ninth decade.  And that rise in risk is
4  a non-linear one.  But it is largely dependent
5  on the accumulation of the major cardiovascular
6  risk factors that we know today are the big
7  contributors, like smoking, dyslipidemia, high
8  cholesterol, high blood pressure, obesity,
9  physical inactivity, certain aspects of diet.
10  And as we get older, we accumulate these risk
11  factors, and the atherosclerotic process
12  accelerates to the point where events begin to
13  be occurring.
14            Now, we've had a big impact on that
15  age-adjusted incidence and mortality rates
16  for -- but we either -- the word we use is
17  cardiovascular disease, but a closely related
18  term would -- I think we're using a similar
19  term, cardiovascular disease rates.  But they
20  rise rapidly decade by decade, particularly in
21  the later decades, but it's highly dependent on
22  the presence of -- the risk factor profile of
23  the individual.
24  BY MR. NIEMEYER:

Case 2:14-md-02592-EEF-MBN Document 5127-12 SEALED Filed 01/20/17 Page 26 of 130

25          Q.    But even that aside, as you mentioned,


00045
 1    it's -- the most potent risk factor for ATE or
 2    cardiovascular disease is age?
 3          A.    Yes.
 4          Q.    Now, what is pathogenesis?
 5          A.    So pathogenesis?
 6          Q.    Okay.
 7          A.    There's some people, there's
 8    variations on that.
 9                Pathogenesis is just the process of an
10    abnormal -- a pathologic process is an abnormal
11    process.  So pathogenesis is a -- the process of
12    an abnormal disease.  The course, the
13    progression of an abnormal disease process is
14    what we call pathogenesis.
15          Q.    Okay.  Great.
16                So does the pathogenesis of VTE
17    overlap in any fashion with the pathogenesis of
18    ATE?
19                MS. DAVIS:  Objection to form.
20          A.    They are really very, very different
21    processes.  And that's illustrated by the --
22    first, by the fact that, as I told you, we're
23    having great success, and so the trends are that
24    ATE rates are falling.  And particularly if we
25    adjust for age, you have to take that into


00046
 1    account because the population is getting older.
 2    But if we adjust for age, the rates of ATE are
 3    falling, the rates of VTE are climbing.  So it's
 4    quite clear that they are two distinct
 5    processes.
 6                Any one of us under certain
 7    circumstances in a very short time frame could
 8    develop a VTE.  If we were on a long plane ride
 9    to China, a normal person could develop a VTE in
10    a matter of hours.  ATE typically take years to
11    decades to develop, so they really are very
12    distinct pathologic processes.  There are some
13    overlapping risk factors, but the pathogenesis
14    of those two processes are actually quite
15    distinct.
16          Q.    And are you testifying, then, that
17    there is no overlap in the pathogenesis between
18    VTE and ATE?
19                MS. DAVIS:  Objection to form.
20          A.    So it's going to hinge on what you

```
21    think about overlap.  They have two very
22    distinct pathogenic processes.  And I can pick
23    other diseases that are distinct pathogenic
24    processes, but there are certain aspects of
25    similarity, too.  So I'm not sure what you mean
```

00047
```
 1    by overlap.  If you mean that -- part of the
 2    pathogenic process is we think about factors of
 3    risk, so there's some overlap in the risk
 4    factors, like obesity is a risk factor for both.
 5    But the pathogenesis usually refers to the
 6    biologic steps that happen along the pathway.
 7    They are very, very distinct biologic processes.
 8         Q.    As far as risk factors, would you
 9    agree that taking combined oral contraceptives
10    is a risk factor for both VTE and ATE?
11         A.    I would, although what we don't know
12    is how they impact the pathobiology.  I mean I
13    think it's quite possible that it may affect the
14    venous system and the venous thrombus very, very
15    differently than what's going on in the artery,
16    and we just don't know.
17         Q.    Okay.
18         A.    But we know that smoking and obesity
19    and exogenous hormones of all kinds are risk
20    factors in these two distinct processes.  But
21    smoking is a risk factor for lung cancer, that
22    doesn't make the pathogenesis of lung cancer
23    anything like the pathogenesis of a heart
24    attack.
25              MR. NIEMEYER:  I move to strike the
```

00048
```
 1    non-responsive portion of your answer.
 2    BY MR. NIEMEYER:
 3         Q.    Let me ask you this.
 4              Are there therapies that can be
 5    beneficial in the situations of both VTE and
 6    ATE?
 7         A.    The general way we treat these two
 8    disease is quite distinct.  There are
 9    medications that have -- that can have some
10    effect in both, but in general certain
11    medications tend to be much, much better for
12    arterial events like aspirin and antiplatelet
13    drugs, much less effect, although they're not
14    without total effect on the venous side, and
15    blood thinners, coumadin, and some of the newer
16    blood thinners are very effective on the venous
```

USCA5 678

17     side, but much less effective on the arterial
18     side.
19         Q.     But in some instance might you see
20     blood thinners used to treat an ATE?
21         A.     Yes, yes.  Because as we talked about,
22     there are some -- an ATE, a stroke caused by
23     atrial fibrillation is treated by coumadin to
24     prevent a blood clot forming on the artery wall.
25     So that's an ATE, a stroke, that was treated by


00049
 1     coumadin because the main pathogenesis of that
 2     kind of a stroke was due to a blood clot formed
 3     in the artery wall, because the wall doesn't
 4     beat properly, and blood clots can form on the
 5     wall, just like we would use coumadin in a clot
 6     that forms in the venous side.
 7                 So we can use the medications the
 8     same, but the general pathobiology is very
 9     different, and the general treatment,
10     particularly of the atherosclerotic type and the
11     venous type, are actually quite distinct.
12         Q.     Do you agree that a combination of
13     clotting disorders and external risk factors
14     increases risk more than either factor might
15     alone?
16                 MS. DAVIS:  Objection to form.
17         A.     So I'm not sure what you mean.  Having
18     more than one risk factor increases the risk
19     than having more than one, I'm not -- I'm not
20     sure there's any data that suggests there's a
21     synergistic effect to those.  But if you have
22     one, two, three, four risk factors, you have
23     more risks than if you have any one of them
24     alone.
25         Q.     Are you familiar with any studies that


00050
 1     have been conducted that do find a synergistic
 2     effect when there is more than one risk factor
 3     present?
 4         A.     Largely from a clinical perspective on
 5     the atherosclerosis side where I do a lot of my
 6     research, the risk factors are independent and
 7     additive, and they're not multiplicative.
 8     That's the typical -- the typical modeling that
 9     we do for risk factors strongly suggest that our
10     risk factors are additive and they're not,
11     generally speaking, synergistic.
12         Q.     And my question to you, though, was,

USCA5 679

13    are you aware, though, of other researchers who
14    have found that the combination of risk factors
15    does operate in a synergistic way?
16        A.    Well, you know, when we consider a
17    totality of evidence, we often consider the full
18    range, and you can look at -- you can find
19    studies that suggest that cholesterol doesn't
20    cause heart attack.  So I could find many -- if
21    I look at the totality of evidence that says
22    cholesterol causes heart attacks, I may find --
23    I can find articles when I'm doing a review,
24    when I'm looking at thousands or articles, I
25    might find one that says it doesn't cause.  I

00051
1    actually might even find a few that says that
2    cholesterol is protective.  There's actually a
3    few studies that say that.  The totality of the
4    evidence says the other thing.
5            So you can find research on just about
6    anything in a particular field.  The important
7    thing as a cardiologist for clinical purposes
8    and as an epidemiologist for research purposes,
9    we look at the totality of the evidence.  And
10    generally speaking, I'll stand by my answer,
11    that risk factors are additive.  The evidence of
12    synergistic effects for most risk factors is
13    certainly not certain in any way.
14        Q.    And so my specific question, though,
15    to you was, are you aware of the existence of
16    research or studies that states that a
17    combination of risk factors acting together has
18    a synergistic effect on ATE risk?
19            MS. DAVIS:  Objection.  Asked and
20    answered.
21        A.    I couldn't recall any specific ones,
22    but I'm sure that there are -- there is
23    literature out there that suggests that.  I
24    don't put a lot of stock in what that literature
25    says.

00052
1    BY MR. NIEMEYER:
2        Q.    Okay.  If you would, just -- strike
3    that.
4            I take it in the course of your
5    practice that you prescribe many medications?
6        A.    Yes, sir.
7        Q.    Okay.  And it's probably easiest if
8    you would just give me the general categories of

USCA5 680

```
 9    medications you prescribe.
10         A.    Well, I'm not sure I could give you an
11    all-inclusive, complete one.  I can give you
12    some categories that I prescribe fairly
13    commonly.  But in the course of my practice, I
14    have a preventive cardiology practice, but I
15    also attend on medicine wards as a general
16    internist.  So I mean I can be -- when I'm on
17    the wards, I can be giving cancer
18    chemotherapeutics, I can be giving drugs for
19    HIV, I can be giving drugs for pneumonia,
20    common -- other medicines to treat very common
21    diseases.  I know I use more commonly bloods for
22    -- medications for high blood pressure,
23    medications for high cholesterol, medications
24    for diabetes, medications for heart failure,
25    medications for kidney disease, lots of
```

```
00053
 1    medications for lung disease, particularly
 2    chronic lung disease like emphysema, COPD,
 3    medications for asthma, medications for urinary
 4    tract infections, medications for back pain, a
 5    very common mistake -- common complaint.  I mean
 6    the list is rather expansive.
 7         Q.    Let me stop you there.
 8               For each medication you prescribe, do
 9    you conduct independent research about the
10    risk/benefit profile of the drug?
11               MS. DAVIS:  Objection to form.
12         A.    What do you mean by "independent
13    research"?
14    BY MR. NIEMEYER:
15         Q.    I mean do you -- I don't mean do you
16    conduct a study on it, but I mean do you look
17    outside of the provided package insert and
18    label?
19         A.    I would say, generally speaking, the
20    use of all the drugs that we use -- that I use,
21    I think that most of us use, we use in the
22    context of a combination of research, clinical
23    experience, training as a resident or fellow,
24    conferences, experience with other providers.
25    So for the vast majority of medications we get
```

```
00054
 1    information from multiple sources.  I would say
 2    that it's unusual for me to prescribe a medicine
 3    without having received information from
 4    multiple sources.
```

USCA5 681

Case 2:14-md-02592-EEF-MBN   Document 5127-12 - SEALED   Filed 01/20/17   Page 31 of 130

```
 5        Q.    And one of those sources is the drug's
 6   label, correct?
 7        A.    Yes.
 8        Q.    And one of those sources is also other
 9   materials provided to you by the drug
10   manufacturer?
11        A.    I don't interact with drug
12   manufacturers very much.  I mean our hospital
13   has some fairly restrictive rules, so I would
14   say that that's -- throughout my history, of
15   course, you know, information has been provided.
16   It's not a very common source of information.
17        Q.    Would you fault a cardiologist for
18   prescribing a particular medication if that
19   cardiologist relied upon only the cardiologist's
20   prior training, the history and presentation of
21   the patient, and the information provided in the
22   medication's product labeling?
23             MS. DAVIS:  Objection to form.
24        A.    I would be surprised if there weren't
25   a few other things on the list, like his
```

```
00055
 1   clinical experience over the decades that he's
 2   worked.  We understand a lot of these
 3   medications or treatments or lifestyle
 4   recommendations in a context.  And so a new drug
 5   that comes on the market, I already know an
 6   enormous amount of context.  It might be a drug
 7   in a class that's similar to another drug.
 8             So there's going to be a wealth of
 9   information at my disposal, having practiced for
10   28 years, a wealth of information at my disposal
11   to understand the context of a particular
12   decision around a medication.  Decisions for a
13   medication -- the particulars in the package
14   insert are, I would say, in most cases are a
15   small component of all the decision-making that
16   has to go into making a particular decision.
17   BY MR. NIEMEYER:
18        Q.    Okay.  My specific question, and I
19   think you might have described to us the way you
20   practice, would you be critical, though, of a
21   different cardiologist who relied upon his or
22   her clinical experience, training, the
23   information that they have about the patient
24   history and presentation, and the product
25   labeling provided by the manufacturer as his
```

USCA5 682

1    sole basis for decision-making of whether or not
2    to prescribe a drug?
3              MS. DAVIS:  Objection to form.
4         A.    I wouldn't at all.  I mean I would
5    think that that would -- that -- what you
6    described on those four fingers is an enormous
7    amount of information.  If you include in his
8    clinical experience the interactions with
9    colleagues, and training that he goes to
10   throughout the course of his -- that's an
11   enormous amount of information that you've
12   described.  I wouldn't fault anybody for using
13   that totality of evidence for making a decision.
14   BY MR. NIEMEYER:
15        Q.    Then let me ask you this.
16              From the perspective of a physician
17   who prescribes medications, what do you expect
18   the manufacturer's responsibility to be for
19   communicating safety information to doctors
20   about their products?
21             MS. DAVIS:  Objection to form.
22        A.    Well, I mean that's a highly regulated
23   construct.  I mean, and all of us physicians
24   understand the context that a drug comes to
25   market with that requires, under the supervision

00057
1    of the FDA, requires a large amount of testing
2    and understanding of efficacy, and understanding
3    of the risk profile, and agreed-upon language.
4              And then, you know, because we are
5    required to maintain competence on a continual
6    basis for our board certification, we are
7    constantly reviewing the literature on things
8    that are coming up, particularly in our field.
9    I'll see papers about studies that happened
10   before the drug comes out.  So when a drug comes
11   out I already have a background, not only in
12   general about the class or the clinical
13   situation, but also about the drug specifically.
14             And in that regulated context, I think
15   that the information -- I do put the information
16   that I get in -- that has been provided to me in
17   that general context, I think it's a reasonable
18   process.
19        Q.    Are you an expert in drug labeling?
20        A.    No, sir.
21        Q.    And would you agree that -- would you
22   expect a manufacturer who has knowledge about
23   risks that their products can cause should make
24   every effort to communicate those risks to

USCA5 683

25     physicians?


00058
 1             MS. DAVIS:  Objection to form.
 2        A.    So I think that the -- I think that
 3   the drug companies should follow all of their
 4   regulatory requirements to fulfill their
 5   obligations to provide the information that we
 6   clinicians need.  I think they should follow the
 7   rules and regulations set forth to the FDA -- by
 8   the FDA.
 9   BY MR. NIEMEYER:
10        Q.    And if the FDA rules allow them to
11   submit information for labeling that describes
12   risks that they -- that the manufacturer
13   believes are present, would you agree that they
14   should then communicate that to the FDA and to
15   the physicians?
16             MS. DAVIS:  Objection to form.
17        A.    So I mean I think that's the
18   understanding, is that they should follow the
19   rules of the process.  And if it turns out that
20   people violate laws, that's not a good thing.
21   And if it turns out they're following the
22   regulations, that's what they're obliged to do.
23             And there is a dialogue that goes on
24   with the FDA.  I think we're fortunate in this
25   country that we have a rigorous oversight


00059
 1   process that's in place, and I rely on the FDA
 2   to oversee that process.
 3   BY MR. NIEMEYER:
 4        Q.    Have you seen the studies or papers
 5   that talk about the fact that the FDA is
 6   understaffed and not able to vigorously and
 7   rigorously monitor drug applications and drug
 8   safety?
 9             MS. DAVIS:  Objection to form.
10        A.    I've seen -- I've seen numbers of
11   reports about -- over my lifetime about how good
12   and how bad the FDA and any other federal agency
13   do their jobs.
14   BY MR. NIEMEYER:
15        Q.    Okay.  Let me ask you, you have
16   testified in a number of other litigations on
17   behalf of drug manufacturers, correct?
18        A.    A few.
19        Q.    And, in fact, you were paid by Merck
20   over $100,000 for your work and testimony in the

```
21   Vioxx litigation, is that correct?
22        A.    I don't recall the precise amount.  I
23   worked for them in understanding the literature
24   for about four or five years, and I don't
25   remember the precise total, but I would guess
```

00060
```
 1   that it would be over $100,000.
 2        Q.    And in that litigation, you gave at
 3   least two depositions and testified at trial,
 4   correct?
 5        A.    Yes, sir.  I testified at one trial.
 6        Q.    In the Vioxx litigation, the adverse
 7   event -- the Vioxx litigation involved
 8   cardiovascular adverse events, correct?
 9        A.    Yes, sir, in the case for trial it was
10   a myocardial infarction.
11        Q.    And, in fact, you testified on behalf
12   of Merck in the Vioxx litigation that, quote,
13   "no reasonable epidemiologist or clinician that
14   has looked at all the data would come to the
15   conclusion that Vioxx causes cardiovascular
16   events."
17             MS. DAVIS:  Objection to form.
18   BY MR. NIEMEYER:
19        Q.    Is that correct?
20        A.    So I mean if you want to have a more
21   detailed discussion, there's a statement taken
22   out of context.  But my --
23        Q.    Did you testify to that?
24        A.    I don't recall the precise words, but
25   I'd be happy to look at that statement within
```

00061
```
 1   its context and discuss with you my particular
 2   testimony.
 3        Q.    Okay.  Ultimately Vioxx was subject to
 4   a voluntary recall and taken off the market,
 5   correct?
 6             MS. DAVIS:  Objection to form.
 7        A.    Yes, I believe it was.  Yes.
 8   BY MR. NIEMEYER:
 9        Q.    And then Nutraquest, the manufacturer
10   of ephedra, paid you for your consultation and
11   testimony in the ephedra litigation, is that
12   correct?
13             MS. DAVIS:  Objection to form.
14        A.    Yes.  I actually don't even remember
15   the name of the company, but I did testify about
16   ephedra.
```

17   BY MR. NIEMEYER:
18        Q.    And in that litigation back in the
19   early 2000s, you testified in a hearing or trial
20   setting, and also gave a two-day deposition, is
21   that right?
22        A.    Yes, it was a hearing before a judge.
23        Q.    And I take it that you're not sure
24   what you were paid by Nutraquest for ephedra,
25   but you were paid for your work?


00062
 1        A.    Yes, sir.
 2        Q.    And again, in that litigation, the
 3   adverse event was cardiovascular events,
 4   correct?
 5        A.    Yes, I believe it might have been
 6   sudden death or something to that nature, but I
 7   don't recall precisely.
 8        Q.    But related to the cardiovascular
 9   system?
10        A.    Well, a good number of sudden deaths,
11   again I don't recall completely, can be caused
12   by cardiovascular causes, although it's not the
13   only cause.
14        Q.    In that litigation where you were
15   hired by Nutraquest, did you testify that,
16   quote, "it's my opinion that the totality of
17   evidence does not support a relationship between
18   ephedra intake and serious cardiac events?
19              MS. DAVIS:  Objection to form.
20        A.    So, again, I don't recall the
21   specifics.  I'd be happy to look at the context
22   of that testimony.
23              My recollection is that I do not
24   recall that the data supported a definitive
25   relationship between ephedra and cardiovascular


00063
 1   events.
 2              (Whereupon, Gaziano Exhibit Number 1,
 3              Copy of 4/1/05 Nutraquest trial
 4              transcript, was marked for
 5              identification.)
 6   BY MR. NIEMEYER:
 7        Q.    Doctor, I'm going to give you what's
 8   been marked as Gaziano Exhibit 1.  I'll ask you,
 9   if you would -- well, first, the first page of
10   that, it indicates it's testimony in what
11   proceeding?
12        A.    United States District Court, District

USCA5 686

```
13    of New Jersey, Nutraquest, Inc., Transcript of
14    Trial Before Honorable Garrett E. Brown, Jr..
15         Q.    Okay.  And if you would turn to
16    Page 216.
17              MR. NIEMEYER:  Counsel, that's my only
18    other copy.  Could I ask you if you wouldn't
19    mind looking on his, or going to it and looking
20    at it there and handing it back over to me?
21              MS. DAVIS:  Sure.  That's fine.
22              MR. NIEMEYER:  We can put it up on the
23    ELMO, too, and he can have his copy there.
24              MS. DAVIS:  That will be great.
25         A.    We can share, if you want.


00064
 1    BY MR. NIEMEYER:
 2         Q.    Let's go to Page 216.  And at the top
 3    of the page weren't you asked "Is it your
 4    opinion, having looked at all of the evidence,
 5    that ephedrine does not cause serious
 6    cardiovascular adverse events?"
 7              And then your answer was "Yes.  It's
 8    my opinion that the totality of it does not
 9    support a relationship between ephedra intake
10    and serious cardiac events."
11         A.    Yes.
12         Q.    And that was your opinion in that
13    case, correct?
14         A.    It was.
15         Q.    Do you still hold that opinion?
16         A.    Yes.  Well, I hold the opinion that at
17    that time -- I've not reviewed the literature on
18    ephedra since, but at that time the quality of
19    the data could not support a cause and effect
20    relationship.
21         Q.    And ephedra was subject also to a
22    voluntary recall and taken off the market,
23    correct?
24         A.    Correct.
25              MS. DAVIS:  Objection to form.


00065
 1         A.    And the FDA said they would be happy
 2    to review additional information that the
 3    manufacturer could provide, making no
 4    determination of whether or not there was
 5    definitive harm.
 6    BY MR. NIEMEYER:
 7         Q.    Isn't it true that the FDA said "based
 8    on the best available scientific data and the
```

USCA5 687

```
 9    known pharmacology of ephedrine alkaloids and
10    similar compounds, we conclude that dietary
11    supplements containing ephedra alkaloids pose
12    short-term and long-term risks"?
13              MS. DAVIS:  Objection to form.
14         A.    I'd have to look at the whole
15    document.  I'd have to look at the context.  The
16    FDA did make a -- if I recall correctly, the FDA
17    did make a statement that the company could
18    bring data regarding its safety back to them for
19    review.
20    BY MR. NIEMEYER:
21         Q.    And are you aware of whether or not
22    that was done, and what the result was?
23         A.    I have no idea.
24         Q.    Okay.
25         A.    But they wouldn't have said that if
```

00066
```
 1    they had come to some definitive conclusion.
 2         Q.    And it remains off the market today,
 3    correct?
 4         A.    I'm not aware.
 5         Q.    Okay.  Now, here in the Yaz/Yasmin
 6    litigation, it's your opinion that the totality
 7    of the evidence does not support an increased
 8    risk of VTE or ATE in Yaz or Yasmin use versus
 9    other combined oral contraceptives, correct?
10         A.    Correct.
11         Q.    But, and I think we've already talked
12    about this, you do agree that the totality of
13    evidence does support a relationship between Yaz
14    and Yasmin intake and increased risk for VTE and
15    ATE versus non-users?
16         A.    Yes, and look to all other oral
17    contraceptives.
18         Q.    So in addition to doing past work for
19    Merck, which is a pharmaceutical company, and
20    Nutraquest in the ephedra litigation, which is a
21    pharmaceutical company, you've also done
22    consulting work for the manufacturer of PPA,
23    correct?
24         A.    Yes.  I don't know if the manufacturer
25    of ephedra are a pharmaceutical company, I think
```

00067
```
 1    they may be a dietary supplement company.
 2         Q.    Fair enough.
 3              And you've done consulting work also
 4    for Santaris, who is the manufacturer of the
```

USCA5 688

```
 5   diabetes drug Cycloset, correct?
 6        A.     I did research.  I've done a research
 7   drug for them.
 8        Q.     And they paid to do that?  They paid
 9   to have you do that?
10        A.     They didn't pay me.  They paid the
11   institution.  It was a research project.  We
12   took research funds at our institution to do a
13   trial of that drug.
14        Q.     And along those lines, there has
15   been -- since 1992, you have been involved in
16   numerous funded projects, projects that are
17   either funded or somehow supported by a product
18   manufacturer, is that correct?
19               MS. DAVIS:  Objection to form.
20        A.     So numerous is in the eyes of the
21   beholder.  I've been involved in studies
22   predominantly funded by the NIH where we
23   generally got drug packaging and perhaps
24   placebos for those drugs.  In some cases they
25   provided more material support for those
```

00068
```
 1   studies.
 2   BY MR. NIEMEYER:
 3        Q.     And, in fact, some of the product
 4   manufacturers that have provided support or
 5   funding for projects that you've worked on are
 6   BASF, McNeil, Corning, Wyeth, Amgen, and Hinkle,
 7   is that correct?
 8               MS. DAVIS:  Objection to form.
 9        A.     That's correct.  I'm part of a large
10   group.  While I'm not the PI of a number of
11   those, I was involved in studies that were
12   funded by any number of sources, the vast
13   majority of which are federal support, but we do
14   get some support from industry, non-profits,
15   specialty societies, etcetera.
16   BY MR. NIEMEYER:
17        Q.     And you have never testified on behalf
18   of a plaintiff in a case against a drug
19   manufacturer or product manufacturer, is that
20   true?
21        A.     I don't believe I have.
22        Q.     Okay.
23        A.     I've never been asked.
24        Q.     Okay.  Now I want to talk to you about
25   your relationship with Bayer Pharmaceuticals.
```

```
 1   Now, Bayer makes or manufactures Yaz and Yasmin,
 2   what you're testifying about here today,
 3   correct?
 4        A.    That's correct.
 5        Q.    And Bayer also manufactures aspirin,
 6   is that correct?
 7        A.    That's correct.
 8        Q.    And Bayer hired you and has paid you
 9   $250,000 to chair the executive committee for
10   the ARRIVE trial, correct?
11        A.    Yes.  That work comprises about 10
12   years, 10 years plus now in work.
13        Q.    And they paid you $250,000 to do that,
14   right?
15              MS. DAVIS:  Objection to form.
16        A.    Over that 10 years, yes, sir.
17   BY MR. NIEMEYER:
18        Q.    In fact, they paid it over five years?
19        A.    Well, they did.  But the planning of
20   that -- they paid it in a five year fashion, but
21   the study is still going on, and the planning of
22   that took three years before that.
23        Q.    Okay.  And the purpose of the ARRIVE
24   trial was to try to determine whether aspirin
25   given to people at moderate risk will prevent
```

```
00070
 1   cardiovascular events, correct?
 2              MS. DAVIS:  Objection to form.
 3        A.    Correct.
 4   BY MR. NIEMEYER:
 5        Q.    And you say that that process is still
 6   ongoing, or have you made your determinations?
 7        A.    So the data is still blind.  I don't
 8   make determinations.  What we do is we run a
 9   study, it's actually run by an independent CRO,
10   and the data -- I'm blinded to the data at this
11   point, but that study is ongoing, and the study
12   is not yet published.
13        Q.    And why is blinding important, just in
14   a general sense, in studies?
15        A.    Well, the main reason is that it
16   limits certain types of factors that can
17   influence the result of a study, although in
18   some cases it's not possible or necessary.  When
19   it's possible, it's an advantage to not let the
20   patients know what drug they're on, not let the
21   doctors that are taking care of the patients
22   know what drug they're on if we're comparing a
23   drug to a placebo or a drug to another drug, and
24   to not let the investigators know nor the people
```

USCA5 690

25    that are handling the data.


