UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | * * * | MDL 2592 |
| THIS DOCUMENT RELATES TO: *ALL CASES* | * * * * * | SECTION L JUDGE ELDON E. FALLON MAG. JUDGE NORTH |

* * * * * * * * * * * * * * * * * * * * * *

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO PRECLUDE SPECULATIVE TESTIMONY FROM SIX DFENSE EXPERTS ABOUT POTENTIAL OUTCOMES FROM OTHER ANTICOAGULANTS**

**I.    INTRODUCTION**

Bayer and Janssen have proffered expert reports presenting statements and opinions about what may or may not have happened to Mr. Boudreaux and/or Ms. Orr if they had been using an anticoagulant other than Xarelto. This untested, speculative theory has not been subjected to peer review or publication, has no standards controlling its operation, and has not been generally accepted within the relevant scientific community. Additionally, it will have no bearing on any matter of consequence to this litigation, but instead carries a great risk of undue prejudice. As such, any testimony on this matter should be precluded.

**II.   FACTUAL BACKGROUND**

Five defense experts opined in their reports that no definitive statement could be made about whether Mr. Boudreaux and/or Ms. Orr would have suffered the same consequences if they had been taking a different anticoagulant, with some also commenting that rivaroxaban was a safer option than warfarin:

1

**Expert Report of Dr. Scott Boniol (*Boudreaux*), at 13:** "Being on rivaroxaban allowed for rapid 'reversal' by simply not taking the drug. In contrast, bleeding on warfarin would have resulted in very difficult, tedious and dangerous measures to reverse the effects of warfarin quickly. Being on rivaroxaban made this much easier to manage than on Coumadin, and his risk of death … from this bleed was much lower than had he been on Coumadin…. It is also impossible to say that this bleed would not have occurred on another anticoagulant."[1]

**Expert Report of Colleen Johnson, MD, MS (*Boudreaux*), at 9**: "There is no evidence that Mr. Boudreaux . . . would not have had a bleed if he had been prescribed a different anticoagulant."[2]

**Report of Dr. Marc J. Kahn, MD, MBA (*Boudreaux*), at 9**: "There is no way to rule out that the same GI bleed Mr. Boudreaux experienced, would have happened if he was taking any other anticoagulant, including a vitamin K inhibitor[ ] like warfarin or another NOAC."[3]

**Report of Dr. Marc J. Kahn, MD, MBA (*Orr*), at 9-10**: "There is no way [to] determine whether or not Ms. Orr's ICH would have happened if she had been taking any other anticoagulant, including a vitamin K inhibitor like warfarin or another NOAC. Rather, studies reported in the medical literature have found that the risk of ICH with rivaroxaban is lower tha[n] the risk of ICH with warfarin."[4]

**Expert Report of Dr. Clement Eisworth, MD (*Orr*), at 7**: "There is no reason to believe that Mrs. Orr would not have had her intracerebral hemorrhage or that the ultimate outcome would have changed if warfarin or a different NOAC was used instead of Xarelto to lessen her very high risk of an embolic stroke or other embolic event from the PAF."[5]

**Expert Report of Dr. William Franklin Peacock, IV, MD, FACEP (*Orr*), at 6, 7**: "We know that people do worse on warfarin

---

[1] Attached as Exhibit 1.

[2] Attached as Exhibit 2.

[3] Attached as Exhibit 3. "NOAC" is an acronym for Novel Oral Anticoagulants. There are currently four NOACs on the market: dabigatran (Pradaxa), rivaroxaban (Xarelto), apixaban (Eliquis), and endoxaban (Savaysa).

[4] Attached as Exhibit 4.

[5] Attached as Exhibit 5.

> with a reversal agent than a DOAC without a reversal agent. It's better to be on any DOAC without a reversal agent than warfarin with a reversal. Nobody can say this event would not have occurred if Mrs. Orr had been on a different anticoagulant… Some data suggest that the prognosis for an ICH in a patient on [an] anticoagulant is better with any DOAC than warfarin. Since Mrs. Orr was on rivaroxaban, as she complained of GERD with Pradaxa, she was on the safest option she could have."[6]

