UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  XARELTO (RIVAROXABAN)      *          MDL 2592
PRODUCTS LIABILITY LITIGATION      *
                                   *          SECTION L
THIS DOCUMENT RELATES TO:          *
    *ALL CASES*                    *          JUDGE ELDON E. FALLON
                                   *
                                   *          MAG. JUDGE NORTH
                                   *

* * * * * * * * * * * * * * * * * * * * * * * * *

---

**EXHIBIT 7 TO
PLAINTIFFS' MOTION TO PRECLUDE SPECULATIVE TESTIMONY
FROM SIX DEFENSE EXPERTS ABOUT POTENTIAL OUTCOMES
FROM OTHER ANTICOAGULANTS**

---

# FILED UNDER SEAL

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  XARELTO (RIVAROXABAN)              MDL NO. 2592
PRODUCTIONS LIABILITY LITIGATION      MAG. JUDGE NORTH
THIS DOCUMENT RELATES TO:
JOSEPH BOUDREAUX, NO. 14-0270

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

ORAL DEPOSITION
OF
STEVEN SCOTT BONIOL, M.D.

Taken at the offices of
Cook, Yancey, King & Galloway
333 Texas Street
Shreveport, Louisiana

January 14, 2017                        9:13 a.m.

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 2

```
 1  APPEARANCES:
 2  FOR PLAINTIFF:
 3              GOZA & HONNOLD
                11150 Overbrook Road
 4              Suite 250
                Leawood, KS  66211
 5              By:  Bradley Honnold, Esquire
 6
    FOR JANSSEN:
 7
                BARRASSO, USDIN, KUPPERMAN, FREEMAN &
 8                SARVER
                Suite 2400
 9              909 Poydras Street
                New Orleans, LA  70112
10              By:  Richard E. Sarver, Esquire
                     RSarver@BarrassoUsdin.com
11                   Madison Sharko, Esquire
                     MSharko@BarrassoUsdin.com
12
13              IRWIN, FRITCHIE, URQUHART & MOORE
                Suite 2700
14              404 Poydras Street
                New Orleans, LA  70130
15              By:  James Irwin, Esquire
                     JIrwin@IrwinLLC.com
16                   Jeanette Mills
                     JMills@IrwinLLC.com
17
18  FOR BAYER:
19              WILKINSON, WALSH & ESKOVITZ
                Suite 800
20              1900 M Street NW
                Washington DC  20036
21              By:  Kim Channick, Esquire
                     KChannick@WilkinsonWalsh.com
22                   Kieran Gostin, Esquire
                     KGostin@WilkinsonWalsh.com
23
24  REPORTED BY:  Sarah B. Townsley, CCR, CSR, RPR, Notary
25  VIDEOGRAPHER:  Lyn Rieger, Golkow Technologies
```

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 3

```
 1                    STIPULATIONS
 2      IT IS HEREBY STIPULATED BY AND BETWEEN COUNSEL FOR
 3  THE PARTIES THAT THE ORAL VIDEO DEPOSITION OF STEVEN
 4  SCOTT BONIOL, M.D., IS BEING TAKEN BEFORE SARAH B.
 5  TOWNSLEY, CCR, RPR, CERTIFIED COURT REPORTER IN AND FOR
 6  THE STATES OF TEXAS AND LOUISIANA, PURSUANT TO NOTICE
 7  AND IN ACCORDANCE WITH THE FEDERAL RULES OF CIVIL
 8  PROCEDURE AS PROVIDED BY LAW, AT THE OFFICES OF COOK,
 9  YANCEY, KING & GALLOWAY, 333 TEXAS STREET, SHREVEPORT,
10  LOUISIANA, ON JANUARY 14, 2017;
11      THE PARTIES HEREBY WAIVE ALL FORMALITIES IN
12  CONNECTION WITH THE TAKING OF THE DEPOSITION, WITH THE
13  EXCEPTION OF THE SWEARING OF THE WITNESS AND THE
14  REDUCTION OF THE QUESTIONS AND ANSWERS TO TYPEWRITING;
15      THE RIGHT OF THE WITNESS TO READ AND SIGN A COMPLETED
16  TRANSCRIPT OF TESTIMONY IS SPECIFICALLY RESERVED;
17      COUNSEL FOR ALL PARTIES RESERVE ALL OBJECTIONS EXCEPT
18  AS TO THE FORM OF THE QUESTION AND RESPONSIVENESS OF THE
19  ANSWER AT THE TIME OF TAKING OF SAID DEPOSITION, AND
20  THEY ALSO RESERVE THE RIGHT TO MAKE OBJECTIONS AT THE
21  TIME THAT TAKING OF SAID DEPOSITION OR ANY PART THEREOF
22  MAY BE OFFERED INTO EVIDENCE, WITH THE SAME RIGHTS AS IF
23  THE TESTIMONY HAD BEEN GIVEN IN OPEN COURT;
24      SARAH B. TOWNSLEY, CCR, RPR, OFFICIATED IN
25  ADMINISTERING THE OATH TO THE WITNESS.
```

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 4

```
 1                    INDEX
 2  EXAMINATION BY                           PAGE NO.
 3  MR. HONNOLD                                 6
 4
 5                    EXHIBITS
 6  NO.   DESCRIPTION                         PAGE NO.
 7  1     expert report                          11
 8  2     "Gastrointestinal Safety of Direct Oral..."  56
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 5

```
 1   PROCEEDINGS:
 2               STEVEN SCOTT BONIOL, M.D.,
 3   having been first duly sworn, testified on oath as
 4   follows:
 5               VIDEOGRAPHER:      We're now on the
 6   record.  My name is Lyn Rieger, videographer for Golkow
 7   Technologies.  Today's date is January 14, 2017.  The
 8   approximate time is 9:13 a.m.  The video deposition is
 9   being held in Shreveport, Louisiana, in the matter of
10   Xarelto products liability litigation, filed in the
11   United States District Court, Eastern Division of
12   Louisiana.  The deponent is Dr. Scott Boniol.  The court
13   reporter is Sarah Townsley, and the deposition right now
14   is representing the family of Joseph Boudreaux, and
15   attorneys, if you will introduce yourselves for the
16   record, and then our court reporter will swear the
17   witness.
18               MR. HONNOLD:       Thank you.  Brad Honnold
19   for Mr. Boudreaux.
20               MR. SARVER:        Rick Sarver for Janssen.
21               MS. SHARKO:        Madeline Sharko for
22   Janssen.
23               MS. MILLS:         Jeanette Mills for
24   Janssen.
25               MRS. CHANNICK:     Kim Channick for Bayer.
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 7

```
 1   A.   I do remember.
 2   Q.   I'm going to set those just here.  You and I
 3   might have some reason to access those, and, rather
 4   than re-mark things, we can just refer to them as what
 5   had been marked yesterday as the appropriate exhibit
 6   number.  What I would like to do is just hand you what
 7   have been marked as Exhibit 2 from yesterday and have
 8   you identify for me in those invoices the dated
 9   invoices that show your specific work that you did in
10   the Boudreaux case.
11   A.   These are 14 invoices.  Are you asking me to
12   look for the ones that are specifically for Boudreaux?
13   Q.   Yes, sir.
14   A.   Looking at this, certainly, some of my invoices
15   as it relates to just general knowledge, and research,
16   and background relating to Xarelto use, side effects,
17   should probably be included, because, certainly, that
18   was instrumental in helping form my opinion.  The
19   majority of these early invoices, dated April 6, 2015,
20   through October 20, 2015, were back related to Science
21   Day, which, again, was a lot of research done to
22   educate -- or more deeply educate myself, as well as to
23   educate Judge Fallon and all the counsel involved in
24   the case on the specifics of this, so that allowed me
25   to not need nearly as much time to review specifically
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 6

```
 1               MR. GOSTIN:        Kieran Gostin for Bayer.
 2               MR. IRWIN:         Jim Irwin for Janssen.
 3          [Witness was sworn.]
 4   EXAMINATION BY MR. HONNOLD:
 5   Q.   Doctor, good morning.  You know we're here
 6   today to take your deposition related to the Boudreaux
 7   case?
 8   A.   Yes, sir.
 9   Q.   And you know that's a case that you have
10   reviewed some materials, medical records, and have
11   been retained to express opinions in that regard?
12   A.   Yes, sir.
13   Q.   And I don't know if we have the benefit of the
14   marked exhibits from yesterday.  It looks like we do
15   have them, so I might need to resort to them for some
16   reason.  Why don't we just put those out in the
17   middle, because, if we go back and forth between the
18   billing and things like that, it might be helpful.  Do
19   you recall that, yesterday, we were here, and we took
20   -- you can either call it your general deposition or
21   generic deposition, for kind of your global opinions
22   related to Xarelto, right?
23   A.   Yes, sir.
24   Q.   And you know that we marked numerous things as
25   exhibits in that deposition yesterday?
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 8

```
 1   some of the stuff pertinent to this case, but I would
 2   say invoice number 55, 57, 58, 59 relate to -- and, I'm
 3   sorry, and 60 relate to Mr. Boudreaux.
 4   Q.   When did you receive the medical records in the
 5   Boudreaux case?
 6   A.   I believe I received the medical records in the
 7   Boudreaux case in late August or early September of
 8   2016.
 9   Q.   So you would not have looked at any of Mr.
10   Boudreaux's records prior to August of 2016?
11   A.   I did not, no.  If I received them -- you know,
12   they sat in my office for a little while before I
13   opened them.
14   Q.   And so the first invoice that you have that
15   makes any reference to reviewing the Boudreaux medical
16   records is invoice number 59?
17   A.   That is correct.
18   Q.   And then on invoice number 59, in terms of that
19   entry, do you know how much time out of that twelve
20   hours that's reflected on the invoice was related to
21   the review of the Boudreaux medical records?
22   A.   I would think at least eight hours of that was
23   specifically to Boudreaux.
24   Q.   Then after invoice number 59, did you bill for
25   any additional time reviewing the Boudreaux medical
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 9

```
1    records?
2         A.   Yeah, I think you can see there on invoice 60,
3    dated 11/16/2016, obviously, the initials "JB" there
4    for case-specific reports also include that of Mr.
5    Boudreaux.
6         Q.   So my question did you bill for any additional
7    time reviewing medical records other than what's on
8    invoice 59?
9         A.   Yes.
10        Q.   And so that would have been on invoice 60?
11        A.   Correct.
12        Q.   And is some of that time, then, where you say
13   "case-specific reports"?  Is that what you're referring
14   to, then?
15        A.   Yes, sir.
16        Q.   And out of that billing line entry, how much
17   time would have been spent related -- additional time,
18   to the eight hours you had before related to reviewing
19   Mr. Boudreaux's medical records?
20        A.   I would think another four hours.
21        Q.   And so, then, related to Mr. Boudreaux's case,
22   your best estimate is you would have had twelve hours
23   spent on reviewing his medical records?
24        A.   On just his medical records, correct.
25        Q.   Then the same general questions relating to
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 10

```
1    the preparation of the report for Mr. Boudreaux.  When
2    would have been -- which invoice would have reflected
3    the first work that you did on the Boudreaux report?
4         A.   Well, it's kind of hard to put down to a
5    specific there.  I mean, in preparation for this, as I
6    side before, there's been at least a last-15-year thing
7    in just knowing hematology and learning hematology and
8    medicine, but specifically typing on his report would
9    be likely number 59.
10        Q.   And in terms of that line entry there that has
11   twelve hours of time, how much of that twelve hours
12   would have been devoted to preparing or working on the
13   Boudreaux report?
14        A.   Probably about an hour, hour and a half.
15        Q.   Then after invoice 59, would you have had any
16   additional time spent or reflected on invoice 60 for
17   work on the Boudreaux report?
18        A.   Probably, you know, at least another hour, hour
19   and a half there, too.
20        Q.   So out of the 18 hours on invoice 60, one hour
21   to 1.5 hours would have also been working on the
22   Boudreaux report?
23        A.   To the best of my recollection, yes.
24        Q.   So, then, in terms of time spent, either
25   related to review of the Boudreaux medical records or
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 11

```
1    preparing the Boudreaux report, you would have twelve
2    hours of record review, and then anywhere from 2 to 3
3    hours of work on the report?
4         A.   Yeah, you know, as far as the specifics to
5    Boudreaux, I think, probably, you can also make some
6    time from invoice number 58, work on formal reports,
7    just because some of the work I did on general reports
8    was later more tailored down to Boudreaux, so some of
9    this stuff intertwines, and, you know, it's hard to
10   say exactly.  Again, you know, I don't know if you
11   want to count all the countless hours I've spent
12   learning how to read medical records that allowed me
13   to get through them a lot quicker as part of
14   preparation or not.  I don't know how far you want to
15   go with that, but specifically that I billed, I think
16   you're right on it with the numbers you have.
17        Q.   I'm going to show you what we are marking for
18   today's deposition as Exhibit 1.  What is that
19   document?  And I apologize.  Some of these aren't
20   stapled.  My traveling stapler malfunctioned.
21             MR. SARVER:     Not a problem.
22        A.   This document is my expert report on the Joseph
23   Boudreaux case, as well as cited references, reliance
24   lists.  It does have the older CV at the end.  I think
25   we cleared that up yesterday with the more up-to-date
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 12

```
1    one.  I don't think that has any bearing on what you're
2    asking me on this case, though, so this is just the
3    reliance list of materials that I reviewed to consider
4    both sides of the case.  It does appear, again, to be a
5    reliance list that has been amended, that was given to
6    you yesterday, so I think we're a little short on this
7    reliance list, but it also refers to the specific
8    medical records that I reviewed for this case.
9                                      BY MR.
10   HONNOLD:
11        Q.   Before we get into some of the details of the
12   report, the invoices that we just looked at, these
13   documents actually have the invoice number on their
14   series of numbers, starting at 22, and the last one is
15   0060.  What controls the -- in terms of the software
16   package that you -- that somebody uses to prepare these
17   bills, what controls the selection of the invoice
18   number?
19        A.   So, you know, the invoice number is controlled
20   by sequential invoices that I send to people for doing
21   billing for any work that I do.
22        Q.   And so other than the medical-legal work
23   that's reflected on the invoices for your work on this
24   case, what other sort of individualized invoices for
25   the work that you do do you generate?
```

Page 13

1    A.  Certainly, I do work for -- I used to do
2 contract work for hospice, which is end-of-life care.
3 Sometimes I will do work for -- you know, or just
4 independent work as far as focused practice review for
5 physicians in the hospital that are new, to make sure
6 they're doing their job correctly, so anytime I do
7 anything on a 1099-type work, I give them a separate
8 invoice.  I can tell you all the invoices I've ever
9 sent in on this litigation are included here.
10    Q.  And so your other 1099 income, though, would be
11 things that would fill in the gaps on the other invoice
12 numbers?
13    A.  Correct.
14    Q.  The reason that these invoices have the number
15 that they do, it means that they followed invoices
16 that were generated for some other purpose?
17    A.  Correct.
18    Q.  So other than -- well, let me ask you about
19 the contract work for hospice, then.  Who is the
20 entity that you would have billed for the contract work
21 for hospice?
22    A.  It would billed out of Christus Home Health
23 Care.
24    Q.  And then, for that work, do you bill by the
25 hour, or some other rate?

