UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  XARELTO (RIVAROXABAN)      *         MDL 2592
PRODUCTS LIABILITY LITIGATION    *
                               *         SECTION L
THIS DOCUMENT RELATES TO:      *
    *ALL CASES*                 *         JUDGE ELDON E. FALLON
                               *
                               *         MAG. JUDGE NORTH
                               *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

---

**EXHIBIT 8 TO
PLAINTIFFS' MOTION TO PRECLUDE SPECULATIVE TESTIMONY
FROM SIX DEFENSE EXPERTS ABOUT POTENTIAL OUTCOMES
FROM OTHER ANTICOAGULANTS**

---

# FILED UNDER SEAL

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2

 3

     IN RE:  XARELTO        )   MDL No.:  2592
 4   (RIVAROXABAN) PRODUCTS  )   Section:  L
     LIABILITY LITIGATION    )   Judge Eldon E. Fallon
 5                           )   Mag. Judge North
                             )
 6                           )
     JOSEPH J. BOUDREAUX     )
 7                           )   Civil Case No.:
     versus                  )   2:14-cv-02720
 8                           )
     JANSSEN RESEARCH &      )
 9   DEVELOPMENT, ET AL      )
10

11

12   PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW
13

14

15

16      Videotaped Deposition of MARC J. KAHN, M.D.,
17   M.B.A., taken on Friday, January 13, 2017, in the
18   office of Chaffe McCall, L.L.P., 1100 Poydras
19   Street, Suite 2300, New Orleans, Louisiana 70163
20   commencing at 8:36 a.m.
21

