UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  XARELTO (RIVAROXABAN) | * | MDL 2592 |
| PRODUCTS LIABILITY LITIGATION | * | |
| | * | SECTION L |
| THIS DOCUMENT RELATES TO: | * | |
| *ALL CASES* | * | JUDGE ELDON E. FALLON |
| | * | |
| | * | MAG. JUDGE NORTH |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * *

---

**EXHIBIT 11 TO**
**PLAINTIFFS' MOTION TO PRECLUDE SPECULATIVE TESTIMONY**
**FROM SIX DEFENSE EXPERTS ABOUT POTENTIAL OUTCOMES**
**FROM OTHER ANTICOAGULANTS**

---

# FILED UNDER SEAL

Protected - Subject to Further Protective Review

```
 1              UNITED STATES DISTRICT COURT

                EASTERN DISTRICT OF LOUISIANA

 2

 3

      IN RE:  XARELTO          )  MDL No.:  2592

 4    (RIVAROXABAN) PRODUCTS    )  Section:  L

      LIABILITY LITIGATION      )  Judge Eldon E. Fallon

 5                              )  Mag. Judge North

                                )

 6                              )

                                )

 7    JOSEPH J. BOUDREAUX,      )  Case No.:

      JR.                       )  2:14-CV-2720

 8    and LORETTA BOUDREAUX     )

 9

10

11    PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

12

13

14      Videotaped deposition of SAMMY KHATIB, M.D.,

15    taken on Saturday, January 21, 2017, in the office

16    of Irwin, Fritchie, Urquhart & Moore, L.L.C., 400

17    Poydras Street, Suite 2700, New Orleans, Louisiana

18    70130, commencing at 12:20 p.m.

19

20

21

22

23

      Reported by:

24    AURORA M. PERRIEN

      CERTIFIED COURT REPORTER

25    REGISTERED PROFESSIONAL REPORTER
```

Page 2

```
 1              I N D E X
                             Page
 2
      Caption............................1
 3
      Appearances........................3
 4
      Agreement of Counsel...............5
 5
      Witness' Certificate.............105
 6
      Reporter's Certificate...........106
 7
 8
          E X A M I N A T I O N
 9
      MR. HONNOLD.......................7
10
11
12        E X H I B I T S
13    Exhibit No. 1....................12
      Expert Report of Dr. Sammy Khatib
14
      Exhibit No. 2....................73
15    (articles in globo)
16    Exhibit No. 3....................77
      (articles in globo)
17
      Exhibit No. 4....................94
18    (statements/invoices)
19
20
21
22
23
24
25
```

Page 4

```
 1    REPRESENTING JANSSEN PHARMACEUTICALS, INC.,
      JANSSEN RESEARCH & DEVELOPMENT, L.L.C., JANSSEN
 2    ORTHO, L.L.C.:
 3        IRWIN, FRITCHIE, URQUHART & MOORE, L.L.C.
          BY:  JIMMY IRWIN, ESQ.
 4        400 Poydras Street, Suite 2700
          New Orleans, Louisiana 70130-3280
 5        504.310.2106
          Jimmy@irwinllc.com
 6
          IRWIN, FRITCHIE, URQUHART & MOORE, L.L.C.
 7        BY:  MEERA U. SOSSAMON, ESQ.
          400 Poydras Street, Suite 2700
 8        New Orleans, Louisiana 70130-3280
          504.310.2106
 9        Msossamon@irwinllc.com
10        BARRASSO, USDIN, KUPPERMAN, FREEMAN &
          SARVER, L.L.C.
11        BY:  RICHARD E. SARVER, ESQ.
          909 Poydras Street, Suite 2400
12        New Orleans, Louisiana 70112
          504.589.9700
13        Rsarver@barrassousdin.com
14        BARRASSO, USDIN, KUPPERMAN, FREEMAN &
          SARVER, L.L.C.
15        BY:  SHAUN P. McFALL, ESQ.
          909 Poydras Street, 24th Floor
16        New Orleans, Louisiana 70112
          504.589.9764
17        Smcfall@barrassousdin.com
18
19    ALSO PRESENT:
20        MELISSA BARDWELL, VIDEOGRAPHER
21
22
23
24
25
```

Page 3

```
 1          A P P E A R A N C E S
 2    REPRESENTING PLAINTIFFS:
 3        LEVIN, PAPANTONIO, THOMAS,
          MITCHELL, RAFFERTY, PROCTOR, P.A.
 4        BY:  NEIL E. McWILLIAMS, JR., ESQ.
          316 South Baylen Street
 5        Pensacola, Florida 32502
          850.435.7000
 6        Nmcwilliams@levinlaw.com
 7        THE LAMBERT FIRM, A.P.L.C.
          BY:  EMILY C. JEFFCOTT, ESQ.
 8        701 Magazine Street
          New Orleans, Louisiana 70130
 9        504.581.1750
          Ejeffcott@thelambertfirm.com
10
          GOZA & HONNOLD, L.L.C.
11        BY:  BRADLEY D. HONNOLD, ESQ.
          11181 Overbrook Road, Suite 200
12        Leawood, Kansas 66211-2241
          913.451.3433
13        Bhonnold@gohonlaw.com
14
15        REPRESENTING BAYER HEALTHCARE PHARMACEUTICALS,
16    INC., and BAYER PHARMA AG:
17        NELSON, MULLINS, RILEY &
          SCARBOROUGH, L.L.P.
18        BY:  ERIC A. PAINE, ESQ.
          1320 Main Street, 17th Floor
19        Columbia, South Carolina 29201
          803.255.5518
20        Eric.paine@nelsonmullins.com
21
22
23
24
25
```

Page 5

```
 1          S T I P U L A T I O N
 2       It is stipulated by and among Counsel that
 3    the videotaped deposition of SAMMY KHATIB, M.D.,
 4    is being taken under the Federal Rules of Civil
 5    Procedure for all purposes permitted under the
 6    law.
 7       The formalities of reading and signing are
 8    not waived.
 9       The formalities of sealing, certification
10    and filing are not hereby waived.  The party
11    responsible for services of the discovery material
12    shall retain the original.
13       All objections, except those as to the
14    form of the questions and/or the responsiveness of
15    the answers, are reserved until the time of the
16    trial of this cause.
17              *  *  *  *  *
18       Aurora M. Perrien, Certified Court
19    Reporter, Registered Professional Reporter, in and
20    for the State of Louisiana, officiated in
21    administering the oath to the witness.
22
23
24
25
```

Protected — Subject to Further Protective Review

| Page 6 | Page 8 |
|---|---|

**Page 6**

1   P R O C E E D I N G S
2   THE VIDEOGRAPHER:
3       We are now on the record.  My name is
4   Melissa Bardwell, videographer here for
5   Golkow Technologies.  The date today is
6   January 21st, 2017.  The time now is
7   approximately 12:20 p.m.  The videotaped
8   deposition is being held in New Orleans,
9   Louisiana, taken in reference to the
10  Xarelto (rivaroxaban) Products Liability
11  Litigation.  The deponent today is
12  Sammy Khatib, MD.
13      Would counsel present please introduce
14  themselves and state their affiliations
15  for the record.
16  MR. HONNOLD:
17      Brad Honnold for Mr. Boudreaux.
18  MR. McWILLIAMS:
19      Ned McWilliams for the plaintiffs.
20  MS. JEFFCOTT:
21      Emily Jeffcott for the plaintiffs.
22  MR. SARVER:
23      Rick Sarver for Janssen.
24  MR. McFALL:
25      Shaun McFall for Janssen.

**Page 7**

1   MR. IRWIN:
2       Jim Irwin for Janssen.
3   MR. SOSSAMON:
4       Meera Sossamon for Janssen.
5   MR. PAINE:
6       Eric Paine for Bayer.
7   THE VIDEOGRAPHER:
8       The court reporter is Aurora Perrien,
9   and she will now swear in the witness.
10  (The court reporter swore in the witness.)
11      E X A M I N A T I O N
12  BY MR. HONNOLD:
13  Q.  You're still Dr. Khatib?
14  A.  I think so.
15  Q.  Yeah.  Okay.
16      So that's the third time you've taken an
17  oath in a -- in a case related to Xarelto in some
18  way; right?
19  A.  Yes, sir.
20  Q.  Okay.  So in -- related to the Xarelto
21  litigation, you prepared a general or a generic
22  report related to general issues on the Xarelto
23  litigation; is that right?
24  A.  Yes, sir.
25  Q.  Then you prepared an individual report

**Page 8**

1   related to a case -- Mrs. Orr's case; right?
2   A.  Yes, sir.
3   Q.  And we've spent the morning or much of the
4   morning taking your deposition in that case;
5   correct?
6   A.  Yes, sir.
7   Q.  And in addition to that work, you've also
8   prepared a report in a case related to
9   Joseph Boudreaux; is that right?
10  A.  Yes, sir.
11  Q.  So is it fair to say that that work -- the
12  work that you did on your general or generic
13  report, the work that you did on Mrs. Orr's
14  report, and the work that you did on
15  Mr. Boudreaux's report, would that -- would that
16  encompass all of the work that you've done on the
17  Xarelto litigation?
18  A.  No.  I was involved in science day.
19  Q.  Okay.  So beyond those three cases,
20  there's more work that you've done for Janssen --
21  A.  Yes, sir.
22  Q.  -- related to Xarelto; is that right?
23  A.  Yes, sir.
24  Q.  Okay.  And you said something about
25  science day; is that right?

**Page 9**

1   A.  Yes, sir.
2   Q.  And -- and what -- what kind of work did
3   you do for that?
4   A.  That was presenting to Judge Fallon
5   regarding the science of atrial fibrillation and
6   Xarelto.
7   Q.  And so that -- that work then would take
8   you -- would date back to the early parts of 2015;
9   is that right?
10  A.  Yes, sir.
11  Q.  So you've been retained and working for
12  Janssen in -- in some regard going back to the
13  early parts of 2015 up until today, the early part
14  of 2017.  Is that true?
15  A.  Yes, sir.
16  Q.  In terms of the entirety of work that
17  you've ever done for Janssen, would that cover
18  everything, or is there other types of work
19  that -- or consultation work that you've done for
20  Janssen over the years?
21  A.  That is everything.
22  Q.  Okay.  Have you ever -- have you or
23  Ochsner ever received work that you were involved
24  -- received monies where you were involved in
25  doing some work or presentation work for Janssen

Protected – Subject to Further Protective Review

Page 10

1  in any way?
2      MR. SARVER:
3          Object to the form.
4      THE WITNESS:
5          No, sir.  I'm sorry.  Can you repeat
6      that?
7      MR. HONNOLD:
8          Sure.
9      THE WITNESS:
10          I want to make sure I'm answering
11      right.
12  BY MR. HONNOLD:
13      Q.  Did -- to your knowledge --
14      A.  Before this?
15      Q.  Yes.  Before this.
16      A.  No, sir.
17      Q.  Okay.  So you've -- other than the work
18  related to Xarelto, you've never received any
19  monies from Janssen?
20      A.  Not to my knowledge.
21      Q.  Okay.  And were you involved in doing any
22  presentations or symposiums or seminars where
23  Janssen had made payments to you or Ochsner for
24  that work?
25      A.  Oh.  To Ochsner, yes.  Yes, sir.

Page 11

1      Q.  All right.  Tell me about that.
2      A.  That was a -- no.  Not -- not Janssen.
3  I'm sorry.  That was Bristol-Myers Squibb for
4  Eliquis.
5      Q.  Okay.  All right.  So you've worked for
6  another maker of one of the drugs in the NOAC
7  class besides Janssen; is that right?
8      A.  No, sir.  I was -- I was employed by
9  Ochsner, paid by Ochsner --
10      Q.  Okay.
11      A.  -- to do this.  This was something that
12  Ochsner sponsored and they asked me to get
13  involved.  So I would say I was working for
14  Ochsner.
15      Q.  Okay.  So the work that you did that was
16  in some way related to Eliquis, your view is that
17  was in kind of the course and scope of your
18  employment with Ochsner?
19      A.  Yes, sir.
20      Q.  Okay.  To your knowledge, was Ochsner in
21  some way compensated by the makers of Eliquis for
22  that work?
23      A.  Yes, sir.
24      Q.  Okay.  We talked about the fact that you
25  prepared a report in Mr. Boudreaux's case;

Page 12

1  correct?
2      A.  Yes, sir.
3      Q.  Okay.  I'm going to hand to you what's
4  been marked as Deposition Exhibit No. 1.
5          (Exhibit No. 1 was marked for
6          identification and attached hereto.)
7      MR. SARVER:
8          Thank you.
9  BY MR. HONNOLD:
10      Q.  And can you tell us what -- what Exhibit 1
11  is?
12      A.  This appears to be my expert report in --
13  regarding Mr. Boudreaux.
14      Q.  And we never met before today; correct?
15      A.  No, sir.
16      Q.  You did know, though, today well in
17  advance that you were going to be called upon to
18  give a deposition in the Boudreaux case; right?
19      A.  Yes, sir.
20      Q.  And this report related to the Boudreaux
21  case, you signed it on November 15th, 2016; is
22  that right?
23      A.  I don't recollect the date.  Yep.  There
24  it is.
25      Q.  And that --

Page 13

1      A.  Yes, sir.
2      Q.  That's shown on Page 18 of the report;
3  correct?
4      A.  Yes, sir.
5      Q.  Since November 15th of 2016, have you come
6  upon any reason that would cause you to think
7  there was a need to modify, change, or update your
8  report in any way?
9      A.  No, sir.
10      Q.  Okay.  So as of today, the things that are
11  set forth in Exhibit 1 are essentially your
12  opinions as it relates to the Boudreaux case?
13      A.  I'm comfortable with the -- the report.
14  Yes.
15      Q.  Who was it that -- that engaged you or
16  retained you in terms of preparing an individual
17  report on Mr. Boudreaux's case?
18      A.  I -- I know who it was that initially
19  engaged me regarding the whole project.  That was
20  Kim Moore.  As to who brought up this specific
21  one, I -- I think it was Kim Moore, but I can't
22  promise that.
23      Q.  Do you recall when you first received
24  Mr. Boudreaux's medical records?
25      A.  Not off the top of my head.  Not off the

Page 14

1 top of my head.

