UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  XARELTO (RIVAROXABAN) | * | MDL 2592 |
| PRODUCTS LIABILITY LITIGATION | * | |
| | * | SECTION L |
| THIS DOCUMENT RELATES TO: | * | |
| **_ALL CASES_** | * | JUDGE ELDON E. FALLON |
| | * | |
| | * | MAG. JUDGE NORTH |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * *

---

**EXHIBIT 13 TO
PLAINTIFFS' MOTION TO PRECLUDE SPECULATIVE TESTIMONY
FROM SIX DEFENSE EXPERTS ABOUT POTENTIAL OUTCOMES
FROM OTHER ANTICOAGULANTS**

---

# FILED UNDER SEAL

Protected - Subject to Further Protective Review

1              UNITED STATES DISTRICT COURT

               EASTERN DISTRICT OF LOUISIANA

2

3

     IN RE:  XARELTO         )  MDL No.:  2592

4    (RIVAROXABAN) PRODUCTS  )  Section:  L

     LIABILITY LITIGATION     )  Judge Eldon E. Fallon

5                             )  Mag. Judge North

                              )

6                             )

                              )

7    JOSEPH ORR, JR., as      )  No.:  15-03708

     lawful surviving         )

8    spouse of SHARYN ORR     )

9

10

11   PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

12

13

14      Videotaped deposition of SAMMY KHATIB, M.D.,

15   taken on Saturday, January 21, 2017, in the office

16   of Irwin, Fritchie, Urquhart & Moore, L.L.C., 400

17   Poydras Street, Suite 2700, New Orleans, Louisiana

18   70130, commencing at 9:02 a.m.

19

20

21

22

23

     Reported by:

24   AURORA M. PERRIEN

     CERTIFIED COURT REPORTER

25   REGISTERED PROFESSIONAL REPORTER

| Page 2 | Page 4 |
|---|---|

**I N D E X**

Page

Caption............................1

Appearances.......................4

Agreement of Counsel...............6

Witness' Certificate...............148

Reporter's Certificate.............149

**E X A M I N A T I O N**

MS. JEFFCOTT.......................8, 134

MR. IRWIN..........................129

**E X H I B I T S**

Exhibit No. 1......................9
Plaintiff's Amended Notice with
Subpoena Duces Tecum of Oral Videotaped
Deposition of Sammy Khatib, MD

Exhibit No. 2......................10
Sammy Khatib, M.D., Additional
Reliance List 2017.01.20

Exhibit No. 3......................10
Updated Materials Relied on, Reviewed,
and/or Considered by Dr. Sammy Khatib
M.D.

Exhibit No. 4......................11
(statements/invoices)

Exhibit No. 5......................20
Expert Report of Dr. Sammy Khatib,
Sharyn Orr, et al.

Exhibit No. 6......................24
NOMH Neuroscience Critical Care, Lab
Results (04/26/15 - 04/24/15)
(Continued), SOrr-OMC-MD-000463 - 000464

**A P P E A R A N C E S**

REPRESENTING PLAINTIFFS:
 LEVIN, PAPANTONIO, THOMAS,
 MITCHELL, RAFFERTY, PROCTOR, P.A.
 BY:  NEIL E. McWILLIAMS, JR., ESQ.
 316 South Baylen Street
 Pensacola, Florida 32502
 850.435.7000
 Nmcwilliams@levinlaw.com
 THE LAMBERT FIRM, A.P.L.C.
 BY:  EMILY C. JEFFCOTT, ESQ.
 701 Magazine Street
 New Orleans, Louisiana 70130
 504.581.1750
 Ejeffcott@thelambertfirm.com

 GOZA & HONNOLD, L.L.C.
 BY:  BRADLEY D. HONNOLD, ESQ.
 11181 Overbrook Road, Suite 200
 Leawood, Kansas 66211-2241
 913.451.3433
 Bhonnold@gohonlaw.com


REPRESENTING BAYER HEALTHCARE PHARMACEUTICALS,
INC., and BAYER PHARMA AG:
 NELSON, MULLINS, RILEY &
 SCARBOROUGH, L.L.P.
 BY:  ERIC A. PAINE, ESQ.
 1320 Main Street, 17th Floor
 Columbia, South Carolina 29201
 803.255.5518
 Eric.paine@nelsonmullins.com

| Page 3 | Page 5 |
|---|---|

Exhibit No. 7......................26
NOMH Neuroscience Critical Care,
Consult Notes (continued),
SOrr-OMC-MD-000236

Exhibit No. 8......................27
NOMH Neuroscience Critical Care,
Radiology Results (04/25/15 - 05/04/15)
(Continued), SOrr-OMC-MD-000466 - 000467

Exhibit No. 9......................45
(Frank Cruz, M.D. medical record),
SOrr-FCruz-000103 - 000105

Exhibit No. 10.....................51
Quest Diagnostics Incorporated,
(Collected:  10/28/2014),
SOrr-FCruz-000060

Exhibit No. 11.....................55
Quest Diagnostics Incorporated (record),
SOrr-FBH-000010

Exhibit No. 12.....................85
In re Xarelto MDL Litigation, Expert
Report of Dr. Sammy Khatib

Exhibit No. 13.....................102
NOMH Neuroscience Critical Care,
History & Physicals (continued),
SOrr-OMC-MD-000031 - 000034

REPRESENTING JANSSEN PHARMACEUTICALS, INC.,
JANSSEN RESEARCH & DEVELOPMENT, L.L.C., JANSSEN
ORTHO, L.L.C.:
 IRWIN, FRITCHIE, URQUHART & MOORE, L.L.C.
 BY:  JIMMY IRWIN, ESQ.
 400 Poydras Street, Suite 2700
 New Orleans, Louisiana 70130-3280
 504.310.2106
 Jimmy@irwinllc.com

 IRWIN, FRITCHIE, URQUHART & MOORE, L.L.C.
 BY:  MEERA U. SOSSAMON, ESQ.
 400 Poydras Street, Suite 2700
 New Orleans, Louisiana 70130-3280
 504.310.2106
 Msossamon@irwinllc.com
 BARRASSO, USDIN, KUPPERMAN, FREEMAN &
 SARVER, L.L.C.
 BY:  RICHARD E. SARVER, ESQ.
 909 Poydras Street, Suite 2400
 New Orleans, Louisiana 70112
 504.589.9700
 Rsarver@barrassousdin.com
 BARRASSO, USDIN, KUPPERMAN, FREEMAN &
 SARVER, L.L.C.
 BY:  SHAUN P. McFALL, ESQ.
 909 Poydras Street, 24th Floor
 New Orleans, Louisiana 70112
 504.589.9764
 Smcfall@barrassousdin.com
 TUCKER ELLIS, L.L.P.
 BY:  MICHAEL C. ZELLERS, ESQ.
 515 South Flower Street, 42nd Floor
 Los Angeles, California 90071
 213.430.3301

ALSO PRESENT:
 MELISSA BARDWELL, VIDEOGRAPHER

Protected — Subject to Further Protective Review

| Page 6 | Page 8 |
|---|---|

**Page 6**

1    S T I P U L A T I O N
2     It is stipulated by and among Counsel that
3   the videotaped deposition of SAMMY KHATIB, M.D.,
4   is being taken under the Federal Rules of Civil
5   Procedure for all purposes permitted under the
6   law.
7     The formalities of reading and signing are
8   not waived.
9     The formalities of sealing, certification
10  and filing are not hereby waived.  The party
11  responsible for services of the discovery material
12  shall retain the original.
13    All objections, except those as to the
14  form of the questions and/or the responsiveness of
15  the answers, are reserved until the time of the
16  trial of this cause.
17          * * * * *
18        Aurora M. Perrien, Certified Court
19  Reporter, Registered Professional Reporter, in and
20  for the State of Louisiana, officiated in
21  administering the oath to the witness.
22
23
24
25

**Page 8**

1   MR. ZELLERS:
2       Michael Zellers for Janssen.
3   MR. McFALL:
4       Shaun McFall for Janssen.
5   MR. SARVER:
6       Rick Sarver for Janssen.
7   MR. PAINE:
8       Eric Paine for Bayer.
9   THE VIDEOGRAPHER:
10      The court reporter today is
11  Aurora Perrien, and she will now swear in
12  the witness.
13      (The court reporter swore in the witness.)
14          E X A M I N A T I O N
15  BY MS. JEFFCOTT:
16    Q.  Good morning, Dr. Khatib.
17      Would you --
18    A.  Good morning.
19    Q.  -- mind stating your full name for the
20  record.
21    A.  Sammy Khatib.
22    Q.  And we've met before.  My name is
23  Emily Jeffcott.  I -- I represent the plaintiffs
24  in this matter.
25      I want to take care of a few housekeeping

**Page 7**

1        P R O C E E D I N G S
2   THE VIDEOGRAPHER:
3       We are now on the record.  My name is
4   Melissa Bardwell, videographer here for
5   Golkow Technologies.  The date today is
6   January 21st, 2017.  The time is
7   approximately 9:02 a.m.  This videotaped
8   deposition is being held in New Orleans,
9   Louisiana, taken in reference to the
10  Xarelto (rivaroxaban) Products Liability
11  Litigation.  The deponent today is
12  Sammy Khatib, M.D.
13      Would counsel present please introduce
14  themselves and state their affiliations
15  for the record.
16  MS. JEFFCOTT:
17      Emily Jeffcott for the plaintiffs.
18  MR. McWILLIAMS:
19      Ned McWilliams for the plaintiffs.
20  MR. HONNOLD:
21      Brad Honnold for the plaintiffs.
22  MR. IRWIN:
23      Jim Irwin for Janssen.
24  MR. SOSSAMON:
25      Meera Sossamon for Janssen.

**Page 9**

1   matters before we get started with questioning.
2   The first thing I'd like to hand you is a copy of
3   your deposition notice that I'm marking as
4   Exhibit 1.
5       (Exhibit No. 1 was marked for
6        identification and attached hereto.)
7   BY MS. JEFFCOTT:
8     Q.  Would you mind taking a look at that and
9   just letting me know if you've seen that before.
10  MS. JEFFCOTT:
11      Do you need a copy?
12  MR. ZELLERS:
13      (Shakes head.)
14  THE WITNESS:
15      Amended notice.
16  BY MS. JEFFCOTT:
17    Q.  And, Doctor, your -- your amended notice
18  is -- is really more of the formal document that
19  tells you --
20    A.  Oh, okay.
21    Q.  -- when and where to go.  And attached to
22  it is -- I believe as Exhibit A is a list of
23  documents that you were asked to bring to the
24  deposition.
25    A.  Yes.

Protected — Subject to Further Protective Review

Page 10

1 Q. Does that --
2 A. This, I've seen. Yes.
3 Q. Okay. And what I'm going to mark as
4 Exhibit 2 is -- is an additional reliance list
5 that your counsel provided me before the start of
6 the deposition.
7     (Exhibit No. 2 was marked for
8     identification and attached hereto.)
9 BY MS. JEFFCOTT:
10 Q. Would you mind looking at that for me.
11 A. Sure.
12 Q. Does that look familiar to you?
13 A. Yes.
14 Q. And then what I'm marking as Exhibit 3 is
15 the additional reliance list that you provided in
16 your deposition last week.
17     (Exhibit No. 3 was marked for
18     identification and attached hereto.)
19 BY MS. JEFFCOTT:
20 Q. If you wouldn't mind taking a look at that
21 and telling me whether or not that looks familiar
22 to you.
23 A. It does.
24 Q. Okay. And those are additional materials
25 that you reviewed after you issued your generic

Page 11

1 report in this matter; is that correct?
2 A. I don't remember the timing of the review
3 of the depositions. I know I had reviewed the FDA
4 reanalysis at the time of the report and there was
5 an omission not to have it on the original one.
6 So I -- I don't remember which ones were -- were
7 done before that or after.
8 Q. Okay. And it's just fair to say that
9 those items listed on either Exhibit 2 or 3 are --
10 are items that weren't included in your reference
11 list?
12 A. Initial -- yes.
13 Q. Okay.
14 A. Yes.
15 Q. And then what I'd like to mark as
16 Exhibit 4 and just so I don't forget about it is
17 the list of invoices that your counsel provided to
18 me.
19     (Exhibit No. 4 was marked for
20     identification and attached hereto.)
21 BY MS. JEFFCOTT:
22 Q. Would you mind just flipping through those
23 briefly and -- and letting me know if those look
24 familiar to you?
25 A. They do.

Page 12

1 Q. And do you see any invoices that -- that
2 might be missing from Exhibit 4?
3 A. It's -- I have not created a new invoice
4 since then. There are hours that haven't been
5 done yet. But this -- these are all the
6 invoices --
7 Q. Okay.
8 A. -- that I've submitted.
9 Q. All right. And, Doctor, you've been
10 employed by John Ochsner Heart & Vascular
11 Institute for like the -- the better part of a
12 decade; correct?
13 A. Seems like that. I -- I was a fellow from
14 '03 to '06. I don't know what -- how you would
15 characterize that employment. I left for 2 years.
16 And I've been on faculty since '08 --
17 Q. Okay.
18 A. -- May of '08.
19 Q. And the Heart & Vascular Institute is --
20 is separate from Ochsner's Neurosciences
21 Institute?
22 A. We're all employed by the hospital. It's
23 a different service line.
24 Q. Okay. Is really more the -- the focus of
25 the Heart & Vascular Institute cardiovascular

Page 13

1 medicine? Is that --
2 A. Absolutely.
3 Q. Okay. And -- and patients that come to
4 see you are primarily having heart issues?
5 A. Correct. They have, in the purview of all
6 of their medical issues. But our focus and
7 concentration is on their cardiovascular issues.
8 Yes.
9 Q. And Ochsner's Neurosciences Institute
10 covers patients having more issues with the
11 nervous systems, such as stroke?
12 A. Absolutely.
13 Q. Okay.
14 A. We work in conjunction a lot with the
15 neuroscience -- the neurologists and the
16 neurosurgeons when it comes to the strokes. But
17 that's in their purview. Yes.
18 Q. And that's where I was getting at.
19     I imagine there's some amount of overlap
20 between the Heart & Vascular Institute and the
21 Neuroscience Institute as it comes to patients?
22 A. There's some.
23 Q. And -- and -- and you see patients who
24 have suffered strokes?
25 A. Yes.

Protected – Subject to Further Protective Review

| Page 14 | Page 16 |
|---|---|

**Page 14**

1 Q. But you would see those patients in terms
2 of their cardiovascular issues as opposed to
3 issues specific to neurological impairment?
4 A. I don't see them for issues relative to
5 their neurologic impairment. That's correct.
6 Their cardiovascular issues include stroke. But I
7 am not involved in the sequelae of -- or the
8 management of the sequelae of the stroke.
9 Q. Okay. And so in that vein, it's not part
10 of your normal practice to diagnose patients who
11 are having strokes?
12 A. I'm not in the emergency room diagnosing
13 strokes. That goes back to internal medicine. So
14 no. I'm -- it is not part of my practice to -- it
15 -- it happens rarely, but no.
16 Q. And in terms of when it rarely happens,
17 can you explain the -- the kind of situation where
18 it would occur?
19 A. If someone is in the hospital for another
20 cardiovascular problem and they are having signs
21 of a stroke or whatnot. And the answer would is --
22 we would activate the stroke team. So it's not a
23 -- or get a CAT scan. If someone -- if I've done
24 a procedure -- I -- you know, I do a lot of a-fib
25 ablations. And if someone is having complaints

**Page 15**

1 afterwards, I will do the assessment and get the
2 relevant imaging in those patients.
3 Q. And -- and about how often does that occur
4 say in a -- in a given year?
5 A. Not often.
6 Q. Well --
7 A. Yeah. I -- you want a number. Less than
8 ten.
9 Q. Okay. And -- and -- and you had mentioned
10 the emergency room.
11 Do you -- do you do rounds in the
12 emergency room?
13 A. I -- I get called down to the emergency
14 room. I don't do rounds. We don't have a lot of
15 patients down there. But when one of my patients
16 shows up or I'm on consult service and there's a
17 patient with an arrhythmia issue, I will go down
18 there.
19 Q. And just to ask a little bit different
20 here: Are you ever on call for Ochsner's
21 emergency room?
22 A. I -- I'm not an emergency room physician,
23 so I don't work in the emergency room. But I take
24 call for patients from the emergency room that
25 have EP, arrhythmia issues.

**Page 16**

1 Q. And that would be to provide a consult?
2 A. Yeah.
3 Q. Okay. And then it -- since you've been --
4 I guess for the better part of the last decade,
5 about how many patients have you -- have you seen
6 that have had a hemorrhagic stroke?
7 A. Hard to quantify. I would put it at -- in
8 the last year?
9 Q. Sure.
10 A. Less than five.
11 Q. Okay. And in the last five years,
12 ballpark?
13 A. Less than 30.
14 Q. And those patients that you've seen, those
15 -- those few patients that you've seen that have
16 had a hemorrhagic stroke, were you treating them
17 for an arrhythmia issue?
18 A. The majority of time it's been management
19 of arrhythmia issues. However, I also round on
20 the cardiovascular service independent of the
21 arrhythmia issues service. And so some of that
22 has been in the -- that context as well.
23 Q. Okay. And in -- in that kind of context,
24 what -- what treatment do you provide?
25 A. If they're in heart failure, we'll manage

**Page 17**

1 their heart failure. Hypertension, we will assist
2 in the management of their hypertension. Are --
3 we're talking about the cardiovascular, not the
4 arrhythmia? If they're having a heart attack,
5 managing the MI.
6 Q. And -- and so in -- in the patients that
7 you've seen with hemorrhagic strokes, were you
8 involved in the diagnosis of the actual
9 hemorrhagic stroke?
10 A. Have I ever diagnosed? I've -- I've
11 diagnosed ischemic strokes. Nope.
12 Q. Now in terms of treating a patient for a
13 cardi -- cardiovascular issue, you had mentioned
14 that if -- in the course of treatment you
15 recognize that's -- a patient's having a stroke or
16 what have you, you'll -- you'll initiate the CT
17 scan --
18 A. Uh-huh.
19 Q. -- what have you?
20 Is it fair to say that as a normal part of
21 your clinical practice you don't order CT scans of
22 -- of -- of a patient's brain?
23 A. I don't know what "normal" means. It's
24 not outside the spectrum of what I do. It's not a
25 common occurrence, if that's --

Page 18

1    Q.  It's a routine?
2    A.  It's routine if they're reporting symptoms
3  after a procedure or whether or not they're having
4  a procedure.  So I order them, but I wouldn't say
5  that that's -- if you're looking for volume,
6  that's not high in terms of -- in terms of the
7  tests that I order, that would be a lower volume
8  number.
9    Q.  Okay.  So in -- in terms of the -- the
10  past year, how often have you ordered --
11    A.  The CAT scan?
12    Q.  -- a CAT scan or MRI for some sort of
13  brain imaging.
14    A.  I've done -- now we're including MRI.
15  Okay.  For 2016 -- and again, I -- I'm just
16  pulling numbers.  I would put it below 10.
17    Q.  And if we were just looking at CT scans
18  that you've ordered in 2016, what would your
19  ballpark . . .
20    A.  That I specifically ordered, not that was
21  ordered by somebody else, probably two or three.
22  You know, that's a very specific number, and I
23  reserve . . . But a few, I would say.
24    Q.  Okay.
25    A.  Not many.

