UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | * * * | MDL 2592 |
| | * | SECTION L |
| THIS DOCUMENT RELATES TO: | * * | JUDGE ELDON E. FALLON |
| *Dora Mingo v. Janssen et al.* Case No. 2:15-cv-03469 | * * * | MAG. JUDGE NORTH |
| *William Henry v. Janssen et al.* Case No.  2:15-cv-00224 | * * * | |

* * * * * * * * * * * * * * * * * * * * * * * * * *

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO PRECLUDE SPECULATIVE TESTIMONY FROM SEVEN DFENSE EXPERTS ABOUT POTENTIAL OUTCOMES FROM OTHER ANTICOAGULANTS**

I.  **INTRODUCTION**

Bayer and Janssen have proffered expert reports presenting statements and opinions about what may or may not have happened to Ms. Mingo and/or Mr. Henry if they had been using an anticoagulant other than Xarelto.  This untested, speculative theory has not been subjected to peer review or publication, has no standards controlling its operation, and has not been generally accepted within the relevant scientific community.  Additionally, it will have no bearing on any matter of consequence to this litigation, but instead carries a great risk of undue prejudice.  As such, any testimony on this matter should be precluded.

II. **FACTUAL BACKGROUND**

Six defense experts essentially opined in their reports that Ms. Mingo and/or Mr. Henry would have or could have suffered the same consequences if they had been taking a different anticoagulant:

1

**Expert Report of Dr. Kevin Wheelan (*Henry*), at § V(B)(8):** "There is no data or evidence in this case to suggest that had Mr. Henry been on a different anticoagulant that this GI event would not have occurred."[1]

**Expert Report of Dr. Steven Deitelzweig (*Mingo*), at 5**: "Selection of a different anticoagulant for Ms. Mingo's DVT would not have led to a different outcome."[2]

**Expert Report of Vonda Reeves-Darby, M.D. (*Mingo*), at 13**: "Ms. Mingo's clinical course would not have been any different had she taken a different anticoagulant."[3]

**Expert Report of Alan E. Jones, MD, FACEP (*Mingo*), at 14**: "[R]egardless of the type of anticoagulant she had been placed on for her DVT (for example Coumadin or Lovenox) she would have had the same bleeding event that occurred while she was on Xarelto."[4]

**Expert Report of Randy C. Roth, MD, FHM (*Mingo*), at 7**: "Ms. Mingo's use of Xarelto for treatment of a deep vein thrombosis most likely unmasked the slowly bleeding gastric ulcer; the use of any anticoagulant to treat the deep vein thrombosis would most likely have resulted in the same oozing of the underlying gastric ulcer."[5]

**Expert Report of Demondes Haynes, MD, FCCP (*Mingo*), at 3, 26:** "There is no evidence that Ms. Mingo would not have sustained a bleed if she had been prescribed a different anticoagulant…. There is no scientific evidence to support an assertion that Ms. Mingo's ulcer would not have bled had she not taken Xarelto or that a bleed would not have occurred had she been taking a different anticoagulant…. She would have bled on any anticoagulant because all NOACs carry a risk of bleeding."[6]

---

[1] Attached as Exhibit 1.

[2] Attached as Exhibit 2.

[3] Attached as Exhibit 3.

[4] Attached as Exhibit 4.

[5] Attached as Exhibit 5.

[6] Attached as Exhibit 6.

However, one of those experts – Dr. Haynes – went on to admit that it would be pure conjecture to speculate on what the effects would have been had Ms. Mingo been using another anticoagulant:

> Further, there is no head-to-head clinical trial comparing the safety and efficacy of Xarelto to other NOACs on the market. Therefore, as a clinician, I cannot draw any conclusion as to whether a different NOAC would have proven to be a safer alternative for Ms. Mingo, and to do so would be pure conjecture.[7]

Similarly, another of those experts – Dr. Roth – testified at his deposition that while he knows any anticoagulant would have increased the risk of bleeding, he would have no way of knowing if, or to what extent, Ms. Mingo's bleed would have occurred had she been using another anticoagulant:

> A. I think she would have probably bled, with most reasonable certainty, on Coumadin just as well as she bled on the factor Xa inhibitor.
>
> Q. Would she have bled the same intensity?
>
> A. I can't answer that.
>
>    MS. HOFFMAN: Objection.
>
> Q. Okay. Would the bleeding have been the same duration as it was on Xarelto?
>
> A. I can't answer that.
>
> Q. Would she – would she have lost the same volume of blood?
>
>    MS. CONKLIN: Objection.
>
>    MS. HOFFMAN: Objection.
>
> A. I can't answer that.
>
> Q. So you can't say –

---

[7] *Id.* at 3.

