Protected - Subject to Further Protective Review

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


------------------------------ §
IN RE:  XARELTO (RIVAROXABAN)    § MDL NO. 2592
PRODUCTS LIABILITY LITIGATION    §
                                 § SECTION L
THIS DOCUMENT RELATES TO:        §
------------------------------ § JUDGE ELDON E. FALLON
                                 §
Dora Mingo V. Janssen Research & § MAG. JUDGE NORTH
Development, et al.,              §
                                 §
Civil Case No. 2:15-cv-03469     §
------------------------------ §


  ** PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW **


                    - - -


          Thursday, February 16, 2017

                    - - -


        Videotaped deposition of RANDY ROTH, M.D.,
    held at Hilton Garden Inn, 2703 Denny Avenue,
    Pascagoula, Mississippi, commencing at 3:58 p.m.,
    on the above date, before Susan D. Wasilewski,
    Registered Professional Reporter, Certified
    Realtime Reporter, Certified Realtime Captioner.




                    - - -


          GOLKOW TECHNOLOGIES, INC.
      877.370.3377 ph | 917.591.5672 fax
              deps@golkow.com

Protected - Subject to Further Protective Review

## Page 2

APPEARANCES:

BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.
BY: JOSEPH G. VANZANDT, ESQUIRE
218 Commerce Street
Montgomery, Alabama 36104
(334) 269-2343
joseph.vanzandt@beasleyallen.com
Representing Plaintiffs

SCHWABE, WILLIAMSON & WYATT
BY: MARGARET HOFFMANN, ESQUIRE
1211 SW 5TH Avenue, Suite 1900
Portland, Oregon 97204
(503) 222-9981
mhoffmann@schwabe.com
Representing Defendants Janssen and
Johnson & Johnson

IRWIN, FRITCHIE, URQUHART & MOORE, LLC
BY: CLAIRE NOONAN, ESQUIRE
400 Poydras Street, Suite 2700
New Orleans, Louisiana 70130
(504) 310-2146
cnoonan@irwinllc.com
Representing Defendants Janssen and
Johnson & Johnson

MITCHELL WILLIAMS SELIG GATES & WOODYARD, PLLC
BY: ADRIA W. CONKLIN, ESQUIRE
425 West Capitol Avenue, Suite 1800
Little Rock, Arkansas 72201
(501) 688-8869
aconklin@mwlaw.com
Representing Defendant Bayer

ALSO PRESENT:

MELISSA BARDWELL, Videographer

## Page 3

- - -
INDEX
- - -

Testimony of:  RANDY ROTH, M.D.          PAGE
   DIRECT EXAMINATION BY MR. VANZANDT............ 6

E X H I B I T S

ROTH DEPOSITION EXHIBITS          PAGE

Exhibit 1   Plaintiffs' Notice with Subpoena        8
            Duces Tecum of Oral Videotaped
            Deposition of Randy Roth, MD

Exhibit 2   Responses and Objections to          8
            Plaintiff's Notice with Subpoena
            Duces Tecum of Oral Videotaped
            Deposition of Randy Roth, MD
Exhibit 3   2/13/2017 Invoice                9
            Randy C. Roth, MD

Exhibit 4   12/12/2016 Invoice               9
            Randy C. Roth, MD
Exhibit 5   Expert Report of Randy C. Roth, MD,   12
            FHM

Exhibit 6   Efficacy and safety of rivaroxaban    25
            in patients with diabetes and
            nonvalvular atrial fibrillation:
            The Rivaroxaban Once-daily, Oral,
            Direct Factor Xa Inhibition Compared
            with Vitamin K Antagonism for
            Prevention of Stroke and Embolism
            Trial in Atrial Fibrillation (ROCKET
            AF Trial)
            Sameer Bansilal, MD

## Page 4

E X H I B I T S
(Attached to transcript)
ROTH DEPOSITION EXHIBITS          PAGE
Exhibit 7   Article: Point-of-Care Warfarin     29
            Monitoring in the ROCKET AF Trial

Exhibit 8   ICMJE Forms for Disclosure of      30
            Potential Conflicts of Interest
Exhibit 9   Article: Rivaroxaban versus       32
            Warfarin in Nonvalvular Atrial
            Fibrillation
            Manesh R. Patel, MD

Exhibit 10  Article: Rivaroxaban - Once daily,   34
            oral, direct factor Xa inhibition
            Compared with vitamin K antagonism
            for prevention of stroke and
            Embolism Trial in Atrial
            Fibrillation:  Rationale and Design
            of the ROCKET AF study
            The Executive Steering Committee, on
            behalf of ROCKET AF Study
            Investigators
Exhibit 11  Xarelto Prescribing Information     91
            Initial US Approval:  2011

## Page 5

- - -

THE VIDEOGRAPHER:  We are now on the record.
My name is Melissa Bardwell, videographer, here for
Golkow Technologies.  The date today is February
16th, 2017 the time is approximately 3:58 p.m.

This videotaped deposition is being held in
Pascagoula, Mississippi, in reference to the
Xarelto (Rivaroxaban) Products Liability
Litigation.

The deponent today is Randy Roth, MD.

Would counsel present please introduce
themselves and state their affiliations for the
record.

MR. VANZANDT:  Joseph VanZandt for plaintiff
Dora Mingo.

MS. HOFFMANN:  Margaret Hoffmann for the
Janssen defendants.

MS. CONKLIN:  Adrian Conklin for Defendant
Bayer.

MS. NOONAN:  Claire Noonan for the Janssen
defendants.

THE VIDEOGRAPHER:  The court reporter today is
Susan Wasilewski and she will now swear in the
witness.

THE COURT REPORTER:  Would you raise your

Protected - Subject to Further Protective Review

## Page 6

1 right hand?
2        Do you solemnly swear or affirm the testimony
3 you're about to give will be the truth, the whole
4 truth, and nothing but the truth?
5        THE WITNESS:  Yes, ma'am, I do.
6        THE COURT REPORTER:  Thank you.
7        RANDY ROTH, M.D., called as a witness by the
8 Plaintiffs, having been duly sworn, testified as
9 follows:
10           DIRECT EXAMINATION
11 BY MR. VANZANDT:
12    Q.  Good afternoon, Doctor.  Would you please
13 state your name?
14    A.  Randy Roth, R-o-t-h.
15    Q.  Okay.  We met briefly off the record but I
16 will reintroduce myself.  My name is Joseph VanZandt.
17 I'm one of the lawyers for Ms. Dora Mingo, and do you
18 understand that you've been identified as an expert
19 witness on behalf of one of the defendants in this
20 litigation?
21    A.  Yes, sir.
22    Q.  Okay.  And we're here today to take your
23 deposition.  Do you understand that?
24    A.  Yes, sir.
25    Q.  Okay.  And you understand that you're under

## Page 7

1 oath today?
2    A.  Yes, sir.
3    Q.  All right.  Have you ever given a deposition
4 before?
5    A.  One or two probably six, seven, eight, nine
6 years ago, but none in the last four or five years.
7    Q.  Okay.  All right.  Well, I'll walk through
8 just some of the ground rules --
9    A.  Sure.
10    Q.  -- for depositions and if you have any
11 questions, you can certainly let me know.
12        First off, we were told before we started that
13 you have a patient that, you know, may need your
14 attention, so if your phone rings, feel free to let us
15 know at any time and, obviously, you can step outside
16 and take care of that.
17    A.  Thank you.
18    Q.  If you need to take a break at any other time,
19 just let us know.  I would just ask that we answer
20 whatever question we're on at the time before --
21    A.  Sure.
22    Q.  -- before we take a break.  If I ask a
23 question that you do not understand, please let me
24 know and I will rephrase that question however I best
25 can so that you could understand it, but it will be

## Page 8

1 assumed that if you answer a question, that you
2 understand the question; is that fair?
3    A.  Yes, sir.  Yes, sir.
4    Q.  Okay.
5        (Roth Exhibit 1 was marked for
6 identification.)
7 BY MR. VANZANDT:
8    Q.  Doctor, I'm going to hand you what I'm marking
9 as Exhibit Number 1 to your deposition.  This is a
10 copy of the notice to your deposition.
11        MS. HOFFMANN:  We'll mark as Exhibit 2 the
12 objections to the document request that's attached
13 to it.
14        (Roth Exhibit 2 was marked for
15 identification.)
16 BY MR. VANZANDT:
17    Q.  Doctor, have you ever seen that document
18 before today?
19    A.  I don't think so.
20    Q.  Okay.  If you could, turn to page 2 of the
21 notice for me.
22        Page 2 is labeled as Plaintiff Exhibit A.
23 Have you ever seen this document before today?
24    A.  No, sir.
25    Q.  Doctor, did you bring any documents with you

## Page 9

1 to the deposition today?
2    A.  Not related to this.  This is medical stuff
3 from a previous patient.
4        MS. HOFFMANN:  But let the record reflect
5 we've provided invoices to plaintiffs' counsel.
6        (Roth Exhibit 3 was marked for
7 identification.)
8        (Roth Exhibit 4 was marked for
9 identification.)
10 BY MR. VANZANDT:
11    Q.  Doctor, I'm going to mark -- I'm going to mark
12 as Exhibit 3 and 4 two invoices that Counsel handed me
13 right before the deposition, if you could review those
14 documents.
15    A.  Yes, sir.
16    Q.  Okay.  Are those invoices that you have
17 prepared in relation to your work in this case?
18    A.  They are.
19    Q.  Okay.  And let's look at the first invoice,
20 Exhibit 3.  Is that the one with the total of $6,000?
21    A.  That's one of them, right.  That's 3.
22    Q.  Okay.  Exhibit 3, could you go over and
23 basically tell me what work this invoice covers?
24    A.  Six hours of chart review, which is mainly the
25 medical record of your client.  It also included the

3 (Pages 6 to 9)

Protected - Subject to Further Protective Review

Page 10

1    depositions of the plaintiff, the gastroenterologist,
2    the hospitalist.
3         We had a phone conference concerning this
4    right around New Year's Eve and I met with Counsel two
5    times at our hospital to discuss that, and then I
6    spent some time looking at some product PIs that were
7    provided.
8    Q.  Okay.  And does Exhibit 3 represent any of the
9    time you spent preparing your expert report in this
10   case?
11   A.  No.
12   Q.  Okay.  And does it include any time for your
13   deposition here today?
14   A.  No, sir.
15   Q.  Okay.  All right.  If we look at Exhibit 4,
16   the total of that invoice is $8,250.  Does this
17   invoice reflect the time that you spent preparing your
18   report in this case?
19   A.  Yes.
20   Q.  Okay.  And what's the total amount of time
21   that you spent preparing your report?
22   A.  Probably two hours, hour and a half, two
23   hours.
24   Q.  Okay.  What indication on the invoice here
25   does it indicate -- in which part of that is you

Page 11

1    preparing your report in this case?
2    A.  I probably included that with the review of
3    medical records.  I probably should have separated
4    them out, but that's probably what that is.
5    Q.  Okay.  And so you're saying that it took you
6    approximately two hours to prepare your report that
7    you've provided in this case?
8    A.  That's the expert report, correct, yes, sir.
9    Q.  Yes, sir.  Okay.  And these two invoices, do
10   these invoices represent all the work that you've done
11   on this case up until today?
12   A.  Yes, sir.
13   Q.  Okay.
14        THE WITNESS:  Up until today?
15        MS. HOFFMANN:  Do you have unbilled time?
16        THE WITNESS:  If I do, it's not much.
17        MS. HOFFMANN:  Okay.
18        MR. VANZANDT:  Okay.
19        THE WITNESS:  I mean, maybe --
20        MS. HOFFMANN:  I'm sorry.  I just wanted it to
21   be clear.
22        MR. VANZANDT:  Oh, that's fine.  No, I
23   appreciate it.
24   A.  No, no.  Up until today, I mean, I may have
25   spent 30 minutes last night looking at something, but

Page 12

1    until today, this is consistent.
2    Q.  Okay.  And you will -- do you plan on
3    submitting an additional invoice after the deposition
4    today?
5    A.  Not right after the deposition for sure.
6    Q.  Right.  But you will at some point after the
7    deposition?
8    A.  Yes, sir.
9    Q.  Okay.  And what is -- the work that you did
10   prior to the deposition, what was your hourly rate for
11   that work?
12   A.  For what work?
13   Q.  All the work that you did prior to today.
14   A.  It says here $500.
15   Q.  $500.  Okay.  And what is your hourly rate for
16   today for testifying?
17   A.  It's whatever I provided to them when they
18   engaged me.  I don't know the number, to be honest
19   with you.
20   Q.  Okay.
21        (Roth Exhibit 5 was marked for
22   identification.)
23   BY MR. VANZANDT:
24   Q.  Doctor, I'm handing you what I've marked as
25   Exhibit 5.  Could you identify that document for the

Page 13

1    record?
2    A.  This is the document that I worked on, put
3    together, with some qualifications and a very brief
4    report of my findings of the case.
5    Q.  Okay.  And on the first page of Exhibit 5, is
6    that your signature?
7    A.  Yes, sir.
8    Q.  And what's the date there beside your
9    signature?
10   A.  It's bad handwriting.  I assume it's 12/5.
11   Q.  Okay.  And is that the day that you signed
12   this document?
13   A.  To the best of my recollection, yes, sir.
14   Q.  Okay.  And have you made any amendments or
15   changes to your report since that date?
16   A.  No, sir.
17   Q.  All right.  If you could, let's turn to the
18   very last page of your report.  This is labeled in
19   your report as Exhibit B to your report.  Do you see
20   that?
21   A.  Yes, sir.
22   Q.  Could you identify what that page -- what that
23   page is or shows?
24   A.  It shows what I reviewed prior to today.
25   Q.  Okay.  Are there any other documents or

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 14

1    materials that you have reviewed in your work in this
2    case that is not listed on this page?
3        A.  No, sir.
4        Q.  Okay.  Did you prepare this page, Exhibit B to
5    your report?
6        A.  No.
7        Q.  Okay.  Who prepared that?
8        A.  I'm sure Counsel.
9        Q.  Okay.  Looking at the deposition transcripts
10   that you've reviewed, you have listed Dora Mingo,
11   Jileta Mingo, Stephen Keith and Renie Jordon, both
12   doctors.  Have you reviewed any other deposition
13   transcripts in this case?
14       A.  No, sir.
15       Q.  Have you -- did you review the deposition
16   transcript of Dr. Henry Rinder that he gave in this
17   case?
18       A.  Yes.  That's the case-specific report or his
19   deposition?
20       Q.  Right.  Well, you have his report listed
21   there, but did you -- did you review his deposition?
22       A.  No.
23       Q.  Okay.
24       A.  Sir.
25       Q.  I'm definitely not a sir.

Page 15

1        A.  I know you could be my son, I'm sure.
2        Q.  You also have two Xarelto product labels
3    listed on this document, labels from August 2013 and
4    then January 2014; is that correct?
5        A.  Yes.
6        Q.  Okay.  Did you review those documents in
7    relation to your work in this case or just in your
8    work as a practicing physician?
9        A.  Both.
10       Q.  Both.  Okay.  Why specifically did you review
11   those two labels?
12       A.  I initially reviewed them years ago, when the
13   product came out, and that's not how I practice, but,
14   you know, I do have a special interest in
15   anticoagulation, so I went through it for that reason,
16   and then when they are presented to prepare, I
17   reviewed them also.
18       Q.  Okay.  Did you review the label that would
19   have been in effect at the time Ms. Mingo was
20   prescribed Xarelto?
21       A.  I reviewed what was provided.
22       Q.  Okay.  Are you aware of when Ms. Mingo was
23   prescribed Xarelto?
24       A.  I'm sure it was on the case.  I don't remember
25   the date.

Page 16

1        MS. HOFFMANN:  You can look in your report if
2    need be.
3        I mean, do you want him to do that?
4        MR. VANZANDT:  Well, I mean, if he needs to to
5    refresh his recollection.
6        A.  She went there 1/16 of '15.
7        Q.  Okay.  And so did you review the label that
8    would have been in effect in January of 2015?
9        A.  No, sir.
10       Q.  Have you reviewed the deposition transcript of
11   any other expert that has testified in this
12   litigation?
13       A.  No, sir.
14       Q.  And have you reviewed any other expert reports
15   other than the case-specific Mingo report of Dr. Henry
16   Rinder?
17       A.  No.
18       Q.  You have listed all medical records for Dora
19   Mingo.  Were those records provided to you by Counsel?
20       A.  Yes, sir.
21       Q.  Have you ever reviewed medical reports of Dora
22   Mingo outside of the context of this litigation?
23       A.  No, sir.
24       Q.  Okay.  Did you bring any of Ms. Mingo's
25   medical records with you today?

Page 17

1        A.  I did not.
2        Q.  You list all medical records for Dora Mingo.
3    What do you mean by that?
4        A.  I reviewed not only her hospitalization that I
5    think started at St. Dominic's in Jackson, but I
6    reviewed some of her outpatient clinic records that
7    were provided.
8        Q.  Okay.
9        A.  That preceded her hospitalization for her
10   surgery.
11       Q.  So, I mean, did you review all of Ms. Mingo's
12   medical records that she's ever had?
13       A.  I would doubt that.
14       Q.  Okay.  You reviewed the records that were
15   given to you by Counsel?
16       A.  That were provided, yes, sir.
17       Q.  Okay.  Doctor, do you agree that in preparing
18   a scientific or medical opinion, it's important to
19   review information that would be considered both pro
20   and con to the position that you were taking?
21       A.  Sure.
22       MS. HOFFMANN:  Objection.
23       Q.  I mean, because if you don't look at
24   everything, then you may not get the full picture of
25   all the information that's out there; is that correct?

Protected - Subject to Further Protective Review

Page 18

1    A.  Sure.  Yes, sir.
2    Q.  Okay.  And the only information that you
3  reviewed and relied on in preparing your report and in
4  forming your opinions in this case are the documents
5  that are listed on Exhibit B of your report; is that
6  correct?
7    A.  That's what I've reviewed for this case.  I
8  certainly have reviewed and studied things that have
9  come out since 2015, but not in particular for this
10  case.
11    Q.  Okay.  Have you studied and reviewed
12  additional materials related to anticoagulants?
13    A.  Unrelated to this, sure.  That's one of the
14  mainstays of my practice.
15    Q.  Okay.  But those other documents that you've
16  reviewed in your practice were not relied on in
17  forming your opinions in this case?
18      MS. HOFFMANN:  Objection.
19      MS. CONKLIN:  Objection.
20    A.  Say it again.
21    Q.  The other documents that you are referring to
22  that you said you've reviewed since 2015 just as part
23  of your general practice, have those documents played
24  any part in forming your opinions in this case?
25    A.  Just in terms of basic medical knowledge, but

Page 19

1  not in terms of the outcomes of this case.
2    Q.  Are there any specific data or -- well, let's
3  just say that.  Is there any specific data that you
4  rely on from other medical literature to form your
5  opinions in this case that are not -- that's not
6  listed in documents contained on this page?
7    A.  It's mainly what I would call continuing
8  medical education.  You know, there is a speaker at a
9  conference that talks about NOACs or DOACs or DVT/PE,
10  things like that.
11      MS. CONKLIN:  Joe, can we get an agreement
12  that an objection by one defendant goes to both of
13  them?
14      MR. VANZANDT:  Absolutely.  Absolutely.
15    A.  That's a good sign.
16      MR. VANZANDT:  Let's go off the record real
17  quick.
18      THE VIDEOGRAPHER:  Okay.  Sorry.  Time now is
19  4:13 p.m.  We are off the record.
20      (Recess from 4:13 p.m. until 4:14 p.m.)
21      THE VIDEOGRAPHER:  Time is 4:14 p.m.  We are
22  back on the record.
23  BY MR. VANZANDT:
24    Q.  Doctor, are there additional medical
25  journal -- medical literature articles that you plan

Page 20

1  on using or referring to in your work in this case?
2    A.  Anything that -- that I would use in my
3  regular daily practice, nothing specific to this case.
4      I had a patient today that is, you know,
5  related to a similar product that I will use, you
6  know, whatever I need to use but not as to this.
7    Q.  So I'm just trying to get a, you know, idea
8  of --
9    A.  Sure.
10    Q.  -- everything that your opinion is based on.
11    A.  That's fine.  I understand.
12    Q.  So I'm just, you know -- my job is to make
13  sure that I know everything that you relied on.
14    A.  I understand.  I understand.
15    Q.  So, you know, when -- if you testify at trial
16  in a few months, are there additional documents that
17  you know of, medical journals, medical articles,
18  scientific data that you would refer to in your -- to
19  express your opinions in this case?
20    A.  You know, up to the months, UpToDate, things
21  that I would use would be New England Journal, JAMA,
22  Lancet, as it pertains to this, things I come across
23  in CMEs, conferences that I would go, but
24  specifically, that's kind of where I go.  It's all
25  computer based.  It's really not in paper anymore.

Page 21

1  You know, there is Medsurg, there is UpToDate, there's
2  other things like that, but that's kind of where --
3  that's kind of how I base my CME and education on, is
4  the patient presents with this, I may read up on that,
5  and I'll read the most up-to-date stuff to that effect
6  and I will apply it to my daily practice.
7    Q.  So that would be in relation to your daily
8  practice and not your work in this case?
9    A.  Right.
10    Q.  Okay.  All right.  You listed four medical
11  literature articles on Exhibit B to your report.  How
12  did you come about obtaining these articles?
13    A.  They were provided by Counsel but I actually
14  had reviewed them years ago, when they first came out.
15  This was a huge paradigm shift of how we can treat
16  disease processes, so I won't say that I delved into
17  the ROCKET and EINSTEIN trials for hours, but when you
18  have a paradigm shift like this, I think it's
19  important that you at least familiarize yourself with
20  the original studies.
21    Q.  When you were provided these documents by
22  Counsel, did you re-review those documents?
23    A.  Yes, sir.
24    Q.  And did you rely on these four documents in
25  forming your opinions in this case?

6 (Pages 18 to 21)

Protected - Subject to Further Protective Review

Page 22

1    A.  I think EINSTEIN clearly much more than
2    ROCKET, but yes.
3    Q.  Did you review EINSTEIN, data on EINSTEIN in
4    forming your opinions in this case?
5    A.  I've reviewed data on EINSTEIN since '12,
6    since 2012, so I'm pretty knowledgeable about that
7    trial.
8    Q.  Did you re-review that information in -- when
9    you were preparing this report or preparing for this
10   deposition?
11   I reviewed a lot of meta-analysis of several
12   of the anticoagulation studies, but I can't say that I
13   actually reviewed word for word the EINSTEIN study
14   that was in the New England Journal of Medicine.
15   Q.  Did you review any medical journal or any
16   other peer-reviewed articles regarding the EINSTEIN
17   study in your work in this case?
18   A.  No.
19   Q.  Did you do any research to find medical
20   journal articles or data that may be relevant to your
21   opinion in this case?
22   A.  No, sir.
23   Q.  Okay.  So the only medical articles that you
24   have relied on in preparing your opinions in this case
25   were those given to you by Counsel?

Page 23

1    A.  That and anything I would read in my practice
2    as it relates to anticoagulation, DVT/PE, which
3    happens for me weekly and monthly.  So there are lay
4    journals or throwaway journals all the time that have
5    articles on PE, DVT, anticoagulation, NOACs and DOACs
6    that I read it on a daily basis.  Were they done with
7    the intent to just using it for this situation?  The
8    answer to that is no.
9    Q.  Okay.  Were they -- I mean, did they influence
10   your opinions at all in this case?
11   A.  No.  They enhanced my knowledge base or they
12   may have presented something to me, but it didn't
13   affect what I'm going to talk about I think today with
14   you.
15   Q.  Did -- I mean, can you tell me the last
16   article regarding --
17   A.  There was a very simple article in the Journal
18   of Thrombosis that I was asked to look at because I'm
19   giving the talk in a couple months that I looked at
20   two or three weeks ago.  That was provided as I
21   prepared for my talk.  I didn't -- I used that
22   knowledge base but I'm not going to use that -- that's
23   not what I'm here to talk about, but there are tons of
24   articles that surround the literature in the space of
25   NOACs and DOACs and we use those on a daily -- I use

Page 24

1    them on a daily basis.
2    So, you know, in preparing for a talk I'm
3    giving at the end of the month, you know, I may look
4    at the Journal of Thrombosis or the Journal of, you
5    know, Hematology just to prepare, but not with the
6    intent of tapping what I said today.
7    Q.  Okay.  You said given materials preparing for
8    a presentation.  What are you talking about?  What are
9    you referring about?
10   A.  Like I'll -- there may be a -- like the other
11   day there was an article in the Journal of Thrombosis
12   that talks about some of the implications of NOAC and
13   DOAC therapy, and I'm going to use that for my talk in
14   March.  So that article, I use that article and base
15   maybe a slide for a talk I'm giving.
16   Q.  Okay.  What kind of talk are you going to be
17   giving in March?
18   A.  Actually, I'm going to be giving a talk on
19   NOACs and DOACs to a bunch of hospitalists and family
20   practice doctors.
21   Q.  Okay.  Where will that be at?
22   A.  Destin, Florida.
23   Q.  Okay.  Is Janssen paying you to give that
24   presentation?
25   A.  No, sir.

Page 25

1    Q.  What are you -- who are you giving that
2    presentation for?
3    A.  It's a -- I'm the Chief Medical Officer of our
4    organization, I'm also in charge of continuing medical
5    education, so it's a CME for primary care doctors in
6    the community.
7    (Roth Exhibit 6 was marked for
8    identification.)
9    BY MR. VANZANDT:
10   Q.  All right.  Doctor, I'm going to hand you what
11   I'm marking as Exhibit 6.  I'll represent to you this
12   is one of the articles that was listed on your report.
13   And I won't say the entire title of this article --
14   A.  Please.
15   Q.  -- but it's the "Efficacy and safety of
16   rivaroxaban in patients with diabetes and nonvalvular
17   atrial fibrillation."  Is that correct?
18   A.  Yes.
19   Q.  And this is one of the documents that you were
20   provided by Counsel and reviewed in preparation for
21   your work in this case?
22   A.  Yeah.  I'm familiar with the trial prior to
23   that, but yes.
24   Q.  Okay.  All right.  Now, this particular
25   article deals with atrial fibrillation, correct?

