Protected - Subject to Further Protective Review

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE: XARELTO (RIVAROXABAN)      MDL NO. 2592
PRODUCTS LIABILITY LITIGATION,

                                  SECTION L

THIS DOCUMENT RELATES TO:         MAG. JUDGE NORTH

DORA MINGO, NO. 15-03469




                    - - -


              FEBRUARY 15, 2017

                    - - -


    PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

                    - - -


        Videotaped deposition of VONDA G. REEVES-DARBY,
MD, held at Bradley Arant Boult Cummings, One
Jackson Place, 188 East Capitol Street, Suite 400,
Jackson, Mississippi, commencing at 4:11 p.m., on
the above date, before Joan L. Pitt, Registered
Merit Reporter, Certified Realtime Reporter, and
Florida Professional Reporter.


                    - - -


          GOLKOW TECHNOLOGIES, INC.
    877.370.3377 ph | 917.591.5672 fax
              deps@golkow.com

Protected - Subject to Further Protective Review

## Page 2

```
 1        APPEARANCES:
 2        BRADLEY D. HONNOLD, ESQUIRE
          Goza & Honnold, LLC
 3        111150 Overbrook Road, Suite 250
          Leawood, Kansas 66211
 4        913.451.3433
          bhonnold@gohonlaw.com
 5        Representing Plaintiffs
 6
 7        MARY CATHERINE WAY, ESQUIRE
          Mitchell Williams
 8        425 West Capitol Avenue, Suite 1800
          Little Rock, Arkansas 72201
 9        501.688.8890
          mway@mwlaw.com
10        Representing Defendant Bayer
11
          MARGARET HOFFMANN, ESQUIRE
12        Schwabe Williamson Wyatt
          1211 Southwest 5th Avenue, Suite 1900
13        Portland, Oregon 97204
          503.796.2868
14        mhoffmann@schwabe.com
          Representing Janssen Defendants
15
16
          ALSO PRESENT:
17
          Melissa Bardwell, Videographer
18
19
20
21
22
23
24
```

## Page 3

```
 1                    - - -
 2                  I N D E X
 3                    - - -
 4        Testimony of:  VONDA G. REEVES-DARBY, MD
 5        DIRECT EXAMINATION BY MR. HONNOLD        5
 6
 7
 8            E X H I B I T   I N D E X
 9        REEVES-DARBY   DESCRIPTION         PAGE
10        No. 1  PLAINTIFFS' NOTICE WITH SUBPOENA DUCES   12
                 TECUM OF ORAL VIDEOTAPED DEPOSITION OF
11               VONDA REEVES-DARBY, MD
12        No. 2  EXPERT REPORT OF VONDA REEVES-DARBY, MD   15
13        No. 3  RESPONSES AND OBJECTIONS TO PLAINTIFFS'   15
                 NOTICE WITH SUBPOENA DUCES TECUM OF
14               ORAL VIDEOTAPED DEPOSITION OF VONDA
                 REEVES-DARBY, MD
15
          No. 4   SEPTEMBER 2015 XARELTO LABEL        40
16
          No. 5   REVISED REFERENCE LIST FOR VONDA      196
17                REEVES-DARBY, MD
18        No. 6   REFERENCE LIST FOR VONDA REEVES-DARBY,   196
                  MD
19
20
21
22
23
24
```

## Page 4

```
 1                    - - -
 2            THE VIDEOGRAPHER:  We are now on the record.
 3        My name is Melissa Bardwell, videographer here for
 4        Golkow Technologies.  The date today is February 15,
 5        2017.  The time is approximately 4:11 p.m.
 6            This videotaped deposition is being held in
 7        Jackson, Mississippi, in reference to the Xarelto
 8        (Rivaroxaban) Products Liability Litigation.  The
 9        deponent today is Vonda Reeves-Darby, MD.
10            Would counsel present please introduce
11        themselves and state their affiliations for the
12        record.
13            MR. HONNOLD:  Bradley Honnold for Ms. Mingo.
14            MS. HOFFMANN:  Margaret Hoffmann for the
15        Janssen defendants.
16            MS. WAY:  Mary Catherine Way on behalf of
17        Bayer.
18            THE VIDEOGRAPHER:  The court reporter today is
19        Joan Pitt, and she will now swear in the witness.
20            THE COURT REPORTER:  Raise your right hand,
21        please.  Do you swear or affirm the testimony you
22        give will be the truth, the whole truth, and nothing
23        but the truth?
24            THE WITNESS:  I do.
```

## Page 5

```
 1            THE COURT REPORTER:  Thank you.
 2            VONDA G. REEVES-DARBY, MD, called as a witness by
 3        the Plaintiff, having been first duly sworn, testified
 4        as follows:
 5                 DIRECT EXAMINATION
 6        BY MR. HONNOLD:
 7            Q.  Doctor, good afternoon.  Tell me your full
 8        name, please.
 9            A.  Vonda Gail Reeves-Darby.
10            Q.  You're a doctor?
11            A.  Yes.
12            Q.  Or a physician, whatever your preferred term
13        is?
14            A.  Interchangeable, yes.
15            Q.  Okay.  And you have a specialty area of
16        practice of gastroenterology?
17            A.  Yes.
18            Q.  And can you tell us what gastroenterology is or
19        what type of practice that is?
20            A.  Gastroenterology is the study of digestion,
21        anything that pertains to the digestion of food or any
22        liquid products.  It also entails the practice of
23        hepatology.  That is the study of liver diseases.
24            Q.  Okay.  Okay.  And then do you also deal with
```

Protected - Subject to Further Protective Review

## Page 6

1  injuries or trauma to the GI tract in any way?
2      A.  If you're talking about blunt trauma or things
3  of that nature, no, but injuries in other areas, yes.
4      Q.  And you certainly deal with ulcer disease?
5      A.  I do.
6      Q.  Okay.  And you -- where do you practice?
7      A.  My practice is Gastrointestinal Associates, PA.
8  We have three locations, all here in the State of
9  Mississippi.
10     Q.  And where do you spend most of your time in
11 terms of those three locations, and we'll talk about
12 hospitals in a second, but out of your three locations
13 of your group, where do you spend the most of your time?
14     A.  The majority of my time is spent in Flowood,
15 Mississippi, and in Madison, Mississippi.
16     Q.  And so you do see patients in the office?
17     A.  I do.
18     Q.  You do see patients, I assume, in the
19 procedural suite where you perform endoscopy; right?
20     A.  I do.
21     Q.  You see patients in the hospital?
22     A.  All settings, yes.
23     Q.  I take it that you have medical staff
24 privileges at hospitals in the Jackson, Mississippi,

## Page 7

1  area; is that right?
2      A.  Yes, sir, I do.
3      Q.  In terms of your professional time, how it
4  breaks down on a normal week to the extent that you have
5  one that's illustrative of others, how would your time
6  break down in terms of seeing scheduled patients in the
7  office, seeing scheduled patients for procedures, doing
8  rounds or seeing patients in the hospital?
9      A.  The majority of my time is spent in the
10 outpatient setting, so that means that I am doing
11 endoscopic procedures or I'm seeing clinic patients.
12     Q.  And endoscopic procedures, that would include
13 things -- both the upper GI tract and lower GI tract?
14     A.  Yes, and other procedures.
15     Q.  And biliary system as well?
16     A.  Yes.
17     Q.  So you do colonoscopies; is that right?
18     A.  Yes.
19     Q.  Upper GI studies; correct?
20     A.  Upper endoscopy.
21     Q.  Upper endoscopy?
22     A.  Yeah.
23     Q.  ERCPs?
24     A.  Yes, I do.  I'm a fully trained

## Page 8

1  gastroenterologist.  The only exception is EUSs that I
2  no longer perform.
3      Q.  So you -- in terms of procedures other than
4  EUSs, you still on occasion perform the full panoply of
5  endoscopic procedures that gastroenterologists do; is
6  that right?
7      A.  Yes.
8      Q.  Is there -- is there a physician or physicians
9  in your group that tend to focus on certain types of
10 gastrointestinal or liver diseases more than other
11 physicians do?  What I mean by that, do you have some
12 doctors in your practice that primarily see complex
13 liver patients or see complex ulcerative colitis
14 patients, things like that?
15     A.  We're not segmented in that way.  Most of us,
16 the majority of us, particularly those of us that are
17 not as young, are fully trained gastroenterologists, but
18 as we have acquired younger partners, they have done a
19 lot more of the EUS work.  So we're -- we're -- that's
20 how the practice is divided.
21     Q.  You're going to have to share your secret with
22 us.  What's EUS?
23     A.  Endoscopic ultrasonography.
24     Q.  So it sounds like there's a way to use an

## Page 9

1  endoscopic equipment to take ultrasound pictures of the
2  gastrointestinal tract or some of its structures?
3      A.  Yes.  It's the instrument actually is -- it's
4  fixed to the end of an endoscope, and the scope is
5  actually like an upper endoscope, but it has a balloon
6  fixture that gives either a radial or a circumferential
7  sonogram on the tip of it.
8      Q.  Okay.  And is there a reason why you don't do
9  that?  That doesn't sound all that different than
10 other -- other procedures?
11     A.  I was trained in it probably about 20 years
12 ago, and in my transition where I was, there was not a
13 lot of it being done, and now you have such elite scopes
14 and new young bright minds that it's not necessary for
15 me to do it.  I have wonderful partners that I can refer
16 to.
17     Q.  Okay.  So how many doctors are in your group?
18     A.  There are 25.
19     Q.  And in terms of how you structure your time
20 during a week, do you have certain days when you see
21 appointment patients in the office versus scheduled
22 patients where you're doing procedures?
23     A.  Yes, I do.
24     Q.  How do you -- how do you break your time down?

Protected - Subject to Further Protective Review

Page 10

1      A.  I'm -- the majority of my time is in endoscopy,
2   four days a week I do nothing but procedures, and one
3   day a week I'm in the clinic if that's my outpatient
4   week.
5      Q.  So four days a week you are essentially
6   spending your entire day at a procedural site, whether
7   that's connected to your office or a freestanding
8   facility; right?
9      A.  That's correct.
10     Q.  And do you do procedures at both in terms of
11  where you have procedures suites coincident to one or
12  more of your offices and also freestanding facilities?
13     A.  All of our offices were designed and built for
14  that.
15     Q.  So if somebody has just a scheduled appointment
16  to see you in the office, they'd be going to essentially
17  the same address as somebody who would be going to have
18  a colonoscopy?
19     A.  That would be correct.
20     Q.  You mentioned some of this in your report, but
21  I think you said you may see sometimes 20 to 25 patients
22  a day?
23     A.  Yes, sir.
24     Q.  Okay.  Are there days when you do that many

Page 11

1   procedures?
2      A.  Some days, yes.
3      Q.  You don't ever do 25 colonoscopies in a day?
4      A.  I can.
5      Q.  Okay.  But do you routinely?
6      A.  I have one of the larger practices in this
7   area, and so routinely I do a pretty moderate volume of
8   procedures, but usually it's a mix.
9      Q.  Okay.  What's that mean?
10     A.  A mix of upper endoscopics and colonoscopies.
11     Q.  Okay.  In this -- you know we're here today
12  to -- for me to take your deposition as it relates to
13  Ms. Mingo's case; right?
14     A.  That's correct.
15     Q.  And you've prepared a report in this case;
16  right?
17     A.  I did, yes, uh-huh.
18     Q.  What was your understanding as to the purpose
19  or why you were doing a report?
20     A.  I was doing a report to give my opinions on the
21  particular case, Ms. Mingo's case.
22     Q.  And so was it your intention and goal when you
23  were preparing the report to set forth all of your
24  opinions in the case?

Page 12

1      A.  The majority of them were summarized in the
2   case.
3      Q.  What's that mean?
4      A.  That means that they are inclusive.
5      Q.  You say the majority of them were summarized in
6   the case, meaning in your report or some other source?
7      A.  The report and the references that I gave.
8      Q.  Okay.  So is it true that all of the opinions
9   that you have in this case are contained in your report?
10     A.  That's correct.
11     Q.  Okay.  And there is a reference list that's
12  attached as an exhibit to your report; is that right?
13     A.  Yes, it is.
14     Q.  I think you say that those are the materials
15  that you relied upon for your opinions; correct?
16     A.  That's not the only thing, now.  I practice and
17  I've had a lot of medical experience in a lot of
18  different environments, so bottom line is that it's my
19  personal clinic experience, it's ongoing medical
20  education in various forms, and exposure to the
21  literature.
22         (Reeves-Darby Exhibit No. 1 was marked for
23  identification.)
24  BY MR. HONNOLD:

Page 13

1      Q.  I'm first going to hand you Deposition
2   Exhibit 1.  It may or may not be something that you've
3   seen before.  It's just kind of the written notice for
4   your deposition today.  Have you seen that document
5   before?
6      A.  I see it now, yes.
7      Q.  Okay.  It's essentially just kind of a legal
8   invitation or a notice to everybody, lawyers and
9   everybody, about the fact that we're having the
10  deposition today.
11     A.  Yes.
12     Q.  You see that it sets forth today's date and
13  time and place?
14     A.  Yes.
15     Q.  There's a request that's attached to this about
16  a whole bunch of materials requesting that you gather
17  those and bring those.  Have you seen that list before
18  today?
19     A.  I know of these lists, but this is the first
20  time I'm looking at this list, but it's --
21     Q.  Did you gather materials of any type and give
22  them to anyone?
23     A.  Did I gather materials?  Are you talking about
24  to give to a person, or what?

4 (Pages 10 to 13)

Protected - Subject to Further Protective Review

Page 14

1    Q.  Yeah, did you gather up some materials and give
2  them to anyone related to this case?
3    A.  Yes, I did.
4       MS. WAY:  Object to the form.
5       THE WITNESS:  I have a reference list, and
6  that's basically the only thing that I can tell you
7  that goes along with this.
8  BY MR. HONNOLD:
9    Q.  Okay.
10   A.  Okay?  Is that what you were asking?
11   Q.  Kind of, but that's -- that's okay.
12   A.  Okay.  Okay.
13      MS. WAY:  Brad, if I can interject.
14      MR. HONNOLD:  Yes.
15      MS. WAY:  Just for completion, can I go ahead
16  and introduce this as Exhibit 2?
17      MR. HONNOLD:  Yes.
18      MS. WAY:  It's our objections and responses.
19      MR. HONNOLD:  Yeah, that's great.  So let's
20  mark that as 2 and we'll clip that in there.
21  BY MR. HONNOLD:
22   Q.  So do you -- do you have either a physical --
23      MR. HONNOLD:  Actually, we're going to have to
24  mark it as 3, because I put 2 on her report.  Is

Page 15

1  that okay?
2       MS. WAY:  Yes.
3       MR. HONNOLD:  So just for the record so it's
4  clear, I'm putting a sticker that says Exhibit 3 on
5  the defendant's objections to the deposition notice.
6       (Reeves-Darby Exhibit No. 2 was marked for
7  identification.)
8       (Reeves-Darby Exhibit No. 3 was marked for
9  identification.)
10  BY MR. HONNOLD:
11   Q.  Do you have a -- do you have a file in this
12  case either physical or electronic?
13   A.  Yes, I do.
14   Q.  Okay.  Where is it?
15   A.  It's in my --
16      MS. HOFFMANN:  You mean where she physically
17  keeps it?
18      MR. HONNOLD:  Yeah.
19      THE WITNESS:  My house is a good place.
20  BY MR. HONNOLD:
21   Q.  And is your file, is it in a box, in a drawer?
22  Does it exist electronically or combination of both?
23   A.  I have an Office Depot cart that I use instead
24  of carrying around all of that weight.

Page 16

1    Q.  Okay.  And did you get that cart for -- for
2  your work on this case?
3    A.  No.
4    Q.  Okay.  You use it for other things?
5    A.  Yes.
6    Q.  Okay.  You understand that you're serving in
7  the capacity of an expert witness in this case?
8    A.  That's correct, medical expert witness.
9    Q.  Have you spoken with any of the treating
10  physicians in this case?
11   A.  No, I have not.
12   Q.  Do you know any of them?
13   A.  Not personally.
14   Q.  Do you know them in some way other than
15  personally?
16   A.  I've seen the name of Dr. Gholson before.  She
17  refers to our practice.
18   Q.  What does that mean?
19   A.  She refers patients to our practice.
20   Q.  So if she has a patient that has a
21  gastrointestinal disease or disorder or she suspects one
22  does, she might send that patient your way for
23  evaluation?
24   A.  She might.  She has a lot of choices.  She

Page 17

1  could refer it locally or to us.
2    Q.  Have you served as an expert witness before?
3    A.  I have.
4    Q.  In what -- in what context?
5    A.  A full range.  I have done product litigation
6  before.  I have served as an expert for some malpractice
7  suits.
8    Q.  And you said you've served as an expert on some
9  products cases before.  What kind of products cases?
10      MS. WAY:  Let me interject here and just state
11  that to the extent you're asking her for any -- to
12  disclose any consulting -- cases that she's
13  consulted upon that she hasn't been disclosed in I'm
14  going to ask her not to disclose those.
15      MR. HONNOLD:  Well, I can ask her about it and
16  she doesn't -- it might depend upon whether I ask
17  her to disclose specific contents, but I can
18  certainly ask her, and she's going to have to tell
19  me what things she has consulted on.
20      I may not be able to get into the substance or
21  her opinions, but I'm going to be able to find out
22  what she's done.
23      MS. WAY:  Yeah, and I guess my objection is
24  going to be consistent with the federal rules and

Protected - Subject to Further Protective Review

Page 18

1   that she's certainly not been required to disclose
2   any expert work that she has done in a capacity
3   where she has not written a report or served a
4   report or been disclosed as an expert.
5        MR. HONNOLD: Yeah, okay.
6   BY MR. HONNOLD:
7        Q.  Tell me all the times you've served as an
8   expert witness in products cases.
9        A.  Excuse me a minute.  Are you instructing me to
10  answer this?
11       MS. WAY: You can answer that, yes.
12       THE WITNESS: Okay.  All right.  Now, repeat
13  your question.
14  BY MR. HONNOLD:
15       Q.  Tell me all the times you've been an expert
16  witness in products cases.
17       MS. WAY: Not a consulting witness, an expert
18  witness.
19       THE WITNESS: An expert witness?
20       MS. WAY: Yes, that's right.
21       THE WITNESS: Probably three or four times.
22  BY MR. HONNOLD:
23       Q.  Okay.  In what kind of cases?
24       A.  Silicone breast implants, Propulsid.  Those are

Page 19

1   two that come into mind.
2        Q.  Any other products cases?
3        A.  Not off the top of my head, but I've been doing
4   this for about 30 years, so I might not be completely up
5   to some of the others.
6        Q.  You've been doing what for 30 years?
7        A.  Practicing medicine.
8        Q.  Okay.  And so for how long has it been that
9   you've been serving or been willing to serve as an
10  expert witness in a medical legal case?
11       A.  I actually did that when I was also in Texas,
12  when I was at the University of Texas medical branch.
13       Q.  In Galveston?
14       A.  Yes.
15       Q.  Okay.  So now can you answer my question?  For
16  how long have you been serving as an expert witness in
17  medical legal cases?
18       A.  Over a period of 25 years.
19       Q.  So when was -- what was the first type of case
20  where you served as an expert witness in a medical legal
21  case?
22       A.  It would have been in Galveston.
23       Q.  What type of case?
24       A.  I was working with V&E out of Houston on

Page 20

1   silicone breast implant product litigation.
2        Q.  What's V&E?
3        A.  Vinson & Elkins.
4        Q.  Are they kind of commonly known on the street
5   as V&E in that area of the country?
6        A.  Yes, in most legal circles, yes.
7        Q.  Most legal circles.  How do you know that?
8        A.  I have a lot of friends that are lawyers.
9        Q.  Okay.  Where?
10       A.  Texas, Louisiana, Mississippi, New York.
11       Q.  And it's through those legal circles that
12  you've discovered that Vinson & Elkins is known as V&E
13  in legal circles?
14       MS. WAY: Object to the form.
15       THE WITNESS: Well, one of the principals at
16  V&E was a good friend of mine.
17  BY MR. HONNOLD:
18       Q.  Who is that?
19       A.  Gosh, I was just talking about him.  I trained
20  his wife in Galveston.  Kyles, John Kyles.
21       Q.  And when you say you trained his wife, as a
22  doctor?
23       A.  Yes.
24       Q.  Okay.  So you've -- any other -- any other good

Page 21

1   friends that you have at V&E?
2        A.  No.  That's been -- that's been over a decade
3   ago, sir.  That's been over a decade ago.
4        Q.  Okay.
5        A.  Okay.
6        Q.  I'll take your word for it.
7        A.  Good.
8        Q.  Lawyers in New York, who are those?
9        A.  My son.
10       Q.  Okay.  Where does he work?
11       A.  NBC Universal.
12       Q.  So he's a lawyer for -- for the television
13  network?
14       A.  Yes.
15       Q.  And lawyers in Texas or Mississippi that you
16  know?
17       A.  That's a long list, but I'll give it to you.
18  The mayor of Houston is a friend of mine, Sylvester
19  Turner.  He's also a lawyer.  Johnny Gill was a lawyer
20  in Texas.  Covington, Mississippi.  Most of the lawyers
21  at Butler Snow.  We retain Baker Donelson for our own
22  private work.
23       There's quite a few.  I think the list can be
24  fairly exhaustive.

Protected - Subject to Further Protective Review

Page 22

1    Q.  Any other law firms here in Jackson that you're
2 familiar with?
3    A.  Oh, quite a few.
4    Q.  Which ones?
5    A.  Felicia Perkins and Associates.  Lisa Ross.
6 Walker & Walker.  Blackmon & Blackmon.
7    Q.  Ed Blackmon?
8    A.  Yes.
9    Q.  Any firms in Jackson represented you before?
10    A.  I'm sorry?
11    Q.  Any firms in Jackson represented you before?
12    A.  Yes.  Walter Johnson's firm, Watkins & Eager.
13    Q.  So we'd add them to the list?
14    A.  Yes.
15       MS. HOFFMANN:  We're making a list of friends
16 or just a list of law firms that she's familiar
17 with?
18       THE WITNESS:  Yeah, what's the -- how do you
19 want me to -- I've given you everybody that I know.
20 Just about.
21 BY MR. HONNOLD:
22    Q.  We'll call it that.  You gave me a list of
23 everybody -- lawyers that you know?
24    A.  I can probably go -- triple that list if you'd

Page 23

1 like.
2       MS. WAY:  Where are we going?  I mean, are we
3 going to --
4       MR. HONNOLD:  I've asked some just very simple
5 questions and we've just gotten ourselves into this
6 situation, so it's nothing that I'm doing.
7 BY MR. HONNOLD:
8    Q.  Who are the people at Butler Snow that you
9 know?
10    A.  At Butler Snow?
11    Q.  Uh-huh.
12    A.  Christy Jones.
13    Q.  Okay.  And how do you know Christy Jones?
14    A.  We worked on litigation together, and she's
15 personal friend.
16    Q.  Okay.  And what litigation did you work on
17 together with Christy Jones?
18    A.  Propulsid.
19    Q.  And how did you become Christy Jones' personal
20 friend?
21    A.  We have the same social circles.
22    Q.  And did you know Christy Jones as a friend from
23 your same social circles before you worked with her as
24 an expert witness?

Page 24

1    A.  No.
2    Q.  Okay.  So you first met Christy Jones in work
3 that you did on the Propulsid case?
4    A.  Yes.
5    Q.  And then you became her personal friend?
6    A.  Uh-huh.
7    Q.  Yes?
8    A.  Yes.
9    Q.  And you're still her personal friend?
10    A.  Yes.
11    Q.  Any other lawyers that you know that work on
12 products cases that you considered as personal friends?
13       MS. HOFFMANN:  Objection.
14       MS. WAY:  Same.  Can we get an agreement on the
15 record that an objection for one is an objection for
16 both?
17       MR. HONNOLD:  Sure.
18       THE WITNESS:  I have a lot of friends and I
19 do -- do have to say that they are lawyers.
20 BY MR. HONNOLD:
21    Q.  Okay.  And that's fine.  I appreciate that.
22 But I just said --
23    A.  Can you just kind of clarify what you're
24 actually saying?

Page 25

1    Q.  Who are your lawyer friends that you can think
2 of that you know that work on products cases?
3    A.  You know, Christy does the majority of it.
4    Q.  What is SEAK?
5    A.  SEAK?  It's an agency that does training for
6 physicians.
7    Q.  What kind of -- so it's an agency.  What is
8 your affiliation with SEAK?
9    A.  I don't have an affiliation with them.
10    Q.  Okay.  Are you listed with SEAK, do you know?
11    A.  Yes, I am.  They have a national directory.
12    Q.  And so is that the same SEAK that you're saying
13 is an agency that trains physicians?
14    A.  Yeah, uh-huh.
15    Q.  What type of physician training does SEAK do?
16    A.  They basically have a body of literature on
17 depositions, medical expert, things of that nature.
18    Q.  And what does SEAK train physicians to do?
19    A.  Basically, to -- how to be -- how to be well
20 prepared and how to create documents and do medical
21 expert witness testimony that is appropriate.
22    Q.  And have you participated in that training from
23 SEAK?
24    A.  Yes.

