Protected - Subject to Further Protective Review

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

--------------------------------§
IN RE:  XARELTO (RIVAROXABAN)    § MDL NO. 2592
PRODUCTS LIABILITY LITIGATION    §
                                 § SECTION L
                                 §
THIS DOCUMENT RELATES TO:        § MAG. JUDGE NORTH
DORA MINGO, NO. 15-03469         §
                                 §
_____  §

- - -

THURSDAY, FEBRUARY 9, 2017

- - -

PROTECTED - SUBJECT TO FURTHER

PROTECTIVE REVIEW

- - -

        Videotaped deposition of BRIAN E. PERSING, M.D.,
held at the Hilton Garden Inn, 14108 Airport Way,
Gulfport, Mississippi, commencing at 8:48 a.m.,
on the above date, before Kelly J. Lawton,
Registered Professional Reporter, Licensed Court
Reporter, and Certified Court Reporter.

- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Protected - Subject to Further Protective Review

## Page 2

APPEARANCES:
LEVIN PAPANTONIO THOMAS MITCHELL RAFFERTY &
PROCTOR, P.A.
BY:  NED McWILLIAMS, ESQUIRE
316 South Baylen Street, Suite 600
Pensacola, Florida 32502
(850) 435-7000
nmcwilliams@levinlaw.com
Representing Plaintiffs

DOUGLAS & LONDON, P.C.
BY:  LARA J. SAY, ESQUIRE
59 Maiden Lane, 6th Floor
New York, New York 10038
(212) 566-7500
lsay@douglasandlondon.com
Representing Plaintiffs

MITCHELL WILLIAMS
BY:  MARY CATHERINE WAY, ESQUIRE
425 West Capitol Avenue, Suite 1800
Little Rock, Arkansas 72201
(501) 666-8890
mway@mwlaw.com
Representing Defendant Bayer

SCHWABE, WILLIAMSON & WYATT
BY:  MARGARET HOFFMANN, ESQUIRE
1211 Southwest 5th Avenue, Suite 1900
Portland, Oregon 97204
mhoffmann@schwabe.com
Representing Defendant Janssen

IRWIN, FRITCHIE, URQUHART & MOORE, LLC
BY:  CLAIRE A. NOONAN, ESQUIRE
400 Poydras Street, Suite 2700
New Orleans, Louisiana 70130
(504) 310-2100
cnoonan@irwinllc.com
Representing Defendant Janssen

ALSO PRESENT:
   Melissa Bardwell, Videographer

## Page 3

- - -
I N D E X
- - -
Testimony of:  BRIAN E. PERSING, M.D.
   DIRECT EXAMINATION BY MR. McWILLIAMS.......... 5

E X H I B I T S

PERSING                          PAGE
Exhibit 1   Brian Persing, M.D. Expert Report      8
Exhibit 2   Figures for Dora Mingo's Hemoglobin    8
            Values

Exhibit 3   Xarelto Label                         30

## Page 4

- - -

THE VIDEOGRAPHER:  We are now on the record.
My name is Melissa Bardwell, videographer, here
for Golkow Technologies.  Date today is
February 9th, 2017.  The time is approximately
8:48 a.m.  This videotaped deposition is being
held in Gulfport, Mississippi, in reference to
the Xarelto (Rivaroxaban) Products Liability
Litigation.  The deponent today is Brian Persing,
M.D.
   Would counsel present please introduce
themselves and state your affiliations for the
record.
   MR. McWILLIAMS:  Ned McWilliams for the
plaintiffs.
   MS. SAY:  Lara Say for the plaintiffs.
   MS. WAY:  Mary Catherine Way on behalf of
Bayer.
   MS. NOONAN:  Claire Noonan on behalf of the
Janssen defendants.
   MS. HOFFMANN:  Margaret Hoffmann on behalf of
the Janssen defendants.
   THE VIDEOGRAPHER:  The court reporter today
is Kelly Lawton, who she will now swear in the
witness.

## Page 5

THE COURT REPORTER:  Doctor, would you please
raise your right hand.
   Do you swear or affirm the testimony you're
about to give will be the truth, the whole truth,
and nothing but the truth?
   THE WITNESS:  I do.
   THE COURT REPORTER:  Thank you.
   BRIAN E. PERSING, M.D., called as a witness
by the Plaintiff, having been first duly sworn,
testified as follows:
      DIRECT EXAMINATION
BY MR. McWILLIAMS:
   Q.  Good morning, Doctor.
   A.  Good morning.
   Q.  Would you please state your full name for the
record?
   A.  Brian Edward Persing.
   Q.  And you're a doctor; is that correct?
   A.  Correct.
   Q.  You're a medical doctor?
   A.  Correct.
   Q.  And you're a hematologist; is that correct?
   A.  I am.
   Q.  Are you a board-certified in hematology?
   A.  I am.

