Protected - Subject to Further Protective Review

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE: XARELTO (RIVAROXABAN)          MDL NO. 2592
PRODUCTS LIABILITY LITIGATION
                                      SECTION L

THIS DOCUMENT RELATES TO:             MAG. JUDGE NORTH

DORA MINGO, NO. 15-03469



                        - - -

                  FEBRUARY 14, 2017

                        - - -

        PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

                        - - -


        Videotaped deposition of DEMONDES HAYNES, MD,
held at Bradley Arant Boult Cummings, One Jackson
Place, 188 East Capitol Street, Suite 400, Jackson,
Mississippi, commencing at 9:14 a.m., on the above
date, before Joan L. Pitt, Registered Merit
Reporter, Certified Realtime Reporter, and Florida
Professional Reporter.


                        - - -


              GOLKOW TECHNOLOGIES, INC.
        877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com

Protected - Subject to Further Protective Review

## Page 2

```
 1    APPEARANCES:
 2       BRADLEY D. HONNOLD, ESQUIRE
         Goza & Honnold, LLC
 3       111150 Overbrook Road, Suite 250
         Leawood, Kansas 66211
 4       913.451.3433
         bhonnold@gohonlaw.com
 5       Representing Plaintiffs
 6
 7       MARY CATHERINE WAY, ESQUIRE
         ADRIA CONKLIN, ESQUIRE
 8       Mitchell Williams
         425 West Capitol Avenue, Suite 1800
 9       Little Rock, Arkansas 72201
         501.688.8890
10       mway@mwlaw.com
         aconklin@mwlaw.com
11       Representing Defendant Bayer
12
         MARGARET HOFFMAN, ESQUIRE
13       Schwabe Williamson Wyatt
         1211 Southwest 5th Avenue, Suite 1900
14       Portland, Oregon 97204
         503.796.2868
15       mhoffmann@schwabe.com
         Representing Janssen Defendants
16
17
         ALSO PRESENT:
18
            Melissa Bardwell, Videographer
19
20
21
22
23
24
```

## Page 3

```
 1              ---
 2           I N D E X
 3              ---
 4    Testimony of:  DEMONDES HAYNES, MD
 5       DIRECT EXAMINATION BY MR. HONNOLD............  5
 6
 7
 8        I N D E X   E X H I B I T S
 9    HAYNES          DESCRIPTION          PAGE
10    No. 1   REPORT FOR XARELTO FEDERAL LITIGATION   13
             EXPERT REPORT OF DEMONDES HAYNES, MD,
11           FCCP
12    No. 2   POWERPOINT PRESENTATION        36
             DVT AND PE CLINICAL PRESENTATION &
13           DIAGNOSIS
14    No. 3   ELIQUIS LABEL            153
             REFERENCE ID: 3961165
15
      No. 4   DECEMBER 2014 XARELTO LABEL    153
16           REFERENCE ID: 3676584
17
18
19
20
21
22
23
24
```

## Page 4

```
 1              ---
 2          THE VIDEOGRAPHER:  We are now on the record.
 3    My name is Melissa Bardwell, videographer here for
 4    Golkow Technologies.  The date today is February 14,
 5    2017.  The time is approximately 9:14 a.m.
 6          This videotaped deposition is being held in
 7    Jackson, Mississippi, in reference to the Xarelto
 8    (Rivaroxaban) Products Liability Litigation.  The
 9    deponent today is Demondes Haynes, MD.
10          Will counsel present please introduce
11    themselves and state your affiliations for the
12    record.
13          MR. HONNOLD:  Brad Honnold for Ms. Mingo.
14          MR. CONKLIN:  Adria Conklin for Bayer.
15          MS. HOFFMANN:  Margaret Hoffman for the
16    Janssen defendants.
17          MS. WAY:  Mary Catherine Way for Bayer.
18          THE VIDEOGRAPHER:  The court reporter today is
19    Joan Pitt, and she will now swear in the witness.
20          THE COURT REPORTER:  Raise your right hand,
21    please.  Do you swear or affirm the testimony you
22    give will be the truth, the whole truth, and nothing
23    but the truth?
24          THE WITNESS:  I do.
```

## Page 5

```
 1          THE COURT REPORTER:  Thank you.
 2          DEMONDES HAYNES, MD, called as a witness by the
 3    Plaintiff, having been first duly sworn, testified
 4    as follows:
 5             DIRECT EXAMINATION
 6    BY MR. HONNOLD:
 7       Q.  Dr. Haynes, good morning.
 8       A.  Good morning.
 9       Q.  Will you tell me your full name, please?
10       A.  Demondes Haynes.
11       Q.  And you're a physician; right?
12       A.  Yes, sir.
13       Q.  And by specialty or area of training, you are a
14    pulmonologist and a critical care physician; is that
15    right?
16       A.  That's correct.
17       Q.  Can you explain to us what, I guess, that area
18    or areas of medicine entail?
19       A.  Yes, sir.  Pulmonary medicine entails caring
20    for patients with any lung problems.  Some examples
21    would be asthma, COPD, emphysema, pulmonary fibrosis.
22    We take care of patients with DVT, pulmonary embolism.
23          In critical care, we take care of patients
24    mostly in the medical ICU, but any patient with a
```

Protected - Subject to Further Protective Review

Page 6

1   critical care issue.  So anytime you hear of anyone
2   needing to go to the intensive care unit, we could
3   potentially care for those patients.
4       Q.  I've heard before the term "intensivist" used.
5       A.  Yes.
6       Q.  So as you use the term "critical care
7   medicine," does that also encompass an intensivist
8   practice?
9       A.  It does.  Most times when people talk about the
10  intensivist model it's those people who only do ICU
11  care, that they don't do much hospital-based care or
12  clinic, any clinic, actually, if they're just a pure
13  intensivist.
14      Those of us who do some of both when we're in
15  the ICU with the intensivists for that period of time,
16  and then we may not be in for a month, or varying in
17  academics, then we're clinic or caring for patients in
18  the hospital.
19      Q.  Then at your facility, are there physicians who
20  are just intensivists?
21      A.  Not in my group.  Not in the medical group.
22  There are -- well, let's see.  The surgeons, no, all of
23  them do something different.  Neuro, they do a little
24  something different.

Page 7

1       There is one just intensivist, I think, in the
2   cardiac ICU, who only does ICU work.
3       Q.  Presently, how does your professional time
4   break down between the various different things that you
5   might do between direct patient care, teaching,
6   administration, independent research, things of that
7   nature?
8       A.  So probably 60 percent of my time is patient
9   care.  Maybe 40 percent -- I'm the fellowship program
10  director, meaning I'm responsible for deciding which
11  trainees come in to specialize in pulmonary and critical
12  care, so I oversee their training, their curriculum, and
13  making sure that they take all the exams and meet all
14  the requirements.  So I have probably about a 35 to
15  40 percent role in administrative time just doing
16  fellowship paperwork.
17      Q.  And then is some of your time devoted to
18  independent research or writing that you might do?
19      A.  We do.  Probably 5 percent of the time.  I work
20  with the fellows on all of their research projects, so
21  that's counted for some of my research time, and then
22  I'll spend a small percentage of time, probably less
23  than 5 percent, writing articles, or reviews, or things
24  of that nature.

Page 8

1       Q.  In terms of your day-to-day practice, do you
2   have patients who are admitted to your service, or is
3   your practice primarily consultative where you're seeing
4   patients at the request of other physicians?
5       A.  If I'm on the ICU service, and the way we do
6   things at the university is we do the ICU service either
7   two weeks or a month at a time.  So if you're on the ICU
8   service, then those patients are admitted directly to me
9   in the ICU, what we would call the closed ICU model, and
10  then if I'm not on the ICU service and what we call the
11  pulmonary consult service, then I'm just in a
12  consultative role.  So I don't have patients admitted,
13  usually, directly to me in the general hospital ward.
14      Q.  And then how frequently or often are you
15  assigned to that constant duty in the ICU?
16      A.  In the ICU, this year, probably about four
17  months out of the 12 in the ICU.
18      Q.  And then does it go consecutive months or every
19  other month, or --
20      A.  No, it varies.  So it's split among all those
21  of us who work in the ICU.  I also -- I should have
22  mentioned this -- do one to two months a year in the ICU
23  at the VA Hospital, so that would count in the months.
24  Sometimes it's four months at the university, one to two

Page 9

1   at the VA in the ICU, but it'll vary.  So I may be on
2   service in January and not on again until March or
3   April.
4       Q.  Does the VA also have a closed ICU model?
5       A.  Yes.
6       Q.  Then do you also see patients in either a
7   freestanding or university-based clinic?
8       A.  I do.  I see patients on Monday afternoons and
9   Thursday mornings, and then when I'm on the consult
10  service I also see patients on Tuesday afternoons with
11  the fellows in the fellows clinic.  So two to three half
12  days per week.
13      If it is a month where I'm off the ICU service
14  and not on the consultative service, I'm mostly doing
15  administrative fellowship work.  Then I can add extra
16  days based on room availability for clinic.
17      Q.  So if there is a physician at the University
18  Medical Center who wants to request a pulmonology
19  consultation, how does that work at any given point in
20  time?  Does -- is it -- is it known who is on call from
21  pulmonology?
22      A.  Yes.  So we have a schedule for daytime hours.
23  If one of the hospitalists or someone in the hospital
24  says, "I need a pulmonary consult," they would put the

Protected - Subject to Further Protective Review

Page 10

1    order in and it would go to our office.  Most times the
2    residents would call the fellow who's on service as
3    well, but there's a master schedule that's online, and
4    it would go to whoever is assigned to be on.
5        Q.   Is the fellow on call usually the initial
6    responder to the request?
7        A.   Not always.  Probably the majority of the time,
8    but sometimes the hospitalists will call one of us
9    directly and say, you know, "I haven't spoken to your
10   fellow yet, but I would like you to see this patient."
11       Q.   So if you have an idea in terms of the
12   percentage of pulmonology consults that might be made
13   from other members of the medical staff, what percentage
14   are actually responded to in some way by, I guess,
15   senior medical staff or faculty, beyond fellow?
16       A.   Oh.  So 100 percent of our consults are seen by
17   the attending, seen by us.  The initial contact, it
18   would be a guess, but maybe 20 percent of the time they
19   might call us directly, depending on who the hospitalist
20   is, but all of them are always seen by us.  Even if the
21   fellow goes initially, they may go and gather initial
22   information, but we always see the patients.
23       Q.   Okay.  So regardless of who the initial
24   responder is, there is always then an attending

Page 11

1    physician --
2        A.   Yes.
3        Q.   -- that will see that patient at some point?
4        A.   Oh, yes.
5        Q.   Can you break down what percentage of either
6    your direct patient care in the clinic or the consults
7    that you receive, any idea as to what percentage of
8    those pertain to dealing with patients with acute new
9    onset DVT or PE?
10       A.   In the hospital, it would be a guess, but maybe
11   10 to 15 percent.  In the clinic, maybe about the same,
12   10, 15, maybe 20 percent.
13       Q.   And in the clinic, I take it, might those be
14   patients who are presenting with some constellation of
15   symptoms and haven't yet been diagnosed with DVT or PE?
16       A.   Some.  So some of those are patients that I
17   follow where they have some other disorders and they
18   come in with a complaint and I'll order an ultrasound
19   and diagnose a DVT, or a CT and diagnose a PE.
20            Some of those have already been diagnosed in
21   the hospital and are seeing me as follow-up.  Some of
22   those could be patients who were diagnosed at an outside
23   facility and are coming to see me for an opinion as
24   well.

Page 12

1        Q.   Would it be fair to say then that, in terms of
2    all your different practice areas where you come into
3    contact with patients, that 10 to 15 percent is probably
4    a fair estimation of your patient population that has
5    DVT or PE that you deal with?
6            MS. HOFFMANN:  New onset?
7            MR. HONNOLD:  Well, he --
8            MS. HOFFMANN:  That was your initial question.
9            MR. HONNOLD:  That's right, but you know that
10   his answer kind of delved into some follow-up, too,
11   so...
12   BY MR. HONNOLD:
13       Q.   Let me ask -- let me ask a question without
14   interruption, although it was well-pointed, well-done.
15           MS. HOFFMANN:  Thank you, Counsel.
16   BY MR. HONNOLD:
17       Q.   The -- what's your best estimate then in terms
18   of the direct patient contact that you have deals with
19   patients that have DVT or PE, whether that's dealing
20   with patients with acute onset or at some other point in
21   the -- in the evolution of their disease?
22       A.   Again, it would really be a guess.  Probably --
23   just guessing, probably 15 to 20 percent.
24           MS. WAY:  Brad, can we get an agreement on the

Page 13

1    record that an objection by one of the defense
2    counsel is an objection that's good for all?
3            MR. HONNOLD:  Yes.
4            MS. WAY:  Thank you.
5    BY MR. HONNOLD:
6        Q.   At some point you prepared a written report in
7    this case; is that right?
8        A.   Yes, sir.
9            (Haynes Exhibit No. 1 was marked for
10   identification.)
11   BY MR. HONNOLD:
12       Q.   I'm going to hand you what we've marked as
13   Deposition Exhibit No. 1.  Can you tell me what that is,
14   please?
15       A.   Okay.  Yes, this looks to be the report that I
16   have prepared as well as, looks like, my CV, reference
17   list, and depositions and trials.
18       Q.   And this is -- this report is one that you
19   prepared specifically for use in this case relating to
20   Ms. Mingo; is that right?
21       A.   That's correct.
22       Q.   And if you go to page 27 of the report, you
23   signed it on January 6 of this year; is that correct?
24       A.   That's correct.

4 (Pages 10 to 13)

Protected - Subject to Further Protective Review

Page 14

1    Q.  Do you have -- do you either know or have an
2    estimate as to how much time it took you to prepare the
3    report?
4    A.  Probably about 35 to 40 hours.
5    Q.  Do you have any type of documentation in terms
6    of billing records or correspondence that might reflect
7    or show specifically how much time you spent?
8    A.  Yes, I keep a list of time that I spent on the
9    case on my computer.
10   Q.  And have you sent invoices to anyone for -- to
11   be reimbursed or compensated for your time that you
12   spent on the case?
13   A.  Not yet.
14   Q.  So what is the total amount of time that you
15   believe you have committed to this project?
16       And when I say "this project," I mean not just
17   the report, but all of your work on the case, review and
18   everything.
19   A.  Meetings and records review?
20   Q.  Yes.
21   A.  Maybe about 50, 50 to 60 hours, if that
22   includes meetings.
23   Q.  When were you retained to work on this case?
24   A.  I believe I received the first records about

Page 15

1    July of 2016.  July or August.
2    Q.  And with whom was your first contact on this
3    case?
4    A.  I believe it was Diana Davis.
5    Q.  And did you speak with anyone else other than
6    Diana Davis before you received materials on the case?
7    A.  There was another attorney that met with me.
8    He was with her, but I cannot remember his name.
9    Q.  So did the first contact come by way of a
10   telephone call, or did someone literally show up at your
11   office and just come in?
12   A.  No, I actually received an e-mail from
13   Ms. Davis a few months before that, and we met briefly
14   before that, but the first records are not until about
15   July or August.  I think we met maybe in January or
16   February of that year.
17   Q.  Had you ever met Ms. Davis before?
18   A.  I had.
19   Q.  You had?
20   A.  Yes.
21   Q.  Okay.  And in what context had you met
22   Ms. Davis before?
23   A.  I worked with her on another litigation,
24   reviewing records and doing a report.  I believe it was

Page 16

1    the Yaz litigation.
2    Q.  And Yaz as you use the term is an oral
3    contraceptive; is that right?
4    A.  Yes.
5    Q.  And do you know, the report that you prepared
6    in that case, did you sign it?
7    A.  I believe I did.
8    Q.  Did you give a deposition in that case?
9    A.  I did not.
10   Q.  Was Ms. Davis your primary contact in terms of
11   counsel contact on that case?
12   A.  She was.
13   Q.  Have you yourself taken care of patients where
14   you rendered a diagnosis of either DVT or pulmonary
15   embolus induced by use of oral contraceptives?
16   A.  Yes.  Usually those had some other factors with
17   it, but I definitely have taken care of patients who
18   have had a venous thromboembolism while taking oral
19   contraceptives.
20   Q.  Have you ever written in a medical record for a
21   patient that you felt that the use of any oral
22   contraceptive either caused or contributed to cause in
23   some way the patient's onset of DVT or PE?
24   A.  Probably.  I can't remember that for certain,

Page 17

1    but probably.
2    Q.  Why do you say "probably"?
3    A.  Just knowing the number of patients that we
4    see, because we're sometimes consulted by the
5    obstetricians and gynecologists as well for patients
6    that may develop DVT or PE, so more than likely I've
7    probably written that it was a contributor in some case.
8    Q.  And when you use the term "likely was a
9    contributor in some case," what do you mean when you use
10   that phrase?
11       MS. WAY:  Object to form.
12       THE WITNESS:  I guess, if this answers your
13       question, I'm usually looking at everything that's
14       going on with the patients, all of their risk
15       factors, so if that's a risk factor, or if they have
16       a DVT or PE and they don't have any other risk
17       factors, I may say that's the more likely cause.
18   BY MR. HONNOLD:
19   Q.  And when you use the phrase "more likely," do
20   you mean probably did?
21   A.  Yes.
22   Q.  And in those instances where you've taken care
23   of patients that have developed DVT or PE induced or
24   probably induced by use of oral contraceptives, have you

5 (Pages 14 to 17)

Protected - Subject to Further Protective Review

## Page 18

1  prescribed anticoagulant to those patients?
2      A.  Yes.
3      Q.  And in that patient population, what have been
4  the types of anticoagulants that you use for care and
5  treatment of their VTE?
6      A.  I can't remember the last one that I've taken
7  care of that was using oral contraceptives, but it would
8  have been, if they were hospitalized, if we were giving
9  parenteral therapy, it would have been with heparin,
10 either IV or subcutaneous.
11      If it was oral or if we were discharging them
12 home on oral, it would have been one of the direct
13 orally acting anticoagulants, Factor Xa's, or warfarin.
14      Q.  So in that patient population you have
15 prescribed warfarin for -- for the treatment of DVT or
16 pulmonary embolus?
17      A.  Oh, I'm sure I have, because -- yeah.
18      Q.  In your work on the Yaz case, how much time did
19 you spend on that, on that assignment?
20      MS. WAY:  Object to form.
21      THE WITNESS:  I don't remember.  That was about
22 maybe four years ago.  I can't remember
23 specifically.
24

## Page 19

1  BY MR. HONNOLD:
2      Q.  In the Yaz litigation, did you specifically
3  look at records of individual patients in that work?
4      A.  I remember looking at, I believe, two to three
5  patients.
6      MS. WAY:  Brad, are we going to get on to this
7  litigation anytime soon?  Just curious.
8      MR. HONNOLD:  Eventually, I'm sure we will.  So
9  I think this is probably proper fodder for
10 exploration in cross-examination.
11      MS. WAY:  I don't agree with that, but --
12      MS. HOFFMANN:  I think it -- I think you've
13 been allowed some latitude.  I don't think you will
14 be allowed to talk about specific patient records
15 that he looked at.
16      MR. HONNOLD:  And I've not.  I've asked if he
17 looked at them.
18      MS. HOFFMANN:  I agree.  I agree.
19      MR. HONNOLD:  You're doing a lot of prospective
20 advising of me here rather than just stating
21 objections, so --
22      MS. HOFFMANN:  You're making us nervous.
23      MR. HONNOLD:  Huh?
24      MS. HOFFMANN:  You're making us nervous when

## Page 20

1  you start talking about other patient records.
2      MR. HONNOLD:  You can be nervous if I asked for
3  who -- what were their names and all of that and
4  tell me their date of birth and where they lived and
5  anything like that about their social history.  If I
6  do that, then I'm out of bounds and you can raise
7  heck, but I think I tried to be fairly cautious
8  about the way that I've approached it.
9  BY MR. HONNOLD:
10      Q.  So you did review some individual patient
11 records in your work on the Yaz case?
12      A.  Yes.
13      Q.  Okay.  And specifically what company was it
14 that you were working on behalf of in the Yaz
15 litigation?
16      A.  So that's a great question.  I don't know for
17 sure.  I believe Diana was counsel for Bayer.  I don't
18 know if any others were involved.
19      Q.  And you know Bayer is involved in this case as
20 well where you're working?
21      A.  Yes, sir.
22      Q.  In your work on the Yaz case, did you either
23 meet with or talk to directly any Bayer employees?
24      A.  Not that I know of.  As far as I remember, it

## Page 21

1  was just attorneys that I met with.
2      Q.  In this case, have you met with or spoken with
3  directly any employees either of Bayer or Janssen?
4      A.  No.
5      Q.  Have you ever been called upon by sales
6  representatives of Bayer or Janssen?
7      A.  Yes.
8      Q.  Okay.  Tell me about that.
9      A.  Most of the pharmaceutical companies will visit
10 us either in the office, "office," I mean clinic, or
11 sometimes they may make an appointment and come to our
12 office if they have information to share with us about a
13 product or about a program.
14      Q.  And what is it that you recall about sales
15 representatives either from Bayer or Janssen calling on
16 you about Xarelto?
17      A.  Anything specific other than they usually come
18 by and say, "Here's our product.  Here's how it's
19 available."  This is -- almost all the drug reps
20 approach things the same way, and so they'll say,
21 "Here's our product.  Here's our product information
22 insert."
23      If there is a special patient assistance
24 program, sometimes they'll give that information.

6 (Pages 18 to 21)

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 22

1    Sometimes they'll tell us which insurance companies
2    cover if they have that information with them.
3        Q.  When is the last time you think that you were
4    called on by a sales representative related to Xarelto?
5        A.  I can't tell you the exact time.
6        Q.  Recently, or not so recently?
7        A.  Oh, probably recently, recently being within --
8    we see a lot of reps that come to our hospital, so I
9    would say probably within the last three to four months,
10   I'm sure.
11       Q.  And the sales reps that you've seen, do you
12   know whether they were affiliated with Bayer or Janssen?
13       A.  That's a great question.  I'm not sure.  I
14   think Bayer, because at least the last one that came by.
15       Well, I don't know.  I don't know which company
16   actually does Xarelto, if it's Bayer or Janssen, so I
17   just know she was a Xarelto rep.
18       Q.  And have those sales representatives ever left
19   written information with you in the form of sales pieces
20   or marketing pieces?
21       A.  Yes.
22       Q.  Have they ever left medical literature with
23   you?
24       A.  Not that I know of.

Page 23

1        Q.  Have you ever been invited to attend any sort
2    of educational meetings or sessions where another
3    physician might be speaking on Xarelto?
4        A.  No.
5        Q.  Have you had occasion when those sales
6    representatives have called upon you to actually look at
7    materials that were on either a laptop computer or a pad
8    of some sort?
9        A.  Probably, because most of the reps usually --
10   well, yeah, most of them sometimes will bring in an iPad
11   and say, "Oh, let's show you a dosing or "Show you some
12   approval," or something of that nature, so I'm sure I've
13   looked at one of them, an iPad or laptop.
14       Q.  Have you yourself served as either a consultant
15   or a speaker for Bayer or Janssen related to Xarelto?
16       A.  No.
17       Q.  Have you ever served as a speaker or consultant
18   for any pharmaceutical product?
19       A.  Yes.
20       Q.  Which ones?
21       A.  For AstraZeneca Pharmaceuticals.
22       Q.  What product?
23       A.  Bevespi, B-e-v-e-s-p-i, Aerosphere, and
24   Daliresp, D-a-l-i-r-e-s-p.

Page 24

1        Q.  And what kinds of medicines are those?
2        A.  Those are for COPD.  And also for Actelion
3    Pharmaceuticals, A-c-t-e-l-i-o-n.
4        Q.  And for Actelion, what was the product?
5        A.  Probably Tracleer, T-r-a-c-l-e-e-r, and
6    Opsumit, O-p-s-u-m-i-t.
7        Q.  And what kind of medicines are those?
8        A.  Those are medications for treatment of
9    pulmonary hypertension.
10       And there's one other I just thought about.
11   This is probably five or six years ago.  Sanofi-Aventis.
12   I believe it was for Lovenox.
13       Q.  And Lovenox is a low molecular weight heparin?
14       A.  Yes.
15       Q.  You're probably too young for this, but did you
16   do any expert witness work or consultation on the
17   fen-phen litigation?
18       A.  No.
19       Q.  You are too young for that.
20       MS. HOFFMANN:  But we're not.
21       MR. HONNOLD:  We're definitely not.
22   BY MR. HONNOLD:
23       Q.  In those consultant arrangements that you've
24   done, what kind of work did you do?

Page 25

1        A.  Usually would serve as -- on the speakers
2    bureau where we would do promotional lunch or dinner
3    programs.
4        Q.  Would you ever travel for that?
5        A.  Yes.
6        Q.  And what -- for any of those, whether it was
7    for Sanofi-Aventis, or Actelion, or Astra Zeneca, what
8    types of places would you go to?
9        A.  Most in the Southeast.  What's the farthest
10   I've been?  Yeah, most in the Southeast that I can --
11       Q.  So does that mean Brookhaven or Atlanta?
12       A.  Ah-hah.  So I have been to a couple of
13   different states.  So I've been to Alabama, Arkansas,
14   places in Mississippi, and Kansas.  Actually, I went a
15   little farther, now that I think about it.  That's kind
16   of Midwest, isn't it?
17       Q.  It depends on what part.  People close to
18   Oklahoma get confused sometimes.
19       A.  Ah-hah.
20       Q.  Where in Kansas did you go?
21       A.  Wichita City.  I guess it is --
22       Q.  That's definitely Midwest.
23       A.  Maybe it's not City.  Maybe it's just Wichita.
24   I don't know.  I'm confused.

7 (Pages 22 to 25)

Protected - Subject to Further Protective Review

Page 26

1    Q.   I wrote down Wichita.
2    A.   Okay.
3    Q.   And then when you would go to those places,
4    would you be compensated for that time or work?
5    A.   Yes.
6    Q.   And how would you be paid for that?
7    A.   After the program, the company would send an
8    honorarium check after submitting paperwork.
9    Q.   And would you be reimbursed for your expenses?
10   A.   Yes.
11   Q.   In terms of your work with AstraZeneca, did you
12   ever physically go to any office or location of
13   AstraZeneca itself?
14   A.   No.
15   Q.   When you did -- well, the same question for the
16   other entities.  Actelion or Sanofi-Aventis, did you
17   ever go to their headquarters or offices for any sort of
18   training or work?
19   A.   No.
20   Q.   For the work that you did for those three
21   pharmaceutical companies, did you give prepared
22   presentations or remarks?
23   A.   Yes.
24   Q.   And the materials that you presented, were

Page 27

1    those materials that you prepared yourself, or had they
2    been prepared and generated by someone else?
3    A.   No, prepared and generated by someone else.
4    Q.   And was the situation such that you would find
5    yourself sometimes giving a talk or a PowerPoint
6    presentation before or after dinner where other
7    physicians were attending?
8    A.   Yes, usually during dinner.
9    Q.   And then who -- who did your -- in terms of you
10   finding out when and where you were supposed to be for
11   any of those meetings, who kind of directed traffic in
12   that regard?  Who did you get your assignments from?
13   A.   They have a speakers bureau, yeah, that's
14   usually where we e-mail, the speakers bureau, that
15   coordinates the meetings, the travel, and things of that
16   nature.
17   Q.   The AZ, the Actelion, and the Sanofi
18   arrangements, did you have any sort of written
19   agreements with any of those three companies?
20   A.   Oh, yes.
21   Q.   Were they contracts?
22   A.   Contracts, yes.
23   Q.   And was the contract a document that was
24   presented to you by the company?

