Protected - Subject to Further Protective Review

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

```
--------------------------------§
IN RE:  XARELTO (RIVAROXABAN)   § MDL NO. 2592
PRODUCTS LIABILITY LITIGATION   §
                                § SECTION L
                                §
THIS DOCUMENT RELATES TO:       § MAG. JUDGE NORTH
DORA MINGO, NO. 15-03469        §
                                §
_____§
```
   - - -


                    - - -


          FRIDAY, FEBRUARY 10, 2017

                    - - -


          PROTECTED - SUBJECT TO FURTHER

                PROTECTIVE REVIEW

                    - - -



          Videotaped deposition of ALAN JONES, M.D.,
     held at Bradley, Arant, Boult, Cummings, One
     Jackson Place, 188 East Capitol Street,
     Suite 400, Jackson, Mississippi, commencing at
     7:11 a.m., on the above date, before
     Kelly J. Lawton, Registered Professional
     Reporter, Licensed Court Reporter, and Certified
     Court Reporter.

                    - - -


          GOLKOW TECHNOLOGIES, INC.
     877.370.3377 ph | 917.591.5672 fax
              deps@golkow.com

Protected - Subject to Further Protective Review

## Page 2

```
1    APPEARANCES:
2    GOZA & HONNOLD, LLC
     BY:  BRADLEY D. HONNOLD, ESQUIRE
3    11150 Overbrook Road
     Suite 250
4    Leawood, Kansas 66211
     (913) 451-3433
5    bhonnold@gohonlaw.com
     Representing Plaintiffs
6
7    MITCHELL WILLIAMS
     BY:  ADRIA W. CONKLIN, ESQUIRE
8    425 West Capitol Avenue
     Suite 1800
9    Little Rock, Arkansas 72201
     (501) 666-8890
10   aonklin@mwlaw.com
     Representing Defendant Bayer
11
12   SCHWABE, WILLIAMSON & WYATT
     BY:  MARGARET HOFFMANN, ESQUIRE
13   1211 Southwest 5th Avenue
     Suite 1900
14   Portland, Oregon 97204
     mjoffmann@schwabe.com
15   Representing Defendant Janssen
16
17   ALSO PRESENT:
18   Melissa Bardwell, Videographer
19
20
21
22
23
24
25
```

## Page 4

```
1            E X H I B I T S
2    JONES                          PAGE
3    Exhibit 13  Plaintiffs' Notice with Subpoena   220
                 Duces Tecum of Oral Videotaped
4                Deposition of Alan Jones, M.D.
5    Exhibit 14  Responses and Objections to        220
                 Plaintiffs' Notice with Subpoena
6                Duces Tecum or Oral Videotaped
                 Deposition of Alan Jones, M.D.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
1           - - -
          I N D E X
2           - - -
3    Testimony of:  ALAN JONES, M.D.
4        DIRECT EXAMINATION BY MR. HONNOLD............  6
5
6
7          E X H I B I T S
8    JONES                          PAGE
9    Exhibit 1   February 15, 2016 Invoice      50
10   Exhibit 2   August 14, 2016 Invoice        51
11   Exhibit 3   September 5, 2016 Invoice       51
12   Exhibit 4   October 24, 2016 Invoice       51
13   Exhibit 5   December 26, 2616 Invoice       51
14   Exhibit 6   January 16, 2017 Invoice       51
15   Exhibit 7   January 6, 2017 Expert Report of    75
                 Alan E. Jones, M.D.
16
     Exhibit 8   December 2014 Xarelto Package      111
17               Insert
18   Exhibit 9   Center for Drug Evaluation and     190
                 Research Application Number:
19               202439Orig1s000 Clinical
                 Pharmacology and Biopharmaceutics
20               Review(s)
21   Exhibit 10  Drawing by Dr. Alan Jones of a     192
                 Linear Relationship
22
     Exhibit 11  April 2013 Pradaxa Label          197
23
     Exhibit 12  Compilation of Materials from      200
24               Reliance List of Dr. Alan Jones
25
```

## Page 5

```
1           - - -
2        THE VIDEOGRAPHER:  We are now on the record.
3    My name is Melissa Bardwell, videographer here
4    for Golkow Technologies.  The date today is
5    February 10th, 2017.  The time is approximately
6    7:11 a.m.
7        This videotaped deposition is being held in
8    Jackson, Mississippi, in reference to the Xarelto
9    Rivaroxaban Products Liability Litigation.  The
10   deponent today is Alan Jones, M.D.
11       Would counsel present please introduce
12   themselves and state their affiliations for the
13   record.
14       MR. HONNOLD:  Bradley Honnold for the
15   plaintiffs.
16       MS. CONKLIN:  Adria -- Adria Conklin
17   representing Bayer.
18       MS. HOFFMANN:  Margaret Hoffmann representing
19   the Janssen defendants.
20       THE VIDEOGRAPHER:  The court reporter is
21   Kelly Lawton, and she will now swear in the
22   witness.
23       THE COURT REPORTER:  Doctor, would you please
24   raise your right hand.
25       Do you swear or affirm the testimony you're
```

Protected - Subject to Further Protective Review

Page 6

1    about to give will be the truth, the whole truth,
2    and nothing but the truth?
3         THE WITNESS:  I do.
4         THE COURT REPORTER:  Thank you.
5         ALAN JONES, M.D., called as a witness by the
6    Plaintiffs, having been first duly sworn, testified
7    as follows:
8              DIRECT EXAMINATION
9    BY MR. HONNOLD:
10        Q.  Doctor, good morning.  Tell me your full
11   name, please.
12        A.  Alan Jones.
13        Q.  Where do you work?
14        A.  At the University of Mississippi Medical
15   Center.
16        Q.  And you're a physician?
17        A.  Correct.
18        Q.  With a speciality area of practicing in
19   emergency medicine?
20        A.  That is correct.
21        Q.  What is a PT test?
22        A.  A PT test is a blood test that is performed
23   to determine the balance between procoagulant and
24   anticoagulant activity in the body.
25        Q.  And do you ever order a PT test in your

Page 7

1    practice?
2         A.  Yes.
3         Q.  Tell me all the occasions or instances when
4    you might order a PT test in your practice.
5         A.  Gosh, I'm not so sure I could go through
6    every --
7         Q.  Tell me the ones you can remember as of this
8    morning at 7:10 a.m. on Friday.
9         A.  Well, it -- it's commonly ordered in patients
10   that you're concerned have a bleeding diathesis.  So
11   they have a medical problem that could predispose
12   them to bleeding.  It's commonly ordered on patients
13   that you plan to administer a anticoagulant to.  It's
14   commonly ordered in patients who will undergo some
15   type of an invasive procedure.  It is ordered in
16   patients that have sustained trauma, and it's ordered
17   in patients who are -- have evidence of bleeding.
18        Those are probably the -- the broad, general
19   categories that I can think of right now.
20        Q.  Let's go through that list.
21        I think one thing you mentioned is that it
22   may be ordered in patients that have a bleeding
23   diathesis.  What is a bleeding diathesis?
24        A.  A medical condition that -- that predisposes
25   one to bleed.

Page 8

1         Q.  Such as?
2         A.  Liver disease would be an example.  An
3    inherited deficiency in one of the clotting
4    disorders -- I mean, excuse me -- clotting proteins.
5    Medical issues such as dialysis can lead to a
6    bleeding diathesis.  So those are some examples.
7         Q.  Then you said you might order a PT in a
8    patient where you were anticipating starting
9    anticoagulants; is that right?
10        A.  Either anticipating starting or a patient
11   that is -- that is on an anticoagulant.
12        Q.  Why is it might you order a PT in a patient
13   that's on an anticoagulant?
14        A.  Well, specifically, we order PTs in patients
15   that are on Coumadin, usually to determine the degree
16   of anticoagulation to make sure that the patient is
17   maintained in -- in a therapeutic range.
18        Q.  And at your facility where you work, what
19   particular reagent is employed by the laboratory
20   there for when the PT test is performed?
21        A.  I don't know.
22        Q.  Have you ever inquired of your laboratory
23   director to find out what reagent is used for your PT
24   tests?
25        A.  No.

Page 9

1         Q.  So you have -- so as you sit here today as an
2    emergency medicine physician at the University of
3    Mississippi, you have no idea what reagent is used in
4    your laboratory?
5         A.  That's correct.
6         Q.  What are the reagents -- the various reagents
7    that you're aware of?
8         A.  Gosh, I think that there are a large number
9    of them that are FDA approved currently, so I'm not
10   sure I can name the specific reagents in the PT
11   tests.
12        Q.  Can you name one?
13        A.  Well, I know the one that is of most interest
14   in -- in regards to Rivaraxaban is the PT test that
15   uses Neoplastin.
16        Q.  Why do you say that one is of the most
17   interest related to Rivaraxaban?
18        A.  Well, in my reading in the materials and the
19   reports and depositions in this case, it seems to be
20   the one that has raised the most interest and -- and
21   area of inquiry.
22        Q.  Then you said that you may order a PT test in
23   a patient who needs to or is scheduled to undergo an
24   invasive procedure; is that correct?
25        A.  Yes, that's correct.

3 (Pages 6 to 9)

Protected - Subject to Further Protective Review

Page 10

1    Q. Why is a PT -- or why might a PT be ordered
2 in a patient who needs to undergo an invasive
3 procedure?
4    A. Again, you're looking for some underlying
5 predilection to bleed that you might not otherwise
6 know about in a -- typically, that would be some
7 undiagnosed medical problem.
8    Q. For a patient who might be unresponsive, and
9 you might be trying to rule out whether or not they
10 are on an anticoagulant; correct?
11        MS. HOFFMANN: Objection.
12        THE WITNESS: Unresponsive meaning, they come
13        into the hospital not responding?
14 BY MR. HONNOLD:
15    Q. Out cold, unconscious, with no history, and
16 not able to give their own history, and no -- no
17 friend or family to give a history.
18    A. Well, even a PT in that situation may not
19 tell you that the patient is on an anticoagulant. An
20 elevated PT in that situation could be a
21 reflection of the traumatic process that's going on
22 in the body.
23    Q. If you take -- order a PT test in a -- in an
24 unresponsive patient and it's significantly elevated,
25 at least a differential cause of that test might be

Page 11

1 the fact that the patient is on an anticoagulant;
2 correct?
3        MS. CONKLIN: Object to form.
4        THE WITNESS: That could be one of the causes
5        for an elevated PT test.
6 BY MR. HONNOLD:
7    Q. And when I use the term "differential," you
8 know what I'm talking about. You understand --
9 you're familiar with the process of differential
10 diagnosis; correct?
11    A. Yes, I am.
12    Q. And why -- why can it be important to rule
13 out an elevated PT in a patient who is scheduled to
14 undergo an invasive procedure?
15    A. Well, you don't order the test to rule out an
16 elevated PT. You order the test to determine the
17 balance of the coagulation system in the body. So
18 what you really are ordering the test to determine is
19 if there is going to be the potential risk for a
20 patient to bleed more than you might anticipate. So
21 you want to know if the test -- what -- what the
22 results of the test are.
23    Q. So then we can agree that in a patient who is
24 scheduled to undergo an invasive procedure, the
25 reason that a PT test might be ordered would be to

Page 12

1 determine whether that patient is the type of patient
2 who may have excessive or inordinate bleeding;
3 correct?
4    A. You are -- as a physician, you're looking to
5 determine the potential risk for bleeding. Just
6 because you have an elevated PT doesn't mean that
7 you're going to bleed more or have inordinate
8 bleeding.
9    Q. Okay. So what does the PT test tell you,
10 then, about the risk of bleeding in that situation?
11    A. Well, the PT test, in and of itself, only
12 tells you what the balance of pro- and anticoagulant
13 activity in the body is. It doesn't necessarily tell
14 you what the predilection or risk for bleeding is.
15    Q. You told me just before that the PT test can
16 give you some information about the patient's risk of
17 bleeding, and that's what I -- that's what I wanted
18 to get at.
19        What -- what is it about the PT test, the
20 level that's given, that speaks to the patient's
21 particular -- potential risk for bleeding?
22    A. I see.
23        Well, I think it has to be used in
24 conjunction with what the other medical issues are in
25 that patient.

Page 13

1        So, for example, you could have a patient
2 with liver disease that has a normal PT test, but
3 it's normal because you have suppression of all of
4 the proteins in the body that contribute to both the
5 pro- and anticoagulant activity, such that that
6 patient might be at a higher risk for bleeding, but
7 their PT test be at normal.
8        And so you can also have a patient who might
9 have an elevated PT test, you know, depending on how
10 it's elevated, that -- that is of no higher risk for
11 bleeding than -- than a patient with a normal PT
12 test.
13        So it really kind of depends on a lot of
14 patient-specific issues.
15    Q. Sure.
16    A. Just the test, in and of itself, is -- it's
17 hard to tell you what exactly that risk is.
18    Q. Tell me the situation then, where a patient
19 might have a significantly elevated PT test, but
20 they're not at an increased risk of bleeding during
21 an invasive procedure. List those conditions or
22 situations for me.
23    A. The question is a situation where a patient
24 has an elevated PT test where they're not at an
25 increased risk of bleeding?

Protected - Subject to Further Protective Review

Page 14

1    Q.  Right.
2       I'm -- I'm asking you that question because
3    you told me that there are situations that you were
4    thinking of where a patient may have a significantly
5    elevated PT test and not be at an increased risk of
6    bleeding.  I want you to tell me what those
7    situations or conditions are.
8       MS. HOFFMANN:  Objection to form.
9       THE WITNESS:  Okay.  So I guess as I think
10   about what I was trying to convey -- and
11   potentially my words were not exactly -- didn't
12   come out exactly to what I was trying to convey
13   in my head.
14      But what I was trying to convey is that an
15   elevated PT test, in and of itself, is just a
16   piece of information that doesn't necessarily
17   allow you to give an exact risk of bleeding.
18      Would I say, as a general statement, that a
19   patient that has an elevated PT test has some
20   balance in their coagulation system that is
21   tipped towards anticoagulant?  Yes.
22      But what that particular risk is, depending
23   on the level of the PT test, I can't say how much
24   risk there is to bleed for an invasive procedure;
25   in other words, what the -- what the actual risk

Page 15

1    is.
2    BY MR. HONNOLD:
3    Q.  And I appreciate that.  I want to follow back
4    up what you told me, though.
5       You said there were situations where a
6    patient may have a significantly elevated PT and not
7    be at an increased risk of bleeding during an
8    invasive procedure.  Describe for me such a
9    situation.
10   A.  Well, I mean, you -- you know, you could have
11   a situation where you have an elevated PT test and
12   you do, you know, a procedure such as a -- put a
13   chest tube in a patient, and they don't bleed more
14   than you anticipate them bleeding.
15      So, you know, there are times when that
16   occurs.  I mean, it's not like there are very
17   specific -- you know, in this patient, with this
18   disease, with this test result, that are written in
19   the literature.
20      I'm just saying as a practicing clinician, we
21   see situations where the PT test can be elevated and
22   we do a procedure, and the patient doesn't bleed more
23   than we would anticipate them bleeding or that a
24   patient without an elevated PT would bleed.
25   Q.  Are there situations, however, prospectively

Page 16

1    when you believe a patient needs an invasive
2    procedure and you perform a PT test and it's
3    significantly elevated, where you might tell a
4    surgeon, or anyone else who's going to undertake an
5    intervention, that the patient might be at an
6    increased risk of bleeding based upon the PT test?
7       MS. CONKLIN:  Object to the form.
8       THE WITNESS:  We particularly get concerned
9    about elevated PT tests in situations where
10   there's going to be surgery, particularly a
11   neurologic surgery.  That's one of the areas I
12   would say is of more concern, because it's -- you
13   know, like, if they need a craniotomy or if they
14   need back surgery, because those are more
15   enclosed areas, and once they're closed up,
16   there's not a lot of space.
17      So I would say that's one area of surgery or
18   procedures where we get more concerned about
19   elevated PT tests than, say, doing it in an area
20   that's more readily accessible and not as closed.
21   BY MR. HONNOLD:
22   Q.  Okay.  So other than a spinal procedure or
23   intracranial, what other procedures might you have
24   some concern about proceeding with an invasive
25   procedure or a surgery if a patient has a

Page 17

1    significantly elevated PT preoperatively?
2       MS. HOFFMANN:  Objection to form.
3       THE WITNESS:  Well, I should qualify this by
4    saying that I'm not a surgeon.  So I'm not making
5    those decisions in realtime.  The surgeons are
6    making those decisions.
7       But as a practicing emergency physician,
8    particularly I would say neurologic surgeries,
9    potentially ophthalmologic procedures, those
10   would probably be the two major ones that I would
11   be the most concerned about.
12   BY MR. HONNOLD:
13   Q.  And neurologic includes back, spine,
14   intracranial?
15   A.  Yes.
16   Q.  And eye, meaning actual procedures -- ocular
17   procedures?
18   A.  Correct.
19   Q.  Any -- anything else you can think of, renal
20   biopsy, laparotomy, hernia, mastectomy, anything like
21   that?  Or is that beyond your area of expertise?
22   A.  Yeah.  I would say that that probably is
23   pushing -- pushing my area of expertise.
24   Q.  The -- the PT test that's used at your
25   hospital, what is the range of normal?

5 (Pages 14 to 17)

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 18

1      A.  Oh, gosh.  I'm not even sure I can tell you
2    the range.  It comes with the test, follows the test.
3    So I don't know exactly what the ranges are.
4      Q.  What percentage increase on the upper range
5    of normal is that something that may -- may get your
6    attention as either being indicative of a patient
7    that might have a bleeding diathesis or a
8    coagulopathy or might even be on an anticoagulant?
9          MS. CONKLIN:  Object to the form.
10         THE WITNESS:  I'm not -- as a clinician, I
11   don't think that -- I don't, and I -- I've never
12   heard clinicians talk about a percent increase.
13   I think, you know, whenever you have any
14   abnormality, it certainly should make you at
15   least think about what that means to the patient
16   and, you know, what the -- what the patient
17   needs, so . . .
18   BY MR. HONNOLD:
19     Q.  So when you do have an abnormality in a PT,
20   what could that mean for the patient?
21     A.  Well, I think you need to consider whether
22   that patient -- what the risk to the patient is and
23   what the benefit to the patient is, if they do need
24   to go on and have a procedure done.
25         So you're trying to determine, you know, the

Page 19

1    benefit of the procedure is outweighed by the risk of
2    the potential to bleed based on a test, as well as,
3    you know, what their other risk factors are or
4    medical issues are.
5      Q.  So when you see an elevated PT in a patient,
6    one of your concerns might be whether that patient is
7    at increased risk for bleeding; correct?
8          MS. CONKLIN:  Object to the form.
9          THE WITNESS:  Yes.  That certainly would be
10   considered one of the risks -- one of the
11   concerns.
12   BY MR. HONNOLD:
13     Q.  And when you initially gave the list of -- at
14   the beginning of your testimony, you -- you said that
15   you may perform a PT test when a patient has some
16   evidence of bleeding.  Tell me why a PT test might be
17   performed when a patient actually is showing evidence
18   of active bleeding.
19     A.  Well, the first -- one reason would be to
20   establish a baseline level in -- in following the
21   clinical course.  So if something happens and the
22   patient deteriorates, you would want to know -- we
23   typically want to have some baseline levels of their
24   lab test to determine if, at the time of
25   deterioration, there's been some change in those

Page 20

1    tests.
2          The second reason would be to determine if
3    the bleeding event itself has had some effect on the
4    coagulation system in a patient that would otherwise
5    be expected to have a normal coagulation system.
6          The third would be to evaluate whether
7    there's some underlying coagulopathy due to a medical
8    problem that you don't know about or that's
9    undiagnosed.
10         And the fourth would be probably to
11   determine, in an otherwise -- in a -- in a patient
12   that is on an anticoagulant, as a matter of routine,
13   we usually order coagulation tests.
14     Q.  Why is it, in a patient who is on an
15   anticoagulant that as a matter of routine -- as a
16   matter of routine, you order coagulation testing?
17     A.  Well, because we know that they're on some
18   medication that's going to affect their coagulation
19   system.  And probably out of conditioning from
20   training -- up until recently, the only oral
21   anticoagulant was Coumadin.  And obviously, Coumadin
22   is monitored with PT INR in clinical practice.
23     Q.  So are you telling me that in situations
24   where patients are on anticoagulants other than
25   Coumadin, you might also find yourself ordering a PT

Page 21

1    just out of kind of a reflective response based upon
2    what you learned when taking care of patients on
3    Coumadin?
4      A.  I think that's generally what occurs, in my
5    experience.
6      Q.  So are you're telling me that in performing a
7    PT test on a patient with bleeding that's taking
8    Rivaroxaban, that ordering a PT test would not be
9    medically indicated then?
10     A.  Well, I would say that it's not as -- that
11   information is not necessarily as quantitatively
12   useful to my clinical practice or -- clinical
13   practice as it is with the INR -- PT INR for a
14   patient taking Coumadin.
15         And the reason for that is, is we know from
16   years of study that PT INRs are a reliable indicator
17   of -- of the anticoagulant effect of Coumadin on the
18   body.  What's less well-known is the use of the
19   different PT tests for assessing the activity of
20   Rivaroxaban on the body or whether it's even
21   necessary.
22         So if it is ordered by a clinician on a
23   patient that's on Rivaroxaban, typically, my
24   experience is that it's ordered because we're
25   conditioned to do that and not necessarily that it

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 22

1    drives changes in -- it -- it, in and of itself,
2    drives changes in management.
3        Q.   So is it your testimony, then, that a
4    significantly elevated PT test in a patient on
5    Rivaroxaban is of -- is -- is if no substance or meaningful
6    information?
7        MS. CONKLIN:  Object to the form.
8        THE WITNESS:  Well, to me, as a practicing
9    clinician, if I have a patient that I order a PT
10   test that's -- PT test on a patient that's taking
11   Rivaroxaban, and it is elevated, it -- it merely
12   suggests to me that there is some anticoagulant
13   effect of the Rivaroxaban in the body.  So it
14   indicates to me that they have actually been
15   taking the medication.
16      That being said, I have seen situations of
17   patients that state compliance with the
18   medication that have had normal PT tests also.
19      So you, again, have to use the information in
20   the entire clinical picture and not in isolation
21   or as a single piece of information.
22   BY MR. HONNOLD:
23      Q.   I just want to make sure that I'm very, very
24   clear about this, then.  Is it your testimony in this
25   case, as it relates to the PT test and Rivaroxaban,

Page 23

1    that its only utility or usefulness is to determine
2    whether there's essentially drug on board or whether
3    the patient's been taking the medicine?
4        A.   Yes, that's -- that's my testimony, my
5    opinion, and the way I see it used clinically.
6        Q.   And so your testimony, then, as it relates to
7    this matter and Rivaroxaban, in general, is that in
8    your laboratory, if you assume that the upper range
9    of normal is 13½ -- let's just take that as a -- just
10   as a -- as a matter of assumption -- are you stating,
11   then, that there is no difference in terms of the
12   patient's risk of bleeding if they have a PT result
13   that's 16, as opposed to 28?
14      MS. CONKLIN:  Object to the form.
15      MS. HOFFMANN:  Objection to form.
16      Brad, where I get confused is in one sentence
17   you talk about this matter and Rivaroxaban in
18   general.  Are you talking about in Ms. Mingo's
19   case?
20      MR. HONNOLD:  That's -- that's a good
21   objection, so the court reporter will take it
22   down.
23      THE WITNESS:  I'm sorry, I'm going to ask you
24   to repeat the question.  I got --
25   ///

Page 24

1    BY MR. HONNOLD:
2        Q.   Sure.
3        So what's upper limit of normal for a PT test
4    at your hospital?
5        A.   I think I've already told you I don't know
6    the exact numbers on that.
7        Q.   Okay.  Ballpark.
8        A.   I think it's around 13.2.
9        Q.   Okay.  And so imagine a given patient that's
10   on Rivaroxaban and has a PT of 16, and that same
11   patient on Rivaroxaban has a PT of 28.  Any
12   difference in terms of that information in terms of
13   usefulness of the information about the patient's
14   risk of bleeding?
15      MS. HOFFMANN:  Objection.
16      MS. CONKLIN:  Object to the form.
17   BY MR. HONNOLD:
18      Q.   Or their intensity of anticoagulation?
19      MS. CONKLIN:  Object to the form.
20      MS. HOFFMANN:  Objection.
21      THE WITNESS:  And you're talking about
22   specifically that way I'd use at my hospital?
23   BY MR. HONNOLD:
24      Q.   Just the PT test at your hospital?
25      A.   And so -- so the way I use the PT test at my

Page 25

1    hospital -- and I think, you know, from my
2    understanding of the reading of, you know, the
3    majority of the literature, is that the PT test is --
4    if elevated in a patient that is taking Rivaroxaban,
5    can indicate that there is the effect of the
6    medication.
7        There's not a good way of normalizing what
8    degree of anticoagulant activity or degree of
9    anticoagulation is across PT tests like there
10   is for Coumadin, which is the INR.
11      So because we can't reliably normalize that,
12   and all PT tests and their reagents don't interact or
13   react with Rivaroxaban the same way, it's not
14   reliable to say that -- that looking at, you know,
15   degrees of elevation give you a consistent
16   relationship between the degree of anticoagulation or
17   the -- and -- and the test results.
18      So I do not have any -- hold any higher
19   credence with, say, a test of 16 versus a test of 26.
20   To me, as a practicing clinician at my hospital, it
21   just means the patient has some anticoagulant effect.
22      Q.   Okay.  Just so we're a clear then, at your
23   hospital, it -- it's not your understanding, is it,
24   that from day-to-day your hospital uses different
25   reagents for the PT, is it?

7 (Pages 22 to 25)

Protected - Subject to Further Protective Review

---

Page 26

1  A. In the main hospital, I -- they use the same
2  test. Of course, we have different labs and
3  different areas of the hospital system. So I'm not
4  sure that they're standardized across the hospital
5  system.
6  Q. Okay. So when somebody comes into your
7  emergency room and needs a PT, where does the --
8  where does the test go?
9  A. It goes to the main lab.
10  Q. Okay. And as far as you know, do they
11  consistently use the same reagent?
12  A. Yes. I would suspect that that's true.
13  Q. So as it relates to your practice at your
14  hospital, you're not in a situation where you're
15  talking about comparing or normalizing different
16  tests, right, different reagents?
17  MS. HOFFMANN: Objection.
18  MS. CONKLIN: Objection.
19  THE WITNESS: Not -- not within, like,
20  intratest variability at my hospital.
21  BY MR. HONNOLD:
22  Q. Right. That's not an issue at your practice.
23  I mean, when you see a 14 in one patient and a 28 in
24  another, you aren't thinking that the reason that
25  those levels are different is because they were

---

Page 27

1  performed using a different reagent; correct?
2  A. That would be true.
3  Q. Okay. And so your testimony in this matter
4  is that for a patient taking Rivaroxaban, there's no
5  difference in -- from your perspective, in terms of
6  clinical utility of information, for a PT test of 16
7  versus 28; correct?
8  A. I'd say as a general statement, if we're just
9  talking -- I mean, if we're just saying generally PT
10  tests, yes, that's -- that's a true statement.
11  Q. Okay. And continuing that analysis, there
12  would be no difference between a 16 and a 32,
13  correct, in your mind?
14  MS. CONKLIN: Object to the form.
15  THE WITNESS: Again, if we're talking about
16  just PT tests in general, then I would agree with
17  that.
18  BY MR. HONNOLD:
19  Q. Let's talk about the PT test in your
20  hospital. When you would see those two tests, is
21  there no difference in your mind between the
22  situation of a patient who has a PT of 16 versus a PT
23  of 32?
24  A. As a practicing clinician, if I have a
25  patient that's on Rivaroxaban and they have a 16 or

---

Page 28

1  they have a 32, I'm doing the same thing, which is
2  I'm evaluating them clinically. If I believe that
3  they have bleeding that is critical or is clinically
4  significant, then regardless of those two levels, I'm
5  going to treat them the same way.
6  Q. So let's imagine a patient that you're
7  evaluating for an invasive procedure and a patient on
8  Rivaroxaban. What's the period of time that you will
9  want them to stop taking the drug before the
10  procedure?
11  MS. CONKLIN: Object to the form.
12  THE WITNESS: Well, just to make sure we're
13  clear, I don't manage patients where I ask them
14  to stop taking drugs in order to do a procedure
15  on them, because I don't do scheduled procedures.
16  BY MR. HONNOLD:
17  Q. Okay.
18  A. So I typically do emergent procedures.
19  So in a situation where you have a patient
20  with an elevated PT and they're on Rivaroxaban and
21  they need an emergent procedure, I would treat them
22  the same way regardless of what the PT test is.
23  Q. And your preprocedure evaluation of their
24  potential risk of bleeding would be the same, meaning
25  that the PT test in a patient on Rivaroxaban does not

---

Page 29

1  provide you with any information as to that patient's
2  particular risk of bleeding; right?
3  MS. HOFFMANN: Objection. Objection.
4  THE WITNESS: Well, when I'm doing an
5  emergent procedure, I don't do preprocedural
6  tests. I do a procedure because it's an emergent
7  procedure.
8  BY MR. HONNOLD:
9  Q. Okay. So -- so in a -- in a patient -- or in
10  patients that are being evaluated for invasive
11  procedures on Rivaroxaban then, if before the
12  procedure, one patient has a normal PT and one has a
13  patient of -- or a PT of 26, there's no difference
14  between those patients in terms of their potential
15  bleeding risk related to the procedure; correct?
16  MS. HOFFMANN: Objection to form.
17  THE WITNESS: And this is for -- you said for
18  an elective procedure?
19  BY MR. HONNOLD:
20  Q. Yes.
21  A. Well, again, I'm -- I'm going to go back and
22  say I don't do elective procedures. So I don't
23  typically think about risk in terms of, you know, how
24  long I would want a patient off or what their risk is
25  for those elective types of procedures. So I'm

Protected - Subject to Further Protective Review

Page 30

1    probably not the correct person to ask that.
2        Q.  So that particular question would be outside
3    your area of expertise; right?
4        A.  For elective procedures, I don't -- I don't
5    think I'm the right person to ask that.
6        Q.  Just generally, based on the PT test and
7    reagent that's used at your laboratory, your view
8    then, of the information that comes from the PT test,
9    in terms of risk of bleeding, is that there is no
10   difference, in terms of a patient's particular risk
11   of bleeding on Rivaroxaban, if their PT is 14 versus
12   their PT being 26?
13       MS. CONKLIN:  Object to the form.
14       MS. HOFFMANN:  Objection to form.
15       THE WITNESS:  My view of that is that that
16   test tells you there's some effect of the drug on
17   board, but it doesn't give you the ability to
18   quantify the risk of bleeding.
19   BY MR. HONNOLD:
20       Q.  And so are you saying there's no way to tell
21   whether there's a difference between the risk of
22   bleeding for those two patients?
23       MS. HOFFMANN:  Same objection.
24   BY MR. HONNOLD:
25       Q.  Or are you saying that there's not any

Page 31

1    difference in the risk of bleeding in those patients?
2        MS. CONKLIN:  Object to form.
3        THE WITNESS:  I'm telling you that there's no
4    reliable scientific evidence that can guide me to
5    let me know what that risk difference is or if it
6    exists.
7    BY MR. HONNOLD:
8        Q.  What are the things, then, in patients taking
9    Rivaroxaban that influences what the PT is at a
10   particular point in time?
11       A.  I'm not sure I understood that question.
12   Could you --
13       Q.  Sure.
14           What are the things about a particular
15   patient, then, that will influence what their PT is
16   on Rivaroxaban at a given point in time?
17       A.  What degree of elevation their PT is?  I'm
18   still trying to understand exactly --
19       Q.  Sure.
20           Let me ask it this way:  What's your
21   expectation as to what a patient's PT -- how it would
22   react on a serial basis if you were literally taking
23   over the course of 24 hours post-dose?
24       A.  Well, I think it's going to be variable
25   according to the metabolism of the drug.

