UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | MDL No. 2592 |
| | SECTION L |
| THIS DOCUMENT RELATES TO: | JUDGE ELDON E. FALLON |
| Joseph J. Boudreaux, Jr., et al. v. Janssen et al. Case No. 2:14-cv-02720 | MAGISTRATE NORTH |
| Joseph Orr, Jr., et al. v. Janssen et al. Case No. 2:15-cv-03708 | |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO PRECLUDE JAMES A. REIFFEL, MD (AND ANY OTHER MEDICAL EXPERT'S TESTIMONY) ABOUT ATTORNEY ADVERTISING AND EARLIER CANCER DETECTION FROM ANTICOAGULANT-RELATED BLEEDS**

The opinion testimony of Dr. James A. Reiffel, M.D. is relevant, reliable, and admissible under *Daubert*.[1] Plaintiffs' Motion, which is in large measure an *in limine* motion in a *Daubert* dress, seeks to preclude Dr. Reiffel from (1) referring to his own and another published paper analyzing the impact of attorney advertisements in the Xarelto® litigation on adverse event reporting and patient safety, and (2) testifying that anticoagulant medicines, such as Xarelto, promote early detection of certain diseases processes, including cancer. For the reasons explained below, Plaintiffs' Motion should be denied.

The two papers that Plaintiffs seek to exclude specifically relate to the impact of attorney advertising in the Xarelto litigation on patient safety, adverse event reporting, and physician practices related to use of Xarelto – all relevant issues based on Plaintiffs' theory of the case. *See* Reiffel, J.A., Misleading Advertising by Attorneys Concerning NOACs Is Adversely Costly

---

[1] Plaintiffs filed separate motions on February 10, 2017 directed to other experts on similar topics. Defendants will oppose the other motions in a separate opposition to be filed under the deadlines in CMO2D on March 6, 2017.

to Our Patients and Society, *Journal of Atrial Fibrillation* 2016; 8(5) (Exh. A); Burton, P. and Peacock, W.P., A Medwatch review of reported events in patients who discontinued rivaroxaban (XARELTO) therapy in response to legal advertising, *Heart Rhythm Case Reports* 2016; 2:248-49 (Exh. B).

In this litigation, Plaintiffs have relied on recent observational studies and a publication by the Institute for Safe Medical Practices known as QuarterWatch, which is edited by one of their experts in the *Mingo* case and which publicizes adverse event rates reported to the U.S. Food and Drug Administration through a system known as MedWatch. ▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ However, the actual evidence, based on the published literature and a review of MedWatch reports, is that adverse events reported through MedWatch have been driven by aggressive and pervasive attorney advertisements that have permeated the airwaves, and include each and every lawsuit that has been filed, meritorious or not, and have artificially increased the number of reports. Defendants are entitled to explain, through expert testimony, the impact of those advertisements on the reported adverse events, including thrombotic and bleeding events when patients have decided to stop using Xarelto after seeing an attorney advertisement, as well as reported rates of bleeding events driven by these same advertisements.

Contrary to Plaintiffs' assertions, Dr. Reiffel's opinions are not based on "personal" subjective beliefs; rather, they are based on an extensive review of the relevant studies and literature, including an analysis of MedWatch reports in the published literature, as well as his

clinical experience regarding the impact of attorney advertisements on physicians and patients. Although Plaintiffs seek to exclude this highly relevant opinion testimony and evidence, they do not call into question the validity or accuracy of the articles from a medical or scientific perspective, and even if they were to do so, this line of attack would be a subject for cross-examination at trial, not exclusion of opinion testimony. The published literature based on the same MedWatch reports submitted to the FDA and referenced in QuarterWatch specifically notes that individuals stopped using Xarelto because of attorney advertisements and experienced adverse events that were later reported to FDA. The articles and MedWatch Reports noting this phenomenon are relevant and admissible, and Dr. Reiffel's opinion testimony based on this published literature satisfies *Daubert*.

Testimony regarding lawyer advertising also is relevant for other reasons. Plaintiffs are expected to offer evidence of the defendants' marketing to argue that Defendants encouraged patients and doctors to use Xarelto instead of available alternative medicines. But given the volume spent on attorney advertising, it is important and only fair for the jury to know that Janssen's was not the only voice in the media. The plaintiff lawyers had a competing voice, and the volume of adverse events reported in Dr. Reiffel's paper and in another paper by Dr. Peacock and Dr. Burton demonstrates the effectiveness of the plaintiff lawyer advertising that undermined the safety information in the label. Further, the jury should hear the impact that these advertisements have on the practice of medicine, as articulated by Dr. Reiffel, and the impact on physicians, including ▉▉▉▉▉▉▉▉▉▉, who prescribed Xarelto to Joseph Boudreaux, Jr. and who now must counsel patients to continue use of Xarelto given its significant benefits. Likewise, at least one of the *Orr* Plaintiffs claims to have seen lawyer advertisements and relied on the truth of them before and after the alleged injuries in question.

