UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) ) ) ) | MDL 2592 |
| | | SECTION L |
| THIS DOCUMENT RELATES TO ALL CASES | | JUDGE ELDON E. FALLON |
| | | MAG. JUDGE NORTH |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO PRECLUDE CERTAIN TESTIMONY FROM J. MICHAEL GAZIANO, MD, MPH**

Plaintiffs' Motion to Preclude Certain Testimony from J. Michael Gaziano, MD, MPH (Dkt. No. 5127) mischaracterizes the opinions at issue, by seeking to exclude purported opinions that Dr. Gaziano has never offered. As explained below, Dr. Gaziano's 30-year medical career clearly qualifies him to offer the opinions actually set forth in his report and discussed at his deposition. Plaintiffs' motion should be denied.

**STATEMENT OF FACTS**

Dr. Gaziano is a practicing cardiologist in Boston, a professor at Harvard Medical School, and an adjunct professor at Boston University Medical School. Gaziano CV at 1–2 (Exh. 1); Gaziano Report at 1 (Exh. 2). After receiving his medical degree from the Yale University School of Medicine in 1987, Dr. Gaziano completed his residency in internal medicine at Brigham and Women's Hospital, which is a principal teaching and treating hospital for Harvard Medical School. Gaziano Report at 1 (Exh. 2). He then finished a three-year fellowship in cardiology at Brigham and Women's and a research fellowship at Harvard, with a focus on the treatment and prevention of cardiovascular disease. *Id.*; Gaziano CV at 1 (Exh. 1). Dr. Gaziano is board certified in cardiovascular disease, Gaziano Report at 1 (Exh. 2), and has an active medical practice, both

teaching other doctors and seeing patients with various cardiovascular diseases that require anticoagulation therapy, including atrial fibrillation. *See id.* at 2.

In addition to treating patients and teaching medical students, Dr. Gaziano has directed and participated in a wide variety of clinical trials, including several large-scale trials concerned with the prevention and treatment of cardiovascular risk factors and disease. Gaziano Report at 2 (Exh. 2). He has authored or co-authored nearly 400 publications, co-edited two books on cardiology, and is a contributing editor for the *Journal of the American Medical Association*. *Id.* He also holds a Master of Public Health degree from the Harvard School of Public Health, with a concentration in cardiovascular epidemiology. *Id.* at 1.

## ARGUMENT

Plaintiffs argue that Dr. Gaziano may not offer expert testimony on three topics: the adequacy of the Xarelto label; the Xarelto dosing regimen for reducing stroke risk in atrial fibrillation patients; and the amount of time that patients taking the anticoagulant warfarin typically spend in the medicine's therapeutic range ("TTR"). *See* Dkt. No. 5127–1, Pls.' Mem. in Support of Mot. ("Pls.' Mem.") at 1–2. As he actually articulates his opinions, Dr. Gaziano is more than qualified to offer this testimony based on his extensive experience and training as a cardiovascular physician, epidemiologist, clinical trialist, and researcher, as well as his review of medical literature on Xarelto and other anticoagulants.

### I. Dr. Gaziano Is Qualified To Discuss Whether The Xarelto Label Provides Physicians With Adequate Safety and Efficacy Information.

Plaintiffs argue that Dr. Gaziano cannot testify as a "labeling expert," because his opinion about the Xarelto label is not based on "recognized industry or regulatory standards or principles." Pls.' Mem. at 5–6. But Defendants do not offer Dr. Gaziano as an expert on whether the Xarelto label comports with legal and regulatory requirements. Dr. Gaziano's *sole* mention in his report

of the adequacy of the Xarelto label is on page 22, where he writes: "The labeling of rivaroxaban under the supervision of the FDA clearly conveys the important safety and efficacy information."

