# Exhibit 2

# FILED UNDER SEAL

**EXPERT REPORT**
**XARELTO MDL LITIGATION**

**J. Michael Gaziano, MD, MPH**


**Background**

I am a physician, epidemiologist and trialist.  I practice cardiology as a treating physician, conduct epidemiology research, and teach both clinical cardiology and research methods to trainees. My primary research area is prevention and treatment of cardiovascular disease, with emphasis on improving public health by identifying avoidable risk factors and defining the potential benefits and risks of therapies and interventions. As an epidemiologist, I conduct much of my research in studies of large populations. In my medical practice, I treat patients with an emphasis on preventive and long term care.

I received my M.D. from the Yale University School of Medicine in 1987, following which I served as an Intern and then Resident in Internal Medicine at Brigham and Women's Hospital in Boston, Massachusetts. Brigham and Women's Hospital is a principal teaching and treating hospital for Harvard Medical School. During my internship and residency, I also served as a Clinical Fellow in Medicine at Harvard Medical School.

Following the completion of my internship and residency, I became a Fellow in Cardiology at Brigham and Women's Hospital and a Research Fellow in Medicine at Harvard Medical School, with my medical practice and research focused principally on treatment and prevention of cardiovascular disease. I was board certified in internal medicine in 1990 and recertified in 2002. I was board certified in cardiovascular disease in 1993 and recertified in 2003. In 1993, I also was awarded a Master of Public Health degree from the Harvard School of Public Health, concentrating in cardiovascular epidemiology.

In 1993, I was appointed an Instructor in Medicine at Harvard Medical School. In 1995, I became an Assistant Professor there, and in 2000 I became an Associate Professor of Medicine and was appointed Professor of Medicine in 2009. I hold a variety of other appointments and positions devoted in whole or in part to prevention and treatment of cardiovascular disease and research in understanding cardiovascular disease as well as other chronic diseases. These include Director of the Preventive Cardiology Section and Fellowship Program for the Veterans Affairs Boston Healthcare System and Chief of the Division of Aging at Brigham and Women's Hospital.

The courses that I teach and the clinical programs that I conduct are concentrated in the treatment and prevention of cardiovascular disease and other chronic diseases, and in the conduct of clinical trials and epidemiology studies. My teaching responsibilities at Harvard and its affiliated hospitals, and as faculty on an invited basis at other institutions, include advanced epidemiology and clinical care. A related sub-discipline in which I give

PROTECTED INFORMATION – SUBJECT TO PROTECTIVE ORDER

instruction and do considerable writing is evidence-based medicine: the assimilation and evaluation of data from clinical trials, epidemiology, basic science, and other sources to determine optimal care and risk avoidance strategies in the area of cardiovascular disease and other chronic diseases.

I have participated in, co-directed, or directed many clinical trials, including several large-scale clinical trial programs concerned with prevention and treatment of cardiovascular risk factors and disease. My experience with large-scale clinical trials and observational studies includes serving as Principal Investigator of the Physicians' Health Study II (a large-scale primary prevention trial), Co-Principal Investigator of the Homocysteine Lowering Study (a large-scale secondary prevention trial), and Co-Investigator of the Women's Health Study (a large-scale ongoing primary prevention trial), the Women's Antioxidant Cardiovascular Disease Study (a large-scale trial of secondary prevention), and the Selenium and Vitamin E Cancer Prevention Trial (a large-scale primary prevention trial). I am currently involved in a number of ongoing cardiovascular primary and secondary prevention trials. Primary prevention in this context means avoidance of a first cardiovascular event. Secondary prevention means avoidance of recurrence.

I have lectured, taught, and written extensively on the identification, treatment, and prevention of cardiovascular and other chronic diseases and epidemiology methods in the study of chronic diseases. These activities are summarized in greater detail in my curriculum vitae. To date, I have authored or co-authored nearly 400 publications, including over 40 book chapters, principally on cardiology. I have also co-edited two books on the subject: *Prevention of Myocardial Infarction* and *Clinical Trials in Cardiovascular Disease*. I am also Editor of *Atlas of Cardiovascular Risk Factors*. My curriculum vitae includes a list of publications authored by me. A large number of these are synthetic works including reviews and book chapters that represent syntheses of the evidence base in a given area. I also serve as a contributing editor for the *Journal of the American Medical Association (JAMA)*.

In addition to my teaching and research responsibilities, I maintain an active medical practice. In this clinical setting I teach other doctors and health workers how to apply evidence-based medicine to the clinical setting. I run a preventive cardiology program that has clinics and has an associated fellowship program. My inpatient activities have consisted of treating patients in the hospital as a general medical attending, cardiology attending, and palliative care attending. I see patients with all types of cardiovascular disease including conditions that require various anticoagulation treatments such as atrial fibrillation, valve disease, post valve replacement, various venous and arterial thrombotic events, and various diseases of the clotting system.

PROTECTED INFORMATION – SUBJECT TO PROTECTIVE ORDER

**Quality of Research Data**

As a preventive cardiologist, epidemiologist and trialist, my clinical practice and research focus on identifying and recommending agents and behaviors that help prevent cardiovascular disease and identifying and discouraging agents and behaviors that increase the risk of cardiovascular disease. To do this, I am routinely involved in evaluating data generated from the investigational techniques commonly used in studies of the efficacy and safety of drugs, such as randomized, controlled clinical trials and epidemiology studies in which the incidence of positive or negative health outcomes is studied in selected populations. I am also extensively involved in evaluating basic research, such as pharmacology studies, that seeks to identify biological mechanisms and potential effects of drugs that may have clinical significance for cardiovascular risk, and evaluating whether any such clinical significance is demonstrated by clinical trials or other actual health outcomes data.

The analytical framework that is typically applied in evidence based medicine to evaluate and weigh data from the variety of studies that can be used to study the cardiovascular risk or benefit of an agent or behavior is the same framework that I have applied to my evaluation of Xarelto. These studies fall generally into four types, which I discuss below in the following order: (1) randomized, controlled clinical trials; (2) human observational studies, such as cohort or case-control epidemiology studies; (3) basic research, which includes human physiologic and animal studies, in vitro experiments, and pharmacology and pharmacokinetics studies in which the effects of a drug are examined in short-term studies in human volunteers; and (4) synthetic works, including meta-analyses, systematic reviews and other analyses that combine data from individual studies.

In randomized, controlled clinical trials, participants are picked according to specific criteria depending on the intervention being tested. The participants are randomly assigned to treatment groups. By selecting the groups randomly, factors that could affect the results of the trial are balanced in each group. In a placebo-controlled clinical trial, one group is exposed to the drug under study and the other group is given a placebo (essentially a sugar pill). During the trial, one or more predetermined clinical outcomes are measured -- for example, thrombotic cardiovascular events or gastrointestinal bleeding.  Once a certain predetermined number of outcomes occur or a predetermined period of time goes by, the trial is over.

When the trial is double-blinded (i.e., neither the participants nor the doctors or support personnel who treat the patients is aware of whether the patient is receiving the drug or placebo), potential bias and confounding factors have been reduced to the greatest extent feasible. Randomized, double-blinded, placebo-controlled clinical trials are often the most reliable type of scientific evidence and are often therefore referred to as the "gold standard." Non-blinded trials may sometimes be necessary for several reasons such as feasibility, safety, or ethical considerations.

