# Exhibit 3

# FILED UNDER SEAL

Protected - Subject to Further Protective Review

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA


* * * * * * * * * * * * * * *

IN RE:  XARELTO              * MDL 2592

(RIVAROXABAN) PRODUCTS       *

LIABILITY LITIGATION         * SECTION L

                             *

THIS DOCUMENT RELATES TO     * MAG. JUDGE NORTH

ALL CASES                    *

* * * * * * * * * * * * * * *

- PROTECTED -

- SUBJECT TO FURTHER PROTECTIVE REVIEW -


VIDEOTAPED DEPOSITION OF JOHN MICHAEL GAZIANO, M.D.

ECKERT SEAMANS CHERIN & MELLOTT, LLC

Two International Place

Boston, Massachusetts

December 15, 2016          2:06 p.m.




Maryellen Coughlin, RPR/CRR

bdd999cf-a489-4a1f-a89e-5cb6e21e1201

Protected - Subject to Further Protective Review

Page 2

1    APPEARANCES:

2    Representing the Plaintiffs:

3          SEEGER WEISS LLP

4          77 Water Street, 26th Floor

5          New York, New York 10005

6          BY:  JEFFREY S. GRAND, ESQ.

7          212.584.0700
           jgrand@seegerweiss.com

8

9    Representing Bayer:

10         THE PIORKOWSKI LAW FIRM

11         1155 F Street NW, Suite 200

12         Washington, DC 20004

13         BY:  JOSEPH D. PIORKOWSKI, JR., ESQ.

14         202.223.5535
           jpiorkowski@lawdoc1.com

15

16   Representing Janssen:

17         DRINKER BIDDLE & REATH LLP

18         600 Campus Drive

19         Florham Park, New Jersey 07932

20         BY:  JULIE L. TERSIGNI, ESQ.

21         973.549.7106

22         julie.tersigni@dbr.com

23

24

25

Protected - Subject to Further Protective Review

1       A.      Correct.

2       Q.      Okay.

3       A.      Over the last, I believe, four

4   years.

5       Q.      Four years.  There were a number of

6   cases on that list.  Were those -- other than the

7   ones we've spoken about, were those medical

8   malpractice cases?  Could you describe the nature

9   of those cases?

10      A.      So they were all medical.  You

11  know, other than the ones I believe we've talked

12  about on that list, I believe they were all

13  medical malpractice.  Yes, they were.

14      Q.      And who do you -- who do you

15  generally represent in those cases?

16          MR. PIORKOWSKI:  Object to form.

17      A.      I've represented both defendants

18  and plaintiffs.

19      Q.      Okay, I want to sort of shift gears

20  a little bit and ask you some questions about

21  your CV and some of your past experience.

22      A.      Okay.

23      Q.      Do you -- do you hold yourself out

24  as an expert in drug labeling?

25      A.      I use drug labeling as a

bdd999cf-a489-4a1f-a89e-5cb6e21e1201

Protected - Subject to Further Protective Review

1    educational tool for myself and education of

2    young trainees.

3                    Because I'm an expert in the type

4    of literature trials and other studies that go

5    into the -- into labeling, I do consider myself

6    more expert than the average physician or trainee

7    in interpreting what's the information that's in

8    a label.

9         Q.      Okay.  More expert than the average

10   physician?  Can you answer my question, which is

11   are you holding yourself out as an expert in

12   labeling?

13                    MR. PIORKOWSKI:  Object to form.

14        A.        I don't know what you mean by hold

15   myself out.  I have an expertise in the kinds of

16   trials that -- the kinds of research that goes

17   into labeling and is often used for determining

18   clinical indications for drugs, and I teach and

19   lecture in the area of how those studies are

20   done, and that's not an expertise that's present

21   in the -- your average clinician.  So I do hold

22   myself out to be -- if hold myself out means -- I

23   have an expertise in randomized trials, which are

24   often the mainstay of the work in a label, more

25   so than the majority of clinicians that don't --

Protected - Subject to Further Protective Review

1    that are not involved in research.

2          Q.      Okay.  When did you acquire

3    expertise in labeling?

4          A.      I didn't say I was an expert in

5    label.  I said I was an expert in being able to

6    interpret the data in the label.

7          Q.      Okay.  Is it your intention to

8    offer an expert opinion as to the adequacy of the

9    label in this case?

