UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) | * | MDL 2592 |
| PRODUCTS LIABILITY LITIGATION | * | |
| | * | SECTION L |
| THIS DOCUMENT RELATES TO: | * | |
| | * | JUDGE ELDON E. FALLON |
| *Joseph J. Boudreaux, Jr., et al. v. Janssen et al.* | * | |
| *Case No. 2:14-cv-02720* | * | MAG. JUDGE NORTH |
| | * | |
| *Joseph Orr, Jr., et al. v. Janssen et al.* | * | |
| *Case No. 2:15-cv-03708* | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

---

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION *IN LIMINE* TO EXCLUDE CERTAIN OPINIONS OF
LAURA M. PLUNKETT, PH.D.,
UNDER FEDERAL RULE OF EVIDENCE 702
[REC. DOC. 5108]**

---

# FILED UNDER SEAL

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................ 3

    I.    Dr. Plunkett Is Well-Qualified To Opine On Drug Pharmacology And Related
Regulatory Matters Including The Adequacy Of Labeling. ................................... 3

    II.    Dr. Plunkett's Opinions Will Assist The Jury To Understand Xarelto's
Pharmacology And Whether The Drug's Label Is Adequate Based On Its
Pharmacolgical Profile. ........................................................................................... 5

ARGUMENT ............................................................................................................... 8

    I.    The Legal Standard Governing Expert Testimony Favors Admissibility. ............. 8

    II.    As An Expert In Pharmacology, Toxicology And A Consultant To
Pharmaceutical Companies On Drug Safety, Regulatory Compliance And
Labeling, Dr. Plunkett Is Well-Qualified To Testify About Xarelto's
Pharmacological Profile And Whether Xarelto's Label Is Adequate Based On
That Profile. ........................................................................................................... 13

    III.    Dr. Plunkett Will Not Testify About How Doctors Will React To The Xarelto
Label Or What The Label Means To A Physician................................................. 18

    IV.    Defendants' Argument That Dr. Plunkett Did Not Consider A Certain Document
May Be Fodder For Cross-Examination But It Is Not A Basis For Exclusion
Under *Daubert*. ................................................................................................... 19

    V.    Dr. Plunkett Is Qualified To Review And Rely On Internal Company Documents
As Part Of Her Opinion Although She Does Not Intend To Testify Regarding
Motive, Intent, And State Of Mind....................................................................... 19

        A.    Dr. Plunkett's Use of Corporate Documents Is Proper............................. 19

        B.    Dr. Plunkett Does Not Speculate About State of Mind, Intent or Motive. 20

CONCLUSION ........................................................................................................... 23

i

# TABLE OF AUTHORITIES

## Cases

*Alexie v. Appex Tool Grp., LLC,*
Case No. 12-2212, 2014 WL 5603386 (E.D. La., Nov. 3, 2014) ..................................... 19

*Baldonado v. Wyeth,*
No. 04-c-4312, 2012 WL 1802066 (N.D. Ill., May 17, 2012)........................................ 13

*Burst v. Shell Oil Co.,*
120 F. Supp. 3d 547 (E.D. La. 2015) ........................................................................... 9

*Cantrell v. GAF Corp.,*
999 F.2d 1007 (6th Cir. 1993)") ................................................................................ 18

*Cooper v. Brown,*
565 F.3d 581 (9th Cir. 2009) ...................................................................................... 12

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
509 U.S. 579 (1993)............................................................................................. passim

*Decker v. GE Healthcare Inc.,*
770 F.3d 378 (6th Cir. 2014) ...................................................................................... 16

*Doe v. Cutter Biological, Inc.,*
971 F.2d 375 (9th Cir. 1992) ...................................................................................... 13

*Engenium Sols., Inc. v. Symphonic Techs., Inc.,*
924 F. Supp. 2d 757 (S.D. Tex. 2013) ......................................................................... 13

*Fox v. Dannenberg,*
906 F.2d 1253 (8th Cir. 1990) .................................................................................... 13

*Gen. Elec. Co. v. Joiner,*
522 U.S. 136 (1997).................................................................................................... 1

*Huss v. Gayden,*
571 F.3d 442 (5th Cir. 2009) ................................................................................. 9, 14

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.,*
MDL No. 1203, 2000 WL 876900 (E.D. Pa., June 20, 2000) ......................................... 20

*In re Flonase Antitrust Litig.,*
884 F. Supp. 2d 184 (E.D. Pa. 2012) .......................................................................... 20

*In re Fosamax Products Liab. Litig.,*
645 F.Supp.2d 164 (S.D. N.Y. 2009)........................................................................... 20

*In re Gadolinium-Based Contrast Agents Products Liab. Litig.,*
1:08 GD 50000, 2010 WL 1796334 (N.D. Ohio, May 4, 2010)................................. 16, 17

*In re Levaquin Prod. Liab. Litig.,*
MDL No. 1943, 2011 WL 6888533 (D. Minn., Dec. 29, 2011)..................................... 20

*In re Seroquel Products Liab. Litig.,*
6:06-MD-1769-ORL-22D, 2009 WL 3806436 (M.D. Fla., July 20, 2009)............... passim

*In re Seroquel,*
2009 WL 3806435 ..................................................................................................... 17

*In re Tylenol (Acetaminophen) Mktg., Sales Practices, & Products Liab. Litig.,*
    2:12-CV-07263, 2016 WL 403932 (E.D. Pa., July 28, 2016) ................................... 15, 17
*In re Tylenol,*
    2016 WL 4039329 ................................................................................................ 21
*In re Vioxx Products Liab. Litig.,*
    401 F.Supp.2d 565 (E.D. La. 2005) ........................................................... passim
*In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Products Liab. Litig.,*
    3:09-MD-02100-DRH, 2011 WL 6302889 (S.D. Ill., Dec. 16, 2011) ...................... 17, 19
*In re Zyprexa Prods. Liab. Litig.,*
    04-MD-1596, 493 F.Supp.2d 571 (E.D.N.Y. 2007) .................................................. 17, 19
*In re Zyprexa Products Liab. Litig.,*
    04-MD-1596, 2008 WL 2696916 (E.D.N.Y., July 2, 2008) .......................................... 17
*Johnson v. Samsung Elecs. Am., Inc.,*
    277 F.R.D. 161 (E.D. La. 2011) ................................................................................. 11, 12
*Kruszka v. Novartis Pharms. Corp.,*
    28 F. Supp. 3d 920 (D. Minn. 2014) ........................................................................ 20
*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999) ........................................................................... 1, 9, 10, 11
*Lofton v. McNeil Consumer & Specialty Pharm.,*
    672 F.3d 372 (5th Cir. 2012) ...................................................................................... 16
*Lofton v. McNeil Consumer & Specialty Pharm.,*
    682 F.Supp.2d 662 (N.D. Tex. 2010) ....................................................................... 16
*Lofton v. McNeil Consumer & Specialty Pharm.,*
    CIV.A. 3:05CV1531LBH, 2008 WL 4878066 (N.D. Tex., July 25, 2008) ....................... 16
*Moore v. Ashland Chem., Inc.,*
    151 F.3d 269 (5th Cir. 1998) ...................................................................................... 12
*Newman by and through v McNeil Consumer Healthcare,*
    2013 WL 9936293 (N.D. Ill.,  Mar. 29, 2013) .......................................................... 15
*Pipitone v. Biomatrix, Inc.,*
    288 F.3d 239 (5th Cir. 2002) ...................................................................................... 11
*Reid v. Albemarle Corp.,*
    207 F. Supp. 2d 499 (M.D. La. 2001) ......................................................................... 13
*Sanchez v. Boston Scientific Corp.*
    Civil Action No. 2:12–cv–05762, 2014 WL 4851989 (S.D. W.V., Sept. 29, 2014) ........ 20
*Santana Marine Service, Inc. v. McHale,*
    346 F.2d 147 (5th Cir. 1965) ...................................................................................... 13
*State v. Ortho-McNeil-Jannsen Pharm.,*
    2011 WL 3794016 (C.C.P. S.C., Feb 24, 2011) ......................................................... 16
*Strum v. DePuy Orthopedics, Inc.,*
    2013 WL 324715 (Ill. Cir. Ct., March 8, 2013) .......................................................... 16

