UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  XARELTO (RIVAROXABAN) | * | MDL 2592 |
| PRODUCTS LIABILITY LITIGATION | * | |
| | * | SECTION L |
| THIS DOCUMENT RELATES TO: | * | |
| | * | JUDGE ELDON E. FALLON |
| *Joseph J. Boudreaux, Jr., et al. v. Janssen, et al.* | * | |
| *Case No. 2:14-cv-02720* | * | MAG. JUDGE NORTH |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

---

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'
*DAUBERT* MOTION TO EXCLUDE CERTAIN OPINIONS OF
NATHANIEL WINSTEAD, M.D. [RECORD NO. 5120]**

---

# FILED UNDER SEAL

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 3

STANDARD FOR ADMISSIBILITY OF EXPERT EVIDENCE ................................ 5

ARGUMENT ................................................................................................................. 7

    I.      Defendants' Attacks on Dr. Winstead's Testimony are Misplaced ………….... 7

    II.     Dr. Winstead's Opinions are Well-Reasoned and Supported by the Facts ….…... 10

    III.    Peer-Reviewed Literature and Other Evidence Support Dr. Winstead's Opinions ……………………………………………………………………….. 14

    IV.    Dr. Winstead's Clinical Experience Supports His Opinions …………………..... 16

    V.     Other Experts in this Case Support Dr. Winstead's Opinions …………………. 16

CONCLUSION ............................................................................................................. 17

## TABLE OF AUTHORITIES

**Cases**

*Cooper v. Brown,*
    565 F.3d 581 (9th Cir. 2009) ……………………………………………………………6

*Daubert v. Merrell Dow Pharm., Inc.,*
    509 U.S. 579 (1993) ………………………………………………………………1, 5, 6

*Gen. Elec. v. Joiner,*
    522 U.S. 136 (1997) ………………………………………………………………………1

*Heller v. Shaw Indus., Inc.,*
    167 F.3d 146 (3d Cir. 1999) …………………………………………………………....14

*Huss v. Gayden,*
    571 F.3d 442 (5th Cir. 2009) …………………………………………………………….5

*Knight v. Kirby Inland Marine Inc.,*
    482 F.3d 347 (5th Cir. 2007) …………………………………………………….............14

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999) …………………………………………………………………1, 6

*McCullock v. H.B. Fuller Co.,*
    61 F.3d 1038 (2d Cir. 1995) …………………………………………………………....14

*Moore v. Ashland Chem.,*
    126 F.3d 679 (5th Cir. 1997) ………………………………………………………......16

*Pick v. Am. Med. Sys., Inc.,*
    958 F. Supp. 1151 (E.D. La. 1997) …………………………………………………….14

*Seatrax, Inc. v. Sonbeck Int'l, Inc.,*
    200 F.3d 358 (5th Cir. 2000) …………………………………………………………….6

*United States v. 14.38 Acres of Land,*
    80 F.3d 1074 (5th Cir. 2012) ……………………………………………………… 6, 16

*Viterbo v. Dow Chem. Co.,*
    826 F.2d 420 (5th Cir.1987) …………………………………………….............6, 16

*Wagoner v. Exxon Mobil Corp.,*
    813 F. Supp. 2d 771 (E.D. La. 2011) …………………………………….............1, 5

*Wells v. SmithKline Beecham Corp.*,

    601 F.3d 375 (5th Cir. 2010) …………………………………………………………5

*Westberry v. Gislaved Gummi AB,*

    178 F.3d 257 (4th Cir. 1999) …………………………………………….........14

**Rules**

Fed. R. Evid. 702 ……………………………………………………………………1, 5, 7

**Other**

Fed. R. Evid. 702 Advisory Committee Note ……………………………………5, 7

**TABLE OF EXHIBITS**

Exhibit 1      Deposition of Marc J. Kahn, M.D., M.B.A.

Exhibit 2      Expert Report of Nathanial S. Winstead, M.D.

Exhibit 3      Deposition of Nathanial S. Winstead, M.D.

Exhibit 4      Progress Notes by Najy N. Masri, M.D., 02/04/2014
               (JBoudreaux-OMC-K-MD-00017)

Exhibit 5      Deposition of Virendra Joshi, M.D.

Exhibit 6      Xarelto Prescribing Information, 09/2015

Exhibit 7      Deposition of Scott D. Berkowtiz, M.D.

Exhibit 8      FDA Draft Briefing Document for the Cardiovascular and Renal Drugs
               Advisory Committee (CRDAC), 09/08/2011

Exhibit 9      Deposition of Peter S. Fail, M.D.

Exhibit 10     Deposition of James Smith, M.D.

