Protected - Subject to Further Protective Review

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE:  XARELTO          )
(RIVAROXABAN) PRODUCTS   )
LIABILITY LITIGATION     )  MDL No.:  2592
                         )  Section:  L
                         )  Judge Eldon E. Fallon
                         )  Mag. Judge North
                         )
THIS DOCUMENT RELATES    )
TO ALL CASES             )




PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW



    Videotaped Deposition of MARC J. KAHN, M.D.,

M.B.A., taken on Monday, January 9, 2017, in the

office of Chaffe McCall, L.L.P., 1100 Poydras

Street, Suite 2300, New Orleans, Louisiana 70163,

commencing at 9:00 a.m.




Reported by:
AURORA M. PERRIEN
CERTIFIED COURT REPORTER
REGISTERED PROFESSIONAL REPORTER

Protected - Subject to Further Protective Review

## Page 2

I N D E X
                                    Page

Caption............................1

Appearances.......................4

Agreement of Counsel...............6

Witness' Certificate..............197

Reporter's Certificate.............198


E X A M I N A T I O N

MR. DENTON.........................8, 191

MR. SLONIM.........................189


E X H I B I T S

Exhibit No. 1......................8
Plaintiffs' Notice with Subpoena Duces
Tecum of Oral Videotaped Deposition...
Exhibit No. 2......................10
Responses and Objections to Plaintiffs'
Notice with Subpoena Duces Tecum...
Exhibit No. 3......................11
(M. Kahn invoices)

Exhibit No. 4......................24
"Update in Hematology and Medical
Oncology:  Evidence Published in 2011"

Exhibit No. 5......................25
Keeping Thinner:  New Oral Anticoagulants,
(PowerPoint presentation)

Exhibit No. 6......................26
Drugs Affecting Hemostasis,
(PowerPoint presentation)

## Page 3

Exhibit No. 7......................28
Expert Report of Marc J. Kahn, MD, MBA

Exhibit No. 8......................124
"Safety, pharmacodynamics, and
Pharmacokinetics of BAY 59-7939-an
oral, direct Factor Xa inhibitor-after
multiple dosing in healthy male subjects"

Exhibit No. 9......................137
"Emergency Management of Bleeding
Associated With Old and New Oral
Anticoagulants"
Exhibit No. 10.....................140
"Managing Bleeding and Emergency
Reversal of Newer Oral Anticoagulants:
A Review for Primary Care Providers"

Exhibit No. 11.....................157
"Rivaroxaban versus Warfarin in
Nonvalvular Atrial Fibrillation"

Exhibit No. 12.....................190
"Characterizing Major Bleeding in
Patients With Nonvalvular Atrial
Fibrillation:  A Pharmacovigilance Study
of 27 467 Patients Taking Rivaroxaban"

Exhibit No. 13.....................191
"Real-world evidence of stroke
prevention in patients with nonvalvular
atrial fibrillation in the United States:
the REVIST-US study"

## Page 4

A P P E A R A N C E S
REPRESENTING PLAINTIFFS:
   SCHLICHTER, BOGARD & DENTON, L.L.P.
   BY:  ROGER DENTON, ESQ.
   100 South 4th Street, Suite 1200
   St. Louis, Missouri 63102
   314.621.6115
   Rdenton@uselaws.com

   HERMAN, HERMAN & KATZ, L.L.P.
   BY:  ANNE "BESS" E. DeVAUGHN
   820 O'Keefe Avenue
   New Orleans, Louisiana 70113
   504.581.4892
   adevaughn@hhklawfirm.com


REPRESENTING BAYER HEALTHCARE PHARMACEUTICALS,
INC., and BAYER PHARMA AG:
   ARNOLD & PORTER KAYE SCHOLER, L.L.P.
   BY:  BERT L. SLONIM, ESQ.
   250 West 55th Street
   New York, New York 10019-9710
   212.836.8897
   Bert.slonim@kayescholer.com

   NELSON, MULLINS, RILEY & SCARBOROUGH,
   L.L.P.
   BY:  MICHAEL W. HOGUE, ESQ.
   1320 Main Street, 17th Floor
   Columbia, South Carolina 29201
   803.255.9514
   Michael.hogue@nelsonmullins.com

## Page 5

REPRESENTING JANSSEN PHARMACEUTICALS, INC.,
JANSSEN RESEARCH & DEVELOPMENT, L.L.C., JANSSEN
ORTHO, L.L.C.:
   BARRASSO, USDIN, KUPPERMAN, FREEMAN &
      SARVER, L.L.C.
   BY:  RICHARD E. SARVER, ESQ.
   909 Poydras Street, Suite 2400
   New Orleans, Louisiana 70112
   504.589.9700
   Rsarver@barrassousdin.com
   BARRASSO, USDIN, KUPPERMAN, FREEMAN &
      SARVER, L.L.C
   BY:  MADISON A. SHARKO, ESQ.
   909 Poydras Street, 24th Floor
   New Orleans, Louisiana 70112
   504.589.9700
   Msharko@barrassousdin.com




ALSO PRESENT:

   MARK ANCALADE, VIDEOGRAPHER

Protected - Subject to Further Protective Review

Page 6

STIPULATION

1
2      It is stipulated by and among Counsel that
3   the videotaped deposition of MARC J. KAHN, M.D.,
4   M.B.A., is being taken under the Federal Rules of
5   Civil Procedure for all purposes permitted under
6   the law.
7      The formalities of reading and signing are
8   not waived.
9      The formalities of sealing, certification
10  and filing are not hereby waived.  The party
11  responsible for services of the discovery material
12  shall retain the original.
13     All objections, except those as to the
14  form of the questions and/or the responsiveness of
15  the answers, are reserved until the time of the
16  trial of this cause.
17         * * * * *
18         Aurora M. Perrien, Certified Court
19  Reporter, Registered Professional Reporter, in and
20  for the State of Louisiana, officiated in
21  administering the oath to the witness.
22
23
24
25

Page 7

PROCEEDINGS

1
2   THE VIDEOGRAPHER:
3      My name is Mark Ancalade, the
4   videographer with Golkow Technologies.
5   Today's date is January the 9th, 2016, at
6   the time indicated on the video screen,
7   which is 9:00 a.m.  Today's deposition is
8   being held at 1100 Poydras Street,
9   Suite 2300, New Orleans, Louisiana, taken
10  in the matter of In Reference:  Xarelto
11  (rivaroxaban) Products Liability
12  Litigation.  Today's deponent is
13  Dr. Marc J. Kahn.  Our court reporter
14  today is Miss Aurora Gonzales [sic].
15     I would ask that counsel please state
16  their name for the record, which
17  thereafter would the court reporter please
18  swear in the witness.
19  MR. DENTON:
20     Roger -- Roger Denton and
21  Bess DeVaughn for the plaintiffs.
22  MR. SLONIM:
23     Bert Slonim on behalf of defendant
24  Bayer.
25  MS. SHARKO:

Page 8

1      Madison Sharko on behalf of defendant
2   Janssen.
3   MR. SARVER:
4      Rick Sarver for Janssen.
5   MR. HOGUE:
6      Michael Hogue, Bayer.
7   (The court reporter swore in the witness.)
8         EXAMINATION
9   BY MR. DENTON:
10  Q.  Good morning, Doctor.
11  A.  Good morning.
12  Q.  Are you ready to allow me to ask you a few
13  questions about your expert report?
14  A.  I am.
15  Q.  Okay.  The first thing I'm going to hand
16  you is Exhibit 1, which is a notice of your
17  deposition.
18     (Exhibit No. 1 was marked for
19     identification and attached hereto.)
20  BY MR. DENTON:
21  Q.  Have you seen that before, Doctor?
22  A.  Yes.  I have.
23  Q.  And have you read through it?
24  A.  Yes.  I have.
25  Q.  In response to that notice of deposition,

Page 9

1   do you have some materials that you brought with
2   you or your counsel brought with you to provide to
3   me?
4   A.  Mr. Slonim has materials for you.
5   MR. SLONIM:
6      We --
7   MR. DENTON:
8      Okay.
9   MR. SLONIM:
10     We do.  We have the following
11  materials.  We have invoices.  I'll hand
12  you a couple of copies.  We have a
13  PowerPoint presentation called "Keeping
14  Thinner," have a medical article titled
15  "Update in Hematology and Medical
16  Oncology" published in 2011, and a
17  PowerPoint presentation of a program that
18  Dr. Kahn gives to medical students.
19  MR. DENTON:
20     Okay.
21  MR. SLONIM:
22     By the way, could I ask you also,
23  Counsel, to just mark the objections to
24  the notice of deposition, just as a
25  housekeeping matter?

3 (Pages 6 to 9)

Protected - Subject to Further Protective Review

Page 10

1    MR. DENTON:
2        (Tenders document.)
3    MR. SLONIM:
4        Thanks.  That's been marked as
5    Deposition Exhibit No. 2.
6        (Exhibit No. 2 was marked for
7    identification and attached hereto.)
8    MR. DENTON:
9        That's -- that's correct.
10   MR. SLONIM:
11       Thank you.
12   BY MR. DENTON:
13       Q.  Doctor, the materials you brought -- when
14   I say "materials" -- and I'll mark these.  But
15   there's one medical article.  It looks like two
16   separate PowerPoints.
17       Did you reference any of those three
18   documents in your report?
19       A.  I did not.
20       Q.  Did you list them on your CV?
21       A.  The article is clearly indicated on my CV.
22   The talk that was given to physicians is on my CV,
23   but talks that I give to medical students are not
24   on my CV.
25       Q.  Okay.  All right.  And we'll -- we'll get

Page 11

1    to those.
2        MR. DENTON:
3        Can I have the invoices, please?
4    MS. DeVAUGHN:
5        Uh-huh.
6    MR. DENTON:
7        I assume each clip, Bert, is a full
8    set?
9    MR. SLONIM:
10       I think so.  Yes.
11   MS. DeVAUGHN:
12       Uh-huh.
13   MR. DENTON:
14       Okay.
15   BY MR. DENTON:
16   Q.  Doctor, I have marked Exhibit 3.
17       (Exhibit No. 3 was marked for
18   identification and attached hereto.)
19   BY MR. DENTON:
20   Q.  Can you identify what that is, please?
21   A.  These are invoices I have provided to
22   Mr. Slonim for reimbursement for services rendered
23   concerning this matter.
24   Q.  I tell you what might be handy for you,
25   Doctor.  As we go through these exhibits, once we

Page 12

1    -- I move on to another one, it's sometimes
2    convenient to take the first one and turn it over.
3    And we stack them up, therefore they're in order
4    if you ever need them again.
5        A.  That's fine.
6        Q.  And here's 2.  Let's put 2 in there.  But
7    keep 3 out.  I'm going to ask you a couple
8    questions about your invoice.
9        A.  That's fine.
10       Q.  The invoices appear to be in chronological
11   order beginning in July.  The first one's dated
12   July 1st, 2016, although it looked like you did
13   some work at the end of June.  Fair enough?  Is
14   that . . .
15       A.  That's correct.
16       Q.  And these invoices are current through
17   your work as of January 2nd, 2017?
18       A.  That is correct.
19       Q.  And what have you done if anything since
20   January 2nd, 2017 that would be charged to this
21   file to Mr. Slonim?
22       A.  I met with Mr. Slonim and Mr. Hogue
23   yesterday and of course the deposition that we've
24   just started.
25       Q.  Okay.  And about how long did the meeting

Page 13

1    yesterday take?  How long did you meet with the
2    lawyers?
3        A.  Four-and-a-half hours --
4        Q.  Okay.
5        A.  -- including travel time.
6        Q.  Where did you have to travel from?
7        A.  My house.
8        Q.  Oh, okay.  Do you charge -- what is your
9    hourly rate?  Five --
10       A.  My hourly rate depends on what I'm doing.
11   For phone conference and review of records, I
12   charge $500 an hour.  For in-person meetings and
13   depositions, I charge $750 an hour.
14       Q.  Okay.  And how much do you charge from
15   your travel time?
16       A.  I included that with office -- in-person
17   meeting.
18       Q.  Okay.  Well, you mentioned that in your
19   last answer.  So I assume you charge them $750 an
20   hour to drive from your home to the meeting?
21       A.  I did.
22       Q.  Okay.
23       A.  It was a half hour total.  But . . .
24       Q.  Okay.  So a half hour drive to -- from the
25   home to wherever you met was $375, you charged

4 (Pages 10 to 13)

Protected - Subject to Further Protective Review

Page 14

1  them for a half hour; correct?
2      A. That's correct. That invoice, I have not
3  submitted.
4      Q. I -- I -- I understand that. But you will
5  submit that --
6      A. Yes.
7      Q. -- intend to submit that?
8      A. Yes.
9      Q. All right. And your -- and I -- your time
10 here today is 750 an hour?
11     A. Yes.
12     Q. Okay. If you're asked to testify in the
13 courthouse here in New Orleans, what is your rate,
14 if it's any different?
15     A. I have to look at my fee schedule, but I
16 believe it's $1200 an hour.
17     Q. $1200 an hour?
18     A. Correct.
19     Q. Do you -- you -- you mentioned a fee
20 schedule. What is that, sir? Do you have some
21 document that you were referring to?
22     A. There's a fee schedule that I provided to
23 Mr. Slonim when I was initially retained in this
24 case.
25     Q. Okay.

Page 15

1      A. I basically iterated to you what the fee
2  schedule states.
3      Q. Fair enough.
4          But I assume you have that on paper
5  somewhere or at least sent it in an e-mail?
6      A. I do.
7      Q. Okay. When were you first contacted by
8  Mr. Slonim to work on this matter?
9      A. To the best of my recollection, the end of
10 June 2016.
11     Q. Okay. And prior to that time, had you
12 performed any expert type-work associated with
13 litigation?
14     A. I have.
15     Q. Can you tell me about that, please.
16     A. So I about five years ago was asked to
17 provide expert testimony regarding an educational
18 matter dealing with a medical student. Perhaps
19 two years before that I was asked to comment on a
20 case that dealt with an employment contract issue.
21     Q. Okay. Have you -- and is that the extent
22 of your litigation experience before this case?
23     A. That's correct.
24     Q. All right. Are you -- well, strike that.
25         Have you participated in a deposition

Page 16

1  before today?
2      A. Yes.
3      Q. How many times?
4      A. I believe three times, two pertaining to
5  the matters that we've already discussed and one
6  about 25 years ago dealing with a medical case
7  when I was a medical resident.
8      Q. All right. And -- so you're -- you're
9  generally familiar with this process. Is that
10 fair?
11     A. That's a fair statement.
12     Q. All right. And you're prepared to answer
13 questions related to the content of your report
14 that I have received in this case; is that
15 correct?
16     A. That's correct.
17     Q. All right. Have you -- well, strike that.
18 Yesterday -- well, I don't know how to ask that.
19 Strike that as well.
20         Have you recently reviewed your report for
21 accuracy or any changes, supplements, or updates
22 you feel you need to make before I present it to
23 you and ask you questions about it?
24     A. I reviewed my text and -- my report both
25 yesterday and this morning.

Page 17

1      Q. Okay. And having done that, Doctor, are
2  there anything that you noted in those reviews
3  that needs to be updated, corrected, or
4  supplemented in that report before we start asking
5  questions about it here today?
6      A. I think I noticed one or two typographical
7  errors. But aside from that, no.
8      Q. So the substance remains unchanged. Fair
9  enough?
10     A. Fair enough.
11     Q. All right. Are there any updates to your
12 CV that was attached to your report that might be
13 in your mind pertinent to this discussion today
14 about Xarelto?
15     A. No. There are some additional articles,
16 but they deal not with Xarelto nor hematology.
17     Q. Okay. What were you asked to do when you
18 were hired at the end of June 2016 with respect to
19 this litigation?
20     A. To the best of my recollection, I was
21 initially approached with a request to educate the
22 court about coagulation matters. That -- I -- I
23 actually never actually performed that task. And
24 then subsequently I was asked if I would be
25 willing to review some cases relevant to the

5 (Pages 14 to 17)

Protected - Subject to Further Protective Review

Page 18

1  rivaroxaban matter.
2      Q.  And when you say "cases," you're talking
3  about individual patients that are part of this
4  litigation.  Is -- is that what you mean?
5      A.  That is correct.
6      Q.  All right.  And I'm not going to ask about
7  those, but -- but I'm just trying to understand
8  the history a little bit.
9      So when you were you -- and I'm not going
10  to ask you today -- we -- we've seen individual
11  reports about certain patients.  They're not on
12  the table today.  What's on the table today is
13  what I call your general or generic report.
14      You understand that?
15      A.  I do.
16      Q.  Okay.  So how did it come about that you
17  were asked to and prepared your generic report?
18      A.  After I was asked to educate the court --
19  again, I did not end up performing that task -- I
20  was asked if I would provide a generic report that
21  would basically summarize the salient features of
22  a presentation to educate the court.
23      Q.  Okay.  So -- and that's what ended up
24  being your generic report?
25      A.  Yes.

Page 19

1      Q.  Okay.  When did -- let me ask this:  What
2  did you do?  Did -- did you do any medical
3  literature search or any other type of research or
4  review of materials before you drafted your
5  generic report?
6      A.  I did.  The basic principles of
7  coagulation, I did not have to rely on outside
8  information as that's something that I've talked
9  about for over 25 years.  Some of the specific
10  issues related to drug effects, etcetera, I did do
11  a literature review.
12      Q.  All right.  Tell me about your practice,
13  Doctor.  What -- you're -- you're -- I -- I know
14  you have a clinical practice.  I believe you have
15  an academic role as well.  But -- but please share
16  with me the highlights of your current practice.
17      A.  I have an active clinical practice.  I am
18  a tenured professor of medicine.  My practice
19  basically focuses on nonmalignant hematology.
20  However, I remain currently board-certified in
21  internal medicine, hematology, and oncology.
22  Although my outpatient practice focuses on
23  nonmalignant hematology, several months a year I
24  participate on our consult service, where I am
25  seeing patients with malignant hematology as well

Page 20

1  as solid tumors.
2      Additionally, I spend time with residents
3  in internal medicine at their -- they used to call
4  them morning reports.  They're now in the
5  afternoon.  I try to attend them several times a
6  month.  I regularly attend medical grand rounds.
7      I believe that summarizes and answers your
8  question.
9      Q.  And how frequently do you see patients in
10  your clinical practice?
11      A.  Every week.
12      Q.  Okay.  And is that every day of every week
13  or --
14      A.  No.  It's --
15      Q.  -- five days -- tell me.
16      A.  I see patients in my private -- it's not
17  private, but it's an academic practice.  A half
18  day a week.  Yes.
19      Q.  Okay.  Could you explain just a little bit
20  more what you mean by "nonmalignant hematology."
21  I think I might know, but I want to hear it from
22  you.
23      A.  So when we talk about hematology,
24  hematology is obviously disorders of the blood.
25  There are people who are hematologists who have a

Page 21

1  particular interest in hematologic malignancies,
2  blood cancers, if you will.
3      Q.  Like leukemias?  Is that --
4      A.  Like leukemias --
5      Q.  Yeah.
6      A.  -- lymphomas --
7      Q.  -- Got you.
8      A.  -- myeloproliferative disorders, and the
9  like.  And there are people who are hematologists
10  who focus more on nonmalignant issues such as
11  coagulation, anemia, low platelets, bleeding
12  disorders, and the like.
13      Q.  And that's the practice -- clinical
14  practice you -- you maintain.  Is that fair?
15      A.  That is correct.  I am more a -- my
16  clinical practice as an outpatient focus is more
17  on nonmalignant hematology.
18      Q.  All right.  And then you've -- you've told
19  me about ground rounds and speaking to students.
20  Do you -- you -- I think you told me you had a
21  full-time academic appointment as well?
22      A.  I do.
23      Q.  What -- could you describe that for me.
24      A.  Sure.
25      I am a tenured professor at Tulane.  I

6 (Pages 18 to 21)

Protected - Subject to Further Protective Review

Page 22

1   have a named professorship called the
2   Peterman-Prosser -- excuse me -- Professorship,
3   and that's a professorship to introduce humanities
4   into medical education. I also have an
5   appointment as a senior associate dean at the
6   medical school. I have an appointment in the
7   department of medicine as well as the department
8   of pharmacology. And I have an appointment at the
9   A.B. Freeman School of Business.
10      Q. But do you have classroom lectures for
11  medical students?
12      A. I have classroom lectures for medical
13  students pretty regularly.
14      Q. And -- and can you give me a sense how, to
15  define that a little bit more.
16      A. For -- I give lectures to medical students
17  during their first year in biochemistry and
18  histology. I also give lectures to second year
19  medical students dealing with pharmacology and
20  hematopathology. I teach third year students more
21  in a clinical -- in a -- more in a -- in clinical
22  situations when they're on my consult team, and
23  similarly, that's how I teach fourth year
24  students.
25      Q. Okay. But how frequently are you in the

Page 23

1   classroom teaching medical students or giving a
2   lecture or presentation?
3       A. I'd say it -- I'd say that my classroom
4   instruction amounts to about 15 percent of my
5   time.
6       Q. And how about your clinical practice where
7   you're actively seeing patients in the clinic the
8   half day a week, what percentage would that be?
9       A. If it's -- the -- the clinical outpatient
10  practice a half day a week would be 10 percent of
11  my time, but you have to add to that the consult
12  service time that I spend two or three months a
13  year. So my actual clinical time, if you want to
14  make it a percentage -- and these are estimates --
15      Q. Understood.
16      A. -- is estimated between 20 and 25 percent.
17      Q. All right. So have you published any
18  medical literature on the topic related to -- in
19  -- in any way related to rivaroxaban?
20      A. Yes.
21      Q. And which articles are those?
22      A. The main article would be the one that was
23  provided you from the Annals of Internal Medicine
24  titled "Update in Hematology . . . Medical
25  Oncology."

Page 24

1       Q. All right.
2       A. There are three authors on that paper.
3       Q. Right. Any other articles before we get
4   to this one?
5       A. No.
6       Q. Let's -- let's go ahead and mark this so
7   we know what it is. I'm going to mark it at the
8   top just not to cover up anything. This is
9   Exhibit 4.
10          (Exhibit No. 4 was marked for
11          identification and attached hereto.)
12  BY MR. DENTON:
13      Q. That's -- that's the article you just were
14  talking about, Doctor, that relates to rivaroxaban
15  in some way?
16      A. That's correct.
17      Q. And it -- and that -- and was this article
18  on your CV?
19      A. It was.
20      Q. Okay. All right. All right. Let's set
21  that aside a second.
22          So that's the only publy -- published
23  literature that you're an author or coauthor
24  related to rivaroxaban. Is that fair?
25      A. That's the only published manuscript.

Page 25

1   Correct.
2       Q. All right. Now, I want to just mark for
3   purposes of identification some other materials
4   your lawyer has handed me this morning that we've
5   referenced, but let's make it official. I'm going
6   to hand you Exhibit 5, which appears to be a copy
7   of a PowerPoint presentation.
8          (Exhibit No. 5 was marked for
9          identification and attached hereto.)
10  BY MR. DENTON:
11      Q. Tell me what Exhibit 5 is, please.
12      A. Exhibit 5 is a -- are a copy of the slides
13  for a talk that I gave. I believe that this was a
14  talk that I gave in Panama City, Panama, but I
15  could be mistaken.
16      Q. Okay. So you think it might have been in
17  Panama City, Panama?
18      A. It's on my CV.
19      Q. Okay. And who asked you to present at
20  this -- I assume it was a medical conference of
21  some type?
22      A. It was. It was the Latin American College
23  of Physicians and the American College of
24  Physicians.
25      Q. Okay. And I didn't see it on your CV.

