PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1              UNITED STATES DISTRICT COURT

               EASTERN DISTRICT OF LOUISIANA

2

     ******************************

3

     IN RE:  XARELTO              MDL No. 2592

4    (RIVAROXABAN)                Section L

     PRODUCTS LIABILITY           Judge Eldon Fallon

5    LITIGATION                   Mag. Judge North

6    THIS DOCUMENT RELATES TO:

     JOSEPH J. BOUDREAUX

7    Case no. 2:14-CV-0270

8    ******************************

9

     PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

10

11

12              VIDEOTAPED DEPOSITION OF

13              NATHANIEL S. WINSTEAD, MD

14

15         Monday, December 12th, 2016

16                8:55 a.m.

17

18      Held At:

19              The Lambert Law Firm

20              701 Magazine Street

21              New Orleans, Louisiana

22

23

24   REPORTED BY:

25   Maureen O'Connor Pollard, RMR, LA Cert #2011025

Page 2

1  APPEARANCES:

2  FOR THE PLAINTIFFS:

3     KIRK J. GOZA, ESQ.

4        GOZA & HONNOLD, LLC

5        11181 Overbrook Road, Suite 200

6        Leawood, Kansas 66211

7        913-451-3433

8        kgoza@gohonlaw.com

9        -and-

10    EMMA E. KINGSDORF, ESQ.

11       BARRIOS KINGSDORF & CASTEIX, LLP

12       701 Poydras Street

13       New Orleans, Louisiana 70139

14       504-524-3300

15       ekingsdorf@bkc-law.com

16

17 FOR THE BAYER DEFENDANTS:

18    BRIAN L. STEKLOFF, ESQ.

19    KIERAN GOSTIN, ESQ.

20       WILKINSON WALSH & ESKOVITZ

21       1900 M Street, NW, Suite 800

22       Washington, DC 20036

23       202-847-4030

24       bstekloff@wilkinsonwalsh.com

25       kgostin@wilkinsonwalsh.com

Page 3

1  APPEARANCES (Continued):

2

3  FOR THE JANSSEN DEFENDANTS:

4     MARGARET HOFFMANN, ESQ.

5        SCHWABE, WILLIAMSON & WYATT

6        1211 SW 5th Ave., Suite 1900

7        Portland, Oregon 97204

8        503-222-9981

9        mhoffmann@schwabe.com

10       -and-

11    SHAUN P. McFALL, ESQ.

12       BARRASSO USDIN KUPPERMAN FREEMAN

13       & SARVER, LLC

14       909 Poydras Street, 24th Floor

15       New Orleans, Louisiana 70112

16       504-589-9764

17       smcfall@barrassousdin.com

18

19 Videographer:  Melissa Bardwell

20

21

22

23

24

25

Page 4

1                    INDEX

2  EXAMINATION                    PAGE

3  NATHANIEL S. WINSTEAD, MD

4  BY MR. STEKLOFF                  7

5  BY MS. HOFFMANN                173

6  BY MR. GOZA                    201

7  BY MR. STEKLOFF                206

8  BY MS. HOFFMANN                224

9

10

11          E X H I B I T S

12 NO.      DESCRIPTION            PAGE

13 1    Expert Report of Nathaniel S.
        Winstead, MD........................ 13

14

15 2    Responses and Objections to
        Defendants' Notice with Subpoena
        Duces Tecum of Oral Videotaped
16      Deposition.......................... 20

17 3    August, 2013 Xarelto label........... 95

18 4    Graham, et al study titled Stroke,
        Bleeding, and Mortality Risks in
19      Elderly Medicare Beneficiaries
        Treated With Dabigatran or
20      Rivaroxaban for Nonvalvular Atrial
        Fibrillation........................135

21

22 5    Lip, et al paper titled Real-world
        comparison of major bleeding risk
        among non-valvular atrial
23      fibrillation patients initiated on
        apixaban, dabigatran, rivaroxaban,
24      or warfarin.........................135

25

Page 5

1

2  6    Lip, et al paper titled Indirect
        Comparisons of New Oral
        Anticoagulant Drugs for Efficacy
3      and Safety When Used for Stroke
        Prevention in Atrial Fibrillation....135

4

5  7    Yao, et al paper titled
        Effectiveness and Safety of
        Dabigatran, Rivaroxaban, and
6      Apixaban Versus Warfarin in
        Nonvalvular Atrial Fibrillation......136

7

8  8    Medical record, Bates
        JBoudreaux-OStAGH-MD-000056..........158

9  9    Medical record, Bates
        JBoudreaux-PPR-001664 through 1673...163

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1    P R O C E E D I N G S

2

3        THE VIDEOGRAPHER:  We are now on the
4  record.  My name is Melissa Bardwell,
5  videographer for Golkow Technologies.  Date
6  today is December 12, 2016.  Time is
7  approximately 8:55 a.m.
8        This videotaped deposition is being
9  held in New Orleans, Louisiana in reference to
10  the Xarelto (Rivaroxaban) Products Liability
11  Litigation.
12        The deponent today is Dr. Nathaniel
13  Scott Winstead.
14        Will counsel present please introduce
15  themselves and state their affiliations for the
16  record.
17        MR. GOZA:  Kirk Goza on behalf of
18  Plaintiffs.
19        MS. KINGSDORF:  Emma Kingsdorf on
20  behalf of Plaintiffs.
21        MR. STEKLOFF:  Brian Stekloff on
22  behalf of Bayer.
23        MR. GOSTIN:  Kieran Gostin on behalf
24  of Bayer.
25        MS. HOFFMANN:  Margaret Hoffmann on

Page 7

1  behalf of Janssen.
2        MR. MCFALL:  Shaun McFall on behalf of
3  Janssen.
4        THE VIDEOGRAPHER:  The court reporter
5  today is Maureen Pollard, and she will now swear
6  in the witness.
7
8        NATHANIEL S. WINSTEAD, MD,
9  having been first duly sworn, was examined and
10  testified as follows:
11        EXAMINATION
12  BY MR. STEKLOFF:
13    Q.   Good morning, Dr. Winstead.
14    A.   Good morning.
15    Q.   Have you ever been deposed before?
16    A.   Yes.
17    Q.   How many times?
18    A.   Once.
19    Q.   What was the context in which you were
20  deposed?
21    A.   That was a medical review panel for a
22  malpractice issue.
23    Q.   And was that litigation in court, or
24  was that Louisiana medical review process?
25    A.   That was a Louisiana medical review

Page 8

1  process.
2    Q.   And when was that?
3    A.   That was approximately five years ago.
4    Q.   Can you briefly describe the issue of
5  the medical -- the topic of the medical review
6  panel?
7    A.   There was an allegation I failed to
8  meet the standard of care in the State of
9  Louisiana, and the panel found that I had, in
10  fact, met the standard of care.
11    Q.   What were the medical issues that the
12  patient was claiming?
13    A.   That -- you're familiar with these
14  things.  They allege about a million things.
15  The patient alleged that I was negligent, and
16  that they had had an esophageal perforation as a
17  consequence of a procedure I had performed.
18    Q.   Did it involve -- did the procedure
19  relate to a gastrointestinal bleed?
20    A.   No.
21    Q.   Did the patient have atrial
22  fibrillation?
23    A.   No.
24    Q.   Did the patient take any -- take
25  Warfarin or any DOAC?

Page 9

1    A.   No.
2    Q.   Do you prefer the term NOAC or DOAC
3  just so we can be --
4    A.   NOAC is fine.
5    Q.   Okay.  Is it fair to say this is the
6  first time you've been deposed in a litigation
7  between two parties unrelated to a medical
8  review board?
9    A.   So I performed expert services as a --
10  for the defense in a medical malpractice issue
11  in Florida.  I was never deposed in that matter,
12  though.  And apparently in Florida these things
13  drag on forever, and the files are all still
14  sitting in the office in the corner.  And I
15  check annually, and I keep being told that I
16  can't get rid of them.
17        MR. GOZA:  I think he just wants to
18  know if you've been deposed before.
19    A.   No, but I've always -- you know, it's
20  legal, I feel like I have to spill my guts.
21  BY MR. STEKLOFF:
22    Q.   Well, you anticipated another topic I
23  was going to ask, which is prior expert work.
24        Before we get into that, let me just
25  say, I'm sure Mr. Goza has gone over this with

Page 10

1 you, but first of all, I think we're doing a
2 pretty good job, let's not try to talk over each
3 other.
4 Second of all, just please give verbal
5 answers, which I think you're very good at.
6 And, third, if you need a break at any
7 time, just let us know. If a question is
8 pending, Mr. Goza and I may debate whether you
9 have to answer it or not, but otherwise if you
10 need a break, just let us know.
11 A. Fair enough.
12 Q. Let's go to your prior expert work.
13 You mentioned a case in Florida. Is
14 that the only time you've served as an expert
15 before?
16 A. That's the only time, yes, sir.
17 Q. And so this would be the second time
18 you've served as an expert?
19 A. Correct.
20 Q. In the case in Florida, can you just
21 give a very general description of the issues
22 there?
23 A. That surrounded a very narrow issue.
24 A patient alleged that a medication called
25 doxepin caused irreversible gastroparesis, which

Page 11

1 is sort of best described as the stomach doesn't
2 squeeze and contract and empty normally anymore.
3 And that was six or so years ago. That's been
4 quite a while.
5 Q. And you don't know the status of that
6 litigation?
7 A. My understanding from my annual check
8 as to whether or not I can dispose of the
9 records is that it's still pending.
10 Q. When were you first retained in this
11 litigation?
12 A. I believe it was April-May time frame.
13 I couldn't tell you exactly.
14 Q. Do you recall who first contacted you?
15 A. I was contacted by Mark Whitehead.
16 Q. And in general, you'll -- Mr. Goza
17 will tell you not to answer if I ask about
18 discussions with attorneys, but I just want --
19 in terms of your prep today and other things,
20 but I do want to ask, when you were first
21 contacted by Mr. Whitehead, did he ask you --
22 did he explain to you before you were retained
23 why he was contacting you and what your
24 assignment might be in the litigation?
25 MR. GOZA: No, I'll let you answer

Page 12

1 that just generally.
2 A. I would just say yes in very general
3 terms.
4 BY MR. STEKLOFF:
5 Q. Can you describe in general terms what
6 you described?
7 A. That's a long time ago. I think that
8 he just explained to me that there were -- that
9 there was -- he was working with a group of
10 Plaintiffs' attorneys, and I believe he was very
11 general at that time and didn't name a specific
12 product, but was interested in if I was willing
13 or able to serve as an expert in a matter
14 involving gastrointestinal bleeding and new or
15 oral anticoagulant. I'm not even sure he even
16 mentioned the specific drug during our initial
17 conversation, to be honest with you.
18 Q. How much -- strike that.
19 What did you do to prepare for your
20 deposition today? And again, I'm not asking
21 about specific discussions you had, but just
22 generally what you did to prepare.
23 A. I reviewed 3 to 4,000 pages of medical
24 records for Mr. Boudreaux's case, reviewed
25 pertinent literature. I tried to go back to the

Page 13

1 beginning, and I, you know, reviewed information
2 about the approval process, the initial studies
3 of rivaroxaban, and then follow-up studies in
4 general terms.
5 MR. GOZA: You probably ought to tell
6 him, too, because I don't know what's in your
7 identification, you've read some depositions.
8 A. Well, yeah, sorry, yeah, multiple --
9 yeah, multiple depositions.
10 BY MR. STEKLOFF:
11 Q. So to break -- well, why don't we do
12 this. I'm going to mark, just so we can work
13 off the same document, your report as Exhibit 1.
14 (Whereupon, Winstead Exhibit Number 1,
15 Expert Report of Nathaniel S.
16 Winstead, MD, was marked for
17 identification.)
18 MR. STEKLOFF: Do you want a copy?
19 MR. GOZA: That would be awesome.
20 MR. STEKLOFF: All right (handing).
21 MR. GOZA: Thank you.
22 BY MR. STEKLOFF:
23 Q. Dr. Winstead, is this the report you
24 prepared in Mr. Boudreaux's matter?
25 A. Yes, it is.

Page 14

1    Q.   And if you'd turn to Appendix A,
2 there's a list of materials that at the top it
3 says you relied on, reviewed and/or considered.
4       Do you see that?
5    A.   Mm-hmm.
6    Q.   And are those -- when you discuss
7 medical records, depositions, literature, and
8 there are two labels listed here, is that what
9 you're referencing?
10    A.   Correct.
11    Q.   So now to put the report down, I
12 assume you reviewed all of those materials prior
13 to completing your report?
14    A.   Yes.
15    Q.   And your report is dated October 14th?
16    A.   Yes.  Correct.
17    Q.   So then again, and I'm not asking
18 about any discussions with Mr. Goza, but since
19 October 14th, maybe even in the past week or so,
20 what have you done to prepare for this
21 deposition today?
22    A.   Well, I went back and reviewed my
23 report again and the supporting documents, and I
24 reviewed Mr. Boudreaux's records again.  I just
25 kind of went back through everything.

Page 15

1    Q.   Did you meet with Mr. Goza or any
2 other attorneys?
3    A.   Yes.
4    Q.   When did you meet?
5    A.   I met with Ms. Kingsdorf and Mr. Goza
6 on Thursday and again briefly this morning, and
7 I met with Mr. Goza yesterday.
8    Q.   When you and Mr. Goza and
9 Ms. Kingsdorf met on Thursday, approximately how
10 long did you meet?
11    A.   That was about 50 minutes.
12    Q.   And then yesterday how long did you
13 meet with Mr. Goza?
14    A.   It was about an hour and 15 minutes or
15 so.
16    Q.   And then this morning was brief?
17    A.   15 minutes maybe.
18    Q.   Beyond the materials that you reviewed
19 prior to completing your October 14th report,
20 are there materials that you're now -- is there
21 anything to add to this list that I'm looking at
22 in Appendix A?
23    A.   No, I don't believe so.
24    Q.   So just to be clear, you haven't
25 reviewed any additional deposition transcripts

Page 16

1 since -- that you didn't have before
2 October 14th?
3    A.   I believe the Wong deposition I had a
4 copy of, and I hadn't reviewed in detail, and I
5 had gone back and looked at that over the
6 weekend.  I mean, just in the matter of being
7 thorough and comprehensive, this says all
8 depositions, I believe I had a copy of the Wong
9 deposition, I hadn't -- I don't recall if I had
10 reviewed it thoroughly, but I reviewed it some
11 more this weekend.
12    Q.   And we may come back to Dr. Wong's
13 testimony, but did anything in Dr. Wong's
14 testimony after having reviewed it in more
15 detail this weekend change or revise or --
16    A.   No.
17    Q.   -- in any way alter --
18    A.   No.
19    Q.   -- any of your opinions?
20    A.   No.
21    Q.   Did you review any deposition
22 transcripts of any other experts who have been
23 retained by the Plaintiffs that have been taking
24 place recently?
25    A.   No.

Page 17

1    Q.   Did you review any additional
2 literature beyond the four studies that are
3 listed here in Appendix A?
4       MR. GOZA:  You mean in preparation for
5 the deposition?
6 BY MR. STEKLOFF:
7    Q.   Well, let's start with preparation for
8 the deposition.
9    A.   Specifically in preparation for the
10 deposition, no.  No, I think the one thing maybe
11 I did look at was the HAS-BLED score.  I looked
12 at that again just because I was curious about
13 it.  I would say that's about it, though.
14    Q.   Prior to October 14th, did you review
15 additional literature that you may have not put
16 on this because you are not relying on it or
17 considering it specifically for your opinions,
18 but is there anything else that you recall
19 reviewing?
20    A.   So you're asking me if prior to
21 October 14th I reviewed any other literature --
22       MR. GOZA:  Ever?
23    A.   -- ever?
24 BY MR. STEKLOFF:
25    Q.   No, not in -- we'll come back to your

Page 18

1  medical practice, but anything that you reviewed
2  specifically to prepare your opinions or your
3  report in this matter that you reviewed but
4  didn't include on this document, Appendix A?
5      A.   So there were other studies that I
6  reviewed that are not -- that I didn't really
7  think I relied upon in order to formulate my
8  opinion.  Well, I mean, there are other things
9  that I reviewed that didn't really affect my
10 opinion very much.
11     Q.   And sitting here today, is there
12 anything that -- you know, this is my
13 opportunity to make sure that you're not going
14 to come in and say -- just so you understand,
15 I'm not trying to play any tricks, you're not
16 going to come into court and say, well, also,
17 this study is really important and it was a
18 major part of why I formed my opinions, or it
19 was a part of why I formed my opinions.  So I'm
20 just trying to understand, I'm not trying to do
21 a memory quiz or ask --
22     A.   Yeah.
23     Q.   -- every study you've ever read, but
24 make sure this is a comprehensive list of the
25 studies that you believe support and underlie

Page 19

1  your opinions, and that there aren't any other
2  studies that do that, that are significant or
3  contribute significantly to your opinions.
4      A.   For this matter, for my opinion in
5  this matter, this is a reasonable -- this is a
6  list of the relevant literature.
7      Q.   And now moving away from Appendix A,
8  and obviously we're going to talk about your
9  opinions in your report, but are all of the
10 opinions that you intend to offer in
11 Mr. Boudreaux's case contained in the three
12 pages of your report?
13          MR. GOZA:  I'll just object to the
14 form.
15     A.   Restate your question again so I can
16 make sure I understand.
17 BY MR. STEKLOFF:
18     Q.   Sure.
19          Are all of the opinions that you
20 intend to offer in Mr. Boudreaux's case
21 contained in the three pages of your report?
22          MR. GOZA:  Same objection.  Form.
23     A.   That's kind of an impossible question
24 to answer.  I mean, you do your best to put
25 everything into three pages.

Page 20

1  BY MR. STEKLOFF:
2      Q.   Sitting here today, do you have any
3  other opinions relevant to Mr. Boudreaux's care
4  or treatment that weren't put in -- that aren't
5  included in your report?
6          MR. GOZA:  Same objection as to form.
7      A.   This report is an adequate explanation
8  of my opinion of Mr. Boudreaux and what
9  transpired.
10         (Whereupon, Winstead Exhibit Number 2,
11         Responses and Objections to
12         Defendants' Notice with Subpoena Duces
13         Tecum of Oral Videotaped Deposition,
14         was marked for identification.)
15 BY MR. STEKLOFF:
16     Q.   I'm just going to mark, I don't have
17 extra copies for Exhibit 2, just for the record,
18 a document called Responses and Objections to
19 Defendants' Notice with Subpoena Duces Tecum of
20 Oral Videotaped Deposition of Nathaniel S.
21 Winstead, MD (handing).
22         Dr. Winstead, have you seen either
23 this document or the notice that was -- that led
24 to this document before?
25     A.   I saw the notice.  I don't believe

Page 21

1  I've seen this document before.
2      Q.   And I do not want to go through topic
3  by topic the notice.  But in general, have
4  you -- understanding that your counsel has made
5  some objections to our requests, have you
6  undertaken an effort to provide your counsel
7  with everything that was subject to the notice,
8  in terms of materials you reviewed or created in
9  drafting --
10     A.   Yes.
11     Q.   -- your report?
12     A.   Yes.
13     Q.   There's no other notes or documents
14 that you created or, really, anything else that
15 hasn't been provided at least to your counsel?
16     A.   No.
17     Q.   So if we --
18         MR. GOZA:  The only objection I have
19 to the form is we're not his counsel.
20         MR. STEKLOFF:  That's fair.  To
21 Plaintiffs' counsel.
22 BY MR. STEKLOFF:
23     Q.   So if you can turn back to Exhibit 1,
24 which is your report, I want to ask some
25 questions about your background.

Page 22

1    A.    Sure.
2    Q.    First of all, how do you pronounce
3  your business, so I don't -- just the first
4  word.
5    A.    The name of the town is Houma.
6    Q.    Okay.  And when did you open Houma
7  Digestive Health Specialists, LLC?
8    A.    Three years ago.
9    Q.    And how many doctors are employed at
10  Houma?
11    A.    It's myself and a physician assistant.
12    Q.    And on a general level, can you
13  describe your practice?
14    A.    It's a busy general gastroenterology
15  and hepatology practice.
16    Q.    Do you prescribe anticoagulants?
17    A.    No.
18    Q.    Have you ever prescribed
19  anticoagulants?
20    A.    When I was in training and practicing
21  general medicine.  That was before any of these
22  drugs came along, and all we had was warfarin.
23    Q.    When you were prescribing warfarin in
24  your training, what, if any, challenges did you
25  find in treating patients who were being

Page 23

1  prescribed warfarin?
2         MR. GOZA:  I'm just going to object to
3  the vague nature of the question.
4    A.    You know, that's a long time ago.
5  It's been -- it's been 12 years since I
6  practiced general internal medicine.  I would
7  say just the usual issues of treating any
8  condition; compliance, adherence.  That's about
9  it.
10  BY MR. STEKLOFF:
11    Q.    With respect to warfarin, what were
12  the issues that you confronted with compliance?
13         MR. GOZA:  Same objection.  Goes to
14  form and speculation.  No foundation.
15         Go ahead.
16    A.    Just people not taking their
17  medication.
18  BY MR. STEKLOFF:
19    Q.    And when you use the word "adherence,"
20  is that the same thing, or something different?
21    A.    Correct.
22    Q.    Did you have any concerns at the time
23  that you were prescribing warfarin about keeping
24  your patients within the therapeutic range of
25  warfarin?

Page 24

1    A.    We always have these concerns.  You
2  know, in the system that I worked in, mostly
3  that was handled by a pharmacology clinic.  But
4  again, we're talking about something that was a
5  long time ago.
6    Q.    Were you still a student or a resident
7  or a fellow when this was happening?
8    A.    No, I was a resident.
9         As a, you know, board certified
10  licensing physician since completing internal --
11  since basically passing my internal medicine
12  board -- well, actually, since graduating
13  fellowship and finishing -- I mean, graduating
14  residency and being chief resident, I'm not sure
15  that I wrote a -- I haven't written an
16  anticoagulant prescription in, like, 13 years.
17    Q.    Do you have patients who come to see
18  you, in the absence of a bleed, who are taking
19  anticoagulants?
20    A.    Yes, all the time.
21    Q.    I assume all of the anticoagulants?
22    A.    Correct.
23    Q.    Do you have discussions with them
24  about maintaining a blood concentration within
25  the therapeutic range?

Page 25

1    A.    No.  That's well outside of my area of
2  expertise and practice.
3    Q.    And that's been true ever since you
4  completed your residency?
5    A.    Yes.
6    Q.    In terms of bleeds in your practice at
7  Houma Digestive Health Specialists, are you
8  focused on gastrointestinal bleeds?
9    A.    Correct.
10    Q.    Are there other types of bleeds that
11  you treat beyond gastrointestinal bleeds?
12    A.    No.
13    Q.    And what percentage of your practice
14  relates to, this can be very approximate, bleeds
15  as -- gastrointestinal bleeds as opposed to
16  other gastrointestinal issues?
17    A.    Oh, boy.  Acute bleeding or chronic
18  bleeding?
19    Q.    Let's start with acute.
20    A.    Acute bleeding is probably 5 to
21  10 percent of -- you know, 5 percent of my
22  aggregate professional time, boots on the
23  ground.
24         Chronic bleeding is probably, it could
25  probably be more, 5 to 10 percent.

Page 26

1    Q.   And can you just very -- on a very
2   high level describe to the jury the difference
3   between acute bleeding and chronic bleeding?
4    A.   Acute bleeding is, you know, if you
5   come into the emergency room with a low blood
6   pressure, passing blood in your stool, or
7   vomiting blood.
8        Chronic bleeding is patients who are,
9   you know, chronically off and on experiencing
10  some overt bleeding, or sometimes patients who
11  are chronically anemic with low red cell indexes
12  and abnormal -- abnormally low iron stores who
13  are losing blood chronically in their GI tract.
14   Q.   Prior to opening Houma Digestive
15  Health Specialists, when you were working at
16  Ochsner Health System, was your practice
17  similar?
18   A.   Very similar, yes.
19   Q.   And I see that you're also principal
20  of something called ClinRes, LLC?
21   A.   Yes.  We perform clinical research
22  studies, primarily drugs and devices.
23   Q.   And in that work, do you -- are the
24  clinicals trials always sponsored by
25  pharmaceutical or device companies?

Page 27

1    A.   Yes.
2    Q.   Have you done any trials on behalf of
3   Bayer before?
4    A.   Not Bayer, no.
5    Q.   Have you done any trials on behalf of
6   Janssen?
7    A.   I'm trying to think what Janssen
8   makes.  I'm not being evasive.
9        The problem, there have been so many
10  mergers and acquisitions that I can't keep it
11  all straight in my head anymore.  I don't think
12  I've ever done anything for Janssen, no.
13   Q.   Have you done any clinical trials
14  associated with anticoagulants?
15   A.   No.
16   Q.   Have you done any clinical trials
17  associated with the treatment of atrial
18  fibrillation?
19   A.   No.
20   Q.   Have you done any clinical trials that
21  you would describe as relevant to the opinions
22  you're offering here today?
23   A.   No.
24   Q.   What percentage of your work is
25  clinical care of patients versus being an

Page 28

1   investigator in clinical trials or something
2   else?
3    A.   That's in the midst of transitioning.
4   I mean, right now clinical trials probably
5   comprises 2 percent of my work.  But that's, in
6   the last three months, that's beginning to
7   change and evolve and that amount is picking up.
8   I'm anticipating it's going to be more like 5 or
9   10 percent next year.
10   Q.   Is that because of a specific trial?
11   A.   It's because we've brought in four to
12  five research trials.  And I'm in the midst of
13  hiring some support staff.
14   Q.   Is ClinRes a company or a business
15  that's owned by you?
16   A.   So I have two partners.  ClinRes has
17  actually wrapped up operations.  And so my --
18  the research studies now, we had some
19  contracting issues, and this is lawyer stuff
20  that I don't really understand.  PhRMA wants to
21  contract directly with practices rather than a
22  third party.  So we've kind of wrapped up
23  ClinRes, but I had two partners who were both
24  research coordinators.
25       But in the two or three months since I

Page 29

1   prepared this report, or I think my CV was
2   prepared earlier than that, we've kind of
3   wrapped up ClinRes operations, and those
4   operations have folded back into my clinical
5   practice because of lawyer issues, contracts.
6    Q.   Those lawyers.
7    A.   Those lawyers.
8        MS. HOFFMANN:  Doctor, could I ask you
9   just to keep your voice up just a little?
10       THE WITNESS:  I am sorry.
11       MS. HOFFMANN:  Don't be sorry.  I'm a
12  older and a little, probably, harder of hearing.
13  Mr. Goza is smiling at that.
14       Thank you.
15       MR. GOZA:  Only because I can relate.
16  BY MR. STEKLOFF:
17   Q.   And so now any clinical trial work
18  that you'll be participating in will come
19  through Houma Medical -- sorry, Digestive Health
20  Specialists?
21   A.   Yes.
22   Q.   And will you have employees that are
23  specifically focused on that clinical trial
24  work, or just your team?
25   A.   Yes.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 30

1    Q.   Okay.  And so you're adding employees?
2    A.   I'm adding one.  I'm working on a
3  contract.  Lawyers.
4    Q.   A doctor or someone else?
5    A.   She's a research coordinator
6  basically.  She coordinates the studies and
7  helps with logistics and execution.
8    Q.   And so beyond the approximately 5 to
9  10 percent of work that may become clinical
10  trial work, is the other -- is the remaining 90
11  to 95 percent --
12    A.   95 percent is clinical work, yes.
13    Q.   Do you still have any academic or
14  professorial responsibilities?
15    A.   So I'm what is -- what's the title?
16  I'm an associate professor, or a clinical
17  assistant professor at Tulane, is the official
18  title.  I have, off and on, done teaching and
19  lecturing for them.  I haven't done any in maybe
20  18 or 20 months.  I just -- if they invite me to
21  come do something, I'm usually happy to come
22  lecture.  And it's usually to residents in
23  training.
24    Q.   And is it usually a sort of one-day
25  ad hoc lecture?

