PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1            UNITED STATES DISTRICT COURT
 2            EASTERN DISTRICT OF LOUISIANA
 3
 4  IN RE: XARELTO (RIVAROXABAN) * MDL NO. 2592
    PRODUCTS LIABILITY LITIGATION *
 5                               * SECTION: L
                                 *
 6                               * JUDGE
                                 * ELDON E. FALLON
 7  ***************************** *
                                 * MAG. JUDGE NORTH
 8  THIS DOCUMENT RELATES TO:    *
    BOUDREAUX V. JANSSEN RESEARCH *
 9  & DEVELOPMENT, ET AL.        *
    CIVIL CASE NO. 2:14-CV-2720  *
10                               *
    ***************************** *
11
12    PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW
13
14          Deposition of VIRENDRA JOSHI, M.D., taken
15  in accordance with Rules 26, 30 and 34 of the
16  Federal Rules of Civil Procedure, taken at Ochsner
17  Medical Center-Kenner Campus, 200 W. Esplanade
18  Avenue, Kenner, Louisiana, on the 28th day of
19  September, 2016.
20
    Videographed By:
21
        Brian Soileau
22
    Reported By:
23
        Diana S. Ezell, CCR, RPR, RMR
24      Certified Court Reporter
25
```

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1          E X A M I N A T I O N   I N D E X
 2
 3                                            Page
 4
 5  Examination by Mr. Goza....................6, 124
 6  Examination by Mr. McCauley.........30, 122, 129
 7  Examination by Ms. du Pont...................117
 8
 9
10          E X H I B I T   I N D E X
11
12  Exhibit 1....................................  7
        Notice of Deposition
13
    Exhibit 2....................................  9
14      Progress Notes
        OMC-K-MD-000017, 000022, 000027
15
    Exhibit 3.................................... 14
16      Consult Notes
        OMC-K-MD-000035 and 000036
17
    Exhibit 4.................................... 16
18      Procedure Note for Colonoscopy
        OMC-K-MD-000102-104
19
    Exhibit 5.................................... 21
20      History & Physical and Procedure Report
        OMC-K-MD-000504-507
21
    Exhibit 6.................................... 48
22      Medical Records of Joseph Boudreaux
        OMC-K-MD-000001-000531
23
24
25
```

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1  Appearances:
 2    Goza & Honnold, LLC
      By: Kirk J. Goza, Esq.
 3    11181 Overbrook Rd.
      Suite 200
 4    Leawood, Kansas 66211
      Email: kgoza@gohonlaw.com
 5        Attorneys for the Plaintiffs
 6    Beasley, Allen, Crow, Methvin, Portis & Miles,
      PC
 7    By: David B. Byrne, Esq.
      250 Commerce Street
 8    Montgomery, Alabama 36103-4160
      Email: david.byrne@beasleyallen.com
 9        Attorneys for the Plaintiffs
10    Venable LLP
      By: John A. McCauley, Esq.
11    750 E. Pratt Street
      Suite 900
12    Baltimore, Maryland 21202
      Email: jmccauley@venable.com
13        Attorneys for the Janssen Defendants
14    Kaye Scholer, LLP
      By: Julie B. du Pont, Esq.
15    250 West 55th Street
      New York, NY 10019-9710
16    Email: julie.dupont@kayescholer.com
          Attorneys for the Bayer Defendants
17
    Also Present:
18
        Roger Denton
19
20
21
22
23
24
25
```

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1          S T I P U L A T I O N
 2
 3          It is stipulated and agreed by and among
 4  the various parties that the testimony of the
 5  witness may be taken in accordance with Rules 26,
 6  30 and 34 of the Federal Rules of Civil Procedure
 7  taken at the time and place hereinbefore noted;
 8          That the testimony of the witness may be
 9  taken down in shorthand (stenotype) by Diana S.
10  Ezell, Certified Court Reporter, and by her
11  transcribed;
12          All formalities, with the exception of
13  the reading and signing by the witness, are
14  waived;
15          That all objections, save objections to
16  the form of the question, being reserved to the
17  time of trial;
18          That one objection by defense is good
19  for all defendants;
20          It is further stipulated the witness may
21  be sworn by Diana S. Ezell, Certified Shorthand
22  Reporter, in and for the State of Louisiana.
23
24
25
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
1              (On record at 3:30 p.m.)
2         THE VIDEOGRAPHER:
3              Today is the 28th day of September,
4    2016.  The time is approximately 3:30.  This is
5    the videotaped deposition of Virendra Joshi with
6    the case entitled In Re: Xarelto Products
7    Liability Litigation.
8              Would counsel please identify themselves
9    and which party they represent?
10        MR. GOZA:
11             Kirk Goza on behalf of the plaintiffs.
12        MR. BYRNE:
13             David Byrne on behalf of the plaintiffs.
14        MR. DENTON:
15             Roger Denton on behalf of the
16   plaintiffs.
17        MR. McCAULEY:
18             John McCauley on behalf of the Janssen
19   defendants.
20        MS. DU PONT:
21             Julie du Pont on behalf of the Bayer
22   defendants.
23        THE COURT REPORTER:
24             Do you solemnly swear that the testimony
25   you are about to give will be the truth, the whole
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
1    truth and nothing but the truth so help you God?
2         THE WITNESS:
3              Yes.
4                        * * *
5              VIRENDRA JOSHI, M.D., 200 W. Esplanade
6    Avenue, Suite 313, Kenner, Louisiana, 70065, after
7    being first duly sworn in the cause, testified as
8    follows:
9    BY MR. GOZA:
10        Q.   Dr. Joshi, if you would, please state
11   your full name for the record, sir.
12        A.   Virendra Joshi.
13        Q.   If you would, sir, you are a medical
14   physician, correct?
15        A.   Yes.
16        Q.   And you have an area of specialty in
17   which you practice?
18        A.   Yes.
19        Q.   And that area of specialty is
20   gastroenterology?
21        A.   Correct.
22        Q.   You understand that we are here today to
23   take your deposition related to your care and
24   treatment of Mr. Boudreaux which occurred back in
25   February of 2014?
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
1         A.   Correct.
2         Q.   You understand that I represent
3    Mr. Boudreaux in this lawsuit?
4         A.   Correct.
5         Q.   You understand as well that no one here,
6    neither the plaintiff -- and I think we've heard
7    from the defendant as well -- has any issue or
8    take any issue with the care that you provided in
9    this case?  Do you understand that?
10        A.   Correct.
11        Q.   You were brought in as a consultant by
12   Dr. Masri in the care of Mr. Boudreaux; is that
13   correct?
14        A.   That's correct.
15        Q.   Let me do a couple of things.  First,
16   let me hand you what has been marked as Exhibit 1,
17   and that's simply the notice for the deposition
18   today, and somewhere along the line I assume your
19   office got that.
20        A.   That's correct.
21        Q.   Do you have anything specifically in the
22   way of any paper or documentation here with you
23   today?
24        A.   No.
25        Q.   We have got your medical records.  I
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
1    don't think that's going to be an issue, and
2    that's probably the only thing we really needed.
3    At some point if you have a Curriculum Vitae that
4    you can provide us, that would be good.
5         A.   Sure.
6         Q.   Can you tell the court and jury exactly
7    what a gastroenterologist does?
8         A.   Gastroenterology involves multiple
9    things.  It's basically physicians taking care of
10   gastrointestinal disease states.  It could be --
11   if you want me to explain more.  It could be liver
12   disease, pancreatic disorders, you know, stomach
13   problems, esophagus, small bowel, and the colon.
14   That includes Mr. Boudreaux's problem, which is
15   gastrointestinal bleeding.
16        Q.   You are obviously licensed to practice
17   medicine.
18        A.   That's correct.
19        Q.   Are you licensed in the state of
20   Louisiana?
21        A.   Yes.
22        Q.   Any other states?
23        A.   Georgia.
24        Q.   Are you board certified in your
25   specialty?
```

1   A.   That's correct.

2   Q.   I'm going to hand you what I have marked

3   as Exhibit 2.  Your treatment of Mr. Boudreaux

4   took place at least initially at the Ochsner

5   Medical Center, the Kenner facility; is that

6   correct?

7   A.   That's correct.

8   Q.   So I'm going to hand you what are three

9   pages of that record beginning with 00017 and it

10  includes Page 22 and Page 27 as well, so it's a

11  three-page document marked as Exhibit 2.

12  A.   Okay.

13  MR. McCAULEY:

14       17, 22, and 27.  Okay.

15  BY MR. GOZA:

16  Q.   And this appears to be a progress note

17  by Dr. Masri that was prepared or filled out the

18  morning of February 4th of 2014.  Does that appear

19  correct to you?

20  A.   That seems to be -- on February 4th,

21  2014, at 6:30.  That's correct.

22  Q.   Doctor, if we go down, it says that the

23  patient arrived from St. Ann Hospital with no

24  distress noted and no active bleeding.  Patient

25  arrived by ambulance and spouse arrived minutes

1   your plan was to do an EGD that day?

2   A.   That's correct.

3   Q.   You and I had an opportunity to meet for

4   five or ten minutes earlier this afternoon,

5   correct?

6   A.   That's correct.

7   Q.   That meeting didn't get scheduled until

8   apparently early evening last night or late

9   afternoon; is that correct?

10  A.   Yes.  Yes.  Yes.

11  Q.   And then you were a couple of hours late

12  in being able to attend.

13  A.   That's correct.

14  Q.   So I think we spent five or ten minutes

15  together?

16  A.   That's about it.  Yes.

17  Q.   I asked what your role was in the care

18  of Mr. Boudreaux, and you indicated that your role

19  was to determine an anatomic source of the

20  bleeding.

21  A.   Correct.

22  Q.   Is that correct?

23  A.   Correct.

24  Q.   And I'm going to talk to you now a

25  little bit about some of the things that you did

1   later.  Patient has no complaints of pain.  Did I

2   read that correctly?

3   A.   Yes.

4   Q.   And then Dr. Masri goes on and says

5   "Patient seen and examined.  I agree with the

6   findings and plan of care as in the resident

7   note," and then it says, "1. GI Bleed - Related to

8   recent Xarelto initiation."  Did I read that

9   correctly?

10  A.   That's right.

11  Q.   It goes on to say that gastroenterology

12  has been consulted, correct?

13  A.   That's correct.

14  Q.   And so at this point in time when you

15  were ultimately consulted that day, you were aware

16  that Mr. Boudreaux had been diagnosed with a

17  gastrointestinal bleed?

18  A.   Correct.

19  MS. DU PONT:

20       Objection.

21  BY MR. GOZA:

22  Q.   You were aware that Dr. Masri had

23  related it to his recent Xarelto initiation?

24  A.   That's correct.

25  Q.   You were brought in for consultation and

1   to try and determine the anatomic source.  First

2   you did an EGD; is that correct?

3   A.   I don't have that report, but yes.

4   Q.   If you look at the next page, Page 21.

5   A.   Yes.  Here it is.  Yes.

6   MR. McCAULEY:

7       You said 21 or --

8   MR. GOZA:

9       I'm sorry.  22.

10  A.   Yes.  This here.  It's 21.  That's

11  correct.  "EGD with Barrett's esophagus."  "No

12  obvious source of bleeding."  That's correct.

13  MR. GOZA:

14       And so we are clear on the record, it is

15  Bates stamped 000022.  It happens to be Page 21 of

16  the chart.  That's why he's referring to Page 21.

17  MR. McCAULEY:

18       Got it.

19  BY MR. GOZA:

20  Q.   So it appears that the EGD was done and

21  there was no obvious source of bleeding with

22  respect to the EGD?

23  A.   That's correct.

24  Q.   And what exactly is the EGD procedure?

25  A.   So it involves, as the name suggests, E

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  is for esophagoscopy, G is for looking at the
2  stomach, gastric mucosa, and D is for duodenum.
3  Esophagogastroduodenoscopy.  That's what it means.
4      MR. McCAULEY:
5          That's why we call it EGD instead,
6  right?
7      THE WITNESS:
8          Exactly.  It's hard to pronounce it.
9  BY MR. GOZA:
10     Q.   The EGD showed no obvious source of
11 bleeding.  So the next step, as I understand it,
12 was to do a colonoscopy.
13     A.   That is correct.
14     Q.   And you understood at that point that
15 the patient had been transfused with blood
16 products and his hemoglobin had been stabilized?
17     MS. DU PONT:
18         Objection to form.
19     A.   That is correct.
20 BY MR. GOZA:
21     Q.   And I think he had been treated in the
22 ICU?
23     A.   That's correct.
24     MR. McCAULEY:
25         Kirk, while you are stamping that, we

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  correctly?
2      A.   That's correct.
3      Q.   It says, "History of Present Illness:
4  Patient is a 71-year-old male presents with anemia
5  and fatigue while on anticoagulation for a planned
6  cardioversion for afib.  EGD yesterday.  No source
7  of GIB."  GIB stands for gastrointestinal bleed.
8      A.   That's correct.
9      Q.   "Has received two units of packed red
10 blood cells.  Stable hemoglobin."  Did I read that
11 correctly?
12     A.   Correct.
13     Q.   "Patient denies nausea, vomiting,
14 shortness of breath currently."  Meaning he denies
15 all of those things?
16     A.   Denies.
17     Q.   "Symptoms improve with transfusion.
18 Previous studies include EGD.  Last colonoscopy 15
19 years ago.  No hematochezia, no melena."
20     A.   Melena.
21     Q.   Melena.  Thank you.  And at that point
22 the plan was to -- I think your plan after seeing
23 the patient -- and it appears that you had already
24 done the EGD by this time.
25     A.   Right.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  would just like the same stipulation that an
2  objection by one defense counsel equals an
3  objection by both.
4      MR. GOZA:
5          I will stipulate to that.
6      MR. McCAULEY:
7          Okay.  We may still both object when we
8  find it really, really bad.
9      MR. GOZA:
10         I recognize that.
11 BY MR. GOZA:
12     Q.   Doctor, let me hand you what has been
13 marked as Exhibit 3.
14     MS. DU PONT:
15         Can you just identify what pages you are
16 looking at?
17     MR. GOZA:
18         Sure.  I was getting ready.
19     MS. DU PONT:
20         Okay.  Thank you.
21 BY MR. GOZA:
22     Q.   Exhibit 3 is Bates stamped Ochsner
23 Medical Center Kenner 000035 and 000036.  Now,
24 this appears to be your consult note for your
25 gastroenterology consult.  Did I get that

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1      Q.   That had been done on the 4th.
2      A.   Right.
3      Q.   So you actually do your gastroenterology
4  note on the 5th.
5      A.   Right.  The moment we see an ER patient
6  who is bleeding, we right away get them to the
7  endoscopy, to the urgent care, emergency care,
8  when somebody is felt to be bleeding and
9  symptomatic.
10     Q.   So Mr. Boudreaux came in through the
11 emergency room.  He was transferred from St. Ann's
12 by ambulance to the emergency room.  You were
13 summoned to do a consult and immediately stepped
14 in to do an endoscopy to determine if there was an
15 obvious source of bleeding?
16     A.   Bleeding.  That's correct.
17     MS. DU PONT:
18         Objection.  Form.
19 BY MR. GOZA:
20     Q.   Did I get that correctly?
21     A.   That's correct.
22     Q.   I'm going to hand you now what has been
23 marked as Exhibit 4, and Exhibit 4 is the OMC-K
24 medical record 000102, 103 and 104, and I believe
25 this is the actual procedure note for the

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  colonoscopy that was done on -- it appears
2  February 7th of 2014.  Did I get that correct?
3      A.   That is correct.
4      Q.   So this was the -- why don't you just
5  explain quickly to the jury what a colonoscopy
6  procedure is?
7      A.   So a colonoscopy, as the name suggests,
8  is the evaluation of the colon, and we go with the
9  endoscope, a very similar kind of instrument to
10 the upper scope with a little white light and look
11 around the colon finding the source of the bleed,
12 suspected bleed, and it may involve other things
13 like biopsy if we find a source trying to
14 determine what would have caused the bleeding.  We
15 are trying to find the source of the cause of the
16 bleeding in the colon since we didn't find
17 anything in the upper evaluation.
18     Q.   If I just use the upper GI tract and the
19 lower GI tract --
20     A.   Upper and lower GI tract.  A colonoscopy
21 starts from the rectum to the cecum if you want me
22 to be very specific for the landmarks, from the
23 left side to the right side of the belly, and it
24 usually takes about 15 or 20 minutes.
25     Q.   In this it says, if we turn to

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  it appears that you also did an upper GI
2  endoscopy; is that correct?
3      A.   Yes.  That's what, yeah, we started
4  with.
5      Q.   Okay.  That was the --
6      A.   EGD.  So we call it -- you know,
7  different ways you can put it.
8      Q.   Okay.  So the upper GI endoscopy really
9  was the EGD --
10     A.   Right.
11     Q.   -- that we had been talking about since
12 February of 4th.
13     A.   Right.  Right.
14     Q.   Is that correct?
15     A.   That's correct.
16     MR. McCAULEY:
17         Kirk, I think when you said 102, you
18 meant 102 of the chart pages.
19     MR. GOZA:
20         Correct.  You are right.  I will correct
21 that.
22     MR. McCAULEY:
23         It's not wrong.  It's just confusing.
24     MR. GOZA:
25         I got it.  I'm with you.

