Protected - Subject to Further Protective Review

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA
- - -

IN RE:  XARELTO      :  MDL NO. 2592
(RIVAROXABAN) PRODUCTS :
LITIGATION           :  SECTION L
                     :
THIS DOCUMENT RELATES :  JUDGE ELDON
TO ALL CASES         :  E. FALLON
                     :
                     :  MAG. JUDGE
                     :  NORTH

VOLUME I
- - -
October 19, 2016
- - - -
- PROTECTED -
- SUBJECT TO FURTHER PROTECTIVE REVIEW -
          Videotaped deposition of
SCOTT D. BERKOWITZ, M.D., taken pursuant
to notice, was held at the law offices of
Kaye Scholer, LLP, 250 West 55th Street,
New York, New York, beginning at 9:04
a.m., on the above date, before Michelle
L. Gray, a Registered Professional
Reporter, Certified Realtime Reporter,
Certified Shorthand Reporter and Notary
Public.

- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

---

Protected - Subject to Further Protective Review

Page 3

 1    APPEARANCES:  (Cont'd.)
 2
      KAYE SCHOLER LLP
 3    BY:  JEFFREY H. HOROWITZ, ESQ.
      250 West 55th Street
 4    New York, New York 10019
      (212) 836-7572
 5    jeffrey.horowitz@kayescholer.com
 6       - and -
 7    KAYE SCHOLER, LLP
      BY:  PAMELA J. YATES, ESQ.
 8    1999 Avenue of the Stars
      Suite 1600
 9    Los Angeles, California 90067
      (310) 788-1278
10    pamela.yates@kayescholer.com
11       - and -
12    BRADLEY ARANT BOULT CUMMINGS, LLP
      BY:  LINDSEY C. BONEY, IV, ESQ.
13    One Federal Place
      1819 Fifth Avenue North
14    Birmingham, Alabama 35203
      (205) 521-8303
15    Lboney@bradley.com
      Representing Bayer Pharmaceuticals
16    and the Witness
17
      DRINKER, BIDDLE & REATH, LLP
18    BY:  SEAN A. KENNEDY, ESQ.
      600 Campus Drive
19    Florham Park, New Jersey 07932
      (973) 549-7000
20    sean.kennedy@dbr.com
      Representing the Janssen entities
21
22
23
24

---

Protected - Subject to Further Protective Review

Page 2

 1    APPEARANCES:
 2
      LEVIN PAPANTONIO THOMAS
 3    MITCHELL RAFFERTY & PROCTOR, PA
      BY:  BRIAN BARR, ESQ.
 4    316 South Baylen Street, Suite 600
      Pensacola, Florida 32502
 5    (888) 435-7001
      bbarr@levinlaw.com
 6
         - and -
 7
      SCHLICHTER, BOGARD & DENTON, LLP
 8    BY:  ROGER C. DENTON, ESQ.
      100 South Fourth Street
 9    Suite 1200
      St. Louis, Missouri 63102
10    (314) 621-6115
      rdenton@uselaws.com
11    Representing the Plaintiffs
12
13
14
15
16
17
18
19
20
21
22
23
24

---

Protected - Subject to Further Protective Review

Page 4

 1    APPEARANCES:  (Cont'd.)
 2
 3
      ALSO PRESENT:
 4
      Larissa A. Eustace
 5    (Bayer Pharmaceuticals)
 6
 7    VIDEOTAPE TECHNICIANS:
      Henry Marte
 8    Kevin Pollard
 9
      LITIGATION TECHNICIAN:
10    John Knowles
11
12
13
14
15
16
17
18
19
20
21
22
23
24

```
 1                    -  -  -
 2                I N D E X
 3                    -  -  -
 4
 5  Testimony of:
 6                SCOTT D. BERKOWITZ, M.D.

 7           By Mr. Barr                    16
 8
 9
10
                     -  -  -
11
              E X H I B I T S
12
13
14  NO.        DESCRIPTION          PAGE
15  Berkowitz-1  E-mail Thread       26
    (398481)     4/25/11
16               Subject, Para on HB
                 Monitoring
17               XARELTO_BHCP_
                 00431001-03
18
    Berkowitz-2  Current Xarelto     32
19               Label
20  Berkowitz-3  Masterplan Project  41
    (3790275)    Description
21               Rivaroxaban BAY 59-7939
                 XARELTO_BHCP_
22               08850969-10
23
24
```

```
 1                    -  -  -
 2        E X H I B I T S (Cont'd.)
 3                    -  -  -
 4
 5  NO.        DESCRIPTION          PAGE
 6  Berkowitz-4  Laboratory Methods  47
    (99874)      Advisory Board
 7               Meeting Agenda
                 12/19/06
 8               XARELTO_BPAG_
                 00374026-31
 9
    Berkowitz-5  Clinical Development 60
10  (936154)     Go/No Go Criteria
                 Bayer
11               DVT
                 XARELTO_BPAG_
12               01894035
13  Berkowitz-6  Clinical Development 68
    (936155)     Go/No Go Criteria
14               Bayer
                 Stroke
15               XARELTO_BPAG_
                 01894036
16
    Berkowitz-7  Collaborative       71
17  (7741)       Development and
                 License Agreement
18               10/1/05
                 (Excerpted)
19               XARELTO_BHCP_
                 00015914
20
    Berkowitz-8  E-mail Thread       77
21  (399453)     Subject, Xarelto DVT
                 And SPAF List of Questions
22               XARELTO_BHCP_
                 00439542-44
23
24
```

```
 1                    -  -  -
 2        E X H I B I T S (Cont'd.)
 3                    -  -  -
 4
 5  NO.        DESCRIPTION          PAGE
 6  Berkowitz-9  E-mail Thread,      83
    (551816)     3/29/10
 7               Subject, A-GEST Review
                 Assays for Rivaroxaban
 8               XARELTO_JANSSEN_
                 02406794-97
 9
    Berkowitz-10  E-mail Thread      95
10  (177638)      V-GEST Review of
                  Manuscript
11                XARELTO_JANSSEN_
                  00500535-36
12
    Berkowitz-11  E-mail Thread     101
13  (3083259)     11/30/15
                  Subject, Request for
14                Presentations
                  XARELTO_JANSSEN_
15                15426725-28
16  Berkowitz-12  Counterpoint PK   103
    (3083260)     Based Dosing Strategy
17                PowerPoint
                  XARELTO_JANSSEN_
18                15426729
19  Berkowitz-13  E-mail Thread     136
    (1158770)     6/18/08
20                Subject, My Slides for
                  Thursday
21                Belgian Advisory Board
                  XARELTO_BHCP_
22                02644380-82
23
24
```

```
 1                    -  -  -
 2        E X H I B I T S (Cont'd.)
 3                    -  -  -
 4
 5  NO.        DESCRIPTION          PAGE
 6  Berkowitz-14  TES Advisory Board 136
    (1158771)     19, June, 2008
 7                Agenda and Presentations
                  PowerPoint
 8                XARELTO_BHCP_
                  02644384
 9
    Berkowitz-15  E-mail Thread     148
10  (372292)      4/20/11
                  Subject, SPAF
11                Responses Word Files
                  XARELTO_BHCP_
12                00159895-96
13  Berkowitz-16  List of Questions 148
    (372322)      Day 60
14                XARELTO_BHCP_
                  00160023-36
15
    Berkowitz-17  E-mail Thread     190
16  (389795)      12/4/13
                  Subject, Summary of
17                Team Telecon
                  XARELTO_BHCP_
18                00302572-77
19  Berkowitz-18  E-mail Thread     203
    (1077060)     7/15/14
20                Subject, JCC TC for
                  Portola Bayer
21                Janssen Friday
                  XARELTO_BHCP_
22                00915493-94
23
24
```

## Page 9

```
 1                    - - -
 2           E X H I B I T S  (Cont'd.)
 3                    - - -
 4
 5   NO.         DESCRIPTION              PAGE
 6   Berkowitz-19 E-mail Thread          210
     (1091142)  8/15/13
 7               Subject, Requests from
                 Portola in Prep for EOP2
 8               Meeting 081413
                 XARELTO_BHCP_
 9               01532010-12
10   Berkowitz-20 E-mail Thread          217
     (386989)   1/31/14
11               Subject, Andexanet
                 Xarelto Ph3 Protocol
12               Endpoints
                 XARELTO_BHCP_
13               00283286-87
14   Berkowitz-21 E-mail Thread          232
     (119114)   2/1/11
15               Subject, Antidote
                 GDC, 19 January 2010
16               XARELTO_JANSSEN_
                 00114700
17
     Berkowitz-22 Antidote GDC           232
18   (119115)   19 January 2010
                 PowerPoint
19               XARELTO_JANSSEN_
                 00114701
20
21
22
23
24
```

## Page 11

```
 1                    - - -
 2           E X H I B I T S  (Cont'd.)
 3                    - - -
 4
 5   NO.         DESCRIPTION              PAGE
 6   Berkowitz-28 E-mail Thread          291
     (2139017)  12/18/12
 7               Subject, Rivaroxaban
                 Monitoring, Normal Values
 8               XARELTO_BPAG_
                 05382366-67
 9
10   Berkowitz-29 E-mail Thread          296
     (3673723)  8/11/12
11               Subject, Further
                 Thoughts on GI
12               Mucosal Bleeding and
                 Anticoagulants
13               DCRI 0002808-28
14   Berkowitz-30 E-mail Thread          319
     (1070527)  3/29/15
15               Subject, Help Obtaining
                 Think Tank Summary Slides
16               XARELTO_BHCP_
                 00876949-51
17   Berkowitz-31 Opportunities and      319
     (1070529)  Challenges of Using
18               A Pharmacometric
                 Approach
19               PowerPoint
                 XARELTO_BHCP_
20               00876953
21   Berkowitz-32 M/W GR 72663 01        332
     (1589)     ENGL 01 OR PDF
22               XARELTO_BHCP_
                 00002169
23
24
```

## Page 10

```
 1                    - - -
 2           E X H I B I T S  (Cont'd.)
 3                    - - -
 4
 5   NO.         DESCRIPTION              PAGE
 6   Berkowitz-23 E-mail Thread          242
     (358604)   11/30/11
 7               Subject, Xarelto
                 Antidote Clinical
 8               Experience Study Design
                 Concepts
 9               XARELTO_BHCP_
                 00020288-90
10
     Berkowitz-24 E-mail Thread          246
11   (119111)   12/19/11
                 Subject, Project Boss
12               Riva Antidote Communication
                 XARELTO_JANSSEN_
13               00114696-97
14   Berkowitz-25 E-mail Thread          263
     (881796)   4/26/12
15               Subject, Plasma
                 Concentration of
16               Rivaroxaban
                 XARELTO_BPAG_
17               01566804-09
18   Berkowitz-26 E-mail Thread          279
     (77266)    2/10/15
19               Subject, Class Labeling
                 7-Day Information Request
20               XARELTO_BPAG_
                 00008625-27
21
     Berkowitz-27 Product Monograph      288
22   (1095705)  Date of Revision
                 11/24/14
23               XARELTO_BHCP_
                 01643646-719
24
```

## Page 12

```
 1                    - - -
 2           E X H I B I T S  (Cont'd.)
 3                    - - -
 4
 5   NO.         DESCRIPTION              PAGE
 6   Berkowitz-33 Letter from            338
     (200572)   Stockbridge to Rhoge
 7               Encl. Meeting Minutes
                 and Sponsor's Slides
 8               ESUS
                 XARELTO_JANSSEN_
 9               00632503-22
10   Berkowitz-34 GD-C-MC-SPAF           346
     (417681)   Concepts April 2006
11               PowerPoint
                 XARELTO_BPAG_
12               01170248
13   Berkowitz-35 Challenges in          357
     (1094747)  Designing and
14               Implementing a
                 Global Clinical
15               Research Program
                 10/15/14
16               XARELTO_BHCP_
                 01620471-72
17
18   Berkowitz-36 E-mail Thread          380
     (389615)   1/13/14
19               Subject, Xarelto LCM
                 Documents for our Call
20               XARELTO_BHCP_
                 00301258-59
21   Berkowitz-37 20140110 JSC           380
     (389617)   Next Steps
22               PowerPoint
                 XARELTO_BHCP_
23               00301261
24
```

---

Protected - Subject to Further Protective Review

Page 13

```
1               -  -  -
2          E X H I B I T S  (Cont'd.)
3               -  -  -
4
5  NO.        DESCRIPTION          PAGE
6  Berkowitz-38 E-mail, 11/25/13    392
   (88763)     Subject, Lifecycle
7              Proposals
               11/27/13 Draft
8              PowerPoint
               XARELTO_BPAG_
9              00057564
10 Berkowitz-39 Lifecycle Proposals 392
   (88764)     11/27/13 Draft
11             PowerPoint
               XARELTO_BPAG_
12             00057565
13 Berkowitz-40 Minutes - TASC CAR  402
   (387807)    11/27/13
14             XARELTO_BHCP_
               00287766
15
   Berkowitz-41 Status Xarelto      411
16 (91258)     LCM New Wave
               PowerPoint
17             XARELTO_BPAG_
               00066677
18
   Berkowitz-42 E-mail Thread       420
19 (389762)    12/9/13
               Subject, Slide Sets
20             XARELTO_BHCP_
               00302502
21
   Berkowitz-43 ROCKET-AF 2.0       420
22 (389766)    for LCM 20 November 13
               XARELTO_BHCP_
23             00302506
24
```

---

Protected - Subject to Further Protective Review

Page 14

```
1               -  -  -
2         DEPOSITION SUPPORT INDEX
3               -  -  -
4
5  Direction to Witness Not to Answer
6  PAGE   LINE
       None.
7
8  Request for Production of Documents
9  PAGE   LINE
       None.
10
11 Stipulations
12 PAGE   LINE
       None.
13
14 Questions Marked
15 PAGE   LINE
       None.
16
17
18
19
20
21
22
23
24
```

---

Protected - Subject to Further Protective Review

Page 15

```
1               THE VIDEOGRAPHER:  We are
2  now on the record.
3       My name is Henry Marte.  I'm
4  a videographer for Golkow
5  Technologies.
6       Today's date is October 19,
7  2016, and the time is 9:04 a.m.
8       This videotaped deposition
9  is being held at the offices of
10 Kaye Scholer LLP, 250 West 55th
11 Street, New York, New York, taken
12 in the matter of In Re:  Xarelto
13 products liability litigation,
14 filed in the United States
15 District Court, Eastern District
16 of Louisiana.
17      The deponent is Dr. Scott
18 Berkowitz.  Counsel will be noted
19 on the stenographic record.
20      The court reporter is
21 Michelle Gray and will now
22 administer the oath to the
23 witness.
24
```

---

Protected - Subject to Further Protective Review

Page 16

```
1               -  -  -
2       ... SCOTT D. BERKOWITZ, M.D.,
3  having been first duly sworn, was
4  examined and testified as follows:
5               -  -  -
6           EXAMINATION
7               -  -  -
8  BY MR. BARR:
9       Q.   Sir, could I get you to
10 state your name and full title for the
11 record.
12      A.   Scott Darrell Berkowitz.
13 I'm a vice president at Bayer
14 Pharmaceutical.  I oversee the group
15 called thrombosis group in development.
16      Q.   Okay.  And you've held that
17 title for how long?
18      A.   Since 2007.
19      Q.   2007, all right.  Now, have
20 you had your deposition taken before?
21      A.   No.
22      Q.   No.  Okay.  I'm sure your
23 counsel has given you some basic ground
24 rules to follow.  I'm not going to go
```

Protected - Subject to Further Protective Review

Page 17

```
1    through all of that with you today.
2              The only thing I ask is that
3    you allow me to get out my complete
4    question before trying to answer.  I will
5    allow you to try to get out your complete
6    answer, but try not to talk over each
7    other.  It makes for a confusion written
8    record.  It makes for a confusing video,
9    and it's hard for people to follow.  So
10   let's just try and make sure nobody is
11   talking when you are going.
12             I'm sure your lawyer at some
13   point will object.  As I'm sure he has
14   told you, unless he instructs you not to
15   answer, just let him state his objection.
16   Then go ahead and answer the question.
17   Okay?
18        A.   Okay.  Mm-hmm.
19        Q.   Is there any reason today
20   that you cannot give honest and truthful
21   testimony?
22        A.   No.
23        Q.   Just from a 30,000-foot
24   view, can you give me a thumbnail sketch
```

Protected - Subject to Further Protective Review

Page 18

```
1    of your work in Xarelto.
2         A.   Well, I joined the company
3    in 2006 as a -- in a position that we
4    call global clinical leader.  This is in
5    essence a physician who oversees an --
6    either an indication of a drug and
7    provides strategy as well as operation
8    expertise to the team.
9         Q.   Strategy as far as how to
10   conduct the clinical trials or -- or is
11   it broader than that?
12        A.   It can be broader depending
13   on when in the program you are.  So if
14   you join when it's already in Phase III,
15   then it's more about the strategy of
16   the -- the trial, probably less strategy
17   and more operation part.  When I say
18   "operation," I mean the mechanics of how
19   it goes, handling issues that come up
20   day-to-day.
21             If you come in earlier in
22   the program when a new molecule is coming
23   up, often those people are people who
24   have expertise in the field.  That's why
```

Protected - Subject to Further Protective Review

Page 19

```
1    they were hired or that's why they were
2    assigned.  So then you'll give more.
3         Q.   So you came in in 2006 --
4         A.   '6.
5         Q.   -- so that was roughly
6    between the time of Phase II and
7    Phase III?
8         A.   Correct, yes.
9         Q.   And so you had more
10   involvement in Phase III obviously than
11   you did in Phase II?
12        A.   Correct.
13        Q.   Were there any specific
14   clinical trials that you oversaw?
15        A.   Not a specific one that I
16   was directly involved in its operation
17   and mechanics.
18        Q.   Now, I want to spend some
19   time with you this morning talking about
20   the concept of monitoring as that has
21   been discussed with the use of
22   anticoagulants and Xarelto.  Do you know
23   what I mean by "monitoring"?
24        A.   Well, I know what monitoring
```

Protected - Subject to Further Protective Review

Page 20

```
1    is, but I'm not sure what you mean by
2    "monitoring."  So maybe you could tell me
3    what you're thinking with the word.
4         Q.   Well, when the label for
5    Xarelto says, "No routine monitoring
6    required," do you have an understanding
7    of what that means?
8         A.   Yes.
9         Q.   Can you give me your
10   understanding of what that means?
11        A.   What's meant with that
12   phrase is that you don't have to do a
13   blood test to keep the drug in the
14   appropriate range for the different
15   indications, unlike a drug like a vitamin
16   K antagonist, warfarin, where that is a
17   requirement.  It doesn't mean that you
18   don't watch the patient, monitor the
19   patient.  It's more about measuring a
20   value.
21        Q.   Okay.  So it's your belief
22   that the statement "no routine clinical
23   monitoring required" means you don't ever
24   have to take a measurement?
```

Page 21

```
 1        A.   I can't --
 2        MR. HOROWITZ:  Objection to
 3    form.
 4        Go ahead.
 5        THE WITNESS:  I can't agree
 6    with that, because that's not
 7    correct.  It's no routine
 8    monitoring, meaning for most
 9    patients, as they were studied in
10    the clinical trials, it's not a
11    requirement to do that.
12 BY MR. BARR:
13    Q.   Okay.  So what you're saying
14 is you don't have to regularly come in
15 and have a blood test taken like you
16 would with warfarin on Xarelto, right?
17    A.   Well, almost.  We instruct
18 people about it from the very beginning
19 and the teams and then out to physicians,
20 the patients on anticoagulants, whatever
21 they are, need to be regularly followed,
22 but in terms of drawing the blood as you
23 said, that's correct.
24    Q.   Okay.  And so all I'm really
```

Page 22

```
 1 trying to find out is if it's your
 2 position that there's never a point at
 3 which a measurement needs to be taken of
 4 either rivaroxaban blood plasma
 5 concentration or a surrogate like PT to
 6 determine whether or not somebody is
 7 properly anticoagulated with Xarelto.
 8    A.   Well, as we discussed, you
 9 were talking about routinely doing that.
10 And in general, no, that's not a
11 requirement.
12    Q.   Okay.  But there are
13 instances where you do believe
14 measurement should happen?  Is that what
15 I understand?
16    A.   Not in routine care, but
17 let's say a patient came in for a
18 bleeding event or came in for some
19 reason, the doctor wanted to know if
20 medication was on board.  I mean, I could
21 see that.  But I thought you were talking
22 about routine monitoring, the general
23 care of the patient day-to-day on the
24 drug.
```

Page 23

```
 1    Q.   Okay.  So you would agree
 2 with me that monitoring is different than
 3 measuring?
 4    A.   I believe that that's true.
 5 It's just a little bit semantics.  We
 6 can -- if we all know what we're talking
 7 about with the word, then I think we're
 8 fine.  I think that's a good description.
 9    Q.   Yeah.  I just want to make
10 sure that you and I are on the same
11 page --
12    A.   Yes.
13    Q.   -- when we're using these
14 words.
15    A.   I appreciate that.
16    Q.   That's all I'm trying to do.
17        Would you agree with me that
18 the more information -- strike that.
19        Would you agree that more
20 information to the doctor and patient is
21 better than less information about a
22 drug?
23        MR. HOROWITZ:  Objection to
24    form.
```

Page 24

```
 1        THE WITNESS:  I guess it
 2    depends on what we mean by "more
 3    information."  There's lots and
 4    lots of information about all
 5    drugs.  But doctors need only a
 6    certain information to do the
 7    daily care.  And lots of other
 8    information, including some that's
 9    in the label and some that's not
10    in the label, is not helpful to
11    practice.
12 BY MR. BARR:
13    Q.   Okay.  Do you agree with me
14 that drug companies have a responsibility
15 to provide information to doctors on how
16 to use a drug safely?
17    A.   I think it's what we try to
18 do every day, and when we develop labels
19 and when we develop our protocols for the
20 trial so they can be useful, I think
21 that's what we try to do.  So I agree in
22 that sense.
23    Q.   Okay.  Do you agree with me
24 that if a company is aware of a way to
```

Page 25

1 use a drug more safely, they have an
2 obligation to provide that information to
3 doctors?
4          MR. HOROWITZ:  Objection to
5      form.
6          THE WITNESS:  I would agree
7      that if there is knowledge that
8      would be helpful, then it's
9      important to have that.  But if
10     there's not data to show that,
11     then it doesn't help.
12 BY MR. BARR:
13     Q.   Now, we talked about this a
14 little bit.  You do agree that a doctor
15 prescribing Xarelto should be monitoring
16 the patient -- I'm not talking about
17 taking blood tests, but monitoring the
18 patient for signs of overanticoagulation?
19     A.   Yes.  And
20 underanticoagulation.  But yes.  These
21 are potent medicines, and they need to be
22 observed.  It's not just about a lab
23 test, whatever that is.
24     Q.   Right.  I want to show you

Page 26

1 what we'll mark as Exhibit Number 1.
2          (Document marked for
3      identification as Exhibit
4      Berkowitz-1.)
5          MR. BARR:  And this is
6      Plaintiff's 398481.
7 BY MR. BARR:
8     Q.   Sorry these are small and
9 may be hard to read.  It's how they are
10 produced.
11         MR. HOROWITZ:  Can you give
12     him a second there, Brian.
13 BY MR. BARR:
14     Q.   Sure.  What I'm going to
15 focus your attention on is the e-mail
16 that starts -- it's from you.  It says
17 from Scott Berkowitz sent on April 25th,
18 2011.  And it's "Re:  Para on HB
19 monitoring for Question 22 and related
20 DVT Question 35."  And it starts, "Dear
21 Olga."
22         Do you see that?
23     A.   Yes.
24     Q.   If you want to take a second

Page 27

1 to review it, that's fine.  Have you had
2 a chance to read that, sir?
3     A.   Not completely.  I'm just
4 down to the next-to-the-last paragraph.
5 I have not seen this since it was
6 written.
7     Q.   Are you ready?
8     A.   Mm-hmm.
9     Q.   There's a question that you
10 respond to.  It says, "We have a related
11 question for DVT.  And here is my current
12 draft."
13         Do you see that?
14     A.   First page?
15     Q.   On the first page, yes, sir.
16     A.   Okay.
17     Q.   "Question 35.  A
18 recommendation to follow hemoglobin
19 hematocrit levels during treatment to be
20 discussed and implemented in the product
21 information as appropriate."
22         Did I read that correctly?
23     A.   Yes.  This is a question, I
24 assume, from -- I'm not sure where it's

Page 28

1 from.  It's a question we're responding
2 to.
3     Q.   It's a question from a
4 regulatory authority?
5     A.   Okay.
6     Q.   I'm asking you.  Do you know
7 that?
8     A.   I don't know that for a
9 fact.  But it looks like a kind of
10 question that you might get when you are
11 submitting a product.  So...
12     Q.   Okay.  Do you know what
13 would have been in submission in April of
14 2011 that would get these types of
15 questions?
16     A.   We did a number of
17 indications at the time.  Well, several,
18 not a number.  But we had the atrial
19 fibrillation.  We had DVT treatment.  We
20 also had pulmonary embolism.  I'm not
21 sure.  It's in that range.
22     Q.   Okay.
23     A.   This is talking about DVT
24 trials.

Page 29

1      Q.    Right.  And the response is,
2   "Hemoglobin values were not monitored in
3   the 1/17/02 DVT and 11/8/99 trials.
4   Rather, patients were assessed at regular
5   intervals.
6            "In good anticoagulation
7   management practice, clinical
8   surveillance of any patient receiving
9   anticoagulation therapy is a must."
10           Did I read that correctly?
11     A.    You read that correctly.
12     Q.    And then it goes on to say,
13  "As these are potent medications whose
14  effect can be altered by the patient's
15  general health and current medications,
16  good clinical surveillance of the patient
17  consists of periodic visits to the
18  healthcare provider with a systematic
19  approach involving a review of the
20  patient's general clinical medication and
21  bleeding histories since the last visit,
22  and a detailed physical examination for
23  evidence of bleeding, obvious or occult."
24           Did I read that correctly?

Page 30

1      A.    Correct.
2      Q.    And then I want to point
3   down to the last paragraph of what you
4   write.  You write, "The applicant's
5   position is that clinical surveillance as
6   performed in general anticoagulation
7   management practice is the best way to
8   follow patients on anticoagulant
9   medications, including rivaroxaban, and
10  is recommended throughout the treatment
11  period.  Routine hemoglobin monitoring is
12  of low yield and appears to be clinically
13  unnecessary.  Hemoglobin testing has a
14  place when guided by clinical suspicion."
15           Did I read that correctly?
16     A.    Yes.
17     Q.    Do you know where in the
18  Xarelto label it informs any doctor that
19  good clinical -- strike that -- that
20  clinical surveillance of any patient
21  receiving anticoagulation therapy is a
22  must?
23           MR. HOROWITZ:  Objection to
24       form.

Page 31

1            THE WITNESS:  First of all,
2       this is a draft, number one.
3       Number two, it's my opinion.
4       Number three, that's not how
5       things would be put in the label.
6   BY MR. BARR:
7      Q.    So you would agree with me
8   that nowhere in the label does it inform
9   a doctor that they need to maintain good
10  clinical surveillance of their patients
11  while on Xarelto?
12           MR. HOROWITZ:  Objection to
13       form.
14           THE WITNESS:  I would not
15       say that.  I can't point to exact
16       sections, but I know that we have
17       wording in there about evaluating
18       patients.  "Surveillance," I
19       believe, is a term that's actually
20       in at least the SPC.  Maybe you're
21       talking about maybe the USPI.  I
22       don't know.
23  BY MR. BARR:
24     Q.    Yes, we're here on behalf of

Page 32

1   United States patients taking this drug
2   in the United States, so I would be
3   talking about the United States product
4   insert.
5      A.    I can't -- I can't remember
6   where it might be there, or if it's there
7   or not.  We'd have to look at the label
8   together to see.
9      Q.    Okay.  Well, I've got some.
10  I'll hand you a current label.  This is
11  labeled "current Xarelto label."  It
12  doesn't have a number.  This will be
13  Exhibit 2.
14           (Document marked for
15       identification as Exhibit
16       Berkowitz-2.)
17           MR. HOROWITZ:  Just give him
18       a minute to orient himself, Brian.
19  BY MR. BARR:
20     Q.    Well, are you familiar with
21  the United States label?
22     A.    Yes.  I don't know it word
23  for word.  And they change periodically
24  with some adjustments, but I'm familiar

Protected - Subject to Further Protective Review

Page 33

1  with it.
2       Q.   Okay.  Where in the label
3  would we expect to find language
4  informing the doctor that he needs to --
5  that clinical surveillance of any patient
6  receiving anticoagulation therapy is a
7  must?
8            MR. HOROWITZ:  Objection to
9       form.
10           THE WITNESS:  I wouldn't
11      know the section.  I'd have to
12      look through the different
13      sections to see where it might be.
14      Sometimes the way it's structured
15      is not exactly how we might write
16      the document.  So I would have to
17      look at it and see what it says.
18 BY MR. BARR:
19      Q.   Well, look for it and see if
20 you can find it for me.
21      A.   Okay.
22           And you're looking for the
23 word "surveillance"; is that...
24      Q.   I'm looking for the

Protected - Subject to Further Protective Review

Page 34

1  statement:  "Clinical surveillance of any
2  patient receiving anticoagulation therapy
3  is a must."
4       A.   Well, I don't know why it
5  would say it is a must.  That's my
6  opinion about -- as a coagulation
7  physician.  So -- in my draft document.
8  So I'm not sure if it will say those
9  exact words.
10           But I'm -- if you're aware
11 of where it is, maybe you can point me to
12 it, because I'm not.
13      Q.   I don't believe it's in the
14 label.
15      A.   Okay.  I don't know if it is
16 or not.
17      Q.   Can you point to anything in
18 the label that says "surveillance of
19 patients on Xarelto is a must"?
20           MR. HOROWITZ:  Objection to
21      form.
22           THE WITNESS:  I would have
23      to search my computer because I
24      think this would take too long to

Protected - Subject to Further Protective Review

Page 35

1       check the whole thing.  I don't
2       know where they might put it.  I
3       mean, it might be in warnings.
4       It --
5  BY MR. BARR:
6       Q.   Well, let's look at the
7  warnings section.  That's Section 5.
8            MR. HOROWITZ:  Are you done
9       with your answer?
10 BY MR. BARR:
11      Q.   Were you done with your
12 answer?  I did cut you off.
13      A.   That's fine.  Yes.  Right.
14 Let's look at it and see.
15      Q.   So the first section is
16 Section 5.1, "Increased risk of
17 thrombotic events after premature
18 discontinuation."  You don't see anything
19 in there, do you?
20      A.   No.  This is focusing on --
21 on something different.  So we need
22 something that talks about the general
23 care.
24      Q.   Okay.  And risk of bleeding,

Protected - Subject to Further Protective Review

Page 36

1  anything in there?
2       A.   Information on promptly
3  evaluating signs and symptoms of blood
4  loss.  That's important.
5       Q.   But anything in there
6  telling the doctor that they need to
7  maintain clinical surveillance of the
8  patient?
9            MR. HOROWITZ:  Objection to
10      form.
11           THE WITNESS:  Well, you
12      know, this is a -- what we are
13      talking about here is routine care
14      with any anticoagulant including
15      this one.  So one of the things
16      about the USPI, and one of the
17      things about companies putting
18      information is that we don't tell
19      doctors how to practice.  That's
20      not our purview from the company
21      and the -- from the FDA
22      standpoint, their part is in
23      protecting patients.  But they
24      don't tell the physicians what --

Protected - Subject to Further Protective Review

Page 37

```
 1        what to do unless there's
 2   something specific.
 3   BY MR. BARR:
 4        Q.   So you would agree with me
 5   that at least in the warning section, you
 6   don't see that language that you
 7   reference in your response?
 8        MR. HOROWITZ:  Objection.
 9        Asked and answered.
10        THE WITNESS:  Well, as I
11        have said, that's -- that's my
12        opinion as a coagulation physician
13        for many years.  That's my draft.
14        I don't know the other factors
15        that lead to it coming in and
16        it's -- what we can look at so
17        far, I don't see those words that
18        you mention.  But it is practice.
19   BY MR. BARR:
20        Q.   Okay.  Okay.  Now, would you
21   agree with the statement that the issue
22   of monitoring as it pertains to Xarelto
23   is purely an issue of convenience for the
24   patient?
```

Protected - Subject to Further Protective Review

Page 38

```
 1        A.   I'm sorry.  Say that again.
 2        Q.   The issue of monitoring,
 3   whether you should or should not monitor
 4   a patient on Xarelto, the only real issue
 5   is the convenience of the patient;
 6   there's no risk or safety reason not to
 7   monitor?
 8        A.   No, sir.  I'm sorry.  That's
 9   not correct.  I mean, besides the minor
10   inconvenience of coming and, you know,
11   being stuck with a needle to draw the
12   blood and then the possibility of a false
13   result, there's the possibility of
14   adjusting dose inappropriately because
15   there's no data to do it.  So there's
16   real risk in terms of certainly losing
17   efficacy and just the errors that happen
18   in clinical practice.  You don't want to
19   increase that opportunity if there's not
20   good reason to do it.  So I couldn't
21   agree with that.
22        Q.   What -- this data you're
23   talking about, where would that data have
24   to come from?
```

Protected - Subject to Further Protective Review

Page 39

```
 1        A.   It would come up with either
 2   clinical trials or prior experience, like
 3   how we developed it for warfarin.
 4   Warfarin is so old that it didn't come up
 5   in the original trials because the most
 6   important thing was, as it is now, the
 7   efficacy.  But it took many years for us
 8   to grasp and understand how to use the
 9   drug and it needed that -- that -- that
10   kind of adjustment.  It needed a
11   measurement.
12        Q.   To paraphrase that.  The
13   data would have to come from the company,
14   correct?
15        MR. HOROWITZ:  Objection to
16        form.
17        THE WITNESS:  No.  Because
18        there are lots of -- with the drug
19        being available and with grants
20        being given, there are lots of
21        other places, academic
22        institutions, small practices,
23        registries, there are lots of
24        places where there -- where those
```

Protected - Subject to Further Protective Review

Page 40

```
 1        can be done.  NIH studies.  I
 2        mean, there's a lot of places.
 3   BY MR. BARR:
 4        Q.   So you believe that the
 5   company should be able to depend upon
 6   people that aren't making money on the
 7   drug to provide data on the safe use of
 8   the drug?
 9        A.   I think our common goal has
10   been to try to do better than we have for
11   warfarin, to try to have at least as good
12   efficacy as warfarin, which is an
13   effective drug, but very difficult to
14   use.  And then to try to be as safe as
15   one can.
16        Q.   You would certainly agree
17   with me that the company has not provided
18   any data on appropriate measurements for
19   the use of Xarelto, right?
20        MR. HOROWITZ:  Objection to
21        form.
22        THE WITNESS:  As we had
23        mentioned, that's not something
24        that's required for it.  So
```

Protected - Subject to Further Protective Review

Page 41

1    there's data about why that's not
2    needed.
3    BY MR. BARR:
4        Q.   Getting back to the issue of
5    convenience. I want to hand you what is
6    plaintiffs' 3790275.
7            MR. BARR:  We'll mark this
8        as Exhibit 3.
9            (Document marked for
10       identification as Exhibit
11       Berkowitz-3.)
12   BY MR. BARR:
13       Q.   Just to set the stage on
14   this, because I'm not going to ask you
15   detailed questions about this entire
16   document.  You see that this is a --
17   what's labeled as a "Master Plan Project
18   Description Rivaroxaban, BAY 59-7539."
19   Do you see that on the front?
20       A.   Yes.
21       Q.   Okay.  And it's listed as
22   "Strictly confidential.  Do not copy
23   without authorization of a recipient."
24           Do you see that?

Protected - Subject to Further Protective Review

Page 42

1        A.   Yes.
2        Q.   Okay.  And it is -- it -- it
3    has you as a GPT member.  Do you see
4    that, it says, "Clinical, Scott
5    Berkowitz"?
6        A.   Yes.
7        Q.   Now, what I want -- do you
8    recall receiving this memo?
9        A.   No, not offhand.  This is an
10   early document, early in the program.
11       Q.   Right.
12       A.   So it must have been -- I
13   don't see a date, but it must have been
14   early.
15       Q.   Yeah, I don't need -- I was
16   hoping you could help me with that.
17       A.   I'm guessing it goes back
18   to -- if I'm on it, it could go back to
19   2006 when I joined the company.
20       Q.   Okay.  Now, what I want to
21   point you to, if you just go -- if you
22   look at the bottom, do you see the little
23   Bates numbers?
24       A.   I do.

Protected - Subject to Further Protective Review

Page 43

1        Q.   Go to the one that's 973.
2    Are you with me?
3        A.   Yes, I see.
4        Q.   Okay.  What I'm looking at
5    is Number 2, target product profile.  Do
6    you see that?
7        A.   Yes.
8        Q.   And what they are talking
9    about here is the prevention of VTE in
10   patients undergoing major orthopedic
11   surgery such as hip replacement surgery
12   or knee replacement surgery, correct?
13       A.   Yes.
14       Q.   Okay.  And then it lists
15   under convenience.  Do you see that?
16       A.   I do.
17       Q.   Well, let's break it out a
18   little.  First it says efficacy, right?
19       A.   Yes.
20       Q.   And it -- and it says,
21   "Superior efficacy compared to enoxaparin
22   and non-inferiority versus enoxaparin."
23           Do you see that?
24       A.   Yes.

Protected - Subject to Further Protective Review

Page 44

1        Q.   And then it has, "Safety.
2    Culpable safety.  No clinically relevant
3    food interaction.  No relevant drug
4    interaction."
5            Do you see that?
6        A.   Mm-hmm.
7        Q.   And then it lists
8    convenience.
9        A.   Yes.
10       Q.   "Oral twice a day.
11   Once-a-day is market enhancing."  Do you
12   see that?
13       A.   Yeah.
14       Q.   And then it says, "No need
15   for monitoring.  Monitoring of
16   coagulation parameters possible."
17           Do you see that?
18       A.   Yes.
19       Q.   So under this memo, the need
20   for monitoring is listed solely under
21   convenience, not efficacy or safety,
22   right?
23       A.   Well, that's not related
24   to -- to, according to the

Page 45

1 characteristics of the drug.  So I guess
2 their -- and I wasn't part of developing
3 the document.  I guess that was part of
4 their thinking of how that would be
5 easier, because, you know, many patients,
6 although they need anticoagulation don't
7 take it.  So it's actually the biggest
8 problem we have.  This is something that
9 Dr. Stockbridge at the FDA is really
10 strong about.
11        Q.   So the answer to my question
12 is "yes," the need for monitoring is
13 listed only under convenience, correct?
14            MR. HOROWITZ:  Objection to
15        form.  Asked and answered.
16            THE WITNESS:  Well, it
17        appears on this particular page.
18        That's the only place it is, under
19        the target product profile.
20 BY MR. BARR:
21        Q.   Okay.  Let's look at the
22 next.  It says, "Treatment," then
23 "Secondary prophylaxis of venous
24 thromboembolism, VTE treatment."

Page 47

1        Q.   The next document I want to
2 point you to is plaintiffs' 99874.
3            MR. BARR:  We'll mark this
4        as Exhibit 4.
5            (Document marked for
6        identification as Exhibit
7        Berkowitz-4.)
8 BY MR. BARR:
9        Q.   You see that this is some
10 minutes on agenda from a laboratory
11 methods advisory board meeting held on
12 December 19, 2006, in Paris.  Do you see
13 that?
14        A.   I do.
15        Q.   Do you remember this
16 meeting?
17            MR. HOROWITZ:  I'm sorry.
18        Just give him another --
19            MR. BARR:  I'm just asking
20        if he remembers the meeting in
21        Paris.
22            MR. HOROWITZ:  Yeah, answer
23        that question and take a second.
24        I don't want him flipping through

Page 46

1            Do you see that?
2        A.   Yes.
3        Q.   Do you see no need for
4 monitoring listed under either efficacy
5 or safety?
6        A.   Because the thought is it's
7 not needed, so I don't see it there.
8        Q.   It's listed only under
9 convenience again, correct?
10        A.   I see it under convenience.
11        Q.   Okay.  Then we go to drug
12 prevention and atrial fibrillation.  Do
13 you see that?
14        A.   Yes.
15        Q.   Do you see anything about no
16 monitoring necessary in efficacy or
17 safety?
18        A.   I don't see it listed there,
19 but it is -- this is just bullet points.
20        Q.   It's listed only under
21 convenience, correct?
22        A.   You mean on Bates Page 975?
23        Q.   Yes, sir.
24        A.   Yes.

Page 48

1        while he's --
2            MR. BARR:  That's fine.
3 BY MR. BARR:
4        Q.   Do you remember a meeting in
5 Paris talking about laboratory methods --
6 laboratory methods advisory board?
7        A.   I barely remember it.  I
8 mean, we've had many, many meetings.  But
9 I know that this is something that we
10 were working on.
11        Q.   Would you have attended this
12 meeting?
13        A.   If it says in here I
14 attended the meetings, I would have
15 attended.  It doesn't always mean that I
16 would.  But I see my name there.
17        Q.   Okay.  So if you want to
18 take a second to look at it.
19            MR. HOROWITZ:  Thanks.  Flip
20        and give him a second.  Thanks,
21        Brian.
22            MR. BARR:  No problem.
23            THE WITNESS:  Okay.  Thank
24        you.

Page 49

```
1    BY MR. BARR:
2         Q.   Are you ready?  Do you
3    recall why the company had a laboratory
4    methods advisory board?
5         A.   Well, those of us who
6    develop anticoagulants, this is something
7    that's important in general, just to have
8    some sense of what's going on.  We like
9    to have some measures, because we're only
10   left with clinical outcomes.  So we're
11   always looking for a surrogate marker.
12   Unfortunately in our field, unlike some
13   others, like cardiovascular where you can
14   follow blood pressure in cardiovascular,
15   we don't have great ones, but we're
16   looking to do that with each of the
17   molecules.
18        Q.   Okay.  And was this advisory
19   board a group of independent experts in
20   the field outside of the company?
21        A.   Let's take a look at the
22   list again.
23             Yes.  So there are external
24   consultants and then attendees from Bayer
```

Page 50

```
1    and from Johnson & Johnson.
2         Q.   Okay.  And just so I
3    understand what this is, are the
4    consultants and the attendees from Bayer
5    and J&J members of the board, or is this
6    just consultants?
7         A.   It's usually the -- it's for
8    the consultants, and what we strongly do
9    is, it's emphasized in our development
10   team.  We're there to listen to the
11   consultants.  We add where it's needed.
12   And of course, some of us are experts in
13   the area, but we work at the company, so
14   we -- we have that free interchange.  The
15   goal is, of course, to listen to the
16   advisors.
17        Q.   And this group of
18   consultants -- let's see, there's -- one,
19   two, three, four, five, six -- seven of
20   them.  Are these all respected people in
21   the field?
22        A.   In different areas of the
23   field, except I cannot remember a
24   Dr. Calatzis.  And I know of the -- I
```

Page 51

```
1    know of the other people or know them
2    personally.
3         Q.   I want to look at what the
4    consultants said.  I'm going down to --
5    if you're on Bates 027.  You see it
6    says -- I'm looking at the paragraph that
7    starts, "General comments about all
8    tests, confounded, and the outcomes of
9    the discussions were as follows."
10            Do you see that?
11        A.   Yes.
12        Q.   Okay.  And what I want to go
13   to is the fourth bullet point.
14        A.   So the next page?
15        Q.   Yes, sir.  What it says is,
16   "Monitoring requires standardization.
17   Sensitivity and predictability are less
18   important.  Efficacy and safety are not
19   an issue.  Human factors are the issue,
20   compliance, errors, and overdoses.
21   Short-term monitoring is simpler than
22   long-term monitoring."
23            Did I read that correctly?
24        A.   You read it correctly.
```

Page 52

```
1         Q.   All right.  So this group of
2    consultants told the company that
3    efficacy and safety are not an issue when
4    it comes to monitoring, correct?
5         A.   No, we can't tell that from
6    the minutes.  The minutes are in bullet
7    points.  They're general comments.  I
8    don't know if there was consensus or if
9    one person said it and it was included or
10   if a number of people said it and that's
11   why it was included.
12            So I can only just read that
13   at face value.  But it's not a conclusive
14   statement in my mind.
15        Q.   Is there anything in that
16   bullet point that says anybody disagreed
17   with that statement?
18        A.   It doesn't say whether three
19   agreed and three disagreed or whatever,
20   five agreed.  It doesn't say that in any
21   of them.  So I don't know what that
22   means.
23        Q.   It makes the very blanket
24   statement that efficacy and safety are
```

Page 53

```
1    not an issue, correct?
2            MR. HOROWITZ:  Objection to
3        form.  Argument.  Asked and
4        answered.
5            THE WITNESS:  We're talking
6        about an advisory committee
7        meeting that happened before any
8        Phase III trials were started, and
9        there were probably others.  And
10       there was a lot of work done over
11       the next five to seven years.  So
12       whatever it says here, that's not
13       gospel; that's just whatever the
14       minute taker put in the minutes.
15       And I'm sorry, but I don't
16       remember at the meeting.
17           I don't think if it were put
18       in there it would be to say we
19       don't care about efficacy and
20       safety.  That's not true.  But we
21       know that the drug has predictable
22       pharmacokinetics.  We know that it
23       doesn't require the kind of levels
24       that vitamin K antagonists do.
```

Page 55

```
1            THE WITNESS:  I'm sorry.
2        What's your question?
3    BY MR. BARR:
4        Q.   Let me -- I'll rephrase it.
5    No Phase III clinical trial had been
6    completed at the point this statement is
7    made, correct?
8        A.   Right.  We had Phase II
9    studies, but not Phase III.
10       Q.   Okay.  You go on to say,
11   "But the drug can be monitored very well
12   by several options.  This is a clear
13   advantage of the substance comparing
14   other anticoagulants.  The aspect that
15   Bayer is open to monitoring and supports
16   physicians that want to monitor" -- "want
17   to monitor their patients should
18   facilitate the market introduction of
19   rivaroxaban."
20           Did I read that correctly?
21           MR. HOROWITZ:  Objection to
22       form.  Brian, my objection is you
23       said "you go on to say," implying
24       that he wrote this.
```

Page 54

```
1            That's what I could say.
2    BY MR. BARR:
3        Q.   All right.  Let's go to the
4    conclusions, action items at the end of
5    this on Page 6.  I'm looking at Number 1.
6    It says, "Routine monitoring of
7    rivaroxaban is not necessary."
8            So that's the statement that
9    you just made, right?
10       A.   It happens to be.  I didn't
11   know it was here.
12       Q.   And this statement is made
13   in 2006 before the first Phase III
14   clinical trial was ever conducted, right?
15       A.   No, not conducted, but
16   finished.
17       Q.   Well, it hadn't even been
18   started yet, had it?
19       A.   Yes, the orthopedic trials
20   had started in February.
21       Q.   Had ROCKET been started yet?
22           MR. HOROWITZ:  Slow down a
23       little, Brian.  You cut him off a
24       bit.
```

Page 56

```
1            MR. BARR:  I'm sorry.
2            MR. HOROWITZ:  Sorry to be
3        hypertechnical, but --
4            MR. BARR:  No, that's okay.
5        I'll rephrase it.
6            MR. HOROWITZ:  The document
7        says.
8    BY MR. BARR:
9        Q.   Does the minutes go on to
10   say, "But the drug can be monitored very
11   well by several options.  This is a clear
12   advantage of the substance comparing
13   other anticoagulants.  The aspect that
14   Bayer is open to monitoring and supports
15   physicians that want to monitor their
16   patients should facilitate the market
17   introduction of rivaroxaban."
18           Did I read that correctly?
19       A.   You read -- you read what it
20   says there correctly.  Whether it's
21   accurate or not is different.
22       Q.   Is there anything you're
23   aware of that gives you the idea that
24   Bayer was open to monitoring when it came
```

Protected - Subject to Further Protective Review

Page 57

1 to rivaroxaban?
2      A.    Well, we're a very
3 science-driven company.  And certainly in
4 clinical development.  So we're open to
5 see if we could find methods to do that
6 if they're needed.  Not having the
7 clinical trials done, we have to prove
8 our belief.  So we are open to it.  But
9 our -- we're now in 2016.  And from that
10 decade of work, we believe that you do
11 not need routine monitoring.  That's
12 substantiated.
13      Q.    That was the decision the
14 company made in the original development
15 of this drug back in the early 2000s,
16 that we weren't going to have a drug that
17 required monitoring, correct?
18      A.    I object to your view of
19 saying that it's a decision that was
20 made.  It's an aspirational goal, because
21 why would you want to develop another
22 warfarin?  We don't need that.  So why do
23 you do the science, do the trials, put
24 the patients through all this, if you're

Protected - Subject to Further Protective Review

Page 58

1 going to have the same thing as warfarin?
2 So it was a goal.
3      Q.    Do you understand there can
4 be a difference between measuring a
5 person's blood to determine if they're
6 overanticoagulated at initiation and
7 routine monitoring as is required in
8 warfarin?  Do you understand the
9 difference there?
10      A.    I understand the difference
11 of measuring and monitoring.
12      Q.    Okay.  So just because you
13 have a drug that may require measurement,
14 that doesn't mean you've put another
15 warfarin on the market, correct?
16      A.    As I had noted, the goal of
17 developing any new oral anticoagulant
18 will be for all of them not to have to do
19 routine monitoring.
20      Q.    I mean, you're aware the
21 company never actually did any testing
22 for monitoring, correct?
23           MR. HOROWITZ:  Form.
24           THE WITNESS:  You'll have to

Protected - Subject to Further Protective Review

Page 59

1      explain to me what you mean by
2      that.
3 BY MR. BARR:
4      Q.    The company never conducted
5 any trials to determine whether or not
6 monitoring was required, correct?
7      A.    We don't do trials to
8 determine that.  We do trials to
9 determine if the drug is efficacious and
10 safe.
11      Q.    The answer to my question is
12 you never conducted a trial to determine
13 whether or not monitoring was necessary?
14           MR. HOROWITZ:  Objection to
15      form.  Asked and answered.
16           THE WITNESS:  I can only say
17      that I don't remember a trial that
18      was specifically designed to do
19      that.
20 BY MR. BARR:
21      Q.    We'll come back to that.  I
22 want -- I don't want to get too
23 sidetracked here.
24           MR. HOROWITZ:  That was the

Protected - Subject to Further Protective Review

Page 60

1      sidetrack?  What's the front
2      track?
3 BY MR. BARR:
4      Q.    Now, you're aware very early
5 on that both Bayer and Janssen, as we
6 talked about, decided they only wanted to
7 pursue Xarelto if it was a drug that did
8 not require monitoring.
9           Do you remember that?
10      A.    I don't remember that
11 exactly.  As I said, that's a goal.  If
12 it had turned out that it needed to be
13 monitored, I can't tell you what would
14 happen.
15      Q.    Okay.  Let me show you
16 Plaintiffs' 936154.
17           MR. BARR:  This will be
18      Exhibit 5.
19           (Document marked for
20           identification as Exhibit
21           Berkowitz-5.)
22 BY MR. BARR:
23      Q.    You see that this is a
24 document titled "Clinical Development

Page 61

1    Plan, Go/No go Criteria, Bayer."
2             Do you see that?
3        A.    I do.
4        Q.    And the date of this is May
5    5th, 2003.
6             Do you see that?
7        A.    Yes.
8        Q.    So this would have been
9    before you came to the company, correct?
10       A.    Yes.  About three years.
11       Q.    But you reviewed this
12   document -- document to prepare for this
13   deposition, correct?
14       A.    Not correct.  I don't
15   remember seeing it.
16       Q.    Well, it's certainly on the
17   list that was given to us of documents
18   that were at least given to you to look
19   at.
20       A.    Well, then maybe -- maybe I
21   did see it.  But I honestly don't
22   remember it.
23       Q.    Okay.
24             MR. HOROWITZ:  Yeah, that's

Page 62

1             what I was going to say.  He said
2             he didn't remember.
3             MR. BARR:  I'm just pointing
4             out that it's -- it's at least
5             been represented that it --
6             MR. HOROWITZ:  That's fine.
7             It's on his list.  We will
8             stipulate.
9    BY MR. BARR:
10       Q.    Now --
11            MR. HOROWITZ:  Brian, give
12            him a second.  You jumped right
13            in.  You've -- you've laid what it
14            is.  Give him a second to look at
15            it.
16   BY MR. BARR:
17       Q.    Are you ready?
18       A.    I think so, yeah.
19       Q.    Okay.  And -- and the -- the
20   document lists the owner as the global
21   clinical leader.  Is that the role you
22   now serve?
23       A.    No.
24       Q.    No?  Okay.  Who is the

Page 63

1    global clinical leader?
2        A.    Global clinical leader is
3    any physician that has that title
4    overseeing the product.  Remember that I
5    had mentioned in the beginning, depends
6    on where you are in the program.
7        Q.    Okay.
8        A.    In the very early years
9    there would be more of this strategy.
10       Q.    I gotcha.
11       A.    But it does not mean -- when
12   it says "owner," it doesn't mean that's
13   the only person involved, just for
14   clarity.
15       Q.    Okay.  I understand.  I'm
16   looking at the box that is Phase II-B to
17   Phase III.  Do you see that?
18       A.    Yes.
19       Q.    Okay.  And so this is the
20   phase, at least according -- this is the
21   phase where you would have been coming
22   in, right, Phase II-B to Phase III?
23       A.    Right --
24             MR. HOROWITZ:  Objection to

Page 64

1        form.  Foundation.  Time.
2             THE WITNESS:  Somebody would
3        have been global -- globe -- could
4        have been the same global clinic
5        leader or a different one.  It
6        depends on the indications because
7        we have a number of indications.
8             In the traditional sense,
9        often it's just you have one
10       indication so they would cover the
11       whole thing.  But it could be
12       somebody different.
13   BY MR. BARR:
14       Q.    Okay.  And maybe my question
15   wasn't clear.
16       A.    Okay.
17       Q.    This indication is the
18   prevention of venous thromboembolism.  Do
19   you see that?
20       A.    Oh yes, you're right.  I see
21   it.  Mm-hmm.
22       Q.    And -- and the point where
23   you actually came in to work on
24   Xarelto --

Page 65

1      A.   Mm-hmm.
2      Q.   -- was between Phase II-B
3 and Phase III, right?
4      A.   Correct.  They had just
5 started the Phase III trials when I came.
6      Q.   Okay.  And this document
7 lists here for the VTE prevention
8 indication, no-go.  Do you see that?
9      A.   The criteria for no-go.
10     Q.   Right.
11     A.   Specific criteria it says.
12     Q.   And one of -- and it says,
13 "No dose decreased the DVT incidence
14 below 20 percent or a DVT incidence below
15 20 percent was reached only in those dose
16 groups with a major bleeding rate above 4
17 to 5 percent.  Therapeutic index too
18 narrow.  Unable to go for fixed
19 unmonitored dose."
20          Do you see that?
21     A.   I see it.
22          MR. HOROWITZ:  Objection.
23     Foundation.
24 BY MR. BARR:

Page 67

1      same.
2          THE WITNESS:  So I'm just
3      simply saying that it's written
4      here just as you note under the
5      no-go specific criteria, of the
6      number of things they are looking
7      for, including therapeutic index
8      not too narrow.  Unable to go for
9      fixed unmonitored dose.  So that's
10     their target in 2003.  That's the
11     goal.
12 BY MR. BARR:
13     Q.   Mm-hmm.  So in 2003, the
14 decision is made that if we can't go
15 forward on an unmonitored dose, this is a
16 no-go, right?
17     A.   No --
18          MR. HOROWITZ:  Objection to
19     form.  Foundation.
20          THE WITNESS:  Again, it says
21     "no-go specific criteria."  But
22     it's not a decision.  It's just a
23     guidepost for what you are going
24     to do going forward.

Page 66

1      Q.   So according to this
2 document, under the clinical development
3 plan, it was a no-go if the -- if the VTE
4 prevention indication could not be
5 developed unless it was unmonitored,
6 right?
7          MR. HOROWITZ:  Objection.
8      Form.  Foundation.
9          THE WITNESS:  Well, what
10     you're looking at is a living kind
11     of document.  It appears at this
12     particular point in time, it said
13     unable to go fixed unmonitored
14     dose.  What exactly that means
15     is -- is not actually stated,
16     so --
17     Q.   Well, it's listed under
18 no-go --
19          MR. HOROWITZ:  Brian, you've
20     got to stop cutting him off.  He
21     was still speaking.
22          So go ahead and finish your
23     answer.  Brian will give you the
24     courtesy and you'll give him the

Page 68

1 BY MR. BARR:
2      Q.   Now, I want to show you
3 936155 which is Exhibit 6.
4          (Document marked for
5          identification as Exhibit
6          Berkowitz-6.)
7 BY MR. BARR:
8      Q.   Just for purposes of the
9 record, this is the same document but now
10 we're dealing with the prevention of
11 stroke in patients with atrial
12 fibrillation.
13     A.   Yes, I see that.
14     Q.   Everything about it is the
15 same, same date, same owner, correct?
16     A.   Well, same owner.  I haven't
17 been able to compare it all.  But I
18 would --
19     Q.   Okay.
20     A.   I would have to look and
21 see.  But it's the same BAY number.  I
22 don't know about IP number, et cetera.
23          MR. HOROWITZ:  Take a moment
24     and look.  Just give him a minute.

Page 69

1          It's a short document, Brian.
2   BY MR. BARR:
3          Q.    Are you ready?
4          A.    Okay.
5          Q.    If you look under the box
6   that says "Phase II-A to Phase III-A."
7   You see it also has those same no-go and
8   go criteria, right?
9              MR. HOROWITZ:  Why don't you
10             give me a continuing objection to
11             foundation based on the date.
12             MR. BARR:  Okay.  That's
13             fine.
14             MR. HOROWITZ:  I appreciate
15             it.  I'll stop objecting to your
16             question.
17             THE WITNESS:  So I see
18             no-go, and there are general
19             criteria and several to consider,
20             and then specific criteria, same
21             thing, several to consider.
22  BY MR. BARR:
23         Q.    And then there's also a go
24  criteria, correct?

Page 70

1          A.    There's a go criteria,
2   correct.
3          Q.    But under the no-go criteria
4   it also says for the -- can we call
5   the -- the atrial fibrillation stroke
6   prevention, can we call that SPAF?
7          A.    We -- sure.  We do.  Stroke
8   prevention and atrial fibrillation.
9   Mm-hmm.
10         Q.    So for the SPAF indication,
11  it also says, "Unable to go for fixed
12  unmonitored dose is a no-go criteria,"
13  correct?
14         A.    Well, again, it's one of a
15  number listed there.
16         Q.    Okay.  Now, I want to --
17  well, are you aware that in 2005 Bayer
18  entered a collaboration agreement with,
19  it was Ortho-McNeil at the time, but
20  ultimately became Janssen for the
21  co-development and promotion of Xarelto?
22         A.    Yes.
23         Q.    Have you ever read that
24  agreement?

Page 71

1          A.    Not cover to cover.  I've
2   seen it.  It's rather thick is all I
3   remember.
4          Q.    Okay.  Are you aware that
5   that agreement requires that the product
6   will not require monitoring?
7              MR. HOROWITZ:  Objection to
8              form.
9              THE WITNESS:  I would have
10             to look at the wording to say --
11             to -- to say what it actually
12             means.  If it says that, I'm not
13             aware exactly that it says that.
14  BY MR. BARR:
15         Q.    Well, let me show you.  It's
16  Exhibit 7741.  I did not bring the entire
17  collaboration agreement.
18             MR. HOROWITZ:  I'll have to
19             object.  Incomplete exhibit.
20             That's the easiest one I made all
21             day.
22             (Document marked for
23             identification as Exhibit
24             Berkowitz-7.)

Page 72

1   BY MR. BARR:
2          Q.    This is Exhibit E to the
3   collaboration agreement.
4          A.    Okay.
5          Q.    And you see if you turn
6   over -- well, it's Exhibit E marked as --
7              MR. BARR:  Well, actually, I
8              didn't mark this into the record.
9              This will be Exhibit 7.  And this
10             is plaintiffs' 7741.
11             That one was on me, not
12             Roger.
13             MR. HOROWITZ:  Roger looks
14             so happy now.
15  BY MR. BARR:
16         Q.    You see that Exhibit 7 is a
17  document titled, "Exhibit E, Marketing
18  Plan."  Do you see that?
19         A.    Right, meaning it's part of
20  the overall document?
21         Q.    Yes.
22         A.    It's an appendix or
23  something?
24         Q.    It was an exhibit to the

Protected - Subject to Further Protective Review

Page 73

```
 1   collaboration agreement.
 2        A.    Okay.  Thank you.
 3        Q.    And it's BAY 597 --
 4   BAY 59-7939.  That's rivaroxaban,
 5   correct?
 6        A.    That is.
 7        Q.    Okay.
 8              U.S. commercial strategy and
 9   initial marketing plan, Johnson &
10   Johnson, September 2005.  Do you see
11   that?
12        A.    I do.
13        Q.    What I want you to go to is
14   Page 3, and I'm looking at the paragraph
15   that says, "The BAY target product
16   profile is summarized by the following."
17              Do you see that?
18        A.    Yes.
19        Q.    Okay.  And I want to point
20   you to the very last bullet of this list.
21        A.    The next -- the next page?
22        Q.    Next page, yes, sir.
23              MR. BARR:  16068.  I'm
24        sorry.  Just telling him where it
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 74

```
 1        is.
 2              Do you got it, John?
 3        0016068.
 4              MR. HOROWITZ:  While he's
 5        doing that, take a moment to flip
 6        through the excerpts that he's
 7        given you.
 8              THE WITNESS:  Mm-hmm.
 9              MR. BARR:  If you don't have
10        it, it's not a big deal.
11              Off the record.
12              (Whereupon, a discussion was
13        held off the record.)
14              MR. BARR:  All right.  Back
15        on the record.
16   BY MR. BARR:
17        Q.    All right.  So what we're
18   looking at -- let's go back to Page 3 so
19   we have a complete uninterrupted line of
20   questions.
21        A.    Sure.
22        Q.    We're looking at, it says,
23   "The BAY target product profile is
24   summarized by the following."
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 75

```
 1              Do you see that?
 2        A.    I see that.
 3        Q.    Okay.  And what I want to
 4   point you to is the last bullet point on
 5   Page 4.  It says, "Use of the product."
 6   And the product in this case is Xarelto,
 7   right?
 8        A.    Yes, it's in that category.
 9        Q.    "Use of the product shall
10   not require routine monitoring."
11              Did I read that right?
12        A.    Yeah.
13        Q.    It uses the word "shall,"
14   right?
15        A.    Yeah, in a future -- future
16   sense.  That's their hope.
17        Q.    Well, that's not a hope, is
18   it?  Is "shall" a hope?
19        A.    Well, until the --
20              MR. HOROWITZ:  Wait, wait.
21        Objection to form.  Asked and
22        answered.  Argument.
23              THE WITNESS:  In a document
24        that's written in 2005 without the
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 76

```
 1        trials done, that's aspirational.
 2        That's not a requirement.  I mean,
 3        the results will come out, right?
 4   BY MR. BARR:
 5        Q.    Does it -- does it say, "We
 6   hope that the product will not require
 7   monitoring"?
 8        A.    No.  I was not saying that's
 9   what it says in the document.  I was
10   saying, when you asked about "shall,"
11   that's not a commandment.  It's
12   aspirational.  It's what they are
13   expecting and hoping to happen.
14        Q.    Now, you're certainly aware
15   that there were instructions from the
16   leaders at Bayer to resist monitoring,
17   correct?
18              MR. HOROWITZ:  Objection to
19        form.
20              THE WITNESS:  That's not
21        correct, in my interpretation.  I
22        never received any instructions or
23        know of anyone that received
24        instructions that you can't
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Page 77

```
1           develop a molecule.
2                As I've said, a molecule
3           that does not have it.  But it's
4           certainly our goal.  And those of
5           us who have worked in the field a
6           long time, and there are a number
7           at Bayer, as well as myself, this
8           is what we're trying to do.
9    BY MR. BARR:
10          Q.   Okay.  Let me show you what
11   I'm going to mark as Exhibit Number 8.
12   This is Plaintiffs' 399453.
13               (Document marked for
14          identification as Exhibit
15          Berkowitz-8.)
16               MR. HOROWITZ:  Take a moment
17          to look through it.
18   BY MR. BARR:
19          Q.   I'm focusing purely on the
20   top e-mail.  Actually, no, the top two
21   e-mails.
22               MR. HOROWITZ:  Two.
23   BY MR. BARR:
24          Q.   Just let me know when you're
```

Page 79

```
1           Q.   And Mr. Glombitza on the
2    next page writes, "Dear Kemal," right?
3                Do you see that?
4           A.   Oh, yes.  I'm sorry.  I
5    thought you were going to continue.
6           Q.   No, no.  I wanted to make
7    sure you were there.
8           A.   Yeah, we are on the next
9    page.  Yeah.
10          Q.   Who is Kemal Malik?
11          A.   Dr. Malik is on the board of
12   Bayer now.  His position was, I believe,
13   at the time head of clinical development.
14   No.  Sorry.  Head of development.
15          Q.   Is that higher or lower in
16   the chain than you?
17          A.   Higher than me.
18          Q.   And Mr. Glombitza lists
19   pushback items.
20               Do you see that?
21          A.   Yeah, it looked like from me
22   reading it, a list of questions.
23          Q.   All I asked is if you saw
24   it.
```

Page 78

```
1    ready.
2           A.   Okay.
3           Q.   You ready?  You see -- we're
4    going to start with the e-mail that
5    starts -- it looks like it's from
6    Mr. Glombitza.
7                Do you see that?
8           A.   I do.
9           Q.   On April 28, 2011.  It's to
10   Kemal Malik.  It copies a whole series of
11   people, including yourself, right?  I can
12   circle you.
13          A.   Right.  I'm having trouble
14   finding.
15               MR. HOROWITZ:  Mind if I
16          help?
17               THE WITNESS:  I see it.
18          Thank you.
19   BY MR. BARR:
20          Q.   And it's subject, "Xarelto,
21   DVT and SPAF, list of questions, Day 1
22   for release, strategy of response."
23               Do you see that?
24          A.   Yes.
```

Page 80

```
1                MR. HOROWITZ:  Hold on a
2           second.
3                MR. BARR:  Okay.  All I
4           asked if he saw it.
5                MR. HOROWITZ:  Okay.  That's
6           fair.
7                Answer his question.  You'll
8           get a chance.  He'll ask you more
9           questions.
10               THE WITNESS:  Okay.  I see a
11          space under Bernhard's name that
12          says "pushback items."
13   BY MR. BARR:
14          Q.   Okay.  And one of the
15   pushback items listed is, "No specific
16   monitoring."
17               Do you see that?
18          A.   Yes.  It says, "Hemoglobin
19   renal coagulation."
20          Q.   So that is what
21   Mr. Glombitza is relating to Mr. Malik or
22   Dr. Malik as something that we need to
23   push back on, right?
24               MR. HOROWITZ:  Objection to
```

Page 81

```
 1        form.
 2          THE WITNESS:  Yeah, I don't
 3      know exactly what he means by this
 4      laundry list and what it relates
 5      to.  As I read the rest of the
 6      e-mail, I don't see anything in it
 7      about monitoring or not.
 8   BY MR. BARR:
 9      Q.   Now let's look at
10   Dr. Malik's response to Mr. Glombitza,
11   which is on the first page.  And this is
12   May 3rd, 2011, correct?
13      A.   Correct.
14      Q.   And you received this e-mail
15   as well, correct?
16      A.   Well, I'm listed on it.  I
17   can't say that I remember it.
18      Q.   Okay.  Do you make a habit
19   of reading e-mails that are sent to you?
20      A.   I try to.  I get 125 to 130
21   a day, so sometimes it's a challenge.
22      Q.   Join the club.
23      A.   But I try, yeah.
24      Q.   Okay.  And it says, "Dear
```

Page 83

```
 1        considerations from my side,"
 2        among which that was listed.
 3   BY MR. BARR:
 4      Q.   Your boss's boss's boss?
 5      A.   Understood.
 6      Q.   Let me show you another one.
 7   We'll mark this as Exhibit 9.
 8          (Document marked for
 9        identification as Exhibit
10        Berkowitz-9.)
11          MR. BARR:  And this is
12        Plaintiffs' 551816.
13   BY MR. BARR:
14      Q.   I will say that I don't see
15   you listed on this e-mail.
16          MR. HOROWITZ:  Foundation.
17   BY MR. BARR:
18      Q.   But it is a document that,
19   according to the response to our notice
20   we got from your lawyers, that you had
21   reviewed prior to this deposition.  Do
22   you recall reviewing this document?
23      A.   Again, not offhand.  I
24   don't -- I'm not saying that I didn't.
```

Page 82

```
 1   Bernhard, thanks.  A few considerations
 2   from my side."  And Number 2 he says,
 3   "Monitoring should be resisted."
 4          Did I read that correctly?
 5      A.   That's correct.
 6      Q.   That's Dr. Malik.  Fair to
 7   say he's your boss?
 8      A.   He is my boss's boss's boss.
 9      Q.   He is way up there?
10      A.   Yes, he's way up there.
11   This is not the way our company works.
12   We're not directed -- it's not
13   hierarchical in that sense.  We're
14   trusted as the clinical developers to do
15   what's -- basically we call it following
16   the science.
17      Q.   Okay.  So your boss's boss's
18   boss wrote an e-mail May 3rd, 2011, that
19   said, "Monitoring should be resisted,"
20   right?
21          MR. HOROWITZ:  Objection to
22        form.  Asked and answered.
23          THE WITNESS:  The e-mail
24        actually says, "A few
```

Page 84

```
 1   I'm saying I guess it didn't strike in my
 2   memory.
 3          MR. HOROWITZ:  Just I don't
 4        want to put a speaking objection,
 5        but I am.  I mean, I don't think
 6        that would cure a foundation
 7        objection that it's on his list of
 8        materials reviewed.
 9          MR. BARR:  We can let Judge
10        Fallon deal with that, and then
11        I'll give you a continuing
12        objection on that.
13          MR. HOROWITZ:  I appreciate
14        that.
15   BY MR. BARR:
16      Q.   All right.  You see this is
17   an e-mail.  And I'm only looking at the
18   top e-mail.
19      A.   Right, but to understand the
20   top e-mail, I need to look at the thread.
21      Q.   Let me ask the questions
22   first.  And then see if you need -- if
23   you need it to answer my question, that's
24   fine.  But let me ask the question and
```

Protected - Subject to Further Protective Review

Page 85

```
1   then let's see if you need to review.
2           MR. HOROWITZ:  Go ahead and
3       ask your question.  But if he
4       wants to review, let him review.
5   BY MR. BARR:
6       Q.    You see that this is an
7   e-mail from
8   AnjaAlpers@BayerHealthcare.com.
9           Do you see that?
10      A.    I do.
11      Q.    Do you know who that is?
12      A.    Yeah.
13      Q.    Who is that?
14      A.    She's a global project
15  management person.
16      Q.    Where does she fall in the
17  hierarchy?  If Dr. Malik is your boss's
18  boss's boss, where is Mr. Alpers in the
19  hierarchy?
20      A.    Our structure is not in the
21  hierarchy in that sense.  It's a matrix
22  organization.  She is in project
23  management.  That's part of development.
24  It's not -- it's not in the clinical
```

Protected - Subject to Further Protective Review

Page 87

```
1   this.
2           She writes, "In general" --
3   and this is March 29, 2010.
4           Do you see that?
5       A.    I do.
6       Q.    She writes, "In general, we
7   should avoid to talk too much about
8   'monitoring of rivaroxaban.'  The
9   underlying message that 'no monitoring of
10  rivaroxaban is required' needs to be
11  kept.  The lab tests which are described
12  could be of assistance in specific
13  clinical circumstances, but sometimes it
14  reads that they should be used to
15  monitoring rivaroxaban."
16          Did I read that right?
17          MR. HOROWITZ:  Objection to
18      form.  Foundation.
19          MR. BARR:  I already gave
20      you a continuing.
21          MR. HOROWITZ:  Sorry.  I
22      can't help myself.  But the other
23      thing is let the man read the
24      document now.
```

Protected - Subject to Further Protective Review

Page 86

```
1   development group that I'm in, but we
2   work together on these projects.  That's
3   what I mean by "matrix."  So that's the
4   best I could say.
5       Q.    Do you have any sense of
6   what her role with Xarelto was?
7       A.    Well, we have different team
8   members.  We have clinical development
9   physicians.  We have statisticians.  We
10  have regulatory advice.  We have project
11  managers that help guide timelines and
12  pull things together to bring information
13  to management.  Does that help?
14      Q.    Yeah, yeah.  I'm just
15  trying -- but you don't know specifically
16  what her role was?
17      A.    Well, we have on -- at the
18  time in 2010, she was one of the global
19  project managers.  Exactly what
20  responsibilities were assigned to her as
21  opposed to some of the others, I don't
22  remember.
23      Q.    Okay.  And I just want to
24  see if you were ever told anything like
```

Protected - Subject to Further Protective Review

Page 88

```
1           MR. BARR:  I'm just asking
2       if he was ever given an
3       instruction like that.
4           MR. HOROWITZ:  Objection to
5       form.  If you want him to read the
6       document, because you're using the
7       document as a prop to ask the
8       question.
9           MR. BARR:  I'm just asking
10      if he was ever given this
11      instruction.
12          MR. HOROWITZ:  Are you
13      telling him not to read the
14      document?
15          MR. BARR:  He doesn't need
16      to read the document to know
17      whether or not he was ever given
18      that instruction.
19          MR. HOROWITZ:  He needs to
20      read the document if you're going
21      to use it as an exhibit.
22          MR. BARR:  No, he doesn't.
23  BY MR. BARR:
24      Q.    Can I get an answer, sir?
```

Page 89

```
 1              MR. HOROWITZ:  No, you
 2    cannot.
 3              Don't answer the question.
 4              MR. BARR:  You're going to
 5    instruct him not to answer?
 6              MR. HOROWITZ:  Absolutely,
 7    until he's read the document.
 8    Once he's read the document, I'll
 9    be happy to answer your questions.
10              MR. BARR:  We can go off the
11    record and he can read every
12    document.
13              MR. HOROWITZ:  We're not
14    going off the record.
15              MR. BARR:  We had a long
16    discussion about this in the depo
17    protocols.  And it wasn't going to
18    be this thing where someone has to
19    read every page of the document.
20              MR. HOROWITZ:  I'll tell you
21    what, my brother, my witness is
22    going to take a look at the
23    document if you're going to use it
24    as a prop to ask these questions.
```

Page 91

```
 1    language.  And this wording that
 2    you and I discussed in the
 3    beginning about what is
 4    monitoring, what is measuring.  So
 5    that's all I see.  I don't see
 6    a -- you know, a demand, don't do
 7    this.  I think there's a -- trying
 8    to explain our thinking in terms
 9    of how we view it.
10    BY MR. BARR:
11         Q.   So you don't recall anybody,
12    other than Mr. Malik's e-mail, coming to
13    you and saying let's not talk too much
14    about monitoring?  Nobody ever did that
15    to you?
16         A.   No --
17              MR. HOROWITZ:  Objection to
18    form.
19              THE WITNESS:  No.  That's
20    not how it works in our company.
21    And I don't believe that that's
22    the case.  I have not heard that
23    in meetings.  I mean, I think you
24    may look at the e-mail from
```

Page 90

```
 1    So go ahead and look at the
 2    document.
 3              THE WITNESS:  So I've looked
 4    at the document --
 5              MR. BARR:  If it continues
 6    we're going to get the judge on
 7    the phone.  We're not going to
 8    waste time like this.
 9              MR. HOROWITZ:  Do what you
10    need to do.
11              Go ahead and read.
12              THE WITNESS:  I've had an
13    opportunity to read the document,
14    and I can now answer the question.
15              MR. BARR:  That's what you
16    were doing.
17              MR. HOROWITZ:  It worked.
18              THE WITNESS:  So as I read
19    this, I mean, I don't remember
20    getting a direct -- someone
21    telling me to do that.
22              What I read is someone -- is
23    two things.  Someone who doesn't
24    speak English as their primary
```

Page 92

```
 1    Dr. Malik and say that's what he
 2    was saying.  But I know Dr. Malik,
 3    and I know that he wouldn't do
 4    that.  But e-mail is not the best
 5    form to discuss those things
 6    because they can be
 7    misinterpreted.
 8    BY MR. BARR:
 9         Q.   You know he wouldn't do that
10    even though he did do it?
11              MR. HOROWITZ:  Objection to
12    form.
13              THE WITNESS:  Well, he
14    wrote -- he wrote a sentence.  But
15    as you know, what gets put in
16    e-mail doesn't give all the
17    context like you and I can do back
18    and forth.
19              And I know Dr. Malik, and
20    that's just not the kind of thing
21    he does.  That's -- the culture
22    that we have at Bayer is not like
23    that.
24    BY MR. BARR:
```

Protected - Subject to Further Protective Review

Page 93

1      Q.   Well, let's look back at
2  Exhibit Number 8.
3            MR. HOROWITZ:  Read the
4        whole thing.  I'm just kidding.
5  BY MR. BARR:
6      Q.   Which is Dr. Malik's e-mail.
7  Is there anything ambiguous or unclear
8  about his statement that requires more
9  context that monitoring should be
10 resisted?
11     A.   Well, it's ambiguous as to
12 what does "resisted" mean, Number 1 --
13 Number 1.
14          Number 2, knowing Dr. Malik,
15 or anyone who writes me an e-mail, I have
16 the -- the background of knowing what
17 they mean.  We have prior conversations.
18 We have discussions at meetings.  So that
19 factors in, not the four words that are
20 there.
21     Q.   So -- so what did he mean,
22 other than to resist it, by "monitoring
23 should be resisted"?
24          MR. HOROWITZ:  Objection to

Protected - Subject to Further Protective Review

Page 95

1            MR. BARR:  And this is
2        Plaintiffs' 177638.
3            (Document marked for
4            identification as Exhibit
5            Berkowitz-10.)
6  BY MR. BARR:
7      Q.   And I'll give you a minute
8  to look at it.  I just want to ask --
9            MR. HOROWITZ:  Thank you
10 very much.
11 BY MR. BARR:
12     Q.   You see that this is an
13 e-mail from Gerlind Holberg?
14     A.   Gerlind Holberg.
15     Q.   And -- this is sent to a
16 group of people including yourself,
17 right?
18     A.   Yes.
19     Q.   You are on the second line
20 there, right?
21     A.   I see it.  Mm-hmm.
22     Q.   This is July 16, 2012,
23 correct?
24     A.   Yes.  Mm-hmm.

Protected - Subject to Further Protective Review

Page 94

1        form.
2            THE WITNESS:  I think you'd
3        have to ask Dr. Malik.
4  BY MR. BARR:
5      Q.   Well, you said you had
6  multiple discussions with him and you
7  know that's not what he meant.  So I'm
8  asking you what he meant.
9            MR. HOROWITZ:  Same
10         objections.
11           THE WITNESS:  It's the same
12       thing.  I don't know exactly
13       what -- what he meant.  You'd have
14       to talk to him what was in his
15       mind.  But my interpretation of
16       what he put here is not -- it's
17       not -- not directly to me, but,
18       Scott, don't do this.  Because
19       that's just not my experience in
20       my decade of work I've had at
21       Bayer.
22 BY MR. BARR:
23     Q.   Let me show you what I'm
24 going to mark as Exhibit Number 10.

Protected - Subject to Further Protective Review

Page 96

1      Q.   Okay.  Who is Gerlind
2  Holberg?
3      A.   Gerlind Holberg is one of
4  the medical affairs colleagues in the --
5  on the program at the time.
6      Q.   And do -- do you recall in
7  2016 what Gerlind's responsibility was in
8  2012?
9      A.   Not exactly.  It's a medical
10 affairs group.  It's different than
11 clinical development so I don't know
12 exact role.
13     Q.   I mean --
14     A.   She's on the Xarelto
15 program.  She's -- I don't know what
16 responsibilities her manager assigned
17 her.
18     Q.   Okay.  All right.  Fair
19 enough.
20     A.   But I -- I mean, I know her.
21     Q.   Okay.  You work with her
22 regularly?
23     A.   Not regularly.  But -- but
24 frequently enough.

Protected - Subject to Further Protective Review

Page 97

1    Q.    Okay.  Then did you work
2  with her frequently on Xarelto?
3    A.    She was on that program.
4    Q.    Okay.  And what she has sent
5  around is a review of a manuscript that
6  looks like it was written by Dr. Mueck.
7  Do you see that?
8    A.    He is the lead author.
9    Q.    Right.  And -- and she has
10  enclosed some comments to this article,
11  correct?  And that's just what she says
12  on her e-mail, "comments enclosed,"
13  right?
14    A.    Right.
15    Q.    And so did the medical
16  affairs group have the ability to provide
17  comments to manuscripts that were going
18  to be put forward for publication?
19    A.    My memory is medical
20  affairs, of course, but not commercial,
21  not market.
22    Q.    Okay.  And she is in medical
23  affairs?
24    A.    She is medical affairs.  She

Protected - Subject to Further Protective Review

Page 98

1  is a veterinary physician.  She has a
2  veterinary degree, but she has a long
3  history in drug development.
4    Q.    Okay.  And what she writes
5  is, she says, "Comments enclosed.  Please
6  try to refrain from the term 'monitoring'
7  when talking about NOACs."
8          Do you see that?
9    A.    I see that.
10    Q.    Okay.  And Xarelto is a
11  NOAC, right?
12    A.    It is.
13    Q.    Okay.  And I've heard it
14  novel.  I've heard it new.  What's your
15  understanding of --
16    A.    Well, those of us who are
17  older, we called it novel, because back
18  when we were trying to develop
19  replacements for warfarin, they were --
20  they were novel.  Now, of course, they
21  are not so novel, right, there are
22  several of them.
23    Q.    Okay.
24    A.    So new is used.

Protected - Subject to Further Protective Review

Page 99

1    Q.    All right.  So -- so
2  Ms. Holberg in the medical affairs
3  department is sending comments and
4  copying you and asking people to refrain
5  from the term "monitoring" when talking
6  about NOACs, correct?
7    A.    That's what she says.
8    Q.    Okay.  All right.  And you
9  certainly received that e-mail, correct?
10    A.    Received it.  But many
11  people are entitled to their comments.
12    Q.    Well, do you agree that
13  there are certain situations where
14  measuring coagulation levels could be
15  helpful for both the patient and the
16  doctor?
17    A.    Are you talking about
18  rivaroxaban?
19    Q.    Yes, sir.
20    A.    I -- there could be urgent
21  situations where that -- I can't think of
22  very frequent ones, but I can think that
23  there could be.
24    Q.    Okay.  Do you recall a

Protected - Subject to Further Protective Review

Page 100

1  presentation you did in 2015, you were
2  asked to speak and give the
3  counterpoint -- it's a point-counterpoint
4  presentation about whether or not NOACs
5  should be monitored?  Do you remember
6  that?
7    A.    I do.
8    Q.    And -- and you presented.  I
9  believe Bob Temple presented.
10    A.    Correct.
11    Q.    I don't know if there were
12  others.
13    A.    Other people on the panel.
14  But this was a point-counterpoint kind of
15  debate thing.
16    Q.    You were -- were you asked
17  by the company or were you asked from
18  people outside the company to come make
19  this presentation?
20    A.    I was asked by the
21  organizers of the outside group which is
22  the -- the cardiac safety research
23  consortium, which is a -- a group of
24  independent academic and it -- it -- it's

Protected - Subject to Further Protective Review

Page 101

```
1   a group.  It has pharmacy,
2   pharmaceutical.  It has regulatory like
3   FDA.  And it has other academics on
4   the -- on the group.
5        Q.   Do you know why they came to
6   you?
7        A.   Well, I was on the
8   organizing committee.  And I -- we all
9   gave our views.  Dr. Temple was on the
10  committee as well.  He -- he gave his
11  views.  And they asked me to do it.  I
12  don't know why except that I have that
13  view and I've been in coagulation since
14  1985.  So maybe some of it was out of
15  respect.
16       Q.   Okay.  I'm going to show you
17  Exhibit 11.  And this is Plaintiffs'
18  3083259.
19            (Document marked for
20            identification as Exhibit
21            Berkowitz-11.)
22            MR. BARR:  We're not going
23            to spend significant time on this
24            but...
```

Protected - Subject to Further Protective Review

Page 103

```
1   this point-counterpoint?
2        A.   Right.  The final
3   presentation.
4        Q.   Okay.  And -- and this is a
5   presentation you put together for
6   yourself -- you put it together yourself?
7        A.   I put it together myself.
8        Q.   All right.  Did you receive
9   input from others or anyone from Bayer or
10  Janssen on this presentation?
11       A.   From Bayer, Janssen,
12  Dr. Temple.  Stuff that he's done.  Stuff
13  that's on the internet.  The literature
14  and my many years of experience in
15  coagulation.
16       Q.   Okay.  And so what you
17  attached was your presentation.  So I
18  want to go to that now.
19            This will be Exhibit 12.
20            (Document marked for
21            identification as Exhibit
22            Berkowitz-12.)
23            MR. BARR:  And it's
24            Plaintiffs' 3083260.
```

Protected - Subject to Further Protective Review

Page 102

```
1   BY MR. BARR:
2        Q.   And I don't think I'm going
3   to ask anything substantive about this,
4   so I don't know that you need to review
5   the whole thing.
6             You see that that's an
7   e-mail on the first page from you to a
8   group of people primarily at Janssen,
9   correct?  Well, there's some Bayer folks
10  in there too.
11            MR. HOROWITZ:  You just
12            looking at the top e-mail, Brian?
13            MR. BARR:  Yeah, I'm just
14            looking at this -- this one right
15            here.
16            THE WITNESS:  Yes.  Mm-hmm.
17  So it looks like Anne sent this
18  inside to her -- her group, it
19  looks like.
20  BY MR. BARR:
21       Q.   Okay.  And you -- and she's
22  forwarding to her group an e-mail she
23  received from you with the attachment
24  that included your presentation on -- on
```

Protected - Subject to Further Protective Review

Page 104

```
1   BY MR. BARR:
2        Q.   I've handed you Exhibit 12.
3   Is this your PowerPoint presentation that
4   you gave at the CSRC symposium?
5        A.   It appears to be.
6        Q.   Okay.  And this is a
7   PowerPoint you put together for a
8   symposium that was titled "Is there a
9   role for pharmacokinetic/pharmacodynamics
10  dosing for novel anticoagulants," right?
11       A.   Yes.  That's part of the
12  second session on precision dosing.
13       Q.   And yours is, "Counterpoint:
14  PK dosing strategy is impractical and may
15  not add value," right?
16       A.   Correct.
17       Q.   And Mr. Temple gave the
18  point to the counterpoint?
19       A.   Dr. Temple.
20       Q.   Right.  And did he go before
21  you or after you?
22       A.   He went before me.
23       Q.   Okay.
24            MR. HOROWITZ:  Do you want
```

Page 105

1    to flip through for a second?
2        THE WITNESS:  Sure.
3        MR. BARR:  He needs to
4    review the PowerPoint.
5        MR. HOROWITZ:  Brian, you
6    are being ridiculous.
7        MR. BARR:  I've been very
8    patient.
9        MR. HOROWITZ:  I'm very good
10   about this.  Let him orient
11   himself.
12       THE WITNESS:  Okay.
13   BY MR. BARR:
14       Q.    All right.  I'm on Page 9 of
15   your PowerPoint.  It's titled "Is there a
16   rationale for monitoring?"
17       Do you see that?
18       A.    Yeah.
19       Q.    And your first bullet point
20   is, "When is it valuable to monitor
21   routinely," correct?
22       A.    Yes.
23       Q.    And that would be when you
24   have a patient regularly come in and have

Page 107

1    you want it to be.
2        Q.    Okay.  So you believe if a
3    person is stable on an anticoagulant,
4    they shouldn't be switched?
5        A.    Well, if it's effective and
6    it's safe, and they're stable and
7    reliably you feel comfortable with it, I
8    don't recommend switching.
9        Q.    Do you think it would be
10   inappropriate for a company to encourage
11   people that were stable on an
12   anticoagulant to switch to a different
13   anticoagulant?
14       MR. HOROWITZ:  Objection to
15   form.
16       THE WITNESS:  Well, it would
17       depend on what the reason for
18       switching would be.  In other
19       words, are there side effects to
20       worry about besides being stable?
21       But are there side effects?  Is
22       there another reason why another
23       molecule would be better for that
24       patient?  This, I don't know.

Page 106

1    their blood tested to determine what
2    their anticoagulation levels are, right?
3        A.    And then determine what to
4    do with those levels.
5        Q.    Right.  Then determine if
6    you need to either dose adjust or remove
7    them from therapy possibly, correct?
8        A.    Well, unlikely to remove
9    from therapy but adjust the dose.  I
10   mean, unless there was some serious
11   problem.  But by and large it's about
12   keeping them in the therapeutic range
13   like you have to do with warfarin.
14       Q.    Let me be clear about what I
15   was saying and move from there.  I'm not
16   saying remove from anticoagulant therapy
17   altogether, but possibly put on a
18   different anticoagulant.
19       A.    Okay.  Possible.
20       Q.    That would be one of the
21   reasons you may monitor, right?
22       A.    I don't know so much if it's
23   to switch, but rather whether you're
24   getting the dose therapeutically the way

Page 108

1        But just when patients are
2        stable, then as a physician,
3        usually we wouldn't just make a
4        change just to make a change.
5    BY MR. BARR:
6        Q.    Okay.  And so what you lay
7    out is you lay out four criteria for when
8    is it valuable to monitor routinely.  And
9    your Number 1 is, "Test accurately and
10   precisely measure drug levels," correct?
11       A.    These are not listed in any
12   order.  They're not including all of
13   them.
14       Q.    That's fair.
15       A.    They're just there.
16       "Test accurately and
17   precisely measure drug levels."
18       Q.    Okay.  And then your second
19   one is, "Target window validated and can
20   be maintained," correct?
21       A.    Yes.
22       Q.    And your third one is, "Test
23   results predict clinical outcome,"
24   correct?

Page 109

```
 1        A.    Correct.
 2        Q.    And then your fourth is,
 3  "Modifying treatment on basis of test
 4  result improves outcome," correct?
 5        A.    If there's proof of that,
 6  yes.
 7        Q.    In your view, do all four of
 8  those have to be available --
 9        A.    That was --
10        Q.    Just let me finish.
11        A.    I'm sorry.
12              MR. HOROWITZ:  Let him
13        finish his question.
14  BY MR. BARR:
15        Q.    In your view, do all four of
16  these factors have to be true for routine
17  monitoring to be valuable?
18        A.    I would have to look.  When
19  you put it that way, let me just see.  I
20  mean, I think you need -- you need --
21  usually what we do as physicians, we try
22  to lay out certain parameters, so we
23  don't usually just go with one.  But I
24  would think that it would be helpful if
```

Page 110

```
 1  you had all of them.  But I don't think
 2  you have to have all of them.  There
 3  might be others that I didn't list.
 4        Q.    Okay.  So you don't
 5  necessarily believe that all of these
 6  have to be available?
 7        A.    No.  And I wasn't saying
 8  that.  This was just making the
 9  distinction that you and I had said about
10  monitoring and measuring just from the
11  very beginning.
12        Q.    Right.  Because as I
13  understand some of the documents that
14  I've read from you, you don't believe
15  that INR, when used with warfarin,
16  predicts bleeding outcomes, correct?
17        A.    I know that it can predict
18  some.  But I also know that patients --
19  and this is from years of clinical
20  experience -- they have bleeding events
21  in therapeutic range.  So if you're
22  saying is it always predictive, no, it's
23  not.
24        Q.    But they still routinely
```

Page 111

```
 1  monitor with it?
 2        A.    And this was done
 3  retrospectively.  This doesn't -- wasn't
 4  done with prospective trials.  This was
 5  done over years, decades actually, of
 6  developing the INR and the prothrombin
 7  time ratio before that and PTs before
 8  that.
 9        Q.    But they show routinely
10  monitor --
11        A.    It's the best we have.
12  Yeah.  But it's not perfect.
13        Q.    Is anything in medicine
14  perfect?
15        A.    Unfortunately not, but we
16  strive for it.
17        Q.    Then you list, "When is it
18  valuable to measure," correct?
19        A.    Yes.
20        Q.    And you say, "When we need
21  to know drug levels, PK, or coagulation
22  effect, PD," right?
23        A.    Yes.
24        Q.    And with Xarelto, the main
```

Page 112

```
 1  coagulation effect that you were looking
 2  at was PT, correct?
 3        A.    Well, PT is not a very good
 4  measure.  It's the best of the routine
 5  tests that are available in hospitals.
 6  But even then, it's not good, because not
 7  all the hospitals use the same
 8  thromboplastin reagent.
 9        Q.    Well, in your clinical
10  trials, the decision was made that PT was
11  good enough to serve as a PK surrogate,
12  correct?
13        A.    It matches depending on the
14  timing with the concentration.  But it's
15  not what you would use in practice to
16  take care of patients.
17        Q.    It's linear --
18        A.    When tested, as you said.
19        Q.    It's linear correlated to --
20  PT has a linear correlation to the drug
21  plasma concentration with Xarelto,
22  correct?
23              MR. HOROWITZ:  Objection to
24        form.
```

Page 113

1        THE WITNESS:  Depending on
2     the time that it's taken.
3  BY MR. BARR:
4        Q.    Okay.  And also the reagent
5  used?
6        A.    Definitely the reagent,
7  because there are some that are --
8  there's one in particular that's very
9  sensitive.  There are others that are
10  sensitive; some that are insensitive.
11        Q.    Let's talk about that for a
12  second.
13        A.    Sure.
14        Q.    As I understand it, the one
15  that's really sensitive is Neoplastin?
16        A.    Well, we tested a few.  I
17  don't know exactly how many, six or so.
18  But there are a number more.  But of the
19  ones that are were tested and used in the
20  clinical trials that were easier to
21  obtain, there is the Neoplastin Plus that
22  was used.  And that seemed to match the
23  best.
24        Q.    So the Neoplastin Plus, in

Page 114

1  your view, is the best match for the
2  reagent, correct?
3        MR. HOROWITZ:  Objection to
4     form.  Asked and answered.
5        THE WITNESS:  Of the few
6     reagents that were tested.  You
7     have to remember these agents are
8     designed to test warfarin.  They
9     were refined over years to test
10     warfarin, so not for rivaroxaban
11     or any of the NOACs.  They're not
12     for that purpose.
13  BY MR. BARR:
14        Q.    Okay.  But in your clinical
15  trials, you used PT Neoplastin as a
16  surrogate rather than taking actual PK
17  samples and getting blood plasma
18  concentrations, correct?
19        A.    That's not correct.
20        Q.    I'm sorry.  In your Phase
21  III -- in ROCKET.
22        A.    In Phase III.  We usually do
23  our PK work in our Phase II, because
24  that's where you can -- you really have

Page 115

1  better control of the sampling and stuff
2  so it's more accurate.  It's very
3  difficult to do in Phase III.
4        So we did do PT testing, to
5  have something to match up with.  But
6  that wasn't to try to show whether it
7  would be of value or not.
8        Q.    So you go on and you list
9  several bullet points on when you may
10  need to know drug levels and coagulation
11  levels under the, "When is it valuable to
12  measure?"
13        A.    When is it valuable.
14        Q.    You list, "Assess
15  adherence," right?
16        A.    Could be used there.  If
17  there's no drug on board, then you're
18  going to be suspicious.
19        Q.    Right.
20        A.    Not taking the medicine.
21        Q.    Or they could just be at
22  trough, right?
23        A.    Well, it depends on the
24  sensitivity.  If you did a PT at trough,

Page 116

1  you might not be able to detect it
2  because it's insensitive down there.
3        Q.    Detect overdose?
4        A.    If you thought someone took
5  an overdose and you thought they might be
6  at a high level, you could use it for
7  them.
8        Q.    Do you know, as you sit here
9  today, what a high level PT would be to
10  tell somebody whether or not they were
11  overdosed on rivaroxaban?
12        MR. HOROWITZ:  Form.
13        THE WITNESS:  We don't have
14     a level, and we have the issue
15     with the PT that in different labs
16     they have different ranges.  I
17     mean, they are not markedly
18     different, but they are different.
19     So there's no cutoff that we're
20     aware of.
21  BY MR. BARR:
22        Q.    Are you aware of a blood
23  plasma concentration that would indicate
24  overdose?

Protected - Subject to Further Protective Review

Page 117

```
1        A.   No, I'm not.
2        Q.   Something as high as
3   700 micrograms per liter, you just don't
4   know?
5        A.   Well, I don't know an exact
6   measure of where it would be.
7        Q.   Okay.  So even though you're
8   saying when is it valuable to measure and
9   one of those things is detect overdose,
10  you have no information that you can
11  provide the doctor as to what an overdose
12  is, correct?
13       A.   Well, I guess it depends on
14  how you term "overdose."  Overdose
15  meaning people take too much medicine,
16  maybe a suicide attempt or something like
17  that.  That's what I meant by overdose.
18       Q.   But you still -- if you're
19  going to test, if you're going to
20  measure, that measurement has to mean
21  something, right?
22       A.   Absolutely.
23       Q.   And if you've given doctors
24  no data as to what that measurement
```

Protected - Subject to Further Protective Review

Page 118

```
1   means, how is the doctor going to do
2   anything with this test?  What is he
3   going to look to that tells him this
4   patient is overdosed?
5             MR. HOROWITZ:  Objection to
6        form.
7             THE WITNESS:  Well, I think
8        we have to understand that the PT
9        is just a semi-quantitative
10       measure.  It's a high or low, on
11       board or not, maybe higher than
12       you might expect.  We have ranges
13       in some of the clinical
14       pharmacology pages -- papers of
15       what we've seen in trials.  So
16       something could be used, but I
17       don't know of a, you know, across
18       the board level that if it's above
19       that then that's a problem.
20            I mean, any of us could
21       guess by looking at those numbers
22       that something much higher than
23       that, of course.  I mean, I think
24       doctors can understand that.
```

Protected - Subject to Further Protective Review

Page 119

```
1   BY MR. BARR:
2        Q.   Well, all I'm asking you is
3   what information has the company provided
4   to doctors in the instructions for use
5   that would indicate to a doctor somebody
6   has overdosed on the drug?
7             MR. HOROWITZ:  Objection to
8        form.
9             THE WITNESS:  I don't know
10       what else could be said than what
11       I said.  I don't know for certain
12       in the instructions -- sorry -- in
13       the USPI if levels are listed in a
14       range in the trials.  I can't
15       remember if there's a diagram of
16       that.  But I think doctors could
17       obtain that.
18  BY MR. BARR:
19       Q.   Okay.  We'll come back to
20  that.  You also have, "Evaluate potential
21  drug interactions," right?
22       A.   These are just -- these are
23  general for all drugs.
24       Q.   Right.
```

Protected - Subject to Further Protective Review

Page 120

```
1        A.   Yes.
2        Q.   "Disease of the metabolizing
3   organs," right?
4        A.   Sure.
5        Q.   "Plan timing of urgent
6   surgery," right?
7        A.   That's a convenience thing
8   of wanting to know if there's drug on
9   board before you do a procedure.
10       Q.   Is it really just
11  convenience?
12       A.   Well, it's convenience to
13  know -- I mean, testing it would be a
14  convenience to know would this be an okay
15  time to do surgery.  That's what I'm --
16       Q.   Well, it's really a safety
17  issue, isn't it?
18       A.   Well, it's -- oh, you mean
19  to perform surgery?  You might want to
20  know if they have drug on board or not.
21  You certainly understand the half-life of
22  the drug and its metabolism, so you can
23  predict about what's going to --
24       Q.   If you have a person --
```

Protected - Subject to Further Protective Review

Page 121

```
 1              MR. HOROWITZ:  Brian --
 2              MR. BARR:  I'm sorry.  I
 3       thought he was done.  I wasn't
 4       trying to cut him off.
 5              MR. HOROWITZ:  In fairness,
 6       he wasn't done yet.
 7              THE WITNESS:  That's okay.
 8       That's fine.
 9   BY MR. BARR:
10       Q.   Did you finish?
11       A.   Yeah, that's fine.  Go
12   ahead.
13       Q.   If you have a patient come
14   into the ER and they're having an
15   intracranial hemorrhage and you don't
16   know when the last time they took Xarelto
17   was, according to the label, you're
18   supposed to wait 18 to 24 hours from last
19   use before surgery, right?
20       A.   Mm-hmm.
21       Q.   It would certainly be
22   beneficial to a doctor in that situation
23   to be told, "Run a PT, find out what
24   their drug level is, and then you know
```

Protected - Subject to Further Protective Review

Page 122

```
 1   whether or not there's drug on board and
 2   whether or not you can proceed to surgery
 3   or if you have to wait 24 hours,"
 4   correct?
 5       A.   No.  I'm sorry.  I have to
 6   disagree.  I mean, if the prothrombin
 7   time is prolonged, it's possible that
 8   there's drug on board.  There could be
 9   other reasons that the prothrombin time
10   is prolonged.  If you're looking for a
11   magic number for when to go in for
12   surgery, that doesn't exist.  But you
13   have drug on board, and that's what the
14   doctors need to know.
15          I mean, it's not okay to
16   have a level at say 50 or 100, but not
17   okay to do surgery at some other number.
18   It's on board or not.  And then you have
19   to understand when the possibility of
20   when they took the drug, what the
21   metabolism might be.
22          But if it's urgent surgery,
23   you just got to go.
24       Q.   So you think they just need
```

Protected - Subject to Further Protective Review

Page 123

```
 1   to ignore the warning?
 2       A.   No one is saying to ignore
 3   the warning.  And I'm not saying that.
 4   I'm just simply saying when you're faced
 5   with that situation, then having just
 6   some number come back and tell you,
 7   that's not the whole story.  You have to
 8   know the whole patient.  You have to know
 9   the drugs they're taking and the one that
10   you are concerned about.
11       Q.   But you would agree with me,
12   nowhere in the label does it give a
13   doctor any number that they would be
14   looking at, that would indicate to them
15   whether or not drug was on board,
16   correct?
17       A.   No, I don't remember if
18   there's anything in there.  But I
19   wouldn't think so because either the
20   prothrombin time, if that's what you're
21   going to use, which is not the best test
22   either, prolonged, or it's not.
23       Q.   But one of the things that
24   you don't have listed here, and we'll --
```

Protected - Subject to Further Protective Review

Page 124

```
 1   we'll get into this later in -- in the
 2   day.  What about identifying somebody
 3   that's just a high absorber of
 4   rivaroxaban?
 5       A.   I'm not aware of what --
 6   what that is.
 7       Q.   You are aware that in the --
 8   at least in the studies published by
 9   Dr. Mueck, there are highly variable
10   levels at trough of concentration of
11   Xarelto in people's blood.  Same
12   person -- different people take the same
13   pill, one person at trough could be
14   10 micrograms per liter and another
15   person at trough could be 126 micrograms
16   per liter, correct?
17              MR. HOROWITZ:  Objection.
18       Form.  Foundation.  Compound and
19       argument.
20              THE WITNESS:  That sounds to
21       me like a misrepresentation of
22       the -- the data that's in his
23       papers.
24   BY MR. BARR:
```

Page 125

```
 1        Q.   Okay.  We'll -- we'll look
 2   at that later.  We don't need to get into
 3   that yet.
 4             MR. HOROWITZ:  Hey, Brian,
 5        it's been about an hour and a
 6        half, and I know we are in the
 7        middle of an exhibit but just
 8        thinking about a break here soon.
 9        Whatever works for you.
10             MR. BARR:  We can break now.
11        That's all right.
12             MR. HOROWITZ:  Is that okay?
13             MR. BARR:  Yeah.
14             MR. HOROWITZ:  Why don't we
15        do that.
16             THE VIDEOGRAPHER:  All
17        right.  This marks the end of
18        Videotape Number 1.  The time is
19        10:33 a.m.  Going off the record.
20             (Short break.)
21             THE VIDEOGRAPHER:  The time
22        is 10:48 a.m.  We are back on
23        record.
24   BY MR. BARR:
```

Page 127

```
 1   monitoring not to be valuable?
 2        A.   Probably depends on which
 3   one.  But you don't have to have all
 4   eight.  These are just conditions that
 5   talk about -- you have to remember we're
 6   giving a 15-minute talk.  So you're
 7   basically just trying to give the lay of
 8   the land.
 9        Q.   Okay.  Are there -- are
10   there any of these eight that are more or
11   less important to you?
12        A.   I'd have to re-read them to
13   know, which I'll do now.  Yeah.  It
14   depends on the drug and the clinical
15   situation.
16        Q.   Well, we're here talking
17   about Xarelto, so let's -- in relation to
18   Xarelto.
19        A.   Same thing.  It would just
20   depend on the clinical indication.
21        Q.   Okay.  So let's talk about
22   the Afib indication then.
23        A.   Okay.  What do you want to
24   know?
```

Page 126

```
 1        Q.   All right.  Dr. Berkowitz,
 2   we're continuing with Exhibit 12 in front
 3   of you.
 4             And I have moved to the next
 5   page, which is titled "When it is not
 6   valuable to monitor or measure," correct?
 7        A.   Yes.
 8        Q.   Okay.  So the point of this
 9   slide, as I understand it, is to say when
10   these conditions exist, there's no value
11   in either routine monitoring or
12   measuring, correct?
13        A.   In essence.  I mean, in
14   essence, yes.
15        Q.   Do each -- you say when.
16   And you list -- one, two, three, four,
17   five, six, seven -- eight different
18   factors.
19             Do you see that?
20        A.   I do.
21        Q.   What you're meaning by this,
22   do all eight of these have to be true for
23   monitoring not to be valuable or does
24   just one of these have to be true for
```

Page 128

```
 1        Q.   Which one of these factors
 2   would you look at with the Afib
 3   indication where you say, "This factor is
 4   the one I look at when I say it's not
 5   valuable to monitor or measure"?
 6        A.   No, that's not the purpose
 7   of to just pick one.  It's just these are
 8   the kinds of things to think about that
 9   you wouldn't find it very valuable to
10   monitor.
11        Q.   Okay.  I'm just trying to
12   figure out, when you -- it's your
13   position that it isn't -- with Xarelto in
14   either the Afib indication or the VTE
15   prevention indication, it is not valuable
16   to monitor or measure, right?  That's
17   your position?
18        A.   Are you comparing the
19   prevention to the atrial fibrillation?
20        Q.   They're both once-a-day
21   20-milligram dosages, correct?
22        A.   I'm sorry.  When you say
23   prevention, when we talk about
24   prevention, it's not just stroke
```

Protected - Subject to Further Protective Review

Page 129

1  prevention.  It's prevention of
2  thromboembolism, for example, with
3  orthopedics, and that's 10 milligrams.
4      Q.   Okay.  I thought that --
5  maybe I'm confused here.  So which one is
6  the 20 milligram once-a-day?
7      A.   We use -- we've tested each
8  one of the indications.  And
9  20 milligrams is what's used for atrial
10 fibrillation if your creatinine clearance
11 is above 49.  So 15 milligrams if not,
12 down to 30.  And then we go give the
13 medication.
14          For VTE treatment, we give
15 15 milligrams twice a day for the first
16 three weeks and then 20 milligrams each
17 day.
18          For the orthopedic, it's 10
19 milligrams a day.
20     Q.   So for the indications in
21 which you're giving 20 milligrams
22 once-a-day, okay?
23     A.   Okay.
24     Q.   It's your position that it

Protected - Subject to Further Protective Review

Page 130

1  is not valuable to monitor or measure
2  those patients, correct?
3      A.   In general, there's not a
4  need to routinely monitor in those
5  patients.
6      Q.   When you say "in general,"
7  that means there could be situations
8  where it may be valuable to monitor those
9  patients.  Are you talking about purely
10 the instances you listed on the page
11 before when you said when is it valuable
12 to measure?
13     A.   This is a general statement
14 that talks about monitor and measure.
15 Remember, that's what you mentioned.  And
16 that's an opportunity -- so it's a
17 conglomerate.  And we talked about just
18 very recently conditions where you might
19 want to measure.  So that's why I said it
20 would depend.
21     Q.   Okay.  Let's go two pages
22 over.  You have --
23     A.   Page number?
24     Q.   It's Page 12.

Protected - Subject to Further Protective Review

Page 131

1      A.   Thank you.
2      Q.   "What we should do rather
3  than monitor/measure a level."
4          Do you see that?
5      A.   I do.
6      Q.   And you have monitor the
7  patient, right?
8      A.   Yes.
9      Q.   That's what we talked about
10 this morning, correct?
11     A.   Yes, when we were defining
12 the terms.  Right.
13     Q.   Then you have, "Know the
14 label"?
15     A.   Yes.
16     Q.   But knowing the label, you
17 can only -- you can't know what's not in
18 the label, right?
19          MR. HOROWITZ:  Objection to
20     form.
21          THE WITNESS:  It's important
22     to know what's in the label.
23     That's what it's saying.  Know the
24     label.  In other words, valuable

Protected - Subject to Further Protective Review

Page 132

1      information that the sponsor and
2      the regulatory authorities believe
3      should be in the label, know it.
4          The labels are thick.  And
5      there's a lot -- there's a lot to
6      know already.  This is one of our
7      problems in medicine.  Sometimes
8      physicians don't read all of the
9      label.
10 BY MR. BARR:
11     Q.   Is there information outside
12 of the label that doctors need to know?
13     A.   Doctors these days are very
14 well educated.  They take continuing
15 medical education.  They follow the
16 literature.  There's lots of information
17 that if I have a specific question I'm
18 probably not going to find in the label,
19 that I might need to look for data in the
20 literature.  So yes, there's always
21 information.  We're always learning about
22 what to do.
23     Q.   So you believe that it's
24 appropriate for information necessary to

Page 133

1  use a drug safely to not be in the label
2  and require the doctors to go out looking
3  for that information?
4           MR. HOROWITZ:  Object.
5           THE WITNESS:  I -- sorry.
6           MR. HOROWITZ:  Objection.
7       Form.
8           THE WITNESS:  I believe that
9       the most important safety
10      information as determined by the
11      company along with the regulatory
12      authorities, because they have the
13      ultimate say in how the wording
14      actually goes, is in the label.
15      But of course, their patients are
16      all different.
17           There are different
18      situations.  We read about cases.
19      We read about clinical trials.
20      Doctors think about these things.
21      And you have to take all of that
22      in conjunction, not just the
23      label, to your patient with every
24      drug that you use.

Page 135

1       label is the only source of
2       information.
3  BY MR. BARR:
4       Q.   Let's move on from that one.
5       Okay.  The PowerPoint that
6  we just talked about was your position on
7  whether or not there is value in
8  monitoring or measuring, correct?
9       A.   Yes, it says that in the
10 document that it's the opinion of mine.
11 Not necessarily the opinions of others in
12 the company or outside.
13      Q.   Do you know if the company
14 has a -- view on whether or not
15 monitoring or measuring is ever valuable?
16          MR. HOROWITZ:  Objection to
17      form.
18          THE WITNESS:  I don't think
19      I've ever seen anything that says
20      this is the company's position
21      of -- on if monitoring or
22      measuring is ever valuable.
23 BY MR. BARR:
24      Q.   The only position the

Page 134

1  BY MR. BARR:
2       Q.   Do you know what sources,
3  other than the medical literature,
4  doctors could go to to find this
5  information about how to use -- how to
6  use Xarelto safely?
7           MR. HOROWITZ:  Objection to
8       form.
9           THE WITNESS:  There are
10      certain scientific congresses,
11      where we talk about -- when I say
12      "we," we as physicians -- talk
13      about the use of all the NOACs.
14      We talk about -- we've been
15      talking about warfarin for
16      50 years at those conferences.
17      And so there's always learning.
18      There's the literature, as I said.
19      There's continuing medical
20      education online.  There are a
21      number of things.
22           We're not saying that's
23      where all of it is.  We're just
24      saying that one can't just say the

Page 136

1  company has put out that you know of is
2  the position in the label that says no
3  routine monitoring is necessary, right?
4       A.   Right.  That's the -- the
5  message to the physicians, that they
6  don't need to be looking for some test to
7  check every so often on patients
8  routinely.
9       Q.   Okay.  Let me show you --
10 we'll mark these as Exhibits 13 and 14.
11          (Document marked for
12      identification as Exhibit
13      Berkowitz-13.)
14          (Document marked for
15      identification as Exhibit
16      Berkowitz-14.)
17          MR. BARR:  And this is
18      Plaintiffs' 1158770 and 1158771.
19 BY MR. BARR:
20      Q.   I'm going to start with a
21 cover e-mail before I go to the
22 attachment.  You see this is a string of
23 e-mails that includes Dr. Spiro and then
24 you're also copied on some of these.  Do

Page 137

```
 1   you see that?
 2        A.   Okay.  Now -- yeah, I see
 3   that.
 4        Q.   You're specifically
 5   forwarded this by Dr. Spiro on June 18,
 6   2008.  Do you see that on the first page?
 7        A.   Well, no.  I'm forwarded on
 8   the 16th.
 9        Q.   You're right.  Just so you
10   can see where you are.  You're right.
11        A.   Correct.  Okay, but
12   that's -- and that's on the -- yeah, I
13   see.  That's on the 17th.
14        Q.   The 17th.  I'm sorry.
15        A.   Mm-hmm.
16        Q.   And this is a "slides for
17   Thursday Belgium advisory board."
18             Do you see that?
19        A.   I do.
20        Q.   Do you know what that's a
21   reference to?
22        A.   I do not.
23        Q.   Do you know why Dr. Spiro
24   would have been sending these to you?
```

Page 139

```
 1             MR. BARR:  That's fine.
 2             MR. HOROWITZ:  Thank you.
 3             THE WITNESS:  Yeah, let's
 4        take a look -- there's a lot in
 5        there.  So let's see what your
 6        questions are and I'll see if I
 7        need to do any more.
 8   BY MR. BARR:
 9        Q.   This is -- the PowerPoint is
10   titled "Agenda Advisory Board June 19th."
11   Right?
12        A.   Yeah, I guess we -- we had
13   said that was '08 --
14        Q.   That would be 2008 according
15   to the e-mail, correct?
16        A.   Okay.
17        Q.   And it lists a series of
18   agenda points, with one of them being
19   Xarelto and monitoring.  And that's --
20   the speaker is listed as Dr. Theodoro
21   Spiro, global clinical leader, correct?
22        A.   Correct.
23        Q.   And he reported to you,
24   correct?
```

Page 138

```
 1        A.   He reports to me.
 2        Q.   Okay.  Would you have had --
 3   does he -- does he have to send this type
 4   of stuff to you before he presents at an
 5   advisory board or anything like that?
 6        A.   No.  It's a courtesy to --
 7   you know, to me, I assume to let me see
 8   the work that he's doing.
 9        Q.   Do you review the material
10   that Dr. Spiro sends to you?
11        A.   In a -- in a way.  I review
12   some things.  But Dr. Spiro has a
13   tremendous amount of experience in the
14   field.  He helped bring low-molecular
15   weight heparin to North America.  So I
16   don't have to check everything he does.
17        Q.   Okay.  So let's look at the
18   PowerPoint he sent you.  And this is
19   Exhibit 14, Plaintiffs' 1158771.
20             MR. HOROWITZ:  Brian, just
21        give him a minute.  I'm not going
22        to say he has to read every slide.
23        Let him flip through and orient
24        himself for a minute.
```

Page 140

```
 1        A.   In 2008, yeah.
 2        Q.   Okay.  And so let's go into
 3   Dr. Spiro's presentation.  That is on
 4   Page 22 of the PowerPoint.
 5        A.   Current thoughts.
 6        Q.   Xarelto and monitoring,
 7   current thoughts, do you see that?
 8        A.   I'm there.  Mm-hmm.
 9        Q.   Okay.  The next page, it's
10   anticoagulation in the past.  Monitoring
11   required.  Coumadin PT.  Heparin aPTT.
12   Right?
13        A.   Yes.
14        Q.   And then if you go to
15   Page 26 it says, "Monitoring."  Do you
16   see that?
17        A.   Monitoring.
18        Q.   Right.
19        A.   Mm-hmm.
20        Q.   And it says, "How to monitor
21   this plurality of substances.  Specific
22   anti-Xa and anti-IIa methods in every
23   lab."
24             Do you see that?
```

Protected - Subject to Further Protective Review

Page 141

1          A.      Question mark.  Mm-hmm.
2          Q.      Right.  "The good news.
3   Routine monitoring required only with
4   Coumadin and heparin," right?
5          A.      Yes, I see that.
6          Q.      Okay.  And then Dr. Spiro
7   writes that "all the other substances,"
8   and that would include rivaroxaban,
9   correct?
10         A.      I can only surmise that.  I
11  can't -- it doesn't say.  I don't know.
12  That's what we are talking about, so...
13         Q.      This is -- this is in the
14  Xarelto and monitoring section --
15         A.      Right.
16         Q.      -- of his PowerPoint, right?
17         A.      It sounds like it.
18         Q.      Okay.  And he's talking
19  about how to monitor this plurality of
20  substances, and he's talking about
21  anti-Xa drugs, right?
22         A.      Yes.
23         Q.      Okay.  And he says, "All the
24  other substances require monitoring only

Protected - Subject to Further Protective Review

Page 142

1   in special situations," right, that's the
2   good news?
3          A.      That's what the slide says.
4          Q.      And then he says the bad
5   news.  "There are many special
6   situations."  Do you see that?
7          A.      Yep.
8          Q.      Very low weight.  Bleeding
9   under anticoagulation.  Compliance.
10  Progression of thromboembolism.
11  Accumulation.  Critically ill patients.
12  Pregnancy.  Children.  Obesity.
13         Did I read all that right?
14         A.      Yes.
15         Q.      So according to Dr. Spiro in
16  2008, there are special situations with
17  Xarelto that require monitoring, right?
18         MR. HOROWITZ:  Objection to
19         form.
20         THE WITNESS:  I'm sorry.  I
21         have to disagree with you.  That's
22         not what the slides say.
23  BY MR. BARR:
24         Q.      Okay.

Protected - Subject to Further Protective Review

Page 143

1          A.      They just raise the -- the
2   issue of areas to look.  That's what the
3   question marks all over it are about.
4          Q.      Okay.  Do you know of any
5   studies the company actually did to
6   determine in these special situations
7   whether or not monitoring would be
8   required?
9          A.      If -- if you look at the --
10  the -- the label and if you look back at
11  the different trials, Phase I trials and
12  all that work, that's where a lot of that
13  was done with -- with, you know,
14  half-life in young and elderly, with
15  obesity, gender.  These kinds of studies
16  were done.
17         Q.      Okay.  But the Phase I
18  trials were before 2008, correct?
19         A.      Yeah, they should have been.
20         Q.      Okay.  So these shouldn't
21  have been question marks in 2008,
22  correct?
23         MR. HOROWITZ:  Objection to
24         form.

Protected - Subject to Further Protective Review

Page 144

1          THE WITNESS:  I -- I guess
2          you need to understand how the
3          science is done.  You don't just
4          do one trial and then all the
5          answers are there.  We continually
6          evaluate this over time.  So we
7          don't make the assumption until
8          we've got all the trials out and
9          we have years of experience and a
10         large number of patients.  So
11         we're just looking at someone
12         presenting his view on how things
13         might be and what to think about.
14  BY MR. BARR:
15         Q.      Okay.  But I had asked you,
16  do you know of any studies the company
17  actually did to try to answer these
18  question marks, and you pointed me to the
19  Phase I trials?
20         A.      There are some studies
21  there.  That's what you asked.
22         Q.      Okay.  But these are still
23  question marks in 2008 after the Phase I
24  trials, right?

Page 145

```
 1            MR. HOROWITZ:  Objection to
 2       form.  Asked and answered.
 3            THE WITNESS:  As I said,
 4       we -- nothing is definitive.
 5       We -- we use an aggregation of
 6       data.
 7            So we've got the Phase I.
 8       They are very important.  But we
 9       still need to look at our clinical
10       trials.  We don't ignore them just
11       because we have that data.
12  BY MR. BARR:
13       Q.    In any of your clinical
14  trials after 2008, did you try to answer
15  the question of whether or not these many
16  special situations required monitoring?
17       A.    We assess the different
18  sub-groups in all the clinical trials and
19  look at these kinds of things.  They are
20  part of routine work.
21       Q.    So you -- you believe this
22  was all part of your Phase II/Phase III
23  work?
24       A.    It's a continual process.
```

Page 146

```
 1  With each indication we do it.
 2       Q.    You believe you answered all
 3  these questions?
 4       A.    We are doing the best we can
 5  to answer them.
 6       Q.    And you believe you answered
 7  all of these questions about the bad news
 8  with many special situations that require
 9  monitoring is it is not required?
10       A.    I don't think that one slide
11  in 2008, you know, gives a sense about
12  what's going on with all the work from
13  that time before or that time going
14  forward to 2016.
15       Q.    With any of these special
16  situations in 2016, do you indicate that
17  monitoring is required?
18       A.    We have not found it to be
19  so.
20       Q.    Can you point to any
21  specific study where you tried to answer
22  the question from 2008?
23            MR. HOROWITZ:  Object to the
24       form.  Asked and answered.
```

Page 147

```
 1            THE WITNESS:  Which
 2       question --
 3  BY MR. BARR:
 4       Q.    I'm asking for a specific
 5  study.
 6       A.    Which one?
 7       Q.    Any one of them.  Pick one
 8  of them.
 9            Can you name any specific
10  study where you answered the question
11  about whether or not monitoring was
12  required in any of these special
13  situations?
14       A.    I don't believe that --
15            MR. HOROWITZ:  Form.
16            Go ahead.  Sorry.
17            THE WITNESS:  I don't
18       believe that one specific study
19       answers these types of questions.
20       As I said, we study it during all
21       of the indications and the
22       subgroup analysis and we have the
23       Phase I studies.  So there won't
24       be one study that could answer
```

Page 148

```
 1       this for you.
 2  BY MR. BARR:
 3       Q.    Was there any study designed
 4  to answer the question on whether or not
 5  elderly people required monitoring?
 6       A.    I'm not aware of a -- a
 7  particular study for that.  As I said, we
 8  look at each indication at the different
 9  doses for each of these kinds of groups.
10  So if you look at the trials, you'll see
11  in the manuscripts the sub-groups like
12  elderly or -- or body weight.  That's
13  where you'll get the most information.
14            MR. BARR:  Exhibit 15.  It's
15       Plaintiffs' 372292.
16            (Document marked for
17            identification as Exhibit
18            Berkowitz-15.)
19            MR. BARR:  I'm also going to
20       go ahead and give you 16, which is
21       372322.
22            (Document marked for
23            identification as Exhibit
24            Berkowitz-16.)
```

Page 149

1          MR. DENTON:  15 is 372292.

2          MR. BARR:  2322 is 16.  Just

3      make that 16.

4              (Whereupon, a discussion was

5          held off the record.)

6  BY MR. BARR:

7          Q.    We're starting with

8      Exhibit 15.  And this is just to

9      establish that you received this.

10             You see this is an e-mail

11     from Juergen Weber on April 20, 2011,

12     right?

13         A.    Yes.

14         Q.    And it's -- you're listed as

15     a person that was cc'd on this, right?

16         A.    Correct.

17         Q.    And it's SPAF, and that's

18     the Afib indication.  Responses Word

19     files.

20             Do you see that?

21         A.    Yeah.

22         Q.    And then there's a whole

23     series of attachments to this e-mail.

24             Do you see that?

Page 151

1          Q.    Are those both Bayer

2      employees?

3          A.    Yes.

4          Q.    Okay.  And Question 17,

5      "Monitoring of coagulation parameters may

6      be considered in special situations" --

7      excuse me.  I didn't read that right.

8      Let me start over.

9              MR. HOROWITZ:  While you are

10             starting over, give him one

11             second.  It just looks like you're

12             going into substance now.

13             THE WITNESS:  Thank you.

14     BY MR. BARR:

15         Q.    It says, Question 17,

16     "Monitoring of coagulation parameters may

17     be considered in situations of bleedings

18     or perceived increased bleeding risk.

19     More firm recommendations on how this can

20     be performed in clinical routine are

21     requested to be implemented in the SPC."

22             And can you just tell people

23     what the SPC is?

24         A.    That's a summary of product

Page 150

1          A.    Yeah.

2          Q.    Now let's go to Exhibit 16,

3      which is one of those attachments.  And

4      this is Plaintiffs' 372322.  You see that

5      this is "Bayer Healthcare AG Xarelto

6      15-milligram film-coated tablets and

7      20-milligram film-coated tablets response

8      to list of questions, clinical aspects."

9              Do you see that?

10         A.    I do.

11         Q.    Do you know where these

12     questions came from?

13         A.    It sounds like they came

14     from the European authorities.

15         Q.    And it's list of questions,

16     Day 60.  Draft due by end of March.

17             Do you see that?

18         A.    Yes.

19         Q.    And it's specifically for

20     the Afib indication, right?

21         A.    Correct.

22         Q.    And the author is listed as

23     John Paolini and Dagmar Kubitza, right?

24         A.    Yes.

Page 152

1      characteristics.  That's the -- what we

2      call the USPI in the U.S.  That's for

3      Europe.

4          Q.    Okay.  And then it goes on

5      to say, "Monitoring of coagulation

6      parameters may be considered in

7      situations of bleedings or perceived

8      increased bleeding risk.  More firm

9      recommendations on how this can be

10     performed in clinical routine are

11     requested to be implemented in the SPC.

12     The applicant should ensure that such

13     reliable biological tests are available

14     before granting of the new indication as

15     such monitoring is of importance in this

16     extended target population of

17     rivaroxaban-treated patients."

18             Did I read that correctly?

19         A.    Yes.

20         Q.    Okay.  So according to the

21     EMA in this new indication, monitoring

22     was of importance, correct?

23             MR. HOROWITZ:  Form.

24             THE WITNESS:  Their question

Page 153

1          is posing it as being important,
2     and they are asking our response
3     on it.
4     BY MR. BARR:
5          Q.    Okay.  And your response is,
6     "The applicant has investigated several
7     laboratory assays throughout the clinical
8     development program in order to assess
9     the appropriateness of laboratory assays.
10    Inhibition of Factor Xa, PT, aPTT, and
11    HepTest were measured in nearly all
12    studies and correlations with plasma
13    concentrations were established.  Except
14    for PT, the tests were not considered
15    suitable for following the
16    pharmacodynamic effects of rivaroxaban
17    because of a curvilinear relationship or
18    a low sensitivity of a PK/PD
19    relationship."
20          Did I read that right?
21    A.    Yeah.
22          Q.    Okay.  So according to your
23    response, PT was considered suitable for
24    following the pharmacodynamic effects of

Page 155

1     at going forward.
2          Q.    Okay.  And that's because if
3     you read, it says, "In contrast, a linear
4     correlation between PT and plasma
5     concentrations were established in
6     Phase I as well as in Phase II trials in
7     patients treated for VTE."
8          Did I read that right?
9          A.    Well, you read it right.
10    But that means that the PT Neoplastin,
11    the sensitive reagent.
12          Q.    So with that small -- and I
13    don't mean small to minimize it.  But
14    with that edit, PT Neoplastin has the
15    linear correlation, right?
16          A.    Yes, sir.
17          Q.    What you have is you have a
18    Figure 1, correct?
19          A.    On 160024?
20          Q.    Yes, sir.
21          A.    Yes, I see it.
22          Q.    And that has PTs going up to
23    about, what, 40 seconds?
24          A.    Yes.

Page 154

1     rivaroxaban, correct?
2               MR. HOROWITZ:  Form.
3               THE WITNESS:  Well, that's
4          just a very small portion of the
5          whole thorough response.  So of
6          the tests that are available, PT
7          would be one for consideration.
8     BY MR. BARR:
9          Q.    Well, your sentence is,
10    except for PT, all of the others are not
11    considered to be suitable, right?
12          MR. HOROWITZ:  Form.  Asked
13          and answered.
14          THE WITNESS:  The PT was
15          considered suitable.  The others
16          were not considered suitable.  It
17          doesn't mean that it would be
18          reliable, validated, et cetera.
19          Certainly going forward, we'd look
20          at it.
21    BY MR. BARR:
22          Q.    Okay.  So according to your
23    response PT is suitable?
24          A.    Certainly should be looked

Page 156

1          Q.    And PTs starting at around,
2     what, about 10 seconds?  Is that about
3     right?
4          A.    Yeah, well, I think 11.  I'm
5     just trying -- yes, okay.
6          Q.    Do you know, with this
7     chart, whether or not those PTs were all
8     taken at the same time?
9          A.    Taken at the same time?  I
10    would doubt --
11          Q.    As far as --
12          A.    You mean same time -- no.
13          Q.    Yes.
14          A.    No, I don't know that for
15    sure.  It doesn't say.  But, you know,
16    there's always some variability around
17    the time, even if you set it at one time,
18    there's a window.  It could be two, plus
19    or minus two hours, three hours,
20    something like that.  I don't know what
21    they did.
22          Q.    Now, I want to turn you to
23    Page 34 on the Bates.
24          A.    Okay.

Protected - Subject to Further Protective Review

Page 157

```
1        Q.   Are you there?
2        A.   Yes.
3        Q.   I'm on the paragraph that
4   says, "Since it was not possible."
5             Do you see that?
6        A.   Mm-hmm.
7        Q.   Okay.  I'm looking at --
8   let's start here.
9             See the sentence that
10  starts, "For these purposes"?
11       A.   I do.
12       Q.   It says, "For these
13  purposes, the applicant proposes to
14  provide information on the exposure range
15  that was observed in the ROCKET Phase III
16  trial in the target population."
17            And you write, "In patients
18  with nonvalvular atrial fibrillation
19  receiving rivaroxaban for the prevention
20  of stroke and systemic embolism, the 5th
21  to 95 percentiles for PTs one to
22  four hours after tablet intake, i.e., at
23  the time of maximum effect" -- so that
24  would be at peak, right?
```

Protected - Subject to Further Protective Review

Page 158

```
1        A.   It should be in the peak.
2   It says for PT Neoplastin one to four
3   hours after tablet intake.
4        Q.   "And range from 14 to
5   40 seconds in patients treated with
6   20 milligrams once-a-day, and 10 to
7   50 seconds in patients with moderate
8   renal impairment with 15 milligrams
9   once-a-day."
10            Did I read that correctly?
11       A.   Yes.
12       Q.   Would you agree with me that
13  that's a pretty wide range of a response?
14       A.   I wouldn't agree that it's
15  a -- not surprising for a test that's not
16  really developed for this, so it depends
17  on what you would consider wide.  But if
18  you were comparing it to warfarin, for
19  example, then that would range less than
20  that for sure.
21       Q.   Okay.  But a -- a -- the
22  difference in PT as far as anticoagulant
23  effect from 14 to 40 seconds is pretty
24  significant, is it not?
```

Protected - Subject to Further Protective Review

Page 159

```
1        A.   It doesn't have the same
2   meaning as it has for warfarin, so I
3   can't say how significant it is.
4             Do you -- do you understand
5   what I mean?  The reagent is not
6   developed specifically for rivaroxaban.
7   So there -- a lot of variability is seen
8   with that.  So if it were specific for
9   it, then one would -- it would be a lot
10  easier to say.
11       Q.   So how is this useful
12  information to a doctor if it's not
13  meaningful?
14       A.   It's all that is available
15  with tests that are -- granted, they may
16  not have the Neoplastin, but at least
17  they have a semi-quantitative test or a
18  qualitative test, meaning you know it's
19  on or not.
20            But it's not reliable.  And
21  that's why we went on to develop the
22  basis with an anti-Factor Xa assay.
23  Because at this time we were still trying
24  to develop that, and we had the PT.  But
```

Protected - Subject to Further Protective Review

Page 160

```
1   as I mentioned to you before, we
2   continually are trying to improve it.
3   And it turns out PT is just not the right
4   test to use.
5        Q.   So does that mean that all
6   of the studies you did using PT as a
7   surrogate aren't valid?
8        A.   No, it doesn't mean they are
9   not valid.  It's -- what you're seeing is
10  the actual research in progress.  And,
11  you know, we know lots about our standard
12  of care warfarin because we've had it
13  since 1954, so we've had decades to do
14  that work.  And you're seeing it as we
15  get more patients, more studies, more
16  capability to assess it.  So it's not
17  invalid.  It's just forming the basis of
18  your decisionmaking.
19       Q.   But at least when you were
20  seeking approval, you were using PT as
21  your surrogate for PK, right?
22       A.   Well, the authorities were
23  looking for something.  We're all looking
24  for something, right?  It would be good
```

Page 161

```
 1    to have something.  This is the data that
 2    was available.  And they -- when they
 3    requested to put it in, we discussed back
 4    and forth.  Because they -- when I --
 5    when I say "they," the regulatory
 6    authorities, and we, don't want to
 7    mislead either.  But we present the data
 8    that we have at the time.
 9         Q.    Would you at least agree
10    with me that it's roughly three times
11    difference between 14 to 40 seconds as
12    far as the PT measurement?
13         A.    You are talking about simple
14    math.
15         Q.    Yes.
16         A.    Well, that's simple math.
17    But that doesn't have anything to do with
18    the clinical portion.
19         Q.    And that's on 20 milligrams.
20               And at 15 milligrams there's
21    a five times difference, right, between
22    10 and 50 seconds?
23         A.    Well, that's comparing
24    apples to oranges.  Because now you're
```

Page 163

```
 1         at that and say, okay, some
 2    patients get 50 and some come up
 3    with a 14 or whatever.
 4    BY MR. BARR:
 5         Q.    You would at least agree
 6    with me that as far as you know, neither
 7    Bayer nor Janssen ever conducted any
 8    studies to determine the appropriate
 9    anticoagulation range with rivaroxaban,
10    correct?
11         A.    No.  I'm sorry.  I can't
12    agree to that.  We studied in each and
13    every indication the appropriate dose for
14    that indication, for that patient
15    population.  That's why we have different
16    doses in different indications.  If it
17    were all just one, then, you know, we
18    would have just one -- one dose.
19         Q.    So you believe that,
20    speaking specifically on the Afib
21    indication, that you conducted studies to
22    determine the appropriate dose?
23         A.    We believe for all of them
24    within the reasonable capabilities of
```

Page 162

```
 1    talking about patients with moderate
 2    renal failure, so it's a different...
 3         Q.    All I'm asking is if there's
 4    a -- you had some patients that tested at
 5    peak, at a level of PT -- prolongation of
 6    10 and -- and another patient within the
 7    5th to 95th percentile tested at
 8    50 seconds, right, taking the same drug,
 9    right?
10               MR. HOROWITZ:  Objection.
11         Asked and answered.
12               THE WITNESS:  I mean, what I
13         would say is that you are not --
14         you don't know if the patients are
15         all the same.  They are probably
16         not.  We had quite a disparate in
17         the patient characteristics.  As
18         you know, we had CHADS.  The
19         scoring system was quite broad in
20         our trial compared to other
21         trials.  So there were very sick
22         patients and not so sick patients.
23         So those factor into what the PT
24         would be.  So we can't just look
```

Page 164

```
 1    clinical trials and patient safety that
 2    we did the appropriate dosing beforehand.
 3    And then, forget that part, we have
 4    clinical trials to show how the dose
 5    worked.  We have large Phase III clinical
 6    trials.
 7               So then, that's -- that's
 8    the important thing.  At least from a
 9    clinical trialist standpoint.
10         Q.    Sitting here today, can you
11    testify for the jury what the range of
12    blood plasma concentration is for
13    efficacy to -- to a point where you're
14    exceeding bleed risk?
15               MR. HOROWITZ:  Object to the
16         form.
17    BY MR. BARR:
18         Q.    Does that make sense?
19         A.    I think I know what you're
20    getting at.  But maybe you want to
21    clarify.
22         Q.    Go ahead and try and answer
23    if you know what I'm getting at.
24               MR. HOROWITZ:  Well,
```

Page 165

```
 1          let's --
 2              THE WITNESS:  I think since
 3      you raised that, you must have
 4      some concern about your own
 5      question.  So let's hear so that I
 6      don't go off on some --
 7  BY MR. BARR:
 8      Q.    That's fair.  That's fair.
 9  I opened that one up.
10      A.    Okay.
11      Q.    I'll restate it.
12      A.    Sure.
13      Q.    Can you testify for the jury
14  today what the appropriate blood plasma
15  concentration is for Xarelto to make sure
16  somebody is at a level that provides
17  enough benefit to reduce stroke risk but
18  is not at such a high bleed risk level
19  that the bleed risk is exceeding any
20  stroke benefit they are getting?
21      A.    I don't believe that -- that
22  is known.  I don't know that it can be
23  known.  I think it's important for
24  everyone to understand that, in the
```

Page 166

```
 1  current environment, even with our new
 2  anticoagulants, that we have not been
 3  able to uncouple bleeding from efficacy.
 4  It is our goal.  We tried to do that as
 5  we develop more and more molecules.
 6  That's not known for rivaroxaban.
 7      Q.    So sitting here today, can
 8  you tell anyone the level of exposure at
 9  which bleed risk becomes excessive?
10      A.    I can't tell you.  I mean,
11  one could look at trials.  We can look at
12  the papers to see if we have those
13  levels, but off the top of my head, I
14  don't know an actual level.
15      Q.    Okay.  Do you agree there is
16  such a level?
17      A.    No.  But I have a view on
18  coagulation that may be a little
19  different than people who don't work in
20  the field.  And so that plays into my
21  thinking.
22      Q.    Well, please expound on
23  that.
24      A.    Well, there's -- there are
```

Page 167

```
 1  some misconceptions about how these drugs
 2  work and how coagulation works.  And one
 3  in particular is that patients bleed when
 4  they have high levels of antithrombotics.
 5  The fact of the matter is patients bleed
 6  whether they have high levels or low
 7  levels.  Certainly the anticoagulants
 8  don't help things.  But patients have
 9  a -- a reason for bleeding.  They have a
10  vascular malformation.  They have an
11  ulcer.  They might have an occult cancer
12  which is then brought out.  And we see
13  this when you first put patients on
14  warfarin or novel antithrombotics.
15              So the thinking is, oh,
16  there's a certain level and then people
17  are going to bleed.  No.  You could look
18  at trials, see bleeding events, and say,
19  okay, what was the level at that time.
20  But one has to understand, and I think
21  you probably have seen this concept that
22  I've -- I've espoused in the slide set,
23  that these events occur not at the time
24  of the level that's drawn, but they start
```

Page 168

```
 1  off maybe minutes, maybe you can catch
 2  it.  But hours or days before, let's say,
 3  if it's a -- if it's a clot to the brain.
 4              So checking the level
 5  doesn't tell you what was happening at
 6  the time, unfortunately.
 7      Q.    Okay.  So you don't believe
 8  there is a level of rivaroxaban in the
 9  blood that puts somebody at too high of a
10  risk of a bleed?
11      A.    I think it depends on the
12  patient and their characteristics.  In
13  other words, their underlying makeup.  We
14  all know some people who say they are
15  free bleeders or people who just seem to
16  never clot even if they have their blood
17  drawn.  That's just our basic makeup, you
18  and I.
19              Then there's the medical
20  conditions, diabetes, vascular disease,
21  platelet abnormalities.  All of this
22  plays a role as to what level might
23  affect it.  So it's just multifactorial.
24  So I can't give you, nor do I know one
```

Protected - Subject to Further Protective Review

Page 169

```
 1   level for all patients.  It would be
 2   convenient, would like to know something
 3   like that.  But it's just not possible.
 4       Q.    Okay.  So I'm just trying to
 5   understand what it is you're saying.
 6       A.    Yes.
 7       Q.    You believe that the level
 8   of rivaroxaban in the blood at which
 9   bleed risk becomes excessive cannot be
10   standardized across the patient
11   population, but is an individual factor
12   patient by patient?
13       A.    Well, I mean, there are
14   certain populations that are kind of the
15   same.  This is what we try to do with
16   grouping and clinical trials.  And you'll
17   notice in the papers, the first table of
18   patient characteristics.  So there are
19   patient types.  Atrial fibrillation, VTE
20   treatment.  But then the problem -- so
21   that would -- would be able to do
22   something -- you would hope to do
23   something more general.  But then you get
24   the part where, okay, but a subsegment of
```

Protected - Subject to Further Protective Review

Page 171

```
 1   something like that.
 2             But, I'm sorry.  I don't
 3   have a number.  I don't know a number or
 4   an exact threshold that you could say
 5   anybody who hits that is going to bleed.
 6       Q.    Do you know of any work the
 7   company has done to try to identify such
 8   a number?
 9       A.    I don't know how one would
10   do that without putting patients at -- at
11   significant risk of bleeding, and that we
12   don't do.
13       Q.    Do you know of a number at
14   which -- strike that.
15             Are you aware of a blood
16   plasma concentration that a patient must
17   reach to have stroke benefit?
18       A.    Well, I mean, all I know is
19   that levels have been -- that there are
20   ranges and levels for the patients that
21   were in the ROCKET-AF trial as an
22   example, or in the EINSTEIN trials for
23   DVT.  So there are plasma ranges, but I
24   don't know what the actual value would be
```

Protected - Subject to Further Protective Review

Page 170

```
 1   them are smokers.  Another subsegment are
 2   diabetics.  Another subsegment is both
 3   and they have -- so this is what I mean
 4   by it's very difficult to just pick that
 5   out.
 6       Q.    But wouldn't you agree with
 7   me that you could at least establish a
 8   level that would -- would indicate
 9   somebody was at excessive bleed risk for
10   all patients, that if anyone is above
11   this level, they are at too high of a
12   bleed risk?
13       A.    Well, I don't know if that's
14   possible.  It would have to be something
15   very high that we don't hit.  But what we
16   know with our drug in their indications
17   for their dose, that the -- the exposure
18   is quite flat or sometimes you just don't
19   find anything.  There might be a slight
20   increase.  But sometimes you just don't
21   find anything.
22             They don't go into those
23   ranges.  Unless there are other problems
24   going on.  Severe organ shutdown or
```

Protected - Subject to Further Protective Review

Page 172

```
 1   where people are at a risk.
 2             Again, I would -- I would
 3   propose that for people at risk, that
 4   they have heightened factors just like
 5   you do for bleeding.  So you have to
 6   weigh in the patient characteristics.
 7   This is why I emphasize this so much.
 8       Q.    You would agree with me that
 9   for the dose-response curve, when you're
10   looking at dose-response with
11   rivaroxaban, the efficacy curve is flat,
12   right?
13       A.    In general it's flat,
14   especially for DVT.  For example, we did
15   not see in our Phase II dosing for 20,
16   30, and 40 milligrams -- I remember
17   this -- that that was very flat.
18       Q.    And so if I understand that
19   right, what that's basically telling you
20   is that once you reach a certain level,
21   you're no longer increasing stroke
22   benefit.  Your concentration, your
23   benefit -- your reduction of risk of
24   stroke is not going up as you put more
```

Page 173

1  drug into the system, right?
2      A.    Well, that may be looking at
3  graphs.  But that doesn't mean in each
4  patient that's the same.  That's the part
5  that we don't know.
6          So we get it into a range,
7  but we don't know that maybe one person
8  might need a little more, because you're
9  conglomerating all that stuff together.
10 And of course, we treat patient by
11 patient, so we're trying to find a dose
12 that will fit -- fit the patients that
13 have those patient characteristics and
14 that disease.
15     Q.    Okay.  So with the
16 dose-response curve on efficacy being
17 flat, every microgram of concentration
18 above the efficacy line is doing nothing
19 but increasing bleed risk, right?
20     A.    I'm sorry.  I can't agree
21 with that either.  I don't think that's
22 something that we know.  That's something
23 as a construct, we look at a graph, and
24 we all look at it and say, hey, oh I

Page 174

1  guess it wouldn't help.  But how do we
2  know?  We don't know.  I mean, you'd have
3  to test each one of those and do a large
4  number of patients at each one of those
5  levels and see if some had stroke and
6  didn't.  And that's not going to happen.
7      Q.    So you're saying those
8  studies can't be done?
9      A.    I think it's extremely
10 infeasible to do that.  I mean, it's not
11 just for rivaroxaban, but for
12 antithrombotics in general, that this is
13 the best that we have.
14         The way we try to counter
15 that, although it doesn't get maybe to
16 the individual one person, is do large
17 trials where you incorporate all those
18 people, but sometimes the signals are not
19 strong.
20     Q.    Okay.  But at least
21 according to the pharmacological profile,
22 accepting that there is an increase in
23 bleed risk as you increase rivaroxaban
24 concentration, true?

Page 175

1      A.    Yes.  At certain point, yes,
2  and then it goes up.
3      Q.    And then on the efficacy
4  curve, it's flat, right?
5      A.    Well, for each indication
6  there is a little bit of difference.  So
7  it's not like everything is completely
8  flat.  Because -- you know, like for VTE
9  there is some -- excuse me.  For AF there
10 is some increase, but by and large.
11     Q.    Okay.  And so just according
12 to the profile, as you get -- add more
13 concentration, you're only increasing
14 bleed risk, right?
15         MR. HOROWITZ:  Objection.
16 BY MR. BARR:
17     Q.    Because your efficacy is
18 staying flat, right?
19         MR. HOROWITZ:  Objection.
20         Asked and answered.
21         THE WITNESS:  I mean, I
22         can't say anything different than
23         what I've said.  I don't fully
24         agree with what you're saying.  I

Page 176

1          don't know if it's increasing the
2          bleeding risk.  There might be
3          some point, some threshold where
4          things tip over.
5              But, again, you're looking
6          at a whole population when they do
7          this these studies, and you're
8          looking at these curves.  And then
9          you're trying to say, okay, well,
10         this patient, that's going to be a
11         problem.  That's not the same.
12         These are just a conglomeration.
13 BY MR. BARR:
14     Q.    But those curves are telling
15 you what I'm saying is correct, right?
16     A.    They're telling me that the
17 dose-response at some point becomes flat.
18 And we're fortunate with this particular
19 drug that in the target areas that we
20 want to go it is flat.  That is to say,
21 we get efficacy, and then we try to keep
22 the dose.
23         Obviously we don't give,
24 say, 30 or 40 or 60 milligrams.  We get

Protected - Subject to Further Protective Review

Page 177

1    below that point that you're talking
2    about.
3        Q.    Okay.  But you don't know,
4    as you sit here today, what the efficacy
5    level is, right, how much you need in
6    your blood to reach a level of efficacy,
7    correct?
8        A.    I know what dose to give
9    that keeps people -- because of the
10   predictable pharmacokinetics, that keeps
11   people in a range that they need for that
12   particular disease.
13       Q.    Okay.  Do you think it would
14   be helpful for doctors to know the
15   no-effect level?
16       A.    I don't know how they might
17   use that.  Scientifically, it's
18   interesting.
19       Q.    Does the company know the
20   no-effect level?
21       A.    Well, we've tried to make
22   estimate of that.  That was very hard as
23   well.  We do not have a good
24   understanding for each indication of what

Protected - Subject to Further Protective Review

Page 178

1    would be the lowest level, and as you had
2    asked, the highest level.  And that has
3    to do with the fact that the drug has a
4    fairly wide therapeutic index.  It's not
5    as narrow as warfarin.  And that's why we
6    need, with warfarin, to be certain by
7    doing the pro time.
8        Q.    You know the FDA found that
9    you did not show that you have a wide
10   therapeutic index, right?
11             MR. HOROWITZ:  Object to the
12       form.
13             THE WITNESS:  I don't
14       remember them saying that they
15       know that we didn't find.  I know,
16       for example, Dr. Grant in the
17       early years felt that we didn't
18       have that.
19             But this is a general
20       statement that we make over time.
21       And I don't know what their
22       feeling is in 2016.
23   BY MR. BARR:
24       Q.    At approval, they certainly

Protected - Subject to Further Protective Review

Page 179

1    said that you had not proven that there
2    was a wide therapeutic range, correct?
3             MR. HOROWITZ:  Object to the
4        form.
5             THE WITNESS:  Well, first of
6        all, we're not saying it's like
7        the widest.  We're just saying
8        it's not narrow index.  So it's
9        wider.
10            Second of all, at that
11       particular time, I remember a
12       statement from Dr. Grant saying
13       that.
14            I also remember that they
15       approved the drug and that we use
16       it as a 20 milligrams once-a-day
17       or 15 if your creatinine clearance
18       is below 50.
19   BY MR. BARR:
20       Q.    We'll get to the dose stuff
21   later.
22       A.    Right.  But that's pertinent
23   to the therapeutic index.
24       Q.    I understand.  There was a

Protected - Subject to Further Protective Review

Page 180

1    point in time when the company was
2    working with Portola.  Do you remember
3    that?
4        A.    We still work with Portola.
5        Q.    You were working on a
6    particular product for use with
7    rivaroxaban, correct?
8        A.    Well, for all the novel oral
9    anticoagulants.
10       Q.    They were particularly
11   working on essentially a reversal agent,
12   correct?
13       A.    They continue to do that.
14       Q.    Okay.  And you worked with
15   them on that, correct?
16       A.    Those of us at Bayer, yes.
17       Q.    Okay.  You agree there's
18   nothing in the label that informed --
19   that tells doctors what the no-effect
20   level is for Xarelto, correct?
21       A.    I don't believe there's
22   anything in the label for that, although
23   I don't know how that would help them.
24       Q.    Well, what -- and we talked

Protected - Subject to Further Protective Review

Page 181

1    about this a little briefly.  And I
2    forgive -- forgive me for going back to
3    it.
4              But if a patient comes into
5    the emergency room bleeding and the
6    doctor wants to perform emergency
7    surgery, and they want to know whether or
8    not drug is on board before they do that
9    surgery, how are they supposed to figure
10   that out?
11             MR. HOROWITZ:  Objection to
12        form.
13             THE WITNESS:  I guess I'm
14        not understanding.  They have
15        bleeding but then they want to do
16        surgery?  I'm not sure what you
17        mean.
18   BY MR. BARR:
19        Q.   Well, it could be an
20   intracranial hemorrhage which is
21   bleeding.
22        A.   Okay.
23        Q.   And they are wanting to do
24   surgery.  How is the doctor supposed to

Protected - Subject to Further Protective Review

Page 182

1    figure out whether or not there's drug on
2    board?
3              MR. HOROWITZ:  Object to the
4         form.
5              THE WITNESS:  Well, I think
6         the USPI says the information
7         that we have from the prothrombin
8         time, even if it's not Neoplastin,
9         that if it's prolonged, that they
10        probably have -- assuming they
11        don't have any other
12        antithrombotic drugs on board,
13        that they probably have some drug
14        on.
15   BY MR. BARR:
16        Q.   Let's go back to that label.
17   That was Exhibit Number 2.
18             Now, you said this was in
19   the label.
20        A.   Well, I don't know if it's
21   in the USPI.  I think it's in the SPC at
22   least.  I have to cover more than one
23   label.
24        Q.   That's fair.  But this is

Protected - Subject to Further Protective Review

Page 183

1    litigation in the United States.  So
2    we're talking about the United States
3    label.
4         A.   That's fine.  But I'm in
5    global.
6              MR. HOROWITZ:  Take it
7         question by question.  Sometimes
8         you have asked about the SPC.
9         Sometimes you've asked about the
10        U.S. label.  So I don't think we
11        can assume every question you ask
12        is about the U.S. label unless we
13        specify.
14             MR. BARR:  Fair enough.
15   BY MR. BARR:
16        Q.   We're talking about the U.S.
17   label.
18        A.   Okay.
19        Q.   I'm talking about a patient
20   coming into the emergency room with an
21   intracranial hemorrhage in the United
22   States and a doctor wanting to know
23   whether or not there is drug on board.
24   How is he supposed to figure that out?

Protected - Subject to Further Protective Review

Page 184

1              MR. HOROWITZ:  Object to the
2         form.
3              THE WITNESS:  Well, talk to
4         the patient if they could speak to
5         them.  Talk with the family if
6         they could speak to them.  Check
7         the medical record.  They can --
8    BY MR. BARR:
9         Q.   They can check -- I'm sorry.
10   They can check their medical record to
11   determine if a drug they take
12   once-a-day -- they can use a medical
13   record to figure out whether or not they
14   took their pill that day?
15        A.   Not whether they take it or
16   not, but whether they take rivaroxaban or
17   not.  That would be helpful.  What if
18   they take another drug?
19        Q.   Okay.  Let's assume with my
20   hypothetical, then, that the spouse has
21   told them they take rivaroxaban, so they
22   know that.  And they are wanting to know
23   whether or not the person has drug on
24   board.  How are they supposed to figure

Protected - Subject to Further Protective Review

Page 185

1    that out?

2            MR. HOROWITZ:  Object to the

3        form.  Foundation.  Incomplete

4        hypothetical.

5            THE WITNESS:  Yeah, again, I

6        can only say what's available now

7        in the U.S., because in Europe we

8        have a specific assay for

9        rivaroxaban, but as the assay is

10       not yet approved in the U.S., all

11       that we have is the prothrombin

12       time.

13   BY MR. BARR:

14       Q.   Okay.  And where are they

15   supposed to figure that out?  Where in

16   the label does it tell them if their

17   prothrombin time is, whatever the number

18   is, that means they have drug on board?

19   Where is that in the label?

20       A.    There's no specific -- I

21   don't know if there's a specific area,

22   because I don't have time to re-review

23   the label.  But there is a section on

24   pharmacodynamics that talks about the

Protected - Subject to Further Protective Review

Page 186

1    dose-depending inhibition effect of

2    Factor Xa with the drug, so.  I mean,

3    that gives some, but if you're looking

4    for a specific number, I don't know if

5    there's something in the label about

6    that.

7        Q.   You know --

8        A.    There's other knowledge, of

9    course.  There's other -- and sort of --

10   as the things we mentioned, training and

11   education.  And this is a topic of

12   discussion in scientific meetings every

13   year.

14       Q.   You are aware there's

15   nothing in the label that would tell

16   somebody, if you run a PT, it will -- it

17   will tell you whether or not a person has

18   drug on board?  That's nowhere in the

19   label, you know that, right?

20       A.    I don't know that for sure.

21   I'd have to re-read the label, which I do

22   from time to time.  But I'd have to take

23   a look.  But I can just ask you if you --

24   if you --

Protected - Subject to Further Protective Review

Page 187

1        Q.   I'm giving you a chance to

2    look at the label.

3        A.    Do you want me to sit and

4    read the whole label?  Okay.

5            MR. HOROWITZ:  Let's -- do

6        you want him to go off the record

7        and go through the label?  Is

8        that...

9            MR. BARR:  Yeah, let's go

10       off the record.  Yeah.

11           MR. HOROWITZ:  Okay.  Why

12       don't we take a break anyway.

13       It's been --

14           THE VIDEOGRAPHER:  The time

15       is 11:44 a.m.  We are going off

16       the record.

17           (Short break.)

18           THE VIDEOGRAPHER:  The time

19       is 12:00 p.m.  Back on record.

20   BY MR. BARR:

21       Q.   When we took a break, you

22   were taking a break to look at the label

23   to see where in the label it would tell a

24   doctor in an emergency setting whether or

Protected - Subject to Further Protective Review

Page 188

1    not rivaroxaban was on board.  Did you

2    find anything in the label?

3        A.    Thank you for the

4    opportunity, and I didn't find anything

5    about the seconds I was remembering from

6    the SPC, which I also work on, and only

7    found the section that we mentioned about

8    dose-dependent inhibition of Factor Xa

9    activity and prothrombin time.

10           So we did work on this in

11   terms of labeling.  But in the end, the

12   authority decided that it not be in

13   there.

14       Q.   Okay.  We'll have to get

15   into that later, because that's not

16   exactly how that played out.  But we'll

17   talk about that later.

18           MR. HOROWITZ:  Move to

19       strike the comments.

20   BY MR. BARR:

21       Q.   What the label actually

22   tells the doctor in an emergency setting

23   to do is to wait 18 to 24 hours since the

24   last dose, right?

Protected - Subject to Further Protective Review

Page 189

1       A.   I didn't see the actual
2  wording on it.  Could you refer me to --
3       Q.   Now I'll have to find it.
4  If you look at Section 2.7.
5       A.   Okay.
6       Q.   And that's discontinuation
7  for surgery and other interventions.
8          Do you see that?
9       A.   I do now.  Thank you.
10      Q.   It says, "If anticoagulation
11  must be discontinued to reduce the risk
12  of bleeding with surgical or other
13  procedures, Xarelto should be stopped at
14  least 24 hours before the procedure to
15  reduce the risk of bleeding.  In deciding
16  whether a procedure should be delayed
17  until 24 hours after the last dose of
18  Xarelto, the increased risk of bleeding
19  should be weighed against the urgency of
20  intervention."
21          Did I read all that
22  correctly?
23       A.   Yes.
24       Q.   As far as you know, you're

Protected - Subject to Further Protective Review

Page 190

1  not aware of any other language that
2  informs a doctor on how to handle that
3  situation in this label?
4       A.   In this label, I'm not.
5       Q.   Now, we were talking about
6  your work with Portola.  And you're aware
7  Portola was working on a reversal agent,
8  correct?
9       A.   That's correct.
10      Q.   I want to show you
11  Plaintiffs' 389795, which we will mark as
12  Exhibit 17.
13          (Document marked for
14       identification as Exhibit
15       Berkowitz-17.)
16  BY MR. BARR:
17      Q.   Do you have that, sir?
18      A.   I have that in my hand.
19      Q.   What I'm talking -- what I'm
20  going to refer you to is your e-mail.
21  It's actually the first e-mail in the
22  string, that starts on Bates 00302575.
23      A.   Okay.
24          MR. HOROWITZ:  Take a

Protected - Subject to Further Protective Review

Page 191

1  minute, Scott.
2  BY MR. BARR:
3       Q.   If you want to take a second
4  to look at it, that's fine.
5       A.   If I could, just to
6  familiarize myself again.
7          MR. HOROWITZ:  Thanks,
8       Brian.
9  BY MR. BARR:
10      Q.   Are you ready?
11      A.   In a minute.  Yes.  Thank
12  you.
13      Q.   This is an e-mail that you
14  write to a group of people at both Bayer
15  and Janssen on December 2nd, 2013,
16  correct?
17      A.   Yes.
18      Q.   And the subject is "Summary
19  of team teleconference, what level of
20  rivaroxaban is required at which bleeding
21  would stop?"
22          Did I read that correctly?
23      A.   Yes.
24      Q.   That sounds like information

Protected - Subject to Further Protective Review

Page 192

1  doctors would want to know, correct?
2          MR. HOROWITZ:  Objection to
3       form.
4          THE WITNESS:  I don't know
5       that doctors need to know the
6       level of rivaroxaban and then it
7       stops.  I mean, what we'd like to
8       know is have something, some kind
9       of knowledge about what -- what
10      range they're in and what they do
11      with the dosing.  That's what we
12      get from the clinical trials.
13  BY MR. BARR:
14      Q.   It says, "At our
15  teleconference of November 26th, we
16  addressed Portola's request for providing
17  from our best knowledge a level of
18  rivaroxaban at which bleeding would stop.
19  I have summarized the discussion below.
20  There is no clinical data from which to
21  state for certain what are the
22  therapeutic levels of rivaroxaban for
23  efficacy, the excessive levels of
24  rivaroxaban which produce bleeding, or

Page 193

1   levels below which bleeding should stop
2   if it is present."
3           Did I read that correctly?
4       A.   Yes.
5       Q.   And that clinical data is
6   from the clinical trials run by Bayer and
7   Janssen, correct?
8       A.   I believe that was
9   summarizing the discussion.  I believe
10  that's what that's about.
11      Q.   And according to your
12  e-mail, those clinical trials don't
13  provide data to answer any of these three
14  issues set out in your e-mail, right?
15      A.   Right, that we could
16  determine from the data.
17      Q.   "The question raised by
18  Portola to help them in their process of
19  identifying appropriate doses to reverse
20  rivaroxaban is as follows:  What level of
21  rivaroxaban is required at which bleeding
22  would stop?  It would be helpful to
23  provide to Portola a plasma concentration
24  below which we should aim to ensure

Page 195

1   which epidural catheters can be removed
2   after the 10-milligram dose as in our
3   SPC," correct?
4       A.   Yes.  I mean, in other
5   words, if we could think about the
6   thinking that went behind coming up with
7   that, which was also not easy to do.
8       Q.   Do you recall, sitting here
9   today, what the blood plasma
10  concentration at which epidural catheters
11  can be removed for the 10-milligram dose
12  is?
13      A.   I'm sorry.  I do not.  I'm
14  not sure that there is a known level to
15  do it.  I mean, we did some work on it
16  both internally and externally, looking
17  at the RECORD trial, but I don't remember
18  exactly if one was for certain.  So what
19  we ended up doing, and what you see in
20  the label, I believe, is the timing.
21      Q.       Okay.  What do you mean by
22  that?
23      A.   By waiting a certain amount
24  of time before you pull the catheter out.

Page 194

1   hemostasis."
2           Did I read that correctly?
3       A.   You read it correctly.
4       Q.   What do you mean by that?
5       A.   Well, this was their idea.
6   It's not our idea.  That they think if
7   they had a plasma concentration they
8   could aim for because they're trying to
9   set up some kind of trial or study at the
10  time -- this was '13 -- on how their
11  agent works.
12          So one way would be if you
13  knew a level, then could you target that
14  level to get it down.
15      Q.   And then you say, "There's
16  several ways to assess this," right?
17      A.   Well, we were brainstorming.
18  This is just sort of minutes.  But we're
19  brainstorming on what ways it could be.
20  There might be others and I don't know
21  them.  But I was just summarizing what
22  the group thought.
23      Q.   Okay.  And the first one is,
24  "Consider the plasma concentration at

Page 196

1   In other words, the -- the whole point of
2   it, even when giving the anticoagulation
3   is to assure hemostasis.  So from a
4   clinical sense, visually and -- and
5   maximizing your time before the next
6   dose, that was the best that we could do
7   that we thought would be reliable.
8       Q.   You say, "Another way is to
9   use modeling such as provided by Todd
10  Moore from the ACS program to determine a
11  'no-effect dose.'"
12          Did I read that correctly?
13      A.   Yes.
14      Q.   Todd Moore is a -- is a
15  gentleman with Janssen, correct?
16      A.   Correct.
17      Q.   And did you rely upon him in
18  your work with Xarelto?
19      A.   Well, he was a clinical
20  pharmacologist and the -- you know, he is
21  part of the team.  So we worked together
22  on it.  He had done some work in the ACS
23  dosing because we had, at the lower end
24  of the range up to 20 milligrams, a fair

Page 197

1   amount of data from that Phase II ATLAS
2   ACS trial.
3        Q.    Okay.  And then you have,
4   "There may be some other ways to approach
5   this question," and then it has
6   discussion.  Do you see that on the next
7   page?
8        A.    I do.
9        Q.    Let's go down to where it
10  says for 20 milligrams once-a-day.  Do
11  you see that?
12       A.    It's in treatment, VTE
13  treatment?
14       Q.    It's one, two, three -- it's
15  right below that, in the SPAF.
16       A.    Okay, the SPAF, okay.  For
17  20 milligrams OD in the SPAF population.
18       Q.    Right.
19       A.    Yeah.
20       Q.    So is this -- "20 milligrams
21  OD in the SPAF population with normal
22  renal function at 24 hours the mean
23  concentrations around 44.7 nanograms per
24  milliliter, free fraction of 7 percent, a

Page 199

1        A.    In dosing depending on
2   indication, it's sensible to target a
3   range --
4        Q.    Yeah, I just don't want to
5   change your --
6        A.    No, I agree, and I was
7   having trouble reading my own typing.
8   So...
9        Q.    So with that revision:
10  "With some difference in doses depending
11  on indication, it is sensible to target a
12  range."
13       A.    Yeah.
14       Q.    "With a mean concentration
15  of 17.9 nanograms per milliliter at
16  18 hours after a 10-milligram dose and
17  44 nanograms per milliliter at 24 hours
18  after a 20- to 15-milligram, a reasonable
19  range for free fraction concentrations to
20  target is 1.5 to 3.1 nanograms per
21  milliliter.  This is around the no-effect
22  level reported by BMS/Pfizer for apixaban
23  which is 2.6 nanograms per milliliter."
24  Correct?

Page 198

1   3.1 nanogram per milliliter, while in the
2   moderate renal function SPAF population
3   receiving 15 milligrams OD, the mean
4   concentration is similar at around
5   44.4 nanograms per milliliter."
6             Did I read that right?
7        A.    Yes.
8        Q.    Okay.  And so that's at
9   trough, correct?
10       A.    It doesn't say.  And I would
11  think so.
12       Q.    Well, it says at 24 hours,
13  right?
14       A.    Oh, I'm sorry.  At 24 hours.
15  Probably trough, yeah.  Of course --
16       Q.    And it imparts a once-a-day
17  drug, right?
18       A.    Yeah.
19       Q.    And then you have
20  conclusions.
21            "With some difference" --
22  "with some difference is dosing" -- and
23  that should be "in dosing," don't you
24  think.

Page 200

1        A.    That -- that's what it says,
2   yes.
3        Q.    Okay.  And I am trying to
4   understand all of this, because you're
5   doing some math in this that -- that
6   isn't apparent on the page.
7             As I understand this, what
8   you're saying is, with a mean
9   concentration, and I'm focusing on the
10  20- to 15-milligram dose --
11       A.    Mm-hmm.
12       Q.    -- with a mean concentration
13  of 44 nanograms per milliliter at
14  24 hours, that that is essentially your
15  no-effect level, correct?
16       A.    Well, it says mean
17  concentration, so there's a range to the
18  mean.
19       Q.    Okay.  But you know at a
20  mean, if you're at 44 nanograms per
21  milliliter, you're at the no-effect
22  level?
23       A.    No.  You know at the mean
24  that 50 percent -- or not 50 percent,

Page 201

1    medium, but the average is.
2         Q.    Okay.
3         A.    But what if you chose that
4    and someone were in the 75 percent?  Then
5    that wouldn't hold, right?  So that's the
6    problem.
7         Q.    So what it gets down to is
8    you still don't know -- what is this --
9    what is the thing with the free fractions
10   concentrations to target.  What is that
11   all about?
12        A.    Well, it's about whether --
13   what's not bound to Factor X.
14        Q.    Okay.
15        A.    So now we don't normally
16   talk about it in that way, but we were
17   trying to extrapolate to help resolve --
18   you know, mentally trying to figure out
19   from the data we had what could we use to
20   help them set some kind of target.  It
21   would have to be tested, wouldn't be
22   real, but that's all it was about.  And
23   they wanted -- they actually asked for
24   the free fraction.

Page 203

1    all provided this information to Portola?
2         A.    Sure, we talked with them.
3    We had sent them an e-mail, I believe.
4         Q.    Did y'all ever give them
5    what y'all thought the no-effect level
6    would be or a range to target?
7              MR. HOROWITZ:  Objection.
8              THE WITNESS:  I provided the
9              information.  I summarized it
10             here.  I don't know if it was
11             exactly word for word here.  But I
12             know that I -- I mean, that was
13             the -- the test was to pull the
14             team together and try to give our
15             best estimate to help them.  They
16             appreciated it.  We went to the
17             FDA with it.
18   BY MR. BARR:
19        Q.    Let me show you another one.
20   We'll mark this as Exhibit 18.  And this
21   is Plaintiffs' 1077060.
22             (Document marked for
23             identification as Exhibit
24             Berkowitz-18.)

Page 202

1         Q.    Do you know if this testing
2    was ever done?
3         A.    No.  Well, do you mean did
4    they do any testing or --
5         Q.    Yes.  Well, do you know if
6    any testing was ever done to prove or
7    disprove this mean concentration at
8    24 hours as to whether that that was a
9    no-effect level?
10        A.    Well, what would you do?  I
11   mean --
12        Q.    You're the scientist.  I'm
13   asking.
14        A.    Yeah, well, we wouldn't --
15   if you were to do that, then you would
16   hurt people.  We're not going to do that.
17        Q.    Okay.  So you -- so
18   basically there's no way to test it.
19        A.    Well, I can't say never no
20   way.  In science someone may come up with
21   a way.  But I'm not aware of a way that
22   we could do that and not put patients at
23   risk.
24        Q.    Okay.  So do you know if you

Page 204

1              MR. HOROWITZ:  Take a
2              minute.
3    BY MR. BARR:
4         Q.    All right.  You see that
5    this is an e-mail from you on July 15,
6    2014, right?
7         A.    Yeah.
8         Q.    And it's "Re:  JCC
9    teleconference for Portola Bayer Janssen
10   Friday."  Do you see that?
11        A.    Yeah.
12        Q.    Do you know what the JCC
13   stands for?
14        A.    I can't remember what that
15   was.  Some joint committee, I guess.
16        Q.    Okay.  It says, "I'm
17   following up on a question raised during
18   our JCC teleconference for Portola Bayer
19   Janssen Friday, July 11, 2014.  There was
20   discussion around the no-effect level of
21   rivaroxaban.  In particular, the question
22   was raised by Bayer Janssen regarding
23   statements made in the Phase IV protocol
24   draft we are currently reviewing that the

Page 205

1   18-hour time point was selected based on
2   the approximate time following a dose of
3   a Factor Xa inhibitor to a plasma
4   concentration that is approximately equal
5   to two to three times the no-effect
6   level, and the efficacy analysis
7   population for the study will include
8   only" -- "will only include patients
9   whose central laboratory determined
10  anti-Factor Xa activity is greater than
11  75 nanograms per milliliter, a level
12  estimated to correspond to two to three
13  times the no-effect level."
14             Did I read that right?
15       A.   Yes.
16       Q.   So according to the Phase IV
17  protocol draft that y'all were reviewing,
18  Portola was using a no-effect level of --
19  well, I have to figure out the best way
20  to say it.
21             The no-effect level would be
22  75 nanograms per milliliter divided by 2
23  or 3, right?
24             MR. HOROWITZ:  Object to the

Page 207

1             THE WITNESS:  As I said, we
2   just looked at that document.
3   BY MR. BARR:
4        Q.   Okay.  And then they had a
5   cutoff at two to three times that level
6   which they set at 75 nanograms per
7   milliliter, correct?
8        A.   It seems they used that
9   cutoff.  It might just be from a
10  practical standpoint they would be able
11  to -- to measure as opposed to getting
12  down to the very low levels that we
13  talked about.
14       Q.   Let's go down to -- I'm
15  starting with, it says, "The following is
16  a brief summary of the information that
17  we provided to Portola last year on this
18  topic."
19             Do you see that?
20       A.   I do.
21       Q.   And what I'm looking at is
22  the second bullet point.  And you again
23  state, "There is no clinical data from
24  which to state for certain what are the

Page 206

1        form.
2             THE WITNESS:  I don't think
3   I can agree with that.  They --
4        they took the information that
5        they -- that I provided them from
6        our team.
7   BY MR. BARR:
8        Q.   Mm-hmm.
9        A.   And they came up with some
10  kind of cutoff target to use to aim for
11  in their protocols.  Their protocol.  And
12  I think we're reviewing it.  I think it
13  was arbitrary to my knowledge.  Where
14  they came up with the two to three, I
15  don't know.  But that's what this is
16  about, if I recall correctly.
17       Q.   But they got the no-effect
18  level from you, correct?
19       A.   We just looked at the
20  document --
21             MR. HOROWITZ:  Objection.
22       Objection.  Form.
23             THE WITNESS:  Sorry.
24             MR. HOROWITZ:  Go ahead.

Page 208

1   therapeutic levels of rivaroxaban for
2   efficacy or excessive levels of
3   rivaroxaban which produce bleeding,"
4   correct?
5        A.   Yes.
6        Q.   That's been your testimony
7   consistently throughout this deposition
8   so far, correct?
9        A.   That's correct.
10       Q.   "As an accurate
11  determination of the no-effect level for
12  rivaroxaban is not available, review of
13  the pharmacologic data led to the
14  conclusion that there is a mean
15  concentration of 17.9 nanograms per
16  milliliter at 18 hours after a
17  10-milligram dose of rivaroxaban and 44
18  nanograms per milliliter at 24 hours
19  after 20 to 15 milligrams," correct?
20       A.   That -- that's right.  That
21  confirms what we saw in the other e-mail.
22       Q.   Right.  And that's the same
23  data that we just looked at.
24       A.   The same data, yes.

Page 209

```
 1        Q.   And then you write, "From
 2   the available data, we suggested that a
 3   reasonable range for free fraction
 4   concentrations to consider as a no-effect
 5   level would be 1.5 to 3.1 nanograms per
 6   milliliter," correct?
 7        A.   That's what it says.
 8        Q.   So y'all -- y'all being
 9   Bayer -- believed that that was a
10   reasonable range to consider a no-effect
11   level, correct?
12        MR. HOROWITZ:  Objection to
13        form.
14        THE WITNESS:  For the
15        purposes of what they were asking.
16        And it says up above that Portola
17        felt it would be helpful to have
18        some plasma concentration below
19        which to aim for.  I was referring
20        to the data that we used and
21        explaining to the group that we
22        did not tell them to use a 75
23        nanogram per mL, which is what
24        they implied when we were on the
```

Page 211

```
 1        Plaintiffs' 1091142.
 2        MR. HOROWITZ:  Take a minute
 3        or two.
 4   BY MR. BARR:
 5        Q.   Let me know when you're
 6   ready.
 7        A.   Okay.  Okay.  Thank you.
 8        Q.   This is an e-mail from you
 9   to, it looks like, people at Bayer.  I
10   don't see anybody from Janssen on that.
11        A.   That's correct.
12        Q.   Dated August 15, 2013,
13   right?
14        A.   Yes.
15        Q.   And it's subject line,
16   "Request from Portola in prep for end of
17   Phase II meeting, August 14, 2013."
18        Do you see that?
19        A.   Yes.
20        Q.   Okay.  And you say, "Dear
21   Dagmar" -- is that John or Jan?
22        A.   Jan.
23        Q.   I wasn't close with any of
24   them.
```

Page 210

```
 1        phone call.  My note says that
 2        they said that we provided that.
 3        That's not what we provided.  I
 4        was providing the team the actual
 5        data, as best as we could pull it
 6        together, for them.
 7   BY MR. BARR:
 8        Q.   Are you aware of any
 9   information provided to prescribing
10   doctors in the United States of Bayer's
11   view of what a reasonable range of the
12   no-effect level is?
13        A.   I don't know if there's
14   anything in papers.  I don't know of
15   anything being in the label for that.
16   But this is not solid.  So I could
17   understand why.  I don't know exactly how
18   doctors would use that.
19        Q.   Okay.  I want to move now to
20   what I'll mark as Exhibit 19.
21        (Document marked for
22        identification as Exhibit
23        Berkowitz-19.)
24        MR. BARR:  And this is
```

Page 212

```
 1        MR. HOROWITZ:  That was
 2        weak.
 3   BY MR. BARR:
 4        Q.   I'm not German.  And
 5   Corrina.
 6        "During the rehearsal for
 7   Portola in the Phase II meeting, Portola
 8   has some questions for the new Factor Xa
 9   inhibitor companies, in order that we
10   build a case that the anti-Factor Xa
11   assay as a surrogate marker for use in a
12   potential Phase III trial using their
13   antidote to stop bleeding.
14        "I have the four questions,
15   replies, and references below."
16        Do you see that?
17        A.   I do.
18        Q.   Okay.  So these are your
19   responses to the questions?
20        A.   No, not exactly.  This is
21   what was discussed at the meeting.  It's
22   not exactly mine.
23        Q.   You certainly wrote the
24   e-mail?
```

Protected - Subject to Further Protective Review

Page 213

```
1        A.    Pardon me?
2        Q.    You wrote the e-mail?
3        A.    I wrote the e-mail.
4        Q.    The question is, Number 1,
5   "At what level of rivaroxaban do we lose
6   anticoagulation effect in nanograms per
7   milliliter?"
8              Do you see that?
9        A.    I do.
10       Q.    And your reply is, "Around
11  23 micrograms per liter," correct?
12       A.    Yes.
13       Q.    And then you provide support
14  for it, which is -- it looks like a study
15  from Ms. Kubitza, correct?
16       A.    First-in-man study, the
17  clinical study report.  That's where it
18  was pulled from.
19       Q.    So according to your answer
20  to this question, you lose
21  anticoagulation effect with rivaroxaban
22  at 23 micrograms per liter, right?
23       A.    I don't know if that's
24  right.  I don't know what this means
```

Protected - Subject to Further Protective Review

Page 214

```
1   exactly.  It's a first-in-man study, so
2   it's not by indication.  I don't think --
3   I can't tell, but I don't think I was
4   aware of it when I was doing the work
5   before.  I don't know where it came up.
6   But just reading the first-in-man study,
7   that -- it says exactly that.  But I
8   can't interpret it any more than that.
9        Q.    Did you put any of that in
10  this e-mail where you said, "Reply:
11  Around 23 micrograms per liter"?
12       A.    That wouldn't be the kind of
13  thing one puts in an e-mail when we are
14  sitting on calls together and then we
15  summarize and we are passing on the
16  information, then we have a call to go
17  over the details.
18       Q.    You answered this question
19  very directly, did you not?
20       A.    I think we're actually
21  asking these colleagues their input on
22  it.  So this is laying out some structure
23  and then seeing what they have to say
24  about it.
```

Protected - Subject to Further Protective Review

Page 215

```
1        Q.    Have you -- do you know of
2   any information provided to doctors in
3   the United States that lets them know
4   that you lose anticoagulation effect at
5   around 23 micrograms per liter?
6              MR. HOROWITZ:  Object to the
7        form.
8              THE WITNESS:  I would think
9        any doctor would know that as your
10       anticoagulation level goes down,
11       you use anticoagulant protection.
12       What particular number it is, I
13       don't see how that's of pertinence
14       to them.  I don't know where it
15       is.
16  BY MR. BARR:
17       Q.    Given the flat dose-response
18  curve for efficacy, don't you think that
19  might be relevant to them?
20             MR. HOROWITZ:  Object to the
21       form.
22             THE WITNESS:  Again, we
23       treat the patients daily with the
24       drug.  We do clinical trials.  And
```

Protected - Subject to Further Protective Review

Page 216

```
1        we prove the benefit.  So picking
2        just some arbitrary value at some
3        time at any particular point in
4        any patient is not of value.
5   BY MR. BARR:
6        Q.    Okay.  So you don't think
7   it's of value to know when a patient
8   loses anticoagulation effect?  That's
9   just of no value to anyone?
10             MR. HOROWITZ:  Objection to
11       form.  That's not what he said.
12             THE WITNESS:  You didn't
13       repeat what I said.  You changed
14       what I said.  We take everything
15       together.  All right.  We take the
16       patient, the patient
17       characteristics, the dose, the
18       clinical trials, the first-in-man,
19       all the Phase I studies, all that
20       data together, and then you select
21       one value and you think that's
22       going to give you the answer in
23       coagulation.
24             And as I've been saying all
```

Page 217

```
 1          morning, that's not how
 2      coagulation works.
 3  BY MR. BARR:
 4          Q.    Okay.  This is in 2013,
 5      correct?
 6          A.    It is in 2013.
 7          Q.    You've been involved in this
 8      drug at this point for seven years.  And
 9      do you know how long the company has been
10      studying this drug as of 2013?
11          A.    Probably 13 years, maybe
12      14 years.  But it's not always easy to
13      figure these things out.  If they were,
14      we would lay them out there.
15          Q.    Let me show you
16      Exhibit Number 20.  This is Plaintiffs'
17      386989.
18              (Document marked for
19              identification as Exhibit
20              Berkowitz-20.)
21  BY MR. BARR:
22          Q.    And you see that this is an
23      e-mail that you're copied on.  It's
24      from -- is that Ihab Girgis?
```

---

Page 219

```
 1  III protocol endpoints."
 2          Do you see that?
 3          A.    I do.
 4          Q.    And he sent this to you,
 5      right?
 6          A.    And to Troy Sarich.
 7          Q.    Right.  He says, "Scott and
 8      Troy, we are working on finalizing the
 9      endpoints for the Xarelto Phase III
10      protocol.  One target we are using is the
11      around 30 nanograms per milliliter
12      no-effect level you shared with us.
13              "Another way we are looking
14      to justify to the regulators the depth
15      the reversal needed would be the
16      guidelines you use for Xarelto for
17      surgery, i.e., at what plasma level of
18      Xarelto do you advise surgeons that they
19      have a safe-to-proceed-to-surgery level?"
20          Did I read that right?
21          A.    Yes.
22          Q.    So they're looking for a
23      plasma level at which it's safe to
24      proceed to surgery, correct?
```

---

Page 218

```
 1          A.    Ihab Girgis.
 2              MR. HOROWITZ:  Don't even
 3          try anymore.  Just ask.
 4  BY MR. BARR:
 5          Q.    Is it Dr. Girgis?
 6          A.    I believe so.
 7          Q.    Okay.  So Dr. Girgis writes
 8      an e-mail to Todd Moore and Troy Sarich,
 9      both at Janssen, and copies yourself and
10      Dagmar Kubitza at Bayer, correct?
11          A.    Yes.
12              MR. HOROWITZ:  Take a
13          second.
14  BY MR. BARR:
15          Q.    Are you ready?
16          A.    Just one more section here.
17      Yes.
18          Q.    I want to start with the
19      first e-mail which is on the second page.
20      It's an e-mail from John Curnutte from
21      Portola.
22          A.    Curnutte.
23          Q.    This is January 27, 2014.
24      Subject line, "Andexanet/Xarelto Phase
```

---

Page 220

```
 1          A.    That was one of the
 2      questions.  Yeah, they're looking for a
 3      level for any of them.
 4          Q.    Right.  And Troy Sarich
 5      copies in Todd Moore and Dagmar Kubitza
 6      on the next e-mail.  Do you see that?
 7      Brings them into discussion?
 8          A.    Yes.  They're clinical
 9      pharmacologists.
10          Q.    Right.  And he says, "Hi,
11      Todd and Dagmar.  Any thoughts on John's
12      questions below?  E.g., we advise waiting
13      24 hours before initiating a procedure in
14      our labels, so does that correspond to
15      less than 30 nanograms per milliliter in
16      ORS patients receiving 10 milligrams?
17      What about 20 milligrams in SPAF?"
18          Did I read that right?
19          A.    You read it right.
20          Q.    Okay.  So he's saying in our
21      label, we say wait 24 hours, right?
22          A.    That's what he's saying.
23          Q.    He's wanting to know if that
24      corresponds with this 30 nanograms per
```

Page 221

```
 1    milliliter safe-to-proceed-to-surgery
 2    level, right?
 3         A.    Right.
 4         Q.    At -- at any point in this
 5    e-mail chain have you piped in to say
 6    that that "30" -- "30 nanograms per
 7    milliliter level has never been tested
 8    and we don't know what it means"?
 9         A.    Well, I -- I don't see my
10    e-mail.  I -- if I wrote an e-mail, I
11    don't see it in here, but you're only
12    talking about a 14-hour time difference
13    so...
14         Q.    Again, Mr. Moore responds
15    back, copies you again.  He says, "Dear
16    Troy.  Sorry for the delayed response.
17    Attached is a POP PK figure from the
18    ROCKET-AF study.  Also included in" -- I
19    forgot his name --
20         A.    Ihab.
21         Q.    Ihab.
22         A.    He has the manuscript.
23    Mm-hmm.
24         Q.    -- "Ihab's manuscript to be
```

Page 223

```
 1    affect" -- "affect Factor Xa activity
 2    assay."
 3              Did I read all that right?
 4         A.    You read it right.
 5         Q.    "Slide Number 2 shows 5th to
 6    95th percentiles of the baseline Factor
 7    Xa activity in ACS subjects.  The median
 8    profiles for Factor Xa for doses up to
 9    2 milligrams twice a day, up to a
10    concentration maximum of around
11    40 milligrams per liter are entirely
12    within Factor Xa baseline 90 percent
13    interval."
14              Did I read that correctly?
15         A.    Right.
16         Q.    "It seems that 30 micrograms
17    per liter could be safe-to
18    proceed-to-surgery level but more
19    simulations/work would be needed for the
20    targeted population."
21              Did I read all that right?
22         A.    Yes.  If that's what he
23    means.
24         Q.    So he's saying that this
```

Page 222

```
 1    submitted to JCP in the very near future.
 2    While you can eyeball the concentration
 3    axis and estimate that by 20 to 24 hours
 4    you are down to around 30 nanograms per
 5    milliliter for both a 15- and
 6    20-milligram dose, perhaps Ihab will
 7    provide a more exact estimate on timing."
 8              Did I read that right?
 9         A.    Yeah.
10         Q.    Okay.  And then Ihab
11    responds back and he says, "Trust all is
12    well.  Please find attached a couple of
13    slides that could help deciding on riva's
14    no-effect plasma concentration.  Slide
15    Number 1 shows the simulated Factor Xa
16    activity over time in patients in the hip
17    study receiving rivaroxaban 10 milligrams
18    twice daily.  The estimated median
19    concentration minimum is around
20    36 micrograms per liter.  The estimated
21    90 percent interval of Factor Xa at
22    trough overlaps with postsurgery baseline
23    obtained from patients receiving
24    enoxaparin since enoxaparin does not
```

Page 224

```
 1    30 micrograms per liter, that's a
 2    reasonable number based upon the data we
 3    have for safe-to-proceed-to-surgery
 4    level, right?
 5              MR. HOROWITZ:  Object to the
 6         form.  Foundation.
 7              THE WITNESS:  Well, again,
 8         this is from -- I mean, some of
 9         these things like 10 milligrams
10         twice a day, which we don't do, I
11         don't know exactly what this
12         means.
13              What I -- what I do know is
14         the only way we really know is in
15         the patient trials and the
16         authorities didn't accept some
17         kind of level.  They want clinical
18         trials.  That's -- that's all I
19         can pull from it.
20    BY MR. BARR:
21         Q.    This is to --
22         A.    We're somewhere in that
23    range -- yeah, we're -- we're somewhere
24    in that range below 30.  Is that -- is
```

Page 225

```
 1   that it?  I mean, before when we were
 2   talking we were lower -- or higher, 44
 3   was the mean.
 4            But, again, the only way to
 5   really know that is when they do their
 6   study, their andexanet study, they have
 7   to do it in patients.
 8        Q.   Okay.  He -- he also says
 9   "more simulations/work would be needed
10   for the targeted population."
11            Do you see that?
12        A.   Yeah.  But, again, I would
13   say, I don't know that simulations are
14   going to help us anymore.  We've got this
15   rough idea around here.  But if you're
16   interested in trying to make a difference
17   for the patients, that's not enough.  So
18   we need to see what happens with the
19   clinical trials which are ongoing.
20        Q.   Are you aware of any further
21   simulations or work that was done to
22   determine the safe-to proceed-to-surgery
23   level?
24        A.   Well, I'm not a clinical
```

Page 227

```
 1   BY MR. BARR:
 2        Q.   So they would have to try to
 3   figure it out themselves?
 4            MR. HOROWITZ:  Object to the
 5        form.
 6            THE WITNESS:  It would just
 7        mean knowing about the drug you
 8        are giving to your patient.
 9   BY MR. BARR:
10        Q.   Like I said, they would have
11   to go try and figure it out by
12   themselves?
13        A.   Doctors --
14            MR. HOROWITZ:  Object to the
15        form.
16            THE WITNESS:  Doctors do
17        this all the time.  That's what we
18        have to do.  We don't have
19        everything right at our
20        fingertips.
21   BY MR. BARR:
22        Q.   Okay.  So what about the
23   neurosurgeon that's trying to treat a
24   person with an ICH.  They -- they are
```

Page 226

```
 1   pharmacologist or a modeler.  And that's
 2   where that -- that's the department that
 3   would be.  So I don't know exactly what
 4   they are doing now, if they look at that
 5   now or not.
 6        Q.   So the answer is you're not
 7   aware of any?
 8        A.   I'm not aware of any.  That
 9   doesn't mean it's not being done.
10        Q.   Are you aware -- aware of
11   any information provided to people
12   treating patients on Xarelto in the
13   United States that informs them that
14   30 micrograms per liter could be the
15   safe-to-surgery level?
16            MR. HOROWITZ:  Object to the
17        form.  Foundation.
18            THE WITNESS:  The only thing
19        I'm aware of in that regard would
20        be to look at the pharmacology
21        papers that give the levels,
22        ranges, and CMIN and CMAX, and you
23        could tell from that kind of the
24        work that we're doing here.
```

Page 228

```
 1   supposed to go take the time to figure
 2   out what the safe-to proceed-to-surgery
 3   level is, they are supposed to go
 4   research all of that before they can
 5   decide whether or not they are going to
 6   go to surgery?
 7            MR. HOROWITZ:  Object to the
 8        form.  Argument.
 9            THE WITNESS:  Well -- well,
10        surgeons who have to face these
11        issues day after day have a
12        procedure on what to do.  And they
13        are certainly knowledgeable on
14        what drugs are out there that they
15        have to face, right.  They get
16        these patients in front of them.
17            So they have their meetings.
18        They have their discussions.  They
19        talk with colleagues at -- at
20        their hospital.  And they get that
21        information in different ways.
22            But this is not solid
23        information.  So we have to be
24        careful about putting out data
```

Protected - Subject to Further Protective Review

Page 229

```
1        that's not proven to provide what
2    you're asking for.
3            MR. BARR:  It's probably a
4    good break point.
5            MR. HOROWITZ:  Lunch?  Okay.
6    Great.
7            THE VIDEOGRAPHER:  The time
8    is 12:37 p.m.  We are going off
9    the record.
10           (Whereupon a luncheon recess
11   was taken at 12:37 p.m. until 1:34
12   p.m.)
13                   -  -  -
14   A F T E R N O O N   P R O C E E D I N G S
15                   -  -  -
16           THE VIDEOGRAPHER:  The time
17   is 1:34 p.m.  We are back on
18   record.
19                   -  -  -
20           CONTINUED EXAMINATION
21                   -  -  -
22   BY MR. BARR:
23       Q.    Welcome back from lunch,
24   Dr. Berkowitz.
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 231

```
1    go in and conduct surgery is always
2    better than waiting, right?
3        A.    Well, in that situation,
4    having the level isn't going to help you
5    much.  You have to go ahead with your
6    plans to address the current critical
7    organ situation, which in this case you
8    mentioned is intracranial hemorrhage.
9        Q.    So you believe in a
10   situation of an emergency, somebody comes
11   into the emergency room with an
12   intracranial hemorrhage, the doctor
13   should not wait 24 hours; they should go
14   ahead and conduct surgery if that's
15   medically indicated?
16           MR. HOROWITZ:  Objection to
17       form.
18           THE WITNESS:  Well, I'm not
19       here to say what a neurologist or
20       a neurosurgeon or emergency
21       physician would do at the time.
22       That's according to practice these
23       days.
24   BY MR. BARR:
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 230

```
1            When we left, we were
2    talking about no-effect levels and the
3    ability of primarily emergency room
4    physicians to identify whether or not
5    rivaroxaban was on board.  Do you
6    remember that?
7        A.    Yeah.
8        Q.    Okay.  You agree it would
9    help surgeons save lives if they were
10   able to determine whether or not
11   rivaroxaban was on board, correct?
12       A.    I don't know that we could
13   say it would help surgeons save lives,
14   because once a patient has an
15   intracranial hemorrhage it's very
16   difficult to do anything about it.  Most
17   of the -- something on the order of 50 to
18   66 percent actually will die.  It's
19   important to know if the drugs are on
20   board.  I think the qualitative part is
21   probably more important than exactly what
22   the value would be.
23       Q.    Right.  If it's not
24   necessary to wait 24 hours, being able to
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 232

```
1        Q.    The ability to figure out
2    whether or not rivaroxaban is on board in
3    an emergency situation is particularly
4    important as there's no reversal agent
5    for Xarelto, right?
6        A.    There's no specific reversal
7    agent for Xarelto or any of the NOACs
8    other than the thrombin inhibitor.
9        Q.    Right.  You would agree
10   that's an unmet medical need, right?
11       A.    It's something that we're
12   addressing.
13       Q.    Let me show you -- I'll mark
14   these as Exhibits 21 and 22.
15           (Document marked for
16       identification as Exhibit
17       Berkowitz-21.)
18           MR. BARR:  The first is
19       Plaintiffs' 119114.  That will be
20       Exhibit 21.
21           (Document marked for
22       identification as Exhibit
23       Berkowitz-22.)
24           MR. BARR:  And Exhibit 22
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Page 233

1      will be 119115.

2              (Whereupon, a discussion was

3      held off the record.)

4  BY MR. BARR:

5      Q.    I'll acknowledge that you're

6  not on this series of e-mails.  But what

7  I want to find out from you is whether or

8  not you agree with the statements on

9  this.  Okay?

10             You see that this is, at

11  least the head e-mail on Exhibit 21,

12  which is Plaintiffs' 119114, it is an

13  e-mail from Sigmond Johnson to a whole

14  group of people at Janssen February 1,

15  2011, regarding ad hoc CDT riva antidote.

16             Do you see that?

17             MR. HOROWITZ:  Object.

18      Form.  Foundation.  Why don't you

19      give him a second to look at that.

20  BY MR. BARR:

21      Q.    Do you see that?

22      A.    I see it.

23      Q.    And what it claims to be

24  attaching is, "Please see attached slide

---

Page 235

1      attached to the both.

2              MS. YATES:  A couple of

3      pages attached.  The first one you

4      mean?

5              MR. BARR:  No, I'm talking

6      about Exhibit 22 now.  This is the

7      PowerPoint.

8              THE WITNESS:  22.

9              MR. HOROWITZ:  So

10     Exhibit 21, should it just be the

11     e-mail then?

12             MR. BARR:  Yeah, it should

13     just be the e-mail.

14             MR. HOROWITZ:  Why don't we

15     take off -- that's why when I was

16     talking about letting him review.

17     Blame Roger again.

18             THE WITNESS:  Okay.  Now,

19     you're looking at this.  22.

20     Okay.

21  BY MR. BARR:

22      Q.    Right.

23      A.    Gotcha.

24      Q.    You see that this is a

---

Page 234

1  deck on the Bayer riva antidote under

2  development," right?

3      A.    Yes.

4      Q.    Okay.  Now, the CDT, that's

5  the compound -- is that the compound

6  development team?

7      A.    Well, this is a Janssen

8  hierarchy, so that's what I understand it

9  to be.  I don't know exactly who composes

10  it, but I believe that's what it stands

11  for.

12      Q.    Was there a joint compound

13  development team between the two

14  companies?

15      A.    There is a global

16  development committee, the GDC.  But

17  there's not a CDT.  I'm not sure what

18  functional members are in their group.

19      Q.    Okay.  What I want to look

20  at is the PowerPoint that's attached to

21  this.  And this is Exhibit 22.

22             MR. HOROWITZ:  I'm confused.

23             MR. DENTON:  22 is the

24      PowerPoint.  I think it was

---

Page 236

1  PowerPoint titled

2  "Xarelto/Rivaroxaban-Specific Antidote

3  BAY 1110262, Working Draft For

4  Information.  GDC, January 19, 2011,"

5  right?

6      A.    Yes.

7      Q.    And this is a Bayer

8  Healthcare PowerPoint, correct?

9      A.    Well, it's on the Xarelto --

10  oh, yeah, from the front one I see, yeah.

11  It's from the Xarelto -- yeah.  Sorry.

12  It says Bayer Healthcare there.

13      Q.    Would you have had a role in

14  preparing this PowerPoint?

15      A.    Not necessarily.  I don't

16  remember being on it.  I have to look

17  through the whole thing to see.  But we

18  had a team that was working on -- we were

19  working on a reversal strategy for a long

20  time.

21      Q.    Okay.  Were you on the GDC?

22      A.    I'm on the GDC.

23      Q.    Okay.  This is a GDC

24  PowerPoint, right?

Protected - Subject to Further Protective Review

Page 237

```
 1        A.   So it says it's a working
 2   draft for information.  I don't know if
 3   it's for GDC, if it's something they used
 4   in other meetings, or if it was specific
 5   for the GDC.  It doesn't say.  It says
 6   working draft.
 7        Q.   It also says GDC January 19,
 8   2011?
 9        A.   It looks like they presented
10   it.  But I thought you were saying was
11   this a GDC prepared type of PowerPoint,
12   and I don't know.  It looks like they
13   showed it at this time.  They were
14   planning to, at least.
15        Q.   So we go to the next page.
16   And it says "project rationale," right?
17        A.   Yes.
18        Q.   And it says, "Anticoagulants
19   are associated with a bleeding risk,"
20   correct?
21        A.   Yes.
22        Q.   It says, "There is an unmet
23   medical need for effective antidotes for
24   anticoagulants in general," right?
```

Protected - Subject to Further Protective Review

Page 239

```
 1        Q.   Okay.  And it says, "No
 2   specific antidotes are available for the
 3   new anticoagulants."  And that would --
 4   that would include Xarelto, correct?
 5        A.   At this time, yes.  Mm-hmm.
 6        Q.   And it says,
 7   "Life-threatening bleeds can be expected
 8   in 1 to 3 percent of Xarelto patients."
 9        Did I read that right?
10        A.   You read it right.  I don't
11   know if that's accurate, but that's what
12   they say there.
13        Q.   Do you know how many Xarelto
14   prescriptions there are in the United
15   States?
16        A.   No.  I've got a sense about
17   the world, as I'm a global person.
18        Q.   Let's use the world then.
19   How many worldwide?
20        A.   Something on the order of 23
21   million.
22        Q.   23 million.  I'm not the
23   best at math.  Do you know what one
24   percent of 23 million is?
```

Protected - Subject to Further Protective Review

Page 238

```
 1        A.   Yes.
 2        Q.   Do you agree with that?
 3        A.   Well, I think -- well, it
 4   depends on what you mean.  "Antidote" is
 5   not a good term here.  Reversal agent
 6   would be better because "antidote"
 7   implies that you have something very
 8   specific right for the particular
 9   molecule.  For example, dabigatran's
10   antibody is an antidote.
11        Q.   Would you agree that there
12   is an unmet medical need for effective
13   reversal agents for anticoagulants in
14   general?
15        A.   I think there are occasions
16   when you would need them.  How great the
17   need is in question, but it would make
18   everyone feel better to have something,
19   wouldn't it?
20        Q.   Would you agree that there's
21   an unmet medical need for effective
22   reversal agents for Xarelto?
23        A.   I think there could be some
24   need for it.  Yes.
```

Protected - Subject to Further Protective Review

Page 240

```
 1        A.   You mean if this were
 2   correct?
 3        Q.   Yes.
 4        A.   I guess 1 percent would
 5   be -- so 230,000.
 6        Q.   So from 230,000 to three
 7   times that, roughly 600,000, right?
 8        A.   I guess you have to multiply
 9   it out.  He's doing it on the calculator.
10        MR. DENTON:  No, I'm not.
11        THE WITNESS:  You're doing
12        your e-mail?
13        MR. DENTON:  No.  I'm trying
14        to get to my calculator.
15        THE WITNESS:  Anyway, we're
16        in that range.
17   BY MR. BARR:
18        Q.   We're in the 200,000 to
19   600,000 life-threatening bleeds due to
20   Xarelto, right?
21        A.   Right.  It doesn't say how
22   many events, efficacy events.  We're just
23   talking about bleeding, right?
24        Q.   Right.  So according to this
```

Page 241

```
1   PowerPoint, we can expect 200- to 600,000
2   life-threatening bleeds with Xarelto,
3   right?
4              MR. HOROWITZ:  Objection to
5        form.
6              THE WITNESS:  Again, I mean,
7        this is a very general statement
8        depending on what dose patients
9        are getting, what their clinical
10       condition is, so I don't know the
11       exact number.
12             But these are concerns to us
13       that, as I mentioned to you
14       before, that none of the agents
15       are able to uncouple bleeding from
16       the efficacy of these lifesaving
17       medicines.
18   BY MR. BARR:
19       Q.   But you would agree that
20   that's a -- that's a fairly substantial
21   unmet medical need, correct?
22       A.   Well, you know, any patient
23   suffering a bleeding event is of concern
24   to us, so if there's a need -- there's a
```

Page 243

```
1        Berkowitz-23.)
2              MR. HOROWITZ:  Take a
3        moment.
4              THE WITNESS:  Okay.  Thank
5        you.  Mm-hmm.
6   BY MR. BARR:
7        Q.   So this is an e-mail, and
8   I'm focusing at the top e-mail from you
9   where you wrote to -- is it Dr. Spiro?
10       A.   Yes, that's correct.
11       Q.   Dr. Spiro, Robert Kramer,
12   and Frank Misselwitz, right?
13       A.   Yes.
14       Q.   And -- and you wrote this on
15   November 30, 2011, right?
16       A.   Yes.  In response to the
17   e-mail I received that day.
18       Q.   Right.  And -- the
19   subject of this is "Xarelto antidote
20   clinical experience study design
21   concepts," correct?
22       A.   Yes.
23       Q.   And you say, "Due to the
24   CVCT forum in Paris," what is -- do you
```

Page 242

```
1   need, then we would -- we try to address
2   it.
3        Q.   And for the 2- to 600,000 of
4   those patients, that's a very serious
5   unmet medical need, right?
6              MR. HOROWITZ:  Object to the
7        form.  Foundation.  Asked and
8        answered.
9              THE WITNESS:  So, I mean,
10       any -- any bleeding events are of
11       concern to us.
12   BY MR. BARR:
13       Q.   Okay.  You actually believed
14   that a reversal agent should be a high
15   priority for the company, correct?
16       A.   I -- I do believe that's an
17   important thing if it's something to
18   accomplish.  And as you can see from the
19   work stream that we've had for years,
20   we've been trying to develop one.
21       Q.   Let me show you Exhibit
22   Number 23 which is Plaintiffs' 358604.
23             (Document marked for
24        identification as Exhibit
```

Page 244

```
1   know what -- do you remember what the
2   CVCT forum in Paris was?
3        A.   It's a cardiovascular and
4   clinical therapeutic meeting that
5   Professor Zannad holds.
6        Q.   Okay.  So you say, "Due to
7   this meeting in Paris, I'm not able to
8   attend your meeting.  However, please
9   keep me closely in the loop on this
10  project and plan studies.  I'm very
11  interested in our progress, especially
12  since returning from AHA where I had a
13  lot of interaction with some KOLs and
14  former colleagues."
15             KOL, is that key opinion
16  leaders?
17       A.   Yes.
18       Q.   Base -- "Besides our current
19  antidote compound current" -- strike
20  that.
21             "Besides our current
22  antidote compound under study, we need to
23  develop other studies to" -- "to assess
24  other potential reversal agents already
```

Protected - Subject to Further Protective Review

Page 245

```
 1   available, PCCs, and" -- is that
 2   recombinant Factor VII?
 3        A.   Yes.
 4        Q.   "This should be a high
 5   priority for the coming year."
 6        Did I read that right?
 7        A.   Yes.
 8        Q.   So you thought it was a high
 9   priority to study these other reversal
10   agents, correct?
11        A.   We -- we find it important
12   to study any reversal therapies that
13   might be of benefit.  The difficulty has
14   been finding one that's easy -- easy to
15   do.
16        Q.   Now, do you recall whether
17   or not Janssen was willing to study
18   these reversal agents and antidotes?
19             MR. HOROWITZ:  Form.
20             THE WITNESS:  The way you
21             present the question, it sounds
22             like we don't work together.  But
23             we do.  I mean, we interdigitate
24             between the clinical development,
```

Protected - Subject to Further Protective Review

Page 246

```
 1             regulatory, statistics, clinical
 2             pharmacology.  So there -- there
 3             could be views on -- in either
 4             company that may be different.
 5             But my sense, working with them
 6             and with us has been that we work
 7             together on this issue.  Finding a
 8             path has been the challenge for
 9             us.
10   BY MR. BARR:
11        Q.   Okay.  Let me show you what
12   I'm going to mark as Exhibit Number 24.
13   This is Plaintiffs' 11911.
14             (Document marked for
15             identification as Exhibit
16             Berkowitz-24.)
17   BY MR. BARR:
18        Q.   And, again, I recognize that
19   you're not on this e-mail.  But I want to
20   know if you're familiar with these
21   communications.
22             Do you see that this is an
23   e-mail from Nancy Ondovik?  Do you see
24   that?
```

Protected - Subject to Further Protective Review

Page 247

```
 1        A.   Yes.  Mm-hmm.
 2        Q.   Do you know that -- that
 3   lady?
 4        A.   I believe she is the -- she
 5   is a liaison between the companies for
 6   alliances.
 7             MR. HOROWITZ:  Just object
 8             to foundation.  Continuing
 9             objection.  And maybe give him a
10             second to take a gander at this
11             before you ask substance.
12             MR. BARR:  Well, I'm just --
13             again, I'm just wanting to know if
14             he was familiar with this
15             conversation.
16             THE WITNESS:  I know that
17             there was discussion about whether
18             Janssen would want to be part of
19             our development program for the
20             compound.
21   BY MR. BARR:
22        Q.   Right.
23        A.   We have that -- that
24   relationship between that if something
```

Protected - Subject to Further Protective Review

Page 248

```
 1   like this comes up, then we discuss it
 2   back and forth.
 3        Q.   Okay.  And the subject line
 4   on this is "Project BOSS.  Riva antidote
 5   communication."
 6             Did I read that right?
 7        A.   Yes.
 8        Q.   What was Project BOSS, if
 9   you know?
10        A.   I don't.
11        Q.   Okay.
12        A.   That was probably an
13   internal term for their project, as this
14   was all internal Janssen.
15        Q.   Okay.  It says, "Hello
16   everyone.  Just wanted to let you
17   know" --
18             MR. HOROWITZ:  Again, I'm
19             sorry, but I don't want to be --
20             at least let the man look at it
21             before you --
22             MR. BARR:  It really doesn't
23             require it.
24             MR. HOROWITZ:  Okay.  No --
```

Page 249

```
 1          MR. BARR:  Just -- just let
 2    me ask the -- just let me ask
 3    the -- just let me ask the
 4    question first.  If he needs to,
 5    I'll let him.
 6          MR. HOROWITZ:  Brian --
 7          MR. BARR:  I'm not going to
 8    stop him.  Just -- I've been very
 9    patient --
10          MR. HOROWITZ:  Actually not.
11    You're not -- you're not going to
12    question a witness about a
13    document that he's never seen
14    before.
15          MR. BARR:  I'm going to --
16    I'm going to ask my question, and
17    then he can do what he needs to do
18    to answer it.
19          MR. HOROWITZ:  Sure.  Go
20    ahead and ask the question.
21          And then we'll let -- let
22    you read the document.  Okay.
23  BY MR. BARR:
24     Q.   You say -- well, not you.
```

Page 251

```
 1          MR. BARR:  All you can do is
 2    object to form.  Knock it off.
 3          MR. HOROWITZ:  Now, Brian,
 4    let the man read the document.
 5          MR. BARR:  I don't have to
 6    let him do that.
 7          MR. HOROWITZ:  Well,
 8    actually, I think you do.
 9          MR. BARR:  No, I don't.
10          MR. HOROWITZ:  Are you
11    actually saying on the record that
12    you want to question --
13          MR. BARR:  I'm asking for
14    his --
15          MR. HOROWITZ:  Let me see if
16    I understand this correctly --
17          MR. BARR:  -- his memory.
18    Let's go off the record.
19          MR. HOROWITZ:  Yeah, we
20    don't -- we don't need to do this
21    on the video.
22          But let me see if I
23    understand this correctly.
24          THE VIDEOGRAPHER:  Off the
```

Page 250

```
 1          The e-mail writes:  "Just
 2    wanted to let you know that Bob and I
 3    communicated our decision not to move to
 4    diligence or pursue the riva antidote
 5    opportunity any further with Bayer late
 6    last week.  Bayer was understandably
 7    disappointed by this decision and had
 8    hoped to share more details on the
 9    program and their rationale and reasons
10    for moving forward with the antidote as
11    part of the diligence process.  They were
12    quite surprised that we decided to stop
13    prior to completing diligence."
14          Did I read that right?
15          MR. HOROWITZ:  You can
16    answer if he read it right.  And
17    then you're going to go -- you're
18    going to read the document.
19          THE WITNESS:  Yes.
20  BY MR. BARR:
21     Q.   Do you recall this
22    communication from Janssen?
23          MR. HOROWITZ:  First of
24    all --
```

Page 252

```
 1    record.  The time is 1 --
 2          MR. HOROWITZ:  You want to
 3    question the witness about a
 4    Janssen document --
 5          MR. BARR:  Yes.
 6          MR. HOROWITZ:  -- that
 7    you've already confessed he's not
 8    on, has never seen before in his
 9    life, and not even give him a
10    second to look at it?
11          MR. BARR:  All I'm asking --
12          MR. HOROWITZ:  That is
13    absurd and we're not doing that.
14          MR. BARR:  All I'm asking is
15    if he remembers this conversation,
16    period.
17          MR. HOROWITZ:  You can ask
18    him all you want --
19          MR. BARR:  He doesn't have
20    to read this whole e-mail to
21    answer that question.
22          MR. HOROWITZ:  He needs to
23    look at it.  He needs to review it
24    and skim it.
```

Protected - Subject to Further Protective Review

Page 253

```
1              MR. BARR:  No, he doesn't.
2        MR. HOROWITZ:  You are
3   wasting all of the time --
4              MR. BARR:  No, you keep
5   giving these long objections when
6   we -- the order is very clear on
7   this.
8        MR. HOROWITZ:  The order
9   does not say --
10             MR. BARR:  The only thing
11  you're allowed to say is, "Object
12  to form."
13       MR. HOROWITZ:  The order
14  does not --
15             MR. BARR:  This is getting
16  ridiculous.
17       MR. HOROWITZ:  The order
18  does not --
19             MR. BARR:  I have sat here
20  and let him read things all day.
21  And the one time I say it's not
22  necessary -- now are seriously
23  both of you going to sit there and
24  say I have not let him read
```

Protected - Subject to Further Protective Review

Page 255

```
1   witness on documents without
2   giving the witness a chance to
3   look at them before you ask your
4   question.  That is what you just
5   articulated.
6              MR. BARR:  I'm happy to give
7   him a chance to review documents
8   when necessary to answer the
9   question.
10             MR. HOROWITZ:  You don't
11  make that choice.
12             MR. BARR:  The question is
13  not whether the statement is
14  correct.  The -- it -- it was, is
15  this true that that was their
16  decision.  I would agree, he
17  should be able to read the
18  document to say it.
19       The question was, is:  Do
20  you remember this conversation
21  happening with Bayer.  That was
22  the question.
23             MR. HOROWITZ:  Brian, I'm
24  going to make this real simple.
```

Protected - Subject to Further Protective Review

Page 254

```
1   documents?
2              MR. HOROWITZ:  You --
3              MR. BARR:  We've had huge
4   moments of silence here where I've
5   let him read documents.  I have
6   not interrupted with that.  I will
7   let it happen.  I'm -- I'm just
8   trying to move this along.  That's
9   all I'm trying to do.  You are
10  sitting here wasting time by
11  saying he has to read all of this.
12  All I'm trying to do is move it
13  along.  That's it.
14             MR. HOROWITZ:  You can keep
15  talking all you want.  You're not
16  going to question this witness
17  without giving him an opportunity
18  to review the documents you're
19  putting in front of him.
20       If that's going to be your
21  position, then you're right, we
22  will go to the Court and you're
23  going to explain to Judge Fallon
24  that you want to question a
```

Protected - Subject to Further Protective Review

Page 256

```
1   You're going to let the man -- are
2   you going to let the man review
3   documents before you ask him
4   questions?
5              MR. BARR:  I have done that
6   throughout this deposition.
7              MR. HOROWITZ:  Then let him
8   review the document.  That's all
9   I'm asking.
10             MR. BARR:  Quit
11  interrupting.
12             MR. HOROWITZ:  That's all
13  I'm asking.
14             MR. BARR:  Quit interrupting
15  and I'll let him review things.
16             MR. HOROWITZ:  Okay.  So why
17  don't you go ahead and review the
18  document.  And when you are ready
19  to proceed, then he will give you
20  the courtesy --
21             MR. BARR:  Well, we're going
22  to start going off the record,
23  because we're wasting time.
24             MR. HOROWITZ:  We're not --
```

Protected - Subject to Further Protective Review

Page 257

```
1    he's not abusing it.  And that's
2    absurd.
3        MR. BARR:  Well, this is the
4    only deposition I've done where
5    the witness has insisted upon
6    reading the entire document.
7        MR. HOROWITZ:  First of all,
8    you're overstating what he's
9    doing.  That's a complete
10   misinterpretation of what's
11   occurred.  He's reviewing the
12   document, he's orienting himself,
13   and then he's answering your
14   questions.  He has not been
15   abusive with the process, not at
16   all.
17       MR. BARR:  No, you have
18   been.  He hasn't been, he's been
19   fine.
20       MR. HOROWITZ:  Okay.  Well,
21   since I am not involved in the
22   process, that's not true as well.
23   So let's just let him review the
24   document and then answer your
```

Protected - Subject to Further Protective Review

Page 258

```
1    questions.  That's all I'm asking.
2    The way we've been proceeding just
3    about most of the time.  But you
4    don't get to unilaterally decide
5    when he's not allowed to review a
6    document.  That's not going to
7    happen.
8        MR. BARR:  The only thing
9    I'm trying to say is if he can
10   answer it without doing that --
11       MR. HOROWITZ:  Okay.  That's
12   great.
13       MR. BARR:  -- we can cut
14   through it.  If he has -- and
15   that's what I said.  If he has to
16   review the document to answer the
17   question, that's fine.
18       MR. HOROWITZ:  He's going to
19   review every document you put in
20   front of him.
21       MR. BARR:  So you're
22   deciding when he has to do it?
23       MR. HOROWITZ:  Yes.  He's
24   going to review every document you
```

Protected - Subject to Further Protective Review

Page 259

```
1        put in front of him.
2        MR. BARR:  I got it.  I got
3    it.
4        MR. HOROWITZ:  I didn't say
5    read it cover to cover, but he's
6    going to review it.
7        So go ahead and read what
8    you need to review.
9        THE WITNESS:  Okay.  Thanks.
10   BY MR. BARR:
11       Q.   Now, can you answer my
12   question?
13       A.   Could you ask it again?
14       Q.   Do you recall this
15   conversation where Janssen communicated
16   to Bayer they were not moving forward on
17   the Bayer riva antidote opportunity?
18       A.   I was not involved in that,
19   did not hear it.  I heard about it later,
20   but not at the time.
21       Q.   Was that personally
22   disappointing to you?
23       A.   Well, by the time I heard
24   about it, we already knew that the
```

Protected - Subject to Further Protective Review

Page 260

```
1    molecule wasn't going to work.  So at the
2    time it didn't much matter.
3        Q.   So the molecule that was
4    being developed by Bayer, Bayer had
5    already learned as of December of 2011
6    that it wasn't going to work, or some
7    later point when you heard about this
8    conversation?
9        A.   That's not correct.  It
10   wasn't in December.  Whenever I learned
11   about it, which wasn't at the time, I
12   knew at that time that the molecule
13   unfortunately didn't work, a
14   disappointment to us all.
15       Q.   Do you know approximately
16   when that was?
17       A.   I'm sorry.  I do not.  This
18   is a molecule -- of course, being in the
19   research department, I don't know the
20   timing of it.
21       Q.   Now, in your -- in
22   Exhibit 23, you had talked about looking
23   at PCC and recombinant Factor VII in
24   developing other studies to assess
```

Page 261

1  essential reversal agents being a high
2  priority.  Do you remember that?
3       A.    Trying.  And we had in the
4  label this information as well from
5  preclinical work.  We wanted to figure
6  out a way if we could do things in a
7  clinical sense as well.
8       Q.    I'm just asking since 2011
9  what work has been done, what other
10  studies have been done to assess these
11  other potential reversal agents.
12       A.    So there are some studies
13  working with outside external advisors,
14  like in the Netherlands and the U.S. on
15  PCCs and how they might work, the
16  four-factor PCC was one of the studies
17  that was done.
18            There's been some work in
19  trying to see if tranexamic acid would be
20  of some value.  But there hasn't been a
21  reliable or good way for us to do the
22  studies and be convinced that they make a
23  difference.  So it's been a difficulty,
24  and actually even today we still talk

Page 262

1  about what we can do for this.
2       Q.    So as we sit here today in
3  2016, you're not aware of a potential
4  reversal agent that could be used in a
5  clinical setting in the United States,
6  correct?
7       A.    Do you mean approved or
8  working on?
9       Q.    Approved.
10       A.    Not approved.  But still
11  working on it.  And that's the case for
12  all of the Xa inhibitors.  The thrombin
13  inhibitors was easier to make an antibody
14  to.  It's not our molecule.  The Xa
15  appear to have difficulty because of
16  their structure.
17       Q.    Now, you are aware that
18  certain laboratories have reached out to
19  you wanting to know the coagulation
20  parameters for the appropriate treatment
21  of Xarelto patients, correct?
22       A.    I'm not sure what you're
23  talking about.  It's very general.  I
24  don't know what you mean.  Certain

Page 263

1  laboratories?
2       Q.    Okay.  I can show you.
3       A.    Okay.
4            MR. BARR:  This is
5       Exhibit 25, which is Plaintiffs'
6       881796.
7            (Document marked for
8       identification as Exhibit
9       Berkowitz-25.)
10            MR. HOROWITZ:  You could
11       have given him time to review it,
12       if you had it there.  Sorry.
13       Couldn't help myself.
14  BY MR. BARR:
15       Q.    Do you want to take a brief
16  time to review it?  Let me know.  Thank
17  you.
18       A.    Yes.  Thank you.
19       Q.    Now, this is a series of
20  e-mails that you have written back and
21  forth with some members of Bayer and a
22  person from Quest Diagnostics, correct?
23       A.    Yes.  It appears that I got
24  a -- I think I remember this.  Someone

Page 264

1  from Quest laboratories was asking about
2  obtaining materials for setting up an
3  assay.
4       Q.    Right.  Quest is an
5  independent laboratory that conducts all
6  types of laboratory testing, right?
7       A.    Correct, in the U.S.  I
8  don't know if they're worldwide.  But in
9  the U.S. they do all kinds of laboratory
10  testing for doctors.
11       Q.    And so what happens is, is
12  if you look on the next-to-last page
13  which is 808.
14       A.    Okay.
15       Q.    It's an e-mail from Nadia
16  Gould.
17            Do you see that?
18       A.    Yes.
19       Q.    And she writes to you on
20  April 24, 2012, right?
21       A.    Yes.
22       Q.    The subject is "Plasma
23  concentration of rivaroxaban," right?
24       A.    Yes.

Page 265

```
 1        Q.    And she says, "May I ask for
 2   your assistance with one additional item
 3   related to rivaroxaban, please?  I am
 4   having a hard time finding a reference
 5   for peak plasma concentrations in
 6   patients taking 20 milligrams once daily
 7   for atrial fibrillation.  I've come
 8   through the most recent Chest article on
 9   guidelines for oral anticoagulant
10   therapy, which lists pharmacokinetic
11   properties of rivaroxaban under various
12   conditions but not the above.  I can only
13   find mean values rather than a range.  Do
14   you know of any references that would
15   help me in this regard?  I've looked at
16   other articles as well, but with no
17   success."
18              Did I read that right?
19        A.    Yes.
20        Q.    So this is a lab writing you
21   and saying, "I'm trying to find this
22   reference range.  I'm looking in the
23   published literature, and I can't find
24   anything," right?
```

Page 267

```
 1        Q.    Okay.  So all you would have
 2   really had to have done is send her the
 3   Mueck papers, right?
 4        A.    If I were aware of it at the
 5   time.
 6        Q.    Well, you certainly were
 7   aware of the Mueck papers.  I'm sorry.
 8   You might not have been in 2012.
 9        A.    That's 2012.  I might not
10   have seen it.  I don't get everything
11   come across my desk.
12        Q.    Okay.  All right.  So you
13   respond back on Page 807.  You send this
14   to Dagmar Kubitza and Wolfgang Mueck,
15   right?
16        A.    Yes.  They're our clinical
17   pharmacology for people for
18   pharmacodynamics and pharmacokinetics.
19        Q.    And you say a lot that I'm
20   not sure has direct impact on this
21   e-mail.  But at the end you write,
22   "Meanwhile, today I received the e-mail
23   below.  Please advise me on how we should
24   respond and what references could be
```

Page 266

```
 1        A.    That's what it says.
 2        Q.    She also -- there -- this is
 3   nowhere in the label, correct.  She
 4   couldn't look there?
 5        A.    Well, what's in the label,
 6   is that what you're asking?
 7        Q.    Yes.
 8        A.    What's in the label.  I
 9   don't know if it's nowhere in the label.
10        Q.    So you think the reference
11   range for plasma concentration -- peak
12   plasma concentration may be in the label?
13              MR. HOROWITZ:  Object to the
14         form.
15   BY MR. BARR:
16        Q.    In the U.S. label?
17        A.    I didn't say that.  I said I
18   don't know, as I'm not as familiar.  My
19   Janssen colleagues are more familiar with
20   the U.S. label.  But there's the Mueck
21   papers that have the different
22   indications and ranges listed, if I
23   remember, CMAX and CMIN.  They should
24   have it there.
```

Page 268

```
 1   cited," right?
 2        A.    Yeah.  I tried to introduce
 3   her to the appropriate people so that
 4   they were aware and then ask for their
 5   guidance.
 6        Q.    And Dr. Mueck responds back
 7   to you, right?
 8        A.    Yes.
 9        Q.    He says, "The lab" -- "The
10   lab riva lab team under Anja's lead
11   already takes care of this."
12              Do you know what that's
13   referencing?
14        A.    I believe that's the team
15   that was working on the assay that we saw
16   with Dr. Spiro.  She's the project
17   manager on that.
18        Q.    Okay.  It says, "With
19   respect to plasma concentration data in
20   SPAF patients, you may recall that all
21   work for this indication has been done by
22   our J&J colleagues; thus, I copied Todd
23   in."
24              Did I read that right?
```

Page 269

1          A.     Yes.
2          Q.     It says, "To my knowledge,
3    there is an abstract available for AHA
4    2010 and a full manuscript has been under
5    preparation reporting on PK and SPAF
6    patients, 20 and 10 milligram from the
7    ROCKET subcohort.  Todd, could you update
8    us?  Thanks.
9                 "Just a remark, Scott:  The
10   eagerness to get ranges means for me they
11   want to monitor their patients, which has
12   no scientific ground as these are just PK
13   percentiles and not automatically linked
14   to bleeding risk on an individual basis."
15               Did I read that right?
16         A.     Yes.
17         Q.     Then Ms. Alpers responds to
18   this e-mail, correct, on the -- on 806?
19         A.     Yes.  It looks like she
20   responded.  She was copied and then she
21   responded and sent a note that said, "Hi,
22   Scott."  But it was sent to me and
23   Wolfgang, Dagmar, and Todd with others
24   copied.

Page 270

1          Q.     It says, "I believe that
2    Wolfgang's remark is very important."
3                 And that would be the remark
4    talking about them wanting to monitor,
5    correct?
6          A.     Well, it says Wolfgang's
7    remark.  It says just remark, so I guess
8    that's the sentence that he wrote.
9          Q.     "And that we have to
10   repeatedly provide basic scientific
11   information to the labs who want to
12   measure rivaroxaban concentration and
13   asking for ranges.  We had the same
14   discussions with Diagnostica Stago,
15   Technoclone, and Hyphen before entering
16   material transfer agreements with them.
17   Just as an example.
18                "Quest Diagnosis stated in
19   their current compound request the
20   following:  Routinely rivaroxaban does
21   not need to be monitored, however there
22   are instances where monitoring is needed.
23   Determination of failure of therapy
24   versus poor compliance" -- "poor

Page 271

1    compliance.  Potential dose adjustment
2    required for renal or hepatic
3    dysfunction.  Titration."
4                 Did I read all that
5    correctly?
6          A.     You read it correctly.  I
7    don't think it's accurate.  But that's
8    their -- apparently this is something
9    that they wrote in their compound
10   request.
11         Q.     Okay.  And then it appears,
12   looking at this, she responded to herself
13   on this.  Do you see the next one is also
14   from her?
15         A.     I'm sorry.  Let me get to
16   that.  It's only two pages here.
17                No, I think -- I think that
18   was added on the bottom of her e-mail
19   above that says Wednesday, April 25,
20   2012.  I think that's all part of the
21   same e-mail going down to the one we just
22   discussed.  So I think this part from
23   here up is all part of the same e-mail.
24         Q.     Okay.  You think that's all

Page 272

1    part of the same e-mail?
2          A.     I think so.  It says --
3    yeah, I don't know why it was there after
4    her name, but...
5          Q.     And it says, "Dear Scott.
6    One addition to my prior mail.  The team
7    would generally prefer to refer to data
8    which are included in our SPC if
9    possible," right?
10         A.     That's what she says.
11         Q.     It -- "Although these data
12   are only included for DVT patients,
13   please see excerpt from SPC below.
14   Nevertheless, these data might be
15   supportive for our communication because
16   they show that we are really talking
17   about ranges and not specific values
18   limits.
19                "Attached please find also
20   for your information the current MSL
21   slide deck on coagulation parameters
22   prepared by medical affairs for
23   scientific and educational purposes."
24                Do you see that?

Protected - Subject to Further Protective Review

Page 273

1      A.    I see it.
2      Q.    And then she includes an
3  excerpt from the SPC for 15 to
4  20 milligrams which gives the
5  pharmacokinetic data in patients and
6  provides that the -- the 90 percent
7  interval two to four hours, in about
8  24 hours after a dose, concentration was
9  215 and 32.  Do you see that?
10      A.    Yeah.
11      Q.    So those are the reference
12  ranges from her that are in the SPC,
13  right?
14      A.    From the -- the European
15  label, correct, yeah.
16      Q.    Right.  This is not the
17  U.S. label?
18      A.    It's not the U.S. label,
19  right.  They -- they are structured
20  differently and the regulatory
21  authorities have different
22  requirements --
23      Q.    Okay.
24      A.    -- and different assessment

Protected - Subject to Further Protective Review

Page 275

1  provide an anticoagulant with a better
2  profile that provides consistent
3  therapeutic levels which do not require
4  routine laboratory monitoring to assure
5  this.
6          "Our large Phase III trials
7  have tested our doses without laboratory
8  monitoring and have successfully shown a
9  positive benefit-risk.  I will craft a
10  response tomorrow consistent with the
11  information you have provided."
12          Do you see that?
13      A.    Yes.
14      Q.    And then if you go up to
15  your first e-mail, you write, "In light
16  of the discussion on this topic at the
17  GDC today, I understand that there is a
18  team working on this request in
19  addressing these issues, so I think it
20  best that I not respond directly back to
21  Quest but rather have the communication
22  go through the team.  Please let me know
23  if you disagree."
24          Right?

Protected - Subject to Further Protective Review

Page 274

1  on how to put it in or not to put it in.
2      Q.    Okay.  You write back, and
3  this is -- your e-mail starts on the
4  front page, 804.
5      A.    Okay.
6      Q.    On April 25, 2012.  And it
7  just catches the header, "Dear Wolf" --
8  "Dear Wolfgang, Anja, Dagmar, and Theo"
9  and then it continues on.  Do you see
10  that?
11      A.    Yes, mm-hmm.
12      Q.    And you thank them for their
13  response.  And you explain your purpose
14  for bringing this correspondence to their
15  attention, right?
16      A.    Yes.
17      Q.    Okay.  You say, "I fully
18  agree with your thoughts.  Nothing of
19  clinical value can or should be said
20  about ranges unless they were studied in
21  clinical trials for each indication and
22  matched with efficacy and safety events.
23  Of course, one of our main objectives in
24  developing rivaroxaban has been to

Protected - Subject to Further Protective Review

Page 276

1      A.    Right.
2      Q.    So you made the decision
3  ultimately yourself not to send a
4  response to Quest, right?
5      A.    Well, I interpreted the
6  e-mail, and then what's not said here is
7  what was discussed at the GDC.  So that's
8  a 3- to 8-hour meeting that we have each
9  month, and I don't know what that
10  discussion was, but I think the key piece
11  is likely that we -- we need to have one
12  team handle all the requests and not have
13  different requests come from different
14  people.  Because then we can have a
15  consistent response.  For example, if
16  they need reagent, which sometimes they
17  ask if they need drug, they want -- I
18  don't have the control over that.  So it
19  needs to go through a central team.  And
20  that's what this is saying.
21      Q.    Okay.  So you did nothing --
22  you personally did not send her the
23  reference ranges that were in the SPC,
24  correct?

Page 277

```
1         A.   I don't remember what I did
2    or didn't.  All I -- all we know is
3    what's in this e-mail.
4         Q.   Okay.  Well, you say in this
5    e-mail, you're not going to do that,
6    right?
7         A.   I don't --
8              MR. HOROWITZ:  Object to the
9         form.
10             THE WITNESS:  I don't know
11        if there was any other
12        correspondence after this, so I
13        can't tell you for sure.  I don't
14        remember.
15   BY MR. BARR:
16        Q.   Well, you don't -- you don't
17   have a specific memory of doing that, do
18   you?
19        A.   I don't have a memory of
20   doing it.
21        Q.   Okay.  But --
22        A.   It doesn't mean it didn't
23   happen.
24        Q.   And what you write is, "So I
```

Page 278

```
1    think it best that I not respond directly
2    back to Quest," right?
3         A.   When we get an individual
4    request from a company, I think the
5    decision at that time was we should have
6    one team reach out to the different
7    groups.  That way it's coordinated.
8         Q.   Now, if the company wanted
9    to provide --
10             MR. BARR:  Can we go off the
11        record for a second.
12             THE VIDEOGRAPHER:  The time
13        is 2:13 p.m.  Off the record.
14             (Whereupon, a discussion was
15        held off the record.)
16             THE VIDEOGRAPHER:  The time
17        is 2:18 p.m.  We are back on the
18        record.
19   BY MR. BARR:
20        Q.   Providing reference ranges
21   for doctors in the United States to look
22   at could be as simple as providing the
23   data that was provided in the Canadian
24   label, right?
```

Page 279

```
1              MR. HOROWITZ:  Object to the
2         form.
3              THE WITNESS:  I don't
4         remember what's in the Canadian
5         label, so I am not sure I can
6         answer that.
7    BY MR. BARR:
8         Q.   Okay.  Well, let's look at
9    it.
10             (Document marked for
11        identification as Exhibit
12        Berkowitz-26.)
13             MR. BARR:  I'm going to hand
14        you Exhibit Number 26, which is
15        Plaintiffs' 77266.
16             MR. HOROWITZ:  It's short.
17        One second.  He'll be ready.
18             THE WITNESS:  Okay.  Thank
19        you.
20   BY MR. BARR:
21        Q.   And what it says is -- this
22   is an e-mail from Suzanne Morency.  Do
23   you know that person?
24        A.   Yes.
```

Page 280

```
1         Q.   Who is she?
2         A.   She works in regulatory at
3    our Canadian office.
4         Q.   Okay.  And you're -- you are
5    one of the recipients of this e-mail,
6    correct?
7         A.   Yes.
8         Q.   And this is February 10,
9    2015, right?
10        A.   Yes.
11        Q.   Okay.  If you go to the next
12   page, it says, "A seven-day information
13   request was received from Health Canada
14   for the class labeling NC currently under
15   review."
16             Do you know what that NC
17   means?
18        A.   I'm sorry.  I lost my place.
19   Okay.  Class labeling NC currently under
20   review.  I don't.
21        Q.   Okay.  It says, "A copy of
22   the annotated PM submitted to Health
23   Canada is attached."
24             Do you see that?
```

Page 281

```
1        A.    Yes.
2        Q.    Is that product monograph?
3        A.    Product monograph.  Yeah.
4        Q.    It says, "Health Canada's
5   comments.  In dosage and administration,
6   there's a new paragraph to be included.
7   At the beginning of this section, add the
8   word 'antagonist' after 'as for any
9   non-vitamin K.'"
10             Do you see that?
11       A.    Yeah.
12       Q.    When we go down a little
13  further, it says "Health Canada proposed
14  changes."
15             Do you see that?
16       A.    Yeah.
17       Q.    Okay.  It says, "As for any
18  non-vitamin K antagonist oral
19  anticoagulant drug, before initiating
20  Xarelto ensure that the patient
21  understands and is prepared to accept
22  adherence to NOAC therapy as directed."
23             Do you see that?
24       A.    I do.
```

Page 283

```
1   the label.
2             Now, we tried to keep
3   consistent.  We have a core data
4   sheet, and we try to keep
5   consistent across the labels.  But
6   we have regional exceptions which
7   the authorities, you know, in
8   their judgment will decide what
9   will eventually be in or not.  But
10  we start off with a standard and
11  we start off working with the
12  authority providing our initial
13  one, and then there's a back and
14  forth.
15  BY MR. BARR:
16       Q.    Right.  But at least
17  according to this chart being included in
18  the Canadian label, this is more
19  information that doctors in Canada have
20  than doctors in the United States are
21  given in the label?
22       A.    It's in their -- it's in --
23             MR. HOROWITZ:  Objection to
24       form.
```

Page 282

```
1        Q.    And then it provides a
2   Xarelto dosage, the plasma concentration
3   range, concentration maximum, the range
4   at trough, the PT at max, and the PT at
5   trough, on Neoplastin, correct?
6        A.    Yes.
7        Q.    And you looked at earlier
8   today the U.S. label.  You would agree
9   with me that none of this information is
10  in the U.S. label, correct?
11       A.    Well, I don't remember
12  seeing it in the label, but that's not
13  completely up to the company.  The
14  authority decides on what will go in and
15  go out in the final run.
16       Q.    Okay.  So you believe at
17  some point the company attempted to
18  include this chart in its label?
19             MR. HOROWITZ:  Object to the
20       form.
21             THE WITNESS:  I cannot
22       remember what we attempted to
23       include.  But we wanted to give
24       some information as we have it in
```

Page 284

```
1        Go ahead.  Sorry.
2             THE WITNESS:  It's in their
3        label.  So it's something they
4        have.  I don't know how it was put
5        together; that is to say, the
6        footnotes.  I don't know what
7        these footnotes are.  I don't know
8        what the references are, whether
9        they're the Mueck papers or
10       something else.
11            But -- and it looks like
12       we're in the middle of this or
13       some kind of draft.  But it looks
14       like that's the way they were
15       going.
16  BY MR. BARR:
17       Q.    Right.  I can show you the
18  Canadian label if you want to see it.
19       A.    If that's what you see, I
20  trust that.  I'm just saying that at this
21  time it looks like we were having a
22  discussion back and forth about -- not
23  really.  They're telling us that's what
24  they want in there, so...
```

Page 285

```
 1        Q.    And one of the things it
 2   gives is it gives plasma concentration
 3   at -- concentration trough.  Do you see
 4   that?
 5        A.    Yes.
 6        Q.    It gives a range of 12 to
 7   137, correct?
 8        A.    For patients with atrial
 9   fibrillation on the 20-milligram
10   once-a-day dose.
11        Q.    Yes, sir.
12        A.    Right.
13        Q.    You would agree that that's
14   a tenfold difference in the range?
15        A.    That's using that simple
16   math calculation that people like to do,
17   but want us to take it in the context of
18   the patient and the value.  So we have
19   that kind of spread when we look at these
20   kind of antithrombotic drugs.  This is
21   not unusual.
22        Q.    At trough, according to the
23   chart in the Canadian label, there's a
24   tenfold difference in concentration.  Two
```

Page 287

```
 1   may have put unreliable information in
 2   their label?
 3        MR. HOROWITZ:  Object to the
 4        form.
 5        THE WITNESS:  I didn't say
 6        that.  I didn't say that.
 7   BY MR. BARR:
 8        Q.    Well, you said you didn't
 9   know if this information was reliable.
10        MR. HOROWITZ:  He didn't say
11        that either.  Objection to form.
12   BY MR. BARR:
13        Q.    I thought that's what I
14   heard.  If that's not what you were
15   saying --
16        A.    Sorry.  No, that's not what
17   I said.
18        Q.    So what were you saying
19   about unreliability?
20        A.    I was just saying that it
21   would be nice to know what the footnotes
22   were as to where they were referencing
23   from.
24        Q.    We can do that.
```

Page 286

```
 1   people take the same drug, a tenfold
 2   difference, correct?
 3        MR. HOROWITZ:  Object to the
 4        form.
 5        THE WITNESS:  I don't know
 6        that that's the case, two patients
 7        take it and they have a tenfold
 8        difference.  I don't know what the
 9        basis of it, if it's just in
10        volunteers, if it's taken from
11        other data.
12        So all I know is that this
13        is a range found.  And I don't
14        know if -- how reliable the data
15        is in terms of the timing of the
16        dosing, whether they're truly
17        troughs.
18        But if it comes from, say,
19        the papers that I know about, from
20        our clinical pharmacologists,
21        we'll have to take it at its face
22        value that that's the data.
23   BY MR. BARR:
24        Q.    So you think the Canadians
```

Page 288

```
 1        A.    I think that would help.
 2        MR. BARR:  109 --
 3        This will be Exhibit Number
 4        27.
 5        MR. HOROWITZ:  27.
 6        MR. BARR:  1095705.
 7        (Document marked for
 8        identification as Exhibit
 9        Berkowitz-27.)
10        MR. HOROWITZ:  He's got to
11        read every word before he talks to
12        you.
13        MR. BARR:  Not bad advice.
14        MR. HOROWITZ:  He took
15        something at face value and
16        trusted you.  I don't know what
17        that was about.
18        MR. BARR:  You clearly
19        didn't prep him appropriately.
20   BY MR. BARR:
21        Q.    Let me go to Page 30.
22        A.    Sure.
23        Q.    Well, let me -- you
24   recognize this as the Xarelto product
```

Page 289

1 monograph in Canada, correct?  And this
2 is date of revision November 24, 2014?
3      A.   Yes.
4           And 30, you said?
5  Q.   Page 30.
6  A.   Okay.
7  Q.   One more.
8  A.   30 of 74.  You want 31?
9  Q.   Mine says Page 30 of 74.
10  A.   It's 31 of 74.
11      MR. HOROWITZ:  What's your
12 Bates number?
13      MR. BARR:  It doesn't have
14 it on here.  The way I printed it.
15 It doesn't matter.
16      THE WITNESS:  Okay.  It's
17 Table 11 that you're looking at?
18 BY MR. BARR:
19  Q.   Table 11, yes, sir.  And
20 this has the footnotes on it, correct,
21 that you wanted to see?
22      A.   Yes.  Thank you.  Now I see.
23           Okay.  So these were --
24 Okay.  Yeah.  So they gave the windows of

Page 290

1 time here.
2  Q.   Right.
3  A.   Okay.  Right.  And then you
4 were asking about -- this table looks a
5 little different than the one that we
6 saw.  But I see the column.
7      MR. HOROWITZ:  Let him ask a
8 question.
9      THE WITNESS:  Okay.  Thank
10 you.  I'm just orienting.
11 BY MR. BARR:
12  A.   You said you wanted to see
13 it for reliability purposes.  So I was
14 simply showing you the footnotes.
15      MR. HOROWITZ:  Well,
16 objection to --
17 BY MR. BARR:
18  Q.   Does that change any of your
19 answers?
20  A.   Yes.  Because the footnote
21 says 16 to 32 hours after drug
22 administration.  16 to 32.  That's eight
23 hours before the trough, up to eight
24 hours after the trough.  So that likely

Page 291

1 accounts for this range that you were
2 talking about.
3  Q.   Okay.  Well, we'll look at
4 the Mueck paper individually later.
5      Give me a second to get
6 organized here.
7      Are you aware about a
8 decision within Bayer not to provide
9 observed peak and trough values in the
10 label?
11      A.   I'm not aware of that, that
12 I can remember.  I mean, our goal is to
13 try to put as much information as we can
14 that we think is pertinent.  And as I had
15 said, the authorities will tell us what
16 they think is pertinent to the label.
17  Q.   Let me show you Exhibit 28.
18 This is Plaintiffs' 2139017.
19      (Document marked for
20      identification as Exhibit
21      Berkowitz-28.)
22 BY MR. BARR:
23  Q.   Do you recall reviewing this
24 e-mail in preparation of this deposition?

Page 292

1      A.   I'm sure it's in German.
2 There's a bottom part maybe I can read.
3  Q.   Can you read German?
4  A.   No, I cannot.
5  Q.   Okay.  I was going to get
6 you to translate it for me.
7      MR. HOROWITZ:  It will cost
8 you extra.
9 BY MR. BARR:
10  Q.   Just let me know when you've
11 had a chance to look at it.
12  A.   I just can read the one from
13 December 18th from Susanne Hes.
14  Q.   Well, we're on the same
15 page.  That's all I can read.
16  A.   Okay.
17      MR. HOROWITZ:  That makes
18 all of us.
19 BY MR. BARR:
20  Q.   So that's Susanne Hes?
21  A.   Yes.
22  Q.   And she's writing to Gerlind
23 Holberg, who we talked about; Anja
24 Alpers, who we talked about; and Dagmar

Page 293

1  Kubitza; and Martin van Eikels.  Right?
2        A.    Yes.
3        Q.    She writes -- I'm assuming
4  that's German.
5              "Hallo Liebes Monitoring
6  Team."
7        A.    Yes.  Hello friends.
8        Q.    What was the rivaroxaban
9  monitoring team?
10       A.    I don't know -- I don't know
11 that as a group.  But I mean, a couple of
12 the people are -- actually, many of the
13 people on there are on medical affairs,
14 so maybe they have a team.  But we didn't
15 have a team that I know of in
16 development.
17       Q.    It says, "As you may know,
18 the recent apixaban physicians
19 leaflet" -- now, which NOAC is apixaban?
20       A.    That's the BMS Pfizer,
21 what's called Eliquis.
22       Q.    Okay.  It says -- "not the
23 label contains some guidance as to
24 expected upper and lower values of Xa

Page 294

1  activity.  This triggered the strong need
2  to include something like this in our
3  material.  I am aware about previous
4  decisions on noncommunication of observed
5  peak and trough values and support this
6  decision.  However, there is the strong
7  need to come up with, A, a reactive
8  statement, and, B, a plan to obtain data
9  soon."
10             Did I read all that right?
11             MR. HOROWITZ:  Object to the
12       form.  Foundation.
13             THE WITNESS:  You read what
14       I read here.
15 BY MR. BARR:
16       Q.    Were you aware of a decision
17 on noncommunication of observed peak and
18 trough values?
19       A.    No.  I'm not sure what that
20 means.
21       Q.    Okay.  You -- you don't know
22 where such a decision would have come
23 from?
24       A.    No.  It wouldn't be

Page 295

1  centralized decision.  Maybe something
2  within the team or a certain group.  But
3  I also don't know what they exactly mean,
4  noncommunication of observed peak and --
5  and -- it says thorough -- or -- well,
6  through values.  I guess you meant
7  trough.
8        Q.    That's supposed to be
9  trough, so...
10       A.    Okay.  Yeah, I think so.
11 And support the system.  Yeah.  Sorry.  I
12 don't know about that.
13       Q.    You don't know what that is?
14 Okay.
15             You are aware that there is
16 a significant GI bleed risk with Xarelto,
17 right?
18             MR. HOROWITZ:  Form.
19             THE WITNESS:  I'm aware that
20       patients who receive NOACs have an
21       increased risk of GI bleeding.
22 BY MR. BARR:
23       Q.    Do you know Dr. Califf?
24       A.    I do.

Page 296

1        Q.    Who is Dr. Califf?
2        A.    Dr. Califf was the head of
3  the Duke Clinical Research Institute at
4  Duke University, and he is now the FDA
5  commissioner.
6        Q.    Has he ever told you that he
7  has concerns about the GI bleed risk with
8  Xarelto?
9        A.    Well, I believe there was
10 discussion about all the bleeding that we
11 see with the antithrombotic.  If there's
12 something specific, I mean, obviously GI
13 bleeding and the -- where we saw
14 increases were of concern to all of us.
15             MR. BARR:  Let me hand you
16       Exhibit 29.  And this is
17       Plaintiffs' 3673723.
18             (Document marked for
19       identification as Exhibit
20       Berkowitz-29.)
21             MR. HOROWITZ:  This is a
22       long one.
23             MR. BARR:  Yeah.  You notice
24       I haven't even started saying

Protected - Subject to Further Protective Review

Page 297

1  anything yet.
2      MR. HOROWITZ:  Give him a
3  sec.
4  BY MR. BARR:
5      Q.   Are you oriented enough so
6  we can take a stab at a couple questions?
7      A.   Hold on.  Just a few more
8  pages.  I'm not trying to read the whole
9  thing though, just trying to get the gist
10 because it's a long -- long trail from
11 several months before.
12     MR. HOROWITZ:  One more
13 second.
14     THE WITNESS:  So just let me
15 do that.
16     Okay.  Okay.  Let's hear the
17 questions.  If I might -- there
18 are some other sections I might
19 need to read if you don't mind.
20 BY MR. BARR:
21     Q.   Okay.  In general, this is a
22 series of e-mails about a -- a draft
23 ROCKET-AF bleeding event manuscript that
24 eventually turns into a discussion about

Protected - Subject to Further Protective Review

Page 298

1  GI mucosal bleeding with Xarelto,
2  correct?
3      A.   Right.  Trying to understand
4  the GI bleeding signal.  As you probably
5  know, there was a -- something new found
6  with the Factor Xa inhibitors that there
7  seemed to be a little more GI bleeding
8  and there was less intracranial
9  hemorrhage and critical organ bleeding.
10 And that was a new pattern to us as
11 physicians with anticoagulants.
12     Q.   Right.  So if you go to
13 page -- if you look at the Bates 2815.
14     A.   Okay.
15     Q.   I'm not going to really ask
16 you a lot of questions about this.  I'm
17 just trying to orient you in the
18 document.
19     A.   Okay.
20     Q.   You offer a theory on May 2,
21 2012, as to why there may be higher GI
22 bleeds with Xarelto, right?
23     A.   Well, it was first focused,
24 I think, on a statement about some of the

Protected - Subject to Further Protective Review

Page 299

1  things that were said, and I had to go
2  back to my clinical pharmacology
3  colleagues to -- to brush up on what had
4  been learned in their studies.
5      Q.   Right.
6      A.   So, yes, we were trying to
7  address that issue and try to have some
8  understanding about -- about it.
9      Q.   Right.  Dr. Califf responds
10 back to you and says, "Look, this is a
11 great discussion, it's fascinating how
12 you can now track statements in the
13 academic enterprise that goes like the
14 game whisper."
15     Did I read that right?
16     A.   Right.  He's making a
17 comment on the fact that with the track
18 changes we can look back over the
19 changes.
20     Q.   Right.  And so you thank
21 Dr. Califf for his response on Page 814.
22 Do you see that?
23     A.   Yes.
24     Q.   Okay.  And then he sends a

Protected - Subject to Further Protective Review

Page 300

1  response specifically to the e-mail from
2  Shaun Goodman who is responding to you.
3  He being Dr. Califf.
4      Do you see Shaun Goodman
5  responds on May 8, 2012, and thanks you
6  for pursuing this?
7      A.   Yes.
8      Q.   And Dr. Califf responds to
9  that e-mail, right, and copies you on it?
10     A.   Yes.
11     Q.   And he says --
12     A.   No, I'm sorry.  I'm looking
13 at Graeme Hankey.  He said -- okay.
14 Dr. Califf he writes there, yeah.  Okay.
15     Q.   Dr. Califf writes on May 8,
16 2012 --
17     A.   Yeah.
18     Q.   "This sounds fine" --
19     A.   Mm-hmm.
20     Q.   -- "but somewhere down the
21 line we need to really explore the GI
22 bleeding issue."
23     A.   Yeah.
24     Q.   "It's the only real

Page 301

1  liability in helping people avoid it,
2  deal with it, would be great."
3       Did I read that right?
4       A.   Yes.
5       Q.   What has Bayer done since
6  this e-mail from Dr. Califf to really
7  explore the GI bleeding issue, to help
8  people either avoid it or deal with it?
9       A.   Well, when he says
10 "exploring," what I believe he meant was
11 looking into our databases and trying to
12 understand what was going on.  What we've
13 learned since that time is that patients
14 who have issues with their GI tract are
15 more likely to bleed, as we talked about
16 before.
17      So, I mean, that -- what's
18 been done is to look at the ongoing
19 trials and the future trials.  This is an
20 area of interest for our GPV, our global
21 pharmacovigilance area, where they look
22 at adverse events that come in.  We look
23 at sub-groups in the trials.  And that's
24 how we try to evaluate it.

Page 303

1  knowledge, we have no evidence of them
2  affecting the GI tract, but rather people
3  who have malformations, ulcers, cancers,
4  things I mentioned, they are more likely
5  to bleed.  So they are unmasked.
6       Q.   Okay.
7       A.   But as I said, we continue
8  to look in our trials at this.
9       Q.   Has Bayer put out any
10 information to help people avoid this
11 increased risk of GI bleeding?
12      MR. HOROWITZ:  Form.
13      THE WITNESS:  Well, the
14      label and the discussions with
15      doctors, the education of doctors
16      and patients, patients who have
17      susceptibility to bleeding have to
18      be watched carefully.
19 BY MR. BARR:
20      Q.   What in the United States
21 label helps doctors in the United States
22 avoid GI bleeding with Xarelto?
23      A.   Again, the doctors have to
24 look at the patient's characteristics and

Page 302

1       So it's sort of -- it's
2  something that we look at going forward.
3       Q.   Right.  And -- and so when
4  you say, "What we've learned since that
5  time is that patients who have issues
6  with their GI tract are more likely to
7  bleed," you're talking about patients on
8  Xarelto that have issues with their GI
9  tract?
10      A.   No, that's the confusion.
11      Q.   Okay.
12      A.   So for -- we talked about
13 there with dabigatran there was some
14 issue with GI bleeding and the thinking
15 at the time -- dabigatran and the
16 thrombin inhibitors in general are not
17 well absorbed.  And, as we talked about
18 in the e-mail that you saw, the PGP
19 activity increases, we believe,
20 concentration of the drug.  That's not
21 true for the Xa inhibitors.  It's earlier
22 in the e-mail.  You can -- can see it.
23      But what we understand is
24 that their drugs don't -- to our

Page 304

1  make a determination whether
2  anticoagulation is right for them.
3       Q.   So what you're saying as I
4  understand it is they -- certain patients
5  that are at risk of these GI bleeds, it
6  just may be inappropriate to
7  anticoagulate them with anything?
8       A.   That's true.  If we have,
9  for example, a patient with a history of
10 duodenal ulcer, we have to be very
11 careful about anticoagulating him.  For
12 patients that have a -- a AV malformation
13 in the intestine, we have to be careful
14 about that.
15      Q.   Are these contraindications
16 listed in the United States label?
17      A.   They're not
18 contraindications necessarily.  Again, we
19 talked a lot today about bleeding, but
20 not at all about the thrombotic risk that
21 these patients suffer, which is manyfold
22 higher.  And that's the balance.  It's a
23 benefit-risk that we have to deal with.
24 And that's what the doctors do.

Page 305

1      Q.   I understand that.
2      A.   Good.
3      Q.   But are any of these
4  clinical issues that you've described
5  that put somebody at a higher risk of a
6  GI bleed, are any of those issues
7  described in the United States label as
8  things doctors need to take account of to
9  determine whether or not somebody should
10 be put on Xarelto?
11     A.   Well, again, I'm not the
12 expert on the USPI label.  We would have
13 to talk with other colleagues who may
14 know it more or spend more time looking
15 at the label as we did before.  So I'm
16 not aware.
17     Q.   I want to look at one more
18 of your e-mails in this chain.  It's your
19 e-mail on May 8, 2012.  It's on Bates
20 2811.
21          You've written an e-mail to
22 Shaun Goodman, Graeme Hankey, Robert
23 Califf, and you've cc'd a group of
24 people, correct?

Page 306

1      A.   Yes.  They're the co-authors
2  and members of the ROCKET-AF steering
3  committee.
4      Q.   Okay.  And what you write
5  is, "There's little in the literature
6  that I can find on the relation of
7  hemostasis and GI mucosal bleeding other
8  than on ulcers, vascular malformations,
9  and other anatomic lesions, even if
10 searching before the pattern was observed
11 with the new anticoagulants.  I think
12 there are at least four potential
13 reasons, not mutually exclusive.  Support
14 and plausible arguments are provided for
15 much of this in Jeff Weitz's most recent
16 paper, attached.  Below I summarize with
17 some excerpts and some of my thoughts."
18          Did I read that right?
19     A.   Yes.
20     Q.   Who is Jeff Weitz?
21     A.   Professor Weitz is professor
22 of medicine and pathology at the McMaster
23 University in Canada.
24     Q.   Is he -- do you know what

Page 307

1  his field of expertise is?
2      A.   Hemostasis and he does basic
3  research and clinical research.
4      Q.   Is he a respected expert in
5  the field?
6      A.   Yes.
7      Q.   Go to the next page.  In
8  your e-mail there is a heading, "Dose."
9          Do you see that?
10     A.   Yes.
11     Q.   What you write is, "For the
12 clinical development for the two Factor
13 Xa inhibitors furthest along, the
14 exposure target accepted has been
15 different.  The doses of rivaroxaban
16 appear slightly on the high end of what
17 is needed for efficacy in the various
18 indications, and apixaban doses appear
19 more on the lower end excluding ACS, my
20 opinion."
21          Did I read that right?
22     A.   Yes.  In 2012.
23     Q.   So it's your opinion in
24 2012, that the dose of rivaroxaban is on

Page 308

1  the high end of what's needed for
2  efficacy, right?
3      A.   Well, at that time looking
4  at the data that we have and the
5  information that we have that's not here,
6  we know that the apixaban dose is set
7  lower.
8          We know it's set lower
9  because the scientists have told us it
10 was set lower.  It's set lower because
11 they were second to market and they
12 wanted to get there faster.
13          So looking at their data and
14 seeing that they failed in an orthopedic
15 study and failed in an ACS study, we find
16 them to be on the lower end.
17     Q.   Okay.  But you actually
18 write Xarelto is slightly on the high end
19 of what's needed for efficacy, right?
20     A.   I don't know that I'm right.
21 All I know is that our goal, we always
22 try to balance the efficacy with the
23 safety.  And we would like to, especially
24 four years ago, and maybe it's not

Page 309

```
1    possible with any of the Xa inhibitors
2    because now we have edoxaban out and we
3    have apixaban out there in a lot more
4    patients so we can see the bleeding
5    profile.
6                 We are unable to uncouple
7    the bleeding from the efficacy.  If we
8    could adjust that, that would be a great
9    thing.
10        Q.    Okay.  But --
11        A.    So one can make the
12   assumption, looking at that, that
13   we're -- compared to apixaban, we dose a
14   little higher than they do.  Whether they
15   would be successful or not, that's a
16   different story.
17        Q.    But that's not what you
18   wrote.  You did not write you dose higher
19   than apixaban.  What you wrote is, "The
20   doses of rivaroxaban are slightly on the
21   high end of what is needed for efficacy."
22                 That's what you wrote.
23                 MR. HOROWITZ:  Object to the
24        form.
```

Page 311

```
1         A.    It says doses of rivaroxaban
2    are appear -- and I don't know what that
3    means -- slightly on the high end --
4         Q.    You wrote --
5         A.    -- of efficacy.
6         Q.    These are your words.
7                 MR. HOROWITZ:  Let him --
8         he's trying to explain to you his
9         words.  Let him talk, please.
10                 THE WITNESS:  This is an
11        e-mail.  E-mails can have flaws in
12        them.  They're not 100 percent
13        accurate, and they're not like us
14        talking back and forth, are they?
15        They don't have the depth.  They
16        don't have the context.  They
17        don't have any of that.  They're
18        just communication in a quick
19        form.
20            So I don't think it's
21        appropriate to take any of these
22        e-mails and just say that's the
23        gospel, especially as research is
24        going on in time.
```

Page 310

```
1                 THE WITNESS:  Well, I
2         don't -- I don't have the values.
3         I only have my opinion as it says
4         there in 2012.  And what you're
5         seeing, and you can see it through
6         these months of work, is us
7         investigating the problem.
8             So you're seeing research in
9         work -- at work.
10   BY MR. BARR:
11        Q.    So your opinion in 2012 was
12   that the dose of rivaroxaban given was
13   higher than necessary for efficacy,
14   right?
15                 MR. HOROWITZ:  Object to the
16        form.
17   BY MR. BARR:
18        Q.    That's what it says?
19        A.    Incorrect.
20                 MR. HOROWITZ:  Object to the
21        form.  Argument.
22   BY MR. BARR:
23        Q.    How else can you interpret
24   that?
```

Page 312

```
1             So you're just seeing us at
2         work.  And what we think on one
3         day could be a little bit
4         different the next day.
5    BY MR. BARR:
6         Q.    But I want to make sure I
7    understand what you were saying in 2012.
8         A.    I can only tell you --
9         Q.    Let me ask the question.
10        A.    I'm sorry.
11                 MR. HOROWITZ:  Just let him
12        ask the question.  Slow down a
13        little bit.  Let him ask.
14   BY MR. BARR:
15        Q.    Your opinion in 2012 was
16   that the dose of rivaroxaban was slightly
17   on the high end of what is needed for
18   efficacy?
19        A.    I'm sorry.
20        Q.    Right?
21        A.    No, not right.  That's why
22   I'm interjecting.  Sorry.  Go ahead.
23        Q.    So what you wrote isn't what
24   you meant?
```

Page 313

```
 1          A.    Well, it may not be, but --
 2   it may not be, but may be, because I don't
 3   know exactly what I was thinking at that
 4   moment.  We only know the words on the
 5   page.  But there's a lot going on at this
 6   time.  During the time that we developed
 7   rivaroxaban, which was ahead of apixaban,
 8   you have to understand that the
 9   guidelines for atrial fibrillation
10   allowed aspirin for CHADS2 patients.
11   That's a weak anticoagulant being used --
12   or antiplatelet being used.
13          And we all were concerned
14   about using these novel anticoagulants in
15   patients who were at high risk.  We only
16   wanted patients to receive them that
17   could tolerate the possibility of the
18   side effects.  We didn't know what the
19   profile would be.
20          So we target to be
21   efficacious.
22          Apixaban targeted to be
23   safe, already knowing that the Xa's were
24   effective.  So in wording it in a general
```

Page 315

```
 1   non-inferior to warfarin unless you look
 2   at the on-treatment population, because
 3   after all, anticoagulants don't work
 4   unless you have them on board.
 5          Q.    But the FDA --
 6          A.    When they're on board --
 7   well, when they were on board, they were
 8   actually superior.  But the FDA uses the
 9   ITT analysis.  Fair enough in science.
10   ITT does things differently.  So yes, it
11   was non-inferior.
12          Q.    Which means it's as good as,
13   right?
14          A.    It means it's non-inferior;
15   it's not worse than.  It could be better
16   than.
17          Q.    But you did not prove it was
18   better than?
19          A.    We did not prove superiority
20   in the ITT analysis, but we did in the
21   on-treatment analysis.  But the labeling
22   comes from the ITT analysis.
23          Q.    Okay.  Then the other
24   question that I wanted to ask was, you
```

Page 314

```
 1   term, I don't have values there.  I don't
 2   know exactly what I'm trying to express.
 3   I believe it's just that our interest is
 4   efficacy.  That is the FDA's interest,
 5   efficacy.
 6          Bleeding has become more
 7   important over the years.  Not that it
 8   wasn't important to us, but you have to
 9   understand we were facing the issue of
10   trying to improve on warfarin.
11          So as I look at it, when I
12   look at the agents, then I see for
13   rivaroxaban, is it possible that a lower
14   dose could be better, as you were saying,
15   is it possible?  Could be.  But we think
16   that the work that's been done shows that
17   rivaroxaban at 20 milligrams is
18   appropriate, and 15 for patients with
19   renal failure is appropriate.
20          Q.    Two things, and we'll take a
21   break.  You would agree with me that you
22   did not prove that Xarelto was better
23   than warfarin, correct?
24          A.    We showed that it was
```

Page 316

```
 1   know, you were saying that could a
 2   10-milligram dose be better?
 3          A.    No.  I didn't say that.
 4          Q.    You were asking -- well, you
 5   were asking if a lower dose could be
 6   better, right?
 7          A.    I was simply saying that you
 8   don't get the opportunity to perfect
 9   exactly what it is.  You used your Phase
10   II studies, whatever you can do, your
11   modeling.  And then you do the clinical
12   trial.  Once the clinical trial is done,
13   then you have your dose.  It either works
14   or it doesn't.  And it worked.
15          Q.    So let me just try to get
16   this right.  You said, is it possible
17   that a lower dose could be better as you
18   were saying, is it -- it is possible?
19   Could be.
20          Right?  That's what you
21   said?
22          A.    Could, would, should, yeah.
23   It could be better.  But you would have
24   to trial --
```

Protected - Subject to Further Protective Review

Page 317

1    Q.    You would agree with me that
2   you never tested that dose, a lower dose,
3   in Phase III patients, right?
4        A.    For atrial fibrillation --
5        Q.    Yes.
6        A.    -- we tested 20 milligrams
7   with 15 milligrams for patients in
8   moderate renal failure.
9        Q.    The reason that you don't
10  know that answer is because you never did
11  the study to find out, right?
12       MR. HOROWITZ:  Object to the
13       form.
14       THE WITNESS:  There's lots
15       of doses we didn't test.  But you
16       can't do those kinds of trials by
17       adding two, three, four, five
18       different dosing arms.  That's a
19       Phase II study.
20  BY MR. BARR:
21       Q.    We'll get into that later.
22       MR. BARR:  Let's take a
23       break.
24       THE VIDEOGRAPHER:  The time

Protected - Subject to Further Protective Review

Page 318

1   is 2:54 p.m.  We are going off the
2   record.
3       (Short break.)
4       THE VIDEOGRAPHER:  The time
5   is 3:13 p.m.  We are back on the
6   record.
7   BY MR. BARR:
8        Q.    Earlier in the day, in
9   the -- in the last session, we talked
10  about Professor Jeff Weitz.  Do you
11  remember that?
12       A.    Yeah.
13       Q.    Are you aware that he
14  disagrees with you as far as whether or
15  not there is a need to measure with
16  Xarelto?
17       A.    I don't know that we have
18  much disagreement.  I know Dr. Weitz
19  personally.
20       Q.    Okay.  Well, let's -- let's
21  look at his e-mails and attachments.
22       MR. BARR:  This will be
23       Exhibit 30.  And it's Plaintiffs'
24       107527.

Protected - Subject to Further Protective Review

Page 319

1       (Document marked for
2       identification as Exhibit
3       Berkowitz-30.)
4       MR. BARR:  And Exhibit 31,
5       which is 1070527.
6       (Document marked for
7       identification as Exhibit
8       Berkowitz-31.)
9       MR. BARR:  The first one is
10      1070527, is Exhibit 30.
11  BY MR. BARR:
12       Q.    I've handed you Exhibit 30,
13  which is Plaintiffs' 105027.  I'll give
14  you a chance to review it.  All I'm
15  really trying to establish is that you
16  received this e-mail.
17       Do you see that this is an
18  e-mail from Anne Vosatka dated March 29,
19  2015, correct?
20       A.    Yes.
21       Q.    And you are in the list of
22  recipients for this e-mail, are you not?
23       A.    Yes.
24       Q.    Okay.  And the subject line

Protected - Subject to Further Protective Review

Page 320

1   of this is "Help obtaining think-tank
2   summary slides."
3       Do you see that?
4        A.    Yes.
5        Q.    And what this attaches to it
6   are some slides by Jeff Weitz.  And that
7   is Exhibit 31.
8       So this is Exhibit 31 that I
9   put in front of you.  It's Plaintiffs'
10  1070529.  If you want to take a second
11  and familiarize yourself, it's fine.
12       A.    Thank you.  Okay.
13       Q.    The title of this is
14  "Opportunities and Challenges of Using a
15  Pharmacometric Approach."  And it's
16  Dr. Jeff Weitz, professor of medicine and
17  biochemistry, McMaster University.
18       Do you see that?
19       A.    Yes.
20       Q.    Okay.  And on the next page
21  he lists some disclosures and says that
22  he is a consultant for multiple different
23  companies, including Bayer and Janssen,
24  right?

Page 321

1    A.    Yeah.
2    Q.    That one company should
3  probably change their name, Isis
4  Pharmaceuticals?
5    A.    They have changed their
6  name.  It's now Ionus.
7    Q.    Very smart on their part.
8    A.    Well, this is a name they
9  had since 1996 --
10    Q.    They had to have been upset
11  about it.
12    A.    -- and had a lot of meaning
13  to them.  The people had been with the
14  company a long time.  But they had to
15  change it for reasons we know recently.
16    Q.    That would have certainly
17  been my advice to them.
18         All right.  I want to flip
19  towards the back.  It's the third --
20  third page from the back.  And it's a
21  slide titled, "Monitoring Versus
22  Measuring Anti" -- "Anticoagulant Effect
23  of NOACs."
24         Do you see that?

Page 323

1  there are times, because you had a
2  PowerPoint slide if I remember in your
3  point-counterpoint that said that
4  monitoring or measuring would not have
5  value, correct?
6    A.    No.  I think we said look at
7  it.  I did not say would not have value.
8  The question was when might things have
9  value, and I think if you look through
10  this slide set as I did, you'll find many
11  of the points that I espoused are ones
12  Dr. Weitz espoused.
13    Q.    And it says, "When do we
14  need to know drug levels or coagulation
15  effects"?
16    A.    Next slide.
17    Q.    Next slide.
18    A.    Yes.
19    Q.    It's, "Assess adherence.
20  Detect overdose.  Evaluate potential drug
21  interactions.  Plan timing of urgent
22  surgery.  Diagnose potential causes of
23  stroke or bleeding.  Decide on use of
24  thrombolytics."

Page 322

1    A.    Yeah.  Monitoring versus
2  measuring?
3    Q.    Yes, sir.
4    A.    Mm-hmm.  Go ahead.
5    Q.    And it says, "We do need to
6  measure.  We don't need to monitor."
7    A.    Okay.
8    Q.    Did I read that right?
9    A.    Yes.
10    Q.    As I understand your
11  testimony, you don't believe that there
12  is a need to measure, correct?
13    A.    No, sir.  I have to disagree
14  with you.  I don't think you understood
15  my testimony.
16    Q.    Okay.
17    A.    I said we are working -- we
18  have worked on a lab test to measure.  We
19  can measure.  It was about monitoring.
20  And we talked about special situations
21  when you might need to measure.
22         So I don't think that was my
23  testimony.
24    Q.    Okay.  So you do believe

Page 324

1         Right?
2    A.    Yes, that's what it says.
3    Q.    Those are many of the same
4  special circumstances that we've talked
5  about, correct?
6    A.    Correct.
7    Q.    Then you go to the next
8  page.  It says, "Routine assays can be
9  used to determine anticoagulant effects."
10  Do you see that?
11    A.    I do.
12    Q.    And for rivaroxaban it has
13  anti-Xa assays and sensitive PT, right?
14    A.    Right.  Meaning the
15  Neoplastin.
16    Q.    Right.  Saying that can be
17  used to determine anticoagulant effect,
18  right?
19    A.    Well, it's talking about
20  what routine assays might be available
21  now in the laboratory around the world.
22    Q.    Okay.
23    A.    And so these are ones that
24  can be used.

Page 325

1      Q.    He's saying it would be
2   appropriate to use a sensitive PT to
3   determine anticoagulant effects, right?
4      A.    It says routine assays can
5   be used to determine anticoagulant
6   effects.
7      Q.    Let me restate my question
8   to make sure it's clear what I'm talking
9   about.
10          He says that in the case of
11  rivaroxaban, Xarelto, sensitive PT can be
12  used to determine anticoagulant effects.
13          MR. HOROWITZ:  Object to the
14      form.
15  BY MR. BARR:
16      Q.    That's what that checkmarks
17  next to rivaroxaban and sensitive PT
18  means, right?
19          MR. HOROWITZ:  Objection to
20      form.
21          THE WITNESS:  No.  I'm
22      sorry.  I can't agree to that.
23      This is a slide showing a table of
24      potential tests that could be

Page 326

1          used.  For example, look at
2          dabigatran, aPTT is listed.  The
3          thrombin time and the dilute
4          thrombin time and the ETT.  The
5          best would be the ETT.  So it's
6          not saying anything different than
7          what we've been saying.
8   BY MR. BARR:
9      Q.    Well, I thought your
10  testimony was that PT could not be used?
11      A.    No, that was not my
12  testimony.  My testimony is that it's not
13  the best test to use.  It's not very
14  reliable.  It gives you a qualitative or
15  semi-quantitative.  It's not what we
16  would recommend that physicians use
17  because we don't think it's the best
18  test.
19          If you use a test that's not
20  precise and accurate, then you can get
21  results that are not valuable.
22      Q.    You would recommend using an
23  anti-Factor Xa assay, right?
24      A.    Well, what you need to do as

Page 327

1   was done with warfarin, although this
2   took decades, was to refine a test or
3   make up a test that is specific to your
4   drug.  And we've done that with
5   rivaroxaban.  And we have one.
6          Now, we tried to do it on
7   the PT-based assay.  But it wasn't good
8   enough.  It wasn't close enough.  It
9   didn't measure sensitively enough.  So we
10  had to go to the anti-Xa test, that
11  assay, and use that platform and develop
12  a test with rivaroxaban calibrators and
13  controls that were specific to
14  rivaroxaban.
15          That's the test that one
16  would want to use if you wanted to
17  measure.
18      Q.    Okay.  And that test is not
19  available in the United States, correct?
20      A.    Not yet.  I understand it's
21  before the FDA, but it's not yet
22  approved.  But it is approved outside of
23  the U.S.
24      Q.    This idea of being able to

Page 328

1   measure anticoagulant effect, that's
2   something that would have been known to
3   Bayer in the early 2000s, right?
4          MR. HOROWITZ:  Object to the
5      form.
6          THE WITNESS:  I'm sorry.
7      I'm not sure I understand the
8      question.
9   BY MR. BARR:
10      Q.    The desire of clinicians to
11  monitor or measure -- strike the monitor.
12          The idea of clinicians
13  wanting to be able to measure the
14  anticoagulant effect of any anticoagulant
15  was known to Bayer in the early 2000s,
16  right?
17          MR. HOROWITZ:  Object to the
18      form.
19          THE WITNESS:  I can't say
20      what was known to Bayer before I
21      got there.
22          I can say that some of us
23      have been in the field a long time
24      trying to develop antithrombotics,

Protected - Subject to Further Protective Review

Page 329

```
 1        and many of us, like Dr. Weitz and
 2        myself, who is not of the company,
 3        but those of us who are
 4        hematologist, we measure.  We like
 5        to measure.  This is how we check
 6        things.
 7             Doctors like to do that
 8        because they're used to heparin
 9        and warfarin.  They grew up
10        thinking they had to do that.  It
11        was a big change for
12        low-molecular-weight heparins to
13        come along and not need to be
14        monitored.  It was very hard.
15             And you see the same thing
16        now.  Doctors would like to
17        measure because it makes them feel
18        like it's doing something.  But
19        you have to have a test that
20        allows you, that tells you that
21        it's really doing something, not
22        just treating the doctor, but
23        actually treating the patient.
24   BY MR. BARR:
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 330

```
 1        Q.    Okay.  But for purposes of a
 2   patient in the United States where an
 3   anti-Factor Xa assay is not available,
 4   the only thing that's available is PT
 5   with Neoplastin, correct?
 6        A.    Sorry.  I have to correct
 7   you just a little bit.  There's
 8   anti-Factor Xa assays, and there's the
 9   rivaroxaban assay that's based on the
10   platform.  If you mean the platform, yes.
11   Unfortunately, not at this time do we
12   have the test, but we're hopeful it will
13   be available.
14        Q.    So the only thing that a
15   doctor can use in present practice today
16   is PT Neoplastin, right?
17             MR. HOROWITZ:  Object to the
18        form.
19             THE WITNESS:  In practice
20        today, that would be the closest
21        we could get.  This could change.
22   BY MR. BARR:
23        Q.    Now, I want to go to this
24   idea that you were talking about with
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 331

```
 1   dose.  You were talking about not knowing
 2   whether or not a lower dose could be more
 3   effective, or it could be safer.  The
 4   various different things that we talked
 5   about.
 6             Do you remember that?
 7             MR. HOROWITZ:  Object to the
 8        form.
 9             THE WITNESS:  I remember us
10        talking about dose and those
11        aspects.
12   BY MR. BARR:
13        Q.    You recall the FDA asked the
14   company to study different doses in the
15   Afib indication, correct?
16        A.    The FDA requests that we
17   study different doses in every indication
18   that we go to see them about.  They like
19   to see that.
20        Q.    And the company specifically
21   told the FDA no, correct?
22        A.    That's not correct.  That's
23   not what the company said.  The choice of
24   dose is up to the sponsor when they do
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 332

```
 1   the clinical trials.  But the trials were
 2   performed with the dose that they were
 3   accomplished with, and the FDA did not
 4   say no to the protocol.
 5        Q.    Let's look at Exhibit Number
 6   32, which is Plaintiffs' 1589.
 7             (Document marked for
 8        identification as Exhibit
 9        Berkowitz-32.)
10   BY MR. BARR:
11        Q.    These are the meeting
12   minutes from the end of Phase II meeting,
13   held September 12, 2006, to discuss the
14   Phase III development program for Xarelto
15   in the Afib indication.
16             Do you see that?
17        A.    I do.
18        Q.    You've seen this before,
19   correct?
20        A.    Yes.
21        Q.    You actually attended this
22   meeting, correct?
23        A.    I did.
24        Q.    Okay.  So if you look on the
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 333

```
 1   third page -- I'm sorry -- fourth page of
 2   the document, where it has "minutes for
 3   FDA submission."
 4               Do you see that?
 5       A.   Yes, I do.
 6       Q.   It lists Bayer attendees,
 7   and it lists you as the second attendee
 8   as global clinical leader, correct?
 9       A.   Yeah.
10       Q.   And it says -- you go down
11   to "Executive Summary of Minutes."
12               Do you see that?
13       A.   I do.
14       Q.   I want to go to Point Number
15   5.
16               MR. HOROWITZ:  Give him a
17           minute to flip.  He's been
18           furiously trying to find where you
19           are.  Get yourself oriented.
20               THE WITNESS:  Thank you.
21   BY MR. BARR:
22       Q.   Point Number 5.  It says,
23   "Bayer/J&J can proceed with 20 milligrams
24   once-a-day, but it is at the company's
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 334

```
 1   risk as division believes that BID" --
 2   that's twice a day, right?
 3       A.   Correct.
 4       Q.   -- "may be slightly more
 5   effective."
 6               Did I read that right?
 7       A.   You did.
 8       Q.   So the FDA believes that
 9   twice-a-day dose may be more effective,
10   and the company says, "Well, we're not
11   going to study that dose.  We're going to
12   go forward on 20 milligrams once-a-day at
13   our risk," right?
14               MR. HOROWITZ:  Objection to
15           form.
16               THE WITNESS:  No.  What they
17           said was that we can proceed with
18           the 20 milligram OD.
19   BY MR. BARR:
20       Q.   At your risk?
21       A.   At the company's risk.  And
22   the division believes that BID dosing,
23   whatever that would be -- I don't know
24   what dose that is.  15 twice a day, 10
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 335

```
 1   twice a day -- I'm not sure what they
 2   meant -- might be slightly more
 3   effective.  And I don't know what data
 4   they're using for that from here.  But
 5   that was their belief at that time.
 6               Q.   They would have had to have
 7   used your Phase II data to come up with
 8   that, right?
 9       A.   Right.  But which -- which
10   of the data?  What values they used, I
11   can't say.  I don't know what dosing they
12   think would have been better.  It doesn't
13   say.
14       Q.   Well, it would have had to
15   have been the DVT Phase II data, because
16   you didn't do any Phase II data with
17   Afib, right?
18               MR. HOROWITZ:  Objection to
19           form.
20               THE WITNESS:  But whatever
21           data was -- they were looking at
22           is what I'm speaking about.  Yes,
23           it would be the DVT because we had
24           an agreement with the authorities,
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 336

```
 1           both the European and the FDA,
 2           that we could use the dosing from
 3           DVT.
 4   BY MR. BARR:
 5       Q.   I mean, it is not a mystery
 6   of what data they're looking at here, is
 7   it?
 8       A.   All I'm saying is that when
 9   they say "believe BID may be slightly
10   more effective," I meant the values that
11   they were looking at.  What made them
12   think that it, quote-unquote, may be
13   slightly more effective.  And I don't
14   know exactly what brought them to that
15   conclusion.
16       Q.   They didn't say that in the
17   meeting?
18       A.   I don't remember from 2006.
19       Q.   But certainly the company --
20   neither company, in the Phase III tested
21   twice a day dosing in Afib, right?
22       A.   Having tested it in DVT and
23   orthopedic surgery and later in ACS, we
24   had a pretty good sense of what the
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 337

1  molecule could do.
2      Q.    But the ACS would have been
3  irrelevant to your studies, what you're
4  talking about here.  That was after this,
5  right?
6      A.    It's after this, but it's
7  not irrelevant, because we know that as
8  we get below 10 milligrams, we find it
9  better to do BID.  And we actually
10 started out with BID dosing when we first
11 started the program, and then went to OD
12 when we found that that would be a
13 possibility.
14     Q.    Okay.  We might have to get
15 into that a little bit.  We'll have to
16 see.
17           Let's go to the next page.
18 I'm with the paragraph that says, "The
19 division is not objecting."
20           Do you see that?
21     A.    Yes.
22     Q.    It says, "The division is
23 not objecting to the proposed OD dosing,
24 but the choice of the dose regimen is at

Protected - Subject to Further Protective Review

Page 339

1      Q.    You see these are meeting
2  minutes from the FDA in May of 2013,
3  right?
4      A.    Yes.
5           MR. HOROWITZ:  While you are
6           getting yourself, let him just
7           take a minute.
8           THE WITNESS:  Okay.  It's
9           very thick, so if we have to go to
10          certain sections, I might need to
11          read --
12 BY MR. BARR:
13     Q.    Okay.  That's fair.
14     A.    Yeah.
15     Q.    I'm looking at the
16 discussion section on Page 2 --
17     A.    Okay.
18     Q.    -- and it's question to the
19 agency, Question 1.  "Choice of dosage.
20 Does the agency agree that 20 milligrams
21 once-a-day rivaroxaban, 15 milligrams
22 once-a-day for creatinine clearance 30 to
23 49 milliliters per minute, and 10
24 milligrams once-a-day rivaroxaban as

Protected - Subject to Further Protective Review

Page 338

1  Bayer/J&J's risk.  The division cited
2  data that once-a-day and twice a day
3  dosing was about the same in patient
4  compliance, that twice a day was not more
5  burdensome than once-a-day, but that
6  three times a day dosing was a more
7  significant problem."
8           Did I read that right?
9      A.    You read that particular
10 part right.  It talks about -- I'm sorry.
11 It talks about the fact that the division
12 is more concerned about efficacy, and
13 it's more important to prevent a stroke
14 than a bleeding event.  The goal is to
15 minimize stroke.  I think that's
16 important.
17     Q.    All right.  Let's go forward
18 in time.  Let's go what I'm going to mark
19 as Exhibit 33.  This is Plaintiffs'
20 200572.
21          (Document marked for
22          identification as Exhibit
23          Berkowitz-33.)
24 BY MR. BARR:

Protected - Subject to Further Protective Review

Page 340

1  doses selected for this study?"
2           Do you see that?
3      A.    Yes.
4      Q.    Then it says, "The FDA.  We
5  agree with your proposal to test more
6  than one dose but have the following
7  suggestions:
8           "At least one of the doses
9  tested should be administered twice
10 daily.  Based on the PK and PD properties
11 of rivaroxaban, only a twice-daily
12 regimen will provide significant
13 anticoagulant effect throughout the
14 interdosing interval."
15          Did I read that right?
16     A.    That's their opinion.  You
17 read it right.
18     Q.    Okay.  And -- and as far as
19 their opinion, the FDA doesn't stand to
20 turn a profit on Xarelto, right?
21     A.    The opinion comes from the
22 pharmacokinetic and pharmacodynamic
23 division.  It's not necessarily a view of
24 all the members of the committee,

Page 341

1    including the head of the division.
2             MR. HOROWITZ:  Object to the
3        form.  Foundation.
4             MR. BARR:  He doesn't know
5        whether or not the --
6             MR. HOROWITZ:  No, your
7        question.  You're not clear in
8        your question as to which
9        indication you're speaking of.
10   BY MR. BARR:
11       Q.    Well, this is clearly not
12   the Afib indication, right?  This is
13   2013, correct?
14       A.    This is the embolic stroke
15   of undetermined source, and it's an
16   ongoing program.
17       Q.    Okay.
18            MR. HOROWITZ:  Thank you.
19   BY MR. BARR:
20       Q.    And then it goes on into the
21   third bullet point.  It says, "Include PK
22   sampling or measure relevant coagulation
23   parameters such as prothrombin time,
24   Factor Xa activity, et cetera, from all

Page 342

1    patients to evaluate the concentration or
2    PD clinical outcome efficacy/safety
3    relationships for rivaroxaban in this
4    target population."
5             Did I read that right?
6        A.    Yes.
7        Q.    Then it says, "Discussion
8    during the meeting.  The sponsor agreed
9    to study more than one dose, but added
10   they are likely to study only once-daily
11   regimens.  Rivaroxaban administered
12   once-a-day was found effective in the
13   ROCKET-AF trial and the sponsor believes
14   the condition to be studied in this trial
15   is closely related to that study in
16   ROCKET-AF.  The division indicated that
17   they thought the current trial presented
18   an excellent opportunity to compare the
19   safety and efficacy of once-a-day versus
20   twice-a-day regimen.
21            "The sponsor clarified" --
22   "the sponsor also agreed that rivaroxaban
23   will be administered with food as
24   described in the approved package insert.

Page 343

1             "The sponsor clarified that
2    they are not planning to collect any
3    PK/PD information in the proposed study.
4    The division explained that having PK or
5    PD information, such as coagulation
6    parameters, may prove useful in
7    provide" -- "providing dosing
8    instructions and may also provide useful
9    evidence of efficacy if a correlation
10   between PD and outcomes can be
11   established."
12            Did I say that right -- did
13   I read that right?
14       A.    Yes, you read that right.
15       Q.    Okay.  So the -- the -- the
16   FDA again with a different indication,
17   the ESUS indication, are asking for the
18   company to study twice-a-day dosing,
19   right?
20       A.    The clinical pharm -- the --
21   the PK and PD group at the FDA likes to
22   see PK/PD data in all studies that you
23   do.  They enjoy that.  But it's not
24   always possible for us to do that.  We

Page 344

1    have to make compromises.
2        Q.    That wasn't my question.
3    And I -- I do appreciate that answer, but
4    that wasn't my question.  It had to do
5    with the twice-a-day dosing, not whether
6    they were going to collect PK or PD data.
7        A.    Mm-hmm.  So please repeat it
8    and then, I'll try to answer it.
9             MR. HOROWITZ:  Yeah, I think
10            you just missed each other.  So
11            maybe try again.
12   BY MR. BARR:
13       Q.    So you would agree with me
14   that, once again, the agency is asking
15   the sponsor to conduct -- have an arm of
16   the study with twice-a-day dosing and
17   the -- and the -- the sponsor once again
18   refused to do it, right?
19       A.    At this time we did not
20   believe that that was the appropriate way
21   to go forward with this indication.
22       Q.    So you rejected the advice
23   of the FDA --
24            MR. HOROWITZ:  Object to the

Page 345

```
 1          form.
 2   BY MR. BARR:
 3          Q.    -- right?
 4          A.    We are free to accept and --
 5   and reject the advice.  We follow what
 6   the FDA has -- mandates us to do, but the
 7   dose is the responsibility of the sponsor
 8   since the understanding is that we know
 9   the drug the best.
10          Q.    Okay.  Now, did you know
11   back in 2006 that Janssen actually wanted
12   to study two doses in ROCKET?  Were you
13   aware of that?
14          MR. HOROWITZ:  Object to the
15          form.
16          THE WITNESS:  It doesn't
17          ring a bell.  I don't know that
18          that's a surprise, but I don't
19          remember it.
20   BY MR. BARR:
21          Q.    And Bayer decided that that
22   would be too expensive to do.  Did you
23   know that?
24          MR. HOROWITZ:  Object to the
```

Page 347

```
 1          A.    Yes.
 2          Q.    Do you know Dr. Misselwitz?
 3          A.    Yes.
 4          Q.    Okay.  Were you with the
 5   company in April -- on April 5th of 2006?
 6          A.    No.
 7          Q.    Okay.  So you have not seen
 8   this before?
 9          A.    I don't think I've seen it
10   before, but I can't rule it out that at
11   some point it was in the early documents.
12          Q.    Okay.  And when I -- when I
13   say -- I mean see this during the regular
14   course of your work, because this was a
15   document that was listed as something you
16   reviewed in preparation for this
17   deposition.
18          A.    I'm sorry.  I don't --
19   didn't remember that, but it may be.  I
20   was speaking to, you know, certainly it's
21   the kind of stuff that we work with as
22   we're developing trials and stuff.  So
23   that's why I was saying I may have seen
24   it.  Probably have seen it.  But I don't
```

Page 346

```
 1          form.
 2          THE WITNESS:  I don't know
 3          that.  That's not normally the
 4          term that we think of when we're
 5          doing development.  You have to
 6          consider costs, of course, in
 7          order to get the trials performed.
 8          But I don't remember hearing that.
 9          I was there starting in April of
10          2006 and I don't remember hearing
11          it that way.
12          MR. BARR:  Let me show you
13          what I'm going to mark as
14          Exhibit 34.  This is Plaintiffs'
15          417681.
16          (Document marked for
17          identification as Exhibit
18          Berkowitz-34.)
19   BY MR. BARR:
20          Q.    Are you ready?
21          A.    Sure.
22          Q.    So this is a PowerPoint
23   slide from Frank Misselwitz.  Do you see
24   that?
```

Page 348

```
 1   know that.  Okay.  Anyway, we can work
 2   through it.
 3          Q.    Right.  And so I'm looking
 4   at Page 5.
 5          A.    Got it.
 6          Q.    It's SPAF option space.  Do
 7   you see that?
 8          A.    Yes.
 9          Q.    And Option X is a population
10   of moderate and high risk, one
11   rivaroxaban dose arm, double-blind no.
12          Do you see that?
13          A.    Yes.
14          Q.    And Option Y is two
15   rivaroxaban dose arms and -- and no
16   double-blind, right?
17          A.    Correct.  Not double-blind.
18          Q.    And Option Z is two
19   rivaroxaban dose arms and yes on
20   double-blind.  Do you see that?
21          A.    Yes, I do.
22          Q.    Okay.  Then let's go to the
23   next page.  So this is Slide 6, and it
24   says, "Potential financial implications
```

Page 349

```
 1   of SPAF" -- "SPAF options," right?
 2        A.   Right.
 3        Q.   Do you know what that M-I-O,
 4   do you know what all that means?
 5        A.   I think that's millions of
 6   euros.
 7        Q.   Okay.  Millions of euros.
 8             "Its cost estimates by Bayer
 9   Healthcare have not yet costed by J&J,"
10   right?
11        A.   Yes.
12        Q.   And you've listed a budget
13   of 34.9 million euros, right?
14        A.   I haven't listed anything on
15   there.  It's what's on here.
16        Q.   Let me restate that.  That's
17   fair.
18             The PowerPoint lists a
19   budget of 34.9 million euros, right?
20        A.   Yes.
21        Q.   And then for Option X, which
22   is the one dose arm, not double-blind,
23   the PowerPoint lists, what's that,
24   165.5 million euros?
```

Page 351

```
 1             THE WITNESS:  Correct.
 2   BY MR. BARR:
 3        Q.   Okay.  And then for
 4   Option Z, rivaroxaban dose arms two, and
 5   double-blinded, that adds $43.6 million
 6   to the cost of the study, taking it to
 7   339.2 million euros, correct?
 8             MR. HOROWITZ:  Same
 9        objections.
10   BY MR. BARR:
11        Q.   According to the PowerPoint?
12        A.   Yes.
13             MR. HOROWITZ:  Same
14        objections.
15   BY MR. BARR:
16        Q.   So then let's go to Page 13.
17   And it lists differences between Bayer
18   Healthcare and J&J proposals.  Do you see
19   that?
20        A.   Yes.
21        Q.   And it's "J&J unclear
22   whether open label or double-blind is
23   preferred.  Their preference is to study
24   two doses fully powered."  Right?
```

Page 350

```
 1        A.   That's what I would read it
 2   as, yes.
 3        Q.   A 130.6 million euro
 4   increase over the budget?
 5        A.   Yeah, I -- well, I guess.
 6   I'm not sure what the budget -- it says
 7   budget.  I don't know what that exactly
 8   means in relation to this, but whether
 9   that was an actual budget for the trial
10   and then they come to the realization it
11   would take more or what, I don't know.
12        Q.   Okay.  For Option Y, which
13   is two rivaroxaban dose arms.
14        A.   Right.
15        Q.   The cost is 295.6 million
16   euros, right?
17        A.   Right.
18             MR. HOROWITZ:  Objection.
19        Form.  Foundation.
20   BY MR. BARR:
21        Q.   And that's an increase of
22   130.1 million euros, correct?
23             MR. HOROWITZ:  Same
24        objection.
```

Page 352

```
 1             MR. HOROWITZ:  Object to the
 2        form.
 3   BY MR. BARR:
 4        Q.   According to the PowerPoint?
 5        A.   According to the PowerPoint
 6   at this time, I guess that was the J&J
 7   position summarized at that time point.
 8        Q.   Right.  And the Bayer
 9   Healthcare position was an open label,
10   and one dose was sufficient, less likely
11   to study two fully powered doses,
12   correct?
13        A.   That's what it's saying,
14   that the likelihood of being able to
15   fully power the study to know both doses
16   would be very, very difficult.  So
17   that's -- they're thinking that one dose
18   is sufficient.
19        Q.   And what did ROCKET end up
20   being?
21        A.   ROCKET was a double-blind
22   study with warfarin versus rivaroxaban,
23   20 milligrams for patients who have
24   creatinine clearance above 50.  If it was
```

Page 353

1  49 to 30, then it was 15.  And if it was
2  below, they weren't in the trial.
3       Q.    Okay.  Which of these
4  options would that more fall into?
5       A.    Well, this was a morphing,
6  shall we say.  It was evolving while I
7  was coming into the program.  So it was
8  still not settled.  That's the way these
9  things go.  They get discussed over time.
10  So at what point this was in the final
11  decision, I'm not exactly sure how close
12  it was.  I don't know where to put it.
13            It had double-blind, which
14  J&J had one of their preferences.  It had
15  one of their dose, as BHC had.
16       Q.    It certainly, you would
17  agree with me, would be significantly
18  more expensive to run ROCKET with two
19  fully powered doses, correct?
20       A.    Because of the event rate,
21  which is in the order of 2 percent, it's
22  extremely difficult to accomplish these
23  trials.  As a matter of fact, you can't
24  prove the difference without large sample

Page 354

1  size.
2       Q.    I didn't ask if it would be
3  difficult.  I asked if it would be more
4  expensive.  So let's stick to that.
5            Certainly you would agree
6  with me that it would be significantly
7  more expensive to run ROCKET with two
8  fully powered doses, correct?
9       A.    Well, it depended on if you
10  wanted it to be successfully powered or
11  not.  If you weren't paying attention to
12  that, then it could be the same sample
13  size but not meet the endpoints.  If you
14  increase patients, you increase costs.
15       Q.    So the answer to my question
16  is yes, to appropriately run that study,
17  run ROCKET with two fully powered doses,
18  it would be substantially more expensive?
19            MR. HOROWITZ:  Objection to
20       form.
21  BY MR. BARR:
22       Q.    Right?
23       A.    I don't know if it was
24  substantially.  Certainly with more

Page 355

1  patients with a bigger -- with another
2  arm, which would be more patients, then
3  it would cost more.
4       Q.    I mean, just according to
5  this PowerPoint, adding one fully powered
6  arm increases the cost 130.1 million
7  euros, right?  Almost doubles the cost?
8            MR. HOROWITZ:  Object to the
9       form.
10            THE WITNESS:  The PowerPoint
11       says it increases the cost.
12  BY MR. BARR:
13       Q.    Almost doubles it, correct?
14       A.    Well, whatever it is.  I
15  mean, when you increase patients, you
16  increase cost.
17       Q.    Okay.
18       A.    So I --
19       Q.    And the collaboration
20  elected not to go forward with a study
21  that had two fully powered dose arms,
22  correct?
23       A.    It may be partly due to
24  cost, but it may not be all due to cost.

Page 356

1  But we did the two arm study, one dose
2  arm.
3       Q.    Would you agree that the
4  question of whether once-a-day versus
5  twice-a-day dosing would be both safer
6  and more effective in the SPAF indication
7  for Xarelto is still undecided as of
8  today?
9            MR. HOROWITZ:  Form.
10            THE WITNESS:  I think I'd
11       like you to ask that again.  I'm
12       not sure I got all that.
13  BY MR. BARR:
14       Q.    Sure.  I can try again.  It
15  was probably a bad question.
16            Would you agree that the
17  question of whether once-a-day dosing
18  versus twice-a-day dosing would be both
19  safer and more effective in the Afib
20  indication for Xarelto is still unknown
21  as of today?
22            MR. HOROWITZ:  Form.
23            THE WITNESS:  We have not
24       tested twice a day in the SPAF

Protected - Subject to Further Protective Review

Page 357

1    indication, so I don't have an
2    answer for that.
3  BY MR. BARR:
4        Q.   It's still unknown, right?
5        MR. HOROWITZ:  Objection to
6    form.  Asked and answered.
7        THE WITNESS:  It's unknown
8    if TID would be better also.
9  BY MR. BARR:
10       Q.   Okay.  I'm going to hand you
11   what I'm going to mark as Exhibit 35.
12       It's Plaintiffs' 1094747.
13       (Document marked for
14   identification as Exhibit
15   Berkowitz-35.)
16  BY MR. BARR:
17       Q.   It's my understanding, based
18   upon the way these were produced, and you
19   can confirm this or not, that these are
20   your notes from your custodial file.  Do
21   you recognize these?
22       A.   I haven't looked at it in a
23   long time.  It looks like notes that I
24   took in speaking with Dr. Mueck to get

Protected - Subject to Further Protective Review

Page 358

1  some history on what they faced early on
2  with the design of the program.  So it
3  looks like something I might produce.
4        Q.   If this is produced as
5  coming from your custodial file, do you
6  have any reason to believe these are not
7  your notes?
8        A.   No, I wasn't saying that.
9  I'm just saying that I don't have memory
10 of it right off the top of the bat.  But
11 it's the kind of thing that I would
12 write, in the normal course of my work.
13       Q.   In the normal course of your
14 work, you kept notes like this?
15       A.   Not all the time.  But I
16 think this was -- I can't remember what
17 this was for.  But I think I was trying
18 to get an understanding of the program,
19 not having been there in the beginning
20 because the program actually started in
21 1999.  I just wanted to have some sense,
22 and I had an opportunity to talk with the
23 clinical pharmacologist who was part of
24 the original team.

Protected - Subject to Further Protective Review

Page 359

1        So it looks like, as I was
2  reading it -- it's kind of chopped up.
3  But it looks like I was taking notes and
4  trying to pull together what I heard.
5        Q.   Okay.  When you took notes,
6  you would be talking with him on the
7  phone and typing, or would you handwrite
8  them and then put -- transcribe them?
9        A.   I've done it different ways.
10 This one looks like I did it afterwards.
11 So I was doing it from memory, I think.
12       Q.   Okay.  So you believe this
13 is a conversation you had with Dr. Mueck
14 on October 15, 2014?
15       A.   I think I asked him some
16 questions and then wrote down the
17 responses.  I can't remember why I was
18 asking the questions, what I was
19 preparing for, or if I was just trying to
20 understand.  But anyway, that's what it
21 looks like to me.
22       Q.   Okay.  And the first
23 question you asked him was about
24 once-a-day versus twice a day; is that

Protected - Subject to Further Protective Review

Page 360

1  correct?
2        A.   Not necessarily.  Usually
3  when I do it this way, it's what first
4  comes to mind.  So I'll put it down.  It
5  doesn't necessarily mean that it was the
6  first question I asked him.
7        Q.   That's fair.
8        A.   That popped into my head,
9  and so I start a stream of consciousness,
10 writing.
11       Q.   Do you know why you would
12 have been asking Dr. Mueck about
13 once-a-day versus twice a day in October
14 of 2014?
15       A.   Well, it may have been in
16 preparation for the paper that we were
17 writing about once-a-day versus twice a
18 day, because there was a lot of
19 discussion.  There's misunderstanding as
20 far as I'm concerned about this
21 once-a-day, twice a day thing.  People
22 have this idea in their head, and some
23 scientists too.  They look at the
24 half-life, and then they make an

Page 361

```
1   assumption about how it works.  And
2   coagulation isn't like a hypertension
3   drug.  It doesn't work that way.  So
4   that's what this, I think, was related
5   to.
6           Q.    Okay.  So let's see what you
7   put in your notes.  Just curiosity, do
8   you always use hearts as your bullet
9   points, or do you think that's a problem
10  with the document just the way it -- mine
11  shows hearts.
12          A.    Mine has bullet points.
13                MR. HOROWITZ:  Mine has
14      bullet points.
15                MR. BARR:  It's just weird
16      how these things print things out.
17                MR. HOROWITZ:  That's not
18      the weirdest thing that happened
19      today.
20                MR. BARR:  We can talk about
21      that.
22  BY MR. BARR:
23          Q.    So let's talk about it.
24  Your first bullet point is, "Still
```

Page 362

```
1   unsolved in general."
2                Did I read that right?
3           A.    Yes.
4           Q.    So would that -- as you're
5   noting that, would that mean that
6   Dr. Mueck told you that the once-a-day
7   versus twice a day issue was still
8   unsolved in general?
9           A.    Not necessarily.  It might
10  be my interpretation after speaking with
11  him on top of others as to what that was.
12  So that's just a note to me.
13          Q.    Okay.  So the note to
14  yourself was the question of once-a-day
15  versus twice a day is still unsolved in
16  general as of October 15, 2014, right?
17          A.    Again, when I put down the
18  notes, there are things that we may be
19  speaking about that I may have collated
20  from others.  But it's not the full
21  finalized fact.  So that raises a
22  question to my mind to think about it.
23  It doesn't say it as a fact; it's still
24  unresolved.  It says that's a topic to
```

Page 363

```
1   me, at least when I do my bullet point
2   minutes.
3           Q.    So the statement "still
4   unsolved in general" is just a topic
5   point?
6           A.    Could be.  I don't know for
7   sure.  I don't know what I was thinking
8   at the time.
9                 But I will use that kind of
10  shorthand to myself, that it's a topic
11  that people talk about.
12          Q.    Okay.  Next bullet point is,
13  "Early antithrombotic" -- is that
14  supposed to be Factor XI?  What is that?
15  Is that Factor Xa inhibitor, that FXI?
16          A.    It looks like a Factor XI.
17  But I'm not sure.
18          Q.    Okay.  "Want to use AB."
19  What is AB?  Do you know?
20          A.    I don't know.  It could be
21  antibody.  I don't know.
22          Q.    "Versus long T1 half."  Do
23  you know what that is?
24          A.    That's half-life.
```

Page 364

```
1           Q.    Okay.  "Flat inhibition
2   curves.  DNA approach Isis that inhibit
3   synthesis."  Is that right?
4           A.    Could be.  Synth.  I'm not
5   sure.
6           Q.    Let me try this differently
7   rather than me struggling trying to read
8   this.
9                 What does that bullet point
10  mean to you?
11          A.    I can't make much out of it
12  at this particular moment.  I don't know
13  what my -- I don't know what I was
14  thinking.
15          Q.    Okay.  You can't interpret
16  your own notes here?
17          A.    Sometimes.  You should see
18  my handwriting.
19          Q.    Maybe that's why you typed
20  it.  It doesn't appear to be helping.
21          A.    Yeah, I could have -- I
22  could have typed from the handwriting and
23  then not -- not realized what it was
24  saying, I mean, not even recognize then.
```

Page 365

1   But put it down, as I said sort of from
2   my mind this is what I could remember.
3   Because I do that too.  So if I take hand
4   notes and then try to type it, it may not
5   make sense.  And I put it back on here in
6   case it will come to my memory.
7        Q.   Gotcha.
8             The next bullet point is,
9   "At the time we developing riva" -- and
10  that would be Xarelto, right?
11       A.   Yes.
12       Q.   -- "people thought about
13  warfarin and fact that it produced
14  constant inhibition as a vitamin K
15  synthesis inhibitor"; is that correct?
16       A.   Yes.
17       Q.   All right.  We got one
18  right.
19            "In theory, we worked on
20  that too with twice-a-day and
21  extended-release," correct?
22       A.   Right.  That's what it says.
23       Q.   "Phase II-A happened to
24  include a once-a-day 30-milligram and we

Page 367

1   that once-a-day fine then and go to Phase
2   III and confirm."
3             Did I read that right?
4        A.   I think so.
5        Q.   "If you just" -- "if you
6   just a PK guy, say half-life of 9 to
7   11 hours, then you should use
8   twice-a-day, but we have done clinical
9   work and then clinical confirmation."
10            Did I read that one right?
11       A.   Yeah.  I think I understand
12  what I was writing here.
13       Q.   Okay.  Help me out.
14       A.   Well, it was basically the
15  concept we were just speaking about.  So
16  the half-life of rivaroxaban for a young
17  healthy volunteer is 5 to 9 hours.  The
18  half-life in young elderly patients is 9
19  to 13 hours.  It usually gets said that
20  the half-life is something like 5 to
21  9 hours or something.  But it varies a
22  bit.
23            The problem is that the
24  half-life in the circulation has no -- no

Page 366

1   saw that clinical data gave no hint of
2   big different" -- "big difference" --
3        A.   I think so.  Yeah, I'm not
4   sure that -- I'm not sure what that
5   means, but it sounds like it could mean
6   from the start.  Big difference at the
7   start.  I don't know.
8        Q.   "From poor PK" -- is that
9   thinking?
10       A.   Yeah.  It could be.  It
11  looks like an abbreviation of thinking.
12       Q.   "From poor" -- "from poor PK
13  thinking you ask self if" -- "if optimal,
14  but we test in previous and" -- what --
15  what are you using RX for there, do you
16  know?
17       A.   It could be treatment.  It
18  might be prevention and treatment
19  setting.
20       Q.   Okay.  That's fair.  Okay.
21  That's probably it.
22            "But we test in prevention
23  and treatment setting a once versus
24  twice-a-day and conclude on clinical data

Page 368

1   important meaning in coagulation, because
2   it's the pharmacodynamic effect that
3   makes the difference.
4             What happened was, we
5   initially started testing the drug as
6   twice-a-day, because the half-life might
7   make you think that.  But it turned out
8   that when we did more sophisticated
9   coagulation tests, or more sophisticated
10  than a PT or a PTT, but did like thrombin
11  generation, it turns out that thrombin is
12  inhibited beyond 24 hours.  Now, that
13  wasn't realized at first in the program.
14  So you'll see the first dosing studies
15  were BID.
16            When it was realized that OD
17  might be possible, we did another study.
18  We added on a study.  It actually
19  lengthened the program.  It cost us about
20  a year.  But we added on a once-a-day arm
21  in the orthopedic and tested it, and it
22  looked clinically good in Phase II.
23  That's -- that's how it went.  So the
24  important lesson from it to me, although

Page 369

1   it's miss -- mistaken a lot even today,
2   half-life for an anticoagulant isn't the
3   major important thing.  It's the
4   pharmacodynamic effect.
5        Q.   Okay.  So when it comes to
6   anticoagulation, what you're really
7   looking at is things like the effect on
8   PT?
9        A.   Well, and -- and the sine
10  qua non, the most important thing, the
11  events, clinical events.  You suppress
12  those events.  That's an antithrombotic.
13  That's the difference between an
14  anticoagulant that affects a PT, it takes
15  a lab test and an antithrombotic.  It
16  really prevents clots, and that's what we
17  want to do for patients.
18       Q.   Do you remember a time when
19  both Janssen and Bayer were considering
20  conducting a ROCKET2 study?
21       A.   Yes.
22       Q.   And I've seen a lot of
23  documents on this, and -- and multiple
24  different variations.  There appeared to

Page 371

1        setting -- setting out.
2   BY MR. BARR:
3        Q.   Now, did you work -- what
4   input did you have on whether or not
5   this -- either company went forward on a
6   ROCKET2?
7        A.   Well, as part of the team I
8   weigh in just like everyone else.  We --
9   we are very, as I mentioned to you,
10  matrix-oriented and function-oriented.
11  So we value the opinions of clinical
12  development.  Of course, our
13  statisticians play a role.  Our
14  regulatory strategists play a role.
15  Medical affairs, commercial and other
16  functions, project management,
17  operations, they all, as we're working on
18  it, they can -- can weigh in as to what
19  their thoughts are.
20       Q.   You agree --
21       A.   I'm a piece of that.  Just
22  to -- just to answer your question, I
23  mean, I'm part of that group.
24       Q.   And you know ROCKET2 was

Page 370

1   be many different thoughts on what to do.
2   I've read some that wanted to just test
3   once-a-day versus twice-a-day.  I've seen
4   some that wanted it to be a comparison to
5   other NOACs.
6        And I've seen some that
7   wanted it to be just a lower dose test,
8   trial.
9        Were all of those different
10  aspects of ROCKET2 considered by the
11  company?
12       MR. HOROWITZ:  Object to the
13       form.
14       THE WITNESS:  Well, the -- a
15       number -- I would agree I don't
16       remember if all of those and any
17       permutations that you might have
18       missed were included.  But there
19       were thoughts given as to -- as to
20       that situation, as to whether
21       another trial should be done, how
22       it should be done and could it be
23       done.  Would it -- would it
24       accomplish the goal that you're

Page 372

1   ultimately not done, right, no form of
2   it?
3        A.   Ultimately a -- a second
4   ROCKET study was not performed in SPAF,
5   that's correct.
6        Q.   Yet it was not conducted,
7   primarily because it turned out there was
8   no risk to the product in the market,
9   right?
10       A.   No, that's not correct.  I
11  think that's not the case.  But what I
12  think ultimately turned the tide on that
13  was the edoxaban data, the -- the fourth,
14  or third Xa inhibitor, when they did look
15  at their BID in lower doses, and there,
16  there was loss of efficacy.  And this is
17  our greatest concern and the FDA's
18  greatest concern.  And so at that point
19  then it became clear to us that that's
20  probably not the best step.
21       The other thing that
22  happened is we are doing a very large
23  program in lifecycle to look at other
24  indications that have unmet need.  And

Page 373

1   obviously resources can only go so far.
2       Q.   Now, you were aware that
3   ROCKET2 was primarily being designed to
4   defend the drug against competition,
5   right?
6           MR. HOROWITZ:  Object to the
7       form.
8           THE WITNESS:  What I'm aware
9       of is that there were -- after the
10      advisory committee and -- although
11      the drug was ultimately approved,
12      we do listen to what the people
13      say, the clinicians say, what the
14      FDA said.  And -- and the question
15      was raised by the co-chairs, could
16      something else be done to give
17      confidence.
18          Of course, as time goes on,
19      and the drug is given, then -- and
20      used in the indication, and we see
21      that there -- the issues were not
22      as great as we might have worried
23      about.  But we always like to have
24      as much information as we can.

Page 374

1       It's a matter of whether you can
2       accomplish it.
3   BY MR. BARR:
4       Q.   Well, you certainly could
5   have accomplished a ROCKET2, correct?
6       A.   Well, we're doing a -- a
7   trial that's similar for patients that
8   have a condition called embolic stroke of
9   undetermined source.  So while it's not
10  exactly the AF population, it's in the
11  same area and we'll get some more
12  information in rivaroxaban in that study.
13  But it's not a SPAF study.  But it's
14  another study.  Many other -- well, there
15  aren't that many others.  But the other
16  Xa inhibitors are not looking at all the
17  indications we are.
18      Q.   So if that study were to
19  show that a lower dose of rivaroxaban
20  would be as effective but safer, is it
21  your testimony that the company would go
22  to the FDA and recommend that the label
23  be changed and indicated for a lower
24  dose?

Page 375

1           MR. HOROWITZ:  Object to the
2       form.
3           THE WITNESS:  Well, you
4       can't do that because the
5       population is not the same, so
6       it's not -- it's not exactly
7       regulated, as I said.
8           But it's another area close
9       to atrial fibrillation of unmet
10      need, where the event rates are in
11      the order of 4-1/2 percent per
12      year, where we'll get some sense
13      about handling these clots that
14      develop in the heart.
15          That won't change the SPAF
16      label, but it will take care of
17      the patients that have things
18      related.
19  BY MR. BARR:
20      Q.   So to -- to answer the
21  question specifically related to SPAF,
22  whether or not either a lower dose or a
23  twice-a-day dose would be as effective
24  and more safe, the only way that that

Page 376

1   question is going to be answered is if
2   Bayer or Janssen conduct a clinical trial
3   specifically designed to answer that
4   question, right?
5           MR. HOROWITZ:  Object to the
6       form.
7           THE WITNESS:  For the
8       most -- most definitive answer on
9       that question, a clinical trial
10      would need to be performed.  There
11      may be other ways to look at it.
12      But I would agree that that's the
13      most definitive as a clinical
14      trialist.
15  BY MR. BARR:
16      Q.   What other ways could there
17  be to look at it?
18      A.   Well, as -- in -- in some
19  practices, doctor practices and some
20  countries, sometimes the dose -- a
21  different dose is given.
22          For example, 15 milligrams
23  could be given when the -- the patient,
24  by label, should get 20.  Or we know for

Protected - Subject to Further Protective Review

Page 377

```
1   a fact that with other drugs, like
2   apixaban, lower doses are given despite
3   the label.  In other words, it's not on
4   label.  These are called real-world
5   evidence studies.  You may have seen some
6   of these.  And these might pick that up
7   in a registry or looking at a -- a
8   medical database and then looking for if
9   they had the right dose or not.  That
10  might be a way to look.
11          None of these are the
12  clinical trials, so it's not as strong.
13  And I would agree, it's unlikely that a
14  label would be changed on that, because
15  the FDA has certain requirements for how
16  they make adjustments.
17      Q.   Is there any activity
18  ongoing where the company is doing these
19  registry reviews or database reviews,
20  trying to figure out if people using the
21  drug off-label at a lower dose are
22  getting the same benefit and less risk?
23          MR. HOROWITZ:  Object to the
24      form.
```

Page 378

```
1           THE WITNESS:  This I'm not
2       the best person to answer.  These
3       would be run in the medical
4       affairs department.  And I don't
5       know exactly what they're -- a lot
6       of -- I know a lot of studies are
7       being done, but I don't know
8       exactly.
9   BY MR. BARR:
10      Q.   But you do know there is no
11  planned clinical trial to answer this
12  question?
13      A.   That's my understanding.
14      Q.   There was a discussion to do
15  one with ROCKET2 and ultimately the
16  company decided not to go forward with
17  that?
18          MR. HOROWITZ:  Object to the
19      form.  Asked and answered.
20          THE WITNESS:  Well, there
21      was a discussion on it.  It was a
22      long discussion, as you saw.  It
23      included externals, including the
24      co-chairs, and in the end there
```

Page 379

```
1   was agreement not to proceed.
2   BY MR. BARR:
3       Q.   It also included Dr. Califf,
4   right?
5       A.   It did.
6       Q.   Dr. Califf, fair to say,
7   wanted the company to conduct this study,
8   correct?
9       A.   Initially he did.  But then
10  there was not more requests once we saw
11  other data out there.
12      Q.   And that other data is
13  ENGAGE?
14      A.   Partly ENGAGE.  And then, of
15  course, the doctors having rivaroxaban in
16  their hands and using it.
17      Q.   I'm going to show you what
18  I'm going to mark as Exhibit 36.
19          MR. BARR:  We'll do this and
20      take a break and come back for the
21      last.  Why don't we go until 5:30.
22          MR. HOROWITZ:  Why don't we
23      chat on the break and see what
24      makes sense?
```

Page 380

```
1           MR. BARR:  So this is
2       Plaintiffs' 389615.
3           (Document marked for
4       identification as Exhibit
5       Berkowitz-36.)
6           MR. BARR:  And I'll go ahead
7       and hand you Exhibit 37, which is
8       389617.
9           (Document marked for
10      identification as Exhibit
11      Berkowitz-37.)
12  BY MR. BARR:
13      Q.   You see this is an e-mail
14  chain.  You're on the top one.  And
15  you're writing to Hardi -- is that Mundl?
16      A.   Correct.
17      Q.   And Edmond Chen at Bayer,
18  right?
19      A.   Yes.
20      Q.   And this is January 13,
21  2014, right?
22      A.   Yes.
23      Q.   And it's Xarelto life care
24  management, documents for our call,
```

Page 381

```
 1   right?
 2        A.    Yeah.
 3        Q.    Do you recall now in 2016
 4   what this call -- is that Mr. or
 5   Mrs. Mundl?
 6        A.    Dr. Mundl.
 7        Q.    Dr. Mundl is -- and
 8   Dr. Chen?
 9        A.    Yes.
10        Q.    Dr. Chen, what it -- what it
11   would have been about?
12        A.    I do not.  It says GDC.
13   That's where it is from.  JFC.  But this
14   isn't ringing a bell.
15        Q.    Okay.  You are forwarding an
16   e-mail you got from Hannes Sommer at
17   McKinsey.
18             Do you see that?
19        A.    Yes.
20        Q.    Who is that?
21        A.    I don't know that person.
22   It looks like it's an McKinsey
23   consultancy.  McKinsey was involved in
24   our discussions about lifecycle
```

Page 382

```
 1   management.  When I say that, I mean
 2   trials and other indications of unmet
 3   need going forward.  And they were
 4   involved in helping the company work
 5   through which ones we might do.
 6        Q.    Just give me a better
 7   understanding of what kind of company
 8   McKinsey is.  I heard you say consultant.
 9   But do they have a consultant specialty
10   as it comes -- when it comes to
11   pharmaceutical companies?
12        A.    I'm not the expert in this.
13   I don't know.  There are different
14   consulting groups.  I know that they're
15   one.  They're supposed to be very large.
16   But I don't really know anything about
17   McKinsey other than what I've told you.
18        Q.    Okay.  So you had nothing to
19   do with the bringing in of McKinsey to
20   help advise the company on the lifecycle
21   management for Xarelto?
22        A.    No.
23        Q.    Did you -- did you listen to
24   the advice they gave you?
```

Page 383

```
 1        A.    I don't know.  I mean, I was
 2   brought in as part of a group, I guess.
 3   I'm not even sure what these are about.
 4   If I was just informing my new GCLs, this
 5   is 2014, so maybe it was just to inform
 6   them of ways that the company was
 7   thinking of going forward.  But that's
 8   all I remember.
 9        Q.    Okay.
10        A.    We worked on the -- I do
11   remember that we worked on the lifecycle
12   strategy for a year, and we had different
13   work streams.  This might have been in a
14   work stream different from mine.  I don't
15   know.
16        Q.    But what you attached to
17   your e-mail to Dr. Mundl and Dr. Chen is
18   this next steps PowerPoint slide.
19             Do you see that?
20        A.    Yes, I see it.
21        Q.    This is Exhibit 37.
22   Plaintiffs' 389617.  "Preparation for the
23   JSC meeting, next steps."
24             Do you see that?
```

Page 384

```
 1        A.    Yes.
 2        Q.    Remind everyone what JSC is.
 3        A.    JSC is joint steering
 4   committee.  So that's a higher management
 5   level above me that manages the alliance
 6   between the companies.
 7        Q.    Okay.  It's a joint
 8   committee, members from both companies?
 9        A.    Yes.
10        Q.    You weren't part of that
11   committee?
12        A.    I don't know at this time.
13   During the time, I became the -- my boss
14   was leading the GDC from our side.  And I
15   supported them.  And then at a point he
16   was on the JSC, and I was leading the
17   clinical part.  And in '14 I'm not --
18   somewhere in that time there was a
19   transition.  The bottom line is I'm on
20   the GDC, and I attend the JSC now.  I
21   don't know if I did then.
22        Q.    Okay.  So the fifth point
23   down here is ROCKET2.
24             Do you see that?
```

Page 385

1          A.   I do.
2          Q.   It says -- in the column
3    that's labeled "achieved" during
4    January 10th, GDC.  Do you see that at
5    the top, the label?
6          A.   Yes, I do.  Yes, I do.
7          Q.   It says, "Alignment on the
8    specific strategic role of the study as a
9    defense measure," right?
10         A.   Right.
11         Q.   What was ROCKET2 defending
12   against?
13              MR. HOROWITZ:  Form.
14              THE WITNESS:  I'm not sure
15         what this exactly means.  I think
16         the important thing is that
17         ROCKET2 was still being considered
18         in '14, that among our lifecycle
19         program, as I had mentioned to
20         you, we were still thinking about
21         if there was a way that it would
22         be valuable.
23              But what exactly that
24         meant -- this was, as it said,

Page 387

1              MR. HOROWITZ:  Objection to
2         form.  Foundation.
3              THE WITNESS:  No.  I'm
4         sorry.  You misunderstand it.
5              It says -- I think what they
6         are talking about, they're
7         preparing for the JSC meeting.
8         The GDC meeting is held before the
9         JSC meeting.  And apparently the
10        teams aligned on whatever role
11        they were talking about.
12   BY MR. BARR:
13        Q.   Let's try this again.  Look
14   at Exhibit 36.
15        A.   36.
16        Q.   The one right before it.
17             MR. HOROWITZ:  The e-mail.
18   BY MR. BARR:
19        Q.   Your e-mail.  What's the
20   date of that?
21        A.   January 13, 2014.
22        Q.   Okay.  Now, let's look at
23   Exhibit 37.
24        A.   It says -- yes.  Okay.

Page 386

1              either it came from the consulting
2              group or on the commercial side.
3              It's not a development slide.
4    BY MR. BARR:
5         Q.   Okay.  But this is
6    indicating that ROCKET2 is being
7    developed as a defense measure, correct?
8              MR. HOROWITZ:  Objection.
9         Form.  Foundation.
10             THE WITNESS:  I don't think
11        that's correct.  It's saying
12        alignment on specific strategic
13        role of the study.  And I'm not
14        sure exactly what that means.  If
15        it means do it as a defense
16        measure.  Don't do it.  I don't
17        quite know what that means.
18   BY MR. BARR:
19        Q.   It says that was achieved
20   during the January 10th GDC, right?
21             MR. HOROWITZ:  Objection to
22        form.  Foundation.
23   BY MR. BARR:
24        Q.   This is done, right?

Page 388

1         Q.   The date of the GDC meeting
2    is January 10th, right?
3         A.   No.
4         Q.   That's what it says.
5    Achieved during 10th January GDC, right?
6              MR. HOROWITZ:  Where are you
7         looking?
8    BY MR. BARR:
9         Q.   It's the title of the
10   column.
11        A.   Okay.  Yes.  So I guess it
12   was January 10th.  Okay.
13        Q.   So it's saying during the
14   GDC meeting of January 10th, we achieved
15   alignment on this specific strategic role
16   of the study as a defense measure, right?
17             MR. HOROWITZ:  Objection to
18        form.  Foundation.  Asked and
19        answered.
20             THE WITNESS:  I'm not
21        certain what this is.  I read
22        where it says achieved during 10th
23        January GDC.  I don't know what it
24        means to say "alignment on the

Page 389

1    specific strategic role."  I don't
2    know if it truly was an alignment,
3    if that was a goal to have
4    alignment or what.  It could be;
5    it couldn't be.  I don't know.
6  BY MR. BARR:
7        Q.    But you forward this three
8  days after January 10th, right?
9        A.    Well, the 13th is three days
10  after.  But I'm not understanding the
11  point.
12        Q.    The next column is,
13  "Outstanding questions and next steps
14  before January 17th," right?
15        A.    Yes.  And next steps.
16        Q.    For ROCKET2, it says, "List
17  other potential defense options besides
18  previously suggested Phase III study,"
19  right?
20              MR. HOROWITZ:  Form.
21  Foundation.
22              THE WITNESS:  Yes.
23  BY MR. BARR:
24        Q.    So it's being considered as

Page 391

1  mean that I know everything about it on
2  the paper.  This is informational.  You
3  know, this is how business occurs now.
4  We do it globally.  We work with e-mails
5  that are not perfect.  We're not all
6  sitting next to each other.
7              So some assumptions are
8  being made by a few words on the page
9  that I don't think are accurate.
10        Q.    Okay.  Well, when you got
11  this, did you read it and send it back to
12  anybody and say, "What do you mean by
13  ROCKET as a defense measure?"
14        A.    I can't remember.
15        Q.    "I don't understand what
16  that means."
17        A.    I can't remember what I did
18  when I got the document.  That's a couple
19  of years ago.
20        Q.    Okay.
21              MR. BARR:  It's probably a
22  good time for a break.
23              MR. HOROWITZ:  Sounds good.
24              THE VIDEOGRAPHER:  The time

Page 390

1  a defense option, and now we need to find
2  some different ones other than ROCKET2,
3  right?
4              MR. HOROWITZ:  Same
5    objections.
6              THE WITNESS:  All I know is
7    you're making an interpretation of
8    what a defense measure is or
9    defense options.  I don't know
10    what that means.  If you want to
11    know about that, then you need to
12    talk with the commercial people or
13    McKinsey who wrote it, because to
14    me as a clinical developer it's
15    not making any sense.
16  BY MR. BARR:
17        Q.    Well, see, I wasn't there.
18  You were there.
19        A.    No.
20        Q.    And you forward --
21        A.    I was at the GDC.  I don't
22  know if I was at JSC.  The fact that I
23  forwarded it to my people to let them
24  know about different programs doesn't

Page 392

1    is 4:17 p.m.  We are going off the
2    record.
3            (Short break.)
4            THE VIDEOGRAPHER:  The time
5    is 4:40 p.m.  We are back on the
6    record.
7  BY MR. BARR:
8        Q.    All right, Dr. Berkowitz,
9  welcome back.
10            I'm going to now move to
11  Exhibit 38, which is Plaintiffs' 88763.
12            (Document marked for
13    identification as Exhibit
14    Berkowitz-38.)
15            MR. BARR:  And let's go
16    ahead and hand you Exhibit 39,
17    which is 88764.
18            (Document marked for
19    identification as Exhibit
20    Berkowitz-39.)
21  BY MR. BARR:
22        Q.    I'm not really asking you
23  anything substantive about the e-mail.  I
24  really just want to confirm that you got

Page 393

1  it.

2          You see that this is an

3  e-mail from Andrea Derix to you on

4  November 25, 2013, correct?

5      A.   Yes.

6      Q.   Okay.  And she's attaching

7  what looks like a lifecycle proposals

8  draft PowerPoint.  Do you see that?

9      A.   Yes.

10     Q.   And then she asked you to

11  share this with Olivia Cavlan from the

12  McKinsey team.  Do you see that?

13     A.   I do.

14     Q.   And I said I wasn't going to

15  ask anything substantive, so it turns out

16  I'm not honest with you.

17         Who is Olivia Cavlan?

18     A.   I don't remember the name or

19  the person.  It says it's from McKinsey

20  team, so...

21         I'm not sure why she's

22  asking me to forward it either, but... I

23  don't know.

24     Q.   Do you know if you did that?

Page 394

1      A.   I -- I don't know.  I assume

2  I did, but I -- I don't -- I don't know.

3      Q.   Okay.  Does Andrea -- I

4  mean -- I'm going to strike that.

5          So let's go to the

6  PowerPoint slide which is Exhibit 39.

7  This is Plaintiffs' 88764.  If you want

8  to take a minute to familiarize yourself

9  with it, that's fine.

10     A.   Yeah.

11         MR. HOROWITZ:  Thanks,

12  Brian.

13         THE WITNESS:  Okay.  Yeah.

14  BY MR. BARR:

15     Q.   I want you to go, it's,

16  let's see -- one, two, three, four --

17  five pages in.

18         MR. HOROWITZ:  Ours are

19  numbered.  Page 5.

20         MR. BARR:  Mine -- mine

21  doesn't have one, so I don't know.

22         MR. HOROWITZ:  Okay.  It's

23  Roger.

24  BY MR. BARR:

Page 395

1      Q.   And it says, *ROCKET 2.0

2  after ENGAGE.*

3          Do you see that?

4      A.   Yeah, I do.  There's a --

5  some of the pages don't have it.

6      Q.   Okay.

7      A.   So yeah.

8      Q.   What is -- what is ENGAGE?

9      A.   I don't know.  I'm assuming.

10  It was talking about edoxaban Phase III

11  AF trial.

12     Q.   Okay.  So you believe --

13  well, your understanding, ENGAGE is a

14  trial with edoxaban specifically looking

15  at an Afib population, correct?

16     A.   Edoxaban had a trial called

17  ENGAGE-AF.  And I'm just making that

18  assumption because at the top it says

19  *apixaban* and it says *VTE-P dose for

20  edoxaban.*  It looks like they were

21  talking about comparisons.

22     Q.   Okay.  And it says, *A lower

23  dose SPAF study to respond to a potential

24  competitive threat,* right?

Page 396

1      A.   Right.

2      Q.   *Head-to-head study apixaban

3  was discussed in the team.  Reactive

4  only,* right?

5      A.   Yes.

6      Q.   So one of the things being

7  talked about is a lower dose Afib study

8  to respond to a competitive threat,

9  right?

10     A.   I think it's about the

11  thought from the commercial side that the

12  BMS Pfizer group was going to do a

13  head-to-head study.  And so it was like a

14  counter-study.  I don't remember exactly.

15  It's not -- it wasn't a -- at least at

16  the time it wasn't in the clinical

17  development space.

18     Q.   But you're not thinking

19  about doing the study for safety or

20  efficacy reasons.  You're thinking about

21  doing this study because there is a

22  perceived competitor threat because one

23  of your competitors may be doing a study

24  that's a head-to-head study, right?

Page 397

```
 1            MR. HOROWITZ:  Objection to
 2      form.  Foundation.
 3            THE WITNESS:  I can't say
 4      exactly from the slides what all
 5      the reasons were to do it or
 6      whether there was one reason to do
 7      it.  I really don't know.  I'm
 8      just reading it off as you are.
 9  BY MR. BARR:
10      Q.    Okay.  But you were involved
11  in those discussions?
12      A.    I was at some of the
13  meetings, but I just don't remember back
14  then.  It's three years ago.  I don't
15  remember what all the discussions are.
16  We don't -- I can just say in general we
17  don't just do trials for a competitive
18  threat.  That's not to say that a
19  commercial member might not raise it for
20  that, but there's a lot more that goes
21  into doing a trial than just to do it for
22  a competitive threat.
23      Q.    Okay.  It says, "The
24  proposal to compare 20 to 15 milligrams
```

Page 399

```
 1  important.
 2            So the concern there would
 3  be to go to a low dose, a VTE prophylaxis
 4  dose, like 10 milligrams, that probably
 5  would be way too low.  And efficacy is
 6  the key.
 7            It would be safe, I guess,
 8  because it's low.  But if you don't give
 9  enough anticoagulant, then, of course,
10  there would not be as much bleeding, but
11  you don't get the efficacy.
12      Q.    I understand there's a
13  tradeoff.
14      A.    That's the problem.  But
15  that's the best that I can remember from
16  it.
17      Q.    Would it be fair to say that
18  low dose edoxaban was no longer perceived
19  as a threat after the ENGAGE study?
20            MR. HOROWITZ:  Object to the
21      form.
22            THE WITNESS:  No.  I don't
23      think edoxaban, you know, being
24      the next one on the market, I
```

Page 398

```
 1  with a lower dose 10-milligram VTE-P dose
 2  will no longer be pursued by the team
 3  after the ENGAGE results showing clear
 4  superiority of the VTE-T dose over the
 5  VTE-P dose for edoxaban in SPAF."
 6            Do you see that?
 7      A.    Yes.
 8      Q.    And I'm trying to understand
 9  how the results of the trial on a
10  different drug would lead the company to
11  decide we don't need to study low dose of
12  our drug?
13      A.    Well, I can't answer that
14  completely because I don't know all the
15  thinking that was going on.  But the
16  point is that Xa inhibitors as a class
17  are looking at some of the same
18  indications.  And we know that the
19  dose -- the planned doses and the doses
20  used by edoxaban in the trial showed that
21  the lower dose was not effective.  And,
22  again, while bleeding is important and it
23  concerns us, it's efficacy and patients
24  taking their medicines that's more
```

Page 400

```
 1      don't think that's so much a
 2      threat.  The big thing is what
 3      science -- what can be learned by
 4      looking across to that trial?
 5      That's the key.  And that's where
 6      there was concern about whether
 7      you would lose efficacy.
 8  BY MR. BARR:
 9      Q.    Okay.  Then it says, "A
10  second proposal with a lower 15
11  milligram/10 milligram MRI."
12            Do you know what that MRI
13  means?
14      A.    Yeah.  As you can see, it
15  was 2015 we tested -- we considered two
16  doses, so it's renal insufficiency.  With
17  15, we did renal failure, as I've
18  mentioned, moderate renal failure.  And
19  that was a second dose, if you will.
20      Q.    So we've ruled out --
21      A.    Same thing here, I think.
22  Sorry.
23      Q.    We've ruled out the proposal
24  to compare the 20/15 milligram and the
```

Page 401

1  lower dose, and now we're thinking about
2  a second proposal with a lower
3  15-milligram dose in a low to moderate
4  SPAF risk population versus warfarin,
5  right?  That's what J&J is proposing?
6          MR. HOROWITZ:  Object to the
7      form.
8          THE WITNESS:  I'm not
9      exactly sure where we are in the
10     makeup of this deck.  That is to
11     say, is it final?  Is it draft?
12     Were decisions made?  I don't
13     know.
14         I just see what you see,
15     that there's mention of a second
16     proposal by J&J with this lower
17     dose.  And that's as much as I
18     could say.
19 BY MR. BARR:
20     Q.    And you know neither one of
21 these -- neither one of these were ever
22 conducted, right?
23     A.    Well, that's true.  But I
24 mean, we're talking about what the

Page 402

1  possibilities might have been, right.
2      Q.    And once the ENGAGE results
3  came out, it was decided that we don't
4  need to do these studies, correct?
5      A.    Well, it was decided that
6  the likelihood of success of a study like
7  that was not high.
8          MR. BARR:  Let's move to
9      Exhibit 40.  This is Plaintiffs'
10     387807.
11         (Document marked for
12     identification as Exhibit
13     Berkowitz-40.)
14 BY MR. BARR:
15     Q.    You see that these are
16 minutes of the TASC-CAR.
17         Do you see that?
18     A.    Yes.
19     Q.    And can you explain what
20 that means?
21     A.    Well, yeah, I actually can.
22 It's therapeutic area committee.  I can't
23 remember what the "S" is.  It's changed
24 in its function over the last several

Page 403

1  years.  At this time, I believe it was
2  more on the -- just explaining from a
3  scientific basis what might be going on.
4  But that's as much as I can remember.
5  I'm not a regular member to TASC.  But
6  apparently I was called to that meeting.
7      Q.    So this was a meeting that
8  took place November 27, 2013, right?
9      A.    Yes.
10     Q.    And you are listed as a
11 participant in that meeting?
12     A.    Yes.
13     Q.    Do you recall this meeting?
14     A.    I don't.
15     Q.    It was in Berlin?
16     A.    But I may have taken it by
17 telecon, as I'm in the U.S.
18         MR. HOROWITZ:  Let him flip
19     through for a second.
20         THE WITNESS:  Okay.  Yeah.
21 BY MR. BARR:
22     Q.    So there's a -- the next box
23 on Page 1 is summary of action items from
24 that meeting.

Page 404

1          Do you see that?
2      A.    Yeah.
3      Q.    And the second action item
4  is Xarelto life care management, right?
5          MR. HOROWITZ:  Do you mean
6      lifecycle management?
7          MR. BARR:  Lifecycle
8      management.  Sorry.
9          THE WITNESS:  Yeah.  I'm
10     sorry.  I thought I saw it and
11     then I --
12 BY MR. BARR:
13     Q.    The second box.  Right here.
14     A.    LCM study proposals?  Oh,
15 down here.  Oh, you're over here.  Okay.
16 Yes, I see.
17     Q.    And it says, "LCM study
18 proposals have been prioritized."  What
19 was ESUS again?  Help me.  Do you
20 remember?
21     A.    Embolic stroke of
22 undetermined source.
23     Q.    Okay.  So that's the first
24 priority.  Second priority is VTE

Page 405

1  prevention, hip and major surgery.  Third
2  priority is arterial, ACS dual.  Fourth
3  priority is arterial PAD/CABG, right?
4       A.   Yes.
5       Q.   And it says "ROCKET 2.0 has
6  been declined," right?
7       A.   Yes.
8       Q.   Let's go into Page 3.  It
9  has, you see, a Number 3.  It's
10  talking --
11       A.   Page 3.
12       Q.   Page 3 of 4.
13       A.   I have Page 2 of 5.  3 of 5
14  says -- looks like that.  Then 4 of 5
15  looks like that.
16       Q.   Let me see yours.
17            MR. BARR:  I don't know how
18            these things have gotten mixed up.
19            It's probably just the conversion
20            of the native to PDF.
21            MR. HOROWITZ:  You just
22            destroyed the exhibit, Brian.
23            MR. BARR:  It's okay.  We
24            can revise it.

Page 407

1  be highly appreciated, but we are not
2  going to run ROCKET 2.0 with a reduced
3  dose of 15 milligrams.
4            "In a similar sense like
5  ROCKET 2.0, the group agreed that ESUS
6  with 10 milligrams is off the table due
7  to the learnings from the ENGAGE-AF
8  trial.  The lower dose is not viable as a
9  primary dose.
10            "Notwithstanding, it goes
11  without saying that SPAF/stroke
12  prevention is the key area that needs
13  support."
14       Do you see that?
15       A.   Yes.
16       Q.   Now, if you remember, help
17  me with this, because this -- this
18  paragraph talks about -- makes a very
19  blanket statement that we're not going to
20  run ROCKET 2.0, right?
21            MR. HOROWITZ:  Objection to
22            form.
23            THE WITNESS:  It says we're
24            not going to run ROCKET 2.0,

Page 406

1  BY MR. BARR:
2       Q.   It's your 4 of 5, my 3 of 5.
3  For the purposes of the record, we are
4  looking at Bates 00287769.
5            MR. HOROWITZ:  We can put it
6            back together.  We can rebuild it.
7  BY MR. BARR:
8       Q.   I'm looking at -- do you see
9  the column that's "LCM Xarelto," right?
10       A.   Yeah.  Mm-hmm.
11       Q.   I'm starting with the
12  paragraph that starts, "The TASC
13  members."
14       Do you see that?
15       A.   Yes.  Mm-hmm.
16       Q.   It says, "The TASC members
17  intensively discussed the strategic value
18  of individual studies and clearly agreed
19  to strengthen our leadership position in
20  venous indications firstly, and secondly
21  to build on a leadership position in the
22  arterial space.
23            "Of course everything that
24  supports Bayer's position in SPAF would

Page 408

1       right.
2  BY MR. BARR:
3       Q.   Right.  And then right after
4  that, it says, "In a similar sense like
5  ROCKET 2.0, the group agreed that ESUS
6  with 10 milligrams is off the table due
7  to the learnings from the ENGAGE-AF
8  trial," right?
9       A.   Yeah.
10       Q.   The learnings from ENGAGE-AF
11  trial, were those, at least according to
12  this document, only used to rule out the
13  10 milligrams with ESUS or was that also
14  part of the decision not to run ROCKET
15  2.0?
16       A.   I -- I think it's written in
17  a funny way, but I -- because it's saying
18  in a similar sense.  But I believe the
19  ENGAGE-AF and that data about edoxaban
20  using a lower dose affected -- we didn't
21  have data on efficacy up until that point
22  with the lower dose.  We just had the
23  apixaban data.  We had our data.  So that
24  affected the thinking of a lot of people

Page 409

1    across both of those indications.
2        Q.   So, again, we're making a
3    decision on a study, whether or not Bayer
4    is going to conduct a study upon the
5    results from a study of a different drug,
6    right?
7        A.   Well, I -- I understand what
8    you're saying, but you're not using your
9    drug, but we're in our class and while
10   they are definitely not the same, it was
11   another piece of data.  When we do
12   clinical trials and when they run
13   together like they were doing with this
14   program, and they still do today, we look
15   at the other drug for some hints.  We can
16   make mistakes by doing that because it is
17   cross-study comparisons.  You shouldn't
18   do that.
19            But with the decrease in
20   efficacy, that was the primary piece.  So
21   you lower the dose, then you could have
22   less efficacy.
23        Q.   But you would agree that you
24   cannot make a determination as to whether

Page 411

1        to setup the trial, what's your
2        rationale for going forward.  We
3        don't have any other for
4        rivaroxaban to add, so there's
5        nothing more that can be said.
6            If another trial is ongoing
7        in your space, then you try to
8        learn from that.
9            MR. BARR:  Let me now show
10       you Exhibit 41, and this is
11       Plaintiffs' 91258.
12           (Document marked for
13           identification as Exhibit
14           Berkowitz-41.)
15   BY MR. BARR:
16       Q.   Do you want to take a moment
17   with the document?
18       A.   Thank you.
19       Q.   More than happy to let you
20   do that.
21       A.   It would be good to view it.
22   Okay.
23       Q.   You see this is a PowerPoint
24   titled, "Xarelto LCM New Wave Selected

Page 410

1    or not lower dose Xarelto would be as
2    effective and safer based upon the
3    results of the ENGAGE trial, right?
4            MR. HOROWITZ:  Object to the
5        form.
6            THE WITNESS:  I -- you know,
7        we don't have any other data to go
8        on, so you go with what data you
9        have, as you're new in the field,
10       you know, it's like we have
11       decades of work, then we have to
12       try to extrapolate from what we
13       have.
14   BY MR. BARR:
15       Q.   Okay.  But that is a
16   conclusion you cannot extrapolate, right?
17   The only way you can draw that conclusion
18   is to conduct the study, correct?
19           MR. HOROWITZ:  Object to the
20       form.
21           THE WITNESS:  Well, when we
22       design the trials at the start, we
23       use different pieces of evidence.
24       That, in other words, when we go

Page 412

1    Pages For Discussion With AGM."
2            Do you see that?
3        A.   Yes.
4        Q.   Do you recall reviewing this
5    PowerPoint prior to today?
6        A.   I -- I recognize a couple of
7    the slides, but I don't know about
8    reviewing it.  I don't know what it
9    was -- or where it was shown, what it was
10   shown -- prepared for and where it was
11   shown.
12       Q.   Okay.  So you didn't prepare
13   this PowerPoint?
14       A.   No.
15       Q.   Okay.  Do you know what AGM
16   is in the title?
17       A.   My guess would be
18   Anne-Grethe Mortensen, our lead for
19   commercial.
20       Q.   So the first slide is
21   "Objectives For Today's Call."  Do you
22   see that?
23       A.   Yes.
24       Q.   And it's Number 1, "Share

Page 413

1  thinking on strategic scenarios for
2  ROCKET2."
3      A.    Right.
4      Q.    And this is -- I don't think
5  we said this for the record.  This is
6  January 16, 2014.
7      A.    '14, right.
8      Q.    So this is after the TASC
9  memo that we just looked at that said
10 we're not going to go forward with
11 ROCKET2, correct?
12     A.    And that was in 2013?
13     Q.    Yes, sir.
14     A.    Yes.  Okay.
15     Q.    Okay.  And so we're still
16 talking about it.
17     A.    Right.  This is the way --
18 this is the way it works.
19     Q.    Okay.  And so then you go to
20 the next slide.
21     A.    Yes.
22     Q.    And it says, "Context.  What
23 is the best reaction to a potential
24 head-to-head trial of apixaban versus

Page 415

1      A.    Right.
2      Q.    So the -- the concern was
3  there was going to be a head-to-head that
4  came out from BMS Pfizer that tried to
5  demonstrate that when you look at Eliquis
6  and Xarelto, you have a higher number of
7  bleeds with Xarelto, right?
8          MR. HOROWITZ:  Object to the
9          form.
10         THE WITNESS:  I don't know
11         what they were assuming.  They
12         apparently had some competitive
13         intelligence or some rumor, I
14         don't know, that there may be a
15         trial head-to-head.  And their
16         assumption, I know, was that,
17         well, that's what they've been
18         targeting.  They never talked
19         about efficacy.  They are always
20         talking about bleeding.
21 BY MR. BARR:
22     Q.    Right.
23     A.    That's not a -- they are not
24 talking about that fact.  And efficacy is

Page 414

1  Xarelto in SPAF?"
2          Right?
3      A.    Yes.
4      Q.    And just so everybody
5  understands what that is, apixaban is
6  Eliquis, right?
7      A.    Right.  It's another Factor
8  Xa inhibitor.
9      Q.    Right.  And Eliquis in its
10 clinical trials showed superiority to
11 warfarin in both efficacy and safety,
12 correct?
13     A.    That's true.
14     Q.    And it says, "The goal is to
15 provide the best possible response to the
16 potential BMS Pfizer trial versus
17 Xarelto," right?
18     A.    That's what it says.
19     Q.    "A competitor trial
20 presumably will be a head-to-head safety
21 comparison of apixaban versus Xarelto
22 20 milligrams in SPAF and will be aiming
23 to demonstrate the higher bleeding rate
24 in Xarelto arm," right?

Page 416

1  very important.  But that was their
2  concern from the commercial side.
3      Q.    Well, they had already -- at
4  least compared to warfarin, Eliquis
5  showed that it was superior to warfarin,
6  right?
7      A.    Well, it was a larger trial,
8  and so it had more events, and so they
9  were able to show that.  It's not clear
10 that rivaroxaban couldn't have showed
11 that if it had the same size and number
12 of events.
13     Q.    Okay.  The next bullet point
14 is, "So far no concrete competitor design
15 anticipated or announced," right?
16     A.    So apparently they didn't
17 have anything, yes.  Apparently, they
18 didn't have anything to actually look at,
19 whether this was real or not.
20     Q.    Right.  They are planning a
21 what-if?
22     A.    I think -- I think so, yeah.
23 Which is a common scenario planning in
24 the -- in that group.

Page 417

1     Q.   Okay.  So it's a "what if
2  this happens, what is our response going
3  to be?"
4     A.   Sure.  Right.
5     Q.   And -- and what is proposed,
6  if you look at the -- the third diamond,
7  the big bullet point?
8     A.   Yes.
9     Q.   "A ROCKET 2.0 lower dose
10  Xarelto proposal has been suggested as a
11  proper response.  Such a dose would then
12  be launched as soon as the competitor
13  announces trial TBD, to be determined,"
14  right?
15     A.   Right.
16     Q.   "Yet only very limited date
17  available for alternative Xarelto doses
18  in SPAF, 20 milligrams once-a-day versus
19  15 milligrams versus" -- "once-a-day
20  versus 10 milligrams once-a-day versus
21  7-1/2 milligrams twice a day," right?
22     A.   Yes.
23     Q.   So this version of ROCKET
24  2.0 is only being considered as a

Page 419

1     Q.   Is that any excuse for you
2  not to conduct a study to determine a
3  safer dose of your drug?
4     A.   I --
5       MR. HOROWITZ:  Object to the
6       form.  Argument.
7       THE WITNESS:  I think it
8       highlights the fact that doing
9       these kinds of trials is no easy
10       matter.  It's just not as simple
11       as saying, oh, just do a trial.
12       These are huge trials and there's
13       a lot of risk to them and they
14       take a large number of patients.
15       So if you're going to put patients
16       at risk like that, then you really
17       need to be certain that you're
18       going to get the benefit.
19  BY MR. BARR:
20     Q.   And you are already approved
21  anyway, so what difference does it make,
22  right?
23       MR. HOROWITZ:  Object to the
24       form.

Page 418

1  response to a potential head-to-head from
2  a competitor, right?
3       MR. HOROWITZ:  Object to the
4       form.
5       THE WITNESS:  I don't know
6       that.  I know it is -- by reading
7       the slide, it is being considered
8       in this context.  I just don't
9       know if that's the only reason.
10       Of course, it was after the TASC
11       that you mentioned, so it may be.
12       But I think the important
13       thing here is that ROCKET 2.0 was
14       not just rejected out of hand not
15       important.  We tried to figure a
16       way that it could be useful.  And
17       the discussion still -- was still
18       going on even after the testing.
19  BY MR. BARR:
20     Q.   Okay.  And it was still
21  never done, right?
22     A.   It eventually wasn't done.
23  But also the apixaban versus Xarelto
24  study apparently wasn't done either.

Page 420

1       THE WITNESS:  No, I think
2       that's not correct to say.  What
3       that -- that implies that we don't
4       care about patients which is
5       certainly not true.
6       MR. BARR:  Let me show you
7       what I'm going to mark as
8       Exhibits 42 and 43.
9       I think it's 389765.
10       MR. DENTON:  62.
11       MR. BARR:  62, close enough.
12       389762, and then Exhibit 43 will
13       be 389766.
14       (Document marked for
15       identification as Exhibit
16       Berkowitz-42.)
17       (Document marked for
18       identification as Exhibit
19       Berkowitz-43.)
20  BY MR. BARR:
21     Q.   If you want to take a
22  second.  Let's start with the e-mail
23  instead of the PowerPoint.
24     A.   Yes.  Okay.

Protected - Subject to Further Protective Review

Page 421

```
1        Q.   So let's start with
2   Exhibit 42, which is Plaintiffs' 389762.
3             You see that this is an
4   e-mail from you to Dr. Spiro and Dr. Chen
5   again, right?
6        A.   Yes.
7        Q.   And this is December 9,
8   2013, right?
9        A.   Yeah.
10       Q.   And the subject line is
11  "Slide sets," correct?
12       A.   Correct.
13       Q.   And you've attached -- one,
14  two, three -- four different PowerPoint
15  slides, right?
16       A.   No.  I see three.
17       Q.   I see -- that's right.
18  Three.  Okay.  You're right.  You count
19  better than I do.
20            So you've got these three
21  PowerPoint slides that you've attached to
22  this e-mail and sent to Dr. Spiro and
23  Dr. Chen, right?
24       A.   Yes.
```

Golkow Technologies, Inc. - 1.877.370.DEPS

---

Protected - Subject to Further Protective Review

Page 423

```
1   shared, right?
2        A.   Right.
3        Q.   Do you know why you did
4   that?
5        A.   Not exactly.  I mean, they
6   weren't taken in secret, if that's the
7   implication.
8             They're just to hold onto
9   them because they may not be final.  I
10  don't know for sure.
11       Q.   Do you know --
12       A.   Sorry.  Just the key piece.
13  It said "not shared."  What I think was
14  meant by that, used or shared, was not to
15  take them and put them in other slide
16  decks and show them at this time.  That's
17  what was likely meant.
18       Q.   Do you recall, sitting here
19  today, who you got these slides from at
20  Janssen?
21       A.   I don't.  I don't know what
22  it's from.  I don't know if it was a team
23  working.  We worked together on the
24  lifecycle.  So I don't know it was
```

Golkow Technologies, Inc. - 1.877.370.DEPS

---

Protected - Subject to Further Protective Review

Page 422

```
1        Q.   You write, "Enclosed, please
2   find the slide sets I received from
3   Janssen Re ROCKET 2.0 ACS dual after our
4   meeting November 26.  These are
5   confidential and should not be used or
6   shared, and the slide set I put together
7   for Andrea Derix for the TASC LCM meeting
8   11/27, it contains the pertinent elements
9   from the ROCKET 2.0 and ACS dual sets."
10            Did I read that right?
11       A.   Yes.
12       Q.   Okay.  Why did you send
13  these Janssen PowerPoint slides on to
14  Dr. Spiro and Dr. Chen?
15       A.   I don't know for sure, but
16  they're probably on the lifecycle team
17  with me, and I get advice from them
18  because they're experts in different
19  areas.  So it's just to keep them
20  informed, I think, best I can tell from
21  this.
22       Q.   But you specifically
23  instructed them that these slides are
24  confidential and should not be used or
```

Golkow Technologies, Inc. - 1.877.370.DEPS

---

Protected - Subject to Further Protective Review

Page 424

```
1   something that was sent over from them or
2   if it came through that McKinsey group.
3   I don't know.
4        Q.   So let's look at the
5   PowerPoint.
6        A.   Okay.
7        Q.   And this is exhibit --
8   there's multiples.  I'm only going to
9   look at one of them.  This is Exhibit 43
10  which is Plaintiffs' 389766.  If you want
11  to take a minute and familiarize
12  yourself.
13       A.   Yes.  Just quickly to see
14  what we're looking at.
15       Q.   So this is a PowerPoint
16  slide that you received from Janssen in
17  the ordinary course of business, correct?
18       A.   I don't know how I received
19  it.  Whether I received it from them or
20  from the team that was working together,
21  I don't know.
22       Q.   Okay.  And you forwarded it
23  to two of your colleagues at Bayer,
24  right?
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 425

```
1        A.    Right.  Two that report to
2   me.
3        Q.    Okay.  And so the title of
4   this PowerPoint is ROCKET-AF 2.0, right?
5        A.    Yes.
6        Q.    And it's dated December 11
7   and 12, 2013, and it's got a Janssen logo
8   on it, right?
9        A.    Yes.
10       Q.    So then, let's go to the
11  next page.  It says, "Rationale:  A dose
12  reduction could garner similar efficacy
13  and improve safety," right?
14       A.    Yes.
15       Q.    It says, "If successful,
16  this could lead to a substantial change
17  in clinical practice," correct?
18       A.    That's what it says.
19       Q.    "In addition, the TTR in
20  ROCKET-AF has been a source of concern
21  for some health authorities.  The conduct
22  of a second clinical trial with
23  well-controlled warfarin resulting in a
24  high TTR could be of substantial
```

Protected - Subject to Further Protective Review

Page 427

```
1        study, and it could fail.  You
2        cannot do the study properly and
3        it could fail.  You could have not
4        a large enough study and it could
5        fail.  You could miscalculate the
6        sample size and it could fail.
7   BY MR. BARR:
8        Q.    So because a study could
9   possibly fail, that's a reason not to do
10  it?
11       A.    It is a reason not to do it.
12  If you don't have the parameters to have
13  some certainty in designing the trial,
14  then it's not a place to work.  You have
15  to have an understanding of the event
16  rates and your chances for success.  You
17  can't just go do studies without some
18  solid evidence that you're going to be
19  successful.
20       Q.    Okay.  But the FDA, if you
21  remember, was asking you to look at lower
22  doses, right, and study them, correct?
23       A.    They were asking us to
24  explore that.
```

Protected - Subject to Further Protective Review

Page 426

```
1   benefit."
2              Did I read that correctly?
3        A.    Yes.
4        Q.    So what they're saying here
5   in this rationale for performing ROCKET2
6   is it's possible that a dose reduction
7   could have similar -- similar efficacy
8   and improved safety, i.e., have a lower
9   amount of bleeds, right?
10       MR. HOROWITZ:  Objection to
11       form.  Foundation.
12       THE WITNESS:  It's possible.
13  BY MR. BARR:
14       Q.    Okay.  And the only way we
15  can figure that out is to study the
16  issue, right?
17       A.    That's possible.
18       Q.    No.  That's the only way you
19  can figure out if a dose reduction could
20  garner similar efficacy and improve
21  safety is to conduct a study, correct?
22       MR. HOROWITZ:  Object to the
23       form.
24       THE WITNESS:  You can do the
```

Protected - Subject to Further Protective Review

Page 428

```
1        Q.    And back in 2000 -- in the
2   late 2000s, when they were asking you to
3   do that, up through approval in 2011,
4   through 2013 and continuing in today, you
5   still haven't done that study, right?
6        MR. HOROWITZ:  Objection to
7        form.  Asked and answered.
8        THE WITNESS:  We've not done
9        a study in SPAF.
10  BY MR. BARR:
11       Q.    The Janssen PowerPoint also
12  points out that one of the things we can
13  do is we can design the study better and
14  have well-controlled warfarin that we
15  would be comparing against, correct?
16       A.    Well, it says that on the
17  slide.  What does that mean?
18       Q.    Well, it means you would
19  have a TTR of better than 55 percent,
20  right?
21       MR. HOROWITZ:  Objection to
22       form.
23       THE WITNESS:  Well, while
24       ours was 55 percent across the
```

Page 429

```
1         world, it was 64 percent in the
2    U.S.
3    BY MR. BARR:
4         Q.    In the U.S. -- and we can
5    talk about this tomorrow some more.  But
6    in the U.S. where you had a 64 percent
7    TTR, you also showed inferiority when it
8    comes to bleed risk, right?
9         A.    You must be referring to the
10   subgroup analyses.
11        Q.    No.  I'm referring to your
12   data from -- that you have now put into
13   the label as of September 2015.
14        A.    The FDA requested us to
15   standardize all the labels to put that
16   data in.  But it's subgroup analysis.
17        Q.    Okay.  And that subgroup
18   analysis shows that in your area where
19   you had the best TTR, you were inferior
20   when it comes to bleed risk, right?
21        A.    Maybe you misunderstand what
22   I'm saying.  Subgroup analysis without
23   adjustment is not -- doesn't have great
24   value.  When we do these trials, we do
```

Page 431

```
1              THE WITNESS:  I only know
2         what you have here on the slide
3         saying that the conduct of a
4         second trial with well-controlled
5         warfarin resulting in a high TTR
6         could be of substantial benefit.
7    BY MR. BARR:
8         Q.    Right.  Because in your
9    label it says that we don't know how
10   Xarelto compares to well-controlled
11   warfarin, right?
12        A.    That is wording that the FDA
13   put in.
14        Q.    Right.  Do you think they're
15   wrong?
16        A.    No.  I just think that there
17   are a lot of factors that play a role in
18   what the TTR is, and that the TTR is not
19   the only assessment of how well a drug
20   does.
21        Q.    But the FDA thought it
22   important enough that it needed to be in
23   the label so that doctors understood we
24   don't know how Xarelto compares to
```

Page 430

```
1    them across the world because we need a
2    large number of patients.  So then you
3    can't start looking at other groups and
4    make the kinds of statements you want to
5    make.  You can use them for hypothesis
6    generating, but you can't say things like
7    you're trying to say.
8         Q.    Well, then maybe you
9    shouldn't bring up things like having the
10   U.S. having a TTR of 64 percent.
11             MR. HOROWITZ:  Wait, wait.
12        We're not going to argue with each
13        other.  Let's ask a question.
14             THE WITNESS:  Just please
15        ask a question, because there is a
16        point here.
17   BY MR. BARR:
18        Q.    All right.  One of the
19   things that Janssen was hoping to
20   accomplish was to have a trial where
21   warfarin was better controlled, could be
22   considered well-controlled, right?
23             MR. HOROWITZ:  Objection to
24        form.  Foundation.
```

Page 432

```
1    well-controlled warfarin, right?
2              MR. HOROWITZ:  Objection to
3         form.
4              THE WITNESS:  The FDA put it
5         in for that purpose because they
6         know that the TTR rate in most
7         clinical practices is not up at 64
8         or 70 percent.
9    BY MR. BARR:
10        Q.    Right.  But they also know
11   that in clinical trials, 55 percent is
12   well below the standard, right?
13        A.    Not well below the standard.
14   It's within the range of the standard.
15        Q.    It's the lowest TTR in any
16   of the NOAC clinical trials, right?
17        A.    But it's not the lowest TTR
18   in the other SPAF trials that have been
19   done over the last two decades.
20        Q.    So let's talk about -- let's
21   go into -- you see where it says "study
22   drug administration"?
23        A.    Which page?
24        Q.    I'd be guessing.  You just
```

Page 433

1  passed it.  You see the title of the
2  slide is "Study Drug Administration"?
3       A.   Yes.
4       Q.   And it says rivaroxaban
5  15 milligrams, right?
6       A.   Yes.
7       Q.   So that's a lower dose if
8  we're ignoring the people with poor
9  creatinine clearance, right?
10      A.   Well, first of all, it's not
11 poor creatinine clearance.  Second of
12 all, we're not -- we don't ignore them.
13 We adjusted the dose to be specific.  I
14 don't think that should be missed.
15      Q.   I understand that.  I'm just
16 talking about this 15 milligram.
17      A.   15 milligrams is what it
18 says here.
19      Q.   Okay.  Do you have an
20 understanding if that would have been in
21 replacement of the 20-milligram dose?
22      A.   Well, it doesn't say.  But
23 it says 15 milligrams.  The next question
24 would have to be would there be an

Page 435

1  drug, right?
2       A.   Yes.
3       Q.   They say the expected
4  outcome is rivaroxaban will be superior
5  to well-controlled warfarin, right?
6       A.   Yes.  So another
7  aspirational goal for a clinical trial.
8       Q.   They're hypothesizing that
9  low dose -- lower dose 15 milligrams
10 rivaroxaban will be superior to
11 well-controlled warfarin, right?
12           MR. HOROWITZ:  Objection to
13      form.  Foundation.  Asked and
14      answered.
15           THE WITNESS:  Sorry.  Sorry.
16      Not right.  I said to be
17      discussed.  So I don't know that
18      it's going to be 15 milligrams
19      according to the slide that you
20      showed me.
21 BY MR. BARR:
22      Q.   Okay.  What would be the
23 point in running ROCKET 2.0 with the same
24 dose that's already been approved?

Page 434

1  adjustment for renal dysfunction.
2       Q.   Okay.  And it says,
3  "Warfarin titrated to a target INR range
4  2.5," right?
5       A.   Yes, that's the target range
6  that we used for the ROCKET-AF trial as
7  well.
8       Q.   Right.  But the goal in
9  warfarin therapy is to keep someone with
10 an INR of 2 to 3?
11      A.   2.0 to 3.0.  Correct.
12      Q.   Let's go into a slide, it's
13 towards the back.  It's titled "Expected
14 Outcomes."
15           Are you with me?
16      A.   Yes, I see it.
17      Q.   It says "Expected Outcomes."
18 This is -- this is from Janssen, right?
19      A.   That's what it says at the
20 bottom of the slide.
21      Q.   The NDA holder in the United
22 States, right?
23      A.   Yes.
24      Q.   And your partner in this

Page 436

1       A.   Don't know, other than to
2  just repeat and see if you do better.  Is
3  it just a fluke?  I don't know.
4       Q.   Okay.  But on this -- in
5  this PowerPoint slide, they're
6  referencing using 15 milligrams, right?
7       A.   The slide that you showed
8  me -- can we look at that slide?
9       Q.   Sure.  I know what it says.
10      A.   It says to be discussed.
11      Q.   Yes, it does.
12      A.   Well, that wasn't
13 read out, and that's the part that I
14 wasn't sure about.
15           So, again, it's -- this is a
16 design.  I don't know the timing of it.
17 I don't know what draft they thought it
18 was.
19      Q.   This is dated December of
20 2013.
21      A.   Right.  But I don't know
22 where it was in their final thinking.
23      Q.   Okay.  But their expected
24 outcome based on the content of this

Page 437

1    PowerPoint slide is that rivaroxaban will
2    be superior to well-controlled warfarin,
3    right?
4              MR. HOROWITZ:  Objection.
5    Form.  Foundation.  Speculation.
6    Asked and answered.
7    BY MR. BARR:
8         Q.    That's what it says?
9         A.    I guess the -- the
10   problem -- the slide says it.  But the
11   problem I'm having understanding the
12   question is that you have to start off
13   with some basis and -- and you refine it.
14   And where we are on that point I don't
15   know.  But one hypothesis would be, would
16   we be superior to well-controlled
17   warfarin.
18             We were superior
19   on-treatment.  So I guess that's what
20   they are saying.  But I don't know that.
21        Q.    Well, you weren't superior
22   to well-controlled warfarin because you
23   didn't have well-controlled warfarin?
24        A.    Well, I guess that's -- that

Page 439

1    18,000 patients, so 4,000 more
2    than we did, was not performed.
3              MR. BARR:  Okay.  We can
4    break for the day.
5              MR. HOROWITZ:  Okay.  Do you
6    mind if we just put on the
7    record -- we don't need the video,
8    we can go off the video.
9              THE VIDEOGRAPHER:  The time
10   is 5:22 p.m.  We are going off the
11   record.
12             MR. HOROWITZ:  Brian, do you
13   mind if I just put on the record
14   the brief conversation that we had
15   about today would be a seven
16   hours?
17             MR. BARR:  Yeah, that's
18   fine.
19             MR. HOROWITZ:  I just want
20   to put on the record that Mr. Barr
21   and I agreed that, even though he
22   didn't use seven hours today,
23   whatever the time is is going to
24   count as seven hours.  A

Page 438

1    would be true.  We didn't do
2    well-controlled warfarin if you use that
3    kind of context.
4              But there -- if you read the
5    minutes of the AdCom, you'll see that not
6    everyone agreed with that kind of
7    thinking.
8         Q.    And then it says, "Safety
9    will be better with rivaroxaban though
10   perhaps not statistically significant,"
11   right?
12        A.    Right.  That's what it says.
13   But that's -- that's aspirational again.
14   It's predictive.  It's a hope.
15        Q.    Okay.  But this study where
16   the expected outcome was rivaroxaban
17   would be superior to well-controlled
18   warfarin and safety would be better with
19   rivaroxaban was never conducted, right?
20             MR. HOROWITZ:  Object to the
21   form.  Foundation.  Asked and
22   answered.
23             THE WITNESS:  This -- this
24   trial that they were planning for

Page 440

1    seven-hour full day.  So we start
2    tomorrow seven hours, one day
3    down.
4              MR. BARR:  Yeah, we agree.
5              (Excused.)
6              (Deposition adjourned at
7    approximately 5:22 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Protected - Subject to Further Protective Review

Page 441

```
 1
 2              CERTIFICATE
 3
 4
 5        I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
 6 deposition is a true record of the
   testimony given by the witness.
 7
          It was requested before
 8 completion of the deposition that the
   witness, SCOTT D. BERKOWITZ, M.D., have
 9 the opportunity to read and sign the
   deposition transcript.
10
11
   _____
12   MICHELLE L. GRAY,
     A Registered Professional
13   Reporter, Certified Shorthand
     Reporter, Certified Realtime
14   Reporter and Notary Public
     Dated:  October 19, 2016
15
16
17        (The foregoing certification
18 of this transcript does not apply to any
19 reproduction of the same by any means,
20 unless under the direct control and/or
21 supervision of the certifying reporter.)
22
23
24
```

Protected - Subject to Further Protective Review

Page 443

```
 1          - - - - -
            E R R A T A
 2          - - - - -
 3
 4 PAGE  LINE  CHANGE
 5 ____  ____  _____
 6      REASON: _____
 7 ____  ____  _____
 8      REASON: _____
 9 ____  ____  _____
10      REASON: _____
11 ____  ____  _____
12      REASON: _____
13 ____  ____  _____
14      REASON: _____
15 ____  ____  _____
16      REASON: _____
17 ____  ____  _____
18      REASON: _____
19 ____  ____  _____
20      REASON: _____
21 ____  ____  _____
22      REASON: _____
23 ____  ____  _____
24      REASON: _____
```

Protected - Subject to Further Protective Review

Page 442

```
 1      INSTRUCTIONS TO WITNESS
 2
 3          Please read your deposition
 4 over carefully and make any necessary
 5 corrections.  You should state the reason
 6 in the appropriate space on the errata
 7 sheet for any corrections that are made.
 8          After doing so, please sign
 9 the errata sheet and date it.
10          You are signing same subject
11 to the changes you have noted on the
12 errata sheet, which will be attached to
13 your deposition.
14          It is imperative that you
15 return the original errata sheet to the
16 deposing attorney within thirty (30) days
17 of receipt of the deposition transcript
18 by you.  If you fail to do so, the
19 deposition transcript may be deemed to be
20 accurate and may be used in court.
21
22
23
24
```

Protected - Subject to Further Protective Review

Page 444

```
 1
 2      ACKNOWLEDGMENT OF DEPONENT
 3
 4          I,_____, do
 5 hereby certify that I have read the
 6 foregoing pages, 1 - 445, and that the
 7 same is a correct transcription of the
 8 answers given by me to the questions
 9 therein propounded, except for the
10 corrections or changes in form or
11 substance, if any, noted in the attached
12 Errata Sheet.
13
14
15 _____
16   SCOTT D. BERKOWITZ, M.D.        DATE
17
18
19 Subscribed and sworn
   to before me this
20 _____ day of _____, 20_____.
21 My commission expires:_____
22
   _____
23 Notary Public
24
```

Protected - Subject to Further Protective Review

Page 445

1                LAWYER'S NOTES

2   PAGE   LINE

3   ____   ____   _____
4   ____   ____   _____
5   ____   ____   _____
6   ____   ____   _____
7   ____   ____   _____
8   ____   ____   _____
9   ____   ____   _____
10  ____   ____   _____
11  ____   ____   _____
12  ____   ____   _____
13  ____   ____   _____
14  ____   ____   _____
15  ____   ____   _____
16  ____   ____   _____
17  ____   ____   _____
18  ____   ____   _____
19  ____   ____   _____
20  ____   ____   _____
21  ____   ____   _____
22  ____   ____   _____
23  ____   ____   _____
24  ____   ____   _____

Protected - Subject to Further Protective Review

```
 1          IN THE UNITED STATES DISTRICT COURT
 2         FOR THE EASTERN DISTRICT OF LOUISIANA
 3                       -  -  -
 4
   IN RE:  XARELTO        :  MDL NO. 2592
 5   (RIVAROXABAN) PRODUCTS :
   LITIGATION             :  SECTION L
 6                         :
   THIS DOCUMENT RELATES   :  JUDGE ELDON
 7   TO ALL CASES           :  E. FALLON
 8                         :
                           :  MAG. JUDGE
 9                         :  NORTH
10              VOLUME II
11                       -  -  -
12             October 20, 2016
13                       -  -  -
14             - PROTECTED -
15   - SUBJECT TO FURTHER PROTECTIVE REVIEW -
16       Continued videotaped deposition of
   SCOTT D. BERKOWITZ, M.D., taken pursuant
17   to notice, was held at the law offices of
   Kaye Scholer, LLP, 250 West 55th Street,
18   New York, New York, beginning at 8:37
   a.m., on the above date, before Michelle
19   L. Gray, a Registered Professional
   Reporter, Certified Realtime Reporter,
20   Certified Shorthand Reporter and Notary
   Public.
21
                         -  -  -
22
           GOLKOW TECHNOLOGIES, INC.
23         877.370.3377 ph| 917.591.5672
               deps@golkow.com
24
```

---

Page 451

```
 1      E X H I B I T S (Cont'd.)
 2                 -  -  -
 3   NO.   DESCRIPTION          PAGE
 4   Berkowitz-46 E-mail Thread    474
     (3673689)   7/17/12
 5              Subject, Assessment
              RE Document In
 6              XARELTO_BHCP_
              DCRI 0002642-44
 7
   Berkowitz-47 E-mail Thread     487
 8   (1265602)   6/13/07
              Subject, Needed
 9              Pooled Analysis
              XARELTO_BPAG_
10              03348410-12
   Berkowitz-48 Rivaroxaban and  498
11   (17763)9)   Other Novel Oral
              Anticoagulants
12              Pharmacokinetics
              In Healthy Subjects
13              Thrombosis Invited
              Review
14              XARELTO JANSSEN_
              0050053 7-78
15   Berkowitz-49 Clinical       507
   (32615 28)  Pharmacokinetic
16              and Pharmacodynamic
              Profiles
17              (Mueck)
18
19
20
21
22
23
24
```

Page 453

```
 1      E X H I B I T S (Cont'd.)
 2                 -  -  -
 3   NO.   DESCRIPTION          PAGE
 4   Berkowitz-54 E-mail Thread    555
     (1074495)   4/18/15
 5              Subject, Correction
              RE Document In
 6              XARELTO_BHCP_
              00909477-85
 7
   Berkowitz-55 Consolidation Call  570
 8   (1094903)   Xarelto PK/PD Statement
              7/31/14
 9              XARELTO_BHCP_
              01627932-94
10   Berkowitz-56 SPAF, PT, and Major 574
   (1094802)  Bleeding
11              01625953-94
   Berkowitz-57 Rapporteurs Joint   710
12              Response Assessment
              Report
13              XARELTO_BPAG_
              00449275021
14   Berkowitz-58 Xarelto USPI     735
   (29055274)  Labeling Contingency
15              Document From LRC
              4/23/09
16              XARELTO JANSSEN_
              14140831-924
17
18
19
20
21
22
23
24
```

---

Protected - Subject to Further Protective Review

Page 452

```
 1      E X H I B I T S (Cont'd.)
 2                 -  -  -
 3   NO.   DESCRIPTION          PAGE
 4   Berkowitz-50 E-mail Thread    514
     (3668403)   10/10/15
 5              Subject, ATLAS
              Exposure-Response
 6              Modeling
              XARELTO JANSSEN_
 7              18626226-2
   Berkowitz-51 Project 100 QS    514
 8   (3668404)   Draft
              PowerPoint
 9              Presentation
              XARELTO JANSSEN_
10              18626228
   Berkowitz-52 E-mail Thread     523
11   (80333)    8/18/14
              Subject, Hold for
12              Review of the
              Sensitive PR
13              Communication
              XARELTO_BPAG_
14              00020941-47
   Berkowitz-53 E-mail Thread     535
15   (3388635)   11/19/15
              Subject, Difficulties
16              With Preparing Slide
              Presentations for
17              EMA Workshop
              XARELTO_BPAG_
18              25276077-78
19
20
21
22
23
24
```

Page 454

```
 1      E X H I B I T S (Cont'd.)
 2                 -  -  -
 3   NO.   DESCRIPTION          PAGE
 4   Berkowitz-59 E-mail Thread    750
     (113350)   8/18/06
 5              Subject, Fall Back
              Options
 6              XARELTO JANSSEN_
              00084847-50
 7   Berkowitz-60 Strategy Fall Back 750
   (11335 1)  Options WITH FBPA
 8              PowerPoint
              XARELTO JANSSEN_
 9              00084851
   Berkowitz-61 E-mail Thread     760
10   (3674039)   4/3/13
              Subject, ROCKET AF
11              NDA Manuscript
              DCRI 00053 52
12   Berkowitz-62 Population       761
   (3674040)  Pharmacokinetics
13              Of Rivaroxaban in Patients
              With Nonvalvular Atrial
14              Fibrillation: Results
              From ROCKET AF
15              DCRI 00052 50
   Berkowitz-63 Center for Drug   766
16   (75943)    Evaluation and Research
              Summary Review
17
18
19
20
21
22
23
24
```

---

Protected - Subject to Further Protective Review

Page 447

```
 1  APPEARANCES:
 2  LEVIN PAPANTONIO THOMAS
   MITCHELL RAFFERTY & PROCTOR, PA
 3  BY:  BRIAN BARR, ESQ.
    316 South Baylen Street, Suite 600
 4    Pensacola, Florida 32502
    (888) 435-7001
 5    bbarr@levinlaw.com
 6          - and -
 7  SCHLICHTER, BOGARD & DENTON, LLP
   BY:  ROGER C. DENTON, ESQ.
 8    100 South Fourth Street
    Suite 900
 9    St. Louis, Missouri 63102
    (314) 621-6115
10    rdenton@uselaws.com
    Representing the Plaintiffs
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 449

```
 1  APPEARANCES:  (Cont'd.)
 2
 3  ALSO PRESENT:
 4    Larissa A. Eustace
    (Bayer Pharmaceutical)
 5
 6
 7  VIDEOTAPE TECHNICIANS:
    Henry Marte
 8    Kevin Pollard
 9
10  LITIGATION TECHNICIAN:
    John Knowles
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 448

```
 1  APPEARANCES:  (Cont'd.)
 2
 3  KAYE SCHOLER LLP
   BY:  JEFFREY H. HOROWITZ, ESQ.
 4    250 West 55th Street
    New York, New York 10019
 5    (212) 836-7575
    jeffrey.horowitz@kayescholer.com
 6          - and -
   KAYE SCHOLER LLP
 7   BY:  PAMELA J. YATES, ESQ.
    1999 Avenue of the Stars
 8    Suite 1600
    Los Angeles, California 90067
 9    (310) 788-1278
    pamela.yates@kayescholer.com
10          - and -
   BRADLEY ARANT BOULT CUMMINGS, LLP
11   BY:  LINDSEY C. BONEY, ESQ.
    One Federal Place
12    1819 Fifth Avenue North
    Birmingham, Alabama 35203
13    (205) 521-8303
    Lboney@bradley.com
14    Representing Bayer Pharmaceuticals
    and the Witness
15
   DRINKER, BIDDLE & REATH, LLP
16   BY:  SEAN KENNEDY, ESQ.
    500 Campus Drive
17    Florham Park, New Jersey 07932
    (973) 549-7000
18    sean.kennedy@dbr.com
    Representing the Janssen entities
19
20
21
22
23
24
```

Page 450

```
 1                 -  -  -
 2          I N D E X
 3                 -  -  -
 4   Testimony of:
 5       SCOTT D. BERKOWITZ, M.D.
 6   By Mr. Barr          466, 733
 7   By Mr. Horowitz     585, 800
 8
 9                 -  -  -
10
11          E X H I B I T S
12                 -  -  -
13   NO.   DESCRIPTION          PAGE
14   Berkowitz-44 E-mail Thread    457
   (76601)   4/21/14
15              Subject, CSRC
              Anticoagulant
16              Induced Bleeding
              00084826-27
17   Berkowitz-45 E-mail Thread    464
   (1097767)   5/28/14
18              Subject, Clinical
              Pharmacology/Clinical
19              Sciences
              01701654-57
20
21
22
23
24
```

---

Protected - Subject to Further Protective Review

Page 455

```
 1                 -  -  -
 2      DEPOSITION SUPPORT INDEX
 3                 -  -  -
 4
 5   Direction to Witness Not to Answer
 6   PAGE   LINE
 7   None.
 8
 9   Request for Production of Documents
10   PAGE   LINE
11   None.
12
13   Stipulations
14   PAGE   LINE
15   None.
16
17   Questions Marked
18   PAGE   LINE
19   None.
20
21
22
23
24
```

Page 457

```
 1  explain it for me.
 2      Q.  Well, I'm just -- I mean,
 3  when it comes to the use of XARELTO, is
 4  that a term that -- that you understand?
 5      A.  It's not a term that we use,
 6  so --
 7      Q.  Okay.
 8      A.  -- it would be good for you
 9  to explain it.
10      Q.  Okay.
11          Let me show you what I'm
12  going to mark as Exhibit 44.  This is
13  Plaintiffs' 76601.
14          (Document marked for
15  identification as Exhibit
16  Berkowitz-44.)
17  BY MR. BARR:
18      Q.  And I'm focusing on the top
19  e-mail here from Mr. Talmage to you.  Who
20  is Ian Talmage?
21      A.  Just a second, sir.  I'll
22  take a look at what we're looking at.
23  Okay.
24      Q.  Maybe you can just tell me
```

Page 456

```
 1                 -  -  -
 2   THE VIDEOGRAPHER:  Today's
 3   date is October 20, 2016.  The
 4   time is 8:37 a.m.
 5      We are back on the record.
 6   Dr. Berkowitz, just want to
 7   remind you, you're still under
 8   oath.
 9                 -  -  -
10   ... SCOTT D. BERKOWITZ, M.D.,
11   having been previously sworn, was
12   examined and testified as follows:
13                 -  -  -
14      CONTINUED EXAMINATION
15                 -  -  -
16  BY MR. BARR:
17      Q.  Good morning.  Welcome back,
18  Dr. Berkowitz.
19      A.  Good morning.
20      Q.  I want to move topics now.
21          Do you have an understanding
22  of what I mean by the term "high
23  absorbers"?
24      A.  It would be fine for you to
```

Page 458

```
 1  who Ian Talmage is.
 2      A.  I can -- I can tell you that
 3  while I'm looking at it.  Ian Talmage is
 4  a colleague who works in commercial.
 5      Q.  Commercial?
 6      A.  Commercial.
 7      Q.  Okay.  Is he a doctor or
 8  anything like that?
 9      A.  Not that I know of.
10      Q.  Okay.  And you see he wrote
11  you this e-mail on April 21, 2014,
12  correct?
13      A.  Yes.
14   MR. HOROWITZ:  Why don't you
15   take a moment now to look at it.
16   THE WITNESS:  Mm-hmm.
17   MR. BARR:  He just did.
18   THE WITNESS:  I just looked
19   at the back.  I just need to look
20   at the front.
21   MR. HOROWITZ:  Let him look
22   at it.
23   THE WITNESS:  Okay.  Thank
24  you.
```

Protected - Subject to Further Protective Review

**Page 459**

1 BY MR. BARR:
2 Q. Okay. You see the -- he
3 wrote you this e-mail on April 21, 2014?
4 A. Yes, sir.
5 Q. And the subject is "CSRC
6 anticoagulant induced bleeding and
7 reversal agents think tank meeting."
8 Do you see that?
9 A. Yes.
10 Q. And do you know what that
11 is?
12 A. We went over it yesterday.
13 Q. Okay.
14 A. It was the slide sets that
15 we looked at yesterday.
16 Q. This is the same meeting
17 that you did the point-counterpoint?
18 A. That's the same meeting.
19 Q. Okay. And I am focusing on
20 starting with the third paragraph. He
21 writes and he says, "I also see that BI,"
22 that's Boehringer
23 Ingelheim Company?
24 A. Boehringer Ingelheim?

**Page 460**

1 Q. Yes, sir.
2 A. Mm-hmm.
3 Q. "I see that BI will be
4 represented by Paul Reilly speaking to
5 the topic of highly specific and
6 selective reversal agents for
7 dabigatran."
8 You know that to be Pradaxa,
9 right?
10 A. Yes.
11 Q. "I assume that this is the
12 same researcher cited in the media
13 discussion regarding the matter of
14 coagulation monitoring. This too may
15 attract some attention."
16 Did I read that correctly?
17 A. Yes.
18 Q. He goes on to say, "The
19 documents show that Boehringer Ingelheim
20 employees openly fretted when it appeared
21 that the results of the research paper
22 written by Paul Reilly, a clinical
23 program director at the company,
24 indicated that some patients could

**Page 461**

1 benefit from monitoring of their blood.
2 A certain segment of the -- "a certain
3 segment of patients, the paper found,
4 absorbed too little of the drug to
5 effectively prevent strokes, while
6 another group absorbed so much that they
7 are at a higher risk for bleeding."
8 Did I read that correctly?
9 A. Yes.
10 Q. Okay. And so when I use the
11 term "high absorbers," I'm talking about
12 it in the same sense that Mr. Talmage is
13 talking about it in this e-mail to you
14 where he says that in the Reilly paper
15 they identified users of Pradaxa that
16 absorbed so much of the drug that they
17 are at risk -- at a higher risk for
18 bleeding. Okay. Can we agree on that
19 terminology?
20 A. Sure.
21 MR. HOROWITZ: Object to the
22 form.
23 THE WITNESS: Yes, I can
24 agree to that.

**Page 462**

1 BY MR. BARR:
2 Q. Okay. Are you aware of
3 whether or not Xarelto has issues with
4 high absorbers?
5 A. That's not a problem with
6 the Xa inhibitors, or rivaroxaban to my
7 knowledge. That's a problem with direct
8 thrombin inhibitors like -- like Pradaxa
9 which is a different class of -- of
10 NOACs.
11 Q. Okay. So you do not agree
12 with the statement that the data for
13 Xarelto also shows groups that absorb so
14 much that they are at higher risk for
15 bleeding?
16 A. You're reading that from a
17 document?
18 Q. No. I'm asking the
19 statement.
20 A. Oh. Could you say it again.
21 Q. You do not agree with the
22 statement that the data for Xarelto also
23 shows groups that absorb so much that
24 they are at higher risk for bleeding?

Protected - Subject to Further Protective Review

**Page 467**

1 A. Yes.
2 Q. "Based on the established
3 linear relationship between rivaroxaban
4 plasma concentration and prothrombin
5 time, carry PT measured at peak and
6 trough, and all pivotal Phase III
7 programs to use them as PK surrogate for
8 subsequent exposure response, mainly
9 bleeding event analyses, all conducted by
10 biometry/GIA."
11 Did I read that correctly?
12 A. Yes.
13 Q. What is biometry/GIA?
14 A. Don't know.
15 Q. Don't know. Okay.
16 A. I -- I assume biometry is
17 the statistics. I don't know what the
18 GIA part is. Although we don't often
19 call the statistical group biometry, but
20 some go by biometricians.
21 Q. So as far as you're aware,
22 you're not aware of a department within
23 Bayer that is called biometry/GIA?
24 A. Not that I'm aware of. But

**Page 468**

1 this is in the research group. It's
2 another department, and they have their
3 own like modeling. I'm not familiar with
4 the different subsections. I don't know
5 if this is internal or external.
6 Q. Okay. Gotcha. It says,
7 "Your attached table seems to reflect
8 this. On a personal note, I would
9 reorder it to have POP PK/PD and PT event
10 analyses reports side by side to
11 underline the outlined concept."
12 Correct?
13 A. That's what it reads.
14 Q. And then it goes on to say,
15 "FYI, in contrast, the Boehringer
16 dabigatran team has decided to carry PK
17 sampling into their Phase III SPAF RE-LY
18 trial in approximately two-thirds of
19 included patients, allowing them to do
20 direct concentration response analysis, I
21 assume mainly to support their final dose
22 decision," correct?
23 A. That's what it says.
24 Q. Which is different than how

**Page 469**

1 ROCKET was designed, correct?
2 A. Well, it's different because
3 dabigatran is a direct thrombin
4 inhibitor, and I have some experience
5 with direct thrombin inhibitors since I
6 had developed ximelagatran, the one
7 before dabigatran. And these inhibitors
8 have an issue with bioavailability, such
9 that they're less than 10 percent
10 absorbed by the gut.
11 So there's a bigger issue
12 when we do development of direct thrombin
13 inhibitors.
14 Q. But it's still true that PK
15 was not carried into ROCKET, correct?
16 A. We said that yesterday.
17 Q. I'm just --
18 A. Yes.
19 Q. Yes -- I'm going -- I'm
20 skipping down a little bit, that whole
21 parenthetical. It says, "In summary,
22 that is relation between dabi" --
23 that's Pradaxa, right?
24 A. Yes.

**Page 470**

1 Q. "In summary, that a
2 relationship between dabi trough
3 concentrations and bleeding risk could be
4 detected from such analyses in this trial
5 was to be expected," right?
6 A. That's what it says.
7 Q. So because they carried it
8 forward, they were able to make the
9 correlation, correct?
10 MR. HOROWITZ: Objection to
11 form.
12 THE WITNESS: Well, because
13 they carried it forward, then they
14 had some data to go by.
15 BY MR. BARR:
16 Q. Right.
17 A. But they had a higher degree
18 of suspicion than you would have for the
19 Xa inhibitors because they don't have the
20 problems that the direct thrombin
21 inhibitors have.
22 Q. Right. And Bayer and
23 Janssen made the decision not to carry
24 that forward, so they were unable to make

Protected - Subject to Further Protective Review

**Page 463**

1 A. That's not something that
2 I'm familiar with.
3 Q. Do you know if that's
4 something other Bayer or Janssen ever
5 looked for in the conduct of their
6 trials?
7 A. I can't answer that
8 question. Lots of things that might be
9 looked for that I might not know or don't
10 know. So I don't know about. We don't
11 just focus upon just that one thing.
12 Q. Okay.
13 A. So I can't tell you.
14 Q. But you're certainly aware
15 that Boehringer was able to make the
16 conclusion they were able to make in the
17 Reilly paper, because they carried PK
18 testing into the Phase III trials,
19 correct?
20 A. They performed more PK
21 testing in the trials, something
22 important to do with a direct thrombin
23 inhibitor, a different class of drugs.
24 MR. BARR: So let me show

**Page 464**

1 you what I'm going to mark as
2 Exhibit 45. And this is
3 Plaintiffs' 1097767.
4 (Document marked for
5 identification as Exhibit
6 Berkowitz-45.)
7 BY MR. BARR:
8 Q. I'm going to ask you some
9 questions on this. I'll give you a
10 chance to look at it.
11 A. Okay. Thank you.
12 Q. I want to focus on the
13 second page which is -- I guess
14 technically your e-mail starts on the
15 first page. It shows that it's from you,
16 right there at the top. But then if you
17 go to the next page, you're sending this
18 to Dr. Mueck.
19 Do you see that?
20 A. I do.
21 Q. Okay. And you write to
22 Dr. Mueck, and you say, "I'm writing to
23 see if you can help provide some
24 information for us due to your long

**Page 465**

1 association and work on the Xarelto
2 project. Medical affairs and GCD have
3 been asked to help address questions
4 around clinical pharmacology/clinical
5 sciences PK/PD analyses supporting Phase
6 II and Phase III Xarelto studies. In
7 particular, since the publication of
8 Reilly on dabigatran sampling around the
9 time of efficacy and bleeding events,
10 questions have come externally about
11 Bayer's performance of any similar PK/PD
12 studies. We understand that from when
13 analysis had been done no correlation was
14 found with approved doses."
15 Correct? Did I read that
16 correctly?
17 A. Yeah.
18 Q. Okay. You go on to ask him
19 if he can provide some input on this,
20 correct?
21 A. Yes.
22 Q. Okay.
23 A. As -- as to -- I mean, it
24 goes on to talk about information that I

**Page 466**

1 had heard from Dr. Misselwitz.
2 Q. Right. And he responds back
3 to you on May 28, 2014, correct?
4 A. Yes.
5 Q. Okay. And he says, "First
6 of all, let's recall what our strategy
7 has been. Planned and executed for all
8 indications. See respective Clin Pharm
9 CTD parts 2.7.2!!!"
10 Q. Okay. "Do a comprehensive
11 Clin Pharm program to profile rivaroxaban
12 the best we can."
13 Correct?
14 A. Yes.
15 Q. "Implement PK/PD components
16 in all Phase II dose finding trials to
17 characterize PK/PD in the target
18 populations, understand PK/PD and its
19 variability, and quantify influence of
20 relative patient covariates done by Clin
21 Pharm."
22 Correct?

Protected - Subject to Further Protective Review

**Page 471**

1 the correlation between PK and bleeding
2 events, right?
3 MR. HOROWITZ: Objection to
4 form.
5 THE WITNESS: I think we
6 forget that we have several
7 indications where they're just
8 looking at one indication. So we
9 have data from the Phase II in
10 several indications. So where we
11 look at the PK is a matter of
12 decision by the company.
13 And since it's much easier
14 to do -- when I say easier, your
15 more accurate information in Phase
16 II -- we decided that that's where
17 we would do our work.
18 So whether it's done in
19 Phase II or Phase III, I don't see
20 that makes much difference to the
21 Xa inhibitors.
22 BY MR. BARR:
23 Q. In the trial did Bayer or
24 Janssen attempt to correlate PK to

**Page 472**

1 bleeding outcomes?
2 A. Well, the issue is that
3 we -- we know from prior developments,
4 those of us who have worked in it in both
5 companies, that it's very difficult to
6 try to capture PK sampling when you have
7 a bleeding or an efficacy event. So that
8 was not taken forward in this program,
9 because we had experienced from the
10 ximelagatran that it doesn't work well.
11 Q. All right. So the answer to
12 my question is, there was not a trial --
13 A. The answer to your
14 question --
15 MR. HOROWITZ: Let him
16 finish. Slow down.
17 BY MR. BARR:
18 Q. The answer to my question is
19 there was not a trial where Bayer or
20 Janssen attempted to correlate PK with
21 bleeding events, correct?
22 MR. HOROWITZ: Objection to
23 form.
24 THE WITNESS: The answer to

**Page 473**

1 your question is there was not a
2 trial because it would not serve
3 an important purpose since there
4 is not a good hypothesis to go
5 after.
6 MR. BARR: Okay. I'm going
7 to move to strike everything
8 after, "There was not a trial."
9 A brief moment off the
10 record.
11 THE VIDEOGRAPHER: The time
12 is 8:52 a.m. Off the record.
13 (Whereupon, a discussion was
14 held off the record.)
15 THE VIDEOGRAPHER: The time
16 is 8:54 a.m. We are back on the
17 record.
18 BY MR. BARR:
19 Q. We actually know today, and
20 there have been findings, that Pradaxa is
21 a safer drug than Xarelto, correct?
22 MR. HOROWITZ: Objection to
23 form.
24 THE WITNESS: I believe

**Page 474**

1 that's not correct. I'm sorry. I
2 can't agree with you. That's not
3 the case.
4 BY MR. BARR:
5 Q. So you haven't seen the
6 number of epidemiological studies that
7 have come out in recent months indicating
8 that Xarelto is worst in class of the
9 NOACs?
10 A. I've seen a number of
11 epidemiologic observational nonrandomized
12 uncontrolled analyses on a number of
13 drugs, and almost every week you see
14 something going one way and the other.
15 That's not the kind of data that I focus
16 on.
17 MR. BARR: Let me show you
18 what I'm going to mark as
19 Exhibit 46. This is Plaintiffs'
20 3673689.
21 (Document marked for
22 identification as Exhibit
23 Berkowitz-46.)

Protected - Subject to Further Protective Review

Page 475

1  BY MR. BARR:
2     Q.  And I'll apologize to you in
3  advance about the table that I'm going to
4  question you about.  It's very difficult
5  to read.  But that's how we got it.  I
6  think you'll be able to make it out with
7  the questions that I have about it.
8     A.  Okay.  Thank you.
9     Q.  So you see that this is a
10 series of e-mails that includes yourself
11 and Dr. Califf, correct?
12    A.  Yeah.
13    Q.  And we talked about who
14 Dr. Califf is, right?
15    A.  We did.
16    Q.  The other folks on here, is
17 this the ROCKET-AF executive committee?
18    A.  Yes.  These are the members
19 of the ROCKET-AF executive committee.
20    Q.  Okay.  And you send around
21 an e-mail to the executive committee on
22 July 16, 2012, correct?
23    A.  Yeah.
24    Q.  And the subject is

Page 476

1  "Assessment requested by ROCKET-AF
2  executive committee LaHaye, et al.
3  Clinical decision made.  Selection of
4  antithrombotics for stroke prevention in
5  AF."  Right?
6     A.  Yes.
7     Q.  And your email says, "The
8  attached article and supplementary
9  material were published in the European
10 Heart Journal July 3rd."
11       Did I read that correctly?
12    A.  Yes.
13    Q.  What is the European Heart
14 Journal?
15    A.  Just as it says.  It's a
16 heart journal from Europe.
17    Q.  Respected publication?
18    A.  There are a number of
19 respected publications.  It's one of
20 them.
21    Q.  Okay.  "It was picked up
22 been our medical affairs physicians,
23 ATOR, and commercial groups.  Here's a
24 summary.  A clinical decision aid" -- and

Page 477

1  then you have a summary kind of copy and
2  pasted in there, it looks like?
3     A.  Yeah, it looks like the
4  abstract from the paper, and I guess a
5  figure from the paper.
6     Q.  Right.  And what I want to
7  focus on is the picture.  I understand
8  that it's difficult to read.  But bear
9  with me.  I think we can make this out.
10 You see on the left-hand column -- is
11 that MAS bled score?
12    A.  Has bled score.
13    Q.  Has bled score.  Okay.  It's
14 very difficult to read.  What is the has
15 bled score?
16    A.  It's one of a number of
17 scores trying to assess bleeding with the
18 risk factors.
19    Q.  Okay.  And then that goes
20 from zero up to seven, correct?
21    A.  That's what -- that's what's
22 listed on the table.
23    Q.  Then on the bottom scale,
24 it's got the CHA2DS2 score, right?

Page 478

1     A.  Well, that's actually the
2  CHA2DS2-VASc score.  It's a little
3  different from the CHA2DS2 score, but
4  they're essentially the same.
5     Q.  Okay.  And that goes from
6  zero to nine, correct?
7     A.  Correct.
8     Q.  And is it correct to assume
9  that has bled score goes up, bleeding
10 risk is going up for that person?
11    A.  That's how the score works.
12    Q.  And as the CHA2DS2 score goes
13 up, stroke risk is going up for that
14 person?
15    A.  That's correct.
16    Q.  Okay.  And this lists a
17 table of, depending upon what your score
18 is, which drug you should be on, correct?
19    A.  That's what this is intended to do?
20    A.  Well, I mean, this is a
21 table that was created in 2012 from the
22 literature just pulling out numbers.  So
23 this is what these -- I guess that's what
24 they're saying.  Treatment recommendation

Protected - Subject to Further Protective Review

Page 483

1     Q.  I'm just don't
2  understand why the boxes are greyed out
3  and why you wouldn't travel.  But, okay.
4     Q.  So you would agree with me
5  that nowhere in this box is there a
6  recommendation of Xarelto, right?
7     A.  In this particular paper,
8  there -- I don't see rivaroxaban in
9  there.
10    Q.  Okay.  And -- and Dr. Califf
11 responded to you on this, did he not?
12    A.  Yes.  To the group.
13    Q.  Right.  But it was in -- in
14 response to your e-mail, right?
15    A.  Sure, it's attached.
16    Q.  Mm-hmm.
17    A.  Right.  It says, "This is
18 exactly what you would predict from a
19 back-of-the-envelope indirect
20 comparison," right?
21    A.  That's what he wrote.
22    Q.  So he's clearly not
23 surprised by this outcome, correct?
24    A.  He's not surprised, though

Page 484

1  when you do this kind of work you're
2  going to get this kind of result.
3     Q.  Right.  Well, and he says,
4  "This ray" -- he says, "Raises the issue
5  of what would happen if the indirect
6  comparison was actually done."
7        Right?
8     A.  Right.
9     Q.  "Good topic for the 24th,"
10 right?
11    A.  Right.
12    Q.  For discussion.
13    A.  Because there will be a lot
14 of controversy among the academic leaders
15 of how this study was performed.
16    Q.  And that -- that indirect
17 comparison was never conducted by Bayer
18 or Janssen, correct?
19    A.  This I have no idea.  There
20 are lots of indirect -- of comparisons
21 done, but it's not something that we
22 favor and Dr. Califf doesn't favor doing
23 that.  He favors doing more scientific
24 work than this.

Page 485

1     Q.  He wanted to do some
2  head-to-head studies?
3     A.  Well, we all like to do
4  head-to-head as clinical trialists, but
5  is the -- the supreme.
6     Q.  Is there anything that's
7  stopping you from doing a head-to-head?
8     A.  I'm sorry.  I don't know
9  what you mean.  You mean testing all the
10 drugs in four or five arms?
11    A.  Well, I mean --
12       MR. HOROWITZ:  Guys, one at
13 a time.
14       THE WITNESS:  I didn't look
15 at --
16 BY MR. BARR:
17    A.  That's my fault.  Go ahead.
18    A.  No, go ahead.
19    Q.  Bayer and Janssen certainly
20 had never conducted a head-to-head,
21 right?
22    A.  Explain what you mean by
23 head-to-head.
24    Q.  A head-to-head of Xarelto

Page 486

1  versus any competitor other than
2  warfarin.
3     A.  No.
4     Q.  No.  And -- and there's
5  nothing stopping you from doing that,
6  right?
7     A.  There are lots of things
8  stopping us from doing it.
9     Q.  Like what?
10    A.  There are very large
11 lifecycle program that we're doing that
12 others aren't doing --
13    Q.  Okay.
14    A.  -- where we're looking at
15 all these other indications that we
16 talked about yesterday, like the related
17 indications.
18    Q.  So business plans and
19 strategies are stopping you from doing
20 it.
21    A.  Patient care and unmet need
22 is what's stopping us.
23    Q.  Okay.  There's no -- no
24 legal or regulatory reason that you can't

Protected - Subject to Further Protective Review

Page 479

1  table.
2     Q.  Is Xarelto listed in any of
3  the boxes?
4     A.  It's hard to see anything in
5  any of the boxes.  But if I --
6     Q.  I think we can make it out.
7  The first column, the first column under
8  CHA2DS2 zero is no treatment, right?
9  They're all no treatment?
10    A.  Yes.  It looks like all no
11 treatment.
12    Q.  The CHA2DS2 of one,
13 everything from a bleed score from two up
14 is no treatment.  And if you've got a
15 zero or a one on your has bled, it's
16 apixaban, right?
17    A.  That's what it looks like.
18    Q.  Okay.  Go to CHA2DS2 two.
19 If you've got a bleed score -- bled score
20 of zero to one -- zero to two, it's
21 apixaban, correct?
22    A.  And if you've got a bled
23 score from three to seven, it's ASA,

Page 480

1  right?
2     A.  Yes.
3     Q.  Now, we haven't talked about
4  ASA, I believe, today.  What's ASA?
5     A.  Well, it doesn't say in the
6  chart.  So we would have to assume that
7  they mean -- there's no footnote to it.
8  But we would assume that it's aspirin.
9     Q.  Okay.  And let's go to a
10 CHA2DS2 score of three.  Of the bled score
11 from zero to three, the recommendation is
12 apixaban, right?
13    A.  Correct.
14    Q.  And then from four to seven,
15 the recommendations ASA, right?
16    A.  That's what this group is
17 recommending.
18    Q.  Okay.  Then we go to CHADS
19 of a 4.  And the recommendation that a
20 bleed risk of -- blood risk of zero is
21 dabigatran 150.  Do you see that?
22    A.  Yes, sir.

Page 481

1     A.  Yes.  You're right.  Yeah,
2  dabigatran 150.
3     Q.  And then for has bled of 1
4  to 4, it's apixaban, right?
5     A.  Yes.  That's what's in the
6  table.
7     Q.  And then -- and then for has
8  bled of 5 to 7, it's ASA, right?
9     A.  That's what's in the table.
10    Q.  Okay.  Then we go to a CHADS
11 score of 5.  There you have dabigatran at
12 a bled score of zero, right?
13    A.  Yes.  That's what I see.
14    Q.  And apixaban from a bled
15 score of 1 to 7, correct?
16    A.  Yes.
17    Q.  Okay.  And then you go to a
18 CHADS score of 6, and you have dabigatran
19 at a bled score of zero, correct?
20    A.  Yes.
21    Q.  And apixaban from a bled
22 score of 1 to 7, right?
23    A.  Yes.
24    Q.  Okay.  Then you go to a

Page 482

1  CHADS score of 7.  If you've got a bled
2  score of zero, do you know why that box
3  would be greyed out?
4     A.  You would have to ask the
5  authors where they got their information
6  from.
7     Q.  And then for a -- for a bled
8  score of 1 to 7, the recommendation is
9  apixaban, right?
10    A.  Yes.
11    Q.  Which is Eliquis, right?
12    A.  We know it as Eliquis in
13 this country.
14    Q.  Right.  Then for a CHADS
15 score of 8, for a bled score of 1, it's
16 Pradaxa 150, right?
17    A.  Yes.
18    Q.  And then Eliquis from a bled
19 score of 2 to 7, right?
20    A.  Yes.
21    Q.  And then for a -- a CHADS
22 score of 9, for a -- and a bled score
23 from 2 to 7, the recommendation is
24 Eliquis, correct?

Protected - Subject to Further Protective Review

Page 487

1  conduct those studies, correct?
2        MR. HOROWITZ:  Object to the
3  form.
4        THE WITNESS:  I'm not sure
5  what that has to do in -- in
6  strong sense with how we decide
7  what trials need to be done for
8  patients.
9  BY MR. BARR:
10    Q.  Okay.  Let's move on.  The
11 studies that have been done by Bayer do
12 identify patients who are high absorbers.
13 You know that, right?
14    A.  I think that statement is
15 untrue.
16    Q.  Okay.  Let me show you what
17 I'm going to mark as Exhibit 47.  This is
18 Plaintiffs' 1265602.
19       (Document marked for
20 identification as Exhibit
21 Berkowitz-47.)
22 BY MR. BARR:
23    Q.  Just let me know when you're
24 ready.

Page 488

1     A.  Okay.  Thank you.  It's a
2  long one.  Thank you.
3     Q.  You see that this -- and I'm
4  focusing on -- on the first e-mail.
5     A.  The top e-mail?
6     Q.  Yes, sir.
7     A.  Okay.
8     Q.  The e-mail from Dr. Mueck to
9  you is dated June 13, 2007, right?
10    A.  Yes, sir.
11    Q.  So this is four years plus
12 five months before the drug is approved
13 by the FDA, right?
14    A.  Yes.
15    Q.  And the subject line is
16 "Pooled analysis of PK/PD and Phase II
17 clinical data on INR and rivaroxaban."
18       Right?
19    A.  Let me just -- I'm sorry.
20 If I could just -- my memory is there was
21 approval for -- I might be wrong --
22 approval for the orthopedic program
23 earlier.  If you mean -- okay.
24    Q.  And I -- I should have been

Page 489

1  more clear talking about the November
2  approval.
3     A.  Yes.  You're right.
4     Q.  Thank you.
5        He says, "What I can provide
6  immediately is this graph with PT values
7  for baseline peak 2- to 4-hour
8  post-dosing and trough, 24-hour
9  post-dosing, from the 20-milligram
10 once-a-day dose in VTE treatment patients
11 N equals 130 taken from the EINSTEIN
12 study," correct?
13    A.  Yes.
14    Q.  And just people understand
15 what this means, that N equals 130,
16 that's the number of subjects in the --
17 in the study, right?
18    A.  Correct.
19    Q.  Okay.  Then he has a chart
20 that gives you the -- the ranges for CMAX
21 and -- and 2 and 4 hours PT max.  Do you see
22 that all that on the bottom?
23    A.  Yeah.  Mm-hmm.
24    Q.  And -- and those PT numbers,

Page 490

1  you would agree there's a pretty wide
2  range there, right?
3     A.  For -- for the PT max?
4     Q.  Right --
5     A.  I'm sorry.  The PT 24 and
6  the --
7     Q.  For the PT max.
8     A.  The PT max, there -- well,
9  there's a -- a significant outlier and
10 then there is a spread.  It seems to be a
11 little less in the 24 and a little less
12 with the PT based.
13    Q.  Right.  With the -- the
14 outlier is up above a PT of 40, correct?
15    A.  Yes, if you look on the
16 right side there's one that's further out
17 at 40.  It's probably not reliable.
18    Q.  So in this -- in this study
19 of 130 patients, one of them ended up
20 with a -- with a PT above 40 at max,
21 right?
22       MR. HOROWITZ:  Object to the
23 form.
24       THE WITNESS:  Well, there's

Protected - Subject to Further Protective Review

Page 491

1  a value here.
2  BY MR. BARR:
3  Q.  And the others range from
4  just above 30 to somewhere between 15 and
5  20, correct?
6  A.  Yes.  A little higher than
7  15, but -- at the base.  For PT max we
8  are talking about.
9  Q.  For PT max, yes, sir.
10  A.  Yes.
11  Q.  And what he writes is, "As
12  you can see, outliers in PT higher than
13  25 seconds, 90th percent" -- "percentile
14  of this cohort of patients are possible."
15  A.  Mm-hmm.
16  Q.  "Compare the corresponding
17  maximum rivaroxaban concentrations."
18  Correct?
19  A.  Yes.
20  Q.  So he says, "Outliers in PT
21  are possible," right?
22  A.  Well, I think when he's
23  using outliers compared to when I was
24  using outliers, he's talking about the

Page 492

1  patients at the edges.  I was using the
2  term "outlier" for the one that's up at
3  like 40 seconds.  It's -- it's quite
4  valuable that in values like that, when
5  you find that in any of these, that
6  sample may not have been obtained
7  properly, processing, whatever.  So I'm
8  focusing on the range that you and I were
9  talking about, 30 to...
10  Q.  Okay.  But you -- you don't
11  have anything that you can offer here
12  today that -- that says that this -- that
13  proves that this PT above 40 was
14  improperly taken, do you?
15  MR. HOROWITZ:  Object to the
16  form.
17  THE WITNESS:  I just have
18  years of experience of working in
19  the laboratory and having samples
20  drawn and analyzing them.
21  BY MR. BARR:
22  Q.  Okay.  But you --
23  A.  Other than that I don't have
24  anything here.

Page 493

1  Q.  Okay.  He says, "Now let's
2  calculate with baseline 13 seconds in
3  Neoplastin reagent with ISI equals 1.8."
4  Do you know what any of that
5  means?
6  A.  Sure.
7  Q.  Okay.  Explain that.
8  A.  The baseline PT was at
9  13 seconds.  It took 13 seconds for it to
10  clot.  The Neoplastin reagent was what we
11  talked about yesterday where you need a
12  sensitive reagent to test.  And the
13  international sensitivity index is 1.8.
14  Q.  Okay.  "This gives you INR
15  values for PT equals 25 seconds of 3.2
16  values for PT seconds of 4.5 and PT
17  equals 40 seconds of 7.6."
18  Did I read that right?
19  A.  Yes.
20  Q.  So carrying this into the
21  parlance of people -- that people
22  understand with INR in trying to keep
23  patients within 2 to 3, this is saying
24  that this individual above 40 seconds is

Page 494

1  at an unusual INR of 7.6, correct?
2  A.  No.  This is worthless in
3  regard to INR.
4  Q.  PT we already know it's far
5  off, but it's as close as we have.  INR
6  is not useful here.
7  A.  Okay.  Then why did you need
8  this calculation?
9  MR. HOROWITZ:  Brian.
10  THE WITNESS:  You have to
11  understand how the INR is done.  I
12  have to explain to you how the INR
13  is done.
14  BY MR. BARR:
15  Q.  No, I mean, I know how it
16  works and what it's based on.  But I'm
17  asking you why you did this calculation.
18  A.  Well -- if --
19  MR. HOROWITZ:  Brian, hold
20  on a second.  We got to -- both of
21  y'all have got to slow down a
22  little bit.  Brian, you did cut
23  him off in the middle of a

Protected - Subject to Further Protective Review

Page 495

1  sentence.  So please let him
2  finish, and you can of course do
3  what you need to do.
4  MR. BARR:  Go ahead.
5  MR. HOROWITZ:  So let him
6  finish.
7  THE WITNESS:  So there are a
8  couple of facts.  These days,
9  laboratories report an INR whether
10  you're on warfarin or not.  The
11  INR was developed, as you know, to
12  standardize PT values around the
13  world because of the different
14  thromboplastin ISI values, the
15  different sensitivities.
16  They're honed and refined
17  using World Health Organization
18  standards of blood to develop
19  those standards.
20  They're for vitamin K
21  antagonist.  They are not for
22  dabigatran or for rivaroxaban or
23  Eliquis.  So the INR has no value
24  in interpretation.  You can get

Page 496

1  it.  The machine will spit it out.
2  But you can't interpret it.
3  Want to look at the PT, talk
4  about the Neoplastin C Plus, fine.
5  But just because it reports that
6  number, doesn't give it value.
7  BY MR. BARR:
8  Q.  Okay.  So I'm asking you why
9  you did the calculation if it's
10  valueless?
11  A.  I can't answer that.  You'd
12  have to ask Dr. Mueck.
13  Q.  He certainly thought it was
14  valuable enough to calculate, correct?
15  MR. HOROWITZ:  Objection to
16  form.  Slow down.
17  THE WITNESS:
18  A.  He did the work, correct?
19  A.  Of course, but the machines
20  can spit it out, and machines in
21  laboratories will do it.  And this is
22  what confuses doctors.  So when we say
23  things like putting in PTs, and then they
24  just get an INR from the laboratory, the

Page 497

1  doctors don't really know.  They assume
2  that the lab has this all worked out.
3  It's not.  The INR is worked out for
4  warfarin.  And that's dangerous to use it
5  for patients.  And that's why I get a
6  little bit concerned when we try to make
7  these extrapolations, because patients
8  can get hurt when we do these things.
9  Will they know what's behind them?
10  Q.  With that concern, did you
11  write back to Dr. Mueck and say, "Wait,
12  wait, wait.  I'm really concerned here.
13  Why are you calculating INR?  You could
14  be hurting patients"?
15  A.  Well, first of all, this is
16  from a PK/PD lab.  This is not patients
17  in his lab.
18  But I guess I just get
19  confused why you ask those kinds of
20  questions, did I write back.  I mean,
21  there are many things that might be done
22  or not done every day.  So I'm not sure
23  what that means.
24  Anytime that I have a

Page 498

1  question that I should write back to
2  everybody and ask it, I'm a little
3  perturbed by that.  What's that all mean?
4  Q.  It means that you didn't
5  respond to this in the way that you're
6  responding in the deposition, did you?
7  A.  Because you're asking a
8  different question than what we were
9  addressing.
10  We can move on.
11  Now let's look at some
12  papers that were published by Dr. Mueck.
13  I want to start with what I'll mark as
14  Exhibit 48.  This is Plaintiff 177639.
15  (Document marked for
16  identification as Exhibit
17  Berkowitz-48.)
18  BY MR. BARR:
19  Q.  I know you'd probably like
20  to read this whole thing.  I'm going to
21  ask that you not do that.  I'm more than
22  happy for you to skim it quickly.
23  MR. HOROWITZ:  Why don't we
24  do this, Brian.  Number one, let

Protected - Subject to Further Protective Review

Page 499

1  him skim it.  Number two, if
2  there's a particular section that
3  you're going to be asking about,
4  it might be helpful --
5  MR. BARR:  Well, I'm going
6  to be asking about the figures on
7  the very last page.
8  MR. HOROWITZ:  Okay.  That's
9  helpful.
10  BY MR. BARR:
11  Q.  So if you can look at the
12  last page and see what figure it's --
13  MR. HOROWITZ:  Then
14  he can decide what else he needs
15  to look at.
16  THE WITNESS:  I'd just like
17  to read the abstract here, and
18  then I'll go back to that.
19  MR. HOROWITZ:  Take your
20  time.
21  Mr. Barr shenaniganizing.
22  THE WITNESS:  Last page?
23  BY MR. BARR:
24  Q.  Yes, sir.

Page 500

1  A.  Sorry.  I have to look
2  inside the document where the figure is
3  referred to so we can understand the
4  figure.
5  MR. HOROWITZ:  Do what you
6  need to do.  You don't have to --
7  inner monologue is okay.  Keep it
8  inside.  And then he'll ask you
9  his questions when you're ready.
10  BY MR. BARR:
11  Q.  Now, this manuscript is
12  titled "Rivaroxaban and Other Novel Oral
13  Anticoagulants: Pharmacokinetics in
14  healthy subjects, specific patient
15  populations and relevance of coagulation
16  monitoring."  Correct?
17  A.  Yes.
18  Q.  And this is written by
19  Dr. Mueck among others, right?
20  A.  Yes.
21  Q.  It's going to be published
22  in the journal Thrombosis, right?
23  A.  That's the target journal.

Page 501

1  This is Draft 6.  So I don't know the
2  final paper.
3  Q.  Fair enough.
4  And the date issued for
5  review is July 11, 2012, with feedback
6  requested July 18, 2012, correct?
7  A.  Yes.
8  Q.  Now, let's turn
9  towards the last page, which is Page 42.
10  And I'm looking at Figure 5.
11  Do you understand a
12  box-and-whisker chart, what it's showing?
13  A.  I think so.
14  Q.  These box-and-whisker charts
15  are showing estimated levels of
16  rivaroxaban exposure of a 20-milligram
17  dose in patients with Afib with normal
18  and moderately impaired renal function,
19  and it's showing plots for CMAX and area
20  under the curve, right?
21  A.  Yes.
22  Q.  And so just so the jury
23  understands, can you explain what CMAX
24  and area under the curve are?

Page 502

1  A.  Well, CMAX is the
2  concentration maximum, so it would be the
3  peak value that has a time range
4  somewhere in the order of two to
5  four hours after a dose is given in
6  general.
7  The area under the curve is
8  a calculation of the concentration all
9  during the 24-hour period or whatever
10  period you choose.
11  Q.  Okay.  It says, "Top and
12  bottom of the shaded boxes correspond to
13  the upper 75 percent and lower 25 percent
14  percentiles respectively.  The central
15  white bands represent the median.
16  Whiskers correspond to the lowest and
17  highest data points within in 1-1/2 times
18  interquartile range calculated from the
19  center of the data.
20  "Points beyond this range
21  are possible outliers indicated by
22  horizontal lines," right?
23  A.  Yes.
24  Q.  These charts are showing a

Protected - Subject to Further Protective Review

Page 503

1  group of subjects who received a
2  20-milligram pill, right?
3  A.  20-milligram and
4  50-milligram.
5  Q.  And just so -- I'm focusing
6  on the 20-milligram side of the CMAX
7  chart.  Okay?
8  A.  Okay.
9  Q.  And so this figure is
10  representing a group of patients who all
11  received the 20-milligram pill, right?
12  A.  It says 20 milligrams.  So
13  that's what I assume.
14  Q.  They all received the same
15  dose, right?
16  A.  Again, it says
17  20 milligrams.  So I'm assuming that
18  group is the patients that got
19  20 milligrams.
20  Q.  And the CMAX ranged from
21  just below 200 to almost 500, right?
22  A.  CMAX, micrograms per liter,
23  150.  You're looking at the left plot?
24  Q.  No, I'm looking at the right

Page 504

1  plot, which is the 20 milligrams?
2  A.  I'm sorry.  Area under the
3  curve.
4  Q.  No, no, I'm looking at the
5  CMAX.
6  A.  Okay.  You're looking at the
7  left plot with the one that's on the
8  right in the left plot.
9  Q.  Yeah.  I thought I said I
10  was looking at the CMAX?
11  MR. HOROWITZ:  It's a lot
12  like who's on first.
13  THE WITNESS:  CMAX.
14  20 milligrams.  Okay.
15  Q.  CMAX?
16  A.  I see it.
17  Q.  And the CMAX ranges from
18  just below 200 --
19  A.  Yes.
20  Q.  -- to just below 500?
21  A.  Yes.
22  Q.  Right.  So that's a roughly
23  two-and-a-half-fold difference right?

Page 505

1  A.  Using simple math
2  calculations, yes.
3  Q.  Right.  So two -- so people
4  taking the same pill, their blood plasma
5  concentration ranges from just below 200
6  to somebody else taking the same pill to
7  just below 500, right?
8  MR. HOROWITZ:  Form.
9  THE WITNESS:  In this study
10  in these however many patients you
11  said it was, that's the finding
12  that they have here.
13  BY MR. BARR:
14  Q.  And do you believe that that
15  is a significant variation in
16  concentration?
17  A.  No.
18  Q.  No.  How would you describe
19  that variation?
20  A.  I would call it moderate,
21  but I'm not a clinical pharmacologist.
22  Q.  So you believe there
23  is moderate variation with Xarelto; is
24  that true?

Page 506

1  MR. HOROWITZ:  Form.
2  Q.  So I don't
3  believe that there's a -- whatever
4  you had called it before, whatever
5  term --
6  BY MR. BARR:
7  Q.  We were calling them high
8  absorbers.
9  A.  That's an even different
10  thing in my mind.
11  Q.  I thought we agreed on what
12  that term means.
13  MR. HOROWITZ:  Guys, both
14  slow down a little bit.
15  THE WITNESS:  Maybe I
16  missed -- maybe I missed your
17  question.  Because I thought you
18  were asking me about the -- the
19  CMAX for the 20-milligram.
20  BY MR. BARR:
21  Q.  I am.  I am.
22  A.  Okay.  So I don't know where
23  the absorbance part came in.
24  Q.  I'm just asking you what

Protected - Subject to Further Protective Review

**Page 507**

1 your characterization of the variability
2 with Xarelto is. And I thought I heard
3 you say moderate; is that right?
4 A. What you heard me say is I'm
5 not a clinical pharmacologist, and we
6 should talk to those specialists. But my
7 understanding is that it's moderate.
8 From what I've seen from drugs and what
9 I've seen from rivaroxaban, that fits
10 into a more moderate category.
11 Q. Okay. That's what I wanted
12 to know. All right.
13 So let's go to Plaintiffs'
14 49 -- I mean -- I butchered that.
15 Exhibit 49. Plaintiffs' 3261528.
16 (Document marked for
17 identification as Exhibit
18 Berkowitz-49.)
19 MR. HOROWITZ: What do I get
20 if I guess what this exhibit is?
21 Do I get a prize?
22 MR. BARR: No, probably not.
23 You get more questions. That's
24 what you get.

**Page 508**

1 Were you right?
2 MR. HOROWITZ: I was right.
3 BY MR. BARR:
4 Q. All right. I've handed
5 you -- and I'll give you a second to
6 review it. I just want to say what this
7 is.
8 I've handed you a -- a paper
9 from Dr. Mueck, Stampfuss, Kubitza and
10 Becka. And this is titled "Clinical
11 Pharmacokinetic and Pharmacodynamic
12 Profile of Rivaroxaban."
13 Do you see that?
14 A. Yes.
15 Q. And this is published in
16 September -- on September 3, 2013, right?
17 A. Yes. Online. Mm-hmm.
18 Q. Okay. If you want to take a
19 moment to --
20 A. Sure. Thank you.
21 Q. I'll tell you I'm going to
22 focus on the -- the charts and -- so it
23 will be table -- Table 1. This is where
24 I'm going to focus.

**Page 509**

1 Okay. Take a quick look
2 here.
3 Q. And I'm sorry. Table 3 as
4 well.
5 A. Okay. Thank you.
6 Q. So I just want to -- let's
7 look at the abstract first.
8 A. Okay.
9 Q. And if you go down about a
10 third of the way through the abstract, do
11 you see the sentence that starts
12 "Variability?"
13 A. The sentence that starts
14 Got it.
15 Q. Okay. It says, "Variability
16 in the pharmacokinetic parameters is
17 moderate, coefficient of variation 30 to
18 40 percent," correct?
19 A. Yes.
20 Q. So, according to this paper,
21 the variation is moderate, correct?
22 A. That's what it's saying
23 here. For -- now it's taking all the
24 pharmacokinetic parameters together.

**Page 510**

1 Q. Which is consistent with
2 what you understand?
3 A. What I understood.
4 Q. Okay. So now let's go to
5 Table 3. You understand that Table 3 in
6 this paper is data from the ROCKET trial,
7 correct?
8 A. Well, looking at the table,
9 I understand it's data from the various
10 trials that we've done, including the
11 ROCKET trial.
12 Q. Okay. And I'm looking at
13 the stroke prevention in patients with AF
14 20 milligrams once a day. Okay?
15 A. So you're looking at the
16 patients with the creatinine clearance
17 greater or equal to 50?
18 Q. Yes, sir.
19 A. Right? Okay.
20 Q. Mm-hmm. And what this has
21 here, if you look at concentration
22 trough, and just for purposes of the
23 record, can you explain to the jury, and
24 I know you've done this before, but you

Protected - Subject to Further Protective Review

**Page 515**

1 (Document marked for
2 identification as Exhibit
3 Berkowitz-51.)
4 BY MR. BARR:
5 Q. And I'll represent this is
6 not an e-mail you're on. But I do have
7 this as a document you reviewed to
8 prepare for this deposition.
9 MR. HOROWITZ: So just, how
10 about an ongoing objection to
11 foundation.
12 MR. BARR: You can have --
13 you can have the continuing
14 objection.
15 MR. HOROWITZ: Thank you.
16 And just to be clear, you're
17 saying both 50 and 51 were on his
18 list?
19 MR. BARR: Yes, they were.
20 MR. HOROWITZ: Okay. Same
21 foundation objection. But...
22 BY MR. BARR:
23 Q. And -- and maybe to try and
24 help you out here, I'm not really going

**Page 516**

1 to ask you about the e-mail. I was
2 showing this to you, to show you that you
3 hadn't seen this before. That's really
4 the only reason I'm giving you this
5 exhibit.
6 A. Oh okay.
7 Q. I didn't -- I didn't want
8 there to be confusion that this was
9 something that you had seen before.
10 MR. HOROWITZ: I think he
11 wanted me to help establish lack
12 of foundation.
13 MR. BARR: Well, I'm trying
14 to be fair to the witness.
15 MR. HOROWITZ: Thank you.
16 MR. BARR: Okay.
17 THE WITNESS: You -- you
18 need me to look at this --
19 BY MR. BARR:
20 Q. Yes. What I want you to
21 really do is look at --
22 A. Yes.
23 Q. -- Exhibit 51 which is the
24 PowerPoint.

**Page 517**

1 A. Okay.
2 Q. And I'll tell you what I'm
3 going to focus on. If you want to look
4 at more of this than that, that's fine.
5 I'm hoping you won't need to. But what
6 I'm looking at is PowerPoint Slide Number
7 4.
8 A. Okay.
9 Q. And it references -- the
10 title of it is "Dabigatran." And there's
11 a blue box that says, "A case for routine
12 monitoring." That's what I'm going to be
13 asking you about.
14 A. Do you want me to just read
15 through this and just --
16 Q. Right.
17 A. Okay.
18 Q. You see this is a PowerPoint
19 from Janssen titled "Rivaroxaban Project
20 100, Quantitative Sciences," correct?
21 A. Yeah.
22 Q. It was attached to an
23 e-mail, which is Exhibit 50, that was
24 dated October 10, 2015, correct?

**Page 518**

1 A. Yes.
2 Q. And I'm -- and I'm looking at
3 Page 4 of the PowerPoint, which is titled
4 "Dabigatran."
5 Q. Do you see that?
6 A. Yes.
7 Q. And there's a blue box on
8 the bottom two-thirds of the page with a
9 bold heading, "A case for routine
10 monitoring?"
11 Q. Do you see that?
12 A. Yes.
13 Q. And there's a statement
14 right after that that says, "Relatively
15 high intersubject variability in Phase
16 III ADI trial C trough displayed a
17 420 percent and 450 percent variability."
18 Did I read that correctly?
19 A. Yes.
20 Q. So as trough,
21 according to this document, dabigatran
22 had a 420 percent variability for the
23 120 milligrams twice a day, and a
24 450 percent variability at trough for the

Protected - Subject to Further Protective Review

**Page 511**

1 never know what part of these things are
2 going to get played.
3 Q. Well you explain to the jury
4 what concentration trough means?
5 A. Well, the concentration at
6 trough is basically as low as the
7 concentration might be before the next
8 dose. So the -- the time period could
9 vary unlike the CMAX which has a more
10 narrow range that you would be sampling
11 from.
12 Q. Right. Okay. So the
13 concentration trough, the mean is 44,
14 right, 44 micrograms per liter, correct?
15 A. That's what it says for --
16 for the stroke prevention now.
17 Q. And the 5th to
18 95th percentile is 12 to 137 micrograms
19 per liter, right?
20 A. Yeah.
21 Q. That a tenfold difference,
22 correct?
23 A. Well, again, doing simple
24 math, that's a -- well, not quite.

**Page 512**

1 Q. It's actually more than 10.
2 A. I'm sorry. From 18 to 136?
3 Q. No, from 12 to -- you're
4 looking at --
5 A. Oh, I'm sorry. I'm on the
6 wrong line. Yep, I lost my place.
7 Yes. Mm-hmm.
8 Q. Okay. So it's actually a
9 slightly greater than tenfold increase,
10 right?
11 A. But you can call it tenfold.
12 Q. Okay. And so that -- that
13 gets back to the original idea that
14 different patients taking the same
15 20-milligram pill at trough, there is a
16 tenfold variation in their blood plasma
17 concentration at trough, right, across
18 the 5th and 95th percentile?
19 MR. HOROWITZ: Object --
20 object to the form.
21 THE WITNESS: Yeah, I think
22 the -- one has to understand how
23 the samples are drawn, and there's
24 a wide window for trough. So you

**Page 513**

1 are going to get a wider spread.
2 BY MR. BARR:
3 Q. Okay. Well, who controls
4 how those samples are drawn? You would
5 be the person that designed the study,
6 right?
7 A. It would be the standard
8 used by a clinical pharmacologist. So
9 that would be across, you know, academia
10 and regulatory authorities and the
11 industry.
12 Q. Okay. But then if you go to
13 CMAX, there is a median of 249, correct?
14 A. Yes.
15 Q. I'm sorry. It's the
16 geometric mean. Geometric mean of 249,
17 correct?
18 A. Sorry. Let me check the
19 footnote. Yes, geometric mean. Correct.
20 Q. And the variation in the 5th
21 to 95th percentile is 184 to
22 343 micrograms per liter, right?
23 A. Yes.
24 Q. Approximately a twofold

**Page 514**

1 difference, right?
2 A. So as we had noted a more
3 narrow, a more narrow range and a more
4 narrow fold.
5 Q. Right. So according to this
6 data, it's a narrower range at CMAX and a
7 wider range at trough, right?
8 A. Well, according to this
9 data, what I was saying was that the
10 sampling time is wider. Now as I said,
11 I'm not a clinical pharmacologist, but as
12 a clinician, that's how I understand it.
13 That's how I look at the data.
14 Q. Okay. Now, I want to show
15 you -- I'm going to show you what I'm
16 going to mark as 50 and 51.
17 3668403, and Exhibit 51 is Plaintiffs'
18 3668404.
19 (Document marked for
20 identification as Exhibit
21 Berkowitz-50.)
22

Protected - Subject to Further Protective Review

**Page 519**

1 150 milligram twice a day, correct?
2 MR. HOROWITZ: Form.
3 THE WITNESS: Just reading
4 what they say in this slide.
5 That's what it says.
6 BY MR. BARR:
7 Q. And in this slide, a 420 to
8 450 percent variability is described as
9 high intersubject variability, correct?
10 A. No. It's described as
11 relatively high.
12 Q. Fair enough.
13 A. That's not the same thing.
14 Q. Fair enough. Relatively
15 high intersubject variability, correct?
16 A. Yes.
17 Q. Whereas if you look at the
18 Mueck paper that we just looked at, at
19 trough there is a tenfold difference for
20 patients on 20 milligrams, correct? Do
21 you remember that?
22 MR. HOROWITZ: Form.
23 THE WITNESS: Yes.

**Page 520**

1 BY MR. BARR:
2 Q. That a thousand percent
3 increase, correct?
4 MR. HOROWITZ: Same
5 objection.
6 THE WITNESS: Again, you're
7 doing simple math with clinical
8 pharmacology numbers that I'm not
9 expert in. So I can't really help
10 you here. I think you need to
11 talk to the people who do the
12 clinical pharmacology.
13 BY MR. BARR:
14 Q. You would agree with me that
15 a tenfold different variability in trough
16 is a thousand percent variability,
17 correct?
18 MR. HOROWITZ: Objection.
19 Same objections.
20 THE WITNESS: Simple math
21 says that.
22 BY MR. BARR:
23 Q. So the answer to that is
24 yes?

**Page 521**

1 A. I don't know what that means
2 in a clinical pharmacology sense.
3 Q. But the answer to my
4 question is yes, that's a thousand
5 percent variability?
6 MR. HOROWITZ: Same
7 objections. It's asked and
8 answered 27 times now.
9 MR. BARR: You can really
10 just stick to "object to form."
11 THE WITNESS: The question
12 is did you do your math right?
13 BY MR. BARR:
14 Q. Yes.
15 A. It sounds like it.
16 Q. Okay. And -- never mind.
17 We'll move on from that.
18 MR. BARR: I think now is a
19 good time for a break.
20 THE VIDEOGRAPHER: Stand by,
21 please. The time is 9:40 a.m. We
22 are going off the record.
23 (Short break.)
24 THE VIDEOGRAPHER: The time

**Page 522**

1 is 10:01 a.m. We are back on
2 record.
3 BY MR. BARR:
4 Q. I want to dig a little
5 further into an issue we talked about
6 yesterday. We probably won't spend a lot
7 of time on this topic. But do remember
8 the discussion yesterday about whether or
9 not Janssen or Bayer ever truly conducted
10 testing to determine whether or not
11 monitoring was -- was needed with the use
12 of Xarelto?
13 A. I'm sorry. Say that again.
14 Q. Do you recall the discussion yesterday about
15 whether or not Janssen or Bayer ever
16 truly conducted testing to determine
17 whether or not monitoring was needed with
18 Xarelto?
19 A. I remember discussions on
20 that, yes.
21 Q. Okay. Do you have a
22 position as to whether or not the idea of
23 monitoring was ever tested by Bayer or

Protected - Subject to Further Protective Review
Protected - Subject to Further Protective Review

Page 523

1 Janssen?
2    MR. HOROWITZ: Form.
3    THE WITNESS: I guess I'm
4 not understanding what -- what
5 you're asking.
6 BY MR. BARR:
7    Q. Okay. Well, let me know you
8 a document and maybe I can help you out.
9    A. Okay.
10    Q. I'll show you Exhibit 52.
11 And this is Plaintiffs' 80333.
12    (Document marked for
13 identification as Exhibit
14 Berkowitz-52.)
15 BY MR. BARR:
16    Q. And I'll give you a minute
17 to familiarize yourself with it.
18    A. Okay. Thank you.
19    Q. So you see that this is a
20 series of e-mails that got forwarded to
21 you by Ms. Kubitza. Do you see that?
22    A. Dr. Kubitza, yes.
23    Q. Right. And she sent this to
24 you on August 18, 2014, correct?

Page 524

1    A. Yes.
2    Q. Okay. And the subject line
3 is "Hold for review of time sensitive PR
4 communication."
5    Did I read that correctly?
6    A. Yes.
7    Q. And she writes to you, "Dear
8 both" -- well, you and Dr. Derix. It
9 says, "Dear both. Some background
10 information for the discussion to come
11 later this week. Best regards, Dagmar."
12    A. Yeah.
13    Q. Correct?
14    So what I want to do is I
15 want to start looking at this. And I'm
16 going to start with the e-mail from Paul
17 Burton that starts on the bottom of the
18 page at 20944.
19    A. Okay.
20    Q. Do you see the e-mail from
21 Paul Burton?
22    A. Yes.
23    Q. And this is August 14, 2014,
24 correct?

Page 525

1    A. Yes.
2    Q. All right. And he sends an
3 e-mail to, it looks like a group of
4 people at Janssen primarily, correct?
5    A. Correct.
6    Q. Okay. And he says, "I think
7 the edits for clarity are valuable. I
8 would keep the information in the middle
9 column that we perform testing for
10 monitoring in early and late stage trials
11 and were able to confidently conclude
12 that monitoring is neither necessary nor
13 required with Xarelto as not routine
14 clinical practice."
15    Did I read that correctly?
16    A. Yes.
17    Q. Okay. You agree with me
18 that the label indicates that routine
19 monitoring is not required with Xarelto,
20 correct?
21    A. That's correct.
22    Q. Okay. And according to
23 Mr. Burton here -- do you know if it's
24 mister or doctor? I don't remember.

Page 526

1    A. Doctor.
2    Q. Okay. According to
3 Dr. Burton here, he believes that the
4 companies tested for monitoring in early
5 and late stage trials and were able to
6 confidently conclude that monitoring is
7 neither necessary nor required with
8 Xarelto use, correct?
9    MR. HOROWITZ: Object to the
10 form.
11    THE WITNESS: Well, that's
12 what it -- he's writing in his
13 e-mail here. I'm just reading
14 that. I don't know what he
15 actually believes.
16 BY MR. BARR:
17    Q. Well, that's what he
18 wrote, correct?
19    Q. Okay. Do you agree or
20 disagree with that statement?
21    A. Well, my memory of it, I
22 mean, we did a little bit of PK in small
23 samples in the ROCKET trial, 160 or so.

Protected - Subject to Further Protective Review

Page 527

1 But we did our work, as -- as I
2 mentioned, in Phase II where we looked at
3 these connections with bleeding and
4 events the best we could from that work.
5    Q. So is that an agreement or a
6 disagreement? I just want to --
7    A. Well, I guess it depends
8 what we talked about, early or late stage
9 trials. But if it -- I mean, I'm
10 thinking of -- you know, Phase II I think
11 of the middle. So early I think of as
12 Phase I. So I'm not sure what he means
13 by early or late stage trials. But to
14 me, the bulk of the work doing the
15 comparisons that you asked about us doing
16 a study, maybe we were missing each other
17 in terms of -- of the discussion before
18 the break, but we did that work in Phase
19 II. And we looked at those connections.
20    Q. Okay. Now, I want to look
21 at one of the responses from Todd Moore.
22 This is on Page 20943.
23    You see the e-mail from Todd
24 Moore dated August 15, 2014, in the

Page 528

1 middle of the page?
2    A. I see one August 15th.
3    Q. I'm sorry. August 15, 2014,
4 in the middle of the page.
5    A. Yes.
6    Q. Okay. And -- and remind the
7 jury who Todd Moore is again?
8    A. Todd Moore is a -- a
9 clinical pharmacologist at Johnson &
10 Johnson.
11    Q. Okay. He says, "Dear Judy.
12 I'm concerned with the statement in the
13 middle column, 'testing for monitoring
14 in early and late stage
15 trials."
16    "I don't believe this
17 statement is accurate. After discussing
18 this with Dagmar this morning, perhaps a
19 better strategy would be to highlight the
20 results from the multiple large
21 postmarketing-type studies that appear to
22 show a consistent bleeding profile as was
23 determined in the pivotal Phase III
24 trials, correct? I state this because I

Page 529

1 don't believe we truly tested for
2 monitoring."
3    Did I read that correctly?
4    A. That's what's written here.
5    Q. So Todd Moore, the clinical
6 pharmacologist at Janssen, is saying, we
7 never truly tested for monitoring,
8 correct?
9    MR. HOROWITZ: Object to the
10 form.
11    THE WITNESS: I'm not sure I
12 take that completely from what he
13 said. I think he corrects the
14 version about the early and late
15 stage when he says, I don't
16 believe this statement is correct.
17    And then as you go on
18 further, then he says, I state
19 this -- that portion about I don't
20 believe we truly tested for
21 monitoring. But I don't know
22 what -- if he means in one of
23 those programs or at all. It
24 doesn't say that.

Page 530

1 BY MR. BARR:
2    Q. Okay. You agree with him on
3 that statement, don't you?
4    A. I agree with him on the
5 statement about the early and late stage.
6 But as -- as we had spoken about earlier,
7 in the Phase II program we looked at the
8 connection of -- of bleeding and PT and
9 you can find this information in our
10 files.
11    But I'm not sure what
12 exactly he meant by that.
13    Q. Okay. Well, let's look --
14 he -- I think he clarifies a little
15 later.
16    If you go to the -- the
17 first page. This is just to give you the
18 beginning of the e-mail. You see his
19 e-mail starts right there on the bottom,
20 from Todd Moore to Dr. Burton, August 15,
21 2014. It's right on --
22    A. Oh, yeah. Right. I do see
23 it. Mm-hmm.
24    Q. So then, you flip to the

Page 531

1 next page, and he says, "Thanks for your
2 response. Perhaps I misunderstood what
3 is meant by testing for monitoring in
4 this regard. During the Phase I and II
5 clinical development we collected
6 intensive PK and PD to help characterize
7 the drug's profile. We have a lot of
8 data on this. However, I don't know if
9 we can consider any of this testing for
10 monitoring" -- "monitoring. I don't
11 believe Bayer performed or could perform
12 any specific analysis for this."
13    Did I read that correctly?
14    A. Yes.
15    Q. So he's saying we didn't do
16 any testing for monitoring at all,
17 correct?
18    MR. HOROWITZ: Object to the
19 form.
20    THE WITNESS: He's saying
21 that there is -- from his memory
22 that no testing -- "testing for
23 monitoring" or -- or that we could
24 perform that.

Page 532

1 BY MR. BARR:
2    Q. Okay. Then if you go down
3 to the bottom, he says, "Without taking
4 significantly more PK and PD samples in
5 the Phase III studies."
6    And there was a specific
7 decision not to take PK samples from all
8 patients in the Phase III studies, right?
9    MR. HOROWITZ: Object to the
10 form.
11    THE WITNESS: We did not
12 take -- sorry.
13    We did not take PK samples
14 in all patients in their Phase
15 III, as we did all that work in
16 the Phase II.
17 BY MR. BARR:
18    Q. But you had a small subgroup
19 of patients in the ROCKET trial that you
20 did some PK at Week 12 and Week 24,
21 correct?
22    A. Well, a small subgroup at
23 Week 12 and 24 is a far cry from doing
24 the 360,000 samples that we got during

Page 533

1 the whole trial.
2    So that you can have a
3 little better control. And then that's a
4 lot of the issue for us is in Phase II
5 where you can control the setting and
6 control the sampling, have the tubes, get
7 the timing right. That's a -- that's a
8 more reliable way to do it. And that's
9 how we chose to do it for this program.
10    Q. He says, "Without
11 taking significantly more PK and PD
12 samples in the Phase III studies and
13 performing a more rigorous type of
14 analysis, more than observational,
15 perhaps a regression type, et cetera, I
16 don't know if we can truly say we tested
17 the need for monitoring."
18    Correct?
19    A. That's what he writes.
20    Q. So he -- he reiterates,
21 "Without substantially more data there's
22 no way that we can truly say we tested
23 for monitoring," correct?
24    MR. HOROWITZ: Object to the

Page 534

1 form.
2    THE WITNESS: Just -- just
3 confirming what he says in the
4 document.
5 BY MR. BARR:
6    Q. Well, do you agree with
7 that?
8    A. I'm not an expert on
9 the clinical pharmacology. So I can't
10 say. But all I can say is that we did
11 that work in Phase II and we -- we didn't
12 see a need in doing the various
13 indications that we study, because we
14 didn't just study one indication. We
15 didn't see how that would be of benefit.
16    Q. Okay. Can you identify
17 which Phase II studies where the
18 companies looked at PK/PD versus
19 outcomes?
20    A. Well, I think you can look
21 at the FDA AdCom briefing document where
22 we list those. I don't believe they
23 numbers offhand. But if you check that,
24 I think you'll find the comparisons in PK

Protected - Subject to Further Protective Review

Page 535

1 and PD.
2    Q. And you're specifically
3 correlating those to outcomes?
4    A. I know for a fact that they
5 discuss bleeding outcomes.
6    Q. Okay. You agree -- well,
7 you believe there are no gaps in your
8 PK/PD data, correct?
9    MR. HOROWITZ: Form.
10    THE WITNESS: I'm sorry.
11 I'd have to disagree with that. I
12 don't remember ever saying there
13 are no gaps.
14 BY MR. BARR:
15    Q. Let me hand you what I'm
16 marking as Exhibit 53, which is
17 Plaintiffs' 3388635.
18    (Document marked for
19 identification as Exhibit
20 Berkowitz-53.)
21 BY MR. BARR:
22    Q. Just let me know when you're
23 ready.
24    A. Yes.

Page 536

1    Q. Are you ready?
2    A. Mm-hmm.
3    Q. You see this is a series of
4 e-mails between you and your colleagues
5 at Bayer on November 9, 2015, correct?
6    A. Yes.
7    Q. And y'all are discussing the
8 subject difficulties with preparing slide
9 presentation for EMA workshop.
10    Do you see that?
11    A. Yes.
12    Q. Okay. And you write to your
13 colleagues on November 9th, and you say,
14 "I'm running into difficulties determining
15 what slides and data should be presented
16 at the EMA workshop, and in terms of a
17 draft slide set, haven't gotten very far.
18 As you know, the ten minutes we are
19 allotted are in the very last section at
20 the end of the meeting entitled
21 "Session 4: Future perspectives. What
22 could be done?"
23    Do you remember this?
24    A. Yes.

Page 537

1    Q. And what was this EMA
2 workshop?
3    A. Well, I don't know the --
4 all the details about it. But EMA had a
5 workshop on monitoring and
6 therapeutic dose monitoring could be
7 useful in improving benefit-risk. As I
8 understand it, there was a number of
9 companies there. There were lawyers
10 there. There were journalist there. It
11 was a broad meeting with the CHMP.
12    Q. And just so the record is
13 clear and people understand, the EMA is
14 the European equivalent of the FDA,
15 correct?
16    A. Yes. The European Medicines
17 Agency.
18    Q. Okay. And the therapeutic
19 drug monitoring, there was discussion
20 about whether or not you could monitor
21 either blood plasma concentrations or a
22 PD marker and then have dose adjustments
23 based on whatever the blood testing
24 showed, right?

Page 538

1    A. Well, that was part of it.
2 It was mostly about whether you could add
3 benefit to the care.
4    Q. Okay. And if I recall
5 correctly, Bayer's position was -- is
6 that would not add benefit to the care,
7 correct?
8    MR. HOROWITZ: Form.
9    THE WITNESS: My
10 understanding of our position then
11 was the very same, that it would
12 not add benefit over and above
13 patient characteristics as we've
14 said or what is in our label.
15 BY MR. BARR:
16    Q. So I want to go down
17 to your last paragraph on the first page.
18 You say, "I need your help in deciding
19 and obtaining slides that will directly
20 address the description provided for our
21 section, which is, 'This session aims to
22 discuss ways to fill the gaps in our
23 knowledge about PK/PD measurements as
24 well as how to better use the available

Protected - Subject to Further Protective Review

**Page 539**

1 data, future scenarios on how knowledge
2 can be obtained should be depicted.'"
3 correct?
4 A. Mm-hmm.
5 Q. So that is the description
6 for the section that you've been asked --
7 the company has been asked to present on,
8 correct?
9 A. I think that's a
10 word-for-word lift from the agenda.
11 Q. Okay. And you say, "It is
12 our position that we do not have gaps.
13 And other than the modeling and
14 simulation project which is ongoing, we
15 do not have more to suggest."
16 Did I read that correctly?
17 A. Yes.
18 Q. Okay. So you certainly said
19 on November 9, 2015, that when it comes
20 to your knowledge and data about PK/PD
21 measurements that it was your position
22 that the company does not have gaps,
23 correct?
24 A. It's my position and this is

**Page 540**

1 talking about the position of the group,
2 not just myself, that we don't have gaps.
3 Q. Okay. So you believe, as
4 you sit here today, that the company does
5 not have gaps in its PK/PD data, correct?
6 A. Well, as I've stated to you,
7 I'm not a PK/PD expert. I'm talking
8 about some major gap involved that we
9 need to help patients. Now, there might
10 be things that clinical pharmacologists
11 could come up with or other disciplines I
12 could come up with. But although here I'm
13 representing the group here, that is my
14 view, that there are no major gaps.
15 Q. Okay. So if there are no
16 gaps in your PK/PD data, no major gaps in
17 your PK/PD data, what is the maximum
18 safe -- maximum safe blood plasma
19 concentration of Xarelto?
20 MR. HOROWITZ: Form.
21 THE WITNESS: We discussed
22 this yesterday. We don't have
23 definitive level for that.

**Page 541**

1 BY MR. BARR:
2 Q. Okay. If there are no major
3 gaps in your PK/PD data, what is the
4 absolute minimum blood plasma
5 concentration necessary to successfully
6 reduce stroke risk?
7 MR. HOROWITZ: Objection to
8 form.
9 THE WITNESS: I'm not aware
10 of having that. Are these major
11 gaps?
12 BY MR. BARR:
13 Q. If there are no major gaps
14 in your PK/PD data, what is the range of
15 blood plasma concentration needed to
16 maintain a sufficient risk-benefit
17 profile with Xarelto?
18 MR. HOROWITZ: Same
19 objection.
20 THE WITNESS: Not certain
21 what you're meaning.
22 BY MR. BARR:
23 Q. Okay. You don't understand
24 what I mean by a sufficient range of

**Page 542**

1 therapeutic -- therapeutic levels range
2 to maintain a good risk-benefit profile?
3 A. Yeah, I don't understand.
4 What -- when your -- before your clinical
5 Phase III trials, when you're doing
6 clinical pharmacology, I can understand
7 some of these questions. What I don't
8 understand is when you have large Phase
9 III trials in indications, a number of
10 indications, and you've proven with
11 patients a dose.
12 When that's been proven and
13 the authorities around the world have
14 approved the drug, I don't understand
15 this part. That's where I'm confused.
16 Q. So you understand my
17 question. You just don't understand why
18 I'm asking it; is that right?
19 A. I don't understand the
20 benefit-risk part, where that adds in
21 here once you have Phase III data.
22 Q. Okay. Are you able to
23 provide the range of concentration needed
24 so that people maintain sufficient stroke

Protected - Subject to Further Protective Review

**Page 547**

1 correlation.
2 Q. Okay. Then would you agree
3 that it's known within the company as PT
4 goes up, bleed risk goes up?
5 MR. HOROWITZ: Form.
6 THE WITNESS: I -- I think
7 we understand that as the PT go
8 up, as -- as flawed as the test is
9 for rivaroxaban, that bleeding
10 risk may go up.
11 BY MR. BARR:
12 Q. Okay. And you -- would you
13 agree that PT has been shown in Phase I
14 and Phase II clinical studies to be a
15 reliable exposure marker for Xarelto
16 plasma concentrations when a sensitive
17 assay is used?
18 A. I would agree that if you
19 use a PT with a Neoplastin plus reagent,
20 which is sensitive, that then you can get
21 some fix, some semi-quantitative fix on
22 the rivaroxaban concentration, but would
23 recommend using the assay that's specific
24 for rivaroxaban.

**Page 548**

1 Q. Okay. Now, PT, was
2 certainly sufficient in the company's
3 view to be used as a biomarker to be
4 carried forward as a PK surrogate in all
5 Phase III trials for an exposure response
6 analysis, correct?
7 A. I believe that's correct.
8 Q. And -- and that's because of
9 the established linear relationship
10 between rivaroxaban blood plasma
11 concentration and PT, right?
12 A. Well, when you use the
13 sensitive reagent for PT, not for all PT.
14 Q. Fair enough. So when you
15 use the sensitive reagent Neoplastin, PT
16 has an established linear relationship
17 with rivaroxaban blood plasma
18 concentration, correct?
19 A. That's correct. You can see
20 a linear relationship.
21 Q. Right. And -- and the
22 decision was made in the Phase III trials
23 to carry PT forward as the surrogate when
24 you were attempting to analyze exposure

**Page 549**

1 response, particularly bleeding, correct?
2 A. The -- its decision was made
3 to carry forward the PT in the Phase III
4 trials.
5 Q. I think you've agreed with
6 this, but I just want to make sure, so
7 I'm going to show you an exhibit.
8 Let me give you Exhibit 54.
9 And this is Plaintiffs' 1097767.
10 (Document marked for
11 identification as Exhibit
12 Berkowitz-54.)
13 MR. BARR: I already used
14 this.
15 MR. HOROWITZ: Objection.
16 MR. BARR: We're going back
17 to Exhibit 45.
18 MR. HOROWITZ: Then I'll
19 strenuously object. Do you want
20 to withdraw 54?
21 MR. BARR: Yeah, we'll
22 withdraw 54.
23 MR. HOROWITZ: And do a new
24 one when we get there?

**Page 550**

1 MR. BARR: And I'll do a new
2 one when we get there. Sorry. I
3 can't keep track.
4 (Exhibit Berkowitz-54
5 withdrawn.)
6 BY MR. BARR:
7 Q. So referring back to
8 Exhibit 45.
9 MR. HOROWITZ: All right.
10 Let's take a sec to --
11 MR. BARR: Well, we can --
12 MR. HOROWITZ: No, no, no.
13 It's just going to take me a sec
14 right there.
15 MR. BARR: And I'll go ahead
16 and give you your objection for
17 asked and answered.
18 MR. HOROWITZ: Thank you.
19 Will you sustain it?
20 MR. BARR: If I could only
21 make that call.
22 MR. HOROWITZ: Give him just
23 one second, just to remind
24 himself.

Protected - Subject to Further Protective Review

**Page 543**

1 benefit without excessive bleed risk?
2 Can you give that range of concentration?
3 MR. HOROWITZ: Objection to
4 form.
5 THE WITNESS: I'm not aware
6 of a range, because it hasn't been
7 tested that way, once we
8 have the dose tested and the
9 clinical trials.
10 BY MR. BARR:
11 Q. Okay. So let's make this
12 about Factor Xa inhibition then. If
13 there are no gaps in your PK/PD data,
14 what is the maximum safe Factor Xa
15 inhibition level?
16 MR. HOROWITZ: Same
17 objection.
18 BY MR. BARR:
19 Q. With Xarelto?
20 MR. HOROWITZ: I'm sorry.
21 Same objection.
22 MR. BARR: Again, as I
23 said before, it's not no gaps.
24 It's no major gaps. I don't see

**Page 544**

1 this as a major gap when we have
2 the dose for patients. If you
3 need more information on this,
4 then I suggest you talk with our
5 clinical pharmacologists.
6 BY MR. BARR:
7 Q. If there are no major gaps
8 in your PK/PD data, what is the absolute
9 minimum necessary Factor Xa inhibition
10 level to successfully reduce stroke risk?
11 MR. HOROWITZ: Same
12 objection.
13 THE WITNESS: As we have
14 the -- I don't have a level for
15 that as we have the clinical trial
16 data which shows the effectiveness
17 of preventing stroke in patients.
18 BY MR. BARR:
19 Q. If there is no major gaps in
20 your PK/PD data, what is the range of
21 Factor Xa inhibition needed to maintain
22 stroke protection without excessive bleed
23 risk?

**Page 545**

1 objection.
2 THE WITNESS: I don't have
3 any levels that I can give you
4 because we have the clinical trial
5 data, which I find more important.
6 BY MR. BARR:
7 Q. Okay. Let's try PT.
8 If there are no major gaps
9 in your PK/PD data, what is the maximum
10 safe PT prolongation due to Xarelto?
11 MR. HOROWITZ: Objection to
12 form.
13 THE WITNESS: I don't think
14 that exists. I don't think that
15 exists.
16 BY MR. BARR:
17 Q. Okay. If there are no major
18 gaps in your PK/PD data, what is the
19 minimum PT prolongation needed to
20 successfully reduce stroke risk?
21 MR. HOROWITZ: Same
22 objection.
23 THE WITNESS: As we've
24 discussed, the PT is not the best

**Page 546**

1 test for measuring rivaroxaban.
2 For that question and the question
3 before, they are not major gaps.
4 BY MR. BARR:
5 Q. If there are no major gaps
6 in your PK/PD data, are you able to
7 provide a range of PT prolongation that
8 shows somebody has effectively --
9 reducing the risk of stroke without
10 putting them at excessive bleed risk?
11 MR. HOROWITZ: Same
12 objection.
13 THE WITNESS: As noted
14 before, I think the PT is an
15 inappropriate test to be testing
16 for rivaroxaban. So your
17 questions are not pertinent to the
18 clinician.
19 BY MR. BARR:
20 Q. Do you believe a correlation
21 analysis has been conducted between PT
22 and bleeding events with Xarelto?
23 A. As I mentioned in the FDA
24 AdCom document, you'll find that

Protected - Subject to Further Protective Review

**Page 551**

1 THE WITNESS: Yes, I
2 remember this now. Mm-hmm.
3 BY MR. BARR:
4 Q. Okay. And so we -- we
5 looked at this earlier today, and this is
6 the e-mail from Dr. Mueck to yourself
7 copying multiple other of your colleagues
8 on May 28, 2014, correct?
9 A. Yes.
10 Q. And -- and he writes to you
11 that "based on the established linear
12 relationship between rivaroxaban plasma
13 concentration and prothrombin time, carry
14 PT measured at peak and trough in all
15 pivotal Phase III programs" --
16 A. Sorry. I don't see where we
17 are.
18 Q. It's the third bullet point.
19 A. Okay. Got it. Thank you.
20 Q. Do you want me to start
21 over?
22 A. Just you said at "based" on
23 there?
24 Q. Yes, sir.

**Page 552**

1 A. Okay. So we are on the same
2 page. Mm-hmm.
3 Q. "Based on the established
4 linear relationship between rivaroxaban
5 plasma concentration and prothrombin
6 time, PT, carry PT measured at peak and
7 trough in all pivotal Phase III programs
8 to use them as PT" -- "PK surrogate for
9 subsequent exposure/response, mainly
10 bleeding event analyses," right?
11 A. Yes.
12 Q. So the idea was carry PT
13 forward for a subsequent exposure
14 response mainly dealing with bleeding
15 events, correct?
16 A. That's what it says.
17 Q. Do you know if that was ever
18 done, this exposure response dealing
19 mainly with bleeding events?
20 A. It -- it's been done. I
21 mean it's going on.
22 Q. Okay. And what that
23 analysis shows is that bleed risk
24 increases with -- as PT goes up, right?

**Page 553**

1 MR. HOROWITZ: Well,
2 objection to form.
3 THE WITNESS: P -- well,
4 we've established that already,
5 right? As the PT goes up there's
6 an increased risk of bleeding.
7 BY MR. BARR:
8 Q. Okay. And -- and you
9 certainly agree with that, right, you
10 personally?
11 A. I agree that that's what was
12 found.
13 Q. Okay. Do you think it would
14 be misleading to inform patients or
15 doctors or anyone that there is no
16 correlation between bleeding events and
17 blood plasma concentration of Xarelto?
18 MR. HOROWITZ: I'm sorry.
19 Say again.
20 BY MR. BARR:
21 Q. Sure.
22 Do you think it would be
23 misleading to inform anyone that there is

**Page 554**

1 no correlation between bleeding events
2 and blood plasma concentration of
3 Xarelto?
4 MR. HOROWITZ: I wouldn't
5 think that that would be a
6 right -- a correct statement.
7 BY MR. BARR:
8 Q. You're going to have to help
9 me out with that. What wouldn't be a
10 correct statement --
11 A. Well --
12 Q. -- that that would be
13 misleading or the -- the statement that
14 there's no correlation would not be
15 correct?
16 A. It wouldn't be correct is
17 what I mean to say.
18 Q. Okay. I think we stepped on
19 each other's --
20 A. Again, I'm --
21 Q. I want to make sure the
22 record is clear.
23 A. Yeah.

Protected - Subject to Further Protective Review

**Page 555**

1 Q. What is it that would not be
2 a correct statement?
3 A. I don't have the benefit of
4 reading it like you do off the screen,
5 but...
6 It sounded like you said the
7 correlation between bleeding risk and
8 increased concentration. It's well-known
9 and again something -- a topic we talked
10 about yesterday, that anticoagulants, if
11 you increase their -- their blood
12 concentration, there's an increased risk
13 of bleeding. Unfortunately we're not
14 able to uncouple bleeding from efficacy,
15 meaning decrease in strokes and blood
16 clots to the lung, et cetera. That's not
17 yet possible.
18 Q. Let me show you
19 Exhibit 55 --
20 MR. DENTON: 54.
21 MR. BARR: 54, as Roger has
22 corrected me, which will be
23 Plaintiffs' 1075492.
24

**Page 556**

1 (Document marked for
2 identification as Exhibit
3 Berkowitz-54.)
4 BY MR. BARR:
5 Q. Do you want to take a
6 moment, just let me know when you're
7 ready.
8 A. Sure. Okay. Thank you.
9 Q. Now, you see that this is a
10 series of e-mails internal at Bayer,
11 right?
12 A. Yes.
13 Q. Okay. And in -- the top
14 e-mail is -- is an e-mail from you, but
15 it includes multiple of your colleagues,
16 right?
17 A. Yes.
18 Q. And we've talked about a
19 number of these before. I don't believe
20 we've talked about Claudia Henn. Who is
21 she?
22 A. Claudia Henn is a physician
23 in the medical affairs division.
24 Q. Okay. And you're talking

**Page 557**

1 about corrections to Document 1A Version
2 04181, right?
3 A. That's what the subject line
4 says.
5 Q. And this is April 18, 2015,
6 right?
7 A. Yes.
8 Q. And do you remember
9 specifically what that document was?
10 A. Not exactly.
11 Q. Okay. Let's go in. And I
12 want to start with -- it looks like --
13 it's an e-mail that starts on 09 -- 9481
14 at the bottom. If you look --
15 A. Okay. Mm-hmm.
16 Q. There's an e-mail from
17 Dr. Henn?
18 A. Yes.
19 Q. On April 18, 2015,
20 forwarding Document 1A.
21 Do you see that?
22 A. Yes.
23 Q. Okay. And she has -- she
24 says, "I've read the document, and I'm

**Page 558**

1 fine with it. I've only added a
2 subheader, clinical trial program, in the
3 Chapter 2.1.1 analysis of the
4 relationship." And she goes on, right?
5 A. Okay.
6 Q. And then she has -- one,
7 two, three -- four kind of bullet points
8 within her e-mail, right?
9 A. Yeah.
10 Q. Okay. If you look right
11 above that, you see your e-mail back to
12 her. So you see you've responded to
13 Dr. Henn on the page before on April 18,
14 2015?
15 A. Yes.
16 Q. Okay. And what you say is,
17 "Thank you for addressing these remaining
18 questions, which I also noted. My
19 thoughts are in red below," right?
20 A. Right.
21 Q. So you took the text from
22 her e-mail, and some added comments
23 to it, right?
24 A. That's what it says.

Protected - Subject to Further Protective Review

**Page 563**

1 BY MR. BARR:
2 Q. You actually believe, do you
3 not, that PT is predictive of bleeding,
4 don't you, with Xarelto?
5 A. As I've mentioned to you
6 before, I don't believe that the PT is a
7 reliable and best way to assess
8 rivaroxaban. It's the best that we have.
9 It's flawed. So we're making these --
10 spending a lot of time on these
11 distinctions about a test that I don't
12 think is the best test to be using, but
13 it's all we have.
14 So there may be some
15 relationship. But it's not what I would
16 want to use in taking care of my
17 patients.
18 Q. Okay. Regardless of whether
19 you would want to use it or not, you
20 agree it's all we have, right?
21 A. You did ask for my opinion.
22 I agree that's all we have.
23 Q. Okay. I asked -- I don't
24 want to argue with you.

**Page 564**

1 MR. HOROWITZ: Let's not.
2 THE WITNESS: I don't mean
3 to be argumentive.
4 BY MR. BARR:
5 Q. No, I meant my question -- I
6 was saying my question was going to be
7 argumentive.
8 A. Well, I wasn't trying to be
9 argumentive. Because it was related --
10 you started with, "in your opinion." So
11 I'm just saying, that was my opinion.
12 Q. No, I get it. I get it?
13 MR. HOROWITZ: No one is
14 going to argue. Everybody slow
15 down. Question, answer, question,
16 answer.
17 BY MR. BARR:
18 Q. So do you agree that PT is
19 predictive of bleeding with Xarelto?
20 Whether you like the test or not, do you
21 agree that it's predictive of bleeding?
22 MR. HOROWITZ: Objection to
23 form. Asked and answered.
24 THE WITNESS: So in the work

**Page 565**

1 that we've discussed in the Phase
2 II, we can see that there's a
3 correlation with it. What we've
4 also seen with that is that
5 whether patients have a high PT or
6 not, if you look at patients with
7 bleeding outcomes with bleeding
8 events, you can find patients with
9 and without high PT.
10 So in that sense it's not
11 helpful to me as a physician.
12 BY MR. BARR:
13 Q. And is that due to the idea
14 that something additional -- never mind.
15 Strike that.
16 Can I add to my statement?
17 Q. No, I prefer you didn't.
18 MR. HOROWITZ: Well, you can
19 explain your answer.
20 MR. BARR: He was done
21 answering. We're not going to --
22 MR. HOROWITZ: No, no, no.
23 MR. BARR: There's not a
24 question pending. There's not a

**Page 566**

1 question pending. I had started
2 asking a question.
3 MR. HOROWITZ: Go ahead and
4 explain your answer.
5 MR. BARR: Well, I'm going
6 to move to strike it.
7 MR. HOROWITZ: That's fine.
8 You can move to strike it. You
9 can't tell him not to speak.
10 THE WITNESS: Simply
11 referring to what we've already
12 talked about before, that it's not
13 about just having an elevated PT
14 level or an elevated
15 concentration. Patients bleed
16 because of other clinical factors
17 and then you have an
18 antithrombotic, whatever it is, on
19 board.
20 BY MR. BARR:
21 Q. Right. And that
22 antithrombotic potentially makes that
23 bleed worse?
24 A. All antithrombotics do.

Protected - Subject to Further Protective Review

**Page 559**

1 Q. Okay. So what I want to
2 look at is your comments to Point Number
3 4 in Dr. Henn's e-mail. Are you with me?
4 A. Yes.
5 Q. Bullet Point 4 is, "In
6 summary no obvious relationship between
7 PT and bleeding events was observed in
8 any of these analyses. There were wide
9 overlaps of the distribution of PT values
10 between patients with bleeding events of
11 different severities and patients without
12 bleeding events within the box plots
13 which did not allow the determination of
14 a threshold of PT to identify patients at
15 higher risk of bleeding for any of the
16 studies."
17 Did I read that correctly?
18 A. Yes.
19 Q. And then your comment is
20 below.
21 Do you see that?
22 A. Well, I see the writing
23 below it. It's not in color. So I can't
24 tell if it's mine.

**Page 560**

1 Q. Okay. It says, "No, I don't
2 think we can simply state no correlation
3 to plasma concentration."
4 A. Excuse me. Actually, it's
5 probably not mine, because later it has
6 my initials in the colon, and then my
7 statement. But if it were in color and
8 as it said in red, we could see better.
9 Q. Okay. We'll get to that,
10 and maybe we can clear this up. There's
11 a comment below Number 4 that says, "No,
12 I don't think we can simply state no
13 correlation to plasma concentration.
14 This would be too simplified and could be
15 misleading as there are correlations to
16 CMAX, area under the curve, et cetera in
17 dose-finding trials, e.g., this is my
18 understanding. Am I right?"
19 Do you see that?
20 A. That's me.
21 Q. And then there's an SDB.
22 That's you, right?
23 A. That's me.
24 Q. You say, "I believe you are

**Page 561**

1 correct and this is an appropriate way to
2 state it," right?
3 A. That's what it says.
4 Q. So you agree that you can't
5 simply state there's no correlation to
6 plasma concentration and that that would
7 be too simplified and could be
8 misleading, right?
9 A. Exactly as I had said
10 previously.
11 Q. Right. Okay. So if anyone
12 is out there telling people that there's
13 no correlation between plasma
14 concentration and bleeding, they're
15 misleading them, correct?
16 MR. HOROWITZ: Objection to
17 form.
18 THE WITNESS: If anyone is
19 out there saying that, it may
20 simply be the lack of
21 understanding as it's been quite
22 complicated. You've seen the
23 years in which we've been
24 discussing this back and forth. I

**Page 562**

1 don't believe that anybody is
2 intentionally misleading patients.
3 BY MR. BARR:
4 Q. Well, whether they are doing
5 it intentionally or not, it's still
6 misleading, correct?
7 MR. HOROWITZ: Objection to
8 form.
9 THE WITNESS: It depends on
10 what they are saying. We would
11 have to see what you're actually
12 talking about.
13 BY MR. BARR:
14 Q. If anybody is saying there's
15 no correlation between blood plasma
16 concentration and bleeding, that is a
17 misleading statement, right?
18 MR. HOROWITZ: Objection to
19 form.
20 THE WITNESS: Taken on face
21 value without having the patient
22 characteristics, the trials, and
23 the clinical situation, then that
24 could be misleading.

Protected - Subject to Further Protective Review

**Page 567**

1 Again, it's that concept which we are
2 working to try to change of not being
3 able to remove the risk of bleeding from
4 clot -- from the clotting, the
5 thrombosis, the stroke because of the way
6 the coagulation system works.
7 Q. Right. The anticoagulation
8 therapy could take a nonmedically
9 relevant bleed and make it a major bleed,
10 right?
11 A. That's one of the options.
12 But it also can save thousands of lives.
13 Q. And I'm not saying it can't.
14 But that's the idea, right?
15 A. Yeah. In our development we
16 have to balance those things. And we
17 don't take it lightly. But the number of
18 bleeds compared to the benefit of lives
19 saved and morbidity improved is great.
20 So we just wanted to say that as a
21 clinician.
22 Q. Do you have any sense of the
23 risk of bleeding that would need to be
24 present to exceed the benefit of whatever

**Page 568**

1 stroke protection percentage you want to
2 put on it?
3 MR. HOROWITZ: Objection to
4 form.
5 THE WITNESS: I think I
6 understand what you're asking, but
7 I can't say that I'm very good at
8 trying to balance those numbers.
9 When they're far apart of course
10 it's easier for all of us. And
11 this is a topic that authorities
12 and the companies have been
13 struggling with for a long time.
14 As you may know, often the
15 focus was on efficacy. And then
16 there was -- when I say efficacy,
17 the preventing of clots. And
18 also, there's been an emphasis
19 even more these days on bleeding,
20 because now we have good drugs
21 that we didn't have before.
22 The actual intersection and
23 that number and balance is
24 difficult, because to you and me,

**Page 569**

1 if we have an event that's
2 extremely important. But in
3 looking at the overall population
4 that we're studying, then you get
5 into these numbers.
6 So that's the struggle. I
7 don't have an exact threshold.
8 BY MR. BARR:
9 Q. Are the risk of bleed and
10 the stroke benefit percentages items of
11 information you believe practicing
12 clinicians would want to account for in
13 determining whether or not Xarelto
14 provides a benefit to their patients?
15 MR. HOROWITZ: Objection to
16 form.
17 THE WITNESS: When we all
18 look at those numbers, both as
19 practicing physicians when you're
20 looking at the papers talking
21 about the scientific meetings.
22 Those of us internally who are
23 doing clinical studies with and
24 without the external world, the

**Page 570**

1 regulatory authorities, we're all
2 looking at those.
3 BY MR. BARR:
4 Q. Okay. Do you know if any of
5 that information is provided to
6 clinicians in the label?
7 A. Well, in the USPI, I do
8 remember that there are tables, and they
9 like to show -- they often actually don't
10 show in table -- tabular form the
11 prevention of clots, stroke. They'll try
12 it. It's in the indication. They tend
13 to focus right now in the label on
14 adverse events, and when we say adverse
15 events we don't mean the primary
16 outcomes.
17 But they also have tables
18 for the primary and the secondary
19 outcomes on the bleeding side.
20 Q. Okay. I want to get back to
21 this idea of PT being predictive of bleed
22 risk. Okay. And I want to show you what
23 I'm marking as Exhibit 55. And this is
24 Plaintiffs' 1094903.

Protected - Subject to Further Protective Review

Page 571

1    (Document marked for
2    identification as Exhibit
3    Berkowitz-55.)
4    BY MR. BARR:
5        Q.  Just let me know when you're
6    ready.
7        A.  Okay.
8        Q.  We looked at another set of
9    your notes.  Do you recognize this?
10       A.  They look like --
11       Q.  Exhibit -- let -- let me --
12       A.  Sorry.  I thought you were
13   done.
14       Q.  That's okay.
15           Do you recognize Exhibit 55
16   as your notes that are taken in the
17   ordinary course of business?
18       A.  They look like notes that I
19   would take.
20       Q.  You don't have anything that
21   would suggest these are not your notes,
22   correct?
23       A.  Correct.
24       Q.  And so these are your notes

Page 572

1    from a consolidation call on the Xarelto
2    P -- PK/PD statement July 31, 2014,
3    right?
4        A.  Correct.
5        Q.  Do you recall this
6    consolidation call or what would
7    have been about?
8        A.  Not exactly.
9        Q.  So you don't have any memory
10   of a call on this, who was on the call,
11   anything like that?
12       A.  No.
13       Q.  Okay.  Well, you -- you take
14   a few notes here.  And I want to point
15   to, you note that bleeding tend to higher
16   values, correct?
17       A.  What's that -- I -- yeah, it
18   says, "Bleeding tend to higher values."
19   As I look through these though, it seems
20   like I'm taking notes of different
21   people might be saying.
22       Q.  Okay.  When you take notes
23   like this, do you write if you disagree
24   with something?

Page 573

1        A.  No.  As a matter of fact,
2    usually it would have corrections of
3    spelling if they were like my final notes
4    or ones that I was using.  If they are
5    just something, if I'm at a meeting and I
6    want to take down some concepts so I can
7    use them while I'm at the telecon, it
8    would look like this, rather rough.
9        Q.  Okay.  Okay.  And -- and
10   another one of your notes is, "PT is
11   predictive of bleeding so cannot say
12   that."
13           Did I read that right?
14       A.  Yes, you read that right.
15   I'm not exactly sure what that means.
16   Say what?  I'm not sure.  It says P --
17   says, "PT is predictive of bleeding so
18   cannot say that."
19           So I don't know what that --
20       Q.  Yeah, I mean, the notes
21   aren't written in a way where we can
22   understand what it is you're noting that
23   cannot be said.
24       A.  Right.

Page 574

1        Q.  But they do establish your
2    note that PT is predictive of bleeding,
3    right?
4            MR. HOROWITZ:  Object to the
5        form.
6            THE WITNESS:  Yeah, I mean,
7        this -- this is saying that PT is
8        predictive of bleeding which is
9        something that we've said over and
10       over the last couple hours.
11   BY MR. BARR:
12       Q.  Right.  And, yeah, sometimes
13   we have to show you these things so I
14   make sure they're yours.
15       A.  Yes.  I -- it looks like the
16   kind of notes that I take.
17       Q.  Okay.
18           The next document I want to
19   show you is Exhibit 56 which we will mark
20   as 1094802.
21           (Document marked for
22   identification as Exhibit
23   Berkowitz-56.)
24           THE WITNESS:  Okay.

Protected - Subject to Further Protective Review

Page 579

1    response that was given to Health Canada
2    according to your notes, right, to that
3    question?
4        A.  Not necessarily.  This could
5    be how the Health -- Health Canada
6    interpreted what we said, when it says,
7    "The applicant has investigated."
8        Q.  Okay.
9        A.  So I'm not sure.
10       Q.  All right.  Fair enough.
11           It says, "The applicant has
12   investigated several laboratory assays
13   throughout the clinical development
14   program.  In order to assess the
15   appropriateness of laboratory assays,
16   inhibition of Factor Xa, PT, aPTT and
17   HepTest were measured at nearly all
18   studies and correlations with plasma
19   concentrations were established.  Except
20   for PT, the tests were not considered to
21   be suitable for following the
22   pharmacodynamic effects of rivaroxaban
23   because of a curvilinear relationship or
24   a low sensitivity of the PK/PD

Page 580

1    relationship."
2            Did I read that correctly?
3        A.  Yes.
4        Q.  And so in contrast, a linear
5    correlation between PT and plasma
6    concentrations were established in
7    Phase I as well as in Phase II trials in
8    patients treated for VTE, correct?
9        A.  Yes.
10       Q.  And then there's a note that
11   says, "Somehow we need to address the
12   perceived discrepancy.
13           "I have approached it from
14   an" -- "the fact that a bleeding event
15   days weeks before or after Week 12 and
16   Week 24 measurement of PT cannot be
17   accurately linked.  Although we need to
18   be careful as we also believe the PK/PD
19   are predictable which allows us dosing
20   without monitoring.
21           "Other points are that we do
22   not know what the PT riva concentration
23   is at the time of the bleeding events
24   that did occur in our trials.  And that

Page 581

1    it is not a given that a bleeding event
2    occurs when a PT riva concentration is at
3    peak."
4            Did I read all that
5        correctly?
6        A.  Yes.
7        Q.  Okay.  Explain to me what
8    you're trying to say about this
9    discrepancy.
10           MR. HOROWITZ:  Object to the
11       form.
12           THE WITNESS:  Well, I can't
13       say that I'm saying this.  I don't
14       know for sure.  So I don't know
15       what's exactly being said.  I am
16       not sure what the perceived
17       discrepancy is.  And I'm -- I'm
18       not clear on where this is from or
19       what it is.
20   BY MR. BARR:
21       Q.  Okay.  So you don't -- you
22   don't have an understanding of this?
23       A.  Not exactly.
24       Q.  Okay.  Well, if you don't

Page 582

1    understand it, I'm not going to ask you a
2    bunch of questions about it.
3        A.  I would just be supposing,
4    so...
5        Q.  Would you agree with me that
6    Bayer itself has concluded that bleed
7    risk increases with PT?
8            MR. HOROWITZ:  Object to the
9        form.
10           THE WITNESS:  I believe I
11       stated all morning that there's
12       seen a relationship into the risk
13       of bleeding when you isolate it as
14       you have in looking at PK samples,
15       PT samples and the like.
16   BY MR. BARR:
17       Q.  In the morning though, so
18   far we've been talking about your views
19   on it.  I'm asking if you know whether or
20   not Bayer has a view.
21           MR. HOROWITZ:  Object to the
22       form.
23           THE WITNESS:  I don't know
24       if I know everyone's view.  I'm

Protected - Subject to Further Protective Review

Page 575

1    BY MR. BARR:
2        Q.  Is this another set of -- of
3    notes you've taken that you can tell?
4        A.  Well, it looks like it's
5    a -- a set of notes, but it's not like
6    the other set of notes.  It looks like
7    copy and pasting in certain sections.
8    But it's clearly a draft of thinking,
9    sort of like you would prepare an outline
10   or -- for a presentation or something
11   like that, kind of pull ideas together
12   from different sources.  That's what it
13   looks like to me.
14       Q.  Okay.  And so -- and this is
15   something you would regularly do in your
16   work?
17       A.  I don't do it so regularly.
18   I do it from time to time.
19       Q.  Okay.  But so from time to
20   time in your work, you've put together
21   these kind of outlines, pulling together
22   of ideas for presentations you're
23   thinking about giving, correct?
24       A.  Well, it's not necessarily

Page 576

1    presentations.  It might be just me
2    trying to think about an idea like you
3    would put things down on a piece of
4    paper.  I would -- might do it
5    electronically because it's easier to cut
6    and paste from different documents and
7    then try to pull the thoughts together.
8        Q.  Okay.  And you -- you
9    believe that these are yours.  This is a
10   document you wrote?
11       A.  Well, I see my name at
12   8:51 a.m.  I see no time.  I'm not sure
13   what it's from.
14       Q.  Okay.  You don't have any
15   reason to believe this isn't something
16   that you wrote, right?
17       A.  Not that I can think of.  I
18   don't -- I don't remember it
19   significantly.  I mean, I don't have any
20   real memory about it.
21       Q.  Okay.  So let's look at
22   what -- what you put on this piece of
23   paper.  You -- and I'm starting with the
24   similar analysis.  Do you see that?

Page 577

1        A.  Not yet.
2        Q.  It's right here.
3        A.  Okay.  Yes, I see it.
4        Q.  It says, "Similar analysis.
5    Although adjustment for selected" --
6    "although with adjustment for selected
7    covariates were presented for the
8    ROCKET-AF study, in FDA briefing
9    Document 10 for the cardiovascular and
10   renal advisory committee meeting which
11   was held on September 8, 2011.  These
12   analyses suggest that based on ROCKET-AF
13   Week 12 and 24 measurements, the bleeding
14   risk increases with PT, but the
15   relationship between PT prolongation and
16   major bleeding was more pronounced in
17   concomitant ASA users while less increase
18   was seen in non-ASA users."
19       Right?
20       A.  Right.  I remember that
21   there -- somewhere in the order of
22   two-thirds of the patients had
23   concomitant ASA, and that's where the
24   major bleeding became obvious when I

Page 578

1    combined the antiplatelet with an
2    anticoagulant.
3        Q.  Okay.  And in -- in ROCKET,
4    the only PK measurements that were taken
5    were in the Week 12 and Week 24, right?
6        A.  Right.
7        Q.  And what the analysis showed
8    was that the bleeding risk increased with
9    PT on that, correct?
10       A.  Right.
11       Q.  You go on to say, there's a
12   question.  It says, "However the SPAF
13   response 2011 doc for Health Canada has
14   the following."
15       Do you see that?
16       A.  I do.
17       Q.  Okay.  It says, "In the
18   ROCKET-AF trial is there a PT threshold
19   where there is an association to an
20   increase in bleeding."
21       Do you see that question?
22       A.  Yes.
23       Q.  Okay.  And it says, "The
24   applicant" -- and this is allegedly the

Protected - Subject to Further Protective Review

Page 583

1        MR. BARR:  At this time,
2    plaintiffs pass Dr. Berkowitz and
3    reserve the remainder of our time
4    for any recross after the direct.
5            - - -
6        (Whereupon, a luncheon
7    recess was taken at 11:13 a.m.
8    until 12:36 p.m.)
9            - - -
10   A F T E R N O O N   P R O C E E D I N G S
11           - - -
12       THE VIDEOGRAPHER:  The time
13   is 12:36 p.m.  We are back on the
14   record.
15           EXAMINATION
16           - - -
17   BY MR. HOROWITZ:
18       Q.  Dr. Berkowitz, as you know,
19   I'm Jeff Horowitz.  I represent Bayer and
20   I'm going to ask you some questions now
21   both in follow-up to some of the things
22   you were asked by plaintiffs' counsel
23   and -- and give you a chance to maybe

Page 584

1    there's a relationship of PT and
2    the risk of bleeding.  But that
3    the test is flawed.  I'm not sure
4    another way that I could say it.
5    BY MR. BARR:
6        Q.  Okay.  You understand the
7    FDA also believes that -- that an
8    increased PT leads to increased bleed
9    risk, correct?
10           MR. HOROWITZ:  Object to the
11       form.
12           THE WITNESS:  I would assume
13       that that's the -- I mean, we had
14       agreement on that, that -- in
15       preparation of the AdCom and for
16       going forward.  So I would assume
17       that's -- that's still their
18       position.
19       MR. BARR:  Okay.  Give me
20   two minutes to talk to Roger.
21       THE VIDEOGRAPHER:  The time
22   is 11:01 a.m.  We are going off
23   the record.
24       (Short break.)

Page 585

1    sure I don't know everyone's view
2    in the company.  But, again, I
3    think we've looked at documents
4    over and over that say the same
5    thing.
6    BY MR. BARR:
7        Q.  It would be fair if -- if
8    the company is responding to a regulatory
9    authority on an issue that that would be
10   the official company position, correct?
11           MR. HOROWITZ:  Object to the
12       form.
13           THE WITNESS:  All I think
14       you can say is we've been looking
15       at documents that go over several
16       years, that people are thinking
17       about the topic and -- and you're
18       watching our work in progress.
19           So, I mean, the fact that we
20       find some discrepancies at times
21       in people's thinking or what you
22       find in notes, I don't find that
23       of concern.
24           My understanding is that

Page 586

1    explain some things.  Okay?
2        A.  Okay.
3        Q.  I understand you are a
4    medical doctor?
5        A.  I am.
6        Q.  Are you board certified in a
7    particular area?
8        A.  In internal medicine.
9        Q.  And are you actually
10   licensed to practice medicine?
11       A.  Yes, I am.
12       Q.  Currently what states are
13   you licensed?
14       A.  Pennsylvania, North
15   Carolina.  Although I've had licenses in
16   other states, but as I'm not in
17   those areas I released them.
18       Q.  Where else were you
19   previously licensed to practice -- and
20   did you actually, in fact, practice in
21   those states?
22       A.  Yes.  I practiced in Ohio.
23   I practiced in California.  I practiced
24   in New York State.

Page 587
1 Q. Where are you originally
2 from?
3 A. Wilmington, Delaware.
4 Q. Did you grow up in
5 Wilmington, Delaware?
6 A. Born and raised, yes.
7 Q. Dare I ask how old are you,
8 sir?
9 A. I'm 63.
10 Q. Are you married?
11 A. Yes.
12 Q. How long have you been
13 married?
14 A. Forty years this August.
15 Q. Kids?
16 A. Yes. We have four sons. We
17 have two that are physicians, and one
18 that has high-functioning autism, and one
19 that's a statistician.
20 Q. What about grandkids?
21 A. We have two grandchildren.
22 Q. Boys? Girls?
23 A. Two boys.
24 Q. Keep you on your toes?

Page 588
1 A. Yes, they do.
2 Q. Where do you currently work?
3 A. I work at Bayer Healthcare
4 Pharmaceuticals out of New Jersey with
5 the main offices in Germany.
6 Q. Bear with me. I'm in a
7 chair where my feet don't touch the
8 ground.
9 MR. BARR: Nobody could have
10 seen that.
11 MR. HOROWITZ: I'm just
12 saying. I'm so glad the video is
13 rolling.
14 BY MR. HOROWITZ:
15 Q. Okay. You said you
16 currently work at Bayer?
17 A. I currently work at Bayer.
18 Q. How long have you worked at
19 Bayer?
20 A. Just over ten years now.
21 Almost ten and a half.
22 Q. Since April of 2006?
23 A. April 2006.
24 Q. What's your current role at

Page 589
1 Bayer?
2 A. I am vice president and head
3 of the thrombosis group in clinical
4 development.
5 Q. What is thrombosis? You
6 said "thrombosis group." Explain that.
7 A. Sorry.
8 Q. That's okay.
9 A. Sometimes we use terms in
10 the medical field that may not be
11 understood. It's basically a
12 pathological clot. So in other words, a
13 blood clot that goes to an area where it
14 shouldn't.
15 Q. And is thrombosis kind of
16 the study of blood clots and how to treat
17 them in the clinical setting?
18 A. Yeah. So study of
19 coagulation is the study of the balance
20 between blood flow or hemostasis and
21 coagulation, bleeding, and clotting. All
22 those things.
23 Q. And explain for the jury, if
24 you would, please, what your personal

Page 590
1 work primarily focuses on as the head of
2 thrombosis group, global head, and with
3 an eye towards clinical development at
4 Bayer.
5 A. So my job is to oversee our
6 antithrombotics portfolio. Those are
7 drugs that are trying to address the
8 conditions of blood clotting. So stroke,
9 deep vein thrombosis, leg clots,
10 pulmonary emboli, which are clots. They
11 can cause shortness of breath and
12 patients to die. These kind of
13 conditions. So we work to develop drugs
14 to prevent these.
15 Q. And stroke, I think most
16 folks know what a stroke is. But just in
17 case, what is a stroke and how does it
18 occur and where do you fit into the
19 picture in terms of trying to develop
20 these drugs?
21 A. Well, most strokes develop
22 from a thrombus that is a clot either
23 moving from some other area to the brain,
24 or occurring near the site. So as an

Page 595
1 fibrillation, whether it's treating blood
2 clots as we had mentioned that are in the
3 leg and go to the lungs, whether it's
4 embolic stroke of undetermined source or
5 acute coronary syndrome.
6 All those things would have
7 their own clinical trials.
8 Q. Now, just a couple terms you
9 mentioned in there that if you can just
10 define for us. I think you kind of mixed
11 into your answer what PK is or
12 pharmacokinetics. But could you just
13 give us a sense -- we don't need
14 scientific, you know, but to understand.
15 A. Well, it's a -- they're
16 complicated concepts. And as I
17 mentioned, I'm not an expert in PK/PD,
18 but it's part of my work.
19 And how I like to think of
20 it, maybe it's simplest for most people
21 when we talk about pharmacokinetics,
22 measuring these parameters we talked
23 about, like concentration max or min or
24 area under the curve. This is what, in

Page 596
1 discovery of a compound, there's what we
2 call preclinical, where they're tested in
3 animal models that might be related to
4 human disease. Then there are the three
5 or four phases of clinical trials.
6 So there's the Phase I
7 trials, which is when we're often first
8 in humans and we're looking at the PK and
9 PD, getting a fix -- excuse me -- on how
10 the drug is handled by the body and what
11 the drug does to the body -- to the drug.
12 Sorry. What the body does to the drug.
13 So it's a back and forth.
14 Excuse me. There's a second
15 phase we call Phase II. This is usually
16 where we do the dose ranging where we'll
17 look at a wide range of doses. We'll do
18 more of the pharmacokinetic work and
19 pharmacodynamic work.
20 And then we have Phase III
21 where we'll do the clinical trials where
22 we have a certain indication, a medical
23 need or area to treat, whether it's
24 preventing stroke after atrial

Page 597
1 essence, what the body does to the drug.
2 So how it -- what it does when it sees
3 the drug, you get these high levels, it
4 gets rid of it by metabolizing the drug,
5 excreting it, and getting it out of the
6 body.
7 The PD is pharmacodynamics.
8 So that's what the drug does to the body.
9 You could think of in other words in this
10 instance it might prolong the prothrombin
11 time or another coagulation factor.
12 So you're looking at both
13 sides when we do this PK/PD. And we do
14 most of this work in Phase II and Phase I
15 studies.
16 Q. And then you use the phrase
17 "dose-ranging studies" or "dose-finding
18 studies." What does that mean?
19 A. So we go -- it depends on
20 the drug class and other things, but we
21 start with a very low dose in patients.
22 We actually start off in human volunteers
23 and look at low doses to see what these
24 PK/PD phenomenon would be. Toxicology,

Page 591
1 example, the embolic stroke is like SPAF.
2 We talked about, where a clot moves from
3 the heart and goes to the brain. A
4 thrombotic clot would be one, say, in the
5 carotid artery, or in a vessel closer to
6 the brain that basically blocks the blood
7 vessel and causes a clot.
8 You can also have
9 hemorrhagic strokes, but they are much
10 less frequent than the thrombotic and
11 embolic type.
12 Q. Okay. And a hemorrhagic
13 stroke is basically bleeding through a
14 vessel in the brain?
15 A. It would be bleeding of --
16 for example, if you have an arteriovenous
17 malformation, then a blood vessel could
18 burst. Like an aneurism, that would be a
19 hemorrhagic-type stroke.
20 Q. And I don't know if I heard
21 you explain. What about a pulmonary
22 embolism? If you said it, I'm sorry. I
23 might have missed it. What's that?
24 A. So blood clots that develop

Page 592
1 in the leg can be basically shuttled to
2 the lungs. They filter through the lungs
3 before they go to the heart. So blood
4 flow from the legs goes to the lungs,
5 then to the heart, and when those clots
6 burst. Like an aneurism, that blocked into
7 the lungs, they can block your ability to
8 absorb oxygen, and you can't breathe.
9 Q. There was a fair amount of
10 talk with counsel for the plaintiffs
11 about the risk side of the equation with
12 respect to Xarelto and anticoagulants and
13 antithrombotics. The benefit side, what
14 is the benefit side and how does it
15 relate to what you were just describing
16 to us?
17 A. Well, the benefit side is
18 that we can identify in many patients
19 risk factors that lead them to clot. And
20 then on the -- so that would be
21 preventive type of preventing these blood
22 vessels -- sorry -- these blood clots.
23 It's important to remember
24 that the hemostatic system is a balance.

Page 593
1 And certain clots can be good if you have
2 a break in the blood vessel or a peptic
3 ulcer. You develop a clot to close that
4 down. That's physiologic. The body is
5 doing that on purpose.
6 But it becomes pathologic
7 when it goes beyond the usual need when
8 some disease state occurs or you have
9 certain risk factors. So we inhibit
10 those clots.
11 And then there's another
12 group where you have a clot, and you
13 treat that clot. So there's the
14 preventive or prophylaxis like we talked
15 about in SPAF, and there's the treatment
16 kind. Once you get it, what do you do.
17 Q. Just to make that a bit more
18 understandable for folks like myself, do
19 blood clots cause strokes?
20 A. Yes. That's the -- that's
21 the cause of most of the strokes is a
22 blood clot.
23 Q. And do people who have
24 blood clots?

Page 594
1 A. People do die. First of
2 all, about 60 percent of the clots that
3 you get in SPAF, these blood clots are
4 debilitating strokes. They're not little
5 ones.
6 Q. So when we're talking about
7 the efficacy side of the equation in
8 these medications that you work on, are
9 we talking about medications that are
10 designed to basically prevent these types
11 of things from occurring?
12 MR. BARR: Object to form.
13 THE WITNESS: The goal of
14 developing these drugs is to take
15 care of these major unmet needs
16 where people have a high risk of
17 clotting, and these are -- these
18 are among the top two or three
19 causes of death in the world.
20 BY MR. HOROWITZ:
21 Q. To save people's lives?
22 MR. BARR: Object to form.
23 THE WITNESS: That's the
24 whole point, yeah.

Page 599
1 looking for any side effects. Is it
2 safe? And then we gradually range up to
3 higher and higher doses to a point where
4 we think we're not going to see the
5 benefit and efficacy.
6 Q. The focus of your work is
7 largely which phase?
8 A. So I work primarily in Phase
9 III.
10 Q. And those are the larger
11 trials to try and provide substantial
12 evidence on safety and efficacy or
13 benefit-risk?
14 A. Yeah. Most of --
15 MR. BARR: Objection.
16 THE WITNESS: Most of my
17 work has been the pivotal Phase
18 III trials, the trials that come
19 to the regulatory authorities for
20 the indication. So they're very
21 large, often 1-, 2-, 3,000, up to
22 currently 27,000 patients that we
23 evaluate the therapies for their
24 safety and their efficacy.

Page 600
1 BY MR. HOROWITZ:
2 Q. And you used the words
3 "pivotal trials." Just explain that
4 briefly.
5 A. Sorry. Pivotal trial is a
6 trial that would be considered by the
7 regulatory agency as one of the ones that
8 they might use to approve a drug for an
9 indication.
10 Q. And is your role today the
11 same as when you first arrived at Bayer,
12 or was there some evolution for you over
13 time?
14 A. There was a little
15 evolution. I was promoted in 2007 from
16 the position that we spoke of, the global
17 clinical leader in our company, to
18 basically overseeing all of the clinical
19 development trials with our
20 antithrombotic drugs.
21 Q. How many doctors or clinical
22 trial folks report to you now?
23 A. I have seven physicians
24 reporting to me at this time.

Page 601
1 Q. And they all work on various
2 clinical trials?
3 A. Different aspects of our
4 clinical trials. We have a very large
5 program with Xarelto. The company has
6 invested in this over a long period of
7 time in many different areas of unmet
8 need, which is a very exciting part to me
9 as I've spent my life developing
10 antithrombotic drugs. So we're having
11 the opportunity to look at other areas of
12 unmet need that often go ignored, and
13 then doctors are left with not having the
14 information.
15 Q. When you use the phrase
16 "unmet need," what do you mean?
17 A. Well, these are areas where
18 we don't think the current standard of
19 care is sufficient or there may not be
20 any good therapy at the time. So our
21 goal is to -- we focus first -- that's
22 how we make our decision as to where to
23 go, is where there isn't the most
24 important need, but where we think a

Page 602
1 particular molecule in a particular class
2 will be effective.
3 Q. Okay. Who do you report to?
4 A. I report to Dr. Frank
5 Misselwitz.
6 Q. You said that you've worked
7 on the drug rivaroxaban or Xarelto.
8 And -- and just so the jury, what is the
9 difference between rivaroxaban, the word
10 "rivaroxaban" and the word "Xarelto,"
11 just explain that.
12 A. Oh sure.
13 Q. The jury has heard both.
14 A. Yeah. So normally when a
15 compound comes out, a chemical entity, a
16 molecule, it has a number in any company
17 or even a research center that it's known
18 by. Ours was BAY, BAY number 79, 59, 39,
19 something like that.
20 But then it goes to the
21 World Health Organization Nomenclature
22 Committee, and gets what's called the
23 INN, which is the international
24 nomenclature committee for giving classes

**Page 603**

1 of drugs a certain name.
2 So rivaroxaban is in the
3 category of -- of abans, Factor Xa-bans,
4 X-A-B-A-N, to -- to give people an
5 understanding that that's a Xa inhibitor
6 as opposed to, say, dabigatran which has
7 a different classification for thrombin
8 inhibitors. It's -- it's just the --
9 what we would call the generic name. And
10 then Xarelto would be the tradename that
11 a company might use.
12 Q. So if we say the word
13 "rivaroxaban," it's meaning Xarelto
14 and -- and vice versa?
15 A. Yes. So -- yes, it means
16 Xarelto and vice versa. It could be at a
17 company that you have a chemical that's
18 known by different names in a couple of
19 different countries. And that's --
20 that's a distinction. Xarelto, to my
21 knowledge, is not that way. Xarelto is
22 rivaroxaban and vice versa.
23 Q. And your role over the years
24 with respect to Xarelto, can you give the

**Page 604**

1 jury just a sketch of your work over
2 time?
3 A. With Xarelto?
4 Q. Yes, please.
5 A. Well, it started out as
6 being a liaison physician with a trial
7 that was done through our copartner, the
8 ROCKET-AF trial which was the SPAF
9 indication. And then it was -- once I
10 was promoted a year later into the
11 position of overseeing the various trials
12 that we were doing, so it was a little
13 less -- actually a lot less operational.
14 More in helping to manage the physicians
15 who were doing the trials and more into
16 the strategy in terms of what we might do
17 going forward or the design of the trials
18 or particular problems that might develop
19 during trials.
20 Q. And you said the SPAF
21 indication with respect to the ROCKET-AF
22 study. Just tell the folks what that is.
23 A. So I -- what I meant is was
24 stroke prevention and atrial fibrillation

**Page 605**

1 is the indication. So this is a
2 condition where patients have an
3 irregular heartbeat. It's an electrical
4 issue. But what happens is in the upper
5 chambers of the heart, especially on the
6 left, because flow is not regular, and
7 it's irregular, then you develop blood
8 clots there.
9 When they are sitting in the
10 chamber, that's okay. But the problem is
11 that they can be launched from the heart
12 to the brain. And in some instances can
13 go to the lower legs or to the intestines
14 or to the arms, but most of them go,
15 about 93 percent go up to the brain, and
16 this is what creates what we know as a
17 stroke.
18 Q. What are the
19 characteristics, the typical
20 characteristics of a patient who has SPAF
21 in terms of age and that sort of thing?
22 A. Well, this -- it can start
23 young, maybe in the 40s. But the rate
24 goes up considerably as we age. So many

**Page 606**

1 of us will have AF by the time we reach
2 80 years old. So this is a condition
3 that crosses age barriers and this is, of
4 course, a time when patients are
5 developing more of their medical problems
6 so it complicates that situation.
7 Q. You mentioned dabigatran and
8 there were some questions about
9 dabigatran. Is that Pradaxa?
10 A. That's known as Pradaxa in
11 this country, yes.
12 Q. And you had mentioned that
13 it's -- it has some differences with
14 rivaroxaban. Can you just explain that
15 to us a little bit.
16 A. Yeah. Pradaxa works in a
17 different class. It works to affect
18 thrombin. Thrombin is a major protein in
19 the coagulation cascade; whereas the Xa
20 inhibitors affect the conversion of the
21 precursor molecule to thrombin. So in
22 essence, they will have a similar effect,
23 but the classes are different. Their
24 chemical structures are different. Their

**Page 611**

1 medical resident, and then I did a fourth
2 year as the chief medical resident at
3 Mercy Hospital.
4 Q. And after -- after you were
5 the chief resident, did you go on to do a
6 fellowship?
7 A. Yeah. I became interested
8 in patients with -- with cancer and
9 bleeding problems, and looked for a
10 program that had that. And went to Ohio
11 State University for two years in a
12 clinical hematology/oncology fellowship.
13 In those days there were almost no
14 oncology fellowships. Everything was --
15 in that area was run by hematologists.
16 So I was exposed to a lot of -- a lot
17 more hematology, blood clotting, and that
18 type of thing and developed a further
19 interest in that area.
20 Q. And what did you do after
21 that?
22 A. I -- my plan had been to go
23 back to Wilmington, as I had said. And I
24 thought in those days, of course, we did

**Page 612**

1 not have internet. We read the medical
2 journals to keep up. And a lot of the
3 papers were coming out of laboratories
4 and -- and research was being done. And
5 that was a training I didn't have. So I
6 thought I would do a postdoctoral
7 research fellowship in hemostasis.
8 And -- and found a fellowship, went -- I
9 checked a number of places, but there are
10 very few in the United States. But found
11 a program at Scripps Clinic in La Jolla,
12 California, that had a -- a program in
13 experimental hemostasis. This is a
14 strong research institute where there
15 were a lot of coagulation leaders at the
16 time. And so I spent -- although I
17 attended one year as a post-doc, I
18 actually did three years there
19 researching von Willebrand factor and
20 bleeding disorders.
21 Q. And this was at Scripps
22 Clinic?
23 A. That was the research
24 institute of Scripps Clinic in

**Page 613**

1 California, yeah.
2 Q. And hemostasis, what is
3 that?
4 A. So this -- that's basically
5 fluid flow maintenance. It's a
6 clotting -- and sort of the clotting and
7 bleeding -- the balance of -- of your --
8 your system. It's -- you could think of
9 it like, homeostasis is sort of the
10 balance in biology. This is the balance
11 of coagulation and -- and bleeding.
12 You -- you need to have your blood
13 flowing, of course, so oxygen and food
14 are moved throughout the body. But you
15 also need to be able to clot when you
16 need to clot, when there's a problem, you
17 get some trauma or something. This is an
18 understanding of the -- the biochemistry,
19 the molecular biology, the physiology of
20 how that occurs.
21 Q. Okay. Did there come a time
22 when you left the research part of
23 Scripps Clinic and went on to something
24 else?

**Page 614**

1 A. Yes. We all have to grow up
2 and get a real job. And I got a
3 professorship at State University of
4 New York at Stony Brook after three years
5 at Scripps.
6 Q. And what did you do at Stony
7 Brook? And -- and one of the things I'm
8 interested in, did you take care of
9 patients while you were there?
10 A. Yes. I actually took care
11 of patients all during this time, from
12 medical school on. There I was a
13 assistant professor of medicine and
14 pathology in the hematology division. So
15 I saw patients with hematologic problems,
16 bleeding and this type of thing.
17 Q. And after Stony Brook, what
18 did you do next?
19 A. I went to -- back to
20 California. My mentor at Scripps Clinic
21 had died as a young man, and my focus was
22 more on clinical practice. So I had
23 friends at Southern California, and
24 Permanente Medical Group, who had a

**Page 607**

1 side effect profile will be different.
2 But they are acting in the same way of
3 trying to inhibit blood clotting.
4 Q. And I've heard the term
5 "novel oral anticoagulant," or "new oral
6 anticoagulant," or "NOAC."
7 Is Xarelto considered to be
8 a NOAC?
9 A. Yes. When we were
10 developing and -- I mean, I can tell you
11 this just by living the history. In the
12 '90s when we were looking to develop
13 anticoagulants, the only oral
14 anticoagulant that's been available since
15 1954 in the U.S. has been warfarin. And
16 so when you read the literature and they
17 talked about oral anticoagulant, they
18 were only talking about vitamin K
19 antagonists. And so the term was
20 developed as we were looking for novel
21 agents, many of which failed in those
22 days. We were looking at various ways to
23 attack the coagulation system and inhibit
24 clotting.

**Page 608**

1 The term came about,
2 "new" -- well, first of all, "novel oral
3 antithrombotics," and that got very
4 complicated to write on slides and,
5 et cetera. So "NOAC" kind of became a
6 shortened version.
7 But now we've been working
8 on these drugs, now I've been working on
9 these drugs since 1990, these kinds of
10 drugs. And now people say, well, they
11 are not really novel anymore. So you'll
12 hear people say, well, they are new oral
13 anticoagulants, et cetera. It's just a
14 semantic term.
15 Q. Switch gears a little bit.
16 I want to talk about your education and
17 background a little bit. Some of the
18 things you did before you came to Bayer
19 in April of 2006. Okay?
20 A. Okay.
21 Q. Just briefly tell the jury
22 where you went to college, medical
23 school, that sort of thing.
24 A. Okay. Well, as I said I was

**Page 609**

1 born and raised in Wilmington, Delaware.
2 I went to college at the University of
3 Delaware. In between semesters I worked
4 as a nurse's aid in the hospital back
5 when they had medical wards, taking care
6 of patients as a nurse assistant.
7 Then I was four years doing
8 a degree in -- a Bachelor of Arts in arts
9 and science at the University of Delaware
10 with a goal of -- they didn't have a
11 pre-med major, but the goal was to go to
12 medical school.
13 Q. Did you go to medical
14 school?
15 A. I did. Yeah, I wanted to be
16 a physician since I was 9 and that was
17 my -- my focus in all that time. Sorry.
18 But that's -- that's --
19 I wanted to be a basketball
20 player until I was 9.
21 Q. Right.
22 A. Actually, until I was 18,
23 but --
24 A. But since I was 9, I mean,

**Page 610**

1 that was my life's dream to do. And I
2 was successful, although in my state
3 there's not a medical school, so it was a
4 little bit more of a challenge to -- to
5 get in. But I did.
6 Q. And where did you go to
7 medical school?
8 A. I went to Jefferson Medical
9 College in Philadelphia.
10 Q. And that did you do an
11 internship and residency after that?
12 A. I did. I went to -- my goal
13 was to go back to my hometown and be an
14 internal medicine doctor, take care of
15 patients. And so I was looking for a
16 program that -- that had a strong
17 intercity kind of program, as well as a
18 suburban practice. I wasn't thinking I
19 would be academic at those times. So I
20 went to a large hospital, Mercy Hospital
21 in Pittsburgh, which is now part of the
22 University of Pittsburgh system where I
23 was an intern in internal medicine.
24 I was then two years as a

**Page 615**

1 position open in hematology/oncology. I
2 had colleagues out there, and so I went
3 back to San Diego.
4 Q. And what did you do when you
5 went back to San Diego?
6 A. Well, I was there for about
7 a year and a half, but the job was not so
8 much coagulation. But I had also
9 colleagues from Scripps Clinic on the
10 clinical side, because I used to go to
11 clinical conferences while I was doing
12 research, and I was seeing patients at
13 Kaiser Permanente, moonlighting we would
14 call it back in those days.
15 So my colleagues there had
16 said that they had an opening for a
17 clinical coagulationist, and asked me to
18 oversee the -- the hematology part of
19 the -- or the coagulation part of the
20 laboratory.
21 Q. And so when you went to
22 Scripps, do you recall about what year
23 that was?
24 A. Yes. I got there about

**Page 616**

1 1990.
2 Q. And you got there, did
3 you also care for patients?
4 A. My whole time there, yes.
5 Q. And -- and what was -- in
6 addition to caring for patients, I mean,
7 what -- what primarily was the nature of
8 the work that you were doing there, both
9 in terms of caring for patients,
10 laboratory work, all of the above?
11 A. Yeah. So I had -- I had
12 individual patient care, consultation.
13 And so patients would come from actually
14 several hundred miles in that southern
15 California, Arizona, Nevada area, because
16 there were people that did coagulation in
17 those days.
18 I oversaw the coagulation
19 laboratory in terms of PTs, PTTs and how
20 to read them out and the quality of them,
21 this type of thing.
22 I also worked on clinical
23 trials, first with the oncology group
24 where they had a drug that was -- that

**Page 617**

1 was proven to be very useful in hairy
2 cell leukemia.
3 And then I did my own
4 clinical trials in antithrombotics.
5 That's when I started with the -- with
6 the help of others, physicians, there at
7 Scripps and in the pharmaceutical
8 industry.
9 Q. You mentioned you supervised
10 the clinical coagulation laboratory.
11 A. Yeah. Most laboratories,
12 they have a pathology director and the
13 operational part is driven, but they
14 often like a medical director to provide
15 the clinical input and make that liaison
16 or that transition between just a
17 laboratory value and an actual patient
18 and how it matters.
19 So I would read out the
20 clinical reports, interpret them, based
21 on the clinical pieces.
22 Q. And was PT or prothrombin
23 time one of the lab tests that you
24 focused on in that laboratory?

**Page 618**

1 A. Yes. I did PTs, PTTs. We
2 didn't have a large number of tests in
3 those days that we do now.
4 Q. Yeah, that was one of the
5 other things that I wanted to ask you
6 about. Did you have any personal
7 experience as a young physician and as a
8 doctor with respect to the lack of
9 understanding of blood clotting and how
10 to treat it during this time frame?
11 MR. BARR: Object to form.
12 THE WITNESS: I mean, I
13 would say that I spent a lot of my
14 career in that area. Coagulation
15 is a young field. And I've been
16 doing coagulation since 1985. And
17 I would freely admit that despite
18 doing it all these many years,
19 it's not fully understood. There
20 is still a lot for us to learn.
21 BY MR. HOROWITZ:
22 Q. After the Scripps clinic,
23 where did you go and how did you end up
24 there?

Protected - Subject to Further Protective Review

**Page 619**

1 A. Yeah, that's interesting. I
2 met one of the cardiologists at Scripps
3 clinic's name is Dr. Richard Schatz. And
4 he was the co-inventor of the bare metal
5 stent, sometimes known as the Johnson &
6 Johnson stent. It was the first coronary
7 stent, a metal structure that you could
8 insert into the coronary arteries to keep
9 it open and prevent the recurrence of a
10 blood clot.
11 And he encouraged me to go
12 to American Heart and American College of
13 Cardiology, because as a hematologist,
14 you saw patients with bleeding disorders.
15 But thrombosis was relatively not given
16 much thought in those days. We only knew
17 of three risk factors that were involved
18 that you could test for.
19 And when I worked with him,
20 I saw that there was a whole new world on
21 the cardiology side.
22 And since that time I've
23 spent my life on the border of hematology
24 and cardiology.

**Page 620**

1 Once I went to those
2 meetings, I met up with cardiologists who
3 were interested in coagulation. One of
4 those people was Dr. Robert Califf. And
5 Dr. Califf recruited me to come to Duke
6 University, which is how I left Scripps,
7 because he was overseeing the -- what was
8 called at that time, the Duke
9 Cardiovascular Data Bank, now known as
10 the Duke Clinical Research Institute.
11 And he wanted a coagulationist who could
12 understand the cardiology world and help
13 his cardiologists in interpreting the new
14 drugs that were coming, like
15 thrombolytic, looking at bleeding side
16 effects and the efficacy from a
17 coagulation standpoint.
18 And so I joined the faculty
19 there at Duke in the hematology division
20 and the cardiology division. I have a
21 dual appointment in both on the hospital
22 side. And I was a faculty member of the
23 Duke Clinical Research Institute.
24 Q. And what years were you at

**Page 621**

1 Duke?
2 A. So from late '93 to 2000.
3 Q. And you said you were on the
4 faculty while you were at Duke?
5 A. In both of those areas. So
6 dual appointment in cardiology
7 hematology. And I was assistant and then
8 associate professor of medicine and
9 pathology, because we also had a
10 pathology appointment because of our
11 laboratory experience and interactions.
12 Q. Did you continue to treat
13 patients while you were at Duke?
14 A. The whole time, yes.
15 Q. And what was the primary
16 focus of your work and practice when you
17 were at Duke?
18 A. Well, as a -- I was one of
19 the -- we had five by that time, now,
20 five clinical Exhibit Berkowitz-56
21 coagulationists. So we rounded on the
22 floor. We did a general medicine
23 rotation during the year. We did
24 clinical coagulation in the hospital,

**Page 622**

1 being a consultant.
2 In those days where
3 there were few consultants, I would see
4 patients anywhere from the neonatal unit
5 to octogenarians and older, all the
6 different specialities, OB/GYN,
7 pediatrics, internal medicine, surgery.
8 That's where we would go for consultation
9 and patient care, inpatient.
10 And then of course had an
11 outpatient practice and did as well
12 clinical trials both on the venous side
13 and the arterial side.
14 Q. What was the primary
15 medicine used to treat clots, prevent
16 clots, anticoagulation during your time
17 at Duke?
18 A. Well, in those days, all we
19 had was warfarin, an effective medicine
20 but very difficult to use. And it took
21 an anticoagulation clinic, which we had
22 at Duke, to manage many of the patients.
23 And we had unfractionated heparin, which
24 required monitoring with PTT and a lot of

Protected - Subject to Further Protective Review

**Page 623**

1 fluctuation up and down.
2 And then
3 low-molecular-weight heparins came in.
4 So that altered that a bit.
5 Q. Okay. Let's break this down
6 a little bit. What is warfarin? And
7 explain, you said it was hard to use.
8 Why is it hard to use?
9 A. Well, it's hard to use
10 because it's affected by different foods,
11 how much vitamin K they have in them, and
12 by different medications. And so
13 patients can be stable on the medication
14 for weeks, sometimes months, and then all
15 of the sudden be out of control.
16 Sometimes that's due -- you
17 can find that it's due to the change in
18 diet. Maybe they decided to be, not
19 necessarily vegetarian but have more
20 salads per week, try to take a healthier
21 lifestyle. Or they could -- someone
22 could add a drug on, another physician,
23 and not even know that they're on
24 warfarin.

**Page 624**

1 So it's a drug that we call
2 a narrow therapeutic index drug that
3 requires that we have to do some kind of
4 testing to try to ensure that the patient
5 is within a certain therapeutic range.
6 Q. And what do you mean by
7 "narrow therapeutic index" or "narrow
8 therapeutic range"?
9 A. Well, I'm talking about a
10 drug where we're not certain what you're
11 giving the patient is what they get. So
12 if you give them 5 milligrams,
13 7-1/2 milligrams, 10 milligrams, is that
14 giving me the pharmacodynamic effect that
15 I want, the effect on the coagulation
16 parameter, on the outcomes that we talked
17 about like stroke or DVT.
18 You need to make sure with
19 that kind of drug that the patient is in
20 a range so that you can get the result.
21 Now, that wasn't known right
22 away. Before, it was give the
23 medication, and then for the first
24 30 years or so it was not easy to follow.

**Page 625**

1 Then the PT test was found
2 that could be utilized. This was a test
3 that was not developed for monitoring
4 drugs. It was developed to detect factor
5 deficiencies, protein deficiencies. But
6 over several decades it was modified and
7 the reagents adjusted to be sensitive to
8 warfarin.
9 So then, when looking back
10 at clinical trials, it didn't start out
11 that we had the INR that we talked about,
12 this international normalized ratio. You
13 looked at the PT. You kind of guessed
14 from the prolongation where the patient
15 should be.
16 Then they started using this
17 PT ratio, which was a ratio of the PT
18 value that the patient had to an
19 arbitrary control value in the lab. That
20 was a little better, but that wasn't --
21 that wasn't perfect.
22 Q. Okay. Let me break that
23 down a little bit. You said a lot there.
24 A. Okay.

**Page 626**

1 Q. When you talk about PT and
2 INR in the context of warfarin and
3 measuring or monitoring that, is that
4 where you're talking about therapeutic
5 drug monitoring?
6 MR. BARR: Object to form.
7 BY MR. HOROWITZ:
8 Q. That's a horrible question.
9 Let me try that again.
10 What is therapeutic drug
11 monitoring in the context of an
12 anticoagulant like warfarin? Could you
13 explain that?
14 A. I think it's simply just
15 checking a value periodically. Not --
16 not just because you want to, but because
17 it's necessary to try to ensure that the
18 patient is within range. It's not a
19 guarantee that they're within range.
20 They could go in and out of range,
21 depending on how often you check it.
22 But the goal is to target a
23 certain range. And that range was
24 determined not by prospective studies.

Protected - Subject to Further Protective Review

**Page 627**

1 That was determined by looking back at
2 the literature, and it's important to
3 note that that range was determined by
4 making a conversion from that PT ratio
5 that I mentioned.
6 Q. And remind the jury, when
7 you say "PT" or "prothrombin time," what
8 is that again?
9 A. Prothrombin time is one
10 measure of a clotting test, basically.
11 It's measured in seconds. It looks at a
12 certain portion of the coagulation
13 cascade. The cascade is a number of
14 proteins that makeup the coagulation
15 system or the hemostasis system we were
16 talking about.
17 If I could step back a bit.
18 The hemostasis system consists of these
19 coagulation proteins that we've been
20 talking about inhibiting, but we have to
21 remember that there's more to the system.
22 There are also proteins that try to make
23 you clot. There are proteins that try to
24 inhibit you from clotting. There are

**Page 628**

1 proteins that try to break up clots when
2 you have them. There are tiny cells in
3 the blood that make you clot when you
4 need to clot, like when you cut your
5 finger. They're the little blood cells.
6 White blood cells, it turns
7 out, plays a role. And finally, the
8 blood vessels and their lining, their
9 endothelial cells, they all play a role.
10 Q. Okay. And what is it about
11 warfarin that makes it necessary to
12 monitor INR or PT in its form as -- PT as
13 INR, if you will? Why do you have to do
14 that with warfarin?
15 A. Well, again, you're trying
16 to find a range where -- sometimes people
17 use the term -- I'm sure a lot of people
18 will know this -- blood thinner. When
19 they say thinning the blood, actually the
20 blood doesn't get thin, but it tends to
21 clot -- takes a little longer to clot.
22 So you're trying to make it
23 a little harder for the blood to clot but
24 not too much.

**Page 629**

1 And that's a delicate
2 balance to do that when you're using
3 warfarin. So you need the PT to manage
4 that.
5 Q. When you say "you need the
6 PT to manage it," what relationship does
7 that have to the dose of warfarin that a
8 doctor is giving a patient?
9 A. Well, the dose changes all
10 the time, so you can't use a constant
11 dose. For example, a patient could be on
12 5 milligrams a day and could be fine for
13 several days, weeks, months, and then
14 they might change.
15 So you're really not using
16 the dose. It's not predictable
17 pharmacokinetics and pharmacodynamics.
18 When you give a dose, that doesn't mean
19 that's what you're going to get. So
20 you're utilizing by force, because you
21 need to, the PT as your guide.
22 Q. Does the PT -- wow.
23 Does the PK and PD profile
24 of warfarin change depending on what

**Page 630**

1 people eat and that sort of thing?
2 A. It's affected by that,
3 because warfarin -- basically what
4 warfarin does is it prevents vitamin K
5 from appropriately maturing the
6 coagulation proteins. It actually
7 affects four proteins, because four of
8 the clotting proteins and two of the
9 nonclotting proteins require vitamin --
10 vitamin K to actually function properly.
11 Q. When you said it does not
12 have predictable PK/PD parameters or
13 characteristics, is that what you're
14 talking about?
15 A. Yeah. I mean -- what I mean
16 is that when I give a dose, you know, a
17 set dose, it -- it's going to always
18 produce the same PT. And so I have to
19 adjust it a little bit depending on a
20 patient's diet, depending on new drugs,
21 depending on if they had an infection
22 recently, and I have to try to get it in
23 that range. So somebody might be fine
24 at -- at 5 or 3 or -- or 6, and then they

Protected - Subject to Further Protective Review

**Page 631**

1 are not. And it's a little -- it's
2 really unpredictable, and so that's why
3 we need an actual blood test to determine
4 that.
5 Q. And to adjust the dose based
6 on that test?
7 A. We adjust the dose based on
8 that test, and then we come back and do
9 it again to make sure that we didn't over
10 or underdose it. And finally if it looks
11 like it's stable then we can give them,
12 you know, a few weeks' respite.
13 Q. You mentioned a couple of
14 other drugs, I think unfractionated
15 heparin and heparin. Can you just tell
16 the jury what those are and whether
17 there's any challenges with those.
18 A. Yes, there are challenges.
19 Based -- the heparins have been around
20 since the 1920s, used in clinical
21 practice since 1934. However, they have
22 their own issues in terms of the fact
23 that they are very large molecules.
24 These are called glycosaminoglycans,

**Page 632**

1 which just simply means they have a
2 carbohydrate backbone structure to them.
3 They have been produced
4 initially from other biologic --
5 basically from either porcine or beef
6 intestine or lung. So they have been
7 purified and -- but they are not pure
8 molecules like today's drugs are, and so
9 there is a lot of variability with them.
10 They bind to plasma
11 proteins, and so there's a lot of
12 fluctuation because of that.
13 Q. And if you are a patient
14 receiving heparin or low-molecular-weight
15 heparin, how is a doctor going to give it
16 to you? How do they receive it?
17 A. You know, that is something
18 actually I tried to work on with a
19 company back in the '90s. It has to be
20 given either intravenously, so you have
21 to have a hole in the -- in the vessel,
22 and put a line in and drip it in. Or you
23 could put it by injection under the skin.
24 We call that subcutaneous. But then you

**Page 633**

1 have to do it usually two or three or
2 maybe four times a day, inject it. But
3 we have not been able to make it oral.
4 That's what I meant. I had worked with a
5 team on making heparin oral, but it was
6 not possible.
7 Q. So when -- when you were
8 practicing medicine and treating patients
9 and trying to deal with anticoagulation
10 of those patients with warfarin and --
11 and medicines like heparin and low
12 molecular-weight heparin, were you, as a
13 physician, satisfied with these as -- as
14 treatments?
15 A. Well, I was utterly
16 unsatisfied being the one who would have
17 to adjust the PT everyday in the hospital
18 or, you know, in the clinic we would see
19 patients that had difficult problems.
20 The heparin had to be adjusted several
21 times a day, and it just seemed to me
22 that there had to be a better way. And
23 that became the focus of my research,
24 especially when I got to Scripps Clinic

**Page 634**

1 where I had the opportunity to be part of
2 clinical trials.
3 Before that it was just a
4 frustration, but I didn't have a way to
5 act on it.
6 Q. And did you continue to do
7 that kind of work when you went to Duke
8 University?
9 A. Yes. I've been
10 developing -- trying to develop
11 antithrombotic drugs since 1990.
12 And then there come a time
13 when you left Duke and joined a company
14 called as AstraZeneca?
15 A. Yes. I had the opportunity
16 to work on the first direct thrombin
17 inhibitor, the first replacement for
18 warfarin that was oral.
19 Q. Okay. And when did you do
20 that work, just to give the jury some
21 time frame here?
22 A. From 2000 to 2004 or so. I
23 mean, I was there until 2006, but the
24 actual work was in that -- in that first

Page 635

1 period.
2     Q.   So you were at AstraZeneca
3 from 2000 to 2006?
4     A.   Correct.
5     Q.   And what was your role when
6 you were there?
7     A.   I was a -- basically, I
8 would say, like a clinical research
9 physician.
10     Q.   And -- and what was the drug
11 in particular that attracted you to go
12 there and what did you do while you were
13 there?
14     A.   So this drug was called
15 the -- the generic name would be
16 ximelagatran.  So it has a "tran" name
17 like dabigatran.  It was before
18 dabigatran.
19         It was known as Exanta for
20 the trade name, in case people know that
21 name.  It was a very exciting period
22 where we had the first oral.  It was a
23 twice-a-day like dabigatran.  And the
24 initial studies, in Phase II -- up to

Page 636

1 Phase II and even into Phase III were
2 very promising until -- as we always do,
3 we're watching for safety signals -- a
4 safety signal developed in terms of liver
5 dysfunction, and it had to be removed
6 from the market.
7     Q.   Why did it have to be
8 removed?
9     A.   Because it -- it had a
10 safety signal in liver that in very rare
11 instances it could cause liver
12 abnormalities and -- and liver necrosis
13 in at least one patient.
14     Q.   As a -- a medicine to treat
15 thrombosis, did you consider -- I can't
16 pronounce it -- I'll call it Exanta -- to
17 be a medical advance of any kind even
18 though it had to be withdrawn from the
19 marker -- market due to liver injury?
20         MR. BARR:  I need to
21 object to form.
22 BY MR. HOROWITZ:
23     Q.   I think I've got to try that
24 question again.

Page 637

1         What was your view of Exanta
2 as a medicine that could treat thrombosis
3 and as an anticoagulant compared to
4 warfarin, the treatments that came before
5 it, even though it had to be removed from
6 the market because of the liver injury
7 issue?
8     A.   Well, I'm -- I'm a person
9 who considers themselves very scientific
10 and academic.  And it would take a lot to
11 pull me from the university situation
12 once I was there.  But the opportunity to
13 work on an oral replacement for warfarin
14 to affect patients' lives in that way was
15 just too enticing for me having that
16 opportunity.  I wasn't directing the
17 program, but I would be able to see the
18 data first.  I could design trials.  So I
19 saw that as a tremendous advance over
20 warfarin if it could be successful.
21     Q.   What about with respect to
22 the need for routine anticoagulation
23 monitoring?
24     A.   Well, again, this is another

Page 638

1 tremendous advantage if we would not need
2 to do that in most situations.  Even
3 being twice a day, this was a great thing
4 if it could be pulled off.  And that
5 required the clinical trials.
6     Q.   And that was the focus of
7 your work?
8     A.   The focus of my work was
9 those Phase III trials.  I worked with
10 the orthopedic and the venous indications
11 in doing clinical trials with Exanta.
12     Q.   And then did there come a
13 time when you left as AstraZeneca and
14 ended up going to work for Bayer where
15 you continue to work today?
16     A.   That's right.  Because they
17 were waiting for the backup compound to
18 come into my area.  It was not clear when
19 that would happen.  I had given thought
20 to going back to the university, but I
21 got another chance to work on an
22 antithrombotic drug and -- and this was
23 extremely important to me.  So I was at
24 American Heart in 2005, it's usually in

Page 643

1 before you came to -- and preventions
2 before you came to Bayer?
3     A.   Yes.  I did a number of
4 things, including in my time at Duke I
5 had consulted with something like 17
6 companies in the seven years that I was
7 there working on various aspects of,
8 like, laboratory monitoring for if it
9 would be needed for future
10 antithrombotics.  How you might educate
11 physicians about coagulation, because
12 this is always a big challenge.
13         And thinking about how to do
14 things, like make heparin oral, or where
15 should we try to look for molecules that
16 could affect the coagulation system.  So
17 all in that area.
18     Q.   Okay.  And have you told us
19 about all your experience in treating
20 patients and prescribing antithrombosis
21 medicines over the years before you came
22 to Bayer?
23     A.   Yes.  Well, as a coagulation
24 specialist, you know, as we start -- when

Page 644

1 I started out, as I mentioned, we mostly
2 saw bleeding cases.  And so we handled
3 bleeding problems.  But as the '90s wore
4 on, we had more and more factors that we
5 could evaluate and more and more work was
6 being done in treatments.  There was
7 investment in trying to develop something
8 in this area, because at that time it was
9 about hypertension and cholesterol
10 lowering and these things.
11         But as there became more
12 interested in funding to study this,
13 people were able to see more and more how
14 important thrombosis was.
15     Q.   Why were you so interested
16 in thrombosis?
17     A.   I -- I don't know.  It's a
18 funny thing, how something attracts you.
19 But blood coagulation has always
20 attracted me.
21         But what the big thing for
22 that was that I really saw that there was
23 something that I could do in research
24 where you could really make a difference

Page 645

1 for patients.
2         And I thought -- I just
3 thought that here is something.  But I
4 was doing the benchtop research, but I
5 didn't see how that was going to lead to
6 important things.  But I could really see
7 having to deal with warfarin and heparin
8 all the time, that we could really make a
9 difference and affect patients' lives.
10         And we don't -- you know, we
11 take care of patients day to day, and
12 that's an important thing.  But to have
13 the opportunity to make these kinds of
14 change, to do practice changing trials
15 and drugs and other things that we do
16 these days, that led me to spend the time
17 that I have on antithrombotics.
18     Q.   We talked a little bit about
19 this already.  And you talked a lot to
20 counsel for plaintiffs asking you
21 questions.  Remind us and explain to us
22 the benefit side and the risk side of the
23 medicines like Xarelto that are used as
24 antithrombotics.

Page 646

1         MR. BARR:  Object to form.
2         THE WITNESS:  Well, I mean,
3 this is something that I have had
4 the good fortune to be in the
5 field a long time.  And I've
6 learned a lot in it.  It's not all
7 in the textbooks when you start
8 out.  And I've also lived long
9 enough to see the textbooks
10 change.
11         But I got to see in clinical
12 trials coagulation in people, not
13 in the laboratory, not stopped,
14 put in a test tube, run to the
15 lab, and then restart it like we
16 do a PT, but actually see it in
17 patients.
18         And seeing it in that way,
19 you learn a lot about what
20 coagulation really is, and you
21 certainly learn to be humble.
22         So in developing these
23 drugs, it's been an important --
24 important aspect to pay close

Page 639

1 November, and -- and my boss, Dr. Frank
2 Misselwitz, and his boss, Dr. Joerg
3 Moeller, recruited me to Bayer to work on
4 their program.
5         I -- I didn't know it at the
6 time, because when you are involved in
7 these programs, you're not looking so
8 much externally, but a lot of the
9 companies were looking to how we had set
10 up that program, what indications needed
11 to be done, and so I thought that that
12 would be useful.
13     Q.   How you had worked on the
14 Exanta program?
15     A.   Right.  And my knowledge
16 about, you know, just, you know, what you
17 learn inside the program, you know, in
18 these programs, you're not looking at
19 trials and looking for safety signals and
20 looking for efficacy outcomes and -- and
21 approving them so that you could get
22 approval by the authorities.
23     Q.   And who was it that
24 recruited you to Bayer?

Page 640

1     A.   Frank Misselwitz, my boss,
2 who is a vascular medicine physician, and
3 Dr. Joerg Moeller, who's now head of
4 development now at Bayer.
5     Q.   And you mentioned you met
6 them at the American Heart.  Which
7 American Heart?
8     A.   American Heart is one of the
9 cardiology meetings that -- and, you
10 know, neurologists go there.  Lots of
11 physicians interested in vascular
12 medicine in the U.S. and -- and people in
13 Europe come to the American Heart meeting
14 to go over scientific presentations.
15     Q.   Why did you choose to go to
16 Bayer in 2006 when Dr. Misselwitz and
17 Dr. Moeller recruited you to go there?
18     A.   Well, the first one was the
19 opportunity to stay in my field.  It's
20 not easy to spend your whole career in
21 coagulation.  It's not a large specialty.
22 But my research interest being in
23 antithrombotics, they not only had
24 rivaroxaban but they had a commitment to

Page 641

1 patients in antithrombotic therapy.  And
2 that was important to me because I
3 know -- knew very well how a drug can
4 develop a safety signal or have some
5 other problem that doesn't make it
6 successful.  After all, only one in nine
7 that gets into the phase programs that we
8 do actually makes it.
9         And so they had that
10 commitment.  And I liked the culture that
11 I understood from there when I
12 interviewed.
13     Q.   Is it fair to say when you
14 chose to come to Bayer in 2006, that you
15 had spent virtually your entire
16 professional career working in the area
17 of antithrombosis?
18         MR. BARR:  Object to form.
19         THE WITNESS:  In -- in
20 essence, it's been 20 -- it's been
21 26 years, just in the
22 antithrombotics, another five
23 years in coagulation in general.
24 So I've spent my whole career

Page 642

1 there.
2 BY MR. HOROWITZ:
3     Q.   Your entire career?
4     A.   Yeah.
5     Q.   And before you came to
6 Bayer, had you actually done laboratory
7 research with respect to antithrombosis?
8     A.   Not in the -- just the
9 laboratory work that I talked about in
10 terms of overseeing coagulation labs.  My
11 basic research work was in protein
12 chemistry with von Willebrand factor
13 which is a bleeding disorder, and -- and
14 using monoclonal antibodies to map the
15 molecule.
16     Q.   Okay.  But you oversaw the
17 lab where you actually read PTs and --
18     A.   Oh yeah --
19     Q.   -- clinical interpretation?
20     A.   Yes.  And also worked in the
21 anticoagulation clinics, especially the
22 one at Duke.
23     Q.   And you had done clinical
24 research on antithrombosis treatments

Page 647

1         attention to what we've learned
2         from the clinical trials.
3 BY MR. HOROWITZ:
4     Q.   What's the risk specifically
5 that is trying to be balanced against the
6 benefits.  What's the primary risk?
7     A.   Well, something that I've
8 looked for for a long time, working on
9 different molecules in the '90s -- I
10 worked on argatroban, hirudin, heparin,
11 we talked about.  I worked on the oral
12 glycoprotein IIb/III inhibitors.  That
13 class died.
14         But the biggest problem that
15 we have is a term that I use, is
16 uncoupling the bleeding from the
17 efficacy.
18         In other words, not having
19 bleeding, but still preventing as much of
20 the clotting as needs to be prevented.
21 And we're always seeking a balance with
22 the drugs and the dosing.  But we have
23 not yet come up with a drug that inhibits
24 the clotting part but leaves a patient

Page 648

1 without bleeding.
2         Now, we're still hopeful for
3 that.  But the way the coagulation system
4 works, if we talk about this balance back
5 and forth, then it's very difficult to
6 even imagine that you could do that, in
7 other words have strong efficacy, but
8 also not have the bleeding.
9         So unfortunately up until
10 this time, they have come in hand.  But
11 what we focus on is having of course
12 a lot more of the efficacy and as little
13 of the bleeding as we can.
14     Q.   Have you discussed essentially
15 your career to trying to achieve this
16 uncoupling of efficacy from risk?
17         MR. BARR:  Object to form.
18         THE WITNESS:  It's certainly
19 been a goal of mine.  But I think
20 it's difficult for one person to
21 do that.  I've just spent most of
22 my time working on drugs that
23 accomplish that.
24         And you -- in that instance

Page 649

1 you have to be -- you have to be
2 flexible.  You have to move, as I
3 have, go to different
4 universities, or go to companies
5 where they have the molecules.
6         I mean, at the university I
7 had patients, but I didn't have
8 the molecules, and there's not
9 funding.  The National Institutes
10 of Health don't fund this kind of
11 research.  You have to do that in
12 industry, as it is considered a
13 private sector issue.
14         So, yeah, I've spent my
15 career trying to be as close to
16 that and make as much of a
17 difference as I can.
18 BY MR. HOROWITZ:
19     Q.   Is that one of the reasons
20 that you went from academia at a place
21 like Duke into industry, as you said?
22     A.   It was -- it was a really
23 difficult decision, but that is the
24 reason I went, was because I had the

Page 650

1 opportunity to work with one of those
2 drugs.  And as I say, seeing the data,
3 watching as we increase the dose and
4 watch what happens, this gives the most
5 understanding.  You often find sometimes
6 what's written in the literature, what
7 you find in the books, it's not as
8 practical and real as what you see when
9 you're as close to the patients as you
10 are in those situations.
11     Q.   And when you came from
12 AstraZeneca to Bayer in 2006, did you
13 understand that you would be working on
14 Xarelto?
15     A.   Yes.  Yeah.  That was quite
16 clear.
17     Q.   And were you excited?  Or
18 how would you characterize, you know,
19 your view and your decision to come to
20 Bayer to work on Xarelto?
21     A.   I was one of the very
22 fortunate few in the world that had an
23 opportunity to work on big programs
24 in antithrombotics.  I was very thrilled

Page 651

1 to be on the program.
2    Q.   Yeah.  And why in particular
3 were you very thrilled to be on the
4 Xarelto program and part of the clinical
5 development team on Xarelto?
6    A.   Well, I had the chance to
7 work on a novel agent, again, that was
8 oral.  And I spend my time mostly on the
9 oral agents because that's what I'm
10 looking for.  We can attack a broad
11 number of indications that way when it's
12 easier for the patients to take them.
13    So I was excited about that.
14 I was excited about their portfolio and
15 interest in coagulation.  And I had the
16 experience, which I thought would be
17 valuable to the company, having been
18 through the ximelagatran program.  As I
19 mentioned to you, only one in nine drugs
20 makes it in these areas.  But that
21 doesn't mean that you haven't had
22 learnings from all those others.
23    So what often happens is
24 physicians who might work on that

Page 652

1 program, staying in one company, if they
2 don't have other molecules, they might be
3 going off to diabetes or hypertension,
4 and I had experience where I could then
5 transfer over to Bayer.
6    Now, I had another
7 advantage.  And that is a number of my
8 colleagues who were at AstraZeneca went
9 to our co-development partner, and so
10 there was the opportunity to work with
11 people who had grown up in the
12 ximelagatran program with me.  And then
13 the culture was important to me.  I -- in
14 interviewing over in Germany, I felt that
15 the culture was a good fit for me.
16    Q.   Why was the culture a good
17 fit for you?
18    A.   Well, in our company -- I
19 don't know all companies, but in our
20 company, you are free to provide your
21 views and you're not -- it's not stepped
22 on.  Everyone is listened to.  It's a
23 very matrixed organization -- matrixed
24 organization.

Page 653

1    But all functional views are
2 heard and respected.  And I think people
3 are respected there.  And it's about the
4 patients.  There's a very strong concern
5 about patients and care and doing the
6 right thing.
7    So I know that in certain
8 functions that don't always
9 the case.  There's more of a business
10 mind to it.  But I know that in my
11 company, at least in my area, my sphere,
12 that's never been the case.  And that
13 makes me very comfortable.
14    I don't always get my view
15 seen.  But my view is certainly heard and
16 respected.  And that was not now ten
17 years later only, but that was from day
18 one.
19    Q.   I guess you say in response
20 to some of the questions to plaintiffs'
21 counsel that you felt like you and the
22 development team, you know, at Bayer were
23 allowed to follow the science.  What did
24 you mean by that?

Page 654

1    A.   It's just sort of an
2 expression that we have that we look at
3 the data first.  I mean, I'll freely
4 admit that I can't do clinical trials
5 without funding, right?  I mean, whether
6 it's the NIH or some other organization,
7 American Heart or my company.  I have to
8 present a case that's going to be
9 valuable, because there is no other way
10 to get research done.  And I can't get it
11 through government funding.
12    So it's important to have
13 that funding, but we have the freedom in
14 the company to follow whatever the data
15 shows.
16    So I think a great example,
17 in my mind, if I can say, was the
18 decision about BID twice a day and once a
19 day.  That was something that came up in
20 the discussion.  This is a very
21 interesting story to me because --
22    Q.   Yeah, sure.  Let me ask
23 about that then.  I'm going off script,
24 much to Mr. Barr's concern.  But yes,

Page 659

1    Q.   Let me back up a little bit.
2 When you get to Bayer and you're working
3 on Xarelto, what was the problem and what
4 was the unmet medical need, if you will,
5 that you and the scientists and doctors
6 at Bayer were trying to solve in
7 developing a drug like Xarelto?
8    A.   Well, there were several
9 indications that still need -- that
10 needed, and there are some that -- that
11 need and aren't yet attacked, at that
12 time.
13    But -- so the prophylaxis or
14 prevention of blood clots after total hip
15 and total knee surgery is a really
16 important area.  These patients, if -- if
17 a knee patient does not have any
18 prophylaxis, they have a 50 to 65 percent
19 rate of having a blood clot in their leg.
20 And if it's a hip, then it's on the order
21 of 40 to 50 percent.  So something needs
22 to be done.
23    But what did we have?
24 We had aspirin, which -- which some doctors

Page 660

1 still use.  We had warfarin, which takes
2 days and up to two weeks to be in
3 steady-state.  And by then the -- the
4 risk is almost over.  We had heparin,
5 which means that patients had to inject
6 themselves.  So there was an area where
7 an oral drug could be of benefit.
8    There was the treatment of
9 deep vein thrombosis and pulmonary
10 embolism.  Again, what did we have?
11 Unfractionated heparin, low
12 molecular-weight heparin, warfarin.
13    And then we had SPAF.  So we
14 had -- and -- and then there are others
15 after that.  So those are what we were
16 looking at.
17    Q.   Okay.  And those are the
18 particular indications you were looking
19 at, correct?
20    A.   Yes.
21    Q.   Okay.  What about in
22 comparison to warfarin, low
23 molecular-weight heparin, and heparin,
24 what were the -- the issues with those

Page 661

1 drugs that you were trying to solve by
2 developing Xarelto?
3    A.   Well, the goal was to try to
4 be able to give the medication without
5 worry about food, that whatever food that
6 the patient took or whatever drugs that
7 they took.  So the goal was to try to
8 find a drug that had predictable
9 pharmacokinetics and pharmacodynamics.
10    What -- what do I mean?  I
11 mean that we know what happens the patient
12 will be in for their -- their
13 concentration maximum and when the drug
14 would be eliminated and when you could
15 give the drug again, and you can do that
16 day in and day out.
17    Q.   And do you consider Xarelto
18 to be an improvement over warfarin and
19 heparin and low molecular-weight heparin?
20    A.   I certainly do not discount
21 the value of warfarin and its
22 effectiveness.  But it's so hard to use,
23 many patients don't want to be on it,
24 can't be on it.  And doctors can't manage

Page 662

1 it.  And I certainly consider Xarelto to
2 be a major achievement.
3    If we think about what
4 happens to a patient today versus when --
5 we are talking 15 years ago -- who has
6 deep vein thrombosis with risk of
7 pulmonary embolism, what happens today.
8 They go to the doctor's office or
9 emergency department and what would
10 happen 15 years ago is they would be
11 admitted to the hospital, and they would
12 be started on unfractionated heparin.
13 And today they go to the doctor's office.
14 They are in an emergency room.  They get
15 oral Xarelto.  In two hours the doctor
16 knows that it's effective and they can go
17 home.  I would say that's a major advance
18 for patients and doctors in the
19 healthcare system.
20    Q.   I've heard the phrase "fixed
21 dosing without the need for routine
22 anticoagulation monitoring" with respect
23 to Xarelto.  Are you familiar with that
24 phrase?

Page 655

1 let's ask about that.
2    MR. BARR:  Worried about you
3 cutting him off.
4 BY MR. HOROWITZ:
5    Q.   Let me ask about OD versus
6 BID and that decision that you're talking
7 about.  What do you mean that was a
8 follow-the-science type of decision?
9    A.   Well, you know, the initial
10 part -- and I think Mr. Barr and I
11 discussed this.  When one first looks at
12 drug in general, we often look at the
13 half-life and it give us a sense of what
14 a drug might be if it's oral.  Is it once
15 a day, twice a day, three times a day.
16 That's a first step.
17    But coagulation is a little
18 bit different.  And initially Xarelto was
19 the same way.  It was looked at first
20 from the half-life.  And it started off
21 in twice-a-day dosing.  And several
22 trials were done.  There were three
23 orthopedic trials done that way.
24    While that was going on,

Page 656

1 then some more sophisticated coagulation
2 testing was done.  First they do the
3 usual, PT, PTT, the things that we have
4 available in hospital labs.  But there
5 was another test being developed back in
6 that time which is used now, although not
7 so easy to do as a PT, PTT.  And that's
8 called the thrombin generation time.
9    And the bottom line is, it's
10 just a measure of how a molecule might
11 affect thrombin.  Thrombin, as we said,
12 is an important molecule in coagulation.
13    So what we learned in those
14 studies -- and actually, I should say
15 what they learned, because I wasn't there
16 at the company -- was that the molecule
17 inhibited thrombin for over 24 hours.
18    The PT, you know, there's a shorter
19 period of time.  The half-life, shorter
20 period.
21    But our goal with
22 coagulation is affecting the clotting in
23 the patient, not in the test tube, not in
24 the PT test or PTT test or any of those

Page 657

1 tests, but in the patient.
2    And so they started adding
3 OD, once a day, in the testing.  Well,
4 that's following the science.  It cost
5 us, I think, nine months or a year.  We
6 added another program, could have gone to
7 market if things were successful a year
8 earlier, but that wasn't the way they
9 developed that molecule.
10    There's four orthopedic
11 dosing studies, two DVT/PE studies, a
12 full range in ACS.  That's the kind of
13 thing that a scientist really appreciates
14 inside a company.
15    Q.   And what's the clinical
16 significance from a clinician's
17 perspective of having a once-a-day
18 anticoagulant to treat an indication like
19 SPAF or an atrial fibrillation?
20    A.   As opposed to having a twice
21 or three times?
22    Q.   Twice or three times a day.
23    MR. BARR:  Object to form.
24    THE WITNESS:  There's a lot

Page 658

1 of data on this.  It's not the
2 strongest science, of course.
3 These are hard things to measure.
4 They're done, though, by looking
5 and talking to patients about
6 adherence and persistence.
7    And it's very clear that
8 once a day, if it can be done, is
9 just easier for patients to take,
10 and when they are -- it's easier
11 to take.  Then their compliance is
12 much more -- is much higher.  It's
13 more reliable.  And, therefore,
14 you get the effect that you want.
15    BID is not bad, but it's
16 just a little better, OD.
17    TID, there's a significant
18 difference.  That's three times a
19 day.  And so that's not as
20 desirable.
21    But once a day, if it all
22 works, is a very good thing for
23 patients and for doctors.
24 BY MR. HOROWITZ:

Page 663

1    A.   I -- I've heard that term
2 before, yes.
3    Q.   Okay.  What does fixed
4 dosing mean?
5    A.   Fixed dosing means that
6 we -- we've studied a range of doses to
7 get us into Phase III.  We choose a dose.
8 We test it, and if it's effective and
9 safe, that -- that patients can get that
10 dose, then it's fixed at that dose.
11    Some adjustments might be
12 needed.  For example, in SPAF, we know
13 that patients with moderate renal failure
14 need some dose adjustment.  We tested for
15 that.  So you can think of us giving two
16 doses in the SPAF ROCKET-AF program.  But
17 we fixed it at that dose after doing some
18 study.
19    Q.   Does every indication for
20 Xarelto have the same dose?
21    A.   Well, that's something
22 unique to the program.  We studied
23 Xarelto indication by indication.  That's
24 time consuming, resource consuming.  But

Page 664

1 each patient population is different and
2 needs to be tested according to the
3 patient population.  So this is why we
4 have, in many, many cases, different
5 doses for the different indications.
6    Q.   For example, what are the --
7 what are the two doses for SPAF, or --
8 or atrial fibrillation that you just
9 mentioned?
10    A.   So we use a 20 milligrams
11 once a day for patients unless their
12 creatinine clearance, which is a measure
13 of kidney function, is in the range of
14 49 milliliters per minute down to
15 30 milliliters per minute.  If it's lower
16 than that, then we recommend not to be
17 using Xarelto.
18    Q.   And what about VTE
19 prevention for somebody who has had
20 orthopedic hip or knee surgery?
21    A.   Right.  So in that instance
22 we don't need as high a dose.  We've
23 learned from our -- our clinical trials
24 and 10 milligrams is -- is used once a

Page 665

1 day each day for a period of either two
2 to five weeks depending on your surgery.
3    Q.   And what about for -- for
4 treatment, VTE treatment, what's the
5 regimen there?
6    A.   So the treatment there is
7 different, we studied that as well,
8 because we know in patients with VTE,
9 venous thromboembolism, which includes
10 deep vein thrombosis and pulmonary
11 embolism, we know the first few weeks are
12 the most dangerous.  And so we've learned
13 that from our prior antithrombotics work.
14 And so those patients we give
15 15 milligrams twice a day, and then after
16 three weeks they get 20 milligrams once a
17 day.  And that was very effective.
18    Q.   Okay.  I want to talk about
19 a topic now that we talked a lot about
20 over the last day and a half with counsel
21 for plaintiffs, this idea of therapeutic
22 drug monitoring.
23    Are you with me?
24    A.   Yeah.  Mm-hmm.

Page 666

1    Q.   First of all, do patients
2 taking Xarelto for any of these
3 indications we just went through, need to
4 have routine anticoagulation therapeutic
5 drug monitoring done?
6    MR. BARR:  Object to form.
7    THE WITNESS:  It's our
8 opinion that routine therapeutic
9 drug monitoring is not needed for
10 Xarelto after the large clinical
11 Phase III programs and indications
12 that we've studied and the PK/PD
13 work that has been done in
14 Phase II.
15 BY MR. HOROWITZ:
16    Q.   Do patients taking Xarelto
17 for any of these indications need to have
18 their blood monitored to make sure they
19 are getting the proper dose?
20    MR. BARR:  Object to form.
21    THE WITNESS:  No.  We do not
22 believe they need to -- to be
23 done.  And that's not just because
24 we want to say that, but because

Protected - Subject to Further Protective Review

Page 667
1  we have the trial proof to show
2  that and the -- the
3  pharmacokinetic and
4  pharmacodynamic information.
5  BY MR. HOROWITZ:
6      Q.   And what is it about the
7  pharmaco and -- pharmacodynamic or the
8  PK/PD profile of Xarelto that makes it so
9  you don't need to do this type of
10  monitoring?
11      A.   Well, we see that the --
12  when the CMAX comes in for -- for
13  patients, and when the drug is
14  eliminated, we know that we can give it
15  once a day.  It does not accumulate.  So
16  you -- you can give the next day the next
17  dose and there won't be this build-up of
18  drug because it's metabolized.  We
19  understand its metabolism very well.  We
20  know that it has several routes of
21  elimination.  So it's not primary renal.
22  It's partly renal and partly liver.
23       Actually a third goes out
24  the kidney unchanged, one third is

Page 668
1  metabolized by the kidneys, and one third
2  is metabolized by the liver.  So it has a
3  nice spread.
4       We know that food doesn't
5  affect it.  We know that food improves
6  absorption, but it's important to
7  understand that Xarelto is not at high
8  doses well absorbed.  It works very well
9  under doses of say 60 milligrams which is
10  higher than we often use, that we ever
11  use actually, but as you increase it,
12  there's less and less absorption of the
13  drug.  It's not that soluble.
14       So these are characteristics
15  that are important to managing that part
16  about not needing routine coagulation
17  monitoring.
18      Q.   Okay.  And when we talk
19  about routine coagulation monitoring with
20  respect to anticoagulants, just to be
21  clear again, define that for us, what is
22  it you're talking about?
23      A.   I'm sorry.  Routine --
24      A.   Yeah, routine

Page 669
1  anticoagulation monitoring --
2      A.   Oh.
3      Q.   -- or anticoagulation
4  monitoring.
5      A.   Just meeting a requirement
6  that we have to check periodically to
7  make sure that the drug is in a certain
8  level, that's not necessary.
9      Q.   And is that one of the
10  problems that Xarelto was developed to
11  solve, the need for that with a drug like
12  warfarin?
13       MR. BARR:  Object to form.
14       THE WITNESS:  It is my
15  opinion that that's the major
16  importance.  I'm not really
17  understanding why one would want
18  to develop a drug that needs
19  monitoring if we could put our
20  efforts -- we're only going to get
21  to do, in this world, a few kinds
22  of projects.  And I would think
23  that's where the -- the
24  development should be, in drugs

Page 670
1  that don't need to be monitored.
2  BY MR. HOROWITZ:
3      Q.   Okay.  And to be clear, does
4  the absence of the need for the routine
5  anticoagulation monitoring recommendation
6  mean that doctors don't need to bring
7  their patients in for visits to check on
8  them or keep an eye on them?
9       MR. BARR:  Object to form.
10       THE WITNESS:  No, I think
11  this is a misunderstanding.
12  What -- what's happened over the
13  years is people have become --
14  with warfarin, we're focusing on
15  the INR visit.  The visit where
16  they come at least once a month to
17  see the doctor to check the blood
18  test.  But anticoagulants,
19  whatever they are, are potent
20  medicines.  It's not okay.  These
21  patients have to be watched
22  carefully.  You have to know your
23  patient.  You have to watch them
24  and -- and ask them the questions

Golkow Technologies, Inc.                    Page: 57 (667 - 670)

Protected - Subject to Further Protective Review

Page 675
1  views and perspectives expressed are
2  mine, and they don't necessarily reflect
3  Bayer Healthcare Pharmaceuticals.
4      Q.   Let's take a look at Slide
5  3.  I want to walk through some of these
6  slides.  Take us through Slide 3.  At the
7  top it says, "Initial PK/PD measurement.
8  Should we do it?"  Is this the first
9  section that you just described for us
10  how you broke down your presentation?
11      A.   Yes.  It was first to
12  discuss that, and here we talked about
13  clinical value of performing such a
14  measurement for NOACs, and there are a
15  couple other points on slides afterwards.
16  But this was the main one here about
17  whether NOAC -- whether there's clinical
18  value for making one of these PK/PD
19  measurements for NOACs.
20      Q.   And What's the point that
21  you make about clinical value?
22      A.   Well, it's important when
23  you're going to measure that there has to
24  be an appropriateness of the measure.  In

Page 676
1  other words, the measure that you choose
2  has to be appropriate.
3       And it has to be the right
4  time to measure.  It's very easy to
5  measure for warfarin because warfarin is
6  a long-acting medication.  It takes two
7  weeks for the patients to be stably
8  anticoagulated.  It takes days for them
9  to come off the medication.  So you can
10  sample at any time.  That's easy to do.
11       But these drugs, having a
12  short half-life and having a short peak
13  and the elimination and the trough,
14  that's very difficult to determine the
15  very best time to do that.  And then what
16  proof is there of clinical worth of even
17  taking the measurement?  And that is not
18  available at this time.
19      Q.   When you say initial
20  measurement, what do you mean by that?
21      A.   Initial measurement, I
22  didn't remember if I had said that, about
23  an initial measurement.
24      Q.   In other words, the

Page 677
1  beginning of therapy?
2      A.   Oh, that's what someone
3  would mean about initial measurement,
4  yes.
5      Q.   Okay.  And what was your
6  view with respect to the need to do that
7  for Xarelto?
8      A.   Well, we don't find a need
9  to take a measurement in the routine
10  situation.  So when patients have
11  whatever condition, you put them on a
12  medication, you don't routinely need to
13  check a level.
14      Q.   And why is that?
15      A.   Again, because the PK and PD
16  are predictive.  When you give the dose,
17  you know what you're getting, assuming
18  that you follow the rules of the
19  labeling.  So if they are on CYP3A4
20  inhibitors, you don't use the medication
21  and these things.
22      Q.   Okay.  Let's just go through
23  a few of these bullet points.  The first
24  bullet says, "Appropriateness of the

Page 678
1  measure."
2       Do you see that?
3      A.   Yes.
4      Q.   And I know you mentioned
5  that, but what does that mean?
6      A.   Simply that the routine
7  coagulation tests that we have in the
8  laboratory --
9      Q.   Slow down a little bit.
10      A.   Okay.  Sorry.
11      Q.   Take a breath.
12      A.   -- are not designed to
13  measure any of the drugs with the
14  exception of the PTT and the PT.  Now, as
15  I've mentioned both of those tests
16  actually were developed to detect factor
17  deficiencies back in the 1960s.  Over
18  time, it was found that they could be
19  useful if modified to monitor heparin
20  with a PTT or with warfarin, the PT test.
21       So, the routine tests that
22  doctors order from the coagulation lab
23  are not useful in use in the novel
24  anticoagulants.

Golkow Technologies, Inc.                    Page: 59 (675 - 678)

Protected - Subject to Further Protective Review

Page 671
1  every month or -- or few weeks or
2  whatever you choose.  But you have
3  to find a time to talk with the
4  patient about how they are doing
5  on their medicine and their
6  thrombotic disease.  This requires
7  physicians to watch their
8  patients.
9  BY MR. HOROWITZ:
10      Q.   Why don't you take a look at
11  Exhibit 12, if you will.  This is a slide
12  presentation that counsel for plaintiffs
13  marked as an exhibit and asked you some
14  questions about.
15       Do you recall that?
16      A.   I do.
17      Q.   And have there been kind of
18  ongoing discussions in the medical and
19  scientific community about monitoring
20  with respect to the new or -- or novel
21  oral anticoagulants?
22      A.   Yes.  It's -- it's
23  understandably uncomfortable when doctors
24  have been monitoring drugs like warfarin

Page 672
1  or adjusting PTTs and monitoring
2  unfractionated heparin, that when you
3  have medications that don't need that it
4  seems a little uncomfortable.
5      Q.   And remind us, give us some
6  context for this slide deck.
7       First of all, did you
8  prepare Exhibit 12, the slides?
9      A.   I did.
10      Q.   What's the context of this
11  presentation?
12      A.   Well, I was asked to give a
13  presentation in a point-counterpoint kind
14  of debate at this cardiac safety research
15  consortium symposium -- symposium on
16  December 3, 2015.
17      Q.   And did you, in fact, give
18  this presentation?
19      A.   I did.
20      Q.   And who -- who were the
21  attendees at this kind of presentation,
22  what kind of folks were there?
23      A.   Well, they were -- like
24  academic people were there.  A couple of

Page 673
1  journalists were there.  A couple of
2  lawyers were there.  It was a bi- the --
3  some regulatory people both from Europe
4  and from the FDA were there.  So it was a
5  broad smattering of people interested in
6  the topic.
7      Q.   And specifically what was
8  the topic that you were asked to present
9  upon?
10      A.   I was asked to present on
11  the topic here, "PK-based dosing strategy
12  is impractical and may not add value."
13      Q.   And then did you break your
14  presentation into three sort of
15  subsections there, A, B, and C?
16      A.   Yes.  So I first talked
17  about the initial PK measurement, should
18  it be done.  Is there a rationale for
19  monitoring.  And we're using the term
20  "monitoring" to mean the routine
21  monitoring of -- of the drug, not
22  monitoring of the patient.  That's a
23  different question which we address in
24  the talk.

Page 674
1       And then is it possible to
2  measure and/or monitor.  What parameters
3  are there for both.
4      Q.   And this was a presentation
5  you gave December 3, 2015, at the CSRC
6  symposium?
7      A.   Correct.
8      Q.   And the CSRC again is what?
9      A.   It's called the Cardiac
10  Safety Research Consortium.  This is a
11  consortium that was developed with
12  support of the FDA and run through the
13  Duke Clinical Research Institute from the
14  academic side where they look at
15  different safety issues with medications
16  in the cardiovascular field.
17      Q.   And does this PowerPoint
18  that you put together convey your views
19  on the need to -- for routine
20  anticoagulation monitoring and dose
21  adjustment with respect to Xarelto?
22      A.   Yes.  This presentation, is
23  a little bit different in that it's my
24  views, as I say in the disclosures, the

Golkow Technologies, Inc.                    Page: 58 (671 - 674)

Protected - Subject to Further Protective Review

Page 679
1      Q.   It says under there, "Not
2  originally designed for this purpose."
3  What does that mean with respect to PT
4  and warfarin -- and Xarelto?
5      A.   Well, as I had mentioned,
6  that the test was not originally designed
7  for any monitoring purpose.  But what
8  happens now is there are a number of
9  commercial companies that make the
10  thromboplastin reagent.  That's a reagent
11  that's needed to perform the PT test.
12       They are made to be
13  sensitive to -- they're made two ways,
14  either to be sensitive to warfarin or to
15  be sensitive to pick up a lupus
16  anticoagulant.  This is a rare condition
17  that some patients can have.
18       But basically, the
19  companies' focus, you know, sort of
20  specialty, is focusing on these two areas
21  for the PT test.  They're not -- they're
22  not developed, though, for rivaroxaban,
23  dabigatran, Eliquis, or edoxaban.
24      Q.   You were asked a lot of

Page 680
1  questions even about a specific assay of
2  PT test called the Neoplastin assay that
3  was actually used to measure in the
4  clinical trials of Xarelto.  Do you
5  recall those questions?
6      A.   Yes.
7      Q.   And plaintiffs' counsel
8  suggested in his questions to you that
9  Bayer should tell doctors to do a PT test
10  with the Neoplastin PT assay at the
11  initiation or beginning of therapy.  Do
12  you recall those questions?
13      A.   I remember that.
14      Q.   Do you agree with that
15  suggestion by counsel for plaintiffs that
16  Bayer should be telling doctors to do a
17  PT test with the Neoplastin PT assay at
18  the beginning of therapy to make
19  decisions about whether to give a patient
20  Xarelto or what dose to give the patient?
21       MR. BARR:  Object to form.
22       THE WITNESS:  No.  Sorry.  I
23  can't agree with that for a number
24  of reasons.  The PT test, as I

Page 681
1  mentioned, is not developed for
2  this.  The Neoplastin reagent, of
3  the few that were tested, but
4  there are a number worldwide, was
5  the most sensitive.  But it's not
6  the best test for this.
7       And doctors, most of the
8  time, if not all the time, don't
9  have control over what reagent is
10  used in their hospital.  That's
11  determined by the pathology
12  department that runs the lab and
13  the procurement department that
14  obtains the reagent in bulk
15  supply.
16       So they get what they can
17  get, and get what they can afford.
18  And if they have a strong desire
19  to have one, that's fine.  But it
20  may not work for other situations.
21       So to have doctors do that
22  without any proof that there is
23  any benefit to it, and the fact
24  that the test is not good, means

Page 682
1  that they could do something with
2  the dose that would be not have
3  been shown in clinical trials.
4       So that's dangerous.  Now we
5  are talking about instead of
6  thinking about, oh, well, maybe we
7  could prevent bleeding, then we're
8  talking about not preventing
9  stroke and pulmonary embolism.
10  BY MR. HOROWITZ:
11      Q.   And to be clear, if a doctor
12  makes an adjustment of dose and the dose
13  is too low, what's the potential issue
14  for the patient?
15       MR. BARR:  Object to form.
16       THE WITNESS:  Yeah, the
17  potential problem is, of course,
18  that you wouldn't have efficacy.
19  If you had a patient on
20  15 milligrams and -- because they
21  had renal failure and you decided
22  to put them on 10 based on a PT
23  level and not based on the
24  clinical characteristics of the

Golkow Technologies, Inc.                    Page: 60 (679 - 682)

**Page 683**

1 patient, that's not evidence-based
2 medicine and that's not what we
3 do.
4     That, in my mind, is
5 treating the patient -- sorry --
6 treating the physician, making
7 them feel better. And I
8 understand why they might. But
9 it's not evidence-based. So it's
10 not treating the patient. It's
11 making the doctor feel better.
12 BY MR. HOROWITZ:
13     Q. Let's go to the next bullet
14 point on Page 3, "Appropriate time to
15 measure." What did you mean by that?
16     A. Well, again, the NOACs have
17 a shorter half-life. So the timing of
18 the sample is much more critical than it
19 is with an INR, which you can check
20 almost at any time. And you have to
21 decide, well, which are we going to look
22 at? Should we look at peak? Do we look
23 at trough? Do we look at the mid range?
24     And then you're also

**Page 684**

1 dependent on when to take the sample
2 according to when the patient says they
3 last took the medication. We're all
4 human, and sometimes we don't remember
5 yesterday when we took our Xarelto pill
6 or any other pill.
7     And that timing is important
8 in trying to dose the medication. I'm
9 sorry. I didn't mean dose. I meant in
10 testing the medication.
11     Q. Let's look at the next
12 bullet point. "Proof of the clinical
13 worth of taking the measurement." I
14 think you're probably explained this.
15 But give it to us in a short,
16 understandable way.
17     A. Right. When you take a
18 value, whatever measurement that you
19 take, the value of the concentration
20 level or of the PT is fleeting, because
21 the concentration level in the blood is
22 changing.
23     That's not like how it is
24 with warfarin where it's fairly constant

**Page 685**

1 during the day.
2     So there's very little
3 lasting information beyond the moment of
4 testing. And so you're trying to kind of
5 play catchup. Remember, you know, the
6 sample won't come to you with a result
7 the next minute. It probably will take
8 an hour or so to get it back. You have
9 to judge, okay, where might the patient
10 be on the curve?
11     And despite the work that's
12 been done so far, there hasn't been any
13 direct association made with that having
14 a benefit. So where we are right now is
15 that it's just not proven to be of
16 clinical benefit.
17     The clinical trial data and
18 the patient characteristics are what are
19 important.
20     Q. All right. Let's go to
21 Slide 5. You may have just covered the
22 first bullet point. "Value added for the
23 patient by taking the measurement not
24 clear."

**Page 686**

1     Have you explained that to
2 us or is there anything you want to add
3 here?
4     A. Yeah, well, this is another
5 important point, I think, about
6 coagulation, that when we see a patient
7 who has a blood clot or we see a patient
8 that comes in with a bleeding event,
9 that, that -- what the value, whether --
10 what the value is of a NOAC at that time
11 is not when the event occurred. You
12 don't know that. That could happen
13 minutes before. It could be hours
14 before. It could be days before. Clots
15 in the legs start in the valves and tiny
16 vessels. And then they grow and grow and
17 grow.
18     By the time they're
19 symptomatic to you and me, there could be
20 hours and days that have gone by. So the
21 measurement is not of value in that
22 situation.
23     So that's the point of that
24 bullet.

**Page 687**

1     Q. Let's go down to the bottom
2 bullet point there. "Drug plasma
3 concentration level does not provide
4 information about the overall status of
5 hemostasis in the patient in conjunction
6 with that level."
7     Do you see that?
8     A. Yes.
9     Q. What are you -- what are you
10 conveying there?
11     A. Well, as we had mentioned
12 before, the coagulation is not just about
13 inhibiting Factor X or inhibiting
14 thrombin. The coagulation proteins play
15 an important role, but they're not the
16 only important factors. There are the
17 platelets. There are fibrinolytic
18 proteins. There are proteins that
19 counterbalance the coagulation proteins.
20 They are white blood cells. And there's
21 the lining of blood vessels.
22     All of these play a role in
23 coagulation. And the body is adjusting.
24 When we affect Xa or when we affect

**Page 688**

1 thrombin, the body adjusts to that to a
2 point.
3     Q. If you flip the slide to
4 Page 6. The last bullet says, "Plasma
5 drug concentration level, PK, or
6 laboratory coagulation test, PD, cannot
7 capture the dynamics of hemostasis over
8 time."
9     A. Correct.
10     Q. What does that mean?
11     A. Well, I see hemostasis --
12 and it took years to come to the idea.
13 It's dynamic, meaning it changes in time.
14 It changes minute to minute. Our protein
15 levels go up and down a little bit. Our
16 platelet number goes up and down. Their
17 function, they can be activated and not
18 activated anymore. Chemicals are
19 secreted.
20     This is the whole system.
21 It changes over time. And you can't
22 capture what's going on in the entire
23 hemostasis system that leads to clotting
24 or leads to bleeding by just taking some

**Page 689**

1 sample. That just doesn't really capture
2 what happens in people.
3     Q. Let me ask you, plaintiffs'
4 counsel in -- in his questions to you
5 asked you about the correlation between
6 blood plasma concentration of rivaroxaban
7 and bleeding risk.
8     Do you recall that?
9     A. Right.
10     Q. And he asked you questions
11 about whether it would be misleading to
12 say that there's no correlation between
13 Xarelto blood plasma concentration and
14 bleeding risk.
15     Do you recall that
16 conversation?
17     A. Yes, it was a little bit
18 confusing, because there was some mixup
19 with concentrations and PTs. And I was
20 not clear on some of the questions.
21     Q. Okay. In what phase of the
22 clinical trials did the company primarily
23 look at the PK/PD parameters and blood
24 plasma concentration and bleeding risk?

**Page 690**

1     A. So all that work was done in
2 the Phase III -- sorry -- the Phase II
3 studies, the dosing studies. So the
4 orthopedic for phase II studies. The VTE
5 treatment Phase II studies. We also had
6 ACS studies.
7     Q. And -- and how would you
8 characterize the range of doses that were
9 looked at in Phase II?
10     A. Well, there we -- we went to
11 a range from 1.25 milligrams, I believe,
12 all the way up to 80 milligrams. These
13 are 80 milligrams, of course, and -- and
14 above 20 milligrams as we know we don't
15 use, but we did a wide range in those
16 studies. That is the purpose of them.
17     Q. Okay. And what did you see
18 in Phase II? When you looked at this
19 broad or wide range of doses, what did
20 you see with respect to concentration
21 increases at those higher doses and the
22 correlation to bleeding risk?
23     MR. BARR: Object to form.
24     THE WITNESS: Well, I think

**Page 691**

1 this is where the confusion came
2 in. So I was thinking about our
3 work in Phase II, and when you get
4 up into that range, into 60 and
5 80 milligrams, then you certainly
6 can see some increase and
7 relationship to bleeding risk.
8     But it's in the Phase -- in
9 the indication doses that we use
10 like 20 milligrams or
11 10 milligrams in the -- the
12 different indications we have
13 approval for.
14 BY MR. HOROWITZ:
15     Q. Do you see a correlation
16 between bleeding risk and blood plasma
17 concentration within the therapeutic
18 doses?
19     MR. BARR: Object to form.
20     THE WITNESS: I -- I don't
21 believe that's been shown. I
22 don't think we saw that. I think
23 we saw it in those -- we just saw
24 it in our Phase II studies where

**Page 692**

1 we really looked at this
2 carefully, at the high ranges.
3 BY MR. HOROWITZ:
4     Q. The high range of doses?
5     A. High range of -- of doses as
6 part of that whole program. Looking
7 for -- we didn't know where it was going
8 to come in, but that's where it came in,
9 at doses that are not used or approved.
10     Q. And -- and counsel for
11 plaintiffs was asking you about
12 statements that might miss -- be
13 misleading. I mean, to evaluate a
14 particular statement and whether or not
15 it's misleading, a statement about
16 Xarelto blood plasma concentration and
17 bleeding risk, what would you need to do
18 to evaluate that statement?
19     MR. BARR: Object to form.
20     THE WITNESS: Well, I -- you
21 know, as we do with anything, we
22 did this with the documents during
23 the last two days, we need to see
24 what the statement is. I -- I

**Page 693**

1 need to understand the context of
2 it, what -- where it was given and
3 what was trying to be explained.
4 I don't -- I don't know otherwise.
5 BY MR. HOROWITZ:
6     Q. And -- and in the context of
7 those questions, were you shown any
8 particular statement to do that kind of
9 evaluation?
10     A. I was not.
11     Q. Let's go back to your slide
12 deck. Let's turn to Slide 9. I think
13 we're up to B now.
14     A. Yes.
15     Q. Is there a rationale for
16 monitoring?
17     A. It was the middle section of
18 the talk.
19     Q. Okay. And -- and what are
20 you conveying with respect to your first
21 bullet point: "When is it valuable to
22 monitor routinely?"
23     A. Yeah, so this is a -- just a
24 general discussion of -- of monitoring.

**Page 694**

1 And here we are talking about monitoring
2 in a routine way of labs. And the
3 question is just when is it valuable to
4 monitor routinely. So what situations
5 would you consider.
6     So if you have a test that
7 accurately and precisely measures the
8 drug levels, if you have a target window
9 that validated and maintained, if the
10 test actually predicts clinical outcome,
11 and if modifying the treatment on the
12 basis of the test result is shown to
13 improve outcome, these would be
14 situations where that could make a
15 difference. And you might want to
16 monitor routinely.
17     Q. Has that ever been shown for
18 Xarelto?
19     MR. BARR: Object to form.
20     THE WITNESS: That's not
21 been shown for Xarelto.
22 BY MR. HOROWITZ:
23     Q. Let's take a look at the
24 next slide, Page 10.

**Page 695**

1     A. Yeah.
2     Q. Now, this is titled "When is
3 it not valuable to monitor or measure?"
4     Is -- is there a difference
5 between monitor and measure in your mind?
6     A. Yes. I -- I think when --
7 we have to be careful about the words
8 that we use and we want to be clear with
9 each other when we use them.
10     So in these -- in this
11 context, we've been using monitor to mean
12 checking periodically and being required
13 to do that, a laboratory test. That's as
14 opposed to being able to measure.
15 Something that the company has worked on
16 for years and has achieved with other
17 commercial companies.
18     We do have a laboratory test
19 that can be used to measure. It's not
20 yet approved in the U.S., but it's
21 something we've worked hard with the
22 companies to allow.
23     Q. What test is that?
24     A. Well, this is a test that's

**Page 696**

1 not based on the PT test, because that --
2 although research was done on that, it's
3 just not reliable as a -- as a base for
4 the test.
5     Q. Let me pause you there.
6 When you say research was done on that,
7 who did that research?
8     A. Well, the way we worked for
9 this is we weren't trying to have a
10 commercial test of our own from Bayer.
11     So the company worked with
12 actually five companies that are
13 diagnostics companies, and we gave
14 intellectual support along with academic
15 leaders and provided substance to use to
16 do the testing. So it was done
17 independently, but we -- we talked with
18 the thought leaders on that.
19     Q. Did you also provide Dr. Ted
20 Spiro to work on that?
21     A. Yes, Dr. Ted Spiro's a -- he
22 is actually a pathologist initially, but
23 worked in antithrombotics for many years.
24 And he reports to me. He had expertise

**Page 697**

1 in that area, so he's been working on
2 that.
3     Q. And did Dr. Spiro tip that
4 upsidedown with respect to PT over
5 several years?
6     MR. BARR: Object to the
7 form.
8     THE WITNESS: And when --
9 when you say -- could you rephrase
10 it in terms of -- when you say --
11 BY MR. HOROWITZ:
12     Q. I have no idea what I just
13 said.
14     A. Okay. I think -- I mean,
15 we -- we -- I think we were all hopeful
16 that we could use the PT based test --
17     Q. Let me ask a real question.
18     A. Okay. Sorry.
19     Q. Yeah. What was -- what
20 was -- why was the company looking at PT
21 in terms of developing a test that could
22 measure prothrombin time in the context
23 of the Xarelto development program?
24     A. Well, they were looking at

**Page 698**

1 it not that the PT itself would be, but
2 that you could use it as a base to
3 develop a test. And it's simpler. So --
4 and doctors would have some -- more
5 familiarity, the lab would -- it would be
6 a little bit easier. So that's the
7 start. I mean, if you could, you would.
8     But -- but doing that work,
9 it turned out that the anti-Factor Xa
10 assay, which is a little bit more
11 complicated was a better base, a more
12 reliable base to develop the entire test
13 on.
14     Q. So as between the PT test,
15 even when using Neoplastin assay and
16 anti-Factor Xa, for measuring
17 rivaroxaban, it turned out the
18 anti-Factor Xa was the better way to go?
19     MR. BARR: Object to the
20 form.
21     THE WITNESS: Yeah, because
22 the PT test was -- was just not
23 sensitive, especially at the lower
24 levels.

Page 699

BY MR. HOROWITZ:
1  Q.   Let's go -- and that
2  included Neoplastin assay, by the way?
3  A.   Yes, as I understand it.
4  I'm not an expert on it, but that was
5  what I understood from the group.
6  Q.   Okay. Let's go to slide --
7  the bottom of Slide 10.
8  A.   Yes.
9  Q.   It says, "No evidence to
10 date for NOACs that dose adjustment based
11 on PK or PD measurements results in
12 improved outcomes."
13         What does that mean?
14 A.   Well, just simply that we
15 don't have evidence in that regard. That
16 adjusting the dose, this would require
17 very large studies and all the
18 indications to try to show that there's
19 not a need to do that since we know that
20 we have effective doses because we did
21 the initial trials to patients.
22 Q.   And I think the last bullet
23 point you've already covered.

Page 700

1         And what are you conveying
2  when you say, "Obtaining a level and
3  taking a dose adjustment decision without
4  clinical outcomes correlation is not
5  evidenced based, risks harming patients
6  and negating a proven benefit."
7         What are you getting at
8  there?
9  A.   Well, medicines today and in
10 the last decade, even decade and a half,
11 has become, instead of empiric based,
12 evidence based. That is to say using
13 good clinical science data to make our
14 decisions as best we can.
15         We can't always do
16 head-to-head clinical trials or big Phase
17 III clinical trials. But we try to use
18 evidence and think carefully through it.
19 To just check a level and then to adjust
20 the dose because a doctor thinks that
21 might be better, is not evidence based.
22 There's not data to support it.
23         I understand that the doctor
24 makes the final decision about the

Page 701

1  patient, but it's not evidence based.
2  And while we talk about doing that, and
3  Dr. Temple has talked about doing that
4  for the safety side, it ignores the very
5  important efficacy side about preventing
6  strokes and preventing pulmonary emboli
7  and these kinds of clots.
8         So we have to have evidence
9  for it.
10         We are required by the
11 regulatory authorities to do large,
12 controlled Phase III trials to prove what
13 dose to use and to get approval from --
14 from the authorities, whether it's FDA or
15 EMA or other countries. And that's what
16 was done. That's the most solid evidence
17 in my mind.
18 Q.   You were asked a -- a series
19 of questions by counsel for plaintiffs
20 about gaps or major gaps in the company's
21 PK/PD program. Do you recall those
22 questions?
23 A.   Yes.
24 Q.   And you were asked whether

Page 702

1  there was a maximum safe blood
2  concentration, a minimum efficacious
3  blood concentration, a range. Do you
4  recall that?
5  A.   Yes.
6  Q.   You were also asked the same
7  questions with respect to anti-Factor
8  Xa -- I'm sorry -- with respect to
9  Factor Xa and with respect to PT, whether
10 there was a maximum, minimum and a range.
11         Do you recall that?
12 A.   Yes.
13 Q.   In your view, is the absence
14 of this information, do you consider that
15 to be major gaps now?
16         MR. BARR: Object to form.
17         THE WITNESS: I -- I don't
18 consider this to be major gaps now
19 that we have the Phase III data.
20 Very large trials. That, to me,
21 is the -- the most important
22 information that we can have to
23 help us take care of patients.
24 BY MR. HOROWITZ:

Page 703

1  Q.   Okay. And explain why it is
2  that these are not major gaps and why it
3  is that you don't believe that this is
4  necessary information to take care of
5  patients?
6         MR. BARR: Object to form.
7         THE WITNESS: Well, the --
8  the question would be, if you
9  don't have proof as to what those
10 values might mean, as we talked
11 about it's not evidence based,
12 then you are making decisions
13 without proof. But you're --
14 you're making yourself maybe feel
15 comfortable as a physician, as a
16 healthcare provider, but we don't
17 have proof for that.
18         Then, how is it known that
19 any of those make a difference?
20 Remember, we said hemostasis is
21 dynamic. So just having a level
22 doesn't tell you what's going on
23 and -- and it's not really
24 sampling all of what happens in

Page 704

1  coagulation.
2         So whether your level is
3  low, you can have an INR value
4  that's therapeutic and you can
5  still bleed, and you can have an
6  INR level that's therapeutic and
7  you can clot. This happens.
8  BY MR. HOROWITZ:
9  Q.   Do you believe this is
10 information that Bayer should be
11 providing to doctors for them to make
12 clinical judgments based upon?
13         MR. BARR: Object to the
14 form.
15         THE WITNESS: I don't see
16 how it helps physicians who are
17 taking care of patients do
18 anything differently.
19 BY MR. HOROWITZ:
20 Q.   Let's go back to your slide
21 deck, Page 12. The title is, "What we
22 should do rather than monitor measure a
23 level." And the first bullet point is,
24 "Monitor the patient." What do you mean

Page 705

1  by that?
2  A.   Yes, I get a little vehement
3  about this point, because I care so much
4  about patients. But, you know, despite
5  spending my career in developing
6  antithrombotic medications, it was never
7  about not being able to see the patient.
8  In other words, be free of seeing them
9  for six months. As I said,
10 anticoagulants are very potent medicines.
11 But they have a very important purpose.
12         But we have to watch the
13 patient. It's always about the patient.
14 So we need to understand them. As they
15 he age, they get new patient
16 characteristics to worry about. They get
17 different medications. And we must see
18 them periodically and ask them the litany
19 of questions about, for example, did they
20 have some bleeding around the gums.
21 Maybe they forgot when they brushed their
22 teeth two weeks ago and you remind of
23 that when you ask.
24 Q.   Or did they have blood on

Page 706

1  the toilet tissue. You ask them about
2  the kinds of things that could hint that
3  there could be a problem in the future
4  and then you ask.
5         So you don't -- it's not
6  just about checking an INR, which is
7  convenient. And in some ways, just easy
8  to do and not even talk to the patient.
9  I checked the INR every four weeks.
10 Everything is fine. It's much more than
11 that, especially in a patient such as
12 the right reasons"? Explain that to us.
13 A.   I think you have to have
14 some understanding of what you're
15 measuring for. You have to have a reason
16 to do it. If a patient said to you, you
17 know, I'm having frequent episodes of
18 bleeding, but maybe they're more minor.
19 Maybe it is gum bleeding or maybe it is
20 on the toilet tissue, that could be an
21 indication where you might want to check
22 it and see if maybe it is at some level.

Page 707

1         But it's more than just
2  checking the drug. It's checking
3  creatinine clearance. It's checking
4  hemoglobin. It's measuring certain
5  things that will provide you value. You
6  have to be able to interpret the result
7  when you get it; otherwise, you increase
8  the risk of errors in patient care.
9  Q.   The last bullet point,
10 "Treat the patient, not a level," what
11 does that mean?
12 A.   Well, you know, oftentimes
13 we'll get a PT value. Let's say it's an
14 INR of 3.2. Is that -- that's high.
15 Yeah.   What do you do? Do you change
16 them? Do you change their dose? They've
17 been stable for months. You get a 3.2 or
18 3.5.
19         That's not what most
20 physicians should do. They should go
21 over the questions with the patient. Did
22 their diet change? Did they get new
23 medications? Did something change in
24 their life? Did they have an infection?

Page 708

1  And if all of that seems pretty stable,
2  you're more likely to bring them back in
3  a few days and recheck it and see if it
4  still is high.
5         If it's high then, then you
6  may make a change. But you don't just
7  get a list of INRs on your patients that
8  day and just start adjusting doses
9  without talking with the patient. You
10 treat and monitor the patient, not the
11 level.
12         MR. HOROWITZ: Let's go off
13 the record for a couple of
14 minutes. I want to check my notes
15 and decide where we are. Thank
16 you.
17         THE VIDEOGRAPHER: The time
18 is 2:16 p.m. We are going off the
19 record.
20         (Short break.)
21         THE VIDEOGRAPHER: The time
22 is 2:30 p.m. We are back on
23 record.
24 BY MR. HOROWITZ:

Page 709

1  Q.   Dr. Berkowitz, you ready to
2  continue?
3  A.   Yes.
4  Q.   You were shown a document I
5  want to put in front of you by counsel
6  for plaintiffs, Exhibit 16.
7         Do you have it in front of
8  you?
9  A.   Yes.
10 Q.   And is this a -- a draft
11 document that was prepared to respond to
12 some questions to the European health
13 authority, EMA, that -- that were asked
14 of the company about the Xarelto SPAF
15 indication?
16 A.   Yep, that's what it looks
17 like. It says, "Draft due by end of
18 March." So maybe an early draft I guess
19 Q.   Okay. And -- and you were
20 asked questions about Question 17 which
21 is, it says is now Question 29. Do you
22 see that?
23 A.   I do.
24 Q.   And really the focus of the

Page 710

1  questioning was with respect to PT and
2  the company's work on -- on the PT and
3  use of PT during the development program
4  for SPAF. Do you recall that?
5  A.   Yes.
6  Q.   Okay. Let me show you our
7  next exhibit, which will be Berkowitz-57.
8  Bates number Xarelto_BHCP 00444927.
9         (Document marked for
10 identification as Exhibit
11 Berkowitz-57.)
12         MR. HOROWITZ: Exhibit 57.
13 BY MR. HOROWITZ:
14 Q.   And after you've had a
15 moment to take a look, could you identify
16 that for us, please.
17 A.   And so this looks like -- as
18 it says, "Joint Response Assessment
19 Report," with responses to questions that
20 were sent to us from the rapporteur.
21 It's dated -- I guess this report is
22 July 1st of '11. So...
23 Q.   Okay. And so the jury
24 understands, the -- the -- the

Page 711

1  rapporteur's joint assessment response,
2  is this the response from the European
3  health authority, EMA, to the -- to
4  the -- the responses from the company to
5  questions that were asked by EMA?
6  A.   I --
7         MR. BARR: Object to form.
8         THE WITNESS: I believe,
9  yes, it has the rapporteur and the
10 co-rapporteur assessment,
11 assessing this.
12 BY MR. HOROWITZ:
13 Q.   And if you turn to -- and
14 what is a rapporteur. Is that -- is that
15 the reviewer?
16 A.   In essence, it's our liaison
17 with CHMP. CHMP is a scientific body
18 that assesses trials and data for EMA.
19 And there is a rapporteur and
20 co-rapporteur assigned for every drug.
21 So that's -- two people are the first who
22 get the information.
23 Q.   And they review it and
24 assess it on behalf of the European

Page 712

1  health authority?
2         MR. BARR: Object to form.
3         THE WITNESS: Yes.
4  BY MR. HOROWITZ:
5  Q.   Do they review it and assess
6  it, as far as you know?
7  A.   They do -- they do. They
8  are quite thorough about it. They --
9  they'll come back with some questions if
10 they need to, and you can tell in how
11 they put together the document that they
12 do spend a lot of time assessing it.
13 Q.   Let's go to Question 29,
14 which is on Bates page 4995. It's about
15 two-thirds, probably three-quarters
16 actually, of the way in.
17 A.   Okay. I have it here.
18 Q.   Do you see Question 29
19 there?
20 A.   I do.
21 Q.   And do you see where it
22 says, "Summary of the applicant's
23 response"?
24 A.   I see that.

Page 713

1  Q.   What is the -- the summary
2  of the applicant's response set forth in
3  the rapporteur's assessment?
4  A.   So the rapporteur's
5  assessment says, "In summary, the
6  applicant has identified PT as an
7  appropriate marker of exposure of
8  rivaroxaban as it closely correlates to
9  plasma concentrations if the Neoplastin
10 assay is used. This has not only been
11 shown in Phase I, but also in Phase II
12 dose ranging studies. Consequently, PT
13 was used as an exposure marker in the
14 Phase III ROCKET trial."
15 Q.   And does -- does it go on to
16 discuss the analysis of PT values?
17 A.   Yes.
18 Q.   And what does it say?
19 A.   "Analysis of PT values at
20 any time of the rivaroxaban treatment did
21 not identify any threshold of PT to
22 identify patients at higher risk of
23 bleeding. A similar analysis
24 investigated the distribution of PT

Page 714

1  values in patients."
2  Q.   What does that mean, "could
3  not identify any threshold of PT to
4  identify patients at a higher risk of
5  bleeding"?
6         MR. BARR: Object to form.
7         THE WITNESS: I guess they
8  could not find a PT value at which
9  it would say that a patient was at
10 higher risk or not.
11 BY MR. HOROWITZ:
12 Q.   Okay. And this was the
13 company's response to EMA, correct?
14 A.   Well, the -- the rapporteur
15 takes our responses, includes them in the
16 report if they agree with them, and --
17 and weaves that into their response. So
18 they'll use that for --
19 Q.   So this is -- this is a
20 question that EMA agrees?
21 A.   It --
22         MR. BARR: Object to form.
23         THE WITNESS: It is --
24 I -- I don't know exactly who

Protected - Subject to Further Protective Review

**Page 715**

1 wrote this, whether it was the
2 rapporteur or they were agreeing
3 with our response. But that's --
4 that's definitely the summary.
5 BY MR. HOROWITZ:
6 Q. And then below that
7 it says, "A similar analysis investigated
8 the distribution of PT values in
9 patients." And it lists several types of
10 patients. Do you see that?
11 A. Yes. Different -- different
12 sub-groups like different age groups,
13 renal impairment and weight categories.
14 Q. Was that work that was done
15 by the company?
16 A. Honestly I can't remember
17 exactly except I know that's routine
18 things that we do. So I would assume
19 that it was done by our statistical
20 group.
21 Q. Okay. And I -- I mean, at
22 the end of the day, I don't want to know
23 the individual that did it. But this is
24 Bayer's submission to EMA that is being

**Page 716**

1 reviewed, right?
2 A. Indeed --
3 MR. BARR: Object to the
4 form.
5 THE WITNESS: -- it is.
6 BY MR. HOROWITZ:
7 Q. And then this submission
8 reflects age groups, severities of renal
9 impairment, weight categories, looking at
10 all those different things with respect
11 to PT values and distribution of
12 analysis, correct?
13 MR. BARR: Object to the
14 form.
15 THE WITNESS: Yes. These
16 are the things we talk about as
17 patient characteristics.
18 BY MR. HOROWITZ:
19 Q. And then what does the
20 summary reflect with respect to
21 distribution of PT values in all of these
22 different populations?
23 MR. BARR: Object to form.
24 THE WITNESS: So the

**Page 717**

1 rapporteur's assessment report
2 goes on to say that "the
3 distribution of PT values was
4 similar in the overall population,
5 as well as in all sub-groups at
6 all investigated time points and
7 for all severities of bleeding.
8 No threshold was found that would
9 identify patients at an increased
10 risk of bleeding depending on any
11 of these sub-groups. Since it is
12 not possible to determine any
13 exposure threshold to identify an
14 increased bleeding risk, the
15 applicant is not able to provide
16 guidance on monitoring of any
17 coagulation test for such
18 purposes. However, the applicant
19 acknowledges that there may be a
20 desire to check patients'
21 compliance or diagnose overdose."
22 BY MR. HOROWITZ:
23 Q. Okay. Let's stop there for
24 a second.

**Page 718**

1 A. Okay.
2 Q. So what is this telling us
3 with respect to what the company found
4 when it looked at PT values and whether
5 or not there was correlation with
6 bleeding risk?
7 MR. BARR: Object to the
8 form.
9 THE WITNESS: It was not
10 possible to make any decision
11 because some threshold that could be
12 used.
13 BY MR. HOROWITZ:
14 Q. What does threshold mean?
15 A. It's simply some kind of
16 value or line above which one could use
17 to make some kind of statement about
18 whether patients were at increased
19 bleeding risk.
20 Q. And if you go to the next
21 page, 997, you see it says "Applicants
22 conclusions"?
23 A. I do.
24 Q. And what is set forth in the

**Page 719**

1 first conclusion?
2 MR. BARR: Again, can I just
3 get a continuing objection on all
4 this stuff about a document that
5 we have not established any
6 foundation for him to testify on?
7 MR. HOROWITZ: Okay.
8 BY MR. HOROWITZ:
9 Q. Go ahead and answer it.
10 MR. BARR: Can I get a
11 continuing?
12 MR. HOROWITZ: Sure. Yeah.
13 Sure. Sure.
14 THE WITNESS: So it gives
15 the applicant's conclusions,
16 "Despite substantial efforts the
17 applicant was not able to identify
18 a threshold of exposure that would
19 identify patients at an increased
20 risk of bleeding in the overall
21 population or in subgroups of
22 patients categorized by age,
23 weight, or renal function.
24 "Therefore, the applicant is

**Page 720**

1 not able to provide guidance for
2 monitoring to avoid bleeding."
3 The first bullet point.
4 BY MR. HOROWITZ:
5 Q. Okay. And do you have an
6 understanding based on your work on the
7 SPAF indication at Bayer as to whether or
8 not EMA accepted the company's position
9 on PT?
10 A. That is my understanding,
11 that they did accept the position.
12 Q. Okay. And with respect to
13 these types of reports, these rapporteur
14 assessment reports for indications like
15 SPAF, which you were involved with, did
16 you receive these types of reports and
17 have an opportunity to look at them?
18 A. I know that I have seen this
19 report before, and often we will get the
20 report. Usually it's final and it has
21 importance in that other countries
22 besides the rapporteurs can respond, and
23 those could be included. But there's
24 nothing else here.

**Page 721**

1 Q. Okay. And in fact, did you
2 receive this report in the ordinary
3 course of your work on the SPAF
4 indication at Bayer?
5 A. Yes. As I'm working on the
6 submission and the questions with a team
7 of people.
8 Q. Okay. And do you believe it
9 accurately characterizes, as you went
10 through, the work that was done with
11 respect to PT and what was found in the
12 SPAF development program?
13 A. Is wording is what I have
14 seen in the past, the kinds of things
15 that the team that works on it has
16 developed.
17 Q. Okay. And is it consistent
18 with your understanding as to what the
19 program showed?
20 A. Yes.
21 Q. You told us yesterday, and I
22 think even a little bit today, you were
23 asked questions about this.
24 But even putting aside EMA

**Page 722**

1 report and the rapporteur's assessment
2 report and the submission to the company,
3 I think you said that the PT with the
4 Neoplastin assay is just -- and this is
5 what I wrote down -- it's just not the
6 right test to use with respect to
7 rivaroxaban levels. Do you recall that?
8 A. That's correct. Yes.
9 Q. Explain that to us.
10 A. Well, it's a test that's
11 available. It's a test that was used.
12 It's a test that if you use the
13 Neoplastin reagent, you get some
14 information from, but it doesn't give you
15 the full information in terms of
16 sensitivity and low levels. So it's not,
17 in my opinion, of sufficient quality to
18 use in taking care of patients.
19 As we said before, the PT
20 tests not designed for monitoring or
21 measuring rivaroxaban. It doesn't mean
22 you can't test it. You can test the PTT
23 test, but they're not appropriate for
24 these patients.

**Page 723**

1 Q. You were asked some
2 questions by counsel for
3 plaintiffs about PT language -- or
4 language about PT measurements that
5 appears in the SMPC, the European label
6 but not in the United States label.
7 Do you recall that?
8 A. I remember that, yes.
9 Q. What is your understanding
10 as to why -- or what happened with
11 respect to why it's not in the U.S.
12 label?
13 MR. BARR: Object to form.
14 THE WITNESS: Well, the
15 regulatory authority in the U.S.
16 versus Europe, they have different
17 standards and guidelines and
18 requirements for their labels.
19 The labels look different. They
20 do them in a different way, even
21 in terms of where dosage would be.
22 And my understanding, the
23 USPI, I'm a little bit less
24 familiar with than the SPC because

**Page 724**

1 I oversee the global program and
2 our co-partner works with the FDA
3 on our details about the label.
4 But I do understand that we
5 had -- we have PT information
6 listed in our SPC. This was not
7 included in the USPI because,
8 although J&J had proposed it, the
9 FDA had struck it. I don't know
10 why. I just know that.
11 BY MR. HOROWITZ:
12 Q. And you are -- this is the
13 last thing I want to talk to you about.
14 I know you're getting tired. Let me put
15 back this front of you the label,
16 Exhibit 2. And while we're putting that
17 in front of you. Let me ask you about
18 this. Your slide presentation to the
19 CSRC, you had bullet points in there that
20 we talked about, about trust the patient,
21 not a blood test. Do you recall that?
22 A. So.
23 Q. And you were asked a lot of
24 questions yesterday, actually, about the

**Page 725**

1 phrase -- I think it was clinical
2 surveillance and whether or not there's
3 anything in the U.S. label that talks
4 about clinical surveillance in
5 particular.
6 Q. Do you recall that?
7 A. I do.
8 Q. And do you understand, you
9 know, clinical surveillance to mean as a
10 physician?
11 A. Well, that term is a general
12 one like the monitor one. I mean, we
13 have to understand what it's meant to
14 mean, I believe, is observing the
15 patient, doing all the things I mentioned
16 before.
17 It's not just about looking
18 at a blood level and reacting to that,
19 but talking to the patient, doing a
20 physical exam and weighing that whole
21 picture.
22 So you could call it
23 surveillance or you could call it
24 observation or you could call it a number

**Page 726**

1 of things. But that's what I think is
2 being spoken about.
3 Q. Do you think it is accurate
4 to suggest that the label in the United
5 States does not give doctors the
6 necessary information that they need to
7 follow their patients properly?
8 MR. BARR: Object to form.
9 THE WITNESS: No, I don't
10 think that's the case. I think
11 there are sections in there that
12 address this. I know that the FDA
13 has instructions for us that we
14 are not to determine clinical
15 practice for doctors. So that's
16 partly why they limit the
17 labeling, because they don't think
18 that's our purview.
19 But there are some
20 statements in there about the most
21 important things.
22 BY MR. HOROWITZ:
23 Q. In other words, the FDA does
24 not tell doctors how to practice

**Page 727**

1 medicine?
2 MR. BARR: Object to the
3 form.
4 THE WITNESS: That's right.
5 It's not the purview, right.
6 BY MR. HOROWITZ:
7 Q. That said, does the U.S.
8 label for Xarelto provide information to
9 doctors who need in your view to make
10 appropriate decisions about how to best
11 treat their patients?
12 MR. BARR: Object to form.
13 THE WITNESS: I think it
14 does.
15 BY MR. HOROWITZ:
16 Q. Why don't we take a look at
17 a few. Why don't we look at, example,
18 Section 5, the warning and precautions
19 section.
20 A. Right.
21 Q. What is Section 5.2 headed?
22 THE WITNESS: Let me just
23 get to that page. That is the

**Page 728**

1 section on warnings and
2 precautions on risk of bleeding.
3 BY MR. HOROWITZ:
4 Q. What, if anything, does it
5 say with regard to evaluation of
6 patients?
7 MR. BARR: Object to the
8 form.
9 THE WITNESS: Well, as we
10 had discussed about how we care
11 for patients, promptly evaluate
12 any signs or symptoms of blood
13 loss and consider the need for
14 blood replacement.
15 So clearly that's evidence
16 that you have to watch patients on
17 anticoagulants.
18 BY MR. HOROWITZ:
19 Q. What about, for example,
20 Section 5.4, use in patients with renal
21 impairment. What does it say with
22 respect to patients and what does it --
23 what type of information is provided to
24 doctors about patients with nonvalvular

**Page 729**

1 atrial fibrillation?
2 MR. BARR: Object to the
3 form.
4 THE WITNESS: In that
5 particular situation, it says
6 periodically assess renal function
7 as clinically indicated; that is,
8 more frequently in situations in
9 which renal function may decline,
10 and adjust therapy accordingly to
11 the dosage and administration
12 Section of 2.4 where we provide
13 that information.
14 BY MR. HOROWITZ:
15 Q. What about -- let's go down,
16 for example, to prophylaxis of deep vein
17 thrombosis following hip or knee
18 replacement surgery. What information is
19 given to doctors with respect to how to
20 follow their patients?
21 MR. BARR: Object to form.
22 THE WITNESS: So firstly
23 avoid the use of Xarelto in
24 patients with creatinine clearance

**Page 730**

1 of less than 30 milliliters per
2 minute due to an expected increase
3 in rivaroxaban exposure and
4 pharmacodynamic effects in this
5 patient population.
6 Observe closely and promptly
7 evaluate any signs or symptoms of
8 blood loss in patients with a
9 creatinine clearance 30 to
10 50 milliliters per minute.
11 BY MR. HOROWITZ:
12 Q. Maybe we'll give one more
13 example. What about use in patients with
14 hepatic impairment? First of all, what's
15 hepatic impairment?
16 A. They're talking about liver
17 function that is not perfectly normal.
18 Q. And what does it tell
19 doctors about treating patients with
20 hepatic impairment?
21 MR. BARR: Object to the
22 form.
23 THE WITNESS: Well, the drug
24 should not be used for severe

**Page 731**

1 hepatic impairment because we --
2 it says no clinical data are
3 available for patients with severe
4 hepatic impairment. And then it
5 says avoid use of Xarelto in
6 patients with moderate (Child-Pugh
7 B) and severe (Child-Pugh C)
8 hepatic impairment or any hepatic
9 disease associated with
10 coagulopathy since drug exposure
11 and bleeding risk may be
12 increased.
13 BY MR. HOROWITZ:
14 Q. Maybe one more example. Go
15 to 5.6. Use with PGP and strong CYP3A4
16 inhibitors or inducers. What's being
17 referenced there and what are doctors
18 told?
19 MR. BARR: Object to the
20 form.
21 THE WITNESS: Referencing
22 drugs that use, in terms of their
23 metabolism, a combined -- both the
24 PGP receptors and -- that are

**Page 732**

1 CYP3A4 inhibitors.
2 BY MR. HOROWITZ:
3 Q. Are you okay? Do you want
4 to get a drink of water?
5 A. Yeah, I think so.
6 Q. Don't expire on me, Doctor.
7 Hang in there. We're almost done. The
8 question is what does it say with respect
9 to how doctors treat these types of
10 patients?
11 A. Avoid -- avoid concomitant
12 use of Xarelto with combined PGP and
13 strong CYP3A4 inhibitors, and it lists
14 them -- sorry -- which ones to use. And
15 also avoid concomitant use with drugs
16 that have combined PGP and strong CYP3A4
17 inducers.
18 MR. HOROWITZ: Doctor, I'm
19 going to ask you no more
20 questions. Thank you very much
21 for your time.
22 THE WITNESS: Thank you.
23 MR. HOROWITZ: I'm going to
24 pass you back to counsel for

**Page 733**

1 plaintiffs.
2 THE VIDEOGRAPHER: Stand by.
3 The time is 2:48 p.m. We are
4 going off the record.
5 (Short break.)
6 THE VIDEOGRAPHER: The time
7 is 3:23 p.m. We are back on
8 record.
9 - - -
10 EXAMINATION
11 - - -
12 BY MR. BARR:
13 Q. Okay. Dr. Berkowitz, I have
14 some follow-up questions based upon your
15 examination from counsel for Bayer.
16 Okay?
17 One of the things you spent
18 some time talking about was language
19 about PT in the United States product
20 insert. Do you remember that?
21 A. Yes.
22 Q. And you said there was
23 language about PT that was proposed by
24 Janssen I believe, that the regulatory

**Page 734**

1 authority would not allow into the label;
2 is that correct?
3 A. What I said was that we have
4 standard language in our CCDS, our core
5 data sheet, and we include it in the SPC.
6 I know that we use it for all the labels,
7 and that it was initially there and then
8 during the interchange back and forth
9 it's not. And they -- they struck it.
10 They have their reasons for why they do
11 different things but that's what I know.
12 Q. But you were not involved in
13 label negotiations between Janssen and
14 the FDA for the United States product
15 insert, were you?
16 A. No. That's not correct.
17 I -- I am. I'm not deeply involved in
18 it. They keep us in communication. We
19 may comment on the label that they go
20 back and forth. So there's some
21 interaction. But they are responsible.
22 Q. Let me ask the question a
23 little differently to make sure it was
24 clear what I was saying.

---

**Page 739**

1 in the United States product
2 insert label contingency document, right?
3 A. Yes.
4 MR. HOROWITZ: Objection to
5 form.
6 THE WITNESS: This is the
7 contingency document. That's what
8 we see.
9 BY MR. BARR:
10 Q. And if you go over --
11 A. This is a draft? Is this?
12 Or what is this?
13 Q. If you go over to the third
14 box there on the bottom, it just has in
15 bold, "Number 1, defend not having any
16 laboratory monitoring statement in the
17 warning section," doesn't it?
18 A. Sorry. Where are you?
19 Q. This box right here.
20 A. Okay. Thank you.
21 Q. It says, "Defend not having
22 any laboratory monitoring statement,"
23 doesn't it?
24 A. Yes.
25 Q. And this is in the warning

**Page 740**

1 section?
2 A. Yes.
3 Q. And it strikes out "if
4 needed" all of this language about PT,
5 correct?
6 MR. HOROWITZ: Objection to
7 form.
8 THE WITNESS: It's talking
9 about coagulation parameters.
10 Okay. So I see a section on PT or
11 sentence on PT. Okay. Your
12 question? Sorry.
13 BY MR. BARR:
14 Q. It strikes all the language
15 about PT out, correct?
16 MR. HOROWITZ: Objection to
17 form. Mischaracterizes.
18 THE WITNESS: Yeah, I'm not
19 sure exactly if this is all the
20 language about PT or not. I just
21 see a Section 2, it says "if
22 needed" and everything is struck
23 from there.
24 BY MR. BARR:

**Page 741**

1 Q. Okay. Are you aware of at
2 any point Janssen requesting the FDA to
3 include language about PT in the warning
4 section of the label?
5 A. I'm not aware of the
6 detailed discussions and negotiations.
7 As I had said, I know in our core data
8 sheet and in our other labels we include
9 data about PT, and that's what I had said
10 before. And that's what I can say now.
11 Q. It's in your
12 pharmacodynamics section, if I
13 understand, right?
14 A. I'm not certain exactly. I
15 just know that we keep that information.
16 Q. Now, you spent some time
17 going back through the zelea -- well, let
18 me show you this. This was -- I don't
19 remember what exhibit it was. We've
20 already used it. 1075492.
21 Can we pull back out
22 Exhibit 54.
23 MR. HOROWITZ: Was it one I
24 covered?

**Page 742**

1 MR. BARR: You talked about
2 it. You didn't pull it out.
3 MR. HOROWITZ: Then
4 objection.
5 MR. BARR: Yep.
6 BY MR. BARR:
7 Q. And you remember in your
8 questioning and your testimony upon
9 questioning from counsel for Bayer, you
10 talked about the idea of a statement
11 being misleading. Do you remember that?
12 MR. HOROWITZ: Objection to
13 form.
14 THE WITNESS: I remember a
15 statement about misleading.
16 BY MR. BARR:
17 Q. Right. I just want to make
18 sure this is clear. When you go on to
19 Exhibit 54 and you go to the page marked
20 9482 at the bottom.
21 A. Yes.
22 Q. And we're back on Bullet
23 Point Number 4, which is the language I
24 had asked you about when I was

---

**Page 735**

1 You were not yourself
2 directly involved in the negotiations,
3 negotiating the label, with the FDA?
4 A. No. That's part of the
5 regulatory positions at J&J.
6 Q. And as I believe you
7 testified to, you don't know why the FDA
8 struck that language, do you?
9 A. I don't remember why that
10 was.
11 Q. All right. Which would mean
12 that you don't know why, right?
13 A. At this moment I don't
14 remember.
15 Q. So if I were to ask you why
16 they did it, your answer would have to be
17 "I don't know"?
18 A. I don't know. Is what I
19 said.
20 Q. Okay. Let me show you what
21 I'm going to mark as Exhibit 58. And
22 this will be Plaintiffs' 2905274.
23 (Document marked for
24 identification as Exhibit

**Page 736**

1 Berkowitz-58.)
2 MR. HOROWITZ: You know I'm
3 going to require him to read the
4 whole thing, right?
5 BY MR. BARR:
6 Q. Exhibit 58 is a document
7 entitled "Xarelto USPI Label Contingency
8 Document" from LRC, April 23, 2009,
9 correct?
10 A. Yes.
11 Q. Okay. And you see if you
12 look down at the bottom, this is a
13 Janssen document, correct?
14 A. Yeah. That means it was
15 produced to us from Janssen.
16 Q. Okay. Thanks.
17 A. I'll represent that.
18 Q. And so if you would turn with me
19 to -- it says Page 15, but if you also
20 look on the Bates number, there's an
21 845.

**Page 737**

1 MR. HOROWITZ: Just let him
2 look at it. You can turn to that
3 page, but if you want to take a
4 moment to look, it's up to you.
5 THE WITNESS: Let's see what
6 we're talking about here. I get
7 the gist. Sorry. The page, I
8 lost it.
9 Q. Top of the document,
10 which is Bates 845 at the bottom.
11 A. Okay. Thank you.
12 Q. If you look you see there's
13 a statement in the middle of the box that
14 says, "Will not need to add a new 5.4
15 laboratory section like Lovenox?"
16 Do you see that?
17 A. I do.
18 Q. You understand that Section
19 5 is the warning section of the United
20 States product insert, right?
21 A. Yes.
22 Q. And what it says, if you go
23 down to the box on the -- instead of

**Page 738**

1 trying to describe the box, I'm going to
2 point it to you. This box right here.
3 A. Okay. Got it. Mm-hmm.
4 Q. It says, "Only if section is
5 requested, consider modifying
6 significantly without stool occult blood
7 test and PT is not insensitive."
8 Do you see that?
9 A. Yeah.
10 Q. And what it says
11 is -- and then it lists the language from
12 the Canadian label.
13 Do you see that?
14 A. I do.
15 Q. So and the instructions is
16 only give this if the section is
17 requested, right?
18 A. Well, it says, "Only if
19 section is requested, consider modifying
20 significantly without stool occult blood
21 test and PT is not insensitive."
22 Q. Right.
23 A. Yeah.
24 Q. So that's was the -- that's

---

**Page 743**

1 questioning you. Do you remember that?
2 A. Yes.
3 Q. And it says, "No, I
4 don't think we can simply state no
5 correlation to plasma concentration."
6 Do you remember that?
7 A. Yes.
8 Q. And it says, "This would be
9 too simplified and could be misleading,"
10 right?
11 A. That's what it says.
12 Q. And it says, "This is my
13 understanding. Am I right?" Correct?
14 MR. HOROWITZ: Objection to
15 form. You don't read the whole
16 document to him.
17 A. Yes.
18 Q. Is that what it says?
19 MR. HOROWITZ: Well,
20 objection. It didn't say the
21 way --
22 MR. BARR: I heard your
23 objection.

**Page 744**

1 THE WITNESS: You jumped
2 over some words there.
3 BY MR. BARR:
4 Q. That's fine. Did I read the
5 words I said correctly?
6 MR. HOROWITZ: Well,
7 objection. You didn't.
8 MR. BARR: I got your
9 objection.
10 MR. HOROWITZ: I'm glad you
11 did. Don't mischaracterize the
12 document.
13 THE WITNESS: I'm going to
14 need you to go over this again. This
15 is what if you're asking me?
16 BY MR. BARR:
17 Q. We'll start over and we'll
18 do this like fifth graders.
19 It says here, "No, I don't
20 think we can simply state no correlation
21 to plasma concentration. This would be
22 too simplified and could be misleading as
23 there are correlation to CMAX, AUC, et
24 cetera, in dose finding trials. E.g.,

**Page 745**

1 this is my understanding. Am I right?"
2 Is that what that says?
3 A. That's what those words say.
4 Q. And then you write, "I
5 believe you are correct," right? Those
6 are your words?
7 A. Yes, as we had said before,
8 I had said in my note that it would be in
9 red. It's not. I can't tell. But it
10 does say SDB. Those are my initials. It
11 says, "I believe you are correct." So
12 that much I can say.
13 Q. What else does he go on to
14 say? It goes on to say, "And this is an
15 appropriate way to state it," doesn't it?
16 A. "And this is an appropriate
17 way to state it."
18 Q. And the way it was stated
19 was, this would be too simplified and
20 could be misleading, correct?
21 A. Well, there's a lot of stuff
22 in there that it could be appropriate way
23 to state. You could take different
24 sections. So it's just a general

**Page 746**

1 statement about it's an appropriate way.
2 It doesn't say the exact words.
3 Q. You had no problem
4 with that statement, correct?
5 MR. HOROWITZ: Objection to
6 form.
7 THE WITNESS: I'm not sure
8 what you're asking now.
9 BY MR. BARR:
10 Q. You didn't have any issues
11 with the accuracy of the statement?
12 A. No, that's not what it says.
13 Q. That could be
14 misleading. You said, "I believe you are
15 correct and this is an appropriate way to
16 state it."
17 MR. HOROWITZ: Objection to
18 form. Asked and answered.
19 THE WITNESS: It doesn't --
20 it doesn't say exactly as you're

Protected - Subject to Further Protective Review

Page 747
```
1   wording it.
2   BY MR. BARR:
3       Q.   What doesn't say exactly as
4   I'm wording it?
5       A.   I mean, you're saying that
6   I'm saying I don't have any problems at
7   all with it.  I'm simply saying here I
8   believe you are correct, and this is an
9   appropriate way to state it.
10      Q.   So do you often, when you
11  have somebody says something that you
12  don't think is appropriate, you just tell
13  them, whatever?  I mean, does that not
14  mean anything to you, the word
15  "appropriate"?
16           MR. HOROWITZ:  Objection to
17  form.  Argument.
18           THE WITNESS:  Again, I'm not
19  sure what you're asking.
20  BY MR. BARR:
21      Q.   Never mind.  We'll move on.
22  I've made my point.
23           Now, you also spent some
24  time talking about dose.  Do you remember
```

Page 748
```
1   that?
2       A.   Yes.
3       Q.   And I believe what your
4   testimony was, was when it came to the
5   question of once-a-day versus twice-a-day
6   dosing, Bayer followed the science,
7   right?
8       A.   We do follow the science.
9       Q.   Right.  There were no
10  predetermined decisions about which
11  direction we were going to go for
12  marketing purposes.  We simply followed
13  the science, correct?
14      A.   I did not say we simply
15  followed the science.  I said we followed
16  the science.  You have to have a
17  hypothesis, and then you follow it.
18      Q.   Okay.  Let me -- let me
19  rephrase my question then.
20           There were no predetermined
21  decisions about which direction Bayer was
22  going to go for marketing purposes.  We
23  followed the science, correct?
24      A.   There are a number of
```

Page 749
```
1   reasons why one goes forward.  So
2   certainly those could be part of them.
3       Q.   Okay.  But it's your
4   testimony that you followed the science.
5   right?
6       A.   I'm still not understanding
7   what you're saying.  I said that we --
8       Q.   Those were your words, not
9   mine.
10           MR. HOROWITZ:  Don't cut him
11  off, please.
12  BY MR. BARR:
13      Q.   Those were your words,
14  right?  You followed the science?
15      A.   Hold on.
16           Brian, he was in the middle of a
17  sentence.  Please don't cut him
18  off.
19           THE WITNESS:  Would you ask
20  the question --
21  BY MR. BARR:
22      A.   I already had.
23      A.   -- instead of three
24  questions?
```

Page 750
```
1           MR. HOROWITZ:  Let's not
2   argue both each other.
3   BY MR. BARR:
4       Q.   You followed the science.
5   That was your testimony, correct?
6       A.   We followed the science,
7   yes.
8       Q.   Let me show you what I'm
9   going to mark as Exhibit 59 and 60.
10  Plaintiffs' 11350 for Exhibit 59 and
11  Exhibit 60, 11351.
12           (Document marked for
13           identification as Exhibit
14           Berkowitz-59.)
15           (Document marked for
16           identification as Exhibit
17           Berkowitz-60.)
18           MR. BARR:  Sorry.  I thought
19  you handed it to him.
20           MR. HOROWITZ:  Are you going
21  to let him look at it?
22           MR. BARR:  We'll see.
23  BY MR. BARR:
24      Q.   It's your belief that
```

Golkow Technologies, Inc.                    Page: 77 (747 - 750)

---

Protected - Subject to Further Protective Review

Page 755
```
1   first e-mail, it's from Bernhard
2   Glombitza.  Do you see that?
3       A.   Well, first I'm going to
4   look at the e-mail.
5           MR. HOROWITZ:  Yeah, let him
6   take a look at the e-mail.
7           THE WITNESS:  Okay.  I see
8   it.
9   BY MR. BARR:
10      Q.   Okay.  You are at the
11  company as of August 18, 2006, correct?
12      A.   Yes.
13      Q.   You're working with the
14  people on this e-mail as of August 18,
15  2006, correct?
16      A.   Well, I was there for four
17  months, so I may not know all the people
18  on the e-mail at that time.  But, yes,
19  I'm working with the people.
20      Q.   Okay.  And so let's look at
21  what the people on this e-mail had to
22  say.  So this is an e-mail from Bernhard
23  Glombitza to Sanjay Jalota.
24  Do you know Mr. Jalota?
```

Page 756
```
1       A.   Yes.
2       Q.   He is at Janssen, correct?
3       A.   Yes.
4       Q.   Okay.  And this is written
5   to a -- a whole host people at both
6   Janssen and Bayer, correct?
7       A.   Yes.
8       Q.   Okay.  Are these -- I see
9   Frank Misselwitz is on there, correct?
10      A.   Yes.
11      Q.   That's the gentleman who
12  recruited you to Bayer and was your boss,
13  right?
14      A.   Yes.
15      Q.   And so, this --
16           MR. HOROWITZ:  I'm sorry.
17  Is he on here?  He is not on here,
18  is he?
19           MR. BARR:  No, he is not on
20  here.
21           MR. HOROWITZ:  Okay.  So
22  will you give me a continuing
23  objection?
24           MR. BARR:  I'll -- sure.
```

Page 757
```
1   BY MR. BARR:
2       Q.   This also attaches, if you
3   see, it's got several attachments on it.
4   "Strategy fallback options."  Do you see
5   that?  It's -- it's in the description of
6   attachments.
7       A.   Sorry.
8       Q.   Do you see that?
9       A.   Yes, I do see it.  Mm-hmm.
10      Q.   Okay.  So I want to turn to
11  the attachment.  So this will be -- this
12  is Exhibit 60.
13           MR. DENTON:  113251.
14  BY MR. BARR:
15      Q.   All right.  You see that
16  this is a slide, it's titled "Priority of
17  Defense."  Do you see that?
18      A.   Yes.
19      Q.   And it says, "Not in
20  the give-in pool," correct?
21      A.   Yes.
22      Q.   Okay.  And the very first
23  thing in the not-give-in pool is what,
24  sir?
```

Page 758
```
1       A.   It says OD.
2       Q.   Which is what?
3       A.   Once a day, I would assume.
4       Q.   Right.  And that is listed
5   in the not-give-in pool as of
6   August 2006, correct?
7           MR. HOROWITZ:  Objection to
8   the form.  Foundation.
9           THE WITNESS:  That's what it
10  says here.
11  BY MR. BARR:
12      Q.   Okay.  Had the science been
13  completed at this point in time, in
14  August of 2006?
15      A.   Had the science -- had the
16  science been completed?
17      Q.   Yes, sir.
18      A.   I'm not sure what you mean.
19      Q.   Well, you said you followed
20  the science.  And in 2006, I'm looking at
21  a document that says, "OD is in the
22  not-give-in pool."  So I'm wondering why
23  the -- has the road for twice a day
24  dead-ended by this point?
```

Golkow Technologies, Inc.                    Page: 79 (755 - 758)

---

Protected - Subject to Further Protective Review

Page 751
```
1   everybody in Bayer followed the science,
2   right?
3           MR. HOROWITZ:  Object to the
4   form.
5   BY MR. BARR:
6       Q.   All the -- let me rephrase
7   that.
8           It's your belief that all of
9   the scientists within Bayer followed the
10  science that were studying this drug,
11  correct?
12      A.   I said we followed the
13  science, so we followed the science.
14      Q.   That's not just you; that's
15  everybody, right?
16      A.   I did not say everyone
17  follows the science.  I said we follow
18  the science.
19      Q.   Who is we?
20      A.   Most of the people in the
21  company.  Could be all of the people of
22  the company.  But I didn't say all the
23  people in the company.
24      Q.   Okay.  Well, I'm asking you
```

Page 752
```
1   what you mean by "we."
2       A.   I think I just told you.
3       Q.   No -- no.  You said most of
4   the people, some of the people.
5       A.   I -- I said it could be --
6       Q.   I want to know who.
7       A.   I said it could be most of
8   the people.  I said it could be all of
9   the people.
10      Q.   Okay.  But what is it to
11  you?  You're making the statement.
12      A.   Well, which statement are we
13  talking about now?
14      Q.   Well, what -- use of -- your
15  use of the word "we" in follow the
16  science.
17      A.   Were we not talking about a
18  specific topic?
19      Q.   We're talking about -- this
20  shouldn't -- I just want to know who
21  you're referring to when you say, "At
22  Bayer, when we were investigating
23  Xarelto, we followed the science."  All
24  I'm trying to find out is who is "we."
```

Page 753
```
1       A.   And all I'm saying is I need
2   to know specifically when you say those,
3   you repeat those statements, what's the
4   topic that we are talking about.
5       Q.   They were your statements --
6       A.   True.  But they were the
7   result of a number of topics.
8       Q.   All right.  Well, we'll
9   narrow it down to dosing then.  On the
10  once-a-day versus twice-a-day dosing
11  issue.  Does that help?
12      A.   Certainly.
13      Q.   Okay.  So when you say, "We
14  followed the science on that issue," who
15  are you talking about?
16      A.   Talking about those of us
17  that were developing the -- the drug in
18  that particular case.  At that particular
19  time I wasn't in the company.
20      Q.   Okay.
21      A.   But the people that I worked
22  with and worked with afterwards were
23  following the science.
24      Q.   Okay.  Would that include
```

Page 754
```
1   somebody like Bernhard Glombitza?
2       A.   I was not there so I can't
3   tell you.
4       Q.   All right.  Would that
5   include Andrea Derix?
6       A.   Again, I wasn't there at the
7   time so I can't tell you.
8       Q.   So you don't know if you
9   actually followed the science on the
10  dosing issue?
11           MR. HOROWITZ:  Object to the
12  form.
13           THE WITNESS:  I know from
14  the time that I joined the company
15  till now we followed the science.
16  BY MR. BARR:
17      Q.   Okay.  So you joined the
18  company in 2000 -- remind me again?
19      A.   2006.
20      Q.   What month?
21      A.   April of 2006.
22      Q.   So April of 2006.  Okay.
23  Well, let's look at this
24  e-mail.  You see that, if you look at the
```

Golkow Technologies, Inc.                    Page: 78 (751 - 754)

---

Protected - Subject to Further Protective Review

Page 759
```
1           MR. HOROWITZ:  Object to the
2   form.  Foundation.
3           THE WITNESS:  It would seem
4   very unlikely since studies were
5   done beyond this time.
6   BY MR. BARR:
7       Q.   Okay.
8       A.   So I guess they were still
9   following the science.
10      Q.   Even though once a day was
11  in the not-give-in pool?
12      A.   Whether it's --
13           MR. HOROWITZ:  Object to the
14  form.  Foundation.  Argument.
15           THE WITNESS:  Yeah, whether
16  it's in there or not, the science
17  continued, right.  The studies
18  were done, were ongoing.
19  BY MR. BARR:
20      Q.   Now, I should have known
21  this, and I guess I -- I hadn't
22  sufficiently studied your resumé.  I was
23  not aware you had worked at Duke.  So you
24  have a very -- what, you've known
```

Page 760
```
1   Dr. Califf for a long time; fair to say?
2       A.   I have.
3       Q.   Okay.  You respect
4   Dr. Califf's views?
5       A.   I respect Dr. Califf's
6   views.
7       Q.   And you say have testified to
8   the jury, he is now the current head of
9   the FDA, correct?
10      A.   He is the commissioner at
11  the FDA.
12      Q.   Okay.  Have you had any
13  discussions with him about the
14  appropriateness of the dosing program for
15  Xarelto?
16      A.   I've been on the program for
17  over ten years.  So I can't remember
18  every conversation that I've had.  I
19  certainly may have had conversations with
20  him and many other thought leaders in --
21  externally as well as internally.
22      Q.   Okay.  I want to show you
23  something he's written.
24           MR. DENTON:  61.
```

Page 761
```
1           MR. BARR:  This will be
2   Plaintiffs' -- this is Exhibit 61,
3   and it's Plaintiffs' 6 -- 3674039.
4           (Document marked for
5           identification as Exhibit
6           Berkowitz-61.)
7           MR. BARR:  And I'll also go
8   ahead and give you Exhibit 62,
9   which is Plaintiffs' 3674040.
10           (Document marked for
11          identification as Exhibit
12          Berkowitz-62.)
13  BY MR. BARR:
14      Q.   And I'm actually going to
15  start, sir, with Exhibit 62.  So if you
16  want to look at that one.
17           MR. HOROWITZ:  Oh, I took
18  the original.
19  BY MR. BARR:
20      Q.   And I'm only going to be
21  questioning you about a statement in the
22  abstract.  Okay?
23      A.   Okay.
24      Q.   So if you go to the first
```

Page 762
```
1   page of this, you see that this is a -- a
2   manuscript titled "Population
3   Pharmacokinetics and Pharmacodynamics of
4   Rivaroxaban in Patients With Nonvalvular
5   Atrial Fibrillation:  Results From
6   ROCKET-AF."
7           Right?
8       A.   Yeah.
9       Q.   They list a number of
10  authors.  Is that most of the members of
11  the ROCKET executive committee?
12      A.   No.
13      Q.   No.  Who are these folks?
14      A.   Well, I don't know if it's
15  mister, probably Dr. Girgis is a -- was a
16  PK/PD person at J&J.
17      A.   The -- Dr. Patel is the chairman of
18  the committee.  Dr. Peters is a clinical
19  pharmacologist and clinical trialist at
20  Janssen.  And Todd Moore is listed, we've
21  mentioned him.  Dr. Mahaffey is also on
22  the -- on the steering committee.
23  Dr. Nessel is a physician who works at --
```

Golkow Technologies, Inc.                    Page: 80 (759 - 762)

Protected - Subject to Further Protective Review

**Page 763**

1  at J&J.  Dr. Paolini was a physician that
2  worked at Bayer.  Dr. Halperin is on the
3  committee.  And Dr. Califf is on the
4  committee.  And Dr. Fox is on the
5  committee, and Dr. Becker is on the
6  committee.
7     Q.  Okay.  And it lists
8  institutions that supported this paper as
9  being Janssen, Duke, a different Janssen,
10  in their Titusville branch, and then
11  Bayer Mount Sinai, Duke and University of
12  Edinburgh, right?
13     A.  These are the institutions
14  of which the co-authors are associated.
15     Q.  Right.  So what I'm looking
16  at in the abstract, is I'm just looking
17  at the last sentence.  It says, "These
18  findings support the ROCKET-AF dosing
19  selections," right?
20     A.  That's what the words say.
21     Q.  Okay.  And it -- what it's
22  talking about is -- well, do you have an
23  understanding of what findings they are
24  talking about there that supported the

**Page 764**

1  dosing selections convened in the
2  abstract?
3     A.  Not exactly.
4     Q.  Okay.  Well, I don't want to
5  question you on something that you don't
6  know a whole lot about.  But I want to
7  show you Dr. Califf's reaction to that
8  statement.
9        MR. HOROWITZ.  Objection.
10  Move to strike the windup.
11  BY MR. BARR:
12     Q.  And this will be Exhibit 60.
13  61.  I'm sorry.
14     Q.  You see and this e-mail is
15  from Dr. Califf, and he writes to
16  Dr. Mahaffey and Dr. Patel all at Duke,
17  right?
18     A.  Yes.
19        MR. HOROWITZ.  Object to the
20  form.
21  BY MR. BARR:
22     Q.  Your former employer, right?

**Page 765**

1        MR. HOROWITZ.  Yeah, let me
2  just give a little foundation
3  objection.
4        MR. BARR.  You can have a
5  continuing.
6        MR. HOROWITZ.  Thank you.
7  BY MR. BARR:
8     Q.  It attaches this PK/PD
9  draft, right, this e-mail?
10     A.  Apparently.
11     Q.  Okay.  And let's look at
12  what Dr. Califf has to say about this.
13  He says, "Did you okay this language
14  about supports the dose?  This is
15  corporate BS.  Every single person
16  involved has told me that privately they
17  agree that there's probably a better
18  dose."
19        Did I read that correctly?
20     A.  You read the words
21  correctly.
22     Q.  That's Dr. Califf, current
23  head of the FDA, about the dose chosen in
24  ROCKET, right?

**Page 766**

1        MR. HOROWITZ.  Objection to
2  form.
3        THE WITNESS.  That's what it
4  says.
5  BY MR. BARR:
6     Q.  Okay.  We can move on.
7        I want to show you what the
8  FDA has had to say about the dose chosen
9  in ROCKET?
10        MR. DENTON.  63.
11        MR. BARR.  Exhibit 63, and
12  this is Plaintiffs' 75 --
13        MR. DENTON.  943.
14        MR. BARR.  -- 943.
15        (Document marked for
16  identification as Exhibit
17  Berkowitz-63.)
18  BY MR. BARR:
19     Q.  This is just the summary
20  review that I've handed you.  This is a
21  major approval package.  I've just given
22  you the summary review.  If you want --
23  are you familiar with the summary review?
24  Have you read that before?

Protected - Subject to Further Protective Review

**Page 767**

1     A.  I've read it before.  But we
2  can take a look at it again.
3     Q.  Okay.
4     A.  Okay.  Thank you.
5     Q.  I'm looking at Page 8 of the
6  summary review, which is -- if you look
7  at the bottom, there's a Bates of 2099.
8        Do you see that?
9     A.  Yeah.
10     Q.  Okay.  And it's a heading
11  labeled -- titled "Dose of Xarelto
12  Administration in ROCKET."
13        Do you see that?
14     A.  Yes.
15     Q.  Okay.  And what the -- what
16  the FDA writes here is, "Anticoagulants
17  are intrinsically narrow therapeutic
18  drugs because their principal
19  toxicity, bleeding, is a result of their
20  intended pharmacodynamic activity.  Too
21  low a dose results in inadequate
22  prevention of pathological thrombosis and
23  consequent serious clinical events, and
24  too high a dose results in excessive

**Page 768**

1  inhibition of physiologic clotting and
2  excessive bleeding."
3        Did I read that correctly?
4     A.  Yes.
5     Q.  It says, "Therefore, prudent
6  drug development of anticoagulant should
7  include robust investigation of the
8  relationship between dose and outcomes in
9  order to choose reasonable doses for
10  administration to patients," correct?
11     A.  Yes.
12     Q.  It says, "The division
13  concurs with all reviewers of this NDA
14  that data adequate to select a dose to be
15  tested in ROCKET were not available when
16  the trial was designed," correct?
17     A.  That's what it says.
18     Q.  So according to the FDA
19  summary review, there was inadequate data
20  to select dose to be tested in ROCKET,
21  right?
22        MR. HOROWITZ.  Objection to
23  form.
24        THE WITNESS.  Actually, I

**Page 769**

1  would disagree with that statement
2  and a couple of the ones above,
3  because there was discussion with
4  the FDA and the EMA authorities
5  about the dosing.
6  BY MR. BARR:
7     Q.  Okay.  So the FDA doesn't --
8  you disagree with the FDA's own statement
9  about its review of ROCKET?
10        MR. HOROWITZ.  Objection to
11  form.
12        THE WITNESS.  That's not
13  what I said.
14        MR. BARR.  Okay.  You said you disagree
15  with this statement.
16        THE WITNESS.  Yes.
17     Q.  So you disagree with the FDA
18  on this point?
19     A.  I disagree with what's said
20  in that sentence.
21     Q.  And you understand this is
22  the FDA saying this, right?
23        MR. HOROWITZ.  Objection to

**Page 770**

1  form.
2        THE WITNESS.  I can disagree
3  with the content of it.
4  BY MR. BARR:
5     Q.  Okay.  I'm just asking, you
6  disagree with the FDA on this?
7        MR. HOROWITZ.  Asked and
8  answered ten times.
9  BY MR. BARR:
10     Q.  Sir?
11     A.  As I said.
12     Q.  Yes what?
13     A.  Yes, okay.
14     Q.  Yes, you disagree?
15     A.  I disagree with the way that
16  was worded.
17     Q.  Okay.  It says, "The
18  subject based on two to small dose-ranging
19  studies.  A rather narrow range of doses
20  was explored, 20 to 40 milligrams QD in
21  one and 10 to 30 milligrams BID and
22  40 milligrams QD in the other," correct?
23     A.  That's what it says, yes.

Protected - Subject to Further Protective Review

**Page 771**

1     Q.  "The interpretation of the
2  data from these studies was not obvious
3  and the applicant's stated interpretation
4  lacked adequate rationale," correct?
5     A.  That's what it says.
6     Q.  All right.  So the FDA is
7  saying the applicant's interpretation of
8  the data lacked adequate rationale,
9  right?
10        MR. HOROWITZ.  Objection to
11  form.
12        THE WITNESS.  The FDA agreed
13  in minutes with the FDA with the
14  dose that was used.  And they did
15  not disapprove using that dose.
16  BY MR. BARR:
17     Q.  So you think they agreed
18  with the dose that was used?
19     A.  No.  They said that they
20  didn't agree with the dose.  But the
21  choice of dose is up to the sponsor.
22     Q.  I just want to make sure the
23  testimony was clear.
24        "When the applicant inquired

**Page 772**

1  if the division concurred with their dose
2  selection, we said that we did not
3  concur," right?
4     A.  That's what it says.
5     Q.  Right.  The FDA disagreed
6  with the dose selection the sponsor chose
7  in ROCKET, right?
8        MR. HOROWITZ.  Objection to
9  form.
10        THE WITNESS.  In scientific
11  discussions, we can agree to
12  disagree.
13  BY MR. BARR:
14     Q.  Okay.  It says, "The
15  half-life of rivaroxaban is less than
16  12 hours, resulting in trough serum
17  concentrations less than 25 percent of
18  peak concentrations when administered
19  once a day.  So we suggested that
20  administering Xarelto twice a day might
21  result in better outcomes," correct?
22     A.  This is what they wrote.
23     Q.  Okay.  And despite that
24  suggestion, the company never took them

**Page 773**

1  up on that suggestion, right?
2        MR. HOROWITZ.  Objection to
3  form.
4        THE WITNESS.  In 2011, when
5  they wrote this, they had certain
6  ideas, including the idea that it
7  was a narrow therapeutic range
8  drug, which I don't believe is
9  correct.
10  BY MR. BARR:
11     Q.  Okay.  So you disagree with
12  the FDA on that as well?
13     A.  We're allowed to disagree.
14  We're scientists.
15     Q.  I'm just asking if you
16  disagree.
17     A.  And I'm answering that we're
18  allowed to disagree.
19     Q.  Okay.  It says, "Given the
20  limitations in available information at
21  the time doses to be tested in ROCKET
22  were selected, an additional dose should
23  have been tested," right?
24     A.  That's the opinion of the

**Page 774**

1  people writing this.
2     Q.  And to this day, the
3  company has not tested an additional dose
4  for the Afib population, right?
5     A.  My understanding is that
6  drug is approved at 20 milligrams a day,
7  15 for people with creatinine clearance
8  below 50 by the FDA.
9     Q.  That wasn't my question.
10  That's an interesting side story, but it
11  wasn't my question.
12        MR. HOROWITZ.  Just go ahead
13  and ask your question.
14  BY MR. BARR:
15     Q.  My question was, to this day
16  the company has not tested an additional
17  dose for the Afib population, right?
18        MR. HOROWITZ.  Objection to
19  form.
20        THE WITNESS.  Besides the
21  20-milligram and 15-milligram
22  doses, we have not tested another
23  dose for atrial fibrillation.
24  BY MR. BARR:

Protected - Subject to Further Protective Review

**Page 775**

1     Q.  Okay.  Let's go on.  It
2  says, "Nonetheless, the division allowed
3  ROCKET to proceed," right?
4     A.  Yes.
5     Q.  "We did so because we lack
6  authority to put trials on clinical hold
7  for inadequate dose selection.  We may
8  put a trial on hold if the protocol for
9  the investigation is clearly deficient in
10  design," and it cites a regulation,
11  right?
12     A.  It does.
13     Q.  "Clearly deficient is a high
14  standard.  It was not impossible that the
15  trial testing a 20-milligram dose would
16  succeed as it eventually did, although
17  perhaps not as successfully as it might
18  have had another dose or doses been
19  tested," correct?
20     A.  That's what they said.
21     Q.  Okay.  Let's go to the next
22  paragraph.
23        I'm not going to read this
24  whole thing.  It just says, "Absent

**Page 776**

1  significant toxicity, inadequate dose
2  exploration is rarely an impediment to
3  approval.  If inadequate dose exploration
4  results in an ineffective dose being
5  tested in a trial, then will trial the
6  fail, and we do not have any data about
7  how different doses might have performed
8  in ROCKET," right?
9     A.  That's what it says.
10     Q.  And they don't have the data
11  because Janssen and Bayer never did the
12  requested study, right?
13        MR. HOROWITZ.  Objection to
14  form.  Argument.
15        THE WITNESS.  Janssen and
16  Bayer didn't do that study because
17  the trial did not fail.  It was
18  approved on 20 milligrams.
19  BY MR. BARR:
20     Q.  They asked you to do lower
21  dose, multiple dose, twice-a-day dose
22  before ROCKET was ever started, right?
23        MR. HOROWITZ.  Objection to
24  form.

**Page 777**

1        THE WITNESS.  Before it was
2  started, yes, they asked this for
3  many of the trials.  But we're not
4  guilty required to follow that
5  advice.
6  BY MR. BARR:
7     Q.  You refused to do it, right?
8        MR. HOROWITZ.  Objection to
9  form.
10        MR. BARR.  Let me restate
11  that.
12  BY MR. BARR:
13     Q.  And Bayer and Janssen
14  refused to do it, correct?
15        MR. HOROWITZ.  Objection to
16  form.
17        THE WITNESS.  We felt that
18  we had a dose that was appropriate
19  to go forward into Phase III.
20        MR. HOROWITZ.  Okay.  You
21  done with this?
22        MR. BARR.  Yeah, I'm done
23  with that one.  It might circle
24  back around.

**Page 778**

1        MR. HOROWITZ.  I'll keep it
2  nearby.
3        MR. BARR.  Keep it nearby.
4        But I doubt it.
5  BY MR. BARR:
6     Q.  So we're going to go to
7  Exhibit 64 -- well, no, this is
8  Exhibit 2.  We've already marked this.
9  It's already marked.  Now, you were
10  handed during your depositions by counsel
11  for Bayer the United States product
12  insert, Exhibit 2.  Do you remember that?
13     A.  Okay.
14     Q.  And he asked you to go
15  through and read various different
16  sections of the label, right?
17        MR. HOROWITZ.  Objection to
18  form.
19     Q.  And -- and you did that,
20  right?
21     A.  Okay.
22     Q.  Okay.  And I want to go back

**Page 779**

1 and look at some of these sections you
2 read.
3     A.   Okay.
4     Q.   So you read, I believe, use
5 in patients with renal impairment,
6 Section 5.4.  Do you remember that?
7     A.   Just a second.  Yes.
8     Q.   Okay.  It says,
9 "Periodically assess renal function as
10 clinically indicated and adjust
11 frequently" -- "and adjust therapy
12 accordingly.  Consider dose adjustment or
13 discontinuation of Xarelto in patients
14 who develop acute renal failure while on
15 Xarelto."
16         Then it says, "See use in
17 specific populations, 8.7."
18         Do you see that?
19     A.   Okay.  It says.
20     Q.   You skipped a few things,
21 but that's what it says.
22     Q.   Right.  I'm trying to just
23 get the gist of it and wrap this thing
24 up.

**Page 780**

1     A.   I really am.
2         MR. HOROWITZ:  I understand.
3     I mean --
4         MR. BARR:  I consider
5     reading all of it --
6         MR. HOROWITZ:  You don't
7     need to comment on his answer.
8         Just ask your question.  But I
9     hear you.
10 BY MR. BARR:
11     Q.   And it says, "Avoid the use
12 of Xarelto in patients with creatinine
13 clearance less than 30 milliliters per
14 minute due to an expected increase in
15 rivaroxaban exposure," right?
16     A.   Yes.  You're in a different
17 section.  Now you are in treatment of DVT
18 and PE?
19     Q.   Yes, sir.
20     A.   Okay.  I see it.
21     Q.   The concern here is an
22 increase in exposure, right?
23     A.   The concern is an increase
24 in exposure and pharmacodynamic effects

**Page 781**

1 in this patient population.
2     Q.   Right.  And that -- that
3 pharmacodynamic effect would be bleeding,
4 correct?
5     A.   Well, bleeding is not a
6 pharmacodynamic effect.  That's sort of
7 looking at laboratory type -- do you
8 mean?
9     Q.   Yes.
10     A.   Yeah.
11     Q.   But the concern we're
12 talking about and the reason we are
13 adjusting the dose down is a concern
14 about bleeding, right?
15         MR. HOROWITZ:  Object to the
16     form.
17         THE WITNESS:  Yeah, that --
18     yeah, that's what we're looking
19     for.
20 BY MR. BARR:
21     Q.   Right.  That's the exposure
22 we're worried about here?
23         MR. HOROWITZ:  Same
24     objection.

**Page 782**

1         THE WITNESS:  Well, it's not
2     the -- so much the exposure we're
3     worried about.  I think we both
4     agree, we're worried about the
5     bleeding risk.
6 BY MR. BARR:
7     Q.   Okay.  And then let's look
8 at 5.5.
9     A.   Okay.
10     Q.   It says, "Use in patients
11 with hepatic impairment."
12         Do you see that?
13     A.   I do.
14     Q.   It says, "Avoid use of
15 Xarelto in patients with moderate and
16 sever hepatic impairment with any hepatic
17 disease associated with coagulopathy
18 since drug exposure and bleeding risk may
19 be increased," right?
20     A.   Yes.
21     Q.   So, again, we're worried
22 about the concept of overexposing
23 somebody to the drug and putting them at
24 excess bleed risk, right?

**Page 787**

1     Q.   Exposure to the drug
2 matters, correct?
3         MR. HOROWITZ:  Object to the
4     form.
5         THE WITNESS:  It's a very
6     general statement.  I don't know
7     what you mean by it.
8 BY MR. BARR:
9     Q.   You don't know what exposure
10 matters means.  As a -- as a hematologist
11 whose life mission has been to figure out
12 how to properly coagulate people.
13     A.   So, you mean -- let me just
14 try to get it straight.  You mean
15 exposure matters in terms of whether we
16 prevent stroke or DVT as well as --
17     Q.   And increased bleed risk.
18 The entire profile of the drug.  Exposure
19 matters.
20     A.   Exposure matters in terms of
21 getting the right dose to patients to
22 prevent blood clot, stroke, DVT, PT and
23 bleeding.
24     Q.   And not put them at

**Page 788**

1 excessive bleeding.
2     A.   Or at excessive efficacy
3 risk.
4     Q.   And parameters that judge
5 exposure are important parameters for
6 the -- for the companies to look at,
7 right?
8     A.   Well, again, you have to
9 take the whole patient into
10 consideration.  You can't just find one
11 value, some magic value that makes you
12 feel comfortable with the threshold.
13     A.   Yeah, and the -- there was
14 certainly enough -- 127 percent increase
15 for sure in the curve was a magic
16 enough value for the company to decide
17 those people shouldn't be on this drug,
18 right?
19         MR. HOROWITZ:  Object to the
20     form.  Argument.  Asked and
21     answered.
22         THE WITNESS:  So that was
23     the value that was obtained I
24     assume from the study.  So whether

**Page 789**

1 that's magical or not is not --
2 but when you add on the -- the
3 increase to the kinds of
4 conditions that these patients
5 have, if you've taken care of
6 them, you would see that this is
7 not a situation where you want
8 them to be on anticoagulants,
9 whether it's rivaroxaban or other
10 anticoagulants.
11 BY MR. BARR:
12     Q.   Okay.  Now, the last thing I
13 want to ask you about is your statements,
14 and they were in the PowerPoint.  We've
15 gone over them.  I don't believe that we
16 need to pull out the PowerPoint and go
17 over them again.  But your statements
18 about how a clinician needs to monitor
19 the patient.
20         Do you remember that?
21     A.   I do.
22     A.   And -- and -- and in
23 fairness to you, you're not talking about
24 a -- a blood monitoring, you're talking

**Page 790**

1 about clinically bringing them in and
2 asking them questions, monitoring their
3 general condition, right?
4     A.   We're talking about the
5 overall patient picture.
6     Q.   Right.
7     A.   Correct.
8     Q.   And -- and what -- as I
9 understood what you said, you said in --
10 in clinical practice with somebody on an
11 anticoagulant, a -- a clinician needs to
12 bring their patient in and make sure they
13 are having discussions with them to find
14 out things like, are your gums bleeding,
15 is there -- is there blood on the toilet
16 paper, do you remember that?
17     A.   Right.
18         MR. HOROWITZ:  Object to the
19     form.
20         THE WITNESS:  Sorry.  To
21     bring them in to talk about things
22     like that and whether they are
23     drooling or they've lost their
24     speech or they have weakness in

**Page 783**

1     A.   We're using clinical patient
2 characteristics that doctors can follow
3 to make a determination about what to do
4 about dose.
5     Q.   Okay.  Let's go to -- this
6 refers us to Section 8.8.  Do you see
7 that?
8     A.   Mm-hmm.  Yes.
9     Q.   Okay.  Let's go look at 8.8.
10 And this says, "Hepatic Impairment."  Do
11 you see that?
12     A.   Yeah.
13     Q.   It says, "In pharmacokinetic
14 study compared to healthy subjects with
15 normal liver function, area under the
16 curve increases of 127 percent were
17 observed in subjects with moderate
18 hepatic impairment," right?
19     A.   Yes.
20     Q.   So that's an increase of --
21 of an -- in exposure as measured by AUC
22 of 127 percent, right?
23     A.   If you use AUC, yes.
24     Q.   And -- and that was

**Page 784**

1 sufficient for the company to decide
2 people with severe liver problems
3 shouldn't even be on this drug because
4 we're worried about overexposure, right?
5         MR. HOROWITZ:  Object to the
6     form.
7         THE WITNESS:  I'm sorry.  I
8     can't agree with you on that.
9 BY MR. BARR:
10     Q.   What do you disagree with?
11     A.   I disagree with the fact
12 that that's the only parameter.  You have
13 to understand that patients that have
14 liver disease, their livers make
15 coagulation factors.  So there are other
16 abnormalities on top of the drug.  So
17 this is adding the drug on top of other
18 parameters that cause patients with
19 hepatic impairment bleed.  People with
20 hepatic impairment bleed.
21     Q.   Okay.  Where does that --
22 where is that, any of that in this
23 Section 8.8 about hepatic impairment?
24         MR. HOROWITZ:  Objection.
25         THE WITNESS:  That -- that's

**Page 785**

1 common knowledge for physicians
2 who take care of patients.
3 BY MR. BARR:
4     Q.   Right.  So it's not in here?
5     A.   It's not in our purview
6 to -- to dictate practice.
7     Q.   Okay.  So it's not in the
8 language about 8.8.  It only talks about
9 an increase of exposure.
10         MR. HOROWITZ:  Object to the
11     form.
12         THE WITNESS:  The FDA
13     wouldn't put that language in --
14 BY MR. BARR:
15     Q.   You know that?
16     A.   I know it's not -- I know
17 that because we're not to dictate
18 practice.  This is common physician
19 knowledge.
20     Q.   What discussion that you had
21 with the FDA about whether or not that
22 type of language should be in hepatic
23 impairment --
24     A.   I've been involved in

**Page 786**

1 discussions with the FDA over many years,
2 so I've heard this.
3     Q.   In relation to Xarelto, what
4 conversations have you had with the FDA
5 on this issue?
6     A.   So now that's a different
7 question.  I don't remember the
8 discussions I had.  But I have been at
9 the FDA meetings with the authority.
10     Q.   And -- and it's your
11 testimony that this Section 8.8 -- never
12 mind.  We'll move on.
13         Section 8.8 only talks about
14 exposure, right?
15         MR. HOROWITZ:  Object to the
16     form.  Asked and answered.
17         THE WITNESS:  No, I don't
18     know that it only talks about
19     exposure.
20 BY MR. BARR:
21     Q.   The point of all this is
22 exposure matters, right?
23         MR. HOROWITZ:  Objection.
24 BY MR. BARR:

**Page 791**

1 the arm or the leg, or numbness
2 and tingling.  The whole -- the
3 whole picture, the efficacy and
4 the bleeding.
5 BY MR. BARR:
6     Q.   Right.  And -- and what you
7 said is, if I remember right, was, if
8 there were indications of bleeding, you
9 might want to check, right?
10     A.   You want to evaluate the
11 whole situation.  You might want to check
12 the hemoglobin.  You might want to check
13 the creatinine.  You might want to know
14 about the patient.
15     Q.   Would you want to check
16 anything to determine whether or not they
17 were over-anticoagulated?
18     A.   If you had a test that you
19 could do reliably and if you knew what to
20 do with that test, if there were proof in
21 what to do, then that test might be
22 helpful.
23         But if you have the patient
24 characteristics, if you have the things

**Page 792**

1 that we mentioned, otherwise you can make
2 that decision without it.  But you have
3 to monitor the patient.  You have to see
4 what to do depends on that.
5     Q.   Okay.  So if -- if the
6 doctor is -- is following his patient
7 appropriately as -- as you've suggested,
8 they bring them in, there are signs of
9 bleeding, and -- and they want to check,
10 what are they supposed to do?
11     A.   They want to check what?
12     Q.   The -- it was your testimony
13 that they might want to check.  So I'm
14 trying to figure out what it is you think
15 that doctor is supposed to do.
16         MR. HOROWITZ:  Well, object
17     to the form.
18         THE WITNESS:  Well, at the
19     present time in the United States
20     there isn't a -- a test that you
21     can check to -- to have a value.
22     So you have to go with your other
23     factors, your hemoglobin, your
24     creatinine, your questions, your

**Page 793**

1 history, and your physical
2 examination, and you have to make
3 an assessment about what to do.
4 The laboratory test isn't going to
5 help do that.  The clinical
6 situation is what's important.
7 BY MR. BARR:
8     Q.   So you don't believe if they
9 ran a PT and the PT was 50 seconds, that
10 that would tell them anything?
11         MR. HOROWITZ:  Well, object
12     to the form.
13         THE WITNESS:  Well, as -- as
14     I said, the laboratory test of PT
15     is not reliable for rivaroxaban.
16     But as a clinician, I don't need
17     that test to tell me that.  The
18     patient's telling me that they
19     have bleeding gums or there --
20     they'll have a hemoglobin that's
21     low or something, then obviously
22     I've got a lot of other things to
23     do, and whether the value is this
24     or that makes no difference then,

**Page 794**

1 then we decide what to do.
2 BY MR. BARR:
3     Q.   Okay.  So what do you do?
4     A.   Well, it depends on what
5 you --
6     Q.   Do you -- let me -- let
7 me --
8     A.   Sorry.
9     Q.   Let me get the whole
10 question out.
11     A.   Yeah.
12     Q.   So you titrate the dose, do
13 you put them on a different
14 anticoagulant, do you remove them from
15 anticoagulation therapy altogether?  What
16 is it that doctor is supposed to do?
17         MR. HOROWITZ:  Well, object
18     to the form.
19         MR. BARR:  Form, you got it.
20         MR. HOROWITZ:  Well --
21         MR. BARR:  You got it in
22     form.
23         MR. HOROWITZ:  Well, hold on
24     a second.

Protected - Subject to Further Protective Review

Page 795

1     MR. BARR:  You got it in
2  form.
3     MR. HOROWITZ:  Object to the
4  form.  Incomplete hypothetical.
5  You're getting into expert
6  testimony here beyond what we...
7     MR. BARR:  I'm just
8  following up on the -- on his
9  testimony.
10     MR. HOROWITZ:  I think
11  you're going beyond that.
12     MR. BARR:  That's fine.  You
13  got your objection in.
14     MR. HOROWITZ:  Fair enough.
15  BY MR. BARR:
16     Q.  Can I get an answer?
17     MR. HOROWITZ:  Well, go
18  ahead and answer.
19     THE WITNESS:  Okay.  So it
20  depends upon each patient
21  situation.  But let's say -- you
22  know, let's say the patient had
23  been a patient that had a
24  creatinine clearance of, I don't

Page 796

1  know, let's say 55 and they had
2  been on the drug for six months
3  and then something like this
4  happens.  And you check the
5  creatinine clearance again and now
6  it's, say, 47 or 30 even.  You can
7  make an adjustment.  We've tested
8  that.  You can give 15 milligrams.
9     Or, if -- if they had some
10  other situation, if they have some
11  problems, say they had some blood
12  on the toilet tissue and you do a
13  gastrointestinal workup, you find
14  out they have a cancer, you've
15  unmasked it, you're obviously
16  going to address that.
17     So if -- if they need to be
18  on the medication for a very
19  strong reason like preventing
20  stroke, then you have to make
21  those decisions and balance what
22  to do.
23  BY MR. BARR:
24     Q.  But that --

Page 797

1     A.  In that situation -- just as
2  an example.  In that situation, another
3  anticoagulant wouldn't make a difference
4  because they are all going to produce it
5  until you handle the primary problem
6  which is the cancer.
7     Q.  Let's -- let's go back to
8  the first one you -- you laid out there
9  which was the person with creatinine
10  clearance.  Okay.  So you -- you test
11  creatinine clearance.  Let's say it comes
12  back, it's still fine.  It's still above
13  the limits that you would need for
14  20 milligrams.
15     A.  Mm-hmm.
16     Q.  So what are you going to do?
17     MR. HOROWITZ:  Object to the
18  form.  Foundation.  Calls for
19  expert testimony, and it's an
20  incomplete hypothetical.
21     THE WITNESS:  So now
22  we're -- you know, you're
23  supposing, you're presenting a
24  clinical case, and that's a

Page 798

1  decision you have to make at the
2  time.  I have my own personal
3  thoughts of what I might do if I
4  were -- were practicing at this
5  time, but I -- it would depend on
6  the case.
7     You'd have to show me the
8  case, the history, the concomitant
9  medications, the creatinine
10  clearance, et cetera, and then we
11  can make a decision.
12  BY MR. BARR:
13     Q.  The -- the company is
14  certainly giving the doctor in that
15  situation no information to use through
16  which he could either -- to which he
17  could titrate the dose appropriately,
18  correct?
19     MR. HOROWITZ:  Well, object
20  to the form.  Argument.
21     THE WITNESS:  Well, the
22  doctor could make the
23  decision to -- in that situation,
24  the doctor could make the decision

Golkow Technologies, Inc.                Page: 89 (795 - 798)

---

Protected - Subject to Further Protective Review

Page 799

1  because they are free to do
2  whatever -- whatever dose
3  adjustment is available.
4     In other words, if there's
5  15 milligrams or if there's
6  another dose, they could make a
7  decision.  But we don't have any
8  data to provide them.  So we
9  prefer not to provide them with
10  information that's not accurate.
11  BY MR. BARR:
12     Q.  So the doctor could just
13  gamble and say maybe this person will be
14  at above -- will be protected for stroke.
15  I don't know it because the company
16  hasn't given me the information, so I'm
17  just going to throw the dice on the
18  table?
19     MR. HOROWITZ:  Object to the
20  form.  Mischaracterizes his
21  testimony.  Argument.
22     THE WITNESS:  I think you
23  understand what physicians do
24  and how they make these decisions

Page 800

1  everyday.
2  BY MR. BARR:
3     Q.  No, I'm actually wanting
4  them to get additional information so
5  they can do their job.
6     A.  They know --
7     Q.  Take initiative.
8     A.  They know how to do it.
9     MR. BARR:  Okay.
10     MR. HOROWITZ:  Are you done?
11     MR. BARR:  Yeah, I'm done.
12     MR. HOROWITZ:  Okay.  Let me
13  just look at my notes, consult
14  with them for a second.
15     MR. BARR:  Okay.
16     MR. HOROWITZ:  I think we're
17  probably done, but let me just
18  check.
19     THE VIDEOGRAPHER:  Stand by.
20  The time is 4:12.  We are going
21  off the record.
22     (Short break.)
23     THE VIDEOGRAPHER:  The time
24  is 4:34 p.m.

Page 801

1     Back on the record.
2     - - -
3     EXAMINATION
4     - - -
5  BY MR. BARR:
6     Q.  Doctor, I just -- once
7  again, Jeff Horowitz on behalf of Bayer.
8  I just want to follow up very quickly on
9  one document that plaintiffs' counsel has
10  asked you about a couple of times now.
11  It's Exhibit 54.  Do you have that in
12  front of you?
13     A.  I do.
14     Q.  If you recall, you were
15  asked questions, really twice now, about
16  the e-mail from Claudia Henn and --
17  on September 18th and some of the
18  comments that you provided in response
19  to, frankly, the comments that are set
20  forth in the e-mail.
21     Do you recall that?
22     A.  Yes.
23     Q.  And in particular, there are
24  some comments that were made at the

Page 802

1  end -- after Paragraph 4 at the end at
2  the very bottom of Bates Page 482.  You
3  were asked a lot of questions about that
4  particular paragraph.  Do you recall
5  that?
6     A.  I do.
7     Q.  Okay.  Were you shown by
8  counsel for plaintiff the very first
9  e-mail in the chain at the top, if you go
10  to the first page?  Was this covered with
11  you in questioning by plaintiffs'
12  counsel?
13     A.  No, this wasn't.
14     Q.  Okay.  So this is an e-mail
15  that you wrote on April 18, 2015, that
16  added additional comment?
17     A.  Yes.  It says, "Correction
18  of Document 1A version."  So that's the
19  subject.
20     Q.  And what's the comment that
21  you said you forgot to add?  Can you tell
22  us what that was?
23     A.  It looked like I had a
24  follow-up later in the afternoon of that

Golkow Technologies, Inc.                Page: 90 (799 - 802)

---

Protected - Subject to Further Protective Review

Page 803

1  day.  It says, "Dear all, I forgot to add
2  one comment, which is now in the attached
3  version."
4     Q.  What did you say?
5     A.  I say, "Attempting to
6  incorporate posthoc dose adjustments for
7  a drug that does not have a narrow
8  therapeutic range, marked pharmacokinetic
9  variability, or a compliance issue after
10  clinical trials outcomes" -- sorry --
11  "clinical outcomes trials have proven its
12  efficacy and safety and postmarketing
13  surveillance has consistently shown a
14  positive benefit-risk balance is
15  scientifically inappropriate.  Altering
16  the current dose regimens in such a way
17  could lead to loss of efficacy with no
18  certainty of improvement in safety."
19     MR. HOROWITZ:  Doctor, I
20  have no further questions.  Thank
21  you.
22     MR. BARR:  I will be
23  gracious and give Mr. Horowitz the
24  last word.  I have no further

Page 804

1  questions either.
2     THE VIDEOGRAPHER:  Stand by,
3  please.  This marks the end of
4  today's deposition.  The time is
5  4:36 p.m.  We are going off the
6  record.
7     (The witness was excused.)
8     (Deposition concluded at
9  approximately 4:36 p.m.)

Page 805

CERTIFICATE

     I HEREBY CERTIFY that the
witness was duly sworn by me and that the
deposition is a true record of the
testimony given by the witness.

     It was requested before
completion of the deposition that the
witness, SCOTT D. BERKOWITZ, M.D., have
the opportunity to read and sign the
deposition transcript.

          MICHELLE L. GRAY,
          A Registered Professional
          Reporter, Certified Shorthand
          Reporter, Certified Realtime
          Reporter and Notary Public
          Dated:  October 20, 2016

     (The foregoing certification
of this transcript does not apply to any
reproduction of the same by any means,
unless under the direct control and/or
supervision of the certifying reporter.)

Page 806

INSTRUCTIONS TO WITNESS

     Please read your deposition
over carefully and make any necessary
corrections.  You should state the reason
in the appropriate space on the errata
sheet for any corrections that are made.

     After doing so, please sign
the errata sheet and date it.

     You are signing same subject
to the changes you have noted on the
errata sheet, which will be attached to
your deposition.

     It is imperative that you
return the original errata sheet to the
deposing attorney within thirty (30) days
of receipt of the deposition transcript
by you.  If you fail to do so, the
deposition transcript may be deemed to be
accurate and may be used in court.

Golkow Technologies, Inc.                Page: 91 (803 - 806)

---

Protected - Subject to Further Protective Review

Page 807

1     - - - - - -
2     E R R A T A
3     - - - - - -
4
5  PAGE LINE CHANGE
6  _____
7     REASON: _____
8  _____
9     REASON: _____
10  _____
11     REASON: _____
12  _____
13     REASON: _____
14  _____
15     REASON: _____
16  _____
17     REASON: _____
18  _____
19     REASON: _____
20  _____
21     REASON: _____
22  _____
23     REASON: _____
24  _____

Page 808

1
2     ACKNOWLEDGMENT OF DEPONENT
3
4     I, _____, do
5  hereby certify that I have read the
6  foregoing pages, 446 - 809, and that the
7  same is a correct transcription of the
8  answers given by me to the questions
9  therein propounded, except for the
10  corrections or changes in form or
11  substance, if any, noted in the attached
12  Errata Sheet.
13
14
15  _____
16  SCOTT D. BERKOWITZ, M.D.     DATE
17
18  Subscribed and sworn
19  to before me this
20  ___ day of _____, 20___.
21
22  My commission expires:_____
23
24  _____
     Notary Public

Page 809

LAWYER'S NOTES

PAGE LINE
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____

Golkow Technologies, Inc.                Page: 92 (807 - 809)