Protected - Subject To Further Protective Review

```
 1            UNITED STATES DISTRICT COURT
 2            EASTERN DISTRICT OF LOUISIANA
 3
 4  IN RE:  XARELTO (RIVAROXABAN)  MDL No. 2592
    PRODUCTS LIABILITY LITIGATION
 5                                 SECTION L
 6  _____        JUDGE FALLON
 7  THIS DOCUMENT RELATES TO:    MAG. JUDGE NORTH
 8  BOUDREAUX VS. JANSSEN RESEARCH
    & DEVELOPMENT, ET AL.
 9
    Civil Case No. 2:14-cv-02720
10
11
12    PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW
13
14            SEPTEMBER 22, 2016
15
16
17               - - -
18         Videotaped deposition of PETER S. FAIL,
    M.D., held at the Cardiovascular Institute of the
19  South, 225 Dunn Street, Houma, Louisiana, commencing
    at 5:13 p.m., on the above date, before Leslie B.
20  Doyle, Certified Court Reporter (#93096), Registered
    Professional Reporter, Certified Realtime Reporter.
21
22               - - -
23         GOLKOW TECHNOLOGIES, INC.
24      877.370.3377 ph|917.591.5672 fax
25            deps@golkow.com
```

---

Protected - Subject To Further Protective Review

```
 1  A P P E A R A N C E S :
 2
 3  COUNSEL FOR THE PLAINTIFF:
 4      KIRK J. GOZA, ESQ.
            Email:  Kgoza@gohonlaw.com
 5      Phone:  (913) 451-3433
        GOZA & HONNOLD, LLC
 6      11181 OVERBROOK ROAD, SUITE 200
        LEAWOOD, KANSAS  66211
 7
 8  COUNSEL FOR PETER S. FAIL, M.D.:
 9      CHARLES J. BOUDREAUX, ESQ.
            Email:  Cboudreaux@joneswalker.com
10      Phone:  (337) 593-7764
        JONES WALKER, LLP
11      600 JEFFERSON STREET, SUITE 1600
        LAFAYETTE, LOUISIANA  70501
12
13  COUNSEL FOR THE JANSSEN DEFENDANTS:
14      JOHN A. MCCAULEY, ESQ.
            Email:  Jmccauley@venable.com
15      Phone:  (410) 244-7655
        VENABLE LLP
16      750 E. PRATT STREET, SUITE 900
        BALTIMORE, MARYLAND  21202
17
18  COUNSEL FOR THE BAYER DEFENDANTS:
19      BERT L. SLONIM, ESQ.
            Email:  Bert.slonim@kayescholer.com
20      Phone:  (212) 836-8897
        KAYE SCHOLER, LLP
21      250 WEST 55TH STREET
        NEW YORK, NEW YORK  10019-9710
22
23  ALSO PRESENT:
24      MARK ANCALADE, VIDEOGRAPHER
25      MELISSA BARDWELL, VIDEOGRAPHER
```

---

Protected - Subject To Further Protective Review

```
 1            INDEX OF EXAMINATIONS
 2  EXAMINATION
 3    BY MR. SLONIM.....................6, 104
 4    BY MR. GOZA..................88, 113, 119
 5    BY MR. MCCAULEY.................115, 121
 6  CERTIFICATE........................123 - 124
 7
 8               * * *
 9
10            INDEX OF EXHIBITS
11  EXHIBIT #1.................................10
12    CROSS NOTICE OF DEPOSITION OF PETER
13    FAIL, M.D.
14  EXHIBIT #2.................................10
15    CURRICULUM VITAE
16  EXHIBIT #3.................................11
17    MEDICAL RECORDS
18  EXHIBIT #4.................................12
19    4/2/15 HISTORY & PHYSICAL
20    (JBoudreaux-PPR-002624- 2626)
21  EXHIBIT #5.................................16
22    4/27/15 HISTORY & PHYSICAL
23    (JBoudreaux-PPR-002510 - 2513)
24
25
```

---

Protected - Subject To Further Protective Review

```
 1  EXHIBITS (CONTINUED):
 2
 3  EXHIBIT #6.................................20
 4    ARTICLE FROM THE DAILY COMET:  HOUMA
 5    DOCTOR AMONG FIRST IN LA TO PERFORM
 6    PROCEDURE
 7  EXHIBIT #7.................................23
 8    AGENDA - NCVH LAFAYETTE
 9  EXHIBIT #8.................................23
10    "OTHER STRUCTURAL HEART INTERVENTIONS"
11  EXHIBIT #9.................................36
12    COMMENT REGARDING PERCUTANEOUS LEFT
13    ATRIAL APPENDAGE (LAA) CLOSURE THERAPY
14  EXHIBIT #10................................48
15    CONSENT FOR SURGERY OR TREATMENT AND
16    ACKNOWLEDGMENT OF RECEIPT OF MEDICAL
17    INFORMATION
18    (JBoudreaux-TGMC-MD-000115 - 0121)
19  EXHIBIT #11................................51
20    5/11/15 OPERATIVE REPORT
21    (JBoudreaux-PPR-001501 - 1502)
22  EXHIBIT #12................................54
23    9/16/15 PROGRESS NOTE
24    (JBoudreaux-PPR-002714 - 2718)
25
```

Protected - Subject To Further Protective Review

```
1   EXHIBITS (CONTINUED):
2
3   EXHIBIT #13...............................57
4     HOSPITAL ADMIT/HISTORY AND PHYSICAL/
5     CONSULT
6     (JBoudreaux-PPR-002701 - 2705)
7   EXHIBIT #14...............................58
8     3/24/16 PROGRESS NOTE
9     (JBoudreaux-CIS-H-000355 - 0359)
10  EXHIBIT #15...............................59
11    4/26/16 PROGRESS NOTE
12    (JBoudreaux-CIS-H-000360 - 0364)
13  EXHIBIT #16...............................62
14    CONSENT FOR SURGERY OF TREATMENT AND
15    ACKNOWLEDGMENT OF RECEIPT OF MEDICAL
16    INFORMATION
17    (JBoudreaux-PPR-005279 - 5280)
18  EXHIBIT #17...............................64
19    DISCHARGE SUMMARY
20    (JBoudreaux-PPR-005124 - 5125)
21  EXHIBIT #18...............................67
22    PROGRESS NOTE
23    (JBoudreaux-PPR-005254 - 5257)
24
25
```

---

Protected - Subject To Further Protective Review

```
1              PROCEEDINGS
2        THE VIDEOGRAPHER:  My name is Mark
3     Ancalade, the videographer.  Also with me
4     is Melissa Bardwell.  We're with Golkow
5     Technologies.
6        Today's date is September the 27th --
7     22nd, 2016, at the time indicated on the
8     video screen, which is 5:13.  Today's
9     deposition is being held at 225 Dunn
10    Street in Houma, Louisiana, taken in the
11    matter of In Re:  Xarelto (Rivaroxaban)
12    Products Liability Litigation, being heard
13    before the United States District Court,
14    Eastern District of Louisiana.
15       Today's deponent is Dr. Peter S. Fail.
16    The court reporter is Ms. Leslie Doyle.
17       I would ask that counsel state their
18    names for the record, which, thereafter,
19    would the court reporter please swear the
20    witness.
21       MR. GOZA:  Kirk Goza on behalf of
22    plaintiff, Joseph Boudreaux.
23       MR. BOUDREAUX:  Chuck Boudreaux on
24    behalf of Dr. Fail.
25       MR. SLONIM:  Bert Slonim on behalf of
```

---

Protected - Subject To Further Protective Review

```
1   EXHIBITS (CONTINUED):
2
3   EXHIBIT #19...............................72
4     FLASH DRIVE
5   EXHIBIT #20...............................90
6     PROGRESS NOTES
7     (JBoudreaux-OMC-K-MD-000017 - 0023)
8
9                     - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Protected - Subject To Further Protective Review

