PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

1                  UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF LOUISIANA
2

3

     IN RE:  XARELTO          )   MDL No.:  2592
4    (RIVAROXABAN) PRODUCTS   )   Section:  L
     LIABILITY LITIGATION     )   Judge Eldon E. Fallon
5                             )   Mag. Judge North
                              )
6                             )
                              )
7    JOSEPH J. BOUDREAUX,     )   Case No.:
     JR.                      )   2:14-CV-0270
8    and LORETTA BOUDREAUX    )

9

10

11   PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

12

13

14      Videotaped deposition of JAMES WAYNE SMITH,

15   M.D., taken on Wednesday, December 14, 2016, in

16   the office of Irwin, Fritchie, Urquhart & Moore,

17   L.L.C., 400 Poydras Street, Suite 2700, New

18   Orleans, Louisiana 70130, commencing at 12:57 p.m.

19

20

21

22

23

     Reported by:
24   AURORA M. PERRIEN
     CERTIFIED COURT REPORTER
25   REGISTERED PROFESSIONAL REPORTER

**Page 2**

I N D E X

Page

Caption.............................1

Appearances........................4

Agreement of Counsel...............6

Witness' Certificate.............192

Reporter's Certificate...........193

E X A M I N A T I O N

MR. GOZA............................8

E X H I B I T S

Exhibit No. 1.....................11
Plaintiffs. Notice with Subpoena Duces
Tecum of Oral Videotaped Deposition of
James W. Smith, MD

Exhibit No. 2.....................15
Expert Report of James William Smith,
M.D.

Exhibit No. 3.....................34
"Risk of gastrointestinal bleeding
associated with oral anticoagulants:
population based retrospective cohort
study"

Exhibit No. 4.....................34
(Fee schedule and time sheets)

Exhibit No. 5.....................34
(Xarelto) Highlights of Prescribing
Information

Exhibit No. 7....................148
(Excerpt from Edward S. Peters' report
dated 10/12/16, Pages 10 - 13)

**Page 3**

Exhibit No. 8.....................154
"Bleeding with Direct Oral Anticoagulants
vs Warfarin:  Clinical Experience"

Exhibit No. 9.....................167
"Comparative risk of gastrointestinal
bleeding with dabigatran, rivaroxaban,
and warfarin:  population based cohort
Study"

**Reporter's Note:  There is no Exhibit No. 6.

**Page 4**

A P P E A R A N C E S
REPRESENTING JOSEPH J. BOUDREAUX, JR. AND
LORETTA BOUDREAUX:

BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
BY:  DAVID B. BYRNE, ESQ.
218 Commerce Street
Montgomery, Alabama 36104
334.269.2343
David.byrne@beasleyallen.com

BARRIOS, KINGSDORF & CASTEIX, L.L.P.
BY:  EMMA E. KINGSDORF, ESQ.
701 Poydras Street, Suite 3650
New Orleans, Louisiana 70139-3650
504.524.3300
Ekingsdorf@bkc-law.com
GOZA & HONNOLD, L.L.C.
BY:  KIRK J. GOZA, ESQ.
11181 Overbrook Road, Suite 200
Leawood, Kansas 66211-2241
913.451.3433
Kgoza@gohonlaw.com

REPRESENTING JANSSEN PHARMACEUTICALS, INC.,
JANSSEN RESEARCH & DEVELOPMENT, L.L.C., JANSSEN
ORTHO, L.L.C.:
KAY SCHOLER, L.L.P.
BY:  BERT L. SLONIM, ESQ.
250 West 55th Street
New York, New York 10019-9710
212.836.8897
Bert.slonim@kayescholer.com

**Page 5**

REPRESENTING BAYER HEALTHCARE PHARMACEUTICALS,
INC., and BAYER PHARMA AG:

SCHWABE, WILLIAMSON & WYATT, P.C.
BY:  MARGARET HOFFMANN, ESQ.
1211 South West Fifth Avenue, Suite 1900
Portland, Oregon 97204
503.796.2868
Mhoffmann@schwabe.com
BARRASSO, USDIN, KUPPERMAN, FREEMAN &
SARVER, L.L.C.
BY:  SHAUN P. McFALL, ESQ.
909 Poydras Street, 24th Floor
New Orleans, Louisiana 70112
504.589.9764
Smcfall@barrassousdin.com

ALSO PRESENT:

MARK ANCALADE, VIDEOGRAPHER

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 6

1    S T I P U L A T I O N
2    It is stipulated by and among Counsel that
3 the videotaped deposition of JAMES WAYNE SMITH,
4 M.D., is being taken under the Federal Rules of
5 Civil Procedure for all purposes permitted under
6 the law.
7    The formalities of reading and signing are
8 not waived.
9    The formalities of sealing, certification
10 and filing are not hereby waived.  The party
11 responsible for services of the discovery material
12 shall retain the original.
13    All objections, except those as to the
14 form of the questions and/or the responsiveness of
15 the answers, are reserved until the time of the
16 trial of this cause.
17        * * * * *
18    Aurora M. Perrien, Certified Court
19 Reporter, Registered Professional Reporter, in and
20 for the State of Louisiana, officiated in
21 administering the oath to the witness.
22
23
24
25

Page 8

1    MS. KINGSDORF:
2       Emma Kingsdorf on behalf of the
3    plaintiffs.
4    MS. HOFFMANN:
5       Margaret Hoffmann on behalf of
6    defendant Janssen.
7    MR. SLONIM:
8       Bert Slonim on behalf of the Bayer
9    defendant.
10    MR. McFALL:
11       Shaun McFall on behalf of Janssen.
12    (The court reporter swore in the witness.)
13       E X A M I N A T I O N
14 BY MR. GOZA:
15    Q.  Doctor, if you would, please state your
16 full name for the record.
17    A.  James Wayne Smith.
18    Q.  And Doctor, my name is Kirk Goza.  You and
19 I had an opportunity to meet just before the start
20 of this deposition?
21    A.  Yes.
22    Q.  Have you given deposition testimony
23 before?
24    A.  I think I've only given one deposition
25 before.

Page 7

1      P R O C E E D I N G S
2    THE VIDEOGRAPHER:
3       We're now on the record.  My name is
4    Mark Ancalade, the videographer with
5    Golkow Technologies.  Today's date is
6    December the 14th, 2016, at the time
7    indicated on the video screen, which is
8    12:57.  Today's deposition is being held
9    at 400 Poydras Street, Suite 2700,
10    New Orleans, Louisiana, taken in the
11    matter of -- in reference: Xarelto
12    (rivaroxaban) Products Liability
13    Litigation, being heard before the
14    United States District Court, Eastern
15    District of Louisiana.  Today's deponent
16    is Dr. James W. Smith.  Today's court
17    reporter is Miss Aurora Gonzales [sic].
18       I would ask that counsel please state
19    their names for the record, which
20    thereafter would the court reporter please
21    swear in the witness.
22    MR. GOZA:
23       Kirk Goza on behalf of the plaintiffs.
24    MR. BYRNE:
25       David Byrne on behalf of plaintiffs.

Page 9

1    Q.  And can you tell me the facts and
2 circumstances under which you gave that
3 deposition?
4    A.  Correct.
5       About 28 years ago I was -- I was sued for
6 a complication from a procedure called ERCP, and I
7 gave a deposition in that regard maybe 25 years
8 ago.
9    Q.  Understanding that it's been some time
10 since you've given a deposition, let me go through
11 a few ground rules with --
12    A.  Yeah.
13    Q.  -- you.  Okay?
14       First of all, I am not a physician, so it
15 is certainly possible that I will ask you a
16 question that is not artfully phrased from a
17 medical standpoint or that you don't understand.
18 If I do that, please tell me you don't understand
19 the question and I'll try to rephrase it in a way
20 that is intelligible to you.
21       Fair enough?
22    A.  Very good.
23    Q.  Also, very important for you and I --
24 it'll be easy to anticipate the end of my question
25 and for me to anticipate maybe the end of your

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 10

1 answer. But we have to let each other finish
2 completely for the court reporter in order for her
3 to get a clear record. So let's try not to talk
4 over one enough.
5     Fair enough?
6     A. I understand.
7     Q. Okay. This isn't a contest of sitting
8 here hours on end. You do -- are entitled to take
9 a break. We are operating under some time
10 constraints today, as you probably had explained
11 to you. But if there is a point you need to take
12 a break, please raise your hand, let me know,
13 somehow tell me you want to take a break.
14     Fair enough?
15     A. Very good.
16     Q. And I just want to make sure. If I'm in
17 the middle of a question, I'd ask that you not
18 take a break until at least you've had a chance to
19 answer my question and then you can move forward
20 at a break and -- and --
21     A. Okay.
22     Q. -- and you can take time to do whatever
23 you need to do. Okay?
24     A. Okay.
25     Q. First of all, let me ask -- there is a --

Page 11

1 in front of you I think what has been marked as
2 Exhibit 1 should be a deposition notice?
3     (Exhibit No. 1 was marked for
4      identification and attached hereto.)
5     THE WITNESS:
6         Yes.
7 BY MR. GOZA:
8     Q. And the deposition notice, just for
9 purposes of the record, was set for 9 o'clock this
10 morning. There was a scheduling conflict, and we
11 are here not actually starting your deposition
12 until 1 o'clock this afternoon; correct?
13     A. Correct.
14     Q. Have you had a chance to see that
15 deposition notice before today?
16     A. No.
17     Q. All right. The -- the deposition notice
18 asks you to bring certain items with you today.
19     Rather than us getting in too much detail,
20 let me just simply ask you: Did you bring any
21 documents here today with you in -- for purposes
22 of your deposition?
23     MS. HOFFMANN:
24         Counsel, let -- let me interject just
25         for a minute. We have provided you at the

Page 12

1 very beginning of this deposition some of
2 his billing invoices and records. I also
3 provided you with a copy of the Ochsner
4 schedule that they set forth for fees. We
5 have also prior to this deposition
6 provided you with objections to the Notice
7 of Deposition. The doctor has brought --
8 a copy of his report with him today, and
9 that's the only document.
10 MR. GOZA:
11     Got it.
12 BY MR. GOZA:
13     Q. So Doctor, just so I can have you say the
14 same thing and we don't have to go through it --
15 and I -- and I'm not -- I'm not -- just -- I just
16 want to get it on the record.
17     The only thing that you brought here with
18 you today is -- is your billing information; is
19 that correct?
20     A. And a copy of my expert report.
21     Q. And a copy of your expert report. Okay.
22     Is that -- so that's the sum total of the
23 documents that you have here today; correct?
24     A. Correct.
25     Q. Okay. Just looking quickly at your

Page 13

1 billing information, it appears to me that you're
2 -- and -- and let me ask this: Are you an
3 employee of the Ochsner system?
4     A. Yes.
5     Q. Okay. So how long have you been in -- in
6 such a capacity?
7     A. Thirty years.
8     Q. Oh. You've always been an employee of the
9 company?
10     A. Yes. Well, that's complicated. For the
11 first 15 or 20 years, I was a partner. But then
12 they restructured so that I'm an employee. So --
13     Q. Okay.
14     A. -- we're -- it's no longer a partnership.
15 It's a -- it's a typical employee of a giant
16 corporation.
17     Q. Okay. And your -- your -- the Ochsner
18 charge for your time here today, it looks to me
19 like it's $1185 an hour; is that --
20     A. Yes.
21     Q. -- correct?
22     And as I understand it, you are entitled
23 to keep 50 percent of that charge?
24     A. Yes.
25     Q. And the work that you do for purposes of

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 14

1  your review in the case as opposed to your
2  deposition testimony, is that -- are those charges
3  pursuant to the Ochsner corporate, or does that go
4  to you directly?
5      A.  I -- I charge $500 an hour for record
6  review.  Ochsner keeps 20 percent of that, and I
7  get 80 percent.
8      Q.  And the record set out, generally
9  speaking, the amount of time that you have spent
10 in working in this case?
11     A.  Yes, sir.
12     Q.  It appears to me that you did some initial
13 review and you've done some further review in
14 November and December; is that correct?
15     A.  Yes.
16     Q.  When was the last time that you had an
17 opportunity to meet with any of the lawyers in
18 this case?
19     A.  Monday evening, December 12th.
20     Q.  And I take it you haven't billed for that
21 time yet?
22     A.  No.
23     Q.  Meaning I'm correct?
24     A.  Correct.
25     Q.  And how long were you able to spend with

Page 15

1  the lawyers on Monday evening, December 12th?
2      A.  About two hours, a little bit less.
3      Q.  And December 12th was just a day or two
4  ago, two days ago?
5      A.  Two nights.
6      Q.  Two nights.
7      A.  Yes.
8      Q.  Were you aware that the deposition of our
9  GI expert was taken that Monday?
10     A.  Yes.
11     Q.  Were you apprised of some of the opinions
12 offered by that expert?
13     A.  Yes.
14     Q.  Did you know the expert, Dr. Winstead?
15     A.  Yes.
16     Q.  You consider him to be a qualified and
17 competent gastroenterologist?
18     A.  Yes.
19     Q.  In your -- and we have marked as Exhibit
20 No. 2 your report in this case.
21     (Exhibit No. 2 was marked for
22     identification and attached hereto.)
23 BY MR. GOZA:
24     Q.  Do you see that?
25     A.  Yes.

Page 16

1      Q.  And -- give me just one second.  If we
2  look -- attached to your report is Exhibit A,
3  which is your curriculum vitae; is that correct?
4      A.  Yes.
5      Q.  Exhibit B to your report is materials.  It
6  says Exhibit B is "Materials Relied On, Reviewed,
7  and/or Considered by James William Smith, MD";
8  correct?
9      A.  Correct.
10     Q.  So this Exhibit B sets forth all of the
11 materials that you have reviewed in preparation
12 for formulating and offering your opinions in this
13 case; is that correct?
14     A.  Yes.
15         I have read one additional article that I
16 did not put on there, and that was the -- Patel's
17 New England Journal study on the -- the ROCKET AF
18 study.  I apologize for not putting that on there.
19     Q.  Okay.
20     MS. HOFFMANN:
21         Well -- and I also want to say for the
22         record, for clarification purposes, he was
23         also provided with copies of some of the
24         plaintiff expert reports after this report
25         was submitted.  And they are not on the

Page 17

1         list, but he can tell you which ones he
2         looked at.
3  BY MR. GOZA:
4      Q.  Did you have an opportunity to see
5  Dr. Winstead's report?
6      A.  Yes.  I did.
7      Q.  What other experts did you see?
8      A.  I reviewed the expert reports of
9  Leissinger, Rinder, and Winstead.
10     Q.  Did you review the expert report of
11 Dr. Peters, the epidemiologist?
12     A.  No.  I did not see that.
13     Q.  Okay.  Let me ask you:  In terms of the
14 depositions -- and I just want to now make sure I
15 understand the wealth of materials that you've had
16 a chance to look at.
17         First, in terms of depositions, it says,
18 "All depositions."  Do you have specific
19 recollections of which ones you reviewed or which
20 ones you remember as you sit here today?
21     A.  I can try and go off the top of my head
22 and remember them all.  I mean, it -- it was --
23     Q.  I'm assuming that you remember the ones
24 that were most important to you?
25     MS. HOFFMANN:

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 18

1    Objection.
2    THE WITNESS:
3    I was -- I was supplied a lot of
4    depositions, both of the -- the
5    Boudreaux -- Mrs. Boudreaux, the doctors
6    involved -- the nurses involved.  So . . .
7  BY MR. GOZA:
8    Q.  Okay.  Would that have included Dr. Fail?
9    A.  Yes.
10   Q.  Dr. Joshi?
11   A.  Yes.
12   Q.  Do you know Dr. Joshi?
13   A.  Yes.
14   Q.  Consider him to be a qualified and
15 competent GI specialist?
16   A.  Yes.
17   Q.  Nurse Theriot?
18   A.  Well said.  Yes.
19   Q.  It says here too that you have reviewed
20 the Xarelto label, the 2013 and the 2014 label?
21   A.  Yes.
22   Q.  Have you reviewed any labels of any other
23 NOACs?
24   A.  No.  I have not.
25   Q.  It says all the medical records for Joseph

Page 19

1  Boudreaux.  When we use the term "all" -- there
2  certainly is a number of medical records for
3  Mr. Boudreaux.  Is that true?
4    A.  There are.
5    Q.  How many pages, if you recall?
6    A.  I have no way . . .
7    Q.  Okay.  Certainly goes back several --
8    A.  It'd be easier --
9    Q.  -- years?
10   A.  -- to guess pounds.  But . . .
11   Q.  Point is it goes back several years.
12 True?
13   A.  Yes.
14   Q.  Okay.  You have listed a number of
15 articles that you have reviewed?
16   A.  Yes.
17   Q.  How is it you went about gathering these
18 articles?
19   A.  Well, I was asked to make a report, not --
20 initially a report as almost an introduction or
21 primer on GI bleeding and -- and acute GI bleeding
22 in general.  So many of those articles are -- are
23 what I consider the kind of landmark articles that
24 I would tell my fellows or students that they're
25 important articles to know.

Page 20

1    Do you want me to keep going as far as --
2    Q.  Please.
3    A.  Okay.  So once I started going into the
4  specific aspect of bleeding in the NOACs -- I'm
5  sure this is the same way in law.  But as in
6  medicine, there are certain people you look toward
7  in the country as being leaders.  If -- if it's in
8  Crohn's disease, I look for something -- you know,
9  for a guy at Chicago.  For GI bleeding, I always
10 think of Dennis Jensen at UCLA.  For NOACs, I
11 think of Neena Abraham.  And so I -- I checked and
12 see what I found that would be in -- written by
13 her.  Because I -- I mean, at national meetings, I
14 think a lot of us look to her as being an expert
15 on this.  And so that -- that would be how I --
16 how I started getting articles on that.
17   Q.  Okay.  Were you supplied any articles by
18 defense counsel?
19   A.  No.
20   Q.  So the articles that you have listed here
21 -- and -- and I -- I want to make sure.  I -- I
22 count.  There are a number of just general
23 articles -- fair to say -- that talk about GI --
24 acute GI bleeding in a -- in a more general
25 fashion, not necessarily related to

Page 21

1  anticoagulants?
2    A.  Yes.
3    Q.  Then you have some specific articles that
4  are related to gastrointestinal bleeding
5  associated with direct oral anticoagulants;
6  correct?
7    A.  Correct.
8    Q.  And I counted one, two, three, four, five,
9  six articles related to bleeding on
10 anticoagulants.  Is that -- why don't you look
11 and --
12   A.  I'm sure -- that sounds about --
13   Q.  -- just make sure.
14   A.  Right.  But --
15   Q.  Yeah.  I just want -- and we can identify
16 which ones they are.  Let -- in fact, let's walk
17 through them.  If you turn to the back page --
18   A.  Yes.
19   Q.  -- you have the Abraham article --
20   A.  Yes.
21   Q.  -- correct?
22     Both the first one and the second one?
23   A.  And the second one, yes.
24   Q.  Then if you go I think to the Article 4
25 you have listed, the Ashburner article, that --

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 22

1    A.  Well --
2    Q.  -- seems to be --
3    A.  And -- and Acosta is too.  I mean,
4  that's -- that -- that -- Acosta wrote for
5  gastrointestinal endoscopy, the --
6    Q.  Okay.  Is -- sorry.  Go ahead.
7    A.  So the -- the -- I consider that a key
8  article as far as both NOACs and Coumadin.
9    Q.  Did it have any discussion about the
10 relative risk factors associated with the
11 different NOACs?
12   A.  No.  It did not --
13   Q.  Okay.  It doesn't have anything -- and --
14 and part of what I'm -- what I really want to
15 understand now -- you offered some opinions here
16 about the relative risks of bleeding associated
17 with NOACs.  And I want to understand the basis
18 for which you're operating.
19       And so the -- the first article that might
20 have something relevant to that would be the
21 Abraham article, the first one you list; correct?
22   A.  Correct.
23   Q.  The second article would be the other
24 Abraham article that's No. 2 on your list?
25   A.  Correct.

