UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) | * | MDL 2592 |
| PRODUCTS LIABILITY LITIGATION | * | |
| | * | SECTION L |
| THIS DOCUMENT RELATES TO: | * | |
| | * | JUDGE ELDON E. FALLON |
| *Joseph J. Boudreaux, Jr., et al. v. Janssen et al.* | * | |
| *Case No. 2:14-cv-02720* | * | MAG. JUDGE NORTH |
| | * | |
| *Joseph Orr, Jr., et al. v. Janssen et al.* | * | |
| *Case No. 2:15-cv-03708* | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

---

**THE PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION
*IN LIMINE* TO EXCLUDE CERTAIN OPINIONS OF DAVID A. KESSLER, M.D.
UNDER FEDERAL RULE OF EVIDENCE 702
[REC. DOC. 5111]**

---

# FILED UNDER SEAL

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 2

    I.    Dr. Kessler Is Well-Qualified To Opine On Regulatory Matters .......................... 2

    II.    Dr. Kessler's Opinions Will Assist The Jury On Matters Pertaining To Xarelto ... 4

ARGUMENT ....................................................................................................................... 6

    I.    The Legal Standard Governing Expert Testimony Favors Admissibility ............. 6

    II.    Dr. Kessler's Opinions Are Reliable And The Result Of A Sound Methodology . 6

    III.    Dr. Kessler May Testify About His Analysis Of Xarelto's Regulatory History And The Relevant Documents That Support His Opinions ................................... 9

    IV.    Dr. Kessler's Use Of Corporate Documents Is Proper And He Does Not Intend To Testify Regarding, Motive, Intent Or State Of Mind ........................................... 14

        A.    Dr. Kessler's Use of Corporate Documents Is Proper ............................ 14

        B.    Dr. Kessler Does Not Speculate About State of Mind, Intent or Motive . 15

    V.    Dr. Kessler May Testify To Breach Of The Standard Of Care, Without Invading The Province Of The Court .................................................................................... 18

    VI.    Dr. Kessler's Opinions As To Whether Defendants Withheld Information From The FDA Or Misled The FDA Are Proper And Are Not Preempted Under *Buckman* ............................................................................................................... 22

    VII.    Dr. Kessler's Opinion That Information From Laboratory Tests Is Useful In Identifying Patients At An Increased Risk Of Bleeding From Xarelto Is Proper. 26

CONCLUSION ................................................................................................................. 28

# TABLE OF AUTHORITIES

**Cases**

*Alexie v. Appex Tool Grp., LLC,*
    Case No. 12-2212, 2014 WL 5603386 (E.D. La., Nov. 3, 2014) ................................ 8, 27

*Buckman v. Plaintiffs Legal Comm.*,
    531 U.S. 341 (2001) ................................................................................................ 22, 23, 25

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
    509 U.S. 579 (1993) ....................................................................................................... passim

*DePaepe v. Gen. Motors Corp.,*
    141 F.3d 715 (7th Cir. 1998) ............................................................................................ 16

*Drake v. Allergan, Inc.,*
    No. 2:13-CV-234, 2014 WL 5392995 (D. Vt., Oct. 23, 2014) .................................. 17, 18

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ......................................................................................................... 1

*Highland Capital Management, L.P. v. Schneider*,
    379 F. Supp. 2d 461 (S.D.N.Y. 2005) ............................................................................. 12

*In re Baycol Prod. Litig.*,
    532 F. Supp. 2d 1029 (D. Minn. 2007) ...................................................................... 20, 23

*In re C.R. Bard, Inc.,*
    948 F. Supp. 2d 589 (S.D.W. Va. 2013) ................................................................... passim

*In re Chinese Manufactured Drywall Prods. Liab. Litig.,*
    MDL No. 2047, 2015 WL 3603624 (E.D. La. June 5, 2015) ............................................ 8

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.,*
    MDL No. 1203, 2000 WL 876900 (E.D. Pa., June 20, 2000) .................................... 17, 20

*In re Flonase Antitrust Litig.,*
    884 F. Supp. 2d 184 (E.D. Pa. 2012) ............................................................................. 14

*In re Fosamax Products Liab. Litig.,*
    1:06–MD–1789 (JFK), 645 F.Supp.2d 164 (S.D.N.Y. 2009) .................................... 10, 20

*In re Levaquin Prod. Liab. Litig.,*
    MDL No. 1943, 2011 WL 6888533 (D. Minn., Dec. 29, 2011) ...................................... 16

*In re Medtronic, Inc.,*
    465 F. Supp. 2d 886 (D. Minn. 2006) ............................................................................ 23

*In re Mirena IUD Prod. Liab. Litig.,*
    169 F. Supp. 3d 396 (S.D.N.Y. 2016) ............................................................................ 16

*In re Prempro Prods. Liab. Litig*.,
    554 F.Supp.2d 871 (E.D. Ark. 2008) ............................................................................. 13

*In re Prempro Prods. Liab. Litig*.,
    586 F.3d. 547 (8th Cir. 2009) .................................................................................... 13, 14

*In re Prograf Antitrust Litig.*,
    No. 1:11-MD-02242-RWZ, 2014 WL 7641156 (D. Mass., Dec. 23, 2014)...................... 2

*In re Rezulin Products Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y.2004)...................................................................... 12

*In re Seroquel Products Liab. Litig.*,
    6:06-MD-1769-ORL-22D, 2009 WL 3806436 (M.D. Fla., July 20, 2009)....................... 8

*In re Trasylol Prods. Liab. Litig.*,
    709 F. Supp. 2d 1323 (S.D. Fla. 2010) ................................................... 12, 13, 14

*In re Trasylol Prods. Liab. Litig.*,
    763 F. Supp. 2d at 1329-30 (2010) .......................................................................... 24

*In re Tylenol (Acetaminophen) Mktg., Sales Prac. & Prod. Liab. Litig.*,
    MDL No. 2436, 2016 WL 1569719 (E.D. Pa., Aug. 31, 2016)............................ 16, 25

*In re Tylenol (Acetaminophen) Mktg., Sales Prac. & Prod. Liab. Litig.*,
    MDL No. 2436, 2016 WL 4538621 (E.D. Pa., Aug. 31, 2016)................................. 10

*In re Tylenol*,
    MDL No. 2436, 2016 WL 807377 (E.D. Pa., Mar. 2, 2016)................................... 10

*In re Vioxx Prod. Liab. Litig.*,
    501 F. Supp. 2d at 788-89 (E.D. La. 2007)............................................................. 23

*In re Vioxx Products Liab. Litig.*,
    401 F.Supp.2d at 574 (E.D. La. 2005) ............................................................ passim

*In re Welding Fume Prod. Liab. Litig.*,
    MDL 1535, 2005 WL 1868046 (N.D. Ohio, 2005) ................................................. 10

*In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices and Prods. Liab. Litig.*,
    No. 3:09–md–02100–DRH–PMF, 2011 WL 63002889............................................. 8, 15

*In re Yasmin and Yaz (Drospirenone) Marketing, Sales Prac. and Prod. Liab. Litig.*,
    MDL No. 02100, 2011 WL 6302287 (S.D.Ill., Dec. 16, 2011)............................ passim

*In re Zyprexa Prods. Liab. Litig.*,
    04-MD-1596, 493 F.Supp.2d 571 (E.D.N.Y. 2007) ................................................. 8

*Johnson v. Wyeth LLC*,
    Case No. 10–02690, 2012 WL 1204081 (D. Ariz., Apr. 11, 2012)............................ 11

*Kruszka v. Novartis Pharms. Corp.*,
    28 F. Supp. 3d 920 (D. Minn. 2014)....................................................................... 16

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ............................................................................................... 1

*LinkCo, Inc. v. Fujitsu Ltd.*,
    Case No. 00 Civ. 7242, 2002 WL 1585551 (S.D.N.Y., July 16, 2002)...................... 12

*Mahaney ex rel. estate of Kyle v. Novartis Pharm. Corp.*,
    835 F.Supp.2d 299 (W.D. Ky. 2011) ............................................................... 19, 23

*Media Sport & Arts s.r.l. v. Kinney Shoe Corp.*,
    Case No. 95 CIV. 3901,1999 WL 946354 (S.D.N.Y., Oct.19, 1999) ...................... 12

*Mobil Expl. & Producing v. A-Z/Grant Int'l Co.*,
    Case No. 91–3124, 1996 WL 194931 (E.D. La., Apr. 22, 1996) .............................. 21

*Oakberg v. Zimmer, Inc.*,
    Case No. 03–47, 2004 WL 5503779 (D. Mont., Nov. 23, 2004).............................. 24

*Paz v. Brush Engineered Materials, Inc.*,  ...................................................................................
    555 F.3d at 388 (5th Cir. 2009)........................................................................ 8

*Rowland v. Novartis Pharms. Corp.*,
    9 F. Supp. 3d 553 (W.D. Pa. 2014)................................................................... 24

