# EXHIBIT-2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

*********************************************************************

IN RE:  VIOXX PRODUCTS           MDL NO. 1657
LIABILITY LITIGATION           SECTION: "L"
                                 NEW ORLEANS, LOUISIANA
                                 MONDAY, APRIL 12, 2010

*********************************************************************

THIS DOCUMENT RELATES TO:

STATE OF LOUISIANA, EX REL
JAMES D. CALDWELL, JR.,
ATTORNEY GENERAL

       VERSUS

MERCK

CASE NO. 05-CV-3700

*********************************************************************

TRANSCRIPT OF TRIAL PROCEEDINGS
HEARD BEFORE THE HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE
DAY 1, MORNING SESSION


APPEARANCES:


FOR THE LOUISIANA DEPARTMENT
OF HEALTH AND HOSPITALS:

                         DUGAN LAW FIRM
                         BY:  JAMES R. DUGAN, II, ESQ.
                             DAVID FRANCO, ESQ.
                         650 POYDRAS ST., SUITE 2150
                         NEW ORLEANS, LA 70130

                         MURRAY LAW FIRM
                         BY:  STEPHEN B. MURRAY, JR., ESQ.
                             DOUGLAS R. PLYMALE, ESQ.
                             JUSTIN BLOOM, ESQ.
                         650 POYDRAS ST., SUITE 1100
                         NEW ORLEANS, LA 70130

1   BELIEVE THE COURT WILL RENDER A JUDGMENT FOR MERCK.

2           THANK YOU, YOUR HONOR.

3           THE COURT:  THANK YOU, COUNSEL.  ALL RIGHT.  DO YOU ALL

4   NEED A MOMENT TO GET YOUR WITNESSES OR CAN WE GO?

5           MR. DUGAN:  CAN WE HAVE FIVE MINUTES, YOUR HONOR?

6           MR. MURRAY:  BEFORE WE BREAK, YOUR HONOR.

7           THE COURT:  WE'LL TAKE A FIVE-MINUTE BREAK.

8           THE DEPUTY CLERK:  EVERYONE RISE.

9           MR. MURRAY:  YOUR HONOR, I'M SORRY, BEFORE WE DEPART.  AT

10  THIS POINT THE PLAINTIFFS WOULD MOVE THAT YOUR HONOR REVISIT THE

11  RULING WITH RESPECT TO DR. VINCENT CULOTTA AND OTHER MEMBERS OF THE

12  P&T COMMITTEE.  I BELIEVE COUNSEL HAS JUST OPENED THE DOOR WITH

13  RESPECT TO THOSE ISSUES, HE IS SAYING THAT THERE IS NO LOUISIANA

14  DOCTOR WHO WILL TESTIFY THAT THEY WERE MISLED AND NO DOCTOR FROM

15  LDHH THAT WILL TESTIFY THAT THEY WERE MISLED.  I THINK HE'S OPENED

16  THE DOOR WIDE OPEN, YOUR HONOR.

17          MR. ISMAIL:  YOUR HONOR, IF THERE IS GOING TO BE NO

18  PROOF, THAT DOESN'T OPEN THE DOOR.

19          THE COURT:  I AGREE.  I'LL DENY THE MOTION.

20          MR. ISMAIL:  THANK YOU.

21      (WHEREUPON, A RECESS WAS TAKEN.)

22      (OPEN COURT.)

23          THE COURT:  BE SEATED, PLEASE.  CALL YOUR FIRST WITNESS.

24          MR. DUGAN:  THE STATE CALLS AS ITS FIRST WITNESS

25  DR. DAVID KESSLER.

Page 43

1          THE COURT:  COME FORWARD, DR. KESSLER, PLEASE.

2          THE DEPUTY CLERK:  PLEASE STEP INTO THE WITNESS BOX.

3  DOCTOR, PLEASE RAISE YOUR RIGHT HAND.

4      (WHEREUPON, DAVID A. KESSLER, WAS SWORN IN AND TESTIFIED AS

5      FOLLOWS:)

6          THE DEPUTY CLERK:  PLEASE BE SEATED AND WOULD YOU STATE

7  YOUR NAME FOR THE RECORD.

8          THE WITNESS:  DAVID AARON KESSLER.

9          THE COURT:  WOULD YOU SPELL THE LAST NAME.

10          THE WITNESS:  K-E-S-S-L-E-R.

11          THE DEPUTY CLERK:  THANK YOU.

12          THE COURT:  YOU MAY PROCEED, COUNSEL.

13          MR. DUGAN:  YOUR HONOR, MAY I APPROACH THE WITNESS?

14          THE COURT:  YES.

15          MR. DUGAN:  YOUR HONOR, WHAT I'VE HANDED DR. KESSLER IS A

16  BINDER OF EXHIBITS THAT WILL BE DISCUSSED TODAY, AND I'VE GIVEN

17  YOUR HONOR A COPY, WHICH I SEE THAT YOU HAVE.

18          THE COURT:  RIGHT.

19          MR. DUGAN:  AND KATIE, AND ALSO HAVE BEEN PROVIDED TO THE

20  DEFENDANTS.

21                      VOIR DIRE EXAMINATION

22  BY MR. DUGAN:

23  Q.  MAY IT PLEASE THE COURT, MY NAME IS JAMES DUGAN, AND I AM GOING

24  TO BE ASKING YOU QUESTIONS OBVIOUSLY HERE TODAY, DR. KESSLER.

25          COULD YOU PLEASE TELL THE COURT, HAVE YOU SERVED AS

1    COMMISSIONER OF THE UNITED STATES FOOD & DRUG ADMINISTRATION OR THE

2    FDA?

3    A.  YES, I DID.

4    Q.  AND WHEN DID YOU SERVE IN THAT POSITION?

5    A.  FROM 1990 TO 1997.

6    Q.  AND WHO APPOINTED YOU AND WHAT WAS THE PROCESS?

7    A.  I WAS APPOINTED BY PRESIDENT GEORGE H.W. BUSH, I WAS

8    RE-APPOINTED BY PRESIDENT BILL CLINTON; AND IT WAS A PROCESS THAT

9    REQUIRED CONFIRMATION BY THE SENATE.

10   Q.  IN THAT POSITION WHAT WERE YOUR RESPONSIBILITIES?

11   A.  ENFORCEMENT OF THE FEDERAL FOOD, DRUG AND COSMETIC ACT ENACTED

12   IN 1906 AND THEN MANY TIMES THEREAFTER.

13   Q.  AND WHAT IS YOUR CURRENT EMPLOYMENT?

14   A.  I AM CURRENTLY A PROFESSOR OF PEDIATRICS EPIDEMIOLOGY

15   BIOSTATISTICS AT THE UNIVERSITY OF CALIFORNIA, SAN FRANCISCO SCHOOL

16   OF MEDICINE.

17   Q.  AND HAVE YOU LECTURED IN MEDICAL SCHOOL?

18   A.  YES, I'VE LECTURED IN A NUMBER OF MEDICAL SCHOOLS AND

19   UNIVERSITIES.

20   Q.  ON WHAT SUBJECTS?

21   A.  RANGE OF SUBJECTS, CERTAINLY ON THE REGULATION OF FOODS, DRUGS,

22   MEDICAL DEVICES, PUBLIC HEALTH ISSUES GENERALLY.

23   Q.  ARE YOU A LICENSED PHYSICIAN?

24   A.  I AM, I'M BOARD CERTIFIED PEDIATRICIAN.

25   Q.  WHEN AND WHERE DID YOU GET YOUR MEDICAL DEGREE?

1    A.  I GOT MY MEDICAL DEGREE FROM HARVARD MEDICAL SCHOOL, ENTERED

2    1973 AND GRADUATED 1979.

