# EXHIBIT-3

```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                                  )
                                        ) No. 04-10981-PBS
NEURONTIN MARKETING, SALES PRACTICES,   ) MDL No. 1629
AND PRODUCTS LIABILITY LITIGATION       )
----------------------------------------)
This document relates to:               )
KAISER FOUNDATION HEALTH PLAN, et al,   )
                                        )
               Plaintiffs               )
                                        )
          -V-                           )No. 04-10739-PBS
                                        )Pages 1 - 152
PFIZER, INC., et al,                    )
                                        )
               Defendants               )
```

JURY TRIAL - DAY TWO

BEFORE THE HONORABLE PATTI B. SARIS

UNITED STATES DISTRICT JUDGE

United States District Court

1 Courthouse Way, Courtroom 19
Boston, Massachusetts
February 23, 2010, 8:45 a.m.


LEE A. MARZILLI and VALERIE A. O'HARA

OFFICIAL COURT REPORTERS

United States District Court
1 Courthouse Way, Room 7200
Boston, MA 02210

Page 28

1  advertisement, right?  It's generally meant for physicians, but
2  a lot of times consumers read that drug label.
3  Q.   Is it legal for a doctor to prescribe a drug for an
4  off-label use?
5  A.   Yes.
6  Q.   And why is that?
7  A.   FDA over the decades has respected the judgment of an
8  individual physician taking care of his or her patient, and
9  that's been long respected by the Federal Food, Drug and
10 Cosmetic Act and the FDA.
11 Q.   Is that in part because of the physician's education,
12 training, and ability to review the scientific evidence-based
13 literature?
14 A.   Once a drug is approved and is legally marketed, the FDA
15 has always taken the position that it does not want to
16 interfere in the patient-doctor relationship.
17 Q.   Is it legal for a drug manufacturer to promote a drug to a
18 doctor for an off-label use?
19 A.   No, and that's a distinction.  So while a doctor can use a
20 drug for an off-label use, the drug sponsor, the drug
21 manufacturer, the drug industry who makes the drug, they cannot
22 promote the drug for an off-label use.  That has been the clear
23 law for decades.
24 Q.   Okay, I want to move to a new subject now, the FDA
25 approval process.  You've been talking about these double-blind

Page 50

1       MR. GREENE:  I offer Exhibit 195, your Honor.

2       THE COURT:  We might actually at some point -- it's
3  taken me five years to learn the abbreviations -- so just maybe
4  have a chart so people remember AED, PHN, all these things.

5       MS. NUSSBAUM:  We will do that, your Honor.

6       MR. CHEFFO:  That's a good idea, your Honor.  We'll
7  work together.

8       (Plaintiff Exhibit 195 received in evidence.)

9  Q.   Could you tell us what the Division of Drug Marketing,
10 Advertising and Communication is?
11 A.   Let me address another acronym, all right?  This is DDMAC.

12      THE COURT:  By the end of this, you won't believe how
13 much you're going to have.

14      THE WITNESS:  I'm sorry, your Honor, for doing that.

15      THE COURT:  So DD --

16      THE WITNESS:  It's the Division of Drug Advertising,
17 Marketing and Communications.  So it's within the center at FDA
18 that deals with drugs, and its responsibility is to oversee the
19 advertising and promotion of drugs.

20      MR. GREENE:  Excuse me, your Honor.  I think this
21 morning I gave you two copies of that, one that had a sticker
22 on it and then a marked-up copy?

23      THE COURT:  You think I've still got it, huh?  Good
24 luck to you.

25      MR. GREENE:  I've been searching for it.

1              THE COURT:  No, here it is.  I think this is it.
2              MR. GREENE:  Thank you.
3    Q.   Let me show you what we've marked as Exhibit 190?
4              THE COURT:  You know, if they're not objected to, you
5    can just throw them up on the machine so you don't have to --
6              MR. KENNEDY:  No objection.
7    Q.   Exhibit 190.
8              (Witness examining document.)
9    Q.   Now, is this a letter from the FDA's DDMAC division that
10   you just defined to the jury to Pfizer?
11   A.   It's from Laurie Lenkel to Pfizer, yes, and it's by the
12   Division of Drug Marketing, Advertising and Communications.
13   Q.   I wanted to direct your attention to the first page.  Do
14   you have that in front of you?
15   A.   Yes, sir.
16   Q.   And dropping down a little bit, do you see the paragraph
17   "Overstatement of Efficacy"?  Do you have that?
18   A.   Yes, I do.
19   Q.   And was there a statement there made with regard to
20   promotional materials?  Could you read that to the jury.
21   A.   The first sentence of the last paragraph, "Promotional
22   materials are false or misleading if they state or imply that a
23   drug is better, safer, or more effective than has been
24   demonstrated by substantial evidence."
25   Q.   Okay.  And does the next sentence indicate that

