# EXHIBIT-5

February 20, 2013

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE WESTERN DISTRICT OF OKLAHOMA

3

4   JESSICA WELLS, individually    )
    and as next friend of J.W.,    )
5                                   )
         Plaintiff,                 )
6                                   )
7                   -vs-            ) No.  CIV-12-973-C
                                    )
8   ALLERGAN, INC.,                 )
                                    )
9        Defendant.                 )
                                    )
10

11

12

13

14

15                    VOLUME II

16               TRANSCRIPT OF HEARING

17       BEFORE THE HONORABLE ROBIN J. CAUTHRON

18           UNITED STATES DISTRICT JUDGE

19                FEBRUARY 20, 2013

20

21

22

23

24

25   REPORTED BY:  SHERRI GRUBBS, CSR, RPR, RMR, RDR, CRR

# EXHIBIT-5

1    **Q.**   Now, the BOTOX, is it approved by the FDA

2    for -- we know it's not for pediatric spasticity, but is

3    it approved for other indications?

4    **A.**   Yes.

5    **Q.**   You may not be able to name them all off the

6    top of your head, but could you give us some examples?

7    **A.**   Something called cervical dystonia; migraines;

8    strabismus, which is crossing of the eyes;

9    blepharospasm, which is uncontrolled blinking; as well

10   as certain other conditions in adults or in older -- or

11   in adolescents.

12   **Q.**   What about cosmetically?  Is it approved for

13   cosmetic use?

14   **A.**   Yes.  It is used for the frowning at a lower

15   dose.  And that's something called BOTOX cosmetic.

16   **Q.**   And what is the approved dose for cosmetic

17   use?

18   **A.**   It's about 20 -- 20 units.

19   **Q.**   20 units.

20        What are some of the typical doses that are

21   approved for adult use?

22   **A.**   Somewhere between 200 and 300.  Again, let's

23   make sure we understand it's units that I'm talking

24   about.

25   **Q.**   Right.  Now, has the manufacturer, Allergan,

1     established a maximum safe dose for children?

2         A.   Yes.

3         **Q.**   What is that maximum safe dose?

4         A.   8 units per kg.

5         **Q.**   All right.  I think we've probably heard

6     enough about that to know how you compute that, but

7     would you tell us why pediatric doses are expressed in

8     terms of body weight?

9         A.   It's pretty -- pretty straightforward.  I may

10    have a child who weighs 10 pounds or 20 pounds or 50

11    pounds, 100 pounds, or 200 pounds, and I want to give

12    the right amount of medicine per size of that child.

13             So we're very sensitive in pediatrics, because

14    kids are obviously various sizes.  It's also true, even

15    adults, men and women are different sizes.

16             But, you know, adult docs tend to use absolute

17    numbers.  Pediatricians always think in dose per weight.

18    We don't use pounds, we use the metric system, so it's

19    kilograms.

20        **Q.**   What dosage did Jackson Wells receive on a

21    body weight basis?

22        A.   18.35 units per kg.

23        **Q.**   Dr. Kessler, let's talk about where this 8

24    unit maximum came from.

25             What evidence are you relying on for saying

1    that Allergan has established 8 units as a maximum?

2        A.   If you look, Allergan's own documents talk

3    about the 8 units per kg as a maximum.

4            If you go to something that's called the

5    Company Core Data Sheet, which collects -- it's a

6    company internal document for a drug that a company

7    keeps with the safety information, the indications, the

8    adverse events.

9            It was a concept -- this concept of Company

10   Core Data Sheet, we evolved in the 1990s, sort of the

11   best place you can go to look at what a company knows

12   about its own drugs.  It's used to coordinate the

13   selling of the drug and what's said about a drug across

14   the world.

15       Q.   And is this Plaintiff's Exhibit 85 that's on

16   the monitor, is that the Company Core Data Sheet for

17   BOTOX that you're referring to?

18       A.   Yes, it is, sir.

19       Q.   And which version is this, please, Doctor?

20       A.   This is Version 13.  It's dated April 2007.

21       Q.   Okay.  And where in here is the 8 units

22   established as a maximum dose?

23       A.   If you could kindly go to page 7, Bates number

24   ending in 297.

25            So if you read that -- this sentence in the

1    A.    The letter contains answers to two questions.

2  You asked me about the maximum dosing levels associated

3  with use of BOTOX.

