# In The Matter Of:

*Pledger v.*
*Janssen, et al.*

---

*(Jury Trial - Afternoon)*
*Vol. III*
*January 28, 2015*

---

*John J. Kurz, RMR-CRR, Official Court Reporter*
*City of Philadelphia*
*First Judicial District Of Pennsylvania*
*100 South Broad Street, 2nd Floor*
*Philadelphia, PA 19110*

1      IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
          FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
2                   CIVIL TRIAL DIVISION

3    ------------------------------
     IN RE: RISPERDAL® LITIGATION   :
4    March Term, 2010, No. 296      :
     _____ :
5    Philip Pledger, et al.,        :
                    Plaintiffs,     :   APRIL TERM, 2012
6        v.                         :   NO. 01997
                                    :
7    Janssen Pharmaceuticals, Inc.,:
     Johnson & Johnson Company,     :
8    and Janssen Pharmaceutical     :
     Research and Development,      :
9    L.L.C.                         :
                    Defendants.     :
10
     ------------------------------
11

12                      –  –  –

13          WEDNESDAY, JANUARY 28, 2015

14                      –  –  –

15                  COURTROOM 425
                     CITY HALL
16          PHILADELPHIA, PENNSYLVANIA

17                      –  –  –

18    B E F O R E:   THE HONORABLE RAMY I. DJERASSI, J.,
                     and a Jury
19

20                      –  –  –

21          JURY TRIAL – VOLUME III

22            AFTERNOON SESSION

23
       REPORTED BY:
24        JOHN J. KURZ, RMR, CRR
          CERTIFIED REALTIME REPORTER
25        OFFICIAL COURT REPORTER

```
 1   APPEARANCES:

 2           SHELLER, P.C.
             BY:  CHRISTOPHER A. GOMEZ, ESQUIRE
 3           E-mail:  Cgomez@sheller.com
             1528 Walnut Street, 4th Floor
 4           Philadelphia, PA 19102
             Phone: (215) 790-7300 Fax: (215) 546-0942
 5           Counsel for Plaintiff(s)

 6

 7           KLINE & SPECTER, A Professional Corporation
             BY:  THOMAS R. KLINE, ESQUIRE
 8               KRISTEN LOERCH SIPALA, ESQUIRE
             E-mail: tom.kline@klinespecter.com
 9           E-mail: kristen.loerch@klinespecter.com
             1525 Locust Street, 19th Floor
10           Philadelphia, PA 19102
             Phone: (215) 772-1000 Fax: (215) 772-1359
11           Counsel for Plaintiff(s)

12

13           ARNOLD & ITKIN, LLP
             BY:  JASON A. ITKIN, ESQUIRE
14           6009 Memorial Drive
             Houston, Texas 77007
15           Phone: 713-222-3800 Fax: 713-222-3850
             Counsel for Plaintiff(s)

16

17

18   Representing Defendants:

19           DRINKER BIDDLE & REATH, LLP
             BY:  KENNETH A. MURPHY, ESQUIRE
20               MELISSA A. GRAFF, ESQUIRE
             One Logan Square, Suite 2000
21           Philadelphia, Pennsylvania 19103-6996
             Phone: (215)988-2700  F:(215)988-2757
22           E-mail: kenneth.murphy@dbr.com
                      melissa.graff@dbr.com
23           Counsel for Defendant Janssen Pharma.,
             J&J, and Janssen Research & Development
24

25
```

1   APPEARANCES:  (Continued)

2               WEIL, GOTSHAL & MANGES, LLP
                BY:  DIANE P. SULLIVAN, ESQUIRE
3                    ALLISON BROWN, ESQUIRE
                     (admitted pro hac vice)
4               301 Carnegie Center, Suite 303
                Princeton, New Jersey 08540
5               T: 609-986-1100 F: 212-310-8007
                E-mail: diane.sullivan@weil.com
6               E-mail: allison.brown@weil.com
                Counsel for Defendant Janssen Pharma.,
7               J&J, and Janssen Research & Development

8

9

10

11      Also Present:

12              Marianne Mari, Tipstaff

13              Cory Smith, Display Technician

14              Ken Reed, Display Technician

15

16

17

18

19

20

21

22

23

24

25

- PLEDGER, et al. -vs- JANSSEN, et al. -                    4

```
 1                    - I N D E X -

 2   WITNESSES                  DR     CR     RD     RC

 3   DAVID A. KESSLER, M.D.
       By Mr. Kline              8     --     --     --
 4

 5

 6

 7

 8

 9                  E X H I B I T S

10   NO.                                  PAGE NO.

11   P-5        CV of Kessler                 129

12   P-6        Expert report of Kessler      130

13   P-7        Supplemental report of Kessler   131

14   P-8        2002 Risperdal label          121

15   P-9        Label, Bates JJRP00838257 to 264    12

16   P-10       2002 label; 2006 label          16

17   P-11       2002 label; 2006 label          26

18   P-12       USPI Labeling History           42

19   P-13       E-mail 9/8/06                   43

20   P-14       E-mail 1/28/03                  44

21   P-15       Letter dated 8/15/96
                Bates No. JJRP00378109         124
22
     P-16       Record of FDA contact
23              Bates No. JJRE 01093953         62

24   P-17       Clinical Research Report
                Bates No. JJRIS02562360 to 2447   71
25
```

```
 1                  I N D E X (Continued)

 2                    E X H I B I T S

 3    NO.                                      PAGE NO.

 4    P-18       Assessment of New Instrument/
                 Symptom Questionnaire           125
 5

 6    P-19       Topline results
                 Bates No. JJRE02297143 to 7155    93
 7

 8    P-20       Clinical Research Report
                 Bates No. JJRE08344114 to 4214   102
 9

10    P-21       Developing chart, handwritten   118

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    (The following transpired in open
 2          court outside the presence of the jury at
 3          2:01 p.m.:)
 4                         -  -  -
 5                    THE COURT:  All right.  You can be
 6          seated.  I think we're going to get the jury
 7          in here.
 8                    MR. GOMEZ:  Your Honor, before we
 9          bring in the jury, I just have a quick
10          housekeeping matter.
11                    THE COURT:  Okay.  Hold it.
12                    Yes, sir.
13                    MR. GOMEZ:  Your Honor, plaintiffs'
14          exhibits, I just want to put on the record,
15          just going forward to keep things in
16          sequential order from yesterday -- or on
17          Monday.  The handwritten visits by
18          Mr. Gilbreath that Mr. Kline put up on the
19          easel, that would be Exhibit 1B.  The
20          Mathisen chart which was --
21                    THE COURT:  All right.  If we're
22          going to talk about exhibits, I would like to
23          do that after 4:30 today.
24                    MR. GOMEZ:  Perfect.
25                    THE COURT:  We have a concern -- some
```

```
 1            jurors with child-care-type issues.  I'd
 2            rather not antagonize them so early in the
 3            trial.
 4                   But, yes, we have difficulty
 5            ourselves with two different ways and
 6            formulas for recording the evidence, and we
 7            will address those after.  As long as at the
 8            moment, these documents that are being used
 9            are in some kind of numerical identification
10            that we can then go back to and then
11            reidentify if we have to, I'm fine.
12                   MR. GOMEZ:  All right.
13                   THE COURT:  But we will get order
14            into the process after -- I guess after the
15            direct examination or cross, whatever.
16                   MR. GOMEZ:  Okay.
17                   THE COURT:  I'd rather just get going
18            with this.
19                   MR. GOMEZ:  Sure.  Thank you.
20                   THE COURT:  All right.
21                        -  -  -
22                   (Pause.)
23                        -  -  -
24                   (Whereupon an off-the-record
25            discussion was held.)
```

- DAVID A. KESSLER, M.D. - DIRECT -                8

```
 1                        -  -  -
 2                COURT CRIER:  All rise as the jury
 3        enters.
 4                        -  -  -
 5                (Whereupon the jury entered the
 6        courtroom at 2:08 p.m.)
 7                        -  -  -
 8                (The following transpired in open
 9        court in the presence of the jury:)
10                        -  -  -
11                THE COURT:  All right.  Please be
12        seated everybody.  Good afternoon.
13                All right.  We are now going to
14        resume the direct testimony of Dr. Kessler.
15                And, Mr. Kline, when you're ready,
16        you may proceed.
17                MR. KLINE:  I'm ready, Your Honor.
18        Good afternoon.
19                THE COURT:  Good afternoon.
20                (Dr. Kessler previously sworn.)
21                        -  -  -
22                DIRECT EXAMINATION (Continued)
23                        -  -  -
24    BY MR. KLINE:
25    Q.   I am -- I'd like to bring to your attention,
```

1    Dr. Kessler -- good afternoon.

2    A.    Good afternoon, sir.

3    Q.    -- the exhibit which is Bates marked

4    17JJRE0290174 through 176, now marked Plaintiff's

5    Exhibit 8.

6              MR. KLINE:  And, Your Honor, we will

7         catch up on the first seven and mark this way

8         continuously.

9              THE COURT:  We will do that.

10             MR. KLINE:  And provide a copy to the

11        Court.

12   BY MR. KLINE:

13   Q.    It is the -- would you identify the document

14   for me, sir.

15   A.    So if you turn to the last page, Bates No.

16   177, you'll see a date there.  We'll start with

17   that.  It says February 2002.  And this is the

18   label, what's called the US prescribing information,

19   the label meant for physicians, got it?  Everyone

20   sort of reads this also.  But this is the

21   prescribing information that the company and the FDA

22   agree to.  And this is the label for Risperdal or

23   risperidone.

24   Q.    And is this the -- could this be accurately

25   described as the official prescribing information?

1   A.    Exactly.

2   Q.    And I believe there's no objection to the

3   document, any of the pages, so I will display it.

4                 MS. SULLIVAN:  No objection.

5                 THE COURT:  One moment.  There's no

6          objection.

7                 Members of the jury, can you hear

8          everybody?

9                 I'm going to ask Mr. Kline that --

10         either that you get closer to the microphone

11         or use that, and as well Dr. Kessler also.

12                MR. KLINE:  Okay.  How about now?  Is

13         that better?

14  BY MR. KLINE:

15  Q.    Okay.  So this is the official prescribing

16  information, correct?

17  A.    Yes.

18  Q.    Having the Court's permission and no objection

19  from counsel, I would like Mr. Smith, who is our

20  technician, to go to Page 177 of the label.  And I

21  would like to show what you've just described in the

22  bottom right-hand corner.

23                At the end of the day, does this --

24  is this label the responsibility of the

25  pharmaceutical company, in this case Janssen?

1    A.     Yes.

2    Q.     And is there a date that the label becomes

3    effective?

4    A.     The -- February 2002 indicates the time period

5    that it's in effect.

6    Q.     All right.  Now, I would like to call your

7    attention on that page to a -- to just a few words.

8    Under "Endocrine Disorders," top left-hand column of

9    Bates No. 177, what does it say in the 2002 label

10   about the endocrine disorder, gynecomastia?

11   A.     It says, "Rare," then it says "gynecomastia."

12   Q.     Yes.

13               And is there a place in the label, if

14   we can look at Page 176, where the -- where there is

15   a definition of "rare"?

16   A.     There is.  Should I read it?

17   Q.     Yes, you can.

18   A.     It says rare events are those infrequent --

19   rare events are those occurring fewer than one in a

20   thousand patients.

21   Q.     Okay.  So as this label presented it, the risk

22   was less than one in a thousand for gynecomastia; is

23   that correct?

24   A.     That's exactly what the label says, yes.

25   Q.     Now, this label, of course, at the time the

1    drug had no indication for children or adolescents

2    of any kind; is that correct?

3    A.    That is correct.

4    Q.    And was there any other information about

5    gynecomastia as to the frequency of gynecomastia

6    that's stated in this label?

7    A.    Not to frequency.

8    Q.    Okay.  Now, I would like to on this very same

9    topic, if I may, move ahead, and then we'll go back.

10   We're going to go back and forth between the 2002

11   and 2006 label.

12              As to the label in 2006, sir, let's

13   go to the -- let's, first of all, identify the

14   document.  It would be Bates Nos. JJRP00838257

15   through 264.  And we are going to put an exhibit

16   number on it as number -- as P-9.

17              (Whereupon Exhibit P-9 was marked for

18        identification.)

19              MR. KLINE:  I believe there's no

20        objection.  And with the Court's permission,

21        I will display it.

22              MS. SULLIVAN:  No objection.

23              THE COURT:  All right.  Thank you.

24              MR. KLINE:  And I would like to go to

25        the last page.

```
 1                    THE WITNESS:  Yes, sir.
 2                    (Exhibit displayed.)
 3   BY MR. KLINE:
 4   Q.    And on the last page of this document, it has
 5   the Janssen insignia; is that correct?
 6   A.    Yes.
 7   Q.    And, by the way, as with the other one, it has
 8   in the top right-hand corner, it says "Janssen
 9   2003," and it actually has a copyright, correct?
10   A.    Yes.
11   Q.    And the copyright means that the person, the
12   corporation, it has ownership rights, correct?
13   A.    Fair to say.
14   Q.    And I'd like to just see what it says in
15   October of 2006 about the frequency in children of
16   gynecomastia.
17   A.    Would you like me to point it out?
18   Q.    Yes, sir.
19   A.    So if you kindly go to ending Bates No. 8260.
20   And can I just note, this is in a section of the
21   label called "Pediatric Use."  So if you go to the
22   very bottom of the left-hand column.
23   Q.    Bottom of the left-hand column.  And I'm sure
24   Mr. Smith will see Pediatric Use and will pull it up
25   for us.
```

1  A.    That's just for the heading purpose.

2  Q.    And let us go now under Pediatric Use to

3  PRECAUTIONS.  And is there a reported rate of

4  gynecomastia in 2006?

5  A.    Yes.

6             Should I explain it?

7  Q.    Yes.

8  A.    So if you go to the second paragraph, and if

9  you kindly highlight, "In clinical trials, in 1,885

10 children and adolescents with autistic disorder or

11 other psychiatric disorders treated with

12 risperidone," gives a rate for galactorrhea.  I can

13 explain that if you want.

14 Q.    No.  Let's focus on this for now.

15 A.    Gynecomastia was reported in 2.3 percent of

16 risperidone-treated patients.

17 Q.    Okay.  And in terms of the comparison as to

18 the information, let me see, I think we have it

19 pulled up in a convenient piece, these are nothing

20 more than the exact type of the exact labels that we

21 just saw?

22 A.    That's correct.

23 Q.    And we see in the same typeface of the same

24 labels that in 2002, it said gynecomastia was rare;

25 and in 2006, it said it was reported in 2.3 percent

1   of risperidone-treated patients, as it applied to

2   pediatrics and adolescents.

3                MS. SULLIVAN:  I'm sorry, Mr. Kline,

4          can I get a copy of that demonstrative?

5                MR. KLINE:  I believe we just copied

6          the stuff, but, sure, we'll print it and

7          provide a copy.

8                MS. SULLIVAN:  Thank you.

9                MR. KLINE:  Quite welcome.

10               I might add that it is just the same

11         information that we've been describing in the

12         same -- and the same type of events.

13               THE COURT:  Well, I have no problem

14         with the admissibility.  I agree that these

15         things, I'm sure our tech people can make

16         them available so that our record is complete

17         as well.

18               MR. KLINE:  Yes.

19               Now -- and in fact, we will print it

20         and we will mark it.  We'll mark what's being

21         displayed now, the language, the comparative

22         language as Exhibit No. 10.

23               THE COURT:  Okay.

24               MR. KLINE:  P-10.

25               THE COURT:  That's the way to handle

```
 1            that.

 2                      Thank you.

 3                      MR. KLINE:   Thank you.

 4                            -  -  -

 5                      (Whereupon Exhibit P-10 marked for

 6            identification.)

 7                            -  -  -

 8  BY MR. KLINE:

 9  Q.    Now, the label -- any label have -- oh, I'm

10  going to do something else.

11                      This 2006 label, sir --

12  A.    Yes.

13  Q.    -- you, I know, are familiar with the --

14  strike that.

15                      Is there a document, which I'm going

16  to mark it, which has Bates -- it's under -- I'm

17  going to try to also help counsel.  In our book it's

18  tabbed 26.  That's not a number.  That's just a

19  convenience, finding it in the book, number.  And we

20  moved 26 to the front, Your Honor, when we

21  reorganized for this presentation.

22                      There is a document with Bates Nos.

23  JJRIS03129532 through 545.

24                      Do you have that document in front of

25  you, sir?
```

1    A.    I do, sir.

2    Q.    And is that a labeling history of the drug?

3    A.    Yes.

4              MS. SULLIVAN:  And, Your Honor, may I

5         have a sidebar on this with Mr. Kline?

6              THE COURT:  Sure.

7                   -  -  -

8              (The following discussion transpired

9         at sidebar out of the hearing of the jury:)

10                  -  -  -

11             THE COURT:  Where is this document,

12        Mr. Gomez?

13             MR. GOMEZ:  It's right here, Your

14        Honor.

15             (Indicating.)

16             MS. SULLIVAN:  Your Honor, this is an

17        internal Janssen document about when they

18        ruled out certain issues in terms of labeling

19        on the actual manufacturing line.  This

20        witness knows nothing about it.  It's

21        different than when the sales reps were given

22        labels.  I mean, he needs a company witness

23        to talk about this.  This has nothing to do

24        with expert testimony of the precautions.

25             THE COURT:  Well, I think the way to

```
 1              handle all of these type of objections are to

 2              be very, very thorough in laying a foundation

 3              for any of these documents.  That way you can

 4              do all of this on the record.

 5                   Now, is this document something that

 6              this witness used or relied on?

 7                   MS. SULLIVAN:  No.  No.  It's not

 8              even attached to his report.  He never

 9              mentioned it in his report.

10                   MR. GOMEZ:  It is attached to his

11              report.

12                   MS. SULLIVAN:  Is it a supplement?

13                   MR. KLINE:  It's attached to his

14              report, although she represented the

15              opposite, ma'am.

16                   THE COURT:  Well, you need to lay a

17              foundation for these kind of things.

18                   MR. KLINE:  I will.  Here's the only

19              issue:  I can tell you the issue.  And I can

20              tell you the sensitivity as to why she's

21              already exercised in the third question this

22              morning --

23                   (Counsel whispering.)

24                   COURT REPORTER:  Excuse me?

25                   THE COURT:  That's a sexist-type
```

```
 1              statement.
 2                    MR. KLINE:  It's not.  I would say it
 3              if it was Mr. Murphy; it would be exercised
 4              as well.  There's nothing -- I never --
 5                    THE COURT:  All right.  I take that
 6              back.
 7                    MR. KLINE:  Never in my life --
 8                    THE COURT:  I take that back.  Go
 9              ahead.
10                    MR. KLINE:  -- never in my life done
11              anything that I believe falls in that
12              category.
13                    THE COURT:  I agree.  However, let's
14              do this --
15                    MR. KLINE:  Here's my point --
16                    THE COURT:  I don't want to do this
17              in this posture, at sidebar every two
18              minutes.
19                    MS. SULLIVAN:  No.  It's the --
20                    THE COURT:  What's the issue?
21                    MR. KLINE:  If I'm told I have the
22              floor, I'll speak.
23                    Number one, it was mentioned in
24              Dr. Kessler's report.  Number two, it's
25              important in the case to understand when
```

1      exactly the label came into effect and when

2      it was known to physicians.  This expert --

3      this expert is literally an expert in it

4      because he ran the FDA.  It goes to his -- it

5      was in his report as to when this label was

6      known and when it was -- and when it was

7      printed.

8           All this label shows -- by the way,

9      we could have been long gone.  You see, all I

10     want him to show is on Page 13.  I'm not

11     going through this document for more than one

12     thing.  We'd be gone and off to the next

13     race.

14          Number 13 is -- Number 13 says, on

15     Page 13, you see, this is the -- this is the

16     label, and one of the issues in the case,

17     Your Honor, has to do with -- and we

18     recognize this -- is when the label became

19     effective, when it became known.

20          If you recall yesterday -- if you

21     recall yesterday, Ms. Sullivan, I might add,

22     improperly --

23          MS. SULLIVAN:  Well, here we go.

24          MR. KLINE:  -- said to -- no.  Said

25     to -- improperly suggested to the witness,

1      repeatedly, repeatedly, that the new label

2      would have been on those packages that he got

3      in his office in October.

4              The fact of the matter is that our --

5      our expert, whose expert report says he

6      relied on these documents, will simply be

7      able to tell the jury -- simply be able to

8      tell the jury that he's familiar with this

9      kind.  That's my foundation.  Familiar with

10     the type of document, and that this document

11     shows that they didn't even run the

12     production of the -- of the label in October

13     of 2006.

14              MS. SULLIVAN:  First of all, that's

15     the problem, Judge.  It's not the truth.

16     It's not going to be what the evidence shows.

17              THE COURT:  You know what, I'll

18     excuse the jury.  This is a real problem for

19     the Court, so -- in terms of the way this is.

20              MS. SULLIVAN:  This is a big issue.

21              THE COURT:  This should have been

22     brought up ahead of time.

23              MS. SULLIVAN:  Exactly.

24              MR. KLINE:  You asked her what she

25     was worried about this morning.

```
 1              MS. SULLIVAN:  He said in the six
 2        e-mails --
 3              MR. KLINE:  Instead of excusing the
 4        jury, let me push forward with the label.
 5              THE COURT:  We can come back to this
 6        a little later and we'll address it.  It
 7        seems to me that if a foundation has been
 8        laid and it has been relied on by the
 9        witness, it's going to come in one way or the
10        other.
11              MS. SULLIVAN:  Your Honor, this is so
12        misleading.  This is internal
13        manufacturing --
14              THE COURT:  That's why we have
15        cross-examination.
16              MS. SULLIVAN:  But it's not proper
17        like this.
18              THE COURT:  I don't know.  It seems
19        to be proper if it was relied on and it's
20        going to help the jury understand his
21        testimony.
22              MS. SULLIVAN:  It doesn't mean he
23        knows anything about it.  It's just --
24              THE COURT:  Let's go.
25                         -  -  -
```

```
 1                     (Sidebar discussion concluded.)

 2                          -  -  -

 3                     (The following transpired in open

 4             court in the presence of the jury:)

 5                          -  -  -

 6                     THE COURT:  We'll come back to this

 7             matter with the jury.  Rather than excusing

 8             you, we'll push forward and we'll address

 9             this without intruding on your time, okay?

10                     MR. KLINE:  Now may I, Your Honor?

11   BY MR. KLINE:

12   Q.    Now, 2002, sir, in the label -- I would like

13   to go back to the 2002 label.

14   A.    Yes, sir.  I'm there.

15   Q.    Okay.  In the 2002 label, I would like to look

16   at a different section, and I would like to look at

17   the section on hyperprolactinemia.  That would be on

18   175.

19   A.    I see it.

20   Q.    Page 175.  I am still within the confines of

21   Exhibit 8, the 2002 label.

22                     And there it says, "As with any other

23   drugs that antagonize dopamine D [sic] receptors,

24   risperidone elevates prolactin levels and the

25   elevation persists during chronic administration."
```

1                      Did you read that as part of the

2    materials that you reviewed, sir?

3    A.    Yes.

4    Q.    Now, and in 2006, sir, looking at Exhibit No.

5    9, if I can turn your attention to the comparable

6    section in 2006.  It states the same language on

7    Page 259, under the section -- do you see it, sir?

8    A.    I do see it.

9    Q.    Under "PRECAUTIONS."

10   A.    Yes.

11   Q.    And under the PRECAUTIONS section it says, "As

12   with drugs that antagonize dopamine D2 receptors,

13   risperidone elevates prolactin levels and the

14   elevation persists during chronic administration."

15                    Is that the same exact language --

16   A.    Yes, it is.

17   Q.    -- that was there in 2002?

18   A.    Yes, same language.

19   Q.    But, sir, is there something now added?

20   A.    There's an additional sentence.

21   Q.    And what does the additional sentence say in

22   2006 that wasn't there in 2002?

23   A.    It says, "Risperidone is associated with

24   higher levels of prolactin elevation than other

25   antipsychotic agents."

- DAVID A. KESSLER, M.D. - DIRECT -        25

1    Q.    Okay.  And were there other antipsychotic

2    agents on the market that were being sold by

3    pharmaceutical companies as prescription medications

4    in 2002 and 2006?

5    A.    Sure.

6    Q.    And what were they generally known to be?

7    A.    Well, you've mentioned Abilify as one.

8    Q.    Okay.  Are there others that come to mind?

9    Otherwise I'll do a list at some point.

10   A.    Zyprexa -- I have an entire list, if you'd

11   like, so I can be accurate.

12                 THE COURT:  Take your time, Doctor.

13                 Right now just for our record, this

14            is page -- this is from Page 259?

15                 MR. KLINE:  Yes.  Bates No. 00838259,

16            which is part of P-9.

17                 THE COURT:  All right.

18                 THE WITNESS:  So let me give you the

19            other drugs and their dates.  So Clozaril

20            went on the market in '89.  That was

21            clozapine.

22                 Zyprexa was in '96.  Seroquel in '97.

23            Geodon in 2002.  And Abilify in 2002.

24   BY MR. KLINE:

25   Q.    Okay.  Those were other antipsychotic agents.

```
 1                    So this statement here is added in
 2    2006, correct?
 3    A.    Yes.
 4    Q.    All right.  Now, if I can, just briefly,
 5    again, using the same type, just taking -- just
 6    pulling the two out together comparatively.
 7                    Mr. Smith, do you have that back
 8    there?
 9                    The 2002 label does not have that
10    sentence, and the 2006 label has that sentence,
11    correct?
12    A.    Yes.
13    Q.    So --
14                    THE COURT:  And this again, is this
15         the same -- this is a different -- this is a
16         different --
17                    MS. SULLIVAN:  Demonstrative.
18                    THE COURT:  This is now P-11?
19                    MR. KLINE:  This we'll mark as the
20         next P number, P-11; yes.
21                    THE COURT:  Okay.  Very good.
22                    MS. SULLIVAN:  And again, Counsel, if
23         I can get a copy of the document.
24                    MR. KLINE:  You can get a copy.
25                    THE COURT:  We'll all get copies.
```

```
1              MR. KLINE:  Sure.  We'll print it.
2         Again, I didn't, frankly, view it as a
3         "demonstrative."  I viewed it as just pulling
4         the information off of the same label.
5              THE COURT:  I would think that we're
6         going to want a full record of the case, so
7         that's fine.
8              MR. KLINE:  Sure.
9              THE COURT:  No problem.
10                  -  -  -
11             (Whereupon Exhibit P-11 marked for
12         identification.)
13                  -  -  -
14   BY MR. KLINE:
15   Q.   Okay.  Now, in -- and the opinion that you
16   expressed today, sir, that would include -- all
17   these documents are documents that you've relied
18   upon when you formed that opinion that you've
19   expressed in the beginning of the case, correct?
20   A.   Yes.
21   Q.   Okay.  Because that's what I'm doing now.  I'm
22   going through all the documents that you relied on
23   in getting to that ultimate conclusion.
24             Now, if I may, sir, I'd like to look
25   at table -- okay.
```

```
 1                    Now, the drug in 2006, I see on Page
 2    258.  We do not need to display it.  And you can
 3    take that down for now.  Thank you.
 4                    We'll work without demonstratives for
 5    a bit.
 6                    The drug was indicated for what use
 7    in pediatrics in 2006, sir?
 8    A.    In 2006, it was for irritability associated
 9    with autistic disorders.
10    Q.    Okay.  And I notice the emphasis on
11    "associated."  What are you telling the jury, very
12    briefly?
13    A.    That it's irritability that this drug is
14    treating.  It's associated -- it's not necessarily
15    one of the core --
16                    MS. SULLIVAN:  Objection, Your Honor;
17         way beyond this witness's expertise.
18                    THE COURT:  Overruled.  Overruled.
19                    Go ahead.
20                    He's a doctor, correct?
21                    MS. SULLIVAN:  He's not a
22         psychiatrist, Your Honor.
23                    THE COURT:  He's a doctor.
24                    Go ahead.
25                    THE WITNESS:  It's not a core -- it's
```

```
 1            not one of the core reasons that causes
 2            autism.  It doesn't go to the core of autism.
 3            It's associated with a symptom of
 4            irritability that's associated with autism.
 5                      MR. KLINE:  Okay.
 6                      MS. SULLIVAN:  Withdraw the
 7            objection.
 8   BY MR. KLINE:
 9   Q.    Now -- I'm sorry, the objection --
10                      MS. SULLIVAN:  I withdraw the
11            objection.
12                      MR. KLINE:  The objection is now
13            withdrawn.  Okay.
14   BY MR. KLINE:
15   Q.    Now, sir, I want to be clear, that sentence --
16   if we can put the comparative label back up for the
17   one that has the extra sentence in it, please,
18   Mr. Smith, Exhibit No. P-11.
19                      (Document displayed.)
20                      That sentence that says, "Risperidone
21   is associated with higher levels of prolactin
22   elevation than other antipsychotic agents."  If I
23   can now look at the label itself on Page 259, 8259.
24   In what section -- while it's coming up you can give
25   us the answer -- in what section of the label is
```

1    that contained?

2    A.    So we are into the PRECAUTIONS section of the

3    label.

4    Q.    Okay.  And what is the PRECAUTIONS section of

5    the label?

6    A.    In essence, it's a part of the label that says

7    be on the lookout for.

8    Q.    Okay.  Now, did both the 2002 and the 2006

9    labels indicate -- did they both indicate that

10   gynecomastia could be associated with this drug?

11   A.    I think that would be fair.

12   Q.    Okay.  And did both labels say that prolactin

13   elevations could be found in this -- in this drug,

14   with use of this drug?

15   A.    Yes, I think that also would be fair.

16   Q.    Prior to 2006, did the label say anything

17   about the additional sentence which we've discussed?

18   A.    No.

19   Q.    And did the label say anything about the fact

20   that the pediatrics problem existed to a tune of 23

21   times what it was being stated for as adults,

22   informing less than one in a thousand?

23   A.    It would be at least 23 times.

24   Q.    It was -- yes.  And my question is was --

25   thank you for the clarification -- was that anywhere

- DAVID A. KESSLER, M.D. - DIRECT -          31

1  in the label in 2002?

2  A.    The label, no.  The label was "rare,

3  gynecomastia," which was less than one in a

4  thousand.

5  Q.    Now, from all the documents you've reviewed,

6  sir, was it well known to Janssen Pharmaceutical

7  Company that this drug was being widely prescribed

8  in children and adolescents?

9  A.    No doubt in my mind about it.

10  Q.    In fact, sir -- in fact, sir, did you see

11  documents as of the early 2000s, not dollars, in

12  million dollars, but just as to percentage of the

13  drug that they were selling, that they were selling

14  to children and adolescents?

15  A.    Yes.  My recollection is something of the

16  order -- don't hold me exactly -- about 20 percent

17  was used in children and adolescents.

18               THE COURT:  What period was that

19       again?

20               MR. KLINE:  What's the document from?

21  BY MR. KLINE:

22  Q.    As of 2000, 2001, it was about 20 percent of

23  the drug being sold to children?

