# In The Matter Of:

*Pledger v.*
*Janssen, et al.*

*(Jury Trial-Afternoon)*
*Vol. IV*
*January 29, 2015*

*John J. Kurz, RMR-CRR, Official Court Reporter*
*City of Philadelphia*
*First Judicial District Of Pennsylvania*
*100 South Broad Street, 2nd Floor*
*Philadelphia, PA 19110*

Original File 29JANUARY-2015-DJERASSI-PLEDGER-AFTERNOON-FINISHED.txt
Min-U-Script® with Word Index

1    IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
          FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
2                 CIVIL TRIAL DIVISION

3   ------------------------------
    IN RE: RISPERDAL® LITIGATION  :
4   March Term, 2010, No. 296     :
    _____  :
5   Philip Pledger, et al.,       :
                  Plaintiffs,     :   APRIL TERM, 2012
6        v.                       :   NO. 01997
                                  :
7   Janssen Pharmaceuticals, Inc.,:
    Johnson & Johnson Company,    :
8   and Janssen Pharmaceutical    :
    Research and Development,      :
9   L.L.C.                        :
                  Defendants.     :
10
    ------------------------------
11

12                   -  -  -

13          THURSDAY,JANUARY 29, 2015

14                   -  -  -

15              COURTROOM 425
                 CITY HALL
16         PHILADELPHIA, PENNSYLVANIA

17                   -  -  -

18    B E F O R E:  THE HONORABLE RAMY I. DJERASSI, J.,
                  and a Jury
19                   -  -  -

20           JURY TRIAL – VOLUME IV

21            AFTERNOON SESSION

22

23    REPORTED BY:
         JOHN J. KURZ, RMR, CRR
24       CERTIFIED REALTIME REPORTER
         OFFICIAL COURT REPORTER
25

```
 1    APPEARANCES:

 2              SHELLER, P.C.
               BY:  CHRISTOPHER A. GOMEZ, ESQUIRE
 3             E-mail:  Cgomez@sheller.com
               1528 Walnut Street, 4th Floor
 4             Philadelphia, PA 19102
               Phone: (215) 790-7300 Fax: (215) 546-0942
 5             Counsel for Plaintiff(s)

 6

 7              KLINE & SPECTER, A Professional Corporation
               BY:  THOMAS R. KLINE, ESQUIRE
 8                 KRISTEN LOERCH SIPALA, ESQUIRE
               E-mail: tom.kline@klinespecter.com
 9             E-mail: kristen.loerch@klinespecter.com
               1525 Locust Street, 19th Floor
10             Philadelphia, PA 19102
               Phone: (215) 772-1000 Fax: (215) 772-1359
11             Counsel for Plaintiff(s)

12

13              ARNOLD & ITKIN, LLP
               BY:  JASON A. ITKIN, ESQUIRE
14             6009 Memorial Drive
               Houston, Texas 77007
15             Phone: 713-222-3800 Fax: 713-222-3850
               Counsel for Plaintiff(s)

16

17

18    Representing Defendants:

19              DRINKER BIDDLE & REATH, LLP
               BY:  KENNETH A. MURPHY, ESQUIRE
20                 MELISSA A. GRAFF, ESQUIRE
               One Logan Square, Suite 2000
21             Philadelphia, Pennsylvania 19103-6996
               Phone: (215)988-2700  F:(215)988-2757
22             E-mail: kenneth.murphy@dbr.com
                       melissa.graff@dbr.com
23             Counsel for Defendant Janssen Pharma.,
               J&J, and Janssen Research & Development
24

25
```

1    APPEARANCES:  (Continued)

2              WEIL, GOTSHAL & MANGES, LLP
               BY:  DIANE P. SULLIVAN, ESQUIRE
3                   ALLISON BROWN, ESQUIRE
                    (admitted pro hac vice)
4              301 Carnegie Center, Suite 303
               Princeton, New Jersey 08540
5              T: 609-986-1100 F: 212-310-8007
               E-mail: diane.sullivan@weil.com
6              E-mail: allison.brown@weil.com
               Counsel for Defendant Janssen Pharma.,
7              J&J, and Janssen Research & Development

8

9

10

11      Also Present:

12              Marianne Mari, Tipstaff

13              Cory Smith, Display Technician

14

15

16

17

18

19

20

21

22

23

24

25

```
1                  – I N D E X –

2    WITNESSES                    DR     CR     RD     RC
     (Continued)
3    DAVID A. KESSLER, M.D.
       By Mr. Kline               7      --     --     --
4

5

6

7

8

9                    E X H I B I T S

10   NO.                                          PAGE NO.

11   P-33        Chart on blackboard-handwritten      7

12
     P-34        E-mail 5/15/2002                     10
13

14   P-34A       Table 21 from Long-term risperidone
                 treatment –                          11
15   P-35        Snapshot of Study                    31

16
17   P-36        E-mail from Binder to Pandina dated
                 July 16, 2002 –                      40
18

19   P-37        Snapshot of Table 21                 50

20
     P-38        E-mail chain, Bates No. 168 –        63
21

22   P-39        Draft two, Bates JJRE00115170 –      74

23
     P-39A       Call-out, Bates No. JJRE00115192 –   76
24

25   P-40        Call-out, Bates No. JJRE00115192 –   76
```

```
 1              I N D E X  (Continued)

 2    NO.                                          PAGE NO.

 3    P-41        Statistical Documentation, Long-Term
                  Risperidone Treatment versus Prolactin
 4                Pooled Analysis
                  Bates Nos. 03888723 to 03888729 -    80
 5

 6    P-42        Large packet, September 27, 2002 -    84

 7
      P-42A       Table 20, Bates No. JJRE03888769 -    84
 8

 9    P-43        Normalization of Prolactin Levels
                  in Children & Adolescents
10                Bates Nos. JJRE04405229 -            91

11
      P-43A       Call-out, Bates Nos. 04405248/5249 - 95
12

13
      P-44        Meeting Report: The Risperdal Child
14                and Adolescent Psychiatry
                  National Advisory Board Meeting
15                Bates Nos. JJRE03900098 to 0113 -    102

16

17    P-45        E-mail, Bates No. JJRE03892170 -     116

18
      P-46        Manuscript, Bates No. JJRE14088063 - 118
19

20

21

22

23

24

25
```

```
 1                    COURT CRIER:  Come to order, please.
 2          This court is reconvened.
 3                    Good afternoon, Your Honor.
 4                    THE COURT:  Good afternoon.
 5                    You can be seated.  Okay.
 6                    (Pause.)
 7                    COURT CRIER:  All rise as the jury
 8          enters.
 9                         -   -   -
10                    (The following transpired in open
11          court in the presence of the jury:)
12                         -   -   -
13                    (Whereupon the jury entered the
14          courtroom at 1:46 p.m.)
15                         -   -   -
16                    THE COURT:  All right.  Good
17          afternoon.  Please be seated.
18                    All right.  We are now going to
19          continue the direct examination of
20          Dr. Kessler.
21                    Okay.
22                    MR. KLINE:  Your Honor, good
23          afternoon.
24                    Good afternoon, all.
25                    (Dr. Kessler previously sworn.)
```

- DAVID A. KESSLER, M.D. - DIRECT -                7

```
 1                        -  -  -

 2                 DIRECT EXAMINATION (Continued)

 3                        -  -  -

 4   BY MR. KLINE:

 5   Q.    And good afternoon, Dr. Kessler.

 6   A.    Good afternoon.

 7   Q.    We were in Statistics 201 or so and -- we were

 8   beyond 101 -- and I just want to go back and

 9   understand stuff before we talk about it.

10               I've marked as Exhibit P-33, just a

11   working blackboard that I have here.

12               And I want to focus kind of on what

13   I'm writing on the bottom, one more time.

14               If someone -- if something has a

15   p-value of less than .02, the converse of it is that

16   your 98 -- .98, that would be 98 percent certain

17   that the result is not by chance?

18   A.    Yes.  That's a fair way of saying it.

19   Q.    And if you have a p-value of .10, that means

20   the converse of it is 90 percent, or 90 percent that

21   it's not by chance, correct?

22   A.    Yes.

23   Q.    Okay.  And to stick with the conventional term

24   that you told us about in science, when they go .05,

25   the converse of it is .95 percent, and so you have
```

1   95 percent that it's not by chance, correct?

2   A.    Fairly said, yes.

3   Q.    That course would be taught -- that basic

4   course would be taught somewhere in college,

5   correct?

6   A.    Sure.

7   Q.    Okay.  And the last thing I'd like to ask

8   about -- sorry to keep going back and forth -- is so

9   if the jury saw a .0158, that's of course less than

10  .02, which means that it is 90 -- almost 99 percent

11  not by chance.

12  A.    Yes.  It's statistically significant, as I

13  would call it.

14  Q.    Okay.  Just one more.

15                Do you have Table 20 handy?

16                And if the jury saw .0992, that would

17  mean it's roughly 90 percent not by chance because

18  this is almost .10, and therefore, it would be the

19  converse which is 90 percent not by chance; do I

20  have it right?

21  A.    Yes.

22  Q.    Okay.  Because we're going to see numbers like

23  that and --

24  A.    Again, it's a little more complicated, but

25  generally you're -- that's a fair statement.

1  Q.    Okay.  We -- meaning we laypeople who are in

2  this room -- would be on the same page as -- right

3  now in terms of what we're looking at -- a physician

4  who's looking at these numbers basically.  Can we

5  agree?

6  A.    Sure.

7  Q.    Okay.  Now --

8  A.    You'd have to ask everyone else.  I can't talk

9  for everyone.

10  Q.    I understand.  I just want to make sure we had

11  the basic understanding.

12              So where we were when we broke for

13  lunch is that Janssen pooled the studies together

14  and asked the question, and again, put the question

15  in my mind that we're going to see in Table 21 and

16  then we'll push forward.

17  A.    Okay.  The question we're looking at -- that

18  Janssen is looking at now is whether prolactin, that

19  hormone, whether elevations in that hormone are

20  associated with side effects.

21              Is prolactin elevation associated

22  with gynecomastia, lactation?  And they're doing the

23  analysis to answer that question.

24  Q.    Okay.  So the data is run, and there is a

25  table in the pooled analysis, which is Table 21,

 1   correct?

 2   A.    Yes.  And can I just point out the date of it?

 3   Q.    Yes.

 4   A.    Because it -- it's May 15, 2002.  That's the

 5   data set that I'm referring to.

 6   Q.    Yes.  And we're going to display it.

 7                 I'm going to mark what is a table

 8   from "Long-term Risperidone Treatment versus

 9   Prolactin Statistical Documentation for Manuscript

10   Support, May 15, 2002."

11                 I'm marking this one page out of a

12   long -- much longer document as P-34.

13                 THE COURT:  Okay.

14                 MR. KLINE:  I have marked a copy.

15            I'm handing it to the court officer and to

16            counsel and requesting, so long as there's no

17            objection --

18                 MS. SULLIVAN:  Your Honor, I don't

19            have a problem with Mr. Kline using this

20            document, but it's part of a whole data

21            analysis; and I just prefer, because we're

22            going to be referring to it, that he show the

23            witness and the jury the entire set.  It's --

24                 MR. KLINE:  Huge.

25                 THE COURT:  Well, we can introduce

- DAVID A. KESSLER, M.D. - DIRECT -          11

```
 1              the entire set as P-34 and make this page a
 2              subset.
 3                    MS. SULLIVAN:  But he's just going to
 4              pick out one and ignore the rest.  That's the
 5              problem.
 6                    MR. KLINE:  That's their theory, Your
 7              Honor.
 8                    But I will promise, by asking some
 9              questions, that we can get there.
10                    THE COURT:  Okay.  P-34 is going to
11              be the entire document and then this page is
12              P-34A.
13                    MR. KLINE:  Yes.  And we'll furnish
14              it so that now the Court has about this much
15              paper to add to the case (indicating).
16                    THE COURT:  Well, no.  I think
17              Ms. Sullivan will have that.
18      BY MR. KLINE:
19      Q.    The question that I have, sir, is did you
20      review the entire document?
21      A.    So I asked for the entire document.
22      Q.    Okay.
23      A.    And I asked to search the database for the
24      entire document.  If my memory is correct, I saw the
25      tables.  That was what was in the database, okay.
```

- DAVID A. KESSLER, M.D. - DIRECT -          12

1   Q.    Okay.  To give the jury an explanation as to

2   what we have here, when we consulted with you, did

3   we as lawyers -- I wasn't the lawyer at the time

4   involved in all this legwork.  I don't take credit

5   for it either.  But did the lawyers provide you

6   certain documents?  Yes or no?

7   A.    Yes; this at my request.

8   Q.    And then did you along the way say, based on

9   my knowledge, education, experience, I'd like to see

10  other information?

11  A.    Yes.

12  Q.    Okay.  And is there a enormous databank, a

13  database, like millions of documents?

14  A.    Yes.

15  Q.    And were they produced with Bates stamped

16  numbers on them?  The plaintiffs' lawyers

17  representing these children and the Janssen people

18  are exchanging documents.  And did you see -- or did

19  you ask people for the documents when you thought

20  you wanted to see something else?

21  A.    Yes, exactly.  I asked for this entire plan,

22  yes.

23  Q.    Okay.

24  A.    This entire data set and saw certain tables,

25  was given certain tables because that was what was

 1  in the database.

 2  Q.    Okay.  And just by way of an example, when you

 3  had asked for something, for example, Ms. Brandon

 4  here, is she someone -- who you came to know -- to

 5  know this database of millions of documents and you

 6  would say to her, Ms. Brandon, get me this or get me

 7  that?

 8  A.    Exactly, because she would key in -- I would

 9  give her key words, for example, or I say I'm

10  looking for the statistical documentation, can you

11  tell me what's in the database.

12  Q.    Okay.  And while we may not be at Janssen, did

13  you make an effort to find what you thought was the

14  important information?

15  A.    I was searching for this information, yes.

16  Q.    Did we -- when I say the "we," collectively --

17  ever find anything about the statistical tables in

18  these 3 million documents?

19  A.    Let me go back at a break and just check my

20  binders so I'm absolutely certain.  I remember a

21  collection of tables sitting here right now, but I

22  can double-check.

23  Q.    Okay.  I'm sure if there's a write-up to it,

24  then you'll be able to see that, too, if it becomes

25  germane.  And you'll be prepared to answer, you'd be

- DAVID A. KESSLER, M.D. - DIRECT -          14

```
 1    willing to answer any questions about it, correct?
 2    A.    Absolutely.
 3    Q.    Okay.  Was there -- I'm going to ask you it
 4    again since it came up and you said only one table.
 5    Did you look at a stack of data on a computer screen
 6    and print it out that contained what you believed to
 7    be the tables, many tables from this study?
 8    A.    Yes.  I looked at many tables from this study.
 9    Q.    And when you look at many tables from a study,
10    sir, is the point to look for that which is
11    important at the end of the day?
12    A.    I certainly looked at the -- yes.
13    Q.    In your experience at the FDA -- I'm going to
14    ask you a general question back to the FDA, sir.
15    Your experience with the FDA, have you had the
16    subject of what you could call data dumps, people
17    throw you millions of documents and then they say,
18    oh, we gave it to you?
19              MS. SULLIVAN:  Objection.
20    BY MR. KLINE:
21    Q.    We gave it to you.
22              MS. SULLIVAN:  Objection, Your Honor.
23        That's lawyer argument.
24              THE COURT:  Overruled.
25              MR. KLINE:  It's not lawyer argument
```

```
 1            at all.
 2                    THE COURT:  Overruled.
 3    BY MR. KLINE:
 4    Q.    Have you had that experience?
 5    A.    I'd get -- when I was at FDA, I got millions
 6    and millions of pages.  I mean --
 7    Q.    Is it important -- I didn't want to cut you
 8    off, but I wanted to get to the next thing.  Is it
 9    important -- is it important to get to the key data
10    and for a pharmaceutical company to flag the key
11    data?
12    A.    Sure.  Can I -- can I explain?
13    Q.    Yes.
14    A.    So if you look at the data on Risperdal at
15    FDA, I mean, it's vast, right.  I mean, it is -- I
16    don't have an exact number, but it's hundreds of
17    thousands of pages, okay.
18                    I would venture to say that no one
19    individual, right -- never say never -- but no one
20    individual looks at every single page that's in that
21    application.
22                    In fact, I mean, when I would go
23    testify in front of Congress, if they wanted to make
24    fun of the FDA, what they do is they bring in what's
25    the application and the application would fill up
```

1     the -- all -- you know, a big part of the room.

2     There would be boxes and boxes, right.

3                    So, yes, it's very important for the

4     manufacturer to share everything.  But it's also

5     important for the manufacturer, I mean, to be able

6     to summarize and tell the FDA what's important.

7     Q.    Does the FDA actually rely upon -- and when

8     the FDA relies upon, that means do the American

9     people rely upon the drug companies to flag safety

10    problems?

11    A.    The -- certainly in the 30 years that I've

12    studied this and have been involved in this, the

13    important point from my perspective is it's the

14    manufacturer's responsibility to assure the safety

15    of their drug.  FDA tries very hard, right, to

16    review the data.  I mean, FDA works with the

17    manufacturer.  But at the end of the day, it's the

18    company that sells the product that is responsible,

19    I mean, to the patient ultimately, to assure the

20    safety.  FDA plays a very big role, but the company,

21    certainly in my view, in my opinion, has primary

22    responsibility.

23    Q.    Okay.  So when we have a key safety problem

24    that's found in a particular document, is it the

25    responsibility of the company to say here's what it

- DAVID A. KESSLER, M.D. - DIRECT -          17

```
 1   is to the FDA?
 2   A.    Yes, absolutely.  You will see not only
 3   tables, you'll see summaries that are submitted of
 4   the data, and it's very important for the company to
 5   be up-front with the agency so that you -- you can't
 6   go look, I mean, through millions and millions and
 7   millions of pages.  You have to rely on the
 8   manufacturer to make sure that they're helping the
 9   FDA and ultimately the physician and patient.
10   Q.    Okay.  Now, I would like to have a discussion
11   with you about information that's in Table 21 and
12   then what ended up happening to that information.
13   Are you prepared to discuss it with me?
14   A.    I'd be happy to.
15   Q.    And Table 21, which we will display.
16              Before I leave, I marked as P-33 my
17   blackboard, which is now complete, on statistics and
18   what they mean.
19              Now, in Table -- I'm going to
20   display -- I'm going to display a document.  It's
21   one page of a document.  And it's a larger document
22   which we will furnish as the larger part of P-34,
23   and this will be 34A, this one page.
24              And in this P-34, I'd like to look at
25   what it says on the top.  I'd like to get some
```

1   information about it before we go into what you

2   found on it.  So let's display it, so long as

3   there's no objection, so long as the Court allows me

4   to do so.

5              THE COURT:  Yes.  Please, go ahead.

6   BY MR. KLINE:

7   Q.    And let's look at the very top of the

8   document.

9              The document says, "Long-Term

10  Risperidone Treatment versus Prolactin, Statistical

11  Documentation for Manuscript Support, May 15, 2002."

12  And it says, "Protocols, RIS-CAN-19, RIS-CAN-20,

13  RIS-USA-93, RIS-USA-97, RIS-International-41, and it

14  contains Janssen-Ortho, Inc."  And it says

15  "Confidential," correct?

16  A.    Yes.

17  Q.    And looking to the title of this table, the

18  words that are used by the company at the time are:

19  "Prolactin-related side effects by prolactin levels,

20  at or above upper limit of normal, paren ULN, paren

21  PAP dash as observed, end of paren:  Frequency

22  tables."

23              Did I read it correctly?

24  A.    Yes.

25  Q.    Thanks for being my checker.

1                      And does the paper -- does the table

2    indeed relate to prolactin-related side effects by

3    prolactin levels?

4    A.    Yes.  It gives numbers of prolactin-related

5    side effects down below.

6    Q.    Okay.  Now, we have to look at something

7    different here because this now just isn't the

8    incidence of gynecomastia which we've been

9    discussing before, correct?

10   A.    It's a different question.

11   Q.    Yes.  Different question.  Important question?

12   A.    Of course.

13   Q.    Now, let's look on the bottom because I

14   don't -- let's look at the bottom.  I won't tell you

15   why, but just look.

16                      And it says SciAn Services, Inc.  Who

17   do you understand that to be?

18   A.    That was the statisticians that Janssen had

19   contracted with.

20   Q.    And we know the date of this document is

21   May 15, 2002, correct?

22   A.    Yes, both from the top and the bottom.

23   Q.    So we know that this data was available to and

24   known to Janssen by that date, correct?

25   A.    Yes, sir.

```
 1                    MS. SULLIVAN:  Again, Your Honor,
 2           this is not cross-examination.  I object to
 3           the constant leading.  If he could just ask a
 4           question and let the doctor -- Dr. Kessler
 5           answer.
 6                    THE COURT:  Well, again, I would
 7           allow some leeway since the answer really is
 8           self-evident.  But for these self-evident
 9           answers, I'll permit it.
10                    Go ahead.
11   BY MR. KLINE:
12   Q.    Now, is there anything more about the table or
13   explanatory which you believe is needed before we
14   delve into the finding that's here?
15   A.    So I think we should probably define --
16   there's -- if you look in the middle, it says
17   "prolactin" in that heading.  And I think we should
18   define above the upper limit of normal and normal.
19   Q.    Okay.  Let's take down everything that we have
20   on the screen.  So the record is clear, while this
21   testimony is going on, we're displaying this
22   exhibit, which is now 34A, in front of the jury.
23                    And if you can focus in, sir, on this
24   section here, "prolactin," so the jury can see.
25                    (Technician complies with request.)
```

1                    There you go, "prolactin."  And if
2    you would explain and then we'll get back to the
3    full chart.
4    A.    So where it says above the upper limit of
5    normal, there's a footnote that's also related.
6    Janssen selected a laboratory value of prolactin,
7    right, and it did it, 18 for males and 30 for
8    females.  Those were the laboratory numbers for
9    prolactin.  And Janssen said above those numbers,
10   we're going to consider that above the upper limit
11   of normal, and then below those numbers we'll
12   consider within normal limits.  So there's a cutoff
13   here.
14   Q.    Is this, sir, like when we may -- not many of
15   us may have had prolactin levels done or that we
16   know about, but is this like when you have your
17   sugar level and you get the lab result back and it
18   has ULN and then it's boldfaced and you say, Oops, I
19   got to -- I got to eat less Necco wafers?
20   A.    Or your cholesterol level.
21   Q.    Or your cholesterol.
22   A.    There's a cutoff.
23                    And those who are elevated and you're
24   comparing those who have normal.  So you have two
25   groups here, in essence.

- DAVID A. KESSLER, M.D. - DIRECT -          22

1  Q.    Okay.  Now, when we look at this chart, and

2  let's see the best way to do it and it can also be

3  enlarged to see.  What I'd like to do is display it.

4                    Take that down.

5                    And there's no enlarging towards

6  this, right?

7                    But get rid of everything on the top

8  and the bottom and give us kind of the middle, the

9  core of it as big as you can.

10                   (Technician complies with request.)

11                   MR. KLINE:  Yes.

12 BY MR. KLINE:

13 Q.    That's what we need to see, correct, sir?

14 A.    Yes.  I'm happy to explain what that is.

15 Q.    Okay.  Now, let me ask some questions and then

16 I'm going to ask you generally to explain.

17                   First of all, is this looking at --

18 we learned -- we learned that they're pooling five

19 studies together; correct so far?

20 A.    Right.  So all the children that are in those

21 five studies.

22 Q.    And we know that all of those studies, every

23 child was on Risperdal.  They were looking at all

24 kids that were on Risperdal, correct?

25 A.    Exactly.

- DAVID A. KESSLER, M.D. - DIRECT -          23

1  Q.    Okay.  Step back to footnote.  Some of these

2  studies -- sometimes there's a study where they

3  study people on a drug and people on a sugar pill.

4  They're called a placebo and you're comparing the

5  ones on the drug to the ones on the sugar pill.

6  This is not that kind of study?

7  A.    It can -- it's a comparison, the way they did

8  it.  But it's comparing a different aspect.  It's

9  not comparing to a placebo because everyone's on the

10  drug.  It's comparing those who are within the

11  normal limits of prolactin versus those who are

12  elevated.

13  Q.    And a couple of more predicate questions.

14             Every -- okay.  I saw a look or two,

15  so I just want to -- I want to go back.

16             Every child in this study, every

17  number in this study relates to a child who was

18  actually on the drug, correct?

19  A.    Yes.

20  Q.    And some of them had prolactin levels which

21  were above normal, and some had prolactin levels

22  which were within normal.

23  A.    Exactly.

24  Q.    Okay.  And --

25             (Microphone feedback.)

```
 1                    -  -  -
 2              (Whereupon an off-the-record
 3         discussion was held.)
 4                    -  -  -
 5   BY MR. KLINE:
 6   Q.    Okay.  Trying again.  Now, let's tackle it, if
 7   I may.
 8              So we have the time periods set up on
 9   the left side, correct?
10   A.    Yes.
11   Q.    And we have predose -- I'll tell you what to
12   mark -- predose.
13   A.    Before the drug even starts.
14   Q.    Weeks four to seven?
15   A.    After four to seven weeks.
16   Q.    What do you mean after four to seven weeks?
17   A.    Well, it's -- predose is before, at sort of
18   time zero.  These children have not received any
19   drug.  Weeks four to seven means that we're doing
20   the measurements after four to -- at between four to
21   seven weeks on the drug.
22   Q.    Weeks 8 to 12.
23   A.    Exact same thing.  Children have now been on
24   the drug for 8 to 12 weeks.
25   Q.    And the same thing would be true weeks 16 to
```

1    24; weeks 28 to 36; and weeks 40 to 48?

2    A.    Exactly.

3    Q.    Now, we have numbers that are there, and we

4    see actually the numbers are higher and continue to

5    get lower as the weeks go on.

6    A.    Children drop out of the study, I assume.

7    Q.    Every number that's in this -- on this page,

8    when we get to weeks 8 to 12, do you see weeks 8 to

9    12, there are 499 children?

10   A.    Yes.

11   Q.    Every one of those is a child with a

12   disability, correct?

13   A.    Those are all children that are enrolled in

14   that trial.  They have conduct -- I mean, they've

15   met the eligibility for disruptive behavior conduct

16   disorder with intelligence limitations.

17   Q.    Now, let's go to the analysis.

18              If I can go all the way to the right

19   side first, the chi-square test?

20   A.    That's a test for statistical significance for

21   an association.

22   Q.    For an association.

23              And tell us, I don't think we've

24   that -- we heard the word; but tell us, sir, what is

25   an association?

```
 1   A.    Is this related to that (indicating).
 2                 So I want to know whether this, in
 3   this case, is elevated prolactin levels related to,
 4   associated with, gynecomastia, lactation, with side
 5   effects.  Is that abnormal?  Is that increased
 6   laboratory value?
 7   Q.    And here did they set the test for what they
 8   would say was the association?
 9   A.    Yes.  They're doing the chi-square test.  And
10   they're setting all -- they're setting the
11   parameters.  They set the upper limit of normal.
12   They set the statistical analysis, yes.
13   Q.    When you teach biostatistics, sir, how many
14   days or weeks would we spend on the chi-square, if I
15   said to you what's the chi-square?
16   A.    I think in a college course, you would spend a
17   number of days on it.
18   Q.    Okay.  Well, I don't think that I'm going to
19   be giving it.
20                 And I just saw His Honor shake his
21   head.
22                 So what I'd like to know, in three
23   sentences or less, what's the chi-square?
24   A.    Chi-square test is a statistical test to
25   determine whether there is an association between
```

1    two variables.

2    Q.    Okay.  By the way, who picked it?  Who picked

3    this test with these -- with this parameter?

4    A.    It was Janssen.

5    Q.    And I want to put the statistic chi-square.

6    It says .3 down at weeks -- of all of these, three,

7    six, does one of them stick out as being less than

8    .2 -- .02, which is statistically significant?

