# In The Matter Of:

*Pledger v.*

*Janssen*

*(Jury Trial - Afternoon Session)*

*Vol. V*

*January 30, 2015*

*John J. Kurz, RMR-CRR, Official Court Reporter*

*City of Philadelphia*

*First Judicial District Of Pennsylvania*

*100 South Broad Street, 2nd Floor*

*Philadelphia, PA 19110*

Original File 30JANUARY-2015-DJERASSI-AFTERNOON-FINISHED.txt

Min-U-Script® with Word Index

1    IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
            FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
2                   CIVIL TRIAL DIVISION

3    ------------------------------
     IN RE: RISPERDAL® LITIGATION  :
4    March Term, 2010, No. 296     :
     _____ :
5    Philip Pledger, et al.,       :
                     Plaintiffs,   :   APRIL TERM, 2012
6        v.                        :   NO. 01997
                                   :
7    Janssen Pharmaceuticals, Inc.,:
     Johnson & Johnson Company,    :
8    and Janssen Pharmaceutical    :
     Research and Development,     :
9    L.L.C.                        :
                     Defendants.   :
10
     ------------------------------
11

12                    - - -

13             FRIDAY,JANUARY 30, 2015

14                    - - -

15                 COURTROOM 425
                     CITY HALL
16           PHILADELPHIA, PENNSYLVANIA

17                    - - -

18    B E F O R E:  THE HONORABLE RAMY I. DJERASSI, J.,
                     and a Jury
19                    - - -

20
               JURY TRIAL - VOLUME V
21
               AFTERNOON SESSION
22

23    REPORTED BY:
          JOHN J. KURZ, RMR, CRR
24        CERTIFIED REALTIME REPORTER
          OFFICIAL COURT REPORTER
25

```
 1   APPEARANCES:

 2             SHELLER, P.C.
             BY:   STEPHEN A. SHELLER, ESQUIRE
 3                 CHRISTOPHER A. GOMEZ, ESQUIRE
             E-mail: Sasheller@sheller.com
 4           E-mail: Cgomez@sheller.com
             1528 Walnut Street, 4th Floor
 5           Philadelphia, PA 19102
             Phone: (215) 790-7300 Fax: (215) 546-0942
 6           Counsel for Plaintiff(s)

 7

 8             KLINE & SPECTER, A Professional Corporation
             BY:   THOMAS R. KLINE, ESQUIRE
 9                 KRISTEN LOERCH SIPALA, ESQUIRE
             E-mail: tom.kline@klinespecter.com
10           E-mail: kristen.loerch@klinespecter.com
             1525 Locust Street, 19th Floor
11           Philadelphia, PA 19102
             Phone: (215) 772-1000 Fax: (215) 772-1359
12           Counsel for Plaintiff(s)

13

14             ARNOLD & ITKIN, LLP
             BY:   JASON A. ITKIN, ESQUIRE
15           6009 Memorial Drive
             Houston, Texas 77007
16           Phone: 713-222-3800 Fax: 713-222-3850
             Counsel for Plaintiff(s)
17

18

19   Representing Defendants:

20             DRINKER BIDDLE & REATH, LLP
             BY:   KENNETH A. MURPHY, ESQUIRE
21                 MELISSA A. GRAFF, ESQUIRE
             One Logan Square, Suite 2000
22           Philadelphia, Pennsylvania 19103-6996
             Phone: (215)988-2700  F:(215)988-2757
23           E-mail: kenneth.murphy@dbr.com
                     melissa.graff@dbr.com
24           Counsel for Defendant Janssen Pharma.,
             J&J, and Janssen Research & Development
25
```

```
 1   APPEARANCES:  (Continued)

 2              WEIL, GOTSHAL & MANGES, LLP
             BY:  DIANE P. SULLIVAN, ESQUIRE
 3                  ALLISON BROWN, ESQUIRE
                  (admitted pro hac vice)
 4             301 Carnegie Center, Suite 303
             Princeton, New Jersey 08540
 5             T: 609-986-1100 F: 212-310-8007
             E-mail: diane.sullivan@weil.com
 6             E-mail: allison.brown@weil.com
             Counsel for Defendant Janssen Pharma.,
 7             J&J, and Janssen Research & Development

 8

 9

10

11      Also Present:

12              Priscilla M. Brandon, Esq., Sheller, P.C.

13              Marianne Mari, Tipstaff

14              Cory Smith, Display Technician

15

16

17

18

19

20

21

22

23

24

25
```

1                     – I N D E X –

2    WITNESSES                               CROSS

3    DAVID A. KESSLER, M.D.
        By Ms. Sullivan                       19
4

5

6

7

8                      E X H I B I T S

9    NO.                                    PAGE NO.

10   D–14        2002 and 2006 label            97

11

12   D–15        Letter from Paul Leber, M.D.
                 Bates No. JJRIS01230685        123
13               (also D221.1)

14

15   D–16        Clinical trial info/studies    130

16

17   COURT–2    FDA response                    149

18

19

20

21

22

23

24

25

1          (The following transpired in open

2      court outside the presence of the jury, at

3      1:45 p.m.:)

4                         -  -  -

5          COURT CRIER:  Come to order.

6          THE COURT:  All right.  You can be

7      seated.

8          All right.  Before we are ready to

9      proceed on cross-examination, before we do

10     so, let me just give you some guidelines

11     regarding these issues.

12          You know what, Dr. Kessler, why don't

13     you just step out just for a moment.

14          (Witness, Dr. Kessler, exited the

15     courtroom.)

16          THE COURT:  All right.

17          First of all, in relationship to the

18     question regarding the fee situation, how

19     cross-examination may proceed, I am going to

20     follow the Mohn versus Hahnemann Hospital

21     case, at 357 Pa. Super 173, 815 A.2d 920,

22     1986, and specifically as a guide.  I've made

23     a copy of this for defense counsel.

24          Judge Rau's opinion at Molinaro

25     versus Ramoska, 2006 WL 620 9929, April 12,

1     2006, I think she had a real good guide there
2     on Page 10 out of 19, which we just printed
3     out.  And in that case, I agree with her, she
4     thought it was -- extensive cross-examination
5     she permitted as follows:  The total number
6     of cases he has testified; the number of
7     cases per year; the percentage of plaintiff
8     versus defense; the number of states in which
9     the witness has testified in; what portion of
10    the expert witness's work is part of his
11    income.  Those were all permitted.
12          As long as we don't get into the
13    numbers, the specific numbers for anything
14    outside of this case, that is the guideline,
15    all right?
16          And that will be strictly enforced.
17          Here is for, I guess, the defense
18    team is that little portion on Page 10 out of
19    19, and I kept one for the other counsel.
20    Same procedures would follow for any defense
21    witnesses.  For any --
22          MS. SULLIVAN:  And, Your Honor, I
23    just would note that Mr. Kline went into that
24    precise subject with Dr. Kessler on direct,
25    so I think the door's been opened here on

```
 1         that.
 2                  THE COURT:  Well, the door has not
 3         been opened to specific numbers of fees
 4         generated by other cases.  That is specific.
 5         And I will admonish you in front of the jury
 6         if you attempt to do that here with this
 7         specific guidance that I'm providing.
 8                  And now as to the other question
 9         having to do with Mr. Kline's very late
10         motion, there are some issues that need to be
11         addressed.  Essentially, the motion is
12         basically saying that the Pennsylvania Rules
13         of Evidence in its peculiarity forbids or
14         precludes the admission of US documents.
15                  And I believe that would be under,
16         what was that, under Section 6104 by statute,
17         42 Pa. C.S.A. Section 6104.  It wasn't by
18         Rules of Evidence.  It was by statute.
19                  However, what was neglected to be
20         mentioned to the Court is the existence of
21         Section 5328 of the same title, "Proof of
22         Official Records."
23                  Now, that particular statute does
24         permit a court to introduce certified --
25         self-authenticated certified documents of the
```

1          US government.

2                  Do we have those?

3                  MS. SULLIVAN:  Yes, Your Honor.

4                  THE COURT:  Okay.

5                  MS. SULLIVAN:  I'm sorry, Judge.

6                  THE COURT:  Let me just see one of

7          them and make sure that they are

8          self-authenticated and then we may proceed.

9                  MS. SULLIVAN:  You want an FDA

10         document?

11                 THE COURT:  Anything that you intend

12         to use, they do have to be

13         self-authenticated.

14                 MS. SULLIVAN:  And, Judge, there's

15         two grounds for admission -- one is the

16         public records exception, and the other is

17         the business records exception -- because

18         Janssen maintains these FDA documents in the

19         ordinary course of business.  They're

20         attached to all of their FDA approvals, all

21         the medical reviews, and it's part of their

22         business records, and --

23                 THE COURT:  Well, I haven't been

24         asked to review the business record nature of

25         the documents.  The objection has been based,

1    at the moment, on whether or not these are

2    public documents or official records that may

3    be admitted.

4              MS. SULLIVAN:  I --

5              THE COURT:  If you have another

6    grounds for admission, fine.  But as far

7    as -- we can end the discussion if you have

8    certified documents.

9              MS. SULLIVAN:  Well, I have -- I

10   don't have a stamped certified.  But I have

11   an FDA heading signed by an FDA official on

12   all of these documents.

13             THE COURT:  No.

14             MS. SULLIVAN:  Then, Your Honor, I

15   submit they should be admitted as business

16   records.  I'll have a witness come.  They all

17   are maintained by Janssen in the ordinary

18   course as part -- and they're --

19             THE COURT:  Well, the problem here,

20   of course, is that by filing this late, after

21   a motion in limine, it should have been filed

22   before trial.  You were not given the chance

23   to comply with the technicality of Section

24   5328.  So now I need to know exactly what

25   documents you are intending to use.

```
 1              MS. SULLIVAN:  Sure.
 2              THE COURT:  In much the same fashion
 3        as we did for the plaintiff, so I can limit
 4        this discussion before the jury.
 5              MS. SULLIVAN:  Sure, Your Honor.  And
 6        I can pull up --
 7              THE COURT:  All right.  Let's see the
 8        documents.
 9              MS. SULLIVAN:  And they are -- and we
10        can get them -- but they are FDA approval
11        letters, FDA medical review officer --
12              THE COURT:  Well, how many of them
13        are there?
14              MS. SULLIVAN:  There's been six or
15        seven different approvals, so there's
16        several.
17              THE COURT:  Well, let's see them.
18        Let's get them marked and do it hopefully
19        within ten minutes and get rolling here.
20              MS. SULLIVAN:  Your Honor, this,
21        again, this was sprung on us right before
22        cross-examination.  It's going to take awhile
23        to get this stuff together.
24              THE COURT:  Well, do you plan to use
25        it during cross-examination?
```

1          MS. SULLIVAN:  I do, Your Honor.

2          THE COURT:  All right.

3                  -  -  -

4              (Pause.)

5                  -  -  -

6          MR. KLINE:  May I be heard just

7      briefly?

8          MS. SULLIVAN:  Your Honor --

9          THE COURT:  Well, you may be heard,

10     otherwise then we're going to have to go into

11     the business records.  Maybe everything will

12     come in.

13         MS. SULLIVAN:  Yeah.  Your Honor, you

14     permitted Mr. Kline to use all these e-mails

15     subject to --

16         THE COURT:  I want to know ahead of

17     time what the evidentiary disputes are so we

18     don't get into a situation where every single

19     document is being contested before the jury,

20     requiring sidebar and interruptions.

21         MS. SULLIVAN:  May I make a

22     suggestion, Judge?  Why don't we start the

23     cross-examination and then we can break at a

24     point --

25         THE COURT:  Very well.

```
 1                    MS. SULLIVAN:  I think I can get a
 2          fair amount --
 3                    THE COURT:  As long as you don't use
 4          these documents --
 5                    MS. SULLIVAN:  So they can --
 6                    THE COURT:  As long as you don't use
 7          these documents before the break.
 8                    MS. SULLIVAN:  Thank you, Your Honor.
 9                    THE COURT:  All right.  Now let's go.
10          Yes, sir.
11                    MR. KLINE:  Your Honor, my point,
12          respectfully, was not to spring anything on
13          anyone.  I simply -- I simply thought that
14          rather than standing up and objecting, that a
15          bench memo would suffice.
16                    All I was suggesting was that rather
17          than running to sidebar the first time, that
18          I would do it this way.
19                    I don't believe that it is kind of
20          the "motion in limine" material.  My view of
21          it was, respectfully, that it was when we try
22          complicated cases, that we occasionally say
23          to the court -- just like I did with the
24          Kessler money thing -- hey, here are the
25          cases in advance.  I think this is going to
```

1      come up.  So I would hope the Court would not

2      think that I was trying to do something.

3              THE COURT:  No.

4              MR. KLINE:  Second --

5              THE COURT:  I am glad we are able to

6      resolve it so that we are not interrupted.

7              MS. SULLIVAN:  Your Honor, there was

8      25 in limine motions.  This is the core of

9      our case, and they spring this on us now,

10     come on.

11             THE COURT:  Well --

12             MR. KLINE:  It's not --

13             THE COURT:  -- in any event, we

14     are -- I have reviewed the law on it, and I'm

15     confident that this stuff was admissible, you

16     know, if it had notice.

17             MR. KLINE:  Here's my -- but some of

18     it I do believe is admissible, and my point

19     in the memo was this -- my point was simply

20     this:  That there are certain documents,

21     there are certain things that they want --

22     there are certain documents that they would

23     like to put before the witness, which are

24     third-party documents, which are out-of-court

25     statements, which are hearsay.

```
 1                  My only point in this whole memo, my
 2          core point in the memo was that, to that
 3          extent, I didn't believe that under
 4          Pennsylvania law, a court can allow those
 5          type of statements.  And, again, two or three
 6          more sentences.
 7                  I'm not suggesting that they can't
 8          say that the FDA approved this drug -- my
 9          word, I've said.  They can't -- they're
10          not -- that's a fact.  Facts in these reports
11          are allowable.  Opinions of others are not.
12          And so all I was saying to the Court was
13          rather than being a jumping jack during
14          cross-examination, that it would be
15          well-advised for me not to spring something
16          on somebody, but simply say to the Court,
17          Hey, we're now going to have an issue which
18          has to do with things that they're going to
19          read to the FDA, like didn't you know that
20          the FDA thought that it was this and that?
21          That's a third-party statement.  It's out of
22          court.  It's not subject to
23          cross-examination.
24                  And for whatever the quirk is in
25          Pennsylvania law, we have a different view of
```

1       803.6 than the feds.  And so my only point in

2       doing this was to say, Hey, ahead of time, I

3       believe, Your Honor, that hearsay statements

4       in FDA documents are not admissible.

5               By the way -- by the way, Your Honor,

6       I'm not here to try to put the defendants to

7       the task of bringing in a copy with a ribbon

8       on it.  That's not what this is all about.

9       And this is not about trying to hold up the

10      trial or do something silly.  It's just to

11      alert the Court to the fact that I believe

12      that based on the cross-examinations that

13      I've seen of Ms. Sullivan in other

14      pharmaceutical matters -- and I'm not -- I'm

15      not disparaging it.  I'm just saying that I

16      know that she's going to say:  Isn't it true

17      that FDA, Ms. Woodcock, thought this?  And

18      isn't it true that FDA executive so-and-so

19      thought that?

20              And my only point is that as to

21      facts, as to the facts, was it approved or

22      not approved, that's fair game.

23              As to what FDA officials were

24      thinking, I don't believe comes in under

25      either Pennsylvania hearsay, the hearsay

1          rule, which is somewhat different, at least

2          as I understand it, than the federal rule

3          that allows a much more expansive view.  My

4          only point was it's not a motion.  It's not a

5          last-minute ditch effort.  It's to say I

6          don't want to be at sidebar, Judge.  That's

7          all I was trying to do.

8                    THE COURT:  All right.  Well, if

9          we're at sidebar on hearsay issues, then

10          we're at sidebar on hearsay issues.

11                    MR. KLINE:  Okay.

12                    THE COURT:  The memorandum that I

13          read had to do with the public record, proof

14          of official records, and actually no mention

15          of the effect of official records generally.

16          One of these statutes wasn't even cited.  So

17          I'm fine with the hearsay.

18                    I will say this:  That as a general

19          matter, we are going to be hopefully looking

20          at Dr. Kessler's cross-examination in the

21          same way we were addressing his direct

22          examination.  If, of course, you open the

23          door to asking him what he thinks was going

24          on in the FDA's mind, you will then be

25          opening the door to a rebuttal that was not

1        permitted during direct examination,

2        Ms. Sullivan.

3                MS. SULLIVAN:  And, Your Honor, just

4        on the public records, these are official

5        conclusions not of one person, of the FDA.

6                THE COURT:  I haven't seen the

7        documents yet, so let's go forward.  You're

8        saying you're going to think it over on a

9        break and we'll look at it.  I don't know

10       what the documents are.

11               But I'm not afraid of any kind of

12       objections involving hearsay.  But, again, we

13       permitted hearsay in terms of the

14       out-of-state documents that -- out-of-court

15       documents that were admitted in relationship

16       to these e-mails, so that is not very

17       persuasive.

18               It has to do with what you're asking

19       Dr. Kessler to do, and all I'm saying is if

20       the rule is good for one, it's good for the

21       other.

22               Namely, if you want Dr. Kessler to

23       start telling the jury what he thinks was

24       going on in the minds of the FDA or whatever,

25       if that's the situation that we're going to

```
 1              have, then that's a fair prompting for
 2              rebuttal.
 3                       MR. KLINE:  Okay.
 4                       THE COURT:  All right.
 5                       MS. SULLIVAN:  Understood, Your
 6              Honor.
 7                       MR. KLINE:  Your Honor, Page 2 of the
 8              memo talks about 803.
 9                       THE COURT:  I have 803, Mr. Kline,
10              right here.  I have Bernstein's version.
11                       MR. KLINE:  I was just saying it
12              was his -- I have the yellow one.
13                       THE COURT:  Have a seat, Dr. Kessler.
14                       MR. KLINE:  He likes when counsel has
15              it in their hand.
16                       THE COURT:  I have it right in my
17              hand.
18                       COURT CRIER:  All rise as the jury
19              enters the courtroom.
20                              -  -  -
21                       (The following transpired in open
22              court in the presence of the jury:)
23                              -  -  -
24                       (Whereupon the jury entered the
25              courtroom at 2:01 p.m.)
```

```
 1                    -  -  -
 2                THE COURT:  All right.  Good
 3       afternoon everybody.
 4                JURY PANEL:  Good afternoon.
 5                THE COURT:  Be seated.
 6                All right.  We're now going to begin
 7       the cross-examination on behalf of Janssen
 8       Pharmaceuticals.
 9                Ms. Sullivan, you may proceed.
10                MS. SULLIVAN:  Thank you, Your Honor.
11                Good afternoon everyone.
12                JURY PANEL:  Good afternoon.
13                    -  -  -
14                CROSS-EXAMINATION
15                    -  -  -
16   BY MS. SULLIVAN:
17   Q.    Good afternoon, Dr. Kessler.  How are you?
18   A.    I'm well.  Good afternoon.
19   Q.    Dr. Kessler, you and Mr. Kline spent awhile
20   going through numbers and statistics and things on
21   Dr. Findling's article; do you remember that?
22   A.    The Janssen pooled analysis.
23   Q.    Yes.
24   A.    Yes.
25   Q.    And you've also read Dr. Mathisen, the
```

- DAVID A. KESSLER, M.D. - CROSS -            20

1   prescribing physician's deposition in this case; you
2   mentioned that the other day?
3   A.     Yes.
4   Q.     And you know, Dr. Kessler, that Dr. Mathisen
5   never saw the article that you two have been
6   spending hours talking about, right?
7   A.     You'd obviously have to ask Dr. Mathisen.  I
8   have no reason to dispute that statement.
9   Q.     But you have his deposition.  Did you see his
10  testimony, sir, where he said I never saw the
11  Findling article?
12  A.     Yes.  But I would rather not talk about
13  deposition testimony when you have a witness.  But,
14  yes, I agree with you.  That's what I read.
15  Q.     You read that he never saw the Findling
16  article?
17  A.     Yes; the Janssen pooled analysis, yes.
18  Q.     And, Dr. Kessler, you spoke to -- you gave a
19  little speech to our jurors yesterday about the
20  importance of telling the whole truth, right?
21  A.     Yes.
22  Q.     And, Dr. Kessler, you haven't told our jurors
23  the whole truth in this case, have you, sir?
24  A.     Tell me what question -- and I've been on the
25  stand for now two days.  Tell me what I've not told

 1   the whole truth.
 2   Q.    All right.  Dr. Kessler, let's start with
 3   Plaintiff's Exhibit 45.
 4                    If I could have the ELMO, Ken.
 5                    (Document P-45 displayed on the
 6         screen.)
 7   BY MS. SULLIVAN:
 8   Q.    And, Dr. Kessler, you remember going through
 9   this e-mail --
10   A.    Can I see a copy, please?
11   Q.    Oh, I'm sorry.  Sure.  Of course.
12                    THE COURT:  All right.  Yeah.  This
13           is another thing, which -- is this in
14           evidence now?  What number is it?
15                    MS. SULLIVAN:  Yes, Your Honor.  It's
16           Plaintiff's Exhibit 45.
17                    THE COURT:  Can we have 45, the court
18           copy shown to -- the hard copy shown to
19           Dr. Kessler.
20                    COURT CRIER:  Yes, Your Honor.
21                    MR. KLINE:  May we follow with the
22           Bates number?  Because on redirect I want to
23           pull up the Bates that we were doing.
24                    THE COURT:  Well, the Bates number --
25           you know, whatever the Bates number is, let

```
 1            me see it.
 2                   The Bates No. is 03892170.
 3                   COURT CRIER:  P-45 to the witness.
 4   BY MS. SULLIVAN:
 5   Q.    And, Dr. Kessler, do you have it?
 6   A.    I do.
 7   Q.    Okay.  And this is an e-mail -- looking at the
 8   bottom -- November 2002, from Carin Binder.  Do you
 9   see that?
10   A.    I see a November 18.  Am I reading that wrong,
11   ma'am?
12   Q.    Yeah.  November 18, 2002.
13   A.    Yes.
14   Q.    And you know, Dr. Kessler, that Carin Binder
15   is a Janssen person in Janssen Canada, right?
16   A.    In Toronto, yes.
17   Q.    Yes.
18                   And she's writing to Gahan Pandina
19   and the US group -- she's actually writing to these
20   people at Janssen saying Gahan and the US group
21   convened a child and adolescent advisory board on
22   November 15th.  Do you see that?
23   A.    Yes.  The meeting in New York, I believe, yes.
24   Q.    And you know, Dr. Kessler, that the US group
25   refers to Janssen's scientists in the US working on
```

1  these prolactin and Risperdal issues, right?

2  A.    I assume so, yes.

3  Q.    Yeah.

4              So the US group at Janssen convened

5  an advisory board, and the advisory board are the

6  outside advisors that you talked about, right?

7  A.    Yes; Dr. Rapoport, et cetera.

8  Q.    And they're talking about this manuscript that

9  you and Mr. Kline talked about.  The authors have

10  just finished reviewing this Findling manuscript on

11  the prolactin issues, right?

12  A.    Right.

13  Q.    And it goes down to say, "Secondly, the US

14  group" -- and that's referring to the Janssen US

15  scientists, right? -- "the US group recommended that

16  the manuscript list all cases of gynecomastia in

17  males and state whether prolactin levels were normal

18  or elevated as well as state the new rates of

19  gynecomastia as identified by the endos."  Do you

20  see that?

21  A.    Yes.

22  Q.    And, Dr. Kessler, it goes on to state that

23  they felt -- referring to the Janssen US

24  scientists -- that applying the endos' position of

25  gynecomastia in boys in puberty not being SHAP

1  without listing all gynecomastia was hiding the

2  data.  Do you see that?

3  A.    I see that exactly.

4  Q.    And so, Dr. Kessler, when you and Mr. Kline

5  were suggesting to our jurors that it was the

6  outside scientists saying it would be hiding the

7  data not to include all gynecomastia, the truth is

8  it was Janssen saying we've got to include all

9  gynecomastia in the manuscript?

10  A.    If you can give me back my exact sentence, I

11  think I said he said what it says.

12  Q.    Yeah.  And so what it says, Dr. Kessler, is

13  that the US scientists at Janssen were saying we

14  have to put all of the gynecomastia cases in this

15  study, right?

16  A.    That -- that's what that says.

17  Q.    Yeah.

18  A.    And the meeting minutes also say that was

19  based on what your outside expert said.

20  Q.    And what you didn't tell our jurors and what

21  Mr. Kline and you skipped over was the fact that the

22  outside scientists, the pediatric endocrinologists

23  who were on the Findling study, including some

24  pretty famous people, did not want to include the

25  SHAP(A) stuff because they thought it was not good

- DAVID A. KESSLER, M.D. - CROSS -          25

```
 1   data because so many boys get gynecomastia
 2   naturally, right?
 3   A.    No, I don't think that's in fact what I saw
 4   happen.
 5   Q.    Well, let's look at what the document actually
 6   says.
 7   A.    Right.
 8   Q.    And so -- and just to go back, Dr. Kessler, on
 9   the Findling.  The jury has heard -- and we can
10   remind them -- that there were outside authors on
11   this paper in addition to Janssen folks, right?
12   A.    Yes.  There were four -- there were four
13   outside experts.
14   Q.    And there were actually two pretty
15   well-respected pediatric endocrinologists, right?
16   A.    There were.
17   Q.    Yes.  And one was actually the chief of
18   pediatric endocrinology at CHOP here in
19   Philadelphia, right?
20   A.    Who's no longer living, I believe.
21   Q.    Yeah, unfortunately.  Otherwise he could
22   actually come in and tell us what this means.
23                   MR. KLINE:  Oh, objection, Your
24          Honor.  Objection.
25                   THE COURT:  That's sustained, as to
```

```
 1           what he can tell us.
 2                   MR. KLINE:  And he --
 3                   THE COURT:  Go ahead.
 4                   MR. KLINE:  -- might have told us the
 5           opposite.
 6                   MS. SULLIVAN:  And, Your Honor,
 7           Mr. Kline has a habit of having a running
 8           commentary during questioning.  I would just
 9           ask that --
10                   THE COURT:  Well, you did say
11           "unfortunately."  We don't know whether it
12           was fortunate or not fortunate, Counsel.
13           Just go ahead.
14   BY MS. SULLIVAN:
15   Q.    The fact is, Dr. Kessler, that Dr. Moshang who
16   was the chief of endocrinology and one of the
17   authors on this paper can't come in here to talk to
18   us about what was actually said and why, right?
19   A.    Yes, he cannot, unfortunately.
20   Q.    And you weren't involved personally in any of
21   this stuff?
22   A.    No, that's correct.
23   Q.    You're coming back ten years later saying I
24   think this is what this means, these are what these
25   documents say and giving your opinions, right?
```

1    A.    No, I don't think it's what I think.  It's

2    what I see in the documents.

3    Q.    Yeah.  But --

4    A.    And the data that I see in the documents and

5    the calculations that I saw in the documents that

6    are not in the final document.

7    Q.    But, Dr. Kessler, why things are included and

8    why they weren't, you weren't there and you weren't

9    part of those discussions?

10   A.    Motive I can't talk about.

11   Q.    Yeah.

12   A.    So why people left the data out, okay.  But it

13   is important at this meeting that --

14   Q.    And, Doctor --

15   A.    -- that this group of advisors never saw, from

16   what I can see, the data.

17   Q.    And, Dr. Kessler, you know that's not true;

18   and we'll look at it.

19   A.    So they saw these -- the statistically

20   significant finding?

21   Q.    Yes.  And we're going to show the jury that,

22   Dr. Kessler.  But stick with me on this, okay?

23   A.    Of course, ma'am.

24   Q.    And, Dr. Kessler, you agree it's not good

25   science and it's not right to just cherry-pick out

- DAVID A. KESSLER, M.D. - CROSS -                    28

```
1   pieces of information and not tell the whole story,
2   right?
3   A.    Well, so I've heard that --
4   Q.    Can you answer that, Dr. Kessler?  Do you
5   agree it's not right to cherry-pick out pieces of
6   information and not tell the whole story?
7   A.    When it comes to safety -- let's say you have
8   a red leg, your leg is all red and inflamed -- and I
9   don't mean to be personal, right -- I have to look
10  at that leg, okay.  So of course my attention is
11  selected on when there is a positive result, okay.
12            When you're talking about
13  effectiveness, if you're talking about causation,
14  right, I agree you want to look at the totality of
15  everything.
16  Q.    Yeah.
17  A.    When you're dealing with safety, you have to
18  look at what's salient.
19  Q.    Okay.  And, Dr. Kessler, even when it comes to
20  reading e-mails, it's good to look at the whole
21  story, not to cherry-pick out a line here or a
22  document here, right?
23  A.    I -- I -- show me anything you want to show
24  me.
25  Q.    Let's do that, Dr. Kessler.
```

1            And so here it talks about the fact
2    that the -- it talks about the endos, right?  The
3    endos' position of gynecomastia in boys.  So it says
4    they felt that applying the endos' position -- and
5    that's talking about the pediatric endo authors
6    outside the company, right?  Dr. Findling -- I'm
7    sorry, Dr. Daneman and Dr. Moshang, right?
8    A.    Yes.
9    Q.    Okay.  And saying that the endos' position --
10   they felt the endos' position of gynecomastia in
11   boys in puberty not being SHAP without listing all
12   gynecomastia was hiding data.  Do you see that?
13   A.    (No response.)
14   Q.    And so what Janssen is saying in this e-mail
15   is that we think that the pediatric endocrinologists
16   outside the company, their suggestion about not
17   including the boys over 10 would be hiding data so
18   we'd like to include it, right?
19            MR. KLINE:  Object.
20   BY MS. SULLIVAN:
21   Q.    That's what they're saying.
22            THE COURT:  Wait.  Is there an
23        objection, sir?
24            MR. KLINE:  Yes.  First of all, to
25        yelling.

```
 1                    THE COURT:  First of all, there is an
 2          objection?
 3                    MR. KLINE:  Yes.  The objection is,
 4          first of all, to the yelling.
 5                    The second --
 6                    THE COURT:  That's overruled.  Go
 7          ahead.
 8                    MR. KLINE:  The second --
 9                    MS. SULLIVAN:  I didn't think I was
10          yelling.  I apologize.
11                    THE COURT:  All right.  Go ahead.
12                    MR. KLINE:  The second objection is
13          to the interpretation of this, the same as we
14          discussed --
15                    THE COURT:  Well, that I had
16          sustained, unless you want to change the
17          procedures, Ms. Sullivan.  I agree; you're
18          asking him now to comment himself on what was
19          going on in the minds of the people who wrote
20          this and we did not permit him to do that
21          during direct examination.
22                    MS. SULLIVAN:  Okay.
23  BY MS. SULLIVAN:
24  Q.    Well, we can look at what the words say,
25  Dr. Kessler, and what the words say is that Janssen
```

 1  US recommended that the manuscript list all cases of
 2  gynecomastia and that the endos' position -- these
 3  outside authors -- not listing all cases and just
 4  listing boys not in puberty would be perceived as
 5  hiding data.  That's what Janssen is saying, right?
 6  That's what it says.
 7  A.    Uhmm, it says what it says.  There are
 8  pronouns.  You can certainly interpret that the way
 9  you wish.
10  Q.    Yeah.  And --
11  A.    It is about -- the issue is hiding data.
12  Q.    Yeah.  And Janssen is saying the outside
13  endocrinologists, including one of the leading
14  experts in endocrinology who was at CHOP --
15                 MR. KLINE:  Objection.
16  BY MS. SULLIVAN:
17  Q.    -- had suggested not including boys in
18  puberty?
19                 THE COURT:  There's an objection.
20         However, it was mistimed.  It was during a
21         question.  All right.  Overruled.
22                 Go ahead.
23  BY MS. SULLIVAN:
24  Q.    So just to back up, Dr. Kessler, there is a
25  background rate of gynecomastia in the general

- DAVID A. KESSLER, M.D. - CROSS -          32

1   population.  Gynecomastia has been around a long

2   time before Risperdal, right?

3   A.    Could you -- could you be a little more

4   specific in that question?  A little more -- when

5   you say a "background rate," are you talking about

6   adults?  You talking about kids?

7   Q.    Boys.

8   A.    Talking about in puberty?

9   Q.    Yeah.  Boys during puberty get gynecomastia;

10  it happens?

11  A.    Uhmm...

12  Q.    And percentages would range anywhere from 20

13  to 90 percent in the medical literature.  Are you

14  aware of that, sir?

15  A.    So I've gone back; I've read the studies.  I

16  read the CAM studies going back into the 1960s.

17  There is -- we saw a description of that in the

18  e-mails, and you just have to be careful with the

19  term "gynecomastia" and what's transient and what

20  disappears and what is permanent.  So just -- you

21  have to be careful on the definitions that are used.

