# In The Matter Of:

*Pledger v.*

*Janssen*

---

*(Jury Trial - Afternoon Session)*

*Vol. VI*

*February 2, 2015*

---

*John J. Kurz, RMR-CRR, Official Court Reporter*

*City of Philadelphia*

*First Judicial District Of Pennsylvania*

*100 South Broad Street, 2nd Floor*

*Philadelphia, PA 19110*

Original File 02FEBRUARY-2015-DJERASSI-AFTERNOON-FINISHED.txt

Min-U-Script® with Word Index

```
 1    IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
            FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
 2                    CIVIL TRIAL DIVISION

 3   ------------------------------
     IN RE: RISPERDAL® LITIGATION   :
 4   March Term, 2010, No. 296      :
     _____ :
 5   Philip Pledger, et al.,        :
                      Plaintiffs,   :   APRIL TERM, 2012
 6       v.                         :   NO. 01997
                                    :
 7   Janssen Pharmaceuticals, Inc.,:
     Johnson & Johnson Company,     :
 8   and Janssen Pharmaceutical     :
     Research and Development,       :
 9   L.L.C.                         :
                      Defendants.   :
10
     ------------------------------
11

12                     -  -  -

13             MONDAY, FEBRUARY 2, 2015

14                     -  -  -

15              COURTROOM 425
                 CITY HALL
16         PHILADELPHIA, PENNSYLVANIA

17                     -  -  -

18     B E F O R E:  THE HONORABLE RAMY I. DJERASSI, J.,
                     and a Jury
19                     -  -  -

20
               JURY TRIAL - VOLUME VI
21
               - AFTERNOON SESSION -
22

23     REPORTED BY:
           JOHN J. KURZ, RMR, CRR
24         REGISTERED MERIT REPORTER
           CERTIFIED REALTIME REPORTER
25         OFFICIAL COURT REPORTER
```

```
 1   APPEARANCES:

 2              SHELLER, P.C.
               BY:   STEPHEN A. SHELLER, ESQUIRE
 3                   CHRISTOPHER A. GOMEZ, ESQUIRE
               E-mail: Sasheller@sheller.com
 4             E-mail: Cgomez@sheller.com
               1528 Walnut Street, 4th Floor
 5             Philadelphia, PA 19102
               Phone: (215) 790-7300 Fax: (215) 546-0942
 6             Counsel for Plaintiff(s)

 7

 8              KLINE & SPECTER, A Professional Corporation
               BY:   THOMAS R. KLINE, ESQUIRE
 9                   KRISTEN LOERCH SIPALA, ESQUIRE
               E-mail: tom.kline@klinespecter.com
10             E-mail: kristen.loerch@klinespecter.com
               1525 Locust Street, 19th Floor
11             Philadelphia, PA 19102
               Phone: (215) 772-1000 Fax: (215) 772-1359
12             Counsel for Plaintiff(s)

13

14              ARNOLD & ITKIN, LLP
               BY:   JASON A. ITKIN, ESQUIRE
15             6009 Memorial Drive
               Houston, Texas 77007
16             Phone: 713-222-3800 Fax: 713-222-3850
               Counsel for Plaintiff(s)
17

18

19   Representing Defendants:

20              DRINKER BIDDLE & REATH, LLP
               BY:   KENNETH A. MURPHY, ESQUIRE
21                   MELISSA A. GRAFF, ESQUIRE
               One Logan Square, Suite 2000
22             Philadelphia, Pennsylvania 19103-6996
               Phone: (215)988-2700  F:(215)988-2757
23             E-mail: kenneth.murphy@dbr.com
                       melissa.graff@dbr.com
24             Counsel for Defendant Janssen Pharma.,
               J&J, and Janssen Research & Development
25
```

 1    APPEARANCES:  (Continued)

 2              WEIL, GOTSHAL & MANGES, LLP
              BY:  DIANE P. SULLIVAN, ESQUIRE
 3                   ALLISON BROWN, ESQUIRE
                   (admitted pro hac vice)
 4              301 Carnegie Center, Suite 303
              Princeton, New Jersey 08540
 5              T: 609-986-1100 F: 212-310-8007
              E-mail: diane.sullivan@weil.com
 6              E-mail: allison.brown@weil.com
              Counsel for Defendant Janssen Pharma.,
 7              J&J, and Janssen Research & Development

 8

 9

10

11       Also Present:

12              Priscilla M. Brandon, Esq., Sheller, P.C.

13              Marianne Mari, Tipstaff

14              Cory Smith, Display Technician

15

16

17

18

19

20

21

22

23

24

25

```
 1                    – I N D E X –

 2   WITNESSES              CROSS    REDIRECT    RECROSS

 3   DAVID A. KESSLER, M.D.
        (Continued)
 4     By Mr. Kline            --        94         --

 5     By Ms. Sullivan         10        --        114

 6

 7

 8

 9

10                   E X H I B I T S

11   NO.                                    PAGE NO.

12   D-25          Table 4 Adverse Events Incidence – 59

13

14   D-26          Effects of Short– and Long–Term
                   Risperidone Treatment on Prolactin
15                 Levels in Children – D530.1 –     76

16

17   P-58          2003 Label –                     100

18
     P-59          Study/Table – JJRE0498189 –      104
19

20

21

22

23

24

25                        –  –  –
```

```
 1                    (The following transpired in open

 2           court outside the presence of the jury at

 3           2:11 p.m.:)

 4                           -  -  -

 5                    COURT CRIER:  Come to order, please.

 6                    THE COURT:  All right.  Good

 7           afternoon.

 8                    MR. KLINE:  Your Honor, may we see

 9           you at sidebar?

10                    THE COURT:  Right here.

11                           -  -  -

12                    (The following discussion transpired

13           at sidebar out of the hearing of the jury:)

14                           -  -  -

15                    MR. KLINE:  Your Honor, as the Court

16           knows, this case has a long history here.

17           And we have -- we exchanged expert reports

18           quite awhile ago.  A deposition was taken of

19           my pediatric endocrinologist -- I should say

20           the pediatric endocrinologist who's going to

21           come and testify -- a Dr. Goldstein from

22           Missouri.

23                    I was handed today for the first time

24           a motion which has apparently been either

25           filed with the Court or about to be given to
```

1        Your Honor, which seeks to preclude his

2        testimony.

3               The defendants and the plaintiffs

4        both had pediatric endocrinologists examine

5        this young man who's at issue here, Austin

6        Pledger.

7               The Sheller firm sent Dr. Goldstein

8        from Missouri down to Alabama.  We're now

9        told for the first time something unbeknown

10       to me, totally new to me, by the way.  And I

11       haven't yet even had a chance to look at

12       whether the law recited is correct.

13              But on its face, they say that

14       Dr. Goldstein, by doing an examination

15       without a local physician present in Alabama,

16       committed a crime.  And they say that he was

17       in the unauthorized practice of medicine and

18       that it would subject him to up to as a

19       felony, I believe they say, Class C.  I don't

20       know if any of this is accurate.  I'm only

21       reciting what's in their papers.

22              First of all, it wasn't brought to

23       our attention ever.  It wasn't brought to our

24       attention at the motion in limine stage.

25       It's now sprung on us here at the last

```
 1            minute.  And they will tell you that they had
 2            a local doctor examine the young man for that
 3            reason.  And their firm, I might add, have
 4            known all along that they were going to do
 5            this.
 6                      THE COURT:  First of all, let me
 7            interrupt you.
 8                      Is Dr. Goldstein testifying today?
 9                      MR. KLINE:  No; tomorrow.
10                      THE COURT:  So we will adjourn on
11            this matter and we will review it after,
12            until we finally get Dr. Kessler off the
13            stand.
14                      MR. KLINE:  The only reason I bring
15            it to your attention -- and I understand the
16            need to get him off the stand --
17                      THE COURT:  I'm having a lot of
18            difficulty with our jury.
19                      MR. KLINE:  Okay.  My --
20                      THE COURT:  I understand.
21                      MR. KLINE:  -- my issue was to give
22            myself some time.
23                      THE COURT:  Understand.  I will
24            examine the law.
25                      MR. KLINE:  You now know the issue.
```

```
 1              THE COURT:  I'll examine the law.
 2        But, frankly, I really need to get
 3        Dr. Kessler off the stand.
 4              MR. MURPHY:  Your Honor, one other
 5        issue since while we're at sidebar.  Juror
 6        No. 6, Mr. Eugene, had been napping quite a
 7        bit.
 8              THE COURT:  Well, we're watching him.
 9        We are aware of him.
10              MR. MURPHY:  Okay.
11              THE COURT:  Our policy is, you know,
12        what appears to be napping sometimes is just,
13        you know, closing eyes, because whenever you
14        go over there, he wakes up or he -- you know,
15        we're watching him.
16              MR. MURPHY:  Fair enough, Your Honor.
17              MR. KLINE:  Did the Court get a copy
18        of this?
19              MR. MURPHY:  He didn't.
20              MR. KLINE:  He should have one.
21              MR. MURPHY:  That's fine.
22                    -  -  -
23              (Sidebar discussion concluded.)
24                    -  -  -
25              (Pause.)
```

```
1                         -  -  -
2                  MR. KLINE:  And, Your Honor, while
3          you're looking at the issue, and we're
4          prepared to talk about --
5                  THE COURT:  I hope so.  There are
6          some Philadelphia civil rules, procedural
7          rules involved here, and I'm not going to
8          breach those.
9                      Alabama authorities can do whatever
10         they want to do.
11                 COURT CRIER:  All rise as the jury
12         enters the courtroom.
13                        -  -  -
14                 (Whereupon the jury entered the
15         courtroom at 2:17 p.m.)
16                        -  -  -
17                 (The following transpired in open
18         court in the presence of the jury:)
19                        -  -  -
20                 THE COURT:  All right.  Please be
21         seated everybody.
22                 All right.  We may proceed.
23                 MS. SULLIVAN:  Thank you, Your Honor.
24                 Good afternoon everybody.
25                 JURY PANEL:  Good afternoon.
```

```
 1                         -   -   -

 2                  CROSS-EXAMINATION (Continued)

 3                         -   -   -

 4   BY MS. SULLIVAN:

 5   Q.     Good afternoon, Dr. Kessler.

 6   A.     Good afternoon, Ms. Sullivan.

 7   Q.     Back on the Dr. Findling study.

 8                  So, Dr. Kessler, before the lunch

 9   break, you and I were talking some more about this

10   study that looked at prolactin levels and potential

11   side effects from prolactin in five of the Janssen

12   studies, right?

13   A.     Exactly, ma'am.

14   Q.     And I think you and I made clear to our jurors

15   that the Findling study was just -- just looked at

16   five of these 18 because the other 13 hadn't been

17   done yet, right, back at the time the Findling

18   analysis was done?

19   A.     Well, I don't think that's true.  Didn't --

20   what were there, like MED-8, and some of the earlier

21   studies were small studies; I think those were done,

22   right?

23   Q.     Many of them hadn't been done yet.  Many of

24   the studies hadn't been done yet.  And these were

25   chosen because they had prolactin levels and they
```

 1  had side effects in some instances.

 2  A.     They were a cohort of studies that were, as I

 3  understood it, that were identified as the

 4  developmental -- disruptive behavior cohort.

 5  Q.     Yeah.  And we don't have to quibble about it,

 6  but the point is it was five -- this Findling study

 7  just involved five of the total number of studies?

 8  A.     That's what Janssen selected, yes.

 9  Q.     And we talked about the fact that the Findling

10  analysis contained side effects from these five

11  studies and that all of them except one in terms of

12  gynecomastia came from this one study, INT-41,

13  right?

14  A.     Exactly, ma'am.

15  Q.     And we also talked about the fact that there

16  was no control group, placebo control group?

17  A.     In INT-41?

18  Q.     Right.

19  A.     Yes.  Exactly.

20  Q.     And you know, Dr. Kessler, that after doing

21  the study, the Janssen folks ran a whole bunch of

22  different analysis.  They looked at the data many

23  different ways.

24  A.     I think that's a pretty loose way to say it.

25  Q.     They analyzed, they ran statistics on many

- DAVID A. KESSLER, M.D. - CROSS -          **12**

```
1   different things.  They looked at it by gender.
2   They looked at it on efficacy.  They looked at it by
3   age.  They looked at it several different ways?
4   A.    So as I understand it, there was a May set of
5   data runs; is that a fair way to say it?
6   Q.    Okay.
7   A.    And that May set of data runs, May 15th data
8   runs, had a number of tables that looked at, you're
9   exactly right, a number of variables.
10  Q.    And it had about 50 different tables.  They
11  looked at the data in a number of different ways?
12  A.    Yes.  I'm not sure exactly that number, and
13  then there was another run in September, we know
14  that.
15  Q.    And it's a good thing for scientists to run
16  data and look at various things to figure out what's
17  going on?
18  A.    No.
19  Q.    Okay.  It's not a good thing for scientists to
20  do a lot of statistical analyses to try to figure
21  out what's going on?
22  A.    No.  You don't change things.
23            So what's important is you ask the
24  question, you give certain parameters to the
25  statisticians, you get back certain results.  You
```

1    then don't re-run the data without making, I mean,
2    one, making that explicit.  Two, being very careful.
3    You don't get -- you don't run data, get back
4    certain results and then change, you know, for
5    whatever reason.  I don't want to go into motive.
6    You don't re-run the data unless it's part -- unless
7    there's very special reasons to do that.
8    Q.    And you know here the special reasons to
9    re-run the data was that the outside
10   endocrinologists didn't think you should have
11   puerperal boys in the analysis?
12   A.    No, ma'am.  Because what we do know is that
13   the outside endocrinologists were involved from the
14   beginning.  They met in Toronto in January.  They
15   were part of the analysis plan, that very short
16   document.  They set certain parameters.  The
17   endocrinologists and/or Janssen shouldn't have just
18   re-run it once they got results that they didn't
19   like.  You got to do it up front.
20   Q.    You know, Dr. Kessler, based on your review of
21   the documents, that the outside endocrinologists
22   were concerned about all of the background rate of
23   gynecomastia in puerperal boys?
24   A.    Fair, from the beginning.
25   Q.    Yeah.

```
 1   A.    And they set certain parameters and they ran

 2   the data, got certain results, then you just don't

 3   re-run the data.

 4   Q.    But you know -- whether you think it's right

 5   or not, you know it was the outside endocrinologists

 6   not Janssen that said let's look at the data without

 7   the puerperal boys?

 8                   MR. KLINE:  Objection.

 9                   THE COURT:  Sustained.

10   BY MS. SULLIVAN:

11   Q.    Do you know, Dr. Kessler, that that's a fact;

12   that the outside endocrinologists were the ones who

13   suggested to Janssen --

14                   MR. KLINE:  Same question.

15   BY MS. SULLIVAN:

16   Q.    -- look at the data without the puerperal

17   boys?

18                   THE COURT:  All right.  That's

19           sustained, because I don't recall -- we have

20           a document.  That's all we have.

21                   MS. SULLIVAN:  I'm asking, Your

22           Honor, if he knows.

23                   THE COURT:  Then you're really

24           opening the door, Ms. Sullivan, to him

25           interpreting for himself what was really
```

- DAVID A. KESSLER, M.D. - CROSS -          15

```
1              going on behind closed doors.
2    BY MS. SULLIVAN:
3    Q.    Dr. Kessler, let's take a look at what's been
4    marked previously as Plaintiff Exhibit 46.
5                    And this is --
6    A.    Can I just get a copy or tell me kindly where
7    it is in the binder.
8    Q.    Sure.  It was used by Mr. Kline with you.
9    It's Plaintiff Exhibit 46.
10   A.    I just don't have -- that's meaningless.  I
11   have certain tabs in my binder.  I apologize.
12                   COURT CRIER:  Did you say 46?
13                   MS. SULLIVAN:  46, Marianne.  Thank
14        you.
15                   MR. KLINE:  We'll find it.
16   BY MS. SULLIVAN:
17   Q.    Dr. Kessler, did you not keep a set of the
18   stuff that you used with Mr. Kline?
19   A.    I have it, but I don't have it by plaintiff's
20   exhibit number.
21                   MR. KLINE:  We have it.  Look in Tab
22        21.  It's draft four.
23                   COURT CRIER:  P-46.
24                   THE COURT:  P-46, we have it.
25                   MR. KLINE:  It's the nauseating...
```

```
 1                    MS. SULLIVAN:  Yes.  Let's talk about
 2         that.
 3  BY MS. SULLIVAN:
 4  Q.    Dr. Kessler, this is a draft manuscript being
 5  circulated by Janssen, right?
 6  A.    I have the cover page, yes.
 7  Q.    And it has the line that Mr. Kline has
 8  repeated many, many times during this trial about
 9  the revisions now include a nauseating amount of
10  information on SHAP, specifically gynecomastia, et
11  cetera, right?
12  A.    Yes.
13  Q.    And it says "nauseating amount of
14  information," right?
15  A.    It says exactly that.
16  Q.    Yeah.  And you know there is a ton of
17  information in this analysis about different ways
18  they looked at the data, by gender, by age, by
19  whether it has a relationship -- whether prolactin
20  has a relationship to how well the drug works,
21  whether prolactin levels had anything to do with
22  other side effects like these neurological side
23  effects.  They looked at a whole bunch of different
24  things.  There was a lot of information.
25                    MR. KLINE:  Your Honor, objection.
```

1          It's not a question.  I have it in front of

2      me.

3                   THE COURT:  Sustained.  Sustained.

4                   Yes.  Rephrase it.

5                   MS. SULLIVAN:  Sure.

6    BY MS. SULLIVAN:

7    Q.    Dr. Kessler, you'll agree they looked at a lot

8    of information in terms of prolactin and its

9    relationship to a lot of different things in this

10   paper?

11   A.    Yes.  I mean --

12   Q.    Okay.

13   A.    -- the specific thing that you pointed me to

14   was the stuff on SHAP.  But I agree that there were

15   a lot of different variables looked at.  There were

16   different variables looked at.

17   Q.    And this draft also includes the 8- to 12-week

18   statistically associated finding that you think is

19   so significant, right?

20   A.    Not just me.  It's -- it's in there.  It was

21   made --

22   Q.    Right.

23   A.    It was -- even Janssen said it was notable or

24   significant.

25   Q.    My question was, this contains that finding?

- DAVID A. KESSLER, M.D. - CROSS -            18

```
 1   A.     Exactly, and then it disappears.
 2   Q.     And you see here that the authors -- the
 3   Janssen author of this e-mail says that "there's
 4   nothing to find, people," no matter how you look at
 5   the data, right?
 6   A.     Exclamation point.
 7   Q.     Right.  Even with the 8- to 12-week; in other
 8   words, Dr. Kessler, the authors -- and incidentally,
 9   Dr. Kessler, this contains the author's comments,
10   right?
11   A.     Again, let the sentence read as it does,
12   because it talks about some minor text.  It says
13   exactly that.
14   Q.     Yes.  And the authors -- and Janssen concluded
15   that this 8- to 12-week thing that you think is a
16   red flag was not clinically meaningful --
17                 MR. KLINE:  Objection.
18   BY MS. SULLIVAN:
19   Q.     -- right?
20                 MR. KLINE:  Objection.  The e-mail --
21                 THE COURT:  All right.  That's
22          sustained.  I mean --
23                 MR. KLINE:  The e-mail doesn't have
24          an author on it.
25                 THE COURT:  All I know is the
```

1          objection is sustained.

2                    This document has been read by and

3          commented upon for its language.  I don't

4          know that there was any specific data

5          attached to this that you have attributed to

6          right now.

7    BY MS. SULLIVAN:

8    Q.    Well, Dr. Kessler, it contains the information

9    that you think is so clinically relevant, right,

10   this 8- to 12-week stuff that's on Page 084?

11   A.    This manuscript, right, has the data put back

12   in and then it disappears.  And I do think, as I

13   think Janssen said in earlier draft, that this was

14   notable or significant.

15   Q.    And, Doctor, well, you know that Janssen

16   wanted to -- you know Dr. Pandina from Janssen

17   wanted the 8- to 12-week data information in the

18   manuscript?

19   A.    So, no.  I have Dr. Pandina's presentation to

20   the advisory committee board, right.  That's a few

21   weeks earlier than this.  And he didn't present any

22   of that to the advisory committee board.

23   Q.    Because, Dr. Kessler, you know that the

24   outside authors didn't want SHAP(B) at all, never

25   mind the 8- to 12-week data -- I mean SHAP(A) at

```
 1   all, never mind the 8- to 12-week data --
 2                   MR. KLINE:  Objection.
 3   BY MS. SULLIVAN:
 4   Q.    -- because it was filled with puerperal boys
 5   who had gynecomastia from puberty?
 6                   MR. KLINE:  Objection; her version of
 7          the world.
 8                   THE COURT:  All right.  That question
 9          is sustained.
10                   And remember, ladies and gentlemen,
11          the question is not evidence.
12   BY MS. SULLIVAN:
13   Q.    The truth, Dr. Kessler, is --
14                   MR. KLINE:  Objection to these
15          questions with the truth.
16                   THE COURT:  I don't know what the
17          truth is, Counselor.
18   BY MS. SULLIVAN:
19   Q.    The fact is, Dr. Kessler, that it was the
20   outside authors, including the pediatric
21   endocrinologists from CHOP, who didn't want to look
22   at SHAP(A) at all?
23                   MR. KLINE:  Objection.
24   BY MS. SULLIVAN:
25   Q.    They didn't want that Table A in the paper; it
```

1   was Janssen that put it in the paper?

2                    MR. KLINE:  Objection.  She tries to

3          do what she's told not to do.

4                    THE COURT:  Again, Counselor, this

5          now is getting into what exactly has been

6          discussed before.  He wasn't in the meetings.

7                    MS. SULLIVAN:  Fair enough.

8                    THE COURT:  Okay.

9   BY MS. SULLIVAN:

10  Q.    And that's the truth, Doctor, you don't know

11  because you weren't there?

12                    MR. KLINE:  Objection to "that's the

13         truth."  Objection to asking the same thing

14         again.

15  BY MS. SULLIVAN:

16  Q.    You weren't there, Dr. Kessler?

17                    MR. KLINE:  Like she owns the truth.

18                    THE COURT:  Were you there,

19         Dr. Kessler?

20                    THE WITNESS:  There, define "there."

21                    THE COURT:  Were you at the meetings,

22         at these meetings yourself?

23                    THE WITNESS:  No.

24                    THE COURT:  All right.  Move on

25         please, Counsel.

1              MS. SULLIVAN:  Yes, Your Honor.

2    BY MS. SULLIVAN:

3    Q.    And, Doctor, I want to look at some of the

4    statistical analysis that you talked about, this

5    Table 21 and Table 20.

6    A.    Sure.

7    Q.    I think you told our jury that you are a

8    professor, but you're not a statistician, correct?

9    A.    I think I am a professor of biostat.  I

10   certainly have studied biostat, especially in the

11   pharma -- in the context of statistics and drugs.  I

12   can hold my own.  But in the end, the fact is that I

13   rely on statisticians and would do that routinely

14   when I worked at FDA.

15   Q.    Can you answer my question, Dr. Kessler?

16   You're not a statistician?

17   A.    I'm a professor of biostatistics.  I don't --

18   I certainly rely on others who know a lot more

19   statistics than I do.

20   Q.    And you're not a statistician?

21              THE COURT:  Well, Counsel, again, I

22         mean, he has not -- ladies and gentlemen,

23         this gentleman has not been qualified as an

24         expert in statistics.  He, however, has been

25         qualified as an expert in biostatistics,

1            right.

2    BY MS. SULLIVAN:

3    Q.     And, Dr. Kessler, at least you've acknowledged

4    in the past that you're not a statistician, correct?

5    A.     Others know certainly more -- have much more

6    knowledge about mathematical statistics than I do.

7    Q.     And, Dr. Kessler, I want to look at and talk

8    to you a little bit about this Table 20 and 21 from

9    the five Findling studies.

10                   And so Table 20 is all of the --

11   taking a look at this -- Table 20 looks at the data

12   over five different time periods in addition to

13   before dosing, right?

14   A.     Exactly.

15   Q.     And it includes all the kids?

16   A.     Table 20 as I understood --

17   Q.     I'm sorry.  This is SHAP(B).

18   A.     Thank you, ma'am.

19   Q.     Yes.  And this is the table where boys over 10

20   are excluded?

21   A.     Yes.  And there probably is a footnote that we

22   can point to.

23   Q.     Yeah.  And so this took out boys who were

24   going through puberty, this analysis?

25   A.     This took out boys greater than 10.

1  Q.    Yeah.

2  A.    Greater than 10, and you assume that that was

3  the -- that correlated with puberty, whether it was

4  8- or 9-year-olds.

5  Q.    Yeah, right.

6              And because you saw the outside

7  endocrinologists found that there was a background

8  rate of 50 percent for gynecomastia in boys in

9  puberty?

10  A.    I don't --

11              MR. KLINE:  Objection.  Objection.

12              THE COURT:  What's the basis?

13              MR. KLINE:  Asked and answered at

14      least a dozen times.

15              It's the same question.

16              THE COURT:  All right.  I'll permit

17      it one more time.  Overruled.

18  BY MS. SULLIVAN:

19  Q.    You saw in the paper that they noted a

20  background rate of 50 percent?

21  A.    They noted it.

22  Q.    Yeah.

23  A.    That doesn't mean --

24              MR. KLINE:  Objection.  Objection, if

25      I may.  Objection.  Her last question was

```
 1              20 percent and one question was 90 percent.
 2                   MS. SULLIVAN:  No, no.  It's always
 3              50.  You didn't listen --
 4                   MR. KLINE:  So even -- no.  I'm
 5              listening and I'm watching.  So that has to
 6              be consistent, Your Honor.
 7                   THE COURT:  What is the question,
 8              Counsel?
 9                   MS. SULLIVAN:  I thought I always
10              said 50, Judge.
11   BY MS. SULLIVAN:
12   Q.   The paper says 50 percent, right, Dr. Kessler,
13   that the outside experts put the frequency of
14   puberty in boys -- the frequency of gynecomastia in
15   boys at 50 percent, right?
16   A.   Yes.  It's important -- let me just look at it
17   as you have this up.  It's not talking specifically
18   about this study --
19   Q.   Right.
20   A.   -- in 50 percent.
21   Q.   It's talking about a background rate in the
22   population of boys going through puberty.
23                   MR. KLINE:  May he answer?
24                   THE COURT:  Counsel, are you going to
25              have any experts of your own in this case?
```

```
 1                    MS. SULLIVAN:  Sure are.
 2                    THE COURT:  All right.  Why don't you
 3          move on, then.
 4                    MR. KLINE:  Asked and answered.
 5                    MS. SULLIVAN:  Well, Your Honor, this
 6          is relevant to this whole --
 7                    THE COURT:  Well, it has been asked
 8          and answered repeatedly.
 9                    MS. SULLIVAN:  Okay.
10    BY MS. SULLIVAN:
11    Q.    And, Dr. Kessler, so one way to take out this
12    background rate to figure out if the drug is
13    associated with gynecomastia -- with
14    prolactin-related events like gynecomastia is to
15    take out the boys who might have gynecomastia
16    because of puberty?
17    A.    It could have been done that way.  But that's
18    not the way it was -- the rules were set up front.
19    Q.    And Table 20 does that.  It takes out the boys
20    who might have gynecomastia from puberty?
21    A.    Yes, after the fact.
22    Q.    Yes.
23                    And you would expect, Dr. Kessler, if
24    the medicine had some association with gynecomastia,
25    you'd expect to see it in SHAP(B) as well, right?
```

- DAVID A. KESSLER, M.D. - CROSS -          27

1   A.    I'm not giving an opinion specifically on

2   that.  You can ask the endocrinologist that.

3   Q.    So -- okay.

4              So if Risperdal was associated with

5   gynecomastia or caused gynecomastia, you would

6   expect to see it in this population as well, the

7   boys under 10, right?

8   A.    And you do.  You do see cases of gynecomastia,

9   right.  Add up the number of cases.  We do see that.

10  Q.    But you actually see more in the normal

11  population?

12  A.    The issue is, right, you do see gynecomastia,

13  right, in these cases.

14  Q.    Right.

15  A.    This is an analysis.  It is what it is.  It's

16  an analysis.  It was done after the fact.

17  Q.    But what --

18  A.    I --

19              THE COURT:  Wait.  You know, Counsel,

20         I am going to ask -- if you're asking these

21         questions repeatedly, please allow him to

22         answer his questions repeatedly.

23              MS. SULLIVAN:  Sure.  I didn't mean

24         to interrupt.

25              THE COURT:  Otherwise, you know, we

 1          will start cutting off questions.

 2                    MS. SULLIVAN:  I didn't mean to

 3          interrupt, Your Honor.

 4   BY MS. SULLIVAN:

 5   Q.    So, Dr. Kessler, Table 20 looks at boys under

 6   10 and finds no difference in any of the weeks in

 7   terms of a greater statistical relationship between

 8   the medicine and gynecomastia as compared with the

 9   boys who had normal prolactin levels, right?

10   A.    That's correct, if one takes a statistical .05

11   rate.  But as you see, that in weeks 8 to 12, you

12   still have three times more.  It's not significant

13   at the .05 level.

14   Q.    And statistical significance is used by

15   scientists to try to eliminate the play of chance?

16   A.    Sure.

17   Q.    And so when you look at weeks 4 to 7, no

18   statistical relationship, right?

19   A.    Not after the fact.

20                    MR. KLINE:  It's not being --

21                    THE WITNESS:  Not after the fact.

22                    MR. KLINE:  Your Honor, the whole

23          thing's not being displayed, and you'll see

24          that it's 90 percent.

25                    THE COURT:  No, I don't see anything.

- DAVID A. KESSLER, M.D. - CROSS -          29

```
 1            But I would ask that the entire document be
 2            displayed.
 3                    MS. SULLIVAN:  Of course.
 4                    THE COURT:  And I'm very happy with
 5            going through this cross-examination on these
 6            points.  This is the crux of it.
 7  BY MS. SULLIVAN:
 8  Q.    And, Dr. Kessler, there is also no
 9  relationship in weeks 8 to 12 when you take out the
10  puerperal boys, right, statistically?
11  A.    You have three times the incidence.  You have
12  a 90 percent of P at point -- 90 percent
13  probability, not 95.
14  Q.    Not statistically significant?
15  A.    It depends on -- it depends on how you define
16  statistically significant.  It's three times.
17  Q.    A p-value that --
18                    MR. KLINE:  Let him finish, please.
19                    THE COURT:  That -- really, we're now
20            going through this finally, the crux of it,
21            as far as this particular issue is concerned.
22            Allow him to answer the question.
23                    MS. SULLIVAN:  Sure.
24                    THE COURT:  It's only fair for both
25            sides to have this all aired out.
```

```
 1              MS. SULLIVAN:  Yes, Your Honor.  I
 2         was just trying to move it along, but --
 3              THE COURT:  No, no, no.  Let him
 4         answer this question.  You want to ask him,
 5         he'll answer.  You ask him, he'll answer.
 6              THE WITNESS:  So this is an analysis,
 7         Table 20, that is done after you have a
 8         statistical association, right.  You found a
 9         statistical association on May 15, right, and
10         then you -- and then Janssen ran this after
11         it had that result, which is not proper.
12    BY MS. SULLIVAN:
13    Q.    In your view?
14    A.    No.  Ma'am, no one changes the rules of the
15    game once you have the data and not report the
16    initial results.
17    Q.    And, Dr. Kessler, in fact, there is no
18    statistical significance for any time period in this
19    table, right?
20    A.    It -- the issue is what level of statistical
21    significance, but it makes no difference.  Once you
22    have a statistically significant result on the
23    May 15, right, running it again, you can -- you can
24    change the rules and find results that are not
25    statistically significant.  It doesn't negate the
```

1   statistically significant finding in May.  That's

2   what counts.  You can't change the rules.

3   Q.    Can you answer my question, sir?

4                   MR. KLINE:  Your Honor, he answered

5           it.

6                   THE COURT:  All right.  That's

7           sustained.  He's answering your questions the

8           best he can.  If you don't like the answer,

9           then ask him a different question or move on

10          to some other subject.

11                  MS. SULLIVAN:  Your Honor, my

12          question was very simple.

13                  THE COURT:  Well, then ask him a

14          question in a direct, leading way that gives

15          him no chance to --

16                  MS. SULLIVAN:  John, John, can you

17          repeat my question.  Thank you.

18                  COURT REPORTER:  May I, Your Honor?

19                  THE COURT:  Yes.

20                  And, Doctor, you are basically

21          instructed to answer the question.

