# EXHIBIT-2

USCA5 3133

Xarelto Litigation

Expert Statement of Dena R. Hixon, MD[1]

## BACKGROUND AND QUALIFICATIONS

### Medical Training and Clinical Experience

I am a licensed medical doctor in the state of Maryland, with an M.D. degree from the University of Maryland School of Medicine. I completed residency training in Family Practice and received Board Certification from the American Academy of Family Practice. I also completed residency training in Obstetrics and Gynecology and received Board Certification from the American Board of Obstetrics and Gynecology. I have 13 years of clinical practice experience as an obstetrician/ gynecologist.

During my training and clinical practice experience, I became familiar with the diagnosis and treatment of venous and arterial thromboembolic events (VTEs), including the use of anticoagulant drugs for their management and prevention. The ability to recognize and manage VTE risks and to diagnose and treat deep vein thrombosis (DVT) and pulmonary emboli (PE) is essential in internal medicine and primary care, including the care of pregnant and post-partum women, who are at increased risks of such complications.

### FDA Regulatory Experience

For nearly 13 years, January 1999 to November 2011, I was a Medical Officer in the United States Food and Drug Administration (FDA) Center for Drug Evaluation and Research (CDER). I served as a primary reviewer and team leader in the Office of New Drugs (OND), Division of Reproductive and Urologic Drug Products (DRUDP), where I reviewed and evaluated clinically relevant information regarding the safety and efficacy of women's reproductive healthcare products. I later became the Associate Director for Medical Affairs in the Office of Generic Drugs (also in CDER) and evaluated a broad range of drug products used in many different clinical fields.

During my service at FDA, I conducted reviews of Investigational New Drug (IND) applications and New Drug Applications (NDAs) for women's reproductive healthcare products. I reviewed INDs to ensure reasonable safety of studies in humans. I also reviewed protocol proposals to ensure that the proposed studies were reasonably safe and adequately designed to achieve their objectives. I reviewed NDAs for adequate evidence of safety and efficacy to meet standards for marketing approval. I also reviewed postmarketing labeling proposals, safety reports, and supplemental applications for new indications and/or for labeling changes.

In addition, I conducted and/or participated in numerous meetings with industry sponsors, including pre-IND meetings, end-of-phase 2 meetings, pre-NDA meetings, and other guidance meetings, providing

---

[1] I work as the sole member of Pharmaceutical Lifecycle Consulting, LLC, a Maryland single member limited liability company, established in December 2011.

USCA5 3134

advice and feedback to companies regarding study design, endpoints and/or acceptability of outcome information.

As a team leader, I trained other medical officers and evaluated their work. I also considered the reviews of all relevant disciplines and made recommendations on approval of new drug applications and various efficacy or labeling supplements, ensuring adequate evidence of safety and efficacy and maintaining consistency between products and sponsors as well as compliance with regulatory requirements.

My work in CDER also included participating in a number of inter-office committees and working groups including the following:

1.     Pregnancy Labeling Task Force, from 1999 to 2005. As a member of the task force, I contributed to the development of several guidance documents for industry and FDA reviewers, as well as the 2008 Proposed Rule on Pregnancy and Lactation Labeling,[2] which was finalized in 2014.

2.     FDA Drug Safety Oversight Board,[3] from its inception in 2005 until 2008. This Board was mandated by law in the FDA Amendments Act of 2007 to advise the CDER Center Director on the handling and communicating of important and often emerging drug safety issues.

3.     CDER Pediatric Review Committee (PeRC),[4] previously the Pediatric Implementation Team,[5] from 2002 until 2010. This committee provided consultation on and general review of pediatric information submitted to the Agency in pediatric plans and reviewed Pediatric Written Requests for studies of drug use in children.

4.     CDER Pediatric Exclusivity Board from 2002 until 2011. As a member of this board, I considered pediatric study reports submitted in response to Pediatric Written Requests to determine eligibility for extended periods of exclusivity.

I served as an instructor for CDER reviewers at internal FDA conferences, presenting the roles of the Medical Officer in the drug review process on numerous occasions. I presented clinical considerations in generic drug development to the Office of Generic Drugs and to CDER training conferences on numerous occasions. I also participated in CDER Scientific Rounds on numerous occasions as a presenter and/or panelist.

In addition, I gave presentations at public conferences, presenting the CDER review process to the CDER Forum for International Drug Regulatory Authorities, and presenting various clinical considerations in generic drug development and review at the Annual Generic Pharmaceutical Association Fall Technical Conferences.

---

[2] Federal Register /Vol. 73, No. 104 /Thursday, May 29, 2008 / Proposed Rules; Content and Format of Labeling for Human Prescription Drug and Biological Products; Requirements for Pregnancy and Lactation Labeling; http://www.gpo.gov/fdsys/pkg/FR-2008-05-29/pdf/E8-11806.pdf

[3] http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDER/ucm082129.htm

[4] http://www.fda.gov/downloads/Drugs/DevelopmentApprovalProcess/DevelopmentResources/UCM049871.pdf

[5] http://www.fda.gov/newsevents/testimony/ucm115220.htm

USCA5 3135

**Experience, Materials Reviewed, and Compensation**

My current Curriculum Vitae and a list of the documents I have reviewed in preparing this statement are attached. I have reviewed documents in the Xarelto IND and NDA, related FDA regulations and guidance, and FDA communications with the defendants. I have also reviewed literature reports and publications in the public domain related to the clinical significance of thromboembolism and the history and clinical use of anticoagulant products, and reports of plaintiffs' experts relevant to the regulatory considerations. Throughout this report, specific sources of information are indicated in footnotes.

I have been compensated at a rate of $600 per hour for reviewing materials and creating this report.

**List of cases in which I have testified in the last 4 years:**

In Re Topamax Litigation
Court of Common Pleas, Philadelphia County
Deposition Testimony for Defendant May 1, 2013

Czimmer v. Janssen Pharmaceuticals
In The Court Of Common Pleas, First Judicial District Of Pennsylvania, Civil Trial Division, Court Testimony for Defendant October 28-29, 2013

Powell v. Janssen Pharmaceuticals
In The Court Of Common Pleas, First Judicial District Of Pennsylvania, Civil Trial Division, Court Testimony for Defendant November 12-13, 2013

Anderson v. Janssen Pharmaceuticals
In The Court Of Common Pleas, First Judicial District Of Pennsylvania, Civil Trial Division, Court Testimony for Defendant February 25-26, 2014

Royal v. Novartis Pharmaceuticals Corporation
Circuit Court of Cook County, Illinois
Deposition Testimony for Defendant June 19, 2014

In Re Mirena IUD Products Liability Litigation
United States District Court, Southern District of New York
Superior Court of New Jersey Law Division, Bergen County
Deposition Testimony for Defendant, September 22, 2015

Cipro Cases I and II, Judicial Council Coordination Proceeding Nos. 4154 and 4220
Superior Court of the State of California County of San Diego
Deposition Testimony for Defendants (Barr Laboratories, Hoechst Marion Roussel, Inc., Rugby, and Watson), April 12, 2016

USCA5 3136

Katrina Dawn Copley v. Bayer Healthcare Pharmaceuticals, Inc.
United States District Court for the Middle District of Tennessee
Deposition Testimony for Defendant, April 29, 2016

## BASIS FOR OPINIONS

My opinions set forth in this report are expressed to a reasonable degree of medical and scientific certainty. In forming my opinions, I relied upon my knowledge of the FDA regulations, policies and procedures as well as my own training and clinical experience in Family Practice and Obstetrics/Gynecology, and my experience at FDA as a medical officer and regulatory official.

I have reviewed the IND and NDA documents for Xarelto and correspondences between the FDA and the relevant drug companies, as well as published literature relevant to Xarelto and bleeding events associated with its use. The following discussion relates to the general requirements for approval of a new drug product and to the development, approval, labeling, and postmarketing safety monitoring of Xarelto in particular.

## BRIEF SUMMARY OF THE ISSUES

I understand that personal injury law suits related to Xarelto, a novel oral anticoagulant (NOAC), have been filed against Janssen and Bayer.  The plaintiffs allege that they did not fulfill their regulatory obligations in developing, testing, labeling, marketing and selling the product.   The plaintiffs allege that the companies failed to adequately warn the plaintiffs or their health care providers that Xarelto, when administered as recommended in the product labeling, can cause serious bleeding events that may result in serious harm or death.

## REGULATORY FRAMEWORK

### Authority of the FDA in the Development and Regulation of Drugs

FDA is an agency of the United States government, in the Department of Health and Human Services (DHHS). It is responsible for protecting the public health by assuring the safety, effectiveness, quality, and security of human and veterinary drugs, vaccines and other biological products, and medical devices. The FDA is also responsible for the safety and security of most of our nation's food supply, cosmetics, dietary supplements and products that give off radiation, and for the regulation of tobacco products. Six Centers in FDA regulate products in these categories, including the Center for Drug Evaluation and Research (CDER).[6,7] CDER evaluates the design, composition, manufacture, testing and labeling in its approval of a drug product.[8]

The drug and medical device industries in the United States are highly regulated. FDA/CDER has authority over drugs under development as well as approved drug products. It plays an important role in

---

[6] http://www.fda.gov/AboutFDA/CentersOffices/default.htm
[7] http://www.fda.gov/AboutFDA/WhatWeDo/default.htm
[8] 21 USC 355(b)(1)

USCA5 3137

overseeing drug development, labeling, and advertising, and monitors the safety of drug products in order to ensure that safe and effective drugs are available to the public and that they remain safe and effective.[9]

Before FDA can grant approval for marketing of a drug product, it must determine that the data provide substantial evidence of effectiveness and reasonable safety, based on FDA's analysis of the risks vs. benefits of the drug for its intended use.[10,11] At all times FDA has ultimate authority over the product labeling, as well as continued control of quality, purity, and potency of the drug, and, under the Food, Drug and Cosmetic Act (FDCA) and subsequent amendments, FDA has power to enforce its authority. It may withhold approval of any pending NDA supplements until the sponsor accepts FDA's requested labeling changes. It may also use its enforcement power under misbranding, warning letters, and/or required labeling changes when new safety data show a change in the risk/benefit balance, such that the old labeling is no longer adequate for the safe and effective use of the product.[12] Under the FDCA as amended, if a company fails to submit required periodic safety reports or refuses to make labeling changes requested by FDA, the agency has authority to take enforcement action, and even remove the product from the market.[13,14,15]

FDA does not have authority over the practice of medicine,[16] and does not take action against healthcare providers who prescribe a product for different uses or different dosing regimens than those described in the labeling. In fact, some drugs have substantial use as the standard of care for medical conditions that are not described in the labeling due to lack of adequate evidence, particularly for rare conditions.

### Regulations for Drug Development and Approval

The responsibilities of CDER in regulating drugs are largely governed by the Food, Drug and Cosmetic Act (FDCA),[17] as amended. FDA approval is necessary for marketing a drug in the United States. The FDCA was implemented in 1938 and required sponsors to demonstrate the safety of drug products prior to marketing approval. In 1962, the Kefauver-Harris Amendment to the FDCA added a requirement that sponsors provide evidence of both safety and efficacy prior to marketing approval.[18]

---

[9] http://www.fda.gov/Drugs/default.htm
[10] http://www.fda.gov/Drugs/DevelopmentApprovalProcess/default.htm
[11] http://www.fda.gov/Drugs/DevelopmentApprovalProcess/HowDrugsareDevelopedandApproved/default.htm
[12] http://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/default.htm
[13] 21 CFR 314.80(j), 21 CFR 314.81(d)
[14] http://www.fda.gov/Safety/Recalls/EnforcementReports/default.htm
[15] Guidance for Industry Safety Labeling Changes —Implementation of Section 505(o)(4) of the FD&C Act; http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM250783.pdf
[16] The Dividing Line Between the Role of the FDA and the Practice of Medicine: A Historical Review and Current Analysis; http://dash.harvard.edu/bitstream/handle/1/8846812/cberry.html?sequence=2
[17] FDA History Part II: The 1938 Food, Drug, and Cosmetic Act; http://www.fda.gov/AboutFDA/WhatWeDo/History/Origin/ucm054826.htm
[18] FDA History Part III: Drugs and Foods under the 1938 Act and Its Amendments; http://www.fda.gov/AboutFDA/WhatWeDo/History/Origin/ucm055118.htm

USCA5 3138

The FDCA (and its amendments) has been codified in Title 21 of the Code of Federal Regulations (CFR 21). The parts most relevant to the development and regulation of new drug products are contained within parts 200 through 369, particularly 201.57 for labeling, 312 for Investigational New Drug (IND) regulations, and 314 for New Drug Application (NDA) regulations. These parts of the CFR describe the responsibilities of drug sponsors and FDA in making safe and effective drugs available to the people of the United States. The regulations specify what information is to be submitted in an IND and in an NDA, and describe the required format and content of labeling in detail.

**FDA Review of an IND**

Before a company can legally begin US studies of a new drug in humans, it must submit an IND,[19] including the proposed detailed study plans (protocols), adequate chemistry and pharmacology/toxicology data, and any available prior human data to ensure the safety of the participants in the proposed studies. FDA must promptly review each proposed protocol and supporting data submitted to a new IND to determine whether or not the proposed study is reasonably safe to proceed. If not, FDA has 30 days after submission of the IND to notify the sponsor that the study is on Clinical Hold and may not proceed.[20,21,22]

The regulations at 21 CFR 314.50(d)(2) describe the information required from nonclinical (i.e., animal) pharmacology and toxicology studies, including 1) studies of the pharmacological actions of the drug in relation to its proposed use and/or to possible adverse effects; 2) toxicological studies related to the drug's intended clinical uses, including acute, subacute, and chronic toxicity, carcinogenicity, and local tolerance studies; 3) studies, as appropriate, of the effects on reproduction and on the developing fetus; and 4) studies of the absorption, distribution, metabolism, and excretion of the drug in animals. Some of these studies must be completed before the submission of an IND in order to evaluate safety of the first studies in humans. Additional animal studies are required to support longer durations of treatment and/or higher doses in humans.[23]

When FDA determines that animal studies show reasonable safety for administering a drug to humans for the first time and allows human studies to proceed, the first studies are generally small (phase I) studies in healthy volunteers using single low doses of the drug to test for safety and pharmacokinetics. In subsequent studies, the doses and durations of treatment are gradually increased. Each dose level must be supported by acceptable prior animal studies of similar exposure for similar durations.[24,25]

Phase II studies are generally conducted in order to provide preliminary evidence of a treatment effect and safety. The size of phase II studies is generally between 20 and 100, depending in part on the

---

[19] 21 CFR 312.20
[20] http://www.fda.gov/Drugs/DevelopmentApprovalProcess/HowDrugsareDevelopedandApproved/ApprovalApplications/InvestigationalNewDrugINDApplication/default.htm
[21] 21 CFR 312.20
[22] 21 CFR 312.23
[23] 21 CFR 312.22
[24] http://www.fda.gov/forpatients/approvals/drugs/ucm405622.htm
[25] 21 CFR 312.21

USCA5 3139

frequency of the condition in the population and the sensitivity of the selected endpoints to show an effect. Phase III studies are the large adequate and well-controlled (pivotal) studies of safety and effectiveness that are required to support marketing approval. These studies must enroll enough subjects, usually hundreds, to demonstrate statistical significance when compared to a placebo or other appropriate comparator.[26,27,28]

Throughout the drug development process, there is usually significant interaction between the sponsor and FDA to ensure that each study is appropriate to meet its objectives and that the necessary animal studies have been conducted and have demonstrated reasonable safety to support the proposed human dosing. FDA has the discretion to stop development of a drug at any time by imposing a "Clinical Hold" when significant safety issues arise or when adequate information has not been provided to ensure reasonable safety of the study participants.[29,30,31]

## FDA Review of an NDA [32]

When all necessary studies have been completed, the company must submit a New Drug Application (NDA) to FDA, including the study results and the supporting data, in order to gain marketing approval for the product. FDA reviews the data during a designated period of time, usually 8 to 12 months from the time of submission. To support approval of the NDA, the data must provide substantial evidence of efficacy, reasonable evidence of safety, and evidence that the benefits outweigh the risk of using the product. If the evidence is not adequate, FDA will not approve the product for marketing.[33,34]

FDA does not rely solely on information provided by the applicant, and does its own independent review of the information provided. The data submitted in an NDA are reviewed and analyzed by multi-disciplinary teams, consisting of chemists, biopharmaceutical experts, pharmacologists/toxicologists, medical officers, statisticians and other experts, as needed. Each reviewer provides expertise in the respective discipline, and multi-disciplinary evaluation of all issues contributes to the final decisions regarding product approval. Final approval decisions are largely driven by clinical perspective on safety and effectiveness provided by the medical officer, typically a medical doctor familiar with the indication and the use of similar medical products, bringing their medical training, education, and experience to bear on that process. The clinical perspective includes consideration of the severity, seriousness, prevalence, and public health significance of the disease state and availability and relative risks and benefits of alternative treatments in reaching a determination of reasonable safety and effectiveness.

