# EXHIBIT-4

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: XARELTO (RIVAROXABAN)
PRODUCTS LIABILITY LITIGATION     MDL No. 2592
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~   SECTION L

THIS DOCUMENT RELATES TO ALL      Judge Eldon E. Fallon
CASES                             Mag. Judge North

- PROTECTED -

- SUBJECT TO FURTHER PROTECTIVE REVIEW -

THURSDAY, DECEMBER 8, 2016

SUZANNE PARISIAN, M.D.

     Videotaped deposition of SUZANNE PARISIAN, M.D., held at the law offices of Burg Simpson, 2398 East Camelback Road, Suite 1010, Phoenix, Arizona, commencing at 9:13 a.m., on the above date, before Sommer E. Greene, a Certified Court Reporter and Certified Realtime Reporter.

Protected - Subject to Further Protective Review

Page 24

```
 1     Q.    So you knew what Neoplastin and Neoplastin
 2   Plus were?
 3     A.    Yes, sir.
 4     Q.    Okay.  What is the reagent used for the
 5   neoplastin test?
 6     A.    Well, it's neoplastin.
 7     Q.    Okay.  And what is that?
 8     A.    It's just a different reagent that's used
 9   versus some of the other PT tests that are actually used
10   as an assay method.
11           What you're looking for is the clotting time
12   in a PT test, and you're looking if the normal clotting
13   time which the laboratory develops is extended from the
14   norm -- you compare it to a normal.  Every laboratory has
15   their own normal.  So it's just the reagent that you're
16   giving to the -- form the clot.
17     Q.    Is it your testimony that you're not an expert
18   on performing a PT test?
19     A.    I haven't -- I've done PT tests as a
20   pathologist.  You can run a clinical laboratory.  I
21   haven't looked at that information in that context.  I've
22   been focused on the regulatory issues of what the company
23   knew about their use of a PT test.
24              MR. WEINKOWITZ:  Let me put a late objection
25   to form on that question.
```

Protected - Subject to Further Protective Review

Page 26

1    Q.    BY MR. MURDICA:  You can't say, for example,
2    that the patient in this case had a bleeding event on any
3    particular day.  Correct?
4              MR. WEINKOWITZ:  Objection to the form.
5              THE WITNESS:  I think I've testified I've
6    not looked at any specific history of any particular
7    patient.
8    Q.    BY MR. MURDICA:  Given that, you're not going
9    to be able to say for the purposes of this litigation
10   that any particular label change at any particular time
11   would have had an effect on the outcome of any particular
12   patient.  Correct?
13             MR. WEINKOWITZ:  Objection to the form.
14             THE WITNESS:  That's not what my report
15   has been.  My opinions are based on the whole regulatory
16   history of the development of the product and what the
17   company did.
18             In terms of specific litigation, I know the
19   testimony is usually limited to a specific time frame.
20   I've not been told to limit this to a time frame at this
21   point in time.
22   Q.    BY MR. MURDICA:  I understand, Doctor.
23   Let's try to get an answer to my question.
24             Without knowing when any particular patient
25   event was that's the subject of this litigation, you are

Protected - Subject to Further Protective Review

Page 109

1           The information contained in what you're
2 calling the draft contingency plan, that's information
3 that's foreign to FDA that they don't know to this date.
4 So it would be new safety information. Correct?
5    A.    I'm thinking about the documents. Yeah. The
6 company was going to recommend that back before it got
7 approved, because the company has been adamant there is
8 no monitoring required, and there is no label -- no
9 laboratory information.
10           So it's not so much the information, but
11 it's that the company knows that this information would
12 have been valuable information to a physician that they
13 could have provided, and they didn't.
14           So what the FDA -- is new to the FDA would
15 be that the company was ready to provide it, like
16 Lovenox, and didn't, just because they weren't requested
17 specifically from the FDA.
18    Q.    Okay. But it's not your testimony that FDA
19 was unaware of the content of what you're saying is the
20 contingency plan. Correct?
21           MR. WEINKOWITZ: Objection to the form.
22           THE WITNESS: No, the FDA has asked for
23 monitoring information, for information from the company,
24 and the company has said that there is none and that
25 they're not providing it. And so that would be one thing

