# EXHIBIT-8

# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: LEVAQUIN PRODUCTS LIABILITY LITIGATION | MDL No. 08-1943 (JRT) |
| —————————————————————— | **ORDER DENYING MOTIONS TO** |
| This Document Relates to All Actions | **EXCLUDE CHERYL BLUME** |

Ronald S. Goldser, **ZIMMERMAN REED, PLLP**, 651 Nicollet Mall, Suite 501, Minneapolis, MN 55402-4123; and Lewis J. Saul, **LEWIS SAUL & ASSOCIATES**, 183 Middle Street, Suite 200, Portland, ME 04101, co-lead counsel for plaintiffs.

John Dames, **DRINKER BIDDLE & REATH LLP**, 191 North Wacker Drive, Suite 3700, Chicago, IL 60606-1698; William H. Robinson, Jr., **LECLAIR RYAN**, 1100 Connecticut Avenue N.W., Suite 600, Washington, DC 20036; and Tracy J. Van Steenburgh, **NILAN JOHNSON LEWIS, PA**, 400 One Financial Plaza, 120 South Sixth Street, Minneapolis, MN 55402, liaison and lead counsel for defendants.

Defendants claim that plaintiffs' expert witness Dr. Cheryl Blume has violated pre-trial discovery procedures and committed perjury. Defendants have moved to exclude Dr. Blume's testimony as a sanction for the alleged pre-trial discovery violations, and, independently, as unreliable under Rule 702. Although the Court finds Dr. Blume's actions troubling, because Dr. Blume's discovery violations did not prejudice defendants, and because the Court finds Dr. Blume used reliable data and methods to reach her opinions, the Court denies defendants' motions except as to limited testimony about regulatory history.

## DISCUSSION

### I.    DR. CHERYL BLUME

#### A.    Professional History

Cheryl Blume ("Blume") is the President of the Pharmaceutical Development Group ("PDG"), a consulting firm specializing in pharmaceutical development and registration activities.  She has held this position since 1999.  She received a B.A. and a Ph.D. in Medical Pharmacology from West Virginia University.  From 1977 to 1995, Dr. Blume worked at Mylan Laboratories, as the Director of Pharmacology/Assistant Director of Regulatory Affairs, then as the Technical Director, and finally as Vice President.   From 1993 to 1998, Blume worked as an executive at Somerset Pharmaceuticals.  Blume has also worked at the University of South Florida College of Medicine, first as a research scientist in the Department of Pharmacology from 2004 to 2007, and then as an Affiliate Associate Professor of the Department of Molecular Pharmacology and Physiology from 2007 to 2009.  Blume has authored multiple peer-reviewed pharmaceutical and medical-related articles.

#### B.    Blume's Proposed Testimony

Blume testifies that prior to, during, and after Levaquin's release on the market in the United States, there were numerous signs that the drug could produce tendonopathies, but Ortho-McNeil failed to timely enhance the warnings, and failed to adequately assess the evolving risks.  Blume contends that before Levaquin was introduced to the market,

fluoroquinolones already contained warnings that high doses could cause arthropathy in animals.

Blume notes that in 2001, acting on the array of data at its disposal, Ortho-McNeil sent a "Dear Healthcare Provider" letter to European healthcare providers, but declined to issue such a letter in the United States. (Expert Report of Cheryl Blume ("Blume Rep.") ¶ 3, Aff. of Tracy J. Van Steenburgh ("Steenburgh Aff.") Ex. A, Docket No. 2114.) Blume also highlights that during the period following the Levaquin launch, additional studies supported the theory that tendonopathies could be associated with fluoroquinolone use.

Blume's report further notes, that in a document called "Background Document for the Core Data Sheet Review Committee Levofloxacin and Tendonopathy," Ortho McNeil claimed tendon rupture was associated with concomitant corticosteroid use across **all** age groups, not simply the elderly as the company had claimed. These findings, Blume stresses, were supported by a number of spontaneous adverse event databases, including a database used by Ortho-McNeil known as SCEPTRE.

Blume's colleague, Keith Altman ("Altman") performed an analysis of SCEPTRE, using data internally available to the company during the period leading up to the December 2001 label change, which he provided to Blume. Blume concluded that across all evaluated groups, safety signals were clearly evident during the 1999 to 2001 timeframe, and that in some cases Levaquin in particular appears to have had greater risk

associated with its use than other fluoroquinolones. Neither U.S. healthcare providers nor their patients were informed of these increased risks.

Based on this information, Blume concludes that the SCEPTRE analysis showing elevated risk for tendonopathies across all patient groups was apparent, and not simply restricted to the elderly or to concomitant corticosteroid use. Blume opines that the U.S. warnings should have been further amplified because of this apparent elevated risk. According to Blume, an informative "Dear Healthcare Professional" letter would have increased prescriber awareness, resulting in enhanced patient education relating to the adverse tendon effects associated with Levaquin.