00071
 1         Q.    When you mention factors, basically
 2    you want to blind to remove any bias or
 3    suspected bias, that's one of the reasons you do
 4    that?
 5              MS. DAVIS:  Objection to form.
 6         A.    Yes, yes.  There are -- in the sense
 7    of epidemiologic and population study, there are
 8    bias, intended or unintended, that could be
 9    introduced if people are aware of what treatment
10    procedure, device, drug, they're getting.  So if
11    you can blind that as far across a spectrum as
12    possible, that deals with some of those issues.
13    In some cases it's just not possible.
14    BY MR. NIEMEYER:
15         Q.    Okay.
16         A.    But when you can it's a helpful
17    strategy.
18         Q.    And I want to talk to you a little bit
19    more about your work on the executive committee
20    for the ARRIVE trial for Bayer.
21              On that committee, from time to time
22    you would work closely with Bayer employees from
23    their research department, correct?
24              MS. DAVIS:  Objection to form.
25         A.    I would, yes.


00072
 1    BY MR. NIEMEYER:
 2         Q.    And as you mentioned, you've been
 3    working on that project at various levels since
 4    at least 2006, correct?
 5         A.    I would say probably before that.  I
 6    would say 2004 or '5 was when a small group of
 7    investigators and myself began making the case
 8    for such a study.
 9         Q.    Okay.  And in addition to the $250,000
10    that you were paid for the ARRIVE trial, you've
11    also been paid by Bayer to speak on a number of
12    occasions over the last ten years, correct?
13              MS. DAVIS:  Object.
14    BY MR. NIEMEYER:
15         Q.    By "paid," I mean you've been given an
16    honoraria of 1 or $2,000, and then your travel
17    and expenses have been paid?
18              MS. DAVIS:  Objection to form.
19         A.    Yes.
20    BY MR. NIEMEYER:

```
21      Q.    And that includes -- or those speaking
22 engagements where Bayer paid you and paid for
23 your travel include trips to Taipei, Beijing,
24 Taiwan, and Argentina, correct?
25      A.    Yes.


00073
 1      Q.    And in addition to that, for Bayer you
 2 served on their International Aspirin Award
 3 Selection Committee from 1998 to 2009, is that
 4 correct?
 5      A.    Yes.  That was not paid.
 6      Q.    But your travel was paid, and that
 7 involved a number of trips to Europe as well as
 8 throughout the U.S., correct?
 9      A.    Yes.  Mostly Europe.
10      Q.    Mostly in Europe?
11      A.    I think most of the meetings tended to
12 be in Europe.
13      Q.    Okay.  Now let's talk about --
14 actually why don't -- is this a good time for a
15 break?  I actually could head to the restroom
16 real quick, and we can take five minutes --
17           MS. DAVIS:  Sure.
18           MR. NIEMEYER:  -- and start back up.
19           THE VIDEOGRAPHER:  Going off the
20 record.  The time is 11:37.
21           (Whereupon, a recess was taken.)
22           THE VIDEOGRAPHER:  Back on the record.
23 The time is 11:52.
24 BY MR. NIEMEYER:
25      Q.    Now, doctor, in this case, the


00074
 1 Yaz/Yasmin litigation, you have been hired by
 2 Bayer to provide them with advice and consulting
 3 and testimony, correct?
 4      A.    Yes, sir.
 5           MS. DAVIS:  Objection to form.
 6 BY MR. NIEMEYER:
 7      Q.    And you started your work specific to
 8 this litigation for Bayer in 2011, correct?
 9           MS. DAVIS:  Objection to form.
10      A.    2010.
11 BY MR. NIEMEYER:
12      Q.    2010?
13      A.    Yes.
14      Q.    Okay.  So I'm going to show you what's
15 been marked as Exhibit 2, which I only have one
16 copy of because it was just handed to me this
```

USCA5 692

```
17      morning, and so I'm going to put it up so we can
18      all look at it.
19           A.    Fine.
20                 (Whereupon, Gaziano Exhibit Number 2,
21                 Three invoices, was marked for
22                 identification.)
23           A.    Fine.
24      BY MR. NIEMEYER:
25           Q.    And we'll start with the first page,
```

```
00075
 1      and I'm going to go through, there's the second
 2      page, and then the third page.
 3                 And do these three pages of Exhibit
 4      Number 2 make up the invoices that you have to
 5      date provided to Bayer for your work in the
 6      Yaz/Yasmin litigation?
 7           A.    Yes, sir.
 8           Q.    If we go to the second page, that
 9      tells us -- if we combine the 2010 and 2011
10      work, that was the work that you had completed
11      prior to testifying in your first deposition in
12      this case, correct?
13           A.    Yes.  Prior to and around the time of.
14           Q.    Okay.  And, in fact, you did testify
15      and you have given a deposition for Bayer in
16      this case already, correct?
17           A.    Yes, sir.
18           Q.    And the amounts that you billed and
19      were paid by Bayer leading up to that point in
20      time were $27,000 in 2010, and $38,500 in 2011,
21      correct?
22           A.    Yes, sir.
23           Q.    And you bill at $500 an hour?
24           A.    Yes, sir.
25           Q.    Okay.  And then you separately billed
```

```
00076
 1      for the deposition testimony that you gave in
 2      2011, correct?
 3           A.    Correct.
 4           Q.    And that was a total of $3,000 that
 5      you billed and were paid by Bayer for that,
 6      correct?
 7                 MS. DAVIS:  Objection to form.
 8           A.    I don't know that that was paid by
 9      Bayer.  It could have been.  But I think for the
10      deposition they might have --
11      BY MR. NIEMEYER:
12           Q.    You don't know what the agreement was
```

```
13    as to who paid who?
14        A.    Correct.  Sometimes the other attorney
15    pays for the deposition time.
16        Q.    Sure.
17              Either way you were paid $3,000 for
18    the deposition?
19        A.    Yes, sir.
20        Q.    And then if we look at a bill dated
21    April 1, 2014, for that you billed two hours for
22    a literature search and one hour for meetings
23    and calls, correct?
24        A.    Yes, sir.
25        Q.    And so that's a total bill of $1,500?
```

```
00077
 1        A.    Yes, sir.
 2        Q.    Now, I don't see anywhere in these
 3    invoices the time that you spent preparing
 4    your -- the report, the second report that
 5    you've given in this case, or other meetings and
 6    consultations.  Is it true that Exhibit 2 does
 7    not contain all of the work that you will
 8    ultimately bill Bayer for?
 9        A.    That's correct.
10        Q.    And so if you would, tell us what,
11    beyond what we've looked at in Exhibit 2, what
12    other work, or what other time have you put in
13    on work for this case?
14        A.    Well, I can't give you the precise
15    hours.  We began work in late 2014, and then
16    it's -- as I'm sure -- I assume that we all work
17    in the same way, that there's intense times, I
18    tend to -- I don't have a secretary that does
19    the billing.  I do the billing, you know, after
20    certain major periods of involvement, and so the
21    writing of the report and the preparing for this
22    deposition are that kind of an event, and I will
23    bill for my total time that I've contributed to
24    the development of the report and preparation
25    for this deposition and whatever small amount of
```

```
00078
 1    work that we do in reviewing the deposition, for
 2    instance, afterwards, at some point later this
 3    year.
 4        Q.    And so at this point in time, do you
 5    -- you've kept track of your time, correct?
 6        A.    Yes.
 7        Q.    And do you know the precise amount of
 8    hours you've worked since -- during 2014 and
```

```
 9   2015, or can you at least give me an estimate of
10   the hours?
11        A.    So I don't know the precise amount of
12   time.  My guess would be it would be comparable
13   to the amount of hours that I put in in
14   developing the report and deposition in 2011 for
15   the -- maybe a little bit less, because the
16   amount of relevant literature is a little bit
17   less broad for this particular report.
18        Q.    And so obviously you're billing at
19   $500 an hour, correct?
20        A.    Yes, sir.
21        Q.    And if we look at prior, the time that
22   you spent was 54 hours plus 77 hours, which is
23   131 hours, you think roughly in the same range,
24   and that was valued at 63 -- or $65,500, roughly
25   you're going to bill them for something similar
```

00079
```
 1   to that for the work you're doing?
 2        A.    I would say probably less.  I was
 3   referring to the -- somewhere in the range of
 4   what I billed in 2011 when we were doing -- in
 5   2010 it was -- that was more compiling
 6   literature and developing an understanding.
 7   That having already been done, I don't need to
 8   do that much again.  But the development of the
 9   report and the preparation for the October
10   deposition in 2011, the work in 2011 is probably
11   comparable to the work that I'm doing now, '14
12   and '15.
13        Q.    So closer to the 35 to $40,000 range?
14        A.    I would say so.
15        Q.    And you'll bill Bayer for that in due
16   course?
17        A.    Yes, sir.
18        Q.    In 2012, the list here it says "Review
19   of records, telephone conferences, face to face
20   meetings."  What specifically were you working
21   on there, since it was after your earlier
22   deposition and before you were asked to write a
23   report for this part of the litigation?
24        A.    So I can't recall specifically.  It
25   was what tasks we were working toward in the
```

00080
```
 1   timeline, but we continued to have discussion
 2   about my interpretation of the literature, you
 3   know, on VTE.  And we may have had some
 4   discussions, but my recollection is that in 2012
```

```
 5    that we were still discussing primarily VTE.
 6        Q.    And your assignment since 2012, so in
 7    2014 and 2015 from Bayer, has focused primarily
 8    on ATE now, correct?
 9        A.    Well, I would say primarily, although
10    I won't say that we haven't had discussions
11    about VTE, and the literature continues to
12    evolve.  Actually I do recall, I'm doing a
13    supplement to the report, and I don't remember
14    the date of that, on VTE, but I think that might
15    have been late 2011, but I'm not sure.
16            But the discussion in the last --
17    there wasn't a whole lot of discussion in 2013,
18    hence no billing.  But the discussion in 2014
19    and '15 I would say was more focused on ATE.
20        Q.    Okay.  And with respect to 2014 and
21    2015, what generally did Bayer task you to do?
22        A.    So I -- my understanding with Bayer is
23    always that I do my own work to understand the
24    literature.  It was my understanding that there
25    was going to be a need for a report.  I sort of
```

```
00081
 1    work in phases where I understand the
 2    literature, then I sit down to try to understand
 3    what the tasks are.  The initial main task was
 4    writing a report on ATE, and then the next task
 5    was preparing for this deposition.
 6        Q.    And in the writing of the report for
 7    the ATE, did Bayer give you direction as to what
 8    materials to review, what materials to respond
 9    to, anything of that nature?
10        A.    So I do utilize Bayer's support
11    services.  As I say, I don't have any support
12    staff to help with this in copying and pulling
13    original reports.  I tend to work with paper
14    documents so I will request, you know, Bayer to
15    help with the assembly of the documents.  It
16    is -- I completely reserve the right to review
17    the literature that is in the documents that
18    they provide, and to do my own research, and
19    augment as I see fit.
20        Q.    At any point in time did Bayer ask you
21    to try to quantify the increased risk of ATE for
22    COC users or Yaz/Yasmin users versus non-users?
23        A.    I would say that they didn't enumerate
24    specific tasks in that way.  I mean we certainly
25    discussed in my evaluation of an effect, both
```

00082

1   pro and con, of a drug entails the comparison to
2   a placebo if there's a trial, or a non-user if
3   it's an observational study, or compared to the
4   alternatives.  But I can't say that I was
5   specifically tasked with a given chore.
6       Q.    And whether or not specifically
7   tasked, and this is a topic we talked about a
8   little bit before, even though you didn't have a
9   crystal clear memory of exact numbers, did you,
10  in fact, as part of your work do an analysis
11  that quantified or attempt to quantify the risk
12  of COCs or Yaz and Yasmin ATE risk versus
13  non-users?
14              MS. DAVIS:  Objection.
15              Are you talking about something that's
16  in his report?  Because it sounds like you're
17  kind of encroaching on the drafting process,
18  which I know there's an agreement not --
19              MR. NIEMEYER:  Right.  I don't intend
20  to encroach on the drafting process at all.  I'm
21  asking as part of the formulation of his report
22  did he do certain analyses.
23              MS. DAVIS:  Right.  But I mean are you
24  -- could you point in his report to what you're
25  specifically referring to?


00083
1               MR. NIEMEYER:  I don't think it's in
2   there.  That's my point.
3               MS. DAVIS:  Okay.
4       A.    So I think it would be helpful to know
5   exactly what you mean by "quantitative
6   analysis."  But I do a -- I've done a careful
7   analysis of the literature over the last five
8   years, since 2010.  In my prior report there is
9   some discussion of the evolution of risk of VTE
10  and ATE over the lifecycle of these drugs as
11  they came out in the '60s, I consider that
12  careful analysis.
13              If you're talking about a quantitative
14  analysis using a computer and meta-analyzing
15  data, there are some cases where I will attempt
16  to do some specific recalculation, but I have
17  done very careful analysis of the literature on
18  the topic of VTE and ATE in the various
19  generations of OCs.
20  BY MR. NIEMEYER:
21      Q.    Okay.  And I'll do my best to ask the
22  specific question that I'm trying to ask, and
23  maybe you can help me with it, too.
24              If you wished to, and you may have

25    already done this, you could look at the body of


00084
1    literature that's out there and come to
2    Dr. Gaziano's conclusion about what that rate or
3    range is of the increase in ATE risk caused by
4    taking combined oral contraceptives versus
5    non-use?  You could do that?
6             MS. DAVIS:  Objection to form.
7       A.    I mean we would have to get very, very
8    specific if you want me to come up with a
9    quantitative estimate.  There are some times --
10   I've gone through that process quantitatively.
11   There are some cases where the data are so
12   sparse that doing a quantitative estimate would
13   have great challenges.  The challenges in terms
14   of, in particular, absolute risks are quite
15   large for all these studies because they are not
16   necessarily representative of the entire group.
17            So if you're asking can I come up with
18   a quantitative estimate that's generalized all
19   people at all times, that's not possible.  I
20   have a sense, particularly where there's a
21   wealth of knowledge, of a qualitative risk for
22   ATE and VTE for OCs in general, that there seems
23   to be some evolution of that, but in many cases
24   it's very challenging to develop a precise
25   quantitative estimate when the data are quite


00085
1    sparse.  So I don't attempt to do that because I
2    think it's an exercise that will result in a
3    misrepresentation of the quality of the data.
4    So in many cases I will stay qualitative when I
5    feel that that's required of the data.
6       Q.    You're an epidemiologist, correct?
7       A.    Yes, sir.
8       Q.    All right.  And so we may be missing
9    each other a little bit here, and then again we
10   might not.
11            Have there been studies or research
12   that has put a number on the increased risk for
13   ATE caused by COC use versus non-use?
14      A.    So there have been any number of
15   studies that have provided estimates of those
16   risks.
17      Q.    And what's a meta-analysis?
18      A.    So a meta-analysis is when you take
19   results from individual studies and you combine
20   them in one of several ways; one being combining

Case 2:14-md-02592-EEF-MBN Document 5127-12 SEALED Filed 01/20/17 Page 48 of 130

21  the summary estimates, another being pulling the
22  actual data and rerunning the analysis.
23      Q.    So could you, if you wished to,
24  perform a meta-analysis on the data that puts an
25  estimate on increased risk for COC users versus

00086
 1  non-users for ATE?
 2      A.    I would have to sit down and define
 3  very specific terms on what we want to do, and
 4  the reason is because the drugs, the OCs that
 5  span the decades that they've been in use are so
 6  different in some respects that coming up with a
 7  combined single estimate by meta-analyzing all
 8  of the data would be quite a challenge, and in
 9  some cases might be inappropriate.  You have to
10  do a meta-analysis with a very specific goal in
11  mind with very specific parameters.
12      Q.    It's something you haven't done,
13  correct?
14      A.    Correct.
15      Q.    And if we -- instead of putting the
16  term COCs in there, if I asked you the same
17  question and we inserted Yaz and Yasmin, would
18  you be able to do that type of a study,
19  estimate, meta-analysis, whatever it might be,
20  and let us know what you think the estimate is
21  of what taking Yaz or Yasmin does to your ATE
22  risk versus non-users?
23          MS. DAVIS:  Objection to form.
24      A.    No.  I think that that would be a
25  useless exercise, and the main reason is because

00087
 1  as far as I recall, there's maybe one study of
 2  size that does that -- makes that comparison for
 3  us.  I'd have to go back and look at whether or
 4  not there are incidence estimates.
 5          But when the number of studies are so
 6  small that you can interpret them, you know,
 7  individually on their face value, there's not a
 8  utility, you don't gain anything else by doing a
 9  meta-analysis, especially when -- if one of them
10  is particularly large it's going to dominate the
11  effect of the meta-analysis.  There's so few
12  studies, right now I can recall one that
13  provides an estimate, so meta-analyzing one
14  study would give you the same result.
15  BY MR. NIEMEYER:
16      Q.    What about if we switch gears a little

```
17    bit, is there data out there, has it been looked
18    at -- we talked earlier about age and its effect
19    on risk for ATE.  That was a long, rambling
20    speech, so I'm going to start the question now.
21              Are you able to, if you wished to,
22    quantify ATE risk as it relates to age?
23         A.    So there's -- in general?  ATE risk in
24    general?
25         Q.    In general, however you wanted to
```

```
00088
 1    break it down.  If you want to put, you know,
 2    age groups together and talk about the risks for
 3    age groups --
 4         A.    Are you talking about risks for Yaz
 5    and Yasmin by age group, or risks of ATE?
 6         Q.    I'm sorry, just risk of ATE vis-à-vis
 7    age.
 8              MS. DAVIS:  Objection to form.
 9         A.    Oh, yes.  It can be done and has been
10    done on a number of occasions.
11    BY MR. NIEMEYER:
12         Q.    And is that something that you've
13    reviewed in preparation for your work here today
14    and with your report?
15         A.    No.  It's something that's ingrained
16    in my understanding of the epidemiology of the
17    disease.
18         Q.    And is it so ingrained that you know
19    that -- is it so ingrained that you know the
20    specific numbers, you just know that it
21    increases over a time, and it's not a linear
22    progression, like you told us before?
23         A.    Correct.  And the other thing is that
24    it's the numbers -- the numbers are entirely
25    state-dependent, so they're dependent -- the
```

```
00089
 1    numbers in the United States are going to be
 2    very different than they are in China, the
 3    numbers in Mississippi are very different than
 4    the numbers in Massachusetts.  But they're all
 5    related to age, so if I was -- we could go find
 6    estimates that would quantify that, but it's
 7    going to be entirely, again, specific to the
 8    frame of reference.
 9         Q.    Now, as part of your work process for
10    your work in this litigation for Bayer, did you
11    speak with any of Bayer's other retained
12    experts?
```

```
13        A.    No, sir.
14        Q.    Did you talk with any Bayer employees?
15        A.    No, sir.
16        Q.    Did you review any of the reports
17   prepared by experts for Bayer?
18        A.    I don't recall reviewing any other
19   Bayer expert reports.  I believe I reviewed some
20   expert reports by the Plaintiff side, but I
21   don't believe I reviewed any other experts'
22   reports for Bayer.
23        Q.    And did you review any deposition
24   testimony of any witnesses in this litigation?
25        A.    Yes.
```

00090
```
 1        Q.    Which depositions did you review?
 2        A.    So I reviewed a number of them, I
 3   can't recall, for VTE, and I -- but I didn't
 4   review any of those, I don't believe, relevant
 5   to this.  But I did review a deposition by
 6   Gerstmann, I believe it was a recent deposition.
 7        Q.    And did you review any other
 8   deposition testimony beyond the testimony -- the
 9   recent testimony of Bud Gerstmann?
10        A.    You know, I don't recall, although I
11   might have been provided, I have about four or
12   five feet of materials, and I couldn't say for
13   certain that I didn't see them at some time, but
14   I don't recall reviewing other depositions, read
15   those pertinent to ATE.
16        Q.    Correct.
17              And so anything that you -- strike
18   that.
19              Any documents, testimony, etcetera,
20   that you reviewed in preparation for your ATE
21   report and deposition, is that included in your
22   ATE report where you list materials reviewed?
23        A.    I believe so.
24        Q.    Is there anything that you reviewed or
25   will rely upon come trial that is not included
```

00091
```
 1   in your -- in the report that you turned in,
 2   including its attachments and exhibits?
 3        A.    I don't believe -- I don't believe so
 4   specifically.  However, my understanding of the
 5   totality of the evidence on the diseases
 6   encompasses a lot of work that's listed on my
 7   CV, you know, work of my own, and work of
 8   others, and textbooks that I've contributed to,
```

USCA5 701

```
 9   for instance, also are generally listed on my
10   CV.
11            But I don't anticipate at this point
12   using additional information beyond what's
13   listed.
14       Q.    And let me just follow up on what you
15   said.
16            Do you anticipate citing to or using
17   other materials as exhibits during your trial
18   testimony that's not listed in your report but
19   might be part of your, you know, background
20   knowledge?
21       A.    So I don't anticipate doing that.  I'm
22   sure if -- sometimes a graphic is helpful to
23   draw a picture of an atherosclerotic, I tend to
24   do those from memory rather than from a
25   citation.  So I don't anticipate using any
```