The only two hematologists from this group – Dr. Boniol and Dr. Kahn – expanded on this during their depositions. Dr. Boniol testified that the relative rates of gastrointestinal ("GI") bleeding cannot be compared among NOACs because there have been no head-to-head, blinded, randomized trials directly comparing them in a specific patient population,[7] and, consequently, drug representatives have confirmed that they cannot compare bleeding rates among NOACs or say one is better in terms of GI bleeding.[8] Dr. Boniol also clarified that his statement did not mean that Mr. Boudreaux would have had the same bleed on another anticoagulant; it meant only that one could not say he would not have had the same bleed.[9]

Similarly, Dr. Kahn testified that since there is no prospective, head-to-head, randomized, blinded study comparing the relative bleeding risks of one DOAC versus another, any assessment of their relative risks of bleeding would be speculative.[10] Dr. Kahn also said that retrospective studies have no value because the patient populations are different.[11] As to applicability to patients, Dr. Kahn explained that bleeding can vary between anticoagulants, and that without an

---

[6] Attached as Exhibit 6. "DOAC" is an acronym for Direct Oral Anticoagulants, which is an alternate name for NOACs. The terms will be used interchangeably throughout this memorandum, depending on which term the referenced expert used.

[7] *See* Deposition of Steven Scott Boniol, M.D. (*Boudreaux*), at 16:3-25:9 (attached as Exhibit 7).

[8] *Id.* at 53:3-10, 55:5-20.

[9] *Id.* at 87:4-12.

[10] *See* Deposition of Marc J. Kahn, MD, MBA (*Boudreaux*), at 85:20-86:25, 93:3-94:23 (attached as Exhibit 8).

[11] *Id.* at 87:2-88:8.

empirical trial that puts a patient who bled on one anticoagulant on a different anticoagulant, there can be no assessment of whether the patient who bled on one anticoagulant would bleed on a different anticoagulant.[12] Specifically as to Mr. Boudreaux, he testified that it would be impossible to determine whether he would have had a bleed on another anticoagulant unless he was, in fact, placed on another anticoagulant.[13]

On the opposite side of the spectrum, Dr. Boniol said in his report for Mrs. Orr that "the scientific facts show that she would have had a much worse outcome on warfarin."[14] However, in the two pages immediately preceding this statement, he compared the relative ability of warfarin versus DOACs to decrease clots that already have formed,[15] so it appears that this statement was made in the context of her prognosis after the bleed occurred, rather than in the context of whether the bleed would have occurred in the first place.

The same is true for Dr. Khatib, who said in his report that the outcome would have been the same for Mr. Boudreaux on any anticoagulant:

> In all likelihood, the short term and long term clinical outcome would not have been different if another direct oral anticoagulant or warfarin was utilized… Would the patient's bleeding episode have been less severe if he had been on Warfarin? Some have argued that the lack of a reversal agent would result in a more severe bleeding event. I do not believe that Mr. Boudreaux's hospitalization would have resulted in a different outcome. The patient remained hemodynamically stable throughout the hospital stay. After transfusion with 4 units of packed red blood cells, the patient's hemoglobin/hematocrit stabilized. There was no evidence of ongoing bleeding once the patient was hospitalized. Specifically, the admitting Hospitalist Dr. Masri stated there was no indication for reversal with activated Prothrombin complex concentrate. Mr. Boudreaux did not suffer any long-term adverse events after his

---

[12] *Id.* at 72:10-21.

[13] *Id.* at 97:15-98:7, 104:10-106:22.

[14] *See* Expert Report of Dr. Scott Boniol (*Orr*), at 8 (attached as Exhibit 9).

[15] *Id.* at 7.

> hospitalization related to the bleeding episode. His pericardial effusion was not related to his gastrointestinal bleed. This outcome is similar to what has been published in regard to management of bleeding events with Xarelto… In summary, it is my opinion that Mr. Boudreaux's clinical course would not have been significantly altered with a choice of another agent.[16]

Dr. Khatib confirmed at his deposition that these statements were referring only to the severity of the bleeding episode, and not to whether the bleed would have occurred in the first place.[17] He also agreed that it would be impossible to say one way or the other whether a GI bleed would have happened on a different anticoagulant after the outcome already had happened.[18]

Dr. Khatib did, however, discuss the odds of whether a bleed would have happened on a different anticoagulant in his report for Mrs. Orr's case:

> It is not likely that SO would have had a different outcome if she had been on a different anticoagulant. In ROCKET AF, the major study evaluating the safety and efficacy of Xarelto compared to Warfarin, the overall risk of bleeding was similar in both arms. However, the risk of fatal bleeding was lower in patients on Xarelto compared to Warfarin, with a hazard ration of 0.5, which correlates to a 50% risk reduction compared to warfarin. Furthermore, the risk of intracranial hemorrhage was also lower in patients treated with Xarelto, with a hazard ration of 0.67. Thus, SO's chances of developing a fatal intracranial hemorrhage would have been higher had she been on warfarin. There are no direct comparisons of Xarelto with the other DOAC's, but these agents have similar benefit profiles when compared with Warfarin.
>
> It is also not likely that SO would have fared differently after developing an intracerebral hemorrhage, had she been on warfarin. This is because at presentation, SO's intracerebral bleed was already severe. With an ICH score of 3, the risk of mortality is 72%. By the time of presentation, SO already had signs of midline shift and associated mass effect, very poor prognostic signs. Serial CT scans performed after this did not reveal continued bleeding, but did reveal continued midline shift and associated mass effect. Thus, the

---

[16] *See* Expert Report of Dr. Sammy Khatib (*Boudreaux*), at 14, 16, 18 (attached as Exhibit 10).

[17] *See* Deposition of Sammy Khatib, MD (*Boudreaux*), at 49:8-54:12 (attached as Exhibit 11).

[18] *Id.* at 39:11-21.

> bleeding did not continue, but the impact on her brain of the blood seen on the first CT scan continued. It is extremely unlikely that the presence of a reversal agent would have impacted the ultimate clinical outcome in this case. None of Mrs. Orr's treating physicians, including her neurosurgeon Dr. Bui and neurocritical care physician Dr. Mahanna, could say that Mrs. Orr's outcome would have been any different on warfarin or any other anticoagulant. In fact, Dr. Bui testified that he could not say that earlier surgical intervention would have made a chance in outcome, considering the size of the bleed.
>
> …
>
> It is not possible to say that SO's ICH would not have occurred or that she would have survived if she had been on warfarin or a different DOAC.[19]

However, Dr. Khatib backed down from this position during his deposition, at least in terms of other NOACs, based on the lack of studies comparing NOACs to one another. In terms of other NOACs, he admitted that "it would be speculative to say what would happen if … a patient was on … a different anticoagulant."[20] This is consistent with what Dr. Khatib said in his generic expert report, essentially saying that outcomes cannot be determined for individual patients taking an anticoagulant other than that which was actually taken unless addressed in scientific research:

> In clinical practice, physicians utilize Evidence Based Medicine (EBM) in the process of decision making related to patient care and prescribing medications. EBM is an integration of a clinician's expertise, the patient's values, and the best available current scientific evidence in health care. According to EBM, the best scientific evidence is considered to be randomized controlled clinical studies involving a number of participants demonstrated to quantify efficacy and risk. Based on this understanding of EBM, in an individual patient scenario it is not possible to determine if outcomes would be different if a different anticoagulant was used unless this is specifically addressed in scientific research.[21]

---

[19] *See* Expert Report of Dr. Sammy Khatib (*Orr*), at 15-16, 18 (attached as Exhibit 12).

[20] *See* Deposition of Sammy Khatib, MD (*Orr*), at 86:24-87:12 (attached as Exhibit 13).

[21] *See* Expert Report of Dr. Sammy Khatib (Generic), at 18-19 (attached as Exhibit 14).

6

### III. ARGUMENT

#### A. Speculation About What the Outcomes Would Have Been if a Different Anticoagulant Had Been Used Should be Precluded Under *Daubert.*

In the well-known trilogy of cases – *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993); *General Electric v. Joiner,* 522 U.S. 136 (1997); and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999) – the United States Supreme Court elucidated the standard of admissibility of expert testimony under Federal Rule of Evidence 702.

In *Daubert*, the Court emphasized the trial judge's role as gatekeeper in determining the admissibility of relevant and reliable expert testimony. *Daubert,* 509 U.S. at 589. The trial court must determine whether the proffered expert's testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline." *Id*. at 592. The Court explained that this standard is "flexible," and identified four specific factors that a trial court may consider in determining whether to admit expert testimony:

1. whether the theory can be or has been tested;

2. whether the theory has been subjected to peer review and publication;

3. whether the theory has high known or potential rate of error, and whether there are standards controlling its operation; and

4. whether the theory is generally accepted within the relevant scientific community.

*Id*. at 592-94.