Page 15

1 you would include the updated CV, and you would include
2 the updated reliance list?
3    A.  Yes, sir.
4    Q.  Is there any other work that you've done on
5 the Boudreaux case that isn't reflected either in the
6 report itself or on the invoices related to it?
7    A.  I think, since the report's been generated, you
8 know, I have went back and re-read some of the medical
9 record, yes.
10    Q.  And so in terms of additional unbilled time
11 that you have in the Boudreaux case, after the last
12 November invoice, how much time would there be?
13    A.  You know, I didn't bill for the specific time.
14 I think probably about two hours reviewing some of the
15 medical record.
16    Q.  The issue of comparative results between or
17 among the various NOACs, have you specifically done a
18 literature search on that issue?
19    A.  What do you mean?  I mean, I'm not -- you can't
20 compare the NOACs to each other.  There's no trial
21 that's been done directly comparing them.  I've done a
22 literature search looking at some authors trying to
23 make references to this NOAC versus that NOAC.
24 Certainly, I've read multiple reports looking at that,
25 but, of course, they're all disclaimed.  It's

Page 14

1    A.  By the hour.
2    Q.  And so some of these other invoices, then,
3 that would have been generated between April of 2015
4 and November of 2016, some of those would have gone to
5 Christus Home Health Care?
6    A.  Correct.
7    Q.  And then you mentioned independent work that
8 you do on focus practice review to determine whether
9 new physicians are doing their work or jobs correctly;
10 is that right?
11    A.  Correct.
12    Q.  So, for those invoices, who would you be
13 billing?
14    A.  I send those in to Christus, as well.
15    Q.  And then do you bill Christus by the hour for
16 that work?
17    A.  I do.
18    Q.  And so the other invoice numbers which fill in
19 the gaps for this sequence, would they have all been
20 invoices generated -- or issued to Christus?
21    A.  Yes.
22    Q.  The Orr -- excuse me, the Boudreaux report
23 that we've marked as Exhibit 1, to make it up-to-date,
24 as we had the same discussion -- related to the
25 discussion we had yesterday, for it to be complete,

Page 16

1 well-known in medicine that you can't do that and make
2 any conclusions.
3    Q.  My question for you was:  Have you done a
4 specific search to determine what is out there that
5 speaks to issues of comparative results --
6    A.  So --
7    Q.  -- between the various NOACs?
8    A.  Yes, I have looked at various NOACs looking at
9 each other and considered those, but, certainly,
10 they've not swayed an opinion, and I don't think they
11 would sway any doctor's opinion.
12    Q.  I've just asked you if you've done it.
13    A.  Sure.
14    Q.  That was it; so you have done it?
15    A.  Yes.
16    Q.  And those articles that you would have found on
17 that issue, would they be reflected in the updated
18 reliance list?
19    A.  They should be.
20    Q.  And so if we looked at the updated reliance
21 list, would you be able to identify which are the
22 articles that speak to that issue?
23    A.  If I had time to review it, yes.
24    Q.  The updated reliance list, I think we had
25 marked yesterday as Exhibit 3.

Page 17

1    A.   So, you know, 58 looks at -- compares
2  dabigatran and rivaroxaban.  That was considered.
3  Again, some of -- I might not be able to recognize by
4  title.  I think 24 looks at dabigatran and rivaroxaban,
5  each other; 20 looks at various things; there; 9, 7, 6,
6  3.  Those are the ones that jump out immediately as
7  different articles that look -- that mention different
8  NOACs with each other.
9    Q.   So hold onto that for a second.  Article number
10  3, can you tell by the title as to whether that article
11  does, in fact, discuss relative rates of
12  gastrointestinal bleeding or incidents of
13  gastrointestinal bleeding between the various NOACs?
14    A.   I'd have to look at the exact article.  I can't
15  recall off the top of my head.
16    Q.   But in terms of the references that are on your
17  list that might speak to that, you would at least
18  include number 3 as a candidate to look at?
19    A.   Correct.
20    Q.   Then article number 6 that's on page 15 of
21  Exhibit 3, can you tell, from looking at the title and
22  bibliography listing for that article, whether it
23  specifically speaks to the issue of comparative
24  incidence or rate of gastrointestinal bleeding between
25  or among the various NOACs?

---

Page 19

1  gastrointestinal bleeding?
2    A.   I'm almost certain that one does not.  I'm
3  familiar with that article.
4    Q.   The next one you listed was number 24.  From
5  looking at that bibliography entry, can you tell
6  whether that paper likely does or not speak to
7  comparative data on gastrointestinal bleeding for the
8  various NOACs?
9    A.   I'm fairly certain that one does.
10    Q.   Then the additional one you listed was 58 on
11  page 20 of Exhibit 3.  From looking at that
12  bibliography entry, do you think that that article or
13  paper likely does or does not speak to comparative data
14  amongst the NOACs as to the rate or incidence of GI
15  bleeding?
16    A.   I would think it does not.
17    Q.   So in terms of going through those seven
18  possibilities that you had initially listed, it looks
19  like the only one that you think -- that you could say
20  likely does, based upon either your recollection or
21  looking at the bibliography entries, was article 24 on
22  Exhibit 3?
23    A.   I think we said number 3 probably does.
24    Q.   I think you said number 3, you don't know.
25  You'd have to look at it to tell.

---

Page 18

1    A.   I think it probably would not.
2    Q.   You think that 6, now, would not, as you look
3  at it more closely?
4    A.   I don't think it would -- specifically what
5  you're asking now, no.
6    Q.   Then number 7, also on page 15, can you tell
7  from looking at the bibliography entry as to whether
8  that article likely does or does not speak to
9  comparative information as to the relative incidence or
10  rate of gastrointestinal bleeding between the NOACs?
11    A.   I would say that it probably does.
12    Q.   Then going to page 16, if you look, the next
13  one you said was possible was number 9.  Can you tell
14  from looking at that bibliography entry whether that
15  paper likely does or does not speak to comparisons
16  regarding the rate or incidence of gastrointestinal
17  bleeding amongst the NOACs?
18    A.   It probably does not.
19    Q.   The next one that you listed as a possibility
20  was number 20.  That's on page 17 of Exhibit 3.  From
21  looking at that bibliography entry, can you tell
22  whether that paper likely does or does not --
23    A.   No --
24    Q.   -- speak to a comparison between the various
25  NOACs and the issue of the rate or incidence of

---

Page 20

1    A.   Let me see.  Is that what I said?
2    Q.   I wrote down, "Don't know," but if you think --
3    A.   I think 3 probably does.  I think number 24
4  probably does, for sure.  I'm sorry, go ahead.  I
5  didn't mean to interrupt you.
6    Q.   No, that's okay.  I'm glad you did.  I just
7  want to make sure now that, out of the bibliography
8  entries on Exhibit 3, the two papers or articles that
9  you think probably do speak to comparative data amongst
10  the NOACs on the issue of rate or incidence of
11  gastrointestinal bleeding is probably article number 3
12  and probably article 24?
13    A.   Correct.
14    Q.   And, in fact, to be correct, you said you know
15  with certainty that article 24 does speak to that issue
16  --
17    A.   I said fairly certain that -- it mentions just
18  incidences.  Again, I don't think you can call it
19  comparative data.  You can't compare the two together,
20  but I think it just mentions incidences, yes.
21    Q.   Other than the sources that you've listed in
22  Exhibit 3, are you, today, as you sit here, aware of
23  any other published data that looks at, specifically,
24  and discusses in detail, the issue of relative rates of
25  gastrointestinal bleeding amongst the various NOACs?

Page 21

1    A.   Well, I mean, certainly, if you're talking
2  about relevant rates, you can look at the package
3  studies, you can look at the studies of each individual
4  NOAC and find those.  As far as any study that would
5  comparing study X to study Y, I mean, that's just a
6  waste of time.  You can't do that in different patient
7  populations, so I wouldn't waste my time reading
8  something like that.
9    Q.   Okay, so my question was:  Are you aware of any
10  such literature that talks about that?
11    A.   I don't look for it, so I'm not aware.
12    Q.   Have you looked to determine whether the
13  American College of Gastroenterology has published
14  anything on that issue, in terms of relative data
15  talking about gastrointestinal bleeding of the various
16  NOACs?
17    A.   It wouldn't change my practice, so I don't look
18  for it.
19    Q.   Okay.  Could there be patients, based on their
20  background, medical history, demographics, that the
21  issue of the likelihood of them to have GI bleeding on
22  one particular NOAC over the other might be a relative
23  piece of information to take into account when
24  prescribing the drug?
25         MR. SARVER:      Object to form.

Page 23

1    Q.   Can be?
2    A.   No.  No interceptions can be enough to lose the
3  game, as well.
4    Q.   So I just want to make sure we're clear, then.
5  You do not think there would ever be any valid reason
6  for any prescribing physician to take into account the
7  comparative information that exists on NOACs on the
8  issue of GI bleeding between the NOACs?
9         MR. SARVER:      Object to form.
10    A.   Yeah, so, no, I don't think there's any reason
11  to take that into consideration.  Again, you've got to
12  take in global data, global patient data, so
13  specifically speaking to the NOACs, there's no direct
14  trial that has ever been done; therefore, with any
15  reliability, nothing can be said between NOAC A and
16  NOAC B.  You cannot say anything about any adverse
17  effect between Xarelto and Eliquis until they're
18  studied in the same patient population prospectively.
19  Never been done, so I can tell you with certainty, no,
20  you cannot do that.
21    Q.   Are you aware of anyone that's ever proposed
22  such a trial to any drug manufacturer?
23    A.   Well, so, again, you know, if Eliquis was so
24  much better, I promise you, that manufacturer would
25  jump on the case to prove that they're better.  They

Page 22

1    A.   Absolutely not.
2  BY MR. HONNOLD:
3    Q.   So you don't think there would be any reason
4  for any physician to take into account varying --
5  different rates of gastrointestinal bleeding amongst
6  the NOACs for their patients?
7         MR. SARVER:      Object to form.
8    A.   So there's never been any study to directly
9  compare a specific patient population between the
10  different NOACs, so the data that can drive you to make
11  a scientifically-based decision does not exist, so, no,
12  there's no reason -- you can't look at Study X and say,
13  "Oh, the bleeding rate was this" and look at Study Y
14  and say, "The bleeding rate was this," and say, "Well,
15  gosh, the bleeding rate's higher on this drug."  You
16  can't do that.  Patient populations are different.  You
17  know, the best analogy I always give is if Drew Brees
18  throws four interceptions against the Giants, it
19  doesn't mean he's going to throw four against the
20  Cowboys.  They've got to play the same game.  You
21  cannot compare NOACs until they're studies directly in
22  a prospective, randomized, phase 3 trial; never been
23  done.
24    Q.   One interception's enough to lose the game?
25    A.   No, not necessarily.

Page 24

1  have not done it because they know they likely are not
2  going to be successful, so, no, they're not going to do
3  that trial.
4         MR. HONNOLD:      Move that it be stricken
5  as nonresponsive.
6  BY MR. HONNOLD:
7    Q.   Are you specifically aware as to whether anyone
8  has proposed such a head-to-head trial to any one of
9  the manufacturers of the NOACs?
10    A.   I'm not aware if anyone has.  I'm sure that
11  somebody might ask that question, but they're not going
12  to do it, so ...
13    Q.   But as you sit here today, you're not aware of
14  anyone specifically proposing such a trial to any of
15  the NOAC manufacturers?
16    A.   I have not proposed such a trial, so I can't
17  speak to any other doctor if they have or not.
18    Q.   If you were to propose such a trial -- if you
19  wanted to do such a comparison, how would you structure
20  the trial?
21    A.   Well, I mean, I think what you would do is you
22  would have to take each NOAC for their approved
23  indication, and you'd have to randomize from a central
24  -- you know, blindly randomize patients.  For example,
25  if you were going to do a DVT trial, when patients come

Page 25

1  in with DVT, you're going to have to randomize them to
2  standard -- Arm A could be standard Xarelto treatment,
3  Arm B could be standard Eliquis treatment, Arm C could
4  be standard Pradaxa treatment, Arm D could be standard
5  Savaysa treatment, and then you can look at incidences
6  and see if there's any statistically significant
7  differences in bleed rates.  Until that's done, you
8  cannot say there's any difference in these drugs.  You
9  can't do it.
10      Q.  And if you were to propose a trial like that,
11  would it cost money to do?
12      A.  I'm sure it would.
13      Q.  Well, you talked about the fact that your
14  institution loses money on the clinical trial work
15  that you do, correct?
16      A.  Correct.
17      Q.  And you have to come up with some budgetary
18  estimates as to how you allocate costs to your various
19  staff that works on those things, correct?
20      A.  Correct.
21      Q.  And you are charging for that work back to the
22  company that's undertaking the trial, correct?
23      A.  No, not correct.  I mean, sometimes we do ECOG
24  rials, so there are cooperative groups that fund this,
25  but the federal government runs clinical trials.  It's

Page 27

1      Q.  So page 3 is nothing but historical medical
2  data, correct?
3      A.  Correct.
4      Q.  From his medical records?
5      A.  Yes, sir.
6      Q.  When you set out to do the report for Mr.
7  Boudreaux's case, what was your -- I guess what was the
8  question that was called, or the objective?  What were
9  you trying to do from the outset?
10      A.  Well, I mean, first, I wanted to learn who Mr.
11  Boudreaux was.  I wanted to learn what type of medical
12  problems he had.  I wanted to learn, you know, how he
13  was treated for these various medical issues.  I just
14  kind of wanted to learn his story, you know, wanted to
15  see how he got to where he had -- was placed on
16  Xarelto, wanted to see where he was when his
17  hemoglobin dropped, wanted to see how he was treated,
18  wanted to see, again, what happened to him.  I mean,
19  that's the whole reason you read a medical history, is
20  to figure out what the story is.
21      Q.  Okay, so one objective was to figure out what
22  the story was, right?
23      A.  That's my only objective.  I don't think I had
24  any other objective.  I wanted to learn about who Mr.
25  Boudreaux was and what happened to him.