22

23

     Reported by:
24   AURORA M. PERRIEN
     CERTIFIED COURT REPORTER
25   REGISTERED PROFESSIONAL REPORTER
```

## Page 2

I N D E X

Page

Caption............................1

Appearances........................3

Agreement of Counsel...............5

Witness' Certificate...............163

Reporter's Certificate.............164

E X A M I N A T I O N

MR. GOZA...........................7

E X H I B I T S

Exhibit No. 1......................9
Plaintiffs' Amended Notice with
Subpoena Duces Tecum of Oral Videotaped
Deposition of Marc J. Kahn, MD

Exhibit No. 2......................9
Report of Dr. Marc J. Kahn, MD, MBA

Exhibit No. 3......................20
KNMH Telemetry, Progress Note,
JBoudreaux-OMC-K-MD-000017

Exhibit No. 4......................74
Highlights of Prescribing Information

Exhibit No. 5......................116
"Clinical Pharmacokinetic and
Pharmacodynamic Profile of Rivaroxaban"

## Page 3

A P P E A R A N C E S
REPRESENTING PLAINTIFFS:
    GOZA & HONNOLD, L.L.C.
    BY:  KIRK J. GOZA, ESQ.
    11181 Overbrook Road, Suite 200
    Leawood, Kansas 66211-2241
    913.451.3433
    Kgoza@gohonlaw.com

    THE LAMBERT FIRM, A.P.L.C.
    BY:  EMILY C. JEFFCOTT, ESQ.
    701 Magazine Street
    New Orleans, Louisiana 70130
    504.581.1750
    Ejeffcott@thelambertfirm.com
    BARRIOS, KINGSDORF & CASTEIX, L.L.P.
    BY:  EMMA E. KINGSDORF, ESQ.
    701 Poydras Street, Suite 3650
    New Orleans, Louisiana 70139-3650
    504.524.3300
    Ekingsdorf@bkc-law.com


REPRESENTING JANSSEN PHARMACEUTICALS, INC.,
JANSSEN RESEARCH & DEVELOPMENT, L.L.C., JANSSEN
ORTHO, L.L.C.:

    IRWIN, FRITCHIE, URQUHART & MOORE,
    L.L.C.
    BY:  KIM E. MOORE, ESQ.
    400 Poydras Street, Suite 2700
    New Orleans, Louisiana 70130-3280
    504.310.2108
    Kmoore@irwinllc.com

    BARRASSO, USDIN, KUPPERMAN, FREEMAN &
    SARVER, L.L.C
    BY:  ANDREA M. PRICE, ESQ.
    909 Poydras Street, 24th Floor
    New Orleans, Louisiana 70112
    504.589.9700
    Aprice@barrassousdin.com

## Page 4

REPRESENTING BAYER HEALTHCARE PHARMACEUTICALS,
INC., and BAYER PHARMA AG:

    NELSON, MULLINS, RILEY & SCARBOROUGH,
    L.L.P.
    BY:  MICHAEL W. HOGUE, ESQ.
    1320 Main Street, 17th Floor
    Columbia, South Carolina 29201
    803.255.9514
    Michael.hogue@nelsonmullins.com

    ARNOLD & PORTER KAYE SCHOLER, L.L.P.
    BY:  JULIE B. duPONT, ESQ.
    250 West 55th Street
    New York, New York 10019-9710
    212.836.8572
    Julie.dupont@apks.com


ALSO PRESENT:

    MARK ANCALADE, VIDEOGRAPHER

## Page 5

S T I P U L A T I O N

   It is stipulated by and among Counsel that
the videotaped deposition of MARC J. KAHN, M.D.,
M.B.A., is being taken under the Federal Rules of
Civil Procedure for all purposes permitted under
the law.

   The formalities of reading and signing are
not waived.

   The formalities of sealing, certification
and filing are not hereby waived.  The party
responsible for services of the discovery material
shall retain the original.

   All objections, except those as to the
form of the questions and/or the responsiveness of
the answers, are reserved until the time of the
trial of this cause.

                * * * * *

   Aurora M. Perrien, Certified Court
Reporter, Registered Professional Reporter, in and
for the State of Louisiana, officiated in
administering the oath to the witness.

PROTECTED — SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 6

P R O C E E D I N G S

1   THE VIDEOGRAPHER:
2       My name is Mark Ancalade, the
3   videographer with Golkow Technologies.
4   Today's date is January the 13th, 2017, at
5   the time indicated on the video screen,
6   which is 8:36.  Today's deposition is
7   being held at 1100 Poydras Street,
8   Suite 2300, New Orleans, Louisiana taken
9   in the matter of In Reference:  Xarelto
10  (rivaroxaban) Products Liability
11  Litigation, Case Nos. 2:14-cv-02720.
12  Today's deponent is Dr. Marc J. Kahn.  Our
13  court reporter is Miss Aurora Gonzales
14  [sic].
15      I would ask that counsel state their
16  names for the record, which thereafter
17  would the court reporter please swear in
18  the witness.
19  MR. GOZA:
20      Kirk Goza on behalf of the plaintiffs.
21  MS. KINGSDORF:
22      Emma Kingsdorf on behalf of the
23  plaintiffs.
24  MS. JEFFCOTT:

Page 7

1       Emily Jeffcott on behalf of the
2   plaintiffs.
3   MS. PRICE:
4       Andrea Mahady Price on behalf of
5   Janssen.
6   MS. MOORE:
7       Kim Moore on behalf of Janssen.
8   MR. HOGUE:
9       Michael Hogue on behalf of Bayer.
10  MS. duPONT:
11      Julie duPont on behalf of Bayer.
12  (The court reporter swore in the witness.)
13          E X A M I N A T I O N
14  BY MR. GOZA:
15  Q.  Doctor, if you would, please state your
16  full name for the record.
17  A.  My full name is Marc, M-A-R-C -- I use a
18  middle initial -- J. Kahn, K-A-H-N.
19  Q.  And your business address, sir?
20  A.  My business address is 1430 Tulane Avenue,
21  No. 8010, New Orleans, Louisiana 70112.
22  Q.  Okay.  And, Doctor, prior to today, you
23  had your opportunity to have your deposition taken
24  in the -- I think you were identified as a generic
25  expert in the MDL litigation.

Page 8

1       Is that true?
2   A.  That is correct.
3   Q.  And that deposition was taken on Monday of
4   this week, I believe?
5   A.  That is correct.
6   Q.  And I know that the attorney in that
7   deposition gave you some basic instructions
8   regarding depositions, but I'm just going to
9   restate a few things.
10      Obviously if you need to look at something
11  in order to respond to a question, please ask, and
12  we'll try to dig up whatever it is that you need
13  in order to get you to be able to answer a
14  question.  All right?
15  A.  That's fine.
16  Q.  If I ask you a question that you don't
17  understand -- I'm -- I'm not a doctor, and we'll
18  be using some medical terms today.  But if I use a
19  term incorrectly or you don't understand what I am
20  asking you, simply ask me to rephrase it, and I'll
21  try to make it intelligible to you.
22      Is that fair enough as well?
23  A.  That's fair.
24  Q.  And if at some point you need to take a
25  break, please ask me and we'll stop the

Page 9

1   deposition.  The only caveat to that would be if I
2   am in the middle of a question, I would just
3   propose that you answer the question fully before
4   we take the break, and then we can take a break
5   whenever you need.  All right?
6   A.  I understand.
7   Q.  Okay.  You're here.  We noticed up your
8   deposition for today, January 13th, in
9   New Orleans.  Let me just ask.
10      Have you brought anything with you today
11  pertaining to the Boudreaux case other than your
12  report?
13  A.  I have not.
14  Q.  Okay.  So we have what has been marked as
15  Exhibit 2 in front of you that -- your report in
16  this case?
17      (Exhibit No. 2 was marked for
18           identification and attached hereto.)
19  THE WITNESS:
20      That's correct.
21  BY MR. GOZA:
22  Q.  Okay.  And then we have as Exhibit 1 the
23  notice for the deposition in the case; is that
24  correct as well?
25      (Exhibit No. 1 was marked for

Page 10

1    identification and attached hereto.)
2    THE WITNESS:
3        That's correct.
4  BY MR. GOZA:
5    Q. And I assume at some point you had an
6  opportunity to see the notice?
7    A. I have.
8    Q. Okay. With respect to the Boudreaux case
9  -- and I know you have a number of items listed in
10  your reliance list that are included in your
11  generic report that you have done in this case;
12  correct?
13    A. That's correct.
14    Q. Now, it appears in -- with respect to the
15  Boudreaux case in particular, that on Exhibit A
16  you have a list of the materials that you have
17  reviewed specifically as it relates to this case?
18    A. Exhibit A is a list of the case-specific
19  materials that were considered and reviewed
20  regarding the case review. Correct.
21    Q. Okay. Let's see if we could cover some
22  basic facts and if you and I are in agreement on
23  at least certain basic facts.
24        This patient was presented to primary care
25  provider Nurse Torres on January 7th, 2014 and

Page 11

1  ultimately admitted to the hospital that day; is
2  that correct?
3    A. Give me a minute to refer to my report.
4    Q. I think it's on Page 4 of your report.
5    A. So on Page 4 of my report, I say on
6  June 1st there were labs that were reported in
7  reference to a presentation by Mr. Boudreaux on
8  May 30th, when he presents to his primary care
9  provider.
10    Q. Okay. Look down the next paragraph. I
11  mean, I'm trying to get to the date of his
12  diagnosis of atrial fibrillation. Do you see
13  where that starts on January 7th, 2014? It's the
14  next paragraph down.
15    A. I'm sorry. I see -- I see where you're
16  referring to. On Page 4, midway down,
17  "Mr. Boudreaux presented to his primary care
18  provider, Nurse Torres, on January" 7th, "2014."
19  Yes.
20    Q. Okay. And when was the last time you had
21  an opportunity to review your report?
22    A. I reviewed my report last night.
23    Q. Okay. And when was the last time you had
24  an opportunity to meet with the lawyers for the
25  defense in this case?

Page 12

1    A. I met with my counsel last evening.
2    Q. And between Monday, the time that you gave
3  your deposition in the generic case, and the
4  opportunity to give your deposition here today,
5  how many times have you met or talked about the
6  Boudreaux case with counsel?
7    A. Two times.
8    Q. When was the first time?
9    A. I believe it was Wednesday night.
10    Q. And how long did you spend together
11  Wednesday night?
12    A. I'd have to check my records. I believe
13  it was about two-and-a-half hours.
14    Q. And where did that meeting take place?
15    A. That meeting took place in my office.
16    Q. And then you said you met last night as
17  well?
18    A. That's correct.
19    Q. And how long was that meeting?
20    A. I believe that was 2 hours and 15 minutes.
21    Q. And where did that meeting take place?
22    A. That meeting also took place in my office.
23    Q. All right. So going back to my original
24  questions, is it fair to say that on
25  January 7th, 2014 Mr. Boudreaux was admitted to

Page 13

1  the hospital and was subsequently diagnosed with
2  atrial fibrillation?
3    A. That is correct.
4    Q. Okay. And he had a PT that was taken on
5  that day that you indicate in your notes was 11.4,
6  which would have been within the normal range for
7  that lab. True?
8    A. That's correct.
9    Q. To your knowledge, had Mr. Boudreaux ever
10  had an elevated PT prior to January 7th, 2014?
11    A. Give me a minute to refer to my report.
12    Q. I read your report -- well, go ahead.
13    A. I'm comfortable saying if it's not
14  mentioned in my report I don't have knowledge that
15  he had a prior prothrombin time.
16    Q. Okay. And certainly no elevated
17  prothrombin time prior to that. True?
18    A. If that's not listed in my report, that's
19  correct.
20    Q. In fact, the only -- or strike that.
21        The -- in terms of reviewing your report,
22  the only elevated prothrombin time that
23  Mr. Boudreaux had was after his diagnosis on
24  February 3rd of 2014 of a GI bleed. Is that true?
25    MS. duPONT:

Page 14

1    Object to form.
2    THE WITNESS:
3        So let me look at the time of his GI
4    bleed to see what his prothrombin time
5    was.  That would be on
6    February 14th, 2014.
7    MS. duPONT:
8        Do you mean February 3rd?
9    THE WITNESS:
10       That would be February 3rd.  I'm
11   sorry.  I'm just looking for my
12   prothrombin time.  I don't want to --
13 BY MR. GOZA:
14   Q.  Here, look at Page 7.  On the top of
15 Page 7 --
16   A.  Yeah.  I don't --
17   Q.  -- there was a PT of --
18   A.  Of 13.6 seconds.
19   Q.  Right.
20   A.  Yes.  Thank you.
21   Q.  Okay.
22   A.  I'm -- I'm trying not to rely on memory.
23 I want to make sure I stick to my report.
24   Q.  No.  I'm -- I'm fine with that.  I --
25   A.  Yeah.

Page 15

1    Q.  -- just want to make sure I understand.
2        So the only time that you're aware of that
3    Mr. Boudreaux had an elevated PT or at least the
4    first time would have been February 3rd of 2014;
5    is that correct?
6    MS. duPONT:
7        Object to form.
8    THE WITNESS:
9        So that's what's stated in my report.
10   Based on my review of the records
11   provided, the -- first time there was
12   an elevation in prothrombin time would
13   have been February 3rd.
14 BY MR. GOZA:
15   Q.  Okay.  And in terms of the records you
16 reviewed, if we look at Exhibit 8 [sic], it says
17 that you had reviewed all records as of 11/14 of
18 2016; is that correct?
19   A.  I reviewed all provided records as of that
20 date.  Correct.
21   Q.  Okay.  So you would qualify it with
22 "provided records."  Is that true?
23   A.  That's correct.
24   MR. GOZA:
25       Okay.  And in terms of list of what is

Page 16

1    provided, I'm assuming, Julie, that we
2    have that list of -- of actual records
3    that he saw?
4    MS. duPONT:
5        I believe it's the -- Exhibit A states
6    as of 11/14/16.  It would be whatever was
7    -- had been produced by plaintiffs as of
8    that time.
9    MR. GOZA:
10       Okay.
11 BY MR. GOZA:
12   Q.  Now, is -- now, am I correct that
13 Mr. Boudreaux was started on Xarelto in the
14 hospital after his diagnosis of atrial
15 fibrillation?
16   A.  According to my review of records,
17 correct.
18   Q.  And the first time he would have received
19 his first pill of Xarelto would have been at
20 approximately 9:00 a.m. January 8th of 2014.
21 True?
22   A.  I'd have to check the record for the exact
23 timing -- for the exact time of day that was
24 administered.
25   Q.  Do you know as you sit here what time he

Page 17

1 would have gotten it, what time of day or
2 generally what time of day?
3    A.  I don't know what time of day.  There's a
4 recommendation that the drug be given at night.  I
5 don't have the record in front of me to see when
6 specifically Mr. Boudreaux received his first dose
7 of rivaroxaban.
8    Q.  Right.  And obviously while
9 Mr. Boudreaux's in the hospital, it's not in his
10 control when he receives the first pill of
11 rivaroxaban.  Is that true?
12   MS. duPONT:
13       Object to form.
14   THE WITNESS:
15       While in the hospital, patients are
16   typically given drugs by the nursing
17   staff.
18 BY MR. GOZA:
19   Q.  On February 4th of 2014, Mr. Boudreaux was
20 diagnosed with a GI bleed; is that correct?
21   MS. duPONT:
22       Object to form.
23   THE WITNESS:
24       On February 4th, Mr. Boudreaux was
25   examined and diagnosed with a GI bleed,

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 18

1 according to the medical record.
2 BY MR. GOZA:
3 Q. And he was admitted to the ICU?
4 A. Mr. Boudreaux was admitted to the
5 hospital.
6 Q. And he was given blood transfusions, at
7 least two units that first day?
8 A. Mr. Boudreaux received two units of blood
9 that first day.
10 Q. And a total of four units of blood before
11 he was released from the hospital. Is that true?
12 A. Correct. Mr. Boudreaux received two
13 additional units of blood prior to discharge.
14 Q. And -- and am I correct that prior to
15 February 4th of 2014 Mr. Boudreaux had never been
16 diagnosed with any kind of acute GI bleed; is that
17 correct?
18 A. Per the records provided me, there's no
19 other mention of a GI bleed on Mr. Boudreaux's
20 part.
21 Q. Okay. Mr. Boudreaux had been on a number
22 of medications prior to the administration of
23 Xarelto on January 8th of 2014; is that correct?
24 MS. duPONT:
25 Object to form.

Page 19

1 THE WITNESS:
2 That's correct.
3 BY MR. GOZA:
4 Q. And with respect to his taking those
5 medications, at least in terms of your review of
6 the records, there's no diagnosis that any of
7 those medications ever caused him to have an acute
8 GI bleed. Is that true?
9 MS. duPONT:
10 Object to form.
11 THE WITNESS:
12 The records provided me in review did
13 not state that Mr. Boudreaux had
14 previously had a GI bleed.
15 BY MR. GOZA:
16 Q. In the hospital, Mr. Boudreaux's GI bleed
17 was diagnosed as having been related to his
18 ingestion of Xarelto; is that correct?
19 MS. duPONT:
20 Objection to form.
21 THE WITNESS:
22 I don't know what was specifically
23 stated in the record, but I think that
24 that's a statement that requires
25 clarification.

Page 20

1 BY MR. GOZA:
2 Q. Well, let me just hand you a page out of
3 the record, and this appears to be I think from
4 Dr. Masri.
5 Who do you understand Dr. Masri was?
6 MS. duPONT:
7 Are you making this as an exhibit?
8 MR. GOZA:
9 Oh. I'm sorry. Yeah. Let's go ahead
10 and mark that as an exhibit. I apologize.
11 (Exhibit No. 3 was marked for
12 identification and attached hereto.)
13 MS. duPONT:
14 And -- and go ahead and take time to
15 -- to review the full record before you
16 answer, Doctor.
17 MR. HOGUE:
18 Is that Exhibit 3?
19 MS. duPONT:
20 Yeah. It's --
21 MR. GOZA:
22 This is --
23 MS. duPONT:
24 -- Exhibit 3.
25 MR. GOZA:

Page 21

1 -- Exhibit 3. Yes.
2 BY MR. GOZA:
3 Q. So I --
4 A. I believe the first --
5 Q. Let -- let me --
6 A. -- question --
7 Q. Let's -- before we started asking a
8 question, let's just get a couple of things clear
9 for the record.
10 I have marked as Exhibit 3 a progress note
11 that was done by Dr. Masri on February 4th of 2014
12 at approximately 7:40 a.m. Do you see that?
13 A. I do.
14 Q. And does it say, "GI bleed - Related to
15 recent Xarelto initiation"?
16 A. That is what is written in the record.
17 Q. And you had an opportunity to review that
18 when you were preparing for your deposition in
19 this case. Is that true?
20 A. I did.
21 Q. Do you believe that the PT that was done
22 on February 4th that showed a PT that we -- wait.
23 Let's see.
24 A 13.6, do you believe that was an
25 indication that Mr. Boudreaux was anticoagulated

Page 22

1 to some degree?
2     MS. duPONT:
3         Object to form. Misstates the record.
4     MR. GOZA:
5         Well . . .
6     MS. duPONT:
7         It's not -- it's not February 4th, I
8 don't think.
9     MR. GOZA:
10        Ah. Okay. Let's -- let's -- that --
11 let's get that cleared.
12 BY MR. GOZA:
13    Q. The PT taken on February 3rd of 2014 of
14 13.6, is it your opinion or can you tell me
15 whether it's your opinion that that indicates that
16 to some extent Mr. Boudreaux was anticoagulated?
17    MS. duPONT:
18        Object to form.
19    THE WITNESS:
20        There are many things that can cause
21    an elevation in the prothrombin time. The
22    prothrombin time is not -- strike what I
23    just said.
24        There are many things that cause an
25    elevation of prothrombin time. Most

Page 23

1    notably abnormalities in collection can
2    cause a prolonged prothrombin time. I'm
3    uncomfortable saying that Mr. Boudreaux
4    was anticoagulated solely because of a PT
5    that's elevated a second or two above
6    control.
7 BY MR. GOZA:
8    Q. Would gastrointestinal bleeding be
9 consistent with someone who was on an
10 anticoagulant?
11    MS. duPONT:
12        Object to form.
13    THE WITNESS:
14        Any anticoagulant by nature of it
15    being an anticoagulant can cause an
16    underlying lesion to bleed.
17 BY MR. GOZA:
18    Q. And when an anticoagulant causes an
19 underlying lesion to bleed, is there oftentimes
20 associated with it an elevated PT?
21    MS. duPONT:
22        Object to form.
23    THE WITNESS:
24        That really depends on the
25    anticoagulant. Warfarin clearly in a

Page 24

1    reproducible fashion elevates the
2    prothrombin time. Many other
3    anticoagulants such as those that inhibit
4    platelets like aspirin have no effect on
5    the prothrombin time. So it's -- it's
6    anticoagulant-dependent.
7 BY MR. GOZA:
8    Q. Tell me this -- I understand that many
9 things can cause an elevation of prothrombin.
10        Is it going to be your testimony in this
11 case that Xarelto played no role in the elevation
12 of Mr. Boudreaux's PT elevation on
13 February 3rd of 2014?
14    MS. duPONT:
15        Object to form.
16    THE WITNESS:
17        I think it's my testimony that the
18    relationship between prothrombin time and
19    Xarelto is inconclusive and inconsistent.
20 BY MR. GOZA:
21    Q. Then let me ask the question --
22    A. And -- and further --
23    Q. Oh. Sorry.
24    A. -- there is no consensus panel nor
25 national group that recommends using the

Page 25

1 prothrombin time as a means of assessing
2 anticoagulation with rivaroxaban. It's
3 inconsistent.
4    Q. What would have been the purpose of
5 ordering a prothrombin time in this circumstance?
6    A. I was not the ER physician. But it's
7 common practice that when patients come in with a
8 bleeding -- come in bleeding, that routine
9 anticoagulation tests such as the prothrombin time
10 and the activated partial thromboplastin time are
11 checked.
12    Q. And why?
13    A. Those are commonly checked to see if -- if
14 there's a potential confounding reason why the
15 patient may have GI bleeding.
16        I can go on to say that it's common
17 practice in many emergency rooms to get these
18 tests even in patients that aren't bleeding.
19 There are labs that are just routinely ordered by
20 an ER when patients come in. Those can include
21 coagulation tests, can include a complete blood
22 count, and can include electrolytes.
23    Q. Are they more likely to be included on a
24 patient that is on an anticoagulant?
25    MS. duPONT:

Page 26

1    Object to form.
2    THE WITNESS:
3    So because some anticoagulants can