2     Q. Okay. And do you recall how much time you

3 spent in terms of the number of hours preparing

4 Exhibit 1?

5     A. So how much time I spent specific to

6 Mr. Boudreaux?

7     Q. Yes.

8     A. I have a ballpark, not a absolute number.

9 I would put it around 10 to -- 10 hours, 10, 12 --

10     Q. And in --

11     A. -- somewhere north of 10.

12     Q. In terms of Exhibit 1 related to

13 Mr. Boudreaux, the report specifically for

14 Mr. Boudreaux's case, what was your assignment?

15 What -- what --

16     A. What was --

17     Q. What question were you presented with to

18 take on or address in your report?

19     A. I was asked to comment on the utilization

20 of Xarelto in the case of Mr. Boudreaux and review

21 his clinical course.

22     Q. And so when you say "review his clinical

23 course," does that mean kind of look over the

24 medical facts and details of his -- of his case --

25     A. Yes, sir.

Page 15

1     Q. -- and his care?

2     A. Yes, sir.

3     Q. Okay. And in fact, if you look at

4 Exhibit 1, you spend much of the report

5 essentially providing a narrative in terms of the

6 details of his medical course; is that right?

7     A. I tried to to the best of my abilities.

8 Yes.

9     Q. Okay. Now, if -- if you look at your

10 report and focus on I guess from Pages 2 through

11 the top of Page 12, would it -- would it be fair

12 to say other than the -- other than the statements

13 relating to your background and -- and your

14 current practice, things of that nature, it --

15 would it be fair to say that Pages 2 through 12

16 essentially focus on the medical facts and details

17 related to Mr. Boudreaux's case?

18     A. I think the overall -- the structure and

19 the sequence was dictated by the clinical care --

20 the clinical situation. I -- I -- and I think --

21 if I'm not mistaken, I had commentary clinically

22 that wasn't specific to his records interspersed

23 throughout, trying to do it in a sequence that was

24 related to his clinical course.

25     Q. Okay. There are occasions where you might

Page 16

1 provide some explanatory information that is --

2 that you provided to perhaps present the factual

3 information in a -- in a clearer light or to

4 provide some background explanation for it?

5     A. To give background. The -- the goal is to

6 give background and context.

7     Q. Okay. And so if you look at Pages 2

8 through the top of Page 12, it -- what -- what

9 statements in that page ranges if any do you view

10 as being opinion sourced to you or your -- your

11 opinions about Mr. Boudreaux?

12     MR. SARVER:

13        Object to form.

14     THE WITNESS:

15        Okay. I can try and go through this,

16 if that's what you're asking. So the

17 beginning to Page 4, definitely summation

18 of the facts, development of a-fib and

19 CHF, begins with summation of facts.

20 Summation of facts on Page 5. Summation

21 of facts, Page 6. So opinion has -- after

22 the PT, "this information is not

23 clinically useful," that's my

24 interpretation of the data. That's not a

25 simple fact. So that part is my

Page 17

1 interpretation of the science. After

2 that --

3 BY MR. HONNOLD:

4     Q. And let -- let me -- as we go on here and

5 as you identify things that might be opinion --

6     A. Sure.

7     Q. -- I might have some questions for you.

8 So as it relates to those four lines

9 related to PT on Page 6, you said that that --

10 that is information about the PT that is -- would

11 it be fair to say is interpretation of -- of the

12 data or some data as you read it?

13     A. I'm sorry.

14     Q. Is it --

15     A. The interpretation of the data --

16     Q. Yes.

17     A. -- of the PT?

18     Q. Related to PT that's in the medical

19 literature.

20     A. Is this my base -- my understanding -- my

21 interpretation of the literature and the science

22 regarding PT? Is that --

23     Q. Okay.

24     A. -- what you're . . . Yes.

25     Q. Is that what that is?

Page 18

1  A. Yes, sir.
2  Q. Okay. Now, let me ask you this --
3  A. Sure.
4  Q. -- is -- is that information as it's
5  stated here unique to the Boudreaux case in any
6  way, or is that subject matter that had been
7  talked about at great length in your -- in your
8  general or generic deposition that was taken a
9  while back?
10  A. This is not unique to the Boudreaux case.
11  This is my thoughts on PT utilization in general
12  with rivaroxaban. The -- the time that I made
13  this paper was before the deposition. So it had
14  nothing to do with the discussion from the
15  deposition on the general report.
16  Q. Okay. Now, let me ask you a couple more
17  questions about this then, and I'm going to try to
18  make my questions as specific as I can. Okay.
19  So anywhere on your report on Page 6 do
20  you provide any statement or view as to what you
21  believe was the cause of elevated PT that you
22  reference on Page 6? And my question for you is:
23  In your report, do you make any --
24  A. Got it.
25  Q. -- such statement about it?

Page 19

1  A. No, sir.
2  Q. In the report, do you make any statement
3  or reference to what reagent was used to generate
4  that PT result?
5  A. No, sir.
6  Q. Would it be fair to say that your -- your
7  view about the -- your only view about the PT of
8  13.5 is what you state there on Page 6, the -- the
9  four lines that you say is your view of the
10  science and literature related to PT?
11  MR. SARVER:
12  Object to form.
13  THE WITNESS:
14  I'm reluctant to take a narrow view on
15  this and restrict it to what my statements
16  are here. They're more nuanced than a
17  four-sentence statement.
18  BY MR. HONNOLD:
19  Q. Okay. But you don't state anything in
20  your report other than those four lines; right?
21  A. I don't remember -- and we can go through
22  the rest of the report. I don't have anything
23  here. After this, we go back to the facts.
24  Q. Okay.
25  A. So I don't know that I have other than

Page 20

1  here.
2  Q. Let's just hold that then as an open
3  question as we go through, and let's --
4  A. Okay.
5  Q. -- move back to -- to -- to close that
6  loop as to whether you raise anything else about
7  the PT. Will you -- will you keep that open?
8  A. Yes, sir.
9  Q. Okay. All right. Then why don't we move
10  on then to at the very bottom of Page 6 and moving
11  forward.
12  A. Back to what is fact and what is
13  interpretation?
14  Q. Yes. Thank you.
15  A. Okay. "Decision was made to transfer,"
16  fact. So the rest of that section, I would say
17  fact.
18  Subsequent manage of a-fib . . . So
19  initially the first four -- first one, two, three,
20  four sentences were fact. I then tried to put
21  this into context. So this is my interpretation
22  of the science and how it applies in this specific
23  case.
24  Q. And let's stop right there.
25  So as I interpret that, your -- your basic

Page 21

1  statement there is that -- at that point in the
2  factual narrative, you are stating that given
3  Mr. Boudreaux's clinical situation, it was
4  indicated and appropriate to place him on some
5  type of anticoagulation; is that right?
6  A. I'm sorry. So at the time, after his GI
7  bleed, was it appropriate that -- so this was --
8  this was my comments -- this was after the GI
9  bleed. And this was discontinuation and pursuing
10  a rate control strategy. So that was what -- the
11  context of what I was writing here.
12  Q. Okay. And --
13  A. This was not about the -- I'm sorry to --
14  Q. Okay. No.
15  A. This was not the -- regarding the initial
16  decision to anticoagulate.
17  Q. All right. And I -- and I lost track of
18  where we were, in -- in what time.
19  A. Okay.
20  Q. But your reference there, the citation to
21  the American College of Cardiology statement or
22  guidance, that relates to the recommendations for
23  using anticoagulation after the patient has
24  returned to normal sinus rhythm; correct?
25  A. Yes, sir. Okay.

Page 22

1    Continuing?
2    Q.  And why don't you go ahead and continue
3  there going forward from Page 8.
4    A.  Okay.  So again, the rest of that part
5  before LARIAT Procedure, this is providing
6  clinical context for the rationale for not
7  pursuing a rate control strategy -- or not
8  pursuing a rhythm control strategy at that time.
9  That's my interpretation of the science.
10    The LARIAT Procedure . . . So he was
11  referred to Dr. LARIAT -- Dr. Fail -- by
12  Dr. Timothy for the LARIAT.  That is true.  So
13  this was not opinion or interpretation.  I'm --
14  I'm giving thoughts as to the rationale of why he
15  was referred.  I don't know if you'd put that
16  under purview of fact, medical fact, or
17  interpretation.  That's --
18    Q.  Would it be fair to say there on -- on the
19  bottom of Page 8 and throughout Page 9 what you
20  are doing is reporting both fact but then
21  providing some fairly detailed explanation of
22  background, providing some justification or
23  rationale for the treatment decisions that were
24  made?
25    A.  Yes, sir.

Page 23

1    Q.  All right.  Why don't we go ahead and go
2  forward then if you've gotten to Page 10.
3    A.  Go to 10.  Okay.  So starting with
4  "Initial evaluation," fact.  Outpatient -- so I
5  would say the rest of this was fact.
6    Eleven -- Page 11 now?
7    Q.  Yes, sir.
8    A.  Fact through 11.
9    And then subsequent management of a-fib
10  after LARIAT, continuing?
11    Q.  I'm with you.
12    A.  Okay.  All right.  So it starts with fact,
13  then applying clinical context again for the
14  rationale, similar to what we just discussed.
15  Then going back to fact.  Then description of a
16  cardioversion, that's clinical context.  And then
17  the -- "At follow-up," this was fact.
18    Q.  Okay.  And then that gets us to the
19  heading that's -- the heading on Page 12,
20  "Comments on the Utilization of Xarelto"; is that
21  right?
22    A.  Yes, sir.
23    Q.  And would it be fair to say then in that
24  section on Page 12 and Page 13, that you provide
25  the general backdrop and explanation of the

Page 24

1  science and medicine behind the -- the reasons for
2  putting patients with nonvalvular atrial
3  fibrillation on some type of anticoagulation?
4    A.  This is my attempt to put this in clinical
5  context.  And -- yes, so whether or not the
6  patient should be on anticoagulation.  The --
7    Q.  And -- and you kind of put a point on that
8  at the bottom of Page 13, going to the top of
9  Page 14, by putting a sentence both in bold and
10  underlining it, where you basically state that it
11  was consistent with the standard of care and in
12  fact required by the standard of care under these
13  circumstances to put Mr. Boudreaux on some sort of
14  anticoagulation; correct?
15    A.  I'm not going to use the word "required."
16  I would say "consistent."
17    Q.  So the standard -- so it was consistent
18  with the standard of care then for Dr. Wong to
19  place Mr. Boudreaux on some sort of
20  anticoagulation given his clinical circumstance;
21  correct?
22    A.  Yes, sir.
23    Q.  And then that last paragraph --
24    A.  Where are you?
25    Q.  The paragraph at the top --

Page 25

1    A.  I'm sorry.
2    Q.  -- of Page 14 --
3    A.  Okay.
4    Q.  -- where you attribute some degree of --
5  of state of mind or awareness to Dr. Wong, what's
6  your view of where that comes from --
7    A.  That comes --
8    Q.  -- or what is your source for that?
9    A.  The medical records and his deposition.
10    Q.  And so in terms of the point in
11  Mr. Boudreaux's chronology, where we are at that
12  point is essentially where he starts taking
13  Xarelto based upon the recommendation of Dr. Wong;
14  correct?
15    A.  Yes, sir.
16    Q.  Okay.  Now, in terms of the specific
17  details of what -- of what happened to
18  Mr. Boudreaux once he started taking Xarelto,
19  experiences the bleed, has a resuscitative care
20  for that, and how that continues over time, you
21  don't really go through any narrative relating to
22  those details, do you?
23    A.  We'll see when we review.
24    I did have the -- subsequent care with
25  the LARIAT and the decision to pursue normal sinus

Protected — Subject to Further Protective Review

Page 26

1 rhythm. I tried to focus on his cardiovascular
2 management. So I tried to represent his clinical
3 course subsequent to the bleed to the best of my
4 abilities. I think we have it here.
5     Q. Okay. And I guess to be fair, you didn't
6 go through a detailed recitation of -- for
7 example, when he came to the hospital, was
8 diagnosed as having a bleed, all of the -- the
9 care and treatment that he underwent during that
10 time?
11     MR. SARVER:
12         Object to form.
13     THE WITNESS:
14         I tried to give a summary that was
15     representative and not too wordy. We can
16     go back to that. I believe that was on
17     Page 6 to 7 --
18     MR. HONNOLD:
19         Okay.
20     THE WITNESS:
21         -- development and the management of
22     the GI bleed.
23 BY MR. HONNOLD:
24     Q. Okay. So in terms of -- of his clinical
25 course related to the bleed, that's set forth on

Page 27

1 Page 6 and Page 7; is that right?
2     A. This is in terms of the acute event of the
3 bleed --
4     Q. Okay.
5     A. -- and then the subsequent decisions that
6 were taken after that.
7     Q. And what you write in Page 6 and 7, the
8 source documents for that are many, many pages
9 from the medical records from his hospitalization;
10 correct?
11     A. Yes, sir.
12     Q. And I take it you just used your -- your
13 own judgment in terms of choosing what -- what to
14 comment on --
15     A. What to focus on?
16     Q. -- or what not -- what not to focus on
17 based upon its significance, in your view?
18     A. No. I -- I think that the GI bleed was a
19 significant event in the course of his care. As a
20 cardiologist and, again, in terms of management of
21 a-fib, I felt much -- I -- that's what my area of
22 expertise is and where I'm trying to spend a
23 significant amount of time. I wanted to be
24 thorough and -- and discuss -- and I think it is
25 germane to the discussion.