Page 19

1    Q.  And so is it fair to -- for me to say that
2  images of a -- of a patient's brain are not
3  necessary for assessing a patient's cardiac
4  function?
5    A.  That's a fair statement.
6    Q.  And would you agree that images of a
7  patient's brain, whether from a CT scan or an MRI,
8  is -- is important to determine the location and
9  source of a -- of a brain bleed?
10    A.  Yes, ma'am.
11    Q.  And in the case of Mrs. Orr, did you
12  review her CT scans?
13    A.  No, ma'am.
14    Q.  Did --
15    A.  I reviewed the reports.
16    Q.  That was my next question.
17    A.  That -- yes.
18    Q.  And so did you review the reports of all
19  of her CT scans?
20    A.  I hope so.  I reviewed the records at
21  length.  And I remember reviewing the sequence of
22  events, the -- the CAT scan -- the initial CAT
23  scan, the follow-up CAT scan, what happened after
24  the EV -- EV drains were placed.  But I don't --
25  to say all, I'm not --

Page 20

1    Q.  And --
2    A.  I think so.  That --
3    Q.  Do you remember how many CT scans she had?
4    A.  I would -- I would -- I would say they
5  were daily while she was home.
6    Q.  I'm going to mark as Exhibit 5 a copy of
7  your report in the matter of Sharyn Orr.
8      (Exhibit No. 5 was marked for
9      identification and attached hereto.)
10  BY MS. JEFFCOTT:
11    Q.  And, Doctor --
12    A.  Thank you.
13    Q.  -- would -- would you mind flipping
14  through that and letting me know whether that's a
15  accurate copy of your report?
16    A.  Yes, ma'am.
17    Q.  All right.  And if you wouldn't mind --
18      THE VIDEOGRAPHER:
19      (Indicating.)
20  BY MS. JEFFCOTT:
21    Q.  -- going to the section entitled
22  "Development of Intracerebral Hemorrhage and
23  Death."  Their -- the pages in your report aren't
24  marked.
25    A.  Sorry about that.

Page 21

1    Q.  So it's -- if you count to Page 11, you'll
2  get there.
3    A.  It's near the end --
4    Q.  It's --
5    A.  -- or no?
6    Q.  It's about -- in terms of your report
7  report and not the appendices, it's about halfway
8  through.
9    A.  Got it.
10    Q.  Okay.
11    A.  Okay.
12    Q.  So under the section titled "Development
13  of Intracerebral Hemorrhage and Death," you
14  describe the events leading up to Mrs. Orr's
15  transfer from Ochsner Baptist to Ochsner Main
16  Campus; correct?
17    A.  Yes, ma'am.
18    Q.  And in Paragraph 3, you state, "A stat CT
19  scan of the head was obtained, and this revealed a
20  large intracerebral hemorrhage."
21      Did I read that correctly?
22    A.  Yes, ma'am.
23    Q.  And this CT scan was taken at Ochsner
24  Baptist; correct?
25    A.  I believe so.

Protected - Subject to Further Protective Review

Page 22

1    Q.  And do you recall about what time that was
2   taken?
3    A.  Not off the top of my head.
4    Q.  Now --
5    A.  I -- I want to say 11:00 p.m., around that
6   time, but I -- I don't remember specifics.
7    Q.  I think that's about right.
8        And in -- in terms of an intracerebral
9   hemorrhage, can you please describe to the jury
10  the difference between an intracerebral hemorrhage
11  and a intraventricular hemorrhage.
12   A.  Intracerebral would be within the brain
13  matter of the parenchyma itself.  Intraventricular
14  would be within the cavities surrounding the brain
15  parenchyma.
16   Q.  And it -- and to throw in another term,
17  it's intracranial hemorrhage.  So an intracranial
18  hemorrhage is a hemorrhage within the -- the vault
19  of the cranium; right?  And so would that include
20  an intercerebral and an intraventricular
21  hemorrhage?
22   A.  Yes, ma'am.
23   Q.  Okay.  And if you go back to your report
24  and the statement that I read earlier that says
25  that the CT scan revealed a large intracerebral

Page 23

1   hemorrhage, what's your basis --
2    A.  For not --
3    Q.  -- for that statement?
4    A.  -- calling it intracranial?
5    Q.  Or -- or -- intracranial or
6   intraventricular.
7    A.  This would have been from the records.
8   This would have been an interpretation of -- my
9   interpretation of the CAT scans, because again, I
10  didn't specifically review the CAT scan.
11   Q.  And so do you recall which records support
12  your statement that she suffered a large
13  intracerebral hemorrhage?
14   A.  Not off the top of my head.
15   Q.  Okay.  And -- and do you recall reviewing
16  the radiologist's report for the specific CT scan,
17  Mrs. Orr's first CT scan?
18   A.  I -- I recall reading it.  Do I recall the
19  specific wording off the top of my head?  No.  But
20  I have a feeling you have a report.
21   Q.  Well, Mrs. Orr's first CT scan was
22  reviewed by a doctor, Dr. Ogden.  And it was his
23  interpretation that Mrs. Orr's hemorrhage was
24  likely a primary intraventricular hemorrhage.
25       Does that sound familiar?

Page 24

1   MR. IRWIN:
2       Object to the form.
3   THE WITNESS:
4       I -- I'm happy to look at the -- the
5   report.
6   BY MS. JEFFCOTT:
7    Q.  I have marked this as . . . And, Doctor,
8   what I'm marking as Exhibit 6 is a copy of
9   Mrs. Orr's first and second CT scans.
10       (Exhibit No. 6 was marked for
11       identification and attached hereto.)
12   MS. JEFFCOTT:
13       (Tenders document.)
14   MR. IRWIN:
15       Thank you.
16   MS. JEFFCOTT:
17       That copy goes to him.  I don't . . .
18   THE WITNESS:
19       Got it.  I see the highlight as --
20   MS. JEFFCOTT:
21       Yeah.
22   THE WITNESS:
23       -- well and --
24   BY MS. JEFFCOTT:
25    Q.  So that's --

Page 25

1    A.  -- the impression in -- in the body
2   saying, "No definite parenchymal hemorrhage."
3    Q.  All right.  And so -- and according to
4   Dr. Ogden, it was his opinion that Mrs. Orr's
5   brain bleed was likely a primary intraventricular
6   bleed; is that correct?
7   MR. SARVER:
8       Objection.
9   THE WITNESS:
10       According to the report as -- as
11  written here, yes.  I -- I think sometimes
12  the neurologists and neurosurgeons have a
13  different assessment on it.  But on -- on
14  this one, yes.
15  BY MS. JEFFCOTT:
16   Q.  And, I mean, do you think Dr. Ogden got it
17  wrong?
18   A.  No.  I would not dream to think -- again,
19  I wouldn't interpret the study myself, so I have
20  no basis to say he got it wrong.
21   Q.  Okay.
22   A.  I know that sometimes a radiologist will
23  read it.  And often I will ask the neurologist or
24  the neurosurgeon because they're -- if -- if -- I
25  don't know if Dr. Ogden's a neuroradiologist or a

Protected -- Subject to Further Protective Review

Page 26

1  general radiologist.  But if he's a general
2  radiologist, I would put more into the thoughts of
3  a neurosurgeon or a neurologist in that regard.
4      Q.  And -- well, then I'd like to show you
5  what I'm marking as Exhibit No. 7, which is a
6  consult note from -- what is the name on here --
7  from a vascular -- the vascular neurology.
8      (Exhibit No. 7 was marked for
9      identification and attached hereto.)
10     THE WITNESS:
11       It's Gropen.  I see.  Yep.  I see that
12     he's -- he's calling it intraventricular
13     hemorrhage.
14  BY MS. JEFFCOTT:
15     Q.  And, Doctor, if you wouldn't mind reading
16  for me -- under History Of Present Illness, do you
17  see that?  The second -- or third sentence
18  starting with, "CT . . ."
19     A.  "CT" of the "head showed" a "large" right
20  "IVH with likely intraventricular source extending
21  into 3rd ventricle with" one-and-a-half centimeter
22  "midline shift."
23     Q.  And so, Doctor, would you agree with me
24  that the vascular neurologist believed Mrs. Orr's
25  bleed to be likely of an intraventricular source?

Page 27

1      A.  I think that was his impression when he
2  was writing this.  Yes.
3      Q.  Doctor, I'm going to mark as Exhibit 8 the
4  fourth CT scan report taken of Mrs. Orr.
5      (Exhibit No. 8 was marked for
6      identification and attached hereto.)
7      THE WITNESS:
8        Yes, ma'am.
9  BY MS. JEFFCOTT:
10     Q.  Would you mind reading the highlighted
11  portion?
12     A.  Can -- can I read the rest first?
13     Q.  Absolutely.  Take --
14     A.  Is that okay?
15     Q.  -- all the time you need.
16     A.  This was done on the 27th.  Okay.
17       "A recent acute intracranial hemorrhage is
18  again observed which is predominantly, if not
19  exclusively, intraventricular in position, with a
20  large amount of acute blood density seen within
21  the right lateral ventricle."
22     Q.  Thank you, Doctor.
23       So would you agree that according to the
24  radiologist who interpreted Mrs. Orr's fourth CT
25  scan, that he believed Mrs. Orr's hemorrhage to be

Page 28

1  exclusive to the ventricular space?
2      MR. IRWIN:
3        Object to the form.  You may --
4      THE WITNESS:
5        I think --
6      MR. IRWIN:
7        -- answer the question.
8      THE WITNESS:
9        -- he agrees definitely that it's
10     predominantly.  The -- the modifier of
11     "if," I wouldn't use that as a definitive.
12     So I would say his thought is
13     predominantly intraventricular.
14  BY MS. JEFFCOTT:
15     Q.  And -- and, Doctor, how do you explain the
16  discrepancy between those who treated Mrs. Orr and
17  believed to be -- believed her intracranial
18  hemorrhage to be of a ventricular source and your
19  opinion that her bleed --
20     A.  I think in more --
21     Q.  Let me finish my question.
22     A.  I'm sorry.
23     Q.  -- her -- her -- her bleed originated from
24  an intracerebral hemorrhage?
25     MR. IRWIN:

Page 29

1        Object to the form.  You may answer
2      the question.
3      THE WITNESS:
4        I -- I think a better term would have
5      been "intracranial" than "intracerebral."
6  BY MS. JEFFCOTT:
7      Q.  And so you would agree that at least the
8  records are not clear as to whether Mrs. Orr had
9  an intracerebral hemorrhage versus an
10  intraventricular hemorrhage?
11     A.  Would I agree that the records are not
12  clear?
13     MR. McWILLIAMS:
14       Intracranial.
15  BY MS. JEFFCOTT:
16     Q.  Oh, that's -- sorry.
17     A.  You want to rephrase it?
18     Q.  Let me rephrase it.
19       So --
20     THE WITNESS:
21       I thought you weren't talking.  I'm
22     sorry.
23     MR. McWILLIAMS:
24       I get ahead of --
25     THE WITNESS:

Page 30

1    Go ahead.
2    MR. McWILLIAMS:
3    -- myself sometimes.
4    THE WITNESS:
5    Go ahead.
6    MS. JEFFCOTT:
7    I'll rephrase it.
8    THE WITNESS:
9    Yes, ma'am.
10   BY MS. JEFFCOTT:
11   Q. So you -- you can't say with a reasonable
12   degree of medical certainty that Mrs. Orr suffered
13   a intracerebral hemorrhage?
14   A. I agreed with that. Yes. I think again,
15   after reviewing the depositions and whatnot, a
16   more appropriate term would have been
17   "intracranial" and leaving it there.
18   Q. Now, in reviewing Mrs. Orr's records, did
19   you see any issues with her liver function?
20   A. And I'm going to get the two mixed up.
21   Because I know we have two cases today. Let me go
22   back a little bit.
23   Can I review my report just for a moment?
24   Because there's --
25   MR. IRWIN:

Page 31

1    Yes.
2    THE WITNESS:
3    -- something a little . . .
4    MS. JEFFCOTT:
5    Yeah.
6    MR. IRWIN:
7    You can. Any time. Yes.
8    THE WITNESS:
9    I want to remember her initial
10   assessment. No. Okay. I'm sorry. No.
11   BY MS. JEFFCOTT:
12   Q. All right. And so from what you recall,
13   she was -- Mrs. Orr was never diagnosed with
14   severe liver disease?
15   A. Yes. You are correct.
16   Q. Okay. And -- and you would agree that had
17   she been diagnosed with severe liver disease, that
18   would have been concerning in terms of her usage
19   of Xarelto --
20   A. Yes, ma'am.
21   Q. -- correct?
22   And -- and -- and that's because Xarelto
23   is partially processed by the liver and Xarelto
24   has never been tested in patients with severe
25   hepatic impairment. Is that fair?

Page 32

1    MR. IRWIN:
2    Object to the form.
3    THE WITNESS:
4    It is definitely partially metabolized
5    by the liver. Whether it's been tested in
6    patients with severe disease, I don't know
7    the specific answer to that. I know those
8    patients were specifically excluded in
9    ROCKET. But I can't tell you off the top
10   of my head pharmacokinetic or
11   pharmacodynamic data or modeling that was
12   done --
13   BY MS. JEFFCOTT:
14   Q. And -- but -- but like you --
15   A. -- in patients with severe liver disease.
16   Q. But like you said, it wasn't tested --
17   patients with severe liver -- severe liver disease
18   was -- were not tested in ROCKET?
19   A. In ROCKET, they were excluded.
20   Q. Okay. And you would agree that it's
21   important to test a drug that's going to be used
22   for a particular purpose in appropriate patient
23   populations before that drug is prescribed to
24   patients in -- in those -- those patient
25   populations?

Page 33

1    MR. IRWIN:
2    Object to the form.
3    THE WITNESS:
4    I -- one more time. Sorry.
5    BY MS. JEFFCOTT:
6    Q. So you agree that it's important for --
7    for a drug that's going to be used for a
8    particular purpose to be tested in appropriate
9    patient populations --
10   A. It --
11   Q. -- correct?
12   A. -- should be tested in -- in patient
13   populations that are going to be utilized in.
14   Yes.
15   Q. And -- and that testing should occur
16   before it's actually prescribed to those patient
17   populations. Is that fair?
18   A. I guess I would say the -- the reverse. I
19   wouldn't prescribe -- prescribe a medication if it
20   hadn't been tested --
21   Q. And that's what --
22   A. -- in that regard.
23   Q. And I believe -- if I recall your
24   deposition correctly -- deposition testy [sic]
25   correctly, you wouldn't prescribe Xarelto to

Page 34

1 patients having a creatinine clearance of less
2 than 30 because those patients were excluded from
3 ROCKET --
4    A.  Well --
5    Q.  -- correct?
6    A.  So that's a stable creatinine clearance.
7 So there are times -- and -- and I have done this
8 in my practice.  If they dip below a creatinine
9 clearance of less than 30 for acute reasons --
10 they come in -- and we were talking about
11 diuretics causing renal failure.  And that gets
12 adjusted and it comes back above.  I wouldn't
13 discontinue the utilization of Xarelto in that
14 regard.
15    Q.  So in -- in terms of making that
16 evaluation, how do you determine whether or not
17 it's just a temporary dip of a patient's
18 creatinine clearance or whether it is a sign of,
19 you know, declining renal function?
20    A.  Looking at patterns and looking at the
21 clinical scenario.  So if someone has a creatinine
22 clearance that historically has been in the 40s
23 and then they come in with an acute event that is
24 known to cause acute renal insufficiency and it's
25 25, I wouldn't consider that someone whose

Page 35

1 creatinine clearance is generally under 30 and I
2 would wait to see how the acute event is managed
3 and see the -- the pattern.  Sometimes an acute
4 event can result in a new level of chronic events,
5 and so I'd want to see the creatinine clearance
6 improve back to baseline.
7    Q.  Right.  And so in terms of seeing, you
8 would -- you would do multiple creatinine tests
9 over a duration of time?
10    A.  I don't know how often -- I guess it would
11 -- it depends on the -- my comfort level, the
12 number of creatinine clearances I had done before
13 and the comfort level that what had happened was
14 related to an acute event.  And so --
15    Q.  Well --
16    A.  -- I would follow up, but I wouldn't
17 necessarily then continue -- serially check it.
18        Does that make sense?
19    Q.  Right.  But to assess whether or not the
20 patient goes back to baseline, you would have to
21 do a subsequent creatinine clearance test?
22    A.  If -- yeah.  So I would want to see the
23 creatinine clearance go back above 30.  And then
24 once I did, I -- again, if -- if 40 or 35, all of
25 sudden 20 because they come in with acute renal

Page 36

1 failure and then back up to 30 right before they
2 leave, I'm comfortable with that in that regard.
3    Q.  But --
4    A.  I wouldn't serially withdraw blood for
5 that.
6    Q.  Okay.  And so say if a patient came in and
7 had multiple creatinine clearance -- so over --
8 scratch that.  Let's start over.
9        So over a course of a period of time, a
10 patient comes in after multiple successive lab
11 work, creatinine is below 25 on multiple
12 occasions with --
13    A.  During the acute event?
14    Q.  Following the acute event.
15    A.  How far following?  Is -- so I -- you
16 know, again if it's -- they come in and throughout
17 their hospital stay it's staying low and then the
18 day of hospital stay it's back up to 30, I'd be
19 okay with that.
20    Q.  Okay.
21    A.  If they left with a creatinine clearance
22 of 20, I would be reluctant in that regard to
23 start it back up until I saw, again, a number come
24 back up.  Once I saw -- if a number came back up,
25 I would feel comfortable with resumption.