3

A. I don't know. I mean –

Q. Right.

A. It's not predictable.

Q. Right.

A. I mean, it could have been worse on Coumadin, it could have been better. It could have – where did she – could it – there's a lot of different factors and you just can't predict it based on whether you're on a vitamin K antagonist or a factor X inhibitor. The bottom line is if you are anticoagulated and you have a defect in the – in your belly, you're going to bleed.[8]

. . .

Q. Okay. And so there is no data out there on comparative bleeding rates from direct head-to-head trials among the various NOACs?

A. That's right.

Q. Okay. And so how are you able to say that she would have bled to the same extent if she would have been taking any other NOAC?

A. Just based on the pathophysiology. I mean, a blood thinner is a blood thinner. I know that sounds simple, but the mechanism of action of a Xa inhibitor is a mechanism of action of a Xa inhibitor, and if they are taking it and their blood is thin and they have a gastric ulcer that's already oozing, it's going to probably bleed no matter what agent they take. I mean, I think any reasonable clinician would agree with that.

Q. But there is no –

A. I can't –

Q. There is no head-to-head studies out there –

A. No. No.

---

[8] Deposition of Randy Roth, MD (*Mingo*) ("Roth *Mingo* Dep."), at 171:4-172:5 (attached as Exhibit 7).

4

Q. – that would give you any data –

A. I agree.

Q. – to compare what might have happened had she taken one of the other NOACs?

A. I agree.[9]

…

Q. What we don't know is whether or not that bleed would have happened if she was taking warfarin.

    MS. HOFFMAN: Objection.

A. We don't know because she wasn't taking it, but by clinical experience of doing this for 20 years tell me that she would have had a very similar outcome on any properly taken anticoagulant. Period. I don't know how else to tell you that.

Q. But we can't know that?

A. No.

Q. Okay. And we can't know what would have happened if she would have taken Eliquis or Pradaxa?

A. We can just presume.[10]

…

Q. What data or medical literature do you base your opinion that she would have bled on any anticoagulant? What –

A. Twenty years of experience.

Q. Okay. But I'm – specific – is there any specific data or medical – peer-reviewed medical literature that you rely on for that opinion?

---

[9] *Id.* at 175:22-176:21.

[10] *Id.* at 177:15-178:2.

A. Nope.[11]

Out of the remaining four experts whose reports said the outcomes would not have been different on another anticoagulant, three (Drs. Deitelzweig, Jones, and Wheelan[12]) provided no support for their statements, and the fourth (Dr. Reeves-Darby) relied solely on the fact that "[a]nticoagulants as a general class can cause bleeding."[13]

On the opposite end of the spectrum, Dr. Brian Persing said in his report that the consequences might have been worse had Ms. Mingo been using Lovenox and Coumadin, rather than Xarelto:

> Xarelto may have increased the rate of Mrs. Mingo's gastric bleed; however, administration of Lovenox with Coumadin, with the intent of treating a deep vein thrombosis, would have led, without reservation, to an increased risk of bleeding. Based on the EINSTEIN trial comparing Xarelto to Lovenox and Coumadin, there was a 1 percent risk in bleed with Xarelto that was severe or life-threatening and a 1.7 percent risk of bleed that was severe or life-threatening in the Lovenox and Coumadin arm of the trial. This correlated with a risk reduction of 46 percent favoring administration of Xarelto over Lovenox and Coumadin…. Ultimately, this gastric ulcer bled and this was likely potentiated with anticoagulation in the form of Xarelto and aspirin. However, anticoagulation, including Lovenox and Coumadin, that would have been administered for deep vein thrombosis at treatment doses would have led to an equivalent if not more profound rate of bleed from the gastric ulcer."[14]

However, when asked about these statements during his deposition, Dr. Persing acknowledged that the data he had cited did not apply to Ms. Mingo, and that the correct data actually disputed the presence of a reduced risk of bleeding associated with the use of Xarelto:

---

[11] *Id.* at 179:17-24.