7 (Pages 22 to 25)

Protected - Subject to Further Protective Review

Page 26

1    A.  Yes, sir.
2    Q.  Okay.  Does it deal with EINSTEIN or DVT at
3  all?
4    A.  No.  This is a noninferiority trial comparing
5  the vitamin K antagonist, Coumadin, and the lead-in
6  drug, Lovenox, to Xarelto.  I like -- it's easier to
7  say than rivaroxaban.
8    Q.  Now, this is -- I mean, this is the ROCKET AF
9  trial, right?
10    A.  That's correct.
11    Q.  So it's just comparing Xarelto to just
12  warfarin?
13    A.  That's right.  There are no studies that
14  compare the NOACs and DOACs head-to-head.  They are
15  all compared to the standard of care, which is the
16  Lovenox and warfarin.
17    Q.  Okay.  But this one is not comparing Xarelto
18  to Lovenox and warfarin; it's comparing it just to
19  warfarin, right?
20    A.  Yeah, to -- well, there is -- sure.  There is
21  -- you're right.  There is not a lead-in with this
22  trial.
23    THE COURT REPORTER:  There's not a --
24    THE WITNESS:  Lead-in, Lovenox anticoagulation
25    lead-in.

Page 27

1    Q.  And when you talk about a lead-in, that would
2  be referring to --
3    A.  Giving a dose of heparin --
4    Q.  -- for the DVT indication?
5    A.  That's right.  Before you started the
6  Coumadin.
7    Q.  Okay.
8    MS. HOFFMANN:  One of the things that we have
9  to do, Doc, is let him finish his question before
10  you give your answer.
11    THE WITNESS:  Sure.
12    MS. HOFFMANN:  Otherwise, poor Susan is going
13  to go crazy.  So I tell people, since we're in
14  Mississippi, just go "one Mississippi" after he
15  finishes his question.  That allows me a chance, if
16  I need it, to make an objection.
17    THE WITNESS:  Sure.
18    MR. VANZANDT:  And I'm sorry, Susan.  That's
19  my job to make sure we're not talking over each
20  other.
21    THE WITNESS:  No problem.
22    (Discussion off the record.)
23  BY MR. VANZANDT:
24    Q.  Okay.  Referring back to Exhibit 6, do you see
25  the list of co -- of authors there on the top of the

Page 28

1  documents?
2    A.  Yes.
3    Q.  Okay.  Do you see the Manesh R. Patel, MD?
4  He's on the second line.
5    A.  I do now, yes.
6    Q.  Okay.
7    A.  He's by "b."
8    Q.  And are you aware that Manesh Patel is a paid
9  consultant for Janssen and on the advisory board for
10  Janssen?
11    MS. HOFFMANN:  Objection.
12    A.  No.
13    Q.  Okay.  And just below Manesh Patel,
14  Christopher C. Nessel, do you see that name?
15    A.  Yes.
16    Q.  And that's Christopher C. Nessel, MD.  Are you
17  aware that Christopher Nessel is an employee of
18  Janssen Pharmaceuticals?
19    A.  No.
20    Q.  And just two names over from Nessel there is
21  Scott Berkowitz, MD.  Do you see that?
22    A.  Yes.
23    Q.  And are you aware or were you aware before
24  today that Scott Berkowitz is employed by Bayer?
25    A.  No.

Page 29

1    Q.  Okay.
2    (Roth Exhibit 7 was marked for
3  identification.)
4  BY MR. VANZANDT:
5    Q.  Doctor, I'm handing you what I'm marking as
6  Exhibit 7.  This is an article titled "Point-of-Care
7  Warfarin Monitoring in the ROCKET AF Trial."
8    MR. VANZANDT:  I know you want extra copies of
9  those.
10    Q.  Is that one of the articles that was listed in
11  Exhibit B to your report?  I'm not sure what happened
12  to that.
13    A.  It's in here.
14    Q.  There it is.  There's your report.  Yeah, if
15  you can just keep that handy there.
16    A.  I'm not sure that it is.  I don't think --
17  this appears to be a letter to the editor concerning
18  the ROCKET trial.
19    Q.  So that's not the actual article that you
20  referred to?
21    MS. HOFFMANN:  It's listed in your reference.
22    A.  Okay.  Yes, it is.  Yes.
23    Q.  Okay.
24    A.  Okay.  Obviously, I didn't get too familiar
25  with it.

8 (Pages 26 to 29)

Protected - Subject to Further Protective Review

Page 30

1    Q.  And this was one of the articles that was
2    provided to you by Counsel; is that correct?
3    A.  Yes.
4    Q.  Okay.  And this article also deals with the
5    ROCKET AF trial, correct?
6    A.  Yes.
7    Q.  Okay.  Does it address EINSTEIN or DVT at all?
8    A.  No.
9    Q.  All right.
10        MR. VANZANDT:  Margaret, I've got a document
11   here I want to show him.  I don't have extra
12   copies.  Is that okay?  I mean, y'all can review it
13   beforehand, so I apologize for that.
14        MS. HOFFMANN:  That's okay.
15        (Roth Exhibit 8 was marked for
16   identification.)
17   BY MR. VANZANDT:
18   Q.  Doctor, I'm going to mark this as Exhibit 8,
19   and this is -- I'll represent to you this is the
20   disclosure of conflicts for the article that we've
21   marked as Exhibit 7 that you relied on -- relied on in
22   your report.
23        MS. HOFFMANN:  Objection.
24   Q.  And if you could turn to the first half of
25   that document -- you're welcome to review as much of

Page 31

1    it as you would like, but -- and do you see at the top
2    there that is for a disclosure form for Keith Fox, who
3    is one of the authors of this document?
4        MS. HOFFMANN:  Objection.
5    A.  Yes.
6    Q.  Okay.  And then down where it lists if there
7    are any potential conflicts of interest, do you
8    indicate where he marked yes?
9    A.  Yes.
10   Q.  Okay.  And then do you see below that where he
11   marked that he had received grants and personal fees
12   from both Janssen and Bayer?
13   A.  Yes.
14   Q.  Okay.  And if you could turn to the next tab I
15   have marked there, and this is a similar form for
16   Dr. Manesh Patel.  Is that correct, or is that what
17   the document says?
18   A.  Yes.
19   Q.  It says -- okay.  Sorry about that.
20        And he also indicates that he has conflicts of
21   interest; is that correct?
22   A.  He marked the box, yes.
23   Q.  Okay.  And so he indicates that he received
24   grants from both Johnson & Johnson and Janssen; is
25   that correct?

Page 32

1    A.  Yes.
2    Q.  And he also marked that he received personal
3    fees from both Bayer and Janssen; is that correct?
4    A.  Yes.
5    Q.  Okay.
6        (Roth Exhibit 9 was marked for
7    identification.)
8    BY MR. VANZANDT:
9    Q.  I'll hand you Exhibit 9, which is an article
10   from the New England Journal of Medicine titled
11   "Rivaroxaban versus Warfarin in Nonvalvular Atrial
12   Fibrillation."
13        And is this one of the documents that you
14   listed on Exhibit B of your report?
15   A.  It mentions the dates, yes.
16   Q.  And is this one of the -- I'm sorry.  I didn't
17   mean to talk over you.
18   A.  I'm sorry.  Yes.
19   Q.  And is this one of the documents that you
20   reviewed in preparation of your report in this case?
21        MS. HOFFMANN:  Objection.
22   A.  From -- yeah, I've reviewed the article.  In
23   preparation for this, that was provided.  I reviewed
24   it when it first came out also.
25   Q.  Okay.  Now, this article that we've labeled as

Page 33

1    Exhibit 9, this is an article also regarding atrial
2    fibrillation, correct?
3    A.  Yes.
4    Q.  And anywhere in there does it address EINSTEIN
5    or DVT?
6    A.  No.
7    Q.  And if you look at the list of the authors
8    there, the very first author listed is Manesh Patel,
9    who we've seen from the two prior articles; is that
10   correct?
11   A.  Yes.
12   Q.  Okay.  And the fourth listed article is -- and
13   I can't pronounce his first name but it starts with a
14   G, last name is Pan.  Do you see that?
15        MS. HOFFMANN:  Objection.
16   Q.  Guohua Pan.
17   A.  Yes.
18   Q.  Okay.  And are you aware that he was at that
19   time employed by Johnson & Johnson?
20        MS. HOFFMANN:  Objection.
21   A.  No.
22   Q.  Okay.  And then we see also Christopher
23   Nessel, and do you recall that he was employed by
24   Johnson & Johnson?
25   A.  From the previous -- yes.

9 (Pages 30 to 33)

Protected - Subject to Further Protective Review

Page 34

1    Q.  Okay.  And then a Dr. John F. Paolini, do you
2  see that name?
3    A.  I do.
4    Q.  Okay.  And are you aware that he was employed
5  by Bayer?
6    A.  No, sir.
7    Q.  Okay.  And then the very next thing is a
8  Dr. Scott Berkowitz, and as we recall from the past
9  documents, do you recall that I pointed out that he
10  was employed by Bayer?
11    MS. HOFFMANN:  Objection.
12    A.  Yes.
13    Q.  Okay.
14    (Roth Exhibit 10 was marked for
15  identification.)
16  BY MR. VANZANDT:
17    Q.  I'm handing you Exhibit 10, which is the last
18  one of the articles I will be handing you, and this is
19  an article that was listed on Exhibit B to your report
20  and it's titled "Rivaroxaban - Once daily, oral,
21  direct factor Xa inhibition..." and I'll stop there
22  instead of saying the rest of it.
23    Is this one of the documents that was listed
24  on Exhibit B of your report?
25    A.  In a different form, yes.  I think the format

Page 35

1  was actually from -- right from the American Heart
2  Journal.
3    Q.  Okay.
4    A.  It may have looked different on the front.
5    Q.  But it would be the same content, just a
6  different format, right?
7    A.  (Nodding head.)
8    Q.  Okay.  Is -- I mean, did you review and rely
9  on this document in forming your opinions in this
10  case?
11    MS. HOFFMANN:  Objection.  He's testified he
12  reviewed these.
13    A.  I reviewed them.
14    Q.  Okay.  And this article also deals with the
15  ROCKET study and atrial fibrillation; is that correct?
16    A.  Yes.
17    Q.  Okay.  Does it mention EINSTEIN or DVT
18  anywhere in the article?
19    A.  I do not think so.
20    Q.  And do you see on the bottom of the first page
21  here that one of the authors listed again is a
22  Dr. Manesh Patel?
23    A.  I'm sure -- I don't see his name on the front
24  page but I'm sure it is.  He's a pretty published
25  gentlemen from Duke, from what I remember, so that

Page 36

1  doesn't surprise me.
2    Q.  And then if you would, turn to the very last
3  page of that document.  I'm sorry.
4    A.  That's okay.  Okay.
5    Q.  And you see that on Appendix A, which lists
6  the executive steering committee members, do you see
7  the second name listed there is Scott Berkowitz?
8    A.  Yes.
9    Q.  Bayer HealthCare Pharmaceuticals?
10    A.  Uh-huh.
11    Q.  Okay.  And then the next to the last name is
12  Christopher Nessel, Johnson & Johnson Pharmaceutical
13  Research & Development; is that correct?
14    A.  Yes.
15    Q.  Okay.  So are there any articles or scientific
16  literature that you relied on to form your opinions in
17  this case that were not coauthored by individuals who
18  are employed by either Janssen or Bayer?
19    MS. HOFFMANN:  Objection.
20    MS. CONKLIN:  Objection.
21    A.  That's impossible to answer, and I'm sure I
22  have reviewed several articles in my practice and
23  daily practice of hospital medicine that were written
24  or coauthored by physicians or Ph.D.s that were not
25  employed or associated with pharma companies, but -- I

Page 37

1  mean, I can't testify to that.  I'd have to go back
2  and look at everything I've read in the last eight
3  years, since these drugs became FDA approved.
4    Q.  But the articles that you indicated to us on
5  your expert report, those four articles that you
6  stated, according to Exhibit B, that you reviewed,
7  relied and/or considered in preparing your opinions in
8  this case, were all coauthored by individuals employed
9  by either Janssen and Bayer; is that correct?
10    MS. HOFFMANN:  Objection.
11    A.  Yes.  They were part of the investigational
12  team, yes, sir.
13    Q.  They were not only part of the investigational
14  team, but they were authors of those articles,
15  correct?
16    A.  Right.  Yes, sir.  Agree.
17    Q.  Have you ever been shown any internal company
18  documents from anyone at Bayer or Janssen?
19    A.  No, sir.
20    Q.  I want to ask if you've either met any of
21  these individuals or communicated with them in any
22  way, via telephone, e-mail, written communication
23  or met in --
24    A.  What individuals?
25    Q.  I'm about to go through a list of names.

10 (Pages 34 to 37)

Protected - Subject to Further Protective Review

Page 38

1    A. Oh, I'm sorry.
2    Q. I'm sorry. I want to know if you just -- if
3  you've ever met them in person --
4    A. Sure.
5    Q. -- or if you've ever communicated with them in
6  any way. Okay?
7       The first one is a Tom Wensing?
8    A. No, sir.
9    Q. Frank Misselwitz?
10   A. No, sir.
11   Q. Dagmar Kubitza?
12   A. No.
13   Q. Wolfgang Meuck?
14   A. No.
15   Q. Christopher Nessel?
16   A. No.
17   Q. Scott Berkowitz?
18   A. No.
19   Q. And Manesh Patel?
20   A. No.
21   Q. Okay. When were you first contacted about
22  working as an expert in this litigation?
23      MS. HOFFMANN: You can refer to your invoices
24  if that's helpful.
25   Q. They're probably on the bottom there. Sorry.

Page 39

1    A. I would, based on my invoice, I would say
2  probably October of '16, maybe September or October of
3  '16.
4    Q. And who first contacted you?
5    A. I would imagine someone from the law firm
6  that's being used. I don't remember who the person
7  was.
8    Q. Was it anyone that you had ever met or dealt
9  with before?
10   A. No.
11   Q. How were you first contacted, by e-mail,
12  phone?
13   A. Phone.
14   Q. When is the first time that you had -- that
15  you met with counsel from either Bayer or Janssen?
16   A. Met with?
17   Q. Met in person, yes, sir.
18   A. Probably December 29th, on the phone call we
19  talked, and then the first meeting probably face to
20  face was January '17.
21      MS. HOFFMANN: No.
22   Q. And that would be December 29th of 2016?
23      THE WITNESS: Do you --
24      MS. HOFFMANN: Can we stop for a minute?
25      MR. VANZANDT: Sure.

Page 40

1       MS. HOFFMANN: We had to have met before you
2  signed your report. That's okay.
3       THE WITNESS: I guess I didn't bill for that
4  one.
5  BY MR. VANZANDT:
6    Q. Sounds like they owe you some money.
7    A. We did, but I'm not the best keeper of records
8  but, clearly, I --
9       MS. HOFFMANN: If you have a best estimate,
10  you can tell him. If you don't know the dates,
11  that's fine.
12   A. It was November, December.
13   Q. Okay. I mean, the date on your report, again,
14  I mean, is that January 5th, 2017, is that what that
15  is?
16   A. It's either a 1 or a 12.
17   Q. It's got to be a 1, I guess, if it's 2017. So
18  that's January 5th, 2017. Okay.
19      So your best estimate is that you first met
20  with counsel in November or December of 2016; is that
21  correct?
22   A. Yes. Yes.
23   Q. How many times have you met in person with
24  counsel for either of the defendants?
25   A. Three, to the best of my recollection, three.

Page 41

1    Q. Okay. How many times did you meet with them
2  before preparing -- or, I'm sorry, before submitting
3  your report in this case?
4    A. In person, maybe once.
5    Q. And did you have meetings over the telephone
6  with them as well?
7    A. It looks like we had one for sure on December
8  29th.
9    Q. And have you had any meetings with counsel for
10  Bayer since the time that you've submitted your report
11  in January?
12      MS. HOFFMANN: You mean Bayer or Janssen?
13      MR. VANZANDT: What did I say?
14      MS. HOFFMANN: You said just Bayer.
15   Q. Oh, sorry. Bayer or Janssen.
16   A. Yes. We have met January 17 and February 4.
17   Q. How long did you meet on January 17th?
18   A. Looks like one hour.
19   Q. And then how long did you meet on
20  February 4th?
21   A. Looks like about two.
22   Q. Okay. And is the February 4th meeting the
23  last meeting that you've had before today with counsel
24  from either Bayer or Janssen?
25   A. Yes.

11 (Pages 38 to 41)

Protected - Subject to Further Protective Review

Page 42

1    Q.  Have you had any telephone conversations with
2  counsel from either Bayer or Janssen between February
3  4th and today?
4    A.  Other than maybe logistics of where this is
5  going to take place and the hotel and the conference
6  room.  That's about it.
7    Q.  What did you do to prepare for your
8  deposition?
9    A.  Reviewed the documents here and rode across
10  the street to sit down with you guys.
11    Q.  Did you review any or re-review any of
12  Ms. Dora Mingo's medical records?
13    A.  Not in sole preparation for today, no.  I
14  mean, I reviewed them initially just to get the gist
15  of the case, but to say I reviewed them yesterday or
16  the day before, no, not -- not her medical records.
17    Q.  And you -- the last two meetings that
18  you had with counsel, I think you said January 17th
19  and then February 4th, would those have been to
20  prepare for your deposition?
21    A.  Yes.
22    Q.  And have you reviewed any other documents in
23  preparation for your deposition that are not listed on
24  Exhibit B of your report?
25      MS. HOFFMANN:  Objection; asked and answered.

Page 43

1    Q.  Is that a no?  I'm sorry.
2    A.  No.
3    Q.  Okay.  Sorry.  You were just shaking your
4  head.
5    A.  That's fine.
6    Q.  I need to get a verbal answer.
7    A.  That's fine.
8    Q.  Doctor, you have a bachelor's degree from
9  Rhodes College in biology; is that right?
10    A.  Yes.
11    Q.  And other than medical school, did you attend
12  any other postgraduate schools?
13    A.  No.
14    Q.  Okay.  And you attended medical school at both
15  LSU and UAB; is that right?
16    A.  Yes.  I went to LSU the first year and then I
17  got married to a current medical student at UAB and I
18  transferred, did my last three years at UAB.
19    Q.  And then you did your internship and residency
20  at Baylor University Medical Center, correct?
21    A.  Yes.
22    Q.  Okay.  And are you currently licensed in
23  Alabama, Mississippi and Texas?
24    A.  Yes.
25    Q.  And I say licensed.  You have a medical

Page 44

1  license in those three states, correct?
2    A.  Yes.
3    Q.  Okay.  Have you ever had a medical license in
4  any other state other than Alabama, Mississippi or
5  Texas?
6    A.  No.
7    Q.  And have you ever had your medical license
8  revoked or suspended for any reason?
9    A.  No.
10    Q.  I'm going to refer to your CV in your report,
11  which is attached as Exhibit A to your report, and you
12  list there in your CV that your primary specialty is
13  in internal medicine; is that right?
14    A.  Yes.
15    Q.  And you are board certified in internal
16  medicine?
17    A.  I was boarded in '96 and again in '06.
18    Q.  Okay.  And when will you have to review your
19  board certification?
20    A.  April.
21    Q.  I'm sorry?
22    A.  April.
23    Q.  Okay.  So coming up soon.
24      Have you ever been board certified in any
25  other specialty?

Page 45

1    A.  No, sir.
2    Q.  And according to your CV, you are currently
3  the Chief Medical Officer at Singing River Health
4  System; is that correct?
5    A.  Yes, sir.
6    Q.  And is that -- is that the hospital that's
7  just right across the street?
8    A.  It's one of them.  The other one is in Ocean
9  Springs.
10    Q.  Okay.  And so you are the Chief Medical
11  Officer for the entire system; is that correct?
12    A.  Yes.
13    Q.  Not just that one hospital across the street?
14    A.  (Nodding head.)
15    Q.  How many hospitals are in that system?
16    A.  Two.
17    Q.  Two.  And you've held that position since
18  March 2014?
19    A.  Yes.
20    Q.  So what are your duties and responsibilities
21  in that role as Chief Medical Officer?
22    A.  So I'm directly over supervision of all of our
23  employed physicians, which includes neurologists,
24  thoracic surgeons, primary care, psychiatry,
25  hematology, oncology, and the hospitalists group, and

Protected - Subject to Further Protective Review

Page 46

1    the intensive -- the intensivists or the pulmonary and
2    critical care doctors.
3           I also am responsible for the peer review
4    process and the credentialing process. I'm also on
5    our -- obviously, our board of trustees, and I'm
6    directly responsible for the hospitalist program also,
7    and there's a lot of other stuff but that's -- that's
8    the bulk of what I do.
9        Q.  Okay. When you say you supervise doctors
10   and -- I mean, what exactly --
11       A.  So I'm directly responsible for their
12   contracts, their quality, their core measures, their
13   productivity, and how they perform and how they do
14   their job. That's the employed physicians, not the
15   doctors in the private sector. There is -- probably
16   one-third of our doctors in our community hospital
17   system are employed, the other two-thirds are in the
18   private sector.
19       Q.  And the employed physicians, would those be
20   referred to as hospitalists?
21       A.  The hospitalists and -- but there is also the
22   other subspecialties that I mentioned. We employ,
23   like, cardiovascular surgeons, we employ our
24   neurologists. We don't employ any of our general
25   surgeons, so would have no supervision or jurisdiction

Page 47

1    over them, or with them, I should say.
2        Q.  So when are you supervising those doctors, I
3    mean, are you involved in their daily care for
4    patients?
5        A.  Clearly the ICU intensivists and hospitalists,
6    yes. Directly, I can't oversee a cardiothoracic
7    certain but I review his STS data. I review their
8    outcomes, mortality and morbidity with them.
9        Q.  You were previously the Clinical Director of
10   Hospital Services. Was that for the entire health
11   system as well?
12       A.  Correct, so about 20 hospitalists that cover
13   our inpatient admissions at both hospitals 24/7.
14       Q.  So in that role would you have been
15   supervising those hospitalists?
16       A.  And participating.
17       Q.  And participating. Okay. You also list that
18   you've been the Medical Director For Inpatient
19   Physician Services since 1999; is that correct?
20       A.  That's the hospitalist group, that's correct.
21   IPS, that's the hospitalist group that I founded in
22   1999.
23       Q.  Okay. And is that hospitalist group part of
24   the Singing River Health System?
25       A.  Yes, sir.

Page 48

1        Q.  It's not a private company outside --
2        A.  No, sir.
3        Q.  So what are your roles in that position?
4        A.  I'm a hospitalist, so I have patient contact.
5    I oversee our hospitalists. Do you know what a
6    hospitalist is?
7        Q.  Why don't you explain it to me.
8        A.  So we were the second hospitalist group in the
9    state and what we do is we admit patients from the
10   primary care physicians and we guide them through the
11   hospitalization, and then we hand them back over to
12   the primary care doctors in our community. We find
13   that that's just a better, more efficient way to take
14   care of patients.
15          I've branched that out that we also provide
16   admission services for orthopaedics, neurology and GI,
17   other service lines, because we're in the hospital
18   24/7 and have no outpatient clinic responsibilities,
19   and we just found it's a better, safer, more efficient
20   quality way to take care of patients and what we do.
21          It's gotten very complex in the hospital. You
22   are under regulations from the feds, whether inpatient
23   status, observation status, length of stay, quality
24   markers, and this movement started back in '96 with
25   Bob Wachter from UCSF. He coined the term

Page 49

1    "hospitalist" and it's been a very successful movement
2    within the industry.
3        Q.  And so you -- I mean, you've served as a
4    hospitalist since 1999; is that correct?
5        A.  That's correct.
6        Q.  And you still do that today?
7        A.  Yes, sir.
8        Q.  Okay. You also listed a consultant in
9    hospitalist medicine, May 2002 to present. How is
10   that different?
11       A.  What that is, is I'll get -- well, let's just
12   clarify something. Since the CMO job I've been
13   swamped, I haven't done any of that, but when we
14   started the hospitalist group here, it was wildly
15   successful and I would be asked to go to Jackson or
16   Birmingham and spend boots-on-the-ground time there to
17   help them develop a hospitalist program. So I would
18   -- I may have done seven or eight of those at
19   different places in the southeast United States.
20       Q.  All right. You do not currently maintain a
21   private medical practice, correct?
22       A.  That's correct.
23       Q.  Okay. When is the last time you've had a
24   private medical practice outside of the hospital?
25       A.  1999.

13 (Pages 46 to 49)

Protected - Subject to Further Protective Review

Page 50

1    Q.  Okay.  And I think this is obvious from the
2  answers you've been giving me, but you still are
3  currently treating patients, correct?
4    A.  Yes, sir.
5    Q.  Okay.  So in addition to your role as a chief
6  medical officer, you treat patients on a daily basis
7  or -- I mean, how often are you actually treating
8  patients?
9    A.  Sure.  I guess I would be considered what
10  would be called a .5 FTE in terms of the volume.
11  That's very dependent upon my workload as CMO, but
12  today I admitted three patients and wrote on two other
13  ones.  Hospitalists work shift work, so it's kind of
14  what you hear about the seven on/seven off.  Clearly,
15  I can't work that schedule, so I'm working pretty much
16  every day at a much lower threshold of patient care,
17  but, yeah, it's -- I'm still an active hospitalist.
18    Q.  Okay.  What would be your best estimate of
19  percentage of time spent between your various roles?
20    A.  My last -- very fair.  The last three months
21  we've been swamped with other things.  It's probably
22  been 18, 19, 15 percent clinical, 70 percent
23  administrative.
24      That varies on patient load, do I have a
25  doctor who is out, do I have a doctor who is sick, do

Page 51

1  I have a doctor who left, but my contractual
2  obligations are based on .5 FTE.
3    Q.  Okay.  What's that mean, .5 FTE?
4    A.  .5 full-time equivalent in terms of clinical.
5    Q.  Could you explain that a little more?
6    A.  So if I have one full-time hospitalist who
7  does nothing else but hospital-based care, he's
8  considered a 1 or 1 FTE.
9    Q.  Okay.
10    A.  Because of all my other duties and
11  responsibilities, clearly, my CEO says I need you to
12  do other things to make us better, so I've reduced my
13  clinical loads.  Instead of seeing 22 patients a day,
14  which is the average number our hospitalists do, I may
15  reduce that to four or five a day.
16    Q.  Okay.  All right.  Thank you.
17      Do you currently have any teaching
18  responsibilities in any kind of medical school or
19  university?
20    A.  On the rare occasion, UMC in Jackson and
21  William Carey Osteopathic School will send students
22  and they will rotate with us, maybe -- maybe three to
23  five weeks a year.
24    Q.  Okay.  And you would be directly involved in
25  that?