7 (Pages 22 to 25)

Protected - Subject to Further Protective Review

Page 26

1    Q.   Okay.  And when did you do that?
2    A.   It probably would have been almost seven or
3  eights years ago.
4    Q.   And what specifically did this training with
5  SEAK entail?
6    A.   Basically, it was a series of lectures in which
7  they gave advice on how to look at medical records and
8  prepare reports in the process of being retained as a
9  medical expert, but they also did some other things too.
10  They had reviews on disability reviews and things of
11  that nature.
12    Q.   And then did you at some point grant SEAK
13  permission to list your name on the Internet?
14    A.   Yes, I did.
15    Q.   So did you sign a document that gave them
16  permission to do that?
17    A.   They always ask for a profile, and as part of
18  that you have to submit a signature.
19    Q.   And you filled out that profile for SEAK?
20    A.   Yes.
21    Q.   And this training of SEAK that you went
22  through, was that something that was done online or by
23  video or did you actually go somewhere and attend the
24  event?

Page 27

1    A.   Physical, physical presence.
2    Q.   Okay.  Where did you go?
3    A.   I think I went to Naples, Florida, or Chicago,
4  one or the other.  They kind of rotate according to
5  whether the weather is cold or not.
6    Q.   So have you been -- how do you know that?
7    A.   Because I see the brochures that are
8  circulated.
9    Q.   Okay.  So you're on their mailing list?
10    A.   Yes.
11    Q.   Okay.
12    A.   As are probably half of the physicians in
13  Jackson.
14    Q.   Okay.  Why do you say half the physicians in
15  Jackson are listed with SEAK?
16    MS. HOFFMANN:  She said they're on a mailing
17  list.
18  BY MR. HONNOLD:
19    Oh, half the physicians in Jackson are on the
20  mailing list?
21    A.   Yes, uh-huh, yeah.
22    Q.   And how many times have you gone to SEAK events
23  in places like Chicago or Naples?
24    A.   I think just once.

Page 28

1    Q.   They're kind of different places.  Can you
2  remember which one you went to?
3    A.   You know, SEAK also has a course on writing for
4  physicians as a -- fiction and nonfiction writing, and I
5  remember specifically I went to Massachusetts for that
6  particular course.  I think that was -- I can't remember
7  the name of the place, but it was where John F. Kennedy
8  was from.
9    Q.   Okay.  So they give -- they give training or
10  classes to teach doctors how to write books?
11    A.   Yes, absolutely.
12    Q.   And do you pay?
13    A.   Yes, you do, because you have experts that come
14  in that are authors and they give you literary advice.
15    Q.   Who teaches the other classes about how to give
16  a deposition, how to write a report, how to be well
17  prepared and give good expert testimony?
18    MS. WAY:  Objection to form.
19  BY MR. HONNOLD:
20    Q.   Who teaches that?
21    A.   Physicians and lawyers.
22    Q.   And do you get materials when you go?
23    A.   You can if you want to buy them.
24    Q.   I think your SEAK profile says something that

Page 29

1  says areas of emphasis or expertise and it says pharm or
2  pharma?
3    A.   I don't know what it says.  I haven't looked at
4  it.  Do you have it?
5    Q.   We'll look at it.  When we get to a break, I'll
6  fire up my computer and get it and we can look at it.
7    A.   Sure.
8    Q.   But if it says you're of an area of expertise
9  or emphasis in pharm or pharma, would that have been
10  something that you wrote down yourself?
11    A.   Not necessarily.  I need to look at that
12  myself.
13    Q.   You said that SEAK was an agency.  When you
14  used that term in the context of SEAK, what do you mean
15  by an agency?
16    A.   It's a business.
17    Q.   And when did you first get connected with SEAK?
18    MS. WAY:  Asked and answered.
19    THE WITNESS:  I think I answered that I went
20  seven years ago, and I also shared with you that I
21  was -- I received a mailing from it.
22  BY MR. HONNOLD:
23    Q.   Okay.  And so that's how you got hooked up with
24  them, you responded to a mailing?

8 (Pages 26 to 29)

Protected - Subject to Further Protective Review

Page 30

1      A. Yeah, uh-huh.
2      Q. Did anyone go with you on that trip, either to
3  Chicago or to Naples or to Massachusetts?
4      A. No.
5      Q. Do you know any other physicians personally
6  from the Jackson, Mississippi, area who have ever gone
7  to that similar training program offered for doctors by
8  SEAK?
9      A. It's funny that you should ask that. I had
10  lunch with one of my partners who attended.
11      Q. Okay. And which doctor is that?
12      A. It's Dr. Angela Shannon.
13      Q. And did she just happen to go because she got
14  the mailing too?
15      A. Yes.
16      Q. Did she know that you had been before?
17      A. Yes.
18      Q. Had you told -- when you went, had you -- had
19  you told her later that you had gone and found it to be
20  productive or valuable?
21      MS. HOFFMANN: Objection.
22      THE WITNESS: Angela just joined our practice
23      about two or three years ago, and I went many, many
24      years before that.

Page 31

1  BY MR. HONNOLD:
2      Q. And so before Angela went, did you have any
3  conversation with her about it?
4      A. She asked me about how to prepare legal
5  reports, and then that's when I suggested that maybe she
6  wanted to look at SEAK.
7      Q. So you suggested SEAK to her?
8      A. No, I just basically said, maybe you want to
9  look at it, and I think eventually she got some
10  correspondence in the mail.
11      Q. Do you have any affiliation with any other type
12  of expert witness service or agency?
13      MS. HOFFMANN: Objection.
14      MS. WAY: Same.
15      MS. HOFFMANN: She said she didn't have an
16      affiliation with them.
17      THE WITNESS: The answer is no.
18  BY MR. HONNOLD:
19      Q. When you agreed to allow SEAK to list you, do
20  you -- do you fill out some sort of paperwork that
21  actually you have to sign and agree to abide by any sort
22  of rules or regulations or to do certain things or to
23  not do other things?
24      MS. WAY: Objection.

Page 32

1      THE WITNESS: That's not a binding thing of
2      that nature. I filled out paperwork probably seven
3      years ago.
4  BY MR. HONNOLD:
5      Q. How -- have you ever received contacts or
6  inquiries from lawyers from the SEAK listing?
7      A. I have, but they were about disability reviews.
8      Q. Have you ever done disability reviews for
9  individuals?
10      A. No, that's -- I do not do that.
11      Q. So you declined when those lawyers contacted
12  you?
13      A. Yes, I did, uh-huh.
14      Q. So have you gotten any other type of inquiry
15  from your SEAK listing other than these disability
16  referrals?
17      A. I've been asked to review some records.
18      Q. In what kind of case?
19      MS. HOFFMANN: I'm going to object at this
20      point, and I'm going to caution the witness that if
21      she didn't accept a consultation and she signed any
22      kind of confidentiality agreement in connection with
23      the review of the records and the declination of the
24      work, she shouldn't talk about it.

Page 33

1      MR. HONNOLD: That's not true, legally or
2  otherwise. That's not true.
3      MS. HOFFMANN: I think it is.
4      MR. HONNOLD: No, it's not true.
5  BY MR. HONNOLD:
6      Q. What kind of case were you asked to review
7  records on?
8      A. I'm sorry.
9      MS. WAY: Objection.
10      THE WITNESS: I'm sorry, I'm a little bit
11      confused because I understand what she said, and I
12      don't think I should put myself in a precarious
13      situation if she -- she's someone I respect. I'm
14      sorry. I don't know how to answer that.
15  BY MR. HONNOLD:
16      Q. Did you sign a confidentiality agreement?
17      A. For what?
18      Q. These records that you were asked to review.
19      MS. WAY: Let's back up, Brad.
20      THE WITNESS: Yes.
21      MS. WAY: You asked her a very vague question.
22      MR. HONNOLD: I did not. I asked her, I said,
23      did you get any records, any other inquiries from
24      the SEAK listing, and she said --

Protected - Subject to Further Protective Review

Page 34

1     MS. WAY: That wasn't your question. She can
2   read it back, but trust me, that was not your
3   question.
4     MS. HOFFMANN: That was not your question.
5     MR. HONNOLD: That's where it all started.
6   Okay. If you're going to object to stuff just like
7   you guys say in depositions, you say "Object to the
8   form," and that's what it's all about. Okay? And
9   I've never sat in a deposition in this case and said
10   any other words other than "Object to the form."
11     MS. WAY: Brad, we wanted her to be able to
12   answer the question that she was being asked, and
13   instead of instructing her not to answer something
14   that we weren't clear on. So if your question is
15   about SEAK, what other records have you been asked
16   to review as a result of your involvement with SEAK
17   or however you word it, that's different than
18   instructing her not to answer because of some
19   confidentiality agreement --
20     MR. HONNOLD: Just state your objection. She
21   said she was asked to review some records from
22   another SEAK inquiry.
23     THE WITNESS: No.
24     MS. WAY: No, she didn't. Listen to the

Page 35

1   answer.
2     MR. HONNOLD: Okay, great.
3   BY MR. HONNOLD:
4     Q. What records are you talking about? What kind
5   of case was it?
6     A. There was a company out of North Carolina
7   called Medical Records Review, and not to my knowledge
8   were they associated with SEAK. So the interest came
9   because I do have a Texas license.
10     Q. So this company was from North Carolina and
11   they're called Medical Records Review?
12     A. Medical Records something. I'm not sure of the
13   last part of it. But I don't know of any affiliation
14   that they have with SEAK.
15     Q. And what kind of case was it that they sent you
16   records on?
17     A. Gastroenterology cases.
18     Q. And when you say "gastroenterology cases," what
19   do you mean by that?
20     A. Those in the area of practice that I -- that I
21   do.
22     Q. Okay. And how many cases did Medical Records
23   Review send you to look at?
24     A. Oh, probably two or three over the last three

Page 36

1   or four years.
2     Q. And were those record reviews done on behalf of
3   the plaintiff in the case, the defendant, or was it not
4   disclosed to you?
5     A. It was not disclosed.
6     Q. And did you prepare written reports on those
7   reviews?
8     A. Yes, I did.
9     Q. And what was your understanding -- for whom did
10   you prepare the written report? Was it Medical Records
11   Review?
12     A. Yes.
13     Q. Was this the sort of thing where you were just
14   doing kind of summaries of -- or chronologies of the
15   records?
16     A. I was giving an opinion.
17     Q. And were you giving an opinion on whether there
18   was a departure from the standard of care?
19     A. Yes.
20     Q. And in any of those cases did you give the
21   opinion that you felt that any physician or physicians
22   departed from the standard of care?
23     A. They were only --
24     (Telephone interruption.)

Page 37

1     MS. HOFFMANN: It's not me.
2     THE VIDEOGRAPHER: Should we go off the record?
3     MR. HONNOLD: Yeah, let's go off the record.
4     THE VIDEOGRAPHER: The time is 4:46. We're off
5   the record.
6     (Discussion off the record.)
7     THE VIDEOGRAPHER: The time now is 4:48 p.m.
8   We are back on the record.
9   BY MR. HONNOLD:
10     Q. Doctor, we're back on the record. We just took
11   a very short break due to kind of an equipment
12   malfunction.
13     I think I had asked you whether you gave the
14   opinion for Medical Records Review that any doctor
15   departed from the standard of care?
16     A. My answer was yes. You -- wait a minute. Hold
17   on. You asked me if I gave an opinion that they
18   deviated from the standard of care?
19     Q. Yes.
20     A. And I was about to answer you saying that I had
21   only done about three, and the grading system was that
22   in the majority of these I graded that there was
23   minimal, if any, deviation from the standard of care.
24     Q. Have you ever looked at records related to a

10 (Pages 34 to 37)

Protected - Subject to Further Protective Review

Page 38

1  medical negligence case where you were of the opinion
2  that a physician or other provider departed from the
3  standard of care?
4      A.  I'm sure I have.  I'm sure I have.  I've looked
5  at several things over the years.
6      Q.  What sorts of cases that you recall where you
7  felt that a doctor did depart from the standard of care?
8      A.  My goodness.  That's --
9      Q.  If you can't remember, that will cut it short.
10     A.  I can't remember.  I really can't.
11     Q.  But you think that you probably did?
12     A.  I can't remember, but probably somewhere in my
13  past, possibly.
14     Q.  In this case, based upon the work that you've
15  done, do you feel that all the doctors and health care
16  providers complied with the standard of care?
17         MS. WAY:  Object to the form.
18         THE WITNESS:  In my review of the case, I would
19  say they were within the standard of care.
20  BY MR. HONNOLD:
21     Q.  Does the term "active pathological bleeding"
22  have any meaning to you?
23     A.  It's not a term that's commonly used in
24  gastroenterology.

Page 39

1      Q.  What does the term "active pathological
2  bleeding" mean to you when you hear it?
3         MS. WAY:  Object to form.
4         THE WITNESS:  I'm not sure.  That's not a part
5  of my usual jargon, nor is it for gastroenterology.
6  BY MR. HONNOLD:
7      Q.  So if you were --
8      A.  I know what active bleeding is.
9      Q.  Okay.  What's active bleeding?
10     A.  Active bleeding is an observed obvious bleeding
11  from any variety of sources.  I just have never heard
12  pathologic and active put together like that.
13     Q.  So when you hear or see the word "pathological"
14  modify or describe bleeding, does that have any
15  particular meaning to you?
16     A.  Actually, the definition of pathology would be
17  abnormal versus normal in most medical fields.
18     Q.  So abnormal meaning --
19     A.  Different from normal.
20     Q.  Okay.  Diseased?
21     A.  Yes.
22     Q.  So would bleeding from an ulcer, a gastric
23  ulcer, be pathological bleeding?
24     A.  You're saying that active bleeding -- I'm just

Page 40

1  saying active bleeding is active bleeding.  You continue
2  to say pathologic.  I'm going to say that it's diseased
3  bleeding.  It is not normal.
4      Q.  Meaning that the bleeding isn't normal or that
5  the source or site of the bleeding is not normal?
6      A.  The condition of bleeding.
7      Q.  The label in -- for Xarelto says in its
8  contraindication section, it says active pathological
9  bleeding, so that's where I got this term.  I wasn't
10  just making it up.  I was wondering -- so as you hear
11  the --
12         MS. WAY:  Are you going to show her something,
13  Brad?
14         MR. HONNOLD:  Sure.  I'll show her exactly what
15  I'm looking at.
16         (Reeves-Darby Exhibit No. 4 was marked for
17  identification.)
18  BY MR. HONNOLD:
19     Q.  I'm going to hand you what's the front page of
20  the label September 2015 for Xarelto, and if you look in
21  the contraindication section there on the right, that's
22  where that term active pathological bleeding is listed.
23     A.  Okay.
24     Q.  So as you see it in that context, what's active

Page 41

1  pathological bleeding mean to you?
2         MS. WAY:  Object to the form.  Just let me --
3  hang on one second.  Let the record reflect, you
4  have one page there?
5         THE WITNESS:  Yes.
6         MS. WAY:  Let the record reflect that it's a
7  September 2015 label.  It appears to be the first
8  page.
9  BY MR. HONNOLD:
10     Q.  Do you need some other parts of the label to
11  know what that means?
12     A.  No.
13     Q.  Okay.  So as you see it there, what does that
14  term active pathological -- as you see it there on the
15  label, what does active pathological bleeding mean to
16  you?
17         MS. WAY:  Object to the form.
18         MS. HOFFMANN:  Objection.
19         THE WITNESS:  It's just like I explained to you
20  earlier.  In the context where I look at bleeding
21  and talk about bleeding, I don't couple it with
22  pathologic active bleeding.  We have a different
23  conversation in gastroenterology.  It's just not a
24  terminology that I usually use, but I can tell you

Protected - Subject to Further Protective Review

Page 42

1    what active bleeding is.
2    BY MR. HONNOLD:
3       Q.  Okay.  I'm just -- I'm only asking whether
4    that --
5       A.  I see it.  I basically see it.
6       Q.  -- as it's listed there in that context of
7    being on the front page of the label of Xarelto that
8    this case is about, does it have any meaning to you?
9       MS. WAY:  Asked and answered.
10      MS. HOFFMANN:  Objection.
11      THE WITNESS:  Does it have any meaning to me?
12   Active bleeding has meaning to me.
13   BY MR. HONNOLD:
14      Q.  Okay.  So do you have any understanding as to
15   why active pathological bleeding would be a
16   contraindication for use of Xarelto?
17      MS. HOFFMANN:  Objection.
18      MS. WAY:  Same.
19      THE WITNESS:  Hey, I didn't write the label, so
20   I just know that's how I practice gastroenterology,
21   so --
22      MS. HOFFMANN:  You can't put that back in.
23   It's an exhibit.
24      MR. HONNOLD:  Oh, sorry.

Page 43

1    BY MR. HONNOLD:
2       Q.  Here, I'll give you the entire thing again.  As
3    you see it on the -- on the Xarelto label where it says
4    a contraindication to using Xarelto is active
5    pathological bleeding, to you as a physician, whether or
6    not you wrote the label, does that have any specific
7    meaning to you as a doctor?
8       MS. WAY:  Asked and answered.
9       THE WITNESS:  No, it doesn't.  It's just listed
10   as a contraindication.
11   BY MR. HONNOLD:
12      Q.  What is a contraindication?
13      A.  Well, a contraindication is something which you
14   would want to avoid usage of a particular medication.
15      Q.  Why would somebody want to avoid use of Xarelto
16   if a patient has active pathological bleeding?
17      A.  Because the drug could precipitate bleeding in
18   that person.  If they have active bleeding, it could
19   delay the clotting of -- of -- of a bleeding source.
20      Q.  Okay.  And when you say that the drug could
21   precipitate bleeding, what's that mean?
22      A.  If bleeding is occurring, it may be prolonged
23   because of the exposure to the drug.
24      Q.  So when you use the term "the drug may

Page 44

1    precipitate bleeding," you're saying that it may cause
2    some bleeding to be worse?
3       A.  Yes, it can.
4       Q.  Okay.  And the process by which it causes or
5    can cause some bleeding to be worse is what?
6       MS. HOFFMANN:  Say that again.
7       THE WITNESS:  Say that again.
8    BY MR. HONNOLD:
9       Q.  The process by which it would cause some
10   bleeding to be worse is what for Xarelto?
11      MS. WAY:  Object to form.
12      THE WITNESS:  The -- the drug is an
13   anticoagulant, and so its whole action is to inhibit
14   Factor X, one of the parts of the bleeding cascade,
15   so that's what the utility of the drug is.
16   BY MR. HONNOLD:
17      Q.  So if there's a site in the body that might be
18   prone to bleed, that if you add an anticoagulant like
19   Xarelto to it, it can precipitate bleeding?
20      MS. HOFFMANN:  Objection.
21      THE WITNESS:  What are you talking about when
22   you say a site prone to bleeding?
23   BY MR. HONNOLD:
24      Q.  You said that it can --

Page 45

1       A.  I'll have to have that read back.
2       Q.  Before you said that it can precipitate
3    bleeding?
4       A.  I think we need to restate that.  She can go
5    back and --
6       Q.  You told me before that the drug can
7    precipitate bleeding --
8       MS. HOFFMANN:  Objection.
9       Q.  -- and so in what context, when you say the
10   drug can precipitate bleeding, what are you talking
11   about?
12      A.  We were talking about -- about bleeding and you
13   asked me about -- can you -- can you restate what you
14   asked me previously?
15      Q.  I'll just ask you another question.
16      A.  That's good.  Wonderful.
17      Q.  When you said that the drug can precipitate
18   bleeding, what did you mean by that?
19      A.  If there is a lesion that is bleeding, it can
20   make it worse.  Those seem to be my -- the words that I
21   used.
22      Q.  And how does it make it worse?
23      MS. HOFFMANN:  Objection.  She just answered
24   that.

12 (Pages 42 to 45)

Protected - Subject to Further Protective Review

Page 46

1  BY MR. HONNOLD:
2    Q.  Yeah.
3    A.  How many different ways do you want me to
4  answer it?
5    Q.  I don't know.  Is it just because --
6    A.  Because I want you to be real clear on my
7  answer.
8    Q.  I do too.
9    A.  So I basically went over with you that the
10  whole role of the drug is to stop clotting, and I
11  specifically said Factor Xa is the part of the
12  coagulation cascade that the drug works on.
13    Q.  Okay.  So that may cause then bleeding at an
14  area that's prone to bleed to be worse?
15    MS. WAY:  Object to form.
16    THE WITNESS:  You're talking about prone to
17  bleed.  It usually has to be actively bleeding,
18  okay, and it probably will not stop because of the
19  Xarelto.
20  BY MR. HONNOLD:
21    Q.  Okay.
22    A.  So I'm hoping you're clear on my answer.
23    Q.  We'll see.  We have time.  There is still time
24  for me to see the light I think.

Page 47

1    A.  Yes.
2    Q.  In your office, do you have a laboratory?
3    A.  We just got one in our new office.
4    Q.  Before you got that laboratory in your new
5  office, if you drew labs or drew blood on a patient, did
6  you send it out?
7    A.  We'd have to.
8    Q.  Okay.  And what -- when you sent blood out for
9  testing, what labs did you use?
10    A.  We used the local hospital's labs in most --
11  most cases.
12    Q.  Have you ever ordered a PT test before?
13    A.  Usually PT INR.
14    Q.  Why do you say usually a PT INR?
15    A.  Because the INR is much more relevant to my
16  clinical practice.
17    Q.  How so?
18    A.  I think it's a better value to follow on my
19  patients.
20    Q.  What kind of patients do you say that it's a
21  better value to follow?
22    A.  The whole range of gastroenterology patients.
23  I see all kinds.
24    Q.  Okay.  And why is it -- what about a particular

Page 48

1  patient may cause you to order an INR?
2    A.  Well, if a patient has liver disease, that's
3  probably the most common setting in which I will order a
4  PT INR.
5    Q.  And if a patient's taking warfarin?
6    A.  I don't usually have to order that.
7    Q.  Okay.  Why not?
8    A.  Because the referring physician will usually
9  have already taken care of that, the physician who
10  prescribed it.
11    Q.  Okay.  But if you're going to perform a
12  procedure on a patient that is on warfarin, will you
13  have to have some understanding what the patient's INR
14  is?
15    A.  They have been discontinued on warfarin if I'm
16  doing a procedure on them.
17    Q.  And so will you verify what their last INR was
18  before you do the procedure?
19    A.  No, sir, not standardly.
20    Q.  Are there times when you will, though,
21  unstandardly?
22    A.  If a patient tells me, "Oh, Doc, I forgot and I
23  took warfarin yesterday," I'm going to cancel the
24  procedure.  I'm not necessarily going to order the labs.

Page 49

1    Q.  And in terms of the hospital laboratory that
2  you used, do you know what PT reagent the laboratory
3  used?
4    A.  No idea.
5    Q.  Okay.  And in terms of the laboratory that you
6  have now in your office, do you have an analyzer that
7  can perform a PT test?
8    MS. HOFFMANN:  Objection.
9    THE WITNESS:  Yes, we do.
10  BY MR. HONNOLD:
11    Q.  And what kind of machine do you have?
12    A.  I have no idea.
13    Q.  Do you know what kind of reagent it uses?
14    A.  Not at all.
15    Q.  Don't know what company or brand it is?
16    A.  Well, let me tell you, we have three
17  pathologists in our practice that handle all of that.
18    Q.  Okay.  Is there one of them that's the boss,
19  the head pathologist, the boss of pathologists at least?
20    A.  The boss of all bosses?
21    Q.  No.  The boss of pathologists only?
22    MS. HOFFMANN:  The bossologist.
23    THE WITNESS:  I like that.  We have -- we have
24  two that I would say are equal, one old, one young.