Protected - Subject to Further Protective Review

Page 6

1    Q. Are you board-certified in any other
2  specialities?
3    A. Oncology.
4    Q. Any others?
5    A. I'm -- I've been board-certified in internal
6  medicine. I'm no longer maintaining that
7  certification.
8    Q. Okay. And how long have you maintained your
9  board-certification in hematology?
10    A. Since I completed my fellowship training,
11  about seven and a half years now.
12    Q. Okay. And just generally speaking, what
13  is -- what is hematology? How would you describe
14  that to a -- a layperson?
15    A. Hematology is the study and the treatment of
16  blood-related disorders. Those include benign
17  things, considered nonmalignant such as clotting and
18  hemostasis, but also include the treatment of
19  lymphomas and leukemias.
20    Q. Okay. Have you ever before been asked to
21  determine what the cause of whether or not a person's
22  gastrointestinal bleed was the result of their
23  exposure to an oral anticoagulant?
24    A. I've never been asked formally to determine
25  whether or not they were associated. I've been

Page 7

1  involved in their care from a clinical standpoint,
2  which obviously would include assessing whether or
3  not a bleed was related to an anticoagulant that they
4  were on.
5    Q. Okay. What were you asked to do in this
6  matter, in this case?
7    A. I was asked to review Mrs. Mingo's history
8  and essentially help educate Mrs. Hoffmann and -- and
9  their group as to -- from a hematologic standpoint,
10  kind of what took place.
11    Q. Okay. And have you ever served as an expert
12  witness before?
13    A. I have not.
14    Q. Have you ever had your deposition taken
15  before?
16    A. I have not.
17    Q. Okay. Are you offering any expert opinions
18  in this case?
19    A. I -- I have. I've rendered a medical
20  statement in this opinion -- regarding my medical
21  opinions, yes.
22    Q. And are all of your opinions contained in
23  your export report?
24    A. They are.
25      MR. McWILLIAMS: Let's go ahead and mark that

Page 8

1  as Exhibit 1, please.
2      (Persing Exhibit 1 was marked for
3  identification.)
4  BY MR. McWILLIAMS:
5    Q. And if you would just hang on to the version
6  that has the sticker --
7    A. Sure.
8    Q. -- on it.
9    A. Okay.
10    Q. And if you would be so kind as to pass these
11  to counsel --
12    A. Sure.
13    Q. -- so they can have another copy.
14      And can you please just identify this for us,
15  just for the benefit of the record --
16    A. Sure.
17    Q. -- just confirm, in fact, that this is a
18  complete and accurate copy of your expert report in
19  the Mingo case?
20    A. This -- yes, this looks like my complete
21  report for the Mingo case.
22      MR. McWILLIAMS: And let's go ahead and mark
23  this as Exhibit 2.
24      (Persing Exhibit 2 was marked for
25  identification.)

Page 9

1  BY MR. McWILLIAMS:
2    Q. And I'll just -- for the record, this is --
3    A. You want me keep that? Yeah.
4    Q. Okay. If you could --
5    A. You can keep that because that's -- yeah. So
6  that's -- that's -- that's just the -- the figures
7  with actual data, as opposed to the figure in the
8  report that had no data points on it -- or it had the
9  data points but not the numbers for the data points.
10    Q. Okay. And I should have done this at the
11  beginning --
12    A. Sorry.
13    Q. It's important for the benefit of the court
14  reporter, it's best for you to let me finish my
15  question before you begin your answer. And I'll do
16  my best to let you finish your answer before I start
17  my next question; okay?
18    A. Yes, sir.
19    Q. And it's also good for you to always
20  verbalize your responses. We can't -- the shrug of
21  the shoulders or -- it's not a normal conversation,
22  so try to give affirmative or definitive answers
23  verbally to the court reporter; okay?
24    A. I will do that.
25    Q. Thank you.

3 (Pages 6 to 9)

Protected - Subject to Further Protective Review

Page 10

1    Now, Exhibit 2, I understood this is -- this
2  is what should have been contained in your original
3  report; is that correct?
4    A.  Correct.
5    Q.  Okay.  And Exhibit 2 essentially shows
6  Ms. Mingo's hemoglobin values over time; is that
7  correct?
8    A.  That's correct.
9    Q.  And if I'm reading this chart correctly, her
10 hemoglobin values were at their lowest point
11 immediately after her exposure to Xarelto; is that
12 correct?
13   A.  That's correct.
14   Q.  Okay.  And do you -- so is it fair to say
15 that this drop in hemoglobin values is, in fact,
16 associated with her exposure to Xarelto?
17   A.  It was --
18     MS. WAY:  Object to form.
19     THE WITNESS:  It was associated with her
20 gastric bleed.
21 BY MR. McWILLIAMS:
22   Q.  Okay.  And do you believe her gastric bleed
23 was associated with her use of Xarelto?
24   A.  I think that the Xarelto added to the rate of
25 her gastric bleed, yes.

Page 11

1    Q.  Okay.  And by "the rate," you mean the -- the
2  magnitude and the -- the -- the severity?
3    A.  I think that as with any anticoagulation,
4  it's going to impair the body's ability to slow
5  bleeding, so it affects hemostasis and would increase
6  the rate of bleed.
7      MS. HOFFMANN:  Counsel, before we go too much
8    further, can we agree that an objection by one
9    lawyer is an objection for both the defendants?
10     MR. McWILLIAMS:  Yes, ma'am.
11     MS. HOFFMANN:  Thank you.
12 BY MR. McWILLIAMS:
13   Q.  In your report, you use the word "potentiate"
14 to describe the affect of Xarelto on Ms. Mingo's
15 bleed; is that correct?
16   A.  Correct.
17   Q.  And that means to exacerbate or make worse;
18 is that correct?
19   A.  I think to make -- to make clinically
20 significant.
21   Q.  Okay.  So would it be fair to say that
22 Mrs. Mingo's GI bleed would not have been clinically
23 significant but for her use of Xarelto?
24     MS. WAY:  Object to form.
25     THE WITNESS:  I don't -- sorry -- I --- I