Page 28

1    A.   Yes.
2    Q.   And was it a contract that you had to sign?
3    A.   Yes.
4    Q.   And then the compensation that you would
5    receive for that work, would it go directly to you, or
6    would it go to your academic institution?
7    A.   Directly to me.
8    Q.   Are you currently on any type of speakers
9    bureau?
10   A.   Yes, I'm still on the speakers bureau for
11   AstraZeneca and Actelion.
12   Q.   And when was the last time that you made a
13   presentation either for AstraZeneca or Actelion?
14   A.   Actelion was probably January, and AstraZeneca,
15   probably about two weeks ago.
16   Q.   And you mentioned Actelion, you said January.
17   Does that mean January of 2017?
18   A.   Oh, yes, 2017.
19   Q.   In total during the duration of those three
20   relationships with those companies, how many meeting
21   presentations have you made?
22   A.   So I don't remember for Sanofi, because that's
23   been probably at least five, maybe six years.  They
24   average, for them, I'm guessing, probably two to three

Page 29

1    per year.
2        For Actelion, during the last year, for 2016,
3    probably about six.  And for AstraZeneca, for the last
4    year, was probably about -- maybe about six also.
5    That's a guess.  I can't tell you for certain.
6    Q.   And then the compensation that you derived from
7    those meetings, would you be paid by the hour or by the
8    specific event?
9    A.   No, by the specific event.
10   Q.   And how much would you be paid for each event?
11   Or what was the range, I guess, of payments?
12   A.   From $1,000 to $2,700, based on the travel.
13   Q.   And how was it that you entered into those
14   arrangements, and by that I mean, how did they -- I
15   guess, how did these companies find you and how did you
16   secure that position on being on the speakers bureau?
17   A.   If I remember, most of them had sent me an
18   e-mail and said, "You have been recommended by someone.
19   Would you be interested in serving on our speakers
20   bureau?  If so, send us a copy of your CV."
21   Q.   And so these were all situations where the
22   companies contacted you?
23   A.   Yes.
24   Q.   You've never been in a situation where you

8 (Pages 26 to 29)

Protected - Subject to Further Protective Review

Page 30

1  yourself have inquired of a company whether you could
2  serve on their speakers bureau?
3      A.  No.
4      Q.  Are there other members of your department or
5  division that serve also as members of speakers bureaus
6  for pharmaceutical companies?
7      A.  Yes.
8      Q.  Is it a fairly common thing?
9      A.  You know, it kind of depends.  In the
10  university setting, it depends.  In our department of
11  internal medicine, you have different divisions, so
12  across the divisions, there's some who do more than
13  others.
14      In the just pulmonary division, probably a
15  couple of us do.  Yeah, I guess I would say it's fairly
16  common, now that I think about it, throughout the
17  department of medicine.
18      Q.  Other than the speakers bureaus, of which
19  you're serving now, do you have any other ongoing
20  relationships with any pharmaceutical company?  And the
21  question is intended to include any other ongoing
22  litigation work, expert witness work, things of that
23  nature.
24      MS. HOFFMANN:  Objection.  Form.

Page 31

1      THE WITNESS:  Outside of this one?
2  BY MR. HONNOLD:
3      Q.  Yes.
4      A.  No.
5      Q.  So currently the Mingo case related to Xarelto
6  is the only ongoing expert witness work you're doing for
7  a pharmaceutical company?
8      A.  Yes.
9      Q.  Do you have any other relationships with
10  pharmaceutical companies, whether it's serving as a lead
11  investigator on clinical trials or running or managing a
12  clinical trial site?
13      A.  No.
14      Q.  Where did you grow up?
15      A.  Louisville, Mississippi.
16      Q.  I haven't looked at the map for a while, so --
17      A.  It's about an hour and a half north of here.
18  Kind of east central Mississippi.  Maybe a little less
19  than an hour and a half.
20      Q.  And I've looked at your -- at your CV.  In
21  addition to all of those accomplishments on there, is
22  there anything else of significance that I should know
23  about?
24      I'll tell you why I'm asking this question.

Page 32

1  Okay?  I have found out before by failing to ask this
2  question that I've taken the depositions of expert
3  witnesses who were Eagle Scouts, or who had saved the
4  lives of somebody in a small town, and suddenly that
5  became a point of discussion when they showed up for
6  trial of the case.
7      So anything like that in your -- in your
8  background that you can think of?
9      A.  Not that I can think of.
10      Q.  Okay.  Ever run or held political office?
11      A.  No, not yet.  Just joking.
12      Q.  Given this morning's news, there may be --
13      MS. HOFFMANN:  Yeah.
14      Q.  -- there may be a chance.
15      MS. HOFFMANN:  There's a position open.
16  BY MR. HONNOLD:
17      Q.  Significant position in churches or church
18  groups?
19      A.  In my church, I'm the chair of the usher
20  ministry and used to be head of the personnel committee,
21  I guess it was.
22      Q.  And not to pry, but is that a church here in
23  Jackson?
24      A.  It is.

Page 33

1      Q.  Noteworthy athletic accomplishments or
2  achievements?
3      A.  No.
4      Q.  No?  Okay.
5      A.  Unfortunately not.
6      Q.  Winner of the spelling bee or anything like
7  that?
8      A.  No.
9      Q.  No?  Okay.  I'll stop.
10      Did I ask you enough questions that will kind
11  of trigger what I was talking about?
12      A.  Yes.  Yes.
13      Q.  Let's look at Exhibit 1 a little more closely.
14  When you were -- either when you were initially
15  contacted or at some time during the course of your
16  engagement, were you -- were you actually presented with
17  an issue that Bayer was specifically looking to get
18  expert testimony on?
19      For example, were you told, "We're really
20  looking for you to provide opinions on this specific
21  subject or area"?
22      MS. WAY:  Object to the form.
23      MS. HOFFMANN:  And I object to the extent that
24  it calls for attorney-client privileged information.

Protected - Subject to Further Protective Review

Page 34

1    If you can answer that in a general way without
2    repeating conversations between you and the lawyers,
3    then I think it's a permissible question.
4         THE WITNESS: I was asked to review the medical
5    records of Ms. Mingo and give my opinion about what
6    occurred in that case.
7    BY MR. HONNOLD:
8         Q.  Let's look at page 2. I'll -- I'll stop being
9    vague about this. If you go to your roman numeral III
10   there in the middle of the page, you see it says where
11   you write, quote, "I have been asked to discuss the,"
12   and then there's a long list of stuff. Do you see that?
13        A.  Yes.
14        Q.  Okay. So other than that stuff there where you
15   said you were asked to look at anything, is there any --
16   is there anything else that you were asked to do in
17   terms of the scope of your work or engagement in this
18   case?
19        MS. HOFFMANN: So you're interpreting that
20   sentence as a waiver of the attorney-client
21   privilege, is that your position, Counsel?
22        MR. HONNOLD: No, I'm not interpreting it as
23   anything. I'm just following up to see if he was
24   asked to do anything other than what's listed there.

Page 35

1         MS. WAY: And I'll object and instruct him not
2    to answer to the extent that it calls for any
3    communications with counsel.
4    BY MR. HONNOLD:
5         Q.  Go ahead.
6         A.  Oh, okay. No, nothing further.
7         Q.  So here's what I'm asking, and it's pretty
8    simple: You clearly see there where you attribute
9    having been asked by someone to discuss certain topics
10   or issues; right?
11        A.  Yes.
12        Q.  And so what I'm trying to find out is whether
13   there were specific areas or issues that you were also
14   asked to comment on either where you declined to do so
15   or you felt that it was outside your area of
16   professional expertise.
17        MS. WAY: Same objection.
18        THE WITNESS: Not that I know of.
19   BY MR. HONNOLD:
20        Q.  Now, in terms of the actual organization and
21   format of your report, is it something that you came up
22   with on your own?
23        A.  With the attorneys. Like, I didn't put the --
24   I didn't sit down at the computer and do all the nice

Page 36

1    graphs. Some of them I did, but most of them not.
2         Q.  And that was going to be my next question. In
3    terms of the various tables, graphs, and illustrations
4    that are in the report --
5         A.  Yes.
6         Q.  -- let's go through that, and I'd like to --
7    I'd like to identify the ones that you prepared
8    yourself, the ones that you may have yourself found in
9    texts or other resources, and then things that you might
10   have gotten from someone else. Can we do that?
11        A.  Yes.
12        MS. WAY: And, sorry, on the record real quick,
13   because I've produced a slide show in response to
14   the notice today, some of those charts, graphs,
15   visuals appear in there, so I just want the record
16   to reflect that that's been produced in response to
17   the notice.
18        MR. HONNOLD: Okay, great. Just -- and let's
19   take that up, since you've mentioned it, so it's
20   clear on the record what we're talking about.
21        (Haynes Exhibit No. 2 was marked for
22   identification.)
23   BY MR. HONNOLD:
24        Q.  I'm going to hand you what we've marked as

Page 37

1    Deposition Exhibit No. 2. Doctor, can you tell me what
2    that is?
3         A.  Yes, sir. This is a copy of a PowerPoint
4    presentation that I did in June of 2016.
5         Q.  And is that a PowerPoint that you prepared
6    yourself?
7         A.  Yes.
8         Q.  And the various graphics that are in Exhibit 2,
9    whether it's the photographs, tables, or charts, are
10   those ones that you -- that you developed yourself or
11   used with attribution that came from other sources?
12        A.  Other source. Attributed to another source.
13   I'm trying to think. I don't think -- I want to look
14   and make sure -- that I took any of my own patient
15   pictures and put in here. I think these were all from
16   another source, but I just wanted to make sure that I
17   didn't include any.
18        Yes, as far as I see, all of these are from
19   other sources.
20        Ah. Well -- yeah, no, that's correct.
21        Yeah. Yes.
22        Q.  All right. Can I look at that again one more
23   time --
24        A.  Yes, sir.

10 (Pages 34 to 37)

Protected - Subject to Further Protective Review

Page 38

1       Q.  -- and maybe add a little bit of clarity or
2    specificity to the things you said as you were going
3    through it?
4           So what was the purpose of preparing Exhibit
5    No. 2?
6       A.  It was an educational program.
7       Q.  And who was the audience?
8       A.  The audience was actually employees.  I believe
9    it was for Pfizer Pharmaceuticals.  They had what they
10   called -- it was kind of an internship where they came
11   to the medical center and had various faculty that
12   talked about VTE, from diagnosis, to treatment, to
13   follow-up, and things of that nature.
14      Q.  And did you say Pfizer?
15      A.  I believe it was Pfizer.
16      Q.  Okay.  And that's -- they're a pharmaceutical
17   company?
18      A.  Yes.
19      Q.  And did someone at Pfizer contact you to ask
20   whether you would have interest in preparing materials
21   and giving a presentation related to DVT and PE?
22      A.  No, it was someone at the University Medical
23   Center, one of the faculty there.
24      Q.  And who was that?

Page 39

1       A.  I believe it was our program director,
2    Dr. Herrin.
3       Q.  Herring, as in H-e-r-r-i-n-g?
4       A.  No G.  Sorry.  H-e-r-r-i-n.
5       Q.  And Dr. Herrin is a program director?
6       A.  Yes, for the internal medicine residency
7    program.
8       Q.  And what -- what does that mean, program
9    director?
10      A.  So, like I'm the fellowship program director
11   that decides for people who come into pulmonary, in
12   their training, he decides if all the internal medicine
13   residents at the medical center, there's a three-year
14   residency program, so he's responsible for all those
15   coming in, all their certifications, and the curriculum
16   and the training of those trainees.
17      Q.  Did anyone, whether it was Dr. Herrin, you, or
18   the university, receive any consideration of any type
19   from Pfizer for putting on this program?
20      A.  I did not.  I can't answer for the department.
21      Q.  And either at the time of the presentation or
22   now, did you have any understanding as to whether Pfizer
23   had some sort of product that was, I guess, in the
24   treatment milieu of DVT and PE?

Page 40

1       A.  Yes.
2       Q.  And what -- what was that product?
3       A.  Eliquis, I believe.  E-l-i-q-u-i-s.
4       Q.  And do you on occasion prescribe Eliquis in
5    your practice?
6       A.  I do.
7       Q.  So similar to this presentation that was done
8    for Pfizer that brings into the -- that brought into the
9    discussion of another pharmaceutical company, and so
10   even though this was an ongoing consultation or work, I
11   understand why you didn't mention it to me previously,
12   the way I asked the question.
13          So in the context of doing kind of single or
14   one-off sorts of presentations like this one that's
15   shown in Exhibit 2, any others like that that you did
16   for pharmaceutical companies?
17          MS. WAY:  Object to the form.
18          MS. HOFFMANN:  Object to the form.
19          THE WITNESS:  Not that I know of.  That --
20       because I was asked to do it as -- the people were
21       asked from the department, so, no, I didn't include
22       that since I didn't receive any compensation.
23   BY MR. HONNOLD:
24       Q.  But you knew the audience?  At some point

Page 41

1    someone -- is it your understanding that at some point
2    someone from the pharmaceutical company asked Dr. Herrin
3    about doing this program?
4           MS. HOFFMANN:  Objection.
5           MS. WAY:  Object to the form.
6           THE WITNESS:  I'm assuming.  He asked me.
7    BY MR. HONNOLD:
8        Q.  Was it your understanding that employees of
9    Pfizer were going to be in the audience?
10       A.  Yes.
11       Q.  And you knew that in advance?
12       A.  Yes.
13       Q.  Any of those individuals that were in the
14   audience, have any of those individuals gone on to be
15   your assigned sales representative related to Eliquis?
16       A.  Yes.
17       Q.  And who are those people, if you know?
18       A.  I can't tell you the name.  I'm sure I've met
19   at least two or three of them before.  Like most of the
20   companies, they come by the office.  Promotional
21   materials.  So I know their faces and probably will
22   remember the name when I saw it with the name badge,
23   but...
24       Q.  Do you know the name of your current sales

11  (Pages 38 to 41)

Protected - Subject to Further Protective Review

Page 42

1   representative or representatives related to Xarelto?
2       A.  I know exactly who she is, but I can't tell you
3   her name right now.  It's -- you know, we see a lot of
4   reps, so, sorry, I can't remember their --
5       Q.  But it sounds like that if their -- if you saw
6   the particular individual, you would associate her with
7   being your Xarelto rep?
8       A.  Yes.
9       Q.  Of the various medications that are in the DOAC
10  or NOAC class, which of those do you currently prescribe
11  on occasion for patients?
12      A.  Xarelto and Eliquis.
13      Q.  Currently you are not prescribing Pradaxa for
14  patients?
15      A.  No.
16      Q.  And is there a specific reason for that or some
17  explanation for that?
18      A.  No, not particularly.  I -- no, not
19  particularly.
20      Q.  In terms of your current practice habits in not
21  prescribing Pradaxa, was that view formed or influenced
22  in any way based upon any clinical trials that you've
23  read related to Pradaxa or any comparative
24  epidemiological studies or other reports related to the

Page 43

1   drug?
2       A.  No.
3       Q.  Anything specific related to the elimination
4   profile, half-life, renal issues related to Pradaxa?
5       A.  No.
6       Q.  Have sales representatives for Pradaxa called
7   upon you on occasion?
8       A.  Probably.
9       Q.  Do they continue to call on you?
10      A.  I don't remember the last time we've seen one
11  with Pradaxa, but I don't remember.
12      Q.  Do you know whether there are other members
13  of -- in your division who do on occasion prescribe
14  Pradaxa for patients?
15      A.  I don't know.
16      Q.  Let's go back to Exhibit 2, and we were
17  starting by trying to identify what was -- perhaps came
18  from other sources.  And the PowerPoint includes many
19  slides that have headings and then bullet points;
20  correct?
21      A.  Yes.
22      Q.  Some of those you might have prepared in terms
23  of your own information, but others are -- you attribute
24  to a particular citation or source in the literature;

Page 44

1   correct?
2       A.  Yes.
3       Q.  The third page in Exhibit 2 is just a
4   cross-section of a heart.  Is that something you would
5   have gotten from some other source?
6       A.  I believe I pulled that one from the Internet.
7       Q.  Then the next illustration that appears has
8   something in the lower right-hand corner that says
9   "UpToDate," and it shows the deep veins of the leg.  Is
10  this something that would have been taken from the
11  UpToDate section?
12      A.  Yes.
13      Q.  And do you have access to UpToDate?
14      A.  Yes.
15      Q.  Okay.  Do you use it frequently?
16      A.  Yes.
17      Q.  Do you find it to be a source of information
18  that's up-to-date and materials written by
19  well-qualified authors?
20      MS. WAY:  Object to the form.
21      THE WITNESS:  Most of it.
22  BY MR. HONNOLD:
23      Q.  Have you either referred your residents or
24  fellows to use or access UpToDate on occasion?

Page 45

1       A.  Yes.
2       Q.  Is it fair to state that anything that has the
3   UpToDate logo or mark on it came from an article that's
4   posted on UpToDate?
5       A.  Yes.
6       Q.  Why is it that when you prepared slides that
7   came or the data came from a particular source that you
8   included the citation on the slide?
9       A.  Usually when we do our PowerPoint presentations
10  at the university we want to attribute the source of the
11  information.
12      Q.  And that's just proper academic practice?
13      A.  It is.
14      Q.  The PowerPoint deck also contains three slides
15  that have "DVT Diagnostic Algorithm," and I don't -- I
16  don't see a specific citation source, so what about --
17  what about those, the algorithms?
18      A.  I guess I left the citations off that.
19  Actually, I can see now how the slide is drawn.  I
20  didn't put the citations at the bottom of each of those.
21      Q.  And so this likely came from another source as
22  well?
23      A.  Yes.
24      Q.  As you sit here today, do you think you know

12 (Pages 42 to 45)

Protected - Subject to Further Protective Review

Page 46

1  where that came from?
2    A.  Not specifically.
3        MS. WAY:  Hey, Brad, can we --
4        MR. HONNOLD:  Yes.
5        MS. WAY:  If you're going to continue to ask
6  him questions about it, can we make a copy so that
7  he can have it in front of him?
8        MR. HONNOLD:  Instead of me just holding it
9  up --
10       MS. WAY:  Yeah.
11       MR. HONNOLD:  -- and having him squint at it?
12       MS. WAY:  And for the record to reflect --
13       MR. HONNOLD:  You don't like that?
14       MS. WAY:  Not in particular.
15       MR. HONNOLD:  You know I'm kidding.  We've been
16  going a little more than an hour, so why don't we
17  take a break.  We can do that.
18       MS. WAY:  Okay.
19       THE VIDEOGRAPHER:  The time now is 10:10 a.m.
20  We are off the record.
21       (Recess from 10:10 a.m. until 10:24 a.m.)
22       THE VIDEOGRAPHER:  This begins Disk 2 of
23  today's deposition.  The time now is 10:24 a.m.  We
24  are back on the record.

Page 47

1
2  BY MR. HONNOLD:
3    Q.  Doctor, we've made a copy of Exhibit 2 and put
4  that before you, so what I would like to do then is go
5  to -- we got through the DVT diagnostic algorithm, and
6  then I think the next thing I have a question about is,
7  there's a photograph of a patient that has a discolored
8  leg.  Would that have been taken from another source?
9    A.  Yes.
10   Q.  Do you -- can you tell from looking at either
11  this page or the one following whether these are from --
12  both from UpToDate?
13   A.  I don't remember if this one, the first one, is
14  from UpToDate.
15   Q.  And if we go two or three more slides, there's
16  something that looks like it's from New England Journal
17  of Medicine; is that right?
18   A.  Yes.
19   Q.  And the specific source would be the article
20  that's cited there, the Tapson publication down at the
21  bottom?
22   A.  Yes.
23   Q.  Then the next thing is a V/Q scan algorithm.
24  Do you see that?

Page 48

1    A.  Yes.
2    Q.  And you do have a citation there to JAMA; is
3  that right?
4    A.  Yes.
5    Q.  And then as you look at that algorithm and the
6  way that it's font and the way that it's structured,
7  does it make you think or consider whether that other
8  algorithm that we looked at earlier in Exhibit 2 might
9  have also came from that same JAMA source?
10   A.  I don't know for sure.
11   Q.  Okay.  The next are some, looks like, lung
12  images of some sort, and you've got the citation or
13  source to those; is that right?
14   A.  Yes.
15   Q.  Would that have come from another publication,
16  or did you actually go to Dr. Waxman's website or the
17  Cedars website?
18   A.  I don't remember if it came from the
19  publication or if I went to their website.  Some
20  institutions have things on the website that you can go
21  and take and you put this on it, but I can't remember
22  the -- where this one came from.
23   Q.  The next thing in terms of a chart or graph or
24  table is a CT algorithm that is then followed by a

Page 49

1  number of, it looks like, CT slices.  Do you know where
2  those came from?
3    A.  Probably -- probably from the Internet.  I
4  think I went on there -- looking -- just looking at the
5  quality of some of them, I probably just copied some
6  from the Internet and put on there four of them.
7    Q.  Then there is a slide called PE Treatment, and
8  immediately after that there is an image that looks like
9  lung vasculature, but I don't know for sure.
10   A.  Yes.
11   Q.  And do you know where you found that?
12   A.  I don't remember.  It's probably from the
13  Internet.  It may be from UpToDate too, but I don't
14  remember exactly where I pulled this one.
15   Q.  Then there's a Modified Wells Criteria slide
16  that you have an citation to JAMA.  After that then
17  there is a -- the Padua scoring chart.  Do you know
18  where that came from?
19   A.  That's another one where it looks -- as I'm
20  looking at how I drew the slide, some of the references
21  were cut off, so I can't remember.
22   Q.  As you look at the next slide about the Padua
23  findings, is it likely it came from that Barbar and
24  others article?

13 (Pages 46 to 49)

Protected - Subject to Further Protective Review

Page 50

1    A. I bet it did.

2    Q. And then after the summary, at the very end you

3  had to give some credit to Gray's Anatomy; right?

4  Couldn't be complete without at least one Gray's slide?

5    A. Exactly.

6    Q. All right. Thank you.

7    Let's go back to Exhibit 1, your report, and I

8  want to follow up then on the various tables, graphs and

9  illustrations that are in the report Exhibit 1.

10    Now that we've gone through Exhibit 2, I do see

11  that some of them, or a few of them, at least, may have,

12  in fact, come from Exhibit 2. What I want to do is go

13  to -- let's find one that doesn't have a particular

14  source.

15    If you go to page 15, in -- just below the

16  middle of the page on page 15, there is a, I don't know

17  how you best describe that, whether it's a graph or a

18  table or some sort. Do you know where that came from?

19    A. Yes, this data is from the EINSTEIN-DVT study.

20    Q. So would it have actually been in the

21  publication itself?

22    A. I don't -- I don't remember if this actual

23  graph was from the publication. I don't remember that.

24    Q. Okay. And here's why: There's a couple things

Page 51

1  on here. As you look at that and see the EINSTEIN-DVT

2  study design, after Day 21, was Xarelto actually given

3  as 20 milligrams twice daily?

4    A. That's a mistake.

5    Q. Well, it caught my eye and I just wanted to see

6  where this came from.

7    A. Yeah, no, no, that's a mistake.

8    Q. Okay. Do you know where this -- where this

9  came from on page 15?

10    A. The chart?

11    Q. Uh-huh. Yes.

12    A. With the exception of that mistake, from the

13  study. The data from the study, or -- the actual chart

14  itself?

15    Q. Yes.

16    A. No, I don't think it -- I don't remember if it

17  was in the study or not.

18    Q. Then where did that chart come from?

19    A. Oh, it's probably one that I created with

20  the -- with the attorneys, if it wasn't directly from

21  the study.

22    Q. All right. So if -- and I don't necessarily

23  want to go through your report to identify other places

24  where there might be a need for editing or corrections

Page 52

1  or anything like that, but at least we've stumbled

2  across one area where there -- on page 15, where there

3  is an error; right?

4    A. Uh-huh.

5    Q. Yes?

6    A. Yes.

7    Q. And just so it's clear, I mean, that -- to

8  suggest that EINSTEIN-DVT study at Day 21 put patients

9  on Xarelto 20 milligrams twice daily, that's just flat

10  out wrong; right?

11    MS. WAY: Object to the form.

12    THE WITNESS: Yes, that's a mistake there.

13  BY MR. HONNOLD:

14    Q. Okay. Now, what I want to do is kind of scan.

15  Maybe you could scan through with me the remainder of

16  the report to see if you discuss EINSTEIN in any other

17  places where it suggests that 20 milligrams was given

18  twice daily after Day 21.

19    It looks like it happens again on page 17; is

20  that right?

21    A. Yes.

22    Q. And then it looks like it happens again on page

23  20; is that right? Because on page 20 there's a chart

24  now for the extension portion of the EINSTEIN trial?

Page 53

1    A. Correct.

2    Q. The extension patients didn't get 20 milligrams

3  twice daily, did they?

4    A. No, once daily.

5    Q. And so far we've found three places where

6  there would be need for correction to show that the

7  EINSTEIN patients, whenever -- after Day 21, whether it

8  was in the primary study or the extension, where it says

9  "20 milligrams twice daily," those should all be

10  corrected to "20 milligrams once daily"; right?

11    A. That's correct.

12    Q. In your work on this case, have you reviewed

13  any data or material where clinical trial subjects would

14  have been receiving 20 milligrams of Xarelto twice

15  daily?

16    MS. HOFFMANN: I'm sorry. Can you say that

17  again?

18    MR. HONNOLD: Maybe.

19  BY MR. HONNOLD:

20    Q. In your work -- in your work on this case, have

21  you reviewed any data or material where patients were

22  receiving 20 milligrams of Xarelto twice daily?

23    A. I don't think so.

24    Q. As you sit here today, can you think of a

14 (Pages 50 to 53)

Protected - Subject to Further Protective Review

Page 54

1   clinical trial where any treatment arm had 20 milligrams
2   of Xarelto twice daily?
3       A.  Not that I can think of.
4       Q.  Do you think -- well, let me ask it this way:
5   In terms of those graphics that are at page 15 and 17
6   and page 20 that have the "20 milligrams twice daily,"
7   are you the one that made those key strokes that
8   actually typed "20 milligrams twice daily" in that
9   format?
10      A.  I can't remember.  I'm probably thinking I just
11  copied and just did there and changed the dose, but I
12  did have the attorneys help me with some of the
13  graphics, so that may have been one of the ones that was
14  worked on.  I sent them what I wanted it to look like.
15      Q.  And looking at this in a little bit more detail
16  now, does it refresh your recollection at all as to what
17  the original source was of the structure of this
18  graphic, or was it something that you sketched out
19  yourself and had somebody prepare using some sort of --
20  some sort of software or program?
21      A.  I believe it was sketched out.  I don't believe
22  it looked like this in the study, but I have to look at
23  the study to know for sure.  I can't remember if it was
24  laid out in a graph like this in the study or not.