Page 32

1        Q.  Why?
2        A.  Because we know that the way drugs interact
3    with the body, there are times when they're at their
4    highest concentration or activity in the body, and
5    there are times when they're at their lowest or they
6    have their lowest activity.
7            And so probably because of that, I would
8    guess that there -- there would potentially be some
9    variability in the test.  But that doesn't tell
10   you -- that -- that doesn't allow you to quantify the
11   risk of bleeding or quantify the activity, because
12   there's no data that shows that that's possible.
13       Q.  Okay.  So your view is that there's no --
14   no -- that a serum or plasma concentration level of
15   Rivaroxaban does not provide any information
16   prospectively about a patient's risk of bleeding at a
17   particular point in time?
18       MS. CONKLIN:  Object to form.
19       THE WITNESS:  I don't think I said that.
20       But I think that you can -- the most reliable
21   way of determining, at least from my reading, the
22   activity or generally the concentration of
23   Rivaroxaban is by doing an anti-Xa assay.  But
24   those are not routinely done in clinical
25   practice.  They're not routinely available.  By

Page 33

1    doing that assay, then there are some nomograms
2    or some formulas that allow you then to back into
3    the potential concentration.
4            But, again, those are not tests that are
5    clinical relevant or performed on a routine basis
6    in a clinical setting.
7    BY MR. HONNOLD:
8        Q.  You used together the term "activity" and the
9    term "concentration."  Tell me what you were --
10   you're referring to when you use those terms.
11       A.  Well, I guess concentration would be the --
12   you know, if you were to measure the amount of drug
13   in the blood, that tells you the concentration.
14           And then activity, I use that term to
15   annotate how the drug interacts with the body, with
16   the physiology of the body.
17       Q.  And you suggested to me that the expectation
18   is that the activity of the drug will be greatest
19   when the concentration is the greatest.  Why is that,
20   from a pharmacologic principle?
21       MS. CONKLIN:  Object to the form.
22       THE WITNESS:  Well, to put it in as simple
23   terms as I can, if you, let's say, miss a dose of
24   the drug that you're taking -- and I'm not
25   talking about Rivaroxaban.  I'm talking about any

Protected - Subject to Further Protective Review

Page 34

1 drug, this should be the case for. If you miss a
2 dose of the drug, then the -- the amount of drug
3 available in the body to interact with the body
4 system and have its intended effect is going to
5 be lower. Therefore, the way the drug interacts
6 with the body should be different than if -- than
7 you don't miss a dose of the drug.
8 BY MR. HONNOLD:
9    Q. Similarly, if you take an extra dose, a
10 similar principle would apply, but it could be to
11 enhance effects of the drug; correct?
12    MS. CONKLIN: Object to the form.
13    THE WITNESS: Well, there's got to be some --
14 again, depending on the drug, there's got to be
15 some -- in general, drugs have some effect of a
16 ceiling effect where they can't have more
17 activity. So even though they, you know, have
18 gone above a plasma concentration that would be
19 considered therapeutic, its interaction with the
20 body is not going to be any more severe or put a
21 patient at any more risk, because there is a --
22 an effect where you can't cause any more problem.
23 BY MR. HONNOLD:
24    Q. Coumadin would be one where, if you
25 double-down on the prescribed dose, that may create

Page 35

1 an increased risk of bleeding because there's more
2 blood -- more drug in the system?
3    A. Well, Coumadin has all kinds of issues. But
4 you can certainly -- you can certainly take extra
5 doses of the drug, and its intended effect can affect
6 the coagulation system more.
7    Q. So there are situations where taking more
8 Coumadin can affect the coagulation system more;
9 right?
10    MS. CONKLIN: Object to the form.
11    THE WITNESS: Yes. There are situations
12 where you can take too much Coumadin -- or -- or
13 I shouldn't say too much. You can take more than
14 a prescribed amount of Coumadin, and it can have
15 an effect on the coagulation system that's more
16 than the desired therapeutic effect.
17 BY MR. HONNOLD:
18    Q. And when the effect on the coagulation system
19 results in a greater therapeutic effect, that can
20 increase the patient's risk of bleeding; correct?
21    MS. CONKLIN: Object to the form.
22    THE WITNESS: In Coumadin?
23 BY MR. HONNOLD:
24    Q. Yes.
25    A. Yes, that can increase the risk -- the

Page 36

1 patient's risk of bleeding.
2    Q. Now, can a patient take more Rivaroxaban
3 where it affects the patient's coagulation system
4 more?
5    A. I would say that there's not as much evidence
6 to guide that -- guide that as a scientific principle
7 than there is with Coumadin.
8    What I understand about the way that -- that
9 Rivaroxaban interacts with the coagulation system is
10 that there is a -- there is going to be a maximum
11 effect that it will have -- because of how rapidly it
12 begins to metabolize and the way the metabolites exit
13 the body and the way it interacts with the body,
14 there's going to be a -- a maximum effect of the
15 drug.
16    So at some point, you can -- you can -- you
17 can take, you know, you know, a truckload of it, and -- and
18 it's not going to have any more effect than if you
19 had taken a half truckload. I mean, these are -- you
20 know, I'm just trying to give you a generalization.
21    Q. Sure.
22    But it may be that a tenth of a truckload may
23 have less of an effect than a third of the truckload;
24 right?
25    MS. CONKLIN: Object to the form.

Page 37

1    THE WITNESS: That kind of depends on the
2 pharmacokinetics of the drug and whether, you
3 know, the amount that you're taking in a
4 therapeutic dose reaches the intended level in
5 the body -- you know, has the intended activity
6 in the body, and that if you took more than that,
7 it would have any more intended effect.
8    And right now, I don't think we have good
9 evidence to suggest that that is the case, one
10 way or other.
11 BY MR. HONNOLD:
12    Q. So your view is that a patient taking five
13 milligrams of Rivaroxaban, that doesn't have any less
14 anticoagulant effect on the body than in the same
15 patient who was taking 30 milligrams a day?
16    MS. CONKLIN: Object to the form.
17    THE WITNESS: I would say that it seems, on
18 the surface, that it -- it potentially would have
19 different effect. I mean, there would be more
20 drug to be able to -- to affect Xa, to block Xa.
21 But what the quantification of that effect is or
22 what it actually means to the anticoagulant
23 activity or the risk, I'm not -- I'm not sure I'm
24 the one that can answer that question for you.
25    ///

10 (Pages 34 to 37)

Protected - Subject to Further Protective Review

Page 38

1 BY MR. HONNOLD:
2    Q. Okay. So I just want to make sure that when
3 you say that it seems on the -- on the surface, that
4 that would be the case, that taking more would have a
5 different effect, what are you talking about? Have a
6 different -- what kind of different effect?
7    A. Well, you're -- you would be taking a
8 subtherapeutic dose, if you took five milligrams. So
9 in -- if you're taking a subtherapeutic dose, then a
10 practicing clinician would suspect that it's not
11 going to have the intended therapeutic effect.
12      In other words, if you take a therapeutic
13 dose, then you're going to have the intended
14 anticoagulant effect of the medication. But if
15 you're taking a subtherapeutic dose, as is
16 recommended, then it's not going to have the intended
17 anticoagulant effect. So from that perspective, it
18 does affect the coagulation system differently.
19    Q. Let's talk about 15 versus 30 then. So is
20 there any difference, in terms of the effect on a
21 patient's -- the same patient, is there any
22 difference in the effect on the patient's
23 anticoagulation system in a patient who takes
24 15 milligrams a day versus that same patient who
25 might take 30 milligrams a day?

Page 39

1      MS. CONKLIN: Object to the form.
2      THE WITNESS: Gosh, I -- I mean, as a -- as a
3 clinician, I'm not sure of an indication for
4 taking 30 milligrams. I guess the 15 milligrams
5 twice a day indication for DVT totals 30.
6      So I guess you're asking me if that effect
7 has any difference than a 20-milligram dose. I'd
8 probably say -- you know, my suspicion is that it
9 does not have any substantial difference in its
10 activity. I mean, it's still a therapeutic dose.
11 So it's intending to give you the -- the correct
12 therapeutic activity for efficacy and safety
13 that's been studied.
14 BY MR. HONNOLD:
15    Q. Okay. So if you look -- the half-life of
16 Rivaroxaban, what is it?
17    A. Like, five to nine hours.
18    Q. And so in a patient who's taking
19 20 milligrams a day of Rivaroxaban, when would you
20 expect them to have a maximum plasma concentration
21 level after taking a dose?
22      MS. HOFFMANN: Objection.
23      THE WITNESS: I'm not a pharmacokinetics
24 expert, and I certainly don't think about that as
25 a practicing clinician. My expectation from

Page 40

1 reading would be that I think it's pretty rapidly
2 absorbed and has effect. So I would say a couple
3 of hours, two, three hours.
4 BY MR. HONNOLD:
5    Q. And then what's your understanding of the
6 level of plasma concentration in that two- to
7 three-hour range versus 23 hours after -- after a
8 dose?
9      MS. CONKLIN: Object to the form.
10      THE WITNESS: Well, my understanding is
11 that -- that pretty much immediately, the drug
12 begins to be metabolized. And so as the drug is
13 metabolized and excreted, that it's going to
14 interact differently with the body as the -- as
15 the metabolism occurs. So it's going to have
16 less activity.
17      So if you don't take another dose, I would
18 guess that the activity is lower in 23 hours.
19      MS. HOFFMANN: Would this be a good time to
20 take a quick break?
21      MR. HONNOLD: It depends on what time it is.
22      MS. HOFFMANN: It's about an hour, and I
23 would love a break to blow my nose.
24      MR. HONNOLD: Okay. Yes, that's fine.
25      THE VIDEOGRAPHER: The time now is 7:56 a.m.

Page 41

1 We are off the record.
2      (A recess was taken from 7:56 until 8:03 a.m.)
3      THE VIDEOGRAPHER: This begins Disc 2 of
4 today's deposition. The time now is 8:03 a.m.
5 We are back on the record.
6 BY MR. HONNOLD:
7    Q. Doctor, we're back on the record after a
8 short break.
9      In your view, then, that after a patient
10 takes a dose of Rivaroxaban, then after some period
11 of time, it will reach what would be the maximum or
12 peak serum concentration level for that dose;
13 correct?
14      MS. CONKLIN: Object to the form.
15      THE WITNESS: Yes, that would be my
16 understanding.
17 BY MR. HONNOLD:
18    Q. And -- and your thought was -- and I -- I
19 understand that you're not a pharmacologist and are
20 not necessarily being offered to give pharmacologic
21 opinions in this case. But in -- in terms of your
22 understanding of the drug, your view is that you
23 think that -- that peak serum concentration level may
24 be reached somewhere between two and three hours
25 after taking a dose; right?

11 (Pages 38 to 41)

Protected - Subject to Further Protective Review

Page 42

1        MS. CONKLIN:  Object to the form.
2        THE WITNESS:  I believe that's what I said
3    earlier, yeah.
4    BY MR. HONNOLD:
5        Q.  Okay.  And then I think you would agree with
6    me, then, as time goes on, as the drug is metabolized
7    or eliminated from the body, then there would then be
8    a lower serum concentration level that would result;
9    correct?
10        MS. HOFFMANN:  Objection to form.
11        THE WITNESS:  I would say in general terms,
12    that's -- that's my understanding of how
13    metabolism works.
14    BY MR. HONNOLD:
15        Q.  Now, do you an understanding as to, if a PT
16    test was done at that peak serum concentration level
17    and a PT was done at that lower serum concentration
18    level, how those two PT tests would compare in the
19    same patient?
20        MS. CONKLIN:  Objection to the form.  He's
21    not being offered as an PK/PT expert.
22        THE WITNESS:  I -- no, not really.  I don't
23    really have an opinion about that.
24    BY MR. HONNOLD:
25        Q.  You've reviewed the Rivaroxaban labels in

Page 43

1    this case; correct?
2        A.  Yes.
3        Q.  Does the label say anything about that?
4        A.  About?
5        Q.  About whether the PT would be any different
6    at the peak serum concentration level after a dose,
7    versus lower serum concentration level 20 hours after
8    taking a dose?
9        A.  I -- I don't have the label memorized, but if
10    we want to get it out and look at it, and you can
11    point to it, then I'd be happy to --
12        Q.  Do you -- as you sit right now, do you recall
13    the label providing that information there?
14        A.  There's a lot of information in the label.
15    I -- I don't -- I can't recall everything that's in
16    it, so . . .
17        Q.  When were you retained in this case?
18        A.  I believe it was sometime around the spring
19    or summer of 2016.
20        Q.  And who was it that retained you?
21        A.  Well, the first lawyer that contacted me was
22    Dianne Davis.
23        Q.  And who is Dianne Davis?
24        A.  She's an attorney that I believe is working
25    on this case in some capacity.  I don't know exactly

Page 44

1    what capacity that is.
2        Q.  Do you know if she's at the Kaye Scholer firm
3    in New York City?
4        A.  I don't know.
5        Q.  Oh, no.  Jane, Jane.  Oh, Jane.  I know Jane.
6    Jane's at Nelson -- Nelson, Mullins --
7        MS. HOFFMANN:  No.  He said Dianne Davis.
8        MR. HONNOLD:  Oh, Dianne Davis.
9        MS. CONKLIN:  Dianna Davis.
10    BY MR. HONNOLD:
11        Q.  Oh, Dianne Davis.  Do you know what firm she
12    works at?
13        A.  No.
14        Q.  Okay.  Do you know Jane Davis?
15        A.  Yes, I do know Jane Davis.
16        Q.  Okay.  How do you know Jane Davis?
17        A.  Well, then Dianne Davis passed, I -- I guess,
18    me off to Jane Davis in working on the case, so . . .
19        Q.  What do you mean, she passed you off --
20        A.  Well, I mean, she --
21        Q.  -- to Dianne Davis?
22        A.  -- she basically corresponded with me and
23    said, Jane Davis is going to be taking over work on
24    this area of the case, and she's going to be
25    contacting you.  So that's how it happened.

Page 45

1        Q.  Had you ever done any work with or for
2    Dianne Davis before this case?
3        A.  No.  I don't even -- I don't even know how
4    she found my name.
5        Q.  When Dianne Davis contacted you, what -- what
6    was your initial interaction?
7        A.  To the best of my recollection was she
8    wanted -- she had a case of a patient that was on
9    Xarelto and had emergency-medicine related, you know,
10    issues and wanted me to review the case.
11        MS. HOFFMANN:  Doctor, I just want to caution
12    you at this point, you do not have to disclose
13    any specific conversations you've with the
14    attorneys who are representing you in this case.
15    BY MR. HONNOLD:
16        Q.  When you were retained, what was your initial
17    assignment, or what question was posed to you?
18        A.  I think when I was first contacted, I don't
19    remember there being a question posed to me.
20        Q.  So Dianne Davis, did she call you?
21        A.  I don't recall.
22        Q.  Okay.  At some point did you speak with her?
23        A.  Yes.
24        Q.  And your best recollection of that
25    conversation is that she said she was working on a

12 (Pages 42 to 45)

Protected - Subject to Further Protective Review

Page 46

1  case where a patient was on Xarelto, and that -- that
2  the subject matter or issues had something to do with
3  emergency medicine. Is generally a fair
4  characterization?
5      A. I think related to my speciality as a
6  prescriber and treater, you know, patients that are
7  on -- I don't remember the exact -- you know, exactly
8  what was said, but it was something to that effect.
9      Q. You've given depositions before today?
10     A. Yes, I have.
11     Q. On how many occasions?
12     A. I don't -- over the years, I've probably
13 given half a dozen to 30 or so depositions.
14     Q. A half dozen to 30, so can you --
15     A. I'm sorry, two dozen to 30. I'm sorry. My
16 apologies.
17     Q. Have you ever testified for a -- a
18 plaintiff --
19     A. Yes.
20     Q. -- who was --
21        Okay. In what sort of case?
22     A. Medical malpractice.
23     Q. So you have testified before that an
24 emergency room physician departed from the standard
25 of care in the treatment of a patient?

Page 47

1      A. Yes, I have.
2      Q. And that that departure from standard of care
3  caused injury to the patient?
4      A. I know I've -- I know I've testified to
5  standard of care. I'm not sure if I've testified to
6  causation for -- oftentimes I'm just asked about --
7  you know, to -- to opine on standard of care,
8  so . . .
9      Q. How many medical/legal cases have you
10 reviewed in your career?
11     A. Gosh, I've -- I'm not sure I have any way of
12 knowing that. I mean, I would probably say -- this
13 is a wild guess, so don't hold me to the number --
14 maybe 70 or 80.
15     Q. And when you look at a medical/legal case, I
16 take it you bill for your time; correct?
17     A. Yes, I do.
18     Q. And then when you bill for your time, is that
19 money that goes to you personally, or does it go to
20 your institution or department?
21     A. It goes to me personally.
22     Q. And moneys that are -- are paid for the work
23 that you do reviewing medical/legal cases, does it go
24 to a professional corporation or some sort of entity
25 or just -- just to Dr. Jones?

Page 48

1      A. It just -- to me as an individual.
2      Q. Have you ever reviewed an emergency medicine
3  case that dealt with issues related to management of
4  anticoagulation or dealing with a patient who was
5  excessively anticoagulated?
6         MS. CONKLIN: Object to the form.
7         MS. HOFFMANN: Object to form.
8         THE WITNESS: The only time I recall that
9  happening was very recently, I was contacted by
10 a -- an attorney representing a patient that had
11 had a bleeding complication on an anticoagulant.
12 And he was going to send me the case.
13 BY MR. HONNOLD:
14     Q. And was it sent to you?
15     A. I believe I have received it, but I'm not
16 sure I've reviewed it thoroughly.
17     Q. And do you know what the anticoagulant at
18 issue was in that case?
19     A. I believe it was Lovenox, enoxaparin.
20     Q. When that case was presented to you, was it
21 suggested that the patient had some renal
22 insufficiency or renal failure that might have caused
23 the bleeding complication to develop?
24        MS. CONKLIN: Object to the form.
25        THE WITNESS: I don't know any of the details

Page 49

1  of it at this point. I just know that kind of
2  generalization because that was what was told to
3  me in the -- you know, the initial letter or
4  whatever.
5  BY MR. HONNOLD:
6      Q. How was it that you started reviewing
7  medical/legal cases?
8      A. An attorney contacted me by e-mail out of the
9  blue, I think, around 2005 or '6 and asked me to
10 review a case.
11     Q. And so that was the first time that you would
12 have reviewed a medical/legal case?
13     A. Correct.
14     Q. How many open files do you have now in terms
15 of cases where you're doing ongoing work of some
16 sort?
17     A. I -- I don't really know because, you know, a
18 lot of these things, I don't even get any follow-up
19 on. I would say of cases that seem to have had some
20 activity in the last 12 months, maybe 10, 15.
21     Q. So there are 10 to 15 medical/legal cases
22 that have had -- that you are working on that have
23 had some activity over the past month; is that
24 correct?
25     A. I think --

13 (Pages 46 to 49)

Protected - Subject to Further Protective Review

Page 50

1      MS. CONKLIN: Object to the form.
2      THE WITNESS:  I think I said the last year.
3  BY MR. HONNOLD:
4      Q.  Oh, last year?
5      A.  Yeah, last year.
6      Q.  Okay.  So the last year, you've had activity
7  on 10 to 15 medical/legal cases; is that a fair
8  statement?
9      A.  That's a guess, but I don't keep up with this
10  stuff very closely, so . . .
11      Q.  Who does your billing?
12      A.  Well, my wife creates the invoices, and I
13  send them out.
14      Q.  And so your wife prepared the invoices in
15  this case?
16      A.  Yeah -- yes, sir.  She -- she does the -- the
17  document, and then I send it out.
18      MR. HONNOLD:  Is there a way we can take a
19  quick break so you can make me a copy of these?
20      MS. CONKLIN:  I've --
21      MR. HONNOLD:  Or you've got --
22      MS. CONKLIN:  I've got two copies exactly,
23  so . . .
24      MR. HONNOLD:  Great.  Thank you.
25      (Jones Exhibit 1 was marked for

Page 51

1  identification.)
2      (Jones Exhibit 2 was marked for
3  identification.)
4      (Jones Exhibit 3 was marked for
5  identification.)
6      (Jones Exhibit 4 was marked for
7  identification.)
8      (Jones Exhibit 5 was marked for
9  identification.)
10      (Jones Exhibit 6 was marked for
11  identification.)
12  BY MR. HONNOLD:
13      Q.  Doctor, I'm going to hand you what we've
14  marked as Deposition Exhibits 1 through 6.  What are
15  these materials?
16      A.  These appear to be invoices that I have
17  issued.
18      Q.  Is that all of the billing invoices that
19  you've issued in this case?
20      A.  It appears to be, yes.
21      Q.  And is there work that you have performed in
22  this case that has not yet been billed or invoiced?
23      A.  Yes.  Just some preparation work for this
24  deposition.
25      Q.  How much additional time would that be?

Page 52

1      A.  I don't really know.  Maybe seven, eight
2  hours, something like that.
3      Q.  So you've got an additional seven to eight
4  hours that would be billed that would bring you
5  current up to the time of starting today's
6  deposition?
7      A.  That's a -- a pretty close estimate, yes.
8      Q.  So if you include that seven or eight hours,
9  how many -- how many hours in total have you spent
10  working on this matter?
11      A.  It looks like -- you said including those
12  seven to eight hours?
13      Q.  Yes.
14      A.  It looks like 36 to 37 hours.
15      Q.  And so you got to that 36 or 37 hours by
16  adding up the hours that are reflected on Exhibits 1
17  through 6 and then adding the seven or eight that we
18  discussed previously?
19      A.  Correct.
20      Q.  And the -- in Exhibit 1, there's described a
21  meeting with -- with Dana Davis.  That's -- that's
22  Dianne Davis that we discussed earlier; is that
23  right?
24      A.  Yes, I think so.
25      Q.  Where did that meeting take place?

Page 53

1      A.  We met at a restaurant, coffee shop, in
2  Jackson.
3      Q.  Then the meeting that is reflected in
4  Exhibit 3, where did that take place?
5      A.  I believe it was here at this law firm.
6      Q.  And we're at the Bradley Arant law firm
7  today?
8      A.  That's correct.
9      Q.  Okay.  What law firms in Jackson have you
10  done medical/legal work for or with over the years?
11      A.  I want to say the only one in Jackson I've
12  done work for is Horton, Coker & Bell, but that was
13  a -- I think that was some -- a -- a disability
14  issue.  There may be another one, but I'm --
15  sometimes I don't know exactly are the firms are.
16      Q.  This six-hour meeting that is reflected on
17  Exhibit 4, where did that meeting take place?
18      A.  I believe it took place here.
19      Q.  And the meeting there on Exhibit 4, who was
20  that meeting with?
21      A.  I don't recall.
22      Q.  Do you recall who the meeting was with that's
23  shown on Exhibit 3?
24      A.  I think that meeting was with Jane Davis.
25      Q.  The meeting that's reflected on Exhibit 5,

14 (Pages 50 to 53)

Protected - Subject to Further Protective Review

Page 54

1  where did it occur and who was it with?
2      A.  I think it occurred here, and I do not recall
3  who it was with.
4      Q.  Was it with one lawyer or more than one?
5      A.  I don't recall, in person, if it was one or
6  more than one.  I know that some of the meetings have
7  also had teleconferences, and I just cannot recall
8  exactly which one was which.
9      Q.  But on Exhibit 5, that was a -- an in-person
10 meeting; right?
11     A.  Yes.
12     Q.  Because when it's a teleconference, you list
13 that out?
14     A.  Correct.
15     Q.  And then how was the seven to eight hours of
16 additional work before the deposition today --
17 what -- what did you do during that time?
18     A.  There were a couple of meeting -- in-person
19 meetings, and then there was some just reading on my
20 part.
21     Q.  And the -- the couple of in-person meetings,
22 who were those with?
23     A.  Various of the attorneys that are involved in
24 this.
25     Q.  What are the names you recall?

Page 55

1      A.  I don't think Jane came to either one of
2  these.  These individuals with us today have come to
3  them, and it seems like there might be someone I'm
4  forgetting, but I can't remember off the top of my
5  head.
6      Q.  So some of the meetings, there might have
7  been as many as three lawyers present?
8      A.  I don't remember there ever being three
9  physically present.  I think the most I remember
10 being physically present is two, but I know there's
11 been some teleconferences also.
12     Q.  So there might have been times when there
13 were two lawyers physically present and then an
14 additional lawyer on the phone?
15     A.  That's possible.
16     Q.  You mentioned you did some additional
17 reading.  What -- what reading did you do?
18     A.  Just looking through the -- you know,
19 records, Ms. Mingo's medical records, and looking at
20 my report.
21     Q.  What might explain the difference in a PT
22 level in a patient that's on Rivaroxaban of a PT, for
23 example, of 14 versus 26?  What -- what are the
24 things that might -- in the same patient, what are
25 the things that might explain a patient having a PT

Page 56

1  at one point of 14 and a patient at another time of
2  26?
3          MS. CONKLIN:  Object to the form.
4          MS. HOFFMANN:  Objection to form.
5          THE WITNESS:  I would say that the
6  inconsistency with how the particular reagent
7  interacts with the Rivaroxaban is one, probably
8  would be the most obvious explanation I can think
9  of.
10 BY MR. HONNOLD:
11     Q.  Let's talk about testing being done with the
12 same reagent, though.  Other than that.
13     A.  Well, I think that's still -- even testing
14 being done with the same reagent, that -- it's still
15 possible that you can get -- I mean, there's
16 variability within the same test.  So it's possible
17 that you could get differences in the test from that.
18          Otherwise, you know, clinically, there would
19 be no thought process behind whether it's 14 or 26.
20 It just means that there's some drug on board,
21 so . . .
22     Q.  Could the difference in the same patient
23 between the -- when the PT is 14 versus a PT of 26,
24 using the same reagent, could that be explained by
25 differences in plasma concentration levels?