Plaintiffs' Motion to preclude Dr. Reiffel from rendering opinions about the benefit of Xarelto in the early detection of cancer also should be denied. Under a proper risk-benefit analysis, Dr. Reiffel's opinions that anticoagulant therapy has the benefit of early detection of certain disease processes, such as cancer, also are relevant and reliable as the overall risks and benefits of a product must be considered by the jury in ascertaining whether or not Xarelto is defectively designed.

**ARGUMENT**

**I.  Plaintiffs' claims, QuarterWatch, and related adverse events**

Plaintiffs have relied extensively on recent studies, adverse event reports and QuarterWatch to assert that Xarelto has higher reported rates of adverse event reports than other anticoagulant medicines, and therefore is an unreasonably dangerous medicine under the Louisiana Product Liability Act. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Some of the data that form the basis for these claims are reflected in QuarterWatch reports, a publication that gathers data from the FDA's MedWatch system. QuarterWatch has explained its reported data as being gathered as follows:

> QuarterWatch™ is an independent publication of the Institute for Safe Medication Practices (ISMP) that monitors all adverse drug event reports submitted to the U.S. Food and Drug Administration. We analyze computer excerpts from the FDA Adverse Event Reporting System (FAERS). These reports (best known as MedWatch reports) are a cornerstone of the nation's system for monitoring the safety of prescription drugs after FDA marketing approval.

ISMP, QuarterWatch Q4 2015 (Exh. G).

From the QuarterWatch analysis, Plaintiffs' expert ▮▮▮▮▮▮▮▮ seeks to offer the following opinions:

4



▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉ opinions, however, do not tell the full story. Indeed, MedWatch reports were extensively reviewed by the authors of *Heart Rhythm Case Reports* – one of articles that Plaintiffs seek to preclude Dr. Reiffel from citing. In reviewing these reports, those authors discuss the risks of stopping the medication without medical supervision, and note the pervasiveness of attorney advertising which has led to such "self-treatment":

> Described here are a series of serious medical events reported in 28 submissions of 31 individual patients to Medwatch (The FDA Safety Information and Adverse Event Reporting System; http://www.fda.gov/ Safety/MedWatch/default.htm).
>
> . . . .
>
> Overall, based on the available data, the mean age of the patients was 72 (range, 45–90), and 13 patients were male. All were prescribed rivaroxaban and subsequently discontinued their anticoagulant without consulting their physician after viewing negative rivaroxaban legal advertising. In the majority of these cases (23/31,75%), patients experienced a stroke or a transient ischemic neurologic event; 2 patients had persistent residual paralysis. One patient, a 45-year-old man receiving rivaroxaban for treatment of a deep vein thrombosis, stopped the drug and died of a subsequent pulmonary embolism, and 1 female patient, receiving rivaroxaban for stroke prevention, stopped the drug and died of a massive stroke (Table). All these cases were considered to be serious medical events by the health care professionals that submitted the reports.

Burton, P. and Peacock, W.P., *Heart Rhythm Case Reports* 2016; 2:248-49 (Exh. B).

The authors conclude:

> [I]t is clear that some patients are intimidated enough by the ongoing legal campaign to stop their anticoagulant, and thus suffer an adverse event. These cases serve to highlight the importance of following anticoagulant prescribing information, and that physicians should emphasize that patients should not stop anticoagulants without medical consultation. Continued partnership between drug manufacturers, physicians, regulators, and patients is necessary to provide sufficient education to ensure that these important medical events do not occur.

*Id.*

In the article published in the *Journal of Atrial Fibrillation*, written by Dr. Reiffel himself, reliance is placed on this same article, and the paper explains the adverse event reports and the impact on the practice of medicine:

> Consequent to such advertisements, many patients have discontinued NOAC therapy or have refused to start it. I have encountered such a patient on more than one occasion, mostly atrial fibrillation (AF) patients with an increased risk profile for stroke and systemic embolism (CHA2DS2-VASc score of 2 or higher). It takes considerable effort to make them understand both the benefits and the risks of NOAC therapy and in particular, the overall antithrombotic and mortality benefits to them of being on NOAC therapy despite the risks of a bleed.
>
> Part of such discussions with patients should involve the concepts of fair balance and of net clinical benefit. Using data from the 4 major NOAC vs warfarin pivotal AF trials 2-5 and historical data from AF warfarin vs placebo trials, several calculations can be made to help them understand both what they are not being told in the advertisements they see and the consequences that may arise based upon the non-use of the NOAC.
>
> . . . .
>
> Based on the pivotal NOAC versus warfarin trails, assuming increased risk of AF patients changed from NOAC to warfarin therapy: embolic events would increase by 1.1 to 2.1%/yr; major bleeds would increase by 2.1 to 3.4%/yr, total mortality would increase by 3.5 to 4.9%/yr, but fatal bleeds would increase by only 0.06 to 0.5%/yr.