At his deposition, Dr. Gaziano confirmed the narrow scope of his labeling opinion. When asked about that opinion, he stated that it is his "opinion that the data that is contained in the Xarelto label is a reasonable reflection of the literature in the field." Gaziano Dep. 33:7–13 (Exh. 3); *see also id.* at 35:1–5. Dr. Gaziano does *not* opine on whether the label is adequate as a *legal* matter. *Id.* at 36:23–37:5. Rather, it is his opinion that the label is "a reasonable reflection of the literature" concerning "the *clinical* application" of Xarelto. *Id.* at 37:6–9 (emphasis added); *see also id.* at 232:6–20 (explaining that "as a teacher of clinicians," his opinion is that "the key efficacy and safety information derived from the rivaroxaban studies . . . is contained in the FDA-approved labeling"). In this respect, Dr. Gaziano's opinion is no different in scope from the opinions offered by medical doctors testifying for Plaintiffs about the supposed inadequacy of the Xarelto label to communicate relevant safety and efficacy data to clinicians—opinions that, on Plaintiffs' logic, would have to be excluded as well.[1]

Further, Dr. Gaziano's opinion is amply supported by his experience and training. As he explained, his labeling opinion is based on his ability to interpret and synthesize the pertinent literature on Xarelto. *Id.* at 34:9–20. It is also supported by his use of labeling "as an educational tool for [himself] and . . . young trainees," *id.* at 31:25–32:8, and his "expertise in . . . the kinds of research that go[] into labeling and [are] often used for determining clinical indications for drugs," including randomized trials, *id.* at 32:15–24. As a physician, epidemiologist, clinical trialist, and trainer of other doctors, Dr. Gaziano is qualified to opine that the Xarelto label sufficiently

---

[1] *See, e.g.*, Cuculich Rep. at 12–13 (Exh. 4); Leissinger Rep. at 18 (Exh. 5); Rinder Rep. at 19–20 (Exh. 6); Smart Rep. at 6–7 (Exh. 7).

provides the key safety and efficacy information about the drug that clinicians need. *See In re Vioxx Prods. Liab. Litig.*, 401 F. Supp. 2d 565, 581–82, 599 (E.D. La. 2005) (denying motion to exclude rheumatologist from testifying about adequacy of Vioxx label, based on doctor's clinical experience, clinical trial work, and review of relevant medical literature).

**II.     Dr. Gaziano Is Qualified To Testify About The Safety And Efficacy Of The Approved Doses That Were Tested In The ROCKET AF Trial.**

Plaintiffs also argue that Dr. Gaziano is unqualified to testify on "the dosing of Xarelto." Pls.' Mem. at 6. They complain that Dr. Gaziano hasn't reviewed all of the numerous Xarelto studies (such as early Phase I studies), company correspondence, and internal documents that might have been pertinent to the selection of the doses that were tested in the pivotal ROCKET AF clinical trial that led to approval of Xarelto in atrial fibrillation patients. *See id.* at 6–7.

Plaintiffs again misconstrue Dr. Gaziano's so-called dosing opinion. His opinion—which echoes FDA's own conclusion—is simply that the 20 and 15 mg Xarelto doses were proven safe and effective in ROCKET AF:

> [T]he doses used in ROCKET were shown to be as safe and effective as warfarin. While exploring other doses may or may not be a reasonable next question for a new trial, it does not impact the interpretation of the results for the once-daily 20 mg (or 15 mg in the case of patients with moderate renal failure). The rationale for the dosing used in ROCKET is a clear assessment of the existing data (Kubitza) and is based on the safety in other trials.

Gaziano Report at 17 (Exh. 2).[2]  As a physician who deals with atrial fibrillation and has sat on clinical trial steering committees, interpreting the results of ROCKET AF—a large-scale clinical trial in atrial fibrillation patients—is at the heart of Dr. Gaziano's expertise. *See id.* at 2; Gaziano CV at 2–5 (Exh. 1).  He likewise is qualified to testify that using the 20 and 15 mg doses in

---

[2] *See also* Gaziano Dep. 123:4–8 (Exh. 3) ("The work that went up to the choice of th[e] [approved atrial fibrillation] dose for th[e] [ROCKET AF] study is, in my mind, sufficient and adequate to support the test that was undertaken, and the test results warrant that dose being applied in clinical settings.").