If one agent or intervention is compared to another instead of to placebo, this type of study is called a comparative trial. These trials using a comparator drug rather than

PROTECTED INFORMATION – SUBJECT TO PROTECTIVE ORDER

placebo are more challenging to interpret than placebo-controlled clinical trials. When an active comparator is used, any differences which might be observed in the outcome between patients taking the study drug and patients taking the active comparator can be explained either by effects of the study drug or by effects of the active comparator. This is especially true when the effects of the comparator have not been clearly established. Randomized trials may have limited utility in assessing the comparative effect of agents on rare events given limitations in power.

Observational epidemiological studies analyze the incidence of a disease or other health outcome within a defined population and evaluate relationships between potential factors and diseases. Observational epidemiological studies fall into two broad categories: analytic and descriptive. In general, we use descriptive studies to generate hypotheses about relationships that may be tested in analytic observational studies and/or in randomized clinical trials. When trial data are not available, we rely more heavily on analytic observational studies to provide insight on exposure disease relationships.

The two main types of analytic studies are cohort and case-control studies. Both types of studies are subject to various potential biases and confounding factors because, without the randomization and other controls of a clinical trial, a wide variety of factors can affect the outcome. For this reason, great care must be undertaken in the conduct and interpretation of observational studies.

Cohort studies evaluate subjects before the onset of a disease or health outcome and monitor the subjects over the study period for the development of the disease. Cohort studies can be retrospective or prospective. Prospective studies are less subject to bias because the study is designed in advance to collect data needed to answer the question being investigated. Prospective studies generally are preferable to retrospective studies because relevant data are collected in order to optimize the ability to explore a given relationship. On the other hand, retrospective studies must rely on existing data that may have been collected for entirely different purposes. These retrospective studies might access administrative data (for example, billing records or prescriptions) or clinical data from health care systems and must rely on information already collected for other purposes, which frequently does not include all of the data needed to evaluate the question and was not collected in ways to minimize confounding.

Case-control studies look at a group of individuals with a disease and an appropriate control group without evidence of that disease and measure the rate of exposure in each group. Limitations of case-control studies include biases in the selection process and inaccuracies in the documentation of risk factors. Classical case-control studies identify cases and controls and then collect data directly from these participants. Nested case-control studies identify cases and controls in existing cohorts, registries or databases that exist for other purposes. As in cohort studies, it is generally preferable to collect data that are specifically required to address a given question, rather than rely on data that were collected for other purposes.

PROTECTED INFORMATION – SUBJECT TO PROTECTIVE ORDER

Descriptive studies, which include case reports, ecological studies, and time trends, are the least reliable observational studies in establishing a cause-and-effect relationship, and for that reason are merely hypothesis-generating. Case reports and case series are simple descriptions of a patient's or a group of patients' medical conditions and associated histories of exposure. Spontaneous case reporting can be biased because many factors could influence the choice to report or not report a case. The FDA has clearly described the unreliability of case reports in assessing risk due to lack of uniform collection of exposure, outcome and confounding information; differential reporting; an inability to accurately determine rates; challenges in comparing rates over time; uncertainties of background rates of common disease events in the general populations; etc. This is consistent with my practice of epidemiology. For these reasons, medical recommendations are generally not based on descriptive studies alone.

While randomized trials are preferable in establishing cause and effect, when trial data do not exist or when it is not feasible to conduct trials, observational epidemiological studies can provide information. However, interpretation of observational studies must be cautious because of inherent limitations in observational studies and because the quality of observational studies can vary greatly. Interpretation of observational studies depends on factors such as the design of the study, and the degree to which it is possible to limit potential bias and confounding. Careful evaluation of the quality of the methods of observational epidemiological studies should be undertaken before interpreting the findings.

Basic research studies examine biological mechanisms by a variety of techniques, including pharmacology studies in humans or animals in vivo, or in vitro studies using cell extracts or tissues. In the field of cardiology, basic research is used to identify potential biological processes or mechanisms that could affect the risk of cardiovascular disease. Basic research studies typically cannot be relied on exclusively to demonstrate a cause-and-effect relationship in humans because the human body is too complex for scientists to predict reliably how a particular biological process will affect a person's health. Animal models, while useful, may not always accurately predict how the process under study would affect humans.

Human physiologic clinical investigation studies, i.e. small-scale pharmacology trials, are a type of basic research that examines biological mechanisms in humans, typically by measuring changes that occur in the subjects' bodies. These studies are usually small and do not last long enough to determine whether the subjects experience changes in their health, in other words, whether the pharmacological effect has clinical significance. Because clinical investigations measure changes in the human body, such as biomarkers, without also analyzing the ultimate health effect of those changes, they generally cannot be used to demonstrate a clinical cause-and-effect relationship. The change in a single biomarker may be short lived and there may also be unmeasured changes in other biomarkers. In many cases, changes in biomarkers are not related to clinical events. In the field of cardiology, the most common application of these studies is to identify a potential biological process or effect that merits investigation by conducting a clinical trial where actual health outcomes are assessed.

PROTECTED INFORMATION – SUBJECT TO PROTECTIVE ORDER

The application of the above types of data often requires a careful analysis of all relevant studies that span the spectrum of the hierarchy of data. This is often called the 'totality of evidence' on a given topic. Clinical practice that relies on the careful assessment of this totality is referred to as 'evidence-based medicine.'

It is sometimes useful to combine data from all available and relevant studies in order to derive insights that individual studies could not provide. Meta-analyses and systematic reviews of clinical trials can provide valuable insights and point to new questions, provided that they are complete and adhere to current standards. Meta-analyses and other pooled analyses of observational studies or trials can also provide useful insights and add statistical power to the data, provided that they are conducted properly and appropriate care is exercised in determining which studies are included or excluded.

Meta-analyses are only as good as the underlying data and can generate misleading results if analyses are dominated by unreliable or biased data or include studies that do not belong in a combined analysis. There may be situations where there are so few studies that a meta-analysis does not provide a significant improvement in understanding that could as easily be gleaned from a careful assessment of the individual studies.

In interpreting data, we must consider the role of chance, bias, or confounding in explaining an apparent association. In order to assess the role of chance, we use statistical significance of an observed relationship. A relative risk estimate that differs from 1.0 that is not statistically significant could be due to chance. For testing a single hypothesis, the scientific community has accepted a $p$-value of 0.05 or 95% confidence bounds that do not include 1.0 as significant. The level of significance we use must consider the number of hypotheses being tested. The high level of statistical significance does not eliminate the possibility of bias or confounding as a possible explanation for an observed association. In other words, a statistically significant finding could still be the result of bias or confounding. All of these factors must be considered when assessing the results of a given study.

Important concepts in the application of the available data are relative risk and absolute risk. Relative risk is the risk in one group compared to another. Absolute risk is the true measure of risk in a population. These concepts are important in translating the clinical importance of findings into practice. For example, there may be a large relative difference between two drugs in a clinical outcome, but the event is so rare in absolute terms that the relative difference is of minimal, if any, clinical significance.