10         A.      So it's -- it's my opinion that the

11   data that is contained in the Xarelto label is a

12   reasonable reflection of the literature in the

13   field.

14         Q.      Okay.  Have you ever drafted a

15   label for a pharmaceutical product?

16         A.      No, sir.

17         Q.      Okay.  Have you ever been asked by

18   the FDA to consult on drug labeling?

19         A.      No, sir.

20         Q.      Are you familiar with the federal

21   regulations concerning drug labeling?

22         A.      Vaguely but not in excruciating

23   detail.

24         Q.      Okay.  What do you base your

25   labeling opinions on?

bdd999cf-a489-4a1f-a89e-5cb6e21e1201

Protected - Subject to Further Protective Review

Page 34

1          A.      So I never said I have opinions on
2     labeling.  I have opinions on what's in the
3     label, and what's -- what is contained in the
4     Xarelto label, I think, is an adequate reflection
5     of the literature that's been published on
6     Xarelto and a reasonable representation of that
7     labeling for a clinician to be able to use that
8     product.
9          Q.      Okay.  Your opinion that the
10     Xarelto label is an adequate reflection of the
11     literature, what is that based on?
12          A.      It's based on the reading of the
13     label and my understanding of the literature.
14          Q.      Okay.  Is that based on any set of
15     standards?
16               MR. PIORKOWSKI:  Object to form.
17          A.      It's based on my expertise in being
18     able to interpret the literature and synthesize
19     it, as I've done in many forum, whether it be a
20     lecture or even a review, book chapter, paper.
21          Q.      Okay.  So your opinion that the
22     label is adequate is based -- is not based on any
23     objective set of standards, correct?
24               MR. PIORKOWSKI:  Object to form.
25          A.      You sort of mischaracterized what I

bdd999cf-a489-4a1f-a89e-5cb6e21e1201

Protected - Subject to Further Protective Review

Page 35

1   said.  I said that the label is an adequate
2   reflection of the literature on the topic and as
3   that literature is translated for a clinician to
4   use the -- use the information in clinical
5   practice.
6           Q.      And you're basing that on your own
7   experience?
8           A.      Yes, sir.
9           Q.      Okay.  You're not basing that on
10  any FDA standards as to what should be contained
11  in the label, correct?
12          A.      Correct.
13          Q.      Okay.  And you have no prior
14  experience in either consulting on or drafting
15  drug labeling, correct?
16          A.      That's correct, not specific.
17  Although, I have done studies that were pivotal
18  in acquiring labeling, so I have some
19  understanding of the process in how that -- the
20  literature gets translated from a study that I
21  conducted to a label.
22          Q.      Okay.  When you say you've done
23  studies that were pivotal in acquiring label --
24  acquiring labeling, do you mean gaining approval
25  for an indication?

Protected - Subject to Further Protective Review

Page 36

1      A.      Yes, sir, I do, in gaining approval
2   for indication, and then it got translated into a
3   label, that's correct.
4      Q.      Okay.  You didn't draft a label,
5   correct?
6      A.      No, sir.
7      Q.      Okay.  And you had nothing to do
8   with that sponsor's negotiations with the FDA
9   about the label, correct?
10     A.      So I have been involved in
11  discussions on the design of a trial at the FDA
12  with the FDA, and I think that that probably
13  represents part of that process, not the specific
14  drafting of the language in the label but the
15  design of the study that was required by the FDA
16  to provide approval.
17     Q.      Have you ever written on drug
18  labeling?
19     A.      Written about the process of drug
20  labeling?
21     Q.      Yes.
22     A.      No, sir.
23     Q.      Okay.  Do you understand that the
24  adequacy of the Xarelto label was a legal issue
25  in this case?

bdd999cf-a489-4a1f-a89e-5cb6e21e1201

Protected - Subject to Further Protective Review

1          MR. PIORKOWSKI:  Object to form.
2      A.      I was not using the term in a legal
3   context, but in a clinical one, that it's -- I
4   think it's a -- maybe -- if that's a legally
5   charged word, I can use a different one.  That I
6   think that it is a reasonable reflection of the
7   literature that provides information to a
8   clinician on the clinical application of that
9   drug.
10     Q.      In your report, you state that you
11  treat patients?
12     A.      Yes, sir.
13     Q.      Okay.  How many patients do you see
14  a week?
15     A.      I'm responsible for a clinic that
16  generally has between 10 and 20 patients.  I run
17  that clinic with two to four clinical fellows.
18     Q.      Okay.  How many patients do you
19  personally see a week?
20     A.      Well, I'm responsible for all of
21  them, and I have communication with each of the
22  fellows about the patients, and I see a large
23  number of them.
24     Q.      Okay.  Move to strike as
25  non-responsive.

bdd999cf-a489-4a1f-a89e-5cb6e21e1201

Protected - Subject to Further Protective Review

1     else is prescribing?