*United States v. 14.38 Acres of Land*,
   80 F.3d 1074 (5th Cir. 2012) ......................................................................... 12

*United States v. Hicks*,
   389 F.3d 514 (5th Cir. 2004) ......................................................................... 11

*United States v. Viglia*,
   549 F.2d 335 (5th Cir. 1977) ......................................................................... 13

*Viterbo v. Dow Chems. Co.*,
   826 F.2d 420 (5th Cir.1987) .......................................................................... 11

*Wagoner v. Exxon Mobil Corp.*,
   813 F. Supp. 2d 771, 798 (E.D. La. 2011) ................................................. 8, 13

*Wells v. SmithKline Beecham Corp.*,
   601 F.3d 375 (5th Cir. 2010) ........................................................................... 9

*Wolfe v. McNeil-PPC, Inc.*,
   881 F.Supp.2d 650 (E.D. Pa. 2012) .............................................................. 16

## Other Authorities

Alfred G. Gilman et al., Goodman & Gilman's THE PHARMACOLOGICAL BASIS OF THERAPEUTICS
   (6th ed. 1980) ............................................................................................... 2

Curtis D. Klaassen ed., Casarett & Doull's Toxicology: The Basic Science of Poisons (7th ed.
   2008) .............................................................................................................. 2

## Rules

Fed. R. Evid. 702 ................................................................................... 8, 9, 13

**TABLE OF EXHIBITS**

Exhibit 1    Expert Report of Laura M. Plunkett, Ph.D., D.A.B.T.

Exhibit 2    Deposition of Laura M. Plunkett, Ph.D, D.A.B.T.

Exhibit 3    *Skala v. Johnson & Johnson, et al.,* Case No. 274 (N.J. Super. Ct., Law Div., Dec. 16, 2011)

The Plaintiffs respectfully submits this response in opposition to Defendants' *Motion In Limine to Exclude Certain Opinions of Laura M. Plunkett, Ph.D.,*[1] *Under Federal Rule of Evidence 702* [Rec. Doc. 5108].  In accordance with this Court's role as gatekeeper for expert testimony under *Daubert* and its progeny,[2] the Plaintiffs request that the Defendants' motion be denied.[3]

## **INTRODUCTION**

The vast majority of courts that have considered Dr. Laura Plunkett's qualifications and her methodology have concluded that she is eminently qualified to testify about drug pharmacology, general causation, regulatory matters and the adequacy of labels for both prescription and non-prescription drugs. The Defendants dissent. For the reasons set forth below, this Court should allow Dr. Plunkett to testify to subjects well within her expertise and deny Defendants' motion.

---

[1]Dr. Plunkett is improperly identified as Laura Plunkett, Ph.D. in Defendants' motions. She is properly identified as Laura Plunkett, Ph.D., DABT, the latter signifying she is a Diplomate of the American Board of Toxicology.

[2]*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997).

[3]The Plaintiffs incorporate herein the arguments set forth in their *Joint Response in Opposition to the Motion to Exclude Expert Opinions and Testimony Regarding Unapproved Dosing and Monitoring Regimens, and the Motion to Exclude Expert Opinions and Testimony Regarding the Experts' 20-Second PT Cut-Off Guideline in the Orr and Boudreaux Cases* (hereinafter "*Plaintiffs' Joint Response*"). Similarly, the Plaintiffs incorporate herein the arguments set forth in *Plaintiffs' Opposition to Defendants' Joint Motion for Partial Summary Judgment on the Ground that Federal Law Preempts Plaintiffs' Dosing, Monitoring, And Other Design Related Claims* (hereinafter "*Plaintiffs' Preemption Response*").

Laura Plunkett, Ph.D., DABT is a pharmacologist,[4] toxicologist[5] and a Food and Drug Administration (FDA) regulatory specialist with extensive experience consulting and advising pharmaceutical, medical device and other companies on regulatory matters including the content of labels. Dr. Plunkett's primary role at trial will be to explain Xarelto's pharmacological profile and whether the Xarelto label is adequate based on that profile and her knowledge of the applicable regulatory requirements. Notwithstanding the Defendants' argument to the contrary, Dr. Plunkett will <u>not</u> testify about how physicians react to the Xarelto label or what the label means to a physician. Furthermore, she will <u>not</u> testify about the Defendants' motives, intent or state of mind.

In their motion, the Defendants do not challenge Dr. Plunkett's qualifications to testify about Xarelto's pharmacology including that it has a narrow therapeutic index, an unpredictable pharmacokinetic-pharmacodynamic (PK/PD) profile and a high degree of inter-individual variability in various PK parameters that greatly impacts the efficacy and safety of the drug. Likewise, Defendants do not challenge Dr. Plunkett's qualifications to testify that exposure to Xarelto increases the risk of bleeding, and that obtaining a laboratory blood measure of prothrombin time (PT) to assess exposure would be helpful in identifying at-risk patients since PT is linearly correlated with Xarelto blood levels and can be used as a surrogate marker for drug blood level.

---

[4]Pharmacology is the study of how substances interact with living organisms to produce a change in function. Goodman & Gilman's THE PHARMACOLOGICAL BASIS OF THERAPEUTICS (Alfred G. Gilman et al. eds., 6th ed. 1980).