Plaintiffs respectfully submit this response in opposition to *Defendants' Daubert Motion to Exclude Certain Opinions of Nathaniel Winstead, M.D.* [Rec. Doc. 5120]. Dr. Winstead's core opinion (which is not even mentioned in Defendants' brief) – that Xarelto use is the most probable cause of Mr. Boudreaux's gastrointestinal ("GI") bleed – clearly is admissible under *Daubert* and its progeny.[1]

As detailed in this memorandum, Dr. Winstead is qualified under *Daubert* and its progeny, and the Federal Rules of Evidence, to provide expert testimony regarding Xarelto's ability to cause internal bleeding through a mechanism of action known as "systemic toxicity."[2] Defendants' motion misleadingly states that this mechanism of action is merely a hypothesis created for purposes of this litigation, which lacks scientific consensus or support in the medical literature.[3] In fact, Dr. Winstead has provided ample support for his opinion regarding systemic toxicity and its role in Mr. Boudreaux's injury, and in positing that this mechanism of action can cause GI bleeds in Xarelto patients, including patients who lack any underlying pathology, by drawing on his clinical experience, peer-reviewed studies, and other sources such as the Xarelto label.

## INTRODUCTION

Dr. Winstead's "knowledge, skill, experience, training or education" all inform his opinions about Xarelto's propensity to cause GI bleeding in otherwise healthy patients.[4] He is an

---

[1] However, Plaintiffs agree that a certain portion of Dr. Winstead's deposition testimony, which was prompted solely by Defendants' questioning at his deposition, is not admissible; in fact, Plaintiffs never intended to illicit such testimony from Dr. Winstead at the time of trial. Specifically, Plaintiffs do not intend to offer any opinion through Dr. Winstead that Xarelto causes GI ulcers or direct mucosal toxicity. Neither of these opinions is contained in Dr. Winstead's report.

[2] *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); *Gen. Elec. v. Joiner*, 522 U.S. 136 (1997); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999); Fed. R. Evid. 702.

[3] *See* Defendants' Memorandum of Law in Support of Defendants' *Daubert* Motion to Exclude Certain Opinions of Nathaniel Winstead, MD ("Def. Mem."), at 4.

[4] *See Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 798 (E.D. La. 2011), *quoting* Fed. R. Evid. 702.

incredibly well-trained and credentialed gastroenterologist.[5] He is double board certified in gastroenterology and internal medicine, and also holds a master's degree in public health. He obtained his medical degree from Tulane University, and after completing his residency and fellowship, he has practiced medicine in New Orleans since 2008. Dr. Winstead was the Director of Gastroenterology Research and the Medical Director of the Inflammatory Bowel Disease Center at Ochsner from 2008 until 2013, and he has been evaluating and treating patients with gastrointestinal disorders and injuries in his own clinical practice for many years. He has also served as the principal investigator or sub-investigator in multiple Phase 2 and Phase 3 clinical trials for various drug manufacturers, including three different Phase 3 trials sponsored by Janssen Research and Development, LLC, one of the defendants in this case.[6] Additionally, Dr. Winstead has served as an expert witness in only one other case, which involved issues unrelated to GI bleeds.[7]

At his digestive health practice, Dr. Winstead spends a significant amount of time treating GI bleeds.[8] Dr. Winstead testified that he sees approximately 100 to 200 GI bleeds a year in his practice, and when he is unable to determine the site of the bleed, he regularly concludes that the anticoagulant itself caused the bleed.[9] In these circumstances, he often has to discuss with patients that systemic toxicity – having too much of an anticoagulant drug in their systems – may have caused their bleeds.[10]

---

[5] Indeed, even defense experts agree that Dr. Winstead is a well-trained and competent gastroenterologist. *See* Exhibit 1, Kahn Dep., at 33:21-34:11.

[6] *See* Exhibit 2, Winstead Report, at Appendix B.

[7] *See* Exhibit 3, Winstead Dep., at 10:12-11:4.

[8] *Id.* at 25:6-9, 25:19-25.

[9] *Id.* at 193:21-194:3; 195:10-16.

[10] *Id.* at 195:17-21; 197:14-22.