7 (Pages 22 to 25)

Page 26

1    Do you have an approximate date?
2    MR. SLONIM:
3        It is on the CV.
4    MR. DENTON:
5        I understand it is.  I -- I said I
6    didn't see it.
7    MR. SLONIM:
8        Okay.
9    MR. DENTON:
10       I'm not --
11   MR. SLONIM:
12       Okay.
13   MR. DENTON:
14       -- disputing that it's there.  I'm
15   just ask -- actually, what I'm trying to
16   find out is about when this was presented.
17   THE WITNESS:
18       I -- I -- I can check my CV, but I
19   suppose it was 2012.
20   BY MR. DENTON:
21   Q.  Okay.  All right.  Let's look at No. 6
22   here.
23       (Exhibit No. 6 was marked for
24       identification and attached hereto.)
25   BY MR. DENTON:

Page 27

1    Q.  Tell us what No. 6 is, please.
2    A.  Number 6 are representative slides -- not
3    representative, but the sum total slides for a
4    talk that I give to second year medical students
5    in their pharmacology course.
6    Q.  Okay.  And do you know about when you
7    created these slides?  Or perhaps it's a continuum
8    of time.  But give me your best judgment.
9    A.  So I -- this is not a talk that I've
10   always given.  I was asked to give it I believe
11   for the past two years.  This is a talk that would
12   be given in August, so that would be August of
13   2015 and August of 2016.  There were slides
14   provided me from the previous person that gave the
15   talk, and I modified, updated, and corrected the
16   slides provided me.
17   Q.  Okay.  Who provided the original slides to
18   you?
19   A.  I believe that this lecture was previously
20   given by a pharmacologist whose name is
21   William George.
22   Q.  Okay.  All right.  Well, we'll get into
23   these documents later.  I'm just trying to figure
24   out the universe of topics here before we go much
25   further.  Back to your --

Page 28

1    MR. DENTON:
2        Well, let's just mark his generic
3    report, so we have it out on the table
4    here.
5        (Exhibit No. 7 was marked for
6        identification and attached hereto.)
7    BY MR. DENTON:
8    Q.  Doctor, Exhibit 7, can you identify what
9    that is, please.
10   A.  Exhibit 7 is a copy of my expert report
11   talking about the coagulation cascade, talking
12   about rivaroxaban, and it's also a copy of my CV
13   current as of November 2016.
14   Q.  Right.
15   A.  Oh.  And in the back -- I'm sorry.  I
16   didn't notice that.  In the back, there's a --
17   labeled Exhibit B are materials considered when I
18   wrote my expert report.
19   Q.  Right.  And that's numbered -- there's
20   1 through I believe 60?
21   A.  I believe that is correct.
22   Q.  Right.  Okay.  So how did you decide which
23   materials you were going to review or consider in
24   drafting this report?  How'd you go about making
25   that decision?

Page 29

1    A.  So when I drafted this report many of the
2    citations came from literature that I'm familiar
3    with, but I also did PubMed searches to answer
4    some specific questions.  And I basically did the
5    same type of literature review that I do nearly
6    every day when asked to write review articles
7    and/or textbook chapters -- it's the same
8    process -- or when I see a particular patient and
9    have a particular clinical question.
10   Q.  All right.  So -- but there are a number
11   of articles about rivaroxaban that -- I assume you
12   found in your research that aren't on Exhibit B.
13   True?
14   A.  When you put "rivaroxaban" and anything
15   else as a mesh term into PubMed, you can get
16   thousands of articles.  And clearly I did not
17   review thousands of articles.
18   Q.  I -- I understand that, and I'm not
19   suggesting you should have.
20       What I'm trying to drill down on is -- you
21   picked 60 articles.  How was it that you
22   determined that it was this 60 that you thought
23   were necessary to review for your report?
24   A.  I included -- I include articles that have
25   a high level of evidence based on their

Protected - Subject to Further Protective Review

Page 30

1  methodology and based on the relative impact
2  factor of the journals they were published in. I
3  speak English only. So if there was an article
4  not in English, obviously that's not included in
5  my reference list. And again, I'm periodically
6  asked to write review articles and textbook
7  chapters, and I go through the same process as I
8  did for this report.
9     Q. Okay. Well, we'll -- we'll -- we'll probe
10 that a little bit later.
11    There were two I think FDA material. Look
12 at -- I'll just focus you on No. 1 on Exhibit B.
13    A. Correct.
14    Q. How'd you go about obtaining that
15 document?
16    A. So under Exhibit B, Item 1 was provided me
17 by Mr. Slonim.
18    Q. All right. Go to No. 24, which is the
19 next page. It's labeled "FDA, Medical Review for
20 NDA 202439." How'd you get that?
21    A. That similarly was provided for me by
22 Mr. Slonim.
23    Q. Were there any other matter -- or
24 materials provided to you by counsel for Bayer?
25    A. Item 58, the prescribing information, was

Page 31

1  also provided to me. I believe the most recent
2  prescribing information I obtained myself through
3  the PDR, but I don't keep copies of older PDRs for
4  the older information.
5     Q. Okay. And Physicians' Desk Reference is
6  what you're -- mean by the PDR?
7     A. The PDR is the Physicians' Desk Reference.
8  Yes.
9     Q. Right. Okay. Let's go to Page 3 of your
10 report. And before I ask you about those things,
11 I'm going to remove a few other things from my
12 list here.
13    Have you reviewed any depositions of
14 company witnesses? That would be employees of
15 either Bayer or -- or the Janssen Pharmaceutical
16 Company?
17    A. I have not.
18    Q. Have you been provided any what I will
19 call internal documents, documents that are in the
20 possession only of Bayer employees or Janssen
21 Pharmaceutical employees?
22    A. I have not.
23    Q. Have you -- you mentioned somewhere in
24 your report that you looked at Dr. Rinder's report
25 and Dr. Leissinger's report. Actually it's on

Page 32

1  Page 3 of this exhibit.
2     Have you looked at any other expert
3  reports other than Dr. Leissinger and Dr. Rinder?
4     A. I believe there was a report from
5  Dr. Winstead that I also reviewed.
6     Q. Yeah. And I saw that mentioned, but that
7  was in the case-specific I think report for
8  Mr. Boudreaux.
9     So -- so we got Dr. Winstead, Dr. Rinder,
10 Dr. Leissinger. Those are the only medical -- or
11 expert reports you've reviewed; correct?
12    A. Correct.
13    Q. And -- and that includes no defendant
14 expert reports; correct?
15    A. Correct.
16    Q. Have you reviewed the depositions of any
17 of the expert witnesses? For example, Dr. Rinder,
18 have you reviewed his deposition?
19    A. I have not.
20    Q. Dr. Leissinger, have you reviewed her
21 depositions?
22    A. I have not.
23    Q. Okay. Your medical practice, Doctor, your
24 clinical practice, you have colleagues in that
25 practice with you; right?

Page 33

1     A. That is correct.
2     Q. And how large is that practice? How many
3  physicians are in your -- your practice?
4     A. We've recently had some attrition, but
5  it's about ten.
6     Q. Okay. And one is Dr. Leissinger?
7     A. Dr. Leissinger is in my practice. Yes.
8     Q. And she's a hematologist?
9     A. Dr. Leissinger is a hematologist. Yes.
10    Q. And she's a well-trained hematologist?
11    A. Dr. Leissinger's a well-trained
12 hematologist.
13    Q. And -- and -- and holds a good reputation
14 in the medical community here in New Orleans as a
15 hematologist; correct?
16    A. I consider Dr. Leissinger a good
17 hematologist.
18    Q. All right. I assume you don't know
19 Dr. Rinder personally?
20    A. I do not.
21    Q. All right. Do you know Dr. Winstead?
22 He's a gastroenterologist, GI doctor, here in
23 town?
24    A. I do.
25    Q. And how do you know Dr. Winstead?

9 (Pages 30 to 33)

Protected - Subject to Further Protective Review

Page 34

1     A. I knew Dr. Winstead when he was a medical
2  student.  I helped mentor him into internal
3  medicine.  I worked with him closely when he was
4  my chief resident.  I helped him get his
5  fellowship at UAB.  And we still maintain some
6  contact.
7     Q. Is he a good physician?
8     A. I consider Dr. Winstead a good physician.
9     Q. Well-qualified in his specialty?
10    A. Dr. Winstead is well-qualified in his
11  specialty.
12    Q. Okay.  Do you know Dr. Frank Smart?  He's
13  a cardiologist at LSU.
14    A. I do know Dr. Frank Smart.
15    Q. And how do you know Dr. Smart?
16    A. At one point Dr. Smart was on our
17  cardiology faculty at Tulane.  We worked together.
18  Dr. Smart and I both teach a board review course
19  for the American College of Physicians in the
20  spring of every year for at least the past
21  five years.
22    Q. Is Dr. Smart a well-qualified
23  cardiologist?
24    A. Dr. Smart is a qualified cardiologist.
25    Q. Holds a good reputation in the community?

Page 35

1     A. I consider Dr. Smart a good cardiologist.
2     Q. All right.  Do you know Ed Peters, Ph.D.,
3  epidemiologist?
4     A. I do not.
5     Q. Okay.  What about Wayne Backes, Ph.D., a
6  pharmacologist here in town?
7     A. I do not.
8     Q. All right.  Prior to this litigation work,
9  Dr. Kahn, had -- did you have any association with
10  either Janssen or Bayer where you were paid for
11  any type of work, whether it be consulting,
12  presentation, key opinion leader, anything like
13  that?
14    A. I have not previously been paid by Bayer
15  or Janssen.
16    Q. All right.  Have you done any paid work
17  for any other pharma- -- pharmaceutical company?
18    A. I have not.
19    Q. Okay.  Do you allow sales representatives
20  of the drug companies within your clinical
21  practice or your hospital?
22    A. I don't control what goes on in the
23  hospital, but I do not allow -- I do not entertain
24  visits from pharmaceutical reps in my office or in
25  my clinic.

Page 36

1     Q. Okay.  And is that true across your
2  clinic, or is it individualized depending on the
3  physician within your clinic?
4     A. The hospital has rules regarding
5  pharmaceutical reps being in clinic, that they're
6  not allowed in clinic.  I don't know what my
7  colleagues do in their private offices.
8     Q. Okay.  Have you spoken to Dr. Leissinger
9  about her report or your report or anything to do
10  with this litigation?
11    A. I have not.
12    Q. Has she tried to speak to you about it?
13    A. She has not.
14    Q. All right.  Back to your report,
15  Exhibit --
16        MR. SLONIM:
17           What is it?  Seven?
18        MR. DENTON:
19           Seven.
20        MS. DeVAUGHN:
21           Yes.
22  BY MR. DENTON:
23    Q. Page 3, you -- you have summarized your
24  opinions there.  It's A through G, granted some
25  overlap.

Page 37

1        But generally are those your opinions
2  related to rivaroxaban that you're going to give
3  at the time of trial if asked to?
4     A. Yes, with one trivial exception.  These
5  drugs as a class are now called DOACs officially.
6  So I would probably use the term "DOAC" rather
7  than "NOAC," "DOAC" standing for direct oral
8  anticoagulant.
9     Q. Other than that change in nomenclature, is
10  there anything else you need to change about your
11  opinions -- summary of opinions that are listed on
12  Page 3 of your report?
13    A. No.
14    Q. All right.  And is it fair to say,
15  Dr. Kahn, that your opinions are based upon your
16  clinical practice and experience, your medical
17  training, and the review of the literature that
18  you have attached as Exhibit B?  That's
19  essentially the bases of your opinions; correct?
20    A. My opinions are based on my training,
21  medical practice, attendance at meetings, national
22  meetings, and my review of the medical literature.
23  Correct.
24    Q. Okay.  Have you attended national meetings
25  where rivaroxaban has been discussed?

10 (Pages 34 to 37)

Protected - Subject to Further Protective Review

Page 38

1    A. Yes.
2    Q. And do you recall anything about those
3  events specifically?
4    A. I've attended the meetings -- annual
5  meetings of the American Society of Hematology for
6  the past 25 years.  Rivaroxaban was FDA approved
7  on or around 2011.  As a nonmalignant
8  hematologist, I tend to go to sessions that focus
9  on nonmalignant hematology.  So yes, I do -- I
10  have attended national talks on the DOACs as a
11  class, including rivaroxaban.
12    Q. Fair enough.
13      Speaking of DOACs as a class, do you
14  prescribe, first of all, rivaroxaban in your
15  practice?
16    A. I do.
17    Q. Dabigatran?
18    A. I don't.
19    Q. Apixaban?
20    A. I do.
21    Q. What's the new one?
22    A. Edoxaban.
23    Q. Edoxaban?
24    A. I don't.
25    Q. Okay.  What about warfarin?  You still use

Page 39

1  warfarin?
2    A. I do.
3    Q. Okay.  Is there a reason you don't use
4  dabigatran?
5    A. I think dabigatran can be sometimes
6  cumbersome to use.  These drugs, I personally
7  initiate anticoagulation medications for patients
8  who have had a thromboembolic event.  Dabigatran's
9  a bit more complicated because the FDA approval
10  requires that dabigatran be started after you've
11  used another parenteral agent, and I find that
12  cumbersome.  So for that reason, I tend not to use
13  dabigatran.
14    Q. Got it.  So let me see if I can unpack
15  that and say it like a not-so-sophisticated
16  lawyer.
17      The first part of that answer I think I
18  heard is you typically are considering
19  anticoagulation therapy in the context of a
20  patient that has had a thrombosis of some type?
21    A. That is correct.
22    Q. Either -- and are there any particular
23  types of thrombosis you deal with, or does it run
24  the spectrum?
25    A. It runs a spectrum.

Page 40

1    Q. So it could be a clot in the leg?  It
2  could be a PE in the lung?
3    A. That's correct.
4    Q. Okay.  So you see a patient who's already
5  had a thrombosis, and you are to provide some type
6  of therapy to deal with that condition?  That's
7  the typical situation where you get involved in --
8  with a patient.  Is that fair?
9    A. That's a very fair statement.
10    Q. Okay.  And then back to dabigatran, if I
11  understood your answer in an unsophisticated
12  way -- see if I'm close.
13      The prescribing label for dabigatran,
14  which is Pradaxa, says in the acute phase the
15  initiation of some other agent, perhaps Lovenox or
16  enoxaparin, for a number of days, and then switch
17  over to dabigatran.  Is -- did I get that close?
18    A. You did.
19    Q. Okay.  And that's your -- the part of --
20  about that that you find cumbersome?
21    A. Correct.
22    Q. All right.  Now, you -- you told me you --
23  you use apixaban and you use rivaroxaban, the two
24  Xa anticoagulants, the newer ones; right?
25    A. That's correct.

Page 41

1    Q. And -- and how do you distinguish or
2  determine on a patient basis which one of those
3  two that you prescribe?
4    A. Quite practically it often depends on
5  which one is covered by a given patient's
6  insurance, and often it's the insurance company
7  that dictates which of the two that I use.
8    Q. All right.  Do you treat patients in the
9  clinic that have a-fib?
10    A. I have patients in my clinical practice
11  with atrial fibrillation.
12    Q. But are you the physician that is managing
13  their anticoagulation therapy for the a-fib
14  condition?
15    A. Most commonly patients are put -- with
16  atrial fibrillation are anticoagulated either by
17  their cardiologist or general internist.
18    Q. Okay.  So typically a patient with a-fib
19  wouldn't present in your clinic and you would be
20  the initiator of anticoagulation therapy?
21    A. In my clinic, that is correct.  When I do
22  hospital service, occasionally there are patients
23  that we're asked to see who have atrial
24  fibrillation who for whatever reason are not
25  anticoagulated, and in that setting I might

Protected - Subject to Further Protective Review

Page 42

1  initiate therapy.
2      Q.  Okay.  But that would be -- strike that.
3  I -- I understood your answer.
4      What do you use warfarin for?  What type
5  of patient?
6      A.  So there are patients that I see who have
7  unusual etiologies of thrombosis.  Most
8  specifically, I have several patients with
9  antiphospholipid antibodies.  None of the DOACs
10  currently have FDA approval to be used in that
11  setting.  Not that you can't use a drug off label,
12  but they just don't have that indication.  Many of
13  those patients have been on warfarin for a long
14  time and are doing well and I do not see any
15  reason to change them to a newer medication.
16      Q.  Okay.  And so had that been your view with
17  respect to the DOACs entering the market here more
18  recently?  If you've had a long-term patient who's
19  doing well on warfarin, you do not switch them to
20  the -- to a DOAC?
21      A.  That's correct, unless the patient
22  specifically ask -- asks me if that would be a
23  good alternative.
24      Q.  Okay.  And how do you manage the INR of
25  your warfarin patients?  Do you have a clinic?  Do

Page 43

1  you have someone in your office that does that?
2  How -- how do you go about handling that?
3      A.  So it's both of those things.  We do have
4  a Coumadin clinic at Tulane, which is helpful for
5  patients who are newly started on warfarin.  I
6  have several patients who have been on warfarin
7  for 20-plus years and because they're stable I
8  manage that myself.
9      Q.  Okay.  And how do you go about managing
10  that yourself?  Do you use point-of-care devices,
11  home devices, or do you bring them to the lab?
12  How do you do that?
13      A.  Most of my patients' insurance companies
14  and themselves can't afford point-of-care testing,
15  so they are brought into the clinic to have INR
16  testing.
17      Q.  Okay.  Do you use any point-of-care
18  devices either in your clinic or have patients
19  that use them at home for managing warfarin
20  therapy?
21      A.  Not in my practice.
22      Q.  All right.  I want to ask you a couple of
23  questions about your opinions.  I want to focus on
24  Page 3, Roman numeral 2, Subparagraph D, which is
25  one of your opinions.  Do you see where I'm at?

Page 44

1      A.  I do.
2      Q.  You say, "Rivaroxaban is an anticoagulant
3  with predictable pharmacokinetics and
4  pharmacodynamics."  I know it goes on, but I want
5  to stop right there.
6      What do you base that opinion upon, the
7  concept of predictable pharmacokinetics and
8  pharmacodynamics?
9      A.  I base that opinion on the Phase I and II
10  studies.  Most notably Dr. Mueck, who -- M-U-E-K-E
11  [sic], who I cited in my report --
12      Q.  Right.
13      A.  -- has some pharmacokinetic information
14  that supports that contention.
15      Q.  Okay.  So it's the Bayer
16  pharmacokineticist that's published on this that
17  you're relying on, Dr. Mueck?
18      A.  I am relying on Dr. Mueck.
19      Q.  All right.  And you -- you've not met him,
20  have you?
21      A.  I have never met him.
22      Q.  All right.  It goes on to say in
23  Subparagraph 2D, Rivaroxaban has "moderate amount
24  of inter patient variability."
25      Is it the same answer?  You're relying on

Page 45

1  Dr. Mueck's publications?
2      A.  There's pharmaco -- I think that moderate
3  interpatient variability is actually defined
4  pharmacokinetically as 30 to 40 percent
5  variability.  When you look at look at the
6  correlation -- I'm sorry -- the standard error of
7  the mean of the -- of the serum concentrations --
8  and that comes directly from the pharmaco --
9  pharmacokinetic data and directly from a
10  definition that's commonly accepted among
11  pharmacologists.
12      Q.  Specifically, though, you're referring to
13  Mueck publications --
14      A.  I'm referring to --
15      Q.  -- for the data?
16      A.  I'm referring to the Mueck publications.
17  There's also I think -- I'd have to check.  I
18  believe in the FDA report there's some
19  pharmacokinetic data as well that supports that
20  contention.
21      Q.  Okay.  And we're going to get into the
22  specific stuff.  I'm just trying to get a bracket
23  around what I need to talk to you about.
24      You also mention that rivaroxaban has a,
25  quote, wide therapeutic window, end quote.  What

Protected - Subject to Further Protective Review

Page 46

1  do you base that on?
2      A.  So therapeutic window from a pharmacology
3  perspective is defined as a ratio between the LD50
4  and the ED50.  When you say something has a narrow
5  therapeutic index, you tend to -- the literature
6  supports that that ratio is 2 or less.  In studies
7  looking at rivaroxaban, the LD50 has not yet been
8  -- been reached in doses tried in human patients,
9  hence the ratio is much greater than 2 and
10  actually unknown, making this a wide therapeutic
11  window.
12      Q.  Well, what is the minimum concentration of
13  rivaroxaban that's necessary to provide efficacy
14  against thrombosis?
15      A.  I'd have to check the literature, but I
16  believe it's somewhere around 50 micrograms per
17  liter.
18      Q.  You believe there's literature that
19  supports that?
20      A.  I believe there's literature that supports
21  that.
22      Q.  Okay.  And that literature would somewhere
23  be on your Exhibit B list of materials here;
24  right?
25      A.  It would be somewhere in the literature

Page 47

1  that I cited.
2      Q.  Yes, sir.  Okay.
3      A.  I'd like to make a clarification to that
4  statement.
5      Q.  Absolutely.
6      A.  Again, if the ED50 isn't known precisely
7  but we have not yet reached the LD50, because that
8  number is so high, the therapeutic -- that ratio
9  is not going to be less than 2.
10      Q.  Fair enough.
11          So the -- so the reality is the
12  therapeutic window of rivaroxaban has yet to be
13  established; right?
14      A.  The reality is is that the therapeutic
15  window in rivaroxaban is wide because we have not
16  yet determined the LD50.
17      Q.  But it's true we don't know what the
18  therapeutic window is, do we?
19      A.  We know it's not less than 2, but we don't
20  know the precise number because we don't -- we've
21  not yet reached the upper limit.
22      Q.  Well, we don't know what the lower limit
23  is either, do we?
24      A.  As I stated, I believe the lower limit is
25  somewhere around 50 micrograms per liter.

Page 48

1      Q.  Okay.  All right.  And we'll get into
2  that.  Because you've told me there's some
3  literature in Exhibit B that would -- would
4  support that conclusion; correct?
5      A.  That's what I've told you.
6      Q.  All right.  I'm going to move to
7  Paragraph 2E on Page 3 of your report, Exhibit 7.
8  Are you with me?
9      A.  I am.
10      Q.  The last sentence, you say, "Real World
11  data continues to affirm the safety and efficacy
12  of rivaroxaban."
13          Do you see where I'm at?
14      A.  I do.
15      Q.  What real-world data are you talking
16  about?
17      A.  There's several articles that I cited in
18  my report.
19      Q.  Okay.
20      A.  If I can take a look at those, I can --
21      Q.  You can look at anything you need to.
22      A.  -- probably give you a name or two.
23      Q.  All right.
24      A.  I believe there's a hyphenated name
25  beginning with an L.  Nope.  That's the wrong one.