Page 31

1    A.   Yeah, it's usually a one-hour ad hoc.
2  I have a few things in the can that I usually
3  like to talk about.
4    Q.   I won't ask you to describe everything
5  in the can, but do any of your presentations
6  relate to the opinions that you're offering
7  here?
8    A.   No.  No, I mean, I think the ones that
9  I -- I have some odd little special niche
10  interests because of my mentor in fellowship.
11  And so I have a lovely talk that I give on
12  chronic vomiting.  And if you all want to stick
13  around afterwards I can bust out a PowerPoint.
14       So I tend to give sort of niche talks
15  on stuff that's not really lectured upon very
16  frequently.  The basic stuff, you know, is
17  usually handled by their regular full-time
18  faculty.
19    Q.   Nothing on NOACs?
20    A.   Nothing on NOACs.  Really nothing on
21  bleeding in general.
22    Q.   And nothing on the cause of
23  gastrointestinal bleeds?
24    A.   I don't believe I've done one of those
25  in quite some time.  It would have been back in

Page 32

1  fellowship that maybe I did an off-the-cuff
2  thing for trainees.  I haven't done a standard
3  straight-up gastrointestinal bleeding talk in a
4  long time.
5    Q.   And when you, in your clinical
6  practice, have someone with a gastrointestinal
7  bleed, we'll talk about the process you go
8  through, is it fair to say that you're really
9  trying to find the source of the bleed as
10  opposed to the cause of the bleed?
11    A.   I think that --
12       MR. GOZA:  Object to form.
13       To the extent you understand.
14    A.   I think that you're asking the same
15  question twice.  Source of the bleed versus
16  cause of the bleed, if there's -- you have to
17  look at both.  I mean, you want to think about
18  cause and source and fix whatever you're able
19  to.
20  BY MR. STEKLOFF:
21    Q.   In your clinical practice, if you have
22  a patient who is taking an anticoagulant, do you
23  try to determine whether the anticoagulant is
24  the cause of the bleed?
25    A.   So in my scope of practice, if I have

Page 33

1  a patient bleed on an anticoagulant, do I
2  decide -- do I make a determination as to
3  whether the anticoagulant is the cause of the
4  bleed?
5       So any patient who is anticoagulated
6  is going to have a higher risk of bleeding, and
7  the question becomes risk/benefit to that
8  individual patient.
9    Q.   Well, let me break that down a little
10  bit.
11       Any patient who is on an anticoagulant
12  has a higher risk of bleed, is that right?
13    A.   Than somebody walking around on the
14  street on no medication.
15    Q.   And that's true no matter which
16  anticoagulant the patient is taking?
17    A.   Some anticoagulants more likely than
18  others.
19    Q.   But to answer my question, there's a
20  higher risk of bleed for someone who is on any
21  anticoagulant compared to someone walking on the
22  street who is not on an anticoagulant?
23    A.   On no medications, yes.
24    Q.   And you testified that any patient who
25  is anticoagulant is going to have a higher risk

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 34

1 of bleeding, and the question becomes
2 risk/benefit to that individual patient, right?
3     A.   Correct.
4     Q.   And when you say "risk/benefit,"
5 that's a question of whether the person should
6 continue to be on an anticoagulant, correct?
7     A.   Or the particular anticoagulant that
8 they're on.
9     Q.   Okay.  So you may -- so a doctor, not
10 you because you wouldn't prescribe it, but could
11 recommend that they switch anticoagulants?
12     A.   Correct.
13     Q.   But to go back to my question, isn't
14 it fair to say that in your practice you
15 don't -- when you have someone who has a bleed,
16 you're focused on their treatment going forward,
17 and you are not trying to determine whether the
18 anticoagulant itself caused the bleed, is that
19 fair?
20         MR. GOZA:  The only objection I would
21 make is it's ambiguous.  You're trying to
22 separate two things that can't be.
23     A.   Yeah, I mean, I think that all that is
24 part of the continuing caring for the patient.
25 It's not two separate activities really.

Page 35

1 BY MR. STEKLOFF:
2     Q.   In your practice, if someone is taking
3 an anticoagulant and they have a
4 gastrointestinal bleed, do you undergo a process
5 to determine whether the anticoagulant caused
6 the bleed?
7     A.   It's -- I guess I'm not trying to be
8 evasive.  Do I undertake a process.  I mean,
9 frankly that's not really a yes or a no question
10 either.  Each case is different.  I would say --
11 I would again reiterate that any patient who is
12 on an anticoagulant has a higher risk of
13 bleeding than someone walking around in general,
14 and there needs to be a careful consideration of
15 risks and benefits going forward.  So is it my
16 clinical practice to say, you bled because of X?
17 The problem in medicine is that it's very rare
18 that you can say that's definitively X.
19         And so I would just go back and say
20 again that anybody who is on any anticoagulant
21 is more likely to bleed.  It's very rare that
22 you can narrow something down to one thing and
23 say, you know, Mr. Smith, you bled because you
24 were on drug X, except in situations where, you
25 know, there's nothing else that you can find

Page 36

1 when you look at someone's gastrointestinal
2 tract, they don't have any kind of lesion or
3 irritation or evidence of bleeding anywhere.
4         So, you know, in specific cases where
5 you have no other underlying identifiable
6 pathology after you do a comprehensive
7 evaluation of a patient, if they're on a drug
8 and they bled, you would -- I guess you would
9 say at that point that you need to consider if
10 the drug played a significant role in that
11 bleeding, and then weigh the risks and the
12 benefits for that particular patient going
13 forward.
14     Q.   So again to break that down a little
15 bit, is it fair to say in your clinical practice
16 you do not try to determine that a patient bled
17 because of a specific drug that he or she was
18 taking?
19         MR. GOZA:  Well, I'll object.  That
20 misstates what he just said.
21 BY MR. STEKLOFF:
22     Q.   I'm not -- just I'm not asking you to
23 restate, I'm not stating or restating --
24         MR. GOZA:  But you are -- well, but
25 you have, and you've misstated what he just

Page 37

1 said.
2         MR. STEKLOFF:  I'll ask the question
3 again.
4         MR. GOZA:  Okay.
5 BY MR. STEKLOFF:
6     Q.   Regardless of what you've said already
7 or what you're going to say now, so I'm going to
8 ask a clean question and you can answer it.
9     A.   Okay.
10     Q.   Is it fair to say that in your
11 clinical practice you don't try to determine in
12 an individual patient that a specific drug
13 caused his or her gastrointestinal bleed?
14         MR. GOZA:  And my objection still
15 stands.
16     A.   So if you look at a patient and
17 they've bled and they were on some kind of
18 anticoagulant and you do a comprehensive
19 gastrointestinal tract workup, and you have no
20 other underlying reason, in that case I would
21 make a determination that the patient likely
22 bled because of drug, of the anticoagulant.
23 Okay?  In other cases, it may be more nuanced
24 than that.  And again, you have to raise the
25 risks, benefits, alternatives.

Page 38

BY MR. STEKLOFF:

Q. Do you agree that even in the case where you can't identify an underlying reason during your gastrointestinal tract workup that there has to be an underlying pathology before there can be a bleed even if the person is taking an anticoagulant?

A. I wouldn't agree with that statement.

Q. Why not?

A. Because what you frequently see is patients who in my professional opinion are anticoagulated who will just kind of ooze profusely throughout the GI tract because of the way -- the anatomical structure of the GI tract.

Q. And so in those cases are you saying that the anticoagulant initiated the bleed?

A. Correct.

Q. And what is the mechanism of action through which an anticoagulant can initiate a gastrointestinal bleed?

A. So there's -- there are a number that have been proposed, and there's a number that have been proposed specifically with the NOACs, but one case would be systemic toxicity of the drug, so drug levels which are too high.

Page 39

Another would be direct topical effects of the medication, so in other words biologically active non-absorbed drug within the GI tract.

A third would be direct mucosal toxicity of the drug, or substrates or additives to the capsule or tablet or whatever form the medication is in.

I think that would be a reasonable list.

Q. Do you believe that there's a scientific consensus about any of those theories?

A. So a scientific consensus in general about one of those proposed theories, I think that they're all -- I think that they're all extremely difficult -- well, let me back up.

I think on a case-by-case basis you can possibly sometimes make a determination that one of those is more likely than others. I think for different medications some of those proposed mechanisms seem more likely than others.

But you're asking for a general statement about a general scientific consensus

Page 40

across a range of medications. That's an impossible question to answer.

Q. Let me clarify a little bit.

Do you agree that all three of those proposed mechanisms apply to all anticoagulants?

A. No.

Q. Do they apply to all NOACs?

A. Apply to all NOACs. No, they do not apply to all NOACs because I think -- I feel like direct topical action of the NOACs is important, and I feel like nobody has demonstrated that any of the NOACs cause direct mucosal toxicity like you would see with an NSAID, for instance. Nobody has described an ulcer risk associated with the NOACs.

Q. So I may be confused. Of the three theories that you laid out, I'll walk through them, which ones apply to Xarelto?

A. I think that the direct topical action is most important for Xarelto, because there's a large amount of drug excreted in the stool. I think also the systemic toxicity is important. So I think in this particular case of rivaroxaban, those are the two most important factors.

Page 41

Q. And do those two possible proposed mechanisms of action apply to the other NOACs?

A. My goal in preparing for this deposition was not to exhaustively review the data on other NOACs. I think that the direct topical action is probably more important for rivaroxaban because a large amount of it is excreted in the stool.

Q. And what studies or other support are you relying on in offering that opinion?

A. I believe that information is in the package insert.

Q. And so just to be clear, you believe that Xarelto can initiate a bleed in the absence of any pre-existing or underlying pathology?

A. Correct.

Q. Do you have any opinion on whether other NOACs beyond Xarelto can also initiate a bleed in the absence of pre-existing pathology?

MR. GOZA: Object to form.

A. Well, I mean again, you know, any patient can become toxic on any drug, and so the concerns about systemic effects of the drug are there, I think, for any anticoagulant, including all the other NOACs.

Page 42

BY MR. STEKLOFF:

Q.   And including Warfarin?

A.   Yes.

Q.   But in terms of direct mucosal toxicity, does that theory apply to any -- do you have an opinion on whether that applies to any other anticoagulants?

A.   So let's clarify.  When I said "mucosal toxicity," I was referring to mucosal damage caused by the active compound or something in the capsule or tablet.  There's the risk of topical exposure to active drug, I think, is more of a concern with rivaroxaban than any other anticoagulant.

Q.   And what are you relying on to offer that opinion beyond -- forget beyond.  Let me ask again.

What are you relying on to offer that opinion?

A.   That's been proposed as a potential mechanism of action, and the package insert has information about unchanged metabolites being excreted in the stool.

Q.   Where has it been proposed?

A.   I can't tell you exactly where I came

Page 43

across that.  I would have to check.  I think I have -- it may be in one of the -- I'm trying to remember exactly where I saw that.  I believe it's in one of the articles referenced in my opinion, but I would have to double check.

Q.   You believe that there's been a peer-reviewed article in a scientific journal that offers that potential mechanism of action?

A.   Yes.

Q.   And it's fine if the answer is no, but you believe it's one of the articles that's listed in Appendix A?

A.   Again, there's, you know, there's hard science, prospective randomized controlled trials, and then there's people trying to hypothesize why things happen.  Do you follow what I'm saying?

Q.   Absolutely.

A.   And I think that this falls under the category of hypothesis, why people think things happen.

Q.   But you're a very experienced doctor, so I want to know what you think happens.

And so just going back, do you believe that Xarelto causes bleeds in the absence of any

Page 44

pre-existing pathology?

A.   Yes.

Q.   Do you believe that happened in Mr. Boudreaux's case?

A.   Yes.

Q.   To a reasonable degree of scientific certainty?

A.   To a reasonable degree of scientific certainty.

Q.   And in Mr. Boudreaux's case, what is the mechanism of action -- what is the theory of mechanism of action that you believe, to a reasonable degree of scientific certainty, applies?

A.   Well, I think, again, either systemic effects of Xarelto, so being on too high of a dose or, you know, being a slow metabolizer of the drug; so systemic effects, the presence of the drug to begin with.  I should back up.  Or possibly again, you know, direct topical exposure of active drug to his GI tract, topical exposure.

Q.   And is there any minimum amount of Xarelto, in terms of number of Xarelto tablets or length of time someone took Xarelto, for

Page 45

there to be systematic effects that could lead to a bleed?

MR. GOZA:  Object to form.

A.   No.

BY MR. STEKLOFF:

Q.   Could one tablet do it?

A.   That's beyond my area of expertise, really.  I mean, I would assume, I would assume it could.  But we're -- at this point we're spitballing.

MS. HOFFMANN:  I'm sorry, what was that?

THE WITNESS:  I said at this point we're spitballing, you know, throwing spit against the wall to see if it would stick.

You know, I couldn't tell you that. That's a question for a pharmacologist, if one tablet could increase your risk for bleeding.

BY MR. STEKLOFF:

Q.   Do you think there's any -- can you point to any number of tablets that you think could increase your risk of bleeding, that could cause a bleed without pre-existing pathology?

MR. GOZA:  Same objection.  Form.

A.   Again, I -- it's a question -- that's

Page 46

1 a question that steady state of drug, ingestion,
2 absorption.
3 BY MR. STEKLOFF:
4    Q.   Did you bring the articles, the four
5 articles that you cited with you?
6    A.   No, I don't have physical copies of
7 those with me.  No.
8    Q.   If on a break I'll mark them and
9 provide them to you, will you review them and
10 then point to me in which article this proposed
11 mechanism of action has been --
12    A.   Sure.
13    Q.   -- hypothesized?
14    A.   Certainly.
15    Q.   So is it fair to say you do not think
16 that Mr. Boudreaux had any pre-existing
17 pathology related to his gastrointestinal bleed
18 before he began taking Xarelto?
19    A.   Correct.  I don't think he had any
20 kind of pre-existing gastrointestinal tract
21 pathology.
22    Q.   Now, do you treat patients who
23 experience GI bleeds who take warfarin?
24    A.   Yes.
25    Q.   Have you ever had a patient who took

Page 47

1 warfarin who -- where you were unable to
2 identify the source of the bleed --
3    A.   Yes.
4    Q.   -- through endoscopy and other means?
5    A.   Yes.
6    Q.   And in those cases, did you make a
7 determination that warfarin was the most likely
8 cause of the bleed?
9    A.   Yes.
10    Q.   And so can warfarin, in those cases,
11 cause the bleed without a pre-existing
12 pathology?
13    A.   Yes.
14    Q.   Did you make that determination in
15 those cases?
16    A.   Yes.
17    Q.   Without going through every NOAC, if I
18 asked you the same questions related to NOACs
19 other than Xarelto, would your answers be yes?
20    A.   I would answer the same to those exact
21 questions regarding other drugs, yes.
22    Q.   So you have treated patients who have
23 experienced GI bleeds taking NOACs?
24    A.   Correct.
25    Q.   And in some of those cases, you have

Page 48

1 been unable to identify a source of the bleed?
2    A.   Correct.
3    Q.   And in those cases where you've been
4 unable to identify the source of the bleed, you
5 have determined that more likely than not the
6 non-Xarelto NOAC was the cause of the bleed?
7    A.   Yes.
8    Q.   And so it's fair to say that all
9 anticoagulants have a risk of causing a GI
10 bleed, correct?
11    A.   Correct.
12    Q.   And that all anticoagulants can cause
13 a GI bleed -- can -- strike that.
14        All anticoagulants can initiate a GI
15 bleed in the absence of underlying pathology?
16    A.   Yes.
17    Q.   And you also agree that all of the
18 labels of anticoagulants make clear that there's
19 a risk of bleeding?
20        MR. GOZA:  I'll just object as to
21 outside his expertise.
22    A.   Yeah, I haven't reviewed the package
23 insert for Pradaxa or Eliquis or -- you know, I
24 couldn't tell you exactly what those say.
25 BY MR. STEKLOFF:

Page 49

1    Q.   That's fair enough.
2        And is it fair to say you've only
3 reviewed the Coumadin or warfarin label probably
4 when you were back in medical school?
5    A.   It's been some time since I looked at
6 it.  I think I may have glanced at it for this
7 for review at some point.
8    Q.   Do you agree that the Xarelto label --
9 first of all, you did review some iterations of
10 the Xarelto label?
11    A.   Correct.
12    Q.   Do you agree that the Xarelto label
13 warns doctors of the risk of bleeding?
14    A.   Yes.
15    Q.   Do you agree, having reviewed
16 Dr. Wong's testimony, that he was aware of the
17 risk of bleeding associated with Xarelto prior
18 to prescribing it to Mr. Boudreaux?
19        MR. GOZA:  The only objection I'll
20 make is to the form and ambiguous nature of
21 being aware.
22        But go ahead.
23    A.   It would seem that he was.  Frankly, I
24 don't think like a litigator.  And I reviewed
25 his deposition.  I mean, it does seem that he

Page 50

1 does.  It also seemed like he -- he said that he
2 had been up all night the night before, and his
3 deposition is a bit hard to follow, so...
4     Q.   I was not there, but we probably all
5 agree he seemed tired.
6     A.   Yes.
7     Q.   I want to talk to you about risk
8 factors for suffering a GI bleed --
9     A.   Okay.
10    Q.   -- while on any anticoagulant.
11    A.   Okay.
12    Q.   You mentioned a HAS-BLED score --
13    A.   Correct.
14    Q.   -- before.
15        Can you describe to the jury what the
16 HAS-BLED score is?
17    A.   It's a risk assessment tool for
18 anticoagulating patients.  It's been studied on
19 patients on warfarin.  It tends to give you a
20 risk of bleeding going forward, if the patient
21 is to be anticoagulated, based upon risk
22 factors; they have a baseline.
23    Q.   Is that some -- you said that you
24 reviewed that prior to your deposition today,
25 correct?

Page 51

1     A.   Correct.
2     Q.   Is that something that you utilize in
3 your practice?
4     A.   No.
5     Q.   That's because you're not prescribing
6 anticoagulants?
7     A.   Not prescribing it, no.  I was unaware
8 of it until I started doing this.
9     Q.   Okay.  In general, even before doing
10 this, were you aware that hypertension was a
11 risk factor for bleeding?
12    A.   Well, it's interesting, that's a very
13 interesting medical point.  Because hypertension
14 is not identified as a risk factor independently
15 for gastrointestinal bleeding, but it's a risk
16 in the HAS-BLED score for what they call -- what
17 is the exact term they use, major -- major
18 hemorrhage requiring two or more units of blood
19 transfusion.
20        So, I mean, I'm aware of it.  I find
21 it a little bit interesting.  It's something I
22 want to read more about, because it's not --
23 it's not something we routinely identify.
24        Say a person comes in with an ulcer
25 and bleeding, otherwise healthy person, it's not

Page 52

1 something we routinely use.  I don't advocate
2 for better hypertension management in my
3 patients with ulcers.  So it's interesting.
4     Q.   Interesting in the sense that you want
5 to understand it more to see if you should be
6 utilizing it more in your practice?
7     A.   Yeah, but I don't -- yeah.
8        MR. GOZA:  Object to the form.
9     A.   I think it's unrelated -- it's
10 unrelated to all this.
11 BY MR. STEKLOFF:
12    Q.   Do you agree that Mr. Boudreaux had
13 hypertension prior to being prescribed an
14 anticoagulant?
15        MR. GOZA:  Objection.
16    A.   I believe he did.  But I think in the
17 HAS-BLED score they -- it's not just having
18 hypertension, it's uncontrolled hypertension
19 with systolic blood pressures greater than 160.
20 So there's that.
21        Did he have hypertension?  Yes.  But I
22 don't think he meets their definition of
23 uncontrolled hypertension.
24 BY MR. STEKLOFF:
25    Q.   So do you believe that hypertension

Page 53

1 was a risk factor for bleeding for Mr. Boudreaux
2 prior to being prescribed --
3     A.   If you believe the HAS-BLED scoring
4 and apply it appropriately, he would not get a
5 point for hypertension.
6     Q.   And apart from the HAS-BLED score, I'm
7 just asking what you believe, do you believe
8 that hypertension was a risk factor for bleeding
9 for Mr. Boudreaux prior to being prescribed
10 Xarelto?
11        MR. GOZA:  Just so we're clear, you
12 mean gastrointestinal bleeding?
13        MR. STEKLOFF:  Yes.
14    A.   It's -- so, again, hypertension has
15 not been identified as an independent risk
16 factor for gastrointestinal bleeding.  And,
17 again, just to reiterate, the HAS-BLED score
18 doesn't -- isn't specific for gastrointestinal
19 bleeding, it's major bleeding.
20        So no, I believe, is the answer that I
21 would give.
22 BY MR. STEKLOFF:
23    Q.   So you -- and gastrointestinal
24 bleeding can be -- is a subcomponent of major
25 bleeding, right?  Or can be a subcomponent?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 54

1  A.  Yes, can be.
2  Q.  Do you -- I'm not trying to repeat the
3  question.  I'm just trying to --
4  A.  That's fine.
5  Q.  Since there are some -- you know, lots
6  of words being used here.
7      Do you think that Mr. Boudreaux's
8  hypertension put him at a greater risk of a
9  gastrointestinal bleed prior to his prescription
10 for Xarelto?
11 A.  No.
12 Q.  What about age, is that -- can that
13 be, or is that a risk factor for a -- start with
14 a major bleed?
15 A.  Yes.
16 Q.  Is that something, before reviewing
17 the HAS-BLED score, that you were aware of?
18 A.  Yes.
19 Q.  Is that something that you believe is
20 a risk factor for a major bleed?
21 A.  A major bleed in general?
22 Q.  Yes.
23 A.  I believe it is, yes.
24 Q.  And is age also a risk factor for a
25 gastrointestinal bleed?

Page 55

1  A.  Some studies, yes.  I mean, I would
2  say in my clinical practice I believe yes, age
3  is a relative risk factor.
4  Q.  Is there a specific age that you
5  believe at which you are at a greater risk of
6  suffering from a gastrointestinal bleed?
7      MR. GOZA:  The only objection I make
8  would be that's a very general question.  It
9  might depend on the specifics.
10 A.  I don't have a cutoff, to be honest
11 with you.  If anyone wants to throw a shoe at
12 me, I think you're old when you turn 65.  When
13 you get to 70, I start worrying more.  And most
14 of all, I'm afraid of 80-year-old women, because
15 something always seems to go wrong.
16 Q.  That's perfect.  That's why I asked
17 the question, because you can give me the
18 ranges.
19     What about aspirin, does that increase
20 someone's chances of suffering from a
21 gastrointestinal bleed?
22 A.  Yes.
23     MR. GOZA:  Again, just object to the
24 form.  Vague, without more specifics as to what
25 it might result in.