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  "Findings," it says, "The perianal and digital
2  rectal examinations were normal."
3      A.   Correct.
4      Q.   "Multiple large-mouthed diverticula were
5  found in the sigmoid colon."
6      A.   Uh-huh (affirmative).
7      Q.   And there was no source of bleeding
8  identified.
9      A.   Right.
10     Q.   In terms of your looking at, through the
11 colonoscopy, the lower GI tract, is it fair to say
12 that you did not find any identifiable source of
13 bleeding doing that?
14     A.   That's correct.
15     Q.   And, again, that was your role in the
16 care of Mr. Boudreaux is to determine whether
17 there's some anatomic source of bleeding.  True?
18     A.   That's correct.  That's correct.
19     Q.   Because if you are able to identify a
20 specific, depending upon what it is, a specific
21 source of bleeding, you may be able to treat it
22 with certain medications or potentially even some
23 surgical kind of intervention?
24     A.   That's correct.
25     Q.   If you look at Page 102 at the bottom,

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  BY MR. GOZA:
2      Q.   When we are talking about Exhibit 4, I
3  am really referring to Page 2 of Exhibit 4, which
4  would be Bates stamped 000103 of the records, and
5  that is your report from the prior EGD or what we
6  have been calling the EGD report.
7      A.   Right.
8      Q.   We know from the prior report of the
9  EGD, you had not found a source of bleeding,
10 correct?
11     A.   That's correct.
12     Q.   And I see that if we look at the next
13 page, which would be page, the third page, which
14 would be 000104, that's why it has "Perform a
15 colonoscopy (date not yet determined)"?
16     A.   That's correct.
17     Q.   Because this procedure was done first?
18     A.   Correct.
19     Q.   And it says indications for the
20 procedure was GI bleed.
21     A.   That's correct.
22     MR. McCAULEY:
23         Where are you pointing to, Kirk?
24     MR. GOZA:
25         Where it says "Addendum Number 1,

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1 Addendum Date."
2     MR. McCAULEY:
3         Okay.
4 BY MR. GOZA:
5     Q.   Now, I want to show you one other record
6 and then I have got a few more questions.  Let me
7 hand you what has been marked as Exhibit 5.
8 Exhibit 5 is, again, OMC-K records, MD-00504
9 through 507.  It appears to be that the actual
10 procedure note may be the last page of this, 507.
11     A.   505, 506.
12     Q.   The last page.
13     A.   Yes.  506 is the --
14     Q.   So we avoid any confusion, it's the
15 hospital record 506, but it's actually Bates
16 stamped 507 if you look at the left-hand corner.
17 It's the last page on Exhibit 4.
18     A.   There's a procedure report there.
19     Q.   I'm sorry.  Exhibit 5.  The last page on
20 Exhibit 5 there is a procedure report.  And this
21 is a procedure called a video capsule endoscopy;
22 is that correct?
23     A.   That is accurate.
24     Q.   As I see it, you note that the procedure
25 is a video capsule endoscopy.  The indications

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1 were "GI bleeding, source not documented by
2 previous EGD and colonoscopy," correct?
3     A.   That's correct.
4     Q.   And we have talked about those
5 procedures, correct?
6     A.   That's correct.
7     Q.   It says, "Procedure," the patient was
8 given the capsule enteroscope, which was
9 swallowed, correct?
10     A.   That's correct.
11     Q.   And this involves actually swallowing a
12 capsule that actually has a little camera in it?
13     A.   Yes.
14     Q.   And actually watching it as it moves
15 through the digestive tract?
16     A.   That's correct.
17     Q.   And, again, your whole role in this was
18 to try and determine an anatomical source of the
19 bleeding, correct?
20     A.   That's correct.
21     Q.   The video capsule endoscopy, did you
22 find or locate a specific source of bleeding?
23     A.   No.
24     Q.   So, in summary, you did three separate
25 diagnostic tests on Mr. Boudreaux and were unable

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1 to locate an anatomic source of bleeding, correct?
2     A.   That's correct.
3     Q.   Dr. Masri had indicated that he felt the
4 GI bleed was related to his Xarelto initiation,
5 recent initiation of Xarelto.
6     MS. DU PONT:
7         Object to the form.
8     MR. McCAULEY:
9         I Object.
10 BY MR. GOZA:
11     Q.   We read that in the very first document,
12 correct?
13     A.   That's what was written.  That's
14 correct.
15     Q.   That's what you had by way of history?
16     A.   Right.  That was the reason for
17 consultation.
18     Q.   First of all, the evaluation you did,
19 that is a patient that had a major bleed without
20 an identifiable anatomic source of the bleed would
21 be consistent with a patient that was bleeding or
22 had a bleed due to an anticoagulant, correct?
23     MS. DU PONT:
24         Object to the form.
25     MR. McCAULEY:

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1         I object.
2     A.   That's correct.
3 BY MR. GOZA:
4     Q.   It is not unusual to perform this series
5 of evaluations that you did in a patient who has a
6 bleed from an anticoagulant like Xarelto not have
7 an anatomic source specifically identified,
8 correct?
9     MS. DU PONT:
10         Objection to form.
11     A.   That's correct.
12 BY MR. GOZA:
13     Q.   Part of that is patients that -- in
14 fact, all of us maybe have certain microabrasions
15 or erosions or even scratches in our GI tract that
16 we compensate for or don't bleed from certainly on
17 a day-to-day basis.  True?
18     A.   That's true.
19     Q.   But if a patient becomes
20 overanticoagulated or if a patient is a high
21 responder to an anticoagulant, it can cause that
22 patient to have a major bleed.
23     MR. McCAULEY:
24         I object.
25     MS. DU PONT:

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    Objection. Form. Foundation.
2    A.  Yes.
3  BY MR. GOZA:
4    Q.  The other side of the coin in looking at
5  this, you were told by way of history that the
6  patient had been initiated on Xarelto and that was
7  what Dr. Masri felt was causing his bleed.  True?
8    A.  That's true.  That's in the records.
9    MS. DU PONT:
10    Objection.
11  BY MR. GOZA:
12    Q.  And the clinical picture that you saw,
13  that is a patient with a major bleed that doesn't
14  have an identifiable anatomic source of the bleed,
15  that would be consistent with a bleed on
16  anticoagulation.  True?
17    MR. McCAULEY:
18    I object.
19    MS. DU PONT:
20    Objection. Form.
21    A.  Yes.
22  BY MR. GOZA:
23    Q.  Am I correct as well it would be very
24  unusual -- in fact, you have not seen it in your
25  experience -- a patient to, absent an

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    A.  That's correct.
2  BY MR. GOZA:
3    Q.  And that's what you believed and that
4  was your opinion at the time that you were
5  treating him?
6    MR. McCAULEY:
7    I object.
8    MS. DU PONT:
9    Objection. Form.
10    A.  Yes, sir.  After the evaluation.
11  BY MR. GOZA:
12    Q.  And that was your opinion to a
13  reasonable degree of medical certainty?
14    MS. DU PONT:
15    Objection.
16    A.  That's true.
17    MS. DU PONT:
18    It calls for expert testimony.  Move to
19  strike.
20  BY MR. GOZA:
21    Q.  You formulated that opinion as part of
22  your treatment of Mr. Boudreaux.
23    A.  Yes.  You know, after evaluation and
24  endoscopy, that's what it seemed to be.
25    Q.  Most likely?

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  anticoagulant, who was hemodynamically stable, had
2  no identifiable source of a bleed, and then just
3  spontaneously started to have a major bleed and
4  then recovered without any treatment?  That would
5  be --
6    MR. McCAULEY:
7    I object.
8    MS. DU PONT:
9    Objection. Foundation. Form.
10  BY MR. GOZA:
11    Q.  That would be inconsistent with your
12  experience.  True?
13    A.  That's true.
14    MR. McCAULEY:
15    Same objection.
16  BY MR. GOZA:
17    Q.  In other words, everything that you saw
18  about Mr. Boudreaux's presentation was consistent
19  with Dr. Masri's assessment that this patient had
20  a bleed related to his initiation of Xarelto
21  treatment; is that correct?
22    MR. McCAULEY:
23    I object.
24    MS. DU PONT:
25    Objection. Form.

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    A.  Most likely.
2    Q.  And as I understand it, this was your
3  last treatment of Mr. Boudreaux?
4    A.  That's correct.
5    Q.  So you have not been called upon, you
6  haven't assessed him to determine whether he has
7  any residual, so to speak, from his prior bleed?
8    A.  That's correct.  I haven't seen him.
9    Q.  So you don't know anything about his
10  subsequent medical care?
11    A.  No.
12    Q.  And, again, are we able to maybe at
13  break be able to get a copy of your Curriculum
14  Vitae?
15    A.  Oh, sure.
16    Q.  Just for the benefit of the record, why
17  don't you just tell the jury a little bit about --
18  if I had the CV here, I would just walk you
19  through it, but maybe just tell them a little bit
20  about your training and background.
21    A.  I did my internship at Johns Hopkins.
22  My initial training was back home in India at
23  medical school, but I did my internship at Johns
24  Hopkins, and at the University of Illinois, I did
25  my residency, and then my fellowship further down

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    at the Medical College of Georgia, and then, after
2    that, I have been in practice.
3        Q.   And you have been in practice here at --
4        A.   I have been a professor at Tulane for
5    almost 10 years at the medical school and with an
6    academic appointment, professor at the University
7    of Queensland in Brisbane, Australia.  A research
8    professor there.
9        MR. McCAULEY:
10           I'm sorry.  I didn't hear about the
11   Brisbane, Australia.
12       THE WITNESS:
13           Yes.  University of Queensland.  Ochsner
14   has an affiliation with them, so I'm a professor
15   there also.
16       MR. McCAULEY:
17           Thank you.  I'm sorry.
18   BY MR. GOZA:
19       Q.   When you said you were a professor --
20       A.   Medicine.
21       Q.   Medicine?  Got it.  Okay.
22       A.   At the Tulane Medical School.
23       Q.   And that's here in --
24       A.   New Orleans.
25       Q.   -- New Orleans?  And you have been in

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1        A.   No ways.  I don't know anybody.  In
2    fact, the whole thing is some kind of --
3        Q.   Hopefully you won't get to know us too
4    well --
5        A.   No.  I don't want to.
6        Q.   -- over the next couple of hours.  I
7    just have some questions of my own and some
8    follow-up on the questions that Mr. Goza asked, so
9    I'm going to kind of start where he left off.
10           From where I am sitting, I'm hearing
11   that the doctor who was in charge of diagnosing or
12   trying to find Mr. Boudreaux's gastric bleed is a
13   Hopkins-trained gastroenterologist.  Is that
14   right?
15       A.   That's correct.
16       Q.   And I have a little hometown pride in
17   Hopkins.
18       A.   That's good.
19       Q.   It's a good spot, right?
20       A.   Right.
21       Q.   And, in addition, is a professor at one
22   of the leading medical institutions in the
23   country, Tulane Medical School, is that right,
24   also?
25       A.   Right.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    the active practice of --
2        A.   Gastroenterology.
3        Q.   -- gastroenterology for how many years?
4        A.   Since 1998.
5        Q.   Why don't you give us just a break?  We
6    will take a quick break.
7        THE VIDEOGRAPHER:
8            We are off the record.  It's 3:58.
9            (Short break taken.)
10       THE VIDEOGRAPHER:
11           We are back on the record.  It's 4:01.
12       MR. GOZA:
13           I will pass the witness.
14       MR. McCAULEY:
15           Thank you, Mr. Goza.
16   BY MR. McCAULEY:
17       Q.   Dr. Joshi, my name is John McCauley.  We
18   were introduced to each other just prior to the
19   start of today's deposition.  We haven't met at
20   any time before to my recollection.
21       A.   That's correct.
22       Q.   And I don't think you have met with any
23   of the representatives of Bayer or Janssen --
24       A.   Nobody.
25       Q.   -- involved in this litigation?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1        Q.   He also got treated here in this
2    building where we are taking your deposition
3    today.  This is Ochsner-Kenner.  This is like the
4    crown jewel of the Ochsner enterprise, isn't it,
5    right here?
6        A.   Uh-huh (affirmative).
7        Q.   I'm thinking top doctors, top
8    institution.  He got the best of medical care that
9    was available to him in Louisiana.
10       A.   Correct.  Correct.
11       Q.   Doctor, I guess I will start with where
12   you started, which is with the EGD with
13   Mr. Boudreaux.
14       A.   (Nodding head affirmatively).
15       Q.   We don't have any -- as you pointed out,
16   there are no consult notes in advance of the EGD
17   because of the way things happened on an emergent
18   basis.
19       A.   Right.
20       Q.   But we do know that's where your
21   involvement started, correct?
22       A.   That's correct.
23       Q.   What you are doing with an EGD is
24   actually taking a look inside all the way from the
25   top of the throat, where the esophagus begins, all

1  the way down into the stomach and into the --

2  let's see if I get this right -- duodenum?  I have

3  pronounced that correctly?

4     A.    Duodenum.  That's correct.

5     Q.    All right.  I was going to say duodenum,

6  but I didn't do it.

7     A.    No.  Duodenum.  Well, it would be fine

8  either way.  Tomato or tomato.  It's all good.

9     Q.    That's a long way to look, but in any

10  event, you take a very small camera and put it

11  down there and you can in realtime -- is this

12  what's going on?

13     A.    Realtime.

14     Q.    In realtime you are looking at his

15  esophagus, his stomach, and his duodenum?

16     A.    That's correct.

17     Q.    And the duodenum is the little juncture

18  between the stomach and the small intestine

19  essentially.

20     A.    That's correct.

21     Q.    It's really the first part of the small

22  intestine.

23     A.    Well, it's got four parts; first,

24  second, third and fourth.  There's four parts of

25  the duodenum, and then we get the jejunum which

1  is the -- it's all intestine, but duodenum is a

2  very specific part of the intestine.

3     Q.    If I'm not mistaken, your EGD device

4  goes into the first and second part of the

5  duodenum.

6     A.    You can go up to the third if you push

7  harder.  That's where usually we go look, up to

8  the second part, second and the third junction.

9     Q.    Tell me what you were looking for when

10  you did this EGD.

11     A.    When we suspect a bleed related to an

12  anticoagulant, that was the reason why the scope

13  was performed, to look for a source.  We are

14  looking for an ulcer, we are looking for what we

15  call an inflammation in the food pipe, esophagus

16  or the stomach or the duodenum.  We are looking

17  for entities called vascular malformations, which

18  is also termed as AVMs, arteriovenous vascular

19  malformations.  They can be triggered to bleed.

20  Cancer.  If you put somebody with cancer on

21  anticoagulation, they will bleed.  So these are

22  the things we generally look for, the first

23  things.  In a 78-year-old patient, we look for

24  these things, specifically when you are on an

25  antiplatelet agent.