```
1     defendant, Bayer.
2        MR. MCCAULEY:  John McCauley on behalf
3     of the Janssen defendants.
4                  * * *
5        PETER S. FAIL, M.D.,
6     having been first duly sworn, was examined
7        and testified as follows:
8        MR. GOZA:  At this point, we want to
9     state one thing for the record, that
10    Mr. Boudreaux, seated here to my left, is
11    the lawyer for Dr. Fail, but is not
12    related to my client, Mr. Joseph
13    Boudreaux.
14       MR. SLONIM:  Thank you.
15            EXAMINATION
16  BY MR. SLONIM:
17    Q.  Dr. Fail, good evening.
18    A.  How are you?
19    Q.  My name is Bert Slonim.  As you know, I
20  represent the defendant, Bayer Corporation, in this
21  matter.  My colleague, Mr. McCauley, represents
22  Janssen.
23       You understand, Dr. Fail, that you're
24  being asked to give a deposition in this matter
25  because there's been a lawsuit instituted by
```

Protected - Subject To Further Protective Review

1    Mr. Joseph Boudreaux, who is a patient of yours,
2    against our clients?
3         A.   I do.
4         Q.   And you understand that you are not a
5    defendant in the lawsuit; your practice group is not
6    a defendant in the lawsuit, the plaintiff,
7    Mr. Boudreaux, does not assert that you did anything
8    wrong, or that your practice group did anything
9    wrong, and I want to represent on the record that
10   neither of the defendants assert that you or your
11   practice group did anything wrong.  Do you
12   understand that?
13        A.   I do.
14        Q.   For the record, would you state your full
15   name and your business address, please?
16        A.   Peter Stevens Fail, 225 Dunn Street,
17   Houma, Louisiana.
18        Q.   And I understand that you're a medical
19   doctor, more specifically that you're a
20   cardiologist; is that correct?
21        A.   Correct.
22        Q.   And, of course, you're board certified; is
23   that right?
24        A.   Yes, sir.
25        Q.   In what disciplines are you board

Protected - Subject To Further Protective Review

1         A.   I believe these are the patient's records.
2         Q.   Okay.  Let's mark that as -- the court
3    reporter mark that as Deposition Exhibit #3.
4              (Deposition Exhibit #3 was marked for
5                   identification.)
6              Dr. Fail, is it your understanding that
7    that's a full set of Mr. Boudreaux's records for all
8    his care and treatment by the Cardiovascular
9    Institute of the South?
10        A.   It is.
11        Q.   So that would encompass more than your own
12   personal treatment of Mr. Boudreaux?
13        A.   Yes, sir, it should.
14        Q.   Okay.  Did you bring any other materials
15   with you?
16        A.   No, sir.
17        Q.   Very good.
18             Dr. Fail, your medical practice is located
19   in Houma, Louisiana; is that correct?
20        A.   That's correct.
21        Q.   The CV that we've marked as Deposition
22   Exhibit #2, is that an accurate description of your
23   education, your medical training, your publications,
24   and your research interests?
25        A.   I believe it is.

Protected - Subject To Further Protective Review

1    certified?
2         A.   Board certified in cardiology and
3    interventional cardiology.
4         Q.   Let's mark as Deposition Exhibit #1 -- I
5    think the court reporter handed it to you -- the
6    Notice of Deposition.
7              (Deposition Exhibit #1 was marked for
8                   identification.)
9              Do you have that?
10        A.   Yes, sir.
11        Q.   And the Notice of Deposition asked you to
12   bring certain documents with you?
13        A.   Yes, sir.
14        Q.   Are you aware of that?
15        A.   Yes, sir.
16        Q.   And did you bring some documents with you?
17        A.   Yes, sir.
18        Q.   One of the things that you were asked to
19   bring was a CV; is that correct?
20        A.   That is correct, sir.
21        Q.   Let's mark that as Deposition Exhibit #2.
22             (Deposition Exhibit #2 was marked for
23                   identification.)
24             We'll come back to that in a minute.  What
25   else did you bring with you?

Protected - Subject To Further Protective Review

1         Q.   Now, the case, as I mentioned, concerns a
2    patient that you treated, Mr. Joseph Boudreaux.  As
3    you sit here today, do you have an independent
4    recollection of Mr. Boudreaux, apart from what you
5    see in his medical records?
6         A.   No, sir, I do not.
7              (Deposition Exhibit #4 was marked for
8                   identification.)
9         Q.   We've marked as Deposition Exhibit #3 --
10   I'm sorry -- #4 --
11        A.   #4, yes, sir.
12        Q.   I'm going to adjust this on the Elmo -- a
13   medical record dated April 2nd, 2015.  I projected
14   that on the Elmo and handed you a copy.
15        A.   Yes, sir.
16        Q.   Is this your medical record?
17        A.   Yes, it is.
18        Q.   And do you notice that the -- there's a
19   red box around the date of April 2nd, 2015?
20        A.   Uh-huh.
21        Q.   Do you see that?
22        A.   Yes, sir.
23        Q.   Is it correct that you first saw
24   Mr. Boudreaux on that date, April 2nd, 2015, and
25   that these are your notes of the -- that visit?

Protected - Subject To Further Protective Review

1    A.   Yes, sir.

2    Q.   The section of the medical record that I

3 put in a red box, and it's labeled Chief Complaint

4 and then Present Illness.  Do you see that?

5    A.   Yes, sir.

6    Q.   That section of the medical record

7 indicates that Mr. Boudreaux had been referred to

8 you by a Dr. Al Timothy; is that correct?

9    A.   Yes, sir.

10   Q.   And the purpose of that referral was for

11 you to consider whether Mr. Boudreaux was a

12 candidate for a cardiac procedure called the LARIAT

13 procedure; is that correct?

14   A.   That is correct.

15   Q.   And the LARIAT procedure is an

16 interventional cardiology procedure that's used to

17 treat atrial fibrillation, correct?

18   A.   It's utilized to treat patients who have

19 atrial fibrillation who cannot take anticoagulation.

20   Q.   Okay.  And Dr. Al Timothy is a

21 cardiologist who works in your medical practice

22 group; is that correct?

23   A.   That is correct.

24   Q.   Is Dr. Timothy -- as a cardiologist, is he

25 experienced in treating patients with atrial

---

Protected - Subject To Further Protective Review

1 reviewing the records more recently, that it was a

2 little over a year that he actually had been off

3 anticoagulation?

4    A.   Yeah.  And I'm not sure if that's years or

5 units.  Oh, he may have got transfused.  I'm looking

6 at that now in bad handwriting, so I'm not sure that

7 was -- if I put off transfusion or if I put three

8 units or three years.  I wonder if that's units.

9    Q.   All right.  I see.  It's not clear to you

10 looking at --

11   A.   No, it's not.

12   Q.   -- looking at that note, whether that's --

13   A.   Right.

14   Q.   -- that's referring to the transfusion

15 note about --

16   A.   That's what I believe it -- yeah.

17   Q.   -- or the off anticoagulation to the left?

18   A.   No, that's what I think it -- I think it's

19 referring to the transfusion, yes, sir.

20   Q.   Okay.  But you do know that, at this time

21 as of April 2015, that Mr. Boudreaux had been off

22 anticoagulation for more than a year, right?

23   A.   I understand that, yes, sir.

24   Q.   And your plan was to conduct imaging

25 studies to assess whether Mr. Boudreaux was suitable

---

Protected - Subject To Further Protective Review

1 fibrillation?

2    A.   I believe so.

3    Q.   Has Dr. Timothy referred other patients to

4 you for consideration of the LARIAT procedure?

5    A.   He has.

6    Q.   And is that both before and after

7 Mr. Boudreaux?

8    A.   That is correct.

9    Q.   Now, your note in this medical record, the

10 handwritten part under Present Illness, indicates

11 that Mr. Boudreaux had a history of GI bleeding with

12 anticoagulation therapy; is that correct?

13   A.   Correct.

14   Q.   And even though Mr. Boudreaux was at a

15 high risk of stroke from atrial fibrillation, at the

16 time that you saw him in April 2015, he had been off

17 anticoagulants for more than a year; is that

18 correct?

19   A.   That is correct.

20   Q.   If I understood your note in the lower

21 right-hand corner of the portion that's in the red

22 box, it looks like it indicated three years; is that

23 correct?

24   A.   That's what it looks like.

25   Q.   But you're aware, and based on the

---

Protected - Subject To Further Protective Review

1 for the LARIAT procedure; is that correct?

2    A.   That is correct, yes, sir.

3    Q.   It's bleeding through a little bit.  Let's

4 see.  Dr. Fail, give us a second to adjust the

5 brightness of the projection.

6        (Deposition Exhibit #5 was marked for

7         identification.)

8        Dr. Fail, we've marked as Deposition

9 Exhibit #5 a medical record dated April 27th, 2015,

10 regarding Mr. Boudreaux.  Do you see the date as

11 indicated in the upper left-hand corner in the red

12 box?

13   A.   Yes, sir.

14   Q.   And this is your medical record, correct?

15   A.   That's correct.

16   Q.   So this is dated approximately three

17 weeks -- a little more than three weeks after you

18 had first seen Mr. Boudreaux for consideration of

19 the LARIAT, correct?

20   A.   That's correct.

21   Q.   Can you please read aloud the chief

22 complaint?

23   A.   Referred for evaluation of atrial

24 fibrillation and consideration for LARIAT.

25   Q.   And then would you keep on reading the --

1    A.   73-year-old male referred by Dr. Timothy
2  for atrial fibrillation consideration and for LARIAT
3  procedure.
4    Q.   Dr. Fail?
5    A.   I'm sorry.
6    Q.   Could I ask you to slow down --
7    A.   Yes.
8    Q.   -- just a little bit so the court reporter
9  can catch up with you?
10    A.   The patient was diagnosed with new onset
11  atrial fibrillation in January of 2014, duration
12  unknown and associated with some diastolic heart
13  failure.  The patient was started on Xarelto.  The
14  plans for future cardioversion were discussed.  He
15  was unable to tolerate the anticoagulation due to
16  recurrent GI bleeds.  Outpatient workup also
17  revealed non-ischemic cardiomyopathy and ejection
18  fraction of 35 percent.
19    Q.   Is this accurate, that Mr. Boudreaux had
20  been diagnosed with new onset, meaning first time,
21  atrial fibrillation in January of 2014?
22    A.   That is my understanding, yes, sir.
23    Q.   And so he was -- he had come to see you in
24  April of 2015; that's more than a year later?
25    A.   Correct.

1    Q.   And he had been off anticoagulation for
2  much of that year, more than a year-long period,
3  correct?
4    A.   That is correct, yes, sir.
5    Q.   At the time -- it indicates that at the
6  time, he was -- of the diagnosis, he was started on
7  Xarelto?
8    A.   Yes, sir.
9    Q.   Do you know that he was started on Xarelto
10  by a treating cardiologist, Dr. Kenneth Wong?
11    A.   That's my understanding, yes, sir.
12    Q.   And you know Dr. Wong, of course?
13    A.   I do.
14    Q.   Dr. Wong is a cardiologist that practices
15  with your medical practice group, correct?
16    A.   That is correct.
17    Q.   And is Dr. Wong also experienced in
18  treating atrial fibrillation?
19    A.   I believe he is.
20    Q.   Now, Dr. Fail, you personally never
21  prescribed Xarelto to Mr. Boudreaux; is that
22  correct?
23    A.   That is correct.
24    Q.   We're going to move on to another
25  document, then we're going to return to this

1  document, though.
2    A.   Okay.
3    Q.   One question before we move on.  The
4  note -- there is a note.  The note indicates that
5  the patient was started on Xarelto, and there were
6  plans for future cardioversion.
7    A.   Yes, sir.
8    Q.   Do you know why the cardioversion was not
9  done during this more than year period of time since
10  the diagnosis of atrial fibrillation and the time he
11  came to see you in April of 2015?
12    A.   My suspicion is that he was started on
13  Xarelto with a plan of using anticoagulation for
14  approximately four weeks before the cardioversion,
15  because his AFib was unknown duration, and then
16  bring him in and do the cardioversion at that time.
17  He developed a GI bleed.  It was stopped on his
18  anticoagulation and, therefore, was not being able
19  to be cardioverted without having -- having --
20  convinced that he was anticoagulated.
21    Q.   Is it a requirement for cardioversion that
22  a patient be anticoagulated?
23    A.   It's -- yes, sir.
24    Q.   And that's because there's a risk -- too
25  much of a risk of clots if the patient is not

1  anticoagulated?
2    A.   Correct.  Correct.
3        (Deposition Exhibit #6 was marked for
4              identification.)
5    Q.   I've marked as Deposition Exhibit #6 a
6  newspaper article dated December 13, 2013.  Do you
7  have that in front of you, Dr. Fail?
8    A.   I do.
9    Q.   The newspaper is The Daily Comet.  That's
10  a newspaper that covers events in Houma, Louisiana,
11  and the surrounding area; is that correct?
12    A.   I believe so.
13    Q.   And the -- Dr. Fail, the title of the
14  article, and the second paragraph which I have
15  yellow-highlighted, indicates that you were one of
16  the first cardiologists in Louisiana to use the
17  LARIAT procedure to treat atrial fibrillation in
18  patients who could not tolerate anticoagulation
19  medications.  That's correct?
20    A.   That's what it says.  I was not aware of
21  that, but that's what it says.
22    Q.   Well, actually, I asked -- I asked a poor
23  question, and thank you for picking up on that.
24        The article says that?
25    A.   Yeah.

Protected - Subject To Further Protective Review

1    Q.   Do you know if that's the case?

2    A.   I assume that's true.  Not very many

3   people do that.  You're right.

4    Q.   You were an early adopter --

5    A.   Yes, sir.

6    Q.   -- of the LARIAT technique?

7    A.   Yes, sir.

8    Q.   And according to this article, you first

9   performed the LARIAT procedure in December of 2013.

10   That's about a year and a half before you saw

11   Mr. Boudreaux, correct?

12   A.   That seems about right, yes, sir.

13   Q.   And is that date correct, that you -- your

14   first LARIAT patient was in December of 2013?

15   A.   I would assume so.

16   Q.   You don't have any reason to doubt that?

17   A.   I don't, no, sir.

18   Q.   The two paragraphs that are

19   yellow-highlighted towards the bottom, not the last

20   paragraph, but the next two that are highlighted --

21        MR. MCCAULEY:  Move it up a little

22   bit.

23        MR. SLONIM:  Oh, I'm sorry.

24   BY MR. SLONIM:

25   Q.   These describe the LARIAT procedure.

---

Protected - Subject To Further Protective Review

1   Could I ask you to read those aloud?

2    A.   The LARIAT procedure itself?

3    Q.   Yes.

4    A.   The LARIAT procedure is performed in the

5   cardiac catheterization lab under general

6   anesthesia.  One catheter inserted under the

7   patient's rib cage, another guides the device to

8   part of the heart called the left atrial appendage.

9    Q.   Read the next paragraph.

10   A.   The LARIAT device places and tightens a

11   loop stitch around the base of the appendage,

12   sealing it off from the rest of the heart,

13   decreasing the risk of blood clots traveling to the

14   brain and causing a stroke.

15   Q.   Is that an accurate summary of the

16   procedure that you performed on Mr. Boudreaux?

17   A.   Yes, sir.

18   Q.   Can you read aloud the last paragraph of

19   the article?

20   A.   This procedure offers those patients, who

21   in the past had to worry about a -- had to worry

22   about stroke because they were not able to tolerate

23   anticoagulation medication, an option to

24   significantly reduce the risk associated with atrial

25   fibrillation.

---

Protected - Subject To Further Protective Review

1    Q.   So is that an accurate reflection of a

2   quote that you gave to the reporter who wrote this

3   article?

4    A.   I believe so, yes, sir.

5    Q.   And, Dr. Fail, is it correct that there

6   are many atrial fibrillation patients, like

7   Mr. Boudreaux and like the patient on whom you

8   performed the LARIAT procedure in December 2013, who

9   cannot tolerate any anticoagulation therapy, and

10   that the LARIAT procedure is an option that can

11   reduce the risk of stroke for those patients?

12   A.   I believe so, yes, sir.

13   Q.   Dr. Fail, we've marked as Deposition

14   Exhibit #7 --

15   A.   Uh-huh.

16   Q.   -- an agenda from a scientific meeting

17   organized by New Cardiovascular Horizons on August

18   6th, 2016.

19        (Deposition Exhibit #7 was marked for

20             identification.)

21        And we've also marked as Deposition

22   Exhibit #8 a slide deck that was presented at that

23   meeting with the slide deck that's entitled, "Other

24   Structural Heart Interventions."

25        (Deposition Exhibit #8 was marked for

---

Protected - Subject To Further Protective Review

1             identification.)

2        Do you have those in front of you?

3    A.   I do.

4    Q.   Now, Dr. Fail, you have taught and

5   lectured other cardiologists about the LARIAT

6   procedure, correct?

7    A.   I have.

8    Q.   And Exhibit #7, the agenda for the

9   scientific meeting, if you turn to page 5 of 7.

10   A.   I have it.

11   Q.   Okay.  That indicates that you were a

12   speaker at this program on August 16th, and you gave

13   a talk, a presentation, entitled, "Update in

14   Structural Heart Disease Management," correct?

15   A.   Correct.

16   Q.   You are listed as the speaker there.  And

17   do you see that there's a link to the PDF file that

18   contains the slides that you presented at that

19   meeting?

20   A.   Yes, sir.

21   Q.   Okay.  And Exhibit #8, this is the slide

22   deck that you actually presented at this August 6th,

23   2016, meeting, correct?

24   A.   That's correct.

25   Q.   Okay.  Let's put that on the screen, zoom

Protected - Subject To Further Protective Review

1   that in.

2          Do you recall giving this talk?

3     A.   I do.

4     Q.   Would you turn, please, to slide 33?

5     A.   I have it.

6     Q.   Let me get it on the screen.

7          This is the portion of your talk where you

8   began discussing atrial fibrillation with your

9   fellow cardiologists, correct?

10    A.   That is correct.

11    Q.   And atrial fibrillation, that's the

12  condition for which Mr. Boudreaux was treated,

13  correct?

14    A.   Correct.

15    Q.   Let's turn, please, to slide 34.  Can you

16  explain this slide?  Maybe read it to us and explain

17  it to us.

18    A.   This is basically the scope of the problem

19  of those patients with atrial fibrillation.  Bullet

20  point 1, affects more than 2.3 million people in the

21  United States alone.  Bullet point 2, projected to

22  increase between 5.6 and 12.1 million by 2050.

23  Bullet point 3, patients with atrial fibrillation

24  have four- to five-fold higher increase -- or higher

25  risk of stroke than a patient without atrial

Protected - Subject To Further Protective Review

1   fibrillation?

2     A.   I believe he is, yes, sir.

3     Q.   The next bullet point has a red box around

4   it.  That was in your original slides, correct?

5     A.   That is correct.

6     Q.   And it says that the cornerstone of stroke

7   prevention is oral anticoagulation; is that right?

8     A.   Correct.

9     Q.   Why did you put a red box around that?

10    A.   The point of this talk was to show those

11  patients that cannot take anticoagulation, and what

12  I did not want to do was to promote the procedure

13  over what was still a cornerstone, that would be

14  oral anticoagulation.

15    Q.   So, in other words, if there's any

16  possibility that the patient can tolerate an oral

17  anticoagulation -- an oral anticoagulation medication,

18  that would be the first and most -- and primary

19  therapy for the patient, correct?

20    A.   That is correct.

21    Q.   And the reason that you want to

22  anticoagulate them is to cut this four- to five-fold

23  risk and bring it back as close to baseline as

24  possible, correct?

25    A.   That is correct.

Protected - Subject To Further Protective Review

1   fibrillation.  And Bullet Point 4 is, the

2   cornerstone for stroke prevention is oral

3   anticoagulation.

4     Q.   So let's talk about that, each one of

5   these for a minute.  Based on available reliable

6   statistics, it's your understanding that as of 2016,

7   there are more than 2.3 million people in the U.S.

8   that have this condition that Mr. Boudreaux had,

9   this atrial fibrillation?

10    A.   Correct.

11    Q.   And for various reasons, it's a condition

12  that, as the population ages, the prevalence of that

13  disease is expected to rise --

14    A.   That's correct.

15    Q.   -- significantly over the coming decades,

16  correct?

17    A.   Yes, sir.

18    Q.   The next bullet points says that patients

19  with atrial fibrillation have a four- to five-fold

20  higher risk of stroke than patients without atrial

21  fibrillation.  Is that based on reliable data?

22    A.   Yes, sir.

23    Q.   And is that applicable to Mr. Boudreaux?

24  Was Mr. Boudreaux at a four- to five-fold risk --

25  increased risk of stroke because of his atrial

Protected - Subject To Further Protective Review

1     Q.   And, historically, the way that was done

2   was by prescribing an oral anticoagulant; is that

3   right?

4     A.   Correct.

5     Q.   But the problem that you are describing to

6   this audience is that there are some patients, like

7   the patient you operated on in December of 2013, and

8   like Mr. Boudreaux, who are unable to tolerate the

9   oral anticoagulants, correct?

10         MR. GOZA:  Object to the form.  It's

11  vague, ambiguous as to all.

12    A.   That is correct.

13  BY MR. SLONIM:

14    Q.   Let's turn to the next slide, please.  The

15  title of this slide is "Anticoagulation Intolerant

16  Population by Age"; is that correct?

17    A.   Yes, sir.

18    Q.   So this is a complicated slide with a

19  graph in it.  Can you walk us through this slide and

20  explain it to us, please?

21    A.   This basically was showing that, as the

22  population ages on Coumadin, they seem to take less,

23  and there were several anecdotes, one of them on the

24  left-hand side.  Older patients, fear of falling,

25  leading to hemorrhage, and "You bump your head,

Protected - Subject To Further Protective Review

1  you're dead" is an adage that is used in medicine
2  very often.  And that's why, when we see
3  80-plus-year-old patients with atrial fibrillation,
4  there's always this fear of anticoagulating them.
5        The younger patients want to remain
6  physically active, and, therefore, their fear of
7  falling and causing hemorrhage and stuff like
8  that.  And then all patients, we basically said,
9  side effects from drug-to-drug interaction.  This is
10  specifically directly focused towards Coumadin,
11  which was the cornerstone at the time of these --
12  this study was done.
13     Q.   So there are a variety of reasons why
14  patients may be intolerant to oral anticoagulants,
15  Coumadin and other oral anticoagulants, correct?
16     A.   That is correct.
17     Q.   One of the reasons that they may be
18  intolerant of anticoagulation is they may be fearful
19  of trauma or injury, like a fall?
20        MR. GOZA:  Excuse me.  Are you done?
21        I'm sorry.  I'm just going to object to
22        the form, that intolerant equates with
23        that, so...
24        MR. SLONIM:  Objection noted.
25  BY MR. SLONIM:

Protected - Subject To Further Protective Review

1  has -- that reads 60.7 percent, correct?
2     A.   Yes, sir.
3     Q.   So how common is it for a 73-year-old
4  patient like Mr. Boudreaux to be intolerant to any
5  type of anticoagulant therapy?
6     A.   In this bar graph here, it would say
7  somewhere of 40 percent.
8     Q.   So out of every ten patients in that age
9  range who have atrial fibrillation and you would
10  like to prescribe them oral anticoagulants, for one
11  reason or another, four out of ten of those patients
12  you find are intolerant to anticoagulation; is that
13  right?
14     A.   I'm not sure that's what the study
15  actually showed.  I mean, I think -- I think those
16  are the patients who are truly on anticoagulation.
17  The other flip side of that is there are patients
18  who have AFib are never prescribed it, irrespective
19  of -- irrespective of intolerance.  And so I think
20  that's what that shows is that there is a large
21  group of patients that are not anticoagulated, not
22  necessarily intolerant, but a large group that are
23  not taking it.
24     Q.   Do you know what group of the 73-year-old
25  patients would be intolerant?

Protected - Subject To Further Protective Review

1     Q.   One of the -- Dr. Fail, one of the reasons
2  that you note in your slide that patients may be
3  intolerant of anticoagulation is because they have a
4  concern that they might have a hemorrhage,
5  particularly a brain hemorrhage; is that correct?
6        MR. GOZA:  Same objection.
7     A.   Yes, sir.
8  BY MR. SLONIM:
9     Q.   And patients may be intolerant to
10  anticoagulation because of side effects, meaning
11  they might be -- have a propensity to bleed,
12  correct?
13     A.   Yes, sir.
14     Q.   And then there may be problems attendant
15  to taking medication, like in the case of Coumadin,
16  perhaps watching their diet, and other medications,
17  correct?
18     A.   That is correct.
19     Q.   I wanted to ask you about the bar graph on
20  the right-hand side.
21     A.   Yes, sir.
22     Q.   So Mr. Boudreaux was 73 years old when you
23  first saw him in April 2015; is that correct?
24     A.   I believe that's true, yes, sir.
25     Q.   So that would put him in the bar that

Protected - Subject To Further Protective Review

1     A.   Intolerant?
2     Q.   Yeah.
3     A.   I would -- my -- my guess would be 15 to
4  20 percent, maybe.
5        MR. GOZA:  Just move to strike if it's
6        a guess.
7     A.   Yeah, guess.
8  BY MR. SLONIM:
9     Q.   Is it based on -- is it based on your
10  practice and experience?
11     A.   Yes, sir.
12     Q.   Let's move to the next slide.  It's 36.
13  This slide is entitled, "Rationale for LAA Closure."
14  LAA refers to left atrial appendage, correct?
15     A.   That is correct.
16     Q.   Can you explain this slide, please?
17     A.   So this just has a picture of two
18  different types of left atrial appendages showing
19  sort of the nooks and crannies where blood clots can
20  start, if you will.  And then it says 91 percent of
21  patients with thrombus who have non-rheumatic atrial
22  fibrillation, it originates from the left atrial
23  appendage, and 57 of those patients who have
24  rheumatic atrial fibrillation, it originates from
25  it.  So it just shows a high prevalence from the

1  left atrial appendage.

2     Q.  Now, Mr. Boudreaux's atrial fibrillation

3  was not associated with rheumatic heart disease,

4  correct?

5     A.  I believe that's true, yes, sir.

6     Q.  So he would fall into the first group of

7  patients, correct?

8     A.  That is correct.

9     Q.  And just so it's 100 percent clear, in

10  other words, for atrial fibrillation patients like

11  Mr. Boudreaux who develop a blood clot, 91 percent

12  of the time, the clot originates in a portion of the

13  heart that's known as the left atrial appendage,

14  correct?

15     A.  That is correct.

16     Q.  And can you tell us what the left atrial

17  appendage is anatomically?

18     A.  It is an outpouching that arises from the

19  left atrium.  Its function is not really clear why

20  it's there.  It's probably a vestigial organ.

21     Q.  Let's turn, please, to the next slide --

22  turn to slide 50.

23     A.  50?

24     Q.  Yeah.  Can you please read that slide out

25  loud?

---

1     A.  In my --

2        MR. GOZA:  Object to form.

3     A.  In my opinion, yes, sir.

4  BY MR. SLONIM:

5     Q.  Would you turn, please, to slide 51 and

6  explain that slide to us?

7     A.  So the blackened corner is actually a

8  video of -- an animation video of the procedure

9  itself, and then what you see is actually the left

10  atrial appendage balloon -- that's the big dark

11  circle in the middle -- being inflated, and then in

12  the far right, you can actually make out the LARIAT

13  that's across the left atrial appendage.

14     Q.  And I have a copy of the animation, and we

15  will get to that in due course.

16     A.  Okay.

17     Q.  Turn, please, to slide 52.  Please tell us

18  what that slide shows.

19     A.  I'm sorry?

20     Q.  Can you explain slide 52?

21     A.  Oh, yeah.  So this is just a continuation

22  and showing the LARIAT that is going over -- so on

23  the far left, you see the two magnet wires are

24  linked together and the LARIAT coming from left to

25  right going over the atrial appendage, and then on

---

1     A.  Currently, there is no FDA approved

2  interventional procedure for left atrial appendage

3  exclusion in those patients who cannot take or

4  tolerate anticoagulation.

5     Q.  So if I understand this slide correctly,

6  the LARIAT procedure has not been approved by the

7  FDA for treatment of atrial fibrillation; is that

8  correct?

9     A.  It's been not approved for left atrial

10  appendage exclusion in those patients with atrial --

11  that's correct.

12     Q.  But it has been tested on atrial

13  fibrillation patients, and those results have been

14  published, correct?

15     A.  That is correct.

16     Q.  And even though the LARIAT procedure has

17  not been approved by the FDA for left atrial

18  appendage occlusion in atrial fibrillation patients,

19  there's no prohibition that prevents a doctor from

20  using the procedure, correct?

21     A.  That is correct.

22     Q.  And for patients like Mr. Boudreaux, who

23  cannot tolerate oral anticoagulants, the LARIAT

24  procedure might be the best therapy available to

25  prevent strokes; is that right?

---

1  the right-hand panel, you actually can see that the

2  snare has been closed.

3     Q.  And these images were taken from a patient

4  like Mr. Boudreaux as he or she was undergoing the

5  procedure; is that right?

6     A.  That is correct.

7     Q.  And, finally, would you turn to slide 53,

8  please?  Can you explain this slide to us?

9     A.  So this is just going through the sort of

10  three devices that are available for those patients

11  for left atrial appendage exclusion, the LARIAT, the

12  Watchman and the Amplatz, and goes through some of

13  their pertinent data.

14     Q.  Thank you.  I'm going to move to another

15  document, if I can find it in my collection.

16        MR. GOZA:  This is #9?

17        MR. SLONIM:  Yeah.

18        (Deposition Exhibit #9 was marked for

19               identification.)

20  BY MR. SLONIM:

21     Q.  We've marked as Deposition Exhibit #9 a

22  comment that you submitted to the Center for

23  Medicare on June 15th, 2015.

24     A.  Okay.

25     Q.  Do you have that in front of you?

Protected - Subject To Further Protective Review

1    A.   I do.

2    Q.   And do you see that it's -- there's yellow

3 highlighting under the -- underneath Commenter, and

4 that's your name, correct?

5    A.   Yes, sir.

6    Q.   And the date is indicated as June 6th,

7 2015 -- June 16th?

8    A.   June 16, yes, sir.

9    Q.   June 16, 2015.  And it's correct that this

10 is an accurate copy of a comment that you submitted

11 to the Centers for Medicare, correct?

12   A.   Yes, sir.

13   Q.   This was submitted just a few weeks after

14 you had evaluated Mr. Boudreaux for the LARIAT

15 procedure, correct?

16   A.   I believe that's correct, yes, sir.

17   Q.   And you evaluated him on -- in April of

18 2015, and this is just two months later?

19   A.   Yes, sir.

20   Q.   Why did you write to Medicare?

21   A.   This was a forum that was put forward by

22 SentreHeart, which was the company that produces the

23 LARIAT device, and asking those physicians who

24 performed the procedure to comment on the coverage

25 decision for the Medicare patients.

---

Protected - Subject To Further Protective Review

1 patients who cannot be anticoagulated, the Watchman

2 is not applicable.

3    Q.   Is not applicable.

4    So for the patients that cannot be

5 anticoagulated, the Watchman is not an option, and

6 the only option for those patients would be the

7 LARIAT procedure?

8    A.   The Watchman could be used in an off

9 label, just like the LARIAT is.  So it's not

10 indicated.  So you could use the Watchman in a

11 different manner, as -- the same as the LARIAT.  So

12 both could be done, just I think the LARIAT probably

13 offers you a little bit better closure.

14   Q.   Now, is Mr. Boudreaux one of the patients

15 that you had in mind when you write to the Centers

16 for Medicare about patients for whom anticoagulation

17 is contraindicated, and they are, your words, quote,

18 left with no other option other than the LARIAT

19 procedure?

20   A.   Not him specifically, but, yes, patients

21 like him.

22   Q.   Patients that have his type of condition?

23   A.   Yes, sir.

24   Q.   And, Dr. Fail, because Mr. Boudreaux could

25 not tolerate any type of oral anticoagulant

---

Protected - Subject To Further Protective Review

1    Q.   In other words, you were writing to urge

2 the Centers for Medicare to reimburse patients or

3 cover -- provide insurance coverage for patients

4 that needed this type of procedure; is that correct?

5    A.   That's correct, sir.

6    Q.   I yellow-highlighted the first couple of

7 sentences.  Could you read those aloud, please?

8    A.   As a practicing interventional

9 cardiologist, I am writing in support of the

10 national coverage decision being applicable to both

11 the Watchman and the LARIAT.  LAA closure, LAAC, is

12 an important option for patients that may be

13 noncompliant or -- but eligible with Coumadin

14 therapy in the Watchman and, more importantly,

15 contraindicated to anticoagulation and left with no

16 other option, the LARIAT.

17   Q.   So the Watchman would be a procedure that

18 closes or blocks the left atrial appendage, but the

19 Watchman still requires that patients be able to

20 take anticoagulation therapy; is that right?

21   A.   So the trial was designed that the

22 patient, after they had the Watchman placed, they

23 went back on anticoagulation therapy.  So the

24 indication is for those patients who choose not to

25 be anticoagulated and can go under Watchman.  Those

---

Protected - Subject To Further Protective Review

1 medication, his only option to prevent strokes was

2 the LARIAT procedure, even though that procedure had

3 certain risks and was not approved by the FDA for

4 that purpose?

5    A.   I believe --

6    MR. GOZA:  Object to form.

7    A.   I believe so, yes, sir.

8 BY MR. SLONIM:

9    Q.   Let's go back to that exhibit that we had

10 looked at on April 27th.  That is Exhibit #5.  Yeah.

11   So, Dr. Fail, I put up on the screen, and

12 you should have in front of you, Exhibit #5.

13   A.   Yes, sir.

14   Q.   So this is your note again of April 27,

15 2015, when you saw Mr. Boudreaux.  Your note states

16 that Mr. Boudreaux was, and I quote, unable to

17 tolerate anticoagulation due to recurrent GI bleeds.

18   At the time that you saw Mr. Boudreaux on

19 April 27th, 2015, had he fully recovered from his GI

20 bleed that he had experienced more than a year

21 earlier?

22   A.   It is my assumption, yes, sir.

23   Q.   In other words, he did not have any

24 lingering or permanent damage to his GI tract from

25 his bleed; is that correct?

Protected - Subject To Further Protective Review