Page 23

1    Q.  The next article would be Ashburner, the
2  No. 4 on your list?
3    A.  Yes.
4    Q.  I think we then go down to No. 7, Chang,
5  that article from 2015 from the British -- British
6  Medical Journal; correct?
7    A.  Correct.
8    Q.  And then we have the Desai article, which
9  is out of the Journal of Gastroenterology from
10 2016?
11   A.  Correct.
12   Q.  And then we have Guttermann, the top
13 article on the second page, related to GI
14 bleeding?
15   A.  Right.
16   Q.  Have I covered the articles that you
17 believe relate to the relative risk factors
18 associated with the use of anticoagulants and
19 bleeding?
20   A.  Well, I think -- I think Radaelli and
21 Rockey both have important articles in it as well.
22   Q.  Okay.  Do either one of those attempt to
23 discern the relative safety factors or risk
24 factors associated with the relative NOACs?
25   A.  I don't think they compare the NOACs, if

Page 24

1  that's what you're asking.
2    Q.  That is what I'm asking.
3    A.  No.
4    Q.  Do they -- okay.
5    A.  To -- to my knowledge, they do not.
6    Q.  You cite those for very specific things in
7  your report, those two articles for very specific
8  things in your report; correct?
9    A.  Correct.
10   Q.  And neither of those were cited as it
11 pertains to the relative risk factors of
12 gastrointestinal bleeding associated with the
13 NOACs; correct?
14   A.  Well, I -- I still think they were
15 important articles as far as the assessment of GI
16 bleeding in patients on NOACs.
17   Q.  Sure.  And I'm not talking about the
18 assessment --
19   A.  Okay.
20   Q.  -- of patients.
21       You -- you cite them for symptoms and
22 issues associated with patients that have bleeds
23 on NOACs; correct?
24   A.  Yes.  I --
25   Q.  And -- and what I'm trying to discern, in

Page 25

1  this world of documents that --
2    A.  Yeah.
3    Q.  -- you have in front of you, the number of
4  articles that you looked at that talk about the
5  relative risk factors of bleeding in the NOACs.
6  And I think we've --
7    A.  Okay.
8    Q.  -- identified the six that do that.
9    A.  Okay.
10   Q.  Is that true?
11   A.  Yes.  Yes.
12   Q.  And is it fair to say that those -- or
13 strike that.
14       Obviously not all six of those articles
15 were written by --
16   A.  Neena Abra- --
17   Q.  -- Neena Abraham --
18   A.  Right.
19   Q.  -- correct?
20   A.  Yes.  It would --
21   Q.  How did you come about the other articles?
22   A.  Well, I think that after I -- fortunately
23 the timing of this was that the American Journal
24 of Gastroenterology came out with this -- really
25 this collection of several articles all at once.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 26

1 You know, one was by Rockey, Don Rockey, someone I
2 respect quite a bit. Desai was well-written.
3 I -- I Desai had a table of different rivaroxaban
4 trials, and he specifically quoted the Chang. So
5 I got Chang from reading the Desai article. I
6 don't know how I got the others other than
7 probably looking at the articles, seeing which
8 study they quoted, and -- and -- and trying to
9 pull that article.
10 Q. Okay. You're not trying to represent to
11 either the court or the jury that this is an
12 exhaustive search of the literature on the various
13 risk factors associated with the different NOACs,
14 are you, sir?
15 A. No.
16 Q. If one were to do an epidemiologic review
17 in order to try to make a determination about the
18 risk factors associated with each of the NOACs or
19 even as they compare to one another or as they
20 compare to warfarin, one would want to have as
21 many articles available to them as they could.
22 True?
23 MS. HOFFMANN:
24 Objection.
25 MR. SLONIM:

Page 27

1 Objection.
2 THE WITNESS:
3 If that -- if that's one's goal as an
4 epidemiologist, to -- to do that, sure.
5 BY MR. GOZA:
6 Q. Yeah. And a couple things -- let's talk
7 -- I want to make sure we know the -- the realm of
8 your opinions in this case.
9 Is it fair to say that your opinions are
10 set out in Exhibit No. 2?
11 A. Yes.
12 Q. And you don't intend to offer any opinions
13 that are not set out in Exhibit No. 2?
14 MS. HOFFMANN:
15 Objection.
16 THE WITNESS:
17 If -- if you -- I'm -- I'm prepared to
18 give opinions on whatever you ask, if I
19 think that's within my expertise. So if
20 you ask something that's not on there,
21 I'll be happy to answer that to the best
22 of my ability.
23 BY MR. GOZA:
24 Q. Okay. And -- but what I'm really
25 getting --

Page 28

1 A. Yes.
2 Q. -- at is: With respect to the affirmative
3 opinions that you intend to offer, you've spent
4 time going through this report and trying to set
5 out those key opinions that you think are
6 relevant?
7 A. Yes.
8 Q. And I understand that as it pertains to
9 any opinion, you might have other small opinions
10 or other subopinions, so to speak.
11 But the major points you're trying to make
12 are in your report?
13 A. Correct.
14 Q. I want to talk just for a moment about the
15 risk of gastrointestinal bleeding.
16 One of the articles that you cited in your
17 materials was an article by Chang. Is that true?
18 A. Correct.
19 Q. And, first of all, you would agree that
20 gastrointestinal bleeding can carry with it --
21 well, strike that. Let me start over.
22 The articles that you cite in your report
23 as either relied on or reviewed, I assume you
24 reviewed them because you believe them to be
25 reasonably reliable articles?

Page 29

1 MS. HOFFMANN:
2 Objection. Form.
3 THE WITNESS:
4 Correct.
5 BY MR. GOZA:
6 Q. And they would be articles that you felt
7 would be -- were respected and that you could --
8 in terms of some of the information therein, would
9 be helpful to you in formulating your opinions?
10 A. Correct.
11 Q. Prior to being retained in this litigation
12 as an expert witness, had you ever done any
13 literature search on the NOACs?
14 A. No.
15 Q. And when I say "NOACs," you understand I
16 mean novel oral anticoagulants?
17 A. Correct.
18 Q. And it would include at least three. And
19 maybe there's -- there's four of them now, I
20 guess?
21 A. Correct.
22 Q. And we're talking about Xarelto, Pradaxa,
23 Eliquis -- four --
24 A. And Savyasa [sic]. Isn't that the fourth?
25 Q. Yeah. I think that is. That's --

Page 30

1 A. Yeah.
2 Q. Struggling with it. Sorry. Thank you.
3 And the fourth a -- Savasa [sic]. Okay.
4 Am I correct that you yourself have never
5 prescribed Xarelto?
6 A. That's correct.
7 Q. You have never prescribed any NOAC. True?
8 A. Correct.
9 Q. And you've never prescribed a NOAC. So
10 you yourself have never sat down and done the
11 risk-benefit analysis of weighing the use of a
12 NOAC versus the -- the benefits of -- of a NOAC in
13 a -- in a patient?
14 A. Correct.
15 Q. And am -- and prior to this litigation,
16 you've never sat down and read specific articles
17 with respect to NOACs. True?
18 A. Right.
19 Q. Fair to say you don't consider yourself an
20 expert on NOACs?
21 A. I -- I treat patients almost on a weekly
22 basis that are on NOACs, so I have a great deal of
23 experience. And -- and certainly I have
24 consultations with cardiologists frequently after
25 I take care of the patient, maybe interrupt the

Page 31

1 NOAC for a procedure or take care of them in the
2 hospital with bleeding. So I -- I -- I have
3 experience with that, but only in that capacity.
4 Q. And that's what I -- I want to make sure I
5 understand.
6 A. Yeah.
7 Q. So your -- the -- there's a difference
8 between having experience with a drug and being an
9 expert on it. True?
10 A. Correct.
11 MS. HOFFMANN:
12 Objection.
13 BY MR. GOZA:
14 Q. In terms of being an expert on the use of
15 the drug, when it's used, making that risk-benefit
16 analysis, that's not something you do; correct?
17 MS. HOFFMANN:
18 Objection.
19 THE WITNESS:
20 That's not something I do.
21 BY MR. GOZA:
22 Q. Okay. What you might do is -- if somebody
23 has a bleed on an anticoagulant or a bleed caused
24 by an anticoagulant, you would see them in your
25 practice?

Page 32

1 A. Correct.
2 Q. And you might consult with a physician
3 about the need to interrupt the use of a NOAC or
4 any anticoagulant in order for you to do a
5 procedure?
6 A. Correct.
7 Q. And then you and a cardiologist might
8 consult about restarting the NOAC under certain
9 circumstances?
10 A. Correct.
11 Q. And that would be the role that you have
12 with respect to -- to NOACs?
13 A. Yes.
14 Q. The one thing you do know having looked at
15 -- strike that.
16 MR. BYRNE:
17 What are you looking for?
18 MR. GOZA:
19 I'm just grabbing the label. There we
20 go. I knew I had one.
21 BY MR. GOZA:
22 Q. You said you have looked at the Xarelto
23 label; correct?
24 A. Correct.
25 Q. No question that the Xarelto label and --

Page 33

1 or strike that.
2 The Xarelto label indicates that Xarelto
3 can cause serious bleeding events. True?
4 MR. SLONIM:
5 Can we -- can we mark the label for
6 the next questions you have?
7 MR. GOZA:
8 I'm sorry? What?
9 MR. SLONIM:
10 If you're going to ask some questions
11 directed to it, just the label, can we
12 mark it as an exhibit so the doctor has it
13 in front of him?
14 MR. GOZA:
15 If you want to, if you need it.
16 BY MR. GOZA:
17 Q. I'm -- I'm assuming you're familiar with
18 the label?
19 A. Well, I think if you ask me about it, I
20 probably should have it --
21 Q. Sure.
22 A. -- in front of me just so I see the
23 precise verbiage.
24 MR. GOZA:
25 (Tenders document.)

Page 34

1 MR. SLONIM:
2 Oh. Thank you.
3 MS. HOFFMANN:
4 If you want to -- you know, Exhibit 5.
5 (Exhibit No. 5 was marked for
6 identification and attached hereto.)
7 MR. SLONIM:
8 Number 3.
9 MS. HOFFMANN:
10 Well, he's got --
11 THE WITNESS:
12 Excuse me.
13 MS. HOFFMANN:
14 -- exhibits over here that he's
15 marked.
16 MR. BYRNE:
17 Oh.
18 MS. HOFFMANN:
19 He's got 4 as the billing. He's
20 marked 3.
21 (Exhibit Nos. 3 and 4 were marked for
22 identification and attached hereto.)
23 MS. HOFFMANN:
24 He's got 2 as the report. So 1, 2.
25 MR. GOZA:

Page 35

1 We've marked as Exhibit -- is that
2 Exhibit 5 on it? Is it on the wrong page?
3 There somewhere. Okay. We've marked as
4 Exhibit 5 --
5 THE WITNESS:
6 Exhibit 5.
7 MR. GOZA:
8 -- the two thousand -- August 2013
9 label for Xarelto.
10 BY MR. GOZA:
11 Q. If you looked at Section 5.1 -- 5.2. I'm
12 sorry.
13 A. Yes.
14 Q. Okay. Under the Risk of Bleeding, does it
15 say Xarelto can cause serious bleeding?
16 A. Yes.
17 Q. And Xarelto can cause -- when we -- it
18 says, "Xarelto . . .can cause serious . . .
19 bleeding," it can cause gastrointestinal bleeding?
20 A. Yes.
21 Q. If we go to the specifics in this case for
22 just a moment, Mr. Boudreaux had a-fib diagnosed
23 in January of 2014. Would that be consistent with
24 your recollection of the facts of this event?
25 A. Correct.

Page 36

1 Q. And he had been on several medications for
2 a number of years prior to that. True?
3 A. True.
4 Q. And it -- with respect to -- and let --
5 and let me ask you.
6 You've had a chance to review the medical
7 records in this case. Is it your intent to offer
8 any opinion that any doctor deviated from the
9 standard of care in their treatment of
10 Mr. Boudreaux?
11 A. No.
12 Q. So you agree with the -- the treatment and
13 the diagnoses made by the doctors?
14 A. I agree with the treatment and the
15 diagnoses made by the doctors.
16 Q. And with respect to Mr. Boudreaux --
17 A. I mean, there may be some nuances on that
18 that we can talk about later on. But . . .
19 Q. But generally, you agree?
20 A. Yeah. I think the -- I think the --
21 the -- I think that the care was appropriate.
22 Q. Okay. So let -- let's go through this
23 then. The -- he was diagnosed with --
24 MS. HOFFMANN:
25 Feel free -- you can look at your

Page 37

1 report as --
2 THE WITNESS:
3 Okay.
4 MS. HOFFMANN:
5 -- he's doing this, if you want.
6 BY MR. GOZA:
7 Q. Sure. I'm not sure any of this is in your
8 report. But you're free to look at whatever --
9 MS. HOFFMANN:
10 No. But his rendition of the facts is
11 in there.
12 THE WITNESS:
13 Yeah.
14 MR. GOZA:
15 Yeah. But -- but we'll get, I think,
16 agreement on basic facts.
17 BY MR. GOZA:
18 Q. So atrial fibrillation on January 7th; is
19 that correct?
20 A. Correct.
21 Q. We -- he was started on Xarelto in the
22 hospital. True?
23 A. True.
24 Q. He was started on Xarelto in the morning
25 of January 8th and January 9th; correct?

Page 38

1    A.  That's my understanding.  Yes.
2    Q.  He was seen three times over the course of
3  the next month at his cardiologist's office.
4  True?
5    A.  I think that's true.
6    Q.  Each and every time that he was seen at
7  the cardiologist's office, they documented that he
8  was on Xarelto; is that correct?
9    A.  I don't remember that.
10   Q.  Okay.  You don't remember that, seeing on
11 the medication --
12   A.  I don't remember that --
13   Q.  -- chart?
14   A.  I don't remember that specifically on the
15 medication charts.
16   Q.  If it is on there, you don't have any
17 reason to dispute it?
18   MS. HOFFMANN:
19     Objection.
20   THE WITNESS:
21     The -- I would say that if it is on
22     there, then I'm assuming that they think
23     he is taking it.  I've -- I've been
24     confused about the number of medications
25     that he brought to his deposition, and I

Page 39

1     don't know how to reconcile that.  So
2     that's all I can say.
3  BY MR. GOZA:
4    Q.  Okay.  The -- and I -- he was diagnosed
5  with an acute GI bleed on February 3rd of 2014; is
6  that correct?
7    A.  Yes.
8    Q.  He had a PT taken that day that was 13.6;
9  correct?
10   A.  Correct.
11   Q.  That PT was outside the reference range of
12 normal for that hospital.  True?
13   A.  True.
14   MS. HOFFMANN:
15     Objection.
16 BY MR. GOZA:
17   Q.  The -- that would be consistent with a
18 patient on an anticoagulant.  True?
19   MS. HOFFMANN:
20     Objection.
21   THE WITNESS:
22     That -- that's how I interpreted that.
23 BY MR. GOZA:
24   Q.  And the anticoagulant you presumed he was
25 on at the time was Xarelto.  True?

Page 40

1    A.  True.
2    Q.  And the --
3    A.  Again, not understand -- not knowing
4  exactly what pills he took when.  But at that
5  point in time, that would be my assumption that's
6  the reason why his pro time was a little high.
7    Q.  Okay.  And is it -- just so I'm correct,
8  Mr. Boudreaux, in your -- the review -- review of
9  the records, had never had a prior episode of an
10 acute GI bleed.  True?
11   A.  He'd never had a clinically overt acute
12 bleed, to my knowledge.
13   Q.  And the Xarelto was stopped.  True?
14   A.  Correct.
15   Q.  And it is true that Mr. Boudreaux, after
16 the Xarelto was stopped, stopped bleeding?
17   A.  He stopped having -- he had no further
18 acute overt bleeding.  But I would say there would
19 be some evidence to suggest that -- as we follow
20 him in time, over the next couple of years, he has
21 a unexplained anemia which would be very
22 consistent with ongoing occult GI bleeding.
23   Q.  It would be very consistent with a number
24 of things.  True?
25   A.  Right.

Page 41

1    Q.  You're not offering an opinion to a
2  reasonable degree of medical certainty that
3  Mr. Boudreaux has acute ongoing occult bleeding?
4    A.  Actually I think it's highly likely that
5  he's having chronic -- chronic ongoing slight
6  bleeding.
7    Q.  And tell me the things that you base that
8  on.
9    A.  Well, his hemoglobin was 10.6 in the
10 summer of 2016.  There'd be no reason why his
11 blood count wouldn't have -- be -- be normal at
12 that point.
13   Q.  Do you rule out the possibility that he
14 has some underlying hematologic issue?
15   A.  What I would say is that that has not been
16 explored.  I'm asked to see patients that are
17 anemic all the time.  I'm not a hematologist, but
18 I get referrals for anemia all the time.  And I
19 feel very comfortable in the initiation -- in the
20 initial evaluation and -- and assessment of those
21 patients.  I think that if you have a patient with
22 -- with a low hemoglobin, normal MCV, but there's
23 this question in the past of B12 deficiency, I
24 think there's a very -- probability that they also
25 -- the smaller cells that would go along with an

Page 42

1 iron deficiency too.
2    Q. And when you talk about the smaller cells,
3 you're talking about -- and you saw
4 Dr. Leissinger's explanation of why there might be
5 smaller cells?
6    A. I don't remember that in Dr. Leissinger's.
7 No.
8    Q. With respect to the differentiation
9 between -- and that's what -- when you're talking
10 about -- tell me the test again.
11    A. The RDW or the --
12    Q. The RDW.
13    A. -- MCV?
14    Q. We're --
15    A. Yeah.
16    Q. -- talking about an actual -- is it a
17 qualitative description of the cells themselves?
18    A. It's -- it's the variation in the size of
19 the cells.
20    Q. Right.
21    A. So if it's elevated, that means that
22 there's a population of -- of more diverse cells,
23 large cells and small cells.
24    Q. And did she -- did you have a chance or an
25 opportunity to read what her explanation of that

Page 43

1 was?
2    A. I don't remember seeing her explanation of
3 that.
4    Q. Has any doctor, to your knowledge,
5 diagnosed -- any treating physician diagnosed
6 with -- Mr. Boudreaux with a chronic occult
7 bleeding, gastrointestinal bleeding?
8    A. I don't think they've looked for it. So
9 the answer is no, but I don't think they looked
10 for it.
11    Q. So no one has, even though -- strike that.
12    All these doctors have been deposed and
13 asked about these lab references. Nobody has
14 looked for that issue?
15    MS. HOFFMANN:
16        Objection.
17    THE WITNESS:
18        I -- I -- I don't remember them
19        addressing that issue.
20 BY MR. GOZA:
21    Q. But in a patient that had -- if -- if one
22 was concerned about a patient's decreased
23 hemoglobin and -- that would be one thing that, if
24 they were concerned about an -- an -- an occult
25 bleed, there are tests that can be done to

Page 44

1 evaluate that?
2    MS. HOFFMANN:
3        Objection. Form.
4    THE WITNESS:
5        There -- there are different tests
6        that can be done to -- to help it.
7 BY MR. GOZA:
8    Q. What would those tests be?
9    A. Well, you could go on a very basic and
10 crude level and do stools for occult blood. If
11 it's negative, it doesn't mean he's not
12 intermittently bleeding. If it's positive,
13 there's some false positive. But that's a --
14 that's a inexpensive and easy test that could be
15 done.
16    Q. What else?
17    A. One could -- one could do the -- the --
18 repeat some of the iron studies, the iron in TIBC,
19 which were indicative of a iron deficiency when
20 they were first done on February 5th. But they
21 weren't repeated afterwards.
22    Q. Okay.
23    A. You could do another complete GI workup.
24    Q. Okay. Have we -- I want to just make sure
25 I got an exhaustive list.

Page 45

1    A. Stool test, blood test, or GI workup,
2 those would be the things you could do.
3    Q. Okay. So going back to February 3rd, it's
4 fair to say that he presented to the St. Anne's
5 Hospital with symptoms of a GI bleed; correct?
6    A. Yes.
7    Q. He had decreased hemoglobin?
8    A. Yes.
9    Q. And that hemoglobin was down -- it was at
10 6s; correct?
11    A. It was 6.7. Yes.
12    Q. 6.7, that would be consistent with an
13 acute GI bleed?
14    A. No. Actually just the hemoglobin being
15 low tells you no -- doesn't know whether it's
16 acute or chronic. You can have a chronic bleed
17 and come in with 6.7.
18    Q. Right. If --
19    A. The fact that it --
20    MS. HOFFMANN:
21        Wait.
22    THE WITNESS:
23        -- probably took place over seven days
24        -- or seven to four days. I think the
25        first black stool was reported four days

Page 46

1    ahead of time.  But there was a report of
2    being weak seven days ahead of time.  So
3    the bleeding has taken place more than
4    likely over four days, if not seven days.
5  BY MR. GOZA:
6    Q.  Okay.  So it -- somewhere within four to
7  seven days arrival of the hospital you believe he
8  had a GI bleed?
9    A.  He started bleeding.  Yes.
10   Q.  Okay.  So somewhere between January 27th
11 -- 26th -- January 26th and January 29 he started
12 bleeding?
13   A.  Correct.
14     Now, I also believe there's the very real
15 possibility that there was some occult bleeding
16 even before that.  Because on January 9th, he did
17 have a hemoglobin of 13.  And although --
18   Q.  Was --
19   A.  -- that's only a little bit low, that is
20 low.
21   Q.  It was 13.8?
22   A.  13.0 on the 9th, I think, and 13.8 on the
23 6th.
24   Q.  On the 9th, you said?
25   A.  On -- his initial one was 13.8 and then on

Page 47

1  a follow-up was 13.0.
2    Q.  Right.  In fact, that's why he got the
3  additional two --
4    A.  Uh-uh.  No.  I'm talking about January.
5    Q.  Right.
6    A.  I'm talking about January, the hemoglobin
7  of 13.0.
8      COURT REPORTER:
9        I can only have one at a time.  I'm
10   sorry.
11     THE WITNESS:
12       Oh, I'm sorry.
13     MR. GOZA:
14       No.  That's okay.  We'll try to do
15   better.
16     MS. HOFFMANN:
17       And, Counsel, if you will just let
18   Dr. Smith really finish his answer.  I
19   think he speaks a little bit slower than
20   perhaps you do.  And he has a cold today,
21   which may be causing him to speak even a
22   little bit slower.  So maybe just give him
23   a minute.
24 BY MR. GOZA:
25   Q.  With respect to at least the acute nature

Page 48

1  of his bleed -- and -- and strike that.
2      Are you saying possibilities -- is it your
3  intent to offer some medical opinion to
4  probability about that issue, or are you saying
5  that's simply a possibility?
6    A.  I think that at the time, at that initial
7  encounter in January or in February, I would have
8  not thought that that's very significant.  13.0's
9  not that low.  However, in retrospect, when one
10 looks at the course of events for two years after
11 the Xarelto has been stopped and how he's still
12 anemic, I think with -- I think with probability
13 he was having occult bleeding before.  And I think
14 he continued to have occult bleeding in the years
15 to come, most likely from a arteriovascular
16 malformation, a AVM, of the GI tract.
17   Q.  And can you tell me what evidence that you
18 have that he has an AVM of his gastrointestinal
19 tract?
20   A.  That would -- that would be the most
21 likely cause of the GI bleeding in the -- of this
22 nature.  It'd be -- it's the easiest thing to be
23 missed on a first evaluation, and that it would
24 not be uncommon at all for that to be missed by
25 upper scope, lower scope, or a video capsule.