*Sanchez v. Boston Scientific Corp.*
    Civil Action No. 2:12–cv–05762, 2014 WL 4851989 (S.D. W.Va., Sept. 29, 2014) ...... 14

*Schedin v. Ortho-McNeil-Janssen Pharms., Inc.*,
    700 F.3d 1161 (8th Cir. 2012) ......................................................................... 23

*Schedin v. Ortho-McNeil-Janssen Pharms., Inc.*,
    808 F. Supp. 2d 1125 (D. Minn. 2011)............................................................. 23

*Taylor v. Evans*,
    Case No. 94-8425, 1997 WL 154010 (S.D.N.Y. 1997).................................... 12

*United States v. Garcia*,
    625 F.2d 162 (7th Cir. 1980) ............................................................................ 10

*United States v. Moore*,
    997 F.2d 55 (5th Cir.1993) ............................................................................... 11

*United States v. Pless,*
    982 F.2d 1118 (7th Cir. 1992) ......................................................................... 10

*Walden v. City of Chicago*,
    755 F. Supp. 2d 942 (N.D. Ill. 2010) ............................................................... 11

*Waterhouse v. R.J. Reynolds Tobacco Co.*,
    162 F. App'x 231 (4th Cir. 2006) .................................................................... 11

*Waterhouse v. R.J. Reynolds Tobacco Co.*,
    368 F. Supp. 2d 432 (D. Md. 2005).................................................................. 11

*Wyeth* v. Levine,
    555 U.S. 555 (2009)........................................................................... 3, 18, 22

**Rules**

Fed. R. Evid. 1006 ................................................................................................. 11
Fed. R. Evid. 611 ................................................................................................... 10
Fed. R. Evid. 702 .............................................................................................. 11, 27
Fed. R. Evid. 704 ................................................................................................... 21

**Regulations**

21 CFR § 201.57 ................................................................................................... 27

## TABLE OF EXHIBITS

Exhibit 1     Expert Report and Curriculum Vitae of David A. Kessler, M.D.

Exhibit 2     *In re Vioxx Prod. Liab. Litig.*, MDL No. 1657, Transcript at 42-188 (E.D. La., April 12, 2010)

Exhibit 3     *In re Neurontin Marketing, Sales Pract., and Prod. Liab. Litig.*, MDL No. 1629, Transcript at 28-58 (D. Mass., February 22-23, 2010)

Exhibit 4     *Wells v. Allergan, Inc.,* CIV-12-973-C Order (W.D. Okla., February 4, 2013)

Exhibit 5     *Wells v. Allergan, Inc.,* CIV-12-973-C, Transcript (W.D. Okla., February 20-21, 2013)

Exhibit 6     *In re Actos (Pioglitazone) Prod. Liab. Litig.*, MDL No. 2299, 2014 WL 120973 (W.D. La., Jan. 10, 2014)

Exhibit 7     *Lea v. Wyeth LLC,* Case No. 1:03-cv-01339-MAC, 2011 U.S. Dist. LEXIS 158668, at *23 n.6 (E.D. Tex. Oct. 6, 2011).

Exhibit 8     Trial testimony of David A. Kessler, M.D. in *Pledger v. Jannsen,* April Term, 2012, No 1998 (Court of Common Pleas, Philadelphia County)

Exhibit 9     (Rec. No. 201659) FDA *Summary Review* for NDA 202439, Deputy Division Director Decisional Memo, at 9 (Nov. 4, 2011)

Exhibit 10    Deposition of David A. Kessler, M.D.

Exhibit 11    Expert report of Dena Hixon, M.D.

Exhibit 12    *In re Actos Prod. Liab. Litig.*, No. 11 L 010011, *11-12 (Cook County, Illinois, March 13, 2014)

The Plaintiffs respectfully submit this response in opposition to Defendants' *Motion In Limine to Exclude Certain Opinions of David A. Kessler, MD, Under Federal Rule of Evidence 702* [Rec. Doc. 5111].  In accordance with this Court's role as gatekeeper for expert testimony under *Daubert* and its progeny,[1] the Plaintiffs request that the Defendants' motion be denied.[2]

Defendants have taken a scattershot approach in their challenge to "certain" of Dr. Kessler's opinions. Throughout their motion, they lift fragments and partial sentences from either Dr. Kessler's Report or his deposition stripped of all context to make their broad and sweeping arguments.[3]  Defendants' motion in this regard is vague and non-specific and for this reason alone should be denied.

## INTRODUCTION

David Kessler, M.D., is widely recognized as a leading authority on the standards of care in the pharmaceutical industry. Dr. Kessler's experiences as Commissioner of the United States Food and Drug Administration (FDA), as a professor of food and drug law and an advisor to pharmaceutical companies, trained in both medicine and law, have been repeatedly acknowledged by the Courts as "uniquely" qualified to offer opinions relating to the conduct of pharmaceutical companies. In numerous prior cases involving prescription drugs, Dr. Kessler has been permitted

---

[1] *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997).

[2] The Plaintiffs incorporate herein the arguments set forth in the *Plaintiffs Joint Response in Opposition to the Motion to Exclude Expert Opinions and Testimony Regarding Unapproved Dosing and Monitoring Regimens, and the Motion to Exclude Expert Opinions and Testimony Regarding the Experts' 20-Second PT Cut-Off Guideline in the Orr and Boudreaux Cases ("Joint Response to D&M brief").* the Plaintiffs incorporate herein the arguments set forth in *Plaintiffs' Opposition to Defendants' Joint Motion for Partial Summary Judgment on the Ground that Federal Law Preempts Plaintiffs' Dosing, Monitoring, And Other Design Related Claims* (hereinafter "*Plaintiff's Preemption Response"*).

[3] Def. Mem. at pages 4-6; 8, 9-10, and 12.

to provide admissible opinions about drug companies' duties and their breach of those duties.[4] In this case, Dr. Kessler offers admissible testimony including that Defendants did not adequately notify physicians that some Xarelto patients are at higher risk than others for a serious adverse bleeding events due to the variability in Xarelto plasma concentration levels;[5] and did not adequately instruct physicians how to identify at-risk patients by obtaining a laboratory blood measure of Neoplastin Prothrombin Time ("PT").[6] He concludes that Defendants' failed to adequately instruct physicians on how to clinically manage their patients use of Xarelto including discontinuing the drug or providing additional warnings.[7]

## FACTUAL BACKGROUND

## I.   Dr. Kessler Is Well-Qualified To Opine On Regulatory Matters.

David Kessler, M.D., was appointed in 1990 by President George H. W. Bush as FDA Commissioner and also served in that position under President William J. Clinton until February 1997. He received his M.D. degree from Harvard Medical School in 1979 and his J.D. degree from the University of Chicago Law School in 1978.[8]

Dr. Kessler taught food and drug law at Columbia University Law School from 1986-1990. He has testified many times before the United States Congress on food, drug, and consumer

---

[4]Defendants open their motion by quoting the court in *In re Prograf Antitrust Litig.*, No. 1:11-MD-02242-RWZ, 2014 WL 7641156, at *2 (D. Mass., Dec. 23, 2014). (Def. Mem. at 1-2). Defendants' reliance on *Prograf* is misplaced. Un like this litigation, *Prograf* was an antitrust and not a product liability case. As such, Dr. Kessler's expert opinions in *Prograf* addressed far different issues than his opinions in this litigation. As set forth below, Dr. Kessler has been permitted by numerous courts in product liability cases like this to provide admissible opinions.

[5]Exhibit 1, Kessler Report at Section IV.

[6]*Id.* at Section V.

[7]*Id.* at Section IV, para. 204.

[8]Exhibit 1, Kessler *curriculum vitae*, at Appendix A.

protection issues under federal and state law. Over the last thirty years, he has published numerous articles in legal, medical and scientific journals on the federal regulation of drugs and medical devices, as well as the complementary role of federal regulations and state common law. Dr. Kessler also studied pharmacoepidemiology at Johns Hopkins.

As FDA Commissioner, Dr. Kessler had ultimate responsibility for implementing and enforcing the United States Food, Drug, and Cosmetic Act (FDCA), and he was responsible for overseeing five Centers within FDA, including the Center for Drug Evaluation and Research and the Center for Biologics Evaluation and Research. Dr. Kessler is also a senior advisor to a global private equity firm that owns pharmaceutical and biomedical companies, and he serves on the boards of two pharmaceutical companies. In these capacities, Dr. Kessler advises corporations on the standards of care within the pharmaceutical industry under state and federal law. His published work in this field was cited by the U.S. Supreme Court with approval in *Wyeth v. Levine.*[9]

Dr. Kessler has previously testified at trials following denial of *Daubert* motions in federal courts, on matters similar to those at issue in this case, involving duties of care in the marketing and warning of risks of pharmaceutical products, and the applicability of federal and state law standards.[10] Dr. Kessler's opinions have necessarily survived similar *Daubert* challenges in these

---

[9]*Wyeth* v. Levine, 555 U.S. 555 (2009) (holding that federal regulations do not pre-empt state law failure to warn claims).