3    Q.  AND WHAT POSITIONS DID YOU HOLD AFTER MEDICAL SCHOOL?

4    A.  DID MY RESIDENCY, INTERNSHIP AND RESIDENCY AT JOHNS HOPKINS

5    HOSPITAL, I SERVED ON THE HEALTH STAFF IN THE SENATE LABOR AND

6    HUMAN RESOURCES COMMITTEE DOING FDA OVERSIGHT AND LEGISLATIVE

7    ACTIVITIES WITH REGARD TO THE AGENCY.  I WAS MEDICAL DIRECTOR OF

8    THE HOSPITAL, THE ALBERT EINSTEIN COLLEGE OF MEDICINE, I MENTIONED

9    FDA COMMISSIONER, I BECAME DEAN AT YALE MEDICAL SCHOOL, DEAN AND

10   VICE-CHANCELLOR AT THE UNIVERSITY OF CALIFORNIA SAN FRANCISCO

11   MEDICAL SCHOOL AND CURRENTLY PROFESSOR.

12   Q.  THANK YOU.  WHAT IS PHARMACOEPIDEMIOLOGY?

13   A.  PHARMACOEPIDEMIOLOGY IS THIS STUDY OF DRUGS IN POPULATIONS AND

14   THE METHODS ONE USES TO STUDY THE EFFECTS OF DRUGS ON POPULATIONS,

15   CONCERNED A GOOD DEAL WITH UNDERSTANDING NOT ONLY THE BENEFITS OF

16   DRUGS BUT THE ADVERSE EFFECTS OF DRUGS.  SO IT STUDIES ADVERSE

17   REACTIONS TO DRUGS.

18   Q.  DO YOU HAVE ANY SPECIAL TRAINING IN THAT FIELD?

19   A.  I DO.  I STUDIED THAT AT HOPKINS.

20   Q.  DO YOU HAVE A LAW DEGREE AS WELL?

21   A.  I DO HAVE A LAW DEGREE.

22   Q.  WHEN AND WHERE DID YOU GET THAT DEGREE?

23   A.  I GOT THAT DEGREE FROM THE UNIVERSITY OF CHICAGO LAW SCHOOL, I

24   GRADUATED IN 1978.  FOR THE RECORD, I AM NOT A MEMBER OF A BAR.

25   Q.  HAVE YOU TAUGHT CLASSES IN FOOD AND DRUG LAW?

1    A.  I HAVE.  I TAUGHT AT COLUMBIA LAW SCHOOL, I CO-TAUGHT FOR ABOUT

2    FIVE YEARS FOOD AND DRUG LAW AT THE COLUMBIA LAW SCHOOL, COLUMBIA

3    UNIVERSITY LAW SCHOOL.

4    Q.  HAVE YOU TESTIFIED BEFORE THE U.S. CONGRESS ON MATTERS RELATING

5    TO THE RESPONSIBILITIES OF DRUG MANUFACTURERS?

6    A.  I HAVE, SIR.

7    Q.  ON DRUG SAFETY?

8    A.  YES, SIR.

9    Q.  ON ABOUT HOW MANY OCCASIONS?

10   A.  MORE THAN I CAN REMEMBER.  THE COMMISSIONER OF FDA IS

11   CONSTANTLY HAULED UP BEFORE THE CONGRESS, SO ON NUMEROUS OCCASIONS.

12   Q.  HAVE YOU AUTHORED ANY SCHOLARLY WORKS ON THE SUBJECT OF THE

13   STANDARDS OF CARE THAT APPLY TO DRUG COMPANIES?

14   A.  I HAVE.

15   Q.  AND CAN YOU IDENTIFY THOSE FOR THE COURT?

16   A.  MOST RECENTLY I CO-AUTHORED AN ARTICLE WITH THEN PROFESSOR

17   DAVID VLADECK, HE IS CURRENTLY HEAD OF THE BUREAU OF CONSUMER

18   PROTECTION AT THE FTC.  THAT ARTICLE DEALT WITH THE

19   RESPONSIBILITIES OF A DRUG COMPANIES UNDER BOTH FEDERAL AND STATE

20   CONSUMER PROTECTION LAWS, SPECIFICALLY LOOKING AT THE QUESTION OF

21   PREEMPTION.

22   Q.  WAS THAT ARTICLE CITED IN ANY JUDICIAL OPINIONS?

23   A.  IT HAS BEEN.

24   Q.  AND WHAT CASE IS THAT, SIR?

25   A.  WYETH V. LEVINE, I THINK WE MADE IT INTO A FOOTNOTE INTO THE

1    SUPREME COURT DECISION.

2    Q.   THANK YOU.   IS THE STATEMENT A DRUG COMPANY'S RESPONSIBILITIES

3    YOU DESCRIBED IN YOUR ARTICLE CONSISTENT WITH THE SUPREME COURT'S

4    VIEW OF DRUG COMPANY'S RESPONSIBILITIES REGARDING BOTH STATE AND

5    FEDERAL STANDARDS?

6              MR. ISMAIL:   OBJECTION, YOUR HONOR.

7              THE COURT:   YES.   ARE YOU GOING TO QUALIFY HIM?   ARE YOU

8    GOING TO TENDER HIM AS AN EXPERT OR NOT?   WHERE ARE WE GOING?

9              MR. DUGAN:   YES, I AM, YOUR HONOR.

10             THE COURT:   LET'S JUST GO WITH HIS QUALIFICATIONS FIRST.

11             MR. DUGAN:   OKAY.

12   BY MR. DUGAN:

13   Q.   DO YOU HAVE EXPERIENCE ADVISING COMPANIES ABOUT THE

14   RESPONSIBILITIES UNDER FEDERAL AND STATE CONSUMER PROTECTION

15   STANDARDS?

16   A.   YES.   I WAS A SENIOR ADVISOR TO TPG, FORMERLY KNOWN AS TEXAS

17   PACIFIC GROUP, IT'S A PRIVATE EQUITY FIRM THAT OWNS PHARMACEUTICAL

18   COMPANIES.   I AM ON A BOARD OF A PHARMACEUTICAL COMPANY THAT IS

19   DEVELOPING A DRUG FOR PROSTATE CANCER, SO IN THOSE ROLES AND IN

20   OTHER INSTANCES I'VE HAD THE OPPORTUNITY TO ADVISE COMPANIES ON

21   THEIR RESPONSIBILITIES UNDER BOTH FEDERAL AND STATE CONSUMER

22   PROTECTION LAWS.

23   Q.   THANK YOU.   DR. KESSLER, ARE YOU AN EXPERT ON THE SUBJECTS OF

24   THE STANDARDS OF CARE THAT APPLY TO DRUG COMPANIES?

25   A.   I BELIEVE SO, YES.

1    Q.  AND DOES YOUR EXPERTISE APPLY TO THE STANDARDS FOR NEW DRUG

2    DEVELOPMENT?

3    A.  YES.  I'VE PUBLISHED IN THAT AREA.

4    Q.  IN THE MARKETING AND PROMOTION OF PHARMACEUTICALS?

5    A.  YES, I'VE PUBLISHED IN THAT AREA, TOO.

6    Q.  DRUG SAFETY?

7    A.  YES.

8    Q.  DUTY TO WARN OF RISKS?

9    A.  YES.

10   Q.  DUTY TO INVESTIGATE POTENTIAL RISKS?

11   A.  YES.

12          MR. DUGAN:  AT THIS TIME, YOUR HONOR, I WOULD LIKE TO

13   TENDER DR. KESSLER AS AN EXPERT IN STANDARDS OF CARE, NEW DRUG

14   DEVELOPMENT, MARKETING AND PROMOTION OF PHARMACEUTICALS, DRUG

15   SAFETY, DUTY TO WARN OF RISKS AND DUTY TO INVESTIGATE POTENTIAL

16   RISKS.

17          MR. ISMAIL:  YOUR HONOR, AS TO THE VARIOUS SUBJECTS,

18   POTENTIAL I HAVE AN OBJECTION, WE'LL SEE HOW IT GOES, AS TO DUTY TO

19   WARN IF HE'S GOING TO GET INTO LIKE HE JUST TRIED WITH SUPREME

20   COURT OPINIONS; AND AS TO PROMOTIONAL ACTIVITIES, PERHAPS WE'LL

21   HAVE TO SEE HOW THAT DEVELOPS AS WELL.

22          THE COURT:  OKAY.  I'LL ACCEPT HIM AS AN EXPERT IN THE

23   STANDARD OF CARE AND WE'LL TAKE IT A STEP AT A TIME.  BUT I WILL

24   ACCEPT HIM AND ALLOW HIM TO TESTIFY.  THANK YOU.

25          MR. DUGAN:  THANK YOU, YOUR HONOR.  AND IN CONNECTION

1   WITH THAT, I WOULD LIKE TO IDENTIFY AND INTRODUCE AS STATE OF

2   LOUISIANA NO. 1, WHICH IS TAB NUMBER 1 IN THE BLINDER, IS THE CV OF

3   DR. KESSLER.

4            THE COURT:  ALL RIGHT.  ANY OBJECTION?

5            MR. ISMAIL:  NO OBJECTION, YOUR HONOR.

6            THE COURT:  LET IT BE ADMITTED.

7            MR. DUGAN:  AND AS A HOUSEKEEPING MEASURE, YOUR HONOR --

8            THE COURT:  JUST ONE QUESTION.  DOCTOR, YOU'VE REVIEWED

9   THIS CV AND IT'S ACCURATE?

10            THE WITNESS:  YES, YOUR HONOR.

11            THE COURT:  AND UP-TO-DATE?

12            THE WITNESS:  NOT QUITE.  SOME OF THESE ARE MORE OF A

13   LIVING DOCUMENT.

14            THE COURT:  WHAT YOU'RE SAYING IS THAT THERE ARE MORE

15   THINGS ON IT, BUT WHAT'S ON IT IS ACCURATE?

16            THE WITNESS:  YES, I BELIEVE SO.

17            THE COURT:  LET IT BE ADMITTED.

18            MR. DUGAN:  THANK YOU, YOUR HONOR.  AND THE WAY THAT I AM

19   GOING THROUGH THESE EXHIBIT IS, AS YOUR HONOR KNOWS, WE PREVIOUSLY

20   SUBMITTED A PLAINTIFF'S EXHIBIT LIST WHICH HAS VARIOUS NUMBERS ON

21   IT.  AND SO I WOULD LIKE TO -- MOST OF THESE DOCUMENTS HAVE THOSE

22   NUMBERS ON.  BUT AS I WOULD LIKE TO GO ALONG, WE'LL MARK THEM AS

23   THE COURT HAS INSTRUCTED IN THE ORDER IN WHICH THEY'RE PRESENTED

24   AND PUT IN.  IS THAT OKAY, YOUR HONOR?

25            THE COURT:  YES, THAT'S FINE.

Page 50

1          MR. DUGAN:  OKAY.

2                    DIRECT EXAMINATION

3     BY MR. DUGAN:

4     Q.  DR. KESSLER, WERE YOU ASKED TO REVIEW DOCUMENTS AND PROVIDE

5     OPINIONS REGARDING THE CASE OF THE STATE OF LOUISIANA REGARDING

6     VIOXX?

7     A.  YES, I WAS.

8     Q.  AND WHEN WAS THAT, SIR?

9     A.  SOMETIME LAST YEAR I BELIEVE.

10    Q.  THANK YOU.  BEFORE THAT DID YOU HAVE SOME FAMILIARITY WITH THE

11    VIOXX CASE?

12    A.  YES.

13    Q.  AND WHAT WAS THAT FAMILIARITY?

14    A.  I THINK, YOU KNOW, AS ANY PHYSICIAN, CITIZEN I READ WHAT WAS

15    CERTAINLY IN THE PRESS, IN THE LAW REVIEW ARTICLE THAT WE DISCUSSED

16    MY COLLEAGUE AND I CITED VIOXX AS AN EXAMPLE A NUMBER OF TIMES IN

17    THAT LAW REVIEW.

18    Q.  HAVE YOU ALSO REVIEWED DOCUMENTS THAT YOU RECEIVED FROM THE

19    ATTORNEYS IN THIS CASE?

20    A.  I HAVE.

21    Q.  AND CAN YOU DESCRIBE THE SOURCES OF THOSE DOCUMENTS?

22    A.  THOSE INCLUDED MERCK DOCUMENTS, FDA DOCUMENTS, SCIENTIFIC

23    ARTICLES, SOME EXPERT REPORTS, IN GENERAL STATUTES, REGULATIONS, ET

24    CETERA.

25    Q.  DID THOSE DOCUMENTS PROVIDE INFORMATION ABOUT THE COMPANY'S

1   POSITION ON SUBJECTS RELATING TO THE CASE?

2   A.  IT WAS DOCUMENTS CERTAINLY INCLUDED INFORMATION THAT RELATED TO

3   POSITIONS IN THIS CASE.

4   Q.  AND CAN YOU DESCRIBE FOR THE COURT WHAT YOUR SPECIFIC

5   ASSIGNMENT WAS IN THIS CASE?

6   A.  MY ASSIGNMENT WAS TO REVIEW THOSE DOCUMENTS AND FORM CERTAIN

7   EXPERT OPINIONS ABOUT MERCK'S ACTIONS IN DEVELOPING AND MARKETING

8   VIOXX AS RELATED TO STANDARDS OF CARE THAT RELATE TO THE STATE OF

9   LOUISIANA.

10  Q.  THANK YOU.  AND CAN YOU TELL THE COURT WHAT THE BASIC

11  RESPONSIBILITY OF THE PURVEYOR OF A DRUG IN ITS SIMPLEST TERMS?

12  A.  IT IS A FUNDAMENTAL PREMISE FOR THE LAST ALMOST HUNDRED YEARS

13  THAT IT IS THE PURVEYOR OF A DRUG THAT HAS RESPONSIBILITY TO ASSURE

14  THE SAFETY AND EFFICACY OF ANY DRUG THAT IT SELLS.  THE

15  RESPONSIBILITY TO INVESTIGATE, TO STUDY, TO WARN, THAT

16  RESPONSIBILITY FALLS ON THE PURVEYOR OF THE PRODUCT.

17  Q.  CAN YOU TELL THE COURT IF THERE'S A DIFFERENCE BETWEEN WHAT THE

18  FDA KNOWS ABOUT A DRUG AND WHAT THE COMPANY KNOWS ABOUT THE DRUG?

19  A.  THERE IS.  FDA -- I MEAN, SOMETIMES I'LL REFER TO THE COMPANY

20  AS THE MANUFACTURER OR THE SPONSOR OR THE PURVEYOR.

21          A MANUFACTURER ALWAYS HAS SUPERIOR KNOWLEDGE ABOUT ITS

22  PRODUCT COMPARED TO FDA.  IT WILL HAVE INFORMATION SOONER, FOR

23  EXAMPLE, ABOUT ADVERSE REACTIONS.  IT WILL HAVE INFORMATION THAT

24  RELATES TO CERTAIN IMPRESSIONS, CERTAIN DISCUSSIONS THAT IT'S HAD

25  WITH ITS SCIENTISTS, ITS CONSULTANTS ABOUT THE DRUG.  FDA REQUESTS

Page 52

1    UNDER THE STATUTE AND THE REGULATIONS THE DATA ABOUT A DRUG.  SO IT

2    REQUESTS THE DATA OF CLINICAL TRIALS, OF PRECLINICAL TRIALS OF

3    ANALYSES OF THOSE, BUT THE COMPANY IS IN A SUPERIOR POSITION TO

4    KNOW ABOUT A DRUG, AND THAT'S WHY THE RESPONSIBILITY UNDER THE LAW

5    RESTS WITH THE MANUFACTURER.

6    Q.  AND WHAT ARE THE SOURCES OF THE COMPANY'S DUTY TO INVESTIGATE

7    POTENTIAL RISKS?

8    A.  THAT DUTY TO INVESTIGATE FLOWS FROM THE GENERAL REQUIREMENTS TO

9    ASSURE THE SAFETY AND EFFICACY OF DRUGS UNDER FEDERAL LAW AND UNDER

10   THE DUTY TO WARN UNDER STATE CONSUMER PROTECTION LAWS.

11   Q.  DO ANY FDA REGULATIONS CONCERN THE DUTY TO WARN?

12   A.  YES, THEY DO.

13   Q.  I WILL TURN YOU TO TAB 2 IN YOUR BINDER.

14   A.  YES, SIR.

15   Q.  IS THIS THE REGULATION THAT YOU WERE REFERRING TO?

16   A.  YES.  YES, SIR.

17   Q.  AND CAN YOU PLEASE READ THAT REGULATION INTO THE RECORD, THE

18   ONE YOU'RE REFERRING TO?

19   A.  WELL, IF I MAY, CITE THE COURT'S ATTENTION TO A PARTICULAR

20   PAGE, THAT REGULATION IS A NUMBER OF PAGES.  BUT IF I CAN KINDLY

21   REQUEST THE COURT TO TURN TO PAGE 29 OF 21 CFR 201.57.  AND REALLY

22   THE FIRST EXISTING PARAGRAPH ON THAT PAGE, I THINK IT'S THE FIRST

23   FULL SENTENCE, THE REGULATION STATES:  "IN ACCORDANCE WITH CERTAIN

24   OTHER SECTIONS 314.70 AND 601.12 OF THIS CHAPTER, THE LABELLING --"

25   AND THAT'S A TERM OF ART, LABEL AND LABELLING -- "THE LABELLING

Page 53

1    MUST BE REVISED TO INCLUDE A WARNING ABOUT A CLINICALLY SIGNIFICANT

2    HAZARD AS SOON AS THERE IS REASONABLE EVIDENCE OF A CAUSAL

3    ASSOCIATION WITH A DRUG."

4           AND IT GOES ON.  IT SAYS:  "A CAUSAL RELATIONSHIP NEED

5    NOT HAVE BEEN DEFINITIVELY ESTABLISHED."  THAT'S AN EXCERPT FROM

6    WHAT SOME OF THE REQUIREMENTS THAT ARE IMPOSED ON A MANUFACTURER.

7    Q.  THANK YOU.  DOES A DRUG COMPANY HAVE TO WAIT FOR FDA APPROVAL

8    TO WARN OF A HAZARD ASSOCIATED WITH ONE OF ITS DRUGS?

9    A.  NO.  A COMPANY, WHEN IT COMES TO WARNING, WARNING ON THE SAFETY

10   SIDE, OBVIOUSLY A COMPANY SHOULD NOTIFY THE FDA WHEN IT IS DOING

11   THAT, BUT THAT HAS BEEN CERTAINLY THE POLICY WHEN I WAS AT THE FDA,

12   IT'S IN THE REGULATIONS, AND IT'S BEEN UPHELD AS WHAT IS REQUIRED

13   FOR WARNINGS ABOUT SAFETY.

14          A COMPANY CANNOT GO AHEAD AND MAKE CLAIMS ABOUT ITS

15   BENEFITS ON THE EFFICACY SIDE.  BUT WHEN IT COMES TO A SAFETY

16   PROBLEM, YOU DON'T HAVE TO WAIT FOR FDA -- TO NOTIFY THE FDA OF

17   COURSE -- BUT A MANUFACTURER CERTAINLY CAN CONSISTENT WITH THIS

18   DUTY TO WARN CAN MAKE THOSE WARNINGS AND NOT BE IN VIOLATION OF ANY

19   FEDERAL LAW.

20   Q.  AND IS THERE A REGULATION THAT SPECIFICALLY PERMITS A COMPANY

21   TO DO THAT?

22   A.  YES, SIR.  IT'S GENERALLY REFERRED TO I THINK AS CHANGES BEING

23   AFFECTED.

24   Q.  DR. KESSLER, I WOULD ASK YOU TO TAKE A LOOK AT TAB NUMBER 3 IN

25   YOUR BINDER, PLEASE.

1    A.  YES, SIR.

2              THE COURT:  ARE YOU INTRODUCING SOME OF THIS?

3              MR. DUGAN:  THEY'RE REGULATIONS, YOUR HONOR.

4              THE COURT:  ALL RIGHT.  OKAY.

5    BY MR. DUGAN:

6    Q.  DR. KESSLER, IS THIS A REGULATION THAT YOU'RE REFERRING TO?

7    A.  YES, YES, SIR.

8    Q.  AND CAN YOU TELL THE COURT ABOUT THIS REGULATION?

9    A.  SO THIS IS ONE OF THOSE REGULATIONS WHERE YOU HAVE TO, THERE IS

10   A LOT OF INTERSPERSED MATERIAL.  BUT IF YOU GO TO PAGE, LET'S SEE.

11   LET ME JUST GET IT.  YEAH, IF YOU GO KINDLY TO PAGE 114.  AND YOU

12   GO TO 11 -- 114 AND YOU GO TO ON THE RIGHT-HAND COLUMN LITTLE 3A,

13   AND AGAIN YOU HAVE TO TRACE IT BACK TO WHAT APPLIES, BUT THIS IS

14   BASICALLY THE EXCEPTION THAT ALLOWS A COMPANY UNDER LITTLE 3A, "TO

15   ADD OR STRENGTHEN A CONTRAINDICATION, WARNING, PRECAUTION OR

16   ADVERSE REACTION FOR WHICH THE EVIDENCE OF A CAUSAL ASSOCIATION

17   SATISFIES THE STANDARD FOR INCLUSION IN THIS LABELLING UNDER A

18   CERTAIN SECTION OF THIS TAB."

19   Q.  IS IT THE RESPONSIBILITY OF A DRUG COMPANY TO INVESTIGATE

20   DEPENDENT ON ANYTHING THAT THE FDA DOES OR DOES NOT DO?

21   A.  NO.  IT IS -- THE RESPONSIBILITY RESTS WITH THE DRUG COMPANY TO

22   INVESTIGATE ANY POTENTIAL RISKS OF SAFETY, INDEPENDENT OF WHAT FDA

23   REQUIRES.

24   Q.  THANK YOU.  NOW, DR. KESSLER LET'S TALK ABOUT SOME OF THE

25   MATERIALS YOU REVIEWED IN RELATION TO THE OPINIONS THAT YOU FORMED

1   ABOUT MERCK'S CONDUCT IN THIS MATTER.

2   A.  YES, SIR.

3   Q.  DOCTOR, WHAT IS A NEW DRUG APPLICATION?

4   A.  NEW DRUG APPLICATION IS THE APPLICATION THAT A COMPANY WILL

5   SUBMIT TO THE FDA TO GIVE IT PERMISSION TO MARKET A DRUG FOR A

6   SPECIFIC INTENDED USE IN INTERSTATE COMMERCE.  SOME MDAS ARE

7   MILLIONS OF PAGES.

8   Q.  AND WHAT IS THE STANDARD APPLIED BY FDA TO DECIDE WHETHER TO

9   GRANT APPROVAL?

10  A.  THE STATUTE REQUIRES THAT THE MANUFACTURER HAS THE BURDEN OF

11  SHOWING THAT THE DRUG IS SAFE AND EFFECTIVE FOR ITS INTENDED

12  CONDITIONS OF USE BY ADEQUATE AND WELL CONTROLLED CLINICAL TRIALS.

13  Q.  AND THE STATUTE THAT YOU'RE REFERRING TO IS THE FOOD DRUG AND

14  COSMETIC ACT?

15  A.  YES, SIR.

16  Q.  HAVE YOU REVIEWED DOCUMENTS RELATING TO MERCK'S INVESTIGATIONS

17  OF VIOXX BEFORE SUBMITTING A NEW DRUG APPLICATION?

18  A.  YES, I HAVE.

19  Q.  AND ARE THERE LAWS AND REGULATIONS THAT SAY WHAT HAS TO BE

20  SUBMITTED IN AN MDA?

21  A.  YES, THAT'S SPELLED OUT IN THIS CFR.

22  Q.  DOCTOR, WHAT IS A SAFETY SIGNAL?

23  A.  A SAFETY SIGNAL IS AN INDICATION THAT THERE MAY BE A PROBLEM

24  WITH A DRUG.  IT'S A CLUE BUT IT'S WHAT WE'RE TRAINED TO DO,

25  COMPANIES ARE TRAINED TO DO THIS, THE FDA IS TRAINED TO DO THIS.

1   WHEN A DRUG IS GOING TO ULTIMATELY BE USED BY MILLIONS OF PEOPLE,

2   THOUSANDS OF PEOPLE, MILLIONS OF PEOPLE AND IT'S APPROVED, YOU'RE

3   NEVER GOING TO BE ABLE TO DEFINITIVELY DETERMINE FROM CLINICAL

4   TRIALS BECAUSE THERE ARE LIMITATIONS TO THOSE TRIALS THAT ARE DONE

5   INVESTIGATION, EVERYTHING THAT IS GOING TO HAPPEN WHEN THE DRUG IS

6   USED BY MANY MORE PEOPLE.

7           SO WHAT'S VERY IMPORTANT, AND IT REALLY IS THE KEY TO,

8   IT'S ONE OF THE MAJOR KEYS IN STUDYING DRUGS IS TO BE ABLE TO LOOK

9   AT DATA AND PREDICT BASED ON THESE CLUES, BASED ON THESE SIGNALS

10  WHAT MAY HAPPEN WHEN THE DRUG IS USED IN A LOT OF PEOPLE.

11  SOMETIMES THE ADVERSE REACTION IS RARE, SO IF YOU STUDY A DRUG IN X

12  NUMBER OF PATIENTS IN A STUDY, IT WON'T SHOW UP UNTIL YOU USE IT IN

13  MANY MORE PEOPLE BECAUSE THE RATE THAT THAT ADVERSE REACTION IS

14  SUCH THAT YOU CAN'T DETECT IT, THERE'S NOT ENOUGH POWER IN THOSE

15  CLINICAL TRIALS.

16          SOMETIMES YOU'RE DEALING WITH AN EVENT THAT'S VERY HARD

17  TO DETERMINE, A COMMON EVENT OR RELATIVELY COMMON EVENT, ALL RIGHT,

18  THAT YOU SEE IN THE POPULATION.  SO TO BE ABLE TO TELL WHETHER A

19  DRUG CAUSES THAT, YOU NEED A GREAT DEAL OF POWER IN THOSE STUDIES.

20          SO WHAT A SIGNAL IS IS LOOKING FOR CLUES, SOMEWHAT LIKE A

21  DETECTIVE.  THEY'RE NOT DEFINITIVE, THEY'RE NOT NECESSARILY

22  STATISTICALLY SIGNIFICANT, BUT IT'S BEING ABLE TO PREDICT OR THINK

23  ABOUT, IDENTIFY THOSE SIGNALS AND THEN FOLLOW-UP ON THOSE SIGNALS,

24  ULTIMATELY TO PREVENT HARM.

25  Q.  AND WHAT IS THE COMPANY'S RESPONSIBILITY IN REGARD TO THOSE

1    SAFETY SIGNALS?

2    A.   SO ONCE YOU SEE A SIGNAL, THE GOAL IS TO INVESTIGATE THAT

3    SIGNAL AND INVESTIGATE THAT SIGNAL THOROUGHLY.

4    Q.   AND DID MERCK CONDUCT CLINICAL TRIALS OF VIOXX BEFORE THE DRUG

5    WAS MARKETED?

6    A.   YES, IT DID.

7    Q.   AND WERE THOSE TRIALS SUBMITTED TO THE FDA?

8    A.   YES.

9    Q.   AND DID YOU REVIEW THE RESULTS OF ANY OF THOSE TRIALS?

10   A.   SOME OF THOSE TRIALS I DID, YES.

11   Q.   DOCTOR, WHAT WAS PROTOCOL 017?

12   A.   PROTOCOL 017 WAS ONE OF THOSE TRIALS THAT WAS DONE BY MERCK TO

13   STUDY VIOXX IN RHEUMATOID ARTHRITIS, PRIMARILY A SAFETY STUDY BUT

14   ALSO SOME PRELIMINARY EFFICACY, IF MY MEMORY SERVES ME CORRECT.

15   Q.   AND DID YOU REVIEW ANY DATA FROM PROTOCOL 017?

16   A.   I DID.

17   Q.   DR. KESSLER, I'D ASK THAT YOU TURN TO TAB NUMBER 4 IN YOUR

18   BINDER, PLEASE, SIR.

19   A.   YES.  YES, SIR.

20   Q.   AND CAN YOU PLEASE TURN TO THE PAGE ENDING IN 7368.

21   A.   IF I MAY JUST TURN MY BINDER.  YES, SIR.

22   Q.   IS THIS THE TABLE THAT YOU REVIEWED?

23   A.   IT'S CERTAINLY ONE OF THEM.

24   Q.   AND WHAT DID YOU NOTICE ABOUT THAT TABLE?

25   A.   SO THIS IS A TABLE THAT IS PART OF THE SAFETY SUMMARY, AND THIS

1    HAS, AS YOU CAN SEE FROM THE TOP HEADING, MERCK'S DRUG VIOXX

2    MK-0966 AS IT WAS KNOWN THEN, AND THIS IS SAFETY EXPERIENCE FROM,

3    AS I SAID EARLIER, IN RHEUMATOID ARTHRITIS.  AND YOU CAN SEE FROM

4    THE STUDY NUMBERS WHICH ONES WERE 017 IN THE SECOND COLUMN.  AND

5    YOU CAN SEE ON PATIENTS ON ASSIGNED THERAPY, ON VIOXX, YOU CAN SEE

6    THE SAFETY EXPERIENCE.

7            SO THESE ARE NON-FATAL, THE TITLE IS NON-FATAL SERIOUS

8    CLINICAL ADVERSE EXPERIENCES IN THE RHEUMATOID ARTHRITIS STUDIES,

9    ONE SUBSET OF STUDIES THAT MERCK DID.  AND YOU CAN SEE THE NUMBER

10   OF PATIENTS AND WHO RECEIVED TREATMENT AND THEN WHO COMPARED PEOPLE

11   WHO RECEIVED PLACEBO.

12   Q.   THANK YOU.  ARE THE CONDITIONS OF UNSTABLE ANGINA, PULMONARY

13   EMBOLISM, AND MYOCARDIAL INFARCTION RELATED IN SOME WAY?

14   A.   YES.  SO WHAT I THINK YOU'RE -- COUNSELOR, IF YOU LOOK IN

15   THE -- AND THE ANSWER IS YES, THEY'RE ALL ASSOCIATED WITH

16   THROMBOTIC, IN ESSENCE, CLOTTING MECHANISMS, THEY BELIEVE TOO.  SO

17   IF YOU LOOK IN THOSE PATIENTS THAT RECEIVED THE DRUG, YOU'LL SEE

18   THREE PATIENTS, FOR PATIENTS IN 017, ONE THAT SAYS ACUTE MYOCARDIAL

19   INFARCTION, HEART ATTACK, UNSTABLE ANGINA; ALSO A CARDIAC

20   CONDITION; AND A PULMONARY EMBOLISM WHICH IS A CLOT TO THE LUNGS,

21   ALL HAVE A MECHANISM ASSOCIATED WITH A BLOOD CLOTTING,

22   ARTHROSCLEROSIS CIRCULATORY CONDITION.

23           SO YOU CAN SEE THREE CASES OF THOSE IN THAT, THOSE

24   PATIENTS WHO TOOK THE DRUG IN 017.

25   Q.   THANK YOU.  AND WHAT IS THE DOSE OF VIOXX IN THE PATIENTS WHO

1   SUFFERED THE THROMBOTIC EVENTS?

2   A.  THE DOSE WAS 125.  017 I BELIEVE HAD PATIENTS ON 125 AND 175.

3   THIS TABLE SAYS THESE PATIENTS WERE ON 125.

4   Q.  THANK YOU.  AND WAS THERE A COMPARISON GROUP IN PROTOCOL 017?

5   A.  THERE WAS.  IT WAS -- IT'S A PLACEBO GROUP LISTED ABOVE.  THEY

6   OBVIOUSLY -- THEIR PLACEBO BEING IN ESSENCE NON-DRUG, WAS NOT

7   VIOXX, COMMONLY CALLED A SUGAR PILL.

8   Q.  AND WERE THERE ANY THROMBOTIC EVENTS IN THE CONTROLLED GROUP?

9   A.  NO.  YOU CAN SEE A BASAL CELL CARCINOMA.

10          MR. DUGAN:  YOUR HONOR, AT THIS TIME I WOULD MOVE TO

11   OFFER INTO EVIDENCE AS LOUISIANA EXHIBIT NO. 2 THE DOCUMENT

12   PREVIOUSLY IDENTIFIED AS LOUISIANA EXHIBIT NO. 580.

13          THE COURT:  ALL RIGHT.

14          MR. ISMAIL:  YOUR HONOR, THIS IS A SNIPIT OF A LARGER

15   SAFETY REPORT.  SO PERHAPS THROUGH COMPLETENESS WE MAY ASK FOR MORE

16   INFORMATION BE SUBMITTED.  WE'LL GET WITH THE PLAINTIFF.

17          THE COURT:  THAT'S FINE.  I'LL DO THEM BOTH OR YOU CAN

18   PUT THEM IN.  I'LL ADMIT THE DOCUMENT IN FORM AND FASHION PLAINTIFF

19   WISHES, WITH THE EXCEPTION UNDER 106 THE DEFENDANT HAS A RIGHT TO

20   INTRODUCE THE OTHER.  LET'S GET WITH HIM.

21          THE DEPUTY CLERK:  IS THAT TWO YOU'RE PUTTING IN?

22          MR. DUGAN:  YES, THIS WILL BE LOUISIANA 2.

23          THE COURT:  OKAY.  P-2, IT'S ADMITTED.

24          MR. DUGAN:  THANK YOU, YOUR HONOR.

25   BY MR. DUGAN:

1   Q.  DR. KESSLER, DID YOU REVIEW A MERCK RESEARCH COMMITTEE DOCUMENT

2   THAT DISCUSSED THE RESULTS OF PROTOCOL 017?

3   A.  I DID.

4   Q.  I WOULD ASK YOU TO TURN TO TAB NUMBER 5 IN YOUR BOOK.

5   A.  YES, SIR.

6   Q.  IS THIS THE DOCUMENT THAT YOU REVIEWED?

7   A.  YES, SIR.

8   Q.  AND WHAT IS THE DATE OF THE DOCUMENT AT TOP OF THE FIRST PAGE?

9   A.  OCTOBER 10TH, 1996.

10  Q.  AND I WOULD ASK YOU TO TURN TO PAGE 8 OF THE DOCUMENT.

11  A.  YES, SIR.

12  Q.  IS THERE A REFERENCE TO AN UPDATE ON VIOXX OF MK-966?

13  A.  YES.

14  Q.  AND WHAT DOES IT SAY?

15  A.  WELL, THERE ARE FOUR PARAGRAPHS.  THE FIRST PARAGRAPH TALKS

16  ABOUT THE STUDY AS I MENTIONED EARLIER, AND THE SECOND PARAGRAPH

17  SAYS ADVERSE EVENTS OF MOST CONCERN WERE IN THE CARDIOVASCULAR

18  SYSTEM, E.G., MI, HEART ATTACK, UNSTABLE ANGINA, RAPID FALL IN

19  HEMOGLOBIN AND HEMATIC IN SOME SUBJECTS, ANY SMALL INCREASE IN

20  BLOOD PRESSURE.  WE PLAN TO EVALUATE MK-966 STUDY.  THE SUBJECTS

21  WERE ALSO GIVEN LOW DOSE ASPIRIN.

22  Q.  AND HOW DOES THAT COMPARE, HOW DOES THAT DOSE COMPARE TO THE

23  DOSES THAT WERE EVENTUALLY APPROVED FOR USE?

24  A.  SO 125 MILLIGRAMS IS FIVE TIMES THE DOSE THAT WAS APPROVED FOR

25  VIOXX FOR CHRONIC USE.  THE DOSE THAT WAS USED FOR CHRONIC WAS 25,

1   THIS WAS 125.  THE DOSE THAT WAS USED IN THE ACUTE SITUATION I

2   BELIEVE WAS 50 MILLIGRAMS.

3            SO THIS IS AS MUCH AS FIVE TIMES WHAT THE PATIENTS --

4   WHAT WAS RECOMMENDED IN THE LABEL.  SOME PATIENTS TAKE MORE

5   OBVIOUSLY.

6   Q.  AND, DOCTOR, WHAT IS THE IMPORTANCE OF THE RESULTS OF PROTOCOL

7   017 TO YOUR OPINIONS IN THIS CASE?

8   A.  SO IT'S A SIGNAL, IT'S NOT A DEFINITIVE BY ANY MEANS, IT IS A

9   SIGNAL THAT JUST RAISES CERTAIN FLAGS IN MY MIND THAT SHOULD BE

10  INVESTIGATED.  SO IT'S ONE PIECE OF EVIDENCE, IT'S TOO SMALL TO

11  PROVE ANYTHING, BUT IT'S A SIGNAL.

12  Q.  AND WHAT IS THE BASIS FOR YOUR OPINION IN REFERENCE TO 017?

13  A.  I SEE IN THE TREATED, IN THE PATIENTS RECEIVING DRUGS YOU SEE

14  THREE EVENTS THAT ARE, THAT HAVE AN UNDERLYING SIMILARITY OF

15  MECHANISM, AND MY OPINION OBVIOUSLY JUST READING WHAT MERCK THOUGHT

16  ABOUT THOSE EVENTS, IT REALIZED THAT ADVERSE EVENTS OF MOST CONCERN

17  WERE IN THE CARDIOVASCULAR SYSTEM.  WE STILL DON'T KNOW WHETHER

18  THOSE ARE ASSOCIATED WITH THE DRUG OR NOT AT THIS STAGE, IT'S A

19  SIGNAL, IT NEEDS TO BE INVESTIGATED.

20  Q.  THANK YOU.

21            MR. DUGAN:  AT THIS TIME, YOUR HONOR, I WOULD LIKE TO

22  ADMIT AS PLAINTIFF'S NO. 3 --

23            THE WITNESS:  CAN I JUST ADD, COUNSELOR?

24            MR. DUGAN:  YES, I'M SORRY.

25            THE WITNESS:  ONE POINT I DIDN'T STRESS.  THE USE OF A

1   HIGH DOSE, I ALSO FACTORED THAT IN, THAT'S IMPORTANT IN ASSESSING A

2   SIGNAL BECAUSE WHAT YOU WANT TO DO, AGAIN, BECAUSE YOU'RE LOOKING

3   TO SEE WHAT'S GOING TO HAPPEN WHEN A DRUG IS APPROVED, IN SOME WAYS

4   HIGH DOSES GIVE YOU -- THEY MAY BE ABLE TO STRESS THE MECHANISM A

5   LITTLE SO YOU CAN SEE SOMETHING EARLIER.  SO ESPECIALLY ON HIGH

6   DOSES, I MEAN, AGAIN, I MAY BE SEEING SOMETHING BECAUSE IT'S HIGH

7   DOSE EARLIER THAT I AM ONLY GOING TO SEE LATER WHEN I HAVE A LOT

8   MORE PEOPLE EXPOSED.

9           MR. DUGAN:  THANK YOU, DOCTOR.

10          YOUR HONOR, AT THIS TIME I WOULD LIKE TO MOVE TO ADMIT AS

11   PLAINTIFF'S NO. 3 THE PREVIOUSLY IDENTIFIED EXHIBIT LOUISIANA AG

12   NO. 18.

13          THE COURT:  ANY OBJECTION?

14          MR. ISMAIL:  OBJECTION AS TO RELEVANCE, YOUR HONOR.

15          THE COURT:  I'LL ADMIT IT AND OVERRULE THE OBJECTION.

16          MR. DUGAN:  THANK YOU.

17   BY MR. DUGAN:

18   Q.  DR. KESSLER, DID YOU REVIEW A CLINICAL STUDY REPORT THAT WAS

19   PART OF THE MDA THAT REPORTED DATA FROM A PHARMACOLOGY STUDY KNOWN

20   AS PROTOCOL 023?

21   A.  I DID.

22   Q.  AND DID YOU ALSO REVIEW A DOCUMENT THAT DISCUSSED THE RESULTS

23   OF PROTOCOL 023?

24   A.  I DID.

25   Q.  I WOULD ASK YOU, DOCTOR, TO TURN TO TAB 6 IN YOUR BINDER.

1    A.   YES, SIR.

2    Q.   IS THIS THE DOCUMENT YOU REVIEWED?

3    A.   THIS IS ONE OF THE DOCUMENTS THAT I REVIEWED, YES, SIR.

4    Q.   I WOULD ASK YOU TO TURN TO PAGE 9949 OF THE DOCUMENT.

5    A.   YES.

6    Q.   HOW DID MERCK DESCRIBE THE RESULTS OF PROTOCOL 023?

7    A.   I MEAN IN MERCK'S OWN WORDS, WHAT IS LABELED ON PAGE 2, PAGE 2

8    OF THIS DOCUMENT, UNDER THE HEADING BACKGROUND, IT'S THE RIGHT-HAND

9    COLUMN, ON 949, UNDER BACKGROUND IT SAYS:   STUDY NO. 023 SHOWED

10   THAT MK-0966, VIOXX, SIGNIFICANTLY REDUCED URINARY EXCRETION OF

11   PGIM WHICH MAY REFLECT A DECREASE IN PROSTACYCLIN BIOSYNTHESIS.  IT

12   GOES ON IN MERCK'S WORDS.   PROSTACYCLIN IS A POTENT INHIBITOR OF

13   PLATELET AGGREGATION AND HAS VASCULAR DILATORY PROPERTIES.

14          HOWEVER, VIOXX HAS NO EFFECTS ON SYSTEMIC THROMBOXANE.

15   THE CLINICAL RELEVANCE OF PARTIALLY INHIBITING PROSTACYCLIN

16   SYNTHESIS WITHOUT INHIBITING THROMBOXANE ARE UNKNOWN.   THESE

17   FINDINGS RAISED A CONCERN ABOUT THE POTENTIAL FOR VIOXX TO CAUSE

18   CARDIOVASCULAR THROMBOTIC EVENTS.

19   Q.   THANK YOU, DOCTOR.

20          MR. DUGAN:  AT THIS TIME, YOUR HONOR, I WOULD LIKE TO

21   MOVE AS PLAINTIFF'S NO. 4 --

22          THE COURT:  YOU HAVE NUMBERS?

23          THE DEPUTY CLERK:  JUDGE, IT SEEMS THAT WHAT HE IS

24   MARKING NOW IS ON THE LIST AS A DIFFERENT NUMBER, HE DOESN'T HAVE

25   TO DO THAT.

1              THE COURT:  JIM, WHAT WE'VE DONE IS WE'VE GOT A LIST OF

2     YOUR DOCUMENTS, YOU CAN PUT THEM IN IN THE SAME NUMBER; IN OTHER

3     WORDS, YOU DON'T NEED TO PUT THEM IN -- WHENEVER YOU PUT THEM IN IS

4     FINE, BUT JUST CALL THEM THE SAME NUMBER.

5              THE DEPUTY CLERK:  SO CAN WE GO BACK?

6              THE COURT:  BEFORE WE GO TOO FAR.

7              THE DEPUTY CLERK:  ONE, THE CV OF DR. KESSLER, WHAT IS IT

8     ON THE LIST?

9              MR. DUGAN:  574.

10             THE DEPUTY CLERK:  SO, JUDGE, WE'LL REMOVE IT AS LA-1 AND

11    THEN MAKE IT 574.  AND THEN LA 2 I BELIEVE YOU SAID IS 580 ON THE

12    LIST?

13             MR. DUGAN:  YES.

14             THE DEPUTY CLERK:  SO CAN WE REMOVE LA-2 AND MAKE IT 580?

15             MR. DUGAN:  SURE.

16             THE DEPUTY CLERK:  AND THEN I THINK THREE YOU HAD 518.

17             MR. DUGAN:  THAT'S CORRECT.

18             THE DEPUTY CLERK:  SO NOW INSTEAD OF FOUR, WHAT WOULD

19    THIS DOCUMENT BE?

20             MR. DUGAN:  585.

21             THE COURT:  THAT WOULD BE EASIER FOR YOU AND WE'LL JUST

22    PUT IT IN THAT WAY.

23             MR. DUGAN:  THAT WOULD BE EASIER.  THANK YOU, YOUR HONOR.

24    BY MR. DUGAN:

25    Q.  DR. KESSLER, DID MERCK DO ANY STUDIES IN RESPONSE TO THE

1   RESULTS OF PROTOCOL 023?

2   A.  YES.

3   Q.  AND WAS A STUDY DONE BY DOUGLAS WATSON IN REFERENCE TO THIS?

4   A.  YES.

5   Q.  AND DID YOU -- I'M SORRY, DID YOU REVIEW THE PLAN FOR THE

6   WATSON STUDY?

7   A.  YES.

8   Q.  I WOULD ASK YOU TO TURN TO TAB NUMBER 7 IN YOUR BINDER.

9   A.  YES, SIR.

10  Q.  IS THIS THE DOCUMENT THAT YOU REVIEWED?

11  A.  YES.

12  Q.  I WOULD ASK YOU TO TURN TO PAGE 7040.

13  A.  YES.

14  Q.  WHAT WAS THE STUDY DESIGN?

15  A.  THIS IS A, IF YOU GO DOWN TO THE MIDDLE OF THE PAGE UNDER THE

16  HEADING STUDY DESIGN, THIS IS A COMPARATIVE STUDY OF THE INCIDENCE

17  OF SELECTED CORONARY VASCULAR DISORDERS SERIOUS ADVERSE EVENTS.

18  FROM CLINICAL TRIAL DATABASES FOR VIOXX, PROSCAR AND FOSAMAX.  SO

19  WHAT DR. WATSON DID IS, HE TOOK ALL OF THE TREATMENT ARMS FROM

20  PATIENTS ON VIOXX TRIALS, WHICH INCLUDED PATIENTS ON VIOXX,

21  PATIENTS ON OTHER COMPARATOR DRUG ARMS, AND PLACEBO, AND HE

22  COMPARED THEM TO PROSCAR FOR MEN -- I'M SORRY, THE PLACEBO ARM OF

23  THE TRIALS FOR PROSCAR FOR MEN AND FOSAMAX FOR WOMEN.  SO IT WAS

24  ALL TRIAL ARMS OF VIOXX TRIALS IN THE VIOXX ARM VERSUS THE PLACEBO

25  ARMS OF PROSCAR AND FOSAMAX.

1    Q.  WAS THAT A STANDARD CLINICAL TRIAL DESIGN?

2    A.  NO.  IT IS NOT.

3    Q.  AND WHY WAS IT DONE THAT WAY?

4    A.  WELL, IF YOU GO DOWN TO THE STUDY POPULATIONS, YOU CAN SEE,

5    SINCE THE MAJORITY OF THE VIOXX STUDIES ARE STILL BLINDED.  SO

6    THERE ARE LIMITATIONS, YOU KNOW, TO MERCK'S STUDIES.  I MEAN, THE

7    VIOXX ARE BLINDED, THERE'S GOING TO BE SMALL NUMBERS.  WHAT

8    DR. WATSON IS DOING HERE IS HE IS LOOKING BECAUSE OF THIS

9    BIOLOGICAL MECHANISM THAT'S IDENTIFIED IN 023 THAT RAISES CONCERNS

10   ABOUT WHETHER VIOXX IS INHIBITING THIS INHIBITOR OF BLOOD CLOTTING,

11   YOU SEE THAT BIOLOGICAL MECHANISM OF 023 AND YOU WANT TO SEE

12   WHETHER YOU SEE SIGNALS OF THAT IN PATIENTS.  AND HE IS TRYING TO

13   LOOK AT THE DATA IN SUCH A WAY TO SEE IF HE SEES A SIGNAL.

14   Q.  THANK YOU, DOCTOR.

15        MR. DUGAN:  AT THIS TIME I WOULD LIKE TO MOVE INTO

16   EVIDENCE LOUISIANA AG 128.

17        THE COURT:  LET IT BE ADMITTED.

18   BY MR. DUGAN:

19   Q.  DOCTOR, DID YOU ALSO REVIEW THE RESULTS IN A FEBRUARY 2ND,

20   1998, REPORT?