1 Neurontin -- well, why don't you read the next sentence to the
2 jury, please.
3 A. "Your proposed materials contain the above claims and
4 related graphic representations that suggest that Neurontin has
5 been proven to provide significant reductions in pain in the
6 majority of patients when such has not been demonstrated by
7 substantial evidence."
8 Q. Then I'd like to direct your attention to the next page,
9 the heading, do you see it about three-quarters of the way
10 down, "Misleading Dosage Information"?
11 A. I do.
12 Q. And could you read that to the jury.
13 A. So the first paragraph talks about what is being stated by
14 the drug sponsor, by Pfizer, wants to state in its materials,
15 and it says, the second sentence -- the first sentence says,
16 "Efficacy and safety of Neurontin were demonstrated at doses of
17 1,800 to 3,600 milligrams a day, with comparable effects across
18 the dosing range. In clinical trials, the efficacy and safety
19 of Neurontin in the management of PHN," postherpetic neuralgia,
20 "were demonstrated at doses of 1,800 to 3,600 milligrams per
21 day."
22 Q. What does that mean when it says it was demonstrated at
23 those doses for the management of PHN?
24 A. FDA would require that demonstration is by adequate and
25 well-controlled clinical trials.

1   Q.   Dropping down to the paragraph just below that second
2   sentence, would you read that to the jury.
3   A.   I'm sorry, which paragraph?
4   Q.   It begins with "The above claims."
5   A.   It says, "The above claims along with the chart and the
6   visual aid titled 'Target doses by week' depict dosing
7   information from an 8-week clinical trial.  While Neurontin was
8   studied at doses up to 3,600 milligrams per day, the PI," this
9   is the package insert, the drug label as I describe,
10  "recommends a titration up to 1,800 milligrams a day as needed
11  and clearly states that additional benefits of using doses
12  greater than 1,800 milligrams per day were not demonstrated.
13  Further, the adverse event profile of the drug increased as
14  dosage increased above 1,800 milligrams per day."  So that last
15  sentence says the number of adverse events increased at doses
16  above 1,800 milligrams per day.
17  Q.   Doctor, let me see if I can kind of put this in laymen
18  terms and sort of sum it up.  Was the gist of this letter that
19  claims that Pfizer was making in some promotional materials
20  that Neurontin was effective at doses above 1,800 milligrams
21  were false and misleading because their clinical trials had
22  shown no additional benefits of using doses greater than
23  1,800 milligrams?
24  A.   Yes, and if you turn to the next page, the first new
25  sentence says, "In fact, 1,800 milligrams per day represents

1    the maximum dose recommended in the PI," the package insert,
2    the drug label.
3    Q.   Thank you.
4         MR. GREENE:  Exhibit 190, your Honor.
5    Q.   I think during the past two days you've testified that the
6    FDA approved Neurontin for partial seizures as adjunctive
7    therapy and for the management of postherpetic neuralgia; is
8    that correct?
9    A.   Yes, sir.
10   Q.   In doses up to 1,800 milligrams; is that correct?
11   A.   Yes, sir.
12   Q.   Did the FDA approve Neurontin to be used for any other
13   condition?
14   A.   No, sir.  (Pause.)  It also approved the pediatric use,
15   just a footnote, the pediatric use for partial seizures.
16   Q.   Okay, Doctor, were you aware in 2004 that Parke-Davis pled
17   guilty -- strike that.  Were you aware in 2004 that
18   Warner-Lambert pled guilty to criminal violations of the Food,
19   Drug and Cosmetic Act due to off-label promotion?
20   A.   Yes, I'm aware of that.
21   Q.   And in preparing your opinions today, did you see
22   documents that indicated when the FDA first became concerned
23   with the defendant's off-label marketing?
24   A.   I saw documents when FDA became -- when FDA is indicating
25   awareness.  I can't testify that it was the first, but I can

1  testify I saw documents where FDA was concerned about off-label
2  promotion.
3  Q.   Let me show you what we've premarked as Exhibit 87 and ask
4  you if you'd take a look at that for a moment, and then tell
5  us, do you recognize the document?
6  A.   Yes, I do.
7  Q.   Could you describe the document for us.
8  A.   This is a document from Dr. Leslie Frank, who is from
9  DDMAC, the Division of Drug Marketing, Advertising and
10 Communications at FDA, to Parke-Davis dated July 19, 1996.  And
11 FDA says, "FDA is concerned that Parke-Davis may be promoting
12 Neurontin for off-label uses."  It defines that as any use
13 beyond the FDA-approved indications, and that FDA is initiating
14 an inquiry that will focus on these concerns, and that that
15 off-label use that it was investigating, those promotions were
16 included, but not limited to, chronic pain, bipolar disorders,
17 and other psychiatric conditions.
18 Q.   And did the FDA request certain categories of documents
19 and specifications from the defendant?
20 A.   Yes.
21 Q.   And I'd like to direct your attention to Specifications 12
22 and 13.  Do they request documentation with regard to the
23 defendant's relationship with certain physicians?
24 A.   Yes.  On Page 6 of the document, certain physicians,
25 certain doctors are -- information about the company's