4        As you read through the letter, these are the

5  numbers that are given.  So you can look at the word

6  specifically with regard to maximum, you'll see "maximum

7  of 200."  They talk about a 4-unit dose, but a maximum

8  of 200 first, in other countries.

9        Then they study -- they cite a Graham's study

10  with a maximum -- 12 units per kg with a maximum of 300.

11        They cited a WE MOVE, 16 units per kg or 400.

12        A Heinen -- actually, it's a letter to the

13  editor with a mean dosage of 16 units per kg.

14        A Goldstein article with a mean dose of 19.1.

15        And a European consensus with a safe range

16  that goes anywhere from 6 to 30 units per kg.

17    Q.    By the way, did you mean to draw that little

18  arrow on there?

19    A.    No.

20    Q.    It's a touch screen.

21    A.    I'm sorry.

22    Q.    That's okay.

23    A.    I apologize.

24    Q.    All right.  Did they tell him about the 8 unit

25  maximum?

1       A.   No.

2       Q.   Did they tell him about anything over 8 is

3  considered an overdose?

4       A.   No.

5       Q.   Could they have?

6       A.   Yes.

7       Q.   Should they have?

8       A.   Yes.

9       Q.   Why?

10      A.   Of course, it's going to affect care.  It's

11 going to affect patients.  It's essential information.

12      Q.   Allergan contends that -- I want to use the

13 actual letter language for this -- that this sentence

14 that begins, in the more than 45 countries around the

15 world where it is approved for cerebral palsy, the

16 recommended dosing is approximately 4 with a maximum of

17 200 units.

18           Allergan contends that's an adequate warning.

19 Do you agree?

20      A.   No.

21      Q.   Why not?

22      A.   Because it doesn't say that the maximum was 8

23 units per kg.  If you read that, it's talking about a

24 maximum of 200.  Jackson Wells got 200.  200 was 18

25 units per kg.  That's well above the maximum of 8.

```
 1              THE COURT:  Where is this in my book?
 2              MR. CHESTER:  It would be the next one.
 3              THE COURT:  Which is either Plaintiff's
 4  Exhibit 9 or 210.
 5              MR. CHESTER:  29.  It's right after -- this is
 6  210, and then this --
 7              THE COURT:  I've got it.
 8              I will admit Plaintiff's 29.
 9        Q.   (BY MR. CHESTER)  Just briefly, Doctor, what is
10  the significance of this e-mail exchange between
11  Mitchell Brin at Allergan and Judy at WE MOVE regarding
12  the pediatric dosing chapters for WE MOVE?
13        A.   He's making -- he's making suggestions for
14  that chapter even though he's not an author of that
15  chapter.
16        Q.   And is there anything inappropriate about an
17  Allergan executive corresponding with this independent
18  group about pediatric dosing schedules?
19        A.   It concerns me, yes.
20        Q.   Why?
21        A.   It concerns me because in the context in which
22  we're dealing, which is in an off-label use, and a
23  company cannot promote an off-label use.
24              It can respond to a specific question of a
25  doctor, but it should not promote widely about those
```

 1   off-label uses and it shouldn't use the literature or a

 2   WE MOVE document to do what it can't itself do.

 3      **Q.**   Okay.  Have you looked at any of the BOTOX

 4   marketing plans put together by Allergan?

 5      **A.**   I have.

 6      **Q.**   Do you have before you the 2003 BOTOX

 7   marketing plan, Plaintiff's Exhibit 38?

 8      **A.**   I do, sir.

 9      **Q.**   And does it provide evidence that Allergan

10   used the WE MOVE dosing guidelines as part of its

11   marketing campaign?

12      **A.**   It does.

13      **Q.**   And does this marketing plan also target

14   off-label pediatric spasticity?

15      **A.**   It deals with spasticity.  It deals with

16   increased dose.

17           There were two dosing schedules from WE MOVE.

18   They look similar.  There's a picture on page 21.  I

19   believe Dr. Wright, in his deposition testimony,

20   testified that he got both copies.  And you'll see in

21   other marketing documents that it dealt with pediatric

22   spasticity.

23           **MR. CHESTER:**  Your Honor, we offer Plaintiff's

24   Exhibit 38, the 2003 BOTOX marketing plan.

25           **MR. CRAWFORD:**  I thought that had already been

 1  admitted.

 2          **THE COURT:**  No, it has not.

 3          **MR. CRAWFORD:**  Then the objection is that it's

 4  hearsay, it's irrelevant, and Rule 403.  And with this

 5  witness, it lacks foundation.