24  A.    That's my recollection, sir, yes.

25  Q.    Now...

```
 1                    (Pause.)
 2                    MR. KLINE:  Your Honor, we may need
 3            to see you for a moment at sidebar.
 4                    THE COURT:  You know what, members of
 5            the jury, we'll take our break right here.
 6            We'll hopefully resolve the other matter.
 7            Let's take a recess right here for about five
 8            minutes, ten minutes.
 9                    COURT CRIER:  All rise as the jury
10            exits.
11                        -   -   -
12                    (Whereupon the jury exited the
13            courtroom at 2:38 p.m.)
14                        -   -   -
15                    (The following transpired in open
16            court outside the presence of the jury:)
17                        -   -   -
18                    MR. KLINE:  Do you want the witness
19            out while we talk about it?
20                    THE COURT:  All right.  Yes.
21            Dr. Kessler, if you would just step out for a
22            moment.  We're going to return to a matter
23            that was addressed at sidebar.  I'm not sure
24            if there's an issue now or not about
25            something else.
```

```
 1                    (Witness exited the courtroom.)

 2                    THE COURT:  All right.  You may be

 3           seated.

 4                    First thing's first, this

 5           particular -- was there something you needed

 6           to put together or just as to right this

 7           moment right now?

 8                    MR. KLINE:  What happened, Your

 9           Honor --

10                    THE COURT:  Pardon me?  Do you need a

11           recess, anybody?

12                    MR. KLINE:  No.

13                    MS. SULLIVAN:  I'm good, Judge.

14                    MR. KLINE:  No.  I needed to see the

15           Court before I went into things and caused a

16           commotion, frankly.

17                    THE COURT:  All right.  Well, let's

18           address the first issue then.  This has to do

19           with Page 13 of Tab 5.  I think that was

20           marked.  Was that document actually marked at

21           all?

22                    MR. MURPHY:  No, it wasn't marked as

23           a P number.

24                    MS. SULLIVAN:  Was it on their

25           exhibit list?
```

```
 1                    MR. KLINE:  Yes.
 2                    THE COURT:  All right.  So here we
 3          have various -- Marianne, we're looking at --
 4          do me a favor, Marianne, could you just make
 5          a copy of this document here.
 6                          -  -  -
 7                    (Pause.)
 8                          -  -  -
 9                    THE COURT:  Well, this document --
10          this is on the record now.
11                    I've just made a copy of a particular
12          document, Page 13 of 15 of tabbed at 5.  It
13          was plaintiffs' exhibits, which is a USPI
14          Labeling History.  It was the subject of a
15          sidebar conversation with the jury in the
16          room.  It could not be resolved in that
17          fashion, so I'm now returning to this
18          discussion regarding this particular
19          document.
20                    I'm a little bit -- I am not really
21          sure at the moment what this document is, so
22          maybe, Mr. Kline, you could tell me what this
23          is, where it's from, and how you intend to
24          use it.
25                    MR. KLINE:  Your Honor, this document
```

1       was referred to in the supplemental report of

2       Dr. Kessler.  It is the document on the

3       labeling history of the drug.  It is -- I had

4       the 2002 label, of course, discussed and the

5       2006 label.

6            I simply wanted to have Dr. Kessler

7       testify with a document that he reviewed and

8       a kind of document of which he is

9       knowledgeable about, both of which I'll lay a

10      foundation, to say that on Page 13 of this

11      document, that would be the Bates number

12      ending in 544, that they made this label

13      change; that it was one of -- he counted them

14      up -- I believe 24 label changes made in the

15      drug over the drug's history, which we

16      believe to be an important fact for the jury

17      to know.

18           And that the -- there's an indication

19      here which says that website posting

20      October 2006, "Note:  Will not first run in

21      production, going to next version."

22           I would have him read it and explain,

23      since he certainly has the background,

24      experience to do so, what that -- what he has

25      read and what it means in FDA jargon or

```
 1              language.
 2                      THE COURT:  Well, who produced this
 3              document?
 4                      MS. SULLIVAN:  Janssen did, Your
 5              Honor.
 6                      MR. KLINE:  Janssen document.
 7                      MS. SULLIVAN:  And here's the issue:
 8              This is an expert that the plaintiffs would
 9              like to use to fix any and all problems in
10              their case and let's dump every document --
11              even if he has no -- this is a first -- so
12              now they're going to have Dr. Kessler talk
13              about what Janssen meant by first-run
14              document rather than have a company witness
15              who actually knows about it, talk about it.
16              It's completely improper.
17                      He's a regulatory expert.  This may
18              be proper with a company witness.  It's
19              clearly not proper with him.
20                      It's also dramatically inconsistent
21              with -- I think what they're trying to do is
22              say Dr. Mathisen didn't get the label in
23              October 2006, even though he testified he
24              did.  And we have evidence that the sales
25              reps -- this is a manufacturing --
```

1                THE COURT:  Well, see, here's the
2        problem, Ms. Sullivan, is, first of all, is
3        there any factual error on, you know, is
4        there a factual error in this document in
5        some way?
6                MS. SULLIVAN:  Well, it's misleading.
7        So here's the issue, Judge:  It's misleading.
8        There's two things, right.  There's labels
9        that are printed and given to the sales reps
10       to run out with a new indication and go see
11       doctors, which is what happened --
12               THE COURT:  Which I'm sure you're
13       going to clear up on cross-examination.
14               MS. SULLIVAN:  And then this is a
15       manufacturing run date when things get
16       printed to go with, I think.  We have a
17       witness to talk about it, if necessary.  But
18       the problem is, Dr. Kessler knows nothing
19       about this.  He -- he's just looking at this
20       and saying, oh, I see this and so now I'm
21       going to conclude that Janssen didn't have
22       this on a certain sample bottle.
23               THE COURT:  If there's no factual
24       error here, I will permit it, okay.  It will
25       be permitted.

```
 1                 MS. SULLIVAN:  It's misleading.
 2                 THE COURT:  You're going to have to
 3         point out to the jury how it's misleading.
 4         But if there's no actual factual
 5         misrepresentation as to the dates involved
 6         and the label changes involved, I find that
 7         it could be helpful ultimately to a jury to
 8         understand --
 9                 MS. SULLIVAN:  But --
10                 THE COURT:  -- the timetables
11         involved in this case.
12                 MS. SULLIVAN:  I agree, Your Honor.
13         But not this witness.  He's got no basis --
14                 THE COURT:  Well, this witness has
15         relied on this particular document.  If
16         there's no mischaracterization of fact in
17         here, I don't have a problem with it.
18                 MS. SULLIVAN:  We don't -- he doesn't
19         know what the facts are.
20                 THE COURT:  Well, I mean, as far as I
21         can tell, it's a document that he relied on.
22         There's no chance of a factual error that's
23         not subject to cross-examination.  It
24         doesn't --
25                 MS. SULLIVAN:  That's the problem,
```

```
 1            Judge.  Nobody that actually knows this is
 2            being asked about it.  They're just saying
 3            Dr. Kessler, isn't it true that Janssen
 4            didn't have this on the bottle till
 5            April 2007?  And that's not going to be the
 6            evidence.  It's clear that sales reps went
 7            out in October of 2006 --
 8                 THE COURT:  Well, you're going to
 9            present that evidence.
10                 MS. SULLIVAN:  Yeah.  But this is
11            misleading, Judge.  And this isn't the right
12            witness for this.
13                 THE COURT:  All right.  That's
14            overruled.
15                 MS. SULLIVAN:  Let's use Dr. Kessler
16            to fix all of our problems.
17                 THE COURT:  It's overruled.  That can
18            be used.  It's a fact -- it's a document
19            prepared by Janssen that has no factual
20            errors on it, and it was relied on as a basis
21            of Dr. Kessler's opinion and its weight or
22            validity can be cross-examined through
23            Dr. Kessler as to how he used it for his
24            opinion.  I don't have a problem with it.
25                 Is there something else?
```

```
 1              MR. KLINE:  Yes.  Very briefly, Your
 2         Honor.
 3              In this large binder, when we went
 4         through the e-mails that we wanted to use
 5         with this witness earlier, I had, frankly,
 6         neglected two of them as we were focused on
 7         the draft studies.  There are two additional
 8         e-mails which I'm about to use now, which fit
 9         in the story right now, and both of them, I
10         will represent to the Court, an e-mail of
11         January 28, 2003 --
12              MS. SULLIVAN:  What tab?
13              MR. KLINE:  -- which is under Tab 24.
14         And an e-mail, Your Honor, under tab 25.
15              Both -- both of the -- they're in the
16         front.  We just moved some stuff to the front
17         when we got finally reorganized late last
18         night.  Didn't change the numbers.
19              In both of them, Your Honor, I
20         represent to the Court that they are e-mails
21         involving Pandina.  He's been questioned
22         about both of them.  And one is a Mitelman
23         e-mail.  One is a Pandina e-mail.  Pandina
24         was on both of them.  He was either a cc or
25         an e-mailer.  They're in the same category.
```

```
 1            I have testimony about both documents and I
 2       just didn't want to not do it.
 3                 THE COURT:  All right.
 4                 MR. KLINE:  They are the same
 5       category document.
 6                 THE COURT:  One second.
 7                 MR. KLINE:  One is Bates number --
 8       the one is under tab -- again, the tabs are
 9       nothing but for our convenience.
10                 THE COURT:  All right.  At Tab 24 and
11       this would be --
12                 MR. KLINE:  Document ending in 0659.
13                 THE COURT:  Yeah, I have it.
14                 MR. KLINE:  And Tab 25 is 4519.  And
15       they both fit here now as to what he reviewed
16       so that the story has a chronology and
17       consistency.  I forgot to mention them and I
18       didn't want to --
19                 THE COURT:  I understand.
20                 Well, backing up just for one second,
21       that Page 13, let's have that marked as an
22       exhibit at this point.
23                 MR. KLINE:  I believe --
24                 THE COURT:  It's now going to be P-13
25       or something.
```

```
 1                 MR. KLINE:  Yeah.  It's marked as
 2         P-12.  Page --
 3                 THE COURT:  Let's get that on the
 4         record.  That document is P-12 now, all
 5         right.  So if it comes to -- if you intend to
 6         use it again, it's already been marked, and
 7         there it is.
 8                 MR. KLINE:  Yes.
 9                 THE COURT:  Now, we have on Tab 24,
10         which is JJRE14214519, an e-mail from Gahan
11         Pandina dated September 8, 2006, at 6:45,
12         from Pandina to Susan Serpico.  You would
13         like to use that as a basis for an opinion.
14                 Is there an objection as to anything
15         other than whether it's admissible because of
16         foundation?
17                 If this was a document that has been
18         described and discussed during the deposition
19         or can be presented as a live witness, again,
20         for admissibility purposes, it's admissible.
21         Is there any other reason that it's not --
22                 MS. SULLIVAN:  Your Honor, it's the
23         same reasons we discussed this morning, and I
24         understand you've overruled my objections on
25         that score.
```

```
 1                    THE COURT:  All right.  Then 24,
 2          which is now going to be marked as -- that's
 3          Tab No. 24, that will be -- may be used
 4          subject, of course, to that promise of
 5          foundational admissibility.
 6                    Then we have 25, right, did you say
 7          Tab 25?
 8                    MR. KLINE:  Yes.  Again, the book,
 9          the tab numbers are just for our convenience.
10          I've marked the exhibit that ends in what
11          we've just been discussing ending in the
12          Bates numbers 519 as P-13.
13                    THE COURT:  All right.
14                    MR. KLINE:  Again, for Marianne's
15          sake, we will have P numbers, P exhibits.
16                    THE COURT:  We'll take care of that.
17                    This one here is September 8, 2006,
18          at 6:45.  We're going to be marking that as
19          24.
20                    MR. KLINE:  I marked -- I marked the
21          September 8, 2006 e-mail from Gahan Pandina
22          as Exhibit P-13.
23                    THE COURT:  All right.
24                    MR. KLINE:  That's my next exhibit
25          number.
```

- DAVID A. KESSLER, M.D. - DIRECT -          44

1              THE COURT:  And what is the other one

2        that --

3              MR. KLINE:  The other one is an

4        e-mail of Olga Mitelman, and it's the, "Hi,

5        John," e-mail.  And it's Bates No. 659.

6              THE COURT:  All right.  And that's

7        going to be P-14, right?

8              MR. KLINE:  Yes, sir.

9              THE COURT:  Okay.  Done.  Let's get

10        the jury back in here.

11              COURT CRIER:  All rise as the jury

12        enters the room.

13                    -  -  -

14              (Whereupon the jury entered the

15        courtroom at 2:52 p.m.)

16                    -  -  -

17              (The following transpired in open

18        court in the presence of the jury:)

19                    -  -  -

20              THE COURT:  All right.  You may be

21        seated again.

22              All right.  We have resolved some

23        issues.  And you may now continue again,

24        Mr. Kline, with your direct examination of

25        Mr. Kessler.

1                    MR. KLINE:  Okay.

2    BY MR. KLINE:

3    Q.    Dr. Kessler, we were discussing the label.  If

4    I could put that comparative label back up for one

5    more moment, with the extra sentence.

6    A.    Yes, sir.

7    Q.    The sentence that "Risperidone is associated

8    with higher levels of prolactin elevation than other

9    antipsychotic agents."

10                   If, Mr. Smith, if you could just

11   highlight that one sentence, please.

12                   (Technician complied with request.)

13   BY MR. KLINE:

14   Q.    And I now would like to turn your attention to

15   an exhibit from January of -- January 28 of 2003,

16   keeping in mind that this label, this 2002 label was

17   approved -- if I can go back to the 2002 label.

18   2002 label was approved when?  When did it go into

19   effect?

20   A.    I think -- let me just get it in front of me

21   exactly, the month.

22   Q.    I believe it was February 2002.

23   A.    Exactly, sir.

24   Q.    Okay.  So now I'd like to look at an e-mail of

25   January 28, 2003.  And if I can display Exhibit

1    JJRE03830659, which is now marked P-14.  I'll get to

2    P-13 in a moment.

3              Briefly, this is an exhibit of Olga

4    Mitelman.  Are you aware that she was a Janssen

5    physician working in the Risperdal project?

6    A.    I am.

7    Q.    And it is a letter from her or an e-mail that

8    starts, "Hi, John," and ends with "Thanks, Olga."

9    A.    Yes.

10   Q.    And in that e-mail, sir, in the -- in that

11   e-mail, can you tell -- I just want to get the date.

12   January 28, 2003.

13   A.    Yes, sir.

14   Q.    And I also want to go to the sentence that

15   states "when compared" -- second sentence down after

16   "The Facts."  First of all, if I can go back to

17   "slide."

18              The slide says "The Facts."  Do you

19   see that?

20   A.    I see it.

21   Q.    Was this a presentation that was, as you

22   understand it, that was going to be given to --

23   within Janssen?

24              MS. SULLIVAN:  Objection, Your Honor.

25         Again, this calls for speculation.  This

1              is -- Dr. Kessler wasn't there.

2                    THE COURT:  That's overruled.  That's

3         overruled.

4    BY MR. KLINE:

5    Q.   Understanding that you weren't there, sir,

6    have you had occasion -- maybe I can clear this up.

7                    Have you had occasion as Commissioner

8    of the FDA and in many other capacities to need to

9    review documents which include e-mails and look at

10   the content of the e-mail to figure out what

11   happens?

12   A.   Sure.

13   Q.   And can you tell what was going on here from a

14   reading of it and from your knowledge of the

15   documents?

16   A.   So there --

17                    MS. SULLIVAN:  Objection, Your Honor.

18        This goes to the issue that the Court had

19        raised not permitting Dr. Kessler to

20        speculate.

21                    THE COURT:  Well, first of all --

22        first of all, why don't we have the relevant

23        part read.

24                    MR. KLINE:  Okay.  The relevant

25        part --

```
 1                    THE COURT:  Let's do it the
 2          old-fashioned way.  The relevant part read
 3          and then we'll see whether it needs some
 4          commentary or not.
 5                    MR. KLINE:  Okay.
 6   BY MR. KLINE:
 7   Q.   The relevant part, sir, right here is the
 8   first sentence.  Can I just have the first sentence
 9   highlighted and then we can read it to the jury.
10   Wait until it's finished.
11                    (Document displayed.)
12                    Go ahead.  What does it say, sir?
13   A.   It says, "The statement hyperprolactinemia is
14   a well-recognized effect of all dopamine antagonists
15   is correct, but may be misinterpreted or misapplied
16   by sales reps."
17   Q.   Okay.  Can we take the highlighting down?
18                    The second sentence which I'd like to
19   highlight, which was stated by Olga Mitelman on
20   January 28, 2003, what does that second sentence
21   say?
22   A.   "When compared to competitors, only RIS,
23   R-I-S, Risperdal, causes prolactin elevation at the
24   recommended low doses."
25   Q.   Okay, sir.  And is that -- is that fact, that
```

```
 1   when compared to competitors, only RIS causes
 2   prolactin elevation at the recommended doses, does
 3   that appear from this document to be something known
 4   by Janssen people involved in Risperdal?
 5              MS. SULLIVAN:  Objection, Your Honor.
 6              THE COURT:  That's sustained.  That's
 7         sustained.
 8   BY MR. KLINE:
 9   Q.    Okay.  Is that document something that you saw
10   and relied upon, sir?
11   A.    Yes.
12   Q.    There's also a statement in there, in that
13   same e-mail, if I can pull this down and go to the
14   next paragraph, the first two sentences.  Just the
15   first two sentences, if I may, please.  Just let
16   Mr. Smith catch up with me.
17              Would you read the first sentence,
18   sir?
19   A.    "I don't think it's fair to say that clinical
20   significance of hyperprolactinemia is unknown."
21   Q.    Okay.  And, sir, is that also contained in the
22   e-mail dated January 28, 2003?
23   A.    Yes.
24   Q.    Okay.  Let's move on.
25              And was that one of the documents you
```

1   relied on in your opinion, sir?

2   A.    Yes.

3   Q.    Okay.  Let's move on.

4              I've marked as an exhibit, P-13, a

5   document which is Bates stamp 14519.  Is this

6   another document which you reviewed which led you to

7   your ultimate opinion as to the inadequacy of the

8   warning, sir?

9   A.    Yes.

10  Q.    And I would like to read that document in --

11  just in part.

12             First of all, I need the very top

13  just so we know when it was and who -- when it was

14  written and who wrote it.

15             It says here, if you would, please,

16  who is it from?

17  A.    Gahan Pandina.

18  Q.    And for efficiency, did you understand him to

19  be a psychologist and someone who was involved in

20  the Risperdal project?

21  A.    Yes.

22  Q.    At Janssen?

23  A.    Yes.

24  Q.    And I would like you to go down three

25  sentences, sir.  This, of course, is 2006.  In fact,

1   it's about a month before the label change, correct?

2   A.    Yes.

3   Q.    And what did Pandina say?  I want to look at

4   the note, if you would, please.  It's the third

5   paragraph.  To call it out, it was the third

6   paragraph down.  Again, I only need the first two

7   sentences -- first three sentences.

8   A.    It says, "I will include a bit of" --

9   Q.    You know what, I'm sorry.  Let's do the full

10  paragraph so it's a full context, I'm sorry.  I was

11  trying to get it bigger.  That's why I called out as

12  little as possible.

13               Okay.  This is Dr. Pandina, the

14  psychologist.  Go ahead.

15  A.    He writes [reading]:  "I will include a bit of

16  background here as well.  We have known for years

17  that RIS -- Risperdal -- elevates prolactin, more so

18  than other second generation antipsychotics," then

19  abbreviates them.  And then he says, "First

20  generation anti-" --

21               THE COURT:  Well, Doctor, can you

22          tell us laypeople what those abbreviations

23          are.

24               THE WITNESS:  So --

25               THE COURT:  Q-U-E, Z-I-P, O-L-Z,

```
 1          A-R-I.
 2                    THE WITNESS:  So QUE is the brand
 3          name for Seroquel.
 4                    ZIP is the brand name for Geodon.
 5          OLZ is the brand name for Zyprexa.  And ARI
 6          should be the brand name -- I mean the
 7          chemical name, the generic name for Abilify,
 8          Your Honor.
 9                    THE COURT:  Abilify.
10                    THE WITNESS:  Yes, Your Honor.
11                    THE COURT:  All right.  Go ahead.
12          Thank you.
13    BY MR. KLINE:
14    Q.    Okay.  And then would you continue on with the
15    paragraph, sir.
16    A.    It then says, "First generation
17    antipsychotics, such as haloperidol, also elevate
18    prolactin, either comparably or less than RIS, a
19    fact that has also been known for years."
20                    Should I continue?
21    Q.    Yes.  There's the rest of the paragraph, but
22    that's what I wanted to call out for right now.
23                    MS. SULLIVAN:  Can we ask the doctor
24          to read the next sentence for completeness.
25                    THE COURT:  Yeah.  I would --
```

```
 1              MR. KLINE:  Of course.  Of course we
 2         can.  So let me continue on.  We'll do the
 3         full paragraph and we'll do the next one and
 4         the next one after that.
 5              MS. SULLIVAN:  Just the next
 6         sentence.
 7              MR. KLINE:  Would you -- this is my
 8         witness right now.
 9  BY MR. KLINE:
10  Q.    Would you read the next sentence, sir.
11  A.    "However, prolactin levels, common in greater
12  than 50 to 60 percent of RIS-treated patients, do
13  not correlate with adverse events, less than
14  5 percent of RIS-treated patients, nor does
15  prolactin level predict who might develop and -- who
16  might develop and [sic] adverse event -- a PRL value
17  greater than the upper limit of normal doesn't
18  translate into an AE."
19  Q.    In reaching your opinion, sir, again which is
20  my focus during your entire examination, did you
21  consider the statement made by Dr. Pandina that we
22  have known for years that RIS elevates prolactin
23  more so than other antipsychotic generation -- more
24  than other second generation antipsychotics?
25  A.    Yes.
```

- DAVID A. KESSLER, M.D. - DIRECT -          54

1   Q.    And did you consider the fact that first

2   generation -- that Janssen stated in retrospect that

3   the first generation antipsychotics also elevate

4   prolactin either comparably or less than Risperdal?

5   A.    It was all considered.

6   Q.    Okay.  Now, let's go back to the development.

7              I want to walk you through the time

8   frame all the way from 1993 to -- through 2002.  We

9   can do it in chunks.

10             First of all, in 1993, the drug was

11  approved by the FDA, correct?

12  A.    Yes.

13  Q.    The drug is an antipsychotic drug.

14             Now, can you tell the members of the

15  jury briefly, as someone who at one time was

16  responsible for allowing this drug on the market,

17  what is an antipsychotic drug?  And what was it

18  indicated for when they got approval in adults?

19  A.    So psychosis is generally associated with

20  hallucinations, seeing things that aren't there or

21  hearing things that are not there or not having

22  rational thought.  That was the original label very

23  early on.  But psychosis itself is not --

24  psychiatrists will tell you that it's not, quote, a

25  disease in and of itself.  So there are different

1    disorders, schizophrenia, some bipolar, where you

2    can have psychosis associated with it.

3                    So FDA approved the drug, at

4    Janssen's request, in 1993 for psychosis, but then

5    said to Janssen:  Could you be more specific in what

6    disorder it should be used in? so doctors would use

7    it appropriately.  And that's where the drug became

8    labeled.  And as you see in the 2002 label, it was

9    approved for schizophrenia.

10   Q.    Okay.  And briefly, we may think we have an

11   idea, but what's schizophrenia?

12   A.    Schizophrenia is a disorder where rational

13   thought processes are impaired.

14   Q.    This may or may not be an artful question, but

15   is the -- is this a powerful drug?

16   A.    Absolutely.  This drug works on three brain

17   neurotransmitters that are very important.  They're

18   in all our brains.  They can have a powerful effect.

19   They affect both the dopamine, the serotonin, and

20   the neuroadrenergic, neurochemicals.  So it's a wide

21   variety of neurotransmitters.  And there's no doubt

22   these are very powerful agents.

23   Q.    Okay.  Now, sir, by 1996, did Janssen come to

24   the FDA -- and it would have been, I can represent

25   to you, sometime around August 1996.  When did you

1  leave the FDA?

2  A.    I was still there.

3  Q.    Okay.  In 1996, did they come to the FDA and

4  say, Hey, we want to use it in children?

5  A.    Yes.

6  Q.    Or, Hey, we know it's being used in children,

7  we want to say certain things about it?

8  A.    Exactly.

9              May I just explain for a second?

10 Q.    Yes.

11 A.    As Commissioner, certainly as a pediatrician,

12 one of the important things for me was to try to

13 get -- work very hard to get information on the

14 drug's label for kids.  Because if you only have

15 label for -- label and information for adults, what

16 do you do if you're a pediatrician or, you know, a

17 parent?  You're flying blind.

18             So we worked hard to create

19 incentives for companies to put information in the

20 pediatric section of the label to give docs the

21 information they needed.  We thought that was a good

22 thing, and I was involved in that.

23             And what you see here in August 1996,

24 Janssen, you know, appropriately saying that it

25 wants to add information to the pediatric use

- DAVID A. KESSLER, M.D. - DIRECT -          57

1   section, something we created on the label.

2   Q.    Is this different saying we want to say stuff

3   about using it as distinguished from, hey, we have a

4   safety problem we want to tell you about?

5   A.    Pediatric use can have safety and efficacy

6   information.

7   Q.    Okay.  Now, sir, I'd like to mark as the next

8   exhibit number -- what is it?

9                   MR. GOMEZ:  Fifteen.

10                  MR. KLINE:  Number 15.  Working

11          through our book, again, it's just for

12          convenience, Tab 5, a Bates stamp document

13          produced by Janssen, which is JJRP00378109

14          and 110.  And I'd like to quickly put it up

15          on the screen, the first page, which is 109.

16          It's a Janssen document, dated August 15,

17          1996.

18                  (Document displayed.)

19                  MR. KLINE:  There it is.  Hold on.

20                  MS. SULLIVAN:  I'm sorry.

21                  MR. KLINE:  Oh, I'm sorry.  Take it

22          down.  I don't think there will be a problem,

23          but I want to follow the rules.

24                  MS. SULLIVAN:  No problem.

25                  THE COURT:  Again, Mr. Gomez, what

```
 1          document is this?  Where is this from?
 2                  MR. KLINE:  It's a Janssen letter.
 3          It's in your book.  Tab 5, sir.
 4                  MR. GOMEZ:  Tab 5, Your Honor.  It's
 5          after the blue sheet in Tab 5.
 6                  MR. KLINE:  Is there a problem, Your
 7          Honor?
 8                  THE COURT:  Why don't you show me
 9          like a first page.
10                  MR. KLINE:  Right here.
11                  MS. SULLIVAN:  It's not Tab 5 in
12          ours, Counsel.
13                  MR. KLINE:  It is in my book, under
14          Tab 5.
15                          -  -  -
16                      (Pause.)
17                          -  -  -
18                  THE COURT:  All right.  This -- we'll
19          straighten all of this out.  This is -- okay.
20          It is a document within Tab 5 marked as
21          JJRP00378109.
22                  MS. SULLIVAN:  And, Your Honor, now
23          that I see it, I have no objection to it.
24                  THE COURT:  Okay.  You may proceed.
25                  MR. KLINE:  Okay.
```

- DAVID A. KESSLER, M.D. - DIRECT -          59

```
 1   BY MR. KLINE:
 2   Q.    We have now displayed it, there being no
 3   objection, and I think we're set and all happy.
 4                    It's a Janssen document.  I want to
 5   go to the second page very quickly to establish one
 6   point that I believe that you reviewed, that I know
 7   you reviewed, which is the fifth line, fourth and
 8   fifth line in, where Janssen said, "We are
 9   nevertheless aware."  It starts -- the sentence
10   begins:  "Although this submission does not contain
11   data."
12   A.    Yes.  "Which the agency would normally
13   characterize as substantial evidence, we are
14   nevertheless aware that Risperdal is being utilized
15   in children and adolescents."
16   Q.    Yes.
17   A.    "See summary."
18   Q.    That's the point.  It was no secret that
19   Risperdal was being -- to Janssen, that Risperdal
20   was being used in very large numbers with children,
21   correct?
22   A.    It was being used in substantial numbers, yes.
23   Q.    All right.  Now, I don't want to display the
24   FDA document, but so you do know in your Tab 6, we
25   have it, just as the story goes along, and I know
```

1    you're familiar with it.  What was kind of the

2    upshot?  So I could work through a whole big

3    section.  Everybody will be happy.  I put a whole

4    big section down here.

5                    What was the upshot?

6    A.    So in September 1997, FDA, FDA's Dr. Paul

7    Leber, who ran the section that was responsible for

8    this drug, basically said your request to add this

9    information is inadequate.  It does not provide

10   substantial evidence from adequate and

11   well-controlled trials to support any pediatric

12   indication nor developed a rationale to extend the

13   results of studies from adults to children.  So it

14   was denied, and he gave certain reasons.

15   Q.    Okay.  Now, did Janssen proceed to do --  did

16   Janssen -- did Janssen proceed to do studies in

17   children?

18   A.    Exactly.  And in fact, in a document, I mean,

19   Janssen stated to FDA that planned long-term safety

20   trials in prepuberty children will assess the risk.

21   Q.    Okay.  And was -- did the -- was Janssen told

22   as of 1997 that there was adequate safety data or

23   something completely different?

24   A.    It was something completely different.

25   Q.    And what were they told?

- DAVID A. KESSLER, M.D. - DIRECT -        61

1    A.     They were told specifically -- this is FDA's

2    Paul Leber talking to Janssen -- there were no

3    specific -- basically there was meager safety data

4    submitted to justify adding any information to the

5    labeling at the time.

6    Q.    At the time did Janssen want to add

7    information about labeling of the drug, knowing that

8    children were using it?

9    A.     Yes.

10   Q.    And did Janssen at the time have any safety

11   studies to back up the fact that the drug could be

12   safe in children?

13   A.     Very limited.  FDA points out that Janssen had

14   data for 14 pediatric patients exposed and then 29

15   in the literature.  So FDA is saying too small a

16   number to really base any science upon.

17   Q.    And if you look at Exhibit -- at your Tab 8,

18   again, trying not to display all the exhibits, but

19   rather just get through the chronology here, we

20   talked about the drug being a powerful drug.  Did

21   the FDA have a description of the drug --

22              MS. SULLIVAN:  And, Your Honor, I do

23         have an objection to this hearsay.  If I

24         could be heard at sidebar.