9    A.    I look -- when I look at these numbers, I

10   actually look for .05, at 95 percent.  But you're

11   correct that it's less than .02.  But generally when

12   I look at a chi-square test, I'm looking to see

13   whether there's statistical significance at the

14   95th percentile.

15   Q.    By the way, how do we know that they were

16   looking at .98?  How do we know that they were

17   looking at .02?

18   A.    I think we can -- you'll see -- in certain

19   manuscripts I see it written down in that way.

20   Q.    Okay.  But in any event, this number is less

21   than .95, correct?

22   A.    Yes.

23              Just if we can highlight it so

24   everyone knows the number we're talking about.

25   Q.    By the way, the one above it, if you could

1    highlight .0158.

2    A.    Right.

3    Q.    Does that mean that this finding, which we're

4    going to discuss with the jury in a moment, is

5    approximately 98 percent certain that it's not --

6    that it didn't happen by chance?

7    A.    Yeah.  The best way to say it is it's

8    statistically significant.  And that, I mean,

9    certainly you're right.  You're adding that

10   98 percent.  Again, I tend to look at these things

11   at the 95th percentile.  That's why that sticks out.

12   That's the way I'm trained.

13   Q.    Okay.  And look at the one above it.  Is the

14   one above it within the 95th percentile, too?

15   A.    No, it's not.

16   Q.    The one weeks four to eight.

17   A.    Four to seven, no.  That is not within the

18   95th percentile.

19   Q.    Okay.  I'll come back and talk about that

20   later maybe.

21                  Now, let's look at weeks 8 to 12.

22   Was there a statistically significant finding at

23   weeks 8 to 12?

24   A.    Absolutely, no question about it.

25   Q.    And, by the way, from the documents you've

1   reviewed and what we're about to go through in this

2   with the jury this afternoon, was Janssen well aware

3   that they had this statistically significant

4   finding?

5   A.   Yeah.  This is not controversial, I don't

6   think.  Yes, Janssen referred to this finding as

7   statistically significant, I believe.

8   Q.   Now, let's look at what they found.  Let's go

9   in weeks 8 to 12.  And if we can circle -- if we can

10  get in our yellow that little square there, 2237,

11  257, 7.8, 92.2.  Do you see it, sir?

12  A.   Yes, I do.

13  Q.   Okay.  No, no, the next one.  That's it, Cory,

14  the whole thing.

15                 (Highlighted the screen.)

16                 MR. KLINE:  Excellent.

17  BY MR. KLINE:

18  Q.   Now, let's highlight the other -- if you have

19  another color, that would be good; if not, use the

20  yellow.  That's fine.  But let's look at this as

21  well.

22                 (Technician complied with request.)

23                 Okay.  Now, explain to the members of

24  the jury what we have up there in front of us.

25  A.   So --

1    Q.    Can everyone see that far?  Are we too far

2    away?

3                    Too far away.

4                    THE COURT:  Well, can that be

5            expanded or zoomed?

6                    There you go.

7                    MR. KLINE:  How about that?

8                    (Jurors responded in the

9            affirmative.)

10                   How about one more up?

11   BY MR. KLINE:

12   Q.    Okay.

13   A.    So this study, remember, is looking for the --

14   I mean, the end point of this study is a

15   prolactin-related side effect.  So that's either

16   gynecomastia or lactation or amenorrhea.  That's

17   what you're counting.  And they have two groups.

18   First group are -- I mean of the kids who are on

19   this study and on this drug, the kids who have the

20   upper limit of normal who have an abnormal level,

21   they find 20 of the children with the upper -- who

22   have the abnormal level of prolactin, 20

23   prolactin-related side effects.  And they calculate

24   a percentage here of 7.8.

25                   Now, 237 do not.  That's 92.2.  But

1   the way you need to look at this is you look across.

2   So they're comparing the number --

3   Q.     Look across you said.

4   A.     So if you can highlight some or put a box

5   around the 20 and the 7.8 and the 7 and the 2.9,

6   I'll explain, because that's the statistical

7   significance.

8   Q.     Okay.  Let's do this.  Let's take all the

9   yellow off of it.  Give us a moment.  If everyone

10  will indulge us.

11                    Great.  And you're suggesting --

12  A.     And if you can just do me a favor and just add

13  the heading so everyone sees that the 20 is related

14  to the above the upper limit of normal and the 7 is

15  a limited -- it relates to the normal.

16                    (Technician complies with request.)

17  Q.     Excellent.

18                    Do we now have the data that's needed

19  in front of us to understand this?

20  A.     Yes.

21  Q.     Okay.  I'm going to --

22  A.     At the 8- to 12-week interval, which is an

23  important interval.

24                    MR. KLINE:  Okay.  And I am going to

25        snapshot that and mark it as P-35.  And we

```
 1              will copy it, give it to defense counsel,
 2              give it to the Court at the most opportune
 3              moment.
 4    BY MR. KLINE:
 5    Q.    Okay.  Now, you were saying, sir.
 6    A.    So you see a total of -- remember we were
 7    dealing, I believe, at that 8- to 12-week period.
 8    Let me just tell you, there were 499 children who
 9    had measurements in that 8- to 12-week period.  And
10    257, if you can highlight it, were in this upper
11    limit of normal.  So they were above the upper limit
12    of normal, excuse me.  So they had abnormal levels
13    of prolactin, we'll call it.
14                    So there were 257 in that group and
15    242 who had normal levels of prolactin.
16    Q.    Okay.
17    A.    But the analysis, what stands out, is that 20
18    of the kids who had abnormal levels of prolactin had
19    prolactin-related side effects.
20    Q.    Gynecomastia being the main one?
21    A.    Yes.
22                    And of the normal, kids who did not
23    have -- had normal levels of prolactin, there were
24    seven.
25    Q.    Three times as many if they had -- if they
```

- DAVID A. KESSLER, M.D. - DIRECT -          33

1   were -- they're all on the drug, correct?

2   A.     Yes.

3   Q.     Ones who are on the drug get a raised

4   prolactin level.  And we know the drug raises

5   prolactin level, correct?

6   A.     Yes.

7   Q.     And --

8   A.     And the question -- the question is whether

9   that prolactin level is associated.  We know the

10  drug is related to the gynecomastia, right.

11  Q.     Yes.

12  A.     And the question here is whether the prolactin

13  is related to the gynecomastia.  That's the question

14  that's being asked.

15  Q.     And the answer was?

16  A.     In the weeks 8 to 12, this is statistically

17  significant and there's an association.

18  Q.     And, by the way, did they learn in their

19  studies -- you reviewed all these studies -- did

20  they learn that prolactin levels in the patients who

21  took the drug went up and then went down?

22  A.     Yes.  So that's -- that's a very important

23  point, because you see a number of -- if you can go

24  back to, kindly, the underlined chart.

25  Q.     Snapshot it.  We're going back to the full

1    chart.

2    A.    And you see that there's a number of

3    different -- these are measured in a number of

4    different week intervals, right.  So there's a

5    predose before the drug and then this analysis is

6    done at weeks 4 to 7, 8 to 12, 16 to 24, 28 to 36,

7    and 40 to 48.

8                   So the one statistical finding that

9    jumps out is the 8 to 12 weeks.  The others are not

10   statistically significant.

11   Q.    But do you see, sir, if we can focus in on the

12   portion of it that says "prolactin" -- if we can

13   just grab that piece of it right here (indicating).

14   A.    Can I just finish my answer?

15   Q.    Yes, please.

16   A.    So, again, what's very important when you look

17   at an association, to see whether there's an

18   association, and you're doing that and you're

19   looking, this isn't just about statistics, because

20   statistics alone are not going to tell me

21   necessarily the whole story.  So what I'm very

22   interested in and what I am trained in, because you

23   also have to look at the biology, and what Janssen

24   knew was that there was the rise in prolactin early

25   on and then it came down.  And you can see graphs of

 1    when it came up, right.  But it peaks early on.  It

 2    peaks in that 4- to 7-, 8- to 12-week period, those

 3    periods.  So I know the biology.  I know prolactin

 4    levels are increasing in that period.  And it's in

 5    that period also, this 8- to 12-week, that I see a

 6    statistically significant finding.

 7                    So I have to put the biology, does it

 8    make sense in terms of the biology with the

 9    statistics?  And that's what -- when I looked at

10    that and put that together, that's why, when I saw

11    that, I said that was an important finding.

12    Q.    And, by the way, when Janssen saw it -- we're

13    now going to look at their drafts of their

14    manuscript, of their write-up of this.

15                    When Janssen saw it, did they think

16    exactly what you're telling this jury today, that

17    this was a significant finding?

18    A.    You don't have to take my word for it.  I

19    mean, that's Janssen's --

20                    MS. SULLIVAN:  I'm just going to

21            object again, Judge.  He's not a mind reader.

22            Let the Janssen people talk about this.

23                    THE COURT:  Wait a minute.  Is there

24            an objection?

25                    MS. SULLIVAN:  Yes.  Objection, Your

- DAVID A. KESSLER, M.D. - DIRECT -          36

```
 1            Honor.  No foundation.  He doesn't know what
 2            the Janssen --
 3                    THE COURT:  Well, again, why don't
 4            you leave us not in suspense.  Let's see the
 5            document.
 6                    MR. KLINE:  Sure.  I'm about three
 7            questions from getting to the draft, but I
 8            will --
 9                    THE COURT:  Skip the three questions
10            and get to the draft.
11                    MR. KLINE:  Well, I want to do one
12            thing, which was the trend.
13                    THE COURT:  All right.  Go ahead.
14                    MR. KLINE:  But -- and then I think I
15            could put this document down.
16                    I know it's dense, but stick with me,
17            please.
18    BY MR. KLINE:
19    Q.    Sir, in weeks four to seven, do you see week
20    four to seven?
21                    If we can pull that out.
22    A.    Yes.
23                    MR. KLINE:  Do it all the way across,
24            Cory, and do it with the titles, if you
25            would, please, as efficiently as we can.
```

1          THE WITNESS:  Yes.  I see it.

2    BY MR. KLINE:

3    Q.    Was there a trend leading up to the 8- to

4    12-week, as you saw it?

5    A.    Yes.  Yes.  Let me explain, if I may.

6                And you may want to also just

7    highlight the weeks 8 to 12 underneath that so I can

8    explain.

9                So what's important to compare, in

10   weeks 8 to 12, which we just talked about, there

11   were 20 cases with abnormal levels that had adverse

12   events.  And within that normal levels, there were

13   seven, not -- almost three times, not quite.  There

14   was 20 versus seven.  And that was statistically

15   significant, right.  And it makes sense.  I mean,

16   you see you have 20 in one group, seven in the other

17   group, and it turns out to be statistically

18   significant.

19   Q.    And same question in weeks 4 to 7, sir.

20   A.    I was just going to talk about those.

21   Q.    Go ahead.

22   A.    So if you look -- let's look at the data in

23   weeks 4 to 7.  In the kids who had the abnormal

24   level of prolactin, above the upper limit of normal,

25   you see 21.  If you can highlight that.

- DAVID A. KESSLER, M.D. - DIRECT -          38

1                    (Technician complies with request.)

2                    And you see in the normal group you

3     have six.  So in fact you have more than three

4     times, but that result is not statistically

5     significant.

6     Q.    So if it says -- if the p-value is .3979, that

7     to me is less than point -- is less than .5.  Why

8     isn't it statistically significant?

9     A.    No.  .05, okay.  So that is -- that is not

10    statistically significant.  But let me just make my

11    point.

12    Q.    Oh, I see.  It's .39.

13    A.    Yeah.

14    Q.    I understand.

15    A.    But if I can make my point.

16                   You see in the weeks 8 to 12, you

17    have 20 and 7, and you compare that, and that's

18    statistically significant and it's not even three

19    times.  Weeks 4 to 7, you have 21 versus 6, right.

20    So you really have three times more kids in this

21    upper limit of normal, right.  And you say, well,

22    that's three times more.  But when you do the math,

23    it's not statistically significant.

24                   Now, I can explain that because, I

25    mean, it has to do with the -- the denominator and

```
 1    whatever.  But when you see three times more, and
 2    again, I really think we should focus on the
 3    statistically significant data, but it is important
 4    to point out that there is three times more, but
 5    it's not statistically significant.  That's
 6    generally, statisticians will tell you that's a
 7    trend, because you're building up.  Because these
 8    are not -- this is not just --
 9    Q.    That's what I wanted to ask you.
10    A.    This is not numbers on a page.
11    Q.    Yes.
12    A.    These are patients, right.  And you see this
13    4- to 7-week period early on and then these kids
14    continue.
15    Q.    Yes.
16    A.    So what you see is the numbers are rising
17    here, in this early period.
18    Q.    Okay.  I don't know if we got too much or too
19    little, but I am going to move on.
20              We now are -- we now know that
21    there's that statistically significant result.  Did
22    Janssen go about the writing up of this -- of these
23    statistical data into a paper?
24    A.    Yes.
25    Q.    All right.  And I'm going to mark as Exhibit
```

 1    36 an e-mail which is from Carin Binder to Gahan

 2    Pandina, dated July 16, 2002.  It's now P-36.  And

 3    attached to it is a draft document which is

 4    entitled, "Prolactin levels in children and

 5    adolescents with long-term risperidone use."

 6                    MS. SULLIVAN:  And, Your Honor, I'm

 7          just going to object to these manuscripts

 8          because the prescribing doctor never saw this

 9          study, so it has nothing to do with this

10          case.  So I'll object on relevance and 403

11          grounds.

12                    THE COURT:  No; it's overruled.

13                    MR. KLINE:  Same things that were

14          ruled upon...

15                    THE COURT:  Let me see it.  All

16          right.  This is overruled.

17                    Objection overruled.

18    BY MR. KLINE:

19    Q.    Okay.  Now, sir --

20    A.    May I just ask so I know we're exactly

21    referring to the same thing.

22    Q.    I'm on your Tab 15, if that helps you.  I'm at

23    draft one of the paper.

24    A.    And the e-mail is from whom to whom?

25    Q.    It's from -- the draft one contains an e-mail

1   on the front of it from Binder to Pandina.

2   A.    And the Bates number is 718?

3   Q.    And the Bates number is 718, yes.

4   A.    Thank you for that.

5   Q.    Okay.  Thank you.

6                I want to try to kind of get to the

7   end of the road, which has been a long road.  And I

8   appreciate everybody's patience.

9                Now, here we go.  I need to get to

10  see whether they put this in the study.  I want to

11  go through the study, some highlights of it.

12               Do you have the e-mail in front of

13  you, sir?

14  A.    Yes, I do.

15  Q.    Okay.  And do you see the subject on Page

16  14079718?

17               Cory, if you would be prepared to

18  display it -- or don't display it.

19               It's listed as "Subject:  Draft

20  Prolactin Manuscript," okay.

21               Do you have it there, sir?

22  A.    I see it, yes.

23  Q.    Is that what it says?

24  A.    Yes.

25  Q.    Did you review this document?

1   A.     Yes.

2   Q.     Is this document as well as all these other

3   documents, the ones that I have asked you about, as

4   to whether you have an opinion as to whether

5   Janssen's warning to physicians was inadequate?

6   A.     Exactly.

7   Q.     And, by the way, when we're talking about

8   whether on that question, before we get to this

9   document, on whether the warning was adequate, are

10   there various ways that a drug company, especially

11   with an off-label drug like this being used in

12   children, can warn?

13              MS. SULLIVAN:  Objection, Your Honor.

14         Well beyond this expert's report.  He's

15         testified it should be in the WARNINGS

16         section.  His report said it should be in the

17         WARNINGS section of the label, so I'll

18         object.  It's not in his report.  Everything

19         beyond that --

20              MR. KLINE:  Your Honor --

21              THE COURT:  This document --

22              MR. KLINE:  Let's straighten it out

23         at a break, Your Honor, otherwise we'll end

24         up at a sidebar.

25              THE COURT:  Well, the objection at

 1              the moment is sustained and we'll look at it.

 2                     MS. SULLIVAN:  Thank you, Your Honor.

 3                     MR. KLINE:  I can assure the Court

 4              that it's in his report.  Dear Doctor Letters

 5              and all the rest.

 6                     THE COURT:  I'm sure you'll be able

 7              to show me something.

 8                     All right.  So let me see.

 9                     MR. KLINE:  Okay.  But let's -- I'll

10              move so we can do it at a break rather than a

11              sidebar.

12                     THE COURT:  Go ahead.

13      BY MR. KLINE:

14      Q.    Now, sir, I'd like you to look at the abstract

15      which is two pages in.

16                     I'm going to try to avoid rushing,

17      which was my problem yesterday, even though I have a

18      tendency to want to do it.

19                     I would like you to look at Bates No.

20      721 -- Cory, are you with me as well, sir?

21                     VIDEO TECHNICIAN:  Yes.

22      BY MR. KLINE:

23      Q.    And it's the abstract of the paper.  So long

24      as there's no objection, other than the ones that

25      have been raised, and the Court allows me, I will

 1    display it, if the Court --

 2              THE COURT:  All right.  You may go

 3         ahead.

 4              MR. KLINE:  -- permits it.

 5              THE COURT:  This is at 9721.

 6              MR. KLINE:  Yes.

 7              THE COURT:  And for all of us, this

 8         was an attachment to an e-mail, is that

 9         correct, or part -- this is a page of an

10         attachment to an e-mail.

11              MR. KLINE:  It's really -- I would

12         not identify it that way, sir.  The e-mail

13         simply -- I would say that the e-mail happens

14         to be the transmittal to a draft document.

15         What I'm displaying is a draft -- draft

16         number one of a paper that is entitled,

17         "Prolactin levels in children and adolescents

18         with long-term risperidone use."

19              THE COURT:  All right.  And this

20         is -- and this goes back to July of 2002.

21              MR. KLINE:  That is correct.

22              THE COURT:  Okay.

23              MR. KLINE:  It is dated July 16,

24         2002.

25              THE COURT:  All right.  Very well.

 1              Thank you.

 2                    MR. KLINE:  The very bottom of the

 3              page, it says "Revised July 16, 2002."

 4                    I'm sure that Mr. Smith will

 5              highlight that briefly.

 6                    And as long as we're on that first

 7              page, would you please step back a minute and

 8              not jump ahead of me.

 9                    Thank you.

10                    If we can go back to 4719 which we

11              were on.

12                    (Technician complies with request.)

13                    MR. KLINE:  Thank you.

14   BY MR. KLINE:

15   Q.    On the bottom of the page it says

16   "Acknowledgments supported by Janssen-Ortho, Inc."

17   Do you see that, sir?

18   A.    Yes.

19   Q.    And the information I now want to go to is

20   contained on Page 721.  The document itself is not

21   paginated internally, so I can't refer to their

22   pages.

23                    And under abstract and background,

24   I'd like to look at the first paragraph, sir.

25   A.    Yes.

1   Q.    And I'd like to not highlight the whole thing,

2   Cory, I'd like to just focus on the word "any

3   relationship with side effects."

4                   No.  No.  I'd like you to pull up the

5   whole paragraph and simply highlight "any

6   relationship."  That was my intention.  I gave a --

7   I didn't give a full enough request.

8                   Yes.

9                   Was the purpose to explore any

10  relationship?

11  A.    Yes.  That's exactly what it says.

12  Q.    And is there any indication yet that they were

13  going to take out kids over 10?

14  A.    Not at all.

15  Q.    And in fact under Method, in the -- before we

16  get here.  If you can put that back up, Cory.

17                  They now are using a different

18  terminology.  For the first time we see the words

19  used --

20                  MS. SULLIVAN:  Objection, Your Honor,

21          to the lawyer testifying.

22                  MR. KLINE:  I think that it would be

23          stipulated to, but maybe I'll have to prove

24          it.

25                  THE COURT:  You're going to have to

```
 1             prove it.  If you want to, you can compare
 2             them to another document that has some other
 3             statistic --
 4                  MR. KLINE:  I'll ask a different
 5             question which I don't think will be
 6             objectionable.
 7                  Would you take the highlighting off,
 8             please?
 9                  (Technician complies with request.)
10                  MR. KLINE:  Again, I apologize.  I
11             have a lot I want to cover and I want to
12             rush, but I don't want to rush.  So I'm going
13             to slow myself down.
14   BY MR. KLINE:
15   Q.    Do you see the words -- do you see that
16   sentence, sir?  Would you read it to the jury?
17   A.    [Reading]:  "This analysis was designed to
18   investigate prolactin levels in children with
19   long-term risperidone treatment and explore any
20   relationship with side effects hypothetically
21   attributable to prolactin open parentheses S-H-A-P
22   close parentheses, SHAP."
23   Q.    Okay.  Now, way back when I started, all the
24   documents you saw prior to this point, did they talk
25   about PRAE, prolactin-related adverse events?
```

```
 1    A.     Or prolactin-related side effects, yes.

 2    Q.     Did the main documents with those tables we

 3    were looking at, did they say prolactin-related

 4    adverse events?

 5    A.     Yes.

 6    Q.     Now, this document is talking about something

 7    called "SHAP," symptoms --

 8    A.     Side effects.

 9    Q.     I think it's "symptoms," sir.

10    A.     If you look at the -- just look at the

11    background.

12    Q.     Okay.  Side effects.

13    A.     "Side effects hypothetically attributable to

14    prolactin."  Sorry.  I didn't mean to -- there's a

15    small difference, symptoms, side effects.

16    Q.     Hypothetically.

17    A.     "Attributable to prolactin, SHAP."

18    Q.     Attributed [sic] to prolactin.

19                  And my first question, sir, is --

20    I'll have to write this out better later.

21                  Symptoms hypothetically related.

22                  Well, was there anything

23    hypothetically related, going back in the other

24    studies that you saw?

25    A.     They didn't use that term, no.
```

```
 1    Q.    And when they started to use in this draft the
 2    term "SHAP," is SHAP a word that -- in any document
 3    you had seen prior to this write-up, had you seen
 4    the word in the Janssen documents relating to the
 5    prolactin-related adverse events?
 6    A.    So there is an e-mail that I saw.
 7    Q.    Yes.  Other than that e-mail which I don't
 8    want to discuss with you right now.
 9    A.    I don't recall seeing it.
10    Q.    Okay.  Just bear with me one second.
11                   Now, let's look under Method.
12                   Here we are under Method.
13                   And just very briefly.  Children --
14    all the kids were age 5 to 15 in the study, correct?
15    A.    Yes.
16    Q.    And did they change that at this point?
17    A.    No.
18    Q.    And I'd like to look at page Bates stamp
19    number ending in 740 and 741.
20                   And I'd like to display that.
21                         -  -  -
22                   (Technician complies with request.)
23                         -  -  -
24                   MR. KLINE:  With all that fancy
25               footwork by Mr. Smith, can everyone see it?
```

```
 1                    (Jurors responded in the

 2           affirmative.)

 3                    MR. KLINE:  We okay?

 4  BY MR. KLINE:

 5  Q.    Now, sir, I'd like you to -- what we have

 6  displayed are two pages from the write-up.  Do these

 7  two pages -- is what's before the jury right now the

 8  write-up as it relates to Table 20 -- the key

 9  finding that you flagged for us in Table 21?

10  A.    That's discussed in these -- what's on the

11  screen, yes.

12  Q.    And I'd like to, first of all, snapshot it, if

13  I may, and give it a number, and print it for the

14  Court.  It would be P-37.

15                    We will have that done for the court

16  officer momentarily.

17                    (Whereupon Exhibit P-37 marked for

18           identification.)

19                    MR. KLINE:  We're now printing them

20           right out of the printer here.

21  BY MR. KLINE:

22  Q.    And, sir, would you tell the members of the

23  jury, would you, if I first can point this out, the

24  manuscript goes to -- down to where the bold print

25  is, and then somebody interjects a question, which
```

1  we'll talk about.

2                    So first would you tell us what it

3  states here in the -- first what we're going to

4  learn is the first of a number of drafts of this

5  paper.

6                    THE COURT:  Well, we're only going to

7        do this draft before we take a break,

8        correct?

9                    MR. KLINE:  Okay.

10                   THE WITNESS:  So this -- these

11       paragraphs describe what we talked about on

12       Table 21.  Would you like me to read it?

13  BY MR. KLINE:

14  Q.    Yes.

15  A.    It says [reading]:  "The percentage of

16  children with SHAP was assessed for patients with

17  prolactin levels above the upper limit of normal

18  versus patients with prolactin levels within the

19  normal range at the various analysis time periods.

20                   "The proportions were all comparable

21  except for the weeks 8 to 12 time period, in which

22  7.8 percent of the patients who had prolactin above

23  the upper limit of normal had SHAP at some point

24  during the trial, while 2.9 percent of patients with

25  prolactin levels within the normal range at weeks 8

- DAVID A. KESSLER, M.D. - DIRECT -          52

1    to 12 experienced SHAP at some time during the

2    study."

3                   And then it gives the statistically

4    significant result -- remember you asked me about a

5    p-value -- less than .02.

6    Q.    Yes.

7    A.    And that's where that -- that's that symbol.

8    And then it goes on to say [reading]:  "There were

9    no statistically significant differences in the

10   percentage of patients who reported SHAP for any

11   other analysis time period [sic], whether or not

12   prolactin levels were normal or above the upper

13   limit of normal."  And they gave the range of 3.7 to

14   6.9.

15   Q.    Okay.  A couple of questions, a few questions

16   before we take the break.

17                   First of all, sir, you see this thing

18   that has P equals less than 02?

19   A.    Yes, sir.

20   Q.    And if you can highlight that, Cory.  Do you

21   see it?

22                   In science jargon, now that we're all

23   clued into it, is that saying we have a

24   statistically significant finding by our standard

25   that we picked?

- DAVID A. KESSLER, M.D. - DIRECT -          53

1    A.    Exactly.

2              MS. SULLIVAN:  Objection, Your Honor.

3         This is again mind reading.  They could

4         ask -- they did ask the witnesses.  They can

5         play their actual testimony.

6    BY MR. KLINE:

7    Q.    Sir, I have a different question.

8              THE COURT:  All right.

9    BY MR. KLINE:

10   Q.    I have a question, sir.  Is this mind reading?

11   Is this mind reading?

12   A.    That's statistical significance.  Every

13   scientist will tell you that's what that means.

14             MS. SULLIVAN:  I don't object to the

15        statistical significance.

16             THE COURT:  I'm not --

17             MS. SULLIVAN:  I object to him just

18        talking about what's meant by the words.

19             THE COURT:  Counsel, you'll have your

20        opportunity to ask Dr. Kessler what that

21        means and what it's not, but right now we are

22        pressing on.

23             MS. SULLIVAN:  Thank you, Your Honor.

24   BY MR. KLINE:

25   Q.    Next, is what's flagged here, sir, in this

 1    write-up exactly what you flagged for the jury

 2    today?

 3    A.    If you -- even if you pull up that highlight,

 4    that 7.8, and that 2.9 percent for that weeks 8 to

 5    12 where you highlighted it and had it pulled out

 6    last time, that was exactly what they're talking

 7    about, that time period.

 8    Q.    And every time they're now saying "SHAP," is

 9    that referring to what they were always calling

10    before a prolactin-related adverse event?

11    A.    Yes.  They're calling it by this other term.

12    Q.    And, sir, when it says -- someone

13    interlineated on the bottom, someone who was in the

14    group said how do you want to handle -- how do you

15    want to handle the one significant value?  It goes

16    on to say, "The poster."

17               Briefly, what is a poster?

18    A.    Poster is a presentation of data at a meeting,

19    for example.