22  Q.    And, Dr. Kessler, one of the things, looking

23  at the documents and looking at the depositions of

24  some of the authors on this paper, you know that

25  they were concerned by the background rate of

1    gynecomastia in the public; that is, if you include
2    adolescent boys in the study, it will mess up your
3    study.
4    A.    No.  You're missing Janssen -- the
5    significance of the Janssen study, Ms. Sullivan,
6    because you have two groups.  You have an above the
7    upper limit of normal, right, and you have within
8    the normal level.  So, in essence, you have a
9    comparison.  So you should have, if you're right,
10   that there is -- I mean, it's messing up the study,
11   right.  You have a built-in control, in essence.  So
12   I'm happy to discuss about that.
13   Q.    No.  We'll look -- why don't we look at some
14   of the things the authors of the study actually say,
15   Dr. Kessler.
16   A.    Sure.
17   Q.    And so this e-mail in 2002 notes that the
18   authors have just finished reviewing the manuscript,
19   right?
20   A.    (No response.)
21   Q.    Do you see that in the first bullet?
22   A.    I assume this is the -- yes, I see that.
23   Q.    Okay.
24   A.    I'm not sure exactly who that refers to.  I
25   assume it's the authors of the Janssen pooled --

1   whether that's Janssen employees or outside

2   employees.

3   Q.     And it refers to some of the outside authors'

4   position, the outside pediatrics' position of not

5   including gynecomastia in all boys, right?

6   A.     No.  Ma'am, you're -- you're --

7   Q.     Dr. Kessler, can you try to answer my

8   question?

9   A.     I am.  I don't think those are the two -- I

10   don't think that overlaps.

11                  If you take out the attendees, if you

12   could -- would be so kind, the attendees at the New

13   York meeting, Ms. Rapoport, Peter Jensen, I can pull

14   the list, those are not the authors.

15                  So, again, I'm not sure, you know,

16   which groups we're talking about when you're talking

17   about the endos' position or the authors' position

18   or whether you have the advisors' position.  So we

19   just have to be exact.

20   Q.     Yeah.  And, Dr. Kessler, you know the endos

21   were the outside authors.  They were the only endos

22   on this study, right?  Dr. Moshang and Dr. Daneman,

23   those are the outside authors?

24   A.     Those are the authors -- those were the two

25   endos on the paper.

- DAVID A. KESSLER, M.D. - CROSS -          35

```
1   Q.    Yeah.  Exactly.

2   A.    But --

3   Q.    And so this document refers to the endos'

4   position of not including SHAPs of boys going

5   through puberty, right?  That was the outside

6   authors' suggestion.  And Janssen said "we can't do

7   that."  That's what this says.

8   A.    After your other group of advisors said it

9   would not be transparent.

10  Q.    Yeah.  And then --

11  A.    Wait.

12  Q.    Just to be clear, Dr. Kessler --

13              THE COURT:  You know, what I need

14        here is if you're going to ask questions that

15        invite an answer of some length, then we're

16        going to permit that answer to be made.

17              MS. SULLIVAN:  Okay.  I understand,

18        Your Honor.

19  BY MS. SULLIVAN:

20  Q.    And, Dr. Kessler, one of the things that you

21  and Mr. Kline didn't do when you had this document

22  up is show the whole story, right?

23  A.    Please, I -- I --

24  Q.    Well, you got --

25  A.    I very much want, show the entire story.
```

```
 1   Q.     You guys didn't turn the page, did you?
 2   A.     Ma'am, with all due respect, I wasn't asking
 3   the questions.
 4   Q.     Yeah.  But you didn't correct Mr. Kline or
 5   Mr. Kline didn't show the jury --
 6                   THE COURT:  Counsel.
 7   BY MS. SULLIVAN:
 8   Q.     -- the page.
 9                   MR. KLINE:  Come on, Your Honor.
10                   THE COURT:  Is that a question?
11                   MS. SULLIVAN:  Yeah.
12                   THE COURT:  Please get to the
13         question.
14   BY MS. SULLIVAN:
15   Q.     And if you had actually turned the page,
16   Dr. Kessler --
17                   THE COURT:  What page?  What document
18         is this now, P-40...
19                   MS. SULLIVAN:  This is P-45.
20                   THE COURT:  We have that.  All right.
21   BY MS. SULLIVAN:
22   Q.     If you had turned the page, Dr. Kessler, it
23   talks about the fact that Carin Binder, one of the
24   authors on the paper, says I have no problem, I have
25   no problem adding in gynecomastia in boys over 10
```

1    and keeping the pediatric endo analysis in the

2    manuscript.  Do you see that?

3    A.    It -- it says that, yes.

4    Q.    Yes.

5              So Janssen is saying here that even

6    though the outside authors want just this analysis

7    without the puerperal boys, we have no problem

8    putting it all in there, right?

9    A.    No, ma'am.

10   Q.    That's what she said.

11   A.    No, ma'am.  May I explain?

12   Q.    Well, let's look at the Findling --

13   A.    May I explain why I think you're wrong?

14              MR. KLINE:  Yes.

15   BY MS. SULLIVAN:

16   Q.    Well, I'm sure Mr. Kline will ask you a lot of

17   questions about why I'm wrong.

18              MR. KLINE:  Can we save the time,

19          Your Honor, by letting him answer the

20          question.

21              THE COURT:  Well, we'll permit you to

22          move on.  It is apparent that we will have a

23          redirect, so that's correct.

24              MR. KLINE:  Your Honor, just on

25          procedure, may I have the Bates number when

1          she puts something up?

2                    MS. SULLIVAN:  He has copies, Your

3          Honor.

4                    THE COURT:  Well, again, if there's a

5          document there, Mr. Gomez, please help out

6          Mr. Kline on that front, please.

7                    MR. GOMEZ:  I will, Your Honor.

8                    THE COURT:  Thank you.

9  BY MS. SULLIVAN:

10 Q.    And, Dr. Kessler, let's look at the actual

11 study, if we can, Plaintiff's Exhibit 49.

12 A.    May I have a copy?

13                   THE COURT:  You have it, P-49.

14                   MS. SULLIVAN:  Yes.

15                   THE COURT:  Is this --

16                   THE WITNESS:  I'd be happy to go find

17         them in my book.

18                   THE COURT:  No, no.  Where is this

19         document?

20                   MS. SULLIVAN:  It's a plaintiff's

21         exhibit.

22 BY MS. SULLIVAN:

23 Q.    And, Dr. Kessler, this paper, in addition to

24 being reviewed by outside authors outside the

25 company, also went through something that's called

- DAVID A. KESSLER, M.D. - CROSS -        39

1   the peer-review process.

2   A.    That's a good point.  I looked for those in

3   the database, and I didn't see them.

4   Q.    Well, we'll talk about that.

5   A.    Great.

6   Q.    Didn't you see the comments from the authors

7   in the manuscripts you reviewed?  Did you skip

8   those?

9   A.    I asked -- I saw the comments in the draft

10  manuscript, yes.

11  Q.    Yeah.  By the authors, outside authors?

12  A.    We don't know exactly who made which comments.

13  But what I don't have, just to be clear, is I don't

14  have the -- when this manuscript was submitted, I

15  don't have the peer review.  That was not in the

16  database that I could find from Janssen.

17  Q.    Yeah.  We wish we had it, too.  The outside

18  authors apparently didn't keep it, and we don't have

19  any copies.

20              MR. KLINE:  See, now, Your Honor,

21      objection.

22              THE COURT:  Again --

23              MR. KLINE:  You see, that's a

24      problem.  Janssen --

25              COURT REPORTER:  Excuse me.

- DAVID A. KESSLER, M.D. - CROSS -          40

1                    (Counsel speaking overtop of each

2          other and the Court.)

3                    THE COURT:  You may be seated.

4                    That is sustained as to some kind of

5          testimony about why some document is not

6          present.

7                    You may proceed, Ms. Sullivan.

8     BY MS. SULLIVAN:

9     Q.    And, Dr. Kessler, we know that on this paper,

10    in addition to the Janssen authors, there's four

11    authors outside the company, right?

12    A.    Yes.

13    Q.    And it's also -- this paper also went through

14    the peer-review process?

15    A.    I have no doubt of that.

16    Q.    Yeah.

17                   And that process is -- in order to

18    get an article published in the scientific journal,

19    you have to submit it to a journal's board and some

20    outside doctors and scientists review it, give you

21    comments, make sure it's good science and legitimate

22    and decide whether you can have it published or not,

23    right?  That's generally the peer-review process,

24    right?

25    A.    No, that's incorrect.

- DAVID A. KESSLER, M.D. - CROSS -         41

1    Q.     Okay.

2    A.     Can I explain?

3    Q.     And, Dr. Kessler, we talked about the fact

4    that we had Dr. Daneman from Toronto, and we have

5    Dr. Moshang from the Children's Hospital of

6    Philadelphia who are the two outside

7    endocrinologists, right, as the authors?

8    A.     Yes.

9    Q.     And we also have an outside author,

10   Dr. Kusumakar from Nova Scotia from the university

11   there, right?

12   A.     Yes.

13   Q.     And Dr. Findling who is a leading psychiatrist

14   out of Case Western, right?

15   A.     He's now at Hopkins, yes.

16   Q.     Yes.

17               And, by the way, right in the front

18   page of this paper, the outside authors at Janssen

19   talk about the fact that elevated prolactin has also

20   been associated with gynecomastia, right?

21   A.     Just point --

22   Q.     Page 1.

23               THE COURT:  Wait.  Again,

24        Ms. Sullivan, you must let him answer.

25               MS. SULLIVAN:  Sure.  I'm sorry, Your

```
 1          Honor.
 2                    THE COURT:  Take your time, you know.
 3                    THE WITNESS:  Yes.  There's a general
 4          discussion here.  Okay.
 5   BY MS. SULLIVAN:
 6   Q.    On Page 1?
 7   A.    In the -- in the background.
 8   Q.    Yeah.  On Page 1, though.
 9   A.    That says there -- let's point to the exact
10   sentence.
11                    It says, "Elevated prolactin has also
12   been associated with gynecomastia."
13   Q.    Right.
14   A.    And then it keeps on going.
15   Q.    Right.
16   A.    And then it goes -- I mean, but the purpose
17   was to see whether there was an association, yes.
18                    MR. KLINE:  Like turn the page.
19                    MS. SULLIVAN:  And --
20                    THE COURT:  Doctor, I would like to
21          say one thing, in the interest of the
22          proceedings here.
23                    I'm going to ask, Doctor, that you
24          answer her questions as asked, because in the
25          end, Mr. Kline will have an opportunity to go
```

```
 1          over this testimony again with you for your
 2          clarifications.  So nothing is going to be
 3          left out.  But for purposes of procedure and
 4          also for time --
 5                  THE WITNESS:  Sure.
 6                  THE COURT:  -- it's preferable to go
 7          this route.
 8   BY MS. SULLIVAN:
 9   Q.    And, Dr. Kessler, we can agree that just
10   because something is associated with something else
11   doesn't mean it causes it, right?  There's a
12   difference between causation and association?
13   A.    Yes.
14   Q.    In other words, so if you do a study to see if
15   a medicine causes gray hair, you don't want a lot of
16   people over 50 because there's a big background rate
17   for gray hair in people over 50, right?
18   A.    It depends how you design the experiment if
19   you have an internal control.
20   Q.    And so one of the things that the outside
21   authors, the pediatric endocrinologists, were
22   worried about is that if you have a background rate
23   of puerperal gynecomastia in boys, you won't be able
24   to tell whether any elevated prolactin is associated
25   with Risperdal or is associated with puberty, right?
```

1    That was one of the concerns.

2    A.    That was not one of the concerns when the

3    article -- when they were first convened.

4    Q.    Well, let's take a look at the paper itself,

5    Dr. Kessler.

6                      And the paper talks about the fact

7    that many of the side effects --

8    A.    What page are you on, ma'am?

9    Q.    I'm sorry.  I'm on Page 1366.

10   A.    Thank you.

11                     Yes.

12   Q.    And, Dr. Kessler, it says, "Many of the side

13   effects hypothetically attributable to elevation in

14   prolactin levels are also commonly seen during

15   puberty," right?  See that?  That's what it says?

16   A.    I see it.  Yes, I see that.

17   Q.    And it also says, "Many of the children and

18   adolescents in this analysis were at the age of

19   puberty, so the cause of SHAP could be uncertain,"

20   right?

21   A.    If it was uncontrolled, yes.

22   Q.    And so it says -- and, Dr. Kessler, this was

23   not a controlled study?

24   A.    Well, you had -- you had two groups, right.

25   So you have, in essence -- I mean, it is --

1    Q.    The analysis was two groups, but --

2                  THE COURT:  All right.  I'm going to

3          permit him to answer that question.

4                  MS. SULLIVAN:  Sure.

5                  THE WITNESS:  So, yes, in the

6          traditional sense of it didn't have a placebo

7          and a drug, but you had two groups.

8                  MS. SULLIVAN:  Right.

9                  THE WITNESS:  And the two groups

10         should have all the same characteristics

11         except for one.  So it's controlled, the two

12         groups.  Their only difference is they have a

13         higher elevation of prolactin.  So you've

14         controlled for the incidence of kids going

15         through and age and everything else.  So you

16         have a built-in control, in essence.

17   BY MS. SULLIVAN:

18   Q.    And, Dr. Kessler, the authors of the study are

19   saying that since many kids going through puberty

20   have these prolactin-related events, we're going to

21   do two analyses, right?  It tells the reader in the

22   paper that's what's going to happen, right?

23   A.    Yes.  I have no problems with that.

24   Q.    Okay.  And if we look at the next page,

25   Dr. Kessler, there's no question that this paper

- DAVID A. KESSLER, M.D. - CROSS -          46

```
1   contains all of the gynecomastia events that
2   happened in these five studies, right?  It lists
3   them.
4   A.    Yes.  I don't question that the 5.1 percent
5   and the 30 and the 22 are correct numbers.  I don't
6   contest that at all.
7   Q.    So when you and Mr. Kline were going through
8   in the paper and it didn't include boys over 10, 11,
9   12, 13, 14, the truth is, the first analysis,
10  SHAP(A), includes all the kids, boys over 10 and
11  boys under 10, right?
12  A.    Uhmm, actually, I think the testimony is that
13  point does, but the abstract does not.
14  Q.    Yeah.  But let's -- we're talking about Table
15  2, right?
16               So in the paper, we saw the e-mail,
17  we have no problem including all the kids in the
18  study.  They do include, in Table 2, all the kids in
19  the study, right, in the paper?
20  A.    Not in the abstract, ma'am.
21  Q.    Right, in the paper?
22  A.    Well, which part of the paper are we talking
23  about?
24  Q.    So, Dr. Kessler, can you answer my question?
25  In the published paper, for the world to see, in a
```

 1   table on top of this page, are all the kids in all

 2   of these studies, 10 and above, 10 and below who got

 3   gynecomastia; true?

 4   A.    Yes.  And one place in the paper and not in

 5   another.

 6   Q.    Okay.  Can you -- in the paper.

 7                  THE COURT:  Well, all right.  The

 8            jury, you're going to determine what this all

 9            means in only one page or not another.  It's

10            up to you to decide what's going on.

11   BY MS. SULLIVAN:

12   Q.    And it also, Dr. Kessler, includes the right

13   incidence rate in all of the kids, 5.1, right?

14   A.    Just show me where -- just show where it's

15   saying that.

16   Q.    In the primary analysis.  I have it circled.

17   A.    That circle I have no doubts about.

18   Q.    Yeah.

19                  And so this is a completely accurate

20   table?

21   A.    No.

22   Q.    Table -- SHAP(A)?

23   A.    No.  We went through the percentages.  The

24   percentages are wrong.

25   Q.    Well, let's talk -- 5-point --

```
 1   A.     Let me get my notes, if I may.
 2   Q.     And, Dr. Kessler, I thought --
 3                 THE COURT:  Wait.  Hold on one
 4          second, please.
 5                 MS. SULLIVAN:  I'm sorry.
 6                 THE WITNESS:  I'm sorry.  Just give
 7          me a second.
 8                 Yes, ma'am.  Thank you.
 9                 THE COURT:  All right.  You may
10          proceed, Ms. Sullivan.  Go ahead.
11   BY MS. SULLIVAN:
12   Q.     Dr. Kessler, every boy who got gynecomastia in
13   this study was included in Table 2, correct?
14   A.     (Pause.)
15   Q.     Can you answer that yes or no?
16   A.     You're pointing at a number, so you're -- tell
17   me what number you're pointing at.
18   Q.     I'm pointing at the ITT column and the primary
19   analysis column.  It shows all the boys who got
20   gynecomastia in the study, over 10 and under 10.
21   A.     So -- yes.
22   Q.     Okay.
23   A.     But -- yes, the 22 is correct.  The 3.7, I
24   don't think is correct.
25   Q.     And the 5.1 you've already testified was
```

1    accurate, right?

2    A.    Yes.  I believe that's correct, ma'am.

3    Q.    Okay.  So that's the total.  And so the total

4    incident rate of gynecomastia in boys in this study

5    over 10, under 10, all the kids, was right there for

6    everybody to see in Table 2; they included all the

7    data?

8    A.    I -- I -- I cannot agree that it's there, that

9    everyone sees that, no.

10   Q.    Okay.  Anybody who read this article would see

11   Table 2, right on top.

12   A.    If --

13   Q.    All the kids with gynecomastia, under 10, over

14   10.

15   A.    Everyone who reads this paper -- every

16   physician who reads this paper -- I studied this

17   paper for days; I see this.

18   Q.    Okay.

19   A.    That number -- that point is correct.  I don't

20   dispute that.

21   Q.    You're saying that other doctors aren't as

22   smart as you?

23   A.    Please, I have enormous respect for other

24   doctors.

25   Q.    Yeah.

1  A.     But I know, okay, that not -- the reality is

2  that not every doctor is going to have the time to

3  be able to go figure out every data point that's put

4  there and understand the significance.  That's why

5  there's an abstract.

6  Q.     And, Doctor, going further in the paper, the

7  paper makes clear that it's the outside

8  endocrinologists, Dr. Moshang and Dr. Daneman, who

9  want to exclude in the analysis to do SHAP(B) boys

10  going through puberty, right; it says that?

11  A.     It does say, okay, the first analysis,

12  SHAP(A), used a more inclusive definition of SHAP.

13  In the second analysis, SHAP, excluded additional

14  symptoms that the pediatric endocrinologist

15  attributed to the puberty.

16  Q.     And so right in the paper it makes clear --

17  and just to back up, neither you or Mr. Kline told

18  our jurors that it was the outside endocrinologists

19  who wanted to do SHAP(B)?

20             MR. KLINE:  Your Honor --

21  BY MS. SULLIVAN:

22  Q.     They wanted to exclude gynecomastia in

23  adolescent boys; and it says it right in the paper.

24             MR. KLINE:  Objection, Your Honor.

25             THE COURT:  Objection sustained, for

1              a lot of reasons.

2                    MR. KLINE:  Yes.

3    BY MS. SULLIVAN:

4    Q.    Dr. Kessler --

5                    THE COURT:  Including compound.

6    BY MS. SULLIVAN:

7    Q.    Dr. Kessler, it says in the paper that the

8    pediatric endocrinology authors, Dr. Moshang and

9    Dr. Daneman, wanted to do a second analysis

10   excluding events attributed to puberty.  That's what

11   it says, right?

12                   MR. KLINE:  I'm sorry, where are we

13           pointing?

14                   THE WITNESS:  It says that they --

15           the way I read this is that there should be a

16           SHAP(A) analysis and a SHAP(B) analysis per

17           those endocrinologists.

18   BY MS. SULLIVAN:

19   Q.    Right.  And we saw on the e-mail before, from

20   the beginning the pediatric endocrinologists wanted

21   to exclude boys going through puberty because they

22   thought it would mess up the test.

23                   MR. KLINE:  Objection.

24                   THE COURT:  Wait a minute.

25                   MR. KLINE:  She's testifying to her

```
 1              interpretation, not what the words say.
 2                       THE COURT:  No.  No.  That's
 3              overruled on those grounds.
 4                       You may proceed.
 5                       Can you rephrase the question again
 6              or have it reread.
 7                       THE WITNESS:  Just repeat it again.
 8                       MS. SULLIVAN:  Sure.
 9      BY MS. SULLIVAN:
10      Q.    Dr. Kessler, looking at the e-mail before and
11      looking at the study, it's clear that it wasn't
12      Janssen, but it was the outside endocrinologists,
13      including the chief of endocrinology at CHOP, who
14      said we got to exclude the boys who are over 10 --
15                       MR. KLINE:  Objection.
16      BY MS. SULLIVAN:
17      Q.    -- in our analysis, right?
18                       THE COURT:  All right.  That's
19              overruled.
20                       If you can answer that, Doctor.  Only
21              if you can answer that truthfully.  If you
22              don't know, say "I don't know."
23                       THE WITNESS:  Can I just ask that it
24              be read back?  I'm sorry.
25                              -  -  -
```

 1                   (Whereupon the court reporter read

 2          back the previous question as follows:

 3                   "Question: Dr. Kessler, looking at

 4          the e-mail before and looking at the study,

 5          it's clear that it wasn't Janssen, but it was

 6          the outside endocrinologists, including the

 7          chief of endocrinology at CHOP, who said we

 8          got to exclude the boys who are over 10?")

 9                        -   -   -

10                   THE WITNESS:  I don't think that's a

11          full -- fully correct statement.  I saw

12          Janssen do SHAP(B) to the endocrinologists --

13          to the advisory board.  So I --

14   BY MS. SULLIVAN:

15   Q.    But, Dr. Kessler -- well, maybe you don't

16   know, Dr. Kessler.

17                   MR. KLINE:  Now that --

18                   THE COURT:  Well, I'm going to permit

19          him to answer the question.

20                   MS. SULLIVAN:  Well, I thought he was

21          finished, Judge.

22                   THE WITNESS:  I don't -- the way I

23          interpret this -- and there would be -- I

24          have no problems -- is not to exclude it, not

25          to exclude the association, okay, in -- I

- DAVID A. KESSLER, M.D. - CROSS -          54

```
 1              mean, it would boggle my mind to think that
 2              the two endocrinologists would want to
 3              exclude a statistically significant
 4              association.  They may want to present all
 5              the data and present it both SHAP(A) and
 6              SHAP(B), but not -- it would boggle my mind
 7              to believe that two eminent endocrinologists
 8              would not publish a statistically significant
 9              finding.
10    BY MS. SULLIVAN:
11    Q.    And the truth is, Dr. Kessler, you don't know.
12    You're just speculating.
13    A.    No.  I read Dr. Daneman's e-mail --
14    deposition.
15    Q.    And, Dr. Kessler, we could --
16    A.    No.  I read Dr. Daneman's deposition, okay.
17    Q.    And we're going to play it for the jury, so
18    why don't we wait to hear him say it instead of you.
19              MR. KLINE:  Why doesn't he --
20              THE COURT:  Are you cutting him off?
21              MS. SULLIVAN:  I didn't mean to,
22         Judge.
23              THE COURT:  All right.  You may
24         answer.
25              MR. KLINE:  You read Daneman's
```

- DAVID A. KESSLER, M.D. - CROSS -                55

```
 1              deposition is where you're at.
 2                   THE WITNESS:  I read Daneman's
 3         deposition, and I took away from that
 4         deposition that an endocrinologist would want
 5         to make sure that statistically significant
 6         associations were not hidden.
 7  BY MS. SULLIVAN:
 8  Q.    And, Dr. Kessler, this paper makes clear that
 9  the SHAP(B) analysis was done at the insistence of
10  the outside endocrinologists, right?  It refers to
11  Dr. Moshang and Dr. Daneman attributing events to
12  puberty.
13  A.    I -- I think it would be best, okay, to allow
14  the fact witnesses to testify exactly who prompted
15  who to do what.
16  Q.    Well, Dr. Kessler, we can read what it says.
17  It says that SHAP(B) excluded additional symptoms
18  that the pediatric endocrinology authors -- these
19  are the outside authors, Dr. Moshang and Dr.
20  Daneman -- attributed to puberty.  That's what it
21  says.
22  A.    But you -- but that -- and let's take that as
23  a true statement.  That doesn't mean that Janssen
24  didn't in fact push those endocrinologists and
25  present data selectively.
```

- DAVID A. KESSLER, M.D. - CROSS -          56

1                    So that statement does not tell you
2    who drove what to do -- who drove who to do what.
3    Q.    Actually, but, Doctor, if we look at this
4    e-mail, it's clear that the US scientists at Janssen
5    wanted to put everything in, but they're saying that
6    the pediatric endocrinologists outside the company
7    think that SHAP(B) is the more clinically relevant
8    analysis.
9                    MR. KLINE:  Objection.
10   BY MS. SULLIVAN:
11   Q.    Right?  That's what the e-mail says?
12                   THE COURT:  Whatever the e-mail says
13           is what it says.  That's what it says,
14           whatever it says.  It says what it says.
15           Anything else on this, on that document?
16   BY MS. SULLIVAN:
17   Q.    And, Dr. Kessler, you testify a fair amount,
18   don't you, sir?
19   A.    I do.
20   Q.    And I think Mr. Kline and you talked about at
21   least 25 times over the last five years.
22   A.    In depositions, 23, something like that, yes.
23   Q.    And a thousand dollars an hour?
24   A.    Yes.
25   Q.    And you've testified against a bunch of pharma

- DAVID A. KESSLER, M.D. - CROSS -          57

1   companies, right?

2   A.    A bunch of pharma companies?  I -- there --

3   pharma companies have been on the other side; and

4   several I've testified for pharma.

5   Q.    Well, Doctor, you have testified, sir, against

6   Merck, right?

7   A.    In Vioxx.

8   Q.    And you've testified against Bayer?

9   A.    Hold on a second.

10                 So I was called by the --

11  Q.    Can you just answer my questions?

12  A.    Yes.

13                 THE COURT:  No.  I'm going to permit

14           him to -- if you're now -- this goes to the

15           doctor's own reputation.  He's permitted to

16           explain or discuss or whatever.

17                 You're saying about Merck now.

18                 THE WITNESS:  So I was asked by the

19           Attorney Generals in the state of Louisiana,

20           Utah and Kentucky, right, to testify in cases

21           that the State on behalf of citizens brought

22           against Merck.

23  BY MS. SULLIVAN:

24  Q.    You've also testified against Merck in

25  individual plaintiffs' suits, in Fosamax litigation?

- DAVID A. KESSLER, M.D. - CROSS -          58

```
 1   A.    I have testified on a preemption question, on
 2   a relatively narrow question in Fosamax because of
 3   the expertise on preemption.
 4   Q.    And you've testified against C.R. Bard in an
 5   individual plaintiff's case for plaintiff's lawyers?
 6   A.    That was an MDL, yes.
 7   Q.    And you've testified --
 8   A.    Not in court.  In a --
 9            MR. KLINE:  He's allowed to answer.
10   BY MS. SULLIVAN:
11   Q.    And you testified against Allergan for
12   plaintiffs' lawyers?
13   A.    In two cases of botulism the children got.
14   Q.    And you've testified against Eli Lilly for
15   plaintiffs' lawyers?
16   A.    What case is Lilly, please?
17   Q.    You've testified against Takeda and Eli Lilly
18   in litigation for plaintiffs' lawyers?
19            MR. KLINE:  Your Honor, objection.
20       Plaintiffs' lawyers represent clients and we,
21       on behalf of clients, hire expert witnesses.
22            THE COURT:  Well, no.  Again, there's
23       going to be a chance for redirect, and all of
24       this, if it takes us till kingdom come, can
25       be explained.
```

 1   BY MS. SULLIVAN:
 2   Q.    And, Dr. Kessler, the truth is you've
 3   testified against pharmaceutical companies so much
 4   you just cut and paste your report and stick in the
 5   companies, the different company's name, your expert
 6   report, right?
 7   A.    There are certain essential aspects of Food
 8   and Drug law that apply to all those companies, and
 9   I do not repeat the aspects of law that apply
10   generally.
11   Q.    And so you take your expert report and you
12   just stick in Merck.  Oh, this time it's Johnson &
13   Johnson.  Oh, this time it's Bayer.  Oh, this time
14   it's Allergan, and you cut and paste --
15                 MR. KLINE:  Your Honor, objection.
16                 THE COURT:  That's sustained.
17   BY MS. SULLIVAN:
18   Q.    -- you cut and paste the paragraphs of your
19   report.
20                 THE COURT:  That's sustained.
21                 Frankly, Ms. Sullivan, I think you
22         would know better than that.
23                 MS. SULLIVAN:  Your Honor, may I show
24         his reports to show how he's cut and pasted
25         his opinions?

1          THE COURT:  No, ma'am, unless it's

2      germane to some issue that you're raising.

3          MS. SULLIVAN:  Well, it goes to the

4      bias, Your Honor.

5          THE COURT:  I haven't seen the

6      document.  So anything you want to do, I can

7      look at.

8          MS. SULLIVAN:  Okay.

9  BY MS. SULLIVAN:

10  Q.   And, Dr. Kessler, it's true that each and

11  every time you've come into a court where the issue

12  is did the pharmaceutical company adequately warn,

13  you have said each and every time that the pharma

14  company didn't warn?  Bayer didn't warn; Merck

15  didn't warn; Allergan didn't warn; Janssen didn't

16  warn, et cetera, right?

17          Each and every time where the issue

18  has been did the pharmaceutical company adequately

19  warn, each and every time you've raised your hand

20  for a thousand dollars an hour and said "they didn't

21  warn," right?

22          MR. KLINE:  Oh, my word, Your Honor,

23      I object.

24          THE COURT:  Is there an objection to

25      that compound question?

```
 1                   MR. KLINE:  Yes.
 2                   THE COURT:  To that speech that was
 3          being asked.
 4                   MR. KLINE:  Yes.  I object to the
 5          speech.
 6                   THE COURT:  Sustained.
 7                   MS. SULLIVAN:  Doctor --
 8                   MR. KLINE:  I object to the --
 9                   THE COURT:  Counsel, I advise you to
10          be careful.
11                   MS. SULLIVAN:  Your Honor, I'll
12          rephrase it.
13   BY MS. SULLIVAN:
14   Q.    Each and every time you've come in to testify
15   against a pharmaceutical company, Dr. Kessler, where
16   the issue is did the pharmaceutical company
17   adequately warn, each and every time you've raised
18   your hand and said, "No, they didn't warn," right?
19   Each and every time?
20   A.    That they didn't warn?  I think that would be
21   a general statement.  I think -- I mean, if you look
22   at certain --
23   Q.    Can you just answer that yes or no?
24                   MR. KLINE:  No.
25                   THE WITNESS:  I think that --
```

1                    THE COURT:  Is there an objection

2          there?

3                    MR. KLINE:  I only would like him to

4          be able to finish the answer.

5                    THE COURT:  I would think so.  I

6          would think so.

7                    You're asking him a question about

8          each and every time.  How many times are we

9          talking about?

10                   MS. SULLIVAN:  And, Your Honor, I'll

11         put up the impeachment --

12                   MR. KLINE:  He's testified in court

13         seven.

14                   THE COURT:  Seven times?

15                   MR. KLINE:  Yes.  Three for

16         plaintiffs; other times for others.

17                   MS. SULLIVAN:  Your Honor --

18                   THE COURT:  I just don't know.  He's

19         allowed to answer the question so he can

20         explain this question.

21  BY MS. SULLIVAN:

22  Q.   Dr. Kessler, it's true, sir, that in every

23  single case where the subject was:  Did the pharma

24  company's label adequately warn of the risk, in

25  every single case you were working for a plaintiff's

1   lawyer and you said the labels didn't adequately

2   warn?  You said the same thing every time?

3   A.    First of all, no, I did not say the same thing

4   every time.

5   Q.    Can we --

6   A.    No, no, no.

7   Q.    I want to show you your --

8   A.    Let me finish, please.

9                 So let's just understand.  I've

10  testified seven times in court that I have in my

11  head, between 2010 and 2014, over the last five

12  years.  Three of those cases were cases that involve

13  failure to warn, okay.  This would be the fourth in

14  court, okay.

15                Each one of these cases, as you can

16  see, is a very complex case.  There's an enormous

17  amount of details.  I may have in all three cases

18  concluded that the label was in some way inadequate.

19  In one case, I think I remember, sitting here, that

20  the label was improved at a certain point.

21  Q.    And, Dr. Kessler --

22                MR. KLINE:  Are you finished?

23                MS. SULLIVAN:  I'm sorry.

24                THE COURT:  Let him finish and then,

25       you know, you will put up whatever you have

1          to put up.  But I think he's entitled to

2          explain this question of yours.

3                   THE WITNESS:  But to say that I've

4          testified each and every time the same way, I

5          mean, I've been here for three days, I can

6          assure you, no case has been like this.

7     BY MS. SULLIVAN:

8     Q.   Dr. Kessler, my question was, every time --

9     and it's more than three.  We can get your

10    reports -- you said Merck failed to warn; you said

11    Bayer's failed to warn; you said Takeda failed to

12    warn; you said Allergan failed to warn; you said Eli

13    Lilly failed to warn; and each and every time --

14    A.   I'm sorry.  You're -- you're -- in some of

15    those cases, you're taking a case and there may be

16    multiple defendants, so you're listing -- I believe

17    there were three -- before here, there were three

18    plaintiffs' failure-to-warn cases that I've

19    testified for trial.

20    Q.   I'm not just talking about plaintiffs, Doctor.

21                   THE COURT:  Counsel, I'm going to ask

22          you to move on, because at this point you're

23          inviting us to litigate all those other

24          cases, and we'll be here through next year.