22                  THE WITNESS:  Thank you.

23                           -  -  -

24                  (Whereupon the court reporter read

25          back the previous question as follows:

```
 1                    "Question:  And, Dr. Kessler, in

 2              fact, there is no statistical significance

 3              for any time period in this table, right?")

 4                         -   -   -

 5                    THE WITNESS:  At the .95 level,

 6              that's correct.

 7   BY MS. SULLIVAN:

 8   Q.    And the convention and the statistics is

 9   typically .05 in terms of statistical significance?

10   A.    That's true, but not necessarily all the time.

11   Q.    So according to the convention, none of these

12   time periods at all were statistically significant,

13   true?

14   A.    I think I just answered -- I answered that.

15   Q.    Okay.  And this is the table where you exclude

16   the boys going through puberty, right?

17                    MR. KLINE:  Objection.  That is asked

18              and answered over and over again.

19                    THE COURT:  I, frankly, did not hear

20              it.  So, John, repeat the question.

21                    MS. SULLIVAN:  And, Your Honor,

22              Mr. Kline had Dr. Kessler on the stand for

23              three days.

24                    THE COURT:  Well, you've had -- you

25              know, I'm not counting the hours at the
```

```
 1             moment.  So let me hear the question.
 2                          -  -  -
 3                  (Whereupon the court reporter read
 4             back the previous question as follows:
 5                  "Question:  And this is the table
 6             where you exclude the boys going through
 7             puberty, right?")
 8                          -  -  -
 9                  MR. KLINE:  That was also --
10                  THE COURT:  And "this is" the --
11             again, I'm directing you not to answer that
12             question unless we have a more specific
13             explanation of what "this" is.
14   BY MS. SULLIVAN:
15   Q.    Table 20, Dr. Kessler, we can agree excluded
16   the boys over 10, the boys in puberty?
17   A.    As well as some other exclusions.
18   Q.    Yeah.  But it excluded the boys in puberty?
19   A.    Among other exclusions, yes.
20   Q.    And so when they excluded the boys in puberty,
21   there was no statistical significance for any time
22   period, right?
23   A.    I think I answered that.  But I'm happy to
24   answer that question.  At the .95 level, that's
25   correct.
```

1  Q.    And, Dr. Kessler, even in -- and incidentally,

2  Dr. Kessler, there was actually, in many of the time

3  periods, there were more people in the normal groups

4  percentage-wise that had events hypothetically

5  related -- that had side effects that hypothetically

6  could be prolactin related that had normal prolactin

7  levels, right?

8  A.    Yes.  The 8 to 12 had more in the upper limit

9  of normal.

10  Q.    But there are several time periods where

11  actually the people that had the elevated prolactin

12  had fewer side effects than the people that had

13  normal prolactin levels?

14  A.    Yes, that's exactly correct.

15  Q.    Which is the opposite of what you'd expect?

16                MR. KLINE:  Objection.

17                THE WITNESS:  No.

18                THE COURT:  Objection?

19                MR. KLINE:  Yes.

20                THE COURT:  Sustained.

21  BY MS. SULLIVAN:

22  Q.    And then, Dr. Kessler, looking at Table 21,

23  this is where you include the puerperal boys, right,

24  the boys going through puberty?

25  A.    Let's be specific.  These are the boys greater

1  than 10.

2  Q.    Yes.  Which would include boys going through

3  puberty.

4  A.    Yes.

5  Q.    And even when you do that, you have no

6  statistical significance for all of the time periods

7  except for 8 to 12, right?

8  A.    That's exactly correct.

9  Q.    And it's also true, sir, that if you look at

10 all of the data for Table 21, if you pull all of the

11 time periods, there's no statistical significance

12 overall?

13 A.    Just show me that on this table and the next

14 table.

15 Q.    I'm asking you, do you know?

16 A.    I have not run that myself --

17 Q.    You have --

18 A.    One second.  I went through this data set,

19 right, and I don't see it.

20 Q.    But you know that's true?

21 A.    Show me it, please.

22 Q.    Do you not know?

23 A.    I looked for it several times in this data

24 set.  It doesn't exist.

25 Q.    But my question is do you know, sir, that when

- DAVID A. KESSLER, M.D. - CROSS -          36

1    you look at all the time periods, there's no
2    difference?
3    A.     If you have that data, I'd like to see it.
4    Q.     I'm asking if you know, sir.
5    A.     I have not seen that data.  And I have looked
6    for it in these data sets.  It doesn't exist.
7    Q.     And, Dr. Kessler, and if you actually add up
8    the events, 60 versus 63, there's no way there's any
9    difference statistically, right?
10   A.     I'm not doing post hoc, post hoc analysis --
11   Q.     Yes.
12   A.     -- as you're doing here.  These are
13   statistical analyses that Janssen got at a point in
14   time.
15   Q.     So, Dr. Kessler, you're not going to
16   acknowledge to the jury that when you look at the
17   data overall, all of the time periods, there's no
18   difference?
19   A.     I am perfectly willing to acknowledge to the
20   jury, and this is what's important, is the
21   statistically significant finding in 8 to 12 weeks,
22   and that time period is of critical importance.
23   Q.     And, Dr. Kessler, the only way you get there
24   is if you ignore 9 of 10 data points and just pick
25   out that one period?

1   A.    Ma'am, I didn't ignore anything.  Look at the

2   Janssen manuscripts.  They point out this is a

3   significant and notable finding.

4   Q.    And if you -- and so you have to ignore weeks

5   4 to 7, 6 to 24, 28 to 36, 40 to 48, and all of the

6   other time periods including 8 to 12 in the boys

7   without puberty, right?

8   A.    None of that justifies throwing out the

9   statistically significant results and hiding it.

10  Q.    Well, Dr. Kessler, you and Mr. Kline keep

11  talking about hiding data.  But the fact is, you saw

12  the e-mail that it was Janssen that wanted the

13  gynecomastia rates in the Findling article?

14                  MR. KLINE:  Objection.

15                  THE COURT:  All right.  That's

16          sustained.  The jury is going to have to

17          determine that themselves, not from an expert

18          witness on, you know -- this witness has

19          offered a particular opinion, and we've had

20          about four days of testimony back and forth

21          on the substance of that opinion.  And that's

22          for the jury to decide whether or not to

23          accept his opinion.

24  BY MS. SULLIVAN:

25  Q.    Dr. Kessler, I'm going to put up Plaintiff's

1    Exhibit 37 which is a call-out from one of the

2    manuscripts here.  And I want to just ask you about

3    a statement in there.

4    A.    Can you just tell me which version of the

5    manuscript?  What the date is.

6    Q.    It's the July 16, 2002 version, Plaintiff's

7    Exhibit 37, and it looks like it's on Page 741.

8    A.    Let me get it, please.  Thank you.

9              MR. KLINE:  Is this from draft one?

10         July 16.

11              THE WITNESS:  So I have it -- correct

12         me if I'm wrong, this is from Bates No. 740

13         and 741; is that correct?

14              MS. SULLIVAN:  Yes, sir.

15              THE WITNESS:  Thank you.

16              MS. SULLIVAN:  You got it.

17              THE WITNESS:  I have it exactly in

18         front of me.

19   BY MS. SULLIVAN:

20   Q.    And it talks about the fact that 7.8 percent

21   of patients who had prolactin above the upper limit

22   of normal had SHAP at some point during the trial,

23   right?

24   A.    Exactly.

25   Q.    And what that means is that some of the side

1   effects could have -- for example, some of the boys

2   could have gotten gynecomastia before they had the

3   elevated prolactin.  That's how the data was

4   collected?

5   A.    That's exactly how Janssen designed the study,

6   yes.

7   Q.    Yeah.  So some of the gynecomastia events

8   could have occurred before prolactin was even

9   elevated?

10  A.    It -- it measured them independently of each

11  other.

12  Q.    Right.

13  A.    Exactly, ma'am.

14  Q.    So many of the events counted in the Findling

15  article and in Table 21 could have occurred before

16  prolactin was even elevated?

17  A.    That's a -- that's a correct statement.  I

18  don't know -- you added the word "many."  I don't

19  have that data.

20  Q.    Okay.  Dr. Kessler, I want to go back to

21  INT-41, the actual study report.  And it's

22  Plaintiff's Exhibit 20, briefly.

23  A.    And if I can just get a copy.

24          (Pause.)

25          Yes, I have it.

1    Q.    And, Dr. Kessler, and this is the study

2    report, the final one for INT-41, right?

3    A.    Yes.  That's what it looks like.

4    Q.    And this is the kind of thing that companies

5    and Janssen did here submit to the FDA after a study

6    is done, right?

7    A.    Yes.

8    Q.    And I think you and Mr. Kline --

9    A.    Hold on.  Sometimes.  Sometimes it's part of

10   an application.  It had -- each of these have

11   their -- they get submitted at different times.  So

12   I just don't want to represent exactly when it was

13   submitted.

14   Q.    And, Dr. Kessler, you and Mr. Kline kept

15   calling this the quote-unquote special attention to

16   prolactin study, right?

17                MR. KLINE:  Your Honor, objection.  I

18         asked him questions.  He answered the

19         questions.  It's not me, him and Mr. Kline.

20         It's so silly what she tries to do, and I

21         object.

22                THE COURT:  Okay.  Mr. Kline, my

23         preference is, of course, if you have an

24         objection and then a short statement of what

25         the objection is.

```
 1                    MR. KLINE:  That was my --
 2                    THE COURT:  You're saying that this
 3          is irrelevant?
 4                    MR. KLINE:  Yes.
 5                    THE COURT:  All right.  It's not --
 6          that's overruled.
 7                    But, again, I don't mean to be fussy
 8          about this, but what is this document number?
 9                    MS. SULLIVAN:  This is Plaintiff's
10          Exhibit 20, Your Honor.
11                    THE COURT:  All right.  We've seen
12          this before, correct?
13                    MS. SULLIVAN:  Yes, Your Honor.
14                    MR. KLINE:  Yes.
15                    THE WITNESS:  May I answer that
16          question?
17                    THE COURT:  Yes, Dr. Kessler, please
18          answer her questions regarding this document.
19                    THE WITNESS:  So you don't have to
20          take my word for the use of the word "special
21          attention."  Turn to 159, assuming this is
22          Bates, the same as my copy.
23     BY MS. SULLIVAN:
24     Q.    Yeah.  And let's look at that, Doctor.
25                    In fact, Dr. Kessler, the company was
```

1  paying special attention to a few different side

2  effects, not just prolactin?

3  A.    You asked me that question, I believe,

4  yesterday.

5  Q.    And let's take a look at that.

6                THE COURT:  No; that was Friday.

7                THE WITNESS:  Oh, I'm sorry.

8  BY MS. SULLIVAN:

9  Q.    And I asked you -- but we didn't have the

10  document to show our jurors.  We now do.  And they

11  were paying special attention to these neuromuscular

12  side effects, right, extra EPS?

13  A.    The extrapyramidal, the neuromuscular, with --

14  Q.    You see that on Page 58 there?  They were

15  paying special attention to that, too, right?

16  A.    58.  I'm sorry.  I was on 59.

17                So, yes, it says special attention

18  was given, yes, and it says exactly what it does.

19  Q.    And they were also paying special attention to

20  glucose, right?

21  A.    Yes.

22  Q.    And they also were paying special attention to

23  prolactin?

24  A.    Yes.  That's what it says.

25  Q.    And so they were looking for and paying

- DAVID A. KESSLER, M.D. - CROSS -          43

1   attention to different side effects?

2   A.    Yes.

3   Q.    This wasn't a prolactin-only study, by any

4   means?

5   A.    No.

6   Q.    And going back, Dr. Kessler, to Page 193 of

7   this document where they talk about adverse events.

8   And this is INT-41, right?  Your red flag.

9              They say this is no serious adverse

10  events that were related to the increase in

11  prolactin levels, right?

12  A.    Just show me where --

13              MR. KLINE:  Where are you?

14              MS. SULLIVAN:  193.

15              MR. KLINE:  193.

16              THE WITNESS:  Give me one second,

17     please.

18              MS. SULLIVAN:  I'm sorry, Jurors,

19     making you dizzy here.

20              (Displaying document.)

21              So --

22              THE WITNESS:  So can you show me

23     that, please?

24  BY MS. SULLIVAN:

25  Q.    On Page 193 it says that there are no serious

- DAVID A. KESSLER, M.D. - CROSS -             44

```
1   adverse events that were related to the increase in
2   prolactin levels.  Do you see that?
3   A.    Yes.
4             So that's inconsistent with the table
5   that I have which is the actual listing for
6   RIS-INT-41, which is a table that says a narrative
7   or tabulis summary showing the most frequent and
8   most serious adverse experiences by body systems and
9   that has gynecomastia -- and labels gynecomastia.
10            So just to be -- yes.  There
11  certainly are serious adverse events in INT-41.
12  Q.    And we're going to look at the table.  But in
13  terms of serious adverse events, that's what the CSR
14  says, related to prolactin?
15  A.    (No response.)
16  Q.    In other words, they looked at the people who
17  had adverse events to see if the serious ones had a
18  relationship to elevated prolactin and they found
19  none, right?
20            MR. KLINE:  Your Honor, same
21        objection.  The words say what they say, not
22        what she says they say.
23            THE COURT:  Yeah.  Sustained as to
24        "they."  I think we need to be specific
25        again.  Who wrote this document?
```

```
 1                    MS. SULLIVAN:  This is a Janssen
 2          Clinical Study Report --
 3                    MR. KLINE:  Janssen.
 4                    MS. SULLIVAN:  -- to the FDA.
 5                    THE COURT:  Ah, okay.  Overruled.
 6                    As long as we understand it's a
 7          Janssen -- Janssen's "they," right?
 8                    MS. SULLIVAN:  Sure.
 9                    THE WITNESS:  So I see Janssen also
10          saying there's serious adverse events of
11          gynecomastia, right, and --
12  BY MS. SULLIVAN:
13  Q.    But, Doctor, I think we're missing each other.
14  So there were events of gynecomastia, but what this
15  says, the serious events were not related to the
16  elevated prolactin levels.  When you looked at the
17  people who had elevated prolactin, they didn't have
18  the serious events, right?
19  A.    No.  This says -- there's no question, I
20  believe.  You're not saying that -- I'm not
21  interpreting you to say gynecomastia is not related
22  to increased prolactin levels.  From the beginning
23  gynecomastia was defined by Janssen as
24  prolactin-related adverse event.  So it has -- I
25  mean, it is a related event.
```

```
 1  Q.    Potentially.
 2              MR. KLINE:  Objection, Your Honor.
 3              THE WITNESS:  No.  It's --
 4              THE COURT:  Well, no.  I take that,
 5         Ms. Sullivan, that's a question.  Is that
 6         potentially true or that is true?
 7  BY MS. SULLIVAN:
 8  Q.    Dr. Kessler, can you just answer my question?
 9  The fact is, in INT-41, they found that the people
10  who had the serious adverse events did not have
11  elevated prolactin, right?
12  A.    They are making that statement.
13  Q.    Yeah.
14  A.    Okay.  They are also saying that there's
15  serious adverse events of gynecomastia, and they are
16  defining -- Janssen's defining PRAE and gynecomastia
17  as definitely causally related to prolactin levels.
18  Q.    But, Dr. Kessler, we've already established
19  that boys can have gynecomastia from puberty, right?
20  A.    There certainly can be increased breasts from
21  puberty, yes.
22  Q.    And so Janssen was looking at whether
23  gynecomastia and any other serious adverse events
24  were related to prolactin elevations and they didn't
25  find any that were related to the prolactin
```

1    elevations, right?

2                   When they measured prolactin, the

3    serious adverse events didn't correlate?

4    A.    Well, I don't think that's -- that data is not

5    shown there.  Show me that data there, ma'am.

6    Because the table on gynecomastia does not say which

7    ones correlate and which ones don't correlate.

8    Q.    And, Doctor, it goes on to say in most

9    patients hyperprolactinemia was a lab finding that

10   had no clinical symptoms, right?

11   A.    There is hyperprolactinemia, but the fact is

12   that when you -- there is no data that I've seen,

13   right, that those cases of gynecomastia were not --

14   if you look at that table, right --

15   Q.    And let's look at the table that you want to

16   look at.

17   A.    -- the table does not state that they were not

18   related to hyperprolactinemia.

19   Q.    Well, let's look at the --

20   A.    There's no analysis.

21   Q.    Let's look at the -- did you not look at the

22   appendices to this CSR, Doctor?

23   A.    I looked at a lot of the study, yes, ma'am.

24   Q.    Do you know, sir, that the elevated prolactin

25   levels were not correlated with the serious adverse

1    events?

2    A.    I looked for the evidence of correlation,

3    right, and I don't see -- certainly in this

4    discussion, I don't see the correlation.

5    Q.    And, Doctor, here is the chart you're talking

6    about where the outside investigators grade the

7    severity of the adverse event, right?

8    A.    Be careful with that, okay.

9              That's probably true.  But this study

10   report is authored not just by the outside

11   investigators, it's also authored by the Janssen

12   employees who obviously scrutinize.

13             Now, I assume, right, that those are

14   directly off of investigator reports.  We can go

15   check, but this is --

16   Q.    Of course they are.  You don't have any

17   evidence that there's anything to the contrary?

18   A.    Well, the --

19   Q.    In other words, the outside investigators

20   write "mild, moderate, severe" and Janssen reports

21   that to the FDA?

22   A.    Janssen employees wrote this report.  As you

23   know, that there are times when companies scrutinize

24   what the investigators do.  So you have to be

25   careful.

1                    What we know is -- and I'm certainly

2      willing to speculate -- that that's by the

3      investigators; and what Janssen did was they

4      reported what the investigators said.  And I'm

5      comfortable with that.

6      Q.    And what the investigators said is that the

7      side effects were moderate, mild, moderate, mild,

8      moderate, mild.  In fact, none severe in these

9      tables, right?  No serious adverse events here?

10     A.    No; because you're confusing two things.

11     You're confusing the degree of severity, right, with

12     the way -- if you look here, I have 22 of the most

13     serious adverse events.  So they're considering all

14     the adverse events as serious.  There's different

15     degrees of severity here.  But Janssen on certainly

16     the way it is submitted to the FDA and did the

17     tabulation considered these the most serious adverse

18     experiences.

19     Q.    And for none of them, in terms of

20     gynecomastia, did the outside investigators rate

21     them as severe, right, for none of them?

22     A.    Again, I'm not sure we -- just let us look at

23     the footnotes and see if we have the scale.

24     Q.    I'm just asking you to look --

25     A.    No, no.  I just -- you asked me a question.

```
 1    We would be able to tell that by looking at the
 2    footnotes to see what the -- what the options were.
 3                    MR. KLINE:  Is that down there?
 4                    THE COURT:  Is there a footnote here?
 5                    MS. SULLIVAN:  I don't know what he's
 6         talking about, Your Honor.  He's just making
 7         stuff up.
 8                    THE WITNESS:  No.
 9                    THE COURT:  No.
10                    MR. KLINE:  Oh, my word, Your Honor.
11         Did you hear that?  The suggestion -- did you
12         hear that, Your Honor, what she mumbled under
13         her breath?
14                    THE COURT:  If you don't know --
15         excuse me.  Sustained.
16                    Have a seat, please.
17                    If you don't know, that means the
18         jury doesn't know.  So let's look at the
19         footnote.
20                    MS. SULLIVAN:  I don't know what he's
21         talking about, Your Honor.
22                    THE COURT:  What exhibit are you
23         talking about, Doctor?
24                    THE WITNESS:  So go to the first
25         page.
```

 1            MR. KLINE:  Your Honor, may we -- if
 2       it's a good time for a break, may we see you
 3       at sidebar?
 4            THE COURT:  It's not a good time for
 5       a break.  I want to see this footnote.
 6            MS. SULLIVAN:  I don't know what he's
 7       talking about.
 8            MR. KLINE:  I would request that
 9       counsel doesn't mumble under her breath about
10       making things up.
11            THE COURT:  No; that's a different
12       matter.
13            MR. KLINE:  Because making things up
14       is her forte.
15            THE COURT:  I'm asking you, however,
16       to please be seated.  And I do want to see
17       the footnote; because if counsel doesn't
18       know, that means the jury doesn't know, which
19       means the Judge doesn't know.  And this
20       witness is saying he can explain through a
21       footnote.  I'm happy to look at a footnote.
22            MS. SULLIVAN:  Me, too, Judge.
23            THE WITNESS:  So if you look, okay,
24       there are, right, there are footnotes that go
25       to the C and B and O.

```
 1   BY MS. SULLIVAN:

 2   Q.    What page are you on, Dr. Kessler?

 3   A.    On 82.

 4               MR. KLINE:  82.

 5               THE WITNESS:  And that describes --

 6         that will give you --

 7               THE COURT:  Is that Page 82?

 8               THE WITNESS:  No.  The table is 82.

 9               THE COURT:  I think we were on Page

10         82 originally.

11               THE WITNESS:  No.

12               MS. SULLIVAN:  I don't know what --

13               THE COURT:  Marianne, let me see the

14         report.  What number is this?

15               THE WITNESS:  I'm sorry.

16               THE COURT:  Plaintiff's 20.  He has

17         it.

18   BY MS. SULLIVAN:

19   Q.    Doctor, did you find your footnote?

20   A.    Yes.  There is a footnote on 82.

21   Q.    82 by Bates number or --

22   A.    No.  That's Page 82.  And there's a footnote.

23               You see that footnote.

24   Q.    Yes.

25   A.    C, Caucasian, B...
```

- DAVID A. KESSLER, M.D. - CROSS -          53

1   Q.    Yes, sir.

2   A.    So on severity, you asked me how they graded

3   it.  And I'm looking to see if there was an

4   explanation in the footnote.

5   Q.    Okay.  And I'm showing the footnote here.

6                   (Displaying document.)

7                   And it says there's an asterisk if

8   there's a serious adverse event, right?

9   A.    Yes.

10  Q.    And nobody on this table has an asterisk in

11  terms of gynecomastia, right?

12  A.    Well, it clearly means something because it's

13  there.

14  Q.    In any event, Doctor, the severity rating from

15  the investigators runs from mild to moderate,

16  correct?

17  A.    Exactly.

18  Q.    And it looks like many of the kids recovered,

19  reversed, during the course of the study, right,

20  from the --

21  A.    So let's be -- let's go through this, okay?

22  Q.    Uh-huh.

23  A.    So I think we know from the report that there

24  were about 15 or 16 that didn't recover; is that --

25  Q.    Yeah.  We'll talk about the ones --

- DAVID A. KESSLER, M.D. - CROSS -          54

1   A.     So --

2   Q.     Can we stick first -- we'll talk about those

3   as well.  But can we stick first to many of the kids

4   recovered from whatever prolactin-related events

5   including gynecomastia?

6   A.     So just zero in, if you could, on the chart

7   and just go to the beginning on Table 7.8, the first

8   page.

9   Q.     Uh-huh.

10  A.     We can do this.  Just so, again, the jury can

11  see exactly.  And just zero in on the first patient,

12  for example.

13  Q.     Uh-huh.

14  A.     Right.  So if you go to the top, it says not

15  recovered.

16  Q.     Right.  And that does --

17  A.     So what we could do -- so the table speaks for

18  itself.  And, exactly, we don't have to guess, you

19  can count up which ones were recovered and which

20  ones were not recovered.

21  Q.     Right.  And the study was just a year long, so

22  we don't know which of the patients recovered after

23  the study, right?

24  A.     The data are the data.

25  Q.     Yeah.  And it's certainly possible that

```
 1   several or many or all or none recovered after the
 2   study?
 3   A.      Speculation.
 4   Q.      Right.  And you don't know the answer?
 5   A.      Don't know the answer.
 6   Q.      And also it looks like many of these events
 7   happened -- I think I heard you say that Janssen was
 8   wrong to include the short-term studies in the
 9   incident rate for gynecomastia in the 2006 label?
10   A.      No, I didn't say -- I don't think I said
11   "wrong," okay.  I think you would not necessarily
12   expect your endocrinologists -- Janssen's
13   endocrinologists have testified -- I mean, have
14   stated that they would not expect them in the
15   short-term studies.  There are some in the
16   short-term studies.  It's not as good as the year
17   studies.  It's not as comprehensive.  I don't think
18   I would use the word "wrong."
19   Q.      I thought you said yesterday that you don't
20   see gynecomastia in six weeks from the medicine, so
21   it was a mistake to include those studies in the
22   2006 label.
23   A.      Do me a favor, just give me -- just read back
24   my testimony so we can be very exact.
25   Q.      Maybe after a break we'll pull it out.  We'll
```

1    go back to this point, Doctor.

2                    But certainly some of the events

3    happened in the short term, in 22 days, in three

4    days, in 18 days after taking the medicine, right?

5    A.    Yes, and very much so.

6    Q.    And just so we're clear, just because someone

7    develops a side effect on the medicine like

8    gynecomastia doesn't mean it's necessarily from the

9    medicine?

10   A.    Exactly.

11   Q.    And we don't know, looking at this chart, how

12   many of these gynecomastia, for example, were

13   puerperal?

14   A.    Nor do we have prolactin levels, that's

15   correct.

16   Q.    And when I say puerperal, we don't know how

17   many of these events of gynecomastia on this table

18   were caused by puberty; we don't know that?

19   A.    Janssen -- Janssen didn't design the study to

20   do that.

21   Q.    There were other studies done by Janssen that

22   were placebo controlled where you could tell that?

23   A.    Uhmm, we'd have to go back and review exactly

24   what you can tell.

25   Q.    And you're aware, Dr. Kessler, that there is

1    no placebo-controlled study that shows a higher

2    incident rate in boys getting gynecomastia as

3    associated with Risperdal as compared to boys taking

4    nothing; there's no study that shows that?

5    A.    I would -- the two autism studies did not show

6    that.

7    Q.    Right.  So when -- and in the large

8    placebo-controlled studies that controlled for

9    puberty, you did not see an increased rate of

10   gynecomastia on Risperdal; fair?

11   A.    There weren't that -- I mean, I have -- I

12   don't think that would be correct.  I have the

13   medical reviewer's analysis of those studies, and

14   she says that prolactin data were not available from

15   the placebo-controlled autism studies, right.  So

16   I'm not sure which studies you're referring to.

17   Q.    You're not aware, Dr. Kessler, of any of the

18   placebo-controlled studies done by Janssen or anyone

19   else showing an increased rate of gynecomastia on

20   Risperdal?

21   A.    That's correct.

22   Q.    And I also wanted to go back to INT-70, which

23   was one of the studies you and Mr. Kline talked

24   about, right?

25   A.    Yes.

- DAVID A. KESSLER, M.D. - CROSS -          58

1   Q.    And INT-70 was an extension study to INT-41,

2   the one that you spoke a lot about?

3   A.    Well said.

4   Q.    And I think you corrected -- I think Mr. Kline

5   put on the easel that there was a 12 percent

6   incidence of gynecomastia in INT-70, but you

7   corrected him and said it's actually 6 because there

8   was some double counting going on?

9   A.    Well, don't blame -- I'm not --

10  Q.    I'm not blaming.  I'm just saying it was

11  wrong.

12  A.    I was -- one table did say 12.5.  One table

13  said 6, and I was trying to sort that out.  Those

14  were Janssen's -- those were Janssen's numbers.

15  Q.    And the 12-point -- the only way you get to

16  12.5 is if you double count.  If you count the

17  INT-41 events and the INT-70 events, right?

18  A.    Could we just put up that table or give me

19  that table so I have it?

20  Q.    Sure.

21              This is -- I have the full study, so

22  I'm going to mark it, Judge, as Defense Exhibit --

23  Ms. Brown, what's our next number?

24              MS. BROWN:  It's like 25.

25              MS. SULLIVAN:  25.  If you could give

1           Dr. Kessler and Mr. Kline and the Court a

2           copy, Lamia.  Thank you.  It's 546.

3                     THE COURT:  What document is this?

4                     COURT CRIER:  D-25.

5                          -  -  -

6                     (Exhibit D-25 marked for

7           identification purposes.)

8                          -  -  -

9                     MR. KLINE:  Is this just RIS-70 as

10          previously marked?  I used the toplines.

11                    MS. SULLIVAN:  No.  This is a more

12          complete copy, Counsel.  Remember you had

13          some pages that weren't there.

14                    MR. KLINE:  Oh, yeah, I do remember.

15          Okay.

16                    COURT CRIER:  May I show it to the

17          witness?

18                    (Showing the witness.)

19                    THE COURT:  All right.  The witness

20          is now looking at D-25.

21   BY MS. SULLIVAN:

22   Q.    And, Dr. Kessler, can you -- I'm not sure what

23   table you want to look at, but I think it's 831.

24   A.    So I'm looking at 859, assuming we're looking

25   at the same pagination, the same document.

```
 1                THE COURT:  Why don't you use, for
 2          our sake right now, Doctor, the actual page
 3          number in the real document, because we're
 4          all at different numbers now.
 5                THE WITNESS:  Sure.
 6                I have something called Table 4,
 7          incidence of all adverse events.  And, Your
 8          Honor, I don't have a page number.  I have a
 9          Bates number on the copy I'm looking at.  I
10          can try to find -- if you try to find Table
11          4.
12   BY MS. SULLIVAN:
13   Q.   Maybe we can shorten this, Dr. Kessler.  The
14   fact is that the total events in INT-70 is
15   6 percent, not 12 and a half percent?
16                THE COURT:  Well, wait one second.
17          One second.  I'm not satisfied with that,
18          okay.  In other words, we're not shortening
19          anything.  Nobody's been worried about that
20          up to now.  So where is this document?
21                MR. KLINE:  I'm just lost.  Point me
22          wherever.
23                THE COURT:  I need it by the JJRE
24          number.
25                MS. SULLIVAN:  I'm not sure what he's
```

```
 1              looking at, Your Honor.
 2                   THE COURT:  I'm looking at --
 3                   MS. SULLIVAN:  I have Defense Exhibit
 4              25, but I'm not sure what page he's
 5              interested in, Judge.
 6                   THE WITNESS:  May I give you,
 7              Ms. Sullivan?
 8                   MS. SULLIVAN:  If you want to tell me
 9              what the page is.
10                   THE WITNESS:  Yeah.  So let me just
11              tell you what I have.
12                   THE COURT:  Here, why don't you show
13              it to -- Dr. Kessler, let me see it, please.
14              Give it to Marianne and I'll find it.
15                   THE WITNESS:  Okay.  That was the
16              table that I was referring to.
17                   THE COURT:  Where is it?
18                   COURT CRIER:  That one.
19                   THE COURT:  This page here?
20                   COURT CRIER:  Yes.
21                   THE COURT:  Table 4?
22                   For the record, that's on 00061859.
23                   MS. SULLIVAN:  I think that's a
24              different exhibit, Judge.  I'm not sure what
25              he's got here.
```

- DAVID A. KESSLER, M.D. - CROSS -          62

1                    THE COURT:  It might be.

2    BY MS. SULLIVAN:

3    Q.    Is that -- that's not on the INT.  You're

4    looking at a different exhibit, Dr. Kessler.

5    A.    So I'm looking at something called topline

6    results, RIS-INT-70.

7    Q.    Yes.  I was looking at the final study report,

8    Dr. Kessler, but --

9    A.    So I'm looking at the topline results.  And

10   the topline results in Table 4 -- happy to give it

11   to you so you can project it, not my numbers -- have

12   gynecomastia, and for -- it has three columns,

13   INT-41, INT-41-INT-70, and INT-70, and it says

14   12.5 percent.  Again, Janssen's numbers.  And then

15   there's another table that's Table 7 that has

16   6 percent.

17   Q.    You're right.

18                    But, Dr. Kessler, you know you only

19   get to 12 and a half percent if you double count

20   people that got gynecomastia in the first study,

21   INT-41, and continued into INT-70?

22                    MR. KLINE:  Objection.  It's not

23          double counting, and she knows it.  It's an

24          extension of one year after another.

25                    THE COURT:  You know, I'm going to

- DAVID A. KESSLER, M.D. - CROSS -          63

1              allow him to answer, but then what's going to

2              happen is we're going to have a redirect of

3              about 10 minutes duration, 15 minutes

4              duration, and 15 minutes duration on the

5              other side, and we're going to call it a day

6              and a witness.   That's how we're going to

7              proceed in this matter.

8                     MS. SULLIVAN:   You're cutting off

9              cross-examination, Your Honor?

10                     THE COURT:   I'm not cutting off your

11              cross-examination.   But what I'm saying to

12              Mr. Kline is that when it gets to his turn to

13              clear all this up, he's got 15 minutes and

14              then you'll have 15 minutes on recross.

15                     MS. SULLIVAN:   Understood, Your

16              Honor.

17    BY MS. SULLIVAN:

18    Q.   Well, Dr. Kessler, we don't have to spend a

19    lot of time on this, but do you agree that the real

20    rate was 6 percent, not 12 and a half?

21    A.   I see two different numbers that Janssen are

22    reporting.

23                     Just for INT-70, if you want to show

24    this, INT-70 says on this table 12.5 percent.   It

25    says 6.3 on the other.   And this is -- please, if

1    you want to project this so people can see what I'm

2    talking about.

3                   THE COURT:  That's not going to be

4           done through this -- through this attorney.

5           It might be done through your own attorney,

6           Dr. Kessler.

7    BY MS. SULLIVAN:

8    Q.    Just so it's clear, Doctor, you're not going

9    to agree that the only way you get to 12 and a half

10   is if you double count?

11   A.    The word "double counting," again, I'm not

12   doing any double counting.  Janssen's doing the

13   counting.  On one table they say 12.5, and that's

14   solely the way they list it as INT-41.  When they

15   have a column for double counting -- not double

16   counting, but INT-41 and 70, and there they got

17   8.3 percent.  So, again, the document needs to speak

18   for, you know, the document --

19   Q.    Sounds like you're not going to agree,

20   Dr. Kessler.  I guess we'll have to let somebody

21   else talk about it.