[26] http://www.fda.gov/forpatients/approvals/drugs/ucm405622.htm
[27] http://www.fda.gov/Drugs/ResourcesForYou/Consumers/ucm143534.htm
[28] 21 CFR 312.21
[29] http://www.fda.gov/drugs/developmentapprovalprocess/howdrugsaredevelopedandapproved/approvalapplications/investigationalnewdrugapplication/ucm362746.htm
[30] http://www.fda.gov/drugs/developmentapprovalprocess/howdrugsaredevelopedandapproved/approvalapplications/investigationalnewdrugapplication/ucm362971.htm
[31] 21 CFR 312.22
[32] http://www.fda.gov/ForPatients/Approvals/Drugs/ucm405570.htm
[33] 21 C.F.R. § 314.125
[34] http://www.fda.gov/Drugs/DevelopmentApprovalProcess/HowDrugsareDevelopedandApproved/ApprovalApplications/NewDrugApplicationNDA/default.htm

USCA5 3140

NDA reviews are primarily the responsibility of the assigned primary reviewer in each discipline. The primary reviewers generally discuss with their team leaders any issues of concern, and such concerns may be further discussed up the chain of command to the deputy division director, the division director, and even the director of the relevant Office of Drug Evaluation or the CDER director, depending on the seriousness of the issue and the regulatory implications. Most disagreements or differences of opinion are resolved through such discussions without the need for further action. However, when agreement cannot be reached, the reviewer is responsible to document his/her opinions, rationale, and recommendations in the review. The reviewers present their own opinions, not necessarily the opinion of the FDA.

When a secondary reviewer at a higher level of regulatory experience and authority disagrees, then that person is obligated to set forth the differing opinion, and then an official at a higher level makes a decision. Ultimately, a decision for or against an NDA approval is usually made by the division director, except for new molecular entities (NMEs) such as rivaroxaban, which are approved by the director of the relevant Office of Drug Evaluation, or even the CDER director. Generally, approval decisions are made at the higher levels of management when the product is controversial or a new molecular entity, for a new indication, or a new class of drug, or if differences of opinion cannot be resolved at a lower level or may be precedent-setting.

Differences of opinion may arise between different disciplines, which may require decision-making at higher levels of authority. Each reviewer has the expertise in his/her discipline to identify issues of concern, and the degree of regulatory experience and authority increases at higher levels of review and management. The ultimate decisions on approval and labeling reflect multidisciplinary discussion and input of the entire review team. The role of the Cross-Discipline Team Leader (CDTL) is to review the entire approval package and to identify any significant outstanding issues in any discipline that may impact the approvability of the application. The CDTL works with the individual disciplines and management to resolve any differences of opinion and facilitates final decision-making regarding the impact of the issues on safety and effectiveness of the product and the ultimate approvability of the application.

In the case of Xarelto, there were two separate INDs and two separate NDAs, and they were reviewed by two different divisions in the Office of New Drugs. The Division of Medical Imaging and Hematology Drug Products was responsible for drugs that treat venous thromboembolism, and therefore NDA 22406 was handled by that division in the Office of Oncology Products. Products to treat atrial fibrillation and related cardiovascular indications were assigned to the Division of Cardiovascular and Renal Drug Products in the Office of Drug Evaluation I. Therefore, that division handled NDA 202439.

Because of the many considerations for these applications that are relevant to different FDA offices and divisions, there were a number of reviews and consultations from different groups including the following:

For NDA 22,406, which was approved by the Division of Medical Imaging and Hematology, reviews were provided by the Medical Officer (Clinical Review), Cross Discipline Team Leader, Statistician,

USCA5 3141

Pharmacology Toxicology Reviewer, Chemistry, Manufacturing and Controls, and Clinical Pharmacology. In addition, Consultations were requested from Office of Prescription Drug Promotion (OPDP), Division of Scientific Investigation (DSI), Office of Surveillance and Epidemiology (OSE)/Division of Epidemiology, OSE/Division of Medication Error Prevention and Analysis (DMEPA), Division of Risk Management, Pediatric and Maternal Health, Office of Oncology Drug Products.

For NDA 202,439, which was approved by the Division of Cardiovascular and Renal Products, reviews were provided by the Medical Officer (Clinical), Cross Discipline Team Leader Review, Deputy Director Decisional Review, Statistician, Clinical Pharmacology, Pharmacology/Toxicology, CMC, and Biopharmaceutics. In addition Consultations were requested from the Office of Prescription Drug Promotion, Office of Scientific Investigations, Office of Surveillance and Epidemiology (OSE)/Division of Medication Error Prevention and Analysis (DMEPA), Division of Risk Management, and Division of Hematology Products.

The issues brought forward by the plaintiffs in this case are generally those that have been previously considered in depth by FDA and resolved prior to the approval of the Xarelto NDAs.

### Drug Labeling Review and Approval

The sponsor is required to submit draft labeling in the NDA. All relevant expert disciplines at FDA review the draft for accuracy and adequacy, taking into account the labeling of similar, previously-approved products. FDA revises the labeling, as necessary, so that the proposed labeling accurately summarizes the clinical data and includes adequate directions for use and warnings about risks associated with use of the product as defined by FDA regulations. FDA communicates and discusses its revisions with the sponsor. Final authority on specific labeling text resides with FDA. If FDA determines that specific language is needed and the sponsor refuses, FDA will not approve the application. The labeling for the marketed product must be identical to that approved by FDA and, with certain exceptions, may not be changed without the approval of FDA.[35,36,37] In addition, when reviewing any supplemental application, FDA generally considers the entire label and may refuse to approve the application until requested changes to any portion of the label have been made.

As set forth in the regulations, the purpose of the label is to provide a summary of the essential scientific information needed to inform clinicians in their assessment of the risks and benefits of the product and to guide its safe and effective use.[38] Labeling is not intended to be a dispositive treatise of all possible data and information about a drug, and the Act permits labeling statements with respect to

---

[35] http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/LawsActsandRules/ucm084159.htm
[36] Federal Register / Vol. 71, No. 15 / Tuesday, January 24, 2006 / Rules and Regulations: 2006 Physician Labeling Rule, pp 3968-3969.
[37] 21 CFR 314.70
[38] 21 CFR 201.56(a)

USCA5 3142

safety only if they are supported by scientific evidence and are not false or misleading all as defined by the regulations.[39]

Labels are developed, maintained, and updated in collaboration between the sponsor and the FDA, which at all times maintains final authority over the labeling.[40] Newly acquired information may justify changes to the labeling as defined by 21 CFR 314.70(b).[41] A limited exception to the general requirement for prior approval of a labeling change is the Changes Being Effected (CBE) supplement described in 21 CFR 314.70 (c)(6). If there is no significant new safety information, a labeling change is generally not justified. The January 24, 2006 Final Rule and Notices on Content and Format of Labeling for Human Prescription Drug and Biological Products states that "the determination whether labeling revisions are necessary is, in the end, squarely and solely FDA's under the Act."[42,43,44]

## Postmarketing Safety Reporting

After approval of the NDA, both FDA and the sponsor have a responsibility to continue to monitor the safety profile of the product.[45] The FDA considers postmarketing safety information obtained through its own database, postmarketing studies and literature, evaluations by the Office of Surveillance and Epidemiology, along with information provided by the sponsor. The sponsor provides information to the FDA from multiple sources, including its spontaneous adverse event reporting, literature sources, and post-marketing safety and surveillance studies. Upon receipt of safety information from any source, FDA must weigh the risks, benefits, and available alternatives, and ultimately ensure that the benefits of the drug outweigh the risks.[46]

FDA regulations lay out requirements for pharmaceutical companies with regard to reporting postmarketing safety data. Periodic adverse drug event reports are required for all drugs. In some cases FDA may impose special requirements for postmarket pharmacovigilance.

## Background on Venous Thromboembolic Events and Atrial Fibrillation

According to the Center for Disease Control and Prevention, 60,000 to 100,000 Americans die of venous thromboembolism (VTE)/ pulmonary embolism (PE) every year. VTE occurs for the first time in about

---

[39] Federal Register 44, No. 124, 37443, June 26, 1979, Final Rule: Labeling and Prescription Drug Advertising; Content and Format for Labeling for Human Prescription Drugs

[40] Federal Register / Vol. 73, No. 11 / Wednesday, January 16, 2008 / Proposed Rules pp 2848-2854: Proposed Rule--Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics, and Medical Devices

[41] Federal Register / Vol. 73, No. 11 / Wednesday, January 16, 2008 / Proposed Rules pp 2848-2854: Proposed Rule--Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics, and Medical Devices

[42] Federal Register / Vol. 71, No. 15 / Tuesday, January 24, 2006 / Rules and Regulations; 2006 Physician Labeling Rule, p 3934.

[43] Federal Register / Vol. 73, No. 11 / Wednesday, January 16, 2008 pp 2848-2854: Proposed Rule--Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics, and Medical Devices

[44] Federal Register / Vol. 73, No. 164 / Wednesday, August 22, 2008 / pp 49603-49610: Final Rule--Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics, and Medical Devices

[45] 21 CFR 314.80

[46] http://www.fda.gov/Safety/SafetyofSpecificProducts/ucm180325.htm; Managing the Risks from Medical Product Use: Creating a Risk Management Framework

USCA5 3143

100 persons per 100,000 each year in the United States. The rate increases from less than 5 per 100,000 in children under age 15, to 500 per 100,000 (0.5%) at age 80. Some cases of PE are asymptomatic and diagnosed only at autopsy. Sudden death is the first symptom in about one quarter (25%) of people who have PE. [47,48]

More than 3 million Americans have atrial fibrillation (AF), a rapid and irregular heart rhythm in which the atria do not contract well, leading to reduced blood flow to the lungs and body. This may result in palpitations, shortness of breath, lightheadedness, weakness, and/or chest pain or no symptoms at all. However AF can lead to thrombus formation in the heart, and blood clots can travel to the brain and cause a stroke. There are a number of drugs and procedures intended to correct the abnormal rhythm. However, the main focus of treatment is to decrease the risk of fatal or disabling strokes by preventing the formation of blood clots. [49,50]

**Background on anticoagulation**

The main goals of treatment for DVT include prevention of PE, post-thrombotic syndrome, and recurrent thrombosis. Current standards of care call for anticoagulant medications to be started immediately unless there is a contraindication. In AF patients, anticoagulants have been known for years to reduce the rate of stroke by more than 50% but they may also prevent clotting in situations where it is needed, therefore leading to bleeding. [51]

Before 2010 the only available oral anticoagulant available was warfarin, approved in 1954 and marketed initially under the brand name Coumadin. It was the only drug approved for the prevention of stroke in patients with AF. However, warfarin must be carefully monitored with periodic blood tests and dosage adjustments. If the effect is too small, it will fail to prevent strokes, and if it is too high, it will cause excess bleeding. [52]

Since 2006, the Coumadin (warfarin) labeling has included a Black Box warning for Bleeding Risk. Factors that increase the risk of bleeding include INR >4.0, age >65, highly variable INRs, history of gastrointestinal bleeding, hypertension, cerebrovascular disease, serious heart disease, anemia, malignancy trauma, renal insufficiency, concomitant drugs, and long duration of warfarin therapy. [53]

---

[47] http://www.cdc.gov/ncbddd/dvt/data.html CDC 24/7: Venous Thromboembolism (Blood Clots)/Data and Statistics, Division of Blood Disorders National Center on Mirth Defects and Developmental Disabilities, CDC, updated June 22, 2015

[48] Richard H. White, The Epidemiology of Venous Thromboembolism, Circulation, 2003; 107:I-4—I-8.

[49] Ellis F. Unger, MD, FDA, Atrial Fibrillation, Oral Anticoagulant Drugs, and their Reversal Agents, http://www.fda.gov/drugs/newsevents/ucm467203.htm, October 16, 2015.

[50] Dr. Ellis Unger is the Director of the Office of Drug Evaluation I (ODE I), in the Office of New Drugs (OND)/Center for Drug Development and Research (CDER)/ FDA. ODE I is the office that oversees the Division of Cardiovascular and Renal Products (DCRP), which reviewed the NDA for Xarelto in the treatment of AF.

[51] Ellis F. Unger, MD, FDA, Atrial Fibrillation, Oral Anticoagulant Drugs, and their Reversal Agents, http://www.fda.gov/drugs/newsevents/ucm467203.htm, October 16, 2015.

[52] Ellis F. Unger, MD, FDA, Atrial Fibrillation, Oral Anticoagulant Drugs, and their Reversal Agents, http://www.fda.gov/drugs/newsevents/ucm467203.htm, October 16, 2015.

[53] Coumadin Label, Britol-Myers Squibb Company April, 2006

11

USCA5 3144

Changes in diet or other medications can have a significant effect on the anticoagulant effect of warfarin. Accordingly, the dose of warfarin must be individualized according to the patient's PT/INR response, starting with daily doses of 2 to 5 mg/day. Daily testing of PT/INR is needed for 3-4 days until the results stabilize, and small adjustments are needed to reach the target range of INR at 2.0 to 3.0. Once the INR has stabilized, continued monitoring at intervals of 1 to 4 weeks is needed to maintain an optimal dose.[54] Warfarin was the only oral anticoagulation choice available for over 50 years before 2010.

Since 2010 FDA has approved four new oral anticoagulant drugs, Xarelto, Pradaxa (dabigatran), Eliquis (apixaban), and Savaysa (edoxaban). All four are "blood thinners", like warfarin, that reduce the risk of stroke related to AF but can also cause bleeding. These products were approved based on clinical trials of more than 50,000 patients worldwide, and FDA concluded that all of them were either equivalent to or more effective than warfarin in preventing strokes, with an acceptable risk of bleeding. They were all found to be substantially less likely than warfarin to cause a particular kind of bleeding into the brain that leads to a hemorrhagic stroke, which is different from strokes caused by clots that go to the brain in patients with AF.[55]

Xarelto and the other three new oral anticoagulant drugs have advantages over warfarin, including fewer interactions with food and other drugs, rapid onset of action, and freedom from the need for blood testing.[56] The terminal elimination half-life of Xarelto is 5-9 hours in healthy subjects age 20-45 years. The terminal elimination half-life in elderly subjects aged 60 to 76 years is 11 to 13 hours.[57] None of the NOACs have a black box warning for bleeding risk (except for risks of spinal or epidural hematoma), and none of them are recommended for routine monitoring of therapeutic effect. It would not be appropriate to add a recommendation for monitoring to the labeling when it was not used during the clinical trials.

Most of the bleeding associated with anticoagulants is not life-threatening. Fatal bleeding is actually quite rare, and FDA has concluded that for all of the anticoagulants used in patients with AF, the benefit of preventing strokes outweighs the increased risk of bleeding. Furthermore, most of the bleeding that occurs with these medications does not cause the kind of permanent disability or death that strokes cause.[58]

Dr Ellis Unger, Director of the Office of Drug Evaluation I, the office that oversees the Division of Cardiovascular and Renal Products, stated in an October 2015 article posted on the FDA website that FDA has considered whether it should allow marketing of anticoagulant drugs without a reversal agent, and the answer is yes. He stated that all of these products were approved based on large clinical trials in

[54] Coumadin Label, Britol-Myers Squibb Company April, 2006
[55] Ellis F. Unger, MD, FDA, Atrial Fibrillation, Oral Anticoagulant Drugs, and their Reversal Agents, http://www.fda.gov/drugs/newsevents/ucm467203.htm, October 16, 2015.
[56] Ellis F. Unger, MD, FDA, Atrial Fibrillation, Oral Anticoagulant Drugs, and their Reversal Agents, http://www.fda.gov/drugs/newsevents/ucm467203.htm, October 16, 2015.
[57] Xarelto label, revised August 8, 2016.
[58] Ellis F. Unger, MD, FDA, Atrial Fibrillation, Oral Anticoagulant Drugs, and their Reversal Agents, http://www.fda.gov/drugs/newsevents/ucm467203.htm, October 16, 2015.