Protected - Subject to Further Protective Review

Page 153

1   A.   Sure.  I know Dr. David Kessler.  He had been
2   my boss when I was at the FDA.  I don't know him
3   personally.  He was the head of the FDA.
4   Q.   All right.  Are you aware if he is involved in
5   Xarelto litigation?
6   A.   Yes, I know he is.
7   Q.   Did you review his expert report in the
8   litigation?
9   A.   No, sir.
10  Q.   Why not?
11  A.   I wasn't provided it.
12  Q.   Did you ask for it?
13  A.   No.
14  Q.   Why not?
15  A.   Because I did my own review using the
16  methodology I've always used.  So I don't know what his
17  opinions are.
18  Q.   Okay.  You're not curious about what he says?
19  A.   Not really, because my opinions are based on
20  the facts and the information and the regulations that
21  I've seen them.  He and I have had different exposures
22  while at the FDA, and so we tend to oftentimes describe
23  different issues and look at different documents and
24  types of things.  So, no, I didn't ask for his.
25  Q.   Dr. Kessler was a much more senior member at

Protected - Subject to Further Protective Review

Page 190

1    Q.    Correct?

2    A.    And that's why I had brought for you any
3  document that I've acquired since writing this report so
4  that you have it today.  So that should be the universe
5  of what you've been given.

6    Q.    Okay.  Did you have the entire NDAs and INDs of
7  Xarelto?

8    A.    No.  And the medical officer wouldn't have it
9  anyway.  You would -- I looked at using the methodology I
10  always would at the FDA, which is to look at the reviews,
11  particularly the medical officer's reviews and the
12  statistical review, the pharmacokinetic reviews.  In
13  terms of if you were a medical officer coming into this
14  issue, you would look at the medical reviews.  You're not
15  going to go back and look at it.  No one at the FDA looks
16  at the entire document.

17    Q.    Doctor, I just asked if you had them.  You
18  didn't have them.  Correct?

19    A.    I didn't have the whole --

20    Q.    Okay.

21    A.    And I didn't ask for them.  If I had wanted
22  them, I could have had them, but I didn't ask for them.

23    Q.    Were the other materials that you reviewed
24  aside from pieces of regulatory submissions -- were they
25  provided to you, or did you ask for them?

Protected - Subject to Further Protective Review

Page 201

1  also use PharmD.  In terms of hematology drugs, they were
2  using their PharmD -- I think Beasley or something his
3  name was.  He was also involved.  So there were times
4  when the FDA would not use a medical officer, but more
5  often than not, they did have a medical officer involved
6  with an NDA team.
7      Q.   And I was only asking you about Xarelto.
8      A.   Okay.
9      Q.   Okay.
10     A.   But Xarelto did have two medical officers and a
11 PharmD to review the application in the hematology group.
12     Q.   You're not a lawyer.  Right, Dr. Parisian?
13     A.   I am not, no.
14     Q.   You agree that the best you can give is your
15 own interpretation of the regulations.  Correct?
16     A.   The best I can give is what I was trained to
17 give at the FDA, and that's what I give in terms of
18 regulatory advice to manufacturers.  I'm not a lawyer.  I
19 never said I am, but I was trained in terms of how to
20 review documents for the FDA to make a determination to
21 provide to attorneys who would then take that information
22 and run with it.
23          So I have a role in terms of applying the
24 regulations, in terms of what the regulations require and
25 then providing that as advice to members of FDA.

1  documents that you cited.  Correct?
2      A.    Yes, sir.
3      Q.    So you wrote and reviewed more than a page an
4  hour, about a page and a third an hour.  Correct?
5      A.    In terms of pages, yes, sir.
6      Q.    Okay.
7      A.    And that's because I was looking at a screen,
8  typing as I was going.
9      Q.    Are you a fast typist?
10     A.    Yes, sir, and I had no secretary.  You should
11 have asked that.  So, yes, I typed it.
12     Q.    The way your report is organized you have,
13 let's see, 16 opinions up front.  Correct?
14     A.    Yes, sir.
15     Q.    And then following those, there's a several
16 hundred page -- what's purported to be some sort of
17 recitation of facts.  Correct?
18     A.    Interpretation.  The opinions all have the
19 regulations, and then I try to provide the information
20 considered to come up with those opinions.  And there's a
21 table of contents, too, to try to help organize it so
22 that someone could read this and figure out what they
23 wanted to look at.
24     Q.    Okay.  Now, when you were at FDA more than 20
25 years ago, did you have access to internal company

Protected - Subject to Further Protective Review

Page 215

1   e-mails for companies that had device applications
2   pending before your division?
3        A.   I had -- yes, but not for device applications.
4   I had them in terms of -- the center for devices actually
5   has mandatory recall authority, and so I had boxes of
6   documents that would be obtained from a company by
7   marshals, and they would bring them in.  And then I was
8   required to piece them together in much the methodology I
9   have here.
10              So I looked at e-mails, I looked at company
11  documents, and I had to make a conclusion as to what I
12  was seeing in terms of potential action for the FDA in
13  terms of mandatory recalls, which they didn't have over
14  in CDER.
15       Q.   For the purposes of a nonrecalled product, you
16  never had access to company e-mails.  Correct?
17       A.   No.
18       Q.   Okay.
19       A.   In terms of a mandatory recall, that's correct,
20  but I had about four or five that were mandatory recalls.
21  And so that's when I first began looking at company
22  documents as to try to come up with a regulatory opinion
23  as to what I was seeing and then make recommendations to
24  the FDA general counsel as to what needed to occur.
25       Q.   In the context of a recall?