Blume testified at her deposition that the FDA's Adverse Event Reporting System ("AERS") database is one of the only data sources with potential comparative information regarding tendon injuries among fluoroquinolones. Defendants note that in her expert report, Blume did not say she had reviewed or evaluated the AERS database in formulating her opinions. (Blume Rep. ¶ 6.) At her deposition, Blume denied evaluating the AERS database because "AERS data were employed in the Citizens Petitions, so we didn't duplicate those efforts." (Dep. of Cheryl Blume ("Blume Dep.") 12:15-13:17, July 9, 2010, Goldser Aff. Exs. 2-3, Docket No. 2054.) Blume also said "[i]n other reports where we have been comparing one product to another or other types of medication we will use the AERS database and conduct PRRs." (Blume Dep. 12:24-13:2.)

## II.     EXCLUSION OF BLUME'S TESTIMONY FOR CONDUCT

Defendants move to exclude Blume's testimony on the following grounds: (1) her testimony violates the requirements of Rule 26 for expert reports and as such she should face sanctions; (2) her testimony violates Pretrial Order No. 5 ("PTO 5"); (3) her testimony ignored valid disclosure requests; and (4) her testimony constitutes perjury.

### A.     Rule 26 Disclosures

First, defendants seek exclusion of Blume's testimony for violation of Rule 26. Rule 26 of the Rules of Civil Procedure requires an expert witness to submit a written report including "the data or other information considered by the witness in forming"[1] his or her opinions.  Fed. R. Civ. P. 26(a)(2)(B)(ii).  The Rules are clear that this language is to be "interpreted broadly to require disclosure of **any** material considered by the expert, from whatever source, that contains factual ingredients."  Fed. R. Civ. P. 26, advisory comm. note, 2010 Amends. (effective Dec. 1, 2010).  "The essential purpose of Rule 26(a)(2)(B) is to ensure that an expert report is sufficiently complete, detailed and in compliance with the Rules so that surprise is eliminated, unnecessary depositions are avoided and costs are reduced."  *King v. Reed LLC*, No. 07-1908, 2008 WL 7514360, at *2 (D. Minn. Oct. 6, 2008) (internal quotation omitted); *see Mems v. City of St. Paul-Dept. of Fire and Safety Servs.*, No. 97-1589, 2002 WL 334411, at *1 (D. Minn. Feb. 20,

---

[1] The language "data or other information" will be replaced in December 2010 with "facts or data considered by the witness." Fed. R. Civ. P. 26, advisory comm. note, 2010 Amends. (effective Dec. 1, 2010).

2002).    While an absence of prejudice is not decisive, a lack of evidence suggesting undue prejudice based on a failure to disclose Rule 26 information cuts against the Court excluding expert testimony.  *See Gulf Ins. Co. v. Skyline Displays, Inc.*, Nos. 02-3503, 02-3632, 2004 WL 5716699, at *4 (D. Minn. Apr. 9, 2004).

Defendants argue that they were not provided with the comparative AERS database analysis Blume requested and received prior to issuing her expert report, thus Blume's Rule 26 disclosures were inadequate, even if she did not base an opinion on them.  Defendants contend Blume's report contains opinions about comparisons among Levaquin, Cipro, and Floxin, but does not disclose that a comparative database review may have informed those opinions, thus they were prejudiced because she could not be deposed on those issues.

In a declaration filed with this motion, Blume says:

> I determined that I would not utilize or rely upon Mr. Altman's compilations of the AERS data in my report since this would be duplicative and repetitive of other work. . . .  [M]y practice is to rely upon published and other reliable analyses of AERS data when available, particularly . . . [when] I have access to the proprietary databases . . . .

(Decl. of Cheryl Blume Oct. 13, 2010 ("Blume Decl. Oct. 13") ¶ 5, Docket No. 2167.)

Under the more liberal interpretation of Rule 26 that will be effective in December, Blume  should have disclosed that Altman conducted an analysis of the AERS database.  However, even under the existing rule, Blume's decision not to disclose her receipt of the AERS analysis was questionable at best.  Though the Court does not condone Blume's behavior, it also finds no prejudice resulted from her actions.  Blume

did not rely on the data to form her opinions, and the data has now been produced to defendants. As a result, Rule 37 sanctions are not appropriate at this time.