00092
```
 1   additional materials --
 2       Q.    Okay.
 3       A.    -- at this point.
 4       Q.    Now I want to talk a little bit more
 5   about your professional experience, and I just
 6   want to cover a couple of things.
 7            Over the course of the last five
 8   years, between 25 percent and 50 percent of your
 9   time has been spent actually seeing patients in
10   the clinical setting, is that fair?
11            MS. DAVIS:  Objection to form.
12       A.    I would say that's about right, yes.
13   BY MR. NIEMEYER:
14       Q.    And you hold the position of chief of
15   the Division of Aging at Brigham & Women's
16   Hospital, is that correct?
17       A.    Yes, sir.
18       Q.    And Division of Aging at Brigham &
19   Women's Hospital does a number of things,
20   including providing clinical care to older
21   patients, correct?
22       A.    Correct.
23       Q.    Including teaching faculty in the care
24   of older patients, right?
25       A.    Residents and fellows, yes.
```

00093
```
 1       Q.    And also conducting research relevant
 2   to the care of older patients, correct?
 3       A.    Yes.
 4       Q.    And you're a teacher of sorts,
```

USCA5 702

```
 5   correct?
 6        A.    Yes.
 7              And also research relevant to disease,
 8   not just the care.
 9        Q.    And you teach courses at Harvard
10   Medical School?
11        A.    Yes, at Harvard Medical School and at
12   Harvard School of Public Health.
13        Q.    And you also in the clinical setting
14   might instruct residents and medical students?
15        A.    And medical students, yes.
16        Q.    Now, I think you mentioned this
17   earlier, you're not an
18   obstetrician/gynecologist?
19        A.    No, sir.
20        Q.    The only instance in which you might
21   prescribe an oral contraceptive would be to
22   continue one of your patients on that product,
23   correct?
24              MS. DAVIS:  Objection to form.
25        A.    That's correct.


00094
 1   BY MR. NIEMEYER:
 2        Q.    And in the instances in which you --
 3   well, strike that.
 4              Have you ever prescribed a patient Yaz
 5   or Yasmin?
 6        A.    I don't believe I have.
 7        Q.    And in the instances in which you have
 8   continued one of your patients on a combined
 9   oral contraceptive, did you provide them with
10   any warnings, or risk/benefit analysis, or did
11   you leave that to another physician as part of
12   their care team?
13        A.    I don't recall the last time that I
14   had, you know, written a prescription.  I will
15   renew medications that others have prescribed,
16   and that if I feel there is a -- particularly if
17   it impacts one of the other medications that I'm
18   using to treat, we'll have a discussion,
19   otherwise I will defer that discussion to the
20   person who had the initial -- did the initial
21   risk/benefit assessment on the prescribing of
22   the drug, and had that discussion with the
23   patient, provided it doesn't interfere with the
24   care that I'm providing.
25        Q.    And can you think of any instances as
```

00095

Case 2:14-md-02592-EEF-MBN   Document 5127-12 - SEALED   Filed 01/20/17   Page 53 of 130

```
 1    you sit here where you have provided advice or
 2    information to a patient of yours regarding
 3    either the VTE risk or ATE risk of a combined
 4    oral contraceptive?
 5         A.    So I imagine that over my career I
 6    have.  I just can't recall specific instances.
 7         Q.    And you can't recall the setting in
 8    which that would have occurred?
 9         A.    Well, the more likely setting would
10    have been in the course of attending as a
11    general internist, but it certainly could have
12    come up in my preventive cardiology clinic.
13         Q.    Nothing you remember, though?
14         A.    Nothing I recall.
15         Q.    And now, you've mentioned, and we
16    talked a little bit, that you have been involved
17    in various roles in conducting research and
18    performing studies involving medications?
19         A.    Yes, sir.
20         Q.    Okay.  Now, you have not conducted any
21    studies where combined oral contraceptives were
22    the primary focus as an exposure variable, is
23    that true?
24         A.    That's correct.  We would use the term
25    as the intervention.  Exposure we tend to
```

```
00096
 1    reserve for observational studies, but it's the
 2    same idea.
 3         Q.    But it's the same answer?
 4         A.    Same answer.
 5         Q.    And you haven't been involved in any
 6    past or current projects involving the study of
 7    contraceptives or their risks?
 8         A.    No, sir.
 9         Q.    And with respect to epidemiology, you
10    do not carry a doctorate or a Ph.D in epi, is
11    that correct?
12         A.    Correct.  I have a master's.
13         Q.    And do you carry a Ph.D in any other
14    disciplines?
15         A.    No, sir.
16         Q.    I'm going to hand you what I'm marking
17    as Exhibit 3.
18              (Whereupon, Gaziano Exhibit Number 3,
19              Dr. Gaziano's Expert Report on ATE,
20              was marked for identification.)
21    BY MR. NIEMEYER:
22         Q.    And tell us, if you would, what is
23    Exhibit 3?
24         A.    Exhibit 3 is my report on ATE.
```

25          Q.    And if I could -- well, let me ask you


00097
  1    first, are you a hematologist?
  2          A.    No, sir.
  3          Q.    What is activated protein C
  4    resistance, or APCR?
  5          A.    So APC -- activated protein resistance
  6    is a state where a protein involved in the
  7    clotting cascade is impaired such that there is
  8    a change in the thrombotic balance.
  9          Q.    Okay.  And have you conducted any
 10    studies of activated protein C resistance as a
 11    hemostatic marker or variable?
 12          A.    No, sir.
 13          Q.    Okay.  In what circumstances might we
 14    consider in a clinical case using a measure of
 15    Protein C as a marker or indicator of
 16    prothrombic activity?
 17              MS. DAVIS:  Objection to form.
 18          A.    So typically what we do is if we have
 19    a thrombotic event and a venous thrombotic event
 20    that occurs in a patient for which we don't have
 21    another logical explanation for a thrombotic
 22    event, we may measure certain abnormalities and
 23    clotting factors, including protein C and
 24    protein S.  We also might explore other
 25    thrombotic factors in a situation where there


00098
  1    appears to be a familial occurrence, meaning an
  2    occurrence in families that we might be looking
  3    for an inborn problem, abnormality in clotting.
  4          Q.    I'm sorry, why do you go through that
  5    exercise?
  6          A.    Well, in certain cases if we identify
  7    an inborn abnormality in clotting, the long-term
  8    treatment of that individual might be altered.
  9    The best example is Factor V Leiden, which
 10    alters the clotting cascade, where we would be
 11    inclined to use the anticoagulant that we treat
 12    everybody with for a longer duration.
 13          Q.    So, I'm sorry, is activated protein C
 14    resistance an inborn -- what word did you use?
 15          A.    Abnormality.
 16          Q.    -- abnormality?
 17          A.    Yes.  In protein C and protein S we
 18    can have some deficiencies.  I will tell you
 19    that in the case where we identify any form of
 20    clotting activity, I would engage a hematologist

USCA5 705

```
21        to evaluate the degree to which we feel that
22        this is a problem for that particular patient.
23             Q.    You'd defer to the hematologist in
24        that situation?
25             A.    I would ask their opinion.  It would
```

00099
```
 1        often be -- it can be an interchange, because
 2        I'm the person dealing with the risk side that
 3        the -- the cardiovascular event, they're the
 4        person with the knowledge on -- the in-depth
 5        knowledge on clotting and how best to interpret
 6        those kinds of results.  I will tell you that I
 7        don't see abnormals nearly as often as a
 8        hematologist or oncologist might, particularly a
 9        hematologist.
10             Q.    And is it possible for activated
11        protein C resistance not to be an inborn
12        abnormality, but to be acquired?
13             A.    Yes.
14             Q.    And does that change your analysis in
15        any fashion --
16             A.    Yes.
17             Q.    -- if you're treating somebody?
18             A.    It does.  You know, there are certain
19        states where the clotting system can be
20        perturbed by environmental things such as
21        medications.  What's challenging is that in the
22        inborn type, it's an isolated effect.  In a type
23        that's acquired by perhaps uses of a medication,
24        there can be more than one effect on the system,
25        a drug can have more than one target of effect,
```

00100
```
 1        and so it's sometimes difficult to discern what
 2        the clinical consequences of a protein C problem
 3        might be in an acquired situation.
 4             Q.    Okay.  And how does activated protein
 5        C resistance relate to arterial thrombotic
 6        events?
 7             A.    So they're -- I will tell you that
 8        they're much more of an issue on venous
 9        thrombotic events, and that's the situation that
10        we go looking for them, or an arterial
11        thrombotic event that is caused by a blood clot
12        in an unusual situation, but perhaps on the
13        arterial side.  Remember, we said that blood
14        clots can form, say, in the heart.  So if a
15        blood clot forms and we're not sure why, then a
16        protein C deficiency may play a role.
```

```
17              In the linkage between acquired and
18  either venous or arterial is much weaker.  The
19  linkage between inborn protein S or protein C,
20  Factor V Leiden problems, and venous problems is
21  stronger.
22      Q.    What about inborn and arterial?
23      A.    So not -- again, not a striking
24  relationship.  There have been people who have
25  suggested that it might, but we don't treat a
```

00101
```
 1  patient with a myocardial infarction any
 2  different if they have one of these inborn
 3  conditions.  Although we do treat a venous
 4  thrombus, I gave you the example Factor V
 5  Leiden, as we would treat that patient very
 6  differently if they had a DVT and if they had
 7  one of these inborn problems.
 8      Q.    And does it change if it was acquired?
 9      A.    So again, with acquired, it depends a
10  lot on particularly is it a transient situation,
11  which it certainly could be.  We don't know the
12  clinical consequences of some of the
13  environmentally-acquired changes in the clotting
14  cascade.
15      Q.    Okay.  Would you agree that
16  biochemical factors that may be indicative of
17  hereditary or acquired predisposition for venous
18  or arterial thrombosis include activated protein
19  C resistance?
20      A.    So I'd say more the case for venous.
21            Did you say inborn?
22      Q.    Or acquired.
23      A.    So I'd say that that statement applies
24  that there is a likely excess risk.  This has
25  been studied not in large populations, it's been
```

00102
```
 1  studied going backwards from cases to
 2  abnormalities.  That our general understanding
 3  and practice is some of these inborn activities
 4  have a strong relationship with venous events,
 5  it's not clear the relationship with arterial
 6  events.  And the acquired ones, the
 7  relationships are entirely uncertain.
 8      Q.    I'm going to show you Exhibit 4.
 9            (Whereupon, Gaziano Exhibit Number 4,
10            Yaz Product Monograph from Canada,
11            Revised 2/3/14, was marked for
12            identification.)
```

13    BY MR. NIEMEYER:
14        Q.    And Exhibit 4 is the product monograph
15    for Yaz, or the label, from Canada, revised
16    February 13, 2014.
17                Do you see that on the title page
18    there?
19        A.    I do.
20        Q.    And if we go to Page 9 of 64, that's
21    in the bottom right-hand corner --
22        A.    I see it.
23        Q.    -- the heading on the page is "Other
24    Risk Factors for Venous or Arterial
25    Thromboembolism or of a Cerebrovascular


00103
 1    Accident."
 2                Do you see that?
 3        A.    I do.
 4        Q.    And in fact, what we were talking
 5    about before, other generalized -- the first
 6    sentence begins "Other generalized risk factors
 7    for venous or arterial thromboembolism include
 8    but are not limited to," and then the first
 9    thing listed there is "age."  Correct?
10        A.    Where are you?  I'm sorry.
11        Q.    Right underneath that heading.
12        A.    "Other generalized risk factors," is
13    that where you are?
14        Q.    Yes, sir.
15        A.    Yes.
16        Q.    And you agree with that, right, that
17    age is a generalized risk factor for venous or
18    arterial thromboembolism?
19        A.    Yes.
20        Q.    Then if we skip to the beginning of
21    the next paragraph, so the paragraph at the
22    bottom of the page, this label provided by Bayer
23    states "Biochemical factors that may be
24    indicative of hereditary or acquired
25    predisposition for venous or arterial thrombosis


00104
 1    include Activated Protein C (APC) resistance,"
 2    then it goes on to list some other things,
 3    correct?
 4        A.    Mm-hmm.
 5        Q.    Do you agree with that statement as
 6    it's written and its inclusion of acquired and
 7    arterial thrombosis?
 8        A.    No.  Well, the statement is written

```
 9     quite ambiguously, and it's not clear whether
10     they're listing things that could be related to
11     one or the other.  So first, that's the thing
12     that's not clear.
13           The second is that we know a bit more
14     about some of these than others, and I'm not
15     even sure that it's entirely clear what the
16     precise risk for all of them on the hereditary
17     side.  And on the acquired side, it's such a
18     broad range.
19           So it's a very general statement.  I'd
20     say that there's -- I wouldn't -- I certainly
21     wouldn't agree with this as literally written.
22       Q.    Okay.  And you understand that this is
23     a document that's provided by Bayer to
24     physicians, correct?
25       A.    Yes.
```

00105
```
 1           MS. DAVIS:  Objection to form.
 2     BY MR. NIEMEYER:
 3       Q.    Okay.  And then if we turn to your
 4     report, which is Exhibit 3, and if we go to
 5     Page 6 of your report, the section "Basic
 6     Science and Human Physiologic Studies."
 7           Are you there?
 8       A.    I'm there.
 9       Q.    There's three paragraphs in that
10     section.  If we go to the last sentence of that
11     paragraph, you state in your report "There is no
12     evidence that acquired APC resistance is
13     associated with stroke."
14           That's your statement, correct?
15       A.    Correct.
16       Q.    And is that statement 100 percent
17     accurate, in your opinion?
18       A.    Yes.
19           MS. DAVIS:  Objection to form.
20       A.    I'm quite comfortable with that
21     statement.  And I use the term evidence as a
22     shorthand term for the totality of evidence.
23     BY MR. NIEMEYER:
24       Q.    Okay.  So you'd agree with me that
25     there is some evidence out there that makes up
```

00106
```
 1     the totality of evidence that suggests that APC
 2     resistance is an independent risk factor for VTE
 3     as well as ischemic stroke?
 4           MS. DAVIS:  Objection to form.
```

USCA5 709

```
 5        A.     No, I wouldn't use the term evidence
 6   that way.  So when I use the term evidence, I
 7   mean it's in the -- in a composite way.  As I
 8   said about cholesterol, there are studies that
 9   tell you that cholesterol is protective, but I
10   would not make the statement that there is
11   evidence that cholesterol doesn't cause heart
12   disease.  I would say there are studies that
13   might show any manner of things.  But evidence,
14   and again it's a shorthand word, in this context
15   I often think about the sum total of the
16   evidence when I making an evidentiary statement,
17   that I am very comfortable with that statement
18   that the totality of evidence on the topic does
19   not give us a definitive answer on a
20   relationship between acquired APC resistance and
21   stroke.
22        Q.     And in your report you don't say --
23   you don't use the word totality of evidence, you
24   just use the word evidence, correct?
25        A.     Yes.  But I use -- I'm comfortable
```

```
00107
 1   with that, too.
 2        Q.     Okay.  If we substituted, though, if
 3   we said there is -- there are no studies or
 4   literature that state that acquired APC
 5   resistance is associated with stroke, that would
 6   make that statement false, correct?
 7             MS. DAVIS:  Objection.
 8        A.     You know, actually I would not have
 9   made that statement.  And what I've not done is
10   done an exhaustive review of every study on APC
11   and their impact on ATE because I didn't think
12   it was -- it's not relevant because it doesn't
13   give us clinical information that's useful in
14   making clinical decisions.
15             But I stand by the statement that the
16   consensus of the totality of evidence, or the
17   consensus evidence is that there is not a
18   definitive relationship between acquired APC and
19   stroke.
20        Q.     But you would admit that there are
21   peer-reviewed articles and studies out there
22   that discuss and state that there's an
23   association between acquired APC resistance and
24   stroke and involve an increased risk of stroke?
25             MS. DAVIS:  Objection to form.
```

```
 1         A.    So I can't recall particulars.  I have
 2    a sense of the composite evidence in the field,
 3    and that there is not a consensus that acquired
 4    APC is a risk factor for stroke.  We don't go
 5    looking for it when people -- it's not on our
 6    clinical recommendations to go looking for when
 7    someone has a stroke.
 8              So I stand by the statement.  It's
 9    certainly possible that there are obscure papers
10    that make claims in all directions in the field.
11    BY MR. NIEMEYER:
12         Q.    Is it possible that the papers aren't
13    even obscure, but they're good, solid, peer
14    review articles?
15              MS. DAVIS:  Objection.
16         A.    It's possible that there's papers of
17    all types in a broad body of knowledge.
18    BY MR. NIEMEYER:
19         Q.    Have you reviewed Dr. Jan Rossing's
20    expert reports, or any other literature authored
21    by him in this case?
22         A.    I don't recall.
23         Q.    Did you know that Dr. Rossing states
24    that he's demonstrated that
25    drospirenone-containing oral contraceptives, so
```

```
00109
 1    Yaz and Yasmin, users are more resistant to APC
 2    than levonorgestrel oral contraceptive users?
 3              MS. DAVIS:  Objection.
 4         A.    I don't recall the particular authors,
 5    but I do recall particularly a few years ago
 6    when I was reviewing some of the biochemical
 7    studies that there were some physiologic
 8    intermediate studies that suggested that various
 9    OCs change some of these biologic parameters,
10    and APC happened to be one of them.
11    BY MR. NIEMEYER:
12         Q.    And have you yourself conducted any
13    research to test that?
14         A.    No, sir, I have not.
15         Q.    And typically the researchers who
16    would look into APC resistance and things of
17    that that nature, those would be hematologists
18    generally, correct?
19              MS. DAVIS:  Objection to form.
20         A.    They can be any type of researcher.
21    There's an awful lot of cardiologists that do
22    work in clotting because we -- clotting and
23    platelet aggregation, things that have been
24    historically in the domain of hematologists.
```

25    You know, there's a lot of physiologists that do

00110
 1    work in this area, too.
 2    BY MR. NIEMEYER:
 3        Q.    But you're not one of the
 4    cardiologists who does work in this area?
 5        A.    Correct, not in the biomarkers of the
 6    clotting system.
 7        Q.    Along -- well, kind of a separate
 8    topic, have you looked at -- strike that.
 9            How does the bioavailability of the
10    estrogen component of a combined oral
11    contraceptive relate to ATE or ATE risk?
12        A.    How does the -- can you repeat the
13    question?
14        Q.    Sure.
15            How does the bioavailability of the
16    estrogen component of a combined oral
17    contraceptive relate to the risk of arterial
18    thrombotic events?
19        A.    So I can -- I infer from studies using
20    drugs of different dose that -- which is one of
21    the factors that can contribute to
22    bioavailability, bioavailability is contributed
23    by dose in some of the characteristic and some
24    of the absorption parameters, if you were taking
25    it with food or without food, but dose is one of

00111
 1    the parameters that influences bioavailability.
 2    When the dose is higher, which is particularly
 3    the case for some of the early drugs, the --
 4    were you referring to clinical events, or to
 5    biologic effects?
 6        Q.    I guess both really.
 7        A.    So I think the data are much more
 8    solid on dose and clinical effects, both the
 9    primary effect of the drug, and things like
10    venous thromboemboli where there's true clinical
11    effect.  And at a higher dose we see a higher
12    risk from the early OCs.  And when the OC
13    dose -- the estrogen component dose came down
14    those effects went down.  So I would infer from
15    that that to some degree the bioavailability in
16    general has some impact on the clinical outcome.
17    I don't know the literature specifically on the
18    dose-ranging studies that relate to the clotting
19    cascade.
20        Q.    And have you looked at -- either

```
21    studied yourself or looked at any papers,
22    articles that discuss the bioavailability of
23    estrogen in users of Yaz and/or Yasmin?
24        A.    Bioavailability, are you talking about
25    purely the kinetic of the estrogen getting into
```

00112
```
 1    the system, that kind of bioavailability?
 2        Q.    How much of the estrogen is available
 3    in the system, very basically put.
 4        A.    So I don't have an in-depth knowledge
 5    of the estrogen levels by comparative between
 6    the estrogens used in Yaz compared to the
 7    estrogens used in other OCs.
 8        MR. HALLENBECK:  Mark, when you hit a
 9    spot, can we take a break?
10        MR. NIEMEYER:  Sure.  I'm almost
11    wrapping this up.
12    BY MR. NIEMEYER:
13        Q.    Have you had a chance to look at
14    Dr. Maggio's expert report in this litigation?
15        A.    I don't recall if I've seen
16    Dr. Maggio's or not.
17        MR. NIEMEYER:  Okay.  We'll stop right
18    there.
19        THE VIDEOGRAPHER:  Going off the
20    record.  The time is 12:45.
21        (Whereupon, a luncheon recess was
22        taken.)
23
24
25
```

00113
```
 1            AFTERNOON SESSION
 2
 3        THE VIDEOGRAPHER:  Back on the record.
 4    The time is 1:36.
 5    BY MR. NIEMEYER:
 6        Q.    Doctor, I wanted to go back to our
 7    discussion about your work as a retained expert
 8    or consultant for product or drug manufacturers.
 9    When I asked you questions about that, did we
10    cover all of the instances in which you have
11    been retained as a litigation expert or as a
12    consultant by a drug, pharmaceutical, or other
13    product manufacturer?
14        A.    I believe so.
15        Q.    So nothing new since we talked in
16    2011?
```

USCA5 713

```
17        A.    So I'm involved in a discussion now of
18   whether or not I would be involved in another
19   case, but not active.
20        Q.    Okay.  So they're talking to you about
21   whether or not to retain you, but you haven't
22   been officially retained as a consultant or
23   litigation expert?
24        A.    There is one case where they may have
25   named me.
```

00114
```
 1        Q.    Okay.
 2        A.    A single case.  It's not a class, it's
 3   a single --
 4        Q.    Got you.
 5        A.    -- a single person.
 6        Q.    Okay.  So what manufacturer hired you?
 7        A.    I don't recall.
 8              MR. PIORKOWSKI:  Let me, unless -- if
 9   he's been disclosed, that's okay.  If he hasn't
10   been disclosed, then that's a confidential
11   situation.  We can agree to find out if he's
12   been disclosed.
13              MR. NIEMEYER:  Okay.
14              MR. PIORKOWSKI:  And if he has, to
15   provide that information to you.  Is that okay?
16              MR. NIEMEYER:  That's okay.  And I'll
17   ask more follow-up, but we don't have to talk
18   about who.
19              MR. PIORKOWSKI:  Sure.
20   BY MR. NIEMEYER:
21        Q.    Have you been paid by this particular
22   manufacturer or anyone on their behalf to
23   provide expert services in the case you're
24   talking about?
25        A.    No, sir.
```