The *Joiner* Court added that a trial court need not accept testimony purely based on the *ipse dixit* of an expert's statement. *Joiner,* 522 U.S. at 146. In other words, an expert's testimony that something is the case does not thereby make it fact. As this Court has observed, there must

not be "too great a gap" between the science and the opinion. *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 616 (E.D. La. 2003) (*citing Joiner*, 522 U.S. at 146).

In *Kumho Tire*, the Court noted that the Daubert factors do not constitute an exhaustive set, and that the trial court may consider other factors depending on the nature of the evidence presented. *Kumho Tire*, 526 U.S. at 150-52. The Court also noted that an expert's credentials alone are not sufficient to allow admission of that expert's testimony. *Id*. at 153.

Finally, as this Court has properly observed: "The party seeking to introduce the expert testimony bears the burden of demonstrating that the testimony is both relevant and reliable. The focus is not on the result or conclusion, but on the methodology." *In re Chinese Manufactured Drywall Prods. Liab. Litig.,* MDL No. 2047, 2010 WL 8368083, at *3 (E.D. La. Feb. 17, 2007) (internal citations omitted).

Federal Rule of Evidence 702 has been amended to incorporate these jurisprudential principles into a district judge's determination of expert admissibility,stating that:

> A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Out of the six defense experts who are the subjects of this motion, only two – Dr. Boniol and Dr. Kahn – are hematologists. Three of the others are cardiologists (Drs. Johnson, Eisworth,

and Khatib), and the last specializes in emergency medicine (Dr. Peacock). There is nothing in the backgrounds of the four non-hematologists to suggest that they would be qualified to state opinions about the relative effects of anticoagulants.

Additionally, as addressed in detail above, each of the six defense experts who are the subjects of this motion essentially admitted that they do not know one way or the other whether Mr. Boudreaux and/or Mrs. Orr would have had their bleeding events if they had been taking another anticoagulant.[22] Furthermore, as also addressed above, half of those defense experts – Drs. Boniol, Kahn, and Khatib – admitted that until there is a head-to-head trial, no conclusions can be made about the relative bleeding risks associated with each anticoagulant.[23]

Consequently, their opinions should be barred because they meet none of the requirements for the admission of expert testimony under Federal Rule of Evidence 702 or *Daubert* and its progeny. They are not based on scientific, technical or other scientific knowledge, or on sufficient facts or data, or on reliable principles or methods. They undisputedly have not been tested, or subjected to peer review, appropriate publication, or controlled studies. They are not opinions that have been, or even could be, generally accepted without appropriate testing.

Instead, the opinions of Defendants' experts are based solely on subjective "feelings" and unsupported speculation, which fly in the face of *Daubert,* which was designed with an "aim . . . to exclude expert testimony based merely on subjective belief or unsupported speculation." *See Burst v. Shell Oil Co.,* 120 F. Supp. 3d 547, 550 (E.D. La. 2015) (citation omitted). Testimony based on possibilities that *might* have existed as a result of anticoagulants that *could* have been used but were not used, rather than on what actually was used, lacks reliability and probative value.

---

[22] *See supra* Section II.

[23] *Id.*

*See generally Washington v. Armstrong World Indus., Inc.,* 839 F.2d 1121, 1122 (5th Cir. 1998) (expert testimony "based on possibilities that might exist . . . rather than specific findings or evaluations of test results that were available" was precluded as rank speculation).  As such, the testimony should be excluded on this basis, independent of the preclusion that should occur as a result of its irrelevance, as discussed below.

> **B.     Testimony About What May or May not Have Happened if Another Anticoagulant Had Been Used Should be Precluded as Irrelevant.**

The unreliability addressed above is sufficient on its own to preclude speculative testimony about what the outcomes would have been if a different anticoagulant had been used.  Independent of this, an entirely separate factor – irrelevance – likewise justifies preclusion of this expert testimony.

Only evidence that is relevant is admissible at trial.  This is a basic tenet of the law, clearly set forth in Federal Rule of Evidence 402, and is, without question, the first and foremost gatekeeper mechanism for determining what can and cannot be presented at trial.  Any evidence that is not relevant must be precluded.

It does not matter if the evidence is presented by a lay witness or an expert witness.  Irrelevant evidence does not become relevant or admissible simply because it is presented by an expert.  The United States Supreme Court made that clear in issuing its opinion in *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993):

> Rule 702 further requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.'  This condition goes primarily to relevance.  'Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.'

*Id.* at 591 (*quoting* 3 Weinstein & Berger 702-18).