Page 26

1  not always a company, no.
2      Q.  So you would at least have to obtain funding
3  from some source to do such a trial, correct?
4      A.  Absolutely.
5      Q.  And so the places where that funding could be
6  obtained would be either professional societies or
7  groups, governmental entities such as the NIH, or
8  private pharmaceutical companies, correct?
9      A.  Correct.
10      Q.  In Mr. Boudreaux's report that we've marked as
11  Exhibit 1, I just want to make sure I understand the
12  source of the various information that's in the report.
13  If you look at page 3 of the report.
14      A.  Yes.
15      Q.  Is that all information that would have been
16  taken from his medical records?
17      A.  That is.
18      Q.  And I just want to make sure I understand.  Is
19  there anything in what you've written in page 3 that
20  includes conclusions or inferences that you've made
21  about his underlying medical history or demographic
22  data.  For example, *Because he has diabetes,
23  therefore, such-and-such thing*?
24      A.  No, sir.  I think these are all just medical
25  facts directly taken out of the record.

Page 28

1      Q.  Have you looked at individual medical records
2  for any other patients related to Xarelto litigation,
3  other than Mr. Boudreaux or Mrs. Orr?
4      A.  No, sir.  Those are the only two related to
5  litigation.
6      Q.  If you go on to page 4, is page 4 also, in its
7  entirety, information that came from medical records?
8      A.  Yes, sir.  Page 4 is just factual medical
9  information from his medical records.  I don't draw any
10  conclusions or make any opinions on this page.
11      Q.  Same question for page 5.  Is that also all
12  historical medical record information without any
13  reference or conclusions made by you?
14      A.  With the exception of the last paragraph on
15  page 5, I think I make some -- the very last two
16  sentences, I start talking about what atrial
17  fibrillation is.  That's not part of his medical
18  record.  Other than that, it's all factual information
19  from his medical record.
20      Q.  So the first four paragraphs on page 5 are, in
21  their entirety, information that came from the medical
22  record?
23      A.  Yes, sir.
24      Q.  Then same questions for page 7.  Can you tell
25  me which paragraphs on page 7 might include either some

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 29

1  conclusory or reference data?
2      A.   Which paragraphs would have that?
3      Q.   Yes.
4      A.   Probably all of them.
5      Q.   So the paragraph at the top of page 7 includes
6  some kind of general medical information regarding
7  different medical conditions, correct?
8      A.   Correct.
9      Q.   And that holds true for the remainder of the
10  paragraphs on page 7, right?
11     A.   Right.
12     Q.   So, in addition to including some demographic
13  or medical history for him, that data comes with some
14  explanation from you, right?
15     A.   Correct.
16     Q.   For Mr. Boudreaux, based upon the information
17  related to the status or function of his liver that you
18  make some reference to at the top of page 7, are you
19  suggesting that Mr. Boudreaux did or, in fact, does
20  have some liver disease that causes him to have an
21  underlying coagulopathy?
22     A.   No, I'm not.  I'm just saying his liver's not
23  normal.
24     Q.   But are you stating in this case, or going to
25  testify, that his bleed was, in any way, due to

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 30

1  underlying liver problems or insufficiency?
2      A.   I'm going to testify that it is a contributing
3  factor, or could be a contributing factor.
4      Q.   When you say that something's a contributing
5  factor to an outcome, such as a gastrointestinal
6  bleed, what are you talking about, or what does that
7  mean?
8      A.   So, you know, frequently, things aren't as
9  simple as always just one explanation.  There may be
10  multiple different issues going on that all contribute
11  to an outcome, so it's not going to be as simple as,
12  "This happened" -- you know, "X happened because of Y."
13  It's going to be, "X happened because of A, B, C", so
14  if it's a contributing factor, it's not the sole
15  factor.  It's just part of the constellation of issues
16  that Mr. Boudreaux had that can contribute to this
17  problem he had.
18     Q.   Anywhere in your report, do you explain or set
19  out, or actually come out and state that you feel that
20  his liver disease was a contributing factor to his
21  gastrointestinal bleed?
22          MR. SARVER:     Object to form.
23     A.   I'm not sure if I state that exactly.  I think
24  I state that how his enlarged liver, which is a medical
25  fact, state how he had vascular congestion from

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 31

1  increased portal pressure, is a medical fact in this
2  case.  Those things are known to contribute to GI
3  bleeds, so I don't know if I come out and exactly say
4  that.  Sometimes, as a doctor, as I'm writing this
5  report, I'm like, "Well, geez, everybody knows this",
6  and I just forget that maybe everybody doesn't know,
7  that, hey, if you have these issues that Mr. Boudreaux
8  has, you're much more likely to bleed in the
9  gastrointestinal tract, so if I didn't spell it out
10  exactly, sometimes, you know, you just live in a world
11  where medicine is everything, you might forget to
12  explain that in that way.
13     Q.   So it's obvious to you, as a physician, that
14  there were things about Mr. Boudreaux's underlying
15  medical history that did put him at increased risk for
16  having a GI bleed?
17     A.   Absolutely.
18     Q.   The next paragraph, you talked about Mr.
19  Boudreaux's dDimer result.  You see that on page 7?
20     A.   I do.
21     Q.   And in this case, is it your view that Mr.
22  Boudreaux's dDimer result is, similarly, a contributing
23  factor to his GI bleed?
24     A.   It is not a contributing factor to a GI bleed,
25  no.

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 32

1      Q.   Your view is that the dDimer was elevated when
2  it was possibly because of the GI bleed; is that fair?
3      A.   That's fair.
4      Q.   At the bottom of page 7, you talk about iron
5  deficiency.  Do you see that?
6      A.   Yes, sir.
7      Q.   And is it your belief that Mr. Boudreaux, at
8  some point in time, had an iron deficiency?
9      A.   I mean, it's not my belief.  He has a low iron
10  saturation.  It's a medical fact that he's deficient in
11  iron, so it's not a belief.  It's just a simple fact.
12     Q.   And is it your belief that his iron deficiency
13  was a contributing factor or cause to his GI bleed?
14     A.   No, sir.  Iron deficiency does not cause the GI
15  bleed.
16     Q.   As a general matter for individuals or patients
17  that have iron deficiency, would that be classified as
18  a type of anemia?
19     A.   Yes, sir.
20     Q.   And for patients that do have anemia, including
21  iron deficiency anemias, can those conditions cause the
22  effects of a significant GI bleed to be more pronounced
23  in certain patients?
24     A.   Yes, sir.
25     Q.   So the consequences of a GI bleed of a certain

Page 33

1 type in a patient with an anemia isn't anymore profound
2 or exacerbated than a similar bleed in someone without
3 that anemia?
4     A.   Correct.
5     Q.   And what I'm getting at here -- I just want to
6 understand -- you're not going to say that Mr.
7 Boudreaux felt as sick as he was or had certain
8 consequences as a result of his bleed that was due to
9 the iron deficiency itself?
10    A.   No.
11    Q.   I want to make sure I understand specifically.
12 The hemoglobin that you reference there on page 7, the
13 hemoglobin of 13.8 at 11:42 a.m. on page 7.  Do you see
14 that in the third paragraph?
15    A.   I do.
16    Q.   I just want to make sure that it's absolutely
17 clear as to the date that you're talking about of that
18 hemoglobin.
19    A.   Should be January 7, 2014.
20    Q.   That hemoglobin on January 7, 2014 --
21    A.   Uh-uh.  Right, I'm sorry.  I'm in today's year.
22 Right.
23    Q.   Okay, just so we're clear, then, that
24 hemoglobin of 13.8 was one that was drawn at 11:42 a.m.
25 on January 7, 2014, right?

Page 34

1     A.   Correct.
2     Q.   What significance is there, if any, of that
3 hemoglobin of 13.8 at that time?
4     A.   Sure, so, you know, the biggest significance of
5 this is, looking back at his record, Mr. Boudreaux had
6 a normal hemoglobin.  His hemoglobin was normal.  I
7 think I mentioned in the medical facts earlier, from
8 2002 to 2007, he ran from 14.4 to 15.4.  Subsequently,
9 he was up around -- over 14 at his last few doctors'
10 appointments.  He comes in here and his hemoglobin is
11 low, you know.  We have a range in the lab that defines
12 what normal is.  That range changes between men and
13 women and age.  We adjust that so that you have a range
14 to tell doctors where a person's hemoglobin should be.
15 Hemoglobin is the body's ability to carry oxygen, and
16 is the main protein in red blood cells, so a low
17 hemoglobin, by definition, means anemia.  Anemia just
18 means that you have diminished oxygen-carrying capacity
19 in the body.  Mr. Boudreaux comes in at presentation
20 with a hemoglobin of 13.8, which is lower than the
21 normal range -- it's certainly much lower than where he
22 has been -- indicating that he's had a drop in his
23 number of blood cells in his body, so this tells me
24 this gentleman has become anemic, you know for a --
25 that's all it tells me, that his blood count's lower

Page 35

1 than it has been running, and it's lower than what
2 normally would be expected in a male of his age, so
3 we've got an abnormality here of his red blood cells.
4     Q.   So when you see a patient of the medical
5 history and demographic background like Mr. Boudreaux
6 in a setting like this and see a hemoglobin of 13.8, do
7 you recommend any specific treatment?
8     A.   I recommend it be evaluated, yes.  I mean, you
9 know, Mr. Boudreaux is a patient that is paying me a
10 lot of money to evaluate his health, and he has an
11 abnormal lab value that wasn't abnormal before.
12 Absolutely, you've got to evaluate that.
13    Q.   In this case, have you come to the opinion that
14 any healthcare provider has departed from the standard
15 of care in his treatment?
16    A.   I have not.
17    Q.   And so what would have been the appropriate
18 workup to follow up on that hemoglobin of 13.8?
19    A.   So, you know, as a hematologist, you know,
20 there's different ways, there's different opinions in
21 how to work up anemia.  None of them are better than
22 the other, but a standard anemia-type workup should
23 have been undertaken, based on his medical history.
24 Certainly, in my opinion, the first test that should be
25 done is something called a reticulocyte count, which

Page 36

1 will tell me the effectiveness that Mr. Boudreaux is
2 making blood, so I can determine is this a production
3 problem or a loss problem.
4     Q.   I take it you have -- at least you've not set
5 forth an opinion in your report that Mr. Boudreaux
6 should not have been taking any NOAC after January 7,
7 2014, correct?
8     A.   There's nothing in his medical record at that
9 time that suggests that he should not be placed on any
10 NOAC, no.
11    Q.   And a very specific question for you:  You
12 have not expressed the opinion in your report, in
13 writing, where it states that if a certain type of
14 workup would have been done, it likely would have
15 revealed a certain condition or disease state that
16 would have made a NOAC prescription inappropriate?
17    A.   I've not written that, no.
18    Q.   Let's go on to page 8.  Page 8 now is -- as
19 page 7 was, is a continuation of a mix of historical
20 data for Mr. Boudreaux, as well as some explanatory or
21 reference data that you've added, correct?
22    A.   Correct.
23    Q.   On page 8, are you -- and here's why I want to
24 follow up on this:  You said that sometimes when you're
25 a physician, there's medical conditions or data that

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 37

1  just seems so obvious that you that everyone will know
2  it, and so sometimes you don't explain it directly.  Do
3  you remember when you said that?  Do you recall that?
4      A.  Uh-huh, yes, sir.
5      Q.  So I just want to make sure, on page 8, is
6  there any information or -- that you've set forth in
7  page 8 where you are suggesting, at that time -- the
8  dates that are reflected there, for example, January
9  8th, January 9th -- that, at that time, Mr. Boudreaux
10  should not have been taking a NOAC?
11      A.  No.  So, I mean, the issues with looking at a
12  medical case like this, of course, is, you know, I get
13  the luxury of having a medical record to pore over for
14  hours and hours to retrospectively look,
15  knowing what the outcome already is.  I can't say what
16  I would do, moving forward, if I'm actively looking at
17  this.  His problem at the time is that he's having
18  atrial fibrillation and is short of breath.  I don't
19  fault the doctors for anything that they've done in
20  this case.
21      Q.  So even with the benefit of retrospect, you,
22  then -- you have not stated anywhere in your report in
23  writing that, in retrospect, you believe that Mr.
24  Boudreaux should not have been on a NOAC at any point
25  in time?