4    increase either the prothrombin time, the
5    activated partial thromboplastin time, or
6    both, those can be checked to assess
7    whether or not somebody is adequately
8    anticoagulated on one of those drugs.
9    But I want to state for the record
10   that rivaroxaban has an irreproducible and
11   unreliable effect on the prothrombin time.
12   MR. GOZA:
13   Yeah.  Move to strike as
14   nonresponsive.
15   BY MR. GOZA:
16   Q.  I understand what your opinions are in
17   this case, and I've -- I've read some of them in
18   the -- in the generic testimony.  And we're going
19   to talk about those in some detail.
20   But with respect to this case, is it going
21   to be your testimony that Xarelto played no role
22   in the elevation of Mr. Boudreaux's prothrombin
23   time?
24   MS. duPONT:
25   Objection.  Asked and answered.

Page 27

1    THE WITNESS:
2    My testimony is going to be that it is
3    unclear whether or not rivaroxaban played
4    a role in the prothrombin elevation.  The
5    most frequent reason to have an elevation
6    in the prothrombin time is inadequate
7    specimen collection.  We see that all the
8    time in clinical practice.
9    BY MR. GOZA:
10   Q.  Here, nobody reordered the PT to determine
11   if there was an inadequate collection, did they?
12   A.  To the best of my knowledge, no.
13   Q.  In fact, when somebody's concerned about
14   an inadequate collection, oftentimes the PT's run
15   again.  True?
16   A.  It -- I -- when I am asked to see a
17   patient with an elevated prothrombin time, the
18   first thing I do is repeat the test and make sure
19   it's collected correctly.  I can't comment on what
20   other physicians may or may not do.
21   Q.  Okay.  But it would be your standard
22   practice to do that.  True?
23   A.  If I'm --
24   MS. duPONT:
25   Object to form.

Page 28

1    THE WITNESS:
2    -- concerned about an elevation in
3    prothrombin time, I would repeat the test
4    and make sure it's properly collected.
5    BY MR. GOZA:
6    Q.  You use the word "cannot rule out" a
7    number of times in your report.  True?
8    MS. duPONT:
9    Do you want to refer him to a
10   specific --
11   MR. GOZA:
12   Sure.
13   MS. duPONT:
14   -- part of the report?
15   BY MR. GOZA:
16   Q.  If you look at Page 9 -- I'll just get you
17   one example.  On the fourth paragraph, it says,
18   "There is no way to rule out the same GI bleed
19   Mr. Boudreaux experienced."
20   Do you see that?
21   A.  I do.  About the fifth paragraph down.
22   Q.  Yes, sir.
23   A.  Yes.
24   Q.  And so I'm simply asking that term "there
25   is no way to rule out."

Page 29

1    Would you agree with me that in this case
2    there is no way to rule out that Xarelto played
3    some role in anticoagulating Mr. Boudreaux on
4    February 3rd of 2014?
5    MS. duPONT:
6    Object to form.
7    THE WITNESS:
8    I think there's no way to rule out
9    that rivaroxaban anticoagulated
10   Mr. Boudreaux at the time of his arrival
11   to the emergency room.
12   BY MR. GOZA:
13   Q.  And would you agree as well that there's
14   no way to rule out that that anticoagulation
15   played a role in Mr. Boudreaux's GI bleed?
16   MS. duPONT:
17   Object to form.
18   THE WITNESS:
19   I think that any anticoagulant, by
20   nature of it being an anticoagulant, can
21   make a preexisting lesion more likely to
22   bleed.  Correct.
23   BY MR. GOZA:
24   Q.  Right.  And so with respect to this
25   case -- because Mr. Boudreaux was not on any

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 30

1 anticoagulant. He was on Xarelto during this
2 period.
3    So my question is this: Am I correct that
4 you cannot rule out that Xarelto played a role in
5 Mr. Boudreaux's GI bleed?
6    MS. duPONT:
7      Object to form.
8    THE WITNESS:
9      I think one could not rule out that
10     rivaroxaban, being an anticoagulant,
11     predisposed a preexisting lesion that
12     Mr. Boudreaux had to bleed.
13 BY MR. GOZA:
14   Q. And since being taken off Xarelto, to your
15 knowledge, has Mr. Boudreaux ever been diagnosed
16 with an acute GI bleed?
17   A. As far as the records provided me, there
18 is no other suggestion that Mr. Boudreaux has had
19 a significant GI bleed.
20   Q. In fact, just with respect to the record
21 provided to you, nobody's ever diagnosed him with
22 any kind of GI bleed. Is that true?
23    MS. duPONT:
24      Object to form.
25    THE WITNESS:

Page 31

1      Mr. Boudreaux has had a persistent
2      anemia. That could be consistent with a
3      GI bleed. But to the best of my review of
4      the records, there's no -- there's been no
5      diagnostic test or procedure to ascertain
6      that this was secondary to GI bleeding.
7 BY MR. GOZA:
8   Q. Right. So going back to my original
9 question, which was very specific, there has been
10 no physician that has diagnosed Mr. Boudreaux as
11 having any kind of GI bleed since February 4th of
12 2014; is that correct?
13   A. Per my review of the records, there is no
14 -- there's been no physician that has diagnosed
15 Mr. Boudreaux with a GI bleed subsequent to the
16 initial visit.
17   Q. I think you've made clear that there's no
18 question but that Xarelto can cause bleeds. True?
19    MS. duPONT:
20      Object to form.
21    THE WITNESS:
22      I disagree with that statement. I
23      think that the definition of "cause" is in
24      question. I know that in the product
25      label it does say that rivaroxaban causes

Page 32

1 bleeding. I think that product labels are
2 written for a variety of reasons. It
3 doesn't cause bleeding.
4    What rivaroxaban and similar
5 anticoagulants do is -- by virtue of the
6 -- by nature of the fact that they are
7 anticoagulants, they can -- they can make
8 a preexisting lesion more likely to bleed.
9 I don't consider that cause. I consider
10 that perhaps contribute to. But I don't
11 like the word "cause," even though I fully
12 recognize that's a word used in the label.
13 BY MR. GOZA:
14   Q. Okay. And that was my point.
15    Certainly the company represents to
16 physicians and others that they can cause bleeds.
17 True?
18    MS. duPONT:
19      Object to form.
20    THE WITNESS:
21      I don't know why the company put that
22      in their product insert. I don't work for
23      the FDA.
24 BY MR. GOZA:
25   Q. Right. And I'm not --

Page 33

1   A. But I think --
2   Q. I'm not asking you why.
3    I'm simply saying they do represent that
4 in the label. True?
5   A. The label says rivaroxaban can cause
6 bleeding. Correct.
7   Q. And that includes GI bleeding. True?
8   A. That --
9    MS. duPONT:
10      Object to form.
11    MS. MOORE:
12      Object to the form. Counsel, I'm
13 sorry --
14    MS. duPONT:
15      Just --
16    MS. MOORE:
17      -- to interrupt. Could we just note
18 that the objections made by --
19    MR. GOZA:
20      Sure.
21    MS. MOORE:
22      -- Miss duPont will be uniform for --
23    MR. GOZA:
24      Yes.
25    MS. MOORE:

Page 34

1   -- for Bayer?
2   MS. duPONT:
3       And also, try not to cut him off. I
4   know -- I know you're not trying to but
5   he --
6   MR. GOZA:
7       Sometimes --
8   MS. duPONT:
9       -- he -- sometimes he's -- he's --
10  hasn't finished his answer.
11  BY MR. GOZA:
12  Q. Go ahead.
13  MS. duPONT:
14      Maybe you can read back the question.
15  THE WITNESS:
16      Could you please --
17  BY MR. GOZA:
18  Q. My -- my question --
19  A. -- repeat the question?
20  Q. -- was simply --
21  A. I'm sorry.
22  Q. -- this: We've already -- I think you've
23  agreed with me that the company represents in the
24  label that Xarelto can cause bleeds, and that
25  includes GI bleeds, is my question?

Page 35

1       MS. duPONT:
2       Object to form.
3       THE WITNESS:
4       So the company states that rivaroxaban
5   can cause bleeding, and GI bleeds are one
6   potential complication listed in the
7   product label.
8   BY MR. GOZA:
9   Q. And I understand -- well, I -- I think I
10  hear what you're saying.
11      You're saying you believe that there is
12  some underlying lesion -- for -- or strike that --
13  an underlying lesion that the drug Xarelto will
14  precipitate the bleed in; is that correct?
15      MS. duPONT:
16      Object to form.
17      THE WITNESS:
18      I think the point I'm trying to make
19  is I think the word "cause," although used
20  in the product label, is really too strong
21  based on really what happens
22  physiologically and pharmacokinetically.
23      There are drugs that can specifically
24  cause damage to mucosa that I would use
25  the word "cause" bleeding. Such is not

Page 36

1   the case with rivaroxaban.
2   BY MR. GOZA:
3   Q. And just so -- so I understand clearly,
4   what you're saying is that a patient could have an
5   underlying condition, a preexisting condition, and
6   that when rivaroxaban is added to it, it can along
7   with the underlying condition cause a bleed?
8       MS. duPONT:
9       Object --
10      MS. MOORE:
11      Object.
12      MS. duPONT:
13      -- to form. Misstates prior
14  testimony.
15      THE WITNESS:
16      I think what I've said is that
17  rivaroxaban in and of itself does not
18  cause bleeding. But if somebody has an
19  underlying lesion with a propensity to
20  bleed, rivaroxaban can increase the
21  likelihood that bleeding will occur in
22  that patient.
23  BY MR. GOZA:
24  Q. In other words, contribute to the risk of
25  bleed?

Page 37

1       MS. duPONT:
2       Object to form.
3       THE WITNESS:
4       Rivaroxaban can contribute to the
5   propensity of -- of an underlying lesion
6   to bleed, as can any anticoagulant.
7       MR. GOZA:
8       Move to strike the last part as not
9   being responsive.
10  BY MR. GOZA:
11  Q. In your review of the facts in the case,
12  you said one of the things that -- or strike that.
13      In -- in going through the records, you
14  saw that Dr. Joshi did a number of tests to try
15  and locate any underlying pathologic explanation
16  or anatomic explanation for Mr. Boudreaux's bleed.
17  True?
18  A. Mr. Joshi, the gastroenterologist --
19  Q. I think it's Doctor.
20  A. I'm sorry. Strike it. Mr. -- Mr. --
21  Dr. Joshi, the gastroenterologist, did an EGD. He
22  did I believe a colonoscopy and a capsule
23  endoscopy to try to determine the source of
24  Mr. Boudreaux's bleeding. Yes.
25  Q. And is it fair to say he did not determine

Page 38

1 an anatomic source of the bleeding?
2   A. Dr. Joshi notes in his notes that the
3 patient had what looked like Barrett's esophagus,
4 which can have a propensity to bleed. However, at
5 the time that Dr. Joshi did the EGD, there was no
6 bleeding source noted, that being that the
7 Barrett's esophagus was not bleeding at the time
8 he did his evaluation.
9   Q. In fact, despite the fact that you note
10 that -- that somebody had diagnosed -- or you say
11 that somebody diagnosed Barrett's esophagus.
12 Dr. Joshi did not make that diagnosis, did he?
13   MS. duPONT:
14     Object to form.
15   THE WITNESS:
16     Let me look at my records.
17   MR. GOZA:
18     Sure.
19   THE WITNESS:
20     So according to my record on Page --
21 according to my report on Page 7, I -- I
22 believe the exact words used by Dr. Joshi
23 were that the -- the EGD revealed
24 esophageal mucosal changes suspicious for
25 short-term Barrett's esophagus present in

Page 39

1     the lower third of the esophagus. Those
2     are the exact words used.
3 BY MR. GOZA:
4   Q. Right. And you read Dr. Joshi's
5 deposition. True?
6   A. I did, a while ago.
7   Q. Yeah. And it -- you recall that he
8 testified -- when asked by defense counsel about
9 Barrett's esophagus, he said, I think it's only
10 suspicious, I don't say he had Barrett's, I didn't
11 do a biopsy, No way to say whether he had
12 Barrett's or not.
13   Do you recall reading that?
14   MS. duPONT:
15     Object to form. And do you want to --
16   MR. GOZA:
17     Sure.
18   MS. duPONT:
19     -- show him the transcript?
20   MR. GOZA:
21     I'm happy to if he needs it. I'm just
22 asking right now if he remembers that.
23   THE WITNESS:
24     I don't. And I'd be happy to look at
25 the transcript.

Page 40

1 BY MR. GOZA:
2   Q. Sure.
3     And -- and maybe we can -- and we'll dig
4 it out. But maybe we can short-circuit this in
5 some way.
6     You're not saying that the bleed in this
7 case -- and can't say to a reasonable degree of
8 medical certainty that Barrett's esophagus caused
9 Mr. Boudreaux's GI bleed. True?
10   A. I think that in that -- when the -- when
11 the EGD was performed there was no bleeding noted
12 from the Barrett's esophagus. One cannot say with
13 certainty that was the etiology of the bleed.
14   Q. Okay. And that's what I wanted to make
15 sure of. When it comes time to talk in front of
16 the jury about what things can be said with
17 certainty, you're not going to tell the jury, I
18 can say to a reasonable degree of medical
19 certainty that this patient, one, had Barrett's
20 esophagus, or two, that Barrett's esophagus caused
21 his bleed.
22   MS. duPONT:
23     Object to form.
24 BY MR. GOZA:
25   Q. True?

Page 41

1   A. So I -- I think that's a two-part
2 question. So --
3   Q. It is.
4   A. -- Barrett's esophagus -- if I can focus
5 on that for a minute. Barrett's esophagus -- a
6 trained endoscopist can recognize Barrett's
7 esophagus on endoscopy. However, the definitive
8 diagnosis, as you stated Dr. Joshi had said in his
9 deposition, requires biopsy. So a trained
10 endoscopist is pretty -- is typically pretty sure
11 that he has Barrett's esophagus. He confirm -- he
12 or she confirms that with a biopsy.
13   Q. Okay. We'll just look at Page 42 of
14 Dr. Joshi's testimony. And if you look, there was
15 a question about Barrett's syndrome and how long
16 it took to develop. And I think Dr. Joshi
17 answers, I object, and then there's an answer. Do
18 you see that?
19     Then he says, "What is written in
20 endoscopy is -- I think that's only" suspicion.
21 "It doesn't say he had Barrett's." Do I -- "Did I
22 do a biopsy? I did not. So there's no way to say
23 whether he has Barrett's or not. What I can tell
24 you is endoscopically when we see that kind of
25 mucosa coming up . . . it could be Barrett's, but

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 42

1 what we do is . . . either take a sample" as "in
2 his case, someone who" had "just had a bleed, we
3 do not sample them. So all I could say is
4 suspicious. It's not confirmatory." It's not --
5 "It's just endoscopic visually . . ." And "I"
6 have not "given him a diagnosis."
7      Is that true?
8      MS. duPONT:
9          Object to form.
10     THE WITNESS:
11         That is what's written in Dr. Joshi's
12         deposition. And I believe that summarizes
13         pretty similarly to what I stated having
14         not had the deposition in front of me,
15         that Barrett's is -- is eventually a
16         biopsy-proven diagnosis. However, a
17         trained endoscopist like Dr. Joshi can
18         look at a lesion endoscopically and say
19         that this is likely Barrett's.
20 BY MR. GOZA:
21     Q. Okay. Since 2014, do you -- are you aware
22 that Mr. Boudreaux has been diagnosed with
23 Barrett's by anyone?
24     A. I did not see any mention of that in the
25 medical record.

Page 43

1     Q. Okay. And so what we do know is that
2 Dr. Joshi says what he saw endoscopy was
3 suspicious for it. True?
4     MS. duPONT:
5         Object to form.
6     THE WITNESS:
7         Those were the words used by Dr. Joshi
8         in his deposition, and those are the words
9         that I used in my report.
10 BY MR. GOZA:
11     Q. So you said "suspicious" for it. True?
12     A. That is correct.
13     Q. So as we sit here today, you're -- can't
14 -- you can't say to a reasonable degree of medical
15 certainty, one, that Mr. Boudreaux had Barrett's
16 syndrome on February 3rd of 2014; is that correct?
17     MS. duPONT:
18         Object to form.
19     THE WITNESS:
20         I think that that's a statement that
21         needs to be qualified. I didn't do the
22         endoscopy. And furthermore, I'm not an
23         endoscopist. But Dr. Joshi, who is a
24         trained endoscopist, saw a lesion that he
25         said was suspicious for Barrett's. A

Page 44

1     trained endoscopist can often make that
2     preliminary diagnosis. The definitive
3     diagnosis, however, as stated by me and
4     Dr. Joshi in his testimony, requires a
5     biopsy, which was not done at that time.
6 BY MR. GOZA:
7     Q. So going back to my point, Dr. Joshi uses
8 the word "suspicious." He doesn't say I believe
9 it was, I thought it was Barrett's; correct?
10     MS. duPONT:
11         Object to form.
12     THE WITNESS:
13         Dr. Joshi uses the word "suspicious
14         for."
15         But as an internist and someone who
16         takes care of patients, when an
17         endoscopist says that, there's a
18         reasonable likelihood that that patient in
19         fact does have Barrett's. Again, the
20         definitive diagnosis requires biopsy,
21         which was not done at this --
22 BY MR. GOZA:
23     Q. So going back to my question, is it your
24 testimony, do you intend to go in front of the
25 jury and say that to a reasonable degree of

Page 45

1 medical certainty you believe that Mr. Boudreaux
2 had Barrett's syndrome on February 3rd of 2014?
3     MS. duPONT:
4         Objection. Asked and answered.
5     THE WITNESS:
6         What I would state is that, again, as
7     I've said, a trained endoscopist can
8         recognize a lesion that is likely to be
9         Barrett's. I didn't do the endoscopy.
10         And I'm not an endoscopist. So I wouldn't
11         render an opinion other than to parrot
12         what was stated by Dr. Joshi.
13 BY MR. GOZA:
14     Q. Okay. And as I understand as well, that
15 it is not your intent to offer an opinion to a
16 reasonable degree of medical certainty that
17 Barrett's syndrome caused Mr. Boudreaux's bleed on
18 -- that was diagnosed on February 3rd, 2014; is
19 that --
20     MS. duPONT:
21         Object to form.
22 BY MR. GOZA:
23     Q. -- correct?
24     A. It's my intent to testify that Barrett's
25 cannot be ruled out as a source of bleeding.

Page 46

1 However, in that it was not bleeding at the time
2 of the -- at -- of the endoscopy, it's impossible
3 to say that that was definitively a source of
4 bleeding.
5    Q. Okay. So the answer to my question I
6 believe is yes, but let me make sure. Because --
7 I -- I understand what you say about cannot be
8 ruled out.
9       But it's not your intent to come in and
10 offer an opinion to a reasonable degree of medical
11 certainty that Barrett's syndrome was the cause of
12 Mr. Boudreaux's bleeding. Am I correct?
13    MS. duPONT:
14       Object to form. Asked and answered.
15    THE WITNESS:
16       I'm not go -- I -- I will not state
17    that Barrett's esophagus was definitively
18    the source of Mr. Boudreaux's bleeding.
19 BY MR. GOZA:
20    Q. You talk about -- in -- in reviewing the
21 records, you said that Mr. Boudreaux had a slight
22 anemia that could be related to iron deficiency
23 anemia or inflammatory anemia.
24       Did I read that correctly?
25    MS. duPONT:

Page 47

1       Where are you reading from?
2    MR. GOZA:
3       Page 9.
4    THE WITNESS:
5       So in my report on Page 9 I state a
6    couple things. Firstly and interestingly,
7    Mr. Boudreaux had a B12 deficiency that
8    was previously not diagnosed but
9    documented by lab -- by laboratory studies
10    done during admission for his GI bleed.
11    And then I go on to say his anemia could
12    have been due to either iron deficiency
13    and/or inflammatory anemia.
14 BY MR. GOZA:
15    Q. Yeah. I think that's what I asked.
16    So with respect to the B12 deficiency, did
17 anybody during Mr. Boudreaux's hospitalization
18 give Mr. Boudreaux a diagnosis of B12 deficiency?
19    A. In looking at the records --
20    MS. duPONT:
21       In what hospital diagnosis? I'm
22    sorry.
23    MR. GOZA:
24       Well, he was hospitalized on
25    February 3rd and February 4th of 2014. So

Page 48

1 I'm asking: During the time that he was
2 hospitalized and these labs that Mr. -- or
3 Dr. Kahn is pointing to were taken,
4 whether or not there was a diagnosis of
5 B12 deficiency given by the treating
6 physicians?
7    THE WITNESS:
8       There was a diagnosis of B12
9    deficiency made on February 4th by virtue
10    of the fact that his serum B12 level was
11    less than 146. That is how we diagnose
12    B12 deficiency.
13 BY MR. GOZA:
14    Q. Okay. Now, when you say his anemia could
15 have been due to either iron deficiency anemia or
16 inflammatory anemia, have you made some
17 determination that you intend to offer an opinion
18 at trial about as to which of these two things was
19 causing Mr. Boudreaux's -- what -- what was the
20 test that you said? I apologize. You just said
21 it, the -- the test.
22    A. Serum B12?
23    Q. Serum B12.
24    A. Yeah.
25    Q. That caused Mr. Boudreaux's serum B12, was

Page 49

1 it to be high or low?
2    MS. duPONT:
3       Object to form.
4    THE WITNESS:
5       So neither iron deficiency nor
6    inflammatory anemia contribute to a low
7    B12 level. That's a separate diagnosis.
8 BY MR. GOZA:
9    Q. Okay. Is it your testimony -- maybe I
10 just need to make sure I understand. Maybe you
11 were just noting the B12 deficiency.
12       Is it your testimony that the B12
13 deficiency played some role in Mr. Boudreaux's
14 bleed?
15    A. It is not my --
16    MS. duPONT:
17       Object to form.