Page 28

1     So again, I -- I thought that this
2 represented his acute event and -- and what I deem
3 to be the relevant parts, how much transfusions he
4 underwent, when he underwent his EGD, when he
5 underwent his colonoscopy, the findings, and the
6 outpatient follow-up. So I -- I tried to be
7 thorough and I -- my representation here
8 represents that.
9     Q. Okay. Do -- do you routinely get called
10 to the emergency room if you have patients that
11 are -- I guess patients of yours for the care and
12 treatment of atrial fibrillation that you might be
13 managing them on some sort of anticoagulate, did
14 you -- do you ever get called to the emergency
15 room if they present with a GI bleed?
16     A. Usually -- so our fellow will go down and
17 evaluate. They'll call the fellow, and then it's
18 not uncommon for the fellow to contact me. It
19 depends on who's on service. So if not -- if I'm
20 not on service, it's one of my patients, the first
21 thing they'll do is they'll try and find me. If
22 I'm around and available, they'll come speak to
23 me. If not, they'll talk to one of my partners,
24 in which -- in -- in that scenario, my partner
25 will let me know or I'll follow up with the -- the

Page 29

1 patient after that.
2     Q. Do you find yourself, though, on -- on
3 occasion ever going to an emergency room and
4 actually writing orders for -- for patients who
5 present with a GI bleed?
6     A. Fellows write the orders. We'll discuss
7 the plan, and -- and they will -- and generally
8 for a GI bleed -- so -- the EP, the
9 electrophysiology service doesn't have a hospital
10 service. So we're consultants. So we'll make
11 recommendations as to orders to the primary team,
12 and generally those are carried out by the
13 admitting team.
14     Q. Okay. So as an electrophysiologist, do --
15 you say that you don't have a hospital service.
16 What do you mean by that?
17     A. All patients with cardiovascular issues,
18 be it arrhythmia issues or heart failure issues or
19 related to ischemia, are -- have historically been
20 admitted to the general cardiology service. We
21 have more recently now flipped to those patients
22 now going to a hospital medicine service. So
23 historically, the EP service we serve as
24 consultants. Sometimes we're driving care. So if
25 it's my patient and it's a primary arrythmia

Page 30

1 issue, for the most part the general cardiologists
2 simply defer to us. We'll tell them, These are --
3 this is what we recommend and they'll implement.
4 And sometimes it's truly as a -- in the spirit of
5 consultation.
6     Q. Okay. So in situations where patients are
7 on anticoagulants experience gastrointestinal
8 bleed, you yourself personally aren't the
9 physician that comes to the emergency room and
10 writes the initial orders regarding fluid
11 resuscitation, whether or not to give blood and if
12 so how much, whether or not to admit the patient,
13 things of that nature?
14     A. It's been a long time.
15     Q. Okay. So at your --
16     A. Yes, sir.
17     Q. Okay. So at your hospital, that's either
18 done -- that admission and management is either
19 done through general cardiology or through
20 hospital medicine; right?
21     A. Yes, sir.
22     Q. Okay. And hospital medicine, also called
23 hospitalists?
24     A. Yes.
25     And also we have rounded -- so we round on

Page 31

1 cardiology. Ninety-five percent of my practice is
2 EP. I live and breath electrophysiology. But we
3 spend some time on the cardiology service. So
4 when those patients get admitted to the
5 cardiovascular service -- have, not going forward
6 because we don't have service, but have, then it's
7 my team writing the orders. Again, it's still
8 fellows or residents or mid-level providers
9 writing the specific orders. But it's our plan,
10 my plan.
11     Q. Okay. If we go back to Exhibit 1, your
12 report, Page 14, do you see the heading there in
13 the middle of Page 14?
14     A. "Would the Clinical Outcome Have Been
15 Different if a Different Anticoagulant was
16 Utilized?" Yes.
17     Q. Okay. So were you called upon or asked to
18 render an opinion on that issue in Mr. Boudreaux's
19 case?
20     A. That question was posed. Yes.
21     Q. Okay. And who posed that question?
22     A. I don't remember specifically. To me,
23 it's a natural question to ask in this -- in -- in
24 this case. So I don't remember the context of who
25 and what was proposed. This is I think germane to

Page 32

1 the discussion at hand.
2     Q. Okay.
3     A. That's why we're having this . . .
4     Q. Okay. And when that question was posed to
5 you and when you prepared your report, Exhibit 1,
6 I take it you were mindful of the statements that
7 you had made in your general report; is that
8 right?
9     A. I don't know what you mean by "mindful."
10     I wasn't -- so I -- I did the general
11 report, and I moved on. I did the Orr statement.
12 I moved on. And I did the Boudreaux statement.
13 My writing of the general report facilitated this.
14 But I -- I don't know that I was going back to my
15 general report when I was writing this. This was
16 done as an individual documented entity. I wasn't
17 writing this in relation to the general report.
18     Q. Okay. I want to hand -- back to your
19 general report. And I forget how it was marked in
20 prior depositions. But it's on Page 19. There's
21 a version there before you that has some
22 underlying and highlighting.
23     MR. SARVER:
24     Do you want to mark this separately?
25 I don't care.

Page 33

1     MR. HONNOLD:
2     No. I don't necessarily want to mark
3 it separately in this deposition. All we
4 can say is that I think everybody by this
5 stage knows what -- what -- what we're
6 talking about, which is --
7     MR. SARVER:
8     Yeah. I -- I don't object to that.
9     MR. HONNOLD:
10     -- the generic report.
11     MR. SARVER:
12     That's fine.
13     MR. HONNOLD:
14     Okay. All right.
15     THE WITNESS:
16     Okay.
17 BY MR. HONNOLD:
18     Q. And what -- what statement did you make
19 there that's highlighted in the general report?
20     A. ". . . in an individual patient scenario
21 it is not possible to determine if outcomes would
22 be different if a different anticoagulant was used
23 unless this is specifically addressed in" a -- "in
24 scientific research. To do so would be to base
25 any conclusions on speculation, and not scientific

Page 34

1  evidence."
2     Q.  Okay.  And you read that correctly; right?
3     A.  Yes, sir.
4     Q.  And when you put that in your general
5  report, you put it there for a reason; correct?
6     A.  Yes, sir.
7     Q.  And what was the reason that you put it in
8  your general report?
9     A.  To give context on the utilization of --
10  of how to apply evidence-based medicine in
11  clinical scenarios.
12     Q.  Okay.  And do you still stand by that
13  statement today?
14     A.  I do.
15     Q.  Okay.
16     A.  Oh.  Sorry.
17        MR. SARVER:
18           He wants it back.
19  BY MR. HONNOLD:
20     Q.  And tell me generally when you use the
21  term "evidence-based medicine" what
22  "evidence-based medicine" is.
23     A.  It's the application of clinical -- the
24  clinical context.
25        So when you apply clinical medicine --

Page 35

1  when you're practicing clinical medicine,
2  utilizing -- taking your approach based on
3  evidence and not anecdotes or eminence.  Sometimes
4  in cardiology we'll -- we'll refer to some
5  physicians using eminence-based medicine, not
6  evidence-based medicine, so in other words, this
7  is my personal experience and this is what is
8  real.  Evidence-based medicine is focusing on the
9  data that is present and applying the data to your
10  practice of your patients.  So I -- we always
11  emphasize to our fellows and residents that the
12  practice of evidence-maced [sic] medicine is
13  critical and that when you veer from that you can
14  get into trouble.
15     Q.  Like what kind of trouble?
16     A.  You could have -- you may make practical
17  decisions in regard to patients that the benefits
18  don't outweigh the risks.
19     Q.  And in terms of practicing medicine and
20  making decisions going forward where the benefit
21  might not outweigh the risk, I mean, that could --
22  something that can ultimately or potentially
23  result in patient harm; correct?
24     A.  Anything we do could result -- potentially
25  result in patient harm.

Page 36

1     Q.  But in that scenario specifically, moving
2  forward with treatment where the benefit of the
3  treatment did not outweigh the risk, that would
4  suggest that the patient was being subjected to
5  the risk without appropriate basis in terms of
6  medical evidence?
7        MR. SARVER:
8           Object to form.
9        THE WITNESS:
10           I'm losing you.
11  BY MR. HONNOLD:
12     Q.  Okay.  Well, tell me what you're --
13     A.  I'm not sure --
14     Q.  Specifically, when you say that's how you
15  can get into trouble, I -- I just -- "trouble"
16  means a lot of things.  I mean, "trouble" means
17  you can --
18     A.  Okay.
19     Q.  -- get prosecuted and go to jail.  You can
20  get kicked off the medical staff or something bad
21  could happen to the patient.  Which -- which is
22  it?
23     A.  The last.
24     Q.  Okay.
25     A.  So "trouble" in my -- it's all about the

Page 37

1  patient.
2     Q.  Okay.
3     A.  And we don't worry about -- we -- our
4  focus is always on the patient, not on legal or
5  medical staff.
6     Q.  Okay.  So when you're talking about
7  departing from evidence-based medicine, that may
8  get you into an area where there -- there -- the
9  trouble you're talking about is potential harm to
10  the patient?
11     A.  I think you have to be careful that we --
12  there are times where you -- so not every person
13  or every patient in every clinical scenario fits
14  into a nice tidy box in terms of studies and
15  evidence.  And I think you have to do your best to
16  apply your interpretation of the evidence to a
17  specific individual.  So it's -- data and science
18  is to be applied into a particular patient.  They
19  are by no means law, and that that's the art, you
20  know, when you talk about the art of medicine.  So
21  it has to be in the clinical context.
22        The point I'm trying to make here is that
23  you do have to base your -- your decision-making
24  process in this on sound science and data and not
25  your -- what happened to your last patient.