Page 37

1    Q.  And are you familiar with in ROCKET
2 whether or not patients were excluded whose
3 creatinine clearances fell below 30?
4    A.  I -- it is my impression -- so this is
5 going to be my impression, not -- I can't say this
6 with absolute certainty.  But if it dipped and it
7 came back up, the patients were continued.  That's
8 my recollection, but I can't -- I can't speak to
9 that definitively.
10    Q.  Okay.
11    A.  That was my impression.
12    Q.  And if -- if -- in -- in ROCKET, where
13 patients were -- had two successive creatinine
14 clearances of below 25, they were -- they were
15 permanently excluded from the study.  Does that
16 sound familiar?
17    A.  It -- yes.  It does sound familiar.  Yeah.
18    Q.  Now, in general, if a patient came to
19 you --
20    A.  And -- and let me -- can I just follow up?
21        I wouldn't -- with two successive numbers
22 below and then come back up, I would continue the
23 rivaroxaban in my -- in my practice.  And -- and
24 the reason is is because I think what they're --
25 and they should in a study be more rigorous and

Page 38

1  more -- and err on the side of caution.  But I
2  think what really was evaluated was a chronic
3  creatinine clearance above 30, from 30 to 50 with
4  a dose adjustment.  And I -- I feel comfortable --
5  if there's an acute situation and then it goes
6  back up, I would not discontinue that on the --
7  for the long-term.
8      Q.  So you're -- you're talking about an acute
9  situation.  What do you mean by that?
10     A.  Someone comes in with sepsis or heart
11 failure and their renal insufficiency acutely
12 worsens.
13     Q.  And I think you mentioned before if -- if
14 they -- if the patient after an acute experience
15 in a hospital, if at some point -- whenever they
16 returned to baseline, you're comfortable --
17     A.  I -- I am -- am I?  Correct.
18     Q.  -- having them on Xarelto?
19        What -- what's that time frame, where
20 the -- the patient needs to be able to return to
21 baseline?
22     A.  I don't have a time frame in general.
23 Yeah.  I don't have a -- it's -- there is no time
24 frame.
25        But generally, if it's going to be

Page 39

1  recover, it's not going to be months.  And so
2  again, if it comes back up, I'll go back.  If it's
3  been three months that they've been 20s and then
4  they get a number that's 31, I'm not going to
5  start it back up just because one.  That -- then
6  that becomes an outlier.  I'd want to see
7  follow-up.
8        So it's not months, but I don't have --
9  you know, I can't tell you days, weeks.
10     Q.  But just -- because I think you mentioned
11 that it -- the -- the creatinine clearance would
12 come up to baseline relatively quickly.  Is
13 that --
14     A.  I don't know --
15     Q.  -- fair?
16     A.  It -- no.  It depends on the insult.
17     Q.  Okay.
18     A.  And -- and this is more a nephrology
19 question than a cardiovascular question.  So I
20 can't tell you a time frame.  But my clinical
21 experience is it can be weeks sometime --
22     Q.  Okay.
23     A.  -- usually days.  But again, it depends on
24 the insult and whether there's been a hit to the
25 kidney ATN.  But it -- so it can take longer.

Page 40

1      Q.  And you -- and you mention that if -- if a
2  patient has a creatinine clearance of consistently
3  below 30 for say three months and then, you know,
4  hovers back a little above 30 you would not be
5  comfortable putting them back on Xarelto.  Did I
6  understand you correctly?
7      A.  I'd wait for more data.
8      Q.  Okay.
9      A.  I wouldn't go based on one number.  I'd --
10     Q.  And --
11     A.  -- want to see serial that are remaining
12 above 30.  Began -- again, you -- you never --
13 because there's some variation in -- in -- you
14 know, you draw your creatinine clearance on three
15 different days.  You're going to have some
16 variation in the levels.  And so if we're talking
17 20 versus 30, I wouldn't get overly excited about
18 one.  I'd like -- I like to see trends.
19        So for me, again, if their trend's here
20 and then they dip and then they're back, I'm
21 comfortable.  If they dip and they're staying
22 down, I'm not going to be comfortable with one.
23 I'm going to want to see a couple.
24     Q.  Right.  Because that -- that one could be
25 the outlier?

Page 41

1      A.  Yes.
2      Q.  Okay.  And -- and for a patient that you
3  decide needs to come off Xarelto because their
4  creatinine clearance is dipped, what -- what's the
5  normal course of treatment in terms of anti- --
6  anticoagulation?
7      A.  Warfarin.
8      Q.  And for any patients that are -- have a
9  creatinine clearance below 30, do you consider any
10 of the other DOACs besides Xarelto?
11     A.  You know, with the apixaban they have that
12 -- the two out of three criteria.  And so I will
13 consider it in those situations.  I know that
14 there's the Eliquis -- the -- the people will
15 have -- said that you can use it in patients with
16 end-stage renal disease.  I'm not -- I don't do
17 that.  So I'll -- I'll look occasionally.  But
18 generally, I'll -- I'll switch to warfarin.
19     Q.  And the reason that you wouldn't prescribe
20 the Eliquis is because, the same as with Xarelto,
21 it hasn't been tested with patients of a -- of a
22 creatinine clearance lower than 30.  Is that --
23     A.  Yeah.  I will --
24     Q.  Is that --
25     A.  -- stick to what was used in ARISTOTLE.

Page 42

1    Q. All right. And -- and I recall that in
2  your deposition from last Saturday you were
3  talking in terms of GFR --
4    A. Okay.
5    Q. -- a patient's GFR.
6      So how does that -- how does creatinine
7  clearance translate to GFR in your practice?
8    A. So much more for a nephrologist than me.
9  For me, I use them interchangeably.
10    Q. And so is it fair to say that a GFR score
11  of lower than -- of less than 30 would be
12  indicative to you of severe kidney disease?
13    A. So I don't know the specifics in terms of
14  severe. I've seen a creatinine clearance of less
15  than 30 used. And again, there's some variations
16  between creatinine clearance and -- and GFR, and I
17  think race is a big one. So I don't -- and I -- I
18  -- our hospital will calculate that for us, that
19  difference. And so I don't know off the top of my
20  head what would characterize severe for a GFR.
21    Q. But if you had a patient that had a GFR of
22  less than 30, say, you know, multiple times over
23  three months, you would place that patient on --
24  on warfarin --
25    A. Warfarin.

Page 43

1    Q. -- as opposed to Xarelto.
2    A. If --
3    Q. Is that fair?
4    A. I would use that. Yes.
5    Q. And in terms of a GFR from 15 to 29,
6  that's considered to be Stage 4 severe kidney
7  disease. Does that sound familiar?
8    A. Sounds familiar.
9    Q. With Stage 5 being less than 15 and being
10  somebody that needs dialysis or/either a kidney
11  transplant. Does that sound familiar?
12    A. Sounds familiar, but I'm not going to
13  validate that.
14    Q. Well -- and the reason I ask is because
15  you state in your report that Mrs. Orr had
16  moderate kidney function at Stage 3B.
17    A. Uh-huh.
18    Q. Now, what was your --
19    A. I'm sorry. Yes.
20    Q. What was your basis for that?
21    A. My impression of reading her creatinine
22  clearances and reviewing them all, including the
23  acute hospitalizations and where it was, I -- I
24  would have continued with the Xarelto at the 15.
25  Because I put her creatinine clearance just north

Page 44

1  of 30. That's where I come up with the -- the
2  moderate kidney dysfunction. Again, I think she
3  had occasions when she came in the hospital where
4  she would briefly dip. I also know that when she
5  ultimately came in with her bleed her creatinine
6  clearance was just north of 30.
7    Q. Would you mind explaining to me the
8  difference between Stage 3A and 3B chronic kidney
9  disease?
10    A. I -- I -- you know, I look that up to --
11  to give a specific -- I don't know -- I can't tell
12  you specifically off the top of my head.
13    Q. And --
14    A. I know that Stage 3 in general is
15  moderate, as you mentioned, and historically I've
16  used a creatinine clearance of 30. But I -- I
17  can't tell you off the top of my head A versus B.
18  I was just trying to be accurate in terms of what
19  I was doing.
20    Q. So in terms of the -- the six months
21  before Mrs. -- Mrs. Orr's brain bleed, do you
22  recall how many creatinine clearances or -- or G
23  -- GFRs you reviewed?
24    A. Can I recall how many I reviewed? No.
25    Q. Can you call -- recall about how many --

Page 45

1    A. How many --
2    Q. -- there were?
3    A. -- were done? I know she -- no. I have
4  no -- I have no number or gestalt off the top of
5  my head. I know it came back up. I remember it
6  coming below, then I remember it coming back up.
7  I -- I remember paying attention to where that
8  was, because that's an important part. I -- I --
9  I think it is an important part to discuss.
10    Q. Right. And so do you recall reviewing the
11  records of -- of Dr. Cruz, Mrs. Orr's
12  nephrologist?
13    A. I don't recall the specifics off the top
14  of my head of who I reviewed and not reviewed. I
15  -- I know she was seen by a nephrologist and their
16  thoughts were she had moderate kidney disease, if
17  I recall correctly, likely related to her
18  diabetes. I don't know -- I'm surprised that
19  hypertension would not also have contributed. But
20  if I recall correctly, he had said -- he had made
21  those statements.
22    Q. And I -- and I want to mark as
23  Exhibit 9 -- they're -- Exhibit 9, they're records
24  from Dr. Cruz, Mrs. Orr's nephrologist.
25      (Exhibit No. 9 was marked for

Page 46

1  identification and attached hereto.)
2  THE WITNESS:
3      Oh, God.  We've got to read
4  handwriting?
5  MS. JEFFCOTT:
6      I know.  I'm sorry.
7  THE WITNESS:
8      Okay.
9  MR. IRWIN:
10     You've got --
11 MS. JEFFCOTT:
12     Jim -- yeah.  You see that.
13 THE WITNESS:
14     I have one.
15 MS. JEFFCOTT:
16     Okay.
17 THE WITNESS:
18     Yes, ma'am.
19 BY MS. JEFFCOTT:
20 Q.  Perfect.  So if you -- if you take a look
21 at Exhibit 9 -- had I -- I've highlighted --
22 A.  Stage -- chronic kidney disease, Stage 4.
23 MS. JEFFCOTT:
24     Jim, could I trade copies with you?
25 MR. IRWIN:

Page 47

1      Sure.
2  MS. JEFFCOTT:
3      Thank you.
4  MR. IRWIN:
5      I don't get my own highlighting on it?
6  MS. JEFFCOTT:
7      Sorry about that.
8  MR. IRWIN:
9      Oh, boy.
10 BY MS. JEFFCOTT:
11 Q.  If you take a look.
12 A.  Okay.
13 Q.  Doctor, would you start by reading the
14 date.  It's in the upper -- well, actually let's
15 go to the last page because they're -- they're --
16 I put them in order by Bates number, but that
17 means that the --
18 A.  I remember seeing -- so to -- to go back
19 to your question, I do -- this refreshes seeing
20 something from Dr. Cruz.  Yes.
21 Q.  And so if you're looking at the last page,
22 would you mind reading off the date of that
23 record, Doctor.
24 A.  September 10th, 2014.
25 Q.  Now, if -- and this is a record by

Page 48

1  Dr. Cruz of Mrs. Orr; correct?
2  A.  Yes, ma'am.
3  Q.  Now, if you go down to the part that I've
4  had -- I've highlighted, would you mind reading
5  that handwriting for me, if you can.
6  A.  I -- C -- I'm assuming that's a K, not an
7  H.  I will take that assumption.  "CKD Stage 4."
8  Q.  And -- And, Doctor, if you would turn to
9  the next page.
10 A.  I don't have a next page.
11 Q.  Oh.  The -- I guess the --
12 A.  The prior?
13 Q.  -- prior page.  Thank you.
14 A.  CKD -- sorry.
15 Q.  And -- and would you mind reading the --
16 the -- the date in the upper right-hand corner.
17 A.  11/6/14.
18 Q.  And this is also a record by Dr. Cruz of
19 -- of -- of Mrs. Orr?
20 A.  Yes, ma'am.
21 Q.  And would you mind reading the highlighted
22 portion for me.
23 A.  "CKD Stage 4."
24 Q.  Now, if you would turn to the prior page,
25 the . . . Would you mind reading the date in the

Page 49

1  upper right-hand corner.
2  A.  March 5th, 2015.
3  Q.  And then the highlighted portion.
4  A.  "C" -- I'm -- "KD Stage 4."
5  Q.  And -- and, Doctor, in terms of GFR,
6  creatinine clearance, what does chronic kidney
7  disease Stage 4 typically mean?
8  A.  Again, I'm not a nephrologist, so I don't
9  -- I'm -- I'm constantly trying to click --
10 because I'm asked in Epic to put CKD3, 4, 5.  And
11 I generally follow what's already been in there.
12 So I don't -- I -- I can't tell you off the top of
13 my head.  I know Stage 3 is moderate.  Stage 5,
14 severe or end stage.  I don't know the
15 nomenclature that would be used for 4.
16 Q.  And -- and so Stage 4 is considered severe
17 renal disease.  Does --
18 A.  Okay.
19 Q.  Does that sound familiar?
20 A.  I'm --
21 MR. IRWIN:
22     Object to the form.
23 THE WITNESS:
24     I wouldn't be surprised by that.
25 BY MS. JEFFCOTT:

Page 50

1   Q.  And --
2   A.  I'm just saying I don't know off --
3   offhand.
4   Q.  And can you explain the discrepancy
5   between your report which states that Mrs. Orr had
6   Stage 3B moderate kidney disease and Dr. Cruz's
7   records that indicate that she had in fact Stage 4
8   chronic kidney disease --
9   A.  Sure.
10  Q.  -- severe --
11      MR. IRWIN:
12          Object to the form.
13  BY MS. JEFFCOTT:
14  Q.  -- kidney disease.
15  A.  Sure.
16      I -- so my review, again, of her
17  creatinine clearances were generally above 30.  I
18  think she had some acute setting -- in the -- it's
19  -- acute settings where it would dip below 30.  So
20  I'm -- I'm -- and I'm going to go with Stage 4
21  being 30 to let's say 15.  I -- I can't tell you
22  that.  I'm going -- let's -- below 30.  Okay.
23      I can't tell you why Dr. Cruz had the
24  impression of chronic kidney disease Stage 4.
25  It's possible that his initial one on

Page 51

1   November 10th was based on a creatinine that he
2   reviewed in the acute setting and then he
3   continued -- you know, sometimes we just write the
4   same thing in our follow-up notes.  Again, I don't
5   know.  I'm not going to say anything, but you're
6   asking me why there may be differences.
7       But I do think that ultimately she had a
8   creatinine clearance that generally was above 30,
9   and that's why I would characterize her as a
10  Stage 3.
11  Q.  And -- and is it possible that Dr. Cruz,
12  her -- her nephrologist, had access to kidney data
13  that -- that you didn't in -- in your review of
14  the records for your report?
15  A.  Anything's possible, I would say.
16  Q.  And I'd like to mark as Exhibit 10, which
17  is lab work for Mrs. Orr.
18      (Exhibit No. 10 was marked for
19      identification and attached hereto.)
20  BY MS. JEFFCOTT:
21  Q.  And, Doctor, would you mind reading the
22  date that lab -- that that sample was collected.
23  A.  Collected October 28, 2014.
24  Q.  And would you mind reading her GFR.
25  A.  Estimated GFR for a non-African-American,

Page 52

1   27.
2   Q.  And I -- this is obvious.  But you would
3   agree that's below a GFR of 30?
4   A.  Yes, ma'am.
5       I -- I don't know what the setting of this
6   test -- if this was in the setting of an
7   outpatient or --
8   Q.  I mean, do you recall Mrs. Orr being --
9   A.  I do recall.
10  Q.  -- an acute --
11      MR. IRWIN:
12          I ask that you let him finish his
13      answer, please.  I don't think he was
14      finished.
15      THE WITNESS:
16          I was just saying I'm not sure --
17      MS. JEFFCOTT:
18          Sorry, Doctor.  Go ahead.
19      THE WITNESS:
20          -- if this is in the setting of a
21      hospitalization or a recent illness
22      or . . . I don't have the context --
23  BY MS. JEFFCOTT:
24  Q.  And -- and, Doctor --
25  A.  -- of that.

Page 53

1   Q.  -- would you like to review your -- your
2   report to assess whether or not in -- in your --
3   A.  I -- I -- sorry.
4   Q.  -- history of -- of Mrs. Orr, whether or
5   not she was hospitalized at that time?
6   A.  I don't think I wrote in here every
7   specific hospitalization.  I did write "Developed
8   worsening CHF, with multiple hospitalizations."
9   So I don't know the time frame of this one.  I'm
10  not saying that is -- I'm just saying I don't know
11  the context.
12  Q.  And -- and, Doctor, who would be better
13  qualified to assess Mrs. Orr's kidney function,
14  you or her nephrologist?
15      MR. IRWIN:
16          Object to the form.
17      THE WITNESS:
18          I think --
19      MR. IRWIN:
20          You may answer.
21      THE WITNESS:
22          I think a nephrologist is an expert in
23      the management of renal disorders.
24  BY MS. JEFFCOTT:
25  Q.  And -- and so Mrs. --

Page 54

1    A.  Yes.  Dr. Cruz.  Let me rephrase.
2    Q.  So Dr. Cruz would be in a better position
3  to assess Mrs. Orr's kidney function than you?
4    A.  I'm not going to say in a better position.
5  Because we have the hindsight of a lot of data
6  going forward.  And so what -- the advantage I
7  have over Dr. Cruz is he's making an assessment in
8  the setting of maybe of a 20- or a 30-minute
9  clinic visit and has a limited time and data to
10  look at perhaps.  I've had hours to look at and
11  answer specifically that question.  So he is a
12  expert more than myself.  But is he better
13  prepared in this specific case?  I can't say that.
14  Again, he's got a 20-minute --
15    Q.  Sure.
16    A.  -- window.
17    Q.  Did -- did you treat Mrs. Orr --
18    A.  No.
19    Q.  -- prior to her death?
20    And -- and do you know how long Dr. Cruz
21  treated Mrs. Orr for her kidney issues?
22    A.  I'm -- at least going back to
23  September 2014.  I can say that, but I don't have
24  the dates.
25    Q.  And -- and in fact, it was much earlier?