[12] Dr. Wheelan was identified as a defense expert for the *Henry* case only, and as such, he has not yet been deposed.

[13] *See* Deposition of Vonda G. Reeves-Darby, MD (*Mingo*) ("Reeves-Darby *Mingo* Dep."), at 170:10-23 (attached as Exhibit 8).

[14] Expert Report of Brian E. Persing, M.D. (*Mingo*), at 11, 13 (attached as Exhibit 9).

6

> Q. And, just to be clear, Mrs. – Ms. Mingo received Xarelto for treatment of DVT; correct?
>
> A. That's correct.
>
> Q. She did not receive it for treatment of pulmonary embolism; correct?
>
> A. Correct.
>
> Q. And this data you cite is the pool data of the DVT and pulmonary embolism; correct?
>
> A. That's correct.
>
> Q. But if you were to look at just the DVT data for the EINSTEIN DVT study, there was no such difference with respect to bleeders; correct?
>
> A. Those – those two were identical in their risk.
>
> Q. Okay.
>
> A. Correct.
>
> Q. So there was no – in the – in the study that looked at the type of condition and the treatment that Ms. Mingo received, there was no different in bleed risk; correct?
>
> A. I think that's accurate, yes.[15]

### III. ARGUMENT

#### A. Speculation About What the Outcomes Would Have Been if a Different Anticoagulant Had Been Used Should be Precluded Under *Daubert*.

In the well-known trilogy of cases – *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993); *General Electric v. Joiner*, 522 U.S. 136 (1997); and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999) – the United States Supreme Court elucidated the standard of admissibility of expert testimony under Federal Rule of Evidence 702.

---

[15] Deposition of Brian E. Persing, M.D. (*Mingo*), at 34:1-21 (attached as Exhibit 10).

In *Daubert*, the Court emphasized the trial judge's role as gatekeeper in determining the admissibility of relevant and reliable expert testimony. *Daubert,* 509 U.S. at 589. The trial court must determine whether the proffered expert's testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline." *Id*. at 592. The Court explained that this standard is "flexible," and identified four specific factors that a trial court may consider in determining whether to admit expert testimony:

1. whether the theory can be or has been tested;

2. whether the theory has been subjected to peer review and publication;

3. whether the theory has a high known or potential rate of error, and whether there are standards controlling its operation; and

4. whether the theory is generally accepted within the relevant scientific community.

*Id*. at 592-94.

The *Joiner* Court added that a trial court need not accept testimony purely based on the *ipse dixit* of an expert's statement. *Joiner,* 522 U.S. at 146. In other words, an expert's testimony that something is the case does not thereby make it fact. As this Court has observed, there must not be "too great a gap" between the science and the opinion. *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 616 (E.D. La. 2003) (*citing Joiner*, 522 U.S. at 146).

In *Kumho Tire*, the Court noted that the Daubert factors do not constitute an exhaustive set, and that the trial court may consider other factors depending on the nature of the evidence presented. *Kumho Tire*, 526 U.S. at 150-52. The Court also noted that an expert's credentials alone are not sufficient to allow admission of that expert's testimony. *Id*. at 153.

Finally, as this Court has properly observed: "The party seeking to introduce the expert testimony bears the burden of demonstrating that the testimony is both relevant and reliable. The

8

focus is not on the result or conclusion, but on the methodology." *In re Chinese Manufactured Drywall Prods. Liab. Litig.,* MDL No. 2047, 2010 WL 8368083, at *3 (E.D. La. Feb. 17, 2007) (internal citations omitted).

Federal Rule of Evidence 702 has been amended to incorporate these jurisprudential principles into a district judge's determination of expert admissibility, stating that:

> A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Out of the seven defense experts who are the subjects of this motion, only one – Dr. Persing – is a hematologist. Two are hospitalists (Dr. Deitelzweig and Dr. Roth), one is a gastroenterologist (Dr. Reeves-Darby), one is a pulmonologist (Dr. Haynes), one is an electrophysiologist (Dr. Wheelan), one is an emergency medicine physician (Dr. Jones). With the arguable exception of Dr. Deitelzweig, there is nothing in the backgrounds of the non-hematologists to suggest that they would be qualified to state opinions about the relative effects of anticoagulants.[16]