Page 52

1    A.  Yes.
2    Q.  But as far as go into a medical school,
3  lecturing, teaching as a professor, do you do that?
4    A.  You know, I've done that.  I will do grand
5  rounds when invited to UAB.  I think I have some of
6  those on my CV, but that's not a very large part of my
7  practice.
8    Q.  That's something I've seen, "grand rounds."
9  What is that referring to?
10    A.  So grand rounds is when the whole department
11  of medicine meets and they will bring in what they
12  would call a distinguished professor and he or she
13  would present either recent research or maybe present
14  two or three cases and then they would present it to
15  the entire department of medicine.  It's pretty
16  ceremonial and it's educational, but it's a nice
17  thing.
18      So I think I listed one at UAB I've done, one
19  at the med school, but it's more of a -- it's not a
20  one-on-one teaching.  It's an auditorium level
21  question-and-answer thing.
22    Q.  Okay.  The research that you listed on your
23  CV, you indicated research with you and a Dr. Henry
24  Rothchild:  "Clinical Interviewing:  a computer
25  program for Medical Students."

Page 53

1      And that was in 1990; is that correct?
2    A.  Correct.  So that was my first year of med
3  school and I probably should take it off, it's not
4  very meaningful, but it looked good when I applied to
5  a fellowship.
6    Q.  Yeah.  I mean, have you -- have you conducted
7  any additional research since 1990?
8    A.  No, sir.
9    Q.  Okay.  And I understand you do your reading --
10    A.  Sure, but not bench research, no, sir.
11    Q.  Okay.  Have you ever conducted research on
12  anticoagulants?
13    A.  No, sir.
14    Q.  And what about Xarelto specifically, have you
15  ever conducted research on it?
16    A.  No, sir.
17    Q.  All right.  Have you ever received any kind of
18  grant or grants for research?
19    A.  No.
20    Q.  On publications, you have a publication listed
21  from 1989.  Is that the last publication that you've
22  had?
23    A.  Yes.
24    Q.  Doctor, this litigation is not -- it's the
25  first time that you've worked with Janssen in relation

14 (Pages 50 to 53)

Protected - Subject to Further Protective Review

Page 54

1   to Xarelto, is it?
2       A.  No.
3       Q.  Okay.  You've been paid by Janssen to give
4   presentations about Xarelto in the past; is that
5   right?
6       A.  I was on their speakers bureau in I think '10
7   or '11.
8       Q.  And can you describe to me what a speakers
9   bureau is?
10      A.  Sure.  You speak on behalf of the product.
11  They provide you with a slide set and if you believe
12  in the slide set and believe in the data and
13  literature, I may have -- I know for sure I did two
14  because I remember one in particular in Meridian.  You
15  speak to a group of people, practitioners, physicians,
16  NPs, PAs, about the on-label use for these drugs and
17  you're compensated for that, that's correct.
18      Q.  Did you also receive training from Janssen in
19  relation to the speakers bureau?
20      MS. HOFFMANN:  Objection.
21      A.  There was a training program and I'm not sure
22  whether I completed it online or in person, but they
23  did provide training.
24      Q.  Okay.  How many training events would you have
25  attended?

Page 55

1       MS. HOFFMANN:  For Xarelto?
2       Q.  For Xarelto.
3       A.  Probably only one.
4       Q.  And when is the last time that you attended a
5   training event provided by Janssen in relation to
6   Xarelto?
7       A.  To be honest, I don't know the exact date but
8   I would say it was in '11 probably, '10, '11, or '12.
9   Nothing in the last four or five years.
10      Q.  And were you also paid for your time in the
11  training program?
12      A.  In fairness, I don't know the answer to that.
13      Q.  Okay.
14      A.  I mean, clearly, your expenses, if I travel to
15  it, your expenses are paid, but whether or not I was
16  paid to attend, in fairness, I don't know the answer
17  to that.
18      Q.  And as you sit here today, do you remember if
19  you traveled for training?
20      A.  I went to a training session, but again, it
21  was -- I'm just not sure whether it was for Xarelto.
22  I did some speaking on behalf of Lovenox way prior,
23  around Hurricane Katrina time, and it's kind of
24  getting mixed in, but if I did, it was -- it was one
25  training session.

Page 56

1       Q.  Okay.  And you said that you -- you spoke for
2   Janssen on Xarelto twice that you recall?
3       A.  That I can recall.
4       Q.  Okay.
5       A.  It may have been one or two more, or it maybe
6   just have been one, but clearly I remember one because
7   it was a group of people who I had worked with that --
8   that worked for me prior that had left to go to
9   Meridian and I remember that was one of the reasons
10  they wanted me to go up there, so I do remember that
11  one for sure.
12      Q.  Okay.  Do you recall how much you got paid to
13  speak at those events?
14      A.  It was based on the mileage away that you
15  traveled.  It was variable, between $1500 and $2,000,
16  and that could be off by a hundred or two, depending
17  on whether it was X number of miles from where your
18  home base was.
19      Q.  I mean, if I've got a document showing that
20  you were paid $2500 for a speaking engagement, would
21  that --
22      A.  That wouldn't surprise me.
23      Q.  Would you have any reason to disagree with
24  that?
25      A.  No.

Page 57

1       Q.  And you mentioned that Janssen would provide a
2   slide deck for you for those presentations?
3       A.  (Nodding head.)
4       Q.  Were you able to present your own information
5   or did you have to present the information that they
6   provided to you?
7       A.  You were asked to present the information that
8   -- they were provided to you, probably to keep you on
9   label.  You know, if you were asked questions outside
10  of the slide deck when the presentation was over, you
11  were able to give your personal opinion, but they
12  kept -- they would like you to stay to key with their
13  slides, that's correct.
14      Q.  Okay.  So you were presenting information that
15  was provided to you by Janssen to other doctors; is
16  that correct?
17      A.  Yes.
18      Q.  Okay.  Do you remember the specific topics
19  that you spoke on?
20      A.  I'm sure I was trained to do AFib and DVT.  I
21  will tell you that I'm much more adept to do the DVT
22  and PE.  That's kind of an area that I feel good
23  about.
24      Q.  Okay.
25      A.  And I treat -- and I treat that more in my

Protected - Subject to Further Protective Review

Page 58

1  practice. AFib is an internal medicine disease, but
2  to be honest with you, it's -- if you have 12
3  cardiologists in your community, that's where most of
4  the AFib ends up.
5      Q.  What was involved with the training that you
6  underwent from Janssen?
7      A.  They would bring in speakers and speakers
8  would address the trials, they would address the side
9  effect profiles, they would address compliance, things
10 like that.
11     Q.  I mean, do you know who those speakers were?
12 Were they doctors, researchers?
13     A.  Oh, I'm -- I mean, I don't know their names
14 but several of them were physicians. I mean, I'm sure
15 there were legal counsel, there was legal counsel, but
16 I would imagine they were physicians who were familiar
17 with the data they were presenting.
18     Q.  Did you ever receive any training from
19 marketing personnel from Janssen?
20     A.  Training or information?
21     Q.  Training.
22     A.  No, sir.
23     Q.  Do you recall where you may have traveled for
24 these training programs?
25     A.  I went to Dallas for a meeting of some sort,

Page 59

1  and that may have been where this one was.
2      Q.  Okay. And your travel expenses would have
3  been covered for you going to Dallas; is that correct?
4      A.  Yes.
5      Q.  And would you have also been paid for that
6  training session in Dallas?
7      MS. HOFFMANN:  Objection; asked and answered.
8      A.  I don't remember whether you actually got paid
9  for attending. I know your expenses were paid, and
10 that's just -- that's an honest answer.
11     Q.  How did you get involved with that speakers --
12 did you say speakers bureau, is that what you called
13 it?
14     A.  That's what they were called then, yes.
15     Q.  Okay. How did you get involved with that? Is
16 that something you signed up for or did someone
17 approach you about doing it?
18     A.  I was probably approached by someone in the
19 pharma industry because of what I do and how we, I
20 guess, treat DVTs and PEs and AFib, and I don't know
21 who reached out to me initially but I'm sure it was
22 probably through one of their reps.
23     Q.  Okay. And when you say because of what you do
24 and how you treat DVT and PE and AFib, what do you
25 mean by that?

Page 60

1      A.  We did -- we were one of the first
2  hospitalists groups that did a big project to decrease
3  the rate of hospital-acquired DVTs, and we not only
4  put it in a standardized form, we also incorporated it
5  into our electronic medical record. I'm not saying it
6  was published or, you know, super advanced, but it was
7  pretty good for Pascagoula.
8      So I think they recognized that, and they
9  recognized the strength of the group and the decrease
10 of hospital-acquired DVTs that we saw. It wasn't
11 published. It was just anecdotal. You know, you have
12 eight percent orthopaedic history and then we get it
13 down to two, and I guess that got their attention and
14 they asked me about it.
15     Q.  When you say got their attention, are you
16 referring to Janssen?
17     A.  Or Lovenox or any of the companies. You know,
18 it's not very often that you have a community-based
19 hospital that's our size that, you know, will tackle a
20 quality-based issue. We did it for heart failure, we
21 did it for a lot of our top 5 DRGs, where we have
22 what's called Care Pass.
23     You know, there is only really one or two ways
24 to treat the top 10 diseases that we see. You know,
25 you should be on Antibiotic A or B for

Page 61

1  community-acquired pneumonia; you should receive this
2  for anticoagulation.
3      And we kind of streamlined that to take away
4  the variability within our group.
5      Q.  Okay. So what did your group do differently
6  in relation to DVT to decrease the hospital-onset DVT?
7      A.  We did two things. We made you address why or
8  why not you did not prophylax your patient before
9  you're allowed to move on.
10     So before we had our EMR, we used a system
11 called EPIC.
12     THE WITNESS:  Electronic medical record.
13     A.  It was a paper and it said:  Dear Dr. X, your
14 patient has been hospitalized. They have these risk
15 factors for DVT. What would you like to treat them
16 with for DVT prophylaxis?
17     And if the physician marked nothing, then they
18 had to give an explanation why they did not choose to
19 prophylax this patient.
20     Once we moved to EPIC -- we're paperless
21 now -- it's a hard stop. It's a stop sign that says:
22 (Indicating.) "You used an older set. This patient
23 is not on DVT prophylaxis. Can you tell us why?"
24     And there are some contraindications:
25 Intracranial bleed, allergic to heparin, HIT.

16 (Pages 58 to 61)

Protected - Subject to Further Protective Review

Page 62

1  So we were early in that space of getting our
2  community of doctors involved with that.
3  Q.  Does -- does your hospital group, I mean, is
4  there a -- do you have a certain protocol for treating
5  acute DVTs in patients?
6  A.  Yes.
7  Q.  Okay.  And what is that protocol?
8  A.  It gives options.  We do not have a closed
9  formulary.  So DVT, you are given the option of IV
10 heparin, which we rarely use anymore; low molecular
11 weight heparin, which we can use long-term or
12 short-term; vitamin K antagonists; and now we have the
13 NOACs or DOACs, and if they are FDA approved, they're
14 all on the formulary.  So it's not a -- blinders, you
15 have to use Product A or B, but the products that are
16 FDA approved are options for that physician or
17 practitioner to choose.
18 Q.  Okay.  So is there any kind of formulary or
19 guidelines in your hospital group that indicate which
20 particular product the physician should use?
21 A.  No.
22 Q.  For -- well, let me -- let me finish.
23 The ones they should use for particular
24 circumstances or situations?
25 A.  No.

Page 63

1  Q.  Okay.
2  MS. HOFFMANN:  And I'm sorry, can we get
3  clarification?  I missed it.  Are you talking about
4  for prophylaxis for DVT or treatment?
5  THE WITNESS:  For treatment.
6  MR. VANZANDT:  Yeah, treatment of acute DVT.
7  MS. HOFFMANN:  Treatment.  Okay.
8  A.  There are options that you pull up and, you
9  know, you will put in diagnosis, DVT, and it will spit
10 out, you know:  Do you want IV heparin drip?  Do you
11 want weight-based Lovenox?  Do you want apixaban?  Do
12 you want -- or, you know, choices.
13 Q.  Okay.
14 MS. HOFFMANN:  Can we take a break?
15 MR. VANZANDT:  Yeah.  I was going to say we've
16 been going an hour.
17 MS. HOFFMANN:  I'm going to see if I can quiet
18 this down.
19 THE VIDEOGRAPHER:  The time is 5:04 p.m.  We
20 are off the record.
21 (Recess from 5:04 p.m. until 5:09 p.m.)
22 THE VIDEOGRAPHER:  This begins Disk 2 of
23 today's deposition.  The time now is 5:09 p.m.
24 We are back on the record.
25 BY MR. VANZANDT:

Page 64

1  Q.  Doctor, when is the last time that your CV has
2  been updated?
3  A.  Two-and-a-half years, because my oldest
4  daughter will be 20 in March.
5  Q.  Okay.  Does your CV indicate anywhere your
6  prior work with Janssen prior to your involvement in
7  this litigation?
8  A.  No, sir.  And I guess, unless you would say
9  from '99 to 2005, the 100 hours of CME that I
10 presented, but a lot of that was just CMEs like I'm
11 doing next week and not for Janssen.
12 Q.  Okay.  Have you ever worked for any other
13 pharmaceutical companies?
14 A.  Yes, I did some speakers bureau for -- I don't
15 know what the company was but it was for enoxaparin.
16 Q.  Okay.  And that would be Lovenox; is that
17 right?
18 A.  Yes.
19 Q.  Okay.  When was that?  How long ago was that?
20 A.  That was probably for the two years
21 post-Katrina, so '06 and '07 were probably the years.
22 That was when it just came out and we were using it
23 fairly aggressively for prophylaxis.
24 Q.  Have you ever been retained as an expert
25 witness in any other lawsuit or litigation?

Page 65

1  A.  Yes.
2  Q.  How many times before have you been --
3  A.  Once or twice.  I went to court once for sure.
4  Q.  Okay.
5  A.  And they were internal
6  medicine/hospitalist-based cases.
7  Q.  Okay.  What do you mean by that?  What -- were
8  they medical malpractice cases?
9  A.  Yes, they were medical malpractice cases.
10 Q.  And you were -- I mean, were you an expert
11 witness in those cases?
12 A.  I was an expert witness for the defense,
13 correct.
14 Q.  In both cases?
15 A.  Yes.
16 Q.  All right.  Are those the only two cases you
17 recall testifying as an expert?
18 A.  I'm pretty sure.  I know for a fact only one
19 went to court.  I may have been asked to review some
20 charts and nothing really ever happened with it,
21 but --
22 Q.  And what's your best -- your best guess about
23 how long ago that was?
24 A.  I can tell you, maybe.  Their expert was
25 actually the guy that I worked with when I did

17 (Pages 62 to 65)

Page 66

1   research at LSU, Henry Rothchild.  It was pre-Katrina,
2   so I would say it was '03 maybe, '04.
3       Q.  Okay.
4           MS. HOFFMANN:  You mean 2003 or 2004?
5           THE WITNESS:  Yes, 2003 and 2004.
6       Q.  And have you ever testified in any type of
7   lawsuit via at trial or deposition when you were not
8   an expert, just as a treating physician?
9       A.  No, sir.
10      Q.  Or as any other type of witness in a trial
11  other than an expert witness?
12      A.  Not to my knowledge.
13      Q.  And have you ever worked as a litigation
14  consultant for either Bayer, Janssen or Johnson &
15  Johnson prior to this Xarelto litigation?
16      A.  No.
17      Q.  Okay.  On page 2 of your report, in the middle
18  of the page you have "Presentations" listed.  Do you
19  see that?
20      A.  Uh-huh.  Yes.
21      Q.  And you have DVT management listed as a, I
22  guess, a topic that you presented on.  It should be
23  page 2, about halfway down of your CV.  Is it not
24  showing up on there?
25      A.  Yeah.  Sure.  Yes, I've got it.  It's in

Page 67

1   capital letters, yes.
2       Q.  Okay.  Yes.  Sorry.
3           But the DVT management presentations, I mean,
4   how many times -- well, let me ask you this.  What do
5   you mean by DVT management presentations, what would
6   that include?
7       A.  So because hospitals are so integral to how we
8   manage and prophylax for DVTs, I may get -- I may have
9   gotten asked five or six times to present our strategy
10  in management of this to maybe, like, the Southeast
11  Alabama Association of Hospitalists or -- our regional
12  chapter is the Gulf States Hospitalists Association,
13  Southern Hospitalists Association, and they would ask
14  me to come and present my angle or view upon how we
15  manage that here, and I would say probably, you know,
16  eight, 10, 12 times I would give a CME based on that
17  topic.
18      Q.  Were those in addition to the work you did for
19  Janssen in relation to Xarelto?
20      A.  Yes, they were.  And a lot of these were also
21  given for new nurses at orientation about how we
22  implement the program.  It was educational to our
23  staff, not just our physicians but our nurses, PTs,
24  OTs.
25      Q.  Have you ever traveled internationally to

Page 68

1   speak on DVT management?
2       A.  No.
3       Q.  All right.  Have you ever met Ms. Dora Mingo?
4       A.  No.
5       Q.  All right.  And have you ever treated her as a
6   patient?
7       A.  No.
8       Q.  Do you know -- well, I'm going to -- I'm going
9   to go through a list of Ms. Mingo's doctors --
10      A.  Sure.
11      Q.  -- and just would like to know if you know
12  these doctors personally or through your work.  What
13  about Dr. Renie Jordon, have you ever met Dr. Jordon?
14      A.  No.
15      Q.  Dr. Stephen Keith, have you ever met
16  Dr. Keith?
17      A.  No.
18      Q.  And when I say met, I mean, have you ever met
19  them personally or communicated with them in any way?
20      A.  You know, if they were at the same meeting I
21  was at, maybe, but I have no recollection and no name
22  recognition.
23      Q.  Okay.  And what about Dr. Jennifer Gholson?
24      A.  No.
25      Q.  Dr. Clifton Williams?

Page 69

1       A.  No.
2       Q.  Dr. Gabriel Zevallos?
3       A.  No.
4       Q.  Dr. David Casey?
5       A.  No.
6       Q.  Dr. Dany Haddad?
7       A.  No.
8       Q.  Dr. Ajagbe?
9       A.  No.
10      Q.  Dr. David Gandy?
11      A.  No.
12      Q.  Dr. Donald Netherland?
13      A.  No.
14      Q.  Dr. Peter Hercules?
15      A.  No.
16      Q.  And you haven't spoken with any of those
17  doctors in relation to your work in this case?
18      A.  No.
19      Q.  Do you know what reagent Southwest Mississippi
20  Regional Medical Center uses to measure PT?
21      A.  No.
22      Q.  Okay.  And have you attempted to find out in
23  relation to your work in this case?
24      A.  No.
25      Q.  When is the last time that you've spoken to

Protected - Subject to Further Protective Review

Page 70

1    anyone who is an employee of either Bayer or Janssen,
2    other than their lawyers?
3        A.  Probably in the last two months.  No.  I'm
4    trying to think.  Maybe not.  That was a different --
5    they may have a retail person that comes in and calls
6    on our hospitalists group, but to be honest with you,
7    I don't spend a whole lot of time.  I don't know
8    whether it was a apixaban representative or argatroban
9    or whatever, so -- but probably in the last two months
10   it would have been in the form of a rep, retail.
11       Q.  Were any employees of Bayer or Janssen present
12   at any of the meetings that you had preparing for this
13   deposition?
14       A.  No.
15       Q.  And have you spoken with any employee of Bayer
16   or Janssen regarding this litigation?
17       A.  No.
18       Q.  And as you sit here today, can you recall the
19   names of any of the sales representatives from Janssen
20   who have called on you?
21       A.  No.
22       Q.  Have you ever --
23       A.  A big tall guy from Mobile.  His son goes to
24   Bayside Academy, you can look him up, but that's all I
25   know.

Page 71

1        Q.  That's about all you know?
2        A.  That's about all I know.
3        Q.  Have you ever been involved in conducting
4    clinical trials for a pharmaceutical product?
5        A.  No.
6        Q.  Have you ever been involved in designing
7    clinical trials?
8        A.  No.
9        Q.  And are you holding yourself out as an expert
10   on clinical trials for prescription medications?
11           MS. HOFFMANN:  In this case?
12       Q.  In this case.
13       A.  No.
14       Q.  Do you consider yourself an expert on clinical
15   trials outside of the context of this case?
16       A.  No.
17       Q.  Okay.  And do you intend to offer any opinions
18   regarding Xarelto's clinical trials?
19       A.  If asked, I'll talk about my knowledge of the
20   clinical trials, but I'm not selling myself as an
21   expert in trial evaluation and p-values.
22           MS. HOFFMANN:  And, Counsel, just for the
23   record, there is nothing in his report that
24   addresses those kinds of opinions.  We don't
25   intended to offer him for those.

Page 72

1           MR. VANZANDT:  Okay.  I'm just tying a knot on
2    it.
3           MS. HOFFMANN:  Got it.
4    BY MR. VANZANDT:
5        Q.  Have you ever been involved with an -- or have
6    you ever been employed as an advisor to the FDA?
7        A.  No.
8        Q.  Ever been involved with drafting, interpreting
9    or enforcing FDA regulations?
10       A.  No.
11       Q.  So you don't hold yourself out as an expert on
12   FDA regulations?
13       A.  No.
14       Q.  And do you intend to offer any opinions as to
15   whether Janssen or Bayer complied with FDA regulations
16   in regards to Xarelto?
17       A.  Not my area of expertise.
18       Q.  Is that a no?
19       A.  No.
20       Q.  Okay.
21       A.  Yes, that's a no.
22       Q.  And have you ever been involved with
23   designing, manufacturing, or marketing pharmaceutical
24   products?
25       A.  No.

Page 73

1        Q.  And you're not holding yourself out as an
2    expert in any of those fields?
3        A.  No, sir.
4        Q.  Have you ever been involved with drafting a
5    label for a pharmaceutical product?
6        A.  No, sir.
7        Q.  Now, you are -- you're not a hematologist,
8    correct?
9        A.  That's correct.
10       Q.  Okay.  Do you have any special training in the
11   field of hematology?
12       A.  No, sir.
13       Q.  And do you hold yourself out as an expert in
14   the field of hematology?
15       A.  No, sir.
16       Q.  Likewise, you're not a gastroenterologist?
17       A.  Correct.
18       Q.  Have you ever performed an EGD on a patient?
19       A.  Yes.
20       Q.  You have?
21       A.  Yes.
22       Q.  How often do you do that?
23       A.  Oh, not in 20 years.
24       Q.  Okay.
25       A.  In residency.

19 (Pages 70 to 73)

Protected - Subject to Further Protective Review

Page 74

1      Q.  You did it in residency.  Gotcha.
2      A.  None in my current practice, nor am I insured
3  to do that.
4      Q.  Okay.  And have you ever performed a surgical
5  procedure to treat an active gastrointestinal bleed?
6      A.  No.
7      Q.  Okay.  And so you do not hold yourself out as
8  an expert in the field of gastroenterology; is that
9  correct?
10     A.  That's correct.
11     Q.  Doctor, did you personally draft the report
12  that you signed in this case?
13     A.  My opinion part?
14     Q.  Yes, sir.  Your -- the report, the entirety of
15  your report --
16     A.  Yes.
17     Q.  -- did you personally draft that?
18     A.  Yeah, I wrote it and I may have had somebody
19  transcribe it in any office for me, but yes.
20     Q.  Okay.  You prepared the -- well, let me -- let
21  me -- let's do this.
22         If you could turn to page 7 of your report,
23  please, that's the page that has your opinions and
24  conclusions.  Did you prepare and draft that page of
25  the report?

Page 75

1      A.  Yes.
2      Q.  Okay.  And the information leading up to that,
3  on the first six pages of the report, did you prepare
4  and draft the information that's in your report?
5      A.  Yes.
6      Q.  Did counsel for Janssen or Bayer draft
7  or edit any portions of your report?
8         MS. HOFFMANN:  Objection.  You don't have to
9  answer that.
10     Q.  Doctor, did you have any help preparing this
11  report?
12     A.  Minimum.  I mean, I did the -- if I had a
13  misspelled word, they crossed it out, but no, there
14  was -- this is my work.
15     Q.  Based on what we've discussed so far,
16  it's obvious that you prescribe anticoagulants in your
17  practice; is that correct?
18     A.  Today.
19     Q.  Today.  You prescribed an anticoagulant today?
20     A.  Today.
21     Q.  Okay.  What did you prescribe today?
22     A.  Apixaban.
23     Q.  Apixaban.  And that would be the name brand
24  Eliquis?
25     A.  Yes.

Page 76

1      Q.  Is that right?  Okay.
2         And how often would you say that you prescribe
3  anticoagulants?
4      A.  If you include aspirin, Plavix, Lovenox, the
5  NOACs, DOACs and Coumadin, on a weekly basis.
6         You know, it's not just prescribing.
7  Remember, we're hospital -- I'm a hospitalist, so
8  actually what I usually would do would be to continue
9  the medicines that they may be taking as an outpatient
10  when they come, so it's managing their existing
11  medications.
12     Q.  If a patient comes in on one anticoagulant,
13  would you keep them on that same anticoagulant or
14  would you switch them to a different one?  What would
15  be your general practice in that area?
16     A.  Sure.  If a patient is doing well on a certain
17  anticoagulant, in my opinion, and it's the standard of
18  care, I think there is no reason to change.
19         If a patient comes in and I think that their
20  side effect risk/benefit ratio of let's say them being
21  on warfarin, but they also take three blood pressure
22  medicines that interact with that, I may suggest
23  changing them to a different anticoagulant, but I'm a
24  simple country doctor, and if it's working, I usually
25  don't try to fix it.