13 (Pages 46 to 49)

Protected - Subject to Further Protective Review

Page 50

```
 1   BY MR. HONNOLD:
 2      Q.  What are their names?
 3      A.  Sam Hensley and Keith Brown.
 4      Q.  Both MDs?
 5      A.  MDs.
 6      Q.  Okay.  And is there one of them that has more
 7   expertise in laboratory medicine?
 8      A.  I wouldn't know that.
 9      Q.  You wouldn't know that?
10      A.  I would not, ung-ugh.
11      Q.  And so did you hire them into your practice
12   once you started having your own in-house lab?
13      A.  No, it was -- they were hired before that.
14      Q.  Okay.  And so where were they doing their
15   review of tissue?
16      A.  It's part of our structure, our physical
17   structure.
18      Q.  Okay.  So you did have a place where they
19   were -- there was some sort of place where they were --
20      A.  But you were asking about labs, but you didn't
21   let me clarify.  We take a lot of biopsy specimens, and
22   their specific role is to look at the specimens that we
23   harvest doing our endoscopic procedures.
24      Q.  What was the room or area where they did that
```

Page 52

```
 1      Q.  Okay.  So how would going through the documents
 2   that you've reviewed help you tabulate your time?
 3      A.  I'm very conscious about how much time I spent
 4   on this because I'm very busy, and I have other things
 5   that I do.
 6      MS. WAY:  I think he's just --
 7   BY MR. HONNOLD:
 8      Q.  Okay.  I --
 9      MS. WAY:  I think he wants to know the format
10   like you would submit an invoice.
11      MR. HONNOLD:  No.  That's not what I asked.
12      MS. WAY:  The documents.
13      MR. HONNOLD:  No, that's not what I asked at
14   all.
15   BY MR. HONNOLD:
16      Q.  How would looking at the documents that you've
17   reviewed help you tabulate your time?
18      A.  I would say, okay, I spent this much time on
19   the medical records, okay, I've looked at these articles
20   this long, or, okay, I've looked at this search engine
21   this long.
22      Q.  When were you first retained in this case?
23      A.  I think it was the summer of last year.
24      Q.  So sometime in the summer of 2016 you were
```

Page 51

```
 1   called before?
 2      A.  It's all a part of GI Associates.
 3      Q.  And is there -- does it say pathology or
 4   something where they would do their work?
 5      A.  No, we don't have to label it.  We know where
 6   they are.
 7      Q.  Okay.
 8      MS. HOFFMANN:  Because they're the bossologist.
 9      MR. HONNOLD:  Right.
10      THE WITNESS:  Yeah.
11      MR. HONNOLD:  Right.
12   BY MR. HONNOLD:
13      Q.  Your work on this case, how much time have you
14   spent on it?
15      A.  A lot.
16      Q.  Can you be any more specific than that?
17      A.  Probably 50 or 60 hours.
18      Q.  Okay.  What would you have to do to find out
19   exactly how much you've spent?
20      A.  I'd have to tabulate all of my time and then
21   see.
22      Q.  And what would you have to do to tabulate all
23   your time?
24      A.  Go through my documents that I've reviewed.
```

Page 53

```
 1   first retained?
 2      A.  That's correct.
 3      Q.  And how were you first contacted regarding this
 4   engagement?
 5      A.  I received a call.
 6      Q.  From whom?
 7      A.  Diana Davis.
 8      Q.  Who is that?
 9      A.  She's an attorney.
10      Q.  Where?
11      A.  She's based out of New Jersey.
12      Q.  What firm?
13      A.  I think she is through Kaye Scholer.
14      Q.  How did she get your name?
15      A.  She was given my name by a local physician.
16      Q.  Who?
17      A.  Dr. Malcolm Taylor.
18      Q.  Who is Dr. Malcolm Taylor?
19      A.  He is a local physician.
20      Q.  How was it that Malcolm Taylor was in contact
21   with Diana Davis to give her your name?
22      A.  I don't know.
23      Q.  Did she -- did Diana Davis say to you at some
24   point that she got your name from Dr. Malcolm Taylor?
```

14 (Pages 50 to 53)

Protected - Subject to Further Protective Review

Page 54

1    A.  She basically said, I was given your name and
2  basically I don't think she mentioned his name.
3    Q.  Then how do you know that -- did you learn
4  later that she had gotten your name from Malcolm Taylor?
5    A.  Malcolm texted me and said, hey, I'm going to
6  be giving your name to this lawyer to contact you about
7  a case.  I haven't seen Malcolm in probably two years,
8  so he just sent me a text out of the blue.
9    Q.  And how is it that you know Dr. Malcolm Taylor?
10    A.  Malcolm is a cardiologist at Saint Dominic's
11  Hospital.  That's one of the hospitals that I practice
12  in.
13    Q.  And do you have any understanding of how he was
14  in contact with Diana Davis?
15    A.  No, I don't.
16    Q.  At some point were you contacted by Diana Davis
17  by telephone?
18    A.  Yes, I was.
19    Q.  And what information did she provide you during
20  that first contact?
21       MS. WAY:  Objection.  Instruct not to answer as
22       far as the substance of any communications that
23       you've had with the attorneys in the case.
24  BY MR. HONNOLD:

Page 55

1    Q.  Well, when she first called you, had she
2  retained you yet?
3    A.  No.
4    Q.  Okay.  So when she did first call you and you
5  had a discussion before you were officially retained,
6  what did she say to you?
7    A.  Very, very casual, brief conversation.  It
8  might have lasted five minutes at the most.
9    Q.  Great.  What did she say?
10    A.  I've got a case that I'd like for you to look
11  at and that's about it.  And then we actually made
12  arrangements to meet because she was going to be in this
13  area.
14    Q.  And then did you meet?
15    A.  Yes, we did.
16    Q.  When was that?
17    A.  Summer of 2016.
18    Q.  And at the time that you met, had you already
19  received some materials on the case?
20    A.  No, I had not.
21    Q.  And so when you first met with Ms. Davis you
22  had not reviewed any material related to Ms. Mingo yet?
23    A.  No, sir.
24    Q.  So what did you do or talk about in the first

Page 56

1  meeting?
2    A.  She basically asked me questions about my field
3  of medicine and then asked me if I would be interested
4  in reviewing a case related to Xarelto, and mainly the
5  topic of GI bleeding was what she seemed to focus on.
6    Q.  Does active GI bleeding exist on a continuum?
7       MS. WAY:  Object to the form.
8       THE WITNESS:  What does that mean, sir, when
9       you say continuum as it relates to active bleeding?
10  BY MR. HONNOLD:
11    Q.  I don't know, like a spectrum from a little to
12  a lot.
13    A.  A little to a lot?  I would say that bleeding
14  does have a spectrum.
15    Q.  And is that spectrum from a little to a lot?
16    A.  We don't use that terminology.
17    Q.  Okay.  What terminology do you use?
18    A.  Minor to major.  Minor, moderate, major.
19    Q.  So in terms of active bleeding there can be
20  minor active bleeding; right?
21    A.  There can be occult, there can be minor, there
22  can be moderate, there can be major.
23    Q.  What's occult?
24    A.  Occult is bleeding without an identifiable

Page 57

1  source.
2    Q.  And when you say "bleeding without an
3  identifiable source," does that mean one's not been
4  looked for yet and identified or there has been a search
5  for a source and not able to be identified?
6    A.  Actually it's both.
7    Q.  So you can have a patient based upon signs and
8  symptoms where you suspect bleeding is coming from some
9  site but you can't confirm the site or type of site yet
10  because you've not done a diagnostic evaluation for it,
11  and you'll call that bleeding occult in that context?
12    A.  Actually, you can have occult bleeding and
13  not -- and you have evidence that there is blood loss,
14  and you don't know where the source is.
15    Q.  Yet?
16    A.  Yet.
17    Q.  And so if you have bleeding that you -- that
18  you believe that there is bleeding but you don't know
19  yet where the source is because you've not looked for
20  it, and you do look for it and find the source, then is
21  that bleeding still occult?
22       MS. WAY:  Object to form.
23       THE WITNESS:  No.
24  BY MR. HONNOLD:

15 (Pages 54 to 57)

Protected - Subject to Further Protective Review

Page 58

```
 1      Q.  Okay.  Then what is it called?
 2      A.  Occult means you don't know the source, and in
 3   your comment you said that you identified the source.
 4   So those are -- that's -- it is no longer occult if a
 5   lesion has been identified.
 6      Q.  Okay.  So if a patient has what you believe to
 7   be GI bleeding and there is a diagnostic procedure
 8   that's done to try to find the source and it can't be
 9   found, do you still call it occult bleeding then?
10      A.  If the patient has gone through the normal
11   battery of testing for bleeding and no source has been
12   found, yes, we would -- we would categorize that as
13   occult.
14      Q.  Can occult bleeding also exist on a spectrum or
15   continuum?
16      A.  We don't use that terminology, but occult
17   bleeding is occult bleeding as I previously diagnosed
18   it.  There are different levels of bleeding as I
19   explained earlier.  So I'm -- I just want to be clear
20   I'm answering your question as you're asking it.
21      Q.  Well, can occult bleeding be such that it's
22   minor, moderate or major?
23      A.  I guess it could but that's -- I guess it
24   could, we'll say it like that.  Until you know the
```

Page 59

```
 1   source of bleeding, all bleeding is occult.
 2      Q.  And then if you're in a situation where there's
 3   minor, moderate -- to determine whether occult bleeding
 4   is minor, moderate or major, what are the things that
 5   might help you determine that?  Laboratory values --
 6      A.  The categories?  Actually the categorization is
 7   how the patient presents clinically, what do you see
 8   when that patients comes in for care.
 9      Q.  Does that include their laboratory?
10      A.  Laboratory is one parameter, but that's not the
11   only parameter.  It is an additive parameter.
12      Q.  So the physical exam would be one other
13   parameter?
14      A.  Vital signs and --
15      Q.  Vital signs?
16      A.  -- physical examination.
17      MS. WAY:  Brad, we've been going for about an
18   hour.  If you're at a stopping point for a break, I
19   could --
20      MR. HONNOLD:  Sure, yeah.
21      THE VIDEOGRAPHER:  The time is now is 5:14 p.m.
22   We're off the record.
23      (Recess from 5:14 p.m. until 5:23 p.m.)
24      THE VIDEOGRAPHER:  This begins Disk 2 of
```

Page 60

```
 1   today's deposition.  The time now is 5:23 p.m.  We
 2   are back on the record.
 3      BY MR. HONNOLD:
 4      Q.  Doctor, we're back on the record now after a
 5   short break.
 6      We were talking about the time that you spent
 7   on this case or how you would determine how much time
 8   you spent.  Do you specifically have time sheets that
 9   you filled out where you actually have archived or
10   listed the time that you spent on certain tasks as you
11   did them, as you did it?
12      A.  I have it tabulated on little notes.
13      Q.  So, like, sticky notes?
14      A.  No, I don't use sticky notes.
15      Q.  And so where are those notes?
16      A.  Something like this, a little three-ring
17   binder, or there might be a time denotation on the top
18   of a document, what time I started, what time I ended.
19      Q.  And then what would you need to do to turn that
20   into a bill or an invoice?
21      A.  Tabulate.
22      Q.  And then will you prepare the invoice yourself
23   or will someone do that?
24      A.  I do my own invoicing.
```

Page 61

```
 1      Q.  What's the last invoice that you prepared on a
 2   medical legal matter?
 3      A.  One of the opinions from medical review out of
 4   North Carolina.
 5      Q.  And I lost track of the time frame when you
 6   said those occurred.  How recently would that have been?
 7      A.  Within the last year.
 8      Q.  I think you said before that you think you've
 9   spent 50 to 60 hours on your work on this case.  Is that
10   a fair statement?
11      A.  That's a -- that's an approximation, yes.
12      Q.  And how would that time break down amongst the
13   different tasks or things that you did as part of your
14   work?
15      A.  Well, the biggest volume would have been the
16   medical records, because there was -- there were a lot
17   of pages to it.
18      Q.  So the -- the category that would have the most
19   time allocated to it would be review of medical records?
20      A.  That's what took the most time.
21      Q.  So --
22      A.  But there was also time spent in preparing the
23   report.  There was also time looking at some articles
24   and doing some searches.
```

16  (Pages 58 to 61)

Protected - Subject to Further Protective Review

Page 62

1    Q.  How much time did you spend preparing your
2  report?
3    A.  It probably took me about 10 hours.
4    Q.  Did you prepare the reference list?
5    A.  I submitted the reference list.
6    Q.  And how did you arrive at or find the various
7  articles or medical literature that is attached as an
8  exhibit to the report?
9    A.  Some were given to me by the lawyers and then
10  the others were -- were my own.
11    Q.  And when you say some were your own, what do
12  you mean by that?
13    A.  That means those are the things that I looked
14  at and that I basically investigated myself.
15    Q.  Okay.  So did you do medical literature search
16  then to identify certain articles?
17    A.  I did medical literature search to investigate
18  certain topics.
19    Q.  Tell me what you mean by that.
20    A.  Instead of looking at a specific article, I
21  might have looked at a search that was entitled
22  gastrointestinal bleeding.
23    Q.  And in what database or source were you doing
24  these searches?

Page 63

1    A.  The search was UpToDate.com, but there were
2  other sources that I used also.
3    Q.  Okay.  So one source that you used is UpToDate;
4  is that right?
5    A.  Yes.
6    Q.  And do you use UpToDate in your practice?
7    A.  I do.
8    Q.  And so your subscription, is it yours
9  personally, or is it something that your group purchases
10  for everyone?
11    A.  I have both, and also the hospitals provide it
12  for us for free.
13    Q.  And so in addition to UpToDate, what other
14  sources did you use to do research?
15    A.  Oh, I've attended review conferences for
16  gastroenterology.  I have my own clinical practice
17  experience.  I've looked at different topics mostly that
18  I've been led to from UpToDate.
19    Q.  So I want to make sure I understand.  So the
20  specific articles that are listed on your reference
21  list, would many of those be articles that you found
22  that were part of a bibliography of an UpToDate article
23  that you found?
24    A.  Some of them would be.

Page 64

1    Q.  Okay.  And then the ones that aren't, where did
2  those articles come from?
3    A.  That's mainly the source, but I think I already
4  answered that by saying that I got them from -- from the
5  lawyers.
6    Q.  Okay.  And so some of the articles were ones
7  that you found in the bibliographies of your UpToDate
8  searches for the articles that would kick for
9  whatever -- whatever searches that you did, and then
10  some of them came from the lawyers; is that right?
11    A.  There's a third category also, sir.
12    Q.  That's what I'm trying to get to, and so what
13  was the third category?
14    A.  As I mentioned before, I went to review
15  courses, and there's always a big text that goes with --
16  with going to review courses, and all of these subjects
17  are covered in the field of gastroenterology and
18  hepatology, and each lecture has a bibliography attached
19  to it.
20    Q.  And so are those actual physical paper
21  resources that you have?
22    A.  It's a bibliography, and, yes, you can either
23  do it online or with a physical copy of the manual.
24  Also, mind you, in looking at the reference list you'll

Page 65

1  see that there was a review that is published by the
2  American Gastroenterology Association.
3    Q.  I'm going to hand you what's been marked as
4  deposition Exhibit No. 2, which is your report.  Let's
5  go to the reference list, which is included in there.
6      Okay.  Can you tell from looking at the
7  reference list, which is Exhibit A to Exhibit 2, can you
8  tell out of those items that are on the list which ones
9  of those were articles that were given to you by the
10  lawyers in this case?
11    A.  The majority of them I probably could.
12    Q.  Okay.  Go ahead.
13      MS. HOFFMANN:  How do you want her to do it,
14  Brad, just by the items on the side --
15  BY MR. HONNOLD:
16    Q.  You can just give me the number -- give me the
17  number on the reference list, that would be great.
18    A.  Okay.  Let's start with the first page.  The
19  Abraham article was given, the No. 4, No. 5, No. 6, 7,
20  8, 9, 10, 11, 13, 14, 16, 20, 21, 22, 23, 24, 25, 26,
21  27, 28, 29, 30, 34, 35, 36, 37, 39.
22    Q.  What about 41?
23    A.  That looks like mine.
24    Q.  What is it about 41 that makes you know that it

17 (Pages 62 to 65)

Protected - Subject to Further Protective Review

Page 66

1    looks like yours?
2        A.  It's a general article about the diagnosis and
3    management of GI bleeding, and it probably is a part of
4    the articles that I've used.
5        Q.  And I just want to make sure that I'm clear
6    then.  The numbers that you just listed in response to
7    my last question, those numbers that you stated are
8    articles on your reference list that you received from
9    the lawyers in this case?
10       A.  To the best of my recall.
11       Q.  Which lawyer gave you those articles?
12       A.  Ms. Way.
13       Q.  When did you get those articles?
14       A.  Probably the fall of last year.
15       Q.  Whose idea was it for the lawyers to send you
16   articles?
17       A.  Whose idea was it?
18       Q.  Yes.
19       A.  I don't know whose idea it was.  They provided
20   those for me.
21       Q.  And did you receive them in electronic form or
22   in paper form?
23       A.  A three-ring binder.
24       Q.  Do you still have that binder?

Page 67

1        A.  Yes, sir.
2        Q.  Was there any correspondence that came along
3    with it?
4        A.  Not particularly.
5        Q.  Was there even a letter?
6        A.  Hey, this is a --
7        Q.  Hey letter?
8        A.  Probably a three line letter.
9        Q.  Do you still have that?
10       A.  It's a part of the binder, yes.
11       Q.  Did you do any sort of interlineation or
12   highlighting or tabbing of the articles in the binder?
13       A.  Some of those that I read, I usually underline.
14       Q.  Then let's go back to the reference list then.
15   Can you get that back before you?
16           So Reference Item No. 2, is that something that
17   before you were retained in this case you already -- you
18   already had in your possession?
19       A.  Yes.
20       Q.  And same question for No. 3, is that something
21   that either you already had in your possession when you
22   were retained or it was something that you got
23   possession of as part of attending a seminar or
24   something?

Page 68

1        A.  Let me explain to you as a gastroenterologist,
2    we have to have maintenance of certification.  That
3    means that we have to keep up-to-date with things that
4    are changing in our profession.  So this is a part of
5    that ongoing education that I've participated in the
6    last 30 years.
7        Q.  So --
8        A.  So is -- so is No. 2.  I'm sorry to interrupt
9    you.
10       Q.  No, it's okay.  So citation or Reference Item
11   No. 2, is that an actual thing that exists somewhere in
12   a book shelf or in a file.
13       A.  It is an extremely large set of volumes.  As
14   you can see it says DDSEP8.  This is the eighth edition
15   that came out in 2016, and it is thousands of pages,
16   photographs, testing, it's an interactive learning tool.
17       Q.  So what's the part of it that you -- chapter
18   then, or subpart, that you looked at related to this
19   case?
20       A.  Well, you know, it covers every area of
21   gastroenterology, so as it pertains to this case they
22   have sections on GI bleeding, peptic ulcer disease, et
23   cetera.
24       Q.  But in terms of the names of the specific

Page 69

1    sections or pages you can't be more specific than what
2    you have listed there?
3        A.  That's pretty specific.
4        Q.  So is that something that's publicly available
5    either at a medical library or online?
6        A.  No, no, you'll have to pay the $1,000 like I
7    did.
8        Q.  So where do you keep yours?
9        A.  At home.
10       Q.  And is it a hardbound book or is it something
11   that's in a three-ring notebook?
12       A.  It's both.  Hardbound and it's online.
13       Q.  Then same questions for Reference Item No. 3.
14   Is that -- is that a specific thing, either a book,
15   something that exists online?
16       A.  You have to understand when recertification,
17   what it says is that I have been tested and I have been
18   approved for continuation of my board -- board
19   certification.  That is the actual test that I took.
20   There are study materials that go along with
21   recertification, and Reference No. 2 is one of those.
22       Q.  Reference Item No. 3, what is it?
23       A.  It's my board certification.  It's actually a
24   piece of paper that I frame and hang on my wall, but it

18  (Pages 66 to 69)

Protected - Subject to Further Protective Review

Page 70

1    represents having successfully taken an actual physical
2    test. It means I've passed my recertification boards.
3        Q. So what would I go to if I wanted to know what
4    you looked at in terms of your work on this case for
5    Reference Item No. 3? Where would I go to or what would
6    I look at?
7        A. That generally relates to my certification.
8    You could go to the American Board of Specialty
9    Certification, American Board of Internal Medicine.
10       Q. So Reference Item No. 3 is the certificate
11   that's hanging on your wall?
12       A. It's a part of the body of material that I
13   looked at to maintain certification. I basically
14   categorized it like this because it has to do with the
15   studies that I did over a period of time leading up to
16   that examination.
17       Q. But what is that stuff, though? Where would I
18   go to find it or look at it?
19       A. It's pretty diffuse.
20       Q. Do you have it?
21       A. I have my certificate.
22       Q. Okay. So in terms of what you're talking about
23   then for Reference Item No. 3, other than the
24   certificate what is it?

Page 71

1        A. It's proof that I sat and passed the
2    examination.
3        Q. Number 15, was that something that you had in
4    your possession before you were retained in this case or
5    did you search for it and/or did you find it as a result
6    of some search you did after you were retained?
7        A. Before.
8        Q. And so the things that you had before, did you
9    have those existing in some medical literature file,
10   either paper file or electronic?
11       A. No, not specifically. No, I would have used
12   them in maybe creating a talk. It would have been a
13   basis for a lecture or something of that nature.
14       Q. But did you have a copy of it, though,
15   somewhere?
16       A. At some point, yes.
17       Q. Okay. When you -- when you list, for example,
18   No. 17, when you list an UpToDate article, does that
19   mean specifically that you did read that article and
20   there's something in that article that you are relying
21   upon for an opinion or opinions in this case?
22       A. This is basically a title that was put in the
23   search engine for UpToDate, and that produced an article
24   that had a bibliography associated with it.

Page 72

1        Q. In the UpToDate box, after you log in and
2    there's the box there and you put in -- what words did
3    you put in to find these articles?
4        A. Management of anticoagulants in patients. This
5    is -- had you put in endoscopic procedures, GI bleeding,
6    anticoagulants, and just like any other search engine it
7    will take you to a whole pull down that has a menu of
8    things that you can select to choose to read.
9        Q. I gotcha. But after the author, that is the
10   title of the actual article; right?
11       A. In one of my searches this is one of the
12   articles that I did look at.
13       Q. Okay. So what were the search terms that you
14   used?
15       A. I probably started off with GI bleeding.
16       Q. And then how did you --
17       A. I might have crossed it --
18       Q. -- then refine the search?
19       A. I might have crossed it with anticoagulants and
20   then again you get the menu that has the pull down of
21   topics.
22       Q. And then for all the specific articles that you
23   found and relied upon in some way, are they listed on
24   the reference list?

Page 73

1        A. Yes, sir.
2        Q. And then so on the last page then, Item No. 42,
3    for example, you say "UpToDate: Numerous searches of
4    related topics"?
5        A. Absolutely.
6        Q. Is that referring to something other than the
7    things you might have listed specifically?
8        A. Well, to be inclusive I put it in this, this
9    form because if I searched GI bleeding, if I read
10   something that was a subtitle and then I went to
11   something else and then I shut down the search engine
12   that night, I would not have probably picked up on the
13   same title if I went to search another topic. So there
14   was a wide variety of things that I looked at.
15       Q. Okay. I get that, but if you found a specific
16   article on UpToDate that you said, yes, this is good,
17   I'm relying upon it in some way and I'm going to go put
18   it on the reference list, is everything on here?
19       A. Probably not, but the majority of them are.
20   Those that I rely upon that I found to be interesting,
21   yes.
22       Q. Okay. I just want to know are there some
23   specific ones that when you testify at trial in this
24   case you're going to say I'm particularly relying upon

Protected - Subject to Further Protective Review

Page 74

1    this item for an opinion in this case that's not
2    specifically listed?
3        A.   The main 42 kind of encompasses that, but I've
4    tried to be as complete as I could.
5        Q.   Okay.  Are there other specific UpToDate
6    articles that you're relying upon for your opinions in
7    this case other than ones that you've specifically
8    listed?
9        A.   Those are the main ones.
10       Q.   Okay.  Are there others?
11       A.   There could possibly be.
12       Q.   Okay.  What are they?
13       A.   Well, as I tried to make clear to you, if I'm
14   doing a search, it's just like a Google search, if I
15   started out reading one topic, I might have been carried
16   to another place and so -- but the ones that I did focus
17   on are included in this list.
18       Q.   Can we all agree if she refers to some
19   literature some day that's not listed on the reference
20   list that you'll let me know?
21       A.   I'll be glad to.  I have no problem with that.
22       Q.   You'll be glad to?
23       A.   Yeah, uh-huh.
24       Q.   Number 18, is that something that you had

Page 75

1    before you were retained?  It looks like by date you
2    would have gotten it probably afterwards, but --
3        A.   I participated in that.  I physically went to
4    that review course.
5        Q.   And is it a thing in terms of actual materials
6    that you received?
7        A.   Yes.
8        Q.   Okay.  What is it?
9        A.   It's a review just like the -- it's a set of
10   volumes that have to do with a board review course.
11   It's a five day course in a hotel in Chicago, and
12   actually I signed up for that before I even knew about
13   this litigation.  Again, it's a part of the
14   recertification process that I'm required to do.
15       Q.   Okay.  And so do you have those volumes in your
16   possession?
17       A.   I do.
18       Q.   And are they hardbound books?  Are they
19   three-ring binders?  What are they?
20       A.   They're both.  They're hardbound, and then
21   they're also online.
22       Q.   And I take it you have to participate in the
23   course or class and pay some amount of money to get
24   access to those?