Page 12

1    don't know the answer to that.
2  BY MR. McWILLIAMS:
3    Q.  Well, and I agree, no one really truly knows,
4  but we can deal in possibilities.  Just using your,
5  you know, your medical judgment, your training,
6  experience, and education, and given what --
7  everything you know about Ms. Mingo, her -- her
8  history, her -- how she did on aspirin, Lovenox,
9  warfarin, relative to Xarelto, would you agree with
10 me that it's more likely than not that her use of
11 Xarelto exacerbated her gastrointestinal bleed?
12     MS. HOFFMANN:  Objection; form.
13     THE WITNESS:  I believe that her gastric
14 ulcer was the cause of her bleed.  She had
15 co-administration of both aspirin and Xarelto at
16 the time.  And I think that a combination of all
17 of those three led to her bleed.  I think
18 isolating one of those as the cause is extremely
19 difficult to do.
20 BY MR. McWILLIAMS:
21   Q.  Well, you would agree with me she had a
22 history of being on aspirin prior to being on Xarelto
23 that did not result in a clinically significant
24 gastrointestinal bleed; correct?
25   A.  So she was previously on aspirin at

Page 13

1    81 milligrams.  She was continued at 325 milligrams,
2  which is a higher dose, than she had previously been
3  on.
4      In addition to that, within the -- within the
5  package insert of Xarelto, it actually comments that
6  there is a potentiation of bleeding when aspirin is
7  used concomitantly with Xarelto.
8      So while the aspirin may have carried with it
9  a small risk and the Xarelto a risk as well, the two
10 together would carry with them higher than an
11 additive risk for both of those.
12   Q.  So you believe there's a synergistic risk of
13 bleeding when you combine aspirin with Xarelto?
14   A.  I think that's --
15     MS. HOFFMANN:  Objection to form.
16     THE WITNESS:  I think that's alluded to
17 within the package insert as increased risk of
18 bleeding associated with those two being given --
19 BY MR. McWILLIAMS:
20   Q.  So -- so you believe --
21   A.  -- together.
22   Q.  Excuse me.
23     So you believe the Xarelto package insert
24 states in sum or substance that there's a synergistic
25 effect between aspirin and Xarelto use with respect

4 (Pages 10 to 13)

Protected - Subject to Further Protective Review

Page 14

1  to the risk of major bleeding?
2       MS. HOFFMANN: Objection; form.
3       THE WITNESS: It doesn't state that there's a
4  synergistic effect. It states that there is
5  increased effect of bleeding when the two are
6  administered together.
7  BY MR. McWILLIAMS:
8       Q. Is it your opinion that there's a synergistic
9  effect?
10      A. I believe there is a synergistic effect.
11      Q. And what's the basis for that opinion?
12      A. So Xarelto works by inhibiting Factor Xa;
13  aspirin works by inhibiting platelet function.
14      When we start to bleed, the initial response
15  of the body is to form what we call a platelet plug,
16  okay. That is followed up by the coagulation cascade
17  that allows that clot to form.
18      And so when we interfere with both aspects of
19  our ability to achieve hemostasis, we end up with a
20  higher risk of bleeding.
21      Q. And I understand you mechanistically that
22  that probably is 100 percent correct.
23      But have you seen any actual clinical trial
24  data that supports this opinion?
25      A. No.

Page 15

1       Q. Okay. Would -- if -- if, in fact, there was
2  a synergistic effect between aspirin and Xarelto use
3  with respect to the risk of major bleeding, would you
4  expect to see that -- those results in the clinical
5  trials --
6       MS. HOFFMANN: Objection.
7  BY MR. McWILLIAMS:
8       Q. For example, the patients who are on
9  co-administered aspirin and Xarelto, that they would
10  have a higher rate of bleeding than the parents that
11  were not also on aspirin?
12      MS. HOFFMANN: Objection to form.
13      THE WITNESS: Can you restate it? Sorry.
14  I'm not used to . . .
15      So people that are -- people -- would we see
16  something within the clinical trial showing --
17  I'm sorry. I got sidetracked.
18  BY MR. McWILLIAMS:
19      Q. If -- if your opinion is correct, would you
20  expect to see that pan out in the clinical trial
21  results?
22      A. So for DVT and pulmonary embolism,
23  co-administration of aspirin was not common. So I
24  think to try to isolate a subset, there would be very
25  difficult to do.

Page 16

1       Q. Well, have you looked into that?
2       A. No.
3       MS. HOFFMANN: Objection to form.
4       MR. McWILLIAMS: What's the form objection?
5       MS. HOFFMANN: You say "looked into that," I
6  don't know what you're referring to.
7  BY MR. McWILLIAMS:
8       Q. Have you looked into the clinical trial data
9  to see if there actually was an -- an increased risk
10  of major bleeding in patients that are
11  co-administered aspirin?
12      A. That, I mean, that's within the package
13  insert.
14      Q. I appreciate that.
15      A. Correct.
16      Q. I'm asking if you looked into any of the
17  clinical trial data.
18      A. The clinical trial data, to my knowledge,
19  didn't have the subset analysis looking at that.
20      Q. Okay. Would you agree that Ms. Mingo's
21  prothrombin time results were prolonged at the time
22  she was on Xarelto?
23      A. She had three separate prothrombin times:
24  One on arrival to the hospital; another one after
25  receiving ten milligrams of Coumadin, Lovenox, and