Page 55

1       Q.  If you go to your Exhibit B of your report,
2   there is a document that's called Reference List?
3       A.  Yes.
4       Q.  Can you go to that?
5       A.  Yes.
6       Q.  How was the reference list arrived at?  What I
7   mean by that is, how did -- how did you decide that, I'm
8   especially interested in Items 1 through 36, medical
9   literature citations, how they were derived at?
10      A.  Some of these I had in my own, I guess,
11  repository of journal articles, and some were sent by
12  the attorneys to ask if I'd reviewed them or would
13  review them.
14      Q.  Did you yourself do any independent research
15  for your work on the report, Exhibit 1?
16      A.  As far as pulling articles?
17      Q.  Yes.
18      A.  Yes.
19      Q.  And what was your methodology or approach in
20  doing that?
21      A.  Well, sorry, let me -- let me --
22      Q.  Sure.
23      A.  I guess I shouldn't say independent research,
24  because I already had some of those articles, so I just

Page 56

1   pulled some of the articles that I had.  So as far as
2   going to, like, PubMed or doing a lit search or anything
3   like that, no, I didn't do that.
4       Q.  Is there any way by looking at those citations
5   which are in Exhibit B, Nos. 1 through 36, which are the
6   ones that you had in your personal repository versus
7   what was given to you by counsel?
8       A.  I can't remember which all ones that I had.
9   Several of them I know for sure, but others I can't
10  remember.
11      Q.  And what -- at the time when you went to your
12  repository to get certain articles, what was your
13  personal practice in terms of maintaining a literature
14  file, a repository, under certain topics?
15      A.  So since we do journal club reviews and things
16  of that nature at work, we pull a lot of different
17  articles, and so sometimes it may be by the journal,
18  sometimes it may be by the diagnosis, sometimes it may
19  be by the author.  So saving them in just kind of
20  different files.
21      Q.  Okay.  And you do that yourself?
22      A.  Yes.
23      Q.  And then for you then to access these or round
24  them up, what -- was it a database that you could

Page 57

1   search, or were you just able to recall by memory which
2   were in this topic area?
3       A.  Usually I was going -- if I had maybe a topic
4   area that said DVT/PE, or some of these would have
5   fallen under pulmonary hypertension too, because I keep
6   some DVT and PE things there.  Sometimes I remember
7   authors that have written about VTE.  So I think there
8   would have been various ways saved on my computer.
9       Q.  And I want to make sure I understand the
10  distinction as to why it is that you made specific
11  citations or footnotes to certain things in the text of
12  your report versus just having something listed on the
13  reference list.
14          So what was, I guess, your approach or mind-set
15  as to when you would actually specifically do a footnote
16  citation in the text of the report versus having
17  something on the reference list?
18      A.  I don't know if I understand what you're
19  asking.  Are you asking me is there something I don't
20  have referenced?
21      Q.  No, I guess what I'm trying to understand is,
22  if you have something on the reference list, but it's
23  not specifically the subject of a particular footnote or
24  discussion, specific discussion in the text of the

Protected - Subject to Further Protective Review

Page 58

1    report, why is it on the reference list?
2         A.   Oh.  So if there's any information in here
3    where I've derived information from my opinions that may
4    have been included in the reference, so I don't -- I
5    can't remember.  Let me look and see.
6         I don't know if I specifically put -- yeah, I
7    don't think I put references in my opinions regarding
8    Ms. Mingo and the specific treatment, I don't think.
9    Yeah, I didn't put any in there.
10        Q.   Okay.  So I want to make sure I understand.  If
11   you to go to Exhibit B then, and let's just randomly pick
12   one of the ones on the reference list, for example,
13   Reference No. 5, the Agnelli article regarding apixaban,
14   do you see that?
15        A.   I'm sorry.  Which page?
16        Q.   Yeah.  Let's go to -- let's go to the reference
17   list, Exhibit B.
18        A.   Oh.
19        Q.   And let's just pick a random reference item on
20   there, for example, No. 5, the Agnelli article.  Do you
21   see that?
22        A.   Uh-huh.
23        Q.   Yes?
24        A.   Yes.

Page 59

1         Q.   I think, if we go through, you won't have a
2    specific footnote to that article, so I'm trying to
3    understand why a particular article might be on the
4    reference list when it's not specifically discussed or
5    cited in the text of the report.
6         A.   That would have been because I based my
7    opinions on literature that I reviewed, so I may not,
8    like I said, in my opinions have cited a certain
9    article, but reading those articles or being familiar
10   with those may have factored into my opinion.
11        Q.   Okay.  And so I don't mean to pick on Reference
12   Point No. 5, but it's just the one my eyes focused on.
13   So if you go ahead and look at Reference Point No. 5
14   then in terms of the authors, the title of the article,
15   and its source, can you then go look at some specific
16   place in your report to say, "Oh, here's why reference
17   No. 5 was important to me," because there is a portion
18   of the report that correlates to that?
19        A.   Not that I can think of offhand.
20        Q.   Okay.  And so that's what I'm -- that's what
21   I'm trying to get at.  So, again, using No. 5 as an
22   exemplar, is it -- is it just because No. 5 was in
23   either your personal repository for DVT or NOACs or that
24   counsel gave it to you that you just decided to put it

Page 60

1    on the reference list?
2         A.   Well, I put it on there because I reviewed --
3    any articles that I reviewed while I was working on this
4    report, I listed there.
5         Q.   All right.  And maybe that's -- we've
6    discovered kind of the distinction then.  If it was an
7    article that you reviewed before you prepared -- before
8    you actually prepared the final report, it got put on
9    the reference list?
10        A.   Yes.
11        Q.   Okay.  And I want to make sure I understand.
12   But if you were writing an academic paper, though, for
13   submission for consideration for publication, the
14   bibliography would be -- would be limited to things that
15   you specifically cite during the -- in the paper; right?
16        MS. HOFFMANN:  Objection.
17        MS. WAY:  Object to form.
18        THE WITNESS:  Yes, because those are written
19   specifically with citations for everything.  There's
20   not as much of an opinion when you're writing those.
21   The medical literature requires that citations --
22   there are certain criteria for the -- for the
23   citations that we have to follow.
24   BY MR. HONNOLD:

Page 61

1         Q.   And from my perspective, I just want to make
2    sure that I -- you know, for a particular article that's
3    not specifically either referenced by title either in a
4    footnote or somewhere in the discussion part of your
5    report, I'm just trying to make sure whether there's
6    anything that's particularly important about that
7    article that you might talk about someday.
8         MS. WAY:  Object to form.
9         MS. HOFFMANN:  Objection.
10   BY MR. HONNOLD:
11        Q.   And so that's -- so, again, let's pick No. 5.
12   So as you look at that, I don't know how to get there
13   other than by asking you, so, like, as you sit here
14   today, is there anything about Reference No. 5 that
15   strikes you as being particularly important to this
16   topic that you might someday talk about it in detail?
17        MS. HOFFMANN:  Objection.
18        THE WITNESS:  I don't know if specific
19   questions will be asked about that article, if
20   that's what you're asking.
21   BY MR. HONNOLD:
22        Q.   And as you look at it now and see the title and
23   the -- and the source of it, is there anything that
24   comes to mind about the significance of that article?

16  (Pages 58 to 61)

Protected - Subject to Further Protective Review

Page 62

1    A.  Not necessarily.
2    Q.  Okay.  And let's see if I can make it a little
3  more general, to speed up.  For any other reference item
4  that's on the -- that's on the list in Exhibit B, if
5  it's -- if it's not discussed or referenced specifically
6  in the report or it's something where there's an actual
7  footnote citation, is there any way that we can tell by
8  looking at either the reference list or the report as to
9  its particular importance?
10       MS. WAY:  Object to the form.
11       MS. HOFFMANN:  Objection.
12       THE WITNESS:  I'm not sure.
13       MS. WAY:  I believe it's been asked and
14  answered.
15  BY MR. HONNOLD:
16    Q.  Well, I want to make sure that we're
17  communicating.  Do you kind of understand what I'm
18  asking as to -- I'm trying to figure out what importance
19  a particular reference item has to you if it's not
20  discussed specifically in the text of your report or
21  it's not footnoted in some way.
22       MS. WAY:  Form.  Asked and answered.
23       THE WITNESS:  So, to me, for references, when
24  I'm giving an opinion on something, if there's

Page 63

1  something I reviewed regarding this, we do it all
2  the time for our academic talks, even if we don't
3  have it, but some of our talks, you may have
4  footnotes at the bottom, but at the end you always
5  have a reference list for things you reviewed while
6  putting together that presentation.
7       So when we do -- this one just doesn't happen
8  to have it, but some of our talks, you may have
9  footnotes at the bottom, but at the end you always
10  have a reference list for things you reviewed while
11  putting together that presentation.
12  BY MR. HONNOLD:
13    Q.  And let's see if we can come up with a topic or
14  category then that we can agree on.  Would it be fair to
15  say then that the things that are on the reference list,
16  if not specifically mentioned in the text of the report
17  or cited, would be things that you looked at for general
18  background on the topic?  Would that be a fair way to
19  say it?
20    A.  Yes.
21    Q.  Or maybe another way is that it was a body of
22  literature that you looked at again to perhaps refresh
23  your recollection as to the topic in general that you
24  always have knowledge of because you're a doctor that
25  works in that area, but you looked at those things just

Page 64

1  to remind yourself of the -- of the scope of the
2  literature and publications in that area?  Would that be
3  another fair way to describe it?
4    A.  Some of those, yes.
5    Q.  You're not saying, though, that there's -- in
6  terms of an article that's not discussed or not cited,
7  you can't sit here today to say for a specific reference
8  point there is some specific issue or statement or
9  conclusion drawn from one of those articles that is
10  actually of significance in your report?
11       MS. HOFFMANN:  Objection.
12       MS. WAY:  Object to form.
13       THE WITNESS:  I don't know if I can say that.
14  BY MR. HONNOLD:
15    Q.  Meaning that there may be some statements that
16  are in some of those articles that are echoed in some
17  way generally or specifically in your report?
18    A.  Yes.
19    Q.  Now, do you still have a file on this case in
20  terms of the materials that you looked at and reviewed?
21    A.  Yes.
22    Q.  And where is that file?
23    A.  Saved on my computer.
24    Q.  So the items on the reference list, those are

Page 65

1  things that are -- do those all exist in electronic
2  format on your computer?
3    A.  Yes.
4    Q.  So when you received articles from counsel, did
5  you receive them electronically?
6    A.  Yes.
7    Q.  And then for the articles that you searched in
8  your own repository, those already existed in some way
9  electronically; right?
10    A.  Yes.
11    Q.  And you've now -- you've merged those sources
12  together so that all of these articles on the reference
13  list exist in one place?
14    A.  Yes.
15    Q.  In terms of the medical records and
16  information, or medical records that you got, do you
17  still have those?
18    A.  Yes.
19    Q.  And in what format do those exist?
20    A.  Electronic.
21    Q.  Have you done any electronic highlighting or
22  interlineation on any of your -- the medical records you
23  got?
24    A.  Yes, on some.

17 (Pages 62 to 65)

Protected - Subject to Further Protective Review

Page 66

1    Q.   Okay.  And do those exist on your electronic
2    version of those?
3    A.   Yes, sir.
4    Q.   And the depositions or other materials that you
5    received, including deposition exhibits, were those
6    things that you received electronically?
7    A.   Yes.
8    Q.   There's references on the third page of Exhibit
9    B to some exhibits from the Misselwitz deposition, and
10   those are Items 48 and 49.  Do you see those?
11   A.   Yes.
12   Q.   Did you actually also review the Misselwitz
13   deposition itself?
14   A.   I remember receiving them, and if they're on
15   there, I must have looked at them.
16   Q.   Okay.  But if you look at 48 and 49, they just
17   refer to the exhibits.
18   A.   Oh.
19   Q.   So did you -- did you --
20   A.   Oh, the deposition.  No, no.  I see what you're
21   saying.
22   Q.   If you would have received the Misselwitz
23   deposition, it would have been listed there
24   independently; correct?

Page 67

1    A.   Yes.
2    Q.   For example, if you go to Reference Items 53
3    and 54, the depositions of Dr. Jordan and Dr. Keith, you
4    did get their depositions and exhibits in their
5    entirety; correct?
6    A.   Yes.
7    Q.   And so you can tell me with certainty that you
8    did not receive the Misselwitz deposition transcript;
9    right?
10   A.   I believe so.
11   Q.   Did you receive any depositions of Bayer or
12   Janssen employees?
13   A.   No.
14   Q.   Other than the Deposition Exhibits 15 and 17 of
15   the Misselwitz deposition, were you presented with any
16   company or corporate documents from either Janssen or
17   Bayer?
18   A.   No.
19   Q.   The Xarelto labels that are listed in Reference
20   Items 37 through 47, were those things that you had,
21   were given to you, or that you accessed independently
22   for some reason?
23   A.   These were sent to me.  I had -- well, in some
24   form.  You can always get the PI from the reps or

Page 68

1    someone, so I've always had at least one copy of the PI,
2    but these different iterations were sent to me.
3    Q.   So 37 through 47 on the reference list, those
4    were sent to you by counsel?
5    A.   Yes.
6    Q.   And do you also have those electronically on
7    your computer?
8    A.   Yes.
9    Q.   Let's go through some of the specific sections
10   of the report.  I think Section 1 speaks for itself.
11   That's just kind of a shorthand statement regarding your
12   background and qualifications with reference to your
13   more detailed CV; is that right?
14   A.   Yes.
15   Q.   In terms of your clinical practice relating to
16   the care of patients with DVT or PE, we've already
17   talked about that to some degree; correct?
18   A.   Yes.
19   Q.   I've been throwing around those abbreviations
20   like everybody that might read this or hear it knows
21   what we're talking about.  Can you just explain what DVT
22   and PE, what those stand for, just very generally?
23   A.   Sure.  A DVT is a deep vein thrombosis, so it's
24   a clot that forms in one of the deep veins of the body.

Page 69

1    Q.   And then PE?
2    A.   PE is pulmonary embolism.  So that is when a
3    clot travels from one of the deep veins into the
4    pulmonary arteries, which are the arteries in the
5    cardiovascular -- cardiopulmonary circulation.
6    Q.   Do all PEs have their origin -- or do all PEs
7    originate from a deep vein of the leg?
8    A.   No, probably -- I'd have to look at my exact
9    reference, but probably maybe 10 percent may come from
10   the upper extremities, and then there's some that we
11   would say, whether you include the pelvic veins as part
12   of the leg or not, some can originate in the renal
13   veins, especially patients with various disorders,
14   whether they be cancer, renal disease.  So not all would
15   originate in the legs.
16   Q.   And is it fair to say for pulmonary embolus
17   that they don't independently develop within the lung
18   structure itself?
19   A.   For the majority.  So there's some literature
20   that may state that there's what we would call de novo
21   or clots that form in the pulmonary vasculature from
22   somebody who has some disorders like pulmonary
23   hypertension, but the majority I would say, yes, would
24   originate somewhere else.

18  (Pages 66 to 69)

Protected - Subject to Further Protective Review

Page 70

1      Q.  And it's probably the vast majority originate
2   somewhere else?
3      A.  Oh, yes.
4      Q.  So the title pulmonary embolism may be somewhat
5   confusing in that, even though it's a clot that's in the
6   lung, the vast majority of them don't originate or start
7   in the lung; right?
8      A.  Right.  So that's where the -- I'm assuming
9   where the embolic part of it comes from.  Usually
10  embolic means it breaks off and starts from somewhere
11  and goes somewhere else.
12     Q.  In terms of your use of rivaroxaban and
13  Eliquis, is it limited to the care and treatment of
14  patients that either have DVT or PE, or do you also
15  prescribe it in terms of new prescriptions for patients
16  that either have had atrial fibrillation or have new
17  onset atrial fibrillation?
18     A.  Most of the patients with atrial fibrillation
19  are treated by our cardiologists, so I can't think of
20  where I've started an anticoagulant on a new AFib
21  patient without a cardiologist.
22     Q.  So is it fair to state then that your -- the
23  vast majority of your personal experience in terms of
24  prescribing or using Eliquis and/or Xarelto for patients

Page 71

1   is in the context of DVT or PE?
2      A.  Yes.
3      Q.  In terms of your reference list, in looking at
4   Exhibit B, can you tell whether any of your literature
5   that's cited there are publications that are related to
6   Xarelto or any other NOACs in the context of atrial
7   fibrillation?
8      A.  So the Chest Guidelines, I'm certain, mention
9   something about atrial fibrillation in them, but I'm not
10  sure if any of the others do.
11     Q.  And while it's certainly possible that some of
12  these -- some of the articles on your reference list in
13  passing or in some way may include some comment about
14  atrial fibrillation, at least in going by the title and
15  the apparent subject matter of the articles, you really
16  looked at literature from the perspective of diagnosis,
17  care, and treatment of DVT and PE; is that correct?
18     A.  That's correct.
19     Q.  Do you know, have you ever read the ROCKET
20  trial itself or any articles that comment on the ROCKET
21  trial?  I'll just -- if you're not familiar with it,
22  ROCKET was the clinical trial that led to the approval
23  of the atrial fibrillation indication for Xarelto.
24     A.  I'm familiar with it.

Page 72

1      Q.  Okay.  Do you think that you've -- do you think
2   you've actually read that article?
3          MS. HOFFMANN:  Objection.
4          THE WITNESS:  I'm not sure.
5   BY MR. HONNOLD:
6      Q.  Have you reviewed any original underlying
7   clinical trial data, for example, data that might be in
8   SAS format that actually was the raw data that came from
9   any clinical trial related to Xarelto?
10         MS. WAY:  Object to form.
11         THE WITNESS:  No.  I'm not sure what SAS data
12  is, so maybe I should have asked for that before I
13  said "no."
14  BY MR. HONNOLD:
15     Q.  If you've not -- if you looked at it, you'd
16  know it, and all I wanted to know is whether you've
17  looked at it, so that's good.
18     A.  Okay.
19     Q.  In terms of the actual information about the
20  various clinical trials for Xarelto that you cite in
21  your report and discuss, does the information that you
22  include in your report essentially come from the
23  published trial papers themselves where you actually
24  have an abstract and then will have the sections that

Page 73

1   talk about methodology and results and conclusions?
2      A.  Yes.
3      Q.  I'd like to go to Section III than begins about
4   the middle of the page on page 2 of your report.  Do you
5   see that?
6      A.  Yes.
7      Q.  And I think this is just kind of a matter of
8   housekeeping more than anything, but you see that in
9   Section III you set forth in bullet point fashion the
10  opinions that you state that you hold to a reasonable
11  degree of medical certainty in this case?  Do you see
12  that?
13     A.  Yes.
14     Q.  And there are, looks like, six bullet points;
15  is that right?
16     A.  Yes.
17     Q.  Then if you go to your report, Section VIII
18  that begins on page 25, you also have another -- you
19  have a heading there that's called Case-Specific
20  Opinions.  Do you see that at page 25?
21     A.  Yes.
22     Q.  And I tried to -- I tried to figure this out
23  myself, but I kind of gave up as to whether the opinions
24  that you state in Section III on pages 2 and 3, whether

Protected - Subject to Further Protective Review

Page 74

1  those are separate and apart from the opinions that you
2  have in Section VIII on pages 25, 26, and 27, or whether
3  there's some overlap between those, those two areas.
4          Can you look at that and then just -- and then
5  just try to give me some sense whether those are two
6  actual completely independent sections of opinions or
7  whether there's some -- some overlap or repeat of some
8  of those?
9          MS. WAY: Sorry, Brad, what's the question?
10         Whether there's an overlap between the summary and
11         the case-specific?
12         MR. HONNOLD: Kind of.
13 BY MR. HONNOLD:
14     Q.  I guess maybe I can put it this way: The list
15 of your opinions that you set forth on page 2 and 3, do
16 those last two bullet points essentially incorporate the
17 things that you're also saying at pages 25 through 27?
18     A.  Are these last two bullet points also
19 incorporated into the case-specific summary?
20     Q.  Right. Or put another way, do those last two
21 bullet points, are those the bullet points that
22 essentially summarize what you -- what you're saying on
23 pages 25 through 27?
24     A.  It's included in the summary of that, but

Page 75

1  there's additional information there in 25 through 27
2  that's not in the bullet points.
3      Q.  Okay. All right. Let's -- let's go through
4  some of these, because I really want to understand. On
5  some of these opinions that you state on page 2 and 3, I
6  want to know within the report where the -- where the
7  underlying basis or support for these things are.
8          So let's start with the first bullet point on
9  page 2 --
10     A.  Okay.
11     Q.  -- that says, quote, "DVT and PE are common,"
12 and then it goes on. Do you see that?
13     A.  Yes.
14     Q.  Okay. So in your report for that first bullet
15 point, where would we look to for the information that
16 serves as the basis or support for that first bullet
17 point?
18     A.  That would be from Centers for Disease Control,
19 the Reference No. 1.
20     Q.  And so you're talking about Reference No. 1,
21 meaning what's cited there on page 3?
22     A.  Yes, as -- let's see -- as well as -- that's --
23 I guess that would be my opinion as well. So there's a
24 citation for, when you say common, I guess we don't put

Page 76

1  a numeric value on that, so that's kind of a general
2  statement, I think, that would be my opinion.
3      Q.  Okay. And would it be that your Footnote No.
4  2 on page 4 would be further support for that first
5  bullet point?
6      A.  Yes.
7      Q.  And generally, as it relates to that first
8  bullet point, what is it about DVT and PE that make
9  those conditions potentially life-threatening?
10     A.  So the DVTs usually lead to PE, and what makes
11 them life-threatening is pulmonary emboli, the PE, can
12 cause right heart failure and sudden death. I should
13 say death overall. It's not always sudden.
14     Q.  And then you mention that the conditions
15 require certain treatment, including use of
16 anticoagulant therapy. Is it true that the treatment
17 for DVT and PE can also potentially carry with it or
18 create life-threatening complications or adverse
19 reactions?
20     A.  Yes.
21     Q.  And is it true that this manifests primarily in
22 bleeding, the form of bleeding?
23     A.  Yes.
24     Q.  Let's go to Bullet Point No. 2 that's on page 2

Page 77

1  then. Can you point me to either the specific area by
2  page or paragraph in your report, including citations,
3  if you have them, that serve as the basis or support for
4  that, that opinion?
5      A.  Yes. If you go to page 11, it's kind of a -- I
6  don't know what you call it. After the last full
7  paragraph, kind of in a block setting, it's from the
8  American College of Chest Physicians, 10th edition of
9  Antithrombotic Guidelines.
10     Q.  And so you make a specific footnote reference
11 then to that publication, and that's Footnote No. 8 on
12 page 11, and that discussion continues on to page 12;
13 correct?
14     A.  Correct.
15     Q.  And then if you look at page -- at page 12
16 where there is a paragraph that starts with the phrase
17 "The 2016 Antithrombotic Guideline," do you see that?
18     A.  Yes.
19     Q.  Then that discussion continues on through pages
20 12, 13, and 14; correct?
21     A.  Yes.
22     Q.  And so when it uses the phrase "2016
23 Antithrombotic Guideline," is that still the publication
24 that's cited in Footnote No. 8 on page 11?

20 (Pages 74 to 77)

Protected - Subject to Further Protective Review

Page 78

1    A. Yes.
2    Q. And so just so I'm clear then, that everywhere
3  on pages 11, 12, and 13 that makes reference to
4  antithrombotic guidelines, that's talking about Citation
5  or Footnote No. 8 on page 11?
6    MS. WAY: Object to form.
7    THE WITNESS: Yes.
8  BY MR. HONNOLD:
9    Q. Now, if you go to page 12 and that last -- that
10 last paragraph on page 12, there's a sentence that
11 begins in that paragraph, about halfway through, that
12 starts with the phrase "In contrast, because Xarelto and
13 other NOACs." Do you see that?
14   A. Yes.
15   Q. And there's a couple sentences that continue
16 down to the bottom of page 12. That statement, is
17 that -- is that one that you derived, I guess, on your
18 own, or is that a point that is also set forth and
19 emphasized in the 2016 Antithrombotic Guidelines?
20   A. I don't remember. I think the guidelines make
21 mention about health care delivery system and treating
22 outpatient. If I'm not mistaken, I remember reading
23 something about it. I don't remember if it's that exact
24 sentence.

Page 79

1    Q. Okay. And here's why: Whether it's true or
2  not, that's a significant statement, and I just wanted
3  to know whether you are stating that yourself as an
4  independent opinion or whether it's something that comes
5  from somewhere else and you're essentially citing it
6  based upon your reference to the guidelines?
7    MS. HOFFMANN: Objection.
8    MS. WAY: Objection.
9    THE WITNESS: So, yes, that is my opinion.
10 BY MR. HONNOLD:
11   Q. Okay.
12   A. But I believe that's from the data that I
13 reviewed in the guidelines.
14   Q. You yourself have not undertaken any
15 independent study to look at that issue; correct?
16   A. No.
17   Q. And have you yourself participated in any type
18 of clinical trial related to the use of rivaroxaban for
19 the care and treatment of any sort of VTE, whether it's
20 DVT or PE?
21   A. No.
22   Q. To your knowledge, did your medical center
23 serve as a trial site for the EINSTEIN-DVT, EINSTEIN-PE,
24 or EINSTEIN-Extension trials?

Page 80

1    A. Not to my knowledge.
2    Q. In any of your work on this case, did you look
3  at all or were you presented with any data or medical
4  literature regarding the RECORD trials for rivaroxaban?
5    A. I don't believe I did.
6    Q. And just so you know, I'll just orient you too,
7  RECORD was clinical trials that led up to the approval
8  of the orthopedic surgery prophylaxis indication.
9    A. I've heard of that, but, no, I did not look at
10 that.
11   Q. So for your work on this case, you did not read
12 anything related to the RECORD trials and you weren't
13 presented with any data or information on RECORD?
14   A. I don't believe so.
15   Q. Okay. And, again, in some of your reference
16 lists or other papers, there might be some --
17   A. Mention of it.
18   Q. -- mention or comment --
19   A. That's what I was thinking.
20   Q. -- in there, but separate and apart from that,
21 you've not looked at any materials specifically for
22 RECORD?
23   A. Correct.
24   MR. HONNOLD: I think it's time for a little

Page 81

1  break, isn't it? We've gone about another hour.
2    MS. HOFFMANN: Could be.
3    THE VIDEOGRAPHER: The time now is 11:12 a.m.
4  We are off the record.
5    (Recess from 11:12 a.m. until 11:26 a.m.)
6    THE VIDEOGRAPHER: This begins Disk 3 of
7  today's deposition. The time now is 11:26 a.m. We
8  are back on the record.
9  BY MR. HONNOLD:
10   Q. Doctor, we're back on the record after a short
11 break, and I want to continue with kind of the tedium
12 that we were going through before, before our break.
13   And I think we've made it to Bullet Point No. 3
14 on page 2, and this is the opinion that starts with the
15 phrase "Xarelto was tested and demonstrated." Do you
16 see that?
17   A. Yes.
18   Q. So as we did before, for Bullet Point No. 3,
19 I'd like you to point out or direct me to the place in
20 your report that you set forth the basis or support for
21 that opinion.
22   A. The references for it?
23   Q. Well, or the specific page and paragraphs in
24 the report, as well as references, if there are any,

Protected - Subject to Further Protective Review

Page 82

1    so --
2        A.  So I know that data from that comes from
3    EINSTEIN-DVT and EINSTEIN-PE and XALIA studies.
4        Q.  And so that would -- it looks like that then
5    would be Section V that starts on page 14; is that
6    right?
7        A.  Yes, should be.
8        Q.  And it looks like then that the discussion --
9    your discussions about the various DVT or PE clinical
10   trials is -- takes up a significant portion of your
11   report, starting at page 14, and really continuing all
12   the way through the very top of page 23; is that right?
13       A.  Yeah, that includes all of those, yes.
14       Q.  And let's -- let's spend some time talking
15   about some of the sections and the subsections then.  Is
16   there any way that by way of overview you can just
17   provide a kind of an introduction to the series of
18   EINSTEIN trials and how they were designed and what they
19   were set up in hopes of showing or proving?
20           MS. HOFFMANN:  Objection.
21           MS. WAY:  Objection.
22   BY MR. HONNOLD:
23       Q.  Just generally.  Generally.  And I'm not trying
24   to quiz you, but just kind of generally set it out.

Page 83

1        A.  The way patients were set up for EINSTEIN-DVT?
2        Q.  Yes.
3        A.  So the ones that -- there was the arms where
4    they were treated with Xarelto versus enoxaparin and
5    warfarin, and the EINSTEIN-DVT study, those were
6    specifically with DVTs.
7        Q.  Okay.
8        A.  And in the EINSTEIN-PE trial, it was set up the
9    same way, except those were patients with PE.
10       Q.  And in the PE trial, were there three arms;
11   Xarelto, Lovenox, and warfarin?
12       A.  Two arms; Xarelto, Lovenox plus --
13       Q.  Oh, sorry.  I mean Lovenox and warfarin
14   combination therapy, two arms?
15       A.  Yes.
16       Q.  And then the Extension study, what was that,
17   and how was it set up?
18       A.  So those were patients who the arms were
19   continued treatment with Xarelto versus placebo.  These
20   were people who had already completed their initial
21   three months of therapy.
22       Q.  And in the Extension study, what were the --
23   what were the arms in the Extension study?
24       A.  It was Xarelto versus placebo.