Page 57

1          MS. HOFFMANN:  Objection.
2          MS. CONKLIN:  Object to the form.
3          THE WITNESS:  I think that probably gets
4  beyond where, you know, my knowledge is able to
5  say that.  I mean, I would probably say that my
6  understanding of the PT test, in general, is that
7  it simply gives me an indication -- in the way I
8  use it, it simply gives me an indication that
9  there's some drug on board.  I don't use it to
10 quantify a concentration or an activity.
11 BY MR. HONNOLD:
12     Q.  So -- so in terms or your present
13 understanding about Rivaroxaban, then, is it -- is it
14 your view, then, or your position, that you don't
15 know whether differences in a PT, using the same
16 reagent and the same patients, could be or might be
17 explained by differences in plasma concentration
18 level?
19          MS. CONKLIN:  Object to the form.
20 BY MR. HONNOLD:
21     Q.  And -- and if it's you don't know, that's
22 fine.  And I'll move on.
23     A.  Well, I'm -- I'm telling you how I use it
24 clinically.  But I'm not on expert in plasma
25 concentrations of the drug and how they interact and

Protected - Subject to Further Protective Review

Page 58

1    how they have effect on PT.
2         The way I use it clinically is I order that
3    test. If the test is elevated, it -- it indicates to
4    me that they have been -- that they are -- that they
5    have some drug in their system.
6         But whether I use that to quantify how much
7    or how much activity there is, I don't. And I think
8    the general clinician does not.
9    Q. And I -- I appreciate that. But I'm not sure
10   it's responsive to my question. But I -- but thank
11   you for sharing that with me.
12        So can you tell me whether or not variations
13   in a patient's plasma concentration level of
14   Rivaroxaban can result in a different PT level?
15        MS. CONKLIN: Object to the form.
16        Counsel, he's not offered as an expert in PT
17   levels.
18        MR. HONNOLD: Well, he sure talks about it in
19   his report. So that's what I want to get to. I
20   want to understand what his knowledge is about --
21        MS. CONKLIN: Well, you can show him his
22   report and ask him.
23        MR. HONNOLD: Well, we'll get to that,
24   believe me.
25        THE WITNESS: I'm sorry. Could you repeat

Page 59

1    the question?
2    BY MR. HONNOLD:
3    Q. Yes.
4         Is it possible that one reason that a patient
5    might have a different PT, for example, 26 versus 14,
6    same patient, using the same reagent, that one
7    possibility that might explain that is different
8    plasma concentration levels of the drug?
9         MS. CONKLIN: Object to the form.
10        THE WITNESS: All I can really tell you is
11        how I interact with the, you know, patients and
12        use that information clinically. And clinically,
13        it's not something that I think about, is what
14        the concentration of the drug is.
15   BY MR. HONNOLD:
16   Q. Okay.
17   A. So I'm -- I -- that's about the best answer I
18   can give you to that question.
19   Q. Okay. So tell me, do you know, one way or
20   the other, whether varying degrees of plasma
21   concentration can result in different PT test
22   results?
23        MS. CONKLIN: Objection.
24        THE WITNESS: I don't really have an opinion
25   about that, one way or the other.

Page 60

1    BY MR. HONNOLD:
2    Q. Okay.
3    A. I don't use that -- it's not something that I
4    use in my clinical practice.
5    Q. So do you know one way or the other? And if
6    you don't know, that's fine.
7         MS. HOFFMANN: Objection.
8         THE WITNESS: I don't have an opinion about
9    it.
10   BY MR. HONNOLD:
11   Q. I'm not asking if you have an opinion. I'm
12   asking you if you know.
13        MS. CONKLIN: Object to the form. It's asked
14   and answered.
15        THE WITNESS: I mean, I would say probably
16   the same thing. I don't -- I don't really have
17   an opinion about whether a concentration changes
18   PT level.
19   BY MR. HONNOLD:
20   Q. Okay. So all of those articles that you
21   cited in your report in the reliance list, do any of
22   those say anything about that issue?
23        MS. CONKLIN: Object to the form.
24        THE WITNESS: Some of them talk about PT.
25   Some of them talk about drug concentration.

Page 61

1    BY MR. HONNOLD:
2    Q. Do any of those articles state that, yes,
3    varying degrees of plasma concentration can result in
4    different PT test results?
5         MS. CONKLIN: Object to the form.
6         If you want to show him an article that says
7    that, you can put it in front of him.
8         THE WITNESS: I was going to say, I don't --
9    I don't have the articles memorized, but I'm
10   happy to look at one in particular that --
11   BY MR. HONNOLD:
12   Q. Okay. As you sit right now, can you recall
13   whether any of the literature that you looked at and
14   cited that's on your reliance list in this case, does
15   state that different levels of plasma concentration
16   can result in different PT test results?
17        MS. CONKLIN: Object to the form.
18        THE WITNESS: I don't have them memorized, so
19   I can't -- I can't tell you one way or another.
20   I can look at an article, if you want me to.
21   BY MR. HONNOLD:
22   Q. We talked about before that -- that a patient
23   may have varying levels of plasma concentration after
24   they take Rivaroxaban. Do you recall my questions in
25   that regard?

16  (Pages 58 to 61)

Protected - Subject to Further Protective Review

Page 62

1    MS. HOFFMANN: Objection.
2    THE WITNESS: I recall you asking some
3  questions about that.
4  BY MR. HONNOLD:
5    Q. Right.
6    And you said that at two- to three-hours,
7  your expectation would be that they might be kind of
8  at the peak plasma concentration level after the
9  dose, and that as they eliminate and metabolize the
10  dose, the plasma concentration would go down;
11  correct?
12    A. I'd say that's a very general understanding.
13  Again, I'm not -- I've said this before, I'm not a
14  pharmacologist. I wasn't asked to give pharmacologic
15  opinions about concentrations and dosing and -- you
16  know.
17    So I believe there are other experts you can
18  ask those questions. I don't really -- I'm making
19  very general statements that, you know, I don't have
20  in-depth knowledge of.
21    Q. So in a particular patient on -- well, strike
22  that.
23    Do you describe Rivaroxaban for patients?
24    A. Yes.
25    Q. Okay. So in a patient who's taking

Page 63

1  Rivaroxaban, if you perform a PT test when a patient
2  is at peak plasma or serum concentration level
3  versus, in that same patient, perform at a PT when
4  they are at -- at trough, 20 to 24 hours afterwards,
5  would those PT results be different?
6    MS. CONKLIN: Object to the form.
7    THE WITNESS: I -- I don't really know if
8  they're going to be different or not.
9  BY MR. HONNOLD:
10    Q. Currently, what's the nature of your practice
11  in terms of how you spend your professional time?
12    A. Well, I practice clinically in the emergency
13  department, seeing patients and overseeing residents
14  who are seeing patients. I do that probably 30 to
15  40 percent of my time.
16    I have administrative responsibilities as the
17  chair of the department of emergency medicine. So
18  that's overseeing the administration of the
19  physicians, residents, staff, and the operations of
20  the emergency department. I probably do that about
21  30 percent.
22    And then I do clinical research where I see
23  patients, enroll patients in clinical trials, and
24  follow them throughout their hospital stay. And I
25  probably do that 30 percent of my time.

Page 64

1    Q. In terms of your direct patient care, are you
2  working, actually assigned -- assigned shifts in the
3  emergency room?
4    A. Yes.
5    Q. And who does your staffing or scheduling in
6  your department or group?
7    A. We have one of the physicians on the faculty
8  who does the scheduling.
9    Q. And then does your emergency medical
10  department have its own professional corporation for
11  purposes of its own revenue or income generation?
12    MS. CONKLIN: Object to the form.
13    THE WITNESS: No. We're a part of the
14  University of Mississippi Medical Center. It's
15  not a separate physician group.
16  BY MR. HONNOLD:
17    Q. So there isn't any private physician
18  ownership or management of the emergency department
19  at the University of Mississippi?
20    A. No.
21    Q. And when you are working in the emergency
22  room, then, for that 30 to 40 percent of the time
23  that you mentioned, is that three shifts a week, four
24  shifts a week, or does it vary?
25    A. It varies kind of depending on the need of

Page 65

1  the -- needs of the department.
2    Q. And in terms of patients, would you be
3  assigned individual patients who might come to the
4  emergency department?
5    A. Yes.
6    Q. And based upon your seniority and background
7  and experience, are you assigned particular types
8  of -- of cases or patients, or do you essentially see
9  all comers, like everybody else might?
10    A. We see all comers. I -- the way our ED is --
11  is organized, we have four different care areas. And
12  typically, a team of physicians is assigned to a care
13  area, which consists of 15 to 18 beds. And then any
14  patient that is roomed in those beds, we see. So we
15  don't really have, you know, any input into what
16  types of patients they are.
17    Q. Have you ever filled out and sent in a drug
18  adverse event report?
19    A. Only for clinical trials, when I had to
20  report adverse events related to a clinical trial.
21    Q. And for what medications have you reported
22  adverse events in clinical trials?
23    A. So the largest trial I have ongoing right now
24  uses glucose carnitine in patients with septic shock,
25  and so some related to that.

17 (Pages 62 to 65)

Protected - Subject to Further Protective Review

Page 66

1    And then I've participated in a trial of
2  inhaled nitric oxide for pulmonary embolism, and
3  submitted some for that.
4    And then participated in a trial for the use
5  of serelaxin in patients with heart failure, and we
6  submitted some for that.
7    I have to say, though, I need to clarify your
8  question. I don't think I've ever had to fill out
9  a -- a form and send to the FDA for a unexpected
10  related, serious adverse event.
11    I've just reported -- the definition of an
12  adverse event in a clinical trials is -- is much more
13  broad. So we report those to the sponsor, not to
14  the -- not to any regulatory body. And then we
15  report them to our IRB, our local IRB.
16    Q. So in all your years of practice, you --
17  for -- for any drug, you've never filled out an
18  adverse event report and -- and sent it to the FDA?
19    MS. CONKLIN: Object to the form.
20    THE WITNESS: I have not, not that I recall.
21  BY MR. HONNOLD:
22    Q. Okay. You've never filled out a drug watch
23  form as a practicing physician?
24    A. No.
25    Q. What's your understanding of the criteria for

Page 67

1  filling out a drug watch report?
2    A. Gosh, I -- I don't know if I know the exact
3  criteria. I would -- if I recall correctly, if -- if
4  you -- you suspect there is some life-threatening or
5  serious adverse event related to -- directly related
6  to a medication.
7    Q. And you've never seen such an event in all of
8  your years of practice?
9    MS. CONKLIN: Object to the form.
10    THE WITNESS: Not one -- not one that I can
11  recall being unexpected.
12  BY MR. HONNOLD:
13    Q. So your view is, is that for drug watch or
14  MedWatch reports, it is only for the reporting of
15  unexpected events?
16    MS. HOFFMANN: Objection.
17    THE WITNESS: Again, I don't -- I don't have
18  in-depth understanding of MedWatch form -- forms
19  and reporting.
20  BY MR. HONNOLD:
21    Q. Have you ever reported the failure of any
22  type of medical device, either to the FDA or to your
23  hospital or hospital administration or risk
24  management?
25    A. No.

Page 68

1    Q. How many hospitals do you have privileges at
2  now?
3    A. I have privileges at two hospitals.
4    Q. Which ones?
5    A. The University of Mississippi Medical Center
6  and University of Mississippi Medical Center
7  Lexington.
8    Q. Other than the report that you prepared in
9  this case, have you before, in your capacity as
10  serving as an expert witness, prepared a written
11  report?
12    MS. HOFFMANN: Objection.
13    THE WITNESS: Yes.
14  BY MR. HONNOLD:
15    Q. And so I take it, then, that preparing an
16  expert report was not something that -- when you
17  entered into that work in this case, it was something
18  that you were generally familiar with?
19    A. Yes.
20    Q. You understand that the purpose of the report
21  was to set forth your opinions in this case clearly
22  so that I would have some notice, or we would have
23  some notice as to what you would be testifying to in
24  this case; correct?
25    MS. CONKLIN: Object to the form.

Page 69

1    MS. HOFFMANN: Object.
2    THE WITNESS: That's my general
3  understanding.
4  BY MR. HONNOLD:
5    Q. And if I wanted to know generally what your
6  opinions were in this case, would be -- would
7  be going to your report and reading it would be
8  the -- would that be the best source of that
9  information?
10    A. I would say yes and -- and questioning me
11  like you're doing today.
12    Q. But your view is, in terms of the report that
13  you prepared, it -- it -- it now contains generally
14  your opinions in this case; correct?
15    A. Yes, I would say that's correct.
16    Q. And other than responding to the questions
17  that I might ask you, though, it -- it -- do you have
18  any opinions that you are planning to offer in this
19  case that are not set forth in your report?
20    A. Not that I'm aware of, no.
21    Q. Have you ever testified in a -- a
22  pharmaceutical case where the lawsuit was a plaintiff
23  who claimed to have been injured related to a
24  particular pharmaceutical product?
25    MS. CONKLIN: Object to form.

18 (Pages 66 to 69)

Protected - Subject to Further Protective Review

Page 70

1      THE WITNESS: Yes, I have.
2  BY MR. HONNOLD:
3      Q.  Okay.  And tell me about those cases.
4  What -- what were the circumstances?
5      A.  There was a -- some suits that were filed
6  that were related to whether therapeutic doses of
7  Tylenol caused acute liver failure.  And I'm -- I
8  don't know how many cases there were, but there -- I
9  was asked to review a couple of cases in my capacity
10  through my research with sepsis, because there was
11  some uncertainty as to whether sepsis was the
12  etiology of the liver injury or whether it was
13  Tylenol.
14      Q.  And who were you reviewing those cases on
15  behalf of?
16      A.  I was -- I was contacted by a lawyer who
17  worked out of New York for Butler Snow.
18      Q.  Have you met with or spoken with any Butler
19  Snow lawyers on cases other than the Tylenol cases?
20      A.  No.
21      Q.  Can therapeutic doses of Tylenol cause liver
22  failure?
23      MS. CONKLIN:  Objection to form.
24      MS. HOFFMANN:  Objection.
25      And I just want to caution, if you signed any

Page 71

1  kind of confidentiality order in that case, you
2  need to keep that in mind.
3      And I don't know the answer, but I've had
4  your experts do the same thing --
5      MR. HONNOLD:  I'm asking him as a doctor.
6      MS. HOFFMANN:  And if he can't separate his
7  knowledge from what he learned in review of
8  confidential information in litigation, I think
9  that's a foundational issue.
10      And, Brad, I'm only saying that because when
11  I deposed Dr. Rinder, he brought up the same
12  issue, he could not separate his knowledge, where
13  he had been retained as an expert, reviewed
14  confidential information, and just flat wasn't
15  able to separate the two.
16      And I think in all fairness to this doctor,
17  that question needs to be asked first.
18      MR. HONNOLD:  Okay.  I -- I don't know how to
19  ask it other whether therapeutic doses of Tylenol
20  can cause liver failure.
21      MS. HOFFMANN:  And, Doctor, if you can't
22  answer that question without separating in your
23  mind the confidential information that you
24  reviewed in the course of litigation, then you
25  need to keep that in mind, particularly if the

Page 72

1  confidential information you were given, you
2  signed a confidentiality order for.
3      THE WITNESS:  I do think I had to sign a
4  confidentiality order.  And I'm not an attorney,
5  and I don't know what all that encompasses.  So
6  maybe it's best if I don't answer questions
7  related to that.
8  BY MR. HONNOLD:
9      Q.  Okay.  Generally, as -- as an emergency
10  medicine physician, are you aware of what are the
11  known potential causes of liver failure?
12      A.  Yes.
13      Q.  And it's something that you learned -- some
14  of that you learned in medical school; right?
15      A.  That's correct.
16      Q.  Some of it you learned in your residency;
17  right?
18      A.  Yes.
19      Q.  Some of it you learned in your postgraduate
20  training that you had, as well as your ongoing
21  clinical experience; correct?
22      A.  Yes.
23      Q.  Some of those things about known causes of
24  liver failure, you've learned through continuing
25  medical education and keeping up-to-date with medical

Page 73

1  literature; right?
2      A.  That's correct.
3      Q.  There's certain publications and things that
4  you subscribe to and review on a regular basis;
5  correct?
6      A.  Yes.
7      Q.  That would be part of your professional
8  duties, as being a -- the head of emergency medicine
9  at the University -- or chairman of emergency
10  medicine at the University of Mississippi; correct?
11      A.  No.  It's part of my responsibility as a
12  physician.
13      Q.  Okay.  And -- and based upon all of that
14  intake that you've had in terms of information about
15  the known possible causes of liver failure, have you
16  seen or heard, in the context of that work, that
17  Tylenol -- therapeutic doses of Tylenol can cause
18  liver failure?
19      MS. CONKLIN:  Object to the form.
20      MS. HOFFMANN:  Same -- same objection, with
21  the caution that what you weren't asked is
22  whether you also learned some information in the
23  review of confidential documents in the course of
24  your retention as an expert witness in the
25  Tylenol litigation and whether or not you can

19 (Pages 70 to 73)

Protected - Subject to Further Protective Review

Page 74

1    separate out your other sources of information
2    from what you may or may not have learned through
3    the review of confidential documents.
4        THE WITNESS:  In -- in my -- this is about
5    all I can say about it is, in my capacity, in my
6    training and, you know, my knowledge and my
7    reading, I've never seen any scientific evidence
8    to show that that occurs.
9    BY MR. HONNOLD:
10       Q.  So if a patient asked you that, you would
11   say, I'm -- I'm not aware of any scientific evidence
12   that would suggest that?
13       A.  I would say that, and I'd say I take therapy
14   doses of Tylenol myself and don't have any concern
15   that it's going to cause liver failure.
16       Q.  Well, that doesn't rule out that it might
17   happen in other patients; right?
18       MS. HOFFMANN:  Objection.
19       MS. CONKLIN:  Object to the form.
20   BY MR. HONNOLD:
21       Q.  I mean, that's not a scientific assessment;
22   right?
23       A.  I mean, it's scientific inasmuch as I have
24   evidence of an N of one.
25       Q.  Do you ever -- I mean, other than published

Page 75

1    in a case report, I mean, do you ever write on --
2    have you ever conducted a -- a clinical trial where
3    there was only one -- one subject?
4        MS. HOFFMANN:  Objection.
5        THE WITNESS:  Well, that's not a clinical
6    trial.  But patients rely upon physicians and
7    their experience and their, you know, advice.
8    And whether that advice is anecdotal, personal
9    advice or whether it's scientific advice, it's
10   still an important piece of information that a
11   physician offers a patient.
12   BY MR. HONNOLD:
13       Q.  The -- the reference list that you've
14   attached to your report, how was that arrived at or
15   created?
16       A.  Some of those references were provided to me
17   in the course of the litigation, and some of them I
18   had previously had knowledge of or I came across
19   in -- in the course of writing my report.
20       Q.  I'm going to hand you what we've marked as
21   Exhibit 7.
22       (Jones Exhibit 7 was marked for
23   identification.)
24   BY MR. HONNOLD:
25       Q.  What is that document?

Page 76

1        A.  This appears to be my report.
2        MR. HONNOLD:  Do you all want one of these?
3    It's copied on only one side, so it's much --
4    you've got one?
5    BY MR. HONNOLD:
6        Q.  And this is the report that we mentioned
7    earlier.  This -- this contains all of your opinions
8    that you have in this case; is that right?
9        A.  To the best of my knowledge, yes.
10       Q.  And what I'd like to do is go to that
11   reference list, which is marked separately as
12   Exhibit D at the back of the report.
13       Do you have that before you?
14       A.  Yes.
15       Q.  Can you tell -- and -- and I apologize.
16   The -- the one I've handed you and that I have copied
17   for everyone, it has some of my writing on it.  I
18   brought one that I didn't -- I -- the one I copied, I
19   didn't realize that I had some of my notes on it.  So
20   I apologize with that.  We may replace it with a
21   clean one in terms of what's actually marked for the
22   record.
23       Can you tell from looking at the reference
24   list which of the articles were ones that were
25   provided to you and which are the ones that you

Page 77

1    either found or came across in your -- that you
2    either had or came across in your work on the case?
3        A.  I really cannot.
4        Q.  So in terms of looking at the references that
5    go down through Number 37, you -- there's no way
6    today that you can tell which ones were provided to
7    you and which ones you might have had or found on
8    your own?
9        MS. CONKLIN:  Object to the form.
10       THE WITNESS:  No.
11   BY MR. HONNOLD:
12       Q.  And when you say that some were provided to
13   you, who provided some of the references to you?
14       A.  They were sent to me with some of the other
15   records and depositions and various information that
16   I received.
17       Q.  So they were sent to you by the lawyers?
18       A.  Yes.
19       Q.  Before your work on this case, did you have
20   some preexisting file on Rivaroxaban?
21       A.  I wouldn't say that I had a file.  I mean, I
22   had some articles that I had read relating to them --
23   relating to the medication.
24       Q.  But did you actually have those copies that
25   were archived somewhere, either in paper or

20  (Pages 74 to 77)

Protected - Subject to Further Protective Review

Page 78

1  electronic form, before you started your work on this
2  case?
3      MS. CONKLIN:  Object to the form.
4      THE WITNESS:  I think I may have had some.
5  I, at this point, can't recall what I had and
6  received.
7  BY MR. HONNOLD:
8      Q.  And is there any way that you can tell which
9  are the ones that you -- that you might have had
10  before?
11      MS. HOFFMANN:  Objection.
12      THE WITNESS:  I don't think so.  There might
13  also be some overlap.  I mean, I might have had
14  some of the ones that were provided to me.
15  BY MR. HONNOLD:
16      Q.  Over the past few years, what are the medical
17  publications that you would say that you review or
18  look at on a -- on a frequent or regular basis?
19      A.  Well, let's see.  In my -- in my memberships
20  to various organizations, I receive Annals of
21  Emergency Medicine, Academic Emergency Medicine,
22  Journal of Emergency Medicine, Critical Care
23  Medicine, JAMA.  Those might be the -- the journals
24  that I receive regularly.
25      Of course, I -- I have subscriptions to

Page 79

1  various list serves and search engines that will --
2  will send new articles that are published across
3  various specialities that -- that I review and, you
4  know, look to see if there's something of interest
5  that I might want to read about.
6      Q.  Do you use UpToDate in your practice?
7      A.  No.
8      Q.  Do you know what UpToDate is?
9      A.  Yeah.  It's an online textbook.
10      Q.  In terms of just the breakdown of these
11  references, you know, the literature references that
12  are 1 through 37, do you have some sense for how many
13  of the 37 were provided by the lawyers?
14      MS. HOFFMANN:  Objection.
15      THE WITNESS:  Not really.
16  BY MR. HONNOLD:
17      Q.  Do you have correspondence in your possession
18  that would show which articles were sent to you by
19  the lawyers?
20      MS. CONKLIN:  Object to the form.  The
21  correspondence is privileged.
22      THE WITNESS:  I don't believe I have any
23  correspondence that breaks it down or shows that.
24  BY MR. HONNOLD:
25      Q.  So when they sent you -- when the lawyers

Page 80

1  sent you the articles, did they send them to you in
2  paper form?
3      A.  Yes.
4      Q.  And so when you got them in paper form, was
5  there -- was there some sort of -- of table of
6  contents or list of the articles that were sent?
7      A.  Not that I recall.
8      It was just a stack of articles?
9      A.  I think so.
10      Q.  Were they all sent to you at one time, or
11  were they sent to you over a period of time in -- in
12  multiple batches?
13      MS. CONKLIN:  Object to the form.
14      THE WITNESS:  I do not recall.  I've received
15  various documents over time, and I just can't
16  remember when they came or what came when.
17  BY MR. HONNOLD:
18      Q.  Did you actually conduct some sort of medical
19  literature search as part of your work on this case?
20      A.  I did look at some articles -- various
21  articles, read various things.  I guess that
22  qualifies as -- as a literature search.
23      Q.  Well, how did you define the universe of
24  things that you looked at?  How did you get there?
25      A.  Well, I typically use PubMed as my source --

Page 81

1  as my source of information.  And I'm not sure
2  exactly which search terms I used when I went into
3  PubMed.  But that's -- that's where I go to find
4  information, scientific information.
5      Q.  And so search term, what you're talking about
6  is what -- what you would actually type into the box
7  at the top of the screen?
8      A.  Right.
9      Q.  Okay.  What -- what would have -- what were
10  the types of things that you were looking for when
11  you conducted your -- your PubMed search in this
12  case?
13      A.  Obviously, something related to Rivaroxaban.
14  I'm not -- I don't recall exactly the specific -- you
15  know, when I went, what specific information I was
16  looking for or -- you know, if it was general or if
17  it was specific, I don't recall.  I've probably done
18  several searches, I would guess.
19      Q.  Well, based upon, I guess, the -- the nature
20  of this case and the -- and the scope of the report
21  and the opinions that you set forth therein, what --
22  do you have now, in retrospect, any idea as to the
23  types of things that you would have been putting into
24  the search term box on PubMed?
25      MS. CONKLIN:  Object to the form.

21 (Pages 78 to 81)

Protected - Subject to Further Protective Review

Page 82

1    MS. HOFFMANN: Objection.
2        THE WITNESS: All I can tell you is that they
3    had to have been related to Rivaroxaban. I don't
4    remember specifically, otherwise, what search
5    terms I used.
6    BY MR. HONNOLD:
7    Q. All right. So fair to state that you --
8    you -- one of the search terms that you might have
9    used would have been Rivaroxaban or the term "NOAC"?
10       MS. CONKLIN: Object to the form.
11       THE WITNESS: Probably did not use the term
12   "NOAC." And I probably did use the term
13   "Rivaroxaban" because, typically, in scientific
14   writing, that -- it's usually -- usually
15   publications refer to the -- generic name of
16   the -- of a medication.
17   BY MR. HONNOLD:
18   Q. At any time in preparation of your report,
19   did you -- did you have next to or were you looking
20   at sources or material other than the medical records
21   when you were actually preparing your report?
22       MS. CONKLIN: Object to the form.
23       THE WITNESS: Gosh, I remember, when I was
24   preparing my report, having a whole lot of stuff
25   around me on a big table. I mean, I think, you

Page 83

1    know, the majority of my -- the information in my
2    report was -- came from the medical record and my
3    opinion. But whether there was other stuff
4    around me physically or whether I referenced
5    something else, I'm -- I don't recall.
6    BY MR. HONNOLD:
7    Q. Well, that's what I'm trying to get at. Were
8    there -- were there particular articles in the
9    reference list that you did look at and rely upon for
10   information in preparing your report?
11   A. It's possible, and I just don't -- can't tell
12   you what exactly -- which ones they were.
13   Q. Okay. Why -- why didn't you footnote
14   anything?
15       MS. CONKLIN: Object to the form.
16       THE WITNESS: It's not typically the way I
17   write those reports.
18   BY MR. HONNOLD:
19   Q. As you look at your reference list attached
20   to your report, Exhibit 7, is there any way that you
21   can tell which of those references, 1 through 37,
22   that you would have relied upon to some degree and
23   incorporated into your report?
24   A. Probably not.
25   Q. When you were preparing your report on issues

Page 84

1    related to Rivaroxaban, did you use and rely upon the
2    package insert or labeling for Xarelto to any degree?
3    A. It's possible. I don't specifically recall.
4    I mean, I know that was part of the documents that I
5    had in my possession and -- at -- at the time I was
6    making my report.
7    Q. Who typed up the reference list?
8    A. I believe the reference list was compiled --
9    I sent or provided a -- a list of references, and --
10   and then a list -- a list was -- that was added to a
11   list of what I had been provided. I'm not sure who
12   actually created the final reference list.
13   Q. Okay. So you -- you did -- you did not
14   create the final reference list?
15   A. I asked that the references I had been sent
16   be -- be put in a document, and then that the
17   references that I had -- that I wanted put in the
18   document be added to that, because by the time I was
19   ready to create that list, I -- I was having a hard
20   time knowing, you know, the interplay between those
21   two things.
22   Q. What is the significance of the reference
23   list, or -- or for what purpose was it prepared and
24   attached to the report?
25   A. There -- it's a list of references that I

Page 85

1    think could potentially -- and, again, this -- might
2    get this legally wrong, because I'm not a lawyer --
3    but could potentially be used in the course of my
4    opinions related to the -- what I have in my report.
5    And I don't understand all the rules of federal and
6    state and all that litigation.
7    Q. So what's the significance of any given
8    reference item being on the list? What --
9        MS. CONKLIN: Object to the form.
10   BY MR. HONNOLD:
11   Q. -- what does it mean if -- if a particular
12   article is on your reference list?
13       MS. CONKLIN: Object to the form.
14       THE WITNESS: It might mean that there's some
15   information in that potentially would be
16   pertinent that I would want to use or point out
17   in some specific circumstance, if I was asked a
18   specific question.
19   BY MR. HONNOLD:
20   Q. Would it be fair to state that it's your
21   belief that the reference -- the -- the items on the
22   reference list generally support your opinions in
23   this case?
24       MS. HOFFMANN: Objection.
25       THE WITNESS: I would just -- I would just

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 86

1    say that they're -- it's -- a lot of it is
2    general information about the subject of the
3    case. There -- there are some of the articles
4    that support my opinions, but, you know, it's a
5    lot of information. So a lot of it is just
6    general information about the -- the issues in
7    the case.
8    BY MR. HONNOLD:
9        Q.   Are there any of these articles, reference
10   Numbers 1 through 37, that you believe to be
11   generally reliable?
12       MS. CONKLIN: Object to the form.
13       MS. HOFFMANN: Objection.
14       THE WITNESS: They're just information. I
15   don't -- I don't know, you know, how to answer
16   whether it's reliable or not. I mean, there's a
17   ton of scientific evidence out there. So, I
18   mean, the reliability of it depends on the
19   individual article, but I don't -- can't make a
20   general statement something is or is not
21   reliable.
22   BY MR. HONNOLD:
23       Q.   Any of the particular reference items that
24   you consider to be authoritative?
25       MS. HOFFMANN: Objection to form.