Reiffel, J.A., *Journal of Atrial Fibrillation* 2016; 8(5) (Exh. A).

Dr. Reiffel's opinions and these articles are relevant to the issues in this case because Plaintiffs have chosen to pursue arguments based on an increase in adverse events report through

6

MedWatch and in recent observational studies. The jury should not be limited to hearing only Plaintiffs' side of the story, without the benefit of Dr. Reiffel's testimony on this subject, including reference to the published literature, particularly a paper that he himself published.[2] Allowing Plaintiffs' evidence and argument about increased adverse events but excluding this evidence would be highly prejudicial to Defendants. *See also* David N. Juurlink M.D., Ph.D., et al, *The effect of publication on Internet-based solicitation of personal-injury litigants*, CMAJ 2007; 177(11):1369, 1369 (Nov. 20, 2007). As set forth below, Dr. Reiffel's opinion testimony is a matter of expert opinion, and not a matter within the general public's knowledge, and is reliable and admissible under *Daubert*.

## II. Dr. Reiffel's opinions based on the *Journal of Atrial Febrillation* and *Heart Rhythm Case Reports* are relevant and reliable

Dr. Reiffel is a highly qualified Professor Emeritus at Columbia University College of Physicians and Surgeons, and attending physician [emeritus] at Presbyterian Hospital in New York City. He has extensive knowledge, expertise and training in the area of anticoagulant therapy, including the risks and benefits of Xarelto, warfarin and other medicines. Reiffel Rpt. at 1-3. Dr. Reiffel has been actively involved in teaching, research, and clinical practice for more than 40 years, and for the past two decades has focused predominantly on antiarrythmic and anticoagulant therapies. *Id.* He certainly should be permitted to testify about a paper he himself wrote which is about the subject matter of this case.

The portion of Dr. Reiffel's opinions that refer to the articles in question states in pertinent part:

---

[2] These same articles are relevant to explain the alleged reported rates of adverse events in recent observational studies relied upon by plaintiffs, such as, Graham, D. et al., "Stroke, Bleeding and Mortality Risks in Elderly Beneficiaries Treated with Dabigtran or Rivaroxaban for Nonvalvular Afib," JAMA Int. Med. doi:10.1001/jamaintermed.2016.5964. The study looked at 118,891 patients who were treated between November 4, 2011 and June 30, 2014 and the data analysis was performed between May 7, 2015 and June 30, 2016 from Medicare claims databases.

7



[Redacted] As support for this opinion, Dr. Reiffel refers to his article in the *Journal of Atrial Fibrillation* as well as the article published in *Heart Rhythm Case Reports*.

Plaintiffs' assertions that Dr. Reiffel's opinions are "not based on scientific, technical or other scientific knowledge, or on sufficient or data, or on reliable principles or methods" are simply inaccurate. The article published in the *Journal of Atrial Fibrillaion* cites to six sources from published literature (*see* Exh. A), none of which Plaintiffs have alleged to be unreliable, and discusses the results of the major clinical studies involving NOACs relating to the risk-benefit profile for Xarelto. The fact that the article was published in a peer-reviewed journal further demonstrates its trustworthiness—a key *Daubert* factor identified by Plaintiffs themselves. *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997). Plaintiffs' characterization of Dr. Reiffel's opinion as *ipse dixit* that "is based solely on subjective beliefs and unsupported speculation" does not withstand scrutiny.

Plaintiffs seemingly object to the reliability of Dr. Reiffel's opinion regarding the impact of attorney advertising based on the general assertion that he cannot cite an article that he

published or an article that was authored by individuals who are affiliated with the defendants. That objection also lacks merit. Both points are the subject of cross-examination, not exclusion of expert opinions. Plaintiffs do not dispute the findings of either article and to the extent they wish to call into question the authors, those topics go to the weight not the admissibility and also can be the subject of cross-examination at trial. *See Plunkett v. Merck*, 410 F. Supp.2d 565, 597 (E.D. La. 2005) (Fallon, J.) (reliance on studies of defendant proper to show product was efficacious). Dr. Reiffel's reliance on peer-reviewed, published articles in reaching his conclusion clearly falls within the four corners of a reliable methodology.