4

ROCKET AF was appropriate. That opinion is based on Dr. Gaziano's clinical, research, and teaching experience, review of pertinent literature, as well as him "follow[ing] th[e] field as a cardiologist and epidemiologist for a number of years." Gaziano Dep. 124:20–126:10 (Exh. 3).

Dr. Gaziano is *not* offering any opinion about whether the data might also support the choice of other doses or whether the FDA-approved doses are optimal. *See id.* at 118:7–9 (Gaziano stating that he is "not rendering an opinion about the pharmacology per se [of Xarelto] . . . that led to some of th[e] [dosing] decisions"); *id.* at 122:8–9 ("I'm not rendering an opinion on the best dose."). His opinions are simply that the selected doses were appropriate and proven to be safe and effective in the ROCKET AF clinical trial (as FDA itself concluded). The admissibility of those opinions does not depend on whether Dr. Gaziano reviewed every single Xarelto data point on topics such as "pharmacokinetic dosing models," "pharmacology," and "blood 'trough' levels." Pls.' Mem. at 7.

**III.   Dr. Gaziano Is Qualified To Testify That The TTR In ROCKET AF Is Comparable To That Seen In Many Real-World Settings.**

Plaintiffs finally argue that Dr. Gaziano is unqualified to testify about the percentage of time that warfarin patients typically are maintained in the therapeutic range (or "TTR"). In particular, they take issue with his opinion that the TTR achieved in ROCKET AF (55%) is indicative of "real world" results with respect to warfarin management. *Id.* at 7–8.[3]

As a preliminary matter, Plaintiffs' own expert on TTR and warfarin management, Henry Bussey, agrees with Dr. Gaziano's opinion that 55% is in the expected TTR range of many real-world settings. Mr. Bussey authored a 2013 article about warfarin management where he wrote

---

[3] Dr. Gaziano sets forth his TTR opinion on page 15 of his report. He writes that the design of the ROCKET AF trial with respect to warfarin management "allow[ed] for a more real world comparison and increases generalizability. The TTR for ROCKET is in the range that would be expected in many real world settings." He further acknowledges that the TTR of 55% in ROCKET AF "was lower than had been seen in previous studies comparing NOACs to warfarin." Gaziano Report at 15 (Exh. 2).

that in "the United States, the TTR is ~51% in community-based settings and 63% in specialized anticoagulation clinics."  Bussey et al., Warfarin Self-Testing & Online Management, *Pharmacotherapy* 2013; 33(11): 1136–1146 at 1137 (Exh. 8); *see also* Bussey Dep. 214:8–215:5 (Exh. 9) (discussing the same).  Plaintiffs' argument that Dr. Gaziano's TTR opinion is unreliable as a substantive matter is thus belied by their own expert witness in the field, who supports Dr. Gaziano's view.

Even putting that aside, the claim that Dr. Gaziano is unqualified to provide an opinion on TTR in clinical settings is unfounded.  Dr. Gaziano explained that his opinion is supported by his experience with warfarin patients over his "25 years of practicing cardiology" and his familiarity with medical literature regarding warfarin management.  Gaziano Dep. 192:12–193:15 (Exh. 3); *see also id.* at 196:21–197:12 (explaining that his "clinical experience [with] patients that [he] see[s] . . . supports the notion that [his] [Coumadin] clinic generally fits" in the TTR range of other such clinics).  And while Plaintiffs note that Dr. Gaziano does not currently see patients in an in-patient hospital setting, Pls.' Mem. at 7, they omit the far more important fact that he developed and currently runs a preventative cardiology clinic at which he is responsible for the care of all of the clinic's patients and personally sees a "large number of them."  Gaziano Dep. 37:13–23; 51:16–25 (Exh. 3).  And the "main anticoagulant" used at the clinic is Coumadin (warfarin). *Id.* at 43:10–17.