In the study of drugs, the use of the above described research tools varies depending on the type of question being asked. For example, in the evaluation of the main effect of a new drug, while all types of data may contribute to our understanding, randomized trial data is the most reliable way to determine and quantify a drug's main effects. The level of certainty that trial data provide is required by health authorities before a new drug is allowed to be marketed with specific indications. On the other hand, when evaluating the side effects of a drug, while trial data can be very helpful if the side effect is common,

PROTECTED INFORMATION – SUBJECT TO PROTECTIVE ORDER

when the side effect is rare, trial data may be limited. In this case, pooled data from trials and post marketing observational studies may contribute to a better understanding.

### Conditions Requiring Anticoagulation and Their Management

There are a number of conditions where blood clotting can be part of a pathogenic process. There can be thrombosis or clotting in an artery that blocks blood flow that could cause damage to the organ supplied by that artery, as is the case in a heart attack or certain types of strokes. There can be clotting in a vein or in the heart. A blood clot in a vein can lead to local effects or the clot can break off and travel a distance and have a distant effect. If a clot breaks off and travels it is called an embolus. An example of this is a pulmonary embolus (PE). Under certain circumstances a blood clot can form in the heart. An example of a condition where a blood clot might form in the heart is atrial fibrillation. Another important condition where blood clots form in the heart is in the setting of valve disease that can enlarge the heart and make blood clots more likely. Many replacement valves require anticoagulants to prevent blood clots. Clots formed in the heart or on heart valves can also break off and travel a great distance.

Clots form under the influence of clotting factors and platelets. There are a number of clotting factors that, when activated in sequence, result in the cleavage of fibrinogen to fibrin that helps to form the cross-bridging that builds the clot. Platelets can also be activated and are also involved in the formation of the clot. As clot formation begins, balancing mechanisms to slow clot formation and dissolve clots are also initiated to enable titration of the clotting process.

While there are some similarities between clots that form in the arteries as opposed to those that form in the heart or veins, there are also some differences. While clotting factors and platelets are involved in both settings, the platelet tends to be a more potent player in the process in arteries. These differences lead to differences in treatments. For example, clots in arteries can be treated by antiplatelet agents as well as anticoagulants while those that form in veins and the heart tend to be more effectively treated with anticoagulants than with antiplatelet agents.

There is a wide variety of agents that can prevent clots from forming, can prevent existing ones from getting bigger and can even dissolve clots. There are drugs that block the clotting factors called anticoagulants; drugs that lessen the ability of platelets to assist in clot formation called antiplatelet agents; and even drugs that dissolve or lyse clots called thrombolytic agents or "clot busters." The particular agents used depend on the clinical situation. Since all of these three types of agents decrease the ability of blood to clot as the main mechanism of action, one of the main side effects of all of these agents is increased risk of bleeding.

The focus of attention of this report is the anticoagulants and more specifically the ones that can be given orally for intermediate and longer duration. While there are a number of anticoagulants that can be given intravenously or subcutaneously, for many years

PROTECTED INFORMATION – SUBJECT TO PROTECTIVE ORDER

warfarin was the main oral anticoagulant used for short, intermediate and long term indications. Recently, a new class of novel oral anticoagulants ("NOACs") has emerged as an alternative to warfarin.

There are a number of clinical situations where oral anticoagulants play an important therapeutic role. These include cardiac conditions where clots form in the heart such as atrial fibrillation (AF), valvular heart disease, and various conditions that alter the size or shape of the heart chambers; venous thromboembolism (VTE) which includes deep venous thrombosis (DVT) and pulmonary embolus (PE); VTE prevention; inborn or acquired problems with clotting such as lupus anticoagulant; and certain arterial conditions where anticoagulant can be added to antiplatelet agents in some cases. NOACs have been approved for some of these conditions.

BLOOD CLOTTING IN THE HEART

Atrial fibrillation (AF)

AF is one of the most common cardiac arrhythmias that increases with age and certain cardiac conditions that either put a strain on or increase the size of the atria. This arrhythmia can cause thrombi to form on the wall of the atria.  Left atrial mural thrombi can cause arterial embolization increasing the risk of stroke and other end organ emboli. This risk occurs whether or not the AF is persistent or chronic. Acute management may require antithrombotics such as heparin or related medications but chronic management generally involves oral agents.  AF in the setting of valve disease tends to increase the risk of emboli compared with nonvalvular AF.

Valve disease, replacement valves

Diseases of the native heart valves may or may not require anticoagulation.  Certain native valve conditions such as mitral stenosis may require anticoagulation because of the changes that occur in the left atrium. After valve replacement, most valves require anticoagulation for a short time and others require permanent anticoagulation. For bioprosthetic valves, the recommendations are for short term therapy for several months. For mechanical or artificial valves, most require lifelong anticoagulation.

Cardiomyopathies

Certain diseases of the heart muscle where the heart is enlarged can lead to blood clots in the heart.  Damage to the heart muscle or intrinsic heart muscle conditions called cardiomyopathies can cause enlargement as can diseases of the valves.  There can also be abnormal growths in the heart.  Some of these conditions may require anticoagulation to prevent blood clots from forming.

PROTECTED INFORMATION – SUBJECT TO PROTECTIVE ORDER

BLOOD CLOTTING IN THE VEINS

Venous thromboembolic events (VTE):  Deep vein thrombosis (DVT) and pulmonary embolus (PE)

DVT is a medical condition whereby a blood clot forms in a vein.  This can happen in any vein, large or small.  The venous blood clots that are usually of clinical significance are in the larger veins of the legs, pelvis and much less often the upper extremities.  These larger veins tend to be deep and hence the term deep vein thrombosis (DVT).  Small clots in more superficial veins generally are not of clinical significance.

Blood clots can have local or distant consequences.  Locally, blood clots in veins can obstruct blood flow and cause swelling, pain and inflammation.  A more distant consequence can occur if a piece of the blood clot breaks off and travels with blood returning to the heart. It generally then passes through the heart and can get lodged in the lung.  A blood clot to the lung is called a pulmonary embolus (PE).  A small PE may be of little or no consequence if the blood clot is so small that it does not block blood flow to any significant degree.  In fact, the lungs act as a filter and, by design, filter out small clots on a regular basis.

A blood clot in a large vein, on the other hand, may be of more consequence.  It could remain small and never become a problem or it could grow to a larger size.  A large PE can be serious and sometimes fatal by resulting in obstruction of the flow of blood through the pulmonary vasculature.

Usually, the clot in the vein dissolves and the normal flow of blood returning to the heart is restored.  Sometimes the blood clot does not dissolve and blood flow finds its way back to the heart by using other connected veins.

DVT/PE Prophylaxis

A special case of prevention is in VTE prophylaxis (surgery, immobilization, etc.).  There are situations where the risk of developing a VTE is common enough that treatment (generally lower dose anticoagulation) is recommended to prevent VTE.  A common example of this is at the time of lower extremity orthopedic surgery.