2          A.     All of the above.  I can prescribe

3     them.  I can co-sign for a trainee prescribing

4     them.  I can concur with, you know, what the

5     primary care physician has prescribed, or

6     disagree with for that matter and make a change.

7          Q.     And, again, this happens at the

8     Boston VA?

9          A.     Yes, sir.

10         Q.     Okay.  Do you know what

11    anticoagulants are on the Boston VA's formulary?

12         A.     There's a variety of

13    anticoagulants.  The fortunate thing is, is that

14    we can get any drug whether it's on formulary or

15    not.

16                The prominent one is Coumadin, is

17    the main anticoagulant that we use.  We have a

18    variety of other oral anticoagulants and a

19    variety of subcutaneous ones that are also used,

20    and the formulary does change from time to time.

21         Q.     Okay.

22         A.     But we do -- there's not a drug

23    that we can't get access to, if we choose.  We

24    have to make -- we have to put in a non-formulary

25    request.  So we have the ability to request the

bdd999cf-a489-4a1f-a89e-5cb6e21e1201

Protected - Subject to Further Protective Review

Page 51

1       crossroads division, called the division of
2       aging, and I oversee a clinical program that does
3       have involvement at the Faulkner Hospital, so I
4       have privileges at the Faulkner Hospital.  While
5       the geriatrics team that I'm responsible for in
6       the division of aging has had clinical activity
7       at the Faulkner Hospital for a number of years, I
8       don't see patients in that clinical activity, but
9       I do maintain a privilege appointment.
10              Q.      Okay.  Go down to the Major
11      Administrative Leadership Positions?
12              A.      Yes, sir.
13              Q.      Okay, so I see -- go down to 1996
14      to the current day.
15              A.      Mm-hmm.
16              Q.      There's both director of preventive
17      cardiology and director of preventive cardiology
18      fellowship for the VA Hospital?
19              A.      Yes, sir.
20              Q.      Can you explain that, please?
21              A.      So that's what we were talking
22      about.  That program that I run, I developed way
23      back in 1996, developed that clinical program,
24      and the fellows that I was talking about, we have
25      up to four fellows per year in this fellowship.

bdd999cf-a489-4a1f-a89e-5cb6e21e1201

Protected - Subject to Further Protective Review

Page 52

1      It's a daughter program to the Brigham & Women's

2      cardiology program, but it's a specific

3      subspecialty of cardiology and preventive

4      cardiology.

5              Q.      And that fellowship, is that --

6      when you say you're teaching epidemiology, is

7      that really the bulk of it?  Does it come through

8      the -- does the bulk of that work come through

9      the fellowship?

10             A.      Well, the two things that -- in

11     that program, we teach clinical preventive

12     cardiology, and I was explaining that, early in

13     that clinical preventive cardiology setting.  We

14     also -- I forgot to mention I also do cover the

15     cardiac rehab service as a clinical activity,

16     too, and our fellows gain experience in those

17     areas in the clinical area.