[5]Toxicology is the study of the adverse effects of xenobiotics, or chemicals, on living organisms. It is the study of symptoms, mechanisms, treatments and detection of poisoning, especially the poisoning of people. Casarett & Doull's Toxicology: THE BASIC SCIENCE OF POISONS (Curtis D. Klaassen ed., 7th ed. 2008).

Rather, Defendants argue that Dr. Plunkett is not qualified to do exactly what she does when she consults for her pharmaceutical company clients. Namely, after she evaluates a drug's pharmacology, she then determines whether the drug's label is adequate based on its pharmacological profile. Defendants argue that Dr. Plunkett is not qualified in this litigation to do what she does in the real world because she is not a medical doctor, never worked at the FDA and supposedly failed to review a document that allegedly contradicts her opinion. These arguments are meritless and Defendants' motion should be denied.

## FACTUAL BACKGROUND

I.     **Dr. Plunkett Is Well-Qualified To Opine On Drug Pharmacology And Related Regulatory Matters Including The Adequacy Of Labeling.**

Dr. Plunkett received her Ph.D. in Pharmacology from the University of Georgia. She is Board Certified as a Diplomate of the American Board of Toxicology (1994-present).[6] Between 1984 and 1986, she was a Pharmacology Research Associate Training (PRAT) fellow at the National Institute of General Medical Sciences in Bethesda, Maryland.[7] Dr. Plunkett is also a registered patent agent (U.S. Registration No. 45,015; obtained September 8, 1999) and works closely with inventors to obtain patent rights to their inventions and also to commercialize their inventions.[8]

Dr. Plunkett has written over forty peer-reviewed (40) articles on issues related to pharmacology, toxicology and pharmacokinetics including articles dealing specifically with the

---

[6]Exhibit 1, Plunkett *curriculum vitae*, Appendix A, at 1 and 2.

[7]*Id.* at 2.

[8]*Id.* at 2.

pharmacological impact of prescription drugs on the body.[9]  Most of these articles involve a study of the actions of pharmaceuticals.[10] These studies include animal (pre-clinical) studies, human studies and *in vitro* studies.[11]

Dr. Plunkett was an Assistant Professor of Pharmacology and an Assistant Professor of Toxicology (1986-1989) in the College of Medicine, at the University of Arkansas for Medical Sciences. Since leaving that position, she has prepared and given numerous lectures and has also written several book chapters in her areas of expertise.[12]

Between 1989 and 1997, Dr. Plunkett consulted with pharmaceutical and medical device companies and other entities regulated by the FDA, designing preclinical and clinical studies for both safety and efficacy, advising clients on issues related to statements in product labeling regarding efficacy and warnings based on FDA labeling regulations.[13] Her responsibilities included assessing the risk of certain side-effects with prescription drug treatment and advising clients on the manner in which FDA regulations dictated the communication of such information.[14]

Since 1997, Dr. Plunkett has been a private consultant on pharmacological issues, devoting a substantial portion of her time to consulting with companies that have, or are in the process of, developing and marketing FDA-regulated products of all types, including human drugs, veterinary drugs, medical devices, dietary supplements and cosmetics. Her work, including that consulting for drug companies, focuses on issues related to pharmacology, toxicology, pharmacokinetics,

---

[9]*Id.* at 3-11.

[10]*Id.*

[11]*Id.*

[12]*Id* at 13-14.

[13]*Id* at Exhibit 1, Plunkett Report at paras. 6 and 7; *see also* Exhibit 1, Plunkett CV at Appendix A, p. 1.
[14]*Id.*

human health risk assessment and FDA regulatory compliance.[15] She consults with pharmaceutical companies on the content of drug labels and has submitted parts of New Drug Applications to FDA on behalf of drug companies.[16] In addition, on multiple occasions, Dr. Plunkett has been invited to speak to healthcare industry groups about FDA regulation and has authored published literature on the subject.[17] Dr. Plunkett has also made presentations to the FDA on behalf of her drug and medical device industry clients.[18] Importantly, she has a great deal of experience in cardiovascular pharmacology including studying drugs used to treat different types of arrhythmias including atrial fibrillation, which is relevant in this litigation since Xarelto is indicated for the reduction of stroke in patients with non-valvular atrial fibrillation.[19]

Dr. Plunkett's qualifications are fully detailed in her *Curriculum Vitae* and her Report.[20]

## II.   Dr. Plunkett's Opinions Will Assist The Jury To Understand Xarelto's Pharmacology And Whether The Drug's Label Is Adequate Based On Its Pharmacolgical Profile.

In forming her opinions, Dr. Plunkett did an exhaustive review of the publically available scientific and regulatory data pertaining to the pharmacology and toxicology of Xarelto; the labeling for Xarelto, the Food, Drug and Cosmetic Act (FDCA) and FDA regulations and internal documents from Defendants including documents related to Defendants' Phase 1-3 trials including the ROCKET-AF and other clinical trials.[21] In her Report, she explained that both these public and

---

[15]*Id.,* Exhibit 1, Plunkett Report at para. 1.

[16]Exhibit 2, Plunkett dep. at 56:22-58:6.

[17]Exhibit 1, Plunket Report at para. 7; *see also* Exhibit 1, Plunkett CV at Appendix A, p. 11-13.

[18]Exhibit 2, Plunkett dep. at 56:11-14.

[19]*Id.* at 151:5-7 and Exhibit 1, Plunkett Report at para. 7.

[20]*Id.*

[21]*Id.* at para. 8.

non-public materials are the kinds of materials that she reviews in all her work as a pharmacologist, toxicologist and risk assessor when consulting for industry "that is related to the risk and benefits of therapeutic products both litigation and non-litigation projects."[22]

Defendants do not challenge Dr. Plunkett's qualification or ability to offer admissible testimony on the pharmacological profile of Xarelto. Apparently, Defendants recognize Dr. Plunkett's capacity to opine that Xarelto has a "narrow therapeutic index," or margin of safety, in that the drugs intended effect, prevention of stroke through anticoagulation, leads to its most significant risk, major bleeding.[23] Additionally, the Defendants avoid challenging Dr. Plunkett's opinions that Xarelto exhibits a high degree of inter-individual variability in various pharmacokinetic and pharmacodynamics parameters, contrary to the position advanced the Defendants.[24]

Likewise, Defendants do not contest Dr. Plunkett's explanations that it is not possible to reliably predict blood levels that will be achieved for individual patients dosed with Xarelto based solely on knowledge of the dose level administered without testing each patient's blood.[25] Neither do they contest Dr. Plunkett's  explanations that where there may be increased inter-individual variability in Xarelto blood levels in certain individuals, patients may exhibit higher Xarelto blood levels than expected for any given Xarelto dose.[26] The high level of inter-individual variability in the drug's blood levels has been shown to be clinically relevant.[27] Additionally, she explains that

---

[22]*Id.* at para. 9.