Dr. Winstead underwent extensive preparation to offer his expert testimony in this case. In forming his opinion that Xarelto was the probable cause of Mr. Boudreaux's gastrointestinal bleed, Dr. Winstead scoured through thousands of pages of Plaintiff's medical records, read multiple depositions of other witnesses in this case, examined various iterations of the Xarelto label, and reviewed numerous studies of Xarelto spanning from the approval process to the post-marketing phase.[11] He also relied upon his education, training and clinical experience.[12] Dr. Winstead also performed a thorough differential diagnosis, which is the same methodology he uses in his clinical practice when evaluating and treating patients. He first considered the various potential causes of this injury, then ruled out alternative causes, before concluding that in his opinion, to a reasonable degree of medical certainty, Mr. Boudreaux's Xarelto use was the most probable cause of his gastrointestinal hemorrhage, and to the extent any other factors may have contributed, Xarelto use was the most significant and substantial contributing factor.[13]

Dr. Winstead's qualifications, methodologies and differential diagnoses as set forth above are exceedingly sound, and pass any legitimate *Daubert* challenge. Defendants wrongfully mischaracterize Dr. Winstead's opinions as "*ipse dixit*" by primarily focusing on deposition testimony about topics not contained within his report, nor ever intended by Plaintiffs to be presented at trial. Thus, Defendants' motion should be denied.

## FACTUAL BACKGROUND

Plaintiff, Joseph Boudreaux, was admitted to Ochsner St. Anne General Hospital on January 7, 2014, where he was diagnosed with atrial fibrillation. While in the hospital, Mr. Boudreaux was started on the anticoagulant Xarelto, and he continued to take the medication after

---

[11] *Id.* at 12:19-13:9; 14:1-10; 224:1-13; *see also* Exhibit 2, Winstead Report, at Appendix A.

[12] *See* Exhibit 2, Winstead Report, at 1.

[13] *See id.* at 2-3.

his discharge on January 9, 2014. Other than adding Xarelto, Mr. Boudreaux did not change his drug regimen following his admission to Ochsner St. Anne. He had been taking aspirin for years and had never experienced a gastrointestinal ("GI") bleed.[14]

Less than a month later, on February 3, 2014, Mr. Boudreaux was admitted to Ochsner St. Anne with signs and symptoms of a GI bleed. He was quickly transferred by ambulance to Ochsner Medical Center Kenner, and his Xarelto was stopped. Following Mr. Boudreaux's admission at Ochsner Medical Center Kenner, Dr. Naji Masri, the admitting physician, diagnosed Mr. Boudreaux with a GI bleed related to his recent use of Xarelto.[15] A gastroenterologist, Dr. Virendra Joshi, was subsequently brought in for consultation and identification of the anatomical source of the bleed.[16]

On February 4, 2014, Dr. Joshi performed an upper GI endoscopy (EGD), looking for a source of bleeding in the esophagus, stomach, or duodenum, which was negative.[17] On February 7, 2014, Dr. Joshi did a colonoscopy – an evaluation of the lower GI tract, from the rectum to the cecum – but again was unable to identify any source of bleeding.[18] Finally, on March 18, 2014, Dr. Joshi performed a video capsule endoscopy. This procedure involves swallowing a capsule that contains a small camera, which takes a video as it moves through the digestive tract. Again, the video capsule failed to identify an anatomic source of the bleed.[19] In sum, a complete GI workup failed to identify any anatomical source of Mr. Boudreaux's GI hemorrhage.

---

[14]*Id.* at 3; Exhibit 3, Winstead Dep, at 109:1-5.

[15]*See* Exhibit 4, Masri Progress Notes.

[16]*See* Exhibit 5, Joshi Dep., at 11:17-21.

[17]*Id.* at 11:24-12:3.

[18]*Id.* at 17:20-22, 18:10-18.

[19]*Id.* at 22:7-23.

## STANDARD FOR ADMISSIBILITY OF EXPERT EVIDENCE

As this Court has stated, "[t]he threshold question in determining whether an individual may offer expert testimony under Rule 702 is whether the individual has the qualifications to do so."[20] "Under Rule 702, 'the expert is viewed, not in a narrow sense, but as a person qualified by knowledge, skill experience, training or education.'"[21] A proposed expert does not have to be "highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility."[22]

In *Daubert*, the Court emphasized the trial judge's role as gatekeeper in determining the admissibility of relevant and reliable expert testimony.[23] The trial court must determine whether the proffered expert's testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline."[24] The Court should focus "solely on principles and methodology, not on the conclusions that they generate."[25] It is unreasonable to require that the subject of testimony to "be 'known' to a certainty" because science is an evolving process with "no certainties."[26]

The *Daubert* Court explained that the standard is "flexible," and identified four specific factors that a trial court may consider in determining whether to admit expert testimony: (1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review or publication; (3) whether it has a high known or potential rate of error, and whether there

---

[20]*Wagoner*, 813 F. Supp. 2d at 798, *citing* Fed. R. Evid. 702.

[21]*Id., quoting* Fed. R. Evid. 702 Advisory Committee Note.