Page 49

1          The Camm, Item 12 in Exhibit B, "a
2  real-world, perspective, observational study of
3  patients treated with rivaroxaban for stroke
4  prevention in atrial fibrillation."
5      Q.  The XANTUS study; right?
6      A.  That is correct.
7      Q.  Okay.
8      A.  There are some others in my report if you
9  give me a minute.
10      Q.  I'll help you.  Go to Page 12 of your
11  report.  That might help.  It's not a memory test.
12  I just want to make sure I'm understanding your
13  testimony.
14      A.  Those would be the studies I've used.
15  Yes.
16      Q.  XANTUS, PHSS and REVISIT-US?
17      A.  Correct.
18      Q.  Okay.  Did you go out and research other
19  real-world studies on the safety and efficacy of
20  rivaroxaban besides these three studies?
21      A.  None that are not included in my reference
22  list.
23      Q.  Why not?
24      A.  When you look at the evidence -- when you
25  -- when you make an evidence-based decision, it's

13 (Pages 46 to 49)

Protected - Subject to Further Protective Review

Page 50

1  important to look at the quality of the data,
2  which is reflected by the methodology of the work
3  as well as the relative -- the impact factor or
4  the relative reputation of the journal.  Journals
5  with higher impact factors get that impact factor
6  because articles published within them are
7  cross-referenced more often than those that have
8  lower impact factors.  That is a result of a
9  stringent review process that ensures that those
10 studies are high quality.  So again, in that I
11 don't speak languages other than English very
12 well, I would have exclude -- I would exclude
13 studies that aren't published in the English
14 language, and then I would look at studies that
15 were well done, published in high quality
16 journals --
17     Q.  Well --
18     A.  -- much the same way I would do if I were
19 writing a review article or a textbook chapter.
20     Q.  All right.  Fair enough.
21         Now, let me ask you this:  Did you in your
22 PubMed search do research into the real-world
23 population studies related to rivaroxaban safety
24 and efficacy?  Did you do such a search?
25     A.  Without stating the exact mesh terms,

Page 51

1  which I don't remember, yes, that would be the
2  sort of search that I would do.
3     Q.  All right.  And did you find other
4  real-world literature on real-world safety and
5  efficacy of rivaroxaban in addition to these
6  three, XANTUS, PHSS, and REVISIT-us?
7     A.  Not that were in the English literature
8  and published in high quality journals, no.
9     Q.  Well, did you find English articles that
10 you just discounted because of the journal they
11 were in and didn't review them?
12     A.  If you put in as mesh terms "rivaroxaban
13 real world," I don't know how many citations
14 you'll get, but I would suspect it would be
15 several hundred.  So to say that I read all
16 hundred would be not be true.
17         Again, I looked for journals in the
18 English literature that were published in high
19 quality journals, and those are the ones that I
20 cited.  And those are the ones that form the basis
21 of my report.
22     Q.  I understand you cited them.  I understand
23 they form the basis of your report.
24         But what I'm asking is:  Did you find
25 other similarly conducted real-world safety

Page 52

1  studies on rivaroxaban in the English language in
2  your search that you discounted and did not
3  include in your review because of the journal they
4  were published in?
5         MR. SLONIM:
6             Objection.  Asked and answered.  You
7  can answer.
8         THE WITNESS:
9             I'm not sure that -- that I discounted
10 studies solely based on the journal.  But
11 there's a process that one goes through
12 when one does an evidence-based review.
13 Certainly the quality of the journal is
14 part of the decision process.  The other
15 thing that's part of the decision process
16 is the methodology of the study, the
17 number of patients in the study, whether
18 or not this was merely observational,
19 whether or not there was a control group,
20 and a host of other factors.
21 BY MR. DENTON:
22     Q.  All right.  But my question really is
23 broader than that and maybe not articulated well.
24         Were there other real-world safety studies
25 related to rivaroxaban in the English language

Page 53

1  that you reviewed and decided not to comment on
2  them in your report?  Yes or no?
3         MR. SLONIM:
4             Objection.
5         THE WITNESS:
6             I don't believe that to be a yes/no
7  question.
8  BY MR. DENTON:
9     Q.  Well, give me --
10    A.  I think the --
11    Q.  -- your best answer.
12    A.  -- definition of "reviewed" needs to be
13 made.  So if you meant did an article come up in
14 PubMed based on the search and did I look at the
15 title and the journal -- is that considered a
16 review or does "review" mean that I read the
17 abstract or does "review" mean that I actually
18 read the entire paper?  I can't answer that as a
19 yes/no question.
20    Q.  Well, give me your answer, then.  Answer
21 any --
22    A.  I just gave you --
23    Q.  -- way you want.
24    A.  -- my answer.
25    Q.  Well, did -- did you -- well, what I'm

14 (Pages 50 to 53)

Protected - Subject to Further Protective Review

Page 54

1  trying to find out is -- you -- you picked out
2  three studies funded by Bayer and Janssen; right?
3      A. I don't know that they were funded by
4  Bayer and Janssen.
5      Q. Okay. Well, did you read the articles?
6      A. I read the articles.
7      Q. And the articles have funding information
8  on them, don't they?
9      A. Articles have funding information.
10     Q. All right. Did you read, whether it be
11  the abstract or the complete article, any other
12  English language real-world safety studies with
13  respect to rivaroxaban?
14     A. I'm sure that I did.
15     Q. Okay. Do you recall any of them?
16     A. I do not.
17     Q. Do you know why you did not cite them in
18  your report or list them in Exhibit B of the
19  materials you reviewed?
20     A. I would not have cited them if they didn't
21  meet the selection criteria that I've iterated
22  before, that being that they're well-designed
23  studies in the English literature that appear in
24  high impact journals.
25     Q. And you did not cite any of those articles

Page 55

1  or list any of those articles in the materials
2  considered in Exhibit B of your report; correct?
3      A. As they did not contribute to the
4  substance of my report, they are not listed in the
5  reference list.
6      Q. Okay. Well, you do know, don't you,
7  Dr. Kahn, that there are several real-world safety
8  studies concerning rivaroxaban that have been
9  published in peer review medical literature that
10  you do not cite in your report. True?
11         MR. SLONIM:
12            Objection.
13  BY MR. DENTON:
14     Q. You can answer, I believe.
15         MR. SLONIM:
16            You can -- yes.
17         THE WITNESS:
18            Oh, I'm sorry. I --
19         MR. SLONIM:
20            Oh. It's okay.
21         MR. DENTON:
22            It's okay to answer. He was looking
23  at --
24         THE WITNESS:
25            Oh, okay. I'm sorry.

Page 56

1         MR. DENTON:
2            -- me whether he should --
3         MR. SLONIM:
4            Sorry.
5         MR. DENTON:
6            -- answer.
7         MR. SLONIM:
8            I'm sorry.
9         THE WITNESS:
10           I think to assume that the three
11       articles that I've cited are the only
12       articles in the English literature would
13       be foolhardy. Obviously there are other
14       articles in the literature.
15  BY MR. DENTON:
16     Q. All right. Let's go back to Page 3, back
17  to your summary opinions. I'm going to now go
18  down one to Roman numeral 2, Subparagraph F. You
19  state, "PT is not a good measurement to use with
20  any . . . factor Xa" inhibitor, "including
21  rivaroxaban." Do you -- are you -- are you with
22  me?
23     A. I am.
24     Q. Okay. What do you base that opinion upon?
25     A. I base that opinion on a review of the

Page 57

1  literature, the articles that I've cited, and my
2  knowledge of recommendations of every -- there's
3  not a single society that recommends PT testing
4  for rivaroxaban, whether that be the American
5  College of Chest Physicians, the American College
6  of Cardiology, the American Society of Hematology,
7  or any others. It's on that basis that I make
8  that statement.
9      Q. All right. You do use PT in your practice
10  of hematology; correct, Doctor?
11     A. Of course.
12     Q. And you use it as a PT/INR in warfarin
13  patients; correct?
14     A. I use the INR in patients taking warfarin.
15  Correct.
16     Q. But the INR is simply a normalized ratio
17  of a PT test; right?
18     A. That is not correct.
19     Q. What is it then?
20     A. The INR is a ratio of the PT in the
21  patient to PT control raised to a factor called
22  the ISI, or the international sensitivity index.
23     Q. Right. But it's a -- but the test itself
24  is a PT test; correct?
25     A. An INR is based on a PT result, yes, in

Golkow Technologies, Inc - 877.370.3377

Protected - Subject to Further Protective Review

Page 58

1  seconds.
2      Q.  All right.  What else do you use PT tests
3  for in your practice other than warfarin therapy,
4  if anything?
5      A.  So I use a PT test to evaluate patients
6  with liver disease as a proxy for liver synthetic
7  function.  I use a PT test if I'm evaluating a
8  bleeding patient, to see if they have an
9  abnormality with say -- an abnormality such as
10  Factor VII deficiency.  That's typically when I
11  use a prothrombin time.
12      Q.  Do you visit with patients in emergency
13  rooms?  Is that part of your practice?  I say
14  "visit."  That's probably a little bit inaccurate.
15  Treat, consult.
16      A.  So when I'm on the consult service, we are
17  frequently asked to see patients in the emergency
18  room.  Yes.
19      Q.  And how often does that happen for you?
20      A.  "How often" based on how often when I'm on
21  service or how many months I'm on service or how
22  many times a year?  Can you qualify that question?
23      Q.  Sure.
24      How many days a year do you treat patients
25  in the emergency room or consult with patients in

Page 59

1  the emergency room?
2      A.  I'd be estimating that to be 20.
3      Q.  Twenty days a year?
4      A.  Correct.
5      Q.  And is that an eight-hour shift, a
6  twelve-hour shift, or is that just going through
7  rounds?  Give me a sense of that.
8      A.  So when we're on the consult service,
9  we're asked to see patients with either
10  abnormalities -- either hematologic abnormalities
11  or oncologic abnormalities.  Sometimes those are
12  patients known to our practice, and frequently
13  such patients come to the emergency room to get
14  admitted.  Further, sometimes patients come into
15  the emergency room with bleeding problems, do not
16  yet have a bed, may or may not need to be
17  admitted, and a hematology consult may be
18  requested.
19      Q.  Right.  So do you have an eight-hour shift
20  you cover on those 20 days a year, or -- or how
21  does that work?
22      A.  So I --
23      Q.  I'm trying to get a sense of how many
24  patients you actually yourself see or consult with
25  in an emergency room on a annual basis.

Page 60

1      A.  I understand.
2      So I don't work eight-hour shifts, and I
3  don't work specifically in the emergency room.
4  I'm a consultant for the hospital.  And as a
5  consultant for the hospital, we're asked to see
6  patients in the emergency room, on the wards, in
7  the ICU, bunches of different places.
8      As I mentioned before, I am on the consult
9  service two or three months a year.  When I'm on
10  the consult service, I'm on the consult service
11  for five days straight, 24 hours.  Now,
12  fortunately my specialty is one that doesn't
13  frequently get called at night, but it does happen
14  occasionally.
15      Q.  Got it.  All right.
16      Let's look at your opinion, Page 3, Roman
17  numeral 2 -- 2 -- 2G.  With me?
18      A.  I am.
19      Q.  The last sentence of that subparagraph,
20  you say, "In particular, there is no reliable
21  evidence to suggest that PT values can be used as
22  a threshold to identify patients that should
23  discontinue rivaroxaban."  You see where I'm
24  reading from?
25      A.  I do.

Page 61

1      Q.  There is evidence to support that
2  statement; right?
3      A.  There's no reliable evidence to suggest
4  that.
5      Q.  Okay.  But there is evidence.  You're just
6  saying it's not reliable?
7      A.  I'm saying that there is not reliable
8  evidence, exactly as stated.
9      Q.  Well, there are articles in the published
10  literature, although you don't mention them in
11  your report, that support that conclusion; right?
12      A.  There may be articles that support that
13  contention.  However, PT monitoring of
14  rivaroxaban, as I said before, is not recommended
15  by any society, by any national group.  It is not
16  the community practice standard, and that's
17  because it's an unreliable measure.
18      I refer you to an article that I did cite
19  by Testa that suggests that PT monitoring not only
20  is not reliable but is potentially dangerous,
21  because you can lull -- be lulled into a false
22  sense of security that a normal PT excludes
23  significant presence of rivaroxaban, which is just
24  not borne out by data.
25      MR. DENTON:

16 (Pages 58 to 61)

Protected - Subject to Further Protective Review

Page 62

1     All right.  Move to strike as
2  nonresponsive.
3  BY MR. DENTON:
4     Q.  This is a very different statement.  This
5  statement is not talking about monitoring.  This
6  statement is talking about whether or not there's
7  a threshold at which patients are too exposed to
8  rivaroxaban and shouldn't be on that drug; right?
9     A.  I do not believe that there is adequate
10  evidence to make that statement.
11     Q.  I understand it.  You said no reliable,
12  whether it's not adequate, whatever there is.
13     But there in fact are several pieces of
14  literature and studies that have been done that
15  supports that statement that PT with the right
16  reagent can identify rivaroxaban patients that are
17  overanticoagulated?
18     A.  Sir, if you'd like to show me the studies,
19  I'd be happy to review them.  But I have not seen
20  sufficiently done studies to draw that conclusion.
21     Q.  Well, have you seen any such studies?
22  Because you don't mention them in your report
23  or --
24     A.  I have --
25     Q.  -- your literature?

Page 63

1     A.  I have not, but I'd be happy if you want
2  to show them to me.
3     Q.  Well, why didn't you find them in your
4  research?
5     A.  Because they don't exist.
6     Q.  You -- okay.  That's a challenge I'll
7  take.
8     What about the FDA analysis?
9     A.  I've read the FDA analysis.
10     Q.  They clearly show that increased PT shows
11  increased bleeding risk; right?
12     A.  No.  They don't.  That's --
13     Q.  That's exactly --
14     A.  That's --
15     Q.  -- what they say.
16     A.  No.  That's your interpretation, sir.
17     If you look at the FDA data and you look
18  at the ROCKET trial and you look at PT versus
19  bleeding risk, if you take out the patients who
20  were on aspirin, which are a very different
21  population of patients, that relationship falls
22  apart.  Additionally, if you look at the dosing
23  studies, within any given dose of rivaroxaban, the
24  PTs of patients that bleed are not different from
25  those that don't bleed.  And furthermore, when you

Page 64

1  break down bleeding into major bleeding and minor
2  bleeding, the PTs overlap considerably.
3     That's why I say there's no reliable
4  evidence to suggest that PT values can be used as
5  a threshold to identify patients that should
6  discontinue rivaroxaban.  I think there's adequate
7  data in that FDA report to support what I've just
8  stated.
9     Q.  Support what?
10     A.  To support the fact that rivaroxaban --
11  I'm sorry.  To support the fact that there's no
12  threshold PT -- I'm sorry.
13     To support the fact that PT can reliably
14  be used as a threshold to identify patients who
15  should discontinue rivaroxaban.
16     MR. DENTON:
17     All right.  I'm told by my video that
18  we're short on time.  So we'll take a
19  short break.
20  THE WITNESS:
21     Perfect.  Thank you.
22  THE VIDEOGRAPHER:
23     This is the end of Tape 1.  We're now
24  off the record at 10:11.
25  (Brief recess was taken.)

Page 65

1  THE VIDEOGRAPHER:
2     This is the beginning of Tape 2.
3  We're back on the record.  The time is
4  10:29.
5  BY MR. DENTON:
6     Q.  Ready to go, Doctor?
7     A.  I am.
8     Q.  I want to go back again to these three
9  so-called real-world population studies on Page 12
10  of your report.  Are you there?
11     A.  On Page 12 of my report?
12     Q.  Yes, sir.
13     A.  Yes.
14     Q.  The XANTUS study you pointed out to me on
15  Exhibit B.
16     The PHSS study, where is that on your
17  Exhibit B?  I don't know the author of that, so I
18  couldn't find it.
19     A.  So there's the Graham study and the Yao
20  study that are both real-world studies.
21     Q.  Who reminded you of that at break?
22     A.  Excuse me?
23     Q.  Who reminded you of that at break?
24  MR. SLONIM:
25     You don't have to discuss any

17 (Pages 62 to 65)

Protected - Subject to Further Protective Review

Page 66

1       conversations with counsel. I'm
2       instructing the witness not to answer
3       about any conversations with counsel.
4   BY MR. DENTON:
5       Q. Can you answer the question with that
6   instruction?
7       A. Can't.
8       Q. Okay. So my question was simply the PHSS
9   study. Can you identify where that exists on
10  Exhibit B of your materials considered? And I can
11  tell you I did a PDF word search and could not
12  find it, and that's why I'm asking.
13      A. I confess. I'm not sure what I was
14  referring to there.
15      Q. Okay. Let's go to the REVISIT-US. Where
16  is that on Exhibit B?
17      A. I believe that's the Graham study.
18      Q. And why do you believe that?
19      A. Because that was a large study looking at
20  real word -- real-world data looking at elderly
21  Medicare beneficiaries.
22      Q. Okay. And so that is No. 27 on Exhibit B?
23      A. That's correct, from JAMA Internal
24  Medicine.
25      Q. So you consider that Graham study from

Page 67

1   JAMA Internal Medicine to be an authoritative
2   and -- and reliable real-world study on
3   rivaroxaban and dabigatran; correct?
4       A. I consider it to be a well-done study with
5   the limitation that it is a retrospective
6   observational study.
7       Q. But of high enough quality for you to cite
8   it in your report?
9       A. That's correct.
10      Q. All right. Okay. All right. Different
11  topic, sir. Let's go back to the body of your
12  report, and I'm going to direct your attention to
13  Page 7.
14          And just kind of to set this up, you --
15  you go through some of the salient features of the
16  various anticoagulants on -- that are available in
17  -- in -- in the medical community at the present
18  time; correct? You start with heparin, low
19  molecular weight heparin, warfarin, and then you
20  get into the NOACs; correct?
21      A. That is correct.
22      Q. Let me talk to you about heparin a second,
23  which is on Page 7.
24          It's been around since 1935 to treat blood
25  clots; correct?

Page 68

1       A. That's correct.
2       Q. I understand that has to be administered
3   with an IV, so that requires --
4       A. That's --
5       Q. Go ahead. Sorry.
6       A. That's not correct.
7       Q. Okay. You say, the "Limitations include
8   . . . Intravenous administration" in your report.
9   What I -- what am I missing there?
10      A. So unfractionated heparin is typically
11  given intravenously, but it can also be given
12  subcutaneously.
13      Q. An injection?
14      A. Correct.
15      Q. Okay. You indicate that heparin requires
16  blood monitoring, and you put in parentheses small
17  A, capital PTT.
18          The aPTT test is a standard laboratory
19  test available in your practice; correct?
20      A. The activated partial thromboplastin time,
21  or the aPTT, is available in hospitals and clinics
22  throughout the country.
23      Q. And that assay -- well, is it correct to
24  call that an assay?
25      A. It is.

Page 69

1       Q. All right. That assay, aPTT, can measure
2   the anticoagulation status of a patient who is
3   using heparin; correct?
4       A. It is one such assay. Correct.
5       Q. Are there others that could be used to
6   measure the anticoagulation status of a patient
7   using heparin?
8       A. There are. There are more sophisticated
9   less available assays looking at anti-Factor Xa
10  activity that can be useful for heparin.
11      Q. Do you think -- do you have those in your
12  clinic or hospital?
13      A. We have those in our hospital, but they're
14  not point-of-care. They take several days to get
15  the results back.
16      Q. All right. How -- you mention that
17  heparin's been around since 1935 to treat blood
18  clots. How long has the aPTT been available to
19  measure the anticoagulation status of heparin
20  patients?
21      A. I honestly don't know.
22      Q. Decades?
23      A. Yes.
24      Q. Since you've been practicing medicine?
25      A. Certainly since before I've been

18 (Pages 66 to 69)

Protected - Subject to Further Protective Review

Page 70

1   practicing medicine. Yes.
2       Q. Fair enough.
3           Let's move on to low molecular weight
4   heparins. That's Paragraph 7B on Page 7 of your
5   report. Do you see where I'm at?
6       A. I do.
7       Q. And some of those more commonly known
8   names would include Lovenox; correct?
9       A. They would include drugs such as
10  enoxaparin. Yes.
11      Q. Okay. And Lovenox is the -- is the trade
12  name for enoxaparin?
13      A. Lovenox is the trade name for enoxaparin.
14  Correct.
15      Q. Okay. And again, that's an anticoagulant.
16  True?
17      A. Correct.
18      Q. It can be used to treat folks that have an
19  acute venous thromboembolism; right?
20      A. The low molecular weight heparins as a
21  class and enoxaparin as a specific drug can be
22  used in the acute setting of a venous
23  thromboembolism.
24      Q. And --
25      A. Yes.

Page 71

1       Q. And you in fact use that from time to
2   time; right?
3       A. I do.
4       Q. Is that typically given by a subcutaneous
5   injection?
6       A. The low molecular weight heparins are
7   given by subcutaneous injection. Yes.
8       Q. All right. And there are laboratory
9   assays that can measure the anticoagulation effect
10  of the low molecular weight heparins; correct?
11      A. Because the low molecular weight heparins
12  as a class have predictable pharmacodynamics,
13  there are no commonly utilized laboratory tests to
14  measure the degree of anticoagulations -- degree
15  of anticoagulation in patients taking these drugs.
16  As with unfractionated heparin, anti-Factor Xa
17  assays could be used, but those are not
18  point-of-care tests and not widely available.
19      Q. What -- what -- how -- if one wants to
20  measure the anticoagulant effect of Lovenox on a
21  patient, there are laboratory assays available in
22  this country that could be ordered to provide that
23  information; correct?
24      A. That is correct.
25      Q. All right. And as I -- I've had some

Page 72

1   experience in some other cases.
2           As I understand it, there are women who
3   have either previous VTE or some predisposition to
4   VTE, that while they are pregnant women can be and
5   are prescribed Lovenox injections throughout the
6   pregnancy as an anticoagulant; correct?
7       A. Low molecular weight heparins are used
8   throughout pregnancy. I'd have to check, but I
9   believe that they are a Category C drug in
10  pregnancy. They may be a Category B, but they are
11  not a Category A.
12      Q. Right. And in fact, the women who are
13  pregnant give themselves the injections at home,
14  if prescribed; right?
15      A. Women can give themselves the injections
16  of low molecular weight heparin at home. Yes.
17      Q. All right. Let's go to warfarin. You --
18  you have, I presume -- since your residency in
19  hematology or internal medicine, you have -- you
20  have used and prescribed warfarin and continue to
21  do so to today; right?
22      A. That is correct, with the corollary that
23  I've actually prescribed warfarin as an internal
24  medicine resident as well.
25      Q. Okay. So many, many years?