Page 56

1      MS. HOFFMANN:  At this point, Counsel,
2  I'm going to ask you to really confine your
3  objection to just the word "objection" or
4  "objection to form."
5      I do think that when you add those
6  other terms, it could be construed as perhaps
7  coaching the witness, and I know you don't want
8  that to be reflected on the record.
9      MR. GOZA:  Certainly, no, I don't
10 intend to do that.
11     MS. HOFFMANN:  Thank you.
12     MR. GOZA:  I do think I am able to
13 articulate why, the basis for my objection.
14 I've tried to limit it in that way.
15     MS. HOFFMANN:  I think not actually.
16 I think the rules --
17     MR. GOZA:  You and I are going to
18 fight about it.  So we'll just go forward.  If
19 you want to make something specific that you
20 think you need to take up with the court, we can
21 do it.
22     MS. HOFFMANN:  Thank you.
23     MR. GOZA:  Go ahead.  I don't remember
24 if there's a question pending.
25     MR. STEKLOFF:  He answered it,

Page 57

1  actually, before the -- before the discussion.
2  BY MR. STEKLOFF:
3  Q.  And it's true that all NSAIDs increase
4  someone's chances of suffering from a
5  gastrointestinal bleed, correct?
6  A.  Correct.
7  Q.  As does impaired liver function?
8  A.  So you have to more carefully define
9  impaired liver function if you want an honest
10 answer to that question.
11 Q.  I want honest answers to everything.
12     So how would you define impaired liver
13 function with --
14 A.  Somebody whose, you know,
15 coagulopathic as a consequence of liver disease
16 has signs or symptoms of portal hypertension
17 disease, somebody with markedly abnormal liver
18 function tests, somebody with an ultrasound that
19 shows cirrhosis, I think clearly those patients
20 are at increased risk for portal hypertensive
21 gastrointestinal bleeding.  I think that the
22 best data is using the Child-Pugh score.  I
23 think if you're Child-Pugh C or D your risk is
24 reasonably higher.
25     But, yeah, people with compelling

Page 58

1 evidence of chronic liver disease, yes. You
2 know, increasingly we see people with
3 non-alcoholic steatohepatitis who are just
4 walking around with mildly abnormal liver tests.
5 In my heart of hearts, I don't believe those
6 people are at an increased risk for bleeding
7 because they don't have any of the other sort of
8 really strong risk factors for gastrointestinal
9 bleeding, but I'm not sure that that's been
10 looked at in the literature. So if you just say
11 hepatic impairment or liver disease, you're kind
12 of using a blanket term to identify, you know,
13 specific risk factor. That's not as easy as the
14 other questions.
15     Q.    What about diabetes, do you believe
16 diabetes is a risk factor for GI bleeds?
17     A.    An independent risk factor for
18 gastrointestinal bleeding, no.
19     Q.    What about major bleeding beyond
20 gastrointestinal bleeding?
21     A.    That's beyond my area of expertise.
22     Q.    What risk factors do you believe that
23 Mr. Boudreaux had for a gastrointestinal bleed
24 prior to being prescribed Xarelto?
25     A.    The only one would be age and his

Page 59

1 aspirin use. Those would be the only ones, in
2 my opinion.
3     Q.    You would not consider his
4 hypertension a risk factor?
5     A.    Well, again, he doesn't meet the
6 criteria. If you look at the HAS-BLED score,
7 you're supposed to be uncontrolled hypertension
8 with systolic blood pressure greater than 160.
9 And so using the HAS-BLED score, I would say no,
10 his hypertension is not a significant risk
11 factor.
12     Q.    And what about, are you aware of any
13 other scores other than HAS-BLED that doctors
14 use to determine whether someone should be on an
15 anticoagulant?
16     A.    I'm aware that there are others. What
17 the components of those scores are, I'm not
18 sure. I think the HAS-BLED is probably the best
19 studied of them and has the strongest sort of --
20 you know, they propose these things, and then
21 epidemiologists go through all sorts of
22 machinations to validate them in general
23 populations, particularly things like the
24 HAS-BLED score because they're sort of easy to
25 use and remember and are very useful clinical

Page 60

1 tools for predictions. They go through a lot of
2 the mechanisms of validating these things. And
3 my understanding is, and I'm not an
4 epidemiologist, but the HAS-BLED score is the
5 best validated of these measures.
6         Are there other ones? There are other
7 ones out there. I know that there are other
8 ones, but exactly what their components are, I'm
9 not completely clear on.
10     Q.    Are you familiar with the CHADS score?
11     A.    I am familiar with the CHADS score.
12     Q.    Do you know if hypertension is a risk
13 factor under that score?
14     A.    I think it's congestive heart failure,
15 age, diabetes, and stroke, right, so I don't
16 think that includes hypertension.
17     Q.    And do you think that the HAS-BLED
18 score is a more reliable measure than the CHADS
19 score?
20     MR. GOZA:  Object just to the form.
21 Apples and oranges.
22     A.    I think that they're apples and
23 oranges. They're not even there to do the same
24 thing.
25 BY MR. STEKLOFF:

Page 61

1     Q.    Okay.
2         MR. GOZA:  We're just a little bit
3 over an hour. When you get to a --
4         MR. STEKLOFF:  I'm at a good stopping
5 point now if you want to take a break.
6         MR. GOZA:  Maybe take five minutes.
7         MR. STEKLOFF:  Sure. We can go off
8 the record.
9         THE VIDEOGRAPHER:  The time now is
10 9:58. We're going off the record.
11         (Whereupon, a recess was taken.)
12         THE VIDEOGRAPHER:  This begins disk
13 two of today's deposition. Time now is
14 10:18 a.m. We are back on the record.
15 BY MR. STEKLOFF:
16     Q.    Dr. Winstead, what's your rate for
17 work as an expert in this litigation?
18     A.    $500 an hour.
19     Q.    Is that true no matter what role
20 you're performing?
21     A.    Correct.
22     Q.    So today your rate is $500 an hour?
23     A.    Correct.
24     Q.    And for your review of the medical
25 records and other -- and literature, et cetera,

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 62

1 same rate?
2    A.   Correct.
3    Q.   And is your trial rate, if you're
4 called to testify, the same?
5    A.   As far as I know, yes.
6    Q.   Do you know approximately how many
7 hours you've spent thus far on the litigation?
8    A.   About 30.
9    Q.   And without breaking it down, that
10 includes your review of the records, your
11 preparation with counsel, and your drafting of
12 your report?
13    A.   Correct.
14    Q.   I want to come back to the theories
15 you laid out of how Xarelto can cause a bleed in
16 the absence of underlying pathology.
17    A.   Okay.
18    Q.   Before I do that, is it fair to say
19 that even in context in which you cannot
20 identify the underlying pathology through
21 endoscopies or other means, there still could be
22 an underlying pathology of a gastrointestinal
23 bleed?
24    A.   That's always possible, yes.
25    Q.   And that could be true for someone who

Page 63

1 is taking Xarelto?
2    A.   It could be true of any patient,
3 including patients taking Xarelto.
4    Q.   Now, the three potential mechanisms of
5 action that you described before, you agree that
6 those are theories?
7    A.   Those are proposed mechanisms of
8 action.  I think that systemic toxicity is
9 something that can be directly observed, in the
10 case of something like Coumadin or warfarin.
11 Systemic toxicity can be -- in terms of a lab
12 value or number that you can hang things on.  So
13 I think that that's -- you know, when you have a
14 number, that's not really a theory.
15    Q.   Let me break it down.  So let's put
16 systemic toxicity aside.
17         Do you agree that the direct topical
18 effects and the direct mucosal toxicity
19 mechanisms of actions that you discussed before
20 are hypotheses?
21         MR. GOZA:  Object to form.
22    A.   In the case of which agent?
23 BY MR. STEKLOFF:
24    Q.   Let's start with Xarelto.
25    A.   So in the case of Xarelto, I think

Page 64

1 that what I said before, and what I would say
2 again, is that direct mucosal injury, in terms
3 of causing ulcerations or damage to the mucosa
4 of the GI tract, that is a theory that has not
5 really been borne out by observation in clinical
6 use.
7         Number two, topical effect of active
8 drugs is a theory that has not been borne out.
9    Q.   And when you say "not borne out," what
10 do you mean with that phrase?
11    A.   Well, I don't think anyone is -- I
12 guess if you wanted -- all right.  So if you
13 wanted to study that, you would have to take
14 stool samples from patients on Xarelto and
15 prospectively determine bleeding risk based upon
16 stool concentrations, if you wanted it to be
17 more of -- more than a theory.
18    Q.   So just -- and I do this just so we're
19 talking about the same thing, can we call theory
20 one system toxicity?
21    A.   Okay.
22    Q.   Can we call theory two direct topical
23 effects?
24    A.   Okay.
25    Q.   And can we call three direct mucosal

Page 65

1 toxicity?
2    A.   Injury.  I would call it injury, to
3 disambiguate it from number two.
4    Q.   Direct mucosal injury?
5    A.   Yes.
6    Q.   So for theories two and three, you
7 agree those are just hypotheses that --
8    A.   Those are hypotheses, correct.
9         MS. HOFFMANN:  Sir, you have to let
10 him finish his question --
11         THE WITNESS:  Sorry.
12         MS. HOFFMANN:  -- before you begin the
13 answer.
14         THE WITNESS:  My apologies.
15         MS. HOFFMANN:  For not only the court
16 reporter's sake, but for those of us that are
17 just busily trying to take notes.  Thanks.
18         THE WITNESS:  Fair enough.
19 BY MR. STEKLOFF:
20    Q.   And a hypothesis, by its very nature,
21 is something that hasn't been established
22 through the necessary studies, is that fair?
23    A.   Yes.
24    Q.   So for theories two and three, again
25 by their very nature, there's no scientific or

Page 66

1 medical community consensus that Xarelto can
2 cause a bleed, can initiate a bleed through
3 either of those mechanisms?
4    A.   No.  No, I don't believe that there's
5 a consensus on that.
6    Q.   And you yourself in your clinical
7 practice don't determine that Xarelto has
8 initiated a bleed through either theory two or
9 three, because they're just hypotheses, right?
10    A.   I think that would be a fair
11 statement, yes.
12    Q.   And is it also a fair statement that
13 in Mr. Boudreaux's case you cannot say that
14 Xarelto initiated his bleed through either
15 theory two or three because they're just
16 hypotheses?
17    A.   That's a fair statement.
18    Q.   And just so I understand theory two,
19 the hypotheses, are you saying that it's
20 something on the Xarelto capsule that is causing
21 a bleed?
22    A.   No.  So that's direct topical effect
23 of non-absorbed active chemical, so in other
24 words direct effect in a topical fashion of
25 non-absorbed rivaroxaban.

Page 67

1    Q.   Now, system toxicity, theory one, you
2 said -- sorry.
3        MR. GOZA:  I'll just object to the
4 categorization of Topic 1 as a theory.  But go
5 ahead.
6 BY MR. STEKLOFF:
7    Q.   Well, that -- okay.  So let's talk
8 about system toxicity.
9    A.   Okay.
10    Q.   That was the first possible
11 explanation for how Xarelto can initiate a bleed
12 in the absence of pre-existing pathology, right?
13    A.   Yes.
14    Q.   And is that a hypothesis with respect
15 to Xarelto?
16    A.   No.
17    Q.   And what is the basis for your opinion
18 that it is established that Xarelto can initiate
19 a bleed in the absence of pre-existing
20 pathology?
21    A.   Because it's an anticoagulant.
22    Q.   And so any anticoagulant, in your
23 opinion, can initiate a bleed in the absence of
24 pre-existing pathology?
25    A.   Correct, especially if there's no way

Page 68

1 to monitor the systemic levels of that drug.
2    Q.   It is essentially, in layperson's
3 terms, if you thin out a patient's blood too
4 much it can cause -- it can initiate a bleed?
5    A.   Yes.
6    Q.   And that's true of warfarin?
7    A.   Yes.
8    Q.   And that's true of any of the NOACs?
9    A.   Yes.
10    Q.   And is it your opinion that the
11 potential for system toxicity to initiate a
12 bleed in the absence of pre-existing pathology
13 is equal for all anticoagulants?
14    A.   No.  Well-monitored, well-controlled
15 warfarin in a patient like Mr. Boudreaux, the
16 scores would predict that he would -- his risk
17 of bleeding is 1.8 events per 100 person-years.
18 The available data would suggest that for
19 rivaroxaban, or Xarelto, it's about 50 percent
20 greater.
21    Q.   And that's based on the US subgroup
22 data --
23    A.   Yes.
24    Q.   -- that was added to the label in
25 September, 2015?

Page 69

1    A.   Correct.
2    Q.   Do you believe that there are any
3 limitations to the US subgroup data?
4    A.   No.
5    Q.   You think that the US subgroup data is
6 equally reliable to the overall data from the
7 ROCKET study that was done on rivaroxaban?
8    A.   So now we're getting outside of my
9 area of expertise, because I'm not an
10 epidemiologist.  I have a master's degree in
11 public health, but it's in health economics.
12 That would be a question for an epidemiologist
13 or a biostatistician.
14        I think that the information is
15 important enough that the FDA wanted it put on
16 their label, and the FDA consistently employs
17 the best biostatisticians and epidemiologists
18 that are available.
19    Q.   And you're not an epidemiologist?
20    A.   I'm not an epidemiologist.
21    Q.   You're not a regulatory expert?
22    A.   I am not a regulatory expert.
23    Q.   You have no expertise in active
24 labeling, is that fair?
25    A.   I have no expertise in labeling.  I

Page 70

1 have friends that graduated from public health
2 with me that went to work for Food and Drug, and
3 I know that they were pretty fricking smart.
4    Q.   Do you have any understanding about
5 the history of the labeling change that occurred
6 in September, 2015 between the manufacturers of
7 NOACs and the FDA?
8    A.   No, that's beyond my scope of
9 expertise.
10    Q.   Do you have any understanding of
11 whether or not it was a class labeling change?
12    A.   I don't even know what a class
13 labeling change is.
14    Q.   So are you offering any opinions about
15 whether -- strike that.
16       Do you have any opinions about the
17 level of system toxicity from Xarelto that can
18 cause, initiate a bleed in the absence of
19 pre-existing pathology?
20    A.   My understanding about that is that
21 there's significant disagreement among experts
22 about -- you mean like monitoring prothrombin
23 times or -- I mean, could you kind of focus your
24 question a little bit more?
25    Q.   Sure.

Page 71

1       How much Xarelto does someone have to
2 have for them to be at increased risk of having
3 a bleed initiated by Xarelto?
4    A.   That's a question again for a
5 pharmacologist.  You know, we went back and
6 forth with this on is one pill enough.  It's a
7 question for a pharmacologist.  I just -- I do
8 know, you know, there's not a reasonable way of
9 monitoring drug levels, and that makes Xarelto
10 problematic as well.
11    Q.   And do you agree that there's no blood
12 monitoring of drug levels for all NOACs?
13       MR. GOZA:  I'll object as outside his
14 area of expertise.
15    A.   Yeah, it's outside my area of
16 expertise.
17 BY MR. STEKLOFF:
18    Q.   Well, let's talk about that, because
19 it seems like it shouldn't be outside of your
20 expertise.
21       I mean, you treat patients who take
22 NOACs, right?
23       MR. GOZA:  I'm sorry.  What was the
24 first part that you said?
25       MR. STEKLOFF:  I said it seems like it

Page 72

1 shouldn't be outside of your expertise, but I'll
2 strike that.  I'll withdraw that.
3       MR. GOZA:  I know you will.  I'm just
4 trying to understand what --
5    A.   I don't participate in the therapeutic
6 drug monitoring.  I mean, that's the bottom
7 line, so...
8 BY MR. STEKLOFF:
9    Q.   Do you ever --
10    A.   With the exception of Coumadin and
11 checking INRs, and I see people have those labs
12 checked.  Beyond that, that's the extent of what
13 I understand about therapeutic drug monitoring
14 for anticoagulated patients.
15    Q.   Well, you understand that patients
16 taking NOACs, regardless of the NOAC, do not go
17 to clinics to have routine blood monitoring?
18    A.   Yes, I understand that.
19    Q.   And in your practice, do you interact
20 with your patients' cardiologists or other
21 prescribers of NOACs?
22    A.   I interact with a cardiologist, yes.
23    Q.   And do you talk to a cardiologist
24 about, in general, across -- not for every
25 patient, but in general do you talk to the

Page 73

1 prescribing doctors of your patients who are
2 taking NOACs about which NOAC they're on or why
3 they're on a certain NOAC?
4       MR. GOZA:  Object to form.
5    A.   No.
6 BY MR. STEKLOFF:
7    Q.   That's not something that dictates
8 your clinic care of your patients?
9    A.   No.  I mean, you know, the one
10 circumstance where I may get involved in that is
11 patients who have had recurrent gastrointestinal
12 bleeding.  That's rare, though.  That's once a
13 year maybe.  And just -- and that's limited to a
14 general discussion about, hey, what's the safest
15 way, what's the risk/benefit ratio for this
16 patient, that kind of thing.
17    Q.   So given your testimony that you
18 understand that patients taking NOACs don't
19 undergo blood monitoring, do you believe that
20 all NOACs carry a risk of system toxicity that
21 can initiate a bleed?
22    A.   A gastrointestinal bleed?
23    Q.   Yes.
24    A.   So the risks for Xarelto would seem to
25 be higher than the other NOACs.

Page 74

1  Q.  What's that based on?
2  A.  That's based on the materials
3 referenced, Graham, Lip, Lip, and the Yao study.
4  Q.  But do those studies say that NOACs
5 can initiate a bleed in the absence of
6 pre-existing pathology?
7  A.  Those studies refer to
8 gastrointestinal risk of bleeding as a general
9 condition, and don't narrow down on specific
10 etiologies or lack of etiologies for that
11 bleeding.
12  Q.  We agree.
13  And so I really am trying to come
14 back --
15  MR. GOZA:  Hold on.  I'll just move to
16 strike the commentary, but go ahead.
17  MR. STEKLOFF:  That's fine.  I'll
18 withdraw my commentary.
19  MR. GOZA:  Thank you.
20 BY MR. STEKLOFF:
21  Q.  I'm really now just -- we're going to
22 come to your opinions about different risks
23 between NOACs.
24  A.  Okay.
25  Q.  I really want to focus on this, I

Page 75

1 won't even call it a theory, this mechanism of
2 action that you have described as system
3 toxicity.
4  A.  Systemic toxicity, yes.
5  Q.  Is system toxicity, given the nature
6 of all anticoagulants, something that can
7 initiate a gastrointestinal bleed in a patient
8 in the absence of pre-existing pathology?
9  A.  So can any patient -- and we're
10 talking about just NOACs, or NOACs and warfarin?
11  Q.  We've talked about warfarin.  I think
12 you said yes.  So now --
13  A.  So strictly talking about NOACs now.
14 And so the question, if I'm understanding you
15 correctly, correct me if I'm wrong, is can a
16 patient with no underlying gastrointestinal
17 tract pathology bleed on any NOAC.  Is that --
18  Q.  I'll clarify.
19  A.  Okay.
20  Q.  Can a patient with no underlying
21 gastrointestinal pathology have a bleed
22 initiated because of a NOAC regardless of the
23 NOAC?
24  A.  Yes.
25  Q.  And so of the three potential

Page 76

1 mechanisms of action that you described earlier
2 in the deposition, do you agree now that system
3 toxicity is the only one that you believe is
4 established in the scientific literature?
5  A.  For NOACs, or for Xarelto in specific?
6  Q.  Let's start with -- let's start at the
7 top.  All anticoagulants.
8  A.  So all anticoagulants, yes.
9  Q.  And, therefore, all NOACs?
10  A.  Therefore, all NOACs.  And yes, and in
11 the specific case of Xarelto, yes.
12  Q.  And I want to mark all four articles
13 that you cited.  And if you want to take a
14 break, we can take a break, or if you want to
15 look at them here, I would like for you to
16 identify for me where in any of these articles
17 it says that because of system toxicity a NOAC,
18 or Xarelto specifically, can initiate a bleed in
19 the absence of pre-existing pathology.
20  Do you understand the question?
21  A.  Yeah, I think that you're sort of
22 taking the term "systemic toxicity" and having
23 your way with it.
24  You know, if somebody is on a blood
25 thinner and they bleed, I would say that that's

Page 77

1 a toxic effect of a blood thinner.  So I mean, I
2 would answer your question very generally.
3  MS. HOFFMANN:  I'm going to object and
4 move to strike the first part of the answer as
5 not being responsive.
6  MR. GOZA:  Well, we can debate whether
7 it is.  I believe it is to his general question.
8  So go ahead if you've got another
9 question.
10  A.  I'm just -- I'm only attempting to
11 give you clarity on what my line of thinking is.
12 BY MR. STEKLOFF:
13  Q.  Okay.  I'll follow up.
14  But blood thinners can cause people to
15 have too thin -- to bleed, right?
16  A.  Correct.
17  Q.  You know that that's warned about in
18 every single label for all of these medications?
19  A.  Correct.
20  Q.  And I'm more focused now not on the
21 fact that people can bleed, because you agree
22 everyone understands that, right, in the medical
23 community?
24  A.  Right.
25  Q.  I'm focused on the mechanism of

Page 78

1  action.
2      A.   Okay.
3      Q.   And it's your testimony that a blood
4  thinner, if it thins out the blood too much, can
5  initiate a bleed without pre-existing pathology,
6  correct?
7      A.   Correct.
8      Q.   And you're saying that that opinion
9  comes from the four -- somewhere in the four
10 articles that you cited, is that right?
11         MR. GOZA:  No.  I'll object.  That
12 misstates his testimony.
13     A.   Yeah, I don't think that's what I
14 said.
15 BY MR. STEKLOFF:
16     Q.   Okay.  So that's fine, too.
17         What is your basis for saying that any
18 blood thinner, any anticoagulant, can initiate a
19 bleed, a gastrointestinal bleed in the absence
20 of pre-existing pathology?
21     A.   Because I've seen it dozens and dozens
22 of times.
23     Q.   In each of those dozens and dozens of
24 times, isn't it possible that you through
25 endoscopy and other means just couldn't identify

Page 79

1  the pre-existing pathology?
2         MR. GOZA:  Object to form.
3      A.   Your question was in any of them
4  specifically?
5  BY MR. STEKLOFF:
6      Q.   I'm saying in each of them.
7      A.   Well, I mean, you'd have to be --
8  you'd have to be missing a lot of stuff.
9      Q.   Well, do you believe there is a
10 peer-reviewed scientifically -- a peer-reviewed
11 published article in the scientific literature
12 that says an anticoagulant can initiate the
13 bleed in the absence -- a gastrointestinal bleed
14 in the absence of pre-existing pathology?
15     A.   I think there's a body of literature
16 surrounding that question.  That's sort of like
17 textbook stuff.  And there's also this thing
18 that's referred to as obscure gastrointestinal
19 bleeding, and there's a whole body of literature
20 about obscure gastrointestinal bleeding, and
21 that's really beyond the scope of my testimony
22 today.
23     Q.   But obscure gastrointestinal bleeding
24 means that there is a pathology that just can't
25 be identified, right?

Page 80

1         MR. GOZA:  Object as misstating.
2      A.   No, it's obscure.  It means that
3  you've not been able to identify an etiology.
4  Am I -- I'm not sure if --
5  BY MR. STEKLOFF:
6      Q.   Sure.
7      A.   I'm not sure if I'm answering yes or
8  no to your question.
9      Q.   Me neither.  I'm just going to ask the
10 question again.
11     A.   Okay.
12     Q.   Can you tell me any specific article
13 that says that an anticoagulant can initiate the
14 bleed in the absence of a pre-existing
15 pathology?
16     A.   I can't think of one off the top of my
17 head.
18     Q.   Have you reviewed any of the other
19 expert reports that have been submitted by the
20 Plaintiffs in this litigation?
21     A.   No, no, I have not.
22     Q.   And you already previously testified
23 you have not reviewed any of the depositions
24 that have been taken of other experts that are
25 acting on behalf of the Plaintiffs, is that

Page 81

1  right?
2      A.   Correct.
3      Q.   Including other experts who have
4  offered opinions about Mr. Boudreaux, is that
5  fair?
6      A.   Correct.
7      Q.   If any other expert on behalf of the
8  Plaintiffs said that Xarelto cannot initiate a
9  gastrointestinal bleed in the absence of
10 pre-existing pathology, you would disagree with
11 that opinion, is that right?
12         MR. GOZA:  Two things.  One, I'm just
13 going to object to form.  You can't ask another
14 witness to comment on the testimony of something
15 he hasn't seen, or even testimony of another
16 witness.  So I'm just going to object to that
17 form.
18     A.   I would disagree.  And I would say
19 that in the case of Mr. Boudreaux, he bled, he
20 was on a medication that you had no way to
21 monitor its effects, and no gastrointestinal
22 source was identified.
23         My -- I would posit that he had, you
24 know, oozing from mucosa because of toxic
25 effects of Xarelto.

Page 82

1  BY MR. STEKLOFF:
2      Q.   Is the oozing of mucosa theory three
3  that we talked about before?
4      A.   That would be theory one that we've
5  talked about.
6      Q.   And do you believe that theory one is
7  a hypothesis that needs further testing, or
8  something that's scientifically established?
9          MR. GOZA:  Again, we've already kind
10 of been through theory one.  I'll object to the
11 form, describing it as a theory, which he
12 clearly testified is different.
13         MR. STEKLOFF:  I'm using his terms.
14 BY MR. STEKLOFF:
15     Q.   You understand what I'm saying when I
16 say theory one?
17     A.   I think that -- you know, so I
18 understand what you mean by theory one.
19         So again, you know, what we know from
20 observations of patients on, for instance,
21 poorly controlled warfarin is that if you took a
22 patient -- I'm trying to give you an explanation
23 so that you can understand where I'm coming
24 from.
25         If you took a patient who, for

Page 83

1  instance, had an INR of 8, and they came into
2  the hospital and they were passing blood, and
3  you immediately took that patient and did an
4  upper endoscopy, what you would see, and what
5  I've seen in the circumstances where I have done
6  that, is diffuse oozing from the upper
7  gastrointestinal tract.
8          So what's happened is the drug has
9  interfered with the body's normal homeostatic
10 ability to make and dissolve clots, and because
11 of that, they're oozing blood from everywhere,
12 essentially.  And that's what I'm getting at.
13     Q.   But you agree that NOACs -- or let's
14 talk specifically Xarelto, acts differently on
15 body than warfarin, right?
16     A.   It has a different mechanism of
17 action, yes.
18     Q.   And so how is it that you're taking
19 what you've seen in patients with warfarin and
20 their INR levels, and then transferring that to
21 Xarelto?
22     A.   Well, because they both interfere with
23 the clotting cascade in the body.  They do have
24 a similar mechanism of action, but the end
25 result of that similar mechanism of action is

Page 84

1  similar.
2      Q.   Then my next question is, but do you
3  agree that with respect to Xarelto that is a
4  hypothesis?
5          MR. GOZA:  I'll object to form.
6      A.   Yes, I guess I would.
7  BY MR. STEKLOFF:
8      Q.   And so your opinion that Xarelto more
9  likely than not initiated a bleed in
10 Mr. Boudreaux in the absence of pre-existing
11 pathology is based on that hypothesis about the
12 mechanism of action of Xarelto?
13         MR. GOZA:  I'm going to object.  That
14 misstates his prior testimony and his opinions
15 in the case.
16     A.   So the studies that I referred to, in
17 my opinion, risk for gastrointestinal bleeding
18 was increased.
19 BY MR. STEKLOFF:
20     Q.   But risk of a -- an increased risk of
21 gastrointestinal bleeding tells you nothing
22 about the underlying mechanism of action
23 regarding initiation, isn't that right?
24         MR. GOZA:  But -- object to form.
25     A.   You're kind of splitting hairs.  So,

Page 85

1  you know -- and, again, hypotheses have levels
2  of strength associated with them.
3          So in Mr. Boudreaux's case, you know,
4  we know that he was on Xarelto, we know that his
5  prothrombin time is elevated, he had a bleeding
6  event with no identifiable source, he never bled
7  before Xarelto and he hasn't bled since Xarelto,
8  so I believe with a reasonable degree of medical
9  certainty that Xarelto caused his bleeding.
10         Is that -- is that based upon a
11 hypothesis?  No.  It's based upon my review of
12 3,500 pages of his medical record before,
13 during, and after his bleeding event, my review
14 of the literature surrounding Xarelto.
15     Q.   But there's a -- you understand the
16 difference between exacerbating a pre-existing
17 pathology versus initiation, right?
18     A.   Correct.
19     Q.   And for initiation, there has to be a
20 mechanism of action, right?
21     A.   Correct.
22     Q.   And in the scientific community -- in
23 terms of initiation, before the scientific
24 community will say, yes, X can cause Y, they
25 need to understand the mechanism of action, is

Page 86

1  that fair?
2      MR. GOZA: I'll object. That
3  completely misstates the evidence. And also, it
4  misstates the practice of pharmacology.
5      MR. STEKLOFF: I'm asking Dr. Winstead
6  for his opinions.
7      MR. GOZA: I know you are. But you're
8  saying -- you're asking it like it's a pre --
9  it's a truth that's beyond doubt. And, clearly,
10 that's not the case in the practice of the
11 pharmaceutical industry.
12     MR. STEKLOFF: But he can testify to
13 whatever he thinks about this without you
14 telling him what to say.
15     MR. GOZA: I'm not saying he can't.
16 I'm not instructing him not to answer.
17     MR. STEKLOFF: I understand. You're
18 tell him what to answer.
19     MR. GOZA: No. I'm just objecting,
20 because the way you formulated the question
21 basically asked him to assume something that's
22 not true.
23 BY MR. STEKLOFF:
24     Q. Do you believe it's true that before
25 you can say that something initiates a bleed,

Page 87

1  you need to understand the mechanism of action?
2      MR. GOZA: Object to form.
3      A. Well, so, if you -- if you're speaking
4  in absolutes, which it sounds like you are, then
5  yes.
6      If you're speaking within a reasonable
7  degree of medical certainty, my opinion is that
8  with a reasonable degree of medical certainty
9  that Mr. Boudreaux bled because of his Xarelto.
10     Q. And that the Xarelto initiated the
11 bleed?
12     A. And that he -- he would -- my opinion
13 is that he would not have bled if he was not on
14 Xarelto.
15     Q. That's not my question.
16     Did the Xarelto initiate his bleed?
17     A. I would say yes.
18     Q. And the mechanism of action that --
19 what is the mechanism of action that you would
20 say occurred to initiate that bleed in
21 Mr. Boudreaux's case?
22     A. The mechanism of action is the fact
23 that he was on an oral anticoagulant, and he was
24 not -- there was no way to monitor the blood
25 levels of that anticoagulant. And he bled

Page 88

1  probably because he oozed from the mucosa of the
2  GI tract, and in his case probably the upper GI
3  tract.
4      Q. And the portion of your answer where
5  you said "he probably oozed from the mucosa of
6  the GI tract, and in his case probably the upper
7  GI tract," that's a hypothesis?
8      MR. GOZA: Object to form. It's his
9  opinion.
10     A. It's -- it's my opinion to a
11 reasonable degree of medical certainty.
12 BY MR. STEKLOFF:
13     Q. And can you point me to anything in
14 the scientific literature --
15     A. That says --
16     Q. -- that says that if you take Xarelto,
17 it can, in the absence of pre-existing
18 pathology, cause a patient to ooze from the
19 mucosa of the GI tract?
20     A. So a specific paper? No, I cannot.
21     Q. Because it's your hypothesis about how
22 the mechanism of action occurs, is that right?
23     MR. GOZA: Object. Object. He's
24 already told you three times and answered the
25 question three times, saying it's his opinion

Page 89

1  and what the basis is.
2      A. My opinion.
3  BY MR. STEKLOFF:
4      Q. But it's your hypothesis, right?
5      MR. GOZA: Same objection. We're not
6  just going to sit here and fight all day, with
7  him saying --
8      MR. STEKLOFF: No --
9      A. We can fight about the definition of a
10 hypothesis versus an opinion. I mean, it's --
11 honestly, I don't think the two are all that
12 dissimilar.
13     But it's my opinion, to a reasonable
14 degree of medical certainty, that he bled
15 because of the Xarelto. And he had no
16 underlying identifiable mucosal lesions,
17 vascular lesions, cancers, ulcers, anything that
18 could have bled. He never bled before Xarelto,
19 he hasn't bled since being off of Xarelto.
20 BY MR. STEKLOFF:
21     Q. And you would disagree with any expert
22 who thinks otherwise, right?
23     A. Yeah.
24     Q. We're going to turn away from the
25 mechanism of actions. Kirk will be happy about

Page 90

1  that.  Although Margaret may come back to it.
2      You agree that stroke is a serious
3  condition, right?
4      A.  Yes.
5      Q.  Your risk of stroke is significantly
6  greater if you have Afib than if you don't have
7  Afib?
8          MR. GOZA:  Objection.  I mean, to the
9  extent you're talking about things outside of
10  generalities, it's outside his area of
11  expertise.
12     A.  Yes, that's correct.
13 BY MR. STEKLOFF:
14     Q.  You agree that all anticoagulants
15 decrease the risk of stroke, correct?
16     A.  I don't know that honestly, because I
17 don't prescribe anticoagulants.
18     Q.  Okay.  You don't try to determine that
19 in your clinical practice?
20     A.  I don't deal with stroke, except, you
21 know, gastrointestinal consequences of stroke.
22     Q.  So in your practice, you're not
23 focused on trying to balance the risk of stroke
24 versus the risk of bleeding for a patient?
25     A.  So the -- again, the only time -- I

Page 91

1  think we talked about this briefly earlier, the
2  only time I ever really get involved in that is
3  patients who have recurrent bleeding.
4      Q.  When you say "recurrent bleeding," how
5  would you describe that?
6      A.  What I'm talking about in that
7  situation, and this genuinely really comes up
8  only once or twice a year, it's a patient who
9  has been hospitalized on multiple occasions,
10 required multiple blood transfusions, has had
11 multiple endoscopic workups, and probably needs
12 to get off of anticoagulation because the risk,
13 you know, from transfusion-related adverse
14 events or endoscopic-related adverse events in
15 trying to diagnose the bleeding has become so
16 high, that my opinion becomes it's not really --
17 the juice isn't worth the squeeze; in other
18 words, treating the patient with blood thinners
19 is causing so many complications that I start to
20 feel like, you know, if it was my grandmother I
21 wouldn't want them anticoagulated anymore.
22     Q.  And that's true of any -- with respect
23 to any --
24     A.  That's true for any blood thinner if a
25 patient was like that, yeah.