1     Q.    I'm not sure who said 78 first.  It

2  might have been Mr. Goza, but I think he was

3  around 72.

4     A.    Yes.  Somewhere --

5     Q.    It doesn't really matter.

6     A.    It doesn't matter.

7     Q.    You are talking about an elderly

8  patient?

9     A.    An elderly patient.

10     Q.    Let me ask you a couple of more

11  questions about the vascular malformations that

12  you mentioned.  Those are called arteriovenous

13  malformations also?

14     A.    (Nodding head affirmatively).

15     Q.    And I think you put it, in short, AVM,

16  right?

17     A.    Uh-huh (affirmative).

18     Q.    My layman's understanding of an AVM, and

19  you tell me if I have got it approximately right,

20  is that it's kind of a little tangle of blood

21  vessels that are really not supposed to be there,

22  but in some people they just develop for reasons

23  that we don't really know.  Is that fair enough?

24     A.    Uh-huh (affirmative).

25     Q.    I'm going to ask you, and I'm sorry to

1  have to ask you, but the court reporter will thank

2  me, when you say "uh-huh," it's really hard for

3  her to get, so if you would answer yes or no.

4     A.    Okay.  Yes or no.  Okay.

5     Q.    Or whatever you want to say is good.

6     A.    Yes.  Yes.

7     Q.    And I may remind you from time to time.

8     A.    No problem.

9     Q.    And so those AVMs can be found

10  throughout the digestive tract, can't they?

11     A.    That's correct.

12     Q.    You can find them, for example, in the

13  stomach, you can find them in the small intestine,

14  and you can find them in the large bowel, right?

15     A.    That's correct.

16     Q.    And sometimes they are sizable things,

17  AVMs.  They are like maybe a big cluster of

18  these --

19     A.    That's correct.

20     Q.    -- veins or I'll just call them blood

21  vessels.

22     A.    That's correct.

23     Q.    Would that be better?  And then

24  sometimes they can be very tiny.  Is that true?

25     A.    That's correct.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    Q.   Now, when you look at the stomach and
2  the esophagus and the first and second part of the
3  duodenum, how does the scope work?  Does it look
4  at every area of the stomach wall and every area
5  of the esophagus?  I mean I've never seen one.
6  Would you tell me?
7    A.   Yes.  We have to ensure that a good
8  quality endoscopy is supposed to look at every
9  corner.  We divide the -- the esophagus is
10  straight, so as we go down, we are looking with
11  the light.  You are just going through a tunnel.
12  You're looking at the tunnel and you are looking.
13  I mean it's with experience with thousands of
14  endoscopes, you can pick up.  Your eyes become so
15  in tuned to it.  Anything abnormal, right of way
16  your brain processes it.  The stomach, we look
17  straight and then we look up and then we look at
18  right, left, up, and down.  You cover every place.
19    Q.   You cover every quadrant of the
20  stomach --
21    A.   Every quadrant of the stomach.
22    Q.   -- and every bit of the esophagus?
23    A.   Within the limits of human error.
24    Q.   Right.  And within the limits of
25  technology?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    A.   Technology.  Yes.
2    Q.   So, Doctor, when you did your EGD, you
3  didn't really look at your findings other than you
4  found no source of bleeding.
5    A.   Yes.  That's correct.
6    Q.   Did you find, Doctor, -- if you look at
7  -- I think it's Exhibit 4, if you look at the
8  bottom of Page 103, you will see that is your
9  report there of the EGD that you did; is that
10  right?
11    A.   That's correct.
12    Q.   It looks like you did it on February
13  4th, the first full day that Mr. Boudreaux was in
14  the hospital, right?
15    A.   That's correct.
16    Q.   And it looks like you put him under
17  general anesthesia, right?  Page 10 --
18    A.   Yes.  I got it.  General anesthesia.
19    Q.   And then it says the GIF-HQ190, that's
20  the device you are using?
21    A.   That's the device.  Yes.  The latest
22  endoscope from Olympus.
23    Q.   And that's the best available, right?
24    A.   The best technology available from a
25  specific vendor.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    Q.   And then it goes in right through his
2  mouth and down into the esophagus?
3    A.   That's correct.
4    Q.   And you said you were able to accomplish
5  that without difficulty and that Mr. Boudreaux
6  tolerated the procedure well.
7    A.   That's correct.
8    Q.   Now, if you go to Page 104, which is the
9  next page.  Let's see if I can --
10    A.   104 should be on the other one.
11    Q.   Yes.  Let me see that one.  I might be
12  able to point you to it.  It's this one.  I'm
13  looking at those numbers down there.
14    A.   Oh, those numbers.  Okay.  I got it.
15    Q.   And they are just one off from each
16  other, so that's why it's a little confusing.  So
17  if you look at 104, Bates No. 104, your findings
18  are right there at the top, right?
19    A.   That's correct.
20    Q.   It says, "There were esophageal mucosal
21  changes suspicious for short-segment Barrett's
22  esophagus present in the lower third of the
23  esophagus."
24    A.   That's correct.
25    Q.   That's not a source of bleeding, though,

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  right?
2    A.   No.  No.
3    Q.   But Barrett's esophagus are changes to
4  the esophagus that are potentially precancerous if
5  they are there?
6    A.   That's correct.
7    Q.   What causes Barrett's esophagus?
8    A.   That's a million dollar question.
9    Q.   Okay.  I don't have a million dollars to
10  give you, but I'm hoping for an answer.
11    A.   Okay.  So there are many predisposing
12  factors.  One of the most important is chronic
13  what we call gastroesophageal reflux.  It's a
14  reflux of contents of the stomach whether it may
15  be bile or it may be acid in patients who do not
16  have an intact what we call esophageal sphincter
17  or the valve which separates the stomach from the
18  esophagus.  It's actually a protective mechanism
19  which the body develops from acid and alkaline.
20    Q.   Everybody has got a little valve between
21  their esophagus and their stomach.
22    A.   A flap.  Yes.
23    Q.   It's a little flap, and if it's not
24  working properly, then those very corrosive -- I
25  don't know if that's the right word -- stomach

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    gases can get up into the esophagus?
2        A.   Yes.  Chemicals.
3        Q.   How long does it take for Barrett's
4    esophagus to develop?  I'm asking you another
5    million dollar question and putting myself further
6    in debt.
7        A.   That's my research interest.  I can tell
8    you this, that based on epidemiologic data, we
9    endoscope people who have chronic reflux who had
10   it for 10 years once in their lifetime.  If you
11   have reflux once in 10 years, it should be --
12   specifically if you are Caucasian, you smoke,
13   alcohol, and you are of Caucasian decent.
14       Q.   We have a history from Mr. Boudreaux
15   that's he is not a smoker and really didn't drink.
16   He is Caucasian.  How long would it take for him
17   just with gastroesophageal reflux disorder to
18   develop that esophagus?
19       MR. GOZA:
20            Doctor, I'm going to interject sometimes
21   with an objection before you answer, so I'm going
22   to let him finish his question.  I'm not sure he's
23   quite done.
24       MR. McCAULEY:
25            I know.  I always take a little stutter

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1        Q.   Fair enough.  But you saw mucosal
2    changes?
3        A.   (Nodding head affirmatively).
4        Q.   Even if it's not Barrett's, let's say
5    you haven't diagnosed Barrett's.
6        A.   Right.
7        Q.   Those mucosal changes that you saw on
8    EGD, would they be a product of what's going on
9    acutely or chronically?
10       A.   Okay.  So if this was Barrett's, it
11   takes years, it takes years.  It's a chronic
12   process.  It's not something happens.  That's why
13   I alluded to the fact that if you have 10 years of
14   reflux, that's when we usually put a scope down,
15   once in 10 years.  That's data.  That's based on
16   what our consensus guidelines are.
17       Q.   When you say once in 10 years, that's
18   how often you want to scope somebody?
19       A.   No.  If someone has a history of chronic
20   reflux for 10 years, that's when we scope them
21   once and/or if they have symptoms which suggest
22   that it's something else going on.  It's a risk
23   for cancer.  That's why we want to find it early
24   and put them on surveillance.
25       Q.   Got it.  Doctor, I'm going to next go to

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    step to throw you off.
2    BY MR. McCAULEY:
3        Q.   What I'm asking, Doctor, really is is it
4    something that develops in a matter of weeks, a
5    matter of months or a matter of years?  To see the
6    kinds of mucosal changes in the EGD that you saw,
7    is that a product of a long-term ongoing process
8    or a short-term acute process?
9        MR. GOZA:
10            I'm just going to object because it
11   assumes facts not in evidence, including that he
12   had gastroesophageal reflux.  Go ahead.
13       A.   What is written in endoscopy is -- I
14   think that's only suspicious.  It doesn't say he
15   had Barrett's.  Did I do a biopsy?  I did not.  So
16   there's no way to say whether he has Barrett's or
17   not.  What I can tell you is endoscopically when
18   we see that kind of mucosa coming up the
19   esophagus, it could be Barrett's, but what we do
20   is we either take a sample and in his case,
21   someone who just had a bleed, we do not sample
22   them.  So all I could say is suspicious.  It's not
23   confirmatory.  It's just endoscopic visually
24   suspected Barrett's.  Now, I haven't given him a
25   diagnosis.

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    your impression, which is on page -- again, I'm
2    using the bold face 104.  Your impression was
3    "Esophageal mucosal changes suspicious for
4    short-segment Barrett's esophagus."  Again, I'm
5    not suggesting --
6        A.   That's correct.
7        Q.   You didn't make a diagnosis.
8        A.   Right.
9        Q.   You are just making an observation.
10       A.   Observation.  That's correct.
11       Q.   And then you said "normal stomach,"
12   right?
13       A.   That's correct.
14       Q.   Everything looked okay in the stomach?
15       A.   That's correct.
16       Q.   "And normal 2nd part of the duodenum."
17       A.   That's correct.
18       Q.   And when you say "normal second part," I
19   was taking from that that you meant normal first
20   and second part.
21       A.   Yes.  That's correct.  So this is a --
22   these are softwares.  Automatically it means I
23   reached the second part and evaluated the first.
24   You know, you can't go to the second without
25   looking at the first.  It includes the first.

1    Q.   That's what I assumed when I read that.

2    A.   Right.  Right.  It's a template.  That's

3  how it generates.  We don't write it.  Once you

4  click the --

5    Q.   It kind of fills it in for you?

6    A.   It fills it in.  Yes.  It's all

7  templated.  The software is called Provation.  If

8  you see here at the top, you will see "Provation,"

9  generated by Provation.

10    Q.   I see.  I got it.  I was wondering about

11  that Provation note.

12    A.   Provation is the company which has the

13  software.  It also helps us bill.

14    Q.   Doctor, you said, in your recommendation

15  section, you said "The findings and

16  recommendations were discussed with the patient's

17  family."  Do you state that note there?

18    A.   Yes.  Correct.

19    Q.   First of all, do you remember

20  Mr. Boudreaux, the patient?  Do you have a

21  recollection of him?

22    A.   I have not seen him for a long time.  We

23  see so many patients, I can't --

24    Q.   That's what I expected.  Your

25  recollection of Mr. Boudreaux is limited to what

---

1  tract.  That's the convention.  That's how we

2  start.  Unless it's obvious that the patient is

3  having bright red from the rectum, so the chances

4  are lower first.  It's a clinical judgment at that

5  point where we start with.

6    Q.   That leads into my next question

7  actually.  It is a pretty nice segue.  Do you

8  recall that the history -- and I can show you if

9  you want -- the history of Mr. Boudreaux when he

10  arrived was that he had a couple of episodes in

11  the prior week of black tarry stools?

12    A.   Right.  Right.

13    Q.   The way you are nodding makes me think

14  you are going to say black tarry stools is one

15  indication that it may be in the upper

16  gastrointestinal tract.

17    A.   It could be upper or lower, but more

18  upper or the middle, but it could be the right

19  colon even.  It depends.  Again, you have to look

20  at it historically.  We see both situations.  Now

21  we have to put the things together.  If his blood

22  pressure was low and -- I can not recollect.  I

23  don't have the data.  If we have seen that people

24  who are hypertensive and rapidly bleeding, we

25  think it's upper and they can have red blood, but

---

1  you can remember by looking at the records?

2    A.   Looking at the records.

3    Q.   Fair enough.  So, if I ask you, do you

4  remember what your discussion was with the family

5  about the recommendations?

6    A.   Probably not.  Probably not.

7    Q.   Given that you found that the stomach

8  was normal and everything was pretty good in terms

9  of active sources of bleeding, do you think you

10  would have reassured the family at this point that

11  "We still need to do more tests, but everything in

12  the stomach looks good"?

13    A.   (Nodding head affirmatively).

14    Q.   Doctor, when you did the EGD, I know you

15  later did a colonoscopy, and just to be crude

16  about it, it's at both ends of the

17  gastrointestinal tract.

18    A.   Uh-huh (affirmative).

19    Q.   Did you start at the top of the

20  gastrointestinal tract for a particular reason or

21  is that just standard procedure?

22    A.   Right.  So that's based on old data that

23  if you have a suspected gastrointestinal bleed, we

24  start from above first because we find more

25  sources in the upper tract than in the lower

---

1  generally if you think it was black -- is that

2  what they said?  Black?

3    Q.   Yes.

4    A.   Then it can be all the way to the right

5  colon.  Generally it's upper, but it can even be

6  the right colon.

7    Q.   The right colon meaning the ascending

8  colon?

9    A.   The ascending colon.

10    Q.   And we will get to that in a minute

11  because we are going to talk about the

12  colonoscopy.

13    A.   Right.

14    Q.   I'm going to mark, just so you can have

15  it in front of you, what I think is a complete set

16  of the Kenner records for this hospitalization,

17  and you will see that they duplicate some of the

18  records that you are looking at already from

19  Mr. Goza.  These go from OMC-K-MD-001 all the way

20  through 531 and they are double-sided.

21      MR. GOZA:

22         We will mark that as Exhibit 6.

23      MR. McCAULEY:

24         Kirk, as I mentioned before we started

25  today, I didn't bring an extra set of these.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    MR. GOZA:
2         As long as you have the individual ones
3    that you intend to talk about, that's fine.
4    MR. McCAULEY:
5         I think I do.  I may not for this first
6    one, but let me see.  I may be able to do that for
7    you.
8    BY MR. McCAULEY:
9    Q.   Doctor, I'm going to ask you to look at
10   Page 5 of this set if you don't mind.
11   A.   Okay.  5.
12   MR. McCAULEY:
13        Kirk, for your reference, Page 5 is the
14   history and physical by Dr. Hebert on Page 5.
15   BY MR. McCAULEY:
16   Q.   Do you have that, Doctor?
17   A.   Yes.
18   MR. BYRNE:
19        Let's make a stab at trying -- if you
20   don't have a copy, then we are going to need to
21   look on whatever you are referring to.
22   MR. GOZA:
23        I don't have it in my file.
24   MR. McCAULEY:
25        One second.

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    A.   Right.
2    Q.   This would be the kind of history that
3    you would rely on?
4    A.   Right.  Right.
5    Q.   You see that Mr. Boudreaux described
6    that he had been put on an anticoagulant and had
7    been feeling well for two weeks?  Maybe in the
8    second paragraph there.
9    A.   "The patient was in their usual state of
10   health until three weeks prior."
11   Q.   Do you see it says, Doctor, that he was
12   feeling well for the first two weeks?
13   A.   This is the page, right?
14   Q.   Yes.  That's the one I'm looking at.
15   A.   Feeling well after discharge for two
16   weeks.
17   Q.   Yes.  After discharge for his atrial
18   fibrillation.
19   A.   Yes.
20   Q.   And then it says he had slow onset,
21   weakness, and dizziness over the next week.
22   A.   Yes.
23   Q.   And then it says he had two episodes of
24   black tarry stool.  Do you see that?
25   A.   That's correct.