```
 1      A.   Not that I'm aware of, no, sir.
 2      Q.   And, more specifically, Xarelto did not
 3 cause, in your opinion, Mr. Boudreaux to sustain any
 4 lingering or permanent damage to his GI tract?
 5           MR. GOZA:  Object to foundation.
 6 BY MR. SLONIM:
 7      Q.   Is that correct?
 8      A.   None that I'm aware of.
 9      Q.   And Xarelto did not make Mr. Boudreaux
10 allergic or sensitive to other types of oral
11 anticoagulants, correct?
12      A.   None that I'm aware of.
13      Q.   Xarelto did not make Mr. Boudreaux extra
14 sensitive or extra susceptible to GI bleeding in the
15 future, did it?
16      A.   Not that I'm aware of, no, sir.
17      Q.   In other words, insofar as Mr. Boudreaux
18 had an underlying propensity to GI bleeding when
19 administered an anticoagulant, he had that as a
20 baseline risk, but Xarelto did not do anything to
21 exacerbate or intensify that baseline risk, correct?
22           MR. GOZA:  Object to form and
23           foundation.
24      A.   I don't think Xarelto changed his risk, if
25 I got that question right.
```

Protected - Subject To Further Protective Review

```
 1 BY MR. SLONIM:
 2      Q.   Yes.  At the time that you and Dr. Timothy
 3 were seeing Mr. Boudreaux in 2014 and 2015, there
 4 were several types of anticoagulants on the market.
 5 That would include Pradaxa, Eliquis and warfarin,
 6 which is also known as Coumadin, correct?
 7      A.   Correct.
 8      Q.   But your concern and Dr. Timothy's concern
 9 was that Mr. Boudreaux could not tolerate any of
10 those available oral anticoagulants; is that
11 correct?
12           MR. GOZA:  Object to form.
13      A.   I can't speak to Dr. Timothy's concern.
14 BY MR. SLONIM:
15      Q.   Fair to say that your --
16      A.   He was -- he was -- so he was referred to
17 me after the GI bleed specifically for this
18 procedure, and, therefore, my assumption was that
19 Dr. Timothy did have a concern about putting him on
20 other anticoagulations.
21      Q.   And you know that Mr. Boudreaux, in fact,
22 had been not protected by anticoagulation therapy
23 for more than a year --
24      A.   That's correct.
25      Q.   -- even though he was in atrial
```

Protected - Subject To Further Protective Review

```
 1 fibrillation and at a substantially increased risk
 2 of stroke during that period of time, correct?
 3           MR. GOZA:  Object to the form.
 4      A.   That is correct.
 5 BY MR. SLONIM:
 6      Q.   And, Dr. Fail, your own personal concern
 7 in April of 2015, at the time you were assessing
 8 Mr. Boudreaux for the LARIAT procedure, was that he
 9 would be unable to tolerate a medication like
10 Pradaxa or Eliquis or warfarin; is that right?
11      A.   I'm not sure that we discussed other
12 alternatives, specifically medication.  It was my
13 belief that his primary care cardiologist had
14 already done that and had gone down that road, and
15 that's why he was being referred to me.
16      Q.   Because Mr. Boudreaux was not able to take
17 any type of anticoagulant, and because he was at a
18 high risk of stroke, and based on his imaging
19 studies, Dr. Fail, you felt that the LARIAT
20 procedure would be a good option; is that correct?
21      A.   That is --
22           MR. GOZA:  Object to form.
23      A.   That is correct.
24 BY MR. SLONIM:
25      Q.   Would you turn, please, to the last page
```

Protected - Subject To Further Protective Review