Page 49

1    Q.  But no one's actually ever seen an AVM.
2  True?
3    A.  That's right.
4    Q.  And thorough studies have been done in
5  terms of evaluation of Mr. Boudreaux's GI tract?
6      MS. HOFFMANN:
7        Objection.  Form.
8      THE WITNESS:
9        A complete workup was done, but it's
10   not infallible.  It is easy.
11       And I -- I can't tell you -- I mean,
12   this is what I do for 30 years, is have
13   referrals for GI bleeding that's not found
14   at other institutions.  And it's very
15   common if when we repeat the test we find
16   the cause of bleeding.  It could be
17   something missed on the upper tract.  Be
18   more commonly -- it's -- because it's very
19   easy to miss a lesion -- a small lesion on
20   a video capsule.
21       For example, a video capsule records
22   data for eight hours.  It takes a picture
23   every half second.  It would be very
24   uncommon for -- for any doctor to spend
25   more than an hour looking at that study.

Page 50

1  Even at a hour, you are looking at 32
2  frames per second.  I can't tell you how
3  many video capsule studies I've seen where
4  an AVM was just found on one or two
5  frames.  So if -- depending on the -- the
6  speed at which the doctor went through
7  that study, it's easy to miss.
8      But it's also -- even -- even
9  regardless of how much time they spent, it
10 depends on what kind of prep the patient
11 had ahead of time, whether there were
12 bubbles obscuring the mucosa, whether
13 there were pill fragments obscuring the
14 mucosa, or even whether the AVM was
15 located behind a fold.  Because the video
16 capsule can't turn around and go
17 backwards.  It's going in one direction.
18 And so it is -- it's -- it's very common
19 to -- for an initial video capsule to miss
20 something.  And if you keep looking,
21 you'll find it.
22 BY MR. GOZA:
23     Q.  Okay.  So let me go back and ask this
24 question then:  Have -- have you asked to see an
25 actual video capsule study itself?

Page 51

1      A.  No.  I have not.
2      Q.  Have you just asked whether you could go
3  back and look frame by frame and to see if anybody
4  missed anything that might have been there?
5      A.  No.  I -- I would --
6      Q.  That would at least be one way --
7      MS. HOFFMANN:
8          Let -- he's not finish with his
9  answer.
10 BY MR. GOZA:
11     Q.  Let -- let me -- the answer --
12     MS. HOFFMANN:
13         What --
14     MR. SLONIM:
15         No.  No.  No.
16     MS. HOFFMANN:
17         Kirk, come on.
18     MR. SLONIM:
19         Kirk --
20     MR. GOZA:
21         Okay.  I know.  But, I mean --
22     MS. HOFFMANN:
23         Be polite.
24     MR. SLONIM:
25         Kirk, either withdraw the question or

Page 52

1  let him complete the answer.
2      MR. GOZA:
3          Well, listen --
4      MR. SLONIM:
5          No.  No, Kirk.
6      MR. GOZA:
7          Let me re-ask the question.
8      MR. SLONIM:
9          No.  Withdraw this --
10     MR. GOZA:
11         No.  I'm going to -- I'm --
12     MR. SLONIM:
13         Withdraw -- withdraw this one.
14     MR. GOZA:
15         I'll withdraw the one and re-ask the
16 question.  Because I do want to get
17 answers --
18     THE WITNESS:
19         All right.
20     MR. GOZA:
21         -- to my question.  I don't want long
22 answers if it's a yes-or-no question.
23     MS. HOFFMANN:
24         I object to -- to that dissertation,
25 Counsel.  He is giving you, as he agreed

Page 53

1  at the beginning of the deposition, to
2  give full and complete answers.  You just
3  need to give him an opportunity to do
4  that.
5  BY MR. GOZA:
6      Q.  Have you asked -- and I think this is a
7  yes-or-no question.
8          Have you asked to see the video capsule
9  study that was done?
10     A.  It's my understanding under either HIPAA
11 or medical ethics I have no right to take a look
12 at that.  I'm an expert witness in this case.  I
13 can't -- I can't look at that study.
14     Q.  But you could ask your lawyers or the
15 lawyers on the other side to request the study and
16 look at it.  True?
17     MS. HOFFMANN:
18         He does not have to answer questions
19 about conversations with lawyers.
20     MR. GOZA:
21         Okay.  All right.  Well, I'm not
22 asking him if he had a conversation with a
23 lawyer.  I'm saying --
24     MS. HOFFMANN:
25         You --

Page 54

1 MR. GOZA:
2 -- you -- you could --
3 MS. HOFFMANN:
4 -- just asked him.
5 MR. GOZA:
6 I said --
7 THE WITNESS:
8 I --
9 MR. GOZA:
10 -- well, you could. That's all --
11 THE WITNESS:
12 I don't --
13 MR. GOZA:
14 -- I'm asking.
15 THE WITNESS:
16 I don't know if I have that ability to
17 do that.
18 BY MR. GOZA:
19 Q. Okay. Long and short of it is that you
20 haven't seen it. True?
21 A. I have not seen it. I've seen the report
22 of it.
23 Q. And that was done by Dr. Joshi?
24 A. Yes.
25 Q. Did you see Dr. -- or strike that.

Page 55

1 You believe that the patient was
2 anticoagulated with Xarelto based on the PT time
3 that you saw on February 3rd, 2014. True?
4 MS. HOFFMANN:
5 Objection.
6 THE WITNESS:
7 I believe he was anticoagulated at
8 that time.
9 MR. GOZA:
10 Okay.
11 THE WITNESS:
12 I don't know how much he took in the
13 25 days ahead of time, but at that time I
14 think he was.
15 BY MR. GOZA:
16 Q. Okay. I am correct that the -- do you
17 know -- understand how quickly Xarelto enters the
18 bloodstream?
19 A. It enters right away.
20 Q. And it reaches its maximum level of
21 anticoagulation within three or four hours?
22 A. That's my understanding.
23 Q. And so even if one took one pill of
24 Xarelto, it can cause a state of anticoagulation
25 that increases the risk of bleeding. True?

Page 56

1 MS. HOFFMANN:
2 Objection.
3 THE WITNESS:
4 For the duration of that medicine, and
5 that's -- yeah.
6 BY MR. GOZA:
7 Q. I am correct. True?
8 A. Yes.
9 Q. Yes.
10 And for however long its effective life is
11 in the -- in the bloodstream?
12 A. Right.
13 Q. And how long the effective life is in the
14 bloodstream may vary depending upon certain
15 individual characteristics of the patient?
16 MR. SLONIM:
17 Objection.
18 MS. HOFFMANN:
19 Objection.
20 THE WITNESS:
21 I think the main variable is renal
22 function. I'm not -- I'm not familiar
23 with other variables.
24 BY MR. GOZA:
25 Q. Where you've -- you've -- okay. So let --

Page 57

1 let me ask this -- or strike that.
2 Do you have an understanding of the
3 half-life of the drug?
4 A. Yes. I do.
5 Q. And what is that?
6 A. Six to nine hours.
7 Q. Okay. And then do you know how many
8 half-lifes it takes before the entire effective
9 anticoagulant ability of the drug out of the
10 bloodstream?
11 MS. HOFFMANN:
12 Objection. Form.
13 THE WITNESS:
14 My understanding is that I can feel
15 safe in doing a procedure 24 hours after
16 the last dose.
17 BY MR. GOZA:
18 Q. So just so we're on the -- on the same
19 page, once a patient takes one pill of Xarelto,
20 they are at increased risk of bleeding as soon as
21 the drug reaches its maximum effect, within two to
22 three hours. True?
23 A. True.
24 Q. And that lasts for the duration of the
25 drug, whatever time it is in the patient's system.

Page 58

1  True?
2      A.  True.
3      Q.  You saw Dr. Masri's record that indicated
4  he believed that Mr. Boudreaux's acute
5  gastrointestinal bleed was related to his use of
6  Xarelto?
7      MS. HOFFMANN:
8          Objection.
9  BY MR. GOZA:
10     Q.  Correct?
11     A.  Right.
12     Q.  Do you agree with that?
13     A.  I think that the Xarelto combined with the
14  aspirin was a contributing factor to this --
15  Mr. Boudreaux's bleed, which was caused by an
16  underlying lesion that we haven't found yet.
17     Q.  So --
18     A.  And that -- so I think the --
19     Q.  Sorry.
20     A.  Yeah.  So -- yeah.  So that's all.
21     MS. HOFFMANN:
22          You can finish your answer.
23     MR. GOZA:
24          No.  Don't --
25     MS. HOFFMANN:

Page 59

1          Don't let --
2      THE WITNESS:
3          That -- that --
4      MS. HOFFMANN:
5          -- him cut you off.
6      THE WITNESS:
7          That -- that's --
8      MR. GOZA:
9          Yeah.  I mean --
10     THE WITNESS:
11          That -- that -- that --
12     MS. HOFFMANN:
13          He doesn't mean to.
14  BY MR. GOZA:
15     Q.  Are -- are you --
16     A.  Yeah.
17     Q.  -- done?
18     A.  No.  Yeah.  And we're done.
19     Q.  Okay.  Okay.  I've seen the word or the
20  language used that Xarelto can precipitate a
21  gastrointestinal bleed.  Have you heard that term,
22  seen the term "precipitate"?
23     MS. HOFFMANN:
24          Objection.  Form.
25     THE WITNESS:

Page 60

1          I think if a person has a underlying
2  lesion, then any anticoagulant can -- we
3  can use whatever word we want:
4  precipitate, initiate.  But there has to
5  be an underlying lesion for any
6  anticoagulant to cause the bleed.
7  BY MR. GOZA:
8      Q.  In other words, the patient could have a
9  preexisting condition that Xarelto -- once Xarelto
10  was added, it initiated the bleed?
11     A.  Correct.
12     MS. HOFFMANN:
13          Objection.
14  BY MR. GOZA:
15     Q.  And that's what you believe happened with
16  respect to Mr. Boudreaux's bleed.  True?
17     MS. HOFFMANN:
18          Objection.
19  BY MR. GOZA:
20     Q.  That is that he had a preexisting lesion
21  of some sort and that Xarelto initiated his acute
22  GI bleed?
23     A.  I believe that he had a underlying pre- --
24  preexisting condition and that Xarelto in
25  combination with aspirin precipitated the

Page 61

1  bleeding.  Because we -- we don't -- he was on
2  aspirin with it, so we can't -- we don't know if
3  this would have happened whether or not he was on
4  aspirin.
5      Q.  Well, we know he had taken aspirin before
6  without Xarelto.  True?
7      A.  Correct.
8      Q.  And he did not have anybody -- nobody had
9  diagnosed him with an acute bleed while on
10  aspirin.  True?
11     A.  There had never been an acute overbleed
12  before.  Correct.
13     Q.  So the only thing that changed as of
14  January -- or I'm sorry -- February 3rd of -- of
15  2014 was the addition of Xarelto.  True?
16     MS. HOFFMANN:
17          Objection.
18     THE WITNESS:
19          Well, the only thing that -- I mean,
20  there are many things changing.  I mean,
21  he's -- now has atrial fib.  There's other
22  things like that.  But -- but from a
23  bleeding standpoint, yes, he's now on
24  aspirin and Xarelto.
25  BY MR. GOZA:

Page 62

1   Q.  So he'd been able to -- at least from an
2   acute bleeding standpoint, been able to tolerate
3   the aspirin; correct?
4        MS. HOFFMANN:
5          Objection.
6        THE WITNESS:
7          With the caveat that if -- if that's
8          correct, that his blood count was a little
9          bit low on January 9th, that there could
10         have been some low grade occult GI
11         bleeding going on.
12  BY MR. GOZA:
13   Q.  Right.  But in terms of an acute bleed
14  like he had, he was able to tolerate?  He hadn't
15  had that on aspirin.  True?
16   A.  True.
17   Q.  And so would the -- the only thing that
18  changed in terms of bleeding was the addition of
19  the Xarelto; correct?
20        MS. HOFFMANN:  Asked and answered.
21        Objection.  Asked and answered.
22        THE WITNESS:
23          Yes.  That's the thing that changed.
24  BY MR. GOZA:
25   Q.  And from that standpoint, the only thing

Page 63

1   that was added that would initiate or upset the
2   situation that Mr. Boudreaux was in was the use of
3   the Xarelto; correct?
4        MS. HOFFMANN:
5          Objection.
6        THE WITNESS:
7          That is correct.
8   BY MR. GOZA:
9    Q.  I want to talk about GI bleeds for just a
10  minute.  I think you had cited the Kim article for
11  the fact that there were as many as 300,000
12  admissions for GI bleeding in the United States a
13  year.
14   A.  Yes.
15   Q.  You referred to the Chang article.  And I
16  set the Chang article in front of you.  And I
17  think it's Exhibit -- is it 3 or 4 in there?
18   A.  I don't know.
19        MS. HOFFMANN:
20          Here, Doctor.
21        THE WITNESS:
22          That in there?  Yes.
23  BY MR. GOZA:
24   Q.  And this was -- and Chang was talking
25  about "Risk of gastrointestinal bleeding

Page 64

1   associated with oral anticoagulants:" a
2   "population based retrospective cohort study."
3        Do you see that?
4    A.  Yes.
5    Q.  And if we go down to the bottom of Page 1
6   on the right-hand side, it said, "Information on
7   findings on gastrointestinal safety will allow
8   clinicians to weigh the risks and benefits of
9   these agents"; correct?
10   A.  Correct.
11   Q.  "Gastrointestinal bleeding carries
12  substantial morbidity and mortality"; correct?
13   A.  Correct.
14   Q.  That's true --
15        MS. HOFFMANN:
16          Are you asking him if you're reading
17          it correctly or if he agrees with it?
18          I'm -- I'm --
19        MR. GOZA:
20          Well, right now I'm just asking if I
21          read it correctly.  See, I get to ask it
22          in two parts.
23        MS. HOFFMANN:
24          I get -- I --
25        MR. GOZA:

Page 65

1          Okay.
2        THE WITNESS:
3          You are absolutely reading it
4          correctly.
5   BY MR. GOZA:
6    Q.  Okay.  And do you agree with that?
7    A.  Gastrointestinal bleeding can carry
8   significant morbidity and mortality.
9    Q.  And in the United States, it says an
10  estimated 140,000 or more hospital admissions had
11  the principal diagnosis of GI bleed.  True?
12   A.  It does say that.
13   Q.  And the aggregate costs reached
14  $1.15 billion?
15        MR. SLONIM:
16          Are you asking him -- again, are you
17          asking him if you read that correctly --
18        MR. GOZA:
19          Right now I --
20        MR. SLONIM:
21          -- or if he -- or if he agrees with
22          the statement?
23        MR. GOZA:
24          Perfect.  Right now I'm just reading
25          out of a document that came out of your

Page 66

1  reliance read list --
2  THE WITNESS:
3     Right.
4  MR. GOZA:
5     -- that you said was reasonably
6  reliable.
7  THE WITNESS:
8     Yes.
9  MS. HOFFMANN:
10     Objection.  Move to --
11  BY MR. GOZA:
12  Q.  Now, I'm --
13  MS. HOFFMANN:
14     -- strike.  It's still -- it's still
15  confusing, Counsel, whether you're just
16  reading and asking him if you read it
17  correctly or if he agrees with the
18  sentence that you're reading.
19  MR. GOZA:
20     It won't be confusing when I finish.
21  BY MR. GOZA:
22  Q.  So just so we're clear, I read it -- the
23  first thing I want to make sure is I read it
24  correctly.  True?
25  A.  True.

Page 67

1  Q.  This is from a document that you provided
2  me that you said was reasonably reliable; correct?
3  A.  Correct.
4  Q.  You have no reason to disagree with it?
5  MS. HOFFMANN:
6     Objection.
7  THE WITNESS:
8     I have no reason to disagree with it.
9  BY MR. GOZA:
10  Q.  In fact you do agree with it?
11  A.  I -- I agree with it.
12     Now, one can quote different studies.  So
13  I'll have to get -- see where you're going with
14  this before I, well --
15  Q.  The only thing I'm saying:  There's
16  multiple studies from the United States that show
17  that people that have gastrointestinal bleed,
18  there's a 5 to 10 percent risk of mortality?
19  A.  Yes.  There are many studies that say
20  that.
21     There are --
22  Q.  So --
23  A.  -- studies that say the mortality of
24  people bleeding on anticoagulants is less than the
25  mortality of those not bleeding on anticoagulants.

Page 68

1  So I -- I don't know if we have any studies
2  specifically look at that other than -- you know,
3  unless you look at like the -- the death and the
4  -- or the deaths in like the ROCKET AF study or
5  something like that.
6  Q.  And -- and we'll get to that.  But --
7  A.  Okay.
8  Q.  -- right now I'm just talking about the GI
9  bleeds in general.
10  A.  Yes.
11  Q.  No question --
12  A.  Right.
13  Q.  -- GI bleeds from whatever source --
14  A.  Right.
15  Q.  -- carry with them a 5 to 10 percent
16  mortality?
17  A.  Well, I think --
18  MS. HOFFMANN:
19     Objection.
20  THE WITNESS:
21     I think that you have -- we -- talking
22  about GI bleeding is a big basket.  We
23  have acute upper bleeds.  We have acute
24  lower bleeds.  We have chronic.  We have
25  subacute.  We have obscure GI bleeding.

Page 69

1  We have long-going bleeds, short-acting
2  bleeds.  So I think that as -- as -- I --
3  I do say, for instance, major upper
4  bleeding like ulcer bleeding does have a
5  mortality of 5 to 10 percent, which is
6  based on the patient's underlying other
7  significant comorbidities.  But if you
8  look at chronic GI bleeding, it'd be way
9  below that.  Obscure GI bleeding is way
10  below that.  So it really depends on what
11  pie you're talking about.
12  BY MR. GOZA:
13  Q.  Okay.  And I -- and with all these
14  studies, it depends a little on what pie you're
15  talking --
16  A.  Yeah.
17  Q.  -- about.  True?
18  A.  True.
19  Q.  So I -- I completely understand that.  And
20  I'm just trying to get a general sense, that you
21  would agree that patients that -- that anything
22  that we could do to decrease the risk of GI
23  bleeding would be a good thing?
24  MS. HOFFMANN:
25     Objection.

Page 70

1 THE WITNESS:
2     I -- I would agree that anything we
3 could do to reduce the risk would be a
4 good thing.  Sure.
5 BY MR. GOZA:
6 Q.  And -- and -- because whatever you can do
7 to eliminate the risk of --
8     (MR. SLONIM confers outside the hearing of
9     the court reporter.)
10 MS. HOFFMANN:
11     Right.
12 BY MR. GOZA:
13 Q.  -- morbidity or mortality would be a good
14 thing.  True?
15 MS. HOFFMANN:
16     Wait.
17 THE WITNESS:
18     True.
19 MR. SLONIM:
20     Objection.
21 BY MR. GOZA:
22 Q.  Can --
23 MR. SLONIM:
24     Objection.
25 MS. HOFFMANN:

Page 71

1     Just -- let me just read the question.
2 Just a second.
3 MR. SLONIM:
4     Why -- why don't you have the question
5 read back so the witness has it in mind.
6 MR. GOZA:
7     Well, he answered it.  Did -- are you
8 reading back for you guys or -- yeah.
9 Because you can read it.
10 MR. SLONIM:
11     Why don't we have the question read
12 back, please.
13 THE WITNESS:
14     Could we have the question read back?
15 MR. GOZA:
16     Sure.  Why don't I just re-ask it.
17 I'll withdraw --
18 THE WITNESS:
19     Okay.
20 MR. GOZA:
21     -- that one and re-ask it.
22 BY MR. GOZA:
23 Q.  I simply was saying:  If there is a way,
24 be it through testing or dosing or whatever means
25 available, you could reduce the risk of morbidity

Page 72

1 and mortality associated with gastrointestinal
2 bleeding, you'd want to do that?
3 MS. HOFFMANN:
4     Objection.
5 THE WITNESS:
6     I -- I guess it's -- let's talk about
7 the real world.  I mean, I think that in
8 general anything you can do to reduce the
9 risk of mortality is going to be a good
10 thing.  Starting a PPI on a bleeding ulcer
11 reduces the -- reduced the mortality.  So
12 I think if you're talking in general about
13 reducing mortality, then I think that's
14 good.  If you're talking about GI bleeding
15 with anticoagulants, that's a known risk
16 factor of all anticoagulants.
17 BY MR. GOZA:
18 Q.  And I want to -- I want to hold that
19 thought for just a minute, but let me cover a
20 couple of other things first.
21     In terms of aspirin -- and I read through
22 your report.  And I think you said that -- that
23 there is a risk of bleeding associated with
24 aspirin -- aspirin in the GI tract and that is the
25 result of either gastritis or ulcers?