[10]*See In re Vioxx Prod. Liab. Litig.*, MDL No. 1657, Transcript at 42-188 (E.D. La., April 12, 2010) (Exhibit 2); *In re Neurontin Marketing, Sales Pract., and Prod. Liab. Litig.*, MDL No. 1629, Transcript at 28-58 (D. Mass., February 22-23, 2010) (Exhibit 3); *Wells v. Allergan, Inc.,* CIV-12-973-C Order (W.D. Okla., February 4, 2013) (Exhibit 4) and Transcript, February 20-21, 2013 (Exhibit 5); *In re Actos (Pioglitazone) Prod. Liab. Litig.*, MDL No. 2299, 2014 WL 120973, at *10 (W.D. La., Jan. 10, 2014) (Exhibit 6).

and other litigations.[11] He has testified in state court trials on similar issues, including in Pennsylvania, following the denial of motions seeking to exclude his testimony.[12]

The same result should follow in this case. Dr. Kessler is exceptionally well-qualified to provide admissible testimony that will assist the trier of fact as to the standard of care applicable to the Defendant pharmaceutical companies under state and/or federal law, and whether or not they complied with those laws.

## II.      Dr. Kessler's Opinions Will Assist The Jury On Matters Pertaining To Xarelto.

In his Report, Dr. Kessler explains that drug companies have the responsibility to take steps to minimize the risks associated with a drug, and provide information to doctors and patients so that they can take steps to address those risks.[13] He explains that FDA regulations require that a manufacturer identify in the Warnings and the Precautions section of a drug label any laboratory tests helpful in recognizing patients at risk for serious adverse reactions based upon a patient's response to a drug, which, in this case, included laboratory tests that could be helpful in identifying patients at increased risk of bleeding from Xarelto.[14] He further explains that all manufacturers are required to provide physicians with "adequate directions for use" so that physicians can use the drug safely.[15]

---

[11]*In re Yasmin and Yaz (Drospirenone) Marketing, Sales Prac. and Prod. Liab. Litig.,* MDL No. 02100, 2011 WL 6302287, *10 (S.D.Ill., Dec. 16, 2011); *see also In re C.R. Bard, Inc.,* 948 F. Supp. 2d 589 (S.D.W. Va. 2013).

[12]Exhibit 7, Kessler testimony in *In re Risperdal Prod. Liab. Litig* (*Pledger v. Janssen*), First Jud. Dist. Pennsylvania, Philadelphia Court of Common Pleas (Jan. 2015).  Dr. Kessler has testified in a number of Risperdal trials in Philadelphia.  For the sake of brevity, the Plaintiffs have not attached all the relevant transcripts but can provide them upon request.

[13]Exhibit 1, Kessler Report, Section XIV.

[14]*Id.* at Section II *citing* CFR § 201.57.and 21 CFR § 201.57; Section IV, paras. 185-186 and Section III.

[15]*Id.* at p. 42 *citing* 21 U.S.C. § 352(f)(1).

4

Dr. Kessler offers admissible testimony that Defendants did not adequately notify physicians that some Xarelto patients are at higher risk than others for a serious adverse bleeding event due to the variability in Xarelto plasma concentration levels;[16] and did not adequately instruct physicians how to identify at-risk patients by obtaining a laboratory blood measure of PT.[17]  He explains that by August 2011, there was a known relationship between PT levels and the risk of bleeding;[18] that measuring PT levels in Xarelto patients can be helpful in identifying at-risk patients; useful for physicians in clinical-decision making[19] and that there is a laboratory test (Neoplastin PT) available to measure PT levels in Xarelto treated patients.[20] Dr. Kessler concludes that Defendants have failed to adequately instruct physicians on how to safely manage their patients use of Xarelto in order to avoid use of the product with those at high risk of bleeding. [21]

With regard to Defendants use of a Point-of-Care (POC) device in the ROCKET clinical trial that was subsequently recalled, Dr. Kessler opines that the Defendants failed to meet their duty of reasonably prudent drug manufacturers by not reporting discrepant INR values, and associated adverse events and the Covance recheck program in response to the January 12, 2016 Information Request.[22] He explains that a reasonable and prudent manufacturer, asked by FDA, as part of an IND application process, to provide a summary of information collected by an unblinded physician would have provided such information. Such information was important to FDA because

---

[16]*Id.* at Section IV.

[17]*Id.* at Section V.

[18]*Id.* at Section VI.

[19]*Id.* at Section IV, para. 200 and Section VII.

[20]*Id.* at Section VIII.

[21]*Id.* at Section IV, para. 204.

[22]*Id.* at Section IV, para. 206.

5

FDA was investigating the impact of the use of a recalled POC device in the ROCKET clinical trial, which evaluated the safety and efficacy of Xarelto. He notes that the Defendants did not disclose to FDA, physicians, or patients that the company was in possession of information indicating that "discrepancies of potential clinical relevance were rather frequently observed (approximately in 35% of the estimations) in ROCKET.  In Dr. Kessler's opinion, the POC device used in the ROCKET AF trial malfunctioned, raising questions regarding the validity of the trial.[23]

Finally, Dr. Kessler further opines that some observational data and the FDA's ROCKET Reanalysis support a conclusion that serious adverse events associated with Xarelto therapy include a significant risk of major bleeds relative to other oral anticoagulants, and he opines that these findings further support the need of the manufacturer to identify a helpful laboratory test to minimize serious adverse events associated with the use of their product.[24]

## ARGUMENT

### I.   The Legal Standard Governing Expert Testimony Favors Admissibility.

For the sake of brevity, the Plaintiffs incorporate herein the Legal Standard set forth in its response in opposition to Defendants' *Motion In Limine to Exclude Certain Opinions of Laura M. Plunkett, Ph.D., Under Federal Rule of Evidence 702.*

### II.   Dr. Kessler's Opinions Are Reliable And The Result Of A Sound Methodology.

Defendants' argument that many of Dr. Kessler's opinions are "personal opinions" that are not based on reliable principles and methodology is without merit.[25] They attempt to tarnish Dr. Kessler by cherry-picking excerpts of his opinions and casting them in a false light. One glaring

---

[23]*Id.* at Section XVI and Section IV at paras. 207-209.

[24]*Id.* at Section XV.

[25]Def. Memo at 4.

example is Dr. Kessler's opinion that "as of August, 2011, there is a relationship between PT levels and the risk of bleeding."[26]  Defendants contend that this opinion is pure *ipse dixit*.  Their argument is baseless for at least the following reasons:

*First*, not only is this Dr. Kessler's opinion but his opinion is supported by <u>a finding of the FDA</u>.[27]  Indeed, Defendants concede that Dr. Kessler "quotes from the FDA's clinical pharmacology review…"[28] Defendants' suggestion that Dr. Kessler is simply espousing personal opinions, when those opinions are agency findings, is unfounded.

*Second*, as an FDA expert, one that ran the entire FDA as its Commissioner, Dr. Kessler is eminently qualified to speak about FDA findings.[29]  Moreover, Dr. Kessler is a clinician who has prescribed anticoagulants to patients[30] and is not only familiar with PT testing but testified that has ordered them for patients hundreds of times.[31] He is also a Professor of Biostatistics and as such is eminently qualified to render his opinion in this regard.

*Third,* Defendants' argument that Dr. Kessler "cherry-picked" data is simply false. He reviewed the entire ROCKET-AF trial dataset, and knows how such data is received and analyzed

---

[26]*Id.*

[27]This same opinion was expressed by the FDA, as discussed in the Summary Review memorandum for the atrial fibrillation indication:

> The clinical pharmacology and clinical reviewers demonstrated that there is a linear correlation between rivaroxaban levels and prothrombin time (PT). They also demonstrated that there is also a correlation between PT and risk of bleeding. ***This applicant has not chosen to utilize this information***… [I]nfrequent monitoring (perhaps at initiation and yearly thereafter) to assure appropriate dosing of drugs that prevent stroke and caused bleeding may improve outcomes and be acceptable to patients

Exhibit 9, FDA Summary Review, at 9.

[28]Def. Memo at 5.

[29]*See* argument *infra*. at IV(D).

[30]Exhibit 10, Kessler dep. at 82:7-82:21.

[31]*Id.* at 260:15-260:20.

at the agency. The ROCKET trial, in and of itself, has *proven* that Xarelto increases a patient's risk of bleeding, that this risk of bleeding is variable among patients, and that Neoplastin PT can be used to evaluate the risk of bleeding in an individual Xarelto-treated patient.[32]

*Fourth,* Defendants claim that Dr. Kessler ignored contradictory data. Defendants conspicuously do not identify this alleged "data" because upon information and belief no such data exist.  And, even if it did (which it obviously does not), that omission is better addressed as the subject of cross-examination.[33]

Defendants' reliance on *C.R. Bard*[34] or *Chinese Drywall*[35] is misplaced. Unlike the situation in *C.R. Bard*, Dr. Kessler's opinions are reliable and similarly held by the FDA itself. Similarly, *Chinese Drywall* is distinguished by the fact that Plaintiffs' engineering expert, Mr. Inglis, lacked statistical training to opine on matters in his report. Here, the Defendants do not claim that Dr. Kessler lacks the requisite training education or experience. The Defendants' argument amounts to nothing more than simply disliking the FDA and Dr. Kessler's conclusion.