21   A.  I DID.

22   Q.  AND CAN YOU PLEASE REFER TO TAB NUMBER 8 IN YOUR BINDER.

23   A.  YES, SIR.

24   Q.  IS THIS THE DOCUMENT THAT YOU REVIEWED?

25   A.  YES, THIS IS THE RESULTS, THE PRIOR DOCUMENT WAS THE PLAN.

1    Q.   TURN TO THE EXECUTIVE SUMMARY PAGE AT PAGE 2 ENDING IN 6805.

2    A.   YES, SIR.

3    Q.   WHAT WERE THE RISK RATIOS FOR THE MEN AND WOMEN REPORTED BY

4    WATSON?

5    A.   YOU'RE CHALLENGING MY EYESIGHT A LITTLE.  IF YOU GO TO THE

6    FOURTH PARAGRAPH UNDER THE EXECUTIVE SUMMARY, THE SECOND, BEGINNING

7    WITH THE SECOND SENTENCE, SO IT SAYS:  "THE OVERALL POOLED

8    INCIDENCE RATE FOR MEN IN THE VIOXX PROGRAM WAS NOT STATISTICALLY

9    SIGNIFICANT," BUT TO ANSWER YOUR QUESTION IT WAS 1.28.  SO IT'S 28

10   PERCENT HIGHER, BUT IT'S NOT STATISTICALLY SIGNIFICANT.

11        THE NEXT SENTENCE SAYS:  "THE OVERALL INCIDENCE RATE FOR

12   WOMEN WAS ELEVATED COMPARED TO FOSAMAX, PLACEBO CONTROLS."  AND

13   AGAIN, TO ANSWER YOUR QUESTION, THE ADJUSTED RATE RATIO IS 2.16, SO

14   MORE THAN TWICE.  AND THOSE NUMBERS ARE STATISTICALLY SIGNIFICANT,

15   THOSE CONFIDENCE INTERVALS; SO 1.28 FOR MEN, 2.16 FOR WOMEN.

16   Q.   AND, DOCTOR, WHAT IS THE IMPORTANCE OF THOSE RESULTS TO YOUR

17   OPINIONS IN THIS CASE?

18   A.   THOSE NUMBERS, AGAIN, THEY'RE JUST EVIDENCE OF A SIGNAL.  IT'S

19   VERY IMPORTANT, NONE OF THESE NUMBERS BY THEMSELVES, I THINK,

20   SHOULD BE LOOKED AT.  YOU HAVE TO LOOK AT THE TOTALITY.  SO THESE

21   ARE PIECES OF A PUZZLE, THESE ARE SIGNALS.

22   Q.   AND HOW DID MERCK RESPOND TO THAT SIGNAL?

23   A.   DR. WATSON, IF YOU READ THE NEXT PARAGRAPH -- NO, NOT THE NEXT

24   PARAGRAPH, EXCUSE ME, THE NEXT SENTENCE AFTER THE RELATIVE RATE,

25   SAYS:  "THE INCIDENCE RATE IN WOMEN IS DRIVEN BY VERY LOW RATES IN

1   TWO OF THE FOSAMAX PLACEBO STRATA."  SO YET HE IS SAYING IN

2   ESSENCE --

3            MR. ISMAIL:  ACTUALLY, I THINK IT'S THE INCREASED RATE IS

4   DRIVEN BY.

5            THE WITNESS:  I'M SORRY.

6            THE COURT:  THE INCREASED RATE.  YEAH.

7            THE WITNESS:  I'M SORRY, I'M SORRY, I MISREAD.

8            THE OVERALL INCREASE RATE -- THE INCREASED RATE IN WOMEN

9   IS DRIVEN BY VERY LOW RATES IN TWO OF THE FOSAMAX PLACEBO STRATA,

10  AND HE GIVES THOSE STRATA.

11           SO WHAT DR. WATSON IS DOING, HE SAYS, YES, THERE IS AN

12  INCREASED RELATIVE RISK IN WOMEN, BUT HE IS EXPLAINING IT BASED ON

13  AN EXPLANATION THAT HE THINKS, BASED ON HIS LOOKING AT THE DATA,

14  THAT THE FOSAMAX PLACEBO ARM HAVE A LOWER RATE.  SO HE IS

15  EXPLAINING, HE IS GIVING AN EXPLANATION FOR WHY THE WOMEN HAVE, WHY

16  THE RELATIVE RISK IS HIGHER IN WOMEN ON VIOXX.

17  BY MR. DUGAN:

18  Q.  HADN'T THEY CONSIDERED WHETHER THE FOSAMAX GROUP WAS AN

19  APPROPRIATE CONTROL POPULATION BEFORE THE STUDY WAS DONE?

20  A.  YES.  IN THE PLAN, I DIDN'T SEE ANYTHING THAT SAID IT WAS NOT,

21  AND I'VE SEEN AT LEAST ONE DOCUMENT THAT SHOWED THAT MERCK HAD

22  DISCUSSED THAT AND IT WAS A CHECK MARK NEXT TO THAT.

23  Q.  THANK YOU.  DO YOU HAVE ANY CONCERNS ABOUT HOW MERCK RESPONDED

24  TO THIS DATA?

25  A.  YES.  AGAIN, I DON'T WANT TO OVERSTATE THE IMPORTANCE OF ANY

1    ONE PIECE OF DATA, BUT I SEE RELATIVE RISKS THAT ARE HIGHER IN

2    WOMEN, STATISTICALLY SIGNIFICANT, A LITTLE HIGHER IN MEN, NOT

3    STATISTICALLY SIGNIFICANT, AND AN EXPLANATION GIVEN THAT MAY OR MAY

4    NOT BE TRUE.  AND MY CONCERN IS, I AM WEARY OF EXPLANATIONS THAT

5    EXPLAIN AWAY SIGNALS.  AGAIN, I AM NOT SAYING THAT THEY DON'T TURN

6    OUT, THEY CAN TURN OUT TO BE TRUE, THEY CAN TURN OUT NOT TO BE

7    TRUE; BUT WHEN YOU'RE LOOKING AT SIGNALS, YOU HAVE TO BE CAREFUL

8    THAT YOU DON'T JUST EXPLAIN AWAY THE SIGNALS.

9    Q.   THANK YOU.  DID MERCK LOOK FOR ADVICE FROM SCIENTISTS OUTSIDE

10   THE COMPANY DURING THE PREMARKETING OF VIOXX?

11   A.   YES, THAT'S COMMON.  FOR PHARMACEUTICAL COMPANIES TO DO THAT.

12   Q.   AND DID THEY HAVE A SCIENTIFIC ADVISORY BOARD?

13   A.   YES, THEY DID.

14   Q.   CAN YOU TELL THE COURT ABOUT THAT?

15   A.   A SCIENTIFIC ADVISORY BOARD ACTS AS CONSULTANTS THAT ALLOW A

16   COMPANY TO ENGAGE WITH ACADEMICS AND OUTSIDE EXPERTS.

17   Q.   AND THAT WAS DONE IN VIOXX?

18   A.   I DON'T KNOW WHETHER -- THERE WAS CERTAINLY THE SCIENTIFIC

19   ADVISORY BOARD WAS CONSULTED, THEIR DATA WAS PRESENTED.  I ASSUME

20   THAT SCIENTIFIC ADVISORY BOARD HAD TO DO WITH A RANGE OF ISSUES,

21   NOT JUST VIOXX, BUT I CERTAINLY SAW PRESENTATIONS OF VIOXX TO THAT

22   ADVISORY BOARD.

23   Q.   AND WAS THE SUBJECT OF CARDIOVASCULAR RISK DISCUSSED WITH THE

24   SAB?

25   A.   YES.

1    Q.  DOCTOR, DID YOU REVIEW A WRITE-UP BY ALAN NIES, A MERCK

2    SCIENTIST, FOR THE SAB MEETING?

3    A.  I DID.

4    Q.  DOCTOR, IF I COULD TURN YOU TO TAB NUMBER 9 IN YOUR BINDER.

5    A.  YES, SIR.

6    Q.  IS THIS THE WRITE-UP YOU REVIEWED?

7    A.  YES, SIR.

8    Q.  I WOULD ASK YOU TO TURN TO PAGE 1457 OF THE DOCUMENT.

9    A.  YES, SIR.

10   Q.  WHAT DID DR. NIES' WRITE-UP TELL THE SAB ABOUT THE WATSON

11   ANALYSIS?

12   A.  GIVE ME ONE SECOND.

13   Q.  AND ONCE AGAIN, THE PRINT IS KIND OF SMALL HERE IF YOU COULD

14   IDENTIFY.

15   A.  JUST GIVE ME A SECOND TO REVIEW THIS.

16        SO WHAT YOU SEE IN THIS MAJOR PARAGRAPH ON THIS PAGE IS,

17   AGAIN, THIS BIOLOGICAL MECHANISM THAT WAS IDENTIFIED IN 023 THAT

18   SHOWED AN EFFECT OF VIOXX ON PROSTACYCLIN, THAT IT INHIBITS THIS

19   CHEMICAL THAT HAS AN EFFECT ON BLOOD CLOTTING.  AND IT'S PRESENTING

20   THAT, THAT INFORMATION ON 023.  AND THEN IT SAYS TO ASSESS THE

21   POTENTIAL IMPLICATION, THE POTENTIAL IMPLICATIONS, THE LAST

22   PARAGRAPH, TO ASSESS POTENTIAL IMPLICATION OF THESE BIOCHEMICAL

23   FINDINGS, THAT'S 023, ON CARDIOVASCULAR HEALTH, THE CLINICAL TEAM

24   IN EPIDEMIOLOGY -- THE CLINICAL TEAM AND EPIDEMIOLOGY HAVE ANALYZED

25   THE BLINDED VIOXX DATABASE, THAT'S REFERRING TO THE WATSON REPORT,

1  FOR SERIOUS CARDIOVASCULAR EVENTS.  THE ANALYSIS DOES NOT SUGGEST A

2  CONCERN.  AND HE GOES ON TO TALK ABOUT AN INITIAL LOOK AT THE

3  UNBLINDED STUDIES ALSO DO NOT SHOW, ALSO DO NOT INDICATE AN EXCESS

4  OF CARDIOVASCULAR EVENTS IN PATIENTS.

5  Q.  DOCTOR, DID YOU SEE ANY EVIDENCE THAT MERCK PROVIDED THE

6  OUTSIDE ADVISORS WITH THE ACTUAL RESULTS OF THE WATSON STUDY,

7  SHOWING A STATISTICALLY SIGNIFICANT DOUBLING OF RISKS IN THE VIOXX

8  PATIENTS COMPARED TO THE PLACEBO GROUP FROM THE FOSAMAX TRIAL?

9  A.  COUNSEL, IF I CAN JUST CORRECT YOU.

10  Q.  YES.

11  A.  RESPECTFULLY, IT WAS A DOUBLING OF RELATIVE RISKS IN WOMEN

12  OVERALL, NOT IN MEN.  AND I DO NOT SEE THE WATSON DATA BEING

13  PRESENTED, THE ACTUAL DATA BEING PRESENTED TO THE SAB.

14  Q.  THANK YOU.  IS THERE AN ACTUAL DOCUMENT SHOWING WHAT THE SAB

15  RECOMMENDATIONS WERE?

16  A.  YES.  THERE WAS A WRITE-UP OF A MEETING, WHERE THE SAB

17  CONSIDERED VIOXX AND WHAT TO DO ABOUT IT.

18  Q.  THANK YOU, DOCTOR.

19        IF I COULD ASK YOU TO LOOK AT TAB NUMBER 10, PLEASE.

20  A.  YES, SIR.

21  Q.  IS THIS THE DOCUMENT THAT YOU REVIEWED?

22  A.  YES, SIR.

23  Q.  I WOULD ASK YOU TO TURN TO PAGE 2738.

24  A.  YES, SIR.

25  Q.  WHAT DID THE SAB SAY ABOUT THE POTENTIAL EFFECTS OF ALTERING

1    THE BALANCE OF PROSTACYCLIN AND THROMBOXANE?

2    A.  AGAIN, THESE ARE, THIS IS A DOCUMENT ABOUT A MEETING, SO IT'S

3    UNCLEAR EXACTLY WHO IS SAYING WHAT.  BUT TAKING THIS AS A SUMMARY

4    OF THE DISCUSSION, IT SAYS, IF YOU GO TO THE SECOND NEW PARAGRAPH

5    ON THE PAGE, IT SAYS:  "ONE HYPOTHESIS WOULD BE THAT THE EXCRETION

6    OF THIS PROSTACYCLIN METABOLITE DOES NOT REFLECT --" AGAIN, THIS

7    GOES BACK TO THIS 023 MECHANISM -- "DOES NOT REFLECT SYSTEMIC

8    VASCULAR PROSTACYCLIN BIOSYNTHESIS."  IN ESSENCE, YOU DON'T HAVE TO

9    WORRY ABOUT IT.

10             AND IT SAYS:  "AN ALTERNATIVE HYPOTHESIS IS THAT

11   PROSTACYCLIN BIOSYNTHESIS IN THE VASCULATURE IS INHIBITED BY VIOXX

12   (WITHOUT BLOCKING PRODUCTION OF THROMBOXANE A BY THE PLATELET) BY

13   REMOVING THIS POTENT INHIBITOR --" SO AGAIN, YOU'RE INHIBITING AN

14   INHIBITOR -- "OF PLATELET AGGREGATION, THE PROBABILITY THAT A

15   CORONARY PLAQUE RUPTURE WOULD LEAD TO MYOCARDIAL INFARCTION OR

16   ISCHEMIC VENTRICULAR FIBRILLATION IS ENHANCED."  SO IT SAYS THIS

17   MECHANISM MAY LEAD TO, MAY PREDICT THROMBOTIC EVENTS SUCH AS

18   MYOCARDIAL INFARCTION AND OTHER THROMBOTIC HEART DISEASE.

19   Q.  THANK YOU.  I WOULD ASK YOU TO TURN NOW TO PAGE 2742 OF THIS

20   DOCUMENT.

21   A.  YES.

22   Q.  THE LAST FULL PARAGRAPH OF THE SAB DOCUMENT, DID THE BOARD

23   OFFER ANY ADVICE TO MERCK ABOUT WHEN THE QUESTIONS ABOUT

24   CARDIOVASCULAR RISK OR BENEFITS SHOULD BE ADDRESSED?

25   A.  YES.  SO YOU SEE, BEGINNING WHERE IT SAYS, IT'S TALKING ABOUT

1  WHENEVER YOU'RE DEVELOPING A -- IT SAYS ANY TRULY NOVEL

2  PHARMACOLOGICAL ENTITY, AND THE ADVERSE EFFECTS AS WELL AS

3  POTENTIAL BENEFITS, SHOULD BE ADDRESSED IN PARALLEL WITH THE

4  CONCLUSION OF THE PROCESS OF ACQUISITION AND ANALYSIS OF THE DATA

5  THAT WILL PLACE THIS DRUG IN THE HANDS OF PATIENTS.

6  Q.  SO, DOCTOR, WHAT IS THE IMPORTANCE OF THAT TO YOUR OPINIONS IN

7  THIS CASE?

8  A.  THE SAB IS, YOU KNOW, TALKING ABOUT BOTH THE BENEFITS AND IT

9  TALKS ABOUT THE BENEFITS AND PUTTING, THERE IS A STRONG MANDATE FOR

10  INTRODUCING VIOXX INTO MEDICAL PRACTICE AS SOON AS FEASIBLE, BUT

11  IT'S ALSO SAYING THAT IN PARALLEL TO THE CONCLUSION, I TAKE THAT AS

12  MEANING BEFORE YOU CONCLUDE THE PROCESS OF PUTTING THIS IN THE

13  HANDS OF PATIENTS, YOU ADDRESS THIS MECHANISM AND UNDERSTAND WHAT

14  THE EFFECTS ARE ON THE CARDIOVASCULAR SYSTEM, EITHER POSITIVE OR

15  NEGATIVE.

16  Q.  THANK YOU, DOCTOR.

17       MR. DUGAN:  AT THIS TIME I WOULD LIKE TO MOVE INTO

18  EVIDENCE LOUISIANA EXHIBIT 38.

19       THE COURT:  LET IT BE ADMITTED.

20  BY MR. DUGAN:

21  Q.  NOW, DOCTOR, TURNING TO THE INFORMATION ABOUT CARDIOVASCULAR

22  EVENTS SUBMITTED TO THE FDA.  DID YOU REVIEW A DOCUMENT SHOWING THE

23  INCIDENCE OF THROMBOTIC EVENTS AND OSTEOARTHRITIS PATIENTS IN

24  MERCK'S PREMARKET STUDIES?

25  A.  YES, I DID.

1  Q.  I WOULD ASK YOU TO TURN TO TAB NUMBER 11 IN THE BINDER, SIR.

2  A.  YES, SIR.

3  Q.  IS THIS A DOCUMENT YOU REVIEWED?

4  A.  I REVIEWED FOR MY REPORT PARTS OF THIS DOCUMENT.

5  Q.  I WOULD ASK YOU TO TURN TO PAGE 5480 OF THE DOCUMENT.

6  A.  YES, SIR.

7  Q.  DID YOU REVIEW THIS TABLE?

8  A.  YES, I DID.

9  Q.  AND WHAT DOES THIS TABLE SHOW?

10  A.  SO THIS IS A TABLE PUT TOGETHER BY THE FDA MEDICAL REVIEWER FOR

11  VIOXX, AND THESE ARE THE THROMBOEMBOLIC ADVERSE EVENTS REGARDLESS

12  OF SERIOUSNESS FOR ALL OA TRIALS.  SO ONE OF THE INDICATIONS THAT

13  MERCK IS SEEKING IS FOR USE OF VIOXX IN OSTEOARTHRITIS, SO THIS IS

14  LOOKING AT THREE DIFFERENT SETS OF OA TRIALS.  FIRST COLUMN IS SIX

15  WEEK STUDIES, SECOND TRIAL IS SIX MONTH STUDIES, THIRD COLUMN IS

16  GREATER THAN SIX MONTH STUDIES.  MY UNDERSTANDING IS THAT THE

17  PRIMARY SAFETY DATABASE FOCUSED ON THE SIX WEEK TRIALS.

18        AND YOU CAN SEE HERE, AGAIN, LOOKING AT THROMBOEMBOLIC

19  ADVERSE EVENTS, IN THE PLACEBO ARM OF THIS, FOCUSSING ON THE FIRST

20  COLUMN, THE SIX WEEK STUDIES, YOU SEE THERE WERE 1 OUT OF 412, AND

21  THAT WAS A STROKE.  AND THAT GAVE YOU AN INCIDENCE OF 0.2 PERCENT.

22        THEN YOU SEE INCREASING DOSES -- SO THAT'S THE PLACEBO

23  ARM, AND THEN YOU SEE INCREASING DOSES, 12.5, 25, 50 MILLIGRAMS,

24  125, AND ABOVE.  AND YOU SEE THAT THE INCIDENCE OF PERCENTAGE OF

25  THROMBOEMBOLIC EVENTS FOR THOSE RECEIVING 12.5 MILLIGRAMS IS 0.7,

1  THOSE RECEIVING 25 IS 0.8, THOSE RECEIVING 50 IS 1.1 PERCENT.

2  Q.  THANK YOU.  IF I CAN ASK YOU TO TURN TO THE PREVIOUS --

3  A.  AND 125, 1.4 PERCENT, SORRY.

4  Q.  THANK YOU.  ANYTHING ELSE ABOUT THE TABLE, DOCTOR?

5  A.  YOU ALSO SEE SIMILAR NUMBERS, YOU CAN READ THE COLUMNS FOR THE

6  SIX MONTH STUDIES AND BEYOND SIX MONTHS.

7  Q.  THANK YOU.  I WOULD ASK YOU TO TURN TO THE PREVIOUS PAGE OF

8  5479.