Page 56

1  relationship, the financial information, compensation,
2  et cetera, with certain doctors is requested.
3  Q.   And one of those doctors was Dr. Michael McLean; is that
4  correct?
5  A.   His name is listed, yes, sir.
6  Q.   And another one was a Dr. Mellick.  What's Dr. Mellick's
7  first name?
8  A.   Gary Mellick, M-e-l-l-i-c-k.
9  Q.   Why is the FDA asking these questions about what the
10 defendant's relationships were with these physicians?
11 A.   So when FDA's authority --
12           MR. KENNEDY:  Object, your Honor.  Lack of foundation.
13 He wasn't there at this time.  He may know generally, but I
14 don't think he can talk to this letter.
15           THE COURT:  Why don't you lay a foundation.
16 Q.   Does the FDA have a concern if a physician is promoting a
17 drug off-label for a drug company?
18 A.   The answer is "yes."
19 Q.   Let me give it one at a time.
20 A.   Yes.
21 Q.   Can a drug company pay a physician to promote their drug
22 off-label?
23 A.   That would be considered violative of the Act.
24 Q.   So a drug company is prohibited from promoting off-label,
25 correct?

1    A.    Yes.

2    Q.    And they can't hire a physician to do it for them and get

3    around the law that way, can they?

4    A.    Promotion, no.

5    Q.    So does the FDA have a concern if drug companies are

6    paying physicians money to promote their drugs off-label?

7    A.    Yes.

8    Q.    And is the FDA interested in what the financial

9    relationships are between drug companies and physicians that

10   they pay to speak if they're promoting off-label in those

11   speeches?

12   A.    It's evidence that the company is involved.

13   Q.    And can you tell us then, why would the company be

14   interested in the financial relationship between Dr. McLean and

15   Dr. Mellick and the defendant?

16   A.    You asked the question the company or --

17   Q.    Why would the FDA be concerned or want information about

18   the financial relationship between the defendant and

19   Dr. Mellick?

20          MR. KENNEDY:  Objection.  Lack of foundation.

21          THE COURT:  Overruled.

22   A.    If I'm a physician, and in my independent judgment I have

23   nothing to do with a drug company, and I want to talk about a

24   drug, I am free to do that.  If, however, I am being paid by

25   the drug company, I cannot promote off-label uses.  There is a

Page 58

1  footnote that needs to be added because there's a question of,
2  is it promotion or is it educational?  And there's been a lot
3  of discussion, but if you're paid by a pharmaceutical company,
4  and if you're a doctor paid by a pharmaceutical company, you
5  cannot promote an off-label use.
6           MR. GREENE:  I just have one or two more questions and
7  I'll complete Dr. Kessler's testimony.
8  Q.   Doctor, you started off your testimony by telling us that
9  the FDA was the most important consumer protection agency.  Do
10 you remember that?
11 A.   That's my judgment, yes.
12 Q.   And you've testified concerning the off-label promotion of
13 drugs; is that right?
14 A.   Yes, sir.
15 Q.   And you told us that drug companies are prohibited from
16 doing that, but physicians are allowed to write off-label; is
17 that right?
18 A.   Yes, sir.
19 Q.   If physicians are free to prescribe, how does the FDA
20 off-label rule protect patients and health plans that pay for
21 prescriptions?
22 A.   The judgment that it's okay for doctors to use his or her
23 judgment to prescribe a drug but it's not okay for a drug
24 company to promote an off-label use is really the result of
25 five, six decades of United States policy, right, that that

1  balance is the most appropriate balance to protect patients.
2  It allows a doctor to use their judgment, take care of a
3  patient.  And this is key:  The reason why the FDA has said
4  pharmaceutical companies can't promote or those being paid by
5  pharmaceutical companies can't promote an off-label use is that
6  if you do that, if you allow that to happen -- and it was
7  recognized back in 1962 when the law was written, the new drug
8  amendments, Senator Kefauver recognized it -- if you allow a
9  drug company to promote off-label uses, what will happen is,
10 the drug company will study the drug in a very narrow
11 indication, and that narrow indication will be supported by the
12 science.  Then if you allow the drug company to promote
13 off-label use, and without that science, the drug company not
14 doing the clinical trials can sell drugs for other uses, and
15 you don't have that scientific basis.  So if you allow a drug
16 company to promote for off-label uses, you're basically getting
17 around the requirement that all drugs be scientifically tested.
18 So if you allow the promotion of off-label uses, you're in
19 essence dismantling the whole drug regulatory apparatus.
20 That's why there's balance.  You allow the doctor to use his or
21 her individual judgment, but you have a rule against a
22 pharmaceutical company promoting off-label uses.  That's been
23 the law over the last several decades.
24             MR. GREENE:  I offer Exhibit 87.
25             Thank you, Doctor.  Your witness.