 6          **THE COURT:**  Is Jeff Kline the product manager

 7  at Allergan or somewhere else?

 8          **MR. CHESTER:**  Allergan.

 9          **THE COURT:**  I will admit Plaintiff's 38.

10      **Q.  (BY MR. CHESTER)**  The WE MOVE reference in this

11  marketing plan, is it on page 21 of the document,

12  Doctor?

13      A.   That's a copy of one of the WE MOVE dosing

14  schedules.

15      **Q.**   Okay.  Now, is there a -- a little more

16  specific question than I asked you before.

17          Is there anything inappropriate about a drug

18  company using a third party patient education

19  organization as part of its marketing plan for an

20  off-label indication?

21      A.   If that third party is truly independent,

22  there are specific ways that a drug company can use

23  truly independent information.

24          Once the drug company is involved in editing

25  and it's that -- that third-party information isn't

```
 1   truly independent, then it's nothing more than off-label
 2   promotion.
 3        Q.   All right.  Is off-label promotion by a drug
 4   company permissible under federal law?
 5        A.   No, it's not.  You can't --
 6             MR. CRAWFORD:  Objection, Your Honor.
 7   Irrelevant.
 8             THE COURT:  Just a moment.
 9             MR. CRAWFORD:  Objection.  Irrelevant.
10             THE COURT:  Overruled.
11             WITNESS:  It is impermissible to market the
12   drug for an intended off-label use.
13        Q.   (BY MR. CHESTER)  Now, I just want to do one
14   more example out of here.  Do you see the reference to
15   Heinen?
16        A.   Yes.
17        Q.   Now, have you gone back and researched that
18   reference?
19        A.   Yes, I have.  I studied the paragraph where
20   the Heinen data is summarized on page 2 of the letter.
21        Q.   Okay.  And, furthermore, did you take the
22   reference list at the end of the letter and go back and
23   read each of these pieces?
24        A.   I certainly went through those.  Don't hold me
25   to read everything exactly, all the references.  But I
```

 1   did look at them.

 2       **Q.**   Okay.  Now, where does the Heinen information

 3   in the letter, in this paragraph that begins "Heinen, et

 4   al., 2006," where does that actually come from?

 5       **A.**   Yeah.  So I think it's just a mistaken cite.

 6   There is a reference, if you go to page 3 of the letter,

 7   to a Forian Heinen, et al. reference.  That's really

 8   referencing the European consensus.

 9           That Heinen that is discussed in that second

10   paragraph refers to, I believe -- because it has the

11   same data -- a letter to the editor that was published

12   in *Movement Disorders* in 2006.

13       **Q.**   Just very briefly, is there a difference to

14   you between a letter to the editor and a peer-reviewed

15   scientific article?

16       **A.**   Yes.

17       **Q.**   Just briefly, what is the difference?

18       **A.**   Exactly as what you've stated.  One has

19   further scrutiny than the other.

20       **Q.**   Now, have you seen any evidence, Doctor, that

21   Allergan played a role in getting this Heinen data, this

22   letter to the editor, published?

23       **A.**   Yes.  There's a September 19th, 2006 set of

24   e-mails from Drake Barborka at Allergan where the vice

25   president at Allergan is congratulating colleagues on

1    getting this into print.  And the attachment talks about

2    a Heinen letter on movement disorders which supports

3    multi-muscle option.

4         **MR. CHESTER:**  All right.  Your Honor, we'd

5    offer Plaintiff's Exhibit 251, the e-mail from Drake

6    Barborka, vice president of BOTOX (sic) that Dr. Kessler

7    was just referring to.

8         **MR. CRAWFORD:**  Relevance, Your Honor.

9         **THE COURT:**  Admitted.

10        **Q.   (BY MR. CHESTER)**  Now, the top part of this

11   e-mail, is this the letter to the editor that you're

12   referring to, Dr. Kessler?

13        A.   Yes, I believe it is.

14        **Q.**   And is that the one that contains the

15   information that is quoted by Allergan in their letter

16   to Dr. Wright here in Oklahoma City?

17        A.   Yes.

18        **Q.**   And as you already noted, Drake Barborka was

19   the vice president in the sales side of Allergan;

20   correct?

21        A.   Yes.

22        **Q.**   And is he congratulating his people on getting

23   that into print?

24        **MR. CRAWFORD:**  Objection, Your Honor.