25              THE COURT:  No, no.  Right now I just

```
 1          need to know what document we're looking at.
 2                  MR. KLINE:  We're looking at document
 3          8.  It's a Janssen record of an FDA contact.
 4          In fact, rather than going this way, since
 5          it's a Janssen document and not an FDA
 6          document, I'm simply going to ask to display
 7          it.  I have Exhibit 8 ready to be cued up.
 8                  MS. SULLIVAN:  And, Your Honor, it
 9          is --
10                  MR. KLINE:  It's marked --
11                  THE COURT:  How can I -- I'm
12          really -- I'm just not going to do it this
13          way.  I can't do it this way.  I need the
14          actual document marked, presented and then
15          shown.
16                  MR. KLINE:  Sure.
17                  THE COURT:  I can't do it anymore
18          this way.  This way is not going to work for
19          me.
20                  MR. KLINE:  Okay.  Exhibit P-16 is a
21          Janssen document.  It's Exhibit 93953, Bates
22          number, through 93956.  For the Court's
23          convenience, it's right behind Tab 8 in your
24          book.
25                  THE COURT:  Tab 8?
```

1            MR. KLINE:  Yes.  Tab 8, now marked
2        as P-16, because I've been asked to put "P"
3        numbers on everything that I mark.
4            THE COURT:  All right.  Let me just
5        see the first page of it.
6            MR. KLINE:  It should be right behind
7        the blue page under your Tab 8.
8            COURT CRIER:  How many pages is it?
9            MR. GOMEZ:  Four pages.
10           MR. KLINE:  Four-page document.
11           THE COURT:  Okay.  Plaintiff's 16.
12       What page are you referring to, Counsel?
13           MR. KLINE:  The first page of the
14       document, sir.
15           THE COURT:  Yes.
16           MR. KLINE:  Which is Bates Nos.
17       ending in 953 of what is now marked as P-16.
18           THE COURT:  Right.  But what are
19       you -- what are you asking the doctor to look
20       at or review?
21           MR. KLINE:  I'm looking under
22       "Conduct Disorder" as an indication.
23           THE COURT:  Okay.
24           MR. KLINE:  This is a Janssen
25       document saying what the FDA questioned.

```
 1                    THE COURT:  Okay.  And there's an
 2          objection to this?
 3                    MS. SULLIVAN:  Yes, Your Honor.
 4                    THE COURT:  Overruled.
 5                    Go ahead.
 6  BY MR. KLINE:
 7  Q.    Sir, if we can display --
 8                    MR. KLINE:  May I now display, Your
 9          Honor?
10                    THE COURT:  All right.  You may.
11                    MR. KLINE:  Thank you.
12                    THE COURT:  Conduct disorder.  This
13          is out of Plaintiff's 16, first page.
14                    MR. KLINE:  First page.
15                    THE COURT:  Right.
16                    MR. KLINE:  Is the page ending in
17          953, going to the bottom under what is called
18          "Conduct disorder."
19                    And under the third bullet point,
20          Cory, Mr. Smith, under the third bullet
21          point.
22                    (Document displayed.)
23  BY MR. KLINE:
24  Q.    This is Janssen -- is this a Janssen document,
25  sir?
```

```
 1   A.     This is -- yes.  This is --
 2   Q.     And is Janssen describing what they had
 3   learned from the FDA?
 4   A.     This is specifically minutes of a Janssen FDA
 5   meeting on May 3, 2000.
 6   Q.     Okay.  And, sir, tell me what -- tell me
 7   what's important to you there in your forming of
 8   your opinion.  What did you see in this document
 9   that became important to you for the jury to know?
10   A.     Remember I said that drugs aren't approved, I
11   mean, just the drug.  The drug has to be approved
12   for a specific disease or a specific disorder.  So
13   risperidone doesn't get approved by itself.  It gets
14   approved for schizophrenia.  Now we're talking about
15   in kids.  Janssen comes in to the FDA and says we
16   want to get -- we want to be able to get approval
17   for use in kids with conduct disorder.  And these
18   were kids who were also mentally retarded and so
19   these were vulnerable children.
20               Janssen is coming in and being
21   specific so doctors would know where and when to use
22   it.  They want to use it for conduct disorder in
23   this group of children.
24   Q.     Okay.  And was this a very broad category when
25   you say -- when a pharmaceutical company says I want
```

- DAVID A. KESSLER, M.D. - DIRECT -            66

1    to use this for "conduct disorder," what exactly is
2    that?
3    A.    Well, that was exactly FDA's question, right.
4    And if you go to what FDA told Janssen and what
5    Janssen recorded, just if we can go to the first
6    several bullets where it says -- no.  Please
7    highlight under "conduct disorder."  Yes.
8                   And the first bullet says, "FDA
9    questioned the validity of conduct disorder as a
10   diagnosis," and even the "concept of conduct
11   disorder as a disorder."
12                  FDA stated that even though they
13   thought conduct disorder was in the psychiatric
14   manual, that doesn't mean that it's a disorder
15   warranting an indication in the label.
16                  And then this is the important part
17   where you can see what FDA has said.  FDA is saying,
18   well, FDA feels a public hearing is needed to define
19   how to look at this thing called conduct disorder.
20   "Their main concept" -- this is FDA -- "is that
21   Risperdal or any other product would be used as a
22   chemical straitjacket.  This is the reason the issue
23   needs to be publicly debated."
24                  And just so you understand, what
25   conduct disorder, the fourth bullet, it says "FDA

- DAVID A. KESSLER, M.D. - DIRECT -          67

1   believes aggression is synonymous with conduct

2   disorder."

3              This is a give-and-take between FDA

4   and Janssen.  These are the minute meetings --

5   minutes of the meeting.

6   Q.    And so we're clear, these are the minutes of

7   the meeting by -- of Janssen?

8   A.    Yes.  These are the ones that are written by

9   Janssen.  There's also a set sometimes written by

10  FDA.

11  Q.    Now, so the bottom line -- is the bottom line

12  here today Janssen was turned down for this broad

13  indication for the drug?

14  A.    In 2000, right, Janssen is undertaking a

15  number of studies for conduct disorder.

16  Q.    Okay.  And the studies start to -- the study

17  results start to become known, correct?

18  A.    Yes.

19  Q.    As early as 2000.

20  A.    Yes.

21  Q.    Okay.  Now, there was -- was there a group of

22  five studies originally done; is that a fair way to

23  state it?

24  A.    Yes.

25  Q.    And would you tell us the numbers?  We're

- DAVID A. KESSLER, M.D. - DIRECT -          68

1   going to become familiar with them in a moment.

2   A.     Sir, they go by certain abbreviations, and

3   they are CAN, which just means it's a abbreviation

4   for Canada, CAN-19, CAN-20, USA-93, USA-97, and

5   INT-41, which is International.

6   Q.     Okay.  And other than identifying that it was

7   an international study or a Canadian study, does the

8   place of it make it any better or worse?

9   A.     No.  FDA and the company can audit the studies

10  anywhere in the country -- anywhere in the world and

11  will do that.

12  Q.     All right.  Now, as to these five conduct

13  disorder studies, is that what they were referred to

14  as a group, "conduct disorder studies"?

15  A.     Disruptive behavior developmental disability

16  studies was the acronym, but, yes, they were conduct

17  disorders.

18  Q.     All right.  And of these studies, sir -- am I

19  doing okay on my mic?  Can I be heard?

20              Okay.  Of these studies, was there

21  one of the studies, one, that used the word "special

22  attention" to prolactin and gynecomastia?

23  A.     Yes.

24  Q.     And when you have a lot of studies, do some

25  studies have special attention to certain things and

- DAVID A. KESSLER, M.D. - DIRECT -          69

1   other studies have special attention to other

2   things?

3   A.    It just tells you what the study was giving --

4   was looking for in particular.

5   Q.    Now, of the studies, which of the studies was

6   the "special attention" study to gynecomastia and

7   prolactin?

8   A.    INT-41.

9   Q.    By the way, there were some short-term studies

10  and some long-term studies, correct?

11  A.    Yes.

12  Q.    And of these studies that you've listed, the

13  five studies -- first of all, what defines

14  short-term versus long-term study?

15  A.    Generally short term is a few weeks, six to

16  eight weeks.  Longer term are at least six months to

17  a year.  Tend to think of them -- longer term as a

18  year or close to a year.

19  Q.    That's how you think of it?

20  A.    Yes.

21  Q.    Okay.  And INT was a year study?

22  A.    Yes.

23  Q.    Approximately.

24  A.    Exactly.

25  Q.    And by November of 2000, we now have been

1  through the history in '97, 2000.  By November of

2  2000, were there interim results of the "special

3  attention" study known to Janssen?

4  A.    Yes.

5  Q.    Okay.  Now, I'm just going to need -- because

6  I'm going to be keeping score a little bit on this.

7  May I get the blackboard and may I approach?

8              THE COURT:  Yes.  Sure.

9              Marianne.

10             MR. KLINE:  Would you like me to wait

11        and have the court officer set it up?

12             THE COURT:  What do you want to do?

13        You want it here --

14             MR. KLINE:  I would like it here

15        because I can talk to the witness again and I

16        believe the whole jury could see.  Last time,

17        could you all see all the way back?

18             Okay.

19             Yes, that would be good.  I think it

20        works.

21  BY MR. KLINE:

22  Q.    Sir, let me ask you this:  To save a lot of

23  time, have we gone through these numbers, you and I,

24  and are you prepared to, from the data in the

25  studies, to tell the members of the jury the

```
1   findings in the study?
2              THE COURT:  Well, Counsel, I don't
3         really want to intrude, but I think it would
4         be helpful for all of us if we had some
5         identification of this particular study.
6              MR. KLINE:  Okay.  You mean the
7         document?
8              THE COURT:  Like where it was, who
9         did it and all of that.
10             MR. KLINE:  Oh, sure.
11             THE COURT:  Otherwise it's just a
12        number.
13             MR. KLINE:  Sure.  Sure.  I'm jumping
14        ahead, but sure, Your Honor.
15  BY MR. KLINE:
16  Q.   Let's start with -- let's mark a document
17  which I think might help us.  It is directly under
18  Tab, for Your Honor's convenience, 9.  It is a
19  document which we're going to give a P number to, of
20  P-17, which we're handing to Marianne.  It is the
21  interim analysis of what's called the RIS-41 study.
22             THE COURT:  RIS-INT-41.
23             MR. KLINE:  Yes.  RIS-INT-41.
24             MS. SULLIVAN:  I'm sorry, Counsel,
25        what exhibit number?
```

```
 1                    MR. KLINE:  It's 17.
 2                    THE COURT:  I'm getting the hang of
 3           it.  It's P-17 out of Tab 9, 02562360.
 4                    MR. KLINE:  Yes.  If I had had my
 5           druthers, I just would have used the Bates
 6           numbers, but there was a clamoring for the
 7           opposite.
 8                    THE COURT:  All right.  As long as
 9           we're on the same page, we can always -- we
10           have what we need.
11                    MR. KLINE:  Okay.  But I think -- you
12           got the hang of it, okay.  It's great.
13  BY MR. KLINE:
14  Q.    Now, we now have in front of us a document --
15  want to make sure.  Yes.  Okay.
16                    First of all, tell us what a clinical
17  trial is, Dr. Kessler, and tell us what this
18  particular clinical trial is all about that would
19  clue us into it, sir.
20  A.    So let me give you the title.  We could work
21  through the title and let me explain it.
22                    So this is -- and I'm reading from a
23  report that is dated November 2, 2000.
24                    MR. KLINE:  May I display it?  The
25           front page, I believe, would help.
```

```
 1                    THE COURT:  You may.  You may.
 2                    MS. SULLIVAN:  No objection.
 3                    THE COURT:  You may.
 4                    MR. KLINE:  Any objection?
 5                    MS. SULLIVAN:  No objection.
 6                    THE COURT:  The first page there
 7          which is at 2360, we can look at it.  Go
 8          ahead.
 9   BY MR. KLINE:
10   Q.    And what would be helpful, Doctor, the full
11   top of it?
12   A.    Yes.  That exact -- no, just under "title," if
13   you kindly highlight "title."
14   Q.    Okay.  But let's pull the whole first half --
15   the whole first -- the black -- the box stuff up, if
16   you would, please, sir.  That's great.
17                    (Technician complies with request.)
18                    THE COURT:  All right.
19   BY MR. KLINE:
20   Q.    Okay.
21   A.    So the title says the long-term -- again,
22   close to a year -- long-term safety and efficacy.
23   So it's looking to see both whether the drug is safe
24   and it's looking for an indication of that as well
25   as efficacy, whether the drug works, in conduct
```

- DAVID A. KESSLER, M.D. - DIRECT -                74

1   disorder.  And remember I said, it also says in

2   mild, moderate and borderline mentally retarded

3   children.  And it gives the ages of those children

4   of 5 to 14 years, and then there's a very important

5   caveat.  It says this is "an interim analysis of 319

6   patients."

7   Q.    Okay.  Now, do we know where the study was

8   done?  I believe His Honor asked, and I just wanted

9   to make sure that I have obliged.

10  A.    If you go down, kindly, to the abstract in the

11  first sentence, under the abstract and just

12  highlight that, please.  And just highlight where it

13  says "in this international..." which means, again,

14  nothing wrong with that at all.  In this

15  international, multi-centre, meaning more than one

16  place, open trial.  That means both the doctor and

17  the patients are not blind and people know who's

18  getting the drug.  And then the long-term safety and

19  efficacy of risperidone -- and then it gives the

20  doses; and it's giving those doses in the way

21  pediatricians understand those doses because it's

22  giving milligrams per kilogram -- were assessed in

23  children with borderline intellectual functioning.

24  Q.    And if we could --

25  A.    And also -- and it says, "suffering from

- DAVID A. KESSLER, M.D. - DIRECT -          75

```
1   conduct or other disruptive behavior disorders."
2               And then it gives in the next
3   sentence, if I may, it gives sort of the reason.  It
4   says, "In order to provide the regulatory
5   authorities with long-term safety and efficacy data
6   in a sufficient number of subjects, an interim
7   analysis was carried out."
8   Q.    Okay.  And I notice the words "in a sufficient
9   number of subjects."  Did I read that correctly?
10  A.    Yes.
11  Q.    And I just want to pick up speed, if I can, a
12  little bit.
13              And in the next paragraph, I just
14  want to focus on the page of this -- of these
15  patients that are in the study.  I see that the mean
16  age was 9.6, meaning 10 years old, roughly?
17  A.    Yes.
18  Q.    And that -- I think you already told me that
19  the children were age 5 all the way up to 14.
20  A.    Exactly.
21  Q.    And in the study, did they have any cut-off,
22  let's say, at age 10?
23  A.    No.
24  Q.    And an important fact that I want to put in
25  front of the jury, in the study --
```

- DAVID A. KESSLER, M.D. - DIRECT -                76

```
 1                 MS. SULLIVAN:  Objection.  Your
 2          Honor, I just object to Mr. Kline
 3          highlighting what's important.
 4                 MR. KLINE:  No.  I --
 5                 THE COURT:  All right.  Overruled.
 6                 MS. SULLIVAN:  That's for the jury to
 7          decide.
 8                 THE COURT:  I'm sure you'll come back
 9          to this, if you wish.  I mean, right now, I
10          think it's important that the jury have a
11          context for a lot of this testimony,
12          otherwise we're all going to be lost in the
13          woods.
14                 MR. KLINE:  Okay.  Thank you.
15                 And you're right, Ms. Sullivan.  I
16          apologize.  I didn't mean anything by it when
17          I said "important."
18   BY MR. KLINE:
19   Q.   But what I'd like to just point out is that
20   what percentage of the subjects were male?
21   A.   Vast majority, 83.4 percent.
22   Q.   Okay.  And does that become important to how
23   you're going to and how they review the study in
24   terms of gynecomastia.  Tell me about -- tell me
25   about why gynecomastia -- why it would be important
```

1    to know the number of males if you're looking at

2    gynecomastia.

3    A.     Well, gynecomastia can occur in young -- young

4    girls, too.  Certainly the increase in breast mass

5    prepuberty.  Gynecomastia, the development, in

6    essence, of breast tissue in males is of special

7    concern.

8    Q.     Okay.  And, again, just if I can look briefly,

9    very briefly, a couple of pages ahead, at Bates

10   2364.  His Honor had asked about, you know, where,

11   and I just want to -- it's in front of my eyes.

12                  It was -- was it a multi-center study

13   there?

14   A.     Exactly.  Many different places, many -- a

15   number of different countries that are indicated,

16   close to ten or so countries.

17   Q.     It goes on to Page 2365, which we're

18   displaying.  And we displayed Belgium, Czech

19   Republic, France, Germany, Hungary, Netherlands,

20   Slovakia, South Africa, Spain, and the United States

21   of America, correct?

22   A.     Exactly.

23   Q.     Now, I believe, okay, with that foundation,

24   did this -- and I believe I asked you what an

25   interim analysis is.  I'm not sure if I did with all

- DAVID A. KESSLER, M.D. - DIRECT -                78

1    the questions.  I did.

2                    So my question now is, did they get

3    some interim results here known to the Janssen folks

4    in November of 2002?

5    A.    Yes, and especially with regard to

6    gynecomastia or prolactin-related adverse events.

7    Q.    I'm sorry, I said the wrong -- the wrong date.

8    November 2, 2000.  Let me start again.

9                    As of November 2, 2000, did Janssen

10   Pharmaceuticals have in their possession from a

11   special attention study to gynecomastia and

12   prolactin interim results?

13   A.    Yes.

14   Q.    Okay.  And what I would like to focus on is in

15   the document that we've been reviewing marked as

16   P-17, Bates number near the very end, Bates No. 2427

17   and 2428.

18   A.    Yes.

19   Q.    And did they have multiple reports of

20   gynecomastia?

21   A.    Yes.

22   Q.    And in total, I'm looking at the bottom of

23   page -- the paragraph at the bottom of page Bates

24   number ending in 427.

25   A.    Yes.

```
 1                    THE COURT:  Again, just for our sakes
 2          now, we're still on document that is P --
 3          we're going to mark this entire document as
 4          P-17.
 5                    MR. KLINE:  Yes.
 6                    THE COURT:  Okay.  Do you have the
 7          document?  That's all.  And now we're at Page
 8          2427, 2428 of that document.  That's what's
 9          being shown up on the screen now, correct?
10                    MR. KLINE:  Exactly.
11                    THE COURT:  All right.  Go ahead.
12                    MR. KLINE:  Exactly.  Nothing --
13          nothing different.
14   BY MR. KLINE:
15   Q.   And if I can highlight the bottom page of it,
16   the bottom paragraph.  It said, "In total, there
17   were 16 subjects with symptoms that could be related
18   to increased prolactin levels."  Do you see that?
19   A.   Exactly.
20   Q.   There were 13 reports of gynecomastia, by
21   eleven subjects, correct?
22   A.   Yes.
23   Q.   In seven subjects, gynecomastia was transient.
24   What does "transient" mean?
25   A.   It comes and goes.
```

1   Q.    And the subjects recovered.  That's what you

2   just said.

3                    In ten cases, the adverse event was

4   mild.

5                    And in three cases, considered

6   moderate.  The relationship with risperidone

7   treatment was considered possible in five; probable

8   in three; very likely in four, correct?

9   A.    Yes.

10  Q.    And they go on to say one case of local edema.

11  What is edema?

12  A.    Swelling.

13  Q.    In the left breast was considered unrelated.

14  And they talked about the dosage adjusted in one

15  subject and another subject permanently discontinued

16  treatment.

17                    Okay.  Now, did they have a chart

18  showing it?

19  A.    Yes.  If you turn the page.

20  Q.    Oh, okay.  They had a chart.

21                    Now, and did they -- when I say

22  "they," did Janssen Pharmaceuticals come up with a

23  name for when you had a symptom that was related to

24  prolactin like gynecomastia, and what did they call

25  it?

1    A.    If you look at the title of that table, it

2    says "subjects with prolactin-related adverse

3    events."

4    Q.    Okay.  Subjects with prolactin-related adverse

5    events.

6              And in fact in their documents, did

7    they shorten that to an acronym?  Are there many

8    documents where they actually shortened it to just

9    four letters?

10   A.    Yes.

11   Q.    And what four letters did they, they, Janssen,

12   use?

13   A.    P-R-A-E.

14   Q.    Is that a fair, direct description of what

15   this is, a prolactin-related adverse event?

16   A.    Yes.

17   Q.    Now, we have in this document the -- these

18   various adverse events, correct?

19   A.    Yes.

20   Q.    And, for example, if you go one, two, three,

21   four -- five down, let's take five down, right here,

22   do you see it says there is mild gynecomastia, and

23   it was probably related.  Do you see that?

24   A.    Yes.

25   Q.    Was that a judgment by the company as to the

```
 1   likelihood or not likelihood that it was related to

 2   the drug?

 3                  MS. SULLIVAN:  Objection; lacks

 4            foundation.

 5                  THE COURT:  That's sustained.  That's

 6            sustained.

 7                  MR. KLINE:  Okay.

 8   BY MR. KLINE:

 9   Q.    Okay.  As you -- is that what it says?

10   A.    Yes.

11   Q.    Okay.

12                  MS. SULLIVAN:  That's --

13   BY MR. KLINE:

14   Q.    Who put that in there, sir, by the way, to

15   your understanding?

16   A.    So it's --

17   Q.    Is it Janssen?

18                  MS. SULLIVAN:  Can we ask if he

19            knows?

20                  THE COURT:  Well, first of all, I'm

21            going to do something here.  This is for the

22            record now.  This is -- we're now on the

23            screen --

24                  MR. KLINE:  Is this an issue?

25                  THE COURT:  -- we're looking at
```

1            JJRIS02562429, a document that is a table

2            4-23.  And we are now looking at a particular

3            box in there, AO3299.  And I believe that

4            document should speak for itself.

5                      MR. KLINE:  Okay.

6                      THE COURT:  I mean, it can be put

7            into context in relationship to this graph

8            and have the doctor explain it in

9            relationship to the graph, but as to why, you

10           know, why a particular notation was made

11           by --

12                     MR. KLINE:  Okay.

13                     THE COURT:  -- the people at

14           Janssen --

15                     MS. SULLIVAN:  Objection, Your Honor.

16           That's the problem.  It's -- it's not --

17                     THE COURT:  Well, this is a document

18           that speaks for itself, and --

19                     MS. SULLIVAN:  But these are coming

20           from outside investigators, Your Honor.  And

21           he knows that.  I mean, Dr. Kessler knows

22           that.

23                     THE COURT:  Well, who made this

24           document?

25                     MR. KLINE:  Well, let's go to the

```
 1              basics, if I may.
 2                   THE COURT:  I mean, those are all
 3         fair questions for your expert witness --
 4                   MR. KLINE:  Of course.
 5                   THE COURT:  -- as to how he
 6         interprets this particular document.
 7                   MR. KLINE:  Okay.
 8   BY MR. KLINE:
 9   Q.    Sir, there are many -- sir, would you -- can
10   you go to the very first -- can we go back to the
11   basics?  Can we go back to the first words on the
12   page of Exhibit 2360.
13   A.    Yes.
14   Q.    It's an interim analysis.
15   A.    Yes.
16   Q.    It says on the very top it's a document
17   from -- from where?
18   A.    It is a Janssen document.  Janssen Research
19   Foundation, a division of Janssen Pharmaceuticals,
20   and it tells you who's doing the study.  So the
21   study, the authors are named.
22   Q.    Okay.  I want you to assume, sir, that De
23   Smedt is employed by Janssen.  Did you know that
24   fact?
25   A.    Yes, I did.
```

```
 1                    MR. KLINE:  One second.

 2                    (Pause.)

 3   BY MR. KLINE:

 4   Q.    Now -- and, sir, I want you to assume that

 5   Derivan is a Johnson & Johnson employee.  By the

 6   way, did you know that fact?

 7   A.    I'd have to review that specific name.  I'd

 8   have to look at my papers.

 9   Q.    Okay.  Now, this study, sir, did you

10   understand it to be a Janssen-funded,

11   Janssen-directed study?

12   A.    Sure.

13   Q.    Is there some doubt or issue that there's

14   somebody doing some rogue study under this Janssen

15   Research Foundation?

16                    MS. SULLIVAN:  Objection, Your Honor.

17           Objection, Your Honor.  It's argumentative

18           and it's improper.

19                    MR. KLINE:  Well, it's the kind of

20           questions that get asked here --

21                    THE COURT:  That's sustained as

22           phrased.

23                    MR. KLINE:  And frustrating.

24                    THE COURT:  I don't want the jury to

25           get all confused here.  This is a document --
```

1          this particular document was a Janssen
2          finance study in order to submit to the FDA
3          for their -- their request for this drug to
4          be used for these purposes, control --
5          "control disorder."
6                    MR. KLINE:  Yes.
7                    THE COURT:  All right.  So we're all
8          on the same page, as I said.  I really don't
9          want to get bogged down in this and get it
10         all confused.
11                   MR. KLINE:  Neither did I.
12                   Okay.  Now, I was on the same page.
13                   MS. SULLIVAN:  Well, Your Honor --
14                   MR. KLINE:  Now --
15                   THE COURT:  So now there's an
16         objection as to what?  This is a Janssen
17         document.  And we're not -- I mean, it speaks
18         for itself.
19                   MS. SULLIVAN:  Well, Your Honor, the
20         entries aren't Janssen entries.  That's the
21         misleading part of this.  They come from
22         outside investigators who are conducting this
23         study.
24                   THE COURT:  Okay.  Fair enough.
25                   MS. SULLIVAN:  That's why it's

```
 1              misleading.
 2                      THE COURT:  Well, why don't we make
 3              that clear through this witness here.
 4                      MS. SULLIVAN:  Dr. Kessler knows
 5              that.
 6                      THE COURT:  Why don't we make that
 7              clear through this witness how this doctor
 8              here interprets this document that's on the
 9              screen.
10     BY MR. KLINE:
11     Q.    Can you tell us, sir?
12     A.    So a clinical study has investigators that are
13     contracted with, if you would, by Janssen.  And they
14     conduct the study and they carry out the study, and
15     they make assessments, as part of the clinical
16     trial, of whether an adverse event is related or
17     likely related or not related.  So these are
18     investigators that are part of the clinical trial
19     that are doing this for Janssen.
20     Q.    Okay.  Now, way back when I was asking you
21     whether there were interim results that were
22     available from these outside investigators doing
23     this work for Janssen -- and is it customary that
24     these outside investigators are paid by Janssen,
25     too?
```

- DAVID A. KESSLER, M.D. - DIRECT -          88

1    A.    Sure.  They -- in different forms, but
2    certainly to do the clinical trial, yes.
3    Q.    And there were interim results available.  And
4    I would like to determine, sir, when these interim
5    results came out.
6              I want to create a chart because
7    we're going to have, are we not, interim results,
8    what are called topline results and then final
9    results for the study?
10   A.    Exactly.
11   Q.    And so I want to see as they come in.  So
12   RIS-41 study.  And we have the interim report,
13   I-N-T-E-R-I-M.
14   A.    Yes.
15   Q.    And the date of these was, I believe I heard,
16   11/2/00.
17   A.    If you go to the first page, that's exactly
18   correct.  It's November 2, 2000.
19   Q.    Okay.  And taking all of the children who had
20   something called PRAE.
21   A.    The prolactin-related adverse events.
22   Q.    Okay.  And, by the way, I have to step back on
23   one more predicate question.
24              On the -- on those, they did not only
25   include gynecomastia, the patients that -- the

1    patients.  The jury is familiar with gynecomastia

2    now.  What were some of the other prolactin-related

3    adverse events?

4    A.    So I have reviewed other documents of Janssen

5    where they define PRAE.  And specifically they say,

6    "Prolactin-related adverse events were defined and

7    classified apriori to be either definitely causally

8    related to serum prolactin or possibly causally

9    related."  And then they give the three that are

10   definitely related.  Let me give you what they are.

11                  It's lactation nonpuerperal, which is

12   not associated with puberty.

13                  Second --

14                  MS. SULLIVAN:  I'm sorry, Judge.  Can

15          we know what Dr. Kessler is reading from?

16                  THE COURT:  I believe -- what --

17                  MS. SULLIVAN:  There's a different --

18                  THE COURT:  Was this the same

19          document, Table 43?

20                  MS. SULLIVAN:  No.  He's reading from

21          a different document.

22                  THE WITNESS:  Well, I'm reading from

23          a definition that I --

24                  THE COURT:  Well, again, that would

25          be -- if you want to go -- unless you're

- DAVID A. KESSLER, M.D. - DIRECT -            90

```
1              remembering it by yourself.  You are
2              refreshing your memory from this document,
3              right?
4                      MS. SULLIVAN:  No; he's reading from
5              it, Judge.
6                      THE COURT:  Unless you know without
7              looking at this document what those other
8              PRAEs are.
9                      THE WITNESS:  I can tell you from --
10                     THE COURT:  Well, talk to the jury.
11             I don't really care whether you're reading
12             from a document or not, but --
13                     MS. SULLIVAN:  I don't either, Judge.
14             I just want to know what it is, the document.
15                     MR. KLINE:  May I?
16                     THE COURT:  Okay.  Well, then, if you
17             want to use this document to help you in your
18             testimony, you have it marked and do it that
19             way.
20                     What is that document?
21                     MR. KLINE:  What's the Bates number?
22             And I'll give it a P number.
23                     THE COURT:  Right.  That's all.
24                     THE WITNESS:  JJRE02463704.
25                     COURT CRIER:  Do you have it?
```

```
 1                    THE COURT:  That's a Janssen
 2           definition of PRAE, right?
 3                    MS. SULLIVAN:  I don't know.  I'm
 4           just --
 5                    THE WITNESS:  I'll show it to Your
 6           Honor.  You can have my copy.
 7                    (Counsel conferring.)
 8                    THE COURT:  Yes.  We have it.
 9                    You should have had it, Counsel.  But
10           why don't we make copies for our attorneys.
11           And why don't you testify from memory at the
12           moment while we copy that.
13   BY MR. KLINE:
14   Q.    That's all I wanted to do.  I just wanted to
15   know what they were.
16   A.    They are lactation...
17   Q.    Lactation in nonpubertal girls?
18   A.    Right.
19                    And gynecomastia.
20   Q.    How about amenorrhea?
21   A.    Not definitely related, but possibly related.
22   And they are -- that's amenorrhea, the absence of
23   menses.
24   Q.    Okay.  Let's -- we'll develop this as we go
25   along and I will -- if I may just continue.
```

```
1                    THE COURT:  I think you got your
2          predicate that you were talking about.  So,
3          in other words, the study that you have now,
4          are you going to summarize it for us?
5                    MR. KLINE:  Yes.  I want to get the
6          results.
7                    THE COURT:  And then we'll take a
8          break.
9   BY MR. KLINE:
10  Q.   Of the children with PRAE, how many -- do you
11  have the numbers in front of you?
12  A.   Yes; I can do that.
13  Q.   Okay.  There were -- let's start with just --
14  let's start with all.  That would be the boys and
15  the girls.  How many had prolactin-related adverse
16  events?
17  A.   Sixteen.
18  Q.   Yes.
19  A.   Out of -- so 16's the numerator -- 319 is the
20  denominator.  And that would be for 5 percent.
21  Q.   Okay.  And could you break out in the study,
22  since it's just arithmetic, the number of boys with
23  gynecomastia.
24  A.   Yes, I can.
25  Q.   And --
```

```
 1    A.     There would be ten boys, and you have to
 2    eliminate the girls from the denominator.  So that
 3    would be 266, ten over 266, or 3.75 percent.
 4    Q.     Were those results known to Janssen in
 5    November 2, 2000?
 6    A.     Yes.  It was in a study report.
 7    Q.     All right.  Now, as time progressed, by
 8    August 29th of 2001, were there topline -- was there
 9    a topline report?
10    A.     Yes.
11    Q.     And I'd like to refer to a document which is
12    found, for Your Honor's benefit, under Tab 10 of our
13    book, which I have now marked as Exhibit P-19, which
14    is contains the Bates Nos. 02297143 through 155,
15    entitled, "Topline Results."
16                   COURT CRIER:  Thank you.
17                   MR. KLINE:  You're welcome.  Thank
18         you.
19                        -  -  -
20                   (Whereupon Exhibit P-19 was marked
21         for identification.)
22                        -  -  -
23    BY MR. KLINE:
24    Q.     And I have on my board which I'm making called
25    "topline results."  It's not fancy, but will get it
```

1    done.

2                    And, sir, tell the members of the

3    jury, the first -- first let's display it with --

4    assuming there's no objection from counsel and the

5    Court permits me to do so.

6                    MS. SULLIVAN:  No objection.

7    BY MR. KLINE:

8    Q.    I will display Exhibit 143.  That would be

9    Bates No. 143, which are the topline results.

10                    Can we focus on the first half of the

11   page, please?