20    Q.    The poster says, "There was no direct

21    correlation with prolactin elevation and SHAP.  What

22    analysis was used for this?  Can we get correlation

23    coefficients for prolactin levels versus SHAP as was

24    done for prolactin levels versus age, and if no

25    correlation, just stick with that."

```
 1                    Is that what it says there?
 2   A.    That's exactly what it says.
 3   Q.    Is this science, sir, what you're looking at
 4   right now?
 5                    MS. SULLIVAN:  Objection, Your Honor.
 6           It's argument.
 7                    THE COURT:  That's sustained as to
 8           whether it's science.  You can ask him what
 9           it means to him, though.
10   BY MR. KLINE:
11   Q.    What does it mean to you, sir?
12                    MS. SULLIVAN:  Objection.
13                    THE WITNESS:  Somebody realizes who's
14           read the paper that there is a significant
15           value here.  They also state that they
16           have -- there's a poster that they put out
17           that says there's no direct correlation, and,
18           in essence, this is saying we have a problem.
19                    THE COURT:  Anything else?
20                    MR. KLINE:  Not right now.
21                    THE COURT:  All right.  We're going
22           to take a break here.  It is ten of 3:00.
23           Let's come back at 3 o'clock.  Please do not
24           discuss this matter with each other or any
25           other source, okay?
```

```
 1                    COURT CRIER:  All rise as the jury
 2          exits.
 3                         -  -  -
 4                    (Whereupon the jury exited the
 5          courtroom at 2:48 p.m.)
 6                         -  -  -
 7                    THE COURT:  All right.  We're in
 8          recess for ten minutes.
 9                         -  -  -
10                    (Whereupon a recess was taken.)
11                         -  -  -
12                    (Whereupon an off-the-record
13          discussion was held.)
14                         -  -  -
15                    THE COURT:  You're on notice that I
16          am in no way going to limit the time of
17          cross-examination.  If this witness needs to
18          come back on Monday, then certainly he will
19          be able to come back.
20                    THE WITNESS:  Whatever Your Honor
21          wants.
22                    THE COURT:  He needs to be somewhere
23          this weekend, but he's coming back on Monday.
24                    MS. SULLIVAN:  Well, the only thing
25          we would object to is another witness going
```

- DAVID A. KESSLER, M.D. - DIRECT -          57

```
 1            on before we get to finish the

 2            cross-examination.

 3                    THE COURT:  Well, again, that's not

 4            my practice.  I wouldn't mind taking a

 5            morning off and catching up on all these

 6            other activities that I'm involved with.

 7                    MS. SULLIVAN:  Understood, Your

 8            Honor.

 9                    THE COURT:  So we'll look at it, what

10            the situation is, after today's testimony.

11                    MS. SULLIVAN:  Okay.  Thank you very

12            much, Your Honor.

13                    MR. KLINE:  I just know I got aways

14            to go.

15                    THE COURT:  Okay.

16                    COURT CRIER:  Jurors are now

17            entering.  Please stand.

18                         -  -  -

19                    (Whereupon the jury entered the

20            courtroom at 3:05 p.m.)

21                         -  -  -

22                    THE COURT:  All right.

23                    COURT CRIER:  Please be seated.

24            Court is now back in session.

25                    THE COURT:  Be seated everybody.
```

```
 1                    All right.  Just -- and have you all
 2          met Ms. Zeller?  Kathy Zeller is our court
 3          crier for the afternoon.  Marianne had an
 4          appointment she needed to make.  So I also
 5          wanted the lawyers to know that Ms. Kathy
 6          Zeller is going to be helping us out.
 7                    All right.  Mr. Kline, when you are
 8          ready, you may proceed with Dr. Kessler.
 9                    MR. KLINE:  Okay.  I am ready.
10                    I'd like to return to where we were
11          at the break, which was that call-out of
12          the -- yes.
13  BY MR. KLINE:
14  Q.    Dr. Kessler, the statement that we have there
15  relating to the poster, if we can go down to the
16  poster, the question that was asked about the
17  poster.  It was interlineated, "the poster states
18  that there was no direct correlation..."
19                    Do you see it, Cory?  If you would
20  highlight that.  "The poster states there was no
21  direct correlation with elevation between SHAP."
22                    Now, you told us what a poster was,
23  which is a presentation that apparently had been
24  made on the -- about this, correct?
25  A.    It says -- I don't know if it had been made or
```

```
 1   was going to be made, but clearly there was another
 2   presentation of data.
 3   Q.    Okay.  And in fact if there was a poster that
 4   said that, then that would be incorrect?
 5   A.    Yes, for a number of reasons.
 6   Q.    And what are those number of reasons?
 7   A.    Well, there is an association.  There is a
 8   relationship, okay, at 8 to 12 weeks.  There are
 9   other periods where there's not a relationship but
10   there is that statistically significant finding.
11   Q.    Does this --
12   A.    Can I just finish?
13   Q.    Yes.  You were going to say something else.
14   A.    I apologize.  And I don't want to take -- I
15   could spend the next hour --
16   Q.    Please don't.
17                 (Laughter.)
18   A.    But I promise, but this is -- I could spend
19   the next hour discussing the difference between
20   correlation and association, okay.
21                 Suffice it to say, if you look at the
22   purpose of this study -- and it's right up there in
23   the write-up -- is to see whether there's any
24   relationship.  And you can't do a correlation unless
25   there's continuous variables.
```

```
 1                    So Janssen was correct to do the
 2    chi-square, which is a test of an association.  So
 3    there is not going to be a direct -- the
 4    correlations -- the right way to measure the
 5    relationship is with chi-square, and they see a
 6    relationship.
 7                    So anything that says there's not an
 8    association or not a relationship or leave that
 9    impression would be incorrect.
10    Q.    And the other 58 minutes?
11    A.    If you want I'd be happy to.
12                    THE COURT:  No.  Doctor, not 58
13            minutes.
14                    MR. KLINE:  No.  I said the other 58
15            minutes, the remaining.
16                    Okay.
17    BY MR. KLINE:
18    Q.    So we have in -- at this time, sir, the --
19    when this -- when this draft is being written, which
20    is July of 2002, to go back to a benchmark earlier,
21    was the drug, from the documents that you've seen,
22    this prescription medication, continuing to be
23    prescribed to children around the world?
24    A.    Oh, yes.
25    Q.    Okay.  Now, that would take us, or at least
```

- DAVID A. KESSLER, M.D. - DIRECT -          61

1  me, to asking the question with this in mind and
2  those questions being -- this question being asked,
3  is there anything else in this document that needs
4  to be reviewed in support of your opinion or can I
5  go on to the second draft?
6  A.    You could certainly go on to the second draft.
7  I just want to, if I may, just point out that the
8  language here gets it right.  I mean, this language
9  adequately, in my view, explains the data in Table
10  21.  This is a fair representation in this draft.
11  Q.    And insofar as picking out a data point, was
12  that data point actually zoomed in on, picked out,
13  and focused on by Janssen?
14  A.    Yes.  They -- they did that and they did that
15  appropriately.  That's the statistically significant
16  finding.
17            Let me just -- that "data point,"
18  right, I mean, underlying that data point are
19  hundreds of data points that go into that
20  statistically significant finding.  You saw those
21  denominators, the number of children.  So, I mean,
22  that is, I mean, just -- when you say a data
23  point --
24  Q.    Yes.
25  A.    -- I just want you to understand that there's

- DAVID A. KESSLER, M.D. - DIRECT -          62

1    a lot of data that gets rolled up into that analysis
2    and into that finding.
3    Q.    Okay.  That takes us to draft two.  Was there
4    a second draft which you became aware of relating to
5    this pooled analysis?
6    A.    Yes.
7    Q.    Okay.  And just to focus, I know there's a lot
8    in a short time in this trial, the pooled analysis
9    involves putting the data of these five studies
10   together, correct?
11   A.    Exactly.
12   Q.    All right.  And there is -- there is an e-mail
13   which transmits a second draft.  And I would like
14   to -- and have you reviewed that e-mail, internal
15   e-mail between people on the Janssen team,
16   attempting to develop the drug for use in children
17   and adolescents on label; is there an e-mail?
18   A.    There are actually three e-mails on one page
19   that I have reviewed.
20   Q.    And I'm going to mark -- I'm going to
21   carefully go slow on this.  I'm going to mark an
22   exhibit which is 168 -- Bates No. 168.  I'm going to
23   mark the e-mail that we have -- the e-mail chain we
24   have in front of us as Plaintiff's Exhibit 38.  It's
25   a two-page document.  I'm going to hand it to the

```
 1   court officer to hand to the Court.
 2                   And just assure myself that in our
 3   discussions, that this e-mail I believe to be
 4   usable, top and bottom.  That's my understanding.
 5                   I plan to --
 6                   THE COURT:  All right.  Any
 7        objection, Counsel, P-38?
 8                   MS. SULLIVAN:  Your Honor, I think
 9        you've already ruled on this one.
10                   THE COURT:  Yeah.
11                   MR. KLINE:  Okay.
12                   Then I intend to go to the entire
13        chain of the e-mail, top and bottom e-mail.
14   BY MR. KLINE:
15   Q.   And let me just make sure on one point, if I
16   may.
17                   (Pause.)
18                   MR. KLINE:  Okay.  I wanted to make
19        sure, Your Honor, that we have the requisite
20        testimony --
21                   THE COURT:  Okay.
22                   MR. KLINE:  -- that we've discussed.
23   BY MR. KLINE:
24   Q.   And let's look at the e-mail that is on the
25   bottom of the page from Binder to a number of people
```

1   on the team.

2   A.    I see it.

3   Q.    And it includes Pandina as well, correct?

4   A.    (No response.)

5   Q.    You see his name there?

6   A.    Yes, I do, on the second line of the two.

7   Q.    And, by the way, because I may be able to tie

8   this in later, you see Carmen DeLoria as well,

9   correct?

10  A.    Yes.

11  Q.    And Ms. -- or Ms. Binder says -- addresses the

12  e-mail:  Dear Pediatric Publication Team.

13             I'd like to display the document, so

14  long as there's Court approval, for me to display

15  the bottom e-mail.

16             THE COURT:  Right.  P-38, the bottom.

17             MR. KLINE:  Yes.  And this would be

18       the first page which ends in 168.  00115168.

19             Your Honor, in gauging, are we on a

20       hard stop at 4:30 like yesterday?

21             THE COURT:  No.

22             MR. KLINE:  Was that the issue?

23             THE COURT:  No.  But before 5:00

24       we're going to be out of here; or not.

25             MR. KLINE:  Okay.

1          THE COURT:  I mean, we can go a

2      little bit past 4:30 today.

3          MR. KLINE:  Okay.

4          THE COURT:  I doubt it.

5          MR. KLINE:  I'll be at a point

6      probably when I want to break, but I'll

7      discuss with the Court.

8  BY MR. KLINE:

9  Q.    And it says, Dear Pediatric Publication Team,

10  correct?

11  A.    Yes.

12  Q.    And Ms. Binder says, "May I ask you to please

13  review the attached draft manuscript within the next

14  two weeks, if possible.  Since this is a holiday

15  time, leeway will be extended to early September."

16  The date here being August 15 of 2002.

17          "I have inserted some comments in

18  yellow for our authors to clarify.  Please ignore

19  these."

20          And then she says here -- and I'd

21  like to call it out, if I can, so that you can

22  enlarge it -- "Key message."

23          "Key message."  If you can get that

24  enlarged, please, so that we can actually see it

25  from the jury box.

- DAVID A. KESSLER, M.D. - DIRECT -          66

```
 1                    (Technician complies with request.)

 2                    MR. KLINE:  That's the best you can

 3         do, Cory?

 4                    Can you see?

 5  BY MR. KLINE:

 6  Q.    Okay.  It says there's a Key message:

 7  "Prolactin rise is transient and not related to side

 8  effects hypothetically attributed to prolactin, EPS,

 9  or efficacy response."

10                    Do you see that, sir?

11  A.    Yes.

12  Q.    And based on what you've reviewed, is that

13  consistent with what they found in Table 21?

14  A.    No.

15  Q.    How can you -- how can a pharmaceutical

16  company have a key message --

17                    MS. SULLIVAN:  Objection, Your Honor.

18         It's going to be argument.

19                    THE COURT:  That's sustained.

20                    MR. KLINE:  I'll ask it instead of

21         the "how."

22  BY MR. KLINE:

23  Q.    Is it acceptable, sir, for a prudent

24  pharmaceutical company to have a key message

25  inconsistent with the data in its very files?
```

- DAVID A. KESSLER, M.D. - DIRECT -            67

```
 1                MS. SULLIVAN:  Objection on
 2           foundation.  And it's argument.  And it's
 3           beyond the scope of the --
 4                MR. KLINE:  It's a general question.
 5                THE COURT:  Well, I'm going to
 6           sustain it.
 7                Why don't you relate it, Counsel, to
 8           the actual opinion being offered to the jury.
 9  BY MR. KLINE:
10  Q.    Sir, does this -- when you said that the
11  Janssen Pharmaceutical Company provided an
12  inadequate warning in the period 2002 to 2006, does
13  this document relate to the opinions which you've
14  formulated?
15  A.    Yes.
16  Q.    Tell us how.
17  A.    The most important thing for me, I mean, both
18  at the FDA and as a doc, a physician, is, and as
19  someone who sits on the boards of the pharmaceutical
20  companies, is -- the one thing that you have to do
21  when you're dealing with all medicines, including
22  very powerful medicines, is to tell the truth, and
23  you tell the whole truth and you tell the whole
24  story and you make sure that the data support
25  that -- support what you're saying.
```

- DAVID A. KESSLER, M.D. - DIRECT -          68

1                    A key message -- and pharmaceutical

2     companies have key messages, they have -- what that

3     means is what they want to convey.  And what they

4     want to convey here -- and as you'll see in their

5     own words -- don't match what the data show.  And to

6     me, that's not telling the whole story, especially

7     when you're talking about adverse events that are

8     significant and there's a relationship.

9                    So you just make sure that FDA knows

10    that, make sure doctors know that.  Tell them the

11    whole story, the good and the bad.  It's not

12    statistically significant at every time point, but

13    it is statistically significant at one important

14    time point.  Tell them that, the good and the bad.

15    And that's what I care about.  That's what went into

16    my opinion.

17    Q.    And, sir, what flows from that opinion, I have

18    a question.

19                    Did Janssen, knowing that this was

20    being used off-label in thousands of children, did

21    they have an obligation to get the word out as to

22    this finding?

23    A.    Absolutely.

24                    MS. SULLIVAN:  Objection, Your Honor,

25        in terms of foundation.  An obligation based

 1              on what regulation?

 2                      THE COURT:  Well --

 3                      MR. KLINE:  Based on this information

 4              that's here.

 5                      THE COURT:  Well, if you're opening

 6              the door to it, we could ask the witness all

 7              about what goes into that opinion.

 8                      MS. SULLIVAN:  Well, Your Honor --

 9                      MR. KLINE:  Of course.

10                      MS. SULLIVAN:  I would -- Your Honor,

11              it's our position there's been no violation

12              of any regulation.  And this witness can't

13              tie anything to his expertise which is a

14              regulatory expert.

15                      MR. KLINE:  That's also not true.

16                      THE COURT:  No.  You're --

17                      MS. SULLIVAN:  He's basically saying

18              I think --

19                      THE COURT:  You're making a speech,

20              Counsel.  You may rephrase the question.  But

21              if there is some explanation to be made about

22              the last statement or last opinion, then have

23              him do it.

24                      MR. KLINE:  I will ask -- I will

25              clear it up.

1                    I believe I have that question and

2          answer.

3  BY MR. KLINE:

4  Q.    My next question is, sir, is a general one.

5                    Is there any -- was there any

6  regulation in effect between 2002 and 2006 that said

7  that a pharmaceutical company could not warn of a

8  key safety finding?  Yes or no.

9                    MS. SULLIVAN:  And I'm going to

10          object, Your Honor, on preemption grounds.

11          And the issue is did we violate any.  And

12          Dr. Kessler can't point to any --

13                    THE COURT:  Again, are you making a

14          speech?

15                    MS. SULLIVAN:  Well, Your Honor, it

16          should --

17                    THE COURT:  Objection overruled.

18                    MS. SULLIVAN:  All right.

19                    THE WITNESS:  May I respond?

20  BY MR. KLINE:

21  Q.    Yes.

22  A.    There have been a number of points that have

23  been raised and let me address them, okay.

24                    Most important, okay, and I'll do

25  this from memory, but I'll give you the citation,

1    Your Honor.  The FDA has been very clear, and that

2    goes back to 1979.  It's in the Federal Register.

3    There is -- a manufacturer can always warn about

4    safety and should warn doctors about safety.  There

5    is nothing in the labeling regulations -- this is

6    almost a quote from the Federal Register -- there's

7    nothing in the regulations that prevent a

8    manufacturer from warning.  A manufacturer can warn

9    in many different ways.  Manufacturer can warn in a

10   Dear Doctor Letter.  A manufacturer can have their

11   detail people warn.  A manufacturer can warn in the

12   label.  They can warn in many different places of

13   the label.  There's something called the WARNINGS,

14   with a capital W.  That's not the only place for a

15   manufacturer to warn.

16              On the duty, I'm going to be very

17   specific, there are two duties, I mean, as I see

18   them, okay.  If you're going -- put very simply:  If

19   you're sending a sales representative in to a

20   doctor's office multiple times --

21              MS. SULLIVAN:  Objection.  Again,

22         Your Honor, can I have a sidebar?  This is

23         not in his expert report at all.  They're

24         just coming in and making up a new series

25         of --

```
1              MR. KLINE:  I'm not making anything
2       up.
3              THE COURT:  This is in response to
4       your objection.  Overruled.
5              THE WITNESS:  If you send a sales
6       representative in to a pediatric neurologist
7       and you do that multiple times, right, you
8       have an obligation under the regulations to
9       provide adequate directions for use.  That's
10      required under the law.
11             I can explain that.  I've written
12      about that.  But the important point is leave
13      aside the regulations from an FDA point of
14      view.  Just look -- I can just tell you from
15      sitting on the boards of pharmaceutical
16      companies and I could tell you as a doc, if
17      you have information that relates to the
18      safety of a drug, you have to communicate it.
19      It would not be reasonable, it would not be
20      prudent not to do that.  Tell the good.  Tell
21      the bad.  Make sure that doc is informed.
22      That's what FDA cares about when it comes to
23      safety.
24  BY MR. KLINE:
25  Q.   Now, sir, I'd like to look at draft two.
```

 1                    We had covered the e-mail leading up
 2     to that, and I'd like to go to the one above it.
 3     Carin Binder wrote that e-mail on Thursday,
 4     August 15th, at 11:06 a.m., saying what the key
 5     message should be.
 6                    By the way, she's writing that, as we
 7     know, as the medical -- strike that.  I don't need
 8     to tell you again.
 9                    We have Dear Team, an e-mail above it
10     from -- from the --
11     A.    The August 21, 2002.
12     Q.    Yes.
13                    And if I can focus, this is from
14     Pandina back to Binder and the group.  He's one who
15     responds, correct?
16     A.    Yes.
17     Q.    And if I can go three sentences down,
18     beginning with the words "If, if we can
19     demonstrate."  It's that sentence which will be my
20     call-out, Cory.
21                    "If we can demonstrate" -- yes.
22     He'll get it in a minute.  Okay.
23                    That's the extent it will rise.
24                    "If we can demonstrate that the
25     transient rise in prolactin does not result in

1   abnormal maturation, or SHAP, this would be most

2   reassuring to clinicians."

3                   Do you see that?

4   A.    Yes.

5   Q.    And did you include that -- did you review

6   that as well in forming your opinion as to what was

7   said there by Dr. -- or by the psychologist,

8   Pandina?

9   A.    Yes.

10  Q.    Now, the very top document of the e-mail

11  attaches a document, and I'd like to look at it.

12                  Draft number two.  I'm marking draft

13  number two --

14  A.    Yes.

15  Q.    -- as P-39.  I'm handing it -- Mr. Gomez is

16  handing it to our court officer.

17                  THE COURT:  Okay.

18                  (Whereupon Exhibit P-39 marked for

19          identification.)

20                  THE COURT:  All right.  This was

21          the -- you don't call it an attachment.  But

22          this was referred to in the e-mails.

23                  MR. KLINE:  Yes, exactly.

24                  THE COURT:  P-39.

25                  MR. KLINE:  And it's P-39.  It's

1          actually what we would describe as draft two

2          of the study.

3                    THE COURT:  All right.  This says

4          00115170.

5                    MR. KLINE:  Correct.

6                    THE COURT:  All right.

7                    MR. KLINE:  Thank you, Your Honor.

8                    And I'm going to display some

9          portions of it.  I don't believe there's an

10          objection, and so I believe it's fair game to

11          display.

12                    MS. SULLIVAN:  I believe the Judge

13          has already ruled on this, subject to our

14          objections.

15                    THE COURT:  Yes.  The objection's

16          been preserved.

17                    MR. KLINE:  All right.

18     BY MR. KLINE:

19     Q.    Let's look at the draft very quickly, the

20     draft.  The title doesn't change.  As of now, it

21     says, "Prolactin Levels in Children and Adolescents

22     with Long-Term Risperidone Use," correct?

23     A.    Yes.

24     Q.    And if we go to, again, the -- it's not

25     paginated as an original document, but -- yes.  I

- DAVID A. KESSLER, M.D. - DIRECT -            76

1  need the revision date of the draft -- my colleague

2  reminds me -- which is on the bottom.  It's now

3  revised July 30, 2002.  July 30, 2002 draft.

4              And I'd like to call your attention

5  to page, the Bates number ending in 192; 00115192.

6  A.    I see it, sir.

7  Q.    And I want to call it out, that paragraph, the

8  whole paragraph, if you will, Cory.

9              THE COURT:  All right.  For the

10       record, this particular page is going to be

11       marked eventually as P-39A.

12              MR. KLINE:  Yes.

13              THE COURT:  All right.  So now we're

14       looking at the second -- a certain paragraph

15       of 39A.

16              MR. KLINE:  Yes.  I'm going to

17       snapshot this call-out as the next P number,

18       P-40.

19              We will print it.  We will hand it to

20       the court officer momentarily.

21  BY MR. KLINE:

22  Q.    And this document, sir, as to the write-up of

23  what we've been discussing, it says, "The percentage

24  of children with SHAP was assessed for patients with

25  prolactin levels above normal versus patients with

- DAVID A. KESSLER, M.D. - DIRECT -          77

1  prolactin levels within the normal range at the
2  various analysis time periods.  The proportions were
3  all comparable except for weeks 8 to 12 time period
4  in which 7.4 percent of the patients who had
5  prolactin above the upper limits of normal had SHAP
6  at some period during the trial, while 2.9 percent
7  of patients with prolactin levels within the normal
8  range at weeks 8 to 12 experienced SHAP at some time
9  during the study, paren, P equals .02."
10  A.     I see that.
11  Q.     And, sir, is the language essentially the
12  same?
13  A.     As the prior draft.
14  Q.     And, by the way, did you see e-mails where
15  they were essentially sending these drafts back to
16  brainworks to be redrafted, or don't you have that
17  recollection?
18  A.     I don't have that recollection.
19  Q.     Okay.  And there's a note --
20  A.     Should I read the note?
21  Q.     Oh, no.  Before we read the note, let me
22  finish the paragraph.
23             There's a note in there underlined in
24  bold that has Gahan there.  Do you see that?
25  A.     Yes.

1  Q.    And I don't believe it will be controversial

2  to say that that was added by Gahan Pandina, and

3  we'll produce the deposition testimony of him.

4                 But the last paragraph -- the last

5  sentence says, "There was no statistical

6  significant -- there was no statistical difference

7  in the percentage of patients who reported SHAP for

8  any other analysis time period, whether or not

9  prolactin levels were normal or above the upper

10  limits of normal, paren range 3.4 to 6.5 with SHAP,

11  end of paren."

12                 Putting aside that comment, which

13  we're going to discuss in a minute, did draft two

14  contain the write-up which was in number one and

15  which you also pointed out to the jury before we

16  started to look at these drafts?

17  A.    This is a -- yes.  This is a write-up.  It

18  includes the important information.

19  Q.    Now, Pandina, who we know is on the team, he

20  adds something.  And he says what, sir?

21  A.    He -- the parenthetical says "this" -- and

22  he's talking about the finding that I talked about,

23  that week 8 to 12 increase, that statistically

24  significant finding.  He says, "This may be notable,

25  as this could be seen to suggest that patients who

 1    show an initial rise during the peak period above

 2    the upper limit of normal do have a higher

 3    propensity for SHAP."

 4                    And then he goes on --

 5    Q.    Well, before you go on.  Is that a correct

 6    statement, as you understand it, based on the data?

 7    A.    Yes.  That's exactly what I was saying, yes.

 8    Q.    And he says -- go ahead to finish it.

 9    A.    He says, "I think we need to discuss this

10    somewhere in the manuscript."

11                    May I comment?

12    Q.    Yes.

13    A.    Perfectly appropriate, and I applaud him for

14    writing that.  He points out the significance of the

15    finding as well as I could, and he says "I think we

16    need to discuss this somewhere in the manuscript."

17    Q.    Okay.  Now, let's continue and go to something

18    that happened from there.  That last draft was

19    September -- or was July 30th of 2002.

20    A.    Yes, sir.

21    Q.    In September of 2002, did Janssen decide to

22    write a new data analysis plan?

23    A.    Yes.

24    Q.    Well, I have a question, sir.  I thought

25    they -- if they have a data analysis plan already,

1  why would they have a new data analysis plan?  Do

2  you know?

3  A.    I don't know.  You can certainly amend data

4  analysis plans.  But you certainly don't want to

5  change your statistical plan after you know your

6  results, after you get your data.  That's what

7  you -- I mean, unless there's very, very, very

8  specific circumstances.  But you don't want to get

9  the results and then have a statistical finding.

10 Q.    Okay.  Now, there is a document which I'm

11 going to mark as Plaintiff's Exhibit 41.  I will --

12 it is a multiple page document entitled,

13 "Statistical Documentation, Long-Term Risperidone

14 Treatment versus Prolactin Pooled Analysis."  It

15 begins with Bates Nos. 03888723 and ends with

16 03888729.  Yes, they are JJRE documents.

17            So I will hand it up to the court

18 officer.

19            This, plan, sir, if we can display

20 it.  I believe there's no objection.  And I would

21 ask to display it at this time.

22            MS. SULLIVAN:  No objection.

23            THE COURT:  All right.

24            MR. KLINE:  I'm displaying Bates No.

25       723 first.

```
 1                    THE WITNESS:  Yes.
 2    BY MR. KLINE:
 3    Q.    Okay.  Note the date, September 27, '02.  We
 4    now have a new plan as to how to analyze the data,
 5    correct?
 6    A.    Yes.
 7    Q.    And is there a significant change, sir?
 8    A.    Yes.
 9    Q.    I'd like you to look at Page Bates number
10    ending in 725.
11    A.    Yes.
12    Q.    And look at the very top which says Key
13    Variables.
14    A.    Key Variables Analyzed, yes.
15    Q.    And tell us what are the -- what is the
16    terminology, Key Variables?
17    A.    It's what you're going to include -- what
18    you're -- what the instructions, in essence, you're
19    telling the statisticians to run the data using.
20    Q.    Uh-huh.
21                    And previously, have they included
22    all data sets?
23    A.    Yes.
24    Q.    And have they run data on all the boys?
25    A.    Yes.
```

```
 1    Q.    And now, sir, if you look under Key Variables,
 2    on the second bullet point.
 3    A.    Yes.
 4    Q.    Now, we know that the studies included boys
 5    from 5 to 14, correct?
 6    A.    Yes.
 7    Q.    Now, they're including all of the boys under
 8    10 years old, correct?
 9    A.    They are including only the boys less than 10.
10    Q.    Only the boys less than 10.
11                    That means it now eliminates all the
12    boys who are 11, correct?
13    A.    Yes.
14    Q.    All the boys who are 12, correct?
15    A.    Yes.
16    Q.    All the boys who are 13, correct?
17    A.    Yes.
18    Q.    And all the boys who are 14, correct?
19    A.    Yes.
20    Q.    And most of the boys that are in puberty,
21    correct?
22    A.    Yes.
23    Q.    Was that the plan to begin with?
24    A.    That's not the way the data was run to begin
25    with.
```

```
1   Q.    And was this -- this new statistical plan,
2   sir, if I can go back to Page 723.
3   A.    Yes.
4   Q.    If we can look at the sponsor of the plan, the
5   sponsor was Janssen-Ortho, Inc., correct?
6   A.    Yes.
7   Q.    And it was prepared by the statisticians,
8   correct?
9   A.    Who ran that initial set of data back in May.
10  Q.    But I thought you told me that SciAn had
11  already run data for them.
12  A.    Well, you saw on those -- yes.  I showed you
13  on those tables back on May 15, I showed you that
14  they were prepared by this company, the
15  May 15th data were prepared.
16  Q.    Okay.  Well, I guess it would -- the fall then
17  brought a different plan.
18              They had a -- the other plan was
19  dated when?
20  A.    The original --
21  Q.    May 15.
22  A.    -- the original meeting was back in
23  January 2002.
24  Q.    If I can just step back for one second.  When
25  was the original plan?
```

- DAVID A. KESSLER, M.D. - DIRECT -            84

1                      January 2002, okay.

2                      So of the two plans for 2002, there's

3    a winter plan and now we have a fall plan, correct?