25          Move on, please.

```
 1                    MS. SULLIVAN:  Yes, Your Honor.
 2    BY MS. SULLIVAN:
 3    Q.    And, Dr. Kessler, you haven't worked for the
 4    FDA in about 20 years?
 5    A.    That's correct.
 6    Q.    And you're not authorized to speak on behalf
 7    of the FDA?
 8    A.    That's correct.
 9    Q.    And the truth is, Dr. Kessler, you know the
10    FDA disagrees with you here, right?
11    A.    On what point, ma'am?
12    Q.    Well, I'm asking you a question.  The truth
13    is, you know the FDA disagrees with you?
14    A.    No.  Let's -- would you like me to discuss
15    this?
16    Q.    Well, let me ask you a question.
17                    Dr. Kessler, the FDA disagrees with
18    you about the safety of this drug.  They don't agree
19    that this drug is unsafe, right?
20    A.    Oh, hold it.  Could you do me a favor and tell
21    me exactly where I said this drug is unsafe.
22    Q.    Okay.  Well, then, we don't --
23    A.    Or where the FDA -- please use my words
24    exactly right.
25    Q.    Okay.  Yeah.  Well, maybe I misunderstood, Dr.
```

 1    Kessler.

 2                    So you're not suggesting to this jury

 3    that Risperdal is unsafe when used as labeled,

 4    right?

 5    A.    Let me be very clear.  The issue that I'm

 6    testifying about is what a doctor needs to know in

 7    order to safely prescribe that medicine.  I thought

 8    that's been the subject of the testimony.  I am not

 9    here to testify on the safety and effectiveness of

10    Risperdal, I mean, for any particular indication.

11    This is a question of whether under certain

12    circumstances, of Janssen's certain conduct in doing

13    certain things, they adequately warned.  That's what

14    I thought I'm here testifying.

15    Q.    And, Dr. Kessler, do you agree with the FDA

16    that this drug is safe when used as labeled?

17    A.    At what point in time are we talking about?

18    Q.    At any point.  Do you agree with the FDA that

19    this drug is safe when used as labeled?

20    A.    No.

21    Q.    Okay.

22    A.    May I explain?

23    Q.    I'm sure Mr. Kline will ask you to explain.

24                    Do you agree with the FDA that

25    this drug --

```
 1              MR. KLINE:  Do I have to go back?
 2              THE COURT:  Well, yes.  You're going
 3         to have to go back.
 4              But I'm concerned about these
 5         questions in terms of confusing the issues in
 6         this case as to -- because I really think you
 7         need to ask at what point.  This case is
 8         related to a specific patient and a specific
 9         time or time period.  So these questions
10         about whether FDA, whether it's safe or not,
11         I need to pin down so it's relevant to this
12         case.
13  BY MS. SULLIVAN:
14  Q.    And, Dr. Kessler, the truth is, the FDA during
15  the time of this case never concluded that Janssen
16  failed to adequately warn, correct?  They never --
17  they've never concluded what you're telling this
18  jury, that Janssen failed to adequately warn?
19  A.    The --
20  Q.    Can you answer that one yes or no?
21  A.    Just give me a second.
22              No.  I mean, yes, you're correct.
23  But Janssen didn't know -- I mean, sorry, FDA didn't
24  know what Janssen was doing.
25  Q.    Well, Dr. Kessler, there's no issue in this
```

- DAVID A. KESSLER, M.D. - CROSS -          68

1   case that Janssen gave FDA --

2                MR. KLINE:  Objection.

3   BY MS. SULLIVAN:

4   Q.   -- all of the events of gynecomastia and all

5   their studies; true?

6                THE COURT:  Is there an objection?

7                MR. KLINE:  No.

8                THE COURT:  No.

9                THE WITNESS:  Yes.  But you didn't

10        give the association of --

11  BY MS. SULLIVAN:

12  Q.   And, Doctor --

13                THE COURT:  Again, you're cutting him

14        off, Counsel.  Please.

15                MS. SULLIVAN:  I'm sorry.

16  BY MS. SULLIVAN:

17  Q.   And, Dr. Kessler --

18  A.   There's two missing pieces, okay, that FDA

19  doesn't have, all right.  One was Janssen said there

20  was no correlation.  I didn't see Table -- the data

21  in 21 being told to the FDA in the documents, in the

22  safety updates, in the text.

23                Two, right, what Janssen was doing

24  with Dr. Mathisen -- and, again, I want to be

25  careful, Your Honor, because it goes to the issue

1   of, I mean, going into an office on a use that's not

2   on the label.  That raises a whole set of issues.

3   And I just want to be respectful of what I can say.

4                    THE COURT:  Well, answer her

5            questions.  I'm going to give you permission,

6            of course, to elaborate to some degree, but

7            right now it is her cross-examination, so we

8            just need to have her questions answered

9            and --

10                   MS. SULLIVAN:  And --

11                   THE COURT:  -- we'll go forward.

12   BY MS. SULLIVAN:

13   Q.    And, Dr. Kessler, you know that the FDA knows

14   all about your opinions in this case about the

15   statistical association; and they disagree with you.

16                   MR. KLINE:  Your Honor, objection.

17                   THE COURT:  All right.  That --

18                   MR. KLINE:  That's --

19                   THE COURT:  So that's sustained.

20                   MR. KLINE:  May we see Your Honor at

21            sidebar?

22                   THE COURT:  That is sustained, unless

23            you have evidence from the FDA that's coming

24            in live in this case on that point.

25                   MS. SULLIVAN:  I have a letter to the

```
 1          FDA from them, telling them all about

 2          Dr. Kessler.

 3                  MR. KLINE:  Your Honor, may we see

 4          you at sidebar?  May we see you at sidebar.

 5          I have a motion to make, a significant

 6          motion; or can we take a break now?

 7                  THE COURT:  Yeah.  We'll take a

 8          break.

 9                  COURT CRIER:  All rise as the jury

10          exits.

11                  THE COURT:  Please don't discuss this

12          matter with each other.

13                          -  -  -

14                  (Whereupon the jury exited the

15          courtroom at 2:48 p.m.)

16                          -  -  -

17                  (The following transpired in open

18          court outside the presence of the jury:)

19                          -  -  -

20                  THE COURT:  All right.

21                  MR. KLINE:  Your Honor, I move for an

22          admonishment and a -- and an instruction.

23                  THE COURT:  I was afraid you were

24          moving for a mistrial.

25                  MR. KLINE:  This counsel was told,
```

```
 1              she was told --
 2                   THE WITNESS:  Do you want me to --
 3                   THE COURT:  I'm going to ask,
 4         Dr. Kessler, that you take a break yourself.
 5                   MR. KLINE:  She was instructed that
 6         the Citizens Petition here --
 7                   THE COURT:  Well, wait.  Hold it.
 8                   MR. KLINE:  What she's trying to get,
 9         that, quote, letter, that's --
10                   THE COURT:  Let's let Dr. Kessler
11         take a break himself and we'll straighten it
12         out.
13                   (Whereupon the witness, Dr. Kessler,
14         exited the courtroom.)
15                   MR. KLINE:  May I be heard?
16                   THE COURT:  Sure.
17                   MR. KLINE:  Counsel was told after
18         argument, reargument, re-reargument and
19         re-reargument and re-reargument that the
20         issues raised when Mr. Sheller sent
21         Dr. Kessler's letter to the FDA and the FDA
22         disagreed about it being a serious adverse
23         event was not to be part of this case, not to
24         be suggested, not to be -- not to be
25         interjected into the case.
```

```
 1                 And in fact that Petition, Your
 2         Honor, is currently the subject of a lawsuit
 3         in Federal Court against the FDA involving
 4         significant issues.
 5                 Now, we had a discussion about
 6         whether that was going to be allowed, and
 7         she, in violation of what the instructions
 8         were, suggested to the jury that his opinions
 9         were told to the FDA and the FDA disagreed.
10                 MS. SULLIVAN:  And, Your Honor --
11                 THE COURT:  All right.
12                 MR. KLINE:  And that is --
13                 THE COURT:  I understand it.
14                 MR. KLINE:  And that is wrong.  And
15         it shouldn't be countenanced by the Court.
16                 THE COURT:  Well, before we hear from
17         Ms. Sullivan about this, what I don't know
18         is -- this Court was not a party to any such
19         agreements or any such motions, so I'm a
20         little bit in the dark.  Why doesn't
21         somebody, Mr. Murphy, why don't you fill me
22         in to what we're talking about.
23                 MR. MURPHY:  I beg your pardon?
24                 MS. SULLIVAN:  Your Honor --
25                 THE COURT:  I don't know of any
```

1           statement -- I've never ruled on any in

2           limine motion --

3                   MS. SULLIVAN:  I agree; exactly.

4                   THE COURT:  -- regarding a

5           settlement.

6                   MS. SULLIVAN:  Exactly, Your Honor.

7                   MR. KLINE:  Yes, you did, Your Honor.

8                   MR. MURPHY:  No.

9                   MR. KLINE:  Your Honor, respectfully,

10          respectfully.

11                  MS. SULLIVAN:  No.

12                  MR. KLINE:  We had this whole issue

13          as to whether the "Citizens Petition" and

14          whether the information that was provided to

15          Dr. Kessler in 2013, which has nothing to do

16          with the label from 2002 to 2006, which is

17          the issue here, the 2002 label, and

18          Mr. Sheller going to the FDA last year

19          submitting a lot of information to the FDA

20          and telling the FDA that the 2013 label

21          should contain a "black box warning" and the

22          FDA saying certain things to Mr. --

23                  THE COURT:  Everyone sit down,

24          please.

25                  MR. KLINE:  -- to Mr. Sheller back,

1          that has nothing to do with this case.  And

2          what she wants to do -- what she wants to try

3          to do here is to try to interject a document

4          which she was told has nothing to do with

5          this case.

6                    THE COURT:  Well, if you have an

7          objection based on the document, that's

8          different from an admonishment or anything.

9          We haven't seen the document.  I've never

10         seen it.  So I don't think that there's any

11         real grounds for anything for us to do at

12         this point.

13                    But I will say this, and I'll hear

14         from Ms. Sullivan, but I will say this:  You

15         are on a very slippery slope, in my view, in

16         terms of bringing up what government actions

17         have or have not been taken against your

18         client.

19                    MS. SULLIVAN:  Well, this -- Your

20         Honor, my question -- I understand that

21         point, Your Honor.

22                    THE COURT:  And so you continue --

23                    MS. SULLIVAN:  I moved on.

24                    THE COURT:  If you continue, it's

25         very, very possible that some kind of

```
 1            rebuttal will be permitted about government
 2            action against Johnson & Johnson in the last
 3            year or so on a particular drug named
 4            Risperdal.
 5                     MS. SULLIVAN:  And, Your Honor, this
 6            was a different issue.  This was --
 7                     THE COURT:  Well, I don't know.  The
 8            way you're carrying on about this invites
 9            that kind of rebuttal.
10                     MS. SULLIVAN:  And, Your Honor, on
11            the Citizens Petition issue, Your Honor, he
12            specifically said the FDA never saw this
13            analysis.  The truth is, they know all about
14            it.  His opinion was given to the FDA and
15            that's relevant cross-examination.
16                     THE COURT:  But it's not a relevant
17            point in this trial unless you make it so.
18            What the FDA thought or did not think is not
19            relevant to the stated issues in this case,
20            unless you make it so.  And if you make it
21            so, that it's about what the government had
22            in mind regarding Johnson & Johnson and
23            Merck, that opens a whole new case.
24                     MS. SULLIVAN:  Well, Your Honor, then
25            that puts us in a position where you can't
```

1              even defend yourself.

2                        THE COURT:  You can't have it both

3              ways, Ms. Sullivan, is what I'm trying to

4              tell you.

5                        MS. SULLIVAN:  Well, Judge, it sounds

6              like the Court is not going to permit Janssen

7              to even defend themselves.

8                        THE COURT:  Well, I haven't seen the

9              document.

10                        MS. SULLIVAN:  The fact is, on these

11              narrow issues, the FDA does disagree with

12              Dr. Kessler.  That's cross.

13                        THE COURT:  Well, then present

14              evidence to that point.  Present evidence to

15              that point.  It's not coming in through a

16              letter.

17                        MR. KLINE:  So Your Honor knows, what

18              she's trying to do is interject what the FDA

19              said in 2013 about whether a "black box

20              warning" is needed on the current label.  I

21              have no --

22                        THE COURT:  I want to see a direct

23              examination, the cross-examination on that

24              point, otherwise it won't -- that is hearsay,

25              unless it is something that is admissible

1          here, just like the other documents, the
2          e-mails and everything else were admitted.
3          If this document is admitted by the actual
4          testimony and introduction of the person who
5          wrote it or did it or was deposed about, then
6          they are --
7                    MS. SULLIVAN:  Well, Your Honor, the
8          problem is we can't bring in the FDA.
9                    THE COURT:  I'm sorry, then.
10                   MS. SULLIVAN:  Judge, this is an
11         official document that we can authenticate
12         through our FDA expert, and it's --
13                   THE COURT:  I don't know.  Let me see
14         the document.
15                   MS. SULLIVAN:  It's clear that the
16         FDA disagrees with Dr. Kessler.
17                   THE COURT:  I'll take a look at the
18         document.  But we have the same rules for
19         both parties.  And those rules are that the
20         materials need to be independently
21         authenticated and admissible.
22                   MS. SULLIVAN:  And, Your Honor, I
23         hadn't used the document.  Right now I just
24         wanted to ask --
25                   THE COURT:  Well, you'll have to show

1            it to this witness in terms of trying to

2            impeach him for something, and I need to see

3            the document.  And, frankly, when you do

4            that, you are opening the door to trouble.

5                    MS. SULLIVAN:  Well —— and, Your

6            Honor, I understand your ruling, but it puts

7            Janssen in a position where it can't even

8            defend themselves by saying the FDA disagrees

9            with this hired gun.  They looked at these

10           very issues and said that Dr. Kessler is

11           wrong.  He's wrong on serious adverse event.

12                   THE COURT:  But it's not about what

13           the FDA thinks or not.  It's about whether or

14           not the evidence that he's presenting about

15           the so-called manipulation of data is true or

16           not.  Ask him about that.  Not through ——

17                   MS. SULLIVAN:  And, Your Honor ——

18                   THE COURT:  —— not through a letter

19           by the FDA.  Have the FDA person come in here

20           and refute what Dr. Kessler has said here.

21           But don't do it that way or else you're going

22           to open the door to how the government has

23           viewed Johnson & Johnson on this drug in

24           other matters.

25                   MS. SULLIVAN:  It's a separate issue,

1        Your Honor.  And the FDA's concluded that

2        this statistical analysis he's basing their

3        whole case on is bologna.  It's just -- it's

4        no clinical significance.

5                THE COURT:  Well, you're testifying

6        now.  Then have the FDA person come in and

7        say that.

8                MR. KLINE:  Your Honor --

9                MS. SULLIVAN:  You can't drag -- I

10       wish I could, Judge.  I wish I could bring

11       them down here because they completely

12       disagree with Dr. Kessler.

13               THE COURT:  So what are you saying

14       now; that this is an out-of-court statement

15       that is admissible because it's not

16       available?

17               MS. SULLIVAN:  It's a public record;

18       and, yeah, they're unavailable.

19               THE COURT:  Well, I don't know.  Let

20       me see the document.  What kind of public

21       record is this?

22               MS. SULLIVAN:  Here it is, Judge.

23               MR. KLINE:  The document goes to the

24       2013 label.  It has nothing to do with the

25       2002 label's adequacy.  That's the problem

```
 1              here.  She wants to throw -- and you're going
 2              to now see weeks of it -- anything possible
 3              up against the wall.
 4                      MS. SULLIVAN:  That's not true.
 5                      MR. KLINE:  This is highly
 6              inflammatory and prejudicial.
 7                      MS. SULLIVAN:  It's not, Your Honor.
 8                      MR. KLINE:  It has nothing to do with
 9              the 2002 label at issue in this case.
10                      MS. SULLIVAN:  It has to do with the
11              safety of the medicine.
12                      MR. KLINE:  It has to do with --
13                      MS. SULLIVAN:  It has to do --
14                      MR. KLINE:  When she yells over me to
15              get her way.
16                      COURT REPORTER:  One at a time.
17                      THE COURT:  You know, I was asked by
18              our court reporters that counsel not speak
19              over each other or over me when talking
20              because they have a lot of difficulty in
21              recording what's been said.
22                      MR. KLINE:  You might want to look at
23              it on a recess, Your Honor.
24                      THE COURT:  I mean, I don't --
25                      MR. KLINE:  And you'll see --
```

1              THE COURT:  Frankly, the issue that I

2      have is one of relevance, and including --

3      it's your choice whether to potentially open

4      the door to prior conduct that could be

5      admissible here.

6              As far as this particular discussion

7      is concerned, I'll read the letter.  I'll

8      read it, and so I won't make a definitive

9      ruling.

10             As far as an admonishment is

11      concerned, I don't think it's necessary at

12      this point, a public admonishment.

13             What I can say, though, is that this

14      case is about the state action of a -- a

15      negligence action.  It is clearly not about

16      what the FDA did or did not do, because that

17      is a situation of what did the FDA know and

18      when did it know it.  And unless you are

19      prepared to go down that route, Ms. Sullivan,

20      I would suggest that you not bring up this

21      particular issue now.

22             MS. SULLIVAN:  Well, Your Honor, it's

23      a preemption.  I mean, the FDA has --

24             THE COURT:  There is no preemption

25      involved here.

```
 1                   MS. SULLIVAN:  And, Your Honor, this
 2          is where they alerted the FDA to
 3          Dr. Kessler's opinion in this case.
 4                   THE COURT:  All right.  Well, you can
 5          present whatever is available evidence to you
 6          that's admissible.  This is not admissible
 7          from what I can tell right now.
 8                   MS. SULLIVAN:  Can I, Your Honor,
 9          cross him on the fact that they have sent or
10          told the FDA about his opinion?
11                   THE COURT:  What are you trying to --
12          I mean, are you saying the FDA is not
13          permitted to testify here?
14                   MS. SULLIVAN:  They can't.  We can't
15          bring them in.  There's a prohibition.
16                   THE COURT:  So what does the federal
17          law say about the admissibility of their
18          letters in this court?  Anything?
19                   MS. SULLIVAN:  It's clear, Your
20          Honor, they come in in every case.  We --
21                   THE COURT:  You have to peg this
22          issue to some state evidentiary rule.
23                   MR. KLINE:  Yes.
24                   MS. SULLIVAN:  It's public records,
25          too.
```

```
1                    THE COURT:  Which one is it?  This is

2           a public record?  A letter from the FDA to a

3           law firm is a public record?

4                    MS. SULLIVAN:  A business -- it's a

5           conclusion.  Your Honor, they reviewed it for

6           two years, teams of FDA experts, and they

7           reached conclusions on specific regulatory

8           issues.  This is a response to a Citizens

9           Petition.  It's a formal action which the

10          FDA --

11                   THE COURT:  What Citizens Petition is

12          that?

13                   MS. SULLIVAN:  Mr. Sheller's firm

14          sent a letter to the FDA all about these

15          allegations.

16                   THE COURT:  That's what I'm trying to

17          tell you.  If you want to raise these kind of

18          issues, then we can all get into all kinds of

19          issues involving Johnson & Johnson and

20          Risperdal and the Department of Justice.

21                   MS. SULLIVAN:  But, Your Honor --

22                   MR. KLINE:  Your Honor, if you

23          will --

24                   MS. SULLIVAN:  -- the difference is

25          this related specifically to their
```

1           allegations in this case.

2                   THE COURT:  Well, that is denied

3           then.  Okay.  I have reasons that I do not

4           want this case to go into mistrial-land based

5           on evidence of prior actions, prior

6           activities of issues that are not relevant

7           here based on a 2013 label, unless it is

8           relevant.  And so far I haven't seen that

9           it's relevant.

10                  MS. SULLIVAN:  And, Your Honor, it

11          goes back --

12                  THE COURT:  What the FDA thinks

13          about Dr. Kessler's testimony is not relevant

14          to what the jury might think about it, unless

15          you are anticipating that the government

16          itself is going to come in and testify one

17          way or the other about this case.

18                  MS. SULLIVAN:  Well, I wish they

19          could, Your Honor, but --

20                  THE COURT:  All right.  Well, so do

21          I, but that's the law.

22                  MS. SULLIVAN:  Your Honor, but it's

23          probative on the issue of --

24                  THE COURT:  It may be.  But the

25          government, the FDA for some reason has this

1          law.  And now we're stuck with Pennsylvania

2          law.  And I'm telling you it's not relevant;

3          and also in my judgment it is potentially

4          prejudicial to the plaintiff because of the

5          nature of the relevancy itself.  And also I'm

6          very concerned that it will end up in

7          exploding this case to issues that are really

8          prejudicial to both parties here, especially

9          to the defendant.

10              Let's face it, this particular

11         company has been the subject of a massive

12         judgment outside of this courtroom relating

13         to this particular drug.

14              MS. SULLIVAN:  That was overturned,

15         Your Honor, on appeal.

16              THE COURT:  Well, there's a lot of

17         findings involved in that case that are

18         germane to the issue here.  And I don't want

19         to go into issues that were elsewhere.  And

20         I'm not sure that we need to get into all of

21         that.

22              And, by the way, the conduct involved

23         in this particular case as it relates to

24         Johnson & Johnson, I'm not going to permit it

25         to be used by the plaintiff as to other

1          conduct by Johnson & Johnson with other drugs

2          which have not been overturned.

3                  MR. MURPHY:  Your Honor, if I might.

4          I've heard you and I understand you.

5                  I would ask you to consider under

6          Rule 902 that this is in fact a

7          self-authenticating document.  There are

8          rules regarding public pamphlets published by

9          the government; and as you'll see in some of

10         the commentary, public pamphlets now are

11         outdated.  Websites are what are at issue.

12                 The Citizens Petition here at issue

13         was posted at the FDA's website; the response

14         posted at the FDA's website.  And I would ask

15         you to consider that, Your Honor.

16                 MR. KLINE:  Janssen's response wasn't

17         posted.

18                 But, Your Honor, the fundamental

19         touchstone of this, putting aside anything

20         else, is that -- there are two things:  One,

21         this was ruled upon in limine and the Court

22         eliminated it based on everything we've done.

23         And my objection to start with was how she

24         just blurts it out.

25                 Number two, this document has nothing

```
 1            to do with the issues in this case.  It is a
 2            2013 letter that raises a totally different
 3            issue which is whether a black box needs to
 4            be put on the drug.
 5                    MS. SULLIVAN:  And there --
 6                    MR. KLINE:  And -- and the fact of
 7            the matter is --
 8                    THE COURT:  Well, we'll take a recess
 9            for a few minutes and we will review the
10            document.  If you're so persistent in wanting
11            this document, and Mr. Murphy has spoken, I
12            will take a look at it very carefully under
13            902.
14                    MS. SULLIVAN:  Thank you, Your Honor.
15            It also refers to the issue of whether a
16            different warning is required, because this
17            is a serious adverse event.  The FDA
18            concludes that gynecomastia is not a serious
19            adverse event.
20                    MR. KLINE:  Exactly what you ruled
21            out.
22                    MS. SULLIVAN:  That's not true.
23                    MR. KLINE:  Exactly what you ruled
24            out days ago.
25                    MS. SULLIVAN:  He's never looked at
```

```
 1              the document.
 2                      MR. KLINE:  And, by the way, in the
 3              face of that ruling --
 4                      THE COURT:  See, that's the problem,
 5              Ms. Sullivan.  This is a difficult case for
 6              any jury to really -- to take ahold of.  And
 7              I am afraid that the procedure here of
 8              bringing in the FDA's own analysis of this
 9              outside a court, which is not subject to
10              cross-examination, is inherently unfair.  So
11              I'll take a look at the document and --
12                      MR. KLINE:  Two things as you're
13              looking at the document.
14                      One, have you heard Dr. Kessler say
15              that there needed to be a "black box
16              warning"?  No.
17                      THE COURT:  I know that --
18                      MR. KLINE:  Have you heard Dr.
19              Kessler say it's a serious adverse event?
20              No.
21                      MS. SULLIVAN:  Dr. Mathisen said it.
22                      THE COURT:  Dr. Mathisen testified
23              that he did not read the particular
24              prescription after it came out in October
25              2006.  He wishes he had.  But he didn't see
```

```
 1            it in the black box, didn't see it in the
 2            warnings.  Whether that's relevant to this, I
 3            don't know.  I have to read the document.
 4                    MR. KLINE:  What you have learned
 5            here, Your Honor, is in the face of a ruling
 6            of a document being out, instead of even
 7            going to sidebar, she blurts it out.
 8                    MS. SULLIVAN:  It wasn't ruled out.
 9                    THE COURT:  Well, everybody has their
10            style.  Everyone has their style.
11                    MR. KLINE:  That's not style, Your
12            Honor, respectfully.
13                    THE COURT:  All right.
14                    MS. SULLIVAN:  I, first of all --
15                    MR. KLINE:  That is -- that is
16            improper.  It's not style.
17                    THE COURT:  Now, I understand that.
18            But, again, you know, we're having late
19            motions in limine.  We're having all kinds of
20            things going on here, so let me just take a
21            few minutes and we'll look at this and we'll
22            come right back.
23                    MS. SULLIVAN:  Thank you.
24                         -  -  -
25                    (Whereupon a recess was taken.)
```

```
 1                    -  -  -
 2              (Whereupon an off-the-record
 3         discussion was held.)
 4                    -  -  -
 5              (The following transpired in open
 6         court outside the presence of the jury:)
 7                    -  -  -
 8              THE COURT:  I'd like to go back now
 9         on the record to address some of the more
10         recent points and then get back, hopefully,
11         to the cross-examination.
12              First of all, I just want to be very
13         clear that I am not mistaken.  I'm not
14         necessarily concerned about the outcome of a
15         particular DOJ or FDA.  I'm concerned about
16         what prior acts could be brought into a
17         courtroom in rebuttal of issues involving the
18         government.
19              So, for example, Ms. Sullivan, I am
20         wondering now whether the
21         multi-billion-dollar settlement of
22         November 2013 has been rescinded.
23              MS. SULLIVAN:  I'm sorry, Your Honor.
24         The settlement with the federal government,
25         it involves a different --
```

```
 1              THE COURT:  It involved marketing and
 2         Risperdal and some --
 3              MS. SULLIVAN:  No; for a completely
 4         different indication.  It has nothing to do
 5         with autism.
 6              THE COURT:  Well, then that gets me
 7         to this thing here of the black box.  It's
 8         irrelevant to this case.  It's out.
 9              MS. SULLIVAN:  Dr. Mathisen raised
10         it, Your Honor.
11              THE COURT:  As far as this witness is
12         concerned.  You had the opportunity to
13         cross-examine Dr. Mathisen about that.  The
14         black box issue, is that being raised here in
15         some way?
16              MS. SULLIVAN:  Well, here's the
17         issue:  Dr. Mathisen is not a regulatory
18         expert.  Maybe their way to solve it,
19         Judge --
20              THE COURT:  The problem is that this
21         particular document is written in
22         relationship to a label that was not seen by
23         Dr. Mathisen.  Dr. Mathisen was talking about
24         October 2006.
25              MS. SULLIVAN:  But he --
```

```
1              THE COURT:  Does this document relate
2        to an October --
3              MS. SULLIVAN:  Yes, yes, Your Honor.
4        Here's the relation:  The definition for
5        serious adverse event is the same now as it
6        was then, and the FDA said this does not rise
7        to that level.  They've concluded this -- it
8        was the same definition --
9              THE COURT:  Then present that
10       evidence, I beg you to.  If you wish to, that
11       is a defense that you may raise to your own
12       evidence.
13             MS. SULLIVAN:  Understood, Your
14       Honor.
15             And, Your Honor, I may ask for an
16       instruction at the end of the case that only
17       the FDA can initiate a black box;
18       manufacturers can't.
19             THE COURT:  Well, let me tell you
20       something else that I want to say about the
21       black box, the matter of the black box:  I'll
22       be happy to look at any jury instructions at
23       any time, but the reality of the matter is,
24       is that this Court is going to be very
25       diligent, and I believe I have been up to
```

1      now, and I will continue to do so, in making

2      sure the jury understands the difference

3      between a state negligent, failure-to-act

4      cause of action.  And a review for whatever

5      reason, black box, label, precautions or

6      anything else under the FDA, they are two

7      different -- they are apples and oranges.

8              MS. SULLIVAN:  The problem for

9      manufacturers, Judge, is on the labeling side

10     and on every side, they have to follow the

11     FDA regulations.

12             THE COURT:  Well, you know, again,

13     this Court has been through one of these

14     before where that particular argument was

15     very unsuccessful with the jury, so, you

16     know, bear that in mind.  We are familiar

17     with Wyeth.  We are familiar with the cases.

18     We know the distinctions between a generic

19     and a brand.  This one is a brand, so you

20     know...

21             MS. SULLIVAN:  No.  And, Your Honor,

22     the reason that all this is relevant, it's a

23     negligence case, and FDA is the industry

24     standard that we have to follow.

25             THE COURT:  Well, you make that

- PLEDGER -vs- JANSSEN -          94

```
 1          argument to the jury and present it as part
 2          of your case, not through a irrelevant
 3          cross-examination that invites prior bad acts
 4          by your client into evidence on rebuttal.
 5                    MS. SULLIVAN:  Your Honor, we'll do
 6          it through our witnesses.  Thank you.
 7                    THE COURT:  All right.  Fine.  Now,
 8          bring the jury back.
 9                         -  -  -
10                    (Whereupon an off-the-record
11          discussion was held.)
12                         -  -  -
13                    THE COURT:  All right.  Let's have
14          the jury come back.
15                    (Pause.)
16                         -  -  -
17                    (Whereupon an off-the-record
18          discussion was held.)
19                         -  -  -
20                    THE COURT:  I would also like to put
21          on the record there is one other reason why
22          I'm not permitting this document to be used,
23          and that is because it refers to a different
24          case entirely, Docket No. FDA 2012, P-0857.
25                    COURT CRIER:  All rise as the jury
```

```
 1              enters the courtroom.

 2                        -  -  -

 3                   (The following transpired in open

 4              court in the presence of the jury:)

 5                        -  -  -

 6                   (Whereupon the jury entered the

 7              courtroom at 3:20 p.m.)

 8                        -  -  -

 9                   THE COURT:  All right.  You may be

10              seated everybody.

11                   All right.  Members of the jury, we

12              will continue now with Ms. Sullivan's

13              cross-examination.

14                   MS. SULLIVAN:  Thank you, Your Honor.

15   BY MS. SULLIVAN:

16   Q.    Dr. Kessler, I'm going to go back and put up a

17   demonstrative that you and Mr. Kline were talking

18   about involving the 2002 and 2006 labels, okay.  It

19   should come up on your screen, I think.

20   A.    Thanks.

21                   (Document displayed on the screen.)

22                   (Counsel conferring with technician.)

23   BY MS. SULLIVAN:

24   Q.    And, Dr. Kessler, you remember this, talking

25   to Mr. Kline about this demonstrative?
```

1  A.     Yes, ma'am.

2  Q.     And this is a section of the 2002 label and a

3  section of the 2006 label, and the two of you were

4  comparing them for the jury, right?

5  A.     Yes.

6  Q.     But these are for two completely -- the 2002

7  label was an adult label, right?

8  A.     (No response.)

9  Q.     In 2002 Risperdal was not approved for

10  children?

11  A.     Uhmm, that's correct.

12  Q.     And so the data in the 2002 label related to

13  adults, the safety data, right?  Studies in --

14  safety studies in the adult population.

15  A.     The data, yes, I see that.

16  Q.     It was an adult label.

17            And it was in 2006 for the first time

18  that Risperdal was approved for children and

19  adolescents, correct?

20  A.     Uhmm, yes.

21  Q.     Okay.  And so there are two different patient

22  populations, adults and children, and the safety

23  data was different for each, right, on a variety of

24  issues?