22                   MR. KLINE:  Objection, Your Honor.

23           Objection.  Really.

24                   MS. SULLIVAN:  Okay.

25                   THE COURT:  Is there an objection?

```
1                    MR. KLINE:  Yes.  Really.
2                    MS. SULLIVAN:  Judge --
3                    MR. KLINE:  Really.
4                    MS. SULLIVAN:  -- we could pull up
5          his direct testimony.  He told Mr. Kline it
6          was -- he's changing his testimony.
7                    MR. KLINE:  No, he is not.  See --
8                    THE COURT:  Counsel, Counsel, at this
9          point, I've been, I think, pretty generous in
10          the leeway that's been given to counsel.  If
11          you're going to cross-examine a witness and
12          he has a document he wants to show himself
13          that may counter your point, he should be
14          allowed to do that.  But we'll allow that on
15          redirect.
16                    MS. SULLIVAN:  Of course.
17   BY MS. SULLIVAN:
18   Q.    And, Dr. Kessler, if you can turn to Page 64
19   on INT-70.
20   A.    This is Bates No. 64.
21   Q.    It's Page No. 64, Bates No. 834, and it's
22   Defense Exhibit 25.  This is the Clinical Study
23   Report for INT-70.
24   A.    Yes.
25   Q.    And one of the things when you and counsel
```

- DAVID A. KESSLER, M.D. - CROSS -               66

1    were talking about the study to the jury that you

2    guys didn't highlight was the fact that there was no

3    apparent link between the occurrence of gynecomastia

4    and prolactin levels, right?

5    A.     That says exactly what it says.

6    Q.     And because it's true?

7    A.     I -- that document says what it says.

8    Q.     That the prolactin levels in the subjects who

9    experienced gynecomastia remained within the normal

10   range and were not highest during the occurrence of

11   the AE of gynecomastia, right?

12   A.     That's exactly what that says.

13   Q.     And you don't dispute that?

14   A.     I'm not disputing that at all.

15   Q.     And so what that says is that the people who

16   had gynecomastia didn't have elevated prolactin?

17   A.     The document says exactly what it says.  Yes.

18   Q.     Which is the opposite of what you'd expect if

19   Risperdal was causing gynecomastia, right?

20   A.     I am not opining on causation.  If you'd like,

21   I'd be happy to.

22   Q.     What this says is that the people who had

23   gynecomastia had normal prolactin levels?

24   A.     The document says exactly that.

25                    MR. KLINE:  Would you just tell me

 1          the page on the bottom.

 2                   THE COURT:  Pardon me?

 3                   MR. KLINE:  I just need the bottom of

 4          the page because she blows it --

 5                   THE COURT:  All right.  What page is

 6          this?  I'd like that, too.

 7                   MS. SULLIVAN:  This is Page 64 of the

 8          study report.

 9                   MR. KLINE:  Wait.

10                   THE COURT:  Wait.  In our lingo, is

11          this a plaintiff exhibit?  What number is

12          this?

13                   MS. SULLIVAN:  This is a defense

14          exhibit, Your Honor.

15                   THE COURT:  Well, it's also a

16          plaintiff exhibit, I believe.

17                   MS. SULLIVAN:  No.  There was a -- it

18          didn't have all the pages.

19                   THE COURT:  So what's this --

20                   MR. KLINE:  Ours was -- that's not

21          true either.  It was the topline report.

22          They have the final report.

23                   THE COURT:  All right.  We're going

24          to straighten it out.  I agree.  What's this

25          now?  Because this looks familiar to me.  I

```
 1              think I've seen something like this before.
 2                   COURT CRIER:  D-25.
 3                   THE COURT:  D-25.
 4                   MR. KLINE:  All I've asked is for her
 5         to show the page number.
 6                   THE COURT:  What document is it?  And
 7         what page on D-25 is this?
 8                   MS. SULLIVAN:  Sixty-four.
 9                   THE COURT:  And this document, may I
10         see the cover page to this document right
11         here?
12                   MS. SULLIVAN:  Yes, Your Honor.  This
13         is a Clinical Study Report from INT-70.
14                   THE COURT:  Okay.
15                   All right.
16  BY MS. SULLIVAN:
17  Q.   And, Dr. Kessler, looking at Plaintiff's
18  Exhibit 27, which is the published -- the published
19  version of this trial INT-70, right?
20  A.   Yes.
21  Q.   And it has --
22  A.   Let me just get my copy, if you could give me
23  one second, please.
24                   Or if you can give me a copy, that
25  would be helpful.
```

1                    I should be able to find it in a

2    second.

3    Q.    I'm sorry, Doctor, I didn't realize you didn't

4    have the plaintiff's exhibits.

5    A.    Yeah.  No, I just don't have it in...

6                    Thank you.

7    Q.    And, Doctor, this was also done by an outside

8    author by Janssen, Dr. Croonenberghs?

9    A.    Yes.

10   Q.    And it went through peer review and it was

11   published in the Journal of Child and Adolescent

12   Psychopharmacology, right?

13   A.    2006.

14   Q.    And the published article with the outside

15   author and after peer review says the same thing as

16   the Clinical Study Report; that the gynecomastia was

17   severe, but it was not related to elevated

18   prolactin, right?

19   A.    Six -- so that's pretty amazing, right.

20   Because there it says -- first of all, you're right,

21   two cases of gynecomastia were rated as severe.  But

22   then it says importantly, right, as previously

23   observed by Findling, it says the occurrence of

24   gynecomastia was not related to increases in serum

25   prolactin levels.  And yet we know from the Findling

- DAVID A. KESSLER, M.D. - CROSS -                70

1  study, that Table 1 did in fact show that they were

2  related.  So this study is not reporting on the

3  result that Janssen had.

4  Q.    This study, Dr. Kessler, and we talked about

5  the Findling study and everybody's heard your views

6  on it, but this comment relates to INT-70 which was

7  not part of the Findling analysis, right?

8  A.    No.  It says, As has been previously observed

9  by Findling" -- right -- "there was nothing related

10  to increases -- that gynecomastia was not related to

11  increases in serum prolactin."

12              Findling, in fact, the data found a

13  relationship.  So this is not -- this is again --

14  Q.    I understand.

15  A.    -- repeating --

16              THE COURT:  Please do not cut him

17       off.

18              MS. SULLIVAN:  I didn't mean to, Your

19       Honor.

20              THE WITNESS:  This is repeating,

21       right, the erroneous statement in Findling.

22  BY MS. SULLIVAN:

23  Q.    I understand that your opinion is that

24  Findling is erroneous.  But this is talking about

25  INT-70.  And in INT-70 the fact is that they didn't

```
 1   find any relationship between --
 2                THE COURT:  Counsel, this document
 3          speaks for itself.  You've got to move on.
 4          It says importantly, as has been previously
 5          observed, and that is in reference to the
 6          Findling.
 7                MS. SULLIVAN:  But, Your Honor, the
 8          findings --
 9                THE COURT:  Okay.  It may be used in
10          talking about this document, but let's not
11          belabor a point that is on the screen itself.
12   BY MS. SULLIVAN:
13   Q.   Dr. Kessler, it's true that the people that
14   got gynecomastia in INT-70 had normal prolactin
15   levels?
16   A.   We'd have to -- if you put up the appendix in
17   the prior, I can double-check that, right.  I
18   don't -- I'm not disputing that.  The INT-70 said
19   there was no apparent link.  But, again, we'd have
20   to put up the appendix to be sure.
21   Q.   You're not disputing that?
22   A.   I have no reason to dispute that.
23   Q.   You're not disputing the fact that the kids
24   who had severe gynecomastia had absolutely normal
25   prolactin?
```

- DAVID A. KESSLER, M.D. - CROSS -                72

```
 1   A.    I -- in -- that's what that says.  That's not
 2   in fact the case with Findling.
 3   Q.    This is talking about INT-70, though, not
 4   Findling, this study right here?
 5   A.    It's talking about both, that paragraph that's
 6   highlighted.
 7   Q.    But the findings of gynecomastia and the
 8   normal prolactin levels are from INT-70?
 9                  MR. KLINE:  Objection.
10                  THE COURT:  All right.  That's
11          sustained.  I'm saying it again, sustained.
12   BY MS. SULLIVAN:
13   Q.    And, Doctor --
14                  MR. KLINE:  Does that count against
15          my 15 minutes?
16                  THE COURT:  Well, you might get your
17          15 minutes tomorrow.
18                  MR. KLINE:  At the rate it's going,
19          it's running out the clock.
20                  MS. SULLIVAN:  Come on.
21                  THE COURT:  I'm being careful right
22          now with the amount of redirect and recross,
23          or else we'll never get out of here.
24                  MS. SULLIVAN:  Your Honor, he did
25          take a long time --
```

```
 1                    THE COURT:  I have no problem with

 2          the cross-examination as long as it takes.

 3                    MS. SULLIVAN:  It won't take that

 4          long, Your Honor.

 5   BY MS. SULLIVAN:

 6   Q.    Doctor, you know that there is a

 7   government-funded study that found the exact same

 8   thing as the Dr. Findling study found, right?

 9   A.    The NIH study; is that what you're --

10   Q.    Yes.

11   A.    -- referring to?

12   Q.    Yes.

13   A.    I don't see the NIH study looking for an

14   association with upper limits of normal.  I didn't

15   see that.

16   Q.    Well --

17   A.    Prolactin levels.

18   Q.    Let's talk about that.

19                    So, Dr. Kessler, in 2006, 2007, the

20   National Institute of Health funded a study in

21   children with autism, right?

22   A.    Yes.

23   Q.    And --

24   A.    Can I have it?

25   Q.    I'm sorry?
```

1   A.    Could you kindly show it to me?

2   Q.    Sure.

3               Can we give Dr. Kessler a copy,

4   Lamia.  It's D-530 for identification.

5               Ms. Brown.

6               MS. BROWN:  It's 26.

7               MS. SULLIVAN:  26.  And give a copy

8         to the Court and a copy to Mr. Kline.  Thank

9         you.

10              THE COURT:  All right.  You know

11        what, I'm going to take a recess right here.

12        I think we all need a recess and we'll

13        resume, all right.  We're going to take a

14        break for about ten minutes and then we'll

15        come back.

16              We are going to adjourn today around

17        4:30, so we may not get the redirect in today

18        and the recross.  That's fine.  I have no

19        problem with that, okay.  So we're not

20        rushing the cross-examination, by heavens,

21        no.  So we'll take a ten-minute recess.

22              COURT CRIER:  All rise as the jury

23        exits.

24                      -   -   -

25              (Whereupon the jury exited the

 1              courtroom at 3:20 p.m.)

 2                       -  -  -

 3              THE COURT:  All right.  Ten minutes.

 4              MS. SULLIVAN:  Thank you, Your Honor.

 5                       -  -  -

 6              (Whereupon a recess was taken.)

 7                       -  -  -

 8              (Whereupon an off-the-record

 9       discussion was held.)

10                       -  -  -

11              THE COURT:  Everyone please be

12       seated.

13              COURT CRIER:  All rise as the jury

14       enters.

15                       -  -  -

16              (Whereupon the jury entered the

17       courtroom at 3:44 p.m.)

18                       -  -  -

19              THE COURT:  All right.  You may be

20       seated.

21              All right.  To our juror who has

22       child-care issues, be aware that I have

23       spoken personally now with Ms. Osterweg, or

24       whatever her name is, and she knows of our

25       situation.  And she's expecting you no later

```
 1              than 5:30.  No later than 5:30.  So we are
 2              going to try to complete the
 3              cross-examination today if we at all possibly
 4              can.
 5                     MS. SULLIVAN:  Yes, Your Honor.
 6    BY MS. SULLIVAN:
 7    Q.    Homestretch, Dr. Kessler.  Get you out of
 8    here.
 9    A.    Thank you very much, Ms. Sullivan.
10    Q.    Talking about this --
11    A.    I don't have it yet.
12    Q.    Oh, I'm sorry.  If we could give Dr. Kessler
13    Defense Exhibit 26.  It's 530, the Anderson study.
14                     Oh, he's got it.
15                     COURT CRIER:  Do you have this,
16       Counsel?
17                     MR. GOMEZ:  Yes.
18                     MR. KLINE:  Yes, we're fine.
19                     COURT CRIER:  D-26 to the witness.
20    BY MS. SULLIVAN:
21    Q.    And, Dr. Kessler, this was a study done not by
22    Janssen, correct?
23    A.    You referred to this as an NIH study earlier,
24    but I think this is a Yale Child Study Center.
25    Q.    Funded by the NIH, correct?
```

- DAVID A. KESSLER, M.D. - CROSS -          77

1    A.    I'm sure there was an NIH grant, but it wasn't

2    done by the NIH.

3    Q.    So a study funded by the NIH, National

4    Institute of Health, the government, done by Yale

5    and some other outside investigators, not done by

6    Janssen, correct?

7    A.    That's correct.  Hold on a second.  Yes,

8    that's correct.

9    Q.    And so the government funded this organization

10   called the -- it's a actually famous organization --

11   the RUPP Autism Network, right?  Are you familiar

12   with it?

13   A.    I am.  Although this lists the Child Study

14   Center, as well as Kennedy Krieger and UCLA, yes.

15   Q.    And the RUPP Autism Network is a group of

16   outside investigators from some universities across

17   the country that do research in autism?

18   A.    Yes.

19   Q.    And the government funds some of their work?

20   A.    Yes.

21   Q.    And they funded part of their study?

22   A.    Yes.  It says it's funded in the back.

23   Q.    And this is a study on about 101 kids ages 5

24   to 17 who had autism, right?

25   A.    Yeah.  If I'm correct, there was a short-term

 1  period and then an open-label period.

 2  Q.    Yes, exactly.  It was an eight-week

 3  placebo-controlled period and then a four-month

 4  open-label period, right?

 5  A.    Exactly.

 6  Q.    And they looked at prolactin levels in these

 7  autistic kids and side effects, right?

 8  A.    Yes, exactly.

 9  Q.    And they had physical exams during the study

10  at various points; that the kids taking the

11  Risperdal went in to doctors and they were examined

12  at three different -- at least at three different

13  points in the study?

14  A.    Yes.  So let's just check those three points.

15  That's what I'm looking for.  I don't have that.

16  Q.    Yes.  It's on the bottom of the second page,

17  Page 546.  It talks about -- let me just put this

18  up.

19  A.    Thanks.

20  Q.    And we're showing the jury Defense Exhibit 26,

21  the Effects of Short- and Long-Term Risperidone

22  Treatment on Prolactin Levels in Children.  And we

23  see that the study's funded by an NIH grant, right?

24  A.    Yes.

25  Q.    Okay.  And we also see that in the study --

1    let me make sure that everybody can see here -- that

2    there are physical exams, right?

3    A.    Well, let's be exact in that.  It says the

4    screening included a physical exam.

5    Q.    Right.

6    A.    And then there was weekly follow-up, was a

7    review of adverse effects, right.

8    Q.    Right.

9    A.    And just show me what else it says.

10   Q.    So they had an exam and baseline, and then

11   they had follow-up visits where they had a detailed

12   review of adverse effects, right?

13   A.    Yes.  But I'm just looking for the follow-up.

14   Q.    And then on the bottom it talks about they

15   also had physical examinations and blood draws at

16   various intervals, including at 8 weeks, 6 months,

17   and 22 months, right?

18   A.    So they did it at three intervals.  That's

19   what I was looking for.

20   Q.    Yeah.

21   A.    Thanks for the help.

22   Q.    Yeah.

23   A.    Yes.

24   Q.    And they had weekly visits where they asked

25   patients do you have elevated; do you have excessive

- DAVID A. KESSLER, M.D. - CROSS -                    80

1    breast growth; do you have problems with your

2    period, sort of detailed review of symptoms?

3    A.    Exactly.

4    Q.    And they also actually did physical exams at

5    least three different intervals in the study?

6    A.    Right.  They did it at -- exactly at those

7    three intervals, yes.

8    Q.    And the authors found that -- and they also --

9    and when they took blood, they also measured

10   prolactin, right?

11   A.    I believe so, yes.

12   Q.    And they reported on their findings, right?

13   A.    Yes.

14   Q.    And what they found, Dr. Kessler, is that, in

15   this government-funded study, was that prolactin

16   levels were not associated with clinical complaints

17   or physical exam findings, right, that's what they

18   found?

19   A.    So just to be exact, I mean, that's correct,

20   but read the next sentence.

21   Q.    The side effects review form administered at

22   weeks 1 to 8, 3, 4, 6 and 22 contained specific

23   questions about galactorrhea, gynecomastia, and

24   menstrual problems, right?

25   A.    Right.  But that was not the physical exam

1    necessarily.  That was a form.

2    Q.    But certainly on physical exam, they would

3    have examined the chest, breasts, et cetera, right?

4    A.    They say they did it at three periods of time.

5    Q.    Right.

6    A.    It was a physical exam.  They don't say

7    exactly what they were looking for, if I'm correct.

8    Q.    What they found is there was no relationship

9    to prolactin elevations from Risperdal and side

10   effects, right?

11   A.    That's correct.

12   Q.    That's what the government study found?

13   A.    That's the government's?

14   Q.    The government-funded study.

15   A.    It's not the government.  It's these

16   investigators.

17   Q.    Yeah.  Funded by the government, from the

18   Autism Network.

19   A.    Yes.

20   Q.    Not associated with Janssen?

21   A.    That's correct.

22   Q.    Okay.  And they report in the study that they

23   found exactly what Dr. Findling found, right?

24   A.    Well, let's read their conclusion.

25                   Risperidone treatment was associated

1    with two- to fourfold mean increases in serum

2    prolactin in children with autism.  And although the

3    risperidone increases tended to diminish with time,

4    further research --

5                    MR. KLINE:  Excuse me.  Is what

6            you're reading up on the screen?

7                    MS. SULLIVAN:  I don't know where

8            he's reading from.

9                    Where are you reading from, Doctor?

10                   MR. KLINE:  She's putting that up

11           there.

12                   MS. SULLIVAN:  I was referring to the

13           statement where they found that their data

14           was consistent with Dr. Findling's.

15                   THE COURT:  No.  Is there an

16           objection?

17                   MR. KLINE:  Yes.

18                   THE COURT:  Sustained.

19                   You asked a question regarding the

20           Findling as maybe an aside in your question.

21           But he's now responding to that by, I

22           believe, by reading from the Findling

23           article; is that what you're doing?

24                   THE WITNESS:  No.

25                   MS. SULLIVAN:  No, no.  He's reading

```
 1              from this article.  I just don't know where
 2              you're reading from.
 3                      MR. KLINE:  This is a different --
 4                      THE COURT:  Then I really need one at
 5              a time.  And if he wants to put something up
 6              there, he may, if you're willing to,
 7              Ms. Sullivan.  If not, then I guess he will
 8              be coming back tomorrow.
 9     BY MS. SULLIVAN:
10     Q.    Doctor, my question was the RUPP
11     investigators, these outside investigators, found
12     exactly the same thing Janssen found.  They found no
13     relationship between prolactin elevations from
14     Risperdal and side effects?
15     A.    I was reading from the conclusion of the paper
16     in the abstract.
17     Q.    Okay.
18     A.    That's what I was reading from, Your Honor.
19     Q.    We can do that first.
20                      THE COURT:  Excuse me.  Reading from
21              the conclusion of the abstract in which paper
22              was that?
23                      THE WITNESS:  This paper, I'm sorry.
24              I thought you had asked me what these
25              investigators found.
```

1    BY MS. SULLIVAN:

2    Q.    Well, I can ask you that question.  But my

3    question was, isn't it true they found exactly what

4    Dr. Findling and Janssen found in terms of prolactin

5    elevation from Risperdal not being associated with

6    prolactin-related side effects?

7    A.    I think that they used the word "fairly

8    consistent" in the paper.

9    Q.    Yeah.

10   A.    If I'm correct.

11   Q.    Yeah.

12   A.    Yes.

13   Q.    Exactly.

14              So these outside investigators found

15   the same thing, no association between Risperdal

16   elevations in prolactin and side effects of

17   gynecomastia?

18   A.    The paper speaks exactly for what the paper

19   speaks for.

20   Q.    Okay.

21              MR. KLINE:  I thought we were on the

22        abstract, though.

23              THE COURT:  No, no.  He -- this

24        was -- if you want to go back to the

25        abstract --

```
 1                    MS. SULLIVAN:  I'm happy -- if he
 2          wants to read the abstract, Doctor --
 3                    MR. KLINE:  Just look at the
 4          conclusions.
 5                    MS. SULLIVAN:  -- I'm happy to read
 6          the abstract.
 7   BY MS. SULLIVAN:
 8   Q.    So the conclusion in the abstract says:
 9   Risperidone treatment was associated with two- to
10   fourfold mean increases in prolactin in children
11   with autism, right; that's what it says?
12   A.    Exactly.
13   Q.    And although risperidone increases tended to
14   diminish --
15                    (Reading fast.)
16                    COURT REPORTER:  Excuse me, counsel,
17          please, a little slower.
18   BY MS. SULLIVAN:
19   Q.    [Reading]:  Further research on the
20   consequences of long-term prolactin elevation in
21   children and adolescents is needed.
22   A.    Exactly what they write.
23   Q.    And what they found is, and we talked about
24   it, that these elevations in prolactin from
25   Risperdal didn't have an association with any of the
```

- DAVID A. KESSLER, M.D. - CROSS -                86

1   side effects like gynecomastia?

2   A.    That's exactly what they found.

3   Q.    And, Doctor, by the way, I want to talk a

4   little bit in five minutes, before I turn you over

5   to Mr. Kline, about the FDA.

6   A.    Sure.

7   Q.    You agree, Dr. Kessler, that the FDA is the

8   most important consumer protection agency in the

9   world?

10  A.    You're probably quoting me.

11  Q.    I probably am.

12  A.    Thank you.

13  Q.    And you agree that all of the FDA's employees

14  share a commitment to protect and enhance the public

15  health?

16  A.    "All" is a pretty big statement, but, yeah, I

17  think that's correct.  Very dedicated employees.

18  Q.    And you --

19  A.    Do we have a few clunkers?  I'm sure, but like

20  any organization, but very dedicated employees.

21  Q.    And that the FDA has served the American

22  public well in ensuring the remarkable standard of

23  product safety, and that's been maintained?

24  A.    It sure tries.

25  Q.    And it's the gold standard across the world,

1  the FDA's review and when they decide something's

2  safe and effective?

3  A.    We can be very proud of it.

4  Q.    And the FDA, as you've mentioned, is filled

5  with doctors, scientists, toxicologists, dedicated

6  professionals?

7  A.    Absolutely.

8  Q.    Well-trained and highly trained and some of

9  the best specialists in the world?

10  A.    People who could earn multiple incomes in

11  other jobs that are as smart as anyone I've ever

12  met, yes.

13  Q.    And, Dr. Kessler, you've acknowledged or said

14  that the doctors and scientists at FDA are as smart

15  and as talented as any that you've ever seen?

16  A.    Exactly.

17              MR. KLINE:  Look.

18              THE WITNESS:  At least I'm

19      consistent.

20              THE COURT:  Is there an objection?

21              MR. KLINE:  No.  I'm saying "look."

22  BY MS. SULLIVAN:

23  Q.    And, Dr. Kessler, throughout your professional

24  career, you've always and continue to have every

25  reason to trust the judgment of the officials of the

1  FDA?

2  A.    Yes.  But I have to add a footnote.  They're

3  only as good as what a manufacturer gives them.

4  Q.    And, Dr. Kessler, you agree that all medicines

5  have risks?

6  A.    We can spend probably a day talking about

7  that, but sure.

8  Q.    None are a hundred percent safe?  None have no

9  side effects, unfortunately?

10  A.    Your definition of "safe," yes, medicines are

11  powerful.  Some medicines are even more powerful.

12  Q.    And doctors have to weigh the risks and

13  benefits of a medicine before they prescribe it?

14  A.    Absolutely.  And a company has to give the

15  docs the information.

16  Q.    And doctors -- and the FDA spends a fair

17  amount of time reviewing and editing the labels for

18  a medicine as part of the FDA approval process?

19  A.    Yes.  Up through 2006, it was a negotiation.

20  FDA couldn't order changes, it could negotiate.

21  That doesn't sound right that the FDA couldn't order

22  it and Congress changed the law in 2006 to allow

23  that.

24  Q.    Well, when it comes to drug approval, though,

25  the FDA could say we're not going to approve your

- DAVID A. KESSLER, M.D. - CROSS -          89

```
 1   drug unless you say exactly what we want you to say
 2   on the label; true?
 3   A.    At that moment in time, that probably could be
 4   said.  But I think it's fair to say FDA has always
 5   viewed the label as a negotiation.
 6   Q.    And, Doctor, you've seen in this case where
 7   the FDA's marked up the Janssen letter and said you
 8   got to say this as a condition of approval?
 9   A.    It's a general statement.  There's a -- there
10   was -- there's a negotiation certainly back and
11   forth in the 2006 label.
12   Q.    And, Doctor, you expect when the FDA approves
13   a drug label that doctors actually will read it,
14   right?
15   A.    Which version?
16   Q.    The final label.
17   A.    How many -- there were -- I counted up some 25
18   different versions of the label between 1993 and
19   2006 that Janssen printed.
20   Q.    Well, Doctor, I'm talking -- let's -- we'll
21   talk about Janssen.  But generally do you expect --
22   does the FDA expect that the doctors will actually
23   read drug labels?
24                   MR. KLINE:  Objection.
25                   THE COURT:  Objection to that
```

 1          question.  Overruled.

 2   BY MS. SULLIVAN:

 3   Q.    That's what they're for, right?

 4   A.    We would be living in a fantasy if we thought

 5   that a doctor always read the most current version

 6   in entirety.  That's why FDA in 2006 put the

 7   highlights section in the label, because it

 8   understands that doctors have limited time.  And

 9   especially when you realize that there were so many

10   different versions here.  You have to take that into

11   consideration.

12   Q.    Well, Dr. Kessler, there was a lot of versions

13   because Janssen kept doing studies and kept getting

14   approvals for different things, for bipolar

15   disorder, for schizophrenia, for autism.  They kept

16   doing the studies and getting the approval from the

17   FDA for a variety of different things and that

18   results in label changes.

19   A.    There are some 25 different versions.  Some of

20   them are due to that; others are due to other

21   reasons.

22   Q.    And the FDA and companies take care in putting

23   together prescribing information for doctors to

24   guide them in their decision-making in terms of what

25   medicines to prescribe?

```
 1   A.    For the approved indications.  What is at
 2   issue here is not for the approved indications, but
 3   the fact is this drug was being off-labelly used and
 4   the label was never designed for those off-label
 5   uses because that off-label use was beyond the
 6   statute.
 7   Q.    And, Dr. Kessler, you've reviewed some
 8   information in this case, but you'll agree that the
 9   FDA -- you left in 1997, and there's been 20-plus
10   more years of research on Risperdal since you've
11   left the FDA?
12   A.    By definition.
13   Q.    Yeah.  And so all of the subsequent
14   approvals -- in fact, we put up the 1993 label.  You
15   were actually there at the FDA when Risperdal was
16   first approved?
17   A.    Absolutely.
18   Q.    You didn't take any issue with the label at
19   the time?
20   A.    I took no issue with the label at the time.
21   Q.    And since that time, Dr. Kessler, the FDA has
22   reviewed and approved Risperdal for other
23   indications and reviewed a ton --
24             MR. KLINE:  Objection.
25   BY MS. SULLIVAN:
```

```
 1   Q.      -- of scientific data?
 2                   THE COURT:  Basis?
 3                   MR. KLINE:  Objection.  Basis, of
 4           what they approved today.  It has nothing to
 5           do with the case.  This is a 2002 --
 6                   THE COURT:  I thought it was going to
 7           be "asked and answered."
 8                   Overruled.
 9                   You can go into a question that
10           you've asked before, if you wish.
11                   MR. KLINE:  That wasn't asked, Your
12           Honor.  The question of indications now --
13                   THE COURT:  I didn't hear anything
14           about now.  Are you asking about now,
15           Counsel?
16                   MR. KLINE:  Yes.
17                   MS. SULLIVAN:  No, Your Honor.
18                   MR. KLINE:  Since '06, that's her
19           question.
20                   MS. SULLIVAN:  Well, there were
21           many --
22                   MR. KLINE:  Nothing to do with the
23           case.
24                   MS. SULLIVAN:  Are you done?
25   BY MS. SULLIVAN:
```

- DAVID A. KESSLER, M.D. - CROSS -        93

1   Q.     There were indications, Dr. Kessler, and

2   you'll agree, between 2002 and 2007 when this

3   plaintiff stopped taking Risperdal, there were other

4   indications for Risperdal that was approved?

5   A.     There were indications in 2006 for autism and

6   then later in bipolar and then schizophrenia in

7   young people for which there were applications that

8   were approved, yes.

9   Q.     And they also got approval for an oral

10  solution during that time frame?

11  A.     Different formulations.

12  Q.     And a disintegrating tablet and things like

13  that?

14  A.     Exactly.

15  Q.     And every time that happens, the FDA has

16  occasion to review more safety data and occasion to

17  look and approve the label?

18  A.     Uhmm, yeah.  I think it's -- it's really on

19  the big indications when there's new clinical trial

20  data that can have clinical importance, then the

21  medical officers tend to review the data.

22  Q.     And, Doctor, at no time during the 20 years or

23  so since you've left the FDA, while FDA is reviewing

24  all of this additional safety data, did FDA ever

25  conclude that Janssen failed to warn about a safety

1  risk; true?

2  A.    I have to go back and look at that.  Again,

3  there's a complicated off-label history here.  And

4  are you talking about the on-label uses or the

5  off-label?

6  Q.    Or anything, Dr. Kessler.  It's true that the

7  FDA has never concluded in 20-plus years that

8  Janssen failed to adequately warn about a safety

9  risk?

10  A.    I think that's probably correct the way you

11  phrase it.

12              MS. SULLIVAN:  Nothing further.

13         Thank you, Your Honor.

14                   -  -  -

15              REDIRECT EXAMINATION

16                   -  -  -

17  BY MR. KLINE:

18  Q.    Yeah.  But what would be the full -- may I,

19  Your Honor?

20              THE COURT:  Yes.

21              Like I said, I would like to conclude

22         today at 4:30.  So I'm giving you -- if you

23         want to go forward with redirect, then I

24         would say about a 20-minute or 15-minute

25         redirect and then 15 minutes for the other

1              side.

2                      MR. KLINE:  In the alternative?

3                      THE COURT:  Or the alternative is not

4              to have any redirect whatsoever and no

5              recross and just call it a day.

6                      MR. KLINE:  Okay.  And the third

7              alternative?

8                      THE COURT:  The third alternative,

9              frankly, is to spend another two days of

10             Dr. Kessler's life in this courtroom.

11                     MR. KLINE:  I want to try about three

12             or four areas in 15 minutes.

13                     THE COURT:  All right.  Go ahead.

14                          -  -  -

15     BY MR. KLINE:

16     Q.    And one of the things is before we left off,

17     which is -- hi, again.  It's me.

18                     The -- I'm back.

19                     What was just said, is that the full

20     story, that very last question and answer about the

21     FDA never safety -- you know, never said anything

22     about safety?

23     A.    No, it's not the full story.

24                     I think Ms. Sullivan was correct in

25     the way she phrased that question narrowly.  But

1   let's -- I mean, there's a, you know, a big elephant

2   here is that it was off-label --

3                   MS. SULLIVAN:  Your Honor, can I have

4           a sidebar?

5                   THE COURT:  Pardon me?

6                   MS. SULLIVAN:  May I have a sidebar,

7           Your Honor?

8                   THE COURT:  Sidebar, no, unless

9           there's an objection to something.

10                   MS. SULLIVAN:  Yeah.  I object, Your

11           Honor.  Because he's about to get into things

12           that the Court has ruled out of this case.

13                   THE COURT:  I don't know.  You must

14           be a mind reader.  I don't know.

15                   Overruled.

16   BY MR. KLINE:

17   Q.    You were saying, off-label...

18   A.    If you're in a doctor's office marketing the

19   drug 20 times and you're going to -- so the FDA has

20   not given you approval, you can't look to the label

21   for what you have to do when you're doing that

22   off-label that you shouldn't be doing.

23   Q.    And that takes us -- next exhibit number.

24                   That takes us to something you were

25   talking about two days ago, sir, about intended use.

```
 1   What you really need to look at is what is the
 2   intended use?
 3   A.    Exactly.
 4   Q.    And I have a document of Janssen's, a business
 5   record of Janssen's which talks about how many
 6   children were getting this drug in 2002, which is
 7   what we're looking at.  It's marked as Plaintiff's
 8   Exhibit No. 57.  It has the JJRE number 0082146.
 9   I'm going to hand that to counsel.  It simply tells
10   us the number of prescriptions that were being
11   actually written at that time, so we can talk about
12   what the -- put this in some context.
13                 With the Court's permission, I'll
14   display it to the jury.  I'll hand a copy to the
15   witness.
16                 THE COURT:  All right.  Is there any
17         objection now from the defense, P-57?
18                 MS. SULLIVAN:  Your Honor, if this
19         was a Janssen document, I would have no
20         problem.  But this is a hearsay document from
21         some outside service, so I would object.
22                 THE COURT:  Overruled.  Go ahead.
23                 MR. KLINE:  It's a Janssen-produced
24         document.
25                 THE COURT:  Overruled.  Go ahead.
```

1   BY MR. KLINE:
2   Q.    Sir, can you look at this?  You're familiar
3   with these kinds of charts.
4                   Would you look at the -- in 2002, do
5   you see that?
6   A.    Yes.
7   Q.    I'm not interested in the other atypical
8   antipsychotics.  What I want to know here is you see
9   how this is stated in thousands, estimated treatment
10  prescriptions, volume?
11  A.    Yes.
12  Q.    Okay.  When you're talking about the intended
13  use here and what the label needed to say, how
14  many -- you see here it says one million six hundred
15  and sixty-nine doses were being prescribed to
16  children in 2002?
17  A.    I see that.
18  Q.    One million six hundred and sixty-nine.
19                  Now, sir, as far as measuring the
20  conduct of the company and what they should do,
21  which we've been talking about with you for four
22  days, is that measured in part against how it was
23  really being used and the population in which it was
24  being used?
25  A.    That's what's key.  If the drug is being

1   marketed for children, that's the intended use.