USCA5 3145

which the rates of strokes and bleeding were carefully monitored and compared, and they caused no more bleeding than warfarin. They were at least equivalent to warfarin in preventing strokes and other important blood clots. In addition, all four of these new drugs caused less intra-cranial hemorrhage than warfarin.[59]

Xarelto is an oral anticoagulant, Factor Xa inhibitor, originally approved on July 7, 2011 under NDA 22406 for the prophylaxis of deep vein thrombosis (DVT) which may lead to life-threatening pulmonary embolism (PE) in patients undergoing knee or hip replacement surgery. It was also approved on November 4, 2011 under NDA 202439 to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation (AF). On November 2, 2012 the Division of Hematology Products approved supplemental applications S-001, S-002, and S-003 to NDA 22406, providing for the treatment of DVT and PE, and reduction of the risk of recurrent DVT and PE.

**Xarelto Product Development and Pre-Approval Regulatory Activities**

The following is intended not as a comprehensive history of all of the drug development activities and studies conducted but a broad overview of some of the most basic and important studies relevant to the product approval.

**<u>Prevention of VTE in Patients undergoing Hip Replacement or Knee Replacement Surgery</u>**

---

[59] Ellis F. Unger, MD, FDA, Atrial Fibrillation, Oral Anticoagulant Drugs, and their Reversal Agents, http://www.fda.gov/drugs/newsevents/ucm467203.htm, October 16, 2015.

USCA5 3146

IND 64,892

Bayer submitted IND 64,892 for rivaroxaban (Xarelto) on May 29, 2002 for the treatment and secondary prophylaxis of VTE. All of the clinical trials for NDA 22-406 were conducted under this IND for prophylaxis of VTE in patients undergoing hip or knee replacement surgery.

Bayer also met with the European Agency for the Evaluation of Medicinal Products (EMEA) on July 8, 2003 and with Health Canada (Pre-CTA meeting) on July 28, 2003 to discuss its plans for phase II and III studies and eventual marketing applications for Xarelto.[60,61]

Bayer submitted a request to the FDA for an End of Phase 2 (EOP2) meeting for IND 64,892, which was scheduled for July 5, 2005. On June 2, 2005, Bayer submitted a briefing package with its plans for oral twice daily dosing in patients undergoing hip or knee replacement. The briefing package included a review of the non-clinical and phase II clinical data supporting the proposed phase III program. The stated aim of the development program was to produce a safe and effective anticoagulant treatment with a fixed oral dose of drug that needs no routine monitoring of coagulation parameters.[62]

Non-clinical Data

Early laboratory testing of Xarelto showed that it is a potent inhibitor of factor Xa (FXa), a part of the cascade of human blood clotting factors.[63] Xarelto consistently causes potent anticoagulation and antithrombotic effects in vitro and in thrombosis models in a number of animal species at low doses, e.g., 0.1 mg/kg ED50 in a rat venous stasis model.[64]

Xarelto was tested in live rats and beagle dogs and showed no potential adverse effects regarding cardiovascular, respiratory, CNS, and renal function, lipid metabolism, hematology, blood glucose, and gastrointestinal motility. Testing in various animal tissues in vitro also found no evidence of a risk for arrhythmia or any other clinically relevant adverse effects.[65]

The highest single doses that could be technically administered in rats and mice (500 mg/kg orally (PO), 25 mg/kg intravenously (IV)) did not cause any deaths. Repeat-dose toxicity studies were conducted in mice, rats, and dogs (up to 52 weeks). A full program of reproductive toxicity studies was conducted, showing an increase in common malformations in doses associated with maternal toxicity but no evidence for a primary teratogenic potential. In addition, genotoxicity testing showed no evidence for genotoxic potential.[66]

Phase I Studies in humans (26 studies, 597 subjects)

---

[60] IND 64,892s-283, June 2, 2005, EOP2 briefing package, pp 336-343.
[61] IND 64,892s-283, June 2, 2005, EOP2 briefing package, pp 328-335.
[62] IND 64,892s-283, June 2, 2005, EOP2 briefing package, p.4.
[63] IND 64,892s-283, June 2, 2005, EOP2 briefing package
[64] IND 64,892s-283, June 2, 2005, EOP2 briefing package
[65] IND 64,892s-283, June 2, 2005, EOP2 briefing package
[66] IND 64,892s-283, June 2, 2005, EOP2 briefing package

USCA5 3147

There were 4 basic Phase I studies of Xarelto:

Study 10842 (January 30, 2002 to February 10, 2003) was a single-dose escalation trial of 1.25, 5, 10, 15, 20, 30, 40, 60, and 80 mg with a total of 98 subjects (6 or 8 subjects at each dose). This study evaluated basic safety, pharmacokinetics (PK) and pharmacodynamics (PD) of single doses in healthy volunteers, and it showed no safety signals up to the highest tested dose of 80 mg.

Study 10847 was a multiple-dose escalation trial of 5 mg daily (QD), 5 mg twice daily (BID), 5 mg three times daily (TID), 10 mg BID, 20 mg BID, and 30 mg BID with 7 subjects per dosage group. It was intended to further characterize the basic safety, PK and PD with multiple dosing over 8 days.

Study 10846, a food-effect study in 12 healthy males dosed with 2x5 mg tablets.

Study 10989, a food-effect and formulation-comparison study comparing a single 20 mg tablet with 4x5 mg.

The extended Phase I program included the following:

 7 studies in special populations to study effects of age, gender, weight and ethnicity

 9 studies of PK/PD interactions with other drugs (midazolam, ketoconazole, digoxin, ranitidine, MAALOX, enoxaparin, aspirin, naproxen, and clopidogrel)

 6 special purpose studies of metabolism and absorption, effect on QT prolongation, thrombin generation, and safety and tolerability in patients with renal or hepatic impairment.

In phase I trials, Xarelto was well tolerated at all doses tested, and no drug related serious adverse events or death were reported in any of the trials.  In particular, no bleeding events were reported at any dose.[67]

Phase II Studies (642 patients in phase IIa and 2466 in IIb)

In its EOP2 briefing package submitted June 2, 2005, Bayer discussed the rationale for the use of patients undergoing total hip replacement in its proof of concept study: This intervention is a particularly well benchmarked procedure.  It is an elective procedure, patients are generally stable and it results in high enough event rates, both in terms of thrombotic events and bleeding events, which allows characterizing both the efficacy and safety of new anticoagulants. The majority of patients experience bleeding, two thirds of them receive blood transfusions, and the large number of non-major bleeding events provides a sensitive measure for dose-finding without compromising patients' safety.  In terms of efficacy, even with the recommended preventive measures, still 15-30% of all patients experience an asymptomatic DVT.  Performing a bilateral mandatory venogram early enough in the treatment course (5-9 days after surgery) allows for detection of small and clinically not yet relevant thrombi.  These thrombi can easily be treated without late sequelae for the patient. This model had

---

[67] June 24, 2003, Bayer Background package for July 25, 2003 meeting IND 64,892 S-040, p.10.

USCA5 3148

been used successfully many times in the recent history of development of new anticoagulants and has supported approval of e.g., fondaparinux.[68]

Study 10942 was a phase IIa dose-escalating proof of concept and dose-finding trial, studying twice daily dosing in 642 patients in Europe using an active comparator (enoxaparin) control. This study evaluated safety, tolerability, and efficacy of Xarelto for VTE prevention in patients undergoing elective THR. Doses of 2.5, 5, 10, 20, and 30 mg BID and 30 mg QD were compared to enoxaparin 40 mg SC once daily for 8 +/- 2 days, starting at 6-8 hours after wound closure. No significant dose trend was observed in efficacy, and there was no significant difference between any Xarelto dose and enoxaparin. However, there was a significant dose-related increase in major bleeding events at doses of 30 mg QD and higher, while there were no major bleeding events in the enoxaparin group.[69]

Study 10944 (ODIXa-HIP2) was a phase IIb dose-ranging study in Europe using a double-blind, double dummy, parallel group design, similar in dosing, comparator, and endpoints to Study 10942 with BID dosing of 2.5, 5, 10, 20, and 30 mg. Enoxaparin was administered at a dose of 40 mg SC once daily, starting the evening before surgery in the European study. A total of 726 subjects were enrolled between January 12 and August 10, 2004. Efficacy was similar between the enoxaparin comparator and the Xarelto arms with no statistical evidence of a dose-response trend. The lowest number of events occurred in the 5 and 10 mg BID Xarelto groups. A dose-related trend in bleeding rates was observed in the Xarelto groups, increasing from 0.8% to 5.4% from the lowest to highest groups, respectively, and the bleeding rate for Enoxaparin was 1.5%.[70]

Study 10945 (ODIXa-KNEE) was a similar dose-ranging study conducted in the US and Canada in patients undergoing elective knee replacement, using the same doses as in Studies 10942 and 10944 in a BID regimen. The enoxaparin dose was 30 mg BID, starting 12-24 hours after surgery. This study enrolled 709 patients 39-92 years of age between February and November 2004. The incidence of the primary efficacy endpoint ranged from 23.3% in the 10 mg BID group to 40.4% in the 5 mg BID group with no significant dose trend. The incidence of the primary endpoint was 44.3% in the enoxaparin control group. The incidence of distal DVT was lower in the Xarelto groups than in the enoxaparin group. The incidence of major post-operative bleeding events ranged from 0% with the 5 mg BID dose to 7.5% with the 30 mg BID group, with a statistically significant dose trend, compared to 1.9% in the enoxaparin group.[71]

Study 11527 (ODIXa-OD.HIP) was a dose ranging study in Europe evaluating prevention of VTE in patients undergoing elective total hip replacement that tested once-daily doses of 5, 10, 20, and 30 mg compared to enoxaparin 40 mg QD. This study was ongoing at the time of the EOP2 meeting.[72]

Other Phase II Studies were ongoing at the time of the EOP2 meeting:

---

[68] IND 64,892s-283, June 2, 2005, EOP2 briefing package, p. 152
[69] IND 64,892s-283, June 2, 2005, EOP2 briefing package
[70] IND 64,892s-283, June 2, 2005, EOP2 briefing package
[71] IND 64,892s-283, June 2, 2005, EOP2 briefing package
[72] IND 64,892s-283, June 2, 2005, EOP2 briefing package

USCA5 3149

Study 11223 (ODIXa-DVT) evaluated the treatment of acute symptomatic proximal DVT confirmed by sonography, comparing rivaroxaban at doses of 10, 20, or 30 mg BID or 40 mg QD for 3 months with open label active comparator drug, i.e. the sequence of enoxaparin followed by warfarin for 3 months, using an endpoint of thrombus size after 3 weeks of treatment, assessed by compression ultrasound and perfusion lung scan. The safety endpoint was the incidence of major bleeding events. The secondary endpoint was the cumulative incidence of recurrent VTE during the three months treatment period.[73]

Study 11528 (EINSTEIN) was similar to 11223 but used rivaroxaban doses of 20, 30, or 40 mg once daily and an efficacy endpoint of the cumulative incidence of recurrent VTE during the three months treatment period.[74]

In January 2006, results of Study 11527 became available. The study enrolled 877 subjects (133 to 160 per treatment arm) between November 2004 and July 2005. A dose range of 5 to 40 mg QD was found to be effective in preventing VTE in adults undergoing elective THR compared with enoxaparin. All Xarelto treatment groups had substantially lower rates of VTE and PE than the enoxaparin group. No trend for a dose-response relationship was detected, primarily because of the good efficacy observed in the lower dose groups, in which incidence rates were substantially lower than anticipated for sample size determination. In the PP population the VTE incidence rates ranged from 14.9% in the 5 mg QD group to 6.4% in the 40 mg QD group. The rate in the enoxaparin group was 25.2%. The major VTE incidence rates were 0.9 to 2.7% in the Xarelto groups and 2.8% in the enoxaparin group. The lowest rates were at doses of 20 and 40 mg QD (0.9 and 1.1%), while the incidence rate with 5 mg was 8.5%. The major post-operative bleeding events increased with increasing Xarelto doses in a clear dose-response. Major bleeding rates were similar for Xarelto doses of 5 and 10 mg QD (8 and 6%, respectively) and enoxaparin(9%). Increasing rates of 10%, 13%, and 19% were reported with Xarelto doses of 20, 30, and 40 mg QD, respectively. There were no fatal bleeds or bleeding in critical organs, and no clinically significant bleeding that could not be treated.[75]

Pivotal Phase III Program

Based on the results of the phase I and II studies, three pivotal Phase III studies of Xarelto in the prevention of VTE following hip or knee replacement were proposed, using a dose of 5 mg BID without any dose adjustments. All three pivotal trials were to be conducted globally using enoxaparin as the comparator and Bayer sought agreement of the Health Authorities in Canada and Europe for use of the proposed 40 mg QD regimen.

On November 18, 2005, a Type C meeting was held with the FDA Division of Medical Imaging and Hematology Products to discuss the Phase III program for Xarelto for prophylaxis of VTE following the FDA responses to questions in the briefing document. Based on the results of Study 11527, a 10 mg QD dose was proposed. FDA responded that the 10 mg QD dose is acceptable for study in the Phase 3 trials. FDA noted, however, if this was the only dose studied in the efficacy studies, information may be too

---

[73] IND 64,892s-283, June 2, 2005, EOP2 briefing package
[74] IND 64,892s-283, June 2, 2005, EOP2 briefing package
[75] XARELTO_BHCP_00006068

USCA5 3150

limited to fully elucidate dose response (safety and efficacy) of Xarelto in the proposed indications and may present challenges for approval is the results were unexpected. While the Division agreed to using 10 mg QD as the only dose in the Phase III development in VTE prevention, they recommended that an additional lower dose would provide a broader perspective to provide a clearer path to approval. FDA also raised some caution about use of the 40 mg dose of enoxaparin, as it has not been shown to be non-inferior to the enoxaparin 30 mg bid dosing regimen for the TKR indication.[76]

FDA requested long term safety data on 2000 patients treated for 6 months and 1000 for one year at the time of NDA submission. Superiority in the TKR study was restated as the basis for approval. FDA voiced concern about off-label long term use of the product and stated that the safety data must be adequate to support such use. The meeting minutes state that "FDA will intensely focus on the risk/benefit of the drug. The risk/benefit needs to be persuasively and clearly established."[77]

**NDA 22-406** for Prevention of VTE in patients undergoing total hip replacement or total knee replaement

Janssen submitted the NDA application to FDA on July 22, 2008 and it was received by FDA on July 28, 2008.[78] In August 2008, Bayer transferred regulatory responsibility for IND 64892 to Janssen.[79] FDA accepted NDA 22-406 for filing on October 1, 2008. The pivotal (phase III) studies in support of NDA 22-406 were the following:

RECORD 1 (Protocol 11354): Regulation of Coagulation in Orthopedic Surgery to prevent DVT and PE; was a non-inferiority trial evaluating prevention of VTE in patients undergoing elective total hip replacement (THR), using a dose of 5 mg BID given for 6 weeks, starting 6-8 hours after surgery, compared to enoxaparin 40 mg QD for 6 weeks, starting pre-operatively. The primary endpoint was major VTE, confirmed by mandatory bilateral venography at the end of treatment.

RECORD 2 (Protocol 11357): a similar study intended to bridge short-term and extended prevention in patients undergoing THR. Based on mandatory venography after 35 days of treatment, the trial was planned to show superiority of Xarelto given for 35 days over enoxaparin administered for 10 days followed by placebo.

RECORD 3 (Protocol 11356): a similar study comparing short term (10-14 days) administration of Xarelto vs. enoxaparin in patients undergoing total knee replacement (TKR), using a hierarchical testing procedure to confirm non-inferiority and then testing for superiority using the same endpoint of total VTE.

RECORD4 (Protocol 11355): controlled double-blind randomized study in the prevention of VTE in patients undergoing elective TKR.