Page 372

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: XARELTO (RIVAROXABAN)
PRODUCTS LIABILITY LITIGATION         MDL No. 2592
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~         SECTION L

THIS DOCUMENT RELATES TO ALL          Judge Eldon E. Fallon
CASES                                 Mag. Judge North

- PROTECTED -

- SUBJECT TO FURTHER PROTECTIVE REVIEW -

FRIDAY, DECEMBER 9, 2016

SUZANNE PARISIAN, M.D.
VOLUME II

Videotaped deposition of SUZANNE PARISIAN, M.D., held at the law offices of Burg Simpson, 2398 East Camelback Road, Suite 1010, Phoenix, Arizona, commencing at 8:48 a.m., on the above date, before Sommer E. Greene, a Certified Court Reporter and Certified Realtime Reporter.

Golkow Technologies, Inc. - 1.877.370.DEPS

```
 1      Q.    And those REMS have all been satisfied as of
 2    2014.  Correct?
 3      A.    I want to make sure we're clear of the same
 4    term.  I'm looking at REMS as risk management types of
 5    -- and -- is that what you're using?  Because in terms
 6    of the way -- the question sounds like were the
 7    postmarket requirements fulfilled.
 8            Are you asking specifically about REMS,
 9    or are you asking about postmarket requirements?
10      Q.    I was asking about REMS.
11      A.    Right.
12      Q.    Because there were some risk evaluation --
13      A.    Right.
14      Q.    -- and mediation strategies.
15      A.    That's right.
16      Q.    Correct?
17      A.    And I just -- yes, those were fulfilled.
18      Q.    Okay.  Now, let's talk about Dr. Parisian's
19    methodology in litigation as a plaintiffs' expert
20    against a manufacturer.
21            My first question is what is step one in
22    your methodology, Dr. Parisian?
23      A.    My step one is the same step one that I would
24    use at the FDA, which is determining how a product got on
25    the market, the history of the FDA, what the issues have
```

Protected - Subject to Further Protective Review

Page 415

1    A.    Yeah.  Step two -- step one would be -- step
2    two would be obtaining more information.
3         So you look at the general history.  You
4    look at the approvals. You look at the labels. Step two,
5    you'd start doing -- now we're talking about being at the
6    FDA.  Step two, you would look at the documents that you
7    could acquire about the medical officer's review, maybe
8    the toxicology reviews, the pharmaco -- anything that was
9    more internal.
10        Some of those documents are on the Web site.
11   Some of those documents you had to acquire; you had to go
12   and try to obtain them at the FDA.  They may not have
13   always been that easy to obtain.  So it was another
14   process at the FDA that you had to try to obtain that
15   information.
16   Q.    Dr. Parisian, I didn't ask you about when you
17   were at FDA.  If you remember the beginning of my
18   questions, I asked as a plaintiff against pharmaceutical
19   manufacturers, what is your methodology for formulating
20   your opinions.  Do you remember that question?
21   A.    Yes.
22        MS. BRITTAIN-LANDERS:   Objection.
23        MR. WEINKOWITZ:  Objection.
24        THE WITNESS:  My answer was that the
25   methodology I use was acquired at the FDA.

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 747

1    A.    -- I agree.
2    Q.    You don't hold yourself out as an expert in the
3  laws or regulations governing prescription medications in
4  Europe.  Correct?
5    A.    That's correct.  That's why I'm saying I'm not
6  giving the information as a regulatory expert.  It's only
7  notice as to what information was available and what was
8  being discussed.
9    Q.    You're not an expert in the laws or regulations
10 concerning the European review and approval process for
11 prescription medications.  Correct?
12   A.    That's true.
13   Q.    You're not an expert in the laws and
14 regulations that apply to European labeling for
15 pharmaceutical products.  Correct?
16   A.    That would be true.  I'm not a regulatory
17 expert for Europe or Canada.
18   Q.    All of those answers you just gave about
19 Europe, not being an expert in the laws and regulations
20 and regulatory frameworks, that is also true with Canada.
21 Right?
22   A.    Yes.  And that's why I'm saying it was not
23 given as a regulatory expert.  It was only for notice of
24 information that was available to both companies at
25 different times.