## B.     Violation of PTO 5

Second, defendants argue that Blume's testimony should be excluded because she violated the Court's pretrial order on expert discovery. Specifically, defendants allege that Blume failed to comply with paragraph 8 which states: "[T]he parties' testifying experts will identify in their expert reports the data and other information received or reviewed in connection with the formation of his or her opinions." (PTO 5 ¶ 8.) Defendants describe the PTO by stating "The Order further required that Defendants be provided 'the data and other information the testifying expert received or reviewed in connection with the formation of his or her opinion(s), whether or not he or she relied on that data or information.'" (Defs.' Mot. to Ex. for Cond. at 9.) However, the relevant language from PTO 5 is different: "[T]his Stipulation does not prevent any party from **seeking production of, or asking questions about**, the data . . . ." (PTO 5 ¶ 9) (emphasis added).

PTO 5 specifically excludes communications between testifying experts and their assistants from disclosure unless the expert relies on the communications. (PTO 5 ¶ 4.) Blume stated that she did not use the AERS data, and the SCEPTRE database was more scientifically rigorous and more in line with her standard practice in these scenarios. (Blume Decl. Oct. 13 ¶ 5.) According to Blume "[a]t the time of my initial report, I

never formed any opinions based on those [Altman's AERS compilations] because multiple reviews of the same data were publicly available and cited by me." (*Id.* ¶ 8.)

> In her affidavit responding to the allegations in this motion, Blume claims:
>
> The day prior to my . . . deposition, Mr. Altman provided me with a disk containing his analysis of the SCEPTRE data that I had reviewed and upon which I relied in my report. This is the only occasion in which he provided data to PDG in disk form. At my deposition, I provided Defendants with the disk Mr. Altman provided to me; neither I nor anyone else at PDG prepared the disk; neither I nor anyone else at PDG deleted any data from the disk . . . or altered it in any way before producing it to Defendants. . . . Since all publicly available reviews were provided and discussed, it never occurred to me that I was under an obligation to produce another copy of the already available data. Had I realized this, I would have produced it to Defendants without hesitation, which I understand Plaintiffs' counsel now has done.

(Blume Decl. Oct. 13 ¶¶ 7-8.)

The Court finds that PTO 5, standing alone, did not require disclosure of the AERS analysis. It provided an avenue to obtain documents by "seeking production," but was not itself the mechanism by which an obligation to produce the AERS analysis arose. Therefore, exclusion of Blume's testimony for violations of PTO 5 is not warranted.

## C.    Requests in Deposition Notice

Third, defendants seek exclusion of Blume's testimony for failing to disclose information about the AERS database in connection with her deposition. Defendants contend that Blume had a duty to disclose information about the AERS database, even if she did not base any opinion on it, because the PTO required production of materials

- 8 -

when requested in conjunction with her testimony.  Defendants point to their June 18, 2010 Deposition Notice asking Blume to provide:  "**All** data and other information **received or reviewed** in connection with the formation of your opinions, whether or not you relied on that data or information. . . .  All data or electronic information you created in this case."  (Second Am. Notice of Dep. of Cheryl D. Blume, Ph.D., ¶ 3-4, June 18, 2010, Steenburgh Aff. Ex. D, Docket No. 2114 (emphasis added).)

Blume should have produced the AERS database given to her by Altman.  The deposition notice was broadly worded, and could be read to include information she received, even if she did not rely on it for her opinions.  While agreeing that Blume's failure to provide the AERS database was a violation of the Deposition Notice's requirements, the Court finds exclusion of Blume's testimony is too extreme a sanction because Blume did not base her opinions on that data.  The Court finds no prejudice.

### D.    Perjury

Fourth, defendants argue for exclusion of Blume's testimony because she committed perjury by denying that she or Altman conducted the AERS analysis.  "A witness testifying under oath . . . commits perjury 'if she gives false testimony concerning a material matter with the **willful intent** to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'"  *United States v. Hanson*, No. 07-4416, 2008 WL 906257, at *3 n.6 (D. Minn. Mar. 31, 2008) (quoting *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)) (emphasis added).  "False testimony in a formal proceeding is intolerable.  [A court] must neither reward nor condone such a flagrant

affront to the truth-seeking function of adversary proceedings." *3M Innovative Props.*

*Co. v. Tomar Elecs.*, No. 05-756, 2006 WL 2670038, at *6 (D. Minn. July 21, 2006)

(internal quotation and quotation marks omitted).

Defendants first cite Blume's testimony to suggest she said Altman never looked

at the AERS data:

> Q:     Proportion reporting ratio [PRR]. That is not what you did here, correct?
>
> A:     Correct. We were – we were not comparing in these tables necessarily the tendon ruptures, comparing tendon ruptures with levofloxacin with another product. If we had been using the AERS database, we might have conducted that analysis. But our goal in this database is to look at levofloxacin.