00115
```
 1        Q.    And have they agreed to pay you, and
 2   just haven't paid you yet?
 3        A.    Yes.  If we go forward, yes.
 4        Q.    Okay.  Is the product at issue a
 5   medication?
 6        A.    No, sir.
 7        Q.    A medical device?
 8        A.    No, sir.
 9              MR. NIEMEYER:  Okay.  So our deal will
10   be if he's been disclosed as an expert in this
11   particular case, you'll give me that
12   information, correct?
```

```
13              MR. PIORKOWSKI:  Agree.
14              MR. NIEMEYER:  Okay.
15    BY MR. NIEMEYER:
16         Q.    So did we miss anything else, any
17    other instances in which you've been hired as a
18    litigation expert?
19         A.    I don't believe there's any
20    other drug companies that I've done any work for
21    since 2011.
22         Q.    And I know you've testified in a
23    number of medical malpractice cases since then,
24    correct?
25         A.    Yes.


00116
 1         Q.    Okay.  In your opinion, have
 2    epidemiologic studies confirmed a higher risk of
 3    VTE with drospirenone-containing combined oral
 4    contraceptives?
 5              MS. DAVIS:  Objection to form.
 6         A.    Compared to non-use?
 7    BY MR. NIEMEYER:
 8         Q.    Yes.
 9              I'm sorry.  Strike that.
10              In your opinion, have epidemiologic
11    studies confirmed a higher risk of VTE with
12    drospirenone-containing combined oral
13    contraceptives versus other combined oral
14    contraceptives.
15              MS. DAVIS:  Objection to form.
16         A.    I would say that that's -- it's clear
17    that all oral contraceptives increase the risk.
18    A much more challenging comparison of current
19    OCs to each other, the data is not definitive or
20    conclusive.
21    BY MR. NIEMEYER:
22         Q.    So are you agreeing or disagreeing
23    with the statement that I just read to you?
24         A.    So read the statement again?
25         Q.    Sure.


00117
 1              Have epidemiologic studies confirmed a
 2    higher risk of venous thromboembolism with
 3    drospirenone-containing combined oral
 4    contraceptives as compared to other combined
 5    oral contraceptives?
 6              MS. DAVIS:  Object to form.
 7         A.    I would say confirmed is a statement
 8    of a great deal of -- implies a definitive
```

USCA5 715

```
 9      answer, and I would say that the answer is not
10      definitive, there is not a clear -- what is
11      clear is that all OCs increase risks relative to
12      not using them.
13      BY MR. NIEMEYER:
14          Q.    Let me change the question just
15      slightly.  And I don't mean to trick you, so I'm
16      going to tell you what I'm going to do.  I'm
17      going to substitute levonorgestrel-containing
18      oral contraceptives.  So I'm going to begin my
19      question now.
20              Have epidemiologic studies confirmed a
21      higher risk of venous thromboembolism with
22      drospirenone-containing combined oral
23      contraceptives when compared to
24      levonorgestrel-containing combined oral
25      contraceptives?
```

00118
```
 1              MS. DAVIS:  Object to form.
 2          A.    I would give the same answer.
 3      BY MR. NIEMEYER:
 4          Q.    I know you don't like the term third
 5      generation oral contraceptive, but if I use the
 6      term third generation oral contraceptive or
 7      so-called third generation oral contraceptive,
 8      do you understand me to mean
 9      desogestrel-containing oral contraceptives
10      and/or gestodene-containing oral contraceptions?
11              MS. DAVIS:  Object to form.
12          A.    Well, we can use the specific names.
13      The problem with the generation attribution is
14      that people use them differently, so I think
15      probably the best thing for us to do would be
16      either use the term newer, and then look at
17      drugs in their chronology, or talk specifically
18      about specific agents.
19      BY MR. NIEMEYER:
20          Q.    Okay.  Except if we read in a document
21      or literature that doesn't do us the favor of
22      defining third generation oral contraceptives
23      and simply says third generation oral
24      contraceptives or so-called third generation
25      oral contraceptives, what do you in your
```

00119
```
 1      experience take that to mean?
 2          A.    I try to divine what the author
 3      intended, and I do my best.  Usually when people
 4      are writing a scientific paper there's an
```

5    opportunity for them to define what they mean,
6    and then they use the term subsequently.  So
7    that's -- I would search for what the author was
8    intending to say when they use the term third
9    generation as best I could.
10        Q.    And would you agree with me, though,
11    that in most instances third generation oral
12    contraceptive does refer to desogestrel, or
13    gestodene, or both?
14        A.    I wouldn't be able to put a
15    quantification on how the term is used.  It's
16    tough to put boundaries around it.  As I said,
17    people use the term differently.  And when you
18    want me to say that most, then I have to have
19    sort of an assessment of the denominator and be
20    able to say that more times than not, and I
21    can't really say.  People use it differently.
22    It's not a terminology I use.  In every case
23    where the terminology is used I try to
24    understand what they mean, and I think that's
25    the best way to handle it.


00120
1         Q.    Let me ask you this.
2               In your opinion, is the risk of
3    drospirenone-containing oral contraceptives for
4    venous thromboembolism similar to the risk of
5    desogestrel-containing oral contraceptives?
6         A.    So I would say that the risk for -- as
7    best we can tell, the risk for the commonly
8    used, all of the -- same answer as before, the
9    commonly used COCs, oral, the oral
10    contraceptives, there is a broad range around
11    the risk for each, and that there is a
12    comparability of risk, and that it tends to be
13    -- in these newer drugs that are on the market
14    now, it tends to be lower than the historic
15    ones.
16               But the distinction between the
17    various drugs is much -- I can give a much less
18    certain answer to the distinction between any
19    particular comparison.
20        Q.    I'm going to show you what is marked
21    as Exhibit 5.
22               (Whereupon, Gaziano Exhibit Number 5,
23               Document titled Summary of Product
24               Characteristics, was marked for
25               identification.)


00121

```
 1   BY MR. NIEMEYER:
 2       Q.    And this is a document entitled
 3   "Summary of Product Characteristics," and the
 4   name of the product involved is Yaz, correct?
 5       A.    Mm-hmm.
 6       Q.    And if we go to the very back of the
 7   document you'll see that it's -- the revision is
 8   dated, it's dated in the European style, 25/3 of
 9   '13, to mean March 25th of 2013, correct?
10       A.    That's what it says.
11            MS. DAVIS:  Mark, I'm not sure that
12   Dr. Gaziano has ever seen this document before.
13   Can he have a minute to look it over?
14            MR. NIEMEYER:  He can.
15   BY MR. NIEMEYER:
16       Q.    And just so you know, I'm just going
17   to be asking you a specific question about the
18   Warnings section in the Circulatory Disorders.
19            MS. DAVIS:  Is that Section 4.4?
20            MR. NIEMEYER:  It is indeed.
21       A.    Okay.
22            (Witness reviewing document.)
23       A.    Okay.
24   BY MR. NIEMEYER:
25       Q.    And actually, I will have you look at


00122
 1   a very brief section, and it's the second to
 2   last page.  So since it's double-sided, it's
 3   basically on the last full page.  Number 7, it
 4   discusses the "Marketing Authorization Holder."
 5   And do you see there where it says "Bayer," and
 6   then lists an address of some sort.
 7            Do you see that?
 8       A.    On what page?
 9       Q.    There's no page number, so it's item
10   7.
11       A.    Oh, yes.  Okay.
12       Q.    Do you see that there?
13       A.    I do.
14       Q.    Okay.  I'm sorry, let's flip back then
15   to 4.4.
16       A.    Okay.
17       Q.    And let's go to the very last
18   paragraph on the page, which reads
19   "Epidemiological studies have shown that the
20   risk of VTE for drospirenone-containing COCs is
21   higher than for levonorgestrel-containing COCs
22   (so-called second generation preparations) and
23   may be similar to the risk for
24   desogestrel/gestodene-containing COCs (so-called
```

25    third generation preparations)."

00123
 1              MS. DAVIS:  Object to form.
 2    BY MR. NIEMEYER:
 3         Q.    That's what it says, correct?
 4         A.    Yes.
 5         Q.    And do you agree with that statement?
 6              MS. DAVIS:  Object to form.
 7         A.    Well, I would say that there are some
 8    studies that have shown that.
 9    BY MR. NIEMEYER:
10         Q.    So you do agree with that statement as
11    it's written?
12              MS. DAVIS:  Objection to form.
13         A.    I haven't had an opportunity to review
14    the entire context, but when we talk about
15    specific studies, there are specific studies
16    that report a risk of drospirenone-containing
17    COCs that are higher.  It's very different than
18    the statement that you read before that
19    epidemiologic studies have confirmed.  But as
20    we've talked about before, there are -- in any
21    body of knowledge there are many studies on a
22    given topic.
23    BY MR. NIEMEYER:
24         Q.    And so again, I'm sorry, was that an
25    agreement, you do agree that the statement as

00124
 1    written is accurate?
 2              MS. DAVIS:  Objection to form.
 3         A.    So let me take a careful look, and
 4    I'll take just a little bit of a look at the
 5    context, too, because that's always helpful.
 6              What generally they seem to do here is
 7    just enumerate results of particular studies
 8    rather than drawing any definitive conclusion on
 9    the quality of the totality of the evidence, as
10    we talked about before.  But I think that it is
11    certainly reasonable to make a statement that
12    studies have shown that there is some excess
13    risk of drospirenone-containing COCs.  There are
14    also other studies that haven't shown that.
15              The choice of what goes into a
16    document like this is beyond my expertise, but I
17    assume that this is product information that
18    undergoes a regulatory process.  There's a
19    dialogue that goes on.
20    BY MR. NIEMEYER:

USCA5 719

21      Q.    And do you understand this to be
22  Bayer's documents that they give to physicians
23  in Europe?
24            MS. DAVIS:  Objection to form.
25      A.    I'm taking that on your description.


00125
 1  BY MR. NIEMEYER:
 2      Q.    Okay.  And I want to go back to my
 3  earlier question.
 4            Is there some reason you're unable to
 5  answer yes or no as to whether or not you agree
 6  with the statement "epidemiologic studies have
 7  shown that the risk of VTE for
 8  drospirenone-containing COCs is higher than for
 9  levonorgestrel-containing COCs (so-called second
10  generation preparations) and may be similar to
11  the risk for desogestrel/gestodene-containing
12  COCs (so-called third generation preparations)"?
13            MS. DAVIS:  Object to form.
14      A.    I want to answer the question and make
15  sure that I'm as clear as possible, that some
16  analyses in some studies do show higher relative
17  risk and others do not.  So the statement -- the
18  narrow interpretation of the statement is that
19  there are some analyses in some studies that do
20  report a higher relative risk.  There are other
21  studies that don't.
22            So you could also write a statement
23  that epidemiologic studies have shown that it
24  does not increase the risk, and that would also
25  be true.  I just want to make sure that I'm


00126
 1  referring to this as a very narrow statement
 2  rather than a generic summary.  I don't want to
 3  give the impression that I would agree with this
 4  as a generic summary of the assessment of the
 5  totality of evidence on the subject.  It's a
 6  narrow statement about particular studies.
 7  BY MR. NIEMEYER:
 8      Q.    And I'm just asking you whether or not
 9  you agree with the statement.  I agree with you
10  that we could talk about a number of other
11  statements that we could agree to.  For example,
12  that today we're sitting in Boston, we can agree
13  with that statement.
14            But what I'm asking you is, yes or no,
15  do you agree with the statement as it's written
16  in that paragraph that I've read to you now

Case 2:14-md-02592-EEF-MBN Document 5127-12 *SEALED* Filed 01/20/17 Page 70 of 130

```
17    several times?
18              MS. DAVIS:  Objection.
19         A.    In the narrow context that I've
20    described, my understanding of the context of
21    this statement, I would say yes.
22    BY MR. NIEMEYER:
23         Q.    Now, in this context, this label does
24    not discuss studies that do not show an increase
25    in risk, is that correct?
```

```
00127
 1              MS. DAVIS:  Objection.
 2              He really hasn't had the opportunity
 3    to review the whole document in its entirety, so
 4    if you want to give him that opportunity to be
 5    able to answer that question.
 6              MR. NIEMEYER:  I'm just talking about
 7    the Warnings section, and I'd be delighted to
 8    give him the opportunity to review that.
 9              (Witness reviewing document.)
10         A.    There's a -- my understanding of the
11    Warnings section is that there's a fairly narrow
12    enumeration in the choice of things for a
13    Warnings section.  I mean there are also studies
14    that show that, for instance,
15    drospirenone-containing COCs have a lower risk
16    of ATE.  That's not in a warning.  You could
17    make that statement equally, it's not in a
18    warning statement because I don't govern what
19    goes into a warning statement.  But I would say
20    it's fair to say that those other statements are
21    not there.  Perhaps they're not appropriate in a
22    warning statement.  But you could easily make
23    that kind of a statement, studies have shown
24    that drospirenone-containing COCs have a lower
25    risk of ATE, that would be a fine statement.  It
```

```
00128
 1    might not be appropriate for a warning in a
 2    label, but that's not what I'm an expert on.
 3    BY MR. NIEMEYER:
 4         Q.    Okay.  My question to you is, first,
 5    whether anywhere in this Warning section is
 6    there a statement that studies exist showing a
 7    similar or lower risk for VTE when comparing
 8    drospirenone-containing combined oral
 9    contraceptives with levonorgestrel-containing
10    combined oral contraceptives?
11              MS. DAVIS:  Objection to form.
12         A.    I don't see a statement to that
```

```
13    effect.  There are studies that show that, but I
14    don't see it in this section of this document.
15    BY MR. NIEMEYER:
16         Q.    And do you know how this Warnings
17    section in this label from Bayer compares to the
18    Yaz or Yasmin label in the United States?
19              MS. DAVIS:  Objection to the form.
20         A.    I don't specifically know.
21              MS. DAVIS:  Maureen, what exhibit
22    number was this?
23              THE STENOGRAPHER:  5.
24              MR. NIEMEYER:  What was it?
25              MS. DAVIS:  5.
```

```
00129
 1    BY MR. NIEMEYER:
 2         Q.    Doctor, I'm now going to show you
 3    Exhibit 6.
 4              (Whereupon, Gaziano Exhibit Number 6,
 5              Mircette label, was marked for
 6              identification.)
 7    BY MR. NIEMEYER:
 8         Q.    And I don't expect you have reviewed
 9    this in the past or not.  This is the label for
10    the birth control Mircette that contains
11    desogestrel and ethinylestradiol.  That was a
12    question, if I failed to -- have you seen this
13    before, reviewed it before?
14         A.    I don't believe so.  I thought you
15    were making a statement, sorry.
16              MS. DAVIS:  Do you want to just give
17    him a minute to look it over, Mark?
18              MR. NIEMEYER:  Sure.
19    BY MR. NIEMEYER:
20         Q.    And again, we'll look looking at --
21    and we don't have pages on these things, so it's
22    about four double-sided pages back, number 1,
23    "Thromboembolic disorders and other vascular
24    problems" in the Warnings section.
25         A.    Okay.
```

```
00130
 1         Q.    And specifically we'll talk about "a.
 2    Thromboembolism."
 3              (Witness reviewing document.)
 4         A.    Okay.
 5    BY MR. NIEMEYER:
 6         Q.    So, and if we believe the front page,
 7    Mircette contains desogestrel, correct?
 8         A.    Apparently so, yes.
```

```
 9      Q.    And if we go to the middle paragraph
10   in the Thromboembolism warnings section, there
11   it reads "Several epidemiologic studies indicate
12   that third generation oral contraceptives,
13   including those containing desogestrel, are
14   associated with a higher risk of venous
15   thromboembolism than certain second generation
16   oral contraceptives."  Correct?
17           MS. DAVIS:  Object to form.
18      A.    So that's what it says.
19   BY MR. NIEMEYER:
20      Q.    And then it does -- that does -- the
21   sentence wrapped up with "However, data from
22   additional studies have not shown this two-fold
23   increase in risk," correct?
24           MS. DAVIS:  Objection to form.
25      A.    Yes.
```

```
00131
 1   BY MR. NIEMEYER:
 2      Q.    And do you agree in general with that
 3   paragraph that we just looked at in the Mircette
 4   label?
 5           MS. DAVIS:  Objection to form.
 6      A.    Well, it would be a little harder to
 7   agree or disagree with it because they say third
 8   generation oral contraceptives, and they list
 9   including desogestrel, they don't carefully
10   specify what they mean by third and second
11   generation.  So it's a little bit hard, hard to
12   determine.
13           There are studies of desogestrel that
14   have certain analyses that suggest higher risk
15   when comparing some OCs to other OCs, but I
16   would -- to be able to agree or disagree
17   specifically with that statement, I would really
18   want to know just what comparisons they're
19   referring to.
20   BY MR. NIEMEYER:
21      Q.    Okay.  Have you reviewed the 2012 Yaz
22   and Yasmin labels?
23      A.    I have seen them.
24      Q.    And have you reviewed labels prior to
25   -- I'm sorry.  Strike that.
```

```
00132
 1           Have you reviewed Yaz and Yasmin
 2   labels in iterations prior to April of 2012?
 3      A.    I believe so.
 4      Q.    And would you agree with me that at no
```

USCA5 723

```
 5    time prior to April of 2012 did the Yaz or
 6    Yasmin label give comparative references for VTE
 7    risk between Yaz and Yasmin and other oral
 8    contraceptives?
 9             MS. DAVIS:  Objection to form.
10        A.    Actually I just don't recall the
11    specifics.  My expertise is in summarizing the
12    totality of evidence on the topic.  I am not an
13    expert on how the regulatory implementation of
14    the data find their way into a warning label.
15    That's an issue between the company and the FDA.
16             But I'm happy to look at any
17    statements and give my opinion regarding any
18    statements that you would want me to look at.
19    BY MR. NIEMEYER:
20        Q.    And I'm sorry, is your answer that you
21    don't know whether prior to 2012 in the Yaz and
22    Yasmin label there were comparisons between
23    drospirenone-containing oral contraceptives and
24    other oral contraceptives regarding VTE risk?
25             MS. DAVIS:  Object to form.
```

00133
```
 1        A.    I don't recall.  In particular, I
 2    don't recall the timing of what warnings are in
 3    the Yaz and Yasmin labels.
 4    BY MR. NIEMEYER:
 5        Q.    And do you have a general idea of how
 6    the Yaz or Yasmin changed in April of 2012?
 7             MS. DAVIS:  Objection to form.
 8        A.    I would like to review the document.
 9    But only in the most general terms, but not
10    specific, I don't recall the specific changes in
11    the labeling.
12    BY MR. NIEMEYER:
13        Q.    And what's your general understanding
14    and knowledge of how it changed?
15             MS. DAVIS:  Objection to form.
16        A.    My general understanding is that there
17    is mention, there is more of a discussion of VTE
18    in the later versions, but I can't tell you
19    exactly what the changes are and how they
20    evolved over time without looking specifically
21    at the documents.
22    BY MR. NIEMEYER:
23        Q.    Okay.  Let's go back to your report,
24    if we could.  It's Exhibit 3.  And turn with me
25    to Page 7.  There you say -- you have a section
```

00134

USCA5 724

```
 1   on "Descriptive studies," correct?
 2       A.    Yes, sir.
 3       Q.    And then the second paragraph has some
 4   discussion about Yasmin and OrthoEvra, correct?
 5       A.    Yes.
 6       Q.    What was your impetus for including
 7   this paragraph in your report?
 8           MS. DAVIS:  Object to form.
 9       A.    Well, the general reference to the
10   FDA, and similar in the previous one, is to
11   merely provide some context for these kinds of
12   descriptive studies.  The FDA has set up a
13   system for being responsible for generating some
14   of the data, and evaluating the quality of the
15   data in general, and so all the statements with
16   reference to the FDA are to put the -- I'm going
17   to say lack of ability to draw firm conclusions
18   from descriptive studies in the context of how
19   not only I think about them, but also the FDA
20   thinks about them.
21   BY MR. NIEMEYER:
22       Q.    Okay.  I must admit you lost me a
23   little bit there.  Maybe it's easier if we go
24   kind of statement by statement.  Let's go with
25   the second sentence.
```

```
00135
 1           Bayer conduct -- "Shortly after, Bayer
 2   conducted an adverse event report analysis for
 3   Yasmin versus OrthoEvra, a contraceptive product
 4   that was launched close in time to when Yasmin
 5   was launched."  Next sentence, "This analysis
 6   showed similar VTE and ATE reporting rates for
 7   Yasmin and OrthoEvra."
 8           Why is that significant?
 9       A.    Well, this is just the process when a
10   drug is new, we begin the process of generating
11   postmarketing data, and the first kind is often
12   case reports.  There are many reasons why they
13   can be biased.  But obviously with some dialogue
14   with the FDA, Bayer was also involved.  It's my
15   understanding that there are reporting systems
16   both set up by industry and by the FDA for
17   collecting reports, and it's a fairly standard
18   practice for manufacturers to monitor event
19   reporting as new drugs emerge.  They are --
20   these are not used for causal inferences, but
21   the process was ongoing, what I can best
22   determine in similar fashion and within the
23   standards that the FDA had set for this
24   particular drug.
```

USCA5 725

25          Q.    So this analysis involved case

00136
 1    reports, correct?
 2          A.    My understanding, I don't know if this
 3    involved -- I did mention before a review of the
 4    company's assessment of the trial data, and
 5    there's really very little trial data.  I don't
 6    know if this particular report involves that
 7    trial data as well.  But the idea is to look at
 8    case report and whatever data are available on
 9    the topic.
10               And I believe at the time, 2002, in
11    that range, there weren't the possibility for
12    large scale observational studies, the cohort or
13    case control study, just because there wasn't
14    enough experience.  So what you're left with is
15    reviewing the existing trial data that a company
16    has, and I know they went through that process,
17    although I would say that there's not much
18    information because the events are so low, and
19    then went through the reporting process.  I
20    can't tell you if the report includes both or it
21    was just case reports, but it's the standard
22    process of what I will call
23    hypothesis-generating exercises to monitor a new
24    drug on the market.
25          Q.    And with respect to case reports, are

00137
 1    there instances where case reports would be
 2    informative enough for you to say it's more
 3    likely than not that an agent has caused a
 4    particular outcome?
 5               MS. DAVIS:  Object to form.
 6          A.    It's a very, very rare circumstance.
 7    Certainly not for events that are common.
 8    There's one case that I -- one example that I
 9    can recall, which is the deformities in
10    thalidomide, where case reports were enough to
11    raise a particular concern, and that's because
12    those case events were nonexistent prior to the
13    use of thalidomide.
14               So in that circumstance, there's a
15    case where a case report can -- we can argue
16    whether or not the data are enough to make a
17    causal inference, there's certainly enough to
18    raise enough concern to -- from a -- again, I'm
19    not an expert in regulatory, but from a
20    regulatory perspective to perhaps take an

USCA5 726

```
21   action.
22   BY MR. NIEMEYER:
23        Q.    And are you familiar with the point in
24   time in which the OrthoEvra product label began
25   to carry with it a heightened warning for VTE
```

00138
```
 1   risk versus other contraceptive methods?
 2             MS. DAVIS:  Objection to form.
 3        A.    Again, I'm not familiar with the
 4   chronology of the changes in the OrthoEvra.
 5   BY MR. NIEMEYER:
 6        Q.    Did you know at some point in time,
 7   though, that they did start using a heightened
 8   warning for VTE?
 9        A.    I know for several of the
10   contraceptive agents that there has been an
11   evolution in the language on VTE over time.  But
12   I will tell you that I haven't carefully studied
13   the OrthoEvra chronology.
14        Q.    And I don't think you answered the
15   question directly.
16             Are you aware, whether you call it an
17   evolution or not, that OrthoEvra -- the
18   OrthoEvra label at some point in time started to
19   carry with it a heightened VTE warning?
20             MS. DAVIS:  Objection to form.
21        A.    So again, I don't know what -- whether
22   you and I agree on heightened.  My understanding
23   is -- and again I'm happy to look at particular
24   statements and compare different versions of it
25   to give you my opinion on whether or not they
```

00139
```
 1   changed their -- the general message.
 2             What I am aware of is that for a
 3   number of these agents that there was increased
 4   discussion about VTE in the evolution of their
 5   inserts.
 6   BY MR. NIEMEYER:
 7        Q.    And do you know if the OrthoEvra label
 8   and its increased discussion of VTE began before
 9   the increased discussion for VTE in the Yaz and
10   Yasmin labels?
11             MS. DAVIS:  Objection to form.
12        A.    I don't.
13   BY MR. NIEMEYER:
14        Q.    Would you be surprised if you learned
15   that the OrthoEvra label began to have increased
16   discussion as early as 2006?
```