Evidence is relevant if it has a tendency to make a fact of consequence to the litigation more or less probable than it would be without the evidence. Fed. R. Evid. 401. Relevant evidence need not be conclusive of an ultimate issue, nor make one proposition appear more or less probable, but it must at least advance the inquiry. *Thompson v. City of Chicago,* 472 F.3d 444, 453 (7th Cir. 2006) (citations omitted); *Kalo v. Comm'r,* No. 97-1416, 1998 U.S. App. LEXIS 12570, at *14 (6th Cir. June 9, 1998) (citation omitted).

However, even relevant evidence can be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. A trial court has broad discretion in assessing the probative value of evidence and determining if it is significantly outweighed by the risk of undue prejudice. *See Sprint v. Mendelsohn,* 552 U.S. 379, 384 (2008); *Verzwyvelt v. St. Paul Fire & Marine Ins. Co.,* 175 F. Supp. 2d 881, 888 (W.D. La. 2001), *citing United States v. Johnson,* 558 F.2d 744, 746 (5th Cir. 1977).

Relevant evidence should be excluded if its probative value is substantially outweighed by a danger of unfair prejudice. *United States v. Duncan,* 919 F.2d 981, 987 (5th Cir. 1990), *citing* Fed. R. Evid. 403. "The less probative a piece of evidence is, and thus the less the benefit to the truth-determining function of the jury of admitting it at trial, and the more trial time the presentation of the evidence would consume and the likelier the evidence would be to confuse the jurors by distracting them from more probative evidence, the stronger the argument for exclusion." *United States v. Seals,* 419 F.3d 600, 613 (7th Cir. 2005) (citations omitted).

Plaintiffs need only show that their injuries were proximately caused by their use of Xarelto. The evidence that Defendants hope to assert – that Plaintiffs would have had to take a

11

different anticoagulant, and that a different anticoagulant might have caused a major bleeding event – is an attempt to create a new burden on Plaintiffs.  There is no support – by rule, case law, or otherwise – for placing such an additional burden on Plaintiffs.  There is support, however, for precluding statements about what might have happened in an alternate universe because "such a hypothetical counter factual situation is not sufficient to meet the causation requirement."  *See Sweeney v. Chertoff,* 178 F. App'x 354, 358 (5th Cir. 2006). As such, gratuitous statements such as these, about what can or cannot be said about what would or would not have happened with use of a different anticoagulant, are irrelevant, and should be precluded under Rule 402.

This case is about the bleeds suffered by Mr. Boudreaux and Ms. Orr due to Xarelto – not some other bleed that may or may not have occurred if they had taken some other anticoagulant with different warnings, risks and benefits.  Allowing Defendants' experts to speculate on what may have occurred on a different drug will create a trial within the trial on the warnings, risks and benefits of all anticoagulants that could have been prescribed.  This trial should be limited to Plaintiffs' use of Xarelto.

Even if this evidence were relevant in some way, and it is not, it should be excluded under Rule 403, because it will do nothing more than unduly prejudice Plaintiffs, cause unnecessary confusion, mislead the jury, waste this Court's time, and result in undue delay.  Bayer's own experts have confirmed that assessing what would have happened with a different anticoagulant would involve speculation, and courts have found that "speculative blaming intensifies the grave risk of jury confusion, and it invites the jury to render its findings based on emotion or prejudice." *See United States v. Settle,* 267 Fed App'x 395, 398 (5th Cir. 2008).

## IV. CONCLUSION

For these reasons, Plaintiffs respectfully request that Drs. Boniol, Johnson, Kahn, Eisworth, Peacock, and Khatib be precluded from testifying about what may or may not have happened to Mr. Boudreaux and/or Ms. Orr if they had been using an anticoagulant other than Xarelto.

Respectfully submitted,

Dated:  February 10, 2017

*/s/ Leonard A. Davis*
Leonard A. Davis, Esq. (Bar No. 14190)
**HERMAN, HERMAN & KATZ, LLC**
820 O'Keefe Avenue
New Orleans, LA  70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Email: ldavis@hhklawfirm.com

Gerald E. Meunier (Bar No. 9471)
**GAINSBURGH BENJAMIN DAVID MEUNIER & WARSHAUER, LLC**
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA  70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
Email: gmeunier@gainsben.com

*Plaintiffs' Liaison Counsel*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 10, 2017, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre- Trial Order No. 17.

*/s/ Leonard A. Davis*
**LEONARD A. DAVIS**