Boudreaux_Steven Scott Boniol, MD Deposition_00037

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 39

1      A.  I talk about it for a couple reasons.  One is,
2  yes, you know, it could be that he was bleeding without
3  knowing it, which I do believe was occurring in this
4  case, retrospectively, and also to talk about -- you
5  have these bleeds that are not apparent, that you can't
6  always find them, so occult bleeding can occur, and I
7  think -- you know, I think Mr. Boudreaux has occult
8  bleeding.  I think that's important to mention.
9      Q.  Then, in terms of the medical data that you've
10  looked at, have you stated anywhere an opinion in the
11  report where you've affirmatively stated when you
12  believe that occult bleeding started?
13      A.  I've -- no, not made any statements to when the
14  exact date I think it started.  I just am confident it
15  started before he started on Xarelto.
16      Q.  Then, in terms of the depositions that you've
17  read in the Boudreaux case, let's look at that list for
18  a second.  So, in terms of the depositions that you've
19  read -- or based upon the depositions that you've read,
20  have you developed an understanding as to why or how it
21  was that Xarelto was chosen for Mr. Boudreaux?
22      A.  I mean, I don't have the specific reason.  I
23  think it was -- you know, the gentleman had atrial
24  fibrillation.  He needed to be anticoagulated for that
25  purpose.  Obviously, based on the ROCKET AF data, as

Boudreaux_Steven Scott Boniol, MD Deposition_00039

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 38

1      A.  I don't state that, no.
2      Q.  The hemoglobin data that you discuss on the top
3  of page 8, is it your opinion in this case that that
4  information suggests that, on those dates, Mr.
5  Boudreaux was, in fact, experiencing some degree of
6  gastrointestinal bleeding?
7      A.  On those dates, no.  The dates of those
8  hemoglobins -- I'm -- you have to be more specific.  I
9  talk about the 1/7, 1/8 hemoglobins, 1/9 hemoglobins,
10  but I also talk about the 5/5/12, 10/27/12, and 6/1/13
11  all in that same paragraph, so I'm not sure what you're
12  asking.
13      Q.  Okay, so -- thank you for that.  So any of the
14  that information with a reference to the January 8th
15  hemoglobins or January 9th hemoglobins of 2014, are you
16  using that data to suggest that, at that time, January
17  8, January 9th in 2014, Mr. Boudreaux was having some
18  degree of GI bleeding going on?
19      A.  Retrospectively, looking at this case, with all
20  the information I have, you know, yes, I think he was
21  bleeding prior to initiation of Xarelto.
22      Q.  And is that the reason that next paragraph on
23  page 8, where you talk about the issue of occult
24  chronic GI bleeding, is that why you put that paragraph
25  at that time?

Boudreaux_Steven Scott Boniol, MD Deposition_00038

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 40

1  well as the data we have with -- real-world data, it is
2  a very well-respected medication in the medical
3  community, a highly written drug.  It perfectly fit
4  this gentleman's indication, so he was given the
5  medication, so, I mean, I think it was appropriate.  My
6  assumption is that it was chosen -- I don't remember
7  reading the specifics on the cardiologist that started
8  it, but he made the right -- I mean, he chose a good
9  drug, so I have no problem with his decision.
10      Q.  And you would have had no problem with him
11  being placed on any of the other NOACs, either,
12  correct?
13      A.  I wouldn't have had any problem with him being
14  placed on Eliquis, no.  You know, I've personally not
15  had good experience, or, from what I read with Pradaxa,
16  am a big fan, but would any of those have been wrong?
17  Absolutely not.
18      Q.  And a prescription of Pradaxa would not have
19  been wrong, in your view?
20      A.  No.  Not at all.
21      Q.  You said that, based upon -- I want to make
22  sure I understand.  You're not a big fan of Pradaxa.
23  That's what you just said, right?
24      A.  Right.
25      Q.  And you said that's based upon one thing; it is

Boudreaux_Steven Scott Boniol, MD Deposition_00040

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 41

1  based upon your own personal practice experience,
2  correct?
3      A.   Correct.
4      Q.   And the other thing that you've said, or why
5  you're not a big fan of Pradaxa is based upon what
6  you've read?
7      A.   Well, yeah, right, based on the literature that
8  supports what my experience has been.
9      Q.   And what has your experience been with Pradaxa?
10     A.   It's a very difficult medicine to take.  It
11  causes significant gastrointestinal distress in
12  patients.  I mean, they just aren't comfortable, they
13  feel sick all the time.  I'm not here -- I'm here to
14  make people live longer, and I'm here to make people
15  live better.  If I can't achieve those two goals, I
16  don't want to be part of it, so putting patients on
17  Pradaxa, and the GI upset and distress -- these are not
18  clinical bleeding and none of that that I'm talking to
19  at all.  It's just the inability to take the medication
20  without feeling sick to your stomach that makes me not
21  a big fan of the drug.
22     Q.   Okay, and so that's the only reason that you're
23  saying you're not a big fan of Pradaxa?
24     A.   Correct.
25     Q.   Those side effects aren't experienced by every

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 42

1  patient that takes Pradaxa, correct?
2      A.   No, not by every patient, but, again, it's a
3  lot of patients, and why would I -- if I have -- that's
4  one of the beautiful things about having options and
5  choices in this new NOAC field, is that I don't have to
6  give a patient that drug that has a 35-percent
7  incidence of gastrointestinal upset.  That's huge --
8  I've had more patients stop Pradaxa than I've had stop
9  chemotherapy.  I think that should let you kind of know
10  how difficult that drug is to take.
11     Q.   And as a result, that's formed -- or that's
12  affected your prescribing habits?
13     A.   Yeah, I'm not -- I'm speaking to medical facts.
14  You can look at the Pradaxa package insert.  There's a
15  21-percent discontinuation rate in the original trial.
16  There's certainly a lot of literature that shows it's
17  even higher than that.  We know that there's a
18  35-percent adverse incident effect that's reported by
19  patients.  I mean, personally, as a physician, I don't
20  like giving patients that drug that 1 out of 3 are
21  going to have a significant toxicity to, so that's why
22  I'm not a fan.
23     Q.   And so my point is, so, for newly-diagnosed
24  atrial fibrillation patients, that's why you don't,
25  yourself, prescribe Pradaxa as one of your first-line

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 43

1  treatments?
2      A.   Correct.
3      Q.   You said that you'd have no problem with
4  Eliquis having been prescribed for Mr. Boudreaux.  Why
5  is it that you would not have had any problem with
6  Eliquis being prescribed for him?
7      A.   I think, you know, looking at Eliquis in this
8  situation, it's effective.  Don't have the side effects
9  that you have with Pradaxa.  You know, both of these
10  are Xa drugs.  They do the exact same thing.  Eliquis
11  data is good.  You know, it doesn't matter to me; I
12  think they're both the same drug, so you can
13  essentially choose either one.
14     Q.   So I want to make sure I understand.  When
15  you're saying that they're both the same drug, and do
16  the same thing or work the same way, you're talking
17  about Eliquis and what other drug?
18     A.   Xarelto.
19     Q.   So your view is that Eliquis and Xarelto,
20  because they're both Xa drugs, they're essentially the
21  same, in your view?
22     A.   Well, I mean, they're different medications, so
23  they give you options, but as far as what they do is
24  the same, and, like we said before, there's no data --
25  no direct head-to-head trials have been done, but when

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 44

1  you take the totality of the data from all the clinical
2  trials, yes, in my opinion, they're going to be equally
3  efficacious, with any --
4      Q.   So you think that Eliquis is effective in terms
5  of stroke prevention, right?
6      A.   I do.
7      Q.   And Eliquis was actually, in its clinical
8  trials, found to be superior to Warfarin for stroke
9  prevention, correct?
10     A.   So in the Eliquis trial, it's a different --
11  yeah, they did a low CHAD score, so they treated a
12  different -- in their patient population, which is
13  completely different than the ROCKET patients, and the
14  way their trial was designed, it did show an outcome
15  that, for the effect for low-CHAD-score patients, that
16  it is superior to Warfarin, yes.
17     Q.   And you said that the data on Eliquis is good,
18  correct?
19     A.   Yes, it's good.
20     Q.   At one point, you said they're the same drug,
21  and I just want to make sure that I understand that.
22     A.   Yeah, I don't mean to say they're the same
23  drug.  I'm just saying --
24     Q.   Well, you said it, and that's why I'm asking
25  what did you mean by --

Page 45

```
 1      A.  Yeah, let me clarify that.  Obviously, they're
 2  not the same drug, clearly.  They do the same thing,
 3  as far as their mechanism of action.  You know, when
 4  you look at various patient populations, they're highly
 5  effective, very low-risk medications that have very
 6  good pharmacologic profiles, they're both
 7  wide-therapeutic-index medications that don't have to
 8  be monitored, as we discussed yesterday, so, I think,
 9  in that sense, I consider them in the same class of
10  medications, and, to me, it's no difference if you
11  choose one or the other for the indication.  I think
12  your outcomes are going to be pretty much exactly the
13  same, regardless of which one you choose.
14      Q.  So that laundry list of positive things that
15  you stated, you were absolutely of the mind that those
16  things are true about Eliquis?
17      A.  Yes.
18              MR. SARVER:    Brad, do you mind taking a
19  coffee-elimination break?
20              MR. HONNOLD:    No, I'm all in favor.
21              VIDEOGRAPHER:    Off the record at 10:28.
22          [Short recess was taken.]
23              VIDEOGRAPHER:    The approximate time is
24  10:30 a.m.  We're back on the record.  Tape number 2,
25  deposition of Dr. Scott Boniol.
```

Page 47

```
 1  Certainly, you could have a perforated ulcer that
 2  could result in bleeding out, and possibly even death,
 3  so there's a huge spectrum of GI bleeding.  Some of it
 4  is just, "Oh, by the way, Doctor, I'm on your study,
 5  and I saw some blood on the toilet paper", to, "I'm in
 6  the hospital because I'm bleeding profusely."  There's
 7  a wide spectrum of bleeds there.
 8      Q.  For those patients at that end of the spectrum,
 9  a GI bleed can be a very significant adverse health
10  spectrum for them?
11      A.  At which end of the spectrum?
12      Q.  The more severe end of the spectrum.
13      A.  Yes, sir.
14      Q.  You've seen that in your hospitals?
15      A.  Correct.
16      Q.  Do you believe that the issue of
17  gastrointestinal bleeding is a key issue to consider
18  when assessing the risk/benefit tradeoffs when deciding
19  whether to anticoagulate a patient for atrial
20  fibrillation?
21      A.  So, to make the decision to anticoagulate yes
22  or no, you know, if a patient has a known or active GI
23  bleed, has peptic ulcer disease or a high risk to
24  bleed, yes, you're going to try to opt to not
25  anticoagulate that patient.  Anyone who's had an
```

Page 46

```
 1  BY MR. HONNOLD:
 2      Q.  Doctor, we're back on the record after a short
 3  morning break.  Do you agree that gastrointestinal
 4  bleeding is a significant source of morbidity amongst
 5  patients taking anticoagulation drugs?
 6      A.  You know, if you have one, it is, but as far as
 7  it being significant, you know, the relative rarity of
 8  it is, I don't think it's significant to all patients,
 9  but, certainly, the ones that have the bleeds, it's
10  significant morbidity, but with the rarity of the
11  events occurring, not to the patient population as a
12  whole, no.  I wouldn't agree with that.
13      Q.  A GI bleed in a patient taking anticoagulation,
14  though, certainly can be a significant event for that
15  individual patient?
16      A.  It can.  We talked about this yesterday.  You
17  have to realize a GI bleed is any bleed that occurs
18  lips to anus, so, certainly, hemorrhoidal bleeding
19  would be included in there, which is a very mild, more
20  of a non-issue for a lot of people, hemorrhoidal
21  bleeding.  If I want an anticoagulant -- if I'm in a
22  study of an anticoagulant, and I bite the inside of my
23  mouth and start bleeding, that's reported as a GI
24  bleed, as an adverse event, so we talked about
25  yesterday.  There's a huge spectrum of a GI bleeding.
```