18    THE WITNESS:
19       -- testimony that the B12 deficiency
20    played a role in his bleed.
21       It's my testimony that Mr. Boudreaux
22    has B12 deficiency that was not previously
23    diagnosed, and that could be the reason
24    for an anemia that he had even prior to
25    his GI bleed.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 50

1  BY MR. GOZA:
2      Q.  And B12 deficiency, in terms of causing
3  anemia, what -- what is the mechanism by which
4  that occurs?
5      A.  So B12 is cyanocobalamin.  It's a
6  cofactor.  And B12 is necessary for DNA synthesis.
7  It's necessary for several reactions.
8  Particularly cells of high turnover such as the
9  cells in the bone marrow require B12 for normal
10  maturation and development.  Patients who are B12
11  deficient can have a variety of symptoms, one of
12  which is anemia.  And they develop an anemia.  And
13  they can actually develop low white counts and
14  platelets as well because the absence of B12
15  inhibits the ability of the marrow to function
16  normally.
17      Q.  Okay.  So as I understand it, the anemia
18  that you noted -- I believe you described it as
19  mild anemia?
20      MS. duPONT:
21          Object to form.
22      THE WITNESS:
23          When are we talking about?
24  BY MR. GOZA:
25      Q.  February 2014.  And we can go back.  I

Page 51

1  think you say it earlier in your report.
2      A.  So when Mr. Boudreaux presents to the
3  hospital with a hemoglobin of 6.7, I would not
4  qualify --
5      Q.  Oh.
6      A.  -- that as a -- as a mild anemia.
7      Q.  Good -- yeah.  Good point, and I
8  appreciate you bringing that.
9          That is a fairly significant anemia.
10  True?
11      MS. duPONT:
12          Object to form.
13      THE WITNESS:
14          A hemoglobin of 6.7 for a man is a
15          significant anemia.
16  BY MR. GOZA:
17      Q.  With respect to the potential causes --
18  and I think you had mentioned he had had anemia
19  before his bleed -- his GI bleed.  True?
20      MS. duPONT:
21          Object to form.
22      THE WITNESS:
23          Before Mr. Boudreaux's bleed,
24          Mr. Boudreaux had a mild anemia.  Men have
25          a normal hemoglobin of 14 to 16 grams per

Page 52

1  deciliter.  Mr. Boudreaux was reasonably
2  consistently found to have hemoglobins
3  less than 14.
4  BY MR. GOZA:
5      Q.  Somewhere in the 13s?
6      A.  Correct.
7          Women have lower hemoglobins, but that's
8  not relevant to this --
9      Q.  And that's what I meant when I was talking
10  about your description of it as a mild anemia.
11  True?
12      A.  Thank you.  I just wanted to focus.
13      Q.  No.  And I -- I appreciate that.
14          So just so I understand, when we're
15  talking about that mild anemia that preexisted
16  Mr. Boudreaux's GI bleed, I think you've indicated
17  that there are potentially three causes of that in
18  your mind; is that right?
19      MS. duPONT:
20          Object to form.
21      THE WITNESS:
22          I think that those would be the -- I
23          think that there are three potential
24          causes for Mr. Boudreaux's preexisting
25          mild anemia, yes, B12 deficiency, iron

Page 53

1  deficiency, inflammatory anemia, or quite
2  frankly some combination of the -- the
3  above.  The only one that we know he has
4  for sure -- because the only lab test that
5  we have -- is low B12.  So we know he has
6  that.  Whether or not he has a coexistent
7  iron deficiency and/or inflammatory anemia
8  is less clear.
9  BY MR. GOZA:
10      Q.  Just in terms of the way -- and I -- I
11  want to communicate using your words.  We have --
12  you -- you've indicated that there are three
13  possibilities or even a combination of the three
14  that may be responsible for the mild anemia that
15  he had before his GI bleed.
16          Have I stated that correctly?
17      A.  You have stated that correctly.
18          If I could just clarify one point.
19  Patients with B12 deficiency have large red blood
20  cells, and the reason for that is as cells in the
21  bone marrow mature they progressively get smaller.
22  If there's a problem with DNA synthesis, the cells
23  don't normally get small like they should.  So a
24  patient with B12 deficiency, pure B12 deficiency,
25  I would expect the MCV, the mean cellular volume,

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 54

1  to be elevated.
2       The fact that Mr. Boudreaux's MCV was not
3  elevated and the fact that his RDW, an indication
4  of abnormalities in red cell size, was elevated,
5  suggest that -- suggests that Mr. Boudreaux has
6  more than just B12 deficiency.  Those other
7  etiologies include iron deficiency, inflammatory
8  anemia, or a combination of the two.  And without
9  iron studies prior to his bleed, it's really
10 impossible to discern which of the other two he
11 likely had in conjunction with B12 deficiency.
12      Q.  Okay.  So I think you probably answered my
13 question just now by indicating -- at this point
14 it's impossible to determine exactly what was the
15 cause of his mild anemia or whether it was a
16 combination of several conditions that were the
17 cause?
18      MS. duPONT:
19          Object to form.  Misstates his
20 prior --
21      THE WITNESS:
22          I think it's --
23      MS. duPONT:
24          -- testimony.
25      THE WITNESS:

Page 55

1          -- very -- I -- I -- no.  I think that
2  Mr. Boudreaux definitively had B12
3  deficiency.  That's --
4      MR. GOZA:
5          I understand.
6      THE WITNESS:
7          -- not in question.
8          I think that because his MCV is not
9  elevated, it's -- giving him the diagnosis
10 of B12 deficiency alone is problematic.
11 So I think he has B12 deficiency, then he
12 has either one of or both of iron
13 deficiency and inflammatory anemia.  And
14 whether he just has inflammatory anemia in
15 addition to B12 deficiency or just has
16 iron deficiency in addition to B12
17 deficiency or all three is impossible to
18 determine.  There's no question that he
19 has B12 deficiency.
20      MR. GOZA:
21          Got it.
22      THE WITNESS:
23          And there's no question that -- the
24 fact that he doesn't have an elevated MCV
25 and has an elevated RDW, that there's

Page 56

1  something else going on.  And that's
2  either one of iron deficiency,
3  inflammatory anemia, or a combination.
4          And that part is what's impossible --
5  BY MR. GOZA:
6      Q.  And --
7      A.  -- to determine.
8      Q.  And I think I understood that part of your
9  testimony.  I just want to make sure I'm clear on
10 one thing.
11          With respect to causing the anemia --
12      A.  Correct.
13      Q.  -- is it your -- have you discerned
14 whether it is the B12 that's causing the anemia or
15 the B12 in combination with other -- some -- one
16 of these other conditions that -- that he might
17 have that's causing it?
18      A.  So --
19      MS. duPONT:
20          Object to the form.
21      THE WITNESS:
22          So as an etiology of his anemia, he
23 definitely has B12 deficiency as a cause
24 of his anemia.  That's not in question.
25 But he doesn't have B12 deficiency alone

Page 57

1  because his MCV isn't elevated.  As a
2  cause of anemia, again, he has either iron
3  deficiency, inflammatory anemia, or a
4  combination in addition to B12 deficiency.
5  BY MR. GOZA:
6      Q.  And at trial, are you going to try to
7  separate out which of those three that he has in
8  addition to B12 deficiency --
9      MS. duPONT:
10          Object to form.
11 BY MR. GOZA:
12      Q.  -- other than what you just said to me?
13      A.  It's not possible to determine whether or
14 not Mr. Boudreaux had, in addition to B12
15 deficiency, iron deficiency, or -- and/or
16 inflammatory anemia without iron studies and a
17 serum ferritin, which are not provided prior to
18 his admission to the hospital for his GI bleed.
19      Q.  And to your knowledge, at least with the
20 records you've been provided up to November of
21 2016, you haven't seen anyone do those studies?
22      MS. duPONT:
23          Object to form.  Misstates the record.
24      MR. GOZA:
25          Well, if I do, I want to know.  That's

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 58

1  why I'm asking.
2  BY MR. GOZA:
3  Q. Is there -- is there -- if I've misstated
4  the record, I want to be clear.
5  Is there some study that's been done that
6  -- that clarifies this issue for you that I don't
7  know about?
8  MS. duPONT:
9  I -- I'm objecting to the fact that it
10  was never done, the -- the --
11  MR. GOZA:
12  Well, no.  No.  I know --
13  MS. duPONT:
14  -- ferritin.
15  MR. GOZA:
16  -- it was done back in --
17  MS. duPONT:
18  Okay.
19  MR. GOZA:
20  -- the hospital.
21  BY MR. GOZA:
22  Q. I'm saying since the hospitalization --
23  I'm simply asking:  You have seen -- you've seen
24  some other study -- iron study that's been done
25  that would clarify this issue in any way for you?

Page 59

1  A. So to diagnose whether or not
2  Mr. Boudreaux in addition to B12 deficiency had
3  iron deficiency, inflammatory anemia, or both
4  would require a serum iron, total iron binding
5  capacity, and ferritin.  And to the best of my
6  ability to review the records, I could not find
7  those numbers recorded prior to February of 2014.
8  Q. Going to Page 9 of your report,
9  Paragraph 3.
10  A. I see where you're -- yes.
11  Q. Okay.  And -- and it says, "Mr. Boudreaux
12  presented with symptoms of a GI bleed on
13  February" 3rd, "2014, but the symptoms of that
14  bleed had been going on for at least a week prior
15  to his presentation."
16  Which symptoms is it that you believe had
17  been going on a week?
18  A. Let me refer back to my expert report.  So
19  specifically on Page 7, "Mr. Boudreaux reported
20  that he had felt well until 2 weeks following his
21  discharge . . . when he began to experience
22  slow-onset weakness, dizziness over the following
23  week with 2 episodes of black tarry stool and only
24  2 bowel movements that week."  It's based on that
25  report by Mr. Boudreaux that I make that

Page 60

1  statement.
2  Q. Okay.  And on February 3rd, when he
3  reported to Dr. Wong's office, he reported the --
4  the black stools to be over the last three days.
5  Is that not true?
6  MS. duPONT:
7  Object to form.
8  BY MR. GOZA:
9  Q. I'm just looking at your report.  Go down
10  -- if you look at Page 6, Paragraph 4.
11  A. So on Paragraph 4 on Page 6 -- I'd have to
12  look at the original hospital reports.  Because
13  what I say is that "Mr. Boudreaux presented to
14  Dr. Wong's office with reports that he was very
15  weak for 3 days with very black stools and
16  constipation for 3-4 days."  And I don't know if
17  the black stools go with the constipation for
18  three to four days.  And I -- I don't know if --
19  if the black stools predated the three or
20  four days.
21  But certainly he had symptoms of anemia,
22  according to the medical record when he presented
23  to the hospital with his GI bleed.
24  Q. I was just -- in terms of at least the
25  exact timing of some of those, you'd at least

Page 61

1  agree there's some inconsistency in the records?
2  And I'm not talking --
3  MS. duPONT:
4  Object to the form.
5  BY MR. GOZA:
6  Q. -- about your report, but the medical
7  records.  True?
8  MS. duPONT:
9  Object to form.
10  THE WITNESS:
11  I -- I agree that there's some
12  inconsistency as to when he actually had
13  his black tarry stools.  I think the
14  record's pretty consistent with about a
15  two-week history or so of slow onset
16  weakness and dizziness.
17  BY MR. GOZA:
18  Q. Be -- he had been in to see Dr. Wong on
19  January 24th.  True?
20  A. On January 24th, according to my notes, he
21  presented to Dr. Wong for a follow-up visit.
22  Q. Okay.  So that was in late -- nine days
23  before?
24  A. Correct.
25  Q. And there's no indication in Dr. Wong's

PROTECTED — SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 62

1 letter or notes of that date that he was
2 complaining of anything related to dizziness,
3 weakness, difficulty with stools?
4    A. I do not see anything in my notes. And to
5 the best of my recollection of the original
6 record, I don't -- I don't see any evidence that
7 he had reported those symptoms. No.
8    Q. So going back to my original question,
9 would you agree there are at least -- there is
10 some inconsistency in the records as to when
11 exactly Mr. Boudreaux's symptoms of anemia
12 started?
13    MS. duPONT:
14       Object to form.
15    THE WITNESS:
16       I think that clearly the symptoms
17    began a period of time before
18    presentation. The exact timing is
19    difficult, as it typically is with
20    patients. They don't -- they -- they
21    can't often point to a specific time that
22    they start to feel weak. It's a -- it's
23    gradual and takes some time. So with
24    these sorts of patients, it's not atypical
25    that they can't directly pinpoint when

Page 63

1    symptoms started.
2 BY MR. GOZA:
3    Q. And I think that -- that -- that's my
4 point.
5       The -- this isn't necessarily surprising
6 to you, to see that kind of inconsistency. True?
7    MS. duPONT:
8       Object to form.
9    THE WITNESS:
10       It's not surprising that when a
11    patient with a GI bleed is asked on
12    separate occasions by different
13    physicians, that they can't precisely
14    pinput -- pinpoint the exact onset of
15    symptoms.
16 BY MR. GOZA:
17    Q. And from the -- the patient's standpoint,
18 oftentimes there can be -- it -- it -- it's
19 accumulation of -- of symptoms that give rise to a
20 concern about what's going on with them. Is that
21 fair to say?
22    MS. duPONT:
23       Object to form.
24    THE WITNESS:
25       I -- I think you're going to have to

Page 64

1    be a bit more specific.
2 BY MR. GOZA:
3    Q. Sure. Sure. Let -- this morning, before
4 I ate breakfast I felt weak. I -- I don't believe
5 I was having any GI bleed. I wouldn't go report
6 it. But if I had it throughout a couple of days,
7 it might affect me or I may think of it
8 differently.
9       So my point is: When you're talking about
10 some of these symptoms, they might not set off
11 ringing bells in a -- in a patient immediately.
12    MS. duPONT:
13       Object to --
14 BY MR. GOZA:
15    Q. Is that fair?
16    MS. duPONT:
17       Object to form.
18    THE WITNESS:
19       So I think for you in particular we
20    could do a stool guaiac, but I don't think
21    that's what you're asking us to do.
22    MR. GOZA:
23       I'm not asking to do a rectal exam
24    either. So none of those things are on
25    the table today.

Page 65

1    THE WITNESS:
2       Just wanted to make sure.
3       I think anemia can have a rather
4    insidious onset, and often it's difficult
5    to pinpoint the exact onset of symptoms.
6    MR. GOZA:
7       Thank you.
8    MS. duPONT:
9       We're almost about at an hour. So
10    whenever you want to take a break or if
11    you want to finish up . . .
12    MR. GOZA:
13       I'm finished up that part, so we can
14    take a break right now.
15    MS. duPONT:
16       Okay.
17    THE VIDEOGRAPHER:
18       We're now off the record at 9:33.
19    (Brief recess was taken.)
20    THE VIDEOGRAPHER:
21       This is the beginning of Tape 2.
22    We're now back on the record. The time is
23    9:49.
24 BY MR. GOZA:
25    Q. Doctor, we had a short break.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 66

1 Are you ready to continue?
2 A. I am.
3 Q. Okay. A few questions.
4 It looks like that you had the opportunity
5 to read Dr. Fail's deposition in the course of
6 your preparation today. Is that true?
7 A. Yes. Although if you're going to ask me
8 specifics, I'll need to see the specific
9 reference.
10 Q. Sure. I was going to read you a specific
11 reference and just ask you if you agreed or
12 disagreed or something.
13 First of all, do you know Dr. Fail?
14 A. I don't.
15 Q. Okay. Do you know -- I assume from
16 reading his deposition you know him to be a
17 cardiologist?
18 A. That's correct.
19 Q. With respect to prescribing Xarelto, as I
20 understand it, you generally would not be the
21 primary person prescribing Xarelto for a patient
22 for atrial fibrillation; is that correct?
23 MS. duPONT:
24 Object to form.
25 THE WITNESS:

Page 67

1 So typically patients with atrial
2 fibrillation present either to their
3 primary care provider or their
4 cardiologist, and they're going to be the
5 physicians that initiate anticoagulation
6 in those patients. But in that I still
7 practice internal medicine as well as
8 hematology, I see patients who are on
9 these drugs with atrial fibrillation.
10 BY MR. GOZA:
11 Q. Got it. I -- I -- and I think -- I
12 just -- I want to make sure I -- I ask my question
13 fairly specifically.
14 I understand that you maintain -- how --
15 how many patients do you see in your general
16 internal medicine practice? What percentage of
17 your patient population is that?
18 A. So I'm going to need to qualify that a
19 little bit. I have my own clinic, which is
20 predominantly nonmalignant hematology patients.
21 I'm a -- I -- I do rounds on the consultation
22 service, which are predominantly, this year,
23 hematology, both malignant and nonmalignant
24 hematology, as well as oncology. But I also
25 attend periodically -- not this year, but

Page 68

1 periodically attend on the internal medicine
2 service. And I attend a teaching conference for
3 internal medicine residents several times a month.
4 Q. So going back -- I -- I -- I'm taking all
5 of these qualifications. I'm just trying to get
6 an estimate of how many patients you would see as
7 part of your general practice versus your
8 subspecialty of hematology/oncology.
9 A. I'd say about 80 percent of my patients
10 are subspecialty, and 20 percent would be general
11 medicine.
12 Q. And as I understand it, as part of that
13 20 percent of general medicine patients, some of
14 those might be patients that have atrial
15 fibrillation and who had been placed on an
16 anticoagulant by either their primary care
17 physician or their cardiologist?
18 MS. duPONT:
19 Object to form.
20 THE WITNESS:
21 So the patients that I see with atrial
22 fibrillation tend to be placed on
23 rivaroxaban by their primary care provider
24 or cardiologist.
25 BY MR. GOZA:

Page 69

1 Q. Generally speaking, you would not be the
2 physician who would prescribe an anticoagulant for
3 a patient who had been newly diagnosed with atrial
4 fibrillation?
5 MS. duPONT:
6 Object to form.
7 THE WITNESS:
8 Generally patients with new onset
9 atrial fibrillation don't present to a
10 hematologist, so they would be prescribed
11 their anticoagulant initially by a
12 cardiologist or a primary care provider.
13 MS. duPONT:
14 Excuse me.
15 BY MR. GOZA:
16 Q. Let me ask this question -- or strike
17 that.
18 This question was asked of -- of Dr. Fail.
19 It said, If you looked at the whole host of
20 anticoagulants, many of them work in different
21 ways; correct?
22 And he says, Correct.
23 That's a given in medicine. True? We can
24 all agree with that?
25 A. I think that there are --

Page 70

1    MS. duPONT:
2        Objection.
3    THE WITNESS:
4        -- different drugs that work in
5    different ways.
6  BY MR. GOZA:
7    Q.  And I -- the question was asked:  "And"
8  have you seen "patients that have had a bleed on
9  one anticoagulant be placed on another
10 anticoagulant and be able to tolerate that, true?"
11       And he said, "That is true."
12       Has that been consistent with your
13 experience as well?
14    MS. duPONT:
15       Object to form.  Are you going to read
16    a bunch of Q-and-A from that or . . .
17    MR. GOZA:
18       One more.
19    THE WITNESS:
20       So I think that there are patients who
21    develop a complication from one drug and
22    can be placed on another drug in class and
23    not have that complication.  These are
24    clinical judgments and very
25    patient-specific.  So I think rather than

Page 71

1    saying that I would do that all the time
2    or never, these are clinical judgments
3    that are patient-specific.
4  BY MR. GOZA:
5    Q.  Right.  My only point was -- and I think I
6  ended the question with him, is "simply because
7  you have a bleed on one anticoagulant doesn't mean
8  you're going to bleed on every anticoagulant,
9  true?"
10       And he says, "That seems to be the case,
11 yes sir."
12    MS. duPONT:
13       Object to form.
14 BY MR. GOZA:
15    Q.  Do you agree with that?
16    MS. duPONT:
17       Object to form.
18    THE WITNESS:
19       Because bleeding is -- is sporadic, I
20    think -- I -- I think that there are
21    patients who bleed on an anticoagulant,
22    and then after a period of time, when the
23    underlying lesion is allowed to heal, they
24    can sometimes be placed on another
25    anticoagulant.  Again, whenever we

Page 72

1    anticoagulate somebody, we're weighing the
2    relative risk of bleeding versus the
3    relative risk, in the case of atrial
4    fibrillation, of stroke prevention.  And
5    this is a balance and a clinical decision
6    that we make for each patient.
7  BY MR. GOZA:
8    Q.  Got it.  And I -- and I understand that --
9  that, balancing the -- the risk-benefit analysis.
10       What I -- what I'm simply saying here,
11 though, is:  Simply because you had a bleed on one
12 anticoagulant does not mean that you are going to
13 bleed on every anticoagulant.  Is that true?
14    MS. duPONT:
15       Objection.  Asked and answered.
16    THE WITNESS:
17       I think that without the empirical
18    trial of putting somebody on another
19    anticoagulant and seeing if they bleed --
20    I think certainly bleeding can vary
21    between anticoagulants.
22 BY MR. GOZA:
23    Q.  And in fact, when you look -- and I -- and
24 I was in your -- your preparation list, not so
25 much for this deposition.  But for your general

Page 73

1  deposition, I think you read the labels for
2  Xarelto; is that correct?
3    A.  I have read the label for rivaroxaban.
4  Yes.
5    Q.  Okay.  And I -- I refer to it as Xarelto.
6  But that's the -- the trade name.  True?
7    A.  I -- I have -- have historically
8  throughout my training always used generic --
9  generic names.  It's just something that I do
10 and --
11    Q.  And -- and I --
12    A.  -- and encourage my trainees to do.
13    Q.  Sure.  I'm fine with that.  I just want to
14 make clear for the record --
15    A.  Rivaroxaban and Xarelto are, for this
16 deposition, the same.
17    Q.  That's -- that was the point I wanted to
18 clarify.  Thank you for being a step ahead of me.
19       Anyway, you've had an opportunity to see
20 the labels.  Is that true?
21    A.  I have.
22    Q.  With respect to the 2015 label, there is a
23 table in the label that relates to bleeding events
24 on ROCKET.  And I can --
25    MR. GOZA:

Page 74

1  You have it?
2  MS. KINGSDORF:
3  (Tenders document.)
4  MR. GOZA:
5  I don't have enough for everybody.
6  Sorry.
7  BY MR. GOZA:
8  Q. If you look at Page 4.
9  MS. duPONT:
10  And you're marking this as Exhibit 4,
11  Kirk?
12  MR. GOZA:
13  Yes, ma'am.
14  (Exhibit No. 4 was marked for
15  identification and attached hereto.)
16  (Mr. Goza and Ms. Kingsdorf confer outside
17  the hearing of the court reporter.)
18  MR. GOZA:
19  Oh. Wait a minute. I have two six --
20  okay. I apologize. Hold on a minute.
21  Let me look at something real quick. I
22  think I got -- I -- I have the -- a
23  different one in hand. Here we go.
24  BY MR. GOZA:
25  Q. If you look at Page 11 on Exhibit 4.

Page 75

1  A. Okay.
2  Q. It has a listing at Table 1 of bleeding
3  events in ROCKET, and that was the atrial
4  fibrillation trial, the clinical trial related to
5  rivaroxaban. True?
6  A. Table 1 is labeled "Bleeding Events in
7  ROCKET AF - On Treatment Plus 2 Days."
8  Q. Okay. So here, if we look at
9  gastrointestinal bleeds, it shows that there was a
10  1.61 or essentially a 61 percent increase in
11  bleeds on Xarelto over warfarin; is that correct?
12  A. That's actually not correct.
13  What it shows is that the 95 percent
14  confidel -- confidence interval for the relative
15  risk of gastrointestinal bleeding comparing
16  Xarelto versus warfarin has a mean of 1.61 with a
17  range of 1.3 to 1.99.
18  Q. Okay. So what does that in effect mean?
19  Tell me what it --
20  A. When we talk about relative risk, what we
21  are looking at is a relative risk of an event
22  happening in this case on Xarelto versus rivar --
23  versus warfarin. If in fact the bleeding risk --
24  if in fact the relative risk is the same, we're
25  going to have a confident -- we're going to have a

Page 76

1  relative risk of 1.0. Relative risks are always
2  expressed as a range, typically the 95 percent
3  confidence interval as expressed in this chart.
4  So the 95 percent confidence interval, meaning
5  that the relative risk of bleeding on Xarelto
6  versus warfarin ranges from 1.3 to 1.99. And with
7  95 percent confidence, one can say it would be in
8  that range.
9  Q. Okay. So the -- first of all, let --
10  let's make sure just so I understand -- and I -- I
11  will grant you that -- that I'm not the -- have
12  the knowledge of epidemiology that you do.
13  But as I understand it, there is a term
14  called "statistically significant." True?
15  A. There is a term called "statistically
16  significant."
17  Q. In order for --
18  A. Right.
19  Q. -- a number to be statistically
20  significant, it needed to have a 1 in the
21  parameter of the ranges?
22  MS. duPONT:
23  Object to form.
24  MS. MOORE:
25  Objection.

Page 77

1  THE WITNESS:
2  So I don't --
3  MR. HOGUE:
4  Objection.
5  THE WITNESS:
6  I -- I disagree with that statement.
7  There are different ways to look at
8  statistical significance depending on --
9  on -- on what you're trying to do. We
10  often use p-values. We sometimes use
11  chi-squares.
12  For a confidence interval like this,
13  what you want for something to be
14  significant is you want the range to not
15  include 1. If the range includes 1, that
16  means it's not statistically significant.
17  That means within the 95 percent
18  confidence interval there is a likelihood
19  that the two are in fact the same.
20  BY MR. GOZA:
21  Q. So is it your testimony with respect to GI
22  bleeding that on this chart -- tell me what's the
23  one -- or strike that.
24  Let me ask it this way: Does this
25  indicate that there is a range of increased risk

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 78

1 from 1.3 to 1.99 of Xarelto versus warfarin?
2    A.  So ROCKET AF concluded that in patients
3 treated with rivaroxaban there was an increased
4 risk of gastrointestinal bleeding.  However, there
5 was a markedly decreased risk of fatal bleeding
6 and a markedly decreased risk of intracranial
7 hemorrhage.  And it was for that reason that the
8 drug is approved and used.
9       (Cellular phone interruption in the
10       deposition.)
11      MR. GOZA:
12         Sorry about that.  We had a short --
13      my phone went off.
14 BY MR. GOZA:
15    Q.  Okay.  So I -- but I just want to make
16 sure that I understand.
17      With respect to gastrointestinal bleeding,
18 am I correct that there's --
19      MR. HOGUE:
20         Do you need that?
21 BY MR. GOZA:
22    Q.  -- an increased risk shown in the ROCKET
23 study of gastrointestinal bleeds of Xarelto over
24 warfarin?
25    A.  The ROCKET AF trial showed that patients

Page 79

1 treated with rivaroxaban had an increased risk of
2 gastrointestinal bleeding compared with warfarin.
3    Q.  And that risk -- that increased risk was
4 from -- somewhere between a range of 1.3 to 1.99;
5 correct?
6    A.  It --
7      MS. duPONT:
8         Object to form.
9      THE WITNESS:
10         That risk of bleeding, the 95 percent
11      confidence intervals show a relative risk
12      of 1.3 to 1.99.
13 BY MR. GOZA:
14    Q.  And the -- is -- the 1.61, does that
15 represent the average or mean?
16    A.  Statistically it's -- it's really more
17 complicated than that.  Well, 1.61 would be sort
18 of a mean score.  But the 95 percent confidence
19 intervals don't necessarily suggest that 1.61's
20 exactly in the middle.  That's not the way we do
21 confidence intervals.  But 1.61 would be the mean
22 score, if you want to use that term.
23    Q.  And the mean score would mean what
24 exactly?
25    A.  That the relative risk of gastrointestinal

Page 80

1 bleeding in patients treated with rivaroxaban,
2 according to ROCKET, was 1.61.
3    Q.  And does that mean that with respect to
4 patients on Xarelto or rivaroxaban they would have
5 an increased risk of the mean being 60 percent
6 more than a patient on warfarin to bleed?
7      MS. duPONT:
8         Object to form.
9      THE WITNESS:
10         It's that 60 percent that I disagree
11      with.  They did not have 60 percent more
12      bleeds.  That's not a correct
13      interpretation of the statistics.  Let's
14      stick with relative risks.
15         The relative risk is 1.61.  And that
16      is -- the 95 percent confidence intervals
17      of that relative risk of 1.61 range
18      between 1.3 and 1.99.  That's the right
19      way of looking --
20      MR. GOZA:
21         Okay.
22      THE WITNESS:
23         -- at this.
24 BY MR. GOZA:
25    Q.  And "relative risk" means what?

Page 81

1    A.  "Relative risk" means risk in the treated
2 population -- in this case, risk in the treated
3 patient population treated with rivaroxaban over
4 the risk in the population treated with warfarin.
5    Q.  Got it.
6      And in terms of -- I think you said that
7 the study showed that there was an increased risk
8 of bleed -- gastrointestinal bleeding in Xarelto
9 versus warfarin.  And if I were to ask you what is
10 that increased relative risk, your answer would
11 be . . .
12      MS. duPONT:
13         Object to form.
14      THE WITNESS:
15         According to ROCKET AF, the relative
16      risk of increased gastrointestinal
17      bleeding was 1.6.  But I would qualify
18      that to say some post-marketing studies
19      suggest that that relative risk is
20      actually considerably lower.
21         ROCKET AF is a -- as in any other
22      clinical trial, patients are followed
23      extraordinarily closely.  So patients in
24      the real world don't have, for example,
25      stool guaiacs looking for blood every day.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 82

1 Patients in a clinical trial have periodic
2 monitoring because of the importance in
3 getting the best data that you can as part
4 of a clinical trial.  So some of these
5 risks are overestimated by a clinical
6 trial.  And I think sometimes you have to
7 look at real-world data to make a clinical
8 decision.
9        MR. GOZA:
10            Okay.  And I'm going to move to strike
11        as nonresponsive.
12 BY MR. GOZA:
13    Q.  But let me go back and say:  Just based
14 upon Exhibit 4 and the data provided in the ROCKET
15 study and what's contained in the label that the
16 defendants in this case put out to physicians and
17 to others and -- and to others using the -- the
18 medication, what do they say to them about the
19 increased risk of gastrointestinal bleed of
20 Xarelto over warfarin based on the ROCKET study?
21        MS. duPONT:
22            Object to form.
23        THE WITNESS:
24            So there were a lot of qualifications
25        in that question.  I'm going to ask you to

Page 83

1        repeat it.
2 BY MR. GOZA:
3    Q.  Sure.  Absolutely.
4        I -- I -- I'm simply saying if we look at
5 the document which has been marked as Exhibit 4 --
6 that's the official label of Xarelto.  True?
7    A.  That is correct.
8    Q.  And it's -- it's -- when we're talking
9 about label, that's what the company sends out to
10 physicians to tell them things about the drug.
11 True?
12        MS. duPONT:
13            Object to form.
14        THE WITNESS:
15            I don't believe that they're sent out.
16        If they're sent out, I don't get such
17        mailings.  Maybe they are.  But this is
18        what is in the product label.  This is
19        what is in the Physicians' Desk Reference.
20        This is what can be found online.
21 BY MR. GOZA:
22    Q.  Got it.
23        So this is what the company -- maybe
24 you're correct in saying they don't send them out.
25 But in terms of the public, it's out there for

Page 84

1 consumption, their representations as to the drug.
2 True?
3        MS. duPONT:
4            Object to form.
5        THE WITNESS:
6            The product label is made available to
7        the public for any FDA-approved drug.
8 BY MR. GOZA:
9    Q.  Okay.  And with respect to the product
10 label, what it basically -- what you've indicated
11 here is the relative risk in a patient taking
12 Xarelto is 1.6 over the relative risk presented to
13 a patient of gastrointestinal bleeding with
14 warfarin.
15        MS. duPONT:
16            Object to form.
17 BY MR. GOZA:
18    Q.  True?
19    A.  According to ROCKET AF, again, a clinical
20 trial done very carefully, not a real-world study,
21 there was -- the relative risk of bleeding on
22 rivaroxaban was 1.6 when compared to warfarin.
23    Q.  And have you seen -- strike that.
24        Do you know who Neena Abrahams is or
25 Abraham?

Page 85

1    A.  I do not.
2    Q.  Have you read any of the studies that
3 she's published on Xarelto or any of the other
4 NOACs?
5    A.  You'll have to show me a --
6        MS. duPONT:
7            Object to form.
8        THE WITNESS:
9            -- particular study, and I can tell
10        you if I've read it.
11 BY MR. GOZA:
12    Q.  If we go to Page 9 of your report, you say
13 "There is no way to rule out that" -- "that the
14 same GI bleed Mr. Boudreaux experienced, would
15 have happened if he was taking any other
16 anticoagulant, including a vitamin K" inhibitor
17 "like warfarin or another NOAC."
18        Did I read that correctly, first?
19    A.  You read that correctly.
20    Q.  Okay.  You would agree that there are
21 differences between the NOACs and their relative
22 risk of bleeding as it pertains to
23 gastrointestinal bleeding?
24        MS. duPONT:
25            Object to form.

Case 2:14-md-02592-EEF-MBN Document 5399-12 Filed 02/10/17 Page 24 of 43

Page 86

1  THE WITNESS:
2      I would actually disagree with that
3  statement.
4      The only way to make such a statement
5  is in a study that directly compares one
6  DOAC with another. No such study has ever
7  been done. And in fact, a recent review
8  in Blood that came out December 22nd
9  looking at atrial fibrillation made the
10  exact same statement: There is no data
11  available to compare one DOAC versus
12  another. In the studies that -- that
13  appear in the literature, they're compared
14  directly with warfarin.
15 BY MR. GOZA:
16  Q. So you've never seen a study comparing
17 head to head the different NOACs and their
18 relative risk of bleeding?
19  A. I have never seen --
20  MS. duPONT:
21      Object to form.
22  THE WITNESS:
23      -- nor is there a prospective study
24  that directly compares one NOAC to another
25  DOAC.

Page 87

1 BY MR. GOZA:
2  Q. Are there any retrospective studies?
3  A. There are retrospective studies. The
4 problem with the retrospective studies is the
5 populations of patients in the two groups are not
6 the same.
7      So the way that you do a study to
8 determine if one drug is better or worse than
9 another drug is a prospective -- randomized
10 blinded prospective study.
11      The problem with retrospective studies
12 like you -- like you state is that the populations
13 of the two -- they're either typically
14 case-control or cohort studies, and the
15 populations are not the same.
16  Q. Are there efforts to balance the various
17 baseline characteristics that exist amongst the
18 cohorts in the study?
19  MS. duPONT:
20      Object to form. Are you going to show
21  him a particular study?
22  MR. GOZA:
23      Not yet.
24  THE WITNESS:
25      So there are ways in either a cohort

Page 88

1  or a case control study to try to balance
2  those types of variables. One can do
3  propensity analysis and other types of
4  analysis. The problem is you're still
5  left with the fact that the populations
6  aren't the same because you haven't made
7  an effort to make the populations the same
8  at the time that you initiate the study.
9 BY MR. GOZA:
10  Q. So to your knowledge -- and you would
11 agree that many -- or strike that.
12      Many prospective studies are sponsored by
13 pharmaceutical companies?
14  MS. duPONT:
15      Object to form.
16  THE WITNESS:
17      Prospective studies are sponsored by a
18  lot of groups. Because of the expense
19  needed to undertake a prospective study,
20  they're frequently sponsored by
21  pharmaceutical companies. Sometimes
22  they're sponsored by national groups, if
23  they have the money and the inclination to
24  do the study. And sometimes they're
25  sponsored by the NIH, through grant

Page 89

1  funding. There's multiple mechanisms to
2  do a prospective study. But I would not
3  disagree that pharmaceutical companies
4  sponsor prospective studies.
5 BY MR. GOZA:
6  Q. Okay. And that's why I want to -- to get
7 to.
8      So you would agree with me that
9 pharmaceutical companies do sponsor prospective
10 studies. True?
11  A. As do other groups, yes, I would agree.
12  Q. And you would agree, at least, to your
13 knowledge, no pharmaceutical company has sponsored
14 a prospective study evaluating the NOACs and their
15 relationship to each other in terms of potential
16 risk?
17  MS. duPONT:
18      Object to form.
19  THE WITNESS:
20      I'm going to say that there are -- no
21  one has sponsored a prospective study
22  comparing one DOAC to another to evaluate
23  their prospective risk, no one.
24 BY MR. GOZA:
25  Q. So we have no prospective studies upon

Page 90

1  which to evaluate the relative safety factors with
2  respect to the NOACs. True?
3      MS. duPONT:
4        Object to --
5      MS. MOORE:
6        Object.
7      MS. duPONT:
8        -- form.
9  BY MR. GOZA:
10     Q. No prospective study?
11     A. I would agree, as would the authors of an
12 article that appeared in Blood recently, that
13 there are no prospective studies that have --
14 there are no prospective randomized studies
15 comparing one DOAC to another with respect to
16 efficacy and safety.
17     Q. And you -- you mentioned this a couple
18 times now, this article that appeared in Blood
19 recently. Is that something on your reliance
20 list?
21     A. Because the article came across my desk on
22 Monday, it is not -- I believe the first author is
23 Steinberg. I believe the title of the article was
24 "How I treat Atrial Fibrillation" or something to
25 that extent -- something along those lines.

Page 91

1      Q. Is that something that you're relying on
2  in formulating or making any of your opinions here
3  today?
4      A. That's something that substantiates an
5  opinion and actually a fact with what's available
6  in the medical literature. So I'm not relying on
7  it. It substantiates my statement.
8      Q. To the extent you're using it to
9  substantiate your statement, did you happen to
10 bring a copy with it -- with you today?
11     A. I did not.
12     Q. But your testimony is that the first -- is
13 it -- the only author is Steinberg?
14     A. I believe that's the name of the author,
15 and I'm not sure. Those usually don't have very
16 many authors. He might have been the sole author.
17     Q. And when you say "those," what do you mean
18 by "those"?
19     A. Thank you for allowing me to clarify.
20     The American Society of Hematology's
21 journal, Blood, has a section called "How I
22 Treat." And the How-I-Treat articles don't
23 typically have many authors and sometimes have a
24 single author.
25     Q. And are these -- these How-I-Treat, tell

Page 92

1  me what -- what is the nature of -- of their
2  publication. Maybe -- let me ask that -- that's
3  not a very well-worded question. I'll ask it
4  again.
5      What I'm -- I'm getting at is here: Is
6  this intended to be some peer-reviewed medical
7  article on a subject, or is it simply one
8  physician's, Here's -- here's what I do, and give
9  it thought?
10     MS. duPONT:
11        Object to form.
12     THE WITNESS:
13        Blood is a leading journal based on
14     its impact factor in hematology not only
15     in the United States but in the world. As
16     such, every article undergoes very
17     scrupulous peer review. The How-I-Treat,
18     the difference is is that the author --
19     authors sometimes are selected by the
20     editors of Blood to address a particular
21     topic. But these go through an an -- as
22     equal as -- as equally strenuous a
23     peer-review process as any article in
24     Blood, which again is really the journal
25     with the highest impact factor in our

Page 93

1      field.
2  BY MR. GOZA:
3      Q. All right. And if one doesn't have
4  randomized prospective studies, are there other
5  second tier studies that one can look to to try
6  and evaluate or get an assessment about what the
7  relative risk safety factors are with respect to
8  the NOACs?
9      A. I think it's only speculation at that
10 point in the absence of a head-to-head randomized
11 trial.
12     Q. So if it's only speculation, is it your
13 position at this point that it is speculation to
14 say that with respect to the NOACs they all have
15 the same relative risks as it pertains to
16 gastrointestinal bleeds?
17     MS. duPONT:
18        Object to form.
19     THE WITNESS:
20        It's my contention that we don't know
21     whether one DOAC is better or worse with
22     respect to safety or efficacy when
23     compared to another in the absence of a
24     prospective head-to-head blinded trial.
25 BY MR. GOZA:

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 94

1    Q.  Okay.  Meaning if there is a difference,
2  you can't tell us what that difference is amongst
3  the NOACs.  Is that true?
4       MS. duPONT:
5          Object to form.
6       MS. MOORE:
7          Object to form.
8       MR. GOZA:
9          Let me rephrase the question because
10         it was a little ambiguous anyway.
11  BY MR. GOZA:
12    Q.  If there is a difference in terms of
13  safety profiles with respect to gastrointestinal
14  bleeding amongst the NOACs, you're unable to
15  identify what that is for us here today.  True?
16       MS. duPONT:
17          Object to form.
18       THE WITNESS:
19          It's my contention that in the absence
20         of a head-to-head trial, one cannot affect
21         -- one cannot adequately assess the safety
22         and efficacy of one DOAC compared to
23         another.
24  BY MR. GOZA:
25    Q.  In other words, there may be -- it -- it

Page 95

1  may be that -- when you use the word "DOAC" --
2  "DOAC," let's just define that for the jury.
3  Direct oral anticoagulant.  True?
4    A.  That is correct.  This field has gone
5  through some changes.  And -- and -- and I think,
6  according to the International Society of