Page 38

1    Q.  Okay.  So at Page 19 -- and I apologize.
2  I -- I -- I -- you don't have this before you
3  right now.  But --
4    A.  Oh.  This is the general report?
5    Q.  You say --
6    A.  Yes.
7    Q.  -- in -- "in an individual patient
8  scenario it is not possible to determine if
9  outcomes would be different if a different
10  anticoagulant was used unless this is specifically
11  addressed in scientific research."
12      So when you -- so in that context, are you
13  talking about looking at an event that's already
14  occurred and trying to figure out whether the path
15  could have been different?
16    A.  I think it's -- I think you can look at
17  trends.
18      I don't think it's in one individual
19  patient you can make a specific decision -- or
20  commentary:  This would -- X would definitely have
21  happened if we had done this differently.  There's
22  -- you know, you can't practice that way.  There's
23  no way to know.  So if I have a patient who has an
24  outcome on -- has a bad outcome from this and I do
25  the same procedure on the patient the next week, I

Page 39

1  can't predict that the same outcome is going to
2  occur.
3      So I wouldn't -- I -- I -- you can't --
4  that's what I mean by you can't -- then you're
5  getting more towards eminence-based than -- as
6  opposed to evidence-based.  You can't base your
7  clinical decision-making on necessarily one
8  outcome or whatnot.
9    Q.  Okay.  And I appreciate that.  I'm not --
10  I -- I probably didn't ask a very good question.
11      But when you say "in an individual patient
12  scenario it is not possible to determine if
13  outcomes would be different if a different
14  anticoagulant was used," in making that statement,
15  are you talking about looking at a patient where
16  an outcome has happened, such as an -- such as a
17  GI bleed, and then saying, It's impossible then to
18  say one way or the other whether that would have
19  happened or not if they had been on a different
20  anticoagulant?
21    A.  Yes.
22    Q.  Okay.  And so when -- so when you use the
23  term -- that phrase, you're talking about looking
24  retrospectively at a situation and whether or not
25  it can be said that could the -- would the outcome

Page 40

1  have been different on different therapy?
2    A.  I'm lost now.  I'm --
3    Q.  Okay.
4    A.  -- sorry.
5    Q.  All right.  I think you've answered the
6  question.
7      When you use the phrase "it is not
8  possible to determine," is that the same as saying
9  it is impossible to determine?
10    A.  No.  Well, can I see the --
11    Q.  Sure.
12    A.  May I have this?
13    Q.  Yeah.
14    A.  Okay.  So we're still on "it is not
15  possible."  "It is not possible" -- it is
16  impossible to determine, not possible.  That's a
17  stronger word.  I'm trying to couch this.  You
18  know, again, there's -- there's very little in --
19  in this that I would characterize as absolutes in
20  terms of the practice of medicine.  That's why I
21  would be reluctant -- my initial response to that
22  is not to say "impossible."
23    Q.  Okay.
24    A.  I just -- I don't dwelve [sic] in --
25    Q.  Okay.

Page 41

1    A.  -- absolutes.
2    Q.  Okay.  You -- you chose the words that you
3  chose, though, at the time that you chose them for
4  a reason; correct?
5    A.  Yes, sir.
6    Q.  Okay.  And so I take it you were attaching
7  the normal meaning to those words when you said
8  "it is not possible" --
9      MR. SARVER:
10        Object to form.
11  BY MR. HONNOLD:
12    Q.  -- right?
13      MR. SARVER:
14        Object to form.
15      THE WITNESS:
16        We're -- we're delving into -- I'm not
17      sure I'm following.  I'm --
18      MR. HONNOLD:
19        Okay.
20      THE WITNESS:
21        -- losing you.
22  BY MR. HONNOLD:
23    Q.  When you said "it is not possible," that's
24  what you meant to say when you --
25    A.  Yes, sir.

Protected — Subject to Further Protective Review

Page 42

1  Q. -- signed that report on that date;
2  correct?
3  A. I'm sorry. Yes, sir.
4  Q. Okay. And when you say unless a topic is
5  specifically addressed in scientific research,
6  what are you talking about there?
7  A. I -- I'm -- so I can give an example.
8  Q. Sure.
9  A. Is that -- so it's a colorant.
10  Q. Sure.
11  A. So, for instance, the comparison of
12  different novel oral agents, one being better than
13  the other, I think you get into trouble without
14  that specifically being addressed in a direct
15  head-to-head comparison. That's what I'm trying
16  to -- that's a specific example. So sometimes
17  when you base -- you -- you have to really think
18  about what you're looking at.
19  Q. And -- so you're talking about in -- if
20  it's been addressed in a head-to-head scenario,
21  you're talking about a situation like ROCKET,
22  where warfarin and rivaroxaban were compared head
23  to head?
24  A. So I would feel comfortable with the
25  head-to-head comparison done there. I'd feel,

Page 43

1  again -- so that's a good example.
2  I would not feel comfortable with the
3  direct comparisons of Xarelto to Pradaxa to
4  Eliquis to Savaysa. But yeah. So with Eliquis
5  versus warfarin from ARISTOTLE, Savaysa versus
6  warfarin from ENGAGE AF and Pradaxa versus
7  warfarin, I think you have to stay in those lanes.
8  Q. But that would be the limitation then?
9  A. Limitation of . . .
10  Q. Meaning that would be the only statements
11  that you would be comfortable making.
12  A. Those would be the statements -- I'm
13  trying to think about this. Yeah. So I would --
14  the -- the data that's out there supports those
15  individual comparisons. There's no direct
16  comparisons between the two.
17  Q. Okay. And in terms of data comparing
18  outcomes in patients on rivaroxaban versus
19  warfarin, that's limited to ROCKET?
20  A. I think there's also the real world, the
21  registry data that has been shown, has been
22  published. And there's multiple, not one
23  specific.
24  Q. In -- when you go on to talk about the
25  situation with Mr. Boudreaux --

Page 44

1  A. Are we back to the --
2  Q. Sure. We're going back to his --
3  A. Okay.
4  Q. -- report --
5  A. Yes, sir.
6  Q. -- on Page 14.
7  A. Okay.
8  Q. I want to make sure that I understand all
9  the work that you've done on -- on that issue and
10  everything that you're relying upon in that
11  section. Okay?
12  A. For the Would the Clinical Outcome Have
13  Been Different?
14  Q. Yes. Yes.
15  A. Okay.
16  Q. So I want to make sure that we've
17  identified everything. So in terms of what you --
18  what you rely upon or cite on Page 14, is there
19  any specific study, clinical trial, or other
20  literature that you refer to specifically on Page
21  14?
22  A. Where -- in -- in I don't have any citations
23  here on Page 14.
24  Q. Okay.
25  A. Is that the . . .

Page 45

1  Q. Yep. That's the question.
2  A. Okay.
3  Q. On Page 15, is -- what is the source of
4  the medical literature, clinical trials, or other
5  information that you rely upon for any of your
6  opinions or conclusions on Page 15?
7  A. So there are citations here for the -- the
8  GI one, the GI comments.
9  Q. Okay. So those citations, Footnotes 3 and
10  4, is -- is that the sum total of the information
11  in terms of clinical trial or medical literature
12  that you're relying upon for your statements on
13  Page 15?
14  A. The -- these statements are also taking
15  into -- taking into account my clinical experience
16  and my understanding of -- of the literature
17  before my involvement in this case in that regard.
18  Q. Okay. Now --
19  A. So these are -- I'm sorry.
20  Q. Go ahead.
21  A. These -- the comments about the endoscopy
22  is not revealing evidence of pathology, not
23  meaning that there's no underlying pathology. It
24  is consistent with my clinical experience going
25  back since internal -- since medical school.

Protected - Subject to Further Protective Review

Page 46

1 These are particular studies that I referenced for
2 that, my -- my -- to -- to give scientific data
3 background supporting those premises. But these
4 are all -- are my clinical experience and my
5 appreciation of this.
6     So when someone comes in with a GI bleed,
7 it's not uncommon for them to get an EGD and a
8 colonoscopy and those studies don't show anything,
9 and I don't operate under the assumption that that
10 means that there's nothing there.
11     So -- and -- I'm sorry.
12     Q. And -- and so on Page 15, is there
13 anything whatsoever that speaks to differences in
14 occurrence rate or incident rates of
15 gastrointestinal bleeding between warfarin and
16 rivaroxaban in any -- any way on Page 15?
17     A. No, sir.
18     Q. Okay. And to your knowledge, the
19 references and citations on Page 15, Footnotes 3
20 and 4, those don't speak to any comparisons in
21 terms of incidence or occurrence data of GI
22 bleeding between Xarelto and warfarin; correct?
23     A. Correct.
24     Q. And in fact, on Page 15, you make -- you
25 make no -- in -- in terms of the words that you've

Page 47

1 chosen, you make no specific reference to the
2 ROCKET clinical trial; correct?
3     A. Correct.
4     Q. All right. Let's --
5     A. I should have. That's a good point.
6     Q. Excuse me?
7     A. I should have.
8     Q. Okay. But you've not? You have --
9     A. I know. No. No. I'm agreeing with you.
10     Q. Okay.
11     A. Again, this is not --
12     Q. Okay.
13     A. -- a perfect document. I'm just thinking
14 in my head --
15     Q. Yeah.
16     A. -- how I would do this.
17     Q. Well, you know I came here today to take
18 your deposition? You -- you've known that for a
19 long time, that I was going to be here; correct?
20     A. I know that you were -- I know that I was
21 being deposed.
22     Q. Okay. And you knew that you were going to
23 be asked questions about the report that you
24 prepared for Joseph Boudreaux; right?
25     A. Yes, sir.

Page 48

1     Q. Okay. You had the ability to take your
2 time to look over the report in advance to
3 determine whether any modifications or changes
4 needed to be made; correct?
5     A. Yes, sir.
6     Q. Okay. What was your understanding as to
7 the importance of -- of this report, Exhibit 1 in
8 the Boudreaux case, why it was being done?
9     MR. SARVER:
10         Object to form.
11     THE WITNESS:
12         Come again?
13 BY MR. HONNOLD:
14     Q. Yeah.
15         What was your understanding as to why you
16 were preparing the report?
17     A. To provide clinical context on the
18 clinical course of Mr. Boudreaux and use my
19 clinical experience and my expertise --
20     Q. Okay. And --
21     A. -- to opine on it.
22     Q. Okay. So you would -- we'd agree that you
23 -- you knew that in the report you were -- it was
24 the goal of the report to clearly set forth your
25 opinions; correct?

Page 49

1     A. Yes, sir.
2     MR. SARVER:
3         Object to form.
4 BY MR. HONNOLD:
5     Q. Okay. And -- and the basis for them;
6 right?
7     A. Yes, sir.
8     Q. Now, on the top -- on the first -- on the
9 first paragraph that starts on Page 16 that begins
10 with the phrase "Would the patients," do you see
11 that, that paragraph that starts "Would the
12 patients"?
13     A. Yes, sir.
14     Q. Now, there you start taking on -- or you
15 raise the issue of would Mr. Boudreaux's bleeding
16 episode have been less severe if he had been on
17 warfarin; right?
18     A. Yes, sir.
19     Q. Okay. So in that sentence, you are not
20 raising the issue as to whether it would have
21 occurred or not occurred, but you are simply
22 raising the question would it have been less
23 severe on warfarin; correct?
24     A. Yes, sir.
25     Q. Okay. And that is then what you do for

Protected - Subject to Further Protective Review

Page 50

1 the remainder of Page 16; correct?
2   A. Comment on whether the severity would have
3 been less?
4   Q. Right.
5   A. Let's see here. Yes, sir.
6   Q. And that general topic is something that
7 you continued to speak on over on to the top half
8 of Page 17; correct?
9   A. Yes, sir.
10   Q. Now, up to this point, which is the -- the
11 middle of Page 17, you have not addressed -- in --
12 in -- in the words that you have chosen in terms
13 of what you have written, you have not addressed
14 the issue of incidence or occurrence of any types
15 of bleeding in rivaroxaban versus warfarin;
16 correct?
17   MR. SARVER:
18     Object to form.
19   THE WITNESS:
20     I think what I'm trying to do here is
21 discuss the thoughts on the severity of
22 the bleed.
23   MR. HONNOLD:
24     Okay.
25   THE WITNESS:

Page 51

1     That's what I'm putting here.
2 BY MR. HONNOLD:
3   Q. Okay. And just -- just so we're clear and
4 I get a clear answer to the question, from
5 Pages 14, 15, 16, to the midpoint of Page 17,
6 nowhere have you specifically addressed in your
7 own words the topic of differing incidence or
8 occurrences of any type of bleeding between
9 rivaroxaban and warfarin; correct?
10   MR. SARVER:
11     Object to form.
12   THE WITNESS:
13     Do I specifically discuss the
14     differences and bleeding? No, sir.
15 BY MR. HONNOLD:
16   Q. And then on the bottom of Page 17 -- well,
17 strike that. Let's -- let's go back to Page 16
18 for a moment.
19     On Page -- on Page 16, you include one
20 citation that's set forth in Footnote No. 5;
21 correct?
22   A. Yes, sir.
23   Q. And the Piccini article it looks like
24 takes on or addresses the issue of comparing I
25 guess the nature and intensity of treatment and

Page 52

1 bleeds on warfarin versus rivaroxaban; correct?
2   A. I think it's commenting on the clinical
3 course --
4   Q. Okay.
5   A. -- of patients who have major bleeding.
6   Q. But again --
7   A. Not that I think it is.
8   Q. Okay. But -- okay.
9     So Piccini looks at comparatively the
10 clinical course in patients who experience bleeds
11 between warfarin and rivaroxaban; correct?
12   A. Yes, sir.
13   Q. Okay. Nowhere in the information that you
14 were -- that you've chosen to describe Piccini, it
15 does not get in -- at least the words that you've
16 chosen does not get into this issue of comparative
17 incidence or occurrence rates of any type of
18 bleeding between warfarin and rivaroxaban --
19 correct -- in terms of the words you've chosen?
20   A. The comparative incidence, yes, sir.
21 You're correct.
22   Q. In the bottom of Page 17 you take on or
23 start discussion of the Dresden registry study; is
24 that right?
25   A. Yes, sir.