Page 55

1    MR. IRWIN:
2      Object to the form.
3  BY MS. JEFFCOTT:
4    Q.  And, Doctor, I'm going to mark as
5  Exhibit 11 additional lab records for Mrs. Orr.
6  And I -- I apologize in advance for the poor
7  quality.  I couldn't find a better one in our
8  records.
9      (Exhibit No. 11 was marked for
10      identification and attached hereto.)
11    THE WITNESS:
12      Okay.
13  BY MS. JEFFCOTT:
14    Q.  And, Doctor, would you mind identifying
15  for -- in the column -- do you see the column
16  marked as November 24th, 2014 --
17    A.  Yes.
18    Q.  -- at the top?
19    And then going down and -- and identifying
20  what the GFR for a non-African-American, what
21  those results would have been for Mrs. Orr?
22    A.  26.
23    Q.  And then the -- the column to the left is
24  for March 11th, 2015; is that correct?
25    A.  Yes.

Page 56

1    Q.  And these are Mrs. Orr's lab records, a
2  reproduction of them; is that correct?
3    A.  It says Sharyn Orr.  So unless it's a
4  different one.  It has the same date of birth too.
5  So . . .
6    Q.  And so under that column dated
7  March 11, 2015, would you mind reading off what
8  her GFR score would have been.
9    A.  27.
10    Q.  Okay.
11    A.  Can I also make another comment?
12    Q.  Sure.
13    A.  So if you look at her cortisol level, you
14  see that's also circled.  It is markedly elevated.
15  So to me this is someone who's in an acute
16  stressor.  Those are -- you know, cortisol is a
17  level -- endogenous hormone will go up in times of
18  stress.  And so I don't think she's at a baseline
19  level -- baseline status with that one.
20    Q.  Okay.  What --
21    A.  The one on November 24th, it was normal.
22    Q.  Okay.  And then --
23    A.  But not that one.
24    Q.  And -- and you agree, though, that her
25  GFRs were in fact elevated for the November and

Page 57

1  March readings?
2    MR. IRWIN:
3      Object to the form.
4    THE WITNESS:
5      I agree that you have two readings
6  here on separate dates that are --
7  BY MS. JEFFCOTT:
8    Q.  And --
9    A.  -- 26 and 27.  Yes.
10    Q.  And both of those readings were below 30?
11    A.  Yes, ma'am.
12    Q.  And so based on the lab work I just handed
13  you for -- which would be Exhibit 11 and
14  Exhibit 10 --
15    A.  Ten?  I don't have 10.  Did we skip 10,
16  or --
17    MR. IRWIN:
18      You have 10.
19    THE WITNESS:
20      -- did I not get 10?
21    MS. JEFFCOTT:
22      Ten is the --
23    THE WITNESS:
24      Okay.  Yes.
25    MR. IRWIN:

Page 58

1    Here it is.
2    THE WITNESS:
3        I'm sorry.  Yes, ma'am.  Okay.
4  BY MS. JEFFCOTT:
5    Q.  You have multiple instances consecutively
6  where Mrs. Orr's GFR was below 30.  Do you agree?
7    MR. IRWIN:
8        Object to the form.
9    THE WITNESS:
10       I have two incidents -- three
11   incidents.  Well, what is the date for the
12   other one?  Let me see here.
13   October 28th.  Three incidences, yes,
14   ma'am.
15 BY MS. JEFFCOTT:
16   Q.  And those instances were within relatively
17 a short time span of -- of one another, within --
18 I think it was five months?
19   MR. IRWIN:
20       Object to the form.
21   THE WITNESS:
22       They were within five months of each
23   other.
24 BY MS. JEFFCOTT:
25   Q.  And again, those instances support Dr.

Page 59

1  Cruz's opinion that Mrs. Orr had Stage 4 severe
2  kidney disease?
3    MR. IRWIN:
4        Object to the form.
5  BY MS. JEFFCOTT:
6    Q.  Is that fair?
7    A.  I -- I -- again, I -- I'm -- I'm -- I'm
8  not going to make a statement in -- about that
9  without having the whole context.  If there are
10 other creatinines that were in -- creatinine
11 clearances that were obtained in between these
12 that were above -- again, I'm looking at the
13 March one.  She has something going on.  She's not
14 in a good place.
15   Q.  Well, you -- Doctor, were all these
16 related to acute events?
17   A.  I -- I can't -- that's what I'm saying.
18 I'm not willing to make a reference to her CKDs.
19 I don't know whether these are acute or chronic.
20 I -- I don't have the context.
21   Q.  Well, in -- in -- in your report, do you
22 identify any acute events in the five months
23 preceding her hospitalization for a brain bleed?
24   MR. IRWIN:
25       Object to the form of the question.

Page 60

1    Argumentative.
2    THE WITNESS:
3        She had multiple hospitalizations for
4    heart failure.  I don't have the dates.
5  BY MS. JEFFCOTT:
6    Q.  I mean, would you like to take time to
7  look through your report?
8    A.  I didn't -- I didn't put them in my
9  report.
10   Q.  Did -- and why didn't you include those
11 dates in your report?
12   A.  At the time I didn't think that those
13 would come up in this sort of question.  It's hard
14 to anticipate everything that's going to come up.
15 And I was trying to be somewhat succinct.  I --
16 and keep it to things that I thought were relevant
17 at the time.
18   Q.  Sure.  But you testified here today that,
19 you know, if a patient is having an acute event it
20 can impact their baseline function.  And so
21 wouldn't -- wouldn't you think that's important,
22 to include such acute events --
23   A.  I did in my --
24   Q.  -- in your report?
25   A.  I'm sorry.  I did.  I said she had

Page 61

1  multiple hospitalizations for heart failure.  I
2  just don't have the dates.
3    Q.  And so say if -- if Mrs. Orr didn't have
4  an acute event in the -- in the preceding
5  five months before her brain bleed, would you
6  agree that -- that Dr. Cruz's opinion that she had
7  Stage 4 chronic kidney disease is in fact
8  supported by the lab work?
9    A.  I -- again, my review -- and I wasn't --
10 and I'm -- was as objective as I could be, was
11 that her creatinine clearance generally was above
12 30.  If I had seen her in -- in -- as a clinical
13 visit, that would have been my assessment.  And if
14 -- if she were seeing a nephrologist who had
15 written CKD 4 and I had seen a creatinine
16 clearance pattern that I think was above 30, I
17 wouldn't necessarily go by what -- the label that
18 was put on her.  I would go on what my thoughts
19 are her creatinine clearance in general.
20   Q.  And -- and if in fact -- you know, if
21 Mrs. Orr had a creatinine clearance or a GFR of
22 less than 30, that she would have been -- she
23 would not have been a candidate for Xarelto?
24   MR. IRWIN:
25       Object to the form.  Asked and

Page 62

1  answered.
2  THE WITNESS:
3     Yeah. I -- I -- I keep going back to
4  -- I -- I -- my impression was that my
5  creatinine clearance overall was above 30,
6  except for in acute stages. And you will
7  have occasional outliers that dip below
8  that. I think it was appropriate to use
9  the 15-milligram dosing. And I -- I would
10  have. And I'm -- in -- in my practice, I
11  will -- will use it in that manner.
12  BY MS. JEFFCOTT:
13     Q. And -- and my question's a little bit
14  different.
15     A. Okay.
16     Q. I'm asking if -- if Mrs. Orr [sic]
17  creatinine clearance had dipped below 30 and --
18  and that -- that had become her baseline, would
19  you agree with me that you would not have had her
20  on Xarelto?
21     A. If her creatinine clearance had
22  chronically been below 30 without acute settings,
23  I would have switched.
24     Q. Okay.
25     A. Again, my review of this and seeing what

Page 63

1  her creatinine clearance is, I would have
2  continued the 15-milligram --
3     MS. JEFFCOTT:
4        Motion --
5     THE WITNESS:
6        -- in this specific patient.
7     MS. JEFFCOTT:
8        Motion to strike the -- the part after
9  "I would have switched" as nonresponsive.
10        Do you mind if we take a break?
11  That's okay?
12     THE VIDEOGRAPHER:
13        The time now is 9:57 a.m. We're off
14  the record.
15     (Brief recess was taken.)
16     THE VIDEOGRAPHER:
17        This begins Disk 2 of today's
18  deposition. The time now is 10:07 a.m.
19  We are back on the record.
20  BY MS. JEFFCOTT:
21     Q. Now, Doctor, we had a brief break.
22        Is there any testimony that you want to
23  change having come off the break?
24     A. No, ma'am.
25     Q. Okay. If you wouldn't mind going to

Page 64

1  Page 15. So -- and it's -- the section is titled
2  "Would" Sharyn Orr "Have Fared Differently if She
3  Had Been on Warfarin or a Different DOAC." It's
4  towards -- it's I think --
5     A. Yep. I got it.
6     Q. You got it? Okay.
7     A. Yes, ma'am.
8     Q. You give the opinion that Mrs. Orr would
9  not have had a different outcome if she had been
10  on -- on warfarin or another DOAC; is that right?
11     A. Yes, ma'am.
12     Q. And so, in other words, it's your opinion
13  that her intracranial hemorrhage and death would
14  have occurred regardless if she had been on
15  warfarin or another DOAC. Is -- is that fair?
16     A. That is my impression. There's no way to
17  know a hundred percent, but that is my opinion.
18  Yes.
19     Q. And as your opinion relates to warfarin,
20  would you agree that the relative safety and
21  efficacy of warfarin is dependent on a patient's
22  time in therapeutic range?
23     A. The -- can you state again? Let me just
24  make sure I'm . . .
25     Q. Yeah.

Page 65

1     A. The relative -- relative to what?
2     Q. Relative safety and efficacy of warfarin
3  to a given patient is dependent on a patient's
4  time in therapeutic range.
5     A. I think the longer in the therapeutic
6  range, the better, the more effective --
7     Q. Right. So --
8     A. -- and safe.
9     Q. -- the longer that a patient's in
10  therapeutic range, in TTR, the lower the risk of
11  stroke and the lower the risk of -- of bleeding.
12  Is that fair?
13     A. I think that for an individual, the
14  quality of TTR control correlates with outcomes.
15     Q. Okay. And -- and -- and so the higher the
16  TTR, higher average TTR, whether it's 55, 60, 70,
17  correlates to the -- the outcome, and that -- that
18  outcome includes --
19     A. I think a higher -- I'm sorry.
20     Q. -- outcome includes risk of stroke and
21  bleeding?
22     A. I think higher an individual's time in the
23  therapeutic range, the better they're going to do.
24  Yes. I -- I do believe that.
25     Q. And in terms of outcomes -- well, I

Page 66

1  mean . . .
2      From ROCKET, we know that how Xarelto
3  compared to warfarin was in a population that
4  averaged a -- an average TTR 55 percent of the
5  time?
6      A.  Yes, ma'am.
7      Q.  And -- and we don't know how Xarelto
8  compared to patients on warfarin who had a TTR of
9  say 70, 80 percent; is that -- is that right?
10     A.  Correct.
11     Q.  Okay.  And do you know what the TTR was
12 for patients in ROCKET who suffered a intracranial
13 hemorrhage on warfarin?
14     A.  Do I know the average TTR of
15 patients . . .
16     Q.  Do you know the -- the -- the patient --
17 the individual TTR of patients who suffered a
18 intracranial hemorrhage --
19     A.  No.
20     Q.  -- in ROCKET?
21     A.  I -- not off the top of my head.  I don't
22 remember.  I may have seen something, but I don't.
23     MS. JEFFCOTT:
24         Is the coffee here?  Do -- should we
25     take a break?

Page 67

1      MR. IRWIN:
2          You want to take a quick break?  Yes.
3      THE VIDEOGRAPHER:
4          The time now --
5      THE WITNESS:
6          Now?  Okay.
7      THE VIDEOGRAPHER:
8          -- is 10:10 a.m.  We are off the
9      record.
10     (Brief recess was taken.)
11     THE VIDEOGRAPHER:
12         The time now is 10:12 a.m.  We are
13     back on the record.
14 BY MS. JEFFCOTT:
15     Q.  And, Doctor, before we took our brief
16 coffee break we were talking about in ROCKET, that
17 we -- we don't know how Xarelto patients compared
18 to warfarin patients at a TTR of 70, 80 percent;
19 correct?
20     A.  Correct.
21     Q.  And that you don't know what the TTR was
22 for individual patients who suffered intracranial
23 hemorrhages?
24     A.  Correct.
25     Q.  And are you aware that their TTRs were out

Page 68

1  of range?
2      MR. IRWIN:
3          Object to the form.
4      THE WITNESS:
5          Am I --
6      COURT REPORTER:
7          Their TTRs were what?
8      MS. JEFFCOTT:
9          Out of range.
10     THE WITNESS:
11         Am I aware that there were TTRs that
12     were out of range?
13 BY MS. JEFFCOTT:
14     Q.  Of the patients who suffered intracranial
15 hemorrhages.
16     MR. IRWIN:
17         The same --
18     THE WITNESS:
19         I'm not -- sorry.
20     MR. IRWIN:
21         Same objection.  Form.
22     THE WITNESS:
23         I'm not familiar with the specifics in
24     that regard.
25 BY MS. JEFFCOTT:

Page 69

1      Q.  And can you opine to -- strike that.
2          Can you opine what Mrs. Orr's TTR would
3  have been had she been on warfarin?
4      A.  No.  Not -- my suspicion is that it would
5  have been -- we do know that higher risk factors
6  for CHADS -- CHADS-VASc correlate with low --
7  lower TTRs in general.  So my impression, it would
8  be lower, not higher.  But I can't tell you -- no
9  way to know definitively.
10     Q.  And there's no way to assess what her TTR
11 would have been on warfarin unless she had
12 actually been on warfarin?
13     A.  Yes, ma'am.
14     Q.  Okay.  And -- and -- and since we know
15 that there is a connection between TTR and
16 outcome, you know, what -- whatever that outcome
17 is, whether it's a stroke or a bleed, without
18 knowing Mrs. Orr's TTR, you can't say with a
19 reasonable degree of medical certainty how she
20 would have done on warfarin?
21     MR. IRWIN:
22         Object to the form.
23     THE WITNESS:
24         I -- I'm looking at populations when
25     making that statement.  So if -- in

Page 70

1    general, if someone comes in with a bleed
2    on Xarelto, there's no data that I'm aware
3    of or familiar with that would indicate
4    that she would have been a lower risk if
5    she had been on warfarin, unless she had a
6    contraindication to the Xarelto,
7    creatinine -- end-stage renal disease, or
8    mechanical valve or something of that
9    nature. So I think in general the data
10   doesn't support one way -- doesn't support
11   that it would have gone better with
12   warfarin.
13   BY MS. JEFFCOTT:
14   Q. I think you -- you mentioned a minute ago
15   that there are certain risk factors, like
16   CHADS-VASc, that indicate whether or not somebody
17   will have -- relative to their TTR, that they'll
18   have a lower TTR if -- if they have a higher
19   CHADS-VASc. Did I -- did I state that correctly
20   as --
21   A. CHADS-VASc.
22   Q. -- as what you said?
23   A. I -- the higher the CHADS-VASc, I think
24   there's more of a challenge with TTR in general.
25   Q. And what literature can you cite to

Page 71

1    support that?
2    A. I don't -- I cannot cite off the top of my
3    head. It's -- it's something that I think about
4    in my practice. And I don't know -- again, I
5    can't give you the specific citation. Intuitively
6    it makes sense to me that that would be the case,
7    but I can't give you a specific citation.
8    Q. Has that been specifically studied?
9    A. I'm -- I believe that there is data out
10   there looking at that. I don't -- this is not
11   something that I would have just come up with on
12   the top of my head. But again, I can't quote the
13   specific stuff.
14   Q. At this point in time, you can't name a
15   single study that supports your statement that a
16   lower CHADS-VASc score makes it difficult to
17   assess TTR?
18   A. I -- I can't give a specific study. No.
19   Q. And -- and going back to Mrs. Orr, you
20   would agree that absent knowing how she would have
21   actually done on warfarin through a TTR, you can't
22   actually say what her outcome would have been had
23   she been on warfarin?
24   MR. IRWIN:
25   Object to the form.