---

[16] *See, e.g.,* Roth *Mingo* Dep., at 53:11-16, 73:7-15, 74:7-10, 175:6-11 (testifying that he never conducted research on Xarelto specifically or on anticoagulants generally, that he is not a hematology or gastroenterology expert, and that an assessment of the best way to compare anticoagulants was "not [his] wheelhouse, that's somebody smarter than [him]") (attached as Exhibit 7); Reeves-Darby *Mingo* Dep., at 77:15-20, 98:4-5, 99:7-9, 99:21-23, 101:19-21, 102:7, 130:18, 136:7, 136:15, 161:3-15, 178:24 (testifying that she does not prescribe anticoagulants or manage anticoagulation, that she is not a pharmacologist or an expert on pharmacodynamics or hematology, and that she has expertise only in gastroenterology) (attached as Exhibit 8); Deposition of Demondes Haynes, MD, FCCP (*Mingo*), at

Additionally, as discussed above, none of the seven experts who are the subject of this motion provided any data or studies or peer-reviewed literature to support their statements.[17]  In fact, as also addressed above, the only hematologist (Dr. Persing), as well as one other defense expert (Dr. Roth), essentially admitted that any conclusion about the possible outcome using other anticoagulants would be speculative.[18]

Consequently, these opinions of the seven defense experts should be barred because they meet none of the requirements for the admission of expert testimony under Federal Rule of Evidence 702 or *Daubert* and its progeny.  They are not based on scientific, technical or other specialized knowledge, or on sufficient facts or data, or on reliable principles or methods.  They undisputedly have not been tested, or subjected to peer review, appropriate publication, or controlled studies.  They are not opinions that have been, or even could be, generally accepted without appropriate testing.

Instead, the opinions of Defendants' experts are based solely on subjective "feelings" and unsupported speculation, which fly in the face of *Daubert,* which was designed with an "aim . . . to exclude expert testimony based merely on subjective belief or unsupported speculation." *See Burst v. Shell Oil Co.,* 120 F. Supp. 3d 547, 550 (E.D. La. 2015) (citation omitted).  Testimony based on possibilities that *might* have existed as a result of anticoagulants that *could* have been used but were not used, rather than on what actually was used, lacks reliability and probative value. *See generally Washington v. Armstrong World Indus., Inc.,* 839 F.2d 1121, 1122 (5th Cir. 1998)

---

163:6-8, 178:19-179:2 (testifying that he is not a pharmacist, that he has not studied pharmacodynamics or pharmacokinetics, and that he can't speak intelligently about effects on the risks of bleeding because that was for a higher level than a clinician like him)  (attached as Exhibit 11); Deposition of Alan Jones, MD (*Mingo*), at  124:23, 131:7-8, 133:17-21 (testifying that he is not a pharmacologist or an expert in pharmacokinetics or pharmacodynamics) (attached as Exhibit 12).

[17] *See supra,* Section II.

[18] *Id.*

(expert testimony "based on possibilities that might exist . . . rather than specific findings or evaluations of test results that were available" was precluded as rank speculation). As such, the testimony should be excluded on this basis, independent of the preclusion that should occur as a result of its irrelevance, as discussed below.

**B.     Testimony About What May or May Not Have Happened if Another Anticoagulant Had Been Used Should be Precluded as Irrelevant.**

The unreliability addressed above is sufficient on its own to preclude speculative testimony about what the outcomes would have been if a different anticoagulant had been used. Independent of this, an entirely separate factor – irrelevance – likewise justifies preclusion of this expert testimony.

Only evidence that is relevant is admissible at trial. This is a basic tenet of the law, clearly set forth in Federal Rule of Evidence 402, and is, without question, the first and foremost gatekeeper mechanism for determining what can and cannot be presented at trial. Any evidence that is not relevant must be precluded.

It does not matter if the evidence is presented by a lay witness or an expert witness. Irrelevant evidence does not become relevant or admissible simply because it is presented by an expert. The United States Supreme Court made that clear in issuing its opinion in *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993):

> Rule 702 further requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.' This condition goes primarily to relevance. 'Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.'

*Id.* at 591 (*quoting* 3 Weinstein & Berger 702-18).