Page 77

1         The other thing in hospitalists is, you know,
2  I don't want to upset the primary care doctor's
3  applecart.  If they have somebody on Coumadin for
4  AFib, I trust that they are monitoring their time in
5  therapeutic range and that they think that's the best
6  medicine for them, but on occasion I will see a
7  patient that I think needs to be on a different agent
8  and I will make that change.
9      Q.  Okay.  You've referred to vitamin K
10  antagonist.  Warfarin, Coumadin, those are all the
11  same --
12     A.  Yes, sir.
13     Q.  -- agent; is that correct?
14     A.  Yes.
15     Q.  Okay.  Have you prescribed warfarin to
16  patients?
17     A.  Yes.
18     Q.  Do you still prescribe warfarin to patients?
19     A.  Yes.
20     Q.  So you have -- do you have personal experience
21  with managing patients who are on warfarin?
22     A.  Yes.
23     Q.  Okay.  Do you have personal experience
24  managing the, I guess, INR rates and ensuring that the
25  patient is within the proper therapeutic range; is

Protected - Subject to Further Protective Review

Page 78

1    that correct?
2         A.  Yes.
3         Q.  Okay.  In your practice, what is -- what's an
4    acceptable target for percentage of time for a patient
5    to be in therapeutic range?
6         MS. HOFFMANN:  Objection.
7         A.  I think an exceptional target for time and
8    therapeutic range varies by practice, but I would say
9    that if you are batting 75 to 80 percent in the
10   primary care field, that you're doing well.
11        The -- for my job as a hospitalist, it's a lot
12   easier because I have the patients in the hospital
13   with me, so I can guarantee them that they are either
14   in therapeutic range or they're not because I test
15   them every day, as opposed to a clinician or a
16   clinical physician in the primary care setting that
17   sends Ms. Smith home on Coumadin and brings that
18   patient back.  We have the equivalent of DOT, direct
19   observed therapy, in our hospital, where they hand you
20   the Coumadin and it's almost 100 percent compliant, so
21   we're at a little bit of a competitive advantage.
22        Q.  So in your hospital, your compliant -- I mean,
23   your patient's time in therapeutic range, are you
24   saying it's 100 percent?
25        A.  No, because remember, it takes three or four

Page 79

1    days for the INR to get out.
2         Q.  Right.
3         A.  So they could be on Coumadin while we're
4    overlapping them with Lovenox or heparin product where
5    their INR is subtherapeutic but climbing to the
6    therapeutic range.
7         Q.  Okay.  And for a primary care physician
8    outside the hospital, do you believe 75 to 80 percent
9    would be an acceptable time in therapeutic range?
10        A.  If you are batting 75 percent, I think -- now,
11   I think if you ask a lot of physicians, they will tell
12   you I'm at 90 or 95, but I think realistically, 75
13   percent is a pretty good mark, in my opinion.
14        Q.  Okay.  Would 55 percent be an acceptable time
15   in therapeutic range?
16        MS. HOFFMANN:  Objection.
17        A.  It wouldn't be acceptable but it wouldn't
18   surprise me, because there are so many variables with
19   the use of warfarin or Coumadin that affect the INR
20   that -- you're dealing with compliance, you're dealing
21   with dietary restrictions, you're dealing with med-med
22   drug interactions, but I know there are a lot of
23   studies out there that they talk about what the true
24   time in therapeutic range is versus what it's not.  At
25   55 percent, I hope we can do better but it wouldn't

Page 80

1    surprise me if that's what a lot of folks are at when
2    they take Coumadin or warfarin.
3         Q.  Do you have a way that you prefer to refer to
4    it, Coumadin, warfarin?
5         A.  I'm a -- I like -- Coumadin is easier for me
6    to say.
7         Q.  Okay.
8         A.  Just like Lovenox is easier for me to say.
9         Q.  All right.  I'll try to use that then.
10        Okay.  When you are going -- when you are the
11   doctor who is actually going to initiate anticoagulant
12   treatment for a patient with an acute DVT, how do you
13   decide which agent to prescribe, whether that be --
14   well, all of the choices, basically.  How do you
15   decide what to prescribe to that patient?
16        A.  The first thing you do is you have to look at
17   the clot burden.  If a patient has a voluminous amount
18   of clot in their upper or lower extremity, and you
19   think they are going to need intervention, maybe like
20   venous-directed thrombolytics, we try to stay away
21   from a medicine like a NOAC or a DOAC because you
22   don't want them instantly anticoagulated because we
23   are going to go in there and poke their femoral vein
24   and try to give them direct thrombolytics.
25        So you look at the clot burden first.

Page 81

1         If I have a stable patient, again -- you're
2    just talking about DVT, correct, we're not going to
3    talk about pulmonary emboli with this question?
4         Q.  Yeah, just DVT.
5         A.  Okay.  So the only -- my main concern about
6    the DV -- a simple provoked or unprovoked DVT is the
7    clot burden and am I going to have to do an
8    intervention on this patient, and if I do, I would
9    rather do it when their blood is not thin.
10        The second thing you do is you look at the
11   patient's med list and you look at drug-drug
12   interactions that they're currently -- are they on six
13   medicines that they can interact with.
14        The third thing is, unfortunately or
15   fortunately, you look at their ability to obtain the
16   medication.  Coumadin is much less expensive than
17   warfarin, so if I have a gentleman who lives below the
18   railroad track who presents with a provoked DVT, I'm
19   probably going to get a better chance of getting him
20   Coumadin than I am going to get him a NOAC or a DOAC.
21        And then, if I choose to use Coumadin, I
22   usually will bridge that therapy because the Coumadin
23   will not knock your INR pro time out probably between
24   48 and 72 hours.  So we know that patient has those
25   two to three days where they're exposed to propagation

21 (Pages 78 to 81)

Protected - Subject to Further Protective Review

Page 82

1    of clot, if not pulmonary emboli.  So for those
2    patients I will overlap them with a heparin product.
3    I think the standard of care has always been, up until
4    10, 12, 14 years ago, IV heparin and you bridge that
5    to Coumadin.
6          The low molecular weight heparins have allowed
7    us to use them in a much safer environment.  So,
8    traditionally, what I would do is I would treat that
9    patient quickly once I know they are not going to go
10   to the lab to get intervened with a weight-based dose
11   of Lovenox, 1 mg per kg twice a day or 1.5 once a day.
12         And then 12 hours later I would start their
13   first dose of Coumadin.  That way they're covered,
14   fully anticoagulated within two or three hours of
15   Lovenox, and then, hopefully, by day two or three,
16   their INR gets to 2 or above, where we can safely stop
17   the Lovenox and discharge that patient on warfarin.
18         Then you look at patients who may be better
19   candidates based on age, comorbidities, for the new
20   paradigm shift in anticoagulation, which is in NOACs
21   and DOACs.  So you talk to those patients about the
22   risks and benefits of this drug.  Cost is obviously an
23   issue, especially in our community, and BID dosing
24   versus Q day dosing, dietary restrictions versus
25   nondietary restrictions, having to get coagulation

Page 83

1    tests versus not having to get coagulation tests, and
2    with your patient you should make an educated decision
3    about what's best for them long-term.
4          The last thing I'll talk about is the duration
5    of the treatment, and that's not what you asked but
6    that's part of the equation too, is how long will this
7    patient be on an anticoagulant.
8       Q.  Okay.  For a patient that's on warfarin, you
9    mentioned coagulation studies.  Could you just --
10   well, let me ask you this.  That's -- I mean, that's
11   part of managing a patient, the patient that's on
12   warfarin, correct?
13      A.  Yes.
14      Q.  And you would run blood tests to measure their
15   INR and their PT; is that right?
16      A.  INR is a much more standardized test.  I mean,
17   pro time is nice.  What the pro time will give me when
18   I order it on the patient is it gives me a baseline of
19   what their coagulation cascade is.  So a patient with
20   cirrhotic liver disease, their pro time may be
21   prolonged but it's not because they took Coumadin.
22   It's because they can't produce the clotting products
23   that keep their pro time normal.
24         So the International Normalization Ratio, or
25   INR, is what I use 99.9 percent of the time for

Page 84

1    patients who are on Coumadin.
2       Q.  When is the last time that you've prescribed
3    Xarelto to one of your patients?  Initiated Xarelto,
4    let me say that.
5       A.  Six, seven months, five, six, seven months.
6       Q.  At this point in your practice is there --
7       A.  I take that back.
8       Q.  I'm sorry.
9       A.  Eight weeks ago I had a patient with portal
10   vein thrombosis.  I'm sorry.
11      Q.  They had what condition?
12      A.  They had a clot of their liver vein and I
13   chose to use it there, but in terms of presenting --
14   prescribing it for DVT or PE, it's probably been a
15   couple of months.  Now, I've seen it, obviously, as a
16   patient coming in and presenting with an unrelated
17   problem:  "Yes, I had a DVT four months ago but now
18   I'm here for pneumonia."
19         I've continued that treatment, but I want to
20   make sure I'm accurate with telling about initiating
21   it.
22      Q.  Okay.  In your practice currently, what
23   anticoagulant do you prescribe the most?
24         MS. HOFFMANN:  When he's initiating a
25   prescription?

Page 85

1       Q.  When you are initiating patients on
2    anticoagulant therapy.
3       A.  That's a great question.  Probably Lovenox,
4    because that's the initial bridge that we start a lot
5    of patients on, because, remember, when we admit
6    somebody at the hospital with a PE or a DVT, the first
7    12 hours I'm trying to figure out what their risk
8    factors are and what the best medicine for them is, so
9    probably Lovenox.
10         In terms of my prescribing patterns for the
11   NOACs and DOACs, I don't know what the percentages
12   are.  I couldn't give you really an honest answer on
13   that.
14      Q.  Okay.  When you say you prescribe Lovenox, I
15   mean, is that just initially and then they would go on
16   warfarin, or --
17      A.  Right.  So initially, you know, while we're
18   digging through the clot burden and whether -- because
19   Lovenox's half-life is obviously shorter, while we're
20   digging through the patient's insurance status, and
21   that's a nasty thing to talk about but it is what it
22   is, Lovenox is generic and it's inexpensive and it
23   buys me some time to get to the right -- this
24   is patients with huge clot burden.
25         Clearly, if somebody comes in and they have a

22 (Pages 82 to 85)

Protected - Subject to Further Protective Review

Page 86

1    provoked DVT that barely extends above the knee and
2    they work at the shipyard and their wife is a
3    pharmacist, it's very clear that I think the best drug
4    for that patient, after talking to them, is probably a
5    NOAC or a DOAC.  But I really couldn't tell you what
6    percent I do for the two or three FDA approved agents.
7         Q.   Why -- why do you say that would be clear that
8    a NOAC would be --
9         A.   Because a lot of it depends on their --
10        Q.   I'm sorry.
11        A.   I was alluding to the fact that they have
12   insurance, the fact that they are educated and the
13   fact that they are compliant, alluding to the fact
14   that they can really understand a risk/benefit ratio.
15        Here is a lot different practicing than
16   Austin, Texas, in terms of what we have to take into
17   consideration when I treat -- you know, we call them
18   blood clots.  Hey, blood clots, I'm going to know what
19   that is.  "My grandmother died of a blood clot."  They
20   know what that is.
21        We have to -- we've got to take a lot of
22   different things into consideration.  Do I really
23   think that this patient that I'm going to prescribe
24   Coumadin to is going to show up next week to get their
25   INR drawn?  They live in a tent or they're a shrimper

Page 87

1    that goes offshore for two weeks.  I'm not sure --
2    you've got to take all that into consideration.
3         Q.   Okay.  And so when I asked which anticoagulant
4    you initiate patients on the most, you said -- you
5    said Lovenox?
6         A.   I would say, in fairness, probably so.
7         Q.   Okay.  And -- but that would include -- I
8    mean, that's Lovenox and warfarin; is that right?
9         A.   Lovenox -- well, depends.  It's Lovenox to be
10   bridged to Coumadin.
11        Q.   Okay.
12        A.   If I think that's the best drug for them.  Or
13   it can be Lovenox for the first day and then I get to
14   the patient and I realize that they had taken Coumadin
15   before and they had no problems with their
16   anticoagulant status and that's a great drug to use.
17   Maybe they have a recurrent DVT.
18        Or maybe I go in and see the patient six hours
19   after the hospitalist that worked the night shift
20   initiated Lovenox and I think they are a good
21   candidate in terms of whatever agent you want to
22   choose, apixaban or Eliquis or Xarelto, and I feel
23   very comfortable starting that.
24        Q.   Okay.  So after the initial Lovenox?
25        A.   It's not -- yeah, some of the -- obviously,

Page 88

1    some of the trials had a Lovenox bridge.
2         Q.   Right.
3         A.   I think Pradaxa did.
4         Q.   Right.
5         A.   The trials that I'm familiar with, the
6    EINSTEIN, did not have a Lovenox bridge, but I think
7    that's the way it happens sometimes.
8         Sometimes our patients are admitted by the
9    emergency department and I will give a verbal order to
10   start on Lovenox because I'm busy, tied up in a
11   meeting or on the floor, and by the time I see the
12   patient, I realize that they may be a better candidate
13   for something different.
14        Q.   Okay.  Let me ask it this way.  What's -- what
15   anticoagulant do you prescribe most for continued
16   treatment of the DVT?  So kind of take Lovenox out of
17   the picture.
18        A.   Sure.
19        Q.   So if you start a patient on Lovenox, you
20   know, after that, are -- if you're going to go to
21   warfarin or one of the NOACs -- I mean, between
22   warfarin and one of the NOACs, what do you prescribe
23   most for your patients?
24        A.   I would say -- and this is just a guess, so
25   don't subpoena my prescription writing, but I would

Page 89

1    say it's probably fifty-fifty between the NOACs and
2    DOACs and warfarin.  And that's initiating therapy,
3    because I want to make it clear that if someone is
4    successfully anticoagulated on warfarin and they come
5    into the hospital for an unrelated illness, I'm not
6    going to change the management of that patient.
7         Q.   And among -- among the NOACs, which agent do
8    you prescribe the most?
9              MS. HOFFMANN: Objection.
10        A.   I couldn't tell you.  It's pretty -- it's
11   pretty -- I would imagine pretty close between Xarelto
12   and -- you know, I used Pradaxa when it first came out
13   because it was the first one that had some
14   indications.  I use Eliquis, I would say, you know, a
15   fair amount of the time, but again, a lot of these
16   patients I'm managing already come into me on these
17   agents, and in fairness to the patient, and the
18   primary care guys, I usually don't change their
19   management unless there is a reason.
20        Q.   Okay.  And so as you sit here today, I mean,
21   can you say one way or another which NOAC you
22   prescribe the most in your practice?
23              MS. HOFFMANN: Objection.
24        A.   I think if you looked historically, I think it
25   would be Xarelto and Eliquis.  Pradaxa, if you go back

23 (Pages 86 to 89)

Protected - Subject to Further Protective Review

Page 90

1    real far, where they were the first one that was out,
2    I mean, that may have been up front.
3        Q.  Okay.  Within the last year, which NOAC have
4    you prescribed the most?
5        A.  Probably Xarelto.
6        Q.  Are you aware of any laboratory tests that can
7    measure Xarelto's anticoagulation effect on a
8    patient's blood?
9        A.  There is no clinical data to support a
10   correlation of anticoagulant with pro time and INR.
11   Obviously, there is a anti-X -- factor X test that you
12   can get that's out there, and to be honest with you, I
13   don't know how long it takes for that lab to come back
14   in our organization, but -- I've really never ordered
15   it but I know it's out there.
16       Q.  Okay.  Are you aware of whether or not pro
17   time can be used to measure a Xarelto anticoagulation
18   level?
19           MS. HOFFMANN:  Objection.
20       Q.  Strike that.
21           Are you aware of whether or not pro time,
22   prothrombin time, can be used to measure Xarelto's
23   anticoagulant effect on a patient's blood?
24       A.  In my experience and training and knowledge,
25   there is not a direct correlation between the

Page 91

1    prothrombin time and the anticoagulative effect of
2    Xarelto.
3        Q.  Regardless of which reagent is used to
4    measure pro time?
5        A.  To be honest, I'm not going to sell myself as
6    a reagent expert because that wouldn't be fair to you
7    or anybody else in the room.  Am I aware of a
8    Neoplastine reagent?  Yes, I am.  That's not what we
9    use in our organization.  I'm the CMO, but, you know,
10   the thing that I think I'm the most aware of with the
11   Xa's is the antifactor Xa level, and I think those do
12   have significant clinical relevance to your
13   anticoagulation state.  I just don't think it's
14   readily available.
15           (Roth Exhibit 11 was marked for
16   identification.)
17   BY MR. VANZANDT:
18       Q.  Doctor, I'm going to show you what I'm marking
19   as Exhibit 11, which is the January 2015 Xarelto
20   label.  This is the label that would have been in
21   effect at the time that Ms. Mingo was prescribed
22   Xarelto.
23           MR. VANZANDT:  Do y'all want a copy?
24           MS. HOFFMANN:  Sure, and I'll object to the
25   question.

Page 92

1           MR. VANZANDT:  It wasn't a question.
2           MS. HOFFMANN:  I'll object to the statement.
3           MR. VANZANDT:  Okay.
4    BY MR. VANZANDT:
5        Q.  Doctor, are you aware -- are you aware of what
6    Xarelto label would have been in effect at the time
7    Ms. Mingo was prescribed Xarelto?
8        A.  No.
9        Q.  Okay.  What I've handed you is the January
10   2015 Xarelto label.
11       A.  So this is a PI?
12       Q.  Yes, sir.
13       A.  Okay.
14       Q.  Yes, sir.  Have you ever reviewed that version
15   of that label before?
16       A.  You know, I -- I may have.  Not -- I didn't go
17   out of my way to look at this label.
18       Q.  What's the most recent Xarelto label that you
19   have reviewed?
20       A.  I mean, I'm sure I reviewed it, but to tell
21   you I reviewed it in detail would be -- may not be
22   consistent.
23       Q.  Okay.  All right.  If you could, turn to page
24   10 of that label, Section 5.7.
25       A.  "Risk of Pregnancy-Related Hemorrhage"?

Page 93

1        Q.  Yes, sir.
2        A.  Okay.
3        Q.  Do you see the second full sentence in that
4    paragraph there?  It states:  "The anticoagulant
5    effect of Xarelto cannot be monitored with standard
6    laboratory testing nor readily reversed."
7            Did I read that correctly?
8        A.  Yes.
9        Q.  Okay.  Is that your understanding as to
10   whether or not the anticoagulant effect of Xarelto can
11   be monitored?
12       A.  Yes.
13       Q.  Okay.  If you could, turn to page 18, Section
14   8.1.  The third --
15       A.  She wasn't pregnant.  I didn't miss anything,
16   did I?
17       Q.  That may be a whole different case if she was.
18           The third sentence of the first paragraph
19   states:  "The anticoagulant effect of Xarelto cannot
20   be reliably monitored with standard laboratory
21   testing."
22           Did I read that correctly?
23       A.  Yes, sir.
24       Q.  Okay.  And does that, again, represent your
25   understanding as to whether or not the anticoagulant

Protected - Subject to Further Protective Review

Page 94

1 effect of Xarelto can be monitored?
2 MS. HOFFMANN: With standard laboratory
3 testing.
4 A. Yes. The only test that I'm aware of in my
5 knowledge that would be an accurate reflection or a
6 better reflection of true anticoagulant status of a Xa
7 inhibitor is antifactor Xa assay. I'll be honest with
8 you, I never ordered that before, because it's a
9 send-out for us. So for me, if I'm worried about
10 that's going -- that's not going to affect how I take
11 care of the patient. It may be available at UAB or
12 Ochsner or one of the big guys, but --
13 Q. So you wouldn't consider factor Xa to be a
14 standard laboratory test?
15 A. No.
16 Q. Okay. And when you say you have to send out
17 for it, you have to send it outside of the hospital
18 for another company to do it?
19 A. Yeah. It's kind of like some of the other lab
20 tests, that they are drawn and they're prepared, but
21 they are sent out to the place that has the right
22 tubes or testing or whatever to run that test, as
23 opposed to like a simple blood test, like a chemistry
24 level potassium that's back in six minutes that we
25 run.

Page 95

1 Q. How long would it take to get a factor Xa test
2 back if you sent out for one?
3 A. You know, I can't answer that question, I
4 don't know, but I would --
5 MS. HOFFMANN: Don't guess.
6 A. From what I've read, it's three to four hours
7 even if you do it in-house, but I don't know how long
8 it would take if I have to send it to the AEL lab. I
9 don't know.
10 Q. Okay. Where would that lab be that you would
11 send that out to here?
12 A. I'm not sure where our reference lab is. We
13 have two contracts with -- I don't know where they
14 actually Fed Ex or send the sample to.
15 Q. Okay. Have you ever seen or reviewed any data
16 that indicates that PT can be used to measure the
17 anticoagulant effect of Xarelto?
18 A. Not reliably, no.
19 Q. Okay. Why do you say that, not reliably?
20 A. Any factor Xa inhibitor can affect the
21 prothrombin time, but whether or not that's a direct
22 correlation to their anticoagulation level has never
23 been shown to be effective.
24 Q. Okay. Do you know if that's ever been tested?
25 A. No.

Page 96

1 Q. Okay. Did Janssen test that in Xarelto's
2 clinical trials?
3 A. I'm not aware of it.
4 Q. Are you aware of any data that was generated
5 in the ROCKET AF trials regarding correlation between
6 PT and Xarelto's anticoagulant level?
7 A. Not my expertise level, so no.
8 Q. Have you ever reviewed the Xarelto label from
9 Canada?
10 A. No. I never practiced there.
11 Q. What about the Xarelto product label or
12 information from Europe?
13 A. No.
14 Q. Okay. What about New Zealand?
15 A. No.
16 Q. Okay. Okay. Anywhere in your report have you
17 stated that any doctor, nurse, or other healthcare
18 provider who treated Ms. Mingo departed from the
19 standard of care?
20 A. In her entire medical record?
21 Q. In her treatment related to her DVT, Xarelto,
22 and the treatment of her --
23 A. They were things --
24 Q. I'm sorry. Let me finish that.
25 A. Go ahead.

Page 97

1 Q. Any of her treatment related to the issues in
2 this case, so from the DVT prophylaxis that she had
3 after hip surgery, the treatment of her DVT, and
4 leading up to her GI bleed and the treatment of the
5 bleed.
6 MS. HOFFMANN: Just a minute. I want a
7 clarification. You started the question out,
8 Counsel, I think if we read it back, by saying is
9 there anywhere in your report.
10 So your question -- I just want to make sure
11 your question and his answer are the same.
12 You're asking if in his report he has rendered
13 an opinion about anybody deviating from the
14 standard of care?
15 MR. VANZANDT: That's correct.
16 A. The answer to that is no, not in my report.
17 Q. Okay. Well, outside of your report do you
18 have an opinion that any of her healthcare providers
19 deviated from the standard of care?
20 MS. HOFFMANN: Objection.
21 A. There are some things that I would have done
22 differently, but to say they are outside the standard
23 of care, whether or not someone receives a certain
24 duration of DVT prophylaxis versus an aspirin, there
25 is data to support that as well as data to support

Protected - Subject to Further Protective Review

Page 98

1  what I think is the best.  You know, there is more
2  than one way to skin a cat.
3      So do I think there is a strong deviation from
4  the standard of care?  No.
5      If you are asking me would I have managed her
6  discharge DVT prophylaxis differently, because of the
7  protocol we use, yes.  Is it outside the standard of
8  care?  No.  It's a 1B recommendation versus a 1A.
9  Q.  Okay.  And you're referring to the DVT
10 prophylaxis that she had after her hip replacement
11 surgery; is that correct?
12 A.  Yes.
13 Q.  What would you have done differently?
14 A.  I would have counseled her because of her --
15 some of her other risk factors, that -- I would have
16 prophylaxed her for a total of 30 days.  I'm an
17 old-timer, so I believe, you know, Lovenox and
18 Coumadin for a goal INR of 2 to 2.5 probably would
19 have been a good way to start.
20     I also would have offered her one of the NOACs
21 or DOACs as an inpatient for the orthopaedic
22 prophylaxis for total hips and total knees.  I don't
23 remember exactly what she got but I think it was
24 Lovenox for a couple days after discharge and then
25 aspirin after that, and, you know, that's just not my

Page 99

1  protocol that I think is the best protocol for certain
2  patients.
3  Q.  Okay.  Are there any other areas of her
4  treatment that you disagree with or would have done
5  differently?
6  A.  This is -- I don't want to be critical of the
7  care.  I think she got great care from McComb,
8  Mississippi, and she would have got the same care
9  here.  You know, I probably wouldn't have ordered the
10 bleeding scan and I probably wouldn't have used fresh
11 frozen plasma, because that's not the mechanism of why
12 her prothrombin time was out.  So she got some FFP she
13 may not have needed.
14     I probably wouldn't have transfused her four
15 units because the transfusion criteria, in my opinion,
16 were a little bit high there.
17     But overall, I think she got very quick care
18 in all of her visits, and she had very quick
19 turnaround on her ultrasounds.  The endoscopist was
20 skilled and I think their care was standard.
21 Q.  When you say that you wouldn't have given her
22 fresh frozen plasma because her -- that's not why her
23 PT was out --
24 A.  The mechanism of why you give someone fresh
25 frozen plasma is based on what factors you're

Page 100

1  replacing to correct that.  So the fact that she had a
2  prothrombin time that was prolonged most probably
3  because of the Xarelto and the timing of that dose,
4  FFP is not going to be the quickest thing to correct
5  that.
6      You know, I just -- in my -- that's not a
7  standard of practice for us, or for my group.
8      There is also different transfusion
9  guidelines.  Blood is expensive and it's not without
10 risks.  In fact, if you look at a lot of the Canadian
11 and Australian data recently, you are better off the
12 less you are transfused.  So we actually have
13 transfusion guidelines for hematocrits.  Unless they
14 are unstable or below 21, hematocrit of 21, we try not
15 to utilize that resource.
16     Do I think she needed to be transfused?  I
17 think so.  Do I think she needed four units?  Maybe
18 not.  Maybe that would have saved some resources.
19     But overall, I think she got very good care at
20 King's Daughter.  I think that's where she was.
21 Q.  Is it your opinion that her PT was prolonged
22 because of Xarelto?
23 A.  I would have to assume.  I mean I --
24 Q.  Well, let me phrase this, I'm sorry, because I
25 don't want to ask a vague question.