Page 76

1        A.   Yes.
2        Q.   Then No. 19, what is that?
3        A.   This is the previous board review that I
4    attended in 2014.  I do those on a fairly regular basis
5    to keep my medical acumen up-to-date.
6        Q.   Your what?
7        A.   My medical acumen up-to-date.
8            MS. HOFFMANN:  Did you purposefully skip 15?
9            MR. HONNOLD:  Oh, I didn't purposefully.
10           THE WITNESS:  He did relate to 15.  He made a
11   comment about it.
12           MR. HONNOLD:  So no.
13           MS. HOFFMANN:  Sorry.
14           MR. HONNOLD:  We talked about it.
15           MS. WAY:  Did you skip 12?
16   BY MR. HONNOLD:
17       Q.   12 is an UpToDate article.  So you would have
18   found that as part of your work on this case; correct?
19       A.   That's correct, uh-huh.
20       Q.   Then No. 31 and 32, those are UpToDate
21   articles, so you would have found those on your own;
22   correct?  Right?
23       A.   Yes.
24       Q.   33 also is an UpToDate article, so you would

Page 77

1    have found that on your own?
2        A.   That's correct.
3        Q.   And 38, you would have found that on your own?
4        A.   That's correct.
5        Q.   Number 40, you would have found that on your
6    own?
7        A.   Yes.
8        Q.   The material that's represented by Items 43 to
9    47, would those have been things that were provided to
10   you by counsel since they're medical records and
11   depositions?
12       A.   Yes.  Actually, all the way through 48.
13       Q.   Was the label provided to you by counsel?
14       A.   Yes.
15       Q.   Do you routinely in your practice prescribe
16   anticoagulants?
17       A.   No, sir.
18       Q.   Do you ever have occasion in your practice now
19   to prescribe anticoagulants?
20       A.   No, sir.
21       Q.   Do you ever on occasion for any of the
22   procedures that you perform need to give a patient
23   bridging anticoagulant therapy with Heparin or some
24   other drug?

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 78

1      A.  That's usually done by the referring physician.
2      Q.  What are the types of procedures that you do
3   where you -- where the patient would be bridged using
4   some other anticoagulant?
5      A.  Every procedure that's endoscopic would -- the
6   referring physician would have to give approval for
7   bridging, and they would be the ones that would actually
8   coordinate the bridging of the anticoagulant.
9      Q.  But just based upon your clinical practice and
10  experience, what are the -- what are the types of
11  patients and procedures where a patient might be --
12  might be bridged with some anticoagulant during the
13  procedure?
14     A.  Okay.  Let me go through it.  Endoscopic
15  ultrasonography, esophagogastroduodenoscopy,
16  colonoscopy, ERCP, ERCP with sphincterotomy, ERCP with
17  biliary stenosis and dilatation.  Just about all of
18  them.
19     Q.  Okay.  And what is bridging with an
20  anticoagulant and why is it done?
21        MS. HOFFMANN:  Objection.
22        THE WITNESS:  Bridging means that a person has
23     discontinued one anticoagulant, but because of a
24     predetermined medical condition they might need to

Page 79

1   be on Heparin or something else as close to that
2      endoscopic procedure as possible, therefore,
3      reducing the time that they are not anticoagulated.
4   BY MR. HONNOLD:
5      Q.  And then are you actually involved in yourself
6   ever in ordering the agent that's used for bridging, or
7   is that always the referring doctor?
8      A.  I answered that.
9      Q.  It's the referring doctor?
10     A.  That's correct.
11     Q.  The structure and I guess layout of your
12  report, was that something that you came up with and
13  arrived at on your own?
14     A.  I did that.
15     Q.  And Ms. Mingo, one of your case specific
16  opinions you say that she had anemia before she was
17  taking Xarelto.  What was the cause of that?
18     A.  Can you show me where you're referring to?
19     Q.  Sure.  Page 8 in Exhibit 2.
20     A.  Which paragraph, sir?
21     Q.  Well, you have a heading that says Ms. Mingo
22  had anemia before taking Xarelto.  Do you see that?
23     A.  Yes.
24     Q.  So the anemia that you say Ms. Mingo had before

Page 80

1   she started taking Xarelto, what was the cause of that
2   anemia?
3      A.  I don't know.
4      Q.  For a patient like Ms. Mingo, what were the
5   possible causes or explanations of that anemia that she
6   had?
7      A.  Well, she was a postmenopausal woman, as I
8   alluded to.  Had she been a woman who was having menses,
9   it would be obvious blood loss from her -- from her
10  menstrual cycle, but she was out of that age group.  So
11  I really don't know what the source of her anemia was.
12     Q.  And for a woman like -- are you board certified
13  in internal medicine?
14     A.  I'm board eligible.
15     Q.  Have you ever board certified in internal
16  medicine?
17     A.  Yes.
18     Q.  Okay.  And during what years were you board
19  certified in internal medicine?
20     A.  I was board certified after I completed my
21  residency.
22     Q.  And have you ever become recertified in
23  internal medicine.
24     A.  It has not been necessary.

Page 81

1      Q.  When were you no longer board certified in
2   internal medicine?
3      A.  I let my certification lapse I think when I had
4   been practicing for the first 10 years.  Certification
5   does last 10 years.
6      Q.  And was there a reason why you did not seek
7   recertification in internal medicine?
8      A.  I had gone on to do specialized training in
9   gastroenterology.
10     Q.  So based upon your training, education and
11  experience and the medical records and other materials
12  that you've reviewed regarding Ms. Mingo, what are the
13  possible explanation or causes of this anemia that you
14  say that she had before she started taking Xarelto?
15     A.  Speculatively, looking at her medical records,
16  she had been exposed to nonsteroidals and aspirin.  She
17  also had some other chronic medical conditions that
18  were -- that were present.
19     Q.  When a patient is taking an NOAC medication
20  like Xarelto and then aspirin is added to it, what does
21  that do in terms of the quantification or increased risk
22  of gastrointestinal bleeding?
23        MS. WAY:  Objection.
24        THE WITNESS:  Restate that, please.

21 (Pages 78 to 81)

Protected - Subject to Further Protective Review

Page 82

BY MR. HONNOLD:
1  Q.  Sure.  If a patient is on a NOAC and then
2  aspirin is added to it, what does that do in terms of
3  the patient's risk of gastrointestinal bleeding?
4  A.  They can be additive.
5  Q.  How much?
6  A.  I don't know.
7  Q.  If any of the materials that you put on your
8  reference list state that, do you have any reason to
9  disagree with what it states?
10      MS. HOFFMANN:  Objection.
11      THE WITNESS:  If any materials on my reference
12  list state that, state what?
13  BY MR. HONNOLD:
14  Q.  State a specific quantification of how much the
15  risk is increased when you add aspirin to a NOAC?
16  A.  It depends upon the clinic setting.  You can
17  have healthy people or people with comorbid diseases.
18  So I don't think I could just say that as a global
19  statement.
20  Q.  Okay.  So how -- how can that risk -- how does
21  it vary then?
22  A.  How does it vary?  It depends --
23  Q.  In the subgroups of patients that you've said?

Page 83

1  A.  It depends upon the disease that the patient
2  has.  Say if they have liver disease and they're on an
3  anticoagulant and then they're also on aspirin, well, I
4  don't think I can quantify that.  It depends upon what
5  other comorbid positions that the patient has, so --
6  Q.  Okay.  So for -- for the patients that you're
7  aware of that you frequently see, then what is kind of
8  the range then of the additive effect that giving
9  aspirin to a patient on a NOAC can have, from what to
10  what?
11  A.  That's -- that's such a broad statement, and I
12  see such a broad category of population of patients that
13  I don't think that I can answer that with some merit.
14  Q.  Do you know about any statements that the
15  articles on your reference list state in that regard?
16  A.  I have to ask you specifically which one you're
17  talking about.
18  Q.  Any of them.  As you look at your reference
19  list, do you know whether any of them speak to that
20  issue?
21  A.  I'm not exactly sure.
22  Q.  Okay.  In some patients, can adding aspirin to
23  a patient that's on a NOAC or vice versa, adding a NOAC
24  to the patient that's on existing aspirin, can that as

Page 84

1  much as double the patient's risk of gastrointestinal
2  bleeding?
3      MS. HOFFMANN:  Objection.
4      THE WITNESS:  I think you're asking me the same
5  question and I can't answer that.
6  BY MR. HONNOLD:
7  Q.  You don't know one way or the other?
8  A.  I basically said that I take care of a range of
9  patients and it has to do with the comorbid diseases
10  that the patient has.
11  Q.  Are you aware then of patients that could have
12  a certain presentation or type of comorbid conditions
13  that when they're taking -- when aspirin is added to a
14  NOAC that it could double their risk of gastrointestinal
15  bleeding, can that happen in some patients?
16      MS. WAY:  Object.
17      MS. HOFFMANN:  Objection.
18      THE WITNESS:  You keep referring to doubling,
19  and that's not the conversation that we have in my
20  particular area of expertise.  We don't talk about
21  doubling.  We talk about additive risk, but, again
22  as I kind of keep returning to, it depends upon what
23  other comorbid diseases the patient has.
24  BY MR. HONNOLD:

Page 85

1  Q.  Okay.  So do you have any idea then why authors
2  that have written the articles that are on your
3  reference list might specifically state that adding
4  aspirin to a NOAC can double the risk of
5  gastrointestinal bleeding?
6  A.  It has to do with what other conditions they're
7  looking at.
8  Q.  So in some patients it may be possible that
9  there is a doubling of the risk; is that right?
10      MS. HOFFMANN:  Objection.
11      MS. WAY:  Objection.
12      THE WITNESS:  Actually that was what I was
13  saying.  It depended upon what comorbid diseases
14  that the patient has.
15  BY MR. HONNOLD:
16  Q.  So let's just talk about a patient that's
17  generally in good health other than the fact that they
18  might have had a hip replacement and then developed a
19  DVT afterwards and are put on -- in addition to their
20  preexisting aspirin, they're put on a NOAC.  Do you have
21  any view as to what that combination does in terms of
22  increasing the patient's risk of gastrointestinal
23  bleeding from just as compared to being on aspirin
24  alone?

22 (Pages 82 to 85)

Protected - Subject to Further Protective Review

Page 86

1    A.  Restate your question.  There were a lot of
2  parts to it.
3    Q.  Okay.  So in the scenario of a patient that's
4  generally in good health, except for the fact they've
5  had recent hip surgery and after the surgery developed
6  proximal DVT and as a result they're put on a NOAC and
7  they've been on preexisting aspirin.  In a patient like
8  that, do you have any idea what the addition of the NOAC
9  does to that patient's risk of gastrointestinal bleeding
10  as compared to the patient only being on aspirin?
11       MS. HOFFMANN:  Objection.
12       MS. WAY:  Objection.
13       THE WITNESS:  No, I don't.
14  BY MR. HONNOLD:
15    Q.  Would you at least agree though that there
16  would be some additive effect?
17    A.  Possibly.
18    Q.  Do you know of the articles that are on your
19  reference list whether any of them speak specifically to
20  the issue of whether the anticoagulant effect that
21  Xarelto is having on the patient can be tested or
22  measured?
23    A.  I'm sure they probably do, but I'm not here to
24  speak on that issue.

Page 87

1    Q.  Why are you sure that they probably do?
2       MS. WAY:  Objection.
3       THE WITNESS:  Because there's -- there are a
4  lot of articles there that look at the study of the
5  drug.
6  BY MR. HONNOLD:
7    Q.  So I just want to make sure I'm clear about
8  this.  So you are -- today it's your testimony that
9  you're sure that there are some of the articles on your
10  reference list that speak to how the anticoagulant
11  effect of Xarelto on a patient can be tested or
12  measured?
13    A.  That -- that was referred to, I think, on some
14  of the articles.
15    Q.  Do you know which ones?
16    A.  It might have been on the label, sir.
17    Q.  Are there any of the items on your reference
18  list that you can think of other than the label that
19  might speak to that issue?
20    A.  I'm not -- I'm not sure.
21    Q.  In anywhere in your report did you note or
22  comment on what the results were of any PT testing that
23  was done on Ms. Mingo at any point in time?
24    A.  I probably referred to PT INR.  That's what I

Page 88

1  characteristically would look at.
2    Q.  Okay.  And so if she just -- if there were
3  times when she did have a PT that was done, would you
4  have commented on that in your recitation or medical
5  kind of chronology or overview of her records that you
6  did?
7    A.  It's possible, but, again, I pay a lot of
8  attention to the PT INR.
9       MS. HOFFMANN:  Did you want her to look, is
10  that the idea?
11       MR. HONNOLD:  Sure, she can.
12       MS. HOFFMANN:  I just want to make sure I'm
13  clear, Brad.  So you want her to look in the report
14  and see if she made any comment about a PT test?
15       MR. HONNOLD:  Yeah, if she needs to look at it,
16  she can.  It doesn't matter to me whether she looks
17  at it or not if she answers the question.
18       THE WITNESS:  Do you want me to take the time
19  to do that?  Because I can read it and find out if
20  you'd like to take that time.  I don't have a
21  problem with that.
22
23  BY MR. HONNOLD:
24    Q.  As you sit here now before you look at it, do

Page 89

1  you know whether she had any PT tests that were done
2  along the way?
3    A.  In her medical records, yes, she did, but you
4  asked about my report, and I want to be very clear that
5  I'd have to reread the report to see if I commented on
6  it.
7    Q.  Do you know whether Ms. Mingo had a PT done
8  when she came into the hospital on February 13?
9    A.  On February 13, let me just look at that, sir.
10  This was when she was in the emergency room, correct?
11    Q.  Right, that hospitalization.
12    A.  Yes.
13    Q.  Did she have a PT, or do you know whether a PT
14  was done?
15    A.  I said yes, I did answer you.
16    Q.  Okay.  And what was it?
17    A.  I have to look at the actual records.
18    Q.  Okay.  Is it listed though -- you said you
19  needed to look at your report, and I just wanted to know
20  if it was mentioned in there.
21    A.  I'm sorry.  If you look at page 5, I think I
22  started talking about what was happening with Ms. Mingo
23  on 2/3/15, and I refer to some lab values, specifically
24  the hemoglobin, and then later on I refer to the

Protected - Subject to Further Protective Review

Page 90

1 hemoglobin on page 6. So I don't know the actual values
2 of the PT during that time, but I'm sure that one was
3 done. It would have been part of the standard of care.
4    Q. Why?
5    A. She came in with evidence of anemia and
6 bleeding.
7    Q. Okay. And why would the standard of care
8 require a PT to be performed on a patient like that?
9       MS. WAY: Object to form.
10       THE WITNESS: Basically, it's one of the
11    measures of the body's ability to clot blood.
12 BY MR. HONNOLD:
13    Q. What if the patient's on rivaroxaban or
14 Xarelto?
15    A. It doesn't matter. You're going to --
16    Q. It doesn't?
17    A. It's a basic -- it's a basic standard for
18 any -- anyone in this setting.
19    Q. So even if the patient is on rivaroxaban then
20 the PT is still giving you information about the
21 patient's ability to clot their blood?
22       MS. WAY: Object to form.
23       THE WITNESS: You're trying to specify it for
24    that, but it doesn't matter the source of the

Page 91

1 bleeding. That's a standard of care.
2 BY MR. HONNOLD:
3    Q. Okay. But the PT gives information about
4 measuring the body's ability to clot their blood; right?
5       MS. WAY: Object to the form.
6       THE WITNESS: It's one of many.
7 BY MR. HONNOLD:
8    Q. And if a patient's on Xarelto and has a
9 significantly elevated PT, what is the significance of
10 that or what does that mean?
11       MS. WAY: Objection. Brad, I think she
12    already -- I can -- she --
13       MR. HONNOLD: You can object to the form.
14       MS. WAY: Yeah.
15       MR. HONNOLD: No, no, no. You've just got to
16    object to the form of the question.
17       MS. WAY: I object to the form. She's already
18    said --
19       MR. HONNOLD: No, no --
20       MS. WAY: -- she wasn't going to offer opinions
21    on this.
22       MR. HONNOLD: You just -- just object to the
23    form of the question. You know, you know that.
24       THE WITNESS: Restate your question.

Page 92

1 BY MR. HONNOLD:
2    Q. If a patient on rivaroxaban has a significantly
3 elevated PT value, what does that mean or what is the
4 significance of that?
5       MS. HOFFMANN: Objection.
6       THE WITNESS: I've answered it in your previous
7    questions, but I'm going to be very clear with you
8    that you would get the PT INR regardless of the
9    source of bleeding. That's what I said previously.
10 BY MR. HONNOLD:
11    Q. What is the significance, though, of a patient
12 on rivaroxaban who has a significantly elevated PT?
13    A. It doesn't have any significance.
14    Q. Meaning it's of no -- it's of no value, it
15 provides no information?
16    A. You're asking about specifically for the
17 Xarelto, and I think I answered that.
18    Q. You didn't. What's the -- what -- here's what
19 I'm trying to --
20    A. I said it was clinically -- I said it was not
21 clinically relevant. I'm trying to understand anything
22 else, but what else do you want to know?
23    Q. Here's the question: So if a patient on
24 rivaroxaban has a significantly elevated PT test, what

Page 93

1 is the significance or meaning of it?
2       MS. HOFFMANN: Objection.
3       THE WITNESS: It has -- it has -- I'm sorry.
4       MS. HOFFMANN: Go ahead.
5       THE WITNESS: If the patient is on Xarelto, the
6    PT INR basically doesn't have any clinical
7    relevance, but it may give some suggestion of
8    another cause of bleeding.
9 BY MR. HONNOLD:
10    Q. So if a patient's on rivaroxaban and has a
11 significantly elevated PT test then, is it some other
12 medical condition that's causing it to be elevated other
13 than the rivaroxaban?
14    A. The patient could also --
15       MS. WAY: Object to the form. Sorry.
16       THE WITNESS: I'm sorry. I apologize for that.
17    If the patient has some underlying
18    coagulopathy, if the patient has some type of liver
19    disease or even if the patient is on Coumadin, those
20    things can cause the PT INR to be elevated.
21 BY MR. HONNOLD:
22    Q. Can rivaroxaban itself cause the PT to be
23 elevated?
24    A. Not where it's clinically relevant.

24 (Pages 90 to 93)

Protected - Subject to Further Protective Review

Page 94

```
 1      Q.  And what does that mean, "not where it's
 2   clinically relevant"?
 3      A.  It's something that normally we don't really
 4   give much credence to when we're managing a patient with
 5   GI bleeding.
 6      Q.  So as it relates to a patient that's on
 7   rivaroxaban then, your testimony is that that patient's
 8   PT test does not have any clinical relevance to their
 9   care and treatment?
10      A.  The bottom line is the patient is bleeding,
11   mand it's one of the baseline laboratories that we get
12   whether they're on an anticoagulant or not.
13      Q.  Okay.  So in a patient that's on rivaroxaban
14   and has a significantly elevated PT, can the rivaroxaban
15   itself be the cause of that elevated PT?
16      A.  Regardless of whether they're on rivaroxaban or
17   not, we get it as part of the standard of care.  I've
18   already answered that the rivaroxaban and the PT INR are
19   not clinically relevant.
20      Q.  Okay.  I appreciate what you're telling me, but
21   you're not answering my question.  If you don't know the
22   answer to it, you can tell me that too.
23      A.  I answered it the best that I could, sir.
24      Q.  Okay.  So let me -- let me -- let's try it
```

Page 95

```
 1   another way.
 2      A.  Okay.
 3      Q.  So if you give a patient rivaroxaban, do you
 4   expect there to be a resultant increase in that
 5   patient's PT as a result of taking rivaroxaban?
 6         MS. HOFFMANN:  Objection.
 7         MS. WAY:  Objection.
 8         THE WITNESS:  I don't prescribe rivaroxaban.
 9         MS. HOFFMANN:  She's answering your questions
10   about a bleeding patient, and you've changed the
11   question to just a patient on rivaroxaban.
12         MR. HONNOLD:  Yeah, but I never asked that
13   question.
14         MS. HOFFMANN:  You did in the --
15         MR. HONNOLD:  She brought it up.
16         MS. HOFFMANN:  No, in the beginning --
17         MR. HONNOLD:  Just object.  Okay?
18   BY MR. HONNOLD:
19      Q.  Here's my question for you:  If you give
20   rivaroxaban to a patient, do you anticipate or expect
21   that patient to have an increase in their PT?
22         MS. HOFFMANN:  Objection.
23         MS. WAY:  Objection.
24         THE WITNESS:  Do I expect it?  Well, first of
```

Page 96

```
 1   all, I already told you that I don't prescribe it,
 2   but the literature suggests that it's not clinically
 3   relevant.  I think I've said that about seven
 4   different ways.
 5   BY MR. HONNOLD:
 6      Q.  Okay.  I get it, but here's -- here's my
 7   question for you:  Based upon your training --
 8      A.  You get it?
 9      Q.  What?
10      A.  You said you got it?  I'm trying to figure out
11   how did I -- how did I not say it?  I just wanted my
12   answer to be clear to you.
13      Q.  You done?
14      A.  Yes.
15      Q.  Okay.  Based upon your training, education, and
16   experience and the materials that you've reviewed in
17   this case, if a patient is given rivaroxaban, do you
18   expect there to be a resultant increase in the patient's
19   PT level?
20         MS. HOFFMANN:  Objection.
21         THE WITNESS:  Not necessarily.
22
23   BY MR. HONNOLD:
24      Q.  Can giving a patient rivaroxaban cause an
```

Page 97

```
 1   increase in their PT?
 2         MS. WAY:  Objection.  Asked and answered.
 3         You can go ahead if you want to enlighten him
 4   again.
 5         THE WITNESS:  Restate the question, please.
 6   BY MR. HONNOLD:
 7      Q.  Can giving a patient rivaroxaban cause an
 8   increase in their PT?
 9      A.  Not necessarily.
10      Q.  Can it?
11      A.  Not necessarily, sir.
12      Q.  Is it possible?
13      A.  It is not something that's clinically followed
14   or relevant.
15      Q.  If you look at -- go back and look at the label
16   for Section 12.2, Section 12.2, pharmacodynamics, will
17   you refer to that section, please?  Do you want to go
18   ahead and read Section 12.2?
19      A.  "Dose-dependent inhibition of X -- of FXa
20   activity was observed in humans and the Neoplastin
21   prothrombin time (PT) activated partial prothrombin time
22   (aPTT) and HepTest are prolonged dose-dependently.
23   Antifactor Xa activity is also influenced by
24   rivaroxaban."
```

25 (Pages 94 to 97)

Protected - Subject to Further Protective Review

Page 98

1    Q. What does that mean?
2        MS. HOFFMANN: Objection.
3        MS. WAY: Same.
4        THE WITNESS: I'm not an expert on
5    pharmacodynamics, sir, I'm sorry.
6    BY MR. HONNOLD:
7    Q. So when you as a -- as a board certified
8    gastroenterologist with some 30 years of clinical
9    experience, as you read Section 12.2 are you unable to
10   understand what -- or articulate what that means?
11       MS. WAY: Object to form.
12       MS. HOFFMANN: Objection.
13       THE WITNESS: I read a lot of medical
14   literature, sir, so I would say that I understand
15   what this means, but there are key things about this
16   statement that need to be focused on. Would you
17   like for me to review those for you?
18   BY MR. HONNOLD:
19   Q. I just asked you what that section meant.
20   A. There's a --
21   Q. And then you said you aren't an expert in
22   pharmacodynamics.
23   A. That's right, because there is -- this is a
24   general statement that has to do with the label.

Page 99

1    There's a key phrase here, though, and I'll bring it to
2    your attention. It says dose-dependent, and that's
3    pretty significant.
4    Q. Okay. What does 12.2 mean?
5    A. I'm not a --
6    Q. Even taking dose-dependent into account?
7    A. I'm not really here to discuss the
8    pharmacodynamics. I'm just not that expert.
9    Q. Okay. Then when it -- you made a big point of
10   saying dose-dependent is critical. What does it mean?
11   A. Any drug, any label, has something to do with
12   dose dependency.
13   Q. Why?
14   A. If I gave you a little you may not have an
15   effect. If I give you a lot and even to the range of
16   overdosing, any medicine can be good or it can be bad
17   according to the dose. So when they wrote that, they
18   really put that in there because it had significant
19   weight. So since I didn't write this and I don't know
20   any range but two sentences, I can't say that I'm an
21   expert. I'm just here to do the gastroenterology.
22   That's the only area of medical expertise that I can
23   really comfortably comment on.
24   Q. So when you just told me that when it relates

Page 100

1    to any medicine if you give a little bit it may have a
2    little effect, but if you give a lot it has more of an
3    effect, what do you mean by that?
4        MS. WAY: Objection.
5        THE WITNESS: Well, you're -- okay. If I give
6    you a little bit of arsenic, it won't kill you. But
7    if I give you a lot over time it will. So the more
8    that a medication is increased, you can have adverse
9    effects from it.
10   BY MR. HONNOLD:
11   Q. Okay. And can how much medication then a
12   patient has, can it be -- can you measure that in the
13   bloodstream by figuring out what their plasma
14   concentration is?
15   A. It depends. That's a part of research that's
16   done by those that are studying that particular agent.
17   Q. Okay. So for some of those drugs you're
18   talking about like arsenic or whichever ones you had in
19   mind other than poisons, if the plasma concentration of
20   the drug goes up, then can its -- can its effects or
21   adverse effects also go up?
22       MS. HOFFMANN: Objection.
23       MS. WAY: Same.
24       THE WITNESS: That's possible.