Page 17

1  Xarelto all within a 48-hour -- 36-hour period; and
2  then she had another one on presentation to the
3  hospital at the time that she had her bleed.
4       There was elevation of her PT at the second
5  and third times.
6       Q. Okay. And what is your explanation for those
7  prolongation of PT?
8       A. It's --
9       MS. HOFFMANN: Objection to form.
10      THE WITNESS: It's seen that with
11  administration of Coumadin, we can see elevation
12  in PT INR. And so that could be a result of the
13  first, okay.
14      We also know that there are certain assays
15  where we check PT, where Xarelto can alter that
16  value. And that could be an explanation for both
17  the second and the third values.
18      And she had evidence of bleeding, which can
19  consume coagulation proteins. And you can also
20  see elevation in a PT at those times where we
21  have consumption of the protein, so there's not
22  enough protein to -- to clot.
23  BY MR. McWILLIAMS:
24      Q. So you would agree that her exposure to
25  Xarelto was a contributing factor to the -- to her

5 (Pages 14 to 17)

Protected - Subject to Further Protective Review

Page 18

1    prolongation of her prothrombin time?
2        A.  I think that's a possibility.  I think there
3    are other possibilities as well.  I think, once
4    again, to exclude that from the Coumadin for the
5    second value and her bleed with the third value would
6    be difficult to do.
7        Q.  Well, what was the latency?  What was the
8    duration of time between her ingestion of the one
9    10-milligram pill of Coumadin and her subsequent
10   prothrombin time use?
11       A.  It was approximately two days.
12       Q.  Okay.  And do you believe that one
13   10-milligram pill of warfarin is capable of
14   prolonging PT to the degree observed in Mrs. Mingo?
15       A.  Normally, we wouldn't see a prolongation with
16   one dose of Coumadin at ten milligrams.  If somebody
17   is vitamin K deficient to begin with, they've been on
18   antibiotics, there's always a possibility that they
19   have a very rapid response.  But that wouldn't be
20   common for one dose to cause that.
21       Q.  All right.  So is it --
22       A.  But ten milligrams is a loading dose.
23       I'm sorry.
24       Q.  Right.
25       So if it's -- if it's atypical to see

Page 19

1    prolongation to the degree observed with Ms. Mingo
2    given just one 10-milligram loading dose of warfarin,
3    can we conclude that it's more likely than not that
4    the prolongation was -- can be attributable to her
5    use of Xarelto?
6        MS. HOFFMANN:  Objection to form.
7        MS. WAY:  Objection to form.
8        THE WITNESS:  I still think that's difficult
9        to say in that she received -- she still received
10       Coumadin prior to that.
11   BY MR. McWILLIAMS:
12       Q.  Okay.  But --
13       A.  To reach INR.
14       Q.  But you just testified a moment ago that it's
15   unlikely, it would be atypical for it to prolong it
16   to that degree; correct?
17       MS. WAY:  Object to the form.
18   BY MR. McWILLIAMS:
19       Q.  Actually, I think you said you -- it's
20   unlikely to see any prolongation with a one
21   10-milligram loading dose; correct?
22       MS. WAY:  Mischaracterizes his testimony.
23       THE WITNESS:  So the -- I'm sorry.
24   BY MR. McWILLIAMS:
25       Q.  Did I hear you correctly?

Page 20

1        A.  So the administration of a dose of Coumadin,
2    the half-life is -- is fairly long, okay.  And if
3    somebody is deficient in vitamin K, there's a
4    possibility that a dose -- a single dose, especially
5    a 10-milligram dose, which is a much higher dose than
6    what we typically would recommend starting with,
7    could potentiate that earlier than we might otherwise
8    see.
9        Q.  Okay.
10       A.  Would that be -- would that be normal to see
11   that?  No.  But it's also not normal to load people
12   with a 10-milligram dose of Coumadin.
13       Q.  But are you aware of any evidence indicating
14   Ms. Mingo was vitamin K deficient prior to her
15   initiation of warfarin?
16       A.  I don't know the answer to that.  Nobody --
17   that isn't something that we would know.  There's no
18   lab test that we can check that would say she is or
19   isn't vitamin K deficient.
20       Q.  Okay.  But you agree that Xarelto does
21   prolong PT; correct?
22       A.  There -- there are instances in assays that
23   can be associated with Xarelto prolonging PTTs --
24   PTs, sorry.
25       Q.  Okay.  And do you know what PT reagent was

Page 21

1    used by the hospital that treated Ms. Mingo?
2        A.  I don't.
3        Q.  Okay.  Do you know what reagent is used for
4    the PT at the hospitals where you practice?
5        A.  I don't.
6        Q.  Okay.  So I just want to make sure I
7    understand the sequence of events right.  Ms. Mingo
8    has a history of being on aspirin without any other
9    oral anticoagulants and no history of -- of
10   clinically significant bleeding requiring
11   hospitalization and transfusion; correct?
12       A.  Correct.
13       Q.  And similarly, she has a history of being on
14   aspirin and Lovenox, and she -- that did not require
15   any type of hospitalization or transfusion for a GI
16   bleed; correct?
17       MS. HOFFMANN:  Objection.
18       THE WITNESS:  She was on aspirin and she was
19       on prophylactic doses of Lovenox.
20   BY MR. McWILLIAMS:
21       Q.  And -- and -- but the important part, but it
22   did not require a hospitalization or transfusion;
23   correct?
24       MS. HOFFMANN:  Objection to form.
25       THE WITNESS:  Well, I think that the -- the