Page 84

1        Q.  Do you have an understanding of why Xarelto was
2    tested against placebo only in the Extension trial?
3            MS. WAY:  Object to form.
4            THE WITNESS:  Not sure why they designed it
5        that way.
6    BY MR. HONNOLD:
7        Q.  Because, essentially, in the Extension study
8    Xarelto is being tested against nothing; right?
9            MS. HOFFMANN:  Object to form.
10           MS. WAY:  Object to form.
11           THE WITNESS:  Against placebo.
12   BY MR. HONNOLD:
13       Q.  Right.  Okay.  Against no active treatment?
14       A.  Yes, that's correct.
15       Q.  So let's -- let's look specifically at your
16   section on the EINSTEIN-DVT clinical trial that starts
17   at page 15.  Can you go there?
18       A.  Yes.
19       Q.  Is it -- is it fair to say that your comments
20   about the EINSTEIN-DVT clinical trial essentially
21   discuss the general structure or study design, and with
22   some discussion of the principal safety outcome and the
23   results, and that all happens on page 15 and 16; is that
24   true?

Page 85

1            MS. HOFFMANN:  Objection.
2            THE WITNESS:  Yes.
3    BY MR. HONNOLD:
4        Q.  And the source of all of that information that
5    you include on page 15 and 16 would have been the actual
6    published report of the EINSTEIN-DVT clinical trial; is
7    that true?
8            MS. WAY:  Object to form.
9            THE WITNESS:  The source of the trial data, but
10       there's information here where I talk about Furberg
11       that would have come from his report.
12   BY MR. HONNOLD:
13       Q.  But just in terms of the -- of the comment
14   about the structure, design, and results --
15       A.  Oh.
16       Q.  -- of EINSTEIN-DVT, that comes from Footnote
17   No. 9 on page 15; is that true?
18       A.  Yes.
19       Q.  Now, at this point in your report, in -- we're
20   at Section V(A) that starts at page 15 regarding the
21   EINSTEIN-DVT trial, as you mentioned, there are two
22   paragraphs where you make some comment to the opinions
23   offered by one of the plaintiff's experts, Dr. Furberg;
24   correct?

22 (Pages 82 to 85)

Protected - Subject to Further Protective Review

Page 86

1    A.  Yes.
2    Q.  And so your, I guess, response or retort to
3 Dr. Furberg, that's included in the paragraph at the
4 bottom of page 15 and then another paragraph at the
5 midpoint of page 16; is that correct?
6    A.  Yes.
7    Q.  Okay.  Now, that paragraph that you make in
8 response to one of the criticisms of EINSTEIN-DVT that
9 Dr. Furberg stated is you make some reference to the
10 statistical analysis plan, and that's in that last line
11 of your paragraph that comments about Dr. Furberg.  Do
12 you see where it uses the phrase "Statistical Analysis
13 Plans"?
14    A.  Uh-huh.
15    Q.  Yes, you see that?
16    A.  Yes.
17    Q.  Okay.  And that phrase "Statistical Analysis
18 Plans," you capitalize all of the words in that phrase;
19 correct?
20    A.  Yes.
21    Q.  Now, have you ever -- have you been given the
22 actual statistical analysis plan for EINSTEIN-DVT?
23    A.  I've looked at the statistics with the study,
24 and then there's a -- oh, what do you call it? -- some

Page 87

1 other supporting documents that may not necessarily
2 be -- well, they're published at the same time, but you
3 don't necessarily get them in the journal article.
4    So there's a -- and I can't remember if this
5 one had one or not, but I definitely reviewed the
6 statistics in the article.
7    Q.  Okay.  And you brought up where I was going, so
8 that information, where was it, and where did you get
9 it?
10    A.  So the statistics are actually included in the
11 body of the article.  The statistical plan, how it was
12 done, what software, the equipment, and things of that
13 nature is all included in the article.
14    Q.  And so when you use the phrase "Statistical
15 Analysis Plans" in capital letters, are you referring
16 then only to information that is in the body of the
17 published EINSTEIN-DVT paper?
18    A.  Or if there was any supporting document
19 attached to it.  I can't remember if specifically for
20 this one if it had those, I can't remember the name,
21 what it's called, but articles that are published in the
22 medical literature also have some kind of compendium
23 attached to them.  When you say we want further
24 information, or if you want to review further the

Page 88

1 statistics, if it was attached to it, I would have
2 reviewed it too.
3    Q.  Okay.  So you only would have been looking to
4 what was actually in the text of the published trial or
5 some accompanying compendium of statistics that may or
6 may not have appeared in its entirety in the actual
7 published journal article; correct?
8    A.  Yes.
9    Q.  Sometimes those are things that you can access
10 digitally by clicking on a certain button and it gives
11 you access to it; correct?
12    A.  Correct.
13    Q.  But as it relates to the DVT -- or the
14 EINSTEIN-DVT trial, you just can't remember which
15 situation it was?
16    A.  Yeah, I can't remember.
17    Q.  Do you have any advanced training or degrees in
18 epidemiology or public health?
19    A.  No.
20    Q.  Do you know Dr. Furberg?
21    A.  I do not.
22    Q.  Have you read any of his writings at all?
23    A.  I'm not sure.  Other than his report, I'm not
24 sure if I've looked at any of the others.

Page 89

1    Q.  On this case, the only thing that you've looked
2 at would have been his report in this case?
3    A.  I believe that's correct.
4    Q.  Have you read any testimony from any Bayer or
5 Janssen witness where the EINSTEIN-DVT trial is
6 discussed?
7    A.  No.
8    Q.  If you go back to page 15 and you have the
9 graphic there about the EINSTEIN-DVT study design, do
10 you see that?
11    A.  Yes.
12    Q.  What knowledge do you have about the underlying
13 source of the 15-milligram twice daily dose for the
14 first 21 days of DVT treatment that was employed in the
15 EINSTEIN-DVT study?
16    A.  Repeat that again.  I'm sorry.
17    Q.  What -- what knowledge do you have about the
18 underlying source of the 15-milligram twice daily dose
19 for the first 21 days of DVT treatment that was employed
20 in the EINSTEIN-DVT study?
21    A.  I don't know if I have any additional
22 underlying knowledge other than what they presented in
23 the trial.
24    Q.  As you sit here today, do you have any

23 (Pages 86 to 89)

Protected - Subject to Further Protective Review

Page 90

1    knowledge or understanding about any dose finding
2    studies that either were or were not done before the
3    EINSTEIN-DVT study?
4        A.  No.
5        Q.  Do you know whether dose finding -- comparative
6    dose finding studies were done?
7        A.  I don't know that.  I can only assume.  Most
8    drugs that we use, there's been some type of trial where
9    there was a dose finding study.
10       Q.  If there was one here, you've not read it?
11       A.  I don't believe so.
12       Q.  Do you know whether there has ever been in any
13   clinical trial, regardless of phase, whether there's
14   been any trial where outcomes were compared between 15
15   milligrams twice daily and some other dose?
16       MS. HOFFMANN:  Of Xarelto?
17       MR. HONNOLD:  Yes.  Sorry.
18       THE WITNESS:  Not in treatment of VTE that I'm
19   aware of.
20   BY MR. HONNOLD:
21       Q.  Are you aware of any Xarelto indication where
22   comparative outcome studies were done regarding
23   different doses?
24       A.  I'm not sure.

Page 91

1        Q.  On page 16, you say -- in the first full
2    paragraph on page 16, you say, "The study demonstrated
3    that Xarelto was at least effective as standard
4    therapy."  Do you see that?
5        A.  Yes.
6        Q.  And so I want to make sure that I understand.
7    When you use the phrase "was at least as effective as
8    standard therapy," what does that mean?
9        A.  It means it works as well as the standard
10   therapy.
11       Q.  And in the EINSTEIN-DVT clinical trial, what
12   was -- what was the statistical standard that was
13   included in the trial methodology to measure that issue?
14       A.  You mean what the P value was, or is there
15   something --
16       Q.  Well, first let me ask you this:  Did the
17   DVT -- did the EINSTEIN-DVT trial prove that Xarelto was
18   superior to warfarin in the treatment of DVT?
19       MS. HOFFMANN:  Objection.
20       THE WITNESS:  No, it showed that it was at
21   least as effective as warfarin.
22   BY MR. HONNOLD:
23       Q.  And is that -- in saying that, are you saying
24   that Xarelto was shown to be noninferior to warfarin?

Page 92

1        A.  That's the way some people would look at it is
2    noninferiority.
3        Q.  Okay.  And so from -- from the perspective of
4    clinical trial study design or outcome evaluation, what
5    does noninferior mean in that context?
6        MS. WAY:  Object to form.
7        THE WITNESS:  When we see noninferior, it
8    means -- it shows to us that it's at least as
9    effective.
10   BY MR. HONNOLD:
11       Q.  And statistically does it -- in the -- in the
12   EINSTEIN-DVT trial, do you know what the statistical
13   standard was in terms of how close rivaroxaban and
14   Xarelto had to be to warfarin to be considered
15   noninferior?
16       A.  You know, I think I mentioned that somewhere.
17   I can pull the study.  I remember reading that.
18       Oh, the margin, I believe -- I have to look at
19   the study to know for sure.  I have in the report here
20   that it says in response to -- it had a margin of 2.
21       Q.  What does that mean?
22       A.  That there's -- so I'm not a statistician, so I
23   don't want to pretend to be one and explain.  I just
24   know, looking at the range in the study, I believe it

Page 93

1    was 1.5 to 2.5, that 2 was an acceptable level to show
2    noninferiority.
3        Q.  And when you're saying 2 in this context,
4    what -- I guess, what is the -- what is the significance
5    of 2?  2 what?
6        A.  I don't know.  I just know what they -- that's
7    what they had set as the margin.
8        Q.  And when you say "that is what they set," do
9    you mean those that designed the trial?
10       A.  The study -- must have been the trial designers
11   and the investigators.  Well, yeah, so it had to be the
12   trial design group that would have set that.
13       Q.  Then that factor of 2, is the standard for
14   noninferiority something that can actually be set as
15   part of the trial design saying that we are trying to
16   use a certain standard of noninferiority in performing
17   this trial?
18       MS. WAY:  Object to the form.
19       THE WITNESS:  I'm not sure.
20   BY MR. HONNOLD:
21       Q.  Okay.  And if it's something that is -- that
22   you -- you feel confident saying is outside either your
23   area of expertise or outside the scope of your report,
24   tell me that and I won't ask you any more questions

24 (Pages 90 to 93)

Protected - Subject to Further Protective Review

Page 94

1  about it. Okay?
2      A.  Okay.
3      Q.  Are you telling me that?
4      A.  Yes.
5      Q.  Okay, we're done with that.
6          Let's go on to the EINSTEIN-PE clinical trial.
7  That's in Section V(B) that starts on the bottom of page
8  16. Do you see that?
9      A.  Yes.
10     Q.  Would it be a fair summary or paraphrase that
11 as you did for the DVT clinical trial, you've
12 essentially set forth some basic information about the
13 study design, about the results of the study and the
14 safety outcome, and that that information is, for
15 purposes of your report, is all derived from the actual
16 PE paper, which is cited as Footnote No. 11 on page 17?
17     A.  Yes.
18     Q.  I'm going to try to think of a fair way to go
19 about this.  If -- if the DVT -- or excuse me.
20         If the EINSTEIN-PE clinical trial has certain
21 wonderful strengths or certain weaknesses from the
22 perspective of clinical trial design or how the trial
23 was run or anything like that, either way, it's
24 something that you're not commenting on in your report;

Page 95

1  correct?
2      A.  I remember something in my report saying
3  that -- well, let me look and make sure before I say
4  what I remember.
5      Q.  Could it be that some of these -- these issues
6  are addressed in some way in your responses to
7  Dr. Furberg's criticisms --
8      A.  That's exactly what I was --
9      Q.  -- on page 21?
10     A.  That's what I was looking for.  I was looking
11 for something I thought I put in there.
12     Q.  So to be fair, let's -- let's see if I can get
13 at it this way:  We've had a little bit of prior
14 discussion about a couple of your responses to
15 Dr. Furberg's opinions, and there were two paragraphs in
16 the -- in the DVT study that we've already talked about;
17 correct?
18     A.  Yes.
19     Q.  And then at page 21, which is Section V(E),
20 that starts on page 21 and goes to page 22 --
21     A.  Yes.
22     Q.  -- you also set forth some of your additional
23 responses to certain criticisms that Dr. Furberg has of
24 EINSTEIN; right?

Page 96

1      A.  Yes.
2      Q.  Now, the question that I asked you a bit ago
3  that led into you searching your report, I specifically
4  asked, it related to the DVT/PE study, and you do make
5  some specific response to EINSTEIN generally and the PE
6  part if you look at the details of some of these
7  responses that you have to Dr. Furberg; correct?
8      A.  Yes.
9      Q.  For example, you specifically mention the
10 EINSTEIN-PE study in Paragraph 3 on page 21, and again
11 you make some specific reference to the PE study in your
12 Response No. 4 that goes from page 21 to page 22;
13 correct?
14     A.  Yes.
15     Q.  And is it -- is it fair to say that whatever
16 additional information that -- or testimony that you're
17 going to give about the series of EINSTEIN trials,
18 separate and apart from what is just you've taken from
19 the actual published reports themselves, is limited to
20 your various comments that you make about Dr. Furberg?
21         (Interruption.)
22         MS. WAY:  Can we -- object to the form.
23         MR. HONNOLD:  I'll never object to lunch.  That
24 would be an improper objection.

Page 97

1          MS. WAY:  Can you repeat the question?
2  BY MR. HONNOLD:
3      Q.  The good news in all of this is that lunch is
4  here.  The bad news is that it was just brought across
5  the stage behind you.  So not your fault.  It's just one
6  of those things that happens.  So I'll try to get back
7  to where I was going.
8          You know for the EINSTEIN-DVT trial,
9  EINSTEIN-PE, EINSTEIN-Extension you have set forth in
10 your report really some very basic structural
11 information about how those studies were designed, what
12 the results were, and a little bit about their primary
13 outcomes; correct?
14         MS. HOFFMANN:  Objection.
15         THE WITNESS:  Yes.
16 BY MR. HONNOLD:
17     Q.  When you have done that, that -- you've told me
18 that that information really comes from the actual
19 published clinical trial paper, and you've cited all of
20 those in the text or you've footnoted those in your
21 report; correct?
22         MS. WAY:  Object to form.
23         THE WITNESS:  So the information that's in here
24 would come from those studies, as well as my

Protected - Subject to Further Protective Review

Page 98

1    practice and training.
2    BY MR. HONNOLD:
3        Q.  Okay.  Meaning that every time that you review
4    a clinical trial about a medication, you do so through
5    the lens of your own training, education, and
6    experience; correct?
7        A.  Yes.
8        Q.  You have the ability to determine based upon
9    looking at a clinical trial publication to make some
10   determination yourself as to whether that looks like a
11   well-designed trial, whether it might have some
12   frailties or weaknesses, you're able to make those
13   assessments yourself as you see all sorts of clinical
14   trial data that comes at you in your practice; right?
15       A.  Yes.
16       Q.  Okay.  Now, in terms of the basic information
17   that you've set forth about EINSTEIN-DVT, -PE, and
18   -Extension, much of what you comment on is specific
19   footnoted information that comes out of the papers
20   themselves; correct?
21       A.  For the basic information, yes.
22       Q.  Okay.  Then the additional information that
23   you've set forth is really -- you do that through your
24   various responses or retorts that you have to things

Page 99

1    that have been stated by Dr. Furberg in his report;
2    correct?
3        A.  Yes.
4        Q.  Okay.  You have looked at Furberg's report, and
5    where he makes specific statements of a certain type,
6    there are some things that he has said where you have a
7    specific response to it; correct?
8        A.  Yes.
9        Q.  Okay.  Now, in terms of additional information
10   that you set forth about any aspect of EINSTEIN, is it
11   fair to say that it's limited to the specific comments
12   that you make to what Dr. Furberg says?
13       MS. HOFFMANN:  Objection.
14       MS. WAY:  Object to form.
15       THE WITNESS:  Can you repeat that?
16   BY MR. HONNOLD:
17       Q.  Sure.  Here's what I'm -- here's all I'm trying
18   to get at:  In terms of additional things that you say
19   about the EINSTEIN trials --
20       A.  Okay.
21       Q.  -- separate and apart from what you've taken
22   from the papers themselves and made footnote reference
23   to, additional information about the trials is stuff
24   that you're really saying in response to criticisms that

Page 100

1    Dr. Furberg has of the trials?
2        A.  Yes.  I don't -- let me make sure I understand
3    the question correctly.  If there's other information I
4    relied on except directly from the trial.  So, yes, I've
5    read reviews of trials or the trials may have been
6    referenced in the Chest Guidelines.  I want to make sure
7    I'm not eliminating -- that I'm not leaving out anything
8    besides my experience and training and background that
9    are what I rely on for answers.
10       Q.  Okay.  I think we're on the same page, and I
11   understand your qualification.  Thank you.
12       Your various responses to the criticisms of
13   Dr. Furberg, are those -- are those responses that you
14   spontaneously had when you read his report, or did
15   you -- had you seen such comments about EINSTEIN and
16   similar responses before?
17       MS. WAY:  Object to the form.
18       THE WITNESS:  Had I seen similar comments about
19   EINSTEIN that he made in his report?
20   BY MR. HONNOLD:
21       Q.  Yes.
22       A.  I don't recall.  No, I don't remember seeing
23   those outside of his report.  They may have been
24   somewhere, but I don't remember specifically those

Page 101

1    outside of his report.
2        Q.  The responding to Dr. Furberg's criticisms of
3    EINSTEIN, was that at some point made part of your
4    engagement or assignment in this case where -- where
5    others asked you that, if you had opinions regarding
6    Dr. Furberg's criticisms of EINSTEIN, whether you could
7    provide some commentary on that?
8        MS. HOFFMANN:  Objection.
9        THE WITNESS:  Yes.
10   BY MR. HONNOLD:
11       Q.  And then the paragraphs -- the paragraphs that
12   you have written about Dr. Furberg's criticisms, are
13   those limited to what you set forth in Subsection V(E)
14   on pages 21 and 22, in addition to the couple of
15   paragraphs that we've talked about before?
16       A.  Are you asking are there things in his report
17   that I disagreed with that I may not have put here?
18       Q.  Well, are you going to be testifying about
19   additional things other than what you've listed?
20       A.  Oh.  I don't think so.
21       Q.  Okay.  And those responses in Subsection V(E)
22   on page 21 and page 22, were those ones that -- that
23   came to you yourself in response to reading
24   Dr. Furberg's report?

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 102

1    MS. HOFFMANN: Objection.
2    THE WITNESS: Yes.
3    BY MR. HONNOLD:
4    Q.  So let's go back and identify the areas that
5    we've already talked about Dr. Furberg, and I think we
6    identified -- on page 15 and 16, if you can go there, I
7    think we've identified two paragraphs there that relate
8    to comments of Dr. Furberg's; right?
9    A.  Yes.
10   Q.  And one is at the bottom of page 15, and the
11   other is in the middle of page 16; is that correct?
12   A.  That's correct.
13   Q.  Now, those two paragraphs on page 15 and 16,
14   are those incorporated, in your view, or by your
15   intention, in your responses to Dr. Furberg on pages 21
16   and 22?
17   A.  I don't -- let's -- no, because I don't think
18   we talk about the double-blind in those four specific
19   ones, and I don't think we talked about safety endpoint
20   in those.
21       Let's see.  No, we didn't talk about the
22   primary endpoint changing or the safety endpoint that I
23   see in -- no, not in those four.
24   Q.  And that's how I read it too, but I just wanted

Page 103

1    to check with you.
2        So -- so your responses to any criticisms that
3    Dr. Furberg had of EINSTEIN, those are set forth in
4    Section V(E) on pages 21 and 22 would also include
5    those paragraphs at the bottom of page 15 that goes to
6    the top of page 16, and then also that independent
7    paragraph that's about at the middle of page 16; right?
8    A.  Yes.
9    Q.  And, in fact, you could have essentially taken
10   those two paragraphs on page 15 and 16 and added them to
11   your list at pages 21 and 22, and then your Furberg
12   comments would be complete there; correct?
13   A.  As long as I didn't reference them after that,
14   yes.
15   Q.  Okay.  While we're there, and since you've
16   raised that point, why don't you look to make sure
17   that's right.  That's how I size it up, but that means
18   nothing.  Why don't you go ahead --
19   A.  That's what I remember, but let me just review
20   that -- I don't think I talked about it any further
21   after that.
22       Yeah, I think that's the only place -- those
23   are the only places.
24       Well, we didn't talk about 16.  So we didn't

Page 104

1    talk about page 18, at the top of page 18, where I start
2    with "I disagree."
3    Q.  Okay.  So let's look at that paragraph on page
4    18 then.  It talks about the pooled analysis.  Is that
5    set forth in paragraphs 1 through 4 on pages 21 and 22?
6    A.  I don't remember putting that in there.  No, I
7    don't see it in there.
8    Q.  Okay.  So if we're trying to kind of put a
9    fence around this then, with the addition of the
10   paragraph then on page -- pages 15, 16, and 18, you
11   could take those three paragraphs and have added them to
12   your list at pages 21 and 22, and that would have been
13   your complete list of responses to Dr. Furberg's
14   criticisms; correct?
15   A.  I believe so.
16   Q.  Now, what I want to make sure that I'm clear on
17   is, when you are responding to these criticisms of
18   Dr. Furberg, were they things that you were able to see
19   and kind of express immediately in response to reading
20   Dr. Furberg's report, or did you have to kind of dig
21   into that and research it and analyze it using other
22   source materials?
23       MS. HOFFMANN: Objection.
24       THE WITNESS: So when I read his report, I

Page 105

1    looked at his statements and looked at ones that I
2    disagreed with, and that's what I based it on.
3    BY MR. HONNOLD:
4    Q.  And so are your disagreements, you know, were
5    they just -- were you able just to state them kind of
6    extemporaneously based upon your training, education,
7    and experience, or in stating those retorts in the, I
8    think, seven paragraphs we've identified, did you go to
9    other sources of data or information, whether it was the
10   medical literature or commentary about the EINSTEIN
11   clinical trial series?
12   A.  I definitely would have backed it up with
13   medical literature as well.
14   Q.  Okay.  All right.  And why do you say, "I
15   definitely would have backed it up with medical
16   literature as well"?
17   A.  Because there's, I believe, one specific study
18   I listed, which would have been at No. 2 on page 21.
19       Well, I take that back.  It would have been --
20   oh.  About the noninferiority margin.  I reviewed that
21   study.
22       Yeah, well, that is right.  That's right,
23   No. 2.
24   Q.  All right.  I want to make sure that I

27 (Pages 102 to 105)

Protected - Subject to Further Protective Review

Page 106

1    understand then what you've told me.  You said that in
2    terms of your responses to Furberg criticisms you
3    definitely would have backed those up with medical
4    literature; correct?
5        A.  Yes.
6        Q.  Okay.  Now, what I want to make sure that I
7    understand is, what are all those sources of medical
8    literature that you are using to back up your responses
9    to Dr. Furberg?
10        MS. WAY:  Object to form.
11        THE WITNESS:  So the literature for me would
12    have been the EINSTEIN-DVT and the -PE, as well as
13    the -Extension trials, but also there was an
14    additional article I reviewed that's Reference No.
15    10 when I did those bullet points, or those numbered
16    points.
17    BY MR. HONNOLD:
18        Q.  And just so we're clear, when you say Reference
19    No. 10, that's not Footnote No. 10 but, instead, it's
20    Reference Point No. 10 that's in Exhibit B?
21        A.  Correct.
22        Q.  And that is the paper by Beyer, B-e-y-e-r,
23    hyphen, Westendorf?
24        A.  Yes.

Page 107

1        Q.  W-e-s-t-e-n-d-o-r-f.
2        So that's -- that is your -- the medical
3    literature that you would be relying upon for some of
4    your responses to Furberg's criticisms; is that right?
5        A.  Yes, for some.
6        Q.  And what other medical literature did you or
7    are you relying upon for your responses to Dr. Furberg's
8    criticisms other than Reference No. 10?
9        A.  The EINSTEIN-DVT and the EINSTEIN-PE studies.
10        Q.  Okay.  And so --
11        A.  And the pooled analysis.
12        Q.  And the -Extension study?
13        A.  Yes.
14        Q.  Okay.  And those would be things that are the
15    forms that were actually published in the literature; is
16    that true?
17        A.  Yes.
18        Q.  If we were making then a complete list of the
19    medical literature items that you relied upon in forming
20    your responses to Dr. Furberg's criticisms, those things
21    would be, in list form, the EINSTEIN-DVT clinical trial,
22    the EINSTEIN-PE clinical trial, the EINSTEIN-Extension
23    clinical trial, and then the published EINSTEIN pooled
24    analysis, in addition to Reference No. 10 from your

Page 108

1    reference list; correct?
2        MS. WAY:  And are you just -- sorry.  Is this
3    just a question specific to the literature that he's
4    reviewed --
5        MR. HONNOLD:  Yes.
6        MS. WAY:  -- in support of his rebuttals?
7        MR. HONNOLD:  Yes.
8        MS. WAY:  Okay.
9        THE WITNESS:  So I don't know if I can say I
10    limit it to those, because some of the statements I
11    make are general statements.
12    BY MR. HONNOLD:
13        Q.  And you got me wrong.  That's -- so to the
14    extent that there was literature that you relied on,
15    we've listed it; correct?
16        Let's be fair.  I don't want you to think that
17    I'm trying to -- I'm not -- I'm not trying to be
18    untoward here.  I said, did you -- I asked you, if we go
19    back in the transcript, you'll see that I asked you, did
20    you rely upon certain medical literature in fashioning
21    your responses to Dr. Furberg's criticisms, and I think
22    the record will say, yes, you did back it up or rely
23    upon medical literature.  Do you recall that?
24        A.  I believe so.

Page 109

1        Q.  Okay.  And then I asked at some point after
2    that, I said, tell me what those literature sources are.
3    Do you remember that?
4        A.  Okay.  Yes.
5        Q.  And then that led to the discussion of coming
6    up with this list.  Okay?
7        A.  Okay.
8        Q.  I'm not suggesting that the only source of
9    information about your responses to Furberg are the
10    literature.  Okay?
11        A.  Okay.
12        Q.  In fact, I think in the record at some point I
13    said you may well have been relying upon your education,
14    training, and experience in responding to Furberg, but
15    if there's literature, let's list it.  Okay?
16        A.  Yes.
17        Q.  And so to the extent that there was literature,
18    we've now identified that list; correct?
19        A.  Yes.
20        Q.  In preparing your report, at some point in
21    dealing with this issue or addressing this issue of
22    Dr. Furberg's criticisms, did you yourself undertake any
23    literature review to identify what criticism in terms of
24    study design or study methodology might exist out there

Protected - Subject to Further Protective Review

Page 110

1  in -- in the medical literature arena about the EINSTEIN
2  clinical trial series?
3      A.  Did I do anything independently to look at
4  other data -- I'm just rephrasing to make sure I have it
5  correctly -- other than that one study that I mentioned?
6      Q.  You said it right.
7      A.  Oh, good.  No.
8      Q.  Okay.
9      MR. HONNOLD:  What do you all want to -- let's
10  go off the record real quick.
11      THE VIDEOGRAPHER:  The time now is 12:07 p.m.
12  We are off the record.
13      (Lunch recess from 12:07 p.m. until 12:47 p.m.)
14      THE VIDEOGRAPHER:  This begins Disk 4 of
15  today's deposition.  The time now is 12:47 p.m.  We
16  are back on the record.
17  BY MR. HONNOLD:
18      Q.  Doctor, we're back on the record now after our
19  lunch break.  Where I'd like to pick up is to go back to
20  the bullet points in your report on pages 2 and 3.  I
21  think we made it to the point of Bullet Point No. 4,
22  which is at the very bottom of page 2.  Can you go
23  there?
24      A.  Yes, sir.