Page 87

1        MS. CONKLIN: Objection.
2        THE WITNESS: I would probably answer that
3    question the same way.
4    BY MR. HONNOLD:
5        Q.   Okay. So I -- I just want to make -- make
6    sure I'm clear, then, that in terms of reference
7    items 1 through 37, there aren't any of those
8    references that you are stating or representing are
9    authoritative, in your view?
10       MS. HOFFMANN: Objection.
11       MS. CONKLIN: Object to form.
12       THE WITNESS: Authoritative of one versus
13   another, I would say no.
14   BY MR. HONNOLD:
15       Q.   Is there one or more items on the reference
16   list that you could identify as being specifically
17   authoritative on a -- a particular concept or issue?
18       MS. CONKLIN: Object to the form.
19       THE WITNESS: No, not -- not one that's
20   particularly authoritative or reliable more than
21   another one.
22   BY MR. HONNOLD:
23       Q.   If there is an item on the reference list,
24   does that mean at some point, you actually did have
25   in your physical possession a -- complete paper

Page 88

1    copy of the reference or article?
2        MS. CONKLIN: Object to the form.
3        THE WITNESS: Yes, I had in my possession a
4    physical copy of everything that is in -- that is
5    here.
6    BY MR. HONNOLD:
7        Q.   Did you do any notation or highlighting of
8    any of those articles?
9        A.   No.
10       Q.   Do you still have all the articles in your
11   possession?
12       A.   It's possible. I mean, I have a lot of
13   information. I'm not sure if I've gotten rid of some
14   of it or not.
15       Q.   Okay. If -- if you still have some of them,
16   where would they be?
17       A.   Probably spread between my office and my
18   home.
19       Q.   Were there any references that you went to on
20   PubMed where you ran into a roadblock where they had
21   to be purchased?
22       A.   No.
23       Q.   Okay. So in terms of any PubMed searching
24   you might have done, you -- none of the ones that you
25   looked at on -- on your PubMed search required you to

Page 89

1    pay for them?
2        A.   Not that I recall.
3        Q.   Okay. When you did your PubMed search, where
4    were you doing it from?
5        A.   I don't remember.
6        Q.   Okay. When you did the PubMed search, were
7    you doing it from a location that it gave
8    you universal access to all papers, regardless of who
9    the publisher was or the source of the article?
10       A.   I have through -- through my various, you
11   know, societies and subscriptions, I have access to
12   probably all the major publishers. So by virtue of
13   that, I probably have access to all -- all the
14   articles.
15       Q.   So were there some where you had to type in
16   your -- your personal password or ID code to get
17   access, for example, for Wolters Kluwer or
18   ResearchGate or any of those other entities?
19       MS. CONKLIN: Object to the form.
20       THE WITNESS: I think the way that works is
21   once you type it in or you have some -- you know,
22   you're sent some e-mail and you link to it, that
23   once that's recognized somehow in your computer
24   domains, it's kind of there. You don't have to
25   retype it in every time, unless you -- your

23 (Pages 86 to 89)

Protected - Subject to Further Protective Review

Page 90

1     membership lapses or something, and they turn it
2     off.  That's my understanding of how it works.
3           MS. CONKLIN:  Counsel, I think we've been
4     going about an hour.
5           MR. HONNOLD:  Sure.  You need to take a
6     break?  Yeah, absolutely.
7           THE VIDEOGRAPHER:  The time now is 9:05 a.m.
8     We are now off the record.
9           (A recess was taken from 9:05 until 9:15 a.m.)
10          THE VIDEOGRAPHER:  This begins Disc 3 of
11    today's deposition.  The time now is 9:15 a.m.
12    We are back on the record.
13    BY MR. HONNOLD:
14      Q.  Doctor, we're back on the record after
15    another short break.
16          Currently in your practice, if -- if you had
17    a patient where you wanted to try to determine
18    qualitatively how anticoagulated a patient on
19    Rivaroxaban was, what -- what test would you perform?
20          MS. CONKLIN:  Object to the form.
21          THE WITNESS:  I wouldn't have -- I would not
22    have the circumstance where I would need to know
23    that in my practice.
24    BY MR. HONNOLD:
25      Q.  So in your -- in your speciality area of

Page 91

1     practice, emergency medicine, you are not faced with
2     scenarios where you need to know qualitatively how
3     anticoagulated a patient is on Rivaroxaban; correct?
4       A.  That's correct.  Typically, I need to know,
5     you know, all of the information about the patient.
6     And if the patient is on Rivaroxaban, I usually make
7     decisions based on my assumption that the patient is
8     taking it and then what their clinical presentation
9     is and whether I need to administer something to try
10    to reverse the effects of that or not.
11          So a lot -- there's a lot of information that
12    goes into it, but I don't really need to know
13    quantitatively, in emergent situations, what the
14    quantitative degree of anticoagulation --
15      Q.  And I -- and I said qualitatively how
16    anticoagulated a patient was.  Qualitatively, if you
17    wanted to know how anticoagulated this patient was,
18    are they very anticoagulated on Rivaroxaban, are they
19    marginally anticoagulated on Rivaroxaban, not at all,
20    what test would you do to speak to that issue?
21          MS. CONKLIN:  Object to the form.
22          THE WITNESS:  Well, I would probably have a
23    similar to that, which I don't think about
24    anticoagulation with Rivaroxaban in a qualitative
25    way, because my understanding of the drug and the

Page 92

1     pharmacokinetics and the way the drug interacts
2     with the body is that it's pretty reliable.  And
3     so I assume that the intended therapeutic effect
4     of the drug is present.
5           And there aren't a lot of interactions with
6     other medications or food or patient-specific
7     factors.  So typically, in the emergency
8     department, if I'm making a decision about how to
9     treat a patient, I assume that that is present.
10          I don't really need to know -- and don't --
11    kind of don't know from the literature what
12    they're under therapeutic or overcoagulated
13    really means on Rivaroxaban.
14    BY MR. HONNOLD:
15      Q.  What agents or compounds have you or do you
16    use to reverse the effects of Rivaroxaban?
17      A.  Typically, if I'm trying to reverse the
18    effects, I will use a --a four-factor prothrombin
19    complex concentrate.
20      Q.  And does that have a commercial or trade
21    name?
22      A.  Yes.  It -- the -- the one that I have
23    available to me is Kcentra.
24      Q.  And to your knowledge, has Kcentra actually
25    been evaluated in clinical trials on renal bleeding

Page 93

1     patients on Rivaroxaban?
2           MS. CONKLIN:  Object to the form.
3           THE WITNESS:  I'm not sure I've seen a -- a
4     randomized trial that has -- that has looked at
5     the effects of Kcentra in patients specifically
6     taking Rivaroxaban.
7     BY MR. HONNOLD:
8       Q.  In any of the literature on Kcentra and its
9     ability to reverse the effects of Rivaroxaban, in
10    that literature, how have those effects been
11    measured, meaning, how do those authors determine
12    whether or not the giving of Kcentra has some effect
13    on the anticoagulation status of a patient on
14    Rivaroxaban?
15      A.  Well, one way you can determine that -- and,
16    you know, I think in -- in some of the reports
17    that -- that I've seen, is just looking at the
18    response of the patient and the bleeding of the
19    patient.
20          You could do -- you could do some more
21    research-related assays, which is, you know, some
22    thrombin-related activity assays to determine, I
23    guess, if you wanted to determine how quickly the
24    effects could occur or how long they might last or
25    how long, you know, it might take to get to a normal

24 (Pages 90 to 93)

Protected - Subject to Further Protective Review

Page 94

1    thrombin activity or thrombin time. But those are
2    not typically pieces of information that a clinician
3    uses.
4        Q.   When you reverse a patient with Kcentra, or
5    trying to reverse the effects of Rivaroxaban, what --
6    what are you trying to achieve through that treatment
7    or therapy?
8        MS. CONKLIN:  Object to the form.
9        THE WITNESS:  Well, the use of Kcentra for
10   reversing anticoagulants -- and this is also true
11   in Coumadin -- is what you're trying to do is
12   provide the co-factors to overcome the
13   competitive effects of the medication, such that
14   the body can use those cofactors to do what it
15   needs -- what it needs to do to make thrombin and
16   eventually make fibrin.
17       So you're trying to overcome the effects of
18   the drug, essentially.
19   BY MR. HONNOLD:
20       Q.   Would it be fair to state that you're trying
21   eliminate the anticoagulant effects of the
22   medication?  Correct?
23       A.   I guess in general terms, you're trying to --
24   you're trying to allow the body to do its natural
25   processes by giving it co-factors that it uses

Page 95

1    those -- those processes on. And that eliminates the
2    ability of the drug to, you know, bind -- you know,
3    depending on the drug, to bind to those co-factors in
4    the way that they're supposed to do. So you're --
5    you're kind of overcoming that. You're overwhelming
6    the system such that it can then go on with its
7    normal processes.
8        Q.   Now, I want to go back to the literature,
9    specifically the literature that talks about the
10   effects of Kcentra in -- in patients that are taking
11   Rivaroxaban.
12       In that body of literature, what tests were
13   done to verify that, in fact, Kcentra had an
14   inhibitory effect on patients on Rivaroxaban?
15       MS. CONKLIN:  Object to the form.
16       THE WITNESS:  Well, some of them just look at
17   clinical parameters. But I think the -- you
18   know, some of the papers that I've seen, the --
19   the evidence that I would want to see is looking
20   at the -- the ability of the body to generate
21   thrombin, because ultimately, if -- if you have
22   effects of these medications, then you're going
23   to be -- meaning the Xa inhibitors, then you're
24   not going to be able to generate thrombin the way
25   a normal person would.

Page 96

1    So thrombin-specific assays are the ones that
2    seem to be the most compelling evidence, in my
3    view.
4    BY MR. HONNOLD:
5        Q.   Okay. And so which test would that be,
6    specifically?
7        A.   Well, there's -- there's various research
8    assays. So it's -- I don't know if I can name them
9    all, but there're thrombin time, and I don't know if
10   there's a thrombin potential. I'd have pull out some
11   of the articles to look at the very specific tests,
12   but they're all thrombin-related.
13       And, again, I -- I want to point out, these
14   are not clinical tests. They're not tests that we
15   order in patients. They're -- they're research tests
16   to try to answer questions.
17       Q.   So tell me for Kcentra, then, what type of
18   clinical trial work was actually done on patients to
19   provide some level of evidence that Kcentra is
20   effective in reversing the affects of Rivaroxaban.
21       MS. CONKLIN:  Object to the form.
22       He's not offered as an expert on Kcentra.
23       THE WITNESS:  I think I stated earlier I'm
24   not -- I'm not aware of any science -- large
25   scientific trials that have looked at the effects

Page 97

1    of Kcentra on Rivaroxaban. But I know that
2    clinically it works.
3    BY MR. HONNOLD:
4        Q.   Have you read the papers on Kcentra where
5    plasma has actually spiked? Patients actually are --
6    are given Rivaroxaban to spike their -- their blood
7    to a certain level of Rivaroxaban, and then Kcentra
8    is given, and then the response is measured?
9        Have you read those articles?
10       MS. CONKLIN:  Object to the form.
11       THE WITNESS:  I feel certain in the body of
12   scientific literature there are a lot of articles
13   that potentially speak to this effect that I have
14   never seen. So I don't know specifically what
15   articles you're referencing.
16   BY MR. HONNOLD:
17       Q.   So does your laboratory -- can you get a
18   thrombin time at your -- at your hospital laboratory?
19       A.   I would suspect that you -- you probably can
20   in certain situations, because that's a specialized
21   test, I think, that sometimes hematologists use.
22       But in my clinical practice, it's not
23   something that I would order or have ever had the
24   need to order.
25       Q.   Have you ever used Kcentra or other reversal

25 (Pages 94 to 97)

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 98

1    agents to -- to reverse the effects of Rivaroxaban in
2    a patient with an intracranial hemorrhage?
3         MS. CONKLIN:  Object to the form.
4         THE WITNESS:  I have used it.  I can't
5    remember specifically the various situations or
6    what type of bleeding or that the rationale was
7    for -- for using it.
8         We were one of the -- our hospital was one of
9    the earlier adopters of Kcentra.  And we might be
10   one of the only hospitals that -- that stocks it.
11   So we do receive a lot of number patients that
12   receive it.
13   BY MR. HONNOLD:
14        Q.  But in terms of your clinical experience, you
15   don't know whether you've used it in GI bleeding,
16   intracranial bleeding, other forms of bleeding?
17        MS. CONKLIN:  Object to the form.
18        THE WITNESS:  I don't know the specific
19   situation.
20   BY MR. HONNOLD:
21        Q.  How many times have you used Kcentra to
22   reverse the effects of Rivaroxaban?
23        MS. CONKLIN:  Object to the form.
24        THE WITNESS:  I've used Kcentra a lot.  I
25   can't tell you specifically the number of times

Page 99

1    I've used it for the various new or oral
2    anticoagulants versus Coumadin.  I know I've used
3    it in both situations.  I just don't know the
4    exact numbers.
5    BY MR. HONNOLD:
6         Q.  So if you -- if you've used it for both a
7    lot, would it be fair to say that you've used it for
8    Rivaroxaban several times?
9         A.  I would think so, yes.
10        Q.  The times that you've used Kcentra to reverse
11   the effects of Rivaroxaban in a patient, did you do
12   that because you feel that it was medically indicated
13   and necessary for the patient's well-being?
14        MS. HOFFMANN:  Objection.
15        THE WITNESS:  Yes.  I would say that's
16   probably the reason that I -- I felt like it
17   needed to be done.
18   BY MR. HONNOLD:
19        Q.  Did you use Kcentra in situations where you
20   felt its use and administration for the patient was
21   potentially lifesaving?
22        A.  Honestly, as a practicing clinician, I don't
23   think I think in the terms of whether administering a
24   medication is going to be lifesaving or not.
25        It's using a kind of risk/benefit analysis of

Page 100

1    whether the patient would substantially, you know, in
2    my view, potentially benefit and that benefit
3    outweighs the risk -- you know, there are some risks
4    with Kcentra in that it can cause -- actually can
5    cause thrombosis.
6         So you have to kind of consider, you know,
7    what the potential benefit is to the patient in -- in
8    their particular situation.
9         Q.  In the times that you've used Kcentra to
10   reverse the effects of Rivaroxaban, you did it
11   because you felt that the benefit of hopefully
12   stopping bleeding outweighed the potential risk of
13   causing thrombosis; correct?
14        MS. CONKLIN:  Object to the form.
15        THE WITNESS:  Generally, that would be
16   correct.
17   BY MR. HONNOLD:
18        Q.  And the standard of care would require you to
19   undergo -- undertake that assessment; correct?
20        MS. CONKLIN:  Object to form.
21        THE WITNESS:  It would require me to take --
22   undertake what?
23   BY MR. HONNOLD:
24        Q.  That assessment, that risk/benefit analysis
25   for the patient?

Page 101

1         A.  Well, generally, everything we do in medicine
2    in terms of the way we either order a test or
3    administer a treatment, there is some inherit
4    risk/benefit analysis that's done in a physician's
5    head.  It's not as formal a process as lawyers like
6    to try to make it out to be in depositions often;
7    sometimes it is.
8         But oftentimes those situations where it is a
9    more formal process, it's less of an emergent
10   situation.  It's more of an elective scenario.  But
11   I'd say in general, risk/benefit analysis is done
12   every day in clinical practice about everything we
13   do.
14        Q.  And -- and I don't mean to suggest that the
15   risk/ benefit analysis that you undertake might not,
16   at times, need to be made under fairly urgent
17   conditions, and you make it based upon your
18   accumulation of training and education and those
19   things.  But it is -- but it is something that you go
20   through, even though it may only be kind of an
21   instantaneous process when you're evaluating the need
22   for a particular patient to have reversal; right?
23        A.  Right.  I guess what I was just trying to
24   explain, so we're on the same page, is that it's
25   often not a formal process that, you know, you think

26 (Pages 98 to 101)

Protected - Subject to Further Protective Review

Page 102

1  to yourself, okay, this is the risk and these are the
2  benefits. It's more of an inherit process that you
3  learn, a pattern over time and -- yeah.
4     Q. It almost becomes kind of a compressed or
5  inherent algorithm that you're able to undertake,
6  sometimes almost instantaneously, as to whether to
7  provide a certain treatment or not; correct?
8     A. I would say that that does occur, yes.
9     Q. And oftentimes, it comes down to the
10 assessment of: Do you feel that this particular
11 patient needs this treatment, meaning the need takes
12 into account, sometimes instantaneously, this issue
13 of risk/benefits analysis?
14    MS. CONKLIN: Object to form.
15    THE WITNESS: In general, I'd like to say
16 that I and every clinician wants to consider the
17 need. You wouldn't want to needlessly, you know,
18 provide something. So need certainly factors
19 into it.
20 BY MR. HONNOLD:
21    Q. You would never want to give Kcentra to a
22 patient for the reversal of the effects of
23 Rivaroxaban needlessly; right?
24    MS. HOFFMANN: Objection.
25    THE WITNESS: I wouldn't give Kcentra to a

Page 103

1  patient unless I felt like there was an
2  indication.
3  BY MR. HONNOLD:
4     Q. And the primary indication is that you're
5  trying to stop their bleeding; correct?
6     MS. CONKLIN: Object to form.
7     MS. HOFFMANN: Objection; form.
8     THE WITNESS: No. The primary indication is
9  to reverse the effects that a medication may have
10 on the coagulation system, but it's not to stop
11 the bleeding.
12 BY MR. HONNOLD:
13    Q. Okay. So I want to make sure I state it
14 right then, that the primary reason that the drug is
15 given is to reverse the effects of the medication?
16    MS. HOFFMANN: Objection.
17    THE WITNESS: Reverse the effects of the
18 medication on the coagulation system.
19 BY MR. HONNOLD:
20    Q. The reason that Kcentra is given to the
21 reverse the effects of Rivaroxaban on the coagulation
22 system; correct?
23    A. Right. And that would be for any
24 anticoagulant that you give it for.
25    Q. Including Rivaroxaban; right?

Page 104

1     A. Correct.
2        And I might clarify the use of the word
3  "reverse." Maybe it's -- "overcome" is a better
4  word, as I think about it.
5     Q. But you wouldn't quibble with someone else
6  who use the term "reverse"; would you?
7     MS. HOFFMANN: Objection.
8     THE WITNESS: Well, I'm just thinking reverse
9  typically means that it -- in my mind, reverse
10 means that it is something that directly changes
11 what the medication would do; whereas, in the
12 effects of Kcentra, it is -- it is provided to
13 overcome the effects, but it's not directly
14 reversing the effects. So I think that that's an
15 important distinction.
16 BY MR. HONNOLD:
17    Q. Is it your view that in some situations where
18 patients are bleeding on Rivaroxaban that giving
19 Kcentra is the standard of care in certain
20 circumstances?
21    MS. HOFFMANN: Objection to form.
22 BY MR. HONNOLD:
23    Q. Or has it not evolved to that point yet?
24    MS. HOFFMANN: Same objection.
25    THE WITNESS: I don't think I -- I don't

Page 105

1  think that I could say that a physician that did
2  not administer it breached the standard of care.
3  I do think that there potentially is some
4  accumulating evidence that we might be headed in
5  a direction that way.
6     But I would say at present time, specifically
7  because there are hospitals that don't even have
8  it, it would be hard to say that it is the
9  standard of care.
10 BY MR. HONNOLD:
11    Q. You said that there may -- there is some
12 accumulating evidence to suggest that we're heading
13 in that direction. What accumulating evidence are
14 you talking about?
15    A. Well, I just think there more and more
16 articles coming out about, you know, the -- all of
17 the more novel or new oral anticoagulants, and we're
18 kind of learning more about them, despite every
19 medication over time.
20    Q. Are some of those publications specifically
21 within your area of expertise and appeared in some of
22 those journals you mentioned before that you get as
23 part of your membership in your professional
24 societies?
25    MS. HOFFMANN: Objection to form.

27 (Pages 102 to 105)

Protected - Subject to Further Protective Review

Page 106

1      THE WITNESS:  I have over the years seen some
2   articles in the periodicals that I receive.  I
3   can't -- I don't know if I can specifically say
4   they are related to Kcentra, and I can't remember
5   are where all those various articles I've seen
6   have come from.
7   BY MR. HONNOLD:
8      Q.  Do you know, do any of the articles in your
9   reference list speak to the issues of reversal?
10      MS. HOFFMANN:  I'm sorry, can you just say
11   that again?
12      MR. HONNOLD:  Yeah.
13   BY MR. HONNOLD:
14      Q.  Do any of the articles in your reference list
15   specifically speak to the issue of reversal?
16      A.  Yes.  I think there are -- there are some.
17      Q.  There are several of them; aren't there?
18      A.  Yes.
19      Q.  And are -- those any of those articles on
20   reversal, were those provided to you, or are those
21   ones that you had or found on your own?
22      A.  I think I had several of the articles on
23   reversal prior to ever even being contacted about
24   this.
25      Q.  Why did you include articles on reversal in

Page 107

1   your reference list in this case?
2      A.  Well, I think an important -- particularly
3   important point about the use of Kcentra or PCC is
4   that it, in the same way it -- it reverse -- it helps
5   with the patient with Coumadin, it can help with a
6   patient on Rivaroxaban in that it overwhelms,
7   provides the proteins that are necessary to allow the
8   body to do its job on.
9      And so by virtue of that, it's important to
10   have that information, you know, available,
11   especially because I see -- I'm one of the recipients
12   of a lot of the bleeding issues that patients have
13   on.
14      Q.  In the body of your report, Exhibit 7,
15   anywhere you actually specifically discuss or mention
16   or evaluate or provide any analysis on the issues of
17   Kcentra or the topic of reversal in general?
18      MS. CONKLIN:  Object to the form.
19      THE WITNESS:  I think that I do mention that
20   in the report at some point.
21   BY MR. HONNOLD:
22      Q.  Where?
23      A.  Let me see.
24      Q.  And I'm most interested is if you mention it
25   in the opinion section after Page 12.

Page 108

1      A.  Well, I think I talk about it on Page 8, at
2   the top of Page 8.
3      Q.  Do you mention or discuss Kcentra or reversal
4   anywhere after Page 12 in your case discussion and
5   opinion section of your report?
6      MS. HOFFMANN:  You're talking specifically
7   with respect to its applicability to Ms. Mingo?
8      MR. HONNOLD:  No, I'm just saying at all.
9      MS. HOFFMANN:  I'm sorry, I'm confused.  Can
10   you just read back the question?  That's my issue
11   with my cold, not yours.
12      THE COURT REPORTER:  The question was:  Do
13   you mention or discuss Kcentra or reversal
14   anywhere after Page 12 in your case discussion
15   and opinion section of your report?
16      THE WITNESS:  I don't see anywhere where I
17   specifically mention Kcentra, probably because in
18   this particular case, I would not have
19   administered Kcentra to Ms. Mingo, so it probably
20   didn't materially impact the opinions -- my
21   opinions about how the Xarelto interacted in her
22   particular case.
23   BY MR. HONNOLD:
24      Q.  So the answer is no, it's not mentioned
25   anywhere in your opinion section of your report;

Page 109

1   right?
2      A.  I think I just answered that question, that
3   it doesn't, and for the reasons that I just gave.
4      Q.  And when you mention it -- well, strike that.
5      Where are you prepared your report, were you
6   able to do kind of it at -- at your -- I don't want
7   to say at your leisure -- but I mean, you were in
8   control of the environment and your time, and you
9   were -- you were doing it at a pace and under
10   circumstances that you saw were fit for the job?
11      MS. CONKLIN:  Object to the form.
12      THE WITNESS:  Yes, I would assume I did.
13   BY MR. HONNOLD:
14      Q.  And -- and you got the choice to use the
15   words you wanted to use and use them the way that you
16   wanted to; right?
17      A.  Yes.
18      Q.  You had a chance to edit and review the
19   report many times before today; correct?
20      MS. HOFFMANN:  Objection.
21      THE WITNESS:  I went through -- you know, did
22   it over time, so . . .
23   BY MR. HONNOLD:
24      Q.  The -- if there was something in it that you
25   felt tat needed to be corrected, you could have

28 (Pages 106 to 109)

Protected - Subject to Further Protective Review

Page 110

1  corrected it before today; right?
2      A.  I would assume so.
3      Q.  You could have corrected it before you signed
4  it and made it your final report in this case;
5  correct?
6      A.  Yes.
7      Q.  And when you signed it, you did so with the
8  intention of making it your final report in this
9  case; correct?
10     A.  I did issue a final report, yes.
11     Q.  And when you -- when you did sign the report
12 as reflecting your final report and opinions in this
13 case, and you go to Page 8 where you do talk about
14 4-factor prothrombin complex time concentrate, you
15 actually use the phrase that it has, quote, has been
16 reported to be beneficial in completely reversing the
17 effects of the medication, end quote.
18     Do you see where I read from?
19     A.  Yes.
20     Q.  Okay.  And those -- that was your choice of
21 words at the time you prepared the report; correct?
22     A.  Yes.
23     Q.  I want to hand you what I've marked as
24 Exhibit 8, which is the December 2014 version of the
25 package insert for Xarelto.

Page 111

1      (Jones Exhibit 8 was marked for
2  identification.)
3      MR. HONNOLD:  These aren't the greatest
4  copies, and I'm sorry.
5      MS. HOFFMANN:  That's an understatement.
6      MR. HONNOLD:  Well, these -- these were done
7  on a very interesting looking printer/copier in
8  the lobby of the Residence Inn, once I realized
9  the FedEx Kinko's was not open.  So I did my
10 best.
11     MS. HOFFMANN:  As long as you're not going to
12 ask him questions about those areas that are --
13     MR. HONNOLD:  Well, his is a really good
14 copy.  If you look at his, he's got the --
15     MS. CONKLIN:  He's got a color copy.
16     MR. HONNOLD:  -- he's got the good --
17     MS. CONKLIN:  He's got color.
18     MR. HONNOLD:  So I will definitely --
19     THE WITNESS:  I got the Cadillac.
20     MR. HONNOLD:  Yeah.
21 BY MR. HONNOLD:
22     Q.  I think if you look at your report,
23 Exhibit 7, you had some versions, at least, of the
24 Xarelto label that was made available to you;
25 correct?

Page 112

1      A.  Yes.
2      Q.  Okay.
3      A.  I had several.
4      Q.  I don't know whether this particular version
5  was provided to you or not, and I'm not sure for my
6  questions that it matters that much.
7      MS. HOFFMANN:  Objection; form.
8  BY MR. HONNOLD:
9      Q.  Does it look like you got the December 2014
10 version of the label?
11     A.  I don't see that specific one listed here.
12     Q.  Specifically, when you look -- if you include
13 the December 2014 -- or if you were to include it in
14 the sequence of -- of the labels that are on your
15 reference list, which -- which would be the last form
16 of the label that would have been generated before
17 Mrs. Mingo took Xarelto?
18     A.  In this list, it would be the one listed
19 March -- March 2014.
20     MS. HOFFMANN:  Counsel, can you just direct
21 our attention to that part of Exhibit 8 that you
22 are relying on for this to be the December 2014
23 label?
24     MR. HONNOLD:  I always thought it went by
25 where it says revised 12/2014 in the -- in the

Page 113

1  top section on Page 1.
2      MS. HOFFMANN:  Okay.  I just wondered.
3  That's your basis for saying this is the
4  December --
5      MR. HONNOLD:  Right.
6      MS. HOFFMANN:  -- 2014 label.
7      MR. HONNOLD:  Right.
8      MS. HOFFMANN:  Thank you.
9      MR. HONNOLD:  And I think if you line them
10 all up, I think that's how the dates are shown.
11 BY MR. HONNOLD:
12     Q.  I'd like to ask you some questions about the
13 label.
14     If you look at Page 1 of Exhibit 8 in the --
15 in the top half of the first page, the -- the bold,
16 the section of Warning and Precautions section, which
17 is generally on the right-hand portion of the
18 top-half of the page -- do you see Warnings and
19 Precautions?
20     A.  Yes, sir.
21     Q.  Okay.  Clearly, this label states that -- if
22 you look at the first bullet point there -- risk of
23 bleeding:  Xarelto can cause serious and fatal
24 bleeding.
25     Do you see that?