Simply put, Dr. Reiffel relied on reputable publications in formulating his opinions. Plaintiffs' motion only raises a question of trustworthiness by completely mischaracterizing Dr. Reiffel's opinions as purely a subjective evaluation based only on his own work. His opinions regarding the impact of lawyer advertising on adverse event reporting, along with the risks and benefits of Xarelto in the context of attorney advertising, meet the standard for reliability and admissibility under *Daubert*.

### III.   At least one Plaintiff and ▮▮▮▮▮▮▮▮▮▮ saw attorney advertising

These articles and Dr. Reiffel's opinions also are directly implicated because attorney advertisements were seen by some of the plaintiffs and ▮▮▮▮▮▮▮▮▮▮, the physician who prescribed Xarelto to Mr. Boudreaux. ▮▮▮▮▮▮ testified as follows:

9



[redacted]

[redacted]

[redacted]

[redacted]

In reliance on the truth of one of these advertisements, [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

The testimony of these fact witnesses demonstrates that at least one Plaintiff had seen attorney advertising that may have put Plaintiffs on notice prior to her alleged injuries, and Dr. Reiffel's opinions on the overall risk-benefit of Xarelto in the context of these advertisements is relevant and admissible.

## IV. Dr. Reiffel's opinions that anticoagulant medicines facilitate early detection of certain diseases is both relevant and reliable

Plaintiffs' assertion that Dr. Reiffel should be precluded from testifying about the benefits of anticoagulant therapy in early detection of certain diseases also should be denied. A proper risk-benefit analysis considers the overall risks and benefits of a product, not just select features. *Moore v. BASF*, 2012 WL 6025917, at *4 (E.D. La. 2012) ("Plaintiff must identify a specific alternative design in existence at the time of the injury that was capable of preventing the injury, and they must also perform a risk-utility analysis."); *see also Maxwell v. Howmedica Osteonics Corp*, 713 F.Supp.2d 84, 92 (N.D.N.Y. 2010) ("[A] plaintiff must demonstrate that the alternative design would have [led] to overall improved safety which requires a risk-utility balancing."). Dr. Reiffel's opinions that Xarelto and anticoagulants generally have resulted in early detection of certain diseases are both relevant and reliable. In his report, Dr. Reiffel states:



Dr. Reiffel cites literature supporting this opinion, which is uncontested, and these opinions clearly are relevant to the overall risk-benefit assessment of anticoagulant therapy and

11

any determination by the jury of whether Xarelto, in particular, is unreasonably dangerous in its design. Accordingly, Plaintiffs' motion to preclude this testimony should be denied.

## CONCLUSION

For all the foregoing reasons, the Court should deny Plaintiffs' motion *in limine* to preclude James A. Reiffel, MD about attorney advertising and earlier detection of certain diseases.

Respectfully submitted,

DRINKER BIDDLE & REATH LLP

By: /s/ *Susan M. Sharko*
Susan M. Sharko
DRINKER BIDDLE & REATH LLP
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
susan.sharko@dbr.com

Rodney M. Hudson
DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105-2235
Telephone: (415) 591-7500
rodney.hudson@dbr.com

Chanda A. Miller
DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone: (215) 988-2500
chanda.miller@dbr.com

ARNOLD & PORTER KAYE SCHOLER LLP

By: /s/ *William Hoffman*
William Hoffman
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
william.hoffman@apks.com

Andrew K. Solow
Steven Glickstein
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Telephone: (212) 836-8485
andrew.solow@apks.com
steven.glickstein@apks.com

BRADLEY ARANT BOULT CUMMINGS LLP

By: */s/ Kevin C. Newsom*
Kevin C. Newsom
Lindsey C Boney IV
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place, 1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8803
knewsom@bradley.com

| | |
|---|---|
| IRWIN FRITCHIE URQUHART & MOORE LLC | CHAFFE MCCALL L.L.P. |
| By: /s/ *James B. Irwin* | By: /s/ *John F. Olinde* |
| James B. Irwin | John F. Olinde |
| Kim E. Moore | CHAFFE MCCALL L.L.P. |
| IRWIN FRITCHIE URQUHART & MOORE LLC | 1100 Poydras Street, Suite 2300 |
| 400 Poydras Street, Suite 2700 | New Orleans, LA 70163 |
| New Orleans, LA 70130 | Telephone: (504) 585-7241 |
| Telephone: (504) 310-2100 | olinde@chaffe.com |
| jirwin@irwinllc.com | |
| | *Attorneys for Bayer HealthCare Pharmaceuticals Inc. and Bayer Pharma AG* |
| *Attorneys for Defendants Janssen Pharmaceuticals, Inc., Janssen Research & Development, LLC, and Janssen Ortho LLC, and Johnson & Johnson* | |

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on February 27, 2017, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre-Trial Order No. 17.

*/s/ James B. Irwin*
**James B. Irwin**