"Expert witnesses are allowed to base their opinions on personal experiences provided that their opinions are confirmed by scientifically reliable data," as is the case here.  *Vioxx*, 401 F. Supp. 2d at 580.  Dr. Gaziano's experience and review of the literature qualify him to opine on TTR and support the reliability of that testimony.  *See id.* (finding that rheumatologist was

6

qualified to testify as an expert regarding benefits of drug based on his review of scientific literature and his experience as a prescribing physician).

Finally, Plaintiffs argue that, contrary to Dr. Gaziano's opinion, the TTR in ROCKET AF "is unusually low by any standard," citing other anticoagulant clinical trials where warfarin was the control. Pls.' Mem. at 8. But Dr. Gaziano specifically noted the higher TTR rates in those studies. Gaziano Report at 15 (Exh. 2). He explained that the ROCKET AF patient population "was significantly sicker than the patient populations in which the other [new oral anticoagulants] were studied," and explained why such patients "would be expected to be more difficult to maintain within the target INR range." *Id.* at 15–16. He further explained that, unlike the other trials that used an "algorithmic approach to INR management," investigators in ROCKET AF used "their own clinical judgement and discretion to make dosage adjustments . . . according to their normal clinical practice," which is "more representative of how warfarin would be used in the 'real world' population," (but with the consequence of a lower overall TTR). *Id.*

In sum, Dr. Gaziano is well-qualified to provide his TTR opinion. The opinion is also reliable, per Plaintiffs' own expert and Dr. Gaziano's clinical experience and knowledge of TTR rates reported in medical literature.

## CONCLUSION

For all of the reasons stated above, the Court should deny Plaintiffs' Motion to Preclude Certain Testimony from J. Michael Gaziano, MD, MPH (Dkt. No. 5127) and allow Dr. Gaziano to provide the opinions on labeling, dosing, and TTR that are set forth in his report and were further discussed at his deposition.

Dated: February 27, 2017

Respectfully submitted,

DRINKER BIDDLE & REATH LLP

By: /s/ *Susan M. Sharko*
Susan M. Sharko
Drinker Biddle & Reath LLP
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
susan.sharko@dbr.com

Rodney M. Hudson
DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105-2235
Telephone: (415) 591-7500
Rodney.hudson@dbr.com

Chanda A. Miller
Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone: (215) 988-2500
Chanda.Miller@dbr.com

IRWIN FRITCHIE URQUHART & MOORE LLC

By: /s/ *James B. Irwin*
James B. Irwin
Kim E. Moore
Irwin Fritchie Urquhart & Moore LLC
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
jirwin@irwinllc.com

*Attorneys for Defendants Janssen Pharmaceuticals, Inc., Janssen Research & Development, LLC, and Janssen Ortho LLC, and Johnson & Johnson*

ARNOLD & PORTER KAYE SCHOLER LLP

By: /s/ *William Hoffman*
William Hoffman
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
william.hoffman@apks.com

Andrew K. Solow
Steven Glickstein
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Telephone: (212) 836-8485
andrew.solow@apks.com
steven.glickstein@apks.com

BRADLEY ARANT BOULT CUMMINGS LLP

By: /s/ *Kevin C. Newsom*
Kevin C. Newsom
Lindsey C Boney IV
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place, 1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8803
knewsom@bradley.com

CHAFFE MCCALL L.L.P.

By: /s/ *John F. Olinde*
John F. Olinde
Chaffe McCall L.L.P.
1100 Poydras Street, Suite 2300
New Orleans, LA 70163
Telephone: (504) 585-7241
olinde@chaffe.com

*Attorneys for Bayer HealthCare Pharmaceuticals Inc. and Bayer Pharma AG*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 27th day of February, 2017, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs by operation of the court's electronic filing system and a copy of the proposed documents to be placed under seal sent to Plaintiffs' Liaison Counsel by email transmission.

*/s/     John F. Olinde*