OTHER CONDITIONS

There are a number of other conditions that may require anticoagulation. There are a number of diseases of the clotting system that may require treatment. These include inherited ones such as lupus anticoagulant and Factor V Leiden as well as acquired ones such as in the case of certain cancers.  Arterial Thromboembolic Events ("ATEs") involve an occlusive thrombus in an artery cutting off blood supply to the downstream tissues. ATEs include myocardial infarction (MI), ischemic stroke (IS), and other thrombotic events in peripheral arteries. The main way to treat ATE acutely is with IV anticoagulants, clot busters at times, and antiplatelet agents. The main way to prevent a second heart attack is with antiplatelet agents.  However, in some cases oral

PROTECTED INFORMATION – SUBJECT TO PROTECTIVE ORDER

anticoagulation may be considered in cases where events occur while the patient is on adequate antiplatelet therapy, though this is less common.

TREATMENTS

The treatment of a venous clot or clots that form in the heart can start with IV agents in an acute setting.  For example, the administration of blood thinners, such as heparin or "clot busters" can be given. Large blood clots can be removed surgically. After the acute risk is dealt with in this manner, then patients are transitioned to oral agents for various durations depending on the clinical setting. In some low risk cases, the oral agent can be the starting therapy. Warfarin has been the standard longer term oral anticoagulant for decades, but now the NOACs are alternatives.

Warfarin is a competitive vitamin K antagonist. Vitamin K is important in the production of certain clotting factors.  One major challenge with warfarin is that vitamin K intake can impact the effects of warfarin.  This is one of the factors that contributes to the variability of the effect of warfarin.  For warfarin there is tremendous variability in dosing of individual patients. Since warfarin acts by antagonizing vitamin K, foods that contain vitamin K can interact with warfarin. There are also a number of drug interactions and wide genetic differences in warfarin metabolism.  Warfarin's effect must be continuously monitored with blood testing and the dose must be adjusted. The effect of warfarin can be reversed by the administration of vitamin K.

The NOACs block various clotting factors providing an anticoagulant effect similar to warfarin. From a mechanistic point of view there are two groups of NOACs: the direct thrombin inhibitors (dabigatran) and the Factor Xa inhibitors (rivaroxaban, apixaban, edoxaban). One of the major advantages of NOACs is that they do not provide as variable an effect as warfarin and do not need to be monitored with blood testing. They have much more predictable pharmacokinetics and pharmacodynamics.  This makes dosing easier and there is no need for therapeutic drug monitoring. Agents to acutely reverse the effects of Factor Xa inhibitors are under development. A reversal agent (Praxbind) for dabigatran was approved in October 2015.

While each NOAC has the potential to be used in many clinical situations, they are each approved for the specific uses in which they have been tested.

**Evidence on Rivaroxaban**

Rivaroxaban is a Factor Xa inhibitor that can be taken once a day. Its dose must be adjusted in those with renal failure for those with nonvalvular AF. There were a number of early phase 2 trials to determine appropriate dosing of rivaroxaban.  The first large-scale trials of rivaroxaban were RECORD 1-4 for the prevention of VTE among those undergoing orthopedic surgery. EINSTEIN explored the role of rivaroxaban in the acute and longer term treatment of VTE.  ROCKET AF evaluated the use of rivaroxaban among patients with nonvalvular AF.

PROTECTED INFORMATION – SUBJECT TO PROTECTIVE ORDER

RECORD

Bayer conducted a series of four trials to support the approval of rivaroxaban for the prevention of VTE after total hip or knee replacement surgery, the RECORD 1, RECORD 2, RECORD 3, and RECORD 4 trials. The studies compared the safety and efficacy of rivaroxaban with enoxaparin and included 12,729 subjects at 617 different sites. The studies demonstrated the safety and efficacy of rivaroxaban compared to enoxaparin. Pooled analysis of RECORD1-3 showed superiority. On the basis of RECORD 1-3, the FDA concluded that rivaroxaban is safe and effective for the prevention of VTE after total hip or knee replacement surgery. The indication was also approved by the EMA on the basis of RECORD 1-3. All four trials were submitted to FDA as part of Janssen's NDA for approval of the indication in the United States.

EINSTEIN

EINSTEIN-DVT was an open-label, randomized, event-driven, non-inferiority trial comparing oral rivaroxaban alone (15 mg twice daily for 3 weeks, followed by 20 mg once daily) with subcutaneous enoxaparin followed by a vitamin K antagonist (either warfarin or acenocoumarol) for 3, 6, or 12 months among 3449 patients with acute DVT. In addition, investigators conducted a double-blind, randomized, event-driven superiority study that compared rivaroxaban alone (20 mg once daily) with placebo for an additional 6 or 12 months in patients who had completed 6 to 12 months of treatment for VTE. The primary efficacy outcome for both studies was recurrent venous thromboembolism. In the acute DVT study, rivaroxaban had noninferior efficacy with respect to the primary outcome (hazard ratio, 0.68; 95% CI 0.44 to 1.04; P<0.001). In the continued-treatment study, rivaroxaban had superior efficacy to placebo (hazard ratio, 0.18; 95% CI, 0.09 to 0.39; P<0.001). There were no significant difference in bleeding between rivaroxaban and standard care.

EINSTEIN-PE was a second study that was similar to EINSTEIN-DVT in design except that the entry criteria included 4832 patients with PE, with or without DVT. The dosing was the same as EINSTEIN-DVT, and the primary efficacy and safety outcomes were the same. With regards to the primary efficacy endpoint, rivaroxaban was non-inferior to enoxaparin/VKA in preventing symptomatic recurrent VTE (hazard ratio, 1.12; 95% CI 0.75 to 1.68; P=0.003). The principal safety outcome, major or clinically relevant nonmajor bleeding, occurred in a similar proportion of patients in the rivaroxaban and standard care groups (hazard ratio, 0.90; 95% CI, 0.76 to 1.07; P = 0.23). However, major bleeding was significantly less common in the rivaroxaban group (1.1% vs. 2.2%; hazard ratio, 0.49; 95% CI, 0.31 to 0.79; P = 0.003).

ROCKET AF

ROCKET AF was a large scale, double-blind randomized trial comparing rivaroxaban at a dose of 20 mg per day with dose-adjusted warfarin among 14,264 patients with nonvalvular AF who were at increased risk of stroke. Study subjects who had moderate

PROTECTED INFORMATION – SUBJECT TO PROTECTIVE ORDER

renal impairment received a dose of 15 mg per day. The primary aim was to determine whether rivaroxaban was non-inferior to warfarin with respect to prevention of stroke or systemic embolism.

In the primary analysis, there were 188 (1.7% per year) total primary endpoints in the rivaroxaban group compared with 241 (2.2% per year) in the warfarin group yielding a hazard ratio (HR) of 0.79 (95% CI 0.66-0.96; p value < 0.001 for non-inferiority). For the ITT analysis there were 269 primary endpoints in the rivaroxaban group and 306 in the warfarin group (HR 0.88; (95% CI 0.75-1.03); p value < 0.001 for non-inferiority). Major and nonmajor clinically relevant bleeding was comparable in both groups while there were significant reductions in intracranial and fatal bleeding.

To achieve the dual objectives of maintaining the blinding of patients and investigators and appropriately monitoring INR in the warfarin study subjects, the ROCKET AF study used an INR Point of Care device, which was provided to the study sites by Janssen. These devices were purchased from HemoSense, Inc. and Inverness Medical Innovations, Inc., a company that purchased HemoSense, Inc. in August 2007. The devices purchased from these companies (known as the Alere INRatio) had been cleared for marketing by FDA in 2002 "for use by healthcare professionals in monitoring patients who are on warfarin-type (coumarin) anticoagulation therapy." The devices purchased from these companies were dedicated for use in the ROCKET AF study.