18                     And then we -- of course, we use

19     epidemiology trials in our clinical teaching all

20     the time, but those fellows are also involved in

21     research.  It's a one- or two-year fellowship

22     where they're learning clinical preventive

23     cardiology in the clinical settings that I

24     described, the preventive cardiology program, and

25     increasingly it will be in the cardiac rehab

bdd999cf-a489-4a1f-a89e-5cb6e21e1201

Protected - Subject to Further Protective Review

Page 118

1          Q.       Okay.  And you're not rendering an
2     opinion on dosing, are you, in connection with
3     your testimony in this case?
4          A.       I have some opinions about the dose
5     chosen and used in and the results of the
6     particular doses that's been used in the -- in
7     the randomized trials, but I'm not rendering an
8     opinion about the pharmacology per se, you know,
9     that led to some of those decisions, but I do
10    have opinions about the doses chosen for the
11    trials.
12         Q.       Okay.  Did you review any of the --
13    any of the internal discussions among Bayer and
14    Janssen about dosing for the trials?
15         A.       No, sir.
16         Q.       Okay.  Did you review any of their
17    emails with outside discussions?  I mean, I'm
18    sorry, with outside consultants regarding the
19    dosing for the trials?
20         A.       No, sir, I did not.
21         Q.       Okay.  Did you review any emails
22    between Janssen employees and Robert Califf?
23         A.       No, sir, I did not.
24         Q.       And you did not review all the
25    dosing studies for Xarelto, correct?

bdd999cf-a489-4a1f-a89e-5cb6e21e1201

Protected - Subject to Further Protective Review

Page 122

1   was similar to doses used in other trials for

2   which there was sufficient support to indicate

3   that that would be a acceptable dose to test in

4   the afib situation.

5           Q.      Okay.  When you say acceptable dose

6   to test, is that different from what the best

7   dose to test would be?

8           A.      So, I mean -- and I'm not rendering

9   an opinion on the best dose.  I'm not rendering

10  an opinion on the fact that a lot of work went

11  into coming up with a dose that was felt

12  acceptable to be tested and that had been tested

13  in certain trials in other situations and that

14  the logic behind the discussion in the protocol

15  and the experience that led to some of the power

16  calculations, for instance, on the effect size,

17  was sufficient to warrant the study of that dose

18  in patients with atrial fibrillation.

19          Q.      Okay, but your opinion is not that

20  that's what the dose should be or that's what the

21  safest dose would have been?

22          A.      So you can't -- in my opinion, you

23  know, you can't -- I -- regardless of what other

24  literature there might be on the pharmacology of

25  the drug, the only way for us to really make a

bdd999cf-a489-4a1f-a89e-5cb6e21e1201

Protected - Subject to Further Protective Review

Page 123

1    determination that a different dose would be

2    better or worse would be to do a head-to-head

3    comparison like we've done in statin trials.

4                The work that went up to the choice

5    of that dose for this particular study is, in my

6    mind, sufficient and adequate to support the test

7    that was undertaken, and the test results warrant

8    that dose being applied in clinical settings.  To

9    be able to say from a clinical perspective as a

10   clinician and as an epidemiologist that there is

11   a better dose or there's a worse dose would

12   require a head-to-head comparison of multiple

13   doses, which hasn't been done yet.

14        Q.      Well, not by this manufacturer,

15   correct?

16        A.      Not by this manufacturer for this

17   drug.

18        Q.      Right.  Other manufacturers of

19   NOACs have done different dose regimens, compared

20   them, correct?

21                MR. PIORKOWSKI:  Object to form.

22        A.      That's correct, others have in some

23   cases.  In other cases, they've chosen -- each

24   drug has been chosen with slightly different, in

25   some cases complicated, dosing regimens, and it

bdd999cf-a489-4a1f-a89e-5cb6e21e1201

Protected - Subject to Further Protective Review

Page 124

1    seems to me that each dosing regimen was

2    supported by the literature at that point.  The

3    afib trials and the more chronic trials in my

4    knowledge for rivaroxaban have not been clinical

5    comparisons of various doses.

6         Q.     Okay.  You have not reviewed the

7    dosing studies in rivaroxaban, correct?

8         A.      What I will say is that I have

9    looked at some of the early biology, some of

10   which is, you know, early dosing information, as

11   a clinician, to understand, you know, how these

12   drugs work.

13              As I said earlier, I didn't review

14   specific -- the specific totality of preclinical

15   studies that were a part of the contribution to

16   the design decision to choose the 20 milligram

17   and 15 milligram dosing regimen for rivaroxaban

18   and some of the other trials.  I mean, sorry,

19   ROCKET and some of the other trials.

20        Q.     Okay.  So your statement that it

21   was an appropriate dose to test is based on prior

22   clinical trial results?