[23]*Id.* at para. 9.

[24]*Id.*

[25]*Id.*

[26]*Id.*

[27]*Id.*

the level of inter-individual variability in Xarelto blood levels exceeds the level observed with some other anti-coagulants. [28]

Based on Xarelto's pharmacological profile, Dr. Plunkett concludes that obtaining a laboratory blood measure of PT (Neoplastin) to assess exposure at the initiation of Xarelto therapy would be appropriate and protective of patient health, an issue that FDA had identified during its review of the Xarelto New Drug Application (NDA).[29] She explains that such an assessment would help identify those patients at an increased risk of bleeding events. She concludes that the available evidence demonstrates that exposure assessment is of critical importance for all patients, but, in particular, in susceptible patient subpopulations.[30] All of these opinions go unchallenged by the Defendants.

As she does for her pharmaceutical company clients, Dr. Plunkett assesses Xarelto's label based on its pharmacological profile. She offers admissible testimony that the labeling for Xarelto is inadequate in several ways: *First,* the label does not adequately describe the high level of inter-individual (inter-patient) variability in both PK/PD that are characteristic of Xarelto use. *Second,* the label does not adequately describe that the pharmacodynamics measurement tool, PT (Neoplastin), is linearly correlated with rivaroxaban blood levels and can be used as a surrogate marker for drug blood level and to assess bleed risk.[31] *Finally,* the label does not adequately describe that the Xarelto ROCKET clinical trial demonstrated a predictable exposure-response relationship between PT (Neoplastin) and major bleeding, an important safety issue for patients

---

[28]*Id.*

[29]*Id.*

[30]*Id.*

[31]*Id.*

taking Xarelto.[32] She explains that that the product labeling is not only inadequate in its inaccurate, incomplete description of Xarelto's exposure-response relationships, but also in turn places patient health at unnecessary risk because physicians and their patients rely on drug manufacturers to provide full and adequate labeling.[33] It is only on these last points that Defendants perceive some inability on Dr. Plunkett's part.  As discussed below, the Defendants' arguments are inapt.

## ARGUMENT

### I.   The Legal Standard Governing Expert Testimony Favors Admissibility.

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.[34]

As this Court has recognized, "[t]he threshold question in determining whether an individual may offer expert testimony under Rule 702 is whether the individual has the qualifications to do so."[35] "Trial courts have 'wide discretion' in deciding whether or not a particular witness qualifies as an expert."[36] "Under Rule 702, 'the expert is viewed, not in a narrow

---

[32]*Id.*

[33]*Id.*

[34]Fed. R. Evid. 702.

[35]*Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 798 (E.D. La. 2011) (*citing* Fed. R. Evid. 702) (J. Fallon).

[36]*Id.* (*citation omitted*).

sense, but as a person qualified by knowledge, skill, experience, training or education."[37] A proposed expert does not have to be "highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility."[38]

The Supreme Court mandates that the district court exercise its responsibility in acting as the "gatekeeper" for all types of expert testimony.[39] In exercising this responsibility, the district court is required to ensure that expert testimony is not only relevant, but also reliable.[40]

With respect to the relevancy inquiry, Rule 702 "requires that the evidence or testimony 'assist the trier of fact to understand the evidence.'"[41] "Expert testimony which does not relate to any issue in the case is not relevant and ergo, non-helpful."[42] In other words, there must be a "fit" between the proposed testimony and the questions presented by the case.[43]

With respect to the reliability inquiry, this Court's focus "must be solely on principles and methodology, not on the conclusions that they generate."[44] "The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation."[45] The court's role is "to make

---

[37]*Id.* (quoting Fed. R. Evid. 702 Advisory Committee Notes).

[38]*Huss v. Gayden*, 571 F.3d 442, 452, 455 (5th Cir. 2009) (stating the above, and ruling that a board-certified internist was qualified by education and knowledge to opine that a drug administered by the medical malpractice defendants did not cause or contribute to the patient's cardiomyopathy).

[39]*See Daubert*, 509 U.S. at 597; *Kumho Tire*, 526 U.S. at 141, 147.

[40]*Daubert*, 509 U.S. at 589; *Kumho Tire,* 526 U.S. at 141; *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 378 (5th Cir. 2010).

[41]*Daubert,* 509 U.S. at 591 (*quoting* Fed. R. Evid. 702).

[42]*Id.* (*citation omitted*).

[43]*Id.*

[44]*Id.* at 595.

[45]*Burst v. Shell Oil Co.*, 120 F. Supp. 3d 547, 550 (E.D. La. 2015) (*citing Daubert,* 509 U.S. at 590).

9

certain that an expert … employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[46] "Scientific testimony is reliable only if 'the reasoning or methodology underlying the testimony is scientifically valid,' meaning that such testimony is based on recognized methodology and supported by appropriate validation based on what is known."[47] "The proponent need not prove that the expert's testimony is correct, but must prove by a preponderance of the evidence that the methodology used by the expert was proper."[48]

Consistent with these requirements, *Daubert* provides a two-prong test for assessing the admissibility of expert testimony. In particular, the court "must determine at the outset, pursuant to [Fed. R. Evid. 104(a)], whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."[49] "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."[50]

In *Daubert*, the Supreme Court set forth a non-exclusive list of factors to consider in determining the scientific reliability of expert testimony: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation;

---

[46]*Kumho Tire*, 526 U.S. at 152.

[47]*Vioxx,* 401 F. Supp. 2d at 573 (*quoting Daubert,* 509 U.S. at 592-93).

[48]*Id.* (citation omitted).

[49]*Daubert*, 509 U.S. at 592.

[50]*Id.* at 592-93.

and (5) the general acceptance of the methodology in the scientific community.[51] This is not a "definitive checklist or test;" rather, whether some or all these factors apply in a particular case depends on the nature of the issue, the expert's particular expertise, and the subject of his testimony.[52]

The test of reliability is "flexible."[53] "[T]he law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination."[54] "Thus, whether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine."[55]

The "gatekeeper" role, while essential, is not intended to serve as a replacement for the adversary system.[56] Rather, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion by the jury, rather than its admissibility.[57] It would be unreasonable to require the subject of scientific testimony to "be 'known' to a certainty" because science is an evolving process which arguably has "no certainties."[58] "Vigorous cross-

---

[51]*Id.* at 593-94

[52]*Kumho Tire*, 526 U.S. at 150 (citations omitted).

[53]*Daubert,* 509 U.S. at 594.

[54]*Id.* at 141 (*emphasis in original*).

[55]*Id.* at 153; *see also United States v. Hicks*, 389 F.3d 514, 525 (5th Cir. 2004) (*quoting Kumho Tire,* 526 U.S. at 141, 153).