[22]*Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009).

[23]*Daubert*, 509 U.S. at 589.

[24]*Id.* at 592; *see also Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 378 (5th Cir. 2010) ("[T]he expert must employ in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.") (internal quotations and citation omitted).

[25]*Daubert*, 509 U.S. at 595.

[26]*Id.* at 590.

are standards controlling its operation; and (4) whether the theory or technique is generally accepted within the relevant scientific community.[27] In *Kumho Tire*, the Court noted that these factors do not constitute an exhaustive set; the trial court may consider other factors, depending on the evidence presented.[28] The Court also emphasized that experts may reasonably differ on issues, and that conflicting evidence should be admitted to aid the jury in deciding those issues.[29]

Whether *Daubert*'s suggested indicia of reliability apply to testimony is a fact-specific inquiry dependent "on the nature of the issue at hand, the witness's particular expertise, and the subject of the testimony."[30] "It is hornbook law that evidence is admissible under *Daubert* if there is an accepted scientific method for making a reliable measurement, even if the evidentiary significance of the measurement can be disputed."[31] "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[32]

The Fifth Circuit has recognized that deference should be given to the jury's role as the proper arbiter of disputes between conflicting opinions.[33] "[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system."[34] Rather, "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."[35]

---

[27] *Id.* at 592-94.

[28] *Kumho Tire*, 526 U.S. at 150-52.

[29] *Id.* at 153-54.

[30] *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 372 (5th Cir. 2000), *citing Kumho Tire*, 526 U.S. at 150.

[31] *Cooper v. Brown*, 565 F.3d 581, 596 (9th Cir. 2009).

[32] *Daubert*, 509 U.S. at 596.

[33] *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 2012).

[34] *Id.* at 1078.

[35] *Id.* at 1077, *quoting Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir.1987).

The Federal Rules of Evidence have been amended to incorporate these jurisprudential principles into a district judge's determination of expert testimony admissibility.[36] "[T]he rejection of expert testimony is the exception rather than the rule."[37]

## **ARGUMENT**

### I.  **Defendants' Attacks on Dr. Winstead's Testimony are Misplaced.**

Defendants inexplicably challenge Dr. Winstead's testimony that Xarelto causes bleeding as not being generally accepted by the scientific community.[38] Yet Defendants' own label provides that "Xarelto … can *cause* serious or fatal bleeding."[39] The label also provides that increasing systemic exposure to Xarelto increases the risk of bleeding.[40] All of Defendants' published clinical trials related to Xarelto acknowledge that as systemic exposure increases, the risk of bleeding increases. Even Defendants' own employees echo this acknowledgment.[41]

Moreover, the snippets of Dr. Winstead's deposition testimony that are cited in Defendants' brief are taken out of context. Defense counsel repeatedly tried to create a distorted record of Dr. Winstead's testimony using the term "systemic toxicity" in a tortured manner. Specifically, Dr. Winstead clearly testified that the mechanism of action by which Xarelto causes bleeds due to "systemic toxicity" is *not* a hypothesis. As Dr. Winstead testified at deposition:

---

[36]*See* Fed. R. Evid. 702 ("A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.")

[37]Fed. R. Evid. 702, Advisory Committee Notes (2000).

[38] *See* Def. Mem. at 7.

[39] Exhibit 6, Xarelto Prescribing Information, at § 5.2 (emphasis added).

[40] *See id.* at § 7.4.

[41] *See, e.g.,* Exhibit 7, Berkowitz Dep., at 546:20-547:10.

Q.  Can a patient with no underlying gastrointestinal pathology have a bleed initiated because of a NOAC regardless of the NOAC?

A.  Yes.

Q.  And so of the three potential mechanisms of action that you described earlier in the deposition, do you agree now that system toxicity is the only one that you believe is established in the scientific literature?

A.  For NOACs, or for Xarelto in specific?

Q.  Let's start with – let's start at the top. All anticoagulants.

A.  So all anticoagulants, yes.

Q.  And, therefore, all NOACs?

A.  Therefore, all NOACs. And yes, and in the specific case of Xarelto, yes.

Q.  And I want to mark all four articles that you cited. And if you want to take a break, we can take a break, or if you want to look at them here, I would like for you to identify for me where in any of these articles it says that because of system toxicity a NOAC, or Xarelto specifically, can initiate a bleed in the absence of pre-existing pathology. Do you understand the question?

A.  Yeah, *I think that you're sort of taking the term "systemic toxicity" and having your way with it.* You know, *if somebody is on a blood thinner and they bleed, I would say that that's a toxic effect of a blood thinner.* So I mean, I would answer your question very generally.