Page 73

1       A. I'm not that old, but I'll --
2       Q. Okay. Well -- I'm sorry. I'm trying to
3   lighten this up, but we're having trouble. So
4   thank you. How old are you? No. Don't answer
5   that. Don't answer that.
6       A. I'm happy to tell you I'm 55, for the
7   record.
8       Q. Okay. Well, you look pretty good.
9           But what I -- I want to look at
10  Paragraph 8 of your report. So -- about warfarin.
11  And -- and -- and I assume -- and there's probably
12  no way to even estimate. But you've probably
13  prescribed warfarin to thousands and thousands of
14  patients over those years; right?
15      A. I think it's safe to say that. Yes.
16      Q. All right. And you -- when you bring them
17  in, you -- you counsel them and you tell them
18  about the risks and benefits of why you're
19  recommending warfarin therapy to them; right?
20      A. I do.
21      Q. And how many times of those thousands of
22  thousands of patients have you told them you were
23  prescribing rat poison to them?
24      A. I think that there's the occasional
25  patient who I have a good relationship with where

19 (Pages 70 to 73)

Golkow Technologies, Inc - 877.370.3377

Page 74

1    I've in jest mentioned that this can also be used
2    as rat poison.  But in general, that's not a term
3    I'd use to ensure compliance with the medication.
4        Q.  Right.  I just wondered why you put that
5    in your report.
6        A.  It's of scientific interest.
7        Q.  To whom?  You?
8        A.  To the general public.
9        Q.  All right.  So you have a patient in and
10   you -- you -- you're going to recommend initiation
11   of warfarin therapy.  I'm sure you have a spiel or
12   a statement of information that you give them to
13   inform them of the risks and benefits of the drug;
14   correct?
15       A.  I do have a reasonably standard talk that
16   I give to patients who I'm anticoagulating.  Yes.
17       Q.  Tell me your reasonably standard talk for
18   a new initiated warfarin patient.
19       A.  So I can -- if you'd like me to playact it
20   now, I can do that.  I can tell you that when I
21   interact with patients I like to draw pictures.
22   I'm not a good artist, but it helps patients
23   remember what I'm saying.  So if you'd like me to
24   give the spiel in the absence of that, since that
25   can't be probably contained by the court reporter,

Page 75

1    I'm happy to do so.
2        Q.  Well, what kind of things do you draw out
3    for the patients?
4        A.  I typically start whenever I'm
5    anticoagulating people with a seesaw when I talk
6    about hemostasis, and I talk about the risk of
7    bleeding and clotting.  When a patient has an
8    acute thrombosis, I'll talk about, in -- in -- in
9    lay terms, what a clot is, what risk factors for a
10   clot are, and what the sequelae of a clot could
11   be.  Most notably, if it's a lower extremity clot,
12   we talk about pulmonary embolism and the risk of
13   death.  I try to estimate a bit on the risk of --
14   the risk of that happening.  And then I talk about
15   the need for anticoagulation.  I explain side
16   effects of anticoagulants, which always include
17   bleeding, but may also be specific.  In the case
18   of heparin, even during pregnancy, there is a risk
19   for bone loss, and I explain that.  I talk to the
20   patients about how the drug is taken.  And I talk
21   to the patients about need for monitoring if they
22   are on a drug that does require monitoring.
23       I talk a little bit about cost.  I talk
24   about -- especially with warfarin, I'll talk about
25   Coumadin clinic and the importance.  With

Page 76

1    warfarin, I'll also talk about the importance of
2    having a stable Vitamin K consumption while
3    they're on warfarin, not that they need to avoid
4    green leafy vegetables, but that they need to keep
5    their intake relatively constant.  And I also talk
6    about potential drug interactions and carefully
7    look at their medication list, often put that into
8    a computer program to make sure I'm not missing a
9    drug interaction.  I talk to them about avoiding
10   other things that can predispose them to bleeding,
11   like aspirin, nonsteroidals.  And I talk to them a
12   bit about what to do if they experience bleeding.
13   And I talk to them about symptoms of anemia.
14       Q.  What are the symptoms of anemia that a
15   patient would appreciate to -- to pay attention
16   to?
17       A.  So the symptoms of anemia depend on the
18   degree of anemia and the rapidity at which the
19   anemia is acquired.  For chronic anemias due to
20   perhaps slow bleeds, that can be relatively
21   insidious with few compli- -- with few real
22   symptoms or signs.  For patients that have an
23   acute drop in hemoglobin, the symptoms that I talk
24   about are lightheadedness and decreased exercise
25   tolerance, dark tarry stools, or frank blood per

Page 77

1    rectum or per mouth.
2        Q.  All right.  Do you know who manages or
3    runs the Coumadin clinic at -- at the Tulane
4    medical hospital?
5        A.  I believe it's the department of
6    cardiology.
7        Q.  Okay.  But do you know beyond the
8    department any particular individual?
9        A.  There's a nurse whose name I don't know
10   who is primarily responsible -- she's actually a
11   nurse practitioner -- for managing patients on
12   warfarin.  There is a medical director, a doctor
13   in charge, and that just changed.  And to be
14   candid, I'm not sure who that person is at the
15   present time.
16       Q.  All right.  Do you know what reagent they
17   use with their PT test for the warfarin patients?
18       A.  I don't.
19       Q.  Who would know?  I mean, if you wanted to
20   answer that question, if you thought that question
21   was of importance and you needed to know, what
22   would you do to go about trying to answer that
23   question?
24       A.  I would call the clinical pathologist in
25   charge of the coagulation lab.

20  (Pages 74 to 77)

Protected - Subject to Further Protective Review

Page 78

1   Q. And who is that?
2   A. Jack Scott, S-C-O-T-T. He goes by Jack.
3   His first name is actually John.
4   Q. So Jack is kind of a nickname --
5   A. Correct.
6   Q. -- or an acquired name?
7   A. Correct.
8   Q. Okay. All right. So let's -- you've
9   already told me about Pradaxa.
10      You don't use it; right?
11   A. I've never prescribed it.
12   Q. All right. Have you ever done any
13   literature research related to dabigatran, medical
14   literature?
15   A. I have. There's a variety of journals
16   that I read regularly. Pradaxa is discussed in
17   those journals periodically. I go to meetings
18   where Pradaxa's discussed.
19   Q. And it -- are there any different or
20   additional reasons you don't use Pradaxa other
21   than you told me? In the type of patient you have
22   you don't like doing the so-called bridging
23   therapy with Lovenox on to dabigatran. Are there
24   any other reasons you don't use it?
25   A. That's the primary reason I don't use the

Page 79

1   drug.
2   Q. Is there any other reason? Any safety or
3   efficacy concerns or anything else?
4   A. It's the most renally cleared of the
5   direct oral anticoagulants. Many of our patients
6   in my -- in -- in our practice at Tulane are older
7   and sicker patients, and many of them have renal
8   insufficiency, making the use of dabigatran
9   complicated.
10   Q. Okay. Any other reasons?
11   A. No.
12   Q. All right. Let's go to Page 10 of your
13   report, where you start talking about the
14   Factor Xa inhibitors. Are you with me?
15   A. I am.
16   Q. The first one you talk about is
17   rivaroxaban; correct?
18   A. That's correct.
19   Q. Okay. And -- and you have a graphic here.
20   It looked like you pulled that from the labeling;
21   is that correct?
22   A. The graphic on Page 10, Item 3, is pulled
23   directly from the label.
24   Q. All right. As I understand the labeling
25   -- well, maybe -- strike that. It doesn't matter

Page 80

1   what I understand.
2      Taking rivaroxaban with a meal -- what is
3   the scientific or medical reason that there's
4   recommendation that rivaroxaban be taken with a
5   meal, if you know?
6   A. I honestly don't know.
7   Q. Okay. So when you prescribe rivaroxaban
8   to your patient, when do you tell them about when
9   to take it, what time of day, with a meal, without
10   a meal? Do you -- how do you give that
11   information to your patient when you prescribe
12   this drug?
13   A. I tell them to take it as indicated in the
14   label. I tell them to take it with the evening
15   meal.
16   Q. Well, what about acute treatment of DVT
17   and PE, which are really the patients you've told
18   me you've had the most experience with? You don't
19   tell them that, do you?
20   A. I tell them to take it with food.
21   Q. Okay. But not necessarily the evening
22   meal?
23   A. That's correct.
24   Q. Okay. So what I'm trying to find -- and I
25   understand the first 15 -- or the first 21 days of

Page 81

1   acute treatment, I assume you prescribe riva,
2   15 milligrams, b.i.d.?
3   A. For patients with normal renal function,
4   correct.
5   Q. Right. Right. Right. And then they
6   transition into the once-a-day 20 milligrams with
7   normal renal function; correct?
8   A. That is correct.
9   Q. Okay. So what -- what I'm -- what I'm
10   trying to find out is -- let's just take the --
11   the -- the treatment of DVT or PE, the type of
12   patients that you more frequently see. They get
13   through their first 21 days. When do you tell
14   them to take the 20-milligram once-a-day? Does it
15   matter when in the day they take it, as long as
16   they take it with food once a day?
17   A. That's correct.
18   Q. Okay. Do you consult with or prescribe
19   rivaroxaban in the orthopedic situation? Someone
20   comes in with a hip replacement or knee
21   replacement, obviously most likely performed by an
22   orthopedic surgeon. Do you get involved with
23   making the prescription post-op of any
24   anticoagulants, or is it typically the orthopedic
25   surgeon that does it?

21 (Pages 78 to 81)

Protected - Subject to Further Protective Review

Page 82

```
 1        A.  It's typically done by the orthopedic
 2   surgery department.
 3        Q.  Okay.  Let's go to Page 11.  We've touched
 4   on some of this in the first paragraph or the --
 5   about the variability.  And as I understand it,
 6   the articles you're referring to to support that
 7   riva has moderate variability would be the Mueck
 8   2014 and the Girgis 2014?  Am I correct about
 9   that?
10        MR. SLONIM:
11             Where are you reading?
12        MR. DENTON:
13             I'm sorry.  It's the first paragraph,
14        but it's not the first full paragraph.
15        It's the very top of Page 11.
16        THE WITNESS:
17             That's correct, as stated in the last
18        -- at the end of that paragraph, top of
19        Page 11.
20   BY MR. DENTON:
21        Q.  Now, are you aware that in Japanese
22   patients there's a reduced dose of riva in the
23   labeling?
24        A.  I've read the label several times.  Prior
25   to you tweaking my memory, I'm not sure I would
```

Page 83

```
 1   have remembered that.
 2        Q.  So --
 3        MR. SLONIM:
 4             Are you making that representation
 5        about the U.S. label?
 6        MR. DENTON:
 7             I didn't make any representation.
 8        MR. SLONIM:
 9             You made -- did you state, Are you
10        aware that in Japanese patients there is a
11        reduced dose of riva in the label?  Did
12        you -- did you make that representation,
13        Counsel?
14        MR. DENTON:
15             Well -- Bert, come on.  I've been just
16        as nice as I can be.  Please don't get
17        aggressive here.  I will withdraw the
18        question.  I'm not trying to be tricky --
19        MR. SLONIM:
20             Okay.
21        MR. DENTON:
22             -- or --
23        MR. SLONIM:
24             Okay.
25        MR. DENTON:
```

Page 84

```
 1             -- or aggressive --
 2        MR. SLONIM:
 3             I -- I --
 4        MR. DENTON:
 5             -- or acute or got you.  I'm just
 6        asking questions.
 7        MR. SLONIM:
 8             Roger, if -- if I was out of line in
 9        tone, I apologize.
10        MR. DENTON:
11             Okay.
12        MR. SLONIM:
13             Okay?
14        MR. DENTON:
15             We'll move forward.
16   BY MR. DENTON:
17        Q.  Sir, let me ask a different question to
18   set this up.
19             You're aware, for example, in a-fib that a
20   different dose was tested in Japanese patients;
21   right?
22        MR. SLONIM:
23             Objection.
24        MR. DENTON:
25             I'm --
```

Page 85

```
 1        MR. SLONIM:
 2             You're referring to ROCKET AF or --
 3        MR. DENTON:
 4             ROCKET-J --
 5        MR. SLONIM:
 6             -- or J -- or J-ROCKET?
 7        MR. DENTON:
 8             J-ROCKET.  I said in Japanese
 9        patients.
10        THE WITNESS:
11             I'm not aware of that.  I don't
12        discount it as being true, but I'm not
13        aware of that.
14   BY MR. DENTON:
15        Q.  Have you read that study, the -- the
16   ROCKET so-called substudy that was done in the
17   Japanese patients?  It's -- I think it's referred
18   to as J-ROCKET.
19        A.  Can you tell me who the first author was?
20        Q.  Well, my guess is is it's a Japanese name.
21   Do you remember reading it?  It was an a-fib study
22   of Japanese-only patients that was published in
23   the New England Journal of Medicine, I believe.
24   Maybe not, but it was published, sponsored by
25   Bayer.
```

22 (Pages 82 to 85)

Golkow Technologies, Inc - 877.370.3377

Protected - Subject to Further Protective Review

Page 86

1   A. I -- I question whether it was published
in the New England Journal of Medicine.
2
3   Q. I may -- I may be wrong about that.
4   A. You'd have to show me the article, and
5   then I'll comment on it. I remember a small study
6   of 60 patients that's a Japanese study, but I'm
7   not sure we're referring to the same or not.
8   Q. No. We're not. We're not.
9      Well, let me ask you this: Do you know in
10  Japan, for folks of Japanese ethnicity, that the
11  prescribed dosing is less for that population than
12  in the U.S. population? Were you ever aware of
13  that before I shared it with you?
14  A. I have not been.
15  Q. Okay. Do you know why?
16  A. I could only speculate.
17  Q. Don't want you to speculate.
18      Let's go to the second paragraph. I guess
19  it's actually the first full paragraph on Page 11.
20  A. Okay.
21  Q. You're talking about is -- it starts with,
22  "Rivaroxaban is rapidly and almost completely
23  absorbed (80" at a hundred percent "at the 10 mg
24  dose." You see that paragraph?
25  MR. SLONIM:

Page 87

1      I'm sorry. What page are you on?
2   MR. DENTON:
3      Page 11, the same page.
4   MR. SLONIM:
5      Yeah.
6   THE WITNESS:
7      I do.
8   BY MR. DENTON:
9   Q. Okay. You told me earlier you didn't know
10  why riva was to be prescribed -- to be taken with
11  food. But here you tell us that the
12  bioavailability is increased with food and
13  therefore rivaroxaban should be taken with food.
14      Is -- does that jog your memory?
15  A. Which part?
16  Q. That -- why you are supposed to take riva
17  with a meal.
18  A. I -- I think I state why it's supposed to
19  be taken with a meal in that paragraph.
20  Q. I understand that. But when we looked at
21  the label a few pages earlier, you said you had no
22  idea why riva was to be taken with a meal.
23  MR. SLONIM:
24      Objection.
25  THE WITNESS:

Page 88

1      I think I misunderstood your question.
2      I think that you asked me why it was put
3      into the label, not the scientific basis
4      for why it should be taken with food.
5   BY MR. DENTON:
6   Q. Okay. Well, I actually did. But now give
7   me the scientific basis.
8   A. Because bioavailability is increased with
9   food, bio -- as stated in my report.
10  Q. Okay. So this whole paragraph, you make a
11  number of comments, mostly PK/PD -- mostly PK kind
12  of comments. I may or may not be particularly
13  accurate about that. But you don't have any
14  citation in that paragraph to support any of those
15  statements. And I'm just trying to understand
16  what you're relying on.
17  A. I believe I'm referring to the
18  pharmacokinetic studies done by Mueck.
19  Q. Okay. But which ones? Are they the same
20  two --
21  A. 2014 and the Girgis study, 2014.
22  Q. Okay. So I -- that's fair enough.
23      So you're just continuing those citations
24  down to this next paragraph, essentially; correct?
25  A. That's my recollection. Correct.

Page 89

1   Q. Fair enough. All right.
2      So let's go to the next paragraph where
3   you talk about Dr. Leissinger and Dr. Rinder. You
4   follow me, the paragraph we're on?
5   A. I follow you.
6   Q. Okay. The next sentence, you state, "To
7   the contrary, while the exact therapeutic range
8   was not established in any of the indications"
9   . . . riva "studies establish . . . there is a
10  wide therapeutic window for rivaroxaban." Do you
11  see that?
12  A. I do.
13  Q. Okay. And that -- so -- so it is true
14  that the therapeutic range for rivaroxaban has not
15  been established in any indications; correct?
16  A. I don't want us to confuse dose and
17  therapeutic range.
18  Q. I didn't say anything about dose. I
19  said --
20  A. So --
21  Q. -- therapeutic range.
22  A. So therapeutic range would involve the
23  LD50 and the ED50. And as I stated previously to
24  you, the LD50 for rivaroxaban has not been
25  determined, hence, the therapeutic range has not

23 (Pages 86 to 89)

Golkow Technologies, Inc - 877.370.3377

Protected - Subject to Further Protective Review

Page 90

1    been determined.
2        Q. Fair enough. All right.
3        And you cite at the end of that same
4    paragraph Kubitza 2005. Do you see that?
5        A. I do.
6        Q. That's another Bayer scientist that worked
7    on the rivaroxaban program; correct?
8        A. I don't know that to be true.
9        Q. Okay. But -- and I -- again, I'm not
10    be -- trying to be tricky or got you or whatever.
11    I'm just trying to understand.
12        The -- the comments that you make in that
13    particular paragraph that you end with "Kubitza
14    2005" in parentheses, is it -- is it -- am I
15    correct to understand you're relying on that
16    article to support the conclusions in that
17    paragraph?
18        A. That would be a correct conclusion.
19        Q. All right. So let's go on to this next
20    short paragraph. You -- you make mention of a
21    number of -- you say studies. They're actually
22    case reports, aren't they, about these folks that
23    have ingested a large number of rivaroxaban pills?
24        A. They are in fact case reports. Case
25    reports are one type of study.

Page 91

1        Q. Well, a case report is -- basically a
2    physician has some interesting or unique clinical
3    situation and they summarize that and publish that
4    in the literature. That's what a case report is;
5    right?
6        A. A case report is, as the name suggests,
7    based on a case, or if there's more than one,
8    technically that's a case series. But sometimes
9    case reports have one or a few cases.
10        Q. Did -- did you actually read these case
11    reports that you list here, is this here --
12        A. I did.
13        Q. -- all of them?
14        A. I did.
15        Q. Okay. And they all -- and all of those
16    are on your materials list, I assume, or intended
17    to be anyway?
18        A. They -- they're intended to be on the
19    list. Correct.
20        Q. Okay. So you do know that there is a
21    ceiling effect on absorption of rivaroxaban
22    greater than 50 milligrams a day, don't you?
23        A. Explain to me what you mean by "a ceiling
24    effect."
25        Q. That you can't absorb -- a patient --

Page 92

1    after 50 milligrams a day, that patients aren't
2    capable of absorbing any more rivaroxaban in their
3    bloodstream.
4        A. If you show me the pharmacokinetic data
5    that suggests that, I'll review it and render an
6    opinion. But I'm not prepared to off-the-cuff say
7    that that's in fact a true statement.
8        Q. Are you unaware of what the ceiling effect
9    is on how much a patient can absorb in a day of
10    rivaroxaban?
11        A. I don't have that number at the tip of my
12    tongue. No.
13        Q. Do you have any understanding of what it
14    is?
15        A. I have a good understanding of what
16    ceiling effect is. I don't know what -- the exact
17    dose is without reviewing and going back and
18    looking at the papers.
19        Q. Okay. Well, let's start with what you do
20    have an understanding of.
21        What do you understand the term "ceiling
22    effect" to mean?
23        A. A ceiling effect means that above a
24    certain dose of oral -- well, it doesn't have to
25    be oral. But above a particular dose of a drug

Page 93

1    you get no further effect with increasing dose.
2        Q. Right. So I agree with that definition.
3        But what you don't know is what the dose
4    per day of rivaroxaban would hit that ceiling
5    effect in a patient; correct?
6        A. Without going through the papers that I've
7    cited, I don't have that information at the tip of
8    my tongue. No.
9        Q. Okay. Which papers would you look at?
10        A. I suppose I would look at the Phase II
11    pharmacokinetic studies.
12        Q. All right. Have you ever looked at the
13    Canadian labeling on rivaroxaban?
14        A. I would have no reason to do that and have
15    not.
16        Q. Okay. Has -- has the Canadian labeling
17    ever been presented at any of the conferences? I
18    assume -- assume some of these conferences you go
19    to are international in -- in scope, aren't they?
20        A. Actually not. The American Society of
21    Hematology, by definition, is the American Society
22    of Hematology.
23        Q. Okay. Do you go to any international
24    conferences in hematology?
25        A. In hematology specifically, no.

24 (Pages 90 to 93)

Protected - Subject to Further Protective Review

Page 94

1    Q.  All right.  So the -- so the short answer
2  is you've never read the Canadian labeling, you've
3  never seen the contents of it presented in any
4  kind of form or medical lecture.  True?
5    A.  That is true.
6    Q.  Okay.  Again -- let's go down to the last
7  paragraph of -- on Page 11 that continues over to
8  the top of Page 12.  Do you see what I'm looking
9  at?
10    A.  The paragraph starting with, "Phase II
11  dose ranging"?
12    Q.  Yes, sir.
13    A.  Okay.
14    Q.  And the first thing I want to do is just
15  to -- to -- to confirm with me that that entire
16  paragraph, the statements there, comments made are
17  based on your relying of Mueck 2011.  Am I correct
18  about that?
19    A.  That is correct.
20    Q.  Okay.  And again, on -- on those topics of
21  the -- the dose-ranging studies, you were provided
22  no depositions of company witnesses who actually
23  conducted those studies.  True?
24    A.  That is correct.
25    Q.  You were provided no internal company

Page 95

1  documents related to the clinical trials; correct?
2    A.  That is correct.
3    Q.  Your sole literature, scientific data that
4  you're relying on is contained in the medical
5  literature that you have either cited in your
6  report or listed in your Exhibit B.  True?
7    A.  That is true.
8    Q.  Why, Doctor, are patients with reduced
9  renal function provided a reduced dose?  What's
10  the medical or scientific reason for that?
11    A.  So any drug can be cleared by -- cleared
12  from the body by a variety of mechanisms.  There's
13  both clearance, which involves sometimes
14  metabolizing a drug to a different drug, and then
15  there's elimination.  The way that we eliminate
16  compounds from our body is either predominantly
17  through the urine or feces.  Patients with
18  impaired renal function have a decreased ability
19  to eliminate drugs and their metabolites and
20  therefore frequently require dose adjustment of
21  said drug.
22    Q.  But what -- okay.  I understood all that.
23      But -- but because of the -- the
24  impairment in renal function, the dose is reduced
25  because those patients may have a higher exposure

Page 96

1  to the drug than a person with -- a patient with
2  normal renal function?
3    A.  That is one such concern.  Yes.
4    Q.  All right.  And so the idea being, maybe
5  in a more layman or dumb lawyer view, if you have
6  reduced renal function, you need a lower dose to
7  have similar exposure to a higher dose of a
8  patient with normal renal function?  Did I get
9  that close?
10    A.  I might phrase it that patients with
11  reduced renal function have a decreased ability to
12  eliminate a drug.  And if you don't reduce the
13  dose, you run -- you potentially can run into
14  problems with toxicity.
15    Q.  And "toxicity" being too high of exposure?
16    A.  Toxicity related to too high of an
17  exposure.  Correct.
18    Q.  And -- and -- and one of the toxic things
19  is an increased reading blisk -- reading --
20  bleeding risk with too high of exposure; right?
21    A.  Correct.  Any anticoagulant carries a
22  bleeding risk.  Yes.
23    Q.  Right.  Well -- but it -- but it's also
24  fair to say, isn't it, is the -- the -- the --
25  the -- the -- the more of the intensity of the

Page 97

1  anticoagulant, with all of them, the bleeding risk
2  increases.  True?
3      MR. SLONIM:
4        Objection.
5      THE WITNESS:
6        I think that you'd have to -- I think
7  that there's no easy yes/no answer to that
8  question.  I think it's more complicated
9  than that.
10        When we look at rivaroxaban
11  specifically, based on some of the studies
12  that you and I have talked about and I
13  have cited in my report, there are clearly
14  patients who took very high doses of the
15  drug typically as an accidental exposure,
16  slash, suicide who did not have bleeding.
17  But I think with -- whenever you increase
18  the dose of a drug, there's a -- of an
19  anticoagulant, there's a theoretical risk
20  that you will get excess bleeding.
21  BY MR. DENTON:
22    Q.  When you say "dose" there, you're talking
23  about increased exposure; correct?
24    A.  Exposure is one way to represent dose.
25  Yes.

Protected - Subject to Further Protective Review

Page 98

1    Q. All right. The concentration of the drug
2  in the blood, increasing concentrations is
3  consistent with increasing risk of bleeding;
4  right?
5        MR. SLONIM:
6           Objection.
7        THE WITNESS:
8           It really depends within what --
9        within which parameters. So within a wide
10       range of parameters, for some drugs there
11       are few complications. And other drugs,
12       within a very narrow range, there are
13       complications.
14          I also object to your -- to your
15       assumption that concentration is exposure.
16       From the pharmacokinetic perspective,
17       exposure is most typically area under the
18       curve, not concentration.
19   BY MR. DENTON:
20       Q. All right. Do you have a degree in
21   pharmacology?
22       A. I do not.
23       Q. Do you have a degree in epidemiology?
24       A. I do not.
25       Q. Are you a cardiologist?

Page 99

1       A. I am not a board-certified cardiologist.
2          But I'd like to qualify those statements
3  to say that I'm a board-certified internist who's
4  maintained my certification over the past
5  25 years, and basic cardiology principles are part
6  of internal medicine. I write the in-training
7  exam for internal medicine trainees, and some of
8  those questions involve cardiology questions.
9          And related specifically to your
10 pharmacology question, although I don't have a
11 degree in pharmacology, I'm a member of the -- of
12 the pharmacology department at Tulane. I teach in
13 that section. And I have nationally written
14 pharmacology licensing questions for medical
15 students prior to their graduation from medical
16 school.
17       Q. Your board certification is in internal
18 medicine; right?
19       A. I have three board certifications:
20 internal medicine, hematology, and medical
21 oncology, and they are all current.
22       Q. Okay. Speaking of cardiology, isn't it
23 common to see a-fib patients who are prescribed
24 both an anticoagulant and antiplatelet like
25 aspirin?