Page 92

1      Q.  In absence of recurrent bleeding, so
2  just one GI bleed, do you automatically
3  recommend that a patient be taken off of
4  anticoagulants?
5      A.  It would depend on the severity of
6  that bleeding episode.  And I can't give you a
7  hard cutoff by what I mean by severity.
8          I mean, clearly, if somebody is on,
9  you know, an anticoagulant, they come in, they
10 almost die in the emergency room and need ten
11 units of blood, you know, and you would want to
12 think at that point about having the patient be
13 more carefully monitored if they needed to stay
14 on a blood thinner.  But those become difficult
15 situations with risk/benefit.
16     Q.  But just because someone is taking
17 Xarelto, then experiences a gastrointestinal
18 bleed and it doesn't rise to that level, it may
19 be appropriate for that patient to continue
20 taking Xarelto, in your opinion?
21         MR. GOZA:  And the only objection I'm
22 going to make is, again, that's -- he doesn't
23 make that risk/benefit analyses.
24     A.  Yeah, I don't really make those calls.
25 And it would depend upon the specific etiology

Page 93

1  of the bleeding, if you follow me.
2      So in a patient who had no
3  identifiable source, you would probably want
4  to -- and it was a significant bleed, a
5  clinically significant bleed, you would probably
6  want to change that patient to very closely
7  monitored Coumadin therapy.  That's the extent
8  to which I get involved in those decisions.
9  BY MR. STEKLOFF:
10     Q.  How often are you involved in those
11 types of decisions?
12     A.  That, again, is an uncommon scenario.
13 Maybe a bit more frequent with a patient who has
14 had eight colonoscopies.  But probably two or
15 three times a year.
16     Q.  You largely defer to the
17 cardiologist --
18     A.  Yeah.
19     Q.  -- or the prescribing physician for
20 those types of decisions?
21     A.  Yeah.  And it's like a complete
22 deferral.  It's, hey, this happened, I think
23 maybe we should think about X, and what do you
24 want to do?
25     Q.  Now, you did review the Xarelto label

Page 94

1  in forming your opinions?
2      A.   Yes.
3      Q.   And you agree that the label warns
4  that Xarelto can cause serious and fatal
5  bleeding?
6      A.   Yes.
7      Q.   You agree that the label indicates
8  that major bleeding is -- the risk of major
9  bleeding is similar for warfarin and Xarelto?
10         MR. GOZA:  Object to the form.  That
11 misstates the label.
12     A.   I don't have the label in front of me.
13 BY MR. STEKLOFF:
14     Q.   All right.  Let's look at the label.
15     A.   Do you want to look at the label?
16     Q.   Sure.
17         MR. GOZA:  Which year are you going to
18 look at?
19         MR. STEKLOFF:  The 2013 is fine.
20 We're going to look at August, 2013, which I
21 think you cited in your expert report.
22         MR. GOZA:  Do you have an extra?
23         MR. STEKLOFF:  Of course.
24         MR. GOZA:  I think I've got it.
25         MR. STEKLOFF:  I'm marking the August,

Page 95

1  2013 label as Exhibit 3.
2  BY MR. STEKLOFF:
3      Q.   Here you go, Dr. Winstead.
4          I think if you turn to Section 6.1,
5  that's what I'm going to ask a few questions
6  about.
7          (Whereupon, Winstead Exhibit Number 3,
8          August, 2013 Xarelto label, was marked
9          for identification.)
10 BY MR. STEKLOFF:
11     Q.   Are you with me?
12     A.   Yep.
13     Q.   Okay.  So I'm looking at Table 1.
14 Based on that, do you agree that the Xarelto
15 label as of August, 2013 indicated that the risk
16 of major bleeding was, in terms of statistical
17 significance, the same for Xarelto and warfarin?
18     A.   Yes.
19     Q.   And it warned that the risk of
20 gastrointestinal bleeding was higher, 2.0 events
21 in the Xarelto population and 1.2 events in the
22 warfarin population, is that right?
23     A.   Yes.  I'm just making sure I follow
24 the number exactly.
25         Yes.  Correct.

Page 96

1      Q.   And at least in the ROCKET study, the
2  risk of fatal bleeding was actually lower in the
3  Xarelto population than in the warfarin
4  population, is that right?
5      A.   That's what Table 1 says, yes.
6      Q.   And would you agree that fatal bleeds
7  are of a greater concern in the medical
8  community than gastrointestinal bleeds?
9          MR. GOZA:  Let me just object to the
10 form of the question.
11         But go ahead.
12     A.   Well, you're always more concerned
13 about people dying than about people bleeding.
14 BY MR. STEKLOFF:
15     Q.   Are ICH bleeds also a greater concern
16 than GI bleeds, in general, in your opinion?
17         MR. GOZA:  Again, object to form,
18 without specific facts about the severity.
19     A.   Well, yeah.  I mean you can transfuse
20 blood, but you can't transfuse brain.
21 BY MR. STEKLOFF:
22     Q.   If you turn to Section 5.2, do you
23 agree that the Xarelto label warned about the
24 lack of a reversal agent?
25     A.   We're in 5.2?

Page 97

1      Q.   Yes, Doctor.  It's on Page 8.
2      A.   Yeah, yeah, that's what it says,
3  "Specific antidote for rivaroxaban is not
4  available."
5      Q.   And that's something that you know in
6  your clinical practice, right?
7      A.   Yes.
8          MR. GOZA:  Object.  Outside of his
9  clinical practice.
10         Go ahead.
11     A.   Correct.  Yes.
12 BY MR. STEKLOFF:
13     Q.   And you've known that since NOACs
14 first -- since Xarelto first came on the
15 market?
16     A.   Yeah.  Essentially, yeah.  At the time
17 there was a significant amount of controversy
18 about whether or not they should have approved
19 because there was no available reversal agent.
20     Q.   Well, Mr. Goza said it's outside of
21 your clinical practice.  Do you use reversal
22 agents for patients suffering from GI bleeds who
23 are on warfarin?
24     A.   No.  Typically what happens is when
25 they come into the emergency room, they're given

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 98

1 Vitamin K or fresh frozen plasma prior to my
2 evaluating them. There are occasions where I
3 may give extra doses of Vitamin K or fresh
4 frozen plasma, but those are uncommon.
5    Q.   So how long is it after a patient who
6 is suffering from a GI bleed on warfarin comes
7 into the emergency room, how many hours or days
8 is it typically that you see the patient?
9        MR. GOZA:  I'm just, because -- vague
10 and ambiguous without any foundation.
11    A.   It's extremely variable on a
12 patient-by-patient basis.  You know, sometimes
13 I'm called five minutes after they come in.
14 Sometimes I'm called, you know, 50 hours after
15 they come in.
16 BY MR. STEKLOFF:
17    Q.   Is that true for a patient bleeding
18 who also has been taking a NOAC, that it's
19 extremely variable?
20    A.   Yeah, very, extremely variable.
21    Q.   So I want to spend some time now on
22 your report, if you can turn to that, Exhibit 1.
23        Now, on the first page and a half, is
24 it fair to say that you laid out what you viewed
25 as the most relevant facts from Mr. Boudreaux's

Page 99

1 medical history?
2        MR. GOZA:  Object to form.
3    A.   Can you restate your question again?
4 BY MR. STEKLOFF:
5    Q.   Sure.
6    A.   I'm looking at the first half page.
7    Q.   Sorry, I said page and a half.  Let me
8 just ask a different question.
9        In the report you laid out part of
10 Mr. Boudreaux's medical history, is that fair?
11    A.   Yes.
12    Q.   And I note that you didn't set forth
13 that he had hypertension, is that fair?
14    A.   That's correct.  I didn't mention
15 that.
16    Q.   And is that because, as we discussed
17 before, you don't see that -- you didn't see
18 that as a risk factor for Mr. Boudreaux in terms
19 of a risk of bleeding?
20    A.   Just give me a minute before I answer
21 your question, because I'm trying to look
22 through this again.
23        (Witness reviewing document.)
24    A.   To be honest, I'm not sure why it's
25 not in there.  And I'm not remembering off the

Page 100

1 top of my head what medications he was on at
2 that initial time of presentation.  It's just --
3 I mean, it's just not in there.
4 BY MR. STEKLOFF:
5    Q.   Well, regardless of whether it's in
6 there or not, do you, sitting here, believe that
7 Mr. Boudreaux's hypertension was a risk factor
8 that put him at an increased risk of bleeding?
9        MR. GOZA:  Object.  Asked and
10 answered.
11    A.   Yeah, well, I've answered that before.
12 I don't think so, because the HAS-BLED score
13 defines hypertension as a risk factor if they
14 have poorly controlled blood pressure with
15 systolic greater than 160.
16 BY MR. STEKLOFF:
17    Q.   And so if Dr. Wong believed that
18 Mr. Boudreaux's hypertension put him at an
19 increased risk of bleeding, you disagree with
20 Dr. Wong?
21        MR. GOZA:  Improper form of your
22 question.  You can't ask a witness to comment on
23 the testimony of another witness.
24    A.   I can't, unless he is aware of
25 something with regards to the management of

Page 101

1 Mr. Boudreaux's hypertension that I'm not aware
2 of.
3 BY MR. STEKLOFF:
4    Q.   Well, you read Dr. Wong's testimony,
5 right?
6    A.   I did.
7    Q.   In fact, in more detail when preparing
8 for today, right?
9    A.   Yeah, but it was kind of skimming.
10 And again, Dr. Wong had not slept well.  Did he
11 identify hypertension as a specific risk factor
12 for Mr. Boudreaux?  I mean, I don't recall that
13 specifically.  You all pick interesting things
14 to focus on that I wouldn't necessarily.
15        Again, I would say based on the
16 HAS-BLED score, I'm not aware of Mr. Boudreaux
17 having blood pressures that would give him the
18 point on the HAS-BLED score for hypertension as
19 a risk factor.
20    Q.   And you would focus on the HAS-BLED
21 score in determining whether hypertension is a
22 risk factor?
23    A.   Yeah.
24    Q.   Do you recall Mr. Boudreaux's age when
25 he was prescribed Xarelto?

Page 102

1     A.   So he was 72, right, almost 73?  He
2  was between 72 and 73?
3     Q.   I think between 71 and 72.
4     A.   71, 72, yeah.
5     Q.   And that age put him as an increased
6  risk of bleeding?
7     A.   Yes, based upon the HAS-BLED score.
8          THE VIDEOGRAPHER:  Excuse me.  I'm
9  sorry.  Doctor, I'm about to lose you behind
10  Dr. Goza, and I just don't want to lose you.
11         THE WITNESS:  Sorry.
12         THE VIDEOGRAPHER:  Sorry about that.
13  Thank you.
14  BY MR. STEKLOFF:
15     Q.   You're aware that Mr. Boudreaux was
16  taking aspirin prior to being prescribed
17  Xarelto?
18     A.   Yes.
19     Q.   And in your opinion, did that put him
20  at an increased risk of bleeding?
21     A.   Yes.
22     Q.   So I want to ask you, if you turn to
23  the last paragraph of your report, about the
24  paragraph you have about aspirin.
25         MR. GOZA:  Say that again?

Page 103

1          MR. STEKLOFF:  I'm going to focus on
2  the paragraph on the last page of his report at
3  the top that says "Aspirin."
4  BY MR. STEKLOFF:
5     Q.   Do you see that?
6     A.   Yeah.
7     Q.   Okay.  So I want to break this
8  paragraph down a little bit.
9          You say, "Mr. Boudreaux was actively
10  taking aspirin for years prior to his
11  gastrointestinal hemorrhage, and before starting
12  Xarelto, without any incidence of bleeding."
13         Do you see that?
14     A.   Yes.
15     Q.   It says, "He continued to take aspirin
16  after his gastrointestinal hemorrhage (and after
17  being discontinued from Xarelto), and has not
18  experienced further bleeding."
19         Do you see that?
20     A.   Yes.
21     Q.   What I want to focus on are this last
22  two sentences.  You say, "Further, from
23  Mr. Boudreaux's deposition, there is substantial
24  doubt as to whether Mr. Boudreaux was even
25  taking aspirin at the time of his

Page 104

1  gastrointestinal hemorrhage."
2          Do you see that?
3     A.   Yes.
4     Q.   So is it your opinion to a reasonable
5  degree of medical certainty that Mr. Boudreaux
6  was not taking aspirin at the same time he was
7  taking Xarelto?
8          MR. GOZA:  I'll object to the extent
9  that -- object to form.
10     A.   I tend to believe what patients tell
11  me.  And if you read Mr. Boudreaux's deposition,
12  it seems to me that there is doubt in
13  Mr. Boudreaux's mind as to whether or not he was
14  actually taking the medication.
15         And I included that language because
16  it seems to me from reviewing his 3,000 pages of
17  medical records that -- actually more than
18  3,000 -- that this is a guy who is very vigilant
19  and aware of his medications.  This is a guy who
20  calls his doctor's office to follow up after he
21  makes a refill request from a mail order
22  pharmacy.
23         And so I think that given that
24  Mr. Boudreaux is unsure from his deposition if
25  he was actually taking the aspirin, I think that

Page 105

1  there's doubt about whether he's actually taking
2  the aspirin, because I believe the guy.
3  BY MR. STEKLOFF:
4     Q.   And are there any parts of his
5  deposition that you don't -- that you didn't
6  find credible?
7     A.   No.
8     Q.   And would you put more credit in his
9  medical records at the time, or his testimony in
10  a litigation years later?
11         MR. GOZA:  Object to form.
12     A.   I tend to believe what people tell me.
13  So along that vein, I would tend to believe a
14  deposition.
15  BY MR. STEKLOFF:
16     Q.   More than medical records that are
17  documenting what he was telling the doctor at
18  the time?
19     A.   In this specific case, I feel like, I
20  don't know, I feel like the deposition is what
21  the guy is telling me if I had the opportunity
22  to ask him questions, and so I would take that
23  on face.
24         The other problem I see sometimes is
25  in the era of electronic medical records,

Page 106

1  medication lists aren't consistently reviewed,
2  and sometimes they just cut and paste medication
3  from prior visits. I don't know if there was
4  anything specific in his medical records as to
5  whether he was asked if he was compliant with
6  his aspirin therapy.
7       But in general, I believe what people
8  tell me, and I kind of feel like the deposition
9  is what Mr. Boudreaux could tell me.
10  Q.   And do you think that Mr. Boudreaux
11  had any incentives based on the fact that he was
12  in litigation to state that he wasn't taking
13  aspirin at the time, or couldn't recall whether
14  he was taking aspirin at the time?
15      MR. GOZA:  Object to the form of the
16  question.
17  A.   I mean, he was involved in litigation,
18  so there's always the possibility.
19  BY MR. STEKLOFF:
20  Q.   There's tons of medical literature
21  about how litigation can --
22  A.   Yeah, I mean -- so, yeah, absolutely.
23  Q.   And did you factor that into your
24  credibility determination of Mr. Boudreaux's
25  testimony?

Page 107

1  A.   Making credibility determinations
2  based on depositions is not something I do on a
3  regular basis.
4  Q.   But do you agree that's what you did
5  here?
6       MR. GOZA:  Object just to the extent
7  it makes it sound like his opinion is based on
8  that, and it's not. Object to form.
9  A.   I tend to believe what people tell me,
10  and what I would say is I believe his
11  deposition. I believe what he was told -- what
12  he told. I mean, he seems -- you know, I don't
13  know the guy, but he seems like a stand-up guy.
14  He was -- he seems very vigilant about what he
15  does.
16  BY MR. STEKLOFF:
17  Q.   And you made a credibility
18  determination in offering an opinion about his
19  aspirin use in this case, right?
20      MR. GOZA:  Object. Object to form.
21  A.   I said that there was substantial
22  doubt as to whether Mr. Boudreaux was even
23  taking aspirin at the time of his
24  gastrointestinal hemorrhage.
25  BY MR. STEKLOFF:

Page 108

1  Q.   Based on your credibility
2  determination of his testimony, fair?
3  A.   Yeah, fair. I mean, I would determine
4  his testimony to be credible.
5  Q.   In fact, if you go to the first page
6  of your report, you said in forming your
7  opinions they're all based on -- they're all to
8  a reasonable degree of medical certainty, right?
9  A.   Mm-hmm.
10  Q.   That's a yes?
11  A.   Yes, that's a yes. I'm sorry.
12  Q.   And it's your opinion that
13  Mr. Boudreaux more likely than not was not
14  taking aspirin at the time of his
15  gastrointestinal bleed, right?
16      MR. GOZA:  First, I'll object. That's
17  not what his report says. And secondly, it's
18  not an opinion. It's about fact.
19  A.   My report just says that there's doubt
20  as to whether he was even taking aspirin.
21  BY MR. STEKLOFF:
22  Q.   Right.
23       And in part you ruled out aspirin as a
24  potential cause based on your -- based on that
25  doubt, right?

Page 109

1  A.   As well as the fact that he took
2  aspirin for quite some time before experiencing
3  his Xarelto bleeding, and afterwards for some
4  time without considering -- you know, without
5  any evidence of further bleeding.
6  Q.   But part of your -- the basis for you
7  ruling out aspirin as a cause was your
8  credibility determination that Mr. Boudreaux
9  more likely than not was not taking aspirin at
10  the time of his bleed?
11      MR. GOZA:  Objection. Same, to the
12  form, asked and answered several times.
13  A.   Yeah, yeah. That's at least part of
14  it.
15  BY MR. STEKLOFF:
16  Q.   Now, did you review the medical
17  records to see what they said about
18  Mr. Boudreaux's aspirin use?
19  A.   It was consistently listed on his list
20  of medications.
21  Q.   But you found his testimony more
22  credible than the list of medications in his
23  medical records?
24  A.   I said in my statement that there's
25  doubt as to whether or not he was taking it. I

Page 110

1 don't think that there's a -- I don't think I've
2 assigned some kind of value weight to either
3 statement.
4        I think that there's some doubt as to
5 whether or not he was taking it, because I tend
6 to believe what people tell me, patients tell
7 me.
8    Q.   And if Mr. Boudreaux was taking
9 aspirin at the same time as his gastrointestinal
10 bleed, is it possible that the aspirin was also,
11 not the sole factor, not the only factor, but
12 was also a factor in his bleed?
13        MR. GOZA:  Object to form.
14    A.   Yes.  And I've answered that.  If
15 you're concomitantly on aspirin and a NOAC, you
16 have a higher risk of bleeding than if you were
17 on just a NOAC without aspirin.
18 BY MR. STEKLOFF:
19    Q.   And do you recall that at one point in
20 his deposition Mr. Boudreaux was asked, "And you
21 understand that you were taking aspirin and
22 Xarelto at the same time?"  And his answer was
23 "Yes"?
24    A.   Yeah, I saw that part of his
25 deposition.

Page 111

1        I can't -- I don't recall if that's
2 before or after he talked about whether there
3 was doubt that he was taking aspirin.
4    Q.   It was the page before.
5    A.   It was the page before?
6    Q.   Yes.
7        Can you describe, when a patient comes
8 in with a GI bleed like the GI bleed that --
9 similar to the GI bleed that Mr. Boudreaux
10 experienced, your course of treatment?
11    A.   So --
12    Q.   If you don't like the question, I'll
13 rephrase it, if you don't like the phrase --
14        MR. GOZA:  No, I was trying to think
15 of it in the context of -- well --
16 BY MR. STEKLOFF:
17    Q.   If Mr. Boudreaux had come in with a GI
18 bleed that he came in with and you were there to
19 treat him, let's say within -- you were already
20 at the hospital, so within minutes of him
21 arriving at the hospital, can you describe for
22 the jury what you would have done?
23    A.   I would have done exactly what
24 happened.  I would have assessed him, tried to
25 make a determination as to whether or not it was

Page 112

1 an upper or lower gastrointestinal bleeding
2 source, and then performed appropriate
3 diagnostic intervention.
4        Depending upon the time of day,
5 there's significant debate about, you know, who
6 should be done as emergency within six hours and
7 who should be done in 24 hours.  I think, based
8 on his initial presentation, he probably needed
9 to be resuscitated.  And so, yeah, to -- my
10 management wouldn't vary significantly at all
11 from what he actually had.
12    Q.   When you say there's a significant
13 debate of who should be done with an emergency
14 in six hours versus who should be done within
15 24 hours, can you explain that debate?
16    A.   Yeah, there's -- you know, there's
17 pros and cons, it's one of those weigh the pros
18 and the cons type of items.  You know, if he
19 came in at 3:00 in the morning, you might be
20 more inclined to wait until normal business
21 hours.
22        Do you follow what I'm saying?  If he
23 had a strong history of -- so in other words, if
24 you had a patient who had cirrhosis or
25 significant portal hypertension, like we were

Page 113

1 talking about earlier, and you were concerned
2 that they were having a catastrophic bleeding
3 event, you would be -- you'd be more inclined to
4 immediately go ahead and do, you know, what
5 would hopefully be interventional endoscopy to
6 sort of manage the bleeding procedurally.
7        And so there's pros and cons.  It's
8 kind of -- there's a whole body of literature
9 about that.
10    Q.   Is it fair to say that with someone
11 like Mr. Boudreaux and his GI bleed, that an
12 antidote, if it existed, would have served no
13 purpose?
14        MR. GOZA:  Object to form.
15    A.   That's hard for me to say, because I
16 didn't -- I was unable to assess him.  And I
17 didn't assess him.  I'm going to review those
18 records.
19        It's hard.  That's all retrospective
20 kind of stuff.  What I have -- you're asking me,
21 like, a very fine-tuned medical question.  And
22 you understand, medicine isn't like law, there's
23 not, like --
24        MR. GOZA:  He's just asking you, he
25 just wants to know -- so we'll try to get --

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 114

1 restate the question, and let's see if we can
2 get an answer.
3        MR. STEKLOFF: Sure.
4 BY MR. STEKLOFF:
5    Q.   I understand that everything you're
6 doing is sort of looking backwards because you
7 can only review the medical records.
8        So my question -- I mean, I think all
9 of your opinions, I'm not trying -- just so
10 we're on the same page, fall into that category.
11 So like every other opinion that you are
12 offering, I want to understand.
13        Based on your review of the medical
14 records, isn't it fair to say that an antidote
15 would have served no purpose in treating
16 Mr. Boudreaux, even if it existed?
17        MR. GOZA: Object to the form.
18    A.   I would say yes.
19        MS. HOFFMANN: Are you saying you
20 agree with what he said?
21    A.   I agree that in this particular case
22 that an antidote would have served no purpose.
23        MS. HOFFMANN: Thank you.
24        MR. GOZA: What time did we pick back
25 up?

Page 115

1        MR. STEKLOFF: I was going to ask the
2 same thing.
3        THE VIDEOGRAPHER: 10:18 when we
4 started. We've been going two hours and about
5 almost three minutes.
6        MR. GOZA: When you get to another --
7 I kind of like to take a break about every hour
8 or so.
9        MR. STEKLOFF: I do as well. And I
10 actually organize my thoughts --
11        MR. GOZA: You were at a stopping
12 point. We don't need to have this --
13        THE VIDEOGRAPHER: Do you want to go
14 off the record?
15        MR. GOZA: Yes, we can go off the
16 record.
17        THE VIDEOGRAPHER: The time is
18 11:17 a.m. We are off the record.
19        (Whereupon, a recess was taken.)
20        THE VIDEOGRAPHER: This begins disk
21 three of today's deposition. The time now is
22 11:44 a.m. We are back on the record.
23        MR. GOZA: Just for the record, the
24 doctor had a recollection while looking at his
25 CV that would cause him to amend a prior answer.