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    BY MR. McCAULEY:
2    Q.   Doctor, I'm going to let Mr. Goza have
3    my copy because I think I have got good enough
4    notes on it.  You can look on it.
5    MR. McCAULEY:
6         How about that?  How does that sound to
7    you?
8    MR. GOZA:
9         I'm fine with us just taking a look at
10   whatever you are showing him.
11   MR. McCAULEY:
12        If you don't mind, take a look at that.
13   It's the Dr. Hebert note.
14   BY MR. McCAULEY:
15   Q.   Doctor, while you have that in front of
16   you, do you see when the patient was evaluated by
17   Dr. Hebert, who is Dr. Masri's resident -- do you
18   see that?
19   A.   Yes.  Uh-huh (affirmative).
20   Q.   He took a history, a pretty good
21   history, from Mr. Boudreaux, right?
22   A.   Uh-huh (affirmative).
23   Q.   And this would be the history that would
24   be available to you when you came on service and
25   did the EGD, right?

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    Q.   And that's what we were talking about
2    earlier?
3    A.   Yes.
4    Q.   In addition to being black when you
5    describe stool as tarry, you are talking about its
6    consistency, right, its texture?
7    A.   Yes.
8    Q.   It's very sticky.
9    A.   That's correct.
10   Q.   They say tar because it's very tarry
11   like.
12   A.   Right.  Right.
13   Q.   Do you see that he complained of not
14   having had -- well, have had two bowel movements
15   over the prior week.
16   A.   Okay.
17   Q.   It says only two BMs.
18   A.   Over that week.
19   Q.   Over that week.
20   A.   Uh-huh (affirmative).
21   Q.   Let me ask you this question.  Do you
22   believe that the constipation, if that's what it
23   was, and the black tarry stools go well together?
24   MR. GOZA:
25        Just object to the extent you are asking

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1   him to assume there was constipation.

2      A.  I don't know whether I should call it

3   constipation or not.  It varies what you define --

4   BY MR. McCAULEY:

5      Q.  Sure.  Everybody has got a different

6   system.

7      MR. GOZA:

8         With that, let me just move to object to

9   this requiring speculation.

10  BY MR. McCAULEY:

11     Q.  Go ahead.

12     A.  Yes.  There are tarry stools there, and

13  that's a reason to do an endoscope.

14     Q.  And sometimes when you have blood in

15  your digestive tract, that will actually cause

16  diarrhea, won't it?

17     A.  I don't know whether -- blood is a

18  cathartic, but I don't know.  We don't technically

19  describe it as diarrhea.

20     Q.  It may cause loose stools.

21     A.  We call them blood mixed with stool.  We

22  call it sometimes hematochezia.

23     Q.  I see.  And hematochezia means --

24     A.  It's fresh blood coming -- it should be

25  red -- coming out of the rectum.

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1     Q.  Okay.  What does that suggest to you, if

2  anything?

3     A.  Nothing much.  We ask it because if it's

4  a gastric source or esophageal source, you would

5  expect them to be nauseated.  If there's a lot of

6  blood in the stomach and the food pipe, it tries

7  to come out from the upper tract.  If it is

8  further down, you know, you do not have those

9  classic symptoms of nausea.

10    Q.  Doctor, when you look at Page 10, I'm

11  going to show you what's on Page 10, which is the

12  diagnosis.  Do you see those diagnoses there?  You

13  have your thumb right next to them.

14    A.  Yes.  10.  I got it.

15    Q.  And you see in that diagnoses, there's

16  enlarged liver, hepatomegaly.

17    A.  Uh-huh (affirmative).

18    Q.  There's ascites, A-S-C-I-T-E-S.

19    A.  Uh-huh (affirmative).

20    Q.  Do you have that in that?

21    A.  Uh-huh (affirmative).

22    Q.  Why don't you just read off those

23  diagnoses there if you don't mind?

24    A.  It says 2014.  GI bleed, pleural

25  effusion, CHF, ascites, atrial fibrillation, BPH,

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1     Q.  And you remember when you went over the

2  history with Mr. Goza, there was no hematochezia,

3  no red blood coming out of his rectum?

4     A.  No.

5     Q.  And no melena either?

6     A.  Right.  Nothing is recorded.  This is

7  what he told them.  That's all I get from this.

8  So "patient denies gross blood per rectum or" --

9  hematemesis is vomiting, so no vomiting, and no

10  gross blood per rectum.  That is probably what

11  they are calling hematochezia.  It's gross blood.

12  It's bright red blood.

13    Q.  And where you see a reference to

14  hematemesis, that means blood when you vomit?

15    A.  Vomit.

16    Q.  And you saw that he vomited.  Did you

17  see there is reports of nausea and vomiting?

18    A.  The evening prior to admit with clear

19  fluid in the morning.  I don't know what he

20  vomited.  In the morning he had clear.  There was

21  no evidence that he vomited blood here.

22    Q.  That's what I'm getting at.

23    A.  Right.  Right.

24    Q.  He was vomiting, but it was clear vomit.

25    A.  Clear vomit.

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1   gout, hypertension.  So these are the chronic

2  problems of past medical history.

3     Q.  I just wanted to ask you a couple of

4  questions about those diagnoses.  It looks like

5  there are some cardiac diagnoses, some issues with

6  his heart, like atrial fibrillation.

7     A.  That's correct.

8     Q.  It looks like there are some liver

9  diagnoses, that is the hepatomegaly and the

10  ascites, right?

11    A.  That's correct.

12    Q.  And then there are some kidney

13  diagnoses?

14    A.  That's correct.

15    Q.  I just wanted to make sure and confirm

16  that while you may be expert enough to be

17  consulted on liver, kidney and heart system

18  functions and processes, that was not one of your

19  tasks in this particular case?  You were not

20  brought in to consult on the liver, kidney or

21  heart, were you?

22    A.  That's correct.

23    Q.  So you did no work-up of his hepatic

24  system, his renal system, or his cardiological

25  status as part of what you did?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1   A.   That's correct.

2   Q.   Okay.  Thank you.  Doctor, when you next

3  saw Mr. Boudreaux, it was the next morning.  That

4  was February 5th, and you did a consult note on

5  that.  I think you have already discussed that

6  with Mr. Goza.

7   A.   Uh-huh (affirmative).

8   Q.   And your consult note is on Page 35 if

9  you don't mind.

10   MS. DU PONT:

11      Which is also Exhibit 3.

12   A.   Uh-huh (affirmative).

13  BY MR. McCAULEY:

14   Q.   Do you see Exhibit 3, Page 35?

15   A.   Uh-huh (affirmative).

16   Q.   This is your consult note.  Now, I want

17  to just mention a couple of things and ask you a

18  couple of questions.

19   A.   Uh-huh (affirmative).

20   Q.   One is you noted no hematochezia and no

21  melena.

22   A.   Uh-huh (affirmative).

23   Q.   What's the difference between

24  hematochezia and melena?

25   A.   So hematochezia is bright red blood.

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  it means.  He's not currently having it.

2   Q.   I see.  Got it.  And then when you said

3  "has received two units of packed red blood

4  cells," that's a blood transfusion basically?

5   A.   Blood transfusion.

6   Q.   That's the way people understand that.

7   A.   Right.

8   Q.   And you said "stable hemoglobin."  Do

9  you see that?

10   A.   Yes.  So stable means since he arrived,

11  it has not further dropped.

12   Q.   And so he seems to have stabilized in

13  terms --

14   A.   Stabilized, and he's not bleeding

15  anymore.  So the note basically tells you that

16  he's not actively bleeding, he has stopped

17  bleeding, and we have to pursue whatever

18  intervention we have to pursue next.

19   Q.   And if Mr. Boudreaux was having a bleed

20  related to his anticoagulant and let's say he was

21  on Xarelto and last took it on the morning of

22  February 3rd, you are now seeing him 48 hours

23  later.

24   A.   Uh-huh (affirmative).

25   Q.   All right?  Are you familiar with

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  It's fresh blood.  It can be upper or lower

2  depending.  You can have a brighter blood even

3  from upper if it's a very rapid loss, and melena,

4  again, it's generally upper tract, but if it's a

5  very slow bleed, it can become dark also.  These

6  are just historical parameters or historical

7  things that give you an idea of where the bleed

8  could be pinpointed, but they are not perfected.

9  We ask them because a tarry stool -- melena is a

10  tarry stool.  It's a black tarry stool like this.

11  (Indicating)

12   Q.   But why is he reporting do you think no

13  melena to you at this point when he reported black

14  tarry stool to Dr. Masri or Dr. Masri's associate?

15   A.   When we are talking about melena is we

16  saw him after, we saw him in the hospital.

17   Q.   I see.

18   A.   So in the hospital there had been no

19  events.  That's what it relates to.  What happened

20  before we are not -- we are seeing him in the

21  hospital.  We want to make sure he's not actively

22  having those things which happened in the past or

23  we need to address them differently.  This is

24  almost like a daily progress note.  Since we have

25  already seen him, that's what I think historically

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  Xarelto?  Is that the drug that you --

2   A.   I'm not an expert on Xarelto because I

3  don't prescribe Xarelto.

4   Q.   Yes.  But you would recognize that

5  Xarelto has a fairly short half life, right?

6   A.   Uh-huh (affirmative).

7   Q.   And by 48 hours, whatever anticoagulant

8  effect that it was giving when he took the pill

9  should have been ended by this time; is that

10  right?

11   A.   Yes.  If that's what is in the

12  literature.

13   Q.   Okay.  I'm not asking you to be an

14  expert on anticoagulants.

15   A.   Right.  Right.

16   Q.   Your assessment at this time was that he

17  was no longer bleeding as of the morning of

18  February 5th?

19   A.   That's correct.  That's correct.

20   Q.   Doctor, you wanted to do a colonoscopy

21  on him on that day; is that right?

22   A.   That's correct.

23   Q.   And the colonoscopy was delayed.  Do you

24  recall that?

25   A.   I don't recall the exact timing.  Was it

1  delayed to another day?

2  A.  Yes.  Actually I think it was delayed

3  until February 7th, Doctor.  If you go to Page

4  103, you will see that a colonoscopy was done on

5  -- it's also one of the individual exhibits that

6  you have.

7  A.  103.  Yeah.  Right there.

8  Q.  You see that 103 is --

9  A.  103.  Yes.  Here is the colonoscopy, and

10  the date on this is the 7th.

11  Q.  Yes.

12  A.  Okay.

13  Q.  You see that that's two days after your

14  consult with him and three days after your EGD?

15  A.  Yeah.

16  Q.  I'm going to show you the explanation

17  for that in a second.

18  A.  Right.  Right.

19  Q.  Doctor, when you do a colonoscopy,

20  unlike the EGD, you first have to have a process

21  of cleaning out the bowel.

22  A.  Yeah.  Uh-huh (affirmative).

23  Q.  I think everybody who has had one

24  understands that.

25  A.  Right.  Right.  Right.

1  A.  That's correct.

2  Q.  What that means is that he did his prep,

3  but it didn't clear everything out.  "With

4  residual black stools," do you see that?

5  A.  Yes.

6  Q.  Doctor, if you go to Page 25 and you see

7  that on February 6th in the morning, you were

8  called by a nurse.  Page 25 it says "Drank all of

9  his bowel prep, nurse called Joshi this morning

10  stating patient still having black stools, so he

11  will get another prep at 9 AM."

12  A.  Okay.

13  Q.  Do you see that?  So there's a little

14  difficulty in cleaning him out.

15  A.  Yes.  Yes.  It seems like.  The usual

16  problems.

17  Q.  When you have black tarry stools, that's

18  sometimes a little tougher to clean out than your

19  regular ordinary, to be quite blunt about it, your

20  regular ordinary stools.  Is that true?  Because

21  they are so sticky and sometimes hard to get out.

22  A.  Yes.  There's no perfect science of

23  cleaning.  Whatever the reason was.  It could be

24  multifactorial.

25  Q.  And so whatever it was, that delayed

1  Q.  You have to drink that goopy stuff --

2  A.  That's correct.

3  Q.  -- and hopefully it cleans you out.

4  A.  Cleans out.

5  Q.  The reason you need to clean out is so

6  that you can see well with your scope, right?

7  Isn't that basically it?

8  A.  That's accurate.

9  Q.  And so Mr. Boudreaux -- I will just

10  point you to Page 23 of your exhibit there, and I

11  think that will explain to you what's going on

12  here.

13  A.  Okay.

14  Q.  Doctor, do you see that on Page 23 right

15  in the middle on "Subjective," this is for

16  February 5th.

17  A.  23.  Okay.  I got it.  23 by yours,

18  right, not by the chart?

19  Q.  Yes.  23 by ours.

20  A.  Okay.

21  Q.  Doctor, right in the middle of the page

22  in between those two black lines, do you see it

23  says "No acute events overnight.  Patient drank

24  all of his bowel prep, mainly clear BM with

25  residual black stools"?

1  your colonoscopy because when you do the

2  colonoscopy, you want to make sure you have a good

3  clean look at the bowel?

4  A.  Uh-huh (affirmative).

5  Q.  Because if it's obscured, then you may

6  miss something, right?

7  A.  That's correct.

8  Q.  And when you did your colonoscopy on

9  February 7th, you said there were multiple

10  large-mouthed diverticula were found in the --

11  A.  Let me go back.

12  Q.  I'm sorry.  Page 103.

13  MR. GOZA:

14       It will be Exhibit 4.

15  BY MR. McCAULEY:

16  Q.  Yes.  You can look at Exhibit 4 if you

17  would like.

18  A.  Here it is.  This is easier.

19  Q.  Do you see Page --

20  A.  Oh, yeah.  I got it.  Exhibit 4.  Okay.

21  Q.  So your findings on that were that the

22  perianal -- that's the area right around the anus

23  -- and the digital rectal examinations were

24  normal; that is, you stick a finger into the

25  rectum and that was normal?

1   A.   That's correct.  That's correct.

2   Q.   And then you proceeded with a

3   colonoscopy --

4   A.   That's correct.

5   Q.   -- which means introducing a scope

6   through the anus --

7   A.   Uh-huh (affirmative).

8   Q.   -- and it goes up into the ascending

9   colon, that part of the colon that -- you called

10  it the right colon.

11  A.   Uh-huh (affirmative).

12  Q.   And then it goes across the -- well,

13  actually it goes up the descending colon and then

14  across the transverse.

15  A.   And then down to the right.

16  Q.   And then down the right.  So you take a

17  look at all of those areas very carefully.

18  A.   Uh-huh (affirmative).

19  Q.   And what you found when you looked was

20  multiple large-mouthed diverticula in the sigmoid

21  colon, right?

22  A.   Uh-huh (affirmative).

23  Q.   I gather from your testimony, you don't

24  think those diverticula had anything to do with

25  his bleeding?

---

1   A.   That's correct.  You have good

2   knowledge.

3   Q.   Well, I have Google like everybody else.

4   Doctor, let me just reassess where we are at this

5   point.

6   A.   Uh-huh (affirmative).

7   Q.   You have scoped him from the top of his

8   throat all the way down to his duodenum --

9   A.   Uh-huh (affirmative).

10  Q.   -- which is the beginning of the small

11  intestine.

12  A.   Uh-huh (affirmative).

13  Q.   And then you scoped from the other end

14  on February 7th, from the end of his anus or

15  rectum all the way up to the cecum.

16  A.   That's correct.

17  Q.   And the cecum is the little part of the

18  large bowel that connects to the small intestines.

19  A.   That's correct.

20  Q.   Now we have looked at every part of his

21  digestive tract except the part that we call the

22  small intestines, really the jejunum and the

23  ileum, right?

24  A.   That's correct.

25  Q.   And that's what you are going to look at

---

1   A.   Well, if those were responsible for it.

2   We usually find what we call a stigmata or

3   something to point out that they have recently

4   bled usually.

5   Q.   And if you found those in the sigmoid

6   colon, those would be very close to the rectum?

7   A.   Oh, yes.

8   Q.   And so if he was bleeding from there,

9   you would see red stool?