```
 1 of Exhibit #5.  Let me put that on the screen, as
 2 well.  These are your notes regarding his admission,
 3 diagnosis and your plan for treatment; is that
 4 correct?
 5      A.   That is correct.
 6      Q.   Would you please read your plan for
 7 treatment?  So I put it in the red box, and it would
 8 be the second portion of it.
 9      A.   I see.  So arrange for a TEE on May 6th,
10 2015, with Dr. Engeron and then LARIAT on -- that
11 probably should be the 11th.  Should be May,
12 probably 11/15.  Risks versus benefits discussed in
13 detail.  Patient verbalizes understanding and agrees
14 to proceed.
15      Q.   Now, the TEE, that refers to a
16 transesophageal echocardiogram?
17      A.   That is correct.
18      Q.   And that's an imaging technique that
19 enables you to visualize the cardiac anatomy,
20 correct?
21      A.   That is correct.
22      Q.   And that's one of the techniques that you
23 use to assess whether or not Mr. Boudreaux
24 anatomically would be a suitable patient for the
25 LARIAT procedure?
```

Protected - Subject To Further Protective Review

1    A.    In this case, it was designed to see if
2  Mr. Boudreaux had a clot in his left atrial
3  appendage would prohibit us from doing anything.
4    Q.    Okay.  And based on the examination and
5  imaging studies, you determined that Mr. Boudreaux
6  would be a suitable candidate; is that correct?
7    A.    That is correct.
8    Q.    And the sentence that's in the middle
9  indicates that you had a discussion with the --
10  about the risks and benefits in detail with
11  Mr. Boudreaux; is that correct?
12    A.    That is correct.
13    Q.    Did you tell him that medication was not a
14  good option because he was not able to tolerate
15  anticoagulation?
16    A.    I'm not sure I had that exact terminology.
17  I think that was an assumed that he had already gone
18  through that.
19    Q.    Did you tell him that he needed treatment,
20  something to treat his atrial fibrillation, because
21  without treatment, he was at a very high risk of
22  stroke?
23    A.    I think we discussed the risk of doing
24  nothing versus the risk of doing something, yes,
25  sir.

Protected - Subject To Further Protective Review

1  patient throwing a clot?
2    A.    Yes, sir.
3    Q.    And so Mr. Boudreaux could not tolerate
4  oral anticoagulants, so cardioverting him would be a
5  problem absent the LARIAT; is that right?
6    A.    Before the LARIAT.
7    Q.    Before the LARIAT.
8    A.    Yes, sir.
9    Q.    But if the LARIAT procedure were
10  successful and you occluded the left atrial
11  appendage, then you felt that you would have at
12  least the option of cardioverting without the need
13  for oral anticoagulation because the risk of a clot
14  would be largely eliminated because of the blockage
15  of the left atrial appendage?
16    A.    That is correct.
17    Q.    That's the idea, right?
18    A.    Yes, sir.
19    Q.    Rather than the LARIAT procedure and
20  rather than oral anticoagulants, could you have done
21  something like increased his dosage of aspirin or
22  prescribed an anti-platelet agent, like Plavix, to
23  protect Mr. Boudreaux from strokes?
24    A.    It's not been shown to be effective.
25    Q.    So, in other words, aspirin and Plavix are

Protected - Subject To Further Protective Review

1    Q.    Did Mr. Boudreaux tell you that he
2  understood the risks and the benefits of the
3  procedure and that he would agree to proceed with
4  the LARIAT?
5    A.    I believe he did, yes, sir.
6    Q.    Did Mr. Boudreaux express any aversion to
7  taking oral anticoagulant medications?
8    A.    Not specifically, no, sir.
9    Q.    Was it part of your plan at this time, in
10  April of 2015, to cardiovert Mr. Boudreaux?
11    A.    It was not.
12    Q.    And can you tell us why?  Because the
13  LARIAT procedure does not correct the underlying
14  atrial disturbance in the rhythm, correct?
15    A.    That is correct.  That is correct.  Our
16  plan was to exclude the left atrial appendage,
17  reevaluate him to make sure that it was completely
18  excluded at six months, and then come back and
19  possibly cardiovert him at that point.
20    Q.    So cardioversion remained an option?
21    A.    That is correct.
22    Q.    And so, if I understood correctly,
23  cardioversion requires either anticoagulation or the
24  equivalent in this case, the LARIAT, because the
25  cardioversion procedure would run a risk of a

Protected - Subject To Further Protective Review

1  prescribed to treat some forms of cardiovascular
2  disease, ischemic cardiovascular disease, but they
3  have not shown -- been shown to be effective in
4  preventing strokes in patients like Mr. Boudreaux
5  with atrial fibrillation; is that --
6    A.    That's correct.
7    Q.    Another question I have for you about
8  Mr. Boudreaux.  Based on his EKGs, did he have a
9  history of prior heart attack, prior MI?
10    A.    I don't -- I don't recollect.
11    (Deposition Exhibit #10 was marked for
12            identification.)
13    Q.    I've marked as Deposition Exhibit No. 10
14  the informed consent.  If you turn to page 2, it
15  indicates it was dated on April 27th, 2015?
16    A.    That is correct.
17    Q.    See that?
18    A.    Yes, sir.
19    Q.    Can I ask you to -- she's getting that in
20  focus.
21    A.    Uh-huh.
22    Q.    I put a red box around the top of the
23  informed consent.
24    A.    Yes, sir.
25    Q.    And could I ask you to read that aloud,

1  the contents inside the red box, please?

2      A.   Consent for surgery or treatment and

3  acknowledgment of receipt of medical information.  I

4  hereby authorize Peter Fail, M.D. and/or assistants

5  as may be selected by said physician to treat the

6  following conditions:  Atrial fibrillation.  The

7  procedures planned for treatment of my condition

8  have been explained to me by my physician and are

9  listed below.  Left atrial appendage ligation, a

10 procedure that places a suture around the bottom

11 pouch of the appendage.  The purpose is to cut off

12 blood flow to the appendage and prevent blood clots

13 from forming inside the appendage.

14     Q.   Does this informed consent, and

15 specifically the language that you read, accurately

16 describe the LARIAT procedure, the purpose of the

17 procedure, and the risks associated with the

18 procedure?  I guess the risks associated with the

19 procedure below, so --

20     A.   Yes, sir.

21     Q.   Let me rephrase that question.

22          Does the informed consent document and the

23 portion that you read accurately describe the LARIAT

24 procedure, the purpose of -- and the purpose of the

25 procedure?

---

1  condition and possible bypass surgery.  Future risks

2  identified by my physician to me because of

3  complicating medical conditions are.  I certify that

4  these three pages forms have been explained to me

5  and that I have read them and I have had -- or I

6  have had it read to me, and I understand its

7  consent.

8      Q.   Now, did Mr. -- and then it's signed and

9  witnessed; is that correct?

10     A.   That is correct.

11     Q.   Did Mr. Boudreaux affirmatively state, as

12 evidenced by his signature, that he received and

13 understood the information set forth in the informed

14 consent?

15     A.   That is my understanding, yes, sir.

16     Q.   And Mr. Boudreaux signed this informed

17 consent on April 27th, 2015, at 3:20 p.m.?

18     A.   I believe that's his signature, yes, sir.

19     Q.   And that's the date and time stamped?

20     A.   Yes, sir.

21         (Deposition Exhibit #11 was marked for

22                    identification.)

23     Q.   I've marked as Deposition Exhibit #11 the

24 operative report dated May 11th, 2015.  Do you have

25 that in front of you?

---

1      A.   It does.

2      Q.   And the bottom of the document -- and let

3  me pull that up on the screen -- that goes on to

4  describe in detail the risks that are associated

5  with the procedure, correct?

6      A.   That's correct.

7      Q.   And are those risks accurately described?

8      A.   Yes, sir.  There's more of a generic that

9  happens in all interventional procedures.

10     Q.   But the risks of the LARIAT procedure

11 would include a risk of death; is that right?

12     A.   That is true.

13     Q.   A risk of brain damage?

14     A.   Yes, sir.

15     Q.   Stroke?

16     A.   Yes, sir.

17     Q.   And numerous other serious risks?

18     A.   Yes, sir.

19     Q.   Okay.  Let's turn, please, to page 2 of

20 the informed consent.

21          Would you please read the bottom that's

22 put in the red box?  Read that aloud, please.

23     A.   Alternative therapy:  Medical therapy with

24 only medication or treatment -- or no treatment

25 could contribute to the worsening of the heart

---

1      A.   I do.

2      Q.   Is this your operative report concerning

3  the LARIAT procedure that you performed on

4  Mr. Boudreaux?

5      A.   Yes, sir, it is.

6      Q.   And I yellow-high -- I highlighted in red

7  boxes some of the sections I want to talk about.

8  But going down about halfway on the first page,

9  there's a section entitled, "Procedure in Detail."

10 Do you see that?

11     A.   I do.

12     Q.   Does that describe pretty much step by

13 step the actual LARIAT procedure that you performed

14 on May 11th on Mr. Boudreaux?

15     A.   Yes, sir.

16     Q.   Now, going up to the section that's

17 entitled, "History," that's the second red box; do

18 you see that?

19     A.   Yes, sir.

20     Q.   That indicates that Mr. Boudreaux had

21 something called a CHADs-VASc score of 4, correct?

22     A.   That's correct.

23     Q.   CHADS-VASc is a numerical scoring system

24 that quantifies a patient's risk of stroke if

25 they're not treated with oral anticoagulants or some

Protected - Subject To Further Protective Review

1  other means of preventing stroke; is that correct?

2      A.   That is correct.

3      Q.   And the CHADS-VASc score of 4 is based on

4  Mr. Boudreaux's age -- that counts as one -- his

5  congestive heart failure, his diabetes and his

6  hypertension, correct?

7      A.   Yes, sir.

8      Q.   And that adds to the score of 4?

9      A.   Yes, sir.

10     Q.   And that means that if he were untreated,

11 he was at a high risk of having a stroke, correct?

12     A.   Correct.

13         MR. GOZA:  Object to the form.

14 BY MR. SLONIM:

15     Q.   The note also indicates that Mr. Boudreaux

16 had a history of GI bleeding and was a poor

17 candidate for oral anticoagulation because he had a

18 problem tolerating that type of therapy, correct?

19     A.   That is my assumption, yes.  Yes, sir.

20     Q.   Well, and that's --

21     A.   That's what we say, yes, sir.

22     Q.   Yes.  And I quote, he was felt to be a

23 poor candidate for long-term anticoagulation

24 therapy, correct?

25     A.   Correct.

---

Protected - Subject To Further Protective Review

1      A.   Yes, sir.

2      Q.   Do you know what caused the pericardial

3  effusion?

4      A.   Usually, irritation of the pericardium

5  secondary to the procedure itself.

6      Q.   So, in other words, the procedure itself

7  can cause an irritation, and that irritation can

8  cause the buildup of fluid around the heart?

9      A.   That is correct.

10     Q.   He was treated for that; is that correct?

11     A.   Yes, sir.

12     Q.   Was the treatment for the pericardial

13 effusion effective?

14     A.   Yes, sir.

15     Q.   One of the things that I noted in this

16 record -- I think it's on the -- towards the end,

17 page 5 of 6.

18     A.   I have it.

19     Q.   Yeah.  Indicates that you started him on a

20 drug called Aldactone, 12.5 milligrams daily; is

21 that correct?

22     A.   That is correct, sir.

23     Q.   What was the reason that you started

24 Mr. Boudreaux on Aldactone?

25     A.   Heart failure.

---

Protected - Subject To Further Protective Review

1      Q.   And before that, it notes that he had a

2  history of GI bleed, correct?

3      A.   Yes, sir.

4      Q.   The LARIAT procedure was successful,

5  correct?

6      A.   That's true, yes, sir.

7      Q.   And Mr. Boudreaux initially did well, but

8  several months later did develop some pericardial

9  effusions -- that's fluid around the heart -- that

10 needed treatment, correct?

11     A.   That is correct.

12     Q.   This is a medical record dated September

13 16th, 2015, that we've marked as Deposition Exhibit

14 #12.

15     (Deposition Exhibit #12 was marked for

16             identification.)

17         Do you have that in front of you?

18     A.   I do.

19     Q.   And this indicates that it's a follow-up

20 note for Mr. Boudreaux, correct?

21     A.   That is correct.

22     Q.   And this indicates that he underwent the

23 procedure, the LARIAT procedure, did well initially,

24 but then had some symptoms that indicated that he

25 had a pericardial effusion, correct?

---

Protected - Subject To Further Protective Review

1      Q.   Now, he had previously been on a higher

2  dose of Aldactone prior to the LARIAT procedure; is

3  that correct?

4      A.   I believe that's true, yes, sir.

5      Q.   Can you tell us what your thinking was in

6  regard to prescribing him the lower dose of

7  12-and-a-half milligram?

8      A.   I'm not sure why he was stopped

9  originally, why he was stopped at all, and then I

10 think on him, with a blood pressure of 122, just to

11 get him back on his Aldactone.

12     Q.   So Aldactone was designed to help treat

13 the congestive heart failure symptoms that he was

14 experiencing?

15     A.   Yes, sir.

16     Q.   So, in other words, it's fair to say that

17 Mr. Boudreaux had other cardiac disease and symptoms

18 besides the atrial fibrillation, correct?

19     A.   That is true, yes, sir.

20     Q.   And he had hypertension, correct?

21     A.   Yes, sir.

22     Q.   He had congestive heart failure, correct?

23     A.   Yes, sir.

24     Q.   That's when the heart is not pumping

25 efficiently?

1    A.   Yes, sir.

2    Q.   He had some ischemic heart disease; is

3  that right?

4    A.   I believe it was non-ischemic.

5    Q.   Non-ischemic?

6    A.   I believe it was non-ischemic.

7    Q.   Did he have cardio -- did he have

8  cardiomyopathy?

9    A.   He had cardiomyopathy, yes, sir.

10    Q.   And cardiomyopathy is when the muscle is

11  damaged?

12    A.   Yes, sir.

13    Q.   Could the pericardial effusion have been

14  related to the congestive heart failure?

15    A.   Unlikely, but possible.

16    Q.   One of the consequences and symptoms of

17  congestive heart failure can be a buildup of fluid

18  around the heart; is that correct?

19    A.   That is true.

20       (Deposition Exhibit #13 was marked for

21            identification.)

22    Q.   We've marked as Deposition Exhibit #13 a

23  medical record dated November 10th, 2015.  Do you

24  have that in front of you?

25    A.   I do.

---

1    Q.   So this is now about six months after the

2  LARIAT procedure; is that right?

3    A.   That is correct.

4    Q.   And it's about two months after the record

5  that noted that he was -- had -- was being treated

6  for and had recovered from the pericardial

7  effusions, correct?

8    A.   That is correct.

9    Q.   And according to the record, and I put a

10  red box around it, Mr. Boudreaux was doing well at

11  this time; is that correct?

12    A.   Yes, sir.

13    Q.   That was your assessment based on a

14  physical --

15    A.   Yes, sir.

16    Q.   -- exam?

17    A.   Yes, sir.

18    Q.   In your opinion, had he recovered from his

19  pericardial effusion at this time?

20    A.   Yes, sir.

21       (Deposition Exhibit #14 was marked for

22            identification.)

23    Q.   We've marked as Deposition Exhibit #14 a

24  medical record dated March 24th, 2016.  Do you have

25  that in front of you?

---

1    A.   I do.

2    Q.   And this is another visit, a progress note

3  for Mr. Boudreaux, correct?

4    A.   Yes, sir.

5    Q.   And this represents a new complaint, new

6  symptoms; is that right?

7    A.   Yes, sir.

8    Q.   According to the record, Mr. Boudreaux

9  came to your office complaining of sudden onset of

10  chest pain and shortness of breath when exercising;

11  is that correct?

12    A.   Yes, sir.

13    Q.   Did you diagnose a cause for that

14  condition?

15    A.   I believe we did an echo at that point, an

16  EKG, and did some lab work.

17       (Deposition Exhibit #15 was marked for

18            identification.)

19    Q.   We've marked as Deposition Exhibit #15 a

20  follow-up note to that visit a few weeks earlier.

21  This one is dated April 26th, 2016.  Do you have

22  that in front of you?

23    A.   I do.

24    Q.   This indicates that Mr. Boudreaux had a

25  low ejection fraction noted at 20 percent; is that

---

1  correct?

2    A.   Yes, sir.

3    Q.   Does that indicate that the heart --

4  Mr. Boudreaux's heart was not working efficiently?

5    A.   Yes, sir.

6    Q.   What was the cause of the low ejection

7  fraction?

8    A.   I believe it was non-ischemic

9  cardiomyopathy.

10    Q.   Does atrial fibrillation contribute to

11  that?

12    A.   That was the assumption in this note, yes,

13  sir.

14    Q.   And the problem with -- one of the

15  problems or consequences of atrial fibrillation is

16  that the rhythm of the heart is disturbed so the

17  pump is not as efficient as a heart that's in normal

18  sinus rhythm, correct?

19    A.   That is the thought, yes, sir.

20    Q.   And so -- and one of the consequences can

21  be is that when the heart is pumping efficiently, a

22  lot of blood gets pumped through the aorta into the

23  body, correct?

24    A.   Yes, sir.

25    Q.   But when you have atrial fibrillation,

Protected - Subject To Further Protective Review

1    only a small fraction of that blood may get pumped
2    into the body, correct?
3        A.    Yes, sir.
4        Q.    And that can result in a patient
5    experiencing physical symptoms apart from the risk
6    of clots, correct?
7        A.    That is correct.
8        Q.    So even though the LARIAT procedure was
9    successful in closing the left atrial appendage and
10   reducing the risk of stroke, Mr. Boudreaux still had
11   persistent heart problems because of his atrial
12   fibrillation and his other underlying cardiac
13   diseases, correct?
14       A.    That is the assumption, yes, sir.
15       Q.    At this time, your plan was to give him a
16   drug called amiodarone, correct?
17       A.    Yes, sir.
18       Q.    And amiodarone is a medication that can
19   help improve the heart rhythm, correct?
20       A.    Yes, sir.
21       Q.    And your plan was further to schedule him
22   for a procedure called a cardioversion; is that
23   right?
24       A.    Yes, sir.
25       Q.    And we've talked a little bit about that,

Protected - Subject To Further Protective Review

1    but can you tell us what a cardioversion is?
2        A.    It's basically giving him an electrical
3    shock in order to try to reset the entire rhythm.
4        Q.    So the idea is you give the heart a jolt?
5        A.    Yes, sir.
6        Q.    With electrical paddles?
7        A.    Yes, sir.
8        Q.    And that may cause the heart to
9    spontaneously re --
10       A.    Reset.
11       Q.    -- restore, reset itself back to a more
12   normal sinus rhythm?
13       A.    That is correct.
14       (Deposition Exhibit #16 was marked for
15             identification.)
16       Q.    We've marked as Deposition Exhibit #16 the
17   informed consent for the cardioversion procedure,
18   and this is dated on the bottom June 6th, 2016; is
19   that correct?
20       A.    That is correct.
21       Q.    Does this informed consent document
22   accurately describe the cardioversion procedure, the
23   purpose of the procedure and the risks that are
24   associated with the procedure?
25       A.    I believe it does, yes, sir.

Protected - Subject To Further Protective Review

1        Q.    And the risks that are listed on this
2    document sort of in the middle of the page, these
3    would include the risk of death, brain damage,
4    stroke and other serious risks; is that correct?
5        A.    Yes, sir.
6        Q.    And then on the bottom -- bottom of the
7    page, did Mr. Boudreaux affirmatively state that he
8    understood the information set forth in the informed
9    consent and that he agreed to proceed with the
10   cardioversion?
11       A.    It is my assumption, yes, sir.
12       Q.    Well, you recognize his signature --
13       A.    I do.
14       Q.    -- on the bottom of the document, correct?
15       A.    Yes, sir.
16       Q.    And does that indicate that Mr. Boudreaux
17   signed the informed consent on June 6th, 2016, at
18   9:45 in the morning?
19       A.    It does, yes, sir.
20       Q.    And by the way, the informed consent,
21   specifically, the authorization is to you
22   personally, correct?
23       A.    Yes, sir.
24       Q.    I hereby authorize Dr. Fail?
25       A.    Yes, sir.

Protected - Subject To Further Protective Review

1        (Deposition Exhibit #17 was marked for
2             identification.)
3        Q.    Let's see if I can blow this up a little
4    bit.
5        Dr. Fail, we've marked as Deposition
6    Exhibit #17 -- I'm going to try to get this better
7    on the screen -- a medical record dated June 7th,
8    2016.  Do you have that in front of you?
9        A.    I do.
10       Q.    And under the discharge summary, there's a
11   section that's in a red box entitled, "Summary."
12   Could you please read that aloud to us?
13       A.    74-year-old white male with a past medical
14   history of permanent atrial fibrillation status post
15   LARIAT secondary --
16       Q.    Dr. Fail, the court reporter has to get it
17   down and --
18       A.    I apologize.
19       Q.    -- most of us are not doctors, so --
20       A.    74-year-old white male with a past medical
21   history of permanent atrial fib status post LARIAT
22   secondary to recurrent GI bleed on anticoagulation.
23   Hypertension, non-ischemic cardiomyopathy, chronic
24   systolic heart failure/left ventricular systolic
25   dysfunction, ejection fraction 20 percent.  Post