Page 73

1 MS. HOFFMANN:
2     Objection.
3 THE WITNESS:
4     Aspirin is a very important cause of
5 GI bleeding, both occult and overt.  It --
6 it's a cause because it damages the mucosa
7 of the stomach, duodenum, and possibly the
8 small bowel as well.
9 BY MR. GOZA:
10 Q.  Okay.  And again, no one's ever diagnosed
11 with Mr. Boudreaux as having an ulcer.  True?
12 A.  This is true.
13 Q.  And no one's ever diagnosed him with
14 having gastritis?
15 A.  No.
16 Q.  Meaning I'm correct?
17 A.  Correct.
18 Q.  I want to talk just for a minute about the
19 term "obscure bleeding."
20     You provided me with some articles that
21 have the definition of "obscure bleeding."  Is
22 that true?
23 A.  I don't know if any of them have the
24 definition of obscure bleeding.  In fact, they may
25 not.  I -- I'd be happy to give you a copy of --

Page 74

1    MS. HOFFMANN:
2        Well, it's in --
3    THE WITNESS:
4        -- of -- of --
5    MS. HOFFMANN:
6        -- your report.
7    THE WITNESS:
8        -- of my -- it's in my report. I
9    don't think any of these articles really
10   define it.
11 BY MR. GOZA:
12   Q. Does the -- as part of the definition of
13 obscure bleeding, does it entail the idea of
14 recurrent bleeding when the source remains
15 unidentified after endoscopic procedures?
16   A. No. That's not an adjective at the time.
17 That could be -- that could be the case. That
18 could be -- a subset of GI bleeding would be
19 bleeding that is recurrent. Obscure GI bleeding
20 just means that there's GI bleeding and that the
21 EGD and the colonoscopy are negative. And that
22 can either be acute overt, meaning it's obvious.
23 It can mean it's occult, where it's just blood in
24 the stool. It can be a one-time, or it could be a
25 recurrent event.

Page 75

1        Now, is that okay, if I go on like that
2 when you -- when you ask a question?
3    Q. Yeah. No. That's -- that --
4    A. Because I don't want to --
5    Q. -- part is fine. It was --
6    A. All right.
7    Q. That's responsive. When --
8    A. I thought I was --
9    Q. -- something --
10   A. -- being responsive before.
11   Q. Yeah. That's all right.
12   THE WITNESS:
13       Sorry, Aurora.
14   MS. HOFFMANN:
15       You're doing fine, Doctor.
16 BY MR. GOZA:
17   Q. So I want to make sure -- going back, when
18 one -- or strike that.
19       How -- how do you -- does one know that an
20 underlying lesion exists if you don't ever see it?
21   A. You repeat the studies.
22   Q. Let's assume you repeat them and there was
23 no lesion?
24   A. In my experience from treating many, many
25 of these patients, if you repeat the studies, then

Page 76

1 you will find something, especially if you repeat
2 it very early on. So, for instance, if one puts
3 down that video capsule right away while that
4 patient's having a black stool, then you have a
5 higher -- much higher likelihood of finding
6 something.
7    Q. Is it your testimony that the lesion -- or
8 strike that.
9        If a -- if a lesion only bleeds once, is
10 your testimony that the lesion goes away?
11   A. No. The -- my testimony would be that the
12 lesion is still there and it's still vulnerable to
13 bleeding.
14   Q. Again, so Mr. -- Mr. Boudreaux, after
15 stopping Xarelto went back on aspirin. True?
16   A. True.
17   Q. And has not had any signs of a overt acute
18 bleeding since then. True?
19   A. That's true.
20   Q. If we go -- and I just want to go through
21 your report. And -- so you might just look at
22 Page 16.
23   A. Sixteen. All right.
24   Q. Uh-huh.
25   A. Okay.

Page 77

1    Q. On Page 16, if we look at the third
2 sentence, it says, "Cardiologists caring for
3 atrial fibrillation patients often use a specific
4 scoring system to identify the patients with the
5 highest risk of having a cerebral vascular
6 accident, commonly known as . . . stroke."
7        Did I read that correctly?
8    A. You read that correct.
9    Q. Am -- am I correct, that that would be a
10 CHADS score?
11   A. Yes.
12   Q. That's not something you routinely do?
13   A. No.
14   Q. You didn't do it in Mr. Boudreaux?
15   A. I didn't take care of Mr. Boudreaux.
16   Q. Fair point.
17       So -- and you don't do it routinely with
18 your patients. True?
19   A. I do not do that. Yes.
20   Q. That judgment of -- where you said
21 identifying the risk of cerebral vascular accident
22 is in the realm of cardiology?
23   A. Yes.
24   Q. Not in the realm of gastroenterology;
25 correct?

Page 78

1    A. Correct.
2    Q. You don't hold yourself out as an expert
3  in evaluating CHADS scores on patients for
4  purposes of evaluating risk of stroke?
5    A. I do not.
6    Q. I'm going to actually go -- I'm going to
7  kind of reverse my order just a little bit and try
8  to get to some of your opinions and conclusions
9  first, just so we make sure we cover those.
10    A. Okay.
11    Q. All right? And it will probably lead us
12  to some other things.
13    MS. HOFFMANN:
14      Are you doing okay? Do you want to
15    take --
16    THE WITNESS:
17      Uh-huh.
18    MS. HOFFMANN:
19      -- a break?
20    THE WITNESS:
21      I'm fine.
22    MS. HOFFMANN:
23      Okay.
24  BY MR. GOZA:
25    Q. On Paragraph 11 --

Page 79

1    A. What page, please?
2    Q. I'm sorry. Page 23, I think, of your
3  opinions.
4    A. Oh, okay. Okay. Item 11. Okay.
5    Q. Item 11, I want to cover the second
6  sentence first. Well, we'll -- we'll just read
7  it. "Mr. Boudreaux most likely would have had a
8  GI bleed with any anticoagulant, including
9  Coumadin or any of the other DOACs."
10      And you and I -- you -- you use the word
11  "DOACs." I use the word "NOACs." They're the
12  same thing?
13    A. Yes.
14    Q. So I've read that first sentence
15  correctly?
16    A. Correct.
17    Q. The next sentence says, "Mr. Boudreaux
18  could also have had the same GI bleed in the
19  absence of any anticoagulant"; correct?
20    A. Correct.
21    Q. Have you done an evaluation of
22  Mr. Boudreaux's risk of bleeding based on some
23  kind of scale?
24    A. No.
25    Q. Have you in your -- that wouldn't be

Page 80

1  something that you would normally do in your
2  practice?
3    A. No.
4    Q. You don't routinely use what's called a
5  HAS-BLED scoring system?
6    A. I'm -- right. I do not use the HAS-BLED
7  scoring system.
8    Q. In fact, you generally don't even
9  undertake the analysis that we're talking about
10  here?
11    MS. HOFFMANN:
12      Objection. Form.
13  BY MR. GOZA:
14    Q. That is the -- to evaluate the risk of
15  someone's -- or to evaluate what someone's risk of
16  bleed would be?
17    A. What I commonly do in caring for patients
18  who have bled is, like I've said in the initial,
19  have a consultation with the cardiologist. If,
20  for instance, we have identified and treated the
21  bleeding source, then I feel very comfortable
22  telling the cardiologist, Go ahead and start back
23  on any blood thinner you want, that I -- I think
24  we have it conquered. If -- in this case, we have
25  not found the bleeding source, I feel less

Page 81

1  comfortable.
2      However, there are situations -- and this
3  happens all the time, where the cardiologist says,
4  Look, his risk is so great of stroke that I want
5  to take the risk of a GI bleed.
6    Q. Right. But --
7    A. And that's -- and that's the -- that's the
8  relationship between the cardiologist and the
9  patient establishing that individual patient's
10  risk for stroke, realizing how catastrophic a
11  stroke can be.
12    Q. And that's the -- but that's the realm of
13  the cardiologist, to make that determination;
14  correct?
15    A. Correct.
16    Q. Now, I -- I want to go back, though, to my
17  question.
18      Because you're -- you're talking about a
19  time when Mr. Boudreaux had not had a bleed yet,
20  I'm assuming?
21    A. What do you mean?
22    Q. In --
23    A. I'm sorry.
24    Q. -- Paragraph 11 --
25    A. Yes.

Page 82

1   Q. -- it says, "Mr. Boudreaux could also have
2   had the same GI bleed in the absence of an
3   anticoagulant"; correct?
4   A. That's correct.
5   Q. We're talking about a time period before
6   he bled; right?
7   A. I'm -- that's -- that's a -- that's at --
8   at any time. Right. If one has -- if he has an
9   AVM I believe he does, that can -- that can
10  bleed even without being on an anticoagulant.
11  Q. Right. But it had never bled prior to
12  being on an anticoagulant, at least not an acute
13  bleed. True?
14  A. Correct.
15      MS. HOFFMANN:
16      Objection.
17  BY MR. GOZA:
18  Q. And since then he's never had an acute
19  bleed?
20      MS. HOFFMANN:
21      Objection.
22  THE WITNESS:
23      He's never had an acute overt bleed
24  since then.
25  BY MR. GOZA:

Page 83

1   Q. And so is there some basis -- I want to --
2   I guess I want to understand what basis you have
3   to say that Mr. Boudreaux could have had the same
4   GI bleed in absence of any anticoagulant.
5   A. I'd say that's based on 30 years
6   experience taking care of GI bleeds. You can
7   bleed from an AVM -- you can have a six-unit bleed
8   from an AVM even without a blood thinner.
9   Q. But are -- are you -- so I -- I guess what
10  I'm saying: Obviously anything's possible; right?
11  A. Well, I can't make a blanket statement
12  that anything is possible.
13      However, what I'm saying is that one can
14  bleed seriously from an AVM even without an
15  anticoagulant.
16  Q. But you're not saying that Mr. --
17  Mr. Boudreaux would have bled on February 3rd of
18  two thousand -- or let's say -- strike that.
19  Let's say from January 26th to February 3rd of
20  2014, that he would have bled but for being on an
21  anticoagulant?
22      MS. HOFFMANN:
23      Objection. That's . . . Do you
24  understand the --
25  THE WITNESS:

Page 84

1       I think --
2   MS. HOFFMANN:
3       -- question?
4   THE WITNESS:
5       Well, I -- I think we've gone through
6   this. I mean, I -- yes, I think at that
7   time he was on an anticoagulant. And yes,
8   I believe that the anticoagulant and his
9   aspirin together helped bleed at that
10  time.
11      Now, could he tomorrow have a bleed
12  from this AVM? Absolutely. That'd be
13  very unlikely tomorrow. Could it occur
14  over the next five years? Now you're
15  getting to where there's a higher
16  probability if you go for accumulative.
17  BY MR. GOZA:
18  Q. I just --
19  A. That's --
20  Q. -- want to make sure I understand it.
21      It's not your opinion to a reasonable
22  degree of medical certainty that Mr. Boudreaux
23  would have bled had he not been given --
24  regardless whether he had been given Xarelto or
25  not --

Page 85

1       MS. HOFFMANN:
2       Objection.
3   BY MR. GOZA:
4   Q. -- at that time period?
5   A. For that one specific time on that day, I
6   agree with you. Yes.
7   Q. And I just want to make sure what you're
8   going to say and what you're not going to say.
9       And what you're not going to say is, I
10  think Mr. Boudreaux would have had an acute bleed
11  between January 26th and February 3rd of 2014 even
12  if Xarelto had not been given to him? You're not
13  going to say that?
14  A. No.
15      MS. HOFFMANN:
16      Would have or could have? Because his
17  report says could have.
18  MR. GOZA:
19      Would have.
20  THE WITNESS:
21      I don't think it would have. But like
22  I say, it could happen at any time. But
23  we're talking about a very specific time,
24  that week.
25  MS. HOFFMANN:

Page 86

1 This might be a good time to take a
2 five-minute break. We've been going at it
3 over an hour.
4 MR. GOZA:
5 Okay.
6 THE VIDEOGRAPHER:
7 This is --
8 THE WITNESS:
9 All right.
10 THE VIDEOGRAPHER:
11 -- the end of Tape 1. We're now off
12 the record at 2:03.
13 (Brief recess was taken.)
14 THE VIDEOGRAPHER:
15 This is the beginning of Tape 2.
16 We're now back on the record. The time is
17 2:15.
18 BY MR. GOZA:
19 Q. Doctor, if we go to Opinions 9 and 10 --
20 A. Yes.
21 Q. -- you have identified in 9 one of the
22 things that you can believe be the cause -- one
23 condition that can be the cause of bleeding in the
24 scenario of an occult bleed, and that is an AVM?
25 MS. HOFFMANN:

Page 87

1 Objection.
2 BY MR. GOZA:
3 Q. Am I right?
4 A. Yes.
5 Q. And --
6 A. I've identified what I think is the most
7 common and likely cause.
8 Q. Right.
9 And -- and in No. -- in 10, you identify
10 another possible cause of a bleed in the situation
11 of an occult bleed?
12 A. Correct.
13 Q. Have you formulated an opinion that you
14 intend to offer at trial as to which of these, if
15 either, occurred in Mr. Boudreaux?
16 MS. HOFFMANN:
17 Objection.
18 BY MR. GOZA:
19 Q. Or that -- I'm sorry. "Occurred" would
20 not be the right word.
21 Which condition Mr. Boudreaux had?
22 MS. HOFFMANN:
23 Objection.
24 THE WITNESS:
25 All right. I -- I can't say which

Page 88

1 condition he had. What I'm giving you is
2 -- is my experience based on the common
3 things that are easy to miss that you
4 ultimately find when you repeat workups.
5 An AVM is the easiest to miss. Erosions
6 -- small erosions can be easy to miss as
7 well. I've certainly seen many cases
8 where an erosion and even a small ulcer
9 was missed. So I -- I -- I think that is
10 my explanation of the most likely
11 probability: AVM first, some sort of
12 erosion second.
13 BY MR. GOZA:
14 Q. Are there any other possible conditions
15 that you believe could lead to an occult bleed?
16 MS. HOFFMANN:
17 Objection. In general or in
18 Mr. Boudreaux?
19 BY MR. GOZA:
20 Q. Let's talk about in Mr. Boudreaux.
21 A. All right. So are -- you said occult
22 bleed. Are -- are we going back to the acute
23 overt bleed of February 3rd, or are we talking
24 about any occult bleeding afterwards?
25 Q. Very good point, and I'm glad you -- you

Page 89

1 raised it.
2 So let me ask you this: When you
3 reference 9 and 10, are you talking about the
4 acute bleed that Mr. Boudreaux had?
5 A. I am talking about the acute bleed,
6 although either one of them could be a cause of
7 chronic bleeding as well.
8 Q. So now let me go back.
9 As I understand your testimony, you don't
10 intend to -- to say more probable than not it was
11 a small bowel erosion versus an AVM? You're
12 listing both of these as possibilities?
13 MS. HOFFMANN:
14 Objection. It misstates his prior
15 testimony.
16 THE WITNESS:
17 I -- I stated that I think there's a
18 high likelihood that there's a lesion
19 there, and of the two potential lesions,
20 AVM or erosion, AVM would be statistically
21 more likely.
22 BY MR. GOZA:
23 Q. Okay. Statistically more likely. And I
24 -- I'm not trying to fuss with your opinion. I
25 understand --

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 90

1   A. Okay.
2   Q. -- your opinion is -- something -- there
3 was a lesion. I get that --
4   A. Yeah.
5   Q. -- part of the opinion.
6     What I'm trying to understand is if you're
7 going to try to tell the jury, This is what
8 happened to Mr. Boudreaux or this is exactly what
9 he had. And as I understand what you're saying is
10 either one of these things are possibilities?
11   MS. HOFFMANN:
12     Objection. You're misstating his
13 testimony. He didn't say "possibilities."
14 BY MR. GOZA:
15   Q. Are you going to say that either 9 or 10
16 to a reasonable degree of medical certainty was
17 the underlying condition that Mr. Boudreaux had?
18   A. I think those are the two likely -- the
19 likeliest causes.
20   Q. Okay. But you're not going to
21 differentiate between the two, is what I'm trying
22 to get at?
23   A. I can't.
24   Q. There we go. 'Kay.
25   A. Now, there are -- I mean, there -- for the

Page 91

1 acute event, there are other possibilities of
2 things that could be missed.
3     There's something called a Dieulafoy's
4 lesion, D-I-E-U-L-A-F-O-Y, apostrophe, S. That's
5 an aberrant vessel in the stomach that's very hard
6 to see sometimes. And -- and if you don't catch
7 it while it's bleeding, you miss it. And so the
8 vast majority of those are missed on the first
9 time. That only causes 1 or 2 percent of GI -- of
10 acute upper GI bleeds. But that's one of those
11 things that could have caused the bleed in the
12 first place and Joshi wouldn't have seen it the
13 next day.
14     Also possible that a small ulcer could
15 have been missed. I -- I -- I -- don't think
16 that's the case because I think Joshi would have
17 seen that. But I've certainly seen that for
18 whatever reason sometimes an ulcer could be
19 missed.
20     And likewise, AVMs in the colon could have
21 been missed as well. I -- I've seen many cases
22 where the initial doctor did not see the AVM in
23 the colon and a subsequent exam showed it.
24   Q. Have you -- you said that you read
25 Dr. Winstead's report?

Page 92

1   A. I did.
2   Q. Is there anything in there that you
3 specifically disagreed with?
4   MS. HOFFMANN:
5     Objection.
6   THE WITNESS:
7     As I recall, I think in his report he
8 said that this case was particularly hard
9 to manage because of the lack of a
10 reversal agent, and I disagree with that.
11 I don't see anything to say that. The --
12 a reversal agent wouldn't have come in in
13 any play. So I do disagree with that.
14 And I think that's the -- let me see.
15 MR. SLONIM:
16     Do you want to show him the report?
17 MR. GOZA:
18     No. I -- no. I don't really want to
19 go through it unless you need to.
20 BY MR. GOZA:
21   Q. I mean, I'm just trying to find out is
22 there --
23   A. That --
24   Q. -- something in your mind as you sit --
25   A. That's the --

Page 93

1   Q. -- here today --
2   A. That -- the main thing I remember that
3 I -- that I thought was -- that -- that I
4 disagreed with was the -- the fact that this was
5 particularly more difficult to manage because he
6 was a NOAC and particularly more difficult to
7 manage because there's no reversal agent.
8     Oh, yeah. No. There's something else.
9 Because I mean he's -- he also said that there --
10 because the video capsule was negative, that there
11 -- that that -- that was proof positive that there
12 is no lesion. I mean, not -- not in those words,
13 but he --
14   Q. Yeah.
15   A. He said that -- that the -- that the --
16 the workup ruled out any cause of bleeding, is I
17 think what he said. And I -- I would disagree
18 with that. I just said it -- it didn't show it,
19 but that's -- that's the -- the -- the limitations
20 of the -- of the test.
21   Q. Strike that. I don't . . .
22     So let me go back to the -- in addition to
23 9 and 10, there are other things that you believe
24 may have been potential causes of an acute bleed
25 or -- strike that -- may have been underlying

Page 94

1 conditions that were preexisting; is that correct?
2 A. Well --
3 Q. Strike that. If that question --
4 A. All right.
5 Q. -- doesn't make any sense, we'll --
6 we'll -- we'll start over.
7 Let's actually go forward a little bit.
8 And I want ask you just a few questions about
9 14 --
10 A. All right.
11 Q. -- Opinion 14.
12 The PT time of 13.6, we've already talked
13 about; correct?
14 MS. HOFFMANN:
15 Objection.
16 THE WITNESS:
17 We -- we've talked about that. That
18 was -- that was what the level was on --
19 on the admission to the second -- on that
20 admission. Yes.
21 BY MR. GOZA:
22 Q. And when you're talking about the
23 May 20th, 2015, 13.2 seconds, that was using a
24 different reference range. True?
25 A. I don't know if that was using a different

Page 95

1 reference -- reference range.
2 Q. So as you sit here today, you don't know
3 whether the 13.2 is in the reference range of
4 normal for that hospital or not?
5 A. I do not know.
6 Q. Do you know which reagent was used with
7 respect to developing either PT?
8 A. I do not.
9 Q. Do you know which reagents are most
10 sensitive to Xarelto?
11 MS. HOFFMANN:
12 Objection.
13 THE WITNESS:
14 In reading Dr. Leissinger's report, I
15 learned about the -- I think it's the
16 Neostatin [sic] reagent. So -- but before
17 then, I never had read anything about a
18 reagent. I just know that from my
19 standpoint taking care of these patients
20 now, the -- the pro time is not ordered.
21 The cardiologists don't -- they don't
22 order it because it's -- it doesn't
23 correlate.
24 BY MR. GOZA:
25 Q. Okay. But in terms of your knowledge

Page 96

1 about what reagent is most sensitive to Xarelto,
2 you had no knowledge other than reading
3 Dr. Leissinger's report. True?
4 A. That's the first I'd heard about a special
5 reagent.
6 Q. You -- or . . .
7 Do you consider yourself an expert in the
8 relevance of PT testing and its relevance with
9 respect to establishing drug concentration levels
10 of Xarelto in a patient?
11 MS. HOFFMANN:
12 Objection.
13 THE WITNESS:
14 No.
15 BY MR. GOZA:
16 Q. There is a whole bunch of -- of literature
17 that we can talk about here to -- to go through
18 with respect to PT, direct linear correlation with
19 drug concentration levels, and resulting increased
20 risk of bleed.
21 Is it your intention to offer any opinions
22 with respect to the details of prothrombin times,
23 reagents that are appropriate to use with the use
24 of prothrombin times, and what the significance of
25 elevated prothrombin times might be in any given

Page 97

1 patient?
2 MS. HOFFMANN:
3 Object to the form of the question.
4 That's really long and compound.
5 THE WITNESS:
6 Can we go -- can we go back over the
7 individual pieces of that question?
8 BY MR. GOZA:
9 Q. Sure. Sure.
10 First of all, have you read any literature
11 talking directly about the relationship between PT
12 and drug concentration levels?
13 A. No.
14 Q. You saw that in the label, under 12.2,
15 there -- there was a reference to PT and drug
16 concentration levels?
17 MR. SLONIM:
18 Objection.
19 THE WITNESS:
20 On the Xarelto level?
21 BY MR. GOZA:
22 Q. Yes, ma'am -- sir. Sorry. Yes, sir.
23 A. I don't remember that specifically. I can
24 look at that, if you -- right now, if you wish.
25 Q. Well -- but -- what I'm -- what I'm

Page 98

1 really -- I -- you can feel free to look at it.
2       But the point is you're not an expert in
3 that. True?
4   A. True.
5   Q. You're not prepared here today to talk
6 about the label, the use of PT times, and what
7 reagents are most sensitive to Xarelto?
8   A. I'm not prepared to talk about that.
9   MS. HOFFMANN:
10      And we're not offering him on those
11   topics.
12   MR. GOZA:
13      Okay. But, you know, he's got some
14   things in his report that are generally
15   related to those topics. And I just want
16   to make sure -- if you're not using it for
17   that, this will shorten up a lot.
18   MS. HOFFMANN:
19      Right. And I think what he testified
20   to -- and you can ask him about that, is
21   that in his practice PT is not something
22   that he correlates with significance. So
23   you -- I think that's the area that he's
24   talking about. He's not being offered as
25   an expert on PT or reagents.