---

[32] *See Joint Response to D&M brief.*

[33] *Daubert,* 509 U.S. at 596; *Paz v. Brush Engineered Materials, Inc.,* 555 F.3d at 388 (5th Cir. 2009); *In re Vioxx Products Liab. Litig.,* 401 F.Supp.2d at 574 (E.D. La. 2005) ("The validity or the correctness of the conclusion is for the fact finder"); *Alexie v. Appex Tool Grp., LLC,* Case No. 12-2212, 2014 WL 5603386, at *2 (E.D. La., Nov. 3, 2014) (Fallon, J.) (questions about expert's credibility and the weight to be given to opinions is best handled by cross-examination); *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices and Prods. Liab. Litig., No. 3:09–md–02100–DRH–PMF,* 2011 WL 63002889, *7 (rejecting Bayer's argument that an expert's opinion is inadmissible because he did not rely on all of the major epidemiological studies noting that if the expert "failed to consider an important epidemiological study that may be explored during cross examination."); *In re Zyprexa Prods. Liab. Litig.,* 04-MD-1596, 493 F.Supp.2d 571, 580 (E.D.N.Y. 2007) (similar attacks on Plaintiff's expert "are primarily based on assessments of credibility best left for the trier."); *In re Seroquel Products Liab. Litig.,* 6:06-MD-1769-ORL-22D, 2009 WL 3806436, *10 (M.D. Fla., July 20, 2009) ("AstraZeneca's objection regarding the selection of documents that Dr. Plunkett examined goes to the weight of her testimony regarding drug labeling …").

[34] *In re C.R. Bard, Inc.,* 948 F. Supp. 2d 589, 611 (S.D. W. Va. 2013).

[35] *In re Chinese Manufactured Drywall Prods. Liab. Litig.,* MDL No. 2047, 2015 WL 3603624, at *3 (E.D. La. June 5, 2015) (Fallon, J.).

As this Court has recognized, "the validity or the correctness of the conclusion is for the finder of fact."[36] Disputes over the conclusions or merits of an expert's opinion properly go to the weight of the testimony.[37]

III.   **Dr. Kessler May Testify About His Analysis Of Xarelto's Regulatory History And The Relevant Documents That Support His Opinions.**

Defendants argue that Dr. Kessler should be excluded because he provides a detailed and thorough narrative summary of Xarelto's regulatory history, certain studies and internal company documents.[38] However, Dr. Kessler complies with Rule 26 in narrative form, summarizing the material, studies and other facts relied on to reach his conclusions. There is nothing improper about an expert discussing the documents relied upon in reaching conclusions. Indeed, Defendants' own regulatory expert, Dr. Dena Hixon, does exactly the same thing in her Report.[39]

*First*, expert narrative testimony is entirely permissible where the documents and other information the expert is reviewing are complicated, voluminous, or involve scientific or technical data and such narrative summary would assist the trier of fact in understanding the documents. Plaintiffs expect their evidence to proceed in the form of permissible questions and answers, under the Court's direction; however, an expert report is a written document that cannot possibly follow a question-and-answer format, but instead must include the facts and data that Rule 26 requires,

---

[36]*Vioxx.,* 401 F.Supp.2d at 574.

[37]*See* cases cited n. 33 *supra.*

[38]Def. Memo at 6.

[39]Defendants accuse Dr. Kessler of introducing "portions of Xarleto's regulatory history and "cherry-picked studies." Yet, Defendants' own regulatory expert, Dr. Dena Hixon, acknowledges conducting her own selective recitation of facts: "the following is intended <u>not as a comprehensive</u> history of all the drug development activities <u>and studies</u> conducted but a broad overview of some of the most important studies relevant to the product approval." (Hixon Report, Exhibit "9," p. 13 (underlining added)).

which would then provide the substance of the trial testimony provided in the usual question-and-answer method.

*Second*, "narrative testimony" is not inherently objectionable, as the MDL Court in the *Yaz* explained:

> As to defendant's argument regarding narrative testimony, the Court has broad discretion over the mode and order of examining witnesses and presenting evidence and may allow testimony in narrative form at trial if the Court finds that it would be helpful to the jury. … 'Fed. R. Evid. 611(a) provides district judges with authority to allow testimony in narrative form rather than as answers to specific questions [citations omitted], and we ourselves have said that "there is … nothing particularly unusual, or incorrect, in a procedure of letting a witness relate pertinent information in a narrative form as long as it stays within the bounds of pertinency and materiality."' [citations omitted][40, 41]

Indeed, the Fifth Circuit has expressly approved the use of an "expert summary witness" who is permitted both to summarize evidence or the jury and to offer an expert analysis of the

---

[40] *Yaz,* 2011 WL 6302287, * 32

[41] *See also In re Tylenol (Acetaminophen) Mktg., Sales Prac. & Prod. Liab. Litig.,* MDL No. 2436, 2016 WL 4538621, at *8 (E.D. Pa., Aug. 31, 2016) and *In re Tylenol,* MDL No. 2436, 2016 WL 807377, at *9 (E.D. Pa., Mar. 2, 2016) (a narrative may be admissible, however, if an expert's explanation of complicated facts can help a jury better understand them); *In re Fosamax Products Liab. Litig.,* 1:06–MD–1789 (JFK), 645 F.Supp.2d 164, 190-191 (S.D.N.Y. 2009); Fed. R. Evid. 611*; United States v. Pless,* 982 F.2d 1118, 1123 (7th Cir. 1992) (Fed. R. Evid. 611(a) provides district judges with authority to allow testimony in narrative form rather than as answers to specific questions [citations omitted], and we ourselves have said that 'there is . . . nothing particularly unusual, or incorrect, in a procedure of letting a witness relate pertinent information in a narrative form as long as it stays within the bounds of pertinency and materiality (*United States v. Garcia,* 625 F.2d 162, 169 (7th Cir. 1980)).'); *In re Welding Fume Prod. Liab. Litig.,* MDL 1535, 2005 WL 1868046, *17 (N.D. Ohio 2005) ("Thus, a 'narrative' by an expert is not automatically inadmissible; it is only when, as in *In re Rezulin,* the narrative is purely 'a repetition of the factual allegations in plaintiffs' complaint,' involving 'nothing technical or scientific,' that a court might find the expert testimony unhelpful, because the expert is providing only 'simple inferences drawn from uncomplicated facts.'... In this case, the great majority of the documents and articles that Dr. Levy is reviewing and comparing are complicated, and the inferences those documents may or may not support are not at all simple. It is through the application of his expertise that Dr. Levy may allow the trier of fact to better understand what the documents do (and don't) mean, and, thus, what the defendants did (or didn't) know.") (*citation omitted*)).

facts.[42] The expertise of a historian has often been found useful to assist the jury in understanding the historical record.[43] Numerous courts in pharmaceutical litigation have allowed expert testimony in narrative form on complex subjects such as those that Dr. Kessler is being proffered to testify.

*Third*, at its core, Defendants' argument to preclude experts from providing a "narrative" is nothing more than the familiar trial objection that "the document speaks for itself." That rule should be enforced at trial, in the context of specific documents and expert testimony, not by way of a *Daubert* motion. Questions about the scope of a narrative do not justify exclusion under *Daubert* or Rule 702. Such general objections are more properly addressed by the Court in context at trial.[44]

In response to the identical argument advanced by the Defendants in their motion, the court in *Wells v. Allergan* held: "To the extent the facts relied upon by Dr. Kessler are relevant and not

---

[42]*See United States v. Moore*, 997 F.2d 55 (5th Cir.1993) (IRS agent testified as expert summary witness); *see also* Fed. R. Evid. 1006 (summary evidence).

[43]*See Waterhouse v. R.J. Reynolds Tobacco Co*., 368 F. Supp. 2d 432, 436 (D. Md. 2005), *aff'd*, 162 F. App'x 231 (4th Cir. 2006) (in the tobacco litigation, defendants were allowed to offer the testimony of an historian, who relied on a wide variety of documents, synthesized the documents, and opined that between 1947 and 1969 there was widespread common knowledge among ordinary people that cigarette smoking could cause serious life-threatening diseases); *see also Walden v. City of Chicago*, 755 F. Supp. 2d 942, 948-49 (N.D. Ill. 2010) ("researcher and doctoral candidate in history," who had conducted a historical study regarding the policies and practices of the Chicago Police Department, to testify that "all the available evidence points to the existence of a historic pattern of coercive interrogations and illegal detentions that represented a de facto policy and practice of the Chicago Police Department in existence in 1952 at the time of [the plaintiff's] arrest and alleged mistreatment.").