9  A.  YES.

10  Q.  DID YOU REVIEW THIS PART, THE PART OF THE DOCUMENT STATING THE

11  FDA MEDICAL REVIEWER'S CONCLUSIONS ABOUT THE RISK OF CARDIOVASCULAR

12  THROMBOTIC EVENTS?

13  A.  YES.

14  Q.  AND WHAT WERE THEY?

15  A.  THE SUMMARY, THE MEDICAL REVIEWER, IT SAYS WITH THE AVAILABLE

16  DATA, IT IS IMPOSSIBLE TO ANSWER WITH COMPLETE CERTAINTY WHETHER

17  THE RISK OF CARDIOVASCULAR AND THROMBOTIC EVENT IS INCREASED IN

18  PATIENTS ON VIOXX, AND I THINK APPROPRIATELY SHE STATES A LARGER

19  DATABASE WILL BE NEEDED TO ANSWER THIS AND OTHER SAFETY COMPARISON

20  QUESTIONS.

21  Q.  THANK YOU.  AND WHY IS THIS IMPORTANT TO THE STATEMENTS, WHY IS

22  THIS STATEMENT IMPORTANT TO THE OPINIONS IN YOUR CASE, IN THIS

23  CASE?

24  A.  SHE IS REVIEWING HERE THE THROMBOEMBOLIC EVENTS IN THE OA

25  STUDIES.  AGAIN, THIS IS ANOTHER PIECE OF INFORMATION.  WE HAVE THE

1   017 STUDY, THE RHEUMATOID ARTHRITIS STUDY; WE HAVE THE 023, THE

2   BIOLOGICAL MECHANISM; THE WATSON REPORT; AND NOW THE OA STUDIES

3   THEMSELVES.  BUT THESE ARE, AS SHE CORRECTLY SAID, THEY'RE TOO

4   SMALL TO SAY DEFINITIVELY WHETHER THESE NUMBERS ARE -- DEFINITIVELY

5   SHOW, DEMONSTRATE THAT THERE'S A RISK, CERTAINLY THERE IS AN

6   INCREASED INCIDENCE AND THERE'S MORE WORK THAT NEEDS TO BE DONE TO

7   ANSWER THIS QUESTION, ESPECIALLY BASED ON THIS BIOLOGICAL

8   PLAUSIBILITY MODEL OF ITS EFFECT ON PROSTACYCLIN.

9   Q.  THANK YOU, DOCTOR.

10          MR. DUGAN:  YOUR HONOR, AT THIS TIME, I WOULD LIKE TO

11  MOVE INTO EVIDENCE LOUISIANA AG 149.

12          THE COURT:  OKAY.  LET IT BE ADMITTED.

13  BY MR. DUGAN:

14  Q.  DOCTOR, BASED ON THE EVIDENCE THAT YOU'VE REVIEWED AND

15  DISCUSSED SO FAR TODAY, AND PREVIOUSLY, DO YOU HAVE AN OPINION AS

16  TO WHETHER THERE WAS A SAFETY SIGNAL FOR ADVERSE THROMBOTIC EVENTS

17  BEFORE MERCK MARKETED VIOXX?

18  A.  YES, I HAVE AN OPINION.

19  Q.  AND WHAT IS YOUR OPINION?

20  A.  MY OPINION, BASED ON NOT ONLY THE NUMBERS, THE NUMBERS ARE

21  SMALL AND THERE'S LIMITATIONS TO THE NUMBERS IN THE OA DATABASE,

22  BUT YOU SEE THIS INCREASED TREND OF MORE EVENTS IN --

23  THROMBOEMBOLIC EVENTS IN THE OA DATABASE, YOU SEE THIS IN 017, YOU

24  SEE THIS SIGNAL IN WATSON.  THOSE, AND THIS IS IMPORTANT, COMBINED

25  WITH THIS BIOLOGICAL PLAUSIBILITY, WITHOUT THE BIOLOGICAL

1   PLAUSIBILITY YOU CAN'T, YOU CAN'T GIVE CREDENCE TO A SIGNAL.  BUT

2   WHEN YOU HAVE THIS BIOLOGICAL PLAUSIBILITY, AND AGAIN, IT'S ONLY

3   PLAUSIBILITY PLUS THESE NUMBERS, I SEE A SIGNAL HERE.

4   Q.  THANK YOU, DOCTOR.

5        DO YOU ALSO HAVE AN OPINION ABOUT WHAT MERCK SHOULD HAVE

6   DONE?

7   A.  YES.

8   Q.  AND WHAT IS THAT?

9   A.  TO RESOLVE, TO GET THE ANSWER ON WHETHER VIOXX INCREASES,

10  WHETHER VIOXX CAUSES THROMBOEMBOLIC DISEASE IN PATIENTS, TO DO

11  EXACTLY WHAT THE FDA IS ASKING, FOR A LARGER DATABASE NEEDED TO

12  ANSWER THAT QUESTION.

13  Q.  THANK YOU, DOCTOR.

14       DOCTOR, DID YOU ALSO HAVE A CHANCE TO REVIEW A

15  DESCRIPTION OF THE MARKETING AND PROMOTION LAUNCH OF VIOXX?

16  A.  I DID.

17  Q.  I WOULD ASK YOU TO TURN TO TAB 12 IN YOUR BINDER.

18  A.  YES.

19  Q.  IS THIS A DOCUMENT YOU REVIEWED?

20  A.  THIS IS ONE OF THE DOCUMENTS THAT I REVIEWED.

21  Q.  AND WHAT DOES THIS DOCUMENT SAY ABOUT THE LAUNCH OF VIOXX?

22       MR. ISMAIL:  OBJECTION, YOUR HONOR, THIS IS --

23       THE COURT:  WELL, I AM NOT GOING TO ADMIT IT INTO

24  EVIDENCE, BUT EVEN THOUGH IF I DON'T ADMIT IT INTO EVIDENCE HE CAN

25  USE IT.

1             THE WITNESS:  SO THIS, IF YOU GO TO THE SECOND COLUMN, IS

2    JUST A QUOTE FROM THE PRESIDENT OF MERCK'S HUMAN HEALTH DIVISION,

3    WHERE HE QUOTES, CALLED VIOXX'S INTRODUCTION THE COMPANY'S, QUOTE,

4    BIGGEST, FASTEST AND BEST PRESCRIPTION DRUG LAUNCH EVER.

5             MR. DUGAN:  YOUR HONOR, AT THIS TIME I WOULD LIKE TO MOVE

6    INTO EVIDENCE LOUISIANA AG 578.

7             THE COURT:  NO, I AM GOING TO DENY THAT.  IT'S HEARSAY AT

8    BEST, A NEWSPAPER, I AM NOT GOING TO ADMIT IT.

9             MR. DUGAN:  OKAY.  THANK YOU, YOUR HONOR.

10   BY MR. DUGAN:

11   Q.  DR. KESSLER, DID YOU ALSO REVIEW ANY DOCUMENTS PERTAINING TO

12   MERCK'S USE OF DIRECT OR CONSUMER ADVERTISING?

13   A.  I DID.

14   Q.  I WOULD ASK YOU TO TURN TO TAB 13 IN YOUR BINDER.

15            MR. ISMAIL:  YOUR HONOR, WE'VE GOTTEN VERY FAR AFIELD OF

16   THE ISSUES IN THE CASE, DIRECT OR CONSUMER ADVERTISING TO THE

17   EXTENT IT IMPLICATES PATIENT PRESCRIBING INDIVIDUAL DECISIONS AND

18   THE WHAT THEY'RE GETTING FOR THEIR MEDICINE IS ALREADY BEEN RULED

19   OUT OF BOUNDS.

20            THE COURT:  THE ONLY ISSUE IS THAT HIS BURDEN IS TO SHOW

21   DEFECT AND TO SHOW THAT HE DIDN'T HAVE ANY NOTICE OF IT.  SO SOME

22   OF THIS HAS SOME RELEVANCE ON BOTH OF THOSE MATTERS, SO I'LL

23   OVERRULE THE OBJECTION.

24            MR. DUGAN:  THANK YOU, YOUR HONOR.

25            THE COURT:  YOU OUGHT TO MAKE A LITTLE SHORTER -- I MEAN,

1   ONCE WE DO THIS, I DON'T REALLY NEED TO HEAR IT ANOTHER TIME.

2          MR. DUGAN:  ABSOLUTELY, YOUR HONOR.

3          THE COURT:  GO AHEAD, JIM.

4          MR. DUGAN:  THANK YOU.

5   BY MR. DUGAN:

6   Q.  IS THIS ONE OF THE DOCUMENTS YOU REVIEWED?

7   A.  YES, SIR.

8   Q.  I WOULD ASK YOU TO TURN TO PAGE 8199 OF THIS DOCUMENT.

9   A.  YES, SIR.

10  Q.  AND WHAT DID YOU FIND IMPORTANT ABOUT THIS PAGE?

11  A.  THIS IS IN THE YEAR 2002, AND IT SAYS DTC ACTIVATED A MILLION

12  CONSUMERS AND DELIVERED STRONG ROI.  AND IF YOU LOOK AT THE DTC

13  INVESTMENT OF $65 MILLION IN THIS YEAR, THIS -- THAT AMOUNT OF

14  MONEY BEING INVESTED IN PROMOTION COUPLED WITH, WITH THE VERY, THE

15  STATEMENTS PREVIOUSLY OF THE FASTEST LAUNCH, THE BIGGEST, FASTEST

16  LAUNCH, HOW THE -- HOW MERCK, ONCE IT GOT APPROVAL, HOW IT SOLD AND

17  MARKETED THE DRUG, THIS IS -- I DON'T WANT TO OVERSTATE IT, BUT

18  THIS IS THE STUFF THAT GIVES ME CONCERN BECAUSE YOU STUDY A

19  POPULATION -- YOU STUDY A DRUG IN A CERTAIN POPULATION AND WHEN

20  LAUNCHED, WHEN A DRUG GETS APPROVED AND THOSE ARE LIMITED, WHEN A

21  DRUG GETS APPROVED IT USED TO BE, CERTAINLY DECADES AGO, A DRUG

22  WOULD GET INTRODUCED AND IT WOULD BE USED IN SOME PATIENTS.

23          BUT NOW WITH THESE VERY SIGNIFICANT PROMOTIONAL MARKETING

24  EFFORTS, THESE LARGE LAUNCHES, A DRUG GOES FROM CLINICAL TRIALS

25  INTO A LOT OF PEOPLE VERY QUICKLY.  AND IF YOU WORRY THAT CLINICAL

1   TRIALS, ESPECIALLY IF THERE ARE UNANSWERED QUESTIONS ARE NOT GOING

2   TO GET PICKED UP, THAT RAPID LAUNCH, YOU COULD TURN AROUND AND FIND

3   YOURSELF IN REAL TROUBLE VERY QUICKLY.  AND THAT CONCERNS ME.

4   Q.  AND CAN YOU JUST ARTICULATE WHY THE SCENARIO YOU JUST DISCUSSED

5   IS IMPORTANT TO YOUR OPINIONS IN THIS CASE?

6   A.  HOW IT RELATED TO MERCK'S PRACTICES WITH REGARD TO HOW IT WAS

7   SELLING THE DRUG.

8   Q.  THANK YOU.  AND ALSO DID THE MARKETING INCLUDE PROMOTION TO ANY

9   POPULATIONS THAT WERE AT RISK OF CARDIOVASCULAR DISEASE?

10  A.  YES.

11  Q.  AND IN LIGHT OF HOW MERCK CONDUCTED ITS CLINICAL TRIALS, DID

12  THE NATURE OF THE PATIENT POPULATION TO WHOM THE DRUG WAS MARKETED

13  HAVE ANY BEARING UPON MERCK'S DUTY TO WARN?

14  A.  YES.  LET ME TRY TO ANSWER YOUR LAST TWO QUESTIONS TOGETHER.

15  IF YOU LOOK AT THE MAJORITY OF STUDIES, FOR EXAMPLE, THE OA STUDIES

16  THAT WERE DONE AS PART OF THE INVESTIGATION THAT MERCK DID, THEY

17  EXCLUDED HIGH-RISK CARDIOVASCULAR PATIENTS FROM THOSE STUDIES.

18  THEY EXCLUDED PATIENTS WHO HAD RECENT HEART ATTACKS, RECENT

19  STROKES, UNCONTROLLED HYPERTENSION.  BUT WHEN THE DRUG WAS PUT ON

20  THE MARKET, THERE WERE NO EXCLUSIONS FOR THOSE PATIENTS WHO WERE

21  EXCLUDED IN THOSE STUDIES.

22          CERTAINLY OSTEOARTHRITIS PATIENTS, ONE OF THE ISSUES, THE

23  WEAR AND TEAR ON JOINTS, THERE'S INCREASED WEIGHT, INCREASED WEIGHT

24  HAS OTHER CARDIOVASCULAR EFFECTS.  SO PATIENTS ARE BEING EXPOSED, I

25  MEAN, THE DRUG HAS BEEN SOLD TO PATIENTS WHO ARE AT HIGH RISK FOR

1   CARDIOVASCULAR DISEASE, EVEN THOUGH IN MANY OF THE TRIALS THEY WERE

2   EXCLUDED FROM THAT STUDY.

3   Q.  THANK YOU.

4           MR. DUGAN:  AT THIS TIME, YOUR HONOR, I WOULD LIKE TO

5   MOVE INTO EVIDENCE LOUISIANA AG 579.

6           MR. ISMAIL:  YOUR HONOR.

7           THE COURT:  IS THAT MERCK'S DOCUMENT?

8           MR. DUGAN:  YES, IT IS.

9           MR. ISMAIL:  IN MOTION LIMINE NUMBER 3 YOUR HONOR DENIED

10  IT BECAUSE IT WAS OVERBROAD AS STATED, BUT INDICATED AT THE HEARING

11  THAT INTERNAL MARKETING MATERIALS WOULD BE RULED OUT AT TRIAL.

12          THE COURT:  I UNDERSTAND BUT I'LL ALLOW IT, I AM GOING TO

13  ALLOW IT IN.  OVERRULE THE OBJECTION.

14  BY MR. DUGAN:

15  Q.  LAST QUESTION ON THIS SUBJECT, DOCTOR.  HOW COULD MERCK HAVE

16  INVESTIGATED THIS SAFETY SIGNAL?

17  A.  IT COULD HAVE DONE THE STUDIES, DEVELOPED THE DATABASE THAT I

18  TALKED ABOUT AND DONE THE STUDIES TO LOOK AT CARDIOVASCULAR SAFETY,

19  DESIGN A STUDY TO LOOK AT CARDIOVASCULAR SAFETY.

20  Q.  THANK YOU.  DR. KESSLER, HOW ARE YOU DOING, WE'VE BEEN GOING

21  FOR A BIT NOW, DO YOU NEED A BREAK?

22          THE WITNESS:  I'M FINE, YOUR HONOR.

23          MR. DUGAN:  IS THE COURT OKAY?

24          THE COURT:  LET'S GO.

25  BY MR. DUGAN:

1   Q.  DR. KESSLER, CAN YOU TELL US WHAT YOUR READING OF THE VIGOR

2   STUDY IS?

3   A.  THE VIGOR STUDY WAS A STUDY CONDUCTED BY MERCK IN APPROXIMATELY

4   8,000 PATIENTS, SOME 300 CENTERS WHERE IT WAS CONDUCTED, I BELIEVE,

5   A COMPARISON OF VIOXX TO NAPROXEN IN PATIENTS WITH RHEUMATOID

6   ARTHRITIS FOR PRIMARILY A GI SAFETY STUDY.

7   Q.  AND WERE THOSE RESULTS STATISTICALLY SIGNIFICANT?

8   A.  SO THE RESULTS IN VIGOR, AGAIN, YOU HAVE TO DEFINE WHICH

9   RESULTS IN VIGOR.  WHAT YOU SEE IS A STATISTICALLY SIGNIFICANT

10  INCREASE IN MYOCARDIAL INFARCTIONS AND HEART ATTACKS AND THROMBOTIC

11  EVENTS, APPROXIMATELY FIVE TIMES THE RATE OF MYOCARDIAL

12  INFARCTIONS, HEART ATTACKS AND THROMBOTIC EVENTS, IF MY MEMORY

13  SERVES ME CORRECT, ABOUT A 2.3 RELATIVE RISK WITH REGARD TO SERIOUS

14  OVERALL CARDIOVASCULAR EVENTS.  THEY WERE STATISTICALLY

15  SIGNIFICANT, YES, SIR.

16  Q.  THANK YOU, DOCTOR.

17          AND WHAT IS THE IMPORTANCE OF THE VIGOR STUDY TO YOUR

18  OPINIONS IN THIS CASE?

19  A.  THE VIGOR STUDY SHOWS THAT THERE WAS A STATISTICALLY

20  SIGNIFICANT INCREASE OF SERIOUS THROMBOTIC EVENTS IN PATIENTS THAT

21  RECEIVED VIOXX OVER NAPROXEN.  IT IS PROBABLY THE FIRST

22  STATISTICALLY SIGNIFICANT STUDY -- STATISTICALLY SIGNIFICANT

23  RESULT, SORRY -- THAT MERCK RECEIVES ON CARDIOVASCULAR.  THE

24  EARLIER THINGS WERE SIGNALS, HERE YOU HAVE A STATISTICALLY

25  SIGNIFICANT NUMBER, AGAIN, IN LIGHT OF THIS BIOLOGICAL MECHANISM.

1    Q.   THANK YOU, DOCTOR.

2         DO YOU HAVE AN OPINION AS TO WHETHER THE RESULTS OF THE

3    VIGOR STUDY GAVE RISE TO A DUTY ON THE PART OF MERCK TO ISSUE A

4    WARNING?

5    A.   YES.

6    Q.   AND WHAT SHOULD MERCK HAVE WARNED OF?

7    A.   THROMBOTIC AND MYOCARDIAL INFARCTION.

8    Q.   AND DID MERCK HAVE THE ABILITY TO ISSUE THAT WARNING WITHOUT

9    FDA APPROVAL?

10   A.   YES, THEY CERTAINLY SHOULD NOTIFY THE FDA, BUT THEY CERTAINLY

11   SHOULD WARN.

12   Q.   AND DR. KESSLER, AS YOU DISCUSSED EARLIER, FEDERAL REGULATION

13   201.57(C), AS TO THAT REGULATION, DO YOU HAVE AN OPINION AS TO

14   WHETHER MERCK SHOULD HAVE -- TO WHETHER THAT REGULATION APPLIED TO

15   MERCK'S DUTIES AFTER THE VIGOR DATA?

16   A.   YES.

17   Q.   AND WHY WAS IT IMPORTANT THAT THEY WARN AT THAT TIME?

18   A.   FOR THE STATE OF LOUISIANA, IF YOU'RE BUYING DRUGS FOR THE

19   STATE OF LOUISIANA, YOU'RE NOT GOING TO --

20        MR. ISMAIL:  OBJECTION, YOUR HONOR, THE WITNESS DID NOT

21   POSE ANY LOUISIANA OPINIONS AND AGREED AT HIS DEPOSITION --

22        THE COURT:  YES, I AGREE WITH THAT.  LET'S REPHRASE THE

23   QUESTION.

24   BY MR. DUGAN:

25   Q.   DR. KESSLER, I GUESS IN GENERAL, WHY WAS IT IMPORTANT THAT

1   MERCK WARN AFTER THE VIGOR DATA CAME OUT OF CARDIOVASCULAR RISK, OF

2   THROMBOTIC EVENT RISK?

3   A.  TO PREVENT HARM.

4   Q.  THANK YOU.  DO YOU HAVE AN OPINION AS TO WHETHER THE RESULTS OF

5   VIGOR SHOWED REASONABLE EVIDENCE OF A CAUSAL ASSOCIATION BETWEEN

6   VIOXX AND A CLINICALLY SIGNIFICANT HAZARD?

7   A.  YES, I DO.

8   Q.  AND WHAT IS YOUR OPINION?

9   A.  MY OPINION IS, THERE IS REASONABLE EVIDENCE OF A CAUSAL

10  ASSOCIATION, NOT DEFINITIVE BUT IT NEED NOT BE, THERE IS A

11  REASONABLE EVIDENCE OF A CAUSAL ASSOCIATION.  AGAIN, BOTH NOT

12  LOOKING JUST AT THE NUMBERS OF VIGOR BUT LOOKING AT THE BIOLOGICAL

13  MECHANISM.  COMBINED I THINK PROVIDE THE REASONABLE EVIDENCE.

14  Q.  DID MERCK ISSUE A WARNING AFTER THE VIGOR RESULTS?

15  A.  I HAVE SEEN NOTHING THAT I WOULD CONSIDER A WARNING.

16  Q.  WHAT DID MERCK SAY PUBLICLY TO EXPLAIN THE VIGOR RESULTS?

17  A.  IT INVOKED WHAT -- THE -- WHAT'S CALLED THE, IT WAS THE --

18  TERMED THE NAPROXEN THEORY, THAT NAPROXEN WAS CARDIOPROTECTIVE,

19  THAT THE PROBLEM WASN'T VIOXX, THAT NAPROXEN WAS CARDIOPROTECTIVE.

20  IT ADVANCED THAT THEORY.

21  Q.  THANK YOU.  DOCTOR, IN YOUR OPINION, WHAT IS THE STANDARD TO

22  WHICH MERCK SHOULD HAVE BEEN HELD IN ASSERTING THAT THE VIGOR

23  RESULTS WERE DUE TO NAPROXEN CARDIOPROTECTION?

24  A.  IF YOU'RE GOING TO MAKE THAT STATEMENT, YOU NEED ADEQUATE AND

25  WELL-CONTROLLED TRIALS IN ORDER TO BACK THAT UP.

Page 85

1    Q.  DID MERCK DO THAT?

2    A.  THERE ARE NO ADEQUATE AND WELL-CONTROLLED CLINICAL TRIALS THAT

3    SHOWED THAT NAPROXEN IS CARDIOPROTECTIVE TO MY KNOWLEDGE.

4    Q.  THANK YOU, DOCTOR.

5         DOCTOR, DID YOU ALSO HAVE A CHANCE TO REVIEW A WARNING

6    LETTER FROM THE FDA DIVISION OF DRUGS MARKETING, ADVERTISING AND

7    COMMUNICATIONS, OR DDMAC, TO MERCK DATED SEPTEMBER 17TH, 2001?

8    A.  I DID.

9    Q.  I WOULD ASK YOU TO TURN TO TAB 14 IN YOUR BINDER.

10   A.  YES, SIR.

11   Q.  CAN YOU PLEASE TURN TO PAGE 3 OF THE DOCUMENT.

12   A.  YES, SIR.

13   Q.  ENDING IN 3279.

14   A.  YES, SIR.

15   Q.  COULD YOU TELL THE COURT WHAT THE FDA WAS CONCERNED WITH HERE?

16   A.  WELL, IF YOU GO TO THE LAST PARAGRAPH, AGAIN, THEY'RE TALKING

17   ABOUT A NUMBER OF DIFFERENT PROMOTIONAL MATERIALS, BUT WHAT THEY'RE

18   CONCERNED ABOUT, I READ THIS, IS THIS SENTENCE IN THE LAST

19   PARAGRAPH, THE SECOND SENTENCE IS, "THERE ARE NO ADEQUATE AND

20   WELL-CONTROLLED STUDIES OF NAPROXEN THAT SUPPORT YOUR ASSERTION

21   THAT NAPROXEN'S TRANSIENT INHIBITION AND PLATELET AGGREGATION IS

22   PHARMACODYNAMICALLY COMPARABLE TO ASPIRIN OR CLINICALLY EFFECTIVE

23   IN DECREASING THE RISK OF MIS."  SO IT IS SAYING THERE IS NOT

24   ADEQUATE AND WELL-CONTROLLED STUDIES TO MAKE, TO BE ABLE TO -- FOR

25   THIS NAPROXEN THEORY.

1    Q.   THANK YOU.  COULD YOU PLEASE TURN NOW TO PAGE 6 OF THE DOCUMENT

2    ENDING IN 3282?

3    A.   YES, SIR.

4    Q.   WHAT WAS THE FDA CONCERNED WITH HERE UNDER THE HEADING PRESS

5    RELEASE?

6    A.   IT SAYS THEY'VE IDENTIFIED A PRESS RELEASE THAT THE COMPANY PUT

7    OUT TITLED A PRESS RELEASE, MERCK CONFIRMS FAVORABLE CARDIOVASCULAR

8    SAFETY PROFILE OF VIOXX DATED MAY 22ND, 2001, AND IT GOES ON TO

9    SAY, "YOUR CLAIM IN THE PRESS RELEASE THAT VIOXX HAS "FAVORABLE

10   CARDIOVASCULAR SAFETY PROFILE" IS SIMPLY INCOMPREHENSIBLE GIVEN THE

11   RATE OF MI AND SERIOUS CARDIOVASCULAR EVENTS COMPARED TO NAPROXEN."

12   Q.   DO YOU AGREE WITH THE FDA'S DESCRIPTION?

13   A.   I THINK IT IS A FAIR ASSESSMENT, YES, SIR.

14   Q.   AND, TO YOUR KNOWLEDGE, DID MERCK RESOLVE THE ISSUES RAISED IN

15   THE 9/17/01 LETTER TO FDA SATISFACTION?

16   A.   MY KNOWLEDGE IS, THE ANSWER IS YES, THEY DID RESOLVE THE MATTER

17   WITH REGARD TO THE SPECIFIC CONCERNS THAT THE AGENCY RELATED TO --

18   THERE WERE CONCERNS, IF YOU READ THE ENTIRE LETTER, ABOUT MARKETING

19   TO PHYSICIANS AT CERTAIN MEETINGS AND THEY HAD MERCK SEND OUT A

20   CORRECTION.

21          I AM NOT AWARE OF WHETHER, OF WHAT THE, WHETHER IT WAS

22   CORRECTIVE ACTION OR HOW THE MATTER OF THE PRESS RELEASE WAS DEALT

23   WITH, BUT I BELIEVE THE MATTER WAS CLOSED AND MERCK RESOLVED IT TO

24   FDA SATISFACTION.

25   Q.   THANK YOU.

1          MR. DUGAN:  AT THIS TIME, YOUR HONOR, I WOULD LIKE TO

2    MOVE INTO EVIDENCE LOUISIANA AG EXHIBIT NO. 4.

3          THE COURT:  I'LL ADMIT IT.

4    BY MR. DUGAN:

5    Q.  DR. KESSLER, DID YOU ALSO HAVE A CHANCE TO REVIEW DOCUMENTS

6    RELATING TO MERCK'S PLANS FOR PUBLICATION OF ARTICLES RELATING TO

7    CARDIOVASCULAR RISKS?

8    A.  I DID.

9    Q.  DID YOU REVIEW A MERCK DOCUMENT DATED APRIL 14TH, 2000, THAT

10   DISCUSSED MARKETING NEEDS?

11   A.  YES, I DID.

12   Q.  I WOULD ASK YOU TO TURN TO TAB 15.

13   A.  (WITNESS COMPLIES.)  YES, SIR.

14   Q.  HOW DID THIS APRIL 14, 2000, DATE RELATE TO THE TIME WHEN THE

15   VIGOR RESULTS WERE BEING KNOWN TO THE COMPANY?

16   A.  IT WAS COINCIDED, VIGOR RESULTS WERE KNOWN, INCREASED RATE OF

17   PROBLEMS, CARDIOVASCULAR PROBLEMS WITH THE DRUG, I THINK THIS IS

18   PROBABLY WITHIN ABOUT A MONTH AFTERWARDS.

19   Q.  THANK YOU.  I'D ASK YOU TO TURN TO PAGE 2307.

20   A.  YES.

21   Q.  WHAT'S IMPORTANT TO YOU ON THIS PAGE, DOCTOR?

22   A.  SO IF YOU, THE HEADING OF THE PAGE IS MARKETING UPDATE.  AND

23   THEN IT GOES, "THE FOLLOWING ARE THE MARKETING NEEDS" IS THE

24   HEADING ABOUT THREE PARAGRAPHS DOWN.  AND WHAT'S IMPORTANT TO ME

25   IS, IF YOU LOOK AT THE UNDERLINING OF THE FIRST, OF THE LAST

1   PARAGRAPH, FIRST SENTENCE OF THE LAST PARAGRAPH, IT SAYS:

2   "MARKETING NEEDS:  RAPID PUBLICATION AND COMMUNICATION AT OPINION

3   LEADER EVENTS OF PHRASE III OA RESULTS DEMONSTRATING COMPARABLE

4   INCIDENCE OF THROMBOEMBOLIC EVENTS WITH VIOXX PLACEBO AND NSAID

5   COMPARATIVE."

6   Q.  I WOULD ASK YOU TO TURN TO PAGE -- THE NEXT PAGE, 2308.

7   A.  YES.

8   Q.  IS THERE A STATEMENT AT THE TOP OF THIS PAGE THAT IS IMPORTANT

9   TO THE OPINIONS IN YOUR CASE?

10  A.  YES.

11  Q.  AND WHAT WOULD THAT BE?

12  A.  FIRST, THE UNDERLINE, ESTABLISHED THAT VIOXX, AGAIN, THESE ARE

13  IN THE CONTEXT OF MARKETING NEEDS, ESTABLISHED THAT VIOXX/COXIB

14  COULD NOT INCREASE THE RISK OF THROMBOEMBOLIC EVENTS DUE TO THE

15  UNIQUE MECHANISM OF ACTION, EVEN IN PATIENTS RECOGNIZED AS BEING AT

16  HIGHER RISK.

17          SO THESE ARE, THESE ARE MARKETING NEEDS THE COMPANY NEEDS

18  TO, FOR MARKETING PURPOSES TO ESTABLISH THAT VIOXX DOES NOT

19  INCREASE THE RISK OF THROMBOEMBOLIC EVENTS BECAUSE OF ITS UNIQUE

20  MECHANISM OF ACTION.

21          MR. DUGAN:  YOUR HONOR, AT THIS TIME I WOULD LIKE TO MOVE

22  INTO EVIDENCE LOUISIANA AG 588.

23          THE COURT:  I'LL ADMIT IT.

24  BY MR. DUGAN:

25  Q.  DR. KESSLER, DID YOU ALSO REVIEW A JANUARY 8TH, 2001,

1    MEMORANDUM OF THE COMPETITIVE ASSESSMENT TASK FORCE?

2    A.  I DID.

3    Q.  I WOULD ASK YOU TO LOOK AT TAB 16 IN YOUR BINDER.

4    A.  YES.

5    Q.  IS THIS THE DOCUMENT YOU REVIEWED?

6    A.  YES.

7    Q.  I WOULD ASK YOU TO TURN TO PAGE 592 OF THE DOCUMENT.

8    A.  YES.

9    Q.  AND, ONCE AGAIN, I APOLOGIZE, THE NUMBERS ARE VERY SMALL HERE.

10   IT'S THE FOURTH PAGE.

11   A.  FOURTH PAGE.

12   Q.  WHAT WERE THE OBJECTIVES OF MERCK HERE?

13   A.  AGAIN, IF I CAN JUST TURN, YOU COULD JUST TURN TO THE PAGE

14   BEFORE THAT.  I LOOK AT THE LIST OF THE PEOPLE PUTTING TOGETHER

15   THIS TASK FORCE ARE MARKETING AND PLANNING INDIVIDUALS, OFFICIALS

16   AT MERCK.  AND THEN TURNING, THE MARKETING AND PLANNING INDIVIDUALS

17   PUT TOGETHER OBJECTIVES AND THERE ARE FOUR:  ONE, TO FURTHER

18   DEVELOP OPINION LEADERS AND THE COUNTRY'S UNDERSTANDING AND

19   CONFIDENCE IN THE CARDIOVASCULAR AND RENAL SAFETY OF VIOXX; TWO, TO

20   CONTINUE TO NEUTRALIZE ANY PERCEIVED SAFETY HYPERTENSION, EDEMA,

21   CARDIOVASCULAR CONCERNS; THIRD BULLET, REGAIN THE OFFENSIVE BY

22   SHIFTING PHYSICIAN'S FOCUS BACK TO EFFICACY AND SAFETY; AND FOUR,

23   DEVELOP ACTION PLANS FOR RAPID AND ONGOING RESPONSES IN MONITORING

24   OF COMPETITIVE TACTICS AND NEW CLINICAL INFORMATION.

25   Q.  THANK YOU.  I WOULD ASK YOU TO TURN TO PAGE 596 NOW.

1    A.  YES.

2    Q.  WHAT DID THESE NEUTRALIZATION EFFORTS ENTAIL?

3    A.  AGAIN, THE PRINT IS GETTING SMALLER.  IT SAYS, TO NEUTRALIZE

4    PERCEIVED CARDIOVASCULAR SAFETY CONCERNS, AND THEN IT USES THE WORD

5    PUBLICATIONS.  THESE ARE MARKETING OFFICIALS TALKING ABOUT

6    PUBLICATIONS, AND AS I READ WHERE THE PUBLICATIONS ARE GOING, AJC,

7    AMERICAN JOURNAL OF CARDIOLOGY, SO THEY'RE TALKING ABOUT PUTTING

8    NEUTRALIZING PERCEIVED SAFETY CONCERNS BY PUBLISHING ARTICLES IN

9    THE PEER-REVIEWED LITERATURE ON, FIRST BULLET, CARDIOVASCULAR

10   SAFETY, I THINK THAT'S THE OSTEOARTHRITIS DATABASE, I THINK THAT'S

11   06, I CAN'T READ THE NUMBER, AND THEN, FOR EXAMPLE, THE LAST

12   BULLET, META-ANALYSIS OF CV SAFETY.

13          SO IT'S MARKETING OFFICIALS TALKING ABOUT NEUTRALIZING

14   THE SAFETY, THE CARDIOVASCULAR SAFETY CONCERNS, BY -- IN

15   PUBLICATIONS, OF CERTAIN DATA SETS.

16   Q.  THANK YOU, DOCTOR.

17          MR. DUGAN:  AT THIS TIME I WOULD LIKE TO MOVE INTO

18   EVIDENCE LOUISIANA AG 589.

19          THE COURT:  ADMITTED.

20   BY MR. DUGAN:

21   Q.  DOCTOR, DID YOU ALSO RECEIVE A COMMERCIALIZATION TEAM MEMO OF

22   MARCH 13, 2001?

23   A.  I DID.

24   Q.  I WOULD ASK YOU TO TURN TO TAB 17 IN YOUR BINDER.

25   A.  YES.

1  Q.  I WOULD ASK, ALSO ASK YOU TO TURN TO PAGE 6790.  ABOUT HALFWAY

2  THROUGH THE DOCUMENT.

3  A.  YES, SIR.

4  Q.  WHAT DOES IT TELL YOU ABOUT THE PLANS FOR PUBLICATIONS OF KEY

5  SAFETY MESSAGES?

6  A.  SO IT TALKS ABOUT, UNDER APPENDIX B, IT TALKS ABOUT A

7  COMPREHENSIVE, SCIENTIFIC COMMUNICATION STRATEGY, INCLUDING PLANS

8  FOR ABSTRACT PRESENTATIONS AND PEER-REVIEWED PUBLICATIONS FOR VIOXX

9  FOCUSSING ON KEY SAFETY MESSAGES, INCLUDING CARDIOVASCULAR SAFETY.

10        MR. ISMAIL:  JIM, I DON'T MEAN TO INTERRUPT, MY TAB AT 17

11  I DON'T THINK TRACKS.  WHAT WAS THE BATES NUMBER YOU GAVE?

12        MR. DUGAN:  THE BATES NO. 106697.

13        MR. ISMAIL:  THAT'S MY TAB 19, SORRY.

14        THE COURT:  106791 OR NOT?  WHAT IS THE BATES NUMBER OF

15  THAT?

16        THE WITNESS:  YOUR HONOR, WHAT I JUST READ WAS 1067 --

17  106790.