25   Leading, and the document speaks for itself.

1      **THE COURT:**  Sustained.

2          **Q.   (BY MR. CHESTER)**  Would there be anything in

3      the -- well, let me back up for a second.  That's a

4      valid point.

5              Is there anything inappropriate about Allergan

6      citing this data to Dr. Wright in light of the role they

7      played in getting it in print?

8          A.   If I'm Dr. Wright -- the answer is yes,

9      because I think it creates a certain misleading

10     atmosphere, a misleading nature to it.

11             If I'm Dr. Wright, I'm looking for the best --

12     the best information there is.  I want to take care of a

13     patient.  I want to know what the company knows and I

14     want to know what has been published, but I assume that

15     the literature, unless I'm told differently, that

16     literature is published that's independent, by --

17     independent of people of the drug company.

18             If I'm told that the drug company is doing it,

19     then I can bring my own analysis to it.  But if I'm

20     cited someone else, not told that they are the ones

21     getting it -- the drug companies to print, I mean, I

22     don't know what's behind -- I don't know what to trust.

23         Q.   Okay.  And this letter to the editor that

24     Allergan is congratulating themselves on getting into

25     print contains information stating that the average dose

 1  used is 16.6 units; correct?

 2      A.   Yes.

 3      Q.   Now, do you have before you the Allergan

 4  marketing plan dated June 9th, 2006?

 5      A.   Yes.

 6      Q.   And does it provide evidence that Allergan

 7  attempts to use medical publications as part of its

 8  marketing efforts?

 9      A.   Yes.

10      Q.   And does that include marketing for off-label

11  indications, specifically pediatric spasticity?

12      A.   It certainly talks about, it must continue its

13  dominance of publications on page 11 and talks about

14  achieving a dominance presence in major publications and

15  major meetings.

16      Q.   All right.  If you look at the page that ends

17  in Bates No. 758, does it indicate that marketing for

18  off-label pediatric spasticity was part of this

19  marketing plan, as well?

20      A.   If you can put that up, I don't have that

21  page.

22      Q.   I need to perhaps show this to you before I

23  put it up.  I haven't offered this.

24      A.   I'm sorry.

25          MR. CHESTER:  May I approach the witness,

```
 1   Judge?
 2           THE COURT:  Yes.
 3       Q.  (BY MR. CHESTER)  I believe you have this in a
 4   different section of your notebook.
 5       A.   Thank you, sir.
 6            Yes, it's talking about pediatric injectors.
 7   And that would be for pediatric spasticity.
 8       Q.   Thank you.
 9           MR. CHESTER:  Your Honor, we'd offer
10   Plaintiff's 71.
11           MR. CRAWFORD:  Your Honor, it lacks foundation
12   with this witness.  He doesn't have the ability to
13   explain where the data came from, why it was used.
14           THE COURT:  He doesn't have to.  It's a
15   statement by your client.  It will be admitted.
16       Q.  (BY MR. CHESTER)  Is this the cover of the
17   marketing plan we were just looking at, Doctor?
18       A.   Yes, sir.
19       Q.   And on this page 11, is this the statement
20   that you were talking about that BOTOX must continue its
21   dominance of publications?
22       A.   Yes.
23       Q.   Right messages to the right customers?
24       A.   Yes.
25       Q.   Does that indicate -- what does that indicate
```

```
 1    to you, Doctor?
 2         A.   What's important to me is the context in which
 3    these marketing plans are occurring.  FDA has not
 4    approved BOTOX for pediatric spasticity.  A company may
 5    not promote a drug off-label.  It can answer questions,
 6    but it can't promote, and it can't use the literature
 7    and it can't use mechanisms that are sort of back-door
 8    mechanisms to promote.
 9         Q.   Is that a violation of federal law if they do
10    that?
11              MR. CRAWFORD:  Objection, Your Honor.
12    Irrelevant.
13              THE COURT:  Overruled.
14              WITNESS:  Yes.
15         Q.   (BY MR. CHESTER)  Now, looking at page 12 of
16    this same document, when it's referring to dominant
17    presence in major publications, is that just sort of
18    more of the same idea we were just talking about?
19              MR. CRAWFORD:  Calls for speculation.
20              THE COURT:  Overruled.
21         Q.   (BY MR. CHESTER)  You may answer.
22         A.   Yes, same concern.  What -- the way I look at
23    this is, what are the factors that influence us as
24    physicians.
25              And things that influence us, whether it can
```

1    know is, Dr. Brin is sending in edits around 2002

2    suggestions.  But you see this move up.  It's one

3    thing -- I mean, it's pretty gutsy to promote for

4    off-label.