12                         -   -   -

13                    (Technician complied with request.)

14                         -   -   -

15   BY MR. KLINE:

16   Q.    And does this document pertain to RIS-41, sir?

17   A.    Yes.

18   Q.    And is the report dated August 29, 2001?

19   A.    Yes.

20   Q.    Does that indicate that the results then were

21   known by that date?

22   A.    Yes.

23   Q.    And would you read -- is the title the same as

24   the title that we had before; namely, the long-term

25   safety and efficacy of Risperdal in conduct disorder

1   in mild, moderate and borderline mentally retarded

2   children aged 5 to 14?

3   A.     Yes.

4   Q.     And, sir, does this document have a table at

5   Page 152?

6   A.     Yes.

7   Q.     And since there's no objection to the

8   document, I believe that I would be allowed to

9   display.  It's number Page 152.

10                   THE COURT:  Okay.

11                   MR. KLINE:  And if Mr. Cory Smith

12          would focus in on there.

13                   (Technician complies with request.)

14   BY MR. KLINE:

15   Q.     They have results as to gynecomastia, correct?

16   A.     Yes.

17   Q.     And the number of subjects that are in the

18   study now have increased; is that correct?

19   A.     Yes; 504 total.

20   Q.     That are now -- that are now under -- they're

21   being reported as having been studied among these

22   multicentres, correct?

23   A.     Exactly.

24   Q.     And have you from both this document and the

25   others done the arithmetic on the numbers that have

PRAE?
A. Yes. You can do that simply. If you look at the column, it's gynecomastia, and then look at the reproductive disorders in female, you'll see 2 there. So 26 is the numerator; 504 as the denominator, and I get something like 5.1 percent.
Q. Twenty-six out of 504?
A. Yes, boys.
Q. All comers for what's called prolactin-related side effects known as PRAE?
A. Yes.
Q. And that's 5-point -- I have 5.2, but you have 5.1?
A. I have 5.15.
Q. Now, how about if you just look at the boys with gynecomastia -- the children with gynecomastia, what percentage of the children are getting gynecomastia in the study?
A. I calculate 5.7 percent, because --
Q. And what are the numbers?
A. Twenty-four boys.
Q. Out of?
A. Out of 419 boys.
Q. And that's 5-point?
A. Seven, approximately.

1    Q.    Okay.  The results, we're now November, so,

2    December, January, February -- May, June, July,

3    August, like almost nine months later here, and are

4    the results, as you've read them, better or worse?

5    A.    No.  The results are the results.  I'm sorry.

6    I don't -- when you say are better or worse.

7    Q.    In terms of gynecomastia.  Okay.  The results

8    are the results.  Fine.

9    A.    The results are the results.

10   Q.    Okay.  Now, let's go to -- let me see if I had

11   anything I wanted to ask you about this.  I don't

12   think so.

13                  And I don't know that I got a

14   definition, are these topline reports standard and

15   routine in clinical trials, sir, as you've observed

16   them over the years?

17   A.    It's an internal company, sort of the

18   headlines of the clinical study.  It's not the final

19   study report.  It's not the detail study report.

20   Q.    Are both -- from your review in terms of what

21   you concluded in your ultimate opinion, did you see

22   these numbers in the special attention study as

23   being a red flag?

24   A.    Yes.

25   Q.    Okay.  Now --

- DAVID A. KESSLER, M.D. - DIRECT -           98

```
 1                  THE COURT:  All right.  I'm going to
 2          take a recess right here, okay, right there.
 3          And we will adjourn for about five, ten
 4          minutes.  I'm going to find out from the
 5          attorneys when is a good time for us to
 6          recess for the day.  But let's take a break
 7          right here, okay?
 8                  COURT CRIER:  All rise as the jury
 9          exits.
10                           -  -  -
11                  (Whereupon the jury exited the
12          courtroom at 3:58 p.m.)
13                           -  -  -
14                  (The following transpired in open
15          court outside the presence of the jury:)
16                           -  -  -
17                  THE COURT:  Before we take our
18          recess, I kind of need to know -- I would
19          like to know what, Mr. Kline -- you may be
20          seated.  Everyone may be seated.
21                  What is the time factor here?
22          Because we are getting -- we have to sort
23          this out, as far as one of our jurors has
24          some kind of child-care issues, and I need to
25          straighten some of these issues out.
```

```
 1              So as far as today's concerned, when
 2       would be a good time to adjourn?  I assume
 3       we're going to do the cross-examination
 4       tomorrow.
 5              MR. KLINE:  Oh, I'm nowhere near
 6       finished.
 7              THE COURT:  That's what I thought.
 8              MR. KLINE:  My --
 9              THE COURT:  So why don't we plan on
10       adjourning around twenty of 5:00, you know.
11              MR. KLINE:  I might suggest --
12              THE COURT:  Why don't we take a
13       recess right here and we'll get some more
14       information.
15              MR. KLINE:  I am at a point where I
16       could stop anywhere between now and whenever
17       the Court told me to stop.
18              THE COURT:  All right.  So why don't
19       we find out some more information.  We'll
20       take a recess here and we'll have to figure
21       this out.
22              MS. SULLIVAN:  Thank you.
23                       -  -  -
24              (Whereupon an off-the-record
25       discussion was held.)
```

```
 1                    -  -  -
 2              (Whereupon a short recess was taken.)
 3                    -  -  -
 4              THE COURT:  We will need to adjourn
 5         at 4:30 today, so let's just go for another
 6         15 minutes and we will work on the issues
 7         involving this particular juror and her
 8         child-care issues.  This has caught us by
 9         surprise mainly because we had told her we
10         will only be going till 4:30, so she did not
11         raise it as a hardship, and we'll find out
12         more about it.  But today we'll just go to
13         4:30.
14              If it becomes a problem for us, I
15         will recommend that we agree to excuse her
16         because if we can't -- if we do have to stay
17         later than 4:30, I really can't have the
18         pressure of a child waiting at Olney
19         Elementary School waiting for her mother
20         during this trial, so we'll see.
21              Okay.
22              MS. SULLIVAN:  Thank you, Your Honor.
23              MR. KLINE:  Is your usual break time
24         4:30?
25              THE COURT:  I usually break between
```

```
 1            4:30 and 5:00, but I don't want to be pegged
 2            that I have to adjourn at exactly 4:30 in
 3            order to get her up to Tabor Road.
 4                 MR. KLINE:  Okay.  I get it.
 5                 THE COURT:  So we'll find out more
 6            about this.  I am told that the juror is
 7            trying to work out some other kind of
 8            alternative pickup for this child.
 9                      -  -  -
10                 (Pause.)
11                      -  -  -
12                 COURT CRIER:  All rise as the jury
13            enters the courtroom.
14                      -  -  -
15                 (Whereupon the jury entered the
16            courtroom at 4:13 p.m.)
17                      -  -  -
18                 (The following transpired in open
19            court in the presence of the jury:)
20                      -  -  -
21                 THE COURT:  All right.  You may be
22            seated.
23                 Members of the jury, we will continue
24            today till 4:30.  We'll talk about the
25            situation involving timing after -- just for
```

```
 1            a few minutes after 4:30 when I excuse you.
 2            But we will adjourn around 4:30 today, all
 3            right?
 4                    You may proceed.
 5                    MR. KLINE:  Okay.
 6  BY MR. KLINE:
 7  Q.    Continuing along.  And, Dr. Kessler, would you
 8  also make sure that you stay close to the mic so
 9  that the juror furthest from you can also hear.
10  A.    Of course.
11  Q.    Okay.  I want to make sure everyone can hear.
12                    Now, was there a final report --
13  A.    Yes.
14  Q.    -- of this study?
15  A.    Sorry.  Yes.
16  Q.    And the final report is in Tab 11, for the
17  Court's benefit.
18                    It is now marked for Court
19  identification purposes as P-20, per our protocol.
20                    THE COURT:  Okay.
21  BY MR. KLINE:
22  Q.    And it has Bates numbers beginning
23  JJRE08344114 through JJRE08344214.
24                    And this is the final report,
25  correct?
```

1    A.    Yes.

2    Q.    And the final report is dated October 25th of

3    2001, correct?

4    A.    Yes.

5    Q.    Now, let's look at the document with no --

6    assuming there's no objection and the Court permits

7    it, I will display the cover sheet which is Bates

8    No. 44114.

9                   THE COURT:  Any objection?

10                  MS. SULLIVAN:  Oh, no.  No, Your

11          Honor.

12                  THE COURT:  Okay.

13                  COURT CRIER:  P-20.

14                  MR. KLINE:  And if we can just do

15          the -- highlight the first portion of it.

16                  (Technician complies with request.)

17   BY MR. KLINE:

18   Q.    It holds the same title, correct?

19   A.    Yes.

20   Q.    Same author, correct?

21   A.    Yes.

22                  Well, I have to check the authors.

23   Q.    Okay.  Well, let's not take time right now.

24                  And I'd like to see the department

25   that it's done in.  Is it being done in a department

```
 1   at -- if you go back to the very top of the paper,
 2   by the way.  I missed this.  Can we start again?
 3   Right at the very top.
 4               Notice that it says on the top, what
 5   does it say on the top?
 6   A.    Johnson & Johnson Pharmaceutical Research &
 7   Development, a Division of Janssen Pharmaceutica,
 8   N.V.
 9   Q.    Ah.  Thank you.
10               And it is a clinical report.  And
11   notice the departments that it's in.  If you can
12   highlight very quickly the departments.
13   A.    So it's Biometrics, Statistics, Clinical
14   Pharmacokinetic, study of drugs, Clinical
15   Pharmacology, study of drugs, and Global Clinical
16   Research and Development who does clinical trials,
17   and then Regulatory Affairs/Pharmacovigilance
18   looking for safety effects.
19   Q.    And if you look on the clinical phase, it's
20   clinical phase III, correct?
21   A.    Yes.
22   Q.    Is that -- we had interim, topline and final.
23   Is that the three phases?
24   A.    No.  Clinical phase III refers to something
25   else.  It's the type of clinical trial related to
```

1   the submission to FDA.  So this is the last stage

2   when you're looking for an indication, your phase I,

3   II, and III.  It doesn't relate to interim results

4   or a topline.  It's just the type of trial done.

5   Happy to explain more.

6   Q.    Okay.  No.

7                  What I would like to look at is

8   the -- are a couple of things in the document, in my

9   few remaining minutes.

10                  If I could turn to Page 45 of the

11  document.  That's Exhibit -- and, Your Honor, on the

12  top of the page it's paginated like a book.  And the

13  Bates number is ending in 159 of this document.

14                  MR. MURPHY:  Counsel, before you move

15          forward, there's no 45 in my version.

16                  MR. KLINE:  Okay.  Might have been a

17          reproduction error.  But I can show you what

18          I'm about to display.

19                  THE COURT:  All right.

20                  MS. SULLIVAN:  I don't have a

21          problem.

22                  THE COURT:  All right.  159.  Let's

23          make copies of it because it's not in my tab

24          either.  So why don't we just do that.  159.

25                  Do you have 159?

```
 1                    MS. SULLIVAN:  I have the -- I don't
 2          have that page, Judge.
 3                    THE COURT:  Right.
 4                    MR. KLINE:  Does it go from 158 to
 5          160?
 6                    MS. SULLIVAN:  We're missing in the
 7          copies you gave us, Counsel, 159, which is, I
 8          guess, Page 45.
 9                    MR. KLINE:  Is 158 there?
10                    MS. SULLIVAN:  Yes.
11                    MR. KLINE:  And 160?
12                    MS. SULLIVAN:  Yes.
13                    MR. KLINE:  Okay.  That's odd.  But
14          I'm sorry.
15                    THE COURT:  Why don't you take a look
16          at it.  We're making copies of it.
17                    MS. SULLIVAN:  I don't have a problem
18          with it going up.  I'd just like a copy.
19                    THE COURT:  That can be shown on the
20          screen.
21                    MR. KLINE:  Yes.  And we'll get one
22          for Ms. Sullivan.
23                    THE COURT:  All right.
24    BY MR. KLINE:
25    Q.    When I had mentioned earlier, if I can
```

1    highlight here, Section 3.6.6.1.2, prolactin-related

2    adverse events.

3    A.     Yes.

4    Q.     Does the first sentence say, "Special

5    attention was also given to adverse events that were

6    related to prolactin levels"?

7    A.     Exactly.

8    Q.     When you reviewed all of the other studies,

9    sir, did you see any study that said that they were

10   paying special attention to prolactin-related

11   adverse events?

12   A.     This is the study that I saw that term used.

13   Q.     And I would like to go to Table 7.8 of the

14   final report.

15   A.     Yes, sir.

16   Q.     7.8.  That would be Exhibit Bates ending in

17   Bates 195.

18                  MR. KLINE:  And, Your Honor, in your

19          book it's just -- it's Page 81 of that

20          exhibit.

21                  THE COURT:  All right.

22                  MR. KLINE:  That exhibit has kind of

23          like a mini book.

24                  MS. SULLIVAN:  Counsel, it looks like

25          in your copying there was pages missed, and

```
 1              we're missing that page as well.
 2                   THE COURT:  Okay.
 3                   MR. KLINE:  We would replace them,
 4         but I know you're familiar with it, and I
 5         will get it for you.
 6                   THE COURT:  All right.
 7                   MS. SULLIVAN:  Yeah, it looks like --
 8                   THE COURT:  Table 7.8?
 9                   MR. KLINE:  Yes, 7.8.
10                   THE WITNESS:  And it's actually two
11         pages, the table.
12                   MR. KLINE:  Yes.  It's two pages.
13                   MS. SULLIVAN:  You guys copied every
14         other page, it looks like.
15                   MR. KLINE:  I don't think we did
16         that, Ms. Sullivan.  Honest to god, I don't.
17                   MS. SULLIVAN:  Well, Counsel, look.
18         That's what we got.
19                   THE COURT:  Do you have a hard copy
20         of that?
21                   MR. KLINE:  They have about a hundred
22         hard copies of this key exhibit.
23                   THE COURT:  I don't have it either.
24         So let's just make due with this document and
25         if you have something that you want to show
```

```
 1            out of this document --
 2                    MR. KLINE:  Of course.
 3                    THE COURT:  -- on the screen, let's
 4          do it.
 5                    MR. KLINE:  Yes.
 6  BY MR. KLINE:
 7  Q.    Well, let's do the math first, sir.  Do you
 8  know the number of -- the total number of subjects
 9  and the total number that had a PRAE,
10  prolactin-related side effect?
11  A.    Sir, I have a total number of boys and girls
12  of 504; 33 of whom had prolactin-related adverse
13  events, for a percentage of 6.5 percent.
14  Q.    Hold on a second.
15                    Thirty-three of 504 had a PRAE,
16  meaning a prolactin-related adverse event, and that
17  is 6.5 percent?
18  A.    That's my calculation, yes.
19  Q.    Okay.  How about the boys with gynecomastia?
20  A.    Boys with the gynecomastia, I had 23 out of
21  419, for 5.5 percent.
22  Q.    I notice here on my chart that the denominator
23  is the same for the topline reports and for the
24  final results?
25  A.    Yes, that's correct, as it should be.
```

1   Q.    And they added some -- I'd like to look at
2   this chart that we have in front of us so we can
3   have a sense of what it is before we break for the
4   day.  We'll probably come back to it tomorrow.  Can
5   we zero in on like the first half of it?
6                   You told us that there are 33 out of
7   504 have a prolactin-related adverse event --
8   A.    That's what I --
9   Q.    -- that went on this drug who was a child
10  between the age of 5 and 14?
11  A.    Yes.
12  Q.    And is that something, sir, that's significant
13  or concerning when you have five to six of a hundred
14  that are having an adverse event of a certain kind?
15  A.    Certainly a red flag to me.
16  Q.    And you'll see on their chart, if we go
17  through this, we'll go through some of it tomorrow,
18  there are a total 33 prolactin-related side effects
19  out of 504; correct so far?
20  A.    Yes.
21  Q.    And if you notice, they say whether the
22  investigators here believed that there's a drug
23  relationship.  Do you see "drug relationship"?
24  A.    Yes.
25  Q.    Can we highlight there, "drug relationship"?

1                    Thank you, Cory.

2                    (Technician complies.)

3     BY MR. KLINE:

4     Q.    And do you see on the first one, you have a

5     nine-year-old boy, let's look at the very first one

6     on the PRAE.  Nine-year-old boy, correct?

7     A.    Yes.

8     Q.    With gynecomastia?

9     A.    Yes.

10    Q.    Can we go across that table, please, Cory?

11    Nine-year-old boy, and we have -- they say it's

12    moderate gynecomastia, correct?

13    A.    Yes.

14    Q.    By the way, was this study actually -- was

15    part of the protocol of this study to actually

16    examine the breasts, actually examine the breasts?

17    A.    Yes.

18    Q.    Did they do many studies where they never

19    examined breasts?

20    A.    Sure.  I don't know "many," but certainly

21    there were studies that did not examine the breasts,

22    yes.

23    Q.    And in this study, sir, you see here that the

24    gynecomastia -- we'll go through this tomorrow.  It

25    takes a little -- I just want to get a flavor for

- DAVID A. KESSLER, M.D. - DIRECT -          112

1    it.
2                    Are you able to scroll down, Cory, or
3    do you have to pull it out?  If we could scroll down
4    somewhat.
5                    We have -- let's look at above here,
6    the five-year-old boy.  No.  Let's look here at the
7    14-year-old, just down there, a couple down, toward
8    the 14-year-old.  Oh, no, the next one.  Twelve.
9                    We have children that are all within
10   the -- all within the age range of the study,
11   correct?
12   A.    Yes.
13   Q.    And the age range of the study goes all the
14   way up to 14, correct?
15   A.    Exactly.
16   Q.    It doesn't stop at 10, correct?
17   A.    No.
18   Q.    And you see here, it was categorized by the
19   investigators as being very likely related to
20   gynecomastia?
21   A.    That specific one, yes.
22   Q.    And did you do the arithmetic -- if I can show
23   Page 2.  We're going to have to come back to this
24   tomorrow and start there.  I know 4:30 is my drop
25   dead.

1                    But if you look here at this, there's
2    more of the same, correct?
3    A.    Yes.  It's important to point out this isn't
4    just gynecomastia.  You have lactation.  You have
5    other PRAE things, too.  I think that's obvious.
6    Q.    Scroll down for one moment, please.
7                    (Technician complied.)
8    A.    Go back to the first page, for example.
9    Q.    Yes; I know.  There are different items.  I'll
10   get to that tomorrow.
11                   I'd like to get to the -- I'd like to
12   get to how they -- you see those things where they
13   say "probably"?
14   A.    Yes.
15   Q.    Okay.  Did you actually just count up --
16   that's all that's involved -- the numbers that they
17   said of gynecomastia that were probably related to
18   the drug?
19   A.    Yes.  I think if you count that both, what I
20   did was probably or very likely.
21   Q.    All right.  And how many probably's and very
22   likely's were there?
23   A.    Sixteen out of 23.
24   Q.    Sixteen out of 23.  So it would be 16 out of
25   419 would be the total number?

1    A.    Yes.   That would be 3.8 percent.

2    Q.    So with this data, 16 of the 419 were

3    categorized by Janssen as very likely related --

4                   MS. SULLIVAN:  Objection.

5    BY MR. KLINE:

6    Q.    -- or probably related, to use their words?

7                   MS. SULLIVAN:  Again, Your Honor,

8           objection to the characterization by Janssen.

9           Dr. Kessler's already --

10   BY MR. KLINE:

11   Q.    How about in this document which is labeled

12   Johnson & Johnson and Janssen on the top.

13                  THE COURT:  Well, the document speaks

14          for itself.  And I think we should --

15                  MR. KLINE:  I'll ask a better

16          question.

17                  MS. SULLIVAN:  Dr. Kessler made clear

18          this is from the investigator.

19                  MR. KLINE:  I'll ask a better

20          question.

21                  THE COURT:  All right.  Ask a better

22          question.

23                  MR. KLINE:  They're disavowing the

24          document as being theirs.

25                  So here's the question -- or the

1              results.

2    BY MR. KLINE:

3    Q.     From the information you have in the document

4    which is entitled -- which has as its very first

5    topic -- Johnson & Johnson Pharmaceutical Research

6    Development [sic], a division of Janssen

7    Pharmaceuticals, N.V., [sic] did you get this

8    information that 16 out of 419; namely, 3.8 percent,

9    had gynecomastia in this study which was very likely

10   or probably?

11   A.     Yes.

12                  MR. KLINE:  That's my point.

13                  THE COURT:  All right.  That would be

14        all for today.

15                  MR. KLINE:  We could go on, but that

16        certainly is a point I'd like to end on.

17                  THE COURT:  Okay.  We're going to

18        adjourn right here, okay?

19                  All right.  Thank you.

20                  All right.  Doctor, you're excused

21        for today.  Please do not discuss this matter

22        as far as the case is concerned with anyone,

23        and including with your attorney.

24                  I'm going to just instruct the jury

25        now.  We are going to adjourn for today till

1          tomorrow at 9:30.  And I want you to come in
2          again with the yellow badges and everything.
3                    Please remember -- please do the
4          following:  Any of you who have some issues
5          that I can hopefully help straighten out or
6          get some more information out of you, a job,
7          pick up children, pick up, working on the one
8          involving a refund from Community College,
9          I'm working on all these things, all right?
10         The more information that I have about these
11         issues, the better it is that we might be
12         able to work these things out, okay?
13                    So just come in tomorrow with any
14         information along those lines.
15                    The other thing is remember to keep
16         an open mind about this case, not to discuss
17         this case with anyone, whether it's family,
18         friends, neighbors, anybody, okay?
19                    Remember now -- I'm going to remind
20         you not to use any information that's outside
21         of this courtroom for the purposes of this
22         case, all right?  Now, this goes to whether
23         it's sources from the Internet, whether it's
24         sources from a newspaper, whether there's
25         sources from the radio or TV or anything.

```
1          Anything outside of this courtroom is to be

2          ignored, all right?

3                  Why do I say that?  I've said it

4          before, but the important thing here is that

5          this whole effort is made to present

6          evidence, live witnesses or video or

7          paperwork that is filtered through our rules

8          of evidence so it comes to you, you know,

9          with that filter, okay?

10                 If we go outside of this courtroom

11         for information, it ruins it for everyone,

12         all right?  And we don't want that to happen.

13         We're putting obviously a lot of effort into

14         this, and so are you.  So let's just keep it

15         that way, hopefully.  You're ordered really

16         not to pay any attention to any outside

17         influence in this case, all right?  I'm going

18         to leave it at that.  Have a good evening

19         everyone, and we'll see you tomorrow at 9:30.

20                 COURT CRIER:  All rise as the jury

21         exits.

22                          -  -  -

23                 (Whereupon the jury exited the

24         courtroom at 4:32 p.m.)

25                          -  -  -
```

```
 1                    (The following transpired in open
 2          court outside the presence of the jury:)
 3                          -  -  -
 4                    THE COURT:  Okay.
 5                    MR. KLINE:  While we have the court
 6          reporter.
 7                    THE COURT:  Let's close the door,
 8          please.
 9                    Doctor, you're excused.  You can step
10          down.
11                    (Witness left the stand.)
12                    MR. KLINE:  We will mark the
13          developing chart as P-21, because your court
14          officer, Your Honor, likes to have things
15          marked contemporaneously.
16                    THE COURT:  All right.  Why don't we
17          just wait for Marianne.  They're all gone and
18          everything?
19                    COURT CRIER:  Yes.
20                    THE COURT:  Do you need to deal with
21          the jury at all?
22                    COURT CRIER:  No.
23                    THE COURT:  All right.  So why don't
24          we go back to some evidentiary matters.
25          We'll mark these documents and then whatever
```

```
 1              we need to do, we can do.
 2                     Everyone please be seated.
 3                     MR. MURPHY:  Do you have an
 4              instruction for the witness?
 5                     THE COURT:  Any instructions for our
 6              witness?  I thought I gave an instruction to
 7              the witness on the record that he is not to
 8              discuss this matter with his attorneys.
 9                     MR. MURPHY:  Okay.
10                     (Witness exited the courtroom.)
11                     MR. GOMEZ:  With the Court's
12              permission, I'd just like to clean up the
13              record with some additional --
14                     THE COURT:  Right now Mr. Kline
15              wanted to identify his handwritten summary,
16              essentially, of this particular study.
17                     For the record, the study being
18              RIS-INT-41.
19                     Mr. Kline has used his own
20              handwriting to put up on some sheets on an
21              easel, and we were going to mark that as
22              P-21, for the record.  All of these documents
23              will be kept by our court reporters, P-21, at
24              the conclusion of the case.
25                     MS. SULLIVAN:  And, Your Honor, I'll
```

1          mark the chart that we used with Dr. Mathisen

2          yesterday.

3                    THE COURT:  Dr. Mathisen had one, I

4          believe, also.

5                    MS. SULLIVAN:  Thank you.

6                    THE COURT:  In fact, we will go back

7          in a few moments to recap Dr. Mathisen's

8          testimony so that we can have it in a system

9          that I'm comfortable with.

10                   But is there anything else,

11         Mr. Gomez?  You're referring to something

12         right now?

13                   MR. GOMEZ:  Yeah.  I wanted to mark

14         as a plaintiff's exhibit from yesterday the

15         Bates stamp JJPHPLEPE00000170, which was the

16         Janssen document dated 9/9.

17                   COURT CRIER:  Is this from

18         Dr. Mathisen?

19                   THE COURT:  One second.  If we're

20         going to go to yesterday, we will, but is

21         there anything at the moment for today?

22                   COURT CRIER:  Yes, please.

23                   MR. GOMEZ:  No.

24                   THE COURT:  That we need to --

25                   COURT CRIER:  Can I have from today,

```
 1              8, 9, 10, 11?
 2                     I have 12, 13, 14, 15.  And then I
 3              have 16 on up, just from today.  When you
 4              start marking.
 5                     (Whereupon an off-the-record
 6              discussion was held.)
 7                     THE COURT:  We're still addressing
 8              today's stuff.
 9                     COURT CRIER:  This is all
10              Dr. Kessler.
11                     P-8 is a 2002 Risperdal label.
12                     THE COURT:  Is this for today?
13                     COURT CRIER:  Yes.
14                     THE COURT:  All right.  Why don't we
15              put on the record.  What is this now?
16                     COURT CRIER:  This will be P-8, Your
17              Honor, 2002 Risperdal label.
18                     Okay.  And then P-9.
19                     MR. GOMEZ:  2006 Risperdal label.
20                     COURT CRIER:  P-9 is the 2006
21              Risperdal label.
22                     P-10 was --
23                     MR. MURPHY:  Demonstrative.
24                     COURT CRIER:  Were projected.
25                     MS. SIPALA:  I have copies.  I'll get
```

```
 1              them right now.
 2                      COURT CRIER:  Okay.  So this was P-10
 3              that was projected.
 4                      This is P-11.
 5                      THE COURT:  All right.  P-12 was
 6              Bates 544.  Do we have that?
 7                      COURT CRIER:  I do, Your Honor.
 8                      THE COURT:  Okay.  P-13 was some kind
 9              of e-mail.
10                      COURT CRIER:  It was one of the
11              e-mails.
12                      THE COURT:  Of January 28, '03.
13                      Maybe I got that wrong.  That's why
14              we're doing this.  P-14 I have is an e-mail
15              1/28/03.
16                      COURT CRIER:  One is an e-mail.
17                      MR. GOMEZ:  Yes, 113.  I don't have
18              copies of those handy.
19                      THE COURT:  Which one is that?  What
20              number is that?  What tab?
21                      MR. GOMEZ:  P-13 and 14 would have
22              been --
23                      MR. MURPHY:  Tabs 24 and 25.
24                      MR. GOMEZ:  24 and 25.
25                      THE COURT:  Okay.  Copy them and give
```

1              them back.
2                        COURT CRIER:  Okay.  Just tell me
3              what 13 is, the Bates stamp.
4                        MR. MURPHY:  Does it end in 519,
5              Marianne?  I'm sorry.  Here.
6                        COURT CRIER:  No.  Can plaintiff tell
7              me their exhibits?
8                        MR. GOMEZ:  Thirteen ends in 519.
9                        COURT CRIER:  I need a copy of it.
10                       MR. MURPHY:  That's mine, by the way.
11                       COURT CRIER:  This is P-13.
12                       THE COURT:  Is any of us going to
13             dinner at the Rittenhouse Hotel this evening?
14                            -  -  -
15                       (No response.)
16                            -  -  -
17                       THE COURT:  It would very helpful,
18             counsel, if documents that we are using are,
19             you know, made available in some kind of
20             order.  You might want to look at that, you
21             know, for tomorrow or the day after.
22                       MR. GOMEZ:  It will be remedied, Your
23             Honor.
24                       THE COURT:  It's very difficult to do
25             it this way.  I wanted to do it this way, but

```
 1              what happens is if we make a mistake on the
 2              actual numbers and then when the document is
 3              being referred to in cross-examination, that
 4              would cause even more trouble for us.
 5                      MR. GOMEZ:  Understood.
 6                        (Pause.)
 7                          -  -  -
 8                      (Whereupon an off-the-record
 9              discussion was held.)
10                          -  -  -
11                      COURT CRIER:  Okay.  Now, 14 is what?
12                      THE COURT:  Okay.  What else?
13                      COURT CRIER:  Which one's 14?
14                      THE COURT:  P-15.
15                      COURT CRIER:  No.  Fourteen.  Unless
16              you have a copy of P-14.  I know it's an
17              e-mail.
18                      MR. GOMEZ:  I have 14.
19                      COURT CRIER:  Thank you.
20                      Your Honor, P-14 is an e-mail from
21              Olga Mitelman on January 28, 2003.
22                      THE COURT:  All right.  May I see
23              that?  Let's not make this too complicated.
24                      Okay.  P-14 is January 28, 2003.  And
25              that was at Tab 25, right?
```

```
 1                    COURT CRIER:  Right.
 2                    THE COURT:  Okay.  Let's move on.
 3                    COURT CRIER:  P-15, I think, is
 4          another e-mail.
 5                    MR. MURPHY:  No, it's not.  It's a
 6          letter.
 7                    COURT CRIER:  Can I have it?
 8                    THE COURT:  All right.  P-16 was
 9          something having to do with some kind of
10          conduct disorder.  Yes.  Okay.  Fine.
11                    P-16 was a Janssen -- some kind of --
12          where the conduct disorder first came to
13          play.
14                    P-17.
15                    MS. SIPALA:  Interim analysis.
16                    THE COURT:  That was an interim
17          report, right?
18                    MS. SIPALA:  Correct, yes.
19                    THE COURT:  Okay.  P-17 is an interim
20          report.
21                    COURT CRIER:  P-18 was what the
22          doctor was reading.
23                    THE COURT:  P-18.
24                    COURT CRIER:  He was reading a
25          definition from --
```

```
 1                    THE COURT:  P-18 was 704, ended in

 2          704.

 3                    Okay.  Do we have it?

 4                    COURT CRIER:  Yes.

 5                    THE COURT:  P-19 was a Topline

 6          report.

 7                    COURT CRIER:  I have that.

 8                    THE COURT:  Okay.

 9                    COURT CRIER:  P-20 was another study.

10                    THE COURT:  What was P-20?

11                    MR. GOMEZ:  Final report.

12                    MR. MURPHY:  Final report.

13                    COURT CRIER:  Is it in the binder?

14                    MS. SIPALA:  Yes.

15                    MR. GOMEZ:  I think it would be Tab

16          11.

17                    THE COURT:  Okay.  The report, that's

18          a report dated May 15th of 2002.  And also of

19          the same study RIS-INT-41.

20                    MR. GOMEZ:  Your Honor, that has a

21          couple of dates on the front page.  The

22          report date, for the record, should be

23          10/25/01, which is right there on the front

24          page.

25                    THE COURT:  10/21?
```

```
1                    MR. GOMEZ:  10/25.

2                    MR. MURPHY:  10/25/01.

3                    THE COURT:  Let me see the document

4         again.  These are things that really should

5         be spelled out on the record and done.  They

6         shouldn't be done this way.  I don't want it

7         done this way.

8                    10/25/01, okay.  Report date,

9         10/25/01, okay.

10                    COURT CRIER:  And P-21 is Mr. Kline's

11        handwritten --

12                    THE COURT:  All right.  And P-21 is

13        the document that Mr. Kline has filled out.

14        And that was the final results, final results

15        of this particular study.

16                    Okay.  That covers today.

17                    MR. GOMEZ:  One more, Your Honor.

18                    THE COURT:  We'll work on tomorrow

19        tomorrow.

20                    MR. GOMEZ:  One more, Your Honor.

21        There's -- on the front of P-21 there's

22        something else Mr. Kline wrote.  We would

23        mark it as P-22.

24                    MR. KLINE:  It's a developing

25        document, but --
```

```
 1                    THE COURT:  Is that going to be used
 2         tomorrow perhaps, developing document?
 3                    MR. KLINE:  Yes.
 4                    THE COURT:  Okay.
 5                    I'm hoping that -- the reason that we
 6         are going to have to be meticulous about it
 7         is because there have been objections on the
 8         record about this stuff, and I really would
 9         rather not have to be interrupted by these
10         kind of objections when they really are
11         related to identification, particularly of
12         documents.
13                    Anything else?
14                    MR. KLINE:  Yes.  I would just --
15                    THE COURT:  You know, again, I'm with
16         you as far as I have the documents, but at
17         the end, I did get a couple of objections,
18         and it's just too confusing for us to go back
19         and forth.
20                    MR. KLINE:  Now that I know we have
21         to have a P number, I'll put a P number on
22         everything and we'll be good.
23                    THE COURT:  Just put a P number on it
24         so we can identify it and I'm sure we can
25         work it out with ease.
```

1            MR. KLINE:  Thank you.

2            COURT CRIER:  Your Honor, we were

3       going to mark Dr. Kessler's CV.