4    A.    You have -- yes.  You have data run based on

5    one set of instructions in the early part of 2002

6    and you get that data and you get a statistically

7    significant finding, and then there is this document

8    that's sort of after -- after that data has been

9    run.  It's after that data.

10   Q.    Okay.  Now, did they run the very same table

11   that we saw as Table 21?

12   A.    Yes.  They ran something almost identical.

13   Q.    And in this paper it became -- it had a

14   different number.  It had Table 20; would that be

15   correct?

16   A.    Yes.

17   Q.    And only this time it's done without the boys

18   over 10, right?

19   A.    Yes.

20   Q.    And let's see what we got.

21                      I'm going to mark as the next exhibit

22   number, P-42.  It's part of a larger packet.  And I

23   will put the larger packet together and make it as

24   part of the exhibit.  But this will be 42A.  And

25   we'll bring in the full document.

```
 1                    (Exhibits P-42 and P-42A marked for
 2           identification.)
 3                    THE WITNESS:  Can you tell me what
 4           tab?
 5   BY MR. KLINE:
 6   Q.     Yes.
 7   A.     I'm sorry.
 8   Q.     That's okay.  There's a lot here.  I have it
 9   under tab -- I have it in my book right in Tab 17
10   behind the statistical plan.
11   A.     Thank you, sir, very much.
12   Q.     Do you have it that way in your book?
13   A.     I can find it now.  Yes.
14                    MR. KLINE:  Okay.  42 is going to be
15           the bigger document.
16                    THE COURT:  42 is also September 27,
17           2002, right?
18                    MR. KLINE:  Yeah.
19                    THE COURT:  All right.  So now we're
20           looking at 42A, which is Table 20 of the
21           entire document, and it's a one-page
22           document, and it's Table 20.
23                    MR. KLINE:  Yes.
24                    THE COURT:  All right.
25                    MR. KLINE:  I'm just waiting for
```

1              Mr. Smith to put something up together so we

2         can see it.

3                   (Pause.)

4                   And I know they're small, but on the

5         left side we have Table 20 from the January

6         run, and now we have Table -- I'm sorry --

7         21.  And then we have Table 20 from this run.

8         But they're too small to see.  I'll zero in,

9         promise.

10    BY MR. KLINE:

11    Q.   Now, let's look at this Table 20.

12              Table 20, let's look at the very top

13    and see what it says.

14              It says, "Long-Term Risperidone

15    Treatment versus Prolactin Levels -- Statistical

16    Documentation for Manuscript Support, September 27,

17    2002."

18              Did I read it correctly, sir?

19    A.   Yes.

20    Q.   Now, is there anything different that's said

21    there in that table versus Table 21 that we've

22    already seen other than it has a new date on it?

23    A.   Just the date.

24    Q.   And we know they're using protocols for

25    CAN-19, 20, 93, 97, and 41, correct?

1   A.    Yes.  Correct.

2   Q.    And we now look at the table itself.  You can

3   take the Table 21 down, and let's just work off

4   Table 20, which is Exhibit 42A.

5                   (Document displayed.)

6                   And let's go to weeks 8 to 12.

7                   Are you able to do better?

8                   How did we get it bigger before?

9                   We singled out this.

10                  Okay.  Let's single out this and then

11  put the title on the top, just like we did before so

12  that we can actually see weeks 8 to 12.

13                  (Technician complies with request.)

14  BY MR. KLINE:

15  Q.    Okay.  Well, there are far fewer boys with

16  gynecomastia now, correct?

17  A.    Yes.  There's -- there was 20.  Now

18  there's nine.  Well, in the upper limit of normal

19  there was 20 and now there's nine.

20  Q.    And there's far fewer in the ones that weren't

21  above the normal limit on their prolactins, correct?

22  A.    There's only three here.

23  Q.    Yes.

24                  And the ratio appears to be about the

25  same, sir.  It's still three to one.

1   A.    Yes.  But the statistical significance

2   disappears.

3   Q.    Oh, disappears.

4   A.    Yes.  At the -- at the .05 level.

5   Q.    Hmm.

6                So now when a pharmaceutical

7   company -- now when Janssen is going to report this

8   data and information, at least as to the boys who

9   are -- when you eliminate all the boys over 10, can

10  you say that it's not a statistically significant

11  finding?

12  A.    That's what this would -- yes.  The data are

13  the data if you do it that way.

14  Q.    Would that be the full story?

15  A.    No.

16  Q.    And if you look under Footnote 3 way down

17  there in the footnotes.  Wait.  Before we do it.

18  Can we take the -- can we get the full page back up

19  again?

20                If you were to look for what you are

21  looking at here, on this page what's in front of the

22  jury is Exhibit 42A which is a full page, only we've

23  enlarged it on the screen.  And if you wanted to

24  know that it was only the boys included up to 10

25  years old, you would have to go down to Footnote 3,

1    correct?

2    A.    It's there, yes.

3    Q.    And it says in Footnote 3 at the very end

4    right here and "males."

5              Males under 10 are included?

6    A.    Yes.

7    Q.    By the way, they excluded also I think a very

8    narrow band of females, correct?

9    A.    They didn't have the age restriction on the

10   females, if my recollection is right.

11   Q.    They had to have -- for a girl to be included,

12   they had to have at least one week of amenorrhea for

13   it to be a prolactin-related side effect, correct?

14   A.    That's how they define it, yes.  They don't

15   apply the same age restriction.

16   Q.    Okay.  So now we have Table A and Table B in

17   terms of May 15, 2002 and September 27, 2002,

18   correct?

19   A.    Yes.

20   Q.    And, by the way, does running the new

21   statistical analysis make this key finding now

22   insignificant?

23   A.    The statistical significance goes away.  You

24   still have that nine versus three.  But, in essence,

25   if you're looking at statistical significance, it

- DAVID A. KESSLER, M.D. - DIRECT -          90

1    would get rid of the problem.

2    Q.    Okay.  Now, let's go to the next place, next

3    spot.

4                  Now, with the new data in hand, did

5    the manuscript get drafted a third time?

6    A.    Yes.

7    Q.    And if I can go back to draft two very quickly

8    and look at the cover of it.  That would be, Cory,

9    call out one -- that would be call-out JJRE -- if

10   you'd write this down, Cory -- JJRE00115170,

11   previously marked as Exhibit -- we'll have to check.

12   It was the second draft.

13                  COURT CRIER:  It's 39.

14                  MR. GOMEZ:  39.

15                  MR. KLINE:  39.  Thank you.  Much

16        appreciated.

17   BY MR. KLINE:

18   Q.    And do you see the title that they had on

19   draft two, just to focus on it, that we've been

20   looking at.  "Prolactin Levels in Children and

21   Adolescents with Long-Term Risperidone Use."

22   A.    Yes.

23   Q.    Now, and if you can do this, Cory, I would

24   like to see how draft three gets a new title.

25                  First I'll mark the exhibit,

```
 1    "Normalization of Prolactin Levels in Children and
 2    Adolescents with Long-Term Risperidone Use."
 3    "Normalization of prolactin levels."
 4                   That would be Bates Nos. JJRE04405229
 5    through 256.
 6                   And this is going to be marked as 43.
 7    Draft three of the article is going to be marked as
 8    Exhibit 43.
 9                   (Exhibit P-43 marked for
10         identification.)
11                   I believe there's no objection so we
12    will display the titles of both.
13                   THE COURT:  All right.  Before --
14                   MS. SULLIVAN:  The Court has ruled.
15                   THE COURT:  We have ruled.  That's
16         right.
17                   MR. KLINE:  I'm sorry.
18                   THE COURT:  All previous objections
19         are preserved.
20                   MS. SULLIVAN:  There was an objection
21         to the manuscript because the prescriber
22         never saw it, so...
23                   MR. KLINE:  Right.
24                   THE COURT:  All previous objections
25         are preserved, but you may proceed.
```

```
 1                    MR. KLINE:  Right.
 2      BY MR. KLINE:
 3      Q.    I'd like to look at the new title that we have
 4      here for the document.
 5                    "Normalization of Prolactin Levels in
 6      Children and Adolescents with Long-Term Risperidone
 7      Use."  That's now the new title in draft three,
 8      correct?
 9      A.    It is.
10      Q.    Well, does that title, sir, match the
11      statistically significant finding that was in Table
12      21?
13      A.    No.
14                    What I -- I think that if you just
15      turn the page, I think this -- if I can answer it
16      this way.  If you can just turn the page to Bates
17      No. 230.
18      Q.    Yes.
19      A.    And just look at under the abstract, the first
20      sentence.  The key scientific question that's being
21      asked does not change.
22      Q.    Okay.
23      A.    It's to explore any relationship, right, with
24      side effects.  But it's looking for any -- any
25      relationship between prolactin and these side
```

- DAVID A. KESSLER, M.D. - DIRECT -          93

1   effects, and so that title doesn't match the -- I

2   mean, it's dealing with whether prolactin levels

3   normalize.  But the key question is, is there any

4   relationship?  That's what the paper is saying it's

5   looking at.

6   Q.    Okay.  And if I may, the -- the -- I'm okay.

7             If I can look at Page 230, Bates No.

8   Bates stamp 230, the first sentence you've already

9   shown us, which is it was to explore any

10  relationship.  And there's a sentence here in the

11  Results, under Results.  Can we pull up Results?

12            And there's only one sentence I'd

13  like to ask you about, and then I'd like to see if

14  you can enlarge it, Cory, so we can actually see it,

15  which is, "There was no direct correlation between

16  prolactin elevation and SHAP."

17            Was that a true statement as it

18  pertained to all of the information they had?

19  A.    No.  And let me just explain.

20  Q.    Yes.

21  A.    Again, subject to my 58 minutes still on

22  correlation and association, they are using this --

23  and I've read the depositions -- they're using

24  correlation and association interchangeably.  And

25  they're using the chi-square.  There are footnotes

- DAVID A. KESSLER, M.D. - DIRECT -            94

1    that they should be using chi-square.

2                    There is a relationship, okay, at

3    that 8 to 12 weeks for when you count all the kids.

4    That would be a misleading statement, in my view.

5    Q.    Now, sir, in the prior drafts, the prior

6    drafts, we saw those long -- that paragraph, that

7    paragraph that talked about the 7.8 versus the 2.9.

8    A.    This is a statistically significant finding.

9    Q.    The statistically significant finding.

10   A.    Yes.

11   Q.    We're now in draft three of October -- this is

12   revised, and I did not do this.  If I can step back

13   to the front page, Page 229, and show to the jury

14   the very bottom.  It's October 4, 2002, correct?

15   A.    Yes.

16   Q.    In this draft of October 4, 2002, is the

17   statistically significant finding mentioned at all?

18   A.    No, it's not.  It's gone from this draft.

19   Q.    And, sir, on Page JJRE04405248, Bates No.

20   ending in 248, in the paragraph at the bottom of the

21   page going over to the top of the page, Mr. Smith,

22   I'll come back and show you.  You got it.

23                    Yes.  And up to the top.

24                    (Document displayed.)

25                    I'm now looking at the last four

```
 1   lines.  And can you highlight there was -- it says,
 2   "The percentage of children with SHAP was assessed
 3   for patients with prolactin levels above the upper
 4   limits of normal versus children with prolactin
 5   levels within the normal range at various analyses
 6   time periods."
 7                   Now, I don't need that highlighted.
 8                   THE COURT:  All right.  Counsel,
 9           before we take a break, can you just tell me
10           where that's coming from here.
11                   MR. KLINE:  Yes.  It's coming from
12           Bates No. 248, Your Honor.
13                   THE COURT:  04405248.
14                   MR. KLINE:  Yes.  5248 and 5249 is
15           exactly where we are.
16                   THE COURT:  All right.  We will mark
17           these as P-43A.
18                   MR. KLINE:  Terrific.
19                   THE COURT:  All right.
20                   MR. KLINE:  Yes.
21                   THE COURT:  All right.  We're going
22           to take a recess right here for ten minutes
23           so that we can do our homestretch, all right?
24                   MR. KLINE:  Okay.  Yes.
25                   COURT CRIER:  All rise, please, as
```

```
 1              the jury exits the courtroom.

 2                         -  -  -

 3                   (Whereupon the jury exited the

 4              courtroom at 4:00 p.m.)

 5                         -  -  -

 6                   (The following transpired in open

 7              court outside the presence of the jury:)

 8                         -  -  -

 9                   THE COURT:  All right.  We're going

10              to take a recess for about ten minutes.

11                   MS. SULLIVAN:  Your Honor, I have a

12              motion -- we can do it when you come back --

13              on a motion to strike and then a request for

14              an instruction on the Dear Doctor Letters and

15              the sales reps.  Nowhere in his report, Your

16              Honor.  A big surprise at trial because they

17              don't have us on the regulations that

18              required a new warning label, so now they're

19              going to say we should have sent a Dear

20              Doctor Letter.  It's not in his report.  He

21              wasn't deposed at length.  We don't have an

22              expert prepared to deal with it.  I request

23              that the jury be instructed to disregard that

24              and that's not in this case.

25                   THE COURT:  I'll address jury -- I
```

 1                    don't see anything to caution anybody about.

 2                    There's no surprise that Dr. Kessler was

 3                    admitted as an expert in pharmaceutical

 4                    regulations.  There was no objection to that,

 5                    in fact.

 6                            MS. SULLIVAN:  But, Your Honor,

 7                    they've changed their whole case.

 8                            MR. KLINE:  We did not.

 9                            MS. SULLIVAN:  It used to be that it

10                    had to be in the warning label.  That's --

11                            (Counsel speaking over the Court.)

12                            COURT REPORTER:  One at a time.

13                            THE COURT:  The record will speak for

14                    itself.  There was an objection and there was

15                    a response permitted.

16                            All right.  We'll take a ten-minute

17                    recess.

18                                    -  -  -

19                            (Whereupon a recess was taken.)

20                                    -  -  -

21                            COURT CRIER:  Are you ready for the

22                    jury, Your Honor?

23                            THE COURT:  Yes.

24                            COURT CRIER:  Okay.  Jurors are now

25                    entering.

```
 1                    -  -  -
 2              (Whereupon the jury entered the
 3         courtroom at 4:13 p.m.)
 4                    -  -  -
 5              (The following transpired in open
 6         court in the presence of the jury:)
 7                    -  -  -
 8              THE COURT:  All right.  Please be
 9         seated everybody.
10              COURT CRIER:  Court is now back in
11         session.
12              THE COURT:  All right.  We're going
13         to go till about ten of 5:00, okay?  Maybe a
14         little bit earlier.
15              MR. KLINE:  I can't finish like
16         anywhere near --
17              THE COURT:  Well, we're not going to
18         be finished with this witness no matter what
19         we do, so it's okay.
20              MR. KLINE:  I'll try to say I'm done
21         a little bit earlier.
22              THE COURT:  All right.
23              MR. KLINE:  And I'll try to see what
24         Your Honor says.
25              I'll tell you a convenient break
```

```
 1          point anyway.
 2   BY MR. KLINE:
 3   Q.    Well, here we are in October -- October 4,
 4   2002.  And we're on the third draft.  And I believe
 5   I had asked you -- can we have up where we were?
 6                  Can we highlight, "There was no
 7   statistical difference in the percentage of patients
 8   who reported SHAP for any analysis time period."
 9                  Would that be true if you took out
10   10-year-olds -- or the above the 10-year-olds?
11   A.    Yes.
12   Q.    And would it be true if you reported all the
13   data?
14   A.    No.
15   Q.    The full sentence would read:  "There was no
16   statistical difference in the percentage of patients
17   who reported SHAP for any analysis time period,
18   whether or not prolactin levels were normal or above
19   the upper limits of normal, paren range 1.8 to 3.5
20   with SHAP."  And if we could highlight the rest of
21   it.
22                  And does that, that end language,
23   sir, that range 1.8, does the sentence kind of look
24   the same?
25   A.    (No response.)
```

1   Q.    I'll withdraw the question.  I don't know that

2   it's a good one.

3                    But in any event, that's what it

4   says, correct?

5   A.    Yes.

6   Q.    Now, is there a table in this -- Table 2 on

7   the same page, Page 248?

8   A.    Yes.

9   Q.    One second.

10                   And by the way, as of this draft, had

11  they -- had anyone used the word SHAP A versus SHAP

12  B or not yet?

13  A.    Not yet.

14  Q.    Well, there's a table, and let's look at it.

15  Table 2.

16                   Side effects hypothetically

17  attributable to prolactin, PA and non-PA

18  populations.  That's the primary analysis and

19  non-primary analysis populations, correct?

20  A.    Yes.

21  Q.    Under the primary analysis here -- I think

22  you've explained that earlier -- there were 592

23  patients, correct?

24  A.    Yes.

25  Q.    Thirteen had at least one prolactin-related

1    adverse event that they're now calling SHAP,

2    correct?

3    A.    Yes.

4    Q.    And by either later today or very early

5    tomorrow morning, we'll talk about what these

6    numbers -- what your analysis of the numbers are.

7    And is there any reproduction in this draft three of

8    Table 21?

9    A.    No.

10   Q.    From January, how about Table 20?

11   A.    I don't see -- there's some numbers from 20, I

12   believe.  The 1.8 and 3.5.  I'd have to go check.

13   Certainly not from Table 21.  The statistical

14   significant finding is not in here.

15   Q.    And if I may push you to page 5251.

16              At the very bottom of the page

17   there's a sentence that begins "no correlation."

18   That's my only call-out here, just that sentence.

19              "No correlation" -- this was the

20   discussion section.  And what is a discussion

21   section of a paper like this?

22   A.    It's sort of where you're discussing the

23   results.

24   Q.    And it says here, "No correlation was found

25   between SHAP and prolactin levels."  Is that true if

1   you take out all the boys over 10?

2   A.    Yes.

3   Q.    Is it untrue if you leave all the boys from

4   under 10 in?

5   A.    It would be misleading.

6   Q.    Now, that takes us to November.  This is

7   October of 2002.  We get to October 4, 2002.  We get

8   to November of 2002.  The leaves have fallen, I

9   guess.

10             It's a long day.

11             And there's a meeting November 15,

12  2002, in New York City, correct?

13  A.    Yes.

14  Q.    At the Palace Hotel, correct?

15  A.    I got to check the hotel.

16  Q.    I see it right on the page.  It's page -- I'm

17  going to mark as exhibit number --

18  A.    It is on the title page.  I missed it.  Sorry.

19  Q.    No; that's okay.

20             I'm marking Exhibit No. 44, which is

21  a Meeting Report.  The Risperdal Child and

22  Adolescent Psychiatry National Advisory Board

23  Meeting.

24  A.    I see it.

25  Q.    A Meeting Report, and I'm going to, as I mark

1    it, as Exhibit Number -- tell me again -- 44.  I've

2    handed it to the Court.

3                   I believe there's no objection to

4    this document, so with the Court's permission, I'll

5    display it.

6                   MS. SULLIVAN:  Well, Your Honor --

7                   THE COURT:  Well, for your

8         understanding, all objections relating to

9         these documents are preserved.

10                  MS. SULLIVAN:  Thank you, Your Honor.

11                  THE COURT:  Welcome.

12                  So 44, yes.

13                  MR. KLINE:  Okay.  So 44 may be

14        displayed.  Thank you.

15                  (Document displayed.)

16   BY MR. KLINE:

17   Q.    Let's look at the front page which we have in

18   front of us.

19   A.    Yes.

20   Q.    We're now November 15, 2002.  And we are three

21   drafts into the pooled analysis writing, correct?

22   A.    Yes.

23   Q.    And the Meeting Report is on the top.  On the

24   bottom it says meeting date, which is incumbent on

25   me to establish is November 15, 2002.  The location

1  is the Palace Hotel, New York City.  And the
2  document contains on Page 2 -- oh, by the way, for
3  identification purposes, the document goes from
4  JJRE03900098 through 0113.
5  A.    Exactly.
6  Q.    Yes.  And on the front, it is -- this
7  document -- this Meeting Report was prepared for
8  Janssen Pharmaceutica Products, L.P., correct?
9  A.    Yes.
10  Q.    So this is a Janssen document as you would
11  understand it, correct?
12  A.    It certainly --
13            MS. SULLIVAN:  And, Your Honor, just
14       for the record, it's clear it's prepared by
15       an outside company called Helix.  This is not
16       prepared by Janssen.  It's not a Janssen --
17       it's in the Janssen files because they
18       received it, but they didn't create it.
19            THE COURT:  All right.  I guess why
20       don't we --
21            MR. KLINE:  So stipulated.  And in
22       fact -- thank you, Ms. Sullivan.
23            And in fact it was prepared for
24       Janssen.
25            MS. SULLIVAN:  And, Your Honor --

```
 1                      MR. KLINE:  Which I pointed out,
 2           correct?
 3                      MS. SULLIVAN:  And, Your Honor --
 4                      THE COURT:  I think that's a
 5           rhetorical question because that's what it
 6           says on the title of the page which is up on
 7           the screen.
 8                      MR. KLINE:  Yes.
 9                      THE COURT:  All right.  So we can
10           move on.  Prepared for Janssen Pharmaceutica
11           Products, L.P.
12                      MR. KLINE:  Yes.
13   BY MR. KLINE:
14   Q.    Pharmaceutical companies like Janssen hire
15   outside vendors, correct?
16   A.    Of course.
17   Q.    To run their statistics and to prepare
18   documents, prepare reports and the like, correct?
19   A.    Sure.
20   Q.    Now, the next thing that I would like to know
21   is in the back of the document are the participants,
22   correct?
23   A.    Yes.
24   Q.    And we're already familiar with many of the
25   people, but is Ms. Binder, the Medical Affairs
```

1   Director, MBA, there?

2   A.     Yes.

3   Q.     And is Mr. DeLoria there?

4   A.     Yes.

5   Q.     And also is Mr. -- or is Psychologist Pandina

6   there?

7   A.     Yes.

8   Q.     And is there a list of advisors who are listed

9   there?

10  A.     Yes.

11  Q.     If you can look -- I think we can see it even

12  with the full document.  There's a list of advisors.

13  I know everyone can't read all the names from this

14  distance, but there's a list of advisors and a list

15  of Janssen attendees, correct?

16  A.     Yes.

17  Q.     There were, my count is, 14 Janssen attendees

18  at this meeting, correct?

19  A.     I take your -- no reason to dispute that.  I

20  assume that's right.

21  Q.     And there were 14 advisors there, correct?

22  A.     It looks exactly that way, yes.

23  Q.     And the advisors came from -- from Boston to

24  Los Angeles?

25  A.     Yes; academic institutions.

1   Q.     From Yale to Columbia?

2   A.     Yes.

3   Q.     And what is --

4   A.     This is a different group of advisors, the

5   outside, than in the Toronto meeting.  The Toronto

6   meeting were the authors.  These were not the

7   authors.

8   Q.     Okay.  And, for example, it included -- and it

9   included -- it included, if I may, showing this

10  thing, we may want a couple of call-outs on the top.

11  It included Judith Rapoport from the National

12  Institutes of Mental Health.

13  A.     Yes.  I know her.

14  Q.     And it included Larry Scahill from the Yale

15  School of Medicine?

16  A.     Yes.

17  Q.     And others?

18  A.     Yes.

19  Q.     And among the Janssen people who were there

20  who I did not mention was a name we're already

21  familiar with, Olga Mitelman, correct?

22  A.     Yes.  We've seen an e-mail earlier in the day,

23  I believe.

24  Q.     Now, knowing who was there, let's talk about

25  the report on page ending in 99, 099.

```
1                    Is there on Page 099 a table of
2    contents?
3    A.    Yes.
4    Q.    Does it include an executive summary?
5    A.    Yes.
6    Q.    And does it include -- if we can go all the
7    way down and highlight -- a subgroup analysis on
8    prolactin?
9    A.    It says a subanalysis of prolactin, yes.
10   Q.    No.  Actually, the words there --
11   A.    I'm sorry.
12   Q.    This is my only time to correct you rather
13   than you correcting me.
14   A.    You're right.  I'm on the next page.  I'm
15   sorry.
16   Q.    It says, "Subgroup Analysis: Prolactin,"
17   correct?
18   A.    Yes, exactly.
19   Q.    And I'd like to -- when there -- in this
20   study -- or in this meeting, I'd like you to turn to
21   the Subgroup Analysis: Prolactin on Page 8.  And in
22   the middle of the page you'll see it was being --
23   you'll see two names that are identified with it,
24   and they are Binder and Pandina, correct?
25   A.    Yes.
```

1  Q.    And if I can just give some context, in the

2  first paragraph there it says, "The next two

3  presentations focused mainly on the prolactin data.

4  Carin Binder's presentation focused on data

5  addressing the change in prolactin levels over time.

6  The relationship between prolactin and risperidone

7  dose, age, gender and comparisons between children

8  with prolactin levels below versus above 50 ng/mL."

9              I don't want to get bogged down in

10  this, but I also don't want to have things in front

11  of us that we don't know.  What is ng and mL?  Just

12  the definitions.

13  A.    This is nanograms per mL.  This is not what

14  we're talking -- what we've been talking about.

15  Q.    Thank you, sir.

16              And I'd like you to go over to Page

17  9 -- and I know we're very late in the day -- but on

18  Page 9, first of all, does this document indicate

19  that there was a discussion and interchange between

20  the Janssen Pharmaceutical people and the outside

21  advisors?

22  A.    There was.

23  Q.    And did part of that discussion involve

24  prolactin levels and issues as they relate to

25  prolactin levels and side effects such as

1    gynecomastia?

2    A.     Yes.

3    Q.     And according to this, did Dr. Pandina present

4    data there?

5    A.     Yes.

6    Q.     And I'd like to focus on this.  And I'd like

7    to focus on what it says the discussions were.

8                      By the way, is this the kind of

9    document that is customarily produced after a

10   lengthy meeting like this in a pharmaceutical

11   company with detailed notes written up as to what

12   was done and what was said?

13   A.     Very much so.

14   Q.     And are these the kind of notations that are

15   customarily relied upon in the industry as records

16   of these type meetings?

17   A.     Sure.

18   Q.     Now, we're on the top paragraph of some things

19   that I'd like to address with you.

20                      It says Dr. Pandina in the -- let's

21   take it kind of a few sentence at a time, the best

22   way for you to put it up as large as you can.

23                              - - -

24                      (Conferring with technician.)

25                              - - -

1   BY MR. KLINE:

2   Q.     "Dr. Pandina then presented data on the

3   relationship between prolactin and side effects

4   hypothetically attributable to prolactin,

5   parentheses SHAP."  Do you see that?