25  A.     Sure.

- DAVID A. KESSLER, M.D. - CROSS -          **97**

```
1   Q.     Yeah.

2   A.     Generally, that's fair.

3   Q.     And you read Dr. Mathisen's deposition.  He

4   knew that the 2002 label, that the medicine was not

5   approved for children, right?  He knew he was

6   prescribing off-label?

7   A.     I believe so, yes.

8   Q.     Yeah.

9              And there is actually some other

10  sections of the label that you and Mr. Kline didn't

11  talk about that I wanted to put up.  If we could

12  give counsel -- it's part of the label, counsel, and

13  we can give you the demonstrative.  We'll mark this

14  as Defense Exhibit 14.

15             And, Dr. Kessler, in the 2002 label

16  for adults, it was clearly stated in the label that

17  safety and effectiveness in children had not been

18  established, right?

19  A.     That's exactly what it said.

20  Q.     Yeah.

21             And you know, because you've seen his

22  deposition, that Dr. Mathisen, Mr. Pledger's

23  prescriber, knew that, that safety in children had

24  not been established?

25             MR. KLINE:  Your Honor, objection.
```

```
 1              Objection to the testimony about Dr. Mathisen
 2              and all about it.  We've had him here.
 3                      THE COURT:  Well, no.  That's
 4              overruled.
 5                      But I just want to make sure that I
 6              understand where this label is coming from.
 7              Where is this --
 8                      MS. SULLIVAN:  This is the labels,
 9              Judge, that are already --
10                      THE COURT:  What is our marking on
11              this?
12                      MS. SULLIVAN:  This is Defense
13              Exhibit 14.
14                      THE COURT:  Okay.  Just mark that
15              down.  And the first one was?
16                      MS. SULLIVAN:  That was Plaintiff's
17              Exhibit 11.
18                      MR. KLINE:  Everything has been in
19              front of the jury, Your Honor.
20                      THE COURT:  All right.  But Marianne
21              is the keeper of our records here and she
22              likes it this way, and we're going to call it
23              the "Marianne rule."  Okay.
24                      (Laughter.)
25                      Everything that's flashed up there,
```

```
 1              Marianne needs to know.  So Plaintiff 11 was
 2              the first thing.  And then now we have
 3              defense, what is it?
 4                   MS. SULLIVAN:  Fourteen, Your Honor.
 5                   THE COURT:  Fourteen.  Okay.
 6   BY MS. SULLIVAN:
 7   Q.    And so, Dr. Kessler, it was clear to
 8   prescribers in 2002 that the medicine had not been
 9   proven safe and effective in children yet; that's
10   what it says.
11   A.    You'd have to, again, if we're talking about
12   Dr. Mathisen, it would be great -- I certainly
13   remember that Dr. Mathisen said he knew that it was
14   off-label.  I wasn't here when he testified.
15   Q.    Okay.
16   A.    I know that.  I wouldn't want to characterize
17   Dr. Mathisen's testimony exactly on safety and
18   effectiveness, but he certainly knew it was
19   off-label.
20   Q.    Fair enough.  And our jurors have heard from
21   Dr. Mathisen.
22              But no dispute, Dr. Kessler, that
23   right in the 2002 label, it told prescribers that
24   safety and effectiveness in children had not been
25   established?
```

- DAVID A. KESSLER, M.D. - CROSS -           100

1   A.    Yes, it says that.

2   Q.    And --

3                   MR. KLINE:  Let him --

4                   MS. SULLIVAN:  Oh, I'm sorry.  I

5         didn't mean to cut you off.

6                   THE WITNESS:  The -- there's a "but."

7   BY MS. SULLIVAN:

8   Q.    I'm sorry?

9   A.    There's a "but."  But I'll let you decide.

10                  MR. KLINE:  Just --

11                  THE WITNESS:  Yes, it says that.  But

12        it doesn't put in the safety data -- the

13        safety concerns about kids.

14  BY MS. SULLIVAN:

15  Q.    And, Dr. Kessler, you agree that the

16  information in the 2002 label was adequate for the

17  indication, right?

18  A.    For which indication?

19  Q.    For what it's approved for, for adults; that

20  this label was correct and truthful?

21  A.    So maybe the -- so, no, I don't think that

22  would be correct, because the issue is -- and again,

23  this is an FDA term -- what the intended use was.

24  If the intended use, if Janssen's intended use was

25  for pediatrics, then this was not an adequate label.

- DAVID A. KESSLER, M.D. - CROSS -          101

1              If the intended use was for adults,

2    right, if that's what Janssen's intended use was,

3    then this would be adequate.

4    Q.    And, Dr. Kessler, it was only FDA approved at

5    that time in 2002 for adults, correct?

6    A.    Yes.  But that doesn't determine the intended

7    use.  You have to look at the totality of evidence.

8    Q.    Well, we're going to talk about that.

9              But certainly in 2002, the medicine

10   was only approved for adults and said plainly in the

11   label that safety in children had not been

12   established, correct?

13   A.    Yes, that's correct.

14   Q.    And it also talked about gynecomastia being

15   rare, right?

16   A.    Yes.

17   Q.    And that was true in terms of the indication

18   it was approved for; in other words, the studies in

19   adults showed that it was rare?

20   A.    Yes.  It was approved -- if the intended use

21   was for adults, then that would be correct.

22   Q.    Okay.

23   A.    If the intended use was for children and

24   adolescents, that would not be correct.

25   Q.    And, Dr. Kessler, you know that the indication

1   in 2002, the FDA approved it only for adults with

2   psychosis and schizophrenia, right?

3   A.    Yes.  That was exactly what FDA approved it --

4   Q.    Okay.  And, Dr. Kessler, you know that there

5   was no indication in 2002 for -- it had not been

6   approved for children in 2002?

7   A.    It was widely -- yes.  It was not approved,

8   but that doesn't mean the intended use wasn't for

9   kids.

10  Q.    And, Dr. Kessler, you know that Janssen -- I

11  think you talked about the fact that -- and let me

12  back up.

13             When it says "safety and

14  effectiveness in children has not been established,"

15  FDA does not mean to say that the medicine is

16  unsafe, just that the studies haven't been done

17  sufficient to get approval for kids yet, right?

18  A.    Please understand, this is Janssen's label

19  that gets reviewed and approved or cleared by FDA.

20  So be careful when you say the FDA is saying this.

21  These are Janssen's words as reviewed and approved

22  by FDA.

23  Q.    Yeah.  Dr. Kessler, you know that you can't

24  get a medicine approved unless the FDA says --

25  concludes that your label is okay; and they often

1  make changes and dictate that you say different

2  things as part of the approval process?

3  A.     It's a negotiation.

4  Q.     Yeah.

5  A.     That's correct.  It's a back-and-forth.  But

6  in the end, it's the company's label.

7  Q.     Well, it is -- the FDA makes the final

8  decision at the approval stage.  In other words,

9  companies can't just say anything they want in their

10  label at the approval stage.  The FDA makes very

11  clear -- and we can pull out some of the FDA

12  conclusions, if the Court permits -- when they

13  approve a medicine, they attach the label to the FDA

14  approval letter and says you have to say exactly

15  this, right?

16  A.     Yes.  But if you have safety information at

17  any point in time and you're the manufacturer, that

18  should be disclosed.  Nothing prevents you from

19  disclosing safety information.

20  Q.     And we're going to talk about that.  But at

21  least -- and you know that the FDA approved

22  Risperdal not just twice, but Janssen did a ton of

23  studies on this medicine, comparatively speaking,

24  right?

25              They did -- this is, Dr. Kessler, you

1   would agree, the most studied antipsychotic in

2   history as it relates to child and adolescent

3   medicines, right?

4   A.    Uhmm, a ton is a weight measure.  This was

5   extensively studied and there were a lot of

6   findings, safety findings also.

7   Q.    Along the way?

8   A.    Yes.

9   Q.    And you're not criticizing Janssen for doing

10  the hard science, doing the studies, and getting

11  this medicine approved for kids with autism who have

12  serious problems?

13  A.    (No response.)

14  Q.    Are you critical of Janssen for doing that?

15  A.    No.

16  Q.    Okay.

17  A.    I have no problems with doing studies.  But if

18  you find certain results, you have to make those

19  results known.

20  Q.    And --

21  A.    That's part of the FDA rule.

22  Q.    Yeah.

23  A.    So I am -- I think it's fair to say, I am

24  critical because Janssen, in my opinion, did not

25  make the -- an important finding known.

1  Q.    And we're going to talk about your Table 21,

2  Dr. Kessler, but --

3              MR. KLINE:  Your Honor, can we have a

4         lack of that "we're going to talk about it"

5         every time he answers and just go on to a

6         next question?

7              MR. MURPHY:  Is there an objection?

8              THE COURT:  It's a style.

9              MR. KLINE:  It's a style?

10             THE COURT:  It's a style.  I'd like

11        to get there, though, yes.

12             MS. SULLIVAN:  We'll get there,

13        Judge.  We'll get there.

14             THE COURT:  It is a style.

15             MS. SULLIVAN:  We'll get there.

16  BY MS. SULLIVAN:

17  Q.    Dr. Kessler, you know that Janssen sought --

18  and we'll look at the document -- that Janssen asked

19  FDA if they could put safety data in the medicine as

20  it related to dosing for children, right?

21  A.    In 1996 they asked my colleague, Paul Leber,

22  when I was at the FDA, if they could put dosing

23  information, and he concluded that the data was too

24  meager.

25  Q.    Yeah.  Because Janssen had just started

1    studying the medicine for children at that time.

2    They had not finished all of their pediatric studies

3    yet, right?

4    A.    A fair point.

5    Q.    Yeah.

6              But nonetheless, Janssen knew that

7    the medicine was being prescribed in children, and

8    they wanted to put some safety information about

9    dosing in the label even before it was approved,

10   right, for kids?

11   A.    Well, you're mixing two things, okay.  There's

12   safety information, okay, and there's dosing

13   information.  Now, dosing can be safety information.

14   Q.    Of course.

15   A.    But there's also safety information that is

16   not dosing.  Dosing implies this is the dose you

17   give if you want to use it.  If you have adverse

18   events in kids, that's different from dosing.

19   Q.    Yeah.  But dosing with safety -- you don't

20   want kids to have an overdose on Risperdal.  You

21   don't want kids to take too high a dose so they have

22   side effects.  So what Janssen wanted to do, it says

23   we know we haven't done enough studies to get

24   approval yet, but let's give doctors information

25   about pediatric dosing.

```
1    A.     Something that I encouraged very strongly when
2    I was at the FDA, but, again, it has to be based on
3    the data.
4    Q.     And so I'm putting back up Plaintiff's Exhibit
5    15.
6               And this is an August 15, 1996 letter
7    from Janssen to the FDA, right?
8    A.     Yes.
9    Q.     And in this letter Janssen talks about -- they
10   give whatever safety data they had in pediatric --
11   in the pediatric age group at that time, right?
12   A.     Yes.  Yes.  Exactly.
13   Q.     And in 1996, this is ten years before the
14   medicine was approved by the FDA in kids, and so
15   they had just started to do those studies, right?
16   A.     Yes.
17   Q.     And so they gave the FDA, you know, what they
18   had, and they wanted to give doctors safety
19   information about dosing in kids, right?
20   A.     Yes.
21   Q.     And --
22   A.     But, again, for what indication?
23   Q.     They wanted to give them dosing indication for
24   anything, right?
25   A.     Well, that's the problem.
```

- DAVID A. KESSLER, M.D. - CROSS -          108

```
1   Q.    And let's talk about -- let's look at this.
2              So in 1996, the medicine had just
3   been approved for adults, not for children, right?
4   A.    Yes.
5   Q.    But Janssen knows it's being prescribed in
6   children?
7   A.    Yes.
8   Q.    And they're doing the studies.  And, by the
9   way, Dr. Kessler, it takes a really long time to get
10  a medicine approved by FDA, doesn't it, sir?
11  A.    Uhmm, it takes a long time to develop a
12  medicine.  I have approved important medicines in 45
13  days.
14  Q.    You're talking about the NDA approval process.
15  But all the studies, doing all the studies, the
16  animal studies, the lab studies, the patient
17  studies, it takes years?
18  A.    I've -- yes.  But that's on the company's
19  time.
20  Q.    Right.
21  A.    And it did -- back before I got to the FDA,
22  FDA took a lot of time in reviewing applications;
23  and we accelerated that, the FDA review portion.
24  Q.    And it generally on average takes between 8
25  and 11 years to get a drug to the new drug approval
```

```
 1   stage to the FDA.  It takes companies on average
 2   about 8 to 11 years to get a medicine ready to get
 3   approval, right?
 4                    MR. KLINE:  Objection.  Objection;
 5          relevancy.
 6                    THE COURT:  Overruled.
 7                    THE WITNESS:  That's -- it takes a
 8          long time.  Again, in certain instances, when
 9          a company is efficient and there's an
10          important national priority, we've been
11          able -- we did this in a matter of a few
12          years when it came to important drugs like
13          HIV.
14   BY MS. SULLIVAN:
15   Q.    Yeah.  But it takes years?
16   A.    Yes, of course.
17   Q.    And looking at Page 2 of Plaintiff's Exhibit
18   15.  Janssen talks about the fact that they know
19   that their request to add something about kids in
20   the label in terms of dose, that they don't have the
21   studies yet for kids because they just started them.
22   "Although this submission does not contain data
23   which the Agency would normally characterize as
24   substantial evidence, we are nonetheless [sic] aware
25   that Risperdal is being utilized in children and
```

1   adolescents.  See summary.  Hence, we believe that

2   the Agency's alternative labeling options would not

3   adequately and safely reflect this fact," right?

4   A.    Yes, I see that.

5   Q.    So they're asking the FDA, they're saying we

6   know we don't have all the studies yet done in kids

7   and we know the medicine is only approved in adults,

8   but can we please give doctors dosing information so

9   they could use it safely in their patients, right?

10  That's what they're asking?

11  A.    I think that's a fair statement.

12  Q.    And if we could see -- and I'll pull it out

13  and give my colleague a copy, take a look at the

14  FDA's response.

15              It's 221.

16  A.    May I just trouble somebody for copies?

17  Q.    Of course, Dr. Kessler.

18              MR. KLINE:  Your Honor, objection to

19        the FDA document generally, to the extent

20        there's hearsay in it.

21              If I could have a continuing

22        objection.

23              THE COURT:  Well, first of all, is

24        this a document that has been marked already?

25              MS. SULLIVAN:  This is the first

- DAVID A. KESSLER, M.D. - CROSS -                111

```
 1              time, Your Honor.
 2                   THE COURT:  What is this?
 3                   MS. SULLIVAN:  It's been premarked by
 4              us, but it's the first time we're using it in
 5              the trial, Judge.
 6                   THE COURT:  It's exhibit what?
 7                   MS. SULLIVAN:  It's Defense Exhibit
 8              221.
 9                   COURT CRIER:  Fifteen.
10                   THE COURT:  All right.  Let's do
11              that.
12                   COURT CRIER:  It will be D-15.
13                   MS. SULLIVAN:  And if we could have
14              copies for the Judge and for Dr. Kessler,
15              yes.  Thank you.  And for Mr. Kline.
16                   MR. KLINE:  Yes.  Thank you.
17                   THE COURT:  What is the purpose of
18              this inquiry?
19                   MS. SULLIVAN:  Your Honor, the
20              plaintiffs introduced this request for
21              pediatric dosing.  And this is the FDA's
22              conclusion about whether they could add it in
23              the label or not.
24                   I mean --
25                   THE COURT:  About the dosing?
```

```
 1              MS. SULLIVAN:  Yeah.  The issue in
 2         this case is whether you can add safety data
 3         to the label even though it's not approved,
 4         and I want to show the FDA's response to that
 5         inquiry.
 6              THE COURT:  That's not an issue.
 7         That's sustained.  That's -- that's
 8         understood.  We're going to instruct the jury
 9         to that.
10              MS. SULLIVAN:  And, Your Honor --
11  BY MS. SULLIVAN:
12  Q.    And, Dr. Kessler, you know, without using the
13  document, you know, Dr. Kessler, that the FDA did
14  not allow Janssen to use -- to put the pediatric
15  dosing information in their label, right?
16  A.    Uhmm, yes, because they were concerned that
17  that would promote the use of the drug.
18  Q.    Exactly.  They didn't want any information in
19  there -- even safety information -- that would
20  indicate that this medicine had been approved for
21  children because it hadn't been, right?
22  A.    No.  There's a difference --
23  Q.    The --
24  A.    -- in terms of the -- may I finish?
25              So the FDA's specific concern was
```

```
 1   putting in the dose would -- and I happen to have
 2   this -- would in fact run the risk of promoting the
 3   drug, the use of this drug in pediatric patients
 4   without any justification.
 5   Q.    Yes.
 6   A.    That's if you -- that's if you put the dose
 7   in.  If you put a warning in, that's different than
 8   the dose.
 9             So, again, just be careful, all
10   right.  You can't promote.  You can't market, all
11   right.  You can't -- you know, you can't promote and
12   you can't market, but you can -- you can warn, if
13   this were a warning.  A dose is not a warning.
14   Q.    And, Dr. Kessler, you know that there are FDA
15   officials and former FDA officials who vehemently
16   disagree with your opinion --
17             MR. KLINE:  Objection, Your Honor.
18   BY MS. SULLIVAN:
19   Q.    -- that you can warn about an off-label risk?
20             MR. KLINE:  Objection under many
21        Rules of Pennsylvania Evidence.
22             THE COURT:  Well, I don't know.
23        Dr. Kessler is also opening the door to this
24        kind of thing, and I'm going to permit that.
25   BY MS. SULLIVAN:
```

1   Q.    Dr. Kessler, you know that there are FDA

2   officials who work at the FDA now and who were

3   former FDA officials who absolutely would disagree

4   with your opinion in this case that companies can

5   warn about an off-label risk?  They think you're

6   just flat wrong about that.

7                    MR. KLINE:  Same objection.

8   BY MS. SULLIVAN:

9   Q.    Under the regulations.

10                   THE COURT:  Overruled.

11  BY MS. SULLIVAN:

12  Q.    Can you answer my question?

13  A.    Yes.  Just give me one second.

14  Q.    Can you answer that question or do you know?

15  A.    I'm just looking for the 1979 Federal Register

16  where the Commissioner specifically states -- and

17  I'll do this from memory, okay.

18                   MR. KLINE:  Doctor, take the time.

19                   THE WITNESS:  There is nothing --

20       there is nothing that prevents a warning from

21       happening.  There is no limitation on

22       warning.

23                   Dr. Robert Temple signed an affidavit

24       and stated that.  And --

25                   MS. SULLIVAN:  Okay.  Doctor --

```
 1              THE WITNESS:  As you know.  And
 2         furthermore, I would surmise that -- I mean,
 3         you can only prevent a warning if it's false
 4         or misleading, okay.  That's the only -- and
 5         then it would be misbranding.
 6                 And, Ms. Sullivan, I will assure you
 7         that there is no judge in this -- in the
 8         United States, certainly in my opinion,
 9         right, that would prevent the company from
10         making a true warning about safety
11         information in order to protect kids.
12    BY MS. SULLIVAN:
13    Q.    And, Dr. Kessler, I'm talking about the FDA
14    here.  They wouldn't -- the FDA in this instance
15    said, no, you can't put the safety information about
16    dosing in your label because it's an off-label use,
17    right?  They said no.
18    A.    Because the dose, right, would serve as
19    promotion.  It would serve as use.
20    Q.    Yeah.
21    A.    It's not warn that something bad is going to
22    happen.
23    Q.    But that's --
24    A.    Those things are different.
25    Q.    But that's the concern of FDA about any risk
```

1    information.  What the FDA doesn't want is companies

2    using the guise of a warning to say, look, our

3    medicine is approved for kids because we have

4    something about kids in there.  They don't let you

5    do that.

6    A.     They always let you warn.  You can't use it as

7    a guise, but a true warning is always allowed.

8    Q.     Well, in this instance, Dr. Kessler, the FDA,

9    when Janssen asked, didn't let them warn about the

10   dosing levels, right?

11                  MR. KLINE:  Objection; asked and

12           answered.

13                  THE COURT:  All right.  That's

14           sustained.  Now, that was about the dose as

15           opposed to a warning about safety for

16           children; did I get that right?

17                  THE WITNESS:  Exactly, Your Honor.

18                  THE COURT:  Move on, please.

19   BY MS. SULLIVAN:

20   Q.     And just so we're clear, this is about as the

21   FDA -- as the documents you reviewed indicate,

22   Dr. Kessler, this dosing issue was a safety issue,

23   FDA said that, and the company said that, right?  A

24   safety issue?

25   A.     Let me just give the support for my position,

```
 1   if I may.  Thank you.
 2                 And perhaps --
 3   Q.    And --
 4   A.    Maybe --
 5   Q.    And, Dr. Kessler, you never did answer my
 6   question about --
 7                 THE COURT:  Well, right now we
 8         have -- this question is on the floor.
 9                 What was the question there, John?
10                 MS. SULLIVAN:  My question was that
11         the documents in the case that he's reviewed
12         indicate that this was a safety issue.  The
13         FDA said it and Janssen said it.
14                 THE COURT:  No.  What was the last
15         question that we had?
16                 MS. SULLIVAN:  That was the last
17         question.
18                          -  -  -
19                 (Whereupon the court reporter read
20         back the previous question as requested.)
21                          -  -  -
22                 THE WITNESS:  FDA did not allow them
23         to warn about the dosing levels for fear that
24         the dosing levels would cause the drug to be
25         promoted, and that would not be permissible.
```

```
 1              FDA did say, when it looked at the
 2         data, there are no specific safety findings
 3         of sufficient concern among the meager safety
 4         data submitted to justify adding any
 5         information to the labeling about safety
 6         experience.
 7              So you can always warn about safety,
 8         and that's well-established.  And I'd be
 9         happy to cite the Federal Register right now.
10  BY MS. SULLIVAN:
11  Q.    And, Dr. Kessler, you know the FDA disagrees
12  with you on that, the real FDA, not -- you were
13  there 20 years ago.
14              MR. KLINE:  Objection, Your Honor.
15         Objection, Your Honor.
16              THE COURT:  What's the question?
17              MR. KLINE:  The "real FDA" disagrees
18         with you.  We have to bring the "real FDA" in
19         to do that, because I know different, Your
20         Honor, too.
21              THE COURT:  Well, I'm only concerned
22         with the time period -- Doctor, you can say
23         yes or no -- the time period between 2002 and
24         2006 or 2007, I think it was prescribed.
25              THE WITNESS:  Right.
```

```
 1                    THE COURT:  During that time period,
 2           what is your answer?
 3                    THE WITNESS:  During that time
 4           period, the federal regulations that governed
 5           that time period, Your Honor, that were in
 6           effect, were written and promulgated in a
 7           final rule on June 26, 1979, and that was in
 8           effect through 2006, 2007.
 9                    And that Federal Register -- and I'm
10           quoting from Page 37447, and this is the FDA,
11           right, and it's the FDA that governs that
12           time period in this federal regulation.  It
13           says, "The Commissioner also advises that
14           these labeling regulations" -- because that's
15           what's in effect through 2006 -- "do not
16           prohibit a manufacturer, packer, relabeller,
17           or distributor from warning healthcare
18           professionals whenever potentially harmful
19           adverse effects associated with the use of
20           the drug are discovered."
21   BY MS. SULLIVAN:
22   Q.    That doesn't talk about an off-label use,
23   though, does it, Dr. Kessler?
24   A.    This -- this --
25   Q.    That refers to on-label.
```

```
 1                 MR. KLINE:  She has two questions now
 2          going.  Can he answer the first?
 3                 THE WITNESS:  It refers to the
 4          intended use.  If Janssen's intended use and
 5          is marketing for off-label, it has an
 6          obligation to warn.  But all -- this applies
 7          to everything.  This applies to all warnings.
 8                 It doesn't make sense -- it will not
 9          make sense to anyone to say if I have a
10          warning and I got to let that doc know, of
11          course I got to be able to read that.  You
12          just can't promote the use.  You can't
13          encourage the marketing, but I can always
14          warn.
15   BY MS. SULLIVAN:
16   Q.    And, Dr. Kessler, that refers to intended use
17   which means the approved indication.
18   A.    Wrong.
19   Q.    Well, then, the FDA disagrees with you.
20   A.    No.
21                 MR. KLINE:  See, Your Honor,
22          objection again.
23                 THE WITNESS:  I mean --
24                 THE COURT:  Well, no, no.  That's
25          overruled.
```

```
 1              You may answer, Doctor.
 2    BY MS. SULLIVAN:
 3    Q.    You know, Dr. Kessler, that the FDA disagrees
 4    with you?
 5    A.    No.
 6                   MR. KLINE:  See, Your Honor,
 7           objection again.
 8                   THE COURT:  The FDA disagrees with
 9           what?  When?
10    BY MS. SULLIVAN:
11    Q.    Dr. Kessler knows that the FDA, as indicated
12    by this denial of the pediatric dose and safety
13    information, among other things, disagrees with your
14    opinion that you could just say anything you want in
15    your label about an indication that it's not
16    approved for.
17    A.    Ma'am, I have -- I have studied intended use
18    for 30 years, okay.  And it's a key aspect of our
19    law, right.  And Janssen by going in 20 times to
20    that doctor who was a pediatric neurologist, the
21    totality of the evidence was the intended use was
22    for pediatrics, okay.  And certainly you have a
23    duty, if your intended use is to make sure that
24    you're not -- you tell not just the good, but the
25    whole story.
```

```
 1                    But in any case, in any instances,
 2   right, no one can credibly say you can't warn.  That
 3   just defies all logic.  It defies any humanity.
 4   Q.    Although the FDA told Janssen exactly that
 5   when it came to the safety information about dosing
 6   because it hadn't been approved for kids yet.
 7                    MR. KLINE:  Objection.
 8                    THE WITNESS:  No.  Ma'am, that's not
 9            what FDA is saying.  The FDA is saying -- let
10            me read it.  There were no --
11                    THE COURT:  All right.  What document
12            is this?
13                    MS. SULLIVAN:  This is the document,
14            Your Honor, Defense Exhibit --
15                    MS. BROWN:  We had premarked it, Your
16            Honor, as D-221.
17                    THE COURT:  Which one is it?
18                    MS. SULLIVAN:  It hasn't been
19            admitted, Your Honor.
20                    THE COURT:  If the witness is going
21            to read from it, then it's got to be
22            admissible.
23                    MS. SULLIVAN:  Thank you, Your Honor.
24                    MS. BROWN:  Then it will be Defense
25            15, Your Honor, for our purposes.
```

```
 1                    COURT CRIER:  Sixteen.

 2                    THE COURT:  Sixteen.

 3                    (Counsel and court crier conferring.)

 4                    COURT CRIER:  It's D-15, Your Honor.

 5                    THE COURT:  What is it, D-15?

 6                    COURT CRIER:  Yes, Your Honor.

 7                    THE COURT:  All right.  Let me see it

 8          again.

 9                          -   -   -

10                    (Whereupon Exhibit D-15 was marked

11          for identification.)

12                          -   -   -

13                    THE COURT:  All right.  You may

14          continue.

15                    MS. SULLIVAN:  Thank you, Your Honor.

16   BY MS. SULLIVAN:

17   Q.    And, Dr. Kessler, this was FDA's -- this is

18   official FDA letterhead, right?

19   A.    Yes.

20   Q.    And this is FDA's response, and it talks about

21   Food and Drug Administration, right?

22   A.    Yes.

23   Q.    And this is FDA's response in 1997 to

24   Janssen's request to add safety data about dosing in

25   their adult label for kids -- let me rephrase that.
```

1                    This was FDA's response to Janssen's

2    effort to add information about pediatric dosing in

3    their adult label, right?

4    A.    Yes.

5    Q.    And the FDA says that -- they basically say

6    no, right?

7    A.    If you turn to the second page, yes.

8    Q.    And they say that -- basically telling Janssen

9    you acknowledge that you've not provided substantial

10   evidence from adequate and well-controlled trials to

11   support a pediatric indication nor developed a

12   rationale to extend the results of those studies

13   conducted in adults to children, right?

14   A.    Yes.

15   Q.    And they say -- and we talked about the fact

16   that Janssen was just starting to do studies, they

17   didn't have a lot of studies yet, right?

18   A.    They were early in the development, yes.

19   Q.    And it says, your rationale for proposing this

20   supplement appears to be simply that since Risperdal

21   is being used in pediatric patients, this should be

22   acknowledged in some way in the labeling.  That's

23   what the FDA says, right?

24   A.    Not -- that does not say, as you point out,

25   that you want to include safety information, right.

1    So that -- that's the point.  It's --

2                MR. KLINE:  I think the witness is

3          talking about something that's not on the

4          screen.

5                THE COURT:  Do you want to read the

6          whole document into the record; any of you?

7                MS. SULLIVAN:  I'm sorry?

8                THE COURT:  You want to read the

9          whole document or should I read the whole

10         document into the record?

11               MS. SULLIVAN:  I'm going to read --

12               THE COURT:  Read the whole thing, or,

13         you know, because again we're going to pick

14         apart.  And the document at this point can

15         speak for itself.

16               MS. SULLIVAN:  Okay.

17               Although I will note, Judge, that the

18         plaintiffs were able to read a lot of

19         documents.

20               THE COURT:  Well, I mean, you know,

21         again, this doctor wanted to answer your

22         question by reading from a specific paragraph

23         in this document.  May he do so?

24               MS. SULLIVAN:  I'm sorry?  Of course.

25               THE COURT:  All right.  What is it

```
 1              that you were going to read to us,

 2              Dr. Kessler, from this document?

 3                    THE WITNESS:  If you could kindly go

 4              to the paragraph that starts "accordingly."

 5              And what Dr. Leber is saying beginning with

 6              the sentence, "There were no specific safety

 7              findings of sufficient concern among the

 8              meager safety data submitted to justify

 9              adding any information to the labeling about

10              safety experience with this drug in the

11              pediatric age group.  To permit the inclusion

12              of the proposed vague references to the

13              safety and effectiveness of Risperdal in

14              pediatric patients and the nonspecific

15              cautionary advice about how to prescribe

16              Risperdal for the unspecified target

17              indications would only serve to promote the

18              use of the drug in pediatric patients without

19              any justification."

20                    MS. SULLIVAN:  Yeah.

21                    THE COURT:  That's what you wanted to

22              read?

23                    THE WITNESS:  Yes.

24                    THE COURT:  All right.  You got it.

25    BY MS. SULLIVAN:
```

```
 1   Q.    And, Dr. Kessler, so what they're saying
 2   here -- the FDA is saying is that we're looking at
 3   your safety data and we don't see enough adverse
 4   reactions to justify a pediatric dosing?
 5               MR. KLINE:  Objection.  What the FDA
 6          is saying he just read.
 7               THE COURT:  Again, we now had the
 8          thing read into the record and now it speaks
 9          for itself.  Counsel, you may either go to
10          another question or move on.
11               MS. SULLIVAN:  And --
12               THE COURT:  But this was to
13          explain -- the reason I permitted him to do
14          this was for him to explain an answer which
15          is consistent with this particular statement.
16               MS. SULLIVAN:  Yeah.  And then this
17          particular statement says that we're looking
18          at your data and we don't see any safety
19          issues to justify -
20               MR. KLINE:  Objection.
21               MS. SULLIVAN:  -- this change.
22               THE COURT:  Sustained.  Sustained.
23          You might want to move on or if you want to
24          go to the first page, I don't know.  But that
25          particular paragraph was consistent --
```

```
 1                    MS. SULLIVAN:  I'll move on.
 2                    THE COURT:  -- with his statement
 3          here.
 4                    MS. SULLIVAN:  I'll move on, Your
 5          Honor.
 6   BY MS. SULLIVAN:
 7   Q.    And so, Dr. Kessler, bottom line, the FDA said
 8   no, you can't add pediatric dosing?
 9                    MR. KLINE:  Objection.  It speaks for
10          itself.
11                    THE COURT:  Again, sustained as to
12          the bottom line.  Everything's nuance in this
13          case.
14                    Go ahead.
15   BY MS. SULLIVAN:
16   Q.    Dr. Kessler, I want to talk more about the
17   Findling article and the studies.
18   A.    The Janssen pooled analysis, yes.
19   Q.    Well, it was the Janssen studies, but
20   Dr. Findling, Dr. Moshang and Dr. Daneman, outside
21   authors, were also involved in looking at the data
22   and in the publication; true?
23   A.    At Janssen's request, yes.
24   Q.    Yeah.
25                    And in fact they've testified, and
```

1    you've read their depositions, about their

2    involvement in this process, right?

3    A.     Yeah, I've read their depositions, yes.

4    Q.     Yes.  And --

5                    MR. KLINE:  It's not Dr. Moshang.

6                    MS. SULLIVAN:  Fair enough.

7                    THE COURT:  I'm sorry.  I don't know

8            where we are right now.

9                    MR. KLINE:  Objection to the question

10           which said --

11                   THE COURT:  We haven't heard the

12           question, Mr. Kline.

13                   MR. KLINE:  Well, the last question,

14           Your Honor, I'm sorry.  The last question

15           suggested that there were depositions of

16           Moshang, Daneman and Findling, to my

17           knowledge.

18                   MS. SULLIVAN:  I stand corrected,

19           Dr. Moshang.

20                   THE COURT:  Well, whoever.  Let's do

21           one at a time so that we're on target.

22                   MS. SULLIVAN:  And, Your Honor, and

23           I'll give counsel a copy, I want to put up a

24           demonstrative that just summarizes the number

25           of events in the five -- I don't think this

1          will be controversial -- the five studies

2          that were involved in the -- that were the

3          basis for the Findling analysis.

4                    COURT CRIER:  It's going to be marked

5          D-16, Your Honor.

6                         -   -   -

7                    (Exhibit D-16 marked for

8          identification.)

9                         -   -   -

10                   MS. SULLIVAN:  And it's Defense

11         Exhibit 16.

12                   THE WITNESS:  May I get a copy?

13                   THE COURT:  Do you have copies?

14                   THE WITNESS:  I can look at the

15         screen, if it's simple.

16  BY MS. SULLIVAN:

17  Q.    And, Dr. Kessler, we have put in here, and

18  it's from the studies, and I don't think it will be

19  controversial, the five studies and the incident

20  rate of gynecomastia in each; do you see that?

21  A.    Uhmm, I'm a little off on some of my number of

22  patients on Risperdal.  But I'd be happy to, you

23  know, I assume that's correct.

24  Q.    Yeah.

25  A.    I mean, I -- I have different numbers.  But

1    the incidence of -- the gynecomastia rate is

2    correct.