2   Q.    When this doctor --

3   A.    I didn't finish.  Can I just finish?

4   Q.    Yes, sir.

5                MS. SULLIVAN:  And, Your Honor, again

6          I'm going to object.  There's no evidence in

7          this case that Dr. Mathisen, the prescriber,

8          was marketed to off-label.  In fact, the

9          opposite is true.

10               MR. KLINE:  He was in the office --

11         we'll see him tomorrow.  We'll see the

12         salesman tomorrow.  He was in the office 20

13         times with the samples.

14               THE COURT:  First of all, as to the

15         question of marketing, that is going to be up

16         to the jury to decide as to what was going on

17         in Dr. Mathisen's office.  So I don't need an

18         expert opinion about that from this witness.

19               MR. KLINE:  Okay.

20   BY MR. KLINE:

21   Q.    Next item, sir, let's take this down.  I want

22   to do this in 15 minutes.

23               You were asked a question on

24   cross-examination from the company lawyer about

25   the -- about whether other labels of other drugs in

1    the relevant time period warned about gynecomastia,

2    and you mentioned Striant, correct?

3    A.     Yes.

4    Q.     S-T-R-I-A-N-T, correct, sir?

5    A.     Yes.

6    Q.     And I'd like to hand copies to counsel.  We've

7    marked it as P -- this is the second of about four

8    things I intend to do.  That's all.

9                    MS. SULLIVAN:  Can we have a date,

10          Counsel?

11                   MR. KLINE:  Yes.  I can tell you.

12          Mr. Gomez looked it up.  What year label is

13          it, Mr. Gomez?

14                   MR. GOMEZ:  2003.

15                   MR. KLINE:  2003 label.

16                   And do you have it in your machine?

17   BY MR. KLINE:

18   Q.     Let's look at Page 7 under Warnings.

19                   COURT CRIER:  P-58.

20                        -  -  -

21                   (Whereupon Exhibit P-58 was marked

22          for identification.)

23                        -  -  -

24   BY MR. KLINE:

25   Q.     Do you have a copy in front of you?

```
 1    A.      I've just been handed one.  Yes.

 2    Q.      What was -- what drug company was Striant?

 3    A.      It was manufactured for Columbia Laboratories.

 4    Q.      Okay.  Let's look at when you told the jury

 5    earlier today that other drugs had such warnings;

 6    let's look right down here at number 5.

 7    Gynecomastia develops frequently and occasionally

 8    persists in patients being treated; do you see that?

 9    A.      I do.

10    Q.      Those words were missing from this label where

11    the drug risperidone frequently caused gynecomastia,

12    correct?

13                    MS. SULLIVAN:  Objection.  Objection.

14          That's leading and argumentative, Your Honor.

15                    THE WITNESS:  Yes.

16                    THE COURT:  As far as -- as far as

17          the question, that's sustained.  I mean --

18                    MR. KLINE:  Was this --

19                    THE COURT:  -- again --

20                    MR. KLINE:  I would rephrase it, Your

21          Honor.

22    BY MR. KLINE:

23    Q.      Was a warning similar to this on the Risperdal

24    label?

25    A.      No.
```

```
 1   Q.    Was Risperdal eventually admitted in the 2006
 2   label to have a 2.3 percent incidence of
 3   gynecomastia?
 4   A.    Yes.
 5   Q.    And is that something that's frequent, sir?
 6   A.    Yes.
 7   Q.    And in this drug when it's frequent, is it
 8   right there in the warning?
 9   A.    Yes.  And can I also add, this drug had the
10   warning on gynecomastia, this is in adults.  So
11   especially gynecomastia in kids warrant the same
12   kind of warning.
13   Q.    Now, let's talk about something else that was
14   raised.
15              Do you recall your discussion with
16   the company lawyer about the question involving
17   whether there was a placebo-controlled study,
18   whether there was a placebo-controlled study?  Do
19   you recall that discussion?
20   A.    Yes.
21   Q.    And whether there's any study that measured
22   kids getting Risperdal against kids that were just
23   getting a sugar pill; namely, a placebo.  Do you
24   recall that discussion?
25   A.    Yes.
```

```
1   Q.    All right.  Let me show you a table to RIS-79.

2                   It's JJRE0498189.

3                   MS. SULLIVAN:  And, Your Honor, I

4         would just ask that we use the whole CSR

5         instead of pulling a page out.

6                   MR. GOMEZ:  We can do it like we did

7         the other things.

8                   THE COURT:  Well, first of all, what

9         document is this from?

10                  MR. KLINE:  It's from RIS-79, the

11        Clinical Study Report of RIS-79.  I want to

12        go right to the table.  I copied the one key

13        page.

14                  THE COURT:  All right.  What page is

15        the table on?

16                  MR. KLINE:  The table is on Page 123

17        of this long study.  It is JJRE0498189.

18                  THE COURT:  All right.

19                  MR. KLINE:  I have a copy for the

20        Court.

21                  THE COURT:  Okay.

22                  MR. KLINE:  And we've marked it as

23        Plaintiff's Exhibit --

24                  MR. GOMEZ:  59.

25                  MR. KLINE:  -- 59.
```

```
 1                 THE COURT:  Very well.

 2                      -  -  -

 3                 (Whereupon Exhibit P-59 was marked

 4         for identification.)

 5                      -  -  -

 6                 MR. KLINE:  Does the witness have a

 7         copy, or are you shorthanded?

 8                 MR. GOMEZ:  Shorthanded.

 9                 MR. KLINE:  Your Honor, can we watch

10         up here?

11                 THE COURT:  Sure.

12                 MR. KLINE:  Can I have the Court

13         indulge me on this one?

14                 And may I go behind the witness?

15                 THE COURT:  This is P-59.  This is

16         Page 123.  And it's from a document that is

17         admissible, so you may proceed.

18                 MR. KLINE:  Okay.

19                 You don't have it?

20                 VIDEO TECHNICIAN:  No, I don't have a

21         copy.

22                 MR. KLINE:  You want the JRE number

23         again.  Okay.  Here we go.  I'm trying to be

24         done at 4:15 or 4:20.

25                 It is JJRE0498189.
```

 1   BY MR. KLINE:
 2   Q.    I'm displaying a table which is the result of
 3   a clinical trial of Janssen.
 4   A.    Yes.
 5   Q.    Ms. Sullivan suggested to you that there was
 6   no other study -- no study where they had the kids
 7   on the sugar pill versus the kids on the
 8   risperidone, correct?
 9   A.    Yes.
10   Q.    They did such a very study right here on this
11   table.  It shows the results, correct?
12   A.    Yes.
13   Q.    Does it surprise you, sir, that when they got
14   the risperidone, they got the gynecomastia?
15              MS. SULLIVAN:  Objection, Your Honor,
16        to the form.  It's argumentative.
17              MR. KLINE:  Let's look at --
18              THE COURT:  Well --
19              MR. KLINE:  Yeah, I could ask that.
20        But let me ask it this way.
21   BY MR. KLINE:
22   Q.    Let's look at the study.  There were, very
23   quickly -- and I am rushing -- there are placebo
24   versus risperidone treated.  There were 163 on the
25   sugar pill.  Do you have it highlighted?

```
 1    A.      Not yet.
 2    Q.      We will.  Right up above, Cory.  I know I'm
 3    rushing, placebo number 163.  And maybe you can just
 4    zero in on the top, right there.  That's where we
 5    want to look (indicating).
 6                      (Technician complies with request.)
 7                      MR. KLINE:  Yes.  There you go.
 8    BY MR. KLINE:
 9    Q.      They had 163?
10    A.      Yes.
11    Q.      And they have the placebo.  That means the
12    kids on the sugar pill, in their very study.  This
13    is a Janssen study with which you're familiar?
14    A.      Yes.
15    Q.      When you went through all those boxes, this
16    was one of the pages of the millions of pages,
17    correct?
18    A.      It's in my notes here.
19    Q.      And you see here it says they gave the ris --
20    the placebos had no gynecomastia, correct?
21    A.      That's exactly what the data showed here.
22    Q.      And you're going to have to take this down and
23    show me the whole slice of the top.
24                      Go to the top, please.
25                      (Technician complies with request.)
```

```
 1                    MR. KLINE:  The full top, there.
 2                    I hope you can see.
 3   BY MR. KLINE:
 4   Q.    So what you have is potential
 5   prolactin-related treatment, emergent adverse events
 6   by sex and age during maintenance treatment.
 7                    So they had the total number of
 8   subjects.  They gave some the placebo, which is just
 9   a sugar pill, and they gave some risperidone,
10   correct?
11   A.    Exactly what they did here.
12   Q.    And what they found was none on the sugar
13   pill, correct?
14   A.    Yes.
15   Q.    Five on the risperidone, correct?
16   A.    Yes.
17   Q.    Once again, about three in a hundred kids are
18   getting gynecomastia when they're on the
19   risperidone, correct?
20   A.    Three in 150, 170, yes, exactly.
21   Q.    Three in a hundred, in this study, against the
22   placebo group.
23                    And, by the way, who designs these
24   studies, the good folks at the FDA or the good folks
25   at Janssen?
```

1  A.    The studies are designed by the folks at

2  Janssen.

3  Q.    So in this study, the placebo-controlled

4  study, remember when Ms. Sullivan was questioning

5  you for maybe a half an hour on the question of

6  whether there were no placebo control studies.  This

7  is RIS-41, was just all kids in a "open label"

8  study?

9  A.    This shows exactly that there were zero in the

10 placebo and three in the Risperdal-treated children.

11 Q.    Yes.  In a placebo-controlled study.  And what

12 year was this known to them, sir?

13 A.    INT study was known in September 2000 -- the

14 study was completed in September '03 is what my

15 notes say.

16 Q.    September '03.

17 A.    When the study was complete.

18 Q.    Yes.

19           So in addition to everything else

20 that you've testified about on direct examination,

21 we hadn't gotten to mention this:  And this was

22 known by September of 2003 in its final results,

23 correct?

24 A.    The study was complete.  We have to look

25 exactly when it was available.  I think it was

1   available subsequently.

2   Q.    Yes.

3              And, sir, let me see if I can do one

4   more thing quickly with you.

5              You've mentioned that you've reviewed

6   a whole lot of deposition testimony and the like.

7   A.    I did.

8   Q.    And do you remember your discussion with

9   Ms. Sullivan about the authors of the study and the

10  authors, the outside authors of the study; remember

11  you talked repeatedly about that?

12  A.    Yes.

13  Q.    And how it wasn't just Janssen, it was the

14  outside study; do you remember?

15  A.    Yes.

16  Q.    Do you know as to that thing that you said was

17  key, the question of whether there was a correlation

18  between what they call SHAP now and elevated

19  prolactin levels?

20  A.    Right.

21  Q.    And as part of what you've read, did you also

22  read -- we don't display deposition testimony in

23  this courtroom.

24              Did you also read what Dr. Daneman

25  has to say about that study now --

```
 1                    MS. SULLIVAN:  Objection.
 2   BY MR. KLINE:
 3   Q.    -- under oath?
 4                    MS. SULLIVAN:  Objection, Your Honor.
 5            Let him play the whole thing of Dr. Daneman
 6            instead of taking a line out and having
 7            Dr. Kessler agree with him.  I object to it.
 8                    THE COURT:  Well, I'll permit this.
 9            This is his direct examination, correct?
10                    MR. KLINE:  Yes.  It's on the point.
11                    THE COURT:  Of Dr. Daneman.
12   BY MR. KLINE:
13   Q.    Sir, when asked about the very study which has
14   his name, it says -- the question was asked:  "So
15   you would agree with me that that sentence that I
16   just read" -- this is in the Findling article -- "No
17   correlation was found between SHAP and prolactin
18   levels even when male gynecomastia during puberty
19   was included, is incorrect?"
20                    And what did he say?
21   A.    He answered, "Is inaccurate."
22   Q.    And what you have told the jury today and
23   yesterday and the day before, to say that there's a
24   lack of correlation or a lack of an association,
25   that would be an inaccurate statement, as the author
```

```
 1    of the article under sworn deposition testimony
 2    himself says, like you, correct?
 3                   MS. SULLIVAN:  Objection, Your Honor.
 4             Leading.  And he should play the whole
 5             deposition.
 6                   MR. KLINE:  We will.
 7                   THE COURT:  Well, as far as the
 8             leading, overruled as far as the leading at
 9             this hour.
10    BY MR. KLINE:
11    Q.    Is that correct?
12    A.    Yes.  Dr. Daneman, who published, who was one
13    of the authors, the sentence that I -- the point
14    that I was concerned about, and you saw Janssen's
15    realizing that it was significant, he in his
16    deposition under oath said it was inaccurate.
17    Q.    Just like you told them?
18    A.    Yes.
19                   MR. KLINE:  Okay.
20                   THE COURT:  I think it would be
21             helpful, though, counsel, if we do have, for
22             the record, from this witness who this
23             particular doctor is.
24                   MR. KLINE:  Yes.
25    BY MR. KLINE:
```

1    Q.     Dr. Daneman, let's look at the Findling

2    article and we can wrap up, the Findling article.

3    That's a good point because a point was made about

4    it earlier.

5               The Findling article, while we're

6    getting it out, has two of the authors are Janssen

7    people.  One of whom is this Ms. Binder, the MBA,

8    correct?

9    A.     Yes.

10              He's the third author on the paper.

11              So if you look at the author --

12   Q.     Let's put it back up, if I may, for a minute.

13   A.     Sure.

14   Q.     It is Ms. -- we'll learn the plaintiff's

15   number in a minute.  The JJRE number is

16   JJRE03839224.

17   A.     Yes.  He's the third author -- the first

18   author on the second line.

19   Q.     Yes.  He's from the University of Toronto in

20   Toronto, Canada, correct?

21   A.     Yes.  He was one of the pediatric

22   endocrinologists.

23   Q.     Denis Daneman?

24   A.     Yes.

25   Q.     And he, like you, says that statement is

1  incorrect?

2  A.    He says it's inaccurate, yes, incorrect.

3  Q.    And so we know, you've read his whole

4  deposition, correct?

5  A.    Yes; I've studied it.

6  Q.    So when the questions were asked, you have to

7  pick one thing out of the thing, as to the issue

8  that we have here, the issue as to whether the

9  Janssen Pharmaceutical Company provided the full and

10  complete story on the drug, as to that statement in

11  that article and that statement which was made to

12  the FDA, it is inaccurate, so the author -- one of

13  the authors himself says, correct?

14  A.    That's --

15                  MS. SULLIVAN:  Objection; leading,

16          Your Honor.

17  BY MR. KLINE:

18  Q.    Is that correct?

19                  THE COURT:  That's overruled.  That's

20          overruled because of the hour.

21                  THE WITNESS:  He says it's

22          inaccurate.

23                  MR. KLINE:  Thank you.

24                  And, Your Honor, thank you for

25          letting me get through it quickly.

- DAVID A. KESSLER, M.D. - RECROSS -          114

```
 1                    THE COURT:  All right.  Thank you.
 2                    MS. SULLIVAN:  If I may, Your Honor.
 3                    THE COURT:  All right.  Recross.
 4           Last recross.
 5                         -  -  -
 6                    RECROSS-EXAMINATION
 7                         -  -  -
 8   BY MS. SULLIVAN:
 9   Q.    Dr. Kessler, you read Dr. Daneman's
10   deposition.  You know that he disagrees with you
11   that the 8- to 12-week data is clinically
12   meaningful, right?
13   A.    I have the deposition right here, if you want
14   to show me.
15   Q.    Do you know, sir?
16   A.    I looked at that.  I do know that I've read
17   subsequently that he once did --
18   Q.    Can you answer my question, you know, Dr.
19   Kessler --
20                    MR. KLINE:  He was finishing --
21                    THE COURT:  Well, right now are you
22           asking about the deposition?
23                    MS. SULLIVAN:  Yes.
24                    MR. KLINE:  But he was in the middle
25           of an answer, Your Honor.
```

1              MS. SULLIVAN:  I'm just asking about

2         the deposition.

3              THE COURT:  Okay.

4  BY MS. SULLIVAN:

5  Q.    You know, Dr. Kessler, that in that deposition

6  Dr. Daneman says the 8- to 12-week data is not

7  clinically meaningful, right?

8  A.    If you have an exact quote, please show me.

9  Q.    We're going to play it for the jury.  But you

10  don't remember that?

11  A.    I don't have that exact quote, that exact

12  line.

13              I do know that he said it was

14  inaccurate.

15  Q.    Now, Dr. Kessler, Mr. Kline showed you this

16  placebo-controlled study.  But what you guys didn't

17  talk about is that the fact that there's no -- there

18  was more people in the risperidone arm and that the

19  difference is not statistically significant, right?

20  A.    There are about nine additional people, but

21  there's three additional cases of gynecomastia.

22  Again, I think to -- if I can say what I've said

23  before, the data are the data.  You see zero in the

24  placebo; three in the risperidone arm.  There is no

25  statistics on that chart that I see.

```
 1   Q.    But you know, Dr. Kessler, that that's not a
 2   statistically significant finding?
 3   A.    Show me --
 4              MR. KLINE:  Objection.  There's no
 5        statistics run.
 6              THE COURT:  Wait.  Excuse me.
 7              MR. KLINE:  And it's their study.
 8              THE COURT:  That's sustained.  I
 9        think he answered that question.
10   BY MS. SULLIVAN:
11   Q.    Do you know, sir?
12   A.    I know there's no statistics on that table.
13   Q.    Do you know whether that's statistically
14   significant or not?
15   A.    I know that it's not -- I did not run the
16   statistics.  I've read the table.  There are no
17   statistics on the table.
18   Q.    So you don't know whether it's statistically
19   meaningful or not?
20   A.    Oh, please, you've just changed the
21   terminology.
22   Q.    I didn't.  You don't know whether it's
23   statistically significant or not?
24   A.    Right.  But then you talked about whether
25   something is meaningful.
```

```
 1   Q.     Statistically meaningful.

 2   A.     Right.

 3                  So Janssen didn't run -- didn't show

 4   the statistics on this table.  They could have.

 5   Q.     And Mr. Kline didn't bring in the whole --

 6                  COURT REPORTER:  I'm sorry, counsel,

 7      repeat.

 8   BY MS. SULLIVAN:

 9   Q.     Mr. Kline didn't bring in the whole --

10                  MR. KLINE:  Your Honor, can we not

11      try the case on that?

12                  THE COURT:  Well, again --

13                  MR. KLINE:  Can we try the case on

14      the facts?

15                  THE COURT:  -- I don't believe that

16      was a question, Ms. Sullivan.  So just please

17      ask questions.  It's okay.

18   BY MS. SULLIVAN:

19   Q.     And, by the way, Dr. Kessler, in all of these

20   studies, the overwhelming majority, even in INT-41,

21   95 percent of the kids didn't have any side effects

22   at all --

23                  MR. KLINE:  Objection.

24   BY MS. SULLIVAN:

25   Q.     -- right?
```

```
 1                    MR. KLINE:  Beyond the scope of
 2          redirect.
 3                    THE WITNESS:  So if you --
 4                    THE COURT:  Wait a minute.
 5          95 percent did not have what?
 6                    MS. SULLIVAN:  So --
 7                    MR. KLINE:  It's the same
 8          cross-examination from before, Your Honor.
 9          It's beyond the scope of redirect.
10                    MS. SULLIVAN:  Your Honor --
11                    THE COURT:  I don't know.  It depends
12          on the question.  I didn't catch that.
13          95 percent of what?
14  BY MS. SULLIVAN:
15  Q.    Dr. Kessler, in the study that you and
16  Mr. Kline just looked at, 98 percent of the kids
17  didn't have any side effects at all, right, in terms
18  of the prolactin?
19  A.    You have to put up the numbers.  In Findling,
20  I think it was, what, 7.8 percent, right?
21  Q.    98 percent didn't have any side effects,
22  right, or more?
23  A.    You have -- again, that's not the way you look
24  at safety data.  You compare the two arms, right.
25  So you're looking how many got gynecomastia who were
```

1    treated versus how many got it in the placebo arm.

2    That's what your end point is.

3    Q.     And the one label that Mr. Kline showed you

4    that had gynecomastia in the warnings, that was a

5    steroid drug, right?  It's a steroid.

6    A.     And it had gynecomastia in the one --

7    Q.     Yeah.  It's not a prolactin-elevated drug.

8    It's a steroid.

9    A.     It's not an antipsychotic.

10   Q.     And it's not a prolactin-elevated medicine?

11              MR. KLINE:  Objection.  The whole

12        point was to show --

13              THE COURT:  No, no, no.  Objection?

14              MR. KLINE:  -- you have gynecomastia

15        you warn about.

16              THE COURT:  Hold it.

17              MR. KLINE:  Not the kind of drug it

18        was.

19              THE COURT:  No.  The objection is

20        overruled.

21   BY MS. SULLIVAN:

22   Q.     This is a steroid?

23   A.     Yes.

24   Q.     And it's not a prolactin-elevated medicine?

25   A.     Ask your endocrinologist for the role -- the

```
 1   interrelationship.
 2   Q.    And even though kids take steroids, it doesn't
 3   have it on the warning for kids, right, for
 4   pediatrics in this label?
 5                   MR. KLINE:  Objection.
 6                   THE COURT:  An objection, one second.
 7                   Ms. Sullivan, which drug is this that
 8            you're talking about?
 9                   MS. SULLIVAN:  This is Mr. Kline's
10            label, the Striant.
11                   THE COURT:  Okay.
12                   MR. KLINE:  The one that has the
13            gynecomastia.
14                   THE COURT:  Oh, the one that has that
15            on a warning?
16                   MR. KLINE:  Yes.
17                   THE COURT:  Yes.  Overruled.
18   BY MS. SULLIVAN:
19   Q.    And there is no -- and steroids are used
20   off-label by young men and women?
21   A.    There's no evidence that I have that the
22   company was promoting it for children.
23   Q.    And there is no warning for pediatrics in this
24   label for gynecomastia, right?
25   A.    It had a warning for gynecomastia.
```

```
 1    Q.    But not for pediatrics?
 2    A.    It was in the warning.  If you look at the
 3    warning, it says gynecomastia, I believe.
 4    Q.    But your claim in this case, Dr. Kessler, is
 5    that the company could and should have warned about
 6    an off-label risk.  In fact, the label Mr. Kline
 7    showed you doesn't have that kind of a warning.
 8    A.    If you sell it for an off-label use to kids,
 9    for use in kids, then you have to warn.
10    Q.    And you're telling the jury kids don't use --
11    teenagers don't use steroids?
12    A.    I am not --
13                 MR. KLINE:  Your Honor, that's --
14                 THE COURT:  That's sustained.
15           Sustained.  That's argumentative.
16                 MR. KLINE:  Nor is there proof that
17           they were selling a million prescriptions of
18           it.
19                 THE COURT:  All right.  It's
20           argumentative.  All right.  Sustained.
21    BY MS. SULLIVAN:
22    Q.    And, Dr. Kessler, true that Risperdal has
23    helped millions of children?
24                 MR. KLINE:  Objection; beyond the
25           scope; irrelevant.  And I will show you all
```

1            the ones it hasn't helped.

2                    THE COURT:  Will this end the recross

3            soon?

4   BY MS. SULLIVAN:

5   Q.    We've established that it's widely prescribed?

6                    THE COURT:  Sustained.  Sustained.

7   BY MS. SULLIVAN:

8   Q.    Doctor, it's widely prescribed because it

9   works in kids, right?

10                   MR. KLINE:  Objection.  He just

11           sustained it.

12                   THE COURT:  I don't think that's an

13           issue that's been raised on redirect.

14           Sustained.

15  BY MS. SULLIVAN:

16  Q.    And, Doctor, the FDA has actually found that

17  Risperdal has helped millions of autistic children

18  and their parents and other caregivers, right?

19                   MR. KLINE:  Same objection.

20                   THE COURT:  All right.  Same,

21           sustained.

22                   The same warning or reminder to the

23           jury that questions are not evidence.

24  BY MS. SULLIVAN:

25  Q.    The FDA when it approved -- well, you read the

```
 1   review memos, Dr. Kessler.  The FDA when it approved
 2   Risperdal found that there were no treatments for
 3   these kids and that Risperdal could be an important
 4   medicine to help autistic kids and their parents;
 5   that's what the FDA --
 6                   MR. KLINE:  Same, same objection,
 7        Your Honor.
 8   BY MS. SULLIVAN:
 9   Q.    That's in the FDA review.
10                   MR. KLINE:  When does she stop?
11                   THE COURT:  That's sustained.
12                   You're going to have your own
13        witnesses on all of this, aren't you?
14                   MS. SULLIVAN:  Yes, Your Honor.
15        But --
16                   THE COURT:  All right.  Then please
17        restrict it to what the redirect was.
18   BY MS. SULLIVAN:
19   Q.    And, Dr. Kessler, on the labeling front, you
20   know, sir, that the FDA does not agree with your
21   opinion?
22                   MR. KLINE:  Same objection.
23                   THE COURT:  All right.  That's
24        sustained.  It has been asked.  It's not in
25        evidence in this case, and so it is
```

 1              sustained.
 2                   MS. SULLIVAN:  May I use the FDA
 3          conclusion --
 4                   THE COURT:  You're going to have your
 5          own witnesses testify about what the FDA did
 6          or did not do, so get it through them.
 7                   MS. SULLIVAN:  Thank you.
 8                   No further questions, Your Honor.
 9                   THE WITNESS:  Thank you,
10          Ms. Sullivan.
11                   MR. KLINE:  All right.
12                   THE COURT:  Anything else?
13                   All right.  Dr. Kessler, you've made
14          it.  You've made it.  Congratulations to you,
15          sir.  And you are formally excused as soon as
16          you are ready.  Thank you very much for being
17          in Philadelphia.
18                   THE WITNESS:  Thank you, Your Honor.
19                   MR. KLINE:  Thank you for coming,
20          sir.
21                   (Witness left the stand.)
22                   THE COURT:  All right.  Members of
23          the jury, we have accomplished something, so
24          we're going to rest right there, okay?
25                   So we are going to take our

```
1         adjournment right here.  It should give us
2         enough time to get up to the after-school.
3         And I am asking that that particular juror,
4         to please work on it as far as helping us out
5         to pick up, all right?  So enough said for
6         that.
7              Please wear your yellow badges,
8         again, when you come in.  Keep an open mind
9         in this case, obviously.  Please do not talk
10        to anybody about this case, yourselves or
11        anybody else.
12             Again, a big reminder, not to conduct
13        your own investigation whatsoever on this
14        case, and also not to read or review any
15        media reports about this case, if there are
16        any, any newspapers, any radio, any magazines
17        any Internet coverage, anything at all,
18        television, anything at all, all right?
19             For all the reasons that I've said
20        before, which I'm not repeating now.  It's
21        time to go home, all right?
22             So you are excused.  We'll see you
23        tomorrow.  Please try to come in at 9:15 and
24        we'll get started as soon as all of you are
25        here.
```

```
 1                    Okay.  All right.  Thank you,
 2          everybody.
 3                    COURT CRIER:  All rise as the jury
 4          exits.
 5                          -  -  -
 6                    (Whereupon the jury exited the
 7          courtroom at 4:29 p.m.)
 8                          -  -  -
 9                    THE COURT:  All right.  Let's close
10          the door.
11                          -  -  -
12                    (The following transpired in open
13          court outside the presence of the jury:)
14                          -  -  -
15                    THE COURT:  And I just want to ask
16          counsel, when was your desire, Mr. Kline and
17          Mr. Gomez, to have Dr. Goldstein appear?
18                    MR. KLINE:  Tomorrow.
19                    THE COURT:  Okay.  In that case,
20          we'll argue then the -- I'll hear argument.
21          I have reviewed the document, and I have
22          reviewed this situation involving this
23          defendant's motion to exclude testimony.
24          Well, what is the actual -- the new one is --
25          it's in the form of Defendants Janssen
```

1          Pharmaceuticals, Inc., Johnson & Johnson,

2          Janssen Research and Development, LLC, Bench

3          Memorandum Regarding the Inadmissibility of

4          Dr. Goldstein's Testimony.

5                  So let me hear argument on this

6          briefly, and then we'll -- I'll see if I need

7          more time on this or not.

8                  MR. MURPHY:  Sure.  Thank you, Your

9          Honor.

10                 When we learned that there had been

11         an IME of the plaintiff, we then engaged an

12         endocrinologist to do the same.  We engaged a

13         local endocrinologist, Dr. Vaughan.

14                 THE COURT:  Dr. Who?

15                 MR. MURPHY:  Dr. Vaughan.  He is

16         someone who will be testifying in our case.

17                 Dr. Vaughan is local, in Alabama.  We

18         were aware of what the rules require in terms

19         of someone practicing in the locale.  We have

20         an expert, Dr. Braunstein, from California

21         who has written both a general as well as a

22         specific causation report in this case.  But

23         we knew we could not send Dr. Braunstein in

24         light of the rules that are in Alabama.

25         That's what we did.

```
 1                    Going forward --
 2                    THE COURT:  Let me ask you a
 3          question, Mr. Murphy.
 4                    MR. MURPHY:  Yes.  Sure.
 5                    THE COURT:  I have reviewed the law
 6          that was provided to me, and I've also
 7          reviewed our own law, not to the extent about
 8          admissions of licenses, but our own case
 9          management system.
10                    So, first of all, let me ask you
11          this:  This seems to me to be in violation of
12          the case management order in this case.  And
13          the question becomes for a court, trial
14          court, whether or not to enforce the case
15          management order that exists in these cases
16          or any case.  And, you know, if you can tell
17          me how it is that this particular issue is
18          now raised for the first time on the eve,
19          when apparently this IME report was done --
20          the examination that's in question was done
21          on March 14th of 2014, and you did not
22          include this particular issue in a motion to
23          exclude that went before Judge New which was
24          filed on May 7th.  And I want to know why you
25          did not include this issue at that time.
```

```
 1              MR. MURPHY:  Sure, Your Honor.
 2              The issue that I raised with you this
 3       morning, that is, the last-minute request to
 4       have a de bene esse deposition of a causation
 5       expert, the person who is saying that
 6       Risperdal --
 7              THE COURT:  Is Dr. Goldstein coming
 8       in live or --
 9              MR. MURPHY:  No, no, he is because in
10       light of your ruling.
11              THE COURT:  Then, what does that have
12       to do with anything?
13              MR. MURPHY:  What it has to do
14       with --
15              THE COURT:  That was some kind of
16       effort, as I understood it, to conduct, at
17       your inconvenience, a videotape tonight.  I
18       ruled against that.  He's coming in.
19              MR. MURPHY:  And I --
20              THE COURT:  I'm asking you why this
21       issue, the so-called licensure issue, was not
22       included in the initial motion to exclude
23       expert testimony of Dr. Goldstein's decided
24       by Judge New before this trial -- it never
25       got to me -- when you knew at that time that
```

1      the alleged doctor, that Dr. Goldstein had

2      conducted his examination on March 4, 2014,

3      and the actual motion to exclude before Judge

4      New was not filed till after that, so you

5      knew about this issue.

6              MR. MURPHY:  No, no.  What I'm

7      telling you -- I'm answering your question as

8      to when it came to our attention and what

9      sparked it.  It made absolutely no sense --

10             THE COURT:  All right.  All right.

11             MR. MURPHY:  What I'm saying is, it

12     made absolutely no sense to say you want to

13     conduct a de bene esse.  We then looked to

14     see, well, what could be the problem here?

15     Is there some issue?

16             We go.  We say, is he in fact

17     admitted?  Maybe he's not.  Maybe that's the

18     issue.  Are they going to provide us

19     anything?

20             THE COURT:  I'm sorry.  On those

21     grounds alone, I would deny this motion,

22     because, frankly, it's a violation of the

23     case management order.  You knew of this

24     situation.