---

[76] December 7, 2005, Bayer internal Meeting Minutes for November 18, 2005 Type C Meeting
[77] December 7, 2005, Bayer internal Meeting Minutes for November 18, 2005 Type C Meeting
[78] Susan D. Thompson, MD, Compliance review, May 24, 2011
[79] XARELTO_BHCP_00001901; XARELTO_JANSSEN_14297829; XARELTO_BHCP_00001906

18

USCA5 3151

The FDA Clinical Review of NDA 22406 was completed by Min Lu, MD, MPH on March 30, 2009.

All four studies used the same dose of Xarelto, 10 mg PO QD, starting at least 6 to 8 hours after surgery. Enoxaparin was the active control in all studies. It was dosed as 40 mg once daily starting 12 hours pre-operatively in RECORD 1-3 and 30 mg twice daily starting 12 to 24 hours postoperatively in RECORD 4. The treatment durations were similar in all except RECORD 2, in which rivaroxaban was administered for 35 days, and enoxaparin for 13 days. 40 mg once daily dose of enoxaparin in RECORD 3 was not a US approved dosing regimen of enoxaparin for prophylaxis of DVT in patients undergoing TKR.[80]

Altogether, 12,729 patients were randomized in the four studies, 6356 in the Xarelto group and 6373 in the enoxaparin group. The modified intent-to-treat (MITT) analysis included 8512 (67%) patients, 4248 receiving Xarelto, and 4264 receiving enoxaparin. About 30-39% of randomized patients were excluded from the MITT population mainly due to no adequate assessment of DVT. The primary endpoint in all 4 studies was a composite of total VTE, including proximal or distal DVT, non-fatal PE, or death from all causes at the end of treatment. [81]

**VTE rates in patients undergoing total hip replacement[82]**

|  | Xarelto | Enoxaparin | Non-inferiority/Superiority |
|---|---|---|---|
| RECORD 1 (35 days) N=4433 | 1.1% (35 days) n=2209 | 3.7% (35 days) n=2224 | 95% CI (3.55%, -1.51%); p<0.001 |
| RECORD 2 N=2257 | 2.0% (35 days) n=1228 | 9.3% (13 days) n=1229 | |

**VTE rates in patients undergoing total knee replacement[83]**

|  | Xarelto | Enoxaparin | Non-inferiority/Superiority |
|---|---|---|---|
| RECORD 3 N=2459 | 9.6% n=1220 | 18.9% n=1239 | |
| RECORD 4 N=3034 | 6.9% n=1526 | 10.1% n=1508 | 95% CI (-5.25%, -0.17%); p<0.05 |

<u>Secondary Endpoints</u>

Major VTE rate (VTE-related death, non-fatal PE, or proximal DVT) [84]

|  | Xarelto | Enoxaparin | |
|---|---|---|---|
| RECORD 1 | 0.2% | 2.0% | P<0.05 |
| RECORD 2 | 0.6% (35 days) | 5.1% (13 days) | |

[80] Min Lu, M.D., M.P.H., NDA 22-406 Clinical Review, March 30, 2009
[81] Min Lu, M.D., M.P.H., NDA 22-406 Clinical Review, March 30, 2009
[82] Min Lu, M.D., M.P.H., NDA 22-406 Clinical Review, March 30, 2009
[83] Min Lu, M.D., M.P.H., NDA 22-406 Clinical Review, March 30, 2009
[84] Min Lu, M.D., M.P.H., NDA 22-406 Clinical Review, March 30, 2009

USCA5 3152

| | | | |
|---|---|---|---|
| RECORD 3 | 1.0% | 2.6% | |
| RECORD 4 | 1.2% | 2.0% | NS |

Symptomatic VTE (Safety population n=12,383 )[85]

| | Xarelto | Enoxaparin | |
|---|---|---|---|
| RECORD 1 | 0.27% | 0.49% | |
| RECORD 2 | 0.08% (35 days) | 0.33% (13 days) | |
| RECORD 2 | 0.16% | Placebo 0.90% | P<0.05 |
| RECORD 3 | 0.66% | 1.94% | P<0.05 |
| RECORD 4 | 0.72% | 1.19% | |

The medical reviewer concluded that Xarelto demonstrates efficacy in prophylaxis of total VTE in patients undergoing elective hip or knee replacement surgery with an absolute risk reduction of 2.6% for THR and 3.2% for TKR, compared to the currently available enoxaparin product with similar treatment duration. The treatment difference was mostly due to asymptomatic DVT. There was no significant difference for symptomatic DVT. [86]

A total of 10,600 patients had been exposed to Xarelto in the completed clinical studies, including 6183 from phase III RECORD studies, 2232 from phase II VTE prophylaxis trials, and 1117 from phase I trials. In these studies, the duration of exposure was $\leq$ 12 days for 6095 (57.5%) exposed patients, 28-35 days for 3622(34.2%), 36 days to 12 weeks for 203 (2%), and at least 12 weeks for 635 (6%). At that time, there were 5 ongoing phase III trials, including 4 long-term studies, 2 in patients with AF for prevention of stroke (treatment for up to 4 years) and 2 in patients with VTE for prevention of recurrent VTE (treatment for 3 to 12 months). [87]

Safety findings in the phase III studies included the following:

| | Xarelto | Enoxaparin |
|---|---|---|
| Death | 13 (0.2%) | 25 (0.4%) |
| Serious treatment-emergent AEs | 6% | 8.5% |
| AEs leading to discontinuation | 3.7% | 4.7% |
| $\geq$1 treatment-emergent AE | 68% | 69% |
| Major bleeding | 24 (0.39%) | 13 (0.21%) |
| Fatal bleeding | 2(1 not treated) | 0 |
| Bleeding requiring re-operation | 12 (0.19%) | 7 (0.11%) |
| Extrasurgical site bleed with hgb decr > 2g/dL or >2 units transfused | 8 (0.13%) | 1 (0.02%) |
| Major bleeding--TKR | 0.62% | 0.36% |
| Major bleeding--THR | 0.20% | 0.09% |

---

[85] Min Lu, M.D., M.P.H., NDA 22-406 Clinical Review, March 30, 2009
[86] Min Lu, M.D., M.P.H., NDA 22-406 Clinical Review, March 30, 2009
[87] Min Lu, M.D., M.P.H., NDA 22-406 Clinical Review, March 30, 2009

USCA5 3153

| Clinically relevant non-major bleed | 177 (2.8%) | 145 (2.34%) |
| Macroscopic hematuria | 0.45% | 0.13% |
| Rectal bleeding | 0.32% | 0.1% |
| Nose bleeding | 0.13% | 0.06% |
| Vaginal bleeding | 0.13% | 0.03% |
| Overall incidence of bleeding | 7.0% | 6.5% |

While the nominal incidence of bleeding was higher in the Xarelto group, it is notable that in both groups the incidence of major bleeding was well below 1%, and the overall incidence of bleeding was 7% for Xarelto and 6.5% for Enoxaparin. [88]

The FDA Cardiovascular and Renal Drugs Advisory Committee Meeting met on March 19, 2009 to discuss this NDA. The Committee voted 15 (yes) to 2(no) that the available data demonstrate a favorable risk-benefit profile for Xarelto in the prophylaxis of VTE in patients undergoing hip or knee replacement surgery. With regard to whether a lower strength than 10 mg should be available for special populations based on PK/PD studies, the committee voted 5 (yes) to 9 (no). Many committee members expressed that there were not enough data to support a lower dose requirement. [89]

FDA met with Janssen on April 1, 2009. FDA stated that its goal would be to match exposure. However, it would take action based on the 10 mg dose of Xarelto. In the Division Director Summary Review dated May 12, 2009, Dr. Dwaine Rieves stated, "I concur with the conclusions reached by the clinical pharmacology/biopharmaceutics reviewer that there are no outstanding clinical pharmacology issues that preclude approval. The reviewer provides some recommendations for labeling as well as a recommendation for a post-marketing requirement to develop a 5 mg tablet (or scored 10 mg tablet) for use among patients at risk for clinically relevant changes in rivaroxaban exposure."[90]

A regulatory briefing for CDER management was held on May 1, 2009 supporting the review team's decision to develop a Complete Review letter.[91,92] The panel asked why follow-up and monitoring of INRs was not necessary. The division responded that the sponsor did not propose a routine monitoring plan and did not do routine monitoring in the studies. Also, it is difficult to monitor anti-Factor Xa levels because there is not an accepted standard for the test between institutions. Clinical Pharmacology noted that it had reviewed safety and efficacy data from phase II dose response studies and found a shallow dose response curve for efficacy but a steep dose-response in regard to bleeding, supporting selection of a 10 mg dose, except for certain special populations at risk for increased exposure (e.g., moderate-severe hepatic impairment, strong CYP3A4/P-gp inhibitor use). The Division added that body weight and other factors such as age, sex, and ethnicity were studied and did not show any clinically relevant exposure differences.

---

[88] Min Lu, M.D., M.P.H., NDA 22-406 Clinical Review, March 30, 2009
[89] AC meeting March 19, 2009
[90] Dwaine Rieves, MD, NDA 22-406 Division Director Summary Review, Division of Medical Imaging and Hematology Drug Products, May 12, 2009
[91] Dwaine Rieves, MD, NDA 22-406 Division Director Summary Review, Division of Medical Imaging and Hematology Drug Products, May 12, 2009
[92] Memorandum of Meeting Minutes, May 1, 2009 Regulatory Briefing minutes, John Jenkins, chair.

USCA5 3154

FDA sent a complete response (CR) letter to Janssen on May 27, 2009 stating that it could not approve the application in its present form due to unresolved data reliability issues in the four RECORD studies, a potential signal for severe liver toxicity in the ongoing ROCKET studies in patients with AF, inadequate information to support product quality, and the need for a lower strength formulation for dose modification in certain special populations.[93]

NDA 22-406 was resubmitted as supplement 059 on December 23, 2010, and it was found acceptable for approval on July 1, 2011. The submission provided a full response to the CR letter. It included detailed information regarding the auditing and monitoring procedures and findings for the RECORD studies, the Bayer QA audit plans, SOPs, audit methodology, results and analyses, and corrective actions.[94]

In her background summary for the Division of Scientific Investigations ("DSI") Compliance Review dated May 24, 2011, Dr. Susan D. Thompson provided the following information:

Patients undergoing major orthopedic surgery, including total hip replacement (THR) and total knee replacement (TKR) surgeries, are a group that is at a particularly high risk for venous thromboembolism (VTE), which includes DVT and PE. Without prophylaxis, the incidence of objectively confirmed total DVT based on older studies is approximately 40 to 60% following THR or TKR, with a 10 -30% incidence of proximal DVT. The most appropriate strategy to reduce the incidence of VTE is prophylaxis for all patients undergoing THR or TKR. Current therapeutic agents available for anticoagulant prophylaxis include low molecular weight heparins (LMWHs), fondaparinux, and adjusted -dose vitamin K antagonists such as warfarin. The duration of therapy is at least 10 days for both THR and TKR; for patients undergoing THR, extended prophylaxis to up to 35 days after surgery is recommended. LMWHs and fondaparinux are administered subcutaneously, which may be associated with pain and bruising as well as poor compliance. Warfarin is the only available oral anticoagulant for VTE prophylaxis after major orthopedic surgery in the U.S. However, warfarin has a narrow therapeutic window, exhibits variable dose response, has many dietary and medicinal interactions, requires dose adjustment, and has a slow onset of action. Rivaroxaban offers an alternative oral prophylactic therapy for VTE.[95]

Dr. Thompson summarized the original FDA inspection findings and the information provided in response to FDA's queries about the sponsor's QA program and oversight of CROs and additional third party audits. After reviewing the responses, DSI concluded that Janssen had adequately responded to its requests. In general, review of the audits revealed that appropriate corrective action plans were generated and implemented.[96]

With respect to DSI's assessment of the reliability of RECORD 1-3, for each study, DSI recommended that the data from RECORD 1-3 "can be used in support of the NDA" and found, "despite some identified

---

[93] NDA 22-406 Complete Response Letter
[94] Kathy M. Robie Suh, M.D., Ph.D., Medical Team Leader, Hematology, Division of Hematology Drug Products, NDA 22-406 Medical Team Leader Secondary Clinical Review, June 13, 2011
[95] Susan D. Thompson, M.D., Medical Officer, Division of Scientific Investigations, Compliance Review May 24, 2011
[96] Susan D. Thompson, M.D., Medical Officer, Division of Scientific Investigations, Compliance Review May 24, 2011

USCA5 3155

deficits in study conduct, the deficiencies do not appear pervasive enough to cast doubt on the overall reliability of RECORD [1-3] study data."[97]

DSI recommended that data from RECORD 4 and certain sites from RECORD 1, 2, and 3 were not considered reliable and should not be used to support the application. These sites accounted for only 4.8%, 2.3%, and 1.1% of total enrolled patients in RECORD 1, 2, and 3, respectively. The modified results after exclusion of these sites continued to demonstrate efficacy of Xarelto in reducing VTE events in patients undergoing THR or TKR surgery.[98]

Primary Efficacy Endpoint Analysis Results (Total VTE) Excluding Unreliable Sites[99]

|  | Xarelto % (n/N) | Enoxaparin % (n/N) | Absolute Risk Reduction | P-value |
|---|---|---|---|---|
| RECORD 1 | 1.1% (17/1513) | 3.9% (57/1473) | 2.8% | p<0.0001 |
| RECORD 2 | 2.1% (17/823) | 8.4% (70/831) | 6.3% | p<0.0001 |
| RECORD 3 | 9.7% (79/813) | 18.8% (164/871) | 9.1% | p<0.0001 |
| RECORD 4 | 7.1% (53/742) | 10.8% (79/731) | 3.7% | P=0.0174 |

The resubmission included information on liver safety, safety findings from post-marketing exposures outside of the US, the protocol and safety findings from an observational post marketing study XAMOS, the final study report for ATLAS ACS TIMI 46 with longer-term data, and the requested CMC information. The sponsor also submitted a proposal to conduct a Phase 1 drug interaction study (RIVAROXACS1001) in patients with mild or moderate renal impairment receiving concomitant erythromycin, a moderate CYP3A4/moderate P-gp inhibitor, to address the Clinical Pharmacology recommendation for a lower strength formulation for use in dose modification in certain populations.[100]

A detailed review of the potential risk for serious liver toxicity in 5 trials of Xarelto in doses of 10 to 30 mg daily for chronic use (>35 days to up to 4 years) concluded that the liver toxicity profile is comparable in the Xarelto and control groups.[101]

There was no advisory committee meeting for Xarelto during the resubmission cycle.

An approval letter for NDA 22406, Xarelto 10 mg tablets for the prophylaxis of deep vein thrombosis and pulmonary embolism in patients undergoing hip replacement surgery or knee replacement surgery was issued on July 1, 2011 by Dr. Richard Pazdur, Director of the Office of Oncology Products. He also wrote

---

[97] Susan D. Thompson, M.D., Medical Officer, Division of Scientific Investigations, Compliance Review May 24, 2011
[98] Susan D. Thompson, M.D., Medical Officer, Division of Scientific Investigations, Compliance Review May 24, 2011
[99] NDA 22406 Office Director Decisional Memo, Richard Pazdur, MD July 3, 2011
[100] Kathy M. Robie Suh, M.D., Ph.D., Medical Team Leader, Hematology, Division of Hematology Drug Products, NDA 22-406 Medical Team Leader Secondary Clinical Review, June 13, 2011
[101] Kathy M. Robie Suh, M.D., Ph.D., Medical Team Leader, Hematology, Division of Hematology Drug Products, NDA 22-406 Medical Team Leader Secondary Clinical Review, June 13, 2011

USCA5 3156

an Office Director Decisional Memo in support of the approval action.[102] The approval letter included postmarketing requirements discussed later in this review.

Dr. Parisian says that the approval was conditional, depending on completion of the postmarketing requirements. This is not correct. There is no category of conditional approval for a drug like Xarelto. (The only human drug approvals that might be considered conditional are accelerated approvals of certain drugs for a serious condition with an unmet medical need.) The Xarelto NDA was fully approved on the date of the approval letter. FDA has authority to enforce postmarketing requirements under the FDAAA regulations (505(o)). PMR 1797-1 and PMR 1797-2 were postmarketing requirements under 505(o), but PMC 1797-3 was a postmarketing commitment that did not invoke 505(o) and is not officially a requirement.[103] It appears that FDA intentionally made this distinction in the approval letter, which included PMC 1797-3 under the Bolded heading in all capital letters POSTMARKETING COMMITMENT NOT SUBJECT TO THE REPORTING REQUIREMENTS UNDER SECTION 506. Nonetheless, all three of the requirements/commitment have been completed.[104],[105],[106]

### Treatment and Prevention of DVT and PE

On May 1 and May 28, 2012 Janssen submitted supplemental applications S-001, S-002, and S-003 under Section 505(b) of the FDCA for the Treatment of DVT, Treatment of PE, and Reduction in Risk for DVT and Reduction in Risk for PE. On November 2, 2012, the applications were approved for these indications.