(Blume Dep. 12:13-20.) Defendants then cite the following testimony to suggest that she

again said neither she nor Altman reviewed the AERS analysis:

> Q:     Actually, some of the reports that you have do include PRRs done by regulatory bodies, correct?
>
> A:     Correct. And that was one of the reasons we do not also do the AERS data in this case. We had the SCEPTRE database, and I recall that AERs data were employed in some of the Citizens Petitions, so we didn't duplicate efforts.

(Blume Dep. 13:11-17.) Plaintiffs argue that the line of questioning to which Blume was

responding was directed to the compilation of SCEPTRE data, which she used in

formulating the opinions in her expert report.

Finally, defendants cite the following question and answer:

> Q:     Did you try to determine why the AERS database – presumably Public Citizen knows what they are doing when they go in and look at that database?

A:  [W]e do not independently runs the AERS database. We only – Because we did have the company's database, it's considered a generally more scientific database. We relied upon the FDA – or relied upon the companies. The value of the AERS is you can look at comparisons between and among products, which of course you cannot do with the company's database.

(Blume Dep. 65:3-16.)  Plaintiffs note correctly that Blume never said that **Altman** did not analyze the AERS data, because she was never directly asked that question.

The corresponding testimony from Altman that defendants argue creates the inference of perjury is:

Q:  [Y]ou did not do a comparison between Levaquin and another quinolone or fluoroquinolone; correct?

A:  Yes, I did some comparisons.

Q:  Where in these tables are there those comparisons?

A:  They're not here.

Q:  So you did comparisons between fluoroquinolones that you provided to Dr. Blume?

A:  Yes.

. . . .

Q:  So that analysis is not in any shape, manner or form reflected in Exhibit 517; correct?

A:  I don't know. I never read 517. I mean, I could sit here and read through it if you want.

Q:  Please do.

A:  You want me to read the entire report?

- 11 -

Q:      [G]o right ahead.

A:      I can tell you, there is no analysis here, but I would have to read every piece of text to see whether she describes it or discusses it. . . . That's really a question for Dr. Blume.

(Dep. of Keith Altman ("Altman Dep.") 52:20-54:19, July 9, 2010, Goldser Conduct Aff. Exs. 2-3, Docket No. 2054.)

Altman further testified:

A:      I created a disk of all the underlying information which I sent to Dr. Blume [and that disk was provided to defendants].

Q:      And are you reasonably confident that that disk included the [AERS] analysis?

A:      I'm fairly certain that it does not.

(Altman Dep. 166:5-14.)

The quoted testimony from Blume and Altman, when considered in conjunction with Blume's explanations in her affidavit, does not suggest perjury. Blume was never directly asked if Altman analyzed the AERS data, and no evidence suggests that Blume possessed the willful intent to provide false testimony necessary to support a finding of perjury. The Court finds that a reasonable understanding of Blume's testimony is that neither she nor Altman relied on the AERS database to form any opinions – though Altman did run an analysis of the AERS database and provided it to Blume. The Court also determines that Altman's testimony shows that the disk he created for Blume, which she produced to defendants, did not include the AERS data.

The only way for Blume's testimony to have been perjurious is if she said Altman **had not conducted an AERS analysis**, which she did not do. Dr. Blume's testimony and actions with respect to the AERS database are clearly problematic and are not what the Court expects of an experienced expert witness. However, a careful review of her actions discloses no specific violation warranting the sanction of exclusion of her testimony. In particular, the Court finds no prejudice to defendants. The Defendants' Motion to Exclude is therefore, denied.

## III. EXCLUSION OF BLUME'S TESTIMONY UNDER RULE 702

### A. Standard of Review

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Under Rule 702, proposed expert testimony is admissible if three prerequisites are met. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). First, evidence based on scientific, technical, or specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. *Id.* Second, the proposed witness must be qualified. *Id.* Third the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that if the finder of fact accepts it as true, it provides the assistance the finder of fact requires. *Id.*

With regard to the third prong, amendments to Rule 702 prescribe that evidence is reliable or trustworthy if: (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702.

The district court has a "gatekeeping" obligation to make certain all testimony admitted under Rule 702 satisfies these prerequisites. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597-98 (1993). The proponent of expert testimony has the burden to show by a preponderance of the evidence that expert testimony is admissible under Rule 702. *Lauzon*, 270 F.3d at 686; *see also Daubert*, 509 U.S. at 592. However, "[t]he rule clearly is one of admissibility rather than exclusion." *Lauzon*, 270 F.3d at 686 (internal quotation marks omitted).

### B. Qualifications to Render an Opinion

Defendants challenge Blume's qualifications to render an opinion about proper labeling of fluoroquinolones and FDA regulations, noting that Blume is not a medical doctor, has never prescribed a medication, and has no clinical experience with fluoroquinolones. *See Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 716 (8th Cir. 2001) (finding that an "eminently qualified" expert hydrologist was not qualified to offer an expert opinion on safe warehousing practices).