USCA5 727

```
17            MS. DAVIS:  Objection to form.
18  BY MR. NIEMEYER:
19       Q.   Of VTE.
20       A.   I -- every time the labels changed the
21  discussions changed, and I wouldn't be surprised
22  by any change in particular.
23       Q.   Doctor, do you know if the Yaz and
24  Yasmin labels have ever specifically mentioned
25  that ATE risk increases based upon age?


00140
1             MS. DAVIS:  Object to form.
2        A.   I know there is discussion of ATE risk
3   in the label.  I don't recall a discussion of
4   ATE and age.  I mean, as we've talked about,
5   that's a generic concept, ATE and age, and I
6   don't think there would be any reason to discuss
7   a differential risk by age, because there's
8   certainly not enough data to draw any
9   conclusions about whether the relative risks
10  were different by age.  But I don't recall any
11  specific discussions about ATE and age.
12  BY MR. NIEMEYER:
13       Q.   Were you -- Doctor, were you consulted
14  in any way surrounding the advisory committee
15  hearing held by the FDA regarding the Yaz and
16  Yasmin label back in December of 2011?
17            MS. DAVIS:  Objection to form.
18       A.   I don't believe I was consulted at all
19  regarding any issues about the hearing.
20  BY MR. NIEMEYER:
21       Q.   Did you attend the advisory committee
22  hearing?
23       A.   No, sir.
24       Q.   Have you ever attended an advisory
25  committee hearing?


00141
1        A.   Gee, not with anything to do with OCs.
2        Q.   With anything to do with anything?
3        A.   Gee, a number of years ago I may have
4   attended one, and I can't recall even what the
5   topic was.  But this would have been more than
6   10 or 15 years ago.
7        Q.   Nothing you can remember anything more
8   about?
9        A.   No.
10       Q.   Are you familiar with the finding of
11  the advisory committee regarding Yaz and Yasmin?
12            MS. DAVIS:  Object to form.
```

USCA5 728

```
13        A.     I have reviewed this -- is it December
14   of '11?
15   BY MR. NIEMEYER:
16        Q.     Yes, sir.
17        A.     Is that right?
18               I have reviewed a briefing document
19   prepared by the FDA, so I have some sense of the
20   background information.  I will tell you that I
21   haven't followed carefully the particular FDA
22   deliberations.  I may have seen some summary
23   documents, but I don't recall the specifics.
24        Q.     Do you have an understanding that the
25   FDA advisory committee voted 21 to 5 that the
```

```
00142
 1   Yaz and Yasmin labels were inadequate?
 2               MS. DAVIS:  Object to form.
 3        A.     I don't recall the specifics of any
 4   particular vote.
 5   BY MR. NIEMEYER:
 6        Q.     Do you know whether or not the Yaz and
 7   Yasmin label was changed in April of 2012 in
 8   response to, among other things, recommendations
 9   from the advisory committee?
10               MS. DAVIS:  Object to form.
11        A.     My understanding is that's the normal
12   course of business, is that there are hearings
13   and recommendations, and then there's a dialogue
14   between a company and the FDA.  And I'm aware
15   that there was an updated insert, package insert
16   or labeling information sometime around that
17   time.
18   BY MR. NIEMEYER:
19        Q.     Doctor, I'm going to hand you
20   Exhibit 7.
21               (Whereupon, Gaziano Exhibit Number 7,
22               Yaz '06 Physician Labeling, was marked
23               for identification.)
24   BY MR. NIEMEYER:
25        Q.     And at the same time I'm going to hand
```

```
00143
 1   you Exhibit 8.
 2               (Whereupon, Gaziano Exhibit Number 8,
 3               Yaz 2012 labeling, was marked for
 4               identification.)
 5   BY MR. NIEMEYER:
 6        Q.     Are you familiar with either of these
 7   documents?
 8               MR. HALLENBECK:  Could you say what
```

USCA5 729

```
 9   they are for the record?
10           MR. NIEMEYER:  Yes.  7 is the Yaz
11   March 6, 2016 Physician Labeling, and probably
12   beyond labeling.
13           MR. PIORKOWSKI:  You said March of
14   2016?
15           MR. NIEMEYER:  Yes, sir.  March 16th
16   of 2006.
17           MR. PIORKOWSKI:  Okay.  I thought you
18   said 2016.
19           MR. NIEMEYER:  No.  We'd be ahead of
20   ourselves.  I may have said that, but that's not
21   what I meant.
22           And then Number 8 is the April, 2012
23   Yaz labeling.
24           MR. HALLENBECK:  Thanks.
25           MR. NIEMEYER:  You bet.
```

00144
```
 1   BY MR. NIEMEYER:
 2       Q.    I'm sorry, Doctor, I think my pending
 3   question to you was whether you were familiar
 4   with either/or both of these documents?
 5       A.    So I am familiar with them.  I'm
 6   familiar of their existence.
 7       Q.    If we go to, in 7, if we go to Page 8,
 8   so Exhibit 7, Page 8, "b. Thromboembolism."
 9           You see that there, right?
10       A.    Mm-hmm.
11       Q.    And then go with me at the same time
12   in Exhibit 8 to Page 5, "Warnings and
13   Precautions," Section 5.1.
14           And what I'd like to do is, we'll move
15   back and forth a little bit and I'll try not to
16   do that too quickly, but let's go with
17   Exhibit 7, the earlier, March 16, 2006 label,
18   and the Thromboembolism section is contained
19   right there in the middle of the page, correct?
20       A.    Mm-hmm.
21       Q.    Is that a yes?
22       A.    Yes.
23       Q.    Okay.  I only say that because of the
24   court reporter.
25       A.    Sure.
```

00145
```
 1       Q.    And this may not be your
 2   understanding, I can't remember what your
 3   response was, but is it your understanding that
 4   this was the section that the advisory committee
```

```
 5      said was inadequate with respect to venous
 6      thromboembolism?
 7              MS. DAVIS:  Object to form.
 8       A.    That was your characterization, not
 9      mine.  I didn't recall what their -- adequacy or
10      inadequacy is your term, not mine.
11      BY MR. NIEMEYER:
12       Q.    Fair enough.
13              And it might be the FDA's term, but
14      you don't know that one way or the other,
15      correct?
16              MS. DAVIS:  Object to the form.
17       A.    Absolutely.
18      BY MR. NIEMEYER:
19       Q.    So then let's move to Exhibit 8, and
20      that Page 5, and if you compare -- well, strike
21      that.
22              Are you familiar with the concept of
23      redlining?
24              MS. DAVIS:  Object to form.
25      BY MR. NIEMEYER:


00146
 1       Q.    Generally in a Word document?
 2       A.    Maybe the best thing would be for you
 3      to describe what you mean by it.
 4       Q.    Okay.  All I was going to ask you is,
 5      this document, Exhibit 8, you can see in the
 6      left-hand margin a vertical line beginning at
 7      the bottom of Page 5?
 8       A.    Right.
 9       Q.    And then it continues on in sections
10      of Page 6, 7, and 8.
11       A.    Okay.
12       Q.    And often that is used in redlining to
13      signify that that's a change when there's lines
14      in the margin.
15       A.    Okay.
16       Q.    Is it understanding that the area
17      signified there are changes to the label?
18              MS. DAVIS:  Object to the form.
19      BY MR. NIEMEYER:
20       Q.    In your study of previous labels and
21      this label.
22       A.    I'm not familiar with -- I assume that
23      this, you know, follows some FDA regulatory
24      process, but I don't know what they were trying
25      to indicate.


00147
```

1     Q.     Okay.
2     A.     It's clearly different than the
3  previous document.
4     Q.     And that was going to be my next
5  question.
6            You can see that it's quite different
7  from the Thromboembolism section back in March
8  of 2006?
9     A.     It looks like there's differences in
10 some of the other sections, too.  But I don't
11 know the significance of the line.
12    Q.     Okay.  Let's just go to -- I'm sorry,
13 you have -- you are familiar with Exhibit 8, the
14 2012 label, correct?
15    A.     Yes.
16    Q.     And would you agree with me just
17 generally that the Thromboembolic disorders
18 sections of the 2012 label is more informative
19 than the Thromboembolism of the 2006 label?
20           MS. DAVIS:  Object to the form.
21    A.     Well, again, you'd have to qualify
22 "more informative."  There is more information,
23 if that's what you mean.
24 BY MR. NIEMEYER:
25    Q.     Sure.  Let me --


00148
1            MR. PIORKOWSKI:  Mark, could we go off
2  the record?  Could I talk to you outside for a
3  second just about an issue?  I don't want to
4  sort of interfere with your examination.  I
5  don't want to say it on the record with the
6  witness here.
7            MR. NIEMEYER:  Sure.  We'll take a
8  break.
9            THE VIDEOGRAPHER:  Going off the
10 record.  The time is 2:23.
11           (Whereupon, a recess was taken.)
12           THE VIDEOGRAPHER:  Back on the record.
13 The time is 2:27.
14 BY MR. NIEMEYER:
15    Q.     Okay.  Doctor, I do want to direct you
16 to Exhibit 8, the 2012 label, bottom of Page 5,
17 and there it says -- there's a sentence in the
18 second paragraph, "Based on presently available
19 information on drospirenone-containing COCs,
20 with .3 milligrams of ethinylestradiol (that is,
21 Yasmin), DRSP-containing COCs may be associated
22 with a higher risk of venous thromboembolism
23 (VTE) in COCs containing the progestin
24 levonorgestrel or some other progestins.

USCA5 732

25    Epidemiologic studies that compared the risk of


00149
 1    VTE reported that the risk ranged from no
 2    increase to a three-fold increase."
 3             Do you agree with those two
 4    statements?
 5             MS. DAVIS:  Object to form.
 6       A.    They're very generic -- I mean very
 7    general statements with -- I think since they
 8    used the statement "may be associated," that's a
 9    statement that I can generally agree with.  And
10    the epidemiologic studies range -- yes, I think
11    those are reasonable measured statements.
12    BY MR. NIEMEYER:
13       Q.    And if we go to then Page 7, there's a
14    figure there, Figure 1 entitled "VTE Risk with
15    Yasmin Relative to Levonorgestrel-Containing
16    COCs (adjusted risk)."
17             Do you see that there?
18       A.    Figure 1?
19       Q.    Yes, sir.
20       A.    Yes.
21       Q.    What do we call this type of a figure
22    or graph?
23       A.    Times we call it a whisker plot.
24       Q.    Whisker?
25       A.    Whisker plot.


00150
 1       Q.    Okay.  Is it ever called a forest
 2    plot?
 3       A.    Yes.
 4       Q.    Okay.  Either/or?
 5       A.    Yes.
 6       Q.    And just generally, does this show us
 7    with the vertical line in the middle, that's a
 8    line that is used to indicate no increased risk,
 9    correct?
10       A.    Correct.
11       Q.    And so then this diagram simply plots
12    out where the listed studies fall with respect
13    to whether or not -- or where they showed the
14    risk relative to no increased risk, fair enough?
15             MS. DAVIS:  Object to form.
16       A.    It provides a single result from a
17    number of studies showing in either a hazard
18    ratio, risk -- rate ratio or odds ratio.
19    BY MR. NIEMEYER:
20       Q.    Okay.  Let's talk a little bit about

USCA5 733

21    kind of epidemiologic studies in general, and
22    some of these that are listed in this whisker or
23    forest plot.
24            First of all, I want to talk to you
25    about the entity that funds a study, and I want


00151
1     to ask you, are you familiar with research or
2     studies that show that when a drug company
3     finances a study, that the study is more apt to
4     have a favorable outcome for the drug company
5     than when the funding is neutral --
6             MS. DAVIS:  Object to the form.
7     BY MR. NIEMEYER:
8         Q.    -- such as a government funding
9     source?
10        A.    I'm not aware of a particular
11    analysis.  There's a -- I could understand some
12    explanations for that.  Most trials are not
13    negative, they're not -- it's not a 50/50 split
14    when you embark on a large study, particularly a
15    high cost study, you have an idea on what the
16    outcome is or you wouldn't embark on, it's not a
17    simple coin flip.  So any trial, for instance,
18    done by a sponsor, it's not -- there is -- it
19    would be illogical to expect there to be half of
20    them negative and half of them positive, because
21    you start a trial with a prior hypothesis of a
22    likely outcome, and then you try to confirm that
23    likely outcome.
24            So I'd say it's logical and likely
25    that industry-sponsored trials are more often


00152
1     positive than negative.
2         Q.    Is that sometimes called or described
3     as funding bias?
4             MS. DAVIS:  Object to the form.
5         A.    What I just described would not be
6     funding bias.  It would be funding truth.
7     BY MR. NIEMEYER:
8         Q.    Tell me what funding bias is then.
9         A.    So bias implies that you're getting
10    the wrong answer.  So there is reporting bias
11    and publication bias.  We have some examples of
12    that in some of the literature we can talk about
13    later today.
14            A reporting bias is when you select a
15    result and report only that.  I think Sydney is
16    a good example of reporting bias, they've

17    isolated a result from the FDA study that wasn't
18    the only specified analysis and selectively, so
19    that's a reporting bias.
20              A bias implies that you're getting the
21    wrong answer.  What I described was -- what I
22    described was when an industry gets to the stage
23    3 of doing a drug trial, they have a very good
24    idea of how that study will perform.  They're
25    required to quantify the benefit and they're


00153
 1    required to look at safety issues, they try to
 2    expand it to as broad a population as they can.
 3    But they don't launch a multi-million dollar
 4    trial with a 50/50 likelihood that the trial
 5    will show a positive or negative result.  They
 6    launch a trial with a drug that they have a lot
 7    of information on is likely to show an effect.
 8              So it would be logical for -- if you
 9    looked at all trials funded by industry, they
10    don't make these decisions at a 50/50, they make
11    these decisions on a likely beneficial device or
12    drug, so it's quite logical that more of those
13    trials would have a positive effect given all
14    the background information that went into the
15    design of that trial.  That wouldn't be bias.
16    That would be logic.
17         Q.    So I'll move to strike the portion of
18    your answer as non-responsive that deals with
19    reporting bias.
20              And then I'll follow up with, so your
21    point is that because of where most trials are
22    in the process, it's more likely than not that
23    the trial or study funded by a manufacturer is
24    going to come out favorable to the product, or
25    positive in your words?


00154
 1              MS. DAVIS:  Object to form.
 2         A.    Right.  Because of the development
 3    that goes into the design, all the work that
 4    goes into the design of a trial for a new
 5    product, you don't do that unless there's a high
 6    likelihood that the intended effect of the drug
 7    will be demonstrated.
 8              Now, we do the trial because that's
 9    not always the case, or because there are
10    sometimes balancing risks and benefits that
11    require it, or because we absolutely need to
12    quantify the benefit to see if -- the direction

13    is one thing, what the magnitude of the benefit
14    is the same.
15           When NIH funds a study, could be even
16    a trial, a lot of times it's something that's
17    emerged that we don't have as much background
18    information on.  So to me, that's not surprising
19    that given the logical progression of the
20    development of drugs that if -- that more of
21    trials that are funded by industry have a
22    positive result.
23    BY MR. NIEMEYER:
24       Q.    And you looked at a number of the
25    studies surrounding drospirenone-containing oral


00155
1     contraceptives and VTE and/or ATE in preparation
2     for this, correct?
3        A.    Yes.
4        Q.    And you looked at, among others, the
5     EURAS study, the LASS follow-up, the INAS study,
6     and the Ingenix study, are some of them that you
7     looked at, correct?
8        A.    Yes.
9        Q.    And each -- and you discuss those
10    studies in your report to some extent?
11       A.    I do.
12       Q.    And Bayer funded the EURAS study,
13    correct?
14       A.    I believe so, yes.
15       Q.    Bayer funded the INAS study?
16       A.    I believe so.
17       Q.    Bayer funded the LASS, L-A-S-S, study?
18       A.    I believe they did, yes.
19       Q.    And Bayer funded the Ingenix study?
20       A.    Yes, I believe they were all done with
21    consultation with some regulatory body.
22       Q.    But funded by Bayer?
23       A.    Yes.
24       Q.    And Bayer is also the entity that is
25    paying you to work on this case and to testify


00156
1     here today, correct?
2        A.    Correct.
3        Q.    Now, do you know a scientist by the
4     name of Dinger, Juergen Dinger?
5        A.    Not personally.
6        Q.    Do you know who he is?
7        A.    I know he's the author on some of the
8     studies that I reviewed.

```
 9      Q.    And do you know his employment
10   history?
11      A.    Only vaguely.
12      Q.    Do you understand whether or not he
13   worked at Bayer for a period of time?
14            MS. DAVIS:  Object to form.
15      A.    It is my understanding that he did.
16   BY MR. NIEMEYER:
17      Q.    And did he work at Bayer during --
18   strike that.
19            Was he the author of the EURAS study?
20      A.    I believe he was.
21      Q.    And did he work at Bayer during any
22   point in time that the EURAS study was going on?
23            MS. DAVIS:  Object to form.
24      A.    I don't know about the timing of his
25   employment with Bayer.
```

```
00157
 1   BY MR. NIEMEYER:
 2      Q.    Are there any weaknesses -- strike
 3   that.
 4            Is the LASS study related to the EURAS
 5   study?
 6      A.    Yes.
 7      Q.    Is it kind of a follow-up, or
 8   continuation?
 9      A.    Yes, it's a long-term follow-up with
10   EURAS.
11      Q.    And so are there any weaknesses to the
12   EURAS/LASS studies?
13      A.    Yeah, there are weaknesses.  There are
14   strengths and weaknesses of every one of these
15   studies.
16      Q.    What are the weaknesses of the
17   EURAS/LASS study?
18      A.    Well, there are -- any observational
19   study has potential weaknesses, and some of them
20   that I will enumerate apply in general to
21   observational studies.
22            In comparing it to the ideal, the
23   ideal would be being able to randomize people to
24   one OC and compare it with another OC, and then
25   follow people perfectly for a long period of
```

```
00158
 1   time, not losing anybody to follow-up.
 2            In an observational study you don't
 3   have that opportunity.  So there are potential
 4   biases in every one of these studies.  It's a
```

USCA5 737

    5    fairly long list.  But the prospective nature of
    6    EURAS and LASS eliminates some of those, but --
    7    lessens some of those, but doesn't eliminate
    8    them all.
    9           One example is being able to know for
   10    sure who is taking a drug when, it's not perfect
   11    in EURAS and LASS, it would have been cumbersome
   12    to do so, to watch everybody daily take it, so
   13    you rely on self-report in that case collected
   14    prospectively.  It's actually quite good.  It's
   15    better than, say, in contrast to a registry
   16    study where all you know is the drugs were
   17    dispensed and not used, but it's not perfection.
   18    And any time that there's less than perfect
   19    ascertainment of your exposure variable, it
   20    could have an impact on your result.
   21           Similarly, ascertainment of the
   22    outcome variable, anything less than perfection
   23    could have an impact.  I thought it would -- I
   24    think that EURAS and LASS, and INAS in
   25    particular, are particularly good in that


00159
    1    regard, but they're not perfect.
    2           I think it's more challenging in
    3    general for VTE than for ATE because the setting
    4    in which those events occur can sometimes be an
    5    outpatient setting.  They're not always
    6    hospitalized for a venous thrombotic event, or
    7    there's a shorter hospital stay.  A stroke or a
    8    heart attack are a little bit easier, but
    9    they're not perfect, and any of those
   10    imperfections can lessen the ability to be able
   11    to see a result.
   12           One advantage of LASS, particularly
   13    for VTE, is it has a large number of events.
   14    Limitations particularly for ATE in all of these
   15    studies is that there are not very many events,
   16    and any time there are not very many events, any
   17    estimate you get from that creates uncertainty.
   18           But there's not a single one of these
   19    studies that doesn't have some limitations.  I
   20    think that EURAS and LASS and INAS being
   21    well-characterized prospective studies put them
   22    in the highest quality of the studies.
   23    Q.    Okay.  Let me just ask you some
   24    specific questions about the EURAS/LASS studies.
   25           First of all, can you tell us how the,

USCA5 738

```
 1    quote unquote, other oral contraceptive group
 2    was defined, or the comparator group?
 3         A.     Yes.  Well, would you mind if I took a
 4    look?
 5         Q.     I don't mind at all.
 6         A.     That's the best way to get the
 7    specific answers.
 8             So I think that we can go to either
 9    the LASS follow-up or the main EURAS paper to
10    get some sense.
11             Now, there were several comparison
12    groups established.  And if you could repeat the
13    question, I think I have the table that I need
14    to answer it before me.
15         Q.     Sure.
16             Findings were made comparing
17    drospirenone-containing oral contraceptives to
18    other oral contraceptives, and I'm just
19    wondering how the other oral contraceptive group
20    was defined.
21         A.     So there were three other groups for
22    comparison.  There was levo plus other, and then
23    levo alone, and other alone, as the three
24    comparison categories.
25         Q.     So I want to know what comprised the
```

```
00161
 1    other, whether it was plus other, or whatever it
 2    was, the other OC?
 3         A.     So it was both.
 4             So what they did was they have a
 5    category with LNG plus other, and they also have
 6    a category of LNG alone, and then they have a
 7    category of other alone, without levo.
 8             You want to know specifically what's
 9    in the other?
10         Q.     Yes, sir.  Or how that's defined, if
11    it is.
12         A.     So it is -- so there are -- there's a
13    no use category.  Other OCs is a fairly sizable
14    category.  Let's go specifically to the
15    definition of the exposure variable.
16             So it was oral contraceptives in use
17    by self-report.  And I don't believe in the
18    final paper they give you the breakdown.  It's a
19    substantial number of individuals.  I think
20    perhaps in one of the longer-term follow-up
21    reports there is another specifics about the
22    distribution of OCs.
23             But it's OCs, combined oral
24    contraceptives that were used contemporaneously.
```

Case 2:14-md-02592-EEF-MBN Document 5127-12 SEALED Filed 01/20/17 Page 89 of 130

25    And it may take a minute for me to be able to

00162
 1    find a listing of what else was in that
 2    category.  It's a category bigger than the other
 3    two, but I can't -- I can't offhand get the
 4    specifics of the OC content.
 5        Q.    Okay.  Well, let me ask you another
 6    question about the EURAS/LASS studies.
 7              As far as ATE adjudication, were the
 8    ATE adjudicators blinded?
 9        A.    I'm an ATE adjudicator for our
10    studies, and what's good about ATE is it's a
11    fair amount easier than an awful lot of other
12    outcomes.
13        Q.    Are you blinded in your studies?
14        A.    I tend to be, yes.  But that's --
15    there isn't an alternative.  I don't have a
16    choice.  The data monitoring board keeps the
17    data.
18              I won't say that I'm blinded in all of
19    our observational studies, but in the randomized
20    trials that I'm on the endpoints committee, the
21    data monitoring board keeps the data on that.  I
22    don't have privy to that data until the study is
23    over.
24        Q.    And just so the record is clear, my
25    question to you is, in the EURAS/LASS studies,

00163
 1    were the ATE adjudicators blinded?
 2        A.    I don't know, but I'll try -- I'm
 3    going to the section where the -- blinded
 4    adjudication.  I think that this paper refers --
 5    this paper is more focused on VTE, and they
 6    mentioned blinded adjudication with the
 7    reference to VTE.  I'm not certain what -- I
 8    don't see a specific description of the ATE --
 9    of the specifics of the ATE evaluation.
10        Q.    So you don't -- as you sit here, you
11    don't know whether the ATE adjudicators were
12    blinded or not?
13        A.    "Final analysis classification of the
14    primary outcome of interest VTE."  I assume that
15    they would -- it's actually just as hard to not
16    blind.
17              But the VTEs were.  My assumption
18    would be the ATEs also were, but I don't know.
19        Q.    Okay.  And if a different expert for
20    Bayer testified that ATE adjudicators in the

```
21      EURAS and LASS studies were not blinded, you
22      wouldn't have any basis to disagree with that?
23           A.    I wouldn't have any basis to agree or
24      disagree.
25           Q.    Do you have any concern with EURAS and
```