Page 48

```
 1  occult bleed or had a GI bleed where you can't find the
 2  source of the GI bleed to fix it, you're not going to
 3  anticoagulate that patient with any type of
 4  anticoagulation.
 5      Q.  As a general matter, does significant
 6  gastrointestinal bleeding have a poor prognosis
 7  amongst the elderly?
 8      A.  I mean, my assumption would be yes, but  that's
 9  not my strength.  A lot of times, common sense in
10  medicine doesn't end up making out, so I'm not aware of
11  any literature that says that, but I'm not a
12  gastroenterologist.  I would refer you to a
13  gastroenterologist to answer that question.
14      Q.  Why would you refer that issue to a
15  gastroenterologist?
16      A.  That's their specialty.
17      Q.  So, on that particular issue, would you defer
18  to a board certified gastroenterologist?
19      A.  On the mortality of elderly and bleeds, yes.
20      Q.  And, in addition, not just the mortality, but
21  as to the relative prognosis of GI bleeding in the
22  elderly?
23      A.  General -- yeah.  I mean, I would think that --
24  what would happen in my hospital is, there would be a
25  discussion with gastroenterology.  There would be an
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 49

1  intellectual discussion.  Again, medicine's not as
2  black-and-white as you want to make that, but, as a
3  general rule of gastroenterology, you know, for
4  non-anticoagulated patients with severe bleeds probably
5  know more about the natural pathogenesis than I do,
6  because I wouldn't see them.
7      Q.   You said it was your assumption that GI
8  bleeding in the elderly would have a poorer prognosis.
9  Why is that your assumption?
10     A.   Well, we know for a fact in medicine, you know,
11  that when issues occur, the older we get, the harder it
12  is for us to recover.  Certainly, the older we get, the
13  more problems we have.  We tend to develop heart
14  problems, blood vessel problems, and so I would assume,
15  the older you are, the -- if you have a GI bleed, it's
16  going to be harder to recover than if you're younger.
17  That's my assumption.
18     Q.   In the slides that you used in the
19  presentations that you made to physicians for Xarelto,
20  did they vary over time, in terms of what those slides
21  said about the incidence or occurrence rate of GI
22  bleeding in patients on Xarelto?
23     A.   No, they did not change, because I would
24  present the clinical trial data that doesn't change.
25     Q.   Do you know the issue of how the rate or

Boudreaux_Steven Scott Boniol, MD Deposition_00049

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 50

1  incidence of GI bleeding, how it was described or set
2  forth in the various labels over time for Xarelto,
3  whether it changed?
4      A.   I do not know, specifically.  Again, I was not
5  -- not being a cardiologist, I did not really get
6  involved in speaking, you know.  Initial indication was
7  based on the RECORD trials.  I would assume, as we got
8  more information, that the label would change.  I can't
9  say that it has or not.  I don't know.
10     Q.   At the beginning of that statement you just
11  made, you said, "I wasn't a cardiologist", so --
12     A.   So I did not speak when I -- you know, when
13  Xarelto first came on the market for orthopedic
14  indication, and then as it came on for atrial
15  fibrillation, as a hematologist, even though we know
16  all about the anticoagulation of the experts on the
17  blood, you know, I didn't become intimately involved
18  with prescribing the medication until the DVT and
19  pulmonary embolism, or the EINSTEIN trial came out.
20  That really hit home to me, because that's what I do on
21  a day-to-day basis, so even though I was very familiar
22  with the drug, it didn't become a part of my reality in
23  my day-to-day life until EINSTEIN.  As I'm sure you
24  know, when you look at the EINSTEIN trial, the
25  incidence of GI bleeds is not seen like it was in

Boudreaux_Steven Scott Boniol, MD Deposition_00050

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 51

1  ROCKET, so, you know, I'm more -- so assuming that, as
2  other trials came out, large, huge trials that did not
3  know an increased risk of GI bleeds, they may have
4  changed the label, yes.
5      Q.   You're saying they may have changed the label
6  if the larger clinical trials did show different data
7  about GI bleeds?
8      A.   Right, so I think, you know, the more data you
9  get -- they may have changed the -- I don't know that
10  they did.  I think the way they have it labeled out,
11  the last time I remember reading the label, is they
12  have the bleed rates on each individual trial clearly
13  listed in the label, in the package insert, so I think
14  the only change they made to the label was adding the
15  new information, but the old information remained, so
16  I think they were very -- you know, I think it's very
17  transparent, and very open and honest with physicians
18  that that, you know, there was a higher rate of GI
19  bleeds on ROCKET.  I mean, I think that that's a
20  well-known thing.  The company made that very clear.
21  It's in the data.  You can't ignore the data, and it's
22  there, so I think we've always, as a medical community,
23  been aware of that fact.
24     Q.   Who makes apixaban?  Do you know?
25     A.   It is -- I know it is co -- it's Pfizer and

Boudreaux_Steven Scott Boniol, MD Deposition_00051

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 52

1  Bristol Myers, so I don't know who -- if they both
2  manufacture it, or if one company manufactures it and
3  they co-promote it.  I know, on the label, it's both
4  Pfizer and Bristol Myers.  I believe Bristol Myers
5  probably makes the majority of the drug.
6      Q.   And have you, on occasion in the past, been
7  visited by sales representatives regarding apixaban or
8  Eliquis?
9      A.   I have.
10     Q.   And have you spoken with those sales
11  representatives on a regular basis over the past few
12  years?
13     A.   I have -- well, maybe every four to six months.
14     Q.   And you have -- before today, you have
15  prescribed Eliquis for some patients, correct?
16     A.   Correct.
17     Q.   And the types of patients or conditions that
18  you've prescribed Eliquis for patients, what have they
19  been?
20     A.   For the most part, what I prescribe for would
21  be DVT, pulmonary embolism, or prevention of
22  thromboembolic disease.
23     Q.   When the sales representatives for Eliquis
24  come and speak to you, do they present to you any
25  specific data on the issue of the rate or incidence of

Boudreaux_Steven Scott Boniol, MD Deposition_00052

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 53

1  gastrointestinal bleeding in patients who take
2  Eliquis?
3      A.  Right, no, I've actually asked them this
4  question directly.  I've asked multiple representatives
5  from Eliquis, you know, "Is GI bleeding rates less with
6  Eliquis than Xarelto", and their answer's always, "We
7  can't answer that.  The trials have never been
8  head-to-head, so I cannot say that the bleeding rate's
9  any different."  I've asked them that specific
10  question.  Clearly, they do not promote Eliquis as
11  having a lower GI bleed rate, at all.
12      Q.  As you sit here today, can you think of any
13  type of patient population where GI bleeding would be
14  an important consideration in guiding treatment
15  decisions, especially for atrial fibrillation?
16      A.  Yeah, so I mean, I think, specifically, if a
17  patient has a history of GI bleed, or if they have an
18  occult GI bleed, you know, it's going to be a
19  risk/benefit thing -- and I get in the middle of this
20  all the time.  I would say, at least once a month, I'm
21  called in because cardiology wants the patient
22  anticoagulated.  GI, as we talked about earlier we're
23  going to defer to GI, they have their guidelines.
24  They want the patient not anticoagulated.  Well, the
25  problem is the patient needs to be anticoagulated for

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 54

1  their cardiac problems, and cardiology's insisting that
2  they're anticoagulated, and GI's insisting they're not
3  because of their occult bleed that nobody can find and
4  fix, and so I get called in to be the tie-breaker or
5  the referee all the time, and so you have experts over
6  here in cardiology saying 100-percent, you've got to
7  anticoagulate.  You've got your experts in guidelines
8  in GI saying, "No way you can anticoagulate this
9  person", or "We have these recommendations", but, at
10  the end of the day, the question is -- it's a light
11  switch.  It's very black-and-white.  Either you
12  anticoagulate or you don't.  There's no choice.  It's
13  not, like, "Oh, well, let me choose Coumadin", or "Let
14  me choose this", or "Let me choose that."  It doesn't
15  work that way.  The answer is: Yes or no?
16  Anticoagulate, yes or no?  That's it, and so there's no
17  medication that I can sit there and say, "This is a
18  better choice for this reason."  No.  We have to say
19  "Do we anticoagulate; yes or no?"  That's what I'm
20  called in to do, and, at the end of the day, it's a
21  discussion with the patient, and I have to just lay
22  out with them, "This is your risk of having a stroke
23  if we don't anticoagulate you.  This is the risk of
24  what could happen if you have a GI bleed.  I'm here for
25  you.  You need to be educated on this.  Which way do

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 55

1  you want to go?  I'm sorry, but you're going to have to
2  participate in your medical decision-making, here.  I
3  can't make the decision for you", and that's my
4  approach to that.
5      Q.  So, I take it that, when you get involved in
6  those situations, you do not state or suggest that
7  there might be a preferred agent when GI bleeding is
8  an important consideration in making a treatment
9  decision --
10      A.  And you know, we've read about this.  We've
11  looked at everything.  You know, we've looked at all
12  the data, we have open discussions about this with
13  different doctors in medicine.  Like I told you, you
14  know, we ask the drug -- the pharmaceutical guys if
15  they have any data, you know, "Hey, apixaban rep, your
16  trial of very healthy people showed a lower incidence
17  of GI bleeding than the trial with very sick people.
18  I've got a guy who's in the middle.  Is your drug
19  better?"  "No, I cannot say that."  They'll tell me
20  that all the time, so all we can do, all we know for a
21  fact is that we either have to make the decision, yes,
22  anticoagulate, or no, and so based on GI bleed and the
23  need for anticoagulation, it's a simple part for me to
24  answer, is either yes or no, and, ultimately, the
25  parent's going to have to participate in that

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 56

1  decision-making, because there is risk on both sides,
2  and, unfortunately, in medicine, we can't eliminate all
3  risks.  We never can.  That's just part of what I do
4  for a living.  I'm resigned to the fact that I'll
5  never be able to have a patient have zero risk for
6  anything I do.
7          MR. SARVER:      Doctor, while he's
8  looking for the next exhibit, let Mr. Honnold finish
9  his question before you start answering.
10          THE WITNESS:      I'm sorry.  I just get so
11  excited.  It's a great day to learn hematology.  The
12  weather's nice.  We're right where we need to be.
13  BY MR. HONNOLD:
14      Q.  Let me hand you what's been marked as Exhibit
15  2.  For the record, Exhibit 2 is a paper that has been
16  described as an accepted manuscript called
17  "Gastrointestinal Safety of Direct Oral Anticoagulants
18  - A Large Population-Based Study", by Abraham and
19  others.  My first question for you, Doctor, about this
20  is whether this paper or article is on your reference
21  list.
22      A.  It is not.
23      Q.  Can I ask you a basic question while you're
24  looking at that?  Hopefully, it's not one that --
25      A.  Sure.

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 57

1      Q.   -- will confuse you too much.  Generally, is
2   The Mayo Clinic a respected -- generally, a respected
3   institution?
4      A.   Yes.
5      Q.   Respected for its reputation for patient care,
6   certainly?
7      A.   Absolutely.  The Mayo Clinic is a very good
8   institution.
9      Q.   It's respected for its research capabilities?
10     A.   Yes.  Absolutely.
11     Q.   As a general matter, is The Mayo Clinic viewed
12  as being one of the leading hospitals in various
13  medical specialties?
14     A.   It is.
15     Q.   Is The Mayo Clinic generally recognized as an
16  outstanding institution for the delivery of
17  cardiovascular disease care?
18     A.   I'm not 100-percent certain on that.  I know
19  they're very good at diagnosing things.  I've never
20  seen their data on how good their cardiovascular care
21  is, no.  I'm not saying they're not.  I just don't
22  know.
23     Q.   Are they generally well-respected in your area
24  of practice, that being hematology and oncology?
25     A.   Their Rochester campus is, I think by far,

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 59

1   medical staff at Christus, your primary --
2      A.   Yeah, they're members of -- they're not
3   employed by Christus, but they're members of the
4   medical staff, and provide consultation and endoscopy
5   services on campus.
6      Q.   Does Christus have employed
7   gastroenterologists?
8      A.   Not at my campus, no, sir.
9      Q.   In terms of the methods or methodology set
10  forth in Exhibit 2, how is it that the authors describe
11  their methodology?
12     A.   So it looks like what this group of physicians
13  did was get information on patients through a
14  centralized supply warehouse who received prescriptions
15  for one of the NOACs, and were able to then
16  retrospectively look at the patients who got a
17  prescription for either -- it looks like, in this
18  trial, they looked at dabigatran, rivaroxaban or
19  apixaban from October 1, 2010, to February 28, 2015.
20  They then did a search on these patients based on the
21  procedure codes, diagnoses codes, based on medical
22  claims that were made, to look at rates of GI bleeding.
23     Q.   Then in Exhibit 2, tell me specifically, what
24  were the pages or area within Exhibit 2 that you are
25  looking at for that information?

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 58

1   considered the go-to for hematology/oncology.
2      Q.   When you say they're considered to be the
3   "go-to", or the Rochester campus is considered to be
4   the "go-to" for hematology --
5      A.   As far as The Mayo Clinic campuses, that's the
6   preferred one.  Obviously, in our area, there are much
7   better -- there are much better hematology/oncology
8   institutions and centers than Mayo that we send to, but
9   they're very well respected, yes.
10     Q.   Exhibit 2, have you seen that paper before
11  today?
12     A.   No, sir.
13     Q.   I take it, in your practice, you probably do
14  not routinely review the Journal of Gastroenterology?
15     A.   You are correct.
16     Q.   Who are gastroenterologists on your medical
17  staff that you respect enough or have enough faith in
18  to send a family member to for treatment?
19     A.   You know, we use Arthur Poch, P-O-C-H; Mark
20  Provenza, P-R-O-V-E-N-Z-A.  We use Sid Jaganmohon.
21  I'll let you spell that one.  Dr. Aguilar.  There's
22  David Dies, which is D-I-E-S.  There's a lot of really
23  good ones in town that we refer to a lot.  James
24  Morris, at the medical school is really good.
25     Q.   Are some of those physicians members of the

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 60

1      A.   The majority of this information comes from
2   page 6.
3      Q.   This methodology where researchers might look
4   at information that is derived from health insurance
5   databases, have you seen other research done in a
6   similar manner?
7      A.   You know, I have.  I try not to read these
8   types of articles, because there's -- you know, there's
9   no validation included, and so many mistakes can happen
10  with coding and other things.  I don't think that
11  anybody'd consider these to be a gold standard-type
12  trials.  They -- the best thing that this article could
13  do, just based on methodology, is bring up a question
14  that needs to be asked to an actual clinical trial,
15  so, you know, the amount of weight I would give to a
16  study of this, as far as an impact -- not just me.  I
17  think anybody, when you look at impact of clinical
18  care ratings on an article like this, they're very low.
19          MR. HONNOLD:     I move that be stricken
20  as nonresponsive.
21  BY MR. HONNOLD:
22     Q.   My question for you was:  Have you seen other
23  medical articles written based upon an analysis or
24  inquiry on health insurance data?
25     A.   I've seen them, but, as I just said, I don't

Page 61

1  really read them because of their low impact on
2  clinical practice.
3  Q.  Have you seen data where Bayer or Janssen has
4  done similar studies based upon health insurance data?
5  A.  I have.
6  Q.  For example, the XALIA, X-A-L-I-A, is a study
7  that's, in part, based on health insurance --
8  A.  In part, based on that, but, again, it's a
9  prospective, rather than retrospective, trial.
10 Certainly, we know, as we discussed even with the case,
11 that, prospectively, those trials are a lot less
12 likely to be biased in retrospective, as in the case
13 with this trial, so we prefer prospective over
14 retrospective every time we can get it.
15 Q.  Does it appear, from looking at this accepted
16 manuscript, that it would have been subjected to some
17 peer-review process?
18 A.  It should have been, yes.
19 Q.  And why do you say "it should have been"?
20 A.  I'm not familiar with Gastroenterology
21 Journal, but I'm assuming that they would peer-review.
22 I don't see anywhere where it says it was peer-reviewed
23 here, so I just have to assume.  I mean, if you can
24 direct me to where the people who peer-reviewed it are
25 listed, I'd be happy to look at that, but, certainly,

Page 63

1  A.  Well, the fact that they say that this will
2  undergo review, and the fact there's no peer review
3  listed where it should be on a peer-reviewed article, I
4  think it's pretty safe to say this has not been
5  peer-reviewed, yes.
6  Q.  Your -- what's the particular journal for your
7  professional -- primary professional society or
8  organization?
9  A.  We use the Journal of Clinical Oncology and
10 Blood, which is the journal of the American Society of
11 Hematology.
12 Q.  Have you ever been a stated editor or assistant
13 editor of any of those publications?
14 A.  No, sir.  I don't have time.
15 Q.  And do you know, for those journals for your
16 professional societies, as to whether articles are
17 generally subjected to peer review before they are
18 accepted for publication?
19 A.  Not always.  It just depends on what type of
20 article it is.  Obviously, if it's going to be a
21 practice-changing article, yes, it's going to be
22 peer-reviewed before they can accept it for
23 publication.  Anytime it is a prospective study of some
24 question that we're trying to answer, yeah, they're
25 going to peer-review it before they accept it for

Page 62

1  I don't see anywhere where it's peer-reviewed on the
2  accepted manuscript pages 1 and 2, but, again, I'm not
3  -- as I said earlier, I'm not familiar with this
4  journal, so I don't know how they could say that.
5  There's a disclaimer on the title page that says,
6  "This is an unedited manuscript.  We're providing this
7  early version prior to being published."  It looks
8  like they're going to have to review, copy-edit, and
9  typeset, so I think, based on that, it's pretty clear
10 that this has not been peer-reviewed.
11 Q.  It appears it's been accepted for publication,
12 or you can't tell?
13 A.  I'm looking at the -- if you look at the first
14 page, it says, "This pdf file of an unedited
15 manuscript that has been accepted for publication.  As
16 a service to our customers, we provide this early
17 version of the manuscript.  The manuscript will undergo
18 copy-editing, typesetting, and review" -- I don't know
19 if that's peer review or not -- "of the resulting
20 proof."  I don't know if they're just going to review
21 the typos or not -- "before it is published in its
22 final form", so based on what you've given me, this has
23 not been peer-reviewed, no.
24 Q.  That's your conclusion, based upon at least
25 just looking at the face of the study?

Page 64

1  publication.  These retrospective kind of just
2  chart-review things, they might accept them beforehand.
3  It appears, in gastroenterology, that they do.
4  Q.  If you go to page 11 of Exhibit 2, do you see
5  the subheading that says "Sensitivity Analysis"?
6  A.  I do.
7  Q.  And then do you see the sentence immediately
8  above "Sensitivity Analysis"?
9  A.  The one that says, "Most pronounced ARR in GI
10 bleeding was seen when apixaban was compared to
11 rivaroxaban, highlighting the least favorable GI
12 profile of rivaroxaban"?  That one?
13 Q.  You see that sentence?
14 A.  I do.
15 Q.  Okay, just within the context of this paper as
16 you've looked at it, what is the -- the stated meaning
17 of that sentence, as you read it?  Within the context
18 of this paper.
19 A.  Yeah, so looking at this paper, you know, they
20 -- you got to look at all -- looking at this thing as a
21 whole, you know, the biggest issue you have, obviously,
22 is, patients who are prescribed Xarelto tend to be your
23 high CHAD score, higher-risk-for-bleeding patients,
24 just based on the fact that that's the population that
25 was studied.  They don't break down any of these

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 65

1  patients in the CHAD score risk stratification, so
2  based on -- nor do they say -- they reveal the -- at
3  least that I have -- the severity of GI bleed, so what
4  I read into this is, you know, not stratifying or
5  correcting for patient population differences, or for
6  severity of bleeds, just in those that are reported by
7  ICD-9 data, that there is a difference in bleed --
8  safety profiles between rivaroxaban and apixaban.  I
9  think, again, it's a small sentence making a conclusion
10 that has no bearing on anything I would ever do.
11      Q.   So that data, those findings, those statements
12 by these physicians at The Mayo Clinic would have no
13 effect upon your prescribing practices?
14      A.   I mean, absolutely not.  I think if you want to
15 ask me that question, I think we need to discuss this
16 whole article.  I mean, I think we need to talk about
17 the fact that, number one, there is -- they tell me no
18 information on, you know, how -- how the physicians
19 decided to prescribe different medications to the
20 different patients.  You know, are they the same
21 patient population?  There's no way you can -- there's
22 no area that they validated any of this.  There's no
23 way of looking at any of this as far as, you know, are
24 doctors more likely to prescribe high-risk GI bleed
25 patients rivaroxaban or not?  Again, this is not a

Golkow Technologies, Inc - 877.370.3377

Boudreaux_Steven Scott Boniol, MD Deposition_00065

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 66

1  head-to-head trial, so I can't make any -- there's no
2  conclusions I can make of this, other than it would --
3  maybe this needs to be looked at in a clinical trial.
4  Maybe.
5       Q.   I'm not saying that it is any more or any less
6  than what it is --
7       A.   Right.
8       Q.   -- but I'm just saying this information, as
9  you've seen it for the first time today, your sense is
10 that it would not influence or cause you to vary your
11 practice or prescribing --
12      A.   Not at all.  I think, when you look at this,
13 you know, the biggest thing that I have as a
14 hematologist that prescribes anticoagulants, is,
15 you're looking at one side effect.  Maybe GI's just
16 interested in gastrointestinal.  I'm not.  I'm
17 interested in a persona.  I'm interested in a patient.
18 They have a GI tract.  They also have a pulmonary area
19 or digestive tract, they have a brain, they have all