7  Thrombosis and Haemostasis, the official term is
8  now "DOAC," direct oral anticoagulant.  I will
9  sometimes slip and say "NOAC."  But NOAC, DOAC are
10  the same thing, and I try to use the term "DOAC."
11    Q.  Okay.  And -- and just so the -- the
12  jury's clear, there -- there are several DOACs
13  that are on the market, some of them having
14  different operating or underlying ways in which
15  they -- they cause anticoagulation to occur.
16  True?
17       MS. duPONT:
18          Object to form.
19       THE WITNESS:
20          So among the direct oral
21         anticoagulants there are generally two
22         classes.  There are those that inhibit
23         thrombin.  There's really only one such
24         drug now FDA approved and used in the
25         United States.  That's dabigatran.  And

Page 96

1  there are currently three approved
2  anti-Factor Xa drugs.  Those include
3  rivaroxaban, the drug under discussion;
4  apixaban; and edoxaban.
5  BY MR. GOZA:
6    Q.  And with respect -- just so I'm clear --
7  and I think I understand what you're saying.
8  It's not your intent to tell the jury to a
9  reasonable degree of medical certainty that all of
10  these DOACs have the same safety profile with
11  respect to gastrointestinal bleeds; correct?
12       MS. duPONT:
13          Object to form.
14       THE WITNESS:
15          It's my intent to say that without a
16         clinical trial -- prospective blinded
17         clinical trial, it's not possible to make
18         an assessment of safety and efficacy
19         between these drugs without such a trial.
20  BY MR. GOZA:
21    Q.  Okay.  And so going back to my question,
22  which I want to make sure I'm very clear about,
23  because there has been no such trial, you're
24  unable to tell the jury that the relative risk for
25  gastrointestinal bleed is the same amongst all of

Page 97

1  the DOACs.  True?
2       MS. duPONT:
3          Object to form.
4       THE WITNESS:
5          I'm not prepared to say they're the
6         same.  I'm not prepared to say they're
7         different.  I'm not prepared to say that
8         one is better than another.
9       MR. GOZA:
10          Move to strike after saying "not
11         prepared to say they're" all "the same."
12  BY MR. GOZA:
13    Q.  When you say that -- or strike that.  If
14  in fact there was data -- strike that.
15          Understanding what you're not prepared to
16  say, is it correct then that you're not in a
17  position to say that had Mr. Boudreaux been on
18  another anticoagulant he would have necessarily
19  have bled from that anticoagulant?
20       MS. MOORE:
21          Object.
22       MS. duPONT:
23          Object to form.
24       THE WITNESS:
25          I think that's an impossibility.

Page 98

1     We're trying to make a prediction. I
2     don't know if Mr. Boudreaux would have
3     bled if he were on no anticoagulant. I
4     don't know if he's going to bleed on
5     Anticoagulant A, and I don't know if he's
6     going bleed on -- on Anticoagulant B
7     unless he's in fact placed on those drugs.
8 BY MR. GOZA:
9     Q. Okay. So going back to my -- my question,
10 is that you're not prepared and you're not going
11 to tell the jury that Mr. Boudreaux, had he been
12 taking another anticoagulant, including one of the
13 other DOACs, would necessarily have bled on
14 February 3rd or February 4th, whenever his
15 gastrointestinal bleed started, simply because he
16 was taking another anticoagulant?
17     MS. MOORE:
18         Object to --
19     MS. duPONT:
20         Object to form. Asked and answered.
21     THE WITNESS:
22         So I think there were a couple of
23     negatives in there. But I think without
24     having a clinical situation where
25     Mr. Boudreaux or any other patient is on a

Page 99

1     drug -- is on an anticoagulant, we can't
2     predict up front whether or not such a
3     patient is going to bleed.
4 BY MR. GOZA:
5     Q. Right. But we know Mr. Boudreaux did
6 bleed; correct?
7     A. Mr. Boudreaux had a GI bleed. Correct.
8     Q. And we know that -- strike that.
9     And we know he had been prescribed
10 Xarelto. True?
11     A. Mr. Boudreaux had been on rivaroxaban. I
12 believe he was also taking aspirin.
13     Q. Correct.
14     And Mr. Boudreaux -- and I think you note
15 it in your records -- continues to take aspirin.
16 True?
17     A. Let me just check the record to confirm.
18     Q. Sure. I -- I -- and I'll point it out to
19 you. I think I -- I've got it here marked on
20 your . . .
21     A. If I could -- yes. On Page 8, next to the
22 last paragraph, I state, "Subsequent to the
23 GI bleed, Mr. Boudreaux was continued on aspirin."
24     Q. Right. And as far as you know -- again,
25 we've covered this. But that -- that he's not had

Page 100

1 any acute GI bleeds diagnosed while he's been
2 taking aspirin. True?
3     MS. duPONT:
4         Object to form.
5     THE WITNESS:
6         To the extent that I've -- to the
7     extent that the records that I was
8     provided cover Mr. Boudreaux's course,
9     there's no further mention of bleeding.
10     But that does not mean that he's not going
11     to bleed in the future.
12 BY MR. GOZA:
13     Q. Didn't ask that question.
14     I simply asked you whether there was any
15 records showing that he had bled in the last two,
16 almost three years since the -- the incident in
17 February of 2014?
18     A. I have to check when -- the last record on
19 Mr. Boudreaux I reviewed.
20     Q. It says 11/14/2016 on your identification.
21     A. That's fine. So in the records up to
22 11/14 there is no indication that Mr. Boudreaux
23 had a subsequent GI bleed.
24     MS. duPONT:
25         And can I just clarify? The medical

Page 101

1 records as of 11/14/16. I don't know if
2     the medical records go up through
3     November. It's what we had as of
4     11/14/2016, just to clarify for the
5     record.
6 BY MR. GOZA:
7     Q. Do you know what those would have been,
8 where they -- where they ended?
9     A. I do not know where they were -- ended.
10 I'd have to go back and look.
11     Q. Okay. Don't have that anywhere in your
12 report?
13     A. No. I do not.
14     Q. Okay. But at least as far as the medical
15 records you've been provided -- and it's all we
16 can ask you about here today, is what your
17 knowledge base is.
18     As far as you know, Mr. Boudreaux was
19 continued on aspirin after his bleed in
20 February of 2014. True?
21     A. I believe it was briefly stopped during
22 the hospitalization for his GI bleed, but then it
23 was restarted. Correct.
24     Q. And he's not had any diagnosed GI bleed,
25 as far as you know, from February of 2014 through

Page 102

1 whenever you last were -- saw records of him?

2   A.  The records that I reviewed following
3 February of 2014 do not indicate a subsequent
4 GI bleed on Mr. Boudreaux's part.

5   Q.  And Mr. Boudreaux had taken aspirin before
6 being started on Xarelto in January of 2014.
7 True?

8   A.  Mr. Boudreaux was taking aspirin prior to
9 February of 2014.

10   Q.  And I'm correct in saying that
11 Mr. Boudreaux had never been diagnosed with a
12 gastrointestinal bleed prior to being prescribed
13 Xarelto.  True?

14   A.  Prior to being placed on rivaroxaban,
15 there's no documentation that Mr. Boudreaux had a
16 GI bleed.  Although we have talked about the fact
17 that he's had a mild anemia.

18   Q.  Correct.

19      And -- and we do know -- one other thing.
20 We do know at least with respect to the ROCKET
21 study it indicated that there was a relative
22 increased risk of gastrointestinal bleed on
23 Xarelto versus warfarin.  True?

24   A.  We know from the ROCKET study that in that
25 population, that the relative risk of bleeding on

Page 103

1 rivaroxaban was 1.61 as compared with warfarin.

2   Q.  Okay.  All right.  I think we left off --
3 and I wanted to make sure -- I apologize for the
4 break.

5      But I think we had stated that -- that we
6 know that Mr. Boudreaux had been prescribed
7 rivaroxaban when he had his bleed.  True?

8   A.  At the time --

9      MS. duPONT:

10      Object to form.

11      THE WITNESS:

12      -- of his bleed -- at the time of his
13      bleed, Mr. Boudreaux was prescribed
14      rivaroxaban.

15 BY MR. GOZA:

16   Q.  And we know that rivaroxaban is -- has an
17 increased risk of causing GI bleeds over warfarin.
18 True?

19      MS. duPONT:

20      Object to form.

21 BY MR. GOZA:

22   Q.  At least according to the label?

23      MS. duPONT:

24      Object to form.

25      THE WITNESS:

Page 104

1      ROCKET AF supports the contention that
2 in that population studied in ROCKET, that
3 patients had a higher incidence -- had a
4 relative risk of GI bleeding of 1.6 when
5 compared to warfarin.

6 BY MR. GOZA:

7   Q.  Okay.  And going back I think to -- now
8 we're back at my original question, was:  Simply
9 because Mr. -- strike it.  Let me ask it again.

10      We know that Mr. Boudreaux had a
11 gastrointestinal bleed after being prescribed
12 Xarelto, but that does not lead you to the
13 conclusion that he would have necessarily have had
14 a bleed on any other anticoagulant.  Is that true?

15      MS. duPONT:

16      Object to form.

17      THE WITNESS:

18      I think in absence of actually doing
19      the study; that is, putting Mr. Boudreaux
20      on a medication, there's no way of
21      determining any side effect prospectively.
22      You have to put the patient on the
23      medicine and see what happens.

24 BY MR. GOZA:

25   Q.  Meaning --

Page 105

1   A.  It would only be -- it would -- it would
2 be speculation at best.

3   Q.  Okay.  So I just want to make sure I'm
4 clear.

5      Meaning simply because he bled on Xarelto
6 doesn't mean that Mr. Boudreaux would have been --
7 would have bled had he been placed on another
8 anticoagulant.

9      MS. duPONT:

10      Object --

11 BY MR. GOZA:

12   Q.  True?

13      MS. MOORE:

14      Object.

15      MS. duPONT:

16      Object to form.

17      THE WITNESS:

18      I don't think we know whether
19      Mr. Boudreaux would have bled or not on
20      any anticoagulant unless he was actually
21      placed on the drug and we observed
22      Mr. Boudreaux.

23 BY MR. GOZA:

24   Q.  I know.  And the question I'm asking you
25 -- and I -- I understand what you're saying.  But

## Page 106

1 my question's slightly different. Because I want
2 to make sure I understand what you're prepared to
3 tell the jury and what you're not prepared to tell
4 the jury.
5     You understand that's the purpose of my
6 being here today; correct?
7   A. I understand that.
8   Q. Okay. So what I'm simply saying is: The
9 simple fact that Mr. Boudreaux bled on Xarelto
10 does not allow you to come to the conclusion to a
11 reasonable degree of medical certainty he would
12 have bled had he been on any other anticoagulant.
13 True?
14   MS. duPONT:
15     Objection. Asked and answered.
16   THE WITNESS:
17     Again, we don't know if Mr. Boudreaux
18     would bleed or not on any anticoagulant
19     other than rivaroxaban, which was the one
20     he was taking with aspirin, unless we put
21     him on the drug and see if he bleeds.
22     There's no way of knowing that.
23 BY MR. GOZA:
24   Q. Okay. I want to ask you a few things that
25 -- that -- just to make sure when you and I talk

## Page 107

1 -- because I want to talk -- I want to ask you a
2 few questions about the label, and I want to make
3 sure that you and I are speaking in the same -- or
4 at least I have some knowledge of how you define
5 certain terms.
6     The term "exposure" is used in the label
7 on a number of different occasions. Do you recall
8 reading that?
9   MS. duPONT:
10     Object to form. Are you going to show
11     him a particular point of the --
12   MR. GOZA:
13     No. My --
14   MS. duPONT:
15     -- label?
16   MR. GOZA:
17     -- gosh, if he doesn't know the word
18     "exposure" as used in the label, then I'm
19     going to be here a long time. So . . .
20   THE WITNESS:
21     If you're asking me is the word
22     "exposure" used in the label --
23   MR. GOZA:
24     Yes.
25   THE WITNESS:

## Page 108

1     -- I believe that to be true.
2 BY MR. GOZA:
3   Q. Yes.
4     And as I understand -- why don't you tell
5 me what the term "exposure" means to you.
6   MS. duPONT:
7     Object to form.
8   THE WITNESS:
9     So from a pharmacokinetic,
10     pharmacodynamic standpoint, "exposure" can
11     be defined by several parameters. But
12     typically area under the curve is the one
13     that's probably most apt.
14 BY MR. GOZA:
15   Q. And if we're talking about area under the
16 curve, for -- for the benefit of the jury, if one
17 were to take a -- make a graph and that graph were
18 to have as its parameters horizontally listed in
19 -- in hours and -- and vertically drug
20 concentration or vice versa, however it -- it's
21 done, there would be at least with respect to some
22 medications a bell curve that would come out in
23 some format from that?
24   MS. duPONT:
25     Object to form.

## Page 109

1   THE WITNESS:
2     So when we look at area under the
3     curve, typically on the vertical, or
4     y-axis, there's drug concentration. On
5     the X, or horizontal axis, there's time.
6     There's a time course. It's not actually
7     a bell curve. But what happens is at zero
8     time of exposure there's no drug
9     concentration, so you start at the origin,
10     at 0/0, if you will, on the x/y-axis. And
11     over time, the plasma concentrations
12     increase, and then they decrease. And
13     they follow a certain kinetic pathway.
14     These are not bell curves.
15     Area under the curve is mathematically
16     the integral of that graph, but
17     graphically it's the area under the curve.
18     It's how much drug exposure there is over
19     a time period.
20 BY MR. GOZA:
21   Q. So when we're -- and -- and the -- the
22 definition of "area under the curve" is somewhat
23 repetitive in that it is the area under the curve
24 when you create that graph. True?
25   A. That is correct.

PROTECTED – SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 110

1  Q.  And -- and some of the factors that affect
2  the increase in area of the -- under the curve,
3  can the -- the Cmax -- Cmax refers to what
4  exactly?
5  A.  The Cmax is a maximum concentration found
6  after administration of a drug.
7  Q.  And can an increase in the maximum
8  concentration of a drug in a patient increase the
9  area under the curve?
10  A.  An increase in Cmax can increase the area
11  under the curve but does not have to.  If a drug
12  is rapidly absorbed with a high Cmax and then
13  rapidly excreted, that's going to have -- that
14  drug will have a lower area under the curve than a
15  drug with a slow excretion and not as high a Cmax.
16  That's why area under the curve is a particularly
17  good measurement for exposure.  It takes into
18  account much more than Cmax.  It takes into
19  account elimination as well.
20  Q.  So when we're talking about -- when we
21  talk about drug concentration levels, what does
22  that mean, plasma concentration level?
23  A.  Plasma concentration level is a single
24  point in time attained because blood is drawn, and
25  then using an assay, the amount of drug per volume

Page 111

1  plasma, typically, is -- is measured.  These can
2  be done with a radioimmunoassay or a number of
3  ways to determine what the actual concentration
4  is.
5  Q.  Okay.  And can -- plasma concentration
6  levels increase Cmax levels, I assume?
7  MS. duPONT:
8  Objection.  Form.
9  THE WITNESS:
10  That doesn't -- I'm -- I'm sorry.
11  That question doesn't make a lot of sense.
12  So --
13  MR. GOZA:
14  Okay.
15  THE WITNESS:
16  -- if a patient has a higher -- if a
17  drug has a higher Cmax than another drug,
18  at the point of maximal concentration --
19  at -- at the point of the Cmax, the
20  concentration will be higher.
21  BY MR. GOZA:
22  Q.  And -- and maybe I -- let me ask it in a
23  little bit different way.
24  Can you by giving more, a higher dose of a
25  drug, increase the Cmax?

Page 112

1  MS. duPONT:
2  Object to form.
3  THE WITNESS:
4  For some drugs, if you give a higher
5  dose, you can increase the Cmax.  Some
6  drugs don't have the ability to reach --
7  to increase Cmax with increased dose
8  beyond a certain point.  They're just not
9  absorbed -- if there's a hundred --
10  theoretically, if there's a hundred
11  percent -- if the ability to absorb a drug
12  is a hundred percent saturated, if you
13  give more of the drug, you're not going to
14  be able to get a higher serum
15  concentration.
16  BY MR. GOZA:
17  Q.  You read the --
18  MS. duPONT:
19  Hey, Kirk, I assume that you're going
20  to get to something with Mr. Boudreaux.
21  This seems to be a pretty generic opinion
22  that there was a separate deposition for.
23  I understand foundation issues.  But . . .
24  MR. GOZA:
25  Well, yeah.  Come on.  I'll get there.

Page 113

1  I thought I've been pretty
2  Boudreaux-specific.
3  MS. duPONT:
4  You have.
5  MR. GOZA:
6  What do you mean?
7  MS. duPONT:
8  You have.
9  MR. GOZA:
10  What -- what is is -- what are you
11  talking about?
12  MS. duPONT:
13  You have up until this point.
14  BY MR. GOZA:
15  Q.  Do you -- do you believe that there is a
16  level of increase in area under the curve that can
17  result in increased bleeding to patients on
18  Xarelto?
19  MS. duPONT:
20  Object to form.
21  THE WITNESS:
22  I -- I'd have to look at the
23  pharmacokinetic, pharmacodynamic studies.
24  I'm not sure -- I can't recall any graph
25  that related area under the curve to

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 114

1  bleeding risk.
2  BY MR. GOZA:
3      Q. And when you're saying pharmokinetics
4  [sic], you're talking about the label, or you're
5  talking about something else?
6      MS. duPONT:
7          Object to form.
8      THE WITNESS:
9          When I talk about pharmacokinetics,
10     there were studies by Mueck and Kubitza.
11     There's also an FDA document that I
12     reviewed that reviewed some of the
13     pharmacokinetics and pharmacodynamics. So
14     it's well beyond the label.
15 BY MR. GOZA:
16     Q. Okay. So, for instance, the Mueck article
17 does talk about levels at which there are
18 increased bleeding risks. True?
19     MS. duPONT:
20         Object to form.
21     THE WITNESS:
22         If you show me the specific graph,
23 I'll interpret it for you.
24     MS. duPONT:
25         Again, I think this is -- this relates

Page 115

1  to the generic deposition that he's
2  already been deposed on.
3      MR. GOZA:
4          I'm almost be finished. This will be
5  -- I'll just -- I'll just get this and --
6      MS. duPONT:
7          Okay.
8      MR. GOZA:
9          -- then we're going to take a quick
10 break anyway. And I'm about -- about
11 done.
12         I think there's a table or a chart
13 that he's got, but let's just -- I -- I
14 think I -- just to get to the point, I
15 think the very top --
16     MS. duPONT:
17         Do you have a copy of that for me
18 by --
19     MR. GOZA:
20         Oh, yeah.
21     MS. duPONT:
22         -- chance?
23     MR. GOZA:
24         I'm sorry.
25     MS. duPONT:

Page 116

1          Are you going to mark that or . . .
2      MR. GOZA:
3          Yeah. Let's mark it as Exhibit 5.
4  And here, I'll stick that on there.
5  Doctor, let's mark that as Exhibit 5,
6  please.
7  (Exhibit No. 5 was marked for
8  identification and attached hereto.)
9      MR. HOGUE:
10         What is it?
11     MS. duPONT:
12         It's the Mueck 2014 article.
13     THE WITNESS:
14         Mueck 2014.
15     MS. duPONT:
16         And I -- I just note for the record
17 that I think that this is beyond the scope
18 of Mr. Boudreaux's report and is pertinent
19 to the previous deposition he gave. But
20 I'll allow questioning.
21     MR. GOZA:
22         And I appreciate it. And just indulge
23 me a little bit here, and we'll be -- like
24 I said, we'll be finished and take a quick
25 break.

Page 117

1 BY MR. GOZA:
2     Q. And so my -- my simple question was this
3 -- it -- it looks to me that Mueck is looking at
4 two things here, one, area of the curve and Cmax.
5 Am I correct about that?
6     A. Can you point where you're looking?
7      MS. duPONT:
8          Yeah. What page?
9 BY MR. GOZA:
10     Q. Sure. I'm sorry. If you look at Page 12,
11 summary of drug interactions. And I think I had
12 it open for you. There you go.
13     A. Okay.
14     Q. And this is a summary on drug
15 interactions.
16         And this is an article that you had marked
17 as one that you had reviewed. True?
18     A. That is true.
19     Q. And he's talking here about increases in
20 area under the curve and increases in the mean
21 Cmax. True?
22     MS. duPONT:
23         Object to form. Where are you
24 referring to in that?
25     MR. GOZA:

Page 118

1    I'm looking under -- if you look under
2 the first paragraph, azole-antimycotics,
3 ketoconazole.
4    MS. duPONT:
5       Okay.
6 BY MR. GOZA:
7    Q.  Did I get that right?
8    A.  Ketoconazole.
9    Q.  Ketoconazole.
10    Am I correct that he's saying that a
11 1.7-fold increase in Cmax -- and let's -- I'll --
12 let's read the whole thing to be completely
13 accurate.
14    It says, "Co-administration of rivaroxaban
15 with the azole-antimycotic ketoconazole (400 mg)"
16 -- "od" means once a day -- "led to a 2.6-fold
17 increase in mean rivaroxaban" A -- "steady-state
18 AUC and a 1.7-fold increase in . . . Cmax with
19 significant increases in its pharmacodynamic