Page 53

1   Q. And -- and can you just by way of brief
2 overview provide your understanding of I guess the
3 -- the -- for lack of a better term, the structure
4 and -- and methodology of the -- of the Dresden
5 registry study?
6   A. It was a prospective registry looking at
7 patients who were prescribed Xarelto. And they
8 were trying to get a look at how it was being
9 utilized in a real-world manner and what -- and
10 the outcomes that occurred thereafter and the
11 management of those bleeding events that occurred.
12 So it was -- it wasn't a rigorous trial study.
13 This was real-world data, physicians use Xarelto,
14 how the patients do, and when they do bleed, how
15 are they managed.
16   Q. And there was not a comparator arm of any
17 type; correct?
18   A. No. This was a prospective registry.
19   Q. Okay. So again, the Dresden registry data
20 doesn't speak at all to the issue of incidence or
21 occurrence of any type of bleeding in rivaroxaban
22 patients as compared to patients on warfarin;
23 correct?
24   MR. SARVER:
25     Object to form.

Page 54

1    THE WITNESS:
2        This is a registry that looked at
3        patients with Xarelto.
4   BY MR. HONNOLD:
5    Q.  If you go on to Page 18, in terms of any
6   of the statements that you make on Page 18, do you
7   in your own words on the final page of the report
8   make any reference or statement regarding any data
9   and the relative incidence or occurrence rates of
10  any type of bleeding in rivaroxaban as compared to
11  warfarin?
12   A.  No, sir.
13   Q.  I want to ask you a little bit about what
14  is marked as Exhibit A attached to your report in
15  the Boudreaux case.  Do you see that?
16   A.  Yes, sir.
17   Q.  And what I'm most interested in is -- in
18  this reliance material chart there's many source
19  documents that you call or state that the source
20  of the document is journal.  Do you see that?
21   A.  Yes, sir.
22   Q.  Okay.  And -- and then in document
23  category, you say "Literature"; is that right?
24   A.  I -- I give the reference.
25   Q.  Okay.  And -- and so I take it that when

Page 55

1   you are referencing a document that's literature
2   and then you say "Journal" or gave a website
3   address, that's basically an article that exists
4   out there in the medical literature; is that
5   right?
6    A.  If -- if I have a reference, that's an
7   article that's in the literature.
8    Q.  Okay.  And I apologize to you if this was
9   -- if this was covered in your generic report.
10  But since it's attached to the Boudreaux report, I
11  want to make sure I understand.
12       As it relates to your work on the
13  Boudreaux case, did you undertake a specific
14  medical literature search on -- on any specific or
15  -- or unique issue or topic?
16   MR. SARVER:
17       Object to form.
18   THE WITNESS:
19       I -- I guess I'm not understanding.
20  So I -- there were times when I would go
21  do a literature search on specific
22  questions.
23   MR. HONNOLD:
24       Okay.
25   THE WITNESS:

Page 56

1        So yes.
2   BY MR. HONNOLD:
3    Q.  All right.  So what I want to know is:  As
4   it relates to Mr. Boudreaux, what were the -- what
5   were the literature searches that you performed?
6    A.  I do not recall off the top of my head.
7    Q.  Okay.  When you did the literature
8   searches physically, where were you?
9    A.  Home.
10   Q.  Okay.  And so at home, what -- what tools
11  or access devices would you have to conduct a
12  medical record search -- or medical literature
13  search?
14   A.  PubMed.
15   Q.  Okay.  So --
16   A.  And identify -- and some of this would
17  have like -- some of this occurred at the
18  hospital.  I can't speak to specifically
19  Boudreaux.  But in -- in the three, some of this
20  was done at the hospital.  And then there you have
21  access to more journals.  So I would read
22  something on PubMed.  Often you can pull it off
23  directly from PubMed.  And if you can't, then I
24  can either request it from the hospital or from
25  the -- the lawyers.

Page 57

1    Q.  Okay.
2    A.  They have a pretty good database.
3    Q.  So -- so if you were -- if you were going
4   to be doing a literature review or even
5   undertaking some sort of meta-analysis yourself in
6   your area of expertise, cardiology, and if you
7   were going to try to submit something for
8   publication, that would be something that you
9   would -- you would record and keep track of so
10  that you could list it and describe it in your
11  methods section of the paper; correct?
12   MR. SARVER:
13       Object to form.
14   THE WITNESS:
15       If I were to write a paper, do a
16  meta-analysis, I would include the methods
17  to which I had undertaken that
18  meta-analysis.  Yes.
19  BY MR. HONNOLD:
20   Q.  Okay.  Why?
21   A.  To be comprehensive.
22   Q.  Okay.  And so it could be subjected to
23  review; correct?
24   A.  Yes, sir.
25   Q.  Okay.  So that somebody looking at your

Protected - Subject to Further Protective Review

Page 58

1 work afterwards could undertake some verification
2 for accuracy and whether you're being thorough and
3 -- and -- and correct in your work; right?
4     A. Correct.
5     Q. Okay. That would include doing things
6 like saying what was the database that you went to
7 and what -- the search terms were that you
8 employed; correct?
9         MR. SARVER:
10         Object to form.
11         THE WITNESS:
12         I'm sorry? One more time.
13 BY MR. HONNOLD:
14     Q. That would include stating the databases
15 -- database or databases that you went to and the
16 search terms that you employed; correct?
17     A. Correct.
18     Q. You would also state what your yield was
19 for the particular search in terms of numbers of
20 -- articles; right?
21     A. Correct.
22     Q. You would then describe the nature of
23 review criteria that you used to either say an
24 article was in or out or pertinent or not
25 pertinent? You would have some degree of -- some

Page 59

1 criteria of pertinence that you would attach;
2 correct?
3     A. Yeah. That's a little harder to put into
4 a methods -- there would be criteria, obviously.
5 And I'm just trying to think how we would -- you
6 know, limiting it to prospective registries, for
7 instance, or something of that nature.
8     Q. Sure. But you know there's --
9     A. Yes.
10     Q. -- ways to do that? Those are things that
11 -- that -- that -- physicians that are at least
12 partially academically based or institutionally
13 based like you, those are things you learn how to
14 do; right?
15     A. Yes, sir.
16     Q. Okay. And -- like one basic criteria that
17 you would attach, you would have to figure out --
18 researchers oftentimes have to figure out how to
19 not -- make sure that they're not chasing their
20 tail, that you need to control and -- and get out
21 duplication -- right -- things that are just
22 constantly referencing each other back and forth
23 and are kind of the same data; right?
24         MR. SARVER:
25         Object to form.

Page 60

1         THE WITNESS:
2         I don't understand that.
3 BY MR. HONNOLD:
4     Q. Okay. All right. You -- you might try to
5 just make sure you've not picked up things that
6 are duplicate that have been presented in
7 different journals --
8     A. Yes.
9     Q. Okay.
10     A. Sorry to interrupt.
11     Q. And then you might have some stated
12 relevance criteria for what articles would be
13 considered for the analysis; right?
14     A. One more time.
15     Q. You would have some other form of -- of
16 acceptance criteria in terms of what articles or
17 sources you would be taking on for the purposes of
18 your analysis; right?
19     A. Yes, sir.
20     Q. Okay. Now, I'm not quibbling with you
21 whether it should have been. But that sort of
22 analysis and detail is not set forth at all in
23 your report in this case; right?
24         MR. SARVER:
25         Object to form.

Page 61

1         THE WITNESS:
2         That sort of description of the
3     analysis.
4         I would tell you that the undertaking
5     of this venture was done the same way that
6     I prepared my general report and how I
7     would write a paper or do a presentation.
8     The documentation of that would be at a
9     similar level if I were giving a talk at a
10     national level.
11         I have never -- so this was the first
12     deposition. I get what your -- your line
13     of questions are and to treat this as a
14     scientific paper as opposed to a
15     presentation perhaps. So I did that to
16     the best of my abilities. I applied
17     scientific rigor. I don't have my
18     sources. When I give a talk, I don't
19     normally cite all the sources.
20 BY MR. HONNOLD:
21     Q. Okay. So for the searches that you did --
22 the PubMed searches that you did then, does
23 Exhibit A include the entire yield of those
24 searches?
25     A. I tried to the best of my ability to

Page 62

1 include the entire yield of what I found of value.
2    Q.  Okay.
3    A.  I -- I tried to the best of my ability.
4    Q.  Okay.  So what I'm trying to get at is -- if
5 you look at Exhibit A, there are some references
6 in there that speak somewhat to comparative data
7 in terms of incidence or rate of occurrence of
8 different types of bleeds in different
9 anticoagulants; correct?
10    MR. SARVER:
11       Object to form.
12    THE WITNESS:
13       I'm reluctant to utilize the data in
14    the way that the authors were sometimes
15    recommending, and therefore I wouldn't
16    incorporate it into my reports.
17 BY MR. HONNOLD:
18    Q.  Okay.  Did --
19    A.  So, for instance, if there's -- looking at
20 different cohorts and then trying to compare
21 apples to oranges, I don't think that that's a
22 sound conclusion to be making based on those and I
23 wouldn't include it.
24    Q.  Okay.
25    A.  I wouldn't change my practice.

Page 63

1    Q.  Okay.  So just so I'm sure then, did you
2 specifically undertake a search for your work on
3 the Boudreaux case to at least try to identify the
4 literature that exists out there that reports on
5 different incidence -- incidence rates or
6 occurrence rates of different types of bleeding
7 between different forms of anticoagulation,
8 including warfarin, including rivaroxaban,
9 including apixaban and dabigatran?
10    MR. SARVER:
11       Object to form.
12    THE WITNESS:
13       Did I look at -- I'm not -- so I -- I
14    looked at registries that compared those
15    different cohorts.  And I looked at the --
16    the data that's there from the randomized
17    studies.
18 BY MR. HONNOLD:
19    Q.  Okay.  So the -- when you say that you
20 looked at the data that -- when you say that you
21 looked at the registries that compared those
22 different cohorts, what are you talking about?
23    A.  So -- and again, I -- there were a few,
24 and it kind of all meld at this -- at this point.
25 But the ones that compared the cohort of apixaban

Page 64

1 to warfarin patients, dabigatran to warfarin
2 patients, Xarelto to warfarin patients, and then
3 tried to make conclusions based -- comparing
4 Xarelto to Pradaxa or Eliquis --
5    Q.  Okay.
6    A.  -- based on those different cohorts.
7    Q.  But you did not use any of that from --
8 information at least in terms -- in cite -- cited
9 form or -- or descriptive form anywhere in your
10 report; correct?
11    A.  I don't think that they warranted -- I
12 don't think that the value of those reports
13 warranted being included in the report.
14    Q.  Okay.  And just so I'm clear then, I want
15 -- do you -- what is your best estimate as to how
16 you would have structured or -- or -- or made up a
17 search or sert term -- search terms in PubMed that
18 would have given you the yield of Exhibit A?
19    MR. SARVER:
20       Object to form.
21    THE WITNESS:
22       How would I -- I'm not sure I
23    understand.  So what would I have done
24    that resulted in this?  This was --
25    MR. HONNOLD:

Page 65

1       Yes.
2    THE WITNESS:
3       I can't give you the specific PubMed
4    searches that were done to incorporate
5    this.  These are clinical questions that
6    would come up in my reading of one article
7    resulting in -- you know, sometimes you
8    read an article.  You want to see the
9    citation.  I'll pull up the citation from
10    that article.  That's not a PubMed search.
11    It's just digging deeper into the
12    literature.  Sometimes there's PubMed
13    searches.
14       Again, I can't give you the specific
15    PubMed searches that were done.  Sometimes
16    I'd have a clinical question that I would
17    think about and I would want to query, so
18    I would -- I would do a literature
19    search --
20    MR. HONNOLD:
21       Okay.
22    THE WITNESS:
23       -- on that specific question.  But I
24    can't give you specific -- all the
25    specific ones that I had.  I can -- so I

Protected - Subject to Further Protective Review

Page 66

1  would look up "Xarelto major bleeding
2  registry" or something of that nature.
3      A lot of these were provided to me by
4  the lawyers or by the representatives from
5  each of the three individual companies,
6  and then some of this was also my
7  individual search.
8  BY MR. HONNOLD:
9      Q. Okay. So can you tell on Exhibit A which
10  ones -- which of the literature would have been
11  given to you by lawyers?
12      A. I don't recall. It's -- I can name a
13  couple, if -- if you want a representative. But I
14  couldn't go through this exhaustively and
15  remember, because it was in realtime in going
16  through this.
17      So some of this came from the -- for
18  science day, each side had a compendium of
19  documents, both the plaintiffs and the defense.
20  So a fair amount -- so some of these came directly
21  from there. So the "Pharmacogenetic testing of
22  CYP2C9 and" V -- "VKORC1 alleles for warfarin,"
23  that was probably provided to me. "Adverse drug
24  events in emergency department patients," I don't
25  recall if this is something that was provided to

Page 67

1  me or if I had pulled that in the context of prior
2  lectures that I've given. And again, I'm just
3  going randomly. I just -- there's no way to go
4  through all this. "Rivaroxaban and other novel
5  oral anticoagulants: pharmacokinetics in healthy
6  subjects," the Mueck, I don't recall if this was
7  one that I specifically asked for or the one -- or
8  one that was provided to me. Girgis one was
9  provided to me.
10      Q. Do you have any sense in terms of
11  percentage breakdown as to articles given to you
12  by counsel versus ones that would have been given
13  to you by representatives of the companies versus
14  things that --
15      A. Versus that --
16      Q. -- were generated by your literature
17  searches?
18      A. I would say less than five -- 5 percent
19  from companies. Those are definitely in the
20  minority. And I would probably split the
21  remainder in the course of this.
22      Q. By 50/50?
23      A. Yes, sir. So you want -- yes.
24      Q. So if we were -- if we were to look at the
25  sum total of the articles or trials that are

Page 68

1  referenced and subtract 5 percent from those and
2  then divided that remainder in two, you -- half of
3  them would be from counsel, and the other half
4  would be the product of your literature searches,
5  best estimate?
6      A. That's -- yeah. That's an impression.
7      MR. HONNOLD:
8      Okay. Great. Why don't we take a
9  quick break.
10      MR. SARVER:
11      Sure.
12      THE VIDEOGRAPHER:
13      The time now is 1:25 p.m. We are off
14  the record.
15      (Brief recess was taken.)
16      THE VIDEOGRAPHER:
17      This begins Disk 2 of today's
18  deposition. The time now is 1:35 p.m. We
19  are back on the record.
20  BY MR. HONNOLD:
21      Q. Doctor, we're back on the record after a
22  short break.
23      As it relates to Mr. Boudreaux's GI bleed,
24  his Xarelto use was -- was likely at least a
25  contributing factor to the bleed; correct?