Page 72

1    THE WITNESS:
2    I think if we had a hundred
3    Sharyn Orrs on warfarin and a hundred
4    Sharyn Orrs on rivaroxaban, the overall
5    outcomes would have been similar. I think
6    that's the take-home message that I take
7    home from the data.
8    BY MS. JEFFCOTT:
9    Q. But -- and again, what's -- what's the
10   basis for that?
11   A. ROCKET and the -- the real-world registry
12   data. I -- I think if you look at all --
13   all-comers, I think that's what it showed. So
14   we --
15   Q. But as you --
16   A. It's hard -- I'm sorry.
17   Q. Were you done with your answer?
18   A. No.
19   It -- it's -- it's hard -- what I tell
20   people is, If you have a bleed, it's a hundred
21   percent for you. But we don't look at it that
22   way. You have to look at populations. So I try
23   to frame it for patients, If we put a hundred of
24   you on this or a hundred of you on this, and use
25   that frame of reference. And so that's the --

Page 73

1    kind of the way that I think about it. You can't
2    predict with certainty with any individual when
3    you go down one path or another. But if you look
4    at populations and you're playing a hundred versus
5    a hundred, that's -- that's how I try to frame it
6    for my patients when I'm talking to them in that
7    regard. And I think if you took a hundred on
8    warfarin and a hundred on Xarelto, the outcome
9    would have been different.
10   Q. Well --
11   A. That's how it would have shaken out.
12   Q. But like you said, you can't predict with
13   certainty as to any patient?
14   A. I never predict anything with certainty
15   with any patient when it comes to any situation.
16   There's very -- I -- very few absolutes when it
17   comes to the practice of medicine. I don't -- I
18   can't tell you anything's going to be a hundred
19   percent.
20   I never -- patients will want that, and I
21   will never say anything with absolute certainty.
22   That's not -- that's the practice of medicine.
23   You have to be -- you have to be careful with
24   that. So I try to shy away from using absolutes.
25   People want the word "cure." I'll say, We're not

| Page 74 | Page 76 |
|---|---|

**Page 74**

1  going to use the word "cure," We're going to use
2  "control," and -- and those kind of things.
3      So I'm not going to say with absolute
4  certainty.  It's my opinion that in general a
5  hundred of her on this, a hundred on that, it
6  would have been no different.
7      Q.  Right.  But -- so when you look at
8  ROCKET -- so if you're -- if you -- in the lens of
9  ROCKET and you're looking at a hundred of Mrs. Orr
10  on -- a hundred of Mrs. Orr on Xarelto and a
11  hundred of Mrs. Orr on warfarin, that's assuming
12  that Mrs. Orr would have had a TTR of 55 percent;
13  correct?
14      A.  No.  I think that assumes that some
15  Mrs. Orrs have a TTR of 50, some have a TTR of 70,
16  some have a TTR of 55.  And I think in overall, in
17  the hundreds, they would average a TTR of 55.
18      Q.  But you don't know whether Mrs. Orr would
19  have had an average TTR of -- of 55 percent --
20      A.  Yeah.  Again, I -- there's nothing --
21      Q.  -- correct?
22      A.  -- that you can -- if I used that train of
23  thought, I'd be paralyzed in terms of making a
24  decision.  Because you can't ever say with
25  absolute certainty anything.  It's -- if you --

**Page 75**

1  you have to think about it in terms of averages
2  and populations.  There's no -- there's no
3  clinically meaningful way to say absolutely.  It
4  doesn't -- it's not a clinically -- I'm trying to
5  keep this in the clinical realm of -- you know, in
6  the context of taking patients.  I can't say with
7  absolute certainty that if you took a different
8  Mrs. Orr she would have had the same outcome, you
9  know.  Again, I think you have to look at the data
10  and apply it in that manner.  And if you have a
11  hundred on warfarin, a hundred on Xarelto, I think
12  what ROCKET has demonstrated is equivalence.
13      Q.  And, Doctor, we're not talking about
14  absolute certainty.  We're talking about a
15  reasonable degree of medical certainty here.
16  And --
17      A.  Okay.
18      Q.  -- in -- in that lens, you can't say
19  whether or not Mrs. Orr's outcome would have been
20  different on warfarin?
21      A.  I --
22      MR. IRWIN:
23          Object to the form.
24      THE WITNESS:
25          I feel comfortable with reasonable

**Page 76**

1  degree of medical certainty, that --
2  saying that it would not have been
3  different, because again, if you look at
4  overall numbers, I think that that would
5  have been the case.  I won't say absolute
6  with her, but -- an absolute uncertainty.
7  But it is my impression, it is my opinion
8  based on Mrs. Orr and the data that's out
9  there that there would be no difference.
10  BY MS. JEFFCOTT:
11      Q.  Going back, you -- you don't know whether
12  or not she would have done better or worse or the
13  same as the average patients in ROCKET?
14      MR. IRWIN:
15          Object to the form of the question.
16      THE WITNESS:
17          I think if I had used that train of
18  thought I would never prescribe any new
19  medication.  You can't -- you have to look
20  at populations.  And so individuals -- I
21  understand we're treating individuals, and
22  it's all about the individual.  But when
23  you're applying this, you have to think
24  about this in terms of populations.
25          So again, I think in that lens --

**Page 77**

1  that's the lens that I operate in.  That's
2  the lens that I practice in.  I -- I -- I
3  feel comfortable saying that in general
4  the outcomes would not likely have been
5  different.  I -- I -- you know, can I tell
6  you absolutely?  I can't tell you
7  unequivocally.  But am I comfortable
8  saying with a reasonable degree of
9  uncertainty?  Yes.
10  BY MS. JEFFCOTT:
11      Q.  And -- and are you familiar with
12  statements made by the FDA regarding switching
13  patients that are well-controlled on warfarin to
14  Xarelto?
15      A.  That could be in reference to a couple
16  different things.  So if -- I am aware of some
17  issues in that regard.  And I'm -- if you have
18  something you want to review, we can review.
19      Q.  What -- what specific issues are you --
20  are -- are you familiar with?
21      A.  Transitioning someone from warfarin to
22  Xarelto or stopping Xarelto and going back to
23  warfarin, there have been concerns raised in
24  regard to that.
25      Q.  Are you aware that the FDA recommended not

Page 78

1 switching patients who were well-controlled on
2 warfarin to Xarelto?
3     MR. IRWIN:
4       Object to the form of the question.
5     THE WITNESS:
6       I don't remember wording to that
7     nature. That doesn't mean that's not the
8     case. If you have something, I'm happy to
9     look at it.
10 BY MS. JEFFCOTT:
11    Q. In the eyes of the FDA, it was important
12 that the individual control -- INR control was a
13 factor in assessing whether or not a patient
14 should be switched to Xarelto?
15     MR. IRWIN:
16       Object to the form of the question.
17 BY MS. JEFFCOTT:
18    Q. Is --
19    A. I don't recall them specifically stating
20 -- I -- I know that it's in the label. The
21 caution for interpretation is unclear what
22 patients with a better TTR would have done, how
23 would they have fared. But I don't recall the
24 specifics to what you're -- if you have something,
25 again, I'm happy to . . .

Page 79

1    Q. Okay. Well, let me read you something
2 fairly short.
3     MR. IRWIN:
4       If you've got a document, rather than
5     reading it -- that -- from a document he
6     can't see and you have on a computer, we
7     can take a break, and you can print it up.
8     MS. JEFFCOTT:
9       Let me just read it, and then we'll go
10     from there.
11     MR. IRWIN:
12       Well -- okay. What -- I may tell him
13     not to answer unless you give him the
14     document. But go ahead.
15     MS. JEFFCOTT:
16       On what grounds?
17     MR. IRWIN:
18       On the grounds that you're reading an
19     excerpt of a document that's on your
20     computer screen --
21     MS. JEFFCOTT:
22       Okay.
23     MR. IRWIN:
24       -- that the witness may be entitled to
25     see --

Page 80

1     MS. JEFFCOTT:
2       All right.
3     MR. IRWIN:
4       -- and may say he wants to see. And
5     you can go ahead and ask -- ask the
6     question. I told you you can ask the
7     question. But I'm not sure I'm going to
8     let him answer, but let's see.
9 BY MS. JEFFCOTT:
10    Q. Doctor, do you agree with this statement:
11 Thus the data -- the data do not convincingly
12 demonstrate that rivaroxaban is as effective in
13 presenting strokes and systemic emboli as warfarin
14 when warfarin is used skillfully. This suggests
15 that rivaroxaban should only be used in patients
16 whose INR cannot be well-controlled on warfarin or
17 are unwilling to take it?
18     MR. IRWIN:
19       Object --
20 BY MS. JEFFCOTT:
21    Q. Does that refresh your memory?
22     MR. IRWIN:
23       Object to the form of the question.
24     THE WITNESS:
25       I am --

Page 81

1     MR. IRWIN:
2       You may answer.
3     THE WITNESS:
4       I sure would like to see the context
5     of that. Because I know that the general
6     tenor FDA approved warfarin and doesn't
7     have that statement in the label. So I
8     sure would like to see the context.
9 BY MS. JEFFCOTT:
10    Q. Can -- can --
11    A. I'm happy to --
12    Q. Can you --
13    A. -- look at that.
14    Q. -- answer the question, Doctor?
15    A. I'm not going to answer without having the
16 -- the context. I know that the FDA ultimately
17 approved the medication without that caveat. So
18 I'm -- I'm happy to --
19    Q. But, I mean, are you --
20    A. -- to review it.
21    Q. -- familiar with the statement?
22    A. I -- it --
23    Q. Have you read it before?
24    A. That -- that -- I -- that's a --
25     MR. IRWIN:

Page 82

1    Don't answer the question, Doctor.
2    You asked to see the document.
3    MS. JEFFCOTT:
4        On what grounds are you objecting?
5    MR. IRWIN:
6        On the grounds that the doctor has
7    asked to see the document. He's a
8    witness. He's entitled to see a document.
9    And you have it, and I told you I can
10   print it up for you if you want me to.
11   MS. JEFFCOTT:
12       All right. We'll move on.
13   BY MS. JEFFCOTT:
14   Q. Doctor, would you mind turning to the next
15   page of your report, which is Page 16.
16   A. Very important for next time, label with
17   numbers. I'm sorry.
18   Q. You did in your generic report.
19   A. I know. I don't . . . This was the third
20   or second report. I was getting tired.
21   Which --
22   Q. Do you -- well, before we get to the
23   report -- I think I had you turn the page a little
24   prematurely.
25   But --

Page 83

1    A. Okay.
2    Q. -- do you agree with the general statement
3    that cross-city comparisons are fraught with
4    peril?
5    A. Cross-city?
6    Q. Study.
7    A. Cross-study comparisons are fraught with
8    peril?
9    Q. Have you heard that statement before?
10   A. I've heard the statement before. I --
11   it's -- am I familiar with the statement? Yes.
12   Q. And do you --
13   A. We'll start with that.
14   Q. -- agree with it?
15   A. Do I agree with the statement? Hard to
16   make a blanket statement like that. I think that
17   there are -- you have to be wary when looking at
18   cross-study comparisons. I think that's
19   absolutely critical. But I wouldn't say they're
20   absolutely without merit, but --
21   Q. Fair enough.
22   A. -- definitely need to be interpreted with
23   caution.
24   Q. So I -- I'm going to use an analogy that I
25   think came from science day. And it's a football

Page 84

1    analogy. So just hear me out for a second.
2    A. Is this Boniol's, the Cowboy --
3    Q. Yes.
4    A. Yeah. He's the football guy. Yes. Go
5    ahead. I'm sorry.
6    Q. And I admittedly am not. So if I mess it
7    up, forgive me.
8        And the analogy is that just because the
9    Saints beat the Cowboys and the Cowboys beat the
10   Falcons doesn't mean the Saints will beat the
11   Falcons.
12   MR. IRWIN:
13       The Saints haven't beaten the Falcons
14   In years. So . . .
15   THE WITNESS:
16       I would agree with that.
17   BY MS. JEFFCOTT:
18   Q. And -- and so applying that to the DOACs,
19   would you agree that just because Eliquis was
20   deemed superior to warfarin and Xarelto was deemed
21   noninferior to warfarin doesn't mean that the two
22   drugs -- doesn't mean that you can say which drug
23   is better than the other?
24   A. I'll agree with that.
25   Q. And -- and that's why in your generic

Page 85

1    report you state that it's not possible in an
2    individual patient scenario to determine outcomes
3    on the various DOACs without conducting first a
4    scientific research directed at that?
5    A. Can you show me where you --
6    Q. Sure.
7    A. That sounds familiar. I just want to see
8    the . . .
9    Q. I'll mark as --
10   A. This is in the --
11   Q. It's your generic.
12   A. The generic report. Oh, okay. Going back
13   to that. I thought we had put that --
14   Q. It won't be much.
15   A. -- to rest.
16   Q. This is Exhibit No. 12.
17       (Exhibit No. 12 was marked for
18       identification and attached hereto.)
19   BY MS. JEFFCOTT:
20   Q. And, Doctor, would you just mind --
21   briefly take a look at it.
22   A. Yes, ma'am.
23   MS. JEFFCOTT:
24       Actually, here. No. No. You can
25       take that one.

Page 86

BY MS. JEFFCOTT:

1  Q. And -- And, Doctor, would you mind -- I --
2  I didn't actually print out all the appendices
3  because I didn't think it was necessary. It's
4  just --
5  A. Okay.
6  Q. -- your report. Would you mind just --
7  A. Sure.
8  Q. -- briefly looking through it to make sure
9  it's an accurate copy.
10  A. It looks good. Okay.
11  Q. And if you would turn -- I mean, the --
12  the specific portion that I was -- was discussing
13  was on Page 19 of your report. And -- and what
14  you state is that in an individual patient
15  scenario, it is not possible to determine if
16  outcomes would be different if a different
17  anticoagulation was used unless that -- this is
18  specifically addressed in scientific research.
19  Do you see that?
20  A. Okay. ". . . an individual patient
21  scenario it is not possible to determine if
22  outcomes would be different . . ." Yes. I do.
23  Q. Okay. Now, without a direct comparison of
24  Xarelto to Eliquis to Pradaxa, you would agree
25

Page 87

1  that it would be speculative to opine as to what
2  would happen if a patient was on a different
3  anticoagulant?
4  A. One more time. Let me just think about
5  that --
6  Q. Now --
7  A. -- for a second.
8  Q. -- in terms of comparing Xarelto to
9  Pradaxa to Eliquis, you would agree that it would
10  be speculative to say what would happen if -- if a
11  patient was on a -- on a different anticoagulant?
12  A. Yes. I'll agree.
13  Q. You can put the -- your generic report
14  aside and go back to your case-specific report.
15  Now, if you wouldn't -- now turn to Page 16.
16  Never mind. I think you're on it. It -- it --
17  A. SO's ICH was Most Likely Related? That's
18  my page. That's the page I'm on.
19  Q. It's the page before that.
20  A. Part of the -- Would SO Have Fared
21  Differently if She Had Been on Warfarin or a --
22  Q. This is in --
23  A. -- Different DOAC?
24  Q. There is not a heading on it.
25  A. Yeah. It's from the -- the back of the --

Page 88

1  Q. Yeah.
2  A. -- page.
3  Q. You got it.
4  A. I'm sorry. Okay. Yes. All right.
5  Q. Okay. You opine that it -- it wouldn't
6  have made a difference if Mrs. Orr had had a
7  reversal agent for Xarelto or if earlier surgical
8  intervention would have been different -- sorry.
9  Let's scratch that one, start over.
10  You state that it wouldn't have made a
11  difference if there had been a reversal agent for
12  Xarelto because her bleed was so severe.
13  A. Uh-huh.
14  Q. Is that -- is -- is --
15  A. Yes.
16  Q. Did I interpret that correctly?
17  Now, what do you mean by "severe"?
18  A. I think that the size of the bleed and her
19  status upon arriving over at the Ochsner Main
20  Campus where the neurosurgeons were.
21  Q. And did you measure the size of the bleed?
22  A. No.
23  Q. And so what did you rely on to assess the
24  size of the bleed?
25  A. I went by the medical records.

Page 89

1  Q. Okay. And specifically what in the
2  medical records?
3  A. I don't remember which specific -- I -- I
4  can't remember a specific date of a specific
5  physician that used that. But I remember seeing
6  it replete in the records, referred to as large.
7  Q. What literature can you cite to -- well,
8  scratch that.
9  There is a reversal agent for warfarin;
10  correct?
11  A. There are agents that can be used to
12  reverse the anticoagulant effect. Yes.
13  Q. And what literature can you cite to to
14  support that she would have died even if she had
15  been on -- on -- on warfarin?
16  A. I have -- there's no literature to cite
17  either way. What literature can I cite that --
18  that's a -- there's -- one more time. That was
19  confusing.
20  Q. Okay.
21  A. All right.
22  Q. And I'll -- I'll take it a little
23  differently.
24  A. Okay.
25  Q. In terms of -- when you make a statement

Page 90

1 regarding the severity of the bleed, you -- you
2 identified the mass effect and midline shift.
3 And -- and I'm talk -- and what literature can you
4 cite to to state that that actually impacts
5 mortality?
6 A. I can't give you -- again, I'm not a
7 neurosurgeon or a neurologist. It's just my
8 clinical experience. When someone presents with
9 this and a Glasgow coma scale that was reported as
10 that, that the chances of a meaningful recovery
11 are extremely slim, in my clinical experience,
12 extremely slim. That was a very large bleed, and
13 she came in in a bad shape.
14 Q. And -- and -- and so your clinical
15 experience, having seen a handful of patients with
16 hemorrhagic strokes on an annual basis?
17 MR. IRWIN:
18 Object to the form.
19 THE WITNESS:
20 I guess that would also include my
21 conversations with neurologists and
22 neurosurgeons historically when it comes
23 to bleeds and their assessment. So that
24 is -- that is an impression that I would
25 strongly -- that I -- that I believe in.

Page 91

1 Yes.
2 BY MS. JEFFCOTT:
3 Q. But you would defer to the impressions or
4 the opinions of the neurologist and neurosurgeon
5 in terms of the severity of a patient's
6 hemorrhagic stroke?
7 A. Yeah. If -- I would defer -- I would ask
8 the neurologists and the neurosurgeons in general
9 to comment on the severity. I find it hard for
10 there to be much challenge to -- to the -- whether
11 or not this was a severe bleed. I don't -- this
12 one, even a non-neurologist, non-neurosurgeon can
13 see is an extremely large --
14 Q. And -- and --
15 A. -- bleed.
16 Q. And I'm -- what I'm trying -- trying to do
17 is just understand the basis of -- of your
18 statements and where they come from. And --
19 and -- and part of that is -- in terms of your
20 report, there -- there aren't citations to medical
21 records, and there aren't citations to studies and
22 literature that would allow us to determine. And
23 so the --
24 A. I get you.
25 Q. -- exercise that we're having here is to

Page 92

1 assess that; right?
2 MR. IRWIN:
3 Object to the form.
4 THE WITNESS:
5 I get you. I was not aware of the
6 need for citations when doing a patient
7 report. I -- I understood the value in
8 the setting of the general report. But
9 I . . .
10 BY MS. JEFFCOTT:
11 Q. And -- and, I mean, that kind of takes me
12 to your next statement, where you state that with
13 an ICH score of 3, the risk of mortality is
14 72 percent. And again, you don't have a citation.
15 And so what's the basis of -- of that risk of
16 mortality, Doctor?
17 A. And I don't remember off the top of my
18 head. This would have been between doing a PubMed
19 search or reading this from one of the
20 depositions. I doubt it's from the deposition
21 because that's a specific number. So I'm pretty
22 sure I did a PubMed search and pulled up an ICH
23 score and would have correlated with.
24 Q. So -- and how often in your -- I don't
25 want to say general practice, but routine practice

Page 93

1 do you use the ICH score?
2 A. Extremely rarely.
3 Q. Prior to providing an expert opinion in
4 this case, have you ever utilized the IAH score --
5 ICH score? Excuse me.
6 A. No. And -- and my point would -- of this
7 was to be complete in terms of the records. I was
8 asked to comment on her care from A to Z in this
9 regard. And so that's why I went to the records
10 and the literature to find this. But this is by
11 no means my area of expertise.
12 Q. Okay. And so you're not -- you're -- at
13 trial, you're not planning to offer an opinion
14 whether or not an ICH score of 3 is in fact a
15 proper ICH score for Mrs. Orr?
16 A. I hope not to be involved in that part.
17 Q. Okay. And -- and -- and you mentioned
18 PubMed searches. What -- what were you searching?
19 A. I looked up ICH score in correlation with
20 mortality.
21 Q. Anything else?
22 A. No, ma'am.
23 Q. So in writing this report, did you only
24 conduct that single PubMed search on ICH score and
25 mortality?