Evidence is relevant if it has a tendency to make a fact of consequence to the litigation more or less probable than it would be without the evidence. Fed. R. Evid. 401. Relevant evidence

need not be conclusive of an ultimate issue, nor make one proposition appear more or less probable, but it must at least advance the inquiry. *Thompson v. City of Chicago,* 472 F.3d 444, 453 (7th Cir. 2006) (citations omitted); *Kalo v. Comm'r,* No. 97-1416, 1998 U.S. App. LEXIS 12570, at *14 (6th Cir. June 9, 1998) (citation omitted).

However, even relevant evidence can be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. A trial court has broad discretion in assessing the probative value of evidence and determining if it is significantly outweighed by the risk of undue prejudice. *See Sprint v. Mendelsohn,* 552 U.S. 379, 384 (2008); *Verzwyvelt v. St. Paul Fire & Marine Ins. Co.,* 175 F. Supp. 2d 881, 888 (W.D. La. 2001), *citing United States v. Johnson,* 558 F.2d 744, 746 (5th Cir. 1977).

Relevant evidence should be excluded if its probative value is substantially outweighed by a danger of unfair prejudice. *United States v. Duncan,* 919 F.2d 981, 987 (5th Cir. 1990), *citing* Fed. R. Evid. 403. "The less probative a piece of evidence is, and thus the less the benefit to the truth-determining function of the jury of admitting it at trial, and the more trial time the presentation of the evidence would consume and the likelier the evidence would be to confuse the jurors by distracting them from more probative evidence, the stronger the argument for exclusion." *United States v. Seals,* 419 F.3d 600, 613 (7th Cir. 2005) (citations omitted).

Plaintiffs need only show that their injuries were proximately caused by their use of Xarelto. The evidence that Defendants hope to assert – that Plaintiffs would have had to take a different anticoagulant, and that a different anticoagulant might have caused a major bleeding event – is an attempt to create a new burden on Plaintiffs. There is no support – by rule, case law,

12

or otherwise – for placing such an additional burden on Plaintiffs. There is support, however, for precluding statements about what might have happened in an alternate universe because "such a hypothetical counter factual situation is not sufficient to meet the causation requirement." *See Sweeney v. Chertoff,* 178 F. App'x 354, 358 (5th Cir. 2006). As such, gratuitous statements such as these, about what can or cannot be said about what would or would not have happened with use of a different anticoagulant, are irrelevant, and should be precluded under Rule 402.

This case is about the bleeds suffered by Ms. Mingo and Mr. Henry due to Xarelto – not some other bleed that may or may not have occurred if they had taken some other anticoagulant with different warnings, risks and benefits. Allowing Defendants' experts to speculate on what may have occurred on a different drug will create a trial within the trial on the warnings, risks and benefits of all anticoagulants that could have been prescribed. This trial should be limited to Plaintiffs' use of Xarelto.

Even if this evidence were relevant in some way, and it is not, it should be excluded under Rule 403, because it will do nothing more than unduly prejudice Plaintiffs, cause unnecessary confusion, mislead the jury, waste this Court's time, and result in undue delay. Bayer's own experts have confirmed that assessing what would have happened with a different anticoagulant would involve speculation, and courts have found that "speculative blaming intensifies the grave risk of jury confusion, and it invites the jury to render its findings based on emotion or prejudice." *See United States v. Settle,* 267 Fed App'x 395, 398 (5th Cir. 2008).

### IV. **CONCLUSION**

For these reasons, Plaintiffs respectfully request that Drs. Deitelzweig, Haynes, Jones, Persing, Reeves-Darby, Roth, and Wheelan be precluded from testifying about what may or may

not have happened to Ms. Mingo and/or Mr. Henry if they had been using an anticoagulant other than Xarelto.

Respectfully submitted,

Dated:  February 24, 2017

/s/ *Leonard A. Davis*
Leonard A. Davis, Esq. (Bar No. 14190)
**HERMAN, HERMAN & KATZ, LLC**
820 O'Keefe Avenue
New Orleans, LA  70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Email: ldavis@hhklawfirm.com

Gerald E. Meunier (Bar No. 9471)
**GAINSBURGH BENJAMIN DAVID MEUNIER & WARSHAUER, LLC**
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA  70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
Email: gmeunier@gainsben.com

*Plaintiffs' Liaison Counsel*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 24, 2017, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre-Trial Order No. 17.

/s/ *Leonard A. Davis*
**LEONARD A. DAVIS**