Page 101

1      When she comes in on January 23rd for the GI
2  bleed --
3      MS. HOFFMANN:  No.  You've got your dates
4  wrong.  Start over.
5      MR. VANZANDT:  You're right, February 13th.
6  Q.  When she comes in on February 13th for the GI
7  bleed, is it your opinion that on that day her PT was
8  prolonged due to the Xarelto?
9      MS. HOFFMANN:  Objection.
10 A.  I think her PT could be prolonged for numerous
11 reasons.  I have no evidence to think that she had
12 cirrhosis or underlying liver disease, but that PT
13 value in no way, shape or form would have been a
14 direct reflection of her status of anticoagulation,
15 because the mechanism of her prothrombin time being
16 prolonged is different in factor Xa inhibitors than it
17 is in warfarin, where an INR is a much more consistent
18 test to be done.
19     So if -- first I would have asked, "Do you
20 take Coumadin?"  And, obviously, the answer to that is
21 no, I don't think she was exposed to Coumadin, but I
22 would ask that question even if that wasn't on her
23 medication list, because the most common thing to
24 prolong your INR or PT is Coumadin or underlying liver
25 disease.

26 (Pages 98 to 101)

Protected - Subject to Further Protective Review

Page 102

1    Q.  All right.  So to your knowledge, she didn't
2  have any underlying liver disease?
3    A.  To my knowledge, no.
4    Q.  Okay.  So what other factors could have caused
5  her PT to be elevated to 26.2 on February 13th?
6    MS. HOFFMANN:  Objection.
7    A.  There is a condition called shocked liver.
8  When a patient comes in, trauma, low blood pressure,
9  sepsis, infection, and they have blood pressures in
10  the 60s and 70s over 50s, and normal is 120 or 130,
11  where you could have some hepatic ischemia or lack of
12  blood flow, which can prolong your pro time or your
13  INR.  And then you get to the really rare things, like
14  Tylenol ingestion.
15    Could any patient -- I'm not -- and I'm
16  insinuating that Ms. Mingo took a bunch of Tylenol,
17  but, you know, Tylenol has a direct effect on
18  prothrombin INR and Tylenol toxicity.
19    I don't think she ate a bunch of mushrooms.
20  That's another thing that can cause prolonged PT.
21    And then hepatic ingestion or heart failure,
22  where your liver is actually filled up with fluid, can
23  affect your liver's ability to metabolize those
24  proteins.
25    But I would ask the obvious question first:

Page 103

1  "What medicines are you on?"
2    Q.  Are there any indications or evidence in
3  Ms. Mingo's records that she took Tylenol or that any
4  of those other factors that you just described were in
5  play for her?
6    A.  Other than the fact that I think she was
7  taking Norco, which contains acetaminophen, the answer
8  to that is no.
9    MS. HOFFMANN:  Can we take a break?
10    MR. VANZANDT:  Yeah.  Sure.
11    MS. HOFFMANN:  It's about time.
12    THE VIDEOGRAPHER:  It's 5:55 p.m.  We are off
13  the record.
14    (Recess from 5:55 p.m. until 6:01 p.m.)
15    THE VIDEOGRAPHER:  This begins Disk 3 of
16  today's deposition.  The time now is 6:01 p.m.
17    We are back on the record.
18  BY MR. VANZANDT:
19    Q.  Dr. Roth, does the term "GI bleed" or
20  "gastrointestinal bleed" appear anywhere in your
21  report in this case?
22    A.  Now, I commented on Ms. Gas -- Ms. Mingo's
23  gastric ulcer, but not the term "gastrointestinal
24  bleed."
25    Q.  Okay.  On page 7 of your report, with your

Page 104

1  opinions and conclusions, if you will look at C, you
2  say: "Ms. Mingo's slowly oozing gastric ulcer..."
3    And what are you referring to when you say
4  that?
5    A.  So in looking at her records and looking at
6  her progression, I think that she had a gastric ulcer
7  for a while.  I don't think that it all of the sudden
8  blew up on the day that she presented with the
9  endoscopy visit.
10    She had a presentation when she was hemo
11  positive, although her hematocrit or hemoglobin hadn't
12  changed very much, and -- hemo positive is a stool
13  test that tested positive for blood.  And they did a
14  bleeding scan that was negative, but they did a rectal
15  exam, I assume, and she was seen positive.  That's
16  when she got referred to gastroenterology.
17    So I would have to assume that unless she had
18  a nosebleed that we didn't know about, that that
19  was -- that ulcer was probably maybe slowly oozing at
20  that time.
21    Q.  Okay.  So, I mean, when you say "slowly oozing
22  gastric ulcer," I mean oozing means bleeding, right?
23    A.  Yes, and there's a clinical difference between
24  a ulcer that's present and it has a sheen of blood
25  over it, versus an ulcer that has a vessel that's

Page 105

1  spitting out blood every time your heart beats.  So
2  there is a big distinction between what I call a
3  gastrointestinal hemorrhage, that makes you think
4  blood is shooting everywhere, versus a GI bleed.
5  There are GI bleeds that people live with for months.
6    Q.  Okay.  So although you've referred to
7  Ms. Mingo's bleed as a slowly oozing gastric ulcer, I
8  mean, you agree that she did have a GI bleed?
9    A.  Yes.
10    Q.  Okay.  Where did you get the language "slowly
11  oozing gastric ulcer," I mean where in Ms. Mingo's
12  records?
13    A.  That's my words.  I see patients like her
14  routinely and her presentation is not atypical.
15  Ulcers don't happen overnight and there are certain
16  causative factors that she had risk factors for and
17  that's kind of where I used the term, or how I used
18  the term, I should say.
19    Q.  Okay.  If you look at page 2 of your report,
20  at the very last sentence before you get to the venous
21  thromboembolism section, it says:  "I offer the
22  opinions in this report to a reasonable degree of
23  medical certainty."
24    What do you mean by that statement,
25  "reasonable degree of medical certainty"?

27 (Pages 102 to 105)

Protected - Subject to Further Protective Review

Page 106

1    A.  That my opinions will be based on what I think
2  a reasonable physician with my similar training would
3  do and prescribe and authorize this patient to be
4  taken care of.  I think this is about comparing them
5  to what I think is a reasonable degree of certainty
6  and compatible to my training.
7    Q.  And is that term, reasonable degree of medical
8  certainty, something that you use in your clinical
9  practice?
10    A.  I think it's almost interchangeable with
11  standard of care.
12    Q.  If you could turn to page 3, the top
13  paragraph, the first full sentence on the page,
14  starting with "Ninety percent," it says:  "Ninety
15  percent of the cases of acute pulmonary emboli are
16  emboli that started in the proximal basal lower
17  extremities."
18    A.  Right.  There may be one type, basal, but
19  basilar, but bottom line is -- so ask your question.
20  I'm sorry.
21    Q.  Okay.  Where -- what's your source for that
22  information?
23    A.  That's probably either from Harrison's
24  Textbook of Medicine, it could be from just my
25  experience in knowing those numbers.  I have a

Page 107

1  subscription to several things on the Internet, but
2  that's -- that's just the data.  I think you'd look
3  -- you could Google it.  You could look at, you know,
4  Harrison's.  You could look at John Fordtran's book on
5  GI medicines, another book that I use often.
6    Q.  Okay.  I mean, as you -- as you sit here
7  today, do you know exactly where that data came from?
8    A.  Probably either Fordtran's GI book, he was my
9  department chair when I trained at Baylor, I have his
10  book; UpToDate.  I really can't tell you but I think
11  it's a pretty standard number.
12    Q.  Okay.  And those -- and those items where the
13  information may have come from is not listed on
14  Exhibit B of your report, is it?
15    A.  Well, it's based on my knowledge
16  that I've used for 20 years of practicing
17  hospital-based medicine and not preparing for this
18  document.
19    Q.  Bottom of page 3, next to last paragraph, the
20  last sentence says:  "Without thromboprophylaxis,
21  perioperative mortality from pulmonary embolus occurs
22  in 2-3 percent of patients.  With thromboprophylaxis,
23  that percentage drops to 0.1."
24    A.  Yes.
25    Q.  Where -- I mean, what does that data and

Page 108

1  information come from?
2    A.  From my knowledge, but I'm pretty sure that's
3  the latest from the ACCP guidelines, which I'm very
4  familiar with.  Did I review them for this?  No, but
5  that's probably where I got that from.
6    So what that says or what that means is
7  patients who have total hips or total knees that are
8  appropriately thromboprophylaxed, it's very
9  statistically significant that they are not going to
10  have morbidities associated with pulmonary emboli if
11  they're prophylaxed appropriately.
12    Q.  Okay.  Those ACCP guidelines, are you relying
13  on those guidelines in forming your opinions in this
14  case?
15    A.  It's just part of my knowledge base and
16  practice.
17    Q.  If you could turn to page 4, the last sentence
18  of the first paragraph:  "Anticoagulation therapy is
19  indicated for patients with proximal, symptomatic deep
20  vein thrombosis, because pulmonary embolism will occur
21  approximately 50 percent of the time if the individual
22  remains untreated."
23    Where did you -- where does that data come
24  from, that pulmonary embolism will occur approximately
25  50 percent of the time?

Page 109

1    A.  Probably the same thing, I mean, one of the
2  textbooks that I had in my office, maybe from the
3  ACCP, my own experience, but that number is a pretty
4  standard number.  I mean, it may be 48 percent in one
5  book and 52 percent in UpToDate, which is a -- but
6  that's a pretty standard number.
7    Q.  Okay.  But that data is not included in any of
8  the documents that you list on Exhibit B of your
9  report?
10    A.  Because I didn't use that data to --
11  specifically with this case.  I use that data to take
12  care of patients like whatever -- Ms. Mingo every day.
13    Q.  Okay.  And if you turn to page 6 of your
14  report now, the third full paragraph that starts
15  with "On February 12," the second sentence reads:  "On
16  February 13, 2015, nurse practitioner Zachary of
17  Dr. Gholson's office arranged for Ms. Mingo to have
18  medical admission to Southwest Mississippi Regional
19  Medical Center."
20    What do you mean by that the nurse
21  practitioner arranged for Ms. Mingo to have medical
22  admission?
23    A.  If my memory is right, I think her hematocrit
24  and hemoglobin dropped prior to when she was going to
25  see the gastroenterologist, and that triggered them to

Protected - Subject to Further Protective Review

Page 110

1    contact Ms. Mingo that her blood level had dropped,
2    and I would imagine that this nurse practitioner
3    called the ER and said this patient is coming over
4    with a low H & H.
5        Q.  Okay.  So, I mean, Ms. Mingo did go to the
6    emergency room, correct?
7        A.  Yes.  Yes.
8        Q.  And then she ended up being admitted into the
9    ICU, correct?
10       A.  Correct.
11       Q.  Okay.  And you don't disagree with either one
12   of those statements?
13       A.  No, sir.
14       Q.  Okay.  Let's turn to page 7, the page with
15   your opinions and conclusions.
16           In Section A there you state -- and I'm not
17   going to read the entire statement there, but the
18   second sentence there says:  "This regimen failed."
19           And are you -- are you referring to the
20   prophylaxis of Lovenox and aspirin 325?
21       A.  Yes, should be considered a treatment failure.
22       Q.  Okay.  And is there any evidence that
23   Ms. Mingo developed a DVT while she was taking
24   Lovenox?
25       A.  No.

Page 111

1        Q.  Okay.  And so is there any evidence that the
2    Lovenox failed?
3        A.  Her clear provoking factor for her DVT was her
4    orthopaedic surgery, and the regimen that they chose,
5    for whatever reason, did not prevent the embolism --
6    I'm sorry, the DVT from happening.
7            So whether it was a Lovenox failure versus an
8    aspirin failure -- because you can't pinpoint when
9    this DVT began to propagate.  Was it post-discharge
10   Day 6, 7, 10, 12?  We don't know that, unless you know
11   something I don't know.
12           So to say it was an aspirin or a Lovenox
13   failure, I think both would be inaccurate.  To say
14   that whatever they were given did not work to prevent
15   it would be accurate.
16           MS. HOFFMANN:  Doctor, just a clarification:
17   You said "inaccurate"?
18           THE WITNESS:  Correct.
19           MS. HOFFMANN:  Okay.  I just wanted to make
20   sure.
21   BY MR. VANZANDT:
22       Q.  Well, a patient can, I mean, develop a DVT
23   even if they are being treated with an anticoagulant;
24   is that correct?
25       A.  Yes.

Page 112

1        Q.  Okay.  Then you say, in Section A, that:
2    "Xarelto, in a therapeutic dose, was an appropriate
3    choice for treatment of Ms. Mingo's deep vein
4    thrombosis."
5            What is your basis for that opinion?
6        A.  Personal experience.
7        Q.  What is -- what is a therapeutic dose of
8    Xarelto?
9        A.  I guess maybe I should have said an
10   appropriate or FDA-approved dose.  Believe it or not,
11   people will write medicines all the time and use the
12   wrong dose, and, you know, Xarelto's -- and as well as
13   apixaban, their dosing interval is different for DVT
14   versus AFib, versus prophylaxis, versus treatment.  So
15   I guess I meant more of an appropriate dose, the dose
16   that's -- was FDA approved, which was what she was
17   prescribed.
18       Q.  Okay.  So your Opinion A, you're saying that
19   Xarelto -- I mean, she received an -- a proper
20   FDA-approved dose of Xarelto?
21       A.  Yes, sir.
22       Q.  Is that what you mean?
23       A.  Yeah.
24       Q.  Okay.  Well, I mean, since you used the word
25   "therapeutic dose," what is a therapeutic dose of

Page 113

1    Xarelto?
2            MS. HOFFMANN:  As opposed to a prophylaxis
3    dose?
4        Q.  I just want to know what a therapeutic dose of
5    Xarelto is.
6            MS. HOFFMANN:  Okay.
7        A.  So, you know, Xarelto has different
8    indications.  So the dose of Xarelto for DVT
9    prophylaxis status post-hip or knee is a different
10   dose than it is for DVT with or without PE.
11       Q.  Okay.  So for someone with an acute DVT like
12   Ms. Mingo, what is a therapeutic dose of Xarelto?
13       A.  The appropriate dose that's FDA approved is 20
14   twice a day for the first 21 days.
15           THE WITNESS:  Is that right?
16           MS. HOFFMANN:  No.
17       A.  It's 15, 15 twice a day and then 20 a day
18   after day 21.
19           MS. HOFFMANN:  Let's do it again.
20       A.  And then you've got 5 milligrams for apixaban,
21   2.5 -- there you go.
22           MS. HOFFMANN:  You need your Hippocrates or
23   whatever it is.  Let's -- let's do that again.
24   What is --
25   BY MR. VANZANDT:

29 (Pages 110 to 113)

Protected - Subject to Further Protective Review

Page 114

1    Q.  The -- right.  So you said the FDA-approved
2  dose of Xarelto for a patient with acute DVT --
3    A.  Is 15 milligrams twice a day for the first 21
4  days, which was what she was prescribed.
5    Q.  That's the FDA-approved dose that's in the
6  label, correct?
7    A.  Yes.
8    Q.  But is that a therapeutic dose for Ms. Mingo?
9      MS. HOFFMANN:  Objection.
10   A.  I think it's the right dose.
11   Q.  Okay.  And what's that based on?
12   A.  The FDA's data that says that's the dose that
13  was tested for this lady or this condition.
14   Q.  I mean, is that a therapeutic dose for anyone?
15   A.  It's the FDA-approved dose for this patient.
16   Q.  Okay.  I mean, would that same dosage be a --
17  be therapeutic for a 30-year-old male who weighs 250
18  pounds?
19     MS. HOFFMANN:  Objection.
20   A.  Yes.
21   Q.  And that same exact dose would be therapeutic
22  for a 67-year-old female who weighs 90 pounds?
23     MS. CONKLIN:  Objection.
24   A.  As long as there is no other comorbidities or
25  reasons to change the dose, the answer to that is yes.

Page 115

1    Q.  I mean, are there certain populations, certain
2  people who respond differently to Xarelto?
3      MS. HOFFMANN:  Objection.
4    A.  I mean, that's not what I came here to talk
5  about, but, you know, there are very few reasons I
6  would not use this drug:  In dialysis patients, a
7  600-pound bariatric patient may need a different dose,
8  but I think -- I never met this patient but she
9  appeared to fall within the two parameters that -- I
10  think the dose that was prescribed to her for her DVT
11  was the appropriate dose.
12   Q.  Now, you said two parameters.  What are those
13  parameters?
14   A.  I meant treatment and the dosing.  So, you
15  know, in the -- there are cases I've seen in my own
16  group where it's prescribed incorrectly, where
17  somebody will say, "Well, it's 20 milligrams.  I'll
18  just give it once a day," or "I'm just going to give
19  the 15 milligrams."
20     We know that those first 21 days, these
21  patients need the dose that's FDA approved.  They did
22  it for a reason.  Those patients are more likely to
23  extend and propagate their clot in those first 21
24  days.  So that's the appropriate dose for this
25  patient.

Page 116

1    Q.  Okay.  I mean, as a doctor who prescribed
2  Xarelto to patients, how can you ensure that the
3  dosage you prescribe to that patient is a proper
4  dosage for that specific patient?
5      MS. HOFFMANN:  Objection.
6      MS. CONKLIN:  Objection.
7    A.  I practice based on the guidelines that are
8  put in front of me and I'm held to the standard of a
9  community-based internist who practices hospital-based
10  medicine, and the trial -- I'm not going to get into
11  that because -- but it's clear to me that this lady's
12  dose of Xarelto for her condition was appropriate.
13     I guess, to answer your question too,
14  therapeutic as opposed to nontherapeutic would tell me
15  that I underdosed or overdosed somebody.  She had --
16  she was given the appropriate dose for her diagnosis,
17  both in duration and in milligrams.  Those are the two
18  parameters.
19   Q.  She was given the dosage that is FDA approved
20  and is included in Xarelto's label; is that correct?
21   A.  Correct.
22   Q.  How can you as a prescribing physician
23  determine whether that dosage sufficiently
24  anticoagulates a patient's blood or overanticoagulates
25  a patient's blood?

Page 117

1      MS. HOFFMANN:  Objection.
2      MS. CONKLIN:  Objection.
3    A.  We, as prescribing physicians, are quite aware
4  that there is not a reliable or accessible way to
5  evaluate the anticoagulation effect of the factor Xa
6  drugs, but the fact that every meta-analysis that
7  compared all these drugs showed the bleeding to be
8  less when you look at it across the trial, then there
9  can -- then Coumadin, not head-to-head the NOACs and
10  DOACs, but comparing the warfarin, I think we feel
11  very safe as a prescribing physician that's not
12  involved in clinical trials that the FDA has done
13  their homework and I'm going to write that drug as
14  outlined by them and that's what I think this
15  practitioner probably did.
16   Q.  Certain patients respond to certain
17  medications differently; is that correct?
18     MS. HOFFMANN:  Objection.
19     MS. CONKLIN:  Objection.
20   A.  I'm sure they do.
21   Q.  I mean, do they?  Can one patient have a
22  different response to a particular medication?
23   A.  Sure.  Some bodies are allergic to penicillin
24  and some people aren't.  That's a true statement.
25   Q.  Okay.  And is that the case for warfarin?  So

30 (Pages 114 to 117)

Protected - Subject to Further Protective Review

Page 118

1 do patients' blood respond differently to warfarin?
2   A.  You know, if they have severe underlying liver
3 disease or they have taken medicine that interacts
4 with them, but usually it's pretty consistent.  So I
5 can get somebody's INR out in about the same time
6 frame whether I'm treating you or you.
7   Q.  Right.  And how do you get them in a
8 particular INR range with warfarin?
9   A.  You know, I start them at a certain dose,
10 let's say it's 5 milligrams or 7 milligrams.  Warfarin
11 doesn't have clearly defined dosing parameters like
12 the NOACs or DOACs, at least two agents do, Eliquis
13 and Xarelto.  A lot of that is dependent on the
14 patient's response and their medicines, are they on
15 anything else that could prolong their INR or their
16 pro time.
17   Q.  So for a patient on warfarin, you would
18 measure their INR and based on that result -- I mean,
19 if -- say that their INR was below the therapeutic
20 range.  What would you do for a patient on warfarin?
21   A.  Well, it depends.  If it's Day 2, nothing.
22   Q.  Okay.
23   A.  If it's Day 20 and they are still not out,
24 then I would increase the dose.
25   Q.  Okay.  And if it's Day 20 and a patient is

Page 119

1 above the therapeutic range for warfarin, what would
2 you do?
3   A.  Depends what range they are in.  I mean, if
4 they are 3, I would do nothing.  If they are 22, then
5 I would do something.  That's totally patient to
6 patient.
7   Q.  If a patient is above the therapeutic range to
8 an extent that it concerns you, what -- how do you --
9 how do you respond for that?
10   MS. HOFFMANN:  Objection.
11   A.  I'd probably --
12   MS. HOFFMANN:  Go ahead.
13   A.  I'd probably discontinue the drug for a day or
14 two, repeat the INR later, you know, repeat the INR at
15 a different -- at a set time.
16   Q.  Would you continue the patient on the same
17 exact dose?
18   A.  I said I'd -- I said I'd discontinue it.
19   Q.  Discontinue the medication altogether?
20   A.  Uh-huh, because they are already
21 anticoagulated.  It's different with Coumadin, as
22 opposed to the NOACs and DOACs.  Coumadin will -- they
23 will remain therapeutic for two or three days if
24 they're super therapeutic, so they are not exposing
25 them to any more risk, as opposed to the NOACs and

Page 120

1 DOACs.  If you stop them, within X number of hours
2 they will not be anticoagulated anymore.  They are at
3 risk.
4   Q.  So you said you would just remove the patient
5 or stop warfarin for that patient?
6   A.  I would tell them to hold your Coumadin today
7 and tomorrow, repeat your INR and let's see where
8 you're going.
9   Q.  Okay.  And would you reinitiate the warfarin
10 at any point?
11   A.  Sure.
12   Q.  Or just remove them completely?
13   A.  No.  I would get them back on once I thought
14 -- you know, I'd look into why they all the sudden
15 bounced their INR out.  I mean, you know, did you
16 change your diet?  Did you get put on Cipro?  What did
17 you do to bounce it up?
18   But, yeah, if it's -- if they were having no
19 problems with it, I could put them back on.
20   Q.  When you put them back on it, would you put
21 them back on it at a lower dose?
22   A.  Depends.  If they come back in the therapeutic
23 range and they tell me that, you know, they took two
24 pills a day or I find other reason, that same dose may
25 be fine.

Page 121

1   Q.  Okay.
2   A.  Or, obviously, I could reduce it too, but I
3 don't think that's always the thing to do.
4   Q.  I mean, is there ever a situation to where you
5 reduce a patient's dosage of warfarin?
6   MS. HOFFMANN:  Objection.
7   A.  Yes.
8   Q.  Okay.  And what -- what circumstances would
9 lead you to do that?
10   MS. HOFFMANN:  Objection.
11   A.  If a patient comes in with, you know, an INR
12 that's extended and I think they're at risk, then I
13 will just tell them, you know, we're going to -- we're
14 going to hold it or we're going to decrease your dose,
15 but that's based on, you know, very standardized lab
16 testing of the drug that's not out there with some of
17 the other anticoagulants.
18   Q.  And so for Xarelto, for instance, you don't
19 have that ability to test the patient's anticoagulant
20 level to see if they are within the proper range; is
21 that correct?
22   A.  There is not a consistent and accessible
23 parameter that we can track with the factor Xa
24 inhibitors, but the beauty of the drugs is the studies
25 were done that you don't have to track them.  I mean,

31 (Pages 118 to 121)

Protected - Subject to Further Protective Review

Page 122

1    they're much more consistent, they're much cleaner
2    drugs, there is much less drug interactions, and I
3    think the FDA had the confidence to approve the drug
4    without it having a, quote, unquote, monitoring
5    system, and that's how we prescribe it.
6        Q.   But as a prescriber, you prescribe Xarelto at
7    the dosage indicated on the label and that's the only
8    way you know if that patient is in a therapeutic
9    range?
10       A.   If they are compliant.  You know, obviously,
11   if, you know, if they present 10 days after their
12   treatment and they are having nosebleeds, I want to
13   know how they're taking their medicine.  The same
14   thing is if they would present 10 days after therapy
15   with an extension of their DVT, I'd want to know if
16   they are being compliant.
17       So you monitor them.  You monitor them
18   clinically:  How are you doing?  How do you feel?  Are
19   you coughing up any blood?
20       I mean, you don't have to have a lab test to
21   tell whether somebody is responding to the medicine.
22   Maybe you repeat the ultrasound and the clot is
23   dissipating, then you'd have to presume they are in
24   therapeutic range, it's doing its job.
25       Q.   So the only way you could tell if a patient is

Page 123

1    having a problem with Xarelto, if they are too --
2    overanticoagulated would be if they show up with some
3    kind of adverse event?
4        MS. HOFFMANN:  Objection.
5        MS. CONKLIN:  Objection.
6        A.   Or I could send a -- what I think is only a
7    reliable test, which would be an antifactor Xa, which
8    would not come back to give me, really, any real help
9    in my practice for a day or two or three.
10       Q.   If PT measurements with any reagent were
11   suggested in Xarelto's label, it was suggested that
12   you use PT to measure Xarelto, would you do that in
13   your practice?
14       MS. HOFFMANN:  Objection.
15       MS. CONKLIN:  Objection.
16       MS. HOFFMANN:  I don't know what you mean by
17   suggested.
18       A.   If there was a consistent way to measure the
19   correlation or the anticoagulation effect of the
20   factor Xa's, I think we would use it.  There is no
21   data to show that.  They are somewhat inaccessible
22   currently, in my practice.
23       Q.   Right.  If you had information indicating that
24   pro time testing, the testing that's available at
25   almost every hospital, at your hospital, the reagents

Page 124

1    you have at your hospital, if you had information
2    indicating that PT measurements with those tests could
3    be used to indicate whether a patient is properly
4    anticoagulated on Xarelto, would you have used those
5    tests to do that?
6        MS. HOFFMANN:  Objection.
7        MS. CONKLIN:  Objection.
8        A.   I would be much better off if it was more like
9    an INR, which was standardized across the labs, and
10   not a prothrombin time.
11       Q.   I mean, would you -- would you use pro time to
12   measure a patient if --
13       A.   Probably not.  I'd probably want -- I'd want
14   the standardization across the threshold of an INR
15   before a prothrombin time, but if there was a
16   consistent way that showed a linear correlation
17   between the anticoagulative effect of any drug that's
18   been through the rigorous processes to get approved,
19   would I use it?  Yes.
20       Q.   If Xarelto's label included -- I'm sorry.  Do
21   you need to take that?
22       A.   Nope.  It's about basketball.
23       Q.   If Xarelto's label included instructions on
24   how to use PT to measure the anticoagulation rate of
25   Xarelto, along with the range of what the PT should be

Page 125

1    for a patient to be properly anticoagulated on
2    Xarelto, would you order PT tests for your patients on
3    Xarelto?
4        MS. HOFFMANN:  Objection.  Objection.
5        A.   There is no clear data to support that
6    following a prothrombin time is going to give you an
7    accurate reflection of a patient's anticoagulation
8    status on a factor X inhibitor, so, you know, maybe
9    you need to ask somebody who is smarter than me, but
10   in my practice, and in my opinion, they're -- those
11   two are not clinically correlated to those patients'
12   level of anticoagulation.
13       So I would use it if it was a standardized
14   test across labs across the United States, like an INR
15   is.  That's not what's out there.  That's not what's
16   available.  So I feel very confident in using the
17   NOACs and DOACs when they are indicated without having
18   a knee jerk test out there to tell me what their
19   anticoagulation level is.
20       Q.   So, I mean, does it interest you at all to
21   know what the anticoagulation level is for that
22   specific patient as opposed to the thousands of
23   patients that were in a clinical trial?
24       MS. HOFFMANN:  Objection.
25       MS. CONKLIN:  Objection.