Page 101

1    BY MR. HONNOLD:
2    Q. Okay. And why is it that that's possible?
3    A. Well, that's the basis of doing research on
4    drugs. You want to see how safe a drug is.
5    Q. So when you read Section 12.2 now kind of in
6    light of the explanation that you've given me, what is
7    it the -- what does Section 12.2 suggest about the
8    relationship between taking rivaroxaban and the PT?
9        MS. WAY: Objection.
10       THE WITNESS: It suggests that it's
11   dose-dependent.
12   BY MR. HONNOLD:
13   Q. Meaning the more you take, the higher the PT
14   is?
15       MS. HOFFMANN: Objection.
16       MS. WAY: Objection.
17       THE WITNESS: It says that it can be prolonged
18   in that setting, but the specific dosage, I don't
19   think that they were alluding to. Again,
20   you're pulling me into pharmacodynamics, and I'm
21   just a gastroenterologist.
22
23   BY MR. HONNOLD:
24   Q. So is it fair to state then that from your

26 (Pages 98 to 101)

Protected - Subject to Further Protective Review

Page 102

1  perspective as a gastroenterologist reading
2  Section 12.2, if you needed to read it the way that it's
3  phrased or worded, you don't know what it means?
4      MS. WAY: Objection. She doesn't prescribe it.
5      THE WITNESS: You said that. I didn't. I
6  don't prescribe the drug, and I'm not -- as I said
7  earlier, I'm not an expert in pharmacodynamics.
8  BY MR. HONNOLD:
9      Q. So at least based upon looking at your report,
10  do you have any idea what Ms. Mingo's PT was when she
11  presented to the hospital on February 13?
12      A. I didn't list it in my report if I'm correct,
13  so I'd have to go to the medical records to look at it
14  specifically. Do you want this back, sir?
15      Q. No. It's marked as an exhibit. It's part of
16  the official court record now so what we'll probably do
17  is -- I don't know what you've done in prior
18  depositions, but we'll probably just put them in a stack
19  in order and we'll keep them in front of you in case we
20  need to refer to them?
21      A. I think I've got some things mixed up here.
22      Q. Here's a paper clip that you can kind of put
23  around it.
24      A. Okay. Thank you.

Page 103

1      Q. If you go to page 9 of your report, I'm going
2  to have some questions for you about some of the
3  information on page 9.
4          What are the possible, possible causes of
5  occult bleeding in a patient, occult gastrointestinal
6  bleeding, what can cause that?
7      A. Inflammation, ulceration, infection, cancer,
8  coagulopathy, liver disease, medications, and that's not
9  an exhaustive list. That is just a broad category of
10  things that could cause occult bleeding.
11      Q. How do medications cause occult bleeding?
12      A. Several different ways.
13      Q. How?
14      A. Well, you can have systemic absorption of the
15  medication which can lead to changes. You can have
16  direct injury that can cause bleeding. You can have
17  interference of a normal coagulation cascade. There are
18  many reasons.
19      Q. So when a patient has occult bleeding from the
20  interference with the normal coagulation cascade, can
21  that be caused by medication?
22      A. Yes, but there are other things too.
23      Q. So when a patient has occult bleeding that's
24  caused by interference with the normal coagulation

Page 104

1  cascade due to taking a medicine, then where can that --
2  where is the bleeding actually coming from?
3      A. Where is the bleeding coming from?
4      Q. Right.
5      A. It can come from any location in the body.
6      Q. Well, let's talk about occult GI bleeding.
7      A. Okay.
8      Q. Where would it be coming from?
9      A. Anywhere from lip to anus, or it can be
10  intraperitoneal or inside the liver or the spleen.
11      Q. Kidney?
12      A. That's not a part of the GI tract.
13      Q. If we -- if we go beyond the GI tract then can
14  a patient have occult bleeding in or around the kidney?
15      A. Yes. It's called hematuria or it could be a
16  hematoma in the -- in the kidney.
17      Q. So when a patient has occult bleeding then
18  regardless of its -- of its cause it's going to be
19  coming from somewhere, from some site; correct?
20      A. Regardless of the cause, there is a location of
21  it.
22      Q. Okay. And what is it specifically about the
23  interference with the normal coagulation cascade that
24  can cause occult bleeding?

Page 105

1      A. There are different points in the coagulation
2  cascade that drugs are targeted to, but also drugs such
3  as aspirin are targeted to platelets.
4      Q. How is it that anti-Factor Xa agents like
5  Eliquis or rivaroxaban can interfere with the normal
6  coagulation cascade to the extent they can cause occult
7  bleeding?
8      MS. HOFFMANN: Objection.
9      THE WITNESS: They don't have to cause occult
10  bleeding, but they basically inhibit Factor Xa.
11  BY MR. HONNOLD:
12      Q. And is that how they can -- is that how they
13  can cause occult bleeding?
14      MS. HOFFMANN: Objection.
15      MS. WAY: Objection.
16      THE WITNESS: That causes -- I'm sorry. That
17  causes the blood not to clot.
18  BY MR. HONNOLD:
19      Q. And then that can result in occult bleeding?
20      MS. WAY: Objection.
21      THE WITNESS: Not necessarily.
22
23  BY MR. HONNOLD:
24      Q. But can it?

27 (Pages 102 to 105)

Protected - Subject to Further Protective Review

Page 106

1    MS. HOFFMANN: Objection.
2    THE WITNESS: It's possible. However, it has
3  to usually have a lesion that is going to be -- that
4  will start to bleed. There usually has to be
5  something that is there preexisting.
6  BY MR. HONNOLD:
7    Q. But the lesion can be there preexisting and not
8  be bleeding until you do something that disrupts the
9  coagulation cascade?
10    MS. WAY: Objection.
11  BY MR. HONNOLD:
12    Q. That's possible; correct?
13    A. It depends. It depends.
14    Q. But is it possible?
15    A. Anything is possible.
16    Q. At the very top of page 9, you have a sentence
17  that says, "It is possible that Ms. Mingo had occult
18  bleeding during this time." Do you see that?
19    A. Yes, I do.
20    Q. And so what were the -- you said you always
21  need a lesion. What are the possible places where
22  Ms. Mingo had a lesion that would have been causing or
23  would have been the source of her occult bleeding during
24  that time?

Page 107

1    MS. WAY: Object to the form.
2    THE WITNESS: Well, you'd have to look to see
3  where the lesion was.
4  BY MR. HONNOLD:
5    Q. And I said what were the possible places?
6    A. But I classified it as occult bleeding, so that
7  means it's an unknown. You'd have to look to see. It
8  could have been from her -- the gums from brushing the
9  teeth. It could have been from anywhere in the GI
10  tract.
11    Q. And why do you say it could have been from
12  anywhere in the GI tract?
13    A. You don't have an identifiable location for the
14  source of bleeding.
15    Q. Is there a reason though in the context of that
16  sentence you're limiting it to the GI tract?
17    MS. WAY: Objection. Are we still -- are we at
18  the top of page 9?
19    MR. HONNOLD: Yeah.
20    THE WITNESS: Uh-huh, uh-huh.
21    MS. WAY: Does it -- okay. Last sentence on
22  the -- at the top?
23    MR. HONNOLD: (Nodding head.)
24    MS. WAY: Okay.

Page 108

1    THE WITNESS: Is it possible that I -- it could
2  have been retroperitoneal or it could have been from
3  hematuria.
4  BY MR. HONNOLD:
5    Q. Let's go to the top of page 12 for a moment.
6  The first sentence on the top of page 12 says, "Gastric
7  ulcers, or any form of mucosal injury, may bleed due to
8  exposure to aspirin, anticoagulants, or nonsteroidal
9  agents." Did I read that correctly?
10    A. That's how it's stated.
11    Q. When you use the phrase "due to," if you wrote
12  that sentence and instead of using the phrase "due to"
13  wrote "as a result of," would it mean the same thing?
14    A. No. I meant it as I wrote it.
15    Q. Okay. So when you say that something may bleed
16  due to exposure to aspirin, anticoagulants, or
17  nonsteroidal agents, what are you saying as you -- as
18  you used that phrase then?
19    A. It's very clear. These agents basically can
20  cause a preexisting lesion to -- to bleed, because the
21  header of the sentence was gastric ulcers or any form of
22  mucosal injury.
23    Q. And then before the introduction of the agent
24  that may cause the preexisting lesion to bleed, what was

Page 109

1  going on in the body that prevented the lesion from
2  bleeding before the introduction of the agent?
3    A. An intact coagulation system.
4    Q. And an intact coagulation system would be one
5  where Factor Xa is not being inhibited or disrupted in
6  any way; correct?
7    MS. WAY: Object to form.
8    THE WITNESS: No place -- I'm sorry. I'm so
9  sorry. Nowhere on the cascade.
10  BY MR. HONNOLD:
11    Q. Including Xa; right?
12    A. It's a part of it.
13    Q. And as you sit here today, what are the various
14  or different types of anticoagulants that you -- that
15  you can name today?
16    A. The NOACs are some. Coumadin is one. Those
17  are the primary ones.
18    Q. And we could add heparin -- the heparins too,
19  the low molecular weight heparins?
20    A. Yes, and Lovenox.
21    Q. Thank you. But no doubt in your mind you
22  include NOACs in that list of anticoagulants; correct?
23    A. That's correct.
24    Q. And I just -- I want to make sure that I

28 (Pages 106 to 109)

Protected - Subject to Further Protective Review

Page 110

1    understand how you've done your report.  Go back to page
2    3, and I specifically want to ask you about Heading II.
3    Are you there?
4        A.  I am.
5        Q.  And the heading of -- in your report of II is
6    Ms. Mingo's medical history; is that right?
7        A.  That's correct.
8        Q.  In terms of you being able to comment on
9    Ms. Mingo's medical history, the primary source of that
10   information would have been the medical records that you
11   reviewed; correct?
12       A.  That's correct.
13       Q.  And is it a fair statement that at least the
14   vast majority if not all of the information that you
15   include in your Section II came from her medical
16   records?
17       A.  From my review of them, that's correct.
18       Q.  And when you prepared that Section II that's
19   called Ms. Mingo's medical history, how did you prepare
20   that?  What I mean by that, did you prepare, like an
21   interim summary or chronology of her course and then
22   dictate from that or did you just dictate or type from
23   the records as you -- as you were going through them?
24   How did you do it?

Page 111

1        A.  Well, the medical records had different clinic
2    visits and basically hospital stays, and this is a
3    summary of pertinent issues that I found from -- from
4    looking at those medical records.
5        Q.  And so would it be a fair statement that for
6    any particular data point that you might list in this
7    section that there would be somewhere in the medical
8    record that would corroborate that or be the source of
9    your statement?
10       A.  Basically, yes.
11       Q.  Okay.  There are some places where it looks
12   like when you were writing that if you felt it was
13   necessary to provide maybe some explanation for the
14   reader to put things in context you did -- you did
15   include some information that might not in and of itself
16   been in the records; right?
17       A.  Please show me what you're referring to.
18       Q.  Sure.  Like page 6 where you talk about argon
19   plasma coagulation?
20       A.  Yes.
21       Q.  And that's what I mean by that.  I'm not -- I'm
22   not trying to be tricky about it.  I just mean you did
23   put some --
24       A.  Explanations.

Page 112

1        Q.  -- explanatory things?
2        A.  Yes, explanations for the reader.
3        Q.  And in places where you might put a word or
4    phrase in quotations, that is a specific phrase, a word
5    or phrase that you took verbatim out of the chart;
6    right?
7        A.  Yes, sir.
8        Q.  And you did that on occasion because you felt
9    that those words were so particularly descriptive or
10   helpful you decided the best way to make a point would
11   be to use those actual words?
12           MS. HOFFMANN:  Objection.
13           THE WITNESS:  I didn't want to paraphrase that
14       part.
15   BY MR. HONNOLD:
16       Q.  You note at the top of page 6 -- excuse me.  At
17   least that paragraph that continues onto the top of page
18   6, you have a sentence that says, "She," and I think
19   you're referring to Nurse Practitioner Thornton,
20   "documented uncontrolled chronic anemia."  Do you see
21   that?
22       A.  I do.
23       Q.  And is it your recollection that the term or
24   phrase uncontrolled chronic anemia or something like it

Page 113

1    is actually used by Nurse Thornton in her charting?
2        A.  This wasn't in quotations, so this would have
3    been basically what she documented, and that's how it
4    basically says that she documented uncontrolled chronic
5    anemia.
6        Q.  And can uncontrolled chronic anemia -- well,
7    let me ask it this way:  What are the -- what are some
8    of the explanations known to you or likely explanations
9    of uncontrolled chronic anemia?
10           MS. HOFFMANN:  In general, or for Ms. Mingo?
11           MR. HONNOLD:  As it's used in the context of
12       Nurse Practitioner Thornton is using it.
13           THE WITNESS:  So you're specifically asking me
14       to say why she had chronic anemia or why --
15   BY MR. HONNOLD:
16       Q.  What were the possible explanations for that
17   uncontrolled chronic anemia that I guess this goes to
18   about -- I think this is the discussion that gets us to
19   the early part of February, February 10, I think is when
20   Nurse Practitioner Thornton was seeing Ms. Mingo.  What
21   are the possible explanations of uncontrolled chronic
22   anemia in Ms. Mingo at that point in time, February 10,
23   2015?
24       A.  I'm sorry.  I need to see if I referenced --

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 114

1    Q.  Sure.  Take your -- take your time --
2    A.  Oh, oh, I got it.  I see it here.
3    Q.  To be fair --
4    A.  Yes.
5    Q.  -- you might want to go back to the bottom of
6    page 5 and then the top of page 6 to put in context the
7    question that I've asked.
8    A.  When she saw Nurse Practitioner Thornton,
9    anemia had already been established, and at that
10   particular setting there were several things that could
11   have alluded to chronic uncontrolled anemia.  She could
12   have had anemia chronic disease, exposure to
13   nonsteroidals in the past, her exposure to aspirin,
14   peptic ulcer disease caused by several other of her
15   habits including smoking and things of that nature.
16   Q.  Anything else that as of February 10, 2015,
17   besides what you just listed, that could be an
18   explanation for the uncontrolled chronic anemia
19   documented by Nurse Thornton?
20   A.  Those were some of the things that I just
21   remember, but at that particular time I think that she
22   had seen Dr. Gholson and anemia had been diagnosed.
23   Q.  And as you look at your report on page 6, can
24   you tell one way or the other from what you have -- what

Page 115

1    you have summarized from the records for that time as to
2    whether there was a hemoglobin that was done on
3    February 10?
4    A.  The hemoglobin had been done previously by
5    Dr. Gholson.
6    Q.  On what date?
7    A.  I'm not sure -- on page 5, it basically stated
8    that Dr. Gholson saw her and on 2/3/15 a hemoglobin was
9    drawn.  She was then --
10   Q.  So the -- excuse me.
11   A.  -- referred -- she was then referred to the
12   gastroenterologist.
13   Q.  And then do you know whether or not there was a
14   hemoglobin test that would have been done on or about
15   February 10?
16   A.  I'm not sure that one was done in Mary
17   Thornton's, but then two days later one was drawn by
18   Dr. Gholson's office again.
19   Q.  And that's February 12?
20   A.  That's correct.
21   Q.  And the hemoglobin on February 12 was what?
22   A.  It was noted to be 5.8.
23   Q.  And so that would be an interval drop from
24   February 3 of 2.4 grams?

Page 116

1    A.  That's correct.
2    Q.  What percentage of 8.2 is 2.4?
3    A.  You've got the phone.  I love those gadgets, so
4    you can have at it.
5    Q.  I forget what I asked you.
6    MS. HOFFMANN:  What percentage of 8.2 is 2.4 --
7    no.
8    MR. HONNOLD:  That's easy.  Okay.  So we've got
9    2.4 divided by 8.2 equals -- all right.  So I just
10   divided 2.4 by 8.2 and got .2926.  Does that make
11   sense?
12   MS. HOFFMANN:  Objection.
13   THE WITNESS:  That's the math.
14   BY MR. HONNOLD:
15   Q.  Okay.  So if a patient -- if a patient has a
16   hemoglobin of 8.2 and then loses 2.4 more grams, that
17   would represent about a 29 percent drop in hemoglobin;
18   right?
19   MS. HOFFMANN:  Objection.
20   MS. WAY:  Objection.
21   BY MR. HONNOLD:
22   Q.  If the math is right.
23   A.  You have to start with what her initial
24   hemoglobin was.  You're looking at two different values,

Page 117

1    but what was the first value when she was in the normal
2    range.  And also you have to realize that the hemoglobin
3    only has to do with the oxygen capacity of the red cell.
4    Hematocrit is done in percentages, and it has to do with
5    the extra fluid that surrounds the red cells.
6    Q.  But are you aware of anything -- any of your
7    medical literature references on your exhibit saying
8    about the significance of losing 29 percent -- a drop
9    from -- between -- an interval drop of 29 percent of
10   hemoglobin, the significance of that?
11   MS. WAY:  Objection.
12   THE WITNESS:  29 percent is not a number that I
13   saw in the medical literature, not specifically
14   29 percent.
15   BY MR. HONNOLD:
16   Q.  Okay.  Well, how about 25 percent or
17   30 percent?
18   A.  There are -- now we --
19   Q.  Now we're talking?
20   A.  What we're basically saying is that we're
21   talking about a significant drop in hemoglobin.  That's
22   all that we're talking about.
23   Q.  I guess that's where we were getting.  There's
24   no doubt that she had a significant drop in hemoglobin?

30 (Pages 114 to 117)

Protected - Subject to Further Protective Review

Page 118

1    A.  That's correct, uh-huh.
2    Q.  So we're making it very difficult for our court
3  reporter.  We can agree that a 2.4-gram drop in
4  hemoglobin between February 3 and February 12 is a
5  significant drop in her hemoglobin?
6       MS. WAY:  Objection.
7       THE WITNESS:  Yes.  I'm sorry.  I apologize.
8  BY MR. HONNOLD:
9    Q.  And can we agree that the most likely cause of
10  that drop in hemoglobin was due to gastrointestinal
11  bleeding?
12    A.  She had hemoccult positive stools, so it was
13  highly suggestive.
14    Q.  Are hemoccult positive stools highly suggestive
15  of gastrointestinal bleeding?
16    A.  Yes.
17    Q.  Why?
18    A.  Because the test is specific for blood.
19       MS. HOFFMANN:  It's time for a break.
20       MR. HONNOLD:  Sure.
21       THE VIDEOGRAPHER:  The time now is 6:41 p.m.
22  We are off the record.
23       (Recess from 6:41 p.m. until 6:55 p.m.)
24       THE VIDEOGRAPHER:  This begins Disk 3 of

Page 119

1  today's deposition.  The time now is 6:55 p.m.  We
2  are back on the record.
3  BY MR. HONNOLD:
4    Q.  Doctor, we're back on the record after a short
5  break.  I'd like to refer you or point to you page 6 of
6  your report.
7    A.  Yes.
8    Q.  And there is a paragraph that begins with
9  Dr. Stephen Keith performed an EGD.  Do you see that?
10    A.  Yes.
11    Q.  And so based upon your review of the medical
12  records, is it your sense or view that it is that small
13  6-millimeter ulcer that was the likely site of the -- of
14  Ms. Mingo's gastrointestinal bleeding?
15    A.  There was active bleeding noted from this
16  lesion.
17    Q.  And is it your view or belief, based upon the
18  materials you've reviewed in this case, that it was
19  bleeding from this small 6-millimeter ulcer that would
20  explain the interval drop in Ms. Mingo's hemoglobin from
21  8.2 on February 3 to 5.8 on February 12?
22    A.  That was an -- that was an identifiable source,
23  yes.
24    Q.  And based upon the materials that you reviewed

Page 120

1  in this case, are there any other identifiable sources
2  that you are aware of?
3    A.  There were no active bleeding sources during
4  his examination.
5    Q.  Then have you formed an opinion in this case
6  that there was some other source of bleeding in
7  Ms. Mingo other than that 6-millimeter ulcer that was
8  identified?
9    A.  I could only say that what Dr. Keith did was to
10  look at the GI tract and did not identify any additional
11  sources.
12    Q.  And that 6-millimeter ulcer, based upon your
13  training, education, and experience, is that ulcer,
14  based upon its type, nature, or circumstance location a
15  sufficient identifiable source in your view to explain
16  that interval drop in hemoglobin from 8.2 to 5.8 between
17  February 3 and February 12?
18       MS. HOFFMANN:  Objection.
19       MS. WAY:  Object to form.
20       THE WITNESS:  I would say yes.
21  BY MR. HONNOLD:
22    Q.  And you know from your review of the medical
23  records that during that time Ms. Mingo was on Xarelto;
24  correct?

Page 121

1    A.  Along with other medications, yes.
2    Q.  And based upon your understanding of how either
3  Xarelto or anticoagulants in general work, how would
4  that -- how would the Xarelto been inhibiting or working
5  against Ms. Mingo's body forming a clot at that ulcer
6  site?
7       MS. HOFFMANN:  Objection.
8       MS. WAY:  Objection.
9       THE WITNESS:  The basic mechanism of an
10  anticoagulant is to make the blood thin and not
11  clot.
12  BY MR. HONNOLD:
13    Q.  And so it is your view or belief in this case
14  that the Xarelto that Ms. Mingo was taking would have
15  been having that effect on her clotting cascade?
16    A.  If she took it, yes.
17    Q.  And based upon what you've reviewed in this
18  case, is there any medical record evidence or testimony
19  to suggest that Ms. Mingo was not taking her Xarelto as
20  instructed?
21    A.  Not that I can see.
22    Q.  You have included on your reference list some
23  of the publications that were in the EINSTEIN series of
24  clinical trials.  Are you familiar with those

31 (Pages 118 to 121)

Protected - Subject to Further Protective Review

Page 122

1   references?
2       A.  They were included in the records that I was
3   given.
4       Q.  And as you sit here today, do you have some
5   understanding of what is the significance of the
6   EINSTEIN clinical trials in the history or evolution of
7   rivaroxaban?
8       A.  You know, I really looked at them
9   superficially.  They were not a strong basis for my
10  forming my opinion.
11      Q.  Were any of the articles that were provided to
12  you by counsel a strong basis for forming your opinion?
13      A.  I formed my opinion based on my clinical
14  experience and what I know about gastroenterology.
15      Q.  Okay.  And I appreciate that.  And so then can
16  you answer my question.  Were any of the articles that
17  were provided to you by counsel a strong basis for
18  forming your opinions?
19      A.  Not really.  I relied upon my -- my articles
20  primarily.
21      Q.  And when you say your articles, that means the
22  ones --
23      A.  Those --
24      Q.  -- that we identified that didn't come from the

Page 123

1   lawyers?
2       A.  Right.  Those are the ones that I denoted to
3   you earlier.
4       Q.  And I don't want to go through the list again,
5   but we picked out the ones that were your articles;
6   right?
7       A.  Uh-huh.
8       Q.  Yes?
9       A.  Yes.
10      Q.  And those were primarily the -- amongst other
11  things your articles included the things from UpToDate;
12  right?
13      A.  I'm sorry.  Excuse me.  Can we go off the
14  record for one second, please?
15          THE VIDEOGRAPHER:  The time is 7:02 p.m.  We
16  are off the record.
17          (Discussion off the record.)
18          THE VIDEOGRAPHER:  The time is 7:02 p.m.  We
19  are back on the record.
20          THE WITNESS:  Thank you.
21  BY MR. HONNOLD:
22      Q.  We went through the list and identified your
23  articles?
24      A.  Yes, sir.

Page 124

1       Q.  But your articles included the UpToDate
2   articles; right?
3       A.  Yes, sir.
4       Q.  Do you have any understanding of the definition
5   that has been applied to the terms -- to the term major
6   bleeding by either any medical societies or sponsors of
7   clinical trials?
8       A.  Mostly in gastroenterology societies, sir.
9       Q.  Okay.  And in gastroenterology societies, what
10  is the definition of or how is major gastrointestinal
11  bleeding defined?
12          MS. HOFFMANN:  Can she refer to her report?
13          MR. HONNOLD:  Sure.
14  BY MR. HONNOLD:
15      Q.  Oh, you can always look at your report if you
16  need to to answer anything that I'm asking you.
17      A.  That's fine.
18      Q.  Sure.
19      A.  Basically when you categorize gastrointestinal
20  bleeding it can be mild, moderate or major, and that's
21  one of the ways that some of the GI societies will
22  categorize it.
23      Q.  And what are the objective criteria that lead
24  to or define those definitions?

Page 125

1       A.  The additive criteria would be the clinical
2   status of the patient when they present, and that
3   specifically looks at if they are hemodynamically stable
4   or not, couple that with whether there is evidence of
5   active bleeding going on.  So that basically allows you
6   to place a patient in one of those three categories.
7       Q.  Have you seen in any of the literature that
8   you've looked at where major bleeding is defined by
9   various criteria including the amount or quantity of
10  transfusion or blood products that the patient is
11  given --
12      A.  I think I've --
13      Q.  -- at the time of resuscitation?
14      A.  I think I've looked at that.
15      Q.  And the things that you've looked at that do
16  speak to those factors, do you recall anything in terms
17  of objective criteria for defining a major bleed?
18      A.  If I'm correct, there was a change in the
19  hemoglobin, also along with the number of blood
20  transfusions, also along with the status of the patient.
21      Q.  You know that there are some -- one of the
22  definitions for whether or not the patient had a
23  major -- had a major bleed is whether or not their
24  hemoglobin dropped by at least 2 grams; right?