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 22

1    dosing for Lovenox that she received was
2    40 milligrams, I believe, daily.  That typically
3    is not considered a therapeutic dose to treat a
4    DVT.
5        And so I -- the -- the -- she didn't require
6    hospitalization while she was on prophylactic
7    doses of Lovenox with aspirin.
8  BY MR. McWILLIAMS:
9    Q.  And she didn't require hospitalization for
10   gastrointestinal bleeding at any time point on any
11   dose of Lovenox is my point.  And is that correct?
12       MS. WAY:  Object to the form.
13       THE WITNESS:  She -- she did not require
14   hospitalization while she was on aspirin and
15   Lovenox.
16  BY MR. McWILLIAMS:
17   Q.  Okay.  And the only -- okay.
18       So are you familiar with the concept of
19   challenge, de-challenge, re-challenge --
20   A.  No.
21   Q.  -- when you're assessing adverse events
22   associated with drugs?
23   A.  Oh.  I'm -- that's not the way I would
24   describe it.  But I -- I normally think if somebody
25   has a toxicity from a medicine, then you stop that

Page 23

1    medicine, and then if the issue goes away, then you
2    re-challenge with that medication.
3        Is that what you're asking?
4    Q.  Yeah.
5    A.  Okay.
6    Q.  That's what -- well, you can do challenges,
7    which mean you expose someone to the medicine, and if
8    it causes the adverse event --
9    A.  Okay.
10   Q.  -- you de-challenge it, which means you
11   remove the medicine, and the adverse effect goes
12   away.  And then the last final step is you
13   re-challenge, you re-expose them, and the -- and the
14   adverse effect comes back.
15       MS. HOFFMANN:  There's no question.  That's a
16   statement.
17  BY MR. McWILLIAMS:
18   Q.  Are you familiar with that?
19   A.  Am I familiar with that?  I'm not familiar
20   with that phrase.  I'm familiar with that -- that
21   technique in -- in determining whether or not you can
22   see, you know, the side effects of a medication,
23   whether or not it's associated with that, yes.
24   Q.  Okay.  And is it fair to say that Ms. Mingo
25   had at least those first two steps:  She had no

Page 24

1    history of a gastrointestinal bleed requiring
2    hospitalization, was exposed to Xarelto, and within
3    two weeks required hospitalization and transfusion;
4    removed Xarelto --
5    A.  Right.
6    Q.  -- and she no longer had any clinically
7    significant bleeding.
8    A.  Well --
9    Q.  Correct?
10       MS. HOFFMANN:  Let him finish.
11       MS. WAY:  Object to the form.
12       THE WITNESS:  Sorry.
13  BY MR. McWILLIAMS:
14   Q.  Is that correct?
15   A.  So she had aspirin and Lovenox to start with,
16   did not bleed.  She had Xarelto added, and then she
17   bled.  The difference is we -- first of all, if we're
18   going to use the challenge, de-challenge, and
19   challenge mechanism that you're describing, we never
20   re-challenged, meaning that this carries no clinical
21   weight at all.
22       The second thing is she had a gastric ulcer
23   that's now been corrected.  So if we re-challenged
24   her, we've now changed the mechanism after challenge,
25   de-challenge, and re-challenge once again.

Page 25

1    Q.  The underlying etiology?
2    A.  Right.  The underlying etiology, correct.
3    Q.  Okay.
4    A.  The gastric ulcer.
5    Q.  Are you offering any opinions on the
6    suitability of prothrombin time with respect to
7    assessing the degree of anticoagulation in a Xarelto
8    treated patient?
9    A.  I would not.
10   Q.  Okay.  You're not offering any opinions on
11   that, one way or the other?
12   A.  I mean, as far as offering opinions, I --
13   there's no opinion to offer on this.
14   Q.  Okay.
15   A.  I mean --
16   Q.  Well, you offer no such opinion in your
17   expert report; is that correct?
18   A.  That's correct.
19   Q.  Okay.  I understand you -- in addition to the
20   list of materials identified in your report, you also
21   reviewed Dr. -- I believe -- I wrote down, you
22   glanced at the Rinder report?
23   A.  I did.  I reviewed that.
24   Q.  And when did you do that?
25   A.  I -- I did that December -- the end of

Protected - Subject to Further Protective Review

Page 26

1    December, beginning of January, sometime.
2        Q.  Okay.  But you read it prior to forming your
3    opinions in this case?
4        A.  No.  I had my opinions formed, and then I
5    read that report.
6        Q.  Okay.  And -- and what was your impression of
7    that report?
8        MS. HOFFMANN:  Objection.
9    BY MR. McWILLIAMS:
10       Q.  Tell me what you remember and what think
11   about it.
12       MS. HOFFMANN:  Objection.
13       THE WITNESS:  I -- I mean, that's a -- to --
14   to summarize an eight-page report and what I
15   thought in general, I think that there were
16   accuracies there regarding Mrs. Mingo's clinical
17   course.
18       I think there were inaccuracies regarding
19   aspirin not playing a pivotal role in what took
20   place.  I disagree with that.
21       There's another section, if I recall
22   correctly, where Dr. Rinder comments on the
23   ability to dose-modify Xarelto based on a --
24   a PT, and there's no evidence that suggests that
25   there's any dose modification that should be