Page 111

1      Q.  As you recall, before the lunch break we were
2  kind of going through where it is in your report that
3  you discuss the opinion and where its basis or support
4  is.
5      So as we'd done before, I'd like you to point
6  out for me, where in your report is the basis and
7  support for that Bullet Point No. 4 on page 2 that talks
8  about risk of bleeding.
9      A.  So the basis of that one would be just knowing
10  how anticoagulants work.  Specifically, I reference the
11  package insert, and also, I can't remember, but I
12  believe the Chest Guidelines make a comment about there
13  being no reversal agent.
14      Q.  And then if we actually try to correlate that
15  fourth bullet point with an actual page or paragraphs in
16  the report, are we -- do we go to page 23, Section VI?
17      A.  Yes.
18      Q.  And so in terms of the basis and support for
19  that opinion of Bullet Point 4 on page 2, that would be
20  information that's set forth in Sections VI(A) and
21  VI(B); is that correct?
22      A.  Yes, I believe so.
23      Q.  And those are both on page 23; is that right?
24      A.  Yes, sir.

Page 112

1      Q.  Let's go to page 3 then and focus on those two
2  bullets points there that take up the top half of page
3  3.  Can you go there?
4      A.  Yes.
5      Q.  And this may be a more detailed discussion,
6  because this is a paragraph that has several sentences
7  that cover, I think, different topics or subtopics.
8      So for that bullet point that's at the top of
9  page 3, where would we go in the report to identify the
10  basis or support for the opinion or opinions in that
11  bullet point?
12      A.  So for the first sentence, I would say, yes,
13  evidence from the EINSTEIN-DVT study would support it,
14  the American College of Chest Physicians Antithrombotic
15  Guidelines would support that as well, and the US
16  package insert.  When we talk about the dose, as well,
17  that's from the study too.
18      Q.  Then there's a sentence in that fourth bullet
19  point that says, quote, "There is no evidence that
20  Ms. Mingo would not have sustained a bleed if she had
21  been prescribed a different anticoagulant," end quote.
22  Do you see that sentence?
23      A.  Yes.
24      Q.  Then where -- where in the report do we go to

Page 113

1  find the basis or support for that statement?
2      A.  So I would say that's probably -- I would
3  probably say the Chest Guidelines as well.
4      Q.  And I apologize, I don't have a copy of those.
5  It's a fairly voluminous document --
6      A.  It is.
7      Q.  -- with much more roman numerals and
8  subheadings than in your report, so we'd probably drive
9  ourselves crazy looking at that.
10      But is there a section, a particular section in
11  the Chest Guidelines that you have in your mind's eye
12  that you recall speaking to that issue?  And if you
13  can't recall it, that's fine, just tell me.
14      A.  No, I just know that they talk about the
15  different anticoagulants there, and there's not a
16  preference list of one over the other, which is why I
17  put that sentence.
18      Excuse me.  I don't know if I'd say "different
19  anticoagulants."  They do discuss them all, but they
20  don't put a preference of the NOACs or the direct orally
21  acting agents.
22      Q.  To your knowledge, is there any comparative
23  data in the context of VTE that speaks to comparisons
24  amongst the different NOAC or DOAC agents?

29 (Pages 110 to 113)

Protected - Subject to Further Protective Review

Page 114

1    A.  To my knowledge, there are no head-to-head
2  trials that are looking at the different agents.
3    Q.  And in the absence of head-to-head trials, is
4  there any comparative data that you're aware of in the
5  form of any sort of other study analysis, meta-analysis,
6  that -- that in the context of VTE or PE compares either
7  efficacy or safety outcomes of the different NOACs?
8    A.  I don't know if there are any for VTE
9  specifically.  I don't know that.
10   Q.  The one thing that you can state affirmatively
11  is that there are no direct head-to-head clinical trials
12  where one agent is posed against another; correct?
13   A.  That's correct.
14   Q.  Do you still prescribe warfarin for patients in
15  your practice?
16   A.  Yes.
17   Q.  And to the extent that you can generalize, can
18  you tell me the types of patients for whom you would
19  still prescribe warfarin?
20   A.  Those whose insurance will not cover one of the
21  NOACs.  There may be others.  There's not as much data
22  when you look at -- well, actually, I was going to say
23  cancer patients, but even warfarin in cancer patients is
24  a difficult thing.  At least initially you would like

Page 115

1  low molecular weight heparin in cancer patients.
2    Q.  And in terms of the actual clinical
3  circumstance where you still might prescribe warfarin,
4  is it for prevention, or is it for active treatment of
5  VTE?
6    A.  Active treatment.  Well, and prevention,
7  because if we have a patient who's had a clot and
8  they're at higher risk of recurrent clots, then we would
9  say it would be for prevention as well.
10   Q.  And maybe more specifically we could say
11  prevention of recurrence?
12   A.  Yeah, that's what I was just going to say,
13  recurrence prevention.
14   Q.  Are you aware of whether anyone has proposed
15  any head-to-head trials of the various NOACs, whether
16  it's for atrial fibrillation or VTE?
17   A.  Not that I know of.
18   Q.  The sentence where you say, "Ms. Mingo received
19  appropriate therapy for the treatment of her bleed and
20  has made a full recovery without any lingering adverse
21  effects," in terms of the basis and support for that
22  information, what are you relying on there?
23   A.  So on reviewing the medical records of
24  Ms. Mingo that were provided to me, I saw her blood

Page 116

1  counts after the episode of bleeding on some follow-up
2  visits and I saw she had a repeat endoscopy, and I
3  believe I saw a reference that she had returned to work.
4  Now, that was a side note I remember looking at in the
5  records from one of the nurses, so I don't know if
6  that's for sure or not.  I don't remember seeing it in
7  the doctor's note.
8    Q.  Okay.  So in terms of -- in terms of your
9  statement that she received appropriate therapy for her
10  treatment, I take it that's -- that's based upon your
11  general medical education, training, and experience as
12  to speaking as to whether the standard of care was met
13  in her situation?
14   A.  Yes.
15   Q.  And the point of her making a full recovery
16  without lingering adverse effects, that's based upon
17  information, from your view, that's in the medical
18  records?
19   A.  Yes.
20   Q.  And in terms of your specific report relating
21  to Ms. Mingo, that sentence, I take it, is not reliant
22  upon or depend upon any specific medical articles,
23  clinical trials, or publications; is that right?
24   A.  That's correct.

Page 117

1    Q.  Still within this bullet point, the last
2  sentence says -- speaks to the issue of the reversal
3  agent and your view that had one been available or used,
4  it would not have affected her clinical course.  Do you
5  see that?
6    A.  Yes.
7    Q.  Then, as before, what is -- what is your basis
8  or support for that statement?
9    A.  So I would say two.  One, the package insert
10  says there's no reversal agent, but also the Chest
11  Antithrombotic Guidelines state that although there's no
12  reversal agent, the risk of bleeding, specifically fatal
13  bleeding, is not increased with NOAC therapy compared to
14  warfarin.
15   Q.  Do you know whether or not any reversal agents
16  are used for patients with bleeding on NOAC in the
17  University of Mississippi emergency medicine department?
18   A.  The only one, I think Eliquis has come out with
19  a reversal agent.  I don't know if it's been utilized in
20  our hospital yet or not.
21   Q.  And do you know if any other agents are used
22  for reversal of bleeding in patients that are on NOACs?
23   A.  As far as I know, there are no other reversal
24  agents.

30 (Pages 114 to 117)

Protected - Subject to Further Protective Review

Page 118

1    Q. And I'll tell you, I'm not trying to -- I'm not
2    trying to trick you again. I just wanted to see if you
3    just knew this independently. But there's a Dr. Jones,
4    who is an emergency room physician at University of
5    Mississippi. Do you know him?
6    A. I do, I know him.
7    Q. Okay. And so he talked about in his deposition
8    that he has employed 4-Factor PCC, using it to reverse
9    on patients that have bleeding on NOACs.
10   A. Uh-huh.
11   Q. So -- but that's probably something -- you're
12   not doing that every day in your practice, may not have
13   been aware of that.
14   A. So -- so I thought you meant a specific
15   reversal agent. So the PCCs are the prothrombotic
16   complex concentrates. I equate them and make them a
17   little analogous with fresh frozen plasma. It has
18   certain factors in it. It's just different, which is
19   why it's concentrated.
20        So I would not have said that's a reversal
21   agent. I have seen people utilize those things, and
22   that actually is mentioned in the Chest Guidelines as
23   well as what some people might use, but they also make a
24   point in the guidelines that there's no approved

Page 119

1    reversal agent for these except for the new one that
2    just came out.
3    Q. So your statement about the lack of reversal
4    agent actually speaks to, specifically, specific
5    FDA-approved agents, specific agents for a specific NOAC
6    or the entire group; right?
7    A. Yes.
8    Q. Okay. You're not necessarily speaking to the
9    fact that there may be other agents that are used based
10   upon information that comes from maybe some limited
11   research or limited trials, but not necessarily Phase 3
12   trials; right?
13   A. Correct.
14   Q. And in terms of the 4-Factor PCC, do you have
15   any understanding or awareness in how quickly it can
16   stop or reverse bleeding?
17        MS. HOFFMANN: Objection.
18        THE WITNESS: No.
19   BY MR. HONNOLD:
20   Q. For your work on this case, have you actually
21   looked at any of the information that is -- that exists
22   in the literature about the use of 3- or 4-factor PCCs
23   for the reversal or treatment of bleeding in patients on
24   NOACs?

Page 120

1    A. Other than what is mentioned in the Chest
2    Guidelines, I don't believe I looked at any articles
3    that were specifically looking at that, I don't believe.
4    Q. All right. Just as kind of overview then, for
5    that bullet point at the top of page 3, we've kind of
6    gone through it sentence by sentence and I've asked you
7    about the basis and support for each point.
8        Anything else that you can think of that serves
9    as a basis or support for that bullet point that we've
10   not discussed or you've not told me about?
11   A. I don't believe so.
12        MS. HOFFMANN: Can I just interpose a quick
13   comment --
14        MR. HONNOLD: Sure.
15        MS. WAY: -- or objection?
16        MR. HONNOLD: Sure.
17        MS. HOFFMANN: In the context of going through
18   each of the sentences, I believe most of your
19   questions asked him what medical literature. Your
20   wrap-up question was any additional support.
21        MR. HONNOLD: No, no. I think if you look at
22   the record you'll see that I've been asking it about
23   what information do you rely upon as basis or
24   support for that statement. I think you'll be -- I

Page 121

1    think you'll feel better when you read it.
2        MS. HOFFMANN: I just don't want to eliminate
3    that almost each and every time, in addition to
4    pointing to a particular piece of medical
5    literature, he added his own background, experience,
6    education, that type of thing.
7        MR. HONNOLD: Right, and I think I'm the one
8    that affirmatively offered that --
9        MS. HOFFMANN: I think you did.
10        MR. HONNOLD: -- issue on things related to the
11   standard of care, like she was treated correctly, or
12   she got the right dose, or various things.
13        So I appreciate your comment, but I think -- I
14   think you'll feel better once you'll see that I
15   think -- I think it's been inclusive of that, but I
16   appreciate the comment, and I'll try to do better.
17        MS. HOFFMANN: You're doing great.
18        MR. HONNOLD: Okay. That's what I wanted. I
19   wanted affirmation from you.
20        MS. HOFFMANN: You wanted some affirmation.
21        MR. HONNOLD: Yeah. You just sat there.
22        MS. HOFFMANN: It's Valentine's Day. I want to
23   give you some affirmation. I think you've done a
24   really good job, and I would agree that you have

31 (Pages 118 to 121)

Protected - Subject to Further Protective Review

Page 122

1    tried at times to remind him that his support may
2    also include his own background, education,
3    training, and experience.
4        MR. HONNOLD: Now we're talking. Okay, that's
5    better. Okay.
6    BY MR. HONNOLD:
7    Q.  So let's go to the last bullet point at about
8    the middle of page 3. Again, like the bullet point
9    above, this is one that contains several sentences and
10   includes several opinions and subopinions, so I want to
11   go through it like we've done before.
12   A.  Okay.
13   Q.  I would ask you to be particularly mindful of
14   the issue of your own education, training, and clinical
15   experience, to the extent that that would be responsive
16   to the answer when I ask you about support and basis,
17   that you tell me that. Okay?
18   A.  Okay.
19   Q.  All right. So let's -- let's go through the
20   first sentence, where you say, from your perspective as
21   a clinician and prescriber of the NOACs, you can't agree
22   with what Dr. Rinder says about Xarelto being the cause
23   of Ms. Mingo's gastrointestinal bleed.
24       That first sentence there, what -- what do you

Page 123

1    rely upon for basis and support for that statement?
2    A.  So I hope I'll answer this directly and not
3    roundabout, but it's kind of tied to a couple other
4    statements. So, one, that Xarelto doesn't cause ulcers,
5    so that's why I said that it was not the cause of her
6    gastrointestinal bleeding, since she was found to have a
7    peptic ulcer.
8        As far as where that comes from, that's, to me,
9    general medical knowledge that we're taught that -- how
10   NOACs work, that they don't cause ulcers. I think
11   that's the extent of what I would say about the first
12   sentence.
13   Q.  And do you know whether any of the materials on
14   your reference list or any of the articles that you
15   specifically footnoted in the -- in the body of your
16   report speak to how frequently it is when patients have
17   GI bleeding and investigation is done by way of
18   endoscopy, how often a specific lesion is found to
19   explain the bleeding?
20   A.  I don't know if I know the answer to that. I
21   don't remember specifically looking at any literature on
22   that.
23   Q.  So from your perspective as a physician and
24   taking into account your training, education, and

Page 124

1    clinical experience, if in fact a patient on a NOAC has
2    gastrointestinal bleeding and as part of the treatment
3    and/or surveillance of that condition has a -- has an
4    endoscopy and no specific lesion or bleeding site is
5    found, how would you explain, explain the GI bleeding in
6    that context?
7        MS. HOFFMANN: Objection.
8        THE WITNESS: I think that would be variable,
9    because there -- oftentimes we do endoscopies on
10   patients and you don't find a specific lesion as far
11   as a peptic ulcer disease, but there may be lesions
12   in the small bowel and the large bowel. So I'm not
13   sure I can answer that intelligently without knowing
14   more specifics about an individual patient.
15   BY MR. HONNOLD:
16   Q.  In the last bullet point, there's a sentence
17   that says, "Evidence suggests that Ms. Mingo's ulcer
18   predated her use of Xarelto." Do you see that sentence?
19   A.  Midway -- where is that? Oh, yes, I see it.
20   Q.  And in terms of the basis and support for that
21   statement, my sense is that would be Ms. Mingo's own
22   medical records, but if there's -- if there's something
23   else in addition to your training, education, and
24   experience, let me know, will you?

Page 125

1    A.  No, that's from her records.
2    Q.  And so how is an ulcer diagnosed or confirmed?
3    A.  Usually with an endoscopy, what some people
4    would call an upper scope.
5    Q.  And how many of those did Ms. Mingo have in the
6    records that you looked at?
7    A.  Two that I saw.
8    Q.  And did you see any that were performed before
9    the ulcer was ultimately formally diagnosed?
10   A.  I don't believe so.
11   Q.  And so when you say that there is evidence to
12   suggest that the ulcer predated her use of Xarelto, what
13   are the data points or pieces of information in her
14   medical record that you're relying on?
15   A.  So most of that's from, I believe it was
16   Dr. Keith's deposition. When he did her endoscopy, he
17   made -- or during his deposition, excuse me, he made a
18   mention that it appeared that she had peptic ulcer
19   disease. I don't know the exact phraseology he used,
20   but I gathered that from his deposition.
21   Q.  Now, in the middle of this last bullet point
22   paragraph, there is a sentence that talks about your
23   view that Ms. Mingo -- whether or not she would have
24   bled if she'd been taking some other medication. Do you

Protected - Subject to Further Protective Review

Page 126

1    see that sentence there that's in the middle of that
2    last bullet point?
3        A.  Yes.  Starting with "therefore"?
4        Q.  Okay.  Yes.  And so I just want to confirm with
5    you that that sentence, in terms of what you would be
6    relying upon for its support and basis, it's essentially
7    the same as the sentence -- the similar sentence that's
8    in the bullet point above where you say, said, quote,
9    "There is no evidence that Ms. Mingo would not have
10   sustained a bleed if she had been prescribed a different
11   anticoagulant."  Do you see that?
12       A.  Yes.
13       Q.  Are those two sentences, while they are phrased
14   and structured a little bit differently, essentially
15   meaning to communicate the same thing?
16       A.  I think so.
17       Q.  So there's no need to go into that further than
18   what we've already talked about?
19       A.  I don't think so.
20       Q.  And you'll recall that when we talked about it
21   previously we talked about head-to-head data and things
22   of that nature?
23       A.  Yes.
24       Q.  And as we read the rest of that bullet point on

Page 127

1    page 3, those are essentially additional inferences that
2    you -- that you make from that statement, that in the
3    absence of head-to-head clinical trial data, you're not
4    able to state that being on a different agent would have
5    prevented the bleed; right?
6        MS. WAY:  Object to form.
7        THE WITNESS:  Yes, I think the only other thing
8    that I'm conveying, it may be the same thing, is
9    that I wouldn't have necessarily stopped her
10   Xarelto.  Well, actually, it does say at any time
11   before the bleed, yes.
12   BY MR. HONNOLD:
13       Q.  Is it your opinion in this case that had you
14   been treating Ms. Mingo there was -- there would not
15   have been a time when you would have discontinued her
16   Xarelto before her ultimate hospital admission for the
17   acute bleed?
18       A.  Correct.
19       Q.  And so your view in this case is then that when
20   you look at all of the existing laboratory data and
21   medical record information then, you don't see any
22   basis, sufficient basis that would have caused a
23   physician to actually either outright discontinue her
24   Xarelto or choose another agent?

Page 128

1        A.  Not before her bleed.
2        Q.  And when you say "not before the bleed," you
3    mean the episode of bleeding for which she was
4    ultimately hospitalized and when the ulcer was
5    discovered?
6        A.  Maybe a day before that, because she had a
7    blood count check the day before where her hemoglobin
8    and hematocrit were decreased.
9        Q.  Other than that, though, you did not feel that
10   there was any laboratory data or information in her
11   chart to support a discontinuation of her Xarelto or a
12   switch to a different agent; correct?
13       A.  Correct.
14       Q.  Okay.  When you choose to use warfarin to treat
15   a patient, who is it that you rely upon to deal with the
16   issue of performing an ongoing INR test to monitor
17   whether or not the patient is in a therapeutic range or
18   might need a dose adjustment?
19       A.  The good thing is, it's kind of a, I'd say, a
20   multiprong approach.  If we're initially starting a
21   patient on warfarin, or Coumadin, I will check them, but
22   then I would also refer them to what -- we have a
23   coagulation or anticoagulant clinic that's run by
24   PharmDs, a nurse practitioner, I can't remember who else

Page 129

1    is there, and it's overseen, I believe, by one of our
2    hematologists as the director of that clinic.
3        And then usually, if they have a question about
4    one of our patients, then they will send a message in
5    the electronic health record, or page us, or call us if
6    there's a question, but they usually manage it pretty
7    well for us.
8        Q.  So in your institution the various medical
9    specialties have found that it's an efficient way to
10   provide continuity of care in terms of anticoagulation
11   management to have that be run by a particular clinic in
12   the form and fashion that you've described?
13       MS. HOFFMANN:  Objection.
14       MS. WAY:  Object to form.
15       THE WITNESS:  With warfarin, many people do.
16   Everyone doesn't use the anticoagulation clinic, but
17   many people do.
18   BY MR. HONNOLD:
19       Q.  And you choose to use it?
20       A.  For most of my patients, yes.  If there's some
21   patients that have some nuances, I may do it myself, but
22   that's -- usually I'll refer them after I've managed it
23   briefly to make sure that they're tolerating the
24   medications and not having any issues.

33 (Pages 126 to 129)

Protected - Subject to Further Protective Review

Page 130

1    Q.  And so the patients that you would maintain
2   control over monitoring warfarin, I take it you do on
3   occasion perform INRs for those patients?
4    A.  Oh, yes.
5    Q.  Okay.  And you say, "Oh, yes," like it's
6   obvious that you would do that.
7    A.  Well, so in my mind -- I guess I should
8   verbalize what I'm thinking -- so I have patients who
9   are on warfarin that, if they have other diseases like
10  COPD or whatever, if I give them an antibiotic, I know
11  that the antibiotic may affect their INR, so instead of
12  saying have the coag clinic follow it up, I tell them,
13  "In three days, go have your INR checked, and I'll look
14  at the results and see if you need to hold your
15  warfarin, or Coumadin, based on the fact that I know
16  I've treated them with the antibiotics."
17   Q.  In these patients, so if their INR goes up as a
18  result of drug interaction, why does that matter?
19   A.  With the INR, because we're trying to keep it
20  in the approved range, so I would hold their antibiotics
21  if it is outside of the approved range.
22   Q.  And do you feel that it's clinically important
23  to keep those patients in the approved range as you used
24  that term?

Page 131

1    A.  For INR?
2    Q.  Yes.
3    A.  Yes.
4    Q.  Why?
5    A.  So if you have the INR that is too low, then
6   their risk of clotting is increased because they're not
7   on appropriate therapy.  If it's too high, they may have
8   an increased risk of bleeding.
9    Q.  And what is it about -- in an individual
10  patient maybe over the span of days goes from having a
11  bleeding risk of X, and then as their INR goes up they
12  have an increased bleeding risk to Y, what is it in the
13  interim that's happened that increases their bleeding
14  risk?
15   A.  The blood is thinner, so the Coumadin has
16  depleted the -- what we would call the vitamin K active
17  factors.  So it does what it's supposed to do, it thins
18  the blood, and so if they had an issue where they were
19  cut or had another problem, then their risk of bleeding
20  may be increased.
21   Q.  And is that because as a patient may have an
22  increased level of INR, is that a way of testing that
23  patient to see that they may have increased level of
24  active warfarin in their bloodstream?

Page 132

1    MS. HOFFMANN:  Objection.
2    THE WITNESS:  I don't know if it -- if it tests
3   warfarin level.  The INR, that test is kind of
4   linked to PT/INR, but most times we use INR for
5   warfarin.  I don't know if it tells us there's an
6   increased level.  I don't know that.
7   BY MR. HONNOLD:
8    Q.  But as the INR goes up in a given patient --
9   well, strike that.
10        You talked about the instance where you might
11  have a patient on warfarin that you give an antibiotic,
12  that can cause the INR to go up; right?
13   A.  Uh-huh.
14   Q.  Yes?
15   A.  Yes.
16   Q.  Sorry.  I didn't mean to point at you and say
17  "Yes."  You know the reason I'm doing that?
18   A.  Yes.
19   Q.  I didn't spend the normal time going through
20  the rules.
21   A.  Yes, yes.  Oh, I know.  Yes.
22   Q.  All right.  And that's something that may
23  happen, could happen overnight in a patient; right?
24        MS. WAY:  Object to the form.

Page 133

1    THE WITNESS:  The increased INR?
2   BY MR. HONNOLD:
3    Q.  Yes.
4    A.  You know, I don't know the answer.  I guess it
5   could.  That's not generally what we see in clinical
6   practice.  Usually --
7    Q.  A span of days?
8    MS. HOFFMANN:  You didn't let him finish.
9    MR. HONNOLD:  Sorry.  Sorry.  Sorry.
10   THE WITNESS:  Yeah, usually in clinical
11  practice we see it overrule several days when
12  there's an interaction with antibiotics.
13  BY MR. HONNOLD:
14   Q.  And so specifically then from the -- from the
15  pathophysiological perspective, what is it about the
16  fact that that INR number is going up that puts the
17  patient at an increased risk of bleeding?
18   A.  I don't know if there's anything in particular
19  about the INR.  We just know that if there are drug
20  interactions that some coagulation factors are
21  decreased, or can be decreased, because it's not always
22  that case, and so when you're looking at coagulation, if
23  you're factors are decreased, then it may increase your
24  risk of bleeding.

34 (Pages 130 to 133)

Protected - Subject to Further Protective Review

Page 134

1    Q.  Okay.  Here's what I'm getting at:  So in one
2  of your patients that you've got on warfarin and that
3  you add an antibiotic, and that could be a situation
4  that causes their INR to go up; right?  Right?  Yes?
5    A.  Yes.
6    MR. CONKLIN:  No pointing.
7    MR. HONNOLD:  Sorry.
8    MS. HOFFMANN:  I got yelled at at a deposition
9  recently.
10    MR. HONNOLD:  Believe me, I've read it.  It was
11  hilarious.  I laughed.
12    MS. HOFFMANN:  I was pointing at the court
13  reporter.
14    MR. HONNOLD:  So you say.
15    MS. HOFFMANN:  That's my story, and I'm
16  sticking to it.
17  BY MR. HONNOLD:
18    Q.  So in -- in that hypothetical patient that
19  we're talking about, as the INR goes up, then as a
20  clinician you are -- you are concerned about the fact
21  that something has happened in that patient that now
22  places them potentially at an increased risk of
23  bleeding; correct?
24    A.  Yes.

Page 135

1    Q.  Okay.  What your concern is is that there
2  may -- there may be areas that are already existing in
3  their body, a particular tissue friability or frailty,
4  or endothelial injury, that a certain level of INR the
5  body is still able to self-heal and it doesn't go into a
6  situation of bleeding that clinically manifests, that
7  now that the INR is higher, it may be a situation where
8  the patient can bleed?
9    MS. HOFFMANN:  Objection.
10    MS. WAY:  Object to form.
11  BY MR. HONNOLD:
12    Q.  Is that what you're thinking about?
13    MS. HOFFMANN:  We're still talking about
14  Coumadin?
15    MR. HONNOLD:  Yes, yes.
16    THE WITNESS:  So I'm thinking about what you
17  just described, that scenario.  For bleeding to
18  occur, there has to be some type of damage
19  somewhere.  I'm restating it, and then I hope I'll
20  answer it.
21    And your question is there had to be some
22  underlying -- and maybe not -- to me, you're saying
23  there's some underlying pathophysiology, lesion or
24  something, that if it were for the blood being too

Page 136

1  thin, they may not bleed?
2  BY MR. HONNOLD:
3    Q.  Right.
4    A.  That's probably true.
5    Q.  Yeah.
6    A.  I'm just thinking if there's any instances
7  where it may not be true.  That's why I'm taking a
8  second to answer.  Just thinking through the -- how it
9  was working.
10    Q.  If it's not true, why are you concerned about
11  the INR?
12    A.  Yeah, that's what I'm thinking.
13    Q.  Question.
14    A.  No, that probably is it, that they would
15  probably be at increased risk of bleeding.  I can't say
16  for sure that there's not necessarily an underlying
17  lesion there or that there is one, but that's most
18  probable, so how about we stick with that, most
19  probable?
20    Q.  Okay.  And that's great.  Let's go -- let's
21  talk about the other things too, that if there's not an
22  underlying lesion, are you saying that maybe there are
23  occasions where somehow patients from certain places in
24  the body might have kind of spontaneous bleeding or

Page 137

1  oozing in the absence of specific endothelial or tissue
2  injury?
3    MS. HOFFMANN:  Objection.
4    THE WITNESS:  Probably not, because there's
5  usually going to be some type of barrier to the
6  endothelium for bleeding to occur.  Even with blood
7  thinners, there's going to be some type of lesion
8  breakage or something in the -- in the endothelium
9  or the blood vessel to cause some bleeding.
10  BY MR. HONNOLD:
11    Q.  But not within a viscus?
12    A.  Within a viscus, I would think there would be a
13  lesion that would have to be there as well.
14    Q.  Okay.  So you'd include that, you'd include
15  lesions or abnormalities within an organ as being the
16  same sort of tissue or endothelial damage, that would go
17  into that category?
18    A.  Yes, I think so.
19    Q.  And so I just want to make sure that we've put
20  a point on this, but what I've suggested to you, you
21  agree with, right --
22    MS. HOFFMANN:  Object.
23  BY MR. HONNOLD:
24    Q.  -- that the issue of at some levels of INR

35 (Pages 134 to 137)

Protected - Subject to Further Protective Review

Page 138

1    there may be areas of tissue damage, endothelial
2    weakness, structural weakness, that at a certain level
3    of INR do not bleed, but when the INR becomes
4    supratherapeutic, those are sites that now are at risk
5    of bleeding because of the higher INR because the blood
6    is now more thinned as you've described?
7         MS. HOFFMANN: Objection.
8         MS. WAY: Objection.
9         THE WITNESS: Yes.
10   BY MR. HONNOLD:
11       Q.  And so in that context of warfarin, it is the
12   magnitude of effect of the drug that may be something
13   that impacts directly upon risk of bleed?
14        MS. WAY: Objection.
15        THE WITNESS: Repeat that again.
16   BY MR. HONNOLD:
17       Q.  In the scenario of warfarin then, it is the
18   magnitude of the effect of the drug that may be
19   something that impacts directly upon the risk of
20   bleeding?
21        MS. WAY: Object to form.
22        MS. HOFFMANN: Objection.
23        THE WITNESS: When you say "the magnitude of
24   effect of the drug," I'm assuming you mean the INR?