Protected - Subject to Further Protective Review

Page 114

1     MS. HOFFMANN: Objection.
2     THE WITNESS: Okay. Maybe I didn't --
3  BY MR. HONNOLD:
4     Q.  Under -- under Warnings and Precautions on
5  the right-hand portion of the top-half of the page,
6  there's --
7     A.  Oh, okay.  I'm sorry.
8     Q.  If you look --
9     A.  I'm there now.
10    Q.  -- in the first bullet point under the
11 Warnings and Precautions section, do you see that?
12    A.  Yes, I see that.
13    Q.  And you see that it says:  Xarelto can cause
14 serious and fatal bleeding.
15    Correct?
16    A.  Yes, I see that.
17    Q.  Do you have any understanding of what is the
18 purpose of anticoagulants stating that in the label
19 that a particular agent like Xarelto can cause
20 serious and fatal bleeding?
21    MS. HOFFMANN: Objection to form.
22    THE WITNESS:  Obviously, I don't have any
23    knowledge of why this language was arrived at in
24    terms of it can cause serious and fatal bleeding
25    in -- this probably is not language that I would

Page 115

1  have used, because usually the cause of the
2  bleeding is not the anticoagulant, regardless of
3  the anticoagulant.  The cause is some underlying
4  etiology.  Anticoagulants, you know, somehow
5  interacts with the underlying etiology.  But as a
6  medical doctor, I don't usually think of that as
7  the cause.
8  BY MR. HONNOLD:
9     Q.  But the -- this label boldly and prominently
10 states Xarelto can cause serious and fatal bleeding;
11 right?
12    MS. HOFFMANN: Objection to form.
13    THE WITNESS:  Right.  I'm not arguing with
14    what it says.  I just don't know exactly what
15    they meant when they put that -- as a clinician,
16    I don't really usually assign the cause of the
17    bleeding to that.
18 BY MR. HONNOLD:
19    Q.  In this case, is it important for any of your
20 opinions as to what time of day Mrs. Mingo took any
21 of her Xarelto?
22    A.  No.
23    Q.  Okay.  Have you specifically stated anywhere
24 in your report as to what times she did specifically
25 take Xarelto on any given date?

Page 116

1     A.  The only thing that may be in there -- and I
2  will have to look to be sure -- but I may have
3  referenced that she took it before -- she took her
4  last dose before she presented to the hospital on the
5  last presentation.
6     I can't remember if I put the exact time for
7  that or not.
8     Q.  What I'd like to do is go to page --
9  Section 12.2, actually in the body of the label.  I
10 think it's actually Page 21.  And yours is copied on
11 the front and back, so I apologize for that.  It just
12 make at less bulky of a document.
13    Do you see Section 12.2?
14    A.  Yes, I do.
15    Q.  That section states, quote:  Dose-dependent
16 inhibition of FXa activity was observed in humans and
17 the Neoplastin prothrombin time (PT) -- which is in
18 parens and capitalized, capital P, capital T --
19 activated partial thromboplastin time -- and in
20 parenthesis, lower A, capital P, capital T,
21 capital T -- and HepTest are prolonged
22 dose-dependently.
23    Do you see that sentence where I -- that I
24 read?
25    A.  Yes, I see that sentence.

Page 117

1     Q.  Did I read it correctly?
2     A.  Yes.  That's what it says.
3     Q.  Okay.  So based upon Section 12.2, do you --
4  what is your understanding as a physician as to what
5  that section means?
6     A.  I guess my understanding would be that
7  when -- when you use the PT test with the Neoplastin
8  reagent that there is potentially some relationship
9  between the PT and the inhibition of Factor Xa along
10 some continuum.  I'm not sure -- it doesn't say --
11 doesn't give anymore specifics about it.  There has
12 to be some relationship there.
13    Q.  And so do of your references speak
14 specifically to that concept or that issue that's set
15 forth in Section 12.2?
16    A.  Yes, some -- there are some of the references
17 that have that information.
18    Q.  And do some of those references state that
19 the relationship between serum plasma concentration
20 of Rivaroxaban is closely and linearly correlated to
21 the Neoplastin PT?
22    MS. CONKLIN: Objection to form.
23    MS. HOFFMANN: Objection to form.
24    THE WITNESS:  I think there's some indication
25    in some of the references that there is a -- that

30 (Pages 114 to 117)

Protected - Subject to Further Protective Review

Page 118

1  there is somewhat of a linear relationship. And
2  I'm not -- again, I'm not sure exactly what --
3  across what concentration or dose or -- but there
4  is some relationship there that is more reliable
5  than some of the other PT assays.
6  BY MR. HONNOLD:
7      Q.   And in the resources that you looked at that
8  speak to that, there are -- there are many places in
9  those references where there are graphs that show
10 that as the plasma concentration goes up on the left
11 axis, then the Neoplastin PT similarly goes up on the
12 right axis; correct?
13         MS. CONKLIN:  Object to the form.
14         THE WITNESS:  I do remember seeing some of
15 those graphs.
16 BY MR. HONNOLD:
17     Q.   And so some of your references suggest that
18 there is, in fact, a linear relationship between
19 Rivaroxaban serum concentration and Neoplastin PT;
20 correct?
21     A.   I believe that is probably true, and I think
22 I mentioned that there might be some relationship
23 in -- in my report also.
24     Q.   And what is it, I guess, pathophysiologically
25 that explains that relationship?

Page 119

1         MS. HOFFMANN:  Objection.
2         THE WITNESS:  Specifically with the
3  Neoplastin reagent?
4  BY MR. HONNOLD:
5      Q.   Yes?
6      A.   I think the theory is that there are some
7  reagents that interact with the -- some of the
8  substances -- some of -- some of the chemical makeup
9  of the Xarelto, such that it interferes with the test
10 and that the Neoplastin reagent is actually
11 sensitive -- more sensitive to the molecule and,
12 therefore, results in a more kind of linear
13 relationship across some continuum.
14     Q.   And when the term "linear relationship" is
15 used, does that mean that -- that as -- as plasma
16 concentration of Rivaroxaban goes up, then there's a
17 corresponding increase in the Neoplastin PT?
18     A.   I would say generally that's kind of a linear
19 relationship means in a -- in reference to a
20 medicine.
21     Q.   Then in your reference list in terms of those
22 graphs that actually show or depict that linear
23 relationship, what is the source of the -- of that
24 data in those references?  Do you know?
25         MS. CONKLIN:  Object to the form.

Page 120

1         THE WITNESS:  I guess I don't understand the
2  question. I mean, I guess the study, the
3  particular study. I -- I don't think I can cite
4  the particular study.
5  BY MR. HONNOLD:
6      Q.   So likely one of the Rivaroxaban clinical
7  trials?
8         MS. HOFFMANN:  Objection.
9         THE WITNESS:  Well, I -- I don't know if
10 that's true or not. I think that there are -- I
11 think there are more than one potential area that
12 have looked at that, and some of them have been,
13 you know, more -- some of the results have been
14 variable. So, again, I think there's multiple
15 sources, given the amount of scientific
16 literature that's out there.
17 BY MR. HONNOLD:
18     Q.   In those -- in those reference materials that
19 have those, that show the graphs and talk about that
20 relationship, what is it that accounts for or
21 explains the varying degrees of plasma concentration
22 of Rivaroxaban in the -- in the patients?
23         MS. CONKLIN:  Object to the form.
24         THE WITNESS:  I'm not sure I follow the
25 question.

Page 121

1  BY MR. HONNOLD:
2      Q.   Well, for there to be data that shows a
3  linear relationship, that would suggest that for
4  some -- some -- there are some patients that have a
5  plasma -- or serum concentration that's lower down on
6  the left-hand axis and some that are higher; correct?
7         MS. HOFFMANN:  I'm going to object. I -- I
8  don't know what study we're talking about. I
9  don't know which graph you're talking about. Are
10 you just speaking in general about graphs?
11         I -- I would offer that if you have a
12 particular study that you're referring to the
13 graft, perhaps we should show that to the
14 witness.
15         MR. HONNOLD:  Believe me, we'll -- we'll get
16 there.
17 BY MR. HONNOLD:
18     Q.   So when you talk about linear relationship of
19 a -- of a dataset, when you look at the left-hand
20 axis, there would be some patients that have lower
21 serum concentrations that would relate to a lower
22 Neoplastin PT; correct?
23         MS. HOFFMANN:  Objection to form.
24         MS. CONKLIN:  Objection to form.
25         THE WITNESS:  I suppose we probably should

31 (Pages 118 to 121)

Protected - Subject to Further Protective Review

Page 122

1   look at what -- what we're talking about so we
2   can be on the same page, the graphs.
3   BY MR. HONNOLD:
4       Q.  Okay.  Okay.  What I'd like you to do is,
5   based upon what we've been talking about, can -- can
6   you graph out the relationship that you've
7   generally -- that -- that we've been talking about
8   and that you've seen in some of the references that
9   you've looked at?
10      A.  So you want me to graph out what a linear
11  relationship looks like?
12      Q.  Right.
13      A.  An exact linear relationship would look
14  something like this, where as you step up this way,
15  you step up this way.  But that's obviously not the
16  way it works in all -- I mean, it's not -- all --
17  every data point is not along that line.  The data
18  points would be scattered out everywhere.  And then
19  there's an attempt mathematically to try to regress
20  that line, such that it gives you the slope of all of
21  that data that's available.
22      Q.  Okay.  So in that dataset for Rivaroxaban
23  patients then, what is it that would explain varying
24  degrees of plasma concentration or serum
25  concentration on the left -- on the upright axis?

Page 123

1       MS. CONKLIN:  Objection to form.
2       MS. HOFFMANN:  Object to form.
3       MS. CONKLIN:  He's not being offered to --
4   he's not offered as an expert for Neoplastin, for
5   one thing; nor for PT.
6       THE WITNESS:  I guess there could be a lot.
7   I'm -- I'm not specific with the specific study
8   you're referring to.  We can -- if we want to
9   look at a specific study, there could be a lot of
10  reasons that you could have differences in.
11  BY MR. HONNOLD:
12      Q.  What are they?
13      MS. HOFFMANN:  Objection.
14      MS. CONKLIN:  Counsel, we're -- we're way --
15  I don't even know what we're talking about at
16  this point.
17      MR. HONNOLD:  We're talking about a label
18  that he's listed and attached in his reference
19  list.
20      MS. CONKLIN:  If you want to show him a
21  graph -- let's talk about something that we can
22  ask --
23      MR. HONNOLD:  Okay.
24      MS. CONKLIN:  -- specific questions about.
25      MR. HONNOLD:  Believe we, we're -- we're

Page 124

1   talking about stuff that is -- that matters.
2       MS. CONKLIN:  Well, let's -- let's look at
3   his report.
4       MR. HONNOLD:  Okay.  Great.  Are you
5   instructing him not to answer?
6       MS. CONKLIN:  I'm not instructing him not to
7   asking him to answer.  I'm asking you to move
8   on --
9       MR. HONNOLD:  Okay.
10      MS. CONKLIN:  -- because he's not offered as
11  an expert for Neoplastin or for PT.
12  BY MR. HONNOLD:
13      Q.  So you just told me there may be a lot of
14  things that might explain varying degrees of plasma
15  concentration or serum concentration of Rivaroxaban
16  in patients.  What are they?
17      MS. CONKLIN:  Object to the form.
18      THE WITNESS:  I guess there could be
19  patient's specific factors.  I supposed there
20  could be dose factors.  I suppose there could be
21  something about the way the metabolism of the
22  drug is in the body.
23      Again, I'm not an expert in pharmacokinetics,
24  and I think you're kind of getting out of the
25  realm of my area of expertise and what I should

Page 125

1   be talking about.  I certainly don't want to
2   indicate in any way that I have expertise in
3   pharmacokinetics or Neoplastin PT testing.
4   BY MR. HONNOLD:
5       Q.  What are the sorts of patient's specific
6   factors that might influence what a patient's
7   Rivaroxaban serum concentration level might be?
8       MS. HOFFMANN:  Objection.
9       MS. CONKLIN:  Objection to form.
10      THE WITNESS:  Potentially organ dysfunction,
11  potentially other medications -- some specific
12  other medications.  I guess the way a patient --
13  the way a patient takes the medication in terms
14  of whether they're compliant or not.  Those are
15  general terms, not specific about Rivaroxaban,
16  but about medications.
17  BY MR. HONNOLD:
18      Q.  You've mentioned metabolism in the body.  Is
19  there -- is there some variation or variability
20  amongst patients in terms of how they might
21  metabolize a patient agent?
22      MS. CONKLIN:  Object to form.
23      THE WITNESS:  Well, it just depends on how
24  that agent is metabolized and what its kind of
25  active form is.  And that gets off into more

32 (Pages 122 to 125)

Protected - Subject to Further Protective Review

Page 126

1    pharmacokinetics and issues.  You know, again,
2    I'm not a pharmacologist.  So it gets off into
3    less clinically relevant things that I'm not an
4    expert in.
5    BY MR. HONNOLD:
6        Q.  When I asked you about the list, you just
7    said metabolism in the body.  So I just wanted to
8    follow up on that?
9        A.  I've -- I've given you about the extent of
10   where I can go with that.
11       Q.  If you go to Page 8 of the label, there's a
12   specific section that talks about reversal of
13   anticoagulant effect.  I'd like you to look at that
14   for a moment.
15       MS. CONKLIN:  I'm sorry, are you looking at a
16   specific section of the label?
17       MR. HONNOLD:  Reversal of Anticoagulant
18   Effect, on Page 8.  It's just slightly above the
19   middle of the page.
20       MS. CONKLIN:  Thank you.
21   BY MR. HONNOLD:
22       Q.  Have you had a chance to take a look at that
23   section?
24       A.  Yes, I have.
25       Q.  I want to ask you specifically about the last

Page 127

1    sentence where it says:  The use of other
2    procoagulant reversal agents like activated
3    prothrombin concentrate complex concentrate, (APCC)
4    or recombinant factor VIIa has not been evaluated.
5        Is that a true statement as -- still as of
6    today?
7        MS. HOFFMANN:  Objection.
8        THE WITNESS:  I think that statement
9    specifically speaks to the -- to the -- to a
10   clinical trial that would evaluate the use of
11   those for the procoagulant reversal.  And I'm not
12   aware of a large clinical trial.  There's --
13   there's scientific evidence out there, but I'm
14   not aware of a specific trial, so . . .
15   BY MR. HONNOLD:
16       Q.  Go to the next page, which is Page 9, please.
17       And I -- I want to probably ask you a series
18   of questions about a term that's used in various
19   places of the label.
20       For example, if you look under Section 5.4
21   under the subheading of Nonvalvular Atrial
22   Fibrillation -- do you see that?
23       A.  Yes, I see that.
24       Q.  The first sentence there that says:  Avoid
25   the use of Xarelto in patients with creatinine

Page 128

1    clearance less than 15 since drug exposure is
2    increased.
3        Do you see where I read from?
4        A.  Yes.
5        Q.  And -- and so that -- that phrase, "drug
6    exposure" as it's use in this context, what does that
7    mean to you?
8        MS. HOFFMANN:  Objection.
9        THE WITNESS:  Drug exposure is not typically
10   a term that I use, and so I don't -- I never
11   really thought about exactly what it means.
12   Maybe "exposure" indicates how something
13   interacts with the body and probably is affected
14   by external factors such as dose duration or, you
15   know, something like that.  But it's not a term
16   that I'm -- that I use or have a specific
17   definition for.
18   BY MR. HONNOLD:
19       Q.  So have you ever had occasion to refer to the
20   Xarelto package insert or labeling information in
21   taking care of patients?
22       A.  Well, I don't know if I specifically refer to
23   it every time I take care of a patient, but I've been
24   familiar with it in my prescribing and, you know,
25   treatment of patients with it.

Page 129

1        Q.  So specifically then as it relates to the
2    type of patient that's being discussed there in -- in
3    5.4, where it says "since drug exposure is
4    increased," is drug exposure something that can be
5    measured in any way?
6        MS. HOFFMANN:  Objection.
7        THE WITNESS:  Well, to me, as a prescriber,
8    this -- this sentence simply means to me, just
9    avoid it, if they have a creatinine clearance of
10   less than 15.  They don't -- you know, it's not
11   described what it means by "drug exposure is
12   increased"; whether that means, you know,
13   concentration or -- or duration or -- I'm -- I'm
14   not sure.
15       I just know that, according to the label, you
16   shouldn't give it to those patients because
17   something changes about it, that --
18   BY MR. HONNOLD:
19       Q.  And -- and that concept of concentration over
20   a period of time, that's area under the curve; right?
21       MS. HOFFMANN:  Objection.
22       THE WITNESS:  I -- I don't know exactly what
23   you're talking about.
24   BY MR. HONNOLD:
25       Q.  Okay.  So that next section where it talks

33 (Pages 126 to 129)

Protected - Subject to Further Protective Review

Page 130

1    about treatment of DVT, pulmonary embolism, and the
2    reduction in -- in the risk of recurrence of DVT and
3    PE, again, it's -- it uses the -- the phrase
4    "increase in Rivaroxaban exposure and pharmacodynamic
5    effects?"
6        Do you see that?
7        MS. CONKLIN:  Object to the form.
8        THE WITNESS:  Yes.
9    BY MR. HONNOLD:
10   Q.  So that term, "pharmacodynamic effects," as
11   it's used there it the label, does that have any
12   particular meaning to you?
13   A.  I mean, my understanding of the general term
14   "pharmacodynamic" is just how the -- how the body --
15   how the drug interacts with the body.  So other than
16   that, it has no particular meaning.
17   Q.  Is there a place in the label, for
18   example, in 12.2, where we looked before where
19   pharmacodynamic effects are -- are described?
20   A.  I would have to look --
21       MS. CONKLIN:  Object.
22   A.  -- at 12.2.
23       12.2, it just -- it just more talks about
24   the -- the test that we talked about earlier.  It
25   doesn't have any specifics about how pharmacodynamics

Page 131

1    are described.
2    Q.  So is one pharmacodynamic effect of -- of
3    taking Rivaroxaban an increase in the Neoplastin
4    prothrombin time?
5        MS. HOFFMANN:  Objection.
6        MS. CONKLIN:  Objection.
7        THE WITNESS:  Again, not being a
8    pharmacologist, what I would say about the
9    pharmacodynamics effect is -- is the way it
10   interacts with Factor Xa.  That's the
11   pharmacodynamics of the medication.
12   BY MR. HONNOLD:
13   Q.  Okay.  And the effect is -- on Xa is what?
14   A.  Well, it -- it binds and inhibits Xa.
15   Q.  So one specific pharmacodynamics effect of
16   taking Rivaroxaban is inhibition of Factor Xa;
17   correct?
18   A.  Yes.  But, I mean, I'm not saying it
19   completely inhibits all of Xa.  I'm just saying
20   that's the intended effect, and it is a Xa inhibitor.
21   Q.  And so does this section then suggest to you
22   that as there are changes or increases in Rivaroxaban
23   exposure that there then can also be increases in the
24   pharmacodynamic effects of the drug, such as
25   increased inhibition of Factor Xa?

Page 132

1        MS. CONKLIN:  Object to form.
2        MS. HOFFMANN:  Objection.
3        MR. HONNOLD:  No.  That -- I mean, that
4    section means to me that I shouldn't give
5    patients with a creatine clearance of less than
6    30 Xarelto, and it is because, you know, there is
7    increased exposure and pharmacodynamic effects.
8    It doesn't say what those are.
9        But that suggests to the clinician that you
10   should avoid it because it's not having the
11   therapeutic effect or whatever effect is intended
12   and -- with that particular dose for that
13   particular indication.
14   BY MR. HONNOLD:
15   Q.  Okay.  And so -- so as you read the label,
16   based upon your education, training, and -- and
17   experience, if increase exposure of a drug needs to
18   increase pharmacodynamic effects, does that suggest
19   that there may be some relationship to risk of
20   bleeding?
21       MS. HOFFMANN:  Objection to form.
22       MS. CONKLIN:  Object to the form.
23       THE WITNESS:  That does not indicate that to
24   me.  It's just not where the intended therapeutic
25   effect is.  What -- what the other effect is is

Page 133

1    not something that you would move further in my
2    thinking, because I know I'm not supposed to use
3    it in that situation.
4    BY MR. HONNOLD:
5    Q.  Then that section where it uses
6    pharmacodynamic effects, do you know whether that is
7    speaking to a specific test result?
8        MS. HOFFMANN:  Objection.
9        THE WITNESS:  I -- I do not know that.
10   BY MR. HONNOLD:
11   Q.  So would it be fair to state then that for
12   all the places in this label where issues of
13   Rivaroxaban exposure are discussed in the context of
14   pharmacodynamic effect, that would not be something
15   that you have any specific knowledge or understanding
16   of?
17   A.  Well, I'm not an expert in that.  It's not
18   something that I, you know, talk about in terms of in
19   my clinical practice exposure and the pharmacodynamic
20   effects and how they're altered.  That's more
21   pharmacology.
22   Q.  In your work on this case, have you looked at
23   any documents -- internal documents either from Bayer
24   or Janssen?
25   A.  No.

34 (Pages 130 to 133)

Protected - Subject to Further Protective Review

Page 134

1     Q.  Have you seen any -- in your reference list,
2  do any of those articles that you've cited speak to
3  issues of dose-finding studies that were done to
4  arrive at the indicated dose for treatment of DVT?
5        MS. CONKLIN:  Object to the form.
6        THE WITNESS:  I think that the EINSTEIN study
7     references some dose-finding studies, but they're
8     not studies that I looked at or that are in my
9     reference list, so -- other than just a reference
10    of a reference.
11  BY MR. HONNOLD:
12    Q.  So is it fair to state in this case
13  specifically you do not know how the dose -- specific
14  dose for DVT treatment was arrived at specifically?
15    A.  Yeah, I'm not aware of that information
16  specifically.
17       MS. HOFFMANN:  Brad, can we take a two-minute
18    break?
19       MR. HONNOLD:  Sure. I'm so sorry. Yes, we
20    certainly can.
21       THE VIDEOGRAPHER:  The time is 10:09 a.m. We
22    are off the record.
23       (A recess was taken from 10:09 until 10:23
24    a.m.)
25       THE VIDEOGRAPHER:  This begins Disc 4 of

Page 135

1     today's deposition.  The time now is 10:23 a.m.
2     We are back on the record.
3  BY MR. HONNOLD:
4     Q.  Doctor, we're back on the record now after
5  the short break?
6        What I'd like to do is spend some time going
7  through certain aspects your report, Exhibit 7.  So
8  if you could get that before you, that would be
9  helpful.
10       In the event -- I'm going to jump around a
11  bit, and I'll try to clearly state or identify the --
12  the areas where I have questions.
13       But what I'd like to do first is to go to the
14  section of your report that starts on Page 8 where it
15  says "Dora Mingo" and really focus then on Pages 8
16  through 12.
17       So if you would go to Page 8, I would
18  appreciate it.
19    A.  Okay.
20    Q.  Are you there?
21    A.  Yes.
22    Q.  Now, if you look at the information on
23  Page 8, 9, 10, 11, and 12, much of that is historical
24  medical record or medical data information for
25  Mrs. Mingo; right?

Page 136

1     A.  Yes, I would agree with that.
2     Q.  So -- so what I would -- what I'd like to do
3  is kind of go paragraph by paragraph and page by page
4  and identify what is -- what is really kind of
5  demographic historical data versus what is something
6  that you have -- are providing narrative or comment
7  on in terms of -- of a direct, you know, comment or
8  statement from you, rather than of a recitation
9  or download from her medical records.
10    A.  Okay.
11    Q.  Would you be able to do that?  And I'll --
12  I'll try to kind of guide you through that.
13       So why don't we just -- why don't we just
14  start on Page 8, and specifically start with the
15  paragraph that begins with "As of June 4, 2014," and
16  go to the bottom of Page 8.
17       My question is:  Is all of that essentially
18  medical history or medical record information,
19  without any comment or narrative from you?
20    A.  Yes, I believe it is.
21    Q.  And there -- there were some places where
22  there -- there may be some -- some significant
23  paraphrase or -- or condensing of information, but
24  it's still things that come from the chart.
25       For example, if you look at the last sentence

Page 137

1  of -- of that paragraph that I referred you to, it
2  says:  She had begun a workup for chronic kidney
3  disease, although her estimated GFRs were mostly
4  always above 60.
5        Do you see that?
6        MS. CONKLIN:  Object to the form.
7        THE WITNESS:  Yes, I see that.
8  BY MR. HONNOLD:
9     Q.  So that's a -- that's a -- that's a statement
10  that comes from the medical records, but it really
11  condenses a fair amount of historical information in
12  terms of summarizing her GFRs over time; correct?
13    A.  Right.  I didn't list the GFRs out.  Yes, I
14  did not.
15    Q.  So what I'd like to do now is go to Page 9
16  and look at that paragraph that begins at the top of
17  Page 9 and goes to just below half-way down.
18       And same question:  Is the information there
19  historical medical record information, rather than
20  commentary -- commentary or kind of explanatory
21  information from you?
22    A.  I would say it -- it's all contained in the
23  medical record.  The last sentence is basically a
24  summary of -- of her --
25    Q.  Right.

Protected - Subject to Further Protective Review

Page 138

1   A. -- of her labs that I've listed out totally,
2   so . . .
3       Q.  Right.
4           Meaning that there isn't a place that you go
5   in the chart where it specifically says 4-gram drop.
6   You've simply done the math to correlate hemoglobin
7   from a beginning time sequence to an end time
8   sequence and calculated the reduction in time;
9   correct?
10      A.  That's correct.
11          MS. HOFFMANN:  Objection.
12          THE WITNESS:  I've summarized the -- the data
13      points that I've -- that I listed out
14      individually.
15  BY MR. HONNOLD:
16      Q.  And the source of those data points was all
17  the Mingo medical records; correct?
18      A.  That's correct.
19      Q.  So the same question then for the -- for the
20  remainder of the information on the, you know, kind
21  of the bottom third to one-fourth of Page 9:  Is
22  that, again, all historical medical record
23  information?
24          Perhaps with the exception of what you state
25  about the dose -- her dose of Xarelto.

Page 139

1           MS. HOFFMANN:  So, I'm sorry, the pending
2       question is whether or not the information, with
3       the exception of that one part about the dose,
4       comes from the medical records?
5           MR. HONNOLD:  Yes.
6   BY MR. HONNOLD:
7       Q.  And -- and here's what I'm asking you,
8   Doctor, so you -- I -- I don't mean to be confusing
9   about this, but there are -- there are -- been many
10  experts who have written these reports where they'll
11  insert some education plan story information, or they
12  try to make certain inferences from -- from things?
13          And I'm just trying to identify truly on
14  these pages what is just raw, historical data, versus
15  what is something that you have put in by way of
16  explanatory information.
17      A.  Okay.
18      Q.  And, again, now we're focusing on that bottom
19  paragraph on Page 9.
20      A.  So I believe all that information is
21  contained in the medical record.  I think the phrase
22  where I say "Which was an appropriate dose for her,
23  given that her creatinine was 1.14," the -- the part
24  about the appropriate dose for her, given that her
25  creatinine -- that is -- that wasn't written in the

Page 140

1   medical record.  That is me saying that that -- that
2   is an appropriate dose.
3       Q.  You're just confirming that that is, in fact,
4   the indicated dose for her particular circumstance?
5       A.  That is correct.
6       Q.  All right.  Let's go on to Page 10 then.
7   Let's go -- same -- same questions for those top
8   three lines on the top of Page 10, as well as
9   that -- that next full paragraph on Page 10.
10      A.  You want me to go through the first full
11  paragraph, you said?
12      Q.  Yes, yes.  And, again, just -- just delineate
13  for me which is just raw, historical medical record
14  information versus what is some commentary or
15  explanation by you.
16      A.  I believe that -- that the last bit of the
17  paragraph at the top of the page, as well as the
18  first full paragraph all contains factual information
19  from the medical records, with the exception of the
20  last phrase, after the comma in "visit," which was me
21  indicating my opinion was that Dr. Hercules made a
22  reasonable decision not to stop the Xarelto and
23  aspirin, and -- and why I thought that was a
24  reasonable decision.  I don't think he actually
25  stated that in the medical records.

Page 141

1           MS. HOFFMANN:  Did you want him to go on to
2       the next part?
3           MR. HONNOLD:  Yes.
4   BY MR. HONNOLD:
5       Q.  Let's go ahead and go on to the next
6   paragraph on Page 10.
7       A.  I believe that's all factual information in
8   the next paragraph.
9       Q.  Thank you.
10          Same questions then for the information at
11  the very bottom of Page 10, going through that first
12  paragraph break there at the top of Page 11.
13      A.  I believe that's all factual information.
14      Q.  Thank you.
15          Same question then for that middle paragraph
16  on Page 11.
17      A.  I believe that's all factual.
18      Q.  Again, same questions then for the bottom
19  paragraph on Page 11.
20      A.  So down to the last full sentence, I think
21  it's all factual, with the exception of I do state
22  why the Protonix is -- why Protonix is administered
23  to decease acid production in the stomach.  So that's
24  stating something that is maybe not contained in the
25  medical record.