There was a concern raised about the device used to monitor INR among those on warfarin at the point of care. FDA issued a class 1 recall for the Alere INRatio and INRatio 2 PT/INR monitor systems and test strips that were manufactured between April 2008 and December 2014. The recall notice, issued on December 5, 2014, stated that the device should not be used in patients with certain medical conditions such as anemia (with hematocrit less than 30), conditions associated with elevated fibrinogen levels, including acute and chronic inflammatory conditions, severe infection, and advanced stage cancer. Although an urgent medical device correction letter was supposed to have been sent to customers who had purchased potentially affected devices, Janssen was never notified of this recall by Alere, Inc., the successor company to Hemosense, Inc. and Inverness Medical Innovations, Inc.

This concern has been erroneously used by plaintiff's experts to make blanket statements about the interpretation of the results of ROCKET that are unfounded. The main issue was that in a subset of study subjects, the Alere device modestly underestimated the INR. Several subsequent sensitivity analyses were conducted and the conclusion drawn by the investigators and the FDA was that there was no material impact on the main finding of the study.

Plaintiff's experts opine that the problem with the Alere device should invalidate the efficacy and safety findings in ROCKET. This opinion demonstrates a lack of understanding of the mechanism at play for both safety and efficacy. The effect of warfarin on the clotting system is the driver for both efficacy in preventing thromboembolic events and the increased bleeding risk. Increasing the INR would

PROTECTED INFORMATION – SUBJECT TO PROTECTIVE ORDER

improve the efficacy of warfarin thus decreasing the chance of rivaroxaban to demonstrate non-inferiority or superiority. However, the sensitivity analysis as mentioned above had no impact on the primary results of ROCKET.

The main driver of risk and benefit with the use of warfarin is the variability of INR levels in certain individuals. Wide swings in INR are a major predictor of both increased bleeding and decreased efficacy. This would not have been affected by the modest alterations in the readings of INR. These wide swings in INR that occur in the general population would be lessened in a trial given the compliant volunteer effect and greater scrutiny provided by study staff.

When the sponsors became aware of the concern over the device, years after the completion of the ROCKET AF trial, a number of steps were taken to evaluate the impact of the device issue on the results of ROCKET. In September 2015, however, Janssen apparently became aware of the recall notice and its potential applicability to the INRatio devices used in the ROCKET AF trial. Janssen contacted Alere to determine the applicability of the recall to the devices used in ROCKET AF, and was informed that some of the devices involved in the recall could have been used in ROCKET. When the applicability of the device recall was confirmed by Alere, Janssen and Bayer notified the regulatory authorities for which they had respective responsibilities.

The important issue presented by these events was the potential effect of the Alere device recall on the validity of the ROCKET AF study results. In theory at least, the Alere device could have affected INR readings for some patients in the warfarin arm of the ROCKET AF study by providing lower-than-actual INR readings. This, again in theory, could have resulted in unnecessary upward dosage adjustment of warfarin or failure to make downward dosage adjustments when appropriate for some patients, which possibly could have resulted in a further reduced stroke risk and increased bleeding risk in this subset of study subjects.

To investigate this question, Bayer and Janssen initially conducted a series of three sensitivity analyses of both efficacy and safety to obtain a more complete understanding of the potential effects of the recall on the results of the ROCKET AF study. The intent to treat population was used for the efficacy analyses and the safety population was used for the safety analyses. The first set of analyses included all patients but excluded specific times of observation in which the patients had recall-related conditions. The second set of analyses (which were the most conservative) included only patients without any recall-related condition ahead of any endpoint event or censoring. The third set of analyses included patients who had an event or censoring outside of a recall-related time of observation. Each of the three sets of analyses has its own strengths and limitations, and each provides useful information to the overarching question concerning the potential effect of the Alere device on the ROCKET AF study results.

On both the efficacy and the safety sides, the hazard ratios remained unaffected by any of the sensitivity analyses, all of which continued to show no statistically significant difference between the Xarelto group and the warfarin group. The hazard ratio of the

PROTECTED INFORMATION – SUBJECT TO PROTECTIVE ORDER

most conservative analysis, Analysis 2, on the safety side approached statistical significance (HR of 1.08 (95% CI 0.99 to 1.17)), but the subcomponents illustrated that the most important safety endpoints continued to trend in a favorable direction to Xarelto (death due to bleeding HR 0.43 (0.25, 0.74); critical organ bleeding HR 0.63 (0.46, 0.87); intracranial hemorrhage HR 0.58 (0.39, 0.87)).  Overall, the sensitivity analyses strongly support that any potential problem with the Alere device did not affect the results of ROCKET AF.

Independently from the sensitivity analyses conducted by Bayer and Janssen, the ROCKET Executive Committee and Investigators conducted their own sensitivity analyses using a slightly different approach.   The results of these analyses were published in the New England Journal of Medicine in February 2016.  Two physicians who were blinded to the study medication reviewed baseline medical history and adverse events for all patients enrolled in the study who had any of the specified medical conditions that had been identified in the Alere recall as conditions that could have affected the accuracy of the INR measurements.  The entire study population was divided into patients who had the conditions specified in the recall notice (37%) and patients who did not (63%).  The authors noted that both types of patients were equally distributed between the Xarelto and warfarin groups.  They found that both analyses (i.e., of patients without recall conditions and of patients with recall conditions) were consistent with the original reported results of the ROCKET study.   They also found that, in patients with the recall condition, there was a trend towards higher bleeding in Xarelto patients compared to warfarin patients, which is exactly the opposite of what one would expect to find if warfarin patient with the recall conditions were effectively being overdosed.  Although the approach taken by the Executive Committee was somewhat different methodologically from the company's approach, the results of these analyses are highly consistent, i.e., they both demonstrate that any potential problem with the Alere device in measuring INR did not affect the validity of the results and conclusions of the ROCKET study.

Finally, in addition to the sensitivity analyses described above, one additional source of information was explored to evaluate the potential effect of the Alere recall on the ROCKET study results.  As part of the ROCKET study protocol, blood samples were drawn on the same day that point-of-care tests were perfomed at 12 weeks and 24 weeks (paired samples), and INR testing of these samples was performed at a central laboratory.  Paired samples at either time point (12 weeks or 24 weeks) were obtained from a total of 87% of patients in the trial.  These samples represent approximately 6% of the total point-of-care INR tests conducted in the ROCKET study.

Investigators found that, for patients in the warfarin arm, discrepant INR values between the point-of-care and central laboratory testing "were present in 13% of the samples obtained at either 12 weeks or 24 weeks and in 4% of the samples obtained at both time points."  These differences are modest and some of the difference could be explain by variability in each test and the fact that the repeat INRs were conducted on frozen samples.