23        A.      No, it's based on -- what I said is

24   for writing my report I didn't do an excruciating

25   in-depth review of all of the preclinical studies

bdd999cf-a489-4a1f-a89e-5cb6e21e1201

Protected - Subject to Further Protective Review

Page 125

1    or a significant number of them, but I've also
2    stated that I have followed this field as a
3    cardiologist and epidemiologist for a number of
4    years and am aware of some of the information
5    around things like renal clearance, liver
6    clearance, half-life, those kinds of things.
7    Those are pharmacology studies.  And I'm aware of
8    that literature and aware of some of those
9    comparisons between the NOACs, and then also
10   aware of some of the earlier clinical trials, and
11   the decision to design a study for comparison of
12   the 20 milligram dose with the 15 milligram dose
13   regimen, which is a -- what's clinical useful is
14   that it's a simple dosing regimen, and in my
15   estimation, one of the more simple dosing
16   regimens for the NOACs.  And that's also a
17   consideration when you take a drug from testing
18   to practice, you want to have -- so yet again
19   another one of the many considerations, the
20   pharmacology, the previous preclinical trials,
21   the previous clinical work and then the
22   applicability of an intervention all goes into
23   the decision making about choosing a drug to
24   study, and to me, the logic behind the choice of
25   the 20 milligram dose to study in this particular

bdd999cf-a489-4a1f-a89e-5cb6e21e1201

Protected - Subject to Further Protective Review

1    situation seems appropriate.

2         Q.     Based on your limited review?

3         MR. PIORKOWSKI:  Object to form.

4    A.     Based on my -- based on my clinical

5    experience, research experience, teaching

6    experience and --

7         Q.     Sorry.  Go on.

8         A.     -- and review of the literature

9    that I've done that has not been the extensive

10   review of all of the pharmacology data.

11        Q.     Well, with respect to pharmacology,

12   you have not looked at the totality of the data,

13   have you?

14        A.     That's correct, I've not looked at

15   every pharmacology paper on rivaroxaban.

16        Q.     You haven't actually looked at

17   quite a few, correct?

18        A.     That's correct.

19        Q.     And you haven't looked at any of

20   the pharmacokinetic analyses or projections with

21   respect to dosing, have you?

22        MR. PIORKOWSKI:  Object to form.

23        A.     No, no.  Actually, I think that

24   over the years I've actually followed this field

25   and have looked at some of the -- and

bdd999cf-a489-4a1f-a89e-5cb6e21e1201

Protected - Subject to Further Protective Review

Page 192

1          MR. PIORKOWSKI:  Those are the best
2     questions.
3          MR. GRAND:  Yeah, when I withdraw
4     it before anyone has to answer.
5          Okay, and again, I just -- strike
6     that.
7          Independent of any issues with the
8     point-of-care device and the ROCKET study, would
9     you agree that the time within therapeutic range
10    for the warfarin patients was low.
11         A.     No.
12         Q.     Is it your opinion that that
13    percentage is what you would expect in real world
14    setting?
15         A.     Oh, it's better than real world
16    setting.  The median is 58 percent.  The median
17    is a 55 percent mean time in therapeutic range,
18    and 58 percent median.  Median is actually a
19    better representation 'cause the value is skewed,
20    and with a skewed value, a very high -- a few
21    high values can bring the mean up, but the mean
22    level of 58 percent is actually better than what
23    we tend to see in clinical practice.
24         Q.     And what are you basing that on?
25         A.     Well, I'm basing it on my

bdd999cf-a489-4a1f-a89e-5cb6e21e1201

Protected - Subject to Further Protective Review

1    understanding of the literature over, you know,

2    my clinical practice on patients' time in

3    therapeutic range who are on Coumadin.

4         Q.      Okay, let's break that down.  I

5    think you said a lot of things there.  Are you

6    basing that on medical literature?

7         A.      Yes, sir.

8         Q.      Okay.  Is any of that medical

9    literature cited in your report?

10        A.      I believe there's reference to some

11   of that literature in the report, but I also have

12   elicited -- but I also have a general knowledge

13   that I have accumulated over 25 years of

14   practicing cardiology on how often patients are

15   in therapeutic range in clinical practice.

16        Q.      You keep a database that tracks

17   what percentage of time they're in therapeutic

18   range?

19        A.      No, not a formal database.  I keep

20   that understanding in my head as a number that's

21   important for us to practice medicine.  It's --

22   generally speaking, the literature supports a

23   number from about 40 to 70 percent with some

24   variability in the practices.