[56]*Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002).

[57]*Johnson v. Samsung Elecs. Am., Inc.*, 277 F.R.D. 161, 165 (E.D. La. 2011); *Viterbo v. Dow Chems. Co.,* 826 F.2d 420, 422 (5th Cir.1987) (same).

[58]*Daubert*, 509 U.S. at 590.

11

examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[59]

"Wholesale exclusion" is not an appropriate safeguard.[60] Rather, "[t]he validity or the correctness of the conclusion is for the fact finder."[61] "It is hornbook law that evidence is admissible under *Daubert* if there is an accepted scientific method for making a reliable measurement, even if the evidentiary significance of the measurement can be disputed."[62]

A review of case law after *Daubert* shows that rejection of expert testimony is the exception rather than the rule.[63]  As recognized by the Fifth Circuit, *Daubert* "did not otherwise work a sea change over federal evidence law," and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system."[64] Rather, deference should be given to the jury's role as the proper arbiter of disputes between conflicting opinions,[65] and evidence is "presumptively admissible unless excludable on some other ground."[66]

---

[59]*Id.* at 596.

[60]*Id.*

[61]*Vioxx*, 401 F. Supp. 2d at 574; *see also Moore v. Ashland Chem., Inc.,* 151 F.3d 269, 276 (5th Cir. 1998) (finding need to prove only reliability, and not correctness).

[62]*Cooper v. Brown*, 565 F.3d 581, 596 (9th Cir. 2009); *see also Daubert*, 509 U.S. at 595 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.").

[63]*Johnson,* 277 F.R.D. at 165 ("Notwithstanding *Daubert*, the Court remains cognizant that the rejection of expert testimony is the exception and not the rule.").

[64]*United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 2012).

[65]*Id.* at 1077

[66]*Id.* at 1078.

II.    **As An Expert In Pharmacology, Toxicology And A Consultant To Pharmaceutical Companies On Drug Safety, Regulatory Compliance And Labeling, Dr. Plunkett Is Well-Qualified To Testify About Xarelto's Pharmacological Profile And Whether Xarelto's Label Is Adequate Based On That Profile.**

Defendants argue that Dr. Plunkett is not qualified to offer opinions about regulations and labeling.[67] According to Defendants, she is unqualified to testify to these issues because she is a pharmacologist / toxicologist and lacks the experience as either a medical doctor or a regulatory agent, never worked for the FDA, and never worked for a drug company.[68] Defendants' argument about Dr. Plunkett's qualifications to testify about regulatory and labeling issues misses the mark.

The standard for qualifying expert witnesses is liberal.[69] Witnesses may be qualified as experts if they possess specialized knowledge, skill, experience, or education.[70] A proposed expert does not have to be "highly qualified in order to testify about a given issue. Differences in expertise

---

[67] Def. Memo at 4-10.

[68] *Id.*

[69] *Daubert,* 509 U.S. at 588-89.

[70] Fed. R. Evid. 702; *see Wagoner,* 813 F. Supp. 2d at 798 (*quoting* Fed. R. Evid. 702 Advisory Committee Notes); *GWTP Investments, L.P. v. SES Americom, Inc.,* No. 3:04-CV-1383-L, 2007 WL 7630459, at *12 (N.D. Tex,, Aug. 3, 2007) (*quoting Southern Cement Co., Division of Martin–Marietta Corp. v. Sproul,* 378 F.2d 48, 49 (5th Cir.1967)(noting that the fact that an expert's experience may not dovetail with the issues presented in the case goes to weight, not admissibility); *United States v. Viglia,* 549 F.2d 335, 337 (5th Cir. 1977) (expert witness qualified when experience, knowledge, or training related to general area of pediatric medicine and pharmacology, not to specific question before trier of fact regarding treatment of patients for obesity); *Santana Marine Service, Inc. v. McHale,* 346 F.2d 147, 148 (5th Cir. 1965); *Engenium Sols., Inc. v. Symphonic Techs., Inc.,* 924 F. Supp. 2d 757, 770 (S.D. Tex. 2013) (same); *Reid v. Albemarle Corp.,* 207 F. Supp. 2d 499, 505 (M.D. La. 2001) (although a proposed expert may lack academic credentials to qualify as an expert, "it is possible that he may have gained enough expertise in practical work to be so qualified."); *Fox v. Dannenberg,* 906 F.2d 1253, 1256 (8th Cir. 1990) ("[A]n individual can qualify as an expert where he [or she] possesses sufficient knowledge gained from practical experience, even though he [or she] may lack academic qualifications in the particular field of expertise."); *Baldonado v. Wyeth,* No. 04-c-4312, 2012 WL 1802066, at *8 (N.D. Ill., May 17, 2012) (rejecting *Daubert* challenge to the reliability of the expert's opinion on the applicable standard of care, reasoning that the expert "may reliably draw on his vast experience in this area, and his expert knowledge of federal and industry regulations, to opine on the standard of care ); *Doe v. Cutter Biological, Inc.,* 971 F.2d 375, 385 (9th Cir. 1992) ("Ordinarily, courts impose no requirement that an expert be a specialist in a given field, although there may be a requirement that he or she be of a certain profession, such as a doctor.").

bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility."[71]

Contrary to Defendants' argument, Dr. Plunkett need not be a physician, have worked at the FDA or been employed at a drug company to have gained the requisite regulatory experience necessary to assess the Xarelto's pharmacology and to evaluate the adequacy of Xarelto's label based on that pharmacology. As set forth above, Dr. Plunkett has consulted for industry on regulatory issues for over 25 years and has gained the requisite experience to render opinions about the adequacy of the Xarelto label based on the drug's pharmacological profile.[72]

Courts have consistently found Dr. Plunkett fully qualified to testify about the drug pharmacology, the regulatory duties of pharmaceutical companies and the adequacy of both prescription and non-prescription drug labels and other products subject to FDA regulation.

For example, in the *Seroquel* MDL*,* the court rejected a similar challenge to Dr. Plunkett. The court concluded that Dr. Plunkett was qualified to offer variety of opinions including about the adequacy of the drug's label:

> AstraZeneca has not established that Dr. Plunkett is unqualified to **render labeling opinions simply because she is a pharmacologist and not a medical doctor.**
>
> …
>
> Further, it appears Dr. Plunkett's background and education qualify her to render opinions regarding the **adequacy of the Seroquel label.** Contrary to AstraZeneca's suggestion, it does not appear that

---

[71]*Huss,* 571 F.3d at 452, 455 (stating the above, and ruling that a board-certified internist was qualified by education and knowledge to opine that a drug administered by the medical malpractice defendants did not cause or contribute to the patient's cardiomyopathy).