> MS. HOFFMANN:  I'm going to object and move to strike the first part of the answer as not being responsive.

> MR. GOZA:  Well, we can debate whether it is. I believe it is to his general question. So go ahead if you've got another question.

A.  I'm just – *I'm only attempting to give you clarity on what my line of thinking is.*[42]

---

[42]Exhibit 3, Winstead Dep., at 75:20-77:11 (emphasis added).

More to the point, Dr. Winstead also testified as follows:

> Q.  Okay. So that's fine, too. What is your basis for saying that any blood thinner, any anticoagulant, can initiate a bleed, a gastrointestinal bleed in the absence of pre-existing pathology?
>
> A.  *Because I've seen it dozens and dozens of times.*
>
> . . .
>
> Q.  If any other expert on behalf of the Plaintiffs said that Xarelto cannot initiate a gastrointestinal bleed in the absence of pre-existing pathology, you would disagree with that opinion, is that right?
>
> > MR. GOZA:  Two things. One, I'm just going to object to form. You can't ask another witness to comment on the testimony of something he hasn't seen, or even testimony of another witness. So I'm just going to object to that form.
>
> A.  I would disagree. *And I would say that in the case of Mr. Boudreaux, he bled, he was on a medication that you had no way to monitor its effects, and no gastrointestinal source was identified. My – I would posit that he had, you know, oozing from mucosa because of toxic effects of Xarelto.*
>
> . . .
>
> Q.  And so your opinion that Xarelto more likely than not initiated a bleed in Mr. Boudreaux in the absence of pre-existing pathology is based on that hypothesis about the mechanism of action of Xarelto?
>
> > MR. GOZA:  I'm going to object. *That misstates his prior testimony and his opinions in the case.*
>
> A.  So the studies that I referred to, in my opinion, risk for gastrointestinal bleeding was increased.
>
> BY MR. STEKLOFF:
>
> Q.  But risk of a – an increased risk of gastrointestinal bleeding tells you nothing about the underlying mechanism of action regarding initiation, isn't that right?
>
> > MR. GOZA:  But – object to form.

> A.   *You're kind of splitting hairs*. So, you know – and, again, hypotheses have levels of strength associated with them. So in Mr. Boudreaux's case, you know, we know that he was on Xarelto, *we know that his prothrombin time is elevated*, he had a bleeding event with no identifiable source, he never bled before Xarelto and he hasn't bled since Xarelto, *so I believe with a reasonable degree of medical certainty that Xarelto caused his bleeding. Is that – is that based upon a hypothesis? No.* It's based upon my review of 3,500 pages of his medical record before, during, and after his bleeding event, [and] my review of the literature surrounding Xarelto.[43]

Thus, a full reading of Dr. Winstead's testimony clearly shows that his opinion about Mr. Boudreaux's bleeding event being caused by his increased exposure to Xarelto is supported by scientific literature, his clinical experience, and his review of Mr. Boudreaux's medical records.

## II.   Dr. Winstead's Opinions are Well-Reasoned and Supported by the Facts.

In his expert report and at deposition, Dr. Winstead opined, to a reasonable degree of medical certainty, that Xarelto was the probable cause of, or the most significant and/or substantial contributing factor to, Mr. Boudreaux's GI bleed:

> So in Mr. Boudreaux's case, you know, we know that he was on Xarelto, we know that his prothrombin time is elevated, he had a bleeding event with no identifiable source, he never bled before Xarelto and he hasn't bled since Xarelto, so I believe with a reasonable degree of medical certainty that Xarelto caused his bleeding."[44]

When asked about possible mechanisms of action for causing a bleed, Dr. Winstead said there were several proposed mechanisms documented in the literature, but clearly explained that one of them – systemic toxicity – was *not* a hypothesis and simply meant that too much drug is circulating in the blood supply.[45] Dr. Winstead further testified as follows:

---

[43]*Id.* at 78:16-22, 81:7-25, 84:8-85:14 (emphasis added).

[44]*Id.* at 85:3-9; *see also id.*at 43:24-44:9, 87:6-17, 143:14-144:7, 144:23-145:10, 146:23-147:6, 173:24-174:5, 214:7-11; Exhibit 2, Winstead Report, at 3.

[45]Exhibit 3, Winstead Dep., at 67:17-68:1, 138:13-19.

Q.  When you say "the most probable cause of Mr. Boudreaux's bleed," how do you define the word "cause" in terms of initiation or contribution or anything else?

A.  His exposure to Xarelto increased his risk for gastrointestinal bleeding, and he had a bleed while he was on Xarelto. So within a reasonable degree of medical certainty, given the fact that he never bled before and he hasn't bled since, that's what I would define as cause.