Page 100

1       A. It's been my experienced based on the
2  nature of the beast, the heart, that there are
3  patients with atrial fibrillation who are also put
4  on antiplatelet agents. Correct.
5       Q. Which would include aspirin?
6       A. Which would include aspirin, drugs like
7  clopidogrel, and other drugs.
8       Q. All right. So -- all right.
9        MR. DENTON:
10          How much time we got on the tape?
11       THE VIDEOGRAPHER:
12          (Indicating.)
13       MR. DENTON:
14          Let's take a short break, if you don't
15       mind.
16       THE WITNESS:
17          Sure. Not at all.
18       MR. SLONIM:
19          Yeah.
20       THE VIDEOGRAPHER:
21          This is the end --
22       MR. SLONIM:
23          Yeah. No. I'm good.
24       THE VIDEOGRAPHER:
25          -- of Tape 2. We're now off the

Page 101

1  record at 11:12.
2  (Brief recess was taken.)
3       THE VIDEOGRAPHER:
4          This is the beginning of Tape 3.
5       We're now back on the record. The time is
6       11:29.
7  BY MR. DENTON:
8       Q. Okay, Doctor. I -- I'm going to shift
9  topics a bit, but stay with your report. I'm
10 going to go to Page 13, which is the coagulation
11 testing, and it starts on Page 13 and goes over to
12 14 and I guess continues even on to 15. So that's
13 the section of the report I'm going to focus on
14 for a few minutes. Okay?
15       A. I'm with you.
16       Q. Okay. So you -- Page 13 essentially is
17 PT/INR anticoagulation testing of warfarin; right?
18       A. Correct.
19       Q. And that's been around -- I think the
20 INR's been around for, what, for 30 years or more?
21       A. No. It's not been that long. When I
22 first entered training we were still talking about
23 PT ratios.
24       Q. Right.
25       A. The INR probably became in vague -- I'm

26 (Pages 98 to 101)

Protected - Subject to Further Protective Review

Page 102

1    guessing somewhere early '90s, late '80s.  But now
2    I think about it, that's about 30 years, isn't it?
3        Q.  I was going to say.  Your report said
4    1983.
5        A.  Yeah.  Okay.  It wasn't commonly used 'til
6    a little bit after that.  But --
7        Q.  Okay.
8        A.  -- yeah.
9        Q.  All right.  Time flies, doesn't it?
10       A.  Time flies.
11       Q.  Okay.  And so it's been, you know, the
12   standard of care for monitoring warfarin patients
13   to use a PT/INR.  And for most indications, you
14   try to keep the patient anticoagulated in the INR
15   2 to 3 range; right?
16       A.  For patients with atrial fibrillation, the
17   recommended INR range is 2 to 3.  That differs for
18   some mechanical valves, but that's not relevant to
19   our discussion today.
20       Q.  Well -- and also for the VTE.  Someone
21   that has acute VTE, let's say they have an acute
22   VTE, you bridge them on Lovenox, and then you're
23   going to do long-term warfarin therapy.  You're
24   still shooting for 2 to 3 on an INR for that
25   long-term warfarin therapy; right?

Page 103

1        A.  In most cases, for VTE, the target's
2    2 to 3.  There are some specific special
3    populations where that might be higher.
4        Q.  Okay.  The anticoagulant effect would be
5    higher -- in other words, higher than 3 INR?
6        A.  There are clinical scenarios where you
7    would bump up the INR to higher than 3.  Yes.
8        Q.  And what would you bump it up to and why
9    and for what indication?
10       A.  There are some patients with either
11   congenital or acquired coagulopathies who have a
12   thrombosis despite being on warfarin with an INR
13   between 2 and 3 where you might elect to bump up
14   the INR to a higher level to prevent subsequent
15   thrombosis.
16       Q.  Got it.
17           That's a unique patient, though?
18       A.  That's a unique patient, but the type of
19   patient a hematologist would see.
20       Q.  Right.  So you talk a little bit about
21   time in therapeutic range on Page 13.
22           What is time in therapeutic range as it
23   relates to INR and warfarin?
24       A.  Time in therapeutic range is typically
25   expressed as a percentage, and it's a percentage

Page 104

1    of the time that the patient's I -- in -- in the
2    case of warfarin, it's a percentage of the time
3    that the patient's INR is in the therapeutic
4    range.
5        Q.  Right.  So do you maintain any data or
6    information on your patients, your warfarin
7    patients that you manage, what -- what your
8    average time in therapeutic range is?
9        A.  I don't.
10       Q.  Do you have any assessment of it?
11       A.  The patients that I see in my practiced --
12   in my practice who are on warfarin tend to be a
13   rather sophisticated group, and I would estimate
14   my time in therapeutic range to be relatively high
15   for those patients.  For the general patient in --
16   in other clinics, it might be less than that.  And
17   I am aware of what the literature reports real
18   word -- real-world data TTRs --
19       Q.  Right.  But what I'm trying to find out is
20   your data.  So in the patients you take care of --
21       A.  The patients I take care of tend to be in
22   therapeutic range greater than 55 percent,
23   although I could not tell you an exact number.
24       Q.  What about the Coumadin clinic there at
25   Tulane?  Do they keep any data or records on time

Page 105

1    in therapeutic range?  Do you know?
2        A.  The Coumadin clinic at Tulane does keep
3    such records, and I do not know what their TTRs
4    are.
5        Q.  Okay.  Let's flip to Page 14, sir, please.
6    Again, we've talked about this a little bit, but I
7    -- but you've repeated it.  So I'm going to ask a
8    little bit about it.
9            So on to unfractionated heparins, it's
10   monitored typically with an aPPT [sic] or PTT,
11   which is activated partial thromboplastin time;
12   correct?
13       A.  That is correct.  That's one way to
14   monitor heparin.
15       Q.  Okay.  And then the -- the low molecular
16   weight heparin, you've told us that most patients
17   do not require monitoring.  But there are assays
18   that are available to monitor certain patients
19   that may need to have the anticoagulation effect
20   determined; correct?
21       A.  In general, low molecular weight heparins,
22   because of predictable pharmacokinetics, don't
23   require monitoring.  However, in specific patient
24   populations, one can check anti-Xa levels.  Those
25   are not point-of-care testing and they're -- they

27 (Pages 102 to 105)

Protected - Subject to Further Protective Review

Page 106

1  typically take several days to get back, but they
2  are available.
3      Q.  Right.  And you make some comment that it
4  could be done, for example, in morbidly [sic]
5  obese patients or pregnant patients; right?
6      A.  Those would be two indications where you
7  might want to check anti-Xa levels.  Yes.
8      Q.  And -- in and in patients with renal
9  impairment, you -- you put there; right?
10     A.  That's correct.
11     Q.  So even if you have a -- and in -- the
12 Lovenox or the low molecular weight heparins are
13 -- are -- are Factor Xa anticoagulants; right?
14     A.  Heparins inhibit much more than Factor Xa.
15 Low molecular weight heparins still have some
16 anti-Factor II activity, but they predominantly
17 have Xa activity.  Unfractionated heparin has much
18 greater anti-Factor II activity.
19     Q.  Okay.  But -- but the -- the low molecular
20 weight heparins, the -- the -- one of the
21 significant mechanism of -- of action is the
22 Factor Xa activity; right?
23     A.  A major mechanism of action of low
24 molecular weight heparins is inhibition of
25 Factor Xa.  Yes.

Page 107

1      Q.  Which is also true of rivaroxaban and
2  apixaban.  True?
3      A.  That is correct.  Rivaroxaban, apixaban,
4  and edoxaban are also Factor Xa inhibitors.
5      Q.  Right.  And -- and you say or told me in
6  an answer that even folks using, for example,
7  Lovenox, which you say has predictable
8  pharmacokinetics and pharmacodynamics, there are
9  certain patients where there's a need to monitor
10 their anticoagulation status.  You list three such
11 type patients:  Renal impairment, pregnant
12 patients, or obese patients; right?
13     A.  So what I've listed in my report are three
14 clinical scenarios where you might measure Xa
15 levels.  I don't want that to be assumed that you
16 do measure Xa patients [sic] in every pregnant
17 patient, because that would not be true.
18     Q.  Right.  But the point is -- is that if a
19 physician believed there was a clinical need for
20 an individualized patient using Lovenox, they
21 could order a Factor Xa assay and determine the
22 anticoagulation status of that patient even though
23 Lovenox has predictable pharmacokinetics and
24 pharmacodynamics; right?
25     A.  That is a true statement.  A patient on

Page 108

1  enoxaparin could have ant-Xa levels checked.  The
2  assay would be calibrated with enoxaparin.  But --
3      Q.  Right.
4      A.  -- yes.
5      Q.  Okay.  So now let's move on to C, which is
6  the use of coagulation testing with NOACs.  But
7  before I do that, let me go back.
8          The -- the PT/INR for warfarin, you find
9  that test useful in making clinical decisions for
10 those patients; right?
11     A.  Patients on warfarin, the INR is a useful
12 test.  Yes.
13     Q.  What -- is it also true that the activated
14 partial thromboplastin time is a useful test for
15 patients using unfractionated heparin?
16     A.  For patients on typically continuous
17 infusion unfractionated heparin, the aPTT is a
18 useful test.  Yes.
19     Q.  And is it also a useful test to use a
20 Factor Xa assay in patients in unique situations
21 that are using Lovenox?
22     A.  There are unique situations in patients on
23 enoxaparin where a Xa assay may be useful.  Yes.
24     Q.  All right.  Is it also true then, sir,
25 with rivaroxaban, that it would be useful to a

Page 109

1  hematologist or a clinician to have a reliable
2  laboratory test to assess the anticoagulation
3  status of a rivaroxaban patient?
4      A.  So there are several ifs to my answer.  If
5  a test were available and reliable, there are
6  certain circumstances where such a test may be
7  useful for patients taking rivaroxaban.  Yes.
8      Q.  Okay.  And if a reliable and available
9  test were available, what types of patients would
10 that assay be useful for?
11     A.  As I think about this, I think that if I
12 had a -- if such a test, reliable and available --
13 if a reliable test were available, if I had a
14 patient on rivaroxaban who had to undergo an
15 emergency procedure, it might be useful, if the
16 test were reliable, to see how much rivaroxaban
17 was -- let me rephrase that.  It might be useful
18 to determine their degree of anticoagulation prior
19 to an emergent procedure.  For an elective
20 procedure, I think most of us would probably wait
21 several half-lives before doing such a procedure.
22 But for an emergency procedure in a patient on a
23 Xa inhibitor, if there were an accurate reliable
24 test, that could be useful, yes.
25     Q.  What about a patient with borderline renal

28 (Pages 106 to 109)

Protected - Subject to Further Protective Review

Page 110

1  function or declining renal function over time?
2      A. I think when you look at the rivaroxaban
3  pharmacokinetic data -- and I think that it's
4  pretty robust. I think that the dose that was --
5  the dose that's recommended -- let's stick with
6  atrial fibrillation. I -- the -- dose is
7  pretty reliable through a wide range of renal
8  impairment. So I don't think it would be very
9  useful in that setting. The same cannot be said
10 for heparin, unfortunately. And that's why Xa
11 levels may be important for patients on heparin.
12     Q. But isn't it true, Doctor, that elderly
13 people can have fluctuating renal function?
14     A. Elderly patients can have fluctuating
15 renal function. But in patients with creatinine
16 clearances greater than 15, the reproducibility of
17 the single dose of rivaroxaban has been
18 well-established in the pharmacokinetic studies.
19 So although they vary, they don't vary typically
20 around that threshold level of 15 CCs per -- per
21 minute. And if a patient has a creatinine
22 clearance close to that range, quite frankly I
23 would shy away from using any anticoagulant.
24     Q. What about warfarin?
25     A. I wouldn't use warfarin either.

Page 111

1      Q. So what do you do for those patients?
2      A. So whenever we decide to anticoagulate a
3  patient, we're always weighing the relative risk
4  of bleeding on the drug with the relative benefit
5  of anticoagulation.
6          Specifically for atrial fibrillation, the
7  overall risk of stroke in a patient in atrial
8  fibrillation is said to be about 4.4 per hundred
9  patient years. Having said that, there are
10 patients whose risk is higher and lower.
11 Historically, we've used the CHADS score. That's
12 been modified by many to the CHADS-VASc score.
13 But we can give an estimate for a patient's
14 likelihood of stroke. When we put a patient on an
15 anticoagulant, we balance that with the relative
16 risk of bleeding of the anticoagulant before we
17 make a clinical decision as to whether or not to
18 anticoagulate at all.
19         For a patient with a creatinine clearance
20 of 5, the relative risk of bleeding is going to be
21 considerable. Firstly, renal insufficiency in and
22 of itself inhibits platelet function. And
23 secondly, pharmacokinetics of drugs that have
24 renal elimination are going to be not predictable.
25 For such a patient, the risk of bleeding is going

Page 112

1  to be higher than the nascent risk of thrombosis
2  and such a patient would not be anticoagulated.
3  And I've seen many such patients in my practice.
4      Q. Do you remember what the question was?
5      A. I do.
6          The question was would I use warfarin in a
7  patient with impaired renal function?
8      Q. And then what's the answer to that
9  question?
10     A. The answer is --
11         MR. SLONIM:
12             Object.
13         THE WITNESS:
14             -- it depends on the clinical
15         scenario.
16         MR. DENTON:
17             Okay.
18         MR. SLONIM:
19             Objection.
20         MR. DENTON:
21             What was the objection?
22         MR. SLONIM:
23             The objection was it was asked and
24         answered. How many times do you want to
25         hear the answer?

Page 113

1  BY MR. DENTON:
2      Q. Is warfarin renally cleared?
3      A. I believe that there is some renal
4  excretion of warfarin. I could not tell you the
5  percentage of warfarin that's eliminated by the
6  kidney and the percentage that's eliminated
7  through feces without looking. That's not a
8  number I carry in my pocket.
9      Q. What about apixaban? What is the
10 clearance -- how is apixaban cleared?
11     A. Apixaban is a drug that has the least
12 renal clearance amongst any of the direct oral
13 anticoagulants. So it's -- it -- it's a drug that
14 can be used in patients with low creatinine
15 clearance -- can be more safely used in patients
16 with low creatinine clearance.
17     Q. Okay. Let's move on to Paragraph C1 on
18 Page 14, where you talk about prothrombin time
19 related to rivaroxaban use. Do you see that?
20     A. Correct.
21     Q. All right. You state right about the
22 middle of the paragraph, quote, "Medical consensus
23 is that PT cannot be used to assess the intensity
24 of rivaroxaban anticoagulation," end of the
25 sentence, end quote. And then you cite it looks

29 (Pages 110 to 113)

Protected - Subject to Further Protective Review

Page 114

1  like four articles.  Do you see that?
2      A.  I do.
3      Q.  And so you -- you -- if I understand what
4  you're telling me, is -- to support that statement
5  that I just read, you cite Smythe, Adcock,
6  Lindhoff-Last, and Testa; right?
7      A.  I believe the first name is Smythe.  But
8  correct.
9      Q.  Okay.  Have you seen any other literature
10 drawing the opposite conclusion, that PT can be
11 used to assess the intensity of rivaroxaban
12 anticoagulation?
13     A.  Not any study that's been significantly
14 powered and designed to actually make that
15 statement.  I believe that there's a study of
16 about 60 Japanese patients.  I believe it's on my
17 citation, but it's a small study.  And I think
18 that the interpretation of that study can be
19 called into question.
20     But let me offer you that no medical group
21 endorses PT testing to monitor rivaroxaban
22 exposure, not a single one, not the American
23 College of Physicians, not the American College of
24 Chest Physicians, not the American Hematology
25 Association, not the American College of

Page 115

1  Cardiology.  And it's not the practice of any of
2  my colleagues, both locally or nationally, to
3  follow PT or measure PT in patients taking
4  rivaroxaban.
5      Q.  Are you sure about that?
6      A.  I am absolutely sure about that.
7      Q.  Okay.  What about Dr. Kubitza, the Bayer
8  scientist or article that you cite in your report?
9          MR. SLONIM:
10             Objection.  Form.  What about what?
11 BY MR. DENTON:
12     Q.  What about Dr. Kubitza?  What did she say
13 in the article you cited in her report on the use
14 of PT to measure the anticoagulation effect of
15 rivaroxaban?
16     A.  Can you show me the article?  And I'll
17 review it and then render an opinion.
18     Q.  You don't remember?
19     A.  I'm asking you to show me the article.
20 I'm not going to rely on my memory.  I'm sorry.
21     Q.  Okay.  So you have no memory of that.  Is
22 that fair?
23     A.  That is not what I said, sir.  You know
24 that.  Come on.  Don't play me.
25         MR. DENTON:

Page 116

1          Guys.  Guys.  Guys, I'm --
2      THE WITNESS:
3          You're playing me.  Come on.
4      MR. SLONIM:
5          All right.  Just --
6      MR. DENTON:
7          Why don't we take a break.
8      MR. SLONIM:
9          Fine.
10     MR. DENTON:
11         I'm not playing --
12     MR. SLONIM:
13         Fine.
14     MR. DENTON:
15         -- him.
16     THE VIDEOGRAPHER:
17         We're now off the record at 11:47.
18     (Brief recess was taken.)
19     THE VIDEOGRAPHER:
20         We're now back on the record.  The
21 time is 12:47.
22 BY MR. DENTON:
23     Q.  Ready to go, Doctor?
24     A.  I am.
25     Q.  Good.

Page 117

1      If you were in the emergency room and a
2  patient came in with a very serious bleeding
3  event, let's say, for example, an ICH, that --
4  you'd consider that very serious; right?
5      A.  Intercranial [sic] hemorrhages are serious
6  bleeding events.  Yes.
7      Q.  All right.  Here in New Orleans, in the
8  medical practice, is there any laboratory test
9  that's available that could assess the
10 anticoagulation status of that ICH patient who has
11 also given a history of being on rivaroxaban?
12     A.  There is not any commercially available
13 validated test available in New Orleans to assess
14 a patient who's had an intracranial hemorrhage on
15 rivaroxaban.
16     Q.  So -- but -- but it is true, the PT test
17 -- PT assay is available in every emergency room
18 in this area, probably every emergency room in the
19 country; right?
20     A.  The PT test, just a small matter of
21 clarification, is available in every hospital.
22 And the emergency rooms use hospitals.  They're
23 not typically done in the emergency room, but
24 that's a technicality.
25     Q.  All right.  So can the PT test that's

30 (Pages 114 to 117)

Protected - Subject to Further Protective Review

Page 118

1    currently available -- let's say at your hospital
2    at Tulane.  Can it at least qualitatively test the
3    patient as to whether or not they are taking
4    rivaroxaban?
5        A.  No.  It cannot.
6        Q.  So regardless of the PT reagent, if the PT
7    reagent -- if a PT is done on a rivaroxaban
8    patient and it -- that PT comes back in the normal
9    reference range, that would not be an indication
10   that the patient is not anticoagulated on
11   rivaroxaban?
12           MR. SLONIM:
13             Can -- can I have the question back?
14           Roger, there are a lot of negatives in
15           there.  But let's have the question read
16           back, and if the witness understands it, I
17           have no -- I won't -- I won't object.
18   BY MR. DENTON:
19       Q.  Do you -- do you need the question,
20   Doctor?
21           MR. SLONIM:
22             I'll -- I'll ask the court reporter to
23           read it back.
24           MR. DENTON:
25             Sure.

Page 119

1        (The record was read back by the
2        reporter.)
3    THE WITNESS:
4        The way I'm going to answer the
5        question is:  Patients can be on
6        rivaroxaban and have a normal prothrombin
7        time.  Many of the papers cited in my
8        review point out that prothrombin time
9        testing is an unreliable and, in the case
10       of the Testa article, a potentially
11       dangerous way of assessing rivaroxaban
12       concentrations.
13   BY MR. DENTON:
14       Q.  So -- and -- and I'm not asking for a
15   quantification, but I'm just trying to talk about
16   a qualitative measurement.
17       Can any PT be used to qualitatively
18   determine whether or not a particular patient has
19   rivaroxaban onboard in their system, in your
20   opinion?
21       A.  In my opinion, in review of the data, I
22   think that the prothrombin time testing is not
23   ready for prime time as a test to look at rivar-
24   -- to -- to be used in rivar- -- patients taking
25   rivaroxaban.

Page 120

1        I think when you look at some of the
2    pharmacokinetic data, plotting prothrombin time
3    versus rivaroxaban concentration, straight lines
4    are drawn through that data, but there's no
5    R-squared given for that line.  And if you only
6    look at the area of that graph at which
7    traditional concentrations are reached, the line
8    is far from linear and the R-squared is nearly
9    likely a very low number, although not provided.
10   That's a long way of saying that there are certain
11   clinical scenarios where it would -- might be
12   important to be able to assess anticoagulation for
13   patients taking rivaroxaban, but currently there
14   is no assay that's sensitive enough to be useful.
15       And I'm going to add, in my opinion, if
16   and when such an assay becomes available, it's not
17   going to be the prothrombin assay.  It's probably
18   going to be a modified Xa assay, if I had to
19   guess.
20       Furthermore, because of the number of
21   patients taking rivaroxaban and other Xa
22   inhibitors, it -- if there was a big market space
23   for such a testing procedure, I would assume that
24   such a test would be developed by industry, and
25   quite frankly it hasn't.

Page 121

1        So I think that as appealing as it might
2    be to have a test to measure degree of
3    anticoagulation for patients taking rivaroxaban,
4    we do not currently have such a test.  And from my
5    review of the literature and from other expert
6    opinion that I've provided you, it does not appear
7    as the PT is such a test.
8           MR. DENTON:
9             All right.  Move to strike as
10           nonresponsive.
11   BY MR. DENTON:
12       Q.  I'm going to read the question back again.
13       Can any PT be used to qualitatively
14   determine whether or not a particular patient has
15   rivaroxaban onboard?
16       A.  So I think that's too general a question.
17       As I answered in my previous response, it
18   is -- there -- the -- there are graphs drawn that
19   show a linear relationship between prothrombin
20   time and rivaroxaban concentration.  However,
21   those curves are carried out to rivaroxaban
22   concentrations that are five- to six-fold what are
23   found at typical dosing levels.  If you look at
24   the typical serum concentrations, that line is far
25   from linear and, most importantly, there's clearly

31 (Pages 118 to 121)

Protected - Subject to Further Protective Review

Page 122

1   patients who are therapeutically anticoagulated on
2   rivaroxaban who have normal prothrombin times,
3   making reliance on prothrombin time potentially
4   dangerous if one makes the assumption that that
5   patient is not anticoagulated.
6           MR. DENTON:
7               Somehow we're not communicating.  And
8       I'm going to move to strike that answer
9       again.
10  BY MR. DENTON:
11      Q.  I -- I simply -- it's a pretty simple
12  concept, I think.  And I -- I'd like to see if you
13  can answer it directly and simply.
14          Can PT as we know it today in the medical
15  practice be used to determine whether or not a
16  patient has rivaroxaban onboard in their system,
17  just qualitatively?  Yes or no?  Not to quantify
18  it, but to -- just qualitatively.
19      A.  I'm going to have to qualify my answer.
20  The answer is:  it depends.  The problem
21  is there are patients who have rivaroxaban onboard
22  and have a normal prothrombin time.  Those are
23  well-reported in the literature and well-reported
24  in the Phase I and II studies.  Because there are
25  such patients, it would be inadvisable to assume

Page 123

1   that a normal prothrombin time excludes the
2   presence of rivaroxaban.
3           MR. DENTON:
4               Okay.  I think he answered it to at
5       least my understanding.
6           THE WITNESS:
7               Thank you.
8   BY MR. DENTON:
9       Q.  Have you seen any medical literature in
10  your research that comes to a different conclusion
11  with respect to PT being able to assess the
12  anticoagulation effect of -- of rivaroxaban?
13      A.  There are some studies that suggest that
14  the prothrombin time can be used to look at
15  rivaroxaban exposure.  However, when you look at
16  the study methodology, that being the size of the
17  patient population studied, and other factors, I
18  believe those studies are inadequate to draw such
19  a conclusion.  When you look at the way this was
20  interpreted by the FDA and other major groups,
21  none of them, none of them, none of them recommend
22  PT testing as a way to follow rivaroxaban
23  patients.
24      Q.  So let's go to Dr. Kubitza's paper that
25  caused the -- the lunch break.  We'll mark that as

Page 124

1   Exhibit 9.
2           (Exhibit No. 8 was marked for
3       identification and attached hereto.)
4           MR. SLONIM:
5               I'm sorry?  What exhibit number?
6           MR. DENTON:
7               It's going to be -- I think we're on
8       9.
9           MS. DeVAUGHN:
10              No.  We're on 8.
11          MR. DENTON:
12              Oh.  Well, where is 8?  It's on the
13      other sheet.  Sorry.  That's why you're
14      here.  (Tenders document.)
15          MR. SLONIM:
16              Thanks.
17          THE WITNESS:
18              Thank you.
19  BY MR. DENTON:
20      Q.  Take a look at that.  And I just want you
21  to confirm with me that that is the Kubitza 2005
22  article that you cite in your report on a couple
23  of places, in -- in the body of your report and
24  also on your materials relied list.  I think it's
25  No. 33, just to help you, on your Exhibit B.