Page 116

1 So...
2    A.   So I've had three studies which were
3 funded by Janssen in the past that have closed
4 enrollment, and then I have two active studies.
5        As an explanation, the studies are
6 usually run by third parties, so it's never
7 really completely apparent in the front of your
8 mind where it's coming from.
9 BY MR. STEKLOFF:
10    Q.   Just following up on that,
11 Dr. Winstead, based on your specific experience
12 in those studies, were those studies run
13 ethically?
14    A.   Oh, yeah. They were run ethically,
15 yeah. Yes, absolutely.
16    Q.   You had no concerns about the safety
17 of patients?
18    A.   No.
19    Q.   Or on any unethical issues in those
20 studies?
21    A.   (Nodding in the negative).
22    Q.   And you continue to work indirectly
23 with Janssen, is that fair?
24    A.   Correct.
25    Q.   Now, I'd like to turn to the second

Page 117

1 page of your report, and if you look at the
2 third paragraph down, if you have, I believe
3 Exhibit 1, there's a paragraph that starts, "The
4 absence of a recommendation."
5    A.   Third page?
6    Q.   Sorry, second page, third paragraph.
7    A.   Okay.
8    Q.   Are you with me?
9    A.   Yes.
10    Q.   Okay. So I'll just read that
11 sentence, the first sentence, and that's the
12 sentence I want to talk to you about now. It
13 says, "The absence of a recommendation for
14 appropriate laboratory studies to measure his,"
15 Mr. Boudreaux's, "anticoagulation contributed to
16 the difficulty managing his gastrointestinal
17 bleeding."
18        Do you see that?
19    A.   Yes.
20    Q.   Now, you agree that the FDA approved
21 Xarelto understanding that there were -- that
22 there wouldn't be routine blood monitoring, is
23 that fair?
24    A.   Yes.
25    Q.   And that's true for all NOACs,

Page 118

1 correct?
2     A.   Yes.
3     Q.   And you understand that the FDA
4 continues to approve Xarelto, understanding that
5 there's no routine blood monitoring, right?
6     A.   Yes.
7     Q.   And that that's also true for all
8 NOACs, is that right?
9     A.   Yes.
10     Q.   And you don't have the opinion that
11 Xarelto should be pulled from the market because
12 there's no routine blood monitoring?
13         MR. GOZA:  Object to form.
14     A.   I am of the opinion that --
15 BY MR. STEKLOFF:
16     Q.   You don't have the opinion that
17 Xarelto should be pulled from the market?
18     A.   No, I do not.
19     Q.   In other words, Xarelto can be an
20 effective medication for patients being treated
21 with atrial fibrillation?
22         MR. GOZA:  Object again to form and
23 ambiguous nature.
24     A.   Yeah, I think it's a useful -- I think
25 it's a useful drug.

Page 119

1 BY MR. STEKLOFF:
2     Q.   And you say that even though there is
3 no routine blood monitoring for it?
4         MR. GOZA:  I'll again object to
5 whether there's monitoring or not.  It's outside
6 his area of expertise.  Object to form.
7     A.   Yeah, and again, I don't manage
8 patients who need to be anticoagulated.
9 BY MR. STEKLOFF:
10     Q.   But you treat patients who take
11 Xarelto, right?
12     A.   Yes, I treat patients who take
13 Xarelto.
14     Q.   And for some patients, Xarelto is a
15 useful medication that treats their atrial
16 fibrillation, right?
17     A.   Correct.
18     Q.   Now, this sentence that we just read,
19 can you explain how the absence of a
20 recommendation for appropriate laboratory
21 studies to measure Mr. Boudreaux's
22 anticoagulation contributed to the difficulty in
23 managing his GI bleed?
24     A.   Well, so that there's no -- there's
25 no -- let me think about this, how to best put

Page 120

1 this.
2         There's no way, that I'm aware of,
3 that's been recommended to risk-stratify
4 patients taking Xarelto into low, medium, high
5 bleeding risk while on Xarelto.  And so the fact
6 that you could not risk-stratify Mr. Boudreaux
7 after, say, he had been on the medication for
8 one or two or three weeks contributed to
9 managing -- you know, management issues going
10 forward.
11     Q.   Do you agree that as of today, there
12 is no reliable measurement tool to stratify
13 patients on Xarelto?
14         MR. GOZA:  I'll object.  Misstates
15 evidence, outside of his area of expertise.
16     A.   Yeah, again, I think I answered a
17 similar question earlier.  I think there's
18 considerable debate in terms of labs to use,
19 reagents to use, that kind of thing, so I don't
20 know the answer to that question.
21 BY MR. STEKLOFF:
22     Q.   Okay.  So then maybe we can wrap up
23 this portion of the deposition quickly.
24         Are you -- you're not offering --
25 despite this sentence, are you offering any

Page 121

1 opinions about whether there should be an assay
2 or a test to measure patients --
3         MR. GOZA:  Can I be a lot more
4 specific and tell you what we're not using him
5 to do?  Would that be helpful?  Because he's not
6 going to offer an opinion about whether or not
7 there is a test that is presently available to
8 risk-stratify a patient.  Whether that exists or
9 not, and whether the whole issue of monitoring
10 with respect to the risk stratification, whether
11 a test exists, he's not going to offer an
12 opinion about that.
13 BY MR. STEKLOFF:
14     Q.   So you're not offering any opinions
15 about PT?
16         MS. HOFFMANN:  Let's let the witness
17 answer.
18         MR. GOZA:  That's a little different.
19         Go ahead.
20     A.   So a PT can give you, from my
21 understanding, can give you evidence of whether
22 or not the patient's been exposed, and my
23 understanding is that there may be a linear
24 relationship between PT value and drug levels.
25         But beyond that, I honestly don't

Page 122

1 understand the pharmacology well enough, and I
2 don't understand the mechanics of that lab test
3 well enough to start giving you specific
4 opinions about what level PT matters, those kind
5 of things.
6 BY MR. STEKLOFF:
7 Q. Okay. So I'm going to follow up a
8 little bit on what you just said.
9 You say a PT can give you evidence of
10 whether or not a patient has been exposed?
11 A. Correct.
12 Q. What do you mean by that?
13 A. Been exposed to Xarelto, been taking
14 Xarelto.
15 Q. And what is your basis for saying
16 that?
17 A. I believe that is in the -- it may be
18 in the PI. I believe it's also in the ROCKET
19 study, which is basically the PI.
20 Q. Okay. So look at the PI. I just want
21 to know for all of your opinions specifically
22 what you're relying upon.
23 And while I'm at it, just so you have
24 them in front of you, I will mark all -- the
25 four articles that you cite in your report. You

Page 123

1 can look at those at any time for the remainder
2 of the day to offer any of your opinions.
3 A. Here, Section 12.2, "Dose-dependent
4 inhibition of Factor Xa activity was observed in
5 humans and the Neoplastin prothrombin time,
6 activated partial thromboplastin time and
7 HepTest are prolonged dose-dependently. The
8 anti-Factor Xa activity is also influenced by
9 rivaroxaban."
10 BY MR. STEKLOFF:
11 Q. Okay. So that was warned about in the
12 label?
13 A. Yes.
14 MR. GOZA: In the 2013 label.
15 BY MR. STEKLOFF:
16 Q. And have you gone -- have you
17 conducted any -- in preparing your opinions in
18 this case, have you looked at any literature to
19 see what the scientific community says about
20 using PT or activated partial thromboplastin
21 time as measures of drug concentrations?
22 A. No.
23 Q. You don't have an opinion one way or
24 the other? You would defer to other experts on
25 the utility of using PT in clinical practice as

Page 124

1 a measure of how much drug is in someone's
2 system?
3 A. Correct.
4 Q. And are you offering any opinions on
5 the therapeutic range of Xarelto?
6 A. The blood level ranges, dose ranges,
7 no.
8 Q. So you would defer to other experts on
9 whether monitoring is needed to keep -- whether
10 they believe monitoring is needed -- strike
11 that.
12 You would defer to other experts on
13 whether you can even quantify a range or
14 determine a Xarelto concentration level that
15 optimizes the risk/benefit profile of Xarelto?
16 A. Yeah, I would defer. I don't have a
17 very clear -- I don't have a clear enough
18 understanding of that to formulate an opinion.
19 Q. And you're not planning on offering
20 any opinions on that topic?
21 A. I wouldn't, no. It's beyond my area
22 of expertise.
23 Q. And you also would defer to other
24 experts in the litigation on whether Xarelto is
25 an -- on interpatient variability and whether

Page 125

1 that impacts -- whether that can impact a
2 patient's risk/benefit profile, is that fair?
3 A. Interpatient variability of what?
4 Q. Of the drug concentration of Xarelto.
5 MR. GOZA: I'm just going to object to
6 form.
7 A. So I would defer to another expert on
8 whether interpatient variability of drug level
9 is clinically significant in weighing a
10 risk/benefit ratio. That's a correct statement.
11 BY MR. STEKLOFF:
12 Q. You don't have an opinion on that?
13 A. I don't have an opinion on that.
14 Q. And you're not going to offer an
15 opinion on that?
16 A. No.
17 Q. And would you, similarly, defer to
18 other experts in the litigation on whether there
19 is a PT score that tells you whether a patient
20 is at risk -- a higher risk of bleeding?
21 A. Yeah, I would. I mean, I just know
22 that, you know, again, from the PI that there's
23 some prolongation of the prothrombin time. You
24 know, at what point does that become clinically
25 significant, I don't have an opinion on. I'm

Page 126

1 not sure that, I'm not sure --
2      MR. GOZA:  You're not going to offer
3 an opinion.
4   A.   Yeah.
5 BY MR. STEKLOFF:
6   Q.   It may not have any clinical
7 significance?
8   A.   It may not.
9      MR. GOZA:  Well, I think that's
10 outside his area of expertise.
11   A.   Except for -- except for being exposed
12 to drug.
13 BY MR. STEKLOFF:
14   Q.   Any drug?  It doesn't matter what the
15 drug is?
16   A.   For prothrombin time?
17   Q.   No.  I mean -- strike that.
18   A.   Okay.
19   Q.   You agree that -- strike that.
20      Do you agree that prothrombin time
21 would only have meaning if it was correlated
22 with bleeding events?
23      MR. GOZA:  I'm going to again object.
24 It's outside of his area of expertise and not
25 relevant to his opinions in this case.

Page 127

1   A.   No.  No, I wouldn't, because you would
2 also have to -- you would also have to -- you
3 would also care about stroke risk.
4 BY MR. STEKLOFF:
5   Q.   Exactly.  If you're -- you can't
6 ignore stroke risk in looking at prothrombin
7 time, right?  You have to balance the stroke
8 risk with the bleeding risk, right?
9      MR. GOZA:  Again, I'm just going to
10 object, only because -- you are free to spend
11 your time however you want, but he's not
12 offering opinions about these, and it's outside
13 his area of expertise.  So I'm going to object
14 again.  He told you 50 times he doesn't do that
15 risk/benefit analysis.
16   A.   Yeah, so everything is a risk/benefit.
17 I don't perform those kind of risk/benefit
18 analyses.
19 BY MR. STEKLOFF:
20   Q.   But do you agree that any -- given
21 that -- your clinical practice treating patients
22 who have bleeds who take anticoagulants, do you
23 agree that any risk/benefit analysis has to
24 balance the risk of stroke versus the risk of
25 bleeding?

Page 128

1   A.   I just answered yes to that question.
2 So I would say yes again.
3   Q.   I understand.  Sometimes I have to ask
4 questions because lawyers interject with
5 speaking objections.
6      And do you agree that in assessing
7 that risk/benefit analysis, in terms of the risk
8 of bleeding, you would want to correlate PT with
9 bleeding events?
10      MR. GOZA:  Object.  Again, outside of
11 his area of expertise.  Requires speculation.
12   A.   In the case of patients on Xarelto, or
13 any other anticoagulant, or warfarin?
14 BY MR. STEKLOFF:
15   Q.   Xarelto.
16   A.   So would I think that correlating
17 prothrombin time with bleeding risk is
18 important?
19   Q.   Yes.
20   A.   Is that basically the question you're
21 asking?
22      Yes, I would think that that's
23 important.
24   Q.   And in the absence of doing so, do you
25 agree it would be dangerous to establish a PT

Page 129

1 cutoff at which patients should be taken off of
2 Xarelto?
3      MR. GOZA:  Again, this is a point
4 where now you're asking him to offer comments,
5 expert opinions about things that are way
6 outside his area of expertise, which he's not
7 been designated for.
8   A.   Yeah.  I mean, you're kind of way off
9 the track of what I --
10 BY MR. STEKLOFF:
11   Q.   You're the one who has an opinion
12 about how the lack of laboratory studies to
13 measure anticoagulation contributed to
14 Mr. Boudreaux's case.  So I'm trying to explore
15 that opinion.
16      MR. GOZA:  But that's not what you're
17 asking.  The lack of something doesn't mean that
18 he can specify what it would be or how it would
19 work or anything else.
20      I mean, he's already said ten
21 different ways that he doesn't have any opinions
22 about those.
23      MR. STEKLOFF:  Okay.  But then he's
24 trying to tie PT in the label to his opinion
25 here.  So he does have opinions about PT.

Page 130

1      MR. GOZA: He's read what from your
2  label says. He's not going into what -- we made
3  very clear -- I think what I said was he's not
4  going to offer any opinions about what tests,
5  what level would make a difference clinically,
6  and he's going to leave it to all the other
7  experts to fight about that. He just
8  understands there's a debate about that. He
9  said that three times.
10 BY MR. STEKLOFF:
11     Q.   So tell me how PT specifically could
12 have -- or how -- strike that.
13     Tell me how the absence of a
14 recommendation for PT measurements contributed
15 to the difficulty managing Mr. Boudreaux's
16 gastrointestinal bleed.
17     A.   I didn't say PT measurements in my
18 opinion.
19     Q.   Okay. But the only thing you can
20 point to for your opinion is the statement about
21 PT in the label?
22     A.   No. You had -- you had asked a number
23 of questions regarding PT. You had asked if
24 there was anything that you could measure, and I
25 said, well, this was what's in the label. So

Page 131

1  you're then trying to take that and infer this.
2      Q.   Okay. So you're not saying that PT is
3  a valid way to measure patients -- their
4  anticoagulation on Xarelto?
5      MR. GOZA: He's not offering an
6  opinion on --
7      A.   It's not been proposed by the FDA.
8  It's not in the product label. We just know
9  that there's some relationship.
10 BY MR. STEKLOFF:
11     Q.   So do you think -- are you aware of
12 any laboratory study that exists that could have
13 helped manage Mr. Boudreaux's gastrointestinal
14 bleeding?
15     A.   No. I mean, that's inferred in my
16 report, it's that there's an absence of a
17 recommendation for appropriate laboratory
18 studies.
19     Q.   And are you criticizing Bayer and
20 Janssen for not making such a laboratory study
21 available?
22     A.   I think that that -- I think it would
23 be nice if there was some way you could
24 risk-stratify bleeding in patients who are
25 anticoagulated.

Page 132

1      Q.   And my question is, are you
2  criticizing the Defendants in this case?
3      A.   Am I criticizing? Well, I certainly
4  think it -- well, yes, I guess, if you get down
5  to -- yes.
6      Q.   In what way?
7      A.   In that there's no way to
8  risk-stratify bleeding risk for patients on
9  Xarelto, and that it's a one-size-fits-all dose,
10 and there's no way to monitor if that
11 one-size-fits-most works for all patients.
12     Q.   So it's your opinion that the
13 Defendants should have come up with a way to
14 monitor patients even if one doesn't exist?
15 That's the core of your opinion here?
16     A.   Yes.
17     Q.   And then you're speculating that if
18 that existed, it could have impacted
19 Mr. Boudreaux's treatment?
20     MR. GOZA: Object to the form of the
21 question.
22     A.   Yes.
23 BY MR. STEKLOFF:
24     Q.   You don't know in any way how it would
25 have impacted his treatment?

Page 133

1      MR. GOZA: Well, object, again, to the
2  form of the question.
3      A.   You're talking about a hypothetical
4  lab for a hypothetical clinical scenario.
5  BY MR. STEKLOFF:
6      Q.   And everything that happened to
7  Mr. Boudreaux could have happened if he was on
8  warfarin, right?
9      MR. GOZA: Well, again, object as to
10 the form of the question.
11     A.   So what we know from the best
12 head-to-head studies is that if Mr. Boudreaux
13 had been on well-controlled warfarin therapy
14 with an INR of 1 to 2, his risk of bleeding
15 would have been approximately 1.8 events per 100
16 patient years. And from the best head-to-head
17 data we have, we know that his risk from
18 bleeding was higher on Xarelto.
19 BY MR. STEKLOFF:
20     Q.   And that was in the label?
21     A.   I believe that's in the label. We
22 covered that already.
23     Q.   And Dr. Wong was aware of that? You
24 read his testimony?
25     MR. GOZA: Object to speculation.

Page 134

1    A.   So yeah, again, Dr. Wong's deposition
2 is bit hard to follow.  But yes, I believe
3 Dr. Wong was aware of that.
4 BY MR. STEKLOFF:
5    Q.   Now, everything that we've discussed
6 that happened to Mr. Boudreaux could have
7 happened if he was taking any other NOAC other
8 than Xarelto, right?
9         MR. GOZA:  Object to form.
10   A.   Anything is possible.  But Xarelto
11 seems to have a higher risk of gastrointestinal
12 bleeding.
13 BY MR. STEKLOFF:
14   Q.   What are you basing your opinion on to
15 say that?
16   A.   What I just talked about.  You
17 asked -- oh, specifically about NOACs?
18   Q.   Yes.
19   A.   So I would refer you to the list of
20 literature, the Graham, the Lip, the Lip, and
21 the Yao studies.
22        MR. STEKLOFF:  Now I'm just going to
23 mark those studies, so we -- so we have done it.
24 Because I'll probably come back to this.  I'm
25 going to make the Graham study, study 4.

Page 135

1         (Whereupon, Winstead Exhibit Number 4,
2         Graham, et al study titled Stroke,
3         Bleeding, and Mortality Risks in
4         Elderly Medicare Beneficiaries Treated
5         With Dabigatran or Rivaroxaban for
6         Nonvalvular Atrial Fibrillation, was
7         marked for identification.)
8         MR. STEKLOFF:  2016 Lip, we'll make
9 Exhibit 5.
10        (Whereupon, Winstead Exhibit Number 5,
11        Lip, et al paper titled Real-world
12        comparison of major bleeding risk
13        among non-valvular atrial fibrillation
14        patients initiated on apixaban,
15        dabigatran, rivaroxaban, or warfarin,
16        was marked for identification.)
17        MR. STEKLOFF:  2012 Lip, we'll make
18 Exhibit 6.
19        (Whereupon, Winstead Exhibit Number 6,
20        Lip, et al paper titled Indirect
21        Comparisons of New Oral Anticoagulant
22        Drugs for Efficacy and Safety When
23        Used for Stroke Prevention in Atrial
24        Fibrillation, was marked for
25        identification.)

Page 136

1         MR. STEKLOFF:  And the Yao study we
2 will make Exhibit 7.
3         (Whereupon, Winstead Exhibit Number 7,
4         Yao, et al paper titled Effectiveness
5         and Safety of Dabigatran, Rivaroxaban,
6         and Apixaban Versus Warfarin in
7         Nonvalvular Atrial Fibrillation, was
8         marked for identification.)
9 BY MR. STEKLOFF:
10   Q.   Do you agree, Dr. Winstead, that these
11 are all observational studies?
12        MR. GOZA:  Which one is this one?
13        MR. STEKLOFF:  Yao, which is Number 7.
14 They go in order on -- they follow the same
15 order, 4, 5, 6, 7, on his Appendix A.
16 BY MR. STEKLOFF:
17   Q.   Would you agree, Dr. Winstead, that
18 these are all observational studies?
19   A.   These are all observational studies.
20   Q.   And there are -- you're not relying on
21 any head-to-head clinical trials comparing
22 Xarelto to any other NOAC, correct?
23   A.   I don't believe there is any
24 head-to-head trials.
25   Q.   And so an observational study -- all

Page 137

1 four of these observational studies have
2 limitations, would you agree?
3    A.   Correct.
4    Q.   And many of them state those
5 limitations explicitly, right?
6    A.   Yes.
7    Q.   And is that -- if you really wanted to
8 understand the relative risk of, for example, GI
9 bleeding between Xarelto and another NOAC, you
10 would prefer to have a head-to-head clinical
11 trial, right?
12   A.   Correct.
13   Q.   Because of the limitations expressed
14 in these studies?
15   A.   Correct.
16   Q.   If Mr. Boudreaux had taken another
17 NOAC, he may have had a gastrointestinal bleed?
18        MR. GOZA:  Object to the form of the
19 question.
20   A.   Anything is possible.
21 BY MR. STEKLOFF:
22   Q.   By their very nature, they thin out
23 your blood, and that, I don't -- that, for lack
24 of a better phrase, theory one about systematic
25 exposure could occur with any of these other

Page 138

1  NOACs, right?
2      A.   Yes.
3      Q.   And similarly, you can't monitor the
4  other NOACs, correct?
5      A.   Right.
6      Q.   So with any of the other NOACs, you
7  could have had too much drug concentration that
8  thinned out the blood too much and led to a
9  gastrointestinal bleed in Mr. Boudreaux?
10         MR. GOZA:  Object to form.
11     A.   Yes.
12 BY MR. STEKLOFF:
13     Q.   And when you said -- and the
14 systematic toxicity, that's basically just too
15 much drug?
16     A.   Too much drug is circulating in the
17 blood supply, or too much drug -- yeah, too much
18 drug is circulating in the -- or too much drug
19 absorbed in target tissues.
20     Q.   Now, and that systematic toxicity
21 theory of mechanism of action applies equally to
22 all the NOACs?
23         MR. GOZA:  Object, when you say
24 "equally."
25     A.   Yeah, I mean, I think that there's

Page 139

1  some issues with metabolism that vary amongst
2  the drugs.  You all have some -- there's some
3  issues about -- in your PI about use with P-gp
4  and strong CYP3A4 inhibitors, which is somewhat
5  beyond my area of expertise, but there are
6  drug-drug interactions that are specific to
7  Xarelto.  I'm not sure to the extent -- what the
8  extent of their issues with other drugs or drug
9  metabolism and other drugs is.
10 BY MR. STEKLOFF:
11     Q.   Well, with respect to Mr. Boudreaux,
12 he wasn't taking any of those drugs that had
13 drug-to-drug interaction, is that right?
14     A.   With respect to Mr. Boudreaux.  Can
15 you state the question again?  I'm sorry.
16     Q.   Sure.
17         You were discussing drugs that may, I
18 think, hypothetically have caused metabolism
19 considerations with Xarelto, right?
20     A.   Right.
21     Q.   And Mr. Boudreaux --
22         MR. GOZA:  I'm just going to object to
23 the form.  I didn't get it in there fast enough,
24 but go ahead.
25 BY MR. STEKLOFF:

Page 140

1      Q.   Mr. Boudreaux wasn't taking any of
2  those drugs, right?
3      A.   The ones that are specifically called
4  out in the PI, let's see.
5          (Witness reviewing document.)
6      A.   He wasn't on any of the medications
7  that are specifically called out in Section 5.6
8  of the PI.  And then there's also 7.1, which is
9  cross-referenced in there.  Let's see the drugs
10 they list in there.
11         I don't think he was on any of these
12 drugs that are specifically called out in the
13 PI.
14 BY MR. STEKLOFF:
15     Q.   So in Mr. Boudreaux's case, there
16 wouldn't have been another drug that could have
17 impacted his metabolism related to Xarelto,
18 right?
19     A.   Well, I can't tell you for certain,
20 because, you know, the issue is that they call
21 out about five drugs that are very strong
22 inhibitors, and there's -- the list of the drugs
23 that are potential inhibitors is quite -- I
24 mean, it's a huge list.  So can I say for
25 certain?  No.

Page 141

1      Q.   More likely than not, though?
2      A.   As far as I could tell.
3      Q.   And in Mr. Boudreaux's case, he also
4  had no renal impairment that was impacting his
5  metabolism, right?
6      A.   No, he did not.
7      Q.   And so in Mr. Boudreaux's case, given
8  those two considerations, he could have had the
9  same hypothetical systematic exposure if he was
10 taking another NOAC, is that right?
11         MR. GOZA:  Object to form.
12     A.   That's correct.
13 BY MR. STEKLOFF:
14     Q.   And earlier in the deposition at the
15 beginning, you stated that your opinions were
16 supported in the medical literature that you
17 cited, right?
18     A.   Mm-hmm.
19     Q.   That's a yes?
20         MS. HOFFMANN:  Is that yes?
21     A.   Yes.  Sorry.
22 BY MR. STEKLOFF:
23     Q.   And now, and take your time and review
24 all four articles, but do you agree that there
25 is nowhere in any of those four articles that

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 142

1 says Xarelto can initiate a bleed through
2 systematic toxicity, or otherwise, without a
3 pre-existing pathology?
4     MR. GOZA:  Well, object to the extent
5 it assumes that it addresses it at all, so...
6     MR. STEKLOFF:  I'm actually not
7 assuming that.  I don't think it does address
8 that.
9     MR. GOZA:  He already said it didn't,
10 and that wasn't what he was pointing to.  We
11 already went through this.
12     A.   These are -- these studies are about
13 the incidence of outcomes and patients exposed
14 to drugs.  They don't discuss -- let's see.
15     (Witness reviewing documents.)
16     MR. STEKLOFF:  Just so the record is
17 clear, while you review those I'm going to ask
18 the question again.  You can state an objection,
19 but we were talking over, you and I
20 appropriately were talking over each other.  I
21 just want there to be a clear question and then
22 a clear answer.
23 BY MR. STEKLOFF:
24     Q.   Dr. Winstead, there's nowhere in any
25 of the articles that you rely upon to form your

Page 143

1 opinions in which the authors state Xarelto can
2 initiate a gastrointestinal bleed through
3 systematic toxicity in the absence of
4 pre-existing pathology?
5     MR. GOZA:  And my objection is he's
6 already asked and answered that and explained
7 the specifics of that.
8     A.   Yeah, I don't believe any of these
9 studies actually call that out, or I don't think
10 any of these actually propose mechanisms for
11 bleeding.  They're all just discussing the
12 risks, the risk for bleeding.
13 BY MR. STEKLOFF:
14     Q.   And your core opinion in this case is
15 that Mr. Boudreaux's gastrointestinal bleed was
16 initiated by Xarelto in the absence of
17 pre-existing pathology?
18     A.   Xarelto increased his risk for
19 gastrointestinal bleeding.  His evaluation
20 revealed no underlying etiology.  He's not bled
21 before, he didn't bleed before, he hasn't bled
22 since.  So my opinion is that he bled because of
23 the Xarelto.
24     Q.   And that Xarelto initiated the bleed
25 in the absence of pre-existing pathology?