10  A.   Generally, yes.

11  Q.   Okay.  And there was no history of red

12  stool?

13  A.   No.

14  Q.   You didn't see any stigmata on the

15  diverticula --

16  A.   That's correct.

17  Q.   -- to indicate they had been bleeding.

18  A.   That's correct.

19  Q.   And you didn't see anything else in your

20  colonoscopy to indicate a source of bleeding.

21  True?

22  A.   That's correct.

23  Q.   You found of a lipoma in the sigmoid

24  colon, but that's just a little cyst of fat cells,

25  isn't it?

---

1   next with that video capsule endoscopy, right?

2   A.   That's correct.

3   Q.   I had a couple of questions about that.

4   Well, let me ask you this.  Do you have any

5   recollection of telling anyone from

6   Mr. Boudreaux's family that his colonoscopy had to

7   be delayed because he was in critical condition?

8   A.   No.

9   Q.   And based on your review of the records,

10  do you think that that provided any reason for

11  delaying his colonoscopy that he was in critical

12  condition?

13  A.   No.

14  Q.   You did the EGD on the first day, right?

15  A.   Right.

16  Q.   You were able to do that and you did the

17  colonoscopy on February 7th, and neither of those

18  things cause any bleeding, do they?

19  A.   No.  No.

20  Q.   Not if you do them obviously skillfully?

21  A.   Right.

22  Q.   And there was no blood loss?

23  A.   No.

24  Q.   I think you mentioned no blood loss on

25  either process.

1  A.  That's correct.

2  Q.  There was no reason for you to tell

3  anybody that the reason you couldn't do a

4  colonoscopy was because Mr. Boudreaux was in

5  critical condition?

6  A.  No.

7  Q.  All right.  Now, Doctor, the video

8  capsule involves the patient swallowing, basically

9  swallowing a tiny little camera, right?

10  A.  That's correct.

11  Q.  And that tiny little camera goes

12  throughout his entire digestive process and takes

13  pictures along the way.

14  A.  That's correct.

15  Q.  Tell me if this is right.  It relays

16  those pictures to kind of a belt that he's wearing

17  around his abdomen.

18  A.  That's correct.

19  Q.  And that belt then becomes, you know,

20  for lack of a better word, the analog of a film

21  that you can then develop and look at?

22  A.  That's correct.

23  Q.  I want to understand a little bit more

24  about that process.  First of all, how long does

25  it take that pill, that tiny camera, to go through

---

1  the hospital?

2  A.  He could be in the hospital, like

3  Mr. Boudreaux was delivered in the hospital.  He

4  was in the bed.  So he could have been going

5  between -- I don't know what he was doing.  He

6  could have been going to the bathroom and the bed.

7  At home, they can bring it back the next day.

8  Q.  Now, for context, Mr. Boudreaux's -- let

9  me show you a couple of more documents.  If you go

10  to 504 to 506.  I want you to focus on 506 first.

11  A.  Okay.  506.

12  Q.  I'm going to tell you right up front I

13  don't understand these notes and I'm hoping you

14  can help me understand them.

15  A.  Yes.

16  Q.  506?

17  A.  Yes.  506.

18  Q.  The bold face 506.

19  A.  Right.

20  Q.  And you see at the top it is a

21  continuation of history and physical?

22  A.  Uh-huh (affirmative).

23  Q.  But it has plan of care notes, and it

24  looks like the note time is February 20th.  It

25  says "Star Rome with Dr. Akingbola's office."  Who

---

1  the intestinal tract?

2  A.  Usually eight hours we have the capsule

3  out, I mean transit time.  Each patient is

4  different, but generally about --

5  Q.  So from the time they swallow it until

6  the time it comes out of the other end --

7  A.  Right.

8  Q.  Do they always know when it comes out

9  the other end?

10  A.  Not necessarily.

11  Q.  You don't keep it.  It just gets thrown

12  away?

13  A.  No.  We just take out the monitor.  Once

14  it has reached its goal, which is what we call the

15  terminal ileum, the end where the cecum meets,

16  that's it.  That's usually the time.  We know

17  that's the average time.

18  Q.  How can you tell when it has reached the

19  terminal ileum?

20  A.  Well, the monitor has ways to -- once it

21  has reached that, it syncs with where the capsule

22  is.  It relays messages where it is.  It's sending

23  pictures.

24  Q.  And so when this is going on, is the

25  patient like walking around at home or is he in

---

1  is Dr. Akingbola?

2  A.  Yes.  That's another partner of ours.

3  Q.  And Star Rome is an employee of Dr.

4  Akingbola's office?

5  A.  Uh-huh (affirmative).

6  Q.  And "escorted patient to clinic in order

7  to deliver pill capsule."  Do you see that?

8  A.  Yes.  Yes.

9  Q.  Does that mean they physically handed it

10  to Mr. Boudreaux or did they ask him to swallow

11  it?

12  A.  It's in front of them they swallow the

13  pill to make sure it goes down because if it

14  doesn't go down, we have to deliver it a different

15  way.

16  Q.  I see.  So you've got to make sure it

17  gets into the --

18  A.  It gets into the system.

19  Q.  Got it.

20  A.  The pill is then not the size of the

21  average pill.  It's larger, so some patients may

22  have difficulty swallowing, so it has to be

23  delivered in front of someone.

24  Q.  Does it appear to you from this note

25  that Mr. Boudreaux swallowed the pill on February

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  20th?

2      A.   Well, "Charge entered by endoscopy

3  unit."  It seems like somebody charged the

4  patient.  He must have swallowed it.  The patient

5  was billed.

6      Q.   That's usually a good sign, right?

7      A.   A good sign, right?

8      Q.   So, Doctor, I want you to go back to

9  Page 504, which is your note of February 21, and

10  what I'm struggling with is is --

11     A.   521?

12     Q.   No.  504.

13     MR. GOZA:

14         Which would be the other way.  It's the

15  front of this, I believe.  One more page.

16     A.   Okay.

17  BY MR. McCAULEY:

18     Q.   Now, so on 504 we have a history and

19  physical by yourself.

20     MR. GOZA:

21         You guys aren't looking at the same 504.

22  Let me just turn this.

23     A.   Okay.  Okay.

24     MR. McCAULEY:

25         Thank you very much.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1      A.   Right.

2      Q.   Because I'm seeing --

3      A.   What was done this day?  It seems like a

4  service was -- service, none.  Something was

5  provided this day, huh, why I did this note or why

6  I checked off this note?

7      Q.   Yes.

8      A.   It has to be the pill.  What day was the

9  pill given?

10     Q.   Again, I'm trying to find out.  Look at

11  Page 506 again.  I'm trying to understand the --

12  these electronic records are maddening.

13     A.   Right.  They are.  So I signed it on the

14  21st.  I just signed the thing on the 21st, but

15  admission was the 20th.  The capsule was delivered

16  on the 20th.  If you go on that Page 505,

17  admission was 2/20.  I just happened to sign it

18  the 21st, the note.  You can sign the note any

19  day.  It doesn't have to be -- I must have

20  appended it and then signed it on this day at 2:18

21  p.m.  It looks like the patient was admitted for

22  the procedure on 2/20.

23     Q.   If I am looking at Page 506 -- let's

24  make sure we are on the same page.

25     A.   505, 506.  Yes.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  BY MR. McCAULEY:

2      Q.   You see that there's a history and

3  physical continued and it really starts on Page

4  503.

5      A.   Right.  Right.

6      Q.   It's your history and physical on

7  February 21.  Do you see that?

8      A.   Right.

9      Q.   Does this suggest to you that perhaps

10  Mr. Boudreaux came in overnight for the pill and

11  then you did a history and physical the next

12  morning?

13     A.   Let me see.  This is a clinic note?

14  This is from endoscopy.

15     Q.   Well, this is from February 21.

16     A.   21.  So he came to the clinic, huh?

17     Q.   I'm trying to figure it out.

18     A.   This looks like -- it's a hospital

19  outpatient procedure.  We call it -- prior to

20  every procedure, we just review the H and P.  So

21  this is an H and P prior to the procedure, which

22  is kind of mandated.  It's not a clinic note.

23  It's probably endoscopy.

24     Q.   So there may be something just off with

25  the dates on this?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1      Q.   This page here, Doctor, I'm sorry to

2  invade your space there, but it looks like, in the

3  other orders on Page 506, it looks like you issued

4  an order for the capsule endoscopy on February

5  19th.

6      A.   Yes.

7      Q.   And then it goes down further "order

8  during telephone on February 18th," and then the

9  CPT code, which is the procedure code, says "PR GI

10  tract capsule endoscopy," and then the very next

11  entry says "video capsule endoscopy," and that's

12  signed on 3/18/14.  Do you see that on the same

13  page if you go right here?

14     A.   Yes.  Yes.

15     Q.   So I'm wondering is there a difference

16  in those two orders or --

17     A.   2/18 and then here it says 3/18?

18     Q.   Yes.

19     A.   "Legacy interface."  I don't know what

20  legacy interface is.

21     Q.   We will just leave it as a mystery for

22  now.

23     A.   Yes.  I don't know.

24     Q.   But it looks to you like he got the pill

25  on February 20th?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1      A.   It looks like on the 20th he got the
2  pill and it was charged by the nurse on 2/20.
3  "Charge entered by endoscopy unit."
4      Q.   And it looks like the very preceding
5  page, 505, which you have in your hand, right on
6  your left hand, this 505 right here, this 505,
7  that's your history.   You think that was signed on
8  February 21, but actually you did it on February
9  20th?
10     A.   It says here "admission, 20th."  It was
11 electronically signed on the 21st.
12     Q.   I got it.  In that you said "Medications
13 on discharge.  Resume home meds.  No NSAIDS."
14 What does that mean?
15     A.   That means no Ibuprofen, Aleve, aspirin,
16 et cetera.
17     Q.   Why did you not want him to take any
18 Ibuprofen?
19     A.   No blood thinners.  If somebody has a
20 history of bleeding, you don't want to give them
21 any kind of --
22     Q.   NSAIDs.
23     A.   Yes.  It affects the platelets.
24     Q.   There are prescription NSAIDs and there
25 are over-the-counter NSAIDs.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  your area.
2      A.   There are different pathways of how you
3  -- the cascades, cytoband cascades, they are
4  proinflammatory and there's a balance, a ying and
5  a yang in the body.  If you look at Ibuprofen, it
6  promotes bleeding.  Those pathways which make the
7  blood, you know, thinner, I would say simply they
8  are procoagulation.  They cause injury and
9  inflammation in the mucosa by direct injury.
10     Q.   The NSAIDs do?
11     A.   Yes.  Directly and indirectly.
12     Q.   Got it.
13     A.   Through cytoband pathways.
14     Q.   Thank you.  That's as much as I can
15 absorb at this point.
16     MR. GOZA:
17          Move to strike.
18 BY MR. McCAULEY:
19     Q.   Doctor, I would like to ask some more
20 questions about the video capsule endoscopy.
21 Sometimes people call it a pill cam.  I may use
22 that word.  Is that also okay?
23     A.   That's correct.  That's correct.
24     Q.   Now, the pill cam is -- what you really
25 want to get a look at with the pill cam -- I know

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1      A.   Uh-huh (affirmative).
2      Q.   Are they equally risky for someone who
3  has got a --
4      MR. GOZA:
5           I will object to the extent it's outside
6  to his expertise.
7  BY MR. McCAULEY:
8      Q.   Well, I'm just asking what you know as a
9  doctor.
10     A.   All of them can make you bleed.  That's
11 all I can say.  There's a risk with all kind of
12 anticoagulants including this.
13     Q.   An NSAID can cause -- what's the
14 mechanism by which it causes bleeding?
15     MR. GOZA:
16          Again, same objection.  It's outside of
17 his area.
18 BY MR. McCAULEY:
19     Q.   You may answer.
20     A.   I may answer?
21     Q.   Yes, you may.  His objection is for the
22 record.
23     MR. GOZA:
24          My objection is for the record.  Unless
25 you don't have an answer, say it is outside of

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  it looks at the stomach as it goes by, but what
2  you really want to get a look at is what you
3  haven't seen before, and that is the small
4  intestine?
5      A.   That's correct.
6      Q.   You need to have a look-see into that
7  jejunum and the ileum mainly?
8      A.   That's correct.
9      Q.   And the reason you do it with the pill
10 cam is because there's, to put it crudely, lots of
11 nooks and crannies --
12     A.   That's correct.
13     Q.   -- in that small intestine, right?
14     A.   That's correct.
15     Q.   And it's very dangerous to stick an
16 instrument in there and try to weave it around all
17 of those little things?
18     A.   That's correct.
19     Q.   So this pill cam is a good solution for
20 that?
21     A.   That's correct.
22     Q.   That is it just passes through.  There's
23 no worry about puncture really.
24     A.   That's correct.
25     Q.   When the patient is sent home, he has

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  the belt on and he's told "keep that belt on until
2  you pass the pill."  Is that right?
3       A.   That's correct.
4       Q.   And then he can take the belt off, and
5  then what does he do with the belt?  Does he bring
6  it back?
7       A.   He brings it back.
8       Q.   Is it immediately read or is it
9  sometimes not read right away?
10      A.   That's a great question, you know.  We
11 try to read it as quickly as possible.  The moment
12 it is downloaded, the nurse tells us "Okay, it's
13 downloaded in the system, you can go ahead and
14 review it."  It takes time to review it.  So
15 generally within 24 hours.
16      Q.   Again, I'm trying to figure out the
17 records.  It looks like your view of that pill cam
18 came --
19      A.   There's a difference between having
20 reviewed it and having done the report.
21      Q.   Okay.  Fair enough.  So your report came
22 out in March of 2014, right, March 18th?
23      MR. GOZA:
24           507 is what he is referring to.
25 BY MR. McCAULEY:

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  20th.
2       Q.   It does say that.  Again, I have no
3  explanation other than I'm trying to figure it out
4  myself.
5       A.   Me too.  It's so far away.
6       Q.   We will just do the best we can, but it
7  looks like the procedure date on the Provation
8  report is March 18th, 2014.  I'm looking on Page
9  507 which you were looking at just a moment ago.
10      A.   Right.
11      Q.   So I would assume, and I think you have
12 already answered this, if you thought the patient
13 were bleeding, he would have had this video
14 capsule endoscopy a lot sooner than even February
15 20?
16      A.   Yes.  Oh, definitely.
17      Q.   Right, but it was because you were
18 comfortable that he was no longer bleeding that
19 you felt that he could wait until February 20th
20 after he was out of the hospital?
21      A.   That's correct.  And also, of course, if
22 he was bleeding, he would be in the emergency room
23 and we would be doing this much earlier.
24 Sometimes it's a scheduling issue.  Who knows?
25      Q.   Because these pill cams don't grow on

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1       Q.   Page 507.  It looks like your report of
2  the video capsule endoscopy --
3       A.   No.  This is probably when it got
4  signed.  You see this is not the -- it's probably
5  reviewed but signed.  So this report only comes in
6  the Provation and registered only when it's
7  signed.  The capsule endoscopy software is
8  separate from Provation software, so we have to
9  read it in Provation.  So you read it in the
10 capsule endoscopy system and then you have to
11 write a separate report in the Provation system.
12 They are two different softwares.
13      Q.   Doctor, the procedure date on this
14 report says March 18th, 2014.
15      A.   I don't know.
16      Q.   Doctor, is it sometimes the case that if
17 you schedule a video capsule for a particular date
18 that it will be rescheduled?
19      A.   Oh, yes.  Right.
20      Q.   It looks like you issued two orders for
21 a video capsule, one on February 18th and then one
22 on March 18th.
23      A.   It's possible.  There are two orders
24 here, and something may have happened here.  I
25 don't know, but they say they delivered it on the