```
 1    LARIAT he developed pericardial effusion requiring
 2    pericardialcentesis.  An echocardiogram was repeated
 3    post pericardialcentesis to assess for recurrent
 4    pericardial effusion.  Ejection fraction 20 percent
 5    without pericardial effusion.  EF decreased likely
 6    secondary to AFib.  Amiodarone started for Afib with
 7    plans of future cardioversion.  The patient is
 8    tolerating amiodarone, ready for cardioversion.
 9    Status post successful cardioversion.  Family at
10    bedside.  Patient awake and alert.
11        Q.   So that is a very technical and succinct
12    summary of Mr. Boudreaux's medical course up to and
13    immediately after the cardioversion, correct?
14        A.   That is correct.
15        Q.   And some of the pertinent facts are that
16    Mr. Boudreaux underwent the LARIAT procedure because
17    he was unable to be treated with anticoagulants
18    because of GI bleeding problems, correct?
19        A.   That is correct.
20        Q.   After that, he did develop these
21    pericardial effusions, but those were treated
22    successfully; the fluid was just drained, and those
23    problems resolved, correct?
24        A.   Yes, sir.
25        Q.   But then he had a problem with his
```

```
 1        Q.   So, in other words, it corrected the
 2    cardiac rhythm disorder, the atrial fibrillation, at
 3    its root, correct?
 4        A.   Yes, sir.
 5        Q.   And it made Mr. Boudreaux's heart pump
 6    more efficiently, correct?
 7        A.   That is my assumption, yes, sir.
 8        (Deposition Exhibit #18 was marked for
 9             identification.)
10        Q.   We've marked as Deposition Exhibit #18 a
11    medical record a couple of weeks later.  It's dated
12    June 22nd, 2016.  Do you have that in front of you?
13        A.   I do.
14        Q.   So this is a follow-up visit that occurs
15    about two weeks after the cardioversion, correct?
16        A.   That is correct.
17        Q.   And according to this record,
18    Mr. Boudreaux was doing well, and his heart was
19    working better; is that right?
20        A.   That is my assumption, yes, sir.
21             MR. SLONIM:  The videographer tells me
22        that we've only got a couple of minutes
23        left on the tape, so let's use this as a
24        short break, and we're almost done.
25             THE VIDEOGRAPHER:  This is the end of
```

```
 1    ejection fraction.  His heart was not pumping
 2    efficiently.  It was only pumping 20 percent of the
 3    blood out of his left ventricle, correct?
 4        A.   That is correct.
 5        Q.   And that's a problem because you need more
 6    blood, correct?
 7        A.   Yes, sir.
 8        Q.   And you felt that the left ejection
 9    fraction was -- that the ejection fraction was
10    decreased because of that persistent atrial
11    fibrillation, correct?
12        A.   That was my assumption, yes, sir.
13        Q.   So even though the LARIAT had
14    successfully, hopefully, reduced the risk of stroke,
15    he still had this underlying problem with his
16    cardiac rhythm that was causing this reduced
17    ejection fraction, and so you wanted to do the
18    cardioversion procedure to try to improve that,
19    correct?
20        A.   That is correct.
21        Q.   And you performed the cardioversion
22    procedure on June 6th, 2016, and the following day
23    you assessed that it was a successful procedure,
24    correct?
25        A.   That is correct.
```

```
 1             Tape 1.  We're now off the record at 6:29.
 2    (Recess.)
 3             THE VIDEOGRAPHER:  We're now back on
 4        the record at 6:38.  Wait.  We need to go
 5        off, 6:38.
 6             We're now back on the record at 6:38.
 7    BY MR. SLONIM:
 8        Q.   Dr. Fail, when we just broke, we were
 9    discussing a medical record following up on the
10    cardioversion procedure.  The last record, I
11    believe, that we have from your files concerning
12    Mr. Boudreaux date from June 2016, so that's about
13    three months ago.  Do you still continue to see and
14    treat Mr. Boudreaux?
15        A.   Yes, sir.
16        Q.   When was the last time you saw him?
17        A.   I believe this is it here, sir.
18        Q.   Okay.  So this is the most recent record?
19        A.   Yes, sir.
20        Q.   Based on that record and your assessment
21    of his status, can you tell us what his current
22    cardiac status is?  How would you describe him?
23        A.   Based on this, I believe he was improving
24    after the cardioversion.
25        Q.   Is it fair to say that he actually was in
```

Protected - Subject To Further Protective Review

```
 1   a better state than he was in January of 2014, at
 2   the time he was first diagnosed with atrial
 3   fibrillation?
 4        A.   My assumption would be yes, sir.
 5        Q.   And that's because the risk of blood clot
 6   had been minimized to prevent it with the LARIAT
 7   procedure and because the cardioversion was
 8   successful in restoring him back to normal sinus
 9   rhythm?
10        A.   Correct.
11        Q.   And because his ejection fraction had
12   improved, and that helped relieve some of the
13   congestive heart failure symptoms?
14        A.   That, we're not aware of.  He was supposed
15   to come back for a repeat echo, so we're not aware
16   that his ejection -- that was -- the note here would
17   say, repeat echo in three months after the
18   cardioversion.
19        Q.   Okay.  So he's due in imminently, then?
20        A.   Yes, sir.
21        Q.   Do you know if he's scheduled that
22   appointment?
23        A.   That, I do not know.
24        Q.   Insofar as Mr. Boudreaux had GI bleeding
25   prior to the time that you first saw him in April
```

Protected - Subject To Further Protective Review

```
 1   audience of fellow cardiologists to, in part, teach
 2   them about the LARIAT procedure, correct?
 3        A.   Yes, sir.
 4        Q.   And the two images on the lower right,
 5   those are actually radiographic images of the
 6   LARIAT, correct?
 7        A.   That is correct.
 8        Q.   And the box that -- in the lower left
 9   that's opaque, it's black in this particular slide,
10   that you told us was actually a computer animation
11   that showed and illustrated the LARIAT procedure; is
12   that correct?
13        A.   That is correct.
14        Q.   I've marked as Deposition Exhibit #18 a
15   computer animation that I've handed to Mr. Goza, and
16   I am going to put it on the screen and show it to
17   you, and I'm going to let the animation run in its
18   entirety.  It runs 1 minute and 15 seconds.  And I'd
19   like you to watch that video and tell us if it is
20   the animation that you presented.
21        A.   Okay.
22        Q.   I was just advised I misdesignated the
23   exhibit number.  This -- the animation is Exhibit --
24        A.   19.
25        Q.   -- #19.
```

Protected - Subject To Further Protective Review

```
 1   2015, he has fully recovered from that bleeding
 2   event, correct?
 3        A.   As far as I know, yes, sir.
 4        Q.   And, medically, he does not have any
 5   lingering effects or limitations that are
 6   attributable to his GI bleed that occurred prior to
 7   the LARIAT procedure; is that correct?
 8             MR. GOZA:  Object; foundation.
 9        A.   None that I'm aware of, sir.
10   BY MR. SLONIM:
11        Q.   And to the extent that Mr. Boudreaux
12   currently today has health issues, are they
13   attributable to his underlying medical conditions
14   rather than to the GI bleed that he had prior to
15   20 -- to April 2015?
16             MR. GOZA:  Object to form.
17        A.   That is my assumption, yes, sir.
18   BY MR. SLONIM:
19        Q.   Dr. Fail, I want to go back to Deposition
20   Exhibit #8.  It's slide 51.  I'll show it to you.
21   You don't need to -- I don't think we need to pull
22   them out.  I can put it on the --
23        A.   Yes, sir.
24        Q.   So this is a PDF file, so it's a -- just a
25   still image of a presentation that you gave to an
```

Protected - Subject To Further Protective Review