Page 99

1 BY MR. GOZA:
2   Q. Okay. So you're talking about with the
3 limit -- within the limits of your practice.
4 True?
5   A. True.
6   Q. You haven't undertaken an exhaustive
7 research effort to try to determine whether
8 there's a correlation between PT levels and the
9 drug concentration levels; correct?
10   A. Correct.
11   Q. You aren't here to offer opinions if there
12 -- about what the literature says in terms of drug
13 concentration levels and how that might relate to
14 upper percentiles of people being on the drug or
15 what risk that would create in terms of bleeding?
16   A. Correct.
17   Q. Okay.
18   MR. SLONIM:
19      But he -- he has offered opinions
20   about -- about expert statements issued by
21   his medical society.
22   MR. GOZA:
23      We'll get to that, the documents.
24   Because -- you know, here's -- here's what
25   I'm going to do at the end of this. And I

Page 100

1 want this to come as no surprise if he's
2 going to. When I'm going to show him 35
3 articles that he's never seen before today
4 and walk him through each and every one of
5 those and say, You would not hold yourself
6 out to be an expert . . . And I don't
7 think that makes much sense.
8   MR. SLONIM:
9      I don't think that makes much sense,
10   and I think a lot of other people will
11   be --
12   MR. GOZA:
13      Well, that's why --
14   MR. SLONIM:
15      -- addressing these subjects.
16   MR. GOZA:
17      But it kind of happened to me
18   yesterday, so I'm kind of feeling in a
19   little bit of a mood about it. But my
20   only point is if we can short-circuit a
21   lot of that --
22   MR. SLONIM:
23      I think you can, Kirk. But I want to
24   make -- but -- but, look, I just want to
25   call your attention to Page 19 of -- of

Page 101

1 Dr. -- of the doctor's report. And -- and
2 he refers to information about ASGE
3 guidelines and you to be aware of that.
4   MR. GOZA:
5      Sure -- I -- so -- and let's just --
6   because I -- I think that there are . . .
7 BY MR. GOZA:
8   Q. Have you -- or in your mind, do you
9 believe you've undertaken an exhaustive effort to
10 be able to speak as an expert on PT times and
11 their reliability to measure potential drug
12 concentration levels and the potential for injury
13 to patients -- bleeding risk to patients?
14   A. No. I've not gone into depth researching
15 that. I -- I think that -- I've looked at my
16 society papers, and that's Ruben Acosta's paper
17 for the ASGE saying that the PT is a -- is a crude
18 measurement of the level of anticoagulation with
19 Xarelto or the NOACs and that you can have a
20 normal PT and still have its effect in -- in play.
21 So that -- that's -- that -- that is what my
22 society has said. I've heard that at other
23 meetings. And so that's -- that's what I'm going
24 with. I -- I -- I did not research that myself.
25   Q. Okay. And -- and so that -- that's really

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 102

1 my -- my point in this.
2     You've cited one article with respect to
3 the -- the Acosta article with respect to your
4 ASGE published guidelines. True?
5     A. True.
6     Q. And what it does say, though, is they are
7 crude measurements of the drug effect. True?
8     A. Right. True.
9     Q. And it -- what it says -- and are
10 insensitive tests, meaning they may not show how
11 high the drug concentration level is even -- for
12 instance, you could be anticoagulated even if the
13 PT was normal?
14     MS. HOFFMANN:
15         Objection.
16     THE WITNESS:
17         I think I --
18     MS. HOFFMANN:
19         Form.
20     THE WITNESS:
21         -- just said that. Yes.
22 BY MR. GOZA:
23     Q. But if you -- if you see a PT that is
24 elevated, then you know the patient's
25 anticoagulated. True?

Page 103

1     MS. HOFFMANN:
2         Objection.
3     THE WITNESS:
4         That's what I understood from Acosta's
5 note as well.
6 BY MR. GOZA:
7     Q. Okay. And in --
8     A. But to what degree -- he said there was
9 poor correlation in some . . .
10     Q. Okay. And whether there's other papers
11 that talk about that correlation or not, that's
12 where your education about this issue ends?
13     A. Correct. Well, I mean, I wouldn't say my
14 education ends. When I -- our --
15     Q. I apologize. That's a poor word.
16     MS. HOFFMANN:
17         Well, let him finish.
18     THE WITNESS:
19         Okay.
20 BY MR. GOZA:
21     Q. Yeah. Go ahead.
22     A. No. When I -- when -- I mean, the last
23 time I went to a national meeting and
24 Neena Abraham spoke about it, I -- I think she
25 said something about the fact that the PT is

Page 104

1 not -- is not used in that. I -- I've heard that
2 at lectures, when I go to meetings as far as --
3 because this is a very popular topic as far as how
4 to handle procedures and complications of the
5 patients on -- on NOACs.
6     Q. Okay. So have you seen -- and there --
7 the FDA has published -- there is an FDA briefing
8 schedule, and we can go through it. But let me
9 just say that it shows the top 25 percent and the
10 bottom 75 percent of responders to Xarelto.
11     MS. HOFFMANN:
12         Objection.
13     THE WITNESS:
14         I have not --
15 BY MR. GOZA:
16     Q. How do they calculate that?
17     A. I have not seen the FDA documents on that.
18     Q. Okay. Well, how would anybody -- would
19 it -- would it be of significance as a clinician
20 if you knew a patient was in the top 10 percent
21 responder to any drug? Would that be of relevance
22 to you?
23     MS. HOFFMANN:
24         Objection.
25     THE WITNESS:

Page 105

1         I think you're asking me to -- to give
2 expertise beyond where -- where I am. I
3 mean, I'm a gastroenterologist taking care
4 of patients who have bleeding. The FDI
5 has -- the FDA has approved this medicine
6 with the parameters of how -- how it's
7 used. And -- and that's how cardiologists
8 are using it. And that's -- and I'm
9 taking care of patients who are being
10 cared for that way. So . . .
11 BY MR. GOZA:
12     Q. That wasn't my question to you, and I
13 apologize.
14         If the -- would it be relevant to you to
15 know whether a patient was what they called a high
16 responder; that is, for whatever reason was in the
17 top 25 percent of people responding to the drug,
18 or do you have an opinion about that?
19     MS. HOFFMANN:
20         To what drug?
21     MR. GOZA:
22         To Xarelto.
23     THE WITNESS:
24         Well --
25     MS. HOFFMANN:

Page 106

1    Object. I object to the form of the
2 question.
3    THE WITNESS:
4       I don't think I have an opinion on
5 that. I -- I'd -- I -- I don't know those
6 statistical values enough to -- to comment
7 on the validity of it. If -- if one had a
8 crystal ball saying who would bleed, that
9 would be wonderful, but this -- that --
10 one doesn't.
11 BY MR. GOZA:
12    Q. Well -- but for instance, you do have -- I
13 think the -- the point is when -- there are ways
14 of testing warfarin. True?
15    A. Yes.
16    Q. You've read -- you read Nurse Theriot's
17 deposition. True?
18    A. True.
19    Q. She talked about the use of INR management
20 of patients on Coumadin. True?
21    MS. HOFFMANN:
22       Objection.
23    THE WITNESS:
24       I don't remember her talking about
25    that, but that very well could be in

Page 107

1    there.
2 BY MR. GOZA:
3    Q. And she testified in her clinic that she
4 would try to keep patients in a -- in a time in
5 therapeutic range of 70 to 80 percent?
6    MS. HOFFMANN:
7       Objection. Do you want to show him --
8    MR. GOZA:
9       Sure.
10    MS. HOFFMANN:
11       -- what you're talking --
12    THE WITNESS:
13       Right.
14    MS. HOFFMANN:
15       -- about?
16    MR. GOZA:
17       Sure. Absolutely. Okay. Yeah. I
18    do. But hold on just a minute. I want to
19    find that testimony. I just had it
20    sitting out here.
21 BY MR. GOZA:
22    Q. So these are the questions that were asked
23 and answered. And --
24    A. Okay.
25    Q. -- I've just got one page. And I'm

Page 108

1 happy -- we could stand over each other's
2 shoulder. But I just ask if you remember this.
3    "And -- and . . . you would expect" --
4 this is on Page 136, Line 21. "And -- and . . .
5 you would expect your patients taking Coumadin to
6 be in therapeutic range really at least 70 to
7 80 percent of the time if not more."
8    Objections.
9    "Is that fair?"
10    Witness: "It's fair."
11    "Did you say yes? That's fair?"
12    "That is fair. Yeah."
13    Do you remember reading that in her
14 deposition?
15    A. Yeah. I think so.
16    Q. Okay. Do you -- or strike that.
17    I -- I take it Nurse Theriot is with the
18 -- is it Cardiology Institute of the South?
19    A. Yes. Was she with CIS and then later an
20 Ochsner employee or -- I -- I -- I thought I got
21 that in my mind, that . . .
22    Q. You -- and you might well be right.
23 She's --
24    A. Yeah.
25    Q. -- either employed at the same facility

Page 109

1 you are --
2    A. Yeah. Well, the -- the same --
3    Q. Corporation?
4    A. -- parent company.
5    Q. Yeah. Same parent corporation as you.
6    A. Yeah.
7    Q. True?
8    A. Yeah. Yeah.
9    Q. And she's one of the people that's
10 involved in running the -- the Coumadin clinic?
11    A. I think --
12    MS. HOFFMANN:
13       Objection.
14    THE WITNESS:
15       -- she is. I -- I -- I know she was
16    at CIS for a long time. I -- I don't --
17    really don't know what her current
18    capacity is right now.
19 BY MR. GOZA:
20    Q. Okay. But you have no reason to dispute
21 what she's talking about in terms of management of
22 patients in her clinical trials --
23    A. Well --
24    Q. -- her clinical --
25    MS. HOFFMANN:

Page 110

1      Objection.
2  BY MR. GOZA:
3      Q.  -- management?
4      A.  I know that if -- if -- if she is the
5  Coumadin clinic person there, then that -- that's
6  her goal, is to keep her patients in -- in the
7  right INR range.  And -- and she certainly
8  understands the difficulty of doing that.
9      Q.  Going back, if we can look at -- go to
10  your Conclusions and Opinions and start on
11  Page 22.
12     A.  Correct.  I'm there.
13     Q.  Where it says, "Mr. Boudreaux needed to be
14  anticoagulated because of his atrial fibrillation
15  and his CHADs-VASc score," again, that's a
16  judgement that you don't make?
17     A.  No.  That's --
18         MS. HOFFMANN:
19             Objection.
20         MR. SLONIM:
21             Objection.
22         THE WITNESS:
23             -- what Dr. Wong made, and -- and I
24         determined that from his deposition.
25  BY MR. GOZA:

Page 111

1      Q.  Right.  But you're relying entirely on
2  Dr. Wong's testimony about that; correct?
3          MS. HOFFMANN:
4              Objection.
5          THE WITNESS:
6              Well, I mean, his CHADS score is
7          either a 3 or a 4 based on looking at it.
8          So I -- I know that's the range that
9          cardiologists say that the benefit
10         outweighs the risk for anticoagulating.
11  BY MR. GOZA:
12     Q.  Well, what I'm trying to understand,
13  though, is whether or not you're going to have an
14  indopinion -- opinion whether his CHADS score and
15  compared to his HAS-BLED score and how that
16  changes over time, whether you're going to have
17  opinions about that or whether you're simply
18  relying on Dr. Wong or the other cardiologists?
19         MS. HOFFMANN:
20             Object to the form of the question.
21         THE WITNESS:
22             I'm relying on Dr. Wong's assessment
23         and his patient-physician relationship to
24         make that decision.
25  BY MR. GOZA:

Page 112

1      Q.  And whether Xarelto was going to be
2  prescribed or another NOAC or even Coumadin, that
3  again is a decision in which you defer to
4  Dr. Wong?
5      A.  Yes.  That was his decision based on
6  knowing the patient, and he cited a number of
7  reasons why he -- why he chose that.
8      Q.  Do you have an idea -- you mention his
9  prior use of Indocin.  Do you have an idea of when
10  he stopped taking his Indocin?
11         MS. HOFFMANN:
12             Objection.
13         THE WITNESS:
14             The -- you know, I think that his use
15         -- in reading his deposition, it sounds
16         like -- and -- and Mrs. Boudreaux's as
17         well, because I think she reported that he
18         hadn't had any gout attacks in -- in a
19         while.  So I think that it had been a
20         while since he had a gout attack that
21         required Indocin.  I can say that at the
22         time that he's being evaluated that night
23         -- and you don't have all the history.
24         We don't have all this information.  And
25         he's telling a doctor that Indocin is one

Page 113

1          of his home medicines.  That would be very
2          important for me to know at that time.
3          However, in retrospect, now that we have
4          records and depositions and know that he
5          hasn't been taking, it's not as much a
6          factor.  But it would have been very much
7          a factor that night when you're in the
8          trenches.
9  BY MR. GOZA:
10     Q.  When somebody that was there actually
11  treating him, it would have made a difference in
12  terms of potentially -- at least weighing one of
13  the -- what's going on here?
14     A.  If -- if he had been actually taking it
15  recently, Indocin is -- is possibly the most
16  ulcerogenic of any of the NSAIDs.  And the -- I
17  would think there would be a high likelihood of a
18  gastric or duodenum ulcer from the Indocin.
19     Q.  Right.  But to your knowledge, now having
20  all the information and looking at it
21  retrospectively, he wasn't on Indocin at the time?
22         MS. HOFFMANN:
23             Objection.
24         THE WITNESS:
25             I have no reason to think that he had

Page 114

1 been taking Indocin any time recently, but
2 one doesn't know for sure.
3 BY MR. GOZA:
4 Q. But at least in terms of your reading of
5 the testimony and the evidence in the case, you
6 have no reason to believe he had been taking
7 Indocin for some period of time?
8 MS. HOFFMANN:
9 Objection.
10 THE WITNESS:
11 I don't know when his last dose of
12 Indocin was and . . .
13 BY MR. GOZA:
14 Q. When you say "A mild . . . occult GI bleed
15 prior to Xarelto also cannot be ruled out based on
16 Mr. Boudreaux's laboratory findings," I just want
17 to understand.
18 This is -- you're saying prior to Xarelto.
19 So what are the laboratory findings specifically
20 you're referring to there?
21 A. I'm talking to the hemoglobin of 13.0,
22 which I believe was January 9th. I'm also talking
23 about the fact that on February 5th they did iron
24 and TIBC and the iron was -- the iron saturation
25 percent was 17 percent, which would indicate an

Page 115

1 iron deficiency, which doesn't happen right away
2 in an acute bleed. That would indicate to me some
3 degree of chronic GI bleeding.
4 Q. With respect to the hemoglobins, what are
5 the other possible causes of a hemoglobin of 13.8
6 or 13.0?
7 MS. HOFFMANN:
8 On January 9th?
9 MR. GOZA:
10 On January 7th and 9th.
11 THE WITNESS:
12 The -- you know, there's patients who
13 have anemia, a chronic disease. He
14 doesn't really have any of the chronic
15 diseases I think of that's causing anemia.
16 But that -- that would be a common cause.
17 It would be very unusual to have a dietary
18 deficiency. You know --
19 BY MR. GOZA:
20 Q. He had pulmonary --
21 MS. HOFFMANN:
22 Wait. He's not --
23 MR. GOZA:
24 I'm sorry.
25 MS. HOFFMANN:

Page 116

1 -- finished.
2 MR. GOZA:
3 Oh. I'm sorry.
4 THE WITNESS:
5 No. I -- I don't have any other --
6 MR. GOZA:
7 Yeah.
8 THE WITNESS:
9 -- guesses on why he -- why he would
10 have a low --
11 MR. GOZA:
12 Okay.
13 THE WITNESS:
14 -- hemoglobin then.
15 BY MR. GOZA:
16 Q. He -- he did have -- was getting fluid
17 resuscitation. True?
18 A. Actually I think on January 7th he was
19 getting more diuresis, because he was -- he came
20 in with congestive heart failure. So I think they
21 were being very cautious about giving any IV fluid
22 at that time.
23 Q. What -- and what about the congestive
24 heart failure? Can that be contribute to his
25 decreased hemoglobin?

Page 117

1 A. To -- to my knowledge, no. I don't know.
2 Q. Was he on IVs at that point? Do you
3 remember?
4 A. I think he was on IVs. But again I think
5 at that time the doctors would have been very
6 cautious to be restricting extra fluid.
7 Q. You mean concerned about volume overload?
8 A. Correct.
9 Q. But they were giving him IV fluids. No
10 question about that?
11 A. I can't say that. I don't know.
12 Q. You don't know as you sit here?
13 A. Right.
14 Q. You would agree, though, that fluid
15 resuscitation can decrease hemoglobin?
16 A. Agree. Right.
17 Q. On Paragraph 8 -- and I think we've
18 covered this. I just want to make sure.
19 "Mr. Boudreaux received an appropriate GI
20 workup in an attempt to find the source of his GI
21 bleed, including a colonoscopy, an EGD, and a
22 PillCam study."
23 I read --
24 A. Yes.
25 Q. -- that correctly?

Page 118

1    A. You read that correctly.
2    Q. And those all three would have been
3 appropriate tests to do at the time?
4    A. Yes.
5    Q. It says, "No source for Mr. Boudreaux's
6 bleed was found"; correct?
7    A. Correct.
8    Q. Meaning there was no anatomic explanation
9 for his bleed at that time?
10    A. Meaning that those studies did not
11 identify an anatomic source.
12    Q. I want to talk -- and we may take a break
13 in a minute. But I just want to make sure I
14 understand.
15    You say, "Mr. Boudreaux most likely would
16 have had a GI bleed with any anticoagulant."
17    MS. HOFFMANN:
18    Where are you referring to now?
19    MR. GOZA:
20    Paragraph 11.
21    THE WITNESS:
22    Yes.
23    MS. HOFFMANN:
24    We talked --
25    MR. GOZA:

Page 119

1    And --
2    MS. HOFFMANN:
3    -- about that. Okay.
4    MR. GOZA:
5    No. We haven't talked about this
6 part, but that's okay.
7 BY MR. GOZA:
8    Q. "Mr. Boudreaux most likely would have had
9 a GI bleed with any anticoagulant, including
10 Coumadin or any of the other DOACs"; correct?
11    A. Correct.
12    Q. I want you to tell me first all of the
13 bases that you have that -- upon which you base
14 your opinion.
15    A. Well, any anticoagulant has a risk of GI
16 bleeding. That's its main side effect. That --
17 and if you look at Neena Abraham's work on the
18 comparative, where she looks at both Pradaxa to
19 Coumadin, as well as Xarelto to Coumadin, they
20 both have approximately the same amount of GI
21 bleeding as Coumadin. There's some variations.
22 You know, I think that -- you know, and she -- for
23 Pradaxa maybe there was a little bit less bleeding
24 for a-fib and a little bit more bleeding
25 non-a-fib. But the bottom line is that the risk

Page 120

1 is just about the same for the NOACs and Coumadin.
2    Q. So -- I -- I just want to make sure I -- I
3 get this.
4    The reason that you feel you are able to
5 make this statement is because of your opinion or
6 belief that the risk of gastrointestinal bleeding
7 is the same with all NOACs and with Coumadin?
8    MS. HOFFMANN:
9    Objection.
10    THE WITNESS:
11    I do believe that it's just about the
12    same. I think there's some variation
13    between one study and the next, but I
14    think it's -- it's about the same risk.
15 BY MR. GOZA:
16    Q. Now, I want to know everything that you
17 have done to formulate that opinion. Because, I
18 mean, it was inherent in what you were saying,
19 I'm -- I'm -- I was assuming. So now I want to
20 understand that -- that -- what you've done to
21 formulate that opinion.
22    A. All right. Well, one, based on my
23 experience taking care of lots of GI bleeding
24 patients, there doesn't seem to be any one that
25 causes more bleeding than the others. I see it as

Page 121

1 a equal opportunity complication for all of them.
2 As far as the literature there, it seems like that
3 there may be some variation from one study to the
4 next. But the overall aggregate is that they all
5 cause GI bleeding in about the same percentage of
6 cases.
7    Q. And the literature specifically that
8 you're pointing to are the six articles that exist
9 in your reliance list?
10    A. Yes. And the ROCKET AF study that I added
11 to that.
12    Q. Okay. Now, let's go back.
13    In terms of your practice, do you keep
14 records of how many bleeds you get on what
15 patients?
16    A. It's -- it's funny you ask that. Because
17 when I -- when I did -- my paper said that I've
18 taken care of at least 5,000 bleeds. I can tell
19 you how I base that, and I can -- and how it's --
20 that's really a very low estimate.
21    How I base that was -- about two years ago
22 I was asked to give a lecture at a local
23 hospitalist course on GI bleeding. I hadn't given
24 that lecture in a while, so I decided to update my
25 slides. So -- so I kept track of all the bleeds I

Page 122

1  had for one week: acute upper, acute lower. And
2  there were 40 bleeds during that week while I was
3  on call: 28 acute uppers, 6 acute lowers, 4
4  obscure, 4 were on Coumadin, 1 on Xarelto, 1 on
5  Pradaxa. And then what I kept on doing is --
6  every time I was on call, I would keep track of
7  the number of GI bleeds that I took care of that
8  week. And the short -- the smallest number I ever
9  had in one week was 20. The largest I had was 40.
10  Now, after I did this paper last -- but
11  those are just one weeks at a time. I'm -- I'm
12  roughly on call one weekend every month. That
13  really doesn't count the other three weeks.
14  And so last month I kept track of all my
15  GI bleeds, which includes, you know, the patients
16  I saw for chronic bleeding that I do scopes on,
17  the patients I saw in the office for acute or
18  intermittent bleeding I set up for scopes. And
19  that was actually 46 cases in a month.
20  So that's roughly how I came up with the
21  numbers of -- of how many patients with GI
22  bleeding. And again, GI bleeding is
23  all-encompassing for chronic, acute, upper, lower,
24  obscure, recurring, every -- every variation.
25  Q. Okay.