[44]*See, e.g., In re Actos,* 2014 WL 120973 at *10 ("The objection that testimony is 'narrative' is an objection as to form, foundation, or responsiveness, and must be presented at trial--as no question is now before the Court to which objection can be made.") (Exhibit 6); *Johnson v. Wyeth LLC*, Case No. 10–02690, 2012 WL 1204081, at *3 (D. Ariz., Apr. 11, 2012) ("Objections to narrative testimony, however, are best made at trial"); *Lea v. Wyeth LLC,* Case 1:03-cv-01339-MAC (E.D. Tex., Oct. 6, 1011) (not officially reported)(Defendant's motion to exclude "narrative" testimony denied "[s]hould [the experts] become witnesses that merely read documents to the jury, as Defendants suggest, an objection should be lodged at trial that the documents speak for themselves," Exhibit 7.

cumulative, Dr. Kessler may include them in his testimony. … Defendant may object at trial if Dr. Kessler appears to be simply regurgitating facts, rather than using relevant facts as context for his expert opinions."[45] Here, Plaintiffs intend to have their expert witnesses, including Dr. Kessler, provide opinions based on factual context, as required. The Court will exercise its authority to preclude improper testimony at trial.[46] There is no methodologically-based reason for exclusion of the necessary factual basis for the opinions stated in a Rule 26 report.

Fourth, the cases that Defendants rely on are based directly or indirectly on a line of district court cases in New York that have excluded witnesses from simply constructing a narrative history of events based on a self-explanatory documentary record.[47] Those cases have reasoned that the jury does not need an expert to provide such a narrative, and it is the job of trial counsel to provide such a narrative. Those cases have no application where, as here, the documents and evidence is voluminous and complex and the jury cannot reasonably be expected to understand it without some expert guidance.

For example, throughout their brief, Defendants heavily rely on the ruling in Trasylol[48] addressing another of Bayer's drugs, where the court excluded a Plaintiff's regulatory expert. However, Trasylol is  simply inconsistent with Moore and other compelling authority, supra, which permits the use of summary expert witnesses. In addition, Trasylol is distinguishable on its

---

[45]Exhibit 4 at 4-5.

[46]Exhibit 6 at *10.

[47]Highland Capital Management, L.P. v. Schneider, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005); In re Rezulin Products Liab. Litig., 309 F. Supp. 2d 531, 546 (S.D.N.Y.2004) (Kaplan, J.); Taylor v. Evans, Case No. 94-8425, 1997 WL 154010, at *2 (S.D.N.Y. 1997); LinkCo, Inc. v. Fujitsu Ltd., Case No. 00 Civ. 7242, 2002 WL 1585551, at *1-*2 (S.D.N.Y., July 16, 2002); Media Sport & Arts s.r.l. v. Kinney Shoe Corp., Case No. 95 CIV. 3901,1999 WL 946354, at *3 (S.D.N.Y., Oct.19, 1999).

[48]In re Trasylol Prods. Liab. Litig., 709 F. Supp. 2d 1323, 1324-7 (S.D. Fla. 2010).

facts. There, the court concluded that the Plaintiff's regulatory expert was excluded because she was unable to support her opinions because she failed to reference particular FDA statutes or regulations.[49] In this case, Dr. Kessler is able to do so. His Report specifically references applicable regulations:

- 21 CFR § 201.57 requiring manufacturers to: "identify any laboratory tests helpful in following the patient's response or in identifying possible adverse reactions. If appropriate, information must be provided on such factors as the range of normal and abnormal values expected in the particular situation and the recommended frequency with which tests should be performed before, during, and after therapy."[50]

- 21 CFR § 201.57(e)(1999) establishing that a drug company's ongoing duty to warn and modify label without delay when hazards emerge post-approval, specifically authorizing a drug company to take steps to inform physicians and patients of emerging risks, without advance approval from the FDA;[51]

- 21 CFR § 201.57(c)(6), 21 CFR § 314.70 establishing a drug companies' obligation to revise a label "to include a warning about a clinically significant hazard as soon as there is reasonable evidence of a causal association with a drug; a causal relationship need not have been definitely established."[52]

Furthermore, the *Trasylol* court's reliance on *Prempro*[53] reflects a misapprehension of the Plaintiff's regulatory expert's role in that case. In fact, the regulatory expert in *Prempro*, Dr. Parisian, had been permitted to provide FDA regulatory testimony during the compensatory phase

---

[49]*Id.*

[50]Exhibit 1, Kessler Report, paras. 12-14.

[51]*Id.* at paras. 85-86.

[52]*Id.*

[53]*In re Prempro Prods. Liab. Litig.*, 554 F.Supp.2d 871, 880, 886 (E.D. Ark. 2008). The Defendants subsequently appealed to the Eighth Circuit, which affirmed the jury verdict and compensatory damages, vacating only the punitive damages portion of the verdict *In re Prempro Prods. Liab. Litig.*, 586 F.3d. 547, 559 (8th Cir. 2009). Defendants neglect mentioning that the motion to strike the regulatory experts opinions in that case was denied and the compensatory damages verdict was upheld. In fact, the Court of Appeals repeatedly refers to the Plaintiff's regulatory expert's testimony and opinions regarding the inadequacy of the manufacturer's warnings throughout its factual statement. *Id.* at 558; 561-562.

of the trial.[54] Finally, in *Trasylol,* the court was concerned that the regulatory expert's opinion would discuss the intent of Defendant.[55]

As set forth in *Section* IV (D) below, Dr. Kessler is not being proffered to provide any unsupported opinions regarding the intent of the Defendants. Rather, he is being proffered to explain the FDA's regulatory system to the jury and explain the ways in which Defendants failed to comply with those regulations, as numerous courts have allowed him to do.

## IV.   Dr. Kessler's Use Of Corporate Documents Is Proper And He Does Not Intend To Testify Regarding, Motive, Intent Or State Of Mind.

### A.      Dr.  Kessler's Use of Corporate Documents Is Proper.

Dr. Kessler will offer testimony regarding the standard of care of a pharmaceutical company in Defendants' position with respect to the study, design, labeling/warnings, marketing, and approval of Xarelto, and that Defendants' breached that standard of care based upon his understanding derived from the documents he reviewed. Dr. Kessler necessarily had to review Defendants' internal documents to complete his analysis of whether Defendants breached their duties to investigate and to warn. Courts regularly allow experts to discuss documents that form the basis of their opinions.[56]

---

[54]*Id.*

[55]*Trasylol,* 709 F.Supp.2d at 1346.

[56]*See, e.g., Sanchez v. Boston Scientific Corp.* Civil Action No. 2:12–cv–05762, 2014 WL 4851989, at *4 (S.D. W.Va., Sept. 29, 2014) (noting that "an expert may testify about his or her review of internal documents solely for the purpose of explaining the basis for his or her opinions*); In re Flonase Antitrust Litig.,* 884 F. Supp. 2d 184, 192-93 (E.D. Pa. 2012) (permitting expert to use internal documents to opine on information that was available to manufacturer regarding FDA practice and policy as to approval of drug application); *In re Fosamax,* 645 F. Supp. 2d at 192 (permitting expert to comment on documents and exhibits in the context of "explaining the regulatory context in which they were created, defining any complex or specialized terminology, or drawing inferences that would not be apparent without the benefit of experience or specialized knowledge").

**B.**     **Dr. Kessler Does Not Speculate About State of Mind, Intent or Motive.**

Defendants fear that Dr. Kessler's opinion testimony will venture into the Defendants' employees' knowledge, motives, and intent. However, that is not the purpose or goal of Dr. Kessler or the Plaintiffs. Simply because Dr. Kessler answered defense counsels' questions posed to him during a lengthy deposition (regardless of subject, relevance or admissibility at trial) is hardly a means to justify a blanket exclusion of his testimony, especially when the witness testified repeatedly that he has no intention to speak to the extraneous matters raised by defense counsel during the deposition.[57]

In *Actos*, the court rejected a similar challenge to Plaintiff's regulatory expert. The court distinguished between what the regulatory expert "believes [Defendant] or the FDA thought or knew" and "documentary exhibits which on their face establish [Defendant] or the FDA's knowledge or intent and upon which Dr. Parisian relied in forming her opinion."[58] Likewise, in *Vioxx*, this Court permitted the Plaintiff's regulatory expert to testify about the significance of certain documents and how these documents fit into the FDA's regulatory scheme.[59] This Court noted that state of mind objections similar to those raised by the Defendants here were best decided at trial.[60]

---

[57]Exhibit 10, Kessler dep. at 33:6-8 (cannot get into people's minds); 39:20-23 (would not get into people's heads) and 41:1-2 (stating he cannot tell what is in the heads of the scientists at the FDA). *See Yaz,* 2011 WL 6302287, at *12 (noting that Dr. Kessler "repeatedly assured defendants during his deposition that he did not intend to testify about the intent or motive of [defendants'] personnel").

[58]*In re Actos Prod. Liab. Litig.*, No. 11 L 010011, *11-12 (Cook County, Illinois, March 13, 2014) (Exhibit 12).