18        THE COURT:  OKAY.  GO AHEAD.

19        MR. DUGAN:  YOUR HONOR, AT THIS TIME I WOULD LIKE TO MOVE

20  INTO EVIDENCE LOUISIANA AG 590 AS AN EXHIBIT TO THIS CASE.

21        THE COURT:  THAT'S THE WHOLE THING?

22        MR. DUGAN:  YES, SIR, YOUR HONOR.

23        MR. ISMAIL:  YOUR HONOR, IT SEEMS TO BE DEALING WITH

24  OTHER DRUGS, INTERNAL MARKETING PROMOTIONAL PLANS.  SAME OBJECTION

25  AS WE'VE ISSUED EARLIER.

1           THE COURT:  THE ONLY THING FROM THE STANDPOINT OF

2  MARKETING IS THAT I AM NOT INTERESTED IN THE MARKETING TO SHOW HOW

3  MANY DRUGS WERE SOLD AND THAT SORT OF THING.  BUT THE MARKETING MAY

4  HAVE SOME RELEVANCE WHEN THE POSITION OF MERCK IS THAT LOUISIANA

5  KNEW OR COULD HAVE KNOWN, I DON'T KNOW WHETHER IT'S INDICATIVE OR

6  NOT, I AM NOT SPEAKING ON THAT.  BUT IT IS RELEVANT, SO I'LL ADMIT

7  IT.

8           MR. DUGAN:  THANK YOU, YOUR HONOR.

9  BY MR. DUGAN:

10 Q.  DR. KESSLER, DID YOU ALSO REVIEW MERCK'S SCIENTIFIC

11 COMMUNICATION PLAN DATED MARCH 27TH, 2001?

12 A.  YES, I BELIEVE I DID.

13 Q.  I WOULD TURN YOU TO TAB 18 OF YOUR BINDER.

14 A.  YES.  YES, SIR.

15 Q.  IS THIS THE DOCUMENT THAT YOU REVIEWED?

16 A.  YES, SIR.

17 Q.  FROM THE TABLE AT THE BOTTOM OF PAGE 257, WHAT WERE MERCK'S

18 MESSAGES?

19 A.  WITH REGARD TO CARDIOVASCULAR SAFETY, CARDIOVASCULAR, THE KEY

20 MESSAGES, THE CARDIOVASCULAR EFFECTS WERE SIMILAR TO PLACEBO AND

21 NSAIDS, AND THAT THE DIFFERENCE IN MIS IN VIGOR WERE DUE TO

22 CARDIOPROTECTION WITH NAPROXEN BASED ON LIMITED DATA.

23 Q.  THANK YOU, DOCTOR.

24           CAN YOU NOW TURN TO PAGE 263 OF THIS DOCUMENT?

25 A.  YES, SIR.

1    Q.   WHAT DOES THIS PAGE SHOW AND WHY IS IT IMPORTANT?

2    A.   THIS IS AN APPENDIX TO THAT DOCUMENT, AND IT TALKS ABOUT

3    CERTAIN PREFERRED EXTERNAL SPEAKERS.   THESE INCLUDE CARDIOLOGISTS

4    AND NEPHROLOGISTS.   CARDIOLOGISTS, UNDER THERE IT SAYS MI,

5    MYOCARDIAL INFARCTION EXPERTISE WITH REGARD TO MYOCARDIAL

6    INFARCTION, HYPERTENSION AND EDEMA, AND THE ASTERISK SAYS "ALL

7    CARDIOLOGISTS LISTED HAVE BEEN ENGAGED BY MERCK RESEARCH

8    LABORATORIES OR THEIR -- I CAN'T READ IT -- AND HAVE DEMONSTRATED A

9    CLEAR UNDERSTANDING OF MERCK'S POINT OF VIEW ON CARDIOVASCULAR AND

10   RENAL ISSUES.   THOSE CARDIOLOGISTS MARKED WITH AN ASTERISK

11   REPRESENT CERTIFIED NATIONAL SPEAKERS, WHO CONSISTENTLY COMMUNICATE

12   MERCK'S POINT OF VIEW ON THESE ISSUES AND PRESENTATIONS TO THEIR

13   COLLEAGUES."

14   Q.   THANK YOU, DOCTOR.

15         MR. DUGAN:   AT THIS TIME, YOUR HONOR, I WOULD LIKE TO

16   MOVE INTO EVIDENCE LOUISIANA AG 127.

17         THE COURT:   ADMITTED.

18   BY MR. DUGAN:

19   Q.   DR. KESSLER, DID YOU ALSO REVIEW ANY OF THE ARTICLES WRITTEN BY

20   MERCK EMPLOYEES AND CONSULTANTS REGARDING CV RISKS?

21   A.   I DID.

22   Q.   DID YOU REVIEW AN ARTICLE WHERE DR. KONSTAM WAS LISTED AS THE

23   FIRST AUTHOR FOLLOWED BY DR. WEIR AND SOME MERCK EMPLOYEES?

24   A.   I DID.

25   Q.   DID YOU ALSO REVIEW AN ARTICLE BY DR. REICIN?

1    A.  I DID.

2    Q.  AND DID YOU ALSO REVIEW AN ARTICLE WHERE DR. WEIR WAS LISTED AS

3    THE FIRST AUTHOR FOLLOWED BY SOME MERCK EMPLOYEES?

4    A.  I DID.

5    Q.  AND BASED ON YOUR REVIEW OF THOSE ARTICLES, DO YOU HAVE AN

6    OPINION AS TO WHETHER THEY COMMUNICATED THE MERCK POINT OF VIEW AS

7    INDICATED IN THE MERCK DOCUMENTS FROM 2000 AND 2001 THAT YOU'VE

8    BEEN REVIEWING?

9    A.  I DO HAVE AN OPINION.

10   Q.  AND WHAT IS THAT?

11   A.  THAT THEY DID COMMUNICATE THE MERCK POSITION.

12   Q.  DOCTOR, DID YOU ALSO HAVE A CHANCE TO REVIEW A MERCK DOCUMENT

13   DATED DECEMBER 19TH, 2000, THAT TALKED ABOUT THE PLAN TO CONDUCT A

14   META-ANALYSIS FOR POSSIBLE PUBLICATION?

15   A.  YES.

16   Q.  DOCTOR, I WOULD ASK YOU TO TURN TO TAB 19 IN YOUR BINDER.

17   A.  YES.

18   Q.  IS THIS THE DOCUMENT YOU REVIEWED?

19   A.  YES.

20   Q.  AT THE BOTTOM OF THE FIRST PAGE ENDING IN 5346 OF THIS DOCUMENT

21   REGARDING META-ANALYSIS, WHAT WAS IMPORTANT TO YOU ABOUT THAT?

22   A.  IF YOU READ IT, IT SAYS:  "CONDUCT THE META-ANALYSIS OF

23   CARDIOVASCULAR EVENTS FROM ALL PHRASE III STUDIES," AND THEN THE

24   LAST SENTENCE IN THAT BULLET, IT SAYS:  "IF RESULTS ARE POSITIVE,

25   THEN PUBLISH."

1          SO YOU HAVE TO, I HAD -- AGAIN, TAKING THAT STATEMENT AND

2    TRYING TO PUT IT IN CONTEXT, IF THE RESULTS ARE POSITIVE FOR THE

3    DRUG, ARE THE RESULTS POSITIVE ON THE META-ANALYSIS, THEN PUBLISH.

4    AS IN THE CONTEXT THAT I SAW THE RESULTS BEING PUBLISHED, THE

5    RESULTS WERE NEGATIVE, SO I TOOK THIS TO MEAN THAT IF THE RESULTS

6    ARE POSITIVE FOR THE DRUG, THEN WE'RE GOING TO PUBLISH.  BUT THAT

7    WAS AN INFERENCE.

8    Q.  AND WHY IS THAT IMPORTANT TO YOUR OPINIONS IN THIS CASE?

9    A.  MY OPINIONS HAD TO DO WITH WHETHER THERE WAS SELECTIVE

10   PRESENTATION OF DATA.  AND AGAIN, WHAT MERCK PRESENTED AND WHAT

11   PEOPLE COULD HAVE KNOWN DEPENDS ON WHAT MERCK PRESENTS.

12   Q.  THANK YOU, DOCTOR.

13          MR. DUGAN:  AT THIS TIME, YOUR HONOR, I WOULD LIKE TO

14   MOVE INTO EVIDENCE LOUISIANA AG 586.

15          THE COURT:  WHAT EXACTLY IS THIS?

16          MR. DUGAN:  THIS IS A MERCK --

17          THE COURT:  OKAY.  IT'S NOT AN ARTICLE, IS IT?

18          MR. DUGAN:  NO, IT'S NOT, YOUR HONOR.

19          THE COURT:  OKAY.  I'LL ADMIT IT.

20   BY MR. DUGAN:

21   Q.  DR. KESSLER, I WOULD ASK YOU TO TURN TO TAB 20 IN YOUR BINDER.

22   A.  YES.

23   Q.  WHAT IS THIS ARTICLE IN REFERENCE TO?

24   A.  THIS IS, THIS ARTICLE WAS FIRST AUTHORED BY ALISE REICIN, A

25   MERCK EMPLOYEE, AND SHE IS REPORTING ON THE CARDIOVASCULAR

1  THROMBOTIC EVENTS FOR PATIENTS WITH OSTEOARTHRITIS TREATED WITH

2  VIOXX AND OTHER DRUGS.

3  Q.  AND IF YOU LOOK AT THE FIRST PAGE AT THE END OF THE SUMMARY OF

4  THE ARTICLE, WHAT WAS THE CONCLUSION?

5  A.  IF YOU LOOK AT THE ABSTRACT AND YOU GO TO THE LAST SENTENCE, IT

6  SAYS:  "THUS, IN THE VIOXX OSTEOARTHRITIS DEVELOPMENT PROGRAM,

7  THERE WERE NO DIFFERENCES BETWEEN VIOXX COMPARATOR, NONSELECTIVE

8  NSAIDS AND PLACEBO IN THE RISKS OF CARDIOVASCULAR THROMBOTIC

9  EVENTS."  THERE WAS NO DIFFERENCE BETWEEN VIOXX AND PLACEBO IN THAT

10  OA DATABASE.

11  Q.  THANK YOU.  SO DID THE REICIN ARTICLE PRESENT DATA ON ALL OF

12  OSTEOARTHRITIS STUDIES THAT MERCK HAD CONDUCTED AS OF THE TIME THIS

13  STUDY WAS PUBLISHED?

14  A.  NO, IT DID NOT.

15  Q.  WHICH STUDIES DID IT PUBLISH?

16  A.  IT PUBLISHED THE STUDIES THAT WERE AVAILABLE TO THE COMPANY UP

17  THROUGH, I BELIEVE, 1998, AS IT SAYS IN THE ARTICLE.

18  Q.  TURNING TO PAGE 207 OF THE ARTICLE.

19  A.  YES, SIR.

20  Q.  DOES TABLE 4-B SHOW A COMPARISON BETWEEN VIOXX AND PLACEBO AS

21  OF 1998?

22  A.  YES.  SO YOU HAVE TO GO, IF YOU GO TO THE SECOND TABLE ON THE

23  PAGE AND YOU GO TO THE BOTTOM HALF OF THAT B SECTION AND YOU LOOK

24  AT WHERE IT SAYS OVERALL POPULATION, VIOXX VERSUS PLACEBO, AND YOU

25  JUST MOVE OVER TO THE RELATIVE RISK ESTIMATE, YOU SEE A RELATIVE

1   RISK OF 0.94, AND IT'S NOT STATISTICALLY SIGNIFICANT FOR THE

2   OVERALL POPULATION.

3   Q.  WHAT OTHER STUDIES OF OSTEOARTHRITIS PATIENTS FOR VIOXX VERSUS

4   PLACEBO HAD MERCK COMPLETED AS OF 2002 WHEN THIS ARTICLE WAS

5   PUBLISHED?

6   A.  I BELIEVE THOSE ARE PROTOCOLS 083, 085, 090.  I BELIEVE THEY

7   WERE NOT INCLUDED, THEY WERE DONE AFTER 1998 BUT BEFORE THIS

8   ARTICLE WAS PUBLISHED.  I ALSO BELIEVE THERE WAS A STUDY 010 THAT

9   WASN'T INCLUDED.

10  Q.  SO DID DR. REICIN'S ARTICLE MENTION ANY OF THOSE TRIALS?

11  A.  NO.  THOSE ADDITIONAL TRIALS, NO.

12  Q.  HAVE YOU REVIEWED DOCUMENTS SHOWING WHAT THE RELATIVE RISK

13  WOULD HAVE BEEN IF MERCK HAD INCLUDED THESE STUDIES?

14  A.  YES.

15  Q.  DOCTOR, I WOULD ASK YOU TO LOOK AT TAB 21 IN YOUR BINDER.

16  A.  YES, SIR.

17  Q.  IS THIS THE DOCUMENT THAT YOU REVIEWED SHOWING THE RESULTS OF

18  THE OSTEOARTHRITIS TRIALS?

19  A.  YES, SIR.

20  Q.  I WOULD ASK YOU TO TURN TO PAGE 2239 OF THE DOCUMENT.

21  A.  YES, SIR.

22  Q.  DOCTOR, CAN YOU TELL THE COURT WHAT THE RELATIVE RISK WOULD

23  HAVE BEEN IF MERCK HAD REPORTED OA STUDIES THAT YOU REFERENCED

24  EARLIER INSTEAD OF ONLY THOSE STUDIES DONE THROUGH 1998?

25  A.  YES.  SO IF YOU GO TO TABLE 10 ON PAGE 26 AND YOU LOOK AT STUDY

1    BLOCK OA, AND YOU CAN SEE REICIN'S ARTICLE, I BELIEVE, IS INCLUDING

2    PROTOCOLS 029 THROUGH 058.  BUT IF YOU INCLUDE, AS I SAY, 083, 085,

3    090, THIS IS A POOLED ANALYSIS THAT WAS DONE BY MERCK, IF YOU

4    INCLUDE THOSE THREE OTHER STUDIES, YOU SEE A RELATIVE RISK OF 1.80

5    HIGHER THAN, ABOUT DOUBLE THE NUMBER RELATIVE RISK.  IT IS NOT

6    STATISTICALLY SIGNIFICANT.

7         THIS DOES NOT INCLUDE 010, I BELIEVE THAT WOULD INCREASE

8    THE RELATIVE RISK TO 1.9, AGAIN, NOT STATISTICALLY SIGNIFICANT.

9    Q.  AND WHY WOULD THAT INFORMATION BE IMPORTANT?

10   A.  IT -- CERTAINLY A RELATIVE RISK OF 1.8 IS CONSIDERABLY HIGHER

11   THAN A RELATIVE RISK OF LESS THAN 1, EVEN THOUGH IT'S NOT

12   STATISTICALLY SIGNIFICANT.  THE PROBLEM IS WE'RE DEALING WITH

13   RELATIVELY SMALL SIZES AND IT CERTAINLY IS, IT'S CERTAINLY A

14   SIGNAL.

15   Q.  DR. KESSLER, DO YOU HAVE AN OPINION AS TO WHETHER THE REICIN

16   ARTICLE ACCURATELY INFORMED READERS OF THE RISK OF THROMBOTIC

17   EVENTS IN OA CASES?

18   A.  I DO.

19   Q.  AND WHAT IS THAT?

20   A.  IT WAS NOT COMPLETE, IT DIDN'T INDICATE THAT OTHER STUDIES HAD

21   BEEN DONE, AND IT DIDN'T INCLUDE THOSE STUDIES AND THE RELATIVE

22   RISKS WOULD HAVE BEEN DIFFERENT.

23   Q.  THANK YOU.  I WOULD ASK YOU TO TURN -- I'M SORRY, YOUR HONOR.

24        MR. DUGAN:  AT THIS TIME I WOULD LIKE TO MOVE INTO

25   EVIDENCE LOUISIANA AG 587 AS AN EXHIBIT.

1                    THE COURT:  ADMITTED.

2      BY MR. DUGAN:

3      Q.  DOCTOR, I TURN YOU TO TAB 22.

4      A.  YES.

5      Q.  COULD YOU TELL THE COURT ABOUT THIS ARTICLE?

6      A.  THIS IS AN ARTICLE THAT APPEARED IN THE JOURNAL CIRCULATION,

7      FIRST AUTHOR MARVIN KONSTAM AND IT'S TITLED, CARDIOVASCULAR

8      THROMBOTIC EVENTS IN CONTROLLED CLINICAL TRIALS OF VIOXX.

9      Q.  AND WHAT WAS THE CONCLUSION OF THIS ARTICLE?

10     A.  IF YOU MOVE DOWN TO THE CONCLUSION, THERE ARE TWO SENTENCES:

11     "THIS ANALYSIS PROVIDES NO EVIDENCE FOR AN EXCESS OF CARDIOVASCULAR

12     EVENTS FOR VIOXX RELATIVE TO EITHER PLACEBO OR NON-NAPROXEN NSAIDS

13     THAT WERE STUDIED.  DIFFERENCES OBSERVED BETWEEN VIOXX AND NAPROXEN

14     ARE LIKELY THE RESULT OF THE ANTI-PLATELET EFFECTS OF THE LATTER

15     AGENT."

16     Q.  DOCTOR, DID YOU SEE ANY DRAFTS OF THIS ARTICLE IN YOUR DOCUMENT

17     REVIEW IN THIS CASE?

18     A.  I DID.

19     Q.  AND WHO PREPARED THE DRAFT THAT YOU SAW?

20     A.  MERCK.

21     Q.  AND DID YOU NOTICE WHETHER DR. KONSTAM APPEARED AS ONE OF

22     MERCK'S CARDIOLOGISTS WHO HAD BEEN ENGAGED AND DEMONSTRATED CLEAR

23     UNDERSTANDING OF MERCK'S POINT OF VIEW IN THE SCIENTIFIC

24     COMMUNICATION PLAN?

25     A.  HE WAS ONE OF THE CARDIOLOGISTS THAT WAS LISTED WITH AN

1    ASTERISK; THE ANSWER IS YES.

2    Q.   THANK YOU, DOCTOR.  I TURN YOU TO TAB 23 IN THE BINDER.

3    A.   YES.

4    Q.   CAN YOU TELL US ABOUT THIS ARTICLE?

5    A.   THIS IS AN ARTICLE BY MATTHEW WEIR AS THE FIRST AUTHOR FROM THE

6    UNIVERSITY OF MARYLAND HOSPITAL, ALONG WITH THREE MERCK SCIENTISTS,

7    PHYSICIANS, AND IT IS A REVIEW OF THE VIOXX DEVELOPMENT PROGRAM AND

8    ITS CARDIOVASCULAR EFFECT.

9    Q.   ARE THOSE MERCK EMPLOYEES, SPURLING (PHONETIC), BRYSON

10   (PHONETIC) AND GERTZ?

11   A.   YES.

12   Q.   DID DR. WEIR'S NAME APPEAR ON THE LIST OF MERCK'S PREFERRED

13   EXTERNAL SPEAKERS FOR SCIENTIFIC COMMUNICATIONS?

14   A.   YES.  HE DID NOT HAVE AN ASTERISK, I BELIEVE.

15   Q.   DOES WEIR'S AFFILIATION AS A MERCK CONSULTANT APPEAR ANYWHERE

16   IN THIS ARTICLE?

17   A.   I DID NOT SEE IT ANYWHERE IN THIS ARTICLE.

18   Q.   LOOKING AT THE END OF THE SUMMARY ON THE FIRST PAGE, DOCTOR,

19   WHAT WAS THE MAIN MESSAGE OF THE WEIR ARTICLE?

20   A.   THE LAST SENTENCE:  "THE TOTALITY OF DATA IS NOT CONSISTENT

21   WITH AN INCREASED CARDIOVASCULAR RISK AMONG PATIENTS TAKING VIOXX."

22   AND THEN YOU MOVE UP TWO SENTENCES, IT SAYS AGAIN:  "NAPROXEN

23   APPEARED TO BE THE OUTLIER SUGGESTING A CARDIOPROTECTIVE BENEFIT OF

24   NAPROXEN."

25   Q.   DID WEIR INCLUDE ALL OF OA STUDIES AVAILABLE AT THE TIME THIS

1    ARTICLE WAS PUBLISHED?

2    A.   NO, I BELIEVE HE DID NOT.

3    Q.   COULD YOU TELL US WHAT WOULD THE RELATIVE RISKS HAVE BEEN IF

4    ALL OF THE OA STUDIES HAD BEEN REPORTED?

5    A.   I BELIEVE IT WOULD'VE BEEN --

6              MR. ISMAIL:  JUDGE, CAN WE HAVE SOME FOUNDATION, YOUR

7    HONOR?

8              THE COURT:  LET'S GET A FOUNDATION.  THAT'S NOT THE 1.8?

9              THE WITNESS:  I'M SORRY, YOUR HONOR?

10             THE COURT:  IT'S NOT THE 1.8, NO?

11             THE WITNESS:  NO.

12             THE COURT:  LET'S ASK HIM HOW DOES HE KNOW.

13   BY MR. DUGAN:

14   Q.   DR. KESSLER, COULD YOU PLEASE TELL THE COURT HOW YOU WOULD

15   ARRIVE IN DETERMINING A RELATIVE RISK NUMBER HERE?

16   A.   LET ME JUST TRY TO REMEMBER THE PROCESS THAT I DID.  I BELIEVE

17   THERE WERE TWO THINGS, IF MY MEMORY SERVES ME RIGHT, ON THE

18   PROCESS.  I BELIEVE THAT, THAT COUNSEL MAY HAVE HAD, AGAIN, WHAT

19   WE'RE TALKING ABOUT IS THE ENTIRE OA DATABASE RUN FROM 010 TO 136

20   AND HAD AN OUTSIDE CONSULTANT DO THAT.  I BELIEVE I SAW THOSE

21   NUMBERS.

22             I BELIEVE I CHECKED THOSE NUMBERS BY PLUGGING THOSE

23   NUMBERS INTO THE STATISTICAL SOFTWARE OF 010 THROUGH 0 -- 1 THROUGH

24   136, IT'S THE ENTIRE OA DATABASE.  SO I BELIEVE I CONFIRMED THAT

25   MYSELF STATISTICALLY.  I DON'T HAVE AN EXACT MEMORY.

1          THE COURT:  I'LL SUSTAIN THE OBJECTION.

2          MR. DUGAN:  OKAY.  THANK YOU.

3    BY MR. DUGAN:

4    Q.  DOCTOR, DO YOU HAVE AN OPINION AS TO WHETHER MERCK'S OVERALL

5    PRESENTATION OF CARDIOVASCULAR RISK INFORMATION IN THE

6    PEER-REVIEWED LITERATURE ACCURATELY INFORMS READERS OF THE CV RISK

7    OF VIOXX?

8    A.  I DO.  I DO HAVE AN OPINION.

9    Q.  AND WHAT IS THAT OPINION?

10   A.  I DO NOT BELIEVE THE THREE ARTICLES THAT WE JUST DISCUSSED

11   ACCURATELY REFLECT THE CV RISK IN THE PEER-REVIEWED LITERATURE.

12   Q.  AND, DOCTOR, DO YOU HAVE AN OPINION AS TO WHETHER YOU BELIEVE

13   THE STATE OF LOUISIANA COULD HAVE KNOWN OF THE TRUE CV RISKS BEFORE

14   IT WAS WITHDRAWN ON SEPTEMBER 30TH, 2004?

15          THE COURT:  JUST -- OBJECTION.  I AM GOING TO SUSTAIN THE

16   OBJECTION.

17          MR. DUGAN:  I'LL REPHRASE THE QUESTION.

18   BY MR. DUGAN:

19   Q.  DOCTOR, DO YOU HAVE AN OPINION AS TO WHETHER YOU BELIEVE THE

20   MEDICAL COMMUNITY OR THE PUBLIC COULD HAVE KNOWN OF THE TRUE CV

21   RISK OF VIOXX BEFORE IT WAS WITHDRAWN ON SEPTEMBER 30TH, 2004?

22          MR. ISMAIL:  SAME OBJECTION.

23          THE COURT:  SAME THING.  YES, I SUSTAIN THE OBJECTION.  I

24   UNDERSTAND WHAT HE IS SAYING, BUT TO EXTRAPOLATE, THAT'S JUST TOO

25   BROAD OF A QUESTION.  DID THEY ACCURATELY STATE IT, THAT'S

Page 103

1    SOMETHING HE CAN SAY, BUT WHETHER OR NOT SOMEBODY UNDERSTOOD IT IS

2    A LITTLE FAR AFIELD.  SO TO THAT EXTENT, I'LL SUSTAIN THE

3    OBJECTION.  ASK YOU TO REPHRASE IT IF YOU NEED TO.

4            THE QUESTION REALLY IS, DID THEY ACCURATELY STATE THE

5    RISK?

6            THE WITNESS:  NO.

7            THE COURT:  ALL RIGHT.  GO AHEAD.

8            MR. DUGAN:  THANK YOU.  JUDGE, I HAVE ABOUT TEN MINUTES

9    LEFT.

10           THE COURT:  OKAY.  WHY DON'T WE GO AHEAD.

11           MR. DUGAN:  OKAY.  THANK YOU.

12   BY MR. DUGAN:

13   Q.  DR. KESSLER, DID YOU REVIEW ANY DOCUMENTS REGARDING MERCK'S

14   SUBMISSION OF A PROPOSED LABEL REVISION TO FDA AFTER THE VIGOR

15   STUDY?

16   A.  I DID.

17   Q.  I'D ASK YOU TO TURN TO TAB 24.

18   A.  YES.

19   Q.  IS THIS ONE OF THE DOCUMENTS YOU REVIEWED?

20   A.  YES.

21   Q.  I WOULD ASK YOU TO TURN TO PAGE 8038 OF THE DOCUMENT.

22   A.  YES.

23   Q.  IS THIS PART OF THE INFORMATION YOU REVIEWED?

24   A.  YES.

25   Q.  AND WHAT IS THE IMPORTANCE OF THIS DOCUMENT TO YOUR OPINIONS IN

Page 104

1   THIS CASE?

2   A.  THIS IS A PROPOSED LABEL THAT IS BEING SUBMITTED TO FDA, AND IF

3   YOU GO TO THE THIRD PARAGRAPH, IT STARTS OFF, IN THIS STUDY, AND

4   THEN IT GOES DOWN, YOU CAN SEE WHERE IT GOES, THE SECOND SENTENCE:

5   "THE INCIDENCE OF CONFIRMED ACUTE MYOCARDIAL INFARCTION WAS 0.4

6   PERCENT IN PATIENTS TREATED WITH VIOXX AND .1 PERCENT OF PATIENTS

7   TREATED WITH NAPROXEN."

8           AND THEN IT GOES ON TO SAY:  "THIS IS CONSISTENT WITH THE

9   KNOWN ANTI-PLATELET EFFECTS OF NAPROXEN."  SO THIS IS, AGAIN, THE

10  NAPROXEN THEORY BEING ADVANCED BY MERCK IN THE PROPOSED LABEL.

11          MR. ISMAIL:  AGAIN, THE COPY OF THIS EXHIBIT THAT WE

12  RECEIVED STOP.

13          THE COURT:  I'M SORRY, I DIDN'T HEAR THAT.

14          MR. ISMAIL:  THE COPY OF THE EXHIBIT THAT WE RECEIVED

15  STOPPED AT --

16          THE COURT:  IT'S ON THE BACK OF THE PAGE I'VE GOT.

17          MR. ISMAIL:  THANK YOU.

18  BY MR. DUGAN:

19  Q.  DR. KESSLER, WHAT IS THE IMPORTANCE OF THIS DOCUMENT TO YOUR

20  OPINIONS IN THIS CASE?

21  A.  THIS IS MERCK ADVANCING THE NAPROXEN THEORY TO EXPLAIN THE

22  VIGOR RESULTS.

23  Q.  THANK YOU.

24          MR. DUGAN:  YOUR HONOR, AT THIS TIME I WOULD LIKE TO MOVE

25  INTO EVIDENCE, THIS IS DEFENDANT'S EXHIBIT 145.

1          THE COURT:  ADMITTED.

2   BY MR. DUGAN:

3   Q.  DOCTOR, DID YOU ALSO REVIEW ANOTHER LABEL PROPOSAL THAT MERCK

4   SUBMITTED IN MARCH OF 2001?

5   A.  I DID.

6   Q.  I WOULD ASK YOU TO LOOK AT TAB 25.

7   A.  YES.

8   Q.  IS THIS THE DOCUMENT?

9   A.  YES, I BELIEVE THE LABEL IS, THE PROPOSED LABEL IS SOMEWHERE IN

10  THIS DOCUMENT.

11  Q.  YEAH, I WOULD ASK YOU TO LOOK AT PAGE 6832.

12  A.  YES, SIR.

13  Q.  ARE YOU THERE, DOCTOR?

14  A.  ONE SECOND, PLEASE.  YES.

15  Q.  WHAT IS THE IMPORTANCE OF THIS DOCUMENT TO YOUR OPINIONS IN

16  THIS CASE?

17  A.  THIS IS ANOTHER PROPOSED LABEL FROM MERCK TO FDA.  IF YOU GO TO

18  THE SECOND PARAGRAPH UNDER CARDIOVASCULAR EFFECTS, IT SAYS IN THE

19  MIDDLE OF THAT PARAGRAPH, AGAIN, AFTER EXPLAINING VIGOR, SLIGHTLY

20  DIFFERENT LANGUAGE THAN THE PRIOR LABEL, IT SAYS:  "AS NOTED IN ITS

21  PRODUCT CIRCULAR, NAPROXEN MAY DECREASE PLATELET AGGREGATION AND

22  PROLONGED BLEEDING TIME."  AGAIN, IT'S ADVANCING LITTLE LESS

23  AFFIRMATIVELY THE NAPROXEN THEORY WITH THE FDA.

24  Q.  THANK YOU, DOCTOR.

25          MR. DUGAN:  YOUR HONOR, AT THIS TIME I WOULD LIKE TO MOVE

Page 106

1    INTO EVIDENCE LOUISIANA AG 590.

2            THE COURT:  I'LL ADMIT IT.

3            MR. ISMAIL:  YOUR HONOR, IF WE MAY HAVE A MOMENT SINCE

4    THE WITNESS APPARENTLY ONLY REVIEWED ONE OR TWO PAGES OF THIS

5    DOCUMENT, I WILL GET WITH COUNSEL.  IF ONLY A PORTION SHOULD BE

6    ADMITTED, WE'LL RAISE IT AT THAT TIME.

7            THE COURT:  DO YOU HAVE ANY PROBLEM WITH THAT, ADMITTING

8    THE PAGES THAT HE REVIEWED?  I MEAN, IT'S JUST A QUESTION OF

9    MATERIAL AFTER A WHILE.

10           MR. DUGAN:  WELL, WE'RE ALMOST DONE, YOUR HONOR, IF YOU

11   DON'T MIND I'D LIKE TO --

12           THE COURT:  NO, I DON'T MEAN THAT, I MEAN WITH THE 25, IS

13   THERE SOMETHING ELSE THAT YOU WANTED TO -- DID YOU REVIEW THE

14   ENTIRE DOCUMENT, DOCTOR?

15           THE WITNESS:  I FOCUSED ON THE LABEL, YOUR HONOR, I

16   BELIEVE.

17           THE COURT:  WHAT YOU REVIEWED WAS PAGE 6832?

18           THE WITNESS:  I'M SORRY, YOUR HONOR.  68 -- LET'S SEE,

19   THE PROPOSED, THE PROPOSED LABEL REALLY STARTS BACK, I THINK

20   APPENDIX C, SO IT'S IN THE CONTEXT, I THINK, OF -- I CERTAINLY

21   FOCUSED ON THOSE ASPECTS THAT RELATED TO THE VIGOR TRIAL.

22           MR. DUGAN:  AND, YOUR HONOR, IT'S BEEN PREVIOUSLY

23   ADMITTED IN TAB 17, SO WE ADMITTED IT EARLIER, WE'RE JUST

24   REFERENCING IT A SECOND TIME.

25           THE COURT:  LET'S MOVE ON.  I'LL ADMIT IT.

1        MR. DUGAN:  OKAY.  THANK YOU.

2    BY MR. DUGAN:

3    Q.  DR. KESSLER, DID YOU ALSO REVIEW ANY PROPOSED LABELLING

4    PROVIDED BY THE FDA TO MERCK?

5    A.  I DID.

6    Q.  I WOULD TURN YOU TO TAB 26.

7    A.  YES.

8    Q.  IS THIS THE DOCUMENT YOU REVIEWED?

9    A.  YES.

10   Q.  IF YOU COULD TURN TO PAGE 309, AND ONCE AGAIN, I APOLOGIZE, THE

11   PRINT IS VERY SMALL.  IT'S ONE, TWO, THREE, FOUR, FIVE, SIX, SEVEN,

12   EIGHT, IT'S THE EIGHTH PAGE.

13   A.  YOU ARE CHALLENGING ME.  YES, SIR.

14   Q.  DID FDA PROPOSE THAT MERCK INCLUDE INFORMATION ABOUT VIGOR IN

15   THE WARNING SECTION OF THE LABEL?

16   A.  SO I READ THIS DOCUMENT, THIS PAGE SPECIFICALLY, TO BE THE FDA

17   TEXT OF, THE HEADING OF OCTOBER 15, 2001, WITH MERCK SHOWING THE

18   REVISION MARKS AND DELETIONS.  SO I READ THE, IN COMPARING TO THE

19   PREVIOUS, IN THIS SECTION, I READ THE AGENCY SAYING, PROPOSING IN

20   THE FIRST PARAGRAPH, THE LABEL SHOULD SAY VIOXX SHOULD BE USED WITH

21   CAUTION IN PATIENTS AT RISK OF DEVELOPING CARDIOVASCULAR THROMBOTIC

22   EVENTS, SUCH AS THOSE WITH A HISTORY OF MYOCARDIAL INFARCTION AND

23   ANGINA AND IN PATIENTS WITH PREEXISTING HYPERTENSION AND CONGESTIVE

24   HEART FAILURE.  I SEE THAT STRUCKEN.

25        AND THEN ON THE COMMENTS, IT IS SAYS, MERCK PROPOSES TO

1  REVISE AND RELOCATE THIS -- I TAKE THIS BECAUSE IT'S WITH

2  ANAPHYLACTIC REACTIONS WHICH IS IN THE WARNING SECTION, MERCK IS --

3  I TAKE THIS AS STRIKING THAT AND IT SAYS MERCK PROPOSES TO REVISE

4  THE LANGUAGE AND RELOCATE IT TO THE PRECAUTION SECTIONS, NOT THE

5  WARNING SECTION.  THAT'S THE WAY I READ THIS DOCUMENT.

6  Q.  PUT SIMPLY, MERCK DID NOT ACCEPT THE FDA'S PROPOSAL?

7  A.  THAT'S CORRECT.

8  Q.  DR. KESSLER, DID YOU ALSO REVIEW ANY DOCUMENTS SHOWING MERCK'S

9  INTERNAL RESPONSE TO THE FDA'S PROPOSAL?

10  A.  I DID.

11  Q.  I'D ASK YOU TO TURN TO TAB 27.

12       THE COURT:  DID YOU ADMIT 26?

13       MR. DUGAN:  I DID NOT, JUDGE, BECAUSE IT WASN'T

14  PREVIOUSLY IDENTIFIED.  BUT I'D LIKE TO AT THIS TIME MOVE IT INTO

15  EVIDENCE.

16       THE COURT:  I'LL ADMIT IT.

17       THE DEPUTY CLERK:  HOW IS IT MARKED?

18       MR. DUGAN:  IT'S MARKED AS -- BY BATES NUMBERS.

19       THE COURT:  NO.  WHAT EXHIBIT NUMBER?

20       MR. DUGAN:  IT WASN'T PREVIOUSLY IDENTIFIED IN OUR

21  WITNESS LIST AS FAR AS THE LABELING.

22       THE COURT:  YOUR LAST NUMBER ON YOUR LIST IS 721, WOULD

23  YOU LIKE TO MAKE IT 722?

24       MR. DUGAN:  722 WOULD BE GREAT.

25       MR. ISMAIL:  YOUR HONOR, WE HAVE NO OBJECTION.

1          THE COURT:  OKAY.  LET IT BE ADMITTED.

2          MR. DUGAN:  THANK YOU.

3   BY MR. DUGAN:

4   Q.  DR. KESSLER, TURNING TO TAB 27.

5   A.  YES, SIR.

6   Q.  DID YOU REVIEW THIS DOCUMENT?

7   A.  YES, SIR.

8   Q.  AND WHAT DOES THIS DOCUMENT SAY ABOUT MERCK'S REACTION TO THE

9   FDA'S PROPOSAL?

10          MR. ISMAIL:  OBJECTION, YOUR HONOR, ALL HE IS GOING TO DO

11  IS READ SOMEBODY ELSE'S E-MAIL AND GIVE HIS CHARACTERIZATION OF

12  THEIR REACTION IS NOT EXPERT TESTIMONY.

13          THE COURT:  YEAH, THAT'S -- FROM THE STANDPOINT OF

14  ADMITTING IT, I AM NOT GOING TO ADMIT IT, BUT HE CAN TESTIFY ABOUT

15  IT.

16          MR. DUGAN:  YOUR HONOR, HE WAS QUALIFIED AS AN EXPERT IN

17  STANDARD OF CARE, AND THIS IS COMPANY -- TOP COMPANY EXECUTIVE

18  BREACHING THAT STANDARD OF CARE.

19          THE COURT:  YEAH, I UNDERSTAND.  BUT BASED -- YOU NEED TO

20  FRAME THE QUESTION WITH THAT IN MIND.  BASED UPON THAT, HAVE YOU

21  REACHED A CONCLUSION.

22  BY MR. DUGAN:

23  Q.  DR. KESSLER, AFTER READING THIS DOCUMENT, DO YOU HAVE -- HAVE

24  YOU REACHED A CONCLUSION OR AN OPINION AS TO THIS DOCUMENT?

25          THE COURT:  AS TO WHETHER THEY BREACHED THE STANDARD OF

1    CARE.

2            THE WITNESS:  YOUR HONOR, THEY ARE FIGHTING THE FDA HERE

3    HARD.  IT IS CERTAINLY, THE WAY I READ THIS, IS MERCK IS SAYING IT

4    WILL NOT ACCEPT THE LABEL, IT'S GOING TO TAKE THIS -- THEY'RE GOING

5    TO ASK TO GO TO AN ADVISORY COMMITTEE.  AND THIS IS UGLY AND LEAVE

6    ASIDE HOW THEY CHARACTERIZE THE AGENCY IN THIS.

7            IT IS THEIR -- I THINK IT IS THEIR RIGHT TO ASK FOR AN

8    ADVISORY COMMITTEE.  I SEE IN THIS DOCUMENT THE COMPANY FIGHTING

9    NOT TO INCLUDE THE FDA LABEL.  MY OPINION, THAT FIGHTING

10   BREACHED -- BY NOT ACCEPTING THAT LABEL THEY BREACHED THEIR DUTY TO

11   WARN.

12   BY MR. DUGAN:

13   Q.  THANK YOU, DOCTOR.

14           DID YOU ALSO REVIEW ANY DOCUMENTS SHOWING WHETHER MERCK

15   WAS AWARE OF EFFECTS THAT VARYING LABEL CHANGES COULD HAVE ON ITS

16   SALE FORECAST?

17   A.  YES, I DID.

18   Q.  I TURN YOU TO TAB 28.

19   A.  YES.

20   Q.  IF YOU COULD TURN TO PAGE 674.

21           MR. ISMAIL:  YOUR HONOR, THESE FINANCIAL FORECASTING AND

22   BUDGET PROFIT DOCUMENTS HAVE ALREADY BEEN RULED OUT OF THE CASE IN

23   RESPONSE TO MOTION IN LIMINE NUMBER 8.

24           THE COURT:  WHERE ARE WE GOING WITH THIS, JIM?

25           MR. DUGAN:  ONCE AGAIN, YOUR HONOR, IT GOES TO THE

1    STANDARD OF CARE.

2         MR. ISMAIL:  YOUR HONOR, WE'RE TALKING INTERNAL

3    FORECASTS, THIS WITNESS HAS NO PERSONAL KNOWLEDGE AND NO EXPERT

4    OPINION ON IT.

5         THE COURT:  YES, I DON'T SEE WHERE THIS IS -- I DON'T

6    KNOW HOW THAT BEARS ON THE STANDARD OF CARE.

7         MR. DUGAN:  IT GOES TO SHOW THE PROFIT MOTIVE, YOUR

8    HONOR.

9         THE COURT:  I AM NOT GOING TO ADMIT THIS, BUT ASK HIM

10   ABOUT WHETHER THE DOCUMENT INDICATES ANY REASON FOR THEIR ACTIONS.

11   BY MR. DUGAN:

12   Q.  DR. KESSLER, DOES THIS DOCUMENT OR THIS PAGE IN PARTICULAR

13   ALLOW YOU TO OPINE ON THE STANDARD OF CARE OF MERCK'S CONDUCT IN

14   THIS CASE?

15   A.  IT HAS AN EFFECT ON MY OPINION.

16   Q.  AND WHAT IS THAT, YOUR HONOR -- I'M SORRY, WHAT IS THAT,

17   DR. KESSLER?

18   A.  YOU SEE THAT, WHEN I READ THIS, THE EFFECT OF PUTTING A WARNING

19   ON THE LABEL, CARDIAC WARNING, WHICH I THINK SHOULD HAVE BEEN DONE,

20   RATHER THAN PUTTING IT -- THEY GIVE TWO OTHER OPTIONS, THEY GIVE A

21   CASE OF PUTTING A WARNING LABEL ON, WHICH IS THE DOWNSIDE, DOING IT

22   AS A PRECAUTION, SORT OF A WATERED-DOWN WARNING, MAYBE NOT BE AN

23   ACCURATE -- A PRECAUTION IS NOT AS STRONG AS A WARNING AS THE BASE

24   CASE.

25        IN THE UPSIDE WHERE THERE IS, THE LABELLING IS IN THEIR

Page 112

1    TERMS MILDER AND NO PROTHROMBOTIC VIOXX IS -- THERE IS A SALES

2    PROTHROMBOTIC EFFECT, YOU CAN SEE IN ONE YEAR THAT WITH SALES OF

3    $2.5 BILLION, IF I READ THIS DOCUMENT CORRECTLY, THE EFFECT OF

4    PUTTING A WARNING LABEL, IN ONE YEAR ACCORDING TO SALES, IS A

5    BILLION DOLLARS PROJECTED FORECAST; AGAIN, I CAN'T, I HAVE NO

6    INDEPENDENT OPINION ON WHETHER THOSE NUMBERS ARE RIGHT.

7            BUT YOU SEE, YOU SEE THE ECONOMIC STAKES THE COMPANY SAW

8    AT STAKE IF IT PUT A WARNING, A CARDIAC WARNING ON THE LABEL, THAT

9    THERE WOULD BE TREMENDOUS FINANCIAL STAKES, AND THAT CERTAINLY HAD

10   AN INFLUENCE, I MEAN, ON THE COMPANY.

11   Q.  THANK YOU, DOCTOR.

12           THE COURT:  WHAT'S THE PAGE NUMBER OF THAT?  I'LL ADMIT

13   THAT PAGE.

14           MR. DUGAN:  THANK YOU, YOUR HONOR.  THAT IS PAGE NUMBER

15   17.