5         What my concern is, promoting for doses that

6    are above the maximum.  That's my concern.  That's what

7    I am concerned about in this marketing plan.

8        Q.   Is there any mention in any of the Allergan

9    marketing plans that you've reviewed about the 8 unit

10   maximum safe dose for children?

11       A.   No.

12       Q.   Now, have you seen any business planning

13   memorandums that discuss this increasing dose in the

14   context of sales revenue for Allergan?

15       A.   Yes.

16       Q.   Do you have before you the Allergan business

17   planning memorandum dated October 12, 2001 --

18       A.   Yeah.

19       Q.   -- "Final Report, high growth core users"?

20       A.   Yes.

21       Q.   And does it have a section on pediatric

22   specialists?

23       A.   Yes.

24       **MR. CHESTER:**  Your Honor, we offer Plaintiff's

25   249.

```
 1                    MR. CRAWFORD:  Relevance, Your Honor.

 2                  THE COURT:  I thought I admitted that.

 3                  MR. CHESTER:  I showed it in opening, but I'm

 4    not sure if it's been admitted.

 5                  THE COURT:  I will admit 249.

 6        Q.  (BY MR. CHESTER)  By the way, do we see some

 7    familiar names here in the addressee block?

 8        A.   Yes.  Some of the vice presidents for

 9    marketing and sales.

10        Q.   All right.  And is the subject "Final Report,

11    high growth core users"?

12        A.   Yes.  And you should -- this is part of a

13    business planning exercise.

14        Q.   Okay.  What's the significance of that?

15        A.   This, to me, was probably the most concerning

16    document --

17        Q.   Okay.

18        A.   -- that I've looked at.

19        Q.   What in particular?

20        A.   If you turn to page 7, it talks about the

21    factors that drive increased use of BOTOX by pediatric

22    specialists.

23             And it says, "Increased dosing for pediatric

24    spasticity (from 4 to 6 units/kg several years ago to

25    10-20 units/kg now) was identified as an important
```

```
 1   factor that underlies the growth in volume of BOTOX use
 2   among pediatric specialists."
 3            Then if you move further down, it says that,
 4   "The main recommendation to drive growth in the use of
 5   BOTOX is to educate the various specialties who treat
 6   CP."
 7            This dose has been increased from 4 to 6,
 8   which was below the maximum recommended dose, to 10 to
 9   20.  This is about business growth.  No one is talking
10   about safety here.
11        Q.   Have you seen any analyses that directly
12   relate increases or decreases in the pediatric dose to
13   Allergan sales dollars?
14        A.   Yes.
15        Q.   You have before you an e-mail addressed to
16   Mr. Drake Barborka, vice president of sales, dated
17   February 29, 2008, that addresses that topic?
18        A.   Yes.
19            MR. CHESTER:  Your Honor, we'd offer
20   Plaintiff's 254.
21            MR. CRAWFORD:  Relevance, Your Honor.
22            THE COURT:  It will be admitted.
23        Q.   (BY MR. CHESTER)  Tell us the relevance of this
24   document, Dr. Kessler.
25        A.   The context -- the dates are important here
```

1    because at the same time as this analysis is being done,

2    FDA and Allergan are in discussions about putting

3    further labeling on the drug package insert about spread

4    of toxin.

5          And this is a complicated document, and

6    it's -- talks about -- in essence, it has a various

7    number of assumptions, but it looks at what -- you know,

8    how much money would be lost if the dose were reduced by

9    50 units.

10          And, again, it's built on certain business

11    planning assumptions, you know.  And that's perfectly

12    appropriate, you know.  A company is entitled to do its

13    business planning and what would be at risk.

14          But the company, I mean, has calculated what a

15    50-unit reduction would end up costing them in revenue.

16    **Q.**   What does the "At risk patients" refer to,

17    Doctor?

18    **A.**   The way I read this --

19          **MR. CRAWFORD:**  Lacks foundation.  Calls for

20    speculation.

21          **THE COURT:**  I'm sorry.

22          **MR. CRAWFORD:**  Lacks foundation.  Calls for

23    speculation.

24          **THE COURT:**  Can you establish a foundation?

25          **MR. CHESTER:**  Yes, sir.  I sorry.  Yes, Your

1   Honor.

2       Q.   **(BY MR. CHESTER)**  Dr. Kessler, have you read

3   and studied the entire document?