4            MR. GOMEZ:  As 5.

5            COURT CRIER:  As P-5.

6            Can I have it?

7            MS. SULLIVAN:  These aren't -- that's

8       just for identification.

9            MR. MURPHY:  He's not moving them.

10      It's just for identification.

11           COURT CRIER:  We mark everything.

12           MR. MURPHY:  I understand.  He's

13      identifying it.  He's not moving it in.

14           THE COURT:  Well, in this courtroom

15      all documents referred to are part of the

16      evidence.  And, you know, we don't send out

17      anything without anybody agreeing or a court

18      order.  But, frankly, everything that has

19      been identified and marked gets a number.

20           MS. SULLIVAN:  But, Your Honor,

21      things like the expert report, that doesn't

22      go back into evidence.

23           THE COURT:  The expert report also is

24      going to get a number.  It was referred to

25      and it gets a number.  These are all matters

1          for potential review.  I don't want to have

2          to dig out some expert report out of a box

3          somewhere in the event that it ever becomes

4          an issue, such as testimony that's beyond the

5          scope of an expert report.

6                    MS. SULLIVAN:  No.  Your Honor, I

7          don't have any problem marking it for

8          identification.  I was just -- it doesn't go

9          back --

10                    THE COURT:  That's what they are.

11          And then ultimately what we're going to do is

12          we're going to have a final tabulation at the

13          end of the case of what has been formally

14          admitted and what is not.  But everything

15          that's been referred to gets marked in my

16          courtroom.

17                    MS. SULLIVAN:  Understood, Your

18          Honor.

19                    COURT CRIER:  So, Your Honor, P-5 is

20          Dr. Kessler's CV.

21                    THE COURT:  Which one?

22                    COURT CRIER:  P-5.

23                    THE COURT:  Is the CV.  All right.

24          We have it.

25                    COURT CRIER:  P-6 is the expert

```
 1              report of Dr. Kessler.
 2                     And P-7 is the supplement to the
 3              expert report of Dr. Kessler.
 4                     THE COURT:  Okay.
 5                     COURT CRIER:  Now, I don't have
 6              anything on Dr. Mathisen yet, but --
 7                     THE COURT:  That's it for today,
 8              correct?
 9                     COURT CRIER:  For today.
10                     MR. KLINE:  May I ask a point of
11              information so that I know, Your Honor?
12                     THE COURT:  Yes, sir.
13                     MR. KLINE:  Just so I understand how
14              the defense are going to mark their exhibits,
15              are they going to mark them sequentially like
16              us, or are they going to use the premarked --
17              some premarked number that they already have
18              put on them?
19                     THE COURT:  Well, I haven't seen
20              the -- I've heard that the defense has a
21              system.  I would prefer now that we're doing
22              it this way, that it's also in order of
23              presentation; no?
24                     COURT CRIER:  Well, they have a
25              premarked list that they've provided.
```

1              MS. SULLIVAN:  Your Honor, there was
2        an order to exchange a trial exhibit list and
3        we filed it and marked our exhibits.
4              THE COURT:  No.  As long as you're
5        referring to a particular document that we
6        can then mark in our sheets in order, from
7        the top to bottom, like, in other words, if
8        their first document is going to be their
9        Number Exhibit 8, then our first entry will
10       be Exhibit 8.
11             I just want our chronological order
12       to be easy to follow, you know.  I don't care
13       what the number is, as long as
14       chronologically as it's presented here it's
15       in order for us.
16             COURT CRIER:  I got it.
17             MR. KLINE:  If I may ask a point of
18       clarification, maybe I'm dense and maybe it's
19       late in the day, but I don't understand.
20             Are they -- we're going to be
21       marking -- I came here under a different set
22       of assumptions, maybe wrongly, maybe wrong
23       assumptions, which had to do with the fact
24       that for years now I've just been putting
25       exhibits up with Bates numbers, take all the

```
 1            Bates numbers and hand them to the court
 2            reporter.
 3                     THE COURT:  Yeah.  But you haven't
 4            faced Ms. Sullivan recently, I don't think.
 5                     MR. KLINE:  No; that's okay.
 6                     THE COURT:  And she is very, very
 7            expert in --
 8                     MR. KLINE:  She does everything her
 9            way.  Yes.  Oh, yes.  Oh, yeah.
10                     MS. SULLIVAN:  Well, Your Honor --
11                     THE COURT:  So I just don't want to
12            get caught up with --
13                     MS. SULLIVAN:  -- all I just asked
14            for was just have exhibit numbers on your
15            documents.
16                     MR. KLINE:  I have a point of
17            inquiry, only a point of inquiry.  I don't
18            have a point of argument.  I just a point of
19            inquiry.
20                     My point of inquiry is -- my point of
21            inquiry is as follows:  Are they going to be
22            marking their documents sequentially?
23                     So I'm now starting 1, 2, 3, 4, 5.
24            Every time I'm going to mark a document it's
25            going to be the next number sequentially in
```

```
1          the sequence of numbers from 1 to when I run

2          out.

3                    COURT CRIER:  Right.  Because I

4          didn't have a list.

5                    MR. KLINE:  Now are they -- just a

6          point of inquiry -- they have a premarked

7          list.  By the way, part of their premarked

8          list, it won't surprise you, makes it nearly

9          impossible to deal with the documents because

10         they've marked, for example, some of their

11         exhibits have 2,000 pages in it within the

12         exhibit.

13                    Now, what I'm trying to figure out,

14         frankly, is how I manage the -- I got a laugh

15         over there -- what I'm trying to figure out

16         is how I manage it when they go to work,

17         flying documents around, and she's saying in

18         the middle of the jury, "You have that

19         document, Mr. Kline."

20                    MS. SULLIVAN:  No.  We'll give you

21         copies.

22                    MR. KLINE:  Now that's -- now

23         that's --

24                    MR. MURPHY:  May I answer?

25                    THE COURT:  Well, let me hear him.
```

```
 1              MR. KLINE:  If I can be heard.  I sat
 2         still for a half an hour.
 3              What I would like to know, and I
 4         would assume Marianne would like to know, now
 5         that we have a system, which is the
 6         old-fashioned way, which is a great system,
 7         and it's going to work for everybody, I would
 8         just like to know when they start out are
 9         they going to have Exhibit 1, Exhibit 2,
10         Exhibit 3 like we have and mark them
11         sequentially in order, giving them
12         essentially a courtroom trial number, rather
13         than some premarked number?  It's a point of
14         inquiry.
15              THE COURT:  Well, does it make a
16         difference to you?
17              MR. KLINE:  It makes a difference to
18         me.
19              THE COURT:  Okay.
20              MR. KLINE:  It makes a difference to
21         me.  I think it would be -- I think we should
22         follow the same system on two sides which
23         is -- which is to have sequential numbers of
24         documents referring to things and --
25              THE COURT:  Fine.  That's my
```

 1        preference.
 2              MR. KLINE:  And, by the way, what
 3        we've done, we may not have done it perfect
 4        today, but what we did was we came with a
 5        witness with a book of documents, gave them
 6        to the other side, gave them to the Court.
 7        It might not have been perfect the way we
 8        marked them, but the one thing we have was
 9        the documents lined up.  And, by the way, for
10        them, now they have them for another day
11        ahead of the witness.  And I, by the way --
12              THE COURT:  Well, I personally -- I
13        don't really care, you know.  From my point
14        of view, I was comfortable and am comfortable
15        with the system that the defense had or that
16        the plaintiff had which is the different
17        numbers.  But, frankly, because we started
18        getting objections and I needed to be clear
19        on the record.  So if it makes it -- is it
20        too difficult to re -- to call your -- like
21        he has been forced to do?
22              You have Exhibit 1.  He's been forced
23        to do the same thing, which is, you know,
24        Number 00059 has become Plaintiff's Exhibit
25        5.

1              MR. MURPHY:  The issue, Your Honor,

2      is that we started out with an exhibit list

3      like Your Honor is familiar with.  Both

4      parties submit an exhibit list going from 1

5      to whatever.

6              THE COURT:  No, I didn't get an

7      exhibit list from the plaintiff.

8              MR. MURPHY:  But what I'm saying is

9      that's what we submitted to the Court.

10              THE COURT:  I know.  I realize that.

11              MR. MURPHY:  And that's what we did.

12              THE COURT:  I understand that.  We

13      did not get an exhibit list of that nature

14      from the plaintiff, so we're now ad hoc'ing.

15              MR. MURPHY:  And every document that

16      we have has a D exhibit number.  But we will

17      provide them whatever document we use.  They

18      will have a copy.  You will have a copy.

19      There will be one provided to the witness.

20              MR. KLINE:  Fine.  That's --

21              THE COURT:  You know what, I'm going

22      to ask for a favor.  If we're going to do it

23      that way, then we go D-1, D-2, D-3, just like

24      he's been forced to do, which is to have

25      your -- where is that document?

 1              MR. MURPHY:  He hasn't been forced --
 2       Your Honor, with all due respect, he hasn't
 3       been forced to do it.  They deviated from the
 4       standardized way of giving exhibits.  That's
 5       the reason we find ourselves here.
 6              MR. KLINE:  That's not true either.
 7              THE COURT:  I've been talking for a
 8       long time about setting up a protocol for
 9       this court, which I haven't done.  So I can
10       understand the question.
11              The defense exhibit list, I don't
12       think, is that complicated, counsel, to --
13       you have Exhibit 1.  Like let's say tomorrow,
14       your first exhibit here is going to be
15       Children's Hospital for Mathisen bill, tab
16       what you marked as Exhibit 6.  What is so
17       difficult to mark that for us as D-1 and you
18       refer to it as Exhibit 6?  So I have it the
19       same way in my notes.  And what's so tough
20       about doing it that way?
21              MR. MURPHY:  There's nothing tough
22       about it.  But what it requires is for me to
23       say it is actually marked, the marking on
24       it --
25              THE COURT:  Absolutely, just like

```
 1              he's been doing all day.
 2                   MR. MURPHY:  The marking on the
 3              document is D-674.1.  We're going to now call
 4              it D-1.  That's what you would like us to do.
 5                   THE COURT:  I think so.
 6                   MR. MURPHY:  Okay.  Fine.  We're
 7              clear.
 8                   THE COURT:  So you'll call it as --
 9              for us now D-1, and just like he's been asked
10              to do, you know, he's indulged me on this at
11              this point and then he referred to -- he's
12              referring to these document numbers on a tab
13              and then he's been referring to the JJRIS
14              number, all are similar in identifications.
15                   All I'm asking to do is D-1, if you
16              have Exhibit 6 is D-1, we already know what
17              Exhibit 6 is, and Marianne is happy and she
18              can write down the description.
19                   MR. MURPHY:  I understand.  But I
20              just want to be clear, we did it the right
21              way from the beginning.
22                   THE COURT:  Absolutely.  You did it
23              the right way.
24                   MR. MURPHY:  Yes.  Thank you very
25              much.
```

1          THE COURT:  Okay.  But the right way

2     is going to be modified to conform to our own

3     system of numbers.

4          COURT CRIER:  We have 12 exhibits

5     from Dr. Mathisen, defense exhibits.

6          THE COURT:  Well, I'm going to worry

7     about Dr. Mathisen's exhibits tomorrow.  It's

8     5 o'clock.

9          COURT CRIER:  Okay.

10         MR. MURPHY:  Thank you, Your Honor.

11         THE COURT:  All right.  Thank you.

12         Mr. Gomez, I'm asking that your team

13    kind of put this in order for us so we don't

14    have these kind of issues going forward.

15         MR. GOMEZ:  It will be done, Your

16    Honor.

17         MR. KLINE:  All you're really saying

18    is put P numbers on them rather than by the

19    way --

20         THE COURT:  Right.  Right.  Because

21    otherwise --

22         MR. KLINE:  We actually don't know

23    the P number until we're about to use the

24    exhibit.

25         THE COURT:  That's right.  I think

1          that -- I understand that from this bar, the

2          mass tort bar, it slows you down.  But the

3          fact of the matter is that you're dealing

4          with a jury that is not as educated as any of

5          us most likely, and so therefore, we need to

6          slow it down so that they are following what

7          is up there.  Because some of these

8          documents, you just put out there and they

9          don't even know what it is.

10                    So if we slow it down and we get the

11          documents in and we explain what they are and

12          who's written them and what they're from and

13          we slow it down, it will be very helpful, I

14          think, overall for the jury's sake not to be

15          confused.

16                    MR. KLINE:  I will do that tomorrow.

17          I was trying to go too fast.

18                    THE COURT:  No.  We're not in that

19          kind of hurry.

20                    Let's just get it, you know.

21                    COURT CRIER:  If I could get the

22          copies.

23                    MR. KLINE:  Okay.

24                    THE COURT:  No hurry.  All right.

25                    MR. KLINE:  That's good to know.

1                Thank you.

2                THE COURT:  Okay.  Thank you.

3                MR. GOMEZ:  Thank you, Your Honor.

4                MR. MURPHY:  Thank you, Your Honor.

5                     -   -   -

6                (Court adjourned at 5 o'clock p.m.)

7                     -   -   -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T I O N

2

3              I hereby certify that the proceedings

4       and evidence are contained fully and

5       accurately in the notes taken by me on the

6       trial of the above cause, and that this copy

7       is a correct transcript of the same.

8              I further certify that I am not a

9       relative or employee of any attorney or

10       counsel employed in this case.

11

12

13

14       _____

15       John J. Kurz, RMR, CRR
        Registered Merit Reporter
16       Certified Realtime Reporter
        Official Court Reporter
17

18

19              (The foregoing Certification of this

20       transcript does not apply to any reproduction

21       of the same by any means unless under the

22       direct control and/or supervision of the

23       certifying reporter.)

24

25

Case 2:14-md-02592-EEF-MBN Document 5599-9 Filed 03/02/17 Page 145 of 160
(Jury Trial - Afternoon) - Vol. III - January 28, 2015
Pledger v. Janssen, et al.

**[**

**[reading] (1)**
51:15
**[sic] (4)**
23:23;53:16;115:6,
7

**A**

**abbreviates (1)**
51:19
**abbreviation (1)**
68:3
**abbreviations (2)**
51:22;68:2
**Abilify (4)**
25:7,23;52:7,9
**able (5)**
21:7,7;65:16;
112:2;116:12
**above (2)**
112:5;143:6
**absence (1)**
91:22
**Absolutely (3)**
55:16;138:25;
139:22
**abstract (2)**
74:10,11
**accurate (1)**
25:11
**accurately (1)**
9:24;143:5
**acronym (2)**
68:16;81:7
**across (1)**
111:10
**actual (4)**
17:19;38:4;62:14;
124:2
**actually (12)**
13:9;33:20;36:15;
39:1;81:8;108:10;
111:14,15,16;113:15;
138:23;140:22
**ad (1)**
137:14
**add (5)**
15:10;20:21;56:25;
60:8;61:6
**added (3)**
24:19;26:1;110:1
**adding (1)**
61:4
**additional (5)**
24:20,21;30:17;
40:7;119:13
**address (4)**
7:7;22:6;23:8;
33:18
**addressed (1)**

**32:23**
**addressing (1)**
121:7
**adequate (2)**
60:10,22
**adjourn (7)**
98:3;99:2;100:4;
101:2;102:2;115:18,
25
**adjourned (1)**
142:6
**adjourning (1)**
99:10
**adjusted (1)**
80:14
**administration (2)**
23:25;24:14
**admissibility (3)**
15:14;42:20;43:5
**admissible (2)**
42:15,20
**admitted (1)**
130:14
**adolescents (7)**
12:1;14:10;15:2;
31:8,14,17;59:15
**adults (4)**
30:21;54:18;56:15;
60:13
**adverse (20)**
53:13,16;78:6;
80:3;81:2,4,15,18;
87:16;88:21;89:3,6;
92:15;107:2,5,11;
109:12,16;110:7,14
**AE (1)**
53:18
**Affairs/Pharmacovigilance (1)**
104:17
**affect (1)**
55:19
**Africa (1)**
77:20
**afternoon (5)**
8:12,18,19;9:1,2
**again (30)**
26:5,14,22;27:2;
31:19;41:8;42:6,19;
43:8,14;44:21,23;
46:25;51:6;53:19;
57:11,25;61:18;
70:15;73:21;74:13;
77:8;78:8;79:1;
89:24;104:2;114:7;
116:2;127:4;128:15
**age (6)**
75:16,19,22;
110:10;112:10,13
**aged (1)**
95:2
**agency (1)**
59:12
**agents (6)**

**24:25;25:2,25;**
**29:22;45:9;55:22**
**ages (1)**
74:3
**aggression (1)**
67:1
**agree (5)**
9:22;15:14;19:13;
38:12;100:15
**agreeing (1)**
129:17
**Ah (1)**
104:9
**ahead (14)**
12:9;19:9;21:22;
28:19,24;48:12;
51:14;52:11;64:5;
71:14;73:8;77:9;
79:11;136:11
**allowed (1)**
95:8
**allowing (1)**
54:16
**almost (1)**
97:3
**along (4)**
59:25;91:25;102:7;
116:14
**alternative (1)**
101:8
**although (2)**
18:14;59:10
**always (1)**
72:9
**amenorrhea (2)**
91:20,22
**America (1)**
77:21
**among (1)**
95:21
**analysis (6)**
71:21;74:5;75:7;
77:25;84:14;125:15
**and/or (1)**
143:22
**antagonists (1)**
48:14
**antagonize (3)**
7:2;23:23;24:12
**anti- (1)**
51:20
**antipsychotic (8)**
24:25;25:1,25;
29:22;45:9;53:23;
54:13,17
**antipsychotics (4)**
51:18;52:17;53:24;
54:3
**anymore (1)**
62:17
**AO3299 (1)**
83:3
**apologize (1)**

**76:16**
**appear (1)**
49:3
**applied (1)**
15:1
**apply (1)**
143:20
**approach (1)**
70:7
**appropriately (2)**
55:7;56:24
**approval (2)**
54:18;65:16
**approved (9)**
45:17,18;54:11;
55:3,9;65:10,11,13,
14
**Approximately (2)**
69:23;96:25
**April (1)**
39:5
**apriori (1)**
89:7
**argument (1)**
133:18
**argumentative (1)**
85:17
**ARI (1)**
52:5
**A-R-I (1)**
52:1
**arithmetic (3)**
92:22;95:25;
112:22
**around (4)**
55:25;99:10;102:2;
134:17
**artful (1)**
55:14
**assess (1)**
60:20
**assessed (1)**
74:22
**assessments (1)**
87:15
**associated (12)**
24:23;28:8,11,14;
29:3,4,21;30:10;
45:7;54:19;55:2;
89:12
**assume (4)**
84:22;85:4;99:2;
135:4
**assuming (2)**
94:4;103:6
**assumptions (2)**
132:22,23
**attached (3)**
18:8,10,13
**attention (14)**
8:25;11:7;24:5;
45:14;68:22,25;69:1,
6;70:3;78:11;97:22;

**107:5,10;117:16**
**attorney (2)**
115:23;143:9
**attorneys (3)**
91:10;98:5;119:8
**audit (1)**
68:9
**August (6)**
55:25;56:23;57:16;
93:8;94:18;97:3
**author (1)**
103:20
**authorities (1)**
75:5
**authors (2)**
84:21;103:22
**autism (3)**
29:2,2,4
**autistic (2)**
14:10;28:9
**available (3)**
15:16;87:22;88:3;
123:19
**aware (3)**
46:4;59:9,14

**B**

**back (32)**
7:10;12:9,10;19:6,
8;22:5;23:6,13;26:7;
29:16;44:10;45:4,17;
46:16;54:6;61:11;
70:17;76:8;84:10,11;
87:20;88:22;104:1;
110:4;112:23;113:8;
118:24;120:6;123:1;
128:18;129:22;130:9
**background (2)**
35:23;51:16
**backing (1)**
41:20
**badges (1)**
116:2
**bar (2)**
141:1,2
**base (1)**
61:16
**basically (2)**
60:8;61:3
**basics (2)**
84:1,11
**basis (3)**
38:13;39:20;42:13
**Bates (34)**
9:3,15;11:9;12:14;
13:19;16:16,22;
25:15;35:11;41:7;
43:12;44:5;50:5;
57:12;62:21;63:16;
72:5;77:9;78:16,16,
23;90:21;93:14;94:9;
102:22;103:7;

Case 2:14-md-02592-EEF-MBN Document 5599-9 Filed 03/02/17 Page 146 of 160
(Jury Trial - Afternoon) - Vol. III - January 28, 2015
Pledger v. Janssen, et al.

105:13;107:16,17;
120:15;122:6;123:3;
132:25;133:1
**became (4)**
20:18,19;55:7;65:9
**become (4)**
67:17;68:1;76:22;
136:24
**becomes (3)**
11:2;100:14;130:3
**beginning (3)**
27:19;102:22;
139:21
**begins (1)**
59:10
**behavior (2)**
68:15;75:1
**behind (2)**
62:23;63:6
**Belgium (1)**
77:18
**believes (1)**
67:1
**benefit (2)**
93:12;102:17
**better (8)**
10:13;68:8;97:4,6;
114:15,19,21;116:11
**beyond (2)**
28:17;130:4
**big (3)**
21:20;60:2,4
**bigger (1)**
51:11
**bill (1)**
138:15
**binder (2)**
40:3;126:13
**Biometrics (1)**
104:13
**bipolar (1)**
55:1
**bit (6)**
28:5;34:20;51:8,
15;70:6;75:12
**black (1)**
73:15
**blackboard (1)**
70:7
**blind (2)**
56:17;74:17
**blue (2)**
58:5;63:7
**board (1)**
93:24
**bogged (1)**
86:9
**book (12)**
16:17,19;43:8;
57:11;58:3,13;62:24;
93:13;105:12;
107:19,23;136:5
**borderline (3)**

74:2,23;95:1
**both (19)**
30:8,9,12;35:9;
40:9,15,15,19,22,24;
41:1,15;55:19;73:23;
74:16;95:24;97:20;
113:19;137:3
**bottle (2)**
37:22;39:4
**bottom (11)**
10:22;13:22,23;
64:17;67:11,11;
78:22,23;79:15,16;
132:7
**box (3)**
73:15;83:3;130:2
**boy (4)**
111:5,6,11;112:6
**boys (10)**
92:14,22;93:1;
96:8,15,21,23;
109:11,19,20
**brain (1)**
55:16
**brains (1)**
55:18
**brand (4)**
52:2,4,5,6
**break (7)**
32:5;92:8,21;98:6;
100:23,25;110:3
**breast (3)**
77:4,6;80:13
**breasts (4)**
111:16,16,19,21
**briefly (6)**
26:4;28:12;40:1;
46:3;54:15;55:10;
77:8,9
**bring (2)**
6:9;8:25
**broad (2)**
65:24;67:12
**brought (1)**
21:22
**bullet (2)**
64:19,20;66:8,25
**bullets (1)**
66:6

**C**

**calculate (1)**
96:19
**calculation (1)**
109:18
**call (7)**
11:6;51:5;52:22;
80:24;136:20;139:3,
8
**called (10)**
9:18;13:21;51:11;
64:17;66:19;71:21;

88:8,20;93:24;96:9
**calls (1)**
46:25
**came (5)**
20:1;88:5;125:12;
132:21;136:4
**can (99)**
6:5;7:10;10:7;
11:14,17;13:20;
14:12;15:4,15;18:3,
19,19;22:5;24:5;
25:11;26:4,23,24;
28:2;29:16,23,24;
38:21;39:17,22;
42:19;45:17,25;
46:11,16;47:6,13;
48:8,9,17;49:13;
51:21;52:23;53:2;
54:9,14;55:2,18,24;
57:5;62:11;64:7;
66:5,17;68:3,9,19;
70:15;72:9;73:7;
75:11;77:3,8;79:15;
82:18;83:6;84:9,10,
11;87:11;89:14;90:9;
91:6;92:12,24;94:10;
96:2;102:9,11;
103:14;104:2,11;
105:17;106:19,25;
110:2,4,25;111:10;
112:22;116:5;118:9;
119:1;120:8,25;
123:6;125:7;128:24,
24;129:6;132:6;
135:1;138:9;139:18
**CAN-19 (1)**
68:4
**CAN-20 (1)**
68:4
**Canada (1)**
68:4
**Canadian (1)**
68:7
**capacities (1)**
47:8
**care (4)**
43:16;90:11;
132:12;136:13
**carried (1)**
75:7
**carry (1)**
87:14
**case (16)**
10:25;19:25;20:16;
27:6,19;36:10;38:11;
80:10;115:22;
116:16,17,22;117:17;
119:24;130:13;
143:10
**cases (2)**
80:3,5
**catch (2)**
9:7;49:16

**categorized (2)**
112:18;114:3
**category (4)**
19:12;40:25;41:5;
65:24
**caught (2)**
100:8;133:12
**causally (2)**
89:7,8
**cause (2)**
124:4;143:6
**caused (1)**
33:15
**causes (3)**
29:1;48:23;49:1
**caveat (1)**
74:5
**cc (1)**
40:24
**certain (7)**
17:18;37:22;56:7;
60:14;68:2,25;
110:14
**certainly (7)**
35:23;56:11;77:4;
88:2;110:15;111:20;
115:16
**Certification (1)**
143:19
**Certified (1)**
143:16
**certify (2)**
143:3,8
**certifying (1)**
143:23
**chance (1)**
38:22
**change (3)**
35:13;40:18;51:1
**changes (2)**
35:14;38:6
**characterization (1)**
114:8
**characterize (1)**
59:13
**chart (9)**
6:20;80:17,20;
88:6;109:22;110:2,
16;118:13;120:1
**check (1)**
103:22
**chemical (2)**
52:7;66:22
**child (3)**
100:18;101:8;
110:9
**child-care (2)**
98:24;100:8
**child-care-type (1)**
7:1
**children (29)**
12:1;13:15;14:10;
31:8,14,17,23;56:4,6;

59:15,20;60:13,17,
20;61:8,12;65:19,23;
74:3,3,23;75:19;
88:19;92:10;95:2;
96:16,17;112:9;
116:7
**Children's (1)**
138:15
**chronic (2)**
23:25;24:14
**chronological (1)**
132:11
**chronologically (1)**
132:14
**chronology (2)**
41:16;61:19
**chunks (1)**
54:9
**clamoring (1)**
72:6
**clarification (2)**
30:25;132:18
**classified (1)**
89:7
**clean (1)**
119:12
**clear (11)**
29:15;37:13;39:6;
47:6;67:6;87:3,7;
114:17;136:18;
139:7,20
**clearly (1)**
36:19
**clinical (19)**
14:9;49:19;72:16,
18;87:12,15,18;88:2;
97:15,18;104:10,13,
14,15,16,19,20,24,25
**close (5)**
69:18;73:22;77:16;
102:8;118:7
**closer (1)**
10:10
**clozapine (1)**
25:21
**Clozaril (1)**
25:19
**clue (1)**
72:19
**College (1)**
116:8
**column (4)**
11:8;13:22,23;96:3
**comers (1)**
96:9
**comfortable (3)**
120:9;136:14,14
**coming (3)**
29:24;65:20;83:19
**commentary (1)**
48:4
**Commissioner (2)**
47:7;56:11

Case 2:14-md-02592-EEF-MBN   Document 5599-9   Filed 03/02/17   Page 147 of 160
(Jury Trial - Afternoon) - Vol. III - January 28, 2015
Pledger v. Janssen, et al.

common (1)
53:11
commotion (1)
33:16
Community (1)
116:8
companies (2)
25:3;56:19
company (10)
9:21;10:25;17:22;
31:7;36:14,18;65:25;
68:9;81:25;97:17
comparable (1)
24:5
comparably (2)
52:18;54:4
comparative (3)
15:21;29:16;45:4
comparatively (1)
26:6
compared (3)
46:15;48:22;49:1
comparison (1)
14:17
competitors (2)
48:22;49:1
complete (1)
15:16
completely (3)
36:16;60:23,24
completeness (1)
52:24
complicated (1)
124:23;138:12
complied (3)
45:12;94:13;113:7
complies (4)
73:17;95:13;
103:16;111:2
concept (2)
66:10,20
concern (2)
6:25;77:7
concerned (2)
99:1;115:22
concerning (1)
110:13
conclude (1)
37:21
concluded (2)
23:1;97:21
conclusion (2)
27:23;119:24
Conduct (23)
63:22;64:12,18;
65:17,22;66:1,7,9,10,
13,19,25;67:1,15;
68:12,14,16;73:25;
75:1;87:14;94:25;
125:10,12
conducting (1)
86:22
conferring (1)