6   A.     Yes.

7   Q.     Down below it says there was some discussion.

8   Do you see that?

9   A.     Yes.

10  Q.     There was some discussion focused on -- or

11  there was some discussion about the definition of

12  SHAP.  Do you see that?

13  A.     Yeah.  In fact, it says there was -- earlier

14  on it says there's substantial amount of discussion

15  and then --

16  Q.     Okay.

17  A.     -- and then further there was some discussion.

18  I see both, yes.

19  Q.     You know what, let me go back and we'll do

20  some highlighting.  I'm inclined to rush and I

21  shouldn't.  The top, "Dr. Pandina then presented

22  data on the relationship between prolactin and side

23  effects hypothetically related to prolactin" -- stop

24  there -- at SHAP."  We're not interested in the

25  other stuff, if you would, Cory, at the word "SHAP."

1    Yes.

2                    And then if you would highlight "most

3    of the discussion focused on SHAP," and let's leave

4    there.

5                    And then the next part is, "There was

6    some discussion about the definition of SHAP."

7    A.    Yes.

8    Q.    Now do you have it in context, Dr. Kessler?

9    A.    Exactly.

10   Q.    And it says here, "The advisors thought that

11   the most inclusive definition should be used for

12   transparency."  Do you see that?

13   A.    Yes.

14   Q.    Okay.  Would you strike everything off of

15   there that you've highlighted, sir.

16                    (Technician complies with request.)

17                    MR. KLINE:  And would you highlight

18        there?  (Indicating.)

19   BY MR. KLINE:

20   Q.    Sir, what would be the most inclusive

21   definition of what they're now calling SHAP?

22   A.    You'd want to include all the children --

23   those under 10 as well as those over 10.

24   Q.    And were the advisors -- and the advisors were

25   telling them that they would want to do it -- and

1   there's a word up there -- for transparency,

2   correct?

3   A.    Yes.

4   Q.    Meaning?

5   A.    Whole story.  Tell the whole story.

6   Q.    It goes on to say -- bear with me one second.

7            It appears -- it goes on to discuss

8   Dr. Pandina's presentation, and look at the first

9   bullet point.

10            The presentation, it says, can be

11   summarized as follows:  "There appears to be no

12   relationship between prolactin level and SHAP."

13            Do you see that?

14   A.    I see that.

15   Q.    That would be -- what's being reported here is

16   that's what -- that's what Psychologist Pandina told

17   them, correct?

18            MS. SULLIVAN:  Objection, Your Honor,

19      to speculation.

20            THE COURT:  That's sustained.

21   BY MR. KLINE:

22   Q.    Do the words here say, sir, "The presentation

23   and ensuing discussion can be summarized as

24   follows"?

25   A.    Yes.

1  Q.    Does it say:  "There appears to be no

2  relationship between prolactin level and SHAP"?

3  A.    That's exactly what it says.

4  Q.    Based on the data that was in Table 21, is

5  this a correct statement?

6  A.    No.

7  Q.    And, sir, on Page 14, coming out of this

8  meeting, there were action items, action items.

9              And the action items that came out of

10  the meeting -- this would be on Page 03900111,

11  ending in 111, Your Honor.

12              Going over to Page 112, they have the

13  action items.

14              Now, the action items, I would like

15  to go to just Number 112, and I would like to go to

16  just the top lines 1 through 6 as to their action

17  items on prolactin levels --

18  A.    Yes.

19  Q.    -- coming out of this meeting with their

20  advisors.

21  A.    Yes.

22  Q.    Would you, sir, read to the jury the number

23  one action item coming out of this meeting about --

24  coming out of this meeting as to prolactin.

25  A.    You want me to read number one or you want me

1    to tell you the --

2    Q.     One, yes, just read it.

3    A.     "Reanalyze the data on SHAP to include all

4    boys with gynecomastia, not just those under the age

5    of 10."

6    Q.     And, sir, read number three to the jury.

7    A.     "The definition of SHAP should be as

8    inclusive" --

9    Q.     A little slower, sir.

10   A.     I'm sorry.  "The definition of SHAP should be

11   as inclusive as possible; then compared with the

12   incidence of SHAP with the more inclusive definition

13   to that with the more narrow definition."

14   Q.     Does that mean include the boys under 10

15   there, too?

16   A.     It means tell the whole story, show all the

17   data.

18   Q.     And number four came out of this meeting with

19   the advisors.  Could you read number four, what's

20   now displayed to the jury and right in front of

21   them, number four.

22   A.     "When publishing the prolactin results, data

23   on all children with gynecomastia should be

24   included."

25   Q.     Now, moving forward, the Janssen people had

```
 1   some discussion internally in e-mails following this
 2   meeting, correct?
 3   A.    Yes.
 4   Q.    And I'm marking as the next document, 45,
 5   P-45, so long as Your Honor allows, these will be
 6   the last two I would do for today.
 7                 THE COURT:  All right.
 8                 MR. KLINE:  I think I would be right
 9          about at near time.
10                 P-45 is a document, an e-mail from
11          Binder to Pandina.  I'm sorry.  The Judge
12          doesn't have a copy yet.  I'll wait.
13                 THE COURT:  Okay.  Thank you.
14                 This is at 0389270, being marked as
15          Exhibit 45.
16                 MR. KLINE:  Yes.
17                 THE COURT:  All right.  You may
18          proceed.  This is on the second e-mail here?
19                 MR. KLINE:  It is.  It's on the
20          bottom half of the page.
21                 THE COURT:  All right.  You may
22          proceed, on the second e-mail.
23                 MR. KLINE:  Yes, sir.
24   BY MR. KLINE:
25   Q.    On the bottom half of the page coming out of
```

```
 1   this meeting there's an e-mail dated -- and keep in
 2   mind that that meeting was November 15th,
 3   November 15th, this is an e-mail dated
 4   November 18th, the following Monday, the meeting was
 5   on Friday.  This is the following Monday.  There's
 6   an e-mail from Binder to Pandina, et al.
 7                   And that e-mail, sir, we're going to
 8   display as Exhibit P-45, Bates number ending in 170,
 9   to be precise, JJRE03892170.
10                   Bottom paragraph under number 2,
11   "Secondly."
12                   Sir, does it say here, "Secondly, the
13   US group recommended that the manuscript list all
14   cases of gynecomastia in males and state whether
15   prolactin levels were normal or elevated as well as
16   state all the new rates of gynecomastia as
17   identified by the endos.  They felt that applying
18   the endo's position of gynecomastia in boys with
19   puberty not being SHAP without listing all
20   gynecomastia was" -- and do you have a yellow marker
21   for me there -- "hiding data."
22                   (Highlighted.)
23                   Is that what they were told by their
24   advisors?
25   A.    Yes.
```

1  Q.    Is that what this e-mail says from Binder to

2  Pandina?

3  A.    And et al, yes.

4                 THE COURT:  Can this be a good place

5         to stop?

6                 MR. KLINE:  One more, sir.  It's

7         literally one more.  It's kind of the module

8         I have here.

9                 THE COURT:  All right.

10  BY MR. KLINE:

11  Q.    And, sir, there was an e-mail -- there was an

12  e-mail that was dated -- that was November 18.

13                 There was an e-mail dated three days

14  later that was the lead-in to the draft four.  And

15  it says -- and I'm displaying it.  I have to mark it

16  as an exhibit.  Exhibit 46.  Handing it to the

17  Court.

18                 It is Bates No. JJRE14088063.

19                 (Exhibit P-46 marked for

20         identification.)

21                 MR. KLINE:  This will be the

22         manuscript we'll review tomorrow morning, the

23         fourth draft.

24  BY MR. KLINE:

25  Q.    And it says JJRE ending in 063, from Binder to

 1  Pandina and others.  "Attached please find the

 2  revised November 19 prolactin manuscript."

 3                    I'll represent to the Court that will

 4  be our starting point tomorrow.

 5                    "The revisions now include a

 6  nauseating amount of info on SHAP, specifically

 7  gynecomastia throughout [sic] the ages and RIS total

 8  dose versus prolactin analysis."

 9                    "There's nothing to find, people!"

10                    Was that considered by you when you

11  rendered your opinion when we started your

12  testimony?  Was this a document considered by you in

13  formulating your opinion?

14  A.    Yes.

15                    MR. KLINE:  Okay.  We will pick up

16          tomorrow, Your Honor, with the e-mail that's

17          attached to this -- the report that's

18          attached to this document that describes a

19          nauseating amount of gynecomastia.

20                    MS. SULLIVAN:  Objection, Your Honor.

21                    THE COURT:  All right.  Well --

22                    MS. SULLIVAN:  It says a nauseating

23          amount of information, Mr. Kline.  You should

24          read it correctly.

25                    MR. KLINE:  Yes; "a nauseating amount

1          of information on SHAP."  That is correct.

2                    THE COURT:  All right.

3                    Well, we did it, okay.  We're done

4          for the day.  We're done for the day.

5                    Let me just say a couple of things.

6          We will return tomorrow.  I'm going to ask

7          that you try to come in about 9:15, 9:15,

8          okay.  Try to make it 9:15.

9                    Second, there is a birthday in the

10          house, Juror No. 13 has a birthday.

11                             -  -  -

12                    (Applause in the courtroom.)

13                             -  -  -

14                    THE COURT:  And I specifically want

15          to acknowledge this birthday because I want

16          you to know that in order to serve on this

17          jury, she has given up a special trip to the

18          Carolinas in order to be here.  So I mean

19          this is -- you know, she chose to spend her

20          birthday with us here.

21                    (Laughter.)

22                    THE COURT:  Okay.  Thank you very

23          much.  Unbelievable.

24                    All right.  Then a couple other

25          things, just to remind you.  I am asking that

1       you come back tomorrow with your yellow

2       badges; that you keep an open mind about this

3       case.  You've got still some ways to go; that

4       you not talk about this case with anyone

5       within -- anyone, yourselves, family,

6       neighbors, kids, anybody; that you please,

7       very importantly, refrain from reading or

8       listening or anything about this case from

9       any media whatsoever.  And that's radio, TV,

10      newspaper, websites, anywhere, anywhere, all

11      right?

12              And I said this also that the

13      evidence that you're getting has been

14      filtered by this Court through the rules of

15      evidence, all right?  And it's our case, all

16      right?  It's our case.  That's why we're

17      putting all this time and we're relying on

18      you to make it our -- to keep it our case.

19      To keep it our case, okay?

20              So just please do, please follow that

21      rule, please, okay?  It's our case, nobody

22      else's.  That's what makes it very

23      interesting for all of us here.  You can see

24      we have attendants in this courtroom because

25      they want to know what you think about this

```
 1              case, not what somebody else might have said

 2              or written or reported or anything else, all

 3              right?  We're clear about that everybody?

 4                      (Jurors nodding.)

 5                      THE COURT:  All right.  Then we will

 6              see you tomorrow at 9:15.

 7                              -  -  -

 8                      (Whereupon the jury exited the

 9              courtroom at 4:47 p.m.)

10                              -  -  -

11                      (The following transpired in open

12              court outside the presence of the jury:)

13                              -  -  -

14                      THE COURT:  All right.  Let's close

15              the door.

16                      All right.  We will try to -- I'm

17              hoping that by setting an earlier time, we

18              might get people in here by 9:30, so.

19                      MR. KLINE:  Right.  We figured that

20              one out.

21                      THE COURT:  So we'll see you tomorrow

22              everybody.

23                      MR. KLINE:  See you tomorrow.  Good

24              night.

25                      (Court adjourned at 4:46 p.m.)
```

1                C E R T I F I C A T I O N

2

3              I hereby certify that the proceedings

4        and evidence are contained fully and

5        accurately in the notes taken by me on the

6        trial of the above cause, and that this copy

7        is a correct transcript of the same.

8              I further certify that I am not a

9        relative or employee of any attorney or

10        counsel employed in this case.

11

12

13

14        _____

15        John J. Kurz, RMR, CRR
          Registered Merit Reporter
16        Certified Realtime Reporter
          Official Court Reporter
17

18

19              (The foregoing Certification of this

20        transcript does not apply to any reproduction

21        of the same by any means unless under the

22        direct control and/or supervision of the

23        certifying reporter.)

24

25

Case 2:14-md-02592-EEF-MBN   Document 5599-11   Filed 03/02/17   Page 125 of 139
(Jury Trial-Afternoon) - Vol. IV - January 29, 2015
Pledger v. Janssen, et al.

**[**

**[Reading] (3)**
47:17;51:15;52:8
**[sic] (3)**
48:18;52:11;119:7

**A**

**able (6)**
13:24;16:5;43:6;
56:19;64:7;87:7
**abnormal (8)**
26:5;30:20,22;
32:12,18;37:11,23;
74:1
**above (27)**
18:20;20:18;21:4,
9,10;23:21;27:25;
28:13,14;31:14;
32:11;37:24;51:17,
22;52:12;73:2,9;
76:25;77:5;78:9;
79:1;87:21;95:3;
99:10,18;109:8;
123:6
**absolutely (5)**
13:20;14:2;17:2;
28:24;68:23
**abstract (4)**
43:14,23;45:23;
92:19
**academic (1)**
106:25
**acceptable (1)**
66:23
**according (1)**
110:3
**accurately (1)**
123:5
**acknowledge (1)**
120:15
**Acknowledgments (1)**
45:16
**across (1)**
31:1,3;36:23
**action (7)**
114:8,8,9,13,14,16,
23
**activities (1)**
57:6
**actual (2)**
53:5;67:8
**actually (11)**
16:7;23:18;25:4;
27:10;61:12;62:18;
65:24;75:1;87:12;
93:14;108:10
**add (2)**
11:15;31:12
**added (1)**
78:2

**adding (1)**
28:9
**address (3)**
70:23;96:25;
110:19
**addresses (1)**
64:11
**addressing (1)**
109:5
**adds (1)**
78:20
**adequate (2)**
42:9;72:9
**adequately (1)**
61:9
**adjourned (1)**
122:25
**admitted (1)**
97:3
**Adolescent (1)**
102:22
**adolescents (7)**
40:5;44:17;62:17;
75:21;90:21;91:2;
92:6
**adverse (7)**
37:11;47:25;48:4;
49:5;54:10;68:7;
101:1
**advisors (13)**
106:8,12,14,21,23;
107:4;109:21;
112:10,24,24;114:20;
115:19;117:24
**Advisory (1)**
102:22
**Affairs (1)**
105:25
**affirmative (2)**
30:9;50:2
**afternoon (9)**
6:3,4,17,23,24;7:5,
6;29:2;58:3
**Again (21)**
8:24;9:14;14:4;
20:1,6;24:6;28:10;
34:16;35:21;36:3;
39:2;47:10;53:3;
57:3;70:13;71:21;
73:8;75:24;88:19;
93:21;103:1
**age (6)**
49:14;54:24;89:9,
15;109:7;115:4
**agency (1)**
17:5
**ages (1)**
119:7
**agree (1)**
9:5
**ahead (8)**
18:5;20:10;36:13;
37:21;43:12;44:3;

**45:8;79:8**
**al (2)**
117:6;118:3
**allow (1)**
20:7
**allows (3)**
18:3;43:25;116:5
**almost (5)**
8:10,18;37:13;
71:6;84:12
**alone (1)**
34:20
**along (1)**
12:8
**always (2)**
54:9;71:3
**amend (1)**
80:3
**amenorrhea (2)**
30:16;89:12
**American (1)**
16:8
**among (1)**
107:19
**amount (5)**
111:14;119:6,19,
23,25
**analyses (1)**
95:5
**analysis (33)**
9:23,25;10:21;
25:17;26:12;32:17;
34:5;47:17;51:19;
52:11;54:22;62:1,5,
8;77:2;78:8;79:22,
25;80:1,4,14;89:21;
99:8,17;100:18,19,
21;101:6;103:21;
108:7,16,21;119:8
**analyze (1)**
81:4
**Analyzed (1)**
81:14
**and/or (1)**
123:22
**Angeles (1)**
106:24
**apologize (2)**
47:10;59:14
**apparently (1)**
58:23
**appears (4)**
87:24;113:7,11;
114:1
**applaud (1)**
79:13
**Applause (1)**
120:12
**application (3)**
15:21,25,25
**apply (2)**
89:15;123:20
**applying (1)**

**117:17**
**appointment (1)**
58:4
**appreciate (1)**
41:8
**appreciated (1)**
90:16
**appropriate (1)**
79:13
**appropriately (1)**
61:15
**approval (1)**
64:14
**approximately (1)**
28:5
**argument (5)**
14:23,25;55:6;
66:18;67:2
**around (2)**
31:5;60:23
**article (1)**
91:7
**aside (2)**
72:13;78:12
**aspect (1)**
23:8
**assessed (3)**
51:16;76:24;95:2
**associated (4)**
9:20,21;26:4;33:9
**association (14)**
25:21,22,25;26:8,
25;33:17;34:17,18;
59:7,20;60:2,8;93:22,
24
**assume (2)**
25:6;106:20
**assure (4)**
16:14,19;43:3;63:2
**attached (5)**
40:3;65:13;119:1,
17,18
**attaches (1)**
74:11
**attachment (3)**
44:8,10;74:21
**attempting (1)**
62:16
**attendants (1)**
121:24
**attendees (2)**
106:15,17
**attention (1)**
76:4
**attorney (1)**
123:9
**attributable (5)**
47:21;48:13,17;
100:17;111:4
**Attributed (2)**
48:18;66:8
**August (3)**
65:16;73:4,11

**authors (3)**
65:18;107:6,7
**available (1)**
19:23
**avoid (1)**
43:16
**aware (2)**
29:2;62:4
**away (3)**
30:2,3;89:23
**aways (1)**
57:13

**B**

**back (40)**
7:8;8:8;8:13:19;
14:14;21:2,17;23:1,
15;28:19;33:24,25;
44:20;45:7,10;46:16;
47:23;48:23;55:23;
56:18,19,23;57:24;
60:20;71:2;73:14;
77:15;83:2,9,13,22,
24;88:18;90:7;94:12,
22;96:12;98:10;
105:21;111:19;121:1
**background (2)**
45:23;48:11
**bad (3)**
68:11,14;72:21
**badges (1)**
121:2
**band (1)**
89:8
**based (7)**
12:8;66:12;68:25;
69:3;79:6;84:4;114:4
**basic (2)**
8:3;9:11
**basically (2)**
9:4;69:17
**Bates (18)**
12:15;41:2,3;
43:19;49:18;62:22;
76:5;80:15,24;81:9;
91:4;92:16;93:7,8;
94:19;95:12;117:8;
118:18
**bear (2)**
49:10;113:6
**became (2)**
62:4;84:13
**becomes (1)**
13:24
**begin (2)**
82:23,24
**beginning (1)**
73:18
**begins (2)**
80:15;101:17
**behavior (1)**
25:15

Case 2:14-md-02592-EEF-MBN   Document 5599-11   Filed 03/02/17   Page 126 of 139
(Jury Trial-Afternoon) - Vol. IV - January 29, 2015
Pledger v. Janssen, et al.

**behind (1)**
85:10

**below (4)**
19:5;21:11;109:8;
111:7

**benchmark (1)**
60:20

**best (4)**
22:2;28:7;66:2;
110:21

**better (2)**
48:20;87:7

**beyond (4)**
7:8;42:14,19;67:3

**big (4)**
16:1,20;22:9;96:16

**bigger (2)**
85:15;87:8

**Binder (13)**
40:1;41:1;63:25;
64:11;65:12;73:3,14;
105:25;108:24;
116:11;117:6;118:1,
25

**binders (1)**
13:20

**Binder's (1)**
109:4

**biology (4)**
34:23;35:3,7,8

**biostatistics (1)**
26:13

**birthday (4)**
120:9,10,15,20

**bit (3)**
65:2;98:14,21

**blackboard (2)**
7:11;17:17

**Board (1)**
102:22

**boards (2)**
67:19;72:15

**bogged (1)**
109:9

**bold (2)**
50:24;77:24

**boldfaced (1)**
21:18

**book (2)**
85:9,12

**Boston (1)**
106:23

**both (4)**
19:22;67:17;91:12;
111:18

**bottom (21)**
7:13;19:13,14,22;
22:8;45:2,15;54:13;
63:4,13,25;64:15,16;
76:2;94:14,20;
101:16;103:24;
116:20,25;117:10

**box (2)**

**boxes (2)**
16:2,2

**boys (20)**
81:24;82:4,7,9,10,
12,14,16,18,20;
84:17;87:15;88:8,9,
24;102:1,3;115:4,14;
117:18

**brainworks (1)**
77:16

**Brandon (2)**
13:3,6

**break (10)**
13:19;42:23;43:10;
51:7;52:16;55:22;
58:11;65:6;95:9;
98:25

**briefly (3)**
45:5;49:13;54:17

**bring (2)**
15:24;84:25

**broke (1)**
9:12

**brought (1)**
83:17

**building (1)**
39:7

**bullet (2)**
82:2;113:9

**C**

**calculate (1)**
30:23

**call (8)**
8:13;14:16;32:13;
65:21;74:21;76:4,7;
90:9

**called (4)**
23:4;48:7;71:13;
104:15

**calling (4)**
54:9,11;101:1;
112:21

**call-out (5)**
58:11;73:20;76:17;
90:9;101:18

**call-outs (1)**
107:10

**came (7)**
13:4;14:4;34:25;
35:1;106:23;114:9;
115:18

**can (111)**
6:5;9:4;10:2,25;
11:9;13:10,22;15:12,
12;20:23,24;22:2,9;
23:7;25:18;27:18,23;
29:9,9;30:1,4;31:4,
12;32:10;33:23;
34:11,12,14,25;
36:21,25;37:7,25;

**38:15,24;42:12;43:3,**
10;45:10;46:16;47:1;
49:25;50:23;52:20;
53:4;54:22;55:8;
58:15;59:12;61:4;
65:1,21,23,24;
66:2,4,15,15;71:3,8,
9,10,11,12,22;72:11,
14;73:13,17,18,21,
24;80:3,19;83:2,4,24;
85:3,13;86:2;87:2,
12;88:9,18,18;90:7,
23;92:15,16;93:7,11,
14,14;94:12;95:1,9,
23;96:12;99:5,6;
105:9;106:11,11;
108:6;109:1;110:22;
113:10,23;118:4;
121:23

**CAN-19 (1)**
86:25

**capital (1)**
71:14

**care (1)**
68:15

**carefully (1)**
62:21

**cares (1)**
72:22

**Carin (3)**
40:1;73:3;109:4

**Carmen (1)**
64:8

**Carolinas (1)**
120:18

**case (15)**
11:15;26:3;40:10;
96:24;97:7;121:3,4,8,
15,16,18,19,21;
122:1;123:10

**cases (2)**
37:11;117:14

**catching (1)**
57:5

**cause (1)**
123:6

**caution (1)**
97:1

**certain (8)**
7:16;12:6,24,25;
13:20;27:18;28:5;
76:14

**certainly (10)**
14:12;16:11,21;
28:9;56:18;61:6;
80:3,4;101:13;
104:12

**Certification (1)**
123:19

**Certified (1)**
123:16

**certify (2)**
123:3,8

**certifying (1)**
123:23

**chain (2)**
62:23;63:13

**chance (7)**
7:17,21;8:1,11,17,
19;28:6

**change (6)**
49:16;75:20;80:5;
81:7;92:21;109:5

**changed (1)**
97:7

**chart (4)**
21:3;22:1;33:24;
34:1

**check (4)**
13:19;90:11;
101:12;102:15

**checker (1)**
18:25

**child (5)**
22:23;23:16,17;
25:11;102:21

**children (29)**
12:17;22:20;24:18,
23;25:6,9,13;30:21;
32:8;40:4;42:12;
44:17;47:18;49:13;
51:16;60:23;61:21;
62:16;68:20;75:21;
76:24;90:20;91:1;
92:6;95:2,4;109:7;
112:22;115:23

**chi-square (12)**
25:19;26:9,14,15,
23,24;27:5,12;60:2,5;
93:25;94:1

**cholesterol (2)**
21:20,21

**chose (1)**
120:19

**circle (1)**
29:9

**circumstances (1)**
80:8

**citation (1)**
70:25

**City (2)**
102:12;104:1

**clarify (1)**
65:18

**clear (5)**
20:20;69:25;71:1;
104:14;122:3

**clearly (1)**
59:1

**clinicians (1)**
74:2

**close (2)**
47:22;122:14

**clued (1)**
52:23

**coefficients (1)**

**54:23**

**colleague (1)**
76:1

**collection (1)**
13:21

**collectively (1)**
13:16

**college (2)**
8:4;26:16

**color (1)**
29:19

**Columbia (1)**
107:1

**coming (9)**
56:23;71:24;95:10,
11;114:7,19,23,24;
116:25

**comment (2)**
78:12;79:11

**comments (1)**
65:17

**communicate (1)**
72:18

**companies (5)**
16:9;67:20;68:2;
72:16;105:14

**company (15)**
15:10;16:18,20,25;
17:4;18:18;42:10;
66:16,24;67:11;70:7;
83:14;88:7;104:15;
110:11

**comparable (2)**
51:20;77:3

**compare (3)**
37:9;38:17;47:1

**compared (1)**
115:11

**comparing (6)**
21:24;23:4,8,9,10;
31:2

**comparison (1)**
23:7

**comparisons (1)**
109:7

**complete (1)**
17:17

**complicated (1)**
8:24

**complied (1)**
29:22

**complies (10)**
20:25;22:10;31:16;
38:1;45:12;47:9;
49:22;66:1;87:13;
112:16

**computer (1)**
14:5

**conduct (2)**
25:14,15

**Conferring (1)**
110:24

**Confidential (1)**

Case 2:14-md-02592-EEF-MBN   Document 5599-11   Filed 03/02/17   Page 127 of 139
(Jury Trial-Afternoon) - Vol. IV - January 29, 2015
Pledger v. Janssen, et al.