3    Q.    That's consistent with your recollection?

4    A.    Yes.

5    Q.    Okay.  And just to go back to remind our

6    jurors, what -- so the Findling analysis was not a

7    clinical trial.  It was an analysis about data that

8    had already been gathered in other clinical trials,

9    right?

10   A.    So, yes, it took data from other clinical

11   trials and asked a new question.

12   Q.    Right.

13             And the question it asked wasn't

14   specific to gynecomastia.  It was, let's take a look

15   at whether there's some relationship between

16   prolactin elevation and prolactin-related events.

17   A.    Don't mean to quibble, Ms. Sullivan, but the

18   word was "any" relationship.

19   Q.    Yeah.  Fair enough.

20             In other words, they weren't just

21   looking at gynecomastia.  They were looking at any

22   kind of prolactin-related events?

23   A.    Yes.

24   Q.    And if we could just -- if I can use this

25   board for a second.  See if people can still see it

 1   when it's back here.

 2                  MS. SULLIVAN:  Can you see that all

 3         the way down there?

 4                      -  -  -

 5                  (Jurors nodding.)

 6                      -  -  -

 7                  MS. SULLIVAN:  You can.  Thanks.

 8   BY MS. SULLIVAN:

 9   Q.    So just so -- let's see if there's any pages

10   left here.

11                  Just so we're kind of in a basic

12   fashion for my own benefit, Dr. Kessler, what they

13   were looking at was -- and so prolactin, as we

14   talked about, is a hormone in the body that both men

15   and women have, right?

16   A.    Yes, ma'am.

17   Q.    And so what the authors of the study were

18   looking at was whether elevations in prolactin have

19   some event -- have some relationship to these

20   events, these symptoms or events, right, like

21   gynecomastia or not having your period or some of

22   the other things that we talked about, right?

23   A.    I think we're -- I'm not sure what the -- what

24   these two graphs are.

25   Q.    So this is just a bar representing -- so then

1    what they did is they tested the blood -- in the

2    studies they tested the blood of the patients to see

3    what their prolactin levels were at various points

4    during the time periods.

5    A.    Yes.

6    Q.    And some people had normal prolactin, some

7    people had abnormal prolactin levels; true?

8    A.    Some of the children, yes.

9    Q.    Yes.

10                  And what they wanted to do is to

11   see -- so we'll call this "normal," and we'll call

12   this "elevated."

13                  And what they wanted to see was

14   whether there was any relationship to having

15   elevated prolactin, whether that had any

16   relationship to symptoms, right, or events?

17   A.    Yes.

18   Q.    Okay.  And what they found was that in many

19   cases, the people who had the events had normal

20   prolactin.  They had no relationship to the events.

21   Prolactin had no relationship to the events, right?

22   A.    Yes.

23   Q.    And we'll look at that.

24   A.    Well, why don't we look at the actual numbers.

25   Q.    We will.

1  A.    Let's look at the numbers.  But, yes, there

2  were those.  But as we know, there also was that

3  association that --

4  Q.    Yeah.  And believe me, Dr. Kessler, we're

5  going to get to Table 21.

6             But part of the studies showed that

7  many, many people who had absolutely normal levels

8  of prolactin, people who Risperdal didn't elevate

9  prolactin on, actually did have things like

10 gynecomastia and some of the other events we talked

11 about, right?

12 A.    Yes.

13 Q.    So even people who had normal prolactin had

14 gynecomastia, right?

15 A.    Yes.

16 Q.    And part of the --

17 A.    There were -- but there were fewer of those

18 than who had elevated.

19 Q.    And we're going to look at the data.

20            And part of the reason that normal --

21 people who had no elevation in prolactin had

22 gynecomastia is that it's a fairly common condition

23 in puberty.

24 A.    I think you're testifying.  I'll leave that

25 for the endocrinologist to testify.

1    Q.    Fair enough.  Fair enough.

2                   But they found gynecomastia in people

3    that had nothing to do with prolactin?

4    A.    Yes.  But more with -- the whole in that -- in

5    the statistically significant time frame there were

6    more with those above.

7    Q.    We're going to talk about Table 21, I promise

8    you, Dr. Kessler.  But --

9    A.    Okay.

10   Q.    And just going back, just because you find an

11   association between -- just because people develop

12   an event while they're on a drug doesn't mean the

13   drug caused that event.

14   A.    That's why you -- well, first, you're mixing

15   up several things, okay.  You switched sort of the

16   question.

17   Q.    Well, let me rephrase the question.

18                   A lot of things happen to patients in

19   studies, sometimes from the drugs and sometimes not?

20   A.    That's why -- that's why you have studies.

21   You try to control for that study.

22   Q.    So just because somebody develops an event on

23   a study doesn't mean that it was necessarily

24   associated with a drug?

25   A.    That's correct.

- DAVID A. KESSLER, M.D. - CROSS -          136

1   Q.    And so, for example, if you have a -- say you

2   have a bunch of six-year-olds in a study and you

3   want to see if a medicine causes you to lose your

4   teeth, you're going to have a lot of kids losing

5   their teeth at that age that have nothing to do with

6   the drug?

7   A.    That's one example.  But if you give me a

8   medicine and all of a sudden I start flying across

9   the room, it depends on the uniqueness of the event

10  the commonality of the event.

11  Q.    Yes.

12  A.    I mean, I take your point.

13              Just giving a medicine and seeing a

14  side effect doesn't mean that it's causally related.

15  That's why you study this.

16  Q.    Exactly.

17              And just because somebody developed

18  gynecomastia during the study doesn't necessarily

19  mean that the drug caused the gynecomastia?

20  A.    That's -- well, what kind of study are we

21  talking about?

22  Q.    Any study.

23  A.    Well, so, again, that's -- the reason why if

24  you have two groups and they're, in essence, control

25  for everything else, age, and the only difference is

1    prolactin, that's why you control it, to see whether

2    the association is related to the thing that is the

3    variable.

4    Q.     Do you remember my question, Dr. Kessler?

5    A.     Yes.

6    Q.     My question was, just because somebody

7    develops gynecomastia on a medicine doesn't mean the

8    medicine caused gynecomastia?

9    A.     That is true.

10   Q.     And that's especially true because we know

11   that there's a background rate for gynecomastia.

12   And you're going to defer to the endocrinologist

13   about how many or what percentage.  But we know that

14   boys develop gynecomastia with or without Risperdal.

15   A.     As we saw, there is increased breast tissue

16   for some in puberty.  According to Janssen, it

17   disappears.

18   Q.     And -- well, have you -- and you're not an

19   endocrinologist, Doctor.  But have you seen studies

20   that show in 20 percent of the cases it doesn't

21   disappear?

22   A.     Yeah.  I've looked at -- I've tried to look

23   for that data, and that data is not very clear to

24   me.  But, again, let me leave it to the pediatric

25   endocrinologist to discuss that.

1   Q.    All right.  And so going back to the Findling

2   study, so they had -- so this -- these studies that

3   made it into this manuscript that you and Mr. Kline

4   spent a long time talking to the jury about, was

5   made up of these five studies, right?

6   A.    Yes.

7   Q.    And in four of the studies -- in three of the

8   studies there was no gynecomastia at all.  Nobody on

9   the medicine got gynecomastia, right?

10  A.    That's correct.

11  Q.    And in one study, one person out of 107 had an

12  adverse event?

13  A.    1 percent, yes.

14  Q.    And basically, almost all of the events in

15  this manuscript came from one study?

16  A.    I think we discussed that when we were talking

17  about it.

18  Q.    Yeah.

19  A.    Yes.  Two of those studies are short-term, for

20  example.  We went through that.

21  Q.    A couple of them are long-term?

22  A.    Two are long-term, I believe.

23  Q.    Yeah.

24  A.    I mean, three are long-term.

25  Q.    But 99 percent of the events in the Findling

1    paper that we talked about came from this one study,

2    this INT-41, right?

3    A.    Yes.  The one that Mr. Kline --

4    Q.    Spent a long time talking about.

5    A.    And it was labeled as special attention.

6    Q.    Yeah.  I'm going to show you the special

7    attention.

8                   Do you remember, Dr. Kessler, that in

9    that document they paid special attention to a lot

10   of different things, not just prolactin?  Special

11   attention to --

12   A.    EPS.

13   Q.    Special attention to other things, glucose?

14   A.    There were three things that I believe had

15   special attention, and you applaud them for that.

16   Q.    Yeah.  Right.

17   A.    That's a good thing.  Because if you're

18   looking to do a long-term safety, you want to look

19   for those results.  So those were all important --

20   prolactin-related, glucose, and this thing called

21   extrapyramidal syndrome.

22   Q.    And the truth is, Dr. Kessler -- and after

23   these studies, actually, you know that Janssen did

24   13 more pediatric clinical trials?

25   A.    It supported the autism, yes.

1  Q.     Yes.

2  A.     They were part of the autism protocol, yes.

3  Q.     Yes.

4            And you know that in all 18 studies,

5  they collected prolactin data and they looked at

6  whether there was a relationship between prolactin

7  and the events?

8  A.     You know, I read the FDA review, and I think

9  prolactin data was primarily collected in the DBD

10  studies, but we'd have to go back and double-check.

11  I mean, I have that actually in my notes.  But I

12  think FDA -- I don't think a number of the autism

13  studies collected prolactin.  We'd have to

14  double-check.

15  Q.     Do you remember at least that most of them

16  did?

17  A.     I have a list, if you want to go through each

18  one.

19            MR. KLINE:  Yes.

20  BY MS. SULLIVAN:

21  Q.     We can -- it looks like we're going to be

22  back, Dr. Kessler, so I'll make sure I have it for

23  Monday.

24            But the fact is, Dr. Kessler, in all

25  of the 18 studies, it was really just INT-41, this

1   one study, that they found anything close to a

2   significant number of events, right?

3   A.    No.  When the data was pooled, the

4   significance, right, was based on the pooled data,

5   right.

6                    So the statistical significance was

7   not just based on INT-41.  The statistical

8   significance was based on all five of those studies.

9   Q.    But, Dr. Kessler, if there's no events in

10  three and only one event in one, the statistical

11  significance is caused by the one study that has all

12  the events.  That's like kind of common sense,

13  right?

14  A.    The statistical significance was based on the

15  pooled data.  The number of adverse events, positive

16  adverse events, come from INT-41.

17                    THE COURT:  All right.  May I see

18          counsel at sidebar, please?

19                    MS. SULLIVAN:  Sure.

20                         -  -  -

21                    (The following discussion transpired

22          at sidebar out of the hearing of the jury:)

23                         -  -  -

24                    THE COURT:  All right.  So we all

25          know that this witness is coming back on

1              Monday.  I have a note from the jury that if
2         Dr. Kessler is coming back, the jury would
3         like to leave soon.
4                   MS. SULLIVAN:  Good.  I'm fine.
5                   THE COURT:  So why don't we adjourn
6         in five minutes.  Wrap it up for the day and
7         let him try to catch his flight.
8                   MR. KLINE:  Okay.
9                   MS. SULLIVAN:  Okay.  Sure.  Sounds
10        good.
11                        -  -  -
12                   (Sidebar discussion concluded.)
13                        -  -  -
14                   (The following transpired in open
15        court in the presence of the jury:)
16                        -  -  -
17                   THE COURT:  All right.  Members of
18        the jury, we are going to permit a few more
19        questions and then we are going to adjourn
20        for the day.
21                   (Counsel conferring with technician.)
22                   THE COURT:  You have this document up
23        there.  You may want to wrap it up on this
24        one.
25                   MS. SULLIVAN:  Thank you, Your Honor.

 1   BY MS. SULLIVAN:

 2   Q.     And, Dr. Kessler, there is such a thing as

 3   controlled studies and studies that are open-label

 4   or not controlled, right?

 5   A.     Yes.  Exactly.

 6   Q.     And controlled studies are when you have

 7   people on the drug and people not on the drug and

 8   you compare them?

 9   A.     That's -- well, no.  You can have controlled

10   studies when people are on one drug and people are

11   on another drug.

12   Q.     Fair enough.

13   A.     And you can have built-in controls.

14   Q.     Fair enough.

15              What the FDA requires for you to get

16   a medicine approved is that you do what's called

17   placebo-controlled studies?

18   A.     We'd use up your couple of remaining minutes

19   to answer that.  Not always, ma'am, not always.

20   You --

21   Q.     Generally.

22   A.     It's usually the best way to show

23   effectiveness, but it's not always required.

24   Q.     It's viewed as the gold standard,

25   placebo-controlled studies, for showing

1   effectiveness and for analyzing safety?

2   A.    But all oncology studies are not placebo

3   controlled.  What you're referring to as the gold

4   standard is randomized, double-blind, controlled

5   studies, but not always the placebo.

6   Q.    But INT-41 didn't have a control group, right?

7   It was an open-label study; it didn't have a

8   comparison group?

9   A.    In and of itself, yes.

10  Q.    And INT-41, when you say open-label, that's a

11  study where everybody knows what you're taking.  The

12  doctors know you're on Risperdal and the patients

13  know you're on Risperdal?

14  A.    Well said.

15  Q.    And there's nothing to compare it to?

16  A.    That's why Findling did the experimental.  The

17  Janssen pooled analysis was designed the way it was,

18  so there was something to compare.

19  Q.    And I want to show you -- I think Mr. Kline

20  had it up -- the Croonenbergh study.  Jed, if we

21  could put it up.

22              And so, actually, INT-41 was

23  published, and we talked about it.  You and

24  Mr. Kline talked about the actual publication,

25  right?

 1    A.     The 2005, if I remember.

 2    Q.     Yeah.

 3    A.     Right.

 4    Q.     And you know, Dr. Kessler, that Janssen

 5    published all of their pediatric studies, right?

 6    A.     I don't think -- I think there were a few

 7    foreign studies that I didn't see published.  Let me

 8    just see.  I have my list here.

 9                    So I'm not sure whether, for

10    example -- it's a small point.  Bell 22.  I mean,

11    there are some small studies.  We just have to go

12    through them.

13    Q.     Yeah.  And we can talk to another witness

14    about it, but they published the bulk of their

15    studies.

16    A.     I think that's fair.

17    Q.     At that time there was no obligation for

18    companies to publish their data, but Janssen did it,

19    right?

20    A.     So it's not Findling?

21    Q.     I'm sorry?

22    A.     So it's not Findling?

23                    THE COURT:  Which one are you asking

24            about, Counsel?  We're going to try to wrap

25            this up.

```
 1                MS. SULLIVAN:  Your Honor, I'm happy
 2         to let our jurors --
 3                THE COURT:  We'll come back to this.
 4         I think you were asking about INT-41, right?
 5                MS. SULLIVAN:  Yeah.  I can do it
 6         Monday.
 7                THE COURT:  All right.  I think he
 8         has a plane to catch, and I think the jury
 9         wants to go, so we'll do it that way.
10                MS. SULLIVAN:  Okay.  Fair enough,
11         Your Honor.
12                THE COURT:  Thank you very much.
13                All right.  Members of the jury,
14         we're going to adjourn now for the --
15         Dr. Kessler needs to see if he can make a
16         flight.  And I don't know if he will make it
17         or not, but we'll see, hopefully.  And we are
18         going to adjourn for the weekend.  Come back
19         here on Monday at 9:15.
20                The rules are the same.  Please wear
21         the yellow badges.  Please remember to keep
22         an open mind in this case.  We are not done.
23         And I was going to say by any stretch, but,
24         no, we're not done.  And we are going to ask
25         you, again, not to talk to anybody about the
```

1          case, friends, family, neighbors, anyone.

2          And, again, it's extremely important that we

3          not listen to any media or read any media,

4          probe any media, do anything with TV,

5          newspapers or computers in any way to relate

6          to this case, okay?  Very important for the

7          reason that I said before.

8                    This is our case and we're getting

9          the real thing here, all right?  No reason to

10         go anywhere else, all right?

11                   With that, enjoy the Super Bowl, and

12         we'll see you on Monday morning.

13                   COURT CRIER:  All rise as the jury

14         exits the courtroom.

15                          -  -  -

16                   (Whereupon the jury exited the

17         courtroom at 4:11 p.m.)

18                          -  -  -

19                   (The following transpired in open

20         court outside the presence of the jury:)

21                          -  -  -

22                   THE COURT:  All right.  So,

23         Dr. Kessler, you're excused, sir.  Please do

24         not discuss the case with your lawyers.  You

25         can discuss it with your wife or anyone else

1          you want, but not with any press or anybody

2          like that, and we will see you on Monday.

3                    THE WITNESS:  What time on Monday,

4          sir?

5                    THE COURT:  Well, I mean,

6          realistically I just told them 9:15.  So if

7          you can make it here at 9:15, fine.  If not,

8          I will -- we'll play it by ear, okay?

9                    THE WITNESS:  All right.

10                    MR. KLINE:  You're taking the redeye.

11                    I don't want to talk to him at all in

12          public.  Are you taking the redeye?

13                    THE WITNESS:  That may make the

14          judgment of whether I stay in town or not.

15                    MR. KLINE:  All right.

16                    THE COURT:  Okay.  You got it.

17                    THE WITNESS:  May I e-mail them just

18          so they know whether I'm in --

19                    THE COURT:  Yes.  All right.

20                    MS. SULLIVAN:  Thank you very much,

21          Your Honor.

22                    MR. KLINE:  Thank you, Your Honor.

23                    THE COURT:  Thank you.  Have a great

24          weekend.

25                              -  -  -

```
 1                    (Pause.)

 2                   -  -  -

 3             (Whereupon an off-the-record

 4        discussion was held.)

 5                   -  -  -

 6             THE COURT:  I think that for the

 7        record, I want to be clear that one of these

 8        documents, the one from the -- the document

 9        from the FDA response, we're marking that as

10        court something, Court-2.  It was not

11        admitted, but it's certainly part of the

12        record.

13             The other document, there was another

14        one from Mr. Sheller's office out.  I did not

15        make a formal ruling on that.  I did not

16        study that for the purpose of admissibility.

17        So it's still out there and subject to be

18        looked at again.

19             MS. SULLIVAN:  Thank you, Your Honor.

20             THE COURT:  There was something about

21        Dr. Kessler's opinion in that particular

22        document related to 2003.  I did not rule on

23        that.  I don't want to have it recorded that

24        I made a ruling on something that I haven't.

25             MR. KLINE:  You mean Mr. Sheller's
```

 1              actual letter to the FDA?

 2                   THE COURT:  Yeah.  There's something

 3         in there about Dr. Kessler's 2003 opinion.

 4         And since I haven't read that, and I wasn't

 5         making a ruling about that, it's still out

 6         there.

 7                   MR. KLINE:  Well, Mr. Sheller, who's

 8         the author of it, would be available.  And

 9         Ms. Sullivan could cross-examine him.  That

10         would be worth the price of admission.

11                   THE COURT:  No.  No.

12                        -  -  -

13                   (Whereupon an off-the-record

14         discussion was held.)

15                        -  -  -

16                   MR. SHELLER:  I want you to know that

17         there's cases in federal court now; Duane

18         Morris.

19                   MR. KLINE:  Right.

20                   THE COURT:  Duane Morris handled

21         that?

22                   MR. KLINE:  Yeah.  Yeah.

23                   The federal court case involving that

24         Petition is pending now in front of Judge

25         Savage -- the ruling challenging the FDA's --

1          what they did, which we believe is illegal.

2                    THE COURT:  Well, that case, I see

3          that going upstairs, so, you know, it's not

4          relevant here because it's not decided.

5                    All right.

6                         -   -   -

7                    (Whereupon an off-the-record

8          discussion was held.)

9                         -   -   -

10                    (Court adjourned at 4:20 p.m.)

11                         -   -   -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           C E R T I F I C A T I O N

2

3           I hereby certify that the proceedings

4      and evidence are contained fully and

5      accurately in the notes taken by me on the

6      trial of the above cause, and that this copy

7      is a correct transcript of the same.

8           I further certify that I am not a

9      relative or employee of any attorney or

10     counsel employed in this case.

11

12

13

14     _____

15     John J. Kurz, RMR, CRR
       Registered Merit Reporter
16     Certified Realtime Reporter
       Official Court Reporter
17

18

19          (The foregoing Certification of this

20     transcript does not apply to any reproduction

21     of the same by any means unless under the

22     direct control and/or supervision of the

23     certifying reporter.)

24

25

**[**

**[sic] (1)**
109:24

**A**

**A2d (1)**
5:21
**able (7)**
13:5;43:23;50:3;
62:4;109:11;120:11;
125:18
**abnormal (1)**
133:7
**above (4)**
33:6;47:2;135:6;
152:6
**absolutely (2)**
114:3;134:7
**abstract (3)**
46:13,20;50:5
**accelerated (1)**
108:23
**According (1)**
137:16
**accordingly (1)**
126:4
**accurate (2)**
47:19;49:1
**accurately (1)**
152:5
**acknowledge (1)**
124:9
**acknowledged (1)**
124:22
**across (1)**
136:8
**action (5)**
75:2;81:14,15;
83:9;93:4
**actions (2)**
74:16;84:5
**activities (1)**
84:6
**acts (2)**
90:16;94:3
**actual (5)**
38:10;77:3;133:24;
144:24;150:1
**actually (16)**
16:14;22:19;25:5,
14,17,22;26:18;
33:14;36:15;46:12;
56:3;97:9;134:9;
139:23;140:11;
144:22
**add (6)**
109:19;111:22;
112:2;123:24;124:2;
128:8
**adding (3)**

**36:25;118:4;126:9**
**addition (3)**
25:11;38:23;40:10
**additional (1)**
50:13;55:17
**address (1)**
90:9
**addressed (1)**
7:11
**addressing (1)**
16:21
**adequacy (1)**
79:25
**adequate (4)**
100:16,25;101:3;
124:10
**adequately (9)**
60:12,18;61:17;
62:24;63:1;66:13;
67:16,18;110:3
**adjourn (4)**
142:5,19;146:14,
18
**adjourned (1)**
151:10
**Administration (1)**
123:21
**admissibility (2)**
82:17;149:16
**admissible (10)**
13:15,18;15:4;
76:25;77:21;79:15;
81:5;82:6,6;122:22
**admission (4)**
7:14;8:15;9:6;
150:10
**admitted (7)**
9:3,15;17:15;77:2,
3;122:19;149:11
**admonish (1)**
7:5
**admonishment (4)**
70:22;74:8;81:10,
12
**adolescent (4)**
22:21;33:2;50:23;
104:2
**adolescents (4)**
44:18;96:19;
101:24;110:1
**adult (5)**
96:7,14,16;123:25;
124:3
**adults (14)**
32:6;96:13,22;
97:16;100:19;101:1,
5,10,19,21;102:1;
108:3;110:7;124:13
**advance (1)**
12:25
**adverse (12)**
71:22;78:11;87:17,
19;88:19;92:5;

**106:17;119:19;**
**127:3;138:12;**
**141:15,16**
**advice (1)**
126:15
**advise (1)**
61:9
**advises (1)**
119:13
**advisors (3)**
23:6;27:15;35:8
**advisors' (1)**
34:18
**advisory (4)**
22:21;23:5,5;53:13
**affidavit (1)**
114:23
**afraid (3)**
17:11;70:23;88:7
**afternoon (6)**
19:3,4,11,12,17,18
**again (33)**
10:21;14:5;17:12;
34:15;38:4;39:22;
41:23;43:1;52:5,7;
58:22;68:13,24;
89:18;93:12;99:11;
100:22;107:2,22;
109:8;113:9;120:22;
121:7;123:8;125:13,
21;127:7;128:11;
136:23;137:24;
146:25;147:2;149:18
**against (15)**
56:25;57:5,8,22,
24;58:4,11,14,17;
59:3;61:15;72:3;
74:17;75:2;80:3
**age (6)**
44:18;45:15;
107:11;126:11;
136:5,25
**Agency (1)**
109:23
**Agency's (1)**
110:2
**ago (2)**
87:24;118:13
**agree (5)**
6:3;20:14;27:24;
28:5,14;30:17;43:9;
49:8;65:18;66:15,18,
24;73:3;100:15;
104:1
**agreements (1)**
72:19
**ahead (9)**
11:16;15:2;26:3,
13;30:7,11;31:22;
48:10;128:14
**ahold (1)**
88:6
**alert (1)**

**15:11**
**alerted (1)**
82:2
**allegations (2)**
83:15;84:1
**Allergan (4)**
58:11;59:14;60:15;
64:12
**allow (4)**
14:4;55:13;112:14;
117:22
**allowable (1)**
14:11
**allowed (4)**
58:9;62:19;72:6;
116:7
**allows (1)**
16:3
**almost (1)**
138:14
**Along (1)**
104:7
**alternative (1)**
110:2
**Although (3)**
109:22;122:4;
125:17
**always (8)**
116:6,7;118:7;
120:13;143:19,19,23;
144:5
**among (3)**
118:3;121:13;
126:7
**amount (3)**
12:2;56:17;63:17
**analyses (1)**
45:21
**analysis (26)**
19:22;20:17;37:1,
6;44:18;45:1;46:9;
47:16;48:19;50:9,11,
13;51:9,16,16;52:17;
55:9;56:8;75:13;
79:2;88:8;128:18;
130:3;131:6,7;
144:17
**analyzing (1)**
144:1
**and/or (1)**
152:22
**animal (1)**
108:16
**answered (2)**
69:8;116:12
**anticipating (1)**
84:15
**antipsychotic (1)**
104:1
**apart (1)**
125:14
**apologize (1)**
30:10

**apparent (1)**
37:22
**apparently (1)**
39:18
**appeal (1)**
85:15
**appears (1)**
124:20
**applaud (1)**
139:15
**apples (1)**
93:7
**applications (1)**
108:22
**applies (2)**
120:6,7
**apply (3)**
59:8,9;152:20
**applying (2)**
23:24;29:4
**approval (7)**
10:10;102:17;
103:2,8,10,14;
106:24;108:14,25;
109:3
**approvals (2)**
8:20;10:15
**approve (1)**
103:13
**approved (33)**
14:8;15:21,22;
96:9,18;97:5;100:19;
101:4,10,18,20;
102:1,3,6,7,19,21,24;
103:21;104:11;
106:9;107:14;108:3,
10,12;110:7;112:3,
20;116:3;120:17;
121:16;122:6;143:16
**April (1)**
5:25
**argument (3)**
71:18;93:14;94:1
**around (1)**
32:1
**article (8)**
19:21;20:5,11,16;
40:18;44:3;49:10;
128:17
**aside (1)**
86:19
**aspect (1)**
121:18
**aspects (2)**
59:7,9
**associated (7)**
41:20;42:12;43:10,
24,25;119:19;135:24
**association (9)**
42:17;43:12;53:25;
54:4;68:10;69:15;
134:3;135:11;137:2
**associations (1)**

55:6
**assume (4)**
23:2;33:22,25;
130:23
**assure (2)**
64:6;115:6
**attach (1)**
103:13
**attached (1)**
8:20
**attempt (1)**
7:6
**attendees (2)**
34:11,12
**attention (7)**
28:10;139:5,7,9,11,
13,15
**Attorney (2)**
57:19;152:9
**attributable (1)**
44:13
**attributed (3)**
50:15;51:10;55:20
**attributing (1)**
55:11
**August (1)**
107:6
**authenticate (1)**
77:11
**authenticated (1)**
77:21
**author (2)**
41:9;150:8
**authorized (1)**
65:6
**authors (31)**
23:9;25:10;26:17;
29:5;31:3;32:24;
33:14,18,25;34:14,
21,23,24;36:24;37:6;
38:24;39:6,11,11,18;
40:10,11;41:7,18;
43:21;45:18;51:8;
55:18,19;128:21;
132:17
**authors' (3)**
34:3,17;35:6
**autism (5)**
91:5;104:11;
139:25;140:2,12
**available (3)**
79:16;82:5;150:8
**average (2)**
108:24;109:1
**aware (2)**
32:14;109:24
**away (1)**
55:3
**awhile (2)**
10:22;19:19

**B**

**back (33)**
24:10;25:8;26:23;
31:24;32:15,16;
50:17;52:24;53:2;
67:1,3;73:25;84:11;
89:22;90:8,10;94:8,
14;95:16;102:12;
107:4;108:21;
117:20;131:5;132:1;
135:10;138:1;
140:10,22;141:25;
142:2;146:3,18
**back-and-forth (1)**
103:5
**background (7)**
31:25;32:5,25;
42:7;43:16,22;
137:11
**bad (2)**
94:3;115:21
**badges (1)**
146:21
**bar (1)**
132:25
**Bard (1)**
58:4
**based (12)**
8:25;15:12;24:19;
74:7;84:4,7;86:22;
107:2;141:4,7,8,14
**basic (1)**
132:11
**basically (4)**
7:12;124:5,8;
138:14
**basing (1)**
79:2
**basis (1)**
130:3
**Bates (6)**
21:22,23,24,25;
22:2;37:25
**Bayer (3)**
57:8;59:13;60:14
**Bayer's (1)**
64:11
**bear (1)**
93:16
**beg (2)**
72:23;92:10
**begin (1)**
19:6
**beginning (2)**
51:20;126:5
**behalf (4)**
19:7;57:21;58:21;
65:6
**Bell (1)**
145:10
**below (1)**
47:2
**bench (1)**
12:15

**benefit (1)**
132:12
**Bernstein's (1)**
18:10
**best (2)**
55:13;143:22
**better (1)**
59:22
**bias (1)**
60:4
**big (1)**
43:16
**Binder (3)**
22:8,14;36:23
**bit (1)**
72:20
**black (11)**
73:21;76:19;87:3;
88:15;89:1;91:7,14;
92:17,21,21;93:5
**blood (2)**
133:1,2
**blurts (2)**
86:24;89:7
**board (6)**
22:21;23:5,5;
40:19;53:13;131:25
**body (1)**
132:14
**boggle (2)**
54:1,6
**bologna (1)**
79:3
**book (1)**
38:17
**both (5)**
54:5;76:2;77:19;
85:8;132:14
**bottom (3)**
22:8;128:7,12
**botulism (1)**
58:13
**Bowl (1)**
147:11
**box (11)**
73:21;76:19;87:3;
88:15;89:1;91:7,14;
92:17,21,21;93:5
**boy (1)**
48:12
**boys (26)**
23:25;25:1;29:3,
11,17;31:4,17;32:7,9;
33:2;34:5;35:4;
36:25;37:7;43:23;
46:8,10,11;48:19;
49:4;50:9,23;51:21;
52:14;53:8;137:14
**brand (2)**
93:19,19
**break (7)**
11:23;12:7;17:9;
70:6,8;71:4,11

**breast (1)**
137:15
**briefly (1)**
11:7
**bring (6)**
77:8;79:10;81:20;
82:15;94:8;118:18
**bringing (3)**
15:7;74:16;88:8
**brought (2)**
57:21;90:16
**BROWN (2)**
122:15,24
**built-in (3)**
33:11;45:16;
143:13
**bulk (1)**
145:14
**bullet (1)**
33:21
**bunch (3)**
56:25;57:2;136:2
**business (7)**
8:17,19,22,24;
9:15;11:11;83:4

**C**

**calculations (1)**
27:5
**call (3)**
98:22;133:11,11
**called (4)**
38:25;57:10;
139:20;143:16
**CAM (1)**
32:16
**came (5)**
88:24;109:12;
122:5;138:15;139:1
**can (84)**
5:6;9:7;10:3,6,10;
11:23;12:1,5;14:4;
21:10,17;24:10;25:9;
26:1;27:16;28:4;
30:24;31:8;34:7,13;
37:18;38:11;40:22;
41:2;43:9;46:24;
47:6;48:15;52:5,20,
21,23;55:16;57:11;
58:24;60:6;61:23;
62:19;63:5,15;64:5,
9;67:20;69:3;70:6;
77:11;81:13;82:4,7,
8;83:18;92:17;97:13;
103:11;105:3;
106:13;110:8;112:2;
113:12,12,19;114:4,
12,14;115:3;118:7,
22;120:2,13;122:2;
125:14;130:14;
131:24,25;132:2,7;
140:21;143:9,13;

145:13;146:5,15;
147:25;148:7
**Canada (1)**
22:15
**careful (6)**
32:18,21;61:10;
68:25;102:20;113:9
**carefully (1)**
87:12
**Carin (3)**
22:8,14;36:23
**carrying (1)**
75:8
**case (59)**
5:21;6:3,14;13:9;
20:1,23;41:14;58:5,
16;62:23,25;63:16,
19;64:6,15;67:6,7,12,
15;68:1;69:14,24;
71:23,25;74:1,5;
75:19,23;79:3;80:9;
81:14;82:3,20;84:1,4,
17;85:7,17,23;87:1;
88:5;91:8;92:16;
93:23;94:2,24;112:2;
114:4;117:11;122:1;
128:13;146:22;
147:1,6,8,24;150:23;
151:2;152:10
**cases (22)**
6:6,7;7:4;12:22,25;
23:16;24:14;31:1,3;
57:20;58:13;63:12,
12,15,17;64:15,18,
24;93:17;133:19;
137:20;150:17
**catch (2)**
142:7;146:8
**causally (1)**
136:14
**causation (2)**
28:13;43:12
**cause (4)**
44:19;93:4;117:24;
152:6
**caused (4)**
135:13;136:19;
137:8;141:11
**causes (3)**
43:11,15;136:3
**cautionary (1)**
126:15
**certain (12)**
13:20,21,22;59:7;
61:22;63:20;66:11,
12,13;73:22;104:18;
109:8
**certainly (7)**
31:8;99:12,18;
101:9;115:8;121:22;
149:11
**Certification (1)**
152:19