25             MR. MURPHY:  No, I did not.

```
 1                    THE COURT:  When was his document
 2           actually provided?
 3                    MR. MURPHY:  His report?
 4                    THE COURT:  Yeah.
 5                    MR. MURPHY:  He's got a report in --
 6                    MR. KLINE:  And he was deposed.  And
 7           he was asked all about the exam at his
 8           deposition.
 9                    MR. MURPHY:  I'll give you the date.
10           His report is dated March 31st.
11                    THE COURT:  Of what year?
12                    MR. MURPHY:  2014.
13                    THE COURT:  And your motion to
14           exclude in front of Judge New of the expert
15           testimony of David Goldstein was filed on
16           May 14, 2014.  So you had this issue before
17           you filed it.  You failed to include it, and
18           instead you wait till the eve of trial of a
19           witness.  It is denied on those grounds.
20                    But I will go to the merits also
21           because I have to say that I'm not an Alabama
22           judge, and therefore, we're going to follow
23           the rules of Pennsylvania in terms of this
24           evidence.
25                    And the reality of the matter is if
```

```
 1            Alabama wants to sanction Dr. Goldstein, they
 2            may.  All you have given to this Court is a
 3            1998 informal opinion of a medical practice.
 4            My prima facie reading of it is that this
 5            particular doctor, in conducting this
 6            independent medical examination, was not
 7            practicing medicine even in Alabama; and if
 8            he were, he was given up to ten days in
 9            Alabama in order to be able to practice -- to
10            give this particular type of assistance to a
11            forensic situation as this.
12                  So I'm not going to make any formal
13            ruling on Alabama law because it's not before
14            me.  But I think this is a frivolous motion,
15            untimely, and I am not going to let this one
16            go if these type of motions keep on coming to
17            me right before testimony when it should have
18            been brought in front of Judge New who in
19            fact denied the motion to exclude
20            Dr. Goldstein's testimony.
21                  MR. MURPHY:  May I be heard?
22                  THE COURT:  Very briefly, Mr. Murphy.
23            You should know better.  We're not going to
24            be intimidated, essentially, by having these
25            motions pop up on the eve of a trial of
```

1          cross-examination when there is a violation

2          of the case management order.  There's a

3          violation of evidence.  And on top of that,

4          on the merits it would appear to be a

5          frivolous motion.

6                    MR. MURPHY:  May I?

7                    THE COURT:  Yeah.

8                    MR. MURPHY:  Okay.

9                    THE COURT:  I mean, you can have

10         every right, by the way, to cross-examine

11         this witness as to where the examination took

12         place, under what circumstances, and all the

13         rest.  That should be enough.

14                   MR. MURPHY:  I understand that, Your

15         Honor.  The point of the matter is, I

16         explained to you what brought it to our

17         attention.

18                   THE COURT:  Okay.

19                   MR. MURPHY:  Okay.  And this is not

20         the first time that there has been an

21         overlooking of a technical nicety.  In this

22         case we've had a situation where the

23         guardianship and conservatorship was not in

24         place at the time it should have been.  That

25         resulted -- that resulted in this trial being

1         adjourned for some period of time, okay?

2         What we looked --

3                 MR. KLINE:  That has nothing to do

4         with the --

5                 MR. MURPHY:  No.  No.

6                 THE COURT:  Mr. Murphy, as I said, I

7         think I'm being very indulgent to you in even

8         considering this motion at this time.  I do

9         have -- a motion in limine must be filed no

10         later than December 9th of 2014, signed by

11         Judge Arnold L. New, Jr., and that was dated

12         September 25th of 2014, well after you knew

13         that this particular Dr. Goldstein examined

14         this particular plaintiff in Alabama.

15                 And with all due respect, I am

16         really, really not very pleased that this

17         Court is being subjected to these kinds of

18         last-minute motions in a trial of this nature

19         where you've all been working this case for

20         years and years and years.

21                 Anything else?

22                 MR. KLINE:  Yes.  Here's the problem

23         I have, Your Honor, and I have what I believe

24         is a significant problem which I'd like to

25         raise with the Court about Dr. Goldstein:

1          Dr. Goldstein was here last week, so the

2     Court knows.  He hung around here all week.

3     He came a day early because he wanted to beat

4     the snow in.  He didn't get on because

5     Dr. Kessler's testimony went on forever.

6               We had some discussions with him and

7     we said, you know what, we'll get you in and

8     out, and so we did -- we arranged for the de

9     bene esse.  I understand the Court's point

10    and I get it.  But that was what that was all

11    about.  I knew nothing about this.

12              On the other hand, on the other hand,

13    and this goes to the chilling of testimony.

14    Hear me for just a moment, please.  They

15    claim to have gotten Dr. Vaughan, and he

16    examined this patient on April the 25th of

17    2014, because they believe there were

18    "criminal ramifications" if he were

19    to examine -- if Dr. Braunstein, their

20    Hollywood, California expert, were to come to

21    Alabama and do it.  They don't say anything

22    to us, okay?  They don't say anything to

23    anybody.  They take Dr. Goldstein's

24    deposition.  They don't say anything there.

25              Long after they say that they believe

```
 1              that a crime was committed.
 2                     Now -- and they do say, they do say
 3              that it's a crime and that it could be
 4              punishable in Alabama up to ten years in
 5              jail.
 6                     Now, I have a witness coming in here
 7              tomorrow, okay, totally chilled under these
 8              circumstances.  I have to tell him -- I have
 9              to tell this man who, by the way, is a
10              50-year practicing endocrinologist.  And I
11              might vouch for him in this way, not his
12              credentials:  A nice and good, decent man.
13              I've spent a number of hours with him, okay?
14                     Now, I have to go back and tell him
15              that these people from -- the good people
16              from Janssen, as they call themselves, the
17              good people from Janssen believed for a year
18              that you've committed a crime.  Sir, I can
19              tell you, I'm not an Alabama practitioner; I
20              couldn't in a million years believe it.  I
21              can't give you advice.  I'm not a criminal
22              lawyer in Alabama, and --
23                     THE COURT:  I haven't read the
24              criminal statute, by the way.
25                     MR. KLINE:  Well, I've looked at it.
```

```
 1                    THE COURT:  You talking about Alabama
 2          code?
 3                    MR. KLINE:  There's an Alabama code
 4          and there's an informal opinion.
 5                    THE COURT:  I've read that.  I read
 6          that, yes.
 7                    MR. KLINE:  But the Alabama code has
 8          a -- there's an issue which in order for this
 9          man to get further involved, if I were him, I
10          would want counsel.
11                    Now --
12                    THE COURT:  Well, you don't have to
13          put him on tomorrow.  You can wait.
14                    MR. KLINE:  There's another solution
15          to it, by the way.
16                    And that's why I wanted to get this
17          before Your Honor earlier.  A solution -- a
18          solution to this since they think that
19          they're on to something which they -- by the
20          way, they were literally aiding and abetting
21          supposedly what they now call a crime because
22          they knew and I didn't.  But what I suggest
23          is a potential solution.
24                    First of all, I want to go and talk
25          to Dr. Goldstein.  I have to.  He's not my
```

1          client, so I can't give him legal advice.  I

2          have a very serious problem here.  And what

3          I'd like to do is try to figure it out.  Try

4          to get him some -- try to get some advice.

5          And in the meantime, I have at least

6          considered getting somebody else, flying

7          Austin up here very quickly.

8                    Oh, that gets them on their feet

9          quickly.

10                   MS. SULLIVAN:  No.

11                   MR. KLINE:  Having a report in a day

12         maybe, something like that.  There are

13         experts locally who have cooperated with us

14         in the Risperdal litigation, and solving this

15         whole problem.

16                   Your Honor, I don't want to put a man

17         who's devoted his life to practicing medicine

18         who's 71 or 72 years old to -- to being

19         chased around by the Alabama Attorney General

20         due to their malfeasance.  And I really would

21         like to just try to work through the issue.

22                   So one of the things that I'd like to

23         do -- and I don't have the answers yet, but I

24         certainly know, I believe, as a long-time

25         practicing lawyer, what some of the issues

1        are here.  And what the issues are is I have
2        to go back and talk to a man who's not my
3        client and if I were him, I would tell him
4        you got to get counsel because I can't advise
5        you.
6               And one way through the whole thing
7        is, by the way, let this case go forward,
8        I'll fly Austin up here.  By the way, I can
9        represent to you that Philip Pledger,
10       Austin's father, can get on a 6:30 plane
11       tonight.  We can get -- they're literally on
12       standby.  I'll get him up here.  I'll get
13       them in the hands of a pediatric
14       endocrinologist up here or a pediatric -- or
15       a plastic surgeon.
16              By the way, both of whom they've
17       deposed because this litigation has a million
18       tentacles.  That won't surprise you.  There
19       will be no surprise.  And we'll give you a
20       report and we'll go on.
21              This is simply -- this is on its face
22       a simple matter.  This is somebody has to
23       come in and say Risperdal is a substantial
24       contributing factor in this boy's injury.
25       It's all in the, by the way, in my view

```
 1            anyway, "duh" category.  They themselves --
 2            "duh" meaning it's obvious -- they themselves
 3            have an expert witness.
 4                    THE COURT:  You mean obvious that
 5            this is not practicing medicine?
 6                    MR. KLINE:  No, no, no, no, no.  That
 7            part I can't vouch for.
 8                    THE COURT:  Right.
 9                    MR. KLINE:  I'm not an Alabama
10            lawyer --
11                    THE COURT:  I'm not an Alabama judge
12            for sure.
13                    MR. KLINE:  -- let alone an Alabama
14            criminal lawyer.
15                    THE COURT:  You're right.  You're
16            right.
17                    MR. KLINE:  But I can tell you one
18            thing, that that's one way through it.
19                    What I can't tell the Court and the
20            bind that I'm in based on their conduct, not
21            mine --
22                    THE COURT:  All right.
23                    MR. KLINE:  -- they're holding this
24            for a year.
25                    THE COURT:  All right, Mr. Kline.
```

```
 1              MR. KLINE:  A year.
 2              THE COURT:  Well, I've already made
 3         my point, which is that this is an untimely
 4         motion.  It is precisely the reason why these
 5         particular case management orders are in
 6         effect, is to prevent this kind of unfair
 7         surprise at the moment of a witness's
 8         appearance.  I've already established --
 9              MR. KLINE:  I need a remedy.
10              THE COURT:  Excuse me.  I've already
11         established on the record that the conduct or
12         the alleged conduct of this particular
13         witness as regards to Alabama and Alabama law
14         was known to the witness -- to the
15         plaintiff -- defendant before the filing of a
16         motion.  And so I see this as really a
17         tactical measure by the defense in order to
18         cause some kind of unfair surprise.  And for
19         that reason I will in fact permit a new
20         report or a new IME.  If we have a patient --
21         a live witness that can come up to
22         Philadelphia and show the jury in certain
23         types of in-camera situations what it is that
24         he has, that will be permitted.  Or if we can
25         have a doctor conduct another investigation
```

1            over the next week or so, that will be

2       permitted.

3               I am not going to permit a defense

4       from this kind of misconduct.

5               MS. SULLIVAN:  Here's the issue, Your

6       Honor:  We knew -- we knew about this --

7       they're lawyers, too, Judge.  There's a

8       statute in Alabama.  We had to go out of our

9       way to get a local guy that we didn't want --

10              THE COURT:  I don't know.  You

11      haven't cited to me a single case on this

12      particular situation involving expert

13      testimony for a court.

14              MS. SULLIVAN:  Your Honor --

15              THE COURT:  If you had something to

16      work with since -- Mr. Kline is right.  We

17      don't want his witness to be a guinea pig

18      necessarily for this kind of a litigation.

19              MS. SULLIVAN:  But here's the

20      prejudice, Your Honor, because we followed

21      the law --

22              THE COURT:  If you had filed this

23      back in April --

24              MS. SULLIVAN:  Your Honor, we didn't

25      know -- we assume they had a letter from an

```
 1          Alabama doctor.
 2                  THE COURT:  The problem here,
 3          Ms. Sullivan, is you had your own witness as
 4          early as April of 2014.
 5                  MS. SULLIVAN:  And we thought that
 6          they complied with the statute.  All that
 7          required was that they had a consult with an
 8          Alabama doctor.  When they did the de bene
 9          esse, we were like, oh, my God, maybe they
10          didn't.
11                  THE COURT:  Again, I don't see it --
12          I see it as unfair surprise that is being
13          launched here the night before.
14                  MS. SULLIVAN:  Your Honor, because
15          they violated the law, you're going to put
16          us --
17                  THE COURT:  I don't know whether they
18          violated the law.  There's been no
19          adjudication about that.
20                  I do know that you're violating this
21          Court's case management order, that much I do
22          know.
23                  MS. SULLIVAN:  Well, Your Honor, it
24          didn't come to our attention --
25                  THE COURT:  It may not have the force
```

```
 1          of law, but it has the -- it actually is the
 2          law in this case.
 3                  MS. SULLIVAN:  But, Your Honor, it
 4          didn't come to our attention until the de
 5          bene esse.
 6                  THE COURT:  All right.  I understand
 7          your position.  That is denied as far as this
 8          motion is concerned.
 9                  MS. SULLIVAN:  But the defense has
10          framed their entire case --
11                  THE COURT:  Mr. Kline has raised a
12          good point.  That has to do with
13          consideration of Dr. Goldstein's own legal
14          position, and therefore, if I'm told that he
15          may not or will not testify, I am going to
16          give Mr. Kline and the plaintiff a remedy.
17                  MS. SULLIVAN:  Your Honor, we have
18          framed our entire defense -- we opened based
19          on Dr. Goldstein's report and his opinions in
20          this case.  To now change the case because
21          their expert violated the law is completely
22          prejudicial and unfair to us.
23                  MR. MURPHY:  And the suggestion --
24                  THE COURT:  Well, frankly, if you had
25          brought --
```

```
 1              MS. SULLIVAN:  We did nothing wrong.
 2       We didn't know about it.
 3              THE COURT:  Frankly, if you had
 4       brought this particular issue ahead of
 5       time --
 6              MS. SULLIVAN:  We didn't know about
 7       it.
 8              THE COURT:  You had known about it at
 9       the time you filed the motions in limine
10       before trial so that you wouldn't have been
11       prejudiced with your opening arguments.  You
12       just didn't play it that way, Ms. Sullivan,
13       or Mr. Murphy.
14              MS. SULLIVAN:  No.
15              THE COURT:  And I'm not going to
16       permit that kind of unfair surprise in any
17       case, let alone in this one in which we have
18       a doctor who apparently needs to be advised
19       about what his legal position is regarding
20       some conduct in Alabama.
21              MR. MURPHY:  And, Your Honor, I hear
22       you.  I hear you, and I understand you.  But
23       I have to say on the record and make it
24       abundantly clear that we did not know.  And
25       what you're saying --
```

```
1              THE COURT:  You didn't know till
2       today?
3              MR. MURPHY:  We did not know that --
4              THE COURT:  What are you telling me?
5              MR. KLINE:  They told me --
6              COURT REPORTER:  One at a time.
7              MR. MURPHY:  What I'm telling you is
8       I did not know, we did not know that they had
9       not crossed the box; that they had not in
10      fact either gotten a local physician to
11      comply with him -- to consult with him.
12             MR. KLINE:  When was his deposition?
13             THE COURT:  Frankly, unless you're
14      telling me that the testimony itself is
15      incompetent to be heard in this courtroom, I
16      don't really care.
17             In other words, that is a matter
18      between Mr. Kline and his witness.  It's not
19      a matter for you.  If you're telling me his
20      testimony is incompetent because he may have
21      violated some technical situation in Alabama,
22      that's something I care about.
23             MR. MURPHY:  Well, that is the very
24      point.
25             THE COURT:  Well, show me something
```

1          where that is an actual -- something that

2          binds this Court on whether or not to accept

3          an expert opinion from Dr. Goldstein because

4          of some kind of Alabama situation that none

5          of you have ever litigated or will litigate

6          apparently.

7                    MR. MURPHY:  Well, no.  I've never

8          litigated it, but here's the point, and

9          please appreciate it:  The very underpinning

10         of his opinion, okay, is based upon an

11         illegal and invalid --

12                    THE COURT:  If you tell me -- if you

13         show me or give to me some kind of legal

14         argument that is legal; in other words, that

15         is telling me that his testimony is

16         incompetent and must be stricken.  Let's say

17         he testified now, are you telling me that

18         there's some kind of violation or some kind

19         of rule that hasn't been litigated before and

20         you're telling me that I must strike it, then

21         I would.  But right now you're not giving me

22         anything other than something that it seems

23         like if there's a problem down in Alabama

24         that we didn't know about till the eve of

25         trial, then all of a sudden, it's not

```
 1              admissible here, I don't know.  Show me
 2         something.
 3                   MR. MURPHY:  If the very basis for
 4         his opinion rests on an act that was invalid
 5         and illegal, how can that be --
 6                   THE COURT:  Well, you show me.
 7                   MR. MURPHY:  Just hear me out.
 8                   THE COURT:  Mr. Murphy --
 9                   MR. MURPHY:  How can that be injected
10         in a civil proceeding?
11                   THE COURT:  You show me.  You show
12         me.
13                   MR. MURPHY:  Okay.  Understanding my
14         argument, if you choose to disagree with me,
15         fine.  But I --
16                   THE COURT:  I don't choose to do
17         anything.
18                   MR. MURPHY:  But I need you to
19         understand --
20                   THE COURT:  I am ruling -- I am
21         ruling this particular motion denied on the
22         basis of untimeliness.  That's it.
23                   MR. MURPHY:  Fair enough.
24                   But I needed you to understand the
25         basis for the motion.
```

```
 1                    THE COURT:  I understand your basis,
 2            and we'll carry on.
 3                    My suggestion is that if Mr. Kline
 4            believes through his witness that his witness
 5            may have violated a statute that could put
 6            him at some kind of risk down there, whatever
 7            his situation is, I will give the plaintiff
 8            the opportunity to have a new IME produced
 9            because of the untimeliness of your motion.
10                    MS. SULLIVAN:  Then we move --
11                    MR. KLINE:  Okay.  Thank you.
12                    THE COURT:  But that's it.  We are
13            out of here.
14                    MR. KLINE:  Thank you.
15                    MS. SULLIVAN:  Then, Your Honor, we
16            would move for a mistrial, because that
17            changes the entire case.  We defended based
18            on Dr. Goldstein's report.  We learned that
19            he didn't consult with an Alabama expert when
20            they pulled this de bene esse thing.
21                    THE COURT:  No, no, no, no.  You were
22            responding to Dr. Goldstein's report in your
23            opening without anything having to do with
24            Alabama, I think.
25                    MS. SULLIVAN:  I opened that he was
```

1      not licensed in Alabama, Your Honor.  I

2      opened.

3              THE COURT:  Fine, not licensed in

4      Alabama.  That does not mean that, you know,

5      that his testimony in this Court is stricken.

6      If you're moving for a mistrial, say so.

7              MS. SULLIVAN:  Only if you're

8      switching -- if you're going to permit them

9      to switch experts at this late date --

10             THE COURT:  I don't know.  At this

11     point, at this point that is premature

12     because Mr. Kline and his team have not --

13             MS. SULLIVAN:  Okay.  Then I'll

14     reserve my motion.

15             THE COURT:  I personally don't

16     believe it's an issue for this gentleman

17     because I have reviewed the law myself, and I

18     don't believe he was practicing medicine in

19     Alabama.  And then the other reason for that

20     belief is that if he were there, there is an

21     exception in the Alabama code that permits a

22     nonlicensed doctor to practice for up to ten

23     days.

24             So if his examination was less than

25     ten days, he should be comfortable in terms

1              of his own legal position in Alabama.

2                      MR. MURPHY:  When consulting with a

3              state licensed doctor.

4                      THE COURT:  I don't know about that.

5                      MR. MURPHY:  It's in the statute.

6                      THE COURT:  Again, you're leaping to

7              conclusions, and therefore -- but my ruling

8              at the moment solely is that this particular

9              motion to exclude Dr. Goldstein's testimony

10             is denied for untimeliness.

11                     All right.  So we will return

12             tomorrow at 9:30.

13                              -  -  -

14                     (Court adjourned at 4:52 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T I O N

2

3              I hereby certify that the proceedings

4        and evidence are contained fully and

5        accurately in the notes taken by me on the

6        trial of the above cause, and that this copy

7        is a correct transcript of the same.

8              I further certify that I am not a

9        relative or employee of any attorney or

10       counsel employed in this case.

11

12

13

14       _____

15       John J. Kurz, RMR, CRR
         Registered Merit Reporter
16       Certified Realtime Reporter
         Official Court Reporter
17

18

19              (The foregoing Certification of this

20       transcript does not apply to any reproduction

21       of the same by any means unless under the

22       direct control and/or supervision of the

23       certifying reporter.)

24

25

**[**

**[Reading] (1)**
85:19

**A**

**abetting (1)**
137:20
**able (3)**
50:1;69:1;132:9
**above (3)**
38:21;106:2;152:6
**absolutely (6)**
71:24;87:7;88:14;
91:17;130:9,12
**abstract (7)**
83:16,21;84:22,25;
85:2,6,8
**abundantly (1)**
145:24
**accept (2)**
37:23;147:2
**accomplished (1)**
124:23
**according (1)**
32:11
**accurate (1)**
6:20
**accurately (1)**
152:5
**acknowledge (2)**
36:16,19
**acknowledged (2)**
23:3;87:13
**across (2)**
77:16;86:25
**act (1)**
148:4
**actual (6)**
39:21;44:5;60:2;
126:24;130:3;147:1
**actually (14)**
27:10;34:2,11;
36:7;58:7;77:10;
80:4;89:13,22;91:15;
97:11;122:16;131:2;
144:1
**add (5)**
7:3;27:9;36:7;
88:2;102:9
**added (1)**
39:18
**addition (2)**
23:12;108:19
**additional (3)**
93:24;115:20,21
**adequately (1)**
94:8
**adjourn (2)**
7:10;74:16
**adjourned (2)**

**134:1;151:14**
**adjournment (1)**
125:1
**adjudication (1)**
143:19
**administered (1)**
80:21
**admissible (2)**
104:17;148:1
**admissions (1)**
128:8
**admitted (2)**
102:1;130:17
**Adolescent (1)**
69:11
**adolescents (1)**
85:21
**adults (1)**
102:10
**adverse (24)**
43:7,9;44:1,8,11,
13,17;45:10,24;
46:10,15,23;47:3,25;
48:7;49:9,13,14,17;
53:8;60:7;79:7,12;
107:5
**advice (3)**
136:21;138:1,4
**advise (1)**
139:4
**advised (1)**
145:18
**advisory (2)**
19:20,22
**AE (1)**
66:11
**afternoon (5)**
5:7;9:24,25;10:5,6
**after-child (1)**
125:2
**Again (30)**
18:11;21:4,14;
22:21;30:23;32:18;
33:11;41:7;44:25;
49:22;54:10;62:14;
64:11,17;70:13;
71:19;72:11;94:2;
95:17;99:5;101:19;
104:23;107:17;
115:22;117:12;
118:23;125:8,12;
143:11;151:6
**against (5)**
72:14;98:22;
102:22;107:21;
129:18
**age (3)**
12:3;16:18;107:6
**agency (1)**
86:8
**ages (1)**
77:23
**ago (2)**

**5:18;96:25**
**agree (15)**
17:7,14;33:15;
63:19;64:9,19;67:24;
86:7,13;88:4;91:8;
93:2;110:7,15;
123:20
**Ah (1)**
45:5
**ahead (4)**
95:13;97:22,25;
145:4
**aiding (1)**
137:20
**aired (1)**
29:25
**Alabama (38)**
6:8,15;9:9;127:17,
24;131:21;132:1,7,9,
13;134:14;135:21;
136:4,19,22;137:1,3,
7;138:19;140:9,11,
13;141:13,13;142:8;
143:1,8;145:20;
146:21;147:4,23;
149:19,24;150:1,4,
19,21;151:1
**alleged (2)**
130:1;141:12
**allow (5)**
27:21;29:22;63:1;
65:14;88:22
**allowed (1)**
65:14
**alone (3)**
130:21;140:13;
145:17
**along (2)**
7:4;30:2
**alternative (4)**
95:2,3,7,8
**Although (3)**
77:13;82:2;85:13
**always (5)**
25:2,9;87:24;89:4;
90:5
**amazing (1)**
69:19
**American (1)**
86:21
**Among (1)**
33:19
**amount (4)**
16:9,13;72:22;
88:17
**analyses (2)**
12:20;36:13
**analysis (15)**
10:18;11:10,22;
13:11,15;16:17;22:4;
23:24;27:15,16;30:6;
36:10;47:20;57:13;
70:7

**analyzed (1)**
11:25
**and/or (2)**
13:17;152:22
**Anderson (1)**
76:13
**answered (12)**
24:13;26:4,8;31:4;
32:14,14,18;33:23;
40:18;92:7;110:21;
116:9
**antipsychotic (1)**
119:9
**antipsychotics (1)**
98:8
**apologize (1)**
15:11
**apparent (2)**
66:3;71:19
**apparently (4)**
5:24;128:19;
145:18;147:6
**appear (2)**
126:17;133:4
**appearance (1)**
141:8
**appears (1)**
8:12
**appendices (1)**
47:22
**appendix (2)**
71:16,20
**application (1)**
40:10
**applications (1)**
93:7
**apply (1)**
152:20
**appreciate (1)**
147:9
**approval (6)**
88:18,24;89:8;
90:16;93:9;96:20
**approvals (2)**
90:14;91:14
**approve (2)**
88:25;93:17
**approved (9)**
91:1,2,16,22;92:4;
93:4,8;122:25;123:1
**approves (1)**
89:12
**April (3)**
135:16;142:23;
143:4
**areas (1)**
95:12
**argue (1)**
126:20
**argument (4)**
126:20;127:5;
147:14;148:14
**argumentative (4)**

**101:14;105:16;**
**121:15,20**
**arguments (1)**
145:11
**arm (3)**
115:18,24;119:1
**arms (1)**
118:24
**Arnold (1)**
134:11
**around (3)**
74:16;135:2;
138:19
**arranged (1)**
135:8
**article (11)**
37:13;39:15;69:14;
82:23;83:1;110:16;
111:1;112:2,2,5;
113:11
**aside (1)**
82:20
**assistance (1)**
132:10
**associated (9)**
17:18;26:13;27:4;
57:3;80:16;81:20,25;
84:5;85:9
**association (7)**
26:24;30:8,9;
73:14;84:15;85:25;
110:24
**assume (3)**
24:2;48:13;142:25
**assuming (2)**
41:21;59:24
**asterisk (2)**
53:7,10
**attached (1)**
19:5
**attention (16)**
6:23,24;7:15;
40:15;41:21;42:1,11,
15,17,19,22;43:1;
130:8;133:17;
143:24;144:4
**attorney (4)**
64:4,5;138:19;
152:9
**attributed (1)**
19:5
**atypical (1)**
98:7
**Austin (3)**
6:5;138:7;139:8
**Austin's (1)**
139:10
**author (10)**
18:3,24;69:8,15;
110:25;112:10,11,17,
18;113:12
**authored (2)**
48:10,11

**authorities (1)**
9:9
**authors (12)**
18:2,8,14;19:24;
20:20;80:8;109:9,10,
10;111:13;112:6;
113:13
**author's (1)**
18:9
**autism (12)**
57:5,15;73:21;
77:11,15,17,24;
81:18;82:2;85:11;
90:15;93:5
**autistic (3)**
78:7;122:17;123:4
**available (3)**
57:14;108:25;
109:1
**aware (5)**
8:9;56:25;57:17;
75:22;127:18
**awhile (1)**
5:18

**B**

**Back (25)**
10:7,17;12:25;
13:3;19:11;31:25;
33:4;37:20;39:20;
43:6;55:23;56:1,23;
57:22;74:15;77:22;
83:8;84:24;89:10;
94:2;95:18;112:12;
136:14;139:2;142:23
**background (5)**
13:22;24:7,20;
25:21;26:12
**badges (1)**
125:7
**based (5)**
13:20;140:20;
144:18;147:10;
149:17
**baseline (1)**
79:10
**basically (1)**
31:20
**basis (7)**
24:12;92:2,3;
148:3,22,25;149:1
**Bates (6)**
38:12;41:22;52:21;
60:9;65:20,21
**beat (1)**
135:3
**becomes (1)**
128:13
**beginning (4)**
13:14,24;45:22;
54:7
**behavior (1)**

11:4
**behind (2)**
15:1;104:14
**belabor (1)**
71:11
**belief (1)**
150:20
**believes (1)**
149:4
**Bench (1)**
127:2
**bene (6)**
129:4;130:13;
135:9;143:8;144:5;
149:20
**benefits (1)**
88:13
**best (2)**
31:8;87:9
**better (1)**
132:23
**beyond (4)**
91:5;118:1,9;
121:24
**big (4)**
86:16;93:19;96:1;
125:12
**bind (1)**
140:20
**binder (3)**
15:7,11;112:7
**binds (1)**
147:2
**biostat (2)**
22:9,10
**biostatistics (2)**
22:17,25
**bipolar (2)**
90:14;93:6
**bit (3)**
8:7;23:8;86:4
**blame (1)**
58:9
**blaming (1)**
58:10
**blood (2)**
79:15;80:9
**blows (1)**
67:4
**board (2)**
19:20,22
**body (1)**
44:8
**both (5)**
6:4;29:24;72:5;
127:21;139:16
**bottom (4)**
67:1,3;78:16;79:14
**box (1)**
146:9
**boxes (1)**
106:15
**boys (33)**

13:11,23;14:7,17;
20:4;23:19,23,25;
24:8;25:14,15,22;
26:15,19;27:7;28:5,
9;29:10;32:16;33:6,
16,16,18,20;34:23,
24,25;35:2;37:6;
39:1;46:19;57:2,3
**boy's (1)**
139:24
**Braunstein (3)**
127:20,23;135:19
**breach (1)**
9:8
**break (5)**
10:9;51:2,5;55:25;
74:14
**breast (1)**
80:1
**breasts (2)**
46:20;81:3
**breath (2)**
50:13;51:9
**briefly (3)**
39:22;127:6;
132:22
**bring (3)**
7:14;117:5,9
**brought (6)**
6:22,23;132:18;
133:16;144:25;145:4
**Brown (4)**
58:23,24;74:5,6
**bunch (2)**
11:21;16:23
**business (1)**
97:4

**C**

**California (2)**
127:20;135:20
**call (5)**
63:5;95:5;109:18;
136:16;137:21
**called (3)**
60:6;62:5;77:10
**calling (1)**
40:15
**call-out (1)**
38:1
**came (3)**
11:12;130:8;135:3
**can (75)**
9:9;15:6;22:12,15;
23:22;27:2;30:23,23;
31:3,8,16;33:15;
38:4;39:23;43:22;
46:8,19,20;48:14;
51:20;54:2,3,10,10,
19;55:24;56:24;
59:22;60:10,13;
62:11;64:1;65:18;

68:24;71:17;73:24;
74:3;76:4;79:1;
83:19;84:2;87:3;
88:6;92:9;93:20;
96:3;97:11;98:2;
99:3;100:9,11;102:9;
103:6;104:9,12;
106:3;107:2;109:3;
112:2;114:18;
115:22;117:10,13;
128:16;133:9;
136:18;137:13;
139:8,10,11;140:17;
141:21,24;148:5,9
**Canada (1)**
112:20
**care (3)**
90:22;146:16,22
**career (1)**
87:24
**careful (4)**
13:2;48:8,25;72:21
**caregivers (1)**
122:18
**carry (1)**
149:2
**case (40)**
5:16;25:25;72:2;
89:6;91:8;92:5,23;
96:12;99:7;117:11,
13;121:4;123:25;
125:9,10,14,15;
128:8,12,12,14,16;
130:23;133:2,22;
134:19;139:7;141:5;
142:11;143:21;
144:2,10,20,20;
145:17;149:17;
152:10
**cases (7)**
27:8,9,13;47:13;
69:21;115:21;128:15
**catch (1)**
118:12
**category (1)**
140:1
**Caucasian (1)**
52:25
**causally (1)**
46:17
**causation (3)**
66:20;127:22;
129:4
**cause (2)**
141:18;152:6
**caused (3)**
27:5;56:18;101:11
**causing (1)**
66:19
**Center (2)**
76:24;77:14
**certain (8)**

12:24,25;13:4,16;
14:1,2;15:11;141:22
**certainly (13)**
22:10,18;23:5;
44:11;46:20;48:3;
49:1,15;54:25;56:2;
81:2;89:10;138:24
**Certification (1)**
152:19
**Certified (1)**
152:16
**certify (2)**
152:3,8
**certifying (1)**
152:23
**cetera (2)**
16:11;81:3
**chance (3)**
6:11;28:15;31:15
**change (5)**
12:22;13:4;30:24;
31:2;144:20
**changed (2)**
88:22;116:20
**changes (4)**
30:14;88:20;90:18;
149:17
**changing (1)**
65:6
**chart (4)**
48:5;54:6;56:11;
115:25
**charts (1)**
98:3
**chased (1)**
138:19
**check (2)**
48:15;78:14
**chest (1)**
81:3
**Child (3)**
69:11;76:24;77:13
**child-care (1)**
75:22
**children (12)**
73:21;78:22;82:2;
85:10,21;97:6;98:16;
99:1;108:10;120:22;
121:23;122:17
**chilled (1)**
136:7
**chilling (1)**
135:13
**choose (2)**
148:14,16
**CHOP (1)**
20:21
**chosen (1)**
10:25
**circulated (1)**
16:5
**circumstances (2)**
133:12;136:8