### Prevention of Stroke and Systemic Embolism in Patients with Atrial Fibrillation

### IND 75,238

Bayer initially proposed an indication for the prevention of stroke and cardiogenic thromboembolism in patients with chronic AF, but after discussions with FDA, Bayer and the Division of Gastrointestinal and Coagulation Drug Products (DGCDP) agreed that stroke is not an appropriate endpoint for an initial dose-finding study because it would involve placing too many patients at an unjustifiable risk of stroke by possibly receiving sub-therapeutic doses of Xarelto in the study. In July 2003, the sponsor and FDA agreed that, to determine dose for a potential stroke prevention indication, it would instead be appropriate to use surrogate endpoints that occur earlier in time in the course of the disease state but which have similar etiology, i.e., to use the incidence of thrombus regression in patients with acute DVT. Accordingly, FDA agreed that for an indication of prevention of stroke in AF, the effective dose would be chosen based on the results of a phase II study in DVT treatment. [107],[108]

---

[102] NDA 22406/ S000 Office Director Decisional Memo, Dr. Richard Pazdur 7/1/2011
[103] http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM172001.pdf
[104] http://www.accessdata.fda.gov/scripts/cder/pmc/index.cfm
[105] NDA 22406/S-010 Approval letter 2/13/2014,
[106] NDA 22406 Fulfillment of Postmarketing Requirement letter 3/2/2016 XARELTO_JANSSEN_23525088
[107] June 24, 2003, Bayer Background package for July 25, 2003 meeting IND 64,892 S-040 p.33.
[108] XARELTO_BPAG_00438554

USCA5 3157

Bayer submitted IND 75,238 specifically for the indication of stroke prevention in AF.[109] EOP2 meeting was held with Bayer/ Janssen and the FDA Division of Cardiovascular and Renal Drug Products (DCRDP) on September 12, 2006 to discuss the Phase III development program for Xarelto for the prophylaxis of stroke and non-CNS systemic embolism in subjects with non-valvular AF (SPAF program). The sponsors proposed a single trial, to test 20 mg QD (and 15 mg QD for renally impaired patients) based on the phase II DVT trial data. The Division agreed to accept a single study for approval of SPAF, provided that the results were sufficiently robust. Hierarchical testing first for non-inferiority and then for superiority was considered acceptable.[110] The Division stated that the company could "proceed with 20 mg OD but it is at the company's risk"[111], indicating that if the study failed to demonstrate safety and efficacy at that dose, then the company would not have a fall-back dose that might be approved.  The meeting minutes state that "The Division is much more concerned about efficacy; it is more important to prevent stroke than a bleeding event.  The goal is to minimize stroke."[112]

<u>NDA 202439</u>

NDA 202439 was received on January 5, 2011. It included a single large pivotal study (ROCKET) in over 14,000 subjects comparing the efficacy of Xarelto to that of warfarin in the prevention of stroke and systemic embolism in patients with AF.[113]

ROCKET was an international, randomized, double-blind, double-dummy, event-driven non-inferiority study comparing rivaroxaban 20 mg QD (15 mg in patients with CrCl 30-49 mL/min) to warfarin titrated to target an INR of 2.0 to 3.0. ROCKET targeted a population of non-valvular AF patients at higher risk of embolic events than in other recent trials in this area. It enrolled subjects that had either (1) a prior stroke (ischemic or unknown type), transient ischemic attack (TIA) or systemic embolism or (2) two or more of the following: age $\geq$ 75 years, hypertension, diabetes or heart failure/left ventricular ejection fraction $\leq$35%. Patients at a particularly high risk of bleeding were excluded by hemorrhage risk-related exclusion criteria, although use of aspirin $\leq$ 100 mg monotherapy and thienopyridine monotherapy could be enrolled. Patients with CrCl <30 mL/min were excluded. [114]

Dr. Parisian is critical of the use of a non-inferiority study to demonstrate the safety and effectiveness of Xarelto in the prevention of stroke and systemic embolism in patients with AF.  She suggests that only superiority testing should be allowed. I disagree.

In this case, at the time that Xarelto was under development, warfarin was the only available oral drug for prevention or treatment of VTE or stroke. A new drug that is as effective as warfarin, with similar

---

[109] As with IND 64,892, Bayer transferred regulatory responsibility for IND 75,238 to Janssen in August 2008. XARELTO_BHCP_00002713; XARELTO_JANSSEN_14297831; XARELTO_BHCP_00002716.

[110] June 24, 2003, Bayer Background package for July 25, 2003 meeting IND 64,892 S-040 p.33.

[111] XARELTO_BHCP_00002169

[112] Bayer/J&J minutes of September 20, 2006 meeting with the Division of Cardiovascular and Renal Drug Products, page 3 of minutes

[113] Aliza Thompson, Division of Cardiovascular and Renal Drug Products, NDA 202439 Cross-Discipline Team Leader Review, October 6, 2011.

[114] Aliza Thompson, Division of Cardiovascular and Renal Drug Products, NDA 202439 Cross-Discipline Team Leader Review, October 6, 2011.

USCA5 3158

safety profile, would be considered acceptable for treatment and/or prevention of the same serious conditions. An equally safe and effective drug offers an alternative choice. FDA encourages availability of new choices with similar safety and effectiveness to ensure options for patients. Because warfarin has many drawbacks including the need for frequent blood testing to monitor appropriate dosing, additional choices were more than welcome.

In the ROCKET study, warfarin was to be dose-adjusted based on INR results from a point of care device (INRatio).[115] Adequacy of the warfarin management in ROCKET was monitored using the time in therapeutic range (TTR). The mean TTR was 55%, median 58%, while other recent anticoagulant trials had reported a range of TTR from 62-73%. This finding raised concern on the part of the FDA primary medical reviewers, who concluded that the lower TTR may be an indication of inadequate warfarin management in the control arm, which may have resulted in comparatively better results in the Xarelto arm compared to what would have been seen if the control arm were skillfully used, theoretically leading to fewer strokes and systemic emboli in the control arm. Therefore, the primary reviewers recommended not accepting the data from ROCKET and in turn not approving the NDA.[116] The Cross-Discipline Team Leader and the Deputy Division Director both disagreed, and in their supervisory secondary reviews they documented their rationale for not accepting these opinions and recommendations.

Dr. Thompson, the Cross-Discipline Team Leader, rejected the primary reviewers' position that the data from ROCKET were not adequate to determine whether Xarelto is as effective as warfarin when warfarin is used *skillfully*. The Clinical reviewers argued that in order for AF patients to be protected from the risk of thrombotic events, a new drug for this indication should be demonstrated to be as effective as warfarin when warfarin is used skillfully. They contended that such a requirement stems from an FDA policy that it is essential for public health protection that a new therapy be as effective as alternatives that are already approved for marketing if the disease to be treated is life-threatening or capable of causing irreversible morbidity. They did not suggest that non-inferiority studies should not be done in this therapeutic area. Instead, they focused on the meaning of the term "as effective" with regard to the management of the active comparator warfarin and the achieved TTR in non-inferiority studies.[117]

Dr. Thompson concluded that there were strong indicators that Xarelto is "reasonably effective". It was robustly non-inferior to warfarin as used in ROCKET, and event rate data from the placebo arm of historical trials indicate that, in ROCKET, warfarin was administered in a way that provided some, perhaps even significant, benefit to patients. The fact that various analyses exploring the potential impact of the quality of warfarin administration produced the results they did (and not worse) ass also somewhat reassuring. In the US where INR control was better, the results were still favorable. Considering the data in their totality and keeping in mind that the skillful use of warfarin is not always realized in clinical practice, Dr. Thompson concluded that the applicant satisfied the regulatory

---

[115] Aliza Thompson, Division of Cardiovascular and Renal Drug Products, NDA 202439 Cross-Discipline Team Leader Review, October 6, 2011.
[116] Nhi Beasley Martin Rose and Preston Dunnmon, NDA 202439, Clinical Review, August 10, 2011.
[117] Aliza Thompson, Division of Cardiovascular and Renal Drug Products, NDA 202439 Cross-Discipline Team Leader Review, October 6, 2011.

USCA5 3159

requirement for effectiveness. She concluded that any uncertainty about Xarelto's effectiveness relative to warfarin (or skillfully managed warfarin) can be and should be reflected in labeling.[118] Hers was the opinion that FDA accepted.

Dr. Thompson's review also summarized the bleeding risks of Xarelto. The incidence of major bleeds was similar in the two treatment arms, though types and sites of major bleeding differed. Hemoglobin drops and transfusions were more frequent with Xarelto, and critical site bleeds were more frequent on warfarin. Major GI bleeds were more common on Xarelto, and intracranial hemorrhages were more common on warfarin.[119]

Dr. Stephen Grant, Deputy Division Director, who was at a supervisory level above the Cross-Discipline Team Leader, wrote a Decisional Memo dated November 4, 2011, supporting the conclusions of Dr. Thompson. He notes that "numerically fewer strokes and deaths were observed in Xarelto treated subjects relative to warfarin subjects. The outcomes in the USA and important subgroups were consistent with the overall study results. The principal safety issue for anticoagulants is bleeding; relative to warfarin, the risk of major bleeding in Xarelto subjects in ROCKET was similar but with less intracranial bleeding and more gastrointestinal bleeding. Those results would usually be sufficient for approval to market an anticoagulant in this therapeutic area."[120]

Xarelto was approved because the studies demonstrated safety and effectiveness at the selected dose. Dr. Norman Stockbridge, Director of the Division of Cardiovascular and Renal Products, issued an approval letter for this NDA on November 4, 2011. A Risk Evaluation and Mitigation Strategy (REMS) with a Medication Guide was approved at the same time.

**ROCKET Reanalysis**

In September 2015, Janssen informed the FDA that the Alere INRatio point of care (POC) device that was used at all study sites in the ROCKET AF trial to monitor the INR and adjust warfarin dose in control patients had been subject to a Class 1 recall. The INRatio device was made by a different company and sold to Janssen. The recall was based on post-marketing findings that values reported by the device were lower than readings from a laboratory device in certain patient groups identified by the manufacturer of the device.[121]

FDA, Janssen, Bayer, and the ROCKET AF Executive Committee independently performed a variety of analyses on the data to characterize the impact of the INRatio device on the results of ROCKET. Based on these reanalyses, FDA determined that the conclusion made in 2011-- that the benefits of Xarelto in patients with non-valvular AF outweigh its risks--should not be changed. In September 2016, FDA

---

[118] Aliza Thompson, Division of Cardiovascular and Renal Drug Products, NDA 202439 Cross-Discipline Team Leader Review, October 6, 2011.
[119] Aliza Thompson, Division of Cardiovascular and Renal Drug Products, NDA 202439 Cross-Discipline Team Leader Review, October 6, 2011.
[120] Stephen M. Grant, NDA 202439,Deputy Division Director Decisional Memo, November 5, 2011
[121] Martin Rose, MD, JD, NDA 202439 Rivaroxaban (Xarelto): Impact of use of the INRatio device in the ROCKET AF trial, Division of Cardiovascular and Renal Products, CDTL Review, September 26, 2016.

USCA5 3160

recommended no change in the Xarelto labeling and took no other major regulatory action. FDA recommended that the issues addressed by the review should be communicated to the public in a suitable manner other than labeling changes.[122]

**Reversal agent**

FDA recognized in its review and approval of Xarelto that a specific reversal agent for rivaroxaban was not available, and based on the results of clinical studies, FDA concluded that Xarelto is safe and effective without it. FDA has considered whether it should continue to allow marketing of anticoagulant drugs that do not have a reversal agent and has verified that the anticoagulants on the market have been carefully studied and found worthy of approval without a reversal agent.[123]

**Actions of the sponsors and FDA**

I have reviewed many documents from the defendants and FDA related to the development and testing of the product. I strongly believe that the companies have been responsible in fulfilling their regulatory duties. They have interacted appropriately with FDA by submitting INDs and protocols for review, requesting and responding to FDA feedback, appropriately labeling their approved product, and submitting postmarketing reports as required. They also fulfilled their postmarketing requirements and commitment.

The companies proactively sought guidance from FDA prior to the NDA submission and during the review. They submitted two INDs, one for each indication and sought agreement from FDA on their development plans, study designs, and endpoints before conducting their studies. They conducted all of the required preclinical and phase I, II, and III clinical trials. Janssen and Bayer fulfilled their regulatory responsibility in the development of Xarelto. FDA reviewed the information submitted and ultimately found the evidence of safety and effectiveness adequate to support approval of Xarelto for the requested indications and using the approved labeling. FDA approved NDA 22406 on July 1, 2011 and approved NDA 202439 on November 4, 2011. FDA also approved the supplemental applications 22406/S-001, S-002, and S-003 on November 2, 2012.

The issues that have been raised by the plaintiffs in this case are the same issues that were raised at FDA and documented in the public domain prior to approval with full awareness of these issues. The rationale for the differing opinions and reasons for the decisions made have been well documented throughout the regulatory review and regulation of the product. These issues are addressed throughout this statement. The issues raised by the plaintiffs are not new and they do not represent faulty actions on the part of the companies or FDA. In fact, each of the plaintiffs' theories was considered and rejected by FDA.

**Dose Selection**

---

[122] Martin Rose, MD, JD, NDA 202439 Rivaroxaban (Xarelto): Impact of use of the INRatio device in the ROCKET AF trial, Division of Cardiovascular and Renal Products, CDTL Review, September 26, 2016.
[123] Ellis F. Unger, MD, FDA, Atrial Fibrillation, Oral Anticoagulant Drugs, and their Reversal Agents, http://www.fda.gov/drugs/newsevents/ucm467203.htm, October 16, 2015.

28

USCA5 3161

Plaintiffs have raised issues related to the choice of dose and dosing regimens for Xarelto and have faulted the company for not studying different doses and/or regimens. This has been well addressed in several FDA reviews and memoranda. It is clear that the studies required for the approved indications are very large and onerous compared to most other indications, and the burden of conducting multiple and/or larger studies with multiple doses may be prohibitive and potentially dangerous to patients. Once daily dosing was based on the results of a dose-ranging study # 11527 for prevention of VTE in patients undergoing total hip replacement. FDA communicated its agreement with this approach. The study was large compared to most dose-ranging studies, enrolling 877 subjects, 94 to 113 per dosing group, and it studied once daily doses of 5, 10, 20, 30, and 40 mg of Xarelto and 40 mg of enoxaparin. The net clinical benefit of the individual treatments was assessed based on a composite endpoint of major VTE and post-operative major bleeding events.

Furthermore, the sponsor has conducted multiple dose-ranging studies using both daily and twice daily dosing. While these studies have been characterized as "small" by the plaintiffs, they have enrolled thousands of patients, many more than the usual dose-ranging study in my experience across a range of clinical divisions at FDA. The dose-ranging studies have shown good efficacy across a wide range of doses, and although the bleeding rates increase with dose, the sponsor has selected the doses that are most appropriate for the individual indications with regard to risk/benefit considerations. For VTE prevention in patients undergoing major orthopedic surgery, the patients are generally younger and healthier than the AF patients, and they need only short-term VTE prophylaxis, unlike AF patients who tend to be older and more fragile, and require long-term prophylaxis for stroke prevention. The net clinical benefit analyses show that there is some flexibility in the choice of doses while keeping the safety and efficacy in line with the approved alternatives. The sponsor has made a reasonable choice between the 10 and 20 mg once daily dosing backed by scientific data, and for the VTE prophylaxis in a healthier population at risk of post-operative bleeding related to major orthopedic surgery and with a relatively short term need for dosing, they have selected the lower 10 mg dose. The 20 mg dose provides for the greatest assurance of efficacy for stroke prevention in the more fragile AF population where FDA has considered the benefit of stroke prevention to outweigh the relatively small increase in bleeding risk.