Blume has participated in the development of approximately twenty New Drug Applications for the FDA and been permitted to testify in other litigation about the significance of the results of toxicology, pharmacology, and pharmacokinetics data appearing on a product label. She has also been permitted to testify about the use of adverse event reports as a safety signal, about a company's compliance with FDA standards, and about a company's knowledge of foreign regulatory events. Blume states that she uses epidemiology every day in her work and has participated in collecting and

evaluating post-marketing adverse medical events. She has aided in the preparation of amplified product labeling and written the labeling sections of pharmaceutical packaging about what has to be considered as vulnerable sub-populations.

Blume's long experience in the pharmaceutical industry, particularly her work on behalf of pharmaceutical clients relating to labeling and adverse medical event signals, are sufficient to meet a *Daubert* challenge to her qualifications.

### C.   Reliability of Methodology

#### 1.   SCEPTRE Analysis

Defendants contend that Blume's opinions based on the SCEPTRE analysis are inadmissible because the analysis was prepared by a plaintiff's attorney, was not verified, and is flawed.

Blume hired Altman, a lawyer at Finkelstein and Partners, to conduct an analysis of the SCEPTRE database. Altman searched it for any reports containing the preferred terms "tendon rupture" and "tendonitis." He then searched within those terms to determine whether they were reported to the FDA as "serious events," whether the patients identified in the reports were concomitantly using corticosteroids, the age of the patients, and what country the reports came from. Altman then grouped the data into cumulative tables for various time periods and showed the relative ranking of adverse event reports contained in defendants' own data.

The issue of work done by Altman for Blume has already arisen in a similar context and approved. In *In re Viagra Products Liability Litigation*, the Court found:

- 15 -

> Dr. Blume's opinion is also not inadmissible simply because she received the adverse events reports summary from Plaintiff's counsel [Altman]. . . . Here, there is no indication that the chart Plaintiff's counsel prepared for Dr. Blume was incapable of verification or meaningful review. . . . Dr. Blume also had a long-term working relationship with . . . Altman. Thus she likely knew from experience that she could rely on his summaries of data.

658 F. Supp. 2d 950, 963–64 (D. Minn. 2009).

Defendants also argue that Blume did not perform any additional analysis on the SCEPTRE data, which was a failure to follow her own methodology. However, review of Altman's testimony suggests otherwise:

> Q:     [A]re you aware of any further analysis that Dr. Blume did to give whatever weight may or may not be appropriate for a report . . . ?
>
> A:     No, Dr. Blume routinely synthesizes a conglomeration of information, and she uses it for her purposes. She's done [sic] for years. And that's been my experience in working with her.

(Altman Dep. 86:23-87:8.)

Defendants next argue that Blume's testimony is inadmissible because she did not verify the accuracy of Altman's analysis. Defendants cite the record in *Smith v. Pfizer*, No. 3:05-0444, 2010 WL 1963379, at *12-13 (M.D. Tenn. May 14, 2010), in which Blume says, in response to a question regarding her ability to establish the error ratio of work done by Altman, "I'm not capable of validating his work . . . I am not capable of independently validating his extraction of data from – these databases." (Dep. of Cheryl Blume in *Smith v. Pfizer* 68:25-69-10, Aff. of Goldser in Resp. to Mot. to Ex. Blume ("Goldser Aff.") Ex. 3, Docket No. 2054.)

Defendants do not suggest, however, that Blume claimed she was unable to validate Altman's work **in this case**. Reliance on deposition testimony taken from another case is not appropriate, particularly when Blume testified in this case that she did validate Altman's work.

> [W]e were able to compare our counts using Mr. Altman's system with your client's counts over various periods of time. And we were able to compare the differences in our counts with what your client has reported to various reporting agencies for the relevant time periods.

(Blume Dep. 10:22-11:4.)

> We validated it [SCEPTRE database] two ways: One way is that when Keith was down here one time and ran the entire database, I had our epidemiologist sit with him and literally hand count the counts that went into these tables, to ensure that his electronic tally matched the physical tally. And then another way of validating it was to compare it with your in-house analyses of events during relevant time frames . . . .

(Blume Dep. 176:10-18.)

Finally, defendants argue that courts routinely exclude opinions based on databases like SCEPTRE because the underlying data is unreliable, and the SCEPTRE database itself is flawed. They argue that there are four flaws in Altman's analysis, rendering any conclusions Blume draws from the analysis unreliable. The flaws are:

> (1) Altman did not look at descriptive case information, thus he missed critical information such as that some of the reports were filed by plaintiffs' lawyers in Levaquin litigation;

> (2) Altman made no attempt to distinguish between reports in which Levaquin was the primary medication, and those in which it was a concomitant medication;

- 17 -

(3) Altman double-counted reports that had multiple reported tendon reactions; and

(4) Altman counted tendon injury reports that were later determined not to be tendon injuries.