00164
```
 1      LASS as to whether or not hemorrhagic strokes
 2      were included as ATEs when they should not have
 3      been?
 4               MS. DAVIS:  Object to form.
 5           A.    Well, we tend to use total stroke as
 6      the main outcome in general, often because it is
 7      sometimes difficult to make the distinction.  In
 8      western populations the vast, vast, vast
 9      majority of all strokes are ischemic, so we tend
10      not to exclude them from our total stroke
11      outcome, even when our primary biologic
12      hypothesis is that we're concerned about
13      atherothrombotic events, we tend to exclude
14      them.  It wouldn't have bothered me because the
15      number of events would have been quite small.
16      BY MR. NIEMEYER:
17           Q.    Even so, there's certainly the
18      possibility that included in the stroke data for
19      the EURAS and LASS studies are hemorrhagic
20      stroke?
21               MS. DAVIS:  Object to form.
22           A.    Certainly possible, likely not to be a
23      material -- a small number of total strokes to
24      begin with, it's likely that all -- if not all,
25      nearly all are non-hemorrhagic.
```

00165
```
 1      BY MR. NIEMEYER:
 2           Q.    And isn't it true that if we're
 3      dealing with a small number to start, throwing
 4      off that number by one or two improperly placed
 5      hemorrhagic strokes could affect our results?
 6               MS. DAVIS:  Object to form.
 7           A.    I don't know what you mean by
 8      "improperly placed."  That's to imply that God
 9      placed them in the wrong place?  I mean if they
10      were randomly distributed between the two, it
11      would have no material effect.  If something is
12      not related and they're distributed randomly
13      between the two groups, it's going to have no
14      material effect, particularly if they're small
15      in number.
16      BY MR. NIEMEYER:
```

17      Q.    But if they're not randomly
18  distributed between the two groups and small in
19  number, it very well might affect the outcome to
20  have a hemorrhagic stroke classified and viewed
21  as an ischemic stroke in this study?
22          MS. DAVIS:  Object to form.
23      A.    A lot of things would have to fall in
24  place.  Most of the time God works with
25  randomness, not non-randomness.  So if there are


00166
1   hemorrhagic strokes, the most likely
2   distribution is one of a random one, which would
3   have no effect, especially given the fact that
4   the proportion of hemorrhagic strokes would be
5   exceedingly small.
6   BY MR. NIEMEYER:
7       Q.    But it's not something that you can go
8   back and take a look at for sure to know whether
9   hemorrhagic strokes were included and whether
10  they were randomly distributed?
11      A.    Well, if there's no information
12  provided, I can't go back and look.  But given
13  my background, I can tell you that the
14  likelihood of it having a material impact on the
15  result is infinitely small given what I've
16  described about their likely distribution and
17  their likely small proportion in the total.
18      Q.    Okay.  The Sydney study, or the FDA
19  study, what are the strengths of that study?
20      A.    So it's -- and I will tell you that's
21  one thing that's a little tough to evaluate is
22  that I have never seen a protocol that was
23  provided prior to the -- not accompanying the
24  results.
25          But the strengths of the study are


00167
1   large numbers.  The exposure variable is based
2   on not quite as good data as the prospectively
3   collected data from EURAS and LASS, but it's, I
4   would say, an intermediate level of quality on
5   the exposure data.
6           The outcome data has got some
7   challenges when you're using the kind of health
8   system ascertainment that was made.  The ability
9   to carefully evaluate each outcome is a
10  challenge.
11          The one major weakness of the study is
12  that there are quite a few --

```
13        Q.     Wait a minute.  I don't believe I
14   asked you about weaknesses.  I asked you about
15   strengths.
16        A.     I thought you asked me about strengths
17   and weaknesses like you did the previous one.  I
18   was sort of speeding ahead to the -- the same
19   parallel question that we talked about strengths
20   and weaknesses of the previous one.
21        Q.     That's what I asked you -- anyway, I
22   just asked you about strengths on this one.
23        A.     All right.  So the largest -- the
24   biggest strength is large numbers that can be
25   afforded when you use the kind of health system
```

```
00168
 1   data that was used.
 2        Q.     Okay.  Let's go back to your report,
 3   and go to Page 5, if we could.  And let's look
 4   the section "Comparative Associations of ATE
 5   with Available COCs."
 6               Do you see that there?
 7        A.     Yes.
 8        Q.     Okay.  And again, this is your report,
 9   so these are your statements, right?
10        A.     Yes.
11        Q.     And the first sentence there says "The
12   overall increase in ATE risk with currently
13   available COCs is less than 2-fold."  That's
14   what you say there, right?
15        A.     Yes.
16        Q.     So you did make some quantification
17   effort, but obviously that's very broad, it's
18   just saying it's less than 2-fold.  But that
19   does in some fashion quantify the overall ATE
20   risk with COCs, correct?
21               MS. DAVIS:  Object to form.
22        A.     Yes.  And the intent here is to put it
23   in some context, not to try to quantify it.
24   When the risks are in this range of 2-fold, and
25   this wasn't to say -- just say that that is a
```

```
00169
 1   precise quantitative estimate, but it creates --
 2   the context here is it creates a challenge in
 3   designing studies, when you're looking for a
 4   modest risk.
 5   BY MR. NIEMEYER:
 6        Q.     Okay.  Let's go to -- and it's going
 7   to be tough for me to count the sentences, but
 8   I'll just have you get there with me, it's the
```

```
 9    sentence within the second paragraph of that
10    Comparative Associations of ATE section, and it
11    begins "Similarly."
12         A.    Yes, I see that.
13         Q.    So you say here "Similarly, patients
14    with other medical problems (potential risk
15    factors for ATE) see their doctor more often,
16    giving them a greater opportunity to switch to a
17    newer agent."
18               That's your statement, correct?
19         A.    Correct.
20         Q.    And are you saying there that because
21    folks are seeing the doctor more often, that
22    that in and of itself, because they're in the
23    presence of the doctor, gives them more of a
24    chance to switch their oral contraceptive?
25         A.    Yes, absolutely it does.  I mean if
```

00170
```
 1    you have hypertension or diabetes or high
 2    cholesterol and you're seeing a doctor more
 3    frequently, you can bring up any issues you
 4    might have with any of your drugs.  So it
 5    creates a greater opportunity.
 6         Q.    And is your theory, then, that because
 7    of that greater opportunity, more of these less
 8    healthy people are switching?
 9         A.    So that tends to be the case with
10    patients who are sicker, for a number of -- and
11    a number of drugs tend to get switched to newer
12    drugs.  It's a fairly common phenomenon.  The
13    word we use is channelling.  It's a common
14    phenomenon for many drugs.
15         Q.    And is it something that you
16    specifically studied with respect to patients
17    taking COCs, or are you just extrapolating that
18    theory to this context?
19         A.    It's a more general concept.  I have
20    not studied OCs in general.  There are two
21    things that happen.  One is greater opportunity,
22    because these are drugs that are prescribed and
23    require a physician.
24               The second is that in a patient with
25    multiple medical problems is on multiple
```

00171
```
 1    medications, and often we're stuck with the
 2    dilemma of are there any side effects, are there
 3    any -- as a result of any interference between
 4    drugs, which makes us wonder if we should be
```

```
 5    modifying drugs.  Sometimes if I've got patients
 6    with a challenging side effect profile that I'm
 7    not sure is due to one drug or the other, I
 8    might begin to experiment by switching drugs.
 9    So the greater number of drugs you're on, these
10    are sort of a general phenomenon, the greater
11    number of drugs you're on and the greater number
12    of times you see a physician.
13            And then the third thing that's thrown
14    into the mix is patients with multiple
15    conditions tend to have more complaints.
16            So it does create an opportunity for
17    greater switching of medications, and it's sort
18    of a standard clinical understanding in the
19    treatment of patients in general.
20       Q.    And so here, though, you haven't done
21    any specific analysis with respect to switching
22    of combined oral contraceptives, you're just
23    putting your theory that you just described into
24    that context?
25            MS. DAVIS:  Objection.
```

```
00172
 1       A.    Correct.  Correct.  And it's important
 2    when you're thinking about the comparison of --
 3    I do a fair number of pharmacoepidemiology
 4    studies.  And so it's important when you're
 5    comparing a new drug to an old drug in a
 6    comparative effectiveness modality to understand
 7    that this is a potential phenomenon for any new
 8    drug.
 9    BY MR. NIEMEYER:
10       Q.    And have you theorized or looked at at
11    all how marketing by a drug manufacturer or
12    manufacturers plays a role on starting new
13    medications, or switching from one medication to
14    another?
15            MS. DAVIS:  Object to form.
16       A.    I'm sure there are many influences.
17    You know, could be new side effect profiles they
18    could be made aware of through marketing or
19    through CME courses or through word of mouth.
20    There are probably many potential reasons why a
21    doctor might appropriately choose to consider a
22    new agent that's come onto the market.
23    BY MR. NIEMEYER:
24       Q.    Have you looked at all or been shown
25    at all the marketing campaign employed by Bayer
```

00173

```
 1    for Yasmin and/or Yaz over the course of the
 2    life of these products?
 3              MS. DAVIS:  Object to form.
 4         A.   I have not.
 5    BY MR. NIEMEYER:
 6         Q.   Have you heard any reports about
 7    patients going to their doctors after seeing
 8    commercials or reading magazine ads and asking
 9    to be switched for that reason over to Yaz or
10    Yasmin?
11              MS. DAVIS:  Object to form.
12         A.   Well, I haven't read any reports.  But
13    my patients will come and ask me about something
14    they've seen on the TV, sometimes pertaining to
15    a new medication.  It doesn't -- it doesn't --
16    it gives an opportunity for a discussion.  It
17    doesn't drive my decision.  My decision is based
18    on sound clinical reasoning rather than -- in
19    many cases, rather than a patient's desires.
20    But it does provide an opportunity for a
21    discussion.
22    BY MR. NIEMEYER:
23         Q.   And if those two things can coincide,
24    your sound medical reasoning and a patient's
25    desires, more times than not will you go ahead
```

```
00174
 1    and try to prescribe the medication that the
 2    patient is asking for?
 3              MS. DAVIS:  Object to form.
 4         A.   Well, it all depends.  It depends on a
 5    number of factors.  I won't make any changes
 6    that are not clinically necessary.  I'm also
 7    sometimes restricted to some degree by what our
 8    formulary has.  And a lot of times nowadays our
 9    formularies are a few steps behind the curve for
10    cost reasons.
11              So I may have a discussion.  It may be
12    a reasonable thing that we might consider in the
13    future.  It might not be available to me.
14    BY MR. NIEMEYER:
15         Q.   And by not available to you, you're
16    referring to the fact that a lot of medical
17    facilities are governed by medications that are
18    on a formulary, and thus allowed to be
19    prescribed or prescribed at less of a price
20    versus drugs that are off formulary?
21              MS. DAVIS:  Object to form.
22         A.   Correct.
23    BY MR. NIEMEYER:
24         Q.   Let's go ahead and move in your report
```

25    to Page 12.  Let's hold there for a second.


00175
 1    Actually we may come back to that.  Let's put
 2    the report aside for a second.
 3              Actually let's keep the report out
 4    just generally.  And I think I touched on some
 5    of this, but I just want to make sure that I
 6    have it.
 7              Does this report here with its
 8    attachments, and I know it refers to your
 9    earlier report as well, so does this report that
10    we're looking at, Exhibit 3, contain all of the
11    opinions and references to bases for those
12    opinions that you plan to testify to in trials
13    or in a trial or trials of this -- in this
14    litigation?
15              MS. DAVIS:  Object to form.
16         A.    Yes.  Although as I've said in the
17    report, I reserve the right to comment on new
18    materials that are presented to me.
19    BY MR. NIEMEYER:
20         Q.    As you sit here right now, though, you
21    don't know of any of those?
22         A.    Correct.  I actually am aware of a new
23    BMJ paper on VTE that's not directly relevant.
24    I will take a look at that prior to any
25    testimony.


00176
 1         Q.    Okay.  And along those lines, would
 2    you agree with me that there were a couple of
 3    articles and studies that came out after the
 4    April, 2012 label change?
 5              MS. DAVIS:  Object to the form.
 6         A.    Yes.  Some of the studies -- again
 7    we'd have to go through the -- I think some of
 8    the studies were published, although some of the
 9    data were available, for instance, in the FDA
10    study, the paper was published after, but the
11    primary data were available prior, and I don't
12    think there's anything new in the paper that
13    wasn't in the previous report.
14              I would say there's definitely been
15    some publications.  I can't tell you exactly
16    whether or not there were results that were or
17    were not available at the -- it's April of 2012,
18    correct?
19    BY MR. NIEMEYER:
20         Q.    Yes, sir.

```
21      A.    I don't know what -- I don't know
22  precisely what new data were available.  As I
23  said, the Sydney paper came out later, but most
24  of those results were contained in the previous
25  report.
```

```
00177
 1      Q.    Okay.  Let me just ask you some
 2  specifics here.
 3            Have you reviewed with respect -- and
 4  these are studies that -- or articles that
 5  looked at VTE and drospirenone-containing oral
 6  contraceptives vis-à-vis other oral
 7  contraceptives, including levonorgestrel, have
 8  you looked at the Wu 2013 meta-analysis?
 9            MS. DAVIS:  Object to form.
10      A.    I am familiar with it, and I have
11  looked at it.  I will tell you that it was not a
12  major focus on my ATE review.
13  BY MR. NIEMEYER:
14      Q.    Did you look at the Bird 2013 study?
15            MS. DAVIS:  Object to the form.
16      A.    I believe I have it in my files, but
17  I'm not absolutely certain.  I'm aware of it.
18      Q.    How about Ziller 2014?
19      A.    Again, I'm not certain if I have it in
20  my files or not.  I'm aware of it.
21      Q.    And finally, Vinogradova 2015
22  meta-analysis?
23      A.    That one I'm not sure that I've
24  carefully reviewed.
25      Q.    Okay.  So in what form -- I have your
```

```
00178
 1  report and I have the attachments to it, and I
 2  don't know, did you attach a list of materials
 3  reviewed in this current report, Exhibit 3?
 4      A.    Yes.
 5      Q.    And just tell me what exhibit that is,
 6  if you would.  Or page it's on.
 7      A.    In the back after the CV.
 8            MR. PIORKOWSKI:  If you go to Page 78,
 9  Mark, and it's right after.
10      A.    Report references.  So I do have -- I
11  didn't focus, I do have Wu and Ziller in my
12  possession.  They are listed here.  But I don't
13  -- I couldn't tell -- without looking at them, I
14  couldn't recite the particulars back to you.
15  BY MR. NIEMEYER:
16      Q.    Is there anything that you've reviewed
```

17    or are relying upon that is not mentioned in
18    your report or listed in the References
19    Considered portion of your report?
20         A.    I don't believe so.
21         Q.    Okay.  Let's go back through the
22    report a little bit, if we could.  Page 3.
23         A.    Yes.
24         Q.    Okay.  We talked about this a little
25    bit before, but just to confirm, I'm in the


00179
 1    pathophysiology section, first paragraph, looks
 2    like the third sentence.
 3         A.    Okay.
 4         Q.    "ATE events include myocardial
 5    infarction, ischemic stroke, other thrombotic
 6    events in peripheral arteries, and transient
 7    ischemic attacks," or TIAs.
 8               And that's not only in there, but it's
 9    true, correct?
10         A.    Yes.
11         Q.    Okay.  And then if we go down to "Risk
12    factors," in the paragraph you begin and you
13    list risk factors for ATE, correct?
14         A.    Mm-hmm.
15         Q.    That's in the first sentence.
16               And in the second sentence you list
17    risk factors for VTE, and you say that they are
18    somewhat different, and then you list them,
19    correct?
20         A.    Correct.
21         Q.    And under the VTE, you list pregnancy
22    as one of the risk factors for VTE, correct?
23         A.    Correct.
24         Q.    You do not list pregnancy as one of
25    the risk factors for ATE in this section of your


00180
 1    report, correct?
 2         A.    Correct.  Although I didn't intend
 3    either of these lists -- I mean if I listed all
 4    the factors for both, there are compendium that
 5    could list 4 or 500 names.
 6         Q.    I understand.
 7         A.    So that the ones that are exceedingly
 8    small or uncertain, but that -- my list -- the
 9    distinction here is -- the intent here is to
10    make it -- to make it clear that there are,
11    amongst the major ones, there are some
12    distinctions, but not to be all-inclusive of all

USCA5 749

13   risk factors for both conditions.
14     Q.   Understood.  Let's go to Page 4, and
15   the "Prevention" heading.  And there you list
16   prevention, what prevention involves generally
17   for ATE in the first paragraph and for VTE in
18   the second paragraph, correct?
19     A.   Yes.  And the same idea as there, just
20   to describe they're certainly not identical.
21   While obesity is a risk factor for both, you
22   could list both of them, a mitigation of both,
23   under both.  But there are -- the general
24   approach to prevention of ATE is handled
25   differently than the general approach to the

00181
1   collective set of activities that we do to
2   prevent VTE.
3     Q.   And in this Prevention section under
4   the VTE section, you list avoidance of pregnancy
5   as a prevention strategy, but you do not list
6   avoidance of pregnancy as a prevention strategy
7   for ATE in your report, is that correct?
8     A.   Correct.  Again, it's a matter of
9   degree.  Very, very few coronary events,
10   although there are some cardiomyopathies that
11   occur, it's a different disease and entity.
12         MR. NIEMEYER:  I'll move to strike the
13   portion of the answer beyond "correct."
14   BY MR. NIEMEYER:
15     Q.   Doctor, I'm going to show you
16   Exhibit 9.
17         (Whereupon, Gaziano Exhibit Number 9,
18         Plaintiffs' Notice of Videotaped
19         Deposition of Michael Gaziano, was
20         marked for identification.)
21   BY MR. NIEMEYER:
22     Q.   And you'll notice that that is the
23   deposition notice for today's deposition.
24     A.   Okay.
25     Q.   And if you would, I just want to run

00182
1   over some categories.
2         Actually, did I hand anybody my
3   highlighted copy?
4         Doctor, if you --
5     A.   You did.
6     Q.   That's the answer key.  So let's see
7   if I can --
8         MR. PIORKOWSKI:  I don't know if I can

```
 9    short-circuit this, but we've had an agreement
10    in most of these that basically we're going to
11    produce invoices, and I think there's been
12    objections on both sides to pretty much all of
13    these.  And I think what we've been doing is
14    produce invoices and -- fee agreements under
15    invoices, are pretty much limited to that.
16              MR. NIEMEYER:  Understood.  I'm still
17    going to go over a couple things to see what we
18    have and don't have, but I understand what
19    you're saying.
20              MR. PIORKOWSKI:  Okay.
21    BY MR. NIEMEYER:
22         Q.    So, Doctor, let's do go ahead and turn
23    to Page 4 of 6, and it's Exhibit A.  And just
24    let me run through a few of these.
25              First of all, the invoices that I have
```

00183
```
 1    today that we showed you as Exhibit --
 2              MS. DAVIS:  2, I think.
 3    BY MR. NIEMEYER:
 4         Q.    -- 2, I think is right, that's
 5    everything you've invoiced to date, and it
 6    doesn't include certain things as we've
 7    discussed, correct?
 8         A.    Correct.
 9         Q.    No invoices that I'm missing?
10         A.    No, sir.
11         Q.    Okay.  I've got your CV with your
12    report, right?
13         A.    Yes, sir.
14         Q.    And kind of a combination of 2 and 8.
15              There's no formal -- and you may chime
16    in here -- compensation agreement between you
17    and Bayer, a lengthy, signed document, or
18    anything like that?
19         A.    Correct.
20         Q.    And then as far as your complete file,
21    I just want to make sure that I have or have
22    access to a number of things.
23              Your report, the list of materials
24    that we already talked about is exhaustive at
25    this point, but you've brought a binder here
```

00184
```
 1    today.  Does the binder contain select materials
 2    that are also on the reference list?
 3         A.    Yes, sir.
 4         Q.    Does it contain anything beyond that?
```

```
  5        A.    No, sir.
  6        Q.    And this is -- when we talked last
  7   time, you had a habit of making a few notes on a
  8   study or a document here or there, and last time
  9   I got from you all those documents that you had
 10   made notes on.
 11             Have you made notes on additional
 12   documents since we last talked that are related
 13   to the work you've done in this case?
 14        A.    No, sir.
 15        Q.    With respect to audio/visual or
 16   demonstrative exhibits, I do see at the end of
 17   your report that you have included a few charts
 18   and demonstrative-type exhibits, correct?
 19        A.    Correct.
 20        Q.    Does your report include all such
 21   potential demonstrative exhibits and
 22   audio/visual aids that you think you might use
 23   as of this point in time, other than perhaps a
 24   handwritten drawing that you might do at trial?
 25        A.    Yes.
```

```
00185
  1        Q.    What I'd like to do now is if we could
  2   go off the record, I may look at my notes a
  3   little bit, and see, I think we're pretty darn
  4   close.
  5             THE VIDEOGRAPHER:  Going off the
  6   record.  The time is 3:18.
  7             (Whereupon, a recess was taken.)
  8             THE VIDEOGRAPHER:  Back on the record.
  9   The time is 3:39.
 10   BY MR. NIEMEYER:
 11        Q.    Doctor, have you been asked to and/or
 12   are you planning to testify in a trial or trials
 13   upcoming this summer?
 14        A.    There may be a malpractice case that I
 15   might testify for, but not many.  I've not been
 16   asked specifically for cases.
 17             You mean in reference to --
 18        Q.    To Yaz and Yasmin.
 19        A.    We haven't discussed specific cases.
 20        Q.    And as of this point, no travel plans
 21   made, or anything like that?
 22        A.    Correct.
 23        Q.    Okay.
 24             MR. NIEMEYER:  That's all the
 25   questions I have.  Thank you very much for your
```

```
 1    time.
 2              MS. DAVIS:  Mark, I want to mark a
 3    document, I only have one clean copy, so I was
 4    going to put it up on there, but we can make a
 5    second copy.
 6              MR. PIORKOWSKI:  Let me get a copy
 7    made.
 8              MR. NIEMEYER:  That would be great.
 9              MS. DAVIS:  Let's go off the record.
10              MR. NIEMEYER:  Were you going to start
11    with that?
12              MS. DAVIS:  Yes, I was going to start
13    with that, so let's go off.
14              MR. PIORKOWSKI:  Why don't you start
15    with something else.
16              MS. DAVIS:  All right.
17              CROSS EXAMINATION
18    BY MS. DAVIS:
19         Q.    All right.  Doctor, earlier today
20    Mr. Niemeyer asked you some questions about
21    paradoxical embolism.
22              Do you remember that discussion?
23         A.    Yes, ma'am.
24         Q.    And during that discussion you were
25    asked certain questions about a venous clot
```

00187
```
 1    travelling through a PFO into the arterial
 2    circulation.
 3              Do you recall that?
 4         A.    I do.
 5         Q.    Is there another way by which a PFO
 6    might be associated with a stroke or arterial
 7    event?
 8         A.    Yes, there is.
 9         Q.    Can you explain that?
10         A.    So PFOs are of many different types,
11    and there can be -- the PFO is basically a flap
12    of tissue that covers a hole that allow the
13    blood to cross from the right to left bypassing
14    the lungs when we were all in utero in our
15    mother's stomachs because we weren't breathing,
16    then that flap closes on birth because the
17    pressure has changed and the blood starts
18    flowing through the lungs.
19              There can be some abnormalities, that
20    when that flap closes it might not close all the
21    way, it might have redundant tissue which causes
22    a little aneurysm or little pocket, and in that
23    pocket, blood clots can form.
24         Q.    When you say a pocket or an aneurysm,
```

25      are you referring to an atrial septal aneurysm?