20 kind of places that can bleed.  I'm not worried about
21 one particular side effect.  Globally -- I take care of
22 patients and people.  I don't take care of GI tracts,
23 so I need to know all the side effects, all the data,
24 so, you know, this may be of some interest to a GI
25 doctor.  Do they suggest anything in here to change

Golkow Technologies, Inc - 877.370.3377

Boudreaux_Steven Scott Boniol, MD Deposition_00066

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 67

1  practice at all?  No.  I mean, they clearly don't say,
2  "Hey, based on this, do this."  I mean, they don't say
3  anything.  They don't come to any conclusion, they
4  don't come to any -- "Here's our guidelines.  Here's an
5  algorithm you can use."  None of that's in here.  All
6  they say is, "Hey, you know what?  If you look at a
7  whole bunch of charts that we don't validate,
8  retrospectively, based on some ICDN data, here's a
9  little piece of information that may or may not be
10 interesting."  I happen to not find it very
11 interesting.
12      Q.   Again, I'm not saying anything other than what
13 it is.  My only question for you this past five minutes
14 has been:  Is Exhibit 2, as you see it today for the
15 first time, would not cause you to alter or change
16 your prescribing practices with NOACs, correct?
17      A.   Right, and I understand, but I just gave an
18 explanation as to why my answer is no, this would not
19 change my practice of prescribing NOACs, for the
20 reasons I just stated.
21      Q.   Exhibit 2 would not change your practice of
22 prescribing --
23      A.   Absolutely not.
24      Q.   -- NOACs, based upon all the things that you've
25 stated, correct?

Golkow Technologies, Inc - 877.370.3377

Boudreaux_Steven Scott Boniol, MD Deposition_00067

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 68

1       A.   Correct.
2       Q.   There's no doubt in your mind that Mr.
3  Boudreaux had atrial fibrillation, correct?
4       A.   No.  He had -- yeah, I agree; no doubt in my
5  mind.
6       Q.   And, as a result, there's no doubt that he
7  needed to be prescribed some form of anticoagulation,
8  right?
9       A.   Again, like we -- there's no doubt in my mind
10 that the recommendation should be to anticoagulate this
11 gentleman in the event that there's no contraindication
12 to doing so.
13      Q.   And, based upon your review of all his medical
14 records and data, there wasn't anything to suggest
15 that anticoagulation was contraindicated in him, or
16 even relatively contraindicated?
17      A.   Not on January 7, 2014, no.
18      Q.   When you prescribe Xarelto for patients, do you
19 suggest to them that they should not take fish oil?
20      A.   You know, I don't necessarily -- as an
21 oncologist treating cancer patients, we take all the
22 patients off of fish oil if they have cancer.
23 Usually, as a rule, I will tell them, "If you're on
24 fish oil and you're on Xarelto, your bleeding risk is
25 going to be higher", so I will counsel them as to what

Golkow Technologies, Inc - 877.370.3377

Boudreaux_Steven Scott Boniol, MD Deposition_00068

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 69

1    their risks and benefits are for taking fish oil with
2    Xarelto.  Fish oil, itself, is an anticoagulant, and,
3    regardless of what anticoagulant a patient's on -- if
4    they're on Eliquis, Xarelto, Pradaxa or Coumadin, I
5    counsel them that their bleeding risk will be
6    increased while on fish oil and an anticoagulant of any
7    kind.
8        Q.  So, in terms of the medications that Mr.
9    Boudreaux was on, in terms of ones that had potential
10   anticoagulant effects other than Xarelto, you'd include
11   aspirin and fish oil?
12       A.  And indomethacin, as well.
13       Q.  The paragraph that you reference on page 9
14   about January 10, 2014, when Mr. Boudreaux was back in
15   the clinic, is that all information that came from his
16   medical records?
17       A.  Yes, sir.
18       Q.  Anywhere in your report, do you set forth a
19   statement or opinion that Mr. Boudreaux was bleeding
20   on January 10, 2014?  And my question is just limited
21   to the words --
22       A.  I do not say that in my report, no.
23       Q.  Then if you go to the next paragraph on page 9,
24   is all of that -- does all of that information come
25   from Mr. Boudreaux's medical records?

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 71

1    coagulation proteins enough.  It's possible,
2    especially with his joint pain and things of that
3    nature, that he's developed an inhibitor to one of the
4    factors associated with the extrinsic pathway.  It's
5    possible that he has a degree of rivaroxaban in his
6    plasma that would result in his PT being slightly
7    elevated.  It's possible that there's laboratory
8    error.  That's a pretty complete list of what I would
9    think, off the top of my head, would be going on.
10       Q.  Do you know what time of day -- did you state
11   what time of day that lab was drawn?
12       A.  No, sir, I do not state what time of day, and I
13   don't recall -- I looked at it when I put it in there.
14   I just don't recall the exact time of day.
15       Q.  As compared to the time that the blood was
16   drawn, do you state anywhere in your report, based
17   upon the data that you've reviewed in this case, when
18   his last time of ingestion of Xarelto was?  And again,
19   I'm just asking do you state in your report when he
20   last took the drug.
21       A.  I do not.
22       Q.  The data that you've looked at for Xarelto
23   related to PT, have you seen any data to suggest that,
24   over the post-dose time course for PT, that the PT
25   will tend to trend down from the time of peak to the

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 70

1        A.  Everything but the last sentence.
2        Q.  When Mr. Boudreaux had his PT measured on
3    February 3rd of 2014, he had a PT of 13.6, correct?
4        A.  Correct.
5        Q.  And do you know what reagent was used in the
6    performance of that PT test?
7        A.  I do not.
8        Q.  Have you, yourself, done anything to determine
9    what reagent was used?
10       A.  No, sir.
11       Q.  For example, you've not picked up the phone
12   and maybe called some physician that you know on that
13   medical staff and asked them what reagent they've used?
14       A.  No, sir.
15       Q.  And in terms of the laboratory measure at the
16   hospital for PT, was that 13.6 an elevated number, or a
17   number that was within the normal range?
18       A.  It's a slightly elevated number.
19       Q.  Based upon all of the medical records that you
20   reviewed for Mr. Boudreaux, what are the possible
21   causes or explanations for that PT being slightly
22   elevated on that date and time?
23       A.  So the possible causes could be -- again, we
24   discussed he has a little bit of issues with his
25   liver, so it's possible that he's not making his

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 72

1    time of -- just before the next dose?
2        A.  So, you know, I've seen plenty of data that
3    shows that the PT correlates to the plasma rivaroxaban
4    level, as we agreed on yesterday, again, and I've also
5    seen data that shows plasma rivaroxaban levels
6    decreasing over time, so, yes, it appears that one
7    could surmise that, the farther away you go from
8    dosing of Xarelto, the lower -- after the peak, of
9    course, which is expected to occur two to four hours
10   after taking the drug, that you would see a continued
11   steady decrease in the PT with time.
12       Q.  And then working backwards from a point in
13   time, then, you would, similarly, be able to walk back
14   up that slope towards the time of last use, in terms of
15   seeing an increased PT?
16       A.  Yes, you should be able to do that.
17       Q.  And the data that you've seen in that regard,
18   does that come from the ROCKET trial?
19       A.  I've not seen that data from the ROCKET trial.
20   I'm not saying it doesn't exist.  I just haven't looked
21   at that.  Certainly, that wasn't included in the big
22   publications of the ROCKET trial.  I've seen that more
23   so, like we discussed yesterday, with the FDA briefing
24   documents, with the Mueck article of pharmacodynamics
25   and pharmacokinetics, and its -- you know, that

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 73

1  diagram, that graph, tends to show up in several other
2  articles here or there.
3      Q.   You said something yesterday -- well, strike
4  that.  What is your understanding in terms of -- well,
5  strike it again.  I've got to come up with a better
6  question for you.  I'm sorry.
7      A.   That's okay.
8      Q.   Eliquis, how is it dosed?
9      A.   It's dosed twice a day.
10     Q.   And based upon all the data or information that
11  you've looked at in your practice, does, as a result,
12  Eliquis tend to have higher trough levels than Xarelto,
13  or is that not a comparable situation?
14     A.   Yeah, you can't really compare it.  I mean, I
15  think -- the thing you have to look at here, like we
16  talked about yesterday is exposure, which is, over
17  time, total levels of the medication over time that we
18  talked about and agreed yesterday, would be the area
19  under the curve, so there's two different ways you can
20  get to that area under the curve.  You can go with a --
21  you know, a relatively higher dose once a day to give
22  you a high peak and a higher trough, probably, based on
23  most pharmacokinetics, but the fact that -- if you draw
24  the area under that triangle, one big triangle, versus
25  taking and making two smaller triangles, the area's

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 74

1  going to probably be the same, as far as exposure, but
2  you can't make anything out of the peaks and troughs
3  because the drugs are going to be different.  The other
4  thing you've got to look at is, drugs have different
5  potencies, so if you can measure Drug X -- and pick
6  whatever you want, milligrams, nanograms, doesn't
7  matter, but -- and, again, I'm hypothetically speaking,
8  here.  If you can measure Xarelto as one milligram
9  being in the body, and you can measure apixaban as
10  being ten milligrams in the body, that might have the
11  same potency, you see what I'm saying, because the
12  medicines might -- the medicines are there to attach to
13  factor X, so you can't milligram-to-milligram these
14  drugs because one milligram of one -- and you can
15  reverse that.  Ten milligrams of Xarelto in the body,
16  versus one milligram of Eliquis in the body might have
17  the same affect on Xa, with me?  So it's hard to
18  understand that just based on looking at the
19  milligrams, because you need to know the affinity of
20  binding of the drug to your target, and the potency of
21  that, so it's really hard to compare those two.
22     Q.   Okay, you just made some statement yesterday
23  about issue of troughs being high and potentially being
24  a problem, and here's my question for you today:
25  You're not -- you're not able to state that Eliquis

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 75

1  would be a safer drug if it was given once a day,
2  because, then, as compared to twice a day, it would
3  have lower troughs.
4      A.   Right, so, I mean, I think what you look at,
5  say, dosing Eliquis once a day, obviously, you're going
6  to probably have to -- you're going to have to pick a
7  different dose than giving it twice a day on that
8  particular drug, but, right, so the half-life of the
9  drugs is different, the affinity of binding is
10  different, you know, the oral bioavailability is
11  different, the elimination is different, so if you take
12  all the differences in these drugs and you look at that
13  in the pharmacologic modeling, based on elimination,
14  half-life, and all that, different drugs are going to
15  have different recommendations as far as how to dose
16  them, to make it make sense in the body.  When you plug
17  all the data in for rivaroxaban, it makes more sense to
18  give it once a day.  When you plug all the data in for
19  apixaban, it makes more sense to give it twice a day,
20  but you've got all of those factors you've got to deal
21  with.  It's not as simple as, "I'm going to give you
22  the drug, and it's going to come out of your body."
23  You've got to look at potency, affinity, the degree of
24  action, how long is it bound -- again, just because
25  it's in your plasma doesn't mean it's working, right?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 76

1  And so you need to know, is it bound to X, is it not
2  bound to X, is it reversibly bound, irreversibly -- you
3  have to take all of that into consideration.
4      Q.   And I guess what I'm asking you is, I just
5  want to make sure that the statement that you made
6  yesterday about --
7      A.   Trough was --
8      Q.   -- troughs being higher or lower in a
9  particular drug, that wasn't -- that wasn't meant to
10  be a cautionary statement, that you think that Eliquis
11  is not as safe of a drug because it's given twice a
12  day, and, therefore, might have higher interval
13  troughs?
14     A.   I apologize for interrupting you.  Yeah, I --
15  correct.  I was speaking to rivaroxaban, yesterday,
16  troughs, not to apixaban.  I, in no way, am saying that
17  Eliquis is a more dangerous drug given twice a day, at
18  all, because of the differences just mentioned.
19     Q.   And, I think you said this in the long answer
20  that you just gave; and you're not saying or suggesting
21  that Eliquis given once a day would be a safer drug
22  than Eliquis delivered twice a day?
23     A.   Not at all.  I mean, I think when you look at,
24  like I said, the modeling, it would suggest that it
25  would be better to give that particular molecule twice

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 77

1  a day, rather than once a day, so, you know, because of
2  the deferences in the two medications' activities, they
3  need to be dosed differently.
4      Q.  So you would agree with me that, for some
5  molecules, there are some factors or things that you
6  can look at to determine what its optimal dosing might
7  be for a particular condition?
8      A.  Absolutely, so like we talked -- you know, we
9  look at half-life as the most commonly one that's
10  looked at, and, again, that's how long it takes for
11  half of the drug to be eliminated from the system or
12  from the blood, but you have to look at, okay, just
13  because the drug's there doesn't mean it's doing
14  anything, so you have to look at affinity for the
15  target, you have to look at the potency against the
16  target.  You know, with the case of factor X, you've
17  got to look at free-flowing factor X, at bound factor
18  X.  There are multiple, multiple variables that make
19  this very confounding, and, you know, that's why we
20  have dose-finding trials.  That's why we have all
21  these computer models that tell us, "Hey, this drug
22  needs to be given once a day for the best results, this
23  drug needs to be given twice a day."
24      Q.  In Mr. Boudreaux's situation, that slightly
25  elevated PT of 13.6, for whatever reagent that was

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 78

1  used, there would be a way to determine, even if it's a
2  non-Neoplastine reagent, what the corresponding plasma
3  concentration would be for a particular reagent at a
4  particular level or score, right?
5          MR. SARVER:        Object to form.
6      A.  No, as I think -- because, like we talked about
7  before, even on the Neoplastine label that we looked at
8  yesterday, the PT is not specific for a Xa drug, nor is
9  it specific for Coumadin.  That's why the INR was
10  invented, so there are so many variables that can
11  affect the PT.  There are so many other things -- and,
12  like I mentioned a few of them earlier in Mr.
13  Boudreaux's case that can affect the PT that have
14  nothing to do with rivaroxaban, so that's what
15  makes the PT such a poor, poor test in this situation,
16  or in any situation, to try to determine anything about
17  rivaroxaban and clinical utility.
18      Q.  But in saying that, you're not changing any of
19  your views or the statements you made yesterday about
20  the correlation between increasing PT and increasing
21  plasma concentration, as a general matter?
22      A.  Right, as a general matter, you can correlate
23  -- you know, if you give rivaroxaban, you're monitoring
24  it serially.  The problem you have here is you're not
25  doing that.  You're not bringing them over and over

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 79

1  again and trying to correlate, "Alright, your PT's this
2  at baseline.  Your PT'S this on this day after
3  rivaroxaban."  You've got a guy you haven't checked the
4  PT in in quite a while who comes in, he's got known
5  liver issues, you know.  It's a medical fact that our
6  proteins that cause coagulation are made in the liver,
7  so if those aren't being made -- he could have
8  developed a number of issues that's causing his PT to
9  be elevated, so, in order to correlate like that, it's
10  got to be done in the trial, like they've been done, to
11  show that correlation, but somebody that comes in off
12  the street that has a PT drawn, and hadn't had one in a
13  long time, I can't say, at this particular instance,
14  that it correlates to his plasma rivaroxaban level, and
15  even if it did correlate, certainly, clinically, this
16  test doesn't help me, being where he is, at all in his
17  management of him.
18      Q.  And you don't know one way or the other whether
19  that's a PT for him that's tending towards trough or
20  tending towards closer to peak or --
21      A.  Well, yeah, based on his history, you know, if
22  you look at it, he came into the clinic that morning
23  and he was evaluated.  He was sent home and told not to
24  take his Xarelto.  I'm pretty sure Mr. Boudreaux, from
25  reading his deposition, and his wife's deposition, and

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 80

1  from looking at his case, that he did not take his
2  Xarelto when he went back home, so, based on the timing
3  and the way that the drug works, by the time he got
4  back up to the hospital and had this lab work drawn,
5  he's tending towards trough.
6      Q.  So your view for Mr. Boudreaux is that that PT
7  of 13.6 is a PT that's tending to be towards trough,
8  correct?
9      A.  Right.  I mean, that's not going to -- you
10  know, I'm a little wary of his correlation in this
11  particular instance because of the things I just said
12  before, but, yes I think it's been a while since he's
13  taken Xarelto.
14          MR. HONNOLD:  Why don't we take a short
15  break, and I'll focus on what still needs to be done,
16  and come back for our last lap on this.
17          VIDEOGRAPHER:    It's 11:23 a.m.  We're
18  off-record.
19          [Short recess was taken.]
20          VIDEOGRAPHER:    The approximate time is
21  11:47 a.m.  We're back on record.  Tape number 3,
22  deposition of Dr. Scott Boniol.
23  BY MR. HONNOLD:
24      Q.  Doctor, we're back on the record now after a
25  break, and I apologize for the length of it, due to

Page 81

1  some travel difficulties I'm having, but, in any
2  event, in this case, you would agree with me that
3  Xarelto was a contributing cause to the GI bleed that
4  Mr. Boudreaux was having when he presented to the
5  hospital on February 3rd, 2014?
6         MR. SARVER:       Object to form.
7     A.   I would agree that it was a contributing, but
8  certainly not the sole cause.
9  BY MR. HONNOLD:
10    Q.   And so, fair to state, then, that the Xarelto
11 usage caused or contributed to cause the GI bleed that
12 he had on February 3rd, 2014?
13    A.   No, I would not use the word "cause" in that
14 situation.
15    Q.   The Xarelto usage contributed to cause the GI
16 bleed that he had on February 3, 2014, correct?
17    A.   No, I would not use the word "cause." You keep
18 using the word "cause." I would say that Xarelto
19 exacerbated the GI bleed. I would not use the word
20 "cause."
21    Q.   And it didn't -- in your view, the Xarelto
22 didn't cause the bleed to be worse, then?
23    A.   Well, I guess you could say "cause it to be
24 worse", again, but I think using the word -- I don't
25 like the word "cause" in this situation, because I

---

Page 82

1  don't want to insinuate that Xarelto damaged his GI
2  tract lining, so I prefer to use the word "exacerbate"
3  in my words.
4     Q.   So when you say that Xarelto was a contributing
5  factor to the GI bleed that he had on February 3rd,
6  2014, what do you mean by that?
7     A.   So, you know, again, by being a contributing
8  factor, I think that Mr. Boudreaux has a bleed in his
9  gastrointestinal tract. Certainly, we all,
10 unfortunately, tend to bleed now and again. I think
11 his body was able to control the bleed to keep it from
12 being clinically evident to Mr. Boudreaux, and I think,
13 once he started on Xarelto, because his body could no
14 longer -- could no longer conceal or contain his bleed
15 enough with the coagulation cascade, that the bleed
16 became clinically evident, so, in that it thinned his
17 blood, it contributed to the fact that his bleed was
18 clinically evident. You asked me how it contributed to
19 his bleed on that day, so I don't think it contributed
20 to the ongoing bleed. I think it just made it
21 clinically evident on this day, so it contributed to
22 the fact that he could see his black stool and know
23 that something was going on.
24    Q.   When you say that the Xarelto created a
25 situation where his body could no longer control or

---

Page 83

1  conceal, what are you saying there?
2     A.   So, you know, we know that these medications,
3  such as Xarelto, Eliquis, and Coumadin, do not cause
4  blood vessel damage, they do not cause endothelial
5  lining damage. They do not, themselves, cause
6  bleeding. These drugs do not induce bleeding, so for
7  bleeds like this to occur, they have to already --
8  there has to be some sort of damage to his GI tract.
9  Looking at his medical history retrospectively, I
10 think he had this damage prior to -- or had this slow
11 bleed prior to initiation of Xarelto. I think it was
12 contained by his ability to clot, and, certainly, once
13 you give him -- it was not clinically evident that he
14 was bleeding at the time he was initiated on Xarelto;
15 however, once taking Xarelto, he was no longer able to
16 sufficiently cause enough clotting to occur to prevent
17 this clot from being clinically evident, so once
18 Xarelto was started, blood was thinned, he went from a
19 slow drip in a pipe to a larger drip, and then you
20 could see that the pipe had a hole in it.
21    Q.   What are the possible explanations for the
22 ROCKET data that showed that rivaroxaban had more GI
23 bleeding than Warfarin?
24    A.   So, you know, obviously, one thing could be
25 just extremely bad luck, you know, because the big

---

Page 84

1  question that I can't answer is, why, in all the other
2  clinical trials, we don't see the same increased risk
3  of GI bleed, nor in the wealth of real-world data do
4  we see that increased risk of GI bleeding, so bad luck
5  could be one explanation. Another explanation could
6  be that these drugs do cause an increase in minor
7  bleeds that are of no real clinical significance. Like
8  we talked about before, anytime you have any sort of
9  bleed in the GI tract, it has to be reported as an
10 adverse event. I don't say anywhere in the ROCKET data
11 where they stratify the severity of bleeding specific
12 to GI events, so I don't know that we can quantify what
13 types of bleeds these are. Another explanation could
14 be, maybe, the offset of being safer in intracranial
15 bleeds and fatal bleeds than Coumadin is offset by a
16 lower -- or less significant GI bleed.
17    Q.   I appreciate that. I'm not sure it was
18 responsive to my question. What are the possible
19 scientific explanations for the ROCKET data that showed
20 that patients on rivaroxaban had more gastrointestinal
21 bleeding as compared to Warfarin?
22         MR. SARVER:       Object to form.
23 BY MR. HONNOLD:
24    Q.   Other than bad luck.
25         MR. SARVER:       Object to form.

Page 85