20 effects that may lead to an increased risk of
21 bleeding."
22    So let me ask just a few questions.  "AUC"
23 stands for area under the curve that we've been
24 talking about.  True?
25    A.  "AUC" in this context stands for area

Page 119

1 under the curve.  Correct.
2    Q.  And the mean Cmax we've talked about as
3 the highest point on the graph, so to speak?
4    A.  When you look at a time plasma
5 concentration graph, the Cmax is the highest point
6 on the graph.  Correct.
7    Q.  And when it says "with significant
8 increases in its pharmacodynamic effects," what
9 does that mean?
10    MS. duPONT:
11       Object to form.
12    THE WITNESS:
13       I'd only be speculating.
14 BY MR. GOZA:
15    Q.  Okay.  And it says "that may lead to an
16 increased risk of bleeding."
17    Did I read that correctly?
18    A.  That's what's stated here.
19    Q.  Okay.  Is -- is Dr. -- is it Mueck?
20    A.  I believe it's Mueck.
21    Q.  Yeah.
22    A.  I've not met him.  But . . .
23    Q.  He's a Bayer employee?
24    A.  I don't know that to be fact.  But if it's
25 stated somewhere, I'm happy to agree with that.

Page 120

1    Q.  I think it's stated on the first page of
2 the document, the --
3    A.  I notice that Wolfgang Mueck's e-mail is
4 at Bayer.com.
5    Q.  Yeah.  So I -- I think I'd represent to
6 you that certainly in 2014 he was an employee of
7 Bayer.
8    Does he seem to be saying that there is a
9 level of area under the curve that when you reach
10 that level, the pharmacodynamic effects of the
11 drug are increased to the point where there may be
12 an increased risk of bleeding?
13    MS. duPONT:
14       Object to form.
15    MS. MOORE:
16       Object.
17    THE WITNESS:
18       I think that what is stated in that
19 paragraph is that all -- increases in
20 pharmacodynamic effects may -- he uses the
21 word "may" -- lead to an increased risk of
22 bleeding.  Correct.
23 BY MR. GOZA:
24    Q.  Okay.  You've never seen that table appear
25 in any label of Xarelto.  Is that true?

Page 121

1    MS. duPONT:
2       Object to form.
3    THE WITNESS:
4       I --
5    MS. duPONT:
6       Are you referring to Table 4?
7    MR. GOZA:
8       Yes, sir -- yes, ma'am.  Sorry.
9 Sorry.
10    THE WITNESS:
11       I -- I'd have to relook at the label
12 to see if it's in there.
13    MR. GOZA:
14       Okay.  Why don't we take -- we've been
15 going another hour.  Let's take
16 five minutes, and then I'm going to be
17 close to . . .
18    THE VIDEOGRAPHER:
19       This is the end of Tape 2.  We're now
20 off the record at 10:46.
21 (Brief recess was taken.)
22    THE VIDEOGRAPHER:
23       This is the beginning of Tape 3.
24 We're back on the record at 11:02.
25 BY MR. GOZA:

Page 122

1    Q. Doctor, in -- in your report on
2 Mr. Boudreaux you have a number of paragraphs that
3 relate to the use of PT. Do you recall that? I
4 think it's on Page 11.
5    A. I do.
6    Q. Let me ask you a couple of quick things.
7 If you look at the label on 12.2, which I think
8 we've marked as Exhibit 4, so the -- that's the --
9 I believe you have the 2015 label in front of you.
10 And is it marked as Exhibit 4? Am I correct or --
11    A. Exhibit 4 is the prescribing information
12 for rivaroxaban.
13    Q. Okay. And if you turn to Page 23, which I
14 think is the Pharmacodynamics.
15    A. Yes.
16    Q. And you recall when I left off I had asked
17 you about Dr. Mueck and -- and he said there were
18 increased pharmacodynamic effects when the area
19 under the curve, or the Cmax level, reached a
20 certain point. Do you recall that?
21    MS. duPONT:
22       Object to form.
23    THE WITNESS:
24       I recall that Dr. Mueck says that
25       increases in Cmax with significant -- he

Page 123

1       says that "increases in . . .
2       pharmacodynamic effects . . . may lead to
3       an increased risk of bleeding." Is that
4       what you're referring to?
5 BY MR. GOZA:
6    Q. Right. He says there is increased
7 "pharmacodynamic effects" and "that may lead to an
8 increased risk of bleeding."
9    MS. duPONT:
10       Object to form.
11 BY MR. GOZA:
12    Q. Am I correct?
13    A. The exact statement is: "that may lead to
14 an increased risk of bleeding." Correct.
15    Q. And I was talking about really -- start
16 back a couple of words before that.
17       What does he say about pharmacodynamic
18 effects?
19    A. He says, "significant increases in its
20 pharmacodynamic effects that may lead to an
21 increased risk of bleeding."
22       And this is -- just to qualify, in this
23 context specific for the azole-antimycotic
24 ketoconazole that Mr. Boudreaux wasn't taking. So
25 I'm not sure where we're going with this.

Page 124

1    Q. Well, I'm just asking you: Are -- the --
2 because it -- he's got it listed for other drugs
3 as well. True? I mean, we -- we could go through
4 Table 12. But I'm -- I'm simply right now trying
5 to -- to understand a particular point.
6       In one of the -- the questions I have,
7 when you go to Page 23 of the label and you look
8 at -- at the Pharmacodynamics, when it says --
9 under 12.2. "Dose-dependent inhibition of"
10 Factor Xa "activity was observed in humans and the
11 Neoplastin prothrombin time . . . activated
12 partial thromboplastin time . . . and HepTest are
13 prolonged dose-dependently."
14       So let me ask this question first: What
15 does it mean when it says "dose-dependent
16 inhibition of" Factor Xa "activity was observed in
17 humans" when they were taking Xarelto?
18    MS. duPONT:
19       Object to form.
20    THE WITNESS:
21       So rivaroxaban is a drug that inhibits
22       Factor Xa. The first statement says
23       "Dose-dependent inhibition of" Factor Xa
24       "was observed in humans." That suggests
25       that in a dose-dependent mechanism;

Page 125

1       namely, as you change dose you get changes
2       in inhibition of Factor Xa activities in
3       humans.
4 BY MR. GOZA:
5    Q. Does it suggest to you that the higher the
6 dose, that the higher the inhibition of Factor Xa
7 activity is?
8    A. I'd have to see that graph specifically.
9 But it -- but "Dose-Dependent inhibition of"
10 Factor Xa "activity was observed," is what it says
11 in Paragraph 12.2.
12    Q. Okay. And am I correct that the -- within
13 a certain maximum absorption limit which you've
14 explained to us, but that the higher the dose that
15 is given, the increased concentration of the drug
16 in the blood?
17    MS. duPONT:
18       Object to form.
19    THE WITNESS:
20       So from a pharmacokinetic,
21       pharmacodynamic perspective, you can with
22       many drugs get a higher plasma
23       concentration with higher dose.
24 BY MR. GOZA:
25    Q. And as I hear what you're saying about

PROTECTED – SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 126

1  12.2, it's saying when you have a higher
2  concentration level, that you have increased
3  inhibition of Factor VIII -- Xa activity; correct?
4      MS. duPONT:
5      Kirk, this is again getting into
6  generic issues that we had a generic
7  deposition --
8  MR. GOZA:
9      You know --
10  MS. duPONT:
11      -- for. So unless you can bring it
12  back to Mr. Boudreaux --
13  MR. GOZA:
14      Well, he --
15  MS. duPONT:
16      -- quickly here --
17  MR. GOZA:
18      -- basically says that PT -- in this
19  whole Paragraph 11, he says PT is of no
20  relevance. And -- and -- and so I think
21  I'm entitled to ask questions related to
22  the topic of PT as it pertains to the
23  label.
24  MS. MOORE:
25      But -- but, Counsel, I might add that

Page 127

1  that particular paragraph -- that -- that
2  opinion is the same opinion in the generic
3  report, and there was ample time to
4  address that previously.
5  MR. GOZA:
6      Well -- well, I get it. But the fact
7  that it was in the generic report -- it's
8  also in this report. If he hadn't put it
9  in this report, I wouldn't get maybe to
10  ask about it.
11  MS. duPONT:
12      If -- if you --
13  MR. GOZA:
14      I get that.
15  MS. duPONT:
16      -- want to ask him about what's in his
17  report, ask him about what's in his
18  report.
19  MR. GOZA:
20      Well --
21  MS. duPONT:
22      Okay?
23  MR. GOZA:
24      -- let me get this first because I
25  need to understand this in order to make

Page 128

1  sense of what's in his report. So let --
2  let me make sure I just -- I think I have
3  a question pending. So . . . Go . . .
4      Where did we go before we all started
5  arguing? Oh. Here we go. Here we go.
6  BY MR. GOZA:
7      Q. That -- as I understand, what this is
8  essentially saying in the -- is that the higher
9  the concentration level of the drug, the increased
10  inhibition of Factor Xa activity; is that correct?
11      MS. duPONT:
12      Object to form.
13  THE WITNESS:
14      So again, to read what it says,
15  "Dose-dependent inhibition of" Factor Xa
16  "activity was observed in humans." That
17  suggests that Factor Xa activity
18  inhibition is observed in a dose-dependent
19  fashion.
20  BY MR. GOZA:
21      Q. And I can read it. I'm just wondering
22  what does that mean?
23      A. So what it -- what it suggests is that as
24  you increase dose in human beings you get varied
25  inhibition of Factor Xa activity.

Page 129

1      Q. And is it your interpretation of that
2  statement -- when you say "varied inhibition," do
3  you mean increased inhibition with increased drug
4  levels -- or increased levels of the drug?
5      MS. duPONT:
6      Object to form.
7  THE WITNESS:
8      That would make sense, although that's
9  not specifically stated in -- in that
10  paragraph. I guess conceivably as you
11  increase the dose you could get decreased
12  Factor Xa in -- in activity. It doesn't
13  say that it's -- whether it's -- there's a
14  direct and indirect relationship. But
15  biologically it makes since the drug
16  inhibits Factor X, that at increasing dose
17  you get increased inhibition of Factor Xa.
18  BY MR. GOZA:
19      Q. And when it says that PT is prolonged
20  dose-dependently, what does that mean?
21      A. I don't know what they're trying to say.
22  And in my generic report I spoke at great length
23  about the relationship between pro -- between PT
24  and serum concentration of rivaroxaban. The
25  problem is with a general statement as a -- as --

Page 130

1 as -- as is stated here, is it really depends on
2 what range of serum concentrations we're talking
3 about.  And I made that point pretty clearly in my
4 generic report.
5       There are some pharmacodynamic studies
6 looking at a range of serum concentrations that
7 greatly exceed by a factor of four or five those
8 that you get with typical drug dosing.  And if you
9 plot those concentrations on the x-axis versus
10 prothrombin time on the y-axis, one can come up
11 with a relationship that appears linear.  The
12 problem is is if you look at the area of the graph
13 which is in the far left-hand part of the graph
14 that refers -- where -- where the serum
15 concentrations -- plasma concentrations -- excuse
16 me -- are those that you typically get with the
17 drug, that curve is significantly less linear.
18 That's the problem.
19       So that statement you just made is not
20 specific for range of plasma concentration.
21    Q.  And -- and just so we're clear -- because
22 you said the statement I just made.  I'm just
23 reading what's in the label.
24    A.  That's fair.
25    Q.  Because the -- this is what the drug

Page 131

1 company is saying.  True?
2       MS. duPONT:
3          Object to form.
4       THE WITNESS:
5          The drug company's -- the label is
6          correct as you have read it.  Yes.
7 BY MR. GOZA:
8    Q.  Okay.  And so when it says -- and -- and
9 alls I'm trying to do is make sure I understand
10 what this is saying.  But it says that prothrombin
11 time is prolonged.  When you say prothrombin time
12 is prolonged -- we'll break it down.
13       But when you say prothrombin time is
14 prolonged, it means that the PT time is elevated,
15 higher.
16       MS. duPONT:
17          Object to form.
18 BY MR. GOZA:
19    Q.  True?
20    A.  Higher -- I'm sorry.  Can you repeat --
21 I'm not sure what -- what your --
22    Q.  Sure.
23    A.  -- question is.
24    Q.  Sure.
25       And, you know, here's the thing:  This --

Page 132

1 this is -- the label is something the physician is
2 supposed to be able to read and understand about
3 the drug.  True?
4       MS. MOORE:
5          Object to the form.
6       MS. duPONT:
7          Object to form.
8       MS. MOORE:
9          Sorry.
10       MR. GOZA:
11          Strike that.  We'll -- we'll --
12       we'll -- let me ask it in a different way.
13 BY MR. GOZA:
14    Q.  Okay.  So we're reading from the label,
15 and it says PT -- and we can bypass the rest for
16 now.  But -- but it says PT are prolonged
17 dose-dependently.  So when it -- just -- just take
18 the "prolong."
19       What does it mean when the PT time is
20 prolonged?
21    A.  The prothrombin time is typically -- not
22 typically.  It's expressed in seconds, and it's
23 the number of seconds it takes for the formation
24 of a -- of a fibrin clot in plasma when a reagent
25 is added to it.  And the reagent is typically a

Page 133

1 synthetic or naturally occurring source of tissue
2 factor.  It's measured in seconds.
3       When the label says "prolonged," it means
4 that the number of seconds it takes for that
5 plasma to form a fibrin clot in the test tube is
6 increased.
7    Q.  Okay.  And when it says prolonged
8 dose-dependently, what does that mean?
9    A.  What that would mean is that as you
10 increase dose you get a prolongation in the
11 prothrombin time.  You get a prolongation in the
12 prothrombin time.  Again, that's a very general
13 statement.
14       And I need to qualify to say that when you
15 look at the pharmacokinetic data, that is perhaps
16 only true over a range of plasma concentrations
17 that greatly exceed that you see -- than those you
18 see with normal dosing of the medication.
19       MR. GOZA:
20          Okay.  And I'm going to move to strike
21       after you answered the -- the question,
22       which I think ended with "get a
23       prolongation in the prothrombin time."
24 BY MR. GOZA:
25    Q.  Because I -- I understand what your

PROTECTED — SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 134

1 opinions are. I'm -- I'm simply trying to now
2 understand what it is the drug company says here
3 and get your interpretation of that.
4   A. Well, I think that --
5   MS. duPONT:
6     Object to form.
7   THE WITNESS:
8     I think that to get what they're
9     trying to say it has to be taken in
10     context. And to be fair, you're trying to
11     remove the context. And as such, I'm not
12     going to agree with the statement that you
13     made.
14 BY MR. GOZA:
15   Q. And just so --
16   A. This was -- has to be taken in context.
17   Q. But in -- in 12.2, when it's talking about
18 the pharmacodynamics, I read the entire thing;
19 correct? I didn't -- we're not taking it out of
20 context in that sense, are we?
21   MS. duPONT:
22     Object to form.
23   THE WITNESS:
24     You read Item -- Paragraph 12.2
25     verbatim from the product insert.

Page 135

1     Correct.
2 BY MR. GOZA:
3   Q. Okay. Now, in evaluating patients, do you
4 -- or -- or strike that.
5     There is something called a -- you -- you
6 mentioned before in your -- in your testimony
7 today that there's a risk-benefit analysis that
8 goes on with respect to prescribing an
9 anticoagulant in the context of somebody that has
10 a-fibrillation. True?
11   MS. duPONT:
12     Object to form.
13   THE WITNESS:
14     So I -- I think that as a general
15     statement, whenever we entertain any
16     intervention in a patient, whether that be
17     a drug or a surgery, we always look at
18     risk-benefit. And such would also be true
19     when one prescribes an anticoagulant for
20     atrial fibrillation.
21 BY MR. GOZA:
22   Q. And one in making that evaluation would
23 want to understand as much about the risks as
24 readily or as -- as -- at least in terms of
25 important clinical information in making that

Page 136

1 decision, they want as much information as they
2 could get. True?
3   MS. duPONT:
4     Object to form.
5   THE WITNESS:
6     When physicians make a decision to do
7     any intervention on a patient, including
8     anticoagulation, they use their best
9     clinical judgment to look at risks and
10     benefits. That is correct.
11 BY MR. GOZA:
12   Q. And one of the tools that you I think have
13 mentioned in using or doing that risk-benefit
14 analysis would be a CHADS score?
15   A. So one way --
16   MS. duPONT:
17     Object to form.
18   THE WITNESS:
19     -- to -- one way to assess the
20     thrombotic risk in a patient with atrial
21     fibrillation is a CHADS2 score that's been
22     modified to the CHADS-VASc score, but we
23     can generically call it a CHADS score.
24 BY MR. GOZA:
25   Q. Okay. And the other side of that coin is

Page 137

1 you have to balance that -- the risk of thrombosis
2 against the risk of the -- of the medication, an
3 anticoagulant causing a bleed. True?
4   MS. duPONT:
5     Object to form.
6   THE WITNESS:
7     As with any medication, if one is
8     making such a risk assessment, you'd have
9     to look at the likelihood of benefit
10     versus the likelihood of risk. In a
11     setting of an anticoagulant for atrial
12     fibrillation, the likelihood of benefit
13     would be prevention of stroke, and the
14     likelihood of risk predominantly would be
15     the likelihood of bleeding.
16 BY MR. GOZA:
17   Q. And in doing that risk-benefit, the other
18 side of the risk-benefit analysis, one -- one of
19 the tools that is available to a physician is a
20 HAS-BLED score?
21   MS. duPONT:
22     Object to form.
23   THE WITNESS:
24     So the HAS-BLED score is a tool in the
25     literature to estimate risk for bleeding.

PROTECTED — SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 138

BY MR. GOZA:

1  BY MR. GOZA:
2      Q.  And the HAS-BLED score is broken down into
3  low risk, intermediate risk, and high risk.  True?
4      MS. duPONT:
5          Object to form.
6      THE WITNESS:
7          So candidly, I don't use the high --
8      the HAS-BLED score specifically.  I do it
9      -- although I take into account many of
10     the items found in HAS-BLED.  Because I'm
11     not as familiar with it -- I know that it
12     is broken down into low, intermediate, and
13     high risk.  But I -- I'm not prepared
14     right now without looking at the medical
15     literature to tell you what those specific
16     cutoffs are, if that's what you're going
17     to ask.
18  BY MR. GOZA:
19     Q.  Okay.  But we do know that when a patient
20  has -- in this instance, Mr. Boudreaux had a bleed
21  while being prescribed Xarelto.  That would on the
22  HAS-BLED score increase the risk of potential
23  bleeds in the future in terms of an evaluation.
24  Is that true?
25     MS. duPONT:

Page 139

1          Object to form.
2      THE WITNESS:
3          That's not exactly correct.  Scores
4      like the HAS-BLED score and CHADS apply to
5      populations, not individual patients.  So
6      you're making an extrapolation that if
7      there's an increased risk of bleeding in a
8      population, that would specifically apply
9      to an individual patient.  And quite
10     frankly, that's a -- that's a leap of
11     faith.
12  BY MR. GOZA:
13     Q.  Well, I'm really not trying to make that
14  quantification at all.
15     What I'm simply saying is:  When one looks
16  at the HAS-BLED score and the factors that you
17  consider, prior bleed is one of those factors?
18     A.  My recollection of the HAS-BLED score is
19  that one of the items in the HAS-BLED score is
20  previous bleeding.
21     Q.  Yeah.
22     So the fact that you had a previous bleed,
23  in this instance a previous bleed on Xarelto,
24  would potentially increase or in terms of the
25  physician making an evaluation of what to do going

Page 140

1  forward in this risk-benefit analysis, it adds a
2  point --
3      MS. duPONT:
4          Object to form.
5  BY MR. GOZA:
6      Q.  -- to the other side.  True?
7      A.  So moving forward, once any patient has
8  had a bleed, their likelihood of having a
9  subsequent bleed as assessed by HAS-BLED would be
10  increased.
11     Q.  Okay.  And in fact -- or strike that.
12     And that's where I think you -- we -- we
13  left off when talking about the individual
14  evaluation then about whether to restart on a
15  different anticoagulant or not, is a subjective
16  one made by the physician that's evaluating the
17  overall circumstance of the patient.  True?
18     MS. duPONT:
19         Object to form.
20     THE WITNESS:
21         I think a decision to re-anticoagulate
22     a patient who's bled is based on
23     assessment and risk and -- risk and
24     benefit.
25  BY MR. GOZA:

Page 141

1      Q.  And if someone was looking at a HAS-BLED
2  score, what we do know is that the -- on the risk
3  side of things, that you add a point, so to speak,
4  for having the prior bleed?
5      MS. duPONT:
6          Object to form.
7      THE WITNESS:
8          If one were to use the HAS-BLED score,
9      a previous bleed adds a point, as you have
10     suggested.
11  BY MR. GOZA:
12     Q.  Let me talk a little bit about -- you --
13  you mention the use of NSAIDs I think at
14  Paragraph 10 of your report.
15     MS. duPONT:
16         Page 10?
17     MR. GOZA:
18         Page 10, last paragraph.
19     THE WITNESS:
20         I see where you're referring.
21  BY MR. GOZA:
22     Q.  Now, you -- you had talked about certain
23  kinds of drugs that actually caused physical
24  injury to the intestinal wall.  I think you -- you
25  talked about that earlier.  Maybe "intestinal

Page 142

1  wall" is too limited a term. But . . .
2     A. So with the qualification that it's typic
3  -- it's more typically the gastric mucosa. There
4  are certain drugs that are direct irritants to the
5  gastric mucosa.
6     Q. Okay. Is it your position or are you
7  going to testify that there was -- that the NSAID
8  Mr. -- Mr. Boudreaux's use of NSAIDs in this case
9  caused him to have an ulceration of the GI tract?
10    MS. duPONT:
11       Object to form.
12    THE WITNESS:
13       It's my testimony that nonsteroidal
14    anti-inflammatories as a class are
15    associated with an increased risk of
16    gastric bleeding for several reasons,
17    three specifically: one, as they inhibit
18    prostaglandin synthesis, they inhibit
19    production of the protective mucus lining
20    in the stomach; two, many nonsteroidals
21    are local irritants to the esophagus, the
22    duodenum, and the stomach; and three,
23    because nonsteroidals are reversible
24    inhibitors of cyclooxygenase, as a class
25    they impair platelet function.

Page 143

1       So the combination of a decreased
2    protective level -- layer, a local
3    irritation, and inhibition of a normal
4    clotting cell to do its job render these
5    drugs likely to be associated with GI
6    bleeding.
7  BY MR. GOZA:
8     Q. Okay. And I understand in general
9  there -- there are certain mechanisms by which
10 these drugs can contribute to a bleed.
11    But what I'm trying to understand here --
12 are you saying that in this case, that
13 Mr. Boudreaux's use of -- let's take indomethacin
14 at this point, caused or contributed to cause his
15 GI bleed, or are you simply saying that's a
16 possibility I can't rule out?
17    MS. duPONT:
18       Object to form.
19    THE WITNESS:
20       I'm saying the fact that Mr. Boudreaux
21    was on NSAIDs in addition to aspirin and
22    rivaroxaban, his risk of bleeding was
23    increased over patients not taking those
24    medications.
25 BY MR. GOZA:

Page 144

1     Q. And fair to say that a number of patients
2  are -- in -- in your experience, many patients
3  that have atrial fibrillation are on aspirin
4  therapy?
5     MS. duPONT:
6        Object to form.
7     THE WITNESS:
8        So in my experience, because many
9     patients with atrial fibrillation develop
10    atrial fibrillation as a result of
11    hypertension, which is also a risk factor
12    for coronary artery disease, which is
13    typically treated with low dose aspirin,
14    there are many patients with atrial
15    fibrillation treated with aspirin in
16    addition to an oral anticoagulant.
17 BY MR. GOZA:
18    Q. And you've mentioned in terms of -- is --
19 one of the ways that aspirin contributes to the
20 risk of GI bleeds is through causing an ulcer?
21    MS. duPONT:
22       Object to form.
23    THE WITNESS:
24       So aspirin can contribute to bleeding
25    a number -- aspirin is in the class of

Page 145

1    drugs known as nonsteroidal
2    anti-inflammatories. So what I just said
3    for those, aspirin is included in that
4    class and in that description. Aspirin
5    can cause a direct ulcer, but aspirin can
6    also cause a local irritation known as
7    gastritis that's not a frank ulcer.
8  BY MR. GOZA:
9     Q. Okay. And I -- I am correct that
10 Dr. Joshi certainly didn't diagnose Mr. Boudreaux
11 as having a direct ulcer. True?
12    A. My recollection and review of Dr. Joshi's
13 report is he did not report an ulcer. That's
14 correct.
15    Q. And did he diagnose him with gastritis?
16    A. So gastritis is a difficult diagnosis to
17 make in the absence of bleeding.
18       The problem is is that when Mr. Boudreaux
19 had his upper endoscopy he was no longer bleeding.
20 The fact that gastritis wasn't noted just means
21 that he did not have bleeding at the time of the
22 endoscopy. That doesn't mean that he didn't have
23 it two days before or a week before.
24    Q. It also doesn't mean that he did; is that
25 correct?

Page 146

1　　MS. duPONT:
2　　　Object to form.
3　　THE WITNESS:
4　　　So the fact that it was not -- the
5　　fact that he didn't see it means that he
6　　didn't see it.
7　BY MR. GOZA:
8　　Q. Okay. So let's go back to my original
9　question, was: Did Dr. Joshi diagnose
10　Mr. Boudreaux with gastritis?
11　　MS. duPONT:
12　　　Object to form. Already answered it.
13　　THE WITNESS:
14　　　Dr. --
15　　MS. duPONT:
16　　　Asked and answered.
17　　THE WITNESS:
18　　　-- Joshi did not diagnose him with
19　gastritis, but that does not mean that
20　Mr. Boudreaux did not have gastritis.
21　MR. GOZA:
22　　　Move to strike after the response to
23　　the question.
24　BY MR. GOZA:
25　　Q. What I'm --

Page 147

1　　A. I'm going to qualify my answers. You may
2　not like my qualification, but I'm sorry. I'm
3　going to qualify my answers.
4　　Q. And I -- you're -- you're right. I may
5　not like it, and then I get to move to strike.
6　And we can all let the court decide it later on.
7　　So my -- my real -- what I -- what I'm
8　trying to get at here is -- I understand you've
9　listed a number of possibilities, and we've talked
10　about those several times.
11　　But am I correct that based upon the fact
12　that no one saw gastritis or diagnosed him with
13　gastritis or saw a direct ulcer diagnosed with --
14　diagnosed Mr. Boudreaux as having a direct ulcer,
15　that you're not going to come into the courtroom
16　and testify to a reasonable degree of medical
17　certainty that he had those conditions?
18　　MS. duPONT:
19　　　Object to form.
20　　THE WITNESS:
21　　　I am not going to testify that
22　　Mr. Boudreaux had gastritis or had an
23　　ulcer. And I'm certainly not going to
24　　testify that he did not have those as
25　　well. Well, I can't -- I'm going to

Page 148

1　　testify he did not have an ulcer, because
2　　that would have been visualized.
3　BY MR. GOZA:
4　　Q. You -- you say that Mr. Boudreaux had an
5　enlarged liver of unclear etiology, if I read that
6　correctly?
7　　A. That's correct. And that's from the
8　medical records.
9　　Q. Okay. And has anyone, to your knowledge,
10　in reading the records done any evaluation, or has
11　there been any clearing up of that issue about the
12　cause of any enlarged liver?
13　　MS. duPONT:
14　　　Object to form.
15　　THE WITNESS:
16　　　I believe that there's some
17　　speculation in the chart, but there's no
18　　-- there was no liver biopsy, which is
19　　what would probably be needed to determine
20　　precisely the etiology of his enlarged
21　　liver. I believe that there's some
22　　speculation that this might be passive
23　　congestion from congestive heart failure
24　　and/or fatty liver from diabetes and
25　　obesity, but there's no definitive

Page 149

1　　diagnosis in the record.
2　BY MR. GOZA:
3　　Q. And does enlarged liver from passive
4　congestion -- is it -- is it your testimony that
5　enlarged liver from passive heart congestion
6　result in increased bleeding risk?
7　　A. So because the liver makes every clotting
8　factor in the body, patients with liver injury can
9　have an impaired ability to synthesize coagulation
10　factors, which interestingly, because of the short
11　half-life of Factor VII result in elevations in
12　the prothrombin time.
13　　Q. Okay. I -- I may -- I'm not sure if that
14　is responsive. Let me ask my -- my question again
15　because I'm not sure I -- it had any -- you didn't
16　mention anything about bleeding risk. So I'm --
17　I'm a little unclear.
18　　I said: Is it your testimony that
19　enlarged liver from passive heart congestion
20　results in increased bleeding risk?
21　　MS. duPONT:
22　　　Object to form.
23　　THE WITNESS:
24　　　So insofar as passive congestion can
25　　impair the liver's ability to make

Page 150

1    clotting factors, it can be -- an enlarged
2    liver can be associated with an increased
3    risk for bleeding.
4  BY MR. GOZA:
5    Q.  And is there a way to test for that?
6    A.  So the best way to test for the liver's
7  ability to synthesize coagulation factors would be
8  to measure levels of specific coagulation factors.
9  Those were not done, and I'm not suggesting that
10  they should have been done in the case of
11  Mr. Boudreaux.
12    I will say, however, that because
13  Factor VII is intimately linked to the prothrombin
14  time, patients with liver insufficiency frequently
15  have elevations in their prothrombin time.
16    Q.  But prior to February 3rd of 2014, to your
17  knowledge, Mr. Boudreaux did not have any
18  elevations in his prothrombin time?
19    MS. duPONT:
20      Object to form.
21    THE WITNESS:
22      I'm going to go back and check to see
23      what his prothrombin time was.
24  BY MR. GOZA:
25    Q.  You can look at the time that he had his

Page 151

1  atrial fibrillation in January, and it'll be -- I
2  think you've got it documented in your chart.
3    A.  I -- I have it documented throughout.  Let
4  me just look.
5    Q.  On Page 4.
6    A.  No.  I want to look.
7    Q.  I don't think there is any other --
8    A.  If there's none before that, then I . . .
9  PT was normal at 11.4.  Okay.
10    Q.  Yeah.
11    So the -- the -- as far as you know, the
12  -- the only PT you have documented in your report
13  was the month before, and it was normal?
14    A.  I believe I have PTs documented after that
15  as well --
16    Q.  Okay.
17    A.  -- specifically at the time he was
18  admitted, etcetera, but I don't think those times
19  are P -- prothrombin times that you're referring
20  to.
21    Q.  You mentioned that if someone has iron
22  anemia that's a result of loss of blood from an
23  occult bleed it can be associated with low iron,
24  elevated TIBC, and low ferritin; is that right?
25    MS. duPONT:

Page 152

1    Where are you reading from?
2    MR. GOZA:
3      I'm sorry.  I was reading on Page 9.
4    THE WITNESS:
5      So patients who have iron deficiency
6      show laboratory studies that include a low
7      serum iron, an elevated TIBC, and a
8      decreased ferritin.
9  BY MR. GOZA:
10    Q.  Okay.  And in looking at Mr. Boudreaux's
11  laboratory results from February -- I believe this
12  is the 4th.  You have those listed on Page 8.
13    A.  At the very top?
14    Q.  Yes, sir.
15    His iron level's listed as 53 with a
16  normal of 45 to 160; is that right?
17    A.  That's correct.
18    But I should mention this was after
19  transfusion.  So once you transfuse a patient,
20  since each unit of blood contains about
21  500 milligrams of iron, iron studies are
22  unreliable and uninterpretable.
23    Q.  How --
24    A.  So these tests were done after
25  transfusion.

Page 153

1    Q.  Okay.  And how about with respect to the
2  TIBC?
3    A.  Same thing.  It was done after
4  transfusion.  It's uninterpretable.
5    Q.  And I'm assuming the -- the --
6    A.  Same thing for the sat and the ferritin.
7  Correct.
8    Q.  I was getting there.
9    A.  I jumped ahead for you.
10    MR. GOZA:
11      Why don't we take just a couple-minute
12      break.  I think I'm done.
13    MS. duPONT:
14      Okay.
15    THE VIDEOGRAPHER:
16      We're now off the record at 11:36.
17      (Brief recess was taken.)
18    THE VIDEOGRAPHER:
19      We're now back on the record.  The
20      time is 11:46.
21  BY MR. GOZA:
22    Q.  All right.  If you would pull up -- and I
23  think it's Exhibit 5.  Is that Mueck's article?
24    MS. duPONT:
25      Mueck?

Page 154

1    MR. GOZA:
2        Mueck.
3    MS. duPONT:
4        Yeah.
5    THE WITNESS:
6        Mueck's Article 5.
7  BY MR. GOZA:
8    Q.  If you look on Page 9 -- you and I have
9  been talking about dose-dependent concentration
10 levels, and we had read through the label.  And I
11 -- I want to understand just a couple of things.
12 Mueck, down at the -- on the far left-hand side of
13 that statement -- or far left-hand side of that
14 page, about halfway down, said, "The inhibition of
15 Factor Xa activity and plasma concentrations of
16 rivaroxaban were closely correlated according to a
17 maximum effect (Emax)" mode.  "Prolongation of the
18 PT (using Neoplastin) was correlated with the
19 rivaroxaban plasma concentrations in a linear
20 relationship."
21     First, let's make sure I read right.
22 Did I?
23   A.  You did.
24   MS. duPONT:
25     And I just want to interject a

Page 155

1  objection here, that this is beyond the
2  scope of Mr. Boudreaux's report.  This
3  really does not have to do with
4  Mr. Boudreaux.  So you better lay a
5  foundation quick.
6    MR. GOZA:
7        Well, I -- I'm going to be there
8  quickly.
9  BY MR. GOZA:
10   Q.  So when we had talked a little bit about
11 -- in your report you say, you know, PT is not
12 related --
13   MS. duPONT:
14     Object to form.
15 BY MR. GOZA:
16   Q.  -- in terms of the effect of the -- of the
17 drug or concentration levels.  So I'm trying to
18 make sure I understand this.
19     Is -- is this -- is, first of all, what
20 Dr. Mueck's saying is that as you give -- get a
21 higher concentration of Xarelto in the blood it
22 results in a prolongation of the PT time?
23   MS. duPONT:
24     Object to form.
25   THE WITNESS:

Page 156

1      So we talked about this before the
2  break.  And this is exactly the graph I
3  was referring to, on the same page,
4  Graph B.
5      The problem with that graph is if you
6  look on the x-axis, the rivaroxaban plasma
7  concentrations --
8  BY MR. GOZA:
9    Q.  That's what I was going to -- is -- the
10 x-axis, that would be the horizontal --
11   A.  Correct.  The --
12   Q.  -- axis?
13   A.  -- x is horizontal.
14   Q.  Okay.
15   A.  And that -- carrying that out to 600 is
16 about six-fold what you get with typical drug
17 dosing.  If you look at the part of this graph
18 where the x-axis only goes from 0 to 100 -- or
19 I'll even give you 0 to 200 -- that linearity
20 falls off pretty quickly.
21     So when you say there's a linear
22 correlation, it depends on what part of the graph
23 you're looking at.  And things get much less
24 linear, i.e., there's much more scatter, at the
25 serum concentrations that are typical with the

Page 157

1  drug.
2    Q.  In coming up -- and again, this is --
3  strike that.
4      We've established that -- that Dr. Mueck
5  is an employee of Bayer.  And he looks at this
6  model, though, and comes to the conclusion that
7  there's a linear relationship with prolongation of
8  PT and concentration levels; is that correct?
9    A.  So that conclusion can be drawn from
10 Graph B if you look at the -- the range of serum
11 -- plasma concentrations that greatly exceed the
12 -- those that you see in typical dosing.  So
13 Dr. Mueck is -- is making a statement based on
14 this total graph.  When pharmacokinetic and
15 pharmacodynamic studies are done, they're done
16 over a dosing range in part to find out what the
17 dose that the patient should be treated with
18 actually is.  And it's a dose-finding study.  So
19 that linearity applies to that line over a very,
20 very broad dosing range.
21     Dr. Mueck does not -- and it -- Dr. Mueck
22 just doesn't talk about the part -- portion of the
23 curve that you see with typical doses or the doses
24 that we use in patients.  That would be the
25 proximal part of the curve, the part closest to

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 158

1  the origin, and you can see significant scatter on
2  that diagram in that range.
3     Q.  Are you able to determine at -- for
4  instance, you said I -- I'll give you to
5  200 milligrams.  How is it, first of all, that
6  they -- well, strike that.
7        It -- how far back do you go before you
8  see the linear -- linear relationship that Mueck
9  is referring to?
10       MS. duPONT:
11          Object to form.
12       THE WITNESS:
13          I think Dr. Mueck is referring to
14       linearity over the entire dose range.
15       MR. GOZA:
16          Okay.
17       THE WITNESS:
18          He doesn't break it down by dose.  And
19       that's why the statement is only true over
20       that entire dose range.
21          I'm also going to add that there's no
22       R-squared.  There's no correlation
23       coefficient.  So the exact linearity -- he
24       states it's linear, but I'd like to know
25       an R-squared to know how linear this

Page 159

1       relationship actually is.
2  BY MR. GOZA:
3     Q.  Okay.  And that gets to I -- I -- I guess
4  my -- my point in this.
5        What you're saying is in order to give
6  more weight to his statement, you'd want to know
7  what the R-squared number was with respect to the
8  linearity.  Is that true?
9        MS. duPONT:
10          Object to form.
11       THE WITNESS:
12          So one way of assessing the best fit
13       of a line is the least squares method,
14       where you calculate an R-squared or a
15       correlation coefficient that basically is
16       an indication of the percentage of data
17       points that are accounted for by the line.
18       I'd like to know an R-squared, but
19       specifically I'd like to know an R-squared
20       over the plasma concentrations that are
21       found with typical dosing.
22       MS. duPONT:
23          Kirk, that has gone way beyond
24       Boudreaux.  I think you need to move on.
25       MR. GOZA:

Page 160

1        Last question.
2  BY MR. GOZA:
3     Q.  So is it fair --
4        MS. duPONT:
5          I want you to move on.
6        MR. GOZA:
7          Well, I'm going to -- just one
8       question.
9  BY MR. GOZA:
10    Q.  And at least you don't see that R-squared
11 number in this article; is that --
12       MS. duPONT:
13          Object to form.
14 BY MR. GOZA:
15    Q.  -- correct?
16       MS. duPONT:
17          Object to form.
18 BY MR. GOZA:
19    Q.  And by the way, I'm not saying it's there.
20 I -- I'm -- I'm just asking the question.
21       MS. duPONT:
22          You can answer.
23       THE WITNESS:
24          Oh, I'm sorry.  I --
25       MS. duPONT:

Page 161

1        Yeah.
2  THE WITNESS:
3        -- didn't realize you were waiting for
4  me.
5        I don't see an R-squared associated
6  with that line.  No.
7  MR. GOZA:
8        Okay.  All right.  With that, I don't
9  have any other questions for you.
10 MS. duPONT:
11       So I -- I don't think I have any
12 questions either.
13 MR. HOGUE:
14       All right.
15 THE VIDEOGRAPHER:
16       Today's --
17 MR. GOZA:
18       Okay.
19 THE VIDEOGRAPHER:
20       Today's deposition consists of three
21 tapes.  This is the end of Tape 3.  We're
22 now off the record at 11:54.
23
24
25

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 162

CHANGES AND SIGNATURE
1
2 WITNESS NAME: MARC J. KAHN, M.D., M.B.A.
3 DATE OF DEPOSITION: Friday, January 13, 2017
4
5 PAGE LINE     CHANGE          REASON
6 _____ _____ _____ _____
7 _____ _____ _____ _____
8 _____ _____ _____ _____
9 _____ _____ _____ _____
10 _____ _____ _____ _____
11 _____ _____ _____ _____
12 _____ _____ _____ _____
13 _____ _____ _____ _____
14 _____ _____ _____ _____
15 _____ _____ _____ _____
16 _____ _____ _____ _____
17 _____ _____ _____ _____
18 _____ _____ _____ _____
19 _____ _____ _____ _____
20 _____ _____ _____ _____
21 _____ _____ _____ _____
22 _____ _____ _____ _____
23 _____ _____ _____ _____
24 _____ _____ _____ _____
25 _____ _____ _____ _____

Page 163

1            WITNESS' CERTIFICATE
2
3    I have read or have had the foregoing
4 testimony read to me and hereby certify that it is
5 a true and correct transcription of my testimony
6 with the exception of any attached corrections or
7 changes.
8
9
10
11
12
13
14
15
16
17
18            _____
19            WITNESS' SIGNATURE
20
21
22
23 PLEASE INDICATE
24 [] NO CORRECTIONS
25 [] CORRECTIONS; ERRATA SHEET(S) ENCLOSED

Page 164

1            C E R T I F I C A T E
2    This certification is valid only for
3 a transcript accompanied by my original signature
4 and original seal on this page.
5    I, AURORA M. PERRIEN, Registered Professional
6 Reporter, Certified Court Reporter, in and for the
7 State of Louisiana, as the officer before whom
8 this testimony was taken, do hereby certify that
9 MARC J. KAHN, M.D., M.B.A., after having been duly
10 sworn by me upon the authority of R.S. 37:2554,
11 did testify as hereinbefore set forth in the
12 foregoing 163 pages; that this testimony was
13 reported by me in the stenotype reporting method,
14 was prepared and transcribed by me or under my
15 personal direction and supervision, and is a true
16 and correct transcript to the best of my ability
17 and understanding; that the transcript has been
18 prepared in compliance with transcript format
19 guidelines required by statute or by rules of the
20 board; and that I am informed about the complete
21 arrangement, financial or otherwise, with the
22 person or entity making arrangements for
23 deposition services; that I have acted in
24 compliance with the prohibition on contractual
25 relationships, as defined by Louisiana Code of

Page 165

1 Civil Procedure Article 1434 and in rules and
2 advisory opinions of the board; that I have no
3 actual knowledge of any prohibited employment or
4 contractual relationship, direct or indirect,
5 between a court reporting firm and any party
6 litigant in this matter nor is there any such
7 relationship between myself and a party litigant
8 in this matter. I am not related to counsel or to
9 the parties herein, nor am I otherwise interested
10 in the outcome of this matter.
11
12
13
14
15            AURORA M. PERRIEN, CCR, RPR
16
17
18
19
20
21
22
23
24
25