Page 69

1      MR. SARVER:
2      Object to form.
3      THE WITNESS:
4      I think that it increased his
5  likelihood of bleeding.
6  BY MR. HONNOLD:
7      Q. And in patients that are on a medicine
8  where they -- such as Xarelto, where they have an
9  increased likelihood of bleeding, when the
10  bleeding does in fact occur, it's likely that the
11  -- that the anticoagulant Xarelto was at least a
12  contributing factor to the bleeding outcome;
13  correct?
14      MR. SARVER:
15      Object to form.
16      THE WITNESS:
17      I -- I think that whenever someone
18  presents with a bleed on an anticoagulant,
19  it's hard to argue that it's not
20  contributing.
21  BY MR. HONNOLD:
22      Q. And that would include Mr. Boudreaux's
23  situation; correct?
24      A. Yes, sir.
25      Q. And so -- I don't mean to mince words with

Page 70

1  you, but I'm a lawyer, so it's kind of what we do,
2  unfortunately.
3      So when you say "whenever someone presents
4  with a bleed on an anticoagulant, it's hard to
5  argue that it's not contributing," is another way
6  to say that fairly that when someone presents with
7  a bleed on an anticoagulant, it's probable that
8  the anticoagulant was contributing to the bleed?
9      MR. SARVER:
10      Object to form. Asked and answered.
11      THE WITNESS:
12      Hard to say. I'm not -- so that's why
13  I -- I phrased it that way specifically.
14  You can't say that they wouldn't have a
15  bleed without an anticoagulant or comment
16  on the extent of the -- the bleed.
17      I think in general anticoagulants
18  increase the likelihood of bleeding and
19  the amount of bleeding. But I -- I -- you
20  can't -- I wouldn't say in every case,
21  Okay, He bled on this anticoagulant, He
22  wouldn't have bled not on the
23  anticoagulant. So that's why I phrased
24  it --
25      MR. HONNOLD:

Page 71

1      Okay.
2      THE WITNESS:
3      -- that way.
4  BY MR. HONNOLD:
5      Q. So what is it that -- that you mean then
6  when you say "when someone presents on an
7  anticoagulant with a bleed it's hard to argue
8  that" it wasn't "contributing"?
9      A. I -- I think it's -- there's no way to
10  know -- argue either side, is my point. Because
11  you can't say it wasn't contributing. I --
12  there's no way to look you in the eye and say,
13  Okay, That was not a contributing factor. There's
14  no way to argue that it definitively was a
15  contributing factor, in other words, without the
16  anticoagulant, he wouldn't have bled.
17      Q. Okay. Let -- let's say it this way, that
18  Mr. Boudreaux's use of Xarelto certainly
19  exacerbated his bleed; correct?
20      MR. SARVER:
21      Object to form.
22      THE WITNESS:
23      It increased his risk for bleed. I'm
24  not willing to say the extent -- what his
25  clinical course would have been if he had

Page 72

1  presented with a GI bleed not on
2  anticoagulant. It's hard to say in any
3  absolute terms. So I think in general it
4  -- it can exacerbate, but I don't think
5  you could take a specific situation and
6  say he would have bled or would not have
7  bled or he would have bled to a lesser
8  extent.
9  BY MR. HONNOLD:
10      Q. Based upon --
11      A. I'm talking in -- I'm sorry. I'm just
12  talking populations, not in individuals.
13      Q. Yeah.
14      A. In populations, increases the risk and
15  potentially exacerbates. But in an individual you
16  can't make that comment with any certainty either
17  way.
18      Q. But just breaking it down, explaining it
19  the best you can, hard to argue that
20  Mr. Boudreaux's GI bleed wasn't contributed to by
21  Xarelto, just like you said; right?
22      MR. SARVER:
23      Object to form.
24      THE WITNESS:
25      Hard to argue either way. Yes.

Page 73

1  BY MR. HONNOLD:
2      Q. In his post-Xarelto life, Mr. Boudreaux to
3  your knowledge has not had any other acute GI
4  bleeds; correct?
5      A. Correct.
6      Q. And in his pre-Xarelto life, have you seen
7  any records where he was admitted and treated for
8  a prior acute GI bleed?
9      A. No. I know he underwent a screening
10  colonoscopy, had some pathology noted,
11  diverticulum polyps, but nothing that had resulted
12  any clinical overt bleeding.
13      Q. Okay. So before Mr. Boudreaux went on
14  Xarelto, you have not seen any records to suggest
15  that had any -- had any clinically overt bleeding
16  or an acute gastrointestinal bleed; correct?
17      A. Correct.
18      Q. And since he has stopped taking Xarelto,
19  you've not seen any records to suggest that he has
20  had clinically overt bleeding or an acute GI
21  bleed; correct?
22      A. Correct. Correct.
23      Q. In -- I'm going to hand you what we have
24  marked as Deposition Exhibit No. 2.
25      (Exhibit No. 2 was marked for

Page 74

1    identification and attached hereto.)
2  BY MR. HONNOLD:
3    Q. By way of explanation, this is an exhibit
4  which -- which has printouts of a number of
5  articles. There are some abstracts. And I will
6  tell you as a general matter they tend to focus on
7  comparative data between the various NOACs or
8  DOACs, depending upon what term the author uses,
9  and looks at risk of -- of stroke, bleeding, and
10  mortality amongst the various agents, including
11  warfarin, including apixaban, including
12  rivaroxaban, and dabigatran.
13    And so my -- my question for you is: In
14  -- in terms of your work at all on your -- your
15  generic report or your Boudreaux report, would you
16  have ever done a search that would have
17  intentionally, by -- by method and design, been
18  trying to find articles on these topics?
19    MR. SARVER:
20      Object to form.
21    THE WITNESS:
22      Well, this specific one came out on
23    November 1st of this past year; correct?
24    And so my work on the report was -- I'm
25    pretty sure it predated this. I know I

Page 75

1    signed it November 15th. So I don't know
2    how, you know, getting this one in
3    particular would have happened.
4  BY MR. HONNOLD:
5    Q. Okay. So let's -- let's take date -- date
6  restriction out then. Okay.
7    But in terms of looking at the study
8  objective or the methods of the study in terms of
9  trying to identify existing data, comparative data
10  on the risks of stroke and bleeding, mortality
11  between and amongst the various DOACs and
12  warfarin, were you intentionally trying to find
13  data -- existing data like this when you did any
14  of your PubMed searches that you described before?
15    MR. SARVER:
16      Object to form.
17    THE WITNESS:
18      I -- I looked at comparative data.
19    And again, my -- my impression of the
20    comparative data from these registries, I
21    have not put a significant amount of stock
22    into the comparative data, which -- most
23    people in the practice of EP are not
24    putting as much stock into these compared
25    to the -- the big trials, the randomized

Page 76

1  controlled trials. I think the majority
2  of these, when you read these, they cite
3  as a limitation. You need to have a
4  direct head-to-head comparison. And so
5  I -- I don't put as much value. I think
6  it's worth looking at the general trends
7  and seeing if there's any differences
8  compared to what was found in the -- the
9  randomized controlled trials. But I am
10  wary about comparative data on registries
11  and how to use that in a clinically
12  meaningful context.
13  BY MR. HONNOLD:
14    Q. Okay. And I appreciate that.
15    But when you would -- when you did your
16  PubMed searches, were you trying to generate in
17  terms of responsive articles on that
18  topic, comparative data on stroke and bleeding,
19  efficacy and safety, including mortality and
20  morbidity between and among the various DOACs and
21  warfarin?
22    A. My impression of the registry data, again,
23  when they tried to do the direct comparisons, was
24  that they did not provide clinical value. And so
25  I didn't do a specific search looking for other

Page 77

1  direct head-to-head comparisons of those.
2    I looked at the Graham article when it --
3  I don't remember whose deposition. They kept
4  citing it in that regard.
5    I don't find -- I find registry data -- I
6  think if you're going to look at registry data, I
7  think it's a value to look at prospective registry
8  data, and you have to take it with a grain of
9  salt. And I think you have to look at -- really
10  the -- the thing that you can derive from registry
11  data is in the real world is it showing similar
12  results that was seen in the -- big trials. I
13  -- I'm reluctant to extend that to direct
14  comparisons.
15    Q. Okay. I'm going to hand you what's been
16  marked as Exhibit 3, and I'll just represent to
17  you that it's some additional data along similar
18  lines that have been generated from PubMed
19  searches.
20    (Exhibit No. 3 was marked for
21    identification and attached hereto.)
22  BY MR. HONNOLD:
23    Q. And so my -- I want -- I want to keep
24  focusing on the issue of what you were looking for
25  when you did your -- your searches.

| | Page 78 |
|---|---|
| 1 | MR. SARVER: |
| 2 | I'm sorry to interrupt -- |
| 3 | MR. HONNOLD: |
| 4 | Excuse me. |
| 5 | MR. SARVER: |
| 6 | -- Counsel. |
| 7 | MR. HONNOLD: |
| 8 | Yes. |
| 9 | MR. SARVER: |
| 10 | I -- I just want to make sure. We |
| 11 | haven't identified the individual articles |
| 12 | within the last exhibit. Do -- do you not |
| 13 | want to do that? |
| 14 | MR. HONNOLD: |
| 15 | No. I -- I -- I -- I -- |
| 16 | MR. SARVER: |
| 17 | Okay. All right. |
| 18 | MR. HONNOLD: |
| 19 | I -- I don't necessarily want to |
| 20 | identify them individually. We can if you |
| 21 | want to, if we want to read them into the |
| 22 | record. But I think -- |
| 23 | MR. SARVER: |
| 24 | The only problem is when something |
| 25 | gets lost. |

| | Page 79 |
|---|---|
| 1 | MR. HONNOLD: |
| 2 | Okay. |
| 3 | MR. SARVER: |
| 4 | That's -- that's my concern. But |
| 5 | it's -- it's your call. Your call. |
| 6 | MR. HONNOLD: |
| 7 | Okay. |
| 8 | MR. SARVER: |
| 9 | I won't -- I won't stop you. |
| 10 | MR. HONNOLD: |
| 11 | And I don't want -- and I appreciate |
| 12 | the -- the point. I don't think it's |
| 13 | really a critical issue as to what -- |
| 14 | MR. SARVER: |
| 15 | Okay. |
| 16 | MR. HONNOLD: |
| 17 | -- what I'm trying to accomplish here. |
| 18 | MR. SARVER: |
| 19 | All right. |
| 20 | BY MR. HONNOLD: |
| 21 | Q. So -- so here's what I'm trying to figure |
| 22 | out: Were you trying to identify all of the |
| 23 | comparative data that was out there? Did you |
| 24 | track it all down? |
| 25 | A. I -- |

| | Page 80 |
|---|---|
| 1 | MR. SARVER: |
| 2 | Object to form. |
| 3 | THE WITNESS: |
| 4 | I think it's hard to -- I would never |
| 5 | say that I have found all the objective |
| 6 | data into any -- any time -- no -- no |
| 7 | matter how deep I would dive into a topic |
| 8 | for any sort of endeavor, I would never |
| 9 | use the -- I would never be able to say -- |
| 10 | looking, that I say I found all -- |
| 11 | MR. HONNOLD: |
| 12 | Okay. |
| 13 | THE WITNESS: |
| 14 | -- comparative data. That's not . . . |
| 15 | BY MR. HONNOLD: |
| 16 | Q. All right. Let me ask it this way: If an |
| 17 | analysis of your Exhibit A sitting side by side |
| 18 | with Exhibits 2 and 3 showed that Exhibits 2 and 3 |
| 19 | contained many articles on the topic generally |
| 20 | that are not in your Exhibit A, does that mean |
| 21 | that your search -- your search would have |
| 22 | identified them and you decided to not include |
| 23 | them in Exhibit A or that your search didn't yield |
| 24 | them? |
| 25 | MR. SARVER: |

| | Page 81 |
|---|---|
| 1 | Object to form. |
| 2 | THE WITNESS: |
| 3 | Probably both. When -- can you repeat |
| 4 | it again? |
| 5 | MR. HONNOLD: |
| 6 | Sure. |
| 7 | THE WITNESS: |
| 8 | I want to make sure I'm -- |
| 9 | MR. HONNOLD: |
| 10 | Yeah. |
| 11 | THE WITNESS: |
| 12 | -- I'm not misinterpreting this -- |
| 13 | BY MR. HONNOLD: |
| 14 | Q. And I'm -- |
| 15 | A. -- or misstating this. |
| 16 | Q. I -- I'm not trying to -- |
| 17 | A. I got you. |
| 18 | Q. -- be tricky here. |
| 19 | A. I'm not -- and I'm not -- I'm not -- |
| 20 | Q. Okay. |
| 21 | A. I'm just trying to make sure I answer |
| 22 | you -- |
| 23 | Q. All right. |
| 24 | A. -- honestly and -- |
| 25 | Q. So you've told me that your Exhibit A |