Page 94

1    A. I don't recall -- I can't recall
2  specifically what I used as a PubMed search. This
3  was done in the context of, Here's a clinical
4  question, I'd like to understand this better. So
5  I'm giving you an example of one that I -- I -- I
6  know. But I -- I can't recall off the top of my
7  head what I put in as a PubMed or did as a
8  literature search off the top of my head --
9    Q. And did you --
10    A. -- if there were others. I'm sorry.
11    Q. Okay. No. I don't think you were
12  finished. So . . .
13    A. If -- if there were other phrases that I
14  searched as well. I'm -- I'm sure there were. It
15  wouldn't just be one thing. I -- generally when I
16  do a PubMed search don't use one. I'll flip
17  around and . . . But I can't remember off the top
18  of my head. And I think citations would have been
19  helpful. Not a perfect document. I don't pretend
20  that it is.
21    Q. And -- and so in -- beyond the ICH score
22  which was authored by Dr. Hemphill -- does that
23  sound familiar?
24    A. Sounds familiar.
25    Q. Okay.

Page 95

1    A. I saw the -- the discussions in some of
2  the other depositions.
3    Q. And -- and in addition to Hemphill study
4  regarding ICH score, did you review any other
5  literature specific to intracranial hemorrhages?
6    A. I honestly can't remember. I -- I'm not
7  saying that to obfuscate or anything like that. I
8  honestly can't remember off the top of my head.
9    Q. And if you had reviewed, would you have
10  included those articles in your reference list?
11    A. I would hope to. I tried to make that as
12  comprehensive as possible. I think we saw last
13  week I -- I didn't have the FDA stuff. So I
14  definitely tried to honor the spirit of this and
15  be as comprehensive as possible with your reliance
16  list.
17    Q. And -- and so you know that Hemphill --
18  Hemphill study on ICH was not included in your
19  reliance list. And so I'm trying to get an idea
20  of what you've looked at. Because --
21    A. I --
22    MR. IRWIN:
23      Object to the form.
24    THE WITNESS:
25      I don't -- again, I don't recall. I

Page 96

1  can't tell you.
2    MS. JEFFCOTT:
3      Okay.
4    THE WITNESS:
5      Because it -- it -- I don't even
6  remember the context. I remember the word
7  "Hemphill" from reading some of the other
8  depositions. But I don't remember -- I
9  can't tell you.
10  BY MS. JEFFCOTT:
11    Q. Okay. And so this wasn't literature that
12  you had previously reviewed --
13    A. I -- I can't --
14    Q. -- prior to --
15    A. -- say with --
16    Q. Let me -- let me start the question over.
17    A. I'm sorry.
18    Q. This wasn't literature that you had
19  previously reviewed prior to being hired by the
20  lawyers for Janssen?
21    A. That is correct.
22    Q. Okay. And are you aware that the Hemphill
23  study specifically stated that the ICH score
24  should not use for prognostic purposes?
25    MR. IRWIN:

Page 97

1      Object to the form of --
2    MR. SARVER:
3      Objection.
4    MR. IRWIN:
5      -- the question.
6    THE WITNESS:
7      I'm not.
8  BY MS. JEFFCOTT:
9    Q. Okay. And are you -- are you aware that
10  Hemphill said the ICH score is only appropriately
11  used in terms of risk stratifications in clinical
12  studies?
13    MR. IRWIN:
14      Object to the form of the question.
15    THE WITNESS:
16      I don't recall off the top of my head.
17  I remember somebody saying that -- I think
18  it came up in a deposition. That sounds
19  familiar, but I don't remember.
20  BY MS. JEFFCOTT:
21    Q. Now, did you consider any other grading
22  scales used in assessing intracranial hemorrhages
23  or intraventricular hemorrhages for that matter?
24    A. I -- you know, again, when I was preparing
25  this report, I was trying to be complete on this.

Protected - Subject to Further Protective Review

1 And it -- it is my clinical -- my clinical
2 impression that the severity of her bleed was
3 marked, large, and her prognosis was extremely low
4 on arrival.  That's based on my clinical
5 experience.  And I can't tell you what other
6 literature I used or didn't use.
7     Q.  And -- and -- and going back and focusing
8 on the -- the ICH score and the risk of mortality,
9 knowing that's not something that you use in your
10 normal practice, you can't say one way or another
11 whether or not that score is actually indicative
12 of Mrs. Orr's prognosis?
13     MR. IRWIN:
14         Object to the form of the question.
15     THE WITNESS:
16         I -- I feel comfortable opining on a
17     patient's general prognosis when they come
18     in with a bleed of this severity.  I --
19     I -- I am -- again, I don't use ICH, and
20     these are terms that are used by the
21     neurologists and neurosurgeons.  So I -- I
22     agree with you.
23         I do feel that this was a bleed that
24     was so marked that her clinical course was
25     pretty much there right from the

1     beginning.  Odds were extremely against
2     her.  I don't have literature.  I'm not a
3     neurosurgeon.  I'm not a neurologist.
4     This is based on not just my practice as a
5     cardiologist but as an internal medicine
6     resident in medical school.  This was a
7     huge bleed.
8 BY MS. JEFFCOTT:
9     Q.  So if -- if -- if you ran an emergency
10 room and Mrs. Orr came to you, would you have done
11 nothing?
12     A.  Gosh, nothing's a horrible way to say
13 that.  I wouldn't say nothing.  No.  There --
14 there's things that we would have done.
15     Q.  Like what?
16     A.  I think intubation would have been the
17 first thing, I think protecting her, managing her
18 blood pressure.  I think those would have been the
19 -- the first two things.  And I would have called
20 the neurosurgeon to get their thoughts --
21     Q.  And --
22     A.  -- and their -- I would have deferred to
23 them in terms of the acute management.
24     Q.  And -- and that's because the neurosurgeon
25 would have the -- the clinical experience and --

1 and skill to assess the proper course of treatment
2 for an individual with a hemorrhagic stroke such
3 as Mrs. Orr?
4     A.  Yes, ma'am.  I by no means -- I would
5 defer.
6     Q.  Now, in your report you also state -- I
7 think it's the last sentence on that page, that
8 "Dr. Bui testified that he could not say that"
9 early "surgical intervention would have made a
10 change in outcome," concern -- "considering the
11 size of the bleed."
12         Did I read that correctly?
13     MR. IRWIN:
14         It's back.  Doctor, you've . . .
15     MS. JEFFCOTT:
16         I think the page before that.
17     THE WITNESS:
18         Oh.
19     MR. IRWIN:
20         The page --
21     THE WITNESS:
22         Is that the last sentence?
23     MS. JEFFCOTT:
24         The very last sentence on that page.
25     I apologize.

1     THE WITNESS:
2         Oh.  I'm sorry.  "In fact" --
3     MR. IRWIN:
4         There you go.
5     THE WITNESS:
6         -- ". . . he could not say that
7     earlier . . ."  Okay.  Yes.  I --
8 BY MS. JEFFCOTT:
9     Q.  Do you see that?  Okay.
10     A.  -- am.  Yes.  I do.
11     Q.  Do you want me to read the sentence again?
12     A.  No, ma'am.
13     Q.  Okay.  Do you recall Dr. Bui saying that
14 he would have placed the external ventricular
15 drains earlier if he had known that Mrs. Orr was
16 not anticoagulated?
17     A.  I don't remember the specifics.  I -- I
18 know that he had -- and again, I'm not trying to
19 -- my impression is he definitely pressed the
20 pause button because of his concerns regarding
21 that.  I don't know if he would have, with regard
22 to if the patient wasn't on Xarelto, proceeded
23 immediately or waited.  I don't remember that
24 part.  But I do know that he considered that in
25 his thought process when making a decision to

Protected - Subject to Further Protective Review

Page 102

1 defer.
2     Q. And what do you mean by press the -- the
3 pause button?
4     A. Wait, not place the drain --
5     Q. Okay. So --
6     A. -- emergently or immediately.
7     Q. All right. So delay placing the EVDs
8 until Xarelto had -- in his perspective had
9 passed?
10    A. I don't --
11        MR. IRWIN:
12            Object to form.
13        THE WITNESS:
14            I think -- so the decision was made to
15        delay. And I think that was part of the
16        decision. I -- I don't know that that was
17        the only part of the decision at the time.
18        That's -- that's my impression.
19 BY MS. JEFFCOTT:
20    Q. And, Doctor, what I'm marking as
21 Exhibit 13 is a note by Dr. Khursheed at the very
22 top.
23        (Exhibit No. 13 was marked for
24        identification and attached hereto.)
25 BY MS. JEFFCOTT:

Page 103

1     Q. Do you see that?
2     A. Yes, ma'am.
3     Q. Okay. If you wouldn't -- take -- take a
4 minute just to read that. And, Doctor, are --
5 are -- let me know when you're ready to proceed.
6     A. Okay. Okay.
7     Q. And, Doctor, based on your reading of this
8 note, would it indicate to you that in fact they
9 had delayed neurosurgical intervention because of
10 Mrs. Orr's Xarelto or the question of Mrs. Orr's
11 Xarelto?
12        MR. IRWIN:
13            Object to the form of the question.
14        You may answer.
15        THE WITNESS:
16            I'm not willing to -- to make that
17        statement because of the context of the
18        note. I believe Dr. Khursheed is a
19        resident -- was a resident at this time.
20        What was his status? I believe he was a
21        resident. I don't know if he was working
22        on the neurosurgical service. And he --
23        sometimes people from other services -- so
24        he's making a statement about the thoughts
25        of neurosurgery on this. And so I'd

Page 104

1 rather see the neuro -- if this was the
2 neurosurgical resident, I'd like to see
3 the neurosurgical attending. If this was
4 -- I don't think this is the neurosurgical
5 staff or resident because they're saying
6 neurosurgery, so they're referring to
7 another person. So he's basically stating
8 his thoughts on this.
9        He also doesn't -- I -- I -- my sense
10    -- and I don't know Dr. Khursheed, and I'm
11    not impugning. But he's misspelling the
12    word "Xarelto." And I think that's
13    happened a couple times. That's not the
14    first time I saw that.
15        So again, I'm not going to -- I -- if
16    I were reviewing a chart of the patient
17    and the history, I wouldn't take this and
18    use that to say, Okay, Neurosurgery's not
19    doing this because of this. I would -- I
20    would speak to the neurosurgeons.
21 BY MS. JEFFCOTT:
22    Q. And I guess what would the indication of
23 somebody misspelling a word mean to you in a -- in
24 a medical record?
25    A. And it -- it's hard to judge. I just -- I

Page 105

1 -- it -- it's not fair to judge because, again, I
2 have -- the context of looking there. And he may
3 be at 2:00 in the morning -- 3:40 in the morning
4 he's writing. So it's hard to judge. So I don't
5 want to put it in context. I -- I'm not -- I
6 don't want to say anything about his knowledge or
7 not knowledge of --
8     Q. So --
9     A. -- that. I'll -- I'll take that part
10 back.
11    Q. Okay.
12    A. It's 3:45 in the --
13    Q. So --
14    A. -- morning. I'm going to give him a
15 break.
16    Q. The fact that he -- he misspelled a word
17 doesn't detract from the --
18    A. I think I saw it somewhere else, though.
19 That was kind of bugging me when I saw it
20 somewhere else too. But I -- I'm --
21    Q. It --
22    A. -- not willing to --
23    Q. It happens a lot. You'd be surprised.
24    A. Yeah. And so to me, you know, if
25 someone's familiar with the medication and the --

Page 106

1  the intricacies, spelling -- and a one-time
2  spelling at 3:00, 4:00, 5:00 in the morning, fine.
3  But if -- again, I'm not -- I'm not willing
4  to . . .
5  Q.  And if you look underneath, it's -- the --
6  the -- the type is very light.  It says,
7  "Electronically signed by Elizabeth B. Mahanna,
8  MD."
9  A.  Yes, ma'am.
10  Q.  Do you --
11  A.  The neurointensivist.
12  Q.  And -- and you recall she was the
13  attending on this case; is that correct?
14  A.  She was one of the attendings.  The -- the
15  admitting attending I believe is the
16  neurointensivist.
17  Q.  And -- and to your recollection, was she
18  part of the neurocritical care team?
19  A.  That's my recollection.
20  Q.  And -- and indicated by this light type
21  that she signed off on Dr. Khursheed's addendum;
22  is that correct?
23  A.  She did.
24  Q.  Okay.  And that -- at least by virtue of
25  what Dr. Khursheed wrote, they had to explain --

Page 107

1  "they" being Dr. Khursheed, had to explain to the
2  family why neurosurgery could not proceed with
3  intervention?
4      MR. IRWIN:
5          Object to the form.
6      THE WITNESS:
7          No.  I -- I think they -- so he states
8      neurosurgery says the patient is not a
9      candidate.  That's what he says in terms of
10      terms of what the neurosurgeon said.  I
11      think the rest is him.  I don't know that
12      I would attribute the subsequent sentence
13      to his thoughts on what the neurosurgeons
14      are saying, and not necessarily his
15      impression on that.  I -- I do know he
16      said neurosurgery said the patient is not
17      a candidate for EVD.  But after that, I
18      don't -- my impression from reading that
19      would not be necessarily that he was
20      saying that the neurosurgeons were saying
21      that.  I think that was his impression.
22  BY MS. JEFFCOTT:
23  Q.  Well, going back to Dr. Bui, did you read
24  his deposition?
25  A.  I did.

Page 108

1  Q.  Okay.
2  A.  A while ago.
3  Q.  Fair enough.
4      He stated in his deposition that he -- if
5  he had known that Mrs. Orr was not anticoagulated,
6  that he would have placed the EVDs earlier.
7      Do you --
8  A.  I don't remember that specific statement.
9  Q.  Okay.
10  A.  I'm happy to -- I don't remember that
11  specific statement.
12  Q.  Okay.  And are you familiar with the
13  phrase "time equals brain"?
14  A.  I am.  I'm --
15  Q.  Okay.
16  A.  -- also -- it -- and my -- because we use
17  that for heart:  Time equals myocardium.
18  Generally that's more for ischemic, where you're
19  having problems with blood flow getting there.  I
20  don't know that that correlates with bleeds in a
21  similar manner.  I think when -- I've heard the
22  neurologists use it.  They are using it in a
23  similar manner that we are.  So if someone has an
24  acute stroke and they're having an ischemic event,
25  the longer you wait to give TPA or relieve the

Page 109

1  blockage, the more damage that's being done.  So I
2  don't -- I don't -- it's not my impression that
3  that applies to a bleed --
4  Q.  Okay.
5  A.  -- time equals brain.
6  Q.  Well, in his deposition Dr. Bui used the
7  phrase time equals bleed to describe why he would
8  have placed the EVDs earlier, and this is because
9  the longer that the brain is under pressure, the
10  more cells -- the more that cells are likely to
11  die or become impaired.
12      MR. IRWIN:
13          Object to the form --
14  BY MS. JEFFCOTT:
15  Q.  Does -- does --
16      MR. IRWIN:
17          -- of the question.
18  BY MS. JEFFCOTT:
19  Q.  -- any of that recall --
20      MR. IRWIN:
21          I'm sorry.  I didn't mean to interrupt
22      you.
23      MS. JEFFCOTT:
24          That's --
25      MR. IRWIN:

Page 110

1    I thought you were done with your
2    question. I apologize.
3    BY MS. JEFFCOTT:
4    Q. Does -- does that refresh your
5    recollection at all?
6    MR. IRWIN:
7         Object to the form of the question.
8    THE WITNESS:
9         No. And, you know, I would -- I
10   wouldn't -- that's Dr. Bui's opinion and
11   area of expertise. I'm not saying that.
12   I just -- my impression of time equals
13   brain is that that's more for ischemic
14   than for bleeds.
15   BY MS. JEFFCOTT:
16   Q. Okay. But you would defer to Dr. Bui in
17   terms of his opinion that the EVD, if he could
18   have, would have placed them as soon as possible?
19   MR. IRWIN:
20        Object to the form of the question.
21   THE WITNESS:
22        Yeah. That's -- that's switching --
23   so I would absolutely defer to Dr. Bui as
24   to the timing of the -- that's the
25   surgeon's call, not my call. The -- so

Page 111

1    the risks and benefits, no one's going to
2    know better than the neurosurgeon. He
3    wouldn't tell me when to intervene. I
4    wouldn't tell him when to intervene.
5    Absolutely.
6    BY MS. JEFFCOTT:
7    Q. And if you would turn to the next page --
8    the last page of your report. That's a good sign.
9    Oh, it's the second-to-the-last page. I'm --
10   MR. IRWIN:
11        That is a good sign.
12   BY MS. JEFFCOTT:
13   Q. -- sorry.
14   A. The second-to-last -- the --
15   Q. Yeah.
16   A. So SO's ICH was Most Likely Related, is
17   that where we are?
18   Q. You got it.
19   A. Okay. Yes.
20   Q. From reading your report, it -- it seems
21   like the basis for your opinion that Mrs. Orr's
22   bleed was related to her chronic hypertension is
23   for a few reasons. And I'm going to list a few
24   off. If I miss any, just --
25   A. Sure.