32 (Pages 122 to 125)

Page 126

1    A.  There is no data -- again, we can sit here all
2  night and talk about it.  There is no data to show
3  that it's an accurate reflection at this time.  So to
4  me, it's clinically irrelevant what a prothrombin time
5  is four hours after someone takes a factor Xa
6  inhibitor, because four hours later, it's going to
7  decrease; as opposed to Coumadin, whose half-life is
8  much longer, that that INR may have a very subtle
9  shift.
10      I mean, that's what the INR is.  N is for
11  normalization.  It was normalized across labs.  That's
12  why I think the INR is a much better test for Coumadin
13  and its anticoagulation effect than a pro time.
14    Q.  An INR can't be used to measure the
15  anticoagulant effect for a patient with Xarelto,
16  correct?
17    A.  Neither can PT.
18    Q.  P -- it can't?
19    A.  It's not indicated nor is it shown to be
20  clinically consistent with the anticoagulation level
21  of these drugs.  I mean, that's -- that's not my area
22  of expertise.  My area of expertise is how do I treat
23  somebody with a DVT.  So we can beat this up forever,
24  but that's -- that's not my wheelhouse.
25    Q.  Okay.  Have you ever -- have you reviewed any

Page 127

1  medical -- peer-reviewed medical journal articles
2  regarding whether PT can be used to measure the
3  anticoagulant effect of Xarelto?
4    A.  No.
5    Q.  You haven't?
6    A.  Other than the trials that I've reviewed.  I
7  mean, the first line in the -- you know, the second
8  sentence of several of these trials say that there is
9  not a consistent reliable way to follow the
10  anticoagulation effect of factor Xa inhibitors.  I
11  mean, that's -- that's -- they don't try to hide that.
12  It's in the opening paragraph on several articles.
13      I mean, DOACs cannot be followed by
14  prothrombin times.  Period.  I --
15    Q.  Okay.  I mean, do patients that live in Canada
16  respond to Xarelto differently than patients that live
17  in the United States?
18      MS. HOFFMANN:  Objection.
19      MS. CONKLIN:  Objection.
20    A.  I don't practice in Canada.
21    Q.  Okay.  So you haven't seen Canada's label that
22  lays out how you can measure Xarelto's anticoagulation
23  level with PT?
24      MS. HOFFMANN:  Objection; asked and answered.
25    A.  No.

Page 128

1    Q.  You haven't seen that?
2    A.  (Shaking head.)
3    Q.  You haven't seen the New Zealand label that
4  lays out parameters for measuring Xarelto's
5  anticoagulant effect using PT?
6      MS. HOFFMANN:  Objection.  Counsel, you asked
7  all these questions.
8    A.  I don't have a license in New Zealand or
9  Canada.
10    Q.  Okay.  But you haven't seen those labels?
11    A.  No.  I have no reason to.
12    Q.  Okay.
13    A.  Nor do -- never mind.  Go ahead.
14    Q.  Are you aware of any populations that
15  respond -- when I say populations, age, patient
16  populations that respond differently to Xarelto.
17      MS. HOFFMANN:  Objection.
18    A.  Creatinine clearance, renal failure, I would
19  dose it differently or not use it, but, you know,
20  there is no specific weight-based guidelines that I'm
21  aware of, or African American versus Indian versus
22  Canadian versus New Zealand.
23    Q.  What about -- what about the elderly, is
24  Xarelto safe to use in elderly patients?
25    A.  Sure.  You know, with any anticoagulant, it's

Page 129

1  -- you have to be fearful because a fall or something
2  in the elderly could be something -- on anticoagulant,
3  that would be detrimental, but, you know, I may not
4  use it on an 87-year-old feeble patient, but I've used
5  it in 70-something-year-old patients.
6    Q.  How would you describe a feeble patient?
7    A.  You know, like on a walker, can't walk,
8  wheelchair bound.
9    Q.  Okay.  Are you aware of whether or not Xarelto
10  has been shown to increase the bleeding events in
11  elderly patients?
12    A.  No.
13    Q.  You're not aware of that?
14    A.  (Shaking head.)
15    Q.  Okay.  If you could, grab the Xarelto label I
16  handed you earlier.  Turn to page 19, Section 8.5 on
17  page 19, under "Geriatric Use."
18    A.  Okay.
19    Q.  The last sentence of that paragraph says that:
20  "Both thrombotic and bleeding event rates were higher
21  in these older patients, but the risk-benefit profile
22  was favorable in all age groups."
23      So the first part of that sentence, I mean, is
24  that indicating that the bleeding events rates were
25  higher in older patients?

33 (Pages 126 to 129)

Protected - Subject to Further Protective Review

Page 130

1    A.  Sure.  I mean, that's -- I think that's common
2    sense.  I mean, they have more comorbidities and they
3    probably take more medications than someone who is 30.
4    So does it surprise me that an elderly patient has a
5    higher bleeding event rate with any anticoagulant, no,
6    that would not surprise me.
7    Q.  Okay.  Have you ever reviewed that portion of
8    Xarelto's label that we just looked at?
9    A.  No.
10    Q.  Do you know how old Ms. Mingo was when she was
11    prescribed Xarelto?
12    A.  I think she was in her sixties, but you can
13    tell me.  How old was she, 60 something?
14    Q.  She was 67.
15    A.  Okay.  I'm not sure what the definition of
16    geriatric is, but probably 75 or 70.
17    Q.  Well, I mean, can you look at that
18    paragraph there and tell me how it's defined?
19    A.  My guess, looking at this without -- is
20    greater than 75 years of age appears to be what's
21    there.
22    Q.  And it also, for specifically the third
23    sentence there:  "In the EINSTEIN DVT, PE and
24    Extension clinical studies approximately 37 percent
25    were 65 years and over, and 16 percent were greater

Page 131

1    than 75.  In clinical trials, the efficacy of Xarelto
2    in the elderly" -- and indicates 65 or older -- was
3    similar to that seen than younger than 65.
4    So based on that sentence, would you agree
5    that they are defining "elderly" at 65 years or older?
6    MS. HOFFMANN:  Objection.
7    A.  I guess they are, but either way, it's similar
8    to seeing patients that are younger, so I don't think
9    it's statistically significant.
10    Q.  Doctor, could you turn to page 23?  And it
11    doesn't have a number but it's just listed in the
12    middle of the page "Elderly."
13    It says:  "In clinical studies, elderly
14    subjects exhibited higher rivaroxaban plasma
15    concentrations than younger subjects with mean AUC
16    values being approximately 50 percent higher, mainly
17    due to reduced total body and renal clearance."
18    What does the term "AUC values" mean?
19    MS. HOFFMANN:  Objection.
20    A.  It's not my specialty area.
21    Q.  So you don't know what AUC value means?
22    A.  No.
23    Q.  You don't understand that AUC value means
24    total drug exposure over time?
25    MS. HOFFMANN:  Objection.

Page 132

1    MS. CONKLIN:  Objection.
2    A.  That's fine.  I'll take your word for it.
3    Q.  Okay.  And so for elderly patients, the total
4    drug exposure over time is approximately 50 percent
5    higher according to that paragraph; is that correct?
6    MS. HOFFMANN:  Objection.  In your definition
7    of AUC means.
8    MR. VANZANDT:  Right, that he just accepted.
9    MS. HOFFMANN:  No.  He said he was -- all
10    right.
11    MR. VANZANDT:  No, I'm not saying he accepted
12    it to be truth, but for purposes of this
13    deposition, he's taking my word for it, and we can
14    do that.
15    MS. HOFFMANN:  That's fine.  I'm sorry.  Then
16    why don't you repeat your question.  I apologize.
17    MR. VANZANDT:  Can you please read back the
18    question?
19    (The question was read by the reporter:  And
20    so for elderly patients, the total drug exposure over
21    time is approximately 50 percent higher according to
22    that paragraph; is that correct?)
23    MS. HOFFMANN:  Objection.
24    A.  Again, this is not what my area of expertise
25    is, so, you know, I would base the fact that that

Page 133

1    statement is more age-related would be consistent with
2    other comorbidities and renal function more than age.
3    Q.  Okay.  Well, I mean, this is -- I mean, this
4    is coming directly from Xarelto's label, right?
5    A.  I understand.
6    Q.  And you prescribe Xarelto to elderly patients?
7    A.  I do.
8    Q.  Is that right?  Okay.  And you don't
9    understand what this paragraph is saying when it says
10    AUC values?
11    A.  I understand what it says.  You asked me if I
12    knew what AUC -- I understand what plasma levels of a
13    drug are.
14    Q.  Okay.
15    A.  But, I mean --
16    Q.  Have you ever reviewed that paragraph before
17    today?
18    A.  If -- I mean, I'm sure I reviewed the study,
19    but, I mean, do I remember reading the elderly
20    sentence about AUC?  No.
21    Q.  And that sentence goes on to say -- or that
22    paragraph that:  "Age-related changes in renal
23    function may play a role in this age effect."
24    Can you describe really how -- why -- what's
25    the connection between renal function and age?

Protected - Subject to Further Protective Review

Page 134

1    MS. HOFFMANN: Objection.
2    Q. I mean, I'm trying to understand that. Let
3    me -- do elderly patients have decreased renal
4    function?
5    MS. HOFFMANN: Objection.
6    A. Wear and tear after years, years of
7    hypertension, years of diabetes. They may have
8    decrease in renal function as opposed to someone who
9    is diagnosed at 20. I think their kidneys are
10   probably in better shape than someone who is 67 and
11   had had diabetes for 20 years.
12   Q. So if someone -- if someone has decreased
13   renal function, how does that affect Xarelto?
14   A. It's renally excreted, so at a certain
15   creatinine clearance, then that's when you have to
16   make dosing adjustments or discontinuation of the
17   drug, and that's seen pretty much on any drug that's
18   renally excreted versus hepatically metabolized.
19   Q. So if someone has decreased renal function,
20   does that mean that they are exposed to more of the
21   drug, less of the drug? I mean, what effect does that
22   have?
23   MS. CONKLIN: Objection.
24   A. It means -- it means it extends the half-life
25   if it can't be cleared.

Page 135

1    Q. Okay. I mean, does that mean that they're
2    exposed to the drug longer? I'm just trying to
3    understand what that -- how that would affect the
4    patient.
5    A. It means that it is excreted at a different
6    rate than it would be excreted if they had kidney
7    function that was normal.
8    Q. So if they have -- excuse me.
9    If they have decreased renal function, it
10   would be descreted -- excreted slower?
11   A. Yes.
12   Q. Okay. And so the drug would be in their
13   system longer?
14   A. Correct.
15   Q. Okay. And so a patient with decreased renal
16   function would be exposed to Xarelto longer than a
17   patient with normal renal function?
18   MS. CONKLIN: Objection.
19   A. At a certain level.
20   Q. At a certain level?
21   A. At a certain level, meaning at a certain
22   creatinine clearance level, not at a certain serum
23   concentration level of Xarelto.
24   Q. Okay. Now, we know, don't we, that Ms. Mingo
25   had some degree of compromised renal function,

Page 136

1    correct?
2    MS. HOFFMANN: Objection.
3    A. In reviewing her records, I would not have
4    classified her as -- she had minimal, if any, renal
5    disease based on her glomerular filtration rate and
6    her creatinine level. She was on several medicines
7    that would have needed to be adjusted if everyone was
8    so concerned about her creatinine, like the metformin,
9    the aspirin, the Anaprox, the nonsteroidals that
10   affect kidney function.
11   Did she have a degree of kidney malfunction
12   based on diabetes? I'm sure she probably did. But
13   was it enough that I would have adjusted her dose of
14   this medication? No.
15   Q. Well, I mean, are you aware that she had
16   previously been diagnosed with stage 2 chronic kidney
17   disease?
18   MS. HOFFMANN: Objection.
19   MS. CONKLIN: Objection.
20   A. I've reviewed those medical records.
21   Q. I mean, were you aware of that?
22   A. Yeah.
23   Q. Okay.
24   A. Yes, sir.
25   Q. And were you aware that on January 7th, 2015,

Page 137

1    her eGFR reading was 55?
2    MS. HOFFMANN: Objection.
3    A. I'll take your word for it. That is nowhere
4    near the dosing label that I would change the dose
5    with a GFR of 55 or 60.
6    Q. What would -- what would a patient's GFR
7    have -- eGFR have to be before you would change the
8    dose?
9    A. No, I think --
10   MS. HOFFMANN: For which indication?
11   MR. VANZANDT: The one we're talking
12   about today, acute DVT.
13   MS. HOFFMANN: Thank you.
14   A. Thirty.
15   Q. I'm sorry?
16   A. Fifteen or 30.
17   Q. Now, is that creatinine clearance or eGFR?
18   A. That's creatinine clearance.
19   Q. Okay. So what eGFR would a patient have to
20   have to make that called for?
21   A. I would have to look at the stuff, but in
22   no -- in looking at her medical records, I didn't see
23   any indication that her kidney function was a factor
24   in the decision to use any anticoagulant. I would
25   have treated her with any anticoagulant based on her

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 138

1 kidney function she had at the time of presentation.
2 Q. Okay. I guess I'm trying to understand. You
3 know, the label gives parameters for, you know,
4 creatinine clearance numbers. What's the abbreviation
5 for it? C --
6 A. CCR.
7 Q. Yeah, CCR. But Ms. Mingo's records showed her
8 kidney function readings in eGFR.
9 A. That's the glomerular filtration rate.
10 Q. Okay. And so how do those numbers compare? I
11 mean, so if you are measuring a patient using eGFR,
12 how do -- what's the number, the minimum -- the number
13 that would make you have to do a dose adjustment?
14 MS. CONKLIN: Objection.
15 A. For?
16 Q. For Xarelto.
17 A. I mean, I'd have to look at the studies but,
18 again, it's nowhere close to what her renal function
19 was at the time of her admission for her -- at the
20 time of her hospitalization, and I've reviewed it from
21 January to February.
22 Q. Were you aware that on February 13th, the day
23 that she comes in for the GI bleed, that her eGFR is
24 below 60 on that day?
25 A. Yes.

Page 139

1 Q. Okay. And so, I mean, it's your opinion that
2 her kidney -- her kidney function, the labs that were
3 done to test her kidneys, did not indicate any kind of
4 dose adjustment --
5 A. Correct.
6 Q. -- of Xarelto? Okay.
7 That being so, I mean, we do know that she
8 had -- I mean, she did have some degree of decreased
9 renal function, though, correct?
10 MS. HOFFMANN: Objection.
11 A. Did she -- I mean, based on her values, I was
12 clinically underwhelmed that she had kidney issues
13 that would preclude me from dosing the medicine the
14 way it was dosed.
15 Q. She didn't have the kidney function of a
16 healthy 30-year-old patient, did she?
17 MS. HOFFMANN: Objection.
18 A. I'm not sure I can answer that, unless I do a
19 kidney biopsy, which --
20 Q. But you don't disagree with the fact that she
21 was -- had already been diagnosed with stage 2 chronic
22 kidney disease?
23 A. I have no -- no problem with that statement.
24 Q. And you don't disagree with the fact that she
25 was 67 years old?

Page 140

1 A. No problem with that.
2 Q. Meeting the definition of "elderly" as set
3 forth in Xarelto's label?
4 MS. HOFFMANN: Objection.
5 Q. You don't disagree with that?
6 A. I don't view 67 in my practice as elderly.
7 And does she have kidney disease based upon her risk
8 factors? She may, but in my opinion, the amount of
9 kidney disease she had was irrelevant to the treatment
10 that she got.
11 Q. Okay. So looking at the elderly section on
12 page 23, I mean, that paragraph sets forth -- and the
13 previous elderly section we looked at -- that elderly
14 patients and subjects with decreased renal function,
15 those are two factors that are set forth that may
16 affect how a patient responds to Xarelto; is that
17 correct?
18 MS. HOFFMANN: Objection.
19 A. Say that again.
20 Q. That was a terrible question.
21 So we saw how it said elderly subjects
22 exhibited higher rivaroxaban plasma concentrations
23 than younger subjects with mean AUC values being
24 approximately 50 percent higher.
25 So elderly patients, that's one factor that

Page 141

1 would maybe lead to a patient being exposed to Xarelto
2 longer than a younger patient?
3 MS. CONKLIN: Objection.
4 A. That's not the way that I would approach this
5 patient. Again, I apologize for not saying that I
6 reviewed this but 67, to me, isn't elderly, and her
7 kidney function, to me, for her age and her
8 comorbidities was fine, and I would not have changed
9 the dosing based on her kidney function.
10 Q. If you could turn to page 19 of the label that
11 you have in front of you, Section 8.7, Renal
12 Impairment.
13 A. What page?
14 Q. 19, Section 8.7 towards the bottom down there.
15 So this section of the label sets forth what
16 we were just talking about, the adjustments that
17 should be made with Xarelto dosage based on the
18 patient's kidney function; is that correct?
19 A. You're on 8.7 now, Renal Impairment?
20 Q. Yes, sir.
21 A. Okay.
22 Q. And you'll see it has the AFib section, and
23 then you can turn over, Treatment of DVT and then
24 Prophylaxis DVT.
25 A. Uh-huh.

36 (Pages 138 to 141)

Protected - Subject to Further Protective Review

Page 142

1    Q.  And so if you could just look at the
2  Treatment of DVT section, it says: "In the EINSTEIN
3  trials patients with CRCL levels less than 30
4  milliliters per minute at screening were excluded from
5  the studies.  Avoid use of Xarelto in patients with
6  CRCL level less than 30 milliliters per minute."
7       Did I read that correctly?
8    A.  Uh-huh.  Yes.
9    Q.  And so if a patient's creatinine clearance is
10  below 30, you should not prescribe Xarelto to them?
11   A.  Correct.
12   Q.  For DVT?
13   A.  Correct.
14   Q.  But for AFib, if you turn back to page 19, for
15  AFib, if a patient is below 30, between 15 and 30 --
16  I'm sorry.
17      Let me just ask you this.  There is a dose
18  adjustment for patients on AFib that fall outside of
19  the parameters of the -- the parameters set forth for
20  kidney function in the label, correct?
21   A.  I didn't follow that one.
22   Q.  Okay.  If -- for a patient taking Xarelto for
23  DVT --
24   A.  Okay.
25   Q.  If their creatinine clearance is below 30,

Page 143

1  what do you do?
2    A.  All right.  You monitor that patient
3  differently or don't prescribe the drug.
4    Q.  Okay.  For a patient that's being prescribed
5  Xarelto for AFib, if their creatinine clearance is
6  below 30, what do you do?
7    A.  I'd have to spend some time reading what
8  the nonvalvular AFib and ROCKET said about renal
9  impairment.
10   Q.  Does that -- I mean, does that --
11   A.  I mean, those things are different.  I mean,
12  you've got to understand that --
13   Q.  Okay.  And there is a decreased dose for --
14   A.  Sure.
15   Q.  Okay.  And so instead of 20 milligrams a day,
16  you can give the patient 15 milligrams a day?
17   A.  For AFib.
18   Q.  For AFib, yes.
19   A.  Right.  But it's a different -- whole
20  different pathology, whole different patient, whole
21  different age group, whole different risk factor.
22   Q.  Right.
23   A.  You can't compare them.
24   Q.  Right.  I'm not comparing them.  I'm just
25  saying there is a dose adjustment for AFib.

Page 144

1    A.  There is.
2    Q.  And there's not for DVT?
3    A.  That's right.
4    Q.  So DVT, you just wouldn't prescribe the
5  patient Xarelto?
6    A.  Not with a creatinine clearance of 30 or less.
7    Q.  Okay.  Ms. Mingo was taking the highest
8  available dose of Xarelto, wasn't she?
9       MS. HOFFMANN:  Objection.
10   A.  She was taking the appropriate dose for the
11  diagnosis of DVT.
12   Q.  All right.  That's 15 milligrams twice daily,
13  correct?
14   A.  Uh-huh.
15   Q.  That's 30 milligrams a day?
16   A.  That's what it is.
17   Q.  And that's the highest available dose, daily
18  dose of Xarelto that --
19   A.  I could write it 10 times a day if I wanted
20  to.
21   Q.  Have you ever done that?
22   A.  No.
23   Q.  Okay.
24   A.  So it's not the highest dose.  I mean, that's
25  the correct dose, that's the dose that she should have

Page 145

1  been given.
2    Q.  That's the highest dose -- FDA-approved dose
3  set forth in Xarelto's label?
4    A.  For DVT, yes.
5    Q.  For any indication?
6    A.  Sure.
7    Q.  Okay.  So if a patient is taking Xarelto for
8  AFib and has normal renal function, they take
9  20 milligrams once daily, correct?
10   A.  That's right.  Totally different patient
11  populations between ROCKET and EINSTEIN.
12   Q.  Okay.  But you only relied on ROCKET studies
13  in forming your opinion in this case, though, right?
14      MS. CONKLIN:  Objection.
15      MS. HOFFMANN:  Objection.
16   A.  No.
17   Q.  Well, that's the only ones you've listed in
18  your report.
19      MS. HOFFMANN:  We've been through this,
20  Counsel.
21   A.  EINSTEIN or ROCKET, I mean, obviously, I'm
22  aware of the EINSTEIN trials.
23   Q.  Well, I just want to know why you only
24  included ROCKET trials in the documents that you
25  relied on to form your opinions in this case?

37 (Pages 142 to 145)

Protected - Subject to Further Protective Review

Page 146

1    MS. HOFFMANN: Objection, Counsel. It's all
2  been asked and answered.
3    Q.  Okay. Let's look at page 4 of the label that
4  you have in front of you. I'm sorry. Page 7,
5  Section 4 on page 7, Contraindications.
6    The second contraindication listed there is
7  severe hypersensitivity reaction to Xarelto.
8    How do you determine if a patient is
9  hypersensitive to Xarelto?
10   A.  That's a big doctor word for allergic.
11   Q.  Okay. I mean, how would you know if a patient
12 is allergic to Xarelto?
13   A.  Rash, can't breathe, stridor.
14   Q.  Are there any other adverse reactions that
15 would indicate that a patient is hypersensitive to
16 Xarelto?
17   A.  Not in my opinion.
18     THE COURT REPORTER: Say it again.
19   A.  No -- not in my opinion.
20   Q.  Going back to your report, page 7, Opinion B
21 that you have there, you state that: "Ms. Mingo's
22 deep vein thrombosis was related to her total hip
23 arthro- " -- I can't pronounce that word.
24   A.  Arthroplasty.
25   Q.  -- "arthroplasty which was done on January 6,

Page 147

1  2015."
2    What do you mean by the word "related"?
3    A.  So DVTs are either classified as provoked or
4  unprovoked, and one of the provoking factors for DVT
5  is major orthopaedic surgery and that was her -- she
6  had other risk factors for DVT, I mean, obesity,
7  things like that, but I think most reasonably trained
8  hospitalists or internists would say that her DVT was
9  related to her recent hip arthroplasty.
10   Q.  Do you attribute the DVT to the -- what you
11 called failure of Lovenox/Coumadin regimen?
12   A.  You know, we classify people who have been
13 appropriately prophylaxed as a treatment failure. You
14 know, will it come out that she has breast cancer and
15 her hypercoagulable event that caused her to have a
16 DVT despite prophylaxis was from a different cause?
17 Maybe that's in the future, but common things being
18 common, it was related to her total hip arthroplasty.
19   Q.  And your next opinion, Opinion C, says that:
20 "Ms. Mingo's slowly oozing gastric ulcer is most
21 likely the result of her use of nonsteroidals in the
22 preoperative setting, along with her ongoing aspirin
23 therapy."
24   Okay. Is it your opinion that Ms. Mingo
25 developed a gastric ulcer due to the use of

Page 148

1  nonsteroidals or that she developed a slowly oozing
2  gastric ulcer due to the use of nonsteroidals?
3    A.  I'm not sure I can separate them. You know,
4  she had taken or had listed Anaprox, which is a very
5  good nonsteroidal. You know, when you have hip
6  arthroplasties, you have to jump through numerous
7  hoops before they approve, hoops: Did they fail
8  nonsteroidal therapy first? Yes. Did you try
9  injections with Synvisc? Yes. So, yeah, you qualify
10 for a hip.
11   She was on a full dose of aspirin. Those are
12 known to be good medicines but can cause gastric
13 ulcers, and it's a -- it's pretty well known.
14   Q.  Okay. A patient can have a gastric ulcer that
15 doesn't bleed; is that correct?
16   A.  Yes.
17   Q.  Okay. So is it your opinion that the
18 nonsteroidals caused her to develop a gastric ulcer?
19   A.  Yes.
20   Q.  Okay. Is it your opinion that the
21 nonsteroidals caused the gastric ulcer to bleed?
22   A.  I will say it this way. She developed, in my
23 opinion, she developed a gastric ulcer from the stress
24 of the surgery, the use of nonsteroidals, you can
25 relate smoking into it, although it's way down on my

Page 149

1  radar screen, and the anticoagulant effect of Xarelto
2  unmasked the gastric ulcer and she had a GI bleed, and
3  I think that would have been detected or happened with
4  any of the factor Xa's or even Coumadin.
5    We see it all the time. You will have a
6  patient who will have an underlying colon cancer,
7  that's a friable lesion, and it may have a little bit
8  of friability, meaning it's fragile, and it may have a
9  little bit of blood around it, and they may have a
10 heme-positive stool. So two weeks later they come in
11 and they have a DVT and you anticoagulate them and
12 then they have a more rapid bleed because the drug is
13 doing its job.
14   So the anticoagulant, in this case the
15 Xarelto, unmasked a gastric ulcer that was, in my
16 opinion, most probably caused from the effects of the
17 nonsteroidals.
18   Q.  So the ulcer was caused from the
19 nonsteroidals?
20   A.  That's correct. Uh-huh.
21   Q.  Okay. In your opinion, when did her ulcer
22 start to bleed?
23   A.  That would take a crystal ball.
24   Q.  So you have no opinion as to when Ms. Mingo's
25 ulcer started to bleed?