32 (Pages 122 to 125)

Protected - Subject to Further Protective Review

Page 126

1    A. It could be, but there's also a time factor
2 that goes along with that, sir.
3    Q. What is that time factor that goes along with
4 that?
5    A. It depends upon that patient. You can have a
6 dropping of 2 -- of 2 of a hemoglobin of 2, and it can
7 be over six months or it can be as rapidly as two hours.
8    Q. But in terms of the things that you've seen in
9 your literature, you know, that you've looked at, that
10 you said you've seen, you know that there is a major
11 bleeding definition that talks about a drop of 2 grams
12 of hemoglobin; right?
13    A. Well, in my societies we look at more than one
14 parameter. It's not just the hemoglobin. You have to
15 look at what else is going on with the patient. There's
16 never an independent factor. It's always you look at
17 the patient globally.
18    Q. Then have you formed an opinion in this case as
19 to when it was that the effects of rivaroxaban on
20 Ms. Mingo's ulcer started contributing to bleeding?
21    A. If I'm correct, you asked me have I formed an
22 opinion on when --
23    Q. Yes.
24    A. -- the rivaroxaban caused the bleeding? Is

Page 127

1 that --
2    Q. Or started contributing to the bleeding?
3    A. Started contributing to the bleeding? Not
4 exactly, no.
5    Q. As you sit here now do you have some view on
6 that?
7    A. She started having signs of -- she started --
8 let me go back.
9        Her blood count was noted to change over a
10 relatively short period of time, but clinically she was
11 able to continue with her function.
12    Q. Okay. So based upon what you've told me there.
13 Does that shed some light on when you think that the
14 rivaroxaban started contributing?
15    MS. WAY: Object to form.
16    A. It would have been somewhere in the range of a
17 week or two, maybe, before she presented to the
18 hospital.
19    Q. And why do you say that?
20    A. That's when there was actual -- some
21 documentation of the change in her hemoglobin. Up to
22 that time, I don't think that I had any measure of what
23 the effect could have been.
24    Q. And so as you look at that drop or that change

Page 128

1 in the measure of her hemoglobin, that's some suggestion
2 then that the Xarelto was contributing to bleeding; is
3 that right?
4    MS. WAY: Objection.
5    THE WITNESS: I'm sorry. We didn't know what
6    the cause of bleeding was.
7 BY MR. HONNOLD:
8    Q. Okay. But now in retrospect?
9    A. Well, there are more factors than that, because
10 she also was on aspirin.
11    Q. Okay. So -- and I understand that, but the
12 drop in hemoglobin, is that in retrospect some
13 suggestion or objective evidence as to when Xarelto was
14 contributing to the bleeding?
15    MS. HOFFMANN: Objection.
16    MS. WAY: Same.
17    THE WITNESS: I don't know that we can call it
18    objective evidence because we did not know where she
19    was -- what was causing her bleeding.
20 BY MR. HONNOLD:
21    Q. You say -- you told me that somewhere in the
22 range of a week or two before presentation, you said
23 there was something significant about her hemoglobin
24 during that time. What did you mean by that?

Page 129

1    A. The only measurable data was when she saw
2 her -- her practitioners and labs were drawn.
3    Q. So when she saw her practitioners and labs were
4 drawn, what were the things that were -- that were known
5 about Ms. Mingo at that time that could have explained
6 the changes or drops in her hemoglobin?
7    A. When she was seen, she had the blood work that
8 was drawn. She eventually had stool tested for blood
9 that was positive.
10    Q. Right, and I understand that, those are the
11 kind of the end points, but what were the things that
12 were known about Ms. Mingo when that testing was done
13 that would explain those things?
14    MS. HOFFMANN: Objection.
15    THE WITNESS: When the testing was done, what
16    would have explained those changes?
17 BY MR. HONNOLD:
18    Q. Yes.
19    A. Well, there were a lot of different things.
20 She had a lot of comorbid issues. She was on aspirin.
21 She was on Xarelto. There were a lot of different
22 things.
23    Q. And so that list would be things that could
24 explain her bleeding or her drop in hemoglobin and her

Protected - Subject to Further Protective Review

Page 130

1    positive --
2         A.  These were suggestions --
3         Q.  -- stools?
4         A.  -- but you have to remember we didn't know
5    where she was bleeding from at that point.
6         Q.  I understand that, but in terms of what the
7    information that was known to her providers at that
8    point in time when they are doing that testing, and they
9    are seeing that drop in -- or those test results, what
10   were the things that were known about her at those times
11   that could explain those test results?  And you told me
12   that could be many things, including her comorbidities
13   and the fact that she was on aspirin and Xarelto; right?
14        A.  Absolutely, but remember she was referred to a
15   gastroenterologist to have more definitive studies done.
16        Q.  Have you ever ordered an anticoagulant to be
17   stopped in a patient?
18        A.  I don't manage anticoagulation.  Usually I am
19   seeing a patient as a consultant.
20        Q.  Okay.  So if you are seeing a patient -- have
21   you ever seen patients as a consultant in the context of
22   them having gastrointestinal bleeding that was being
23   caused by anticoagulation?
24             MS. HOFFMANN:  Objection.

Page 131

1             MS. WAY:  Objection.
2             THE WITNESS:  Have I seen those patients?
3    BY MR. HONNOLD:
4         Q.  Yes.
5         A.  Of course I have.
6         Q.  Okay.  Frequently?
7         A.  Yes, I do see patients frequently that are on
8    anticoagulants.
9         Q.  And where they're having GI bleeding as a
10   result?
11        A.  Not necessarily.  Some do and some don't.
12        Q.  Okay.  And in the context of those patients,
13   when you've been called in as a consultant, based upon
14   your training, education and experience, has that ever
15   caused you to say if it's not been discontinued let's
16   make sure we stop the anticoagulant?
17        A.  If they're bleeding, of course, but we do that
18   in consultation with the -- with the physician that
19   prescribed it.  I mean, I don't always know the reason
20   that the anticoagulant was prescribed, and of course if
21   it's some life-threatening issue, I'm going to talk with
22   the person who consulted me.
23        Q.  Okay.  After having that conversation, though,
24   in I guess joint consideration with the prescribing or

Page 132

1    other treating physicians, have you come to the
2    conclusion together that the anticoagulant should be
3    stopped?
4         A.  If we have not identified and treated a source
5    of bleeding, I would say yes, until those measures could
6    be done.
7         Q.  And in those situations where the decision was
8    made in that specific circumstance as you state, why was
9    it that the decision was made to stop the anticoagulant?
10        A.  Say that again.
11        Q.  Sure.
12        A.  Sure.
13        Q.  You've given me a lot of qualifications so I'm
14   trying to say I accept them and I'm bringing them into
15   the question, but I made it harder than I need to.
16        A.  The last -- yeah, the last part of the question
17   I just didn't exactly follow, and I don't -- I don't
18   want to be misleading.
19        Q.  Okay.  You've told me about the situations
20   where you've been called in as a consultant where a
21   patient might have gastrointestinal bleeding and be on
22   an anticoagulant; right?
23        A.  Yes.
24        Q.  And you've told me that you generally would not

Page 133

1    want to stop the anticoagulant without some discussion
2    in consultation with the prescribing physician or
3    another treating physician that knows more about why the
4    patient is on the anticoagulant; right?
5         A.  Yes, that's correct.
6         Q.  Okay.  And then you've told me that on occasion
7    after you've had that interaction with that prescribing
8    or other treating physician the decision may have been
9    jointly made after consultation to stop the
10   anticoagulant; correct?
11        A.  Yes, sir, uh-huh.
12        Q.  And then when that's actually been done, the
13   decision after consultation to stop the anticoagulant,
14   what were the -- what was the reason why it was stopped?
15        A.  Because we haven't identified a source of
16   bleeding, and it hasn't been treated.
17        Q.  And then why is it that you in some
18   circumstances then want the anticoagulant to be stopped?
19        A.  Because I want the patient to stop bleeding and
20   I don't know the source of the bleeding.
21        Q.  And what is it about stopping the anticoagulant
22   that will help the patient stop bleeding?
23        A.  The what is it about it?
24        Q.  Uh-huh.

34 (Pages 130 to 133)

Protected - Subject to Further Protective Review

Page 134

1     A.  Well, an anticoagulant's function is to -- to
2   make sure the blood does not clot.  You want any
3   bleeding source to be able to clot.
4     Q.  Then what is it about stopping the
5   anticoagulant then that allows that to happen?
6     A.  The drug is eventually cleared from the body.
7     Q.  And depending upon that drug the time that it
8   takes for that to happen can vary; correct?
9     A.  Yes, it can.
10     Q.  Have you ever been involved in providing
11   consultation on the issue of whether the effects of an
12   anticoagulant should be reversed or attempted to be
13   reversed in a patient by using some other agent?
14     A.  It depends upon the type of anticoagulant.
15     Q.  Okay.  So tell me about those situations where
16   you've been involved in that.
17     A.  Characteristically it's when they've been
18   exposed to Coumadin.
19     Q.  And then have you been involved in taking care
20   of patients where you were involved in the consultation
21   as to whether the Coumadin -- or steps should be taken
22   to reverse the effects of Coumadin?
23     A.  It usually is already initiated before I'm
24   there.

Page 135

1     Q.  And that's what I'm trying to get at --
2     A.  Sure.
3     Q.  -- is whether that's something that's commonly
4   within your experience or is that something that's
5   usually already done in the emergency room by the time
6   you might be consulted or arrive on the scene.  Is that
7   true?
8     A.  Yes.  A good ER physician would already do
9   that.
10     Q.  Have you been involved in consulting on
11   patients where there's discussion being had on whether
12   or not to make attempts to reverse the effects of one of
13   the NOAC drugs?
14     A.  No, sir.
15     Q.  As you sit here today, is it within your
16   medical knowledge or within your area of expertise as to
17   what the factors would be to go into the decision of
18   whether reversal should be attempted, and if it is
19   attempted, what agents would be used?
20     MS. WAY:  Object to form.
21     MS. HOFFMANN:  With the NOAC or Coumadin or --
22     MR. HONNOLD:  Yes, with a NOAC.
23     MS. HOFFMANN:  I'm sorry.
24     MR. HONNOLD:  I'll ask another question.

Page 136

1     THE WITNESS:  Okay.
2   BY MR. HONNOLD:
3     Q.  Is it -- is it within your knowledge or area of
4   expertise as it relates to a patient who's bleeding as a
5   result of being on a NOAC to decide whether to reverse,
6   and if you do attempt to reverse, what agents to use?
7     A.  I'm not a hematologist, so I would have to say
8   no.
9     Q.  And would it be fair to state then that from
10   your perspective and your practice, those issues about
11   whether or not to attempt reversal of anticoagulation in
12   a patient on a NOAC who's having bleeding as a result,
13   that would be something that you'd be most comfortable
14   referring to a hematologist for that decision?
15     A.  Well, again, I'm not a hematologist, but you
16   have to understand that most of the NOACs have a very
17   short half-life.
18     Q.  Okay.  And so is that something that on the
19   issue of whether or not to reverse -- to make attempts
20   to reverse a NOAC, would you generally feel more
21   comfortable referring that decision to a hematologist?
22     A.  I'm not -- yes, I would, mainly because if it
23   was necessary, but I just really can't recall it ever
24   being necessary.

Page 137

1     Q.  Let's move forward to page 7 again.  I'm back
2   to Roman Numeral Section -- or III section of your
3   report.  Can you go there?
4     A.  I'm there.
5     Q.  And so I want to make sure I understand kind of
6   the format of your report.  It looks like in Section III
7   you have basically identified several case specific
8   opinions; is that right?
9     A.  That's correct.
10     Q.  And what you have done then is provided some
11   explanation or basis for those opinions after they're
12   stated in your report beginning at page 7; right?
13     A.  Actually, what I'm doing is looking at facts
14   from the medical literature and then voicing my opinion
15   on those.
16     Q.  And in terms of just by way of a list of your
17   case specific opinions, those would be the bolded
18   subheadings that are on pages 7, 8, 9, 10, 12 -- and 12
19   of your report; right?
20     A.  Yes.
21     Q.  So if we go through by list, your first
22   case-specific opinion is that Ms. Mingo was at risk for
23   developing a DVT; right?
24     A.  That is -- that's correct.

Protected - Subject to Further Protective Review

Page 138

1     Q.   Your next case-specific opinion is that Xarelto
2   treated Ms. Mingo's blood clot; right?
3     A.   Correct.
4     Q.   The next case-specific opinion is that
5   Ms. Mingo had anemia before taking Xarelto; right?
6     A.   Yes.
7     Q.   The next one is management of GI bleeds, and
8   that's kind of a mix of kind of where you provide some
9   information generally about managing GI bleeds?
10    A.   That's correct.
11    Q.   But then you also weave it into or relate it to
12  Ms. Mingo in some way specifically; right?
13    A.   That's correct.
14    Q.   But much of that section, management of GI
15  bleeds, is information that could be found in the
16  medical literature if you were to be looking for
17  guidance on how to manage a GI bleed; right?
18    A.   That would be correct.
19    Q.   And so while you don't make specific footnote
20  citations to any of your references, is it fair to state
21  that the basis for much of what you've stated in that
22  section, management of GI bleeds, could be found in some
23  of those articles that you cited in your reference list?
24    A.   Yes, definitely.

Page 139

1     Q.   And your next case specific section is causes
2   of gastric ulcers and GI bleeds; right?
3     A.   Yes.
4     Q.   And then your next heading is stated as Xarelto
5   did not create Ms. Mingo's ulcer or cause her bleed;
6   correct?
7     A.   That's correct.
8     Q.   From any -- from reading any of the materials
9   on your reference list, do you know how the dose was
10  arrived at for Xarelto for treatment of DVT?
11    A.   On my reference list?
12    Q.   Yeah, based -- I mean based upon reading any of
13  that stuff, were you able to ascertain how it was that
14  the dose of 15 milligrams twice a day for 21 days
15  followed by 20 milligrams a day, how that dose pattern
16  was arrived at?
17    A.   Not exactly, no.
18    Q.   When a patient experiences a significant drop
19  in hemoglobin, what -- well, strike that.
20         When a patient experiences a significant drop
21  in hemoglobin as a result of a GI bleed, what are the
22  sorts of things that can happen to the patient?  And I
23  mean untoward things.
24    A.   If there's a significant drop as I alluded to

Page 140

1   earlier there's a time frame in which the drop can
2   occur.  If it's over a long period of time the patient
3   may not have any significant symptoms at all.  However,
4   if it's a more acute setting, they can have some
5   hemodynamic instability, changes in the vital signs,
6   blood pressure, things of that nature.
7     Q.   And when a patient experiences a significant GI
8   bleed on some occasions can GI bleeds be significant
9   enough to cause death?
10    A.   That's a rarity.
11    Q.   But it does occur?
12    A.   Very rarely, yes.
13    Q.   Well, have you looked into whether there have
14  been reported events of patient deaths secondary to GI
15  bleeds patients that were taking Xarelto?
16    A.   Not specifically with Xarelto, but in general,
17  yes.
18    Q.   And when you say in general, you're talking
19  being anticoagulants in general?
20    A.   No, sir.  I'm talking about GI bleeding in
21  general regardless of the cause.
22    Q.   Have you ever submitted a MedWatch report
23  related to a patient who suffered injury that you
24  believe was associated with prescription medication?

Page 141

1     A.   A MedWatch report?
2     Q.   Yes.
3     A.   I'm not familiar with that is.
4     Q.   Okay.  Have you ever submitted a report to any
5   agency, professional body, hospital committee that you
6   felt that a patient's injury was contributed to either
7   by a prescription drug or medical device?
8     A.   No, sir.
9     Q.   Have you seen situations where you believe that
10  a patient's condition was caused by or contributed to be
11  caused by a prescription drug or medical device?
12         MS. HOFFMANN:  Objection.
13         THE WITNESS:  I really don't remember
14  specifically, but that's a broad question because
15  there are a lot of devices and medications.
16  BY MR. HONNOLD:
17    Q.   Have you taken care of patients that had
18  significant liver abnormalities that you thought were
19  secondary to prescription medication?
20         MS. HOFFMANN:  Objection.
21         THE WITNESS:  A small segment of my population
22  has been exposed to medicines that can injure the
23  liver.
24  BY MR. HONNOLD:

36 (Pages 138 to 141)

Protected - Subject to Further Protective Review

Page 142

1    Q.  But have you actually seen it manifest in some
2  patients, that injury as a result of taking any of those
3  medications you're talking about?
4        MS. WAY: Objection.
5        THE WITNESS: Which medications, sir?
6  BY MR. HONNOLD:
7    Q.  I don't know.  You brought it up.
8        MS. WAY: No, you did.
9        THE WITNESS: No, I'm sorry.  You asked about
10       had I ever done a report on MedWatch, and then you
11       asked had I ever notified anybody about a specific
12       medical device or drug, and I wanted to specifically
13       ask which one were you talking about.
14 BY MR. HONNOLD:
15   Q.  Okay.  So you said that a small segment of the
16 population of your patients have had liver abnormalities
17 that could be explained by medication; right?
18       MS. HOFFMANN: Objection.
19       MS. WAY: Same.
20       THE WITNESS: You asked me a question before
21       that.  Could you state the question that you asked
22       me?
23 BY MR. HONNOLD:
24   Q.  Let's start all over because obviously it's

Page 143

1  causing a problem between us, and I don't want that to
2  be -- we've been getting along so well.  I want to avoid
3  problems.  I just want to -- let's go to -- let's just
4  go to a new slate, okay, on this issue?
5    A.  There are no problems.
6    Q.  Okay.  So are you aware of medicines that can
7  cause injury to the liver?
8    A.  Yes.
9    Q.  What are they?
10   A.  The list is legion.
11   Q.  Okay.  "Legion" meaning a big list?
12   A.  Huge.
13   Q.  It's a lot of prescription drugs that can
14 injure the liver?
15   A.  Absolutely.
16   Q.  Okay.  Can you think of two or three?
17       MS. HOFFMANN: Like, examples?
18 BY MR. HONNOLD:
19   Q.  Examples, yeah.
20   A.  Yes.
21   Q.  That would be a good way to put it.  Can you
22 think of examples of prescription drugs that can injure
23 the -- two or three that would be on that legion, that
24 legion of drugs?

Page 144

1    A.  I can actually do better than that.  I can do
2  prescription and nonprescription, and we're going to
3  just start with the nonprescription.
4    Q.  Okay.
5    A.  Tylenol.
6    Q.  Okay.  What does that do to the liver?
7    A.  In large dosages it can cause acute hepatic
8  failure and death.
9    Q.  And does large dose mean taking it all at once
10 or taking a lot over a period of time?
11   A.  It means taking it all at once.
12   Q.  Okay.
13   A.  Usually in a suicide attempt.
14       MS. HOFFMANN: So there's an example.
15       MR. HONNOLD: Okay, there's one.
16       MS. HOFFMANN: Where are we going?
17       MR. HONNOLD: Well, she said she's going to
18       start with the nonprescription, so Tylenol is one.
19       What's next?
20       MS. HOFFMANN: I know you're going somewhere
21       with it, so maybe we can get to the end point.
22
23 BY MR. HONNOLD:
24   Q.  I just don't want to -- I don't want to break

Page 145

1  up the -- okay.  So you said you were going to start
2  with the nonprescription and Tylenol.  Okay, there you
3  go.
4    A.  Yeah.
5    Q.  So do you have -- are there other
6  nonprescriptions, or you want to move on to the
7  prescription side?
8    A.  That's actually the number one cause of acute
9  hepatic failure in the United States and the world.
10   Q.  Is what?
11   A.  And it's nonprescription, that's Tylenol.  And
12 then when you go to prescription medications, there are
13 a lot of different classes of that.  If you look at the
14 cardiology drugs, amiodarone is known for that.  Some of
15 the arthritis drugs would be things like methotrexate.
16 There are a lot of different medications.
17   Q.  And whether or not a medication on that legion
18 of drug list can cause liver disease, can -- other than
19 the Tylenol that you said and given in big doses, are
20 there other drugs, whether it's prescription or
21 nonprescription, where the propensity to cause injury to
22 the liver is related to the amount of drug that's taken
23 or the amount of drug in the system?
24   A.  Some are and some not.

37 (Pages 142 to 145)

Protected - Subject to Further Protective Review

Page 146

1    Q. Okay. Which ones are?
2    A. Any drug can give you an idiosyncratic reaction
3  and that can result in liver injury. There's a syndrome
4  called DILI, drug-induced liver injury.
5    Q. And then is DILI, D-I-L-Y, drug-induced liver
6  injury --
7    A. I.
8    Q. -- is that idiopathic, or is that related to,
9  or can it be related to the amount of medicine that is
10  in the patient's bloodstream?
11    A. Either.
12    Q. So as it relates to liver injury, there are
13  instances with certain drugs that the amount of exposure
14  to the drug or the plasma concentration of the drug can
15  influence whether or not it harms the liver?
16    MS. WAY: Object to form.
17    THE WITNESS: It can be either. It is not
18  predictable.
19  BY MR. HONNOLD:
20    Q. Did you take any pharmacology classes in
21  medical school?
22    A. One, about 30 years ago.
23    Q. Okay. In that -- in that class were you
24  taught or did you learn that increased plasma

Page 147

1  concentration of some drugs can determine what effect
2  the drug is going to have?
3    MS. HOFFMANN: Objection.
4    MS. WAY: Same.
5    THE WITNESS: You know, that was a long time
6  ago, and I don't want to misstate myself.
7  BY MR. HONNOLD:
8    Q. So you can't remember?
9    A. Not really.
10    Q. Are there any drugs that you can name that you
11  know that the amount of drug in the blood or the plasma
12  concentration of the blood can be determinative of the
13  effects that the drug will have on the patient?
14    MS. HOFFMANN: Objection.
15    THE WITNESS: I'm going to make sure I hear the
16  question correctly, but why don't you restate it and
17  then I can be much clearer of what you're asking.
18  BY MR. HONNOLD:
19    Q. Sure. Okay. Are there any drugs that you're
20  aware of where the plasma concentration level of a drug
21  can be determinative of how much of an effect the drug
22  will have in the patient?
23    A. Possibly.
24    Q. Okay. And why do you say possibly?

Page 148

1    A. Some -- it depends upon the metabolism of the
2  drug.
3    Q. How so?
4    A. Well, a drug can be metabolized by several
5  different ways, and that's individualized according to
6  what the drug is.
7    Q. And how is it that there -- that some drugs can
8  be individualized in terms of how the drug is
9  metabolized or eliminated by the patient?
10    A. Well, that's just the basis of how the compound
11  is made.
12    Q. Okay.
13    A. Some come out in urine. Some come out in
14  feces. Some are metabolized by the liver.
15    Q. Okay. And is it true that patients can have
16  varying levels of plasma concentration for a given drug?
17    MS. WAY: Object to form.
18    MS. HOFFMANN: Objection.
19    THE WITNESS: I'm not exactly sure. I think
20  we'd have to be specific about that.
21  BY MR. HONNOLD:
22    Q. The -- any of the information that you've read
23  about Xarelto, either generally in your practice or for
24  your work on this case, do you understand or know what

Page 149

1  the mean or expected plasma concentration level is for a
2  patient who takes, for example, 15 milligrams of Xarelto
3  twice a day?
4    MS. WAY: Object to form.
5    THE WITNESS: I don't recall that.
6  BY MR. HONNOLD:
7    Q. Do you know whether that was discussed in any
8  of the items to your reference list?
9    A. It might have been, but I didn't read all of
10  them in their entirety. Some of them I didn't feel were
11  something that I needed to focus on.
12    Q. Okay. So I should have asked you that before,
13  I guess, at the outset. So the things on your reference
14  list, some of them you did not read in their entirety?
15    A. That's correct.
16    Q. Because you could tell by the title that you
17  didn't feel that they were necessarily determinative or
18  going to influence your opinion?
19    A. No, it was a time factor and, plus, I didn't
20  think it was relevant to what I was going to be
21  testifying about and that was gastroenterology.
22    Q. What was the time factor issue? What do you
23  mean?
24    A. I'm very busy.