Page 27

1    administered for Xarelto based on PT.
2        And other than that, probably other small
3    things throughout the report that -- that I would
4    disagree with but probably aren't -- aren't
5    pertinent to what we're discussing.
6    BY MR. McWILLIAMS:
7        Q.  So you -- you disagree with Dr. Rinder's
8    opinion that you can use PT to dose-modify.  Did I
9    hear you correctly?
10       A.  That's correct.
11       Q.  Okay.  And what did you do to investigate
12   that topic, whether or not it's appropriate or not?
13       A.  I mean, I think you can review the package
14   insert.  There's no suggestion for dose modification
15   based on anything within the package insert.  The --
16   the Chest guidelines, which we use to determine
17   standards of care for treatment for DVTs and
18   pulmonary embolism, there's no recommendation for
19   dose modification anywhere within Chest guidelines.
20   And that's -- and that's both Chest guidelines from
21   2012 and from 2016.
22       Q.  Anything else?
23       A.  No.
24       Q.  Is that a no?  Okay.
25       Were you offered or did you request or did

Page 28

1    you any time review any internal documents in the
2    possession of Bayer or Janssen relating to the topic
3    of PT and its ability to assess the risk of bleeding
4    in a Xarelto-treated patient?
5        A.  I have not.
6        Q.  Okay.  Are you -- have you reviewed any of
7    the FDA review documents on that same topic?
8        A.  I have not.
9        Q.  Have you done any independent research on
10   this topic, on the utility of PT to assess the risk
11   of bleeding in the Xarelto-treated patient?
12       A.  I have not.
13       Q.  Okay.  Okay.  In addition, at the -- one of
14   the your citations in your report is this article by
15   Sabir:  Oral Anticoagulants for Asian Patients With
16   Atrial Fibrillation.  What was --
17       A.  Yes.
18       Q.  How did that assist you in forming your
19   opinions in this case?
20       A.  It -- it assisted me in finding a figure that
21   helped define the sites of action of the medications
22   that we're discussing.
23       Q.  Gotcha.  Okay.
24       A.  So it was -- it didn't do anything as far as
25   formulating opinion, but -- but I reviewed it, and I

Page 29

1    think it gave a good rundown of -- of, you know, some
2    of the medications presently used and how they work.
3        Q.  So I understand you -- you -- strike that.
4        I understand that the drug label is an
5    important piece of information to you?
6        A.  Correct.
7        Q.  And do you believe that the Xarelto drug
8    label is scientifically accurate?
9        MS. HOFFMANN:  Objection; form.
10       THE WITNESS:  I have no reason to believe
11   it's not scientifically accurate.
12   BY MR. McWILLIAMS:
13       Q.  Well, you understand the Xarelto label says
14   Xarelto causes bleeding; right?
15       A.  Right.
16       Q.  Okay.  Is that a scientifically accurate
17   statement?
18       A.  Yes.
19       Q.  Okay.
20       A.  Sorry.
21       Q.  No, otherwise, if I take that, the court
22   reporter, she'll track me down and do terrible things
23   to me.
24       MR. McWILLIAMS:  I think that's all I've got.
25   Let's just take a quick break and let me just

8 (Pages 26 to 29)

Protected - Subject to Further Protective Review

Page 30

1    confirm; all right?
2         THE VIDEOGRAPHER: The time now is 9:11 a.m.
3    We're off the record.
4         (A recess was taken from 9:11 until 9:13 a.m.)
5         THE VIDEOGRAPHER: The time now is 9:13 a.m.
6    We are back on the record.
7    BY MR. McWILLIAMS:
8         Q. Doctor, I'm going to hand you what's being
9    marked as Persing Exhibit 3, and it's a copy of the
10   label. And I apologize, it's coming apart.
11        (Persing Exhibit No. 3 was marked for
12   identification.)
13   BY MR. McWILLIAMS:
14        Q. And if you'd pass this to counsel, it would
15   be great.
16        Would you be so kind as to identify for us
17   the section of label that you -- I believe your
18   testimony was that it alludes to the synergism
19   between aspirin and Xarelto with respect to risk of
20   bleeding?
21        MS. HOFFMANN: Objection to form; misstates
22   his testimony.
23        THE WITNESS: Yeah, I actually didn't say
24   "synergism." I believe I said "potentiates."
25        So if we -- if we look at 5 -- 5.2:

Page 31

1         Concomitant use of other drugs that impair
2    hemostasis increases the risk of bleeding. These
3    include aspirin, P2Y12 platelet inhibitors, other
4    antithrombotic agents, fibrinolytic therapy,
5    non-steroidal anti-inflammatories --
6         MS. HOFFMANN: Slow down.
7         THE WITNESS: Sorry.
8         -- selective serotonin reuptake inhibitors,
9    and serotonin norepinephrine reuptake inhibitors.
10   BY MR. McWILLIAMS:
11        Q. Okay. And that's the basis for your opinion
12   that there's a synergistic affect between Xarelto use
13   and aspirin with respect to risk of bleeding?
14        MS. HOFFMANN: Objection.
15        THE WITNESS: I think when it states that
16   there's -- other drugs may impair hemostasis and
17   increases the risk of bleeding, that would
18   suggest that.
19   BY MR. McWILLIAMS:
20        Q. That suggests synergism to you, as opposed to
21   additive?
22        MS. WAY: Object to the form.
23        THE WITNESS: The understanding that these
24   other drugs cause that to begin with, we would
25   understand that there is, at minimum, an additive

Page 32

1    effect, if not additional potentiation through
2    the mechanism that I discussed earlier.
3    BY MR. McWILLIAMS:
4         Q. Okay. But I just want to make sure: Is
5    there any other basis for your opinion that there's a
6    synergistic affect --
7         A. That's based on -- based on what we see
8    clinically.
9         MS. HOFFMANN: Objection to form.
10        THE WITNESS: Sorry.
11        That's what we see from a clinical standpoint
12   and people receiving dual anticoagulation.
13   BY MR. McWILLIAMS:
14        Q. And what -- what clinically do you see?
15   What --
16        A. We see an increased risk of -- of sites of
17   bleeding, bleeding more.
18        Q. Okay. How but do you distinguish between
19   additive and synergism?
20        A. The only way to do that would to be -- would
21   be to proceed with a trial that assesses that
22   information.
23        Q. And, again, you haven't researched the trials
24   that have been done to determine whether or not
25   there's an answer to that question; correct?