Page 139

1
2    BY MR. HONNOLD:
3        Q.  Right.
4        A.  Okay. So maybe. Or probably.
5        Q.  Okay. And are you aware of any other way to
6    evaluate the magnitude of effect of warfarin other than
7    testing the INR?
8        A.  Not that I'm aware of.
9        Q.  In the clinical trials that you read for
10   Xarelto, those being the publications in the various --
11   in the EINSTEIN series, -DVT, -PE, and -Extension, did
12   you see any data in those published resources that
13   talked about either serum or plasma level concentration
14   of rivaroxaban in patients?
15       A.  I don't remember if EINSTEIN or -- well, if any
16   of the EINSTEIN studies really delved into that. I
17   would have to look at them specifically, but I don't
18   remember that.
19       Q.  So to determine that then, it would be
20   nothing other than an exercise of actually going to the
21   publications to see if it was covered; right?
22       A.  Yes.
23       Q.  Okay. I take it in your medical school
24   education and training you took some classes in

Page 140

1    pharmacology; is that right?
2        A.  We did.
3        Q.  Okay. And did you learn in pharmacology that
4    one thing in some drugs that might influence the
5    magnitude of effect of a certain drug, it can be plasma
6    or serum concentration of the drug?
7         MS. HOFFMANN: Objection.
8         THE WITNESS: You said that it might affect the
9    effect of the drug?
10   BY MR. HONNOLD:
11       Q.  Magnitude of effect of the drug.
12       A.  Magnitude of effect of the drug. Yeah, I
13   remember hearing that in pharmacology.
14       Q.  I mean, it's kind of one of the -- it's kind of
15   one of the basic building blocks when you take
16   pharmacology; right?
17        MS. WAY: Objection to form.
18        THE WITNESS: Yes.
19   BY MR. HONNOLD:
20       Q.  That treatment effect, another word for
21   treatment effect is magnitude of drug effect; correct?
22        MS. WAY: Object to form.
23        THE WITNESS: So we don't really talk about
24   treatment effect being magnitude of drug effect.

Page 141

1    That -- our pharmacists and PharmDs go more in
2    detail in using those terms, but we don't -- I mean,
3    I remember hearing that, like you said, in
4    pharmacology, but we don't talk about that as much
5    in clinical practice when we're caring for patients.
6    BY MR. HONNOLD:
7        Q.  Do you have -- do you have some drugs in your
8    practice that you do measure on occasion other than the
9    discussion that we've already had regarding warfarin?
10       A.  In the ICU. Probably in the outpatient, maybe
11   not as much. In the ICU, sometimes we will measure some
12   levels.
13       Q.  And which drugs are coming to mind?
14       A.  Probably Digoxin. Sometimes Dilantin. Well,
15   actually, I could lump them in a group. Some of the
16   antiseizure medications. And maybe theophylline, an old
17   drug but still used by a few people, but -- so sometimes
18   the theophylline can be measured inpatient and
19   outpatient.
20       Q.  And in some of those situations, are you
21   testing what is commonly called a drug level?
22       A.  Yes.
23       Q.  And you know that when you're testing a drug
24   level that that oftentimes is a test that is either

36 (Pages 138 to 141)

Page 142

1    direct measurement of plasma or serum concentration or a
2    surrogate test from which plasma or serum concentration
3    can be accurately inferred?
4        MS. HOFFMANN: Objection.
5        THE WITNESS: Direct measure of serum or a
6    surrogate?
7    BY MR. HONNOLD:
8        Q. Right.
9        A. So I'm not sure how to answer that, because
10   what I'm thinking of, some drugs have what they call a
11   total level, and then some have a free level, so I don't
12   know how to answer your question or if that -- maybe you
13   can repeat it while I'm thinking about total and free.
14       Q. Well, regardless of whether you're looking at
15   total level or free level, it is measuring to some
16   degree the quantity of medication that is in the
17   patient's circulation?
18       A. I'll say yes. I'm thinking, so that's what's
19   taking me a minute.
20       Q. Okay. And if you have some thought that's
21   contrary to the "yes" that you just said, let me know
22   and we'll -- we'll cover that. Okay?
23       A. (Nodding head.)
24       Q. And in those instances when -- when you are

Page 143

1    interested in a drug level, whether it's total level or
2    free level, you're concerned about measuring the drug
3    because you want, one, to know are you -- is the drug
4    likely to have its intended therapeutic benefit, but
5    also you're looking to see are we in a range with this
6    drug that might increase the risk of side effect or
7    adverse reaction; correct?
8        MS. WAY: Object to form.
9        THE WITNESS: Yes, I think probably so.
10   BY MR. HONNOLD:
11       Q. For Digoxin, why is it that you might be
12   concerned clinically about the patient's drug level?
13       A. If they -- if a patient comes in who's on
14   Digoxin and has certain signs or symptoms that might be
15   related to Digoxin toxicity, that would probably be the
16   most common reason that we're checking it.
17       Q. And how does Digoxin toxicity manifest?
18       A. Oh. They can have nausea, blurred vision,
19   visual color disturbances, ringing in the ears. Oh.
20   Bradycardia. How did I leave out slow heart rate. How
21   did I leave that?
22       So it's several different ways, but those are
23   probably, if you looked it up, would be the most common
24   things you might see.

Page 144

1        Q. So those are the sorts of adverse reactions or
2    untoward effects that can occur in a patient whose
3    Digoxin level is toxic or too high; correct?
4        A. I would say yes, with one caveat, that
5    sometimes, you know, there's a range that it gives you
6    for what the level is the expected to be, sometimes
7    patients could have those effects even if it's not at
8    the level over which you would expect.
9        Q. And that's another thing that you probably
10   learned in pharmacology, that there are some drugs that
11   even when they're given absolutely at the intended dose
12   and a patient has the absolute intended mean, average,
13   smack dab in the middle, amount of drug in their blood,
14   they still might suffer from adverse reactions; correct?
15       MS. HOFFMANN: Objection.
16       MS. WAY: Object to form.
17       THE WITNESS: Possibly.
18   BY MR. HONNOLD:
19       Q. And that means that there is a range of patient
20   sensitivity or patient reaction exists somewhat on a
21   continuum; correct?
22       MS. HOFFMANN: Objection.
23       MS. WAY: Object to form.
24       THE WITNESS: I would think so, yes.

Page 145

1
2    BY MR. HONNOLD:
3        Q. Then let's talk about Dilantin. Why is it in
4    Dilantin that you are concerned for the patient on
5    occasion that causes you to measure the amount of drug
6    or level of drug in the patient's system?
7        MS. WAY: Object to the form. Sorry.
8        THE WITNESS: So those factors would be
9    variable. Sometimes you're measuring it because of
10   other medications you might give them, so thinking
11   about a drug interaction. Sometimes you're
12   measuring it because you think they may not have
13   enough or a high enough dose, you might need to
14   increase it. I think would be probably the more
15   common reasons that we check it with Dilantin.
16   BY MR. HONNOLD:
17       Q. I think you mentioned theophylline as well.
18   Tell me about theophylline in terms of why you might be
19   concerned about a drug level there.
20       A. So most people these days clinically aren't
21   checking theophylline levels, because it's not used as
22   much, and then those who are using it are using it at a
23   very, very low once daily dosing, not like it used to
24   be. So we're not checking a bunch of theophylline

37 (Pages 142 to 145)

Protected - Subject to Further Protective Review

Page 146

1    levels, but I know some people might just if a patient
2    is on the drug.  So I can't tell you -- clinically, I'm
3    not checking those levels.  I just mentioned it as one
4    that some people might.
5        Q.   Any other medications that come to mind that
6    you use on occasion where you might want to measure a
7    drug level?
8        A.   Not that I can think of.
9        Q.   Do you treat pneumonia on occasion in the ICU?
10       A.   Yes.
11       Q.   Any antibiotics that you're concerned about on
12   occasion in terms of a drug level?
13       A.   Oh.  So we sometimes order vancomycin peaks and
14   troughs, and maybe gentamicin.  Do we use any other
15   aminoglycosides?  Probably the -- well, maybe
16   tobramycin.
17            So maybe I should say a group of medicine, the
18   aminoglycosides for antibiotics, and then vancomycin is
19   the other antibiotic in that group that might be
20   measured.
21       Q.   And, again, with antibiotics, antibiotic level
22   can be important as to whether the drug level is
23   therapeutic based upon the specific type of disease
24   that's being treated; correct?

Page 147

1        A.   Yes.
2        Q.   I mean, there are different types of infection
3    in terms of how high or high low you might want the
4    blood level to be; correct?
5        A.   Probably if you're looking at the groups, the
6    aminoglycosides, at a certain level, for most types of
7    infections.  Vancomycin, most types everybody now is
8    shooting for higher levels.
9        Q.   Partially due to increased resistance?
10       A.   No.  Certain disease processes you can get
11   better absorption, like pneumonia, of vancomycin at
12   higher levels.  Meningitis also.
13       Q.   Then on the -- on the side of too much medicine
14   with this list or family of drugs that you mentioned,
15   what potentially can happen when there's too much drug
16   on board, potentially?
17            MS. HOFFMANN:  Objection.
18            THE WITNESS:  With the aminoglycosides,
19   potentially renal failure, or renal damage, and
20   maybe hearing issues is what you would see in the
21   literature.
22            With vancomycin, not so much anymore because
23   it's a, as we're told, a pure drug, or whatever
24   they -- they give us a bunch of reasoning.  But we

Page 148

1    don't see as much -- used to see renal failure
2    listed as a possible side effect for vancomycin, but
3    I don't think you'd see that in a lot of places
4    right now.
5    BY MR. HONNOLD:
6        Q.   But at least for some of the drugs in that
7    class there are still issues of nephrotoxicity and
8    ototoxicity, potentially?
9        A.   For the aminoglycosides.
10       Q.   And that's why it makes sense for a
11   practitioner to be obtaining blood levels of those drugs
12   on occasion; correct?
13            MS. WAY:  Object to form.
14            THE WITNESS:  That, and looking for drug
15   interactions that may contribute.
16   BY MR. HONNOLD:
17       Q.   In terms of the materials that you've reviewed
18   relating to Xarelto, and specifically the EINSTEIN trial
19   series that you've looked at, do any of those articles
20   or publications that you've reviewed speak to either the
21   anticipated plasma concentration level for the
22   15-milligram b.i.d. dose or the expected range of plasma
23   concentration levels for the 15-milligram b.i.d. dose?
24       A.   I would have to look at those again.  I don't

Page 149

1    remember if those talk about the plasma concentrations.
2        Q.   And, again, to determine if they do, it would
3    just be a function of going to the publications that are
4    either in your footnotes or in your reference list and
5    just looking at them to see if that's something that's
6    commented on?
7        A.   Yes.
8            MS. WAY:  Brad, we've been going for about an
9    hour.
10           MR. HONNOLD:  Have we?  I lost track of time.
11   So I knew that you'd -- I knew you'd want to quit at
12   some time, so --
13           MS. WAY:  Can I take a break?
14           MR. HONNOLD:  Yes.
15           MS. WAY:  Thanks.
16           THE VIDEOGRAPHER:  The time now is 1:36 p.m.
17   We are off the record.
18           (Recess from 1:36 p.m. until 1:56 p.m.)
19           THE VIDEOGRAPHER:  This begins Disk 5 of
20   today's deposition.  The time now is 1:56 p.m.  We
21   are back on the record.
22   BY MR. HONNOLD:
23       Q.   Doctor, we're back on the record now after a
24   short afternoon break.

38 (Pages 146 to 149)

Protected - Subject to Further Protective Review

Page 150

1      I want to go to VI of your report that begins
2  at page 23. Do you have that before you?
3      A.  Yes.
4      Q.  Okay.  And so Section VI(A) of your report
5  talks about bleeding risk; right?
6      A.  Yes.
7      Q.  And what you're -- what you're stating in
8  Section VI(A) is that the Xarelto label informs
9  physicians that the use of Xarelto increases the risk of
10  serious and fatal bleeding events; correct?
11      A.  Yes.
12      Q.  And you believe that to be true; correct?
13      A.  That it -- yes, that it can increase.
14      Q.  Not only does the label state it, but you
15  believe it is true that the medication increases the
16  risk of serious and fatal bleeding events; correct?
17      MS. WAY:  Object to form.
18      THE WITNESS:  That it -- that it could increase
19  risk of bleeding, yes.
20  BY MR. HONNOLD:
21      Q.  And what is it about Xarelto that makes the
22  situation true that it could increase the risk of
23  serious and fatal bleeding events?
24      MS. WAY:  Object to form.

Page 151

1      THE WITNESS:  So as with any anticoagulant, the
2  way they work is they thin the blood and prevent
3  blots from forming, more specifically, I probably
4  should say, and so if someone has a bleed or risk of
5  bleeding, by being on an anticoagulant, doing what
6  it's supposed to do, they might have that increased
7  risk.
8  BY MR. HONNOLD:
9      Q.  And is the risk of serious and fatal bleeding
10  events the same for all patients on Xarelto?
11      MS. HOFFMANN:  Objection.
12      THE WITNESS:  Is it the same?  I'm not quite
13  sure what you mean by "the same."  So I'm going to
14  give a generic yes to say, with the follow-up,
15  hopefully, because blood thinners or anticoagulants
16  work by thinning the blood, so -- and I don't know
17  if that's what you're asking, but, yes, they're at
18  increased risk of because of the mechanism.
19  BY MR. HONNOLD:
20      Q.  But in terms of their, I guess, statistical
21  risk or likelihood that any given patient will have a
22  serious or fatal bleeding event on Xarelto, are all
23  patients at the same level of risk for that to occur?
24      MS. HOFFMANN:  Objection.

Page 152

1      THE WITNESS:  I don't know if I know the answer
2  to that.
3  BY MR. HONNOLD:
4      Q.  How would you find out?
5      A.  I guess I would have to look and see if there's
6  data that says some patients are at a higher risk of
7  bleeding than others that take Xarelto.
8      Q.  And as you sit here today, are you aware of any
9  particular risk factors that may place one patient at an
10  increased risk of a serious or fatal bleeding event over
11  another patient?
12      MS. HOFFMANN:  Objection.
13      MS. WAY:  Object to form.
14      THE WITNESS:  Not that I know of.
15  BY MR. HONNOLD:
16      Q.  And I just want to make sure of something.  You
17  are not stating, though, affirmatively, you're not
18  giving the affirmative opinion that all patients who
19  take Xarelto are, in fact, at the same statistical
20  likelihood or risk of a serious or fatal bleeding event;
21  correct?
22      MS. HOFFMANN:  Objection.
23      THE WITNESS:  Unless I would see data
24  otherwise, I think I might say that.  I'm thinking

Page 153

1  in my mind trying to reconcile if there is something
2  that would say it differently.  I might actually say
3  that unless there's something that shows me that I
4  hadn't looked at or don't remember that shows one
5  group is at an increased risk of bleeding over
6  another.
7  BY MR. HONNOLD:
8      Q.  Does the label say anything about there being
9  categories of patients who might be at increased risk of
10  bleeding for one reason or another?
11      A.  Could I look at it?  I'm trying to remember,
12  because it's a lot of information on the label.
13      (Haynes Exhibit No. 3 was marked for
14  identification.)
15      (Haynes Exhibit No. 4 was marked for
16  identification.)
17  BY MR. HONNOLD:
18      Q.  I'm going to eventually hand you two things.
19  One I've marked as Exhibit 3 and one I've marked as
20  Exhibit 4.  For the record, Exhibit 3 is the version of
21  the Xarelto -- strike that.
22      Exhibit 4 is the December 2014 version of the
23  Xarelto label that had been previously marked as
24  Exhibit 8 in Dr. Jones' deposition.

Protected - Subject to Further Protective Review

Page 154

1      MR. HONNOLD: I only have one copy of this, and
2  it's a poor copy, but I'll give it to counsel so
3  they can inspect it to make sure it is what I state
4  that it is.
5      MS. HOFFMANN: Can we have the question read
6  back or restated before he goes on?
7      MR. HONNOLD: Sure. You can go ahead and read
8  it.
9      MS. WAY: You're representing that this is the
10 December 2013 label?
11     MR. HONNOLD: I think I said 2014. Look in
12 the -- in the front --
13     MS. WAY: Okay. I wrote down '13, but maybe
14 you did say '14.
15     MR. HONNOLD: Yeah, look in the lower -- in the
16 middle of the first page, about halfway up on the
17 far right hand, it says revised/revision 12/2014.
18     MS. WAY: Revised December 2014.
19     (The question was read by the reporter.)
20     THE WITNESS: So the only thing I saw -- I
21 believe -- let's go back up here -- was -- well, it
22 didn't -- so on page 8, it didn't say specifically
23 about a patient group, which I believe was your
24 question. It just talked about patients who may be

Page 155

1  using aspirin, platelet inhibitors, or other
2  antithrombotic agents or fibrinolytic therapy or
3  NSAIDs may -- actually, it just says, "Concomitant
4  use may increase the risk of bleeding," so it
5  doesn't talk about a patient group that I saw,
6  unless I skipped it with the fast skimming.
7  BY MR. HONNOLD:
8      Q. What about the drug interaction section,
9  Section 7? Is there anything in Section 7 to you that
10 suggests that patients who are taking other drugs
11 concomitant to Xarelto may be at increased risk of
12 bleeding?
13     MS. HOFFMANN: Other than the section he just
14 referred to?
15     MR. HONNOLD: Yes, because I think he was
16 reading from a section other than Section 7.
17     THE WITNESS: Yes. So it says the same thing
18 here in 7.1. It says some drug interactions. If
19 I -- I know I said NSAIDs. I may not have said the
20 cytochrome drugs. It says may increase bleeding
21 risk. 7.2. The cytochrome. Anticoagulants and
22 NSAIDs I said. Then there's another section on
23 cytochrome drugs. So those are the ones that are
24 listed in Section 7.

Page 156

1  BY MR. HONNOLD:
2      Q. So you said something -- one comment you made
3  was, quote, "may increase the" -- "may increase bleeding
4  risk" or "may increase the risk of bleeding." What --
5  what were you commenting on or reading from when you
6  said that?
7      A. I believe that was the NSAIDs. So let's see.
8  So it says, "Avoid concurrent use of Xarelto with other
9  anticoagulants due to increased bleeding risk unless
10 benefit outweighs risk." That's Section 7.3, second
11 paragraph.
12     Q. And what are the other types of drugs that are
13 mentioned in the drug interaction section?
14     A. Specifically it says here NSAIDs, aspirin,
15 platelet aggregation inhibitors, and then I'm
16 assuming -- it just says generic term "other
17 anticoagulants." That's the only one. There's some
18 other drug interactions it mentions here, but it's
19 talking about decreased -- the cytochrome --
20     Q. Does Section 7 talk about any drugs that
21 potentially can increase rivaroxaban exposure and
22 pharmacodynamic effects?
23     MS. HOFFMANN: Does it use that word?

Page 157

1      MR. HONNOLD: Or words like that.
2      THE WITNESS: Yes, there's one in Section 7.
3  BY MR. HONNOLD:
4      Q. And read that to me that you're looking at.
5  What says that?
6      A. "Inhibitors and inducers of these CYP450
7  enzymes," C-Y-P, "or transporters may result in changes
8  in rivaroxaban exposure."
9      Q. And anything else?
10     A. That's it for 7. There's 7.1 that starts a
11 different one.
12     Q. Okay. So what is -- what might be significant
13 about rivaroxaban exposure in terms of the patient's
14 risk of bleeding?
15     MS. HOFFMANN: Objection.
16     MS. WAY: Object to form.
17     THE WITNESS: I couldn't tell you that. So in
18 clinical practice we don't talk about rivaroxaban
19 exposure. That's -- to me, when we're talking to
20 pharmacists and looking at these things, it goes
21 more with the pharmacodynamic and pharmacokinetic
22 properties, which is really at the level of the
23 PharmDs, and so as clinicians, we definitely don't
24 talk about rivaroxaban exposure.

40 (Pages 154 to 157)

Protected - Subject to Further Protective Review

Page 158

1
2    BY MR. HONNOLD:
3        Q.   As you look at Section 7 in that label, is
4    there anything to you that suggests that for certain
5    drugs in combination with rivaroxaban that it can
6    increase rivaroxaban exposure and as a result increase
7    the pharmacodynamic effects of rivaroxaban?
8        MS. WAY:   Object to form.
9        MS. HOFFMANN:   Objection.
10       THE WITNESS:   As I said, we don't in clinical
11   practice talk about exposure, and we don't talk a
12   great deal about pharmacodynamic effects of drugs,
13   so I can't answer that intelligently.
14   BY MR. HONNOLD:
15       Q.   What would it mean to you if a label says that
16   a certain -- using Xarelto in combination with another
17   drug increases the pharmacodynamic effects of
18   rivaroxaban?  What would that mean to you?
19       MS. HOFFMANN:   Objection.
20       THE WITNESS:   I don't know.  I would have to
21   consult with one of my pharmacists and say, "What
22   does this mean?"
23   BY MR. HONNOLD:
24       Q.   Okay.  So can I see Exhibit 4 real quickly?

Page 159

1        A.   Oh.
2        Q.   Yeah, the label.
3        A.   Oh.  (Indicating.)
4        Q.   Yeah, thanks.
5        What does this statement mean to you?  And I'll
6    hand it back to you so you can read it in context --
7        A.   Okay.
8        Q.   -- but I'm going to read you the sentence so
9    you know what I'm talking about since I'm armed with
10   only one copy of this.  I apologize.
11       Quote, "Significant increases in rivaroxaban
12   exposure may increase bleeding risk."  That's in
13   Section 7.1.
14       And then in 7.4, the label states, "Significant
15   increases in rivaroxaban exposure may increase bleeding
16   risk."
17       So I'm going to hand this back to you and ask
18   you to look at Section 7.1 and 7.4 where those sentences
19   exist in the label.  Then I'm going to ask you:  What
20   does that sentence mean to you?
21       A.   7.1 and 7.4?
22       Q.   Yes, Doctor.
23       A.   "Significant increases in rivaroxaban exposure
24   may increase bleeding risk."  The first sentence.

Page 160

1        And then 7.4.  Oh, the last sentence, first
2    paragraph.  Excuse me.  7.4, on page 17, "Significant
3    increases in rivaroxaban exposure may increase bleeding
4    risk."
5        Oh.  So they say the same thing.  Those two
6    sentences say the same thing.
7        Q.   Right.  Sorry.
8        A.   I was looking for something different.
9        Q.   I just wanted to point out to you that it was
10   listed in a couple different places.
11       A.   Okay.
12       Q.   So when you read those sentences in the Xarelto
13   label, what does that mean to you, quote, "Significant
14   increases" -- "Significant increase in rivaroxaban
15   exposure may increase bleeding risk"?
16       MS. WAY:   Object to form.
17       THE WITNESS:   Clinically, it doesn't mean much
18   to me because I'm not sure what all they're talking
19   about when they're talking about rivaroxaban
20   exposure.  So, again, I would need to consult with
21   one of the PharmDs and talk about that, because it
22   seems to talk more about the pharmacodynamic and
23   pharmacokinetic properties of the drugs, which as
24   clinicians we don't deal with a great deal,

Page 161

1    actually, not much at all, depending on the
2    pharmacist.
3    BY MR. HONNOLD:
4        Q.   Let me ask it this way:  That sentence -- those
5    two sentences that you just read, if they're true, if
6    that -- if those statements are true, that could be
7    important information for you, though, as a clinician;
8    correct?
9        MS. WAY:   Object to form.
10       MS. HOFFMANN:   Objection.  He just testified
11   that he doesn't have an understanding of what they
12   mean, so objection.
13       MR. HONNOLD:   She said too much.  "Object to
14   the form" will do.
15   BY MR. HONNOLD:
16       Q.   So that could be important information to you,
17   couldn't it, if it's true?
18       MS. HOFFMANN:   Objection.
19       MS. WAY:   Objection.
20       THE WITNESS:   So I don't know if it would be
21   important or not since I don't understand exactly
22   what they're talking about with exposure.  That's
23   what I'm saying.  I would have to consult with the
24   pharmacist.

41 (Pages 158 to 161)

Protected - Subject to Further Protective Review

Page 162

1
2    BY MR. HONNOLD:
3       Q.  Okay.  Let's break it down.  Is there any
4    specific word in that sentence that you don't
5    understand?
6       A.  Yes.
7       Q.  Which one?
8       A.  Two.  Rivaroxaban exposure.
9       Q.  Okay.  So as you sit here today, you don't know
10   what rivaroxaban exposure is?
11      A.  I don't.
12      Q.  Okay.  Does that sentence suggest to you, if
13   it's true, that in some patients if rivaroxaban exposure
14   goes up, whatever it is, if it goes up, that it can
15   increase bleeding risk?
16         MS. HOFFMANN:  Objection.
17         MS. WAY:  Same.
18         THE WITNESS:  So, again, I don't know what
19      rivaroxaban exposure is.  I can just say what the
20      sentence says, but I can't make any inference or
21      what it means to me clinically.
22   BY MR. HONNOLD:
23      Q.  Okay.  So here's this drug that you're --
24   rivaroxaban.  You're here today serving as an expert

Page 163

1    witness.  You cite all of these labels in your reference
2    list as materials that you've relied upon, and the
3    situation with the label is there are sentences in there
4    that you don't understand?
5         MS. WAY:  Objection.
6         THE WITNESS:  Yes.  I'm not a pharmacist or a
7      PharmD that really studies pharmacodynamics and
8      pharmacokinetics, so...
9    BY MR. HONNOLD:
10      Q.  Would it be helpful to you in understanding
11   that if the label provided explanatory information as to
12   what it meant?
13         MS. HOFFMANN:  Objection.
14         MS. WAY:  Object to form.
15         THE WITNESS:  If someone explained it to me.  I
16      don't know if the label would do it adequately or if
17      I needed it from someone who specialized in that
18      field.
19   BY MR. HONNOLD:
20      Q.  The situation that you find yourself in even as
21   an expert witness in this case dealing with rivaroxaban,
22   you'd either need further explanation in the label or
23   you'd have to go talk to a pharmacist about what that
24   means; right?