Protected - Subject to Further Protective Review

Page 142

1    Do you want me to keep going on to the next
2 page?
3    Q.  Yeah.
4    Then why don't we go on through the remainder
5 of that at the bottom of Page 11 and the top of Page 12.
6    Is it fair to say for that information, the
7 last full sentence on 11 and then the sentences that
8 carry on to the top of Page 12, that that is fair to
9 state that that is somewhat commentary, or your view,
10 I guess, of -- of her situation when she was in the
11 emergency department?
12    MS. CONKLIN:  Object to the form.
13    THE WITNESS:  It's probably my -- the last
14    sentence on 11, leading into and ending on the
15    top of Page 12, and then the -- then the first
16    full sentence on Page 12 is basically my overview
17    of her presentation.  The last sentence on the
18    top of Page 12 is actually fact from the medical
19    record.
20 BY MR. HONNOLD:
21    Q.  When patients like Ms. Mingo experience a
22 drop in hemoglobin, is -- is one possible sequela of
23 that that they may have some cardiac effects?
24    A.  Certainly a -- a low hemoglobin can cause --
25 the principal thing that we worry about is it causes

Page 143

1 ischemia to heart tissue.  So low oxygen delivery
2 causes lack of oxygen to the cardiac monocytes, which
3 results in killing the monocytes.  It can also cause
4 a high cardiac output failure to the heart.  So you
5 could -- you could over -- kind of, more or less,
6 terms overwork the heart until the point that it
7 doesn't work correctly.
8    So those are two possible options with severe
9 anemia, not necessarily to -- I'm not saying
10 necessarily to the level that she had, but those are
11 two things that we think about with patients with
12 severe anemia.
13    Q.  And there are times when a patient does
14 present with some -- some amenia or an interval drop
15 in hemoglobin.  You don't always know where that
16 patient might end up, correct, in terms of the
17 process that's been going on, that -- for -- for
18 example, a patient might present with a 9, but if
19 they've had some process going on, there still might
20 be some drop from 9; correct?
21    MS. CONKLIN:  Object to form.
22    MS. HOFFMANN:  Objection.
23    THE WITNESS:  So you're saying you don't
24    know -- well, you don't know if one point in time
25    check what the nadir would be?

Page 144

1 BY MR. HONNOLD:
2    Q.  Right?
3    A.  Or if they were to continue, let's say, to
4 bleed?
5    You know, presumably if someone -- yes, so I
6 see what you're saying.  So -- so one point in time
7 doesn't show you changes over time, obviously.
8    Q.  Right.
9    So a -- a patient like Mrs. Mingo, who -- who
10 presents with a drop in hemoglobin or an anemia,
11 there -- it would at least be reasonable for a
12 physician to be concerned, prospectively, about the
13 potential of these sorts of cardiac conditions
14 potentially developing; correct?
15    MS. CONKLIN:  Object to the form.
16    THE WITNESS:  I don't -- typically, that's
17    not the way clinically you think.  I mean, you
18    don't think, well, I'm concerned this is going to
19    occur.  You kind of look at the symptoms and you
20    determine what -- what you believe is present,
21    and then you try to, you know, treat the
22    condition such -- such that if you think there's
23    ischemia present, if you reverse that ischemia.
24    But I'm sure that if you think -- clinically,
25    usually you don't think forward what might happen

Page 145

1 if.
2 BY MR. HONNOLD:
3    Q.  There wasn't anything wrong --
4    MS. HOFFMANN:  Wait.  Was he finished?
5    MR. HONNOLD:  Oh, I didn't mean to interrupt
6    him.
7    THE WITNESS:  I was finished.
8    MS. HOFFMANN:  Okay.
9    MR. HONNOLD:  Yes.
10    MS. HOFFMANN:  I'm sorry, I had my head down,
11    and I just heard not a period at the end of that
12    sentence.
13    MR. HONNOLD:  We're going to have to move you
14    down to the corner.
15    MS. HOFFMANN:  Sorry.
16 BY MR. HONNOLD:
17    Q.  Was there anything wrong or inappropriate or
18 negligent about sending her in the intensive care
19 unit?
20    MS. CONKLIN:  Object to the form.
21    THE WITNESS:  No, not at all.  I mean,
22    oftentimes that is -- there's -- sending someone
23    to the intensive care unit can be a -- can be a
24    complex process in terms of how you decide who
25    goes where.  It can be physician-centric; it can

37 (Pages 142 to 145)

Protected - Subject to Further Protective Review

Page 146

1  be patient-centric.  It could be
2  recourse-centric.  So there -- there are a lot of
3  reasons how or why a patient ends up in the
4  intensive care unit.
5      Now, obviously, if you are critically ill and
6  require resources that are only provided in an
7  intensive care unit, that's -- that's an easier
8  decision.
9      But absent that, the decision of where to put
10  a patient, there's a lot of input into that
11  decision.
12  BY MR. HONNOLD:
13  Q.  And it -- it may be facility-specific in
14  terms of the other options that were available.  For
15  example, really what were their capabilities for
16  patient monitoring on their regular medical surgical
17  floor, for example; right?
18      MS. CONKLIN:  Object to the form.
19      THE WITNESS:  That -- that can be true of --
20  of some hospitals, that there are certain
21  resources that are only available at certain
22  places or monitoring at certain places.
23  BY MR. HONNOLD:
24  Q.  If blood loss is significant enough, can --
25  can patients actually experience cardia arrest?

Page 147

1  A.  You could -- you could bleed to death.  Yes,
2  you can bleed to death.
3  Q.  But short of an absolute exsanguination, I
4  mean, can -- can blood loss induce certain organ
5  dysfunction that can be significant?
6      MS. CONKLIN:  Object to form.
7      MS. HOFFMANN:  Object -- yeah.
8      THE WITNESS:  So blood loss can result in --
9  the effect of blood loss on the body can result
10  in, say, for example, the blood pressure to -- to
11  drop to a dangerously low level, and that -- that
12  could cause a lack of profusion to organs, which
13  could sustain injury because of that.
14      It's probably more of the effect of the blood
15  loss on the physiology, rather than the direct
16  blood loss.
17  BY MR. HONNOLD:
18  Q.  So blood loss can lead to volume loss or
19  hypovolemia, which can lead then to hypotension,
20  which then can lead to a decrease in organ profusion?
21      MS. CONKLIN:  Object to the form.
22      THE WITNESS:  That's across the continuum.
23  That's -- that's a true statement.
24  BY MR. HONNOLD:
25  Q.  And if -- if that happens to some organs, it

Page 148

1  may cause -- we've talked about the heart -- but it
2  may cause cardiac irritability onset of -- of heart
3  failure, might induce arrhythmia, things of that
4  nature?
5      MS. HOFFMANN:  Objection to form.
6      MS. CONKLIN:  Objection.
7      THE WITNESS:  Arrhythmia is less likely.  We
8  did talk about ischemia and heart failure.  And
9  those things are usually acute; they're not
10  persistent.  So once you deal with the problem at
11  hand that's resulting in the abnormal physiology,
12  then those things resolve.
13  BY MR. HONNOLD:
14  Q.  And in other organs, might induce things such
15  as acute renal failure or a -- a shocked liver?
16  A.  Those --
17  Q.  Correct?
18  A.  Those things can happen with severe
19  hypotension, yes.
20  Q.  And if you go back to Page 11, you do make
21  the statement near the bottom of Page 11 or -- or you
22  include from the medical record the information that
23  she had a -- a PT of 26.2 seconds.
24      Do you see that?
25  A.  Yes.

Page 149

1  Q.  And that was against a normal range of 13 to
2  15 seconds; correct?
3  A.  That's correct.
4  Q.  And do you know from any of the medical
5  records or testimony that you've read in this case
6  what reagent was used for that prothrombin time test?
7  A.  I do not.
8  Q.  Anywhere specifically in your report do you
9  set forth or list the possible causes or explanations
10  for that prothrombin time of 26.2?
11      MS. CONKLIN:  Object to the form.
12      THE WITNESS:  I think I do in -- in -- in my
13  case discussion state that -- discuss that, that
14  the PT doesn't provide the clinician -- in the
15  way it's used in clinical practice, doesn't
16  provide the clinician with information above and
17  beyond indicating that the patient has some
18  effect of the drug.
19      But in routine clinical practice as of today,
20  PT test is not used to assess the degree of
21  anticoagulant activity in a patient taking
22  Xarelto, and it really doesn't affect the
23  decision-making process about how to treat the
24  patient.
25  BY MR. HONNOLD:

38 (Pages 146 to 149)

Protected - Subject to Further Protective Review

Page 150

1      Q.  And -- and I appreciate that.  My -- my
2   question was just slightly differently?
3      Do you -- do you state anywhere the list of
4   causes or possible causes of why that hemoglobin was
5   elevated?
6      MS. CONKLIN:  Object to the form.
7      THE WITNESS:  You mean the PT?
8   BY MR. HONNOLD:
9      Q.  The PT.  I'm so sorry.
10     A.  I don't believe I specifically list that out.
11   I just try to -- to -- to highlight what the clinical
12   utility of -- of the PT test is in that scenario and
13   what it means to the clinician.
14     Q.  And based upon a reference that you gave me
15   in your prior answer, does that mean that the
16   elevated PT confirms the presence of drug on board or
17   that the patient has been ingesting -- or consistent
18   with ingestion of Rivaroxaban?
19     MS. CONKLIN:  Object to the form.
20     THE WITNESS:  So my interpretation of it is
21   there is some -- there is some effect of
22   Rivaroxaban.
23   BY MR. HONNOLD:
24     Q.  And based upon not only your -- your clinical
25   experience but -- but the information that's in

Page 151

1   your -- your references that you've listed in your
2   report, what is the PT that you would expect to see
3   for a patient who is taking the dose of Rivaroxaban
4   that Ms. Mingo was?
5      MS. CONKLIN:  Object to the form.
6      THE WITNESS:  I have no particular
7   expectation of what that PT would be.
8   BY MR. HONNOLD:
9      Q.  So for a patient like Ms. Mingo taking
10   Rivaroxaban, your view is that you don't -- you
11   don't really have any view of what the -- what the PT
12   should be as a result of taking the drug, other than
13   that you -- it would not surprise you for it to be
14   somewhat elevated as a result of her taking the drug?
15     MS. CONKLIN:  Objection to the form.
16     MS. HOFFMANN:  Objection.
17     THE WITNESS:  Yes.  To me, it's a clinically
18   irrelevant -- it's -- it's not a necessary piece
19   of information as to how I'm going to treat
20   Ms. Mingo.
21     So if Ms. Mingo comes in and tells me that
22   she takes -- she took her last dose of
23   Rivaroxaban and I order a PT and it's normal and
24   I believe that she is unstable -- and I'm making
25   all this up -- and I'm going to treat her with

Page 152

1   PCC, it doesn't matter to me what the PT is.  And
2   it's the same decision as if the PT test is 29;
3   I'm still going to treat the patient based on all
4   the information that I have.  And the PT is just
5   a single piece of data.
6   BY MR. HONNOLD:
7      Q.  When you use Kcentra to reverse the effects
8   of Coumadin, do you generally get an INR first?
9      A.  Well, typically, if I'm -- the answer to that
10   is usually not.  Typically, if I'm treating a patient
11   with an emergent condition with PCC and they're on
12   Coumadin, then I just give the maximum dose of -- of
13   Kcentra and don't necessarily base it on -- base it
14   on the PT -- I mean, excuse me, the INR value.
15     Q.  In any of the literature that you've cited in
16   your -- in your reference list, is there anything
17   that states what the average or median PT was for
18   patients in EINSTEIN?
19     MS. CONKLIN:  Object to the form.
20     THE WITNESS:  I'm not familiar with that
21   information.
22   BY MR. HONNOLD:
23     Q.  Have you at any point in time read the ROCKET
24   study, the clinical trial that lead to the approval
25   of Rivaroxaban for the nonvalvular atrial

Page 153

1   fibrillation indication?
2      MS. HOFFMANN:  Objection to form.
3      THE WITNESS:  I'm familiar with the ROCKET
4   study.  I don't know if I've read the study from
5   word one to word end.
6   BY MR. HONNOLD:
7      Q.  In any of your work on this case, have you
8   looked at any material that was generated by the FDA
9   as part of their review process leading to approval
10   of Rivaroxaban for any of its indications?
11     MS. CONKLIN:  Objection.
12     MS. HOFFMANN:  Are you including the label?
13     MR. HONNOLD:  Other than the label.
14     MS. HOFFMANN:  Thank you.
15     THE WITNESS:  Not other than the label.
16   BY MR. HONNOLD:
17     Q.  Okay.  So you've not looked at any of the FDA
18   briefing documents or any of the clinical or
19   pharmacologic reviews that were done leading up to
20   approval?
21     A.  I have not.
22     Q.  Do you know whether your laboratory has
23   available any of the for-research-use-only assays for
24   determining a Rivaroxaban level?
25     MS. CONKLIN:  Object to the form.

39 (Pages 150 to 153)

Protected - Subject to Further Protective Review

Page 154

1      THE WITNESS: I do not know that. But if
2  they're for research only, I would guess that the
3  clinical lab does not have those.
4  BY MR. HONNOLD:
5      Q. Were -- were you -- have you ever been a
6  clinical -- clinical trial sponsor for Janssen or
7  Bayer in your career?
8      A. Meaning -- well, the answer to that is no.
9      But I wanted to clarify "sponsor." You mean
10 a --
11     Q. Trial site.
12     A. No.
13     Q. Let's keep going through your report like we
14 did before.
15     Let's go ahead and go to the middle -- well,
16 everything else on Page 12, down to the subheading of
17 Case Discussion and Opinions.
18     A. I believe that's all actual information.
19     Q. In terms of your review of the medical
20 records in this case, did -- what is your view as to
21 whether or not Ms. Mingo took any Rivaroxaban on
22 February 13th?
23     MS. HOFFMANN: Did you say based on the
24 medical records?
25     MR. HONNOLD: Medical records or anything

Page 155

1  else he's reviewed.
2      MS. HOFFMANN: Thank you.
3      THE WITNESS: My understanding is that she
4  took a 15-milligrams dose on the morning of
5  February 13th, and that was her last 15-milligram
6  dose.
7  BY MR. HONNOLD:
8      Q. And -- and did not take any more Xarelto on
9  February 13th; correct?
10     A. That's my understanding.
11     Q. And did not take any Xarelto on
12 February 14th; right?
13     A. Correct.
14     Q. So your view in terms of her entire -- the
15 entirety of Ms. Mingo's usage of Xarelto, the last
16 dose was the 15-milligram -- the single 15-milligram
17 dose she took on February 13th; correct?
18     A. Correct.
19     MS. CONKLIN: Object to the form.
20 BY MR. HONNOLD:
21     Q. Then on Page 12 where you refer to a PT of
22 16.4, that suggests that her PT was still elevated to
23 some degree on February 14th; correct?
24     A. Well, it was above the lab -- upper limit of
25 normal, 15.

Page 156

1      Q. What are the possible explanations for that
2  PT still being elevated on --on February 14th, after
3  she had not taken indicated doses and was receiving
4  blood products?
5      MS. CONKLIN: Object to the form.
6      THE WITNESS: Well, it could be from -- it
7  could be from the fresh frozen plasma that was --
8  that was administered. Fresh frozen plasma has
9  an INR of 1.5. So that's one possible
10 explanation.
11     Bleeding, to some degree, can induce a
12 coagulopathy, because the body is attempting to
13 control the bleeding with -- through the normal
14 coagulation cascade. So you can utilize the
15 clotting factors faster than you can produce
16 them. So it's a possibility that it was an
17 artifact of -- of the bleeding.
18     And then I don't have the exact time that
19 this was measured, but -- and, again, I'm not a
20 pharmacology expert -- but she had taken a dose
21 of Rivaroxaban 24 hours ago. So I suppose
22 there's a possibility that there -- there was
23 still some effect of the Rivaroxaban. Although I
24 think that's a lower -- a lot lower possibility,
25 given what I know about the pharmacokinetics of

Page 157

1  the drug.
2  BY MR. HONNOLD:
3      Q. And -- and tell me specifically in terms of
4  pharmacokinetic attributes of the drug, what -- what
5  about those attributes would make Rivaroxaban a lower
6  likelihood explanation for that PT still being
7  elevated on the 14th?
8      A. Well, you would have cycled through probably
9  three half-lives or so of the drug. So typically, by
10 cycling through that many half-lives, the
11 pharmacologic effect of -- of a drug would almost not
12 be present, assuming that you're otherwise
13 metabolizing the drug appropriately.
14     Q. Can that process of drug elimination or
15 metabolization change or be altered as a result of
16 bleeding?
17     A. Not to my knowledge.
18     Q. So when you said that that -- the 16.4 PT
19 could be the result of bleeding, you were talking
20 about kind of that depletion phenomenon that it might
21 be elevated because her body had already used up its,
22 I guess, storage of -- of -- of factors or -- or
23 blood components?
24     MS. CONKLIN: Object to the form.
25     THE WITNESS: Bleeding itself can induce

40 (Pages 154 to 157)

Protected - Subject to Further Protective Review

Page 158

1  coagulopathies simply just from overconsumption.
2  BY MR. HONNOLD:
3     Q.   And -- and you use the term
4  "overconsumption."  I said "depletion."  But we're --
5  we're talking about the same phenomenon?
6     A.   Yes, I believe so.
7     Q.   And then I think you said down to the
8  subheading of Case Discussion and Opinions that's,
9  again, all medical record data; correct?
10    A.   That's correct.
11    Q.   Have you been called upon sales
12  representatives of either Bayer and/or Janssen
13  related to Rivaroxaban?
14    A.   I know I did have a meeting with a sales
15  representative that was trying to get the hospital
16  information about the -- I'm not even sure what the
17  program that they have to provide a trial of
18  Rivaroxaban.  And I referred that person to the
19  pharmacy department, one of our clinical pharmacists.
20    Q.   And do you know whether that representative
21  was from Bayer and/or -- or Janssen?
22    A.   I have no idea.
23    Q.   Was it your understanding that they were --
24  they were looking to try to introduce Xarelto into
25  the hospital formulary or have it be a medication

Page 159

1  taken into account to be given at discharge, or both?
2     MS. CONKLIN:  Object to the form.
3     THE WITNESS:  I believe that the medication
4  was already formulary.  I -- I think it was more
5  knowing the -- we serve a patient population that
6  has -- that's got a high self-pay or
7  non-commercial payer mix, and they were thinking
8  that this could be beneficial to that patient
9  population, because there's some program to help
10 provide the medication.
11 BY MR. HONNOLD:
12    Q.   So it was some sort of a financial incentive
13 program, whether it was samples or coupons or a trial
14 course of the drug, something like that?
15    MS. HOFFMANN:  Objection.
16    MS. CONKLIN:  Object to the form.
17    THE WITNESS:  I know it wasn't samples,
18 because our hospital doesn't allow samples.  But
19 it was some -- yes, some program that they have
20 to help with the medication.  I'm not exactly
21 sure what it is, because I just referred the
22 patient -- or the -- the sales rep right off,
23 because I don't -- I'm not involved in those
24 decisions.
25 BY MR. HONNOLD:

Page 160

1     Q.   Let's go on to Page 12 then.
2        And what -- what -- was it your idea to break
3  your report down into the sections that you have,
4  including the Ms. Mingo section that we've just
5  reviewed and -- and then the Case Discussion and
6  Opinion section that starts at the very bottom of
7  Page 12?
8     MS. HOFFMANN:  Objection.  I think that's
9  getting dangerously close to attorney/client
10 privilege.
11    MR. HONNOLD:  I -- I don't know.
12    THE WITNESS:  You guys tell me what you want
13 me to do.  You're looking at me like --
14 BY MR. HONNOLD:
15    Q.   Was the format of your opinion something that
16 a lawyer told you to do?
17    MS. HOFFMANN:  Objection.
18    THE WITNESS:  No.  This is the way I
19 formulated the report.
20 BY MR. HONNOLD:
21    Q.   In this case, do you specifically have an
22 understanding as to why any of the PT tests were
23 performed on Ms. Mingo?
24    A.   I have an opinion as to why they were
25 performed, and then I've got some information based

Page 161

1  on the deposition testimony.
2     Q.   I want to get to what is your understanding
3  of why it was done based upon testimony.
4     A.   My overall understanding, it was done out of
5  matter of routine on a patient that is taking an
6  anticoagulant, an oral anticoagulant.
7     Q.   Have you, at any time in your work on this
8  case, taken the PT level that Ms. Mingo had and then
9  gone to any source to try to correlate it with a
10 serum or plasma concentration level of Rivaroxaban?
11    A.   I have not.
12    Q.   In your work on this case, have you been
13 privy to, I guess, either in terms of documents or
14 materials that you've reviewed or things that you've
15 been told about how patients had their PT tested
16 during the ROCKET trial?
17    MS. CONKLIN:  Object to the form.
18    THE WITNESS:  The only thing I can remember
19 about any of that was in some of the deposition
20 testimony, some -- there was some questions of
21 the treating physicians specifically relating to
22 that issue of the ROCKET trial.  That's the only
23 thing I recall at all.
24 BY MR. HONNOLD:
25    Q.   But -- but do you specifically -- do you

41 (Pages 158 to 161)

Protected - Subject to Further Protective Review

Page 162

1   specifically know in terms of how PT testing was done
2   and for what purpose in the ROCKET trial?
3       A.  Outside of those questions, that's the only
4   thing I've ever heard about, so I don't know.  I
5   don't have any other information.
6       Q.  Have you ever reviewed any piece of medical
7   literature that suggests that the Neoplastin PT is a
8   relatively reliable laboratory test to evaluate the
9   level of anticoagulation or anticoagulant effect in a
10  patient taking Xarelto?
11      MS. CONKLIN:  Object to the form.
12      THE WITNESS:  I've reviewed literature that
13  alludes to that, but I've not reviewed anything
14  that shows that that test, you know, should be
15  used regularly to assess the effect of Xarelto,
16  mainly because I think it is so predictable that
17  it wouldn't really be necessary to do that.
18  BY MR. HONNOLD:
19      Q.  When you say "it's so predictable," what do
20  you mean?
21      A.  Meaning that it's not influence -- so, for
22  example, Coumadin is influenced by so many different
23  things:  Dose, patient-specific factors, diet, that
24  it -- it's not necessarily predictable in the way
25  it -- its effects are on the body.

Page 163

1       But Rivaroxaban tends to be much more
2   predictable in its pharmacology and, therefore,
3   routine testing and monitoring is not necessary.
4       Q.  You said that some of the literature you've
5   looked at, it's alluded do.  What do you mean by
6   that?
7       A.  Meaning I haven't systematically searched the
8   literature to, you know, look at -- look -- study and
9   learn and become an expert in Neoplastin tests.  I
10  mean, I know I've seen written that -- and seen
11  questions in the depositions that -- that there's --
12  there may be some information about a dose -- linear
13  dose relationship, but I didn't get into it anymore
14  that are than, because I wasn't asked, in my view, to
15  do that for this case.  I was asked to really look at
16  Ms. Mingo specifically.
17      Q.  Okay.  And that's why at the beginning I kind
18  of asked you what was your -- what was your
19  assignment or what was the question that was posed at
20  the outset, to kind of see what the -- what the
21  general parameters of your -- of your engagement
22  were.
23      But you've not viewed it as part of your work
24  on this case to kind of evaluate the various medical
25  literature that -- that -- or actually in your

Page 164

1   reference list that speak to that issue.  You've not
2   gone through to try to kind of look at all of those
3   things and the basis for that and -- and evaluate
4   that information; correct?
5       MS. CONKLIN:  Object to the form.
6       THE WITNESS:  And give opinions about it, no,
7   I have not.
8   BY MR. HONNOLD:
9       Q.  And it's not referenced anywhere in your
10  report; correct?
11      A.  Not that specific information.  That's
12  correct.
13      Q.  When Ms. Mingo was initially taking Lovenox,
14  would that have been a drug that would have effected
15  her PT level?
16      A.  It -- it can have variable effects on a PT
17  level, yes.
18      Q.  When you are treating patients with -- well,
19  strike that.
20      Do you have occasion in the hospital where
21  you might actually administer Lovenox to a patient
22  and then follow them for some period of time through
23  subsequent administrations or doses?
24      A.  Yes.  There are several scenarios in which I
25  might do that.

Page 165

1       Q.  Okay.  And Lovenox, that's a know
2   molecular-weight heparin; correct?
3       A.  That's correct.
4       Q.  And it works by inhibiting Factor Xa as well;
5   correct?
6       MS. CONKLIN:  Object to the form.
7       THE WITNESS:  It works at the Factor Xa -- Xa
8   level; although it's not a direct inhibitor.
9   BY MR. HONNOLD:
10      Q.  And is there a laboratory test that can be
11  used to monitor the effects of Lovenox on a patient?
12      MS. CONKLIN:  Object to the form.
13      THE WITNESS:  You can measure antithrombin
14  levels on Lovenox patients.  It's not typically
15  something that is done routinely, but I know it
16  can be done.
17  BY MR. HONNOLD:
18      Q.  Is it something that you might be concerned
19  about in patients that have a fluctuation in their
20  renal function?
21      A.  I suppose that's possible.  I mean, we know
22  that -- that -- that Lovenox can be effected by --
23  the effects of it can be effected by renal function.
24      Q.  Do you know in your laboratory at your
25  hospital whether your Factor Xa test or

42 (Pages 162 to 165)

Protected - Subject to Further Protective Review

Page 166

1 anti-Factor Xa test, whether it -- or what
2 medications it has been calibrated for?
3 MS. CONKLIN: Objection to form.
4 THE WITNESS: I do not know that.
5 BY MR. HONNOLD:
6 Q. What situations or circumstances do you
7 prescribe an anti-Factor Xa test -- or order, excuse
8 me?
9 A. In my clinical practice, I really don't have
10 utility for anti-Factor Xa test.
11 Q. Okay. Do you, yourself, as -- as -- and I'm
12 going to use the term "alone" -- but independently on
13 occasion have to treat ulcers endoscopically -- I
14 mean, actually provide curative treatment?
15 A. I don't do endoscopies, if that's what you're
16 asking.
17 Q. That's kind of what I was asking. It
18 wouldn't include that? Okay.
19 When endoscopy is necessary, then is that
20 usually through consulting a GI physician?
21 A. That's correct.
22 MR. HONNOLD: I don't want to get messed up
23 in terms of time, what we need -- let's go off
24 the record real quick. Sorry.
25 THE VIDEOGRAPHER: The time now is 11:12 a.m.

Page 167

1 We are off record.
2 (A recess was taken from 11:12 until
3 11:18 a.m.)
4 THE VIDEOGRAPHER: The time now is 11:18 a.m.
5 We are back on the record.
6 BY MR. HONNOLD:
7 Q. Doctor, we're back on the record now after a
8 short break?
9 The depositions -- all of the depositions
10 that you've reviewed in this case, they're set forth
11 on your reference list; is that true?
12 A. That's true.
13 Q. Okay. And I take it you haven't asked for
14 any other depositions or been asked to read any other
15 depositions in this case?
16 A. I have not.
17 Q. If I mention the name Michael Samama to you,
18 is that -- is that a -- is that a -- an author that
19 sounds familiar to you based upon the materials that
20 you've looked at?
21 A. Yes.
22 Q. Okay. And why is Samama a familiar name to
23 you?
24 A. He is, I would say, relatively pleuritic
25 author on Rivaroxaban and its use and various topics

Page 168

1 related to it.
2 Q. And just generally, are you -- are you
3 familiar with, you know, any particular points that
4 Dr. Samama has advocated or -- or suggestions that
5 he's made in any of his writings?
6 MS. CONKLIN: Object to the form.
7 THE WITNESS: Not specific points.
8 BY MR. HONNOLD:
9 Q. Do you recall anything about the
10 recommendations or conclusions that Dr. Samama has
11 drawn that if a clinician is interested in evaluating
12 the anticoagulant status of a patient that's on
13 Rivaroxaban, what laboratory tests would be the best
14 one to use for that?
15 MS. CONKLIN: Object to the form.
16 THE WITNESS: I'm not specifically familiar
17 with that recommendation.
18 BY MR. HONNOLD:
19 Q. Do you know whether or not any employees of
20 Janssen and/or Bayer have been co-authors with
21 Dr. Samama on any of his writings on the issue of
22 measuring the effects of Rivaroxaban using laboratory
23 tests in patients?
24 MS. CONKLIN: Object to the form.
25 THE WITNESS: I have no idea.