PROTECTED INFORMATION – SUBJECT TO PROTECTIVE ORDER

The investigators found no relationship between the discrepant samples and the presence of the conditions listed in the Alere recall notice. The investigators noted that event rates were higher for warfarin-treated patients with discrepant values than those with non-discrepant values for both stroke and bleeding events.  If a problem with the Alere device had systematically led to overdosing of patients in the warfarin arm resulting in clinical events, then one would expect to see higher rates of bleeding in the discrepant warfarin users, but not higher (in fact, potentially lower) rates of stroke.  This additional analysis, which was published in the New England Journal of Medicine in July 2016, further supports the conclusion that any issues relating the Alere device being used to measure INR in patients in the warfarin arm of ROCKET did not affect the validity of the original trial results.

The FDA conducted its own re-analysis of the data. In the ROCKET AF Reviews document, they noted the POC INR averaged about 13% less than the LAB INR with "modest variability" except when the LAB INR was below 2.  The FDA used mathematical modeling approaches to estimate the impact of this difference on POC and LAB INR and each analysis predicted a small decrease in the expected rate of major bleeding and a small increase in hazard ratio or rate ratio.  However, they noted that this did not have a major impact on the overall results stating:

"Overall, these estimated reductions in their rates of bleeding events in the warfarin arm were small enough so that the benefits of rivaroxaban would still outweigh its risks if efficacy were not affected . . . the conclusion we made in 2011 that the benefit of rivaroxaban in patients with non-valvular atrial fibrillation outweigh its risks should not be changed."

Time in therapeutic range (TTR)

ROCKET was a well-designed, large-scale randomized trial testing specifically the efficacy and safety of rivaroxaban compared with warfarin managed as it is in clinical practice. The study team carefully considered a number of design issues and settled on a comparison with warfarin as standard care rather than protocol driven care. This allows for a more real world comparison and increases generalizability. The TTR for ROCKET is in the range that would be expected in many real world settings.  It illustrates the major limitation of warfarin that many patients spend a significant amount of time out of the therapeutic range.

In ROCKET AF, among patients in the warfarin arm, the proportion of time in which the intensity of anticoagulation was in the therapeutic range was a mean of 55%.  As the authors noted, this was lower than had been seen in previous studies comparing NOACs to warfarin.   In the context of this study, however, the lower relative TTR does not raise concerns.

First and perhaps most importantly, the patient population in ROCKET was significantly sicker than the patient populations in which other NOACs were studied, such as the RELY and ARISTOTLE trials.   Over 60% of patients in ROCKET had congestive heart

PROTECTED INFORMATION – SUBJECT TO PROTECTIVE ORDER

failure ("CHF"), approximately 40% had diabetes, and almost 55% of each group had a history of a previous stroke, systemic embolism, or transient ischemic attack (TIA).   By contrast, in RELY, only about 32% had CHF, approximately 23% had diabetes, and about 20% had a history of previous stroke or TIA. Similarly, in ARISTOTLE, approximately 35% had CHF, approximately 25% had diabetes and less than 20% had previous stroke, TIA, or systemic embolism.  The patient population in the ENGAGE trial was somewhat sicker than RELY and ARISTOTLE with about 57% having CHF, 36% having diabetes, and 28% having prior stroke, but still overall not as sick as the population studied in ROCKET.  The mean CHADS2 score for ROCKET was 3.5 in contrast with 2.1 for RELY and ARISTOTLE and 2.8 for ENGAGE.  Patients with more co-morbidities would be expected to be more difficult to maintain within the target INR range, both on account of their co-morbidities as well as the effects and potential drug interactions from medications needed to treat those co-morbidities.

Second, instead of using an algorithmic approach to INR management in which the study protocol strictly dictates the circumstances in which dose adjustments need to be made, ROCKET permitted individual investigators to use their own clinical judgment and discretion to make dosage adjustments when deemed appropriate according to their normal clinical practice.  These two different approaches to INR management each have their own strengths and limitations.  An algorithmic approach is more likely to result in a higher INR and better overall control of the warfarin patients.  The investigator discretion approach will likely yield lower TTR, but has the benefit of being more representative of how warfarin would be used in the "real world" population.

In recommending approval of Xarelto for the atrial fibrillation/stroke prevention indication, the FDA Division Director specifically addressed this point: "Prior to approval of dabigatran, there were frequent discussions within FDA about the advisability of conducting real world trials versus trials in which the warfarin dose was optimized by adjusting it centrally using an algorithm.  Some thought real world trials were more likely to provide information about the actual risks and benefits of new therapies when introduced into practice.  Others thought new drugs should be demonstrated to be at least similar to outcomes to warfarin when warfarin was optimally managed.  We never concluded that either approach was unacceptable (or even that one approach was preferable) so the approach taken by this applicant was acceptable."  [FDA Division Director's Memo].  Plaintiffs' experts appear to be contending that the approach used by Janssen was unacceptable, but for the reasons noted by the Division Director, plaintiffs' expert's personal opinions on this issue is out of step with the prevailing view of the scientific community.

The plaintiffs' experts rely far too heavily on subgroup analysis for their interpretation of results from ROCKET. For example, the overall finding of approximately a one-third lower intracranial hemorrhage was called into question by an unusual analysis that excluded one geographic region. The plaintiff's experts point to the US subgroup of ROCKET suggesting that the difference in TTR lead to disparate results.  However, this conclusion cannot be drawn from looking at this subgroup.  Subgroup analyses are rarely powered for hypothesis testing and therefore are largely for hypothesis generation. There

PROTECTED INFORMATION – SUBJECT TO PROTECTIVE ORDER

can be differences between subgroups largely due to chance and multiple testing issues must be considered. The US subgroup of ROCKET is small and when there are many subgroups we need to be extremely cautious that multiple testing can result in the appearance of modest differences that are the result of the play of chance.

The plaintiffs' experts suggest other doses should have been tested. Ultimately, the doses used in ROCKET were shown to be as safe and effective as warfarin. While exploring other doses may or may not be a reasonable next question for a new trial, it does not impact the interpretation of the results for the once-daily 20mg (or 15mg in the case of patients with moderate renal failure). The rationale for the dosing used in ROCKET is a clear assessment of the existing data (Kubitza) and is based on the safety in other trials.

The plaintiffs' experts opine that the ROCKET investigators should not have included hemorrhagic stroke in the efficacy endpoint definition. However, this is often done in large scale trials of anticoagulants and other drugs that affect blood clotting. Total stroke has been included in other trials of NOACs. In some countries where these studies are conducted imaging is not as common as in the US and it can be difficult to distinguish the type of stroke from the clinical data alone. More importantly, the rationale is that using total stroke is a conservative assessment of the impact on clinically important events that includes the benefit of prevention of ischemic events combined with and offset by the most important side effect, that of intracranial bleeding. However, all the results are available to the reader of the main paper. While the approach chosen by the ROCKET investigators is consistent with other studies, the data are included in the main effects paper and permit others to analyze the data in alternate ways.

The plaintiff's experts criticize the design of ROCKET for including a range of patients including some at high risk. Industry is often criticized for doing just the opposite because it can minimize the detection of side effects that can be more apparent in a sicker population. The risk of bleeding increases in sicker patients that are at risk for strokes. There are no data that suggest that the effect of oral anticoagulants is less effective in those at higher risk.