25                The collective information in the

bdd999cf-a489-4a1f-a89e-5cb6e21e1201

Protected - Subject to Further Protective Review

Page 196

1    is there anything I could do to validate what

2    your patients and your practice time within

3    therapeutic range is for warfarin?

4         A.     What my patients or the patients in

5    general at the institutions that I work you

6    could -- you could look at -- I don't know that

7    we've done a specific study, but if you wanted

8    to, you could pull the data on all the INRs that

9    have been drawn on either all the patients that

10   go to the clinic like I send my patients or all

11   of my patients within that clinic over the last

12   20 years and look at the time that they spend in

13   that therapeutic range.

14        Q.     Okay.  But you haven't done that

15   yourself?

16        A.     No, no, but I read the literature.

17        Q.     Okay.  But you're speculating about

18   patients in your own practice, correct?

19        A.     Well, yes.

20             MR. PIORKOWSKI:  Object to form.

21        A.     We run a Coumadin clinic, and

22   there's been QA assessment of that clinic.  I've

23   not done those analyses, but there's been a QA

24   assessment, a quality assurance assessment of

25   how -- over a period of time.  I don't have any

bdd999cf-a489-4a1f-a89e-5cb6e21e1201

Protected - Subject to Further Protective Review

Page 197

1    of that data on my fingertips.

2                    However, the clinic is set up

3    consistent with -- by the hematology group that

4    runs it -- consistent with the general medical

5    literature in the field about how you should run

6    a Coumadin clinic and how you make the

7    adjustments, and my clinical experience of

8    patients that I see -- when I see them, I look at

9    their INRs, and my clinical experience supports

10   the notion that our clinic generally fits that

11   broad range where I know that general clinics

12   are, in that 40 to 70 percent range.

13        Q.        So with respect to the statement in

14   your report or the statement you just gave me,

15   there's nothing I can look to that proves that

16   other than your assessment of the general

17   literature and your feelings about what's going

18   on in your practice?

19        A.        Well, I mean, they're not feelings.

20   They're, you know, educated assessments.  There

21   are things we could do.  I mean, if you like, I

22   can, I can -- if you want me to specifically

23   address the question about what -- do a review of

24   the literature on what the range of time in

25   therapeutic range is in clinical practice in

bdd999cf-a489-4a1f-a89e-5cb6e21e1201

Protected - Subject to Further Protective Review

Page 232

1    rivaroxaban under the supervision of the FDA

2    clearly conveys the important safety and efficacy

3    information."

4                   Did I read that correctly?

5         A.        Yes, sir.

6         Q.        And when you say important safety

7    and efficacy information, you mean important to

8    you?

9         A.        So I do mean important to me, and

10   as a teacher of clinicians, I think the

11   information that needs to be known -- I will tell

12   you that my opinion generally of labels include

13   more information, that some of which is of less

14   utility, but the -- and particularly subgroup

15   analyses that seem to find their way into results

16   that perhaps to some give it more weight, but

17   that the -- the key efficacy and safety

18   information derived from the rivaroxaban studies

19   in my opinion is contained in the FDA-approved

20   labeling.

21        Q.        But you're not basing -- you're

22   basing that statement on your own practice and

23   experience.  You're not basing that on any

24   objective guidelines or any regulatory guidelines

25   for labeling, correct?

bdd999cf-a489-4a1f-a89e-5cb6e21e1201

Protected - Subject to Further Protective Review

Page 248

1                    C E R T I F I C A T E
2              I, Maryellen Coughlin, RPR/CRR and
3     notary public in the Commonwealth of
4     Massachusetts, do hereby certify that the
5     foregoing is a true and accurate transcript of
6     my stenographic notes of the deposition of JOHN
7     MICHAEL GAZIANO, M.D., who appeared before me,
8     satisfactorily identified himself, and was by me
9     duly sworn, taken at the place and on the date
10    hereinbefore set forth.
11             I further certify that I am neither
12    attorney nor counsel for, nor related to or
13    employed by any of the parties to the action in
14    which this deposition was taken, and further
15    that I am not a relative or employee of any
16    attorney or counsel employed in this case, nor
17    am I financially interested in this action.
18             THE FOREGOING CERTIFICATION OF THIS
19    TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF
20    THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT
21    CONTROL AND/OR DIRECTION OF THE CERTIFYING
22    REPORTER.
23
24             MARYELLEN COUGHLIN, RPR/CRR
25