[72]*See* Section II(A) *supra.*

Dr. Plunkett is merely stating her personal views in the guise of an expert opinion.[73]

Furthermore, just 6 months ago, Janssen's parent, Johnson & Johnson ("J&J") (a defendant in this litigation) challenged Dr. Plunkett's qualifications in the *Tylenol* MDL. According to J&J in *Tylenol*, Dr. Plunkett was unqualified to offer opinions on whether J&J acted "reasonably" with respect to providing appropriate warnings and whether acetaminophen was capable of causing liver injury.  The court rejected both of J&J's claims and concluded that she was qualified to testify to the full breadth of those opinions: "***FDA regulations***," "toxicology and pharmacology" ***"adequacy of the label,"*** and "general causation.*"*[74] The court in *Tylenol* rejected the same argument that Defendants make in the present case, that Dr. Plunkett was not qualified because she was not a medical doctor:

> The Defendants claim that Dr. Plunkett is not qualified to offer opinions about the adequacy of the Tylenol label []. They claim her testimony on this issue should be excluded **because she is not a medical doctor** and uses unreliable methodology. Dr. Plunkett's testimony about the Tylenol label are made in reference to her opinions as a regulatory expert — about what actions she believes the Defendants should have taken to fulfill their legal duties as a drug manufacturer. She is qualified to offer such as opinion.[75]

As both J&J and Janssen well know, Dr. Plunkett has been qualified to give <u>labeling opinions</u> not just in *Tylenol* but also in cases involving their drug Motrin,[76] their prescription drug

---

[73]*In re Seroquel Products Liab. Litig.,* 6:06-MD-1769-ORL-22D, 2009 WL 3806436, *10 (M.D. Fla., July 20, 2009*).

[74]*In re Tylenol (Acetaminophen) Mktg., Sales Practices, & Products Liab. Litig.,* 2:12-CV-07263, 2016 WL 4039329, at *9 (industry standards), *13 (toxicology); *12-13, 15 (general causation), *14 (labeling) (E.D. Pa., July 28, 2016).

[75]*Tylenol,* 2016 WL 4039329, at *7.

[76]*Newman by and through v McNeil Consumer Healthcare*, 2013 WL 9936293, at *5 (N.D. Ill.,  Mar. 29, 2013) ("Dr. Plunkett is qualified and has a reliable foundation for her opinions concerning the regulatory status and labeling of *Motrin* products"; *see also Lofton v. McNeil Consumer & Specialty Pharm.*, CIV.A.

Risperdal[77] and at least one of their defective medical devices, the recalled ASR Hip implant.[78] Thus, arguments that her labeling opinions should be relegated or restricted to OTC drugs, not prescription medicines or devices, are without foundation.

Additionally, in *Gadolinium*, Dr. Plunkett's qualifications to testify on similar issues including labeling with respect to the element gadolinium, which was used for MRI contrast and was alleged to be able to cause a disease called Nephrogenic Systemic Fibrosis (NSF). The court concluded that Dr. Plunkett was qualified to testify to "NSF causation," "pharmacology," "toxicology," and the "**adequacy of information in the label**."[79] Significantly, in *Gadolinium* the defendants sought reconsideration of the court's conclusions but the court reaffirmed that "Dr. Plunkett is a board-certified pharmacologist and toxicologist and a regulatory consultant who the court determined was qualified to testify regarding pharmacology, toxicology **and regulatory matters**."

The *Tylenol, Gadolinium,* and *Seroquel* MDL courts exhaustively examined Dr. Plunkett's methodology, the same methodology that she applied in the present litigation, and found it

---

3:05CV1531LBH, 2008 WL 4878066, at *9 (N.D. Tex., July 25, 2008), objections overruled, 682 F.Supp.2d 662 (N.D. Tex. 2010), *aff'd*, 672 F.3d 372 (5th Cir. 2012) (qualifying PhD. toxicologist/pharmacologist with similar experience with FDA regulations FDA labeling requirements as Dr. Plunkett to testify about the inadequacy of Motrin's label and other regulatory issues); *Wolfe v. McNeil-PPC, Inc.,* 881 F.Supp.2d 650, 658–59 (E.D. Pa. 2012) (same).

[77]*State v. Ortho-McNeil-Jannsen Pharm.,* 2011 WL 3794016, at *8 (C.C.P. S.C., Feb 24, 2011). Dr. Plunkett's trial testimony can be found at *State v. Ortho-McNeil-Jannsen Pharm.,* 2011 WL 2166884.

[78]*Strum v. DePuy Orthopedics, Inc.,* 2013 WL 324715 (Ill. Cir. Ct., March 8, 2013) (denying motion in limine to exclude Dr. Plunkett "as to warnings testimony within Dr. Plunkett's are of expertise as a toxicologist").

[79]*In re Gadolinium-Based Contrast Agents Products Liab. Litig.,* 1:08 GD 50000, 2010 WL 1796334, at *27-8 (N.D. Ohio, May 4, 2010) (emphasis added); *aff'd sub nom. Decker v. GE Healthcare Inc.,* 770 F.3d 378 (6th Cir. 2014), and *aff'd in part sub nom. Decker v. GE Healthcare Inc.,* 770 F.3d 378 (6th Cir. 2014).

16

reliable.[80] This Court should follow these more recent, well-reasoned MDL opinions and not the *Arringdale* and *Baycol,* two unpublished state court orders that Defendants cite.[81] The *Arringdale* and *Baycol* orders contain no analysis or reasoning and thus are of limited precedential value. [82]

The Bayer defendants filed a similar motion in *Yaz*, arguing that a pharmacologist, Dr. Maggio, was not qualified to testify about regulatory areas and the adequacy of the Yaz label because he had no regulatory experience and was not a medical doctor. Dr. Maggio, like Dr. Plunkett, holds a Ph.D.  The court in *Yaz* rejected Bayer's argument:

> With regard to objections about opinions relating to Bayer's labeling, the Court finds that Dr. Maggio is qualified to offer an opinion with regard to whether the information contained on the labeling is accurate or misleading. Dr. Maggio is an experienced pharmacologist; he does not need to be an FDA regulatory expert to form an opinion as to whether the pharmacology information in the Yasmin/YAZ labels is accurate or based on reliable data. As a pharmacologist, Dr. Maggio performed a thorough review of the studies, identified numerous issues, and described those issues in his report. Considering all of this, it is clear that Dr. Maggio is qualified to review the labels on Bayer's products and to form an opinion as to whether they are misleading.[83]

Plainly, Dr. Plunkett is qualified to offer testimony about the FDA regulatory scheme and the adequacy of prescription drug labeling and her testimony in this regard will assist the jury.[84]

---

[80]*Tylenol,* 2016 WL 4039329, at *11-13; *Gadolinium,* 2010 WL 1796334, at *14 (Dr. Plunkett has amply established the methodology underlying her opinions); *In re Seroquel*, 2009 WL 3806435, at *4, *10-11.