Q.  And the mechanism for action of that cause is an initiation, is that correct?

      MR. GOZA:  Object.

A.  He had no identifiable mucosal lesion, no bleeding was seen on upper or lower endoscopy or video capsule. One would assume, given those facts, like I talked about before, that he oozed blood into probably his upper gastrointestinal tract. Had he not been taking Xarelto, his chances of that happening would have been quite low. So in that regard, Xarelto caused his gastrointestinal bleeding.

BY MR. STEKLOFF:

Q.  And that theory of oozing blood is the systematic toxicity that we're talking about, right?

A.  That's exposure to anticoagulation and the breakdown of natural homeostasis between clotting and dissolving clotting from exposure to anticoagulants.

Q.  So that can occur, or could have occurred in Mr. Boudreaux's case if he was taking warfarin?

A.  If he was on – so if he was on carefully monitored warfarin therapy, his risk of that happening would have been 1.8 events per 100 years. And we know from the head-to-head comparison with Xarelto that on Xarelto his risk of that happening is higher.[46]

Dr. Winstead explained this further:

Q.  I understand that part, Doctor. I'm more focused on the mechanism that you talked about before, which I think you called system toxicity. Is that the mechanism that you're relying on?

---

[46]*Id.* at 146:10-147:23.

A.  So I'm – he was – his system was exposed to Xarelto, and that caused him to be at increased risk for bleeding.

Q.   Okay. But all anticoagulants expose a system to be at an increased risk of bleeding, right?

A.  Yes, and Xarelto more than others.

Q.  And you base that on these four studies that you have looked at – oh, no, I'm sorry. For the GI bleeding, you're referring to the ROCKET study?

A.  I'm referring both to the ROCKET study and the four studies that are laid out in my opinion.

Q.  I guess my question is this. When you talk about this systemic toxicity and this oozing of blood from the mucosal area, is that what you're proposing happened to Mr. Boudreaux?

A.  Yes. I'm proposing that he oozed from probably his upper GI tract because he was anticoagulated with Xarelto.

Q.   When you say "he oozed from his upper GI tract," would that oozing leave a mark?

A.  No.

Q.  So the oozing from the upper GI tract that you opine happened to Mr. Boudreaux because of Xarelto would not leave any kind of identification?

A.  No.

Q.  So you wouldn't see it on endoscopy?

A.  No. Unless he was bleeding at the time we looked.

Q.  So the oozing that you propose was self-limiting?

A.  He stopped at – his Xarelto was stopped and he stopped bleeding.[47]

---

[47]*Id.* at 186:6-187:23.

While Dr. Winstead agreed that there could still be an underlying pathology associated with a GI bleed despite negative tests,[48] this did not change his opinion that Xarelto was the causative factor of Mr. Boudreaux's bleed. As Dr. Winstead explained, when a patient has systemic exposure to the drug because they've been taking it, and they have toxicity in the form of bleeding, the increase in the risk of bleeding as a result of the anticoagulant is a toxic effect of the medication.[49] Xarelto increased Mr. Boudreaux's chances of bleeding.[50]

In reaching his opinion, Dr. Winstead systematically considered and ruled out a number of alternative explanations for Mr. Boudreaux's GI bleed before arriving at his conclusion that Mr. Boudreaux's bleed was likely caused by having excessively high blood levels of Xarelto.[51] In addition, Dr. Winstead specifically pointed to the following factors in reaching his conclusions:

(1)    Mr. Boudreaux showed no evidence of a GI bleed before he started taking Xarelto;

(2)    Xarelto was the only change in Mr. Boudreaux's drug regimen;

(3)    Mr. Boudreaux stopped taking Xarelto and has never again been diagnosed with an acute GI bleed;

(4)    Mr. Boudreaux has continued with his other medications with no episodes of acute bleeding;

(5)    Mr. Boudreaux had a PT taken prior to starting Xarelto and it was normal;

(6)    Mr. Boudreaux's PT taken at the time of his GI bleed diagnosis was elevated, indicating he was over anticoagulated;

(7)    PT taken after Mr. Boudreaux's Xarelto had been stopped was normal; and

---

[48]*Id.* at 62:18-24

[49]*Id.* at 198:8-17.

[50]*Id.* at 186:4-5.

[51]*See* Exhibit 2, Winstead Report, at 2-3.