Page 125

1       A.  My Exhibit 33 is in fact this paper from
2   the Journal of Pharmacodynamics.
3       Q.  Okay.
4       A.  Yes.
5       Q.  So -- and that's -- and -- and when you
6   refer to Kubitza 2005 in the body of your report,
7   you're referring to that particular article;
8   correct?
9       A.  Correct.
10          I did misstate it.  It's the European
11  Journal of Clinical Pharmacology.  But yes.
12      Q.  Okay.
13      A.  Yes.
14      Q.  All right.  So that's a reliable study,
15  isn't it, sir, in your opinion?
16      A.  Can you define "reliable"?
17      Q.  Well, you -- you -- you say you've been
18  weighing well-controlled, well -- number of
19  patients, number of patients, the way it's done,
20  the article [sic] it's published in, whatever.  Do
21  you consider it reliable?  You cite it in your
22  report.  I presume that you do, but I'm asking.
23      A.  I consider this a reliable study for the
24  patient population studied.  These -- namely, in
25  healthy male subjects.

32 (Pages 122 to 125)

Protected - Subject to Further Protective Review

Page 126

1    Q. Okay. Now, turn to Page -- it's actually
2 Page 879 in the journal, which is two from the
3 end. You with me? I'm --
4    A. I'm on Page 879.
5    Q. All right. Let's go to the very last
6 sentence in the right-hand column. Let's read
7 that together. You with me?
8    A. Yes.
9    Q. "Pharmacodynamic and pharmacokinetic
10 parameters correlated closely. There was a
11 direct, linear relationship between plasma" -- and
12 that's "BAY 59-7939 concentration and PT."
13    And you do know, sir, that that is the
14 original numbering internal to Bayer for
15 rivaroxaban; correct?
16    A. I do know that. Yes.
17    Q. Okay. So first of all, do you agree that
18 there is a direct linear relationship between
19 plasma rivaroxaban concentration and PT?
20    A. So I agree, in this study, looking at
21 normal healthy males, under ideal conditions --
22 that being this is a pharmacokinetic study, so
23 these patients had their test drawn appropriately,
24 on time. I think there's special care done in
25 such studies to make sure you not only use the

Page 127

1 same brand but the same batch number of Simplastin
2 reagent. And -- and in that situation there's a
3 linear correla- -- there's a linear relationship.
4    However -- however -- and maybe this is
5 your next question.
6    Q. Just answer the one pending.
7    A. In this study, the way this was done, this
8 author concludes that there is such a linear
9 relationship, done under ideal conditions with
10 healthy male patients.
11    Q. Well, you cited that article in your
12 report for a number of your opinions, didn't you?
13    A. I cited it for a number of opinions.
14    Q. Okay. And it was certainly appropriate
15 and reliable for you to cite it for your opinions
16 -- correct -- in your view?
17    A. It -- it's appropriate in the population
18 studied. Yes.
19    Q. All right. Well, you didn't mention --
20 well, strike that.
21    So let's read the next sentence. "This
22 suggests that PT, a routinely used coagulation
23 test, could be used clinically to monitor the
24 anticoagulation effect of" rivaroxaban, "if
25 necessary."

Page 128

1    Do you see that sentence?
2    A. I do see that sentence.
3    Q. And do you disagree with that sentence?
4    A. I don't disagree with the sentence. But I
5 think that you glossed over the word "suggests"
6 and "could."
7    This is not -- this study was never
8 designed as a prospective study to determine
9 whether or not the prothrombin time could be used
10 in the monitoring of patients in rivaroxaban.
11 That's an entirely different question.
12    This is a speculative statement that we
13 all write in the conclusions of our articles.
14 Because when we write manuscripts, we want to give
15 other authors and investigators ideas for future
16 studies. This does not say that the PT is a
17 coagulation test that should be used clinically to
18 monitor the anticoagulation effect of rivaroxaban.
19 Those are two very different questions.
20    Q. But I didn't ask that very different
21 question. I read it correctly. I said, quote,
22 "This suggests that PT, a routinely used
23 coagulation test, could be used clinically to
24 monitor the anticoagulation effects of"
25 rivaroxaban, "if necessary."

Page 129

1    I read that correctly, didn't I?
2    A. And you read that statement correctly.
3 Yes.
4    Q. Well, thank you.
5    A. I believe you asked me if I agreed with
6 it, but I may be incorrect.
7    Q. It goes on to say several sentence [sic]
8 down, "This suggests that PT would be a viable
9 monitoring test of the" anticoagulation "effect
10 of" rivaroxaban, "whatever the ISI of the reagent
11 used, if such monitoring were necessary in
12 individual patients."
13    First of all, did I read it correctly?
14    A. You read the statement correctly.
15    Q. Do you agree with the statement?
16    A. I agree that this may suggest -- again,
17 this is not a prospective study to suggest that PT
18 monitoring should be used in patients taking
19 rivaroxaban. But I agree that you read the
20 statement correctly. And I agree that this is
21 speculative, and that's what we do in the final
22 paragraph of manuscripts.
23    Q. I see.
24    Have you spoken to Dr. Kubitza?
25    A. I have never spoken nor met Dr. Kubitza.

33 (Pages 126 to 129)

Protected - Subject to Further Protective Review

Page 130

1    Q. Do you know what her role was in
2  development of rivaroxaban?
3    A. Not specifically. No.
4    Q. She was a clinical pharmacologist,
5  Dr. Mueck's boss, all the articles you cited by
6  Dr. Mueck. You didn't know that?
7    A. I know that they collaborate. I didn't
8  know who was whose boss. I also believe
9  Dr. Kubitza is a -- is an anesthesiologist, if I'm
10  not mistaken.
11    Q. Actually she's a clinical pharmacologist,
12  M.D.
13        Why did you think she was an
14  anesthesiologist?
15    A. I did a literature search and thought that
16  I saw that she was an anesthesiologist, which
17  would not necessarily be incompatible with having
18  experience in pharmacology.
19    Q. When did you do that literature search
20  relative to Dr. Kubitza?
21    A. I don't remember.
22    Q. Was that part of your work in preparing
23  your report?
24    A. I believe it was after I drafted my
25  report.

Page 131

1    Q. Why did you -- did you do that for all the
2  physicians that are listed in these articles or
3  just Dr. Kubitza?
4    A. I certainly did not do that for every
5  person cited in my report.
6    Q. Did you do it for physicians or scientists
7  in addition to Dr. Kubitza?
8    A. I believe I did it with Dr. Mueck, and
9  there may have been one or two other people that I
10  did it for, more out of interest than anything
11  else.
12    Q. And what did you find out about Dr. Mueck
13  when you researched his name?
14    A. My recollection is that Dr. Mueck is a
15  Ph.D., not an M.D., researcher for Bayer.
16    Q. Do you know Dr. Frank Peacock?
17    A. I believe I cited one of his articles, but
18  I do not know him personally.
19    Q. Have you ever attended any of his
20  rivaroxaban presentations?
21    A. To the best of my recollection, no.
22    Q. You're going to have to help me, sir. I
23  don't see Dr. Peacock's name anywhere in your
24  report or your Exhibit B as an author of an
25  article.

Page 132

1    A. I'd have to check. Some of these I list
2  the first author, et al. So I'd have to check if
3  one of those were Dr. Peacock.
4    Q. Well, I'm trying to -- if you could help
5  me, I'm trying to figure out either in your body
6  of your report or on your Exhibit B which article
7  you're referring to that you thought Dr. Peacock
8  may have been one of the authors. And again, I'll
9  have to tell you I didn't find it visually. And
10  when I did a keyword search of his name, it didn't
11  come up anywhere in your report. So if you could
12  help me, I'd appreciate it.
13    A. To the best of my recollection, he may be
14  an et al. If you'd like to break and allow me to
15  do a PubMed search, I may be able to find that.
16    Q. No. No.
17      MR. SLONIM:
18        No. We're not going to --
19      MR. DENTON:
20        No. I'm not going --
21      MR. SLONIM:
22        We're not going to do that.
23  BY MR. DENTON:
24    Q. No. No. I'm not asking you to do that.
25  I asked you if you knew Frank Peacock. You said

Page 133

1  you thought you did because you cited one of his
2  articles.
3    A. Time out. I -- I want to correct that. I
4  never said I thought I did. I said I don't know
5  him, but I believe that I cited him in one of the
6  articles I used in the report.
7    Q. Right.
8    A. I do not know him.
9    Q. You -- you said that, and I apologize.
10      All I'm trying to find out is really
11  simple. I'm just trying to find out which article
12  either in your report or on these couple of pages
13  of materials considered which -- which article
14  that is. I'm not trying to play a game. But
15  there's --
16      MR. SLONIM:
17        Yeah. So --
18  BY MR. DENTON:
19    Q. -- five or six Peacock articles out there.
20      MR. SLONIM:
21        So Roger, look, I'll do this either on
22    my direct, if you want, or -- or we'll
23    save you some time. But you had asked
24    about real-world studies, and there was --
25    there were two. There was the REVISIT

34 (Pages 130 to 133)

Protected - Subject to Further Protective Review

Page 134

```
 1    study, and there was the -- there was a
 2    typo.  It's said PHSS.  It should have
 3    been PMSS.  You're right that those
 4    studies -- those studies were cited.
 5    Those studies were cited in the expert
 6    report.
 7        MR. DENTON:
 8        Right.
 9        MR. SLONIM:
10        When I went back and checked the list
11    of references, those studies were not
12    included on the reference list.  That was
13    an oversight.  I actually printed out
14    copies and have them if you want them
15    or -- or I'll do it when I have the direct
16    exam -- direct exam.  But Peacock is an
17    author on one of those studies.
18    BY MR. DENTON:
19        Q.  Okay.  All right.  That's -- does -- does
20    that refresh your recollection?
21        A.  Yes.  It does.  Thank you.
22        MR. DENTON:
23        Okay.  Well, that was my problem.
24    Because I spent all weekend looking for
25    PHSS on the Internet and it wasn't in the
```

Page 135

```
 1    report and it wasn't . . .
 2        MR. SLONIM:
 3        So -- so it was a typo in the report.
 4        MR. DENTON:
 5        I understand.
 6        MR. SLONIM:
 7        And -- and there was an oversight, and
 8    then -- and then it was compounded by the
 9    fact that it was left off the reference
10    list.
11        MR. DENTON:
12        Right.
13        MR. SLONIM:
14        Sorry about that.
15        MR. DENTON:
16        Do you have a copy of it?
17        MR. SLONIM:
18        I do.  I have -- I -- I've got a
19    couple of copies, I think.
20        MR. DENTON:
21        Is that all --
22        MR. SLONIM:
23        Those are I think -- I thought I had
24    three copies.  Those are at least two
25    copies.
```

Page 136

```
 1        MR. DENTON:
 2        Okay.  Okay.  Okay.
 3    BY MR. DENTON:
 4        Q.  So if I can get this correct, the
 5    reference to the real-world studies on Page 12,
 6    the "PHSS" is a typo.  It should be PMSS?
 7        A.  Correct.
 8        Q.  Okay.  Post-market surveillance, I assume?
 9        A.  Correct.
10        Q.  Study.  Okay.
11        And it's your recollection that it's that
12    study, although not on your Exhibit B materials,
13    was the one that had Peacock as one of the
14    coauthors; is that right?
15        A.  That is correct.
16        Q.  Okay.  Have you read any of Dr. Peacock's
17    -- the same Dr. Peacock's article concerning
18    measuring anticoagulation effect of rivaroxaban by
19    various laboratory assays?
20        A.  I don't believe I've read that article.
21    No.
22        Q.  There's several of them.  You haven't read
23    any of them?
24        A.  I don't believe I've read them.  No.
25        Q.  Let me hand you Exhibit 9.  It's an
```

Page 137

```
 1    article written by the same Dr. Frank Peacock.
 2        (Exhibit No. 9 was marked for
 3        identification and attached hereto.)
 4    BY MR DENTON:
 5        Q.  Have you ever seen this article before,
 6    sir?
 7        A.  I don't believe I have.  No.
 8        Q.  Did this article come up in your
 9    literature search, your PubMed search, or do you
10    have any recollection?
11        A.  I have no recollection that this article
12    came up in my search.
13        Q.  Let's -- let's go to -- well, the page
14    numbers, they're a little odd.  They're down at
15    the bottom, very bottom on the left.
16        A.  I see.
17        Q.  Okay.  So let's go to, internal to the
18    article, Page 734.
19        A.  I'm on Page 734.
20        Q.  Very good.  And -- and there's a -- on
21    the -- in the left-hand column there is a
22    paragraph that's labeled "Rivaroxaban," and then
23    it says, "Time," slash, "Observations."  Do you
24    see that?
25        A.  I do see that.
```

35 (Pages 134 to 137)

Protected - Subject to Further Protective Review

Page 138

1    Q. Let -- let -- let's read together. Or
2  I'll read and you follow, please.
3       "The anticoagulant effect of rivaroxaban
4  can be assessed by following the PT, preferably as
5  determined with the Neoplastin Plus (Roche
6  Diagnostics) reagent."
7       Do you see that?
8       A. I do.
9       Q. Do you disagree with that statement?
10      A. I -- I'd have to read the entire article
11  to take that in context. But I -- I actually --
12  I'd have to put it in a proper context.
13      As I mentioned before, one can establish a
14  linear relationship between rivaroxaban
15  concentrations and prothrombin time. And if
16  that's what Dr. Peacock means by that statement,
17  then I agree with that statement. If he means
18  that clinically one can measure the clinical
19  effects of rivaroxaban with the PT, I don't agree
20  with that statement. And in that I've not read
21  the entire article, I'm not sure what context that
22  statement's made.
23      Q. Well, let's -- let's just look at the
24  title of the article. "Emergency Management of
25  Bleeding Associated With Old and New Oral

Page 139

1  Anticoagulants." Do you see that?
2       A. I do.
3       Q. And he's an ER doctor, emergency room
4  physician?
5       A. Okay.
6       Q. Okay. And you've never seen this article
7  before; is -- is -- is --
8       A. Not to the best of my recollection. No.
9       Q. Okay. All right. If -- let's -- let's --
10  let's go further in that same paragraph. I think
11  there's some things you'll agree with.
12      He goes on to say in that same paragraph,
13  It's "critical to note that the actual PT, not the
14  INR, must be used for this assessment." You agree
15  with that -- right -- that INR isn't appropriate
16  for rivaroxaban; right?
17      A. I agree with that. INR was developed for
18  warfarin.
19      Q. He goes on to say, "In most patients who
20  discontinue rivaroxaban after steady-state dosing,
21  the PT will" fairly -- or "fall rapidly to
22  near-normal times within 24 hours."
23      Do you agree with that?
24      A. Again, I agree -- I think that the
25  statement needs to be taken in context in that

Page 140

1  there are many patients who take rivaroxaban and
2  do not have an elevation in prothrombin time. In
3  that situation I wouldn't expect it to fall
4  rapidly to near-normal limits since it was at a
5  normal limit to begin with.
6       Q. And -- and again, to support that answer,
7  you're citing the Mueck papers?
8       A. I'm citing the Mueck papers. Yes.
9       Q. All right. Fair enough.
10      Let's go to another paper of
11  Dr. Peacock's. This is No. 10.
12      (Exhibit No. 10 was marked for
13      identification and attached hereto.)
14      THE WITNESS:
15      I'm sorry. I am --
16      MR. DENTON:
17      Take your time.
18      THE WITNESS:
19      -- mixed it up here. Okay. A little
20      bit out of order, but that's okay.
21  BY MR. DENTON:
22      Q. Ready?
23      A. Yeah.
24      Q. Here's No. 10, "Managing Bleeding and
25  Emergency Reversal of Newer Oral Anticoagulants:

Page 141

1  A Review for Primary Care" physicians by
2  W. Frank Peacock, IV, MD.
3       Do you have that in front of you,
4  Exhibit 10? Do you have that in front of you,
5  sir?
6       A. I do.
7       The last word in the title is "Providers."
8  It's a trivial correction.
9       Q. Thank you. I'm not -- not that good.
10  Still learning.
11      Let's go to Page 77 of the article.
12  There's -- in the right-hand column: Measuring
13  Anticoagulant Effect. Do you see that?
14      A. I do.
15      MR. SLONIM:
16      And -- and, Doctor, if you need a
17      minute to read --
18      MR. DENTON:
19      Read the whole thing --
20      MR. SLONIM:
21      Well --
22      MR. DENTON:
23      -- if he wants to.
24      MR. SLONIM:
25      If you -- if you need a minute to sort

Protected - Subject to Further Protective Review

Page 142

1    of get the sense of the article and the
2    context, then --
3        THE WITNESS:
4            Let me at least read the abstract.
5        MR. DENTON:
6            Fair enough.
7        MR. SLONIM:
8            Thank you.
9        THE WITNESS:
10           Okay.
11   BY MR. DENTON:
12       Q.  Are you ready to go?
13       A.  I am.
14       Q.  Okay.  So first of all, just to be clear,
15   you've never read this article?
16       A.  That's correct.  I've never read this
17   article.
18       Q.  And did it -- do you know if it came up in
19   your PubMed search?
20       A.  I don't recall this article coming up in
21   my PubMed search.
22       Q.  Okay.  So let's go now to Page 77 of the
23   article.  Bottom right-hand corner is Page 77.  Do
24   you see that?
25       A.  I do.

Page 143

1        Q.  It says, "Measuring Anticoagulant Effect."
2    Do you see that?
3        A.  I do.
4        Q.  In this article, they refer to these new
5    anticoagulants as TSOACs.  But they're -- he's
6    referring to rivaroxaban, dabigatran, and
7    apixaban; correct?
8        A.  That is correct.
9        Q.  All right.  Second sentence under that
10   paragraph, he says, "clinicians may need to
11   determine the intensity of anticoagulation for the
12   effective management of patients, such as before
13   surgery or other invasive procedures, or in cases
14   of bleeding, anticoagulant" over -- excuse me --
15   "overdose or" deterring [sic] "renal function"
16   constitution -- "constituting functional
17   overdose."
18           Do you see where I'm reading?
19       A.  I do.
20       Q.  Do you agree with that statement?
21       A.  I think that there is a "may" in that
22   sentence that you adequately read, and I -- I
23   agree with that.
24       Q.  So you -- so you -- the way the sentence
25   is written in this article, you agree with it.  Am

Page 144

1    -- am I --
2        A.  I do.
3        Q.  Okay.  Fair enough.  Okay.
4            So then I'm going to skip over the
5    dabigatran stuff.  Let's go to Page 78 --
6        A.  Okay.
7        Q.  -- bottom right.  And he starts talking
8    about rivaroxaban and -- and apixaban.  Do you see
9    that?  It's the bottom -- the last paragraph on
10   the right-hand column.
11       A.  I do.
12       Q.  All right.  And he describes both of them.
13   And then on the next page, Page 79 --
14       MR. SLONIM:
15           Roger, you intentionally skipped the
16   left-hand side of 78?
17       MR. DENTON:
18           No.  I'm just trying to get to my
19   point.  I'm trying to -- to orientate it.
20       MR. SLONIM:
21           Okay.
22       MR. DENTON:
23           You've got the right to ask all the
24   questions you want.  I believe that's
25   still the law in -- in 2017.

Page 145

1    BY MR. DENTON:
2        Q.  All right.  So he states at the top, For
3    factor -- "For the factor Xa inhibitor
4    rivaroxaban, PT is considered the best assessment
5    of" anticoagulation -- "anticoagulant activity."
6            Do you see where I'm reading?
7        A.  I do.
8        Q.  Do you agree with that statement?
9        A.  Best compared to what?  I'm not sure.  I
10   think that this has to be taken into context.
11           But I want to draw your attention --
12       Q.  No.  I want you to answer --
13       A.  -- Page 78.
14       Q.  No.  No.
15       A.  I need -- I need -- it's not a yes-or-no
16   question.
17           On Page 78, he clearly says, "The standard
18   prothrombin time . . . assay . . . does not
19   provide meaningful results."  So he says that, and
20   then he makes this statement, and think that that
21   statement needs to be taken in context.
22       MR. DENTON:
23           All right.  Move to strike as
24   nonresponsive.
25   BY MR. DENTON:

Protected - Subject to Further Protective Review

Page 146

1        Q.  By the way, have you read his report, his
2    expert report in this case?
3        A.  I have not.
4        Q.  Did you know he was an expert in this
5    case?
6        A.  I did not.
7        Q.  Have you read his deposition?
8        A.  Obviously if I didn't know he was an
9    expert I did not read his deposition.  No.
10       Q.  Well, they could have sent it to you, but
11   they didn't; right?
12       A.  I don't know what they could have or
13   should have done.  They did not send it to me.
14       Q.  All right.  Are you comfortable with this
15   process today?
16       A.  As comfortable as I can be.
17       Q.  I'm not trying to make you uncomfortable.
18   If there's --
19            MR. SLONIM:
20            Look.
21   BY MR. DENTON:
22       Q.  -- a problem, I'll try to --
23            MR. SLONIM:
24            No.  No.  That's a -- that's a --
25            THE WITNESS:

Page 147

1            The very question that you're ask --
2        MR. SLONIM:
3            Hold -- hold on.  Hold on.
4        THE WITNESS:
5            All right.
6        MR. SLONIM:
7            Hold on.
8        MR. DENTON:
9            I'm not trying to --
10       MR. SLONIM:
11           Roger -- Roger --
12       MR. DENTON:
13           -- be a jerk.
14       MR. SLONIM:
15           Roger, please, if you have questions
16       about his report, his opinions, his
17       matters, that's fine.
18       MR. DENTON:
19           I --
20       MR. SLONIM:
21           Direct your stuff to those.  Come on.
22       MR. DENTON:
23           Well, I am.
24       MR. SLONIM:
25           Thank you.