Page 144

1     MR. GOZA:  Well, object.  Now you're
2 misstating his testimony.
3     A.   So, well, yeah, I mean, I think his
4 risk for bleeding was -- I think he bled because
5 he took Xarelto.  So his evaluation did not show
6 any specific etiology, so I think he bled
7 because he was anticoagulated.
8 BY MR. STEKLOFF:
9     Q.   So if you look at the last paragraph
10 of your report, going back to Exhibit 1,
11 starting the second line, we can read the
12 whole thing, you write, "In light of my review
13 of the relevant materials, and having ruled in
14 and ruled out all potential risk factors, I
15 conclude to a reasonable degree of medical
16 certainty that Mr. Boudreaux suffered a
17 gastrointestinal hemorrhage and that his Xarelto
18 (rivaroxaban) use was the most probable cause of
19 that bleed."
20     When you say that -- first of all, did
21 I read that correctly?
22     A.   You read that correctly.
23     Q.   And when you say that, your opinion is
24 based on your view that Xarelto initiated
25 Mr. Boudreaux's gastrointestinal bleed in the

Page 145

1 absence of pre-existing pathology?
2     MR. GOZA:  And I'll object because
3 that misstates his testimony, and it misstates
4 what's specifically written here.  You want to
5 add conditions to it.
6     A.   He never bled before he took Xarelto,
7 he took Xarelto and he bled, he hasn't bled
8 since.  So the one identifiable risk factor is
9 his Xarelto use.  So that's my opinion in the
10 last paragraph of the last page.
11 BY MR. STEKLOFF:
12     Q.   And things can cause bleeds in
13 different ways, right?
14     A.   Correct.
15     Q.   Things can initiate bleeds, correct?
16     A.   Correct.
17     Q.   Things -- there could be pre-existing
18 pathology to which something contributes, right?
19     A.   Correct.
20     Q.   Your opinion of causation is that
21 Xarelto initiated the bleed, correct?
22     MR. GOZA:  Well, object.  I'm going to
23 object.  He has an opinion about causation.  Now
24 you're asking a separate question.
25     MR. STEKLOFF:  I'm asking him a

Page 146

1 question that he can answer.
2      MR. GOZA: But they're not dependent
3 upon one another. He's answered the question
4 that you've asked ten times and so. You know,
5 we could sit here and fight, but you're asking
6 him the exact same question that you asked him
7 before, and you're trying to make the two
8 dependent. It's argumentative.
9 BY MR. STEKLOFF:
10     Q.   When you say "the most probable cause
11 of Mr. Boudreaux's bleed," how do you define the
12 word "cause" in terms of initiation or
13 contribution or anything else?
14     A.   His exposure to Xarelto increased his
15 risk for gastrointestinal bleeding, and he had a
16 bleed while he was on Xarelto. So within a
17 reasonable degree of medical certainty, given
18 the fact that he never bled before and he hasn't
19 bled since, that's what I would define as cause.
20     Q.   And the mechanism for action of that
21 cause is an initiation, is that correct?
22     MR. GOZA: Object.
23     A.   He had no identifiable mucosal lesion,
24 no bleeding was seen on upper or lower endoscopy
25 or video capsule. One would assume, given those

Page 147

1 facts, like I talked about before, that he oozed
2 blood into probably his upper gastrointestinal
3 tract. Had he not been taking Xarelto, his
4 chances of that happening would have been quite
5 low. So in that regard, Xarelto caused his
6 gastrointestinal bleeding.
7 BY MR. STEKLOFF:
8     Q.   And that theory of oozing blood is the
9 systematic toxicity that we're talking about,
10 right?
11     A.   That's exposure to anticoagulation and
12 the breakdown of natural homeostasis between
13 clotting and dissolving clotting from exposure
14 to anticoagulants.
15     Q.   So that can occur, or could have
16 occurred in Mr. Boudreaux's case if he was
17 taking warfarin?
18     A.   If he was on -- so if he was on
19 carefully monitored warfarin therapy, his risk
20 of that happening would have been 1.8 events per
21 100 years. And we know from the head-to-head
22 comparison with Xarelto that on Xarelto his risk
23 of that happening is higher.
24     Q.   What was the quantification of that
25 risk on Xarelto?

Page 148

1     A.   What's the hazard ratio?
2     Q.   No. You say 1.8 out of 100 on
3 warfarin. I'm asking --
4     A.   That's based upon the HAS-BLED score.
5 And the risk of -- what was the table we were
6 looking at earlier?
7     MR. GOZA: 2.
8     A.   Table 2?
9     MR. GOZA: I think it was 2.
10     A.   Gastrointestinal --
11 BY MR. STEKLOFF:
12     Q.   Earlier we were looking at Table 1 in
13 6.1.
14     A.   Table 1.
15     So I don't have a calculator to create
16 a hazard ratio, but there were 2.0 events of
17 gastrointestinal bleeding per 100 patient-years
18 in the Xarelto group, and 1.2 in the warfarin
19 group in the ROCKET AF study.
20     Q.   Okay. And understanding that --
21 strike that.
22     The discussion of oozing blood and
23 systematic toxicity, that also could have
24 occurred in Mr. Boudreaux's case had he been
25 taking any of the other NOACs, correct?

Page 149

1     MR. GOZA: The only objection I'll
2 make is I know you've asked that question like
3 ten times.
4     A.   I think I've said yes.
5     MR. STEKLOFF: All right. Let's take
6 a break.
7     THE VIDEOGRAPHER: The time now is
8 12:22 p.m. We are off the record.
9     (Whereupon, a luncheon recess was
10     taken.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 150

1    AFTERNOON SESSION
2
3        THE VIDEOGRAPHER:  This begins disk
4    four of today's deposition.  The time now is
5    1:09 p.m.  We are back on the record.
6    BY MR. STEKLOFF:
7    Q.    Dr. Winstead, going back to the
8    sentence in your report on Page 2 about the
9    absence of a recommendation for appropriate
10   laboratory studies.
11   A.    Yes.
12   Q.    Now, do you agree that the absence of
13   a recommendation for appropriate laboratory
14   studies did not impact the treatment of
15   Mr. Boudreaux once he arrived at the hospital?
16       MR. GOZA:  You're talking about the
17   second time for the bleed?
18       MR. STEKLOFF:  For the bleed.
19   A.    Talking about -- so at that point, the
20   absence of a hypothetically available laboratory
21   test, while -- it doesn't appear to have
22   affected his management at the time he presents
23   to the hospital with his bleeding.
24   BY MR. STEKLOFF:
25   Q.    So you do agree with my statement?

Page 151

1    A.    Yes.
2    Q.    And, in fact, you agree with the
3    management of Mr. Boudreaux's bleed once he
4    arrived at the hospital, correct?
5    A.    Correct.
6    Q.    By his treating physicians?
7    A.    Correct.
8    Q.    And agreeing that we would always
9    prefer for a patient to never have a
10   gastrointestinal bleed, that there's nothing
11   good about a gastrointestinal bleed, can we
12   agree that Mr. Boudreaux's gastrointestinal
13   bleed was routine in the context of your
14   clinical care?
15       MR. GOZA:  That, I'm going to object
16   just to the -- it's ambiguous.
17       But go ahead.
18   A.    Yeah, he had a non-fatal but
19   clinically significant gastrointestinal bleeding
20   event.  So is that routine?
21   BY MR. STEKLOFF:
22   Q.    Let me -- that's a fair objection.
23   A.    Depends on what you mean by "routine."
24   Q.    Let me ask this.  With someone who
25   presents like Mr. Boudreaux did at the hospital

Page 152

1    with a gastrointestinal bleed that he had, in
2    terms of, then, his treatment in the hospital
3    over the course of a couple days, was that
4    typical of what other patients who have similar
5    gastrointestinal bleeds would go through?
6    A.    Yes, his hospital course was
7    relatively typical.
8    Q.    And his recovery was relatively
9    typical?
10   A.    Yes.
11   Q.    And is it fair to say that you're not
12   offering any opinions about Mr. Boudreaux's care
13   and treatment once he left the hospital after he
14   was treated for that gastrointestinal bleed?
15   A.    With the exception of the fact that he
16   followed up for the video capsule study, which
17   was done, I think, a couple of weeks after
18   discharge, right?
19   Q.    And that video capsule study, that was
20   an appropriate course of treatment, correct?
21   A.    That was an appropriate course of
22   treatment.  But I think at that point, you know,
23   my opinion ends.  I would think at that point my
24   opinion ends.
25   Q.    You're not offering any opinions about

Page 153

1    whether or not Mr. Boudreaux could have or
2    should have been placed on an anticoagulant
3    following the resolution of his gastrointestinal
4    bleeding?
5    A.    That's -- yeah, that's outside of my
6    area of clinical practice.
7    Q.    And similarly, you're not offering any
8    opinions about the LARIAT procedure that
9    Mr. Boudreaux ultimately underwent?
10   A.    About the appropriateness, is that
11   what you said?
12   Q.    Correct.
13   A.    No, I mean, that's -- I don't know
14   enough about that to -- except sort of what it
15   does.
16   Q.    Turning to a slightly different topic,
17   based on your review of Mr. Boudreaux's medical
18   records and the deposition testimony, do you
19   agree that there's confusion about the number of
20   Xarelto capsules that he took?
21       MR. GOZA:  I'll object to the form.
22   A.    Do I agree that there's confusion over
23   the number of capsules that he took?  I would go
24   back to my earlier testimony and say that he,
25   Mr. Boudreaux, testified that, in his

Page 154

1 deposition, that he was taking it on a daily
2 basis. And I would believe Mr. Boudreaux was
3 taking it on a daily basis.
4    Q.   You credit his testimony on that?
5    A.   I would credit his testimony on that.
6    Q.   And are you aware that Nurse Theriot's
7 records indicate she prescribed 100 capsules,
8 plus gave him 10 capsules as a sample?
9        MR. GOZA: Objection to the extent --
10 BY MR. STEKLOFF:
11   Q.   I'm sorry, just to -- actually, to ask
12 a more accurate question.
13       That she actually prescribed 90
14 capsules and gave him 10 capsules as a sample?
15       MR. GOZA: First of all, let me just
16 object, just because you said it's her records.
17 It's not her records. That's been clearly
18 established. So I would object to the form and
19 the assumption that's made.
20       MR. STEKLOFF: I'll ask a different
21 question.
22 BY MR. STEKLOFF:
23   Q.   Have you seen medical records that you
24 reviewed indicating that he received 90 capsules
25 as part of his prescription and 10 capsules as

Page 155

1 part of a sample?
2    A.   Did I see medical records? I don't
3 think I -- that's a narrowly focused question.
4        I don't recall if I saw that in his
5 records, or if my memory of that comes from the
6 deposition of Nurse Theriot, to be honest with
7 you.
8    Q.   Are you aware that Mr. Boudreaux
9 brought 96 capsules to his deposition?
10   A.   I am aware of that, yes.
11   Q.   And if he had taken four capsules in
12 total of Xarelto, how, if at all, would that
13 impact your opinion about causation?
14   A.   Well, I think he had taken more than
15 that because he said he was taking it on a daily
16 basis.
17   Q.   And my question is, if the jury
18 determines that he didn't take it on a daily
19 basis --
20   A.   If the jury determines that he doesn't
21 take it on a daily basis, you're kind of getting
22 back at the question that you had for me
23 earlier, which was how much Xarelto do you need
24 to take to increase your bleeding risk. And I
25 would refer you to my answer for that question,

Page 156

1 which is it's probably a better question for a
2 pharmacologist.
3    Q.   And does it also matter, in your
4 opinion, when he took the Xarelto, if he only
5 took four capsules, for example, as -- in
6 relation to when the bleed occurred?
7        MR. GOZA: I'm just going to object to
8 the form.
9    A.   So if you're -- I mean, I guess I
10 suppose that if upon his discharge for his
11 atrial fibrillation hospitalization, if you
12 really believe that he only had -- ever had 100
13 capsules in his possession, and he took the
14 medicine the first four days and then was
15 hospitalized, what's it supposed to be, like,
16 three -- it should be, I think, three weeks
17 afterwards, 20 days?
18   Q.   There was 26 days between his
19 prescription and his --
20   A.   Right. So it would be 20 days later
21 that he bleeds.
22       Under that scenario, I think it would
23 be unlikely that he bled from Xarelto, because
24 he wouldn't have received it for 20 days.
25       But there's a number of hypotheticals

Page 157

1 that lead up to that that I don't think I
2 believe. I think I credit his testimony. I
3 think he was probably given more Xarelto than
4 Nurse Theriot recalls, because my experience is
5 that we drown in prescription samples and do
6 everything we can to get them out of there.
7    Q.   But is it fair to say that you agree
8 that if he only took four capsules, and that he
9 did so closer in time to his prescription than
10 his bleed, you would have a difficult time
11 saying that Xarelto was more likely than not the
12 cause of his bleed?
13   A.   Correct.
14   Q.   And so your causation opinion is,
15 therefore, one of the -- I'll withdraw that.
16       One of the key assumptions for your
17 causation opinion is that he was given more
18 Xarelto capsules and, in fact, took it every
19 day?
20       MR. GOZA: Well, now I'll object to
21 the -- I think that misstates what he just told
22 you.
23   A.   What I'm -- what I'm assuming
24 is that -- I, again, believe Mr. Boudreaux's
25 testimony that he was taking it on a daily

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 158

1 basis.
2 BY MR. STEKLOFF:
3    Q.   And that's a fundamental premise of
4 your causation opinion?
5    A.   Is that I --
6         MR. GOZA:  Objection.
7    A.   -- believe Mr. Boudreaux's deposition.
8 BY MR. STEKLOFF:
9    Q.   Yes.
10        So the answer to my question is yes?
11    A.   In his own words, yes.
12        MR. STEKLOFF:  I'm going to mark as
13 Exhibit 8 a record from one of Mr. Boudreaux's
14 medical records.
15        (Whereupon, Winstead Exhibit Number 8,
16        Medical record, Bates
17        JBoudreaux-OStAGH-MD-000056, was
18        marked for identification.)
19 BY MR. STEKLOFF:
20    Q.   Do you recall seeing this record?
21    A.   Yes.
22    Q.   Do you recall that Mr. Boudreaux was
23 prescribed Xarelto on January 9th, 2014?
24    A.   Yes.
25    Q.   And do you see that the records

Page 159

1 document that he was sent home with a 90-day
2 prescription, and samples given per Veronica RN
3 for next ten days?
4    A.   That's what it says.
5    Q.   And you are assuming, based on
6 Mr. Boudreaux's deposition testimony, that he
7 was given more samples than documented in this
8 record?
9    A.   Correct.
10    Q.   And that's based on your credibility
11 determination of Mr. Boudreaux?
12    A.   Correct.
13    Q.   And nothing else?
14    A.   Correct.
15    Q.   Moving to a new topic.
16        Do you --
17    A.   Excuse me, may I -- may I amend my
18 answer -- my previous answer, rather?
19        MR. GOZA:  You can.
20    A.   That, and the fact that when he
21 presented bleeding he had an abnormal
22 prothrombin time, which would be consistent with
23 using the Xarelto, as we discussed earlier.
24 BY MR. STEKLOFF:
25    Q.   What was his prothrombin time that was

Page 160

1 unusual?
2    A.   When he initially presented?
3    Q.   Yes.
4        MR. GOZA:  He didn't say it was
5 unusual.
6    A.   Bleeding --
7 BY MR. STEKLOFF:
8    Q.   Okay.  What was his prothrombin time
9 that was abnormal?
10    A.   Well, let's look.
11        13.6.
12    Q.   What was -- do you recall any records
13 of what his prothrombin time was before he ever
14 took Xarelto?
15    A.   I believe he had one in the hospital
16 when he was admitted for atrial fibrillation.
17 He had at least one.
18    Q.   And what was it?
19    A.   I can't remember off the top of my
20 head.
21    Q.   What makes you say that 13.6 is an
22 abnormal prothrombin time?
23    A.   It's, I believe, for that laboratory,
24 and I'm going by memory, that that's outside the
25 upper limit of normal.

Page 161

1    Q.   Based on the laboratory records,
2 you're saying?
3    A.   Correct.
4    Q.   Do you know what reagent was used?
5    A.   No.
6    Q.   Do you recall whether he had
7 prothrombin times measured following his bleed
8 and after he was off Xarelto?
9    A.   I don't recall seeing one.
10    Q.   If they were almost exactly the same,
11 13, would you say that his prothrombin time when
12 he presented at the hospital with his bleed was
13 abnormal?
14        MR. GOZA:  I'll object to the form.
15 It misstates evidence.
16    A.   If there were -- well, the answer is
17 it depends if there's something else that he was
18 taking or some other medical condition which
19 would extend his prothrombin time.
20 BY MR. STEKLOFF:
21    Q.   Well, you reviewed all of his medical
22 records.
23        So following his bleed and after he
24 stopped taking Xarelto, did he ever take any
25 medications or have any other medical conditions

Page 162

1 that would have extended his prothrombin time?
2 A. Well, yeah, he's had -- my
3 understanding and my recollection is that he's
4 had issues, ongoing issues with mild to moderate
5 congestive heart failure, which can cause
6 passive liver congestion.
7 Q. And that can increase your prothrombin
8 time?
9 A. It can increase your prothrombin time.
10 Q. So why couldn't that have increased
11 his prothrombin time when it was taken on
12 February -- in February of 2014 and presented
13 with a bleed?
14 A. Because at that time he was not in
15 heart failure, to my understanding. When he
16 presented to the -- when he presented initially
17 with his gastrointestinal bleeding, I don't
18 believe that there was evidence that he was also
19 in heart failure.
20 Q. Okay. Now --
21 A. He wasn't managed as though he was in
22 heart failure.
23 Q. Do you know, was he in heart failure
24 in May of 2015?
25 A. I can't recall. I mean --

Page 163

1 Q. Do you recall seeing that he had a
2 prothrombin time of 13.2 in May of 2015?
3 A. No, I mean, I don't recall looking at
4 that.
5 Q. Is that an abnormal score in May of
6 2015?
7 MR. GOZA: Are you going to show him
8 the reference range so he can --
9 A. Show me the reference. It depends on
10 the reference range for that lab, and that
11 depends somewhat upon the --
12 MR. STEKLOFF: Happy to show it to
13 you.
14 MR. GOZA: Now we're talking a year
15 and a half later?
16 MR. STEKLOFF: We're talking May of
17 2015.
18 MR. GOZA: So a year and a half later.
19 MR. STEKLOFF: So what?
20 MR. GOZA: A year and a half later?
21 MR. STEKLOFF: Yes. I said May 2015
22 from the start.
23 (Whereupon, Winstead Exhibit Number 9,
24 Medical record, Bates
25 JBoudreaux-PPR-001664 through 1673,

Page 164

1 was marked for identification.)
2 A. So I don't know the differences
3 between the reagents between Terrebonne General
4 and Ochsner St. Anne. I don't know what the
5 normal range for Ochsner St. Anne is.
6 Where are we looking here? You don't
7 have a copy of his labs from Ochsner St. Anne
8 that you --
9 BY MR. STEKLOFF:
10 Q. Well, are you --
11 MR. GOZA: Well, I'll tell -- do you
12 want me to tell you what the reference range
13 was?
14 MS. HOFFMANN: No.
15 MR. STEKLOFF: No.
16 MS. HOFFMANN: He's asking questions.
17 Kirk --
18 MR. STEKLOFF: You can ask a
19 question --
20 MR. GOZA: But you can't just give him
21 part information and then say, "is that
22 abnormal."
23 MR. STEKLOFF: I can do whatever I
24 want, and he can answer the questions.
25 MR. GOZA: Well, you can, but then I

Page 165

1 can object and tell him that.
2 Go ahead.
3 A. So 13.2 for Terrebonne General Medical
4 Center on this particular day, May 11, '15, is
5 within the normal range, and it provides an INR
6 of 1.0.
7 BY MR. STEKLOFF:
8 Q. Okay. And so just to go back to this,
9 you are basing your opinion that Mr. Boudreaux
10 took more -- took daily -- took a daily pill of
11 Xarelto from the day he was prescribed Xarelto
12 up until the bleed on two factors; one, his
13 testimony, and two, his prothrombin time on
14 February 3, 2014?
15 MR. GOZA: And I'll object to the
16 extent that misstates his testimony.
17 Go ahead.
18 A. The testimony as well as -- the
19 testimony as well as that information, yes.
20 BY MR. STEKLOFF:
21 Q. So exactly what I said in my question?
22 A. Correct.
23 Q. But you have already testified you're
24 not an expert in prothrombin time?
25 A. No, or laboratory medicine or

Page 166

1 pathology or hematology.
2   Q.   And do you agree there are other
3 factors that could have put Mr. Boudreaux's
4 prothrombin time at 13.6, outside of the
5 reference range on February 3, 2014?
6   A.   So again, he had no prior evidence of
7 liver disease or coagulopathy.  At that time in
8 February, there was no compelling evidence that
9 he was in heart failure.  And the only
10 medication that he was on that prolongs
11 prothrombin time is the Xarelto, that I'm aware
12 of.
13   Q.   So are you now going back to our
14 discussion that we had an hour and a half ago
15 offering any opinions to try to correlate
16 prothrombin time with the risk of bleeding?
17   A.   No, I mean, we went around and around
18 on that.
19   Q.   I just want to make sure.
20       MR. GOZA:  This is -- no, but what he
21 said --
22   A.   What I said --
23       THE COURT REPORTER:  I'm sorry.  One
24 at a time, please.
25       MR. GOZA:  Let me object, just

Page 167

1 because, first of all, the question is
2 argumentative, secondly completely misstates
3 what the doctor spent two hours explaining.
4       MS. HOFFMANN:  Counsel, I think it's
5 easiest and in compliance with the rules if you
6 just say objection.
7       MR. GOZA:  I know what you think.  And
8 if it weren't so completely apparent, I might
9 agree with you in certain circumstances, but now
10 he's asked this question like 50 times and he's
11 trying to misstate what the doctor said in order
12 to try to -- he didn't like the answer the first
13 time so now he wants to change it.
14       So go ahead.
15   A.   I would direct you again to my
16 comments that I made earlier about the package
17 insert.
18 BY MR. STEKLOFF:
19   Q.   And so in Mr. Boudreaux's specific
20 case, are you saying his prothrombin time was
21 elevated because of Xarelto?
22   A.   Yeah, that's what you just asked me.
23 Yes, that is on the day that he presented with
24 his gastrointestinal bleeding episode.  I think
25 that there's no other identifiable source for

Page 168

1 his abnormal prothrombin time, and I think that
2 that's one of the things that I used to
3 formulate my opinion that he was taking his
4 medication.
5   Q.   But you agree that even at a
6 prothrombin time at 13.6 on the day of his
7 bleed, that you're not the expert to say whether
8 that still placed him in the right risk/benefit
9 range?
10   A.   That's correct.
11   Q.   You're really just relying -- and I'm
12 not trying to repeat a question, just I want to
13 make sure I understand -- you're really just
14 relying on this prothrombin time right now to
15 say that that's part of your basis for
16 concluding that he was taking Xarelto?
17   A.   Correct.
18   Q.   And so again, other than that, you
19 don't intend on offering any opinions on
20 prothrombin time?
21   A.   Correct.
22   Q.   Last topic for me before Ms. Hoffman
23 may have some questions.
24       Did you look for observational
25 studies, other than the four, that demonstrated

Page 169

1 that Xarelto performed better on safety and/or
2 efficacy measures than other NOACs?
3       MR. GOZA:  You said Xarelto performed
4 better?
5 BY MR. STEKLOFF:
6   Q.   Or Xarelto -- I won't use the word
7 "performed" since it wasn't a clinical trial.
8       Did you look for observational
9 studies, other than the four that you cited in
10 your report, that conclude that Xarelto compares
11 better on safety and/or efficacy measures than
12 other NOACs?
13       MR. GOZA:  And I don't want to be
14 argumentative, so I'm just going to object
15 because I think it assumes that these four
16 concluded what you just said, which I don't
17 think is true, so...
18 BY MR. STEKLOFF:
19   Q.   No, well, just to be clear, you are
20 setting those -- you're setting four -- we're
21 talking past each other?
22       You're setting four for the view that
23 Xarelto is actually worse on safety and efficacy
24 measures than the other NOACs, correct?
25   A.   Correct.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 170

1   Q.   And my question is, are you aware that
2   there are lots of other observational studies
3   out there about NOACs?
4   A.   I am aware of those.
5   Q.   Okay.  Did you --
6   A.   Wait.  I didn't finish my answer.
7   Q.   Okay.
8   A.   They have their own sets of
9   limitations.
10   Q.   They all have their own?
11   A.   Yes.
12   Q.   They all have the same limitations
13   frankly, right?  Some may be more exaggerated
14   than others, depending on the populations?
15   A.   I would disagree with that contention
16   actually.  I think that what I appreciated
17   reviewing this literature in preparing my
18   statement, my opinion, is that many of the
19   studies that were done early on, like the
20   immediate postmarketing studies, had very small
21   numbers of patients in the Xarelto arms and made
22   it very difficult to make any compelling
23   conclusions.  That's, in general, what I would
24   observe to you.
25   Q.   Did you look for more recent studies

Page 171

1   that compared Xarelto to other NOACs in terms of
2   safety or efficacy?
3   A.   I did look for more recent studies.
4   Q.   Did you see studies that in certain
5   areas of safety or efficacy stated that Xarelto
6   performed better than the other NOACs that were
7   more recent?
8   A.   You're talking general safety and
9   efficacy on general points rather than broad
10   statement.  Yes, I have seen some studies that
11   said -- yeah.
12   Q.   What about the risk of major bleeds?
13   A.   No.
14   Q.   What about the risk of fatal bleeds?
15   A.   I think the answer is no.  But I'm --
16   you know, you get into some very narrowly
17   focused questions, and I can't remember
18   everything that I've ever seen, to be honest
19   with you.
20   Q.   If those studies exist, would you want
21   to consider them in forming your opinion?
22   A.   I'd want to consider those as well as
23   their limitations, yes.
24   Q.   Just like the limitations in the
25   studies you cite?