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  trees.  You have a few pieces of equipment and you
2  have a cue of patients who use them.
3       A.   Right.  Right.
4       Q.   It's not unusual at all for a patient to
5  wait for a pill cam?
6       A.   Wait for a pill cam.  Yes.  Correct.
7       Q.   And what you are looking for in the pill
8  cam video, what is it that you are looking for?
9       A.   In the elective situation?
10      Q.   Yes.  In this situation that you have.
11      A.   You look for sources -- again, going
12 back to sources that I discussed -- a polyp, a
13 mass, an AVM, which could point out the direction,
14 an ulcer, lymphoma.  It could be anything.  We are
15 looking for a source.  Any time we have a bleed
16 related to an anticoagulant, we look for a source,
17 and that's the standard of care.
18      Q.   Right.
19      A.   And pursue it as far as possible.
20      Q.   And, Doctor, is this also true that you
21 don't always find a source of bleed with an
22 anticoagulant?
23      A.   That is accurate.
24      Q.   Is it also true, Doctor, that even in
25 patients who have bleeds in the absence of any

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  anticoagulant, you don't always find a source?
2      MR. GOZA:
3          Object.  Late foundation about the size
4  of the bleed.
5      A.  Yes.
6  BY MR. McCAULEY:
7      Q.  Doctor, it's simply a function of the
8  technology.  You can do the best you can and try
9  to find where he's bleeding from.
10     A.  That's correct.
11     Q.  But you can't always find it.
12     A.  That's correct.
13     Q.  You know something is there because he
14  has had a bleed.
15     A.  That's correct.
16     Q.  And there are instances with or without
17  anticoagulant involved where you just can't find
18  the bleed.
19     A.  That's correct.
20     Q.  But if you are comfortable enough that
21  he is no longer bleeding, that you were
22  comfortable enough, then you can do this pill cam,
23  as you say, as an elective procedure some days
24  after the patient is out of the hospital.
25     A.  That's correct.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1      Q.  Especially when you are looking in the
2  small intestines with all of those nooks and
3  crannies, it's very difficult to be sure you have
4  not -- it's not like when you are going through
5  the esophagus, as you say, with that light in the
6  tunnel and you go in the stomach and you do this
7  quadrant and that quadrant and that quadrant.  You
8  can be pretty confident you have seen everything
9  there is to see, right?
10     A.  That's correct.
11     Q.  But in the small intestines, it's
12  another story altogether, right?
13     A.  Right.  A challenge.
14     Q.  And you have no control over that pill
15  cam as it goes through as to what it's pointing at
16  or where it's pointing.  It's just sort of making
17  its way through the small intestine.  It's not
18  like a scope where you can say "Let's take another
19  look over here" --
20     A.  That's correct.
21     Q.  -- "I thought I saw something," right?
22  So, at best, you are providing the state of the
23  art diagnostic tool to Mr. Boudreaux, but the
24  state of the art is not the same thing as going in
25  and having a look yourself.  I mean you can't

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1      Q.  Now, is it fair to say that sometimes if
2  you have a source of a bleeding, some lesions,
3  some -- you can have an AVM in that small
4  intestine, for example.  They can heal in the mean
5  while some of those things.  They can go away.
6      A.  Ulcers.  Yes.
7      Q.  You can look for something like a week
8  after a bleed happened and it can already have
9  repaired itself.
10     A.  That's correct.
11     Q.  And you might not -- I think you said in
12  the case of the diverticulosis, you might see a
13  stigmata, but you don't always see those stigmatas
14  in the small intestine when you are looking for
15  things.
16     A.  That's correct.
17     Q.  So the mere fact that you didn't find a
18  bleed doesn't mean that there wasn't something
19  bleeding?
20     A.  That's correct.
21     Q.  And the mere fact that you didn't find a
22  bleed doesn't mean that it was so microscopically
23  small that nobody could see it with the naked eye.
24  That doesn't mean that.  Is that true?
25     A.  That's correct.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  really see everything there is to see with a pill
2  cam.
3      A.  We do at times go with deep, we call it
4  deep enteroscopy, but that's a decision we make
5  based on how the patient is doing.  If he has
6  evidence that he's still bleeding, in those cases
7  we go down with a deep enteroscope.  We can go
8  from the mouth to the terminal ileum all the way
9  with the scope.  It's a very thin scope.  A double
10  balloon enteroscope, single balloon enteroscope,
11  can be done, but again, we try to target where we
12  want to go, and this is kind of a targeting
13  technology where we know which part.  If you know
14  which part, then you can do something more.
15     Q.  That balloon enteroscope that you're
16  talking about, that's a very delicate
17  sophisticated device --
18     A.  That's correct.
19     Q.  -- to try to get way down into that
20  small intestine?
21     A.  That's correct.
22     Q.  And the balloon is there to sort of open
23  things up --
24     A.  That's correct.
25     Q.  -- to give you a better look, right?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1      A.   That's correct.

2      Q.   Without that balloon, things are

3  wrinkled --

4      A.   Right.

5      Q.   -- and things collapsing, and it's

6  really hard to get a look.

7      A.   It helps to get a passage.

8      Q.   But understanding that the balloon

9  enteroscopy may give you a better look, you don't

10 do it unless you are pretty confident he has got

11 an active bleed going on.

12     A.   That's correct.

13     Q.   Because it's important to know the

14 source of the bleed, but it's more important to

15 know that he's not bleeding.

16     A.   That's correct.

17     Q.   And you knew that he was not bleeding at

18 that point.

19     A.   That's correct.

20     Q.   That's why you didn't give him an

21 enteroscopy.

22     A.   That's correct.

23     Q.   Sometimes those AVMs that we talked

24 about, those little clusters, they can be hidden

25 in a little pocket --

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  four quadrants and you keep on seeing it again and

2  again and again and again.  It keeps on going

3  down.  It goes back.  It looks behind and forward,

4  both.  So you get a pretty good view, and if you

5  have seen those, they are done many times, you --

6      Q.   Well, in the hands of an expert such as

7  yourself, you get a pretty good idea of what's

8  going on.

9      A.   Sense of what's going on.  Yes.

10     Q.   But am I correct in understanding from

11 what you said that you personally don't look at

12 every frame?

13     A.   Every frame has to go through your eyes.

14     Q.   Oh, you do look at every frame?

15     A.   Oh, yes.  Every frame has to go through

16 your eyes, and you can speed it up.  You can one

17 time, two times, four times, eight times.  It

18 almost becomes like a movie.

19     Q.   I see.  So it's not an eight-hour movie,

20 though, is it?

21     A.   No.  No.  No.  You can review that

22 within 45 minutes to an hour or less --

23     Q.   I see.

24     A.   -- depending how fast you run the --

25     Q.   In your practice, do you take the first

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1      A.   That's correct.

2      Q.   -- in the small intestine.  Very

3  difficult to find even with a pill cam sometimes.

4  True?

5      A.   Yes.

6      Q.   Now, I have a question about the process

7  of reviewing the film.  When the pill cam is going

8  through, is it constantly taking pictures?

9      A.   It's a constant.

10     Q.   That's a lot of images?

11     A.   Uh-huh (affirmative).

12     Q.   So you are anticipating my next

13 question.  Do you look at eight hours worth of

14 images or how do you do it?

15     A.   You can split them into different

16 quadrants and you can view them as the thing is

17 going in the small bowel, and the software also

18 pinpoints, it marks certain suspicious areas also

19 automatically because there's a storage bank of

20 images.  So if it finds something abnormal, it can

21 give you a pointer.  When you go in, you know, our

22 eyes are tuned to blood, AVMs, polyps, anything

23 abnormal.  We have seen those images multiple

24 times.  You process it in your brain, so it's

25 going very fast.  As the pill goes down, you see

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  look at this or do you have a resident look at it?

2      A.   Residents look at -- fellows.  They are

3  trainees for gastroenterology.  They already

4  passed the -- they have their training in

5  gastroenterology.  They look at it first and then

6  we review it.

7      Q.   Okay.  So you will have a fellow, one of

8  your fellows --

9      A.   Fellows.

10     Q.   -- take a preliminary cut through it.

11     A.   Cut through it.

12     Q.   Does the fellow -- does he or she come

13 to you and say --

14     A.   "Oh, there's something there."

15     Q.   -- "I've looked at it, Doctor, and I

16 would like you to take a look at this particular

17 section"?

18     A.   Yes.  That's how it works.

19     Q.   I see.

20     A.   With a resident, they go through it.

21 That's part of the training process.  They go

22 through it and then they identify key areas where

23 they are not sure, and we go through it.

24 Sometimes nurse practitioners are trained to do

25 that too, so they can also review it and then we

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  sign off on the images.
2      Q.  I gather sometimes the capsule takes
3  longer than eight hours to get through?
4      A.  Yes.
5      Q.  Is it a little battery on board?
6      A.  Yes.
7      Q.  Something to give it power to transmit
8  images to that belt?
9      A.  Right.
10     Q.  How long does that battery last?
11     A.  It lasts more than eight hours.
12  Sometimes you may not have enough energy.  We can
13  have problems with that.  In this case it seems we
14  went all the way through and we had enough good
15  images to say that.
16     Q.  And you can say that because your
17  impression was normal ileum.
18     A.  Yes.
19     Q.  And you wouldn't say that in an
20  impression unless you had seen the ileum?
21     A.  Seen the ileum.  Yes.
22     Q.  I got you.
23     A.  Sometimes the capsule goes so fast that
24  it can land up in the colon also.  You know, by
25  the time we finish, it's sitting in the colon.

Golkow Technologies, Inc.                    Page 93

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  erosions or cause ulcers or cause anything -- I'll
2  give you an analogy.  When you are shaving your
3  face when you are on an anticoagulant, you can
4  nick yourself and you will bleed more, right?
5      A.  That's correct.
6      Q.  But the anticoagulant didn't cause the
7  nick.  It was the razorblade that did that.
8      A.  That's correct.
9      Q.  And so similarly, inside in your
10  gastrointestinal tract, the anticoagulant is not
11  acting like the razorblade nicking something and
12  causing a bleed, right?
13     MR. GOZA:
14          Objection.  It misstates the evidence.
15  BY MR. McCAULEY:
16     Q.  Is that right?
17     A.  It's not the --
18     Q.  Go ahead.  You will know how to say it
19  much better than I do.  It's not the what?
20     A.  It's not causing the break in the mucosa
21  or the break in the lining.
22     Q.  Right.  That's something that's there
23  independent of anticoagulation, right?
24     A.  Now, you have to be careful in defining
25  anticoagulation.  You have to be careful what you

Golkow Technologies, Inc.                    Page 95

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1      Q.  Now, I need to ask you some questions
2  about GI bleeds generally.
3      A.  Uh-huh (affirmative).
4      Q.  You see lots of gastrointestinal bleeds,
5  right?
6      A.  Uh-huh (affirmative).
7      Q.  And many of them have nothing to do with
8  anticoagulants.
9      A.  That's correct.
10     Q.  I mean people have gastrointestinal
11  bleeds for a whole variety of reasons.
12     A.  That's correct.
13     Q.  And anticoagulants don't cause a lesion
14  or a site of bleeding.  What happens is there's a
15  site of bleeding that, because of the
16  anticoagulant, bleeds more than it ordinarily
17  would?
18     MR. GOZA:
19          Object to form.
20  BY MR. McCAULEY:
21     Q.  Is that fair?
22     A.  Normally would.  We don't just
23  spontaneously bleed.
24     Q.  Right.  You are not aware of any
25  evidence or science that anticoagulants cause

Golkow Technologies, Inc.                    Page 94

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  consider as anticoagulants.  We are not going in
2  that area, but they do not cause that physical
3  damage.  That's all simply put.
4      Q.  Simply put, they don't cause the
5  physical damage.  What they do is reveal the
6  physical damage if there's a bleeding event?
7      A.  That's accurate.
8      Q.  And that's true of anticoagulants like
9  Eliquis and Xarelto and Warfarin, those kinds of
10  things, right?
11     MR. GOZA:
12          Object to form.
13     A.  Again, these are -- I'm not an expert in
14  these drugs.
15  BY MR. McCAULEY:
16     Q.  If you don't want to comment, that's
17  fine.  I'm not going to insist because it's
18  outside of your area.
19          Were you comfortable that he wasn't
20  bleeding because the anticoagulant had been
21  discontinued?  If you thought it was an
22  anticoagulant bleed and the doctor discontinued
23  anticoagulants after he got in the hospital, was
24  that part of the reason that you were comfortable
25  that he was not bleeding?

Golkow Technologies, Inc.                    Page 96

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1     A.   I think that's most of the time the
2  assumption.  All of these are assumptions.  That's
3  why we stop it.  We stop it because we believe
4  that that is a precipitating factor, and when it
5  stops after taking away the presumed factor, we
6  assume that that's what is happening and we are
7  comfortable.  The discharge issue is, again,
8  different.  The primary team discharges.  We just
9  give our recommendations say from our standpoint.
10     Q.   Have you had the experience that some
11 patients come in to the doctor sooner than others
12 when they see signs of internal bleeding?
13     A.   That's correct.  That's correct.
14     Q.   And that is that some patients are stoic
15 and they don't want to think anything is wrong?
16     A.   That's correct.
17     Q.   And they don't call the doctor, right?
18     A.   That's correct.
19     Q.   But some patients are attentive to the
20 signs and they will come in right away.
21     A.   That's correct.
22     Q.   And if you come in right away and have
23 the anticoagulant discontinued, that's going to
24 reduce the amount of bleeding that you do.
25     A.   That's correct.

Boudreaux_Virendra Joshi, MD Deposition_00097

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1     Q.   When you last saw Mr. Boudreaux, were
2  you satisfied that his bleeding had fully stopped?
3  In fact, when you saw him on February 5th, you
4  thought that, right?
5     A.   Yes.
6     Q.   And when you last saw him with regard to
7  the pill cam, was it your impression, based on the
8  records that were available to you, that he had
9  fully recovered from his bleeding event?
10     MR. GOZA:
11          Object to form and speculation.
12     A.   It's difficult to say.  People can
13 rebleed.  There's no way.
14 BY MR. McCAULEY:
15     Q.   You haven't had any information to
16 suggest he ever rebled?
17     A.   Right.  I haven't seen him since that
18 event.
19     Q.   So far as you know, anticoagulants don't
20 leave residual effects behind after they are
21 discontinued?
22     MR. GOZA:
23          Same objection.
24     A.   Again, I'm not an expert on
25 anticoagulation, but I presume.

Boudreaux_Virendra Joshi, MD Deposition_00099

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1     Q.   And it will also likewise reduce the
2  amount of blood that you need to have infused.
3     A.   That's accurate.
4     Q.   It will reduce your time in the
5  hospital.
6     A.   That's correct.
7     Q.   Just give me one second here, Doctor.
8  I'm almost finished.
9     A.   No problem.
10     Q.   Doctor, were you consulted by any
11 cardiologists after Mr. Boudreaux got out of the
12 hospital to your knowledge?  I didn't see anything
13 in the records.  Were you consulted by any
14 cardiologists about whether to resume
15 anticoagulation or not?
16     A.   I'm not sure.  I think he has a
17 cardiologist.  I don't know.  I'm not sure if
18 there's anything.
19     Q.   I didn't see anything, but you don't
20 have any recollection?
21     A.   No.
22     Q.   And you generally don't get involved in
23 those kinds of decisions?
24     A.   No.  We just ask the specific consult
25 for evaluation of the source, and that's it.