```
 1        A.   Yes, sir.
 2             (Deposition Exhibit #19 was marked for
 3                  identification.)
 4        Q.   I handed Mr. Goza a flash drive with the
 5   animation, and we're going to project it on the
 6   screen, and the first thing I just want you to do is
 7   watch the animation in its entirety and tell us if
 8   this is the animation that you presented.
 9             MR. GOZA:  I just object to
10             foundation.
11             (Animation played.)
12   BY MR. SLONIM:
13        Q.   So, Dr. Fail, the question is, is that the
14   video that you presented?
15        A.   I believe it is, yes, sir.
16        Q.   And, Dr. Fail, can you tell us, is that
17   computer animation which you presented to
18   cardiologists in August of this year, 2016, is that
19   a fair and accurate depiction of the LARIAT
20   procedure that you performed on Mr. Boudreaux on --
21   in April of 2015 -- May of 2015?
22        A.   Yes, sir, it is.
23        Q.   And that's the procedure that's described
24   more fully in detail in your operative report that
25   we had previously marked as an exhibit?
```

1    A.   Yes, sir, it is.

2    Q.   What I'd like to do is go back and replay

3  this animation, and we'll stop it from time to time,

4  and I'll ask you to describe what's being depicted.

5    A.   Yes, sir.

6    Q.   So let's stop right here.  Can you tell us

7  what's being shown on the still?

8    A.   So you have a animation of a heart, and on

9  your lower right-hand -- lower right-hand portion,

10  you have a catheter that is in the intrapericardial

11  space.

12    Q.   And that is the blue --

13    A.   Yes, sir.

14    Q.   -- right over there?

15    A.   Yes, sir.

16    Q.   Now, you've described a left atrial

17  appendage.  Is that visualized on this --

18    A.   Yes, sir.  That is up about midway right

19  there.  Yes, sir.

20    Q.   Okay.  So the area that's being circled by

21  the cursor --

22    A.   That is correct, sir.

23    Q.   -- that's the left atrial appendage?

24    A.   Yes, sir.

25    Q.   This is the catheter that's being

---

1  introduced into the heart, correct?

2    A.   It is on top of the heart,

3  intrapericardial.

4    Q.   Okay.  So this is on the -- this is on the

5  exterior of the heart?

6    A.   That is correct.

7    Q.   Inside the sac?

8    A.   That is correct.

9    Q.   And there are actually two catheters that

10  have been used in this procedure?

11    A.   Yes, sir.

12    Q.   One that gets introduced into the heart

13  and the other that approaches the heart from the

14  exterior?

15    A.   That is correct.

16    Q.   And the catheter we're seeing now is the

17  catheter that's introduced to the heart from the

18  exterior?

19    A.   That is correct.

20    Q.   And when the animation runs, we're seeing

21  the heart beating, correct?

22    A.   That is correct.

23    Q.   And, again, that's the left atrial

24  appendage, and that's the catheter that was --

25  that's the catheter that's being introduced from the

---

1  exterior?

2    A.   That is correct.

3    Q.   Can you describe this cut-away section of

4  the heart?

5    A.   So this is basically the heart in a

6  cut-away section.  On the far left-hand side, you

7  have the right atrium.

8    Q.   This is the right atrium right over here?

9    A.   Yes, sir.  And then you have the tricuspid

10  valve below that.  You have the -- on the right --

11  excuse me -- on the right-hand side, you have the

12  left atrium, the left atrial appendage and the

13  mitral valve.

14    Okay.  So when we saw the

15  three-dimensional heart before, this is a cut-away

16  section; it's as if the heart was sliced laterally

17  and opened up?

18    A.   That is correct, yes, sir.

19    Q.   That's what we're seeing.  And just so

20  it's clear, the heart is divided into chambers, and

21  this is the -- this would be the right chamber, and

22  that would be the right atrium, correct?

23    A.   Yes, sir.

24    Q.   And this is the left chamber, and this is

25  the upper left chamber; it's the left atrium,

---

1  correct?

2    A.   That is correct.  Yes, sir.

3    Q.   That's the mitral valve down there?

4    A.   Yes, sir.

5    Q.   And this pouch-like structure off -- right

6  over here, that is what's called the left atrial

7  appendage, correct?

8    A.   That is correct.

9    Q.   And we're seeing the catheter approach

10  that from the outside of the heart, correct?

11    A.   Correct.

12    Q.   I'm going to continue with the animation.

13  Okay.  Now, can you tell us what's happening on the

14  left side of the heart?

15    A.   So this is a transseptal puncture going

16  from the right to the left with a catheter.  The

17  catheter now exits the right, goes into the left.

18    Q.   Okay.  So you've introduced a catheter

19  internally through a blood vessel -- through a blood

20  vessel in the leg into the heart; is that correct?

21    A.   That's correct.

22    Q.   And then you've threaded that blood vessel

23  all the way up from the leg into the right-hand side

24  of the heart; is that correct?

25    A.   That is correct.

Protected - Subject To Further Protective Review

1    Q.    Into the -- into the right atrium?

2    A.    Right, correct.

3    Q.    And then what you've got to do because

4  there's a septum, there's a muscular wall that

5  separates the right and left side of the heart, you

6  have to take the catheter and punch through that

7  septum, correct?

8    A.    You take a needle and do that, yes, sir.

9    Q.    And then you -- and then you introduce the

10 catheter into the left atrium?

11   A.    Correct.

12   Q.    Let's continue.  Okay.  Can you tell us

13 what's happening here?

14   A.    So this is a magnetic wire that goes from

15 that catheter into the furthest part of the left

16 atrial appendage itself.

17   Q.    So you get the catheter -- the main

18 catheter part way into the left atrium, and then you

19 extrude a magnetic wire that goes all the way across

20 the left atrium into the left atrial appendage; is

21 that --

22   A.    Correct.

23   Q.    And this tip at the end is magnetic,

24 correct?

25   A.    That is correct.

Protected - Subject To Further Protective Review

1    Q.    And the chest cavity is closed; this is

2  not a -- like, an open procedure?

3    A.    No, sir.

4    Q.    There is just very small openings that are

5  made to insert these instruments, these catheters,

6  correct?

7    A.    Yes, sir.

8    Q.    And you, at the same time, to sort of see

9  where you're being positioned, you have different

10 kinds of imaging tools available, correct?

11   A.    That is correct.

12   Q.    So you sort of know where the catheters

13 are at different points in the procedure; is that

14 right?

15   A.    Correct.

16   Q.    Now, you mentioned the balloon.

17   A.    Right there.

18   Q.    Can you tell -- so this is the balloon?

19   A.    Yes, sir.

20   Q.    So you introduce -- so you first run the

21 wire, and then you run this other portion of the

22 catheter that has a balloon, and when the balloon

23 gets positioned, it's inflated?

24   A.    Yes, sir.

25   Q.    And can you remind us again, what is the

Protected - Subject To Further Protective Review

1    Q.    And the idea of having a magnet is because

2  that has a -- that will have an attractive force

3  that will enable it to -- made up with this other

4  catheter that's being introduced from the exterior

5  of the heart, correct?

6    A.    There's a magnetic wire on the other side.

7  Yes, sir.

8    Q.    Good.  Let's continue on.  Now, can you

9  tell us what's being extruded now?

10   A.    So this is a balloon catheter that we use

11 as a marker to give us an idea where the ostium of

12 the left atrial appendage is when we do this under

13 TEE, because it's not clearly defined.  So the best

14 way for us to do that is actually blow up a balloon

15 that has some contrast, and you'll see the balloon

16 dilate in a second.  That lets us know if we're too

17 deep or not deep enough.

18   Q.    So the patient at this point is in the

19 cardio catheterization laboratory -- lab, correct?

20   A.    Yes, sir; yes, sir.

21   Q.    The patient, of course, is under

22 anesthesia?

23   A.    Yes, sir.

24   Q.    But the heart is beating, correct?

25   A.    Correct.

Protected - Subject To Further Protective Review

1  purpose of inflating the balloon at this point?

2    A.    So this is -- what we're doing is looking

3  under TEE to see where the ostium of the left atrial

4  appendage is compared to where we're going to use as

5  a target when we do our LARIAT.

6    Q.    The ostium is this point --

7    A.    That is -- yes, sir.

8    Q.    -- right over here?

9    A.    Yes, sir.

10   Q.    What you want to do is be able to get a

11 marker that enables you to define precisely where

12 you want to put a suture to close this off, correct?

13   A.    Correct.

14   Q.    And by inflating the balloon and then

15 using the transesophageal echocardiogram, you get a

16 good -- you're able to visualize well where you need

17 to put that suture, correct?

18   A.    Correct.  We use that and fluoro together.

19   Q.    Now the balloon is deflated; is that

20 right?

21   A.    Yes, sir.

22   Q.    Because you've got your mark?

23   A.    We have -- yes, sir.

24   Q.    Now, what's going on with this catheter on

25 the right?

1    A.   So this is -- this is another magnetic
2    wire that's coming up from the pericardial sac
3    that's being introduced through the pericardial
4    catheter, and the object is to get these two magnets
5    to meet.
6    Q.   So now what -- so the -- now you've got
7    your mark from the balloon?
8    A.   Correct.
9    Q.   And now what you're doing is moving this
10   catheter around so that you're going to be
11   eventually able to manipulate a surgical instrument
12   around the exterior of the left atrial appendage,
13   correct?
14   A.   Correct.  Makes a -- what we call a rail,
15   so that we have some way to make sure that it's
16   guided, if you will.
17   Q.   Can you describe what's happening here?
18   A.   So this is actually the LARIAT device
19   itself.  It goes in closed, and as it exits the
20   catheter, it opens.  It has to be in a certain
21   position to make sure that as you come across this
22   rail, that it will actually lay across the left
23   atrial appendage appropriately.
24   Q.   So the idea is you want this device to
25   entire -- to come around and entirely encircle the

1    anatomically where you want to be in the patient's
2    heart?
3    A.   That is correct.
4    Q.   Tell us what's happening there.
5    A.   So there's a slide mechanism on the end of
6    the wire that you basically pull back, and it
7    basically creates a noose and tightens.
8    Q.   So the idea is you've now -- you've now
9    constricted but not fully closed off the left atrial
10   appendage, correct?
11   A.   Correct.
12   Q.   The balloon is still inflated?
13   A.   Right.
14   Q.   So you know you're at the right spot?
15   A.   Yes, sir.
16   Q.   Tell us what's happening here.
17   A.   We're separating the magnets and pulling
18   out of the left atrial appendage.
19   Q.   So you deflate the balloon, and now you
20   start to withdraw the magnetic -- first the magnetic
21   wire and then the catheter itself, correct?
22   A.   That is correct.
23   Q.   So now we're seeing the catheter that was
24   in the left atrial appendage being fully withdrawn,
25   correct?

1    left --
2    A.   Correct.
3    Q.   -- atrial appendage --
4    A.   That is correct.
5    Q.   -- as you move it into position, as you
6    move it around this exterior of the heart around the
7    left atrial appendage, correct?
8    A.   That is correct.
9    Q.   Can you tell us what we just visualized?
10   A.   So we watched the LARIAT basically being
11   slid over the left atrial appendage.
12   Q.   And the idea is to position it at your
13   mark --
14   A.   Where that balloon was.
15   Q.   -- where the balloon was?
16   A.   Yes, sir.
17   Q.   Okay.  Can you tell us what happens here?
18   A.   You're just reconfirming that in all the
19   manipulation that you were doing, that that mark
20   that you used originally has not moved.  You're just
21   reassessing.
22   Q.   So you first mark it to note -- to get the
23   exact spot you want to hit; then you manipulate the
24   LARIAT to that spot; then you reinflate the balloon
25   as a double-check to make sure you're exactly

1    A.   Yes, sir.  It's the left atrium now.
2    Q.   Okay.  And the -- meantime, the LARIAT has
3    still encircled but not fully closed off the left
4    atrial appendage, correct?
5    A.   That is correct.
6    Q.   Tell us what happens there.
7    A.   We actually tighten the knot to completely
8    exclude the left atrial appendage.
9    Q.   So once you've withdrawn the catheter that
10   had gone from the right atrium into the left atrium,
11   once you've fully withdrawn that, now you can fully
12   tighten down the suture that was around the left
13   atrial appendage, correct?
14   A.   That is correct.
15   Q.   And then you have to -- you'll have to cut
16   that off -- clip that off --
17   A.   Yes, sir.
18   Q.   -- and then withdraw that?
19   A.   Yes, sir.
20   Q.   And the video kind of jumped at that
21   point, but that's what happened?
22   A.   Yes, sir.  Yeah, there is a mechanism to
23   cut that suture.
24   Q.   Great.  Thank you.
25        MR. SLONIM:  Cut the video.

Protected - Subject To Further Protective Review

1    BY MR. SLONIM:
2        Q.   Is that a fair and accurate depiction of
3    the procedure that you performed on Mr. Boudreaux in
4    May of 2015?
5        A.   Yes, sir.
6        Q.   And it's more fully described in your
7    operative report that we marked as an exhibit,
8    correct?
9        A.   Yes, sir.
10       Q.   And it was a successful procedure,
11   correct?
12       A.   Yes, sir.
13       Q.   And the consequence of the procedure is
14   that it reduced or eliminated the risk of stroke
15   emanating from the left atrial appendage as a
16   consequence of the atrial fibrillation, correct?
17       A.   That's the assumption, yes, sir.
18           MR. SLONIM:  Let me consult with my
19           colleague and see if we have any further
20           questions.
21           THE VIDEOGRAPHER:  We're now off the
22           record at 6:57.
23   (Recess.)
24           THE VIDEOGRAPHER:  We're now back on
25           the record.  The time is 7:01.

---

Protected - Subject To Further Protective Review

1    say that Mr. Boudreaux has received state of the art
2    medical care for atrial fibrillation?
3        A.   I don't know.  Is that self -- is that
4    patting myself on the back?
5        Q.   No.  I'm just asking you.
6        A.   Yes.  I do believe it is, sir.  Yes, sir.
7        Q.   Dr. Fail, I'm not asking you to pat
8    yourself on the back.
9        A.   I do believe it is, yes, sir.
10       Q.   In other words, Dr. Fail, you're board
11   certified in multiple medical disciplines, including
12   interventional cardiology, correct?
13       A.   Yes, sir.
14       Q.   The procedure that we just saw on this
15   animation, which is the procedure that you performed
16   on Mr. Boudreaux, that is one of the most cutting
17   edge, sophisticated examples of interventional
18   cardiology, correct?
19       A.   I believe it is, yes, sir.
20       Q.   And you, Dr. Boudreaux, without being
21   falsely modest --
22           MR. MCCAULEY:  You said Boudreaux.
23           MR. BOUDREAUX:  Dr. Fail.
24   BY MR. SLONIM:
25       Q.   Dr. Fail -- were one of the first

---

Protected - Subject To Further Protective Review

1    BY MR. SLONIM:
2        Q.   Dr. Fail, just a couple of clarifying and
3    final questions.
4            So if I understood correctly from your
5    slide deck that you had presented, for patients that
6    have atrial fibrillation not associated with
7    rheumatic heart disease, like Mr. Boudreaux, for
8    those patients that have clots that form in over 90
9    percent of the cases, the origin of the clot is the
10   portion of the heart called the left atrial
11   appendage; is that right?
12       A.   That is correct.
13       Q.   And by using this LARIAT procedure for
14   Mr. Boudreaux, what you successfully managed to do
15   was totally exclude the left atrial appendage from
16   the cardiac circulation, correct?
17       A.   That is correct.
18       Q.   And in that respect, what you have done
19   successfully is taken 90 percent of the risk of clot
20   formation associated with atrial fibrillation and
21   hopefully and presumably removed that as a risk for
22   Mr. Boudreaux, correct?
23       A.   That is the assumption, yes, sir.
24       Q.   And looking at it and considering the
25   medical technology that's involved, is it fair to

---

Protected - Subject To Further Protective Review

1    cardiologists to perform this procedure in the State
2    of Louisiana, correct?
3        A.   Yes, sir.
4        Q.   And the consequence of your treatment of
5    Mr. Boudreaux between the left atrial appendage
6    occlusion that was successful via the LARIAT and via
7    the cardioversion that you subsequently performed is
8    that his cardiac status is now better than it was in
9    April or even January of 2014, when he was first
10   diagnosed with new onset atrial fibrillation?
11       A.   I believe that's correct, yes, sir.
12           MR. SLONIM:  I pass the witness.
13           THE VIDEOGRAPHER:  We're now off the
14           record at 7:04.
15   (Recess.)
16           THE VIDEOGRAPHER:  We're now back on
17           the record.  The time is 7:15.
18           EXAMINATION
19   BY MR. GOZA:
20       Q.   Doctor, are you ready to continue?
21       A.   I am.
22       Q.   Good evening.  My name is Kirk Goza, and
23   you understand that I represent Mr. Boudreaux in
24   this lawsuit?
25       A.   I do.

Protected - Subject To Further Protective Review

```
1     Q.   First, as I understand it, you first
2   became involved in Mr. Boudreaux's care in April of
3   2015; is that correct?
4     A.   I believe that's correct, yes, sir.
5     Q.   You did, though, have information by way
6   of history concerning the background of
7   Mr. Boudreaux, true?
8     A.   Yes, sir.
9     Q.   To your understanding, he was diagnosed
10  with new onset atrial fibrillation, I believe it was
11  January 7th of 2014?
12    A.   That is correct.
13    Q.   And as a result of being diagnosed with
14  atrial fibrillation, he was placed on a medication
15  called Xarelto beginning on January 8th of 2014?
16    A.   I believe that's correct, yes, sir.
17    Q.   And was it your understanding that in
18  early February, and I believe the date is February
19  3rd of 2014, Mr. Boudreaux ultimately, through going
20  through a couple of health care providers, was
21  transported by ambulance to the Ochsner Medical
22  Center emergency room and then ultimately admitted
23  to ICU?
24    A.   I believe that's correct, yes, sir.
25    Q.   And he was diagnosed with a
```

Protected - Subject To Further Protective Review

```
1     A.   Yes, sir.
2     Q.   And was that your understanding, as well,
3   by history?
4     A.   By history, yes, sir.
5     Q.   In other words, Xarelto had caused him to
6   have a GI bleed?
7          MR. SLONIM:  Objection.
8          MR. MCCAULEY:  Object to form.
9     A.   That was the assumption, yes, sir.
10  BY MR. GOZA:
11    Q.   And am I correct, as well, that there was
12  a gastroenterologist that was brought in?
13    A.   I believe so.
14    Q.   And, ultimately, there was a colonoscopy
15  done which showed no anatomic explanation for the
16  bleed?
17    A.   That is correct.
18    Q.   And when you took over the care, much of
19  your care was based on the premise that
20  Mr. Boudreaux's bleed was the result of the use of
21  the anticoagulant Xarelto?
22    A.   Correct.
23    Q.   And am I correct that -- or strike that.
24         I believe the plan, and I think you
25  articulated it, that Mr. Boudreaux initially was
```

Protected - Subject To Further Protective Review

```
1   gastrointestinal bleed?
2     A.   Yes, sir.
3     Q.   And would it be correct that it was your
4   understanding, prior to January of 2014 and being
5   placed on Xarelto, there was no reported bleeding
6   history in Mr. Boudreaux, correct?
7     A.   None that I'm aware of.
8     Q.   And he had never had a stroke before,
9   correct?
10    A.   None that I'm aware of, no, sir.
11    Q.   In fact, to your knowledge, he's never had
12  a stroke?
13    A.   No, sir.
14         COURT REPORTER:  I'm sorry.  What was
15         your answer?
16    A.   I agree, yes.
17    (Deposition Exhibit #20 was marked for
18         identification.)
19  BY MR. GOZA:
20    Q.   And the -- I'll show you -- let me hand
21  you what has been marked as Exhibit #20, and that is
22  simply a note from the Ochsner Medical Center, and I
23  think that the diagnosis at that time was that he
24  had a GI bleed related to his recent Xarelto
25  initiation.  Did I read that correctly?
```

Protected - Subject To Further Protective Review