Page 123

1  A. So if it's -- if it's --
2  Q. Sorry.
3  A. -- 45 in a month, that would be -- I -- I
4  hate to say this because it shows how long I've
5  been practicing. But that might be 15,000 over a
6  career.
7  Q. So what I'm trying to get at is: Have you
8  -- first of all, do you keep track of how many of
9  your patients are on Xarelto, how many are on
10  Pradaxa, how many are on Coumadin?
11  A. I do not keep a tally specifically. It
12  would just be my feeling or -- or memory.
13  Q. Okay. And certainly you're not telling us
14  you remember 15,000 patients and what they were
15  taking at any point in time?
16  A. Correct.
17  Q. And the -- with respect to the -- let --
18  let's just say -- because obviously the -- the
19  NOACs have been -- not been on the market but
20  since -- what -- what was your understanding when
21  they came on the market?
22  A. I don't know. I think 10 years ago. I
23  don't know.
24  Q. Okay. You don't know as you sit here?
25  A. Yes.

Page 124

1  Q. Okay. So I take it then you don't keep
2  track of which ones are on which drug, which
3  patients of yours are on which drug?
4  A. Well, if -- if a patient is in my practice
5  and they're my patient that I'm taking care of,
6  then I -- I do keep track of what medicine they're
7  taking.
8  Q. Well -- I apologize. And I -- that --
9  that wasn't a well-worded question, and I
10  understand what you're getting at.
11  You'd have in your chart maybe what --
12  what drug they were on; correct?
13  A. Correct.
14  Q. But in terms of being able to sit here to
15  tell us today how many of your patients are on
16  Pradaxa versus Xarelto versus Coumadin versus
17  Eliquis, you're not able to say?
18  A. No. I'm not able to say.
19  Q. Okay. So while you have handled and taken
20  care of a number of patients with GI bleeds, you
21  haven't undertaken some study based on your own
22  personal database of what medication -- specific
23  medications those patients were on. Is that true?
24  A. No. Now, as -- if you looked in my CV, a
25  number of my publications were on bleeding ulcer

Page 125

1  cases and -- but that would have been predating
2  the NOACs. But of course for those patients we
3  kept track of the medications they were on.
4  There's -- if that's what you mean.
5  Q. Sure.
6  And to the extent those patients were on
7  medications preceding the NOACs, more likely than
8  not they were on Coumadin?
9  A. Correct.
10  Q. Okay. So we -- the -- I'm trying to
11  understand now as we sit here and talk about your
12  own personal practice, whether that gives you any
13  basis to say that in fact each of the NOACs are
14  equal.
15  And so what I'm trying to understand:
16  Have you undertaken some kind of study or by
17  tallying how many per week or -- or taking Pradaxa
18  and how many per week have bleeds on Pradaxa and
19  how many per week have bleeds on Xarelto, if
20  you've done that?
21  A. No. I have not done that.
22  Q. So really the -- the -- the basis upon
23  which you are saying that in your opinion the
24  NOACs and Coumadin have an equivalent rate of
25  gastrointestinal bleeding are the six articles

Page 126

1 that we have talked about that you placed on your
2 reliance list?
3     MS. HOFFMANN:
4       Objection.  That's not what he's
5     testified to.
6     THE WITNESS:
7       The -- I've -- I've cited those
8     articles in addition to the ROCKET AF
9     study and my just -- my general knowledge
10     that I've acquired as far as taking care
11     of these patients.
12 BY MR. GOZA:
13   Q.  Okay.  And the --
14   A.  That -- that's all.
15   Q.  Okay.  And the -- and I just -- that's why
16 I want to make sure.
17     Now, when --
18   A.  All right.
19   Q.  -- you say the general knowledge that
20 you've acquired, again that general knowledge just
21 relates to taking care of patients who have
22 bleeds?
23   A.  Well -- and going to meetings and hearing
24 lectures and -- and -- and just -- again, the
25 articles I included are not all the articles that

Page 127

1 I've ever read.  I -- I read every time -- every
2 month.  When the journals come out, I read them as
3 well.  I don't remember any specifically that
4 relate to this.  But . . .
5   Q.  Well, see, here's what I'm trying to find
6 out:  Everything upon which you base this opinion.
7 And if there's something out there that you've
8 read that you base this opinion on, I want to know
9 it.
10     So what I'm trying to get to today:  In
11 terms of the literature, you have cited the six
12 articles that you reviewed in order to formulate
13 your opinion.  True?
14   A.  True.
15   Q.  You have talked to me or explained to me
16 that you have taken care of patients with GI
17 bleeding, but you've not undertaken any kind of
18 study or calculations to determine what are -- the
19 rate of bleeding was amongst the different drugs
20 that you treat patients -- that they're on;
21 correct?
22   A.  Correct.
23   Q.  And you've talked to me about the fact
24 that you looked at the data in the ROCKET AF
25 trial?

Page 128

1   A.  Correct.
2   Q.  Have we now covered everything upon which
3 you base your opinion?
4     MS. HOFFMANN:
5       I'm going to object and -- and refer
6     you back to Page 3 --
7     MR. GOZA:
8       Well --
9     MS. HOFFMANN:
10       -- of his report.
11     MR. GOZA:
12       I'm just going to object.  If you've
13     got objection to form -- you're always
14     instructing me -- make it.
15     MS. HOFFMANN:
16       This is my Kirk Goza objection
17     because --
18     MR. GOZA:
19       No.
20     MS. HOFFMANN:
21       -- I sat through a deposition --
22     MR. GOZA:
23       Listen --
24     MS. HOFFMANN:
25       -- with you the other day where you

Page 129

1     made these types of objections.  And I
2     would refer you to Page 3 of his report.
3     You cannot exclude his background,
4     education, training, and experience.
5 BY MR. GOZA:
6   Q.  And -- and so let's go through that,
7 because I want to make sure.  When we talk about
8 background, you've never prescribed a NOAC.  True?
9   A.  Correct.
10   Q.  You've -- in -- in terms about background,
11 you're not the person that makes the judgments
12 about the risk-benefit analysis of -- use of
13 NOACs.  True?
14   A.  Correct.
15   Q.  In terms of NOACs, you've never undertaken
16 any study or read any literature specifically
17 related to the risk of bleeding except for the
18 purposes of this litigation.  True?
19   A.  I would -- I can't say that's true.
20 Before the -- the -- before this litigation, I
21 would have tried to keep up with any literature
22 that was -- that was pertinent on that topic.  For
23 the study and for my conclusions, I think we'll go
24 with those six articles there.
25   Q.  Okay.  Let me rephrase it then.

Page 130

1    For purposes of your background, to the
2 extent -- as part of your general reading, you had
3 read other articles.  You're not able to cite
4 those to me as we sit here today?
5    A. Correct.
6    Q. For purposes of your training, you are not
7 an epidemiologist?
8    A. Correct.
9    Q. You're not a biostatis -- statistician?
10    A. Correct.
11    Q. You are not a -- or strike that.
12    You're -- you're certainly -- we've
13 already established you're not a cardiologist?
14    A. Correct.
15    Q. And you're not a hematologist.  True?
16    A. Correct.
17    Q. When you were training and they talk about
18 -- she mentioned training.
19    NOACs weren't even in existence when you
20 were training?
21    A. This is correct.
22    Q. So you didn't learn anything about them
23 back in your training.  True?
24    A. True.
25    MR. GOZA:

Page 131

1    Why don't we take about five minutes.
2    I'm going to kind of get things in order.
3    And we're getting -- we'll -- we'll --
4    we'll make some progress here.
5    THE WITNESS:
6    Okay.
7    THE VIDEOGRAPHER:
8    We're now off the record at 2:57.
9    (Brief recess was taken.)
10    THE VIDEOGRAPHER:
11    We're now back on the record.  The
12    time is 3:18.
13 BY MR. GOZA:
14    Q. Doctor, we just took a break.  And we're
15 back on the record.
16    Are you ready to go?
17    A. Yes.  I am.
18    Q. Okay.  You had mentioned to me at the
19 break -- I think we were talking about things that
20 you had looked at, and one of them was the ROCKET
21 AF study.
22    A. Yes.
23    Q. Tell me specifically with respect to the
24 ROCKET AF study what you've looked at.  Is it just
25 the study itself?

Page 132

1    A. Yes.
2    Q. Have you looked at any of the studies that
3 have evaluated the ROCKET data since the original
4 article came out in 2012?
5    A. Not that I know of.
6    Q. Have you --
7    A. Although I -- I think it's cited in some
8 of the articles.  I think it's cited in both the
9 Abraham -- I think it's cited in Abraham, but I'm
10 not sure about that.
11    Q. Okay.  Have you read any of the FDA
12 comments about the ROCKET study?
13    A. No.
14    Q. In looking at the ROCKET study itself,
15 were you able to discern what the risk of major
16 bleeding was with respect to patients on Xarelto?
17    A. Yes.
18    Q. Okay.  And what do -- what did you
19 determine the calculation?
20    A. My interpretation of the results of the
21 ROCKET AF was that Xarelto had slightly more GI
22 bleeding than warfarin, although it had less
23 strokes, less fatal hemorrhage, less fatal GI
24 bleeding, and less intercranial [sic] hemorrhage.
25    Q. Ultimately in looking at that data, were

Page 133

1 you able to determine which of those figures reach
2 statistical significance?
3    A. I think that the less intercranial health
4 was statistically significant.  I think that less
5 deaths was.  And less -- less fatal GI bleeding
6 was statistically significant.  Because it was
7 like -- well, I think that was statistically
8 significant.  I think that the -- as far as the
9 less strokes, it was powered as a noninferior
10 study.  So I -- I don't think they can -- so I --
11 and the results, they don't claim -- they -- they
12 claim noninferior rather than superior.  But --
13 but I -- I don't know if that -- I don't think if
14 that reached statistical significance.
15    Q. Okay.  Other than the ROCKET study and
16 these six articles, we've -- we've covered I think
17 what you've said you looked at in terms of
18 articles relating to the risk of bleeding on the
19 NOACs or Coumadin?
20    A. Yes.
21    Q. Now, I want to go through a few things.
22    First of all, did -- did you ever see the
23 2015 label?
24    A. I was given two labels.  I -- it was
25 really hard for me to determine what year they

Page 134

1  were.
2    Q.  They're listed in your reliance list as --
3    A.  I -- I think it's --
4    Q.  -- 2013 and '14.
5    A.  Okay.
6    Q.  So I take it you never saw the label
7  change --
8    A.  No.
9    Q.  -- that was in 2015?
10   A.  I would not.
11   Q.  Did you or were you aware that the FDA
12 required that subdata analysis of the ROCKET study
13 be included in the label in 2015?
14       MS. HOFFMANN:
15         Objection.
16       THE WITNESS:
17         No.  I was not aware of that.
18 BY MR. GOZA:
19   Q.  Would -- you aware that the statistically
20 significant information showed a 50 percent
21 increase in major bleeds with Xarelto --
22       MS. HOFFMANN:
23         Objection.
24 BY MR. GOZA:
25   Q.  -- versus warfarin?

Page 135

1        MS. HOFFMANN:
2          Objection.
3        THE WITNESS:
4          That was the 3.2 per hundred patient
5  years versus the 2.2 per hundred patient
6  years, I think.  So 50 percent.
7        MR. GOZA:
8          Correct.
9        THE WITNESS:
10         Yeah.
11 BY MR. GOZA:
12   Q.  Have you seen -- and then had -- or strike
13 that.
14       Did you ever look at what the time in
15 therapeutic range was for the Xarelto study
16 overall, the ROCKET study?
17       MS. HOFFMANN:
18         Objection.
19       THE WITNESS:
20         I -- I read the study, and I read the
21 -- but those are things that I don't
22 really -- are not part of the scope of my
23 practice.
24 BY MR. GOZA:
25   Q.  And -- and I appreciate that.

Page 136

1    A.  Right.
2    Q.  Because here's what I'm -- I'm trying to
3  get at:  Because obviously the outcome with
4  respect to bleeding events might relate in part to
5  time in therapeutic range, and that's something
6  that you didn't look at at least in terms of
7  evaluating the ROCKET study and the values there?
8        MS. HOFFMANN:
9          Objection.
10       THE WITNESS:
11         I'm -- I'm not an expert on the
12 time to therapeutic range.
13 BY MR. GOZA:
14   Q.  Okay.  With respect to -- or strike that.
15       In terms of the -- the articles -- and I
16 -- you -- you've drawn a conclusion that all of
17 the anticoagulants and Coumadin are essentially
18 equivalent in terms of gastrointestinal bleed --
19       MS. HOFFMANN:
20         Object.
21       MR. SLONIM:
22         Objection.
23 BY MR. GOZA:
24   Q.  -- as I understand?
25       MS. HOFFMANN:

Page 137

1        Objection.  That's not . . .
2  BY MR. GOZA:
3    Q.  Well, Doctor, let -- let me ask it again.
4        Are -- are you telling the court and jury
5  that with respect to gastrointestinal bleed, the
6  NOACs and Coumadin together are all essentially
7  equivalent in terms of the risk of bleed?
8    A.  I think that they are all about the same.
9    Q.  Okay.  And do you think you can make that
10 statement despite having not looked at all of the
11 literature related to that issue?
12   A.  I think that you -- I think you can cite
13 -- cite one article that shows one is favorable.
14 You can cite another article that that one is
15 favorable.  They all have different methodology.
16 I think until one had a head-to-head study of
17 Drug A and Drug B -- and it would have to be
18 powered in incredible amounts of patients to show
19 any statistically significant difference, that
20 until you have a study like that, you can't say
21 that one is better or worse than the other.
22   Q.  What you mean is -- and -- that -- that
23 the -- in terms of the hierarchy of different
24 studies that are available, a head-to-head
25 comparison, prospective randomized-controlled

Page 138

1 study would be the best?
2     MS. HOFFMANN:
3         Objection.
4     THE WITNESS:
5         Yes.
6 BY MR. GOZA:
7     Q. The -- in terms of the hierarchy of
8 studies. True?
9     A. Yes. That would be the most
10 scientifically valid, would be a head-to-head
11 study.
12     Q. As far as you've seen, no -- there's been
13 no undertaking of that kind of head-to-head study?
14     A. I'm not aware of any study like that.
15     Q. So oftentimes in medicine we don't have
16 head-to-head studies and we're left with the
17 gathering of either retrospective studies,
18 observational studies, other kinds of data. True?
19     A. That's correct.
20     Q. And in order to evaluate that data,
21 obviously one has to see all of the data. True?
22     MS. HOFFMANN:
23         Objection.
24     THE WITNESS:
25         In -- I guess in generalities someone

Page 139

1     has to see all the data. I -- I'm not
2     sure I'm the right one to be interpreting
3     all that. But . . .
4 BY MR. GOZA:
5     Q. Well, the -- that's -- that's the issue
6 I'm really getting at.
7         In terms of the heterogenicity, the bias
8 built into observational studies, calculating
9 and -- for all of the confounding factors that
10 exist in studies, is that within your area of
11 expertise?
12     MS. HOFFMANN:
13         Objection.
14     THE WITNESS:
15         I -- I think it's -- it's not within
16     my expertise. I think I've looked at
17     enough studies that I -- I know to
18     consider some of those aspects as far as
19     maybe a -- an advantage or a disadvantage
20     to that study. But again, that's -- that
21     would not be in the -- in my expertise.
22 BY MR. GOZA:
23     Q. Okay. So here's what I -- I'm going to
24 read a few studies and ask if you -- and I'm
25 assuming you've never seen them and therefore

Page 140

1 couldn't have relied on them.
2     There's a study by Zoppo, "New Options in
3 Anticoagulation for Atrial Fibrillation," which
4 was published by the New England Journal of
5 Medicine, a reputable source, the New England
6 Journal of --
7     A. Yes.
8     Q. -- Medicine?
9     A. It is a reputable source.
10     Q. You did not read that --
11     A. No.
12     Q. -- study?
13     I take it then obviously you couldn't have
14 relied on that study?
15     A. Correct.
16     Q. "Bleeding with Direct Oral Anticoagulants
17 vs Warfarin:" A "Clinical Experience," the
18 American Journal of Medicine, 2016, by Eikelboom.
19         Have you read that study?
20     A. I have not read that study.
21     Q. Obviously didn't rely on that?
22     A. (Nods head.)
23     Q. I -- I've got another -- and I -- I'm not
24 sure I -- I -- I -- I could see it here. And
25 maybe what -- the -- the better thing would --

Page 141

1 would be to mark this an exhibit, have you look it
2 over, and tell you that -- whether you've read any
3 of these or not. But only one of them is on your
4 reliance list.
5         So let me ask you this: The -- don't you
6 believe in order to offer an opinion with respect
7 to the rate of incidence of gastrointestinal
8 bleeding with one NOAC versus other NOACs or even
9 NOACs versus anticoagulants, you would -- versus
10 Coumadin, you would want to have read, looked at
11 the pertinent -- all of the pertinent studies
12 associated with this issue?
13     MS. HOFFMANN:
14         Objection.
15     THE WITNESS:
16         I -- I think you could look at all of
17     them. And I think -- and I could -- and
18     we can spend the time doing all that. And
19     you'd have divergent answers based on
20     them. And you still can't get to the --
21     the final answer, that you can't really
22     compare them unless there's a head-to-head
23     study.
24 BY MR. GOZA:
25     Q. But if somebody is making -- I mean,

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 142

1 you're actually making an affirmative statement.
2 You're not saying I don't know how they compare.
3 You're making an affirmative statement of how they
4 compare. True?
5      MS. HOFFMANN:
6          Where? I --
7 BY MR. GOZA:
8   Q. Well, you're saying they're all equal.
9 That's an affirmative statement, is it not?
10   A. What -- in -- in the studies that I've
11 read, it seems like there's no difference -- or --
12 or very subtle difference and it changes from one
13 study to the next. And so my all -- my
14 interpretation is that they're just about the
15 same, that every anticoagulant has a risk of GI
16 bleeding and that's balanced to get the --
17 balanced against the risk of stroke and that's a
18 decision that the doctor and physician have to
19 make.
20   Q. So where -- the -- the only study that you
21 actually -- and here's the statement that you
22 make. It says that large retrospective database
23 analysis showed that overall GI bleeding rates
24 with NOACs or DOACs are similar to those with
25 warfarin, though the rate of bleeding might be

Page 143

1 higher for patients greater than 75 years of age
2 taking DOACs.
3      And the -- the single study that you cite
4 for that proposition is Abraham -- in this Abraham
5 and Singh study; is that correct?
6   A. Correct.
7   Q. And in terms of if one were to be writing
8 a paper, a peer-reviewed article on the rates of
9 risk of relative bleeding amongst the NOACs or
10 anticoagulants, do you think this would be
11 adequate support for that statement?
12   A. No. I think if one were writing a
13 peer-reviewed article, one would -- that would be
14 something that you would dive into and read
15 everything.
16   Q. And you would read everything because you
17 would want to have that knowledge base in order to
18 make a determination about what exactly the -- the
19 relevant world of data was on that issue?
20      MS. HOFFMANN:
21          Objection.
22      THE WITNESS:
23          You know, I think you'd want to -- if
24 one was wanting -- if one's goal was to
25 make the end-all summary comparing them

Page 144

1      all, then you want to have all the data.
2      So I, you know . . .
3 BY MR. GOZA:
4   Q. Well, your -- your testimony, that I think
5 Mr. Boudreaux would have bled regardless of what
6 anticoagulant he is on, in -- in part is based on
7 your assumption that all NOACs and Coumadin have
8 the same or an equivalent rate of gastrointestinal
9 bleeding?
10   A. I think they all have just about the same.
11 So I think that the -- the probability of him
12 bleeding would have been just about the same with
13 anything.
14   Q. That's -- my -- my point is that you've --
15 you've concluded that, and that conclusion is what
16 leads you to say that in fact he would have bled
17 on any anticoagulant?
18      MS. HOFFMANN:
19          "Most likely" is what that --
20 BY MR. GOZA:
21   Q. Most likely --
22      MS. HOFFMANN:
23          -- says.
24 BY MR. GOZA:
25   Q. Would have bled on any --

Page 145

1   A. Most likely.
2   Q. -- anticoagulant. Am I correct?
3   A. Right.
4   Q. And -- so what I'm asking you is: Would
5 you at least concede the point that there may be
6 articles out there that you would have to read
7 that might change your mind about whether or not
8 the underlying premise of your hypotheses that all
9 NOACs are -- have the same bleeding risk or -- as
10 Coumadin, whether that might change your mind?
11   A. I --
12      MS. HOFFMANN:
13          Objection.
14      THE WITNESS:
15          I think that you -- we could parade
16 out articles, and they might show a subtle
17 benefit here, a subtle decrease here. We
18 could just keep going back and forth and
19 probably show all those things. And if
20 you consider all that together, if one
21 study shows a little bit better, one shows
22 -- shows a little bit worse, then in the
23 long run that to me indicates that they're
24 just about the same. I'm -- I'm not --
25 you know, that's . . .