[59]*Vioxx,* 401 F. Supp.2d at 594-95.

[60]*Id.* at 595 (reserving ruling on state of mind issue should Merck raise objection at trial).

Here Dr. Kessler will not be "guessing" as to what Defendants or the FDA thought or knew. Dr. Kessler reviewed internal corporate and FDA documents and explained the significance of those documents in the context of the pharmaceutical industry and FDA regulatory process. Using the documentary evidence, he explained what knowledge was available to Defendants and their employees and what information they *should have known* as a manufacturer of a New Oral Anticoagulant like Xarelto to meet the standard of care. He explained what the company *should have done* under the regulatory scheme upon learning such information; and what the Defendants' own documents show that they actually *did* or *failed to do* with regard to Neoplastin PT testing, among other things.[61] At times, this testimony necessarily touches on Defendants' knowledge and awareness of the risks of Xarelto or their knowledge about the importance of using a Neoplastin PT testing, but as this understanding is derived from Dr. Kessler's knowledge, training and experience, this is perfectly permissible. An expert may be permitted to testify about another's knowledge or the meaning of internal corporate documents if a jury would not otherwise understand the importance of certain facts without the benefit of expertise. [62]

---

[61]*In re Mirena IUD Prod. Liab. Litig.,* 169 F. Supp. 3d 396 (S.D.N.Y. 2016) (ruling that a regulatory expert, Dr. Parisian may opine on what documents in Bayer's possession said—in other words, on what Bayer "knew" in the sense of what information was in its possession—or on the FDA's or Bayer's intent to the extent it is "clearly indicated in public documents." She may also opine on what the FDA would have done in a typical situation when presented with a set of facts). *See also In re Levaquin Prod. Liab. Litig.,* MDL No. 1943, 2011 WL 6888533, at *2 (D. Minn., Dec. 29, 2011).

[62]*See also In re Tylenol (Acetaminophen) Mktg., Sales Prac. & Prod. Liab. Litig.,* MDL No. 2436, 2016 WL 1569719, at *11 n. 29 (E.D. Pa., Aug. 31, 2016) ("This does not mean, however, that the plaintiff's experts cannot offer evidence that could allow a jury to infer what the defendants' corporate state of mind would be. This is entirely appropriate); *Wells v. Allergan,* 2013 WL 7208221, at *2 ("However, although Dr. Kessler cannot testify as to intent, Dr. Kessler can testify about facts from which the jury can infer intent) (Exhibit 4); *DePaepe v. Gen. Motors Corp.,* 141 F.3d 715, 720 (7th Cir. 1998) (Expert "could give an opinion as an engineer that reducing the padding saved a particular amount of money; he might testify as an engineer that GM's explanation for the decision was not sound (from which the jury *might infer* that money was the real reason ...)") (emphasis added). Additionally, experts are permitted to opine on what defendant pharmaceutical companies, such as the Defendants, actually did, rather than thought. *Kruszka v. Novartis Pharms. Corp.,* 28 F. Supp. 3d 920, 931-32 (D. Minn. 2014) ("[T]estimony that opinions on what the FDA or Novartis actually did, rather than thought, are properly within the scope of admissible

The statements in Dr. Kessler's Report that Defendants selectively challenge are simply not the type of "mind-reading" opinions that are disfavored.  For example, Dr. Kessler does not improperly speculate that "the sponsor acknowledged that information about measuring PT could be helpful in patient care decision-making" as the Defendants' argue.[63] Rather, he draws this conclusion from the documents that he reviewed which on their face establish the Defendants' knowledge of the fact. Moreover, Dr. Kessler is a clinician who has prescribed anticoagulants to patients[64] and is not only familiar with PT testing but testified that he has ordered them for patients hundreds of times.[65] Clearly this situation is distinct from that in *C.R. Bard*, in which the court was concerned with improper "inferences" into the Defendant's state of mind.[66] Here, there is no inference into state of mind required; Defendants' intention is clearly expressed on the face of the documents, and Dr. Kessler properly relies on  the expressed intention of the parties to formulate his opinions.

In *Drake v. Allergan*, the plaintiffs filed suit against Allergan for claims arising from injuries the minor plaintiff allegedly sustained as the result of a Botox injection to treat his lower limb spasticity.[67] The Defendants submitted a motion in limine to preclude Dr. Kessler "from

---

testimony."); *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.,* MDL No. 1203, 2000 WL 876900, at *9 (E.D. Pa., June 20, 2000) ("[i]f the witnesses' bases for the opinions concerning improper intent come from other evidence such as letters, admissions … or other admissible evidence, that is what the jury should hear and the question of [] intent would flow from such evidence to be determined by the jury.") (emphasis in original).

[63]Def. Memo at 8 *citing* Def. Ex. A, Kessler Report paras. 72, 177 and 195.

[64]Exhibit 10, Kessler dep. at 82:7-82:21.

[65]*Id.* at 260:15-260:20.

[66]*C.R. Bard,* 948 F. Supp. 2d at 611.

[67]*Drake v. Allergan, Inc.*, No. 2:13-CV-234, 2014 WL 5392995, at *1 (D. Vt., Oct. 23, 2014).

drawing inferences about the knowledge, motives, or intent of individuals or organizations," among other things which was denied.[68]

This Court ruled in *Vioxx,*[69] that similar objections were best decided at trial. Specifically, the Court held that Dr. Kessler "may be permitted to testify about another party's knowledge if a jury would not otherwise understand the importance of certain facts without the benefit of his expertise-for example what is or is not common knowledge in the pharmaceutical company community based on his experience at the FDA."[70] The Court's ruling in *Vioxx* was correct then and should be applied to deny Defendants' motion now.

## V.     Dr. Kessler May Testify To Breach Of The Standard Of Care, Without Invading The Province Of The Court.

Defendants argue that Dr. Kessler may not testify to certain opinions that they characterize as improper "legal conclusions," including the requirements of the Federal, Food, Drug and Cosmetic Act and related regulations, the relationship between state and federal standards applicable to pharmaceutical manufacturers, and breach of those standards.[71] However, Dr. Kessler has a working knowledge of the intricacies and implementation of these regulations. Because of his reknown qualifications, he has previously been permitted to testify to analogous opinions in *Vioxx, Actos, Fosamax, Yaz, Neurotin* and the *Allergan*.[72]

Defendants' argument is really about Dr. Kessler's methodology and how he came to

---

[68]*Id.* at *5.

[69]*Vioxx,* 401 F.Supp.2d at 595 (reserving ruling on state of mind issue should Merck raise objection at trial).
[70]*Id.*

[71]Def. Memo at 9.

[72]*See also Wyeth*, 555 U.S. at 579, n. 12. Defendants' opening sentence "Dr. Kessler has not been at the FDA in nearly 20 years," implies that Dr. Kessler's pharmaceutical experience is somehow stale. This borders on the frivolous as the numerous courts cited herein have recognized.

render the opinions that Defendants disagree with about their conduct in the context of the FDA regulations. Dr. Kessler employed the same methodology as the Defendants' designated regulatory experts Gregory Campbell, Ph.D. and Dena Hixon, M.D. FDA regulations will need to be explained and discussed in the framework of *both* side's arguments – Defendants' will seek to have their experts testify that they followed the regulations and Plaintiffs will seek the opposite. Experts in pharmaceutical cases are permitted to testify that a Defendant acted unreasonably and/or violated the standard of care by providing an inadequate warning of the risk, and such testimony does not invade the province of the judge or jury.[73] In essence, Dr. Kessler and the Defendants' regulatory experts rely on the same regulations and documents. They simply interpret them differently and reach opposite conclusions. This is not a basis for excluding expert testimony under *Daubert*.[74]

Defendants also confuse Dr. Kessler's opinions which touch on legal issues relevant to federal regulation of the pharmaceutical industry, with testimony attempting to instruct the jury on the ultimate issues of law or direct the jury how to decide these issues. This argument is not valid. In *Fosamax*, a drug manufacturer challenged a regulatory expert, Dr. Parisian, arguing that she would improperly opine on the applicable law.[75] In rejecting this argument, the court reminded the defendant that its case was "not governed by federal regulations but by state law theories of negligence and strict liability" and, therefore, the regulatory expert was not testifying about the

---

[73]*See e.g. Mahaney ex rel. estate of Kyle v. Novartis Pharm. Corp*., 835 F.Supp.2d 299, 310 (W.D. Ky. 2011) ("[T]he Court believes Parisian's testimony will shed light on the internal workings of an agency about which lay persons possess little knowledge and familiarity.").

[74]*See Vioxx*, 401 F.Supp.2d at 565 ("In essence, both the Plaintiff and Merck rely on the same material. They simply interpret it differently and reach contrary conclusions. The Court's role as gate-keeper is to scrutinize the methodology, not the conclusions. Accordingly, Merck's motion is denied).