16           THE COURT:  WHAT'S THE NUMBER?

17           MR. DUGAN:  THAT IS BATES NUMBER --

18           THE COURT:  NO, I DON'T MEAN THAT.  I MEAN THE NUMBER OF

19   WHOLE DOCUMENT.

20           MR. DUGAN:  LOUISIANA AG 55.

21           THE COURT:  I'LL ADMIT THAT PAGE OF THAT DOCUMENT.

22           MR. DUGAN:  DO YOU WANT THE BATES NUMBER?

23           THE COURT:  NO, I DON'T NEED IT.

24           MR. DUGAN:  OKAY.  I AM ABOUT TO WRAP THIS UP, YOUR

25   HONOR.

Page 113

1    BY MR. DUGAN:

2    Q.  DR. KESSLER, DO YOU HAVE AN OPINION AS TO WHETHER MERCK MET THE

3    STANDARD OF CARE IN ITS HANDLING OF THE LABEL CHANGE WITH VIOXX

4    AFTER THE VIGOR STUDY?

5    A.  YES, I HAVE AN OPINION.

6    Q.  AND WHAT IS THAT OPINION?

7    A.  IT DID NOT MEET THE STANDARD OF CARE ON DUTY TO WARN BASED ON

8    THE LABEL.

9    Q.  DO YOU ALSO HAVE AN OPINION AS TO WHETHER THERE WAS AN

10   OBLIGATION TO EXPEDITIOUSLY ASSURE THAT THE DRUG'S LABEL ADEQUATELY

11   INFORMED PHYSICIANS AND HEALTHCARE PROVIDERS OF THE RISKS?

12   A.  YES, I HAVE SUCH AN OPINION.

13   Q.  AND WHAT IS THAT?

14   A.  THAT MERCK SHOULD HAVE MORE EXPEDITIOUSLY WARNED PROVIDERS OF

15   THE HEALTH RISKS OF VIOXX.

16   Q.  AND, DR. KESSLER, DO YOU HAVE AN OPINION AS TO WHETHER MERCK

17   ACCURATELY STATED THE RISK OF VIOXX PRIOR TO WITHDRAWAL OF

18   SEPTEMBER 30TH, 2004?

19   A.  I DO HAVE SUCH AN OPINION.  MY OPINION IS THAT MERCK

20   SELECTIVELY PRESENTED DATA CONCERNING VIOXX AND THAT -- YOU KNOW,

21   MY OPINION IS THAT, MY CONCERN IS THAT A COMPANY IS CONFRONTED WITH

22   A LOT OF DATA ABOUT A DRUG AND MERCK -- MERCK EXPLAINED AWAY SOME

23   OF THAT DATA THAT I THINK WAS VERY IMPORTANT.

24          MR. DUGAN:  THANK YOU, DR. KESSLER.

25          I TENDER THE WITNESS, YOUR HONOR.

Page 114

1        THE COURT:  OKAY.  WE'LL STOP HERE AND COME BACK AT 1:30.

2  THE COURT WILL STAND IN RECESS UNTIL 1:30.

3        THE DEPUTY CLERK:  EVERYONE RISE.

4        MR. DUGAN:  THANK YOU, YOUR HONOR.

5     (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

6

7                       * * * * * *

8

9                  REPORTER'S CERTIFICATE

10

11    I, KAREN A. IBOS, CCR, OFFICIAL COURT REPORTER, UNITED STATES

12  DISTRICT COURT, EASTERN DISTRICT OF LOUISIANA, DO HEREBY CERTIFY

13  THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT, TO THE BEST OF

14  MY ABILITY AND UNDERSTANDING, FROM THE RECORD OF THE PROCEEDINGS IN

15  THE ABOVE-ENTITLED AND NUMBERED MATTER.

16

17

18

19                  KAREN A. IBOS, CCR, RPR, CRR

20                  OFFICIAL COURT REPORTER

21

22

23

24

25

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE:  VIOXX PRODUCTS          *
        LIABILITY LITIGATION    *
                                *
This Document Relates to:       *   MDL No. 1657
                                *
        STATE OF LOUISIANA, ex rel.  *   Section L
        JAMES D. CALDWELL JR.,  *
        Attorney General        *   New Orleans, Louisiana
                                *
             versus             *   April 12, 2010
                                *
        MERCK & CO., INC.       *   1:30 p.m.
                                *
                                *
        Case No. 05-CV-3700     *
                                *
   * * * * * * * * * * * * * * * * *


                TRIAL PROCEEDINGS BEFORE THE
                 HONORABLE ELDON E. FALLON
                UNITED STATES DISTRICT JUDGE
                 DAY 1, AFTERNOON SESSION


APPEARANCES:


For the Plaintiff:          Dugan Law Firm
                            BY:  JAMES R. DUGAN II, ESQ.
                            650 Poydras Street, Suite 2150
                            New Orleans, Louisiana 70130


For the Plaintiff:          Murray Law Firm
                            BY:  STEPHEN B. MURRAY JR., ESQ.
                                 DOUGLAS R. PLYMALE, ESQ.
                                 JUSTIN BLOOM, ESQ.
                            650 Poydras Street, Suite 2150
                            New Orleans, Louisiana 70130


DAILY COPY

Page 116

```
 1    For the Plaintiff:          Lieff Cabraser Heimann
                                     & Bernstein, LLP
 2                                BY:  DONALD C. ARBITBLIT, ESQ.
                                  275 Battery Street, Suite 3000
 3                                San Francisco, California 94111
 4
      For the Defendant:          Goldman Ismail Tomaselli
 5                                   Brennan & Baum, LLP
                                  BY:  TAREK ISMAIL, ESQ.
 6                                     BRIAN P. O'DONOGHUE, ESQ.
                                  1 North Franklin Street, Suite 625
 7                                Chicago, Illinois 60606
 8
      For the Defendant:          Baker Botts, LLP
 9                                BY:  TRAVIS J. SALES, ESQ.
                                  910 Louisiana Street
10                                Houston, Texas 77002
11
      For the Defendant:          O'Melveny & Myers, LLP
12                                BY:  SCOTT M. VOELZ, ESQ.
                                  400 South Hope Street
13                                Los Angeles, California 90071
14
      Official Court Reporter:    Toni Doyle Tusa, CCR, FCRR
15                                500 Poydras Street, Room HB-406
                                  New Orleans, Louisiana 70130
16                                (504) 589-7778
17
18
19
20
21
22
23
24
      Proceedings recorded by mechanical stenography; transcript
25    produced by computer.
```

DAILY COPY

Page 117

1                         I N D E X

2                                                    PAGE

    David A. Kessler

3

        Cross-Examination                          118

4

        Redirect Examination                       182

5

        Recross-Examination                        187

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 118

1                          AFTERNOON SESSION

2                          (April 12, 2010)

3              THE DEPUTY CLERK:  Everyone rise.

4              THE COURT:  Be seated, please.  We have a little

5       housekeeping matter.

6              MR. DUGAN:  James Dugan on behalf of the plaintiff,

7       Your Honor.  During Dr. Kessler's examination, we admitted into

8       evidence Defense Exhibit 145, which ultimately became

9       Plaintiff's Exhibit --

10             THE DEPUTY CLERK:  No.  It stays DX-145.

11             MR. DUGAN:  Oh, it stays DX-145?  It's come to our

12      attention that the whole document is about 1,100 pages, and we

13      just want to offer the portions of the document that are

14      relevant.  So we are going to identify by Bates numbers the

15      range, and that range is MRK-00420008017 through

16      MRK-00420008099.  Thank you, Your Honor.

17             THE COURT:  Okay.  Let that be done.

18                 You may cross-examine, Counsel.

19             MR. ISMAIL:  Thank you, Judge.

20             (WHEREUPON David A. Kessler, having been duly sworn,

21      testified as follows.)

22                          CROSS-EXAMINATION

23      BY MR. ISMAIL:

24      Q.   Good afternoon, Doctor.

25      A.   Good afternoon, sir.

DAILY COPY

Page 119

1   Q.   You described for us this morning that you had a tenure at

2   the FDA back in the '90s; is that correct?

3   A.   I did.

4   Q.   Just so the record is clear, none of your activities at

5   FDA involved review or activities on the COX-2 drugs; is that

6   correct?

7   A.   I have no recollection of being involved.

8   Q.   Nor were you personally involved in any FDA activities on

9   the nonselective NSAIDs?

10  A.   I don't have a recollection, sitting here today, of being

11  involved.

12  Q.   Now, prior to your retention by the plaintiff lawyers to

13  serve as an expert in this case, it would be fair to say you

14  had limited scientific or clinical experience with NSAIDs;

15  true?

16  A.   Yeah.  It's not a class of drugs that I focused on when I

17  was at the FDA, nor is it a class of drugs that I've used a

18  good deal as a physician.

19  Q.   In fact, sir, do you recall, when I took your deposition

20  back in January, I asked you if you could identify any

21  nonselective NSAIDs, and after some thought the only one you

22  came up with was aspirin?

23  A.   I remember the interchange well, and there was something

24  that was going on in my mind.  I actually went back -- you are

25  correct.  I went back and I looked at Goodman & Gilman.  If you

Page 120

1   go to Chapter 26, one of the questions was whether

2   acetaminophen is an NSAID, and I couldn't recall.

3            Certainly, I learned it was an antipruritic.  But if

4   you go to Goodman & Gilman, in fact, Tylenol is listed as a

5   nonsteroidal antipruritic.  There's 24 listed, and I just -- I

6   didn't know.  Even I was surprised when I looked at Goodman &

7   Gilman.  So that was part of the interchange you and I had,

8   right.

9   Q.   Just so my question was clear, I didn't ask you about

10  Tylenol in your deposition.  I asked --

11  A.   It did come up, I believe.

12  Q.   Yes, because later in the deposition you volunteered that

13  you thought Tylenol was a nonselective NSAID.  I actually

14  wanted to go back to the question I asked you this afternoon,

15  which was:  Isn't it true, sir -- and I'll show you your

16  deposition in the process --

17  A.   It's exactly correct.

18  Q.   When I asked you in January of 2010 to name any

19  nonselective NSAID, the only one you could identify was

20  aspirin; true?

21  A.   Yes.  I did not list all the 24 that are in Table 26 in

22  Goodman & Gilman.

23  Q.   In fact, sir, you have never done any scientific or

24  clinical research with regard to nonsteroidal

25  anti-inflammatories?

DAILY COPY

Page 121

1   A.   That's correct.

2   Q.   Prior to your retention to serve as an expert in this

3   case, you hadn't done any scientific research on COX-2

4   inhibitors; right?

5   A.   That's correct.

6   Q.   You had no publications in the peer-reviewed literature

7   about NSAIDs?

8   A.   With the one exception -- I guess the Georgetown Law

9   Journal is not peer-reviewed, and that was not the scientific

10  basis.

11  Q.   Nor, sir, did you read the medical articles about Vioxx

12  prior to the time you agreed to serve as an expert; true?

13  A.   That's probably correct.  We cited certain things in the

14  Law Review article, but I did not focus any more than maybe

15  what was in the general press.

16  Q.   Let me make sure my question is clear.  You have no

17  recollection of even reading any of the peer-reviewed medical

18  journal articles published about Vioxx prior to the time you

19  were retained to serve as an expert by the State of Louisiana;

20  true?

21  A.   I don't have any specific recollection one way or the

22  other whether I read any articles prior.

23  Q.   You have never prescribed Vioxx, Celebrex, or Bextra;

24  correct?

25  A.   That's my recollection.  I would have no reason to

Page 122

1    prescribe it.

2    Q.   You have no recollection of ever writing a prescription

3    for a nonselective NSAID; true?

4    A.   A prescription for a nonselective?  I don't recall the

5    answer to that question.

6    Q.   You have never done a risk/benefit analysis for a patient

7    with regard to the use of a COX-2 inhibitor; correct?

8    A.   No.  Again, as a pediatrician, it's not within the scope

9    of what I tend to do.

10   Q.   I don't believe you went over this on direct, but can you

11   tell the Court what your fee is to testify today.

12   A.   I get $1,000 an hour.

13   Q.   How much have the plaintiff lawyers paid you thus far?

14   A.   I don't have that number in my head.  I have probably

15   spent over -- as we talked in the deposition, probably over 100

16   hours.

17   Q.   So at $1,000 an hour -- that's pretty quick math -- you

18   have made over $100,000 thus far from the plaintiffs?

19   A.   I think that's a correct number.

20   Q.   Now, you discussed in your direct examination some signals

21   that you say were apparent with regard to cardiovascular

22   toxicity.  I want to go over some of those, but first I want to

23   get oriented to what some of the clinical trial data show.

24   Okay?

25   A.   Okay.

Page 123

1    Q.    I believe you said this morning that the VIGOR study was

2    the first clinical trial that demonstrated any statistically

3    significant increased cardiovascular risk with Vioxx; is that

4    true?

5    A.    I believe I said that, yes.

6    Q.    Now, VIGOR was at 50 milligrams; correct?

7    A.    That's correct.

8    Q.    Right up until September 30, 2004, there had never been

9    any individual clinical trial that showed a statistically

10   significant increased cardiovascular risk with Vioxx; correct?

11   A.    I'm sorry.  Up to September 2004; right?

12   Q.    Yes.

13   A.    Could you repeat the question slowly so I can make sure I

14   understand it.

15   Q.    I think I left off the end of my question, so let me start

16   again.

17   A.    I'm sorry.

18   Q.    The VIGOR study was the only clinical trial, right up to

19   September of 2004, that showed a statistically significant

20   increased cardiovascular risk with Vioxx; right?

21   A.    I believe that's correct, yes.

22   Q.    VIGOR was at 50 milligrams; right?

23   A.    Yes.

24   Q.    So there was no study at 25 milligrams, right up to

25   September 2004, that showed a statistically significant

Page 124

1   increased cardiovascular risk with Vioxx; correct?

2   A.   That's correct.

3   Q.   VIGOR was a comparison of Vioxx to naproxen, as we now all

4   know.

5   A.   Yes, sir.

6   Q.   Right up until September of 2004, there had never been an

7   individual clinical trial that demonstrated at any dose an

8   increased cardiovascular risk compared to placebo; correct?

9   A.   Emphasizing the word individual trial, that's correct.

10   Q.   Right up 'til today, there has never been an individual

11   clinical trial that demonstrated a statistically significant

12   increased risk of Vioxx compared to any non-naproxen NSAID;

13   true?

14   A.   Compared to -- I'm sorry.  There has been no statistical

15   significant increase, non-naproxen, that's correct, because you

16   haven't done them.  Merck did not do those studies.

17   Q.   There were plenty of studies that compared Vioxx to

18   non-naproxen NSAIDs; correct?

19   A.   Yes.

20   Q.   None of those clinical studies, right up 'til today, any

21   individual study, showed a statistically significant increased

22   risk compared to Vioxx?  Other than naproxen, sir.

23   A.   That's correct, sir.

24   Q.   Now, you talked about Protocol 023, and that was the

25   prostacyclin metabolite study; is that right?

DAILY COPY

Page 125

1    A.   Yes, sir.

2    Q.   Now, just so we are all clear, that was a study that

3    measured the breakdown product of prostacyclin in the urine;

4    right?

5    A.   Yes.

6    Q.   Didn't actually measure any decreased prostacyclin in the

7    vasculature; correct?

8    A.   It was a metabolite.  I am not a biochemist.  That's

9    correct.

10   Q.   Now, just focusing on Merck's conduct here, did you look

11   to see whether Merck provided that study to the Food & Drug

12   Administration?

13   A.   Yes, I did.

14   Q.   You can confirm for the Court that Merck did provide

15   Protocol 023 to the FDA; correct?

16   A.   So after the deposition and after my report, I went back

17   and I specifically looked for Protocol 023 in -- what was

18   accessible to me at the time were the things under the FDA Web

19   site, so I had the medical reviewers.  I think there were 42

20   parts.  I also had the pharmacology part.

21          What I saw based on that was that 023 was mentioned

22   both in the pharmacology and in the clinical cardiology -- the

23   renal cardiovascular expert.  I didn't see it cited in the

24   medical reviewers.  But I am sure if that happened, Merck

25   supplied it to FDA.  I'm sure it was in the NDA.

DAILY COPY

Page 126

1   Q.   The short answer to my question is:  You can confirm that

2   Merck, in fact, did submit Study 023 to the FDA; true?

3   A.   Yes.

4   Q.   Thank you.  Now, I want to talk about this study by

5   Dr. Watson that you described.

6   A.   Uh-huh.

7   Q.   Do you know what Dr. Watson's role at the company was?

8   A.   I assume he was -- I don't know his specific title.  I

9   assume he was a cardiovascular epidemiologist of sorts.

10  Q.   You did read Dr. Watson's deposition; correct?

11  A.   No, I did not read his deposition.

12  Q.   Now, I think you testified that Dr. Watson's study was --

13  I think you called it a signal; right?

14  A.   I'm sorry?

15  Q.   You called it a signal?

16  A.   I saw an increased relative risk in women reported by

17  Dr. Watson, and that to me was a signal.

18  Q.   Okay.  I want to make sure we understand exactly what

19  Dr. Watson did and did not do.

20  A.   Uh-huh.

21  Q.   I'm going to use this flip chart to help.  I'm going to

22  write "Watson" up here.

23          Now, Dr. Watson, I think you indicated that at the

24  time he did his analysis, the clinical trials were still

25  blinded; correct?

DAILY COPY

1    A.   That's correct.

2    Q.   And so the --

3    A.   The OA trials.

4    Q.   So no one knew what the patients in those clinical trials

5    were taking, how their allocation was; correct?

6    A.   That's correct.

7    Q.   So over here I'm going to say "Vioxx Trials."  I'm going

8    to say "OA Trials" -- or just "OA."  Okay?  Because he only

9    looked at the OA studies; right?

10   A.   He looked at all the treatment arms on the OA, so that

11   included patients on Vioxx, on comparator, and on placebo.

12   Q.   Okay.

13   A.   "Vioxx OA Trials" is probably the way to characterize

14   that.

15   Q.   Fair enough.  So on the one side we had the blinded Vioxx

16   OA studies; right?

17   A.   Yes.

18   Q.   So the drugs that would have been included were Vioxx.

19   What else?

20   A.   Let me get the protocol.  Any comparison drugs to Vioxx

21   that were in the other arms, say, like diclofenac, and there

22   was one other, I believe.

23   Q.   Placebo was in there too; right?

24   A.   I have no reason to doubt that.

25   Q.   And, I believe, ibuprofen?

1  A.   All the treatment arms of 029, 034, 035, and through 045.

2  Q.   No reason to doubt my representation here?

3  A.   No.  I think that's right.

4  Q.   Okay.  So we have on the one side Vioxx, placebo,

5  diclofenac, and ibuprofen, as a group?

6  A.   Yes, sir.

7  Q.   Then he compared it to the Fosamax and, I think you said,

8  Proscar trials?

9  A.   Yes, sir.

10  Q.   That was the placebo arm; right?

11  A.   Yes, sir.

12  Q.   So the comparison was not Vioxx to a placebo arm of

13  another study.

14  A.   Correct.  The Vioxx treatment arms.

15  Q.   Right.  Dr. Watson pooled all these patients together --

16  A.   Uh-huh.

17  Q.   -- because we are still blinded, and he compared it to the

18  placebo arm of a completely different clinical trial program;

19  right?

20  A.   He designed the study this way.

21  Q.   Have I described it accurately?

22  A.   Yes.

23  Q.   Now, these were just preliminary results; correct?  The

24  studies were still ongoing?

25  A.   Yes.

Page 129

1  Q.   First, I'm going to drop my outline, then I'm going to

2  write "Preliminary."  Good so far?

3  A.   Yes.  I think that's well done.

4  Q.   Thank you.  Do you have the analysis that you went over

5  with Mr. Dugan?

6  A.   Sir, I have the relative rates and then -- and when you

7  say "analysis," there are a number of different analyses that

8  he did.

9  Q.   I'll be specific.  The February 1998 document that you

10  referred to with Mr. Dugan.

11  A.   Yes, sir, I have that.  Let me get that.  I do have that.

12  Q.   I would like to turn your attention to Table 6.

13  A.   Is that the results table?

14  Q.   It is.

15  A.   Thank you, sir.

16          THE COURT:  You should have a small screen there.

17          THE WITNESS:  That's actually much better than my

18  copy.  Thank you.

19  BY MR. ISMAIL:

20  Q.   So Table 6 is a table that stratifies the results by

21  gender, age, and duration of use; correct?

22  A.   Yes, sir.

23  Q.   What you would do is you would look where it says "Vioxx"

24  here, but as we know that's not actually what Dr. Watson did,

25  because that's really Vioxx, placebo, diclofenac, and ibuprofen

Page 130

1  all together.

2  A.   Exactly.

3  Q.   Then he has got Proscar, Fosamax, placebo controls?

4  A.   Yes, sir.

5  Q.   And that's over here, which is the totally different

6  clinical trial development with two completely different drugs;

7  right?

8  A.   Yes, sir.  The placebo arm of those trials.

9  Q.   Right.  So if we go through, Dr. Watson provides IRR.

10  What is that?

11  A.   It's his risk ratio.

12  Q.   Then in this column he provides 95 percent confidence

13  intervals; right?

14  A.   Yes.

15  Q.   By convention, if the 95 percent confidence interval

16  straddles 1, that's generally deemed not statistically

17  significant?

18  A.   Yeah.  I mean, if the first number is less than 1, you can

19  assume that.  That's correct.

20  Q.   So if we go through the various groups of patients by

21  gender, by age, and by duration of exposure, all the results in

22  the male group are not significant; correct?

23  A.   As I said earlier, as I testified, that's correct.  The

24  relative rate was 1.28.  It was not statistically significant.

25  Q.   The only one of these lines here that show any statistical

DAILY COPY

1    significance is for women aged 70 to 79; right?

2    A.   The overall was statistically significant.  You're

3    starting with the stratifications.  Overall, it was

4    statistically significant for women.  When you break it down

5    into the substrata, your answer is correct.

6    Q.   Great.

7    A.   You do see an increased relative risk ratio, I believe,

8    certainly for all periods.  I think you do see that for all

9    periods between 50 and 59, and 60 and 69, but the only one

10   that's statistically significant, again, when you start

11   stratifying and you break it down.

12   Q.   And that's the one I've highlighted?

13   A.   Yes, sir.  That's statistically significant.

14   Q.   You have talked about this biological mechanism,

15   Study 023?

16   A.   Whether it's a biological plausibility, yes.

17   Q.   So what is the biological plausibility that only women

18   aged 70 to 79 showed an increased relative risk and none of the

19   other data?

20   A.   The issue is just your statistical analysis.  Whenever you

21   substratify your statistics, you're cutting these groups.  The

22   way you're cutting the groups into sample size don't allow

23   certain substrata to be significant, but your overall number is

24   significant.

25   Q.   All right.  Then let's not substratify.

DAILY COPY

Page 132

1   A.   Okay.

2   Q.   Let's look at Table 7, which is the men versus women

3   study.  We are still, even though it says Vioxx versus

4   Fosamax --

5   A.   It's the way Watson did it, correct.

6   Q.   -- we are still doing it where all the Vioxx studies,

7   whether the patient was on placebo, ibuprofen, or diclofenac --

8   A.   Exactly.  It's somewhat a nonconventional way of doing it.

9   Q.   So this is the table that you say shows overall that

10  statistically significant risk for women; right?

11  A.   It's what Watson reported.

12  Q.   I believe, as you mentioned, there was no statistically

13  significant increase for men; right?

14  A.   A slight increase in ratio, not statistically significant,

15  correct, sir.

16  Q.   Again, we are going back to my question:  Did you identify

17  on direct examination the biologically plausible mechanism for

18  why this would be true?

19  A.   Why those numbers would come out to be what those numbers

20  are or why Vioxx might be causing increased cardiovascular

21  serious adverse events?

22  Q.   This isn't a comparison of Vioxx to anything, is it, sir?

23  A.   Again, the goal of this study, Watson's analysis, was to

24  look for a signal.  Merck decided to do this.  He is calling

25  this Vioxx.  You're correct.  I'm not necessarily saying I

Page 133

1    would have done it this way.  Merck did it this way.  He is

2    comparing the Vioxx treatment arms with placebo arms of Proscar

3    and Fosamax.

4         Biological plausibility goes to the question of

5    whether Vioxx could cause serious cardiovascular events.

6    That's what biological plausibility is.

7    Q.   Do you remember my question, sir?  I was asking you to

8    confirm that Dr. Watson was not comparing Vioxx to anything.

9    True?

10   A.   Wasn't comparing Vioxx to anything?  I don't agree.  I

11   think that's an overstatement of what you tried to do earlier.

12        He is certainly trying to understand -- he is looking

13   for a signal here.  The best data he has is this pool group.

14   Vioxx is in there.  It is true that if you had a high -- let's

15   say ibuprofen and diclofenac itself was causing serious

16   cardiovascular events.  They could skew those numbers.  All

17   right?  But in those groups, Vioxx was in that, so he is

18   looking for a signal to say whether that group with Vioxx has

19   an increased cardiovascular event rate.

20   Q.   Do you see that I pulled out the footers below the table?

21   A.   Yes, sir.

22   Q.   I would like to focus your attention on the line that says

23   the placebo group from the Fosamax program has been previously

24   identified as having an atypically low MI incidence rate.  Now,

25   you have no information to know whether that's true or not;

Page 134

1    correct?

2    A.    I do have information.  I didn't see that identified in

3    the plan, so it's a post hoc -- a post-plan statement about the

4    placebo group.  I would have expected -- I'm not saying it's

5    true, as I think I testified on direct, whether it's true or

6    not true.

7    Q.    Thank you.  Now, after Dr. Watson's report, the studies

8    were completed; correct?

9    A.    Let's define "the studies" because I --

10   Q.    Sure.  Let me rephrase the question.

11           After Dr. Watson did his analysis where he pooled all

12   these patients, regardless what drug they were on, in these OA

13   trials, these osteoarthritis trials were completed; correct?

14   A.    Again, these studies -- yes, that's correct.  Those

15   studies, part of the OA data set went on to be completed, yes.

16   Q.    Then the results were unblinded?

17   A.    Yes.

18   Q.    Then a comparison could be made to see Vioxx versus

19   placebo or the active controls within the same study; correct?

20   A.    Yes, sir.  You could look at those studies individually or

21   in aggregate.

22   Q.    Now, you discussed some of these osteoarthritis studies

23   with Mr. Dugan on direct examination; correct?

24   A.    Yes, sir.

25   Q.    I believe you used the report of Dr. Villalba.

Page 135

1  A.   It's a table of six-week studies, six-month studies, and

2  greater-than-six-month studies.

3  Q.   Do you recall what the exhibit number is for the

4  plaintiff?

5  A.   I can --

6  Q.   So this is the report that you looked at with Mr. Dugan;

7  right?

8  A.   Yeah, that's correct.

9  Q.   I think you testified this is a document you didn't review

10  the entirety of.

11  A.   That's not correct.  What I testified was, for the

12  preparation of my report, I mean, I looked at certain sections:

13  The thrombotic, thromboembolic, as well as the summary.  I went

14  back after my deposition, after my report was complete, and

15  looked at the entire report.

16  Q.   Well, when you and I chatted at your deposition, you

17  hadn't read the whole --

18  A.   No.  I looked at the relevant cardiovascular sections.  I

19  didn't look at all the sections.

20  Q.   So this is the table you went over with Mr. Dugan; right?

21  A.   Yes, sir.

22  Q.   You have here the placebo results, the results on Vioxx at

23  various doses, and then results as well on active comparators

24  like ibuprofen, nabumetone, and diclofenac?

25  A.   That's correct.

DAILY COPY

1   Q.   So the studies, once they became unblinded, they were

2   submitted in the NDA; right?