4       A.   I have.

5       Q.   And based on your experience and your study of

6   this document, is it reasonably clear to you what the

7   "at risk" refers to?

8       A.   Yes.

9       Q.   Could you tell us, please?

10      A.   This is a business planning document, and this

11  is about revenue.

12      Q.   Specifically, what is at risk?

13      A.   Lowering the dose because of a concern about

14  pediatric -- about spread of toxin.  And if the dose had

15  to be lowered, there's a calculation of how much revenue

16  would be lost, how much would be at stake, how much

17  would be at risk.

18      Q.   Have you seen any discussion of loss of

19  revenue from reduced pediatric dosing at the CEO and

20  board of directors level at Allergan?

21      A.   I have.

22      Q.   Specifically, have you seen a PowerPoint

23  presentation made to the board of directors of Allergan

24  in February of 2009?

25      A.   I have.

1          **MR. CHESTER:**  Your Honor, we offer Plaintiff's

2    147 as redacted.  I'm just now showing counsel the

3    redacted version.

4          **MR. CRAWFORD:**  Relevance, Your Honor.

5          **THE COURT:**  It will be admitted.

6      Q.  **(BY MR. CHESTER)**  Is David Pyott, to your

7    knowledge, is he chief executive officer of Allergan?

8      A.   Yes.  And I believe he's chairman, also.

9      Q.   Chairman of the board, as well?

10     A.   I believe he's chairman, yes.

11     Q.   Is that pretty much top dog?

12     A.   Yes.

13     Q.   As high as it gets?

14     A.   I'll leave that to others to conclude, but...

15     Q.   All right.  And February 2009, sort of what

16   was going on in the regulatory context?

17     A.   Still interactions between the company and

18   FDA.

19     Q.   And in his presentation to the board at

20   Allergan, does he have a slide on slowdown in growth

21   rate?

22     A.   Yes.

23     Q.   Now, part of this has been redacted, but is

24   part of the presentation the impact of the FDA early

25   communication on use and dosing in JCP?

1     A.    Juvenile cerebral palsy dosing.  That would

2  affect a slowdown in the growth in business revenue of

3  the company.

4     Q.    Doctor, did the FDA ultimately require a black

5  box warning on BOTOX?

6     A.    Excuse me, sir.  I apologize.

7     Q.    Sure.

8     A.    Yes.

9     Q.    And did that go into effect in 2009?

10    A.    I believe that's correct.

11    Q.    Now, what is a black box warning?

12    A.    It's the most significant warning on the drug

13  label.  If you look at it, it's at the top and it's

14  actually in a black -- with a black border.

15    Q.    Okay.

16    A.    Usually relates to a warning.

17    Q.    A warning about some safety concern?

18    A.    Yes.

19    Q.    Now, have you seen evidence that Allergan

20  resisted the black box warning?

21    A.    Yes.

22    Q.    Okay.  Do you have before you a crisis

23  management plan slide deck dated February 25th, 2008?

24    A.    I leave the date to you.  I've not been able

25  to see the actual date on this because of the copy.  I

1    believe that's around -- that's correct, though.

2        **Q.**    I can read the date.   The only part that's a

3    little questionable is the word "crisis."

4            But is it, in any event, a management plan?

5        **A.**    Yes.

6        **Q.**    My copy does show the date, February 25th,

7    2008.   Does this contain the statements about avoiding

8    the black box warning you were referring to?

9        **A.**    It had a -- the specific statement is "Take

10   proactive regulatory actions to avoid the black box

11   warning."

12           **MR. CHESTER:**   Your Honor, we'd offer

13   Plaintiff's Exhibit 120.

14           **MR. CRAWFORD:**   Your Honor, it's irrelevant.

15   Also, Rule 403.   In fact, the black box warning went

16   into effect.   So there really is no relevance to it.

17           **THE COURT:**   I will admit 120.

18       **Q.   (BY MR. CHESTER)**   So here's -- here's the -- do

19   you see what I mean?   On my copy you can see enough of

20   February to get February 25th, 2008.

21           But the first word, all we can really see is

22   "management plan."   Does that really effect your use of

23   this document?

24       **A.**    No.   I think you may have referred to 2009.

25   This is 2008.   Yes.

1     **Q.**   Clearly, it's 2008.  If I said 2009, I

2   misspoke.

3     **A.**   Right.