91:7
confines (1)
23:20
conform (1)
140:2
confused (3)
85:25;86:10;
141:15
confusing (1)
128:18
consider (2)
53:21;54:1
considered (4)
54:5;80:5,7,13
consistency (1)
41:17
contact (1)
62:3
contain (1)
59:10
contained (3)
30:1;49:21;143:4
contains (1)
93:14
contemporaneously (1)
118:15
content (1)
47:10
context (3)
51:10;76:11;83:7
continue (6)
44:23;52:14,20;
53:2;91:25;101:23
Continued (1)
8:22
Continuing (1)
102:7
continuously (1)
9:8
contracted (1)
87:13
control (3)
86:4,5;143:22
convenience (6)
16:19;41:9;43:9;
57:12;62:23;71:18
convenient (1)
14:19
conversation (1)
34:15
copied (2)
15:5;108:13
copies (10)
26:25;91:10;
105:23;106:7,16;
108:22;121:25;
122:18;134:21;
141:22
copy (17)
9:10;15:4,7;26:23,
24;34:5,11;91:6,12;
106:18;108:19;
122:25;123:9;

124:16;137:18,18;
143:6
copying (1)
107:25
copyright (2)
13:9,11
core (4)
28:15,25;29:1,2
corner (2)
10:22;13:8
corporation (1)
13:12
correctly (1)
75:9
correlate (1)
53:13
Cory (5)
64:20;95:11;111:1,
10;112:2
counsel (18)
10:19;16:17;18:23;
26:22;58:12;63:12;
71:2,24;91:7,9;94:4;
105:14;106:7;
107:24;108:17;
123:18;138:12;
143:10
count (2)
113:15,19
counted (1)
35:13
countries (2)
77:15,16
country (1)
68:10
couple (5)
77:9;105:8;112:7;
126:21;128:17
course (9)
11:25;35:4;43:4;
50:25;53:1,1;84:4;
102:10;109:2
court (342)
6:2,5,11,21,25;
7:13,17,20;8:2,9,11,
19;9:9,11;10:5;
12:23;15:13,23,25;
17:6,11,25;18:16,24,
25;19:5,8,13,16,20;
21:17,19,21;22:5,14,
18,24;23:4,6;25:12,
17;26:14,18,21,25;
27:5,9;28:18,23;
31:18;32:4,9,16,20;
33:2,10,15,17;34:2,9;
36:2;37:1,12,23;38:2,
10,14,20;39:8,13,17;
40:10,20;41:3,6,10,
13,19,24;42:3,9;43:1,
13,16,23;44:1,6,9,11,
18,21;49:6;51:21,25;
52:9,11,25;57:25;

58:8,18,24;61:25;
62:11,17,25;63:4,8,
11,15,18,23;64:1,4,
10,12,15;70:8,11,12;
71:2,8,11,22;72:2,8;
73:1,3,6,18;76:5,8;
79:1,6,11;82:5,20,25;
83:6,13,17,23;84:2,5;
85:21,24;86:7,15,24;
90:6,10,16,23,25;
91:1,8;92:1,7;93:16;
94:5;95:10;98:1,8,15,
17;99:7,9,12,17,18;
100:4,25;101:5,12,
19,21;102:18,20;
103:6,9,12,13;
105:19,22;106:3,15,
19,23;107:21;108:2,
6,8,19,23;109:3;
114:13,21;115:13,17;
117:20;118:2,4,5,7,
13,16,19,20,22,23;
119:5,14,23;120:3,6,
17,19,22,24,25;
121:7,9,12,13,14,16,
20,24;122:2,5,7,8,10,
12,16,19,25;123:2,6,
9,11,12,17,24;
124:11,12,13,14,15,
19,22;125:1,2,3,7,8,
16,19,21,23,24;
126:1,4,5,7,8,9,10,13,
17,25;127:3,10,12,
18;128:1,4,15,23;
129:2,5,11,14,17,23;
130:10,19,21,22,23,
25;131:4,5,7,9,12,19,
24;132:4,16;133:1,3,
6,11;134:3,25;
135:15,19,25;136:6,
12;137:6,9,10,12,21;
138:7,9,25;139:5,8,
22;140:1,4,6,9,11,20,
25;141:18,21,24;
142:2,6
courtroom (15)
8:6;32:13;33:1;
44:15;98:12;101:13,
16;116:21;117:1,10,
24;119:10;129:14;
130:16;135:12
Court's (5)
10:18;12:20;62:22;
102:17;119:11
cover (1)
103:7
covers (1)
127:16
create (2)
56:18;88:6
created (1)
57:1

CRIER (56)
8:2;32:9;44:11;
63:8;90:25;93:16;
98:8;101:12;103:13;
117:20;118:19,22;
120:17,22,25;121:9,
13,16,20,24;122:2,7,
10,16;123:2,6,9,11;
124:11,13,15,19;
125:1,3,7,21,24;
126:4,7,9,13;127:10;
129:2,5,11;130:19,
22,25;131:5,9,24;
132:16;134:3;140:4,
9;141:21
cross (1)
7:15
cross-examination (5)
22:15;37:13;38:23;
99:3;124:3
cross-examined (1)
39:22
CRR (1)
143:15
cued (1)
62:7
customary (1)
87:23
cut-off (1)
75:21
CV (3)
129:3;130:20,23
Czech (1)
77:18

**D**

D-1 (6)
137:23;138:17;
139:4,9,15,16
D2 (1)
24:12
D-2 (1)
137:23
D-3 (1)
137:23
D-674.1 (1)
139:3
data (7)
59:11;60:22;61:3,
14;70:24;75:5;114:2
date (9)
9:16;11:2;37:15;
46:11;78:7;88:15;
94:21;126:22;127:8
dated (8)
42:11;49:22;57:16;
72:23;94:18;103:2;
120:16;126:18
dates (3)
25:19;38:5;126:21
day (7)
10:23;98:6;110:4;

Case 2:14-md-02592-EEF-MBN   Document 5599-9   Filed 03/02/17   Page 148 of 160

(Jury Trial - Afternoon) - Vol. III - January 28, 2015
Pledger v. Janssen, et al.

123:21;132:19;
136:10;139:1
**De (1)**
84:22
**dead (1)**
112:25
**deal (2)**
118:20;134:9
**dealing (1)**
141:3
**debated (1)**
66:23
**December (1)**
97:2
**decide (1)**
76:7
**defense (5)**
131:14,20;136:15;
138:11;140:5
**define (2)**
66:18;89:5
**defined (1)**
89:6
**defines (1)**
69:13
**definitely (3)**
89:7,10;91:21
**definition (5)**
11:15;89:23;91:2;
97:14;125:25
**demonstrative (4)**
15:4;26:17;27:3;
121:23
**demonstratives (1)**
28:4
**denied (1)**
60:14
**denominator (4)**
92:20;93:2;96:6;
109:22
**dense (1)**
132:18
**department (2)**
103:24,25
**departments (2)**
104:11,12
**deposition (1)**
42:18
**Derivan (1)**
85:5
**described (3)**
9:25;10:21;42:18
**describing (2)**
15:11;65:2
**description (3)**
61:21;81:14;
139:18
**detail (1)**
97:19
**determine (1)**
88:4
**develop (3)**
53:15,16;91:24

**developed (1)**
60:12
**developing (3)**
118:13;127:24;
128:2
**development (5)**
54:6;77:5;104:7,
16;115:6
**developmental (1)**
68:15
**deviated (1)**
138:3
**diagnosis (1)**
66:10
**difference (3)**
135:16,17,20
**different (18)**
7:5;17:21;23:16;
26:15,16;54:25;57:2;
60:23,24;77:14,15;
79:13;88:1;89:17,21;
113:9;132:21;136:16
**difficult (3)**
123:24;136:20;
138:17
**difficulty (1)**
7:4
**dig (1)**
130:2
**dinner (1)**
123:13
**direct (6)**
7:15;8:14,22;
44:24;81:14;143:22
**directly (1)**
71:17
**disability (1)**
68:15
**disavowing (1)**
114:23
**discontinued (1)**
80:15
**discuss (3)**
115:21;116:16;
119:8
**discussed (4)**
30:17;35:4;42:18,
23
**discussing (2)**
43:11;45:3
**discussion (7)**
7:25;17:8;23:1;
34:18;99:25;121:6;
124:9
**disease (2)**
54:25;65:12
**disorder (28)**
11:10;14:10;55:6,
12;63:22;64:12,18;
65:12,17,22;66:1,7,9,
11,11,13,14,19,25;
67:2,15;68:13,14;
74:1;86:5;94:25;

125:10,12
**Disorders (7)**
11:8;14:11;28:9;
55:1;68:17;75:1;96:4
**display (15)**
10:3;12:21;28:2;
45:25;59:23;61:18;
62:6;64:7,8;72:24;
94:3,8;95:9;103:7;
105:18
**displayed (8)**
13:2;15:21;29:19;
48:11;57:18;59:2;
64:22;77:18
**displaying (1)**
77:18
**Disruptive (2)**
68:15;75:1
**distinguished (1)**
57:3
**division (3)**
84:19;104:7;115:6
**docs (1)**
56:20
**Doctor (13)**
25:12;28:20,23;
51:21;52:23;63:19;
73:10;74:16;83:8;
87:7;115:20;118:9;
125:22
**doctors (3)**
37:11;55:6;65:21
**document (124)**
9:13;10:3;12:14;
13:4;16:15,22,24;
17:11,17;18:5;20:11;
21:10,10;26:23;
29:19;31:20;33:20;
34:5,9,12,19,21,25;
35:2,7,8,11;36:3,6,
10,14;37:4;38:15,21;
39:18;41:5,12;42:4,
17;48:11;49:3,9;
50:5,6,10;57:12,16,
18;58:1,20;59:4,24;
60:18;62:1,2,5,6,14,
21;63:10,14,25;
64:22,24;65:8;71:7,
16,19;72:14;78:15;
79:2,3,7,8;81:17;
83:1,4,17,24;84:6,16,
18;85:25;86:1,17;
87:8;89:19,21;90:2,7,
12,14,17,20;93:11;
94:16;95:4,8,24;
103:5;105:8,11,13;
108:24;109:1;
114:11,13,24;115:3;
120:16;124:2;127:3,
13,25;128:2;132:5,8;
133:24;134:19;
137:15,17,25;139:3,
12

**documents (30)**
7:8;18:3;21:6;
27:17,17,22;31:5,11;
41:1;47:9,15;49:25;
81:6,8;89:4;118:25;
119:22;123:18;
128:12,16;129:15;
133:15,22;134:9,17;
135:24;136:5,9;
141:8,11
**dollars (2)**
31:11,12
**done (16)**
19:10;44:9;67:22;
74:8;94:1;95:25;
103:25,25;105:4;
127:5,6,7;136:3,3;
138:9;140:15
**door (1)**
118:7
**dopamine (4)**
23:23;24:12;48:14;
55:19
**dosage (1)**
80:14
**doses (5)**
48:24;49:2;74:20,
20,21
**doubt (3)**
31:9;55:21;85:13
**down (24)**
28:3;46:15;48:17;
49:13;50:24;51:6;
57:22;60:4;67:12;
74:10;81:21,21;86:9;
112:2,3,7,7;113:6;
118:10;139:18;
141:2,6,10,13
**Dr (40)**
8:14,20;9:1;10:11;
19:24;32:21;35:2,6;
36:12,22;37:18;39:3,
15,21,23;45:3;47:1,
19;51:13;53:21;60:6;
72:17;83:21;87:4;
89:15;102:7;114:9,
17;120:1,3,7,18;
121:10;129:3;
130:20;131:1,3,6;
140:5,7
**draft (1)**
40:7
**dramatically (1)**
36:20
**drop (1)**
112:24
**drug (41)**
12:1;17:2;28:1,6,
13;30:10,13,14;31:7,
13,23;35:3,15;54:10,
13,13,16,17;55:3,7,
15,16;60:8;61:7,11,
20,20,21;65:11,11;

67:13;73:23,25;
74:18;82:2;86:3;
110:9,22,23,25;
113:18
**drugs (6)**
23:23;24:12;25:19;
65:10;104:14,15
**drug's (2)**
35:15;56:14
**druthers (1)**
72:5
**due (2)**
108:24;138:2
**dump (1)**
36:10
**during (5)**
23:25;24:14;42:18;
53:20;100:20

**E**

**earlier (2)**
40:5;106:25
**early (4)**
7:2;31:11;54:23;
67:19
**ease (1)**
128:25
**easel (2)**
6:19;119:21
**easy (1)**
132:12
**edema (2)**
80:10,11
**educated (1)**
141:4
**effect (6)**
11:5;20:1;45:19;
48:14;55:18;109:10
**effective (2)**
11:3;20:19
**effects (3)**
96:10;104:18;
110:18
**efficacy (6)**
57:5;73:22,25;
74:19;75:5;94:25
**efficiency (1)**
50:18
**effort (2)**
117:5,13
**eight (1)**
69:16
**either (9)**
10:10;40:24;52:18;
54:4;89:7;90:13;
105:24;108:23;138:6
**Elementary (1)**
100:19
**elevate (2)**
52:17;54:3
**elevates (4)**
23:24;24:13;51:17;

Case 2:14-md-02592-EEF-MBN   Document 5599-9   Filed 03/02/17   Page 149 of 160
(Jury Trial - Afternoon) - Vol. III - January 28, 2015
Pledger v. Janssen, et al.

53:22
**elevation (7)**
23:25;24:14,24;
29:22;45:8;48:23;
49:2
**elevations (1)**
30:13
**eleven (1)**
79:21
**eliminate (1)**
93:2
**else (8)**
16:10;32:25;39:25;
104:25;120:10;
124:12;127:22;
128:13
**e-mail (21)**
40:10,14,23,23;
42:10;43:21;44:4,5;
45:24;46:7,10,11;
47:10;49:13,22;
122:9,14,16;124:17,
20;125:4
**e-mailer (1)**
40:25
**e-mails (6)**
22:2;40:4,8,20;
47:9;122:11
**emphasis (1)**
28:10
**employed (2)**
84:23;143:10
**employee (2)**
85:5;143:9
**end (6)**
10:23;78:16;
115:16;123:4;
128:17;130:13
**ended (1)**
126:1
**ending (9)**
13:19;35:12;41:12;
43:11;63:17;64:16;
78:24;105:13;107:16
**Endocrine (2)**
11:8,10
**ends (3)**
43:10;46:8;123:8
**enough (1)**
86:24
**entered (3)**
8:5;44:14;101:15
**enters (3)**
8:3;44:12;101:13
**entire (3)**
25:10;53:20;79:3
**entitled (2)**
93:15;115:4
**entries (2)**
86:20,20
**entry (1)**
132:9
**error (5)**

37:3,4,24;38:22;
105:17
**errors (1)**
39:20
**especially (1)**
78:5
**essence (2)**
30:6;77:6
**essentially (2)**
119:16;135:12
**establish (1)**
59:5
**even (8)**
18:8;21:11;36:11,
23;66:10,12;124:4;
141:9
**evening (2)**
117:18;123:13
**event (8)**
53:16;80:3;81:15;
87:16;109:16;110:7,
14;130:3
**events (16)**
11:18,19;15:12;
53:13;78:6;81:3,5,
18;88:21;89:3,6;
92:16;107:2,5,11;
109:13
**everybody (4)**
8:12;10:8;60:3;
135:7
**Everyone (6)**
9:19;98:20;102:11;
117:11,19;119:2
**evidence (12)**
7:6;21:16;36:24;
39:6,9;59:13;60:10;
117:6,8;129:16,22;
143:4
**evidentiary (1)**
118:24
**exact (4)**
14:20,20;24:15;
73:12
**Exactly (24)**
10:1;11:24;20:1;
21:23;31:16;45:21,
23;56:8;60:18;66:1,
3;69:24;75:20;77:14,
22;79:10,12,19;
88:10,17;95:23;
101:2;107:7;112:15
**examination (4)**
7:15;8:22;44:24;
53:20
**examine (3)**
111:16,16,21
**examined (1)**
111:19
**example (3)**
81:20;113:8;
134:10
**exchange (1)**

132:2
**Excuse (4)**
18:24;21:18;
100:15;102:1
**excused (2)**
115:20;118:9
**excusing (2)**
22:3;23:7
**exercised (1)**
18:21;19:3
**Exhibit (60)**
6:19;9:3,5;12:15,
17;13:2;15:22;16:5;
23:21;24:4;27:11;
29:18;33:25;41:22;
43:10,22,24;45:15,
25;46:3;50:4;57:8;
61:17;62:7,20,21;
71:25;84:12;93:13,
20;94:8;105:11;
107:16,20,22;108:22;
120:14;132:2,9,10;
133:14;134:12;
135:9,9,10;136:22,
24;137:2,4,7,13,16;
138:11,13,14,16,18;
139:16,17;140:24
**exhibits (14)**
6:14,22;34:13;
43:15;61:18;123:7;
131:14;132:3,25;
134:11;138:4;140:4,
5,7
**existed (1)**
30:20
**exited (5)**
32:12;33:1;98:11;
117:23;119:10
**exits (3)**
32:10;98:9;117:21
**experience (1)**
35:24
**expert (16)**
17:24;20:2,3,3;
21:5,5;36:8,17;84:3;
129:21,23;130:2,5,
25;131:3;133:7
**expertise (1)**
28:17
**explain (8)**
14:6,13;35:22;
56:9;72:21;83:8;
105:5;141:11
**exposed (1)**
61:14
**expressed (2)**
27:16,19
**extend (1)**
60:12
**extra (2)**
29:17;45:5
**eyes (1)**
77:11

132:2
**faced (1)**
133:4
**fact (22)**
15:19;21:4;30:19;
31:10,10;35:16;
38:16;39:18;48:25;
50:25;52:19;54:1;
60:18;61:11;62:4;
75:24;81:6;84:24;
85:6;120:6;132:23;
141:3
**factor (1)**
98:21
**facts (3)**
38:19;46:16,18
**factual (6)**
37:3,4,23;38:4,22;
39:19
**Fair (8)**
13:13;30:11,15;
49:19;67:22;81:14;
84:3;86:24
**falls (1)**
19:11
**familiar (8)**
16:13;21:8,9;60:1;
68:1;89:1;108:4;
137:3
**family (1)**
116:17
**fancy (1)**
93:25
**far (6)**
38:20;98:23;99:1;
110:19;115:22;
128:16
**fashion (1)**
34:17
**fast (1)**
141:17
**favor (2)**
34:4;137:22
**FDA (34)**
9:21;20:4;35:25;
47:8;54:11;55:3,24;
56:1,3;59:24;60:6,
19;61:13,15,21;62:3,
5;63:25;65:3,4,15;
66:4,8,12,17,17,18,
20,25;67:3,10;68:9;
86:2;105:1
**FDA's (3)**
60:6;61:1;66:3
**February (4)**
9:17;11:4;45:22;
97:2
**feels (1)**
66:18
**female (1)**
96:4

**few (5)**
11:7;69:15;102:1;
105:9;120:7
**fewer (1)**
11:19
**Fifteen (1)**
57:9
**fifth (2)**
59:7,8
**figure (4)**
47:10;99:20;
134:13,15
**filed (1)**
132:3
**filled (1)**
127:13
**filter (1)**
117:9
**filtered (1)**
117:7
**final (14)**
88:8;97:18;102:12,
16,24;103:2;104:22;
107:14;109:24;
126:11,12;127:14,14;
130:12
**finally (1)**
40:17
**finance (1)**
86:2
**find (6)**
38:6;98:4;99:19;
100:11;101:5;138:5
**finding (1)**
16:19
**findings (1)**
71:1
**fine (7)**
7:11;27:7;97:8;
125:10;135:25;
137:20;139:6
**finished (2)**
48:10;99:6
**first (58)**
9:7;12:13;21:14;
33:4,4,18;35:20;
36:11;37:2;46:16;
47:21,22;48:8,8;
49:14,15,17;50:12;
51:6,7,19;52:16;54:1,
3,10;57:15;58:9;
63:5,13;64:13,14;
66:5,8;69:13;72:16;
73:6,14,15;74:11;
82:20;84:10,11;
88:17;94:3,3,10;
103:15;107:4;109:7;
110:5;111:4,5;113:8;
115:4;125:12;132:8,
9;138:14
**first-run (1)**
36:13
**fit (2)**

Case 2:14-md-02592-EEF-MBN   Document 5599-9   Filed 03/02/17   Page 150 of 160
(Jury Trial - Afternoon) - Vol. III - January 28, 2015
Pledger v. Janssen, et al.

**five (9)**
32:7;67:22;68:12;
69:13;80:7;81:21,21;
98:3;110:13
**five-year-old (1)**
112:6
**fix (2)**
36:9;39:16
**flag (2)**
97:23;110:15
**flavor (1)**
111:25
**floor (1)**
19:22
**flying (2)**
56:17;134:17
**focus (6)**
14:14;53:20;75:14;
78:14;94:10;95:12
**focused (1)**
40:6
**folks (1)**
78:3
**follow (3)**
57:23;132:12;
135:22
**following (11)**
6:1;8:8;17:8;23:3;
32:15;44:17;98:14;
101:18;116:4;118:1;
141:6
**follows (1)**
133:21
**forced (5)**
136:21,22;137:24;
138:1,3
**foregoing (1)**
143:19
**forgot (1)**
41:17
**formally (1)**
130:13
**formed (1)**
27:18
**forming (1)**
65:7
**forms (1)**
88:1
**formulas (1)**
7:6
**forth (2)**
12:10;128:19
**forward (5)**
6:15;22:4;23:8;
105:15;140:14
**found (2)**
30:13;93:12
**foundation (10)**
18:2,17;21:9;22:7;
35:10;42:16;77:23;
82:4;84:19;85:15
**foundational (1)**

**43:5**
**Four (5)**
63:9;80:8;81:9,11,
21
**Four-page (1)**
63:10
**Fourteen (1)**
124:15
**fourth (2)**
59:7;66:25
**frame (1)**
54:8
**France (1)**
77:19
**frankly (6)**
27:2;33:16;40:5;
129:18;134:14;
136:17
**frequency (3)**
12:5,7;13:15
**friends (1)**
116:18
**front (14)**
16:20,24;40:16,16;
45:20;72:14,25;
75:25;77:11;92:11;
110:2;126:21,23;
127:21
**frustrating (1)**
85:23
**full (5)**
27:6;51:9,10;53:3;
73:10
**fully (1)**
143:4
**functioning (1)**
74:23
**further (1)**
143:8
**furthest (1)**
102:9

**G**

**Gahan (3)**
42:10;43:21;50:17
**galactorrhea (1)**
14:12
**gave (5)**
60:14;106:7;119:6;
136:5,6
**generally (3)**
25:6;54:19;69:15
**generation (7)**
51:18,20;52:16;
53:23,24;54:2,3
**generic (1)**
52:7
**Geodon (2)**
25:23;52:4
**Germany (1)**
77:19
**gets (4)**

65:13;129:19,25;
130:15
**Gilbreath (1)**
6:18
**girls (5)**
77:4;91:17;92:15;
93:2;109:11
**give-and-take (1)**
67:3
**given (4)**
17:21;37:9;46:22;
107:5
**gives (5)**
14:12;74:3,19;
75:2,3
**giving (5)**
69:3;74:20,22;
135:11;138:4
**Global (1)**
104:15
**god (1)**
108:16
**goes (7)**
20:4;47:18;59:25;
77:17;79:25;112:13;
116:22
**GOMEZ (35)**
6:8,13,24;7:12,16,
19;17:12,13;18:10;
57:9,25;58:4;63:9;
119:11;120:11,13,23;
121:19;122:17,21,24;
123:8,22;124:5,18;
126:11,15,20;127:1,
17,20;129:4;140:12,
15;142:3
**Good (14)**
8:12,18,19;9:1,2;
26:21;33:13;56:21;
70:19;98:5;99:2;
117:18;128:22;
141:25
**graph (2)**
83:7,9
**great (3)**
72:12;73:16;135:6
**greater (2)**
53:11,17
**group (3)**
65:23;67:21;68:14
**guess (2)**
7:14;106:8
**guys (1)**
108:13
**gynecomastia (44)**
11:10,11,22;12:5,
5;13:16;14:4,15,24;
30:10;31:3;68:22;
69:6;76:24,25;77:2,3,
5;78:6,11,20;79:20,
23;80:24;81:22;
88:25;89:1;91:19;
92:23;95:15;96:3,16,

16,18;97:7;109:19,
20;111:8,12,24;
112:20;113:4,17;
115:9

**H**

**half (4)**
73:14;94:10;110:5;
135:2
**hallucinations (1)**
54:20
**haloperidol (1)**
52:17
**hand (1)**
133:1
**handing (1)**
71:20
**handle (2)**
15:25;18:1
**handwriting (1)**
119:20
**handwritten (3)**
6:17;119:15;
127:11
**handy (1)**
122:18
**hang (2)**
72:2,12
**happen (1)**
117:12
**happened (2)**
33:8;37:11
**happens (2)**
47:11;124:1
**happy (4)**
59:3;60:3;105:5;
139:17
**hard (4)**
56:13,18;108:19,
22
**hardship (1)**
100:11
**heading (1)**
14:1
**headlines (1)**
97:18
**hear (4)**
10:7;102:9,11;
134:25
**heard (5)**
61:24;68:19;88:15;
131:20;135:1
**hearing (3)**
17:9;54:21;66:18
**hearsay (1)**
61:23
**held (4)**
7:25;99:25;121:6;
124:9
**help (6)**
16:17;22:20;71:17;
72:25;90:17;116:5

**helpful (5)**
38:7;71:4;73:10;
123:17;141:13
**hereby (1)**
143:3
**Here's (6)**
18:18;19:15;36:7;
37:1,7;114:25
**Hey (3)**
56:4,6;57:3
**Hi (2)**
44:4;46:8
**higher (3)**
24:24;29:21;45:8
**highlight (12)**
14:9;45:11;48:19;
66:7;73:13;74:12,12;
79:15;103:15;
104:12;107:1;110:25
**highlighted (1)**
48:9
**highlighting (2)**
48:17;76:3
**history (5)**
17:2;34:14;35:3,
15;70:1
**hoc'ing (1)**
137:14
**Hold (4)**
6:11;31:16;57:19;
109:14
**holds (1)**
103:18
**Honest (1)**
108:16
**Honor (74)**
6:8,13;8:17;9:6;
16:20;17:4,14,16;
20:17;22:11;23:10;
28:16,22;32:2;33:9;
34:25;36:5;38:12;
40:2,14,19;42:22;
46:24;47:17;49:5;
52:8,10;58:4,7,22;
61:22;62:8;64:3,9;
71:14;74:8;76:2;
77:10;83:15,20;
85:16,17;86:13,19;
91:6;100:22;103:11;
105:11;107:18;
114:7;118:14;
119:25;121:17;
122:7;123:23;
124:20;126:20;
127:17,20;129:2,20;
130:6,18,19;131:11;
132:1;133:10;137:1,
3;138:2;140:10,16;
142:3,4
**Honor's (2)**
71:18;93:12
**hopefully (3)**
32:6;116:5;117:15

Case 2:14-md-02592-EEF-MBN  Document 5599-9  Filed 03/02/17  Page 151 of 160
(Jury Trial - Afternoon) - Vol. III - January 28, 2015
Pledger v. Janssen, et al.

**hoping (1)**
128:5
**Hospital (1)**
138:15
**Hotel (1)**
123:13
**hour (1)**
135:2
**housekeeping (1)**
6:10
**hundred (2)**
108:21;110:13
**Hungary (1)**
77:19
**hurry (2)**
141:19,24
**hyperprolactinemia (3)**
23:17;48:13;49:20

**I**

**idea (1)**
55:11
**identification (11)**
7:9;12:18;16:6;
27:12;71:5;93:21;
102:19;128:11;
129:8,10;130:8
**identifications (1)**
139:14
**identified (1)**
129:19
**identify (4)**
9:13;12:13;119:15;
128:24
**identifying (2)**
68:6;129:13
**ignored (1)**
117:2
**II (1)**
105:3
**III (3)**
104:20,24;105:3
**impaired (1)**
55:13
**important (16)**
19:25;35:16;55:17;
56:12;65:7,9;66:16;
74:4;75:24;76:3,10,
17,22,25;113:3;117:4
**impossible (1)**
134:9
**improper (2)**
36:16;85:18
**improperly (2)**
20:22,25
**inadequacy (1)**
50:7
**inadequate (1)**
60:9
**incentives (1)**
56:19
**include (5)**

27:16;47:9;51:8,
15;88:25
**including (1)**
115:23
**inconsistent (1)**
36:20
**increase (1)**
77:4
**increased (2)**
79:18;95:18
**indicate (3)**
30:9,9;94:20
**indicated (3)**
28:6;54:18;77:15
**indicates (1)**
11:4
**Indicating (1)**
17:15
**indication (9)**
12:1;35:18;37:10;
60:12;63:22;66:15;
67:13;73:24;105:2
**indulged (1)**
139:10
**influence (1)**
117:17
**information (27)**
9:18,21,25;10:16;
12:4;14:18;15:11;
27:4;56:13,15,19,21,
25;57:6;60:9;61:4,7;
99:14,19;115:3,8;
116:6,10,14,20;
117:11;131:11
**informing (1)**
30:22
**infrequent (1)**
11:18
**inquiry (7)**
133:17,17,19,20,
21;134:6;135:14
**insignia (1)**
13:5
**Instead (1)**
22:3
**instruct (1)**
115:24
**instruction (2)**
119:4,6
**instructions (1)**
119:5
**INT (1)**
69:21
**INT-41 (2)**
68:5;69:8
**intellectual (1)**
74:23
**intend (2)**
34:23;42:5
**interim (18)**
70:2;71:21;74:5;
75:6;77:25;78:3,12;
84:14;87:21;88:3,4,7,

12;104:22;105:3;
125:15,16,19
**I-N-T-E-R-I-M (1)**
88:13
**internal (3)**
17:17;22:12;97:17
**International (4)**
68:5,7;74:13,15
**Internet (1)**
116:23
**interprets (2)**
84:6;87:8
**interrupted (1)**
128:9
**into (10)**
7:14;20:1;30:2;
33:15;45:18;53:18;
72:19;83:7;117:13;
129:22
**intrude (1)**
71:3
**intruding (1)**
23:9
**investigator (1)**
114:18
**investigators (8)**
83:20;86:22;87:12,
18,22,24;110:22;
112:19
**involved (7)**
38:5,6,11;49:4;
50:19;56:22;113:16
**involving (4)**
40:21;100:7;
101:25;116:8
**irritability (3)**
28:8,13;29:4
**issue (14)**
18:19,19;19:20;
21:20;32:24;33:18;
36:7;37:7;47:18;
66:22;82:24;85:13;
130:4;137:1
**issues (11)**
7:1;17:18;20:16;
44:23;98:24,25;
100:6,8;116:4,11;
140:14
**items (1)**
113:9

**J**

**Janssen (80)**
10:25;13:5,8;
17:17;31:6;36:4,6,
13;37:21;39:3,19;
46:4,23;49:4;50:22;
54:2;55:5,23;56:24;
57:13,16;58:2;59:4,8,
19;60:15,16,16,19,
21;61:2,6,10,13;62:3,
5,21;63:24;64:24,24;

65:2,4,15,20;66:4,5;
67:4,7,9,12,14;70:3;
78:3,9;80:22;81:11;
82:17;83:14;84:18,
18,19,23;85:14;86:1,
16,20;87:13,19,23,
24;89:4;91:1;93:4;
104:7;114:3,8,12;
115:6;120:16;125:11
**Janssen-directed (1)**
85:11
**Janssen-funded (1)**
85:10
**Janssen's (1)**
55:4
**January (11)**
40:11;45:15,15,25;
46:12;48:20;49:22;
97:2;122:12;124:21,
24
**jargon (1)**
35:25
**JJPHPLEPE00000170 (1)**
120:15
**JJRE02463704 (1)**
90:24
**JJRE03830659 (1)**
46:1
**JJRE08344114 (1)**
102:23
**JJRE08344214 (1)**
102:23
**JJRE14214519 (1)**
42:10
**JJRIS (1)**
139:13
**JJRIS02562429 (1)**
83:1
**JJRIS03129532 (1)**
16:23
**JJRP00378109 (2)**
57:13;58:21
**JJRP00838257 (1)**
12:14
**job (1)**
116:6
**John (3)**
44:5;46:8;143:15
**Johnson (8)**
85:5,5;104:6,6;
114:12,12;115:5,5
**Judge (9)**
21:15;33:13;37:7;
39:1,11;89:14;90:5,
13;106:2
**judgment (1)**
81:25
**July (1)**
97:2
**jumping (1)**
71:13
**June (1)**
97:2

**juror (3)**
100:7;101:6;102:9
**jurors (2)**
7:1;98:23
**jury (54)**
6:2,6,9;8:2,5,9;
10:7;17:9;21:7,8,18;
22:4,20;23:4,7;
28:11;32:5,9,12,16;
34:15;35:16;38:3,7;
44:10,11,14,18;48:9;
54:15;65:9;70:16,25;
75:25;76:6,10;85:24;
89:1;90:10;94:3;
98:8,11,15;101:12,
15,19,23;115:24;
117:20,23;118:2,21;
134:18;141:4
**jury's (1)**
141:14
**justify (1)**
61:4

**K**

**keep (3)**
6:15;116:15;
117:14
**keeping (2)**
45:16;70:6
**kept (1)**
119:23
**Kessler (25)**
8:14,20;9:1;10:11;
32:21;35:2,6;36:12;
37:18;39:3,15,23;
44:25;45:3;47:1,19;
72:17;83:21;87:4;
89:15;102:7;114:17;
121:10;131:1,3
**Kessler's (5)**
19:24;39:21;114:9;
129:3;130:20
**key (1)**
108:22
**kids (4)**
56:14;65:15,17,18
**kilogram (1)**
74:22
**kind (20)**
7:9;12:2;18:17;
21:9;35:8;60:1;
85:19;98:18,24;
101:7;107:22;
110:14;122:8;
123:19;125:9,11;
128:10;140:13,14;
141:19
**kindly (4)**
13:19;14:9;73:13;
74:10
**Kline (231)**
6:18;8:15,17,24;

Case 2:14-md-02592-EEF-MBN   Document 5599-9   Filed 03/02/17   Page 152 of 160
(Jury Trial - Afternoon) - Vol. III - January 28, 2015
Pledger v. Janssen, et al.