18:15
**Congress (1)**
15:23
**consider (2)**
21:10,12
**considered (2)**
119:10,12
**consistent (1)**
66:13
**constant (1)**
20:3
**consulted (1)**
12:2
**contain (1)**
78:14
**contained (3)**
14:6;45:20;123:4
**contains (3)**
18:14;40:25;104:2
**contents (1)**
108:2
**context (2)**
109:1;112:8
**continue (4)**
6:19;25:4;39:14;
79:17
**Continued (1)**
7:2
**continuing (1)**
60:22
**continuous (1)**
59:25
**contracted (1)**
19:19
**control (1)**
123:22
**controversial (2)**
29:5;78:1
**convenient (1)**
98:25
**conventional (1)**
7:23
**converse (4)**
7:15,20,25;8:19
**convey (2)**
68:3,4
**copy (4)**
10:14;32:1;116:12;
123:6
**core (1)**
22:9
**correcting (1)**
108:13
**correctly (3)**
18:23;86:18;
119:24
**correlation (14)**
54:21,22,25;55:17;
58:18,21;59:20,24;
93:15,22,24;101:17,
19,24
**correlations (1)**
60:4

**Cory (16)**
29:13;36:24;41:17;
43:20;46:2,16;52:20;
58:19;66:3;73:20;
76:8;90:8,10,23;
93:14;111:25
**counsel (9)**
10:16;32:1;53:19;
63:7;67:7;69:20;
95:8;97:11;123:10
**count (2)**
94:3;106:17
**counting (1)**
30:17
**couple (5)**
23:13;52:15;
107:10;120:5,24
**course (7)**
8:3,4,9;19:12;
26:16;69:9;105:16
**COURT (151)**
6:1,2,4,7,11,16;
10:13,15,25;11:10,
14,16;14:24;15:2;
18:3,5;20:6;30:4;
32:2;35:23;36:3,9,
13;40:12,15;42:21,
25;43:3,6,12,25;44:1,
2,5,7,19,22,25;46:25;
50:14,15;51:6;53:8,
16,19;55:7;56:1,7;
56:1,7,15,22;57:3,9,
15,16,22,23,24,25;
58:2;60:12;63:1,1,6,
10,21;64:14,16,21,
23;65:1,4,7;66:19;
67:5;69:2,5,16,19;
70:13,17;72:3;74:16,
17,20,24;75:3,6,15;
76:9,13,20;80:17,23;
85:16,19,24;90:13;
91:13,14,15,18,24;
95:8,13,16,19,21,25;
96:7,9,25;97:11,12,
13,21,23,24;98:6,8,
10,10,12,17,22;
103:2,7,11;104:19;
105:4,9;113:20;
116:7,13,17,21;
118:4,9,17;119:3,21;
120:2,14,22;121:14;
122:5,12,14,21,25
**courtroom (9)**
6:14;56:5;57:20;
96:1,4;98:3;120:12;
121:24;122:9
**Court's (1)**
103:4
**cover (2)**
47:11;90:8
**covered (1)**
73:1
**create (1)**

104:18
**credit (1)**
12:4
**CRIER (11)**
6:1,7;56:1;57:16,
23;58:3;90:13;95:25;
97:21,24;98:10
**cross-examination (3)**
20:2;56:17;57:2
**CRR (1)**
123:15
**customarily (2)**
110:9,15
**cut (1)**
15:7
**cutoff (2)**
21:12,22

---

## D

**dash (1)**
18:21
**data (63)**
9:24;10:5,20;
12:24;14:5,16;15:9,
11,14;16:16;17:4;
19:23;31:18;37:22;
39:3,23;54:18;59:2;
61:9,11,12,17,18,19,
22;62:1,9;66:25;
67:24;68:5;79:6,22,
25;80:1,3,6;81:4,19,
22,24;82:24;83:9,11,
15;84:4,6,8,9;88:8,
12,13;90:4;99:13;
109:3,4;110:4;111:2,
22;114:4;115:3,17,
22;117:21
**databank (1)**
12:12
**database (6)**
11:23,25;12:13;
13:1,5,11
**date (9)**
10:2;19:20,24;
65:16;76:1;81:3;
86:22,23;103:24
**dated (7)**
40:2;44:23;83:19;
117:1,3;118:12,13
**day (7)**
14:11;16:17;
102:10;107:22;
109:17;120:4,4
**days (3)**
26:14,17;118:13
**deal (1)**
96:22
**dealing (3)**
32:7;67:21;93:2
**Dear (7)**
43:4;64:12;65:9;
71:10;73:9;96:14,19

**decide (1)**
79:21
**defense (1)**
32:1
**define (3)**
20:15,18;89:14
**definition (8)**
111:11;112:6,11,
21;115:7,10,12,13
**definitions (1)**
109:12
**DeLoria (2)**
64:8;106:3
**delve (1)**
20:14
**demonstrate (3)**
73:19,21,24
**denominator (1)**
38:25
**denominators (1)**
61:21
**dense (1)**
36:16
**deposed (1)**
96:21
**deposition (1)**
78:3
**depositions (1)**
93:23
**describe (2)**
51:11;75:1
**describes (1)**
119:18
**designed (1)**
47:17
**detail (1)**
71:11
**detailed (1)**
110:11
**determine (1)**
26:25
**develop (1)**
62:16
**difference (5)**
48:15;59:19;78:6;
99:7,16
**differences (1)**
52:9
**different (15)**
19:7,10,11;23:8;
34:3,4;46:17;47:4;
53:7;71:9,12;83:17;
84:14;86:20;107:4
**direct (9)**
6:19;7:2;54:20;
55:17;58:18,21;60:3;
93:15;123:22
**directions (1)**
72:9
**Director (1)**
106:1
**disability (1)**
25:12

**disappears (2)**
88:2,3
**discuss (9)**
17:13;28:4;49:8;
55:24;65:7;78:13;
79:9,16;113:7
**discussed (2)**
50:10;63:22
**discussing (4)**
19:9;59:19;76:23;
101:22
**discussion (16)**
17:10;24:3;56:13;
101:20,20;109:19,23;
111:7,10,11,14,17;
112:3,6;113:23;
116:1
**discussions (2)**
63:3;110:7
**disorder (1)**
25:16
**display (19)**
10:6;17:15,20,20;
18:2;22:3;41:18,18;
44:1;49:20;64:13,14;
75:8,11;80:19,21;
91:12;103:5;117:8
**displayed (5)**
50:6;87:5;94:24;
103:14,15;115:20
**displaying (4)**
20:21;44:15;80:24;
118:15
**dispute (1)**
106:19
**disregard (1)**
96:23
**disruptive (1)**
25:15
**distance (1)**
106:14
**doc (3)**
67:18;72:16,21
**doctor (7)**
20:4;40:8;43:4;
60:12;71:10;96:14,
20
**doctors (2)**
68:10;71:4
**doctor's (1)**
71:20
**document (57)**
10:12,20;11:11,20,
21,24;16:24;17:20,
21,21;18:8,9;19:20;
36:5,15;40:3;43:25;
42:2,9,21;44:14;
45:20;47:2;48:6;
49:2;61:3;62:25;
64:13;67:13;74:10,
11;75:25;76:22;
80:10,12;84:7,25;
85:15,21,22;87:5;

Case 2:14-md-02592-EEF-MBN   Document 5599-11   Filed 03/02/17   Page 128 of 139
(Jury Trial-Afternoon) - Vol. IV - January 29, 2015
Pledger v. Janssen, et al.

92:4;94:24;103:4,15;
104:2,3,7,10;105:21;
106:12;109:18;
110:9;116:4,10;
119:12,18
**Documentation (5)**
10:9;13:10;18:11;
80:13;86:16
**documents (16)**
12:6,13,18,19;13:5,
18;14:17;28:25;42:3;
47:24;48:2;49:4;
60:21;80:16;103:9;
105:18
**done (9)**
21:15;34:6;50:15;
54:24;84:17;98:20;
110:12;120:3,4
**door (2)**
69:6;122:15
**dose (2)**
109:7;119:8
**double-check (1)**
13:22
**doubt (1)**
65:4
**down (19)**
19:5;20:19;22:4;
27:6,19;33:21;34:25;
36:15;47:13;50:24;
58:15;73:17;87:3;
88:16,25;90:10;
108:7;109:9;111:7
**Dr (16)**
6:20,25;7:5;20:4;
53:20;58:8,14;70:12;
74:7;97:2;110:3,20;
111:2,21;112:8;
113:8
**draft (44)**
36:7,10;40:3,23,
25;41:19;44:14,15,
15;49:1;51:7;60:19;
61:5,6,10;62:3,4,13;
65:13;72:25;74:12,
12;75:1,19,20;76:1,3;
77:13;78:13;79:18;
90:7,12,19,24;91:7;
92:7;94:1,11,16,18;
99:4;100:10;101:7;
118:14,23
**drafted (1)**
90:5
**drafts (7)**
35:13;51:4;77:15;
78:16;94:5,6;103:21
**drop (1)**
25:6
**drug (22)**
16:9,15;23:3,5,10,
18;24:13,19,21,24;
30:19;33:1,3,4,10,21;
34:5;42:10,11;60:21;

62:16;72:18
**dumps (1)**
14:16
**during (5)**
51:24;52:1;77:6,9;
79:1
**duties (1)**
71:17
**duty (1)**
71:16

**E**

**earlier (7)**
60:20;98:14,21;
100:22;107:22;
111:13;122:17
**early (7)**
34:24;35:1;39:13,
17;65:15;84:5;101:4
**eat (1)**
21:19
**education (1)**
12:9
**effect (3)**
30:15;70:6;89:13
**effects (21)**
9:20;18:19;19:2,5;
26:5;30:23;32:19;
46:3;47:20;48:1,8,12,
13,15;66:8;92:24;
93:1;100:16;109:25;
111:3,23
**efficacy (1)**
66:9
**efficiently (1)**
36:25
**effort (1)**
13:13
**eight (1)**
28:16
**either (3)**
12:5;30:15;101:4
**elevated (4)**
21:23;23:12;26:3;
117:15
**elevation (4)**
9:21;54:21;58:21;
93:16
**elevations (1)**
9:19
**eligibility (1)**
25:15
**eliminate (1)**
88:9
**eliminates (1)**
82:11
**else (7)**
9:8;12:20;55:19;
59:13;61:3;122:1,2
**else's (1)**
121:22
**e-mail (39)**

40:1,24,25;41:12;
44:8,10,12,13;49:6,7;
62:12,14,15,17,23,
23;63:3,13,13,24;
64:12,15;73:1,3,9;
74:10;107:22;
116:10,18,22;117:1,
3,6,7;118:1,11,12,13;
119:16
**e-mails (4)**
62:18;74:22;77:14;
116:1
**employed (1)**
123:10
**employee (1)**
123:9
**end (9)**
14:11;16:17;18:21;
30:14;41:7;42:23;
78:11;89:3;99:22
**ended (1)**
17:12
**ending (8)**
49:19;76:5;81:10;
94:20;107:25;
114:11;117:8;118:25
**endos (1)**
117:17
**endo's (1)**
117:18
**ends (2)**
64:18;80:15
**enlarge (2)**
65:22;93:14
**enlarged (3)**
22:3;65:24;88:23
**enlarging (1)**
22:5
**enormous (1)**
12:12
**enough (1)**
46:7
**enrolled (1)**
25:13
**ensuing (1)**
113:23
**entered (3)**
6:13;57:19;98:2
**entering (2)**
57:17;97:25
**enters (1)**
6:8
**entire (10)**
10:23;11:1,11,20,
21,24;12:21,24;
63:12;85:21
**entitled (3)**
40:4;44:16;80:12
**EPS (1)**
66:8
**equals (2)**
52:18;77:9
**especially (2)**

42:10;68:6
**essence (4)**
21:25;55:18;81:18;
89:24
**essentially (2)**
77:11,15
**establish (1)**
103:25
**et (2)**
117:6;118:3
**even (5)**
24:13;38:18;43:17;
54:3;106:11
**event (4)**
27:20;54:10;100:3;
101:1
**events (5)**
37:12;47:25;48:4;
49:5;68:7
**eventually (1)**
76:11
**everybody (4)**
57:25;98:9;122:3,
22
**everybody's (1)**
41:8
**everyone (8)**
9:8,9;27:24;30:1;
31:9,13;49:25;
106:13
**everyone's (1)**
23:9
**evidence (3)**
121:13,15;123:4
**exact (2)**
15:16;24:23
**exactly (22)**
12:21;13:8;22:25;
23:23;25:2;35:16;
40:20;42:6;46:11;
53:1;54:1,6;55:2;
62:11;74:23;79:7;
95:15;104:5;106:22;
108:18;112:9;114:3
**examination (2)**
6:19;7:2
**example (5)**
13:2,3,9;54:19;
107:8
**Excellent (2)**
29:16;31:17
**except (2)**
51:21;77:3
**exchanging (1)**
12:18
**excluded (1)**
89:7
**excuse (1)**
32:12
**executive (1)**
108:4
**Exhibit (24)**
7:10;20:22;39:25;

50:17;62:22,24;
74:18;80:11;84:21,
24;87:4;88:22;90:11,
25;91:8,9;102:17,20;
103:1;116:15;117:8;
118:16,16,19
**Exhibits (1)**
85:1
**exited (3)**
56:4;96:3;122:8
**exits (2)**
56:2;96:1
**expanded (1)**
30:5
**experience (4)**
12:9;14:13,15;15:4
**experienced (2)**
52:1;77:8
**expert (4)**
69:14;71:23;96:22;
97:3
**expertise (1)**
69:13
**expert's (1)**
42:14
**explain (11)**
15:12;21:2;22:14,
16;29:23;31:6;37:5,
8;38:24;72:11;93:19
**explained (1)**
100:22
**explains (1)**
61:9
**explanation (2)**
12:1;69:21
**explanatory (1)**
20:13
**explore (4)**
46:9;47:19;92:23;
93:9
**extended (1)**
65:15
**extent (1)**
73:23

**F**

**fact (8)**
15:22;38:3;46:15;
59:3;97:5;104:22,23;
111:13
**fair (4)**
7:18;8:25;61:10;
75:10
**Fairly (1)**
8:2
**fall (2)**
83:16;84:3
**fallen (1)**
102:8
**familiar (3)**
105:24;107:21
**family (1)**

Case 2:14-md-02592-EEF-MBN   Document 5599-11   Filed 03/02/17   Page 129 of 139
(Jury Trial-Afternoon) - Vol. IV - January 29, 2015
Pledger v. Janssen, et al.

**121:**5
**fancy (1)**
  49:24
**far (6)**
  22:19;30:1,1,3;
  87:15,20
**favor (1)**
  31:12
**FDA (19)**
  14:13,14,15;15:5,
  15,24;16:6,7,8,15,16,
  20;17:1,9;67:18;
  68:9;71:1;72:13,22
**Federal (2)**
  71:2,6
**feedback (1)**
  23:25
**felt (1)**
  117:17
**females (3)**
  21:8;89:8,10
**few (2)**
  52:15;110:21
**fewer (2)**
  87:15,20
**figured (1)**
  122:19
**files (2)**
  66:25;104:17
**fill (1)**
  15:25
**filtered (1)**
  121:14
**find (6)**
  13:13,17;30:21;
  85:13;119:1,9
**finding (29)**
  20:14;28:3,22;
  29:4,6;34:8;35:6,11,
  17;50:9;52:24;59:10;
  61:16,20;62:2;68:22;
  70:8;78:22,24;79:15;
  80:9;84:7;88:11;
  89:21;92:11;94:8,9,
  17;101:14
**fine (1)**
  29:20
**finish (6)**
  34:14;57:1;59:12;
  77:22;79:8;98:15
**finished (1)**
  98:18
**First (21)**
  22:17;25:19;30:18;
  45:6,24;46:18;48:19;
  50:12,23;51:2,3,4;
  52:17;64:18;80:25;
  90:25;92:19;93:8;
  109:2,18;113:8
**five (3)**
  22:18,21;62:9
**flag (2)**
  15:10;16:9

**flagged (3)**
  50:9;53:25;54:1
**flows (1)**
  68:17
**focus (10)**
  7:12;20:23;34:11;
  39:2;46:2;62:7;
  73:13;90:19;110:6,7
**focused (5)**
  61:13;109:3,4;
  111:10;112:3
**follow (1)**
  121:20
**following (7)**
  6:10;96:6;98:5;
  116:1;117:4,5;
  122:11
**follows (2)**
  113:11,24
**footnote (5)**
  21:5;23:1;88:16,
  25;89:3
**footnotes (2)**
  88:17;93:25
**footwork (1)**
  49:25
**foregoing (1)**
  123:19
**forming (1)**
  74:6
**formulated (1)**
  67:14
**formulating (1)**
  119:13
**forth (1)**
  8:8
**forward (2)**
  9:16;115:25
**found (5)**
  16:24;18:2;29:8;
  66:13;101:24
**foundation (3)**
  36:1;67:2;68:25
**four (15)**
  24:14,15,16,19,20,
  20;28:16,17;36:19,
  20;94:25;115:18,19,
  21;118:14
**fourth (1)**
  118:23
**Frequency (1)**
  18:21
**Friday (1)**
  117:5
**front (14)**
  15:23;20:22;29:24;
  31:19;41:1,1;62:24;
  88:21;94:13;103:17,
  18;104:6;109:10;
  115:20
**full (9)**
  21:3;33:25;46:7;
  84:25;88:14,18,22;

  99:15;106:12
**fully (1)**
  123:4
**fun (1)**
  15:24
**furnish (2)**
  11:13;17:22
**further (2)**
  111:17;123:8

**G**

**Gahan (3)**
  40:1;77:24;78:2
**game (1)**
  75:10
**gauging (1)**
  64:19
**gave (4)**
  14:18,21;46:6;
  52:13
**gender (1)**
  109:7
**general (3)**
  14:14;67:4;70:4
**generally (4)**
  8:25;22:16;27:11;
  39:6
**germane (1)**
  13:25
**gets (3)**
  61:8;62:1;90:24
**girl (1)**
  89:11
**given (2)**
  12:25;120:17
**gives (2)**
  19:4;52:3
**giving (1)**
  26:19
**goes (11)**
  44:20;50:24;52:8;
  54:15;69:7;71:2;
  79:4;89:23;104:3;
  113:6,7
**Gomez (2)**
  74:15;90:14
**Good (14)**
  6:3,4,16,22,24;7:5,
  6;29:19;68:11,14;
  72:20;100:2;118:4;
  122:23
**grab (1)**
  34:13
**graphs (1)**
  34:25
**Great (1)**
  31:11
**grounds (2)**
  40:11;70:10
**group (9)**
  30:18;32:14;37:16,
  17;38:2;54:14;73:14;

  107:4;117:13
**groups (2)**
  21:25;30:17
**guess (3)**
  83:16;102:9;
  104:19
**gynecomastia (17)**
  9:22;19:8;26:4;
  30:16;32:20;33:10,
  13;87:16;110:1;
  115:4,23;117:14,16,
  18,20;119:7,19

**H**

**half (2)**
  116:20,25
**hand (5)**
  62:25;63:1;76:19;
  80:17;90:4
**handed (1)**
  103:2
**handing (4)**
  10:15;74:15,16;
  118:16
**handle (2)**
  54:14,15
**handy (1)**
  8:15
**happen (1)**
  28:6
**happened (1)**
  79:18
**happening (1)**
  17:12
**happens (1)**
  44:13
**happy (3)**
  17:14;22:14;60:11
**hard (2)**
  16:15;64:20
**head (1)**
  26:21
**heading (2)**
  20:17;31:13
**Health (1)**
  107:12
**heard (1)**
  25:24
**held (2)**
  24:3;56:13
**Helix (1)**
  104:15
**helping (2)**
  17:8;58:6
**helps (1)**
  40:22
**hereby (1)**
  123:3
**here's (1)**
  16:25
**hiding (1)**
  117:21

**higher (2)**
  25:4;79:2
**highlight (19)**
  27:23;28:1;29:18;
  31:4;32:10;37:7,25;
  45:5;46:1,5;52:20;
  54:3;58:20;95:1;
  99:6,20;108:7;112:2,
  17
**Highlighted (5)**
  29:15;54:5;95:7;
  112:15;117:22
**highlighting (2)**
  47:7;111:20
**highlights (1)**
  41:11
**hire (1)**
  105:14
**Hmm (1)**
  88:5
**holiday (1)**
  65:14
**homestretch (1)**
  95:23
**Honor (48)**
  6:3,22;10:18;11:7;
  14:22;20:1;26:20;
  36:1;40:6;42:13,20,
  23;43:2;46:20;53:2,
  23;55:5;56:20;57:8,
  12;63:8,19;64:19;
  66:17;68:24;69:8,10;
  70:10,15;71:1,22;
  75:7;95:12;96:11,16;
  97:6,22;98:24;103:6,
  10;104:13,25;105:3;
  113:18;114:11;
  116:5;119:16,20
**hoping (1)**
  122:17
**hormone (2)**
  9:19,19
**Hotel (3)**
  102:14,15;104:1
**hour (2)**
  59:15,19
**house (1)**
  120:10
**Huge (1)**
  10:24
**hundreds (2)**
  15:16;61:19
**hypothetically (9)**
  47:20;48:13,16,21,
  23;66:8;100:16;
  111:4,23

**I**

**identical (1)**
  84:12
**identification (6)**
  50:18;74:19;85:2;

Case 2:14-md-02592-EEF-MBN Document 5599-11 Filed 03/02/17 Page 130 of 139
(Jury Trial-Afternoon) - Vol. IV - January 29, 2015
Pledger v. Janssen, et al.

91:10;104:3;118:20
**identified (2)**
  108:23;117:17
**identify (1)**
  44:12
**ignore (2)**
  11:4;65:18
**important (22)**
  13:14;14:11;15:7,
  9,9;16:3,5,6,13;17:4;
  19:11;31:23;33:22;
  34:16;35:11;37:9;
  39:3;67:17;68:13;
  70:24;72:12;78:18
**importantly (1)**
  121:7
**impression (1)**
  60:9
**inadequate (2)**
  42:5;67:12
**Inc (4)**
  18:14;19:16;45:16;
  83:5
**incidence (2)**
  19:8;115:12
**inclined (1)**
  111:20
**include (8)**
  74:5;81:17;108:4,
  6;112:22;115:3,14;
  119:5
**included (11)**
  81:21;82:4;88:24;
  89:5,11;107:8,9,9,11,
  14;115:24
**includes (2)**
  64:3;78:18
**including (3)**
  67:21;82:7,9
**inclusive (5)**
  112:11,20;115:8,
  11,12
**inconsistent (1)**
  66:25
**incorrect (2)**
  59:4;60:9
**increase (1)**
  78:23
**increased (1)**
  26:5
**increasing (1)**
  35:4
**incumbent (1)**
  103:24
**indeed (1)**
  19:2
**indicate (1)**
  109:18
**indicating (4)**
  11:15;26:1;34:13;
  112:18
**indication (1)**
  46:12

**individual (2)**
  15:19,20
**indulge (1)**
  31:10
**industry (1)**
  110:15
**info (1)**
  119:6
**information (14)**
  12:10;13:14,15;
  17:11,12;18:1;45:19;
  69:3;72:17;78:18;
  88:8;93:18;119:23;
  120:1
**informed (1)**
  72:21
**initial (2)**
  79:1;83:9
**inserted (1)**
  65:17
**insignificant (1)**
  89:22
**insofar (1)**
  61:11
**instead (1)**
  66:20
**Institutes (1)**
  107:12
**institutions (1)**
  106:25
**instructed (1)**
  96:23
**instruction (1)**
  96:14
**instructions (2)**
  81:18;84:5
**intelligence (1)**
  25:16
**intend (1)**
  63:12
**intention (1)**
  46:6
**interchange (1)**
  109:19
**interchangeably (1)**
  93:24
**interested (2)**
  34:22;111:24
**interesting (1)**
  121:23
**interjects (1)**
  50:25
**interlineated (2)**
  54:13;58:17
**internal (1)**
  62:14
**internally (2)**
  45:21;116:1
**interval (2)**
  31:22,23
**intervals (1)**
  34:4
**into (10)**

18:1;20:14;39:23;
52:23;61:19;62:1,2;
68:15;69:7;103:21
**introduce (1)**
  10:25
**investigate (1)**
  47:18
**involve (1)**
  109:23
**involved (3)**
  12:4;16:12;57:6
**involves (1)**
  62:9
**issue (2)**
  64:22;70:11
**issues (1)**
  109:24
**item (1)**
  114:23
**items (6)**
  114:8,8,9,13,14,17

## J

**Janssen (38)**
  9:13,18;12:17;
  13:12;19:18,24;21:6,
  9;27:4;29:2,6;34:23;
  35:12,15,22;36:2;
  39:22;49:4;60:1;
  61:13;62:15;67:11;
  68:19;79:21;88:7;
  104:8,10,16,16,17,
  24;105:10,14;106:15,
  17;107:19;109:20;
  115:25
**Janssen-Ortho (3)**
  18:14;45:16;83:5
**Janssen's (2)**
  35:19;42:5
**January (4)**
  83:23;84:1;86:5;
  101:10
**jargon (1)**
  52:22
**JJRE (3)**
  80:16;90:9;118:25
**JJRE00115170 (1)**
  90:10
**JJRE03892170 (1)**
  117:9
**JJRE03900098 (1)**
  104:4
**JJRE04405229 (1)**
  91:4
**JJRE04405248 (1)**
  94:19
**JJRE14088063 (1)**
  118:18
**John (1)**
  123:15
**Judge (3)**
  35:21;75:12;

116:11
**Judith (1)**
  107:11
**July (8)**
  40:2;44:20,23;
  45:3;60:20;76:3,3;
  79:19
**jump (1)**
  45:8
**jumps (1)**
  34:9
**Juror (1)**
  120:10
**Jurors (5)**
  30:8;50:1;57:16;
  97:24;122:4
**jury (39)**
  6:7,11,13;8:9,16;
  10:23;12:1;20:22,24;
  28:4;29:2,24;35:16;
  47:16;50:7,23;54:1;
  56:1,4;57:19;65:25;
  67:8;78:15;88:22;
  94:13;96:1,3,7,23,25;
  97:22;98:2,6;114:22;
  115:6,20;120:17;
  122:8,12

## K

**Kathy (2)**
  58:2,5
**keep (5)**
  8:8;117:1;121:2,
  18,19
**Kessler (10)**
  6:20,25;7:5;20:4;
  53:20;58:8,14;70:12;
  97:2;112:8
**key (22)**
  13:8,9;15:9,10;
  16:23;50:8;65:22,23;
  66:6,16,24;68:1,2;
  70:8;73:4;81:12,14,
  16;82:1;89:21;92:20;
  93:3
**kids (12)**
  22:24;30:18,19;
  32:18,22;37:23;
  38:20;39:13;46:13;
  49:14;94:3;121:6
**kind (9)**
  7:12;22:8;23:6;
  41:6;99:23;110:8,14,
  21;118:7
**kindly (1)**
  33:24
**KLINE (150)**
  6:22;7:4;10:14,19,
  24;11:6,13,18;14:20,
  25;15:3;18:6;20:11;
  22:11,12;24:5;29:16,
  17;30:7,11;31:24;

32:4;36:6,11,14,18,
23;37:2;40:13,18;
42:20,22;43:3,9,13,
22;44:4,6,11,21,23;
45:2,13,14;46:22;
47:4,10,14;49:24;
50:3,4,19,21;51:9,13;
53:6,9,24;55:10,20;
57:13;58:7,9,13;
60:14,17;63:11,14,
18,22,23;64:17,22,
25;65:3,5,8;66:2,5,
20,22;67:4,9;69:3,9,
15,24;70:3,20;72:1,
24;74:23,25;75:5,7,
17,18;76:12,16,21;
80:24;81:2;85:5,14,
18,23,25;86:10;
87:14;90:15,17;
91:17,23;92:1,2;
95:11,14,18,20,24;
97:8;98:15,20,23;
99:2;103:13,16;
104:21;105:1,8,12,
13;111:1;112:17,19;
113:21;116:8,16,19,
23,24;118:6,10,21,
24;119:15,23,25;
122:19,23
**knew (1)**
  34:24
**knowing (2)**
  68:19;107:24
**knowledge (1)**
  12:9
**known (1)**
  19:24
**knows (2)**
  27:24;68:9
**Kurz (1)**
  123:15

## L

**lab (1)**
  21:17
**label (6)**
  42:17;62:17;71:12,
  13;96:18;97:10
**labeling (1)**
  71:5
**laboratory (3)**
  21:6,8;26:6
**lactation (3)**
  9:22;26:4;30:16
**language (4)**
  61:8,8;77:11;99:22
**large (1)**
  110:22
**larger (4)**
  17:21,22;84:22,23
**Larry (1)**
  107:14

Case 2:14-md-02592-EEF-MBN Document 5599-11 Filed 03/02/17 Page 131 of 139

(Jury Trial-Afternoon) - Vol. IV - January 29, 2015
Pledger v. Janssen, et al.