**certified (5)**
7:24,25;9:8,10;
152:16
**certify (2)**
152:3,8
**certifying (1)**
152:23
**cetera (2)**
23:7;60:16
**challenging (1)**
150:25
**chance (2)**
9:22;58:23
**change (2)**
30:16;127:21
**changes (1)**
103:1
**characteristics (1)**
45:10
**characterize (2)**
99:16;109:23
**cherry-pick (3)**
27:25;28:5,21
**chief (4)**
25:17;26:16;52:13;
53:7
**child (2)**
22:21;104:2
**children (24)**
44:17;58:13;96:10,
18,22;97:5,17,23;
99:9,24;101:11,23;
102:6,14;105:20;
106:1,7;108:3,6;
109:25;112:21;
116:16;124:13;133:8
**Children's (1)**
41:5
**choice (1)**
81:3
**CHOP (4)**
25:18;31:14;52:13;
53:7
**circle (1)**
47:17
**circled (1)**
47:16
**circumstances (1)**
66:12
**cite (1)**
118:9
**cited (1)**
16:16
**citizens (7)**
57:21;71:6;73:13;
75:11;83:8,11;86:12
**clarifications (1)**
43:2
**clear (17)**
35:12;39:13;50:7,
16;52:11;53:5;55:8;
56:4;66:5;77:15;
82:19;90:13;99:7;

103:11;116:20;
137:23;149:7
**cleared (1)**
102:19
**clearly (2)**
81:15;97:16
**client (2)**
74:18;94:4
**clients (2)**
58:20,21
**clinical (5)**
79:4;131:7,8,10;
139:24
**clinically (1)**
56:7
**close (1)**
141:1
**colleague (2)**
105:21;110:13
**collected (3)**
140:5,9,13
**column (2)**
48:18,19
**coming (6)**
26:23;69:23;76:15;
98:6;141:25;142:2
**comment (1)**
30:18
**commentary (2)**
26:8;86:10
**comments (4)**
39:6,9,12;40:21
**Commissioner (2)**
114:16;119:13
**common (2)**
134:22;141:12
**commonality (1)**
136:10
**commonly (1)**
44:14
**companies (11)**
57:1,2,3;59:3,5,8;
103:9;109:1;114:4;
116:1;145:18
**company (14)**
29:6,16;38:25;
40:11;56:6;60:12,14,
18;61:15,16;85:11;
109:9;115:9;116:23
**company's (4)**
59:5;62:24;103:6;
108:18
**comparatively (1)**
103:23
**compare (3)**
143:8;144:15,18
**comparing (1)**
96:4
**comparison (2)**
33:9;144:8
**completely (4)**
47:19;79:11;91:3;
96:6

**complex (1)**
63:16
**complicated (1)**
12:22
**comply (1)**
9:23
**compound (2)**
51:5;60:25
**computers (1)**
147:5
**concern (4)**
112:25;115:25;
118:3;126:7
**concerned (10)**
32:25;67:4;81:7,
11;85:6;90:14,15;
91:12;112:16;118:21
**concerns (3)**
44:1,2;100:13
**concluded (7)**
63:18;67:15,17;
79:1;92:7;105:23;
142:12
**concludes (2)**
87:18;102:25
**conclusion (2)**
83:5;111:22
**conclusions (3)**
17:5;83:7;103:12
**condition (1)**
134:22
**conduct (4)**
66:12;81:4;85:22;
86:1
**conducted (1)**
124:13
**conferring (3)**
95:22;123:3;
142:21
**confident (1)**
13:15
**confusing (1)**
67:5
**consider (2)**
86:5,15
**consistent (3)**
127:15,25;131:3
**contain (2)**
73:21;109:22
**contained (1)**
152:4
**contains (1)**
46:1
**contest (1)**
46:6
**contested (1)**
11:19
**continue (5)**
74:22,24;93:1;
95:12;123:14
**continuing (1)**
110:21
**control (8)**

33:11;43:19;45:16;
135:21;136:24;
137:1;144:6;152:22
**controlled (9)**
44:23;45:11,14;
143:3,4,6,9;144:3,4
**controls (1)**
143:13
**controversial (2)**
130:1,19
**convened (3)**
22:21;23:4;44:3
**copies (5)**
38:2;39:19;110:16;
111:14;130:13
**copy (10)**
5:23;15:7;21:10,
18,18;38:12;110:13;
129:23;130:12;152:6
**core (2)**
13:8;14:2
**corrected (1)**
129:18
**correlation (1)**
68:20
**counsel (22)**
5:23;6:19;18:14;
26:12;36:6;40:1;
61:9;64:21;68:14;
70:25;71:17;80:18;
95:22;97:12,12;
123:3;127:9;129:23;
141:18;142:21;
145:24;152:10
**countenanced (1)**
72:15
**couple (2)**
138:21;143:18
**course (13)**
8:19;9:18,20;
16:22;21:11;27:23;
28:10;69:6;106:14;
109:16;110:17;
120:11;125:24
**court (298)**
5:2,5,6,16;7:2,20,
24;8:4,6,11,23;9:5,
13,19;10:2,7,12,17,
24;11:2,9,16,25;12:3,
6,9,23;13:1,3,5,11,
13;14:4,12,16,22;
15:11;16:8,12;17:6;
18:4,9,13,16,18,22;
19:2,5,21:12,17,17,
20,24;22:3;23:25;
26:3,10;29:22;30:1,6,
11,15;31:19;35:13;
36:6,10,12,17,20;
37:21;38:4,8,13,15,
18;39:22,25;40:2,3;
41:23;42:2,20;43:6;
45:2;47:7;48:3,9;
50:25;51:5,24;52:2,

18;53:1,18;54:20,23;
56:12;57:13;58:8,22;
59:16,20;60:1,5,11,
24;61:2,6,9;62:1,5,
12,14,18;63:10,14,
24;64:21;67:2;68:6,
8,13;69:4,11,17,19,
22;70:7,9,11,18,20,
23;71:3,7,10,16;72:3,
11,13,15,16,18,25;
73:4,23;74:6,22,24;
75:7,16;76:2,6,8,13,
22;77:9,13,17,25;
78:12,18;79:5,13,19;
80:16,17,18,24;81:1,
24;82:4,11,16,18,21;
83:1,11,16;84:2,12,
20,24;85:16;86:21;
87:8;88:4,9,17,22;
89:9,13,17;90:6,8;
91:1,6,11,20;92:1,9,
19,24;93:12,13,25;
94:7,13,20,25;95:4,9;
98:3,10,14,20;99:5;
103:12;105:8,10,14;
109:6;110:23;111:2,
6,9,10,12,17,25;
112:6;113:22;
114:10;116:13,18;
117:7,14,19;118:16,
21;119:1;120:24;
121:8;122:11,17,20;
123:1,2,3,4,5,6,7,13;
125:5,8,12,20,25;
126:21,24;127:7,12,
22;128:2,11;129:7,
11,20;130:4,13;
141:17,24;142:5,15,
17,22;145:23;146:3,
7,12;147:13,20,22;
148:5,16,19,23;
149:6,10,20;150:2,
11,17,20,23;151:2,10
**Court-2 (1)**
149:10
**courtroom (11)**
5:15;18:19,25;
70:15;71:14;85:12;
90:17;95:1,7;147:14,
17
**CR (1)**
58:4
**credibly (1)**
122:2
**CRIER (14)**
5:5;18:18;21:20;
22:3;70:9;94:25;
111:9,12;123:1,3,4,6;
130:4;147:13
**critical (2)**
104:14,24
**criticizing (1)**
104:9

**Croonenbergh (1)**
144:20
**cross (2)**
76:12;82:9
**cross-examination (18)**
5:9,19;6:4;10:22,
25;11:23;14:14,23;
16:20;19:7,14;69:7;
75:15;76:23;88:10;
90:11;94:3;95:13
**cross-examinations (1)**
15:12
**cross-examine (2)**
91:13;150:9
**CRR (1)**
152:15
**CSA (1)**
7:17
**current (1)**
76:20
**currently (1)**
72:2
**cut (5)**
59:4,14,18,24;
100:5
**cutting (2)**
54:20;68:13

**D**

**D-15 (4)**
111:12;123:4,5,10
**D-16 (2)**
130:5,7
**D-221 (1)**
122:16
**Daneman (9)**
29:7;34:22;41:4;
50:8;51:9;55:11,20;
128:20;129:16
**Daneman's (4)**
54:13,16,25;55:2
**dark (1)**
72:20
**data (45)**
24:2,7;25:1;27:4,
12,16;29:12,17;31:5,
11;49:7;50:3;54:5;
55:25;68:20;78:15;
96:12,13,15,23;
100:12;105:19,23;
107:3,10;109:22;
112:2;118:2,4;
123:24;126:8;127:3,
18;128:21;131:7,10;
134:19;137:23,23;
140:5,9;141:3,4,15;
145:18
**database (2)**
39:3,16
**day (3)**
20:2;142:6,20
**days (5)**

**cross-examination (18)**
20:25;49:17;64:5;
87:24;108:13
**DBD (1)**
140:9
**dealing (1)**
28:17
**decide (3)**
40:22;47:10;100:9
**decided (1)**
151:4
**decision (1)**
103:8
**defend (3)**
76:1,7;78:8
**defendant (1)**
85:9
**defendants (2)**
15:6;64:16
**defense (12)**
5:23;6:8,17,20;
92:11;97:14;98:12;
99:3;111:7;122:14,
24;130:10
**defer (1)**
137:12
**defies (2)**
122:3,3
**definition (3)**
50:12;92:4,8
**definitions (1)**
32:21
**definitive (1)**
81:8
**degree (1)**
69:6
**demonstrative (4)**
95:17,25;97:13;
129:24
**denial (1)**
121:12
**denied (1)**
84:2
**Department (1)**
83:20
**depends (2)**
43:18;136:9
**deposed (1)**
77:5
**deposition (10)**
20:1,9,13;54:14,
16;55:1,3,4;97:3,22
**depositions (5)**
32:23;56:22;129:1,
3,15
**description (1)**
32:17
**design (1)**
43:18
**designed (1)**
144:17
**details (1)**
63:17
**determine (2)**

47:8;101:6
**develop (3)**
108:11;135:11;
137:14
**developed (2)**
124:11;136:17
**development (1)**
124:18
**develops (2)**
135:22;137:7
**dictate (1)**
103:1
**difference (6)**
43:12;45:12;83:24;
93:2;112:22;136:25
**different (21)**
10:15;14:25;16:1;
59:5;74:8;75:6;87:2,
16;90:25;91:4;93:7;
94:23;96:21,23;
103:1;106:18;113:7;
115:24;118:19;
130:25;139:10
**difficult (1)**
88:5
**difficulty (1)**
80:20
**diligent (1)**
92:25
**direct (6)**
6:24;16:21;17:1;
30:21;76:22;152:22
**disagree (5)**
69:15;76:11;79:12;
113:16;114:3
**disagreed (2)**
71:22;72:9
**disagrees (11)**
65:10,13,17;77:16;
78:8;118:11,17;
120:19;121:3,8,13
**disappear (1)**
137:21
**disappears (2)**
32:20;137:17
**disclosed (1)**
103:18
**disclosing (1)**
103:19
**discovered (1)**
119:20
**discuss (7)**
33:12;57:16;65:14;
70:11;137:25;
147:24,25
**discussed (2)**
30:14;138:16
**discussion (13)**
9:7;10:4;42:4;
72:5;81:6;90:3;
94:11,18;141:21;
142:12;149:4;
150:14;151:8

**discussions (1)**
27:9
**disparaging (1)**
15:15
**displayed (2)**
21:5;95:21
**dispute (3)**
20:8;49:20;99:22
**disputes (1)**
11:17
**distinctions (1)**
93:18
**distributor (1)**
119:17
**ditch (1)**
16:5
**doc (1)**
120:10
**Docket (1)**
94:24
**Doctor (19)**
27:14;42:20,23;
50:2,6;52:20;56:3;
57:5;61:7;64:20;
66:6;68:12;114:18,
25;118:22;121:1,20;
125:21;137:19
**doctors (7)**
40:20;49:21,24;
106:24;107:18;
110:8;144:12
**doctor's (1)**
57:15
**document (56)**
8:10;11:19;21:5;
25:5;27:6;28:22;
35:3,21;36:17;38:5,
19;40:5;56:15;60:6;
74:3,7,9;76:9;77:3,
11,14,18,23;78:3;
79:20,23;86:7,25;
87:10,11;88:1,11,13;
89:3,6;91:21;92:1;
94:22;95:21;105:18;
110:19,24;112:13;
122:11,13;125:6,9,
10,14,23;126:2;
139:9;142:22;149:8,
13,22
**documents (30)**
7:14,25;8:18,25;
9:2,8,12,25;10:8;
12:4,7;13:20,22,24;
15:4;17:7,10,14,15;
26:25;27:2,4,5;
32:23;68:21;77:1;
116:21;117:11;
125:19;149:8
**DOJ (1)**
90:15
**dollars (1)**
56:23;60:20
**done (7)**

55:9;86:22;102:16;
106:23;110:6;
146:22,24
**door (7)**
7:2;16:23,25;78:4,
22;81:4;113:23
**door's (1)**
6:25
**dose (10)**
106:16,21;109:20;
113:1,6,8,13;115:18;
116:14;121:12
**dosing (26)**
105:20,22;106:9,
12,13,16,18,19,25;
107:19,23;110:8;
111:21,25;112:15;
115:16;116:10,22;
117:23,24;122:5;
123:24;124:2;127:4;
128:8
**double-blind (1)**
144:4
**double-check (2)**
140:10,14
**doubt (1)**
40:15
**doubts (1)**
47:17
**down (7)**
23:13;67:11;73:23;
79:11;81:19;98:15;
132:3
**Dr (195)**
5:12,14;6:24;
16:20;17:19,22;
18:13;19:17,19,21,
25;20:4,4,7,18,22;
21:2,8,19;22:5,14,24;
23:7,22;24:4,12;
25:8;26:15,15;27:7,
17,22,24;28:4,19,25;
29:6,7,7;30:25;
31:24;32:22;33:15;
34:7,20,22,22;35:12,
20;36:16,22;38:10,
23;40:9;41:3,4,5,10,
13;43:9;44:5,12,22;
45:18,25;46:24;
47:12;48:2,12;50:8,
8;51:4,7,8,9;52:10;
53:3,15,16;54:11,13,
15,16;55:8,11,11,16,
19,19;56:17;59:2;
60:10;61:15;62:22;
63:21;64:8;65:3,9,17,
25;66:15;67:14,25;
68:17,24;69:13;70:2;
71:4,10,13,21;73:15;
76:12;77:16;78:10,
20;79:12;82:3;84:13;
88:14,18,21,22;91:9,
13,17,23,23;95:16,

24;97:3,15,22;98:1;
99:7,12,13,17,21,22;
100:15;101:4,25;
102:4,10,23;103:25;
105:2,17;108:9;
110:17;111:14;
112:12,13;113:14,23;
114:1,23;115:13;
116:8,22;117:5;
118:11;119:23;
120:16;121:3,11;
123:17;126:2,5;
127:1;128:7,16,20,
20,20;129:5,19;
130:17;132:12;
134:4;135:8;137:4;
139:8,22;140:22,24;
141:9;142:2;143:2;
145:4;146:15;
147:23;149:21;150:3

**draft (1)**
39:9

**drag (1)**
79:9

**drove (2)**
56:2,2

**drug (32)**
14:8;45:7;59:8;
65:18,19,21;66:16,
19,25;75:3;78:23;
85:13;87:4;108:25,
25;112:17;113:3,3;
117:24;119:20;
123:21;126:10,18;
135:12,13,24;136:6,
19;143:7,7,10,11

**drugs (3)**
86:1;109:12;
135:19

**Duane (2)**
150:17,20

**due (1)**
36:2

**during (13)**
10:25;14:13;17:1;
26:8;30:21;31:20;
32:9;44:14;67:14;
119:1,3;133:4;
136:18

**duty (1)**
121:23

### E

**ear (1)**
148:8

**early (1)**
124:18

**effect (5)**
16:15;119:6,8,15;
136:14

**effective (1)**
99:9

**effectiveness (9)**
28:13;66:9;97:17;
99:18,24;102:14;
126:13;143:23;144:1

**effects (4)**
44:7,13;106:22;
119:19

**efficient (1)**
109:9

**effort (2)**
16:5;124:2

**either (2)**
15:25;127:9

**elaborate (1)**
69:6

**elevate (1)**
134:8

**elevated (7)**
23:18;41:19;42:11;
43:24;133:12,15;
134:18

**elevation (4)**
44:13;45:13;
131:16;134:21

**elevations (1)**
132:18

**Eli (3)**
58:14,17;64:12

**eliminated (1)**
86:22

**ELMO (1)**
21:4

**else (11)**
43:10;45:15;56:15;
77:2;78:21;86:20;
92:20;93:6;136:25;
147:10,25

**elsewhere (1)**
85:19

**e-mail (13)**
21:9;22:7;29:14;
33:17;46:16;51:19;
52:10;53:4;54:13;
56:4,11,12;148:17

**e-mails (5)**
11:14;17:16;28:20;
32:18;77:2

**eminent (1)**
54:7

**employed (1)**
152:10

**employee (1)**
152:9

**employees (2)**
34:1,2

**encourage (1)**
120:13

**encouraged (1)**
107:1

**end (5)**
9:7;42:25;85:6;
92:16;103:6

**endo (2)**

**29:5;37:1**

**endocrinologist (6)**
50:14;55:4;134:25;
137:12,19,25

**endocrinologists (18)**
24:22;25:15;29:15;
31:13;41:7;43:21;
50:8,18;51:17,20;
52:12;53:6,12;54:2,
7;55:10,24;56:6

**endocrinology (7)**
25:18;26:16;31:14;
51:8;52:13;53:7;
55:18

**endos (5)**
23:19;29:2;34:20,
21,25

**endos' (8)**
23:24;29:3,4,9,10;
31:2;34:17;35:3

**enforced (1)**
6:16

**enjoy (1)**
147:11

**enormous (2)**
49:23;63:16

**enough (10)**
99:20;106:23;
127:3;129:6;131:19;
135:1,1;143:12,14;
146:10

**entered (2)**
18:24;95:6

**enters (2)**
18:19;95:1

**entire (1)**
35:25

**entirely (1)**
94:24

**entitled (1)**
64:1

**EPS (1)**
139:12

**especially (2)**
85:8;137:10

**essence (5)**
33:8,11;44:25;
45:16;136:24

**essential (1)**
59:7

**Essentially (1)**
7:11

**established (5)**
97:18,24;99:25;
101:12;102:14

**et (2)**
23:7;60:16

**even (11)**
16:16;28:19;37:5;
76:1,7;78:7;89:6;
106:9;112:3,19;
134:13

**event (15)**

**13:13;71:23;78:11;**
87:17,19;88:19;92:5;
132:19;135:12,13,22;
136:9,10;138:12;
141:10

**events (24)**
45:20;46:1;51:10;
55:11;68:4;106:18;
129:25;131:16,22;
132:20,20;133:16,19,
20,21;134:10;138:14,
25;140:7;141:2,9,12,
15,16

**everybody (5)**
19:3;49:6;89:9;
95:10;144:11

**everyone (5)**
19:11;49:9,15;
73:23;89:10

**Everything's (1)**
128:12

**Evidence (18)**
7:13,18;21:14;
69:23;76:14,14;
78:14;82:5;84:5;
92:10,12;94:4;101:7;
109:24;113:21;
121:21;124:10;152:4

**evidentiary (2)**
11:17;82:22

**exact (3)**
24:10;34:19;42:9

**exactly (22)**
9:24;24:3;33:24;
35:1;39:12;55:14;
65:21,24;73:3,6;
87:20,23;97:19;
99:17;102:3;103:14;
107:12;112:18;
116:17;122:4;
136:16;143:5

**examination (4)**
16:22;17:1;30:21;
76:23

**example (5)**
90:19;136:1,7;
138:20;145:10

**except (1)**
45:11

**exception (2)**
8:16,17

**exclude (8)**
50:9,22;51:21;
52:14;53:8,24,25;
54:3

**excluded (2)**
50:13;55:17

**excluding (1)**
51:10

**Excuse (1)**
39:25

**excused (1)**
147:23

**executive (1)**
15:18

**Exhibit (15)**
21:3,16;38:11,21;
97:14;98:13,17;
107:4;109:17;111:6,
7;122:14;123:10;
130:7,11

**existence (1)**
7:20

**exited (4)**
5:14;70:14;71:14;
147:16

**exits (2)**
70:10;147:14

**expansive (1)**
16:3

**experience (2)**
118:6;126:10

**experiment (1)**
43:18

**experimental (1)**
144:16

**expert (7)**
6:10;24:19;58:21;
59:5,11;77:12;91:18

**expertise (1)**
58:3

**experts (3)**
25:13;31:14;83:6

**explain (10)**
37:11,13;41:2;
57:16;62:20;64:2;
66:22,23;127:13,14

**explained (1)**
58:25

**exploding (1)**
85:7

**extend (1)**
124:12

**extensive (1)**
6:4

**extensively (1)**
104:5

**extent (2)**
14:3;110:19

**extrapyramidal (1)**
139:21

**extremely (1)**
147:2

### F

**face (3)**
85:10;88:3;89:5

**fact (24)**
14:10;15:11;24:21;
25:3;26:15;29:1;
36:23;41:3,19;44:6;
55:14,24;72:1;76:10;
82:9;86:6;87:6;
102:11;109:18;
110:3;113:2;124:15;

128:25;140:24

**Facts (3)**
14:10;15:21,21

**failed (7)**
64:10,11,11,12,13;
67:16,18

**failure (1)**
63:13

**failure-to-act (1)**
93:3

**failure-to-warn (1)**
64:18

**fair (17)**
12:2;15:22;18:1;
56:17;97:2;99:20;
104:23;106:4;
110:11;129:6;
131:19;135:1,1;
143:12,14;145:16;
146:10

**fairly (1)**
134:22

**false (1)**
115:3

**familiar (2)**
93:16,17

**family (1)**
147:1

**famous (1)**
24:24

**far (5)**
9:6;81:6,10;84:8;
91:11

**fashion (2)**
10:2;132:12

**favor (1)**
65:20

**FDA (144)**
8:9,18,20;9:11,11;
10:10,11;14:8,19,20;
15:4,17,18,23;17:5,
24;65:4,7,10,13,17,
23;66:15,18,24;
67:10,14,23;68:1,18,
21;69:13,23;70:1;
71:21,21;72:3,9,9;
73:18,19,20,22;
75:12,14,18;76:11,
18;77:8,12,16;78:8,
13,19,19;79:6;81:16,
17,23;82:2,10,12;
83:2,6,10,14;84:12,
25;87:17;90:15;92:6,
17;93:6,11,23;94:24;
100:23;101:4;102:1,
3,15,19,20,22,24;
103:7,10,11,13,21;
104:21;105:19,22;
107:2,7,14,17;
108:10,21,22,23;
109:1;110:5,19;
112:13;113:14,15;
114:1,2,3;115:13,14,

25;116:1,8,21,23;
117:13,22;118:1,11,
12,17,18;119:10,11;
120:19;121:3,8,11;
122:4,9,9;123:18;
124:5,23;127:2,5;
128:7;140:8,12;
143:15;149:9;150:1

**FDA's (14)**
16:24;79:1;86:13,
14;88:8;110:14;
111:21;112:4,25;
123:17,20,23;124:1;
150:25

**fear (1)**
117:23

**federal (11)**
16:2;72:3;82:16;
90:24;114:15;118:9;
119:4,9,12;150:17,23

**feds (1)**
15:1

**fee (1)**
5:18

**fees (1)**
7:3

**felt (3)**
23:23;29:4,10

**few (5)**
87:9;89:21;109:11;
142:18;145:6

**fewer (1)**
134:17

**Fifteen (1)**
111:9

**figure (1)**
50:3

**filed (1)**
9:21

**filing (1)**
9:20

**fill (1)**
72:21

**final (3)**
27:6;103:7;119:7

**find (4)**
38:16;39:16;
104:18;135:10

**finding (3)**
27:20;54:9;104:25

**findings (5)**
85:17;104:6,6;
118:2;126:7

**Findling (18)**
20:11,15;23:10;
24:23;25:9;26:6;
37:12;41:13;128:17,
20;129:16;130:3;
131:6;138:1,25;
144:16;145:20,22

**Findling's (1)**
19:21

**fine (5)**

9:6;16:17;94:7;
142:4;148:7

**finish (4)**
62:4;63:8,24;
112:24

**finished (5)**
23:10;33:18;53:21;
63:22;106:2

**firm (2)**
83:3,13

**First (21)**
5:17;12:17;29:24;
30:1,4,33:21;44:3;
46:9;50:11;63:3;
89:14;90:12;96:17;
98:15;99:2;110:23,
25;111:4;120:2;
127:24;135:14

**five (9)**
46:2;56:21;63:11;
129:25;130:1,19;
138:5;141:8;142:6

**flashed (1)**
98:25

**flat (1)**
114:6

**flight (2)**
142:7;146:16

**floor (1)**
117:8

**flying (1)**
136:8

**folks (1)**
25:11

**follow (5)**
5:20;6:20;21:21;
93:10,24

**following (8)**
5:1;18:21;70:17;
90:5;95:3;141:21;
142:14;147:19

**follows (2)**
6:5;53:2

**Food (2)**
59:7;123:21

**forbids (1)**
7:13

**foregoing (1)**
152:19

**foreign (1)**
145:7

**formal (2)**
83:9;149:15

**former (2)**
113:15;114:3

**fortunate (2)**
26:12,12

**forward (2)**
17:7;69:11

**Fosamax (2)**
57:25;58:2

**found (3)**
133:18;135:2;

141:1

**four (4)**
25:12,12;40:10;
138:7

**Fourteen (2)**
99:4,5

**fourth (1)**
63:13

**frame (1)**
135:5

**Frankly (3)**
59:21;78:3;81:1

**friends (1)**
147:1

**front (5)**
7:5;38:6;41:17;
98:19;150:24

**full (1)**
53:11

**fully (2)**
53:11;152:4

**fundamental (1)**
86:18

**further (2)**
50:6;152:8

**furthermore (1)**
115:2

## G

**Gahan (2)**
22:18,20

**game (1)**
15:22

**gathered (1)**
131:8

**gave (3)**
20:18;68:1;107:17

**general (4)**
16:18;31:25;42:3;
61:21

**generally (7)**
16:15;40:23;59:10;
97:2;108:24;110:19;
143:21

**Generals (1)**
57:19

**generated (1)**
7:4

**generic (1)**
93:18

**germane (2)**
60:2;85:18

**gets (2)**
91:6;102:19

**given (2)**
9:22;75:14

**giving (2)**
26:25;136:13

**glad (1)**
13:5

**glucose (2)**
139:13,20

**goes (8)**
23:13,22;42:16;
57:14;60:3;68:25;
79:23;84:11

**gold (2)**
143:24;144:3

**Gomez (2)**
38:5,7

**good (18)**
6:1;17:20,20;19:2,
4,11,12,17,18;24:25;
27:24;28:20;39:2;
40:21;121:24;
139:17;142:4,10

**governed (1)**
119:4

**government (10)**
8:1;74:16;75:1,21;
78:22;84:15,25;86:9;
90:18,24

**governs (1)**
119:11

**graphs (1)**
132:24

**gray (2)**
43:15,17

**Great (3)**
39:5;99:12;148:23

**grounds (4)**
8:15;9:6;52:3;
74:11

**group (12)**
22:19,20,24;23:4,
14,15;27:15;35:8;
107:11;126:11;
144:6,8

**groups (8)**
33:6;34:16;44:24;
45:1,7,9,12;136:24

**guess (1)**
6:17

**guidance (1)**
7:7

**guide (2)**
5:22;6:1

**guideline (1)**
6:14

**guidelines (1)**
5:10

**guise (2)**
116:2,7

**gun (1)**
78:9

**guys (1)**
36:1

**gynecomastia (49)**
23:16,19,25;24:1,7,
9,14;25:1;29:3,10,12;
31:2,25;32:1,9,19;
33:1;34:5;36:25;
41:20;42:12;43:23;
46:1;47:3;48:12,20;
49:4,13;50:22;68:4;

87:18;101:14;
130:20;131:1,14,21;
132:21;134:10,14,22;
135:2;136:18,19;
137:7,8,11,14;138:8,
9

## H

**habit (1)**
26:7
**Hahnemann (1)**
5:20
**hair (2)**
43:15,17
**hand (4)**
18:15,17;60:19;
61:18
**handled (1)**
150:20
**happen (5)**
25:4;45:22;113:1;
115:22;135:18
**happened (1)**
46:2
**happening (1)**
114:21
**happens (1)**
32:10
**happy (6)**
33:12;38:16;92:22;
118:9;130:22;146:1
**hard (2)**
21:18;104:10
**harmful (1)**
119:18
**head (1)**
63:11
**heading (1)**
9:11
**healthcare (1)**
119:17
**hear (3)**
54:18;72:16;74:13
**heard (10)**
11:6,9;25:9;28:3;
71:15;86:4;88:14,18;
99:20;129:11
**hearing (1)**
141:22
**hearsay (11)**
13:25;15:3,25,25;
16:9,10,17;17:12,13;
76:24;110:20
**held (6)**
90:3;94:11,18;
149:4;150:14;151:8
**help (1)**
38:5
**Hence (1)**
110:1
**hereby (1)**
152:3

**Here's (3)**
13:17;91:16;92:4
**hey (3)**
12:24;14:17;15:2
**hidden (1)**
55:6
**hiding (6)**
24:1,6;29:12,17;
31:5,11
**high (1)**
106:21
**higher (1)**
45:13
**highly (1)**
80:5
**himself (2)**
30:18;71:11
**hire (1)**
58:21
**hired (1)**
78:9
**history (1)**
104:2
**HIV (1)**
109:13
**hold (5)**
15:9;48:3;57:9;
65:20;71:7
**Honor (125)**
6:22;8:3;9:14;10:5,
20;11:1,8,13;12:8,11;
13:7;15:3,5;17:3;
18:6,7;19:10;21:15,
20;25:24;26:6;35:18;
36:9;37:19,24;38:3,
7;39:20;42:1;50:20,
24;58:19;59:15,23;
60:4,22;61:11;62:10,
17;65:1;68:25;69:16,
20;70:3,21;72:2,10,
24;73:6,7,9;74:20,21;
75:5,10,11,24;76:17;
77:7,22;78:6,17;79:1,
8;80:7,23;81:22;
82:1,8,20;83:5,21,22;
84:10,19,22;85:15;
86:3,15,18;87:14;
89:5,12;90:23;91:10;
92:3,14,15;93:21;
94:5;95:14;97:25;
98:19;99:4;105:3;
110:18;111:1,19;
112:10;113:17;
116:17;118:14,15,20;
119:5;120:21;121:6;
122:14,16,19,23,25;
123:4,6,15;128:5;
129:14,22;130:5;
142:25;146:1,11;
148:21,22;149:19
**hope (1)**
13:1
**hopefully (4)**

10:18;16:19;90:10;
146:17
**Hopkins (1)**
41:15
**hormone (1)**
132:14
**Hospital (2)**
5:20;41:5
**hour (2)**
56:23;60:20
**hours (1)**
20:6
**humanity (1)**
122:3
**hypothetically (1)**
44:13

## I

**identification (2)**
123:11;130:8
**identified (1)**
23:19
**illegal (1)**
151:1
**impeach (1)**
78:2
**impeachment (1)**
62:11
**implies (1)**
106:16
**importance (1)**
20:20
**important (8)**
27:13;104:25;
108:12;109:10,12;
139:19;147:2,6
**improper (1)**
89:16
**improved (1)**
63:20
**inadequate (1)**
63:18
**incidence (3)**
45:14;47:13;131:1
**incident (2)**
49:4;130:19
**include (8)**
24:7,8,24;29:18;
33:1;46:8,18;124:25
**included (3)**
27:7;48:13;49:6
**includes (2)**
46:10;47:12
**including (11)**
24:23;29:17;31:13,
17;34:5;35:4;46:17;
51:5;52:13;53:6;81:2
**inclusion (1)**
126:11
**inclusive (1)**
50:12
**income (1)**

6:11
**incorrect (1)**
40:25
**increased (1)**
137:15
**independently (1)**
77:20
**indicate (3)**
112:20;116:21;
117:12
**indicated (1)**
121:11
**indication (12)**
66:10;91:4;100:17,
18;101:17,25;102:5;
107:22,23;120:17;
121:15;124:11
**indications (1)**
126:17
**individual (2)**
57:25;58:5
**industry (1)**
93:23
**inflamed (1)**
28:8
**inflammatory (1)**
80:6
**information (28)**
28:1,6;73:14,19;
100:16;103:16,19;
105:23;106:8,12,13,
13,15,24;107:19;
110:8;112:15,18,19;
115:11,15;116:1;
118:5;121:13;122:5;
124:2,25;126:9
**inherently (1)**
88:10
**initiate (1)**
92:17
**inquiry (2)**
111:18;112:5
**insistence (1)**
55:9
**instance (2)**
115:14;116:8
**instances (2)**
109:8;122:1
**instead (2)**
54:18;89:6
**instruct (1)**
112:8
**instructed (1)**
71:5
**instruction (2)**
70:22;92:16
**instructions (2)**
72:7;92:22
**INT-41 (8)**
139:2;140:25;
141:7,16;144:6,10,
22;146:4
**intend (1)**