**cited (1)**
142:11
**civil (2)**
9:6;148:10
**claim (2)**
121:4;135:15
**Class (1)**
6:19
**clear (5)**
10:14;56:6;63:13;
64:8;145:24
**clearly (1)**
53:12
**client (2)**
138:1;139:3
**Clinical (10)**
45:2;47:10;65:22;
68:13;69:16;80:16;
93:19,20;103:11;
105:3
**clinically (4)**
18:16;19:9;114:11;
115:7
**clock (1)**
72:19
**close (1)**
126:9
**closed (1)**
15:1
**closing (1)**
8:13
**clunkers (1)**
86:19
**code (4)**
137:2,3,7;150:21
**cohort (2)**
11:2,4
**collected (1)**
39:4
**Columbia (1)**
101:3
**column (1)**
64:15
**columns (1)**
62:12
**comfortable (2)**
49:5;150:25
**coming (6)**
83:8;124:19;129:7,
18;132:16;136:6
**comment (1)**
70:6
**commented (1)**
19:3
**comments (1)**
18:9
**commitment (1)**
86:14
**committed (3)**
6:16;136:1,18
**committee (2)**
19:20,22
**companies (3)**

**40:4;48:23;90:22**
**company (9)**
41:25;88:14;98:20;
99:24;101:2;102:16;
113:9;120:22;121:5
**compare (1)**
118:24
**compared (2)**
28:8;57:3
**complaints (1)**
80:16
**complete (5)**
59:12;76:2;108:17,
24;113:10
**completed (1)**
108:14
**completely (1)**
144:21
**complicated (1)**
94:3
**complied (1)**
143:6
**complies (2)**
106:6,25
**comply (1)**
146:11
**comprehensive (1)**
55:17
**concerned (4)**
13:22;29:21;
111:14;144:8
**conclude (2)**
93:25;94:21
**concluded (3)**
8:23;18:14;94:7
**conclusion (5)**
81:24;83:15,21;
85:8;124:3
**conclusions (2)**
85:4;151:7
**condition (1)**
89:8
**conduct (9)**
98:20;125:12;
129:16;130:13;
140:20;141:11,12,25;
145:20
**conducted (1)**
130:2
**conducting (1)**
132:5
**confusing (2)**
49:10,11
**Congratulations (1)**
124:14
**Congress (1)**
88:22
**consequences (1)**
85:20
**conservatorship (1)**
133:23
**consideration (2)**
90:11;144:13

**considered (2)**
49:17;138:6
**considering (2)**
49:13;134:8
**consistent (4)**
25:6;82:14;84:8;
87:19
**consult (3)**
143:7;146:11;
149:19
**consulting (1)**
151:2
**consumer (1)**
86:8
**contained (3)**
11:10;80:22;152:4
**contains (3)**
17:25;18:9;19:8
**context (2)**
22:11;97:12
**continue (1)**
87:24
**Continued (2)**
10:2;62:21
**contrary (1)**
48:17
**contributing (1)**
139:24
**control (4)**
11:16,16;108:6;
152:22
**controlled (2)**
56:22;57:8
**convention (2)**
32:8,11
**cooperated (1)**
138:13
**copied (1)**
103:12
**copies (1)**
100:6
**copy (18)**
8:17;15:6;39:23;
41:22;59:2,12;60:9;
68:22,24;74:3,7,8;
97:14;100:25;
103:19;104:7,21;
152:6
**corrected (2)**
58:4,7
**correlate (3)**
47:3,7,7
**correlated (2)**
24:3;47:25
**correlation (5)**
48:2,4;109:17;
110:17,24
**Cory (1)**
106:2
**Counsel (25)**
21:25;22:21;25:8,
24;27:19;51:9,17;
59:12;65:8,8,10,25;

71:2;76:16;85:16;
92:15;97:9;100:6,10;
111:21;117:6;
126:16;137:10;
139:4;152:10
**Counselor (2)**
20:17;21:4
**count (6)**
54:19;58:16,16;
62:19;64:10;72:14
**counted (2)**
39:14;89:17
**counter (1)**
65:13
**counting (8)**
32:25;58:8;62:23;
64:11,12,13,15,16
**country (1)**
77:17
**counts (1)**
31:2
**course (5)**
29:3;40:23;48:16;
53:19;65:16
**court (278)**
5:2,5,6,10,15,25;
7:6,10,17,20,23;8:1,
8,11,17;9:5,11,18,20;
14:9,18,23;15:12,23,
24;17:3;18:21,25;
20:8,16;21:4,8,18,21,
24;22:21;24:12,16;
25:7,24;26:2,7;27:19,
25;28:25;29:4,19,24;
30:3;31:6,13,18,19,
24;32:19,24;33:3,10;
34:18,20;37:15;
40:22;41:2,5,11,17;
42:6;44:23;45:5;
46:4;50:4,9,14,22;
51:4,11,15;52:7,9,13,
16;59:1,3,4,16,19;
60:1,16,23;61:2,12,
17,18,19,20,21;62:1,
25;63:10;64:3,25;
65:8;67:2,5,10,15,19,
23;68:2,3,6,9,14;
70:16;71:2,9;72:10,
16,21;73:1;74:8,10,
22;75:3,11,13,19;
76:15,19;82:15,18;
83:4,20;84:23;85:16;
87:20;89:25;92:2,6,
13;94:20;95:3,8,13;
96:5,8,12,13;97:16,
22,25;99:14;100:19;
101:16,19;103:8,14,
18,20,21;104:1,11,
12,15;105:18;110:8,
11;111:7,20;113:19;
114:1,3,21;115:3;
116:6,8;117:6,12,15;
118:4,11;119:13,16,

19;120:6,11,14,17;
121:14,19;122:2,6,
12,20;123:11,16,23;
124:4,12,22;126:3,9,
13,15,19;127:14;
128:2,5,13,14;129:7,
11,15,20;130:10,20;
131:1,4,11,13;132:2,
22;133:7,9,18;134:6,
17,25;135:2;136:23;
137:1,5,12;140:4,8,
11,15,19,22,25;
141:2,10;142:10,13,
15,22;143:2,11,17,
25;144:6,11,24;
145:3,8,15;146:1,4,6,
13,25;147:2,12;
148:6,8,11,16,20;
149:1,12,21;150:3,5,
10,15;151:4,6,14
**courtroom (8)**
9:12,15;75:1,17;
95:10;109:23;126:7;
146:15
**Court's (3)**
97:13;135:9;
143:21
**cover (2)**
16:6;68:10
**coverage (1)**
125:17
**credentials (1)**
136:12
**CRIER (15)**
5:5;9:11;15:12,23;
59:4,16;61:18,20;
68:2;74:22;75:13;
76:15,19;100:19;
126:3
**crime (5)**
6:16;136:1,3,18;
137:21
**criminal (4)**
135:18;136:21,24;
140:14
**critical (1)**
36:22
**Croonenberghs (1)**
69:8
**crossed (1)**
146:9
CROSS-EXAMINATION (10)
10:2;29:5;63:9,11;
73:2;74:20;76:3;
99:24;118:8;133:1
**cross-examine (2)**
65:11;133:10
**CRR (1)**
152:15
**crux (2)**
29:6,20
**CSR (3)**
44:13;47:22;103:4

**current (1)**
90:5
**cut (1)**
70:16
**cutting (3)**
28:1;63:8,10

# D

**D-25 (6)**
59:4,6,20;68:2,3,7
**D-26 (1)**
76:19
**D-530 (1)**
74:4
**Daneman (7)**
109:24;110:5,11;
111:12;112:1,23;
115:6
**Daneman's (1)**
114:9
**data (53)**
11:22;12:5,7,7,11,
16;13:1,3,6,9;14:2,3,
6,16;16:18;18:5;
19:4,11,17,25;20:1;
23:11;30:15;35:10,
18,23;36:3,5,6,17,24;
37:11;39:3,19;47:4,5,
12;54:24,24;57:14;
70:12;82:13;92:1;
93:16,20,21,24;
106:21;114:11;
115:6,23,23;118:24
**date (4)**
38:5;100:9;131:9;
150:9
**dated (2)**
131:10;134:11
**David (1)**
131:15
**day (6)**
63:5;88:6;95:5;
110:23;135:3;138:11
**days (11)**
32:23;37:20;56:3,
4,4;95:9;96:25;
98:22;132:8;150:23,
25
**de (6)**
129:4;130:13;
135:8;143:8;144:4;
149:20
**December (1)**
134:10
**decent (1)**
136:12
**decide (3)**
37:22;87:1;99:16
**decided (1)**
129:23
**decision-making (1)**
90:24

**dedicated (3)**
86:17,20;87:5
**defendant (1)**
141:15
**defendants (2)**
6:3;126:25
**defendant's (1)**
126:23
**defended (1)**
149:17
**Defense (11)**
58:22;61:3;65:22;
67:13;76:13;78:20;
97:17;141:17;142:3;
144:9,18
**define (2)**
21:20;29:15
**defined (1)**
45:23
**defining (2)**
46:16,16
**definitely (1)**
46:17
**definition (2)**
88:10;91:12
**degree (1)**
49:11
**degrees (1)**
49:15
**denied (5)**
131:19;132:19;
144:7;148:21;151:10
**Denis (1)**
112:23
**deny (1)**
130:21
**depends (3)**
29:15,15;118:11
**deposed (2)**
131:6;139:17
**deposition (16)**
5:18;109:6,22;
111:1,5,16;113:4;
114:10,13,22;115:2,
5;129:4;131:8;
135:24;146:12
**describes (1)**
52:5
**design (1)**
56:19
**designed (3)**
39:5;91:4;108:1
**designs (1)**
107:23
**desire (1)**
126:16
**detailed (2)**
79:11;80:2
**determine (1)**
37:17
**Development (1)**
127:2
**developmental (1)**

11:4
**develops (2)**
56:7;101:7
**devoted (1)**
138:17
**difference (6)**
28:6;30:21;36:2,9,
18;115:19
**different (32)**
11:22,23;12:1,3,10,
11;16:17,23;17:9,15,
16;23:12;31:9;40:11;
42:1;43:1;49:14;
51:11;60:4;61:24;
62:4;63:21;78:12,12;
80:5;83:3;89:18;
90:10,14,17,19;93:11
**difficulty (1)**
7:18
**diminish (2)**
82:3;85:14
**direct (5)**
31:14;65:5;108:20;
110:9;152:22
**directing (1)**
33:11
**directly (1)**
48:14
**disagree (1)**
148:14
**disagrees (1)**
114:10
**disappears (2)**
18:1;19:12
**discussed (1)**
21:6
**discussion (8)**
5:12;8:23;48:4;
75:9;102:15,19,24;
109:8
**discussions (1)**
135:6
**disintegrating (1)**
93:12
**disorder (1)**
90:15
**display (2)**
97:14;109:22
**displayed (1)**
28:23;29:2
**Displaying (1)**
43:20;53:6;105:2
**dispute (2)**
66:13;71:22
**disputing (4)**
66:14;71:18,21,23
**disruptive (1)**
11:4
**dizzy (1)**
43:19
**docs (1)**
88:15
**doctor (41)**

7:2;19:15;21:10;
22:3;31:20;41:24;
45:13;47:8,22;48:5;
50:23;52:19;53:14;
56:1;60:2;64:8;69:3,
7;72:13;73:6;82:9;
83:10;85:2;86:3;
89:6,12,20;90:5;
93:22;99:2;111:23;
122:8,16;130:1;
132:5;141:25;143:1,
8;145:18;150:22;
151:3
**doctors (9)**
78:11;87:5,14;
88:12,16;89:13,22;
90:8,23
**doctor's (1)**
96:18
**document (34)**
13:16;14:20;19:2;
29:1;41:8,18;42:10;
43:7,20;44:25;53:6;
59:3,25;60:3,20;
64:17,18;65:12;66:7,
17,24;68:6,9,10;71:2,
10;97:4,19,20,24;
103:9;104:16;
126:21;131:1
**documents (1)**
13:21
**done (22)**
10:17,18,21,23,24;
26:17;27:16;30:7;
40:6;56:21;57:18;
64:4,5;69:7;76:21;
77:2,4,5;92:24;
104:24;128:19,20
**door (2)**
14:24;126:10
**doors (1)**
15:1
**doses (1)**
98:15
**dosing (2)**
23:13
**double (9)**
58:8,16;62:19,23;
64:10,11,12,15,15
**double-check (1)**
71:17
**down (7)**
6:8;50:3;99:21;
101:6;106:22;
147:23;149:6
**dozen (1)**
24:14
**Dr (141)**
5:21;6:7,14;7:8,12;
8:3;10:5,7,8;11:20;
13:20;14:11;15:3,17;
16:4;17:7;18:8,9;
19:8,16,19,23;20:13,

19;21:16,19;22:15;
23:3,7;25:12;26:11,
23;28:5;29:8;30:17;
32:1,22;33:15;34:1,2,
22;36:7,15,23;37:10,
25;39:20;40:1,14;
41:17,25;43:6;46:8,
18;52:2;56:25;57:17;
59:1,22;60:13;61:13;
62:4,8,18;63:18;64:6,
20;65:18;68:17;69:8;
70:4;71:13;73:8,19;
74:3;76:7,12,21;
80:14;81:23;82:14;
84:4;86:7;87:13,23;
88:4;90:12;91:7,21;
93:1;94:6;95:10;
99:7,17;109:24;
110:5,7,11;111:12;
112:1;114:9,9,18;
115:5,6,15;116:1;
117:19;118:15;
121:4,22;123:1,19;
124:13;126:17;
127:4,13,14,15,17,20,
23;129:7,23;130:1;
132:1,20;134:13,25;
135:1,5,15,19,23;
137:25;144:13,19;
147:3;149:18,22;
151:9
**draft (5)**
15:22;16:4;17:17;
19:13;38:9
**draws (1)**
79:15
**drug (19)**
16:20;26:12;88:24;
89:1,13,23;91:3;
96:19;97:6;98:25;
101:2,11;102:7,9;
113:10;119:5,7,17;
120:7
**drugs (3)**
22:11;99:25;101:5
**due (4)**
90:20,20;134:15;
138:20
**duh (2)**
140:1,2
**duration (3)**
63:3,4,4
**during (9)**
16:8;38:22;53:19;
66:10;78:9;93:10,22;
107:6;110:18

# E

**earlier (7)**
10:20;19:13,21;
76:23;101:5;112:4;
137:17

**early (2)**
135:3;143:4
**earn (1)**
87:10
**easel (1)**
58:5
**editing (1)**
88:17
**effect (2)**
56:7;141:6
**effective (1)**
87:2
**effects (26)**
10:11;11:1,10;
16:22,23;34:5,12;
39:1;42:2,12;43:1;
49:7;78:7,21;79:7,
12;80:21;81:10;
83:14;84:6,16;86:1;
88:9;117:21;118:17,
21
**efficacy (1)**
12:2
**effort (1)**
129:16
**eight-week (1)**
78:2
**either (3)**
5:24;67:21;146:10
**elephant (1)**
96:1
**elevated (13)**
34:11;39:3,9,16;
44:18;45:16,17;
46:11;47:24;66:16;
69:17;79:25;109:18
**elevation (2)**
84:5;85:20
**elevations (6)**
46:24;47:1;81:9;
83:13;84:16;85:24
**eliminate (1)**
28:15
**else (10)**
57:19;64:21;72:23;
79:9;102:13;108:19;
124:12;125:11;
134:21;138:6
**e-mail (4)**
18:3,20,23;37:12
**emergent (1)**
107:5
**employed (1)**
152:10
**employee (1)**
152:9
**employees (5)**
48:12,22;86:13,17,
20
**end (3)**
22:12;119:2;122:2
**endocrinologist (8)**
5:19,20;27:2;

119:25;127:12,13;
136:10;139:14
**endocrinologists (12)**
6:4;13:10,13,17,
21;14:5,12;20:21;
24:7;55:12,13;
112:22
**enforce (1)**
128:14
**engaged (2)**
127:11,12
**enhance (1)**
86:14
**enough (6)**
8:16;21:7;125:2,5;
133:13;148:23
**ensuring (1)**
86:22
**entered (2)**
9:14;75:16
**enters (2)**
9:12;75:14
**entire (4)**
29:1;144:10,18;
149:17
**entirety (1)**
90:6
**EPS (1)**
42:12
**erroneous (2)**
70:21,24
**especially (3)**
22:10;90:9;102:11
**esse (6)**
129:4;130:13;
135:9;143:9;144:5;
149:20
**essentially (1)**
132:24
**established (4)**
46:18;122:5;141:8,
11
**estimated (1)**
98:9
**et (2)**
16:10;81:3
**Eugene (1)**
8:6
**eve (4)**
128:18;131:18;
132:25;147:24
**even (14)**
6:11;17:23;18:7;
25:4;34:1;35:5;39:8,
16;88:11;110:18;
117:20;120:2;132:7;
134:7
**event (5)**
45:24,25;48:7;
53:8,14
**events (32)**
26:14;34:4;36:8;
39:7,14;43:7,10;44:1,

11,13,17;45:10,14,
15,18;46:10,15,23;
47:3;48:1;49:9,13,
14;54:4;55:6;56:2,
17;58:17,17;60:7,14;
107:5
**eventually (1)**
102:1
**everybody (4)**
9:21,24;79:1;126:2
**everybody's (1)**
70:5
**Everyone (1)**
75:11
**evidence (10)**
20:11;48:2,17;
99:6;120:21;122:23;
123:25;131:24;
133:3;152:4
**exact (7)**
55:24;73:7;79:3;
80:19;115:8,11,11
**Exactly (50)**
10:13;11:14,19;
12:9,12;16:15;18:1,
13;21:5;23:14;34:14;
35:8;38:17,24;39:5,
13;40:12;42:18;
53:17;54:11,18;
56:10,23;66:5,12,17,
24;78:2,5,8;80:3,6;
81:7,23;83:12;84:3,
13,18;85:12,22;86:2;
87:16;89:1;93:14;
97:3;106:21;107:11,
20;108:9,25
**exam (7)**
79:4,10;80:17,25;
81:2,6;131:7
**examination (9)**
6:14;94:15;108:20;
110:9;128:20;130:2;
132:6;133:11;150:24
**examinations (1)**
79:15
**examine (5)**
6:4;7:2,24;8:1;
135:19
**examined (4)**
78:11;81:3;134:13;
135:16
**example (3)**
39:1;54:12;56:12
**exams (3)**
78:9;79:2;80:4
**except (2)**
11:11;35:7
**exception (1)**
150:21
**excessive (1)**
79:25
**exchanged (1)**
5:17

**Exclamation (1)**
18:6
**exclude (9)**
32:15;33:6;126:23;
128:23;129:22;
130:3;131:14;
132:19;151:9
**excluded (4)**
23:20;33:15,18,20
**exclusions (2)**
33:17,19
**excuse (6)**
50:15;82:5;83:20;
85:16;116:6;141:10
**excused (2)**
124:15;125:22
**Exhibit (25)**
15:4,9,20;38:1,7;
39:22;41:10;50:22;
58:22;59:6;61:3,24;
62:4;65:22;67:11,14,
16;68:18;76:13;
78:20;96:23;97:8;
100:21;103:23;104:3
**exhibits (1)**
69:4
**exist (2)**
35:24;36:6
**exists (1)**
128:15
**exited (2)**
74:25;126:6
**exits (2)**
74:23;126:4
**expect (10)**
26:23,25;27:6;
34:15;55:12,14;
66:18;89:12,21,22
**expecting (1)**
75:25
**experienced (1)**
66:9
**experiences (2)**
44:8;49:18
**expert (15)**
5:17;22:24,25;
37:17;99:18;127:20;
129:5,23;131:14;
135:20;140:3;
142:12;144:21;
147:3;149:19
**experts (4)**
25:13,25;138:13;
150:9
**explain (1)**
51:20
**explained (1)**
133:16
**explanation (2)**
33:13;53:4
**explicit (1)**
13:2
**extension (2)**

58:1;62:24
**extent (1)**
128:7
**extra (1)**
42:12
**extrapyramidal (1)**
42:13
**eyes (1)**
8:13

**F**

**face (2)**
6:13;139:21
**facie (1)**
132:4
**fact (33)**
11:9,15;14:11;
20:19;22:12;26:21;
27:16;28:19,21;
30:17;32:2;37:11;
38:20;41:25;46:9;
47:11;49:8;60:14;
66:2;70:1,12,25;
71:23;72:2;91:3,14;
99:8;115:17;121:6;
130:16;132:19;
141:19;146:10
**factor (1)**
139:24
**facts (1)**
117:14
**failed (3)**
93:25;94:8;131:17
**Fair (9)**
8:16;12:5;13:24;
21:7;29:24;57:10;
88:16;89:4;148:23
**fairly (1)**
84:7
**familiar (4)**
67:25;77:11;98:2;
106:13
**famous (1)**
77:10
**fantasy (1)**
90:4
**far (8)**
29:21;98:19;
101:16,16;111:7,8;
125:4;144:7
**fast (1)**
85:15
**father (1)**
139:10
**favor (1)**
55:23
**FDA (43)**
22:14;40:5;45:4;
48:21;49:16;86:5,7,
21;87:4,14;88:1,16,
18,20,21,25;89:4,12,
22;90:6,17,22;91:9,

11,15,21;93:15,23,
23,24;94:7;95:21;
96:19;107:24;
113:12;122:16,25;
123:1,5,9,20;124:2,5

**FDA's (3)**
86:13;87:1;89:7

**feet (1)**
138:8

**felony (1)**
6:19

**few (3)**
19:20;42:1;86:19

**fewer (1)**
34:12

**figure (4)**
12:16,20;26:12;
138:3

**filed (8)**
5:25;128:24;130:4;
131:15,17;134:9;
142:22;145:9

**filing (1)**
141:15

**filled (2)**
20:4;87:4

**final (5)**
40:2;62:7;67:22;
89:16;108:22

**finally (2)**
7:12;29:20

**find (10)**
15:15;18:4;30:24;
46:25;52:19;60:10,
10;61:14;69:1;71:1

**finding (7)**
17:18,25;31:1;
36:21;37:3;47:9;
116:2

**findings (4)**
71:8;72:7;80:12,17

**Findling (29)**
10:7,15,17;11:6,9;
23:9;37:13;39:14;
69:23,25;70:5,7,9,12,
21,24;71:6;72:2,4;
73:8;81:23;82:20,22;
84:4;110:16;112:1,2,
5;118:19

**Findling's (1)**
82:14

**finds (1)**
28:6

**fine (5)**
8:21;74:18;76:18;
148:15;150:3

**finish (3)**
29:18;99:3,3

**finishing (1)**
114:20

**firm (2)**
6:7;7:3

**first (20)**

5:23;6:9,22;7:6;
50:24;54:2,3,7,11;
62:20;69:20;83:19;
91:16;99:14;103:8;
112:17;128:10,18;
133:20;137:24

**five (9)**
10:11,16;11:6,7,
10;23:9,12;86:4;
107:15

**flag (2)**
18:16;43:8

**fly (1)**
139:8

**flying (1)**
138:6

**folks (4)**
11:21;107:24,24;
108:1

**follow (1)**
131:22

**followed (1)**
142:20

**following (4)**
5:1,12;9:17;126:12

**follows (2)**
31:25;33:4

**follow-up (3)**
79:6,11,13

**footnote (14)**
23:21;50:4,19;
51:5,17,21,21;52:19,
20,22,23;53:4,5;88:2

**footnotes (3)**
49:23;50:2;51:24

**force (1)**
143:25

**foregoing (1)**
152:19

**forensic (1)**
132:11

**forever (1)**
135:5

**form (4)**
80:21;81:1;105:16;
126:25

**formal (1)**
132:12

**formally (1)**
124:15

**formulations (1)**
93:11

**forte (1)**
51:14

**forth (2)**
37:20;89:11

**forward (3)**
94:23;128:1;139:7

**found (28)**
24:7;30:8;44:18;
46:9;70:12;73:7,8;
80:8,14,18;81:8,12,
23,23;82:13;83:11,

12,12,25;84:3,4,14;
85:23;86:2;107:12;
110:17;122:16;123:2

**four (5)**
15:22;37:20;95:12;
98:21;100:7

**fourfold (2)**
82:1;85:10

**four-month (1)**
78:3

**frame (1)**
93:10

**framed (2)**
144:10,18

**frankly (7)**
8:2;32:19;95:9;
130:22;144:24;
145:3;146:13

**frequency (2)**
25:13,14

**frequent (3)**
44:7;102:5,7

**frequently (2)**
101:7,11

**Friday (1)**
42:6

**frivolous (2)**
132:14;133:5

**front (8)**
13:19;17:1;26:18;
38:18;100:25;
123:19;131:14;
132:18

**full (6)**
58:21;94:18;95:19,
23;107:1;113:9

**fully (1)**
152:4

**funded (8)**
73:20;76:25;77:3,
9,21,22;78:23;81:17

**funds (1)**
77:19

**further (6)**
82:4;85:19;94:12;
124:8;137:9;152:8

**fussy (1)**
41:7

## G

**galactorrhea (1)**
80:23

**game (1)**
30:15

**gave (3)**
106:19;107:8,9

**gender (2)**
12:1;16:18

**general (3)**
89:9;127:21;
138:19

**generally (1)**

89:21

**generous (1)**
65:9

**gentleman (2)**
22:23;150:16

**gentlemen (2)**
20:10;22:22

**gets (2)**
63:12;138:8

**given (6)**
5:25;42:18;65:10;
96:20;132:2,8

**gives (2)**
31:14;88:3

**giving (3)**
27:1;94:22;147:21

**glucose (1)**
42:20

**God (1)**
143:9

**goes (2)**
47:8;135:13

**gold (1)**
86:25

**Goldstein (14)**
5:21;6:7,14;7:8;
126:17;129:7;130:1;
131:15;132:1;
134:13,25;135:1;
137:25;147:3

**Goldstein's (9)**
127:4;129:23;
132:20;135:23;
144:13,19;149:18,22;
151:9

**GOMEZ (8)**
76:17;100:12,13,
14;103:6,24;104:8;
126:17

**Good (18)**
5:6;9:24,25;10:5,6;
12:15,19;51:2,4;
55:16;88:3;107:24,
24;112:3;136:12,15,
17;144:12

**government (6)**
77:4,9,19;81:12,15,
17

**government-funded (3)**
73:7;80:15;81:14

**government's (1)**
81:13

**grade (1)**
48:6

**graded (1)**
53:2

**grant (2)**
77:1;78:23

**greater (4)**
23:25;24:2;28:7;
34:25

**grounds (2)**
130:21;131:19

**group (4)**
11:16,16;77:15;
107:22

**groups (1)**
34:3

**growth (1)**
80:1

**guardianship (1)**
133:23

**guess (3)**
54:18;64:20;83:7

**guide (1)**
90:24

**guinea (1)**
142:17

**guy (1)**
142:9

**guys (2)**
66:2;115:16

**gynecomastia (80)**
11:12;13:23;16:10;
20:5;24:8;25:14;
26:13,14,15,20,24;
27:5,5,8,12;28:8;
37:13;39:2,7;44:9,9;
45:11,14,21,23;
46:15,16,19,23;47:6,
13;49:20;53:11;54:5;
55:9,20;56:8,12,17;
57:2,10,19;58:6;
62:12,20;66:3,9,11,
16,19,23;69:16,21,
24;70:10;71:14,24;
72:7;80:23;84:17;
86:1;100:1;101:7,11;
102:3,10,11;105:14;
106:20;107:18;
110:18;115:21;
118:25;119:4,6,14;
120:13,24,25;121:3

## H

**half (5)**
60:15;62:19;63:20;
64:9;108:5

**hand (5)**
97:9,14;100:6;
135:12,12

**handed (2)**
5:23;101:1

**hands (1)**
139:13

**happen (1)**
63:2

**happened (2)**
55:7;56:3

**happens (1)**
93:15

**happy (7)**
29:4;33:23;51:21;
62:10;66:21;85:1,5

**Health (3)**

73:20;77:4;86:15
**hear (11)**
 32:19;33:1;50:11,
 12;92:13;126:20;
 127:5;135:14;
 145:21,22;148:7
**heard (4)**
 55:7;70:5;132:21;
 146:15
**hearing (1)**
 5:13
**hearsay (1)**
 97:20
**heavens (1)**
 74:20
**held (1)**
 75:9
**help (2)**
 79:21;123:4
**helped (3)**
 121:23;122:1,17
**helpful (2)**
 68:25;111:21
**helping (1)**
 125:4
**hereby (1)**
 152:3
**Here's (2)**
 134:22;142:5,19;
 147:8
**hi (1)**
 95:17
**hiding (2)**
 37:9,11
**higher (1)**
 57:1
**highest (1)**
 66:10
**highlight (1)**
 66:2
**highlighted (2)**
 72:6;105:25
**highlights (1)**
 90:7
**highly (1)**
 87:8
**himself (4)**
 14:25;65:12;111:2;
 113:13
**history (2)**
 5:16;94:3
**hoc (2)**
 36:10,10
**hold (4)**
 22:12;40:9;77:7;
 119:16
**holding (1)**
 140:23
**Hollywood (1)**
 135:20
**home (1)**
 125:21
**Homestretch (1)**

76:7
**Honor (88)**
 5:8,15;6:1;8:4,16;
 9:2,23;14:22;16:25;
 22:1;25:6;26:5;28:3,
 22;30:1;31:4,11,18;
 32:21;40:17;41:10,
 13;44:20;46:2;50:6,
 10,12,21;51:1;60:8;
 61:1;63:9,16;64:22;
 67:14;68:12;70:19;
 71:7;72:24;73:4;
 75:4;76:5;83:18;
 92:12,17;94:13,19;
 96:3,7,11;97:18;
 99:5;101:14,21;
 103:3;104:9;105:15;
 110:4;111:3;113:16,
 24;114:2,25;117:10;
 118:8,10;121:13;
 123:7,14;124:8,18;
 127:9;129:1;133:15;
 134:23;137:17;
 138:16;142:6,14,20,
 24;143:14,23;144:3,
 17;145:21;149:15;
 150:1
**hope (2)**
 9:5;107:2
**hour (3)**
 108:5;111:9;
 113:20
**hours (2)**
 32:25;136:13
**hundred (5)**
 88:8;98:14,18;
 107:17,21
**hung (1)**
 135:2
**hyperprolactinemia (3)**
 47:9,11,18
**hypothetically (2)**
 34:4,5

**I**

**identification (4)**
 59:7;74:4;100:22;
 104:4
**identified (1)**
 11:3
**ignore (3)**
 36:24;37:1,4
**illegal (2)**
 147:11;148:5
**IME (2)**
 127:11;128:19;
 141:20;149:8
**importance (2)**
 36:22;93:20
**important (5)**
 12:23;25:16;36:20;
 86:8;123:3

**importantly (2)**
 69:22;71:4
**inaccurate (7)**
 110:21,25;111:16;
 113:2,12,22;115:14
**Inadmissibility (1)**
 127:3
**Inc (1)**
 127:1
**in-camera (1)**
 141:23
**incidence (4)**
 29:11;58:6;60:7;
 102:2
**incident (2)**
 55:9;57:2
**incidentally (2)**
 18:8;34:1
**include (8)**
 16:9;34:23;35:2;
 55:8,21;128:22,25;
 131:17
**included (3)**
 79:4;110:19;
 129:22
**includes (2)**
 17:17;23:15
**including (4)**
 20:20;37:6;54:5;
 79:16
**incomes (1)**
 87:10
**incompetent (3)**
 146:15,20;147:16
**inconsistent (1)**
 44:4
**inconvenience (1)**
 129:17
**incorrect (3)**
 110:19;113:1,2
**increase (2)**
 43:10;44:1
**increased (4)**
 45:22;46:20;57:9,
 19
**increases (7)**
 69:24;70:10,11;
 82:1,3;85:10,13
**independent (1)**
 132:6
**independently (1)**
 39:10
**indicating (1)**
 106:5
**indications (8)**
 91:1,2,23;92:12;
 93:1,4,5,19
**indulge (1)**
 104:13
**indulgent (1)**
 134:7
**informal (2)**
 132:3;137:4

**information (10)**
 16:10,14,17,24;
 17:8;19:8,17;88:15;
 90:23;91:8
**initial (2)**
 30:16;129:22
**injected (1)**
 148:9
**injury (1)**
 139:24
**instances (1)**
 11:1
**instead (3)**
 103:5;110:6;
 131:18
**Institute (2)**
 73:20;77:4
**instructed (1)**
 31:21
**INT (2)**
 62:3;108:13
**INT-41 (14)**
 11:12,17;39:21;
 40:2;43:8;44:11;
 46:9;58:1,17;62:13,
 21;64:14,16;117:20
**INT-41-INT-70 (1)**
 62:13
**INT-70 (20)**
 57:22;58:1,6,17;
 60:14;62:13,21;
 63:23,24;65:19,23;
 68:13,19;70:6,25,25;
 71:14,18;72:3,8
**intend (1)**
 100:8
**intended (4)**
 96:25;97:2;98:12;
 99:1
**interested (2)**
 61:5;98:7
**Internet (1)**
 125:17
**interpreting (2)**
 14:25;45:21
**interrelationship (1)**
 120:1
**interrupt (3)**
 7:7;27:24;28:3
**intervals (4)**
 79:16,18;80:5,7
**intimidated (1)**
 132:24
**into (6)**
 13:5;21:5;62:21;
 90:10;92:9;96:11
**invalid (2)**
 147:11;148:4
**investigation (2)**
 125:13;141:25
**investigator (1)**
 48:14
**investigators (16)**