**Labeling**

Risk of bleeding

The FDA-approved labeling provides numerous warnings about the risk of bleeding, including:

- In July 2011, the Xarelto labeling warned that "Xarelto increases the risk of bleeding and can cause serious and fatal bleeding."[124]
- From November 2011 on, the Xarelto labeling has warned "Xarelto increases the risk of bleeding and can cause serious or fatal bleeding."[125]

---

[124] July 2011 USPI, Section 5.2 Warnings and Precautions; Risk of Bleeding;
[125] November 2011 USPI, Section 5.2 Warnings and Precautions; Risk of Bleeding; August 2016 USPI, Section 5.2 Warnings and Precautions; Risk of Bleeding

USCA5 3162

- In the same section (5.2), the labeling has always advised physicians to "[p]romptly evaluate any signs or symptoms of blood loss."[126]
- The Highlights of Prescribing Information (Warnings and Precautions) has always warned, "Risk of bleeding: Xarelto can cause serious and fatal bleeding. Promptly evaluate signs and symptoms of blood loss."[127]
- The Medication Guide, which provides patient counseling information, advises that "Xarelto can cause bleeding, which can be serious, and rarely may lead to death."[128]
- The labeling includes tables with bleeding rates from the indication-seeking clinical trials.[129]
- The labeling has also included a boxed warning regarding the risk of spinal/epidural hematoma.[130]

In my opinion these statements are appropriate and consistent with the FDA approved labeling, and they adequately warn of the risk of bleeding associated with Xarelto use.

Boxed Warning

Plaintiff's experts contend that the FDA-approved labeling should include a black box warning for bleeding risk, in part because the Coumadin (warfarin) labeling has such a warning. I disagree. As an initial matter, a pharmaceutical manufacturer cannot add a black box warning on its own, without FDA approval.[131] The information that goes into the box is set by FDA. The language cannot be changed by the sponsor without FDA direction, and a black-box warning cannot be changed or added via CBE unless specifically requested by FDA.There also are reasons why the warfarin labeling would include a black-box warning for bleeding risk and the Xarelto labeling would not. Boxed warnings are intended to alert healthcare providers about serious and life-threatening risks that can be managed by particular physician measures.[132] The warfarin labeling includes a boxed warning to alert healthcare providers of the need for periodic blood testing to monitor the anticoagulant activity of warfarin for facilitate changes in dosage that may be needed to maintain safe and effective use. Xarelto, however, has been shown in Phase III clinical trials not to require periodic blood testing to maintain safe use. Therefore, it is my opinion that a boxed warning for bleeding risk is not necessary. Further, the black box was added to the Coumadin label prior to the application of the 2006 Physician Labeling Rule to warfarin's prescribing information.

Reversal Agent

---

[126] July 2011 USPI, Section 5.2 Warnings and Precautions; Risk of Bleeding; August 2016 USPI, Section 5.2 Warnings and Precautions; Risk of Bleeding
[127] *Ibid*
[128] November 2011 USPI Medication Guide; August 2016 USPI Medication Guide
[129] *Ibid*
[130] July 2011 USPI; August 2016 USPI
[131] 21 CFR 201.57(c)(1)
[132] 2011 Guidance for Industry: Warnings and Precautions, Contraindications, and Boxed Warning Sections of Labeling for Human Prescription Drug and Biological Products—Content and Format

USCA5 3163

The FDA-approved labeling has always stated that "[a] specific antidote for rivaroxaban is not available." In the original labeling that accompanied the initial approval for NDA 22406, this statement was included in section 10 (Overdosage). That statement has remained in section 10 to this day. In November 2011, with the approval of NDA 202439 for the prevention of stroke in patients with AF, the same statement "A specific antidote for rivaroxaban is not available" was added to section 5.2 (Warnings and Precautions; Risk of Bleeding). That statement has remained in section 5.2 to this day.[133]

In my opinion, these statements are appropriate and adequately warn of the risk that there is no reversal agent for Xarelto.

NOAC Harmonization

In 2014 FDA started an internal initiative to present efficacy and safety data in a similar manner for the labeling of all new oral anticoagulants. For this "NOAC Harmonization" FDA sent an information request to Janssen in January 2014 requesting the following information:

1. The number of major bleeding events according to specific parameters and using a specific template
2. A Forest plot showing the risk of major bleeding in specific subgroups set out in the letter
3. A Forest plot showing the risk of stroke and systemic embolism (efficacy endpoint) in the same subgroups.[134]

Janssen submitted the requested information in February, March, and June 2014, and in October 2014 FDA sent a Prior Approval Supplement Request to Janssen for specific revisions. Janssen submitted a labeling supplement in December, and FDA made additional requests for changes in March, May and July 2015.[135] Janssen responded and received an approval letter on September 10, 2015, describing in detail the following six agreed-upon changes:

1. Presentation of bleeding events in ROCKET AD chart in Section 6
2. Addition of Forest plot to Section 6
3. Addition of standard cautionary paragraph to bottom of Forest plt
4. Amendment of Forest plot in Section 14 to present data in an identical way as Section 6
5. Depiction of pharmacokinetics of a NOAC in plot rather than describing study data in paragraph form in Section 12.3, and
6. Other minor editorial changes.

In section 6.1 Janssen added the following figure regarding the risk of major bleeding events:[136]

---

[133] August 2016 USPI
[134] XARELTO_JANSSEN_00000344
[135] Approval Letter for NDA 202439-2015, www.fda.gov
[136] Xarelto USPI September 2015, Section 6.1 Clinical Trials Experience

31

USCA5 3164

Figure 1: Risk of Major Bleeding Events by Baseline Characteristics in ROCKET AF – On Treatment Plus 2 Days



Note: The figure above presents effects in various subgroups all of which are baseline characteristics and all of which were pre-specified (diabetic status was not pre-specified in the subgroup, but was a criterion for the CHADS2 score). The 95% confidence limits that are shown do not take into account how many comparisons were made, nor do they reflect the effect of a particular factor after adjustment for all other factors. Apparent homogeneity or heterogeneity among groups should not be over-interpreted.

The inclusion of the note in the figure above in the labeling is important, as it acknowledges FDA's reservations about interpretation of this subgroup data. In fact, in the initial labeling submission prior to approval of NDA 202439, Janssen proposed to include "Figure 2, Subgroup Analysis of Adjudicated Primary Composite Endpoints by Patient Baseline Characteristics Safety Population/On Treatment".[137] In October 2011, FDA provided comments on Janssen's proposed labeling for NDA 202439, removing figure 2 from the label.[138] Within this document internal FDA reviewers proposed and then deleted the following paragraph under Section 6.1:[139]

---

[137] XARELTO_JANSSEN_00001707, XARELTO_JANSSEN_00023124
[138] XARELTO_JANSSEN_00001453, XARELTO_JANSSEN_00001454
[139] Ibid

USCA5 3165

~~The risk of major bleeds was similar with XARELTO and warfarin across major subgroups defined by baseline characteristics, with the exceptions of race and region. There was a higher annual rate of major bleeding in Black subjects taking XARELTO compared their warfarin-treated counterparts than in non-black subject groups (HR = 1.7, p-interaction = 0.025). Likewise, North American subjects on XARELTO experienced a higher annual bleeding rate compared to their warfarin-treated counterparts than subjects from any other region (HR = 1.4, p-interaction = 0.008).The increases in major bleeding events with XARELTO in the categories of hemoglobin drop and/or transfusion were primarily from the gastrointestinal tract.Other Adverse~~ Reactions

This information did not appear in the approved label for NDA 202439.[140] Based on these labeling discussions prior to approval of NDA 202439, it appears that the FDA had some data regarding patient subgroups, considered using it in the initial labeling, but ultimately decided against it.

PT/PTT

In July 2008, when Janssen submitted NDA 022406, it included the following paragraph in section 12.2 Pharmacodynamics:

Routine monitoring of coagulation parameters is not required with Xarelto use.

Dose-dependent inhibition of Factor Xa activity was observed in humans and the prothrombin time (PT), activated partial thromboplastin time (aPTT) and HepTest® are prolonged dose-dependently. The relationship between PT and rivaroxaban plasma concentration is linear and closely correlated. If assessment of the pharmacodynamics effect of rivaroxaban is considered necessary in individual cases, PT (measured in seconds) is recommended. The Neoplastin® PT assay was measured in the RECORD program and the 5/95 percentiles for PT (Neoplastin®) 2 to 4 hours after tablet intake (i.e., at the time of maximum effect) ranged from 13 to 26 seconds. The International Normalized Ratio (INR) should not be used for measuring rivaroxaban pharmacodynamics effect....[141]

FDA issued a Complete Response Letter on May 27, 2009 for NDA 022406. In this Complete Response letter, further comments on labeling were included.[142] On December 27, 2010, Janssen responded to the Complete Response Letter and included the following proposed language in section 12.2.:

Routine monitoring of coagulation parameters is not required with Xarelto use.

Dose-dependent inhibition of Factor Xa activity was observed in humans and the prothrombin time (PT), activated partial thromboplastin time (aPTT) and HepTest® are prolonged dose-dependently. Anti-Factor Xa activity is also influenced by rivaroxaban. The relationship between

---

[140] Xarelto USPI November 2011
[141] XARELTO_JANSSEN_00047659
[142] XARELTO_JANSSEN_00047169

USCA5 3166

PT and rivaroxaban plasma concentration is linear and closely correlated.  If assessment of the pharmacodynamics effect of rivaroxaban is considered necessary in individual cases, PT (measured in seconds) is recommended.  The Neoplastin® PT assay was measured in the RECORD program and the median (with 5/95 percentiles) for PT (Neoplastin®) 2 to 4 hours after tablet intake (i.e., at the time of maximum effect) was 18 (13 to 26) seconds.  The International Normalized Ratio (INR) should not be used for measuring rivaroxaban pharmacodynamics effect…[143]

In January 2011, Janssen proposed similar language in section 12.2 for NDA 202,439.[144]

On June 13, 2011, FDA sent Janssen its comments on the proposed label for NDA 022406. In section 12.2, FDA expressed its view that the following language should be substituted in place of Janssen's proposed language:

Dose-dependent inhibition of Factor Xa activity was observed in humans and the prothrombin time (PT), activated partial thromboplastin time (aPTT) and HepTest® are prolonged dose-dependently.  Anti-Factor Xa activity is also influenced by rivaroxaban. The predictive value of these coagulation parameters for bleeding risk or efficacy has not been adequately studied.[145]

On June 16, 2011, Janssen responded to FDA's comments and proposed:

Dose-dependent inhibition of Factor Xa activity was observed in humans and the prothrombin time (PT), activated partial thromboplastin time (aPTT) and HepTest® are prolonged dose-dependently.  Anti-Factor Xa activity is also influenced by rivaroxaban. The predictive value of these coagulation parameters for bleeding risk or efficacy has not been established.  The International Normalized Ratio (INR) should not be used for measuring rivaroxaban pharmacodynamics effect.[146]

On June 22, 2011, FDA returned comments to Janssen's proposed change to section 12.2 and stated, "We disagree," with Janssen's proposal: "The predictive value of these coagulation parameters for bleeding risk or efficacy has not been established.  The International Normalized Ratio (INR) should not be used for measuring rivaroxaban pharmacodynamics effect".[147]

Janssen replied to FDA's comments on June 28, 2011.[148]

On July 1, 2011, NDA 022406 was approved.  Section 12.2 in the approved label states:

Dose-dependent inhibition of factor Xa activity was observed in humans and the Neopastin prothrombin time (PT), activated partial thromboplastin time (aPTT) and HepTest are prolonged

---

[143] XARELTO_JANSSEN_00054178, XARELTO_JANSSEN_00054184
[144] XARELTO_JANSSEN_00001707
[145] XARELTO_JANSSEN_05852123
[146] XARELTO_JANSSEN_01231199
[147] XARELTO_JANSSEN_00047264
[148] XARELTO_JANSSEN_00047272

USCA5 3167

dose-dependently. Anti-factor Xa activity is also influenced by rivaroxaban. There are no data on the use of the International Normalized Ratio (INR). The predictive value of these coagulation parameters for bleeding risk or efficacy has not been established.[149]

On November 4, 2011, FDA provided the final comments and a label for NDA 202439, removing the following language from Section 12.2: "There are no data on the use of the International Normalized Ratio (INR). The predictive value of these coagulation parameters for bleeding risk or efficacy has not been established."[150]

The final approved labeling for NDA 202439 contained the following language in Section 12.2 until May 2016:

"Dose-dependent inhibition of factor Xa activity was observed in humans and the Neoplastin prothrombin time (PT), activated partial thromboplastin time (aPTT) and HepTest are prolonged dose-dependently. Anti-factor Xa activity is also influenced by rivaroxaban."[151]

In May 2016 additional language was added to the label regarding end stage renal disease, but no further change to the above information.

The above interactions show that Janssen had frequent discussions with FDA regarding appropriate labeling for use of laboratory parameters for pharmacodynamics activity, and the labeling contained FDA-approved language.

<u>Renal Impairment</u>

The FDA-approved labeling has always advised physicians that patients with renal impairment respond differently to Xarelto and may be at an increased risk of bleeding.

In the initial labeling approved by FDA with the July 2011 approval of NDA 22406, the HIGHLIGHTS OF PRESCRIBING INFORMATION advised that physicians should "[a]void use in patients with severe impairment (CrCl <30 mL/min)" and "[u]se with caution in moderate impairment (CrCl 30 to <50 mL/min)."[152] Those same warnings were included in the WARNINGS AND PRECAUTIONS section (section 5.4), which also warned physicians to "[o]bserve closely and promptly evaluate any signs or symptoms of blood loss in patients with moderate renal impairment (CrCl 30 to <50 mL/min)."[153] The initial labeling also advised that "patients with renal impairment receiving XARELTO with drugs that are combined P-gp and weak or moderate CYP3A4 inhibitors . . . may have significant increases in exposure compared with patients with normal renal function and no inhibitor use."[154] Accordingly, the labeling provided as follows: "Since these increases may increase bleeding risk, use XARELTO in this situation

---

[149] XARELTO_JANSSEN_00047287
[150] XARELTO_JANSSEN_08646664
[151] XARELTO_JANSSEN_23524564
[152] July 2011 USPI
[153] July 2011 USPI Section 5.4
[154] July 2011 USPI Section 7.2

USCA5 3168

only if the potential benefit justifies the potential risk." [155] Finally, the labeling provided an entire section on how to approach Xarelto use in patients with renal impairment.[156]

When FDA approved Xarelto in November 2011 for the indication to reduce the risk of stroke and systemic embolism in patients with nonvalvular atrial fibrillation, it required a downward dose adjustment (to 15 mg once daily) for patients with CrCl 15-50 mL/min, and continued to advise physicians to "avoid use in patients with CrCl <15 mL/min."

Since November 2012, the WARNINGS AND PRECAUTIONS section has included a section on Use in Patients with Renal Impairment (section 5.4) that warns about use in each approved indication by patients with renal impairment. FDA amended the language for AF patients in May 2016, so that the language now reads as follows:

### 5.4   Use in Patients with Renal Impairment
*Nonvalvular Atrial Fibrillation*

Periodically assess renal function as clinically indicated (i.e., more frequently in situations in which renal function may decline) and adjust therapy accordingly *[see Dosage and Administration (2.4)]*. Consider dose adjustment or discontinuation of XARELTO in patients who develop acute renal failure while on XARELTO *[see Use in Specific Populations (8.7)]*.

*Treatment of Deep Vein Thrombosis (DVT), Pulmonary Embolism (PE), and Reduction in the Risk of Recurrence of DVT and of PE*

Avoid the use of XARELTO in patients with CrCl <30 mL/min due to an expected increase in rivaroxaban exposure and pharmacodynamic effects in this patient population *[see Use in Specific Populations (8.7)]*.

*Prophylaxis of Deep Vein Thrombosis Following Hip or Knee Replacement Surgery*

Avoid the use of XARELTO in patients with CrCl <30 mL/min due to an expected increase in rivaroxaban exposure and pharmacodynamic effects in this patient population. Observe closely and promptly evaluate any signs or symptoms of blood loss in patients with CrCl 30 to 50 mL/min. Patients who develop acute renal failure while on XARELTO should discontinue the treatment *[see Use in Specific Populations (8.7)]*.