Blume's deposition testimony details the methods used by Altman to perform the analysis, and her validation of that analysis. (*See, e.g.,* Blume Dep. 9:9-22 ("Q: Wouldn't that result in double-counting or triple counting or quadruple? A: No. Absolutely not. One of the checks on these databases, and which you will see in here, is there are several steps that are undertaken to remove any duplicates . . . [t]he case ID number identifies the patient.").) The fact that a person hired by a plaintiff's witness conducted the analysis goes to weight, not admissibility. Flaws in Altman's analysis can similarly be challenged on cross-examination because defendants have not identified methodological flaws requiring exclusion based on that analysis. The Court finds that the SCEPTRE analysis was conducted validly and can be a reliable basis on which to base an expert opinion under Rule 703.

### 2. Reliability of SCEPTRE Data for an Expert Opinion

Defendants argue that even if Altman's analysis was not flawed and unreliable, the underlying adverse event data cannot provide an acceptable foundation for any admissible expert opinions. *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1250 (11th Cir. 2005) ("The FDA's adverse events reports . . . reflect complaints called in by product consumers without any medical controls or scientific assessment. . . . Uncontrolled

anecdotal information offers one of the least reliable sources to justify opinions about both general and individual causation.").

However, Blume's use of the SCEPTRE database is not to demonstrate causation; it is to display the data and trends internally available to Ortho-McNeil during the time period leading to the December 2001 label change. (Blume Rep. ¶ 87.) This use of adverse event reports is accepted by other courts. *See, e.g.*, *In re Baycol Prods. Liab. Litig.*, 532 F. Supp. 2d 1029, 1042–43 (D. Minn. 2007) ("As Plaintiffs point out, the AER data relevant to this case presented a very strong signal concerning Baycol and its association with rhabdomyolysis, and such evidence may be relevant at trial. It thus follows that Plaintiffs' experts may testify as to the existence of this signal."). So long as Blume's testimony is limited to opinions about signals available from the SCEPTRE database, and not causation, the Court does not consider it unreliable.

### 3. Inadmissible Weighting

Defendants argue that Blume inappropriately assigns weight to various data and studies based on her opinions, not the designs, limitations, or scientific rigor of the data. Defendants first cite Blume's use of the German "Mediplus" study, while dismissing a similar Danish database that allegedly did not support her conclusions. Second, defendants say that Blume "admits that no sufficiently-powered study ever has linked fluoroquinolones in general or Levaquin[] in particular to tendon rupture and acknowledges that the Ingenix study . . . found no increased risk of tendon rupture with Levaquin[] as opposed to other fluoroquinolones." (Defs.' Mot. to Ex. Blume at 40)

(internal citations omitted). Defendants assert that "[n]evertheless, Ms. Blume wants to opine that the results of the Mediplus Study should be added to Levaquin[]'s labeling anyway." (*Id.*) Third, defendants accuse Blume of "cherry-picking" her data, and ignoring the limitations of the Mediplus study.

Defendants' arguments at best suggest that Blume considered a wide variety of studies but gave more credence to some than others; this is within her purview as an expert. *See* Fed. R. Evid. 703. *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union Number 3, AFL-CIO*, 313 F. Supp. 2d 213, 230 (S.D.N.Y. 2004) (finding that an expert's methodology was not flawed when he attributed less weight to certain studies than others in forming an opinion). If she were not able to discriminate between studies she considered useful and those she did not, she would be required to assess every study of a given topic. This level of analysis is not required by *Daubert* or the Rules of Evidence. The Court finds that any issues with the selective use of data by Blume are best addressed on cross-examination.

### 4. Comparisons of Floxin and Levaquin and Non-Human Studies

The validity of experts comparing ofloxacin to levofloxacin was analyzed in a separate order in this case denying defendants' motions to exclude the testimony of Drs. Zizic and Smith. The Court determined that the comparisons of ofloxacin and levofloxacin by both Drs. Zizic and Smith were reliable, and their conclusions that the drugs could be considered the same for epidemiological purposes was found to be valid.

As such, Blume's opinions relying on, or comparing, levofloxacin and ofloxacin are not a basis to exclude her testimony.

### 5.    Other Fluoroquinolones

For the reasons discussed in the Court's November 8, 2010 Order denying defendants' motions to exclude the expert testimony of Dr. Zizic and Dr. Smith, Blume's opinions based on other fluoroquinolones and other antibiotics are not excluded. Defendants can challenge the use of studies involving other classes of drugs on cross-examination, but as part of an overall analysis of various drugs, inclusion of other classes does not render Blume's opinion unreliable.