00188
 1          A.    Yes.  So this hole, this oval hole,
 2      the foramen, is in the atrial septum, and it's
 3      in the development of that -- it has to develop
 4      just right with a little flap that allows the
 5      blood to go through, and immediately on birth it
 6      closes.  There can be abnormalities in that
 7      atrial septum, in the development of this
 8      delicate architecture of this little flap.
 9          Q.    And so abnormalities in that atrial
10      septum could lead to clot formation?
11          A.    Yes.
12          MR. NIEMEYER:  Objection.  Form.
13      BY MS. DAVIS:
14          Q.    Okay.  You were also asked about the
15      Sydney study, also sometimes called the
16      FDA-funded study?
17          A.    Yes.
18          Q.    Specifically Mr. Niemeyer asked you
19      about the strengths of that study.  Can you also
20      describe the weaknesses of that study in your
21      view?
22          A.    Yes.  So there are a number of issues
23      we've discussed.  Some of the general weaknesses
24      with the strategy, one of them is that the
25      exposure variable of interest is the use of OCs,


00189
 1      and it's very useful to get that straight from
 2      the horse's mouth, so to speak, because it tells
 3      you something about how the people directly use
 4      that.
 5                There were a number of hypotheses that
 6      were -- or a number of analyses that were
 7      explored in the report, and there was some
 8      discussion about how those analyses are set
 9      forward.  They weren't as carefully specified as
10      primary analyses and secondary analyses as I
11      would like to have seen, I've never seen a
12      document that describes those, but what it leads
13      to is a number of tests.
14                When we do one test, we understand
15      what a statistically significant value is.  When
16      we do many, then we have to be cautious in
17      interpreting those.  But one of the things that
18      was most concerning to me was that there were a
19      number of analyses provided in the report where
20      there was a really highly selective presentation

USCA5 754

21    of those in the publication.  So that's another
22    issue.
23              Another major issue is that the
24    segregation by new users versus all users.  Now,
25    it's clear from the literature that in the first


00190
1    year of use of an OC, for VTE the risk is
2    considerably higher than later.  That's not the
3    case at all for ATE.  So it makes absolutely no
4    sense as your primary analysis to look at new
5    users, and yet that was the main analysis
6    presented in the paper.
7              When you look at a subgroup like that,
8    the all users showed no effect, you look at the
9    subgroup of individuals, there's a suggested
10    high risk.  But again, when you look at multiple
11    testing and you look at subgroup analysis, you
12    have to be very cautious.
13              The interesting thing is in the
14    non-users subgroup, not only is there not no
15    increased risk, there's a statistically
16    significant reduction in risk of ATE, it's
17    about -- the risk is about one-seventh compared
18    to the levo drug.
19              And I don't view either of those
20    findings as definitive.  I think that the
21    primary analysis should be in all users, not in
22    just new users.
23              If you look at Lidegaard, he looks at
24    the risk of ATE by risk by year, and there is
25    absolutely no difference looking at all the OCs


00191
1    by year.  So the primary analysis should be
2    presented in the main paper.  And it was not a
3    prospective study.
4              Then other typical things of a lot of
5    these studies is the ability to ascertain events
6    and to clearly adjudicate them.
7              And then the last thing was that this
8    study was clearly supposed to be done in two
9    phases.  Phase 1 was supposed to be looking at
10    the associations relatively crudely, being able
11    to adjust for what things are available.  Phase
12    2 was to be much more careful about collecting
13    potential confounders.  Again, that's a striking
14    difference in the non-prospective studies as
15    opposed to the prospective studies.
16              For instance, weight and smoking are

USCA5 755

```
17   things that are best acquired from the
18   individual, and that's only done in the
19   prospective studies.  When you try to get it
20   from some sort of a registry or health system
21   database, your ability to adjust for those very
22   important factors is not available.
23       Q.    Doctor, I'm going to hand you what I'm
24   marking as Exhibit 10.
25
```

00192
```
 1              (Whereupon, Gaziano Exhibit Number 10,
 2              Document titled Combined Hormonal
 3              Contraceptives (CHCs) and the Risk of
 4              Cardiovascular Disease Endpoints, was
 5              marked for identification.)
 6   BY MS. DAVIS:
 7       Q.    And when you were discussing the
 8   weaknesses of the Sydney study, you made
 9   reference to the report and also the
10   publication.  Is this the report that you were
11   referring to?
12       A.    Yes, ma'am.  This is, I believe, the
13   October, 2011 report.
14       Q.    And this report laid out analyses on
15   both all users and new users?
16       A.    Yes.
17              MR. NIEMEYER:  Objection to form.
18   BY MS. DAVIS:
19       Q.    And is it your understanding that the
20   new users were a subgroup of the all users?
21              MR. NIEMEYER:  Objection.  Form.
22       A.    Yes.  So laid out in Page 5.  As I
23   said, I would like to have seen this much better
24   specified in an analysis section of a protocol
25   that it comes out before you have the results.
```

00193
```
 1   Here they clearly state on Page 5 the primary
 2   analysis will be conducted on all users and new
 3   users, but it clearly lists all users first, and
 4   indicates that it would also do some analysis in
 5   new users.
 6              But that was in -- that's a very
 7   general description of the analysis.  That
 8   segregation of all users and new users primarily
 9   applies, generally speaking, to VTE where it
10   makes a lot of sense to do that, because the
11   risk windows great risks that are radically
12   different, that doesn't necessarily apply to the
```

USCA5 756

13    all users.
14              So there's not a clear specification,
15    it doesn't apply to ATE.  The primary analysis
16    should be the risk is static over the long
17    period of time, should be all users.  In that
18    case, the results here are it shows a relative
19    risk right around 1.
20    BY MS. DAVIS:
21        Q.    The relative risk of 1 that you're
22    describing for all users, what was the
23    comparator group for that?
24        A.    So the comparator group was a
25    composite comparator group of the OCs.  In this


00194
1     case we do have some specificity that were used
2     contemporaneously.  But it includes people that
3     are using OCs that have a higher dose of
4     estrogen, and we know that the dose of estrogen
5     is related to VTE and ATE, so there are
6     additional analyses that compare estrogens that
7     are of the same dose, and that's probably a more
8     appropriate comparison.
9         Q.    So the comp group, well, if you turn
10    to Table 12a which is on Page 53 of this
11    document.  There's two tables on this page.  One
12    of them, 12a, lists some results with respect to
13    a comparator group which I believe is the group
14    you were just referring to --
15        A.    Right.
16        Q.    -- that had a number of different oral
17    contraceptives?
18        A.    Yes, that had four --
19              MR. NIEMEYER:  Objection.  Form.
20        A.    -- or 5 different oral contraceptives.
21    BY MS. DAVIS:
22        Q.    And then 12b is a comparison with a
23    group called LNG2?
24        A.    Right.
25        Q.    And do you know what that group is


00195
1     comprised of?
2         A.    Yes.  That's the levo comparison.
3         Q.    Okay.  And levonorgestrel is a
4     progestin, correct?
5         A.    Yes.
6         Q.    And that group also contained -- the
7     COCs in that group also contained estrogen?
8         A.    Yes.

USCA5 757

```
 9              Q.    At what dose?
10              A.    I believe it's -- I have to double
11      check.  I believe it's a comparable estrogen
12      dose.  The LNG2, I'd have to check what they've
13      specified is contained in that group, whether
14      they --
15              Q.    Doctor, if you turn to Page 34 of the
16      document, there's Table 1.
17              A.    Right.
18              Q.    And Table 4 lists certain products --
19              A.    Right.  There were two levonorgestrel.
20      I just had to make sure I had them straight,
21      which one was the 20 and which one was the 30.
22                    So this was -- the LNG2 comparator is
23      with 30.
24              Q.    30 micrograms of ethinylestradiol?
25              A.    Right.
```

00196
```
 1              Q.    And is that the same dose of estrogen
 2      that's in Yasmin?
 3              A.    So in Yasmin, yes, it is.
 4              Q.    And the comparison in Table 12a, which
 5      is against the comp group, and you can refer
 6      back to Table 1 as well which lists out the
 7      comparator COCs in that comp group, what can you
 8      say about the estrogen doses in those
 9      comparators?
10              A.    So it's a mixed bag.  It has some with
11      lower estrogen dose and one with higher.  So
12      it's -- two of them had 20 micrograms of
13      ethinylestradiol.
14              Q.    Okay.  So turning back to Table 12a,
15      for users of Yasmin versus users of the
16      comparator COCs, when looking at ATE risk, what
17      was the relative risk?
18              A.    It's 0.99, which is right there at no
19      risk at all.
20              Q.    When you say "no risk at all," what do
21      you mean by that?
22              A.    So here you can't discern -- you can't
23      make any conclusion from the all users group
24      that there's any risk associated with Yasmin
25      compared to the combined group of other combined
```

00197
```
 1      oral contraceptives.
 2              Q.    When you look at Table 12b and you
 3      look at drospirenone, which is Yasmin, versus
 4      the levonorgestrel 2 group, which is the
```

USCA5 758

```
 5    levonorgestrel plus 30 micrograms of
 6    ethinylestradiol group, under ATE what is the
 7    relative risk there?
 8        A.    It's .81, but with wide confidence
 9    interval.  Again, you draw the same conclusion,
10    no excess risk.  The most conservative way to
11    interpret that would be that they're comparable
12    in risk.
13        Q.    Between the comparator group which is
14    represented in 12a, and the levonorgestrel 2
15    group which is represented in 12b, which, in
16    your view, is the more appropriate comparator?
17        A.    Because we know that estrogen and
18    estrogen dose affects the risk of VTE and ATE,
19    the most appropriate comparison is one that
20    levels the playing field with respect to
21    estrogens, and you're more likely to isolate the
22    effect of the progestin.
23        Q.    So would that be the levonorgestrel 2
24    group represented in 12b?
25                MR. NIEMEYER:  Objection.  Form.
```

```
00198
 1        A.    Yes.
 2    BY MS. DAVIS:
 3        Q.    In that comparison for new users --
 4    and I understand that in your view the all users
 5    comparison is more appropriate.  But if you look
 6    at the subgroup of new users of drospirenone
 7    versus new users of levonorgestrel 2 which
 8    contains 30 micrograms of ethinylestradiol, what
 9    is the relative risk there of ATE?
10        A.    Again --
11                MR. NIEMEYER:  Objection.  Form.
12        A.    -- it's 1.64 with confidence bounds
13    that cross 1.  So the most appropriate way to
14    interpret that is that there's no difference.
15                But I do want to stress the fact that
16    I think that the all users comparison is the
17    right comparison for ATE.  I think it's
18    inappropriate to look at subgroups.  And the
19    best illustration of why that's the case is if
20    you look at the excess 2.0 risk that has
21    marginal statistical significance, you can
22    contrast that with the much more significant
23    reduction in risk in the non-new user group,
24    which gives you a relative risk of about an
25    85 percent reduction, or a risk that's
```

USCA5 759

1    one-seventh compared to the other drugs.
2              And the most conservative way to
3    interpret those two findings that are going in
4    exact opposite directions is that there's a
5    possibility that both of those finders are not
6    real, and so you have to be very careful in
7    interpreting that.
8    BY MS. DAVIS:
9         Q.   So when you say non-new users, what do
10   you mean exactly?  Because I don't think that
11   was a term that was in this report.
12        A.   Right, it's not.  It's just the other
13   group.  Now, one thing about this group, as I
14   mentioned, that one of its weaknesses is that
15   the new users category makes absolutely no
16   sense.  You could be in the new users category
17   as long as you hadn't used an oral contraceptive
18   for six months prior to the observation window.
19   However, once you're in a new user, you are
20   considered a new user until you stopped using
21   that one, changed oral contraceptives, or
22   stopped using it altogether, which makes no
23   sense because it goes -- you could potentially
24   be a new user for years.  So it's a category
25   that really doesn't make a whole lot of sense.


00200
1              In the Lidegaard study they defined
2    users by a fixed time period, and they chose one
3    year, and that's a standard for VTE analyses
4    because we see a different risk in the first
5    year.  But when they were looking at stroke and
6    MI in the Lidegaard study, they did divide them
7    by years of use, which is a much more logical
8    way to explore the possibility of whether or not
9    time plays a role.  And when they looked at
10   that, they showed absolutely no difference.
11   There was no difference in time.
12             But the definition here of new users,
13   you could be a new user having been on the drug
14   -- by my understanding of the protocol, you
15   could have been a new user for years.  It makes
16   -- there's no biologic sense to the definition
17   of new users.
18        Q.   So to make sure I understand what
19   you're saying correctly, you're saying that
20   there's no reason to subgroup new users because
21   there's no evidence showing that new users would
22   show any difference in risk in the context of
23   ATE?
24             MR. NIEMEYER:  Objection.  Form.

```
    25      A.    Correct.  So in VTE there is a reason


00201
     1  because there's a clear difference, and that's
     2  one of the major problems with some of the
     3  studies is that there's not a clear, in my mind,
     4  clear comparison of new user apples to new user
     5  apples when you're using some of the
     6  comparisons.  It's one of my criticisms of the
     7  other studies.
     8          The criticism is not relevant to ATE
     9  because there's no indication in the literature
    10  that there's a difference of risk effect with
    11  respect to ATE over the time course of taking
    12  the drug.  So there's no reason to hamper your
    13  ability to see an observation by reducing your
    14  power by segregating by time windows.
    15          For VTE, it's important to do that
    16  because the risk windows are different, but not
    17  for ATE.  For ATE, it's inappropriate to do it.
    18  It's not the correct way.  It's not the most
    19  powerful way.  And in this definition of new
    20  users isn't even a biologically logical one.
    21  BY MS. DAVIS:
    22      Q.    Now, when you talked about non-new
    23  users before, you'd mentioned what their
    24  relative risk would be.  Could you explain what
    25  a little bit further?


00202
     1      A.    So, the first thing you look at, when
     2  you see the no effect in the overall group and
     3  you begin to look at subgroups and you see
     4  differences happening, it's worth looking at
     5  both subgroups to see if anything that you see
     6  really makes sense.  And a good example of that
     7  was when Dr. Pido from Oxford used astrologic
     8  sign to show you get differences by chance in an
     9  aspirin study that showed that aspirin protected
    10  people from dying of heart attacks with two
    11  astrologic signs, were small subgroups where you
    12  saw an odds finding.  It wasn't real, it was
    13  just a chance finding.
    14          So any time you look at subgroups you
    15  have to begin to be very cautious in
    16  interpreting, particularly if there's not a
    17  biologic plausibility like astrologic sign, or
    18  new user in the case of ATE, there's no biologic
    19  reason to make that distinction.
    20          When you start breaking things up, you
```

USCA5 761

```
21    have to look at all the subgroups to see if
22    there's anything that makes sense, or if there's
23    been some chance occurrence based on your
24    definition of the way you divided the groups.
25              In this case when you divide these
```

00203
```
 1    groups, you see a more profound effect in the
 2    non-new user group of -- the people in the
 3    comparator group are seven times more likely to
 4    have an ATE than the people in the risk group.
 5    Now, to believe that this effect is real and
 6    that effect is real is -- is it possible?
 7    Maybe.  Is it likely?  Not so much.  It's more
 8    likely that this finding and that finding are
 9    both due to chance.  And the most stable result
10    that you can get from this study is the relative
11    risk of .99 showing absolutely no risk.
12              When you put it in context of the
13    other studies that show either no risk or tend
14    to show a beneficial effect, and I'm not going
15    to make the case that there is because just like
16    the case for VTE where we have a whisker plot
17    where we've got some that showed no benefit, I
18    put more stock in the prospective studies, but
19    there's not enough data to say definitively
20    about VTE.  Similarly, I wouldn't look at all
21    this data.
22              But if you look and say there's
23    clearly a protective effect of ATE, if you did a
24    whisker plot of the ATE studies it would look
25    like the inverse of the whisker plot we looked
```

00204
```
 1    at for VTE, and in both cases I would say
 2    there's just not enough data to make a
 3    definitive conclusion.
 4              But this finding of no association is
 5    actually quite consistent with all the other
 6    studies.  But that's not what I put the most
 7    stock in.  I think that's the most robust
 8    finding, and when you analyze the data in the
 9    most logical way that the data should be
10    analyzed.
11    Q.    I want to ask you a little bit about
12    when the Sydney data was further subdivided by
13    age, in particular the study found a heightened
14    risk of ATE in new users 35 and older.  Is that
15    your understanding?
16    A.    Well, finding high risk, the relative
```

USCA5 762

Case 2:14-md-02592-EEF-MBN   Document 5127-12-SEALED   Filed 01/20/17   Page 113 of 130

```
17    risk was higher than 1.  Again, I would even be,
18    you know, equally or more cautious of looking at
19    age stratification, because there's no
20    indication that the effect on VTE where we have
21    more data, and the effect on ATE, the effect of
22    these drugs are different by age, so there's not
23    a biology that would tell us why that would be
24    the case.  So again, I view it the same way,
25    that it's a subgroup analysis, and you would get
```

00205
```
 1    the same result.
 2              If the overall effect is null, you see
 3    increased risk in one group, then by definition
 4    there has to be decreased risk in the other
 5    group.  And when you see something like that
 6    happening, it doesn't make biologic sense.
 7        Q.    You had mentioned a study by
 8    Lidegaard.  I'm going to hand you what I've
 9    marked as Exhibit 11.
10              (Whereupon, Gaziano Exhibit Number 11,
11              Lidegaard, et al article titled
12              Thrombotic Stroke and Myocardial
13              Infarction with Hormonal
14              Contraception, was marked for
15              identification.)
16    BY MS. DAVIS:
17        Q.    Is this the study by Lidegaard that
18    you were referring to earlier?
19        A.    Yes, ma'am.
20        Q.    And what sort of comparisons were made
21    in this study?
22        A.    So this was one study that had
23    significant numbers of person years, almost 10
24    million person years, so they were able -- they
25    were able to provide some estimates for each of
```

00206
```
 1    the drugs, the oral contraceptives,
 2    individually.
 3              And what they did was they compared
 4    back to non-users.  This is one we were talking
 5    about earlier today, which is one of the only
 6    studies that has provided the relative risks by
 7    individual OCs in comparison to non-use.
 8        Q.    I'd like to turn your attention to
 9    Table 2, which is on Page 2262.
10        A.    Yes, ma'am.
11        Q.    Can you tell us what the relative risk
12    of drospirenone with 30 -- well, it's in 30 to
```

USCA5 763

13    40-microgram ethinylestradiol group in this
14    table, what the relative risk of that product is
15    with respect to thrombotic stroke?
16         A.    So the first thing I can point out is
17    that it's in that range that I reported in my
18    review that we had discussed earlier of about
19    less than 2-fold on average if you looked at
20    these on average, if you averaged all of these
21    you would say that it's somewhere less than
22    2-fold overall.  And for drospirenone
23    specifically it's 1.64.
24              And it might be worth pointing out
25    that it's comparable to the levonorgestrel, and


00207
 1    it's less than desogestrel and gestodene.
 2              MR. NIEMEYER:  Objection.
 3    BY MS. DAVIS:
 4         Q.    Doctor, to your knowledge, is
 5    thrombotic stroke something that's warned about
 6    in the Yasmin and Yaz labels?
 7         A.    Yes, it is.
 8         Q.    Is it something that has always been
 9    warned about since those products were first
10    introduced on the market?
11         A.    It's my understanding.
12         Q.    Doctor, I'm going to hand you what
13    I've marked as Exhibit 12.
14              (Whereupon, Gaziano Exhibit Number 12,
15              Yasmin label, was marked for
16              identification.)
17    BY MS. DAVIS:
18         Q.    This is a Yasmin label.  Are you
19    familiar with this document?
20         A.    Yes, ma'am.
21         Q.    If you turn to the last page, which is
22    Page 38, under the copyright you see the year
23    2003.  Do you see that there?
24         A.    Yes, I do.
25         Q.    I'd like you to turn to Page 8.  At


00208
 1    the very bottom is a subsection "c.
 2    Cerebrovascular diseases."
 3              Do you see that?
 4         A.    Yes, ma'am.
 5         Q.    If you turn the page to Page 9, the
 6    first sentence of the second paragraph, it
 7    states "In a large study, the relative risk of
 8    thrombotic stroke has been shown to range from 3

USCA5 764

```
 9   for normotensive users to 14 for users with
10   severe hypertension."
11            Did I read that correctly?
12        A.   Yes, ma'am.
13        Q.   So how do the results of the Lidegaard
14   study, which as you noted is the only study
15   looking at Yasmin versus non-use, compare to the
16   risks as cited in this label?
17            MR. NIEMEYER:  Objection to form.
18        A.   So we always have to, you know, look
19   at any estimate that comes from a single study
20   with some caution.  This gives us some idea of
21   what the range might be.  But there's no
22   inconsistency.  In actuality, the upper bound or
23   the highest value within 95 percent certainty
24   for this particular study is actually below the
25   three times risk that you would see for
```

00209
```
 1   normotensives.  My guess is that there's
 2   probably normotensives and hypertensives in the
 3   Lidegaard group, so that this is a very -- this
 4   actually probably warns of a risk at maybe
 5   higher than we see in the Lidegaard study.
 6   BY MS. DAVIS:
 7        Q.   I'm also going to hand you what I've
 8   marked as Exhibit 13.
 9            (Whereupon, Gaziano Exhibit Number 13,
10            Yaz label, was marked for
11            identification.)
12            MS. DAVIS:  I only have one clean copy
13   of that one.  I think it's the only clean copy.
14   Actually you know what?  There's two clean
15   copies in there.  There's two paperclips in
16   there.
17   BY MS. DAVIS:
18        Q.   Dr. Gaziano, are you generally
19   familiar with this document?
20        A.   Yes.
21        Q.   And this is a Yaz label?
22        A.   Yes, ma'am.
23        Q.   And if you turn to the last page,
24   which is Page 18, at the bottom it says "2007."
25            Do you see that?
```

00210
```
 1        A.   Yes, I see that.
 2        Q.   I'd like you to turn to Page 5.  And
 3   here again there's a subsection "c.
 4   Cerebrovascular diseases."
```

USCA5 765

```
 5              Do you see that?
 6        A.    I do.
 7        Q.    And in the second paragraph down it
 8   states "In a large study, the relative risk of
 9   thrombotic strokes has been shown to range from
10   3 for normotensive users to 14 for users with
11   severe hypertension."
12              Did I read that correctly?
13        A.    Yes.
14        Q.    And so if I asked you how that range
15   compared to the range in the Lidegaard study,
16   would your answer be the same as what you've
17   just stated for the 2003 Yasmin label?
18        A.    Yes, it would.
19        Q.    Okay.  Turning back to the Lidegaard
20   study -- actually turning back to the Lidegaard
21   study in the same table, which was Table 2 that
22   we were discussing earlier.
23        A.    Yes, ma'am.
24        Q.    Under the subcategory
25   "Ethinylestradiol 20 micrograms," do you see
```

```
00211
 1   drospirenone listed there?
 2        A.    Yes.
 3        Q.    And would that indicate the same dose
 4   of ethinylestradiol that's in Yaz?
 5        A.    Yes.
 6        Q.    Okay.  And what is the relative risk
 7   for thrombotic stroke of that drospirenone
 8   product versus non-use?
 9        A.    So it's .8, but with very wide
10   confidence bounds.
11        Q.    Okay.  So turning back to the Yaz
12   label, and I read the text pertaining to
13   thrombotic stroke, what would -- how would this
14   value for a 20-microgram drospirenone product
15   compare to the risk for stroke, thrombotic
16   stroke that is, as stated in this Yaz label?
17        A.    Well, I would say the same thing, that
18   it's warning of a risk between 3 and 14 when
19   this shows no suggestion of a risk.  So that the
20   warning is providing a warning for a risk that's
21   greater than what is observed in the Lidegaard
22   study.
23        Q.    Turning back to Table 2, there's also
24   a column with data regarding myocardial
25   infarction.
```

00212

```
 1              Do you see that?
 2      A.    Yes, ma'am.
 3      Q.    And under the heading
 4  "Ethinylestradiol 30 to 40 micrograms," there's
 5  drospirenone.  Could you tell us what the
 6  relative risk for that product is compared to
 7  non-use with respect to myocardial infarction?
 8      A.    For dros 30?
 9      Q.    Yes.
10      A.    That is 1.65.
11      Q.    I'd like to turn back to the Yasmin
12  label, which is Exhibit 12, I believe.
13      A.    Yes.
14      Q.    If you could turn to Page 7, there's a
15  subsection called "Myocardial infarction."
16              Do you see that?
17      A.    I do.
18      Q.    And turning onto the next page, the
19  first full sentence on Page 8, it states "The
20  relative risk of heart attack for current oral
21  contraceptive users has been estimated to be 2
22  to 6."
23              Did I read that correctly?
24      A.    You did.
25      Q.    So how does that warning in the label
```