```
1      A.  I don't think there's any specific explanation,
2    other than, you know, that, perhaps -- we talked about
3    affinity of different medications to Xa, that perhaps
4    the affinity of Xarelto to the GI tract is higher.  I
5    mean, that's just scientific hypotheses.  There's never
6    been any testing that has proven, any way or another,
7    why that would be.                       BY MR.
8    HONNOLD:
9      Q.  When you said that one explanation may be bad
10   luck, are you saying -- by using that term, are you
11   equating it to statistical chance, or are you equating
12   it to something else?
13     A.  I don't think it's a statistical chance.  I'm
14   just equating it to, you know, you can flip a coin
15   heads or tails, and all of a sudden, you can get a run
16   of two hundred heads.  It's not very likely, but it is
17   possible, so, you know, I think, statistically -- the
18   statistical analysis of the trial would not be up to
19   luck.  It would decrease the chances of this being
20   random event, but random events are still possible.
21   Is it likely?  No.  Is it possible?  Yes.  There's no
22   other sound scientific explanation that I've ever seen
23   to describe why, in this one particular trial, you see
24   this, and you don't see it in others.
25     Q.  So you've not seen any authors or commentators
```

---

Page 87

```
1    how the data is presented, it doesn't suggest that it's
2    due to statistical chance, correct?
3      A.  Correct.
4      Q.  Anywhere in your report that we've marked as
5    Exhibit 1, do you specifically state that Mr. Boudreaux
6    would have had the exact same GI bleed if he'd been on
7    Warfarin?  Do you say that anywhere, in words, in your
8    report?
9      A.  I don't say that specifically.  I do say that,
10   you know, you can't say that he wouldn't have, but I
11   don't say that you can say that he would, so the way
12   you've specifically worded it, I do not say that, no.
13     Q.  The treatment that Mr. Boudreaux had for his
14   bleed, can you provide an overall summary of the
15   treatment that he needed for that?
16     A.  So when he came in with a GI bleed -- and
17   obviously, the first thing that was done was he -- he
18   was evaluated for his degree of anemia.  Based on his
19   low value and the change he'd had over the last three
20   weeks, he had -- it was felt that he'd benefit from
21   giving him blood, so he was initially transfused two
22   units of packed red blood cells.  His rivaroxaban was
23   held, which is, again, as we talked about yesterday,
24   effective to reverse the effects of that anticoagulant
25   alone.  Ultimately, a few days later, he was given two
```

---

Page 86