Page 82

1 included some -- some -- some stuff that you got
2 from drug companies; right?
3     A. Rarely.
4     Q. Five --
5     A. Yes.
6     Q. -- percent; right?
7     A. Yes. I'll put that --
8     Q. Okay.
9     A. -- in the rare.
10     Q. Then if you look at the 95 percent and
11 split it in half, half of it came from lawyers and
12 half came from your own searches; right?
13     A. Sure.
14     Q. So in terms of the world of your own
15 searches --
16     A. Sure.
17     Q. -- I think you've told me generally that
18 you were trying to find or you were trying to
19 yield comparative data, though you couldn't recall
20 the search terms; right?
21     A. I -- my search terms on comparative data
22 was not a significant part of this. Because of my
23 understanding of what the limitations are in
24 general, when you take a registry and look at
25 comparative data, I -- I think there are

Page 83

1 significant limitations, and I'm always wary --
2     Q. All right.
3     A. -- comparing them. Without having a
4 direct head-to-head comparison, I don't know that
5 the clinical value would warrant including.
6     Q. And I appreciate that. But sometimes --
7     A. I'm not answering you. I'm sorry.
8     Q. But sometimes there is some value to
9 knowing what is in the universe of available
10 information; correct?
11     A. Yes.
12     I had some -- I had awareness of what was
13 available in the universe in terms of data. Do I
14 have every study? No way. I have a finite amount
15 of time to write three reports.
16     It is -- as an expert, you know when to
17 dive into one area versus another. This is not
18 area that I would use in a clinically meaningful
19 way. I've gotten articles such as this ad nauseam
20 over the last eight years from different sources.
21 And I understand where the context of comparative
22 registries are in terms of the understanding and
23 interpretation of science. I think that you have
24 to be very limited in terms of what -- the scope
25 of the conclusions that you can reach in that

Page 84

1 regard.
2     I -- you know, again, the Dresden registry
3 that looks at outcomes after major bleeds I think
4 is helpful. Dresden is not trying to compare to
5 another -- to Eliquis. They make reference to a
6 historical cohort from warfarin on this. It's --
7 it's a historical cohort. So although they make
8 that statement, I wouldn't -- I wouldn't be
9 willing to say based on the Dresden registry it's
10 better in terms of bleeding outcomes. I think
11 it's suggestive, but it's not a direct comparator
12 in a prospective manner.
13     So I think you have to be careful with
14 these registries what you're going to get. I
15 think the -- there is limited clinical utility and
16 the clinical utility is do these patients -- in
17 the application of the real world, are they
18 showing the same signals that were seen in the big
19 studies. I think when you take it after that I
20 think you're starting to make leaps of faith that
21 are not warranted. And that's why I didn't spend
22 an inordinate amount of time with comparative
23 registries.
24     Without a direct head-to-head comparison,
25 it is a challenge. And I think it's -- I don't

Page 85

1 think you're doing your patients benefit by making
2 that assessment.
3     Q. Why do places like Johns Hopkins and Mayo
4 Clinic then do the -- this sort of work?
5     A. I think --
6     MR. SARVER:
7         Object to form.
8     THE WITNESS:
9         -- they're suggestive and they can be
10 a thoughtful clinical question that's
11 raised that should be addressed in a more
12 rigorous context. And generally -- and I
13 can't comment on every one of these. But
14 if these authors are doing justice in
15 their limitations, they have mentioned you
16 need a direct head-to-head comparison to
17 make a definitive assessment. And I think
18 that every one of these, if they're done
19 right, are going to make those statements.
20 And that's a big blanket statement. So I
21 won't say every one. I think that that's
22 a fair statement, though.
23 BY MR. HONNOLD:
24     Q. Okay. You've seen that clinical trial
25 proposed by any manufacturers of any NOAC drug?

Page 86

1    A. No, sir.
2    Q. Okay. Have you proposed it to any of the
3  manufacturers?
4    A. No, sir.
5    Q. Okay. What would you have to do to
6  conduct a head-to-head trial like that? How would
7  you structure it if you were going to do it at --
8  at your facility?
9    A. I think you'd have to have a cohort of
10  patients on Xarelto, patients on Eliquis, patients
11  on dabigatran, and on Savaysa with similar --
12  similar inclusion and exclusion criterier --
13  criteria, and similar moniting -- monitoring. I
14  would hope for an extended follow-up. I think
15  some of these registries have three-month or less
16  than three-month follow-up, which also argues to
17  the limited clinical utility. I'd ideally have a
18  two-year follow-up, similar to what you were
19  seeing. And that would be the way to -- to do
20  that.
21    Q. Assigned randomly? Patients assigned
22  randomly --
23    A. Yes. Randomized.
24    Q. -- to the reagent?
25    A. Randomized and prospective. Yes, sir.

Page 87

1    Q. All right. Would that cost money?
2    A. An -- significant amount of money.
3    Q. Okay. Where would you get the money?
4    A. I think that -- either that comes from one
5  of the companies or you could apply for NIH
6  funding or something of that nature. But
7  historically, these big trials are funded by the
8  companies.
9    Q. Okay. Have you ever seen a head-to-head
10  trial on drugs in the same competing class both
11  still with patent protection, a head-to-head trial
12  with different agents?
13    A. My initial inclination is to say no, but
14  let me think about that. I would be surprised.
15  I'm going outside arrhythmia and into cardiology.
16  Yeah. Not off the top of my head.
17    Q. Okay.
18    A. I don't think so.
19    Q. So it seems like in any -- in any of those
20  areas, to the extent there might be interest to
21  see if head-to-head data would exist, it sounds
22  like it could be hard to find head-to-head
23  competing data for drugs that are in the same
24  class; correct?
25    A. I think that is a challenge we always deal

Page 88

1  with.
2    Q. Okay. You certainly know as a practicing
3  cardiologist that drugs within generally the same
4  treatment class, or family, that over time you'd
5  find some to be -- have greater incidence or
6  occurrence rate of particular type of risks as
7  compared to others; correct?
8      MR. SARVER:
9        Object to form.
10      THE WITNESS:
11        I'm trying to give another -- think of
12      a specific example. Do you have a
13      specific example?
14  BY MR. HONNOLD:
15    Q. How about hypertensive drugs and sexual
16  side effects?
17    A. Do they have different types of side
18  effects, the different types of --
19    Q. Or different rates in occurrence?
20    A. Different hypertense -- different
21  anti-hypertensives are in different classes of
22  medications. So . . .
23    Q. Okay. Bad choice on my part then. Let's
24  just talk generally then.
25    A. So let's talk about beta blockers and

Page 89

1  sexual side effects. And I'm not aware of
2  differences with that. There are certain
3  differences with beta blockers and vivid
4  nightmares, because one of them -- and I don't
5  recall which one -- doesn't cross the blood-brain
6  barrier. That would be one example of what you're
7  -- you're --
8    Q. Did that --
9    A. -- mentioning.
10    Q. -- knowledge come from a head-to-head
11  trial between competing agents?
12    A. No. That knowledge comes from -- I don't
13  know where the specifics of the -- how the drug is
14  made and how they know it doesn't cross the
15  blood-brain barrier.
16    Q. If the sponsors or manufacturers of
17  certain drugs in the same class are not themselves
18  going to contribute financially to the performance
19  of head-to-head trials, what would be the next
20  source of data and information available if
21  clinicians were interested in that?
22    A. I think an NIH-sponsored study.
23    Q. Okay. Still a head-to-head study?
24    A. Still a head -- I think the only way to
25  definitively answer that question would be with a

Page 90

1  head-to-head study.
2     Q.  Okay.  And if a clinician was interested
3  in comparative data where there weren't
4  head-to-head studies, in terms of your hierarchy
5  of looking at evidence-based medicine type of data
6  on the pyramid that you cited in your report,
7  what's the next best source of information to look
8  to?
9        MR. SARVER:
10          Object to form.
11       THE WITNESS:
12          I don't have -- outside of direct
13          prospective head-to-head data, I think
14          after that, again, it falls short.  And I
15          would put it under a line where I would
16          say that it's providing clinical -- that
17          clinical question can be answered
18          specifically.
19  BY MR. HONNOLD:
20     Q.  But if someone wanted to look at the
21  available data, what -- where would they go?
22  Like, for example, are you familiar with the
23  Cochrane Collaborative?
24     A.  The name -- yes.
25     Q.  Okay.  What is it?

Page 91

1     A.  It's a database that you can query.
2     Q.  Do they do meta-analyses to look at issues
3  such as this?
4     A.  It can.  Yes.
5     Q.  Okay.  And generally, have you seen
6  reputable physicians and research institutions
7  look to and cite the available data on the
8  Cochrane Collaborative?
9     A.  I've seen that done.  I think that again
10  sometimes these are subject to limitations and you
11  have to take them -- you have to look at the
12  individual.
13     Q.  Okay.  And certainly the Cochrane
14  Collaborative is front and center on -- on setting
15  out what -- what they do, including potential
16  limitations on what they do; correct?
17     A.  I don't understand.
18     Q.  Okay.
19     A.  What do you mean by "potential" --
20     Q.  Well --
21     A.  -- "limitations"?
22     Q.  -- you've talked about limitations and
23  things such as that.  Those things are readily
24  apparent as the Cochrane Collaborative discusses
25  the data and information they make available;

Page 92

1  correct?
2     A.  Do the --
3        MR. SARVER:
4          Object to form.
5        THE WITNESS:
6          -- Cochrane data -- the Cochrane
7          Collaboratives recognize the limitations
8          of what they're collecting and reviewing?
9        MR. HONNOLD:
10          Yes.
11       THE WITNESS:
12          I would expect that.  Yes.
13  BY MR. HONNOLD:
14     Q.  Okay.  So within the context of doing --
15  focusing on the available information and
16  presenting it in a way most appropriate given the
17  limitations, do you think that the Cochrane
18  Collaborative does good work?
19        MR. SARVER:
20          Object to form.
21       THE WITNESS:
22          I wouldn't do anything to denigrate
23          what the Cochrane Collaborative does.  If
24          you want me to comment on a specific
25          collaborative in terms of the utility in

Page 93

1          my clinical armamentarium, I'm happy to
2          review that.
3  BY MR. HONNOLD:
4     Q.  Have you ever for any particular patient
5  based upon patient demographic or patient
6  preference prescribed one NOAC over another for --
7     A.  Patient --
8     Q.  -- any particular patient?
9     A.  Patient preference always trumps
10  everything.  So you provide options and rationale
11  for decisions.  The -- the patient preference
12  trumps the question about anticoagulation or not
13  anticoagulation.
14     Q.  Okay.
15     A.  So I have patients with CHADS-VASc of 3
16  that are not on anticoagulation as a patient
17  preference.
18     Q.  And I meant choice of agent.
19     A.  I would -- I would extend that to choice
20  of agent also.
21     Q.  Okay.  And have you, based upon the
22  particular clinical circumstance, medical history
23  of the patient, chosen one NOAC over another due
24  to certain patient-centered data?
25     A.  I wouldn't say patient-centered data.