Page 112

1    Q. -- tell me at the end.
2    I have one reason, that she had
3    long-standing hypertension; that she had no
4    history of prior bleeds on Xarelto despite
5    concomitant use of aspirin; she was likely not on
6    Xarelto at the time of the bleed because she
7    either didn't take it or she vomited it up; and
8    that she was described -- prescribed prednisone on
9    April 14th, 2015, which was nine days before her
10   bleed; and on April 16th, 2015, her blood pressure
11   was recorded as 200 over 90.
12   Are there any other bases for your opinion
13   that Mrs. Orr's bleed was based on her
14   hypertension?
15   MR. IRWIN:
16        Object to the form of the question.
17   You may answer.
18   THE WITNESS:
19        It -- again, this is a clinical
20   impression. I mean, so as a clinician,
21   you try to think about things logically,
22   in a temporal manner. Here's a lady who
23   -- so Xarelto -- and I know Ned --
24   Mr. McWilliams and I talked about this at
25   length last -- at the general . . . I --

Page 113

1    it's my strong belief that Xarelto doesn't
2    specifically cause bleeding. There is an
3    underlying pathology involved that
4    increases the risk of bleeding.
5    And if you look at this history, the
6    -- the -- the lady, Miss Orr, she was
7    previously on 20 milligrams of Xarelto,
8    on -- and an aspirin, resulting in a
9    higher exposure, higher risk of bleeding
10   at that time acutely, and had -- had no
11   bleed. Okay. And then temporally, you
12   have someone who is given the medication
13   that's known to increase the blood
14   pressure in someone who already
15   has difficult-to-control hypertension.
16   Blood pressure is at a severely elevated
17   rate, comes in with a bleed. It's hard
18   for me not to attribute -- to me,
19   clinically, it just -- that's the most
20   likely thing.
21   And I understand -- and again, I'm not
22   a neurosurgeon. But looking at this from
23   the sky and having all this data, it's --
24   to me it makes sense. Clinically, that --
25   we're always looking for likely scenarios.

Page 114

1    And it's hard to argue the temporal events
2  in this one.
3      Especially -- again, I don't believe
4  Xarelto directly causes bleeds. There has
5  to be an underlying etiology, and I think
6  you have a smoking gun right here.
7  BY MS. JEFFCOTT:
8    Q. Well, I think -- and you -- and you
9  mentioned that -- that your belief that Xarelto --
10  well, strike that.
11    A. You're going to do this too?
12    Q. Not nearly as much as Ned, I promise.
13    A. Okay.
14    Q. But you would agree that uncontrolled
15  hypertension can create a pathology that
16  predisposes a person to bleeding?
17    A. I think uncontrolled hypertension can
18  result in bleeding.
19    Q. Okay. And -- but it creates a pathology
20  where it -- it creates the risk? I think we're
21  saying the same thing.
22    MR. IRWIN:
23      Object to the form.
24    THE WITNESS:
25      So -- yeah. I -- I'm not really sure.

Page 115

1  BY MS. JEFFCOTT:
2    Q. Well --
3    A. Uncontrolled hypertension is a risk factor
4  for -- for bleed.
5    Q. And for someone that is predisposed to
6  bleeds, Xarelto increases that risk of bleeding,
7  in your opinion?
8    A. I think all anticoagulants can increase
9  the risk of bleeding.
10    Q. And -- I mean, and likewise, because the
11  purpose of Xarelto is to, you know, interrupt the
12  clotting cascade, Xarelto can likewise exacerbate
13  a bleed?
14    MR. IRWIN:
15      Object to the form of the question.
16      You may answer.
17    THE WITNESS:
18      Can Xarelto exacerblate [sic] a bleed,
19      make a small bleed a larger bleed? Yes.
20  BY MS. JEFFCOTT:
21    Q. Make any bleed a larger bleed?
22    A. Make a larger bleed an even larger bleed?
23  Yes.
24    Q. Okay. And . . .
25    THE WITNESS:

Page 116

1    Doing okay? I'm slowing . . .
2  BY MS. JEFFCOTT:
3    Q. And -- and can you say to a reasonable
4  degree of medical certainty that Xarelto did not
5  exacerbate Mrs. Orr's bleed?
6    A. No. I think anticoagulants in general
7  would have exacerbated her bleed. I think on
8  warfarin we would have seen a similar outcome.
9    Q. But in warfarin, the risk of an
10  intracranial hemorrhage can be minimized by
11  keeping their INR in range; correct?
12    MR. IRWIN:
13      Objection.
14    THE WITNESS:
15      I think that the patient remains at
16      risk for a bleed with an INR in range. So
17      just because your INR is in range doesn't
18      mean that they're not at risk for bleeding
19      still. The risk is higher the higher you
20      go with the warfarin. But someone could
21      have a bleed with an INR of 1.5. So I
22      think anticoagulants in general could --
23      not the risk. We were talking about the
24      extent. I think we were talking about
25      extent of bleed?

Page 117

1    MS. JEFFCOTT:
2      Exacerbating.
3    THE WITNESS:
4      Yeah, extent of bleeding, it
5      worsening.
6      So I don't -- I think any warfarin
7      would have increased her risk, the extent
8      potentially. Not if she had an INR of 1.
9      If she had an INR of 1, then she's not
10      getting any warfarin effect.
11  BY MS. JEFFCOTT:
12    Q. Would you agree that a patient is still
13  getting a significant anticoagulant effect from
14  Xarelto even after 24 hours?
15    MR. IRWIN:
16      Object to the form of the question.
17    THE WITNESS:
18      I don't know the degree and whether to
19      characterize it as significant or not. I
20      know a trough level, as discussed last
21      week and in my report, there's still
22      significant anticoagulant effect. That's
23      just prior. So I don't know after that
24      how it -- the characteristics are.
25  BY MS. JEFFCOTT:

Page 118

1    Q.  So in your report, where you discuss that
2  there's a significant anticoagulant effect at
3  trough, how would you define "significant" in that
4  context?
5       MR. IRWIN:
6         Object to the form of the question.
7       THE WITNESS:
8         I guess I don't understand the
9         question.
10 BY MS. JEFFCOTT:
11   Q.  So if you would turn to your generic
12 report, which is -- I don't know which exhibit.
13   A.  Okay.
14      MR. IRWIN:
15        I object to going to the generic
16        report.
17      THE WITNESS:
18        You did what he did last week.  You
19        promised you weren't going back.
20 BY MS. JEFFCOTT:
21   Q.  Almost done, I promise.  If you would go
22 to Page 29.
23   A.  It's so much better when you label the
24 numbers.
25      MR. IRWIN:

Page 119

1         It is.  It is, indeed.
2       THE WITNESS:
3         Point taken.  Okay.
4  BY MS. JEFFCOTT:
5    Q.  Okay.  And you state, "Thus, at 24 hours,
6  one is still getting significant" anticoagulate --
7  had -- let me start over.
8         ". . . at 24 hours, one is still getting
9  significant anticoagulant effect with Xarelto."
10   A.  Yes.  Okay.
11   Q.  Did I read that correctly?
12   A.  Yes, ma'am.
13   Q.  And so you would agree that after 24 hours
14 a patient is still receiving the anticoagulant
15 effects of Xarelto?
16   A.  I -- I don't know.  That's what I'm
17 saying, is these were levels at 24.  I don't know
18 going past 24.  It could taper down quickly.  I
19 haven't -- I don't remember from the article what
20 happens after 24 hours.  So this is at 24 hours.
21 I -- I feel comfortable making that
22 statement.  But after, I don't -- it could taper
23 quickly.  It could stay at that label -- level for
24 a while.
25   Q.  Well, it --

Page 120

1    A.  We could pull up the paper and we could
2  look at the -- the -- the way it levels out.
3    Q.  And really what I'm -- what I'm -- I think
4  I'm getting to is that -- in the -- the preceding
5  -- let's see.
6         If you go a little further down, you talk
7  about 0.17 micrograms per liter in terms of
8  circulating plasma concentration?
9    A.  Yes, ma'am.  Uh-huh.
10   Q.  So at that point -- because that's --
11 would exist at 24 hours.  Anything above
12 0.17 micrograms per liter is considered
13 significant.  Do I understand that correctly?
14   A.  I -- I think that's a reasonable
15 statement.
16   Q.  And you would defer to a pharmacologist
17 how long the average patient has more than
18 17 micrograms per liter in their blood?
19      MR. McWILLIAMS:
20        0.17.
21 BY MS. JEFFCOTT:
22   Q.  0.17 micrograms.
23   A.  One more time.  I would probably would
24 defer, but --
25   Q.  Yeah.

Page 121

1    A.  -- let me hear it again.
2    Q.  You would defer to a pharmacologist to
3  assess whether or not a patient has more than
4  0.17 micrograms per liter in --
5    A.  After that?
6    Q.  -- in a patient's blood?  Yeah.
7    A.  I -- I -- I'm sorry.  I interrupted, and I
8  lost it.
9    Q.  Okay.  You would agree -- you would defer
10 to a pharmacologist to assess whether or not a
11 patient has more -- okay.  Let's start over.
12   A.  Sorry.
13   Q.  You would defer to a pharmacologist to
14 determine how long the average patient has more
15 than 7 -- 0.17 micrograms per liter in their
16 blood?
17   A.  Yes, ma'am.
18   Q.  Okay.  Sorry.
19      MR. IRWIN:
20        Doctor, do you want to take a break,
21        or you -- keep --
22      THE WITNESS:
23        I'm okay.
24      MR. IRWIN:
25        -- keep going?

Protected - Subject to Further Protective Review

Page 122

1 THE WITNESS:
2 I'm --
3 MR. IRWIN:
4 Okay. All right. Those pharmacology
5 questions . . .
6 MS. JEFFCOTT:
7 They're tongue-twisters, man.
8 BY MS. JEFFCOTT:
9 Q. And you would agree that the length of
10 time is longer in renally impaired patients?
11 A. The length of time . . .
12 Q. In terms of -- the anticoagulant effect of
13 Xarelto is extended for renally impaired patients.
14 A. I'm not going to comment on the
15 characteristics after a 24-hour period in -- in --
16 in that regard.
17 Q. You would agree that as renal -- as renal
18 function decreases, the half-life also increases
19 in terms of Xarelto?
20 MR. IRWIN:
21 Object to the form of the question.
22 THE WITNESS:
23 Yes.
24 MS. JEFFCOTT:
25 Can we take a break? I'm almost done,

Page 123

1 I think.
2 MR. IRWIN:
3 Sure.
4 MS. JEFFCOTT:
5 I just want to make sure --
6 THE WITNESS:
7 Sure.
8 MR. IRWIN:
9 Yep.
10 MS. JEFFCOTT:
11 -- Ned's not --
12 THE VIDEOGRAPHER:
13 The time now is 11:01 --
14 MS. JEFFCOTT:
15 -- doesn't want . . .
16 THE VIDEOGRAPHER:
17 -- a.m. We are off the record.
18 (Brief recess was taken.)
19 THE VIDEOGRAPHER:
20 The time now is 11:16 a.m. We are
21 back on the record.
22 BY MS. JEFFCOTT:
23 Q. Doctor, I -- I -- I don't have too much
24 longer. I --
25 A. We'll see.

Page 124

1 Q. One of the -- one of your opinions is that
2 the fact that Mrs. Horr didn't -- Mrs. Orr didn't
3 have a history of prior bleeds is in -- is a
4 factor in -- in why you believe it -- her bleed
5 was -- her intracranial bleed was related to
6 hypertension?
7 A. I -- I -- I'm not saying -- that is not
8 something I would use. I'm just trying to put
9 this in the clinical context, temporally what
10 happened with her. So I'm -- I -- I don't
11 uniformly say a prior lack of bleed predicts
12 something down the road. I'm just -- I was
13 looking at the -- we had the benefit of hindsight,
14 and we have a timeline here. And so I was just
15 looking in general. But I wouldn't say that I see
16 someone who has no history of bleed that they're
17 not going to bleed going forward.
18 Q. And -- so like there's not any literature
19 or support from ROCKET that would say that after X
20 amount of months the -- the -- the -- the risk of
21 bleeding goes down for a patient on Xarelto?
22 A. I -- that's an interesting question. So I
23 -- the answer is no. There is no data. I'm --
24 I'm just thinking about that question, whether
25 that should be something that should be looked at.

Page 125

1 I think that's an interesting -- that's an
2 interesting clinical question.
3 Q. I got my -- my second career lined up.
4 When you're looking at the -- the --
5 the -- the data from ROCKET, would you expect that
6 warfarin-related intracranial hemorrhages would be
7 consistent throughout all regions where the study
8 was conducted, all geographical regions?
9 A. I'm not -- so . . .
10 Q. Would -- would you expect in ROCKET that
11 the data would have showed that the -- the
12 presence of intracranial hemorrhages would have
13 been consistent in the various geographic regions
14 where the study was conducted?
15 A. I'm -- I see no reason for variation based
16 on geography.
17 Q. And -- and would you find it peculiar that
18 in East Asia, which represented only 6.5 percent
19 of patients enrolled in ROCKET, that patients
20 there had a 3.9-fold increased risk of
21 intracranial hemorrhage?
22 MR. IRWIN:
23 Object to the form.
24 BY MS. JEFFCOTT:
25 Q. Compared -- and compared to the rest of

Page 126

1 the world.
2    A.  I would -- do I find that peculiar?  I
3 take -- again, we talked about subgroup analysis
4 in the past.  And I'm always wary.  And you have
5 to interpret subgroup analysis with caution.  And
6 this is another example.  So I would -- I would
7 consider and -- and review the data.  I'm not sure
8 -- it's hard to say how much stock I would put
9 into that without having a good reason for a
10 difference.
11    Q.  And -- and you would agree that one
12 purpose of subgroup analysis is to evaluate
13 consistency among -- among the various subgroups?
14    A.  I think there are different reasons to
15 look at subgroup analysis, one of which is
16 consistency amongst different groups.  Yes.
17    Q.  And where you have a prespecified set of
18 groups, which in -- in this case with the
19 geographical regions, it would be an indicator of
20 inconsistency where one geographic -- one specific
21 region has a marked increase of a given adverse
22 event?
23    A.  Gosh, that's a -- that's a twisty
24 sentence.  Let me think about that.  Would I agree
25 that a variation in the geographical patterns --

Page 127

1 I'm sorry.
2    Q.  Let me break --
3    A.  Yeah.  Let me --
4    Q.  -- it down.  I mean -- it's a bad
5 question.
6       And so what I'm trying to -- since --
7 consistency, as you said, is -- is one of the --
8 the things that subgroup analysis can look at, to
9 establish consistency among the various subgroups?
10    MR. IRWIN:
11       Object to --
12 BY MS. JEFFCOTT:
13    Q.  Did I state that correctly?
14    MR. IRWIN:
15       Object to the form.
16    THE WITNESS:
17       Yeah.  I don't -- I don't think of --
18    I'm not sure I'm understanding what you're
19    saying with subgroup -- the value of
20    subgroup analyses.  The consistency across
21    groups, I -- I -- I don't under -- you're
22    studying the heterogeneity of the effect?
23    Is that what you're asking?
24 BY MS. JEFFCOTT:
25    Q.  That's right.  And so one value --

Page 128

1    A.  Okay.
2    Q.  -- of subgroups is to evaluate that
3 amongst all of the prespecified --
4    A.  I -- you know --
5    Q.  -- geographical regions in ROCKET?
6    A.  I -- I -- I am not sure I would use the
7 word "value" for -- for the prespecification of
8 geography on this.  I under -- so it was studied.
9 But I'm not sure I would use the word "value,"
10 because I -- I -- I -- yeah.  I'm -- I'm not
11 comfortable with that.
12    Q.  Would you agree that it's -- it's at least
13 used to evaluate?
14    A.  It's looked at.
15    Q.  Okay.
16    A.  Yeah.  So the -- yes.  It's looked at.
17    Q.  And then are you aware of any literature
18 that's critical of the East Asian clinical trial
19 sites?
20    MR. IRWIN:
21       Object to the form.
22    THE WITNESS:
23       Am I aware of any literature that is
24    critical of any studies that are performed
25    in --

Page 129

1 BY MS. JEFFCOTT:
2    Q.  In East Asia, the clinical trial sites.
3    A.  I -- I have nothing that comes to my mind
4 that specifically says that literature [sic]
5 conducted in East Asia is of less clinical value.
6 I think you have to look at each individual
7 situation.
8    Q.  But are you aware that it's at least a
9 controversial subject, that more and more clinical
10 trials are -- are being conducted abroad?
11    A.  I'm aware that there are concerns that
12 have been brought up.
13    MS. JEFFCOTT:
14       That's all the questions I have.
15    MR. IRWIN:
16       Doctor, I just have one or two.
17 BY MR. IRWIN:
18    Q.  Remember you were asked earlier some
19 questions about Mrs. Orr's creatinine clearance
20 levels and you were shown some lab studies with
21 her GFRs?  Do you recall that?
22    A.  I do.
23    Q.  Some of those were in the time frame of
24 late 2014, maybe one in early 2015.  Do you recall
25 that?

Protected - Subject to Further Protective Review

Page 130

1   A. (Nods head.)
2   Q. Do you --
3   A. Yes. I do. I'm --
4   Q. Yes?
5   A. -- sorry. I --
6   Q. And you --
7   A. I'm not --
8   Q. -- recall those questions involving her
9 nephrologist, a Dr. Cruz?
10   A. Yes, sir.
11   Q. Have you ever had an opportunity to read
12 Dr. Cruz's deposition?
13   A. I don't, to my recollection, recall that.
14   Q. Let me read you from his deposition
15 Page 94, starting on Page 93, at Line --
16     MR. McWILLIAMS:
17       You're going to read him a document
18   without showing it to him?
19   MR. IRWIN:
20     Yeah. Do you want to see it?
21   MR. McWILLIAMS:
22     On the computer?
23   MR. IRWIN:
24     Oh.
25   MR. McWILLIAMS:

Page 131

1     I'll let -- I was --
2   MR. IRWIN:
3     Oh.
4   MR. McWILLIAMS:
5     -- giving you an opportunity to print
6   it. I'm just kidding.
7   MR. IRWIN:
8     That's a -- that's a good objection.
9 BY MR. IRWIN:
10   Q. Here's the question, Page 93, Line 23.
11 Question: "But to follow" up -- "to follow that
12 one step further, do you have any criticisms of
13 Dr. St. Martin for prescribing Xarelto to
14 Mrs. Orr?"
15     Answer: "No." This is Dr. Cruz. "The --
16 from my understanding of the dosing of Xarelto is
17 a GFR above 30, 30 to 50, use the dose of 15."
18     Do you agree with that, Doctor?
19   A. I do.
20   Q. And then the next sentence says, ". . .
21 although she was in Stage 4, which is GFR less
22 than 30, she was always in the high end of that,
23 meaning 27, 28, so that is pretty much 30 in my
24 book."
25     Do you agree with that, Doctor?