38 (Pages 146 to 149)

Protected - Subject to Further Protective Review

Page 150

1    A. She could have had it preoperatively, she
2  could have had it postoperatively. I can't tell you
3  that. That would be an unfair call.
4    Q. Have you seen any information in Ms. Mingo's
5  records that would indicate that her ulcer was
6  bleeding before --
7    A. No.
8    Q. -- her hip replacement surgery?
9    A. Sorry. No.
10   Q. Okay. Any indication in her records that her
11 ulcer was bleeding before she started taking Xarelto?
12   A. No.
13   Q. Do you know -- do you know how long Ms. Mingo
14 had been taking nonsteroidals before she developed a
15 GI bleed?
16   A. Just from looking on her medication list, so,
17 you know, she could -- she listed aspirin and Anaprox,
18 which are two common nonsteroidals. Whether she was
19 taking them or not, I don't know. They were just on
20 her med list.
21   Q. How -- I mean, how long would a person have to
22 take nonsteroidals for it to attribute to developing a
23 gastric ulcer?
24   A. It varies from other comorbidities. Someone
25 who is taking NSAIDs who is otherwise healthy may

Page 151

1  never develop an ulcer. Someone who has risk factors
2  that are different may take an aspirin a day for
3  10 days and their gastric mucosa responds differently
4  and they have an ulcer that would develop.
5    Q. What are other potential causes of gastric
6  ulcers forming?
7    A. You know --
8      MS. HOFFMANN: Other than the NSAIDs and the
9    aspirin? Sorry.
10   A. You know, there is a bacteria called
11 Helicobacter pylori, HP, that's been associated with
12 ulcers.
13     Alcoholism, smoking, stress. When you say
14 stress, it's not I'm stressed today because my kid has
15 a basketball game. It's the stress response to things
16 like surgery. The body releases all these humors, but
17 those are the main ones. I think H. Pylori is
18 probably kind of the hot topic in the last 10 or 15
19 years, because you can treat an ulcer now that's not
20 actively bleeding with an antibiotic regimen and some
21 Pepto-Bismol. It wasn't there 20 years ago.
22   Q. Okay. Do you have any opinion as to how long
23 Ms. Mingo's ulcer had been present before she started
24 taking Xarelto?
25   A. No, sir.

Page 152

1    Q. Do you know how long Ms. Mingo had been taking
2  aspirin before she had the GI bleed?
3    A. It's listed as a home medication, but whether
4  that was prolonged for -- I don't know.
5    Q. Did you see any indication in your review of
6  Ms. Mingo's medical records that she ever suffered
7  from a GI bleed before she started taking Xarelto?
8      MS. HOFFMANN: Objection. You mean a
9    clinically diagnosed?
10   Q. I mean what I said.
11     Did you see any indication in her records that
12 she suffered from a GI bleed before taking Xarelto?
13   A. In the records I reviewed, there was no
14 evidence that she had been treated for a GI bleed in
15 the past.
16   Q. Okay. Is there any data in her records that
17 you reviewed that would lead you to believe she had
18 been suffering from GI bleeding in the past?
19     MS. HOFFMANN: Objection.
20   A. No.
21   Q. And are you aware whether or not Ms. Mingo is
22 continuing to take nonsteroidals today?
23   A. If my memory is right, after her endoscopy,
24 the gastroenterologist pretty much fixed her problem
25 and pretty much said she could take the anticoagulant

Page 153

1  of her choice, Xarelto or aspirin. I think they opted
2  for aspirin probably based upon the fact that her
3  ultrasound came back negative after her GI bleed.
4      So, from my recollection, I think she went
5  home on an aspirin and I would assume she's still
6  taking it.
7    Q. And you consider aspirin to be a nonsteroidal?
8    A. Yes.
9    Q. Is that correct? Not just you but that's what
10 it is, it's a nonsteroidal?
11   A. (Nodding head.)
12   Q. Okay. So based on your review of Ms. Mingo's
13 records, the only GI bleeding event that she has ever
14 been diagnosed and treated for occurred while she was
15 taking Xarelto; is that correct?
16   A. Yes.
17   Q. Do you want to take another break?
18   A. I'm okay. Don't take a break for me.
19   Q. No, we can go, if y'all are ready, I mean, if
20 y'all are fine.
21     MS. HOFFMANN: Let's go off the record for a
22 minute.
23     MR. VANZANDT: Okay.
24     THE VIDEOGRAPHER: The time now is 7:00 p.m.
25 We are off the record.

39 (Pages 150 to 153)

Protected - Subject to Further Protective Review

Page 154

1    (Recess from 7:00 p.m. until 7:06 p.m.)
2    THE VIDEOGRAPHER: This begins Disk 4 of
3  today's deposition. The time now is 7:06 p.m.
4    We are back on the record.
5  BY MR. VANZANDT:
6    Q. Okay. Doctor, referring back to page 7 of
7  your report, Opinion D, the first part of that
8  sentence says: "Ms. Mingo's use of Xarelto for
9  treatment of a deep vein thrombosis most likely
10  unmasked the slowly bleeding gastric ulcer."
11    Did I read that correctly?
12    A. Yes.
13    Q. Okay. And I'm just referencing only the first
14  part of that sentence.
15    What do you mean by -- let me ask you this.
16  When you say unmasked, do you use unmasked in the
17  sense that Xarelto took a nonbleeding asymptomatic
18  ulcer and turned it into a bleeding ulcer?
19    A. No.
20    Q. Okay. What do you mean by unmasked?
21    A. The not -- there's not a direct correlation
22  between the formation of a gastric ulcer and the use
23  of a factor Xa inhibitor. It's the nonsteroidals that
24  caused the gastric irritation.
25    What I mean by unmasked is you have an ulcer

Page 155

1  that's present, caused by the nonsteroidals. Whether
2  it's -- bleeding, to me, is several stages of
3  bleeding. You know, if you have an ulcer and you have
4  any -- how can I say this -- any breach in the
5  integrity of your lining of any organ, let's say
6  stomach for that matter, there is going to be some
7  bleeding. There may be half a teaspoon a month, maybe
8  20 cells a day. But when you have an ulcer develop
9  anywhere, same thing as an ulcer in your arm, you may
10  not have a symptomatic bleed but you can ooze some
11  blood from the ulcer.
12    Unmasked means that the medicine did what it
13  was supposed to do. The patient's blood was thinned.
14  And when you have a friable ulcer that probably
15  prior -- if it developed prior to her use of the Xa
16  inhibitor, and then you start somebody on
17  anticoagulant, whether it's Coumadin or Xarelto or
18  Pradaxa or whatever drug you want, the unmasking term
19  means that that becomes apparent. It will bleed more
20  obviously than it would bleed if you were not exposed
21  to an anticoagulant.
22    It's a pretty common term, "unmasked." I
23  mean, we see it frequently.
24    Q. So we can agree that Xarelto didn't cause the
25  gastric ulcer. Well, let me say this. The gastric

Page 156

1  ulcer is the underlying defect?
2    A. Yes.
3    Q. Is that correct? Okay. And it's your opinion
4  that Xarelto didn't cause that ulcer?
5    A. Correct.
6    Q. Okay. But would you agree that Xarelto played
7  a role in Ms. Mingo's GI bleed?
8    A. Yes.
9    Q. Okay. And what role did Xarelto play?
10    A. Her blood was thinned to prevent extension and
11  possible pulmonary emboli in someone with a DVT postop
12  from a knee arthroplasty. The drug did its job, maybe
13  did its job really well, because the DVT was gone when
14  they repeated the imaging.
15    She had an underlying defect. To me, it would
16  be the same thing as you are cutting your vegetables
17  to cook a jambalaya and you're not on Xarelto and you
18  cut it and you ooze a little bit, but you take Xarelto
19  because you had a DVT and a PE and you bleed a little
20  bit more because you're on the appropriate blood
21  thinner.
22    That's what happened with -- in my opinion
23  with this case. She had risk factors for an ulcer.
24  Any defect, just like if you fall, is going to have
25  some oozing blood. And I'm not saying she had a

Page 157

1  massive GI bleed from the nonsteroidal, but there was
2  a defect in the lining of her stomach caused, in my
3  opinion, by her NSAID use, and clearly, when you
4  expose somebody to any anticoagulant, different from
5  an NSAID, on top of that, she bled. So, yes, it
6  contributed to her extent of her bleed.
7    Q. Did Ms. Mingo bleed while she was taking
8  Lovenox?
9    A. I'm not sure I can answer that. I mean, her
10  hematocrit dropped from her preop to her postop. I
11  mean, I don't have any evidence of that, but I have no
12  evidence to say she wasn't. I mean, her hematocrit
13  went from 37 to 28 when she was taking the Lovenox and
14  the aspirin. Is it fair to say that it's all from
15  surgery? Maybe. They didn't transfuse her. Is it
16  fair to say that she had a little bleeding? I don't
17  know the answer to that. I don't see any direct
18  evidence, but I don't think you can say it didn't
19  happen.
20    Q. If not for taking Xarelto, the underlying
21  anatomical defect, the ulcer, it may have never been
22  revealed or unmasked, correct?
23    MS. HOFFMANN: Object. Objection.
24    A. That's an interesting question. That ulcer
25  could have bled at any time independent of the use of

40 (Pages 154 to 157)

Protected - Subject to Further Protective Review

Page 158

1  a nonsteroidal -- I'm sorry -- of a blood thinner.
2      Clearly, it's more likely to bleed if you are
3  on a blood thinner than if you are not, but I've had
4  several patients who have GI bleeds on nonsteroidals
5  only.  So could it have been undiagnosed for years?
6  Yes.  Could she have had a breakaway bleed just on an
7  aspirin and/or Anaprox?  Yes.
8      Q.  And it's also possible that that ulcer may
9  have never bled; is that correct?
10      A.  That's in the realm of possibilities too, yes.
11      Q.  Okay.  Is it your opinion that Xarelto
12  triggered the bleeding from the gastric ulcer?
13      MS. HOFFMANN:  Objection.
14      A.  I think she had a slowly oozing gastric ulcer
15  caused by nonsteroidals that was unmasked and made
16  worse by the appropriate use of a factor Xa inhibitor,
17  and I've said it, like, seven times, but --
18      Q.  Right.  But she had a slowly oozing gastric
19  ulcer.  When you say that, so she had an ulcer that
20  was already bleeding?
21      A.  I think I said that, yes.  I think when you
22  have any -- again, she had interruption.  She had --
23  her normal gastric mucosa was not -- was impacted by
24  the nonsteroidal.  So I don't know what your
25  interpretation of an ulcer is, but an ulcer isn't like

Page 159

1  a thing of blood.  I mean, it's -- it's a thinning and
2  an interruption of the normal gastric mucosa.  So it
3  would be like me saying if you fell and you scraped
4  your arm, are you going to have a little bit of blood
5  present?  You are.  If you fell and you scraped your
6  arm and you were on Lovenox or Coumadin or a Xa
7  inhibitor, would you have more bleeding?  Yes.
8  that's -- that's what it's supposed to do.  It's no
9  different than an increase of a nosebleed that you see
10  more prominently in patients who are on NOACs, DOACs
11  or Coumadin.
12      Q.  So if Ms. Mingo had a slowly bleeding gastric
13  ulcer, then she starts taking Xarelto, and you say
14  that the Xarelto unmasked the ulcer, how could Xarelto
15  unmask the ulcer if it didn't either trigger the
16  bleeding or exacerbate the bleeding?
17      MS. HOFFMANN:  Objection.
18      A.  I've already made it clear, I think, that
19  there clearly is a direct correlation between the fact
20  that she had an increase in the bleeding once she
21  started on a Xa inhibitor.  I mean, that's what it's
22  supposed to do.  So it just didn't cause it, it
23  unmasked it, just like you could unmask the ulcer if
24  they were taking Coumadin and her INR was 2.
25      Q.  If she already had a slowly bleeding gastric

Page 160

1  ulcer before Xarelto, and Xarelto exacerbated it, then
2  what did it turn into?  Right.  So if it starts off as
3  a slowly oozing gastric ulcer, after Xarelto, what is
4  the ulcer?
5      MS. CONKLIN:  Objection.
6      A.  It's an ulcer that's bleeding more than it was
7  before she -- I mean, again, you have -- you can't
8  predict certain things.  I mean, you know, why didn't
9  she bleed immediately when they introduced the factor
10  Xa inhibitor?  Something anatomically happened where a
11  blood vessel in the ulcer was exposed to
12  nonsteroidals.  Its integrity was compromised.  You
13  put them on a blood thinner and they bleed more.  I
14  mean there -- that's -- I don't know any other way to
15  say it.  That's what it does.
16      Q.  I guess I'm just -- it's more about the
17  description of this ulcer.  So if it starts off as a
18  slowly oozing gastric ulcer, what does it turn into?
19      MS. CONKLIN:  Objection.
20      A.  It turns in -- it would then have the
21  characteristics of an ulcer that would bleed more
22  easily because the patient is on the appropriate dose
23  of anticoagulation for a DVT.
24      Q.  Now, did you review the deposition testimony
25  of Dr. Keith, the treating gastroenterologist?

Page 161

1      A.  Yes.
2      Q.  And did you review any of his records of his
3  treatment of Ms. Mingo?
4      A.  If that was included, I did.
5      Q.  He is -- and I'm -- Dr. Keith was the
6  gastroenterologist --
7      A.  Yeah, he did the endoscopy.
8      Q.  That's right.  That's right.
9      A.  Yes.
10      Q.  And so he is -- he's the only doctor who has
11  actually saw the ulcer and the bleeding with his own
12  eyes; is that correct?
13      A.  Through the scope, yes.
14      Q.  Okay.  I mean, do you have any reason to
15  disagree with Dr. Keith's testimony that the GI bleed
16  that he treated started only after Ms. Mingo started
17  taking Xarelto?
18      MS. HOFFMANN:  Objection.
19      MS. CONKLIN:  Objection.
20      A.  I think the GI bleed and the rate of the GI
21  bleed happened after Ms. Mingo started the Xarelto.
22  The gastric ulcer, in my opinion, was there prior to
23  that.
24      Q.  Okay.  But you have no reason to disagree with
25  his testimony that the bleed, not the ulcer, but that

41 (Pages 158 to 161)

Protected - Subject to Further Protective Review

Page 162

1    the bleed -- that the bleed didn't start until after
2    she started Xarelto?
3        MS. HOFFMANN: Objection.
4        MS. CONKLIN: Objection.
5        A. My opinion is, is that this lady had a very --
6    it all depends, again -- we're beating a dead horse --
7    on how you want to define bleeding. Do you want to
8    define the bleeding as a bleed requiring transfusion?
9    I define exposed blood as exposed blood. I mean, she
10   was bleeding 10 days prior when she presented to the
11   ED and had a heme-positive stool. That's -- she
12   had a heme-positive bleed. She was bleeding from
13   somewhere from her nose to her rectum. Why wasn't she
14   bleeding tremendously at that point?
15       I think Dr. Keith did a great job in treating
16   this lady appropriately for her gastric ulcer. I
17   think it was there for a while, I think it was oozing
18   before, and I think it was unmasked because this drug
19   did what it was supposed to do. He went in there and
20   fixed it, she did great.
21       Q. So you do disagree with his testimony that the
22   bleed --
23       A. No.
24       Q. -- the ulcer --
25       A. I believe he went in there -- go ahead. I'm

Page 163

1    sorry.
2        Q. So you do disagree with his testimony that the
3    ulcer was not bleeding before Xarelto?
4        MS. HOFFMANN: Objection.
5        MS. CONKLIN: Objection.
6        A. I'd have to get the whole medical record out.
7    I'm not even sure I recall what he put in his op note,
8    so I don't want to disagree with him, because I think
9    he did a fine job of managing the patient. I think
10   you're splitting hairs but, I mean, that's -- I know
11   that's your job.
12       Q. Well, do you have any reason to disagree with
13   Dr. Keith's testimony that the EGD he performed on
14   Ms. Mingo was a reasonable and medically necessary
15   procedure?
16       A. It was.
17       Q. And do you disagree -- do you disagree with
18   his -- Dr. Keith's testimony that Ms. Mingo's
19   hemoglobin and hematocrit levels were critically low
20   when she arrived at the hospital on February 13th?
21       MS. HOFFMANN: Objection. If you're going to
22   quote his testimony, I think you should show it to
23   him.
24       Q. You can answer the question.
25       A. If he used the word "critical," he was there,

Page 164

1    I wasn't. She did not appear to be unstable, to me,
2    when she presented to the hospital, but, I mean, her
3    H&H were lower than they were in the week before and
4    lower than they were postoperatively, so yes, I agree
5    with that.
6        Q. Do you have any reason to agree -- to disagree
7    with Dr. Keith's testimony that had he not performed
8    the EGD and addressed her gastrointestinal bleeding,
9    that Ms. Mingo could have experienced organ damage?
10       MS. HOFFMANN: Objection.
11       MS. CONKLIN: Objection.
12       A. She could have experienced a lot of different
13   things. She also could have healed, but yeah, I have
14   no reason to disagree with that.
15       MS. HOFFMANN: Assuming that he's quoting it
16   correctly.
17       A. Right. I mean, I don't have what he said in
18   front of me but that's okay.
19       Q. Do you disagree with Dr. Keith's testimony
20   that the risk of death and morbidity with GI bleeds is
21   significant?
22       MS. HOFFMANN: Objection.
23       MS. CONKLIN: Objection.
24       A. I think the risk of a GI bleed and morbidity
25   and mortality is directly associated to the

Page 165

1    presentation. Someone who is exsanguinating blood
2    from their mouth and their rectum and has a
3    prothrombin time of 40 and they are an alcoholic,
4    that's trouble.
5        Somebody presents to the emergency department
6    with stable vital signs and an H&H of 6 and 19 after
7    the orthopaedic surgical history that she had, could
8    she have died from this GI bleed? Yes, but
9    statistically, that probably is less than a half of
10   one percent. It's pretty low.
11       Q. So do you disagree with Dr. Keith's testimony
12   that the procedure he performed to stop her internal
13   bleeding was a life-saving procedure?
14       A. No, it did. I mean, it's -- I'll tell you, it
15   stopped her GI bleed. I don't think we can say that
16   she would have died from this bleed, but, clearly, he
17   went in there and did what he needed to do, which was
18   the right thing medically.
19       Q. Okay. So do you agree or disagree with his
20   statement that this was a life-saving procedure?
21       MS. HOFFMANN: Objection.
22       A. It makes it sound a little bit more than what
23   it is, but it's okay. Yes.
24       Q. You --
25       A. I agree. That's fine.

42 (Pages 162 to 165)

Protected - Subject to Further Protective Review

Page 166

1    Q.  You agree with it.  Okay.
2        Going back to Opinion D on page 7, the second
3    part of that sentence, it says:  "The use of any
4    anticoagulant to treat the deep vein thrombosis would
5    most likely have resulted in the same oozing of the
6    underlying gastric ulcer."
7        So in the first part of this sentence you say
8    that Xarelto unmasked the slowly oozing gastric ulcer,
9    and in the second part of the sentence you state that
10   any anticoagulant would have resulted in the
11   underlying gastric ulcer.
12       I mean, are -- the term --
13   A.  No.  The results of the bleeding from the same
14   oozing gastric ulcer.  I didn't say it was going to be
15   a causative agent.
16   Q.  You state that the -- any other anticoagulant
17   would have -- would most likely have resulted in the
18   same oozing of the underlying gastric ulcer.
19   A.  Correct.
20   Q.  Can you describe what you mean by that?
21   A.  Any other anticoagulant used to treat a DVT,
22   whether it was Lovenox, Coumadin, or a Xa inhibitor,
23   Pradaxa, whatever you want, would have put the patient
24   at the same risk to expose a previously existing
25   gastric ulcer.  So, in my opinion, if this patient was

Page 167

1    prescribed Coumadin for her DVT two to three weeks
2    prior to this, and she was therapeutic, I think it
3    would have done -- this event would have happened
4    independent of the drug of choice that was used for
5    the DVT treatment.
6    Q.  So if -- I mean, if she was in fact
7    prescribed -- well, she was initially started on
8    Lovenox and Coumadin.
9    A.  Correct.
10   Q.  If she would have stayed on that therapy, did
11   her initial Lovenox and then continued on Coumadin,
12   and never started Xarelto, as part of that treatment
13   she would have had to have undergone coagulation
14   monitoring; is that correct?
15   A.  For Lovenox and Coumadin?
16   Q.  Yes, sir.
17   A.  Correct.
18   Q.  Okay.  So, I mean, as part of her course of
19   treatment on Coumadin, she would have undergone PT
20   testing and the INR testing, correct?
21   A.  Correct.
22   Q.  Okay.  And so when would -- how would that
23   work?  So when would be the first time she would have
24   her INR tested and then how often?
25   A.  You know, every other day until she's

Page 168

1    therapeutic, and then maybe once a week for a month
2    after, maybe two, three weeks after that, and then
3    probably every two to three months once you find the
4    consistent dose.
5    Q.  Okay.  So every other day at first, and then
6    once a week?
7    A.  While they're in the hospital, yeah.
8    Q.  Right.
9    A.  Because you have to know when the INR crosses
10   2 so you can stop the Lovenox and expose them
11   to longer therapy with two agents.
12   Q.  Okay.  So with warfarin, I mean, you're
13   testing every other day while they're in the hospital
14   and then once a week to make -- to --
15   A.  For the first week or two.
16   Q.  Right.  To get their dosage of warfarin and to
17   make sure their blood is in the proper therapeutic
18   range; is that correct?
19   A.  Correct.
20   Q.  You can increase the dosage or decrease it,
21   correct?
22   A.  Correct.
23   Q.  Okay.  And that ensures that Ms. Mingo would
24   be receiving a properly tailored dose of warfarin
25   that's proper for her, correct?

Page 169

1        MS. HOFFMANN:  Objection.
2    A.  For Coumadin.
3    Q.  Right, if she's on Coumadin.
4    A.  Correct.
5    Q.  So all that testing and dose adjustment would
6    ensure that she's receiving a dose --
7    A.  Correct.
8    Q.  -- that's properly tailored to her needs,
9    correct?
10   A.  Correct.
11   Q.  Okay.  As opposed to Xarelto.  You prescribe
12   15 milligrams twice daily for 21 days and then do
13   nothing, correct?
14   A.  No.  And then you change it over to the days
15   and to the duration the therapy is complete.
16   Q.  Right.  For the first 21 days?
17   A.  (Nodding head.)
18   Q.  So after the Xarelto prescription started, she
19   doesn't have any kind of levels monitored or measured
20   every other day like she does on warfarin?
21   A.  That's correct.
22   Q.  Okay.  And then they don't -- you don't bring
23   her in once a week to make sure that her blood is
24   properly anticoagulated?
25   A.  Correct.

43 (Pages 166 to 169)

Protected - Subject to Further Protective Review

Page 170

1    Q.  Okay.  You just prescribe her the dosage in
2  the label and hope she does okay on it?
3      MS. HOFFMANN:  Objection.
4    A.  It's well tested, well documented, there is no
5  way to track it, have decreased rates of bleeding when
6  compared to the gold standard, which was Coumadin, so
7  it stands on its own.  I really don't --
8    Q.  But, I mean, it's not a properly tailored --
9  or it's not a tailored dose for Ms. Mingo
10  specifically, is it?
11      MS. HOFFMANN:  Objection.
12    A.  I don't think you're going to get a tailored
13  dose of these for many patients.  I mean, there are
14  certain limiting factors.  We've already discussed
15  them.  She didn't fit in that category.  She got the
16  appropriate dose that's FDA approved.
17    I mean, I think every reasonable physician
18  that practices hospital-based medicine would have --
19  would have felt good about the treatment and the
20  prescribing that Ms. Mingo was given.
21    Q.  Can you say whether or not Ms. Mingo's ulcer
22  would have bled if she would have been taking a
23  properly tailored dose of Coumadin?
24      MS. HOFFMANN:  Objection.
25    A.  Of Coumadin?