38 (Pages 146 to 149)

Protected - Subject to Further Protective Review

Page 150

1      Q. Can you tell by going to your reference list,
2  which is in your report, Exhibit A, which of the ones
3  that you didn't read in their entirety?
4      A. Quite a few of the ones that the lawyers gave
5  me. I'd have to look at that myself.
6      Q. Go ahead.
7      A. I'm sorry. I'd have to look at the articles.
8  There are quite a few here, so it's kind of hard for me
9  to go through and pick -- pick through that list.
10      Q. So you said there were quite a few of the ones
11  that the lawyers gave you that you did not review in
12  their entirety; correct?
13      A. That's right.
14      Q. We can agree on that much. But is there a way
15  just by perusing through the list as we did before --
16      A. Not really, no.
17      Q. Okay. So sitting here this evening, you
18  couldn't look at the reference list and determine which
19  of Items 1 through 41 you did or didn't read in their
20  entirety; correct?
21      A. Some of them, you know, I got this information
22  several months ago, so it's possible that I would be --
23  I couldn't recall all of them.
24      MS. HOFFMANN: And when you ask her if she read

Page 151

1  them in their entirety, you're not talking about the
2  abstract, you're talking about reading the whole
3  article?
4      (Telephone interruption.)
5      MR. HONNOLD: It said object to the form only.
6  Isn't that what it said? It did.
7      MS. HOFFMANN: When this one rang, it was at a
8  critical moment, and now this.
9      MR. HONNOLD: Yeah, that's --
10      MS. HOFFMANN: It said, "Shut up, you're making
11  speaking objections."
12      MR. HONNOLD: There you go.
13      MS. HOFFMANN: "Brad is going to yell." Sorry.
14  BY MR. HONNOLD:
15      Q. Based upon your work on this case, do you have
16  any understanding as to how the level of plasma
17  concentration of Xarelto in a patient's blood is related
18  to the anticoagulant effect that the Xarelto is having
19  on the patient?
20      MS. WAY: Object to form.
21      THE WITNESS: I'm sorry, I don't.
22
23  BY MR. HONNOLD:
24      Q. Have you ever in your practice looked at --

Page 152

1  strike that.
2      Before you started working on this case, you
3  knew what a drug label was generally; right?
4      A. Yes.
5      Q. You knew that they existed and that every
6  medication had either what's called an approved label or
7  a package insert; right?
8      A. That's correct.
9      Q. Okay. And before you were retained on -- to
10  work on this case, in the course of your practice either
11  as part of educating yourself so that you could provide
12  care and treatment to patients or as part of actually
13  providing care to a patient, have you ever looked at a
14  drug label or a package insert before?
15      A. Not habitually. I have other sources where I
16  can get the information that I need.
17      Q. Okay. And so even though you've not -- you say
18  that you've not done it habitually, have you done it
19  episodically?
20      A. Those are almost the same words as far as the
21  context, and I would have to say that I get my source of
22  information on drugs from courses, articles, and also
23  devices, programs such as Epocrates which will give you
24  the information that I need quite quickly.

Page 153

1      Q. Would that include Xarelto?
2      A. No.
3      Q. Where have you gotten your information that you
4  know about Xarelto then if it's not been through the way
5  you just described?
6      A. The information that I got was on NOACs in
7  general.
8      Q. Okay. And the information that you got on
9  NOACs in general, did you get it through the process
10  that you just described?
11      A. If necessary, but remember I don't -- I don't
12  prescribe it.
13      Q. Okay.
14      A. So it's -- you know, it's not something I
15  needed to delve down deeply into.
16      Q. I've not been with you as you've practiced
17  medicine over the past few years, so I'm just trying to
18  figure out as it relates to NOACs, before you were
19  retained in this case, how was it that you got your --
20  or developed your understanding or knowledge base about
21  NOACs?
22      A. It was in general through review courses and
23  online review sources. I'll have to really admit to you
24  that I've never looked at a drug insert from any of the

39 (Pages 150 to 153)

Protected - Subject to Further Protective Review

Page 154

1 other NOACs.
2     Q.  Okay.  So before your -- before your work on
3 this case, you've never looked at the Xarelto label or
4 package insert; right?
5     A.  No, sir.
6     Q.  You've never looked at it for Eliquis; right?
7     A.  No.
8     Q.  You've never looked at it for Pradaxa?
9     A.  I had Epocrates on my phone.  I could put the
10 word in and dosage, adults, pediatrics.  That's my
11 source.
12     Q.  And I appreciate --
13     A.  And it's quick.
14     Q.  Just humor me on letting me go through the
15 list?
16     A.  Yes, sir.  I'm sorry.
17     Q.  So whatever the NOAC is in the family, however
18 many there are, you've not specifically looked at the
19 package insert of any of them; right?
20     A.  That's correct.
21     Q.  Now, you've listed the label -- one of the
22 forms of the label for Xarelto on your reference list.
23 It's Item No. 48.
24     A.  Uh-huh.

Page 155

1     Q.  How much of it did you or did you not look at
2 related to your work on this case in preparation of your
3 report?
4     A.  I superficially read some of the titles of it.
5 It was provided for me.
6     Q.  If you go to page 3 of your report, there is a
7 sentence that says, "A list of the materials that I have
8 relied upon in forming my opinions in this case is
9 attached as Exhibit A."  Do you see that?
10     MS. WAY:  Sorry.  What page?
11     MR. HONNOLD:  Page 3, the top paragraph.  It's
12 the sentence that starts "a list of materials."
13 It's about the middle of that top paragraph.
14     THE WITNESS:  Yes.
15 BY MR. HONNOLD:
16     Q.  Okay.  So the label is on Exhibit A, so how is
17 it that you've relied upon the label in forming your
18 opinions in this case?
19     A.  Well, it was basically one of the sources, the
20 articles, that I was -- it was -- it was one of the
21 parts of the materials that were provided to me by the
22 lawyers, and not all of them were used to form my
23 medical opinion.  My medical opinion was based on more
24 how I practice gastroenterology.

Page 156

1     Q.  I'm going to hand back to you Exhibit 4, which
2 is the September 2015 package insert for Xarelto, and
3 I'm going to specifically hand you the part that has --
4 includes page 9.  I've highlighted some things there.
5 Those highlighted sentences, can you -- can you read
6 those?
7     MS. WAY:  Just one second.
8     MR. HONNOLD:  Just to yourself.
9     MS. WAY:  What did you title this again?  I
10 know it's an exhibit, but I -- for some reason think
11 you misstated.
12     MR. HONNOLD:  Xarelto label September 2015.
13     MS. WAY:  Okay.  Thanks.
14     THE WITNESS:  Okay.
15 BY MR. HONNOLD:
16     Q.  And so do you see those highlighted sentences
17 where the phrase or term is used "rivaroxaban exposure"?
18     A.  (Indicating.)
19     Q.  "Or drug exposure."  Sorry.
20     The highlighting, the yellow.  So I think I've
21 highlighted kind of three areas in sentences that
22 include the term or phrase drug exposure.  Do you see
23 that?
24     A.  Okay.  Uh-huh.

Page 157

1     Q.  Yes?
2     A.  Yes.
3     Q.  As you read those sentences that use the term
4 or phrase "drug exposure," what does it mean to you,
5 that term?
6     A.  Basically, it means that a person has taken the
7 drug and it is active in their body.
8     Q.  Okay.  And then what is it about as you read in
9 the context of those highlighted areas, what is it about
10 certain situations that can result in increased drug
11 exposure?  What does that mean?
12     MS. HOFFMANN:  Objection.  Form.
13     THE WITNESS:  If you're referring to each of
14 the yellow highlights, exclusive of your
15 underlining --
16 BY MR. HONNOLD:
17     Q.  Yes.
18     A.  -- they are talking about the creatinine
19 clearance of the drug.
20     Q.  Okay.  And so what happens when the drug is
21 given to a patient with a certain level of creatinine
22 clearance suggested by that label?
23     MS. HOFFMANN:  Objection.
24     THE WITNESS:  These readings suggest that a

40 (Pages 154 to 157)

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 158

1    certain level of the creatinine clearance, if it is
2    low, may increase exposure to the drug.
3    BY MR. HONNOLD:
4        Q. Okay. And so increasing exposure to the drug,
5    what does that mean?
6        MS. HOFFMANN: Objection.
7        THE WITNESS: There may be more of the drug
8    around or there may be a delay in its metabolism.
9    BY MR. HONNOLD:
10       Q. Okay. And so we can agree then that an
11   increase in drug exposure may mean -- may mean more of
12   the drug around; correct?
13       MS. WAY: Objection.
14       THE WITNESS: Well, it's -- I think that's
15   probably dose-related.
16   BY MR. HONNOLD:
17       Q. Okay. And there it suggests it's
18   exposure-related; right?
19       MS. WAY: Objection.
20       MS. HOFFMANN: Objection.
21       THE WITNESS: I'm not reading that the same
22   way, sir.
23   BY MR. HONNOLD:
24       Q. All right. What's your understanding that if

Page 159

1    you give a group of patients who have had the same level
2    of general background and health and you give them the
3    same dose of the medication, will they all have the same
4    plasma concentration if it's measured two to four hours
5    later after they take their first dose?
6        MS. HOFFMANN: Objection.
7        MS. WAY: Objection.
8        THE WITNESS: There are a lot of parameters.
9    Are we talking about the normal, healthy people
10   here?
11   BY MR. HONNOLD:
12       Q. Yes.
13       A. And what age are they?
14       Q. Let's say age 60.
15       MS. HOFFMANN: Objection.
16       THE WITNESS: I can't give an opinion on that.
17   BY MR. HONNOLD:
18       Q. Okay. What's your expectation, that all those
19   people would have the same level of plasma concentration
20   or that it would vary?
21       MS. WAY: Object to form.
22       MS. HOFFMANN: Objection.
23       THE WITNESS: I don't know.
24   BY MR. HONNOLD:

Page 160

1        Q. Okay. As you read those highlighted sentences
2    and it talks about an increase in pharmacodynamic
3    effects, what does that mean to you?
4        MS. WAY: Object to form. Asked and answered.
5        MS. HOFFMANN: Objection.
6        THE WITNESS: You remember earlier I told you I
7    wasn't a pharmacology major and I'm not -- I'm not
8    into doing the pharmacodynamics.
9    BY MR. HONNOLD:
10       Q. Okay. And if you can -- if you just say you
11   don't know that's fine, I'll move on.
12       A. Yeah, that's fine with me. I don't know.
13       MS. WAY: Object to form.
14   BY MR. HONNOLD:
15       Q. Okay.
16       A. Would you like this back?
17       MR. HONNOLD: Did you get her "I don't know"?
18       THE COURT REPORTER: (Indicating.)
19       MR. HONNOLD: "I don't know." Great.
20   BY MR. HONNOLD:
21       Q. Do you know what the term "pharmadynamic
22   effects" means?
23       MS. HOFFMANN: Objection.
24       THE WITNESS: The effects, the dynamic effects,

Page 161

1    of a pharmacologic agent.
2    BY MR. HONNOLD:
3        Q. And so for Xarelto, what are the expected
4    pharmacodynamic effects of taking the drug?
5        MS. HOFFMANN: Objection.
6        THE WITNESS: I am not going to render opinion
7    on that.
8    BY MR. HONNOLD:
9        Q. And is it the same, that you don't know?
10       A. I am not going to render an opinion on that.
11       Q. Do you know what the pharmacodynamic effects of
12   Xarelto are?
13       MS. WAY: Object to form.
14       THE WITNESS: I am not an expert in
15   pharmacodynamics.
16   BY MR. HONNOLD:
17       Q. Do you think you need to be an expert in
18   pharmacodynamics to know what the expected
19   pharmacodynamics effects of Xarelto are?
20       MS. WAY: Object to form.
21       THE WITNESS: That's not the situation in which
22   I'm called into this case.
23       MS. HOFFMANN: You're making me nervous with
24   that exhibit, Brad. Can we put it back with the

41 (Pages 158 to 161)

Protected - Subject to Further Protective Review

Page 162

1    others?
2         MS. WAY: I think he has his bank account
3    number on it somewhere. Now everybody's got it.
4    BY MR. HONNOLD:
5         Q. You said before that the effects -- or
6    something along the lines that the NOACs are worked out
7    of the system quickly or something along those lines.
8    Do you remember that?
9         MS. WAY: Object to form.
10        THE WITNESS: That's a very generalized
11        statement. Can you tell me exactly what I said?
12   BY MR. HONNOLD:
13        Q. No, I can't, but do you remember generally
14   saying something along those lines?
15        A. Not exactly.
16        Q. Okay. I was asking you in the area about
17   whether you've ever been involved in deciding to reverse
18   a NOAC. And you said something along the lines, well,
19   they tend to go out of the system quickly. Do you
20   remember that?
21        A. I would have said that they may have had a
22   shorter half-life.
23        Q. Okay. And what's the significance of a NOAC
24   having a shorter half-life?

Page 163

1         A. Well, it means that the body's able to clear it
2    much quicker.
3         Q. And when the body clears the drug then, will it
4    stop having its effects?
5         A. Yes.
6         Q. And will it stop contributing to disruption of
7    the body's clotting cascade?
8         A. Possibly, yes.
9         Q. And will it stop contributing to a patient's
10   bleeding -- that the patient's having -- been having
11   bleeding as a result before?
12        MS. WAY: Object to form.
13        THE WITNESS: It depends upon what the cause of
14   the bleeding is.
15   BY MR. HONNOLD:
16        Q. At what point in time before February 13 could
17   Ms. Mingo's Xarelto have been stopped so that it would
18   have stopped having an effect on her clotting cascade?
19        MS. HOFFMANN: Objection.
20        MS. WAY: Object to form.
21        THE WITNESS: Well, we discussed half-life, and
22        usually a drug is completely metabolized in three
23        and a half half-lives.
24   BY MR. HONNOLD:

Page 164

1         Q. Okay. And so in three and a half half-lives
2    then as it relates to Xarelto, how far back would we
3    have to go back from the 13th then?
4         A. The documented half-life is from five to nine
5    hours, so either that range, you multiply that by 3.5
6    and you have an answer. In general, it's maybe one day
7    to two days.
8         Q. You told me that based upon your review of the
9    medical records and other materials in this case that
10   you felt the health care providers, including
11   Dr. Gholson, practiced within the standard of care
12   related to Ms. Mingo; correct?
13        A. In general, yes.
14        Q. And so your view then is that when Dr. Gholson
15   saw Ms. Mingo on February 3 and saw that her hemoglobin
16   was 8.2 on aspirin and on Xarelto, it was reasonable to
17   think at that time that Ms. Mingo may well be stable
18   from that point forward and not have a further
19   deterioration in her hemoglobin; correct?
20        A. You would assume that, yes.
21        Q. Okay. Tell me why you would assume in her
22   situation that as of February 3 that you would assume in
23   that situation with positive stool tests as of that time
24   and with a hemoglobin of 8.2 and being on Xarelto and

Page 165

1    aspirin, why would it be reasonable for a physician to
2    presume that her patient, Ms. Mingo, would remain stable
3    and not realize a further drop in her hemoglobin going
4    forward?
5         MS. HOFFMANN: Objection. Incomplete
6         hypothetical.
7         THE WITNESS: That's actually a common
8         scenario. The patient was very stable when she was
9         seen by Dr. Gholson, and there was no active
10        bleeding that could be assessed. Her vital signs
11        were stable. That's quite common in
12        gastroenterology practices.
13   BY MR. HONNOLD:
14        Q. Okay. And the presumed source of the hemocult
15   positive stool was what?
16        A. We don't know. That's why she was referred to
17   a consultant to answer that question.
18        Q. But that positive hemocult stool test suggests
19   that she does have blood somewhere in her GI tract;
20   correct?
21        A. Somewhere, yes.
22        Q. Have you told me all the reasons why it would
23   be reasonable to assume -- to have assumed on February 3
24   that going forward Ms. Mingo was going to remain stable

42 (Pages 162 to 165)

Protected - Subject to Further Protective Review

Page 166

1  and not have further degradation of her hemoglobin?
2      A.  In general, I hit on the high points in that
3  she was stable, she walked in unassisted, she had no
4  obvious overt signs of instability.
5      Q.  If Ms. Mingo's Xarelto had been stopped on
6  February 3, how long would it have taken for it to have
7  stopped having an effect on her coagulation cascade?
8      A.  As I answered earlier, three and a half
9  half-lives would be in general, the time frame.
10     Q.  So the same -- the same formula works on a
11 prospective basis as well going forward?
12     A.  Yes, sir.  But, again, though, remember she's
13 also on an antiplatelet agent, the aspirin.
14     Q.  As part of your work on this case, have you
15 reviewed any materials that were generated by the FDA
16 related to the approval of Xarelto for any of its
17 approved indications?
18     A.  Not specifically from the FDA.
19     MS. HOFFMANN:  I'm sorry.  Can you repeat the
20 question?  Just read it back.
21     (The question was read by the reporter.)
22     MS. HOFFMANN:  I assume you're not including
23 the label that you've marked as exhibit whatever?
24 You're talking about other documents.

Page 167

1      MR. HONNOLD:  Other than the label.
2      THE WITNESS:  Okay.
3  BY MR. HONNOLD:
4      Q.  The answer is still no?
5      A.  Correct.
6      Q.  Why would -- well, strike that.  I've asked
7  you.  I get it.
8      MR. HONNOLD:  Oh, sorry.  What did you say?
9      MS. HOFFMANN:  I think she's getting tired.
10     MR. HONNOLD:  Do you want to take a little
11 break?
12     MS. HOFFMANN:  Do you want some coffee?
13     MR. HONNOLD:  Let's go off the record real
14 quick.
15     THE VIDEOGRAPHER:  The time now is 7:57 p.m.
16 We are off the record.
17     (Recess from 7:57 p.m. until 8:09 p.m.)
18     THE VIDEOGRAPHER:  This begins Disk 4 of
19 today's deposition.  The time now is 8:09 p.m.  We
20 are back on the record.
21 BY MR. HONNOLD:
22     Q.  Now, Doctor, we're back on the record after a
23 short break.  Go to page 6, please, in your report.
24     A.  I'm there.

Page 168

1      Q.  If you go to the middle paragraph, or,
2  actually, it's the paragraph that begins with the phrase
3  "on February 12, 2015."  Do you see that?
4      A.  Yes, sir.
5      Q.  The last sentence in that paragraph says,
6  quote, "That same afternoon Ms. Mingo was diagnosed with
7  an acute upper GI bleed."  Do you see that?
8      A.  Yes, sir.
9      Q.  And do you know who it was that made that
10 diagnosis?
11     A.  Dr. Casey -- Casey, excuse me.
12     Q.  And I take it that you agree with Dr. Casey's
13 diagnosis?
14     A.  That was her -- excuse me.  Yes.
15     Q.  And what does the phrase mean "acute upper GI
16 bleed"?  What does that mean to you as a
17 gastroenterologist?
18     A.  Well, it means that with her presentation there
19 were factors that were highly suggestive, and if you
20 look at the sentence that is in quotation, "Reports
21 black stools since January 9 and says she was put on
22 Xarelto around the 23rd of January."
23     Q.  But what does the phrase "acute upper GI bleed"
24 mean?

Page 169

1      A.  The "acute" part of it was the notation of what
2  her hemoglobin was, but that was basically how I worded
3  it, and that was consistent with what the diagnosis was
4  in the ER.
5      Q.  So the phrase "acute upper GI bleed" in that
6  sentence, were those words -- was that your choice of
7  words or did it come from --
8      A.  It wasn't in quotations, so it could have been
9  on the records from Dr. Casey, but it means that a GI
10 bleed that had occurred over a shorter period of time.
11     Q.  And because it's not in quotations, it means
12 you picked the words in that sentence; correct?
13     A.  I wrote the sentence.
14     Q.  Okay.  And had the ability to pick whatever
15 words you wanted to use; right?
16     A.  Yes.
17     Q.  And those are the ones you chose?
18     A.  That's correct.
19     Q.  Because you felt that they were right and
20 appropriate under the circumstances; correct?
21     A.  And also there was evidence from the medical
22 records that she had had a change in her hemoglobin.
23     Q.  At some point in your report you state that you
24 agree with some doctor -- doctor's testimony that

43 (Pages 166 to 169)

Protected - Subject to Further Protective Review

Page 170

1  Ms. Mingo's bleeding would have been the same if she
2  would have been on some other NOAC or other
3  anticoagulant.  Do you recall saying that somewhere in
4  your report?
5      A.  Could you point that out for me, please?
6      Q.  Sure, yes.
7      MS. WAY:  I think it's the top of page 12.
8      Well, first paragraph underneath the heading.
9  BY MR. HONNOLD:
10     Q.  If you go to that first paragraph under --
11  actually, the first full paragraph on page 12, you see
12  the sentence that reads, quote, "I further agree with
13  Dr. Keith's testimony that Ms. Mingo's clinical course
14  would not have been any different had she taken a
15  different anticoagulant."  Did I read that correctly?
16     A.  That is correct.
17     Q.  Okay.  Tell me what all the bases are for
18  support that you rely upon for that statement.
19     A.  Because it's really supported by the medical
20  literature.
21     Q.  Which medical literature?
22     A.  Anticoagulants as a general class can cause
23  bleeding.
24     Q.  Well, you've --

Page 171

1      A.  We as gastroenterologists don't really do a
2  whole lot of subcategorizing when a person comes in on
3  an anticoagulant.  Our job is to identify the source of
4  bleeding.
5      Q.  Well, that's why I'm trying to understand
6  exactly what are the specific bases for that opinion.
7  What are all the things that you rely upon?  Is it
8  specific articles, specific entries in the medical
9  record, what are all your specific bases for that -- for
10 that statement?
11     A.  It's based on a 30-year history of practice in
12  gastroenterology and my clinical experience in this
13  field.
14     Q.  For how long prior to February 13 had Ms. Mingo
15  been taking aspirin?
16     A.  She'd been on it quite a while.
17     Q.  And what was the -- your understanding as to
18  the indication as to why she was on aspirin?
19     A.  I'm not exactly clear, but I would think that
20  it also provides some anticoagulation and she had had a
21  clot.
22     Q.  Is it your understanding then that Ms. Mingo
23  was -- was -- had only been given aspirin for --
24     A.  No, she was given an anticoagulant.  She'd had

Page 172

1  Lovenox and aspirin.
2      Q.  Let me finish my question.  So is it your
3  understanding in terms of Ms. Mingo's medical history
4  that she had not been taking daily aspirin before her
5  hip surgery?
6      A.  She had been taking low dose aspirin --
7      Q.  Why?
8      A.  -- for quite a while.
9      Q.  What was the indication?  That's where I was
10  going with my question.
11     A.  Well, you know, she had osteoarthritis, but
12  some physicians prescribe it prophylactically.
13     Q.  And that's my point.  Based upon your review of
14  her medical records, what was the indication as to why
15  she was taking long-term low dose aspirin?
16     A.  Well, sir, I take a low dose of aspirin because
17  of its cardioprotective effects, but I can't
18  specifically tell you in this situation, but she has
19  taken it long-term as revealed in the medical records.
20     Q.  And so that's my question.  Based upon the
21  medical records reviewed, is there any statement
22  anywhere that specifies the indication as to why she'd
23  been on long-term low dose aspirin, whether it's primary
24  cardioprotection, secondary prevention, some other

Page 173

1  reason?
2      A.  I would have to comb the records to look for
3  that specific reason.
4      Q.  And you don't state it anywhere affirmatively
5  in your report; correct?
6      A.  Not for the low dose aspirin.
7      Q.  Does the label for Xarelto suggest anywhere
8  that when Xarelto is given for the treatment of DVT that
9  it should be given in combination with full
10  325-milligram aspirin?
11     A.  I think that the label dealt with it
12  independently.
13     Q.  Here's my question:  Does the label anywhere
14  for the DVT treatment indication suggest that if Xarelto
15  is going to be given for that purpose that it should
16  also be given with 325-milligram aspirin?
17     A.  And my answer was that this label dealt with it
18  independently.
19     Q.  What does that mean?
20     A.  It means that it addressed Xarelto.
21     Q.  Meaning the indication states that it can be
22  given independent or without aspirin for treatment of
23  DVT; correct?
24     A.  No, sir.  Those were your words.  It refers to

44 (Pages 170 to 173)

Protected - Subject to Further Protective Review

Page 174

1  how Xarelto is used to treat different scenarios when
2  anticoagulation is needed.
3      Q.  Okay.  Does the label suggest that if Xarelto
4  is to be given for DVT treatment that it should also be
5  given along with aspirin?  Does the label state that?
6      A.  I'm not exactly certain of that, sir, but I
7  don't think so.
8      Q.  Who was it exactly based upon your reading of
9  the records that was kind of in charge of the situation
10  and suggested that Ms. Mingo go back -- be given
11  325-milligram aspirin at the same time she was taking
12  Xarelto?  Who was that?
13      A.  It would have been the physician that was in
14  the hospital when she had the DVT, if I'm correct.
15      Q.  And your view is that's consistent with and
16  within the standard of care for treatment of DVT to give
17  15 milligrams of Xarelto twice daily in combination with
18  325-milligram aspirin?
19          MS. WAY:  Object to form.
20          THE WITNESS:  I'm sorry, I'm not an expert in
21  treating DVTs.
22  BY MR. HONNOLD:
23      Q.  Okay.  So you don't know whether that's within
24  the standard of care or not?

Page 175

1      A.  No, I don't.
2      Q.  Okay.  So when I asked you before whether it
3  was your view that all the health care providers acted
4  within the standard of care, and you said yes, there
5  would be some qualification to that because there were
6  some -- some health care providers that you don't
7  necessarily feel qualified on passing as to whether they
8  met the standard of care or not; right?
9          MS. WAY:  Object to form.
10          THE WITNESS:  Now, you -- I basically gave a
11  qualifier when I gave my answer.  I said within a
12  reasonable standard of care, and I think that's
13  pretty well documented on the records.
14  BY MR. HONNOLD:
15      Q.  So you think all of the health care providers,
16  everyone met a reasonable standard of care; is that
17  right?
18          MS. WAY:  Object to form.
19          THE WITNESS:  That's what I stated.
20  BY MR. HONNOLD:
21      Q.  Okay.  And that's true as it relates to the
22  prescription of 325-milligram aspirin along with
23  Xarelto?
24          MS. WAY:  Object to form.