Page 33

1         A. I mean, I've reviewed the -- the EINSTEIN
2    trial, yes. But I mean not, you know -- and I would
3    have to have the EINSTEIN trial in front of me to
4    look specifically at their -- at the -- if there was
5    analysis looking specifically at aspirin
6    administration here.
7         Q. And that reminds me, in your report you talk
8    about the EINSTEIN trial, saying that -- and then
9    you -- you discussed the data on the EINSTEIN.
10        A. Right.
11        Q. Let's see, it was on page --
12        A. I think --
13        Q. -- Page 11?
14        A. -- 11 or 12, uh-huh.
15        Q. You say: Based on the EINSTEIN trial
16   comparing Xarelto to Lovenox and Coumadin, there was
17   a one percent risk in bleed with Xarelto that was
18   severe or life-threatening, and a 1.7 percent risk of
19   bleed that was severe or life-threatening in the
20   Lovenox and Coumadin arm of the trial. This
21   correlated with a risk reduction of 46 percent
22   favoring administration of Xarelto over Lovenox and
23   Coumadin.
24        Did I read that correctly?
25        A. That's correct.

9  (Pages 30 to 33)

Protected - Subject to Further Protective Review

Page 34

1    Q. And just to be clear, Mrs. -- Ms. Mingo
2   received Xarelto for treatment of DVT; correct?
3    A. That's correct.
4    Q. She did not receive it for treatment of a
5   pulmonary embolism; correct?
6    A. Correct.
7    Q. And this data you cite is the pool data of
8   the DVT and pulmonary embolism; correct?
9    A. That's correct.
10    Q. But if you were to look at just the DVT data
11   for the EINSTEIN DVT study, there was no such
12   difference with respect to bleeders; correct?
13    A. Those -- those two were identical in their
14   risk.
15    Q. Okay.
16    A. Correct.
17    Q. So there was no -- in the -- in the study
18   that looked at the type of condition and the
19   treatment that Ms. Mingo received, there was no
20   difference in bleed risk; correct?
21    A. I think that's accurate, yes.
22    Q. Okay. Now, one other thing, would you --
23   how -- is it common for people with ulcers to require
24   transfusions?
25    A. I mean, that's a difficult --

Page 35

1    Q. Let me -- let me rephrase the question.
2     Is it common in patients with ulcers that are
3   not exposed to an oral anticoagulant to require a
4   transfusion?
5    A. I don't know the answer to that, because I --
6   I don't see enough patients that don't have that. I
7   have a selection bias in that the people I see have
8   had a gastric ulcer that's bled. Whether that's
9   related to anticoagulation or non-anticoagulation, if
10   I'm involved, that's a result of -- of bleeding.
11     So I -- I can't comment, because I don't see
12   enough patients with gastric ulcers that haven't bled
13   to say most don't or most so. That's a difficult --
14    Q. Explain that to me, selection bias. I think
15   I know what you mean, but just help me for further
16   understand.
17    A. So typically when I become involved in a case
18   where somebody has had bleeding, regardless of where
19   that's from, it's because the bleeding has been
20   significant enough that they want to include a
21   hematologist in -- in the patient's care and -- and
22   consider, you know, whether it was related to
23   medications, whether those be anticoagulants or even
24   other medications that can -- can increase that risk.
25   So that selection bias is the population that I see.

Page 36

1    Q. And because you -- your -- the population you
2   see is not representative of the whole population,
3   it's hard for you to really distinguish?
4    A. I can't -- I can't comment on the number of
5   people with gastric ulcers that don't require
6   transfusion. I think that's a difficult -- a GI
7   doctor may have a better idea, who that is.
8     I think the other issue would be there are
9   lots of people that may be asymptomatic from gastric
10   ulcers that they have for quite some time; they never
11   have bleeding, never require transfusion, and are
12   seen and we never know they had a gastric ulcer.
13   It's the ones that bleed that tend to come to our
14   attention because they have anemia underlying that
15   prompts an evaluation.
16     So I -- I think it's -- you're the -- the --
17   the -- the -- the -- the definition, it would have to
18   be a -- and I don't know this literature, this would
19   be the GI doctors -- it would be evaluating a -- a --
20   a asystematic population for the number that have
21   gastric ulcers.
22     We -- I don't know -- you know, I'm not aware
23   of any literature. There's no literature that I've
24   reviewed that looks at that, but that would be GI
25   literature.