Page 164

1         MS. HOFFMANN:  Objection.
2         MS. WAY:  Object to form.  He's here as a
3      case-specific expert, Brad.  You know that.  He
4      didn't submit a generic report in this case.
5    BY MR. HONNOLD:
6       Q.  Go ahead.
7         MS. WAY:  Asked and answered.  I mean --
8         MR. HONNOLD:  It's not -- it's not asked and
9      answered.
10        MS. WAY:  You've asked it three different
11     times.
12        MR. HONNOLD:  It's not asked and answered.
13     Don't tell me that.  The question is completely
14     different.  By you stating that objection, you're
15     suggesting to him that my question for some reason
16     is inappropriate or wrong, and it is not the same
17     question.  I will guarantee you it's not.  Come over
18     here and look.
19        MS. WAY:  You can read it back, Brad.  You can
20     read it back.  It's fine if I am incorrect, if you
21     did change it up a bit, but my comment is it sounded
22     to me that it was the same question as the two that
23     you'd asked previously.
24        MR. HONNOLD:  Let's go back.

Page 165

1         MS. WAY:  If it's not, then that's fine, he can
2      answer it again in the same way.
3         MR. HONNOLD:  Let's go back.
4         (Reviewing the realtime computer screen.)
5    BY MR. HONNOLD:
6       Q.  So here it is:  The situation --
7         MR. HONNOLD:  Sorry.  Okay.
8         THE COURT REPORTER:  It's going to keep going.
9         MR. HONNOLD:  Go back a little more.  It's
10     okay.  Okay, now don't type yet, okay?  I'll give
11     you time to retype what it says there, okay, but let
12     me ask it so I don't lose the place there, because
13     there's no way you can freeze it, is there?
14     No.  Okay.  It's okay.
15   BY MR. HONNOLD:
16      Q.  All right.  So here's the question that I
17   asked:  The situation that you find yourself in even as
18   an expert witness in this case dealing with rivaroxaban,
19   you'd either need further -- you'd either need further
20   information in the label or you'd have to go talk to a
21   pharmacist about what that means; right?
22        MS. WAY:  Same objection.
23        THE WITNESS:  Yes.
24   BY MR. HONNOLD:

42 (Pages 162 to 165)

Protected - Subject to Further Protective Review

Page 166

1    Q.  In your clinical practice, whether it relates
2  to rivaroxaban or other drugs, have you ever heard the
3  term or phrase "drug exposure" before?
4    A.  Well, I've read it in the package insert, so I
5  would have to say yes.
6    Q.  And when you say you've read it in the package
7  insert, you mean the Xarelto package insert?
8    A.  Yes.
9    Q.  Other than the Xarelto package insert, have you
10  ever in your clinical practice encountered the term or
11  phrase "drug exposure" before?
12    A.  I can't say if I've ever encountered it.  I can
13  say that we don't use it clinically and it's not
14  something that we use on a routine basis, or even an
15  infrequent basis.
16    Q.  From your review of the sections of the label
17  that we've looked at, if the information is true, does
18  the label suggest to you that there may be situations in
19  particular patients where drug -- rivaroxaban exposure
20  can be increased, and as a result, the risk of bleeding
21  can increase?
22    MS. HOFFMANN:  Objection.
23    MS. WAY:  Object to form.
24    THE WITNESS:  All I can say is that it states

Page 167

1  this in the label, the significant increases in
2    exposure may increase bleeding risk.
3  BY MR. HONNOLD:
4    Q.  Okay.  Now, in that label, is there anywhere in
5  that label that defines for you what is a significant
6  increase in rivaroxaban exposure?
7    A.  Not that I know of.
8    Q.  And from your perspective as a physician, the
9  issue of significance, when you talk about prescription
10  drugs, that is a term that -- that can have many
11  different meanings, correct, what is significant or
12  what's not; right?
13    MS. WAY:  Objection.
14    MS. HOFFMANN:  Objection.
15    THE WITNESS:  I'm sorry.  I misunderstood what
16  you say.  You're saying exposure can have many
17  different meanings?
18  BY MR. HONNOLD:
19    Q.  No, no.  The term "significant" in the context
20  of prescription drugs can have many different meanings;
21  right?
22    A.  I don't know if it has many different meanings.
23  To me, "significant" means, if I'm talking about drug
24  treatment, that its something, as we would say, if we

Page 168

1  say something is significant, that it's important to
2  take note of.
3    Q.  But when we're talking about drug exposure as
4  you've been introduced to that term in the rivaroxaban
5  label, does that suggest to you something that is a
6  quantitative measurement?
7    MS. HOFFMANN:  Objection.
8    THE WITNESS:  I don't know.
9  BY MR. HONNOLD:
10    Q.  So you said there was -- one meaning of
11  "significant" that comes to mind to you is something
12  that is of enough of an increase to take note of,
13  correct, or take into account; fair statement?
14    MS. WAY:  Object to form.
15    THE WITNESS:  Yes.
16  BY MR. HONNOLD:
17    Q.  With some of the drugs that we talked about
18  before, that we went through those, the list, the
19  theophylline, the antibiotics, Digoxin, and
20  anticonvulsives, you mentioned that there was some
21  measure that in some patients it may be important to get
22  a level to determine whether there is a drug level that
23  might be important or that you do need to take note of
24  as a physician; correct?

Page 169

1    A.  With some of those medications, yes.
2    Q.  And in terms of a drug level in the context of
3  antibiotics, theophylline, anticonvulsants, or Digoxin,
4  you have come to know what level of those particular
5  drugs might be significant or something to take note of;
6  right?
7    A.  Yes, I would in some of those drugs because
8  there's a recommendation by the FDA about checking the
9  labels and -- excuse me, checking the levels, not the
10  labels -- because of potential toxicities and because of
11  some of them have some significant effects and have
12  reversal agents that we can treat some adverse reactions
13  with.
14    Q.  And there's also significant discussion or a
15  body of information in the medical literature on those
16  medications on those issues as well; correct?
17    MS. HOFFMANN:  Objection.
18    MS. WAY:  Objection.
19    THE WITNESS:  There's definitely information in
20  the medical literature.
21  BY MR. HONNOLD:
22    Q.  "Significant" can also have a more specific
23  meaning as almost a term of art in the area of
24  statistics; correct?

43 (Pages 166 to 169)

Protected - Subject to Further Protective Review

Page 170

1      A.  To me, when we're looking at statistical
2   analysis, I wouldn't say -- to us it has a meaning -- we
3   say significant or nonsignificant.  I don't know if that
4   answers your question.
5      Q.  Yeah, that's what I mean.  The word
6   "significant" sometimes is used just by itself, whether
7   this result was significant, meaning a term of
8   statistical significance; correct?
9      A.  Yes.  Yes.
10      Q.  And in terms of how "significant" is used in
11   that sentence, a fair reading of that would mean that it
12   is -- it's nonspecific as to what definition is being
13   attached to the -- to the word "significant" in that
14   context; correct?
15         MS. HOFFMANN:  Objection.
16         MS. WAY:  Same.
17         THE WITNESS:  I don't know.  I mean, I don't
18   know if I would call it nonspecific.  Like I said,
19   significant, I'm not sure what they mean by that.
20   BY MR. HONNOLD:
21      Q.  Can you imagine a scenario where the issue of a
22   patient's bleeding risk could be important to either the
23   patient or to the physician?
24         MS. HOFFMANN:  Objection.

Page 171

1         MS. WAY:  Same.
2         THE WITNESS:  An issue of the bleeding risk
3   could be important to them or me?
4   BY MR. HONNOLD:
5      Q.  Yes.
6         MS. HOFFMANN:  Can you imagine any scenario?
7         MR. HONNOLD:  (Nodding head.)
8         MS. HOFFMANN:  Object to form.
9         THE WITNESS:  And this is not dealing with just
10   Xarelto, just any anticoagulant?
11   BY MR. HONNOLD:
12      Q.  Right.
13      A.  I think, as I -- as I would think about it,
14   risk of bleeding is important in anybody on
15   anticoagulation.
16      Q.  And, in fact, it's -- it's what -- it is the
17   information that you infer from the INR when you take it
18   on a patient that's taking warfarin, right, to provide
19   you with information about bleeding risk; correct?
20         MS. HOFFMANN:  Objection.
21         THE WITNESS:  On the INR for warfarin, I think
22   most people would equate it with that.
23   BY MR. HONNOLD:
24      Q.  And now when you look at the rivaroxaban label

Page 172

1   you see that there may be some circumstances by which
2   drug exposure can change in such a way that it increases
3   bleeding risk; correct?
4         MS. WAY:  Objection.
5         MS. HOFFMANN:  Objection.
6         THE WITNESS:  This -- yes, this states this --
7   increases may increase bleeding risk.
8   BY MR. HONNOLD:
9      Q.  When you reviewed the materials for the first
10   time in this case and reviewed the labels that are cited
11   in your reference list, did you notice that when you
12   read through the labels?
13      A.  Yes.
14      Q.  You did?
15      A.  Uh-huh.
16      Q.  And did -- and given the fact that it was
17   something that you didn't understand, were you curious
18   about it as to what it meant?
19      A.  Not particularly, because it's not something --
20   there's a lot in this label, so there are many things in
21   the label that we don't utilize every day in clinical
22   practice, so not necessarily.
23      Q.  Does the label anywhere in its language inform
24   the prescribing physician how that increased risk of

Page 173

1   bleeding can be estimated or measured or determined?
2      A.  Not that I know of.
3      Q.  From your perspective as a prescribing
4   physician, if, in fact, there are certain things about
5   Xarelto, whether it's Xarelto exposure or other things,
6   that would influence or speak to an increased risk of
7   bleeding, would that be something that you would like to
8   know about?
9         MS. HOFFMANN:  Objection.
10         MS. WAY:  Objection.
11         THE WITNESS:  If there was something that could
12   increase the risk of bleeding with Xarelto?
13   BY MR. HONNOLD:
14      Q.  Yes.
15      A.  I think possibly, because having any
16   information about medications that we're using might be
17   helpful.
18      Q.  In your work on this case, in terms of anything
19   that you reviewed, have you seen any information to
20   suggest that there is any sort of laboratory test that
21   speaks to or measures the anticoagulant status or effect
22   of a patient on Xarelto?
23      A.  There's nothing that is a sensitive marker or
24   anything reliable that I've seen that would give that

Protected - Subject to Further Protective Review

Page 174

1   information.
2       Q.  So if a physician wanted to know the
3   anticoagulant status of one of his or her patients on
4   Xarelto, you wouldn't know whether there's a laboratory
5   test that can be done to determine that?
6       A.  There's not one that's FDA approved, and
7   there's not one that's endorsed by the Chest Guidelines
8   that we follow.
9       Q.  Is there one that you're aware of generally
10  that's mentioned in the literature in terms of things
11  that you've run across or reviewed in this case?
12      A.  Not that's reliable, no.
13      Q.  What factors do you know of or can you think of
14  that might influence a particular patient's rivaroxaban
15  exposure level?
16      MS. WAY:  Object to form.
17      THE WITNESS:  I can't answer that since I'm not
18  sure about the exposure level, what that is.
19  BY MR. HONNOLD:
20      Q.  And just so I'm clear then, because -- because
21  you aren't certain as to what the meaning or definition
22  of "rivaroxaban exposure" is, you can't speak to what
23  the factors are that might increase it; is that true?
24      A.  Other than what's listed here.  I mean, there's

Page 175

1   a sentence here that says this may result in change in
2   rivaroxaban exposure, actually, is what it says.
3       Q.  So drug interactions would be one thing that at
4   least the label tells you can influence rivaroxaban
5   exposure enough to increase the risk of bleeding;
6   correct?
7       A.  That's what this says.
8       Q.  Do you know why it is that the label suggests
9   that for patients with certain levels of renal function
10  that they take a lower dose of rivaroxaban?
11      MS. WAY:  Object to the form.
12      THE WITNESS:  As far as I know, in
13  the EINSTEIN-DVT and EINSTEIN-PE studies, that
14  patients with certain levels of renal function were
15  not studied.
16  BY MR. HONNOLD:
17      Q.  So is it true that as you read the EINSTEIN
18  series of trials there was not an alternative dose that
19  was employed for patients with renal insufficiency?
20      MS. HOFFMANN:  Objection.
21      THE WITNESS:  Not that I saw in the EINSTEIN
22  trials.
23  BY MR. HONNOLD:
24      Q.  To your knowledge, as you sit here today, is

Page 176

1   there information in the rivaroxaban label that suggests
2   that patients with renal insufficiency may also
3   experience a significantly increased level of
4   rivaroxaban exposure enough to increase their risk of
5   bleeding?
6       MS. HOFFMANN:  Can you define "renal
7   insufficiency"?  I mean, there's different
8   insufficiency in the label.
9       MR. HONNOLD:  Insufficiency in the renal.
10      THE WITNESS:  In terms of VTE, not that I'm
11  aware of.
12  BY MR. HONNOLD:
13      Q.  What about -- what about for other indications?
14      A.  I can -- if you point me to which section --
15      Q.  Sure.
16      A.  -- I can definitely look at it.
17      Q.  Let me look at it again.
18      A.  (Indicating.)  Sorry.  This back page came off.
19      Q.  Okay.  Thank you.
20      Look at Section 5.4, please.  So my question
21  is:  Is there something in that part of the label that
22  says that variations in renal function may also affect
23  rivaroxaban exposure?
24      A.  So here in 5.4, it says, under treatment of DVT

Page 177

1   and PE and reduction in risk recurrence, "Avoid the use
2   of Xarelto in patients with creatinine clearance less
3   than 30 due to an" -- excuse me -- "due to an expected
4   increase in rivaroxaban exposure and pharmacodynamic
5   effects in this patient population."
6       Q.  Okay.  And so in that section of the label, is
7   "rivaroxaban exposure" defined?
8       A.  No.
9       Q.  And in that section, is "pharmacodynamic
10  effects" defined?
11      A.  No.
12      Q.  As you sit here as an expert witness in this
13  case looking at that label, do you have any
14  understanding what that means, that as rivaroxaban
15  effects -- as rivaroxaban exposure increases, there can
16  also be an increase in pharmacodynamic effects?  Do you
17  know what that means?
18      MS. HOFFMANN:  Object to the form.
19      THE WITNESS:  As I said earlier, no, I would --
20  we don't use these terms routinely in clinical
21  practice.
22  BY MR. HONNOLD:
23      Q.  But they're used routinely in the label; right?
24      MS. HOFFMANN:  Objection.

45 (Pages 174 to 177)

Protected - Subject to Further Protective Review

Page 178

1    THE WITNESS:  It is used in the label.
2 BY MR. HONNOLD:
3    Q.   More than once?
4    A.   Yes.
5    Q.   Okay.  And what are pharmacodynamic effects of
6 a medication generally?
7    A.   Generally, again, with my limited knowledge, we
8 think about pharmacodynamics and pharmacokinetics
9 together, and maybe we're wrong when we discuss that,
10 but we're usually talking about how the drugs act.  I
11 think that's -- to me, that's the most simplistic way
12 that we think about it.
13    Q.   So pharmacodynamic effect speaks to how the
14 drug acts then.  What's the most important way that
15 rivaroxaban acts in the body?
16    A.   By inhibiting Factor Xa.
17    Q.   Which does what?
18    A.   Prevents the formation of clots.
19    Q.   And depending upon the degree of Factor Xa
20 inhibition, what can that do to the risk of bleeding?
21    A.   I don't know if I could talk about the degree
22 of Xa inhibition, because Factor Xa is only so much
23 around, so it's inhibited or not inhibited.  So I don't
24 know -- again, that would be a question that would be a

Page 179

1 higher level than a clinician, but I'm not sure I could
2 speak intelligently about that.
3    Q.   Do you have any understanding at all as to
4 whether there's literature that speaks to whether
5 increased levels of inhibition of Factor Xa can
6 correspond to an increased risk of bleeding?
7    A.   I'm not sure.
8    Q.   Is there any significance to you in a patient
9 on Xarelto who on Day 1 would have a PT of 13 and three
10 days later have a PT of 26?  Any significance at all in
11 that change in laboratory data, to you?
12    MS. HOFFMANN:  Objection.
13    THE WITNESS:  That would depend on what else is
14 going on with the patient.
15 BY MR. HONNOLD:
16    Q.   Okay.  Tell me how.
17    A.   Well, PT is not a reliable indicator of
18 anticoagulant effects of Xarelto, so I wouldn't infer
19 any meaning from that, but there are various disorders
20 and things that can cause patients' PT levels to be
21 abnormal or be different.
22    Q.   Okay.  So from your perspective, based upon
23 your training, education, and experience related to
24 rivaroxaban, as well as the materials you've reviewed on

Page 180

1 this case, your view is, simply put, that a PT level in
2 a patient on rivaroxaban provides no information as to
3 the patient's potential bleeding risk?
4    MS. WAY:  Objection.
5    THE WITNESS:  I don't think so, because all the
6 data I've looked at, PT is not a reliable indicator,
7 so I wouldn't want to use something that's not
8 reliable.
9 BY MR. HONNOLD:
10    Q.   Okay.  And why is it that you say in terms of
11 what you've read?  What's the -- what is the source of
12 things that you've read that says PT is not a reliable
13 indicator of the anticoagulant effects of rivaroxaban?
14    A.   Some of the articles.
15    Q.   And the explanation that those articles give as
16 to why it's not reliable, what are they?
17    A.   Oh.  So there are several articles I read.  I
18 couldn't tell you all.  I could tell you some, probably.
19 Because renal -- excuse me.  Liver issues can affect PT,
20 sepsis, something called DIC, disseminated intravascular
21 coagulation, if somebody's malnourished, if they've been
22 on a lot of antibiotics, various things, and because
23 there's no standardized way of testing PT for use with
24 Xarelto.

Page 181

1    Q.   Okay.  So let's take those things out of the
2 equation.  Okay?  Let's talk about a hypothetical where
3 we control for those things, all right, and let's look
4 at a patient that you presume to be completely absent of
5 any of those medical conditions that you talked about,
6 whether it's sepsis, renal disease, liver disease,
7 preexisting inherited disorders of anticoagulant, things
8 of that nature.
9    A.   Okay.
10    Q.   Do you understand what I'm saying?
11    A.   Yes.
12    Q.   Okay.  And now let's also talk about using a
13 laboratory that uses the same or constant level of PT
14 reagent.  Are you familiar with what I'm talking about
15 there?
16    A.   I've heard -- yes, I've read.
17    Q.   So now assuming those things in the
18 hypothetical, are you also saying then that there would
19 be no clinical significance then under that scenario of
20 a patient who on Day 1 would have a PT of 13 and on Day
21 3 or 4 would then have a PT of 26?
22    A.   I don't know what I could base that on since
23 that's hypothetical and knowing that there's no approved
24 standardization for checking -- using PT, so I don't

Protected - Subject to Further Protective Review

Page 182

1   know if I could answer that appropriately.
2       Q.  Have you read any information or materials in
3   this case where there are authors who do state that
4   there are specific PT reagents that are accurate in
5   measuring a patient's anticoagulation status on
6   rivaroxaban?
7       A.  I don't remember reading any that said that it
8   was reliable.
9       Q.  Okay.  So if you go to your reference list --
10  because I just want to make sure that I understand.
11  When you say that you've looked at stuff that says it's
12  not reliable, are there things that you're talking about
13  other than what's in your reference list?
14      A.  No.
15      Q.  Okay.  So in terms of the literature items in
16  your reference list, Nos. 1 through 36, are there any of
17  those that either by your memory, by publication, title,
18  or author, that you know speak to or include some
19  discussion about whether or not there are any PT
20  reagents that do, in fact, speak to relatively
21  accurately the anticoagulation status of a patient on
22  rivaroxaban?
23          MS. HOFFMANN:  Objection.
24          THE WITNESS:  I don't remember specifically if

Page 183

1   any of these -- I don't remember any of the articles
2   in this list stating specifically that there are
3   measures of PT that would be reliable and
4   recommended for use.
5   BY MR. HONNOLD:
6       Q.  But do they -- do they state the other, though?
7   Do they say specifically that there aren't?
8       A.  Yes.
9       Q.  Okay.  So the general statement that you're
10  making that there are not -- there aren't reliable
11  reagents and that PT cannot be used to assess the
12  anticoagulant status of rivaroxaban, that information
13  comes from your collective take-away from the -- the
14  items in the reference list?
15      A.  That's correct.
16      Q.  Have you yourself looked for other information
17  or literature that speaks to that issue?
18      A.  Beyond this, not that I can think of.
19      Q.  You've not undertaken in your assignment or
20  work on this case to determine whether there is
21  literature that speaks to that issue; correct?
22      A.  I have not.
23      Q.  Do you know whether in the evolution and
24  approval process of rivaroxaban, whether there were

Page 184

1   people at Janssen and/or Bayer who did that work?
2       A.  I don't know.
3       Q.  If you wanted to undertake that project as a
4   medical literature search or as a general research
5   project, how would you go about it to determine whether
6   the medical literature contains information to suggest
7   that there are specific PT reagents that do relatively
8   accurately speak to the anticoagulation status of a
9   patient on rivaroxaban?
10          MS. WAY:  Objection.
11          THE WITNESS:  As far as I know, I would go to
12      PubMed or one search engine and type in the
13      variables that you mentioned, PT, Xarelto, some of
14      those different things, to begin a search.
15  BY MR. HONNOLD:
16      Q.  And when you type those variables into PubMed,
17  it might generate for you a list of references; right?
18      A.  Yes.
19      Q.  And as part of kind of assessing the results of
20  the search that you did, you might actually look at some
21  of the references; correct?
22      A.  Yes.
23      Q.  And what happens oftentimes when you do that
24  work, you might find some references that start to sound

Page 185

1   like each other; right?
2           MS. WAY:  Object to form.
3           THE WITNESS:  Start to sound like each other.
4       Well, some are similar?  Okay.
5   BY MR. HONNOLD:
6       Q.  Yeah, somewhat similar, or cite -- their
7   bibliography cites similar references; correct?
8       A.  Yes.
9       Q.  There might be some that you find for whatever
10  reason aren't really on point or topic; right?
11      A.  Yes.
12      Q.  And you're able to kind of take that list of
13  the literature and kind of synthesize it and maybe come
14  up with some generalized -- a generalized statement as
15  to the state of literature as to what it says on a
16  specific topic; correct?
17          MS. WAY:  Object to form.
18          THE WITNESS:  Yes.
19  BY MR. HONNOLD:
20      Q.  In fact, you've done that as part of your work
21  on this case; right?
22          MS. WAY:  That's -- object to form.
23          THE WITNESS:  So I wouldn't say that, because
24      to me what you're describing is collecting

47 (Pages 182 to 185)

Protected - Subject to Further Protective Review

Page 186

1  information for a literature review like submitting
2  to an academic journal.  That's not the same way
3  that I collected references for this, purposes of
4  this deposition.
5  BY MR. HONNOLD:
6     Q.  But in your report you have stated things that
7  are essentially a fair summary or recitation of the
8  state of the literature, in your view?
9        MS. WAY:  Brad, let me lodge an objection.  If
10       you want to show him something in his report and ask
11       him about it, that's fine.
12       MR. HONNOLD:  Sure.
13  BY MR. HONNOLD:
14     Q.  As you look at your report, are there any areas
15  where you make a generalized statement and then cite to
16  a -- a medical source?
17     A.  I'm not sure what you mean by that.
18     Q.  Sure.  In your report, whether it's on page 3,
19  page 4, page 6 through 8, you are making -- page 10 --
20  you are making some -- some statements, sometimes very
21  specific, sometimes more general, based upon things that
22  you found in the medical literature; correct?
23     A.  Yes.
24     Q.  You could similarly undertake that specific

Page 187

1  task as it relates to the issue of PT and rivaroxaban if
2  you so chose; correct?
3        MS. HOFFMANN:  Objection.
4        THE WITNESS:  And review the literature
5     regarding that?
6  BY MR. HONNOLD:
7     Q.  Yes.
8     A.  Yeah, I could review the literature.
9     Q.  Okay.  And you could make some -- a summary
10  statement about what you found; correct?
11     A.  Yes.
12     Q.  You weren't asked to do that in this case;
13  right?
14     A.  Well, I -- I think I did make summary
15  statements about information that I reviewed.
16     Q.  But you didn't look to the whole -- the whole
17  universe of information that might be out there;
18  correct?
19       MS. WAY:  Objection.
20       THE WITNESS:  I don't think that's possible.
21  There's -- well, anything's possible.  I don't know
22  how doable that is, because you can find -- if you
23  go do a literature search, you can find 1,000
24  articles about any one topic.  So reviewing 1,000

Page 188

1  articles I don't think would be prudent for this
2  case.
3  BY MR. HONNOLD:
4     Q.  Okay.  I'm not suggesting that.  I'm not
5  suggesting there's 1,000 articles on the issue of
6  rivaroxaban and PT and its usefulness in determining the
7  anticoagulation status of a patient.  It's not quite
8  that many, but it's a lot.  But you didn't look for
9  them; right?
10       MS. WAY:  Object to form.
11       MS. HOFFMANN:  Didn't you ask him earlier if he
12    was asked to look at PT?  I lost something in your
13    question.  I thought your earlier question was, "You
14    weren't asked to look at PT in the case."
15       MR. HONNOLD:  I think the question that he just
16    answered is the one that I just asked, so if we want
17    to read that back, we can.
18    Go ahead.
19       THE COURT REPORTER:  Okay.
20       (The question was read by the reporter.)
21       THE WITNESS:  So the question is did I look for
22    articles with P --
23  BY MR. HONNOLD:
24     Q.  (Nodding head.)

Page 189

1     A.  So I can tell you I reviewed some articles
2  regarding PT and rivaroxaban.
3     Q.  But you didn't look for -- to determine whether
4  there's any others; right?
5     A.  No.  I think that goes back to my other
6  statement that I didn't look to see how many were out
7  there.
8     Q.  Okay.  The articles that you looked at were
9  ones that you either had in your existing repository;
10  right --
11     A.  Yes.
12     Q.  -- or that were given to you by counsel; right?
13     A.  Correct.
14     Q.  Okay.  Now, as you've assembled your literature
15  repository on anticoagulation for VTE, you've not been
16  adding to it articles that speak to the issue of what
17  laboratory studies, whether it's PT or otherwise, that
18  may speak to the level of anticoagulation status of a
19  patient on rivaroxaban; correct?
20       MS. WAY:  Object to form.
21       THE WITNESS:  If I came across that article, I
22    would.
23  BY MR. HONNOLD:
24     Q.  Okay.  In your repository, are there any such

48 (Pages 186 to 189)

Protected - Subject to Further Protective Review

Page 190

1    articles that speak to that specifically?
2       A.  Not that I know of.
3       Q.  Okay.  And in the articles that counsel gave
4    you in your assignment on this case, are there any
5    articles that speak to that specifically?
6       A.  Some of the articles discuss PT and INR.
7    Excuse me.  PT and Xarelto use.
8       Q.  Based upon your review of the materials either
9    from your repository or those that were provided to you
10   by counsel in this case, what is your understanding of
11   the relationship between rivaroxaban, plasma
12   concentration level, and the Neoplastine PT?
13       MS. WAY:  Object to the form.
14       THE WITNESS:  What I saw for Neoplastine PT is
15   that it is, again, not a reliable indicator and is
16   not recommended in the articles I reviewed, or in
17   the Chest Guidelines, or by the FDA, as a way to
18   measure rivaroxaban concentration.
19   BY MR. HONNOLD:
20       Q.  So that's -- that's what's in the articles
21   that -- in your reference list, if there's mention of
22   usefulness of Neoplastine PT on the -- on the issue of
23   the relationship to plasma concentration level, it's
24   what you described?