Page 169

1 BY MR. HONNOLD:
2 Q. Is it your view in Ms. Mingo's circumstance
3 that her hemoglobin improved when she stopped taking
4 Lovenox?
5 MS. HOFFMANN: Objection.
6 THE WITNESS: Well, as I point out in my
7 report, there -- there is a change in her
8 hemoglobin concentration between the last one
9 measured in the hospital after her hip surgery
10 and the next one measured; and that's a rise.
11 Now, in that time frame, she was on Lovenox
12 for seven days, and then she was off of it for, I
13 believe, six or seven days also.
14 BY MR. HONNOLD:
15 Q. What are the possible explanations for
16 Ms. Mingo's increase or rebound, as you used the
17 term, in her hemoglobin after she stopped taking
18 Lovenox?
19 A. From my perspective, when she stopped taking
20 the Lovenox, she -- this slow bleeding that she, I
21 believe she had, stopped, and then her body responded
22 by -- and -- and probably had already begun to -- not
23 probably, had already begun to -- to try to generate
24 more red blood cells. That's what happens naturally
25 when you -- when your hemoglobin levels drop. And so

43 (Pages 166 to 169)

Protected - Subject to Further Protective Review

Page 170

1    that's the process that occurred to get it back up.
2       Q.   And then in terms of how you view her
3    laboratory data, is there any suggestion then that
4    she suffered any acute loss of blood until she
5    started taking Xarelto?
6       MS. CONKLIN:  Object to the form.
7       THE WITNESS:  Well, I think I mentioned in my
8    report that I believe that the evidence in the
9    record about her surgery does not justify or does
10   not explain the observed 4-gram per deciliter
11   drop in hemoglobin.
12      So it appears to me, based on all the
13   information that I reviewed, that she began
14   bleeding in her GI tract slowly when she -- when
15   she got the Lovenox and that that continued, and
16   that's what's -- what explains her drop in
17   hemoglobin.
18   BY MR. HONNOLD:
19      Q.   But what made the hemoglobin then start to go
20   back up when she stopped taking the Lovenox?
21      A.   Well, when you stop taking the Lovenox -- and
22   Lovenox is the additional factor.  And she was also
23   on aspirin.  So it works in a different way than
24   aspirin.  So it appears as though when she had the
25   anticoagulant that worked different from aspirin

Page 171

1    added in, that it is -- those two things are what --
2    what's working different places in the coagulation
3    cascade, those two things are what gave her a
4    predilection to bleed.  When one of them is taken
5    away, her bleeding stops.  And then when one's added
6    back, the bleeding starts back.
7       Q.   So one of your opinions in this case is that
8    the removal of Lovenox stopped the bleeding?
9       A.   Well, the hemoglobin rebound, so I think it
10   appears as though she bled while on the Lovenox.
11   When the Lovenox was stopped, then she had -- she
12   rebounded --
13      Q.   Okay.
14      A.   -- from that.  And that -- so the bleeding
15   either stopped or slowed enough that the body was
16   able to keep up with it.
17      Q.   And -- and the process then of what's --
18   what's going on when the Lovenox -- when the Lovenox
19   is removed then, what is allowed to happen in terms
20   of her body's own ability to coagulate and the
21   clotting cascade -- what is -- what is going on in
22   her GI tract to -- in terms of its ability to provide
23   some homeostasis at the site or the defect or lesion?
24      MS. CONKLIN:  Object to the form.
25      THE WITNESS:  See if you can state that --

Page 172

1       MR. HONNOLD:  Sure.
2       THE WITNESS:  -- maybe in another way.  I'm
3    not sure I follow you.
4    BY MR. HONNOLD:
5       Q.   So you said either once the Lovenox is -- is
6    stopped, then she either stops bleeding or it slows
7    down so that the body can -- can deal with it;
8    correct?  Right?
9       A.   Right.  That's correct.
10      Q.   So when the Lovenox is removed at some point,
11   other than the platelet dysfunction that would be
12   induced by the aspirin, her clotting cascade then
13   returns to normal but for the platelet effect;
14   correct?
15      A.   Yes.
16      Q.   Then what is it about that -- of the clotting
17   cascade's return to normal then that allows the --
18   the bleeding to either be stopped or to be reduced to
19   the point where the body can -- can keep up with it?
20      A.   Well, then you're able to form the fibrin
21   clot, which you -- in a normal matter, which you
22   otherwise were not able to do when you have Lovenox
23   bound to antithrombin.
24      Q.   And when the drug is -- and what allows that
25   rebound to happen was the -- was the stoppage of the

Page 173

1    Lovenox; correct?
2       A.   Well, that's what allows the normal process
3    to happen, such that it doesn't -- it stops the
4    bleeding.
5       Q.   Okay.
6       A.   Or it significantly slows the bleeding.
7       Q.   And in Mrs. Mingo's situation, when the
8    Lovenox was stopped, that allowed the situation to be
9    remedied enough so that she did not have to go into
10   the hospital or the intensive care unit at that time;
11   correct?
12      A.   Yes.  She did not have to; that is correct.
13      Q.   And your -- your view is or opinion is
14   that there was essentially some healing in the form
15   of a fibrin cap or fibrin clot that is -- that is
16   able to generate and adhere to the side of the lesion
17   in the GI tract; correct?
18      MS. CONKLIN:  Object to the form.
19      THE WITNESS:  I mean, in -- in simple terms,
20   that's correct.  I mean, I think she had an ulcer
21   that had an open predilection to bleed, you know,
22   with the way it was positioned.  And when the
23   Lovenox was removed, the body was able to slow or
24   stop the bleeding enough.
25   BY MR. HONNOLD:

44 (Pages 170 to 173)

Protected - Subject to Further Protective Review

Page 174

1      Q.  And so in that particular situation,
2   Ms. Mingo's body demonstrated that if you stop a
3   particular anticoagulant in time, then the clotting
4   cascade can return to normal and allow -- allow a
5   lesion to -- to be healed; correct?
6          MS. CONKLIN:  Object to the form.
7          THE WITNESS:  I don't know if I would use the
8      term "to be healed."  I don't -- I don't -- I
9      think there's evidence that it didn't heal,
10     because then when the Xarelto was administered,
11     it bled again.
12  BY MR. HONNOLD:
13     Q.  But at least to be enough of a clot to
14  develop at the cite for -- for the bleeding to -- to
15  stop or be reduced now so that the body can keep up
16  with it; right?
17     A.  That's correct.
18     Q.  Now, when Ms. Mingo's first PT was taken and
19  it was 26 and change, in -- in this case, have you
20  specifically stated an opinion for how long her PT
21  had been at that level?
22         MS. HOFFMANN:  Counsel, are you talking about
23     the PT that was taken on February 13th; not the
24     one that was taken on February 24th?
25         MR. HONNOLD:  The one --

Page 175

1          MS. HOFFMANN:  Or January 24th.
2          MR. HONNOLD:  Yeah.
3          MS. HOFFMANN:  February 13th?
4          MR. HONNOLD:  Yeah, the one that was 26 and
5      change.
6          THE WITNESS:  I have not given any opinion
7      about that.
8   BY MR. HONNOLD:
9      Q.  And have you stated any particular opinion in
10  Ms. Mingo's case that at what point in time after she
11  started taking Xarelto that the PT would have
12  elevated to -- to 26 and change?
13         MS. HOFFMANN:  Objection.
14  BY MR. HONNOLD:
15     Q.  For example, you have not stated whether that
16  happened after her first doses or after her third and
17  fourth doses or fifth and sixth; correct?  You've not
18  stated an opinion on that issue?
19     A.  I have not stated an opinion on that issue,
20  that's correct.
21     Q.  And as you review the information in this
22  case, what was the date specifically that Ms. Mingo
23  started taking Xarelto?
24     A.  I believe she was given her first dose of
25  Xarelto on the 23rd.

Page 176

1      Q.  Of January?
2      A.  Of January.
3      Q.  2015; correct?
4      A.  That's correct.
5      Q.  Now, when you start a patient on Rivaroxaban,
6   do you take a baseline PT before you start the drug?
7      A.  No.
8      Q.  If the label for Xarelto instructed you or
9   gave instructions to do a baseline PT, would you do
10  it upon initiation of therapy?
11         MS. HOFFMANN:  Objection.
12         THE WITNESS:  Depends.  If I have a
13     patient -- I mean, I normally would do basic
14     laboratory work, meaning I would want to know the
15     renal function, and I would want to know the
16     liver function.  If those things are normal and
17     the patient doesn't have any other medical
18     history that suggests that there's any problem
19     with the coagulation cascade, then I may not do a
20     PT level, because it would not be useful
21     information.
22  BY MR. HONNOLD:
23     Q.  But -- but if the label -- if the label
24  instructed you upon initiation of therapy or prior to
25  initiation of therapy to perform a PT for baseline

Page 177

1   information and then to perform a PT upon the patient
2   reading reaching state of the drug, after some series
3   of -- of -- of doses, would you follow those
4   instructions?
5          MS. HOFFMANN:  Objection.
6          MS. CONKLIN:  Object to the form.
7   BY MR. HONNOLD:
8      Q.  If the -- if the label gave that instruction?
9          MS. CONKLIN:  Object to form.
10         MS. HOFFMANN:  Incomplete hypothetical.
11         THE WITNESS:  I would say if I believe it was
12     clinical relevant information.  I wouldn't order
13     a test just because the label says, if I didn't
14     believe it was going to be important information
15     for me to use clinically.  If I thought that it
16     was important clinical information, then I would
17     use those -- use that test.
18         So just to do it as a matter if the label
19     says it, without any guidance or instruction
20     about why to do it, it's not useful information
21     to me, because I wouldn't do anything with the
22     information.
23         Then I'm charging the patient for something
24     that's not necessary, that's not helping me as a
25     clinician.

45 (Pages 174 to 177)

Protected - Subject to Further Protective Review

Page 178

BY MR. HONNOLD:
1   Q.  But if you assimilated -- been determined to
2   be predictive of a risk of bleeding, that the PT, the
3   Neoplastin PT, was, in fact, predictive of the risk
4   of bleeding and that was the basis of the
5   instruction, you would certainly follow those --
6   those instructions for the use of Xarelto; correct?
7       MS. CONKLIN:  Objection.
8       MS. HOFFMANN:  Objection.
9       THE WITNESS:  But the label, in my view,
10  doesn't say that.  So I'm not sure that I can
11  answer your question.  I guess it's a theoretic
12  question?
13  BY MR. HONNOLD:
14  Q.  I'm asking you to assume that if it did?
15  A.  Okay.
16  Q.  That if it did provide you with those
17  instructions, that prior to initiation of therapy to
18  do a baseline PT and then to perform a PT again upon
19  the patient arrival at steady state, would you follow
20  those instructions, if there was known data to
21  suggest that a certain increase or level of PT was
22  predictive of risk of bleeding risk?
23      MS. HOFFMANN:  Objection.
24      MS. CONKLIN:  Objection to form.

Page 179

1       MS. HOFFMANN:  And incomplete hypothetical.
2       THE WITNESS:  Again, I guess I would probably
3   say if -- if I felt it was clinically important
4   information, meaning I was going to do something
5   with it, change the dose or, I don't know, stop
6   the dose.
7   BY MR. HONNOLD:
8   Q.  Or change the drug?
9   A.  Or -- I -- I guess, you know, if it then says
10  if it's a certain level, you have to stop the drug.
11  I mean, if it's clinically relevant information and
12  it's in the label as to how to monitor the drug then,
13  I mean, I would like to believe that most clinicians
14  would try to follow that.
15      But, again, I -- it's not information that's
16  in the label.  It's not information that we have to
17  use clinically, so I can't say one way or another
18  what my experience would be on that.
19  Q.  The depositions you read in this case, you
20  saw a discussion about the ROCKET data that did
21  identify and break down patients by quartile PT --
22  Neoplastin PT range; correct?
23      MS. HOFFMANN:  Objections.
24      THE WITNESS:  I do remember reading some
25  questions that were asked about that.

Page 180

BY MR. HONNOLD:
1   Q.  And after -- after you read those questions
2   in those depositions, did you think yourself to go
3   look at that FDA data in terms of the -- the -- the
4   data compilation that was done based upon the ROCKET
5   patients, to assess that data yourself?
6       MS. CONKLIN:  Object to the form.
7       THE WITNESS:  I did not.  It did -- it was
8   not relevant to what I was doing here in this
9   case, because it's not the indication that I was
10  looking at for Ms. Mingo.  So, no, I did not.
11  BY MR. HONNOLD:
12  Q.  Okay.  So tell me again specifically what was
13  the indication that you were looking at Ms. Mingo
14  for?
15  A.  Well, she was treated with the Rivaroxaban or
16  the Xarelto for DVT, deep vein thrombosis.  And the
17  ROCKET study was for INR values.
18  Q.  No, I understand.
19      But do you know one way or the other whether
20  the EINSTEIN study specifically looked at Neoplastin
21  PT for varying -- for different doses of -- of
22  Rivaroxaban?
23  A.  When I read the EINSTEIN study, I don't
24  recall there being specific data that, you know,

Page 181

1   guided decision-making or anything, one way or
2   another.
3   Q.  And you mentioned for the Lovenox that
4   Ms. Mingo was taking that -- that once she stopped
5   taking it, it allowed fibrin again to generate; is
6   that right?
7   A.  Correct.
8   Q.  And then the next step after fibrin
9   generation in terms of clot formation is what?
10  A.  Well, fibrin is what forms -- is what the
11  clot is.
12  Q.  Okay.  So it's the final step?
13  A.  Essentially, you get layers of fibrin, and
14  that's what the clot is.
15  Q.  Okay.  And so it looks like that even -- even
16  without the assistance -- or at least the presumed
17  lack of assistance from being on aspirin, Ms. Mingo
18  was able to generate enough of a fibrin response to
19  either stop or reduce the rate of bleeding to the
20  extent the body could keep up with it; correct?
21  A.  After the Lovenox was stopped?
22  Q.  Yes.
23  A.  Yes, that's -- that's what it appears.
24  Q.  Now, for patients that take Rivaroxaban, what
25  is, I guess, the actual end product of a clot that is

Protected - Subject to Further Protective Review

Page 182

1  inhibited or kept from being made when a patient is
2  taking Xarelto?
3      A.  It's the same; it's fibrin.
4      Q.  Okay.  And so you presume that a patient like
5  Ms. Mingo, when she is on Rivaroxaban, there's also
6  going to be a secession or a disruption of the
7  ability to generate fibrin; correct?
8      A.  Not completely.  You don't completely disrupt
9  the ability.  But it -- that is the -- the goal of
10  the medication is to inhibit at Xa so that you can't
11  produce thrombin correctly, and thrombin can't lead
12  to the production of fibrin.
13      Q.  But -- but the thought is in taking
14  Rivaroxaban, specifically in Ms. Mingo's case, was to
15  inhibit fibrin production just as it was when she was
16  on Lovenox; correct?
17      MS. HOFFMANN:  Objection.
18      THE WITNESS:  I guess the way the medicine
19  works, yes.  But she was prescribed the Lovenox
20  for prophylaxis, and she was prescribed the
21  Rivaroxaban for therapeutic treatment.
22  BY MR. HONNOLD:
23      Q.  Yeah, right.  No, I -- I understand that.
24      But -- but in -- in terms of impact upon the
25  clotting cascade, it's the same; correct?

Page 183

1      MS. HOFFMANN:  Objection.
2      MS. CONKLIN:  Object to the form.
3      THE WITNESS:  They're different mechanisms.
4  The ultimate goal is to decrease clot formation.
5  BY MR. HONNOLD:
6      Q.  Including fibrin?
7      A.  Well, fibrin is a clot.
8      Q.  The fibrin component?
9      A.  Yeah.  Well, largely the clot.
10      Q.  And so do you know what the timing of is in
11  terms of -- of -- of effect on the clotting cascade
12  and its ability to produce or generate fibrin when a
13  patient is at a presumed therapeutic dose of
14  Rivaroxaban for treatment of DVT when that drug is
15  stopped, as to when that ability to -- to generate
16  fibrin again returns, how long it takes?
17      MS. CONKLIN:  Object to form.
18      THE WITNESS:  I don't -- I don't know that
19  information.
20  BY MR. HONNOLD:
21      Q.  If -- in -- in this case, have you set forth
22  or stated any opinion as to what the impact would
23  have been on Ms. Mingo if, for example, she had
24  stopped taking Rivaroxaban the first of February?
25      MS. HOFFMANN:  Objection.

Page 184

1      THE WITNESS:  No, I have not stated that.
2  BY MR. HONNOLD:
3      Q.  You know that Ms. Mingo was on -- she may
4  have taken a dose or two of -- of Coumadin in one of
5  these intervals; right?
6      A.  My understanding is that she was given a
7  single dose of Coumadin on the 23rd, when she
8  presented to the hospital for the -- for the DVT.
9      Q.  So the effects of that warfarin dose,
10  whatever they were, they -- they -- they would have
11  ceased well prior to when she ended up going into the
12  hospital later in February; correct?
13      MS. HOFFMANN:  Objection.
14      THE WITNESS:  Sorry, that was on the 22nd.
15      But, yes, that should -- that -- the effects
16  of that should have been gone by February 13th.
17  BY MR. HONNOLD:
18      Q.  And on what date -- by what date would
19  Ms. Mingo had to have stopped Xarelto for its effects
20  to have been gone by the time she went into the
21  hospital -- or that date when she ultimately went
22  into to the hospital?
23      MS. HOFFMANN:  Objection.
24      MS. CONKLIN:  Object to the form.
25      THE WITNESS:  Again, I'm not an expert in the

Page 185

1  pharmacokinetics, but, you know, a rough
2  estimate, I would say perhaps maybe the 11th,
3  maybe the 12th.
4  BY MR. HONNOLD:
5      Q.  And why it is that you say that?
6      A.  Just by that time she would have had the
7  opportunity to cycle through several half-lives, and
8  so the -- the intended effect would be negligent,
9  nil, or close to that.
10      Q.  On the bottom of Page 14, you say that you
11  disagree with -- with Dr. Rinder's opinion that
12  aspirin can be ruled out as a cause of Ms. Mingo's
13  gastrointestinal bleed.
14      Do you see that --
15      A.  Yes.
16      Q.  -- at the bottom of Page 14?
17      And so when you say that -- that it's
18  impossible to rule something out, clinically, what
19  does that -- what does that mean, the mere fact it's
20  impossible to rule something out?  What . . .
21      A.  Well, number one, when you're taking two
22  medications that effect the coagulation system in
23  two -- two different mechanisms, there would be no
24  way to assign the relative contribution of each of
25  those medicines to the event at hand, the bleed at

47 (Pages 182 to 185)

Protected - Subject to Further Protective Review

Page 186

1    hand.  So you can't -- by virtue of that, you can't
2    rule out that there was no contribution of aspirin.
3    That's one thing.
4        The second is part of his -- in his report,
5    part of his decision-making is that she had taken
6    aspirin prior to her hip surgery and had never been
7    diagnosed with a GI bleed.  And then after she was
8    taken off the Xarelto and continued on the aspirin,
9    she didn't have a GI bleed or had not since been
10   diagnosed with a GI bleed.
11       And I think that the fault in that theory is
12   that she, in the interval, had an argon ablation and
13   hemoclip placed in the area that was potentially
14   going to bleed, and, therefore, that is what stopped
15   the future bleeding from occurring, not the fact that
16   she continued aspirin and didn't have bleeding.
17       So it's too much confounding to assign any
18   type of contribution of aspirin or lack of
19   contribution of aspirin to the bleeding.
20   Q.  So on Page 15, in the -- in the last sentence
21   of that main paragraph on Page 15 you say, quote:
22   The GI intervention was the reason for no further
23   bleeding and serves to highlight the fact the aspirin
24   cannot be ruled out as a culprit in the bleeding
25   using this evidence relied upon by Dr. Rinder.

Page 187

1        Do you see where I read?
2    A.  Yes.
3    Q.  And did I read it correctly?
4    A.  Yes.
5    Q.  Okay.  Now, in -- in your opinion section of
6    your report, do you -- do you state anywhere that it
7    is your opinion that, in fact, aspirin was, to a
8    reasonable degree of medical certainty, a culprit in
9    the bleeding?
10       And my question for you is:  Do you state
11   that opinion in writing anywhere in the opinion
12   section of your report?
13   A.  I -- I don't explicitly use the words that
14   you -- that I -- that you used, but I guess my
15   discussion in the bottom of 14 and 15, by disagreeing
16   with Dr. Rinder that it can be ruled out suggests
17   that my opinion is that it has to be a contributing
18   factor to the bleeding.  So if you can't rule it out
19   as a continuing factor, then it is a factor, because
20   we know it has effects on coagulation.
21   Q.  Then Xarelto was a continuing factor as well
22   then; correct?
23       MS. HOFFMANN:  Objection.
24   BY MR. HONNOLD:
25   Q.  Because it has impacts upon the coagulation

Page 188

1    cascade; right?
2        MS. CONKLIN:  Objection.
3        MS. HOFFMANN:  Objection.
4        THE WITNESS:  Well, I think that there's
5    evidence, obviously, that she bled when she was
6    on Xarelto and evidence that she bled.  And so --
7    on the Lovenox.
8        And so what I state -- state in my report is
9    that what my opinion is is that when she had
10   those two together, that it was a higher
11   predilection of bleed, and those are the times in
12   the medical record there was evidence where she
13   appeared to be bleeding.
14   BY MR. HONNOLD:
15   Q.  So her Lovenox was a contributing factor to
16   her bleed; right?
17       MS. HOFFMANN:  Lovenox?
18   BY MR. HONNOLD:
19   Q.  To the -- to some bleeding initially that we
20   talked about?
21       MS. HOFFMANN:  Sorry.
22       THE WITNESS:  That's correct.
23   BY MR. HONNOLD:
24   Q.  Okay.  Because you know Lovenox has an effect
25   on the clotting cascade; right?

Page 189

1    A.  Correct.
2    Q.  Okay.  And you have now said that you think
3    aspirin was a contributing factor to some degree to
4    the bleed later in February, because it effects
5    clotting through the innovation of platelets;
6    correct?
7    A.  Correct.
8    Q.  And so similarly because Rivaroxaban has an
9    impact upon to clotting cascade, Rivaroxaban was
10   likely a contributing factor to the bleed as well;
11   correct?
12   A.  I do think it had some contribution to the
13   bleed, yes.
14   Q.  So it would be fair to say that in your
15   opinion, Rivaroxaban was also a contributing factor
16   to the bleed; correct?
17   A.  Yes.  That is part of the reason why she
18   bled, yes.  Not the cause, but one of the reasons for
19   the bleed.
20   Q.  In this case, you've not stated any opinions
21   as to what Ms. Mingo's hemoglobin was on the days
22   before she was admitted to the hospital later in
23   February; correct?
24   A.  I have not stated that -- an opinion as to
25   what the cause was for her hemoglobin levels prior to

48 (Pages 186 to 189)

Protected - Subject to Further Protective Review

Page 190

1  her admission February 13th; is that the question?
2    Q.  Right.
3    A.  I don't believe I've expressly stated that as
4  an opinion.
5      MR. HONNOLD:  Let's go off the record real
6  quick.  There's a piece of paper that I'm looking
7  for, and I have not been able to find it in my
8  mess here.
9      THE VIDEOGRAPHER:  The time is 11:49 a.m.
10  We're off the record.
11     (A recess was taken from 11:49 a.m. until
12  12:22 p.m.)
13     THE VIDEOGRAPHER:  This begins Disc 5 of
14  today's deposition.  The time now is 12:22 p.m.
15  We are back on the record.
16  BY MR. HONNOLD:
17    Q.  Doctor, we're back on the record after our
18  lunch break.
19     There are just -- I've just got three or four
20  other topic areas that I want to go through.
21     And I think we're up to Exhibit No. 9.
22     (Jones Exhibit 9 was marked for
23  identification.)
24  BY MR. HONNOLD:
25    Q.  I'm going to hand you what I've marked as

Page 191

1  Deposition Exhibit No. 9?
2      MR. HONNOLD:  And watch out, that staple is
3  not perfect, and it's a little sharp.
4  BY MR. HONNOLD:
5    Q.  And, Doctor, I'll just represent to you that
6  this is part of the FDA evaluation of Rivaroxaban
7  before its approval for the atrial fibrillation
8  indication?
9     And my question for you -- I want you to go
10  to page -- actually, what is Page 11.  But the
11  numbering starts and stops a couple of times.  So if
12  kind of go probably 20 pages in, you'll see that --
13  how the numbering kind of goes.  And I'm trying to
14  get you to the Page 11 that has this graph on it.
15    A.  Mine's color, but is that --
16    Q.  Yes, that's it.
17     So -- and -- so my question for you is:  When
18  we were talking about this issue of the linear
19  relationship between PT and Rivaroxaban
20  concentration, is that an actual graphic depiction
21  of -- of the concepts we were talking about?
22     MS. HOFFMANN:  Objection.
23     MS. CONKLIN:  Objection.
24     THE WITNESS:  When we were talking about
25  this?

Page 192

1  BY MR. HONNOLD:
2    Q.  Yes?
3    A.  It appears to be a graph that -- that
4  measures PT on the X axis -- or, on the Y axis and
5  concentration on the X axis.
6      MR. HONNOLD:  And I'm going to mark your
7  drawing as Exhibit 10.
8      (Jones Exhibit 10 was marked for
9  identification.)
10  BY MR. HONNOLD:
11    Q.  And as you've pointed out, what is shown here
12  on Page 11 certainly isn't a -- isn't a perfect
13  linear relationship, as you described.  This angle of
14  assent is not at a 45-degree or close to a 45-degree
15  angle like you drew there on Exhibit 10; right?
16    A.  It is not.
17    Q.  And though that Figure 2 on Page 11 of -- of
18  this exhibit -- is that a similar graph to what has
19  been depicted or what is depicted in some of your
20  literature references in your report?
21     MS. HOFFMANN:  Objection.
22     THE WITNESS:  It -- it's potentially in some
23  of the references.  We could pull out a specific
24  one, I guess, and look at it, but . . .
25  BY MR. HONNOLD:

Page 193

1    Q.  Then I want to refer you to Page 34 of this
2  exhibit.
3     And you see here on Page 34 is the quartile
4  breakdown by Neoplastin PT with major bleeding
5  incidents and event rates.
6     And here's my only question for you:  Have
7  you ever seen data presented like this before?
8      MS. CONKLIN:  Objection.
9  BY MR. HONNOLD:
10    Q.  And -- and what I mean is:  Have you seen
11  this exact data presentation before that's set forth
12  on Page 34 in any of your materials that you've
13  looked at?
14     MS. HOFFMANN:  Objection.
15     MS. CONKLIN:  Objection.
16     THE WITNESS:  I can't recall whether I have
17  or have not, to be honest with you.
18  BY MR. HONNOLD:
19    Q.  Okay.  And if you look at some of those PT
20  quartiles, do you see how generally there is some
21  increase in the event rates and incident numbers for
22  the higher quartiles of Neoplastin PT?
23     MS. HOFFMANN:  I'm going to object.  There's
24  been no foundation laid that he's ever seen this
25  document before or any of this information.

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 194

1      MR. HONNOLD: Yeah, I think he said he's not
2  seen it.  Or that he doesn't think that --
3      MS. HOFFMANN:  Then I'm objecting.
4      MR. HONNOLD: -- he's seen it.
5      MS. HOFFMANN:  Then I will object to the form
6  of the question.  To ask about data that somebody
7  has not seen before in a large document on a
8  particular page, I think is -- is an improper
9  form of questioning.
10 BY MR. HONNOLD:
11     Q.  And I'll ask him again:  Do you think you've
12 ever seen this in any of, for example, the articles
13 that are in your reference or reliance list?
14     A.  I think I've said before, I -- I don't recall
15 whether I've seen it or not.  I mean, I've reviewed a
16 lot of information.  Perhaps I have.  I -- I just
17 don't recall, one way or another.
18     Q.  At least this document itself or anything
19 else from the FDA is not listed anywhere on your --
20 your reference pages attached to your report;
21 correct?
22     A.  This document is not listed.  But I think you
23 asked about this particular table.  So I don't know
24 if that's included in something else or not.
25     Q.  If you go back to what is marked as

Page 195

1  Exhibit 8, and if you go to the top of Page 4, which
2  is Section 1.1, but -- but what's stated there at the
3  very top of Page 4.
4      Do you see that statement at the top of
5  Page 4 that says:  There are limited data on the
6  relative effectiveness of Xarelto and warfarin in
7  reducing the risk of stroke and systemic embolism
8  when warfarin therapy is well-controlled.
9      Do you see that?
10     A.  Yes, I see that statement.
11     Q.  What does that mean to you when you read
12 that?
13     A.  I guess that comparing the effectiveness of
14 Xarelto to warfarin for preventing stroke from
15 embolization when warfarin is -- whatever
16 "well-controlled" means -- that there's not -- not a
17 lot of data on it, would be -- I don't know what
18 "well-controlled" means, and I don't know what
19 "limited" means in this context, but . . .
20     Q.  Do you manage patients on warfarin on an
21 ongoing basis in your practice?
22     A.  Not -- not regularly.
23     Q.  In this case, are you -- are you taking the
24 position there's any specific facts related to
25 Ms. Mingo that would suggest that she is not a

Page 196

1  patient that could have been well-maintained on
2  warfarin?
3      MS. CONKLIN:  Object to the form.
4  BY MR. HONNOLD:
5      Q.  Is that part of any of your opinions in this
6  case?
7      MS. HOFFMANN:  Objection.
8      THE WITNESS:  I don't think we know one way
9  or another about how she would have responded.
10 BY MR. HONNOLD:
11     Q.  And that's not -- but that's not an issue
12 that you've addressed at all in your report; correct?
13     A.  No, it's not an issue I have addressed in my
14 report.
15     Q.  Do you know one way or the other whether the
16 Xarelto label instructs prescribers or clinicians
17 about how serial monitoring of hemoglobin may provide
18 meaningful information as to whether or not a patient
19 is bleeding?
20     A.  Whether the label has that in it?
21     Q.  Yes.
22     A.  Well, I mean, I don't have the label
23 memorized.  I did -- I have read it, but I don't
24 remember specifically that point.
25     Q.  Do you prescribe Pradaxa?