The FDA had questions about the inclusion criteria; however, the study design was ultimately accepted. The inclusion of patients with previous events increases the likely number of both thromboembolic and bleeding events thus increasing power. The effect of warfarin and NOACs appears to be the same across the risk spectrum so there is no bias introduced by including a sicker population. The mechanism of action is the same regardless of risk level of the patient. Inclusion of a spectrum of baseline risk provides both an efficient design and the best look at the impact of a drug on a wider variety of patients without any major downsides. In my opinion it is preferable to include a range of risk. It should be noted that there is a wide spectrum of short and long term risk in other patients receiving oral anticoagulants including patients with high clot burden at high risk of death such as those with PE. When you consider the range of studies of rivaroxaban and other NOACs, a wide range of patients at variable risk have been studied and the results seem to generalize to this broad range of patients.

PROTECTED INFORMATION – SUBJECT TO PROTECTIVE ORDER

The plaintiffs' experts also criticize ROCKET for its censoring rules after termination of either study drug. ROCKET chose a conservative censoring rule that allowed the greatest likelihood detecting the impact of this drug. Some drugs have a long-term effect. For example, cholesterol lowering drugs take months to years to have an effect and that effect can persist for quite some time after termination of the drug. For this reason the cholesterol trials use censoring rules that follow patients for events long after termination of the drug. In contrast, some drugs, like most drugs that affect blood clotting are only effective when you are taking them. This is the case for both the efficacy and safety of these drugs. For this reason, the most conservative way to assess the impact of the drug is to censor follow-up time after patients have stopped the drug or after the clinician has determined that the patient should be out of the trial so the patient can be placed on the drug that the physician feels is best, disregarding the blinded assignment. For drugs with an acute effect, including study subjects long after they are no longer taking the assigned treatment reduces the ability to see important differences such as bleeding risk. For this reason, the selected censoring rules for ROCKET were conservative and proper and would not bias the results.

The authors present analyses both as per protocol and as ITT (Patel). It is reassuring that the main results from both analyses are consistent with the conclusion that rivaroxaban is at least as safe and effective as warfarin for treating nonvalvular AF and could be superior.

OTHER TRIALS

Rivaroxaban has been studied in other large scale clinical trials in various clinical situations such as acute coronary syndromes (ACS), (ATLAS ACS2-TIMI 51) and among acutely ill patients at higher risk of VTE such as those with cancer and admitted to the hospital with other acute illnesses (MAGELLAN). These trials did not lead to new indications but do provide additional trial data on safety and efficacy of rivaroxaban.

POST MARKETING STUDIES

Summary and pooled data from trials

There is a limited number of large scale trials of NOACs compared with other therapies in various clinical settings. The data from each individual trial represents the best data on a specific intervention in the setting in which the trial was designed to test that particular NOAC. Since there are no head to head comparisons of the NOACs there have been attempts to summarize the data from trials to determine what general conclusions can be drawn about the NOACs in general and in an attempt to determine if there can be any insights about possible differences between the NOACs.

In general, the collective trial data suggests that there are many similarities between the four approved NOACs in this class of medications. They are easier to take than warfarin because, unlike warfarin, they do not require routine laboratory monitoring to use them

PROTECTED INFORMATION – SUBJECT TO PROTECTIVE ORDER

safely.  They are also not subject to food interactions like warfarin. In general, they all provide safety and efficacy that is equal to or superior to warfarin.

While the collective trial data suggest similarities between NOACs, all of which act through inhibition of the clotting cascade, there have been some who have attempted to use the clinical trial data to make some comparisons of the various NOACs with each other. [Baker (2012), Rasmussen (2012), Schneeweiss (2012)]. This can only be accomplished by the selection of trials in which the same clinical question was assessed. The above mentioned papers have reported indirect comparisons of the various NOACs in the setting of nonvalvular AF.

These studies have tended to demonstrate similar efficacy and safety of the various agents. However, these indirect comparisons must be interpreted with extreme caution because the comparisons are completely artificial.  They are accomplished by the technique that takes advantage of the fact that each study drug was compared to a similar control group such that a comparison of the active study drugs could be made by extrapolation. This is an extremely problematic comparison because there is no way to account for the many differences between the studies.  For this reason, these studies can only be used to generate hypotheses that must be further tested in other studies such as large scale clinical trials that directly compare the agents in question.

Observational studies on Rivaroxaban and other NOACs

Another source of data that becomes available after a new drug reaches the market place is observational studies of that new drug being used in medical practice by a wider population of users. Once the NOACs were in widespread use there was enough data to explore various hypotheses using large databases of patients using these agents in observation studies. These studies are valuable because they can provide data on more users than in the large scale trials but they must also be interpreted with extreme caution because the use of the new agent was not randomized so any differences between comparison groups can be a result of that nonrandom selection of one drug over another.

Several observational studies have explored the use of NOACs in "real world" circumstance.  There are a number of observational studies that have demonstrated safety and efficacy of NOACs in general and rivaroxaban in particular that are consistent with the data from trials [Camm (2016), Ageno (2016), Tamayo (2015)].  Reassuring data have suggested that NOACs including rivaroxaban are safe and effective in populations that were not represented in large numbers in the trials such as Asians [Chan (2016)].

Another use of observational data is the comparison of various NOACs.  Here the data are inconsistent.  There are some studies suggesting no real differences between the NOACs [Ellis (2016), Maura (2015)] while others suggest that there could be differences between various agents [Graham (2016), Noseworthy (2016)].

There are several major problems that lessen the reliability of these observational studies. A major problem is that of confounding in general and by indication in particular.  This is especially the case when a new drug enters into clinical use as an alternative to an

PROTECTED INFORMATION – SUBJECT TO PROTECTIVE ORDER

existing widespread standard therapy. Patients that are doing well on the older therapy have less incentive to switch early to the new therapy. However, those who have had a problem on the standard therapy may be the first to be switched to the newer therapy. If a patient had a bleeding problem or a thromboembolic event on warfarin they might be among the first to be started on a NOAC. Since prior events are potent predictors of future events, this may lead to an incorrect appearance of worse safety or efficacy among those on the newer agent. This type of confounding is notoriously difficult to adjust for. For this reason any findings must be interpreted with great caution.

One major advantage of rivaroxaban for the atrial fibrillation indication is that it is a once a day drug which increases compliance compared to drugs more than once a day. For this reason non-compliant patients might tend to be prescribed a drug that can be taken once daily rather than more than once a day. This is another potential confounding issue.

The same challenges of confounding can impact the interpretation of comparative effectiveness of various treatments against each other in observational studies. Any findings of differences between the NOACs from observational studies must be interpreted with extreme caution. These studies merely raise unproven hypotheses that must be tested in large scale trials that compare agents head to head. Trials comparing similar drugs would be logistically challenging since they may need to be extremely large and may need to run for very long durations to have power to detect modest differences that have been suggested by some of the plaintiff's experts.

One use of post marketing observational studies might be the detection of a very unusual and rare side effect that emerge when there are larger numbers of users of a novel agent, but these also must be interpreted very cautiously given issues with multiple hypotheses. There have been not been novel signals of harm from the NOACs.

Studies that summarize or pool trial data and observational studies post-marketing can add to the totality of evidence on a given drug's impact on safety and efficacy outcomes, and can provide some insight on the comparison of various agents in a class, but as described above they are not nearly as reliable as data from randomized trials. The pooled trial data suggest that NOACs as a class are a safe and effective alternative to warfarin. The studies that make indirect comparisons must be interpreted extremely cautiously given the various differences in trials design and study populations.