[81]Def. Memo at 1-2 citing *Arringdale v. Merck & Co., Inc.*, JCCP, slip op. at 22 (Cal. Super. Ct. L.A. Co., Aug. 1, 2006) and *In re Tex. Second Region Baycol Litig.*, No 0247408, sl. op. at 2 (Texas. Dist. Ct. Harris Co., Jan 28, 2004)

[82]*See Seroquel,* 2009 WL 3806436 at *11 ("Finally, as for AstraZeneca's argument that other courts have refused to allow Dr. Plunkett to testify regarding drug labeling, the two trial court opinions AstraZeneca has filed contain no reasoning for the exclusion of Dr. Plunkett's testimony.  Accordingly, they shed little light on the issue of whether her labeling is admissible in the present case").

[83]*In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Products Liab. Litig.*, 3:09-MD-02100-DRH, 2011 WL 6302889, at *25 (S.D. Ill., Dec. 16, 2011).

[84]*See also*, *In re Zyprexa Products Liab. Litig.*, 04-MD-1596, 2008 WL 2696916, at *112 (E.D.N.Y., July 2, 2008) and *In re Zyprexa Prods. Liab. Litig.*, 04-MD-1596, 493 F.Supp.2d 571, 580 (E.D.N.Y. 2007) (denying defendants' *Daubert* motion with respect to Dr. Plunkett over El Lilly's objection that she was

As the court ruled in *Seroquel,* consistent with this Court's prior rulings, any deficiencies in Dr. Plunkett's opinions "goes to the weight of her testimony, not its admissibility."[85]

### III.     Dr. Plunkett Will Not Testify About How Doctors Will React To The Xarelto Label Or What The Label Means To A Physician.

In support of their  argument that Dr. Plunkett is not qualified to testify about the adequacy of the label because she is not a medical doctor, Defendants incorrectly assert that Dr. Plunkett intends to testify "on how doctors would react to information she proposes be included in Xarelto labeling."[86] Dr. Plunkett will not testify about what Xarelto product labeling means to physicians or how doctors would react to additional information being added to the label.[87] In similar situations in *Seroquel* and *Yaz*, both courts rejected similar challenges.  The same reasoning applies here as Defendants' arguments in this regard are moot.

---

not qualified to render a variety of opinion including that "Lilly failed to change its labeling language to warn of risks it was aware of to patients for hyperglycemia and potentially diabetes, Lilly was widening its marketing of the drug from psychiatrists to general medicine physicians).

It is noteworthy that Dr. Plunkett's opinions have been admitted in non-*Daubert* jurisdictions in cases against Jannsen. *Skala v. Johnson & Johnson, et al.,* Case No. 274 (N.J. Super. Ct., Law Div., Dec. 16, 2011) (Dr. Plunkett qualified to testify concerning her interpretation of FDA regulations, FDA labeling regulations, and alleged failure to warn of Defendant Janssen Pharmaceutical Products, L.P.) [Attached hereto as Exhibit 3].

[85]*Seroquel,* 2009 WL 3806436 at *10-11; *see also Vioxx,* 401 F.Supp.2d at 580 ("Expert witnesses are allowed to base their opinions on personal experiences provided that their opinions are confirmed by scientifically reliable data. *Cantrell v. GAF Corp.,* 999 F.2d 1007, 1014 (6th Cir. 1993)").

[86]Def. Mem at 7 *citing* Plunkett dep. at 340:2-7. Defendants cherry-pick seven lines of Dr. Plunkett's testimony taken out of context from a lengthy deposition to concoct their argument. Simply because Dr. Plunkett answered defense counsels' questions posed to her during a deposition (regardless of subject, relevance or admissibility at trial) does not mean that she intends to offer an opinion about how doctors will react to the Xarelto label or what the label means to a physician. She will not.

[87]*See Seroquel,* 2009 WL 3806436, at *10-11 (rejecting a similar challenge to Dr. Plunkett's proposed testimony regarding the adequacy of the Seroquel label where the Plaintiffs clarified that Dr. Plunkett was not offering opinions about what the labeling means to physicians); *Yaz,* 2011 WL 63002889, *26 (denying Bayer's motion to exclude non-physician pharmacologist's testimony about adequacy of label where plaintiffs clarify that the pharmacologist will "not opine regarding whether hypothetical physicians would have prescribed Bayer's product had different EE AUC [pharmacokinetic] values been provided to them.).

**IV.     Defendants' Argument That Dr. Plunkett Did Not Consider A Certain Document May Be Fodder For Cross-Examination But It Is Not A Basis For Exclusion Under _Daubert._**

The Defendants argue that Dr. Plunkett's labeling opinions are unreliable because she did not review an allegedly key document.[88] In _Seroquel_, the Defendants made the same argument in their unsuccessful challenge to Dr. Plunkett's proposed testimony regarding the adequacy of the Seroquel label.[89] The court in _Seroquel_ rejected this argument ruling that "AstraZeneca's objection regarding the selection of documents that Dr. Plunkett examined goes to the weight of her testimony regarding drug labeling …"[90] The same result should occur in the present case because such issues go to the weight but not the admissibility of expert testimony and are best explored during cross-examination.

**V.      Dr. Plunkett Is Qualified To Review And Rely On Internal Company Documents As Part Of Her Opinion Although She Does Not Intend To Testify Regarding Motive, Intent, And State Of Mind.**

**A.      Dr. Plunkett's Use of Corporate Documents Is Proper.**

Defendants argue that Dr. Plunkett should not be permitted to rely on (and interpret) internal company documents because that reliance is tantamount to giving an opinion about corporate "state of mind." They make a similar argument about FDA documents. Dr. Plunkett

---

[88]Def. Memo 10-11.

[89]_Seroquel_, 2009 WL 3806436 at *10 ("Finally, AstraZeneca argues, Dr. Plunkett did not look at 'key documents' related to Seroquel's safety.").