13

(8)     there was no separate and identifiable anatomic explanation for his bleed despite thorough testing.[52]

Dr. Winstead's causation opinion, based on his methodology using a differential diagnosis, is well supported by the facts and applicable jurisprudence. The majority of courts allow medical expert testimony on the issue of causation derived solely from differential diagnosis.[53] As Dr. Winstead reliably employed a differential diagnosis, his opinions are admissible.

## III.    Peer-Reviewed Literature and Other Evidence Support Dr. Winstead's Opinions.

In his Report and at deposition, Dr. Winstead described systemic toxicity as one of three proposed mechanisms by which Xarelto can cause a GI bleed.[54] In addition, Dr. Winstead testified that Xarelto and other anticoagulants can cause GI bleeds even in patients who lack any underlying pathology, and did cause a GI bleed without any underlying pathology in Mr. Boudreaux.[55] In doing so, he cited his extensive clinical experience, stating there is often no anatomic pathology found to explain a patient's GI bleed.[56]

---

[52]See Exhibit 3, Winstead Dep., at 46:15-21, 85:3-14, 89:13-19, 167:19-168:4, 190:2-191:6, 202:4-203:18; Exhibit 2, Winstead Report, at 2-3.

[53]See Pick v. Am. Med. Sys., Inc., 958 F .Supp. 1151, 1163 (E.D. La. 1997) ("A variety of courts have held, and this Court agrees, that differential diagnosis meets the Daubert criteria.") (internal quotations and citations omitted); Westberry v. Gislaved Gummi AB, 178 F.3d 257, 263 (4th Cir. 1999) ("[T]he overwhelming majority of the courts of appeals that have addressed the issue have held that a medical opinion on causation based upon a reliable differential diagnosis is sufficiently valid to satisfy the first prong of the Rule 702 inquiry."); Heller v. Shaw Indus., Inc., 167 F.3d 146, 156-57 (3d Cir. 1999) (recognizing that differential diagnosis is a methodology that meets the Daubert standard, even where an expert fails to rule out every possible alternative cause); McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1044 (2d Cir. 1995) ("Disputes as to the strength of [an expert's] credentials, faults in his use of differential etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony."). See also Knight v. Kirby Inland Marine Inc., 482 F.3d 347, 354 (5th Cir. 2007) ("We also understand that in epidemiology hardly any study is ever conclusive, and we do not suggest that an expert must back his or her opinion with published studies that unequivocally support his or her conclusions…. Where an expert otherwise reliably utilizes scientific methods to reach a conclusion, lack of textual support may go to the weight, not the admissibility of the expert's testimony…. A contrary requirement would effectively resurrect a Frye-like bright-line standard, not by requiring that a methodology be generally accepted, but by excluding expert testimony not backed by published (and presumably peer-reviewed) studies.").

[54]Exhibit 3, Winstead Dep., at 38:18-39:8.

[55]Id. at 41:13-16, 43:24-44:9.

[56]Id. at 38:2-17.

14

With respect to systemic toxicity (the only mechanism of injury that Plaintiffs intend to present through Dr. Winstead at trial), Dr. Winstead clearly testified that his opinion is supported in a number of ways. Contrary to Defendants' assertions, Dr. Winstead was steadfast in testifying that systemic toxicity is a measurable phenomenon and therefore not a mere hypothesis. He explained that PT, a generic coagulation test that measures clotting speed, acts as a rough indicator of drug blood levels.[57] Dr. Winstead further noted that Mr. Boudreaux's PT was measured at intervals before, during, and after Mr. Boudreaux's hospitalization, and that it was elevated only during his Xarelto use, and normal both before and after he used Xarelto.[58] Referring again to PT, Dr. Winstead said "I think that systemic toxicity is something that can be directly observed . . . in terms of a lab number that you can hang things on…. [W]hen you have a number, that's not really a theory."[59] He added that the risk of systemic toxicity is increased with Xarelto use because, according to Defendants, there is no way to effectively monitor a patient's drug levels.[60]

The idea that an anticoagulant can cause GI bleeding if the drug levels are too high is neither novel nor without basis. Peer-reviewed studies support Dr. Winstead's testimony that systemic toxicity can cause GI bleeding.[61] Even the Xarelto label supports Dr. Winstead's testimony; the United States Xarelto label specifically states that "[s]ignificant increases in rivaroxaban exposure may increase bleeding risk."[62] In fact, that risk is higher with Xarelto than with any other anticoagulant.[63] Dr. Winstead supported this testimony by citing multiple studies

---

[57] *Id.* at 121:20-24.

[58] *Id.* at 202:4-203:18.

[59] *Id.* at 63:8-14.

[60] *Id.* at 67:17-68:1.