Page 148

1            MR. DENTON:
2            I'm -- it's been pretty calm.  I'm
3        just trying to ease this up a little bit,
4        so we can all relax.
5    BY MR. DENTON:
6        Q.  Let me ask you this:  Have you read
7    Dr. Berkowitz -- Scott Berkowitz's testimony, the
8    Bayer scientist that was in charge in the U.S. for
9    rivaroxaban?
10       A.  I have not.
11       Q.  Do you know what he says about PT and the
12   measurement of the anticoagulation effect of
13   rivaroxaban?
14       A.  As I stated previously, I didn't read his
15   report, hence I would not have known what he said.
16       Q.  All right.  Do you consider yourself a
17   rivaroxaban expert?
18       A.  I consider myself an expert insofar as I'm
19   a board-certified hematologist.  I practice in the
20   field of benign hematology.  I've been recognized
21   by the American Society of Hematology.  I've been
22   asked to speak nationally and internationally.
23   Insofar as that applies, I consider myself an
24   expert.
25       Q.  But have you been asked to do so on the

Page 149

1    topic of rivaroxaban?
2        A.  I believe you have a copy of the talks
3    that I've given that pertain to rivaroxaban.  Yes.
4        Q.  The ones to the students?
5        A.  And the one to the Latin American College
6    of Physicians.
7        Q.  Right.
8        A.  Correct.
9        Q.  Okay.
10           So none in the United States outside of
11   your students?
12       A.  If I can correct you, the Latin American
13   College of Physicians is also part of the American
14   College of Physicians since the Panama Canal Zone
15   was part of the United States.
16       Q.  Okay.  I didn't do well in geography or
17   history.
18           Would you at least agree me -- agree with
19   me that a PT using the Neoplastin reagent
20   correlates with rivaroxaban concentrations?
21       A.  I agree that there is some correlation
22   between the prothrombin time as measured by the
23   Neoplastin reagent and serum concentrations of
24   rivaroxaban.  I think that the linearity, the --
25   the R-squared, if you were -- will, has not been

38 (Pages 146 to 149)

Protected - Subject to Further Protective Review

Page 150

1  published.  And I think when you look at
2  therapeutic concentration, that linear -- that
3  linearity falls off.
4      Q.  Well, what R-squared linearity would you
5  want to see to say that there's a good correlation
6  between riva plasma concentrations and PT
7  Neoplastin?
8      A.  I think that we'd expect an R-squared of
9  about .8.  That's traditionally what we use in
10  science.
11      Q.  So certainly point -- an R-squared of .98
12  would be even better; right?
13      A.  An R-squared of .98 is better.
14      Again, I want to look at the R-squared
15  over the typical serum concentrations, not when
16  they're carried out five times that amount.
17      Q.  Well, have you seen any of the Bayer or
18  Janssen publications on that topic?
19      A.  I have.
20      Q.  And you haven't noted what they found?
21      A.  I have.
22      I don't believe they've published their
23  R-squared.  And if they have, I don't recall what
24  the R-squared is.
25      Q.  It's .98.

Page 151

1      A.  No.  It's -- it's .98 for the line over
2  the entire range of concentrations.
3      If you look at the dots and you look at
4  the actual points on that graph and you look at
5  serum concentrations up to 200 or 300 micrograms,
6  those dots are widely disparate.  And there is no
7  R-squared published for that region of the curve,
8  which is the one that's relevant clinically and
9  therapeutically.
10      Q.  Which part of the curve is relevant?
11  And --
12      A.  The left part of the curve, with the
13  tissue -- serum concentrations up to about
14  300 micrograms.
15      Q.  Okay.  That's what I was trying to ask.
16      So you think the relevant concentrations
17  are from zero on the low end up to about
18  300 micrograms per --
19      A.  You can probably go a little bit higher.
20  But those are the most relevant.  Yes.
21      Q.  Because those are the
22  concentrations one would expect to see potentially
23  in the clinical practice?
24      A.  That's correct.
25      Q.  Okay.  All right.  And you're talking

Page 152

1  about the Mueck papers again?
2      A.  I believe it's a Mueck paper, but it was
3  also in Item 1 in my reference list.  I believe
4  it's also in the NDA document.
5      Q.  Yeah.  The J&J public -- or submission --
6      A.  Correct.
7      Q.  -- to the FDA?
8      A.  Right.
9      Q.  Okay.  Okay.  You can set that article
10  aside a second, Doctor.
11      Let's go back to your report a second,
12  Page 14.  I'm looking towards -- right towards the
13  bottom, the last full big paragraph on the bottom.
14  While we're talking about -- you say, "While PT
15  with Neoplastin does appear to correlate to a
16  plasma level of rivaroxaban, there is not a good
17  correlation between PT and the risk of major
18  bleeding with rivaroxaban."
19      Do you see that sentence?
20      A.  I do see that sentence.
21      Q.  Okay.  And I'm interested in the last
22  phrase.  You say there's "not a good correlation
23  between PT and the risk of major bleeding."
24      There certainly is some correlation, isn't
25  there?

Page 153

1      A.  It depends how the data is interpreted.
2  If you look at -- I believe it's Reference 1.  And
3  if you look at the dosing data and if you look at
4  the data that looks at bleeding risk, at the
5  individual doses of rivaroxaban used, if you look
6  at bleeding, which is indicated by one of I
7  believe four lines that range from no bleeding to
8  significant bleeding, and you look at the PT
9  scores, the scatter is large.  Furthermore, within
10  any given dosing range, there's great overlap
11  between prothrombin times in patients who did not
12  bleed and prothrombin times in patients who had
13  significant bleeding.
14      Q.  All right.  When did they collect the PT
15  data on the riva patients in the ROCKET study?
16      A.  I don't have that committed to memory.
17  I'd have to look.
18      Q.  Well, let's pull it out and look.  Do you
19  have a copy of the ROCKET study?
20      MR. DENTON:
21      Do we have a copy of it?  I'll look --
22      look it up.  Let me take a break.  I may
23      have to print it.
24      MR. SLONIM:
25      Okay.

39 (Pages 150 to 153)

Protected - Subject to Further Protective Review

Page 154

1    THE VIDEOGRAPHER:
2        This is -- this is the end of Tape 3.
3    We're now off the record at 1:30.
4    (Brief recess was taken.)
5    THE VIDEOGRAPHER:
6        This is the beginning of Tape 4.
7    We're now back on the record.  The time is
8    1:51.
9    BY MR. DENTON:
10    Q.  Doctor, back to the topic of PT and its
11    correlation or lack of correlation to bleeding
12    risk of rivaroxaban.  That's the topic area.  All
13    right?
14    A.  Okay.
15    Q.  If you were designing a clinical -- strike
16    that.
17        Have you ever been -- participated in any
18    clinical trials?
19    A.  Yes.
20    Q.  What have you done?
21    A.  I have designed, implemented, and
22    published a number of trials in medical education.
23    I have been an investigator in trial -- looking at
24    a novel drug for sickle cell disease.  I have also
25    designed some of my own clinical trials, not

Page 155

1    necessarily using pharmaceuticals, but using
2    laboratories, etcetera.
3    Q.  Okay.  So if you were going to design a
4    clinical trial to -- to test the hypothesis of
5    whether or not PT -- PT in rivaroxaban patients
6    correlated with outcome events, whether it be
7    bleeding on the risk side or efficacy -- you know,
8    protection from thrombosis on the efficacy side,
9    when would you collect that data?
10    A.  So if I were designing such a trial
11    looking at prothrombin time, I -- I think -- and
12    I'm not convinced that there's a right answer.
13    But I would certainly likely draw some baseline
14    lab levels --
15    Q.  Okay.
16    A.  -- in patients participating in the trial.
17    I would probably draw some levels early in the
18    trial as patients first go on the drug, and then
19    would probably check some levels after steady
20    state.  And then I would probably space out my
21    blood draws depending on some of the practicality
22    of the trial; i.e., times that I'm collecting
23    other data it might be convenient to draw the
24    prothrombin time.
25    Q.  Okay.  What about the time of the outcome

Page 156

1    event?  A patient comes to the emergency room
2    either -- let's just talk on the risk side, a
3    major bleeding event.  Would it be helpful to have
4    the collection of blood and analyzation of PT at
5    that time to see how it correlated with
6    outcomes --
7    A.  I think --
8    Q.  -- in that case, a bleeding outcome?
9    A.  I think if one had the hypothesis that a
10    prothrombin time was useful for predicting
11    bleeding in a clinical trial -- prospective
12    clinical trial, if a patient came in with a
13    bleeding event, it would be useful to have a
14    prothrombin level -- a prothrombin time.  Yes.
15    Q.  All right.  Neither Bayer nor Janssen did
16    such collection of data in the ROCKET trial.
17    True?
18    A.  Can I see a copy of the trial?
19    Q.  Sure.  I -- I -- well, what I have is the
20    article you cited, the -- the one published in the
21    New England Journal of Medicine.
22    MS. DeVAUGHN:
23        Mueck.
24    MR. DENTON:
25        No.

Page 157

1    THE WITNESS:
2        Perfect.  If I could take a look at
3    that --
4    MR. DENTON:
5        Yeah.  I'll give you that.  No.  No.
6    No.  I want the -- the other one, the one
7    we just had printed.  That's the actual
8    ROCKET AF study.  What are we on?
9    MS. DeVAUGHN:
10        Eleven.
11    MR. DENTON:
12        (Tenders document.)
13    THE WITNESS:
14        Thank you.
15    MR. DENTON:
16        You're welcome, sir.
17    MR. SLONIM:
18        What exhibit number?
19    MR. DENTON:
20        It's -- we're on 11, Bert.
21    (Exhibit No. 11 was marked for
22    identification and attached hereto.)
23    MR. SLONIM:
24        Okay.  Thanks.
25    THE WITNESS:

40 (Pages 154 to 157)

Protected - Subject to Further Protective Review

Page 158

1    I'm sorry.  In my brief re-read of
2    this article, I don't see any mention of
3    when prothrombin times were done.  If
4    you'd like to direct me to where --
5    BY MR. DENTON:
6    Q.  I don't know if it's in there.  It might
7    be in Mueck.  But let me just withdraw that
8    question and ask a slightly different question.
9        If I understood your previous answer, if
10   you were designing a clinical trial to test the
11   hypothesis as to whether or not there was a
12   relationship with PT and bleeding event, as I
13   understood your answer, you would take PT at --
14   at -- at the study initiation, at steady state,
15   which would be a few days, maybe a week into the
16   study; right?
17   A.  Uh-huh.
18   Q.  And then you said an interval or so
19   thereafter, depending on, you know, convenience or
20   collection of other data, and then at the time of
21   the outcome event?
22   A.  If I were designing a study to test
23   whether PT or for that matter any other --
24   Q.  Right.
25   A.  -- test correlated with the primary

Page 159

1    endpoint, I would -- if I could just clarify a
2    little bit.  I would do it in the beginning,
3    before patients took drug.  And I probably
4    wouldn't wait 'til steady state.  I think I would
5    take it -- if I could keep ahold of the patients,
6    take it throughout the initial -- initiation phase
7    of the drug.  I would then do it at steady state
8    and then periodically thereafter.  And if the
9    patients had an event, yes, I would like to know
10   the results of whatever laboratory test at that
11   time.  Yes.
12   Q.  Right.  Because that -- that is the type
13   of design that would be most appropriate to try to
14   determine whether there's a correlation to outcome
15   events such as bleeding to PT or perhaps some
16   other laboratory assessment; right?
17   A.  I think a proximal assessment of a --
18   whatever test you're studying, a test -- a value
19   that was obtained proximal to the -- the event
20   would be helpful.  Yes.
21   Q.  Okay.  And you would expect the
22   pharmaceutical companies, in evaluating this drug,
23   would do such a study; right?
24   MR. SLONIM:
25       Objection.

Page 160

1    THE WITNESS:
2        I think -- I'm not a pharmaceutical
3    company.  But I think if you look
4    specifically at ROCKET AF -- this was kind
5    of a real-world trial.  This isn't done on
6    the grounds of the pharmaceutical
7    companies.  This is done in practices.
8    And I think that there's going to be
9    variability depending on where the patient
10   presents with the bleed as to whether or
11   not such an assessment is done.  Ideally,
12   I think I -- again, as I stated, I'd like
13   to know the information, but I recognize
14   in a real-world study it might be
15   difficult to always get those data points.
16   BY MR. DENTON:
17   Q.  Well, let me just under- -- ask a very
18   simple question.
19       If a patient comes to an emergency room
20   with a significant bleeding event, let's say a
21   couple of point drops in hemoglobin, isn't it
22   standard practice in every emergency room in this
23   country to take blood and have certain
24   measurements and laboratory studies done on that
25   blood?

Page 161

1    A.  So I can't comment on the practice in
2    every emergency room.  But if you're asking me
3    would it be prudent to check those labs, my answer
4    would be yes.
5    Q.  Okay.  Have you seen in the literature any
6    attempt by either the pharmaceutical companies
7    that make rivaroxaban or any other investigators
8    to attempt to assess PT values at the time of
9    outcome events on rivaroxaban such as a bleeding
10   event?
11   A.  I'd have to look at the FDA studies cited
12   in my report to see when those prothrombin times
13   were done.  I honestly don't recollect, and I'd
14   have to check.
15   Q.  When you say FDA study -- I think you said
16   FDA studies cited in your report.  Can you just
17   tell me what you're referring to, please.
18   A.  I believe it's No. 1.  And I want to say
19   there's a 300-page report that might be No. 9.
20   Let me see if that is correct.  Actually, this is
21   what happened -- out of order.  No.
22   MR. SLONIM:
23       Twenty- --
24   THE WITNESS:
25       It's not No. 9.  I'm sorry.

Golkow Technologies, Inc - 877.370.3377

Protected - Subject to Further Protective Review

Page 162

```
1        MR. SLONIM:
2        Twenty-four.
3    THE WITNESS:
4        It's No. 24.
5    MR. DENTON:
6        Right.
7    THE WITNESS:
8        Thank you.
9    BY MR. DENTON:
10        Q.  Well, you understand the FDA didn't do any
11   studies on rivaroxaban?
12        A.  I understand that the FDA didn't do any
13   studies.  This is labeled as FDA document.  But
14   the FDA did review data --
15        Q.  Yes, sir.
16        A.  -- regarding rivaroxaban.
17        Q.  Right.  I just wanted to clarify that.
18   And --
19        A.  I'm sorry.  I refer to the title of the
20   document, not . . .
21        Q.  Okay.  So to determine when -- so when you
22   looked at the FDA's evaluation of PT and major
23   bleeding risk in the ROCKET study, you did not know
24   when the PT data was collected relevant --
25   relative to a particular outcome, in this case
```

Page 163

```
1    major bleeding.  Is that fair?
2        A.  That's a fair statement.
3        Q.  Wouldn't that be important information to
4    have, sir?
5        A.  It would be important information to have.
6    And I'm happy to go back and look at those
7    documents if you'd like.
8        Q.  Well, I mean, if the PT is collected
9    12 months before the outcome event, it would be --
10   unlikely show a correlation between that major
11   bleed and a PT taken 12 months earlier; right?
12       MR. SLONIM:
13       Objection.
14   THE WITNESS:
15       I think that that's conjecture.  But
16       ideally you'd want to have a prothrombin
17       time at the time of the event.  I've
18       already agreed to that.
19   BY MR. DENTON:
20       Q.  Okay.  And you just don't know in the FDA
21   analysis, without going back and looking at the
22   data or that document, I guess, which would be
23   No. 24 -- right -- on your list?
24       A.  That's correct.
25       Q.  Okay.  Sitting here today giving your
```

Page 164

```
1    deposition, you don't know when any particular PT
2    was collected relative to any major bleeding event
3    in the ROCKET study.  True?
4        A.  I'd have to look at the data, but I don't
5    -- it's not a number I carry in my pocket.
6        Q.  All right.
7        A.  No.
8        Q.  Okay.  Have you ever been involved with
9    any clinical trials that involved a Bayer drug or
10   a Janssen Pharmaceutical drug?
11       A.  To be candid, there's one -- if I could
12   just look at my --
13       Q.  Sure.
14       A.  -- CV a second.
15       Q.  Sure.  You look at whatever you need to.
16       A.  There's one study where I was one of many
17   participants, and I'm not sure of the name of that
18   drug.  So if you give me a second, if it's on my
19   CV --
20       Q.  Sure.
21       A.  -- I can give you an answer.  If I don't
22   list the company, I can only refer you to the
23   citation and . . .
24       Q.  That's fair enough.  Just give me a page
25   and a citation number once you find it.
```

Page 165

```
1        A.  This would be on my CV, Page 38, No. 64.
2    And this was a drug called senicapoc,
3    S-E-N-I-C-A-P-O-C, which is ICA-17043.  I believe
4    that might have been a company called Icagen, and
5    I don't know who they belong to now, if anybody.
6        Q.  What -- what is that drug prescribed for?
7        A.  The drug is not commercially available,
8    but it was an inhibitor of an ion channel thought
9    to potentially be helpful in the treatment of
10   sickle cell vaso-occlusive crises.
11       Q.  Okay.  And -- and that -- your involvement
12   was in the Phase III trial or not?
13       A.  My involvement was one of many
14   investigators in the Phase III trial --
15       Q.  Okay.
16       A.  -- so my name is listed somewhere.
17       Q.  Got you.
18       A.  On my CV it's in parentheses because there
19   are many authors.
20       Q.  Oh, I see.  I see what you're saying.
21       So is it fair to say you were one of many
22   clinical trial sites that enrolled patients in
23   that study?
24       A.  That is a fair statement.
25       Q.  And that drug was never approved.  Is --
```

Protected - Subject to Further Protective Review

Page 166

1    is that my understanding?
2        A.  That drug has not been approved to date.
3    That's correct.
4        Q.  Okay.  All right.  You state in your
5    report I think somewhere -- I remember reading it.
6    Page 3.
7        A.  If you'll give me a second.
8        Q.  Sure.  Take your time.  We've got stuff
9    scattered.
10       A.  I have it.
11       Q.  Okay.  Above your summary of opinions, you
12   make a statement, "All . . . the opinions
13   expressed in this report are made to a reasonable
14   degree of medical and scientific certainty."
15           Do you see that sentence?
16       A.  I do.
17       Q.  What do you mean by that?  What's that
18   mean to you as stated here in your report?
19       A.  That means that the opinions made are
20   based on a reasonable interpretation of the
21   available scientific literature.
22       Q.  All right.  And is it fair that reasonably
23   qualified physicians can disagree on some of these
24   medical topics?
25       A.  There are certainly some topics that

Page 167

1    reasonably qualified physicians can disagree.
2    Yes.
3        Q.  All right.  Same paragraph -- and I'm just
4    trying to -- just trying to close some loops here
5    I'm not, again, trying to play got-you at all.
6    That's not --
7        A.  That's fine.
8        Q.  -- my nature.
9            You -- you indicate you reserve the right
10   to supplement if additional information is made
11   available.  I get that.
12           But my question is:  Has any additional
13   information been provided to you that would cause
14   you to supplement your report as we sit here
15   today?
16       A.  I think with the one technical exception
17   that you already know about.  There were two
18   papers cited that were not provided in the expert
19   report.
20       Q.  Well, yes.  I -- I'm talking about
21   substance.
22       A.  No.
23       Q.  Okay.  And then you do make another
24   sentence that causes all people sitting in my
25   chair some concern.  You say, "I reserve the right

Page 168

1    to comment upon the testimony of plaintiffs'
2    experts and other evidence presented at trial."
3            Have you reviewed any of the testimony of
4    plaintiff experts?  Yeah.  I think you've told me
5    no.  True?
6        MR. SLONIM:
7            Objection.
8        MR. DENTON:
9            Oh, that's -- that is wrong.  I'm
10   sorry.
11   BY MR. DENTON:
12       Q.  Let me ask this:  What -- what -- my
13   problem is -- is the "reserve the right to
14   comment."  I want to make sure you've already
15   commented in your report or here today on what
16   you've reviewed so far today.
17           So what have you reviewed so far today?
18   As I understand it, you looked at the report of
19   your partner, Cindy Leissinger, the report of
20   Dr. Rinder, and the report of Dr. Winstead, a
21   former student of yours; right?
22       A.  That's correct.
23       Q.  Okay.  And that's all you've looked at as
24   far as plaintiff expert reports?
25       A.  That's correct.

Page 169

1        Q.  You make no comment in this report that I
2    see about Dr. Winstead?
3        A.  I do not.  I believe that's in the
4    case-specific report.
5        Q.  Oh.  Maybe that's where it's at.  I'm
6    sorry.
7            But in this report, you don't have any
8    comment about Dr. Winstead; right?  And that would
9    make sense.
10       A.  As Dr. Winstead's not a hematologist --
11       Q.  Right.
12       A.  -- no.
13       Q.  The only -- the only comments that you
14   have about Dr. Leissinger's opinions are contained
15   in this report; right?
16       A.  To date, that's correct.
17       Q.  Okay.  Same question as -- to Dr. Rinder.
18   Any criticisms or comments about his opinions as
19   of today's date are provided here in your report?
20       A.  That's correct.
21       Q.  All right.  So I don't see it in your
22   report anywhere.
23           And I'm going to ask you:  Were you aware
24   that the point-of-care device used in the ROCKET
25   study to monitor the INR of the warfarin patients

Protected - Subject to Further Protective Review

Page 170

1  was a device that was recalled?
2    A.  I am aware that the device used in ROCKET
3  AF was recalled.  Yes.
4    Q.  And how did you become aware of that?
5    A.  I believe that was actually before I was
6  even involved in the current litigation.  It kind
7  of made the news, so to speak.  The American
8  Society of Hematology, in addition to their main
9  scientific journal, Blood, has a number of more
10  newspaper-type publications, and I believe it was
11  discussed at one point in one of those, for lack
12  of a better word, throw-aways.
13    Q.  What are you referring to as a throw-away?
14    A.  A nonpeer-reviewed journal put out by a
15  society.  So the American Society of Hematology
16  has ASH Clinical News, which reads as a newspaper.
17  And it summarizes trials.  For the hematologists,
18  it summarizes trials.  And these aren't primary
19  source research papers.  They're distillations.
20    Q.  Got you.
21     And if you're interested in something,
22  you'd go to the primary source?
23    A.  That's correct.
24    Q.  Got it.
25     So -- I think I asked this, but I want to

Page 171

1  just clarify.  In your practice, your clinical
2  practice or perhaps your hospital practice, the --
3  and -- and you have a warfarin patient, are you
4  point-of-care devices used for any purpose?
5    A.  Not specifically in my practice.  I
6  believe that there are some practitioners that use
7  them, but I personally don't use them.
8    Q.  How about other -- other hematologists in
9  your -- in your practice -- practice group?
10    A.  Because the vast majority of patients
11  treated with warfarin are treated by primary care
12  providers or cardiologists for atrial
13  fibrillation, there's no one in my practice that I
14  know that uses these.  But I believe there are
15  some primary care providers and cardiologists who
16  use these at Tulane.
17    Q.  Okay.  So you -- you -- so you get some --
18  I think you said some kind of throw-away medical
19  information that pointed out that the
20  point-of-care device was recalled, the one used in
21  ROCKET.  Did I get that about right?
22    A.  That is correct.
23    Q.  Okay.  Do you have a recollection about
24  when you found that out?
25    A.  I'd only be guessing.