Page 172

1   A.   Correct.
2   Q.   For example, some of the studies that
3   you cited compared Xarelto in older populations
4   to NOAC -- another NOAC used in another
5   population, right?
6   A.   That's not a completely true
7   statement, because they did what's called
8   propensity scoring and attempting to control the
9   populations that were observed.  So while that
10   statement is true of a direct comparison, they
11   attempted to compensate for it, and a full
12   discussion of that is for an epidemiologist, and
13   I don't want to get into it because I'll get it
14   wrong and everyone will go to sleep.
15   Q.   It's still a limitation even if you
16   try to control for it?
17   A.   It's still a limitation even if you
18   try to control for it.
19   Q.   Especially in the context of an
20   observational study as opposed to a head-to-head
21   clinical trial?
22   A.   Well, yeah.  Observational studies are
23   we're always doing those kind of attempts at
24   controlling for things.
25       MR. STEKLOFF:  I pass the witness to

Page 173

1   Ms. Hoffmann.
2       MR. GOZA:  Are we physically going to
3   move?
4       MS. HOFFMANN:  I don't think so.  I
5   speak loudly and clearly.  If there's a problem,
6   you can let me know.  I don't have that many
7   questions to ask.  I leave it up to Madam Court
8   Reporter.
9       THE COURT REPORTER:  Fine.
10       MS. HOFFMAN:  She's the most
11   important.  I have no doubt that you all can
12   hear me.
13       EXAMINATION
14   BY MS. HOFFMANN:
15   Q.   Doctor, I want to go back.  You have
16   indicated a couple times today that you reviewed
17   over 3,000 pages of medical records that
18   pertained to Mr. Boudreaux, correct?
19   A.   Correct.
20   Q.   And you reviewed those medical records
21   so that you could come here and give your
22   opinions today?
23   A.   Correct.
24   Q.   One of your opinions that you've given
25   today, and I think you've said it a couple

Page 174

1 times, is that you believe that Xarelto caused
2 Mr. Boudreaux's bleed in part because he didn't
3 bleed before he was on Xarelto and he didn't
4 bleed once he stopped taking Xarelto, correct?
5    A.   Correct.
6    Q.   And you've now indicated that that
7 opinion is at least qualified by the fact that
8 you believe for it to be your opinion, there has
9 to be evidence that Mr. Boudreaux actually took
10 Xarelto at or near the time that he had the
11 clinically overt symptoms for his GI bleeding,
12 is that correct?
13    A.   Yes.
14    Q.   Okay.  And you know, because you've
15 also read the depositions that have been done in
16 this case, that Mr. Boudreaux presented at his
17 deposition with 96 pills, and testified that he
18 had prescriptions for 100 pills, correct?
19    A.   Correct.
20       MR. GOZA:  Well --
21 BY MS. HOFFMAN:
22    Q.   How do you --
23       MR. GOZA:  -- I was going to object
24 that he testified to that.  That's...
25 BY MS. HOFFMANN:

Page 175

1    Q.   You read his deposition, did you not?
2    A.   Yes.
3    Q.   Okay.  And you read that at the time
4 of his deposition he physically presented 96
5 Xarelto tablets, correct?
6    A.   Correct.
7    Q.   And he testified in his deposition
8 that upon discharge from the hospital he was
9 given samples, correct?
10    A.   Correct.
11    Q.   And that a prescription for 90 pills
12 was ordered, and that he received those,
13 correct?
14    A.   Yes.
15    Q.   And then you read the nurse's
16 deposition testimony in conjunction with the
17 discharge papers, and you see that according to
18 that documentation, Mr. Boudreaux got ten days'
19 worth of samples, correct?
20    A.   Yes.
21       MR. GOZA:  I'll object to the form of
22 that.  That misstates the evidence.
23    A.   Correct.
24 BY MS. HOFFMANN:
25    Q.   Okay.  You'll agree with me?

Page 176

1    A.   I agree that that's what's in the
2 records we're discussing.
3    Q.   Okay.  And so how do you reconcile the
4 96 pills that were brought to the deposition
5 with the notion that there were 100 pills that
6 were actually prescribed?  Have you formulated a
7 basis for that reconciliation?
8       MR. GOZA:  The only objection I'll
9 make is to the form of "prescribe."
10 BY MS. HOFFMANN:
11    Q.   You can answer.
12       MR. GOZA:  Yeah.
13    A.   I would direct you to my earlier
14 answer, which is that I believe Mr. Boudreaux's
15 testimony.  And as a practicing physician, my
16 experience has been that you are inundated with
17 so many samples that it's difficult to get rid
18 of them, and I also know that we are very bad at
19 documenting how many samples are given to who
20 and for what.  And so --
21 BY MS. HOFFMANN:
22    Q.   So in formulating -- I'm sorry.
23    A.   And so primarily I would rely on
24 Mr. Boudreaux's testimony, because I think him
25 taking the medication on a daily basis is

Page 177

1 plausible and he's believable.  And again, this
2 is a guy who called his doctors' office to
3 follow up after he made refill requests from a
4 mail order pharmacy, which is unusual.
5    Q.   So at least in part, as I understand
6 your answer, you're taking your own clinical
7 experience at being bad about properly
8 documenting samples that are given and
9 transposing that to the nurse and the
10 practitioners who were dealing with
11 Mr. Boudreaux, is that correct?
12       MR. GOZA:  And I'll object as to the
13 form of the question.
14    A.   I'm not bad at documenting giving away
15 samples.  I'm saying my experience has been that
16 many providers are bad about accounting for
17 those things.
18 BY MS. HOFFMANN:
19    Q.   In reviewing Mr. Boudreaux's medical
20 records to form your opinions in this case, you
21 reviewed his medical records both prior to the
22 time that he was given the Xarelto prescription,
23 as well as you reviewed his medical records
24 following his discharge from the hospital?
25    A.   Yes.

Page 178

1   Q.   And in reviewing those medical
2   records, you looked at not only the medical
3   records, but all of his laboratory findings or
4   results?
5   A.   Yes.
6   Q.   And, Doctor, would you agree with me
7   that based on a review of Mr. Boudreaux's
8   laboratory findings prior to the time that he
9   was prescribed Xarelto, that you cannot rule out
10  that he had a mild chronic occult GI bleed?
11  A.   I would not agree with that, because
12  he was not anemic, he had never described any
13  blood in his stool, he had had his stool checked
14  for blood as a routine colorectal cancer
15  screening on a few occasions and there was never
16  any evidence of blood in his stool.
17  Q.   So at least from your review of the
18  laboratory findings prior to the time that
19  Mr. Boudreaux was prescribed Xarelto, you found
20  nothing in those laboratory findings that would
21  suggest the possibility of a mild chronic occult
22  bleed?
23  A.   That's correct, I have not found
24  anything to suggest that.
25  Q.   Now, you mentioned anemia.  Post

Page 179

1   discharge from the hospital, would you agree
2   with me that Mr. Boudreaux has had laboratory
3   findings indicating that he continues to be
4   anemic?
5   A.   Post discharge from what hospital
6   when?
7   Q.   I'm sorry, post -- let me go back.
8        You know that he was in the hospital
9   for his overt clinical GI bleed from about
10  February the 4th until his discharge on February
11  the 8th; you know that from your review of the
12  medical records, right?
13  A.   Yes, ma'am.
14  Q.   So if we talk about the time frame
15  following his discharge on February 8, 2014,
16  you're aware, based on your review of the
17  medical records, that he has had laboratory
18  findings of anemia following that discharge,
19  correct?
20  A.   Correct.
21  Q.   Would you agree with me that given
22  laboratory findings that are in his medical
23  records post February 8, 2014, you cannot rule
24  out a subsequent mild chronic occult bleed?
25  A.   Well, I think he's anemic, I think it

Page 180

1   needs to be worked up.  I mean, I -- can you --
2   you've ruled it out at this point to a
3   reasonable degree of medical certainty again
4   because he's had a comprehensive digestive tract
5   workup.
6        MS. HOFFMANN:  I'm sorry, will you
7   read back my question?  I'm not sure -- I'm not
8   sure you heard my question --
9        MR. GOZA:  I think it was directly
10  responsive.
11       Go ahead, read it back.
12       (Whereupon, the reporter read back the
13  pending question.)
14       MR. GOZA:  And what was the answer?
15  A.   My answer would be that --
16       MR. GOZA:  No, I want her to read it.
17  I just wanted to make sure I heard it correctly.
18  BY MS. HOFFMANN:
19  Q.   That's okay, you can answer it again.
20  If you --
21  A.   I think, to a reasonable degree of
22  medical certainty, a chronic occult
23  gastrointestinal bleed for Mr. Boudreaux has
24  been ruled out.
25  Q.   Post his discharge from the hospital,

Page 181

1   is that correct?
2   A.   Correct.  Yes.
3   Q.   Okay.  And do you have an explanation,
4   then, for his anemic laboratory findings post
5   discharge on February 8, 2014?
6   A.   No.  And he needs to see a
7   hematologist, frankly.
8   Q.   So why would you recommend that he see
9   a hematologist if there is -- if you've already
10  ruled -- if you have already ruled out a mild
11  chronic occult bleed?
12  A.   Because he could have a primary bone
13  marrow problem.  He could have mild dysplasia.
14  He could be on medications which are making him
15  anemic.
16  Q.   And could --
17  A.   He could be B12 deficient.
18  Q.   He could also be having a mild chronic
19  occult bleed that's making him anemic?
20  A.   No.  Again, we ruled that out to a
21  reasonable degree of medical certainty.  He's
22  had a full evaluation of his gastrointestinal
23  tract.
24  Q.   You indicated earlier that he had a
25  pill cam study, correct?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 182

1  A. Yes.
2  Q. Now, he was discharged from the
3  hospital on February 8th, 2014, correct?
4  A. Yes.
5  Q. And that pill cam study was done on
6  March 28, 2014, correct?
7  A. Mm-hmm.
8  Q. Is that yes?
9  A. I'm sorry. Yes.
10  Q. Would you have preferred to see that
11  pill cam study done sooner in time to his
12  discharge from the hospital?
13  MR. GOZA: Object to the form of the
14  question. Outside of his identification as an
15  expert.
16  A. That's a really difficult question to
17  answer. I mean, yeah, you would have liked to
18  have seen it been done a bit sooner, perhaps.
19  Q. Would you find the results of the pill
20  cam study to be more reliable if they are done
21  closer in time to the discharge from the
22  hospital?
23  A. Not really. When you do a pill cam,
24  you're looking for things like tumors and
25  ulcers, vascular malformations in the small

Page 183

1  intestine that can bleed sporadically. And so
2  those things, you know, tumors, polyps, don't
3  just go away. Vascular malformations don't just
4  go away. So, I mean, how relevant is it? I'm
5  not completely sure.
6  Q. Are the results of a pill cam study
7  more reliable, if they're looking for AVM, if
8  they are done closer in time to the diagnosis of
9  the clinically overt bleed?
10  A. Only in that you may see blood in the
11  gastrointestinal lumen.
12  Q. And if you see blood in the
13  gastrointestinal lumen, that helps identify a
14  pathological -- I mean an anatomical source for
15  the bleed, is that right?
16  A. If you see blood, you look for
17  something nearby in temporal or spatial
18  relationship to the blood that you're seeing,
19  and that gives you an idea of what's causing the
20  bleeding.
21  Q. With a pill cam study, you end up
22  getting a video of what the camera has filmed as
23  it goes through the system. Is that the basic
24  idea?
25  A. That's the basic idea.

Page 184

1  Q. And you get about eight hours' worth
2  of film, is that correct?
3  A. It's one frame every six seconds for
4  an eight-hour recording.
5  Q. And when the reader of the AVM is
6  looking at the tape from -- I'm sorry.
7  When a reader of the pill cam study is
8  looking at the tape, he or she is not looking at
9  all eight hours of the film, are they?
10  A. No, in fact, they are.
11  Q. They sit for eight hours and look at
12  every part of the film?
13  A. So it's one frame every six seconds is
14  what's captured. Traditional video playback of
15  TV, I believe, is -- I believe in the US is
16  29.97 frames per second. When the video capsule
17  recording is played back, it can be played back
18  at regular speed. It can also be played back, I
19  think, up to 24 times regular speed. The speed
20  that it's played back at is adjustable by the
21  reader. And those preferences for how fast it's
22  played back vary from reader to reader.
23  Q. As you sit here today, you have no
24  idea who the reader was of the pill cam study
25  that was done on Mr. Boudreaux, correct?

Page 185

1  MR. GOZA: I'll object.
2  A. That's in the medical records. It was
3  Dr. Joshi.
4  BY MR. STEKLOFF:
5  Q. Dr. Joshi actually read it, or do
6  you -- was it one of his assistants or fellows
7  or research people, do you know?
8  A. I believe his name is signed to the
9  report.
10  Q. Do you know how much of the film he
11  actually looked at?
12  A. Well, I have no way of knowing that.
13  Q. I'm sorry?
14  A. I have no way of knowing that.
15  Q. Okay. You don't know how much of the
16  film was looked at, correct?
17  A. That's what I just said.
18  Q. And it's possible, when anybody is
19  looking at those films, to either not look at
20  all of it or to miss something, fair statement?
21  A. Yeah, that's a fair statement.
22  Q. You talked before about the mechanism
23  that you propose was the mechanism in place for
24  Xarelto to have caused Mr. Boudreaux to bleed,
25  correct?

Page 186

1    A.   Yes.
2    Q.   And that mechanism, I think you said,
3  is a systemic or system toxicity, correct?
4    A.   So I believe he was taking Xarelto,
5  and Xarelto increased his chances of bleeding.
6    Q.   I understand that part, Doctor.  I'm
7  more focused on the mechanism that you talked
8  about before, which I think you called system
9  toxicity.
10      Is that the mechanism that you're
11 relying on?
12   A.   So I'm -- he was -- his system was
13 exposed to Xarelto, and that caused him to be at
14 increased risk for bleeding.
15   Q.   Okay.  But all anticoagulants expose a
16 system to be at an increased risk of bleeding,
17 right?
18   A.   Yes, and Xarelto more than others.
19   Q.   And you base that on these four
20 studies that you have looked at -- oh, no, I'm
21 sorry.
22      For the GI bleeding, you're referring
23 to the ROCKET study?
24   A.   I'm referring both to the ROCKET study
25 and the four studies that are laid out in my

Page 187

1  opinion.
2    Q.   I guess my question is this.  When you
3  talk about this systemic toxicity and this
4  oozing of blood from the mucosal area, is that
5  what you're proposing happened to Mr. Boudreaux?
6    A.   Yes.  I'm proposing that he oozed from
7  probably his upper GI tract because he was
8  anticoagulated with Xarelto.
9    Q.   When you say "he oozed from his upper
10 GI tract," would that oozing leave a mark?
11   A.   No.
12   Q.   So the oozing from the upper GI tract
13 that you opine happened to Mr. Boudreaux because
14 of Xarelto would not leave any kind of
15 identification?
16   A.   No.
17   Q.   So you wouldn't see it on endoscopy?
18   A.   No.  Unless he was bleeding at the
19 time we looked.
20   Q.   So the oozing that you propose was
21 self-limiting?
22   A.   He stopped at -- his Xarelto was
23 stopped and he stopped bleeding.
24   Q.   So according to the records and
25 according to his deposition testimony, the last

Page 188

1  time he took Xarelto would be the morning of
2  February the 3rd, is that correct?
3       MR. GOZA:  I'll object.  I don't think
4  that's been testified to, or even asked.
5       MS. HOFFMANN:  Pardon me?
6       MR. GOZA:  I'm saying that wasn't even
7  asked of him at his deposition.
8       MS. HOFFMANN:  Sure it was.
9       MR. GOZA:  No.  But anyway...
10 BY MS. HOFFMANN:
11   Q.   What do you understand was the last
12 time that Mr. Boudreaux took a Xarelto tablet?
13   A.   I assume it was on or before when he
14 presented to the emergency room.
15   Q.   Okay.  And he presented to the
16 emergency room on what day?
17   A.   Let's look so I tell you the right
18 answer.
19      (Witness reviewing document.)
20   A.   That would be February 3rd.
21 BY MS. HOFFMANN:
22   Q.   Okay.  So you understand he took his
23 last Xarelto tablet the morning of February 3rd,
24 he presented to the emergency room.
25      The Xarelto, in your view, had caused

Page 189

1  this oozing of blood from the upper GI mucosa,
2  correct?
3    A.   Correct.
4    Q.   But that it had stopped by the time he
5  had the endoscopy?
6    A.   Correct.
7    Q.   And that's why there was no -- you
8  couldn't see it on endoscopy?
9    A.   Correct.
10   Q.   So there was no indication of any
11 bleeding, active bleeding by Mr. Boudreaux at
12 any time that he was in the emergency room or
13 after he was hospitalized, is that correct?
14   A.   With the exception he had -- his stool
15 was positive for blood when he presented to
16 St. Anne's, so that would be a sign of ongoing
17 bleeding.
18   Q.   Well, would it be a sign of ongoing
19 bleeding, or would it -- does it take time
20 for --
21   A.   Well, that's a fair question.  I mean,
22 yeah, I would concede that that could be a sign
23 that he had bled sometime in the last 24 hours.
24   Q.   But it's not necessarily indicative of
25 a current active bleed, you'd agree with that?

Page 190

1   A.  Not always, no.
2   Q.  I'm talking about Mr. Boudreaux.  So
3 let's just focus on him.
4      Here's the point that I'm trying to
5 understand.  Your opinion that the Xarelto
6 caused a direct toxic effect to his upper GI
7 mucosa that resulted in bleeding was not seen on
8 endoscopy, that we know, correct?
9   A.  You're using a different phrase.  So
10 again, he was exposed to Xarelto, and he had an
11 upper GI bleed.
12      I think the fact that his blood was
13 thin and that the normal homeostasis between
14 forming clot and breaking down -- breaking down
15 a clot was interrupted caused him to ooze from
16 his upper GI tract.
17      He never bled before Xarelto, and once
18 Xarelto was stopped he didn't bleed anymore.  So
19 that's what I think happened to Mr. Boudreaux.
20   Q.  But when you say he didn't bleed
21 before he was exposed to Xarelto, what you're
22 really saying is that he didn't have a
23 clinically overt bleed, is that right?
24     MR. GOZA:  I'll object.  That
25 misstates what he's already testified to.

Page 191

1   A.  No.  What I testified to earlier was
2 he had never been anemic, he had his stool
3 checked for blood, and that had been negative,
4 so there was no evidence of overt or obscure
5 gastrointestinal bleeding in Mr. Boudreaux
6 before he ever took Xarelto.
7 BY MS. HOFFMANN:
8   Q.  How is it, then, that you can rule out
9 that he didn't have some self-limiting bleed in
10 the GI tract before he was on an anticoagulant
11 that just resolved itself?
12   A.  How can I rule out that before he was
13 ever on Xarelto that he had a self-limited
14 gastrointestinal tract bleeding that was
15 subclinical and never diagnosed and never
16 presented with any kind of laboratory
17 abnormality?  Is that what you're asking me?
18   Q.  That's my question.
19   A.  That's kind of -- I mean, you would
20 have some kind of lab abnormality, you would
21 feel poorly, you would be anemic, you know.
22   Q.  You looked carefully at all of his lab
23 values prior to his admission to St. Anne's and
24 then to Ochsner, correct?
25   A.  In February?  Yes.

Page 192

1   Q.  You looked at his -- all of his prior
2 lab values?
3   A.  Correct.
4   Q.  For how long a period back?
5   A.  As far back as I had records, which
6 was several years.
7   Q.  And you found nothing in those
8 laboratory values that suggested to you that
9 there could have been a prior mild occult bleed?
10   A.  No.
11   Q.  Okay.
12     MR. GOZA:  Can we take a short one?  I
13 need to use the restroom.
14     MS. HOFFMANN:  Sure.
15     THE VIDEOGRAPHER:  The time now is
16 1:54 p.m.  We are off the record.
17     (Whereupon, a recess was taken.)
18     THE VIDEOGRAPHER:  Time now is
19 2:05 p.m.  We are back on the record.
20 BY MS. HOFFMANN:
21   Q.  Doctor, I want to change gears for a
22 couple of minutes.
23      Can you tell me, do you do rounds at a
24 local hospital, or do you call at a local
25 hospital?

Page 193

1   A.  Yes.
2   Q.  And how frequently do you do that?
3   A.  Sort of always on call, so that's
4 pretty much a daily event that I make rounds at
5 a hospital.
6   Q.  So you don't do like other -- I know
7 I've talked to some GI docs who will have one
8 week every six weeks where they're the
9 designated person on call.  Do you have anything
10 like that, or are you just generally always on
11 call?
12   A.  I'm generally always on call.
13   Q.  And do you encounter most of the GI
14 bleeds that you deal with in the hospital
15 setting?
16   A.  Yeah.  I mean it's maybe once a year
17 somebody walks in the clinic and has signs or
18 symptoms of -- you know, that started today of
19 gastrointestinal bleeding.  But most of the time
20 it's in the hospital.
21   Q.  So can you give me your best estimate,
22 and I don't know if you want to do it on a
23 weekly basis or a monthly basis, but how many GI
24 bleeds you deal with on a, let's say, monthly
25 basis?

Page 194

1    A.   I would guess two to four a week, two
2 to five a week, which would give you, you know,
3 10 to 20 a year, a couple hundred a year.
4    Q.   And of the one to 200 per year GI
5 bleeds that you deal with, can you estimate how
6 many of those patients are on an anticoagulant?
7    A.   I mean, it would just be a guess, but
8 I would say maybe one in three, one in four.
9    Q.   Is that -- I know you said it's a
10 guess.  Would it be your best estimate?
11       MR. GOZA:  Object to the form.
12    A.   That's what I'm saying, yeah, it's my
13 best estimate.
14 BY MS. HOFFMANN:
15    Q.   Okay.  So about one in four of the GI
16 bleeds that you see are in association with a
17 patient who is on an anticoagulant?
18    A.   Correct.
19    Q.   And can you break that down any
20 further?  Of the one in four that you see who
21 are on an anticoagulant, how many of those are
22 on coumadin as opposed to a NOAC?
23    A.   I can't even give you a best guess in
24 that sense.
25    Q.   Okay.  Is it more of the bleeds that

Page 195

1 you see are associated with patients on Coumadin
2 than patients who are on NOACs?
3    A.   I'm not certain, to be honest with
4 you.
5    Q.   Would you agree that even patients who
6 are on Coumadin and they are within the
7 therapeutic range still are at increased risk of
8 a GI bleed?
9    A.   Yes.
10    Q.   When you deal with patients who have a
11 GI bleed and you go through the various tests
12 available to you and are unable to determine the
13 site of that bleed, do you regularly conclude
14 that it was the anticoagulant itself that
15 initiated the bleed?
16    A.   Yes.
17    Q.   And when you conclude that it was the
18 anticoagulant itself that initiated the bleed,
19 is that information that you share with the
20 patient?
21    A.   Yes.
22    Q.   And I know you said before that you do
23 not initiate anticoagulant prescriptions,
24 correct?
25    A.   Correct.

Page 196

1    Q.   But when you are dealing with a
2 patient who has a bleed who has taken an
3 anticoagulant and you have determined that the
4 anticoagulant was the cause of initiating the
5 bleed, do you share that information with the
6 doctor who was prescribing anticoagulation?
7    A.   Yes.
8    Q.   And do you recommend to the doctor who
9 was prescribing the anticoagulation that the
10 patient not be reanticoagulated?  Do you go that
11 far?
12       MR. GOZA:  I'll object, because I
13 think that's been asked and answered.
14    A.   Yeah, I've answered that question.  I
15 mean, there -- I outline -- I would just refer
16 you to my earlier answers in the transcript,
17 because I answered that exact question.
18       There are certain circumstances where
19 I have discussions with the other doctor that,
20 perhaps, the patient should be managed
21 differently, and I've outlined those scenarios
22 for you.
23 BY MS. HOFFMANN:
24    Q.   When you determine that an
25 anticoagulant was the cause of a patient's

Page 197

1 bleed, do you report that information to the
2 FDA?
3    A.   No, not routinely.
4    Q.   And why is that?
5    A.   So any anticoagulant at all, if a
6 patient has gastrointestinal bleeding on an
7 anticoagulant, why do I not?  I just don't do it
8 in routine clinical practice.  Should I?  I
9 mean, if you read the letters of the rule, any
10 type of adverse reaction to any medication is, I
11 believe, supposed to be reported to the FDA.
12 But do I do it in routine clinical practice?  I
13 do not.
14    Q.   Do you -- when you determine that a
15 patient has had a system toxic reaction to an
16 anticoagulant, is that information you provide
17 to the patient?
18    A.   So if I believe that a patient has
19 received too high of a level of drug and that
20 has led to them being at increased risk for
21 bleeding, do I discuss that with the patient?
22 Yes.  So, yes.
23    Q.   Is there a difference in what you're
24 saying between a person being at an increased
25 risk of a gastrointestinal bleed because they're

Page 198

1 on an anticoagulant and versus an anticoagulant
2 directly causing the bleed?  Is there a
3 difference in those two?
4      A.   I'm not sure I --
5           MR. GOZA:  I'll object to the form.
6      A.   I'm not sure I completely understand
7 the question.
8           But I think what I said to you all
9 before was patients on an anticoagulation, any
10 kind of anticoagulant, warfarin, NOAC, and they
11 have bleeding, they then have systemic exposure
12 to the drug because they've been taking it, and
13 they have toxicity in the form of the bleeding.
14           So a patient who is on an
15 anticoagulant, and that anticoagulant increases
16 their risk of bleeding, that's a toxic effect of
17 medication.
18 BY MS. HOFFMANN:
19      Q.   The goal of an anticoagulant is to
20 inhibit the blood's ability to clot, correct?
21      A.   Correct.
22      Q.   So is it your testimony that the toxic
23 result of an anticoagulant is the same as its
24 intended effect?
25      A.   No, because nobody has ever said that

Page 199

1 the intended effect was for a patient to have a
2 gastrointestinal bleed or major bleeding.
3      Q.   Isn't major bleeding inherent in the
4 notion that if a person is on an anticoagulant
5 and there's a pathological reason for the bleed,
6 the anticoagulant is going to step in and do its
7 job, which is to prevent clotting, the result
8 being more of a bleed?
9           MR. GOZA:  Object to form.
10      A.   Start your question again at the
11 beginning, please.
12 BY MS. HOFFMANN:
13      Q.   Sure.  Let me try it again.
14           If a person has an underlying
15 pathology that starts, puts a hole in their
16 gastrointestinal system such that they start to
17 bleed from that hole, isn't the role of the
18 anticoagulant to inhibit clotting?
19           MR. GOZA:  Object to the form.
20      A.   I mean, you're asking me if
21 anticoagulants are anticoagulants.  So yes,
22 anticoagulants are anticoagulants.
23           That's the function.
24 BY MS. HOFFMANN:
25      Q.   So that if there is an anatomical and

Page 200

1 pathological compromise to the GI system such
2 that a bleed starts, you would expect a person
3 on an anticoagulant to bleed more than a person
4 who is not on an anticoagulant?
5      A.   Correct.  But you don't need something
6 to start the bleeding, which has been my
7 testimony.
8      Q.   That's exactly right.  Your testimony
9 has been that you don't need that underlying
10 pathology because there can be a direct toxic
11 effect between the anticoagulant and the GI
12 system, right?
13      A.   No.  I think you're taking my words
14 and twisting them around a little bit.
15      Q.   Okay.
16      A.   If you're on a blood thinner, it's
17 going to increase your risk of bleeding.  If you
18 bleed on a blood thinner, you have systemic
19 toxicity from the blood thinner.  So in other
20 words, your blood has been thinned, you're
21 bleeding, that's -- the bleeding would be the
22 toxic effect.
23           So you've been exposed to the drug and
24 you're bleeding, so your risk of bleeding has
25 been increased because of the medication.

Page 201

1      Q.   And that, what you just said,
2 summarizes your opinion in this case?
3           MR. GOZA:  I'll object as to the
4 extent, extensive opinion.
5      A.   No, this is my opinion in the
6 document.
7           MS. HOFFMANN:  I don't have any
8 further questions.
9           MR. GOZA:  Do you have some more?  I
10 have just a few.
11           MR. STEKLOFF:  You can go ahead.
12           EXAMINATION
13 BY MR. GOZA:
14      Q.   I just have a few, Doctor.  I want to
15 make sure I understand something.
16           You were asked a little bit about the
17 basis upon which you determined that
18 Mr. Boudreaux was anticoagulated on the date of
19 his bleed on February 3, 2014.
20           Do you recall that?
21      A.   Yes.
22      Q.   And part of your testimony -- and
23 there were several things that I think you
24 testified about, but I want to make sure they're
25 clear for the record.