Boudreaux_Virendra Joshi, MD Deposition_00098

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  BY MR. McCAULEY:
2     Q.   But as a gastroenterologist --
3     A.   Yes.  I presume.  You've got to take
4  them off and they should not theoretically bleed
5  if they are out of the system.
6     Q.   Let me ask you this.  You practice
7  evidence-based medicine, right?
8     A.   Right.
9     Q.   You are at a top medical school.
10     A.   Right.
11     Q.   You were trained at Hopkins.
12     A.   Right.
13     Q.   You are a practitioner of evidence-based
14 medicine.
15     A.   Right.
16     Q.   Do you know of any evidence to suggest
17 that Xarelto or Eliquis or any of the novel
18 anticoagulants, the new oral anticoagulants, have
19 residual effects after they are discontinued?
20     MR. GOZA:
21          My objection is to speculation and no
22 foundation.
23     A.   I have no knowledge.
24 BY MR. McCAULEY:
25     Q.   But as a gastroenterologist, when you

Boudreaux_Virendra Joshi, MD Deposition_00100

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  are treating patients and they say "Doctor, I've
2  been on this anticoagulant and I have had a bleed,
3  should I worry about whether this anticoagulant
4  has injured me permanently," what would you tell
5  them?
6      A.   I would generally defer them to a
7  cardiologist who started the medication.  I
8  generally don't give an opinion where I'm in a --
9      Q.   But from someone who is an expert in the
10  gastrointestinal tract, you are not aware of any
11  evidence that anticoagulants leave behind some
12  scarring or other sort of problem with --
13      A.   Not that I'm aware of.
14  MR. GOZA:
15         Objection.  Asked and answered.
16  MR. McCAULEY:
17         Okay.  Fair enough.
18  MS. DU PONT:
19         Let's take a break.
20  MR. McCAULEY:
21         We will take a break and just consult
22  and maybe we will done.  We'll see.
23  THE VIDEOGRAPHER:
24         We are off the record at 5:23.
25         (Short break taken.)

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  anybody writes anywhere, it's all templates.  It
2  adds to the -- I may not have written it, but it's
3  just repopulated.  That's part of electronic
4  medical records.  You see these errors constantly.
5  Unless somebody removes it, it will stick there.
6  So many people are reviewing these records and
7  writing.  They keep on --
8      Q.   And maybe this is another explanation.
9  I'm going to ask you to turn to Page 502.  Do you
10  have bold face 502 in front of you?
11      A.   Uh-huh (affirmative).
12      Q.   It says in the final diagnoses -- this
13  is for the admission on 2/20/14.
14      A.   What page is it?
15      Q.   Page 502.  I think you are on it.
16      A.   504, 503.
17      Q.   They go in order.
18      A.   502.  Okay.
19      Q.   Do you see the discharge diagnoses?  The
20  first one is iron deficiency anemia.
21      A.   It should have been just anemia.  Was
22  his iron low because he bled?  I'm not sure.
23      Q.   I don't know.  Would an iron deficiency
24  or any uncertainty about iron deficiency, would
25  that hold up the video capsule?

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  THE VIDEOGRAPHER:
2         We are back on the record.  It's 5:30.
3  The beginning of Tape 2.
4  BY MR. McCAULEY:
5      Q.   Doctor, I wanted to ask a question about
6  Page 504.  It's Exhibit 5.  If you want to just
7  pick up Exhibit 5.  504 of the bold face 504.
8      A.   504, bold face 504.  Okay.
9      Q.   That's the note you signed on 2/20 and
10  you thought you probably made it on -- you signed
11  it 2/21.
12      A.   Yes.  I think it was admission.  This
13  was the day the patient was supposed to be having
14  the capsule administered.  All out-patients, they
15  come to endoscopy and you have to kind of do a
16  quick H and P.  It's a quick thing.  It's not like
17  detail stuff.  It's just that you have reviewed
18  the history and the patient gets discharged
19  afterwards.
20      Q.   I have a couple of specific questions
21  about that.  One is I see that it says under
22  "Present Illness," "iron deficiency anemia," and I
23  was trying to understand what that was about.
24      A.   I think some of these things get
25  repopulated from somewhere.  This is EPIC.  So

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1      A.   No.  No.  That's one of the reasons you
2  may be doing it.
3      Q.   Because of iron deficiency?
4      A.   Yes.  If you can't find the source, you
5  might consider doing it.
6      Q.   Doctor, can you tell me, as a
7  gastroenterologist, is somebody with hypertension
8  at risk of bleeding, gastrointestinal bleeding?
9  Does hypertension increase the risk of bleeding?
10      A.   Essential hypertension, no, but portal
11  hypertension, yes.
12      Q.   What kind of hypertension?
13      A.   It's called portal hypertension.
14  Patients with liver disease have what we call a
15  portal hypertension.  It's a raised pressure in
16  the portal system which is separate from the
17  arteriole system, so it's two different.  People
18  with liver disease have a lot of pressure develop
19  in their portal system which can make them have
20  varices, big veins in the food pipe in the
21  stomach, and they can bleed.  Not essential
22  hypertension.
23      Q.   He has essential hypertension.  I
24  understand that.  I don't want to suggest
25  otherwise.  I know he has essential.

1    A.    Yes.

2    Q.    I appreciate the distinction.  Is

3  someone who is taking aspirin long term at risk of

4  bleeding?

5    MR. GOZA:

6         Object as to the extent you're asking

7  him to speculate.  It's outside of his area.

8    MR. McCAULEY:

9         Well, I think gastrointestinal is right

10  smack dab in the middle of his area.

11    MR. GOZA:

12         And I disagree.

13    A.    I can't comment.  It's a difficult

14  question.  It all varies on how much aspirin they

15  are taking and their sensitivity to aspirin.

16  There are many variables.  The mucosa in elderly

17  may be more sensitive versus in young people.

18  It's a question which is very tough to answer.

19  BY MR. McCAULEY:

20    Q.    And is gastrointestinal bleeding

21  associated with elderly patients more than younger

22  patients, higher risk?

23    A.    Again, a difficult question.  I don't

24  think they have randomized studies to suggest that

25  elderly are particularly at risk for a GI bleed.

---

1         Just make sure you're answering yes or

2  no.  You are nodding.

3    THE WITNESS:

4         Yes.

5    MR. McCAULEY:

6         If you say out loud, it's better.

7  BY MR. McCAULEY:

8    Q.    For example, in Mr. Boudreaux's case,

9  you are not suggesting in any way that he is an

10  overresponder to anticoagulants, are you?

11    A.    No.

12    Q.    And you are not suggesting in any way

13  that he was overanticoagulated --

14    A.    No.

15    Q.    -- by his cardiologist?

16    A.    No.  No way.  No.

17    Q.    So, in other words, you can have a

18  bleed, an internal gastrointestinal bleed, without

19  any anticoagulants, correct?

20    A.    Yes.

21    Q.    You can have a gastrointestinal bleed

22  with just the right amount of anticoagulants.

23    A.    That's correct.

24    Q.    And you can have a gastrointestinal

25  bleed if, for example, you are taking Warfarin and

---

1    Q.    Doctor, you testified in response to

2  some questions from Mr. Goza that a reason someone

3  might bleed is if they are overanticoagulated or

4  if they have a -- I think you said they are a high

5  responder to anticoagulation.  Is that what you

6  testified to?

7    A.    Yes.

8    Q.    If you don't mind, I was going to ask

9  you some questions about that.

10    A.    Go ahead.

11    Q.    I understand that you are not an expert

12  in anticoagulants, so you are not an expert in

13  whether there is even such a thing as a so-called

14  high responder to anticoagulation, right?

15    A.    Yes.  I wouldn't --

16    Q.    People who are perfectly anticoagulated,

17  it's just right, might bleed if they have some

18  sort of a source --

19    A.    Source.

20    Q.    -- a spot where the bleeding can come

21  out, right?

22    MR. GOZA:

23         Again, I'm going to object to the

24  speculation.

25    MS. DU PONT:

---

1  you got too much and you are outside that

2  reference range and your blood is too thin.  Even

3  in that situation, you can bleed, right?

4    A.    Yes.

5    Q.    But you can't say whether anything that

6  happened to Mr. Boudreaux was related to any of

7  those particular scenarios, right?  I mean you

8  can't pick out which one it was?

9    A.    No.

10    MR. GOZA:

11         Object to form.

12    A.    It's not possible to.

13  BY MR. McCAULEY:

14    Q.    Now, you said that his clinical picture

15  was consistent with a bleed on anticoagulation.  I

16  think you said that.

17    A.    Yes.  That's the assumption.

18    Q.    It's also consistent with bleeds for a

19  lot of other reasons too, right?

20    A.    Yes.

21    Q.    We can say that if someone comes in who

22  has been on an anticoagulant, it's consistent with

23  what you know that anticoagulants may cause

24  something in the gastrointestinal tract to bleed,

25  right?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    A.   That's correct.

2    Q.   But it's also consistent with not being

3  on anticoagulants too to have a bleed?

4    MR. GOZA:

5         Object to form.

6    A.   Let me put it this way.  The reason we

7  were consulted was with a suspicion that there is

8  a likelihood this is related to anticoagulation.

9  That's the assumption.  That's why we went in,

10 looking for a source, and that's why we went in,

11 but you can't for sure say that this is what it

12 is.  You can't link anything unless you have

13 evidence.

14 BY MR. McCAULEY:

15   Q.   Doctor, in this case I want to give you

16 a little context, defense counsel are not allowed

17 to contact you separately from plaintiffs'

18 counsel.  That's just the rules.  I will just ask

19 you to accept that.

20   A.   Okay.

21   Q.   We can't do it.

22   A.   Okay.  Don't contact me.

23   Q.   And we won't, believe me, and we

24 haven't, right?

25   A.   No.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    Q.   Plaintiffs' counsel are allowed to

2  contact you, right?

3    A.   Okay.

4    Q.   And you were contacted back in June by

5  somebody named Mark Whitehead.  Do you remember

6  that?

7    A.   Yes.  Yes.

8    Q.   Although he's allowed to contact you, we

9  are also allowed to ask about what you discussed.

10 Okay?

11   A.   Okay.

12   Q.   How did the meeting with Mr. Whitehead

13 get set up?

14   A.   He just called my office and asked for

15 an appointment regarding my patient.

16   Q.   Were you the one who took that call from

17 him or --

18   A.   No.  No.  My nurse.

19   Q.   Okay.  Did he introduce himself as a

20 doctor?

21   A.   No.

22   Q.   When he met you, did he say "I'm a

23 doctor, I'm a medical doctor"?

24   A.   No.

25   Q.   So what did you understand his role to

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  be?

2    A.   It seems to me based on -- it was

3  through email, a request for a meeting regarding a

4  patient of mine.

5    Q.   I see.

6    A.   Old patient.  And so I thought maybe

7  some kind of, you know, litigation or some issues

8  or complaint, and he mentioned he had to talk to

9  Dr. Masri also, and that's all.

10   Q.   Did you sit down and meet with him?

11   A.   Yes.  Briefly.

12   Q.   Where was your meeting, here?

13   A.   Yes.  In my offices.

14   Q.   How long did you meet with him?

15   A.   Maybe 35, 45 minutes maybe, an hour.

16   Q.   Did he show you any documents?

17   A.   I think he showed me some of his

18 records.  He alluded to his records.  I don't have

19 any documents that he gave me.

20   Q.   When you say records, do you mean

21 medical records?

22   A.   He referred to the -- I didn't remember

23 the patient, so I looked at the chart.  I said,

24 "What's the issue?"

25   Q.   What's the situation?

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1    A.   Yes.  I had no recollection of this

2  patient, what happened, and then he had to explain

3  what the matter was.

4    Q.   So did he tell you he was acting as

5  Mr. Boudreaux's lawyer?

6    A.   Yes.  He did tell me that, and then I

7  think we referred him to our -- where we have the

8  legal system to help us to set up these

9  meetings.

10   Q.   Ochsner counsel?

11   A.   Yes.

12   Q.   In-house counsel?

13   A.   Yes.

14   Q.   So did he have to go through the Ochsner

15 legal department?

16   A.   Yes.  Yes.

17   Q.   And after that, did he meet with you or

18 before?

19   A.   This meeting was set up through that.

20   Q.   This meeting for this deposition?

21   A.   Yes.  Yes.

22   Q.   But your meeting with Mr. Whitehead, was

23 that set up through Ochsner counsel or not?

24   A.   At that time?  No.  He wanted to meet

25 with me regarding my patient, and that's about it.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1     Q.   And that's all you were told before the
2 meeting?
3     A.   Yes.  And it was through my office.
4     Q.   And at the meeting, did he make a kind
5 of presentation to you about Xarelto?
6     A.   There was some discussion of what
7 happened to the patient.
8     Q.   What did he tell you had happened?
9     A.   He had a GI bleed.  I didn't even
10 recollect, but basically he said he had a GI bleed
11 and that Mr. Boudreaux believes that this is
12 related to Xarelto.  That was the whole issue.  I
13 said "I'm not an expert on Xarelto but, you know,
14 any other way I can help you," and that's about
15 it.  To our counsel, I had told him, you know, "I
16 don't know if I have to do this or not."  They
17 said "You have to do it, the deposition."
18     Q.   This deposition you mean?
19     A.   "You have to do it because it has to be
20 done."
21     Q.   Well, with Mr. Whitehead, did he -- when
22 he got into the meeting with you, did he then tell
23 you that he was a medical doctor?
24     A.   No.
25     Q.   Did he present you with graphs of dosing

Golkow Technologies, Inc.                       Page 113

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1 documents that he brought to show you?
2     A.   No.  No.
3     Q.   Was there anybody else at this meeting
4 with Mr. Whitehead, anybody else there?
5     A.   No.  No.
6     Q.   You met with Mr. Goza today?
7     A.   Yes.
8     Q.   And that was for about five or ten
9 minutes before?
10     A.   Ten minutes maybe.
11     Q.   What did you discuss in the meeting with
12 Mr. Goza?
13     A.   We just discussed a little bit about the
14 care of the patient because I had no recollection
15 still about all the specifics of what happened,
16 and we just went over what we did, what we are
17 discussing, the endoscopy.  He didn't mention what
18 you were going to ask me, but he just, you know,
19 gave me some idea of have I ever done a
20 deposition, how to do a deposition.
21     Q.   Have you ever done a deposition before?
22     A.   Yes.
23     Q.   How many times have you done one?
24     A.   Three times.
25     Q.   I feel bad for you.

Golkow Technologies, Inc.                       Page 115

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1 regimens and twice-a-day dosing and once-a-day
2 dosing or anything like that?
3     A.   So he did tell me about Xarelto because
4 I have minimal knowledge because I don't prescribe
5 it.  We know that anticoagulants are an issue for
6 us.  We see these patients come to the hospital
7 and leaving us to consult on them.  He gave me
8 information on what Xarelto was and some other
9 drugs.
10     Q.   Did he tell you there was something
11 wrong with Xarelto compared to other drugs?
12     A.   He had some data, but I can't recollect
13 he said this was good or bad.  I don't think he
14 was in that position.
15     Q.   Did he ask you any questions about your
16 care of Mr. Boudreaux?
17     A.   My care?  He had a few questions, but I
18 had no recollection, so I had to go to the chart,
19 to the EMR.
20     Q.   Do you recall anything else that you
21 discussed with him?
22     A.   Unh-unh (negative).
23     Q.   Did you take any notes?
24     A.   No.  I didn't take any notes.
25     Q.   Did he leave you with any of the

Golkow Technologies, Inc.                       Page 114

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1     A.   Yeah.  It's not --
2     Q.   It's not a good thing.
3     A.   Well, you've got to do it.
4     Q.   Did you discuss anything about the
5 litigation with Mr. Goza, what the litigation was
6 about?
7     A.   No.  No.
8     Q.   Did you discuss anything about reasons
9 why Xarelto may have injured Mr. Boudreaux?
10     A.   No.  Actually I didn't want to even
11 discuss the drug at all.  I just wanted to discuss
12 the matter, what, you know, the patient care.
13     MR. McCAULEY:
14        I'm going to pass the witness to my
15 colleague, and I think she only has one question.
16     MS. DU PONT:
17        I have one more than one.  I don't want
18 to lie, but it's only going to be a couple of
19 minutes.
20     THE WITNESS:
21        She's with --
22     MS. DU PONT:
23        I'm with Bayer.
24     THE WITNESS:
25        Bayer is German.