```
1   going to be placed on Xarelto for four weeks with
2   the plan of initiating cardioversion, and I believe
3   a date was actually set for February 5th of 2014.
4   Would that be correct with your understanding of the
5   history?
6     A.   I believe that's correct.
7     Q.   And as a result of the Xarelto bleed,
8   Mr. Boudreaux was unable to be cardioverted on
9   February 5th of 2014, correct?
10    A.   Correct.
11         MR. MCCAULEY:  I object.
12  BY MR. GOZA:
13    Q.   And the reason that he was unable to be
14  cardioverted at that time is one needs to be able to
15  take an anticoagulant, and, obviously, he was still
16  in the process of being treated for his bleed at
17  that point, true?
18    A.   Correct.
19    Q.   And as Mr. Slonim pointed out, in the next
20  year and three months, Mr. Boudreaux was not on
21  anticoagulants, true?
22    A.   Correct.
23    Q.   He was not receiving Xarelto?
24    A.   Correct.
25    Q.   He ultimately -- he did not have a stroke
```

Protected - Subject To Further Protective Review

1  during that period of time, to your knowledge,
2  correct?
3      A.   Not that I'm aware of, yes, sir.
4      Q.   And, to your knowledge, Mr. Boudreaux has
5  not had a bleed since he was on Xarelto, true?
6      A.   Correct.
7      Q.   Now, ultimately, you did the LARIAT
8  procedure in May of 2015, correct?
9      A.   Correct.
10     Q.   And that procedure was appropriate because
11  Mr. Boudreaux had a Xarelto bleed, true?
12          MR. SLONIM:  Objection.
13          MR. MCCAULEY:  I object.
14     A.   That was my assumption, yes, sir.
15  BY MR. GOZA:
16     Q.   And so Mr. Slonim went through a video of
17  all that was involved in doing the procedure on
18  Mr. Boudreaux, and that was marked as Exhibit #19.
19  Do you recall that?
20     A.   Yes, sir.
21     Q.   And so Mr. Boudreaux -- and strike that.
22          So I want to just talk for a minute about
23  the results of the bleed.  And I apologize.  Let me
24  start this over.
25          First, it was your understanding that

---

Protected - Subject To Further Protective Review

1  Xarelto bleed was that he had to have the LARIAT
2  procedure performed that you have described in such
3  eloquent detail here today, true?
4          MR. SLONIM:  Objection.
5      A.   Correct.
6  BY MR. GOZA:
7      Q.   And part of what I think you indicated in
8  Exhibit #10 -- you listed a whole kind of litany
9  of -- hold on just a minute.  We had a technical
10  difficulty here.  You had a whole list of risks that
11  Mr. Boudreaux accepted as part of the LARIAT
12  procedure which was necessitated by his Xarelto
13  bleed, true?
14          MR. MCCAULEY:  I object to form.
15     A.   Yes, sir.
16  BY MR. GOZA:
17     Q.   One of the things that -- or strike that.
18          As a result of the LARIAT procedure, there
19  was a complication, correct?
20     A.   Side effect, yes, sir.
21     Q.   Side effect.  Mr. Boudreaux suffered a
22  condition of pericardial effusion, true?
23     A.   Yes, sir; correct.
24     Q.   And it was your opinion to a reasonable
25  degree of medical certainty that that was most

---

Protected - Subject To Further Protective Review

1  Mr. Boudreaux, as a result of his Xarelto bleed, had
2  to be hospitalized for a period of five days?
3      A.   I believe that's correct, yes, sir.
4      Q.   And you noted in your records that he
5  had -- and I think the actual hospital records show
6  four units of transfused blood, but you at least
7  have at least three --
8      A.   Maybe three.  Okay.
9      Q.   -- units of transfused blood, correct?
10     A.   I think that was by a conversation, yes,
11  sir.
12     Q.   And his hemoglobin when he went into the
13  hospital was 6.6, which is extremely low?
14     A.   Yes, sir.
15     Q.   And he -- so he had a significant bleed at
16  that time, true?
17     A.   Yes, sir.
18     Q.   Which required treatment in the ICU,
19  correct?
20     A.   Correct.
21     Q.   The next thing that flowed from his
22  Xarelto bleed is that he was unable to be
23  cardioverted for a period of time, true?
24     A.   Correct.
25     Q.   The next thing that flowed from his

---

Protected - Subject To Further Protective Review

1  likely the result of irritation caused by the LARIAT
2  procedure?
3      A.   Correct.
4      Q.   Again, the LARIAT procedure that was
5  necessitated by the fact that Mr. Boudreaux had a
6  Xarelto bleed, true?
7          MR. SLONIM:  Objection.
8          MR. MCCAULEY:  Same objection.
9      A.   Yes, sir.
10  BY MR. GOZA:
11     Q.   The LARIAT procedure that you performed on
12  Mr. Boudreaux, in addition to involving all of the
13  risks that you set out in Exhibit #10, as we went
14  through the visual that you -- the animation,
15  Exhibit #19 --
16     A.   Uh-huh.
17     Q.   -- showed that, first, he has to be placed
18  under a general anesthetic for that procedure, true?
19     A.   Correct.
20     Q.   And then there has to be incision sites in
21  his chest, true?
22          Needle sticks.
23     Q.   Needle sticks?
24     A.   Yes, sir.
25     Q.   And then I think at some point you had to

Protected - Subject To Further Protective Review

```
 1    stick a needle through his left atrium --
 2        A.   Yes, sir.
 3        Q.   -- correct?
 4             And so all of those things were, again,
 5    necessitated as a result of the Xarelto bleed and
 6    him needing the LARIAT procedure?
 7             MR. SLONIM:  Objection.
 8             MR. MCCAULEY:  I object.  Can we
 9        just -- just one second.  Can we just
10        agree that if one of us objects --
11             MR. GOZA:  Sure, yeah.
12             MR. MCCAULEY:  -- the objection
13        preserves for both?
14             MR. GOZA:  Absolutely.
15             MR. MCCAULEY:  Thank you.  That way, I
16        won't have to chime in.
17             MR. GOZA:  No problem.
18        A.   I agree.
19    BY MR. GOZA:
20        Q.   I'm correct that you have actually treated
21    patients -- first of all, let me do it this way:
22    You've used warfarin or Coumadin for many years for
23    treating patients with atrial fibrillation, correct?
24        A.   Correct.
25        Q.   Mr. Slonim asked you were there other
```

Protected - Subject To Further Protective Review

```
 1    kinds of anticoagulants now on the market, and there
 2    are obviously several different kinds on the market,
 3    true?
 4        A.   Correct.
 5        Q.   And the -- if you looked at the whole host
 6    of anticoagulants, many of them work in different
 7    ways, correct?
 8        A.   Correct.
 9        Q.   And you have seen patients that have had a
10    bleed on one anticoagulant be placed on another
11    anticoagulant and be able to tolerate that, true?
12        A.   That is true.
13        Q.   So simply because you have a bleed on one
14    anticoagulant doesn't mean you're going to bleed on
15    every anticoagulant, true?
16        A.   That seems to be the case, yes, sir.
17        Q.   We know ultimately that Mr. Boudreaux was
18    cardioverted in June of 2016, I believe the last
19    time that you saw him; is that correct?
20        A.   I believe somewhere in that time.  Maybe a
21    little bit earlier, but, yes, sir, in that
22    timeframe.
23        Q.   You're right.  I think --
24        A.   It was April.
25        Q.   Yeah.  Okay.  I appreciate that.  I see
```

Protected - Subject To Further Protective Review

```
 1    what you're saying.
 2        A.   The last time we saw him was in June.
 3        Q.   The last time you saw him was in June.  I
 4    see.  You actually cardioverted him sometime in
 5    April, and that cardioversion was successful?
 6        A.   Yes, sir.
 7        Q.   And is there any reason to believe that
 8    had he been able to be cardioverted in February of
 9    2014, but for his bleed, if he'd have been -- if the
10    cardioversion would have occurred then, any reason
11    to believe it wouldn't have been successful then?
12        A.   No reason to believe it, no, sir.
13        Q.   In fact, the end result, that he was able
14    to be cardioverted, would point to the fact he would
15    have been able to successfully --
16        A.   Correct.
17        Q.   -- sustain the cardioversion?
18        A.   You would assume so, yes, sir.
19        Q.   Let me go through my notes for just a
20    second.
21             It is true from a HAS-BLED score --
22    HAS-BLED score is something that physicians look to
23    in generalities just to make an assessment about the
24    risk of future bleeding for a patient?
25        A.   Based on Coum -- yes, sir.
```

Protected - Subject To Further Protective Review

```
 1             COURT REPORTER:  I'm sorry.  Based on?
 2        A.   Coumadin.  Yes, sir.
 3    BY MR. GOZA:
 4        Q.   And one of the factors that weighs in on
 5    the HAS-BLED score is the history of a prior bleed,
 6    true?
 7        A.   Correct.
 8        Q.   And so the simple fact of a prior bleed on
 9    Xarelto would weigh in your judgment about whether
10    to place a patient on another anticoagulant during
11    an interim period of time?
12        A.   Correct.
13             MR. MCCAULEY:  I object.
14    BY MR. GOZA:
15        Q.   And --
16        A.   Correct.
17             MR. MCCAULEY:  Can I hear that
18        question back?  I'm not sure I heard --
19        that's part of my objection.  I just
20        didn't hear the question.  I'm sorry.
21             COURT REPORTER:  "And so the simple
22        fact of a prior bleed on Xarelto would
23        weigh in your judgment about whether to
24        place a patient on another anticoagulant
25        during an interim period of time?"
```

Protected - Subject To Further Protective Review

1     MR. MCCAULEY:  I maintain my
2  objection.
3     MR. GOZA:  Okay.  Let me ask it --
4  I'll restate it.
5  BY MR. GOZA:
6     Q.   The simple fact that Mr. Boudreaux had a
7  bleed on Xarelto would weigh in your judgment as to
8  whether to use another anticoagulant on him, true?
9     A.   Correct.
10    Q.   And, in fact, in this case, it was
11  ultimately your judgment that rather -- because of
12  his prior history of bleed on Xarelto, it would --
13  the better option would be to do the LARIAT
14  procedure?
15    A.   That is correct.
16    Q.   On Exhibit #4, if you look at that real
17  quick, I just want to clean up a few things.  Are
18  you able to dig that out?
19    A.   Yeah.  Let's see.  8, 1, 2, 3, 4.  Okay.
20  I have it.
21    Q.   When it says, GI bleed with
22  anticoagulation, and then it says, no etiology noted
23  dash transfer, do you see that?
24    A.   Transfused, yes, sir.
25    Q.   Transfused.  When we're talking about the

---

Protected - Subject To Further Protective Review

1  opinion to a reasonable degree of medical certainty
2  is that Xarelto caused his gastrointestinal bleed
3  back in February of 2014?
4     MR. SLONIM:  Objection.
5     MR. MCCAULEY:  I object.
6     A.   I believe it was a mitigating -- yes, sir.
7  BY MR. GOZA:
8     Q.   Caused or contributed to cause his bleed?
9     A.   Yes, sir; yes.
10    MR. MCCAULEY:  I object.
11  BY MR. GOZA:
12    Q.   Just to get a clear answer and clear
13  question --
14    A.   Yes.
15    Q.   -- it's your opinion --
16    A.   Caused.
17    Q.   There you go.  It's your opinion to a
18  reasonable degree of medical certainty that Xarelto
19  directly caused or contributed to cause his bleed?
20    A.   That is correct.
21    MR. SLONIM:  Objection.
22  BY MR. GOZA:
23    Q.   And generally speaking, in using that
24  HAS-BLED score system, Mr. Boudreaux would have had
25  a 1 for hypertension and a 1 for age, as I recall

---

Protected - Subject To Further Protective Review

1  no etiology noted, that's what -- we're referring to
2  the gastroenterology report that there was no
3  anatomic explanation for the bleed?
4     A.   None that could be found, that's correct.
5     Q.   Again, supporting your assumption or
6  belief or opinion -- strike that.
7     Let me ask it this way:  Again, that was
8  supporting your opinion that, in fact, the bleed was
9  due to his anticoagulation with Xarelto?
10    MR. SLONIM:  Objection.
11    MR. MCCAULEY:  I object.
12    A.   My belief was that there was no
13  anatomical -- that was found in probably more of a
14  small intestine thing.  No fixable GI etiology.
15  That's probably a better answer.
16  BY MR. GOZA:
17    Q.   I understand.  No fixable GI etiology, but
18  it stemmed from the anticoagulation Xarelto?
19    A.   Correct.
20    MR. SLONIM:  Objection.
21    MR. MCCAULEY:  Same objection.
22  BY MR. GOZA:
23    Q.   Did I get that correctly?
24    A.   That's correct, yes, sir.
25    Q.   And, in fact, as we sit here today, your

---

Protected - Subject To Further Protective Review

1  the chart.  Would that be consistent with your
2  understanding?
3     A.   Correct.
4     Q.   Therefore, his risk of bleed would be --
5  if he was on Coumadin with appropriate INRs, his
6  risk of bleed would be less than 5 percent, more
7  like 2 percent?
8     A.   That, I'm not -- but, yes, it would be
9  relatively low.  Yes, sir.
10    Q.   It would be very low?
11    A.   Yeah, a 2.
12    Q.   In other words, if you're able to maintain
13  Mr. Boudreaux with his INRs at a -- between 2 and 3,
14  his risk based on a HAS-BLED score, much more
15  probable than not that he would not have a bleed,
16  true?
17    MR. SLONIM:  Objection.
18    A.   That would be the assumption based on the
19  HAS-BLED, yes, sir.
20    MR. GOZA:  I don't have any other
21    questions at this time.
22    FURTHER EXAMINATION
23  BY MR. SLONIM:
24    Q.   So, Dr. Fail, a few questions.
25    So it's correct that every anticoagulant

1  medication that's available today is associated with
2  a risk of bleed, correct?
3      A.   That is correct.
4      Q.   And, in particular, it's associated with
5  an increased risk of bleed in the gastrointestinal
6  tract, correct?
7      A.   That is correct.
8      Q.   But a patient who is on anticoagulation
9  therapy, even if they're over anticoagulated, will
10 not spontaneously bleed unless there is some
11 pathology in the GI tract, in the vasculature,
12 correct?
13     A.   That is the assumption, yes, sir.
14     Q.   Even if the blood is very thin, it will
15 not spontaneously erupt out of the GI tract unless
16 there is some kind of an ulceration or an erosion or
17 some underlying pathological condition in the GI
18 tract, correct?
19     A.   That is the assumption, yes, sir.
20     Q.   So when a patient has a GI bleed,
21 regardless of whether they're anticoagulated or even
22 if they're over anticoagulated, the reason for the
23 GI bleed, the reason for the emission of blood from
24 the tract is because there is some underlying
25 pathology somewhere, correct?

1  technology is, correct?
2      A.   Correct.
3      Q.   Particular portions of the intestinal
4  tract that it affect are obscure, correct?
5      A.   Correct.
6      Q.   So the fact that a source of bleed is not
7  found in no way negates the fact that there is some
8  underlying pathological condition in Mr. Boudreaux's
9  case that was the situs of the bleed, correct?
10     A.   Yes, sir.
11     Q.   And the fact that the doctors who did the
12 best effort to scope him and find the source of the
13 bleed failed to do so doesn't mean that the
14 pathology wasn't there; it just meant that it was
15 not amenable to observation on the imaging
16 techniques that were used, correct?
17     A.   That is correct.
18     Q.   Now, if a patient has such an underlying
19 pathology that was not identified, they can have a
20 propensity, a predisposition, to bleed regardless of
21 the anticoagulant that's used, correct?
22     A.   That is correct.
23     Q.   Now, you were asked a question about the
24 fact that sometimes a patient that has a GI bleed on
25 one anticoagulant may not have a GI bleed on another

1      A.   That is correct.
2      Q.   And what the gastroenterologists do is use
3  imaging techniques; they use scopes that go -- that
4  can image the upper tract, and they can use scopes
5  that image the lower tract in an effort to try to
6  see and identify the situs of the pathology,
7  correct?
8      A.   Correct.
9      Q.   But it is well-known in medicine that
10 those imaging techniques, although good, are not
11 perfect, correct?
12     A.   Correct.
13     Q.   It is not uncommon at all to have a
14 patient that presents with a GI bleed on any
15 anticoagulant and that the GI workup, the endoscopic
16 workup is negative, meaning they're unable to find
17 the source of the bleed, correct?
18     A.   Correct.
19     Q.   But, nevertheless, you know that there is
20 some underlying pathology because the bleed does not
21 happen spontaneously, correct?
22     A.   That is correct.
23     Q.   And, in fact, there are certain parts of
24 the GI tract that are not particularly amenable to
25 imaging, regardless of how good the scoping

1  anticoagulant, correct?
2      A.   Correct.
3      Q.   And that could be due to a variety of
4  reasons; I mean, one reason may be is that the
5  underlying pathology has spontaneously resolved,
6  spontaneously healed, correct?
7      A.   Correct.
8      Q.   And that happens all the time?
9      A.   I believe so, yes, sir.
10     Q.   So one possibility that could have
11 happened for Mr. Boudreaux would have been the fact
12 that he had a GI bleed on Xarelto, the source was
13 not identified, but it had fully resolved with
14 treatment, the blood tranfusions and the treatment,
15 is he could have been -- he could have been started
16 on another anticoagulant, warfarin or Eliquis or
17 Pradaxa, in an effort to see if he could -- if he
18 could accept one of those therapies, correct; that
19 would have been a possible medical alternative?
20     A.   Correct.
21     Q.   But the decision was made not to use one
22 of those other therapies, correct?
23     A.   Correct.
24     Q.   And that was because there was an
25 underlying concern that Mr. Boudreaux's