Page 146

BY MR. GOZA:

Q. But you would want to have an opportunity to weigh the strength of each of those studies; correct?

MS. HOFFMANN:

Objection.

THE WITNESS:

You would want to analyze those studies to see how they were done.

BY MR. GOZA:

Q. Determine how they are -- might be affected by certain biases within the study?

A. Correct.

Q. Determine things like what was their time in therapeutic range in the studies when they were comparing to warfarin?

A. Again, that's not something I generally know about. But I would -- I would think if -- if that is considered important in the cardiology literature, then that would be something that would be important.

Q. You would want to consider the heterogenicity of the -- of the populations involved?

A. Yes.

Page 147

Q. And you'd want to consider time, length of the -- of the study?

A. Certainly.

Q. Those are all factors that you would want to sit out and lay out in looking at the studies to decide what strength to give each study. True?

A. Right.

Q. And that would be more in the world of an epidemiologist. True?

A. I'm not sure who that would be in the realm of.

Q. Not in the realm of a gastroenterologist?

A. You know, I would think that it certainly -- like when Abraham did her study -- she's a gastroenterologist. She would have been, you know, looking at those databases and -- and -- and trying to assess that. I -- but -- but -- but she's -- but for me, a practicing gastroenterologist rather than, you know, a pure academic gastroenterologist, I -- I would not be looking at all that.

Q. I'm going to hand you just a couple of things here in a second.

MR. GOZA:

Let's just mark this as an exhibit.

Page 148

(Exhibit No. 7 was marked for identification and attached hereto.)

MS. HOFFMANN:

Do you have copies?

MR. GOZA:

I don't. We can make some -- and it's -- I'm just going to ask him a couple of quick questions about it. It's a list of articles that relate to this topic. And rather than read them all, I was simply going to say . . .

MS. HOFFMANN:

And the marks on these are what?

MR. GOZA:

Those were just my checkmarks. It came from a deposition. And we can make a clean copy.

MS. HOFFMANN:

Do you have any problem?

MR. SLONIM:

No.

BY MR. GOZA:

Q. Doctor, I want you to take a second just to peruse that list and compare it to your Exhibit B.

Page 149

A. All right.

Q. And I've done this. And -- and so you can --

A. My Exhibit B, is that my -- my --

Q. That's your reliance list.

A. My reliance list. Okay.

Q. Yeah. Yeah. And --

A. Okay.

Q. And here's the thing. I think we've marked what's been -- Exhibit 7 is a list of references. Do you see that?

A. Yes.

Q. Those references have to do with articles related to the risk of gastrointestinal bleeding associated with NOACs in a number of comparison studies. True?

MS. HOFFMANN:

Objection. No foundation.

BY MR. GOZA:

Q. You can read them all over.

MS. HOFFMANN:

So what is the question?

MR. GOZA:

I haven't asked one yet.

MR. SLONIM:

Page 150

1    So there's no question pending,
2  Dr. Smith. And we object to the
3  representation and the gratuitous
4  statement made on the record by Counsel.
5    MS. HOFFMANN:
6      Do you have a question, Counsel?
7    MR. GOZA:
8      I was --
9    THE WITNESS:
10     Yeah.
11   MR. GOZA:
12     Yeah. As soon as he's done. I'm
13  sorry. I didn't see that you were done --
14   MS. HOFFMANN:
15     That's okay.
16   MR. GOZA:
17     -- Doctor.
18 BY MR. GOZA:
19   Q. My -- my question was simply this: In
20 looking that over -- and -- and I know you don't
21 have the underlying articles, only the -- the --
22 the topics listed. Would you agree that most if
23 not all of those articles relate to the evaluation
24 of the risk of bleeding associated with
25 anticoagulants, including the NOACs?

Page 151

1    A. Yes.
2    MS. HOFFMANN:
3      Based solely on the title?
4    THE WITNESS:
5      Yes.
6    MR. GOZA:
7      Yeah.
8    THE WITNESS:
9      Yeah. Based on the title, it looks
10     like what these studies are about.
11 BY MR. GOZA:
12   Q. And the only one on that list that I see
13 that overlaps with the studies that you have
14 looked at would be the Abraham study, which is the
15 first one on the Exhibit 7; is that --
16   A. Correct.
17   Q. -- correct?
18     You would agree that just based on that
19 list there are a number of studies that you've not
20 had a chance to look at or evaluate in formulating
21 your opinions. True?
22   MS. HOFFMANN:
23     Objection.
24   THE WITNESS:
25     That's true.

Page 152

1 BY MR. GOZA:
2   Q. Would you at least concede the possibility
3 that there might be something in one of those
4 articles that would cause you to rethink your
5 position?
6    MS. HOFFMANN:
7      On what?
8    MR. GOZA:
9      On whether or not the --
10   THE WITNESS:
11     Right.
12   MR. GOZA:
13     -- bleeding risk amongst the
14  anticoagulants were equal.
15   MS. HOFFMANN:
16     Objection.
17   THE WITNESS:
18     What -- although I haven't looked at
19  all the studies, I -- I know that in the
20  -- the other literature -- and -- and I
21  think the other Abraham article, not the
22  British Medical Journal, but the American
23  Journal of Gastro looks at comparative --
24  looks at the different NOACs. And she
25  quotes one after the other.

Page 153

1    I -- I still think that the -- the
2  bottom line is that you have a diversity
3  of studies showing different results. And
4  it's -- it's -- it's in that -- and again,
5  in the absence of a head-to-head study, I
6  don't know how to say that one is better
7  than the other.
8 BY MR. GOZA:
9   Q. One study or one drug?
10   A. One agent is better than the other.
11 I...
12   Q. Would you at least concede the possibility
13 there may be people with more expertise in
14 interpreting the total body of data and drawing
15 that conclusion?
16   MS. HOFFMANN:
17     Objection.
18   THE WITNESS:
19     The -- I think that there are going to
20  be people who are more scholarly than I am
21  who can interpret that. I think I'm --
22  I -- I'm capable of evaluating articles
23  and studies.
24 BY MR. GOZA:
25   Q. Do you think -- strike that.

Page 154

1    Do you think Dr. Winstead is capable of
2  evaluating articles and studies?
3    A.  I think he is.
4    Q.  Let me just ask you:  With respect to the
5  ROCKET study itself -- and I'll hand you --
6    MR. GOZA:
7        And we can mark this as Exhibit 8.
8    (Exhibit No. 8 was marked for
9    identification and attached hereto.)
10 BY MR. GOZA:
11   Q.  And just ask you:  This is an article that
12 goes back through -- and if you look on Page 2,
13 are you with me?
14   A.  Is -- on Page 2 is just a table.  On the
15 back of Page 1, is that what --
16   Q.  Correct.
17   A.  -- you're looking at?  Okay.
18   Q.  Yes, sir.
19     And this is a table outlining the "Primary
20 Safety Outcome Data from Phase 3 Studies of" the
21 "DOACs vs Warfarin by Type of Bleeding."
22     Did I read that correctly?
23   A.  Yes.
24   Q.  And do you know anything about the RE-LY
25 study?

Page 155

1    A.  I -- I've heard the RE-LY study mentioned.
2    Q.  Okay.  Have you read it?
3    A.  No.
4    Q.  Do you know whether or not -- what NOAC
5  specific it has to do with?
6    A.  Yes.
7    Q.  Other than --
8    A.  The --
9    Q.  -- looking at this article, I should say?
10   A.  I -- I would have thought it was due to
11 Pradaxa.
12   Q.  And how about the ARISTOTLE study?  Have
13 you heard -- read that study?
14   A.  No.  I have not.
15   Q.  Did you know what it related to?
16   A.  I -- I -- I know now.
17   Q.  I understand you know from looking at
18 this.  Prior to --
19   A.  Yeah.
20   Q.  -- today, had you ever really evaluated
21 that issue or knew what it was related to?
22   A.  No.  I know -- I knew from I think
23 Linder's [sic] expert report he talked about both
24 ARISTOTLE and RE-LY.
25   Q.  How about the ENGAGE study?  Do you know

Page 156

1  what that relates to?
2    A.  No.
3    Q.  The ROCKET AF study, you said you did know
4  that that was a Xarelto study?
5    A.  Yes.
6    Q.  And this was a breakdown of the data.  It
7  says -- looking at safety outcome data, do you see
8  that?
9    A.  Yes.
10   Q.  And it breaks it down according to
11 different kinds of bleeds?
12   A.  Correct.
13   MS. HOFFMANN:
14     Are you asking him just about this
15     table?
16   MR. GOZA:
17     Yes, ma'am.
18   MS. HOFFMANN:
19     Okay.  Kirk, would you mind sitting
20     down?
21 BY MR. GOZA:
22   Q.  The -- is it list that -- there's a
23 listing of -- of major bleeding; correct?
24   A.  Yeah.  It says -- major bleeding is the
25 top row.

Page 157

1    Q.  Okay.  And there would not be any
2  statistically significant difference there under
3  the ROCKET AF study for that?
4    A.  No.
5    Q.  There is intercranial bleeding listed.
6  True?
7    A.  Yes.
8    Q.  And there is no statistical difference
9  between Xarelto and warfarin with respect to that.
10 True?
11   A.  I thought -- well, I -- we'd have to go
12 back over the whole article, what they've taken
13 out of this.  I'm not sure if there was all data
14 versus intention to treat.  But I thought that was
15 -- I -- I -- I thought I remember there being a
16 statistically significant reduction in
17 intercranial bleeding.
18   Q.  At least according to this article there
19 was not?
20   MR. SLONIM:
21     What -- what are you -- where are you
22     getting that from, Counsel?
23   MR. GOZA:
24     I'm looking from the chart.
25   MR. SLONIM:

Page 158

1  The chart says it's a .67 hazard ratio
2  with a P-value of .02, which is less than
3  .05.  Then it shows you the confidence
4  interval is below 1.  It's the -- the
5  upper bounds of -- the confidence --
6  MR. GOZA:
7      Got it.  Okay.
8  MR. SLONIM:
9      -- interval is --
10  THE WITNESS:
11      Right.
12  MR. SLONIM:
13      .93.
14  THE WITNESS:
15      Okay.
16  MR. SLONIM:
17      If you -- if you are making
18  representations -- factual representations
19  about ICH, please be accurate.
20  MR. GOZA:
21      I apologize if I --
22  THE WITNESS:
23      Right.
24  MR. GOZA:
25      -- misstated that.  That's my

Page 159

1      ignorance as opposed to my intentional
2      trying to do it.  I appreciate you
3      correcting it.
4  BY MR. GOZA:
5      Q.  That showed some -- what was the -- the
6  percent difference?
7      A.  There's a 2 percent difference, and it was
8  statistically significant.
9      Q.  Okay.  And when you say -- 2 percent or --
10      A.  .2.
11      Q.  -- .2.
12      A.  .2.  Sorry.
13      Q.  .2 percent.  Okay.
14      And then there is the difference
15  between -- in gastrointestinal bleeding; is that
16  correct?
17      A.  Correct.
18      Q.  And was that statistically significant?
19      A.  It was.
20      Q.  And that was a 1.61 percent difference?
21      A.  Yes.
22      Q.  Meaning in the ROCKET AF study there was a
23  60 percent increased risk of gastrointestinal
24  bleed?
25      A.  Yes.

Page 160

1      Q.  So at least in terms of the ROCKET data
2  that you were relying on, it appears that there
3  was a statistically significant increased risk of
4  gastrointestinal bleed.  Is that true?
5      A.  The --
6  MS. HOFFMANN:
7      But --
8  THE WITNESS:
9      It was the ROCKET data, was also what
10  the -- I guess what the FDA was relying
11  on.  And -- and I guess they saw that
12  there was, although an increased risk of
13  bleed, less risk of intercranial
14  hemorrhage, less risk of death, less risk
15  of fatal GI bleeding, and less risk of
16  stroke.  And I don't think I can be
17  critical of the FDA in -- in making that
18  assessment.  That seems like a reasonable
19  -- reasonable data.
20  BY MR. GOZA:
21      Q.  And I'm not asking you to be critical of
22  the FDA.  I'm not even asking you what the FDA's
23  role or participation was.
24      What I'm --
25      A.  Right.

Page 161

1      Q.  -- simply asking you, this:  Is it -- does
2  -- based on the -- the -- the table in that
3  article, does it --
4      A.  Yeah.
5      Q.  -- appear that there was a 60 percent
6  increased of gastrointestinal bleed on Xarelto?
7  MS. HOFFMANN:
8      Objection.
9  THE WITNESS:
10      Based on that data, there is a -- an
11  increased statistically significant bleed
12  -- risk of bleeding.
13      And in Desai's article, he says that
14  on a difference this small, it would take
15  130 patients to be switched to Xarelto to
16  have one additional bleed based on
17  Coumadin.  So the -- the number needed to
18  treat-type concept.
19  BY MR. GOZA:
20      Q.  Right.  And -- and I get that, the number
21  needed to treat.  We can -- we can talk all day
22  about -- about that because that relates all
23  across the board both to efficacy and to safety.
24  True?
25      A.  You can do efficacy -- yeah.  No need to

Page 162

1 treat for efficacy, yes.
2 Q. Now, my -- my -- my simple question is
3 this: Were you aware when you were formulating
4 your opinion that there was a 60 percent increased
5 risk of -- of gastrointestinal bleed in the ROCKET
6 data?
7 A. I was aware of the ROCKET data that said
8 that. Yes.
9 (Mr. Goza and Mr. Byrne confer outside the
10 hearing of the court reporter.)
11 BY MR. GOZA:
12 Q. And I -- I think I -- I think I already
13 asked this question. I -- I asked you about the
14 subset of U.S. data. And I think you indicated
15 you had not actually taken a look at that; is that
16 correct?
17 A. You mean for ROCKET AF?
18 Q. Yes.
19 A. No. I haven't seen the subset. So I know
20 that they had 1100 centers and -- and -- and quite
21 a few of them were not in -- not in the
22 United States.
23 Q. Okay. There are a number of articles that
24 -- that or strike that.
25 The articles that you did review, I want

Page 163

1 to talk for just a minute about those.
2 MR. GOZA:
3 So we can mark this as Exhibit 9.
4 THE WITNESS:
5 Is that Chang?
6 MR. GOZA:
7 It is. You -- oh.
8 THE WITNESS:
9 It's already --
10 MR. GOZA:
11 It's already an exhibit.
12 THE WITNESS:
13 -- already Exhibit 3.
14 MR. GOZA:
15 Oh. Exhibit 3. Okay. Good.
16 BY MR. GOZA:
17 Q. Chang, just so -- and Chang was -- came
18 out in 2015 --
19 MS. HOFFMANN:
20 Is that a question?
21 BY MR. GOZA:
22 Q. -- it appears; is that correct?
23 A. Correct.
24 Q. And this comes from the -- which -- is it
25 the British Medical Journal?

Page 164

1 A. Yes.
2 Q. And it -- it -- there's a section on here
3 -- and -- and this is an article that you've
4 referred to. True?
5 A. True.
6 Q. It -- it says, "What is Already Known on"
7 this "Topic." Do you see that?
8 A. Please refer me to the page.
9 Q. Strike that. Let's just look at the
10 conclusions first.
11 Am -- is that on the first page, isn't it?
12 A. On -- on the first page, under the
13 Abstract and Results?
14 Q. Yes, sir.
15 A. Okay.
16 Q. Under Conclusions, what was the
17 conclusions reached in that study?
18 A. Do you want me to read it?
19 Q. Yes, sir.
20 A. Okay. "Dabigatran users tended to be
21 older . . . more likely to be male. The rate of"
22 GI "bleeding was highest among dabigatran users
23 and lowest among rivaroxaban users (dabigatran v
24 rivaroxaban v warfarin: 9.01 v 3.41 v 7.02 cases
25 per" hundred -- per patient "years). After"

Page 165

1 judgment -- "after adjustment for potentially
2 confounding covariates, there was no evidence
3 statistically significant difference in the risk
4 of" GI "bleeding between dabigatran and warfarin
5 . . . or between rivaroxaban and warfarin."
6 Q. And then the conclusion?
7 A. "Although rates of" GI "bleeding seemed to
8 be similar in these commercially insured sample of
9 adults . . . we cannot rule out as much as a 50%
10 increase in the risk of" GI "bleeding with
11 dabigatran compared with warfarin" and "more than"
12 a "twofold higher risk of bleeding with
13 rivaroxaban."
14 Q. And when it says it cannot rule out, then
15 if you look at Page 5, it lists the limitations of
16 the study; correct?
17 A. Right.
18 Q. And you reference then the Abraham study
19 as well?
20 MS. HOFFMANN:
21 Are you moving on to another study?
22 MR. GOZA:
23 Yeah.
24 MS. HOFFMANN:
25 Okay.

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 166

1 THE WITNESS:
2 Okay.
3 MR. GOZA:
4 Yeah. I want to -- I'm just going to
5 just --
6 THE WITNESS:
7 So -- so they said they cannot rule it
8 out. But the conclusion was that the
9 rates of GI bleeding seemed to be similar.
10 Correct.
11 BY MR. GOZA:
12 Q. Right. And that -- that's my point, is
13 what they're saying here -- and this is -- I'm
14 just kind of getting us oriented to a date.
15 A. Yeah.
16 Q. They're saying at that point they can't
17 rule it out. True?
18 A. They -- they -- yes. But they also say
19 that based on this analysis the rate seems to be
20 similar.
21 Q. And on the Neena Abraham study -- and I --
22 this is just -- I'm going to -- we'll mark this.
23 MR. SLONIM:
24 What deposition exhibit, please?
25 MR. GOZA:

Page 167

1 Exhibit -- are we on 10?
2 COURT REPORTER:
3 Nine.
4 MR. GOZA:
5 Nine. Thank you.
6 (Exhibit No. 9 was marked for
7 identification and attached hereto.)
8 MR. SLONIM:
9 Is this Abraham?
10 MS. HOFFMANN:
11 And which Abraham's is it? He's
12 mentioned two.
13 MR. GOZA:
14 I think -- oh, I -- the Neena Abraham
15 and Singh study, which is I think the --
16 the article he cites.
17 BY MR. GOZA:
18 Q. Is that right?
19 A. Was that the British Medical Journal from
20 2015?
21 Q. It is.
22 A. Okay.
23 MR. SLONIM:
24 Do you have an extra copy of that, by
25 any chance?

Page 168

1 MR. GOZA:
2 (Tenders document.)
3 MR. SLONIM:
4 Thanks.
5 BY MR. GOZA:
6 Q. You had cited Abraham in saying -- saying
7 that they had looked at large retrospective
8 databases; correct?
9 A. Correct.
10 Q. Now, if you look at where their citation
11 is and it says -- if you look at this --
12 MS. HOFFMANN:
13 What page are you on?
14 BY MR. GOZA:
15 Q. -- article, it's Exhibit --
16 MR. GOZA:
17 What did we mark it? Ten?
18 MR. SLONIM:
19 No. Th -- it's Exhibit 9.
20 MR. GOZA:
21 Exhibit 9. I apologize. Exhibit 9.
22 BY MR. GOZA:
23 Q. She's got a -- there's a box in the
24 article that says, "What is Already Known on" this
25 "Topic"; is that correct?