[75]*Fosamax,* 645 F. Supp. 2d at 191, n.16.

ultimate issues of law.[76] The court in *Fosamax* also observed that cross-examination and competing testimony from the manufacturer's own regulatory experts would ensure that the jury properly weighed the proposed testimony.[77]

Similarly, in *Yaz*, the court explained that Dr. Kessler's proposed testimony, did not impermissibly offer legal conclusions or usurp the court's role to instruct the jury. There, Dr. Kessler offered the following opinions: that "'[t]he manufacturer, not FDA, is primarily responsible for the safety of its products'; that 'FDA regulations and state law provide independent and complementary layers of consumer protection' …; and that "Bayer violated its duties under FDA regulations and state law by selectively presenting data as to thromboembolic events, which did not adequately inform FDA, doctors or consumers of the thromboembolic risks, from pre-marketing to the present."[78] The court concluded that these opinions, which mirror several of the opinions challenged here, were "permissible because of the complex nature of the process and procedures and the jury needs assistance understanding it."[79] [80]

---

[76] *Id.; see also Wells v. Allergan*, 2013 WL 7208221, at *1, Exhibit 4.

[77] *Fosamax,* 645 F. Supp. 2d at 191; *see also Actos,* 2014 WL 120973, at *11 ("Dr. Kessler … posits certain opinions as to [Defendant's] conduct vis-a-vis the FDA … [o]f course, Dr. Kessler is fully subject to vigorous cross-examination and Defendants are free to present contrary evidence and interpretation.") (Exhibit 6); *see also, In re Baycol Prod. Litig.*, 532 F. Supp. 2d 1029, 1053 (D. Minn. 2007) (to the extent expert testimony is offered only to show that the FDA was misled, or that information was intentionally concealed from the FDA, the testimony must be excluded, but such testimony may be admissible to support a claim that the medical community, treating physicians or patients were misled by defendant's failure to submit information to the FDA).

[78] *Yaz*, 2011 WL 6302287, at *10.

[79] *Id.* at *12; *see also Diet Drugs,* 2000 WL 876900, at *9,

[80] Defendants' reliance on *C.R. Bard* is misplaced as it overlooks that part of the opinion which allowed relevant testimony. Def. Memo at 11. While the decision initially states that opinions drawing a legal conclusion by applying law to the facts are generally inadmissible in the Fourth Circuit, the Court goes on to state that Dr. Kessler *would be permitted* to offer expert testimony related to the FDA framework and process.

Consistent with *Fosamax* and *Yaz, supra*, the *C.R. Bard* decision acknowledged that under Federal Rule of Evidence 704(a), "[a]n opinion is not objectionable just because it embraces an ultimate issue." The Court went on to explain that the district court's role under Fourth Circuit precedent was to "distinguish opinion testimony that embraces an ultimate issue of fact from opinion testimony that states a legal conclusion" [citation omitted], by determining "whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular."[81] Thus, while that Court would not permit Dr. Kessler to use the term "failed to warn," Dr. Kessler was allowed to "offer a more general expert opinion, using terms that do not have a separate, distinct, and specialized meaning in the law."[82] In short, the *C.R. Bard* decision did not exclude the substance of Dr. Kessler's opinions, but instead provided a road map to admit his opinions using different terminology. Plaintiffs respectfully submit that *C.R. Bard* is outside the mainstream of judicial interpretation of Rule 704, and that of other federal courts, including this Court in *Vioxx*.

This Court and others, *Actos, Allergan, Fosamax* and *Yaz*,[83] have all appropriately permitted Dr. Kessler to state expressly that a Defendant did not meet its duty to warn. However, even under the more restrictive interpretation in *C.R. Bard*, it is clear that the Dr. Kessler's opinions regarding the applicable framework and Defendants' actions in relation to that framework are relevant and admissible.

---

[81]*Id.*

[82]*Id.*

[83]*See also Mobil Expl. & Producing v. A-Z/Grant Int'l Co.,* Case No. 91–3124, 1996 WL 194931, at *3 (E.D. La., Apr. 22, 1996) (Fallon, J) (Admitting expert's proposed testimony regarding the existence and applicability of certain federal Coast Guard's regulations and whether the alleged mislabeling was consistent or inconsistent reasoning ruling that they do not amount to a legal conclusion).

**VI.    Dr. Kessler's Opinions As To Whether Defendants Withheld Information From The FDA Or Misled The FDA Are Proper And Are Not Preempted Under _Buckman._**

Defendants' argument that Dr. Kessler's testimony that Defendants violated federal regulations by withholding information from the FDA is preempted by _Buckman v. Plaintiffs Legal Committee_ is without merit.[84] As set forth below, numerous courts, including this Court in _Vioxx,_ have rejected this argument and have ruled that evidence of a manufacturer's failure to disclose information to the FDA or manipulation of the FDA regulatory process are relevant to Plaintiffs' claims of failure to warn or design defect claims.

In _Buckman,_ the Supreme Court found that state law "fraud-on-the-FDA" claims were preempted by federal law.[85] The plaintiffs in _Buckman_ pled a stand–alone state law claim of "fraud–on–the–FDA," alleging that but for the Defendant's fraudulent concealment of safety data, the FDA would not have approved the Defendant's medical device.  The Supreme Court held that this claim was preempted because it "conflict[s] with the FDA's responsibility to police fraud consistently with the Agency's judgment and objectives."[86] Notably, the Supreme Court was careful to distinguish _Buckman_-type claims from common law claims arising from a manufacturer's alleged failure to use reasonable care.[87]

Ever since _Buckman_ was decided, pharmaceutical companies, including the two Defendants in this case, began trying to extend its holding to preclude other types of claims.  However, in _Wyeth v. Levine,_[88] the United States Supreme Court made it clear that federal law

---

[84] _Buckman v. Plaintiffs Legal Comm._, 531 U.S. 341 (2001).

[85] _Id._

[86] _Id._ at 350.

[87] _Id._ at 352-53.

[88] _Id._

does not prevent judges and juries in traditional products liability cases from considering a drug company's compliance with FDA regulations.[89] *Buckman* is a claim preemption case and not an evidence exclusion case.[90] As such, courts have consistently rejected the attempt to extend it and have held that evidence of a company's failure to disclose significant and relevant information to the FDA is admissible in traditional products liability cases.[91]

In *Vioxx,* Merck filed a similar motion seeking to exclude Plaintiff's regulatory expert, Dr. Kapit, from testifying about its violations of FDA regulations by withholding information from the agency.[92] In ruling on Merck's attempt to preclude testimony about the company-FDA interactions, this Court reiterated: "*Buckman* is not applicable to this case or issue at all . . . . [J]ust like [defense expert] Dr. Arrowsmith-Lowe's testimony, Dr. Kapit's testimony will help the jury understand the applicable FDA regulations and Merck's responses."[93] This Court later denied a motion for summary judgment, again finding that *Buckman* did not preempt state law tort claims.[94] Furthermore, in subsequent proceedings in the *Vioxx* MDL, this Court rejected two *Buckman-*

---

[89]*Id.* at 568-73.

[90]*See Yaz,* 2011 WL 6302287, at *13.

[91]*See, e.g., Schedin v. Ortho-McNeil-Janssen Pharms., Inc.*, 808 F. Supp. 2d 1125, 1144 (D. Minn. 2011), *aff'd in part and rev'd in part on other grounds,* 700 F.3d 1161 (8th Cir. 2012); *Baycol,* 532 F. Supp. 2d at 1053; *In re Medtronic, Inc.,* 465 F. Supp. 2d 886, 900 (D. Minn. 2006); *Mahaney ex rel. estate of Kyle v. Novartis Pharm. Corp.,* 835 F.Supp.2d 299, 314 (W.D. Ky. 2011) (" '[P]laintiffs may use evidence-if they are able to produce it-of [a pharmaceutical company's] effort to manipulate the [FDA] regulatory process in order to prove their negligence and strict liability claims' ") (quoting *In re Medtronic, Inc., Implantable Defibrillators Litig.,* 465 F. Supp. 2d 886, 900 (D. Minn. 2006); *Actos,* 2014 WL 120973, at *5, *6, Exhibit 6.

[92]*Vioxx,* 401 F. Supp. 2d at 587 ("The Court points out, however, that *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001), would not bar a qualified expert from testifying as to their opinion on whether the FDA correctly balanced the benefits and risks of a drug from a regulatory standpoint. In *Buckman,* the Supreme Court found that state law fraud-on-the-FDA claims were preempted by federal law. This holding is completely inapplicable to the issue at hand.").

[93]*Id.* at 595 (emphasis added).

[94]*Vioxx,* 501 F. Supp. 2d at 788-89.