3   A.   Yes.

4   Q.   Now you can actually look to see Vioxx alone, comparing

5   Vioxx to both placebo and then Vioxx to other NSAIDs; correct?

6   A.   That's correct, sir.

7   Q.   By the way, while we are here, I'm just going to write:

8   "No SS risk for men."

9   A.   I would write a relative risk of 1.28 in confidence

10   intervals.  I think there's a relative risk.  It's slightly

11   increased, but it's not statistically significant.  It's not

12   as -- you know, a very great increase in relative risk.  1.28,

13   I think it is.

14   Q.   As you said:  "SS risk for women."  Right?

15   A.   About 2.1, I think it is.

16   Q.   Now we are back to the actual unblinded data.  Do you see

17   that, when you looked at all the unblinded data, Vioxx did not

18   have a statistically significant increased risk in the

19   preapproval osteoarthritis studies compared to placebo?

20   A.   Yes, because there were too small numbers.

21   Q.   The answer to my question is the risk was not -- there was

22   no statistically significant increased risk; right?

23   A.   Yes.  Because these were studies, I think, that were too

24   small.

25   Q.   Then when you compared Vioxx --

Page 137

1   A.   If you could go back to that table, I think it would be

2   accurate -- again, I certainly would leave this to

3   statisticians to do, but if you go back to the prior table, you

4   saw -- you would have to calculate -- you'd have to get the

5   patient years.  You saw that there was an increase -- there was

6   a trend toward increased events in the higher doses.

7   Q.   Do you see that the medical reviewer also makes the

8   comment here the incidence of thromboembolic events with Vioxx

9   appears similar to comparator NSAIDs?

10  A.   Yes.

11  Q.   You know there was no statistically significant increased

12  risk when you compared Vioxx alone, once the studies were

13  complete, to comparator NSAIDs; right?

14  A.   Right.  I don't disagree with that.

15  Q.   At the time that these studies were done, was it expected

16  and believed that nonselective NSAIDs that were used in the

17  osteoarthritis trials had no increased cardiovascular risk?

18  A.   I would not want to give an opinion on that.

19  Q.   Now, the board of scientific advisors that you discussed

20  with -- I think you called it the scientific advisory board?

21  A.   SAB.

22  Q.   You went over that memo with Mr. Dugan?

23  A.   I think that there were both a briefing memo and then

24  there were this programmatic -- what was it called --

25  programmatic review.

Page 138

1    Q.   That's the one I'm talking about.

2    A.   I don't know if it was a memo.  I don't know what the

3    format was.

4    Q.   Okay.  So this is the one where the board of scientific

5    advisors was commenting on the Vioxx program; right?

6    A.   Yes.

7    Q.   Do you recall what the board of scientific advisors

8    recommended that Merck do?

9    A.   Yes.

10   Q.   I'm going to put up on the screen here a portion of the

11   memorandum from the board of scientific advisors.  Do you

12   recall seeing this --

13   A.   Yes, sir.

14   Q.   -- section before?

15   A.   Yes, sir.

16   Q.   The board advised that:

17            Since it's unlikely that any of the individual trials

18   of Vioxx will have sufficient power to determine whether

19   coronary events are increased or decreased, it is, therefore,

20   proposed that coronary events be predetermined endpoints for

21   all future controlled trials of Vioxx and the backup COX-2

22   inhibitors.  It is proposed that these endpoints be assessed by

23   a uniform set of criteria so that meta-analysis of coronary and

24   cerebrovascular events for all these trials could be performed.

25            Do you see that?

Page 139

1   A.   Yes, I do.

2   Q.   Now, that was one of the recommendations of the board of

3   scientific advisors; correct?

4   A.   Absolutely.

5   Q.   Do you recall that one of the reasons why the board made

6   that recommendation was that there was, in their view, a

7   biologically plausible mechanism that Vioxx could reduce

8   cardiovascular risk?

9   A.   In discussing the biological mechanism, they considered

10  both, that's correct, sir.  They considered the biological

11  mechanism could increase cardiovascular risks, I think as I

12  mentioned.  A number of different hypotheses that they

13  advanced, yes.

14  Q.   In brief --

15  A.   They did not know.

16  Q.   In brief, the biologically plausible mechanism that would

17  suggest that Vioxx would lower cardiovascular risk was that

18  heart disease is an inflammatory condition and that an

19  anti-inflammatory may have cardiovascular value?

20  A.   That was considered.  Again, if you are looking for a

21  safety signal, you tend to look for -- what's paramount in your

22  mind is could it cause harm, but there's certainly that -- you

23  know, plausible hypotheses that were legitimately advanced.

24  Q.   In conclusion -- I think you went over this quickly on

25  direct, but just to make sure -- the board of scientific

Page 140

1  advisors' recommendation is given in context.  Do they say,

2  "There is a strong mandate for introduction of Vioxx into

3  medical practice as soon as is feasible"?

4  A.   In context with the previous sentences that say that

5  acquisition and analysis of the data, the replacement drug -- I

6  mean, resolving these questions.

7  Q.   Sir, did I read that correctly?

8  A.   Yes, you read that, but --

9  Q.   Thank you.

10  A.   -- if you put it in context of resolving the questions

11  about the effects of the drug.

12  Q.   Now, you talked about Study 017.

13  A.   Yes, sir.

14  Q.   Do you have the plaintiff exhibit number there for that?

15  This is where I got lost as to which plaintiff exhibit number

16  it was.

17  A.   If you give me one second, I'm sure I can -- I don't have

18  the plaintiff's number.  I have both the table that Merck

19  submitted as well as this research management committee review

20  of 017.  I can give you the Bates number of the table, if you

21  would like.

22  Q.   It's going to be Plaintiff's 580, I believe.  This is the

23  table you went over; correct?

24  A.   Yes, sir.  I believe this is submitted by Merck.  There's

25  also a table on 017 in Villalba's full report.

Page 141

1  Q.  Do you recall where this table came from?

2  A.  I assume this was part of the integrated summary.  It's

3  from the clinical safety database.

4  Q.  The integrated summary of safety that was part of the new

5  drug application Merck submitted to FDA?

6  A.  I would assume that's correct.

7  Q.  I mean, you didn't review the entirety of the integrated

8  summary of safety, did you?

9  A.  No, I did not.

10  Q.  So this is the Study 017, and I think --

11  A.  It's actually 017, 017(c), and 011.

12  Q.  All right.  Thank you.  But this is the table you went

13  over with Mr. Dugan; right?

14  A.  Yes.

15  Q.  The dosage again, just to remind us, this was the

16  125-milligram study?

17  A.  That's what Merck is reporting here, yes.

18  Q.  Do you recall that the lowest approved dose was

19  12.5 milligrams?

20  A.  Yes.

21  Q.  So this would be 10 times the lowest approved dose?

22  A.  That's correct.

23  Q.  And five times the chronic dose of 25 milligrams?

24  A.  Right.  And two and a half --

25  Q.  Two-and-a-half times the dose that was recommended for

Page 142

1    five days?

2    A.    Exactly correct, sir.

3    Q.    This study, I think you highlighted three events:  This

4    acute myocardial infarction here --

5    A.    Yes.

6    Q.    -- and then this angina and embolism?

7    A.    Yes, sir.

8    Q.    I think you said, "Well, gee, this study shows three

9    events on Vioxx and zero on placebo"?

10   A.    There are three listed -- these three adverse events are

11   on Vioxx, and I don't see any of those type of events on

12   placebo, that's correct.

13   Q.    How long was the duration of this study?

14   A.    If you give me one second, I can get it if you know

15   what --

16   Q.    Six weeks.

17   A.    No.  I'm just going to have -- I'd like to just pull up

18   Villalba's equivalent analysis, if I may, because there's two

19   tables of 017.

20   Q.    I just want to go over the table, sir, that you went over

21   with Mr. Dugan.  Okay?

22   A.    That's fine, sir.

23   Q.    All right.  This table is where you identified the three

24   events, and please confirm that this study was a six-week

25   study.

Page 143

1    A.   I have no reason to -- I believe that's correct.

2    Q.   So any events after six weeks is not in the controlled

3    portion of the study; correct?

4    A.   I don't have the study design in front of me.  I would

5    want to do that.  It's not --

6    Q.   So the study design you would want to review.  That would

7    be part of the clinical --

8    A.   I don't know what the specific study design said, what

9    period of times were included.

10   Q.   You didn't review the clinical study report; correct?

11   A.   I reviewed this and I reviewed the analysis by Villalba.

12        MR. ISMAIL:  I forgot how to get those arrows off the

13   screen.

14        THE DEPUTY CLERK:  There's a "Clear" button.  Just

15   touch the screen inside of the --

16        THE COURT:  I've got it.

17        MR. ISMAIL:  Thank you, Judge.

18   BY MR. ISMAIL:

19   Q.   Okay.  017 is a six-week study, and after six weeks we're

20   beyond the controlled portion of the study; correct?

21   A.   You use the word controlled.  It's probably off drug, yes,

22   certainly, I would agree with.

23   Q.   Well, whether it's off drug or not, there's no longer

24   patients continuing on the placebo arm; right?  That much we

25   know.

Page 144

1    A.   That's probably correct, sir, yes.

2    Q.   And not surprisingly because this is an RA study, and you

3    wouldn't do placebo patients for a long period of time?

4    A.   I don't disagree with that.

5    Q.   All right.  So just to make sure we have the days right,

6    your unstable angina event was 108 days; correct?

7    A.   Yes, sir.

8    Q.   Your pulmonary embolism was 47 days; correct?

9    A.   That's correct.  And the acute myocardial infarction was

10   eight days.

11   Q.   So there was one event during the six-week portion of this

12   study; correct?

13   A.   That's correct, from that table.  There are a number of

14   different -- the reason I think it's important is that you also

15   have the table of adverse events from 017 by FDA, and that data

16   also has events but somewhat different.

17   Q.   My only question, sir, is:  Is it, in fact, correct that

18   there was only one event at 125 milligrams within the six-week

19   portion of Study 017?

20   A.   That's correct.  But if you are implying that the drug

21   can't have effect after that period of time, that's not true.

22   Q.   Now, the --

23   A.   That's why FDA requires --

24   Q.   Sir, there's not a question pending.

25            The 2002 pooled analysis, which I believe is

1    Plaintiff's Exhibit 581 -- I caught on by this point.  Tab 21

2    of the binder.

3    A.   Yes, sir.

4    Q.   Do you recall where this presentation of data came from?

5    A.   I do not know.  I assume this was done by Merck.

6    Q.   You assume it was done by Merck.  Do you know where it

7    went?

8    A.   I assume this went to FDA, but I don't know that as a

9    fact.

10   Q.   So the version of the exhibit that you went over with

11   plaintiff lawyers just began as the data tables and did not

12   include the origin or where the document went; right?

13   A.    I remember asking counsel a little bit more about this

14   document, and I don't have an answer.  I don't know that

15   sitting here today.

16   Q.   This might be a good time to understand how your document

17   review took place.

18   A.   Yes, sir.

19   Q.   You went to one of the plaintiff lawyers' offices?

20   A.   Yes, sir.

21   Q.   You sat in a room?

22   A.   Yes.

23   Q.   When you had a question about, "Gee, I'm curious about

24   this," the plaintiff lawyers would decide what documents you

25   would look at; right?

Page 146

1    A.    Yes.  With certain caveats.

2    Q.    Right.  You wanted them to be fair and balanced, for

3    example?

4    A.    I said that repeatedly, yes, sir.

5    Q.    Okay.  Because that would be important, right, before you

6    gave an opinion in court, that you would want to see a fair and

7    balanced set of materials?

8    A.    I would want to see as much evidence as I could both have

9    time to look at and try to present the important data, yes.

10   Q.    So this document that you went over with the plaintiff

11   lawyers this morning, you don't know where it came from and you

12   don't know where it went; correct?

13   A.    I know it's a pooled analysis of the OA studies through a

14   certain time.  I've seen similar tables.  Table 13 was

15   submitted to the FDA.  Later on, there was an updated safety

16   analysis that was also done that I believe went to the FDA.  I

17   know that Table 13 went.  I just wasn't able to confirm that

18   Table 10 went.

19         MR. ISMAIL:  Your Honor, because this is a bench

20   trial, I've been trying to be patient with the witness and --

21         THE COURT:  Just try to answer the question, if you

22   can.

23         THE WITNESS:  Yes, sir.

24         MR. ISMAIL:  May I approach?

25         THE COURT:  Yes.

DAILY COPY

Page 147

1   BY MR. ISMAIL:

2   Q.   I'm going to hand you what's been marked as Defense

3   Exhibit 285.  This has been previously marked on our exhibit

4   list.  This is the same document, but I'm including the

5   correspondence that notes where the document went to.

6          Can you confirm, sir, that Exhibit 285 shows a

7   correspondence cover letter dated May 22, 2002, from Merck to

8   the FDA?

9   A.   Yes.

10  Q.   I want to go over this document, if I may.  Not the

11  correspondence.  The one you went over with Mr. Dugan.  Do you

12  have tab 21 in front of you still?

13  A.   Yes.

14  Q.   I guess, for the Court's benefit, the front page shows

15  what new drug application number this submission is filed

16  under.  Here's the correspondence you and I just referred to a

17  moment ago; correct?

18  A.   Probably an SNDA, right, or was it an NDA?

19  Q.   Do you know one way or the other?

20  A.   It was an amendment to an SNDA.

21  Q.   You actually didn't review the SNDA submissions, did you?

22  A.   No, I did not.  There may have been tables from them that

23  I reviewed.

24  Q.   So this is where the plaintiff lawyers picked up the

25  examination, with just the table of contents and the tables;

Page 148

1    correct?

2    A.    Yes.    That matches exactly.

3    Q.    581, okay.   Now, there's actually a great deal of

4    cardiovascular information that was contained in this

5    submission; correct?

6    A.    With regard to -- yes, there is cardiovascular.

7    Q.    Let me ask a different question first.   Did you read the

8    entirety of the cardiovascular pooled analysis that you went

9    over with the plaintiff lawyers?

10   A.    I remember focusing primarily -- I was trying to get a --

11   to understand all the OA, RA, all the trials, and I was looking

12   for the relative risk of all the trials.   So there were certain

13   things that I was focusing on.   I don't want to represent that

14   I have read all of the data.

15   Q.    But if you had read all of the data, you certainly would

16   have learned that, in this pooled analysis, there was a great

17   deal of cardiovascular information that Merck is providing;

18   correct?

19   A.    A great deal?

20   Q.    More than one table.   How's that?

21   A.    Sure.

22   Q.    So one of the tables you didn't go over with the plaintiff

23   lawyers I have on the screen.   That's Table 3?

24   A.    Yes.

25   Q.    Maybe that's better.   So this is a comparison of Vioxx

Page 149

1    against placebo; right?

2    A.    Right.  For an APTC endpoint.

3    Q.    An APTC endpoint.

4    A.    Versus the thrombotic endpoint.

5    Q.    We'll get into that in a minute.  So APTC endpoint is the

6    data comparison here; correct?

7    A.    Yes.

8    Q.    APTC is a composite endpoint of different adverse events

9    that you analyzed together; right?

10   A.    Yes.  Antiplatelet.

11   Q.    What this table does, similar to the other one you went

12   over, was it looks at the various studies by indication, or at

13   least by --

14   A.    Study block.

15   Q.    -- study block.  So we have RA, rheumatoid arthritis --

16   A.    Yes.

17   Q.    -- osteoarthritis, Alzheimer's, and other; correct?

18   A.    Yes.

19   Q.    This is, again, placebo-controlled data?

20   A.    Yes, sir.  Exactly.

21   Q.    When you look at the total, do I have it correctly that it

22   shows the relative risk of .94?

23   A.    Yes.  It shows that there are 46 APTC events in patients

24   on Vioxx and 45 on placebo, and that comes to that relative

25   risk, yes.

Page 150

1   Q.   So this is one look at the data that's contained in this

2   document; right?

3   A.   Yes, sir.  Relative risk of 1.53 in the OA.

4   Q.   You wanted to talk about that, so I suppose we can do that

5   now.  You are talking about this number right here; right?

6   A.   Yes, sir.

7   Q.   That's just in osteoarthritis patients?

8   A.   Yes, sir.

9   Q.   I think you and Mr. Dugan went over this on your

10  examination.  The only study block that you went with

11  specificity on is this osteoarthritis study block; correct?

12  A.   The vast majority of patients on Vioxx are on OA and so

13  there's meaning for that.

14  Q.   So the answer to my question is:  Yes?

15  A.   The answer is:  Yes.  I focused on the OA databases

16  because that's what patients were on.

17  Q.   So you identified that there was this -- and according to

18  the APTC endpoint, these differences are not statistically

19  significant; true?

20  A.   That's correct.

21  Q.   Well, let me ask this:  Do you think that there was a

22  specific reason to -- that there was an increased

23  cardiovascular risk for OA as a disease as opposed to folks who

24  had rheumatoid arthritis or other conditions?  Is that part of

25  your charge as an expert in this case?

Page 151

1    A.   I don't know if that was part of my charge.  I did read

2    certain documents that patients with OA and RA are certainly

3    more similar in biological mechanisms than patients in

4    Alzheimer's, but I certainly would --

5    Q.   Well --

6    A.   I mean, as a physician, I can tell you that, and I'm sure

7    that makes sense.  That's common sense.

8    Q.   Sir, did you actually look to see, within the Vioxx

9    clinical development program, an attempt to pool all the

10   osteoarthritis patients to see what their relative risk was

11   against placebo?

12   A.   Yes, I did.

13   Q.   Did that include looking at osteoarthritis patients who

14   were in other study blocks, such as Alzheimer's or other?

15   A.   No.  I didn't go through the Alzheimer's study block for

16   the OA patients listed in the Alzheimer's.

17   Q.   The document we have been looking at actually shows

18   comparisons to other non-naproxen NSAIDs; correct?

19   A.   This has Vioxx versus other non-naproxen NSAIDs, yes.

20   Q.   This is Table 6?

21   A.   Yes, sir.

22   Q.   This is a study of, actually, Vioxx against non-naproxen

23   NSAIDs.

24   A.   Yes.  For the APTC endpoint.

25   Q.   This is the OA study block that you were talking about a

DAILY COPY

Page 152

1    moment ago?

2    A.   Yes.  Well, I mean, again --

3    Q.   All I asked, sir, is whether we are looking at the

4    osteoarthritis study part.

5    A.   Sir, again, the answer is, if you'll notice on this,

6    Protocol 920 is included, so the OA -- what's the OA study

7    block at any point in time changes on what protocols are

8    included.  That was my only caveat.

9    Q.   All right.  So looking at the osteoarthritis study block,

10   which you thought was important to look at, and when you look

11   at Vioxx compared to non-naproxen NSAIDs, was the relative risk

12   reflected here .87?

13   A.   Yes.

14   Q.   By the way, you weren't asked to form an opinion as to the

15   comparative cardiovascular risk of Vioxx to other NSAIDs; true?

16   A.   That's correct.

17   Q.   Nor were you asked to develop an opinion comparing the

18   cardiovascular risk of Vioxx to any other COX-2 inhibitor?

19   A.   That's correct.

20   Q.   Nor were you asked to give an opinion as to whether the

21   cardiovascular risk varies by dose?

22   A.   That's correct.  I declined to do that.

23   Q.   Or duration of exposure?

24   A.   That's correct.  I did not do that.

25   Q.   Or by patient population; correct?

 1   A.   I believe that's correct.

 2   Q.   Just so we are clear, in April of 2002, looking at all the

 3   placebo-controlled data pooled together, there was no

 4   statistically significant increased cardiovascular risk with

 5   Vioxx; correct?

 6   A.   I'm not sure that's a correct answer.

 7   Q.   The table we just looked at, the APTC endpoint, shows that

 8   to be true; correct?

 9   A.   Yes.

10   Q.   Did you look to see the totality of the placebo-controlled

11   data using the all-thrombotic endpoint?

12   A.   Yeah.  But that's what I'm referencing to, and I would

13   have to check dates.  What I did --

14   Q.   If you don't know, sir, just say you don't know.

15   A.   No.  Let me tell you what I did.  Okay?  I looked at all

16   the OA studies done by Merck, both in this OA block and the

17   three other studies that are not included in this block:

18   APPROVe, VICTOR, and ViP.  I don't know the date on which Merck

19   completed that, but that relative risk is statistically

20   significant.

21   Q.   Now, you're making reference to APPROVe, VICTOR, and ViP.

22   A.   Right.

23   Q.   My question was about April 2002.

24   A.   The reason -- this is very important.  I don't know the

25   dates in my head of when Merck had the data on those studies.

1   I think that may have been possibly the next year, but they

2   were published later.  So I just don't know the dates in my

3   head.

4   Q.   The table I have on the screen is the table you went over

5   with Mr. Dugan; correct?

6   A.   Thrombotic endpoints, yes.

7   Q.   This is thrombotic endpoints versus placebo; correct?

8   A.   Yes, sir.

9   Q.   These are for all the placebo-controlled trials in the IIb

10  and Phase III program and Phase IV that had been completed by

11  this point in time; true?

12  A.   It depends on how you characterize Protocol 010.

13  Q.   You made reference to that protocol this morning.  There

14  was a single event in that protocol; correct?

15  A.   I believe that there may have been one or two.  I would

16  have to go back and look at that --

17  Q.   One on 25 milligrams and one on 125 milligrams or

18  175 milligrams?

19  A.   But as you understand --

20  Q.   Am I correct?

21  A.   Yes.  And those were --

22  Q.   Thank you.

23  A.   Yes.  So there were two.

24  Q.   If you add in the one event -- well, first let's, I guess,

25  reveal the total analysis.  So this is the endpoint you wanted

Page 155

1    to look at with Mr. Dugan; right?  All thrombotic?

2    A.    I looked at the OA all thrombotic.

3    Q.    Yeah, I know you looked specifically at OA, but I'm asking

4    you to confirm what the totality of the data showed.  Okay?

5    A.    When you add everything together, is that what you're

6    asking me?

7    Q.    So this table is a comparison of Vioxx to placebo using

8    the all-thrombotic endpoint you went over with Mr. Dugan; true?

9    A.    Yes, sir.

10   Q.    The relative risk that is reflected, when you consider the

11   totality of the placebo-controlled data, is 1.04; correct?

12   A.    Yes, sir.

13   Q.    You discussed the publication by Dr. Reicin and others?

14   A.    Yes, sir.

15   Q.    Now, I believe one of your comments was the publication

16   did not include OA studies that occurred after the approval;

17   correct?

18   A.    I believe the question was were there OA studies that were

19   done before the publication of this paper that were not

20   included.

21   Q.    I pulled up on the first page under the "Methods" section,

22   the following paragraph.  Do you see where I am?

23   A.    Yes, sir.

24   Q.    Does the article make clear that what is being analyzed in

25   the article are eight double-blind, placebo, and active

Page 156

1   comparator studies that were done between 1995 and 1998 and

2   that served the basis for the regulatory approvals?  Is that

3   disclosed in the article?

4   A.   Yes, but it doesn't disclose that other studies were also

5   done by that time.

6   Q.   We'll get to that in a minute, sir.  The scope of the

7   study, the meta-analysis done by Reicin, was disclosed in the

8   paper; true?

9   A.   The thrombotic endpoint --

10  Q.   No.  The studies that were considered and when they were

11  conducted and where they came from is disclosed in the paper?

12  A.   Yes, that's correct.

13  Q.   Table 2 shows a comparison of Vioxx to nonselective

14  NSAIDs?

15  A.   Yes, sir.

16  Q.   You have no reason to doubt the accuracy of any of this

17  data?

18  A.   For the cohort that is reported by Reicin, I do not object

19  to any of the data.

20  Q.   So these are investigator-reported cardiovascular

21  thrombotic events?

22  A.   As opposed to adjudicated, yes, sir.

23  Q.   Because these studies were done before the adjudication

24  protocol; right?

25  A.   That's correct.

Page 157

1    Q.    So the total number of events was 32 on Vioxx with

2    slightly more than twice the patient cohort than the 16 on

3    nonselective NSAIDs; correct?

4    A.    That's what this study says for this cohort.

5    Q.    The myocardial infarction data is virtually identical;

6    right?

7    A.    For this cohort of OA studies.

8    Q.    The cohort that is described and analyzed in this paper

9    also includes a comparison of Vioxx to placebo data; correct?

10   A.    Yes, sir.

11   Q.    Actually, to get back to our friend Dr. Watson, these are

12   the eight OA studies that were analyzed by Dr. Watson; correct?

13   A.    Again, I don't challenge that these were the exact data --

14   I haven't matched these up at this moment, but I assume that

15   that makes sense.

16   Q.    So the Table 2 we just looked at was the

17   Vioxx-versus-NSAID comparison; right?

18   A.    Right.

19   Q.    Now, Table 3 is the Vioxx-versus-placebo comparison;

20   correct?

21   A.    That's correct.

22   Q.    And there are --

23   A.    For the cohort that's being represented.

24   Q.    And the total patient events here are practically

25   identical, .62 percent and .56?

DAILY COPY

Page 158

1    A.    When you go on the incidence, yes.

2    Q.    In fact, there was numerically more or at least, as a

3    rate, more myocardial infarctions on placebo; right?

4    A.    Those numbers are as you represent them for this cohort of

5    OA studies.

6    Q.    Your comment about "for this cohort" is because, after

7    approval, Merck continued to study Vioxx in osteoarthritis

8    patients; right?

9    A.    There were other studies for other purposes, yes, sir.

10   Q.    Including osteoarthritis studies; right?

11   A.    Yes, sir.

12   Q.    Those data were analyzed as part of a meta-analysis by

13   Dr. Konstam; correct?

14   A.    For a cohort of patients.  You're building -- I just don't

15   want -- I think it's important for the Court in answering your

16   question.  These are pieces of the total OA database.  Reicin

17   had a piece, and then Konstam has a piece of that OA database.

18   I don't want to represent that's the entire OA database.

19   Q.    Well, this is Dr. Konstam, Table 1, and this shows the

20   study that was included in his meta-analysis; correct?

21   A.    Yes, sir.

22   Q.    One of the comments you made was that Dr. Reicin's study

23   didn't include -- let's do it this way.  Those are the studies

24   that Dr. Reicin analyzed; right?

25   A.    I believe that's correct.

1  Q.   So these would be additional studies that Dr. Konstam's

2  meta-analysis included that took place after approval?

3  A.   083, 085, 090.  I believe those are the corresponding

4  numbers.  Yes, sir.

5  Q.   So putting Protocol 010 -- by the way, this analysis by

6  Dr. Konstam is described as analysis of the Phase IIb through

7  Phase IV clinical trials done; right?

8  A.   I don't dispute that.

9  Q.   And Study 010 was a Phase IIa study; correct?

10  A.   I think there's one reference, if my memory serves me

11  right, they reference IIb, but I will be happy to say it's a

12  IIa study.

13  Q.   Putting Protocol 010 aside for a moment, the Konstam

14  meta-analysis looked at all those studies you told Mr. Dugan

15  were not in Dr. Reicin's article?

16  A.   In a table, yes, sir.

17  Q.   The meta-analysis was published before Dr. Reicin's paper?

18  A.   Yes, I believe that's correct.

19  Q.   I want to turn now, sir, to two final topics.  You

20  described the warning letter you went over with Mr. Dugan;

21  right?

22  A.   Yes, sir.

23  Q.   Now, obviously, you haven't done a systematic review of

24  all the Vioxx promotional materials; correct?

25  A.   No, sir.

Page 160

1   Q.   You described this letter from DDMAC, I think it was.

2   A.   Yes, sir.  That was an exhibit that I was shown.

3   Q.   Now, a warning letter is not, typically, the agency's

4   final action with respect to a promotional issue; correct?

5   A.   Define final action.

6   Q.   Did you have a problem with that question when I asked it

7   at your deposition?

8   A.   Again, I just -- for purposes of -- I just want to make

9   sure that I'm answering final action.

10  Q.   A warning letter begins the investigation process if DDMAC

11  has a concern about promotional materials; correct?

12  A.   I believe there was a previously untitled letter that's in

13  reference to this.  There are different -- at the time that

14  that was written, I think there were different stages of

15  letters, if that's what you're referring to, if my recollection

16  serves me right.  A warning letter tends to be more serious

17  than an untitled letter.

18  Q.   I'm showing you your deposition.  You were asked the

19  following questions, and did you give the following answers?

20        "Question:  A warning letter is not typically the

21        agency's final action with respect to a promotional issue;

22        right?

23        "Answer:  Final action?"

24  A.   My reaction is exactly the same, so I just want to be

25  clear --

DAILY COPY

Page 161

1  Q.    Yeah.  Until I said, "Am I correct?" and you said, "That's

2  correct."  Have I read correctly your answers to those

3  questions at your deposition?

4  A.    Yes.  I --

5  Q.    Thank you.  Now, you didn't actually review Merck's

6  response to that warning letter; correct?

7  A.    After my deposition, I did go back and read, I believe,

8  Merck's response.

9  Q.    Let's try it this way:  At your deposition you had not

10  reviewed Merck's response to the warning letter; correct?

11  A.    That's correct.

12  Q.    When you were sitting in the plaintiff lawyers' office

13  requesting materials and you wanted that fair and balanced

14  presentation of materials, the plaintiff lawyers hadn't given

15  you Merck's response; true?

16  A.    That's correct.  I asked what happened.

17  Q.    No, I just want to know whether I had it correctly.  The

18  plaintiff lawyers didn't give you Merck's response to the

19  warning letter?

20  A.    I asked a question.  In response to that question, I got

21  an answer, and then I didn't ask for any further documents on

22  that at that point.

23  Q.    Nor did you review the FDA's reply in resolution to that?

24  A.    At the time, that's correct.  I have subsequently.

25  Q.    After your deposition and after you issued your report;

Page 162

1    right?

2    A.    Yes.  And it doesn't change any opinion.

3    Q.    The warning letter discusses three specific promotional

4    activities; correct?

5    A.    Yes.  I believe that's correct.

6    Q.    Audio conferences by a Dr. Peter Holt?

7    A.    I believe that's correct.

8    Q.    Obviously, you don't know who or if anyone was listening

9    in on those audio conferences; right?

10   A.    No, sir.

11   Q.    And it discusses --

12   A.    I assume if anybody -- I assume somebody.  It wouldn't

13   have taken place if no one was listening.

14   Q.    It discusses the activities of two specific sales

15   representatives:  One in Maryland and one in California?

16   A.    I don't challenge that.

17   Q.    And discusses this press release that you referenced

18   earlier; correct?