4     **Q.**   Now, where is the language you were talking

5   about?

6     **A.**   If you can go to page 7, it's the first

7   bullet.

8     **Q.**   Got it.

9     **A.**   And if you go to the second box --

10    **Q.**   Oh, the second box.  I'm sorry.

11    **A.**   Yes.  It's also relevant what you highlighted.

12          "Black box warnings re: pediatric on both

13  labels has serious promotional/commercial implications."

14    **Q.**   What would promotional/commercial implications

15  mean in the context of the pharmaceutical industry?

16    **A.**   Selling less, making less money.

17    **Q.**   Now, as part of this management plan, did they

18  have any plans about how to reduce the impact on sales?

19    **A.**   How to limit the impact?

20    **Q.**   Yes.

21    **A.**   How to -- yes.

22          So if you turn to Bates number ending in

23  1200 -- you know, I think you would expect a company to

24  want to reassure its patients and its customers.

25          But you see the company talking about

1  activating the RSS team globally and developing

2  scientific slide deck to respond to customers and

3  hospital groups with reassuring messages.

4          You know, I guess that's -- that's fine, you

5  know.  The reassuring is, just make sure you're talking

6  about the safety risks and what everyone needs to know.

7          So, again, I don't have a lot of problems with

8  the company, you know, wanting to do things that

9  reassure.

10         **MR. CHESTER:**  Your Honor, I'm right on

11  schedule.  I have about 15 minutes left.  Would you like

12  me to keep going or -- I'm happy to.

13         **THE COURT:**  Well, I promised I'd let you out

14  of here early, and I'm going to.  Even though I can tell

15  you that the weather -- the temperature is not expected

16  to go below freezing probably again this year.  I don't

17  know.  But not today and tomorrow.

18         They're calling for rain and not snow, and it

19  hasn't been below freezing since this morning.  So I

20  think you'll be fine going home and coming back

21  tomorrow.

22         I will ask you to be here for a nine o'clock

23  start.  There is a number where courthouse employees can

24  call.  It's 609-5001.

25         So if, by any chance, the courthouse closes

February 21, 2013

1  doctors that if it says a maximum of 200 units, that

2  that means the lesser of 4 units and 200.

3         Do you recall that testimony?

4    A.    Yes.

5    Q.    All right.  Let me go back to the Core Data

6  Sheet, which is page 85 -- or on -- which is Exhibit 85,

7  I should say.

8         Is this an example of how that type of dosing

9  information should be set forth?

10   A.    Yes, if that's the intent.

11   Q.    If you're talking about injecting medically

12  fragile children with a lethal neurotoxin, should you

13  just assume that people think you mean the lesser of?

14         **MR. CRAWFORD:**  Objection, Your Honor.  Leading

15  and argumentative.

16         **THE COURT:**  Well, it is leading.  Sustained.

17   Q.    **(BY MR. CHESTER)**  You made reference to this

18  earlier.  But when he asked about post-marketing

19  reports, how many were mentioned in the letter?

20   A.    Two.

21   Q.    And how many did Allergan have in its data- --

22  how many was Allergan aware of at that time?

23   A.    Twenty-five.

24   Q.    How do you know that?

25   A.    Because I counted them.

February 21, 2013

```
 1        Q.    Okay.  Did you start with the 26 that are set
 2   forth in the report of December 19th, 2007, Plaintiff's
 3   Exhibit 108?
 4        A.    Yes.  There's an appendix.
 5        Q.    All right.  And how did you get from 26 to 25?
 6        A.    I looked at the date where the company was
 7   aware.  And this report is December 19th.  The letter
 8   was a few months earlier.  So one report of the 26 came
 9   in between this -- the letter and this.  So you can't
10   count that.  The others, the company had received prior.
11        Q.    Is there any reason in the world why Allergan
12   couldn't have fully disclosed all 25 of the
13   post-marketing reports that it later included in the
14   confidential report to the FDA in response to
15   Dr. Wright's letter?
16        A.    Not only is there no reason why it could not,
17   it should have.
18        Q.    Have you seen Plaintiff's Exhibit 223, which
19   is in evidence, it's the adverse event report on this
20   exact case, Jackson Wells?
21        A.    I did.
22        MR. CRAWFORD:  Objection, Your Honor.  This is
23   beyond the scope of the cross.
24        THE COURT:  I don't know what the question is.
25        MR. CHESTER:  I'm going to ask him about the
```