9:6,10,12;10:9,12,14;
12:19,24;13:3;15:3,5,
9,18,24;16:3,8;17:5;
18:13,18;19:2,7,10,
15,21;20:24:21:24;
22:3;23:10,11;25:15,
24;26:19,24;27:1,8,
14;29:5,8,12,14;
31:20,21;32:2,18;
33:8,12,14;34:1,22,
25;36:6;40:1,13;
41:4,7,12,14,23;42:1,
8;43:8,14,20,24;44:3,
8,24;45:1,2,13;47:4,
24;48:5,6;49:8;
52:13;53:1,7,9;57:10,
19,21;58:2,6,10,13,
25;59:1;62:2,10,16,
20;63:1,6,10,13,16,
21,24;64:6,8,11,14,
16,23;70:10,14,21;
71:6,10,13,15,23;
72:1,4,11,13,24;73:4,
9,19;76:2,4,14,18;
79:5,10,12,14;82:7,8,
13,24;83:5,12,25;
84:4,7,8;85:1,3,19,
23;86:6,11,14;87:10;
90:15,21;91:13;92:5,
9;93:17,23;94:7,15;
95:11,14;98:19;99:5,
8,11,15;100:23;
101:4;102:5,6,21;
103:14,17;105:16;
106:4,9,11,13,21,24;
107:18,22;108:3,9,
12,15,21;109:2,5,6;
111:3;114:5,10,15,
19,23;115:2,12,15;
118:5,12;119:14,19;
127:13,22,24;128:3,
14,20;129:1;131:10,
13;132:17;133:5,8,
16;134:5,19,22;
135:1,17,20;136:2;
137:20;138:6;
140:17,22;141:16,23,
25
**Kline's (1)**
   127:10
**knowing (1)**
   61:7
**knowledge (1)**
   47:14
**knowledgeable (1)**
   35:9
**known (15)**
   20:2,6,19;25:6;
   31:6;49:3;51:16;
   52:19;53:22;67:17;
   70:3;78:3;93:4;
   94:21;96:10
**knows (9)**

17:20;22:23;36:15;
37:18;39:1;82:19;
83:21,21;87:4
**Kurz (1)**
   143:15

## L

**label (69)**
   9:18,19,22;10:20,
   24;11:2,9,13,21,24,
   25;12:6,11,12;13:21;
   16:9,9,11;20:1,5,8,
   16,18;21:1,12;22:4;
   23:12,13,15,21;26:9,
   10;27:4;29:16,23,25;
   30:3,5,6,16,19;31:1,
   2,2;35:4,5,12,14;
   36:22;38:6;45:3,4,16,
   16,17,18;51:1;54:22;
   55:8;56:14,15,15,20;
   57:1;66:15;121:11,
   17,19,21
**labeled (2)**
   55:8;114:11
**labeling (6)**
   17:2,18;34:14;
   35:3;61:5,7
**labels (6)**
   14:20,24;17:22;
   30:9,12;37:8
**lacks (1)**
   82:3
**lactation (4)**
   89:11;91:16,17;
   113:4
**laid (1)**
   22:8
**language (6)**
   15:21,22;24:6,15,
   18;36:1
**large (2)**
   40:3;59:20
**last (6)**
   9:15;12:25;13:4;
   40:17;70:16;105:1
**late (2)**
   40:17;132:19
**later (3)**
   22:6;97:3;100:17
**laugh (1)**
   134:14
**lay (2)**
   18:16;35:9
**laying (1)**
   18:2
**laypeople (1)**
   51:22
**learned (1)**
   65:3
**least (2)**
   30:23;69:16
**leave (2)**

56:1;117:18
**Leber (2)**
   60:7;61:2
**led (1)**
   50:6
**left (2)**
   80:13;118:11
**left-hand (3)**
   11:8;13:22,23
**less (6)**
   11:22;30:22;31:3;
   52:18;53:13;54:4
**letter (3)**
   46:7;58:2;125:6
**letters (2)**
   81:9,11
**level (1)**
   53:15
**levels (8)**
   23:24;24:13,24;
   29:21;45:8;53:11;
   79:18;107:6
**life (2)**
   19:7,10
**likelihood (2)**
   82:1,1
**likely (7)**
   80:8;87:17;112:19;
   113:20;114:3;115:9;
   141:5
**likely's (1)**
   113:22
**likes (1)**
   118:14
**limit (1)**
   53:17
**limited (1)**
   61:13
**line (5)**
   17:19;59:7,8;
   67:11,11
**lined (1)**
   136:9
**lines (1)**
   116:14
**list (13)**
   25:9,10;33:25;
   131:25;132:2;134:4,
   7,8;137:2,4,7,13;
   138:11
**listed (1)**
   69:12
**literally (1)**
   20:3
**literature (1)**
   61:15
**little (6)**
   22:6;34:20;51:12;
   70:6;75:12;111:25
**live (2)**
   42:19;117:6
**local (1)**
   80:10

**long (6)**
   7:7;20:9;72:8;
   132:4,13;138:8
**Longer (2)**
   69:16,17
**long-term (8)**
   60:19;69:10,14;
   73:21,22;74:18;75:5;
   94:24
**look (29)**
   11:14;23:15,16;
   27:24;29:23;45:24;
   47:9;51:3;61:17;
   63:19;66:19;73:7;
   77:8;81:1;85:8;96:2,
   3,15;103:5;104:19;
   105:7;106:15;
   108:17;110:1;111:5;
   112:5,6;113:1;
   123:20
**looking (16)**
   24:4;34:3;37:19;
   62:1,2;63:21;69:4;
   73:23,24;77:1;78:22;
   82:25;83:2;90:7;
   104:18;105:2
**lookout (1)**
   30:7
**looks (3)**
   107:24;108:7,14
**lost (1)**
   76:12
**lot (4)**
   68:24;70:22;76:11;
   117:13
**low (1)**
   48:24

## M

**ma'am (1)**
   18:15
**main (1)**
   66:20
**mainly (1)**
   100:9
**majority (1)**
   76:21
**makes (4)**
   134:8;135:17,20;
   136:19
**making (2)**
   93:24;106:16
**male (1)**
   76:20
**males (2)**
   77:1,6
**manage (2)**
   134:14,16
**manual (1)**
   66:14
**manufacturing (4)**
   17:19;22:13;36:25;

37:15
**many (11)**
   47:8;63:8;77:14,
   14;81:7;84:9;92:10,
   15;111:18,20;113:21
**Marianne (8)**
   34:3,4;70:9;71:20;
   118:17;123:5;135:4;
   139:17
**Marianne's (1)**
   43:14
**mark (23)**
   9:7;15:20,20;
   16:16;26:19;57:7;
   63:3;71:16;79:3;
   118:12,25;119:21;
   120:1,13;127:23;
   129:3,11;131:14,15;
   132:6;133:24;
   135:10;138:17
**marked (35)**
   9:3,4;12:17;16:5;
   27:11;33:20,20,22;
   41:21;42:1,6;43:2,10,
   20,20;46:1;50:4;
   58:20;62:10,14;63:1,
   17;78:15;90:18;
   93:13,20;102:18;
   118:15;129:19;
   130:15;132:3;
   134:10;136:8;
   138:16,23
**market (3)**
   25:2,20;54:16
**marking (7)**
   43:18;121:4;130:7;
   132:21;133:22;
   138:23;139:2
**mass (2)**
   77:4;141:2
**materials (1)**
   24:2
**math (1)**
   109:7
**Mathisen (8)**
   6:20;36:22;120:1,
   3,18;131:6;138:15;
   140:5
**Mathisen's (2)**
   120:7;140:7
**matter (8)**
   6:10;21:4;23:7;
   32:6,22;115:21;
   119:8;141:3
**matters (2)**
   118:24;129:25
**may (42)**
   8:16;12:9;17:4;
   23:10;27:24;32:2;
   33:2;36:17;43:3;
   44:20,23;48:15;
   49:15;55:10,14,14;
   56:9;58:24;64:8,10;

Case 2:14-md-02592-EEF-MBN   Document 5599-9   Filed 03/02/17   Page 153 of 160

(Jury Trial - Afternoon) - Vol. III - January 28, 2015
Pledger v. Janssen, et al.

65:5;70:7,7;72:24;
73:1,1,3;75:3;84:1;
90:15;91:25;97:2;
98:19,20;101:21;
102:4;124:22;
126:18;131:10;
132:17;134:24;136:3
**maybe (7)**
34:22;47:6;122:13;
132:18,18,22,22
**meager (1)**
61:3
**mean (16)**
17:22;22:22;38:20;
52:6;60:18;65:11;
66:14;71:6;75:15;
76:9,16;79:24;83:6,
21;84:2;86:17
**meaning (3)**
74:15;75:16;
109:16
**means (6)**
13:11;35:25;68:3;
74:13,16;143:21
**meant (2)**
9:19;36:13
**medications (1)**
25:3
**meeting (3)**
65:5;67:5,7
**meetings (1)**
67:4
**Members (6)**
10:7;32:4;54:14;
70:25;94:2;101:23
**memory (2)**
90:2;91:11
**menses (1)**
91:23
**mentally (3)**
65:18;74:2;95:1
**mention (1)**
41:17
**mentioned (4)**
18:9;19:23;25:7;
106:25
**meticulous (1)**
128:6
**mic (2)**
68:19;102:8
**microphone (1)**
10:10
**middle (1)**
134:18
**might (10)**
15:10;20:21;53:15,
16;71:17;99:11;
105:16;116:11;
123:20;136:7
**mild (4)**
74:2;80:4;81:22;
95:1
**milligrams (1)**

**74:22**
**million (1)**
31:12
**mind (4)**
25:8;31:9;45:16;
116:16
**mine (1)**
123:10
**mini (1)**
107:23
**minute (1)**
67:4
**minutes (10)**
19:18;32:8,8;65:4;
67:5,6;98:4;100:6;
102:1;105:9
**misapplied (1)**
48:15
**mischaracterization (1)**
38:16
**misinterpreted (1)**
48:15
**misleading (8)**
22:12;37:6,7;38:1,
3;39:11;86:21;87:1
**misrepresentation (1)**
38:5
**missed (1)**
104:2;107:25
**missing (2)**
106:6;108:1
**mistake (1)**
124:1
**Mitelman (5)**
40:22;44:4;46:4;
48:19;124:21
**moderate (4)**
74:2;80:6;95:1;
111:12
**modified (1)**
140:2
**moment (12)**
7:8;10:5;32:3,22;
33:7;34:21;45:5;
46:2;68:1;91:12;
113:6;120:21
**moments (1)**
120:7
**Monday (1)**
6:17
**month (2)**
45:21;51:1
**months (2)**
69:16;97:3
**more (20)**
14:20;20:11;45:5;
51:17;53:23,23;55:5;
74:15;88:23;99:13,
19;100:12;101:5;
105:5;113:2;116:6,
10;124:4;127:17,20
**morning (3)**
18:22;21:25;42:23

**most (1)**
141:5
**mother (1)**
100:19
**move (5)**
12:9;49:24;50:3;
105:14;125:2
**moved (2)**
16:20;40:16
**moving (2)**
129:9,13
**much (1)**
139:25
**multi-center (1)**
77:12
**multi-centre (1)**
74:15
**multicentres (1)**
95:22
**multiple (1)**
78:19
**Murphy (27)**
19:3;33:22;105:14;
119:3,9;121:23;
122:23;123:4,10;
125:5;126:12;127:2;
129:9,12;134:24;
137:1,8,11,15;138:1,
21;139:2,6,19,24;
140:10;142:4

## N

**name (8)**
52:3,4,5,6,7,7;
80:23;85:7
**named (1)**
84:21
**namely (2)**
94:24;115:8
**nature (1)**
137:13
**near (2)**
78:16;99:5
**nearly (1)**
134:8
**necessarily (1)**
28:14
**necessary (1)**
37:17
**need (19)**
18:16;28:2;32:2;
33:10;47:8;50:12;
51:6;62:1,13;70:5;
72:10;98:18,24;
100:4;118:20;119:1;
120:24;123:9;141:5
**needed (5)**
33:5,14;56:21;
66:18;136:18
**needs (3)**
17:22;48:3;66:23
**neglected (1)**

**40:6**
**neighbors (1)**
116:18
**Neither (1)**
86:11
**Netherlands (1)**
77:19
**neuroadrenergic (1)**
55:20
**neurochemicals (1)**
55:20
**neurotransmitters (2)**
55:17,21
**nevertheless (2)**
59:9,14
**new (2)**
21:1;37:10
**newspaper (1)**
116:24
**next (15)**
20:12;26:20;35:21;
43:24;49:14;52:24;
53:3,4,5,10;57:7;
75:2,13;112:8;
133:25
**night (1)**
40:18
**nine (1)**
97:3
**nine-year-old (3)**
111:5,6,11
**Nobody (1)**
39:1
**nonpubertal (1)**
91:17
**nonpuerperal (1)**
89:11
**nor (2)**
53:14;60:12
**normal (1)**
53:17
**normally (1)**
59:12
**Nos (4)**
12:14;16:22;63:16;
93:14
**notation (1)**
83:10
**note (3)**
13:20;35:20;51:4
**notes (2)**
138:19;143:5
**notice (6)**
28:10;75:8;104:4,
11;109:22;110:21
**November (9)**
69:25;70:1;72:23;
78:4,8,9;88:18;93:5;
97:1
**nowhere (1)**
99:5
**number (55)**
12:16,16;16:18,19;

**19:23,24;20:14,14;**
26:20;33:23;35:11;
41:7;43:25;57:8,10;
61:16;62:22;67:15;
71:12,19,25;75:6,9;
77:1,15;78:16,24;
90:21,22;92:22;95:9,
17;105:13;109:8,8,9,
11;113:25;122:20;
128:21,21,23;129:19,
24,25;131:17;132:9,
13;133:25;135:12,
13;136:24;137:16;
139:14;140:23
**numbers (26)**
40:18;43:9,12,15;
59:20,22;63:3;67:25;
70:23;72:6;92:11;
95:25;96:20;97:22;
102:22;113:16;
124:2;132:25;133:1,
14;134:1;135:23;
136:17;139:12;
140:3,18
**numerator (2)**
92:19;96:5
**numerical (1)**
7:9
**NV (2)**
104:8;115:7

## O

**object (1)**
76:2
**objection (35)**
10:2,4,6,18;12:20,
22;28:16;29:7,9,11,
12;42:14;46:24;
47:17;49:5;58:23;
59:3;61:23;64:2;
73:2,4,5;76:1;82:3;
83:15;85:16,17;
86:16;94:4,6;95:7;
103:6,9;114:4,8
**objections (6)**
18:1;42:24;128:7,
10,17;136:18
**obliged (1)**
74:9
**observed (1)**
97:15
**obvious (1)**
113:5
**obviously (1)**
117:13
**occasion (2)**
47:6,7
**occur (1)**
77:3
**occurring (1)**
11:19
**o'clock (2)**

Case 2:14-md-02592-EEF-MBN   Document 5599-9   Filed 03/02/17   Page 154 of 160
(Jury Trial - Afternoon) - Vol. III - January 28, 2015
Pledger v. Janssen, et al.

140:8;142:6
**October (7)**
13:15;21:3,12;
35:20;36:23;39:7;
103:2
**odd (1)**
106:13
**off (2)**
20:12;27:4
**office (1)**
21:3
**officer (2)**
70:11;118:14
**official (2)**
9:25;10:15
**off-the-record (4)**
7:24;99:24;121:5;
124:8
**old (1)**
75:16
**old-fashioned (2)**
48:2;135:6
**Olga (5)**
44:4;46:3,8;48:19;
124:21
**Olney (1)**
100:18
**OLZ (1)**
52:5
**O-L-Z (1)**
51:25
**One (58)**
10:5;11:19,22;
13:7;19:23;20:11,16;
22:9;25:7;28:15;
29:1,17;30:22;31:3;
35:13;40:22,23;41:6,
7,8,20;43:17;44:1,3;
45:4,11;49:25;53:3,
4;54:15;56:12;59:5;
68:21,21;74:15;
80:10,14;81:20;85:1;
88:23;98:23;106:21;
111:4,5;112:8,21;
113:6;116:7;120:3,
19;122:10,16,19;
127:17,20;130:21;
136:8;137:19
**ones (1)**
67:8
**one's (1)**
124:13
**only (8)**
18:18;48:22;49:1;
51:6;56:14;88:24;
100:10;133:17
**open (10)**
6:1;8:8;23:3;
32:15;44:17;74:16;
98:14;101:18;
116:16;118:1
**opinion (10)**
27:15,18;39:21,24;

42:13;50:1,7;53:19;
65:8;97:21
**opposite (2)**
18:15;72:7
**order (15)**
6:16;7:13;31:16;
75:4;86:2;101:3;
123:20;129:18;
131:22;132:2,6,11,
15;135:11;140:13
**ordered (1)**
117:15
**original (1)**
54:22
**originally (1)**
67:22
**others (2)**
25:8;95:25
**Otherwise (4)**
25:9;71:11;76:12;
140:21
**ours (1)**
58:12
**ourselves (2)**
7:5;138:5
**out (59)**
13:17;17:9,18;
26:6;32:19,21;37:10;
38:3;39:7;47:10;
51:5,11;52:22;58:19;
61:13;64:13;72:3;
75:7;76:19;87:14;
88:5;92:19,21;96:7,
22,23;98:4,23,25;
99:19,21;100:11;
101:5,7;109:1,20;
110:6,19;112:3;
113:3,23,24,24;
115:8;116:5,6,12;
127:5,13;128:25;
129:16;130:2,2;
134:2,13,15;135:8;
137:2;141:8
**outside (12)**
6:2;32:16;83:20;
86:22;87:22,24;
98:15;116:20;117:1,
10,16;118:2
**over (4)**
35:15;93:3;97:16;
134:15
**overall (1)**
141:14
**Overruled (9)**
28:18,18;39:14,17;
42:24;47:2,3;64:4;
76:5
**own (2)**
119:19;140:2
**ownership (1)**
13:12

P

**P-10 (4)**
15:24;16:5;121:22;
122:2
**P-11 (5)**
26:18,20;27:11;
29:18;122:4
**P-12 (3)**
42:2,4;122:5
**P-13 (8)**
41:24;43:12,22;
46:2;50:4;122:8,21;
123:11
**P-14 (6)**
44:7;46:1;122:14;
124:16,20,24
**P-15 (2)**
124:14;125:3
**P-16 (5)**
62:20;63:2,17;
125:8,11
**P-17 (6)**
71:20;72:3;78:16;
79:4;125:14,19
**P-18 (3)**
125:21,23;126:1
**P-19 (3)**
93:13,20;126:5
**P-20 (4)**
102:19;103:13;
126:9,10
**P-21 (6)**
118:13;119:22,23;
127:10,12,21
**P-22 (1)**
127:23
**P-5 (3)**
129:5;130:19,22
**P-6 (1)**
130:25
**P-7 (1)**
131:2
**P-8 (2)**
121:11,16
**P-9 (5)**
12:16,17;25:16;
121:18,20
**packages (1)**
21:2
**page (57)**
9:15;10:20;11:7,
14;12:25;13:4;20:10,
15;23:20;24:7;25:14,
14;28:1;29:23;33:19;
34:12;35:10;41:21;
42:2;57:15;58:9;
59:5;63:5,7,12,13;
64:13,14,16;72:9,25;
73:6;75:14;77:17;
78:23,23;79:7,15;
80:19;84:12;86:8,12;

88:17;94:11;95:5,9;
105:10,12;106:2,8;
107:19;108:1,14;
112:23;113:8;
126:21,24
**pages (8)**
10:3;63:8,9;77:9;
107:25;108:11,12;
134:11
**paginated (1)**
105:12
**paid (1)**
87:24
**Pandina (10)**
40:21,23,23;42:11,
12;43:21;50:17;51:3,
13;53:21
**paper (1)**
104:1
**papers (1)**
85:8
**paperwork (1)**
117:7
**paragraph (11)**
14:8;49:14;51:5,6,
10;52:15,21;53:3;
75:13;78:23;79:16
**Pardon (1)**
33:10
**parent (1)**
56:17
**part (15)**
24:1;25:16;30:6;
47:23,25;48:2,7;
50:11;66:16;86:21;
87:15,18;111:15;
129:15;134:7
**particular (15)**
33:5;34:11,18;
38:15;69:4;71:5;
72:18;83:2,10;84:6;
86:1;100:7;119:16;
127:15;132:5
**particularly (1)**
128:11
**parties (1)**
137:4
**patients (11)**
11:20;14:16;15:1;
53:12,14;61:14;74:6,
17;75:15;88:25;89:1
**Paul (2)**
60:6;61:2
**Pause (7)**
7:22;32:1;34:7;
58:16;85:2;101:10;
124:6
**pay (1)**
117:16
**paying (1)**
107:10
**Pediatric (8)**
13:21,24;14:2;

56:20,25;57:5;60:11;
61:14
**pediatrician (2)**
56:11,16
**pediatricians (1)**
74:21
**pediatrics (3)**
15:2;28:7;30:20
**pegged (1)**
101:1
**people (4)**
15:15;49:4;74:17;
83:13
**per (2)**
74:22;102:19
**percent (16)**
14:15,25;31:16,22;
53:12,14;76:21;
92:20;93:3;96:6,19;
109:13,17,21;114:1;
115:8
**percentage (4)**
31:12;76:20;96:17;
109:13
**Perfect (3)**
6:24;136:3,7
**perhaps (1)**
128:2
**period (2)**
11:4;31:18
**permanently (1)**
80:15
**permission (3)**
10:18;12:20;
119:12
**permit (1)**
37:24
**permits (2)**
94:5;103:6
**permitted (1)**
37:25
**permitting (1)**
47:19
**persists (2)**
23:25;24:14
**person (1)**
13:11
**personally (1)**
136:12
**pertain (1)**
94:16
**Pharmaceutica (1)**
104:7
**pharmaceutical (6)**
10:25;25:3;31:6;
65:25;104:6;115:5
**Pharmaceuticals (4)**
78:10;80:22;84:19;
115:7
**Pharmacokinetic (1)**
104:14
**Pharmacology (1)**
104:15

Case 2:14-md-02592-EEF-MBN   Document 5599-9   Filed 03/02/17   Page 155 of 160
(Jury Trial - Afternoon) - Vol. III - January 28, 2015
Pledger v. Janssen, et al.

phase (4)
104:19,20,24;
105:2
phases (1)
104:23
phrased (1)
85:22
physician (1)
46:5
physicians (2)
9:19;20:2
pick (3)
75:11;116:7,7
pickup (1)
101:8
piece (1)
14:19
place (3)
11:13;68:8;74:16
places (1)
77:14
plaintiff (4)
123:6;136:16;
137:7,14
plaintiffs (1)
36:8
plaintiffs' (2)
6:13;34:13
Plaintiff's (5)
9:4;63:11;64:13;
120:14;136:24
plan (1)
99:9
planned (1)
60:19
play (1)
125:13
Please (18)
8:11;29:17;45:11;
49:15;50:15;51:4;
66:6;73:16;74:12;
94:11;111:10;113:6;
115:21;116:3,3;
118:8;119:2;120:22
pm (8)
6:3;8:6;32:13;
44:15;98:12;101:16;
117:24;142:6
point (26)
13:17;19:15;25:9;
38:3;41:22;59:6,18;
64:19,21;76:19;
99:15;113:3;115:12,
16;131:10;132:17;
133:16,17,18,18,20,
20;134:6;135:13;
136:13;139:11
points (1)
61:13
portion (1)
103:15
possession (1)
78:10

possible (2)
51:12;80:7
possibly (2)
89:8;91:21
posting (1)
35:19
posture (1)
19:17
potential (1)
130:1
powerful (4)
55:15,18,22;61:20
PRAE (10)
88:20;89:5;91:2;
92:10;96:1,10;109:9,
15;111:6;113:5
P-R-A-E (1)
81:13
PRAEs (1)
90:8
PRECAUTIONS (6)
14:3;17:24;24:9,
11;30:2,4
predicate (2)
88:23;92:2
predict (1)
53:15
prefer (1)
131:21
preference (1)
136:1
premarked (6)
131:16,17,25;
134:6,7;135:13
prepared (2)
39:19;70:24
prepuberty (2)
60:20;77:5
prescribed (1)
31:7
prescribing (4)
9:18,21,25;10:15
prescription (1)
25:3
presence (8)
6:2;8:9;23:4;
32:16;44:18;98:15;
101:19;118:2
present (2)
39:9;117:5
presentation (3)
16:21;46:21;
131:23
presented (4)
11:21;42:19;62:14;
132:14
pressure (1)
100:18
previously (1)
8:20
print (3)
15:6,19;27:1
printed (3)

20:7;37:9,16
Prior (1)
30:16
PRL (1)
53:16
probable (1)
80:7
probably (7)
81:23;110:4;
113:13,17,20;114:6;
115:10
probably's (1)
113:21
problem (19)
15:13;21:15,18;
27:9;30:20;37:2,18;
38:17,25;39:24;57:4,
22,24;58:6;83:16;
100:14;105:21;
106:17;130:7
problems (2)
36:9;39:16
proceed (5)
8:16;58:24;60:15,
16;102:4
proceedings (1)
143:3
process (1)
7:14
processes (1)
55:13
produced (2)
36:2;57:13
product (1)
66:21
production (2)
21:12;35:21
progressed (1)
93:7
project (2)
46:5;50:20
projected (2)
121:24;122:3
prolactin (21)
23:24;24:13,24;
29:21;30:12;45:8;
48:23;49:2;51:17;
52:18;53:11,15,22;
54:4;68:22;69:7;
78:12;79:18;80:24;
89:8;107:6
prolactin-related (16)
78:6;81:2,4,15;
88:21;89:2,6;92:15;
96:9;107:1,10;
109:10,12,16;110:7,
18
promise (1)
43:4
proper (4)
22:16,19;36:18,19
protocol (3)
102:19;111:15;

138:8
provide (5)
9:10;15:7;60:9;
75:4;137:17
provided (2)
131:25;137:19
psychiatric (2)
14:11;66:13
psychiatrist (1)
28:22
psychiatrists (1)
54:24
psychologist (2)
50:19;51:14
psychosis (4)
54:19,23;55:2,4
puberty (1)
89:12
public (1)
66:18
publicly (1)
66:23
pull (4)
13:24;49:13;73:14;
112:3
pulled (1)
14:19
pulling (2)
26:6;27:3
purpose (1)
14:1
purposes (4)
42:20;86:4;102:19;
116:21
push (2)
22:4;23:8
put (21)
6:14,18;12:15;
29:16;33:6;45:4;
56:19;57:14;60:3;
63:2;75:24;82:14;
83:6;119:20;121:15;
128:21,23;131:18;
140:13,18;141:8
putting (2)
117:13;132:24

**Q**

QUE (1)
52:2
Q-U-E (1)
51:25
quick (1)
6:9
quickly (3)
57:14;59:5;104:12
Quite (1)
15:9
quote (1)
54:24

**R**

race (1)
20:13
radio (1)
116:25
raise (1)
100:11
raised (1)
47:19
ran (2)
20:4;60:7
range (2)
112:10,13
Rare (6)
11:11,15,18,19;
14:24;31:2
rate (2)
14:3,12
rather (9)
7:2,17;23:7;36:14;
61:19;62:4;128:9;
135:12;140:18
rational (2)
54:22;55:12
rationale (1)
60:12
re (1)
136:20
reaching (1)
53:19
read (14)
11:16;24:1;35:22,
25;47:23;48:2,9;
49:17;50:10;52:24;
53:10;75:9;94:23;
97:4
reading (14)
47:14;72:22;89:15,
20,22;90:4,11;
125:22,24
reads (1)
9:20
ready (3)
8:15,17;62:7
real (1)
21:18
realize (1)
137:10
really (13)
34:20;61:16;62:12;
71:3;86:8;90:11;
100:17;117:15;
127:4;128:8,10;
136:13;140:17
Realtime (1)
143:16
reason (5)
42:21;66:22;75:3;
128:5;138:5
reasons (3)
29:1;42:23;60:14

Case 2:14-md-02592-EEF-MBN   Document 5599-9   Filed 03/02/17   Page 156 of 160
(Jury Trial - Afternoon) - Vol. III - January 28, 2015
Pledger v. Janssen, et al.