**last (9)**
  8:7;54:6;69:22,22;
  78:4,4;79:18;94:25;
  116:6
**late (1)**
  109:17
**later (5)**
  28:20;48:20;64:8;
  101:4;118:14
**Laughter (2)**
  59:17;120:21
**law (1)**
  72:10
**lawyer (4)**
  12:3;14:23,25;
  46:21
**lawyers (4)**
  12:3,5,16;58:5
**laypeople (1)**
  9:1
**lead-in (1)**
  118:14
**leading (3)**
  20:3;37:3;73:1
**learn (3)**
  33:18,20;51:4
**learned (2)**
  22:18,18
**least (4)**
  60:25;88:8;89:12;
  100:25
**leave (6)**
  17:16;36:4;60:8;
  72:12;102:3;112:3
**leaves (1)**
  102:8
**leeway (2)**
  20:7;65:15
**left (2)**
  24:9;86:5
**legwork (1)**
  12:4
**length (1)**
  96:21
**lengthy (1)**
  110:10
**less (13)**
  7:15;8:9;21:19;
  26:23;27:7,11,20;
  38:7,7;52:5,18;82:9,
  10
**Letter (2)**
  71:10;96:20
**Letters (2)**
  43:4;96:14
**level (11)**
  21:17,20;30:20,22;
  33:4,5,9;37:24;88:4;
  113:12;114:2
**levels (44)**
  18:19;19:3;21:15;
  23:20,21;26:3;32:12,
  15,18,23;33:20;35:4;

37:11,12;40:4;44:17;
  47:18;51:17,18,25;
  52:12;54:23,24;
  75:21;76:25;77:1,7;
  78:9;86:15;90:20;
  91:1,3;92:5;93:2;
  95:3,5;99:18;101:25;
  109:5,8,24,25;
  114:17;117:15
**limit (18)**
  18:20;20:18;21:4,
  10;26:11;30:20;
  31:14;32:11,11;
  37:24;38:21;51:17,
  23;52:13;56:16;79:2;
  87:18,21
**limitations (1)**
  25:16
**limited (1)**
  31:15
**limits (6)**
  21:12;23:11;77:5;
  78:10;95:4;99:19
**line (1)**
  64:6
**lines (2)**
  95:1;114:16
**list (5)**
  106:8,12,14,14;
  117:13
**listed (2)**
  41:19;106:8
**listening (1)**
  121:8
**listing (1)**
  117:19
**literally (1)**
  118:7
**little (7)**
  8:24;29:10;39:19;
  65:2;98:14,21;115:9
**location (1)**
  103:25
**long (11)**
  10:12,16;18:2,3;
  41:7;43:23;45:6;
  64:14;94:6;102:10;
  116:5
**longer (1)**
  10:12
**Long-term (11)**
  10:8;18:9;40:5;
  44:18;47:19;75:22;
  80:13;86:14;90:21;
  91:2;92:6
**look (65)**
  14:5,9,10;15:14;
  17:6,24;18:7;19:6,13,
  14,15;20:16;22:1;
  23:14;27:9,9,10,12;
  28:10,13,21;29:8,20;
  31:1,1,3;34:16,23;
  35:13;37:22,22;43:1,

14,19;45:24;48:10,
  10;49:11,18;57:9;
  59:21;63:24;72:14,
  25;74:11;75:19;
  78:16;81:9,12;82:1;
  83:4;86:11,12;87:2;
  88:16,20;90:8;92:3,
  19;93:7;99:23;
  100:14;103:17;
  106:11;113:8
**looked (3)**
  14:8,12;35:9
**looking (23)**
  9:3,4,17,18;13:10;
  18:17;22:17,23;
  27:12,16,17;30:13;
  34:19;48:3;55:3;
  76:14;85:20;88:21;
  89:25;90:20;92:24;
  93:5;94:25
**looks (2)**
  15:20;106:22
**Los (1)**
  106:24
**lot (4)**
  47:11;62:1,7;85:8
**lower (1)**
  25:5
**LP (2)**
  104:8;105:11
**lunch (1)**
  9:13

### M

**main (2)**
  32:20;48:2
**mainly (1)**
  109:3
**makes (2)**
  37:15;121:22
**making (4)**
  69:19;70:13;71:24;
  72:1
**males (4)**
  21:7;89:4,5;117:14
**manufacturer (11)**
  16:4,5,17;17:8;
  71:3,8,8,9,10,11,15
**manufacturer's (1)**
  16:14
**Manuscript (14)**
  10:9;18:11;35:14;
  41:20;50:24;65:13;
  79:10,16;86:16;90:5;
  91:21;117:13;
  118:22;119:2
**manuscripts (2)**
  27:19;40:7
**many (9)**
  14:7,8,9;21:14;
  26:13;32:25;71:9,12;
  105:24

**Marianne (1)**
  58:3
**mark (14)**
  10:7;24:12;31:25;
  39:25;62:20,21,23;
  80:11;84:21;90:25;
  95:16;102:17,25;
  118:15
**marked (13)**
  7:10;10:14;17:16;
  50:17;74:18;76:11;
  85:1;90:11;91:6,7,9;
  116:14;118:19
**marker (1)**
  117:20
**marking (4)**
  10:11;74:12;
  102:20;116:4
**match (3)**
  68:5;92:10;93:1
**math (1)**
  38:22
**matter (2)**
  55:24;98:18
**maturation (1)**
  74:1
**May (35)**
  10:4,10;13:12;
  18:11;19:21;21:14,
  15;24:7;37:5,6;
  40:20;44:2;50:13;
  58:8;61:7;63:16;
  64:7;65:12;69:20;
  70:19;78:24;79:11;
  83:9,13,15,21;89:17;
  91:25;93:6;101:15;
  103:13;107:9,10;
  116:17,21
**maybe (3)**
  28:20;46:23;98:13
**MBA (1)**
  106:1
**mean (32)**
  8:17;15:6,15,15,
  22;16:5,16,19;17:6,
  18;24:16;25:14;28:3,
  8;30:14,18;35:19;
  37:15;38:25;48:14;
  55:11;61:8,18,21,22;
  65:1;67:17;71:17;
  80:7;93:2;115:14;
  120:18
**meaning (2)**
  9:1;113:4
**means (11)**
  7:19;8:10;16:8;
  24:19;53:13,21;55:9;
  68:3;82:11;115:16;
  123:21
**meant (1)**
  53:18
**measure (1)**
  60:4

**measured (1)**
  34:3
**measurements (2)**
  24:20;32:9
**media (1)**
  121:9
**medical (2)**
  73:7;105:25
**medication (1)**
  60:22
**Medicine (1)**
  107:15
**medicines (2)**
  67:21,22
**meeting (24)**
  54:18;83:22;
  102:11,21,23,25;
  103:23,24;104:7;
  106:18;107:5,6;
  108:20;110:10;
  114:8,10,19,23,24;
  115:18;116:2;117:1,
  2,4
**meetings (1)**
  110:16
**members (2)**
  29:23;50:22
**memory (2)**
  11:24;70:25
**Mental (1)**
  107:12
**mention (1)**
  107:20
**mentioned (1)**
  94:17
**message (7)**
  65:22,23;66:6,16,
  24;68:1;73:5
**messages (1)**
  68:2
**met (2)**
  25:15;58:2
**Method (3)**
  46:15;49:11,12
**Microphone (1)**
  23:25
**middle (3)**
  20:16;22:8;108:22
**might (2)**
  122:1,18
**million (1)**
  13:18
**millions (8)**
  12:13;13:5;14:17;
  15:5,6;17:6,6,7
**mind (9)**
  9:15;35:21;53:3,
  10,11;57:4;61:1;
  117:2;121:2
**minute (4)**
  35:23;45:7;73:22;
  78:13
**minutes (7)**

Case 2:14-md-02592-EEF-MBN   Document 5599-11   Filed 03/02/17   Page 132 of 139
(Jury Trial-Afternoon) - Vol. IV - January 29, 2015
Pledger v. Janssen, et al.

56:8;60:10,13,15;
93:21;95:22;96:10
**misleading (2)**
94:4;102:5
**missed (1)**
102:18
**Mitelman (1)**
107:21
**mL (2)**
109:11,13
**module (1)**
118:7
**moment (4)**
28:4;31:9;32:3;
43:1
**momentarily (2)**
50:16;76:20
**Monday (1)**
56:18,23;117:4,5
**more (15)**
7:13;8:14,24;
20:12;23:13;30:10;
38:3,20,22;39:1,4;
115:12,13;118:6,7
**morning (3)**
57:5;101:5;118:22
**most (8)**
32:2;67:17;70:24;
74:1;82:20;112:2,11,
20
**motion (2)**
96:12,13
**move (3)**
39:19;43:10;
105:10
**moving (1)**
115:25
**much (8)**
10:12;11:14;39:18;
57:12;85:11;90:15;
110:13;120:23
**multiple (3)**
71:20;72:7;80:12
**myself (2)**
47:13;63:2

**N**

**name (2)**
64:5;107:20
**names (2)**
106:13;108:23
**nanograms (1)**
109:13
**narrow (2)**
89:8;115:13
**National (2)**
102:22;107:11
**nauseating (4)**
119:6,19,22,25
**near (2)**
98:16;116:9
**Necco (1)**

21:19
**necessarily (1)**
34:21
**need (8)**
22:13;31:1;41:9;
73:7;76:1;79:9,16;
95:7
**needed (3)**
20:13;31:18;58:4
**needs (3)**
56:17,22;61:3
**neighbors (1)**
121:6
**neurologist (1)**
72:6
**new (15)**
71:24;79:22;80:1;
81:4;83:1;86:22;
89:20;90:4,24;92:3,
7;96:18;102:12;
104:1;117:16
**newspaper (1)**
121:10
**next (16)**
15:8;29:13;53:25;
59:15,19;65:13;70:4;
76:17;84:21;90:2,2;
105:20;108:14;
109:2;112:5;116:4
**ng (1)**
109:11
**ng/mL (1)**
109:8
**night (1)**
122:24
**nine (3)**
87:18,19;89:24
**nobody (1)**
121:21
**nodding (1)**
122:4
**non-PA (1)**
100:17
**non-primary (1)**
100:19
**normal (43)**
18:20;20:18,18;
21:5,11,12,24,23:11,
21,22;26:11;30:20;
31:14,15;32:11,12,
15,22,23;37:12,24;
38:2,21;51:17,19,23,
25;52:12,13;76:25;
77:1,5,7;78:9,10;
79:2;87:18,21;95:4,
5;99:18,19;117:15
**Normalization (3)**
91:1,3;92:5
**normalize (1)**
93:3
**Nos (2)**
80:15;91:4
**notable (1)**

78:24
**notations (1)**
110:14
**note (5)**
77:19,20,21,23;
81:3
**notes (2)**
110:11;123:5
**notice (1)**
56:15
**November (10)**
102:6,8,11;103:20,
25;117:2,3,4;118:12;
119:2
**Nowhere (1)**
96:15
**number (40)**
15:16;23:17;25:7;
26:17;27:20,24;31:2;
33:23;34:2,3;41:2,3;
44:16;49:19;50:13;
51:4;59:5,6;61:21;
63:25;70:22;74:12,
13;76:5,17;78:14;
81:9;84:14,22;
102:17;103:1;
114:15,22,25;115:6,
18,19,21;117:8,10
**numbers (15)**
8:22;9:4;12:16;
19:4;21:8,9,11;25:3,
4;27:9;39:10,16;
101:6,6,11

**O**

**object (9)**
20:2;35:21;40:7,
10;42:18;53:14,17;
56:25;70:10
**objection (31)**
10:17;14:19,22;
18:3;35:24,25;40:17;
42:13,25;43:24;
46:20;53:2;55:5,12;
63:7;66:17;67:1;
68:24;70:17;71:21;
72:4;75:10;80:20,22;
91:11,20;97:4,14;
103:3;113:18;119:20
**objectionable (1)**
47:6
**objections (4)**
75:14;91:18,24;
103:8
**objection's (1)**
75:15
**obligation (3)**
68:21,25;72:8
**observed (1)**
18:21
**o'clock (1)**
55:23

October (7)
94:11,14,16;99:3,
3;102:7,7
**off (6)**
15:8;31:9;47:7;
57:5;87:3;112:14
**offered (1)**
67:8
**office (1)**
71:20
**officer (6)**
10:15;50:16;63:1;
74:16;76:20;80:18
**off-label (2)**
42:11;68:20
**off-the-record (2)**
24:2;56:12
**old (2)**
82:8;88:25
**Olga (1)**
107:21
**one (52)**
7:13;8:14;10:11;
11:4;14:4;15:18,19;
17:21,23;25:11;27:7,
25;28:13,14,16;
29:13;30:10;32:20;
34:8;36:11;37:16;
40:23,25;44:16;
49:10;54:15;62:18;
63:9,15;67:20;68:13;
70:4;73:2,14;78:14;
83:24;84:5;87:25;
89:12;90:9;93:12;
97:12;100:2,9,25;
113:6;114:23,25;
115:2;118:6,7;
122:20
**one-page (1)**
85:21
**ones (6)**
23:5,5;33:3;42:3;
43:24;87:20
**only (14)**
14:4;17:2;51:6;
56:24;71:14;82:9,10;
84:17;87:22;88:22,
24;93:12;101:18;
108:12
**Oops (1)**
21:18
**open (6)**
6:10;47:21;96:6;
98:5;121:2;122:11
**opening (1)**
69:5
**opinion (11)**
16:21;42:4;61:4;
67:8;68:16,17;69:7,
22;74:6;119:11,13
**opinions (1)**
67:13
**opportune (1)**

32:2
**opportunity (1)**
53:20
**order (3)**
6:1;120:16,18
**original (4)**
75:25;83:20,22,25
**others (3)**
34:9;107:17;119:1
**otherwise (1)**
42:23
**out (43)**
10:2,11;11:4;14:6;
25:6;27:7;28:11;
32:17;34:9;36:21;
37:17;39:4;42:22;
46:13;48:20;50:20,
23;54:5;55:16;58:6;
61:7,11,12;64:24;
65:21;68:21;76:7;
78:15;79:14;87:9,10;
90:9;99:9;102:1;
105:1;114:7,9,19,23,
24;115:18;116:25;
122:20
**outside (6)**
96:7;104:15;
105:15;107:5;
109:20;122:12
**over (10)**
46:13;84:18;88:9;
94:21;97:11;102:1;
109:5,16;112:23;
114:12
**Overruled (7)**
14:24;15:2;40:12,
16,17;70:17;72:4
**own (1)**
68:5

**P**

**P-33 (2)**
7:10;17:16
**P-34 (5)**
10:12;11:1,10;
17:22,24
**P-34A (1)**
11:12
**P-35 (1)**
31:25
**P-36 (1)**
40:2
**P-37 (2)**
50:14,17
**P-38 (2)**
63:7;64:16
**P-39 (4)**
74:15,18,24,25
**P-39A (1)**
76:11
**P-40 (1)**
76:18

Case 2:14-md-02592-EEF-MBN   Document 5599-11   Filed 03/02/17   Page 133 of 139

(Jury Trial-Afternoon) - Vol. IV - January 29, 2015
Pledger v. Janssen, et al.

**P-42 (2)**
84:22;85:1
**P-42A (1)**
85:1
**P-43 (1)**
91:9
**P-43A (1)**
95:17
**P-45 (3)**
116:5,10;117:8
**P-46 (1)**
118:19
**PA (1)**
100:17
**packet (2)**
84:22,23
**page (57)**
9:2;10:11;11:1,11;
15:20;17:21,23;25:7;
39:10;41:15;44:9;
45:3,7,15,20;49:18;
62:18;63:25;64:18;
76:5,10;80:12;81:9;
83:2;88:18,21,22;
92:15,16;93:7;94:13,
13,19,21,21;100:7,7;
101:15,16;102:16,16,
18;103:17;104:2;
105:6;107:25;108:1,
14,21,22;109:16,18;
114:7,10,12;116:20,
25
**pages (7)**
15:6,17;17:7;
43:15;45:22;50:6,7
**paginated (2)**
45:21;75:25
**Palace (2)**
102:14;104:1
**Pandina (18)**
40:2;41:1;64:3;
73:14;74:8;78:2,19;
106:5;108:24;110:3,
20;111:2,21;113:16;
116:11;117:6;118:2;
119:1
**Pandina's (1)**
113:8
**PAP (1)**
18:21
**paper (11)**
11:15;19:1;39:23;
40:23;43:23;44:16;
51:5;55:14;84:13;
93:4;101:21
**paragraph (13)**
45:24;46:5;76:7,8,
14;77:22;78:4;94:6,
7,20;109:2;110:18;
117:10
**paragraphs (1)**
51:11
**parameter (1)**

27:3
**parameters (1)**
26:11
**paren (7)**
18:20,20,21;77:9;
78:10,11;99:19
**parentheses (3)**
47:21,22;111:5
**parenthetical (1)**
78:21
**part (9)**
10:20;16:1;17:22;
44:9;84:5,22,24;
109:23;112:5
**participants (1)**
105:21
**particular (2)**
16:24;76:10
**past (1)**
65:2
**patience (1)**
41:8
**patient (2)**
16:19;17:9
**patients (17)**
33:20;39:12;51:16,
18,22,24;52:10;
76:24,25;77:4,7;78:7,
25;95:3;99:7,16;
100:23
**Pause (3)**
6:6;63:17;86:3
**peak (1)**
79:1
**peaks (2)**
35:1,2
**Pediatric (3)**
64:12;65:9;72:6
**people (15)**
12:17,19;14:16;
16:9;23:3,35:22;
62:15;63:25;71:11;
105:25;107:19;
109:20;115:25;
122:18
**people! (1)**
119:9
**per (1)**
109:13
**percent (16)**
7:16,20,20,25;8:1,
10,17,19;27:10;28:5,
10;51:22,24;54:4;
77:4,6
**percentage (8)**
30:24;51:15;52:10;
76:23;78:7;95:2;
99:7,16
**percentile (4)**
27:14;28:11,14,18
**Perfectly (1)**
79:13
**period (17)**

32:7,9;35:2,4,5;
39:13,17;51:21;
52:11;54:7;67:12;
77:3,6;78:8;79:1;
99:8,17
**periods (6)**
24:8;35:3;51:19;
59:9;77:2;95:6
**permission (1)**
103:4
**permit (1)**
20:9
**permits (1)**
44:4
**permitted (1)**
97:15
**perspective (1)**
16:13
**pertained (1)**
93:18
**Pharmaceutica (2)**
104:8;105:10
**pharmaceutical (13)**
15:10;66:15,24;
67:11,19;68:1;70:7;
72:15;88:6;97:3;
105:14;109:20;
110:10
**physician (3)**
9:3;17:9;67:18
**physicians (1)**
42:5
**pick (2)**
11:4;119:15
**picked (4)**
27:2,2;52:25;61:12
**picking (1)**
61:11
**piece (1)**
34:13
**pill (2)**
23:3,5
**place (3)**
71:14;90:2;118:4
**placebo (2)**
23:4,9
**places (1)**
71:12
**plaintiffs' (1)**
12:16
**Plaintiff's (2)**
62:24;80:11
**plan (17)**
12:21;63:5;79:22,
25;80:1,5,19;81:4;
82:23;83:1,4,17,18,
25;84:3,3;85:10
**plans (2)**
80:4;84:2
**play (1)**
53:5
**plays (1)**
16:20

**please (22)**
6:1,1,17;18:5;34:15;
36:17,25;45:7;47:8;
55:23;57:17,23;
59:16;65:12,18,24;
95:25;98:8;119:1;
121:6,20,20,21
**pm (7)**
6:14;56:5;57:20;
96:4;98:3;122:9,25
**point (30)**
10:2;14:10;16:13;
30:14,33;23;38:7,11,
15;39:4;47:24;49:16;
50:23;51:23;61:7,11,
12,17,18,23;63:15;
65:5;68:12,14;70:12;
72:12,13;82:2;99:1;
113:9;119:4
**pointed (2)**
78:15;105:1
**points (3)**
61:19;70:22;79:14
**pooled (6)**
9:13,25;62:5,8;
80:14;103:21
**pooling (1)**
22:18
**populations (2)**
100:18,19
**portion (1)**
34:12
**portions (1)**
75:9
**position (2)**
69:11;117:18
**possible (2)**
65:14;115:11
**poster (12)**
54:16,17,18,20;
55:16;58:15,16,17,
17,20,22;59:3
**powerful (1)**
67:22
**practice (1)**
57:4
**PRAE (1)**
47:25
**precise (1)**
117:9
**predicate (1)**
23:13
**predose (4)**
24:11,12,17;34:5
**preemption (1)**
70:10
**prefer (1)**
10:21
**prepare (2)**
105:17,18
**prepared (12)**
13:25;17:13;41:17;
83:7,14,15;96:22;

104:7,14,16,23;
105:10
**prescribed (1)**
60:23
**prescriber (1)**
91:21
**prescribing (1)**
40:8
**prescription (1)**
60:22
**presence (4)**
6:11;96:7;98:6;
122:12
**present (1)**
110:3
**presentation (7)**
54:18;58:23;59:2;
109:4;113:8,10,22
**presentations (1)**
109:3
**presented (2)**
111:2,21
**preserved (4)**
75:16;91:19,25;
103:9
**pressing (1)**
53:22
**prevent (1)**
71:7
**previous (2)**
91:18,24
**previously (3)**
6:25;81:21;90:11
**primary (3)**
16:21;100:18,21
**print (4)**
14:6;50:13,24;
76:19
**printer (1)**
50:20
**printing (1)**
50:19
**prior (5)**
47:24;49:3;77:13;
94:5,5
**probably (2)**
20:15;65:6
**problem (6)**
10:19;11:5;16:23;
43:17;55:18;90:1
**problems (1)**
16:10
**proceed (4)**
58:8;91:25;116:18,
22
**proceedings (1)**
123:3
**produce (1)**
78:3
**produced (2)**
12:15;110:9
**product (1)**
16:18

Case 2:14-md-02592-EEF-MBN   Document 5599-11   Filed 03/02/17   Page 134 of 139
(Jury Trial-Afternoon) - Vol. IV - January 29, 2015
Pledger v. Janssen, et al.

**Products (2)**
104:8;105:11
**prolactin (91)**
9:18,21;10:9;
18:10,19;19:3;20:17,
24;21:1,6,9,15;23:11,
20,21;26:3;30:22;
32:13,15,18,23;33:4,
5,9,12,20;34:12,24;
35:3;37:24;40:4;
41:20;44:17;47:18,
21;48:14,17,18;
51:17,18,22,25;
52:12;54:21,23,24;
66:7,8;73:25;75:21;
76:25;77:1,5,7;78:9;
80:14;86:15;90:20;
91:1,3;92:5,25;93:2,
16;95:3,4;99:18;
100:17;101:25;
108:8,9,16,21;109:3,
5,6,8,24,25;111:3,4,
22,23;113:12;114:2,
17,24;115:22;
117:15;119:2,8
**Prolactin-related (13)**
18:19;19:2,4;
30:15,23;32:19;
47:25;48:1,3;49:5;
54:10;89:13;100:25
**prolactins (1)**
87:21
**promise (3)**
11:8;59:18;86:9
**propensity (1)**
79:3
**proportions (2)**
51:20;77:2
**Protocols (2)**
18:12;86:24
**prove (2)**
46:23;47:1
**provide (2)**
12:5;72:9
**provided (1)**
67:11
**prudent (2)**
66:23;72:20
**Psychiatry (1)**
102:22
**psychologist (3)**
74:7;106:5;113:16
**puberty (2)**
82:20;117:19
**Publication (2)**
64:12;65:9
**publishing (1)**
115:22
**pull (2)**
36:21;46:4;54:3;
93:11
**pulled (1)**
54:5

**purpose (2)**
46:9;59:22
**purposes (1)**
104:3
**push (2)**
9:16;101:15
**put (14)**
9:14;27:5;31:4;
35:7,10;36:15;41:10;
46:16;55:16;71:18;
84:23;86:1;87:11;
110:22
**putting (3)**
62:9;78:12;121:17
**p-value (4)**
7:15,19;38:6;52:5

**Q**

**quickly (2)**
75:19;90:7
**quite (1)**
37:13
**quote (1)**
71:6

**R**

**radio (1)**
121:9
**raised (3)**
33:3;43:25;70:23
**raises (1)**
33:4
**ran (2)**
83:9;84:12
**range (9)**
51:19,25;52:13;
77:1,8;78:10;95:5;
99:19,23
**Rapoport (1)**
107:11
**rates (1)**
117:16
**rather (2)**
43:10;108:12
**ratio (1)**
87:24
**read (16)**
18:23;47:16;51:12;
55:14;77:20,21;
86:18;93:23;99:15;
106:13;114:22,25;
115:2,6,19;119:24
**reader (1)**
35:21
**reading (4)**
53:3,10,11;121:7
**ready (3)**
58:8,9;97:21
**realizes (1)**
55:13
**really (4)**

20:7;38:20;39:2;
44:11
**Realtime (1)**
123:16
**Reanalyze (1)**
115:3
**reason (1)**
106:19
**reasonable (1)**
72:19
**reasons (2)**
59:5,6
**reassuring (1)**
74:2
**recall (1)**
49:9
**received (2)**
24:18;104:18
**recess (6)**
56:8,10;95:22;
96:10;97:17,19
**recollection (3)**
77:17,18;89:10
**recommended (1)**
117:13
**reconvened (1)**
6:2
**record (4)**
20:20;76:10;97:13;
104:14
**records (1)**
110:15
**redrafted (1)**
77:16
**refer (1)**
45:21
**referred (2)**
29:6;74:22
**referring (4)**
10:5,22;40:21;54:9
**refrain (1)**
121:7
**Register (2)**
71:2,6
**regulation (3)**
69:1,12;70:6
**regulations (6)**
71:5,7;72:8,13;
96:17;97:4
**regulatory (1)**
69:14
**relate (4)**
19:2;67:7,13;
109:24
**related (10)**
21:5;26:1,3;31:13;
33:10,13;48:21,23;
66:7;111:23
**relates (4)**
23:17;31:15;50:8;
72:17
**relating (4)**
49:4;58:15;62:4;

103:8
**relationship (21)**
46:3,6,10;47:20;
59:8,9,24;60:5,6,8;
68:8;92:23,25;93:4,
10;94:2;109:6;111:3,
22;113:12;114:2
**relative (1)**
123:9
**relevance (1)**
40:10
**relied (1)**
110:15
**relies (1)**
16:8
**rely (3)**
16:7,9;17:7
**relying (1)**
121:17
**remaining (1)**
60:15
**remember (4)**
13:20;30:13;32:6;
52:4
**remind (1)**
120:25
**reminds (1)**
76:2
**rendered (1)**
119:11
**rephrase (1)**
69:20
**report (14)**
42:14,16,18;43:4;
71:23;88:7;96:15,20;
102:21,25;103:23;
104:7;107:25;119:17
**reported (7)**
52:10;78:7;99:8,
12,17;113:15;122:2
**REPORTER (3)**
97:12;123:16,23
**reports (1)**
105:18
**represent (1)**
119:3
**representation (1)**
61:10
**representative (2)**
71:19;72:6
**representing (1)**
12:17
**reproduction (2)**
101:7;123:20
**reps (1)**
96:15
**request (15)**
12:7;20:25;22:10;
29:22;31:16;38:1;
45:12;46:7;47:9;
49:22;66:1;87:13;
96:13,22;112:16
**requesting (1)**

10:16
**required (2)**
72:10;96:18
**requisite (1)**
63:19
**respond (1)**
70:19
**responded (2)**
30:8;50:1
**responds (1)**
73:15
**response (5)**
64:4;66:9;72:3;
97:15;99:25
**responsibility (3)**
16:14,22,25
**responsible (1)**
16:18
**rest (3)**
11:4;43:5;99:20
**restriction (2)**
89:9,15
**result (4)**
7:17;21:17;38:4;
39:21;52:4;73:25
**results (7)**
80:6,9;93:11,11,
11;101:23;115:22
**return (2)**
58:10;120:6
**review (6)**
11:20;16:16;41:25;
65:13;74:5;118:22
**reviewed (6)**
29:1;33:19;61:4;
62:14,19;66:12
**Revised (4)**
45:3;76:3;94:12;
119:2
**revision (1)**
76:1
**revisions (1)**
119:5
**rhetorical (1)**
105:5
**rid (2)**
22:7;90:1
**right (103)**
6:16,18;8:20;9:2;
13:21;15:15,19;16:2,
15;21:7;22:6,20;
25:18;28:2,9;33:10;
34:4,13;35:1;36:13;
37:15;38:19,21;
39:12,25;40:16;43:8;
44:2,19,25;49:8;50:7,
20;53:8,21;55:4,20,
21;56:7;57:22;58:1,
7;59:22;60:4;61:8,
18;62:12;63:6;64:16;
70:18;72:7;74:20;
75:3,6,17;76:9,13;
80:23;84:18;85:9,17,

Case 2:14-md-02592-EEF-MBN   Document 5599-11   Filed 03/02/17   Page 135 of 139
(Jury Trial-Afternoon) - Vol. IV - January 29, 2015
Pledger v. Janssen, et al.