8:11
**intended (15)**
100:23,24,24;
101:1,2,6,20,23;
102:8;120:4,4,16;
121:17,21,23
**intending (1)**
9:25
**interest (1)**
42:21
**interject (2)**
74:3;76:18
**interjected (1)**
71:25
**internal (1)**
43:19
**interpret (2)**
31:8;53:23
**interpretation (2)**
30:13;52:1
**interrupted (1)**
13:6
**interruptions (1)**
11:20
**into (18)**
6:12,23;11:10,18;
32:16;60:11;69:1;
71:25;83:18;84:4;
85:19,20;90:16;94:4;
125:6,10;127:8;
138:3
**introduce (1)**
7:24
**introduced (1)**
111:20
**introduction (1)**
77:4
**invite (1)**
35:15
**invites (2)**
75:8;94:3
**inviting (1)**
64:23
**involve (1)**
63:12
**involved (7)**
26:20;81:25;85:17,
22;91:1;128:21;
130:2
**involvement (1)**
129:2
**involves (1)**
90:25
**involving (6)**
17:12;72:3;83:19;
90:17;95:18;150:23
**irrelevant (2)**
91:8;94:2
**issue (33)**
14:17;31:11;60:2,
11,17;61:16;66:5;
67:25;68:25;73:12,
17;75:6,11;78:25;

80:9;81:1,21;82:22;
84:23;85:18;86:11,
12;87:3,15;91:14,17;
100:22;112:1,6;
116:22,22,24;117:12
**issues (23)**
5:11;7:10;16:9,10;
23:1,11;67:5;69:2;
71:20;72:4;75:19;
76:11;78:10;83:8,18,
19;84:6;85:7,19;
87:1;90:17;96:24;
127:19
**ITT (1)**
48:18

**J**

**jack (1)**
14:13
**Janssen (71)**
8:18;9:17;19:7,22;
20:17;22:15,15,20;
23:4,14,23;24:8,13;
25:11;29:14;30:25;
31:5,12;33:4,5,25;
34:1;35:6;37:5;
39:16,24;40:10;
41:18;52:12;53:5,12;
55:23;56:4;60:15;
67:15,18,23,24;68:1,
19,23;76:6;78:7;
102:10;103:22;
104:9,14,24;105:17,
18,25;106:6,22;
107:7,9;108:5;
109:18;112:14;
116:9;117:13;
121:19;122:4;124:8,
16;128:18,19;
137:16;139:23;
144:17;145:4,18
**Janssen's (11)**
22:25;66:12;86:16;
100:24;101:2;
102:18,21;120:4;
123:24;124:1;128:23
**Jed (1)**
144:20
**Jensen (1)**
34:13
**John (2)**
117:9;152:15
**Johnson (14)**
59:12,13;75:2,2,22,
22;78:23,23;83:19,
19;85:24,24;86:1,1
**journal (1)**
40:18
**journal's (1)**
40:19
**Judge (20)**
5:24;8:5,14;11:22;

16:6;53:21;54:22;
76:5;77:10;79:10,22;
91:19;93:9;98:9;
105:13;111:5,14;
115:7;125:17;150:24
**judgment (3)**
85:3,12;148:14
**jumping (1)**
14:13
**June (1)**
119:7
**jurors (9)**
20:19,22;24:5,20;
50:18;99:20;131:6;
132:5;146:2
**jury (48)**
5:2;7:5;10:4;
11:19;17:23;18:18,
22,24;19:4,12;25:9;
27:21;36:5;47:8;
54:17;66:2;67:18;
70:9,14,18;72:8;
84:14;88:6;90:6;
92:22;93:2,15;94:1,8,
14,25;95:4,6,11;96:4;
98:19;112:8;138:4;
141:22;142:1,2,15,
18;146:8,13;147:13,
16,20
**Justice (1)**
83:20
**justification (2)**
113:4;126:19
**justify (4)**
118:4;126:8;127:4,
19

**K**

**keep (2)**
39:18;146:21
**keeper (1)**
98:21
**keeping (1)**
37:1
**keeps (1)**
42:14
**Ken (1)**
21:4
**Kentucky (1)**
57:20
**kept (1)**
6:19
**Kessler (143)**
5:12,14;6:24;
12:24;17:19,22;
18:13;19:17,19;20:4,
18,22;21:2,8,19;22:5,
14,24;23:22;24:4,12;
25:8;26:15;27:7,17,
22,24;28:4,19,25;
30:25;31:24;32:22;
33:15;34:7,20;35:12,

20;36:16,22;38:10,
23;40:9;41:3;43:9;
44:5,12,22;45:18,25;
46:24;47:12;48:2,12;
51:4,7;52:10;53:3,15,
16;54:11,15;55:8,16;
56:17;59:2;60:10;
61:15;62:22;63:21;
64:8;65:3,9,17;66:1,
15;67:14,25;68:17;
69:13;70:2;71:4,10,
13;73:15;76:12;
77:16;78:10,20;
79:12;88:14,19;
95:16,24;97:15;99:7,
22;100:15;101:4,25;
102:4,10,23;103:25;
105:2,17;108:9;
110:17;111:14;
112:12,13;113:14,23;
114:1;115:13;116:8,
22;117:5;118:11;
119:23;120:16;
121:3,11;123:17;
126:2;127:1;128:7,
16;130:17;132:12;
134:4;135:8;137:4;
139:8,22;140:22,24;
141:9;142:2;143:2;
145:4;146:15;147:23
**Kessler's (6)**
16:20;71:21;82:3;
84:13;149:21;150:3
**key (1)**
121:18
**kids (29)**
32:6;45:14,19;
46:10,17,18;47:1,13;
49:5,13;100:13;
102:9,17;104:11;
106:10,18,20,21;
107:14,19;109:19,21;
110:6;115:11;116:3,
4;122:6;123:25;
136:4
**kind (13)**
12:19;17:11;34:12;
40:4;74:25;75:9;
79:20;83:17;113:24;
131:22;132:11;
136:20;141:12
**kindly (1)**
126:3
**kinds (2)**
83:18;89:19
**kingdom (1)**
58:24
**Kline (153)**
6:23;11:6,14;
12:11;13:4,12,17;
16:11;18:3,7,9,11,14;
19:19;21:21;23:9;
24:4,21;25:23;26:2,4,

7;29:19,24;30:3,8,12;
31:15;35:21;36:4,5,
9;37:14,16,18,24;
38:6;39:20,23;42:18,
25;46:7;50:17,20,24;
51:2,12,23,25;52:15;
53:17;54:19,25;56:9,
20;58:9,19;59:15;
60:22;61:1,4,8,24;
62:3,12,15;63:22;
66:23;67:1;68:2,7;
69:16,18,20;70:3,21,
25;71:5,8,15,17;
72:12,14;73:7,9,12,
25;76:17;79:8,23;
80:5,8,12,14,22,25;
82:23;83:22;86:16;
87:6,20,23;88:2,12,
18;89:4,11,15;95:17,
25;97:10,25;98:18;
100:3,10;105:3,9;
109:4;110:18;
111:15,16;113:17,20;
114:7,18;116:11;
118:14,17;120:1,21;
121:6;122:7;125:2;
127:5,20;128:9;
129:5,9,12,13;138:3;
139:3;140:19;142:8;
144:19,24;148:10,15,
22;149:25;150:7,19,
22
**Kline's (1)**
7:9
**knew (6)**
97:4,5,23;99:13,
18;106:6
**knowledge (1)**
129:17
**known (2)**
104:19,25
**knows (5)**
69:13;76:17;108:5;
121:11;144:11
**Kurz (1)**
152:15
**Kusumakar (1)**
41:10

**L**

**lab (1)**
108:16
**label (44)**
62:24;63:18,20;
69:2;73:16,17,20;
76:20;79:24;80:9;
84:7;91:22;93:5;
96:2,3,7,7,12,16;
97:4,10,12,15,16;
98:6;99:23;100:16,
20,25;101:11;102:18,
25;103:6,10,13;

106:9;109:20;
111:23;112:3,15;
115:16;121:15;
123:25;124:3
**labeled (4)**
66:3,16,19;139:5
**labeling (6)**
93:9;110:2;118:5;
119:14;124:22;126:9
**labels (3)**
63:1;95:18;98:8
**label's (1)**
79:25
**lack (1)**
105:4
**last (8)**
56:21;63:11;73:18;
75:2;117:14,16;
129:13,14
**last-minute (1)**
16:5
**late (3)**
7:9;9:20;89:18
**later (1)**
26:23
**Laughter (1)**
98:24
**law (1)**
13:14;14:4,25;
59:8;9:82:17;83:3;
84:21;85:1,2;121:19
**lawsuit (1)**
72:2
**lawyer (1)**
63:1
**lawyers (6)**
58:5,12,15,18,20;
147:24
**leading (2)**
31:13;41:13
**learned (1)**
89:4
**least (4)**
16:1;56:21;103:21;
140:15
**leave (3)**
134:24;137:24;
142:3
**Leber (2)**
105:21;126:5
**left (3)**
27:12;43:3;132:10
**leg (3)**
28:8,8,10
**legitimate (1)**
40:21
**length (1)**
35:15
**letter (13)**
69:25;71:9,21;
76:16;78:18;81:7;
83:2,14;87:2;103:14;
107:6,9;150:1

**letterhead (1)**
123:18
**letters (2)**
10:11;82:18
**letting (1)**
37:19
**level (2)**
33:8;92:7
**levels (8)**
23:17;44:14;
116:10;117:23,24;
133:3,7;134:7
**likes (2)**
18:14;98:22
**Lilly (4)**
58:14,16,17;64:13
**limine (6)**
9:21;12:20;13:8;
73:2;86:21;89:19
**limit (2)**
10:3;33:7
**limitation (1)**
114:21
**line (3)**
28:21;128:7,12
**list (5)**
23:16;31:1;34:14;
140:17;145:8
**listen (1)**
147:3
**listing (5)**
24:1;29:11;31:3,4;
64:16
**lists (1)**
46:2
**literature (1)**
32:13
**litigate (1)**
64:23
**litigation (2)**
57:25;58:18
**little (6)**
6:18;20:19;32:3,4;
72:20;130:21
**live (1)**
69:24
**living (1)**
25:20
**logic (1)**
122:3
**long (9)**
6:12;12:3,6;32:1;
108:9,11;109:8;
138:4;139:4
**longer (1)**
25:20
**long-term (4)**
138:21,22,24;
139:18
**look (36)**
17:9;25:5;27:18;
28:9,14,18,20;30:24;
33:13,13;37:12;

38:10;44:4;45:24;
56:3;60:7;61:21;
77:17;80:22;87:12;
88:11;89:21;92:22;
101:7;105:18;108:1;
110:13;116:2;
130:14;131:14;
133:23,24;134:1,19;
137:22;139:18
**looked (7)**
39:2;78:9;87:25;
118:1;137:22;140:5;
149:18
**looking (19)**
16:19;22:7;32:22,
23;52:10,11;53:3,4;
88:13;109:17;
114:15;127:2,17;
128:21;131:21,21;
132:13,18;139:18
**looks (1)**
140:21
**lose (1)**
136:3
**losing (1)**
136:4
**lot (13)**
37:16;43:15;51:1;
73:19;80:20;85:16;
104:5;108:22;
124:17;125:18;
135:18;136:4;139:9
**Louisiana (1)**
57:19

## M

**ma'am (17)**
22:11;27:23;34:6;
36:2;37:9,11;44:8;
46:20;48:8;49:2;
60:1;65:11;96:1;
121:17;122:8;
132:16;143:19
**maintained (1)**
9:17
**maintains (1)**
8:18
**makes (5)**
50:7,16;55:8;
103:7,10
**making (3)**
93:1;115:10;150:5
**males (1)**
23:17
**manipulation (1)**
78:15
**manufacturer (2)**
103:17;119:16
**manufacturers (2)**
92:18;93:9
**manuscript (11)**
23:8,10,16;24:9;

31:1;33:18;37:2;
39:10,14;138:3,15
**manuscripts (1)**
39:7
**many (12)**
10:12;25:1;44:7,
12,17;45:19;62:8;
113:20;133:18;
134:7,7;137:13
**Marianne (3)**
98:20,23;99:1
**mark (2)**
97:13;98:14
**marked (5)**
10:18;110:24;
123:10;130:4,7
**market (2)**
113:10,12
**marketing (3)**
91:1;120:5,13
**marking (2)**
98:10;149:9
**massive (1)**
85:11
**material (1)**
12:20
**materials (1)**
77:20
**Mathisen (16)**
19:25;20:4,7;
68:24;88:21,22;91:9,
13,17,23,23;97:22;
98:1;99:12,13,21
**Mathisen's (2)**
97:3;99:17
**matter (6)**
16:19;70:12;87:7;
92:21,23;109:11
**matters (2)**
15:14;78:24
**may (43)**
5:19;8:8;9:2;11:6,
9,21;19:9;21:21;
37:11,13,25;38:12;
40:3;7;48:1,9;52:4;
54:4,23;59:23;63:17;
64:15;66:22;69:20;
70:3,4;71:15;84:24;
92:11,15;95:9;
110:16;112:24;
117:1;121:1;123:13;
125:23;127:9;
130:12;141:17;
142:23;148:13,17
**Maybe (6)**
11:11;53:15;65:25;
91:18;100:21;117:4
**MDL (1)**
58:6
**meager (3)**
105:24;118:3;
126:8
**mean (37)**

28:9;33:10;42:16;
43:11;44:25;54:1,21;
55:23;61:21;64:5;
66:10;67:22,23;69:1;
80:24;81:23;82:12;
100:5;102:8,15;
111:24;115:2;
120:23;125:20;
130:25;131:17;
135:12,23;136:12,14,
19;137:7;138:24;
140:11;145:10;
148:5;149:25
**means (5)**
25:22;26:24;47:9;
120:17;152:21
**measure (1)**
104:4
**media (3)**
147:3,3,4
**medical (3)**
8:21;10:11;32:13
**medicine (29)**
43:15;66:7;80:11;
97:4;99:8;101:9;
102:15,24;103:13,23;
104:11;105:19;
106:1,7;107:14;
108:2,10,12;109:2;
110:7;112:20;116:3;
136:3,8,13;137:7,8;
138:9;143:16
**medicines (2)**
104:3;108:12
**meeting (4)**
22:23;24:18;27:13;
34:13
**Members (3)**
95:11;142:17;
146:13
**memo (5)**
12:15;13:19;14:1,
2;18:8
**memorandum (1)**
16:12
**memory (1)**
114:17
**men (1)**
132:14
**mention (1)**
16:14
**mentioned (2)**
7:20;20:2
**Merck (8)**
57:6,17,22,24;
59:12;60:14;64:10;
75:23
**mess (2)**
33:2;51:22
**messing (1)**
33:10
**might (5)**
26:4;80:22;84:14;

86:3;127:23
**mind (6)**
16:24;54:1,6;
75:22;93:16;146:22
**minds (2)**
17:24;30:19
**minute (1)**
51:24
**minutes (6)**
10:19;24:18;87:9;
89:21;142:6;143:18
**misbranding (1)**
115:5
**misleading (1)**
115:4
**missing (1)**
33:4;68:18
**mistaken (1)**
90:13
**mistimed (1)**
31:20
**mistrial (1)**
70:24
**mistrial-land (1)**
84:4
**misunderstood (1)**
65:25
**mixing (2)**
106:11;135:14
**Mohn (1)**
5:20
**Molinaro (1)**
5:24
**moment (2)**
5:13;9:1
**Monday (7)**
140:23;142:1;
146:6,19;147:12;
148:2,3
**money (1)**
12:24
**more (13)**
14:6;16:3;32:3,4;
50:12;56:7;64:9;
90:9;128:16;135:4,6;
139:24;142:18
**morning (1)**
147:12
**Morris (2)**
150:18,20
**Moshang (12)**
26:15;29:7;34:22;
41:5;50:8;51:8;
55:11,19;128:20;
129:5,16,19
**most (2)**
104:1;140:15
**motion (8)**
7:10,11;9:21;
12:20;16:4;70:5,6;
73:2
**motions (3)**
13:8;72:19;89:19

**Motive (1)**
27:10
**move (9)**
37:22;64:22,25;
70:21;116:18;
127:10,23;128:1,4
**moved (1)**
74:23
**moving (1)**
70:24
**much (6)**
10:2;16:3;35:25;
59:3;146:12;148:20
**multi-billion-dollar (1)**
90:21
**multiple (1)**
64:16
**Murphy (6)**
72:21,23;73:8;
86:3;87:11;105:7
**must (1)**
41:24

**N**

**name (1)**
59:5
**named (1)**
75:3
**Namely (1)**
17:22
**narrow (2)**
58:2;76:11
**national (1)**
109:10
**naturally (1)**
25:2
**nature (2)**
8:24;85:5
**NDA (1)**
108:14
**necessarily (3)**
90:14;135:23;
136:18
**necessary (1)**
81:11
**need (9)**
7:10;9:24;35:13;
67:7,11;69:8;77:20;
78:2;85:20
**needed (2)**
76:20;88:15
**needs (4)**
66:6;87:3;99:1;
146:15
**neglected (1)**
7:19
**negligence (2)**
81:15;93:23
**negligent (1)**
93:3
**negotiation (1)**
103:3

**neighbors (1)**
147:1
**neither (1)**
50:17
**neurologist (1)**
121:20
**New (6)**
22:23;23:18;34:12;
75:23;108:25;131:11
**newspapers (1)**
147:5
**next (3)**
45:24;64:24;105:6
**Nobody (1)**
138:8
**nodding (1)**
132:5
**nonetheless (2)**
106:6;109:24
**nonspecific (1)**
126:14
**nor (1)**
124:11
**normal (9)**
23:17;33:7,8;
133:6,11,19;134:7,
13,20
**normally (1)**
109:23
**note (3)**
6:23;125:17;142:1
**notes (4)**
33:17;48:1;140:11;
152:5
**notice (1)**
13:16
**Nova (1)**
41:10
**November (5)**
22:8,10,12,22;
90:22
**nuance (1)**
128:12
**number (17)**
6:5,6,8;21:14,22,
24,25;37:25;48:16,
17;49:19;86:25;
129:24;130:21;
140:12;141:2,15
**numbers (8)**
6:13,13;7:3;19:20;
46:5;130:25;133:24;
134:1

**O**

**Object (4)**
29:19;60:23;61:4,8
**objecting (1)**
12:14
**objection (44)**
8:25;25:23,24;
29:23;30:2,3,12;

31:15,19;39:21;
50:24,25;51:23;
52:15;56:9;58:19;
59:15;60:24;62:1;
68:2,6;69:16;74:7;
86:23;97:25;98:1;
105:7;109:4,4;
110:18,22;113:17,20;
114:7;116:11;
118:14,15;120:22;
121:7;122:7;127:5,
20;128:9;129:9
**objections (1)**
17:12
**obligation (2)**
120:6;145:17
**obviously (1)**
20:7
**occasionally (1)**
12:22
**October (3)**
88:24;91:24;92:2
**off (4)**
54:20;68:14;100:5;
130:21
**office (2)**
69:1;149:14
**officer (1)**
10:11
**Official (8)**
7:22;9:2,11;16:14,
15;17:4;77:11;
123:18
**officials (1)**
15:23;113:15,15;
114:2,3
**off-label (8)**
97:6;99:14,19;
113:19;114:5;
115:16;119:22;120:5
**off-the-record (6)**
90:2;94:10,17;
149:3;150:13;151:7
**often (1)**
102:25
**oncology (1)**
144:2
**one (56)**
6:19;8:6,15;16:16;
17:5,20;18:12;25:17;
26:16;31:13;32:22;
35:20;36:23;42:21;
43:20;44:1,2;45:11;
47:4,9;48:3;63:15,
19;67:20;68:19;
80:16;81:2;83:1;
84:16;86:20;88:14;
93:13,19;94:21;
98:15;114:13;122:2,
17;129:21;136:7;
138:11,11,15;139:1,
3;140:18;141:1,10,
10,11;142:24;

143:10;145:23;
149:7,8,14
**on-label (1)**
119:25
**only (20)**
14:1;15:1,20;16:4;
34:21;45:12;47:9;
52:20;62:3;92:16;
101:4,10;102:1;
110:7;115:3,4;
118:21;126:17;
136:25;141:10
**open (11)**
5:1;16:22;18:21;
70:17;78:22;81:3;
90:5;95:3;142:14;
146:22;147:19
**opened (2)**
6:25;7:3
**opening (3)**
16:25;78:4;113:23
**open-label (3)**
143:3;144:7,10
**opens (1)**
75:23
**opinion (11)**
5:24;75:14;82:3,
10;104:24;113:16;
114:4;115:8;121:14;
149:21;150:3
**Opinions (5)**
14:11;26:25;59:25;
69:14;72:8
**opportunity (2)**
42:25;91:12
**opposed (1)**
116:15
**opposite (1)**
26:5
**options (1)**
110:2
**oranges (1)**
93:7
**order (4)**
5:5;40:17;66:7;
115:11
**ordinary (2)**
8:19;9:17
**others (2)**
14:11;62:16
**otherwise (3)**
11:10;25:21;76:24
**out (31)**
5:13;6:2,3,18;
14:21;27:12,25;28:5,
21;34:11;38:5;41:14;
43:3;50:3;71:12;
86:24;87:21,24;
88:24;89:6,7,8;91:8;
103:11;110:12;
124:24;138:11;
141:22;149:14,17;
150:5

143:10;145:23;
149:7,8,14
**outcome (1)**
90:14
**outdated (1)**
86:11
**out-of-court (3)**
13:24;17:14;79:14
**out-of-state (1)**
17:14
**outside (42)**
5:2;6:14;23:6;24:6,
19,22;25:10,13;29:6,
16;31:3,12;34:1,3,4,
21,23;35:5;37:6;
38:24,24;39:11,17;
40:11,20;41:6,9,18;
43:20;50:7,18;52:12;
53:6;55:10,19;56:6;
70:18;85:12;88:9;
90:6;128:20;147:20
**over (19)**
17:8;24:21;29:17;
36:25;43:1,16,17;
46:8,10;48:20;49:5,
13;52:14;53:8;56:21;
63:11;80:14,19,19
**overdose (1)**
106:20
**overlaps (1)**
34:10
**overruled (8)**
30:6;31:21;52:3,
19;98:4;109:6;
114:10;120:25
**overtop (1)**
40:1
**overturned (2)**
85:14;86:2
**own (4)**
57:15;88:8;92:11;
132:12

**P**

**P-0857 (1)**
94:24
**P-40 (1)**
36:18
**P-45 (3)**
21:5;22:3;36:19
**P-49 (1)**
38:13
**Pa (2)**
5:21;7:17
**packer (1)**
119:16
**Page (22)**
6:2,18;18:7;36:1,8,
15,17,22;41:18,22;
42:6,8,18;44:8,9;
45:24;47:1,9;109:17;
119:10;124:7;127:24
**pages (1)**
132:9

**paid (1)**
139:9
**pamphlets (2)**
86:8,10
**Pandina (1)**
22:18
**PANEL (2)**
19:4,12
**paper (31)**
25:11;26:17;32:24;
34:25;36:24;38:23;
40:9,13;41:18;44:4,
6;45:22,25;46:8,16,
19,21,22,25;47:4,6;
49:15,16,17;50:6,7,
16,23;51:7;55:8;
139:1
**paragraph (3)**
125:22;126:4;
127:25
**paragraphs (1)**
59:18
**pardon (1)**
72:23
**part (15)**
6:10;8:21;9:18;
27:9;46:22;71:23;
94:1;97:12;103:2;
104:21;134:6,16,20;
140:2;149:11
**particular (16)**
7:23;66:10;75:3;
81:6,21;85:10,13,23;
88:23;90:15;91:21;
93:14;127:15,17,25;
149:21
**parties (2)**
77:19;85:8
**party (1)**
72:18
**paste (3)**
59:4,14,18
**pasted (1)**
59:24
**patient (3)**
67:8;96:21;108:16
**patients (9)**
110:9;113:3;
124:21;126:14,18;
130:22;133:2;
135:18;144:12
**Paul (1)**
105:21
**Pause (4)**
11:4;48:14;94:15;
149:1
**peculiarity (1)**
7:13
**pediatric (32)**
24:22;25:15,18;
29:5,15;37:1;43:21;
50:14;51:8,20;55:18;
56:6;106:2,25;

107:10,11;111:21;
112:14;113:3;
121:12,20;124:2,11,
21;126:11,14,18;
127:4;128:8;137:24;
139:24;145:5
**pediatrics (2)**
100:25;121:22
**pediatrics' (1)**
34:4
**peer (1)**
39:15
**peer-review (3)**
39:1;40:14,23
**peg (1)**
82:21
**pending (1)**
150:24
**Pennsylvania (6)**
7:12;14:4,25;
15:25;85:1;113:21
**people (20)**
22:20;24:24;27:12;
30:19;43:16,17;
131:25;133:6,7,19;
134:7,8,13,21;135:2,
11;143:7,7,10,10
**per (2)**
6:7;51:16
**perceived (1)**
31:4
**percent (5)**
32:13;46:4;137:20;
138:13,25
**percentage (2)**
6:7;137:13
**percentages (3)**
32:12;47:23,24
**perhaps (1)**
117:2
**period (8)**
67:9;118:22,23;
119:1,4,5,12;132:21
**periods (1)**
133:4
**permanent (1)**
32:20
**permissible (1)**
117:25
**permission (1)**
69:5
**permit (12)**
7:24;30:20;35:16;
37:21;45:3;53:18;
57:13;76:6;85:24;
113:24;126:11;
142:18
**permits (1)**
103:12
**permitted (9)**
6:5,11;11:14;17:1,
13;57:15;75:1;82:13;
127:13

**permitting (1)**
94:22
**persistent (1)**
87:10
**person (6)**
17:5;22:15;77:4;
78:19;79:6;138:11
**personal (1)**
28:9
**personally (1)**
26:20
**persuasive (1)**
17:17
**Peter (1)**
34:13
**Petition (8)**
71:6;72:1;73:13;
75:11;83:9,11;86:12;
150:24
**pharma (6)**
56:25;57:2,3,4;
60:13;62:23
**pharmaceutical (6)**
15:14;59:3;60:12,
18;61:15,16
**Pharmaceuticals (1)**
19:8
**Philadelphia (2)**
25:19;41:6
**physician (1)**
49:16
**physician's (1)**
20:1
**pick (1)**
125:13
**pieces (3)**
28:1,5;68:18
**pin (1)**
67:11
**place (1)**
47:4
**placebo (3)**
45:6;144:2,5
**placebo-controlled (2)**
143:17,25
**plainly (1)**
101:10
**plaintiff (5)**
6:7;10:3;85:4,25;
99:1
**plaintiffs (4)**
62:16;64:20;
111:20;125:18
**plaintiffs' (6)**
57:25;58:12,15,18,
20;64:18
**Plaintiff's (10)**
21:3,16;38:11,20;
58:5,5,6;22:5;98:16;
107:4;109:17
**plan (1)**
10:24
**plane (1)**

146:8
**play (2)**
54:17;148:8
**please (21)**
21:10;35:23;36:12;
38:5,6;48:4;49:23;
58:16;63:8;64:25;
65:23;68:14;70:11;
73:24;102:18;110:8;
116:18;141:18;
146:20,21;147:23
**Pledger's (1)**
97:22
**pm (6)**
5:3;18:25;70:15;
95:7;147:17;151:10
**point (36)**
11:24;12:11;13:18,
19;14:1,2;15:1,20;
16:4;39:2;41:21;
42:9;46:13;49:19;
50:3;63:20;64:22;
65:11;66:17,18;67:7;
69:24;74:12,21;
75:17;76:14,15,24;
81:12;103:17;106:4;
124:24;125:1,14;
136:12;145:10
**pointing (4)**
48:16,17,18;51:13
**points (2)**
90:10;133:3
**pooled (8)**
19:22;20:17;33:25;
128:18;141:3,4,15;
144:17
**population (2)**
32:1;96:14
**populations (1)**
96:22
**portion (3)**
6:9,18;108:23
**position (15)**
23:24;29:3,4,9,10;
31:2;34:4,4,17,17,18;
35:4;75:25;78:7;
116:25
**positive (2)**
28:11;141:15
**possible (2)**
74:25;80:2
**posted (3)**
86:13,14,17
**potentially (3)**
81:3;85:3;119:18
**precautions (1)**
93:5
**precise (1)**
6:24
**precludes (1)**
7:14
**preemption (4)**
58:1,3;81:23,24

**preferable (1)**
43:6
**prejudicial (3)**
80:6;85:4,8
**premarked (2)**
111:3;122:15
**prepared (1)**
81:19
**prescribe (2)**
66:7;126:15
**prescribed (3)**
106:7;108:5;
118:24
**prescriber (1)**
97:23
**prescribers (2)**
99:8,23
**prescribing (2)**
20:1;97:6
**prescription (1)**
88:24
**presence (7)**
5:2;18:22;70:18;
90:6;95:4;142:15;
147:20
**present (9)**
40:6;54:4,5;55:25;
76:13,14;82:5;92:9;
94:1
**presenting (1)**
78:14
**press (1)**
148:1
**pretty (2)**
24:24;25:14
**prevent (2)**
115:3,9
**prevents (2)**
103:18;114:20
**previous (2)**
53:2;117:20
**price (1)**
150:10
**primarily (1)**
140:9
**primary (2)**
47:16;48:18
**printed (1)**
6:2
**prior (5)**
81:4;84:5,5;90:16;
94:3
**priority (1)**
109:10
**probative (1)**
84:23
**probe (1)**
147:4
**problem (12)**
9:19;36:24,25;
37:7;39:24;46:17;
77:8;79:25;88:4;
91:20;93:8;107:25

**problems (4)**
45:23;53:24;
104:12,17
**procedure (3)**
37:25;43:3;88:7
**procedures (2)**
6:20;30:17
**proceed (7)**
5:9,19;8:8;19:9;
40:7;48:10;52:4
**proceedings (2)**
42:22;152:3
**process (7)**
39:1;40:14,17,23;
103:2;108:14;129:2
**professionals (1)**
119:18
**prohibit (1)**
119:16
**prohibition (1)**
82:15
**prolactin (28)**
23:1,11,17;41:19;
42:11;43:24;44:14;
45:13;131:16;
132:13,18;133:3,6,7,
15,20,21;134:8,9,13,
21;135:3;137:1;
139:10;140:5,6,9,13
**prolactin-related (4)**
45:20;131:16,22;
139:20
**promise (1)**
135:7
**promote (5)**
112:17;113:10,11;
120:12;126:17
**promoted (1)**
117:25
**promoting (1)**
113:2
**promotion (1)**
115:19
**prompted (1)**
55:14
**prompting (1)**
18:1
**promulgated (1)**
119:6
**pronouns (1)**
31:8
**Proof (2)**
7:21;16:13
**proposed (1)**
126:12
**proposing (1)**
124:19
**protect (1)**
115:11
**protocol (1)**
140:2
**proven (1)**
99:9

**provided (2)**
73:14;124:9
**providing (1)**
7:7
**psychiatrist (1)**
41:13
**psychosis (1)**
102:2
**puberty (19)**
23:25;29:11;31:4,
18;32:8,9;35:5;
43:25;44:15,19;
45:19;50:10,15;
51:10,21;55:12,20;
134:23;137:16
**public (14)**
8:16;9:2;16:13;
17:4;33:1;79:17,20;
81:12;82:24;83:2,3;
86:8,10;148:12
**publication (1)**
128:22;144:24
**publish (2)**
54:8;145:18
**published (8)**
40:18,22;46:25;
86:8;144:23;145:5,7,
14
**puerperal (2)**
37:7;43:23
**pull (5)**
10:6;21:23;34:13;
103:11;110:12
**purpose (3)**
42:16;111:17;
149:16
**purposes (2)**
43:3;122:25
**push (1)**
55:24
**put (23)**
13:23;15:6;24:14;
50:3;56:5;62:11;
63:25;64:1;87:4;
94:20;95:16;97:11;
100:12;105:19,22;
106:8;112:14;113:6,
7;115:15;129:23;
130:17;144:21
**puts (3)**
38:1;75:25;78:6
**putting (4)**
37:8;86:19;107:4;
113:1

**Q**

**quibble (1)**
131:17
**quirk (1)**
14:24
**quote (1)**
71:9

**quoting (1)**
119:10

**R**

**raise (2)**
83:17;92:11
**raised (5)**
60:19;61:17;71:20;
91:9,14
**raises (2)**
69:2;87:2
**raising (1)**
60:2
**Ramoska (1)**
5:25
**randomized (1)**
144:4
**range (1)**
32:12
**Rapoport (2)**
23:7;34:13
**rare (2)**
101:15,19
**rate (10)**
31:25;32:5,25;
43:16,22;47:13;49:4;
130:20;131:1;137:11
**rates (1)**
23:18
**rather (4)**
12:14,16;14:13;
20:12
**rationale (2)**
124:12,19
**Rau's (1)**
5:24
**reached (1)**
83:7
**reactions (1)**
127:4
**read (40)**
14:19;16:13;19:25;
20:14,15;32:15,16;
49:10;51:15;52:24;
53:1;54:13,16,25;
55:2,16;81:7,8;
88:23;89:3;97:3;
117:19;120:11;
122:10,21;125:5,8,9,
11,12,18;126:1,22;
127:6,8;129:1,3;
140:8;147:3;150:4
**reader (1)**
45:21
**reading (3)**
22:10;28:20;
125:22
**reads (2)**
49:15,16
**ready (2)**
5:8;109:2
**real (6)**