48:6,11,19,24;49:3,
 4,6,20;53:15;77:5,16;
 81:16;83:11,11,25;
 84:14
**involved (4)**
 9:7;11:7;13:13;
 137:9
**involving (3)**
 102:16;126:22;
 142:12
**irrelevant (2)**
 41:3;121:25
**issue (29)**
 6:5;7:21,25;8:5;
 9:3;27:12;29:21;
 30:20;91:2,18,20;
 113:7,8;122:13;
 128:17,22,25;129:2,
 21,21;130:5,15,18;
 131:16;137:8;
 138:21;142:5;145:4;
 150:16
**issues (3)**
 75:22;138:25;
 139:1
**item (1)**
 99:21

**J**

**jail (1)**
 136:5
**Janssen (63)**
 10:11;11:8,21;
 13:17;14:6,13;16:5;
 17:23;18:3,14;19:13,
 15,16;21:1;30:10;
 36:13;37:2,12;39:5;
 40:5;45:1,3,7,9,23;
 46:22;48:11,20,22;
 49:3,15;55:7;56:19,
 19,21;57:18;63:21;
 69:8;70:3;76:22;
 77:6;81:20;83:12;
 84:4;89:7,19,21;
 90:13;93:25;94:8;
 97:19;105:3;106:13;
 107:25;108:2;
 109:13;112:6;113:9;
 117:3;126:25;127:2;
 136:16,17
**Janssen-produced (1)**
 97:23
**Janssen's (10)**
 45:7;46:16;55:12;
 58:14,14;62:14;
 64:12;97:4,5;111:14
**January (1)**
 13:14
**JJRE (3)**
 60:23;97:8;112:15
**JJRE03839224 (1)**
 112:16

**JJRE0498189 (3)**
103:2,17;104:25

**jobs (1)**
87:11

**John (4)**
31:16,16;32:20;
152:15

**Johnson (2)**
127:1,1

**Journal (1)**
69:11

**Jr (1)**
134:11

**JRE (1)**
104:22

**Judge (16)**
25:10;51:19,22;
58:22;61:5,24;65:2;
128:23;129:24;
130:3;131:14,22;
132:18;134:11;
140:11;142:7

**judgment (1)**
87:25

**July (2)**
38:6,10

**Juror (3)**
8:5;75:21;125:3

**jurors (3)**
10:14;42:10;43:18

**jury (33)**
5:2,13;7:18;9:11,
14,18,25;22:7;36:16,
20;37:16,22;50:18;
51:18;54:10;66:1;
74:22,25;75:13,16;
78:20;97:14;99:16;
101:4;110:22;115:9;
121:10;122:23;
124:23;126:3,6,13;
141:22

**justifies (1)**
37:8

### K

**keep (4)**
15:17;37:10;125:8;
132:16

**Kennedy (1)**
77:14

**kept (4)**
40:14;90:13,13,15

**Kessler (92)**
7:12;8:3;10:5,8;
11:20;13:20;14:11;
15:3,17;16:4;17:7;
18:8,9;19:8,23;20:13,
19;21:16,19;22:15;
23:3,7;25:12;26:11,
23;28:5;29:8;30:17;
32:1,22;33:15;34:1,2,
22;36:7,15,23;37:10,

25;39:20;40:1,14;
41:17,25;43:6;46:8,
18;52:2;56:25;57:17;
59:1,22;60:13;61:13;
62:4,8,18;63:18;64:6,
20;65:18,68:17;70:4;
71:13;73:19;74:3;
76:7,12,21;80:14;
86:7;87:13,23;88:4;
90:12;91:7,21;93:1;
94:6;110:7;114:9,19;
115:5,15;116:1;
117:19;118:15;
121:4,22;123:1,19;
124:13

**Kessler's (2)**
95:10;135:5

**key (3)**
98:25;103:12;
109:17

**kids (25)**
23:15;53:18;54:3;
71:23;77:23;78:7,10;
102:11,22,22;105:6,
7;106:12;107:17;
108:7;117:21;
118:16;120:2,3;
121:8,9,10;122:9;
123:3,4

**kind (15)**
40:4;102:12;
119:17;121:7;
129:15;141:6,18;
142:4,18;145:16;
147:4,13,18,18;149:6

**kindly (2)**
15:6;74:1

**kinds (2)**
98:3;134:17

**KLINE (210)**
5:8,15;7:9,14,19,
21,25;8:17,20;9:2;
14:8,14;15:8,15,18,
21,25;16:7,25;18:17,
20,23;20:2,6,14,23;
21:2,12,17;24:11,13,
24;25:4,23;26:4;
28:20,22;29:18;31:4;
32:17,22;33:9;34:16,
19;37:10,14;38:9;
40:8,14,17,19,22;
41:1,4,14;43:13,15;
44:20;45:3;46:2;
50:3,10;51:1,8,13;
52:4;57:23;58:4;
59:1,9,14;60:21;
62:22;63:12;64:22;
65:1,3,5,7;66:25;
67:3,9,20;68:4;72:9,
14,18;74:8;76:18;
82:5,10,17;83:3;
84:21;85:3;86:5;
87:17,21;89:24;

91:24;92:3,11,16,18,
22;94:17;95:2,6,11,
15;96:16;97:23;98:1;
99:10,19,20;100:11,
15,17,24;101:18,20,
22;103:10,16,19,22,
25;104:6,9,12,18,22;
105:1,17,19,21;
106:7,8;107:1,3;
110:2,10,12;111:6,
10,19,24,25;113:17,
23;114:20,24;
115:15;116:4,7;
117:5,9,10,13,23;
118:1,7,16;119:3,11,
14,17;120:5,12,16;
121:6,13,16,24;
122:10,19;123:6,10,
22;124:11,19;126:16,
18;131:6;134:3,22;
136:25;137:3,7,14;
138:11;140:6,9,13,
17,23,25;141:1,9;
142:16;144:11,16;
146:5,12,18;149:3,
11,14;150:12

**Kline's (1)**
120:9

**knew (9)**
127:23;129:25;
130:5,23;134:12;
135:11;137:22;
142:6,6

**knowledge (1)**
23:6

**known (6)**
7:4;108:12,13,22;
141:14;145:8

**knows (5)**
5:16;14:22;62:23;
75:24;135:2

**Krieger (1)**
77:14

**Kurz (1)**
152:15

### L

**lab (1)**
47:9

**label (28)**
55:9,22;89:2,5,11,
13,16,18;90:7,18;
91:4,14,18,20;93:17;
96:20;98:13;100:12,
15;101:10,24;102:2;
108:7;119:3;120:4,
10,24;121:6

**labeling (1)**
123:19

**labels (4)**
44:9;88:17;89:23;
99:25

**Laboratories (1)**
101:3

**lack (2)**
110:24,24

**ladies (2)**
20:10;22:22

**Lamia (2)**
59:2;74:4

**language (1)**
19:3

**large (1)**
57:7

**last (5)**
6:25;24:25;95:20;
114:4;135:1

**last-minute (2)**
129:3;134:18

**late (1)**
150:9

**later (4)**
75:25;76:1;93:6;
134:10

**launched (1)**
143:13

**law (15)**
6:12;7:24;8:1;
88:22;128:5,7;
132:13;141:13;
142:21;143:15,18;
144:1,2,21;150:17

**lawyer (6)**
99:24;102:16;
136:22;138:25;
140:10,14

**lawyers (1)**
142:7

**leading (5)**
31:14;101:14;
111:4,8,8;113:15

**leaping (1)**
151:6

**learn (1)**
112:14

**learned (2)**
127:10;149:18

**least (6)**
23:3;24:14;78:12;
80:5;87:18;138:5

**leeway (1)**
65:10

**left (5)**
91:9,11;93:23;
95:16;124:21

**legal (6)**
138:1;144:13;
145:19;147:13,14;
151:1

**less (1)**
150:24

**letter (2)**
89:7;142:25

**letting (1)**
113:25

**level (4)**
28:13;30:20;32:5;
33:24

**levels (25)**
10:10,25;16:21;
28:9;34:7,13;43:11;
44:2;45:16,22;46:17;
47:25;56:14;66:4,8,
23;69:25;71:15;72:8;
73:17;78:6,22;80:16;
109:19;110:18

**licensed (3)**
150:1,3;151:3

**licenses (1)**
128:8

**licensure (1)**
129:21

**life (2)**
95:10;138:17

**light (2)**
127:24;129:10

**limine (3)**
6:24;134:9;145:9

**limit (2)**
34:8;38:21

**limited (1)**
90:8

**limits (1)**
73:14

**line (4)**
16:7;110:6;112:18;
115:12

**lingo (1)**
67:10

**link (2)**
66:3;71:19

**list (1)**
64:14

**listen (1)**
25:3

**listening (1)**
25:5

**listing (1)**
44:5

**lists (1)**
77:13

**literally (2)**
137:20;139:11

**litigate (1)**
147:5

**litigated (3)**
147:5,8,19

**litigation (3)**
138:14;139:17;
142:18

**little (3)**
23:8;85:17;86:4

**live (2)**
129:8;141:21

**living (1)**
90:4

**LLC (1)**
127:2

local (6)
6:15;7:2;127:13,
17;142:9;146:10
locale (1)
127:19
locally (1)
138:13
long (8)
5:16;45:6;54:21;
72:25;73:2,4;103:17;
135:25
Long-Term (2)
78:21;85:20
long-time (1)
138:24
look (53)
6:11;12:16;14:6,
16;15:3,21;18:4;
20:21;22:3;23:7,11;
25:16;28:17;35:9;
36:1,16;37:1;41:24;
42:5;44:12;47:14,15,
16,19,21,21;49:12,
22,24;50:18;51:21,
23;59:23;85:3;87:17,
21;93:17;94:2;96:20;
97:1;98:2,4;100:18;
101:4,6;105:17,22;
106:5;108:24;112:1,
11;118:23;121:2
looked (27)
10:10,15;11:22;
12:1,2,2,3,8,11;
16:18,23;17:7,15,16;
35:23;36:5;44:16;
45:16;47:23;48:2;
78:6;100:12;114:16;
118:16;130:13;
134:2;136:25
looking (25)
9:3;34:22;42:25;
46:22;50:1;53:3;
56:11;59:20,24,24;
60:9;61:1,2;62:4,5,7,
9;68:17;73:13;78:15;
79:13,19;81:7;97:7;
118:25
looks (7)
23:11;28:5;38:7;
40:3;53:18;55:6;
67:25
loose (1)
11:24
lost (1)
60:21
lot (12)
7:17;12:20;16:24;
17:7,9,15;22:18;
47:23;58:2;63:19;
90:12;109:6
lunch (1)
10:8

# M

ma'am (9)
10:13;11:14;13:12;
23:18;30:14;37:1;
39:13;47:5,23
machine (1)
100:16
magazines (1)
125:16
maintained (1)
86:23
maintenance (1)
107:6
majority (1)
117:20
makes (1)
30:21
making (7)
13:1,2;43:19;
46:12;50:6;51:10,13
male (1)
110:18
malfeasance (1)
138:20
man (7)
6:5;7:2;136:9,12;
137:9;138:16;139:2
management (7)
128:9,12,15;
130:23;133:2;141:5;
143:21
manufactured (1)
101:3
manufacturer (1)
88:3
manuscript (4)
16:4;19:11,18;38:5
manuscripts (2)
37:2;38:2
Many (22)
10:23,23;11:22,25;
16:8,8;34:2;39:14,
18;53:18;54:3;55:1,
6;56:12,17;89:17;
90:9;92:21;97:5;
98:14;118:25;119:1
March (3)
128:21;130:2;
131:10
Marianne (3)
15:13;52:13;61:14
mark (1)
58:22
marked (9)
15:4;59:6,10;89:7;
97:7;100:7,21;
103:22;104:3
marketed (2)
99:1,8
marketing (2)
96:18;99:15

mathematical (1)
23:6
Mathisen (1)
99:7
Mathisen's (1)
99:17
matter (9)
7:11;18:4;51:12;
63:7;131:25;133:15;
139:22;146:17,19
may (38)
5:8;9:22;12:4,7,7;
24:25;25:23;30:9,23;
31:1,18;41:15;51:1,
2;59:16;61:6;65:13;
68:9;71:9;74:17;
75:19;83:6;94:18;
96:6;104:14,17;
112:12;114:2;124:2;
128:24;131:16;
132:2,21;133:6;
143:25;144:15;
146:20;149:5
Maybe (9)
55:25;60:13;82:20;
106:3;108:5;130:17,
17;138:12;143:9
MBA (1)
112:7
mean (22)
13:1;17:11;18:22;
19:25;22:22;24:23;
27:23;28:2;41:7;
45:25;55:13;56:8;
57:11;70:18;80:19;
82:1;85:10;96:1;
101:17;133:9;140:4;
150:4
meaning (1)
140:2
meaningful (6)
18:16;114:12;
115:7;116:19,25;
117:1
meaningless (1)
15:10
means (8)
38:25;43:4;50:17;
51:18,19;53:12;
106:11;152:21
meantime (1)
138:5
measure (1)
141:17
measured (5)
39:10;47:2;80:9;
98:22;102:21
measuring (1)
98:19
MED-8 (1)
10:20
media (1)
125:15

medical (4)
57:13;93:21;132:3,
6
medicine (16)
6:17;26:24;28:8;
55:20;56:4,7,9;88:13,
18;119:10,24;123:4;
132:7;138:17;140:5;
150:18
medicines (4)
88:4,10,11;90:25
meetings (3)
21:6,21,22
Members (1)
124:22
Memorandum (1)
127:3
memos (1)
123:1
men (1)
120:20
menstrual (1)
80:24
mention (1)
108:21
mentioned (3)
87:4;100:2;109:5
merits (2)
131:20;133:4
met (2)
13:14;87:12
middle (1)
114:24
might (7)
7:3;26:15,20;62:1;
64:5;72:16;136:11
mild (5)
48:20;49:7,7,8;
53:15
million (5)
98:14,18;121:17;
136:20;139:17
millions (3)
106:16;121:23;
122:17
mind (4)
19:25;20:1;96:14;
125:8
mine (1)
140:21
minor (1)
18:12
minute (4)
7:1;112:12,15;
118:4
minutes (13)
63:3,3,4,13,14;
72:15,17;74:14;75:3;
86:4;94:25;95:12;
99:22
misconduct (1)
142:4
missing (2)

45:13;101:10
Missouri (2)
5:22;6:8
mistake (1)
55:21
mistrial (2)
149:16;150:6
moderate (5)
48:20;49:7,7,8;
53:15
moment (5)
33:1;89:3;135:14;
141:7;151:8
months (2)
79:16,17
more (18)
10:9;22:18;23:5,5;
24:17;27:10;28:12;
33:12;34:3,8;59:11;
88:11;91:10;93:16;
109:4;115:18;
118:22;127:7
morning (1)
129:3
most (7)
44:7,8;47:8;49:12,
17;86:8;90:5
motion (21)
5:24;6:24;126:23;
128:22;129:22;
130:3,21;131:13;
132:14,19;133:5;
134:8,9;141:4,16;
144:8;148:21,25;
149:9;150:14;151:9
motions (4)
132:16,25;134:18;
145:9
motive (1)
13:5
Move (7)
21:24;26:3;30:2;
31:9;71:3;149:10,16
moving (1)
150:6
much (5)
23:5;56:5;76:9;
124:16;143:21
multiple (1)
87:10
mumble (1)
51:9
mumbled (1)
50:12
MURPHY (44)
8:4,10,16,19,21;
127:8,15;128:3,4;
129:1,9,13,19;130:6,
11,25;131:3,5,9,12;
132:21,22;133:6,8,
14,19;134:5,6;
144:23;145:13,21;
146:3,7,23;147:7;

148:3,7,8,9,13,18,23;
151:2,5
**must (4)**
96:13;134:9;
147:16,20
**myself (3)**
7:22;35:16;150:17

**N**

**name (2)**
75:24;110:14
**namely (1)**
102:23
**napping (2)**
8:6,12
**narrative (1)**
44:6
**narrowly (1)**
95:25
**National (2)**
73:20;77:3
**nature (1)**
134:18
**nauseating (3)**
15:25;16:9,13
**necessarily (5)**
32:10;55:11;56:8;
81:1;142:18
**need (12)**
7:16;8:2;44:24;
60:23;67:3;74:12;
83:4;97:1;99:17;
127:6;141:9;148:18
**needed (3)**
85:21;98:13;
148:24
**needs (2)**
64:17;145:18
**negate (1)**
30:25
**negotiate (1)**
88:20
**negotiation (3)**
88:19;89:5,10
**Network (3)**
77:11,15;81:18
**neurological (1)**
16:22
**neuromuscular (2)**
42:11,13
**new (12)**
6:10;93:19;126:24;
128:23;129:24;
130:4;131:14;
132:18;134:11;
141:19,20;149:8
**newspapers (1)**
125:16
**next (6)**
35:13;58:23;80:20;
96:23;99:21;142:1
**nice (1)**

136:12
**nicety (1)**
133:21
**night (1)**
143:13
**NIH (8)**
73:9,13;76:23,25;
77:1,2,3;78:23
**nine (1)**
115:20
**nobody (1)**
53:10
**Nobody's (1)**
60:19
**none (11)**
32:11;37:8;44:19;
49:8,19,21;55:1;88:8,
8;107:12;147:4
**nonlicensed (1)**
150:22
**Nor (2)**
56:14;121:16
**normal (13)**
27:10;28:9;34:3,6,
9,13;38:22;66:9,23;
71:14,24;72:8;73:14
**notable (3)**
17:23;19:14;37:3
**noted (2)**
24:19,21
**notes (3)**
106:18;108:15;
152:5
**number (27)**
11:7;12:8,9,11,12;
15:20;27:9;41:8;
52:14,21;58:23;60:3,
8,9,24;67:11;68:5;
96:23;97:8,10;101:6;
104:22;106:3;107:7;
112:15,15;136:13
**numbers (6)**
58:14;60:4;62:11,
14;63:21;118:19

**O**

**oath (2)**
110:3;111:16
**object (5)**
40:21;96:10;97:21;
99:6;110:7
**Objection (58)**
14:8;16:25;18:17,
20;19:1;20:2,6,14,23;
21:2,12,13;24:11,11,
24,24,25;32:17;
34:16,18;37:14;
40:17,24,25;44:21;
46:2;62:22;64:22,23,
25;72:9;82:16;87:20;
89:24,25;91:24;92:3;
96:9;97:17;101:13,

13;105:15;110:1,4;
111:3;113:15;116:4;
117:23;119:11,13,19;
120:5,6;121:24;
122:10,19;123:6,22
**observed (2)**
69:23;70:8;71:5
**obvious (2)**
140:2,4
**obviously (2)**
48:12;125:9
**occasion (2)**
93:16,16
**occasionally (1)**
101:7
**occurred (2)**
39:8,15
**occurrence (3)**
66:3,10;69:23
**off (9)**
7:12,16;8:3;28:1;
48:14;63:8,10;70:17;
95:16
**offered (1)**
37:19
**office (4)**
96:18;99:10,12,17
**officers (1)**
93:21
**officials (1)**
87:25
**off-label (11)**
91:4,5;94:3,5;96:2,
17,22;99:8;120:20;
121:6,8
**off-labelly (1)**
91:3
**off-the-record (1)**
75:8
**old (1)**
138:18
**once (5)**
13:18;30:15,21;
107:17;114:17
**one (54)**
8:4,20;11:11,12;
13:2;24:17;25:1;
26:11;28:10;30:14;
35:18;36:25;38:1,9;
40:2;43:16;57:23;
58:2,12,12;60:16,17;
61:18;62:24;64:13;
65:25;68:23;83:4;
95:16;98:14,18;
101:1;103:12;
104:13;106:16;
109:3;111:12;112:7,
21;113:7,12;119:3,6;
120:6,12,14;126:24;
132:15;138:22;
139:6;140:17,18;
145:17;146:6
**ones (8)**

14:12;44:17;47:7,
7;53:25;54:19,20;
122:1
**on-label (1)**
94:4
**only (9)**
6:20;7:14;29:24;
36:23;58:15;62:18;
64:9;88:3;150:7
**open (5)**
5:1;9:17;108:7;
125:8;126:12
**opened (3)**
144:18;149:25;
150:2
**opening (3)**
14:24;145:11;
149:23
**open-label (2)**
78:1,4
**opining (1)**
66:20
**opinion (12)**
27:1;37:19,21,23;
70:23;99:18;123:21;
132:3;137:4;147:3,
10;148:4
**opinions (1)**
144:19
**opportunity (1)**
149:8
**opposite (3)**
34:15;66:18;99:9
**options (1)**
50:2
**oral (1)**
93:9
**order (11)**
5:5;88:20,21;
128:12,15;130:23;
132:9;133:2;137:8;
141:17;143:21
**orders (1)**
141:5
**organization (3)**
77:9,10;86:20
**originally (1)**
52:10
**Osterweg (1)**
75:23
**others (3)**
22:18;23:5;90:20
**Otherwise (1)**
27:25
**Ours (1)**
67:20
**out (31)**
5:13;12:16,21;
23:23,25;26:11,12,
15,19;29:9,25;36:25;
37:2,8;55:25;58:13;
67:24;72:19,23;76:7;
96:12;103:5;110:6;

112:6;113:7;125:4;
135:8;138:3;142:8;
148:7;149:13
**outside (24)**
5:2;13:9,13,21;
14:5,12;19:24;20:20;
24:6;25:13;48:6,10,
19;49:20;69:7,14;
77:5,16;83:11;84:14;
97:21;109:10,14;
126:13
**over (8)**
8:14;23:12,19;
32:18,18;33:16;86:4;
142:1
**overall (2)**
35:12;36:17
**overlooking (1)**
133:21
**Overruled (13)**
24:17;41:6;45:5;
90:1;92:8;96:15;
97:22,25;111:8;
113:19,20;119:20;
120:17
**overwhelming (1)**
117:20
**own (11)**
22:12;25:25;64:5;
123:12;124:5;
125:13;128:7,8;
143:3;144:13;151:1
**owns (1)**
21:17

**P**

**P-46 (2)**
15:23,24
**P-57 (1)**
97:17
**P-58 (2)**
100:19,21
**P-59 (2)**
104:3,15
**page (34)**
16:6;19:10;38:7;
42:14;43:6,25;50:25;
52:2,7,9,22;54:8;
60:2,8;61:4,9,19;
65:18,21;67:1,4,5,7;
68:5,7,10;78:16,17;
100:18;103:5,13,14,
16;104:16
**pages (4)**
59:13;67:18;
106:16,16
**pagination (1)**
59:25
**Pandina (1)**
19:16
**Pandina's (1)**
19:19

**PANEL (1)**
9:25
**paper (12)**
17:10;20:25;21:1;
24:19;25:12;83:15,
21,23;84:8,18,18;
112:10
**papers (1)**
6:21
**paragraph (1)**
72:5
**parameters (3)**
12:24;13:16;14:1
**Pardon (2)**
67:2;96:5
**parents (2)**
122:18;123:4
**part (9)**
13:6,15;40:9;70:7;
77:21;88:18;98:22;
109:21;140:7
**particular (16)**
29:21;37:19;
111:23;125:3;
128:17,22;132:5,10;
134:13,14;141:5,12;
142:12;145:4;
148:21;151:8
**past (1)**
23:4
**patient (3)**
54:11;135:16;
141:20
**patients (5)**
38:21;47:9;54:22;
79:25;101:8
**Pause (2)**
8:25;39:24
**paying (6)**
42:1,11,15,19,22,
25
**pediatric (7)**
5:19,20;6:4;20:20;
112:21;139:13,14
**pediatrics (3)**
120:4,23;121:1
**peer (2)**
69:10,15
**Pennsylvania (1)**
131:23
**people (20)**
18:4;34:3,11,12;
44:16;45:17;46:9;
62:20;64:1;66:15,22;
71:13;87:10;93:7;
112:7;115:18,20;
136:15,15,17
**percent (28)**
24:8,20;25:1,1,12,
15,20;28:24;29:12,
12;38:20;58:5;60:15,
15;62:14,16,19;
63:20,24;64:17;88:8;

102:2;117:21;118:5,
13,16,20,21
**percentage-wise (1)**
34:4
**perfectly (1)**
36:19
**period (12)**
30:18;32:3;33:22;
36:22,25;78:1,1,3,4;
80:2;100:1;134:1
**periods (10)**
23:12;32:12;34:3,
10;35:6,11;36:1,17;
37:6;81:4
**permission (1)**
97:13
**permit (6)**
24:16;110:8;
141:19;142:3;
145:16;150:8
**permits (1)**
150:21
**permitted (2)**
141:24;142:2
**persists (1)**
101:8
**person (1)**
129:5
**personally (2)**
75:23;150:15
**pharma (1)**
22:11
**Pharmaceutical (1)**
113:9
**Pharmaceuticals (1)**
127:1
**Philadelphia (3)**
9:6;124:17;141:22
**Philip (1)**
139:9
**phrase (1)**
94:11
**phrased (1)**
95:25
**physical (9)**
78:9;79:2,4,15;
80:4,17,25;81:2,6
**physician (2)**
6:15;146:10
**pick (3)**
36:24;113:7;125:5
**pig (1)**
142:17
**pill (6)**
102:23;105:7,25;
106:12;107:9,13
**place (2)**
133:12,24
**placebo (12)**
11:16;56:22;
102:23;105:23;
106:3,11;107:8,22;
108:6,10;115:24;

119:1
**placebo-controlled (10)**
57:1,8,15,18;78:3;
102:17,18;108:3,11;
115:16
**placebos (1)**
106:20
**Plaintiff (10)**
15:4,9;67:11,16;
93:3;127:11;134:14;
141:15;144:16;149:7
**plaintiffs (1)**
6:3
**plaintiff's (11)**
15:19;37:25;38:6;
39:22;41:9;52:16;
68:17;69:4;97:7;
103:23;112:14
**plan (1)**
13:15
**plane (1)**
139:10
**plastic (1)**
139:15
**play (5)**
28:15;110:5;111:4;
115:9;145:12
**please (29)**
5:5;9:20;21:25;
27:21;29:18;35:21;
38:8;41:17;43:17,23;
50:16;51:16;61:13;
63:25;68:23;70:16;
75:11;85:17;106:24;
115:8;116:20;
117:16;123:16;
125:4,7,9,23;135:14;
147:9
**pleased (1)**
134:16
**Pledger (2)**
6:6;139:9
**pm (6)**
5:3;9:15;75:1,17;
126:7;151:14
**point (26)**
11:6;18:6;23:22;
29:12;36:13;37:2;
38:22;56:1;60:21;
65:9,13;71:11;
110:10;111:13;
112:3,3;119:2,12;
133:15;135:9;141:3;
144:12;146:24;
147:8;150:11,11
**pointed (1)**
17:13
**points (5)**
29:6;36:24;78:10,
13,14
**policy (1)**
8:11
**pop (1)**

132:25
**population (4)**
25:22;27:6,11;
98:23
**position (4)**
144:7,14;145:19;
151:1
**possible (1)**
54:25
**possibly (1)**
76:3
**post (2)**
36:10,10
**potential (3)**
10:10;107:4;
137:23
**Potentially (2)**
46:1,6
**powerful (2)**
88:11,11
**practice (4)**
6:17;132:3,9;
150:22
**practicing (7)**
127:19;132:7;
136:10;138:17,25;
140:5;150:18
**practitioner (1)**
136:19
**PRAE (1)**
46:16
**precisely (1)**
141:4
**preclude (1)**
6:1
**preference (1)**
40:23
**prejudice (1)**
142:20
**prejudiced (1)**
145:11
**prejudicial (1)**
144:22
**premature (1)**
150:11
**prepared (1)**
9:4
**prescribe (2)**
88:13;90:25
**prescribed (3)**
98:15;122:5,8
**prescriber (1)**
99:7
**prescribing (1)**
90:23
**prescriptions (3)**
97:10;98:10;
121:17
**presence (3)**
5:2;9:18;126:13
**present (2)**
6:15;19:21
**presentation (1)**

19:19
**pretty (4)**
11:24;65:9;69:19;
86:16
**prevent (1)**
141:6
**previous (2)**
31:25;33:4
**previously (5)**
15:4;59:10;69:22;
70:8;71:4
**prima (1)**
132:4
**printed (1)**
89:19
**prior (1)**
71:17
**probability (1)**
29:13
**probably (7)**
23:21;48:9;86:10,
11;88:6;89:3;94:10
**problem (10)**
73:1;74:19;97:20;
130:14;134:22,24;
138:2,15;143:2;
147:23
**problems (2)**
80:1,24
**procedural (1)**
9:6
**proceed (3)**
9:22;63:7;104:17
**proceeding (1)**
148:10
**proceedings (1)**
152:3
**process (1)**
88:18
**produced (1)**
149:8
**product (1)**
86:23
**professional (1)**
87:23
**professionals (1)**
87:6
**professor (3)**
22:8,9,17
**project (2)**
62:11;64:1
**prolactin (59)**
10:10,11,25;16:19,
21;17:8;28:9;34:6,6,
11,13;38:21;39:3,8,
16;40:16;42:2,23;
43:11;44:2,14,18;
45:16,17,22;46:11,
17,24,25;47:2,24;
56:14;57:14;66:4,8,
16,23;69:18,25;
70:11;71:14,25;72:8;
73:17;78:6,22;80:10,

15;81:9;82:2;83:13;
84:4,16;85:10,20,24;
109:19;110:17;
118:18
**prolactin-elevated (3)**
119:7,10,24
**prolactin-only (1)**
43:3
**prolactin-related (5)**
26:14;45:24;54:4;
84:6;107:5
**promoting (1)**
120:22
**proof (1)**
121:16
**proper (1)**
30:11
**protect (1)**
86:14
**protection (1)**
86:8
**proud (1)**
87:3
**provide (1)**
130:18
**provided (3)**
113:9;128:6;131:2
**Psychopharmacology (1)**
69:12
**puberty (21)**
20:5;23:24;24:3,9;
25:14,22;26:16,20;
32:16;33:7,16,18,20;
34:24;35:3;37:7;
46:19,21;56:18;57:9;
110:18
**public (2)**
86:14,22
**published (5)**
68:18,18;69:11,14;
111:12
**puerperal (9)**
13:11,23;14:7,16;
20:4;29:10;34:23;
56:13,16
**pull (3)**
35:10;55:25;65:4
**pulled (1)**
149:20
**pulling (1)**
103:5
**punishable (1)**
136:4
**purposes (1)**
59:7
**put (19)**
19:11;21:1;25:13;
37:25;58:5,18;71:16,
20;78:17;83:5;90:6;
91:14;97:12;112:12;
118:19;137:13;
138:16;143:15;149:5
**putting (2)**

82:10;90:22
**p-value (1)**
29:17

## Q

**qualified (2)**
22:23,25
**quibble (1)**
11:5
**quickly (5)**
105:23;109:4;
113:25;138:7,9
**quite (2)**
5:18;8:6
**quote (2)**
115:8,11
**quote-unquote (1)**
40:15
**quoting (1)**
86:10

## R

**radio (1)**
125:16
**raise (1)**
134:25
**raised (5)**
102:14;122:13;
128:18;129:2;144:11
**ramifications (1)**
135:18
**ran (4)**
11:21,25;14:1;
30:10
**range (1)**
66:10
**rate (13)**
13:22;24:8,20;
25:21;26:12;28:11;
49:20;55:9;57:2,9,
19;63:20;72:18
**rated (1)**
69:21
**rates (1)**
37:13
**rating (1)**
53:14
**read (25)**
18:11;19:2;31:24;
33:3;55:23;80:20;
81:24;85:2,5;89:13,
23;90:5;109:21,22,
24;110:16;113:3;
114:9,16;116:16;
122:25;125:14;
136:23;137:5,5
**reader (1)**
96:14
**reading (11)**
82:6,8,9,22,25;
83:2,15,18,20;85:15;

132:4
**ready (1)**
124:16
**real (2)**
60:3;63:19
**reality (1)**
131:25
**realize (2)**
69:3;90:9
**realizing (1)**
111:15
**really (16)**
8:2;14:23,25;
29:19;64:23;65:1,3;
83:4;93:18;97:1;
98:23;134:16,16;
138:20;141:16;
146:16
**Realtime (1)**
152:16
**reason (8)**
7:3,14;13:5;71:22;
87:25;141:4,19;
150:19
**reasons (4)**
13:7,8;90:21;
125:19
**recall (4)**
14:19;102:15,19,
24
**recess (4)**
74:11,12,21;75:6
**recited (1)**
6:12
**reciting (1)**
6:21
**record (5)**
61:22;97:5;111:22;
141:11;145:23
**recover (1)**
53:24
**recovered (7)**
53:18;54:4,15,19,
20,22;55:1
**recross (7)**
63:14;72:22;74:18;
95:5;114:3,4;122:2
**RECROSS-EXAMINATION (1)**
114:6
**red (2)**
18:16;43:8
**redirect (12)**
63:2;65:15;72:22;
74:17;94:15,23,25;
95:4;118:2,9;122:13;
123:17
**reference (1)**
71:5
**referred (1)**
76:23
**referring (4)**
57:16;61:16;73:11;
82:12