In February 2014, FDA approved an sNDA adding language to section 7.4 of the labeling regarding the study results from PMR 1797-2:

---

[155] July 2011 USPI
[156] July 2011 USPI Section 8.7

USCA5 3169

## 7.4 Anticoagulants and NSAIDs/Aspirin

Single doses of enoxaparin and XARELTO given concomitantly resulted in an additive effect on anti-factor Xa activity. Single doses of warfarin and XARELTO resulted in an additive effect on factor Xa (FXa) inhibition and PT. Concomitant aspirin use has been identified as an independent risk factor for major bleeding in efficacy trials. NSAIDs are known to increase bleeding, and bleeding risk may be increased when NSAIDs are used concomitantly with XARELTO. Coadministration of the platelet aggregation inhibitor clopidogrel and XARELTO resulted in an increase in bleeding time for some subjects *[see Clinical Pharmacology (12.3)]*.

Avoid concurrent use of XARELTO with other anticoagulants due to increased bleeding risk unless benefit outweighs risk. Promptly evaluate any signs or symptoms of blood loss if patients are treated concomitantly with aspirin, other platelet aggregation inhibitors, or NSAIDs *[see Warnings and Precautions (5.2)]*.

It is my opinion that the Xarelto labeling has always been appropriate with regard to use of Xarelto in patients with renal impairment. Although the text has changed somewhat over time, along with its exact placement in the label, it remains consistent and appropriate.

**Other Labeling Issues**

Dr. Parisian proposes that the distribution of patient PK values observed in the clinical trial program should be reported in the labeling as important information for physicians, and that the label should have the same plasma concentration information and commercial use of anti-factor Xa calibrators, and controls that are required in the European label. I disagree. The FDA Clinical Pharmacology reviewers have reviewed this data, and FDA appropriately determined that it did not belong in the labeling. There is no requirement for US labeling to reflect European labeling. Furthermore, there is no approved anti-factor Xa assay in the US like there is in Europe.

**FDA's Risk/Benefit Assessment of Xarelto**

It is my opinion that FDA appropriately concluded that Xarelto has a favorable risk/benefit assessment, and that the labeling has been adequate throughout the marketing of the product. The benefit of Xarelto for its approved indications is to reduce the risk of venous thromboembolism, including pulmonary embolism and stroke, which are disabling and life-threatening events that occur in people with nonvalvular AF, and the treatment and prevention of DVT and PE.

FDA approved Xarelto based on a robust clinical development program including large phase III clinical trials without routine monitoring and found Xarelto to be safe and effective. FDA allowed the companies to test Xarelto in their selected patient populations and using their selected dosing regimens, with FDA input. FDA appropriately approved the applications based on the outcomes of those clinical trials FDA recognized the public health benefit of providing an alternate anticoagulation choice that lacks much of the well-known disadvantages of warfarin. Overall, FDA concluded that the benefit of reducing the risk of fatal or disabling stroke in AF patients, and VTE patients that may lead to PE in major orthopedic

37

USCA5 3170

surgery patients, and treatment and reduction of the risk of VTE and PE far outweighs the small risk of major bleeding associated with Xarelto, which is similar to the risk associated with warfarin.

FDA has recognized that "it is much more important to prevent stroke than a bleeding event."[157] The agency was well aware of the bleeding profiles prior to the approval and stated that the efficacy in preventing strokes, in particular, the lower numbers of hemorrhagic strokes compared to warfarin, was more important in providing a meaningful benefit to these patients compared to the small numbers of major bleeds that were seen.[158] FDA concluded that the benefits outweighed the risks and approved the AF NDA.

Plaintiffs' expert Dr. Parisian has suggested that it was inappropriate for the sponsor and FDA to rely upon the approval of NDA 22406 for prevention of VTE in orthopedic surgery patients in its review of 202439 for stroke prevention in AF. She states that FDA made no distinction for differing indications, patient populations, or potential drug exposures. This is entirely wrong. The company submitted two separate INDs and two separate NDAs for the two indications. Both NDAs were under review at the same time in different review divisions. FDA review divisions interact with each other, the record documents consultations between the divisions, and the FDA agreed in advance on the study plans. In fact, Dr. Parisian herself acknowledged that the reviewer of NDA 202439 was involved in the labeling of NDA 22406. After all, these two NDAs are for different doses and indications for the same drug in closely related conditions, and both indications depend on the anticoagulant action of the drug. It would have been inappropriate for FDA not to consider findings from each NDA in the review of the other.

The approval of NDA 202439 was based on a large study in 14,000 patients with AF and an endpoint of stroke or systemic embolism, showing robust non-inferiority compared to warfarin.

**Post-Market Requirements and Commitments[159]**

NDA 22406 was approved with the following postmarket requirements and commitment:

PMR 1797-1 A postmarketing pharmacovigilance study of the risk factors, clinical management and outcome of cases of major bleeding in association with Xarelto (rivaroxaban) use, including an "Enhanced Pharmacovigilance Plan". In December 2014, the Office of Surveillance and Epidemiology (OSE) confirmed that Janssen had satisfied the enhanced pharmacovigilance components and that no new safety issues requiring action were presented in the final report. A letter from Barry Miller, Acting Deputy Director for Safety in the Division of Hematology Products, on 03/02/2016 confirming that this requirement has been fulfilled. PMR 1797-1 is posted on the Postmarket Requirements and Commitments Database as fulfilled.

PMR 1797-2 Perform a clinical trial to evaluate the effect of renal impairment (i.e., mild, moderate, severe) plus the concurrent use of P-gp and moderate inhibitors of CYP3A4 on the pharmacokinetics, pharmacodynamics, and safety of rivaroxaban in volunteers so that appropriate dosing

---

[157] XARELTO_BHCP_00002169
[158] *See, e.g.*, Nhi Beasley Martin Rose and Preston Dunnmon, NDA 202439, Clinical Review, August 10, 2011
[159] http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Post-marketingPhaseIVCommitments/

USCA5 3171

recommendations can be developed in these populations. FDA documented that the requirement was fulfilled on February 13, 2014 with the approval letter for supplement S-010, providing revisions to the Drug Interactions and Clinical Pharmacology sections of the labeling.

PMC 1797-3 Develop and propose a 5 mg strength tablet or scored 10 mg tablet to allow for proper dose titration when rivaroxaban needs to be co-administered in patients at risk for clinically relevant changes in rivaroxaban exposure. FDA, in the approval letter for NDA 22406, designated 1797-1 and 1797-2 as postmarketing requirements under 505(0) for which FDA has enforcement authority. However, it stated in all capital letters and bolded text that 1797-3 was a Postmarketing Commitment not subject to the reporting requirements under Section 506B. Postmarketing Commitments are not under the same FDA enforcement authority. However, Janssen did develop and submit a CMC supplement for a 5 mg tablet, which received a Complete Response Letter from FDA requesting bioavailability data or a waiver request with dissolution data. This commitment was closely tied to the requirement 1797-2, which was fulfilled, resulting in labeling regarding use of Xarelto in patients with renal impairment and using concomitant P-gp or CYP3A4 inhibitors. This supported Janssen's conclusion that a 5-mg tablet is not needed.

**Post-marketing Periodic Safety Reporting**

Janssen has submitted periodic adverse drug event reports (PADERs) as required, quarterly for the first three years after approval and annually thereafter. They have submitted separate reports for NDA 22406 and NDA 202439 up to 2015 and then requested to change to the Periodic Benefit Risk Evaluation Report (PBRER) format with a single annual report for both NDAs. All reports have been submitted within the required time frame and have met the regulatory requirements, including the use of the standard MedDRA terminology for reporting and archiving the events.

The reported adverse events have not shown any unexpected findings or significant change in the nature of the reports in general. Specifically, the postmarketing experience has not provided any new or different information regarding severity and frequency of bleeding events that warrants a change in labeling, as the clinical trials provide more reliable and controlled information.

Janssen has responded appropriately to FDA requests for additional information or studies and has updated its labeling when appropriate.

**Marketing**

Janssen has appropriately submitted its promotional and advertising materials to the FDA for review. The FDA Office of Prescription Drug Promotion (OPDP) issued an Untitled letter to Janssen regarding a violative direct to consumer print advertisement (MA #215). Janssen responded promptly by discontinuing the ad and all related promotional materials and taking the corrective actions requested by OPDP.

USCA5 3172

Further, FDA permits the dissemination of information about unapproved indications for approved medications like Xarelto.[160]

**Summary of Primary Opinions**

This summary of primary opinions is not meant to be inclusive of all opinions expressed in this report and in no way limits the opinions expressed herein. I reserve the right to amend this report as additional information or additional opinions from plaintiffs' experts become available.

1. It is my opinion that the clinical development plans for Xarelto were appropriate for the approved indications.
2. It is my opinion that the information submitted in NDA 22-406 was sufficient to support the safety and efficacy of Xarelto at its approved doses for prevention of VTE in orthopedic surgery patients undergoing total hip replacement or total knee replacement surgery.
3. It is my opinion that the information submitted in NDA 202439 was sufficient to support the safety and efficacy of Xarelto at its approved doses in reducing the risk of stroke and systemic embolism in patients with nonvalvular AF.
4. It is my opinion that the information submitted in NDA 22-406/ S-001, 002, and 003 was sufficient to support the safety and efficacy of Xarelto at its approved doses for treatment of DVT, treatment of PE, reduction of the risk of DVT, and reduction of the risk of PE.
5. It is my opinion that the labeling for Xarelto was appropriate at all times.
6. It is my opinion that Janssen and Bayer acted responsibly and interacted appropriately with FDA at all times.

Dated: November 15, 2016                    *Dana R. Hixon, M.D.*

---

[160] http://www.fda.gov/regulatoryinformation/guidances/ucm125126.htm

USCA5 3173

# EXHIBIT "A"

USCA5 3174

# CURRICULUM VITAE

# Dena R. Hixon, M.D.

## Pharmaceutical Lifecycle Consulting LLC



Dena R. Hixon is the sole member of Pharmaceutical Lifecycle Consulting LLC. She offers consulting services in the field of drug development and regulation, including clinical and regulatory considerations for both new and generic drugs, from early development through product approval and postmarket surveillance.

Dr. Hixon has 13 years of regulatory experience with the US Food and Drug Administration (FDA), serving as a primary reviewer and team leader in the Division of Reproductive and Urologic Drug Products before becoming the Associate Director for Medical Affairs in the Office of Generic Drugs.

During her service in the Office of New Drugs, Dr. Hixon was responsible for reviews of Investigational New Drug (IND) submissions, protocol proposals for various phase 1 and 2 studies and Special Protocol Assessments for phase 3 studies, New Drug Applications (NDAs), labeling, and postmarketing safety reports. She also conducted and/or participated in numerous meetings with industry sponsors, including pre-IND meetings, end-of-phase 2 meetings, pre-NDA meetings, and other guidance meetings. As a medical officer, she conducted primary reviews of clinical data and clinical study proposals for evaluating safety and efficacy. As a team leader, she trained other medical officers and reviewed their work. She also summarized the reviews of all relevant disciplines and made recommendations on approval of applications.

Dr. Hixon reviewed a wide variety of drugs for reproductive and urologic indications, including the following:

- Contraception, including oral, injectable, vaginal, and transdermal hormonal contraceptives, other vaginal contraceptives, and intrauterine devices
- Emergency contraception
- Premenstrual syndrome
- Polycystic ovarian syndrome
- Hormone replacement
- Female sexual dysfunction
- Erectile dysfunction

1

USCA5 3175

As Associate Director for Medical Affairs in the Office of Generic Drugs, Dr. Hixon served as an advisor to the office regarding safety issues and other clinical considerations for generic drugs. She supervised a team of medical officers and pharmacists reviewing clinical endpoint bioequivalence studies for locally acting products, and developing recommendations for establishing bioequivalence of complex generic products to their respective reference products. She reviewed many locally-acting products, transdermal products, and other products for which pharmacokinetic studies alone may not be adequate to establish bioequivalence. This work involved reviewing and understanding various aspects of the development and regulation of new drug products across all offices and divisions of the Office of New Drugs.

Dr. Hixon's work in the Center for Drug Evaluation and Research (CDER) included participation in a number of inter-office committees and working groups, including the following:

- She served on the Pregnancy Labeling Task Force from 1999 to 2005, participating in the development of the 2008 Proposed Rule on the Content and Format of Labeling for Human Prescription Drug and Biological Products; Requirements for Pregnancy and Lactation Labeling.
- She served on the FDA Drug Safety Oversight Board from its inception in 2005 until 2008, considering various emerging safety issues and FDA regulatory actions and public communications.
- She served on the CDER Pediatric Review Committee from 2002 until 2010, evaluating Written Requests to conduct studies of drugs for pediatric patients to qualify for pediatric exclusivity.
- She served on the CDER Pediatric Exclusivity Board from 2002 until 2011, considering study reports submitted in response to Pediatric Written Requests to determine whether pediatric exclusivity should be granted.
- She served on the Follow-On Protein Pharmaceutical Planning Committee in 2004-2005 for planning and executing two public workshops on the topic of Follow-On Protein Pharmaceuticals.
- She served on a working group to establish the Unapproved Drugs Compliance Policy Guide in 2006, evaluating risks of an unapproved product.

Dr. Hixon served as an instructor for CDER reviewers at the following internal conferences:

- She presented The Roles of the Medical Officer in the Drug Review Process for New Reviewers Workshop on numerous occasions from 1999 to 2006.

2

- She presented Clinical Considerations in Generic Drug Development to the Office of Generic Drugs and to CDER training conferences on numerous occasions from 2003 to 2010.
- She participated in CDER Scientific Rounds on numerous occasions from 2006 to 2010 as a presenter and/or panelist.
- She presented generic drug findings to the Drug Safety Oversight Board in 2007.

She also gave presentations at external conferences on various regulatory considerations including the following:
- Generics Yes video presentation in 2003 to promote public acceptance of generic drugs
- Annual Generic Pharmaceutical Association Fall Technical Conferences 2003 to 2011, presenting various clinical considerations in generic drug development and review
- FDA public workshop on follow-on protein pharmaceuticals in 2005, serving as a moderator for the Office of Generic Drugs.
- FDA and Generics Drugs—An Interactive Forum, University of Rhode Island College of Pharmacy, 2008: presenting Clinical Considerations for Generic Drugs
- CDER Forum for International Drug Regulatory Authorities, 2005 and 2006, presenting the CDER review process.

**Publications**

Peters JR, Hixon DR, Conner DP, Davit BM, Catterson DM, Parise CM, "Generic Drugs—Safe, Effective, and Affordable," Dermatologic Therapy 2009;22:229-240.

Uhl K, Cox E, Rogan R, Zeldis JB, Hixon D, Furlong LA, Singer S, Holliman T, Beyer J, Woolever W., "Thalidomide use in the US : Experience with Pregnancy Testing in the S.T.E.P.S. Programme," Drug Safety 2006;29(4):321-9.