### 6.    Historian

Defendants allege that Blume is attempting to be "plaintiff's Levaquin historian." (Defs.' Mot. to Ex. Blume at 18.)  Defendants point to the exclusion of similar testimony from Blume by other courts as support for their contention that Blume cannot proffer expert opinions on facts and documents that can be assessed by the jury at trial without need of expert interpretation.  *In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 967; *but see Smith v. Pfizer Inc.*, 2010 WL 1963379, at *11 (M.D. Tenn. May 14, 2010) ("[T]he court finds that Blume's discussion of the record gives context to her conclusions . . . .").

Although, Blume undoubtedly used her expertise to wade through large volumes of potentially relevant documents, much of Blume's report consists of recitations of fact that can be interpreted by the jury without expert assistance.  "The question is not

whether the jury could review all [the] material . . . but whether the jury could interpret the documents that Dr. Blume highlights in her report without the assistance of an expert." *In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d at 967. Although the Court will permit some recitation of facts to provide sufficient context to the jury for Blume's testimony, Blume cannot be the ultimate source of facts able to be proven by counsel through documents and non-expert testimony.

### 7.    Foreign Regulatory Policy

Defendants argue that a significant portion of Blume's opinions are based on actions taken by foreign regulatory bodies regarding levofloxacin. Defendants again cite *In re Viagra*: "[A]ny discussion of foreign regulatory actions is irrelevant to the current litigation." 658 F. Supp. 2d at 965. According to plaintiffs, Blume does not intend to introduce legal actions made by foreign regulatory bodies, except to show what defendants were required to do under US law, and to show defendants' motivations to protect its American market interests. Blume's limited reference to foreign regulatory events for the limited purpose of demonstrating notice is not excludable in this case.

### 8.    Corporate Intent and Motives

Defendants here make a similar argument as in their previous motion to exclude testimony on defendants' knowledge, motivation and intent. Defendants' cite eight paragraphs from Blume's report, and six lines from her deposition testimony, as objectionable because they allegedly express an opinion that the corporate motivation or

intent in conducting certain analyses was to delay labeling changes.  Most of the cited paragraphs from the expert report include quotations from produced documents, or other available material.  Defendants have not identified any testimony consisting of objectionable content on the grounds of motivation or intent.  To the extent Blume seeks to offer any testimony regarding corporate motivations or intent for labeling changes, they can be addressed on cross-examination and should be consistent with the Court's earlier Order.

### 9.    Labeling Differences

Defendants challenge Blume's testimony that "[a]n informative Dear Healthcare Professional letter, disseminated in 2001, would have increased prescriber awareness, resulting in enhanced patient education relating to adverse tendon effects associated with Levaquin."  (Blume Rep. ¶ 98.)  Defendants argue that Blume should not be permitted to opine what warning information physicians review and how different warning information on Levaquin labels would have resulted in "increased prescriber awareness," preventing tendon injuries.  (Defs.' Mot. to Ex. Blume at 23 ("This type of speculation about what prescribing physicians might do is not admissible expert testimony.").)

The Court finds that Blume has sufficient data and refers to a sufficient background and methodology  given her experience working with physicians on the

content and effectiveness of labeling. [2] The issues raised by defendants are best addressed on cross-examination.

### 10. Duty to Warn Patients

Defendants argue that Blume intends to impermissibly opine that they failed to adequately notify and educate patients in the United States. Defendants argue that such an opinion impermissibly conflicts with Minnesota's learned intermediary doctrine. *See Wehner v. Linvatech Corp.*, Civ. No. 06-1709, 2008 WL 495525, at *4 (D. Minn. Feb. 20, 2008) ("[A] manufacturer can satisfy its duty to warn by supplying the plaintiff's physician with an adequate warning."). Blume states that the purpose of the "Dear Doctor" letters is to advise physicians of risks, for the purpose of enhancing patient safety. (Blume Rep. ¶ 98.)

---

[2] In her deposition, Blume said:

Q: Do you think you are qualified to give an opinion about what physicians do or do not do in the context of assessing risks and benefits before prescribing a medicine for a patient?

A: I have conducted a number of focus panels with physicians over the 25 years in which we have addressed labeling iterations and what is important to them in making labeling – or making decisions regarding products, from a clinical perspective, outside of insurance issues and those types of things. So I have spent a lifetime writing labels, working with physicians and their understanding of labels, understanding verbiage in a label . . . . So yes, I think I am qualified to address what is important in a label and what would be important information for physicians when making decisions.

(Blume Dep. 96:23-97:11.)