00213
```
 1  compare with the data from the Lidegaard study?
 2      A.    So I mean I think you could have
 3  broadened the category to say from 1 to 6,
 4  because the confidence intervals are pretty
 5  wide.  But again, it's warning for a risk that
 6  may be higher than what we see in Lidegaard.
 7      Q.    And back at Lidegaard again, we
 8  referred to it before, but there's a
 9  drospirenone product that's listed under
10  ethinylestradiol 20 micrograms?
11      A.    Right.
12      Q.    What's the relative risk of myocardial
13  infarction for that product versus non-use?
14      A.    It can't be calculated because there
15  are no events.
16      Q.    So how do you interpret that?
17      A.    Well, it's less informative because
18  there aren't as many events, but it's certainly
19  no signal of -- it's certainly not evidence of
20  harm.
21      Q.    So turning back to the Yaz label, and
22  if you look on Page 4 of the Yaz label, which is
23  Exhibit 13, the right-hand column, there's a
24  subsection "Myocardial infarction."
```

USCA5 767

25          Do you see that?


00214
1          A.    I do.
2          Q.    And in that first paragraph, kind of
3     two-thirds of the way down, it says "The
4     relative risk of heart attack for current oral
5     contraceptive users has been estimated to be 2
6     to 6."
7               Did I read that correctly?
8          A.    You did.
9          Q.    So how does the data in the Lidegaard
10    study compare with the warning as set forth in
11    this label?
12         A.    Well, it doesn't give us any
13    indication that that warning is inappropriate.
14    It doesn't provide us with any signs of a
15    warning signal.  It certainly doesn't contradict
16    it in any way.
17         Q.    So, Doctor, with regard to ATE, taking
18    into account all of the studies that you've
19    reviewed regarding drospirenone and its risk of
20    ATE with respect to non-use, and also with
21    respect to other products, what conclusions are
22    you able to draw?
23         A.    Well, I'm able to draw the conclusion
24    that there is no clear evidence of excess risk.
25    There are a number of studies of variable


00215
1     quality.  There are a few of the studies that
2     point to a diminished risk by comparison, and
3     the results are statistically significant.
4               However, I think that just like for
5     the VTE studies, the most appropriate way to
6     interpret that data is, given some of the
7     potential limitations of all of these studies,
8     and the fact that it's a limited number of
9     studies with small events, that it might be
10    dangerous to conclude that there is a protective
11    effect for ATE.  But we certainly can draw the
12    conclusion that overall, looking at the most
13    appropriate analyses from each study, that there
14    is no signal of excess ATE harm by comparison to
15    the other comparator OCs.  It would be worth
16    further exploring this hypothesis that the risk
17    is lower.
18         Q.    And with respect to the hypothesis
19    that the risk might be lower, have you explored
20    any biologic mechanisms by which that might be

Case 2:14-md-02592-EEF-MBN   Document 5127-12 *SEALED*   Filed 01/20/17   Page 118 of 130

```
21    plausible?
22         A.    So that's -- it's really challenging
23    to do.  And as I've said before, whether it be
24    ATE or VTE, that in many cases is an exercise in
25    a self-fulfilling promise where you see
```

```
00216
 1    something and you go back and look for evidence.
 2    There are those who have posited biologic --
 3    have used biologic data, I think
 4    inappropriately, to posit a clinical effect in
 5    both directions.
 6              I think the best way to pursue that
 7    hypothesis would be ever higher quality and ever
 8    larger studies that provide enough clinical
 9    outcomes to provide a more definitive answer to
10    the question.
11         Q.    Doctor, would you consider initiation
12    of antihypertensive therapy to be a clinical
13    outcome?
14         A.    So that's the definition of -- we
15    often use that as the definition of
16    hypertension.  So we don't give antihypertensive
17    drugs until people have a clinical diagnosis of
18    hypertension.  So we often use that as a
19    surrogate for the development of hypertension,
20    or the development of sufficient hypertension to
21    warrant medical treatment.
22         Q.    I'm going to hand you what I've marked
23    Exhibit 14.
24
25
```

```
00217
 1              (Whereupon, Gaziano Exhibit Number 14,
 2              9/13/11 Long-term Active Surveillance
 3              Study for Oral Contraceptives (LASS),
 4              Final Study Report, was marked for
 5              identification.)
 6    BY MS. DAVIS:
 7         Q.    Have you reviewed this document
 8    before?
 9         A.    Yes, ma'am, I have.
10         Q.    What is this document?
11         A.    This is the final report of the LASS
12    study, which is the long-term follow-up of the
13    EURAS cohort.
14         Q.    I'd like you to turn to Table 31,
15    which is on Page 59 of 62 in this document.  Can
16    you explain the data that's in Table 31?
```

USCA5 769

Case 2:14-md-02592-EEF-MBN   Document 5127-12 SEALED   Filed 01/20/17   Page 119 of 130

```
17        A.    So this shows the risk, they call the
18   hazard ratio, of developing hypertension as
19   defined by starting new antihypertensive
20   medications, comparing Yasmin to levo, other
21   OCs, and then the combination of other OCs.  And
22   then in each case there is a significant
23   reduction in the risk of hypertension, of
24   30 percent reduction in that risk.
25        Q.    Earlier, Doctor, you were asked about


00218
 1   what types of progestins comprised the other OCs
 2   group in the EURAS study, is that right?
 3        A.    Yes.
 4        Q.    Okay.  I'm going to hand you --
 5        A.    It wasn't clearly specified in the
 6   paper, and I couldn't get to it in the report.
 7        Q.    I'm going to hand you what I've now
 8   marked as Exhibit 15.
 9             (Whereupon, Gaziano Exhibit Number 15,
10             European Active Surveillance Study
11             (EURAS-OC) Final Study Report, was
12             marked for identification.)
13   BY MS. DAVIS:
14        Q.    And this is the final study report for
15   the EURAS study, is that right?
16        A.    Yes.
17        Q.    Could you turn to Page 22?  Does this
18   refresh your recollection as to what progestins
19   were included?
20        A.    Yes.  It provides a listing of the
21   other progestins that were used in the group.
22        Q.    And what other progestins were there?
23        A.    It's a long list.  Desogestrel,
24   Dienogest.
25             Do you want me to list all of them?


00219
 1        Q.    Sure.
 2        A.    Chlormadinonacetate, gestodene,
 3   Cyproteronacetate, norgestimate, norethisterone,
 4   and some others.
 5        Q.    I'm also going to hand you what I'm
 6   marking as Exhibit 16.
 7             (Whereupon, Gaziano Exhibit Number 16,
 8             12/8/11 Background Document for Joint
 9             Meeting of Advisory Committee for
10             Reproductive Health Drugs and the Drug
11             Safety and Risk Management Advisory
12             Committee, was marked for
```

Case 2:14-md-02592-EEF-MBN   Document 5127-12 SEALED   Filed 01/20/19   Page 120 of 130

```
13                   identification.)
14   BY MS. DAVIS:
15        Q.   Do you recognize this document?
16        A.   I do.
17        Q.   What is this one?
18        A.   This is the background document before
19   the FDA meeting.
20        Q.   And is this something that you
21   reviewed in preparation of your opinions in this
22   litigation?
23        A.   Yes, ma'am.
24        Q.   Do you know who prepared this
25   document?
```

```
00220
 1             MR. NIEMEYER:  Objection.  Form.
 2        A.   It was prepared by the officials at
 3   the FDA, and it describes the unit that prepared
 4   the document, the Office of New Drugs, Division
 5   of Reproductive Urologic Products.
 6   BY MS. DAVIS:
 7        Q.   Okay.  And this document was prepared
 8   by that unit of the FDA for what purpose?
 9             MR. NIEMEYER:  Objection to form.
10        A.   To provide information to the
11   committee.  So this is labeled as Background
12   Document for the Joint Meeting Advisory
13   Committee.
14   BY MS. DAVIS:
15        Q.   Okay.  Earlier today, Mr. Niemeyer
16   asked you some questions about channelling.
17        A.   Yes.
18        Q.   I'd like you to turn to Page 39 of
19   this document.
20        A.   Is that in the first 39?
21        Q.   Right.  Yes.  I know, it's a lengthy
22   document.  But yes, the first Page 39.
23        A.   All right.
24        Q.   Under 3.3.1, "Other Covariates," do
25   you see that subsection?
```

```
00221
 1        A.   I do.
 2        Q.   About six lines down, it states
 3   "Although none of the covariates contributed to
 4   a predicted change in the analytical models for
 5   the entire study cohort, some covariates in the
 6   FDA-funded study (Table 16) such as acne,
 7   premenstrual tension, and use of
 8   potassium-sparing diuretics were present more
```

USCA5 771

```
 9    frequently in DRSP users, including those
10    younger than 35 years of age.  In the FDA-funded
11    study, this was the group with the higher VTE
12    risk, suggesting possible channelling (selective
13    prescribing) of DRSP-containing COCs in this
14    group."
15            Did I read that correctly?
16       A.   You did.
17       Q.   I also want you to look further down
18    this same page, 3.3.2, "Prescribing Patterns."
19       A.   Yes.
20       Q.   It says "The Society of Obstetrics and
21    Gynecology of Canada (SGOC) Clinical Practice
22    Gynecology Committee (whose guidelines were
23    approved by the Executive and Council of the
24    SGOC) suggested that, because newer products
25    tend to be prescribed to women who already have
```

```
00222
 1    VTE and ATE risk factors, occurrence of outcomes
 2    may be selectively biased towards certain
 3    products, giving a misleading impression of
 4    risk.  If this statement is true for many
 5    prescribers of CHCs, any resulting epidemiologic
 6    analyses should seriously consider and adjust
 7    for potential channelling bias.  This statement
 8    is also consistent with the observation that the
 9    products that were newer at the time of study
10    initiation, at least in the more recent
11    published studies and the FDA-funded study, were
12    nearly always associated with an increased risk
13    of VTE when compared to older products."
14            Did I read that correctly?
15            MR. NIEMEYER:  Objection to form.
16       A.   You did.
17    BY MS. DAVIS:
18       Q.   Do you agree with that assessment?
19       A.   I think that's what I was describing
20    as good clinical practices when it comes to
21    doing pharmacoepidemiology studies.
22            MS. DAVIS:  Okay.  I have no further
23    questions.
24            REDIRECT EXAMINATION
25    BY MR. NIEMEYER:
```

```
00223
 1       Q.   Doctor, I do have a few follow-ups for
 2    you, and we might as well stay right here with
 3    the FDA background document.
 4            While you reviewed this document, it's
```

```
 5    still your testimony that you haven't reviewed
 6    the transcript or the decision or the
 7    recommendations of the advisory committee
 8    regarding the inadequacy of the Yaz and Yasmin
 9    labels, is that true?
10              MS. DAVIS:  Objection.
11         A.   I may have the documents, but I don't
12    recall the specifics of the recommendation.
13    BY MR. NIEMEYER:
14         Q.   And if we go back to Page 39, and that
15    section of 3.3.1, it talks about the folks
16    involved that had covariates of acne,
17    premenstrual tension, etcetera.
18              Do you know whether in their marketing
19    Bayer targeted women with acne, or PMS, or PMDD
20    to purchase their products or ask for their
21    products?
22              MS. DAVIS:  Object to form.
23         A.   So I don't know what you mean by
24    "targeting."  I know that there are -- I believe
25    there are even some indications for some of
```

```
00224
 1    these, I believe in particular for Yaz, but I'm
 2    not sure about that.  I don't know much about
 3    the marketing.
 4    BY MR. NIEMEYER:
 5         Q.   Okay.  And if we go to Exhibit 15,
 6    which is the EURAS final study report.
 7         A.   Hold on one second.  Let me find it.
 8    Here we go.  Yes.
 9         Q.   You were asked questions about Page 22
10    of 66 and Table 4.
11         A.   Yes.
12         Q.   Correct?
13              And those are -- that's where you now
14    have found the definition of other OCs in that
15    study, correct?
16         A.   Right.
17         Q.   And part of the group include the
18    so-called third generation OCs, including
19    desogestrel and gestodene, correct?
20              MS. DAVIS:  Object to form.
21         A.   Again, we go back to the same -- the
22    third -- second and third generation designation
23    means different things to people.  But it does
24    include desogestrel and gestodene.
25    BY MR. NIEMEYER:
```

00225

```
 1       Q.    In fact, the highest percentage of
 2  folks in the other OC group are folks that were
 3  on desogestrel, right?
 4       A.    Yes.  But it represents less than a
 5  third of the total.
 6       Q.    Or 28.3 percent, to be specific,
 7  right?
 8       A.    Yes.
 9       Q.    And if we add in gestodene to that,
10  then we get 28.3 plus 8.5, that gets us over a
11  third, right?
12       A.    Yes.  36.8.
13       Q.    And then the one below gestodene, how
14  do you say that?  I didn't mean it to be a test,
15  I thought you might know.
16       A.    Cyproteronacetate.  We usually shorten
17  it to say Proteron.
18       Q.    Is that one that's even more recently
19  out?  Is that the one that they're calling a
20  fourth generation along with the
21  drospirenone-containing oral contraceptives?
22            MS. DAVIS:  Object to form.
23       A.    You know, I actually -- I don't pay
24  attention to the generation designation.
25  BY MR. NIEMEYER:
```

```
00226
 1       Q.    Okay.
 2       A.    So I can't help you there.  Sorry.
 3       Q.    Got you.
 4            Dienogest, do you know what the
 5  progestin is there?
 6       A.    I don't.  I don't know the specifics
 7  about the progestin.
 8       Q.    Okay.  And if we go to Exhibit 14, the
 9  LASS final study report, you were directed to
10  Page 59 of 62, and specifically Table 31.
11       A.    Yes.
12       Q.    And you discuss there this, you know,
13  protective effect on hypertension, right, or
14  something like that?
15            MS. DAVIS:  Object to form.
16       A.    Well, protective effect is your word.
17  It shows that the hazard ratios were lower,
18  suggesting an association, an interesting one
19  given some of the ATE results.
20            But as a single finding, I would stick
21  to reporting these interesting findings as they
22  are, and not going beyond that.
23  BY MR. NIEMEYER:
24       Q.    Sure.
```

25          And, in fact, if we look at this

00227
 1    table, there's no difference in the, quote
 2    unquote, reduction in hypertension across all of
 3    the OCs that are looked at here, correct?
 4          A.    That's correct.  There seems to be a
 5    fairly consistent finding.  Interesting in the
 6    context of some of its potassium effects, but
 7    that's again speculation, and I personally think
 8    warrants further study in other large databases.
 9          Q.    And now, you mentioned some of your
10    opinions about ATE.  And also, despite the
11    advisory committee and the label change and the
12    whisker chart that we see in the 2012 label
13    change, you still hold the opinion that there's
14    no increased risk for VTE with
15    drospirenone-containing oral contraceptives
16    versus other oral contraceptives, correct?
17          MS. DAVIS:  Object to form.
18          A.    Not correctly.  What I've said is that
19    given some of the major flaws in the
20    non-prospective studies, that I could not come
21    to the conclusion -- I think your word was
22    confirm a fact.  There's some major problems
23    with some of the studies, particularly the
24    studies that were done by Lidegaard who, it's my
25    understanding, was at some point compensated by

00228
 1    Bayer in this case, in these proceedings, but
 2    that they -- but the most, the highest quality
 3    results are from the prospective studies.  And
 4    given the distribution of the effect, I think
 5    it's premature to draw a definitive conclusion.
 6          MR. NIEMEYER:  Move to strike the
 7    comments about Lidegaard as non-responsive.
 8    BY MR. NIEMEYER:
 9          Q.    Let's now look at Exhibit 11, which
10    is, in fact, Lidegaard's study, if we could.
11    And let me ask you to look at Page 2262 down in
12    the left-hand corner, Table 2.  And you were
13    asked -- part of the questions you were asked
14    were about ethinylestradiol 20-mic group, the
15    drospirenone adjusted relative risk numbers for
16    thrombotic stroke and myocardial infarction, and
17    you mentioned something about the confidence
18    bounds there.  Those both are very wide
19    confidence bounds, correct?
20          MS. DAVIS:  Object to form.

USCA5 775

```
21        A.    Correct.
22   BY MR. NIEMEYER:
23        Q.    And that means that we have to be very
24   cautious in our interpretation of those results
25   and the reliability of those results, right?
```

00229
```
 1             MS. DAVIS:  Object to form.
 2        A.    Absolutely.  And the rates, we don't
 3   know what they really are.  They appear to be
 4   lower than the rates in the other groups.  But
 5   when it comes to doing statistics on so few
 6   events, you just have to be very cautious about
 7   interpreting.
 8             But it certainly doesn't suggest that,
 9   there is no suggestion at all of excess harm,
10   and there's nothing here that would in my mind
11   alter my interpretation of the warnings that
12   were contained in the document that I was shown.
13        Q.    And my question, though, was about the
14   reliability when confidence bounds are that
15   wide.  And we're in agreement that you have to
16   be cautious?
17        A.    Yes.  Absolutely.
18        Q.    And if we go to Page 2260, that Table
19   1 -- or Table 1 is there.  And, in fact, what's
20   done in Table 1 is kind of what you and I
21   discussed from time to time during my
22   examination, and that is that this study takes
23   age groups in five-year intervals from 15 to 49
24   and does quantify --
25        A.    Sorry, Table 1.
```

00230
```
 1        Q.    Table 1.
 2        A.    Yes.
 3        Q.    Okay.  And it does quantify the
 4   increased risk for thrombotic stroke and
 5   myocardial infarction as it relates to age,
 6   correct?
 7        A.    Yes.
 8        Q.    And, in fact, we see exactly what you
 9   talked about, that it's not linear.  If you
10   compare the top group to the bottom group,
11   meaning 45 to 49 years and 15 to 19 years for
12   thrombotic stroke, we see an at least 13-fold
13   increase, correct?
14        A.    For stroke, about a 20-fold
15   difference.
16        Q.    Okay.  Fair enough.
```

USCA5 776

17          And, in fact, for myocardial
18  infarction we see a 100-fold increase?
19      A.    Yeah.  Again, we're talking about
20  small numbers.  But a logarithmic increase.
21  This is the classic age effect.
22      Q.    And there's nothing like that chart on
23  any Yaz or Yasmin label that you've seen, right?
24      A.    This is relative -- this has got
25  nothing to do with the hormone effects.  This is

00231
1   sheerly the age effect.  There's nothing about
2   smoking or cholesterol or diabetes or age or
3   anything like that.
4       Q.    My question was simply, there's
5   nothing like this chart about age and risk for
6   stroke or myocardial infarction in any Yaz or
7   Yasmin label you've seen, right?
8       A.    Yeah, I don't think I've ever seen it
9   in any drug label.  I don't think I've seen a
10  table that describes the relationship between
11  age and cardiovascular risk in any drug label.
12  I don't think it would be appropriate to put it
13  in.
14      Q.    Did you know that in the Yaz Ireland
15  label it does mention that age by itself is a
16  risk factor?
17          MS. DAVIS:  Object to form.
18      A.    Well, I think in some labels it talks
19  about certain risk factors for the disease in
20  generic terms.  But putting a specific table of
21  the actual risks for any of the risk factors
22  isn't something that I've seen in -- I can't
23  recall in any drug labels.
24  BY MR. NIEMEYER:
25      Q.    And again, whether you've seen it or

00232
1   not in others, you haven't seen it in the Yaz
2   and Yasmin label?
3       A.    Correct.
4           MR. NIEMEYER:  Doctor, that's all the
5   questions that I have for you.  Thank you for
6   your time today.
7       A.    My pleasure.
8           MR. PIORKOWSKI:  We'd like to read and
9   sign.  We'd like to have him review his
10  transcript.
11          THE VIDEOGRAPHER:  This concludes the
12  June 12th, 2015 deposition.  Going off the

```
13      record.   The time is 4:40.
14                (Whereupon, the deposition was
15                concluded.)
16
17
18
19
20
21
22
23
24
25


00233
 1      COMMONWEALTH OF MASSACHUSETTS )
 2      SUFFOLK, SS.                  )
 3                I, MAUREEN O'CONNOR POLLARD, RMR, CLR,
 4      and Notary Public in and for the Commonwealth of
 5      Massachusetts, do certify that on the 12th day
 6      of June, 2015, at 10:07 o'clock, the person
 7      above-named was duly sworn to testify to the
 8      truth of their knowledge, and examined, and such
 9      examination reduced to typewriting under my
10      direction, and is a true record of the testimony
11      given by the witness.  I further certify that I
12      am neither attorney, related or employed by any
13      of the parties to this action, and that I am not
14      a relative or employee of any attorney employed
15      by the parties hereto, or financially interested
16      in the action.
17                In witness whereof, I have hereunto
18      set my hand this 22nd day of June, 2015.
19
20                _____
21                MAUREEN O'CONNOR POLLARD, NOTARY PUBLIC
22                Realtime Systems Administrator
23                CSR #149108
24
25


00234
 1                INSTRUCTIONS TO WITNESS
 2
 3                Please read your deposition over
 4      carefully and make any necessary corrections.
 5      You should state the reason in the appropriate
 6      space on the errata sheet for any corrections
 7      that are made.
 8                After doing so, please sign the
```

USCA5 778

```
 9    errata sheet and date it.  It will be attached
10    to your deposition.
11                    It is imperative that you return
12    the original errata sheet to the deposing
13    attorney within forty-five (45) days of receipt of
14    the deposition transcript by you.  If you fail
15    to do so, the deposition transcript may be
16    deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25
```

```
00235
 1                   - - - - - -
                     E  R  R  A  T  A
 2                   - - - - - -
 3    PAGE   LINE   CHANGE
 4    _____  _____
 5       REASON: _____
 6    _____  _____
 7       REASON: _____
 8    _____  _____
 9       REASON: _____
10    _____  _____
11       REASON: _____
12    _____  _____
13       REASON: _____
14    _____  _____
15       REASON: _____
16    _____  _____
17       REASON: _____
18    _____  _____
19       REASON: _____
20    _____  _____
21       REASON: _____
22    _____  _____
23       REASON: _____
24    ____  ____  _____
25
```

```
00236
 1              ACKNOWLEDGMENT OF DEPONENT
 2
 3              I, _____, do
```

USCA5 779

```
 4    Hereby certify that I have read the foregoing
      pages, and that the same is a correct
      transcription of the answers given by me to the
 5    questions therein propounded, except for the
      corrections or changes in form or substance, if
 6    any, noted in the attached Errata Sheet.
 7
 8    _____
      JOHN MICHAEL GAZIANO, M.D.           DATE
 9
10
11
12
13
14
15    Subscribed and sworn
      To before me this
16    _____ day of _____, 20_____.
17    My commission expires: _____
18
      _____
19    Notary Public
20
21
22
23
24
25
```

00237
```
 1                     LAWYER'S NOTES
 2    PAGE   LINE
 3    _____  _____   _____
 4    _____  _____   _____
 5    _____  _____   _____
 6    _____  _____   _____
 7    _____  _____   _____
 8    _____  _____   _____
 9    _____  _____   _____
10    _____  _____   _____
11    _____  _____   _____
12    _____  _____   _____
13    _____  _____   _____
14    _____  _____   _____
15    _____  _____   _____
16    _____  _____   _____
17    _____  _____   _____
18    _____  _____   _____
19    _____  _____   _____
20    _____  _____   _____
21    _____  _____   _____
```

USCA5 780

Case 2:14-md-02592-EEF-MBN   Document 5127-12 SEALED   Filed 01/20/17   Page 130 of 130

22   _____   _____   _____
23   _____   _____   _____
24   _____   _____   _____
25

USCA5 781