```
1    provide scientific explanation for the distinction?
2      A.  I've heard the hypotheses before, but I've not
3    seen any scientific data that has proven why there
4    would be an increased propensity to bleed in the GI
5    tract.
6      Q.  And the hypotheses that you've heard, where
7    have you heard them?
8      A.  You know, I don't know if I've read them.  I
9    just think, in discussions with other physicians, I've
10   heard hypotheses.
11     Q.  And I didn't say that you'd read them.  I said
12   you said you'd heard them, and so where did you hear
13   them?
14     A.  Just in discussions with other doctors.
15     Q.  And have you seen any written scientific
16   explanation?
17     A.  I have not.
18     Q.  In any of the articles on your reference list,
19   is there any scientific explanation for the different
20   rates in ROCKET for GI bleeding between Xarelto and
21   Warfarin?
22     A.  There's not.
23     Q.  And I want to make sure that we're clear on
24   this:  When you look at the statistical analysis for
25   that discrepancy in GI bleeding, at least in terms of
```

---

Page 88

```
1    further units, for a total of four units of blood
2    transfusion, which is not an excessive amount of blood
3    for a GI bleed.  After stabilization, he was evaluated
4    for a source of bleeding by both an upper GI tract
5    camera, which is mouth to stomach, and later on, a
6    couple days later after that, about three days after
7    that, he had a colonoscopy, which looked from his anus
8    to his cecum, so everything but his small bowels was
9    imaged.  He did really well just by withholding Xarelto
10   and transfusing blood.  He stabilized essentially
11   immediately.  His hemoglobin stayed up to where it
12   should be, indicating no clinically-significant ongoing
13   bleeding, and he was discharged home.
14     Q.  What's your understanding as to whether Mr.
15   Boudreaux is on any anticoagulant medication today?
16     A.  He's not.  Well, I'm sorry, as of June 7, 2016,
17   which was the last medical record date that I have, he
18   was not on anticoagulation.
19     Q.  What's the last medical record that you have
20   seen that confirmed, by evaluation of his rhythm, that
21   Mr. Boudreaux still has atrial fibrillation?
22     A.  I believe it's that same date, he had heart
23   catheterization -- no, I'm sorry, his last date of
24   atrial fibrillation, I don't recall.  I'd have to go
25   back and look up.  It may have been that June date
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 89

1  because I think he had a heart catheterization, but
2  I'll have to go back and look at his actual rhythm.  I
3  did not note that.
4      Q.   Is it fair to state that Mr. Boudreaux was
5  admitted to the hospital on February 3rd, 2014 for
6  acute gastrointestinal bleeding?
7      A.   Yes, sir.
8      Q.   Would his use of Xarelto have been -- would it
9  have also been a contributing factor to Mr. Boudreaux
10 needing the medical care that he received in the
11 hospital?
12     A.   Indirectly, in that I feel it exacerbated his
13 GI bleed, yes.
14     Q.   And in terms of the information that you
15 include in your report for when Mr. Boudreaux got out
16 of the hospital, do you make any statement to suggest
17 that you think that Mr. Boudreaux continues to have
18 some underlying GI bleeding?
19     A.   I'm not certain if I make that exact statement.
20 I don't think he has any clinically-evident GI
21 bleeding, no.
22     Q.   So the last medical records that you saw for
23 Mr. Boudreaux suggested that he did not have any
24 clinically-evident gastrointestinal bleeding, correct?
25     A.   The last records that I reviewed for Mr.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 90

1  Boudreaux, June 7th, 2016, show that he has a
2  significant relapse of his anemia, down to 10.5, which,
3  in a male, is a GI bleed until proven otherwise, in my
4  world, so, yeah, I have concern that he has a GI bleed
5  as of that date; subclinical GI bleed.
6      Q.   But in terms of clinically-evident bleeding,
7  there wasn't any that was observed that date --
8      A.   No, sir.
9      Q.   -- correct?  Is it true that, in the
10 population, generally, that individuals -- all of us,
11 to some degree -- do have lesions, deformities,
12 defects in our vasculature that might be things that
13 would cause clinically-evident bleeding, but for the
14 fact that our coagulation system is able to overcome
15 those things and keep clinical bleeding from
16 developing?
17     A.   Well, I think, when you look at any literature
18 or anything that looks at this, by far, the wide
19 majority of us do not.  You know, when you look at --
20 if that were the case, then anytime you put somebody on
21 anticoagulation, they would bleed, we know for a fact
22 that patients come in with -- I see patients on a
23 monthly basis on Coumadin that come in with an INR
24 that's too high to detect, but be greater than twenty,
25 and they don't bleed, and that's the wide majority of

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 91

1  them; or patients come in with INRs that are what we
2  call supratherapeutic, or way higher than they need to
3  be, and they don't bleed.  I think, when you look at
4  clinical trial that report bleeding rates, they're
5  relatively low in people across all anticoagulation,
6  so, no, I think the majority of us do not have that
7  problem.
8      Q.   But your view is that everybody who has a bleed
9  that's on an anticoagulant, it's due to the fact that
10 they do have some underlying vascular defect,
11 deformity, whether it's pre-existing, permanent,
12 temporary -- something, right?
13     A.   They have a significant enough anatomic or
14 pathologic lesion -- I mean, blood is contained in our
15 blood vessels.  For it to get out of its contained
16 system, there has to be an opening.  That's not my
17 opinion.  I think that's pretty much well-known.
18     Q.   What's your -- currently, your understanding of
19 the different degrees of sensitivity with the different
20 PT reagents?
21          MR. SARVER:     Object to form.
22     A.   Sensitivity to what?
23 BY MR. HONNOLD:
24     Q.   To rivaroxaban.
25     A.   You know, again -- I've stated this several

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 92

1  times.  The PT in the rivaroxaban plasma concentration
2  in no way correlates to bleeding.  I don't look at this
3  on a routine basis, because it has no clinical utility,
4  so I don't know.  I have no need to know.
5      Q.   Have you looked at it enough to know that, in
6  the same patient, at the same time, when they're on
7  Xarelto and have a given plasma concentration level,
8  that if you were to do multiple PT tests on them at
9  that point in time, using different reagents, you
10 would get different numbers?
11     A.   You should get different numbers, yes.
12     Q.   And you base that answer on what you've read
13 and what you know about those varying degrees of
14 sensitivity of those reagents to rivaroxaban, correct?
15     A.   Sure.  I think we even looked at a paper
16 yesterday that showed different PTs had lines that were
17 a little bit flatter when they didn't have Neoplastine,
18 but still tended to correlate with a plasma rivaroxaban
19 level.  I think that's well-represented in all the
20 literature that that's a fact.
21     Q.   What's a lariat procedure?
22     A.   So my understanding of a lariat procedure is
23 that it is an invasive procedure done by cardiologists
24 in which the left atrial appendage of the heart, which
25 is the area in which clots can occur during atrial

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 93

```
 1  fibrillation and cause stroke, is what we call ligated,
 2  or cut off from the rest of the atrium, which will
 3  decrease the -- theoretically, at least, should
 4  decrease the incidence of clot formation and stroke in
 5  atrial fibrillation patients, but I would defer any
 6  specifics to the -- I've never done that procedure.
 7  I've never sent a patient to do that procedure.  That's
 8  just from what I've read, so I do not, in any way,
 9  consider myself an expert in the lariat procedure.
10      Q.   You state at page 12 of your report that there
11  is no direct evidence that Mr. Boudreaux's low-dose
12  aspirin is the cause of his GI bleed.  Do you see that?
13      A.   I do.
14      Q.   And how is it or why is it that you state that
15  there is no direct evidence that his low-dose aspirin
16  is the cause of his GI bleed?
17           MR. SARVER:      Object to form.
18      A.   So, you know, direct evidence of aspirin -- so
19  let me back up just a little bit here so we can get on
20  the same page.  So we talked about the anticoagulants
21  such as Eliquis, Xarelto and Pradaxa, they do not cause
22  bleeding.  Aspirin's a little bit different, in that it
23  does have the potential to actually cause bleeding, as
24  well as exacerbate bleeding so it's a totally different
25  medication.  You know, when you look up in any medical
```

Golkow Technologies,  Inc - 877.370.3377

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 95

```
 1  look at it from a whole bunch of different angles to
 2  make sure we're not missing anything here.
 3      Q.   So you completed your report, or signed it, on
 4  November 15, 2016, right?
 5      A.   Yes, sir.
 6      Q.   And I just want to make sure I understand.
 7  What additional material on Mr. Boudreaux's case have
 8  you received since that time?
 9      A.   I think I received the deposition of Dr.
10  Lessenger since that time.
11      Q.   And since November 15th of 2016, you've not
12  supplemented your report or made any changes to the
13  body of your report, correct --
14      A.   No, sir.
15      Q.   And you've known that we were going to be doing
16  these depositions yesterday and today, since when?
17      A.   I think I got my notice of deposition two weeks
18  ago, maybe, somewhere around there; 10 to 14 days ago.
19      Q.   So, in the past two weeks, knowing that the
20  depositions were going to occur, you didn't supplement
21  or change the report --
22      A.   I didn't add anything, no, sir.  I just went
23  back and reread the information that is provided here
24  to refresh my memory and refamiliarize myself with the
25  specifics of the case.
```

Golkow Technologies,  Inc - 877.370.3377

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 94

```
 1  textbooks, journals, lists of the causes of bleeding,
 2  you can find aspirin and drugs, such as indomethacin,
 3  on that list.  You will not find anticoagulants, such
 4  as Xarelto or Eliquis, on that list.  These drugs cause
 5  bleeding by eroding the lining of the gastrointestinal
 6  tract and exposing the underlying blood vessels to the
 7  surface where they weren't exposed before, therefore,
 8  taking, again, the closed, contained blood system and
 9  opening it up to the outside by this direct erosion.
10  There's no direct visual evidence on his scopes that
11  show he's had injury to this part of his GI tract from
12  his aspirin, so, not seeing that in his EGD, you
13  should not see that at all on a colonoscopy.  Aspirin
14  should be absorbed well before it would damage the
15  colon, but also, looking at his pill endoscopy, there's
16  no direct evidence that the aspirin caused his GI
17  bleed.
18      Q.   At the end of your report, you make various
19  statements about you reserve the right to supplement,
20  and if additional information is provided regarding the
21  case; you've not been presented with anything
22  additional since you prepared your report, have you?
23      A.   I've not been -- no, no supplemental literature
24  or anything like that.  I do continue to review his
25  case.  You know, you can look at it from -- I try to
```

Golkow Technologies,  Inc - 877.370.3377

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 96

```
 1      Q.   So, in terms of reevaluation, looking at
 2  additional material and depositions, there wasn't
 3  anything that you saw that caused you to modify or
 4  supplement your written report, as it exists now as
 5  Exhibit 1?
 6      A.   Not at this time.
 7      Q.   Okay, great.  I thank you for your time and
 8  courtesy.  I don't have any other questions for you.
 9      A.   Thank you.
10           MR. SARVER:      No questions.
11           VIDEOGRAPHER:    The approximate time is
12  12:13 p.m. and this is the conclusion of the deposition
13  of Dr. Boniol.
14           [Deposition was concluded.]
15
16
17
18
19
20
21
22
23
24
25
```

Golkow Technologies,  Inc - 877.370.3377

PROTECTED – SUBJECT TO FURTHER PROTECTIVE REVIEW
97

### REPORTER'S CERTIFICATION

This certification is valid only for a transcript accompanied by my original signature and original seal on this page.

I, SARAH B. TOWNSLEY, Certified Court Reporter, as the officer before whom this testimony was taken, hereby certify that STEVEN SCOTT BONIOL, M.D., having been duly sworn by me upon authority of R.S. 37:2554, testified as set forth in the previous 96 pages; this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me, is a true and correct transcript, to the best of my ability and understanding; the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board, am informed about the complete arrangement, financial or otherwise, with the person or entity making arrangements for deposition services; have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and rules and advisory opinions of the board; I have no knowledge of any prohibited employment or contractual relationship, direct or indirect, between a court reporting firm and party litigants in this matter, nor any such relationship between myself and party litigants n this matter, and am not related to counsel or parties herein, nor am I otherwise interested in the outcome of the matter.

Signed this 19th day of January, 2017.

_____

Sarah B. Townsley, CCR, RPR - LA CCR 92016; TX CSR 5746; RPR #814458

Boudreaux_Steven Scott Boniol, MD Deposition_00097

---

PROTECTED – SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 98

```
 1                    ERRATA SHEET
 2         DEPOSITION OF STEVEN SCOTT BONIOL, M.D.
 3                   JANUARY 14, 2017
 4   Please make any changes/corrections on this sheet.
 5   Please do not write in the deposition.
 6
 7   PAGE NO./LINE NO.              EXPLANATION
 8   _____  _____    _____
 9   _____  _____    _____
10   _____  _____    _____
11   _____  _____    _____
12   _____  _____    _____
13   _____  _____    _____
14   _____  _____    _____
15   _____  _____    _____
16   _____  _____    _____
17   _____  _____    _____
18   _____  _____    _____
19   _____  _____    _____
20   _____  _____    _____
21   _____  _____    _____
22   _____  _____    _____
23
24   _____     _____
25   DATE            STEVEN SCOTT BONIOL, M.D.
```

Boudreaux_Steven Scott Boniol, MD Deposition_00098