Protected - Subject to Further Protective Review

---

**Page 94**

1    You look at individuals -- so I don't
2 utilize dabigatran or Savaysa.  So I -- for the NO
3 -- the DOACs, I'll utilize rivaroxaban and
4 apixaban.  When I'm talking to a patient,
5 sometimes I'll push one way or the other.  An
6 example would be if they're already on a
7 once-daily medication and I'm concerned about
8 compliance, I would veer towards the rivaroxaban.
9 If I'm concerned that they're not going to be able
10 to remember to take it after dinner in a specific
11 way -- you know, you want to take the Xarelto
12 right after dinner -- I would veer towards
13 apixaban.  Those are sometimes -- those sometimes
14 come into the clinical scenario.  You -- you know,
15 that's the art of medicine, is applying it to each
16 patient.  And I think that there are times that's
17 not -- that's not the rule, more the exception.
18    Q.  Doctor, I'm going to hand you what we've
19 marked collectively as Exhibit 4.  I know these
20 were provided before Mrs. Orr's deposition earlier
21 this morning.  And I don't know whether we had
22 distributed copies of those or not.  We'll see.
23 But anyway, I'm going to hand you what's been
24 marked as Exhibit 4.
25    (Exhibit No. 4 was marked for

**Page 95**

1    identification and attached hereto.)
2 BY MR. HONNOLD:
3    Q.  Can you tell us what that set of documents
4 is?
5    A.  Invoices.
6    Q.  And are those all invoices related in some
7 way to the work that you've done on the Xarelto
8 litigation?
9    A.  Yes, sir.
10    Q.  And those invoices go back to capture work
11 done beginning on what date?
12    A.  The first one here is March 29th, 2015.
13    Q.  And are there additional invoices that
14 were dated 2015?
15    A.  Yes, sir.
16    Q.  Okay.  And the work that was done in 2015,
17 what was it related to?
18    A.  It was related to science day and the
19 preparation of science day.
20    Q.  Can you tell from any of those invoices in
21 Exhibit 4 when it was that you started working on
22 Mr. Boudreaux's case?
23    A.  No.  It's going to be a challenge.
24    Q.  Why?
25    A.  And the reason it's a challenge is I got

**Page 96**

1 to -- so initially it was the general report and
2 then Boudreaux and Orr.  I don't remember when I
3 did Boudreaux and Orr.  I know that I did the
4 general report first in that regard.  I was being
5 sent depositions on the specific cases while I was
6 preparing the official report, so I was juggling
7 those three.  So it's hard for me to look at this
8 -- and -- and my suspicion is that I didn't -- the
9 -- these invoices don't include the Boudreaux or
10 the Orr reports and that the -- this -- at the
11 time of the last invoice, this was on the general
12 report.  That's my suspicion.
13    Q.  So if you had -- so if you had to estimate
14 how much time you've spent on the -- on the
15 Boudreaux case versus the Orr case versus the
16 general report, is there any way you can do that?
17    A.  I think I spent significantly more time on
18 the general report.  And I would say -- I would
19 estimate that I spent a similar amount of time on
20 the Orr and the Boudreaux reports individually.
21    Q.  Okay.  Can we look at Exhibit 4 then, and
22 can you -- can you I guess identify the range of
23 hours that would be -- that we would slice up to
24 cover the work on the general report and then --
25    A.  I think --

**Page 97**

1    Q.  -- Orr and Boudreaux?
2    A.  I don't think there -- so what I'm saying
3 is I'm not -- I -- I -- my suspicion is that Orr
4 and Boudreaux are not on this, looking at the --
5 the -- the date of the last one.  And I may have
6 stopped it when I finished the formal report and
7 moved on in terms of doing another invoice.  So
8 I'm -- I think that there's nothing on the Orr and
9 Boudreaux on these specific invoices.
10    Q.  Okay.  So then --
11    A.  I think.
12    Q.  Okay.  So -- I mean, you can only answer
13 based upon the information that you think is
14 right.
15    And so as of today, Exhibit 4, the
16 invoices there you don't think reflect specific
17 time -- time entries that would be related to
18 preparation of the Orr and Boudreaux reports;
19 correct?
20    A.  Correct.
21    Q.  Okay.  So does that mean that your work on
22 the Orr and Boudreaux reports is unbilled?
23    A.  It's unbilled at this time.  Yes, sir.
24    Q.  Okay.  And so we're now -- and so if you
25 wanted to figure out how much that was, time,

---

Page 98

1 would you go back -- is there some source document
2 you would go back to?
3    A. I -- I have a piece of paper where I'm
4 keeping track I haven't put into an invoice. I
5 have a piece of paper where I'm keeping track and
6 then create an invoice. But it -- I have a -- I
7 have a piece of paper. I don't have the --
8    Q. Where is it?
9    A. -- particular invoice.
10    It's at home. I haven't billed those
11 hours at this stage.
12    Q. Okay. So all of the work on Orr and
13 Boudreaux would have been done by November --
14 November 15th; right?
15    A. The report -- for preparation of the
16 reports, yes.
17    Q. Okay. So we're -- we're more than 60 days
18 out now. What would be your practice in terms of
19 timely invoice and billing?
20    A. I had a busy holiday season.
21    Q. Okay.
22    A. And I've been very busy doing this since
23 the holiday season. So it's not -- not from lack
24 of -- I'm not hiding anything or anything. I just
25 haven't got to it.

Page 99

1    Q. I'm just trying to figure out how many
2 hours you think you have that's on those --
3 working on those two -- two reports?
4    A. I -- you know, and earlier I had said I
5 would estimate 10 to 12 for Orr. I would make a
6 similar estimate for Boudreaux. I think maybe --
7 I -- I think I did Orr before Boudreaux. And I
8 think I got better at reviewing the records in a
9 more -- in -- in a more succinct manner. So maybe
10 8 to 10 instead of 10 to 12.
11    Q. Can you tell from Exhibit 4 and the
12 invoices there how many hours you would have spent
13 on preparation of the general report?
14    A. I think we can -- we can add up.
15    Q. Okay. How many?
16    A. You want me to add up? Okay. And I don't
17 know if there are others in the other one that I
18 haven't billed yet that would still be -- so I
19 don't know that this is the end of the formal
20 report, the preparation.
21    Q. And --
22    A. But I'll give what I have here.
23    Q. Here's what I'm -- I'm just trying to
24 bookend this because you've told me a couple of
25 different things.

Page 100

1    You said that you think that you would
2 have spent the same amount of time cumulatively
3 between Orr and Boudreaux as you did on the
4 general report?
5    A. No. I didn't say that. I said I spent
6 more time on the general report. I said --
7    Q. Okay.
8    A. -- I spent similar time between Boudreaux
9 and Orr.
10    Q. Okay.
11    A. But I -- my impression is I spent more
12 time on the --
13    Q. All right. So in Exhibit 4, how much time
14 is shown on there related to preparation of the
15 general report?
16    A. Okay. 16.3 hours. And then a conference
17 call October 22nd, that was likely in regard to
18 something similar. So I would put -- 16.8 hours
19 is what I have here. Again, I can't say after
20 this what was specifically for the formal report
21 or whatnot. But I would -- at least 16.8 hours.
22    Q. Okay. What's the last date entry then
23 that you have -- that you think is related to the
24 general report?
25    A. The last date that I have here, which

Page 101

1 would be October 22nd.
2    Q. So you may have significant time that's
3 unbilled between October 22nd and November 15th on
4 the general report, on Orr, and on Boudreaux?
5    A. Yes, sir.
6    Q. Okay. When do you --
7    A. Well, define "significant." Ten hours
8 significant each?
9    Q. Enough to bill for.
10    A. Yes. Absolutely. There's enough to bill
11 for.
12    Q. Okay. When do you plan on doing that?
13    A. My plan was after today. I -- because my
14 impression is that after today there's going to be
15 a little bit of a respite, I hope.
16    Q. How much time did you spend specifically
17 preparing for the two depositions today?
18    A. For today, I would say over the last
19 week -- you know, so I had focused on the general
20 report for the most part. Over the past week, I
21 would say on average an hour a day I was able to
22 do review.
23    Q. Okay. So there may be --
24    A. On average --
25    Q. Okay.

Page 102

1    A. -- again.  So I woke up this morning,
2  reviewed for an hour and . . .
3    Q. So ballpark, there may be another 7 to
4  10 hours for work related to preparing for the
5  deposition?
6    A. Ballpark, yes, sir.
7    Q. Okay.  And that would be unbilled time
8  that you plan on billing for as well?
9    A. Yes, sir.
10    Q. Okay.  Were there meetings with counsel
11  related to either the Orr or -- or Boudreaux
12  depositions?
13    A. On the phone, no.  In person, yes.
14    Q. Okay.  And would that be included in what
15  you just said was the hour additional time?
16    A. Yes, sir.
17    MR. HONNOLD:
18      Okay.  All right.  Let's take another
19    short break.  I may be close to being
20    done.  But . . .
21    MR. SARVER:
22      Okay.
23    THE WITNESS:
24      I've heard that before.
25    THE VIDEOGRAPHER:

Page 103

1      The time now is 2:09 p.m.  We are off
2    the record.
3    (Brief recess was taken.)
4    THE VIDEOGRAPHER:
5      The time now is 2:21 p.m.  We are back
6    on the record.
7    MR. HONNOLD:
8      Doctor, we're back on the record after
9    an afternoon break.  I've looked at my
10    notes, and I'm able to say I don't have
11    any other questions for you.  So I thank
12    you for your time and courtesy.  We just
13    make sure that we leave exhibits marked 1
14    through 4 here, and I think we're done.
15    MR. SARVER:
16      And we have no questions.
17    THE VIDEOGRAPHER:
18      The time now is 2:21 p.m.  Today's
19    deposition of Dr. Sammy Khatib consisting
20    of two disks is now concluded.
21
22
23
24
25

Page 104

1    CHANGES AND SIGNATURE
2  WITNESS NAME:  SAMMY KHATIB, M.D.
3  DATE OF DEPOSITION:  Saturday, January 21, 2017
4
5  PAGE LINE    CHANGE          REASON
6  ____ ____  _____  _____
7  ____ ____  _____  _____
8  ____ ____  _____  _____
9  ____ ____  _____  _____
10  ____ ____  _____  _____
11  ____ ____  _____  _____
12  ____ ____  _____  _____
13  ____ ____  _____  _____
14  ____ ____  _____  _____
15  ____ ____  _____  _____
16  ____ ____  _____  _____
17  ____ ____  _____  _____
18  ____ ____  _____  _____
19  ____ ____  _____  _____
20  ____ ____  _____  _____
21  ____ ____  _____  _____
22  ____ ____  _____  _____
23  ____ ____  _____  _____
24  ____ ____  _____  _____
25  ____ ____  _____  _____

Page 105

1    WITNESS' CERTIFICATE
2
3    I have read or have had the foregoing
4  testimony read to me and hereby certify that it is
5  a true and correct transcription of my testimony
6  with the exception of any attached corrections or
7  changes.
8
9
10
11
12
13
14
15
16
17
18  _____
19    WITNESS' SIGNATURE
20
21
22
23  PLEASE INDICATE
24  []  NO CORRECTIONS
25  []  CORRECTIONS; ERRATA SHEET(S) ENCLOSED

Protected - Subject to Further Protective Review

Page 106

```
 1        C E R T I F I C A T E
 2     This certification is valid only for
 3   a transcript accompanied by my original signature
 4   and original seal on this page.
 5     I, AURORA M. PERRIEN, Registered Professional
 6   Reporter, Certified Court Reporter, in and for the
 7   State of Louisiana, as the officer before whom
 8   this testimony was taken, do hereby certify that
 9   SAMMY KHATIB, M.D., after having been duly sworn
10   by me upon the authority of R.S. 37:2554, did
11   testify as hereinbefore set forth in the foregoing
12   105 pages; that this testimony was reported by me
13   in the stenotype reporting method, was prepared
14   and transcribed by me or under my personal
15   direction and supervision, and is a true and
16   correct transcript to the best of my ability and
17   understanding; that the transcript has been
18   prepared in compliance with transcript format
19   guidelines required by statute or by rules of the
20   board; and that I am informed about the complete
21   arrangement, financial or otherwise, with the
22   person or entity making arrangements for
23   deposition services; that I have acted in
24   compliance with the prohibition on contractual
25   relationships, as defined by Louisiana Code of
```

Page 107

```
 1   Civil Procedure Article 1434 and in rules and
 2   advisory opinions of the board; that I have no
 3   actual knowledge of any prohibited employment or
 4   contractual relationship, direct or indirect,
 5   between a court reporting firm and any party
 6   litigant in this matter nor is there any such
 7   relationship between myself and a party litigant
 8   in this matter.  I am not related to counsel or to
 9   the parties herein, nor am I otherwise interested
10   in the outcome of this matter.
11
12
13
14
15        AURORA M. PERRIEN, CCR, RPR
16
17
18
19
20
21
22
23
24
25
```