Page 132

1   A. I do.
2   Q. "So I wouldn't have recommended to him" --
3 meaning Dr. St. Martin, "I wouldn't have
4 recommended to him, if he had asked, to stop the
5 drug at that time."
6     Do you agree with that?
7   A. I do.
8   Q. "If it had slipped further, and I don't
9 know that -- maybe it did and I missed it, but if
10 it had slipped further, then I would have
11 recommended that he stop the drug."
12     Do you agree with that?
13   A. I do.
14   Q. Do you think that this testimony from
15 Dr. Cruz in his deposition adds clarity to the lab
16 reports that you were shown earlier?
17   MR. McWILLIAMS:
18     Object to the form.
19   MS. JEFFCOTT:
20     Object to --
21   MR. McWILLIAMS:
22     Leading.
23   THE WITNESS:
24     I do.
25 BY MR. IRWIN:

Page 133

1   Q. And why -- why do you believe that it
2 does?
3   A. Well, I think it validates -- his
4 impression was similar, that the patient's overall
5 renal function warranted the utilization of
6 15 milligrams daily, which was my impression from
7 reading the charts.
8   Q. And how does it affect your impression one
9 way or the other about whether or not her GF --
10 her GFR or her creatinine clearance was
11 appropriate for the 15-milligram dose or
12 inappropriate --
13   MS. JEFFCOTT:
14     Object to the form.
15 BY MR. IRWIN:
16   Q. -- for the 15-milligram dose?
17   A. It -- it --
18   MS. JEFFCOTT:
19     I'm sorry.
20   THE WITNESS:
21     -- doesn't change my overall
22   impression, which again was that the
23   15-milligram dose was appropriate for
24   Miss Orr.
25   MR. IRWIN:

Protected - Subject to Further Protective Review

| Page 134 | Page 136 |
|---|---|

**Page 134**

1     Those are all the questions that I
2 have.  Thank you very much.
3     MS. JEFFCOTT:
4       Take a break.
5     THE WITNESS:
6       Okay.
7     THE VIDEOGRAPHER:
8       The time now is 11:26 a.m.  We are off
9 the record.
10     (Brief recess was taken.)
11     THE VIDEOGRAPHER:
12       The time now is 11:29 a.m.  We are
13 back on the record.
14 BY MS. JEFFCOTT:
15     Q.  So, Doctor, before we took a brief break,
16 Mr. Irwin read you testimony from -- from
17 Dr. Cruz, Mrs. Orr's nephrologist.
18     Had you previously seen that testimony
19 before?
20     A.  Not to my recollection.  Again, I reviewed
21 a lot of depositions.  It didn't refresh my
22 memory.
23     Q.  So in the testimony that Mr. Irwin read to
24 you, Mr. Cruz -- Dr. Cruz -- excuse me -- stated
25 that Mrs. Orr's GFR had -- had always been at the

**Page 135**

1 high end of under 30, meaning that it was always
2 27, 28, somewhere around there.
3     Well, Doctor, would you agree that that's
4 below 30?
5     MR. IRWIN:
6       Object to the form.
7     THE WITNESS:
8       And again, my general impression from
9       reading her lab work before all this was
10       that her creatinine clearance was just
11       north of 30.
12 BY MS. JEFFCOTT:
13     Q.  Right.  And --
14     A.  So I -- I -- so those numbers are below
15 30, what he's quoting.  I --
16     Q.  Yeah.
17     A.  -- think that his impression of it being
18 over 30 -- that he's giving his clinical
19 impression on that.
20     Q.  But you gave the testimony earlier today
21 that if a patient -- if you saw a patient that was
22 consistently below 30, that you would take that
23 patient off of Xarelto.  So -- is that correct?
24     A.  It is correct.
25     Q.  Okay.

**Page 136**

1     A.  And I would also -- you know, that --
2 that's not the FDA's take.  They're saying 15 to
3 30 is okay.  I don't -- again, since that wasn't
4 studied, I wouldn't use that data.
5     Q.  But -- and again -- and so here's Dr. Cruz
6 stating that Mrs. Orr was consistently below 30 --
7     MR. IRWIN:
8       Object to the form of the question.
9     THE WITNESS:
10       He was --
11 BY MS. JEFFCOTT:
12     Q.  And --
13     A.  I'm sorry.
14     Q.  -- yet that was 30 in his book.
15     But Doctor, you would agree that that is
16 still below 30?
17     MR. IRWIN:
18       Object to the form of the question.
19     THE WITNESS:
20       His impression was that it was over
21       30.  That was -- my take-away is
22       his clinical context was over 30.  That's --
23       that -- again, I -- I don't have -- we can
24       pull up the deposition.  But my impression
25       from what was read to me was that his

**Page 137**

1       gestalt was that the patient was over 30,
2       that the numbers were under -- just under,
3       but that he thought that the patient was
4       gestalt over 30.
5 BY MS. JEFFCOTT:
6     Q.  What -- I'll read to you what he said.
7     A.  Okay.
8     Q.  ". . . although she was in Stage 4, which
9 was GFR of less than 30, she was always in the
10 high end of that, meaning 27, 28."
11     A.  I get you.
12     Q.  Okay.  So --
13     MR. IRWIN:
14       You want to read the rest of the
15       quote, where --
16 BY MS. JEFFCOTT:
17     Q.  So in your --
18     MR. IRWIN:
19       -- he says, "30 in my book"?
20 BY MS. JEFFCOTT:
21     Q.  So --
22     MR. IRWIN:
23       I'm just saying.
24     MR. McWILLIAMS:
25       I hope he's not a math teacher.

Protected - Subject to Further Protective Review

| Page 138 | Page 140 |
|---|---|

Page 138

1      MR. IRWIN:
2          Okay.
3  BY MS. JEFFCOTT:
4      Q. So following your prior testimony, which
5  you stated if -- if your patient is consistently
6  below 40 [sic], would you have considered
7  Mrs. Orr's GFR scores to be consistently under 30?
8      A. My review of her lab work in the totality
9  of her care, I would have used the 15-milligram
10  dosing of Xarelto. I feel comfortable on this.
11  I'm not going to -- to the rationale for what
12  Dr. Cruz is saying or not saying. That's
13  Dr. Cruz's opinion. This doesn't -- doesn't --
14  again, it doesn't change my opinion. My
15  impression from reviewing this was I -- so I'm
16  seeing her in a clinical context, I would have
17  used the 15-milligram dosing.
18      Q. So you're saying if -- if Dr. -- if -- if
19  Dr. Cruz is correct about Mrs. Orr's kidney
20  function, that she was consistently at 27, 28,
21  that in your opinion -- would it be your opinion
22  that she should not have been on Xarelto?
23      MR. IRWIN:
24          Object to the form of the question.
25      THE WITNESS:

Page 139

1          I'm not comfortable commenting on the
2      rationale that Dr. Cruz would warrant --
3      would use to recommend or -- against or
4      for. That's his -- I -- again, my
5      impression from reviewing her -- her lab
6      work was I would have been comfortable
7      using the Xarelto 15 milligrams. I -- and
8      it wasn't a -- that -- that's my clinical
9      impression.
10  BY MS. JEFFCOTT:
11      Q. I'm not asking you to agree with
12  Dr. Cruz's --
13      A. Okay.
14      Q. -- prescription or -- or Dr. Cruz's
15  assessment. What I'm asking --
16      A. Sure.
17      Q. -- you to do -- if -- if Dr. Cruz, as he
18  states, that Mrs. Orr's creatinine clearance was
19  27, 28, would you have taken Mrs. Orr off Xarelto?
20      A. If he had recommended to take the patient
21  off Xarelto, I would have taken the patient off
22  Xarelto. So he's -- again, it's hard to --
23      Q. That's different than the question I'm
24  asking.
25      MR. IRWIN:

Page 140

1          No. Wait. Wait. That -- that's his
2      answer.
3  THE WITNESS:
4          No. And I have more to say.
5          So he's saying -- it's hard to
6      interpret his rationale for saying that.
7      Ultimately he's recommending the
8      15-milligram. Maybe he thinks that the
9      27, 28 was a couple and generally his
10      feeling is it's over 30. He doesn't say
11      it that way. I don't know what he's
12      trying to say. I just know what his final
13      recommendations were. His final
14      recommendations were he was comfortable
15      with the 15-milligram dosing.
16          I can't -- I'm not going to opine as
17      to his rationale and his specific -- you
18      know, so my -- my comment was it just
19      validates what my impression was. I would
20      have used the 15-milligram dosing on -- on
21      Miss Orr.
22  BY MS. JEFFCOTT:
23      Q. And, Doctor, do you think cutoffs are
24  important in terms of -- in specific ranges? I
25  mean, we -- we talked about -- or you and Ned

Page 141

1  rather talked about in your last deposition
2  regarding the chance findings and p-values.
3      A. Uh-huh. I'm still -- about that, aspirin
4  PT, .06 --
5      Q. Well --
6      A. -- but --
7      Q. -- I mean --
8      A. -- anyways . . .
9      Q. -- do you agree there -- there exists
10  cutoffs for a reason?
11      A. Yes, ma'am.
12      Q. Okay.
13      A. I --
14      Q. And --
15      A. I agree.
16      Q. And -- and earlier in your depo -- in your
17  testimony today, you indicated that 30 was a
18  cutoff, GFR of 30; is that correct?
19      A. Yes, ma'am.
20      Q. Okay. And that if you had a patient with
21  a -- with a consistent GFR of less than 30, that
22  you would not have that patient on Xarelto; is
23  that correct?
24      A. Yes, ma'am.
25      Q. Now -- and Dr. Cruz mentioned in I think

Protected - Subject to Further Protective Review

| Page 142 |
|---|
| 1 the -- the testimony that Mr. Irwin quoted you, |
| 2 that if -- I'll just read it so I don't mess it |
| 3 up. But it says, If Mrs. Orr's GFR "had slipped |
| 4 further, and" -- "and I don't" -- "and I don't |
| 5 know that -- maybe it did and I missed it, but if |
| 6 it had slipped further . . . I would have |
| 7 recommended that he stop the drug." |
| 8 And so if -- if -- in your opinion, if |
| 9 Mrs. Orr's GFR had slipped below 27, 28, would it |
| 10 now be your opinion that she should not have been |
| 11 on the drug? |
| 12 MR. IRWIN: |
| 13 Object to the form. |
| 14 THE WITNESS: |
| 15 You know, again, I keep stating that |
| 16 my -- I would have used the 15-milligram |
| 17 dosing. I'm not going to take his |
| 18 rationale for why he was okay with it and |
| 19 use it to come to a separate conclusion. |
| 20 Ultimately the nephrologist felt that the |
| 21 15-milligram dosing was okay. My |
| 22 impression was that she was generally |
| 23 above 30. He has a gestalt of that or |
| 24 however. He says it's 30s or whatever. |
| 25 I'm not getting into what his opinions and |

| Page 143 |
|---|
| 1 his rationale -- I don't -- that's not my |
| 2 -- that's not appropriate for me, to be |
| 3 making comments on -- |
| 4 MS. JEFFCOTT: |
| 5 Right. |
| 6 THE WITNESS: |
| 7 -- that. But I'm not going to apply |
| 8 that. |
| 9 Again, I -- I look at this -- I see a |
| 10 patient like this. I'm using the -- |
| 11 the -- the 15-milligram dosing. |
| 12 BY MS. JEFFCOTT: |
| 13 Q. Okay. And -- and just so -- to clarify |
| 14 the record, he -- Dr. Cruz didn't say that she was |
| 15 always in the 30s. He said that she was always in |
| 16 the high end, meaning high end of 20s. |
| 17 MR. IRWIN: |
| 18 Object to the form of the question. |
| 19 THE WITNESS: |
| 20 Yes. |
| 21 BY MS. JEFFCOTT: |
| 22 Q. And -- |
| 23 A. That's what he said. |
| 24 Q. Okay. And that she -- |
| 25 A. I'm -- |

| Page 144 |
|---|
| 1 Q. -- was Stage 4 less than 30 GFR? |
| 2 MR. IRWIN: |
| 3 Object to the form of the question. |
| 4 THE WITNESS: |
| 5 I think that there was more said in |
| 6 terms of what his impressions were. |
| 7 Again, I -- I think you have to think |
| 8 about his clinical impression, not his |
| 9 rationale for his decision in that regard. |
| 10 His clinical impression was to use the 15 |
| 11 in -- milligram daily dosing. My |
| 12 impression, my clinical impression from |
| 13 the context of all the reports that I |
| 14 reviewed and -- and -- and my experience, |
| 15 I would have used the 15-milligram dosing. |
| 16 There's nothing he's saying here that |
| 17 would make me feel otherwise. |
| 18 BY MS. JEFFCOTT: |
| 19 Q. And just -- but to be clear for -- in -- |
| 20 in terms of your practice, you would not put a |
| 21 patient on Xarelto who had a creatinine clearance |
| 22 less than 30? |
| 23 A. If their creatinine clearance was |
| 24 consistently less than 30, I would -- I would feel |
| 25 uncomfortable with it. |

| Page 145 |
|---|
| 1 Q. And so you would take -- if -- if you had |
| 2 a patient that was -- had a creatinine clearance |
| 3 or GFR of less than 30 -- |
| 4 A. Not once. |
| 5 Q. -- consistently -- |
| 6 A. Consistent -- chronically. Yes. |
| 7 Q. I'll start over. |
| 8 So if you had a patient that was -- |
| 9 consistently had a GFR that was less than 30 or a |
| 10 creatinine clearance that was less than 30, you |
| 11 would take that patient off of Xarelto; is that |
| 12 correct? |
| 13 MR. IRWIN: |
| 14 Objection. Asked and answered -- |
| 15 THE WITNESS: |
| 16 I would. |
| 17 MR. IRWIN: |
| 18 -- four or five times. |
| 19 MS. JEFFCOTT: |
| 20 That's all the questions I have. |
| 21 MR. IRWIN: |
| 22 Any more questions? |
| 23 MS. JEFFCOTT: |
| 24 That's all the questions I have. |
| 25 MR. IRWIN: |

Page 146

1    Good. No further questions. Thank
2  you very much, Doctor.
3    THE VIDEOGRAPHER:
4      The time now is 11:39 a.m. Today's --
5    THE WITNESS:
6      I still --
7    THE VIDEOGRAPHER:
8      -- deposition of Dr. --
9    THE WITNESS:
10     I still have that aspirin --
11   THE VIDEOGRAPHER:
12     -- Sammy Khatib consisting of two
13 disks is now concluded.
14
15
16
17
18
19
20
21
22
23
24
25

Page 147

1        CHANGES AND SIGNATURE
2  WITNESS NAME: SAMMY KHATIB, M.D.
3  DATE OF DEPOSITION: Saturday, January 21, 2017
4
5  PAGE LINE    CHANGE      REASON
6  ____ ____ _____ _____
7  ____ ____ _____ _____
8  ____ ____ _____ _____
9  ____ ____ _____ _____
10 ____ ____ _____ _____
11 ____ ____ _____ _____
12 ____ ____ _____ _____
13 ____ ____ _____ _____
14 ____ ____ _____ _____
15 ____ ____ _____ _____
16 ____ ____ _____ _____
17 ____ ____ _____ _____
18 ____ ____ _____ _____
19 ____ ____ _____ _____
20 ____ ____ _____ _____
21 ____ ____ _____ _____
22 ____ ____ _____ _____
23 ____ ____ _____ _____
24 ____ ____ _____ _____
25 ____ ____ _____ _____

Page 148

1        WITNESS' CERTIFICATE
2
3    I have read or have had the foregoing
4  testimony read to me and hereby certify that it is
5  a true and correct transcription of my testimony
6  with the exception of any attached corrections or
7  changes.
8
9
10
11
12
13
14
15
16
17
18         _____
19         WITNESS' SIGNATURE
20
21
22
23 PLEASE INDICATE
24 []  NO CORRECTIONS
25 []  CORRECTIONS; ERRATA SHEET(S) ENCLOSED

Page 149

1      C E R T I F I C A T E
2    This certification is valid only for
3  a transcript accompanied by my original signature
4  and original seal on this page.
5    I, AURORA M. PERRIEN, Registered Professional
6  Reporter, Certified Court Reporter, in and for the
7  State of Louisiana, as the officer before whom
8  this testimony was taken, do hereby certify that
9  SAMMY KHATIB, M.D., after having been duly sworn
10 by me upon the authority of R.S. 37:2554, did
11 testify as hereinbefore set forth in the foregoing
12 148 pages; that this testimony was reported by me
13 in the stenotype reporting method, was prepared
14 and transcribed by me or under my personal
15 direction and supervision, and is a true and
16 correct transcript to the best of my ability and
17 understanding; that the transcript has been
18 prepared in compliance with transcript format
19 guidelines required by statute or by rules of the
20 board; and that I am informed about the complete
21 arrangement, financial or otherwise, with the
22 person or entity making arrangements for
23 deposition services; that I have acted in
24 compliance with the prohibition on contractual
25 relationships, as defined by Louisiana Code of

Protected - Subject to Further Protective Review

Page 150

1  Civil Procedure Article 1434 and in rules and
2  advisory opinions of the board; that I have no
3  actual knowledge of any prohibited employment or
4  contractual relationship, direct or indirect,
5  between a court reporting firm and any party
6  litigant in this matter nor is there any such
7  relationship between myself and a party litigant
8  in this matter.  I am not related to counsel or to
9  the parties herein, nor am I otherwise interested
10 in the outcome of this matter.
11
12
13
14
15          AURORA M. PERRIEN, CCR, RPR
16
17
18
19
20
21
22
23
24
25