Page 171

1    Q.  Yes, sir.
2    A.  I've seen people bleed on Coumadin that have
3  INRs that are below norm -- below 2.  So to answer
4  your question, I think she would have probably bled,
5  with most reasonable certainty, on Coumadin just as
6  well as she bled on the factor Xa inhibitor.
7    Q.  Would she have bled the same intensity?
8    A.  I can't answer that.
9      MS. HOFFMANN:  Objection.
10    Q.  Okay.  Would the bleeding have been the same
11  duration as it was on Xarelto?
12    A.  I can't answer that.
13    Q.  Would she -- would she have lost the same
14  volume of blood?
15      MS. CONKLIN:  Objection.
16      MS. HOFFMANN:  Objection.
17    A.  I can't answer that.
18    Q.  So you can't say --
19    A.  I don't know.  I mean --
20    Q.  Right.
21    A.  It's not predictable.
22    Q.  Right.
23    A.  I mean, it could have been worse on Coumadin,
24  it could have been better.  It could have -- where did
25  she -- could it -- there's a lot of different factors

Page 172

1  and you just can't predict it based on whether you're
2  on a vitamin K antagonist or a factor X inhibitor.
3  The bottom line is if you are anticoagulated and you
4  have a defect in the -- in your belly, you're going to
5  bleed.  And I've seen people bleed on Coumadin with
6  gastric ulcers that have INRs of 1.5, and I've seen
7  patients who have gastric ulcers that bleed with an
8  INR of 5.  I have seen INRs of people come in at 20
9  and they don't bleed.  I can't explain why
10  pathophysiologically it's different but it just is.
11    Q.  Well, you say that any anticoagulant would
12  have resulted in the same oozing of the underlying
13  gastric ulcer?
14    A.  That's right.
15    Q.  So, I mean, you're not saying that any
16  anticoagulant would have caused the same intensity of
17  bleeding as Xarelto did, are you?
18      MS. HOFFMANN:  Objection.  I don't think we've
19      even defined the intensity of bleeding.
20    A.  She -- I don't -- I think any anticoagulant --
21  and when I say that, I mean the Xa's, the Pradaxa or
22  the Coumadin, I don't mean another NSAID, like Plavix
23  or aspirin -- that was taken correctly would have
24  resulted in a very similar outcome in this patient.
25    Q.  But you just said, Doctor, that you don't

Page 173

1  know.  If she was taking warfarin, you don't know, I
2  mean, she could have had a worse bleed or --
3    A.  A better one.
4    Q.  -- a better outcome, correct?
5    A.  That's true.
6    Q.  Okay.  Is that the same for any of the other
7  NOACs?
8    A.  If they were taken -- if they were prescribed
9  in the right way, I think she would have -- I mean,
10  there is a lot of different trials that compare the
11  bleeding between -- but there is no head-to-heads to
12  show that one NOAC or DOAC, when it was compared
13  head-to-head, has a higher bleeding rate than the
14  other one, that I'm aware of.  I mean, there may be
15  but I'm not aware of any.
16    Q.  You're talking among the NOACs?
17    A.  I'm aware of no head-to-head trials that
18  compare the NOACs to each other for efficacy or side
19  effect profile.
20    Q.  Okay.  Have you reviewed any of the
21  peer-reviewed medical journals comparing postmarket --
22  postmarket -- let me say this.
23    Have you reviewed any of the postmarket
24  studies comparing -- indirectly comparing bleeding
25  rates associated with the various NOACs?

44 (Pages 170 to 173)

Protected - Subject to Further Protective Review

Page 174

1     MS. HOFFMANN: Objection.
2     A. I'm aware of a bunch of meta-analysis that
3  were done that compared a bunch of the trials
4  together, but to say that I've extensively reviewed
5  them, at least for this, no.
6     Q. Are those of any value to you?
7     A. What?
8     Q. To know how the bleeding rate that patients in
9  the real world are having on these various NOACs.
10     MS. CONKLIN: Objection.
11     A. In head-to-head trial, it would be.
12     Q. Okay. But data as to what's happening in the
13  real world, is that informative to you whatsoever?
14     MS. HOFFMANN: Objection.
15     A. It needs to be a -- it needs to be a good
16  study to have relevance to me as a bedside clinician.
17  So there are some meta-analysis that do compare all
18  these trials and -- but, again, it's a noninferiority
19  comparing the NOACs and DOACs to Coumadin and/or
20  Coumadin and Lovenox. So that data, from 30,000 feet,
21  has a bleeding rate that's noninferior, or maybe even
22  better, than the traditional treatment with Coumadin.
23     So thinking that way, I would say if she was
24  appropriately treated with Coumadin, she would have
25  bled also.

Page 175

1     Q. So because there are no peer-reviewed -- well,
2  let me say this. Because there are no unblinded
3  head-to-head clinical trials comparing the various
4  NOACs, are you saying that you can't compare the
5  bleeding risks among those various NOACs?
6     A. I think you can compare them. I just don't
7  think that's the best way to compare them. I think
8  the best way to compare them would be a head-to-head
9  trial with similar patient populations for similar
10  diagnoses. That's the best way. And again, that's
11  not my wheelhouse, that's somebody smarter than me,
12  but meta-analysis are good, they're a good start, but
13  if I'm going to change the way I manage a patient
14  based on a side effect profile, I would like it to be
15  based on a head-to-head between the two drugs in
16  similar patient populations with similar diagnoses.
17     Q. Okay. So -- but to your knowledge, there's --
18  that data doesn't exist?
19     A. It doesn't --
20     Q. The head-to-head data doesn't exist?
21     A. Not that I'm aware of.
22     Q. Okay. And so there is no data out there on
23  comparative bleeding rates from direct head-to-head
24  trials among the various NOACs?
25     A. That's right.

Page 176

1     Q. Okay. And so how are you able to say that she
2  would have bled to the same extent if she would have
3  been taking any other NOAC?
4     A. Just based on the pathophysiology. I mean, a
5  blood thinner is a blood thinner. I know that sounds
6  simple, but the mechanism of action of a Xa inhibitor
7  is a mechanism of action of a Xa inhibitor, and if
8  they are taking it and their blood is thin and they
9  have a gastric ulcer that's already oozing, it's going
10  to probably bleed no matter what agent they take. I
11  mean, I think any reasonable clinician would agree
12  with that.
13     Q. But there is no --
14     A. I can't --
15     Q. There is no head-to-head studies out there --
16     A. No. No.
17     Q. -- that would give you any data --
18     A. I agree.
19     Q. -- to compare what might have happened had she
20  taken one of the other NOACs?
21     A. I agree.
22     Q. Okay.
23     Q. Can we go off the record for a minute?
24     MS. HOFFMANN: Yeah.
25     Q. Yeah. Sure.

Page 177

1     THE WITNESS: I'll just make sure this
2  isn't --
3     THE VIDEOGRAPHER: The time is 7:33 p.m.
4  We are off the record.
5     (Recess from 7:33 p.m. until 7:34 p.m.)
6     THE VIDEOGRAPHER: The time now is 7:34 p.m.
7  We are back on the record.
8  BY MR. VANZANDT:
9     Q. Doctor, so we do know that Ms. Mingo took
10  Xarelto and that she suffered a GI bleed while she was
11  taking Xarelto.
12     MS. CONKLIN: Objection.
13     Q. Is that right?
14     A. That's correct.
15     Q. What we don't know is whether or not that
16  bleed would have happened if she was taking warfarin.
17     MS. HOFFMANN: Objection.
18     A. We don't know because she wasn't taking it,
19  but by clinical experience of doing this for 20 years
20  tell me that she would have had a very similar outcome
21  on any properly taken anticoagulant. Period. I don't
22  know how else to tell you that.
23     Q. But we can't know that?
24     A. No.
25     Q. Okay. And we can't know what would have

45 (Pages 174 to 177)

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 178

1 happened if she would have taken Eliquis or Pradaxa?
2    A. We can just presume.
3    Q. Okay. Doctor, it's just speculation to say
4 that Ms. Mingo would have suffered the exact same GI
5 bleed with the exact duration, the exact extent of the
6 bleed had she taken any other anticoagulant?
7       MS. CONKLIN: Objection.
8       MS. HOFFMANN: Objection. He's already
9 indicated in his report that the opinions he has
10 given are to a reasonable degree of scientific
11 certainty.
12    A. So repeat your question.
13    Q. It's speculation to say that Ms. Mingo would
14 have -- you just said all we can do is presume, right?
15 So it's just -- it's -- I mean, it's just speculation
16 to say that Ms. Mingo would have had the exact same
17 bleed had she taken any other anticoagulant?
18       MS. HOFFMANN: Objection.
19       MS. CONKLIN: Objection.
20       MS. HOFFMANN: You can speak in probabilities.
21    A. In my opinion, this event -- I can't say it
22 would have happened to -- it may have happened to a
23 worse degree with a different agent or a lesser
24 degree, but when you do this and you take care of
25 patients like we do on the front line, I have seen

Page 179

1 this happen with every agent that's out there.
2       So my opinion is, is that this would have
3 happened independent of a Xa or a vitamin K antagonist
4 if they were therapeutic. Period. I think it would
5 have happened.
6       To what degree? Maybe it was a lot worse.
7 And maybe she would have changed her diet and her INR
8 would have went to 40 and she would have bled a lot
9 more. I don't know that, but I've seen it happen with
10 every agent and the unmasking is the clinically
11 relevant part.
12    Q. So, I mean, Xarelto, by unmasking the bleed,
13 it made her bleed clinically relevant?
14       MS. CONKLIN: Objection.
15       MS. HOFFMANN: Objection.
16    A. And I've said that from the beginning.
17    Q. What data or medical literature do you base
18 your opinion that she would have bled on any
19 anticoagulant? What --
20    A. Twenty years of experience.
21    Q. Okay. But I'm -- specific -- is there any
22 specific data or medical -- peer-reviewed medical
23 literature that you rely on for that opinion?
24    A. Nope.
25    Q. Okay. Moving to Opinion E on your report, it

Page 180

1 states that: "Increased risk of bleeding is a well
2 known and warned about side effect of Xarelto."
3       Now, there is no question that Xarelto has an
4 increased risk of bleeding, correct?
5    A. Correct.
6    Q. Okay. And that's well understood by any
7 doctor who prescribes any anticoagulant, that there is
8 a risk -- increased risk of bleeding; is that correct?
9    A. Compared to placebo, correct.
10    Q. Okay. And there's no question that Xarelto's
11 label warns about a risk of bleeding; is that correct?
12    A. Correct.
13    Q. Okay. Is the risk of bleeding on Xarelto
14 identical to the risk of bleeding with other
15 anticoagulants?
16       MS. CONKLIN: Objection.
17    A. Be specific.
18    Q. Okay. What about the risk of bleeding
19 compared to warfarin?
20    A. Again, the data that I have seen, it actually
21 has a noninferior side effect profile and outcome data
22 as compared to vitamin K and as compared to Coumadin.
23    Q. Okay.
24    A. So, you know, I'll have to get the study out
25 and get your medical records out and we can go

Page 181

1 intracranial hemorrhage, retinal hemorrhage, GI bleed,
2 and every other bleed known to man, but the data, for
3 the most part, says it's noninferior or actually has
4 less bleeds than Coumadin.
5    Q. Okay. What about the data from ROCKET showing
6 that there was a 61 percent increase in
7 gastrointestinal bleeds for the patients taking
8 Xarelto?
9    A. And I reviewed ROCKET, but the lady had a DVT,
10 so --
11    Q. Okay. Right. But you cited all ROCKET
12 studies in your report.
13       MS. HOFFMANN: We've been through that,
14 Counsel.
15    A. And I can talk about AFib if you want, too,
16 but --
17    Q. Right.
18    A. -- to me it's the -- this lady had a DVT, and
19 the risk of bleeding compared to Coumadin is
20 noninferior or better with that agent.
21    Q. So a patient taking Xarelto for AFib, which is
22 what was studied in the ROCKET study, would have taken
23 20 milligrams daily of Xarelto, right?
24    A. Yeah.
25    Q. Okay. And Ms. Mingo was taking 30 milligrams

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 182

1    daily of Xarelto; is that right?
2       A.   Fifteen twice a day.  Right?
3       Q.   Right.  That's a total of 30, right?
4       A.   Uh-huh.
5       Q.   Okay.  And so the ROCKET study, with patients
6    taking 20 milligrams of Xarelto daily, showed a 61
7    percent increase in GI bleeds compared to the patients
8    taking warfarin?
9          MS. CONKLIN:  Objection.
10         MS. HOFFMANN:  Objection.
11      Q.   Is that correct?
12         MS. HOFFMANN:  If you want to show us that.  I
13   don't want him testifying from memory.
14      A.   I mean, I agree.  We can get the studies out
15   and we'll break them down.  These are different
16   trials, so different patient populations.  They
17   weren't the same patients.  I mean, they had different
18   agents, they had different CHAD scores.  They are
19   different.  So you're comparing -- you're comparing
20   apples to oranges in a way.  That's different
21   diagnoses.  It's a different age, different patient
22   population, different comorbidities.  I mean, they are
23   different patient populations.
24         So I don't think you can extrapolate that to
25   compare it to Ms. Mingo's case.  And again, I'm not

Page 183

1    presenting myself as an expert in the bleeding ratio.
2    I can just tell you from a boot-on-the-ground
3    hospitalist's perspective, that we feel very confident
4    that the bleeding in these agents, all the Xa's, is
5    pretty consistent or better than warfarin.  That's
6    what it is.  I mean, you can continue to beat on me
7    about the AFib trial.  The lady had a DVT.
8       Q.   Well, I mean, preparing for your deposition,
9    you know, I reviewed the articles that you cited that
10   you relied on, so I thought we were going to talk
11   about ROCKET because that's the only articles you
12   cited that you relied on.
13      A.   I reviewed them but that's not -- that's not
14   the case.  I mean, this lady had a DVT.  I mean, I
15   think I needed to be knowledgeable of the indications
16   for Xarelto or the other Xa inhibitors, but I'm not
17   here to profess to be a ROCKET expert because I've
18   read them.
19      Q.   Okay.  Before tonight were you aware that
20   there was a 61 percent increase of GI bleeds in the
21   ROCKET study?
22      A.   By looking at the -- you know, looking at
23   ROCKET, I'm aware that -- in the ROCKET trial what the
24   data was, but I can't quote it.
25      Q.   But, I mean, you are aware of the 61 percent

Page 184

1    of increased GI bleeds?
2          MS. CONKLIN:  Objection.
3       A.   I was -- I was aware of a higher GI bleeding
4    rate, but I don't have the study in front of me.
5       Q.   And are you aware that the US population in
6    the ROCKET study, the patients who were taking just 20
7    milligrams a day, showed a 50 percent increase in
8    major bleeding events compared to patients taking
9    warfarin?
10      A.   Not aware.
11         MS. HOFFMANN:  Objection.
12         MS. CONKLIN:  Objection.
13      Q.   You're not aware of that?
14      A.   No.
15      Q.   Okay.  Were you aware that as of September
16   2015, that Xarelto's label now includes the US
17   subpopulation data from ROCKET?
18         MS. HOFFMANN:  Objection.
19      A.   No.
20      Q.   Okay.  Has anyone from Janssen ever told you
21   that the US population in ROCKET had a 50 percent
22   increase in major bleeding compared to warfarin?
23         MS. CONKLIN:  Objection.
24      A.   I can't say yes to none of that, no.
25      Q.   Had you ever heard that before tonight?

Page 185

1       A.   No.
2       Q.   Okay.  Likewise, had you ever heard that the
3    US subpopulation data from ROCKET showed a 61 percent
4    increase in blood transfusions for patients taking
5    Xarelto versus those taking warfarin?
6          MS. HOFFMANN:  Objection.
7          MS. CONKLIN:  Objection.
8       A.   I'm aware of what the study showed but can I
9    quote the numbers that you're saying?  No.
10      Q.   Have you reviewed any of the post -- well, let
11   me say this.
12         Have you reviewed any of the peer-reviewed
13   medical articles showing from postmarket studies that
14   Eliquis is associated with statistically reduced risks
15   of major or clinically relevant nonmajor bleeding
16   compared with Xarelto and the other NOACs?
17         MS. HOFFMANN:  Objection.
18         MS. CONKLIN:  Objection.
19      A.   I'm aware in the meta-analysis of some of the
20   studies that Eliquis has a decreased rate of bleeding
21   in those patients, some patient populations, but can I
22   quote them?  No.
23      Q.   So since Ms. Mingo suffered a GI bleed while
24   on Xarelto -- well, I mean, that's a loaded question.
25         Ms. Mingo suffered from a GI bleed in February

47 (Pages 182 to 185)

Protected - Subject to Further Protective Review

Page 186

1  of 2015, correct?
2  A. Yes.
3  Q. Okay. And she was taking Xarelto at that
4  time, correct?
5  A. Yes.
6  Q. Okay. So since she developed that GI bleed,
7  is she a candidate for anticoagulation treatment in
8  the future?
9  A. Sure.
10  Q. Even though she's had a bleed while taking
11  anticoagulant?
12  A. Sure.
13  Q. Have you calculated Ms. Mingo's HAS-BLED
14  score?
15  MS. HOFFMANN: Objection.
16  MS. CONKLIN: Objection.
17  A. No, but I can tell you that the
18  gastroenterologist actually recommended that she go
19  back on the Xarelto after he fixed the gastric ulcer,
20  and if her DVT would have been there and you would not
21  have treated it, he'd have been sued for a pulmonary
22  embolism.
23  So the fact that you've had a GI bleed does
24  not preclude you from taking anticoagulation in the
25  future. I mean, you may change agents, you may change

Page 187

1  the dose, you may -- that's ludicrous to say because
2  you have had a GI bleed and eight years later you have
3  a PE, you can't treat her. I mean --
4  Q. Well, that's a factor that's considered. I
5  mean, if someone bleeds while on an anticoagulant, I
6  mean, is that something that's considered in
7  calculating the HAS-BLED score for a patient --
8  A. Sure, it is, but it's about --
9  Q. -- as to whether they can be anticoagulated
10  again?
11  A. It's about that patient at that time and not
12  opposed -- and not about what happens eight, 10, 12
13  months later.
14  I mean, I'm not familiar with any data that
15  says a person who has had a GI bleed or, you know,
16  bleeding in their eye because they have diabetic
17  retinopathy, and then has a subsequent event in their
18  coagulation cascade, that they need to be treated by
19  the agents. I mean, that's -- we do it all the time.
20  Q. You mentioned earlier that on ultrasound after
21  her bleed, that there was no DVT seen in her leg
22  anymore; is that correct?
23  A. On the second one.
24  Q. On the second one. Yes, sir.
25  A. That's what the record indicated.

Page 188

1  Q. Okay. Xarelto doesn't get rid of DVTs, does
2  it?
3  A. That's correct.
4  Q. The actual clot?
5  A. It's not a clot buster agent, that's correct.
6  Q. The body has natural processes that takes care
7  of that?
8  A. Or there's different drugs that you can -- TPA
9  is a clot buster, but yes. So the mechanism of action
10  is not for resolution or dissolving of the clot. It's
11  for stopping the propagation of that clot.
12  Q. Okay. And so, I mean, it's not your opinion
13  that Xarelto busted her clot up and --
14  A. No.
15  Q. -- made the clot go away?
16  A. Sorry. No.
17  Q. Okay.
18  MR. VANZANDT: Let's take a quick break
19  let me look over my notes.
20  MS. HOFFMANN: Good.
21  THE VIDEOGRAPHER: The time is 7:47 p.m. We
22  are off the record.
23  (Recess from 7:47 p.m. until 7:53 p.m.)
24  THE VIDEOGRAPHER: The time is now is 7:53 p.m.
25  We are back on the record.

Page 189

1  BY MR. VANZANDT:
2  Q. Doctor, just a few more questions for you.
3  As you sit here tonight, what is your
4  understanding as to what the EINSTEIN DVT trial
5  showed, the comparative bleeding rates between Xarelto
6  and warfarin?
7  A. Again, it's a noninferiority trial and I can
8  look at it and quote the numbers but I didn't think
9  there was any statistically significant difference in
10  the bleeding rate between those two drugs.
11  Q. And that's specifically from the EINSTEIN DVT
12  trial, correct?
13  A. That's from my recollection of the study.
14  Q. Okay. Have you prepared any exhibits in this
15  case that you plan to present at trial?
16  A. No.
17  Q. Obviously, you prepared your report, right?
18  A. Right.
19  Q. Have you prepared any other exhibits or
20  demonstratives as of today that you plan to use at
21  trial?
22  A. No, sir.
23  Q. Okay. We talked a lot at the beginning of the
24  deposition and at various points about the documents
25  that you've indicated on Exhibit B of your report. As

48 (Pages 186 to 189)

Protected - Subject to Further Protective Review

Page 190

1  we've talked tonight about this case, any other
2  documents that have come to your mind that you will
3  review or rely on to support your opinions in this
4  case?
5      MS. HOFFMANN: That he will or that he has?
6  I'm sorry. I missed it.
7      MR. VANZANDT: That he will.
8      A. I think if I -- I guess if I look into more
9  information as it relates to the care that I provide
10  to the patients that I see, I guess I will and I can
11  let y'all know what that is, but I don't plan on doing
12  a whole lot of other extraneous research as it
13  pertains to this case.
14      Q. Are there any specific publications or studies
15  or data that comes -- that has -- that's come to your
16  mind tonight that you plan to review before trial?
17      MS. HOFFMANN: For this case?
18      MR. VANZANDT: For this case.
19      MS. HOFFMANN: Other than what he does in his
20  normal practice?
21      MR. VANZANDT: Yes.
22      A. No.
23      MS. HOFFMANN: Sorry.
24      A. I mean, I'm telling you I am doing a talk on
25  NOACs and DOACs that I will probably look into some

Page 191

1  things, but it will be for that presentation on March
2  the 1st -- April the 1st, I'm sorry, and not for this.
3      MR. VANZANDT: Okay. All right, Doctor.
4  That's all the questions I have for you.
5      THE WITNESS: Thank you.
6      MR. VANZANDT: Thank you very much for your
7  time tonight.
8      THE WITNESS: Thank you. Thank you.
9      THE VIDEOGRAPHER: Any questions?
10      MS. HOFFMANN: No.
11      THE VIDEOGRAPHER: The time now is 7:56 p.m.
12  Today's deposition of Randy Roth consisting of four
13  disks is now concluded.
14      (Whereupon, the deposition concluded at
15  7:56 p.m.)

Page 192

1              C E R T I F I C A T E
2      I, SUSAN D. WASILEWSKI, Registered
3  Professional Reporter, Certified Realtime Reporter,
4  Certified Realtime Captioner, do hereby
5  certify that, pursuant to notice, the deposition of
6  RANDY ROTH, M.D., was duly taken on Thursday,
7  February 16, 2017, at 3:58 p.m. before me.
8      The said RANDY ROTH, M.D., was duly sworn by
9  me according to law to tell the truth, the whole truth
10  and nothing but the truth and thereupon did testify as
11  set forth in the above transcript of testimony. The
12  testimony was taken down stenographically by me. I do
13  further certify that the above deposition is full,
14  complete, and a true record of all the testimony given
15  by the said witness, and that a review of the
16  transcript was requested.
17
18  _____
19  Susan D. Wasilewski, RPR, CRR, CCP, CMRS, FPR, CCR(NJ)
20  (The foregoing certification of this transcript does
21  not apply to any reproduction of the same by any
22  means, unless under the direct control and/or
23  supervision of the certifying reporter.)
24
25

Page 193

1          INSTRUCTIONS TO WITNESS
2
3
4      Please read your deposition over carefully
5  and make any necessary corrections. You should state
6  the reason in the appropriate space on the errata
7  sheet for any corrections that are made.
8
9      After doing so, please sign the errata sheet
10  and date it. It will be attached to your deposition.
11
12      It is imperative that you return the original
13  errata sheet to the deposing attorney within thirty
14  (30) days of receipt of the deposition transcript by
15  you. If you fail to do so, the deposition transcript
16  may be deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25

49 (Pages 190 to 193)

Protected - Subject to Further Protective Review

Page 194

```
1           ------
2         E R R A T A
3           ------
4    PAGE LINE CHANGE
5    ___ ___ _____
6      REASON: _____
7    ___ ___ _____
8      REASON: _____
9    ___ ___ _____
10     REASON: _____
11   ___ ___ _____
12     REASON: _____
13   ___ ___ _____
14     REASON: _____
15   ___ ___ _____
16     REASON: _____
17   ___ ___ _____
18     REASON: _____
19   ___ ___ _____
20     REASON: _____
21   ___ ___ _____
22     REASON: _____
23   ___ ___ _____
24     REASON: _____
25
```

Page 196

```
1            LAWYER'S NOTES
2    PAGE LINE
3    ____ ____ _____
4    ____ ____ _____
5    ____ ____ _____
6    ____ ____ _____
7    ____ ____ _____
8    ____ ____ _____
9    ____ ____ _____
10   ____ ____ _____
11   ____ ____ _____
12   ____ ____ _____
13   ____ ____ _____
14   ____ ____ _____
15   ____ ____ _____
16   ____ ____ _____
17   ____ ____ _____
18   ____ ____ _____
19   ____ ____ _____
20   ____ ____ _____
21   ____ ____ _____
22   ____ ____ _____
23   ____ ____ _____
24   ____ ____ _____
25
```

Page 195

```
1         ACKNOWLEDGMENT OF DEPONENT
2
3       I, _____, do hereby
4    acknowledge that I have read the foregoing pages, 1
5    through 195, and that the same is a correct
6    transcription of the answers given by me to the
7    questions therein propounded, except for the
8    corrections or changes in form or substance, if any,
9    noted in the attached Errata Sheet.
10
11
12   _____        _____
13   RANDY ROTH, M.D.            DATE
14
15
16
17
18   Subscribed and sworn to before me this
19   ____ day of _____, 20___.
20   My Commission expires: _____
21
22   _____
23   Notary Public
24
25
```