Page 176

1          THE WITNESS:  I'm not sure because as I stated
2  previously, I don't treat DVTs.
3  BY MR. HONNOLD:
4      Q.  Okay.  So is it true that you can't speak to
5  the standard of care then as it relates to prescribing
6  aspirin with anticoagulation in the context of DVT
7  treatment?
8          MS. WAY:  Object to form.
9      A.  If I don't -- I'm sorry.  If I don't treat a
10  specific entity, I'm not going to be able to give an
11  opinion on that.
12      Q.  Okay.  It's getting late, okay, and this is a
13  question that's going to be kind of pretty specific.
14  Okay?  So when I ask you the question, if you don't
15  understand it or don't track it, ask me to restate it.
16  Okay, and I'll do my best.
17          But here's the question:  Anywhere in your
18  report do you comment on -- do you comment on whether or
19  not Ms. Mingo would have had her acute GI bleed that was
20  diagnosed on February 13 if her Xarelto and aspirin had
21  been discontinued on February 3?  Do you comment on that
22  issue one way or the another in your report?
23          MS. WAY:  Object to form.
24          THE WITNESS:  I don't -- I'm sorry.  I don't

Page 177

1  reference that point at all in my report.
2  BY MR. HONNOLD:
3      Q.  And do you reference anywhere or at all in your
4  report whether or not Ms. Mingo would have had her acute
5  GI bleed that was diagnosed on February 13 if she had
6  not been on aspirin for the many days prior to
7  February 13?
8          MS. WAY:  Object to form.
9  BY MR. HONNOLD:
10      Q.  Do you comment on that issue one way or the
11  other?
12      A.  Restate the question.
13      Q.  Sure.  In your report, do you comment on the
14  issue one way or the other as to whether Ms. Mingo would
15  have had her acute GI bleed that was diagnosed on
16  February 13 if her aspirin would have been stopped on
17  February 3?
18      A.  You have a lot of parts to that question.
19      Q.  Yeah.
20      A.  But your -- your focus has been on stopping
21  aspirin, the dates and the acute GI bleed, so that's a
22  very specific question, and you'd have to read the whole
23  report to see if I mentioned something about stopping
24  the aspirin.

Protected - Subject to Further Protective Review

Page 178

1    Q.  Okay.  And that's just --
2    A.  It's just, you know, there's a -- I wouldn't
3  have asked that question that way in my profession.
4    Q.  Okay.  My only question for you is:  You have
5  not stated an opinion one way or the other in the report
6  as to whether or not Ms. Mingo would have had the acute
7  GI bleed diagnosed on February 13 if the aspirin had
8  been stopped on the 3rd?  That's not something that you
9  comment on one way or the other; correct?
10   A.  Not that I know of.
11   Q.  Similarly, you do not comment in your report
12 one way or the other if Ms. Mingo would have had her GI
13 bleed, acute GI bleed that was diagnosed on February 13
14 if just her Xarelto had been discontinued on
15 February 3rd, you don't comment on that in your report
16 one way or the other; correct?
17   A.  No, sir.  The medical records basically say she
18 was on the drug until the 13th.
19   Q.  Do you know one way or the other whether a
20 higher plasma concentration level of rivaroxaban can
21 result in an increased risk of bleeding?
22       MS. WAY:  Objection.
23       MS. HOFFMANN:  Objection.
24       THE WITNESS:  I'm not a pharmacologist.

Page 179

1  BY MR. HONNOLD:
2    Q.  What is your understanding generally of how the
3  INR is used to manage patients on warfarin?
4    A.  INR is a monitoring lab that's used when people
5  are exposed to that drug.
6    Q.  And why is it used?
7    A.  Because it sets a therapeutic window for
8  whatever particular entity the physician is prescribing
9  it for.
10   Q.  And when you say sets a window, what do you
11 mean by that?
12   A.  The range in which the drug needs to be kept in
13 order to be effective.
14   Q.  And is effective the only concern with the
15 window, or is there also a --
16   A.  I'm sorry.
17       MS. WAY:  I missed that.
18       THE WITNESS:  Could you restate it?  I'm sorry.
19 BY MR. HONNOLD:
20   Q.  Sure.  In terms of the INR range for warfarin,
21 you said that it sets the range to keep the drug in so
22 it's effective.  Is there also a safety component to the
23 range, meaning the hope is to keep it within the range
24 to potentially reduce or manage the risk of bleeding as

Page 180

1  well?
2    A.  Well, what you want to do is to have it in a
3  range that's effective, and of course you don't want any
4  adverse effects from the medication.
5    Q.  And is that why there's an upper limit also put
6  on the range?
7    A.  There's a -- there's a range.
8    Q.  Okay.
9    A.  And it does vary according to whatever the
10 clinical entity is.
11   Q.  And why is it that in a particular patient that
12 you might not want the upper range of the INR to exceed
13 a certain level?
14   A.  Some physicians require that.  They may need
15 that degree of anticoagulation.
16   Q.  I know, but why might you not -- why don't you
17 want it to go beyond a certain level?
18       MR. HOFFMANN:  Objection.
19       THE WITNESS:  That would -- I'm sorry.  That
20 would have to be a question for that particular
21 prescribing physician.
22 BY MR. HONNOLD:
23   Q.  Have you ever managed patients' Coumadin in
24 your practice?

Page 181

1    A.  No, I haven't.
2    Q.  Do you agree that the issue of whether or not
3  to restart anticoagulation in a patient who has had an
4  acute gastrointestinal bleed is a decision that is
5  individualized based on the risks and benefits for the
6  specific patient as well as the patient's values and
7  preferences?
8    A.  That's a lot of parts to that question.
9    Q.  Okay.
10   A.  Could you take it by the -- the latter part of
11 the question, could you restate it?
12   Q.  Sure.  In terms of the decision as to whether
13 or not to restart anticoagulation in a patient who has
14 suffered an acute gastrointestinal bleed, would you
15 agree that that decision is individually based on the
16 risks and benefits for the specific patient as well as
17 the patient's values and preferences?
18   A.  Both of those things are pertinent, yes.
19   Q.  Okay.  And why is it that the patient's values
20 and preferences are pertinent to that decision?
21   A.  The patient always has control over their
22 medical decisions.
23   Q.  Do you have an understanding as to whether or
24 not Ms. Mingo continues to take aspirin for any reason?

46 (Pages 178 to 181)

Protected - Subject to Further Protective Review

Page 182

1    A.  What time frame are you talking about, sir?
2    Q.  The last time that you have looked at medical
3    records related to her or from reading her deposition?
4    A.  To my knowledge, I think she was prescribed
5    aspirin.
6    Q.  And at that time when she was prescribed
7    aspirin, do you know why it was continued to be
8    prescribed for her specifically?
9    A.  To my recollection, after documentation that
10   her ulcer had healed she had chosen not to restart the
11   Xarelto.
12   Q.  But my question is:  Do you know why the
13   decision was made to continue aspirin?
14   A.  I would assume that it was some type of
15   prophylaxis for further development of DVTs.
16   Q.  What is dyspnea?
17   A.  Dyspnea is a term to describe difficulty in
18   breathing.
19   Q.  Can hypovolemia be one possible cause of
20   dyspnea?
21   A.  Not necessarily.
22   Q.  Can it be?
23   A.  It could be.
24   Q.  How is it then that dyspnea -- or how is it

Page 183

1    that hypovolemia can cause or contribute to cause
2    dyspnea?
3    A.  Well, you see it's rare that hypovolemia by
4    itself is the cause of dyspnea.  Dyspnea means that the
5    patient is lacking oxygen and if they're anemic that
6    means that they don't have enough hemoglobin attached to
7    the red cell to appropriately oxygenate their blood.  So
8    that is independent of whether the person has
9    hypovolemia or euvolemia.  E-u-v-o-l-e-m-i-a.
10   Q.  So can a significantly reduced hemoglobin cause
11   dyspnea?
12   A.  In some settings, maybe.
13   Q.  And explain how in those settings where it can
14   happen, how it happens.  What's the pathophysiology
15   involved?
16   A.  Usually the patient is trying to exert
17   themselves walking or doing strenuous exercises or
18   things of that nature.
19   Q.  And is it due to the lack of or reduced oxygen
20   carrying capability of the blood that can contribute to
21   the dyspnea?
22   A.  Your oxygen demand has increased.  You're doing
23   something that physically exerts yourself.  If you're
24   sitting quietly, there won't be any dyspnea, but if you

Page 184

1    walk across the room you could -- you're asking your
2    body to generate more oxygen and therefore you develop
3    dyspnea because of those reasons.
4    Q.  As part of your work on this case, did you
5    specifically do medical literature search on trying to
6    identify all of the studies or papers that are out there
7    that compare, that take a comparative look at the rate
8    or incidence of gastrointestinal bleeding in patients on
9    NOACs?
10   A.  I looked at the general information.
11   Q.  Okay.  And for you to have looked at the
12   general information, would it be information that would
13   be included in the UpToDate articles?
14   A.  Yes, sir.
15   Q.  Okay.  So if you -- if you yourself did
16   searches or looked for that information, it would be
17   limited to the information that's in those UpToDate
18   articles; true?
19   A.  They're very complete, and the reason the
20   search engine is called UpToDate because it is a
21   review of the most current and strongly evidence-based
22   medicine that's available.
23   Q.  In terms of the articles that were sent to you
24   by counsel, do you have any idea of what search terms

Page 185

1    they used or how comprehensive the search was that
2    whoever it was that came up with that universe of
3    articles used to create that batch of stuff they sent to
4    you?
5        MS. WAY:  Object to form.
6        THE WITNESS:  No, sir.  I'm sorry.  No, sir,
7    I'm not privy to that information.
8    BY MR. HONNOLD:
9    Q.  Did you assume that it was comprehensive or not
10   comprehensive or you didn't think about it one way or
11   the other?
12   A.  I wouldn't have assumed that.
13   Q.  Have you ever been a plaintiff or a defendant
14   in a lawsuit?
15   A.  Have I ever been a plaintiff -- a defendant for
16   a plaintiff in a lawsuit?
17   Q.  No.  A defendant or a plaintiff.
18   A.  A defendant or a plaintiff?
19   Q.  Or a plaintiff in a lawsuit?
20   A.  Yes.
21   Q.  Tell me about them.
22   A.  I've had one lawsuit in my 30-year career.
23   Q.  Where you were a defendant?
24   A.  Yes.

47 (Pages 182 to 185)

Protected - Subject to Further Protective Review

Page 186

1    Q.  Okay.  And have you ever been a plaintiff in a
2  lawsuit?  Have you ever sued anyone related to anything?
3    A.  No, sir, not yet.
4    Q.  The case where you were a defendant, what were
5  the nature and circumstances of that case?
6    A.  The circumstance was an elderly lady who had a
7  colonoscopy, and during the procedure she had a tear in
8  her colon, which resulted in her going to the hospital
9  and having an operation to repair the tear.  She briefly
10  had an ICU stay and then recovered completely.
11    Q.  And what happened to the case?
12    A.  It was dismissed basically because there was no
13  merit in it.  I guess you could say I won that case.  I
14  may not be saying it right because I'm not a lawyer.
15    Q.  Was there a trial?
16    A.  Yes, it was.
17    Q.  There was a trial?
18    A.  Yes.
19    Q.  Where the jury found for you?
20    A.  Yes.
21    Q.  Okay.  Well, you won.
22    A.  I did win.
23    Q.  Okay.  Don't -- don't hesitate.  You won.
24    A.  I just don't know the terminology.

Page 187

1    Q.  Winning is good.  Was it appealed or something
2  to where that decision of the jury was overturned?
3    A.  It was not overturned.
4    Q.  In terms of the hospitals over the years where
5  you've had medical staff privileges, have you ever been
6  on the therapeutics committee?
7    A.  Back in Galveston.
8    Q.  And what would have been the end of that time?
9    A.  I was in Galveston from 1982 to 1997.
10    Q.  So you wouldn't have been on a
11  therapeutics committee since 1997?
12    A.  I am on a therapeutics committee now with an
13  insurance company.
14    Q.  Okay.  Tell me about that.
15    A.  I'm a member of a therapeutic -- pharmacy and
16  therapeutic committee for Blue Cross and Blue Shield of
17  Mississippi.
18    Q.  Okay.  And what is involved in that work?
19    A.  I advise on gastrointestinal drugs.
20    Q.  In terms of your work on this case, do you know
21  whether you specifically looked at any data from the
22  Bayer ODIXa-DVT Phase II clinical trial?
23    A.  I'm not -- I don't recall that specific title,
24  sir.

Page 188

1    Q.  Have you ever had your medical staff privileges
2  at any facility suspended, limited, revoked in any way?
3    A.  Only if I didn't sign my charts occasionally.
4    Q.  Okay.  Tell me about that.
5    A.  If there's a hospital where I didn't sign a
6  chart for a medical record, they might put me on
7  suspension until I signed my charts.
8    Q.  Other than those situations, have you ever had
9  your medical staff privileges limited, revoked or
10  suspended?
11    A.  No, sir.
12    Q.  Ever had any action taken on your license?
13    A.  No, sir.
14    Q.  Ever had a grievance or complaint filed against
15  you with the Mississippi Board of Healing Arts?
16    A.  Board of Healing Arts?
17    Q.  Whatever you call your licensing agency in
18  Mississippi.
19    A.  There may have been one.
20    Q.  What was it?
21    A.  Let's see.  I think the patient -- I really
22  can't remember, but I know I had to submit a report and
23  that -- it was deemed in my favor.  It was probably
24  about four or five years ago.

Page 189

1    Q.  Generally do you recall what the patient or the
2  patient's family was complaining about?
3    A.  The patient himself, I think, was complaining
4  about -- I just can't -- I can't recall.  I can't
5  recall.
6    Q.  Have you spoken with anyone who is employed by
7  Bayer or Janssen related to this case?
8    A.  Only the attorneys.
9    Q.  Okay.  Do you get called upon by sales
10  representatives from Bayer or Janssen for Xarelto?
11    A.  No, sir.
12    Q.  Other than what we've talked about so far, can
13  you tell me all the times when you have undertaken
14  consultative work for a pharmaceutical company?
15    A.  Probably about three.
16    Q.  Okay.  What are those -- what are those?
17    A.  I think I listed them earlier.  Silicone breast
18  implants, Propulsid, maybe Reglan.
19    Q.  What would you -- we hadn't talked about
20  Reglan.  What did you do on Reglan?
21    A.  I think it was a case about side effects of
22  Reglan, but I'm not exactly sure.  I'm not sure.  That
23  was in the remote past.
24    Q.  Can long-term use of Reglan cause tardive

**48 (Pages 186 to 189)**

Protected - Subject to Further Protective Review

Page 190

1    dyskinesia?
2        A.  Tardive?
3        Q.  Tardive dyskinesia.
4           MS. HOFFMANN:  Objection.
5           MS. WAY:  Object to form.
6           THE WITNESS:  Is this relevant to this case?
7    BY MR. HONNOLD:
8        Q.  No.  I just want to know.
9        A.  It's listed in the medical literature as one of
10   the side effects, and sometimes tardive dyskinesia can
11   be permanent.
12       Q.  What companies did you work for on the Reglan
13   litigation?
14       A.  That's what I said, I can't -- I can't
15   remember.
16       Q.  When's the last time you did work on a Reglan
17   case?
18       A.  It had to be over seven to 10 years ago, if at
19   all.
20       Q.  Currently do you prescribe Reglan long-term for
21   patients?
22       A.  I try not to.
23       Q.  Why?
24       A.  Because of the side effects.

Page 191

1        Q.  Including movement disorders?
2        A.  That's usually one of the them.
3        Q.  Have you ever served on a pharmaceutical
4    company's speakers bureau?
5        A.  In the remote past.
6        Q.  Tell me about those situations.
7        A.  Well, you know, basically, I stopped doing that
8    once the Sunshine Act came into place, but in the past I
9    have spoken on proton pump inhibitors, speaker bureaus
10   mostly.
11       Q.  Which company specifically?
12       A.  There's so many.
13       Q.  Which ones did you work for?
14       A.  Let me think.
15       Q.  Okay.
16       A.  Probably the makers of Nexium or Prilosec.
17   There's something else I also did, but I can't exactly
18   be sure.  That wasn't something that I commonly did.
19       Q.  Are you currently doing any work for the makers
20   of Nexium or Prilosec?
21       A.  No, sir.
22       Q.  You said something about the Sunshine Act, that
23   you stopped doing that once the Sunshine Act came into
24   effect.  What did --

Page 192

1        A.  I basically stopped doing it before that
2    anyway.  Okay.  Well, what's the -- I don't get the
3        Q.  Okay.  Well, what's the -- I don't get the
4    connection.  Why did you say that there's -- you stopped
5    doing that when the Sunshine Act came into effect?
6           MS. WAY:  Object to form.  Are we talking about
7        consulting work generally?  What's your --
8           MR. HONNOLD:  We're just talking about she said
9        "Hey, I stopped doing that once the Sunshine Act
10       came into effect."
11          MS. WAY:  I know, but what is that?  What is
12       that?  I don't remember.
13   BY MR. HONNOLD:
14       Q.  I don't know either.  It was consultative
15   speakers bureau work that you did for pharmaceutical
16   companies.  You said you stopped doing it after the
17   Sunshine Act.
18       A.  I basically had stopped doing it before that.
19       Q.  What Sunshine Act are you talking about?
20       A.  You're not familiar with that?
21       Q.  No.  Tell me about it.
22       A.  Well, it's basically a reporting system that
23   pharmaceutical companies do for the government that
24   actually tracks the amount of reimbursement physicians

Page 193

1    get for multiple things, including speaking engagements.
2    But as I said earlier, I had stopped doing that much
3    earlier than when the Sunshine Act --
4        Q.  Okay.  So if we were going to have a do-over
5    then when you told me that that stopped at a certain
6    time, you wouldn't have said anything about the Sunshine
7    Act because they weren't related; right?
8        A.  Yeah, you know, that's just one emphasis.  A
9    lot of physicians stopped doing that.
10       Q.  Why?
11          MS. WAY:  Object to form.
12          THE WITNESS:  I don't know why they did, but I
13       just didn't need to do it.
14   BY MR. HONNOLD:
15       Q.  What would the Sunshine Act have to do with it?
16       A.  It was a public record that made physicians
17   look unfavorable because they were accepting money for
18   speaking engagements.  But there were a lot of things
19   that were included in that, including making and taking
20   their spouses on trips where there were lectures on
21   drugs and things of that nature.
22       Q.  And so you've heard some doctors say they'd
23   just as soon there not be a public record on that?
24          MS. HOFFMANN:  Objection.

49 (Pages 190 to 193)

Protected - Subject to Further Protective Review

Page 194

1    MS. WAY:  That mischaracterizes her testimony,
2  Brad.
3    THE WITNESS:  I didn't say that.  You said
4  that.
5  BY MR. HONNOLD:
6    Q.  Well, then why did you say that that was one
7  reason why they stopped doing it?
8    A.  I gave a generalization of what the Sunshine
9  Act disclosed.
10    Q.  But you've never said a doctor said that the
11  reason that they stopped doing speakers bureau work or
12  going on trips was because of the Sunshine Act?
13    A.  I don't -- no, I don't usually talk to doctors
14  about why they do speakers' benefits.
15    MR. HONNOLD:  Okay.  Hey, thanks for your time
16  and courtesy.  It was nice to meet you.  Wish you
17  the best.  Take care.
18    MS. WAY:  Can we stay on the record for one
19  second?
20    THE VIDEOGRAPHER:  Do you want to go off the
21  record?
22    MS. WAY:  Go off for one second.
23    THE VIDEOGRAPHER:  The time is 8:43 p.m.  We
24  are off the record.

Page 195

1    (Recess from 8:43 p.m. until 8:44 p.m.)
2    THE VIDEOGRAPHER:  The time is now 8:44 p.m.
3  We are back on the record.
4    MS. WAY:  Can I attach this as an exhibit to
5  the deposition?  This is her updated reference list
6  that you incorporated into her report.  I just
7  wanted to have a clean copy to reflect that this is
8  the revised reference list.  I wanted to attach
9  that --
10    MR. HONNOLD:  Do you want me to put the old one
11  then back in there?
12    MS. WAY:  No.  I just want the record to
13  reflect that that's the revised copy.  I just want
14  to attach that as an exhibit.
15    MR. HONNOLD:  Okay.  Well, I get it's revised
16  from what?  I kind of want it to show what it was
17  revised from then so that the record's clear as
18  to --
19    MS. WAY:  That's fine too.
20    MR. HONNOLD:  -- what it was changed from.  So
21  just so it's clear on the record then, we're going
22  to mark as Exhibit No. --
23    MS. WAY:  5.
24    MR. HONNOLD:  -- 5 a copy of the revised

Page 196

1  reference list, which already is included in the
2  current copy of Exhibit 2.
3    (Reeves-Darby Exhibit No. 5 was marked for
4  identification.)
5    MR. HONNOLD:  And then just so the record is
6  very clear, I am then going to mark as Exhibit 6 the
7  copy of the reference list that we originally
8  removed --
9    MS. WAY:  That's fine.
10    MR. HONNOLD:  -- from Exhibit 2, just so it's
11  very clear.  With that, I think we're done.  Thank
12  you.
13    (Reeves-Darby Exhibit No. 6 was marked for
14  identification.)
15    MS. WAY:  Okay.
16    THE VIDEOGRAPHER:  The time is now 8:45 p.m.
17  Today's deposition of Dr. Vonda Reeves-Darby,
18  consisting of four disks, is now concluded.
19    (Whereupon, the deposition concluded at
20  8:45 p.m.)
21
22
23
24

Page 197

1       C E R T I F I C A T E
2
3    I, JOAN L. PITT, Registered Merit Reporter,
4  Certified Realtime Reporter, and Florida Professional
5  Reporter, do hereby certify that, pursuant to notice,
6  the deposition of VONDA G. REEVES-DARBY, MD, was duly taken
7  on February 15, 2017, at 4:11 p.m., before me.
8    The said VONDA G. REEVES-DARBY, MD, was duly sworn
9  by me according to law to tell the truth, the whole
10  truth, and nothing but the truth, and thereupon did
11  testify as set forth in the above transcript of
12  testimony.  The testimony was taken down
13  stenographically by me.  I do further certify that the
14  above deposition is full, complete, and a true record of
15  all the testimony given by the said witness.
16
17   _____
18    JOAN L. PITT, RMR, CRR, FPR
19
20    (The foregoing certification of this transcript
21  does not apply to any reproduction of the same by any
22  means, unless under the direct control and/or
23  supervision of the certifying reporter.)
24

50 (Pages 194 to 197)

Protected - Subject to Further Protective Review

Page 198

INSTRUCTIONS TO WITNESS

1
2
3
4    Please read your deposition over carefully and
5  make any necessary corrections.  You should state the
6  reason in the appropriate space on the errata sheet for
7  any corrections that are made.
8
9    After doing so, please sign the errata sheet
10  and date it.  It will be attached to your deposition.
11
12    It is imperative that you return the original
13  errata sheet to the deposing attorney within thirty (30)
14  days of receipt of the deposition transcript by you.  If
15  you fail to do so, the deposition transcript may be
16  deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24

Page 200

ACKNOWLEDGMENT OF DEPONENT

1
2
3    I, _____, do hereby
4  acknowledge that I have read the foregoing pages,
5  1 - 201, and that the same is a correct transcription of
6  the answers given by me to the questions therein
7  propounded, except for the corrections or changes in
8  form or substance, if any, noted in the attached Errata
9  Sheet.
10
11
12  _____  _____
13  VONDA G. REEVES-DARBY, MD         DATE
14
15
16
17
18  Subscribed and sworn to before me this
19  _____ day of _____, 20___.
20  My Commission expires: _____
21
22  _____
23  Notary Public
24

Page 199

1    - - - - - -
2       E R R A T A
3    - - - - - -
4  PAGE LINE  CHANGE
5  ____ ____ _____
6    REASON: _____
7  ____ ____ _____
8    REASON: _____
9  ____ ____ _____
10    REASON: _____
11  ____ ____ _____
12    REASON: _____
13  ____ ____ _____
14    REASON: _____
15  ____ ____ _____
16    REASON: _____
17  ____ ____ _____
18    REASON: _____
19  ____ ____ _____
20    REASON: _____
21  ____ ____ _____
22    REASON: _____
23  ____ ____ _____
24    REASON: _____

Page 201

LAWYER'S NOTES

1
2  PAGE  LINE
3  ____ ____ _____
4  ____ ____ _____
5  ____ ____ _____
6  ____ ____ _____
7  ____ ____ _____
8  ____ ____ _____
9  ____ ____ _____
10  ____ ____ _____
11  ____ ____ _____
12  ____ ____ _____
13  ____ ____ _____
14  ____ ____ _____
15  ____ ____ _____
16  ____ ____ _____
17  ____ ____ _____
18  ____ ____ _____
19  ____ ____ _____
20  ____ ____ _____
21  ____ ____ _____
22  ____ ____ _____
23  ____ ____ _____
24  ____ ____ _____