Page 37

1    Q. But would you agree with me it would be very
2   rare for someone like -- well, let's talk about
3   Ms. Mingo, the type of GI bleed she experienced that
4   required, I think it was three nights in intensive
5   care unit, five units for transfusion -- what are you
6   shaking your head for?
7    A. No, four --
8    Q. Four?
9    A. I think it's four units of blood cells, a
10   couple units of fresh frozen plasma.
11    Q. I thought it was -- I thought it was three
12   packed red blood cells and the two fresh frozen
13   plasma.
14    A. I think --
15    Q. I could be wrong.
16     MS. HOFFMANN: Let's -- let's get a question.
17   That's all right.
18   BY MR. McWILLIAMS:
19    Q. Okay. Just kidding. I stand corrected.
20   Lara told me --
21     MS. HOFFMANN: So start your question over
22   again.
23   BY MR. McWILLIAMS:
24    Q. So that type of bleed -- the type of bleed
25   experienced by Ms. Mingo --

10 (Pages 34 to 37)

Protected - Subject to Further Protective Review

Page 38

```
 1        A.  Right.
 2        Q.  -- that required hospitalization, intensive
 3   care unit, four transfusions, would you agree with me
 4   that would be atypical for someone with a bleeding
 5   ulcer not exposed to an oral anticoagulant?
 6        MS. WAY:  Objection to form.
 7        MS. HOFFMANN:  Objection to form.
 8        THE WITNESS:  If -- if they have a -- if they
 9   have an ulcer involving an artery -- I've seen
10   people on no anticoagulants bleed as much as she
11   bled.
12        MR. McWILLIAMS:  Okay.  All right.  Is that
13   everything?
14        All right.  That's all I've got.  I
15   appreciate your time today.
16        THE WITNESS:  Thank you.
17        MR. McWILLIAMS:  That's all the questions I
18   have.
19        THE VIDEOGRAPHER:  Ms. Hoffmann, do you have
20   any questions?
21        The time now is 9:21 a.m.  Today's deposition
22   of Dr. Brian Persing consisting of one disc is
23   now concluded.
24        (Whereupon, the deposition concluded at
25   9:21 a.m.)
```

Page 40

```
 1                INSTRUCTIONS TO WITNESS
 2
 3
 4        Please read your deposition over carefully
 5   and make any necessary corrections.  You should state
 6   the reason in the appropriate space on the errata
 7   sheet for any corrections that are made.
 8
 9        After doing so, please sign the errata sheet
10   and date it.  It will be attached to your deposition.
11
12        It is imperative that you return the original
13   errata sheet to the deposing attorney within thirty
14   (30) days of receipt of the deposition transcript by
15   you.  If you fail to do so, the deposition transcript
16   may be deemed to be accurate and may be used in
17   court.
18
19
20
21
22
23
24
25
```

Page 39

```
 1           C E R T I F I C A T E
 2
 3        I, KELLY J. LAWTON, Registered Professional
 4   Reporter, Licensed Court Reporter, and Certified
 5   Court Reporter, do hereby certify that, pursuant to
 6   notice, the deposition of BRIAN E. PERSING, M.D. was
 7   duly taken on February 9, 2017, at 8:48 a.m. before
 8   me.
 9        The said BRIAN PERSING, M.D. was duly sworn
10   by me according to law to tell the truth, the whole
11   truth and nothing but the truth and thereupon did
12   testify as set forth in the above transcript of
13   testimony.  The testimony was taken down
14   stenographically by me.  I do further certify that
15   the above deposition is full, complete, and a true
16   record of all the testimony given by the said
17   witness.
18
19        _____
20           KELLY J. LAWTON, RMR, CRR, FPR
21
22        (The foregoing certification of this
23   transcript does not apply to any reproduction of the
24   same by any means, unless under the direct control
25   and/or supervision of the certifying reporter.)
```

Page 41

```
 1        - - - - - -
 2           E R R A T A
 3        - - - - - -
 4   PAGE  LINE  CHANGE
 5   ____  ____  _____
 6   REASON: _____
 7   ____  ____  _____
 8   REASON: _____
 9   ____  ____  _____
10   REASON: _____
11   ____  ____  _____
12   REASON: _____
13   ____  ____  _____
14   REASON: _____
15   ____  ____  _____
16   REASON: _____
17   ____  ____  _____
18   REASON: _____
19   ____  ____  _____
20   REASON: _____
21   ____  ____  _____
22   REASON: _____
23   ____  ____  _____
24   REASON: _____
25
```

11 (Pages 38 to 41)

Protected - Subject to Further Protective Review

Page 42

```
 1              ACKNOWLEDGMENT OF DEPONENT
 2
 3         I, BRIAN PERSING, M.D., do hereby acknowledge
 4    that I have read the foregoing pages, 1 to 38, and
 5    that the same is a correct transcription of the
 6    answers given by me to the questions therein
 7    propounded, except for the corrections or changes in
 8    form or substance, if any, noted in the attached
 9    Errata Sheet.
10
11
12    _____      _____
13    BRIAN E. PERSING, M.D.          DATE
14
15
16
17
18    Subscribed and sworn to before me this
19    _____ day of _____, 20___.
20    My Commission expires: _____
21
22    _____
      Notary Public
23
24
25
```

Page 43

```
 1              LAWYER'S NOTES
 2    PAGE  LINE
 3    _____ _____ _____
 4    _____ _____ _____
 5    _____ _____ _____
 6    _____ _____ _____
 7    _____ _____ _____
 8    _____ _____ _____
 9    _____ _____ _____
10    _____ _____ _____
11    _____ _____ _____
12    _____ _____ _____
13    _____ _____ _____
14    _____ _____ _____
15    _____ _____ _____
16    _____ _____ _____
17    _____ _____ _____
18    _____ _____ _____
19    _____ _____ _____
20    _____ _____ _____
21    _____ _____ _____
22    _____ _____ _____
23    _____ _____ _____
24    _____ _____ _____
25
```

Golkow Technologies, Inc. - 1.877.370.DEPS