Page 191

1       A.  Yes.
2       Q.  Okay.  Did you look -- did any of the articles
3    that are on your reference list specifically state that
4    there is, in fact, a relationship of some type between
5    rivaroxaban, plasma concentration, and the Neoplastine
6    PT?
7       A.  I don't remember if it said specifically if
8    there's a relationship.  I just remember in the summary
9    of the articles that none of them recommended that it be
10   used routinely or -- and that it's not -- yeah, I
11   believe that's how they made the summary statement when
12   I saw it.  It's not recommended to be used routinely,
13   that it has been used in investigational purposes.
14       Q.  Okay.  But in terms of whether or not there's a
15   relationship, you don't remember what it says about
16   that?
17       A.  I don't.
18       Q.  Okay.  In the label before you, go to
19   Section 12.2.
20       A.  12.2.  Yes.
21       Q.  Is there anything in Section 12.2 that as you
22   read it speaks to the issue of whether there is a
23   relationship between the Neoplastine PT and any other
24   aspect of rivaroxaban, whether it's exposure,

Page 192

1    anticoagulation effect, plasma concentration level?
2       A.  It says here, "Dose-dependent inhibition of
3    Factor Xa activity was observed in humans and the
4    Neoplastine PT, PTT, and HepTest are prolonged
5    dose-dependently."
6       Q.  What does that mean to you, that the
7    Neoplastine PT is prolonged dose-dependently?
8       A.  I'm not sure what that means, because that,
9    again, goes to the pharmacodynamic effects of the drugs,
10   so I'm not sure what that would mean from a clinical
11   standpoint.  I can see what it says, but I'm not sure
12   what it means clinically.
13       Q.  As you look at that again, is there anything
14   there that suggests to you that the higher the
15   Neoplastine PT or the -- strike that.
16       Is there anything in Section 12.2 as you read
17   it that suggests to you that the higher the plasma or serum
18   concentration level of rivaroxaban, then the higher the
19   Neoplastine PT?
20       A.  No, I don't think so.
21       Q.  Okay.  What does it -- what does it say then
22   when it says dose-dependent increase or dose-dependent
23   effects in the Neoplastine PT?  What does that mean to
24   you?

Page 193

1       MS. WAY:  Objection.  Asked and answered.
2       THE WITNESS:  It doesn't mean anything to me
3    clinically.
4    BY MR. HONNOLD:
5       Q.  Let's talk about not clinically then.  Just in
6    terms of a trained physician, as you read that in the
7    context of reading English words and interpreting the
8    meaning within the context of your medical education,
9    what does it mean?
10       MS. HOFFMANN:  Objection.
11       MS. WAY:  Objection.
12       THE WITNESS:  So I'm a clinician, so I can only
13   speak to how things relate to me clinically.
14   BY MR. HONNOLD:
15       Q.  And so Section 12.2 says nothing to you
16   clinically?
17       A.  Not clinically, because I don't use
18   dose-dependent and pharmacodynamics in my routine
19   clinical practice.
20       Q.  You mentioned before that you've looked at
21   something that there's been investigational work done on
22   rivaroxaban and certain PTs or research that looked into
23   it?  You said something about that?
24       MS. HOFFMANN:  Objection.

Protected - Subject to Further Protective Review

Page 194

1     THE WITNESS: One of the articles I mentioned
2  that said it had been used, or that it's been --
3  maybe I should have said "looked at." I don't know
4  as far as an investigational. I just remember
5  seeing it in one of the articles that I reviewed.
6  BY MR. HONNOLD:
7     Q.  We talked about warfarin before and increased
8  levels of INR in some circumstances suggesting an
9  increased risk of bleeding. Do you recall that?
10     A.  I do.
11     Q.  Okay. And would you agree with me that the use
12  of the -- that the INR in a patient on warfarin does
13  speak to the anticoagulant status of that patient on
14  warfarin?
15     A.  Yes, I believe so.
16     Q.  And what you know about the INR is that, again,
17  in the same patient, let's control for diseases and
18  different laboratories and all of that, that in a given
19  patient that you're monitoring on warfarin by using the
20  INR, that generally the rule of thumb is that the higher
21  the INR, the greater the anticoagulant effect that the
22  drug is having on the patient?
23     MS. HOFFMANN: Objection.
24     THE WITNESS: I believe that's correct.

Page 195

1
2  BY MR. HONNOLD:
3     Q.  And why do you believe that's correct?
4     A.  Just from what I know of the INR and the work
5  that's been done, it's been standardized that it would
6  be a measure of the effects of warfarin.
7     Q.  So as you sit here today, can different
8  patients have different levels of effect of rivaroxaban?
9     MS. WAY: Objection.
10     MS. HOFFMANN: Objection.
11     THE WITNESS: I think I would need to know,
12  what do you mean by "different patients"?
13  BY MR. HONNOLD:
14     Q.  Well --
15     A.  Or maybe I should say other different patient
16  factors, you're saying, or just say Patient A and
17  Patient B without regarding factors?
18     Q.  Well, that's a good -- that's a good point.
19  Let me ask it this way: Is there any way to determine
20  by way of laboratory test as to whether the
21  anticoagulant effect of rivaroxaban on a patient varies
22  from time to time?
23     MS. HOFFMANN: Objection.
24     THE WITNESS: Rivaroxaban effects vary from

Page 196

1  time to time? In different patients? I don't know
2  about that.
3  BY MR. HONNOLD:
4     Q.  Okay.
5     MS. HOFFMANN: In different patients or the
6  same patient? I thought you said the same patient.
7  BY MR. HONNOLD:
8     Q.  We said the same patient.
9     A.  Oh, I'm sorry. I thought you said different
10  patient. Sorry.
11     Q.  Yeah.
12     A.  In the same patient? I don't know if you're
13  looking at the half-life in a patient. Is that what
14  you're asking? Maybe I'm not understanding what you're
15  asking.
16     Q.  Is there -- is there any way known to you to
17  determine whether, on a sequential or serial basis,
18  whether the anticoagulant effect of rivaroxaban on a
19  patient is different?
20     A.  Not that I know of.
21     Q.  Okay. Do you know whether it can be different
22  on a serial basis in the same patient from time to time,
23  whether Xarelto can have different levels of
24  anticoagulant effect on a patient?

Page 197

1     MS. HOFFMANN: Objection.
2     THE WITNESS: I don't know.
3  BY MR. HONNOLD:
4     Q.  If that is true, okay, if you just accept for
5  purposes of discussion that that's true, could that be
6  something important to you as a physician to know?
7     MS. HOFFMANN: Objection.
8     THE WITNESS: I don't know.
9  BY MR. HONNOLD:
10     Q.  Okay. For warfarin, it certainly is; correct?
11     MS. WAY: Object to form.
12     THE WITNESS: Warfarin and Xarelto are
13  different drugs, so I wouldn't -- I couldn't make
14  the same inference about Xarelto that I could about
15  warfarin.
16  BY MR. HONNOLD:
17     Q.  I understand, but on the issue of -- for
18  warfarin patients, the anticoagulant effect of warfarin
19  can vary from time to time in the same patient; correct?
20     A.  Yes, I think it can.
21     Q.  And do you know whether it can vary from time
22  to time in terms of rivaroxaban --
23     A.  Don't know.
24     Q.  -- that being the anticoagulant effect?

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 198

1      You don't know?
2   A.  Don't know.
3      Q.  And I may have asked you this before, but
4   I'm -- but just stick with me.  I'm going to ask it
5   again now in the context of the fact that we've
6   discussed this now for some period of time.
7      So in a -- in a given patient, again, in the
8   absence of underlying disease, renal disease, liver
9   disease, disorders of coagulation, using the same
10  laboratory, from your perspective as a clinician, is
11  there any difference in that patient having a
12  Neoplastine PT of 13 versus a Neoplastine PT of 26?
13     MS. HOFFMANN:  Objection.
14     THE WITNESS:  I don't know.  I can't tell you
15  if there's a difference.
16  BY MR. HONNOLD:
17     Q.  And to determine if there is or could be a
18  difference, you'd either have to talk to someone else or
19  do some additional research?
20     MS. WAY:  Objection.
21     THE WITNESS:  For Xarelto?
22  BY MR. HONNOLD:
23     Q.  Yes.
24     A.  I don't know if there's a way, anything that's

Page 199

1   reliable or standardized to look at if there's a
2   difference.  At least it's not recommended in our
3   guidelines, and nothing I've seen from the FDA has
4   recommended using it.
5      Q.  One thing that a prescriber, prescribing
6   physician, can do with warfarin, if they -- if they
7   determine that the anticoagulant effect of the drug has
8   increased on the patient, the dose can be monitored;
9   correct?
10     A.  The dose --
11     Q.  The dose can be changed?
12     A.  Yes, the dose can be changed.
13     Q.  And if need be, the drug can even be abandoned
14  either for one dose or for some longer period of time;
15  correct?
16     A.  Correct.
17     Q.  You're not aware of any information to suggest
18  that there might be some level of anticoagulation in a
19  patient on rivaroxaban where the medication might need
20  to be either temporarily stopped in terms of missing one
21  dose or two or stopped for a longer duration?
22     A.  Not that I know of.  Not in VTE patients that I
23  know of.
24     Q.  Have you ever read any of the writings by a

Page 200

1   Bayer employee by the last name of Spiro and the
2   articles that he's written with Michael Samama,
3   S-a-m-a-m-a?
4      A.  Spiro and Samama?
5      Q.  Yes.
6      A.  Not that I know of.
7      Q.  Okay.  And none of their -- none of their joint
8   papers are listed on your reference list; is that right?
9      A.  Well, I'm looking at first authors.  I don't
10  see them as first authors.
11     Q.  Samama would be a first author.
12     A.  Okay.  No, I did not.
13     Q.  In Ms. Mingo's case, is it possible that the
14  fact that she was on an anticoagulant contributed to her
15  gastrointestinal bleed?
16     MS. HOFFMANN:  Objection.
17     MS. WAY:  Same.
18     THE WITNESS:  Repeat the question, please.
19  BY MR. HONNOLD:
20     Q.  Yeah.  In Ms. Mingo's situation, is it possible
21  that the fact that she was on an anticoagulant
22  contributed to her gastrointestinal bleed?
23     MS. HOFFMANN:  Objection.
24     THE WITNESS:  I don't think so, because her

Page 201

1   bleed was due to an ulcer.
2   BY MR. HONNOLD:
3      Q.  So is it your view of Ms. Mingo's case that if
4   she's not on rivaroxaban she has the same bleed in the
5   same way in the same level of severity requiring the
6   exact same care as it did when she was on rivaroxaban?
7      MS. WAY:  Object to form.  That's a lot of
8   questions.
9      MR. HONNOLD:  It is.
10     THE WITNESS:  So you're saying if she had not
11  been on rivaroxaban, could she have had the same
12  risk of bleeding from her ulcer?
13  BY MR. HONNOLD:
14     Q.  And I mean the same bleed with the same
15  consequences, the same severity, requiring the same
16  treatment.
17     MS. WAY:  Same.
18     THE WITNESS:  Yes, she could have.
19  BY MR. HONNOLD:
20     Q.  Okay.  But are you saying that she would have?
21  Is that your -- is that what your opinion is in this
22  case?  I'm trying to figure out.
23     A.  Would have?  I don't know if I can say would
24  have.  I can say that she -- I'm not sure what other way

Protected - Subject to Further Protective Review

Page 202

1    to say this, could have, because we see patients who
2    bleed all the time with ulcers who are not on any
3    anticoagulants.  So I guess that's what I'm basing my
4    answer on.  It may not be quite the way --
5        Q.   What are the possible effects or contributing
6    factors that rivaroxaban might have had on the nature
7    and severity of Ms. Mingo's gastrointestinal bleed?
8        A.   Okay.  So rivaroxaban works as a blood thinner
9    and an anticoagulant, so it prevents clots from
10   forming.  So -- let me think of the question.
11           One way that it might have contributed -- so
12   the first question you asked me, I thought "caused," but
13   never mind, you said "contributed" -- is it did its job.
14   It thinned the blood, it prevented clots from forming.
15   So when she started bleeding, she did not form a clot.
16       Q.   Okay.  So that would be one way then that
17   rivaroxaban contributed or influenced the nature and
18   severity of Ms. Mingo's GI bleed; correct?
19       A.   It could have.  So if I can go back, I know I
20   said -- you asked me a question earlier, and now my
21   mind is -- my mind thought you said "did it cause it,"
22   but you said "contributing to," so now if I could -- I
23   don't know if I can correct it or not, but I thought you
24   said "caused," but you said "contributed."

Page 203

1        Q.   What if I did say "caused"?
2        A.   I would say my answer would be the same, that I
3    didn't think it caused.
4        Q.   Okay.  But when I asked contributed, you gave
5    me the answer that you gave me; correct?
6        A.   Correct.
7        Q.   Okay.  And the answer that you gave me
8    suggested that there was something about being on
9    rivaroxaban that altered the natural state of her
10   coagulation, bodily coagulation function or the
11   coagulation cascade; right?
12       A.   Yes, that's what anticoagulants do.
13       Q.   Okay.  And in the absence of her being on
14   rivaroxaban, what would have happened would have been
15   that her Factor Xa would not have been inhibited and it
16   would have been active and viable in the clotting
17   cascade and she would have been able to generate
18   thrombin; correct?
19       A.   Possibly.
20       Q.   Okay.  Are you -- do you have any awareness
21   that Ms. Mingo had any underlying disorder of
22   coagulation that -- that stopped -- that inhibited her
23   from being able to make thrombin?
24       A.   I didn't see any evidence of that.

Page 204

1        Q.   Dr. Jones told us in his deposition that there
2    probably was a time, in fact, that Ms. Mingo was able to
3    fully respond with the clotting cascade and it likely
4    did prevent her from bleeding as some -- prevent her
5    from bleeding at some point?
6            MS. HOFFMANN:  There's no question.  You've
7    just made a statement.
8            MR. HONNOLD:  Okay, and I'm going to ask a
9    question.
10           MS. HOFFMANN:  I'm sorry.  You stopped.
11           MR. HONNOLD:  Sometimes you get too excited.
12   See, you get afraid.  You think that I'm not going
13   to do what I'm supposed to do, but it must be
14   something --
15           MS. HOFFMANN:  No.  Sometimes what happens is,
16   not you, but people sometimes make a statement, and
17   then they pause, and the person that they're making
18   the statement to thinks they're supposed to respond
19   to it.
20           MR. HONNOLD:  Okay.
21           MS. HOFFMANN:  And I just want to make sure the
22   doctor knows that in the absence of you posing a
23   question, he need not respond.
24           MR. HONNOLD:  Okay.  Fair enough.

Page 205

1
2    BY MR. HONNOLD:
3        Q.   Okay.  So are you aware of any medical facts in
4    the medical records that you've looked at for Ms. Mingo
5    to suggest that at some point she might have had some
6    gastrointestinal bleeding and her body was or her body's
7    coagulation cascade was functioning normally and she was
8    able to clot?
9            MS. HOFFMANN:  Objection.
10           THE WITNESS:  I'm not quite sure how to answer
11   that, because if -- as I think back to her medical
12   record, she had been on Lovenox for a week, she had
13   been on aspirin and was taking aspirin.  She'd
14   gotten a dose of Coumadin.  So I'm not sure how to
15   answer that.  Could she have formed a clot before
16   all the anticoagulants were on board?  Possibly.
17   BY MR. HONNOLD:
18       Q.   Okay.  Is it possible in Ms. Mingo's case that
19   if she'd been taken off rivaroxaban a week before she
20   had her acute bleed and went into the hospital and had
21   the endoscopy and the ulcer was discovered, is it
22   possible that if she'd stopped taking rivaroxaban then
23   that she would not have had this bleeding event?  Is
24   that possible?

52 (Pages 202 to 205)

Protected - Subject to Further Protective Review

Page 206

1    MS. WAY: Objection.
2    MS. HOFFMANN: Objection.
3    THE WITNESS: It may be possible. I don't know
4    how likely it is.
5    BY MR. HONNOLD:
6    Q. You discussed before that patients on Xarelto
7    can have serious and even in some occasions fatal
8    bleeding; correct?
9    A. Correct.
10   Q. Can GI bleeding in some patients go on to be a
11   medically severe condition?
12   A. In some patients, it could be. In Ms. Mingo's
13   case, it was not.
14   Q. Okay. In some patients, are you aware that GI
15   bleeding can even lead to death?
16   A. Yes, in some patients it can.
17   Q. Have you reviewed any adverse event reports as
18   it relates to rivaroxaban that make reports of patients
19   dying as a result of severe gastrointestinal bleeding?
20   MS. HOFFMANN: Objection.
21   THE WITNESS: Not VTE patients that I'm aware
22   of. Or -- so I haven't reviewed everything in the
23   medical literature, but as far as I know, I have not
24   in VTE patients.

Page 207

1
2    BY MR. HONNOLD:
3    Q. Have you ever seen VTE patients have severe
4    gastrointestinal bleeds as a result of the anticoagulant
5    they're taking?
6    A. Yes.
7    Q. Okay. Have you ever dealt with a patient on
8    rivaroxaban who had a severe gastrointestinal bleed?
9    MS. HOFFMANN: Objection.
10   THE WITNESS: What would you mean by "severe"?
11   BY MR. HONNOLD:
12   Q. What do you mean by "severe gastrointestinal
13   bleed"?
14   A. To me, severe gastrointestinal bleeds are
15   patients that are in the ICU, they're unstable, they're
16   in shock.
17   Q. Have you seen patients like that before on
18   rivaroxaban?
19   A. I have not, actually.
20   Q. Okay. Have you seen patients like that taking
21   warfarin?
22   A. I have.
23   Q. So in some patients gastrointestinal bleeding
24   can result in shock; correct?

Page 208

1    A. Yes.
2    Q. In some patients gastrointestinal bleeding can
3    result in multisystem organ failure; correct?
4    A. Yes.
5    Q. In some patients severe gastrointestinal
6    bleeding can result in cardiac instability; correct?
7    A. Yes.
8    Q. Sometimes can result in heart failure?
9    A. Congestive heart failure? I'm not sure if --
10   Q. How about cardiac arrest?
11   A. Okay. Yes.
12   Q. Cardiac arrest can be induced by hypovolemia or
13   a reduction either in actual volume of flow to the heart
14   or the level of oxygen provided to the heart muscle;
15   right?
16   A. Correct.
17   Q. If a severe gastrointestinal bleed can be
18   prevented in patients taking anticoagulants, you as a
19   physician would like to take reasonable steps to avoid
20   it; correct?
21   A. Sorry. Repeat that question.
22   Q. If a severe gastrointestinal bleed can be
23   prevented in patients taking an anticoagulant, that is
24   something that you as a physician would like to take

Page 209

1    reasonable steps to avoid; correct?
2    A. If we could do that, yes, but that's definitely
3    not something that's within our control.
4    Q. And your thought is that, as it relates to
5    rivaroxaban, that's something that can't be in your
6    control; right?
7    MS. WAY: Objection.
8    THE WITNESS: As what relates to rivaroxaban?
9    BY MR. HONNOLD:
10   Q. As it relates to rivaroxaban, there's no way to
11   know whether a patient is at an increased risk of having
12   a gastrointestinal bleed; right?
13   MS. HOFFMANN: Objection.
14   MS. WAY: Object to form.
15   THE WITNESS: So I wouldn't say that's just by
16   rivaroxaban. There's no way to know if any patient
17   is at increased risk of GI bleeding with any
18   anticoagulant. Patients could be at increased risk
19   of bleeding on an anticoagulant or not if they have
20   peptic ulcer disease.
21   BY MR. HONNOLD:
22   Q. But in terms of the risk of GI bleeding in a
23   patient that does have some underlying damage in their
24   mucosa of their gastrointestinal tract, if a patient has

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 210

1    an INR of 6, they have a greater risk of a GI bleed than
2    a patient not on warfarin at all; correct?
3         A.  For those warfarin patients, yes.
4         Q.  And, in fact, a patient on warfarin with an --
5    with an INR of 6, they have a greater risk of a GI bleed
6    at that site than a patient with an INR of 2; right?
7         MS. HOFFMANN:  Objection.
8         THE WITNESS:  I don't know if there's really
9         that much of a linear correlation.  Probably I would
10        say yes, but I don't know if you can say 2 versus 4
11        versus 6.  Probably that's true, but I don't know if
12        there's direct evidence that really shows that.  I
13        think that's what most people would believe.
14   BY MR. HONNOLD:
15        Q.  And your understanding about rivaroxaban is
16   that there isn't any laboratory tests that you can make
17   such a determination from; correct?
18        A.  Correct.
19        MR. HONNOLD:  Thank you, Doctor, for your time
20   and courtesy.  It's a pleasure meeting you.
21        THE WITNESS:  Thank you.
22        MR. HONNOLD:  Take care.
23        MS. WAY:  Can we take just a quick break?
24        MR. HONNOLD:  Sure.

Page 211

1         THE VIDEOGRAPHER:  The time now is 3:09 p.m.
2    We are off the record.
3         (Recess from 3:09 p.m. until 3:20 p.m.)
4         THE VIDEOGRAPHER:  The time is 3:20 p.m.  We're
5    back on the record.
6         MS. WAY:  We'll read and sign and reserve our
7    questions for trial.
8         MR. HONNOLD:  Would you all care if I asked one
9    more quick question?  There was some -- there was an
10   exhibit I marked and I forgot to mention it, and
11   there's -- do you care?  It's not going to be --
12        MS. WAY:  That's fine.
13        MR. HONNOLD:  -- revolutionary or
14   groundbreaking in any way.  I marked something as
15   Exhibit 3.  Is that --
16        MS. WAY:  You didn't.
17        MS. HOFFMANN:  You pulled it back.  It was
18   another package insert.
19        MR. HONNOLD:  I put a sticker on it.  I put
20   a -- where did I put it?
21        MS. HOFFMANN:  You started to.  It was a
22   package insert.  You started out with two product
23   labels.
24        MR. HONNOLD:  And I said, "Strike that."

Page 212

1         MS. WAY:  And you went from 1 to 4.
2         MR. HONNOLD:  Now I flummoxed myself, and I've
3         now figured out something I want to do, and I just
4         need to find it.
5    BY MR. HONNOLD:
6         Q.  I'm going to hand you now what I previously
7    marked as Exhibit 3.  Do you see that looks like a copy
8    of a package insert for Eliquis?
9         A.  Yes.
10        Q.  Have you ever reviewed -- first, have you
11   reviewed that document as part of your work in this
12   case?
13        A.  I have not reviewed specifically the Eliquis PI
14   for --
15        Q.  In the course of your practice taking care of
16   patients, do you think you ever would have reviewed or
17   become familiar with the Eliquis package insert?
18        A.  Yes.
19        Q.  Have you ever sat down and done kind of a
20   section by section comparison of the differences in
21   information between the Eliquis package insert and the
22   rivaroxaban package insert?
23        A.  I have not.
24        Q.  In your practice, do you generally consider

Page 213

1    them to be very similar drugs?
2         A.  For the most part, yes.
3         Q.  Okay.  Are there particular patient situations,
4    though, where you would intentionally or consciously
5    prescribe one of them over another for a particular
6    patient?
7         A.  Two things come to mind.  Sometimes one
8    insurance company covers one and not the other.
9         The second thing that comes to mind is
10   sometimes some patients do much better with once daily.
11   I should have stated it a lot of patients do better with
12   once daily oral medications than twice daily.  Not the
13   same for everybody, so I think it would be on a case by
14   case basis.
15        Q.  And when you say they do better, do they do
16   better in terms of efficacy or safety, or just in terms
17   of their ability to take their medicine?
18        A.  Compliance with the ability to take medicine.
19        Q.  Other than those two things that you mentioned,
20   whether it's third party payment information or issues
21   of compliance for some patients, do you generally
22   consider them to be very similar drugs?
23        A.  I think so, yes.
24        Q.  And would you prescribe them for the same

54 (Pages 210 to 213)

Protected - Subject to Further Protective Review

Page 214

1    medical conditions in -- in similar patients?
2        A.  Yes.
3        Q.  Okay.  You view them -- but for what you
4    mentioned, you view them as being interchangeable?
5            MS. HOFFMANN:  Objection.
6            MS. WAY:  Objection.
7    BY MR. HONNOLD:
8        Q.  In your practice?
9        A.  Interchangeable or used for the -- I'm not sure
10   what you mean by "interchangeable."
11       Q.  Well, do you identify significant distinctions
12   between them for any reason?
13       A.  Other than the dosing, I don't think so.
14           MR. HONNOLD:  Okay.  That's all the questions I
15   have for you.  Thank you, Doctor.
16           THE VIDEOGRAPHER:  The time now is 3:22 p.m.
17   Today's deposition of Dr. Demondes Haynes,
18   consisting of five disks, is now completed.
19           (Whereupon, the deposition concluded at
20   3:22 p.m.)
21
22
23
24

Page 215

1        C E R T I F I C A T E
2
3        I, JOAN L. PITT, Registered Merit Reporter,
4    Certified Realtime Reporter, and Florida Professional
5    Reporter, do hereby certify that, pursuant to notice,
6    the deposition of DEMONDES HAYNES, MD, was duly taken on
7    February 14, 2017, at 9:14 a.m., before me.
8        The said DEMONDES HAYNES, MD, was duly sworn by
9    me according to law to tell the truth, the whole truth,
10   and nothing but the truth, and thereupon did testify as
11   set forth in the above transcript of testimony.  The
12   testimony was taken down by me stenographically.  I do
13   further certify that the above deposition is full,
14   complete, and a true record of all the testimony given
15   by the said witness.
16
17   _____
18        JOAN L. PITT, RMR, CRR, FPR
19
20       (The foregoing certification of this transcript
21   does not apply to any reproduction of the same by any
22   means, unless under the direct control and/or
23   supervision of the certifying reporter.)
24

Page 216

1        INSTRUCTIONS TO WITNESS
2
3
4        Please read your deposition over carefully and
5    make any necessary corrections.  You should state the
6    reason in the appropriate space on the errata sheet for
7    any corrections that are made.
8
9        After doing so, please sign the errata sheet
10   and date it.  It will be attached to your deposition.
11
12       It is imperative that you return the original
13   errata sheet to the deposing attorney within thirty (30)
14   days of receipt of the deposition transcript by you.  If
15   you fail to do so, the deposition transcript may be
16   deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24

Page 217

1        ------
2        E R R A T A
3        ------
4    PAGE LINE  CHANGE
5    ____ ____  _____
6        REASON:  _____
7    ____ ____  _____
8        REASON:  _____
9    ____ ____  _____
10       REASON:  _____
11   ____ ____  _____
12       REASON:  _____
13   ____ ____  _____
14       REASON:  _____
15   ____ ____  _____
16       REASON:  _____
17   ____ ____  _____
18       REASON:  _____
19   ____ ____  _____
20       REASON:  _____
21   ____ ____  _____
22       REASON:  _____
23   ____ ____  _____
24       REASON:  _____

55 (Pages 214 to 217)

Protected - Subject to Further Protective Review

Page 218

```
1              ACKNOWLEDGMENT OF DEPONENT
2
3          I, _____, do hereby
4      acknowledge that I have read the foregoing pages,
5      1 - 219, and that the same is a correct transcription of
6      the answers given by me to the questions therein
7      propounded, except for the corrections or changes in
8      form or substance, if any, noted in the attached Errata
9      Sheet.
10
11
12      _____ _____
13      DEMONDES HAYNES, MD         DATE
14
15
16
17
18      Subscribed and sworn to before me this
19      ____ day of _____, 20___.
20      My Commission expires: _____
21
22      _____
        Notary Public
23
24
```

Page 219

```
1                 LAWYER'S NOTES
2      PAGE  LINE
3      _____ _____ _____
4      _____ _____ _____
5      _____ _____ _____
6      _____ _____ _____
7      _____ _____ _____
8      _____ _____ _____
9      _____ _____ _____
10     _____ _____ _____
11     _____ _____ _____
12     _____ _____ _____
13     _____ _____ _____
14     _____ _____ _____
15     _____ _____ _____
16     _____ _____ _____
17     _____ _____ _____
18     _____ _____ _____
19     _____ _____ _____
20     _____ _____ _____
21     _____ _____ _____
22     _____ _____ _____
23     _____ _____ _____
24     _____ _____ _____
```

56 (Pages 218 to 219)