Page 197

1      A.  I have, yes.
2      Q.  Okay.  And -- and do you -- do you do it
3  routinely?
4      A.  Well, you know, oftentimes, I choose the oral
5  anticoagulant based on potentially the -- the
6  clinician that's going to be managing the patient
7  on -- on a more ongoing, regular basis.  So there are
8  some clinicians that prefer one over the other.  So
9  that's some of the decision-making that goes into it.
10     Q.  And I've only got one of these, so I'm going
11 to pass it around before I show it to you.
12     MR. HONNOLD:  This is this April 2013 label
13 for Pradaxa that I've marked it as Exhibit 11.
14     And I'm sorry, I don't have copies of it.
15     (Jones Exhibit 11 was marked for
16 identification.)
17     MS. HOFFMANN:  So which exhibit is that?  Say
18 again.
19     MR. HONNOLD:  11.
20     MS. HOFFMANN:  11.
21     MR. HONNOLD:  Have you given it to him?
22     MS. CONKLIN:  I did, yes.
23     MR. HONNOLD:  Oh, thank you.
24 BY MR. HONNOLD:
25     Q.  Do you -- do you have some familiarity with

50 (Pages 194 to 197)

Protected - Subject to Further Protective Review

Page 198

1  the -- with the Xarelto label -- or, the Pradaxa
2  label? Excuse me?
3      A.  Some.
4      Q.  The -- if you go to Section 5.2 there, do you
5  see that the Pradaxa label specifically gives
6  instruction about the need to promptly follow up on
7  drops in hemoglobin?  Do you see that?
8      A.  Yes, I see that.
9      Q.  Okay.  Did you know that that information was
10  in the Pradaxa label?
11      A.  I did not.  It doesn't surprise me.  But I
12  would think this would be general knowledge that any
13  clinician would have regardless of whether it's in
14  the label.
15      Q.  In terms of specific reference to following
16  up on drops in hemoglobin, that -- that specific
17  guidance that's in the Pradaxa label, Exhibit 11, is
18  that similarly stated in the Xarelto label in -- in
19  Section 5.2?
20      MS. HOFFMANN:  Objection.
21      MS. CONKLIN:  Objection.
22      MS. HOFFMANN:  Do you want him to compare it
23  to the -- the Pradaxa label you gave him, or are
24  you asking for any --
25      MR. HONNOLD:  Sure.

Page 199

1      MS. HOFFMANN:  I mean -- for any Xarelto
2  label?
3      MR. HONNOLD:  No.
4  BY MR. HONNOLD:
5      Q.  I'm just saying Exhibit 7 --
6      MS. HOFFMANN:  Sorry.
7      Q.  -- in Section 5.2 of Exhibit 7, does it
8  include the specific guidance on following up of
9  drops of hemoglobin like the Pradaxa label does,
10  Exhibit 11?
11      A.  So it -- it says that, promptly evaluate any
12  signs or symptoms of blood loss and consider the need
13  for blood replacement -- which is one of the signs of
14  blood loss would be a drop which hemoglobin, so . . .
15  And that's such basic medical information, I would
16  think that it's not even necessary to be in the
17  label.
18      So my interpretation is, yes, it is in the
19  label.  Although they don't use the term "hemoglobin"
20  or "hematocrit," they say that you should follow up
21  on a sign of blood loss, which is a drop in
22  hemoglobin or hematocrit.
23      Q.  And why would it be important to do that?
24      A.  Well, you would -- one of the things on a
25  differential diagnosis or a change in hemoglobin or

Page 200

1  hematocrit is bleeding.
2      Q.  Have you ever seen any foreign labels for
3  Rivaroxaban, whether it's European label, Canadian,
4  or New Zealand or Australia?
5      A.  I have not.
6      Q.  What I would like you to do is go to your
7  report, which is, I guess, Exhibit 7.
8      MR. HONNOLD:  I -- I made a mistake when I
9  referred to the Pradaxa label as Exhibit 7.  I
10  should have been saying Exhibit 8 for that.  So I
11  apologize.
12      THE WITNESS:  You have 11 on this.
13      MR. HONNOLD:  Oh, sorry.  For the Xarelto
14  label is 7; it's actually 8.
15      MS. CONKLIN:  Oh, okay.
16      MR. HONNOLD:  I'm sorry.
17  BY MR. HONNOLD:
18      Q.  And so if you would go to the reference list?
19      MR. HONNOLD:  I'm going to mark these
20  materials as collectively Exhibit 12.
21      (Jones Exhibit 12 was marked for
22  identification.)
23  BY MR. HONNOLD:
24      Q.  But I'd like to kind of go through them
25  sequentially?

Page 201

1      So this is the first part of what's going to
2  be a --a larger exhibit, Exhibit 12.
3      Does that look like a copy of your reference
4  list, item number one, the Adcock and Gosselin
5  article?
6      A.  Yes, it does.
7      Q.  Then the next thing I'm going to hand you is
8  another document that you can put behind that.  But
9  my question for you is:  Does this article, Managing
10  Reversal of Direct Oral Anticoagulants in Emergency
11  Situations, does that look like a copy of your
12  reference -- your reference, item number two?
13      A.  Yes, it does.
14      Q.  Then I'm going to hand you the beginning of
15  The Lancet article by Ageno, Mantovani, et al,
16  basically the -- the XALIA study.
17      And I just, because I -- I could not get
18  direct access without purchasing it, I just copied
19  the first page.
20      Does that look like the introductory page of
21  your reference item number three?
22      A.  No.  This is --
23      Q.  Number four?
24      A.  Yes, number four.
25      Q.  Okay.  Then I'm going to hand you -- the next

51 (Pages 198 to 201)

Protected - Subject to Further Protective Review

Page 202

1  item is an abstract --
2      MR. HONNOLD:  Do you want to see that?
3      Q.  -- entitled Diagnosis and Management of Lower
4  Gastrointestinal Bleeding by Barnert and Messmann.
5      Does that at least look like the abstract
6  from PubMed for your reference item number five?
7      A.  Yes.
8      MS. HOFFMANN:  So five was the abstract?
9      MR. HONNOLD:  Five is the abstract.
10     MS. HOFFMANN:  Thank you.
11     MR. HONNOLD:  Right, of the Barnert and
12  Messmann article.
13  BY MR. HONNOLD:
14     Q.  I'm going to hand you the next abstract,
15  which is Clinical Laboratory Measurement of Direct
16  Factor Xa Inhibitors by Barrett, Wang, and Shenker,
17  S-H-E-N-K-E-R?
18     And does that look like the abstract for your
19  reference item number six?
20     A.  Yes, it does.
21     Q.  I'm next going to hand you an abstract of an
22  article by Baumann and Keenan and others from
23  Biomedical Research International.
24     Does it look like that's the abstract for
25  your reference item number seven -- or, excuse me,

Page 203

1  number -- right, number seven?
2      A.  Yes, it is number seven, the abstract for
3  number seven.
4      Q.  The next thing I'm going to hand you, does
5  that look like it's the entire article for number
6  seven?
7      A.  Yes, it does.
8      Q.  The next thing I'm going to hand you is
9  another abstract of an article by Bouillon,
10  B-O-U-I-L-L-O-N, and others.
11     Does that appear that that is the abstract
12  for reference item number eight?
13     A.  Yes, it does.
14     Q.  The next thing is an article by Brooks and
15  others from Therapeutic Advances in Chronic Disease.
16     My question is:  Does it appear that that's
17  the entire article for reference item number nine?
18     A.  Yes, it does.
19     Q.  The next thing is an article by Davidson and
20  others from JAMA.
21     Does it appear that that is the article for
22  reference item number ten?
23     A.  Yes, it does.
24     Q.  The next thing is an abstract of an article
25  by DiNisio, D-i-N-I-S-I-O, and others from Thrombosis

Page 204

1  and Hemostasis.  It's an abstract.
2      Does it appear to be the abstract for
3  reference item number 11?
4      A.  Yes, it does.
5      Q.  The next thing is an article from Circulation
6  by Eerenberg and others regarding Reversal of
7  Rivaroxaban and Dabigatran By Prothrombin Complex
8  Concentrate.
9      Does it look like that is the article for
10  reference item number 12?
11     A.  Yes, it does.
12     Q.  The next thing is an article by Eerenberg and
13  others.
14     Again, does it appear that that is the entire
15  article for item number 13?
16     A.  Yes, it does.
17     Q.  Okay.  The next two papers are from the
18  EINSTEIN Working Group.
19     The first one I'm handing you, does that
20  appear to be item number 14 in your reference list?
21     MS. HOFFMANN:  Is it the entire or --
22     MR. HONNOLD:  Yes, it's in its entirety.
23  Thank you.
24     THE WITNESS:  Yes, it does.
25  BY MR. HONNOLD:

Page 205

1      Q.  The next EINSTEIN item I'm handing you is
2  titled Oral Rivaroxaban for the Treatment of
3  Symptoms -- or Symptomatic Pulmonary Embolism.
4      Does that look like the entire article for
5  reference item number 15?
6      A.  Yes.
7      Q.  The next item, does that appear to be the
8  article by Faust and others for reference item number
9  16?
10     A.  Yes, it does.
11     Q.  The next thing is an abstract by an -- for an
12  article by Fawole, F-A-W-O-L-E, and others from the
13  Cleveland Clinic Journal of Medicine.
14     Does that appear to be the abstract for item
15  number 17?
16     I'm sorry.
17     A.  Yes, it does.
18     Q.  The next thing is an abstract from an article
19  by Gosselin, G-O-S-S-E-L-I-N, and Adcock from The
20  Journal of Thrombosis and Hemostasis.  It's an
21  abstract.
22     Does that appear to be an abstract for
23  reference item number 18?
24     A.  Yes, it does.
25     Q.  Similarly, does what I'm handing you now

52 (Pages 202 to 205)

Protected - Subject to Further Protective Review

Page 206

1    appear to be the article for item number 18?
2    A.  Yes.  This is the full article.
3    Q.  The next thing is by Holbrook and others.
4    It's the guidelines from American College of Chest
5    Physicians.
6        Does this appear to be the entirety of the
7    guideline paper that's reference item number 19?
8    A.  Okay.  Here it is.
9        This is -- I'm not sure what this is.
10   There's several things here.
11   Q.  Oh, did I hand you too much?
12   A.  I don't know what -- this looks like it is
13   a -- AHRQ, maybe a summary of article 19.  There --
14   there are multiple things in this.
15       That is not in 19.
16   Q.  I'll take that back.
17   A.  Do you want me to -- do you want me to give
18   you all this back?
19       MR. HONNOLD:  Where's the stack you've been
20   making?
21       MS. CONKLIN:  Right here.
22       THE WITNESS:  That's everything that you've
23   given me.
24       MR. HONNOLD:  Okay.  That was in here.  Okay.
25   Thank you.

Page 207

1        THE WITNESS:  This is the stack --
2        MR. HONNOLD:  Thank you, thank you.
3    I'm almost done.
4        THE WITNESS:  So you had asked me about 19,
5    and I have not seen 19.
6    BY MR. HONNOLD:
7    Q.  Okay.  I'm going to hand you a set of
8    materials that has both the abstract and the paper
9    for Lindhoff-Last, L-A-S-T, and Samama, Assays for
10   Measuring Rivaroxaban:  Their Suitability and
11   Limitations?
12       Does it appear that those are materials for
13   reference item number 26?
14       MS. HOFFMANN:  So you bypassed the ones in
15   between?
16       MR. HONNOLD:  Well, because I had them messed
17   up.  I had them out of order there.  So I'm not
18   going to take the time on the record to -- to
19   clarify those.
20       THE WITNESS:  Yes, it does appear to be that.
21   BY MR. HONNOLD:
22   Q.  The next thing is an abstract from the paper
23   by Miller and Trujillo, T-R-U-J-I-L-L-O, from
24   American Journal of Emergency Medicine?
25       Does it appear that's the abstract for

Page 208

1    reference item number 27?
2    A.  Yes, it does.
3    Q.  I'm going to hand you a paper by Prins and
4    others from Thrombosis Journal.
5        Does it appear that that is reference --
6    article from reference article number 30?
7    A.  Yes, it does.
8    Q.  The next thing is a -- kind of a bullet point
9    printout entitled Novel Anticoagulants and Bleeding
10   in the Emergency Department.
11       Does it look like that at least some
12   component of reference item number 31?
13       I can't verify that it's in its entirety.
14   It's a fairly complicated website, but at least
15   that's what I was able to download.
16   A.  Yes, it does appear to be that.
17   Q.  The next thing is an abstract by -- a paper
18   by Samama and others from Thrombosis and Hemostasis,
19   Assessment of Laboratory Assays to measure
20   Rivaroxaban.
21       Does it appear that that is the abstract for
22   reference item number 34?
23   A.  Yes, it does.
24   Q.  The next thing is a paper by Siegal,
25   S-I-E-G-A-L, from the Journal of Thrombosis and

Page 209

1    Thrombolysis.
2        Does it look like that was the entire paper
3    for reference number 35?
4    A.  And this is a couple of abstracts that were
5    at the back of that.
6    Q.  Oh, thank you.
7    A.  This is 35.
8    Q.  The next thing is an abstract for a paper by
9    Turpie and others.
10       Does it appear that that's the abstract for
11   reference item number 36?
12   A.  Yes, it does.
13   Q.  The next thing is a paper by Wilkins from the
14   American Family Physicians.
15       Does it appear that is the paper for
16   reference item number 37?
17   A.  Yes, it does.
18   Q.  If -- if there is an article that is on the
19   reference list, would you have at least read it in
20   its entirety at some point in time?
21   A.  I would say that I would have read it, yes.
22   Q.  The next thing is a paper by Samama and
23   others from the Thrombosis Journal.
24       Does it look like that was the paper for
25   article -- or, reference item number 33?

53 (Pages 206 to 209)

Protected - Subject to Further Protective Review

Page 210

1 A. Yes, it does.
2 Q. Okay. Have you ever done any -- any type of
3 consulting work for payment for Janssen or Bayer
4 before -- before work on this case?
5 A. No, I have not.
6 Q. Have you ever made any presentations or
7 lectures regarding the use of Rivaroxaban?
8 A. No, I have not.
9 Q. Do you, yourself, have copies of any of the
10 depositions that you've given in any of the cases
11 before where you've served as an -- as an expert
12 witness?
13 A. I may have -- the cases that have been
14 closed, I -- I get rid of all of those materials. If
15 there's an open case where I've given a deposition,
16 it's possible that I have those. I'm just not
17 absolutely positive.
18 Q. There is one of the exhibits to your report,
19 which is Exhibit B. I'd like you to go to that --
20 A. Okay.
21 Q. -- for a moment.
22    And specifically, I want to ask you about a
23 deposition in 2013, Coonts, C-O-O-N-T-S, v. Messner,
24 et al. It looks like it was a case in Missouri. Do
25 you see that?

Page 211

1 A. Yes.
2 Q. Do you recall what that case was about?
3 A. I believe it was a case of -- you're
4 challenging my memory here -- a patient who had --
5 who presented to the ED with complaints of back and
6 leg pain and was diagnosed with lumbar radiculopathy,
7 and then eventually ended up with an arterial blood
8 clot in the leg where she was also having the sciatic
9 pain or the pain from her pack.
10 Q. And were you testifying on behalf of the
11 plaintiff or the defendant in that case?
12 A. The defendant.
13 Q. Do you recall what county in Missouri it was
14 in?
15 A. No, I do not.
16 Q. Do you recall the name of the lawyer that you
17 worked for in that case?
18 A. I think it was the Maltmus (phonetic) Law
19 Firm.
20 Q. I'm going to go down to the deposition
21 section for 2015.
22    Do you see the second case there, Memenga v.
23 Brady, et al, also in Missouri?
24 A. Yes.
25 Q. Do you recall what the -- the factual

Page 212

1 circumstances of that case?
2 A. That was a case of a patient who presented to
3 an emergency department, was diagnosed with
4 pneumonia, and then suffered a cardiac arrest. And
5 on autopsy was found to have a massive pulmonary
6 embolism.
7 Q. And were you testifying for the plaintiff or
8 the defendant there?
9 A. Defendant.
10 Q. And same as before, do you recall the county
11 that case was in or the name of the lawyer that
12 retained you?
13 A. I believe that was also the Maltmus Law Firm.
14 Q. Then going gown to the Kutmas, K-U-T-M-A-S,
15 versus someone -- it's not -- it's not clear who the
16 defendant was there. Also the case in Missouri. Do
17 you recall the facts of that case?
18 A. I do not recall that one, maybe because I
19 inadvertently left out the other names. Sometimes I
20 know these cases by one name, and I can't remember
21 what that one was.
22 Q. And so in 2015, you would have given 11
23 depositions in medical/legal cases; is that right?
24 A. Yes.
25 Q. And it looks like that Memenga v. Brady case

Page 213

1 went to trial. Do you recall that?
2 A. Yes.
3 Q. Do you know what part of the state you went
4 to to testify?
5 A. If I recall correctly, it was maybe
6 Springfield. I think that's where I flew into. Now,
7 I was driven somewhere, so I don't know exactly where
8 I was driven. I'm not intimately familiar with
9 Missouri.
10 Q. If you go to the next page for 2016, there's
11 a case -- another case from Missouri called
12 Hoaglin v. Cox Health. Do you see that?
13 A. Yes.
14 Q. And do you recall the facts of that case?
15 A. It seems like I should. I believe -- yes,
16 this was a case of a adolescent that had a --
17 presented with a headache and was triaged to a
18 waiting room, and then subsequently after she was
19 evaluated, was found to have subarachnoid hemorrhage.
20 Q. And who retained you for that case?
21 A. The attorneys for the hospital retained me in
22 that case.
23 Q. And is that a case that's still pending?
24 A. No. I --- I think that case was settled.
25    I just remembered this Kutmas case.

54 (Pages 210 to 213)

Protected - Subject to Further Protective Review

Page 214

1    Q.  Yes?
2    A.  It was an appendicitis case.
3    Q.  Were you testifying for plaintiff or
4  defendant?
5    A.  For the defendant.
6    Q.  And who retained you?
7    A.  It was not the Maltmus firm.  It was a
8  different firm.  I can't remember the name of the
9  attorney.
10    Q.  The -- part of your CV that talks about your
11  publications --
12    A.  Yes.
13    Q.  -- do you have specific publications that
14  talk about the prescribing and management of
15  anticoagulation -- or anticoagulants for DVT or PE?
16    A.  There may be some in some of the articles
17  that are related to PE and DVT, there may be some
18  discussion, or there may be some issues with
19  management of the anticoagulation in those patients.
20  But, largely, the PE and DVT studies are related to
21  diagnosis -- diagnostic studies to -- to establish
22  the diagnosis.
23    Q.  Have you or your institutions served as a
24  clinical trial site for any clinical trials related
25  to any of the novel oral anticoagulants and any of

Page 215

1  their indications, whether it's apixaban, Xarelto,
2  Pradaxa, or others?
3    A.  I can represent to you that I have not.  In
4  terms of my institution, I don't -- I don't know the
5  answer to that question.
6    Q.  Have you ever been paid money to speak on
7  behalf of a pharmaceutical or a medical device
8  company related to any product?
9    A.  Never.
10    Q.  Have you served on -- ever served on a
11  therapeutics committee at your hospital?
12    A.  No.
13    Q.  Ever served on a pharmacy committee?
14    A.  No.
15    Q.  Ever served on any risk management or
16  peer-review committees?
17    A.  Well, we have a peer-review committee within
18  our department, but it's not an institutional
19  peer-review committee.
20    Q.  Is it -- is it a peer-review committee
21  organized under the -- properly organized under the
22  statutes of the State of Missouri -- or Mississippi?
23    MS. HOFFMANN:  Missouri?
24    THE WITNESS:  I would think it's not
25  organized under the statutes of the State of

Page 216

1  Mississippi.
2  BY MR. HONNOLD:
3    Q.  Okay.  Have you ever served on any
4  quality-improvement type of committee or undertaken
5  quality improvement reviews for your hospital?
6    A.  We have, again, within our department, which
7  is the department specific quality counsel that I
8  participate in, but I'm not on an institutional
9  review committee.
10    Q.  Do you have any familiarity at all with your
11  testimony or any writings by Frank Misselwitz?
12    A.  I've never heard of him.
13    Q.  What is your understanding as to in a patient
14  who's taking twice a day Rivaroxaban for the
15  treatment -- for the active treatment of DVT, what is
16  the average trough level for those patients between
17  doses?
18    MS. HOFFMANN:  Objection.
19    MS. CONKLIN:  Object to the form.
20    THE WITNESS:  I don't know the answer to that
21  question.
22  BY MR. HONNOLD:
23    Q.  Do you have -- have you read anything that
24  speaks to what the median or average Neoplastin PT is
25  at tough for patients who are taking b.i.d.

Page 217

1  Rivaroxaban?
2    MS. CONKLIN:  Object to the form.
3    THE WITNESS:  No, I don't have any
4  information related to that.
5  BY MR. HONNOLD:
6    Q.  Do you know whether your hospital, whether or
7  not it's in your department, has any preprocedure or
8  periprocedural standing orders or policies and
9  procedures regarding what anticoagulation test, if
10  any, should be performed before a procedure on a
11  patient that's been taking Rivaroxaban?
12    MS. HOFFMANN:  Objection.
13    THE WITNESS:  None to my knowledge.  That's
14  not to represent there might not be some.  But
15  none to my knowledge.
16  BY MR. HONNOLD:
17    Q.  Do you believe that there could be any
18  circumstances when Rivaroxaban exposure could
19  increase enough in a given patient to where the
20  actual risk of bleeding is increased?
21    MS. CONKLIN:  Objection.
22    MS. HOFFMANN:  Objection.
23    THE WITNESS:  I'm not sure I can -- I don't
24  know exactly what you mean by "exposure."  I
25  think earlier I said it's not typically something

55 (Pages 214 to 217)

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 218

1  that I think about as a clinician, so I'm not
2  sure how to answer that.  I -- I don't know what
3  that term means.
4  BY MR. HONNOLD:
5      Q.  And I'm only using it because it's something
6  that's used throughout the label for Rivaroxaban.
7          So I guess you come to the same point, you're
8  not sure of the understanding -- or the meaning of
9  that term, so you can't answer that question?
10         MS. HOFFMANN:  Objection --
11         MS. CONKLIN:  Objection.
12         MS. HOFFMANN:  -- to form.
13         THE WITNESS:  Yes.  It's -- it's not a term
14     that I was as a clinician and how I think about
15     how I prescribe or manage Rivaroxaban in a
16     patient, so it's not -- I don't know how to
17     answer that.
18  BY MR. HONNOLD:
19      Q.  Do you know whether your hospital pharmacy
20  has any particular guidelines or policies or
21  procedures relating to the measurement of Rivaroxaban
22  or which tests to use for the measurement of
23  Rivaroxaban levels?
24         MS. HOFFMANN:  Objection.
25         THE WITNESS:  Not that I'm aware of.

Page 219

1  BY MR. HONNOLD:
2      Q.  Do you know who is the head pharmacist at
3  your -- at your in-hospital pharmacy?
4      A.  I believe his -- yes, I do.  I believe his
5  name is Todd Dear.
6      Q.  Have you ever spoken with him related in any
7  way to evaluation of test results for Rivaroxaban?
8      A.  I have not.
9      Q.  Medical licensure, any actions ever taken
10  against your license to limit it, suspend it, or
11  revoke it in any way?
12      A.  No.
13      Q.  Have your hospital staff privileges
14  suspended, limited, any actions taken on them in any
15  way?
16      A.  No.
17      Q.  Convicted of -- ever convicted of a crime of
18  any type?
19         MS. HOFFMANN:  Object to form.
20         MR. HONNOLD:  Why?
21         MS. HOFFMANN:  Traffic.
22         MR. HONNOLD:  Is that a crime?
23  ///
24  ///
25  ///

Page 220

1          MS. HOFFMANN:  I -- I don't know.  I -- basis
2  of my objection, plus relevance.  I mean, 18;
3  marijuana, who cares?
4  BY MR. HONNOLD:
5      Q.  The answer is no?
6      A.  No.  Not that I recall.
7          MR. HONNOLD:  Doctor, I don't have any other
8  questions for you.  Thank you for your time and
9  courtesy.  It was a pleasure meeting you.
10         THE WITNESS:  Thank you.
11         THE VIDEOGRAPHER:  Do you have any questions?
12         The time now is 1:15 p.m.  Today's deposition
13  of Dr. Alan Jones consisting of five discs is now
14  concluded.
15         (Whereupon, the deposition concluded at
16  1:15 p.m.)
17         (Jones Exhibit No. 13 was marked for
18  identification.)
19         (Jones Exhibit No. 14 was marked for
20  identification.)
21
22
23
24
25

Page 221

1          C E R T I F I C A T E
2
3          I, KELLY J. LAWTON, Registered Professional
4  Reporter, Licensed Court Reporter, and Certified
5  Court Reporter, do hereby certify that, pursuant to
6  notice, the deposition of ALAN JONES, M.D. was duly
7  taken on February 10, 2017, at 7:11 a.m. before me.
8          The said ALAN JONES, M.D. was duly sworn by
9  me according to law to tell the truth, the whole
10  truth and nothing but the truth and thereupon did
11  testify as set forth in the above transcript of
12  testimony.  The testimony was taken down
13  stenographically by me.  I do further certify that
14  the above deposition is full, complete, and a true
15  record of all the testimony given by the said
16  witness.
17
18  _____
19         KELLY J. LAWTON, RPR, LCR, CCR
20
21         (The foregoing certification of this
22  transcript does not apply to any reproduction of the
23  same by any means, unless under the direct control
24  and/or supervision of the certifying reporter.)
25

56 (Pages 218 to 221)

Protected - Subject to Further Protective Review

| Page 222 |
| --- |

1   INSTRUCTIONS TO WITNESS
2
3
4        Please read your deposition over carefully
5   and make any necessary corrections.  You should state
6   the reason in the appropriate space on the errata
7   sheet for any corrections that are made.
8
9        After doing so, please sign the errata sheet
10   and date it.  It will be attached to your deposition.
11
12        It is imperative that you return the original
13   errata sheet to the deposing attorney within thirty
14   (30) days of receipt of the deposition transcript by
15   you.  If you fail to do so, the deposition transcript
16   may be deemed to be accurate and may be used in
17   court.
18
19
20
21
22
23
24
25

| Page 224 |
| --- |

1   ACKNOWLEDGMENT OF DEPONENT
2
3        I, ALAN JONES, M.D., do hereby acknowledge
4   that I have read the foregoing pages, 1 to 220, and
5   that the same is a correct transcription of the
6   answers given by me to the questions therein
7   propounded, except for the corrections or changes in
8   form or substance, if any, noted in the attached
9   Errata Sheet.
10
11
12   _____      _____
13   ALAN JONES, M.D.                   DATE
14
15
16
17
18   Subscribed and sworn to before me this
19   _____ day of _____, 20___.
20   My Commission expires: _____
21
22   _____
   Notary Public
23
24
25

| Page 223 |
| --- |

1            ------
2          E R R A T A
3            ------
4   PAGE  LINE  CHANGE
5   ____ ____ _____
6      REASON: _____
7   ____ ____ _____
8      REASON: _____
9   ____ ____ _____
10      REASON: _____
11   ____ ____ _____
12      REASON: _____
13   ____ ____ _____
14      REASON: _____
15   ____ ____ _____
16      REASON: _____
17   ____ ____ _____
18      REASON: _____
19   ____ ____ _____
20      REASON: _____
21   ____ ____ _____
22      REASON: _____
23   ____ ____ _____
24      REASON: _____
25

| Page 225 |
| --- |

1   LAWYER'S NOTES
2   PAGE  LINE
3   ____ ____ _____
4   ____ ____ _____
5   ____ ____ _____
6   ____ ____ _____
7   ____ ____ _____
8   ____ ____ _____
9   ____ ____ _____
10   ____ ____ _____
11   ____ ____ _____
12   ____ ____ _____
13   ____ ____ _____
14   ____ ____ _____
15   ____ ____ _____
16   ____ ____ _____
17   ____ ____ _____
18   ____ ____ _____
19   ____ ____ _____
20   ____ ____ _____
21   ____ ____ _____
22   ____ ____ _____
23   ____ ____ _____
24   ____ ____ _____
25

57 (Pages 222 to 225)