The observational studies are generally consistent with the trial data, again suggesting that these agents are safe and effective alternatives to warfarin and further suggest generalizability to populations not as well represented in some of the trials. For rivaroxaban, the observational study results are consistent with ROCKET and suggest that it can be extrapolated to the broader populations.

FDA

In the United States, it is the responsibility of the FDA to review data on new drugs, determine the safety and efficacy of new drugs based on the review of those data, grant approval for the marketing of new drugs when supported by the scientific evidence,

PROTECTED INFORMATION – SUBJECT TO PROTECTIVE ORDER

oversee the labeling of new drugs, and then continue to review new data as it emerges on these regulated drugs. Drugs are viewed by FDA both as individual agents and as members of a class. As a class, FDA has given approval to a number of NOACs as alternatives. Rivaroxaban has been carefully reviewed by the FDA during the approval process and subsequently. The FDA has determined that rivaroxaban is safe and effective for those clinical situations for which it is indicated and that rivaroxaban is labeled in accordance with the FDA's guidance. A similar review process has led to similar conclusions by the EMA.

## GUIDELINES ON NOACS

Guidelines provide an additional assessment of new agents as they appear in medical practice. Several guidelines from specialty societies have recommended the use of NOACs including rivaroxaban as an alternative to warfarin. For example, in early 2016, ACCP recommended NOACs for initial and long term treatment of VTE, DVT and PE. In 2014, the AHA/ACC guidelines recommend NOACs for treatment of nonvalvular AF. Recently, the European Heart Rhythm Association provided guidance for the use of NOACs in nonvalvular AF. These specialty society guidelines generally indicate that NOACs can be used as an alternative to warfarin in the settings for which they are indicated and there are no major distinctions between the various NOACs in those clinical situations where the various NOACs have been tested and approved for use.

## CLINCAL PRACTICE

As result of the approval and with the endorsement in various guidelines of NOACs including rivaroxaban, NOACs have become used as safe and effective oral anticoagulants. There use is increasing in general practice and there has been widespread acceptance of them by clinicians and patients.

### Summary of Opinions

There are many conditions that require anticoagulation with agents that impact the clotting cascade. There are a limited number of oral anticoagulants that can be used for a sustained period of time. Since the 1950's warfarin was the main oral agent for this purpose. There is a wealth of experience with this agent; however, there are a number of major drawbacks with its use. First, its mechanism of action is the competition with vitamin K that is necessary for the production of several clotting factors. So the impact of taking warfarin can be significantly altered by vitamin K intake from natural sources or supplements. This can lead to unsteady effect of warfarin on clotting. Second, because of this unsteady effect of the drug, the drug's effect must be monitored closely with a blood test.

The third issue is the tight balance between benefit and risk. The main side effect of warfarin is a result of its main mechanism of action of impacting clotting of blood. Thus, the effectiveness of warfarin is linked to its risk. The higher the dose, the greater the effect in prevention of clots, but there is also greater risk of bleeding. While all bleeding has the potential to be problematic, the greatest concern from the vantage point of

PROTECTED INFORMATION – SUBJECT TO PROTECTIVE ORDER

bleeding risk is intracranial bleeding. In general, GI bleeding related to anticoagulant use tends to be medically manageable, is relatively unlikely to result in permanent injury, and has a relatively low risk of fatality.

Given these challenges with the use of warfarin, there has been the desire for years to develop new oral anticoagulants with key features that mitigate these drawbacks. A drug that did not need laboratory monitoring, had a more predictable effect, and was at least as safe and effective as warfarin would be an important advance. There are several NOACs that have been developed as an alternative to warfarin that are on the market now. None of these require the type of laboratory monitoring that is required by the use of warfarin. Each has been tested against warfarin in various clinical settings and has been deemed an acceptable alternative to warfarin in those specific clinical situations.

Rivaroxaban is one of four available NOACs that have been tested against warfarin and are approved for use in the US. Rivaroxaban and two others, apixaban and edoxaban are direct inhibitors of factor Xa,while dabigatran is a direct thrombin inhibitor. While the study designs and clinical circumstances under which these agents were tested varied, each of these has been approved by the FDA for specific clinical settings as an alternative to warfarin. None of these agents requires the routine INR monitoring required when using warfarin.

Like all NOACs, rivaroxaban has been tested in specific circumstances in large scale trials and consistent with other NOACs, the totality of evidence for rivaroxaban indicates that is a safe, effective, tolerable and convenient alternative to various anticoagulants in certain clinical settings including nonvalvular AF and treatment of VTE. These trials demonstrated an overall effect that permitted the use of rivaroxaban in these settings as an alternative to standard care.

ROCKET was a well-designed, large-scale randomized trial testing specifically the efficacy and safety of rivaroxaban compared with warfarin used as in clinical practice among a range of risk. All design issues were well described and the results were presented transparently. ROCKET demonstrated that rivaroxaban's efficacy and safety profiles are at least comparable to if not better than warfarin's in the setting of nonvalvular AF. The safety profile will likely improve and greater flexibility in its use will be afforded as new agents are developed to reverse the effect of NOACs.

After review of the observational literature and the summarized and pooled trial, the interpretation of the large-scale trials of the NOACs in general and of rivaroxaban in particular is not altered. These post marketing studies of NOACs suggest that the general interpretation of the trials of NOACs compared with warfarin should not be called into question. NOACs in general and rivaroxaban as one of this class of important drugs have a safety, efficacy, tolerability and convenience profile that makes them a valuable alternative to older anticoagulants.

The labeling of rivaroxaban under the supervision of the FDA clearly conveys the important safety and efficacy information. The FDA has reviewed preclinical data, available trial data on rivaroxaban including ROCKET, its own independent re-analysis,

PROTECTED INFORMATION – SUBJECT TO PROTECTIVE ORDER

and observational studies. There have not been any mandates regarding changing the labeling of rivaroxaban and, as noted above, FDA recently reaffirmed its conclusion regarding the safety and efficacy of rivaroxaban.

Finally, guidelines indicate the use of NOACs in a number of conditions. Both American and European specialty societies have released guidelines in the past couple of years updating the treatment and prevention of various conditions with oral anticoagulants. All of these guidelines indicate that NOACs can be used as an alternative to warfarin in the settings for which they are indicated. In these guidelines there are no major distinctions between the various NOACs in those clinical situations where the various NOACs have been tested and approved for use.

In summary, rivaroxaban has undergone extensive study in preclinical and large scale trials as well as observational studies.  The totality of evidence leads to the conclusion that rivaroxaban is a safe and effective medication that is a valuable alternative to warfarin and enoxaparin therapy in those circumstances for which it is indicated.

These opinions are based on my research, clinical, and teaching experiences as well as my extensive review of the data.  The opinions disclosed in this document are held to a reasonable degree of medical and scientific certainty.  I reserve the right to amend these opinions as additional data become available.


*J. Michael Gaziano*                                        11/15/16


J. Michael Gaziano, MD, MPH                    Date

PROTECTED INFORMATION – SUBJECT TO PROTECTIVE ORDER