[90]_Id._ at *11; _see also Daubert,_ 509 U.S. 596; _Alexie v. Appex Tool Grp., LLC,_ Case No. 12-2212, 2014 WL 5603386, at *2 (E.D. La., Nov. 3, 2014) (Fallon, J.) (questions about expert's credibility and the weight to be given to opinions is best handled by cross-examination); _Vioxx_, 401 F.Supp.2d at 574 ("The validity or the correctness of the conclusion is for the fact finder"); _Yaz_, 2011 WL 63002889, *7 (rejecting Bayer's argument that an expert's opinion is inadmissible because he did not rely on all of the major epidemiological studies noting that if the expert "failed to consider an important epidemiological study that may be explored during cross examination."); _Zyprexa,_ 493 F. Supp.2d at 580 (Dr. Plunkett "is a distinguished scientist whose expertise probably will be helpful in deciding relevant scientific...issues. Attacks on them...are primarily based on assessments of credibility best left for the trier.").

methodically reviewed FDA regulations, peer-reviewed studies, animal and *in vitro* studies, mechanistic studies and other generally accepted scientific data in addition to internal company documents and FDA documents to inform her opinions regarding Xarelto. Based in part on this information, she will offer testimony about the pharmacological profile of Xarelto and how the label is inadequate. Her opinions about the facts of the pharmacology of Xarelto from Defendants' own studies, the issues that were ignored, and the assumptions that the Defendants made, are clearly pertinent to her findings and therefore admissible. She necessarily had to review Defendants' internal documents to make her assessment. Courts regularly allow experts, including Dr. Plunkett,[91] to discuss documents that form the basis of their opinions.[92]

### B.     Dr. Plunkett Does Not Speculate About State of Mind, Intent or Motive.

Defendants fear that Dr. Plunkett's opinion testimony will venture into the Defendants' employees' and the FDA's knowledge, motives, and intent.  However, that is not the purpose or

---

[91]*Seroquel,* 2009 WL 3806436, *3-4 (ruling that Dr. Plunkett may use internal corporate documents to demonstrate what AstraZeneca knew about the association between Seroquel and when AstraZenca first knew it because "to rule otherwise would unduly restrict Plaintiffs' experts from explaining the basis of their opinions").

[92]*See, e.g., Sanchez v. Boston Scientific Corp.* Civil Action No. 2:12–cv–05762, 2014 WL 4851989, at *4 (S.D. W.V., Sept. 29, 2014) (noting that "an expert may testify about his or her review of internal documents solely for the purpose of explaining the basis for his or her opinions*); In re Flonase Antitrust Litig*., 884 F. Supp. 2d 184, 192-93 (E.D. Pa. 2012) (permitting expert to use internal documents to opine on information that was available to manufacturer regarding FDA practice and policy as to approval of drug application); *In re Fosamax Products Liab. Litig*., 645 F.Supp.2d 164, 192 (S.D. N.Y. 2009) (permitting expert to comment on documents and exhibits in the context of "explaining the regulatory context in which they were created, defining any complex or specialized terminology, or drawing inferences that would not be apparent without the benefit of experience or specialized knowledge."); *In re Levaquin Prod. Liab. Litig.,* MDL No. 1943*,* 2011 WL 6888533, at *2 (D. Minn., Dec. 29, 2011)*; Kruszka v. Novartis Pharms. Corp.,* 28 F. Supp. 3d 920, 931-32 (D. Minn. 2014) ("[T]estimony that opinions on what the FDA or Novartis actually did, rather than thought, are properly within the scope of admissible testimony."); *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.,* MDL No. 1203, 2000 WL 876900, at *9 (E.D. Pa., June 20, 2000) ("[i]f the witnesses' bases for the opinions concerning improper intent come from other evidence such as letters, admissions … or other admissible evidence, that is what the jury should hear and the question of [] intent would flow from such evidence to be determined by the jury") (emphasis in original).

goal of Dr. Plunkett or the Plaintiffs and she will not testify about state of mind, intent or motive.

As with many of Defendants' other arguments, their "state of mind" argument is recycled from other cases where courts have rejected it.  J&J made a similar argument about Dr. Plunkett's proposed testimony in *Tylenol*, which was soundly rejected:

> The defendants move to exclude Dr. Plunkett's opinions about what the defendants' motives or knowledge were; they claim these opinions invade the province of the jury. I agree that it is the jury, which ultimately gets to decide what the defendants' intent was. To the extent Dr. Plunkett testifies about what the defendants intended by their actions, her testimony will be excluded.
>
> However, I do not see Dr. Plunkett's opinions as going this far. She states what the defendants knew about risks of acetaminophen-induced liver failure based on internal documents or depositions by defense witnesses she reviewed. Her opinions are not based on speculation or inference. She offers these opinions to show how the defendants' actions differed from what a reasonable drug manufacturer should or would have done. In context, her statements about what the defendants knew or did not know would be appropriate. These opinions will help the jury understand how the defendants' actions may have fallen short of the duties required of them.[93]

Likewise, in *Vioxx*, this Court permitted the Plaintiff's regulatory expert to testify about the significance of certain documents and how these documents fit into the FDA's regulatory scheme.[94] This Court noted that state of mind objections similar to those raised by the Defendants here were best decided at trial.[95]

In the present case, Dr. Plunkett will not be "guessing" as to what Defendants or the FDA thought or knew. To the contrary, she relies on *documents* to explain what knowledge was

---

[93]*Tylenol,* 2016 WL 4039329, at *6 (*emphasis added*).

[94]*In re Vioxx Products Liab. Litig.,* 401 F.Supp.2d 565, 595 (E.D. La. 2005) (reserving ruling on state of mind issue should Merck raise objection at trial).

[95]*Id.*

available to Defendants and their employees about Xarelto's pharmacology at the time and what information they *should have known* as a manufacturer of a New Oral Anticoagulant, like Xarelto, to meet the standard of care. Dr. Plunkett has done the same type of analysis she did in *Tylenol, Gadolinium*, *Seroquel, Zyprexa, Risperdal* and *Motrin* including a review of internal company and FDA documents. Dr. Plunkett (and any qualified witness for that matter) can rely on company documents to demonstrate what the Defendant knew or should have known.[96]

---

[96]*See supra.* n. 92.

## CONCLUSION

For the reasons stated above, the Plaintiffs respectfully request that the Court deny to Defendants' *Motion In Limine to Exclude Certain Opinions of Laura M. Plunkett, Ph.D., Under Federal Rule of Evidence 702.*

Dated:  February 27, 2017

Respectfully submitted,

*/s/ Leonard A. Davis*
Leonard A. Davis, Esq. (Bar No. 14190)
*HERMAN, HERMAN & KATZ, LLC*
820 O'Keefe Avenue
New Orleans, LA  70113
PH: (504) 581-4892
FAX: (504) 561-6024
Email:  ldavis@hhklawfirm.com

Gerald E. Meunier (Bar No. 9471)
*GAINSBURGH BENJAMIN DAVID MEUNIER & WARSHAUER, LLC*
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA  70163-2800
PH: (504) 522-2304
FAX: (504) 528-99\73
Email:  gmeunier@gainsben.com

*Plaintiffs' Liaison Counsel*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 27, 2017, the foregoing pleading and its supporting memorandum of law were filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre- Trial Order No. 17.

*/s/ Leonard A. Davis*
**LEONARD A. DAVIS**