[61] *Id.* at 75:25-76:11, 186:15-187:1; Exhibit 2, Winstead Report, at Appendix 2. *See also* Exhibit 8, FDA Briefing Document.

[62] Exhibit 6, Xarelto Prescribing Information, at § 7.4.

[63] *See* Exhibit 3, Winstead Dep., at 133:11-18, 134:5-21, 214:20-24, 186:15-187:1.

and specifically pointing to the United States data in the ROCKET study, which showed a 50% increased risk in causing similar bleeds over warfarin.[64]

## IV.     Dr. Winstead's Clinical Experience Supports His Opinions.

Defendants also argue that Dr. Winstead's opinions are based on anecdotal evidence gleaned from clinical observations of warfarin patients only.[65] Again, Defendants are wrong. Dr. Winstead testified at deposition that he sees patients on all of the available anticoagulants.[66] In any event, Defendants' point is not well-founded, as an expert may rely on a range of evidence, including clinical experiences, in forming his or her opinions.[67] In this regard, the Fifth Circuit has repeatedly held that questions relating to the bases and sources of an expert's opinion should be left to the jury and should not affect a court's preliminary admissibility determination.[68] Thus, Defendants' argument based on anecdotal evidence should therefore be rejected.

## V.     Other Experts in this Case Support Dr. Winstead's Opinions.

Finally, several other experts in this case have provided testimony that supports Dr. Winstead's opinions. *First,* as noted above, Dr. Masri, the admitting physician, diagnosed Mr. Boudreaux with a GI bleed related to his recent use of Xarelto.[69] *Second*, Dr. Joshi, the treating gastroenterologist, testified that it was his opinion to a reasonable degree of medical certainty that Mr. Boudreaux's GI bleed was related to his use of Xarelto.[70] *Third,* Dr. Fail, Mr. Boudreaux's

---

[64]*Id.* at 68:18-69:1, 73:24-74:3, *see also* Exhibit 6, Xarelto Prescribing Information, at § 6.1, Figure 1.

[65]Def. Mem. at 1.

[66]*See* Exhibit 3, Winstead Dep., at 24:17-22, 47:17-21.

[67]*See Moore v. Ashland Chem.*, 126 F.3d 679, 703 (5th Cir. 1997) ("Rule 702, as elucidated by *Daubert*, authorizes a qualified expert in a realm outside of hard science to testify to an opinion or inference based on his knowledge, skill, experience, training, or education if it is soundly grounded in the principles and methodology of his discipline and is relevant to a fact in issue or to an understanding of the evidence.")

[68]*See 14.38 Acres of Land*, 80 F.3d at 1077, *citing Viterbo,* 826 F.2d at 422.

[69]*See* Exhibit 4, Masri Progress Notes.

[70]Exhibit 5, Joshi Dep., at 26:17-28:1.

subsequent treating cardiologist, testified that it was his opinion to a reasonable degree of medical certainty that Xarelto directly caused or contributed to cause Mr. Boudreaux's GI bleed.[71] Even a defense expert, Dr. Smith, concedes that Xarelto was a contributing factor to Mr. Boudreaux's bleed.[72] Given the above, Defendants cannot credibly challenge Dr. Winstead's opinions on specific causation.

## CONCLUSION

For all of the above reasons, Plaintiff respectfully requests that this Court deny Defendants' *Daubert* motion related to Dr. Winstead's specific causation opinion that Xarelto was the most probable cause of Mr. Boudreaux's gastrointestinal hemorrhage and moreover that excessive anticoagulation with Xarelto is capable of causing bleeding. As to Defendants' request to bar Dr. Winstead's testimony related to whether Xarelto causes GI ulcers or direct mucosal toxicity, this request should be denied as moot, as Plaintiffs do not intend to present such testimony from Dr. Winstead at trial.

Respectfully submitted,

Dated:  February 27, 2017

*/s/ Leonard A. Davis*
Leonard A. Davis, Esq. (Bar No. 14190)
**HERMAN, HERMAN & KATZ, LLC**
820 O'Keefe Avenue
New Orleans, LA 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Email: ldavis@hhklawfirm.com

---

[71]Exhibit 9, Fail Dep., at 103:17-20.

[72]Exhibit 10, Smith Dep., at 58:13-16, 60:8-63:7.

17

Gerald E. Meunier (Bar No. 9471)
**GAINSBURGH BENJAMIN DAVID MEUNIER & WARSHAUER, LLC**
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
Email: gmeunier@gainsben.com

*Plaintiffs' Liaison Counsel*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on February 27, 2017, the foregoing memorandum of law was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre- Trial Order No. 17.

*/s/ Leonard A. Davis*
**LEONARD A. DAVIS**