Page 172

1    Q.  Well, I don't want you to guess.  Maybe --
2  maybe we can put some brackets around it.
3     Was it before or after you were hired by
4  counsel for Bayer in or about June of 2016?
5    A.  It was before.
6    Q.  Okay.  So -- and did you look at any of
7  the -- did -- well, strike that.
8     Did you look at any of the information
9  in the published literature about that device?
10    A.  If I can have clarification.  Do you mean
11  before I was retained in this matter or after?
12    Q.  Any time.
13    A.  So before I was retained, I don't believe
14  I did.  And after I was retained -- I don't know
15  if it was in the peer-reviewed literature.  I
16  think that -- that that was the way you described
17  it.
18     Did I -- let me go back a step.  The
19  American -- I'm -- I'm on the -- a long way of
20  answering this question.  But I am on the
21  communications committee of the American Society
22  of Hematology, and as such, they send us a daily
23  news briefing.  The daily news briefing comes to
24  my e-mail, and there's links if I want to read
25  specifically more than the opening sentence, if

Page 173

1  you will.  I believe that's how I actually found
2  this out.
3    Q.  Okay.
4    A.  I don't remember the link, but I think
5  that's how I found this out.
6    Q.  Okay.  So you certainly got the headline.
7  But did you go and look at the literature behind
8  the headline at any time?
9    A.  I believe that I looked at a press
10  release, but I don't believe it was primary data.
11    Q.  Press release put out by Janssen?
12    A.  I don't remember.
13    Q.  All right.  Well, wouldn't you want to
14  know about the details of the defective device
15  that was used in -- in the ROCKET study to manage
16  the warfarin arm?
17    A.  I think what I'd like to know is did that
18  actually affect the interpretation of the results
19  of the trial.
20    Q.  Right.
21    A.  And I know that these results were
22  reviewed by Duke, by Dr. Tom Ortel and his
23  colleagues, and I believe by a European group, as
24  well as by the FDA, all of who concluded that that
25  device did not impact the results of the trial.

44 (Pages 170 to 173)

Protected - Subject to Further Protective Review

Page 174

1    Q.  Well, you just told me you didn't go look
2  at the primary literature.  So did you or did you
3  not?
4    A.  I didn't look at the primary literature
5  when I became aware that the device was withdrawn.
6  That's correct.  That's what you asked.
7    Q.  Okay.  Well, have you looked at that
8  literature now?
9    A.  I've looked at some literature since then
10  to see how that device -- the withdrawal of that
11  device to see if that affected the results of the
12  trial.
13    Q.  Okay.  So -- but none of that primary
14  literature is on Exhibit B, is it?
15    A.  It may or may not be.  Since that is not
16  even mentioned in my report, I probably wouldn't
17  have included it as a reference.  But let me see
18  if Tom Ortel's study is on there.  I don't believe
19  it is.  I don't believe it's cited because that's
20  -- that -- the fact that the device was withdrawn
21  is not -- is -- is not part of my report.
22    Q.  Well, let me ask this -- first of all,
23  spell the name of this physician you're talking
24  about.  You say Martel?
25    A.  Ortel, O-R-T-E-L.

Page 175

1    Q.  Okay.
2    A.  I believe he runs the Duke coagulation
3  clinic.
4    Q.  Right.  Okay.  Do you know him personally?
5    A.  I do.
6    Q.  Have you talked to him about rivaroxaban
7  in any way?
8    A.  I have not.
9    Q.  How do you know him?
10    A.  He's an active member of the American
11  Society of Hematology.  I have a good friend from
12  my fellowship training who's on the faculty at
13  Duke.  I believe he's her boss.  We've I believe
14  served on committees together through the
15  American Society of Hematology.
16    Q.  Who is your good friend that works at
17  Duke?
18    A.  Her name is Gow, G-O-W.  That's short for
19  Gowthami, G-O-W-T-H-A-M-I, Arepally,
20  A-R-E-P-A-L-L-Y.
21    Q.  What was the TTR reported in the ROCKET AF
22  study on the warfarin arm?
23    A.  I'd have to check.  I believe it was about
24  55 percent as a ballpark number.
25    Q.  I think you're right on the money.

Page 176

1    That's rather poor warfarin control, isn't
2  it?
3    A.  For real-world data, that's actually
4  pretty much in line with what real-world TTRs are.
5    Q.  Well, in your real clinic, that's real
6  world.  Your TTR is much higher; right?
7    A.  Oh, I think at Tulane our TTRs are much
8  lower.
9    Q.  I'm talking about your patients, the ones
10  you manage.
11    A.  My estimation is that my patients have a
12  higher TTR.
13    Q.  Right.  Do you have an estimation of what
14  that percentage may be?
15    A.  I believe I gave an estimation earlier
16  this morning.  I don't want to contradict myself.
17  And I'd be guessing, but somewhere between 70 and
18  80 percent.
19    Q.  Okay.  I don't think we got a number
20  earlier.  And I'm not trying to trick you.  So --
21    A.  I understand.  And that's just a guess.  I
22  have not done the --
23    Q.  Right.
24    A.  -- formal analysis.
25    Q.  Right.  Do you agree with this statement,

Page 177

1  that there's no reason other than convenience to
2  switch patients to rivaroxaban if they are stable
3  on warfarin therapy?
4    A.  I think that's a very general statement.
5  But I can tell you that it's been my practice that
6  patients who are stable on warfarin, I do not
7  encourage them to switch to one of the newer
8  agents.
9    Q.  Okay.  Let me ask you if you agree with
10  this statement, that the ROCKET data does not
11  convincingly demonstrate that rivaroxaban is
12  effective in preventing strokes as compared to
13  warfarin when warfarin is used skillfully?
14    A.  I disagree with that statement because
15  there are many subjective words in that statement
16  that are open to interpretation.  I believe that
17  the ROCKET trial reasonably definitively showed
18  that in the study population rivaroxaban was
19  noninferior to warfarin in preventing stroke in
20  patients with atrial fibrillation.
21    Q.  With a warfarin control arm of TTR of
22  55 percent; right?
23    A.  I think when you look at the patient
24  population in ROCKET AF, they were a sicker group
25  of patients with relatively high CHAD scores.  And

45 (Pages 174 to 177)

Protected - Subject to Further Protective Review

Page 178

1    I think that that 55 percent is not out of line
2    with real-world warfarin TTRs.
3         MR. DENTON:
4             Move to strike as nonresponsive.
5    BY MR. DENTON:
6         Q. The warfarin control arm in ROCKET
7    reported a TTR of 55 percent; correct?
8         MR. SLONIM:
9             Asked and answered.
10   BY MR. DENTON:
11        Q. You're allowed to answer one more time.
12        A. I defer to my attorney.
13        MR. SLONIM:
14            No.  You --
15        THE WITNESS:
16            Okay.
17        MR. SLONIM:
18            You can answer it.
19        THE WITNESS:
20            I can answer.  Okay.  I'm sorry.  Let
21   me just check if it was 55 or 55.2
22   or . . .
23   BY MR. DENTON:
24        Q. That's fine.  Be as precise as you --
25        A. Can we say approximately 55 percent?  Then

Page 179

1    I'll agree.
2         Q. We can say anything that you're
3    comfortable with as --
4         A. Here we go.
5         MR. SLONIM:
6             Why don't you --
7         THE WITNESS:
8             Among patients in the warfarin group,
9    INR values were within the therapeutic
10   range a mean of 55 percent of the time.
11        MR. DENTON:
12            Right.
13        THE WITNESS:
14            I -- fine.
15   BY MR. DENTON:
16        Q. And that was based upon an assumption that
17   the point-of-care device was working properly?
18        A. Again, I think that the ROCKET AF data was
19   re-analyzed by Duke, by a European group, and by
20   the FDA, who determined that even with the
21   withdrawn device, the results of ROCKET AF were
22   substantiated and affirmed.
23        Q. What -- do you know -- has anyone tried to
24   calculate the TTR of the warfarin arm now knowing
25   that the device used was faulty and recalled?

Page 180

1         A. I don't know of such a study.
2         Q. Let me -- do you agree or disagree with
3    this statements:  All anticoagulations, including
4    DOACs, have intrinsically narrow therapeutic
5    indices?
6         A. I disagree with that statement.
7         Q. Okay.
8         A. And I believe earlier in the testimony
9    I've explained why.
10        Q. Okay.  Let me ask another question.  And
11   I'm going to read a statement, and then I'm going
12   to ask you if you agree or disagree or need to
13   explain your answer.
14            PT be -- can be used as a surrogate for PK
15   in the range of plasma rivaroxaban concentrations
16   demonstrated in the samples of patients from
17   ROCKET?
18        MR. SLONIM:
19            Can I have that read back?  It's all
20   -- I think there's a lot there, and I just
21   want to make sure.
22   BY MR. DENTON:
23        Q. Can PT -- strike that.
24            Here's the statement:  PT can be used as a
25   surrogate for PK in the range of plasma

Page 181

1    rivaroxaban concentrations demonstrated from the
2    sample of patients in ROCKET.
3         A. I think that that's a broad statement.
4    I'd want "can be used as a surrogate" to be better
5    defined.
6         Q. So you can't agree or disagree?
7         A. I can't agree or disagree with that
8    statement.
9         MR. DENTON:
10            Let's take a short break, if you don't
11   mind.
12        THE VIDEOGRAPHER:
13            We're now off the record at 2:28.
14   (Brief recess was taken.)
15        THE VIDEOGRAPHER:
16            We're now back on the record.  The
17   time is 2:50.
18   BY MR. DENTON:
19        Q. Doctor, did you look at any of the
20   information that was generated in the -- what I
21   call the orthopedic indication NDA for
22   rivaroxaban?
23        A. So only insofar as I read the New England
24   Journal, and I believe -- if I'm not mistaken,
25   that would have been the RECORD trial.  And I

46 (Pages 178 to 181)

Protected - Subject to Further Protective Review

Page 182

1  believe I read the trial when it came out. I'd
2  have to see a copy before I made any comments on
3  it.
4      Q. I -- I don't see any of that literature
5  about the orthopedic indication on your materials
6  relied upon nor in your report. Is that accurate?
7      A. That's accurate. It's not relevant to my
8  report.
9      Q. It's not relevant. Okay.
10     Do you know -- I guess you didn't know
11 about the assessment done by Janssen and Bayer on
12 evaluating the correlation between PT and bleeding
13 risk in the RECORD data?
14     A. I have not reviewed that --
15     MR. SLONIM:
16         Well --
17     THE WITNESS:
18         -- data. No.
19     MR. DENTON:
20         Okay.
21     MR. SLONIM:
22         Well, that -- just -- you may be
23     referring to -- he has -- if you're
24     referring to Reference 1, he has reviewed
25     that.

Page 183

1      THE WITNESS:
2          I'm sorry.
3      MR. SLONIM:
4          You might want to --
5      MR. DENTON:
6          I said RECORD indication.
7      MR. SLONIM:
8          Okay. There -- there are --
9      MR. DENTON:
10         I'm talking about --
11     MR. SLONIM:
12         There --
13     MR. DENTON:
14         -- orthopedic indications.
15     MR. SLONIM:
16         There are -- there are some -- there
17     are some data --
18     MR. DENTON:
19         So --
20     MR. SLONIM:
21         -- on -- on -- in Reference No. 1. I
22     just want to -- it's -- I want you to get
23     the information from the witness, but I
24     don't want you to --
25     MR. DENTON:

Page 184

1          I would prefer that.
2      MR. SLONIM:
3          I don't want you to -- I don't -- but
4      I don't want you to overlook -- I don't
5      want you to overlook something
6      inadvertently.
7      MR. DENTON:
8          Oh, I appreciate all the protection
9      you're giving me, Bert.
10 BY MR. DENTON:
11     Q. Doctor, did you look at the FDA evaluation
12 of the data from the orthopedic indication?
13     A. To follow up with what Mr. Slonim said, I
14 -- you know, Reference 1 is in my list. If that
15 data in fact came from RECORD, I did review it.
16     Q. Okay. But do you -- do you recall
17 reviewing the analysis performed concerning the
18 correlation between PT and bleeding risk from the
19 orthopedic indication?
20     A. I don't recall looking at that data
21 specifically. No.
22     Q. Back to your report, very last page I
23 think it is -- Page 15 is what I mean, the end of
24 the narrative.
25     A. Just give me a second. I'm sorry.

Page 185

1      Q. Take your time.
2      A. I may have misplaced Page 15.
3      Q. Take your time.
4      MR. SLONIM:
5          I -- I can show --
6  BY MR. DENTON:
7      Q. It's simple. It's just that last
8  sentence.
9      MR. SLONIM:
10         Let -- let me -- let me just show him
11     this --
12     MR. DENTON:
13         That's fine.
14     MR. SLONIM.
15         -- just so . . .
16     THE WITNESS:
17         Yes.
18     MR. SLONIM:
19         There you go.
20     THE WITNESS:
21         Thank you.
22 BY MR. DENTON:
23     Q. I want to focus in on that sub --
24 Subparagraph 2, the anti-Factor Xa assays.
25 There's just one sentence I think in there that I

47 (Pages 182 to 185)

Protected - Subject to Further Protective Review

Page 186

1 want to ask you some questions about. Okay?
2     A. I see the area to which you're referring.
3 Yes.
4     Q. Okay. The first thing -- the first phrase
5 of that sentence indicates "There are some
6 anti-factor Xa assays commercially available."
7     First of all, please tell me what you're
8 referring to. Which assays are commercially
9 available, Factor Xa assays -- anti-Factor Xa
10 assays?
11     A. So I can't tell you specifically what the
12 name of those assays are. But that statement
13 refers to the fact that one can in a hospital
14 setting, including my own, send blood for analysis
15 of anti-Factor Xa assays.
16     Q. To evaluate coagulation status in what --
17 in rivaroxaban?
18     A. No. As I say in the next part of that
19 sentence, there's is "no FDA approved assay to
20 measure the degree of Anti-Xa activity in patients
21 taking rivaroxaban." These assays are primarily
22 used in very specific clinical circumstances to
23 measure the anticoagulation effect of most
24 typically low molecular weight heparin, but
25 conceivably unfractionated heparin as well.

Page 187

1     Q. Okay. So that's why -- that's what you're
2 referring to there in the commercially available
3 anti-Factor Xa assays? You're referring to use
4 with heparin or Lovenox?
5     A. That's correct.
6     Q. All right. So you do know, don't you,
7 that there are in fact anti-Factor Xa assays
8 available in Canada, for example, to measure
9 rivaroxaban?
10     A. I believe Mark Crowther has -- if that's
11 what -- the -- if that is who you're referring to,
12 has an assay that is cali- -- an anti-Xa assay
13 calibrated for rivaroxaban. However, that is not
14 commercially available.
15     Q. So that's your understanding?
16     A. That is absolutely my understanding.
17     Q. And is -- and how do you spell that
18 gentleman's name or the physician, I assume?
19     A. C-R-O-W-T-H-E-R. He's in -- actually,
20 he's not in Toronto. He's at --
21     THE WITNESS:
22       McMaster.
23     MR. SLONIM:
24       McMaster.
25     MR. DENTON:

Page 188

1     McMaster's. Yeah.
2 BY MR. DENTON:
3     Q. Did you review any of his publications as
4 part of your work here to prepare your report,
5 Exhibit 7?
6     A. I'd have to look at my reference list. I
7 believe that he's an author on some of the
8 publications that I cited, but I'd have to look.
9     Q. All right. Well, take a look. And I'll
10 do a word search too.
11     A. I actually do not see any. If you found
12 one in the word search --
13     Q. No. I didn't.
14     A. -- let me know.
15     Q. So am I -- is it true that that article or
16 work you're referring to is not on your materials
17 reviewed for this report?
18     A. There's no article with Mark Crowther's
19 name in my report. That's correct.
20     MR. DENTON:
21       Okay. That's all the questions I have
22     at this time.
23     MR. SLONIM:
24       Let me speak with my colleagues, take
25     a short break.

Page 189

1     MR. DENTON:
2       Sure.
3     THE VIDEOGRAPHER:
4       We're now off the record at 2:58.
5     (Brief recess was taken.)
6     THE VIDEOGRAPHER:
7       We're now back on the record. The
8     time is 3:12.
9 BY MR. SLONIM:
10     Q. So Dr. Kahn, could you please pay -- turn
11 to Page 12 of your expert report.
12     And directing your attention to the middle
13 of the page, do you see the paragraph that deals
14 with several real -- real-world studies?
15     A. I do.
16     Q. And --
17     A. The paragraph starts, "Following
18 ROCKET-AF"?
19     Q. Correct.
20     And you recall you were asked some
21 questions by plaintiffs' counsel about that?
22     A. Correct.
23     Q. And the -- the -- the -- you list three
24 real-world studies.
25     The first one is listed as the XANTUS

48 (Pages 186 to 189)

Golkow Technologies, Inc - 877.370.3377

Protected - Subject to Further Protective Review

Page 190

1    study; is that correct?
2       A. That's correct.
3       Q. And if you turn to your references on your
4    expert report, you reference -- you notice that
5    Reference 12 is the XANTUS --
6       A. That's correct.
7       Q. -- study?
8       A. Camm paper, yes.
9       Q. Okay. Now, the next one is list -- is
10   typed on your report as PHSS. But is that a typo?
11      A. That is a typo. That should read PMSS,
12   post-marketing safety and surveillance.
13         MR. SLONIM:
14            Okay. Let's mark as deposition
15         Exhibit No. 12 a paper by Tamayo,
16         T-A-M-A-Y-O, and other colleagues.
17         (Exhibit No. 12 was marked for
18         identification and attached hereto.)
19   BY MR. SLONIM:
20      Q. Do you have Exhibit 12 in front of you?
21      A. I do.
22      Q. Is that the PMSS study that you were
23   referring to on Page 12?
24      A. That is.
25      Q. When I turn to your expert report, is that

Page 191

1    paper included or omitted?
2       A. I believe it is omitted.
3       Q. Let's just double-check.
4            So that was an oversight? That should
5    have been included in your list of materials?
6       A. That should certainly be included in the
7    list of materials.
8         MR. SLONIM:
9            Okay. Let's mark as Deposition
10         Exhibit No. 13 a paper by first author
11         Coleman, C-O-L-E-M-A-N.
12         (Exhibit No. 13 was marked for
13         identification and attached hereto.)
14   BY MR. DENTON:
15      Q. Can you tell us if that paper is the study
16   report for the real-world study that is entitled
17   "REVISIT-US"?
18      A. This is in fact the REVISIT study by
19   Coleman. Correct.
20      Q. Is that paper listed in your ex -- in your
21   list of expert materials?
22      A. I believe this was also inadvertently left
23   off.
24         MR. SLONIM:
25            Okay. That -- that's all I have.

Page 192

1       Thank you very much.
2         MR. DENTON:
3            Just a couple follow-ups, Doctor, on
4         -- just on the materials that Counsel just
5         gave to you.
6    BY MR. DENTON:
7       Q. The REVISIT study was funded by Bayer;
8    right? Look on Page 252 [sic] within the journal.
9       A. If you'll just give me a minute.
10      Q. Sure.
11      A. On Page 2052 it says, "The REVISIT-US
12   study was supported by Bayer Pharma." Correct.
13      Q. All right. Back to Exhibit 12, the PMSS
14   study.
15         If you look at the bottom of the page,
16   this study was funded by Janssen Scientific
17   Affairs and Bayer Healthcare; right?
18      A. On the bottom of Page -- well, my Page 63,
19   I believe --
20      Q. Yes, sir.
21      A. -- it says, "This study is funded by
22   Janssen Scientific Affairs . . . and
23   Bayer Healthcare."
24      Q. And --
25      A. Correct.

Page 193

1       Q. And the other study that was on your list
2    of materials was the XANTUS study, and that was
3    also funded by Bayer and Janssen; right?
4       A. I would have to see a copy of the paper to
5    confirm that.
6       Q. All right.
7       A. I have no reason to doubt that, but I'd
8    just have --
9       Q. Okay.
10      A. -- to see it to confirm it.
11      Q. And you do not mention in the body of your
12   report any of the additional real-world safety
13   studies related to rivaroxaban that were not
14   conducted or funded by Janssen or Bayer. True?
15      A. I believe that there's some other studies
16   mentioned in my report. Let me just take a
17   minute. I believe -- I believe that the Yao,
18   Noworthy -- Noseworthy paper, No. 59 --
19      Q. Right.
20      A. -- is a real-world study.
21      Q. Right.
22      A. And there's at least one other on -- on my
23   list. And --
24      Q. I think that's Graham, isn't it?
25      A. It is Graham. Thank you very much.

49 (Pages 190 to 193)

Protected - Subject to Further Protective Review

Page 194

1    Q. Okay. But you don't comment -- I mean,
2  you -- you list those, I -- I -- I acknowledge.
3  You list those as materials you -- you reviewed.
4  But you do not discuss the findings of those
5  studies anywhere in your report, do you, the --
6  the substance of your report?
7    A. I don't believe I specifically refer to
8  those. When I'm referencing statements, it's not
9  uncommon that I pick several of the papers and not
10  all of them.
11    Q. Is it common that you just pick the ones
12  sponsored by the pharmaceutical companies and not
13  the ones done by independent researchers?
14    A. I think that that's an interpretation, and
15  it certainly was not done intentionally.
16    MR. DENTON:
17      All right. No more questions. Thank
18  you.
19    MR. SLONIM:
20      We're concluded. Thank you very
21  much --
22    MR. DENTON:
23      That's it.
24    MR. SLONIM:
25      -- Dr. Kahn.

Page 195

1    THE VIDEOGRAPHER:
2      Today's deposition consists of four
3    tapes. This is the end of Tape 4. We're
4    now off the record at 3:18.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 196

1      CHANGES AND SIGNATURE
2  WITNESS NAME:  MARC J. KAHN, M.D.
3  DATE OF DEPOSITION:  Monday, January 9, 2017
4
5  PAGE LINE    CHANGE      REASON
6  ____ ____ _____ _____
7  ____ ____ _____ _____
8  ____ ____ _____ _____
9  ____ ____ _____ _____
10 ____ ____ _____ _____
11 ____ ____ _____ _____
12 ____ ____ _____ _____
13 ____ ____ _____ _____
14 ____ ____ _____ _____
15 ____ ____ _____ _____
16 ____ ____ _____ _____
17 ____ ____ _____ _____
18 ____ ____ _____ _____
19 ____ ____ _____ _____
20 ____ ____ _____ _____
21 ____ ____ _____ _____
22 ____ ____ _____ _____
23 ____ ____ _____ _____
24 ____ ____ _____ _____
25 ____ ____ _____ _____

Page 197

1      WITNESS' CERTIFICATE
2
3      I have read or have had the foregoing
4  testimony read to me and hereby certify that it is
5  a true and correct transcription of my testimony
6  with the exception of any attached corrections or
7  changes.
8
9
10
11
12
13
14
15
16
17
18      _____
19      WITNESS' SIGNATURE
20
21
22
23  PLEASE INDICATE
24  [] NO CORRECTIONS
25  [] CORRECTIONS; ERRATA SHEET(S) ENCLOSED

Golkow Technologies, Inc - 877.370.3377

Protected - Subject to Further Protective Review

Page 198

1          C E R T I F I C A T E
2        This certification is valid only for
3    a transcript accompanied by my original signature
4    and original seal on this page.
5        I, AURORA M. PERRIEN, Registered Professional
6    Reporter, Certified Court Reporter, in and for the
7    State of Louisiana, as the officer before whom
8    this testimony was taken, do hereby certify that
9    MARC J. KAHN, M.D., after having been duly sworn
10   by me upon the authority of R.S. 37:2554, did
11   testify as hereinbefore set forth in the foregoing
12   197 pages; that this testimony was reported by me
13   in the stenotype reporting method, was prepared
14   and transcribed by me or under my personal
15   direction and supervision, and is a true and
16   correct transcript to the best of my ability and
17   understanding; that the transcript has been
18   prepared in compliance with transcript format
19   guidelines required by statute or by rules of the
20   board; and that I am informed about the complete
21   arrangement, financial or otherwise, with the
22   person or entity making arrangements for
23   deposition services; that I have acted in
24   compliance with the prohibition on contractual
25   relationships, as defined by Louisiana Code of

Page 199

1    Civil Procedure Article 1434 and in rules and
2    advisory opinions of the board; that I have no
3    actual knowledge of any prohibited employment or
4    contractual relationship, direct or indirect,
5    between a court reporting firm and any party
6    litigant in this matter nor is there any such
7    relationship between myself and a party litigant
8    in this matter.  I am not related to counsel or to
9    the parties herein, nor am I otherwise interested
10   in the outcome of this matter.
11
12
13
14
15           AURORA M. PERRIEN, CCR, RPR
16
17
18
19
20
21
22
23
24
25