Page 202

1     One was Mr. Boudreaux's testimony
2 himself, true?
3     A.   True.
4     Q.   You also looked at the PT levels that
5 were before, at the time of the bleed, and
6 after, true?
7     A.   True.
8     Q.   And the PT level that was taken on
9 January 7, 2014 at the hospital when
10 Mr. Boudreaux had his diagnosis of atrial
11 fibrillation was 11.4 with a reference range of
12 9.0 to 12.5. That would be within normal
13 limits, true?
14     MS. HOFFMANN: Objection. Leading.
15     A.   True.
16 BY MR. GOZA:
17     Q.   And that was only three weeks before
18 his bleed?
19     A.   Correct.
20     Q.   At the time of his bleed, his PT was
21 13.6, again with the reference range of 9 to
22 12.5.
23     That would be abnormal, and indicate a
24 state of anticoagulation, correct?
25     MS. HOFFMANN: Objection.

Page 203

1     A.   Correct.
2 BY MR. GOZA:
3     Q.   The next PT that had been referenced
4 by counsel for the defense was 13.2, but that
5 was at a hospital that had a different reference
6 range, correct?
7     A.   Correct.
8     Q.   The reference range for that hospital,
9 I will represent to you, was 11.5 to 14.0.
10     Is that consistent with your reading
11 of the record?
12     A.   Correct.
13     Q.   Then that would have been within the
14 normal limits and, therefore, not indicative of
15 any level of anticoagulation at that time,
16 correct?
17     MS. HOFFMANN: Objection.
18     A.   Correct.
19 BY MR. GOZA:
20     Q.   And in addition to those laboratory
21 studies and Mr. Boudreaux's testimony,
22 Mr. Boudreaux also made a number of visits to
23 the cardiologist in between the time he was
24 diagnosed with atrial fibrillation and the time
25 that he had his gastrointestinal bleed, would

Page 204

1 that be correct?
2     A.   That's correct.
3     Q.   And I think I counted three visits.
4 And in each and every one of those visits, did
5 the documentation show that he was taking
6 Xarelto?
7     A.   Correct.
8     Q.   And was that another thing that you
9 looked at in terms of formulating your opinions
10 in this case today?
11     A.   Yes.
12     MS. HOFFMANN: Objection.
13 BY MR. GOZA:
14     Q.   I think, and I want to make sure,
15 we've gone through your report, which was marked
16 as Exhibit -- is it 1 or 2?
17     MR. STEKLOFF: 1.
18     MR. GOZA: 1.
19 BY MR. GOZA:
20     Q.   We've gone through that in a fair
21 amount of detail, but I want to just make sure
22 of a couple things.
23     You've had an opportunity now to offer
24 your opinion that Xarelto, in fact, caused
25 Mr. Boudreaux's gastrointestinal bleed that he

Page 205

1 suffered on February 3rd of 2014, is that
2 correct?
3     A.   Correct.
4     Q.   And do you hold that opinion to a
5 reasonable degree of medical certainty?
6     A.   Yes, I do.
7     Q.   And you have also indicated on
8 numerous occasions that you believe Xarelto
9 created an increased risk of bleeding in this
10 patient over and above Coumadin and other NOACs,
11 true?
12     A.   Correct.
13     Q.   Is it also your opinion that had
14 Mr. Boudreaux, in fact, been on well-controlled
15 Coumadin, more likely than not he would not have
16 had a gastrointestinal bleed?
17     MS. HOFFMANN: Objection.
18     A.   Correct.
19 BY MR. GOZA:
20     Q.   And is that based upon all the things
21 that you've explained here today, including the
22 HAS-BLED score, the risk of being less than 1.88
23 over patient years of 100, and all the other
24 things that you have gone through?
25     MR. STEKLOFF: Object to form.

Page 206

1    A.   Yes.
2  BY MR. GOZA:
3    Q.   And similarly speaking, was it your --
4  was it also your testimony that based on your
5  review of the observational comparisons that
6  exist, and your review of the literature, that
7  it's your opinion more likely than not he would
8  not have suffered a bleed on another NOAC?
9    A.   I think it --
10       MS. HOFFMANN:  Objection.
11   A.   I believe his risk was higher, and
12  that's borne out by the observational studies.
13  BY MR. GOZA:
14   Q.   Meaning he was at much or
15  substantially increased risk on another -- with
16  respect to Xarelto as opposed to other NOACs?
17       MS. HOFFMANN:  Objection.
18   A.   From the observational studies, yes,
19  that's correct.
20       MR. GOZA:  I don't have any other
21  questions.
22       MR. STEKLOFF:  I have some follow-up.
23       FURTHER EXAMINATION
24  BY MR. STEKLOFF:
25   Q.   You were just asked about one of the

Page 207

1  bases for your opinions that he was taking
2  Xarelto contemporaneously with his bleed was the
3  fact that Xarelto was listed in his medical
4  records between the time he was prescribed
5  Xarelto and between the time he went to the
6  hospital, is that right?
7    A.   Yes.
8    Q.   Aspirin was listed, too, right?
9    A.   Yes.
10   Q.   You don't believe he was taking
11  aspirin, right?
12   A.   Again, about the aspirin issue, so
13  there were multiple, multiple things about the
14  aspirin.  And, you know, so first and foremost,
15  if the aspirin was playing a role, I would have
16  expected to see some erosion, gastritis,
17  irritation when they had done his endoscopy.  If
18  aspirin was playing a role, I would think of
19  that.
20       Second of all, Mr. Boudreaux testified
21  that he -- you know, there was considerable
22  doubt in his testimony that he was taking his
23  aspirin or not.
24       There wasn't considerable doubt in his
25  testimony as to whether or not he was taking

Page 208

1  Xarelto.  He said that he had been taking it
2  every day.
3       So these -- all these things weigh on
4  my mind.
5    Q.   All of those things weigh on your mind
6  to lead you to find it credible that he was
7  taking Xarelto, but not credible -- incredible
8  that he was taking aspirin?
9    A.   Correct.
10   Q.   Now, Mr. Goza asked you a few
11  questions about his PT scores.
12       Do you recall that?
13   A.   Yes.
14   Q.   Now, you are not an expert in PT
15  reagents, right?
16   A.   Correct.
17   Q.   Sitting here today, can you tell us
18  any of the reagents that were used on any of
19  those three scores?
20   A.   No.  But I can tell you that they use
21  different reference ranges, which would -- they
22  used different reference ranges, which would
23  compel me to believe that they're using
24  different reagents.  But, again, I'm not an
25  expert.

Page 209

1    Q.   Okay.  But you can't tell this jury
2  whether any of those reagents are a reliable
3  measurement tool for Xarelto concentrations
4  specifically?
5    A.   Correct.
6    Q.   You would defer to other experts on
7  that?
8    A.   I would defer to other experts on that
9  matter.
10   Q.   And if other experts on behalf of the
11  Plaintiffs say that there's no reagent that is a
12  reliable indicator of Xarelto concentration, you
13  would defer to that opinion?
14       MR. GOZA:  Well, let me just object to
15  the extent it might depend on who the expert was
16  and the nature of his expertise.  That's vague
17  and ambiguous.
18  BY MR. STEKLOFF:
19   Q.   Would you still defer, if the expert
20  was offering opinions about reagents?
21   A.   I would defer to somebody who is
22  qualified to make those kind of statements.
23   Q.   Especially if the Plaintiffs' lawyers,
24  in their judgment to retain the lawyer, thought
25  that they were qualified, right?

Page 210

1      MR. GOZA: I think you meant doctor.
2  I think you said "lawyer."
3  BY MR. STEKLOFF:
4      Q.   I'm saying the Plaintiffs' lawyers
5  retained a doctor --
6      MR. GOZA: I think you said "retained
7  a lawyer." That's what I thought --
8      MR. STEKLOFF: Sorry.
9  BY MR. STEKLOFF:
10     Q.   And hired a doctor to offer opinions
11 about things like PT and reagents, you would
12 defer to that person's medical judgment,
13 correct?
14     A.   Yes.
15     Q.   Okay. So it's possible that with
16 respect to that 13.6 PT score that occurred on
17 February 3, 2014, that the reagent used was not
18 sensitive enough to measure Xarelto
19 concentration, right?
20     A.   I've testified that I'm not an expert
21 in reagents.
22     Q.   So the answer to my question is yes,
23 right?
24     A.   Start your question over from the
25 beginning so I make sure I understand it.

Page 211

1      Q.   Sure.
2      It's possible that with respect --
3  with respect to the 13.6 PT score that occurred
4  on February 3, 2014 that the reagent used was
5  not sensitive to measure Xarelto concentration,
6  correct?
7      MR. GOZA: Object to form.
8      A.   Yeah, so I'm not an expert on PT
9  reagents. Is it possible? Yes. But I'm not an
10 expert on PT reagents.
11 BY MR. STEKLOFF:
12     Q.   And if the jury determined that the
13 reagent used on that day is not sensitive enough
14 to measure Xarelto concentration, you would have
15 to -- then that really wouldn't factor into your
16 view about whether he was taking Xarelto the day
17 of his bleed, right?
18     MR. GOZA: Object. Object to the form
19 of the question.
20     A.   Well, you asked a question about a
21 jury.
22 BY MR. STEKLOFF:
23     Q.   I'll rephrase it.
24     If an expert who was qualified to
25 testify about reagents said that the reagent

Page 212

1  used on that day to measure the 13.6 was not
2  sensitive enough to measure Xarelto
3  concentration, you would defer to that expert's
4  opinion, and you then would not include that in
5  the basis for your opinion that he was taking
6  Xarelto on the day of the bleed?
7      MR. GOZA: Excuse me, I have to
8  object, because, I mean, that completely
9  misstates his testimony. And the fact that it's
10 not sensitive doesn't have anything to do with
11 whether it shows anticoagulation. I object.
12 That completely misstates what he said.
13     A.   If that expert were an expert on PT,
14 PT reagents, and was offering for the record
15 some kind of evidence that was compelling and
16 supported by other experts and he wasn't just
17 somebody out on a limb, then yes.
18 BY MR. STEKLOFF:
19     Q.   Now turning to one last topic.
20     When asked in your final questions by
21 Mr. Goza about the likelihood or the possibility
22 of whether Mr. Boudreaux would have experienced
23 the bleed on warfarin or any of the other NOACs,
24 you kept using the word in part of your answers
25 "risk," right?

Page 213

1      A.   Correct.
2      Q.   You understand the difference between
3  an increased risk and a cause, correct?
4      A.   In legal terms or medical terms?
5      Q.   Let's start with medical terms.
6      A.   Okay. So again, so Xarelto put
7  Mr. Boudreaux at increased risk for
8  gastrointestinal bleeding more so than
9  well-controlled Coumadin from the direct
10 head-to-head studies. Assuming a direct cause,
11 would he have bled on a different NOAC or
12 well-controlled Coumadin, I think that the
13 observational data would suggest that he was
14 much more at risk for bleeding on Xarelto, and
15 more likely than not would not have bled on a
16 different NOAC or well-controlled Coumadin.
17     Q.   You had a lot in that answer there.
18     So my basic question is, you
19 understand the medical terms -- without anything
20 about Mr. Boudreaux or causation, just as a pure
21 definitional question, you understand the
22 difference between an increased risk and a
23 cause?
24     A.   Correct.
25     Q.   An increased risk is a statistical

Page 214

1 analysis that says you are at a higher risk of
2 something that may or may not occur, correct?
3 A. Correct.
4 Q. A cause says it did happen and I think
5 it happened because of X, correct?
6 A. Correct.
7 Q. It's your view that Xarelto caused
8 Mr. Boudreaux's bleed, correct?
9 A. Correct. Because he never bled before
10 he was on Xarelto, and he hasn't bled since he's
11 been off of Xarelto.
12 Q. Okay. It's your view that he would
13 have had a lower risk of having a bleed had he
14 taken well-controlled warfarin, is that fair?
15 MR. GOZA: I'll object. Misstates his
16 opinion.
17 BY MR. STEKLOFF:
18 Q. I'm not asking for your whole opinion.
19 I'm just asking that question.
20 A. Mr. -- the head-to-head evidence would
21 suggest that Mr. Boudreaux would have a lower
22 risk of bleeding on well-controlled warfarin?
23 Q. A lower risk of a GI bleed?
24 A. Correct, a lower risk of a GI bleed.
25 Thank you.

Page 215

1 Q. He may have had a higher risk of
2 another type of bleed?
3 A. Correct.
4 Q. And that was in the label?
5 A. That was in the label.
6 Q. From day one?
7 A. We covered that.
8 Q. Now, are you also saying that you can
9 say to a reasonable degree of medical certainty
10 that Mr. Boudreaux would not have had a bleed
11 caused by well-controlled warfarin had he been
12 on well-controlled warfarin?
13 A. Am I saying that -- there's no way to
14 guarantee that.
15 Q. It is certainly possible that he could
16 have had a bleed caused by warfarin had he been
17 on well-controlled warfarin?
18 A. It's possible.
19 Q. And you can't say more likely than not
20 whether or not that would have occurred in a
21 world in which he was taking well-controlled
22 warfarin?
23 MR. GOZA: Well, I'll object because
24 he already has testified to that. It misstates
25 his testimony.

Page 216

1 A. His risk would be much lower.
2 BY MR. STEKLOFF:
3 Q. You can't say more likely than not
4 whether he would have had a bleed caused by
5 well-controlled warfarin, if that's what he was
6 taking?
7 MR. GOZA: Same objection. Same
8 objection to form.
9 A. If you take the numbers and you say
10 more like -- you know, more likely than not, I
11 think you can safely say that the Xarelto
12 increased his risk above, and if that is what
13 you can use as a basis for the term "more likely
14 than not," then yes, I would say more likely
15 than not he would not have bled on
16 well-controlled warfarin.
17 BY MR. STEKLOFF:
18 Q. Can someone bleed on -- anyone in the
19 world, can they bleed on well-controlled
20 warfarin?
21 A. Yes.
22 Q. Can well-controlled warfarin be the
23 cause of their bleeding?
24 A. Yes.
25 Q. If Mr. Boudreaux had been on

Page 217

1 well-controlled warfarin, could well-controlled
2 warfarin have caused his bleed?
3 MR. GOZA: Object. Asked and answered
4 numerous times.
5 A. Yes.
6 BY MR. STEKLOFF:
7 Q. Can you say -- I want you -- not talk
8 about risk. I want you to answer my question.
9 Can you say more likely than not,
10 whether Mr. Boudreaux had been on
11 well-controlled warfarin, whether he would have
12 had a bleed caused by that well-controlled
13 warfarin?
14 MR. GOZA: My objection is now you've
15 asked and answered --
16 MR. STEKLOFF: He's not answering my
17 question.
18 MR. GOZA: He just answered.
19 MR. STEKLOFF: Just say object to
20 form. Asked and answered.
21 MR. GOZA: I'm trying to get to the
22 part about asked and answered. You interrupted
23 me.
24 MR. STEKLOFF: No, but there are too
25 many words.

Page 218

1   MR. GOZA: Object to form. Asked and
2 answered at least three times. He's told you
3 his opinion.
4   MR. STEKLOFF: Okay. I'm going to
5 read it again without interruption. You can
6 say, object to form, asked and answered. We
7 will all acknowledge that you've made that
8 objection and a judge can determine later
9 whether your objection is sustained or not.
10 BY MR. STEKLOFF:
11   Q.  Can you say more likely than not
12 whether Mr. Boudreaux had been on
13 well-controlled warfarin whether he would have
14 had a bleed caused by that well-controlled
15 warfarin?
16   MR. GOZA: Object to form.
17   A.  If you look at the -- all right. So
18 you don't want me to talk about risk.
19 BY MR. STEKLOFF:
20   Q.  I'm not asking you to compare his risk
21 compared to Xarelto.
22   I'm saying, in a world in which he
23 never took Xarelto and Dr. Wong had decided to
24 prescribe him warfarin, can you say whether more
25 likely than not he would have had a bleed caused

Page 219

1 by that well-controlled warfarin?
2   MR. GOZA: Would not have had a bleed?
3   MR. STEKLOFF: Would not have had a
4 bleed.
5   A.  If you looked at his HAS-BLED score,
6 his HAS-BLED score would be .18 per 100
7 person-years, so if by -- if the term "more
8 likely than not" is satisfied by .18 per 100
9 person-years chance, then, yes, I could say that
10 more likely than not he would have not bled on
11 well-controlled warfarin.
12 BY MR. STEKLOFF:
13   Q.  Now, can you say whether more likely
14 than not he would have been well-controlled on
15 his warfarin?
16   A.  I don't manage warfarin, so I have no
17 way of answering that question.
18   Q.  Can you say whether more likely than
19 not he would have had a bleed caused by warfarin
20 that was not well-controlled?
21   A.  So if you look at the HAS-BLED score,
22 patients with a labile INR are at increased risk
23 for bleeding. And I believe if the same
24 baseline characteristics held true and
25 Mr. Boudreaux had a history of a poorly

Page 220

1 controlled INR, I believe his HAS-BLED score
2 would go from 1 to 2, and I believe that that is
3 then associated with approximately -- I'm going
4 by memory here -- about four events per 100
5 patient-years, so he would be about twice as
6 likely.
7   And so if you -- again, if you
8 still -- if you're willing to accept that, you
9 know, four events per 100 patient-years
10 satisfies the term "more likely than not," more
11 likely than not he would not have had a bleed on
12 poorly controlled warfarin.
13   Q.  Okay. What are the number of events
14 per 100 patient-years for Xarelto patients who
15 experience gastrointestinal bleeds?
16   A.  What are the number of events per 100
17 patient-years for patients on Xarelto? It's in
18 Table 1 in here.
19   Q.  Right. It's lower than four.
20   A.  It's two.
21   Q.  So knowing that, what would you say
22 about warfarin that wasn't well-controlled,
23 whether that -- in Mr. Boudreaux's case had he
24 been on warfarin and it wasn't well-controlled,
25 whether it would have caused the bleed for him?

Page 221

1   A.  So would he have -- so his -- you
2 know, again, the likelihood, four events per 100
3 patient-years is still fairly low. But, you
4 know, a two-event-per-100 patient-years was
5 enough to make Mr. Boudreaux bleed. So there's
6 a lot of -- you know, there's a lot of hand
7 waving and conjecture going on here.
8   But assuming, you know, a two-per-100
9 person-year, you know, rate of bleeding was
10 enough to get Mr. Boudreaux to bleed, I would
11 assume a four would be more likely to get him to
12 bleed.
13   Q.  Now, I'm going to ask about the other
14 NOACs.
15   A.  Okay.
16   Q.  Again, I'm not asking about risk. I'm
17 asking about cause.
18   A.  Okay.
19   Q.  Can you say more likely than not that
20 had Mr. Boudreaux been prescribed one of the
21 other NOACs he would not have had a bleed caused
22 by that NOAC?
23   A.  Just because --
24   MR. GOZA: I'm just going to object to
25 form and asked and answered.

Page 222

1 But go ahead.
2 A. Just because you bleed on one does not
3 mean you're going to bleed on another one, you
4 know. And I think that the observational
5 studies would suggest that his -- you keep not
6 wanting me to use the word "risk," but his risk
7 from the observational studies would be higher
8 on Xarelto than it is on other NOACs.
9 So could I say more likely than not?
10 Well, so, you know, I think that the variation
11 of the degree of risk for major bleeding events
12 is, you know, to a reasonable degree, you know,
13 he would have a lower risk on another NOACs. I
14 mean, that's a really hard question to get.
15 BY MR. STEKLOFF:
16 Q. Right. Because we're talking -- I'm
17 asking a lot of hypotheticals and asking you to
18 speculate, right?
19 A. Yeah. Right.
20 Q. And so really that's my ultimate
21 point.
22 Isn't it just speculation to say
23 whether or not another anticoagulant other than
24 Xarelto would have caused a bleed in
25 Mr. Boudreaux had that been his prescription?

Page 223

1 MR. GOZA: Object. Misstates his
2 testimony. He's already offered opinions to a
3 reasonable degree of medical certainty.
4 MR. STEKLOFF: I'm allowed that.
5 MR. GOZA: I mean, I know you're
6 allowed. I'm not fussing about asking, but I
7 can make objections. It's misstating his
8 testimony.
9 A. Hit me with the question again --
10 BY MR. STEKLOFF:
11 Q. Sure.
12 A. -- so I remember to get it correctly.
13 Q. Isn't it just speculation to say
14 whether or not another anticoagulant other than
15 Xarelto would or would not have caused a bleed
16 in Mr. Boudreaux?
17 MR. GOZA: Same objection.
18 A. Yeah, I mean it's -- yes, I would
19 agree it's speculation.
20 BY MR. STEKLOFF:
21 Q. And at the end of the day, to the
22 extent you do have the opinion that he would not
23 have bled on another anticoagulation, that's
24 really just based on the relative risk that
25 we're talking about?

Page 224

1 A. And my medical knowledge, and my
2 review of the facts of the case, and
3 Mr. Boudreaux's medical records, and depositions
4 of other experts.
5 MS. HOFFMANN: Excuse me, deposition
6 of other experts? I thought you testified
7 earlier you haven't read depositions --
8 MR. GOZA: He meant other witnesses.
9 Don't get too excited.
10 A. I'm not a lawyer. I'm not a lawyer.
11 I don't have any of the other expert reports.
12 MR. GOZA: He meant other treating
13 physicians.
14 MR. STEKLOFF: He understood. We
15 don't need to -- yeah, we have that.
16 MS. HOFFMANN: I thought we were going
17 to be here three more hours.
18 THE WITNESS: No.
19 MR. STEKLOFF: With that, I have no
20 further questions.
21 A. Thank you.
22 FURTHER EXAMINATION
23 BY MS. HOFFMANN:
24 Q. And I just want to clarify for the
25 record, your testimony just a minute ago when

Page 225

1 you referred to your review of depositions of
2 other experts, you were referring to the
3 treating doctors --
4 A. As experts.
5 Q. -- for Mr. Boudreaux, is that correct?
6 A. Yes.
7 Q. And just to clarify, you have not been
8 made aware of the identity of other experts who
9 have been nominated in this case by the
10 Plaintiff?
11 A. No.
12 Q. And you have not been made aware of
13 the identity of experts in Mr. Boudreaux's case
14 who have been proposed by the defense, is that
15 correct?
16 A. Correct.
17 Q. You have not read any testimony or
18 reports of any experts who have been nominated
19 or proposed by the Plaintiffs or by the
20 Defendants in this case, is that correct?
21 A. That's correct. I just proved the
22 wrong word coming out of your mouth could mean a
23 world of hurt.
24 Q. I'm sorry?
25 A. I just meant his treating physicians.

Page 226

1  I was referring to his treating physicians as
2  experts.
3      Q.   Just a point of clarification.
4          Thank you, Doctor?
5          MR. GOZA:  I don't have any questions
6  for you.
7          I think we're done.
8          THE VIDEOGRAPHER:  The time now is
9  2:38 p.m.  Today's deposition of Dr. Nathaniel
10  Winstead is now concluded.
11          (Whereupon, the deposition was
12  concluded.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 228

1  advisory opinions of the board.
2      That I am not related to counsel or to the
3  parties herein, nor am I otherwise interested in
4  the outcome of this matter.
5
6      Signed this the 12th day of December, 2016.
7
8
9
10  _____
11  MAUREEN O'CONNOR POLLARD, CCR, RMR, CLR
12  Realtime Systems Administrator
13  LA Certificate #2011025
14
15
16
17
18
19
20
21
22
23
24
25

Page 227

1          REPORTER'S CERTIFICATE
2
3      This transcript is valid only for a
4  transcript accompanied by my original signature
5  and original required seal on this page.
6      I, MAUREEN O'CONNOR POLLARD, Certified
7  Court Reporter (LA Certificate #2011025), in and
8  for the State of Louisiana, as the officer
9  before whom this testimony was taken, do hereby
10  certify that NATHANIEL S. WINSTEAD, MD, after
11  having been duly sworn by me upon authority of
12  R.S. 37:2554, did testify as hereinbefore set
13  forth in the foregoing pages; that this
14  testimony was reported by me in the stenotype
15  reporting method, was prepared and transcribed
16  by me or under my personal direction and
17  supervision, and is a true and correct
18  transcript to the best of my ability and
19  understanding; that the transcript has been
20  prepared in compliance with transcript format
21  guidelines required by the statute or by rules
22  of the board, that I have acted in compliance
23  with the prohibition on contractual
24  relationships, as defined by Louisiana Code of
25  Civil Procedure Article 1434 and in rules and

Page 229

1          INSTRUCTIONS TO WITNESS
2
3          Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the appropriate
6  space on the errata sheet for any corrections
7  that are made.
8          After doing so, please sign the
9  errata sheet and date it.  It will be attached
10  to your deposition.
11          It is imperative that you return
12  the original errata sheet to the deposing
13  attorney within thirty (30) days of receipt of
14  the deposition transcript by you.  If you fail
15  to do so, the deposition transcript may be
16  deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25

Page 230

```
1        ------
      E R R A T A
2        ------
3  PAGE  LINE  CHANGE
4  ____ ____ _____
5     REASON: _____
6  ____ ____ _____
7     REASON: _____
8  ____ ____ _____
9     REASON: _____
10 ____ ____ _____
11    REASON: _____
12 ____ ____ _____
13    REASON: _____
14 ____ ____ _____
15    REASON: _____
16 ____ ____ _____
17    REASON: _____
18 ____ ____ _____
19    REASON: _____
20 ____ ____ _____
21    REASON: _____
22 ____ ____ _____
23    REASON: _____
24 ____ ____ _____
25
```

Page 232

```
1    LAWYER'S NOTES
2  PAGE  LINE
3  ____ ____ _____
4  ____ ____ _____
5  ____ ____ _____
6  ____ ____ _____
7  ____ ____ _____
8  ____ ____ _____
9  ____ ____ _____
10 ____ ____ _____
11 ____ ____ _____
12 ____ ____ _____
13 ____ ____ _____
14 ____ ____ _____
15 ____ ____ _____
16 ____ ____ _____
17 ____ ____ _____
18 ____ ____ _____
19 ____ ____ _____
20 ____ ____ _____
21 ____ ____ _____
22 ____ ____ _____
23 ____ ____ _____
24 ____ ____ _____
25
```

Page 231

```
1       ACKNOWLEDGMENT OF DEPONENT
2
3       I, _____, do
   Hereby certify that I have read the foregoing
4  pages, and that the same is a correct
   transcription of the answers given by me to the
5  questions therein propounded, except for the
   corrections or changes in form or substance, if
6  any, noted in the attached Errata Sheet.
7
8  _____
   WITNESS NAME          DATE
9
10
11
12
13
14
15 Subscribed and sworn
   To before me this
16 _____ day of _____, 20____.
17 My commission expires: _____
18
19 _____
   Notary Public
20
21
22
23
24
25
```