Golkow Technologies, Inc.                       Page 116

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  MS. DU PONT:
2      Yes, but they have companies here in the
3  U.S. as well.
4  THE WITNESS:
5      Xarelto is made by who?
6  MS. DU PONT:
7      Should we go off the record?
8  MR. GOZA:
9      Yes.  We probably ought to wait until we
10  are done.
11  BY MS. DU PONT:
12      Q.  I just wanted to go back and understand
13  one thing about the pill capsule because there
14  were two orders, and it's on Exhibit 5 at the
15  bottom, 506.
16      A.  Yes.  Yes.  There were two orders.  I'm
17  confused too.
18      Q.  He only got one pill cam.
19      A.  One pill.  Yes.
20      Q.  And he got that one pill cam on March
21  18th, 2014, correct?
22      A.  Can I say something?
23      Q.  Yes.
24      A.  A lot of times this is on nurses'
25  orders, these things, and half the time I'm

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  signing on this.  (Indicating).
2      Q.  Right.
3      A.  They are doing all the work for us.  We
4  don't even have the time.  This order was probably
5  a verbal order.  It was not like I put it in.
6  It's a verbal order which I sign.  The nurses put
7  it in physically and then we co-sign it.  It is
8  taken as a verbal order and then we co-sign it.
9      Q.  Right, but Mr. Boudreaux had come to the
10  clinic on February 20th.  I'm reading from Page
11  506.
12      A.  Yes.  And the clinic -- you know, this
13  clinic is a little tricky here because if you look
14  at the top, it says "endoscopy."  The patient came
15  for an endoscopy, pill cam endoscopy, which is
16  routed, the billing is routed through the
17  hospital.  The nurses in the clinic -- you know,
18  we have nobody in endoscopy who can administer it,
19  so for administering reasons or administrative
20  reasons, the nurse in the clinic, which was --
21      Q.  Star Rome?
22      A.  -- Star Rome.  She was the only one
23  trained.  She probably gave the pill.  The order
24  was communicated by Jackie Fox.  If you read the
25  "ordering in verbal with readback mode," by

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  Jackie, that was at that time my nurse in the
2  clinic.  She probably wrote it, and then I signed
3  it also, so it comes as my order, and I think it
4  was done on the 20th.  I don't know why it's
5  showing unless someone -- there was an error or it
6  was -- because I have not -- I can't recollect
7  seeing the patient again.
8      Q.  So do you think he got the pill on the
9  20th but for whatever reason the report came out
10  on the 18th of March, a month later?
11      A.  Or this order, there was an order on the
12  20th and I did all of this stuff and the capsule
13  was not able to be delivered that day and the
14  patient came later and they had to put another
15  order.  We can easily find out from the patient
16  what day did you swallow the capsule.  People
17  remember all of that.  I don't think even Jackie
18  or these people remember what happened, but it
19  happens a lot of times.  Sometimes somebody would
20  have eaten something.  "Okay, we can't do it today
21  because you're not prepped."  So things happen,
22  but they are not accurately documented.  Now, we
23  can go into the EMR and see what they wrote
24  separately, and sometimes we have an additional
25  book on the side in the clinic where we keep why

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1  the patient canceled.  So there are multiple ways
2  we can go and, if you really want to know, we can
3  find it out.
4      Q.  But if the procedure date said March
5  18th, 2014, does that suggest to you that that's
6  the day that --
7      A.  Yes.
8      Q.  -- the pill capsule that you wrote the
9  report on occurred?
10  MR. GOZA:
11      I will object.  It requires speculation.
12  Clearly he doesn't know.
13      A.  I don't know.  I can't exactly -- I'm
14  also confused about how the date -- sometimes
15  these dates -- you see, note initiated on 3/18.
16  "This report has been verified."  So this is the
17  date that I signed it off in the Provation.  Now,
18  the report could have been read in the capsule
19  endoscopy software, which is separate.  It is a
20  separate software where the images are reviewed,
21  and you can do a report there also.  So that would
22  really tell exactly what and when I reviewed it.
23  This is a report.  I'm not sure this reflects
24  exactly what date I actually reviewed it.
25  Actually that will tell you when it was done

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1   exactly.  I can look into it if you want, but it's
 2   hard for me to tell you exactly.  The software of
 3   the capsule will exactly tell us the date and time
 4   of the capsule being done, the date, time and when
 5   it was read actually.
 6      Q.  Regardless of whether the capsule
 7   endoscopy or whenever this procedure happened,
 8   whether it was on February 20th or March 18th,
 9   that was at least two weeks after the bleeding
10   event had occurred, correct?
11      A.  Correct.
12      Q.  And it's quite possible that because it
13   was two weeks after the bleeding event had
14   occurred that whatever was bleeding could have
15   resolved by the time you did this test, correct?
16      MR. GOZA:
17          Object to the form.
18      A.  Possible.
19   BY MS. DU PONT:
20      Q.  You can't rule out the fact that there
21   was a bleed in his small bowel, correct?
22      A.  That's correct.
23      Q.  You said earlier that you were called to
24   consult on Mr. Boudreaux's case to identify a
25   source of the bleed, right?
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1   try to provoke memories if I can where there
 2   aren't any.  I have a note that suggests -- it's a
 3   note that phone contact was made by Jackie Fox.
 4   She's a nurse in your office?
 5      A.  Was.  Yes.
 6      Q.  Or was a nurse in your office.  It was a
 7   phone contact for preservice documentation to
 8   determine whether or not the plaintiff had iron
 9   deficiency anemia.  This is note dated February
10   20th.  The capsule procedure was to be performed
11   that date but could not be approved without that
12   info, the info about whether the patient had an
13   iron deficiency anemia or not.  If I had the note
14   in front of me, I would certainly show you.  I
15   don't have it with me, but I wonder if that note
16   would suggest to you that perhaps the intent to do
17   the pill cam on February 20 was postponed due to
18   insurance reasons or otherwise.
19      MR. GOZA:
20          I will object as to the extent it
21   clearly calls for speculation.
22      A.  I don't know.
23   BY MR. McCAULEY:
24      Q.  Fair enough.  If you don't know, you
25   don't know.  That's all I was going to ask.
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1      A.  Correct.
 2      Q.  When a patient like Mr. Boudreaux
 3   presents with black stools and weakness regardless
 4   of whether he's on an anticoagulant, won't you
 5   want to identify the source of the bleed?
 6      A.  Correct.
 7      Q.  That was the only other question that I
 8   had.
 9      MR. McCAULEY:
10          I know it's your turn, Kirk.  I was just
11   going to ask I think it makes things faster.  I
12   have one quick follow-up on this very issue of the
13   timing.  If you want to do yours first, fine.
14      MR. GOZA:
15          Go ahead.
16      MR. McCAULEY:
17          But I think you will find this is
18   better.
19      MR. GOZA:
20          Go ahead.
21   BY MR. McCAULEY:
22      Q.  I don't have the actual record in front
23   of me, Doctor, but I do have a note of what a
24   record suggests, and I'm not suggesting you have
25   to accept this at all, but part of my job is to
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1      MR. McCAULEY:
 2          Go ahead, Kirk.
 3   BY MR. GOZA:
 4      Q.  Doctor, we have had a lot of discussion
 5   -- and let me start off this way.  First of all,
 6   we had a lot of discussion about this capsule
 7   endoscopy.  As you sit here today in looking
 8   through your notes, you don't recall specifically
 9   the details of when it was done.  Is that fair?
10      A.  That's correct.
11      Q.  Because if you look at 515, Page 515, in
12   the records that the defense, Mr. McCauley, has
13   given you, it talks about a surgical report
14   actually on the day of 2/20.
15      A.  This is 5/15 here.
16      Q.  5/15 there.
17      A.  Uh-huh (affirmative).
18      Q.  Does that say surgery report?
19      A.  Surgery report.
20      Q.  And that's from the 20th?
21      A.  From the 20th.  Yes.
22      Q.  As you sit here today, bottom line is
23   you can't tell us?
24      A.  I can't tell you.  It is hard to.
25      Q.  I don't want you speculating.
```

```
 1     A.   I don't want to speculate.
 2     Q.   I want to go back on a couple of things.
 3  One, what I think is clear here is that, no
 4  question, your charge in this case, and we can go
 5  back to the original Exhibit 2 that I think we
 6  had, was that Dr. Masri brought you in because he
 7  felt there was a GI bleed related to recent
 8  Xarelto initiation, and he said "I want to have a
 9  GI consult," correct?
10     MS. DU PONT:
11          Objection.
12     A.   Correct.
13  BY MR. GOZA:
14     Q.   And there's no question that you, a
15  Johns Hopkins board certified physician who
16  teaches other physicians, undertook three separate
17  studies to evaluate the source of a bleed, true,
18  in both the upper and lower GI tracts?
19     A.   Correct.
20     Q.   No question you found no source for the
21  bleed.  True?
22     A.   Correct.
23     Q.   And I'm correct on -- there was some
24  discussion about the suspicious of Barrett's
25  syndrome.  Do you recall that?
```

---

```
 1     Q.   You were responding to some questions by
 2  Mr. McCauley, and one of those questions were did
 3  you feel comfortable that the bleeding had stopped
 4  in part because the Xarelto had been stopped.  Did
 5  I hear you say that?
 6     A.   Yes.
 7     Q.   And that was one of the things that gave
 8  you comfort, correct?
 9     A.   Yes.
10     Q.   And not only had the drug been stopped,
11  but Mr. Boudreaux had come in with a hemoglobin of
12  6.6.  True?
13     A.   Right.
14     MS. DU PONT:
15          Objection.  Foundation.  Sorry.
16     MR. GOZA:
17          Do you need to pull a record?
18     MS. DU PONT:
19          No.  Keep going.  I am just making my
20  objection.
21  BY MR. GOZA:
22     Q.   But you recall reading that, and I think
23  that was part of the record that Mr. McCauley
24  showed you, the admitting history and physical.
25  Do you recall that?
```

---

```
 1     A.   Correct.
 2     Q.   You never diagnosed Mr. Boudreaux as
 3  having Barrett's syndrome, correct?
 4     A.   Correct.
 5     Q.   He has no history of really alcohol,
 6  drinking alcohol or smoking.  There wasn't any
 7  indication there.  True?
 8     A.   Correct.
 9     Q.   In the diagnosis that they had showed
10  you on Page 10 of the records, there was no
11  diagnosis of gastroesophageal reflux.  True?
12     A.   Correct.
13     Q.   So as you sit here today, you didn't and
14  never have diagnosed Mr. Boudreaux as having
15  Barrett's syndrome, correct?
16     A.   That's correct.
17     Q.   I'm correct you have answered a number
18  of questions for me in direct examination.  You
19  stand by those answers as you sit here?
20     A.   Correct.
21     MR. McCAULEY:
22          I object to that kind of question.
23     MS. DU PONT:
24          Objection.
25  BY MR. GOZA:
```

---

```
 1     A.   Right.
 2     Q.   And the hemoglobin was 6.6, correct?
 3     A.   It was low.  The specific number, I
 4  can't --
 5     Q.   Okay.  We can pull it out if you want.
 6     A.   It was low.  It was low enough.
 7     Q.   Okay.  Consistent with a bleed?
 8     A.   Consistent with a bleed.
 9     Q.   He had the history of the black tarry
10  stools that you went into with great detail with
11  Mr. McCauley as well also consisted with some kind
12  of bleed.  True?
13     A.   Correct.
14     Q.   In addition to, on the 5th when you did
15  your consult, you I think took the position and
16  said that there were no signs of active bleeding
17  that day, correct?
18     A.   Correct.
19     Q.   You were comfortable that in all
20  likelihood the bleeding had stopped because of the
21  discontinuation of the anticoagulant.  True?
22     A.   Correct.
23     Q.   But there were other things that you
24  looked to.  In fact, you looked to the fact that
25  his hemoglobin had stabilized?
```

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
1        A.   Correct.

2        Q.   So those were also indications that

3   there was no active bleeding.  True?

4        A.   Correct.

5        Q.   I will say I don't have any questions

6   for you, Doctor.

7   BY MR. McCAULEY:

8        Q.   Just one, Doctor.  The video capsule

9   technology, is that very new technology?

10       A.   No.  It has been there for some time

11  now.

12       Q.   Has it?

13       A.   Yes.

14       Q.   No further questions.

15       A.   It was started by the Israelis.  They

16  used it.  That's how it came.  It was a Israeli

17  company.  Military.

18       Q.   Okay.

19  MR. McCAULEY:

20           I don't have any further questions.

21  MS. DU PONT:

22           No further questions for me.

23  MR. McCAULEY:

24           Thank you.  Thank you very much, Doctor.

25  THE VIDEOGRAPHER:
```

Golkow Technologies, Inc.                    Page 129

Boudreaux_Virenda Joshi, MD Deposition_00129

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
1                   WITNESS CERTIFICATE

2

3

4            I have read or have had the foregoing

5   testimony read to me and hereby certify that it is

6   a true and correct transcription of my testimony

7   with the exception of any attached corrections or

8   changes.

9

10

11

12

13

14            _____

                VIRENDRA JOSHI, M.D.

15

16

17

18  (Check One)

19  (   ) No Corrections

    (   ) Corrections; Errata Sheet(s) Enclosed

20

21

22

23

24

25
```

Golkow Technologies, Inc.                    Page 131

Boudreaux_Virenda Joshi, MD Deposition_00131

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
1            Off the record at 6:02.

2            (Off record at 6:02 p.m.)

3            (End of Deposition.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Golkow Technologies, Inc.                    Page 130

Boudreaux_Virenda Joshi, MD Deposition_00130

---

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
1              E R R A T A   S H E E T
               CHANGES IN TESTIMONY
2
          Deposition of Virendra Joshi, M.D.
3               September 28, 2016
4   Page___ Ln___  Correction_____
    Reason_____
5
    Page___ Ln___  Correction_____
6   Reason_____
7   Page___ Ln___  Correction_____
    Reason_____
8
    Page___ Ln___  Correction_____
9   Reason_____
10  Page___ Ln___  Correction_____
    Reason_____
11
    Page___ Ln___  Correction_____
12  Reason_____
13  Page___ Ln___  Correction_____
    Reason_____
14
    Page___ Ln___  Correction_____
15  Reason_____
16  Page___ Ln___  Correction_____
    Reason_____
17
    Page___ Ln___  Correction_____
18  Reason_____
19  Page___ Ln___  Correction_____
    Reason_____
20
    Page___ Ln___  Correction_____
21  Reason_____
22  I have read the testimony given by me and it is
    true and correct, subject to the changes listed
23  above.
24  Signed_____Date_____
25
```

Golkow Technologies, Inc.                    Page 132

Boudreaux_Virenda Joshi, MD Deposition_00132

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

```
 1              C E R T I F I C A T E
 2         This certification is valid only for a
    transcript accompanied by my original signature
 3  and original required seal on this page.
 4         I, Diana S. Ezell, Certified Court
    Reporter, Registered Professional Reporter,
 5  Registered Merit Reporter, in and for the State of
    Louisiana, as the officer before whom this
 6  testimony was taken, do hereby certify that
    Virendra Joshi, M.D., after having been duly sworn
 7  by me upon authority of R.S. 37:2554, did testify
    as hereinbefore set forth in the foregoing 133
 8  pages; that this testimony was reported by me in
    the stenotype reporting method, was prepared and
 9  transcribed by me or under my personal direction
    and supervision, and is a true and correct
10  transcript to the best of my ability and
    understanding; that the transcript has been
11  prepared in compliance with transcript format
    guidelines required by statute or by rules of the
12  board;
           That I am informed about the complete
13  arrangement, financial or otherwise, with the
    person or entity making arrangements for
14  deposition services; that I have acted in
    compliance with the prohibition on contractual
15  relationships, as defined by Louisiana Code of
    Civil Procedure Article 1434 and in rules and
16  advisory opinions of the board; that I have no
    actual knowledge of any prohibited employment or
17  contractual relationship, direct or indirect,
    between a court reporting firm and any party
18  litigant in this matter; nor is there any such
    relationship between myself and a party litigant
19  in this matter;
           That I am not related to counsel or to the
20  parties herein, nor am I otherwise interested in
    the outcome of this matter;
21         This 30th day of September, 2016, at New
    Orleans, Louisiana.
22
23
             _____
24           DIANA S. EZELL, CCR, RPR, RMR
             CERTIFIED COURT REPORTER #85142
25
```