```
1    predisposition -- underlying predisposition to
2    sustain a GI bleed regardless of the anticoagulant
3    therapy was too great to subject him to that risk,
4    correct?
5             MR. GOZA:  Object to form.
6         A.  Yes, sir.
7    BY MR. SLONIM:
8         Q.  And you agreed with that decision,
9    correct?
10        A.  I did.
11        Q.  And that is the whole reason that the
12   LARIAT procedure had to be considered; as a non-FDA
13   approved procedure, it is still appropriate for a
14   patient that cannot tolerate anticoagulant, like
15   Mr. Boudreaux, correct?
16        A.  Correct.
17        Q.  The fact that Mr. Boudreaux could not
18   tolerate any anticoagulant had nothing to do with
19   the fact that he had a GI bleed on Xarelto; it had
20   to do with the fact that he had an underlying
21   propensity to have a GI bleed on anticoagulation,
22   correct?
23             MR. GOZA:  Object to form.
24        A.  That is the assumption, yes, sir.
25   BY MR. SLONIM:
```

```
1    card -- if he had had the cardioversion in February
2    of 2014, and even if it was -- even if it were
3    successful, he would still need to be placed on
4    anticoagulant therapy, something, correct?
5         A.  That's correct.
6         Q.  And he would be at a risk of having a GI
7    bleed because he was on anticoagulant therapy,
8    correct?
9             MR. GOZA:  Object to form.
10        A.  Correct.
11   BY MR. SLONIM:
12        Q.  And now we know, because of the event that
13   had happened in January 2014, that Mr. Boudreaux had
14   some kind of an underlying pathology that
15   predisposed him to GI bleeding if subjected to
16   anticoagulation, correct?
17        A.  That's the assumption, yes, sir.
18        Q.  And, in part, that risk may have been
19   exacerbated by the fact that Mr. Boudreaux needed to
20   be on aspirin therapy, correct?
21        A.  Potentially, yes, sir.
22        Q.  Okay.  And let's just talk about that for
23   a minute, because I think we may have overlooked it.
24             So Mr. Boudreaux was a long-term user of
25   low dose Ecotrin, correct?
```

```
1         Q.  Now, you were asked the question -- some
2    questions in regard to the cardioversion procedure
3    that had been planned for February -- February of
4    2014.
5         A.  '14; yes, sir.
6         Q.  And I just want to make sure I understand
7    this.  When you have a patient --
8             Dr. Fail, let me restart the question
9    because the mic came off.
10            When a patient has atrial fibrillation and
11   undergoes a cardioversion procedure, and even if
12   that cardioversion is successful, the standard
13   practice is to continue the patient on anticoagulant
14   therapy because of a concern that the atrial
15   fibrillation could recur; isn't that right?
16        A.  Correct.
17        Q.  So although Mr. -- so even assuming that
18   in February 2014, Mr. Boudreaux's cardioversion
19   needed to be deferred for some period of time while
20   the GI bleed had resolved, it would be an in -- it
21   would be an incorrect assumption to think, oh, gee,
22   if he had a successful cardioversion at that time,
23   he would not need to be anticoagulated, correct?
24        A.  Correct.
25        Q.  In other words, he could have had the
```

```
1         A.  Correct.
2         Q.  So that's an enteric-coated form of
3    aspirin, correct?
4         A.  Correct.
5         Q.  But even with enteric coating, aspirin
6    attacks the GI tract, not just the stomach, but
7    other portions of the GI tract, as well, correct?
8         A.  Correct.
9         Q.  And when I say "attack," what I mean is it
10   can cause erosions or ulcerations, right?
11        A.  That is correct.
12        Q.  And those could be quite minute, quite
13   microscopic, correct?
14        A.  Potentially, yes, sir.
15        Q.  And they could be actually be subclinical,
16   correct, meaning they don't have an obvious
17   manifestation; microscopic, almost imperceptible
18   amounts of blood can be leaking out, but you might
19   not notice it, correct?
20        A.  Correct.
21        Q.  And now if you took a patient in that
22   state, where the GI tract had some microscopic
23   erosions, virtually undetectable erosions, and you
24   put that patient on an anticoagulant, any
25   anticoagulant, those erosions can bleed, correct?
```

Protected - Subject To Further Protective Review

1    A.   That would be the assumption, yes, sir.

2    Q.   And they actually could cause quite a loss

3  of blood, correct?

4    A.   Correct; yes, sir.

5    Q.   But they can also spontaneously heal,

6  correct?

7    A.   Potentially, yes, sir.

8    Q.   And they are the kind of damage to the GI

9  tract that might be missed, not because the

10  endoscopic examiner is not qualified or made a

11  mistake, but just because they're in a portion of

12  the bowel that is -- or the GI tract that is not

13  easily observed by endoscopy, correct?

14    A.   That is correct.

15    Q.   It's fair to say that Mr. Boudreaux could

16  have had exactly the same bleed that he had with

17  exactly the same outcome had he been given any

18  anticoagulant, correct?

19         MR. GOZA:  Object; speculation.

20    A.   That would be an assumption, yes, sir.

21         MR. SLONIM:  I have no further

22         questions.  Thank you.

23              FURTHER EXAMINATION

24  BY MR. GOZA:

25    Q.   I do have a few questions for you.

---

Protected - Subject To Further Protective Review

1         And I think I understand better your

2  qualifications on an answer, but I want to make

3  sure.  So Mr. Boudreaux may have had some underlying

4  condition in his GI tract that made him more

5  susceptible to a bleed, correct?

6    A.   That is correct.

7    Q.   He had never had a bleed before, though,

8  that you're aware of, true?

9    A.   None that I'm aware of, that's correct.

10    Q.   And he had been on Ecotrin, aspirin

11  therapy, for a long time, true?

12    A.   I believe that's correct, yes, sir.

13    Q.   And since his bleed, he has continued to

14  be on Ecotrin aspirin therapy, true?

15    A.   Correct.

16    Q.   And he still has never had another bleed,

17  true?

18    A.   None that I'm aware of.

19    Q.   The only time he's had a bleed is when he

20  was on Xarelto, true?

21    A.   Correct.

22    Q.   I have something else I wanted to ask.

23  Give me just one second.

24         And while we can talk about a lot of

25  possibilities, the one thing you know as you sit

---

Protected - Subject To Further Protective Review

1  here or have an opinion to a reasonable degree of

2  medical certainty about is that Xarelto directly

3  caused or contributed to cause Mr. Boudreaux's

4  bleeding event back in February of 2014, true?

5    A.   That's my assumption, yes, sir.

6         MR. GOZA:  I have no further

7         questions.

8         MR. MCCAULEY:  I've got a couple.

9              EXAMINATION

10  BY MR. MCCAULEY:

11    Q.   Doctor, that opinion you just offered --

12         MR. GOZA:  I just object to being able

13         to ask questions at this point, but go

14         ahead.

15         MR. MCCAULEY:  Okay.

16  BY MR. MCCAULEY:

17    Q.   Doctor, the opinion you just offered, that

18  opinion is predicated on your understanding that the

19  patient was taking Xarelto tablets for three or four

20  weeks prior to the onset of his GI bleed; is that

21  right?

22    A.   Yes, sir.

23    Q.   And your opinion might change if you

24  learned that he, in fact, was not taking Xarelto

25  tablets during that period of time?

---

Protected - Subject To Further Protective Review

1    A.   Yes, sir.

2    Q.   It would have to change, I would assume.

3    A.   Yes, sir.

4    Q.   All right.  Doctor, we heard a lot of

5  questions that contained a phrase "Xarelto bleed,"

6  so I want to -- I just want to ask a couple

7  questions on that.

8         I think you answered in response to

9  Mr. Slonim that, in order to have a bleed, there has

10  to be some underlying erosion or ulceration of the

11  GI tract somewhere, correct?

12    A.   That's the assumption, yes, sir.

13    Q.   And the assumption is that, in the absence

14  of such a thing, there's not going to be a bleed,

15  whether it's Xarelto or Eliquis or Coumadin or any

16  of the other anticoagulants, right?

17    A.   Correct.

18    Q.   You need to have that ulceration or

19  erosion, right?

20    A.   That's correct, yes, sir.

21    Q.   And when you're counseling patients who

22  you're putting on drugs, like anticoagulants, do you

23  sometimes tell them, if they nick themselves

24  shaving, that they might bleed longer than they

25  ordinarily would as a result of being on blood

Protected - Subject To Further Protective Review

```
 1   thinners?
 2        A.   Correct.
 3        Q.   And in a very real sense, that nick they
 4   make when they shave is kind of the analogue to the
 5   gastrointestinal erosion or ulceration; it's a place
 6   where blood can come out and will come out more
 7   profusely if their blood is thinner or
 8   anticoagulated --
 9        A.   Correct.
10        Q.   -- fair?
11             So in a sense, you wouldn't -- the direct
12   cause of that bleed, if let's say he's using a
13   Gillette razor, would be the Gillette razor caused
14   that nick?
15        A.   With that analogy, yes, sir.
16        Q.   And the -- and the bleeding that results
17   from that was not caused, but, rather, the thinning
18   of the blood allowed the blood to come out, but it
19   was the nick of the razor that caused the bleed?
20             MR. GOZA:  Object to the form of the
21        question.
22   BY MR. MCCAULEY:
23        Q.   Isn't that right?
24        A.   Correct.
25        Q.   It could be more fairly called a Gillette
```

Protected - Subject To Further Protective Review

```
 1   bleed or some such, but you would refer to it as a
 2   bleed resulting from thin blood as a result of
 3   anticoagulation due to some underlying pathology
 4   that existed before that anticoagulant was
 5   introduced, right?
 6             MR. GOZA:  Object to form.
 7        A.   That's correct.
 8             MR. MCCAULEY:  All right.  I don't
 9        have any further questions.  Thank you,
10        Doctor.
11             FURTHER EXAMINATION
12   BY MR. GOZA:
13        Q.   And, Doctor, just so we're clear, because
14   I started off --
15             MR. GOZA:  What do I have to press to
16        make this work?
17             MS. BARDWELL:  Oh, I'm so sorry.  The
18        projector turned off.  It might take a
19        minute because the projector turned off.
20        I'm so sorry.  It's going to take a
21        second.
22             MR. GOZA:  How long is this going to
23        take?
24             MS. BARDWELL:  It's going to take a
25        second because we paused too long.
```

Protected - Subject To Further Protective Review

```
 1   bleed if we wanted to name them with proper nouns,
 2   right?
 3        A.   Correct.
 4        Q.   And, Doctor, if you -- if you analogize
 5   that, then the gastrointestinal bleed really, if
 6   it's properly denominated as to what it is, it's
 7   some gastrointestinal, erosional bleed facilitated
 8   by use of an anticoagulant; isn't that fair?
 9             MR. GOZA:  Object to form.
10        A.   Correct.
11   BY MR. MCCAULEY:
12        Q.   And I think, as we went through your
13   medical records, there was never an occasion where
14   you and any other doctor said he had a, quote,
15   Xarelto bleed, was there?
16        A.   No, sir.
17        Q.   In fact, what you said was that, because
18   he had a bleed on one anticoagulant, we're going to
19   be very cautious -- I'm sort of paraphrasing -- very
20   cautious about ever giving him another
21   anticoagulant?
22        A.   That is correct.
23        Q.   If he had -- I don't know whether if he
24   had a bleed on Eliquis or Pradaxa, but when Mr. Goza
25   would be calling it a Pradaxa bleed or a Coumadin
```

Protected - Subject To Further Protective Review

```
 1   BY MR. GOZA:
 2        Q.   Okay.  Let's -- let me go ahead and
 3   continue.  When it comes on, I'll ask it.
 4             First of all, with respect to the
 5   questions that Mr. --
 6             MR. MCCAULEY:  McCauley.
 7   BY MR. GOZA:
 8        Q.   -- McCauley asked, he asked whether your
 9   opinions were premised on the fact that Xarelto had
10   been taken for three or four weeks, but the reality
11   of it is that Xarelto, in terms of reaching its
12   maximum thinning of the blood, so to speak, works
13   very quickly, true?
14        A.   That's correct.
15        Q.   In fact, you could take it a day or two
16   days and have the maximum effect of the drug, true?
17        A.   That's my assumption, yes, sir.
18        Q.   So your assumption in formulating these
19   opinions is not that Mr. Boudreaux took it three or
20   four weeks, but that he at least took the
21   medication, was on the medication at the time of his
22   bleed, true?
23        A.   That would be the assumption, yes, sir.
24        Q.   Second, he said that no one had talked
25   about this -- the GI bleed being related to recent
```

Protected - Subject To Further Protective Review

```
 1   Xarelto -- use of Xarelto.  In fact, that was the
 2   specific diagnosis that Mr. Boudreaux left the
 3   hospital with, was GI bleed related to recent
 4   Xarelto initiation; is that true?
 5        A.   That's from the hospital in Kenner, yes,
 6   sir.
 7             MR. GOZA:  I don't have any other
 8        questions.
 9             FURTHER EXAMINATION
10   BY MR. MCCAULEY:
11        Q.   So let me just ask one follow-up to that.
12             If someone took a tablet of Xarelto and
13   then stopped taking Xarelto, the effect would wear
14   off within 24 to 36 hours?
15        A.   Correct.
16        Q.   And so if someone took Xarelto for four
17   days and then decided to stop, by the -- by three or
18   four weeks from then, you wouldn't expect to be
19   seeing any anticoagulation effect of Xarelto going
20   on?
21        A.   You would not.
22             MR. MCCAULEY:  All right.  Thank you.
23        I don't have any further questions.
24             MR. GOZA:  No other questions.
25             THE VIDEOGRAPHER:  Today's deposition
```

---

Protected - Subject To Further Protective Review

```
 1             consists of two tapes.  This is the end of
 2        Tape 2.  We're now off the record at 7:53.
 3             (DEPOSITION CONCLUDED.)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Protected - Subject To Further Protective Review

```
 1        R E P O R T E R ' S   C E R T I F I C A T E
 2        This transcript is valid only for a
 3   transcript accompanied by my original signature and
 4   original required seal on this page.
 5        I, Leslie B. Doyle, Certified Court
 6   Reporter (LA Certificate #93096), in and for the
 7   State of Louisiana, as the officer before whom this
 8   testimony was taken, do hereby certify that PETER S.
 9   FAIL, M.D., after having been duly sworn by me upon
10   authority of R.S. 37:2554, did testify as herein
11   before set forth in the foregoing 122 pages; that
12   this testimony was reported by me in the stenotype
13   reporting method, was prepared and transcribed by me
14   or under my personal direction and supervision, and
15   is a true and correct transcript to the best of my
16   ability and understanding; that the transcript has
17   been prepared in compliance with transcript format
18   guidelines required by statute or by rules of the
19   board, that I have acted in compliance with the
20   prohibition on contractual relationships, as defined
21   by Louisiana Code of Civil Procedure Article 1434
22   and in rules and advisory opinions of the board.
23        I further certify that I am not related to
24   counsel or to the parties herein, nor am I otherwise
25   interested in the outcome of this matter.
```

---

Protected - Subject To Further Protective Review

```
 1        Signed this ___ day of _____, 2016.
 2
 3
 4             _____
 5             LESLIE B. DOYLE, RPR, RMR, RDR
             Certified Court Reporter
 6             LA Certificate #93096
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```