Page 169

1 A. And what -- what --
2 Q. Am I handing you the right document? Or
3 -- I'm sorry. It's the very front page, sir.
4 It's at the bottom left-hand corner.
5 A. Oh, okay. "What is Already Known on" this
6 "Topic."
7 Q. Okay. And she talks about the
8 meta-analysis that she's looked at.
9 A. Okay.
10 Q. True?
11 A. Yes.
12 Q. And what -- what does that say?
13 A. It says that "randomized trials examining"
14 GI "bleeding rates for dabigatran and rivaroxaban,
15 compared with warfarin, have identified higher
16 rates of bleeds for the novel oral
17 anticoagulants." But "very little real world
18 assessment of the safety of" the NOACs "has been
19 reported, other than . . . Medicare population"
20 data.
21 Q. Okay. So what she's -- I mean, you're --
22 you're citing her article saying that the meta --
23 MS. HOFFMANN:
24 You took your microphone off.
25 BY MR. GOZA:

Page 170

1    Q.  You're citing the article saying the
2   meta-analysis that she showed was showing that in
3   fact the NOACs are similar to warfarin.  But she
4   says the meta-analysis that she looked at of the
5   randomized trial "examining gastrointestinal"
6   bleed "rates for dabigatran and rivaroxaban,
7   compared with warfarin, have identified higher
8   rates of" bleed "for the novel oral
9   anticoagulants"
10   A.  But in her conclusion, she says, "The risk
11  of" GI "bleeding related to the novel oral
12  anticoagulants was similar to that of warfarin."
13   Q.  Well, she's talking about her particular
14  study.  But I'm talking --
15   A.  Correct.
16   Q.  -- about the meta-analysis that she looked
17  at.
18     MR. SLONIM:
19       Objection.
20  BY MR. GOZA:
21   Q.  I mean, that's what you cite this for, is
22  specifically that?
23     MR. SLONIM:
24       Objection.
25     THE WITNESS:

Page 171

1       Well, I didn't cite it for what was in
2       the box right there.  But I -- I -- this
3       is one of my articles that I looked at.
4   BY MR. GOZA:
5    Q.  But you cited to say that large -- she's
6   referring to large retrospective database
7   analysis.  She says that overall GI bleeding rates
8   with DOACs are similar to those with warfarin, and
9   I'm just wondering where that cite comes from.
10   A.  I -- I -- I think there are studies that
11  go either way on -- as far as better or worse
12  compared to warfarin.  And she is citing studies
13  that say there's a higher rate.
14   Q.  And she says that the risk of
15  gastrointestinal bleeding increases over the age
16  of 65?
17   A.  She said 75, I thought.
18   Q.  Look at the bottom of this -- what this
19  says, "What This Study Adds," on the front page
20  again --
21   A.  Yeah.
22   Q.  -- where it says, "What is Already Known
23  on the Topic."
24   A.  Right.  I -- I -- yes.  She says over 65
25  and particularly so for 75.

Page 172

1    Q.  Okay.  Mr. Boudreaux was 72?
2    A.  Yes.
3    Q.  Obviously over seven -- 65?
4    A.  Yes.
5      MR. GOZA:
6        We only have a minute left on the
7    tape.  So why don't we take a little
8    break.
9      THE WITNESS:
10       Okay.
11     THE VIDEOGRAPHER:
12       This is the end of Tape 2.  We're now
13   off the record at 3:55.
14   (Brief recess was taken.)
15     THE VIDEOGRAPHER:
16       This is the beginning of Tape 3.
17   We're now back on the record.  The time is
18   4:13.
19  BY MR. GOZA:
20   Q.  Okay.  Doctor, I just want to -- I want to
21  go through a couple of things, and -- and we're --
22  we're kind of cleaning up.  So I -- we're -- we're
23  getting there.
24       You had an opportunity to look at his
25  medical records prior to January 7th of 2014;

Page 173

1   correct?
2    A.  Yes.
3    Q.  And prior to January 7th of 2014 and his
4   diagnosis of atrial -- atrial fibrillation, you
5   had an opportunity to see the lab values.  True?
6      MS. HOFFMANN:
7        Objection.
8      THE WITNESS:
9        I reviewed the data -- I reviewed his
10   medical records prior to that -- that day.
11  BY MR. GOZA:
12   Q.  Okay.  And you saw that his hemoglobin and
13  hematocrit were within normal limits at least in
14  the three or four years going back that I could
15  find?
16   A.  I think they were in the 14s.
17   Q.  Correct.
18       And there were some 15s in there too?
19   A.  Yeah.
20   Q.  Yeah.
21       But everything was within normal
22  parameters.  True?
23   A.  Yes.
24   Q.  Would you agree at least prior to
25  January 7th of 2014 there was no basis for you to

Page 174

1  say that he had a chronic leak?
2      A. I -- I do not remember any hemoglobins
3  being abnormal until that January 9th.
4      Q. Okay. So would the answer to my question
5  be I agree with you?
6      A. I agree with you.
7      Q. Now, I want to talk about anemia in the
8  face of congestive heart failure.
9          Can the congestive heart failure itself --
10  the condition of congestive heart failure result
11  in some degree of hemodilution?
12      A. I can't say that.
13      Q. Okay.
14      A. I don't know.
15      Q. Okay. Because the -- one of the things
16  about congestive heart failure is the body has a
17  buildup of fluids. True?
18      A. Yes. Yeah.
19      Q. And whether or not that buildup of fluids
20  can result in hemodilution and ultimately a
21  decrease in the hemoglobin hematocrit, that's
22  something that's outside of your area of
23  expertise?
24      A. I -- I -- I can't say that I've seen
25  congestive heart failure by itself be a cause of

Page 175

1  anemia.
2      Q. Do you rule that out? I guess what I'm
3  saying is this: I -- there may be people that
4  disagree with you with different kinds of
5  expertise.
6      A. Right.
7      Q. But I just simply want to understand: Do
8  you feel like you're in a position to say, no,
9  that does not happen or I don't know the answer?
10      A. I don't --
11      MS. HOFFMANN:
12          Objection.
13      THE WITNESS:
14          -- know the answer.
15  BY MR. GOZA:
16      Q. I'm sorry?
17      A. I -- I do not know the answer.
18      Q. Okay. So that may be one possible
19  explanation for his decreased hemoglobin the day
20  of January 7th and 9th?
21      MS. HOFFMANN:
22          Objection.
23      MR. SLONIM:
24          Objection.
25      THE WITNESS:

Page 176

1          If it is true, that hemodilution
2      causes that. Now, of course once he comes
3      in with congestive heart failure and
4      they're diuresing him, then that can
5      actually -- as you diurese, that can drive
6      up your hemoglobin. So the hemoglobin of
7      13.0 may be related to diuresis as well,
8      which would mean it's even truly -- truly
9      lower than it is.
10  BY MR. GOZA:
11      Q. And do you know the extent of his
12  diuresis, what they --
13      A. No.
14      Q. -- actually did?
15          And we already talked about the fact
16  you -- you think he was on an IV, but you're not
17  sure about that?
18      A. You know, I -- I -- I do not know what IV
19  fluids he got.
20      Q. Okay. I want to make sure -- we talked a
21  little bit about time in therapeutic range. Do
22  you recall that?
23      A. Yes.
24      Q. And I just want to make sure I understood.
25          I had asked you whether you had

Page 177

1  investigated the time in therapeutic range for the
2  warfarin arm of the ROCKET study, and I think you
3  said you had not; is that correct?
4      A. Correct. I have not.
5      Q. And I think that with respect yet -- I
6  think I asked you this, but there's some debate
7  whether I did or didn't. But I -- I think I did.
8          That with respect to subgroup analysis of
9  the U.S. data, you also didn't investigate what
10  the time in therapeutic range was for the subset
11  of U.S. data?
12      A. No.
13      MS. HOFFMANN:
14          Objection.
15  BY MR. GOZA:
16      Q. Meaning I'm --
17      A. I --
18      Q. Correct?
19      A. I did not.
20      Q. Got it.
21          You felt that was outside of what you were
22  being asked to do?
23      A. Yes.
24      Q. With respect -- and I think we've already
25  talked about this, but I want to make sure. With

Page 178

1  respect to any of the -- or strike that.
2      When you say, "I attach little
3  significance to that PT level" --
4      And this is on 14 -- Paragraph 14.
5      A. Yeah.
6      Q. You probably --
7      A. Yeah.
8      Q. -- know where I'm asking.
9      -- "and note that it is essentially
10 comparable to readings of May 20, 2015, at 13.2."
11     Do you see that?
12     A. Yes.
13     Q. Whether those are truly comparable figures
14 or not would depend on the reference ranges of the
15 laboratories involved. True?
16     MS. HOFFMANN:
17         Objection.
18     THE WITNESS:
19         Yes.
20 BY MR. GOZA:
21     Q. And as you sit here today, you don't know
22 what those reference ranges were?
23     A. Correct.
24     Q. You -- the only thing you do know is with
25 respect to the 13.6, it was outside the reference

Page 179

1  range. True?
2      MS. HOFFMANN:
3          Objection.
4      THE WITNESS:
5          Yes. It was.
6  BY MR. GOZA:
7      Q. With respect to the 13.2, depending upon
8  the reference range, it may or may not be of
9  significance?
10     A. You mean what the INR is? Is that what
11 you're referring to --
12     Q. No. No. No.
13     A. -- or --
14     Q. I'm talk --
15     A. -- or just -- just whether . . .
16     Q. I'm talking about the reference range for
17 the PT.
18     A. Yeah. I do not know what the reference
19 range was.
20     Q. And again, we already went through the
21 fact you don't know what the reagents that were
22 used?
23     A. Yeah.
24     THE WITNESS:
25         It's a tugboat.

Page 180

1      MR. GOZA:
2          Is that me? Oh. It's a tugboat. I
3      thought it was the phone.
4  BY MR. GOZA:
5      Q. I want to go through and make sure I
6  understand your practice.
7      A. Okay.
8      Q. So we'll just go through your CV quickly.
9      First of all, your CV is attached as
10 Exhibit A to your report, which has been marked as
11 Exhibit 2. True?
12     A. Yes.
13     Q. Okay. And you've been in the private
14 practice of gastroenterology for how long?
15     A. Thirty years.
16     Q. Do you have any partners now? I guess
17 a --
18     MS. HOFFMANN:
19         Objection.
20 BY MR. GOZA:
21     Q. Strike that. It's -- it's probably the
22 inappropriate term to use at this point.
23     Do you work in the context of a group,
24 although they may be employed by the Ochsner
25 corporation?

Page 181

1      A. I -- I work in a department of 13
2  gastroenterologists and hepatologists at the main
3  campus. Within a broader prospective, a number
4  more gastroenterologists at different campuses.
5      Q. And those gastroenterologists are all
6  employed by the Ochsner Medical Center or some
7  form of --
8      A. On the --
9      Q. -- that?
10     A. -- main -- on the main campus, yes.
11     Q. And do you have any teaching
12 responsibilities at present?
13     A. Yes.
14     Q. What are those?
15     A. I teach GI fellows. That's a big part of
16 my job on a daily basis. Internal medicine
17 residents, we rotate through. I teach them. And
18 then our medical school, the University of
19 Queensland, I'm the key -- key department member
20 for gastroenterology and teaching them.
21     Q. So in -- in a normal week, how many times
22 would you be -- first of all, in a classroom
23 setting, how often would that occur?
24     A. In a -- in a conference -- a
25 classroom-type conference, probably once a week.

Page 182

1    Q.  Okay.  And then with respect to fellows
2  who round with you, I am assuming?
3    A.  Yes.
4    Q.  How often would that occur?
5    A.  That would occur when I'm on the hospital
6  service every day, all day long.  When I'm in the
7  clinic, that would be maybe one afternoon a week.
8    Q.  And how often are you on the hospital
9  service versus the clinic?
10    A.  I'm on the hospital service right now
11  every sixth week.  For the most part of 30 years,
12  it's probably been every fourth week.
13    Q.  And with respect to the clinic, how often
14  do you spend time -- what's your time spent in
15  clinic?
16    A.  What's my time spent in the clinic?
17    Q.  Yes, sir.
18    A.  You mean hours during the day?
19    Q.  I -- I'm trying to understand.
20      Do you go to the clinic every day --
21    A.  Yes.
22    Q.  -- part of the day or -- that's my --
23  okay.  So why don't you explain that to me.
24    A.  So I -- I either work in the clinic or I
25  -- I do procedures in the clinic every day.

Page 183

1    Q.  And so is there a -- I'm trying to
2  understand the distinction between the hospital
3  service and the clinic service and the different
4  work that you do in both of those areas.  Can you
5  just --
6    A.  Right.
7    Q.  -- give me that quickly.
8    A.  The hospital service are the inpatients.
9  So those are the ones that are sicker that are in
10  the hospital.  When I am taking care of
11  inpatients, I have no responsibilities for my
12  clinic patients.  So I'm over there full-time
13  either doing procedures or evaluating consults and
14  teaching the fellows and residents.  When I'm in
15  the clinic, I'm just in my office taking care of
16  patients.
17    Q.  Now, in your curriculum vitae, you also
18  indicated a list of publications that you have
19  participated in?
20    A.  Yes.
21    Q.  Are there any in this list of publications
22  that you believe are relevant to the issues in
23  this case?
24    MS. HOFFMANN:
25      Objection.

Page 184

1  THE WITNESS:
2      You know, I -- I -- I don't know how
3  to answer that.  I mean, a lot -- if you
4  look at them, a lot of my references have
5  to do with GI bleeding in general, and so
6  that -- that leads -- that's -- that's my
7  -- the -- the body of -- of experience
8  that I have in terms of -- GI bleeding has
9  always been one of my favorite topics
10  within the world of GI.  None specifically
11  dealt with anticoagulation, but none
12  necessarily excluded anticoagulated
13  patients.  For instance, a lot of the
14  studies say that we excluded -- if the pro
15  time was greater than 5 seconds out, of
16  course on -- it's referring to Coumadin
17  patients.  So that would have excluded for
18  some of my hemostasis studies Coumadin
19  unless they were corrected.
20  BY MR. GOZA:
21    Q.  Let's maybe approach it a little bit
22  different way.  Have you -- do you have any
23  publications -- strike that.
24      When was the last publication you
25  participated in?

Page 185

1    A.  I've -- I've got a couple in the works
2  right now with -- with -- with the fellows.  They
3  haven't been published yet, but hopefully they're
4  getting polished up.
5    Q.  Okay.  Are those -- do those at all relate
6  to bleeding while on novel anticoagulants or --
7    A.  They -- they do not.
8    Q.  Okay.  The -- the -- the last publication
9  I see listed -- and I -- and -- and you correct me
10  if I'm wrong.  It looks -- appear to be about
11  2012?
12    A.  Correct.
13    Q.  And I'm -- since the -- the NOACs, I --
14  well, strike that.  I won't make that statement.
15      Do any of your articles or publications
16  talk about the use of NOACs or bleeding while on
17  NOACs?
18    A.  No.  They do not.
19    Q.  What I hear you saying -- and I -- I
20  expect I can determine some of this by looking at
21  the titles, that you have written on the topic of
22  gastrointestinal bleed or hemorrhage?
23    A.  Yes.
24    Q.  Have you -- do you participate in any
25  clinical trials?

Page 186

1    A.  The -- you mean currently or . . .
2    Q.  Ever.
3    A.  Yes.  I mean -- yeah.
4    Q.  Were those clinical trials sponsored by a
5 pharmaceutical entity?
6    A.  I have participated in some
7 pharmaceutical -- pharmaceutical-sponsored
8 studies.  But probably most of the ones recently
9 have just been working with the fellows on -- on
10 either case presentations or -- or retrospective
11 analyses.
12    Q.  The -- have you done any specific work for
13 Janssen or Bayer?
14    MS. HOFFMANN:
15      Clinical trial work?
16    MR. GOZA:
17      Clinical trial work.
18    THE WITNESS:
19      The -- I -- I do the compassionate
20    trial for Cisapride.  Cisapride's an agent
21    that was taken off the market 16 years
22    ago.  And I believe that they were a J&J
23    company, which is now considered under
24    Janssen.  And so they supply the drug for
25    free to patients who meet the study

Page 187

1    criteria.  So there's no support other
2    than they -- they do make the drug
3    available to patients who need it.
4 BY MR. GOZA:
5    Q.  And what is the drug again?
6    A.  Cisapride, propulsid.  It's a -- it's a
7 agent for patients who don't have motility in
8 their stomach.
9    Q.  Got it.
10     Do you have any research that's funded by
11 Bayer or Janssen?
12    A.  No.
13    Q.  And I apologize.  I didn't mean to -- to
14 cut you off.
15     Was there anything else in terms of
16 clinical trials that you had other than what you
17 just mentioned to me?
18    A.  No.  I'm a subinvestigator on
19 compassionate trial for domperidone.  Again,
20 that's another motility agent that is used for
21 gastroparesis.  And then we finished up a study on
22 ustekinumab for Crohn's disease.  But that's --
23 that has been finished for more than a year.
24    Q.  And who manufactures ustekinumab?
25    A.  I don't know who manufactures ustekinumab.

Page 188

1    Q.  Have you ever been involved or -- or
2 spoken at any -- Bayer, Janssen, J&J, have they
3 ever sponsored or asked you to speak at any
4 events?
5    A.  Not to my knowledge.  I -- what I can say
6 is during the '90s I would have done a lot of
7 lectures often sponsored by drug companies.  I do
8 not remember ever having any done -- done any for
9 Cisapride.  Most of them at the time would have
10 been sponsored by the companies that made
11 acid-reducing medicines, either H2 blockers or
12 PPIs.
13    Q.  Have you ever prescribed Coumadin?
14    A.  Yes.  I have.
15    Q.  Was it back before you were a
16 gastroenterologist?
17    A.  It would have been when I was a internal
18 medicine resident in North Carolina.
19    Q.  So how many years ago would that have
20 been?
21    A.  It is a lot.
22    Q.  I hate to -- I -- okay.
23    A.  Yeah.
24    Q.  It sounds like more than 30 years ago?
25    A.  It would be more than 30 years ago.

Page 189

1    MR. BYRNE:
2      Microphone.
3    MR. GOZA:
4      Oh, yeah.  I still got my hand on the
5    microphone, just like a football coach.
6    All right.  We're going to take a quick
7    break because we may be . . . Unless --
8    THE VIDEOGRAPHER:
9      We're now --
10   MR. GOZA:
11     Unless he tells me we're -- got more
12   to do.
13   THE VIDEOGRAPHER:
14     We're now off the record at 4:31.
15   (Brief recess was taken.)
16   THE VIDEOGRAPHER:
17     We're now back on the record.  The
18   time is 4:34.
19   MR. GOZA:
20     I'm finished with my questions.
21   MS. HOFFMANN:
22     Thank you, Counsel.  The only question
23   that I had really is of you and not of the
24   witness.
25     I don't believe you marked an

PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

Page 190

1    Exhibit 6. So we have Exhibits 1, 2, 3,
2    4, 5, 7, and 8. Will you confirm that
3    there's no Exhibit 6?
4    MR. GOZA:
5        I will try to confirm that. I believe
6    that I thought I was going to use an
7    Exhibit 6 and did not and therefore I
8    think you're correct.
9    MS. HOFFMANN:
10       Okay. Thank you. Thank you.
11   THE VIDEOGRAPHER:
12       We're done?
13   MS. HOFFMANN:
14       We're done.
15   THE VIDEOGRAPHER:
16       Today's deposition consists of three
17   tapes. This is the end of Tape 3. We're
18   now off the record at 4:34.
19
20
21
22
23
24
25

Page 191

1            CHANGES AND SIGNATURE
2    WITNESS NAME: JAMES WAYNE SMITH, M.D.
3    DATE OF DEPOSITION: Wednesday, December 14, 2016
4
5    PAGE LINE   CHANGE       REASON
6    ____ ____ _____ _____
7    ____ ____ _____ _____
8    ____ ____ _____ _____
9    ____ ____ _____ _____
10   ____ ____ _____ _____
11   ____ ____ _____ _____
12   ____ ____ _____ _____
13   ____ ____ _____ _____
14   ____ ____ _____ _____
15   ____ ____ _____ _____
16   ____ ____ _____ _____
17   ____ ____ _____ _____
18   ____ ____ _____ _____
19   ____ ____ _____ _____
20   ____ ____ _____ _____
21   ____ ____ _____ _____
22   ____ ____ _____ _____
23   ____ ____ _____ _____
24   ____ ____ _____ _____
25   ____ ____ _____ _____

Page 192

1            WITNESS' CERTIFICATE
2
3        I have read or have had the foregoing
4    testimony read to me and hereby certify that it is
5    a true and correct transcription of my testimony
6    with the exception of any attached corrections or
7    changes.
8
9
10
11
12
13
14
15
16
17
18       _____
19           WITNESS' SIGNATURE
20
21
22
23   PLEASE INDICATE
24   []  NO CORRECTIONS
25   []  CORRECTIONS; ERRATA SHEET(S) ENCLOSED

Page 193

1          C E R T I F I C A T E
2        This certification is valid only for
3    a transcript accompanied by my original signature
4    and original seal on this page.
5        I, AURORA M. PERRIEN, Registered Professional
6    Reporter, Certified Court Reporter, in and for the
7    State of Louisiana, as the officer before whom
8    this testimony was taken, do hereby certify that
9    JAMES WAYNE SMITH, M.D., after having been duly
10   sworn by me upon the authority of R.S. 37:2554,
11   did testify as hereinbefore set forth in the
12   foregoing 192 pages; that this testimony was
13   reported by me in the stenotype reporting method,
14   was prepared and transcribed by me or under my
15   personal direction and supervision, and is a true
16   and correct transcript to the best of my ability
17   and understanding; that the transcript has been
18   prepared in compliance with transcript format
19   guidelines required by statute or by rules of the
20   board; and that I am informed about the complete
21   arrangement, financial or otherwise, with the
22   person or entity making arrangements for
23   deposition services; that I have acted in
24   compliance with the prohibition on contractual
25   relationships, as defined by Louisiana Code of

Case 2:14-md-02592-EEF-MBN  Document 5570-10  Filed 03/02/17  Page 50 of 50

Page 194

1  Civil Procedure Article 1434 and in rules and
2  advisory opinions of the board; that I have no
3  actual knowledge of any prohibited employment or
4  contractual relationship, direct or indirect,
5  between a court reporting firm and any party
6  litigant in this matter nor is there any such
7  relationship between myself and a party litigant
8  in this matter.  I am not related to counsel or to
9  the parties herein, nor am I otherwise interested
10 in the outcome of this matter.
11
12
13
14
15          AURORA M. PERRIEN, CCR, RPR
16
17
18
19
20
21
22
23
24
25