23

based *in limine* motions that sought to prohibit Dr. Kessler from testifying that Defendant misled

the FDA and could have added a stricter warning without waiting for FDA approval.[95]

Following this Court's lead, in *Yaz,*[96] the court rejected Bayer's *Buckman* argument and

allowed plaintiffs' regulatory expert to testify to regulatory matters. The court summarized the law

as follows:

> *Buckman* is a claim preemption case focusing on fraud-on-the-FDA claims, not an
> evidence preemption case. . . .  Further, a comparison between *Buckman* and the
> landmark case *Wyeth v. Levine* . . . demonstrates . . . that federal law does not
> prevent judges and juries in failure to warn cases from considering a drug
> [company's] compliance with FDA regulations."[97]

More recently, in *Tylenol*, Johnson & Johnson (a Defendant in this case and parent to the

Janssen Defendants) filed a similar motion seeking to exclude Plaintiff's regulatory expert from

testifying about its violations of FDA regulations by withholding information from the agency. In

---

[95]*Vioxx,* Defense Motions in Limine Nos. 1, 13; Minute Entry, 3/26/10. Dr. Kessler then testified at trial that the standard of care for a pharmaceutical manufacturer was based on both federal regulations and state consumer protection laws. *Vioxx,* Tr., 4/12/10, Exhibit. "1", at 52:6-10 that adverse events and clinical studies provided a signal of increased risk of heart attacks, to which Defendant's response was inadequate. *Id.* at 57:11-69:8; and that that Merck had a duty to warn of increased risk. *Id.* at 82:1-84:13. In questioning by this Court in *Vioxx*, Dr. Kessler was asked to testify as to "whether they breached the standard of care," and whether an internal document predicting financial losses with a stricter warning "indicates any reason for their actions," and he provided his opinions responsive to the Court's questions. *Id.* at 109:23-112:10. Finally, he testified that Merck "did not meet the standard of care on duty to warn," "selectively presented the data" on risk and "explained away some of that data . . . ." *Id.* at 113:2-23.

[96]*Yaz,* 2011 WL 6302287, at *13.

[97]*Id.* at *82 (*citing Wyeth*, 555 U.S. at 568-73). Even one case cited by Defendants acknowledges that qualified experts routinely are permitted to testify about the general FDA regulatory scheme governing drugs. *See Rowland v. Novartis Pharms. Corp.,* 9 F. Supp. 3d 553, 561-62 (W.D. Pa. 2014).  The court merely decided to follow the minority of courts that have prohibited conclusions about whether the defendant complied with those regulations. *Id.* at 562 (also *compare id.* at 561 n.15 *with id.* at 561 n.16). The court did not say anything about precluding testimony relating to the defendants' specific conduct, but instead appears to have precluded only the expert's final conclusion that the specific conduct constituted non-compliance. *Id.* at 561-62.  Another cited case, over a decade old, cannot be evaluated because it consisted solely of an order with no analysis or explanation. *See Oakberg v. Zimmer, Inc.,* Case No. 03–47, 2004 WL 5503779, at *2 (D. Mont., Nov. 23, 2004). While the last cited case on this point*, Trasylol.,* 763 F. Supp. 2d at 1329-30 does come to the opposite conclusion, it is non-binding, and more importantly, wrongly decided.

rejecting Johnson & Johnson's argument and allowing the regulatory experts' testimony, the Court

held:

> *Buckman* preempts "fraud on the FDA" claims, not evidence. I previously ruled
> that the plaintiff's fraud-based claims are not preempted by *Buckman*. I also ruled,
> in a related motion in limine, that *Buckman* does not exclude evidence of the
> defendants' communications with the FDA because the plaintiff's claims do not rest
> solely on violations of FDA regulations. Dr. Nelson's opinions are intended to
> provide the jury with the scope of the defendants' duties based on FDA and industry
> standards. This information would be relevant to the plaintiff's failure-to-warn,
> design defect, and punitive damages claims. Under *Buckman*, I see nothing
> improper about Dr. Nelson offering opinions about what was expected of the
> defendants.[98]

Likewise, in *Actos,* Judge Doherty denied a similar motion seeking to exclude Dr. Kessler

from testifying about its violations of FDA regulations by withholding information from the

agency. Applying Fifth Circuit law, the court rejected the same *Buckman* argument that Defendants

assert here:

> [T]his Court disagrees with the Defendants' broad interpretation of *Lofton* and finds
> it does not mandate the preemptive effect of *Buckman* under the facts of this case,
> where no "fraud-upon-the-FDA" claims are statutorily mandated, or plead, and no
> related affirmative defenses will be litigated. Therefore, as Dr. Kessler's evidence
> and opinion are not as a matter of law precluded and clearly have relevance to issues
> which will be litigated—i.e. "what Takeda knew or should, with the exercise of
> reasonable care known" as to "all potential dangers" of Actos, within the relevant
> time frame, as well as to Takeda's specific knowledge or credibility, the Defendants'
> argument Dr. Kessler should be wholly precluded from testifying, as a legal issue,
> is unpersuasive and, therefore, OVERRULED.[99]

---

[98]*Tylenol,* 2016 WL 1569719 at *5-7.

[99]*Actos,* 2014 WL 120973 at *6, Exhibit 6; s*ee also, Allergan*, *supra,* n. 1 (permitting Dr. Kessler to testify
as to "the law governing FDA regulations, Allergan's compliance with those regulations, and the
relationship between FDA regulations and state tort liability.") (Exhibit 4); *C.R. Bard,* 948 F. Supp. 2d at
629-30 (notwithstanding Defendants' citation in their brief the court rejected the *Buckman* defense and
explicitly held that Dr. Kessler was permitted to testify, in a failure-to-warn case, that the Defendant "did
not disclose certain information to the FDA that Dr. Kessler, a former Commissioner of the FDA, would
have found pertinent.").

As fraud on the FDA is not a cause of action pleaded or being pursued in any case filed in these MDL proceedings, the admissibility of Dr. Kessler's testimony regarding the Defendants' regulatory reporting failures is not barred by *Buckman*.

**VII.   Dr. Kessler's Opinion That Information From Laboratory Tests Is Useful In Identifying Patients At An Increased Risk Of Bleeding From Xarelto Is Proper.**

Defendants criticize Dr. Kessler for opining on information that would be helpful to prescribing physicians based on this reference to the testimony of bellwether plaintiffs' treating physicians.[100] Because Dr. Kessler is the former FDA Commissioner and a physician who has prescribed anticoagulants[101] and has ordered PT testing for patients, the Court should reject this meritless argument.

To begin, Dr. Kessler does not solely rely on the testimony of the four bellwether physicians as Defendants erroneously assert. Dr. Kessler states in his Report that his opinion is "based <u>in part on the above testimony</u>."[102] His opinions are based on his extensive review of clinical trial data demonstrating that there is:  1) variability in drug plasma concentration levels in patients taking Xarelto;[103] 2) a relationship between Xarelto plasma concentration and levels of PT;[104] and 3) a relationship between Neoplastin PT levels and the risk of bleeding.[105]

*Second*, the fact that the Defendants attempt to disqualify Dr. Kessler from testifying because he provides concrete examples from physicians who treated the bellwether plaintiffs is on

---

[100]*Id.* at 260:15-260:20.

[101]Exhibit 10, Kessler dep. at 82:7-82:21.

[102]Exhibit 1, Kessler Report, para. 20.

[103]Exhibit 1, Kessler Report, paras. 19-22.

[104]Exhibit 1, Kessler Report, paras. 23-29.

[105]*Id.*

26

its face absurd. There is no doubt that had those same treating physicians testified that that Neoplastin PT testing would not have been useful, the Defendants would have touted that testimony and excoriated Dr. Kessler with it.

*Third,* an average juror is not in a position to "adeptly assess" the regulatory requirements under 21 CFR § 201.57 which require manufacturers to: "identify any laboratory tests helpful in following the patient's response or in identifying possible adverse reactions." Nor is the average jury a physician, like Dr. Kessler or the four bellwether treating physicians, able to "adeptly assess" why PT testing is useful due to the variability of a Xarelto's plasma concentration; the linear relationship between Xarelto's plasma concentration and PT and the relationship between PT levels and the risk of bleeding. Thus, contrary to the Defendants' argument such testimony is helpful to the jury under Rule 702 (a).[106]

---

[106]*Alexie*, 2014 WL 5603386 at *2.

## CONCLUSION

For the reasons stated above, the Plaintiffs respectfully request that the Court deny to Defendants' *Motion In Limine to Exclude Certain Opinions of David A. Kessler, M.D., Under Federal Rule of Evidence 702*.

Respectfully submitted,

Dated:  February 27, 2017

*/s/ Leonard A. Davis*
Leonard A. Davis, Esq. (Bar No. 14190)
**HERMAN, HERMAN & KATZ, LLC**
820 O'Keefe Avenue
New Orleans, LA  70113
PH: (504) 581-4892
FAX: (504) 561-6024
Email:  ldavis@hhklawfirm.com

Gerald E. Meunier (Bar No. 9471)
**GAINSBURGH BENJAMIN DAVID MEUNIER
& WARSHAUER, LLC**
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA  70163-2800
PH: (504) 522-2304
FAX: (504) 528-9973
Email:  gmeunier@gainsben.com

**Plaintiffs' Liaison Counsel**

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on February 27, 2017, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre-Trial Order No. 17.

*/s/ Leonard A. Davis*
**LEONARD A. DAVIS**

29