19   A.    That's correct.

20   Q.    And you do know that -- at least, the plaintiff lawyers

21   have told you that the issue raised by FDA was resolved to

22   their satisfaction; correct?

23   A.    I know the matter was closed.  I saw that there were

24   corrective actions with regard to the first two.  I didn't see

25   the corrective action with regard to the press release.

DAILY COPY

Page 163

1    Q.    Final topic:  Your discussion with Mr. Dugan of the label.

2    A.    The label, yes.

3    Q.    The earliest time you have a specific recollection of

4    reviewing any of the Vioxx labels was in 2009, pursuant to your

5    retention by the plaintiffs; right?

6    A.    That's correct.

7    Q.    In fact, you have no recollection, even, at least as of

8    the date of your deposition, of having reviewed any of the

9    labels for any other NSAID or COX-2 inhibitor; true?

10   A.    I have no recollection of that, that's correct, sir.

11   Q.    The question of the labeling that would be instituted

12   after the VIGOR study was the subject of an advisory committee;

13   is that right?

14   A.    I reviewed -- I'm sorry.  Just ask your question again.

15   Sorry.

16   Q.    Do you know, sir, one way or another whether the labeling

17   of the VIGOR study into the Vioxx label was the subject of an

18   advisory committee?

19   A.    The 2001 FDA advisory committee?  Is that the one you're

20   referring to?

21   Q.    Was labeling for Vioxx the subject of an FDA advisory

22   committee?

23   A.    The subject?  I looked at the -- let me tell you what I

24   know and what I don't know.  I have reviewed before today both

25   FDA's advisory committee in the late 1990s and one in 2001, and

DAILY COPY

1    I reviewed the questions as well as the transcript for, you

2    know -- questions specifically with regard to the labeling for

3    cardiovascular safety.

4    Q.   Just to follow up on that gratuitous comment you just

5    made, as of the date of your deposition, you had not reviewed

6    any of the advisory committee materials for 1999 or 2001; true?

7    A.   No.  I've looked at that subsequently.  I've studied that

8    subsequently.

9    Q.   So when you issued your report, laid out your opinions,

10   you had not reviewed any of the advisory committee materials;

11   right?  For 2001 and 1999.

12   A.   I believe that's correct.

13   Q.   The 2001 advisory committee, just to get back on track,

14   did discuss the cardiovascular information for the VIGOR study

15   in light of the Vioxx label; right?

16   A.   There were -- I mean, I literally -- I searched -- I

17   key-searched the words label and labeling throughout, and there

18   were mentions of both.

19   Q.   You were searching where?

20   A.   The transcript.

21   Q.   Is this something the plaintiff lawyers gave you after

22   your deposition?

23   A.   No.  It was something that I downloaded myself from the

24   FDA site.

25   Q.   So when you were sitting in their office and you were

DAILY COPY

Page 165

1    forming opinions about the labeling and you wanted to get the

2    fair and balanced picture of how the labeling was handled after

3    VIGOR, the plaintiff lawyers didn't give you the transcript of

4    the advisory committee meeting; true?

5    A.    That is correct.  I have subsequently reviewed that, and

6    it does not change my opinion.

7    Q.    Well, let's take a look.  Is Exhibit 187, sir, the

8    transcript of the FDA advisory committee you looked at after

9    you formed your opinions in this case?

10   A.    It was a two-day advisory committee.  I obviously looked

11   at it online and I downloaded it on my computer.  So that was

12   the one I went through.

13   Q.    One of the days was --

14   A.    I mean, on Celebrex -- one day was primarily -- this day

15   is on Vioxx.

16   Q.    Actually, let me get my question out.  One day was on

17   Vioxx and one day was on Celebrex; right?

18   A.    That's correct.

19   Q.    You just looked at the Vioxx day?

20   A.    I actually mixed up, at one point, the transcripts.  I was

21   reading the transcript on Celebrex until I get them sorted out.

22   Q.    Do you recall that one of the individuals in attendance at

23   the advisory committee was Dr. Stephen Nissen?

24   A.    Yes.

25   Q.    Dr. Nissen was a cardiologist that was specifically asked

Page 166

1   to be there to help give input on now to interpret the

2   cardiovascular data of VIGOR; true?

3   A.   Yes.  He was a consultant, yes.

4   Q.   Dr. Nissen, I believe, led the cardiology department at

5   The Cleveland Clinic at one point?

6   A.   I don't know exactly his position with Topol and others,

7   that group.

8   Q.   Dr. Nissen, at one point, was he president of the American

9   College of Cardiology?

10  A.   I have no reason to dispute that.

11  Q.   Dr. Nissen is an individual you believe is qualified to

12  fairly and competently interpret cardiovascular data?

13  A.   If he sees all the data, I would certainly think he is a

14  competent individual, yes.

15  Q.   Did you review the entirety of the transcript?

16  A.   There were three different volumes, and I went through --

17  I want to say that I studied -- I won't say that I studied

18  every page.  I searched cardiovascular, cardiac.  I looked at

19  the questions the committee was asking.  I looked at the slides

20  and I looked at the backup briefing material, but I wouldn't

21  want to say that I looked at everything.

22  Q.   So during the advisory committee, the floor was turned

23  over to Dr. Nissen for him to give his analysis of the VIGOR

24  data?

25  A.   Yes.  And I recall looking at that.

DAILY COPY

Page 167

1   Q.   Great.  So here we are with Dr. Nissen giving his

2   analysis.  The way he framed the question -- page 148 of the

3   transcript at line 22.

4   A.   Yes.  Counsel, I want to make sure.  When you say

5   "question," do you have the questions for the advisory

6   committee?  Because I haven't seen that.  That's the question.

7   There were questions for the advisory committee.

8   Q.   We'll go through Dr. Nissen's comments.  If your lawyer

9   wants to go through some other material, he'll have the

10  opportunity to do so.

11  A.   Okay.  But I just don't want this -- you said "questions

12  for the advisory committee."  There are formal questions for

13  the advisory question that get asked.

14  Q.   Then I'll rephrase.  Do you recall seeing Dr. Nissen's

15  comments:  "Well, how can we go about analyzing which of the

16  two hypotheses makes the most sense?"

17  A.   Yes, sir.

18  Q.   Do you recall the hypotheses that were on the table at

19  that point was the difference in VIGOR due to naproxen or due

20  to Vioxx?

21  A.   Yes, sir.  Very much so.

22  Q.   So he says, "Well, one way is to ask the question whether

23  the naproxen event rates are similar to the event rates in

24  patients who receive aspirin and to see whether the rofecoxib

25  event rates are similar to patients who don't take aspirin but

Page 168

1   who are on placebo in a similar risk category."

2   A.   Yes, sir.

3   Q.   Do you recall Dr. Nissen actually prepared an analysis he

4   made of the issue as he framed it?

5   A.   I believe there was some Italian results which he talked

6   about, if I'm correct, if my memory serves me right.

7   Q.   After he goes through his analysis, he says, "Well, what

8   did we see here?"  Then he goes on to say, "Well, it is a bit

9   reassuring that the naproxen event rates in VIGOR and the

10  aspirin event rates" -- and "PPP" is the primary prevention

11  studies?

12  A.   Yes, sir.

13  Q.   Those are aspirin studies looking at cardioprotection?

14  A.   Yes, sir.

15  Q.   So he says, "It's reassuring that naproxen and aspirin

16  were very, very similar."

17  A.   That's correct.

18  Q.   Do you recall seeing that when you read this?

19  A.   That's correct.

20  Q.   He goes on to say, "If you do the confidence intervals

21  here, these are really amazingly close."

22  A.   Right.

23  Q.   Again, talking about naproxen and aspirin?

24  A.   Right.

25  Q.   Then he goes on to say, "This provides some reassurance

DAILY COPY

Page 169

1    that what we may be seeing here is, at least in part, a

2    protective effect of naproxen."  Right?

3    A.   That's part of the transcript of what he is talking about.

4    You also -- he says he's --

5    Q.   Have I read that correctly?

6    A.   That's correct.

7    Q.   Then he goes on to analyze the Vioxx rate from VIGOR and

8    compares it to the placebo rate of another study; right?

9    A.   I believe that's correct.

10   Q.   You recall he presented the analysis of that data as well?

11   A.   My recollection is a little fuzzier on that at this

12   moment, but I have no reason to challenge that.

13   Q.   Do you recall that Dr. Nissen found that the event rate on

14   Vioxx was very similar to the placebo rate from the other

15   study?

16   A.   He got it wrong.

17   Q.   Do you recall that?

18   A.   Yes.

19   Q.   Then he goes on to note:  "Overall, the events were not

20   different but only the differences in MI" -- that's heart

21   attack; right?

22   A.   Right.

23   Q.   -- "are significant."

24        Then he goes on to say, "But there are very few

25   events.  I would point out to everyone at the table" -- that's

DAILY COPY

Page 170

1   all the assembled experts on the advisory committee; correct?

2   A.   And consultants and FDA.

3   Q.   "In the entire cohort, there were only 24 myocardial

4   infarctions:  20 in the Vioxx group and 4 in the naproxen

5   group."

6        He is talking about the VIGOR study here; correct?

7   A.   That's correct.  Fivefold excess when you are talking

8   about myocardial infarctions.

9   Q.   So 24 myocardial infarctions out of 8,000 patients?  Is

10  the data accurate that I just reflected?

11  A.   8,000-some-odd, yes.

12  Q.   Then he says, "A shift of two or three MIs could easily

13  have made a difference here in terms of the outcome with

14  respect to this analysis."

15       Is that Dr. Nissen's comments at the advisory

16  committee?

17  A.   Yes.

18  Q.   You recall that the committee turned to the question of

19  labeling?

20  A.   I remember there was some discussion of labeling, yes.

21  Q.   And there was an extended back-and-forth amongst the

22  various experts at the advisory committee?

23  A.   Well, I remember searching for what I believe was the

24  members of the advisory committee discussing what they thought

25  should be in the label.

Page 171

1          Again, I don't remember, Counsel.  I may have missed

2     it, but I looked specifically whether there was a question for

3     the advisory committee on labeling.  I just didn't see it, an

4     FDA question, but I may have missed it.

5     Q.   So then Dr. Nissen goes on to say, "I think the question

6     for me is whether there is any evidence of an excess event rate

7     over placebo, and that is just not on the table.  So what can

8     we say?  What we can say is that, in this population, getting

9     naproxen was associated with a lower cardiovascular event rate

10    than getting rofecoxib.  Therefore, it seems to me what we

11    probably need to do, since we really don't know, is to make it

12    very clear that there's not a cardioprotective effect for the

13    COX-2 inhibitors, and the decision on whether or not to

14    administer aspirin is a matter of clinical judgment."

15         Then he says, "I don't think any guidance beyond that

16    is possible based upon the data."

17         Was that the comments of Dr. Nissen at the 2001

18    advisory committee?

19    A.   He goes on to say, "We do not have data we need to make a

20    final determination if what we saw was a cardioprotective

21    effect of naproxen or excess risk."  He is saying Merck still

22    had not done that study.  Had Dr. Nissen looked --

23    Q.   Had I read the transcript correctly?

24    A.   The portions of the transcript that you read, you read

25    correctly.  You didn't read the next sentence.

DAILY COPY

Page 172

1   Q.   How about we go to the section where they discuss the

2   label.  You said you couldn't find that when you went through

3   the transcript?

4   A.   It looks as this --

5   Q.   When you were searching this transcript for the advisory

6   committee discussion of the labeling, did you come across this

7   discussion from Dr. Nissen?

8   A.   I believe so, but what -- can I just finish?

9   Q.   I haven't asked a question.  I just asked if you saw this.

10       Did Dr. Nissen say, "Briefly, I think what I would

11  say in the label" -- we are talking about the Vioxx label here?

12  A.   Yes.

13  Q.   -- "is that there was an excess of cardiovascular events

14  in comparison to naproxen, that it remains uncertain whether

15  this is due to the beneficial cardioprotective effects of

16  naproxen or the prothrombotic effects of the agent, and leave

17  it at that.  Basically, we do not know the reason."

18       Is that Dr. Nissen's comments as to what the content

19  of the label should be?

20  A.   That's what Dr. Nissen believed at the time based on what

21  Dr. Nissen -- data Dr. Nissen had.

22  Q.   Of course, you don't know what data Dr. Nissen had, do

23  you?

24  A.   (NO RESPONSE)

25  Q.   Do you, sir?

Page 173

1    A.    I don't know the specific data that Dr. Nissen had, no.

2    Q.    So, then, after Dr. Nissen gave his recommendation for how

3    the label should read -- that, basically, we should just put

4    out there that there was a difference and we don't know the

5    reason for the difference -- the advisory committee asked for a

6    show of hands to see who agreed of some additional language

7    along the lines of what Dr. Nissen suggested in terms of the

8    labeling.

9    A.    I see that.

10   Q.    There was one person who disagreed.  You see that?

11   A.    I see that.

12   Q.    Do you recall that that individual actually said there

13   shouldn't be any change to the label?

14   A.    I don't have a recollection on that.

15   Q.    So following this advisory committee, there was, in fact,

16   a change to the Vioxx label; correct?

17   A.    Approximately 18 months after the negotiations started.

18   Q.    After this advisory committee, there was a change to the

19   label; correct?

20   A.    In 2002, there was a change.

21   Q.    Thank you.  You went over with Mr. Dugan some of the

22   labeling that went back and forth.

23   A.    Yes, sir.  Different versions.

24        MR. ISMAIL:  What did you end up marking the exhibit

25   that wasn't on the exhibit list?

DAILY COPY

Page 174

1   BY MR. ISMAIL:

2   Q.   Do you recall going over with Mr. Dugan the label that the

3   FDA sent to Merck in October 2001, the one that generated

4   the --

5   A.   The October 15 text.

6   Q.   That's the one that --

7   A.   I have the cross-outs, yes, sir.

8   Q.   Sure.  That's the one that generated Dr. Scolnick's

9   animated response?

10  A.   That's fair to say.

11  Q.   You indicated that Merck, in your view, did not exercise

12  standard of care by not just accepting that label; right?

13  A.   There was no cardiac -- it didn't accept the cardiac

14  warning.

15  Q.   The label that the FDA sent Merck in October of 2001, in

16  your view, was it acceptable?

17  A.   It should have had a cardiac warning.

18  Q.   That was contained in the FDA version of the label; right?

19  A.   There should have been a warning in the warning section is

20  my opinion.

21  Q.   Was that part of the FDA recommendation?

22  A.   The document that I saw had FDA language, what appeared to

23  be in the warning section because it was right above

24  "anaphylaxis," which I assume was the warning section, but it

25  wasn't the word warning.  My opinion was there should have been

Page 175

1    a cardiac warning.

2    Q.   So your view is that the FDA label sent to Merck in

3    October 2001, so long as that warning information was in the

4    cardiovascular section --

5    A.   No.  The warning section, sir.

6    Q.   In the warning section.

7    A.   Yes, sir.

8    Q.   Okay.  So the language the FDA had, so long as it was in

9    the warning section.  Are we good so far?

10   A.   It should have warned of a cardiac risk.

11   Q.   That's the one that you believe Merck should have

12   accepted; right?

13   A.   I believe there should have been a cardiac warning in that

14   section of the label.

15   Q.   Along the lines that the FDA suggested?

16   A.   Again, I would want to look exactly at that language.  I

17   think there should have been a cardiac warning in the label.

18   Q.   Well, when you went over that label with Mr. Dugan this

19   morning, had you read it?

20   A.   I believe I read the section out loud here.

21   Q.   Was the information that you went over with Mr. Dugan in

22   the warning section?

23   A.   You couldn't tell from that individual piece of paper

24   because, again, I only had available to me portions of the

25   document.

DAILY COPY

Page 176

1   Q.   Okay.  So how about say it this way:  If that information

2   was in the warnings section, that's what you believe Merck

3   should have accepted.  Fair enough?

4   A.   The language I read this morning warning of hypertension,

5   myocardial thrombotic events, without explaining away those

6   risks, I think were as important, yes.

7            MR. ISMAIL:  Okay.  The actual label that was issued

8   has been marked as Exhibit 273.  Your Honor, I just have about

9   10 more minutes.

10            THE WITNESS:  You don't have a little larger copy, do

11   you?

12            MR. ISMAIL:  Your Honor, I offer Exhibit 285, which

13   was the pooled analysis and the actual correspondence

14   submitting it.

15            THE COURT:  Admitted.

16            MR. ISMAIL:  We also offer Exhibit 273, the label.

17            THE COURT:  Admitted.

18            MR. ISMAIL:  I also offer the 2001 advisory committee

19   hearing transcript, Exhibit 187.

20            THE COURT:  Admitted.

21   BY MR. ISMAIL:

22   Q.   You reviewed this label; right, sir?

23   A.   Yes, I did.

24   Q.   Does the Vioxx label, Exhibit 273, contain Table 2, which

25   shows the VIGOR data?

1   A.   Yes, sir.

2   Q.   The cardiovascular data that is set forth in Table 2 is

3   accurate; true?

4   A.   Yes, sir.

5   Q.   There are additional cardiovascular data from VIGOR set

6   forth in Table 3?

7   A.   Yes, sir.

8   Q.   The cardiovascular data --

9   A.   Not in the warnings section.

10  Q.   The cardiovascular data set forth in Table 3 is accurate;

11  true?

12  A.   Yes, sir.

13  Q.   There is no statement in the April 2002 Vioxx label to the

14  effect that the explanation for the differential in VIGOR was

15  due to naproxen being cardioprotective; true?

16  A.   That is correct.  The label, in my judgment, does try

17  to --

18  Q.   I didn't ask whether, in your judgment, it was adequate,

19  sir.  I just asked you to confirm that the April 2002 Vioxx

20  label did not give the explanation that the differential was

21  due to an effect of naproxen being cardioprotective.

22  A.   That label does not contain that, that's correct.

23  Q.   Thank you.  Now, the regulations you referenced this

24  morning with Mr. Dugan, I think it was tab 1 or tab 2.

25  A.   If you jump ahead a few pages --

Page 178

1   Q.   Well, before I do that --

2   A.   I'm sorry.

3   Q.   -- you actually went over the April 2009 version of these

4   regulations; correct?

5   A.   It's whatever counsel showed me, yes.

6   Q.   Did you review the exhibit that counsel showed you to see

7   if they were the regulations that were in effect prior to April

8   2009?

9   A.   There may have been some changes with regard to certain

10  sections that were linked, I believe.

11  Q.   Do you recall one of the changes to the regulations here

12  is that there was going to be a merging of the precautions and

13  warnings section?

14  A.   Certainly back in 2002 and certainly when I was

15  commissioner, there was a warnings section.

16  Q.   My question was --

17  A.   I have not reviewed any proposed regulations to that

18  effect.

19  Q.   This is the exhibit you went over with the plaintiff

20  lawyer; right?

21  A.   This is the C.F.R.  He showed me certain sections of the

22  C.F.R. with what's required with regard to the -- I believe

23  with regard to the duty to warn and what to include.

24  Q.   We got this exhibit from the plaintiff lawyers last night

25  with all this highlighting on it, and this is the exhibit they

Page 179

1    said they had gone over with you and you were going to review

2    with the Judge in court.

3    A.    Yeah.  I didn't do this highlighting.

4    Q.    Did you review this exhibit before you came in here today?

5    A.    I reviewed certain -- I looked at certain sections of this

6    and am familiar with certain sections of this.

7    Q.    Do you recall, sir, that this version of the regulations

8    has done away with the distinction between precautions and

9    warnings?

10   A.    In 2009, I didn't review this for that.

11   Q.    You didn't review this document sufficient to --

12   A.    Not on this C.F.R., no.

13   Q.    So in the highlighted section here, this -- let me ask it

14   this way:  Do you know today that product labels contain a

15   section -- don't have a distinction anymore between warnings

16   and precautions?

17   A.    This is warnings and precautions.  I would have to -- I

18   don't know what the current standard is at this moment, no.

19   Q.    That October 2001 FDA label you were talking about, one

20   thing we know for sure is that the FDA's proposal did not have

21   a black-box warning; right?

22   A.    No, it had a warning. It warned.

23   Q.    I have handed you Defense Exhibit 3637, a section of the

24   Federal Register that describes the change in labeling format

25   that resulted in the regulation that you went over with the

DAILY COPY

Page 180

1    plaintiff lawyers this morning.

2    A.   In 2006, yes.

3    Q.   So down here, there's a section called "Warnings and

4    Precautions"; correct?

5    A.   You've given me part of the final rule.  Can you give me

6    the whole final rule?

7    Q.   Well, it's an extremely large document.  Consistent with

8    what the parties are doing here, we are going to be handing out

9    portions of exhibits we want to go over.  If there's something

10   else your lawyer wants to go over, he will have the opportunity

11   to --

12   A.   These are in response to certain comments; right?

13   Q.   These are comments in response to the FDA's suggestion

14   they do away with the distinction between warnings and

15   precautions; true?

16   A.   In a comment; right?

17   Q.   Well, the original proposed rule was FDA saying, "We are

18   going to do away with the distinction between warnings and

19   precautions"; correct?

20   A.   I don't have the proposed rule here, so I can't tell you

21   what's in the proposed rules.

22   Q.   How about we do it this way.

23   A.   They tend to be part of the final rule.

24   Q.   "The comments agreed with FDA's findings, based on

25   physician surveys and focus testing, that the distinction

Page 181

1    between warnings and precautions is not meaningful to

2    practitioners who use labeling."

3    A.   Because it was confusing.

4    Q.   Do you see that?

5    A.   Yes.

6    Q.   You made the distinction between warnings and precautions

7    when you were going over the labeling with Mr. Dugan; right?

8    A.   Because at the time --

9    Q.   Was that correct, sir?

10   A.   Yes, because at the time --

11   Q.   There will be a time for your lawyer to continue to ask

12   you questions.

13            MR. DUGAN:  Objection.

14            THE COURT:  He can finish his answer.

15                Go ahead.  You can finish your answer, sir.

16   BY MR. ISMAIL:

17   Q.   Go ahead, sir.

18   A.   Because at the time the Vioxx labeling was being done,

19   there was a warnings section and a precautions section.  The

20   precautions section was a more diluted set of information than

21   the warnings section, so you could see how it could be

22   confusing to physicians.

23   Q.   Are you done?

24   A.   Yes.

25            MR. ISMAIL:  One moment, Your Honor.

Page 182

1              The last point of business is to offer

2    Exhibit 3637.

3              THE COURT:  I'll admit it.

4              MR. ISMAIL:  Thank you.

5              THE COURT:  We'll take a 15-minute break at this

6    time.  Court will stand in recess.

7              THE DEPUTY CLERK:  Everyone rise.

8              (WHEREUPON the Court took a brief recess.)

9              THE DEPUTY CLERK:  Everyone rise.

10             THE COURT:  Be seated, please.

11             You're still under oath, sir.  Redirect,

12   Counsel.

13                    REDIRECT EXAMINATION

14   BY MR. DUGAN:

15   Q.   Good afternoon, Dr. Kessler.

16   A.   Good afternoon.

17   Q.   Do you remember defense counsel's questioning in reference

18   to the Code of Federal Regulations?

19   A.   Yes.

20   Q.   Is it still your opinion that the Code of Federal

21   Regulations require a drug company to warn of a potential risk?

22   A.   Reasonable evidence of causal association, yes.

23   Q.   Dr. Kessler, do you remember the line of questioning

24   defense counsel raised in reference to a number of clinical

25   studies, including VIGOR, Protocol 023, Dr. Watson,

Page 183

1    Dr. Villalba, Study 017, the Dr. Reicin article, the

2    Dr. Konstam article that we've been discussing today?

3    A.   Yes, sir.

4    Q.   In your opinion and judgment, do all of those studies help

5    you in your opinions to determine what Merck knew before it

6    marketed Vioxx?

7            MR. ISMAIL:  Objection, Your Honor.

8            THE COURT:  Counsel, you have to be a little bit more

9    specific on it.  I'll give him an opportunity to answer, but

10   just to throw out that and say, "Comment on it," is a little

11   broad, I think.  You should be a little more specific with your

12   question.

13           MR. DUGAN:  I understand, Your Honor.

14   BY MR. DUGAN:

15   Q.   Dr. Kessler, you testified earlier this morning that,

16   based upon the evidence reviewed and discussed thus far, you

17   had an opinion that there were safety signals for thrombotic

18   events before Merck marketed Vioxx; is that correct?

19   A.   Yes, sir.

20   Q.   Do you stand by that opinion in reference to your analysis

21   of the VIGOR trial?

22           MR. ISMAIL:  Judge, we're just repeating direct at

23   this point.

24           THE COURT:  Let's go through it.  Go ahead.  You can

25   answer.  Did it change your opinion at all?

DAILY COPY

Page 184

1          THE WITNESS:  No, sir.  Nothing defense raised with

2    regard to the data in Watson or 071 or questions relating to

3    VIGOR changed my -- VIGOR was postapproval, but certainly the

4    data that was -- that we talked about earlier on direct, no

5    questions defense asked me changed my opinion.

6          MR. DUGAN:  Thank you, Dr. Kessler.

7              That's what I was attempting to do, Your Honor,

8    is to short-circuit these.

9    BY MR. DUGAN:

10   Q.   Would the same be true for the DDMAC warning letter that

11   defense counsel discussed with you earlier?  Do you have the

12   same opinion in reference to that letter?

13   A.   Yes.  The agency was concerned about the naproxen theory

14   and didn't see a basis for that in the DDMAC letter.

15   Q.   Dr. Kessler, do you remember the line of questioning from

16   defense counsel in reference to the labeling issues and

17   Dr. Nissen in reference to the arthritis advisory committee

18   report, February 8, 2001?

19   A.   Yes.

20       MR. DUGAN:  At this time I would like to approach the

21   witness with a document, Your Honor.

22       THE COURT:  That's fine.

23   BY MR. DUGAN:

24   Q.   I would like to ask you to take a second to review the

25   document.

Page 185

1           MR. ISMAIL:  Your Honor, I don't believe this

2    exhibit's on the -- my apologies if it is.

3           THE COURT:  What was it?  Is there an objection that

4    it's not on the --

5           MR. DUGAN:  It's an article, Your Honor, by

6    Dr. Nissen done six months after the advisory committee.

7    Counsel opened the door talking in reference to this.  I have a

8    very short, specific question in reference to it, Your Honor.

9           THE COURT:  Let's ask it.

10   BY MR. DUGAN:

11   Q.   Dr. Kessler -- I'm sorry.  You're still reviewing the

12   document.

13          THE COURT:  If necessary, I'll give you recross on

14   that one area.

15          MR. ISMAIL:  Thank you, Your Honor.

16          THE WITNESS:  Yes, sir.

17          THE COURT:  What's the question?

18   BY MR. DUGAN:

19   Q.   The question is:  Dr. Kessler, could you please look at,

20   on the first page, the last paragraph.

21   A.   Yes.

22   Q.   Can you read that, please.

23   A.   In the abstract, it says:

24          "The available data raised a cautionary flag about

25   the risk of cardiovascular events with COX-2 inhibitors.

DAILY COPY

Page 186

1    Further prospective trial evaluation may characterize and

2    determine the magnitude of the risk."

3    Q.   So this is only six months after the February 8, 2001

4    advisory committee report; correct?

5    A.   Yes, sir.

6    Q.   Is that a different position that Dr. Nissen has taken?

7    A.   It certainly appears to be different with regard to the

8    class.  Just looking at the conclusion, it appears to be

9    different than the excerpts that counsel showed.  The last

10   paragraph of the paper is probably what I think is most

11   insightful:

12        "Our findings suggest a potential increase in

13   cardiovascular event rates for the presently available COX-2

14   inhibitors.  It is possible that concomitant use of aspirin may

15   not fully offset the risk of selective COX-2 inhibitors."

16        Again, what's most important here is:  "The

17   definitive evidence of such an adverse effect will require

18   prospective randomized trial."

19        The need for that trial to answer those questions was

20   paramount.  My opinion is Merck should have done that trial

21   sooner rather than later.

22   Q.   Is what Dr. Nissen wrote consistent with your opinion

23   regarding safety signals that you discussed earlier?

24   A.   Yes, it certainly is consistent with safety signals.  I

25   believe when you look at the individual studies, you add them

1   up, you see a clear safety signal.  When you look at all the OA

2   data -- not just any one study, not at any interim period of

3   time, but if you look at all the OA data, you see a

4   statistically significant increased risk of thrombotic event.

5          So not only did I see a signal, I see a statistically

6   significant increase in thrombotic events when one looks at all

7   the OA data.

8   Q.   Thank you, Dr. Kessler.  In conclusion, as you testified

9   at the beginning of this redirect, nothing that was covered in

10  your cross-examination will change any of the opinions that you

11  testified earlier to in this case?

12         MR. ISMAIL:  Objection.

13         THE COURT:  He objects to leading.  I sustain the

14  objection.

15         Anything further?  You can recross on that one

16  area.

17                     RECROSS-EXAMINATION

18  BY MR. ISMAIL:

19  Q.   Mr. Dugan just went over and handed you a copy of the

20  article by Drs. Nissen, Topol, and Mukherjee, published in JAMA

21  in 2001?

22  A.   Yes.

23  Q.   So anyone reading the article by Drs. Nissen and Topol

24  would understand that one interpretation of the VIGOR study is

25  that Vioxx increases the risk for thrombotic events; right?

Page 188

1    A.   As I remember this article when I read it at the time,

2    they were being -- they're saying that both are potential

3    mechanisms, yes.  There was a cautionary flag.

4    Q.   I'm just going to hand you your deposition and ask you to

5    turn to page 244, line 4.  Final question.  Were you asked the

6    following question at your deposition, and did you give the

7    following answer under oath:

8            "Question:  So anyone reading the article by

9        Drs. Nissen and Topol would understand that one

10       interpretation of the VIGOR study is that Vioxx increases

11       the risks for thrombotic events; right?

12           "Answer:  They are -- the three of them are certainly

13       laying that out as a possibility."

14       Were you asked that question and did you give that

15   answer?

16   A.   Yes.

17           THE COURT:  Thank you, sir.  You're excused.  Thank

18   you very much.

19               Any other witnesses today?  What's the lineup?

20           MR. MURRAY:  Your Honor, we don't have any additional

21   witnesses live today, but we would at this point introduce some

22   deposition testimony.  We don't have any intention of reading

23   it into the record, but we would introduce the depositions and

24   the exhibits and give Your Honor an idea of the context in

25   which they're being introduced and an opportunity for defense

DAILY COPY