recall (2)
20:20,21
recap (1)
120:7
recently (1)
133:4
receptors (2)
23:23;24:12
recess (8)
32:7;33:11;98:2,6,
18;99:13,20;100:2
recognize (1)
20:18
recollection (2)
31:15,24
recommend (1)
100:15
recommended (2)
48:24;49:2
record (18)
6:14;15:16;18:4;
25:13;27:6;34:10;
42:4;62:3;82:22;
119:7,13,17,22;
121:15;126:22;
127:5;128:8;136:19
recorded (1)
66:5
recording (1)
7:6
recovered (1)
80:1
red (2)
97:23;110:15
refer (2)
93:11;138:18
referred (7)
35:1;68:13;124:3;
129:15,24;130:15;
139:11
referring (6)
63:12;120:11;
132:5;135:24;
139:12,13
refers (1)
104:24
refreshing (1)
90:2
refund (1)
116:8
regard (1)
78:5
regarding (1)
34:18
regulatory (3)
36:17;75:4;104:17
reidentify (1)
7:11
relate (1)
105:3
related (19)
79:17;80:23;81:23;
82:1;87:16,17,17;

89:8,9,10;91:21,21;
104:25;107:6;
112:19;113:17;
114:3,6;128:11
relationship (6)
80:6;83:7,9;
110:23,23,25
relative (1)
143:9
relevant (4)
47:22,24;48:2,7
relied (11)
18:6;21:6;22:8,19;
27:17,22;38:15,21;
39:20;49:10;50:1
remaining (1)
105:9
remedied (1)
123:22
Remember (5)
65:10;74:1;116:3,
15,19
remembering (1)
90:1
remind (1)
116:19
reorganized (2)
16:21;40:17
repeatedly (2)
21:1,1
replace (1)
108:3
report (36)
18:8,9,11,14;
19:24;20:5;21:5;
35:1;72:23;88:12;
93:6,9;94:18;97:19,
19;102:12,16,24;
103:2;104:10;
107:14;125:17,20;
126:6,11,11,17,18,
22;127:8;129:21,23;
130:2,5;131:1,3
reported (4)
14:3,15,25;95:21
REPORTER (5)
18:24;118:6;133:2;
143:16,23
reporters (1)
119:23
reports (4)
78:19;79:20;97:14;
109:23
represent (3)
40:10,20;55:24
represented (1)
18:14
reproduction (2)
105:17;143:20
reproductive (1)
96:4
reps (5)
17:21;36:25;37:9;

39:6;48:16
Republic (1)
77:19
request (8)
45:12;55:4;60:8;
73:17;86:3;94:13;
95:13;103:16
requires (1)
138:22
Research (5)
84:18;85:15;104:6,
16;115:5
resolve (1)
32:6
resolved (2)
34:16;44:22
respect (1)
138:2
response (1)
123:15
responsibility (1)
10:24
responsible (2)
54:16;60:7
rest (1)
52:21
results (31)
60:13;67:17;70:2;
78:3,12;87:21;88:3,5,
7,8,9;92:6;93:4,15,
25;94:9,20;95:15;
97:1,4,5,5,7,8,9,9;
105:3;109:24;115:1;
127:14,14
resume (1)
8:14
retarded (3)
65:18;74:2;95:1
retrospect (1)
54:2
return (1)
32:22
returning (1)
34:17
review (6)
47:9;63:20;76:23;
85:7;97:20;130:1
reviewed (9)
24:2;31:5;35:7;
41:15;50:6;59:6,7;
89:4;107:8
reviewing (1)
78:15
right (118)
6:5,21;7:12,20;
8:11,13;11:6;12:23;
17:13;19:5;25:13,17;
26:4;32:5,7,20;33:2,
6,7,17;34:2;37:8;
39:11,13;40:9;41:3,
10;42:5;43:1,6,13,23;
44:6,7,20,22;48:7;
52:11,22;53:8;58:10,

18;59:23;61:25;
62:23;63:4,6,18;
64:10,15;66:3;67:14;
68:12,18;72:8;73:18;
76:5,9,15;79:11;
81:21;86:7;90:3,23;
91:2,18;93:7;98:1,2,
2,7;99:13,18;101:21;
102:3;103:23;104:3;
105:19,22;106:3,23;
107:21;108:6;
113:21;114:21;
115:13,18,19,20;
116:9,22;117:2,12,
17;118:16,23;
119:14;120:12;
121:14;122:1,5;
124:22,25;125:1,8,
17;126:23;127:12;
130:23;134:3;
139:20,23;140:1,11,
20,20,25;141:24
right-hand (2)
10:22;13:8
rights (1)
91:12
RIS (5)
48:22;49:1;51:17;
52:18;53:22
R-I-S (1)
48:23
RIS-41 (3)
71:21;88:12;94:16
rise (6)
8:2;32:9;44:11;
98:8;101:12;117:20
RIS-INT-41 (4)
71:22,23;119:18;
126:19
risk (2)
11:21;60:20
Risperdal (16)
9:22;46:5;48:23;
49:4;50:20;51:17;
54:4;59:14,19,19;
66:21;94:25;121:11,
17,19,21
risperidone (10)
9:23;14:12;23:24;
24:13,23;29:20;45:7;
65:13;74:19;80:6
risperidone-treated (2)
14:16;15:1
RIS-treated (2)
53:12,14
Rittenhouse (1)
123:13
RMR (1)
143:15
Road (1)
101:3
rogue (1)
85:14

room (2)
34:16;44:12
roughly (1)
75:16
routine (1)
97:15
ruins (1)
117:11
ruled (1)
17:18
rules (2)
57:23;117:7
run (5)
21:11;35:20;37:10,
15;134:1

S

safe (2)
61:12;73:23
safety (11)
57:4,5;60:19,22;
61:3,10;73:22;74:18;
75:5;94:25;104:18
sake (2)
43:15;141:14
sakes (1)
79:1
sales (5)
17:21;36:24;37:9;
39:6;48:16
same (31)
12:8;14:23,23;
15:10,12,12;24:6,15,
18;26:5,15;27:4;
40:25;41:4;42:23;
49:13;72:9;86:8,12;
89:18;94:23;103:18,
20;109:23;113:2;
126:19;135:22;
136:23;138:19;
143:7,21
sample (1)
37:22
sat (1)
135:1
save (1)
70:22
saw (3)
14:21;49:9;107:12
saying (10)
37:20;39:2;56:24;
57:2;61:15;63:25;
66:17;134:17;137:8;
140:17
schizophrenia (5)
55:1,9,11,12;65:14
School (1)
100:19
science (1)
61:16
scope (1)
130:5

Case 2:14-md-02592-EEF-MBN   Document 5599-9   Filed 03/02/17   Page 157 of 160
(Jury Trial - Afternoon) - Vol. III - January 28, 2015
Pledger v. Janssen, et al.

score (2)
  42:25;70:6
screen (6)
  57:15;79:9;82:23;
  87:9;106:20;109:3
scroll (3)
  112:2,3;113:6
seated (8)
  6:6;8:12;33:3;
  44:21;98:20,20;
  101:22;119:2
second (14)
  14:8;41:6,20;
  46:15;48:18,20;
  51:18;53:24;56:9;
  59:5;85:1;89:13;
  109:14;120:19
secret (1)
  59:18
section (16)
  13:20;23:16,17;
  24:6,7,11;29:24,25;
  30:2,4;56:20;57:1;
  60:3,4,7;107:1
seeing (1)
  54:20
seems (2)
  22:7,18
selling (2)
  31:13,13
send (1)
  129:16
sense (1)
  110:3
sensitivity (1)
  18:20
sentence (25)
  24:20,21;26:10,10;
  29:15,17,20;30:17;
  45:5,7,11;46:14,15;
  48:8,8,18,20;49:17;
  52:24;53:6,10;59:9;
  74:11;75:3;107:4
sentences (5)
  49:14,15;50:25;
  51:7,7
September (4)
  42:11;43:17,21;
  60:6
sequence (1)
  134:1
sequential (2)
  6:16;135:23
sequentially (4)
  131:15;133:22,25;
  135:11
Seroquel (2)
  25:22;52:3
serotonin (1)
  55:19
Serpico (1)
  42:12
serum (1)

89:8
set (4)
  59:3;67:9;70:11;
  132:21
setting (1)
  138:8
seven (3)
  9:7;79:23;96:25
several (1)
  66:6
sexist-type (1)
  18:25
sheet (2)
  58:5;103:7
sheets (2)
  119:20;132:6
short (2)
  69:15;100:2
shorten (1)
  81:7
shortened (1)
  81:8
short-term (2)
  69:9,14
show (7)
  10:21;20:10;58:8;
  91:5;105:17;108:25;
  112:22
showing (1)
  80:18
shown (3)
  62:15;79:9;106:19
shows (3)
  20:8;21:11,16
side (4)
  96:10;109:10;
  110:18;136:6
sidebar (8)
  17:5,9;19:17;23:1;
  32:3,23;34:15;61:24
sides (1)
  135:22
significance (1)
  49:20
significant (1)
  110:12
similar (1)
  139:14
simply (5)
  21:6,7;35:6;62:6;
  96:2
SIPALA (4)
  121:25;125:15,18;
  126:14
situation (1)
  101:25
six (4)
  22:1;69:15,16;
  110:13
Sixteen (3)
  92:17;113:23,24
slide (2)
  46:17,18

Slovakia (1)
  77:20
slow (3)
  141:6,10,13
slows (1)
  141:2
small (1)
  61:15
Smedt (1)
  84:23
Smith (8)
  10:19;13:24;26:7;
  29:18;45:10;49:16;
  64:20;95:11
sold (2)
  25:2;31:23
somebody (1)
  85:14
someone (2)
  50:19;54:15
sometime (1)
  55:25
sometimes (1)
  67:9
somewhat (1)
  112:4
somewhere (1)
  130:3
sorry (13)
  15:3;29:9;51:9,10;
  57:20,21;71:24;78:7;
  89:14;97:5;102:15;
  106:14;123:5
sort (4)
  9:20;75:3;97:17;
  98:22
sources (3)
  116:23,24,25
South (1)
  77:20
Spain (1)
  77:20
speak (2)
  19:22;83:4
speaks (3)
  83:18;86:17;
  114:13
special (10)
  68:21,25;69:1,6;
  70:2;77:6;78:11;
  97:22;107:4,10
specific (7)
  55:5;61:3;65:12,
  12,21;85:7;112:21
specifically (3)
  61:1;65:4;89:5
speculate (1)
  47:20
speculation (1)
  46:25
speed (1)
  75:11
spelled (1)

127:5
stage (1)
  105:1
stamp (4)
  50:5;57:12;120:15;
  123:3
stand (1)
  118:11
standard (1)
  97:14
standardized (1)
  138:4
start (11)
  9:16;67:16,17;
  71:16;78:8;92:13,14;
  104:2;112:24;121:4;
  135:8
started (2)
  136:17;137:2
starting (1)
  133:23
starts (2)
  46:8;59:9
state (1)
  67:23
stated (6)
  12:6;30:21;48:19;
  54:2;60:19;66:12
statement (5)
  19:1;26:1;48:13;
  49:12;53:21
states (3)
  24:6;46:15;77:20
Statistics (1)
  104:13
stay (2)
  100:16;102:8
step (3)
  32:21;88:22;118:9
still (5)
  23:20;56:2;79:2;
  121:7;135:2
stop (3)
  99:16,17;112:16
story (3)
  40:9;41:16;59:25
straighten (3)
  58:19;98:25;116:5
straitjacket (1)
  66:22
strike (1)
  16:14
studied (1)
  95:21
studies (27)
  40:7;60:13,16;
  61:11;67:15,16,22;
  68:9,13,14,16,18,20,
  21,24,25;69:1,5,5,9,
  10,12,13;70:25;
  107:8;111:18,21
study (55)
  67:16;68:7,7;69:3,

6,14,21;70:3;71:1,5,
  21;74:7;75:15,21,25;
  76:23;77:12;78:11;
  84:20,21;85:9,11,14;
  86:2,23;87:12,14,14;
  88:9,12;92:3,21;
  93:6;95:18;96:18;
  97:18,19,19,22;
  102:14;104:14,15;
  107:9,12;111:14,15,
  23;112:10,13;115:9;
  119:16,17;126:9,19;
  127:15
stuff (6)
  15:6;40:16;57:2;
  73:15;121:8;128:8
subject (5)
  34:14;38:23;43:4;
  80:15,15
subjects (11)
  75:6,9;76:20;
  79:17,21,23;80:1;
  81:2,4;95:17;109:8
submission (2)
  59:10;105:1
submit (2)
  86:2;137:4
submitted (2)
  61:4;137:9
substantial (3)
  59:13,22;60:10
suffering (1)
  74:25
sufficient (2)
  75:6,8
suggest (1)
  99:11
suggested (1)
  20:25
SULLIVAN (104)
  10:4;12:22;15:3,8;
  17:4,16;18:7,12;
  19:19;20:21,23;
  21:14,20,23;22:1,11,
  16,22;26:17,22;
  28:16,21;29:6,10;
  33:13,24;36:4,7;37:2,
  6,14;38:1,9,12,18,25;
  39:10,15;40:12;
  42:22;46:24;47:17;
  49:5;52:23;53:5;
  57:20,24;58:11,22;
  61:22;62:8;64:3;
  71:24;73:2,5;76:1,6,
  15;82:3,12,18;83:15,
  19;85:16;86:13,19,
  25;87:4;89:14,17,20;
  90:4,13;91:3;94:6;
  99:22;100:22;
  103:10;105:20;
  106:1,6,10,12,17,22;
  107:24;108:7,13,16,
  17;114:4,7,17;

Case 2:14-md-02592-EEF-MBN   Document 5599-9   Filed 03/02/17   Page 158 of 160
(Jury Trial - Afternoon) - Vol. III - January 28, 2015
Pledger v. Janssen, et al.

119:25;120:5;129:7,
20;130:6,17;132:1;
133:4,10,13;134:20
**summarize (1)**
92:4
**summary (2)**
59:17;119:15
**supervision (1)**
143:22
**supplement (2)**
18:12;131:2
**supplemental (1)**
35:1
**support (1)**
60:11
**Sure (28)**
7:19;13:23;15:6,
15;17:6;25:5;27:1,8;
32:23;34:21;37:12;
47:12;62:16;70:8;
71:10,13,13,14;
72:15;74:9;76:8;
77:25;85:12;88:1;
102:8,11;111:20;
128:24
**surprise (2)**
100:9;134:8
**Susan (1)**
42:12
**sustained (5)**
49:6,7;82:5,6;
85:21
**Swelling (1)**
80:12
**sworn (1)**
8:20
**symptom (2)**
29:3;80:23
**symptoms (1)**
79:17
**synonymous (1)**
67:1
**system (7)**
120:8;131:21;
135:5,6,22;136:15;
140:3

**T**

**Tab (34)**
33:19;40:12,13,14;
41:8,10,14;42:9;43:3,
7,9;57:12;58:3,4,5,
11,14,20;59:24;
61:17;62:23,25;63:1,
7;71:18;72:3;93:12;
102:16;105:23;
122:20;124:25;
126:15;138:15;
139:12
**tabbed (2)**
16:18;34:12
**table (9)**

27:25;81:1;83:1;
89:19;95:4;107:13;
108:8,11;111:10
**Tabor (1)**
101:3
**tabs (2)**
41:8;122:23
**tabulation (1)**
130:12
**talk (9)**
6:22;17:23;32:19;
36:12,15;37:17;
70:15;90:10;101:24
**talked (2)**
61:20;80:14
**talking (4)**
61:2;65:14;92:2;
138:7
**team (1)**
140:12
**tech (1)**
15:15
**technician (8)**
10:20;45:12;73:17;
94:13;95:13;103:16;
111:2;113:7
**telling (1)**
28:11
**tells (2)**
69:3;84:20
**ten (6)**
32:8;77:16;80:3;
93:1,3;98:3
**Tend (1)**
69:17
**term (4)**
69:15,16,17;
107:12
**terms (6)**
14:17;17:18;21:19;
76:24;97:7,20
**testified (1)**
36:23
**testify (2)**
35:7;91:11
**testimony (8)**
8:14;17:24;22:21;
41:1;76:11;90:18;
120:8;130:4
**Thanks (1)**
46:8
**theirs (1)**
114:24
**therefore (1)**
141:5
**thing's (1)**
33:4
**third (5)**
18:21;51:4,5;
64:19,20
**Thirteen (1)**
123:8
**Thirty-three (1)**

109:15
**thorough (1)**
18:2
**though (2)**
36:23;66:12
**thought (6)**
54:22;55:13;56:21;
66:13;99:7;119:6
**thousand (4)**
11:20,22;30:22;
31:4
**three (8)**
50:24;51:7;55:16;
80:5,8;81:20;89:9;
104:23
**till (4)**
39:4;100:10;
101:24;115:25
**times (2)**
30:21,23
**timetables (1)**
38:10
**timing (1)**
101:25
**tissue (1)**
77:6
**title (9)**
72:20,21;73:12,13,
21;81:1;94:23,24;
103:18
**today (18)**
6:23;27:16;67:12;
100:5,12;101:24;
102:2;115:14,21,25;
120:21,25;121:3,12;
127:16;131:7,9;
136:4
**today's (2)**
99:1;121:8
**together (2)**
26:6;33:6
**told (10)**
19:21;60:21,25;
61:1;66:4;75:18;
99:17;100:9;101:6;
110:6
**tomorrow (16)**
99:4;110:4,17;
111:24;112:24;
113:10;116:1,13;
117:19;123:21;
127:18,19;128:2;
138:13;140:7;141:16
**top (12)**
11:8;13:8;50:12;
73:11;84:16;104:1,3,
4,5;105:12;114:12;
132:7
**topic (2)**
12:9;115:5
**topline (11)**
88:8;93:8,9,15,25;
94:9;97:14;104:22;

105:4;109:23;126:5
**tort (1)**
141:2
**total (8)**
78:22;79:16;95:19;
109:8,9,11;110:18;
113:25
**tough (2)**
138:19,21
**toward (1)**
112:7
**transcript (2)**
143:7,20
**transient (2)**
79:23,24
**translate (1)**
53:18
**transpired (9)**
6:1;8:8;17:8;23:3;
32:15;44:17;98:14;
101:18;118:1
**treated (1)**
14:11
**treating (1)**
28:14
**treatment (2)**
80:7,16
**trial (13)**
7:3;72:17,18;
74:16;87:16,18;88:2;
100:20;104:25;
105:4;132:2;135:12;
143:6
**trials (5)**
14:9;60:11,20;
97:15;104:16
**trouble (1)**
124:4
**true (2)**
39:3;138:6
**truth (1)**
21:15
**try (2)**
16:17;56:12
**trying (7)**
36:21;51:11;61:18;
101:7;134:13,15;
141:17
**tune (1)**
30:20
**turn (5)**
9:15;24:5;45:14;
80:19;105:10
**turned (1)**
67:12
**TV (1)**
116:25
**Twelve (1)**
112:8
**twenty (1)**
99:10
**Twenty-four (1)**
96:21

105:4;109:23;126:5

**Twenty-six (1)**
96:7
**two (14)**
7:5;19:17,24;26:6;
37:8;40:6,7;49:14,
15;51:6;81:20;
108:10,12;135:22
**type (7)**
14:20;15:12;18:1;
21:10;26:5;104:25;
105:4
**typeface (1)**
14:23

**U**

**ultimate (3)**
27:23;50:7;97:21
**ultimately (2)**
38:7;130:11
**Under (24)**
11:8;14:2;16:16;
24:7,9,11;40:13,14;
41:8;58:13;63:7,21;
64:17,19,20;66:7;
71:17;73:12;74:11;
85:14;93:12;95:20;
132:21;143:21
**Understood (2)**
124:5;130:17
**undertaking (1)**
67:14
**United (1)**
77:20
**unknown (1)**
49:20
**unless (4)**
89:25;90:6;124:15;
143:21
**unrelated (1)**
80:13
**up (36)**
6:18;9:7;13:24;
14:19;21:22;29:16,
24;35:14;37:13;
41:20;45:4;47:6;
49:16;57:14;61:11;
62:7;70:11;73:15;
75:11,19;79:9;80:22;
101:3;106:18;
112:14;113:15;
116:7,7;119:12,20;
121:3;132:25;
133:12;136:9;138:8;
141:7
**upon (3)**
27:18;49:10;61:16
**upper (1)**
53:17
**upshot (2)**
60:2,5
**USA-93 (1)**
68:4

Case 2:14-md-02592-EEF-MBN   Document 5599-9   Filed 03/02/17   Page 159 of 160
(Jury Trial - Afternoon) - Vol. III - January 28, 2015
Pledger v. Janssen, et al.

**USA-97 (1)**
68:4
**use (28)**
10:11;13:21,24;
14:2;28:6;30:14;
34:24;36:9;39:15;
40:4,8;42:6,13;55:6;
56:4,25;57:5;65:17,
21,22;66:1;81:12;
90:17;114:6;116:20;
131:16;137:17;
140:23
**used (18)**
7:8;18:6;31:17;
39:18,23;43:3;55:6;
56:6;59:20,22;66:21;
68:21;72:5;86:4;
107:12;119:19;
120:1;128:1
**using (4)**
26:5;57:3;61:8;
123:18
**USPI (1)**
34:13
**usual (1)**
100:23
**usually (1)**
100:25
**utilized (1)**
59:14

**V**

**validity (2)**
39:22;66:9
**value (1)**
53:16
**variety (1)**
55:21
**various (2)**
34:3;81:18
**Vast (1)**
76:21
**version (2)**
35:21;105:15
**versus (1)**
69:14
**video (1)**
117:6
**view (2)**
27:2;136:14
**viewed (1)**
27:3
**visits (1)**
6:17
**vulnerable (1)**
65:19

**W**

**Wait (3)**
48:10;70:10;
118:17

**waiting (2)**
100:18,19
**walk (1)**
54:7
**wants (1)**
56:25
**warning (1)**
50:8
**warranting (1)**
66:15
**way (52)**
9:7;13:7;15:25;
17:25;18:3;20:8;
21:19;22:9;28:17;
37:5;48:2;54:8;62:4,
13,13,18,18;67:22;
69:9;70:17;74:20;
75:19;82:14;85:6;
87:20;88:22;90:19;
104:2;111:14;
112:14;117:15;
123:10,25,25;127:6,
7;131:22;133:9;
134:7;135:6;136:2,7,
9,11;137:23;138:4,
19,20;139:21,23;
140:1,19
**ways (1)**
7:5
**website (1)**
35:19
**weeks (2)**
69:15,16
**weight (1)**
39:21
**welcome (2)**
15:9;93:17
**well-controlled (1)**
60:11
**well-recognized (1)**
48:14
**weren't (1)**
47:5
**what's (12)**
9:18;15:20;19:20;
31:20;55:11;65:7;
71:21;76:3;79:8;
90:21;96:9;138:19
**whenever (1)**
99:16
**Whereupon (15)**
7:24;8:5;12:17;
16:5;27:11;32:12;
44:14;93:20;98:11;
99:24;100:2;101:15;
117:23;121:5;124:8
**whispering (1)**
18:23
**whole (6)**
60:2,3;70:16;
73:14,15;117:5
**who's (3)**
74:17;84:20;

141:12
**whose (1)**
21:5
**wide (1)**
55:20
**widely (1)**
31:7
**wish (1)**
76:9
**Withdraw (2)**
29:6,10
**withdrawn (1)**
29:13
**within (6)**
23:20;46:23;58:20;
112:9,10;134:11
**without (4)**
23:9;28:4;90:6;
129:17
**WITNESS (39)**
13:1;17:20,22;
18:6;20:25;22:9;
25:18;28:25;32:18;
33:1;36:14,18;37:17;
38:13,14;39:12;40:5;
42:19;51:24;52:2,10;
53:8;70:15;84:3;
87:3,7;89:22;90:9,
24;91:5;108:10;
118:11;119:4,6,7,10;
136:5,11;137:19
**witnesses (1)**
117:6
**witness's (1)**
28:17
**woods (1)**
76:13
**word (1)**
68:21
**words (6)**
11:7;75:8;84:11;
92:3;114:6;132:7
**work (13)**
28:4;56:13;60:2;
62:18;72:20;87:23;
100:6;101:7;116:12;
127:18;128:25;
134:16;135:7
**worked (1)**
56:18
**working (4)**
46:5;57:10;116:7,9
**works (3)**
55:16;70:20;73:25
**world (1)**
68:10
**worried (1)**
21:25
**worry (1)**
140:6
**worse (3)**
68:8;97:4,6
**write (1)**

139:18
**writes (1)**
51:15
**written (4)**
50:14;67:8,9;
141:12
**wrong (5)**
74:14;78:7,7;
122:13;132:22
**wrongly (1)**
132:22
**wrote (2)**
50:14;127:22

**Y**

**year (5)**
69:17,18,18,21;
73:22
**years (7)**
51:16;52:19;53:22;
74:4;75:16;97:16;
132:24
**yellow (1)**
116:2
**yesterday (6)**
6:16;20:20,21;
120:2,14,20
**young (2)**
77:3,3

**Z**

**zero (1)**
110:5
**ZIP (1)**
52:4
**Z-I-P (1)**
51:14
**Zyprexa (3)**
25:10,22;52:5

**0**

**00059 (1)**
136:24
**00838259 (1)**
25:15
**02297143 (1)**
93:14
**02562360 (1)**
72:3
**03 (1)**
122:12
**0659 (1)**
41:12

**1**

**1 (6)**
133:23;134:1;
135:9;136:22;137:4;
138:13

**1,885 (1)**
14:9
**1/28/03 (1)**
122:15
**10 (6)**
15:22;75:16,22;
93:12;112:16;121:1
**10/21 (1)**
126:25
**10/25 (1)**
127:1
**10/25/01 (4)**
126:23;127:2,8,9
**109 (1)**
57:15
**11 (3)**
102:16;121:1;
126:16
**11/2/00 (1)**
88:16
**110 (1)**
57:14
**113 (1)**
122:17
**12 (2)**
121:2;140:4
**13 (11)**
20:10,14,14,15;
33:19;34:12;35:10;
41:21;79:20;121:2;
123:3
**14 (11)**
61:14;74:4;75:19;
95:2;110:10;112:14;
121:2;122:21;
124:11,13,18
**143 (2)**
94:8,9
**14519 (1)**
50:5
**14-year-old (2)**
112:7,8
**15 (5)**
34:12;57:10,16;
100:6;121:2
**152 (2)**
95:5,9
**155 (1)**
93:14
**158 (2)**
106:4,9
**159 (5)**
105:13,22,24,25;
106:7
**15th (1)**
126:18
**16 (7)**
63:11;64:13;79:17;
113:24;114:2;115:8;
121:3
**160 (2)**
106:5,11
**16's (1)**

Case 2:14-md-02592-EEF-MBN   Document 5599-9   Filed 03/02/17   Page 160 of 160
(Jury Trial - Afternoon) - Vol. III - January 28, 2015
Pledger v. Janssen, et al.

92:19
**17 (1)**
72:1
**175 (2)**
23:18,20
**176 (2)**
9:4;11:14
**177 (3)**
9:16;10:20;11:9
**17JJRE0290174 (1)**
9:4
**195 (1)**
107:17
**1993 (3)**
54:8,10;55:4
**1996 (5)**
55:23,25;56:3,23;
57:17
**1997 (2)**
60:6,22
**1B (1)**
6:19

### 2

**2 (9)**
72:23;78:8,9;
88:18;93:5;96:4;
112:23;133:23;135:9
**2,000 (1)**
134:11
**2.3 (2)**
14:15,25
**2:01 (1)**
6:3
**2:08 (1)**
8:6
**2:38 (1)**
32:13
**2:52 (1)**
44:15
**20 (2)**
31:16,22
**2000 (12)**
31:22;65:5;67:14,
19;69:25;70:1,2;
72:23;78:8,9;88:18;
93:5
**2000s (1)**
31:11
**2001 (4)**
31:22;93:8;94:18;
103:3
**2002 (28)**
9:17;11:4,9;12:10;
14:24;23:12,13,15,
21;24:17,22;25:4,23,
23;26:9;30:8;31:1;
35:4;45:16,17,18,22;
54:8;55:8;78:4;
121:11,17;126:18
**2003 (9)**
13:9;40:11;45:15,

25;46:12;48:20;
49:22;124:21,24
**2006 (28)**
12:11,12;13:15;
14:4,25;16:11;21:13;
24:4,6,22;25:4;26:2,
10;28:1,7,8;30:8,16;
35:5,20;36:23;39:7;
42:11;43:17,21;
50:25;121:19,20
**2007 (1)**
39:5
**23 (5)**
30:20,23;109:20;
113:23,24
**2360 (2)**
73:7;84:12
**2364 (1)**
77:10
**2365 (1)**
77:17
**24 (9)**
35:14;40:13;41:10;
42:9;43:1,3,19;
122:23,24
**2427 (2)**
78:16;79:8
**2428 (2)**
78:17;79:8
**25 (7)**
40:14;41:14;43:6,
7;122:23,24;124:25
**258 (1)**
28:2
**259 (3)**
24:7;25:14;29:23
**25th (1)**
103:2
**26 (3)**
16:18,20;96:5
**264 (1)**
12:15
**266 (2)**
93:3,3
**28 (9)**
40:11;45:15,25;
46:12;48:20;49:22;
122:12;124:21,24
**29 (2)**
61:14;94:18
**29th (1)**
93:8

### 3

**3 (3)**
65:5;133:23;
135:10
**3.6.6.1.2 (1)**
107:1
**3.75 (1)**
93:3
**3.8 (2)**

114:1;115:8
**3:58 (1)**
98:12
**319 (2)**
74:5;92:19
**33 (3)**
109:12;110:6,18

### 4

**4 (1)**
133:23
**4:13 (1)**
101:16
**4:30 (12)**
6:23;100:5,10,13,
17,24;101:1,2,24;
102:1,2;112:24
**4:32 (1)**
117:24
**419 (5)**
96:23;109:21;
113:25;114:2;115:8
**4-23 (1)**
83:2
**427 (1)**
78:24
**43 (1)**
89:19
**44114 (1)**
103:8
**45 (3)**
105:10,15;106:8
**4519 (1)**
41:14

### 5

**5 (20)**
33:19;34:12;53:14;
57:12;58:3,4,5,11,14,
20;74:4;75:19;92:20;
95:2;110:10;129:4;
133:23;136:25;
140:8;142:6
**5.1 (2)**
96:6,13
**5.15 (1)**
96:14
**5.2 (1)**
96:12
**5.5 (1)**
109:21
**5.7 (1)**
96:19
**5:00 (2)**
99:10;101:1
**50 (1)**
53:12
**504 (7)**
95:19;96:5,7;
109:12,15;110:7,19
**519 (3)**

43:12;123:4,8
**544 (2)**
35:12;122:6
**545 (1)**
16:23
**5-point (2)**
96:12,24

### 6

**6 (5)**
59:24;138:16,18;
139:16,17
**6.5 (2)**
109:13,17
**6:45 (2)**
42:11;43:18
**60 (1)**
53:12
**659 (1)**
44:5

### 7

**7.8 (4)**
107:13,16;108:8,9
**704 (1)**
126:1,2

### 8

**8 (15)**
9:5;23:21;42:11;
43:17,21;61:17;62:3,
7,23,25;63:1,7;121:1;
132:9,10
**81 (1)**
107:19
**8259 (1)**
29:23
**8260 (1)**
13:19
**83.4 (1)**
76:21
**89 (1)**
25:20

### 9

**9 (4)**
24:5;71:18;72:3;
121:1
**9.6 (1)**
75:16
**9/9 (1)**
120:16
**9:30 (2)**
116:1;117:19
**93953 (1)**
62:21
**93956 (1)**
62:22
**953 (2)**

63:17;64:17
**96 (1)**
25:22
**97 (2)**
25:22;70:1