19,24;89:4,10;91:13,
16,23;92:1,23;95:8,
16,19,21,22,23;96:9;
97:16;98:8,12,22;
102:16;104:19;
105:9;106:20;
108:14;115:20;
116:7,8,17,21;118:9;
119:21;120:2,24;
121:11,15,16;122:3,
5,14,16,19
**RIS (1)**
119:7
**RIS-CAN-19 (1)**
18:12
**RIS-CAN-20 (1)**
18:12
**rise (8)**
6:7;34:24;56:1;
66:7;73:23,25;79:1;
95:25
**rising (1)**
39:16
**RIS-International-41 (1)**
18:13
**Risperdal (4)**
15:14;22:23,24;
102:21
**Risperidone (12)**
10:8;18:10;40:5;
44:18;47:19;75:22;
80:13;86:14;90:21;
91:2;92:6;109:6
**RIS-USA-93 (1)**
18:13
**RIS-USA-97 (1)**
18:13
**RMR (1)**
123:15
**road (2)**
41:7,7
**role (1)**
16:20
**rolled (1)**
62:1
**room (2)**
9:2;16:1
**roughly (1)**
8:17
**rule (1)**
121:21
**ruled (5)**
40:14;63:9;75:13;
91:14,15
**rules (1)**
121:14
**run (11)**
9:24;81:19,24;
82:24;83:11;84:4,9,
10;86:6,7;105:17
**running (1)**
89:20
**rush (3)**

47:12,12;111:20
**rushing (1)**
43:16

**S**

**safety (9)**
16:9,14,20,23;
70:8;71:4,4;72:18,23
**sales (3)**
71:19;72:5;96:15
**same (14)**
9:2;24:23,25;
37:19;40:13,21;
77:12;84:10;87:25;
89:15;99:24;100:7;
123:7,21
**saw (19)**
8:9,16;11:24;
12:24;23:14;26:20;
35:10,12,15;37:4;
40:8;47:24;48:24;
49:6;61:20;83:12;
84:11;91:22;94:6
**saying (10)**
7:18;32:5;52:23;
54:8;55:18;67:25;
69:17;73:4;79:7;93:4
**Scahill (1)**
107:14
**School (1)**
107:15
**SciAn (2)**
19:16;83:10
**science (4)**
7:24;52:22;55:3,8
**scientific (1)**
92:20
**scientist (1)**
53:13
**scope (1)**
67:3
**screen (6)**
14:5;20:20;29:15;
50:11;88:23;105:7
**search (1)**
11:23
**searching (1)**
13:15
**seated (5)**
6:5,17;57:23,25;
98:9
**second (15)**
49:10;61:5,6;62:4,
13;64:6;76:14;82:2;
83:24;90:12;100:9;
113:6;116:18,22;
120:9
**Secondly (2)**
117:11,12
**section (5)**
20:24;42:16,17;
101:20,21

**seeing (1)**
49:9
**sees (1)**
31:13
**selected (1)**
21:6
**self-evident (2)**
20:8,8
**sells (1)**
16:18
**send (1)**
72:5
**sending (2)**
71:19;77:15
**sense (2)**
35:8;37:15
**sent (1)**
96:19
**sentence (12)**
47:16;73:19;78:5;
92:20;93:8,10,12;
99:15,23;101:17,18;
110:21
**sentences (2)**
26:23;73:17
**September (7)**
65:15;79:19,21;
81:3;85:16;86:16;
89:17
**series (1)**
71:24
**serve (1)**
120:16
**Services (1)**
19:16
**session (2)**
57:24;98:11
**set (10)**
10:5,23;11:1;
12:24;24:8;26:7,11,
12;83:9;84:5
**sets (1)**
81:22
**setting (3)**
26:10,10;122:17
**seven (12)**
24:14,15,16,19,21;
28:17;32:24;36:19,
20;37:13,14,16
**shake (1)**
26:20
**SHAP (45)**
47:22;48:7,17;
49:2,2;51:16,23;52:1,
10;54:8,21,23;58:21;
74:1;76:24;77:5,8;
78:7,10;79:3;93:16;
95:2;99:8,17,20;
100:11,11;101:1,25;
111:5,12,24,25;
112:3,6,21;113:12;
114:2;115:3,7,10,12;
117:19;119:6;120:1

**S-H-A-P (1)**
47:21
**share (1)**
16:4
**short (1)**
62:8
**show (7)**
10:22;43:7;68:5;
79:1;94:13,22;
115:16
**showed (2)**
83:12,13
**showing (1)**
107:9
**shown (1)**
93:9
**side (26)**
9:20;18:19;19:2,5;
24:9;25:19;26:4;
30:15,23;32:19;46:3;
47:20;48:1,8,12,13,
15;66:7;86:5;89:13;
92:24,25;100:16;
109:25;111:3,22
**sidebar (3)**
42:24;43:11;71:22
**significance (9)**
25:20;27:13;31:7;
53:12,15;79:14;88:1;
89:23,25
**significant (41)**
8:12;27:8;28:8,22;
29:3,7;33:17;34:10;
35:6,17;37:15,18;
38:5,8,10,18,23;39:3,
5,21;52:4,9,24;54:15;
55:14;59:10;61:15,
20;68:8,12,13;78:6,
24;81:7;84:7;88:10;
92:11;94:8,9,17;
101:14
**simply (3)**
44:13;46:5;71:18
**single (2)**
15:20;87:10
**singled (1)**
87:9
**sits (1)**
67:19
**sitting (2)**
13:21;72:15
**situation (1)**
57:10
**six (2)**
27:7;38:3
**Skip (1)**
36:9
**slow (2)**
47:13;62:21
**slower (1)**
115:9
**small (3)**
48:15;86:4,8

**Smith (4)**
45:4;49:25;86:1;
94:21
**snapshot (4)**
31:25;33:25;50:12;
76:17
**somebody (3)**
50:25;55:13;122:1
**someone (2)**
7:14;13:4;54:12,
13;67:19
**sometimes (1)**
23:2
**somewhere (4)**
8:4;56:22;79:10,16
**sorry (10)**
8:8;48:14;85:7;
86:6;91:17;102:18;
108:11,15;115:10;
116:11
**sort (3)**
24:17;84:8;101:22
**source (1)**
55:25
**speak (1)**
97:13
**speaking (1)**
97:11
**special (1)**
120:17
**specific (2)**
71:17;80:8
**specifically (2)**
119:6;120:14
**speculation (1)**
113:19
**speech (2)**
69:19;70:14
**spend (5)**
26:14,16;59:15,18;
120:19
**sponsor (2)**
83:4,5
**spot (1)**
90:3
**square (1)**
29:10
**stack (1)**
14:5
**stamp (2)**
49:18;93:8
**stamped (1)**
12:15
**stand (1)**
57:17
**standard (1)**
52:24
**stands (1)**
32:17
**started (4)**
47:23;49:1;78:16;
119:11
**starting (1)**

Case 2:14-md-02592-EEF-MBN   Document 5599-11   Filed 03/02/17   Page 136 of 139
(Jury Trial-Afternoon) - Vol. IV - January 29, 2015
Pledger v. Janssen, et al.

119:4
**starts (1)**
24:13
**state (3)**
55:15;117:14,16
**statement (7)**
8:25;58:14;69:22;
79:6;93:17;94:4;
114:5
**states (3)**
51:3;58:17,20
**statistic (2)**
27:5;47:3
**Statistical (28)**
10:9;13:10,17;
18:10;25:20;26:12,
24;27:13;31:6;34:8;
39:23;53:12,15;78:5,
6;80:5,9,13;83:1;
85:10;86:15;88:1;
89:21,23,25;99:7,16;
101:13
**statistically (34)**
8:12;27:8;28:8,22;
29:3,7;33:16;34:10;
35:6;37:14,17;38:4,8,
10,18,23;39:3,5,21;
52:3,9,24;59:10;
61:15,20;68:12,13;
78:23;84:6;88:10;
92:11;94:8,9,17
**statisticians (4)**
19:18;39:6;81:19;
83:7
**Statistics (6)**
7:7;17:17;34:19,
20;35:9;105:17
**Step (4)**
23:1;45:7;83:24;
94:12
**stick (4)**
7:23;27:7;36:16;
54:25
**sticks (1)**
28:11
**still (4)**
87:25;89:24;93:21;
121:3
**stipulated (2)**
46:23;104:21
**stop (3)**
64:20;111:23;
118:5
**story (8)**
34:21;67:24;68:6,
11;88:14;113:5,5;
115:16
**straighten (1)**
42:22
**strike (3)**
73:7;96:13;112:14
**studied (1)**
16:12

**studies (10)**
9:13;22:19,21,22;
23:2;33:19,19;48:24;
62:9;82:4
**study (21)**
14:7,8,9;23:2,3,6,
16,17;25:6;30:13,14,
19;40:9;41:10,11;
49:14;52:2;59:22;
75:2;77:9;108:20
**stuff (2)**
7:9;111:25
**subanalysis (1)**
108:9
**subgroup (3)**
108:7,16,21
**subject (5)**
14:16;41:15,19;
75:13;93:21
**submitted (1)**
17:3
**subset (1)**
11:2
**substantial (1)**
111:14
**Suffice (1)**
59:21
**sugar (3)**
21:17;23:3,5
**suggest (1)**
78:25
**suggesting (1)**
31:11
**SULLIVAN (48)**
10:18;11:3,17;
14:19,22;20:13;35:20,
25;40:6;42:13;43:2;
46:20;53:2,14,17,23;
55:5,12;56:24;57:7,
11;63:8;66:17;67:1;
68:24;69:8,10,17;
70:9,15,18;71:21;
75:12;80:22;91:14,
20;96:11;97:6,9;
103:6,10;104:13,22,
25;105:3;113:18;
119:20,22
**summaries (1)**
17:3
**summarize (1)**
16:6
**summarized (2)**
113:11,23
**summary (1)**
108:4
**supervision (1)**
123:22
**Support (6)**
10:10;18:11;61:4;
67:24,25;86:16
**supported (1)**
45:16
**Sure (17)**

8:6;9:6,10;13:23;
15:12;17:8;36:6;
43:6;45:4;63:15,19;
67:24;68:9,10;72:21;
105:19;110:17
**surprise (2)**
96:16;97:2
**suspense (1)**
36:4
**sustain (1)**
67:6
**sustained (4)**
43:1;55:7;66:19;
113:20
**sworn (1)**
6:25
**symbol (1)**
52:7
**symptoms (4)**
48:7,9,15,21

## T

**Tab (4)**
40:22;85:4,9,9
**Table (44)**
8:15;9:15,25,25;
10:7;14:4;17:11,15,
19;18:17;19:1;20:12;
50:8,9;51:12;61:9;
66:13;84:10,11,14;
85:20,22;86:5,6,7,11,
12,21,21;87:2,3,4;
89:16,16;92:11;
100:6,6,14,15;101:8,
10,13;108:1;114:4
**tables (13)**
11:25;12:24,25;
13:17,21;14:7,7,8,9;
17:3;18:22;48:2;
83:13
**tackle (1)**
24:6
**talk (10)**
7:9;9:8;28:19;
35:22;37:20;47:24;
51:1;101:5;107:24;
121:4
**talked (4)**
37:10;51:11;78:22;
94:7
**talking (9)**
27:24;42:7;48:6;
53:18;54:6;68:7;
78:22;109:14,14
**taught (2)**
8:3,4
**teach (1)**
26:13
**team (6)**
62:15;64:1,12;
65:9;73:9;78:19
**Technician (13)**

20:25;22:10;29:22;
31:16;38:1;43:21;
45:12;47:9;49:22;
66:1;87:13;110:24;
112:16
**telling (4)**
35:16;68:6;81:19;
112:25
**ten (5)**
55:22;56:8;95:22;
96:10;98:13
**tend (1)**
28:10
**tendency (1)**
43:18
**ten-minute (1)**
97:16
**term (4)**
7:23;48:25;49:2;
54:11
**terminology (2)**
46:18;81:16
**terms (4)**
9:3;35:8;68:25;
89:17
**Terrific (1)**
95:18
**test (9)**
25:19,20;26:7,9,24,
24;27:3,12;60:2
**testified (1)**
42:15
**testify (1)**
15:23
**testifying (1)**
46:21
**testimony (6)**
20:21;53:5;57:10;
63:20;78:3;119:12
**Thanks (1)**
18:25
**theory (1)**
11:6
**therefore (1)**
8:18
**third (2)**
90:5;99:4
**Thirteen (1)**
100:25
**though (2)**
43:17;55:9
**thought (5)**
12:19;13:13;79:24;
83:10;112:10
**thousands (2)**
15:17;68:20
**three (25)**
26:22;27:6;32:25;
36:6,9;37:13;38:3,18,
20,22;39:1,4;62:18;
73:17;87:22,25;
89:24;90:24;91:7;
92:7;94:11;101:7;

103:20;115:6;118:13
**throughout (1)**
119:7
**throw (1)**
14:17
**Thursday (1)**
73:3
**tie (2)**
64:7;69:13
**till (1)**
98:13
**times (10)**
32:25;37:13;38:4,
19,20,22;39:1,4;
71:20;72:7
**title (11)**
18:17;75:20;87:11;
90:18,24;92:3,7,10;
93:1;102:18;105:6
**titles (2)**
36:24;91:12
**today (5)**
35:16;54:2;65:2;
101:4;116:6
**today's (1)**
57:10
**together (6)**
9:13;22:19;35:10;
62:10;84:23;86:1
**told (5)**
7:24;58:22;83:10;
113:16;117:23
**tomorrow (2)**
101:5;118:22;
119:4,16;120:6;
121:1;122:6,21,23
**took (2)**
33:21;99:9
**top (17)**
17:25;18:7;19:22;
22:7;63:4,13;74:10;
81:12;86:12;87:11;
94:21,23;103:23;
107:10;110:18;
111:21;114:16
**Toronto (2)**
107:5,5
**total (2)**
32:6;119:7
**towards (1)**
22:5
**trained (2)**
28:12;34:22
**transcript (2)**
123:7,20
**transient (2)**
66:7;73:25
**transmits (1)**
62:13
**transmittal (1)**
44:14
**transparency (2)**
112:12;113:1

Case 2:14-md-02592-EEF-MBN   Document 5599-11   Filed 03/02/17   Page 137 of 139
(Jury Trial-Afternoon) - Vol. IV - January 29, 2015
Pledger v. Janssen, et al.

**transpired (4)**
6:10;96:6;98:5;
122:11
**Treatment (5)**
10:8;18:10;47:19;
80:14;86:15
**trend (3)**
36:12;37:3;39:7
**trial (6)**
25:14;51:24;62:8;
77:6;96:16;123:6
**tries (1)**
16:15
**trip (1)**
120:17
**true (6)**
24:25;69:15;93:17;
99:9,12;101:25
**truth (2)**
67:22,23
**try (7)**
41:6;43:16;98:20,
23;120:7,8;122:16
**Trying (1)**
24:6
**turn (3)**
92:15,16;108:20
**turns (1)**
37:17
**TV (1)**
121:9
**two (22)**
21:24;23:14;27:1;
30:17;43:15;50:6,7;
62:3;64:6;65:14;
71:17;72:25;74:12,
13;75:1;78:13;84:2;
90:7,19;108:23;
109:2;116:6
**two-page (1)**
62:25
**type (1)**
110:16

**U**

**ULN (2)**
18:20;21:18
**ultimately (2)**
16:19;17:9
**Unbelievable (1)**
120:23
**under (20)**
45:23;46:15;49:11,
12;72:8,10;82:1,7;
85:9;88:16;89:5;
92:19;93:11;100:21;
102:4;112:23;115:4,
14;117:10;123:21
**underlined (2)**
33:24;77:23
**underlying (1)**
61:18

**underneath (1)**
37:7
**Understood (1)**
57:7
**unless (3)**
59:24;80:7;123:21
**untrue (1)**
102:3
**up (35)**
14:4;15:25;17:12;
24:8;29:24;30:10;
33:21;35:1;37:3;
39:7,22;42:24;46:4,
16;54:3;57:5;59:22;
62:1;69:25;71:24;
72:2;73:1;80:17;
86:1;88:18,24;93:11;
94:23;99:5;105:6;
110:11,22;113:1;
119:15;120:17
**up-front (1)**
17:5
**upon (5)**
16:7,8,9;40:14;
110:15
**upper (21)**
18:20;20:18;21:4,
10;26:11;30:20,21;
31:14;32:10,11;
37:24;38:21;51:17,
23;52:12;77:5;78:9;
79:2;87:18;95:3;
99:19
**usable (1)**
63:4
**use (11)**
29:19;40:5;44:18;
48:25;49:1;62:16;
72:9;75:22;90:21;
91:2;92:7
**used (8)**
18:18;42:11;46:19;
54:22;68:20;97:9;
100:11;112:11
**using (8)**
10:19;46:17;81:19;
86:24;93:22,23,25;
94:1

**V**

**value (4)**
21:6;26:6;54:15;
55:15
**variables (6)**
27:1;59:25;81:13,
14,16;82:1
**various (4)**
42:10;51:19;77:2;
95:5
**vast (1)**
15:15
**vendors (1)**

105:15
**venture (1)**
15:18
**versus (18)**
10:8;18:10;23:11;
37:14;38:19;51:18;
54:23,24;76:25;
80:14;86:15,21;
89:24;94:7;95:4;
100:11;109:8;119:8
**VIDEO (1)**
43:21
**view (4)**
16:21;61:9;72:14;
94:4
**violate (1)**
70:11
**violation (1)**
69:11

**W**

**wafers (1)**
21:19
**Wait (3)**
35:23;88:17;
116:12
**waiting (1)**
85:25
**wants (1)**
56:21
**warn (10)**
42:12;70:7;71:3,4,
8,9,11,11,12,15
**warning (6)**
42:5,9;67:12;71:8;
96:18;97:10
**WARNINGS (3)**
42:15,17;71:13
**way (38)**
7:18;12:8;13:2;
22:2;23:7;25:18;
27:2,15,19,25;28:7,
12,25;31:1;33:18;
35:12;36:23;42:7;
44:12;47:23;56:16;
60:4;64:7;73:6;
77:14;82:24;85:12;
88:13,16;89:7,20;
92:16;100:10;104:2;
106:22;108:7;110:8,
22
**ways (3)**
42:10;71:9;121:3
**websites (1)**
121:10
**week (4)**
34:4;36:19;78:23;
89:12
**weekend (1)**
56:23
**Weeks (39)**
24:14,15,16,19,21,

22,24,25;25:1,1,5,8,
8;26:14;27:6;28:16,
21,23;29:9;33:16;
34:6,9;36:19;37:7,10,
19,23;38:16,19;
51:21,25;54:4;59:8;
65:14;77:3,8;87:6,
12;94:3
**Welcome (1)**
103:11
**weren't (1)**
87:20
**what's (14)**
13:11;15:24;16:6;
26:15,23;34:16;37:9;
50:7,10;53:18,25;
88:21;113:15;115:19
**whatsoever (1)**
121:9
**Whereupon (12)**
6:13;24:2;50:17;
56:4,10,12;57:19;
74:18;96:3;97:19;
98:2;122:8
**whole (14)**
10:20;29:14;34:21;
46:1,5;67:23,23;68:6,
11;76:8;97:7;113:5,
5;115:16
**who's (2)**
9:4;55:13
**willing (1)**
14:1
**winter (1)**
84:3
**withdraw (1)**
100:1
**within (14)**
21:12;23:10,22;
28:14,17;37:12;
51:18,25;65:13;77:1,
7;95:5;121:5
**without (2)**
84:17;117:19
**witness (14)**
10:23;37:1;51:10;
55:13;56:17,20,25;
69:6,12;70:19;72:5;
81:1;85:3;98:18
**witnesses (1)**
53:4
**word (9)**
25:24;35:18;46:2;
49:2,4;68:21;100:11;
111:25;113:1
**words (9)**
13:9;18:18;46:18;
47:15;53:18;68:5;
73:18;108:10;113:22
**work (1)**
87:3
**working (1)**
7:11

**works (1)**
16:16
**world (1)**
60:23
**write (3)**
48:20;79:22;90:10
**write-up (10)**
13:23;35:14;49:3;
50:6,8;54:1;59:23;
76:22;78:14,17
**writing (5)**
7:13;39:22;73:6;
79:14;103:21
**written (5)**
27:19;60:19;72:11;
110:11;122:2
**wrote (1)**
73:3

**Y**

**Yale (2)**
107:1,14
**years (3)**
16:11;82:8;88:25
**yellow (6)**
29:10,20;31:9;
65:18;117:20;121:1
**yesterday (2)**
43:17;64:20
**York (1)**
102:12;104:1

**Z**

**Zeller (3)**
58:2,2,6
**zero (2)**
24:18;86:8
**zoomed (2)**
30:5;61:12

**0**

**00115168 (1)**
64:18
**00115170 (1)**
75:4
**00115192 (1)**
76:5
**0113 (1)**
104:4
**0158 (2)**
8:9;28:1
**02 (9)**
7:15;8:10;27:8,11,
17;52:5,18;77:9;81:3
**03888723 (1)**
80:15
**03888729 (1)**
80:16
**0389270 (1)**
116:14

Case 2:14-md-02592-EEF-MBN   Document 5599-11   Filed 03/02/17   Page 138 of 139

(Jury Trial-Afternoon) - Vol. IV - January 29, 2015
Pledger v. Janssen, et al.

**03900111 (1)**
114:10
**04405248 (1)**
95:13
**05 (4)**
7:24;27:10;38:9;
88:4
**063 (1)**
118:25
**099 (2)**
107:25;108:1
**0992 (1)**
8:16

## 1

**1 (1)**
114:16
**1.8 (3)**
99:19,23;101:12
**1:46 (1)**
6:14
**10 (16)**
7:19;8:18;46:13;
82:8,9,10;84:18;88:9,
24;89:5;102:1,4;
112:23,23;115:5,14
**101 (1)**
7:8
**10-year-olds (2)**
99:10,10
**11 (1)**
82:12
**11:06 (1)**
73:4
**111 (1)**
114:11
**112 (2)**
114:12,15
**12 (24)**
24:22,24;25:8,9;
28:21,23;29:9;33:16;
34:6,9;37:7,10;
38:16;51:21;52:1;
54:5;59:8;77:3,8;
78:23;82:14;87:6,12;
94:3
**12-week (6)**
31:22;32:7,9;35:2,
5;37:4
**13 (2)**
82:16;120:10
**14 (5)**
82:5,18;106:17,21;
114:7
**14079718 (1)**
41:16
**15 (13)**
10:4;10;18:11;
19:21;40:22;49:14;
65:16;83:13,21;
89:17;102:11;
103:20,25

**15th (4)**
73:4;83:15;117:2,3
**16 (5)**
24:25;34:6;40:2;
44:23;45:3
**168 (3)**
62:22,22;64:18
**17 (1)**
85:9
**170 (1)**
117:8
**18 (2)**
21:7;118:12
**18th (1)**
117:4
**19 (1)**
119:2
**192 (1)**
76:5
**1979 (1)**
71:2

## 2

**2 (5)**
27:8;100:6,15;
104:2;117:10
**2.9 (5)**
31:5;51:24;54:4;
77:6;94:7
**2:48 (1)**
56:5
**20 (24)**
8:15;30:21,22;
31:5,13;32:17;37:11,
14,16;38:17;50:8;
84:14;85:20,22;86:5,
7,11,12,25;87:4,17,
19;101:10,11
**2002 (34)**
10:4,10;18:11;
19:21;40:2;44:20,24;
45:3;60:20;65:16;
67:12;70:6;73:11;
76:3,3;79:19,21;
83:23;84:1,2,5;
85:17;86:17;89:17,
17;94:14,16;99:4;
102:7,7,8,12;103:20,
25
**2006 (2)**
67:12;70:6
**201 (1)**
7:7
**21 (19)**
9:15,25;17:11,15;
37:25;38:19;50:9;
51:12;61:10;66:13;
73:11;84:11;86:7,21;
87:3;92:12;101:8,13;
114:4
**2237 (1)**
29:10

**229 (1)**
94:13
**230 (3)**
92:17;93:7,8
**237 (1)**
30:25
**24 (2)**
25:1;34:6
**242 (1)**
32:15
**248 (3)**
94:20;95:12;100:7
**256 (1)**
91:5
**257 (3)**
29:11;32:10,14
**27 (4)**
81:3;85:16;86:16;
89:17
**28 (2)**
25:1;34:6

## 3

**3 (6)**
13:18;27:6;55:23;
88:16,25;89:3
**3.4 (1)**
78:10
**3.5 (2)**
99:19;101:12
**3.7 (1)**
52:13
**3:00 (1)**
55:22
**3:05 (1)**
57:20
**30 (4)**
16:11;21:7;76:3,3
**30th (1)**
79:19
**34A (2)**
17:23;20:22
**36 (3)**
25:1;34:6;40:1
**38 (1)**
62:24
**39 (4)**
38:12;90:13,14,15
**3979 (1)**
38:6
**39A (1)**
76:15

## 4

**4 (8)**
34:6;37:19,23;
38:19;94:14,16;99:3;
102:7
**4- (2)**
35:2;39:13
**4:00 (1)**

96:4
**4:13 (1)**
98:3
**4:30 (2)**
64:20;65:2
**4:46 (1)**
122:25
**4:47 (1)**
122:9
**40 (2)**
25:1;34:7
**403 (1)**
40:10
**41 (2)**
80:11;86:25
**42 (2)**
85:14,16
**42A (4)**
84:24;85:20;87:4;
88:22
**43 (2)**
91:6,8
**44 (4)**
102:20;103:1,12,
13
**45 (2)**
116:4,15
**46 (1)**
118:16
**4719 (1)**
45:10
**48 (2)**
25:1;34:7
**499 (2)**
25:9;32:8

## 5

**5 (3)**
38:7;49:14;82:5
**5:00 (2)**
64:23;98:13
**50 (1)**
109:8
**5248 (1)**
95:14
**5249 (1)**
95:14
**5251 (1)**
101:15
**58 (4)**
60:10,12,14;93:21
**592 (1)**
100:22

## 6

**6 (2)**
38:19;114:16
**6.5 (1)**
78:10
**6.9 (1)**
52:14

## 7

**7 (7)**
31:5,14;34:6;
37:19,23;38:17,19
**7- (1)**
35:2
**7.4 (1)**
77:4
**7.8 (6)**
29:11;30:24;31:5;
51:22;54:4;94:7
**718 (2)**
41:2,3
**721 (2)**
43:20;45:20
**723 (2)**
80:25;83:2
**725 (1)**
81:10
**740 (1)**
49:19
**741 (1)**
49:19
**7-week (1)**
39:13

## 8

**8 (24)**
24:22,24;25:8,8;
28:21,23;29:9;33:16;
34:6,9;37:7,10;
38:16;51:21,25;54:4;
59:8;77:3,8;78:23;
87:6,12;94:3;108:21
**8- (6)**
31:22;32:7,9;35:2,
5;37:3

## 9

**9 (2)**
109:17,18
**9:15 (4)**
120:7,7,8;122:6
**9:30 (1)**
122:18
**90 (5)**
7:20,20;8:10,17,19
**92.2 (2)**
29:11;30:25
**93 (1)**
86:25
**95 (4)**
7:25;8:1;27:10,21
**95th (4)**
27:14;28:11,14,18
**97 (1)**
86:25
**9721 (1)**
44:5

**(Jury Trial-Afternoon) - Vol. IV - January 29, 2015**
**Pledger v. Janssen, et al.**

**98 (6)**
  7:16,16,16;27:16;
  28:5,10
**99 (2)**
  8:10;107:25