6:1;74:11;118:12,
17,18;147:9
**realistically (1)**
148:6
**reality (2)**
50:1;92:23
**really (5)**
67:6;85:7;88:6;
108:9;140:25
**Realtime (1)**
152:16
**reargument (1)**
71:18
**reason (10)**
20:8;84:25;93:5,
22;94:21;127:13;
134:20;136:23;
147:7,9
**reasons (2)**
51:1;84:3
**rebuttal (6)**
16:25;18:2;75:1,9;
90:17;94:4
**recent (1)**
90:10
**recess (2)**
80:23;87:8;89:25
**recollection (1)**
131:3
**recommended (2)**
23:15;31:1
**record (13)**
8:24;16:13;79:17,
21;83:2,3;90:9;
94:21;125:6,10;
127:8;149:7,12
**recorded (1)**
149:23
**recording (1)**
80:21
**Records (12)**
7:22;8:16,17,22;
9:2,16;11:11;16:14,
15;17:4;82:24;98:21
**red (2)**
28:8,8
**redeye (2)**
148:10,12
**redirect (3)**
21:22;37:23;58:23
**references (1)**
126:12
**referring (3)**
23:14,23;144:3
**refers (10)**
22:25;33:24;34:3;
35:3;55:10;87:15;
94:23;119:25;120:3,
16
**reflect (1)**
110:3
**refute (1)**
78:20

**regarding (5)**
5:11,18;73:4;
75:22;86:8
**Register (3)**
114:15;118:9;
119:9
**regulation (1)**
119:12
**regulations (4)**
93:11;114:9;119:4,
14
**regulatory (2)**
83:7;91:17
**relabeller (1)**
119:16
**relate (2)**
92:1;147:5
**related (7)**
67:8;83:25;96:12;
105:20;136:14;
137:2;149:22
**relates (2)**
85:23;104:2
**relating (1)**
85:12
**relation (1)**
92:4
**relationship (11)**
5:17;17:15;91:22;
131:15,18;132:19;
133:14,16,20,21;
140:6
**relative (1)**
152:9
**relatively (1)**
58:2
**relevance (1)**
81:2
**relevancy (2)**
85:5;109:5
**relevant (13)**
56:7;67:11;75:15,
16,19;84:6,8,9,13;
85:2;89:2;93:22;
151:4
**remaining (1)**
143:18
**remember (10)**
19:21;21:8;63:19;
95:24;99:13;137:4;
139:8;140:15;145:1;
146:21
**remind (2)**
25:10;131:5
**repeat (2)**
52:7;59:9
**rephrase (4)**
52:5;61:12;123:25;
135:17
**report (4)**
59:4,6,11,19
**REPORTER (6)**
39:25;53:1;80:16;

117:19;152:16,23

**reporters (1)**
80:18

**reports (3)**
14:10;59:24;64:10

**represent (1)**
58:20

**representing (1)**
132:25

**reproduction (1)**
152:20

**reputation (1)**
57:15

**request (4)**
109:19;111:20;
123:24;128:23

**requested (1)**
117:20

**required (2)**
87:16;143:23

**requires (1)**
143:15

**requiring (1)**
11:20

**reread (1)**
52:6

**re-reargument (3)**
71:18,19,19

**rescinded (1)**
90:22

**resolve (2)**
13:6

**respect (2)**
36:2;49:23

**respectful (1)**
69:3

**respectfully (5)**
12:12,21;73:9,10;
89:12

**response (13)**
29:13;33:20;83:8;
86:13,16;96:8;
104:13;110:14;
112:4;123:20,23;
124:1;149:9

**result (1)**
28:11

**results (4)**
104:18,19;124:12;
139:19

**review (8)**
8:24;10:11;39:15;
40:20;87:9;93:4;
108:23;140:8

**reviewed (8)**
13:14;38:24;39:7;
83:5;102:19,21;
116:21;117:11

**reviewing (3)**
23:10;33:18;
108:22

**reviews (1)**
8:21

**ribbon (1)**
15:7

**right (225)**
5:6,8,16;6:15;10:7,
21;11:2;12:9;16:8;
18:4,10,16;19:2,6;
20:6,20;21:2,12;
22:15;23:1,6,11,12,
15;24:15;25:2,7,11,
15,19;26:18,25;
27:25;28:2,5,9,14,22;
29:2,6,7,18;30:11;
31:5,21;32:2;33:7,9,
11,19;34:5,22;35:5,
22;36:20;37:8;40:11,
23,24;41:7,11,14,17,
20;42:13,15;43:11,
17,25;44:15,20,24;
45:2,8,21,22;46:2,11,
15,19,21;47:7,12,13;
48:9;49:1,15;50:10,
16,23;51:11,19;
52:17,18;54:23;
55:10;56:11;57:1,6,
20;59:6;60:16,21;
61:18;65:10,19,24;
66:4;68:19,23;69:7,
17;70:20;72:11;
77:23;82:4,7;84:20;
89:13,22;94:7,13;
95:9,11;96:4,7,13,23;
97:5,18;98:20;99:23;
100:17;101:2,15;
102:2,17;103:15,24;
104:3;105:20;106:3,
10;107:7,11,15,19,
24;108:3,20;109:3;
110:3,9;111:10;
112:15,21;113:10,11;
115:9,17,18;116:10,
13,16,23;117:7;
118:9,25;119:11;
121:19;122:2,11;
123:7,13,18,21;
124:3,6,13,17,23,25;
125:25;126:24;
129:2,8;131:9,12;
132:15,20,22;133:16,
21;134:11,14;138:1,
5,9;139:2,16;141:2,4,
5,13,17,24;142:17;
143:4;144:6,25;
145:3,5,19;146:4,7,
13;147:9,10,22;
148:9,15,19;150:19;
151:5

**rise (5)**
18:18;70:9;92:6;
94:25;147:13

**risk (5)**
62:24;113:2,19;
114:5;115:25

**Risperdal (21)**

23:1;32:2;43:25;
66:3,10;75:4;83:20;
91:2;96:9,18;103:22;
106:20;109:25;
124:20;126:13,16;
130:22;134:8;
137:14;144:12,13

**RMR (1)**
152:15

**Robert (1)**
114:23

**rolling (1)**
10:19

**room (1)**
136:9

**route (2)**
43:7;81:19

**rule (9)**
16:1,2;17:20;
82:22;86:6;98:23;
104:21;119:7;149:22

**ruled (5)**
73:1;86:21;87:20,
23;89:8

**Rules (7)**
7:12,18;77:18,19;
86:8;113:21;146:20

**ruling (8)**
78:6;81:9;88:3;
89:5;149:15,24;
150:5,25

**run (1)**
113:2

**running (2)**
12:17;26:7

---

## S

**safe (4)**
66:16,19;67:10;
99:9

**safely (3)**
66:7;110:3,9

**safety (5)**
28:7,17;65:18;
66:9;68:22;80:11;
96:13,14,22;97:17,
23;99:17,24;100:12,
13;101:11;102:13;
103:16,19;104:6;
105:19;106:8,12,13,
15,19;107:10,18;
112:2,19;115:10,15;
116:15,22,24;117:12;
118:2,3,5,7;121:12;
122:5;123:24;
124:25;126:6,8,10,
13;127:3,18;139:18;
144:1

**salient (1)**
28:18

**Same (16)**
6:20;7:21;10:2;

16:21;30:13;45:10;
63:2,3;64:4;77:18;
92:5,8;114:7;146:20;
152:7,21

**Savage (1)**
150:25

**save (1)**
37:18

**saw (14)**
20:5,10,15;25:3;
27:5,15,19;32:17;
39:9;46:16;51:19;
53:11;75:12;137:15

**saying (34)**
7:12;14:12;15:15;
17:8,19;18:11;22:20;
24:6,8,13;26:23;29:9,
14,21;31:5,12;37:5;
45:19;47:15;49:21;
56:5;57:17;73:22;
78:8;79:13;82:12;
102:20;110:5;122:9,
9;126:5;127:1,2,6

**schizophrenia (1)**
102:2

**science (3)**
27:25;40:21;
104:10

**scientific (1)**
40:18

**scientists (8)**
22:25;23:15,24;
24:6,13,22;40:20;
56:4

**Scotia (1)**
41:10

**screen (5)**
21:6;95:19,21;
125:4;130:15

**seat (1)**
18:13

**seated (4)**
5:7;19:5;40:3;
95:10

**Second (13)**
13:4;30:5,8,12;
48:4,7;50:13;51:9;
57:9;67:21;114:13;
124:7;131:25

**Secondly (1)**
23:13

**Section (6)**
7:16,17,21;9:23;
96:2,3

**sections (1)**
97:10

**seeing (1)**
136:13

**sees (1)**
49:9

**selected (1)**
28:11

**selectively (1)**

55:25

**self-authenticated (3)**
7:25;8:8,13

**self-authenticating (1)**
86:7

**sense (4)**
45:6;120:8,9;
141:12

**sent (3)**
71:20;82:9;83:14

**sentence (3)**
24:10;42:10;126:6

**sentences (1)**
14:6

**separate (1)**
78:25

**serious (7)**
71:22;78:11;87:17,
18;88:19;92:5;
104:12

**serve (3)**
115:18,19;126:17

**set (1)**
69:2

**settlement (3)**
73:5;90:21,24

**seven (4)**
10:15;62:13,14;
63:10

**several (3)**
10:16;57:4;135:15

**SHAP (5)**
23:25;29:11;44:19;
50:12,13

**SHAPA (6)**
24:25;46:10;47:22;
50:12;51:16;54:5

**SHAPB (8)**
50:9,19;51:16;
53:12;54:6;55:9,17;
56:7

**SHAPs (1)**
35:4

**Sheller (5)**
71:20;73:18,25;
150:7,16

**Sheller's (3)**
83:13;149:14,25

**short-term (1)**
138:19

**show (17)**
27:21;28:23,23;
35:22,25;36:5;47:14,
14;59:23,24;63:7;
77:25;112:4;137:20;
139:6;143:22;144:19

**showed (2)**
101:19;134:6

**showing (1)**
143:25

**shown (2)**
21:18,18

**shows (1)**

48:19
**side (7)**
    44:7,12;57:3;93:9,
    10;106:22;136:14
**sidebar (12)**
    11:20;12:17;16:6,
    9,10;69:21;70:4,4;
    89:7;141:18,22;
    142:12
**signed (2)**
    9:11;114:23
**significance (8)**
    33:5;50:4;79:4;
    141:4,6,8,11,14
**significant (8)**
    27:20;54:3,8;55:5;
    70:5;72:4;135:5;
    141:2
**silly (1)**
    15:10
**simple (1)**
    130:15
**simply (5)**
    12:13,13;13:19;
    14:16;124:20
**single (3)**
    11:18;62:23,25
**sit (1)**
    73:23
**sitting (1)**
    63:19
**situation (4)**
    5:18;11:18;17:25;
    81:17
**six (1)**
    10:14
**Sixteen (2)**
    123:1,2
**six-year-olds (1)**
    136:2
**skip (1)**
    39:7
**skipped (1)**
    24:21
**slippery (1)**
    74:15
**slope (1)**
    74:15
**small (2)**
    145:10,11
**smart (1)**
    49:22
**so-and-so (1)**
    15:18
**so-called (1)**
    78:15
**solve (1)**
    91:18
**somebody (6)**
    14:16;72:21;
    110:16;135:22;
    136:17;137:6
**sometimes (2)**

135:19,19
**somewhat (1)**
    16:1
**soon (1)**
    142:3
**sorry (22)**
    8:5;21:11;29:7;
    41:25;44:9;48:5,6;
    51:12;52:24;63:23;
    64:14;67:23;68:15;
    77:9;90:23;100:4,8;
    125:7,24;129:7,14;
    145:21
**sort (1)**
    135:15
**sought (1)**
    105:17
**sounds (2)**
    76:5;142:9
**speak (3)**
    65:6;80:18;125:15
**speaking (2)**
    40:1;103:23
**speaks (2)**
    127:8;128:9
**special (6)**
    139:5,6,9,10,13,15
**specific (13)**
    6:13;7:3,4,7;32:4;
    67:8,8;83:7;112:25;
    118:2;125:22;126:6;
    131:14
**specifically (4)**
    5:22;75:12;83:25;
    114:16
**speculating (1)**
    54:12
**speech (3)**
    20:19;61:2,5
**spending (1)**
    20:6
**spent (3)**
    19:19;138:4;139:4
**spoke (1)**
    20:18
**spoken (1)**
    87:11
**spring (3)**
    12:12;13:9;14:15
**sprung (1)**
    10:21
**stage (3)**
    103:8,10;109:1
**stamped (1)**
    9:10
**stand (2)**
    20:25;129:18
**standard (3)**
    93:24;143:24;
    144:4
**standing (1)**
    12:14
**start (5)**

11:22;17:23;21:2;
    86:23;136:8
**started (3)**
    105:25;107:15;
    109:21
**starting (1)**
    124:16
**starts (1)**
    126:4
**state (8)**
    23:17,18,22;57:19,
    21;81:14;82:22;93:3
**stated (3)**
    75:19;97:16;
    114:24
**statement (12)**
    14:21;20:8;53:11;
    55:23;56:1;61:21;
    73:1;79:14;110:11;
    127:15,17;128:2
**statements (3)**
    13:25;14:5;15:3
**states (3)**
    6:8;114:16;115:8
**statistical (6)**
    69:15;79:2;141:6,
    7,10,14
**statistically (5)**
    27:19;54:3,8;55:5;
    135:5
**statistics (1)**
    19:20
**statute (3)**
    7:16,18,23
**statutes (1)**
    16:16
**stay (1)**
    148:14
**step (1)**
    5:13
**stick (3)**
    27:22;59:4,12
**still (3)**
    131:25;149:17;
    150:5
**story (6)**
    28:1,6,21;35:22,
    25;121:25
**straighten (1)**
    71:11
**stretch (1)**
    146:23
**strictly (1)**
    6:16
**strongly (1)**
    107:1
**stuck (1)**
    85:1
**studied (4)**
    49:16;104:1,5;
    121:17
**studies (59)**
    32:15,16;46:2;

47:2;68:5;96:13,14;
    101:18;102:16;
    103:23;104:10,17;
    106:2,23;107:15;
    108:8,15,15,16,16,
    17;109:21;110:6;
    124:12,16,17;128:17,
    19;130:1,18,19;
    133:2;134:6;135:19,
    20;137:19;138:2,5,7,
    8,19;139:23;140:4,
    10,13,25;141:8;
    143:3,3,6,10,17,25;
    144:2,5;145:5,7,11,
    15
**study (37)**
    24:15,23;33:2,3,5,
    10,14;34:22;38:11;
    43:14;44:23;45:18;
    46:18,19;48:13,20;
    49:4;52:11;53:4;
    132:17;135:21,23;
    136:2,15,18,20,22;
    138:2,11,15;139:1;
    141:1,11;144:7,11,
    20;149:16
**studying (1)**
    106:1
**stuff (4)**
    10:23;13:15;24:25;
    26:21
**style (8)**
    89:10,10,11,16;
    105:8,9,10,14
**subject (9)**
    6:24;11:15;14:22;
    62:23;66:8;72:2;
    85:11;88:9;149:17
**submission (1)**
    109:22
**submit (2)**
    9:15;40:19
**submitted (3)**
    39:14;118:4;126:8
**submitting (1)**
    73:19
**substantial (2)**
    109:24;124:9
**sudden (1)**
    136:8
**suffice (1)**
    12:15
**sufficient (3)**
    102:17;118:3;
    126:7
**suggest (1)**
    81:20
**suggested (4)**
    31:17;71:24;72:8;
    129:15
**suggesting (4)**
    12:16;14:7;24:5;
    66:2

**suggestion (3)**
    11:22;29:16;35:6
**suits (1)**
    57:25
**SULLIVAN (250)**
    6:22;8:3,5,9,14;
    9:4,9,14;10:1,5,9,14,
    20;11:1,8,13,21;12:1,
    5,8;13:7;15:13;17:2,
    3;18:5;19:9,10,16;
    21:7,15;22:4;26:6,
    14;29:20;30:9,17,22,
    23;31:16,23;33:5;
    35:17,19;36:7,11,14,
    19,21;37:15;38:2,9,
    14,20,22;40:7,8;
    41:24,25;42:5,19;
    43:8;45:4,8,17;
    47:11;48:5,10,11;
    50:21;51:3,6,18;52:8,
    9,16;53:14,20;54:10,
    21;55:7;56:10,16;
    57:23;58:10;59:1,17,
    21,23;60:3,8,9;61:7,
    11,13;62:10,17,21;
    63:23;64:7;65:1,2;
    67:13;68:3,11,15,16;
    69:10,12,25;72:10,
    17,24;73:3,6,11;
    74:14,19,23;75:5,10,
    24;76:3,5,10;77:7,10,
    15,22;78:5,17,25;
    79:9,17,22;80:4,7,10,
    13;81:19,22;82:1,8,
    14,19,24;83:4,13,21,
    24;84:10,18,22;
    85:14;87:5,14,22,25;
    88:5,21;89:8,14,23;
    90:19,23;91:3,9,16,
    25;92:3,13;93:8,21;
    94:5;95:14,15,23;
    98:8,12,16;99:4,6;
    100:4,7,14;105:12,
    15,16;109:14;
    110:25;111:3,7,13,
    19;112:1,10,11;
    113:18,25;114:8,11,
    25;115:6,12;116:19;
    117:10,16;118:10;
    119:21;120:15;
    121:2,10;122:13,18,
    23;123:15,16;125:7,
    11,16,24;126:20,25;
    127:11,16,21;128:1,
    4,6,15;129:6,18,22;
    130:10,16;131:17;
    132:2,7,8;140:20;
    141:19;142:4,9,25;
    143:1;146:1,5,10;
    148:20;149:19;150:9
**Sullivan's (1)**
    95:12
**summarizes (1)**

**129:**24

**summary (1)**
110:1

**Super (2)**
5:21;147:11

**supervision (1)**
152:22

**supplement (1)**
124:20

**support (2)**
116:25;124:11

**supported (1)**
139:25

**sure (26)**
8:7;10:1,5;21:11;
33:16,24;34:15;
37:16;40:21;41:25;
43:5;45:4;52:8;55:5;
66:23;71:16;85:20;
93:2;96:25;98:5;
121:23;132:23;
140:22;141:19;
142:9;145:9

**surmise (1)**
115:2

**sustained (14)**
25:25;30:16;40:4;
50:25;59:16,20;61:6;
69:19,22;112:7;
116:14;127:22,22;
128:11

**switched (1)**
135:15

**symptoms (4)**
50:14;55:17;
132:20;133:16

**syndrome (1)**
139:21

**T**

**Table (12)**
46:14,18;47:1,20,
22;48:13;49:6,11;
68:20;105:1;134:5;
135:7

**Takeda (2)**
58:17;64:11

**talk (18)**
20:12;26:17;27:10;
39:4;41:19;47:25;
97:11;101:8;103:20;
105:1,4;108:1;
119:22;128:16;
135:7;145:13;
146:25;148:11

**talked (13)**
23:6,9;41:3;56:20;
101:14;102:11;
124:15;132:14,22;
134:10;139:1;
144:23,24

**talking (28)**

20:6;23:8;28:12,
13;29:5;32:5,6,8;
34:16,16;46:14,22;
62:9;64:20;66:17;
72:22;80:19;91:23;
95:17,24;99:11;
108:14;115:13;
125:3;136:21;138:4,
16;139:4

**talks (8)**
18:8;29:1,2;36:23;
44:6;107:9;109:18;
123:20

**target (2)**
126:16;129:21

**task (1)**
15:7

**team (1)**
6:18

**teams (1)**
83:6

**technicality (1)**
9:23

**technician (2)**
95:22;142:21

**teeth (2)**
136:4,5

**telling (7)**
17:23;20:20;67:17;
70:1;73:20;85:2;
124:8

**tells (1)**
45:21

**Temple (1)**
114:23

**ten (3)**
10:19;26:23;
107:13

**term (2)**
32:19;100:23

**terms (7)**
17:13;67:5;74:16;
78:1;101:17;109:20;
112:24

**test (1)**
51:22

**tested (2)**
133:1,2

**testified (22)**
6:6,9;48:25;56:25;
57:4,5,8,24;58:1,4,7,
11,14,17;59:3;62:12;
63:10;64:4,19;88:22;
99:14;128:25

**testify (8)**
55:14;56:17;57:20;
61:14;66:9;82:13;
84:16;134:25

**testifying (5)**
51:25;66:6,14;
79:5;134:24

**testimony (10)**
20:10,13;40:5;

43:1;46:12;66:8;
77:4;84:13;98:1;
99:17

**Thanks (2)**
95:20;132:7

**thinking (1)**
15:24

**third-party (2)**
13:24;14:21

**though (6)**
37:6;42:8;81:13;
105:11;112:3;119:23

**thought (12)**
6:4;12:13;14:20;
15:17,19;24:25;48:2;
51:22;53:20;66:7,14;
75:18

**thousand (2)**
56:23;60:20

**three (12)**
14:5;62:15;63:12,
17;64:5,9,17,17;
138:7,24;139:14;
141:10

**throw (1)**
80:1

**till (1)**
58:24

**times (6)**
56:21;62:8,14,16;
63:10;121:19

**tissue (1)**
137:15

**title (1)**
7:21

**together (1)**
10:23

**told (14)**
20:22,25;26:4;
50:17;68:21;70:25;
71:1,17;72:9;74:4;
82:10;99:23;122:4;
148:6

**ton (2)**
103:22;104:4

**took (3)**
55:3;108:22;
131:10

**top (2)**
47:1;49:11

**Toronto (2)**
22:16;41:4

**total (3)**
6:5;49:3,3

**totality (3)**
28:14;101:7;
121:21

**totally (1)**
87:2

**touchstone (1)**
86:19

**town (1)**
148:14

**traditional (1)**
45:6

**transcript (2)**
152:7,20

**transient (1)**
32:19

**transparent (1)**
35:9

**transpired (8)**
5:1;18:21;70:17;
90:5;95:3;141:21;
142:14;147:19

**trial (7)**
9:22;15:10;64:19;
75:17;111:5;131:7;
152:6

**trials (4)**
124:10;131:8,11;
139:24

**tried (1)**
137:22

**trouble (2)**
78:4;110:16

**true (18)**
15:16,18;27:17;
47:3;55:23;60:10;
62:22;68:5;78:15;
80:4;87:22;101:17;
115:10;116:7;
128:22;133:7;137:9,
10

**truth (12)**
20:20,23;21:1;
24:7;46:9;54:11;
59:2;65:9,12;67:14;
75:13;139:22

**truthful (1)**
100:20

**truthfully (1)**
52:21

**try (8)**
12:21;15:6;34:7;
74:2,3;135:21;142:7;
145:24

**trying (9)**
13:2;15:9;16:7;
71:8;76:3,18;78:1;
82:11;83:16

**turn (3)**
36:1;42:18;124:7

**turned (2)**
36:15,22

**TV (1)**
147:4

**twice (1)**
103:22

**two (34)**
8:15;14:5;20:5,25;
25:14,33;6:34:9,24;
41:6;44:24;45:1,7,9,
11,21;54:2,7;58:13;
68:18,23;83:6;86:20,
25;88:12;93:6;96:3,

6,21;106:11;120:1;
132:24;136:24;
138:19,22

**type (1)**
14:5

**U**

**Uhmm (9)**
31:7;32:11;46:12;
96:11,20;104:4;
108:11;112:16;
130:21

**unavailable (1)**
79:18

**uncertain (1)**
44:19

**uncontrolled (1)**
44:21

**under (15)**
7:15,16;14:3;
15:24;46:11;48:20;
49:5,13;66:11;86:5;
87:12;93:6;113:20;
114:9;152:21

**understands (1)**
93:2

**Understood (3)**
18:5;92:13;112:8

**unfair (1)**
88:10

**unfortunately (3)**
25:21;26:11,19

**uniqueness (1)**
136:9

**United (1)**
115:8

**university (1)**
41:10

**unless (11)**
30:16;60:1;69:22;
75:17,20;76:25;
81:18;84:7,14;
102:24;152:21

**unsafe (4)**
65:19,21;66:3;
102:16

**unspecified (1)**
126:16

**unsuccessful (1)**
93:15

**up (37)**
10:6;12:14;13:1;
15:9;21:23;31:24;
33:2,10;35:22;38:1;
47:10;50:17;51:22;
62:11;63:25;64:1;
74:16;80:3;81:20;
85:6;92:25;95:16,19;
97:11;98:25;102:12;
107:4;129:23;
135:15;138:5;142:6,
22,23;143:18;144:20,

21;145:25
**updates (1)**
68:22
**upon (1)**
86:21
**upper (1)**
33:7
**upstairs (1)**
151:3
**use (37)**
8:12;9:25;10:24;
11:14;12:3,6;65:23;
69:1;100:23,24,24;
101:1,2,7,20,23;
102:8;106:17;110:9;
112:14,17;113:3;
115:16,19;116:6;
119:19,22;120:4,4,
12,16;121:17,21,23;
126:18;131:24;
143:18
**used (9)**
32:21;50:12;66:3,
16,19;77:23;85:25;
94:22;124:21
**using (3)**
111:4;112:12;
116:2
**usually (1)**
143:22
**Utah (1)**
57:20
**utilized (1)**
109:25

## V

**vague (1)**
126:12
**variable (1)**
137:3
**variety (1)**
96:23
**various (1)**
133:3
**vehemently (1)**
113:15
**version (1)**
18:10
**versus (3)**
5:20,25;6:8
**view (4)**
12:20;14:25;16:3;
74:15
**viewed (2)**
78:23;143:24
**violation (1)**
72:7
**Vioxx (1)**
57:7

## W

**Wait (7)**
29:22;35:11;41:23;
48:3;51:24;54:18;
71:7
**wall (1)**
80:3
**wants (4)**
74:2,2;80:1;146:9
**warn (32)**
60:12,14,14,15,15,
16,19,21;61:17,18,
20;62:24;63:2,13;
64:10,11,12,12,13;
67:16,18;113:12,19;
114:5;115:21;116:6,
9;117:23;118:7;
120:6,14;122:2
**warned (1)**
66:13
**warning (16)**
73:21;76:20;87:16;
88:16;113:7,13,13;
114:20,22;115:3,10;
116:2,7,15;119:17;
120:10
**warnings (2)**
89:2;120:7
**way (27)**
12:18;15:5,5;
16:21;31:8;41:17;
51:15;53:22;63:18;
64:4;75:8;78:21;
80:15;84:17;85:22;
88:2;91:15,18;98:22;
104:7;108:9;124:22;
132:3;143:22;
144:17;146:9;147:5
**ways (1)**
76:3
**wear (1)**
146:20
**website (2)**
86:13,14
**Websites (1)**
86:11
**weekend (2)**
146:18;148:24
**weeks (1)**
80:2
**weight (1)**
104:4
**well-advised (1)**
14:15
**well-controlled (1)**
124:10
**well-established (1)**
118:8
**well-respected (1)**
25:15
**weren't (5)**
26:20;27:8,8,8;
131:20
**Western (1)**

41:14
**what's (8)**
28:18;32:19;45:22;
47:10;80:21;118:16;
119:15;143:16
**whenever (1)**
119:18
**Whereupon (15)**
18:24;53:1;70:14;
71:13;89:25;90:2;
94:10,17;95:6;
117:19;123:10;
147:16;149:3;
150:13;151:7
**whole (18)**
14:1;20:20,23;
21:1;28:1,6,20;
35:22;69:2;73:12;
75:23;79:3;121:25;
125:6,9,9,12;135:4
**Who's (2)**
25:20;150:7
**widely (1)**
102:7
**wife (1)**
147:25
**wish (6)**
31:9;39:17;79:10,
10;84:18;92:10
**wishes (1)**
88:25
**within (2)**
10:19;33:7
**without (7)**
24:1;29:11;37:7;
112:12;113:4;
126:18;137:14
**Witness (50)**
5:14;6:9;9:16;
13:23;20:13;22:3;
38:16;42:3;43:5;
45:5;9;48:6;51:14;
52:7,23;53:10,22;
55:2;57:18;61:25;
64:3;68:9;71:2,13;
78:1;91:11;100:6,11;
109:7;114:19;115:1;
116:17;117:22;
118:25;119:3;120:3,
23;122:8,20;125:2;
126:3,23;130:12,14;
141:25;145:13;
148:3,9,13,17
**witnesses (4)**
6:21;55:14;58:21;
94:6
**witness's (1)**
6:10
**WL (1)**
5:25
**women (1)**
132:15
**wondering (1)**

90:20
**Woodcock (1)**
15:17
**word (3)**
14:9;60:22;131:18
**words (9)**
30:24,25;43:14;
52:1;65:23;101:18;
102:21;103:8;131:20
**work (2)**
6:10;114:2
**worked (1)**
65:3
**working (2)**
22:25;62:25
**world (1)**
46:25
**worried (1)**
43:22
**worth (1)**
150:10
**Wrap (3)**
142:6,23;145:24
**writing (2)**
22:18,19
**written (2)**
91:21;119:6
**wrong (9)**
22:10;37:13,17;
47:24;72:14;78:11,
11;114:6;120:18
**wrote (2)**
30:19;77:5
**Wyeth (1)**
93:17

## Y

**year (4)**
6:7;64:24;73:18;
75:3
**years (13)**
26:23;56:21;63:12;
65:4;83:6;107:13;
108:17,25;109:2,12,
15;118:13;121:18
**yelling (3)**
29:25;30:4,10
**yellow (2)**
18:12;146:21
**yells (1)**
80:14
**yesterday (1)**
20:19
**York (2)**
22:23;34:13

## 0

**03892170 (1)**
22:2

## 1

**1 (4)**
41:22;42:6,8;
138:13
**1:45 (1)**
5:3
**10 (17)**
6:2,18;29:17;
36:25;46:8,10,11;
47:2,2;48:20,20;49:5,
5,13,14;52:14;53:8
**107 (1)**
138:11
**11 (5)**
46:8;98:17;99:1;
108:25;109:2
**12 (2)**
5:25;46:9
**13 (2)**
46:9;139:24
**1366 (1)**
44:9
**14 (3)**
46:9;97:14;98:13
**15 (4)**
107:5,6;109:18;
122:25
**15th (1)**
22:22
**16 (1)**
130:11
**173 (1)**
5:21
**18 (4)**
22:10,12;140:4,25
**19 (2)**
6:2,19
**1960s (1)**
32:16
**1979 (2)**
114:15;119:7
**1986 (1)**
5:22
**1996 (4)**
105:21;107:6,13;
108:2
**1997 (1)**
123:23

## 2

**2 (7)**
18:7;46:15,18;
48:13;49:6,11;
109:17
**2:01 (1)**
18:25
**2:48 (1)**
70:15
**20 (5)**
32:12;65:4;118:13;

121:19;137:20
**2002 (23)**
  22:8,12;33:17;
  73:16,17;79:25;80:9;
  95:18;96:2,6,9,12;
  97:4,15;99:8,23;
  100:16;101:5,9;
  102:1,5,6;118:23
**2003 (2)**
  149:22;150:3
**2005 (1)**
  145:1
**2006 (11)**
  5:25;6:1;73:16;
  88:25;91:24;95:18;
  96:3,17;118:24;
  119:8,15
**2007 (2)**
  118:24;119:8
**2010 (1)**
  63:11
**2012 (1)**
  94:24
**2013 (7)**
  73:15,20;76:19;
  79:24;84:7;87:2;
  90:22
**2014 (1)**
  63:11
**21 (4)**
  68:21;105:1;134:5;
  135:7
**22 (3)**
  46:5;48:23;145:10
**221 (2)**
  110:15;111:8
**23 (1)**
  56:22
**25 (2)**
  13:8;56:21
**26 (1)**
  119:7

**3**

**3.7 (1)**
  48:23
**3:20 (1)**
  95:7
**30 (2)**
  46:5;121:18
**357 (1)**
  5:21
**37447 (1)**
  119:10

**4**

**4:11 (1)**
  147:17
**4:20 (1)**
  151:10
**42 (1)**

7:17
**45 (4)**
  21:3,16,17;108:12
**49 (1)**
  38:11

**5**

**5.1 (3)**
  46:4;47:13;48:25
**50 (2)**
  43:16,17
**5328 (2)**
  7:21;9:24
**5-point (1)**
  47:25

**6**

**6104 (2)**
  7:16,17
**620 (1)**
  5:25

**8**

**8 (2)**
  108:24;109:2
**803 (2)**
  18:8,9
**803.6 (1)**
  15:1
**815 (1)**
  5:21

**9**

**9:15 (3)**
  146:19;148:6,7
**90 (1)**
  32:13
**902 (2)**
  86:6;87:13
**920 (1)**
  5:21
**99 (1)**
  138:25
**9929 (1)**
  5:25