**regarding (4)**
41:18;82:19;127:3;
145:19
**regards (1)**
141:13
**related (17)**
34:5,6;43:10;44:1,
14;45:15,21,25;
46:17,24,25;47:18;
69:17,24;70:2,9,10
**relates (1)**
70:6
**relationship (11)**
16:19,20;17:9;
28:7,18;29:9;44:18;
70:13;71:1;81:8;
83:13
**relative (1)**
152:9
**relevant (3)**
19:9;26:6;100:1
**rely (2)**
22:13,18
**remained (1)**
66:9
**remarkable (1)**
86:22
**remedy (2)**
141:9;144:16
**remember (8)**
20:10;59:12,14;
108:4;109:8,10,14;
115:10
**reminder (2)**
122:22;125:12
**repeat (3)**
31:17;32:20;117:7
**repeated (1)**
16:8
**repeatedly (4)**
26:8;27:21,22;
109:11
**repeating (3)**
70:15,20;125:20
**Rephrase (2)**
17:4;101:20
**report (28)**
30:15;39:21;40:2;
45:2;48:10,22;52:14;
53:23;62:7;65:23;
67:8,21,22;68:13;
69:16;81:22;103:11;
127:22;128:19;
131:3,5,10;138:11;
139:20;141:20;
144:19;149:18,22
**reported (2)**
49:4;80:12
**REPORTER (8)**
31:18,24;33:3;
85:16;117:6;146:6;
152:16,23
**reporting (2)**

63:22;70:2
**reports (4)**
5:17;48:14,20;
125:15
**represent (2)**
40:12;139:9
**reproduction (1)**
152:20
**request (4)**
51:8;106:6,25;
129:3
**require (1)**
127:18
**required (1)**
143:7
**re-run (5)**
13:1,6,9,18;14:3
**research (5)**
77:17;82:4;85:19;
91:10;127:2
**reserve (1)**
150:14
**respect (1)**
134:15
**responding (2)**
82:21;149:22
**response (1)**
44:15
**rest (2)**
124:24;133:13
**restrict (1)**
123:17
**rests (1)**
148:4
**result (4)**
30:11,22;70:3;
105:2
**resulted (2)**
133:25,25
**results (13)**
12:25;13:4,18;
14:2;30:16,24;37:9;
62:6,9,10;90:18;
105:11;108:22
**resume (1)**
74:13
**return (1)**
151:11
**reversed (1)**
53:19
**review (15)**
7:11;13:20;56:23;
69:10,15;79:7,12;
80:2,21;87:1;93:16,
21;123:1,9;125:14
**reviewed (9)**
91:7,22,23;109:5;
126:21,22;128:5,7;
150:17
**reviewer's (1)**
57:13
**reviewing (2)**
88:17;93:23

**revisions (1)**
16:9
**right (218)**
5:6,10;9:20,22;
10:12,17,22;11:13,
18;12:9;14:4,18;
16:5,11,14;17:19,22;
18:5,7,10,19,21;19:6,
9,11,20;20:8;21:24;
23:1,13;24:5,16;
25:12,15,19;26:2,25;
27:7,9,12,13,14;28:9,
18;29:10;30:8,9,19,
23;31:6;32:3,16;
33:7,22;34:7,23;35:7,
19;36:9;37:7,15;
38:23;39:12;40:2,6,
16;41:5,11;42:12,15,
20;43:8,11;44:19;
45:7,11,18;46:1,19;
47:1,10,13,14;48:3,7,
13;49:9,11,21;51:24;
53:8,11,19;54:14,16,
21,23;55:4;56:4;
57:7,15,24;58:17;
59:19;60:2;62:17;
66:4,11,19;67:5,23;
68:10,15,19;69:12,
18,19,20,22;70:7,9,
21;71:17;72:4,10,21;
73:8,21;74:10,11,13;
75:3,19,21;77:11,24;
78:4,7,23;79:2,5,7,8,
12,17;80:6,10,12,17,
24,25;81:3,5,10,23;
85:11;88:21;89:14;
90:3;95:13;97:16;
101:6;102:8;103:1,
12,14,18;105:10;
106:2,4;109:20;
114:1,3,12,13,21;
115:7,19;116:24;
117:2,25;118:17,20,
22,24;119:5;120:3,
24;121:19,20;122:9,
18,20;123:16,23;
124:11,13,22,24;
125:1,5,18,21;126:1,
9;130:10,10;132:17;
133:10;140:8,15,16,
22,25;142:16;144:6;
147:21;151:11
**ris (1)**
106:19
**RIS-41 (1)**
108:7
**RIS-70 (1)**
59:9
**RIS-79 (3)**
103:1,10,11
**rise (4)**
9:11;74:22;75:13;
126:3

**RIS-INT-41 (1)**
44:6
**RIS-INT-70 (1)**
62:6
**risk (4)**
94:1,9;121:6;149:6
**risks (2)**
88:5,12
**Risperdal (26)**
27:4;57:3,10,20;
66:19;78:11;81:9;
83:14;84:5,15;85:25;
91:10,15,22;93:3,4;
101:23;102:1,22;
121:22;122:17;
123:2,3;129:6;
138:14;139:23
**Risperdal-treated (1)**
108:10
**Risperidone (14)**
78:21;81:25;82:3;
85:9,13;101:11;
105:8,14,24;107:9,
15,19;115:18,24
**RMR (1)**
152:15
**role (1)**
119:25
**routinely (1)**
22:13
**rule (1)**
147:19
**ruled (2)**
96:12;129:18
**rules (9)**
9:6,7;26:18;30:14,
24;31:2;127:18,24;
131:23
**ruling (5)**
129:10;132:13;
148:20,21;151:7
**run (7)**
12:13,15;13:3;
35:16;116:5,15;
117:3
**running (2)**
30:23;72:19
**runs (4)**
12:5,7,8;53:15
**RUPP (3)**
77:11,15;83:10
**rushing (3)**
74:20;105:23;
106:3

## S

**safe (3)**
87:2;88:8,10
**safety (8)**
86:23;93:16,24,25;
94:8;95:21,22;
118:24

**sake (1)**
60:2
**salesman (1)**
99:12
**Same (22)**
14:14;21:13;24:15;
41:22;44:20;59:25,
25;69:15;73:7;83:12;
84:15;102:11;118:7;
122:19,20,22;123:6,
6,22;127:12;152:7,21
**samples (1)**
99:13
**sanction (1)**
132:1
**satisfied (1)**
60:17
**saw (4)**
24:6,19;37:11;
111:14
**saying (13)**
41:2;45:10,20;
46:14;51:20;58:10;
63:11;72:11;87:21;
96:17;129:5;130:11;
145:25
**scale (1)**
49:23
**schizophrenia (2)**
90:15;93:6
**scientific (1)**
92:1
**scientists (5)**
12:15,19;28:15;
87:5,14
**scope (3)**
118:1,9;121:25
**screen (2)**
71:11;82:6
**screening (1)**
79:4
**scrutinize (2)**
48:12,23
**seat (1)**
50:16
**seated (4)**
9:21;51:16;75:12,
20
**second (11)**
35:18;43:16;60:16,
17;68:23;69:2;77:7;
78:16;100:7;112:18;
120:6
**section (1)**
90:7
**seeks (1)**
6:1
**seems (2)**
128:11;147:22
**selected (1)**
11:8
**sell (1)**
121:8

**selling (1)**
121:17
**send (1)**
127:23
**sense (2)**
130:9,12
**sent (1)**
6:7
**sentence (4)**
18:11;80:20;
110:15;111:13
**September (6)**
12:13;108:13,14,
16,22;134:12
**serious (20)**
43:9,25;44:8,11,13,
17;45:10,15,18;
46:10,15,23;47:3,25;
49:9,13,14,17;53:8;
138:2
**serum (3)**
69:24;70:11;82:1
**served (1)**
86:21
**service (1)**
97:21
**set (8)**
12:4,7;13:16;14:1;
15:17;26:18;35:18,
24
**sets (1)**
36:6
**several (4)**
12:3;34:10;35:23;
55:1
**severe (6)**
48:20;49:8,21;
69:17,21;71:24
**severity (5)**
48:7;49:11,15;
53:2,14
**sex (1)**
107:6
**SHAP (5)**
16:10;17:14;38:22;
109:18;110:17
**SHAPA (2)**
19:25;20:22
**SHAPB (3)**
19:24;23:17;26:25
**share (1)**
86:14
**Sheller (1)**
6:7
**short (3)**
13:15;40:24;56:3
**Short- (1)**
78:21
**shorten (1)**
60:13
**shortening (1)**
60:18
**shorthanded (2)**

**104:7,8**
**short-term (4)**
55:8,15,16;77:25
**show (30)**
35:13,21;42:10;
43:12,22;47:5;57:5;
59:16;61:12;63:23;
65:12;68:5;70:1;
74:1;79:9;103:1;
106:23;114:14;
115:8;116:3;117:3;
119:12;121:25;
141:22;144:25;
147:13;148:1,6,11,11
**showed (4)**
106:21;115:15;
119:3;121:7
**showing (5)**
44:7;53:5;57:19;
59:18;78:20
**shown (1)**
47:5
**shows (4)**
57:1,4;105:11;
108:9
**side (26)**
10:11;11:1,10;
16:22,22;34:5,12;
38:25;42:1,12;43:1;
49:7;56:7;63:5;78:7;
80:21;81:9;83:14;
84:6,16;86:1;88:9;
95:1;117:21;118:17,
21
**sidebar (8)**
5:9,13;8:5,23;51:3;
96:4,6,8
**sides (1)**
29:25
**signed (1)**
134:10
**significance (8)**
28:14;30:18,21;
32:2,9;33:21;35:6,11
**significant (19)**
17:19,24;19:14;
28:12;29:14,16;
30:22,25;31:1;32:12;
36:21;37:3,9;111:15;
115:19;116:2,14,23;
134:24
**silly (1)**
40:20
**similar (1)**
101:23
**simple (2)**
31:12;139:22
**simply (2)**
97:9;139:21
**single (1)**
142:11
**situation (9)**
75:25;126:22;

130:24;132:11;
133:22;142:12;
146:21;147:4;149:7
**situations (1)**
141:23
**six (4)**
55:20;69:19;98:14,
18
**Sixty-four (1)**
68:8
**sixty-nine (2)**
98:15,18
**slice (1)**
106:23
**slower (1)**
85:17
**small (1)**
10:21
**smart (2)**
87:11,14
**snow (1)**
135:4
**so-called (1)**
129:21
**solely (2)**
64:14;151:8
**solution (5)**
93:10;137:14,17,
18,23
**solving (1)**
138:14
**somebody (3)**
64:20;138:6;
139:22
**someone (3)**
56:6;127:16,19
**something's (1)**
87:1
**sometimes (3)**
8:12;40:9,9
**soon (3)**
122:3;124:15;
125:24
**sorry (11)**
23:17;42:7,16;
43:18;52:15;69:3;
73:25;76:12;83:23;
117:6;130:20
**sort (2)**
58:13;80:2
**sound (1)**
88:21
**Sounds (1)**
64:19
**sparked (1)**
130:9
**speak (1)**
64:17
**speaks (4)**
54:17;71:3;84:18,
19
**special (10)**
13:7,8;40:15;

41:20;42:1,11,15,17,
19,22
**specialists (1)**
87:9
**specific (7)**
17:13;19:4;33:12;
34:25;44:24;80:22;
127:22
**specifically (3)**
16:10;25:17;27:1
**speculate (1)**
49:2
**Speculation (1)**
55:3
**spend (3)**
63:18;88:6;95:9
**spends (1)**
88:16
**spent (1)**
136:13
**spoke (1)**
58:2
**spoken (1)**
75:23
**sprung (1)**
6:25
**stage (1)**
6:24
**stand (5)**
7:13,16;8:3;32:22;
124:21
**standard (2)**
86:22,25
**standby (1)**
139:12
**start (1)**
28:1
**started (1)**
125:24
**state (2)**
47:17;151:3
**stated (2)**
55:14;98:9
**statement (12)**
38:3;39:17;40:24;
46:12;70:21;82:13;
86:16;89:9;110:25;
112:25;113:10,11
**statistical (16)**
12:20;22:4;28:7,
10,14,18;30:8,9,18,
20;32:2,9;33:21;
35:6,11;36:13
**statistically (17)**
17:18;29:10,14,16;
30:22,25;31:1;32:12;
36:9,21;37:9;115:19;
116:2,13,18,23;117:1
**statistician (4)**
22:8,16,20;23:4
**statisticians (2)**
12:25;22:13
**statistics (12)**

11:25;22:11,19,24;
23:6;32:8;115:25;
116:5,12,16,17;117:4
**statute (6)**
91:6;136:24;142:8;
143:6;149:5;151:5
**steroid (4)**
119:5,5,8,22
**steroids (3)**
120:2,19;121:11
**stick (1)**
54:2,3
**still (1)**
28:12
**stop (1)**
123:10
**stopped (1)**
93:3
**story (3)**
95:20,23;113:10
**straighten (1)**
67:24
**Striant (3)**
100:2;101:2;
120:10
**S-T-R-I-A-N-T (1)**
100:4
**stricken (2)**
147:16;150:5
**strike (1)**
147:20
**studied (2)**
22:10;113:5
**studies (27)**
10:12,21,21,24;
11:2,7,11;23:9;55:8,
15,16,17,21;56:21;
57:5,8,13,15,16,18,
23;90:13,16;107:24;
108:1,6;117:20
**study (86)**
10:7,10,15;11:6,12,
21;25:18;39:5,21;
40:1,5,16;43:3;45:2;
47:23;48:9;53:19;
54:21,23;55:2;56:19;
57:1,4;58:1,21;62:7,
20;65:22;66:1;67:8;
68:13;69:16;70:1,2,4,
5;72:4;73:7,8,9,13,
20;76:13,21,23,24;
77:3,13,21,23;78:9,
13,25;80:5,15;81:12,
14,22;102:17,18,21;
103:11,17;105:6,6,
10,22;106:12,13;
107:21;108:3,4,8,11,
13,14,17,24;109:9,
10,14,25;110:13;
115:16;116:7;118:15
**study's (1)**
78:23
**stuff (4)**

15:18;17:14;19:10;
50:7
**subject (2)**
6:18;31:10
**subjected (1)**
134:17
**subjects (2)**
66:8;107:8
**submit (1)**
40:5
**submitted (3)**
40:11,13;49:16
**subsequent (1)**
91:13
**subsequently (2)**
109:1;114:17
**substance (1)**
37:21
**substantial (1)**
139:23
**sudden (1)**
147:25
**sugar (6)**
102:23;105:7,25;
106:12;107:9,12
**suggest (1)**
137:22
**suggested (2)**
14:13;105:5
**suggestion (3)**
50:11;144:23;
149:3
**SULLIVAN (196)**
9:23;10:4,6;14:10,
15,21,24;15:2,13,16;
16:1,3;17:5,6;18:18;
19:7;20:3,12,18,24;
21:7,9,15;22:1,2;
23:2;24:18;25:2,9,
11;26:1,5,9,10;27:23;
28:2,4;29:3,7,23;
30:1,12;31:11,16;
32:7,21;33:14;34:21;
37:24;38:14,16,19;
41:9,13,23;42:8;
43:14,18,24;45:1,4,8,
12;46:5,7;50:5,20;
51:6,22;52:1,12,18;
58:25;59:11,21;
60:12,25;61:3,7,8,23;
62:2;63:8,15,17;64:7,
24;65:2,4,16,17;67:7,
13,17;68:8,12,16;
70:18,22;71:7,12;
72:12,20,24;73:3,5;
74:7;75:4;76:5,6,9,
20;82:7,12,25;83:7,9;
84:1;85:1,5,7,18;
87:22;90:2;91:25;
92:17,20,24,25;
94:12;95:24;96:3,6,
10;97:18;99:5;100:9;
101:13;103:3;105:5,

15;108:4;109:9;
110:1,4;111:3;
113:15;114:2,8,23;
115:1,4;116:10;
117:8,16,18,24;
118:6,10,14;119:21;
120:7,9,18;121:21;
122:4,7,15,24;123:8,
14,18;124:2,7,10;
138:10;142:5,14,19,
24;143:3,5,14,23;
144:3,9,17;145:1,6,
12,14;149:10,15,25;
150:7,13
**summary (1)**
44:7
**supervision (1)**
152:22
**supposedly (1)**
137:21
**sure (31)**
12:12;15:8;17:5;
22:6;26:1;27:23;
28:16;29:23;45:8;
49:22;57:16;58:20;
59:22;60:5,25;61:4,
24;71:20;74:2;77:1;
79:1;86:6,19,24;
88:7;104:11;112:13;
127:8;128:4;129:1;
140:12
**surgeon (1)**
139:15
**surprise (7)**
105:13;139:18,19;
141:7,18;143:12;
145:16
**Sustained (28)**
14:9,19;17:3,3;
18:22;19:1;20:9;
31:7;34:20;37:16;
44:23;50:15;72:11,
11;82:18;101:17;
116:8;121:14,15,20;
122:6,6,11,14,21;
123:11,24;124:1
**switch (1)**
150:9
**switching (1)**
150:8
**sworn (1)**
111:1
**symptoms (2)**
47:10;80:2
**system (1)**
128:9
**systems (1)**
44:8

**T**

**Tab (1)**
15:21

**Table (58)**
20:25;22:5,5;23:8,
10,11,16,19;26:19;
28:5;30:7,19;32:3,
15;33:5,15;34:22;
35:10,13,14;39:15;
44:4,6,12;47:6,14,15,
17;52:8;53:10;54:7,
17;56:17;58:12,12,
18,19;59:23;60:6,10;
61:16,21;62:10,15,
15;63:24;64:13;70:1;
103:1,12,15,16;
105:2,11;116:12,16,
17;117:4
**tables (3)**
12:8,10;49:9
**tablet (1)**
93:12
**tabs (1)**
15:11
**tabulation (1)**
49:17
**tabulis (1)**
44:7
**tactical (1)**
141:17
**talented (1)**
87:15
**talk (16)**
9:4;16:1;23:7;
43:7;53:25;54:2;
64:21;73:18;86:3;
89:21;97:11;102:13;
115:17;125:9;
137:24;139:2
**talked (8)**
11:9,15;22:4;
57:23;70:4;85:23;
109:11;116:24
**talking (24)**
10:9;25:17,21;
37:11;48:5;50:6,21,
23;51:7;64:2;66:1;
70:24;71:10;72:3,5;
76:10;88:6;89:20;
94:4;96:25;98:12,21;
120:8;137:1
**talks (5)**
18:12;38:20;78:17;
79:14;97:5
**team (1)**
150:12
**technical (2)**
133:21;146:21
**TECHNICIAN (3)**
104:20;106:6,25
**teenagers (1)**
121:11
**television (1)**
125:18
**telling (9)**
121:10;130:7;

146:4,7,14,19;
147:15,17,20
**tells (1)**
97:9
**ten (6)**
74:14;75:3;132:8;
136:4;150:22,25
**tend (1)**
93:21
**tended (2)**
82:3;85:13
**ten-minute (1)**
74:21
**tentacles (1)**
139:18
**term (1)**
56:3
**terminology (1)**
116:21
**terms (13)**
11:11;17:8;28:7;
32:9;44:13;49:19;
53:11;84:4;90:24;
118:17;127:18;
131:23;150:25
**testified (3)**
55:13;108:20;
147:17
**testify (3)**
5:21;124:5;144:15
**testifying (2)**
7:8;127:16
**testimony (22)**
6:2;37:20;55:24;
65:5,6;109:6,22;
111:1;126:23;127:4;
129:23;131:15;
132:17,20;135:5,13;
142:13;146:14,20;
147:15;150:5;151:9
**Thanks (2)**
78:19;79:21
**therefore (3)**
131:22;144:14;
151:7
**thing's (1)**
28:23
**third (4)**
95:6,8;112:10,17
**though (5)**
72:3;84:22;88:24;
111:21;120:2
**thought (7)**
25:9;55:19;83:24;
84:21;90:4;92:6;
143:5
**thousands (1)**
98:9
**three (20)**
28:12;29:11,16;
32:23;56:3,62:12;
78:12,12,14;79:18;
80:5,7;81:4;95:11;

107:17,20,21;108:10;
115:21,24
**throughout (1)**
87:23
**throwing (1)**
37:8
**till (4)**
130:4;131:18;
146:1;147:24
**times (10)**
16:8;24:14;28:12;
29:11,16;35:23;
40:11;48:23;96:19;
99:13
**today (10)**
5:23;7:8;74:16,17;
76:3;92:4;94:22;
101:5;110:22;146:2
**together (1)**
90:23
**told (9)**
6:9;21:3;22:7;
65:5;101:4;110:22;
111:17;144:14;146:5
**tomorrow (10)**
7:9;72:17;83:8;
99:11,12;125:23;
126:18;136:7;
137:13;151:12
**ton (2)**
16:16;91:23
**tonight (2)**
129:17;139:11
**took (5)**
23:23,25;80:9;
91:20;133:11
**top (6)**
54:14;106:4,23,24;
107:1;133:3
**topline (4)**
62:5,9,10;67:21
**toplines (1)**
59:10
**Toronto (3)**
13:14;112:19,20
**total (3)**
11:7;60:14;107:7
**totally (2)**
6:10;136:7
**toxicologists (1)**
87:5
**trained (1)**
87:8
**transcript (2)**
152:7,20
**transpired (4)**
5:1,12;9:17;126:12
**treated (3)**
101:8;105:24;
119:1
**Treatment (2)**
78:22;81:25;85:9;
98:9;107:5,6

**treatments (1)**
123:2
**trial (14)**
16:8;38:22;68:19;
93:19;105:3;128:13;
129:24;131:18;
132:25;133:25;
134:18;145:10;
147:25;152:6
**tries (3)**
21:2;40:20;86:24
**true (17)**
10:19;32:10,13;
35:9,20;46:6,6;48:9;
66:6;67:21;71:13;
84:3;89:2;94:1,6;
99:9;121:22
**trust (1)**
87:25
**truth (6)**
20:13,15,17;21:10,
13,17
**try (13)**
12:20;28:15;60:10,
10;76:2;95:11;
117:11,13;125:23;
138:3,3,4,21
**trying (3)**
30:2;58:13;104:23
**Turn (4)**
41:21;63:12;65:18;
86:4
**Two (9)**
13:2;49:10;57:5;
63:21;69:21;95:9;
96:25;112:6;118:24
**two- (2)**
82:1;85:9
**type (2)**
132:10,16
**types (1)**
141:23
**typically (1)**
32:9

**U**

**UCLA (1)**
77:14
**Uhmm (2)**
56:23;93:18
**unauthorized (1)**
6:17
**unbeknown (1)**
6:9
**under (11)**
27:7;28:5;50:12;
51:9;100:18;110:3;
111:1,16;133:12;
136:7;152:21
**underpinning (1)**
147:9
**understands (1)**

90:8
**understood (4)**
11:3;23:16;63:15;
129:16
**unfair (5)**
141:6,18;143:12;
144:22;145:16
**unfortunately (1)**
88:9
**universities (1)**
77:16
**University (1)**
112:19
**unless (7)**
13:6,6;33:12;89:1;
96:8;146:13;152:21
**untimeliness (3)**
148:22;149:9;
151:10
**untimely (2)**
132:15;141:3
**up (44)**
6:18;8:14;13:19;
25:17;26:18;27:9;
36:7;37:25;50:7;
51:10,13;54:19;
58:18;60:20;63:13;
65:4;71:16,20;78:18;
82:6,10;83:5;88:19;
89:7,17;91:14;99:15;
100:12;104:10;
106:2;112:2,12;
118:19;125:2,5;
132:8,25;136:4;
138:7;139:8,12,14;
141:21;150:22
**upon (2)**
19:3;147:10
**upper (3)**
34:8;38:21;73:14
**use (14)**
41:20;55:18;60:1;
91:5;96:25;97:2;
98:13;99:1;103:4;
121:8,9,10,11;124:2
**used (10)**
15:8,18;28:14;
59:10;71:9;84:7;
91:3;98:23,24;
120:19
**uses (2)**
91:5;94:4

**V**

**variables (3)**
12:9;17:15,16
**variety (1)**
90:17
**various (3)**
12:16;78:10;79:16
**Vaughan (4)**
127:13,15,17;

135:15
**version (6)**
20:6;38:4,6;68:19;
89:15;90:5
**versions (4)**
89:18;90:10,12,19
**versus (4)**
36:8;105:7,24;
119:1
**VIDEO (1)**
104:20
**videotape (1)**
129:17
**view (2)**
30:13;139:25
**viewed (1)**
89:5
**views (1)**
70:5
**violated (5)**
143:15,18;144:21;
146:21;149:5
**violating (1)**
143:20
**violation (5)**
128:11;130:22;
133:1,3;147:18
**visits (2)**
79:11,24
**volume (1)**
98:10
**vouch (2)**
136:11;140:7

**W**

**Wait (8)**
27:19;60:16;67:9,
10;116:6;118:4;
131:18;137:13
**wakes (1)**
8:14
**wants (4)**
65:12;83:5;85:2;
132:1
**warn (4)**
93:25;94:8;119:15;
121:9
**warned (2)**
100:1;121:5
**warning (12)**
101:23;102:8,10,
12;120:3,15,23,25;
121:2,3,7;122:22
**Warnings (3)**
100:18;101:5;
119:4
**warrant (1)**
102:11
**watch (1)**
104:9
**watching (3)**
8:8,15;25:5

**way (35)**
6:10;11:24;12:5;
26:11,17,18;31:14;
36:8,23;49:12,16;
58:15;64:9,14;86:3;
94:10;95:25;105:20;
107:23;117:19;
118:23;133:10;
136:9,11,24;137:15,
20;139:6,7,8,16,25;
140:18;142:9;145:12
**ways (4)**
11:23;12:3,11;
16:17
**wear (1)**
125:7
**week (3)**
135:1,2;142:1
**weekly (2)**
79:6,24
**weeks (10)**
19:21;28:6,11,17;
29:9;36:21;37:4;
55:20;79:16;80:22
**weigh (1)**
88:12
**Well-trained (1)**
87:8
**weren't (4)**
21:11,16;57:11;
59:13
**what's (12)**
6:21;12:16,21,23;
15:3;24:12;36:20;
58:23;63:1;67:19,24;
98:25
**whatsoever (2)**
95:4;125:13
**whenever (1)**
8:13
**Whereupon (10)**
9:14;31:24;33:3;
74:25;75:6,8,16;
100:21;104:3;126:6
**wherever (1)**
60:22
**whole (15)**
11:21;16:23;26:6;
28:22;103:4;106:23;
109:6;110:5;111:4;
113:3;117:5,9;
119:11;138:15;139:6
**who's (5)**
5:20;6:5;138:17,
18;139:2
**widely (2)**
122:5,8
**willing (3)**
36:19;49:2;83:6
**wish (1)**
92:10
**within (1)**
66:9

**without (6)**
6:15;13:1;14:6,16;
37:7;149:23
**WITNESS (64)**
21:20,23;28:21;
30:6;31:22;32:5;
34:17;37:18,18;
38:11,15,17;41:15,
19;42:7;43:16,22;
45:9;46:3;50:8,24;
51:20,23;52:5,8,11,
15;59:17,18,19;60:5;
61:6,10,15;63:6;
65:11;70:20;76:19;
82:24;83:23;87:18;
97:15;99:18;101:15;
104:6,14;111:22;
113:21;118:3;124:9,
18,21;131:19;
133:11;136:6;140:3;
141:13,14,21;142:17;
143:3;146:18;149:4,
4
**witnesses (2)**
123:13;124:5
**witness's (1)**
141:7
**women (1)**
120:20
**word (7)**
39:18;41:20,20;
50:10;55:18;64:11;
84:7
**words (8)**
18:8;44:16,21;
48:19;60:18;101:10;
146:17;147:14
**work (4)**
77:19;125:4;
138:21;142:16
**worked (1)**
22:14
**working (1)**
134:19
**works (2)**
16:20;122:9
**world (4)**
20:7;86:9,25;87:9
**worried (1)**
60:19
**wrap (1)**
112:2
**write (2)**
48:20;85:22
**written (2)**
97:11;127:21
**wrong (6)**
38:12;55:8,11,18;
58:11;145:1
**wrote (2)**
44:25;48:22

**Y**

**Yale (2)**
76:24;77:4
**year (9)**
54:21;55:16;62:24;
100:12;108:12;
131:11;136:17;
140:24;141:1
**years (9)**
91:10;93:22;94:7;
134:20,20,20;136:4,
20;138:18
**yellow (1)**
125:7
**yesterday (3)**
42:4;55:19;110:23
**young (4)**
6:5;7:2;93:7;
120:20

**Z**

**zero (5)**
54:6,11;106:4;
108:9;115:23

**0**

**00061859 (1)**
61:22
**0082146 (1)**
97:8
**03 (2)**
108:14,16
**05 (3)**
28:10,13;32:9
**06 (1)**
92:18
**084 (1)**
19:10

**1**

**1 (2)**
70:1;80:22
**10 (9)**
23:19,25;24:2;
27:7;28:6;33:16;
35:1;36:24;63:3
**101 (1)**
77:23
**12 (11)**
28:11;29:9;34:8;
35:7;36:21;37:6;
58:5;60:15;62:19;
63:20;64:9
**12.5 (5)**
58:12,16;62:14;
63:24;64:13
**123 (2)**
103:16;104:16

**12-point (1)**
58:15
**12-week (9)**
17:17;18:7,15;
19:10,17,25;20:1;
114:11;115:6
**13 (1)**
10:16
**14 (1)**
131:16
**14th (1)**
128:21
**15 (12)**
30:9,23;53:24;
63:3,4,13,14;72:15,
17;94:25;95:12;
99:22
**150 (1)**
107:20
**159 (1)**
41:21
**15-minute (1)**
94:24
**15th (1)**
12:7
**16 (3)**
38:6,10;53:24
**163 (3)**
105:24;106:3,9
**17 (1)**
77:24
**170 (1)**
107:20
**18 (2)**
10:16;56:4
**193 (4)**
43:6,14,15,25
**1993 (2)**
89:18;91:14
**1997 (1)**
91:9
**1998 (1)**
132:3

**2**

**2.3 (1)**
102:2
**2:11 (1)**
5:3
**2:17 (1)**
9:15
**20 (16)**
22:5;23:8,10,11,
16;25:1;26:19;28:5;
30:7;33:15;39:22;
41:10;52:16;93:22;
96:19;99:12
**2000 (1)**
108:13
**2002 (6)**
38:6;92:5;93:2;
97:6;98:4,16

**2003 (3)**
　100:14,15;108:22
**2006 (11)**
　55:9,22;69:13;
　73:19;88:19,22;
　89:11,19;90:6;93:5;
　102:1
**2007 (2)**
　73:19;93:2
**2014 (8)**
　128:21;130:2;
　131:12,16;134:10,12;
　135:17;143:4
**20-minute (1)**
　94:24
**20-plus (2)**
　91:9;94:7
**21 (6)**
　15:22;22:5;23:8;
　34:22;35:10;39:15
**22 (4)**
　49:12;56:3;79:17;
　80:22
**24 (1)**
　37:5
**25 (6)**
　58:24,25;61:4;
　65:22;89:17;90:19
**25th (2)**
　134:12;135:16
**26 (4)**
　74:6,7;76:13;78:20
**27 (1)**
　68:18
**28 (1)**
　37:5

**3**

**3 (1)**
　80:22
**3:20 (1)**
　75:1
**3:44 (1)**
　75:17
**31st (1)**
　131:10
**36 (1)**
　37:5
**37 (2)**
　38:1,7

**4**

**4 (8)**
　28:17;37:5;60:6,
　11;61:21;62:10;
　80:22;130:2
**4:15 (1)**
　104:24
**4:20 (1)**
　104:24
**4:29 (1)**

　126:7
**4:30 (2)**
　74:17;94:22
**4:52 (1)**
　151:14
**40 (1)**
　37:5
**46 (4)**
　15:4,9,12,13
**48 (1)**
　37:5

**5**

**5 (2)**
　77:23;101:6
**5:30 (2)**
　76:1,1
**50 (8)**
　12:10;24:8,20;
　25:3,10,12,15,20
**50-year (1)**
　136:10
**530 (1)**
　76:13
**546 (2)**
　59:2;78:17
**57 (1)**
　97:8
**58 (2)**
　42:14,16
**59 (3)**
　42:16;103:24,25

**6**

**6 (9)**
　8:6;37:5;58:7,13;
　60:15;62:16;63:20;
　79:16;80:22
**6.3 (1)**
　63:25
**6:30 (1)**
　139:10
**60 (1)**
　36:8
**63 (1)**
　36:8
**64 (4)**
　65:18,20,21;67:7

**7**

**7 (4)**
　28:17;37:5;62:15;
　100:18
**7.8 (3)**
　38:20;54:7;118:20
**70 (1)**
　64:16
**71 (1)**
　138:18
**72 (1)**

　138:18
**740 (1)**
　38:12
**741 (2)**
　38:7,13
**7th (1)**
　128:24

**8**

**8 (8)**
　28:11;29:9;34:8;
　35:7;36:21;37:6;
　79:16;80:22
**8- (10)**
　17:17;18:7,15;
　19:10,17,25;20:1;
　24:4;114:11;115:6
**8.3 (1)**
　64:17
**82 (8)**
　52:3,4,7,8,10,20,
　21,22
**831 (1)**
　59:23
**834 (1)**
　65:21
**859 (1)**
　59:24

**9**

**9 (1)**
　36:24
**9:15 (1)**
　125:23
**9:30 (1)**
　151:12
**90 (4)**
　25:1;28:24;29:12,
　12
**95 (6)**
　29:13;32:5;33:24;
　117:21;118:5,13
**98 (2)**
　118:16,21
**9th (1)**
　134:10
**9-year-olds (1)**
　24:4