**Education and Work History**

College

      Bridgewater College, Bridgewater, VA 1972-1976
      Degree:  B.A. Biology 1976
      Honors:  Summa cum laude

Medical School

      University of Maryland School of Medicine, Baltimore, MD 1976-1980
      Degree:  M.D.  1980

3

Residency Training

- Family Practice—Harrisburg Hospital, Harrisburg, PA 1980-1983
   Board Certified in Family Practice, 1983
- Obstetrics and Gynecology—Milton S. Hershey Medical Center,
   Pennsylvania State University, Hershey, PA 1983-1986
   Board Certified in Obstetrics and Gynecology 1989

Medical Practice

- Central Connecticut Obstetricians and Gynecologists, P.C., Bristol, CT, 1986-1989
- Chesapeake Obstetrics, Easton, MD 1989-1998

Hospital Affiliation

Bristol Hospital, Bristol, CT 1986-1989
Memorial Hospital at Easton, Easton, MD 1989-1998
   Chairman, Department of OB/GYN 1992-1994
   Credentials and Bylaws Committee 1992-1997
   Executive Committee 1991-1995
   Infection Control Committee 1991-1997

Locum Tenens

CompHealth, Salt Lake City, UT, assignments as follow:
   Dr. Rebecca Green, Nashua NH, 1991
   Antietam Health Services, Inc., Hagerstown, MD, 1992
   Kauai Medical Group, OB/GYN, Lihue, HI 1992

U.S. Food and Drug Administration 1999-2011

Center for Drug Development and Research
Division of Reproductive and Urologic Drug Products
Medical Officer January 19, 1999 to July 14, 2002
Medical Officer Team Leader November 19, 2000 to July 14, 2002

Office of Generic Drugs
Associate Director for Medical Affairs July 14, 2002 to August 1, 2011
Acting Director, Division of Clinical Review August 1 to November 5, 2011

4

USCA5 3178

Case 2:14-md-02592-EEF-MBN   Document 5603-2 *SEALED*   Filed 03/02/17   Page 47 of 55

# EXHIBIT "B"

Dr. Dena Hixon
<u>Materials Reviewed and/or Relied On In Addition to Materials Referenced in the Report</u>

Xarelto_BHCP_00003635
Xalelto_BHCP_00000842
Xarelto_BHCP_00002169
Xarelto_Janssen_00047127
Xarelto_Janssen_00047146
Xarelto_Janssen_00047482
Xarelto_Janssen_00047159
Xarelto_Janssen_00047169
Xarelto_Janssen_00054110
Xarelto_Janssen_05114607
Xarelto_Janssen_00047186
Xarelto_BHCP_04150863
Xarelto_Janssen_00000181
Xarelto_Janssen_00047486
Xarelto_Janssen_00047490
Xarelto_Janssen_00047287
Xarelto_Janssen_19117102
Xarelto_Janssen_00000238
Xarelto_Janssen_24065186
Xarelto_Janssen_00323178
Xarelto_Janssen_00054638
Xarelto_Janssen_00000307
Xarelto_Janssen_00047311
Xarelto_Janssen_00000311
Xarelto_Janssen_00044035
Xarelto_Janssen_00047315
Xarelto_Janssen_00000326
Xarelto_Janssen_00000319
Xarelto_Janssen_00310872
Xarelto_Janssen_00000344
Xarelto_Janssen_07538549
Xarelto_Janssen_07538222
Xarelto_Janssen_00000348
Xarelto_Janssen_00047328
Xarelto_Janssen_00047037
Xarelto_Janssen_00125892
Xarelto_Janssen_13994112
Xarelto_Janssen_13808378
Xarelto_Janssen_00047059
Xarelto_Janssen_18692335
Xarelto_Janssen_11046454
Xarelto_Janssen_00144195
Xarelto_Janssen_00342956

1

USCA5 3180

Xarelto_Janssen_11046490
Xarelto_Janssen_14523351
Xarelto_Janssen_11047459
Xarelto_Janssen_11046457
Xarelto_Janssen_14364109
Xarelto_Janssen_22788104
Xarelto_Janssen_06080988
Xarelto_Janssen_22788459
Xarelto_Janssen_06665748
Xarelto_Janssen_11047355
Xarelto_Janssen_24863806
Xarelto_Janssen_24863810
Xarelto_Janssen_11047434
Xarelto_Janssen_23230984
Xarelto_Janssen_11047447
Xarelto_Janssen_15528417
Xarelto_Janssen_18700902
Xarelto_Janssen_18700973
Xarelto_Janssen_24843024
Xarelto_Janssen_18701018
Xarelto_Janssen_16379396
Xarelto_Janssen_18701034
Xarelto_Janssen_18542664
Xarelto_Janssen_18701066
Xarelto_Janssen_24802060
Xarelto_BHCP_00000743
Xarelto_Janssen_00047482
Xarelto_Janssen_00000238
Xarelto_Janssen_01487188
Xarelto_Janssen_01180815
Xarelto_Janssen_00000307
Xarelto_Janssen_23910725
Xarelto_Janssen_11046496
Xarelto_Janssen_11046486
Xarelto_Janssen_15319221
Xarelto_Janssen_23525088
Xarelto_Janssen_00000344
Xarelto_Janssen_00047050
Xarelto_Janssen_00046207
Xarelto_Janssen_00058746
Xarelto_Janssen_00047328
Xarelto_Janssen_24952231
Xarelto_Janssen_00058533
Xarelto_Janssen_00058674
Xarelto_Janssen_00047325
Xarelto_Janssen_11047265

2

USCA5 3181

Xarelto_Janssen_00047036
Xarelto_Janssen_00058130
Xarelto_Janssen_00058134
Xarelto_Janssen_00058635
Xarelto_Janssen_00047518
Xarelto_Janssen_00054937
Xarelto_Janssen_00008324
Xarelto_Janssen_00047166
Xarelto_Janssen_00000321
Xarelto_Janssen_00000325
Xarelto_Janssen_00000329
Xarelto_Janssen_00001606
Xarelto_Janssen_00000332
Xarelto_BHCP_00006181
Xarelto_BHCP_00004208
Xarelto_BHCP_00000484
Xarelto_BHCP_00000463
Xarelto_BHCP_00006068
Xarelto_BHCP_00004442
Xarelto_BHCP_00004336
Xarelto_BHCP_00004220
Xarelto_BHCP_00004205
Xarelto_BHCP_00015558
Xarelto_BHCP_00000794
Xarelto_Janssen_24951551
Xarelto_Janssen_24951552
Xarelto_BHCP_00015725
Xarelto_Janssen 00000234
Xarelto_Janssen 00000247
Xarelto_Janssen 00001453
Xarelto_Janssen 00001455
Xarelto_Janssen 00023122
Xarelto_Janssen 00023214
Xarelto_BHCP_00015726
Xarelto_BHCP_00015737
Xarelto_Janssen_00000248
Xarelto_Janssen 00001454
Xarelto_Janssen 00001456
Xarelto_Janssen 00023123
Xarelto_Janssen 00023215
Xarelto_Janssen 00000237
Xarelto_Janssen 00023216
Xarelto_BHCP_00015729
Xarelto_Janssen_00023124
Xarelto_Janssen_00023203
Xarelto_Janssen_00023204

USCA5 3182

Xarelto_Janssen_00023205
Xarelto_BPAG_39520915
Xarelto_BHCP_11851798
Xarelto_Janssen_00000001 – Xarelto_Janssen_00068954
Xarelto_Janssen_00069619 - Xarelto_Janssen_00074462
Xarelto_Janssen_11046451 - Xarelto_Janssen_11048414
Xarelto_Janssen_13286681 - Xarelto_Janssen_13287022
Xarelto_Janssen_14527612 - Xarelto_Janssen_14538400
Xarelto_Janssen_18682007 - Xarelto_Janssen_18708218
Xarelto_Janssen_20244509 - Xarelto_Janssen_20244509
Xarelto_Janssen_23523489 - Xarelto_Janssen_23525674
Xarelto_Janssen_23557134 - Xarelto_Janssen_23557134
Xarelto_Janssen_24625778 - Xarelto_Janssen_24625935
Xarelto_Janssen_24951130 - Xarelto_Janssen_24952232
Xarelto_BHCP_00000001 – Xarelto_BHCP_00015768
FDACDER 00000001-360


Drugs@FDA Approval History NDA 022406, www.fda.gov

Drugs@FDA Approval History NDA 202439, www.fda.gov

FDA/Drugs/NewsEvents/ucm467203.htm Ellis Unger, updated 10/16/2015, www.fda.gov

FDA/downloads/Drugs/DrugSafety/DrugSafetyPodcasts/UCM374343.mp3—spinal bleeding, www.fda.gov

FDA Drug Safety Communication: Updated recommendations to decrease risk of spinal column bleeding and paralysis in patients on LMWR, www.fda.gov

FDA/downloads/Drugs/DrugSafety/DrugSafetyPodcasts/UCM333208.mp3—prosthetic heart valves, www.fda.gov

Coumadin label, www.fda.gov

NDA 022406 Approval Letter and label, 07/01/2011, www.fda.gov

NDA 022406/S-001,S-002, S-003 Approval Letter and label 11/2/2012, www.fda.gov

NDA 022406/S-004 Approval Letter and label 3/1/2013, www.fda.gov

NDA 022406/S-007 Approval Letter and label 1/7/2014, www.fda.gov

NDA 022406/S-009 Approval Letter and label 3/6/2014, www.fda.gov

NDA 022406/S-010 Approval Letter and label 2/13/2014, www.fda.gov

4

NDA 022406/S-012 Approval Letter and label 01/15/2015, www.fda.gov

NDA 022406/S-015 Approval Letter and label 12/19/2014, www.fda.gov

NDA 022406/S-017 Approval Letter and label 08/7/2016, www.fda.gov

NDA 022406/S-019 and S-020 Approval Letter and label 08/25/2016, www.fda.gov

NDA 202439 Approval Letter and label 11/04/2011, www.fda.gov

NDA 202439/S-008 Approval Letter and label 8/7/2013, www.fda.gov

NDA 202439/S-012 Approval Letter 2/12/2014, www.fda.gov

NDA 202439/S-015 Approval Letter and label 9/10/2015, www.fda.gov

NDA 202439/S-017 Approval Letter and label 5/6/2016, www.fda.gov

NDA 202439/S-019 Approval Letter 9/6/2016, www.fda.gov

NDA 202439/S-020 Approval Letter 10/5/2016, www.fda.gov

Kate Gelperin, M.D.,M.P.H. NDA 22406, Risk Assessment and Risk Mitigation Reviews/ Ongoing evaluation of potential severe liver injury signal in rivaroxaban clinical trials, February 13, 2009, www.fda.gov

Min Lu, M.D., M.P.H., NDA 22-406 Clinical Review, March 30, 2009, www.fda.gov

Dwaine Rieves, MD, NDA 22-406 Division Director Summary Review, Division of Medical Imaging and Hematology Drug Products, May 12, 2009, www.fda.gov

Memorandum of Meeting Minutes, May 1, 2009 Regulatory Briefing minutes, John Jenkins, chair, www.fda.gov

Aliza Thompson, Division of Cardiovascular and Renal Drug Products, NDA 202439 Cross-Discipline Team Leader Review, October 6, 2011, www.fda.gov

Dunnmon and Rose, 202439 Clinical review 02/03/2011, www.fda.gov

Martin Rose, MD, JD, NDA 202439 Rivaroxaban (Xarelto): Impact of use of the INRatio device in the ROCKET AF trial, Division of Cardiovascular and Renal Products, CDTL Review, September 26, 2016, www.fda.gov

FDA Guidance for Industry: Non-Inferiority Clinical Trials to Establish Effectiveness, November 2016, www.fda.gov

5

FDA Guidance for Industry: Warnings and Precautions, Contraindications, and Boxed Warning Sections of Labeling for Human Prescription Drug and Biological Products—Content and Format, October 2011, www.fda.gov

FDA Guidance for Industry: Reports on the Status of Postmarketing Study Commitments—Implementation of Section 130 of the Food and Drug Administration Modernization Act of 1997, February 2006, www.fda.gov

Center for Drug Evaluation and Research, Application Number: 022406Orig1S000, Medical Review(s), www.fda.gov

March 19, 2009 Cardiovascular and Renal Drugs Advisory Committee Meeting Materials and Transcript, www.fda.gov

September 8, 2011 Cardiovascular and Renal Drugs Advisory Committee Meeting Materials and Transcript, www.fda.gov

May 23, 2012 Cardiovascular and Renal Drugs Advisory Committee Meeting Materials and Transcript, www.fda.gov

Center for Drug Evaluation and Research, NDA Application Number 202469, Summary Review, www.fda.gov

Center for Drug Evaluation and Research, NDA Application Number 202469, Pharmacology Review(s), www.fda.gov

Center for Drug Evaluation and Research, NDA Application Number 202469, Cross Discipline Team Leader Review, www.fda.gov

Center for Drug Evaluation and Research, NDA Application Number 202469, Rocket AF Reanalysis Reviews, Clinical Review, Statistical Review, Clinical Pharmacology Review, www.fda.gov

Center for Drug Evaluation and Research, NDA Application Number 202469, Medical Review(s), www.fda.gov

Center for Drug Evaluation and Research, NDA Application Number 022406, Office Director Memo, www.fda.gov

Center for Drug Evaluation and Research, NDA Application Number 022406, Pharmacology Reviews, www.fda.gov

Center for Drug Evaluation and Research, NDA Application Number 022406, Medical Reviews, www.fda.gov

6

Center for Drug Evaluation and Research, NDA Application Number 022406, Summary Reviews, www.fda.gov

Center for Drug Evaluation and Research, NDA Application Number 022406, Cross Discipline Team Leader Review, www.fda.gov

Center for Drug Evaluation and Research, NDA Application 022406, Risk Assessment and Risk Mitigation Review(s), www.fda.gov

EMA/CHMP Assessment Report dated February 5, 2016

FR 44, no.124, June 26, 1979, Final Labeling Rule

FR 65, no.247, December 22, 2000, Proposed Labeling Rule

FR 71, no. 15, January 24, 2006, Final Physician Labeling Rule

Staerk 2016: Staerk L., et al., Ischaemic and haemorrhagic stroke associated with non-vitamin K antagonist oral anticoagulants and warfarin use in patients with atrial fibrillation: a nationwide cohort study, European Heart Journal (2016) 0, 1-9.

Lip GY, Pan X, Kamble S, Kawabata H, Mardekian J, Masseria C, Bruno A, Phatak H. Major bleeding risk among non-valvular atrial fibrillation patients initiated on apixaban, dabigatran, rivaroxaban or warfarin: a "real-world" observational study in the United States. Int J Clin Pract. 2016 Sep; 70(9): 752-63

White, RH, The Epidemiology of Venous Thromboembolism, Circulation, 2003; 107:I-4-I-8

Laliberte, F, et al., Real-world comparative effectiveness and safety of rivaroxaban and warfarin in nonvalvular atrial fibrillation patients, Current Medical Research & Opinion, (2014) 30(7): 1317-1325.

Camm, AJ, et al., XANTUS: a real-world, prospective, observational study of patients treated with rivaroxaban for stroke prevention in atrial fibrillation, European Heart Journal (2015), 1-9.

Powell, JR, Point-of-Care Warfarin Monitoring in the ROCKET AF Trial, New England Journal of Medicine 2016: 374:785-788 (February 3, 2016)

Patel, M, et al, Point-of-Care Warfarin Monitoring in the ROCKET AF Trial, New England Journal of Medicine 2016: 375:390-391 (July 12, 2016)

Patel, M, et al, Point-of-Care Warfarin Monitoring in the ROCKET AF Trial, New England Journal of Medicine 2016:374:785-788 (February 3, 2016)

Andrea Kollath, Deposition Transcripts I and II, March 30-31, 2016, In Re: Xarelto (Rivaroxaban) Products Liability Litigation

7

Troy Sarich, Deposition Transcript, June 29, 2016, In Re: Xarelto (Rivaroxaban) Products Liability Litigation

Andrea Derix, Deposition Transcripts I and II, March 1-2, 2016, In Re: Xarelto (Rivaroxaban) Products Liability Litigation

Purve Patel, Deposition Transcript, September 15, 2016, In Re: Xarelto (Rivaroxaban) Products Liability Litigation

Juergen Weber, Deposition Transcript, May 19, 2016, In Re: Xarelto (Rivaroxaban) Products Liability Litigation

Expert Report of David A. Kessler, MD, October 13, 2016, In Re: Xarelto (Rivaroxaban) Products Liability Litigation

Expert Report of Suzanne Parisian, MD, October 12, 2016, In Re: Xarelto (Rivaroxaban) Products Liability Litigation

Graham, DJ, et al., Stroke, Bleeding, and Mortality Risks in Elderly Medicare Beneficiaries Treated with Dabigatran or Rivaroxaban for Nonvalvular Atrial Fibrillation, JAMA Internal Medicine, Published Online October 3, 2016, E1-E10.

Kearon, C, et al., Antithrombotic Therapy for VTE Disease: CHEST Guideline and Expert Panel Report, Chest 2016; 149(2): 315-352.

Ansell, J, et al., The Pharmacology and Management of the Vitamin K Antagonists: The Seventh ACCP Conference on Antithrombotic and Thrombolytic Therapy, Chest 2004; 126: 204-233.

Garcia, DA and Crowther, MA, Reversal of Warfarin: Case-Based Practice Recommendations, Circulation 2012;125:2944-47.

Khorana, AA, et al., Incidence and Predictors of Venous Thromboembolism (VTE) Among Ambulatory High-Risk Cancer Patients Undergoing Chemotherapy in the United States, Cancer 2013;119:648-55.

8

USCA5 3187