- 24 -

Defendants' arguments are not persuasive that opinions on this topic should be excluded. Blume can testify about the **purpose** of "Dear Doctor" letters, and if legal conclusions or arguments are raised, the Court will address appropriate objections at trial.

### D.     Interpretation of FDA Statutes and Rules

Defendants argue that Blume intends to state as fact opinions about what FDA would and would not allow or require with regard to Levaquin's labeling, which defendants allege are unsupported legal conclusions, are her personal interpretations of FDA regulations, and contradict express determinations made by FDA concerning Levaquin labeling.

#### 1.     Preemption of Labeling Opinions

The parties agree that Levaquin is subject to mandatory class labeling, which means that FDA created each Levaquin label since it was first marketed. (FDA Notice, Lenahan Aff. Ex. M, Docket No. 1881.) However, defendants argue that Blume's opinions are inadmissible as legal conclusions contrary to FDA determinations regarding Levaquin labeling.

#### a.     Class Labeling

Defendants argue that the rules on class labeling mean that without FDA's prior approval or consent, a medicine's prescribing information cannot be modified and in the case of Levaquin, must be identical to the label for all other fluoroquinolones. Plaintiffs

dispute this characterization, and say that it is possible to change class labeling in a manner specific to one member of the class.

Defendants argue, that Blume should not be allowed to testify that a "boxed warning" label change required by FDA in July 2008 for all fluoroquinolones should have been implemented prior to February 2005. But Blume has not, and according to plaintiffs, **will not**, opine that a boxed warning should have been issued earlier. Provided that Blume does not testify about the timing of black-box warnings, the Court finds no reason to exclude her opinion on class labeling generally.

### b.     Comparative Safety Data

Defendants argue that Blume cannot opine that Levaquin's labeling should have included comparative safety data because doing so violates FDA's labeling regulations. 21 C.F.R. § 201.57(c)(2)(iii) (precluding "[a]ny statements comparing the safety or effectiveness of the drug with other agents for the same indication" except where there is "substantial evidence derived from adequate and well controlled studies . . . ."). Defendants cite a response to a comment on FDA regulations about including comparative clinical data labeling, in which the FDA said:

> Labeling is not intended to be a dispositive treatise of all possible data and information about a drug. It is intended instead to advise about potential hazards and to convey documented statements concerning safety and effectiveness. . . . [C]omparative statements concerning safety and effectiveness must be limited to those that are derived from adequate and well-controlled studies designed for that specific purpose.

44. Fed. Reg. 37434, 37441 (June 26, 1979) (codified at 21 C.F.R. pt. 201-202). The FDA defines a well-controlled study as possessing, among other characteristics: (1) a design that permits a valid comparison with a control to provide a quantitative assessment of drug effect; (2) a method of selection of subjects that provides adequate assurance that they have the disease or condition being studied; and (3) a method of assigning patients to treatment and control groups that minimizes bias and is intended to assure comparability of the groups. 21 C.F.R. § 314.126(b). Defendants admit that if a "well-controlled" study existed showing a comparative difference among the fluoroquinolones, then that data could be unilaterally added to the warning section of the Levaquin label, but no such study has been conducted.

The relevant provision of the Code of Federal Regulations provides that "[t]he labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal connection need not be proved." 21 C.F.R. § 201.57(e) (prior to June 2006). Plaintiffs argue that a drug company may change its warning label in order to strengthen a warning. 21 C.F.R. § 314.70(c)(6)(iii)(A). Plaintiffs further argue that there is nothing in the "Warnings" section of the regulation prohibiting comparative statements. They also note that FDA has allowed for studies and references to sources **other** than well-controlled studies to be cited in the "Clinical Studies" and "References" sections of the labeling regulations. 21 C.F.R. § 201.57(m) (prior to June 2006). However, studies other than well-controlled

studies can only be used if the clinical study or reference is cited in the labeling in place of a detailed discussion of data and information concerning an indication for the drug.  *Id.*

Though the regulation and comments suggest that a label should not include all information about a certain drug, there is sufficient latitude in the regulations to allow information suggesting an increased risk of injury to be included on a drug label in some limited instances.  Therefore, the Court finds that these opinions are not contrary to law such as would require exclusion.

## ORDER

Based on the foregoing, and the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Defendants' Motion to Exclude Cheryl Blume for Conduct [Docket No. 2111] is **DENIED.**

2.    Defendants' Motion to Exclude the Expert Testimony of Cheryl Blume [Docket No. 1879] is **DENIED**, except as to limitations on discussion of Levaquin's regulatory history that can be proven through non-expert testimony.


DATED:  November 12, 2010
at Minneapolis, Minnesota.

_____s/ John R. Tunheim_____
JOHN R. TUNHEIM
United States District Judge