UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | * * | MDL 2592 |
| | * | SECTION L |
| THIS DOCUMENT RELATES TO: | * * | JUDGE ELDON E. FALLON |
| ***Joseph J. Boudreaux, Jr., et al. v. Janssen et al.*** ***Case No. 2:14-cv-02720*** | * * | MAG. JUDGE NORTH |
| ***Joseph Orr, Jr., et al. v. Janssen et al.*** ***Case No. 2:15-cv-03708*** | * * * * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

---

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFFS' DESIGN-DEFECT CLAIMS UNDER THE LOUSIANA PRODUCT LIABILITY ACT [REC. DOC. 5115]**

---

# FILED UNDER SEAL

## TABLE OF CONTENTS

INTRODUCTION .......... 1

FACTUAL BACKGROUND .......... 3

LEGAL STANDARD .......... 4

ARGUMENT .......... 5

I. Plaintiffs Have Proven That an Alternative Design of Xarelto Which Was Capable of Preventing Plaintiffs' Damages Existed .......... 5

II. The LPLA's Risk/Utility Test is Easily Satisfied .......... 9

CONCLUSION .......... 11

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ....................................................................4

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ....................................................................4

*Dediol v. Best Chevrolet, Inc.*,
655 F.3d 435 (5th Cir. 2011) ....................................................................4

*Devon Enters., LLC v. Arlington Indep. Sch. Dist.*,
541 Fed. App'x 439 (5th Cir. 2013) ....................................................................4

*Ellis v. Weasler Eng'g, Inc.*,
258 F.3d 326 (5th Cir. 2001) ....................................................................9

*Equal Emp't Opportunity Comm'n v. WC&M Enters.*,
496 F. 3d 393 (5th Cir. 2007) ....................................................................4

*Hines v. Remington Arms Co.*,
648 So. 2d 331 (La. 1994) ....................................................................9

*Hunt v. McNeil Consumer Healthcare*,
297 F.R.D. 268 (E.D. La. 2014) ....................................................................7

*Johnson v. Transwood, Inc.*,
No. 14-cv-102, 2016 WL 589875 (M.D. La. Feb. 11, 2016) ....................................5

*Johnson v. World Alliance Fin. Corp.*,
830 F.3d 192 (5th Cir. 2016) ....................................................................4

*Krummel v. Bombardier Corp.*,
206 F.3d 548 (5th Cir. 2000) ....................................................................10

*Lavespere v. Niagara Mach. and Tool Works, Inc.*,
910 F.2d 167 (5th Cir. 1990) ....................................................................6

*Moyer v. Siemens Vai Servs., LLC*,
No. 11-cv-3185, 2013 WL 3293668 (E.D. La. June 28, 2013) ...........................5, 7, 9

*Sisk v. Sears, Roebuck & Co.*,
959 F. Supp. 337 (E.D. La. 1996) ....................................................................5-6

*Taylor v. American Laundry Mach., Inc.*,
658 So. 2d 288 (La. Ct. App. 1995) ....................................................9

*Theriot v. Danek Med., Inc.*,
168 F.3d 253 (5th Cir. 1999) ..........................................................10

*Wilson v. Hobart Corp.*,
No. 95-2279, 1996 WL 117502 (E.D. La. Mar. 15, 1999) ..............................5, 7, 9

**Statutes**

La. Rev. Stat. § 9:2800.54..................................................................1

La. Rev. Stat. § 9:2800.56.......................................................2, 5, 7,10

La. Rev. Stat. § 9:2800.57..................................................................2

La. Rev. Stat. § 9:2800.59..................................................................6

**Rules**

Fed. R. Civ. P. 56 ...........................................................................4

**Other**

Kennedy, *A Primer on Louisiana Products Liability Act*,
49 La. L. Rev. 565 (1989) ..................................................................5

**TABLE OF EXHIBITS**

| | |
|---|---|
| Exhibit 1 | Dagmar Kubitza, et al., *Safety, pharmacodynamics, and pharmacokinetics of single doses of BAY 59-7939, an oral, direct factor Xa inhibitor,* 78 Clinical Pharmacology & Therapeutics 412 (2005) |
| Exhibit 2 | (Rec. No. 119115) "*Xarelto" Rivaroxaban specific Antidote (BAY 1110261), Working draft for information, GDC,* 01/19/2011 |
| Exhibit 3 | Deborah Siegel, et. al., *Andexanet Alfa for the Reversal of Factor Xa Inhibitor Activity*, 373 New England Journal of Medicine 2413, at 2413 (2015) |
| Exhibit 4 | (Rec. No. 993600) Rivaroxaban Laboratory Test Progress Report, 11/08/11 |
| Exhibit 5 | Canadian Xarelto Product Monograph |
| Exhibit 6 | Deposition of Andrea Derix |
| Exhibit 7 | (Rec. No. 1610279) Rivaroxaban Laboratory Test Progress Report, 03/26/2009 (XARELTO_BCHP_03165997) |
| Exhibit 8 | Expert Report of Peter G. Liechty, M.D., FAANS, FACS (*Orr*) |
| Exhibit 9 | Expert Report of Gianluca Cerri, M.D., FACEP, FAAEM (*Orr*) |
| Exhibit 10 | Deposition of Kenneth Wong, M.D. (*Boudreaux*) |
| Exhibit 11 | Expert Report of Cindy A. Leissinger, M.D. |
| Exhibit 12 | Expert Report of David A. Kessler, M.D. |
| Exhibit 13 | Abstract P4066: W.F. Peacock, et. Al., *Major bleeding in a post-marketing assessment of 39,052 non-valvular atrial fibrillation patients on rivaroxaban*, 36 European Heart Journal 687 (2015) |
| Exhibit 14 | Deposition of John E. Maggio, Ph.D. |
| Exhibit 15 | Expert Report of Robert Charles Gosselin |

Plaintiffs submit this response in opposition to *Defendants' Joint Motion for Summary Judgment as to Plaintiffs' Design-Defect Claims Under the Louisiana Product Liability Act ("LPLA")* [Rec. Doc. 5115].

Defendants contend that if Plaintiffs' claims are not preempted (adopting its separate preemption motion[1]), then Plaintiffs are subject to summary judgment because they have not presented a defective design claim that satisfies the requirements of the LPLA. However, Plaintiffs have provided extensive evidence establishing their actual claims, not the confected claims that are mischaracterized in Defendants' motion. Plaintiffs' actual claims are not preempted, are supported by admissible evidence, and are not ripe for summary judgment. Plaintiffs' evidence controverts all of the false assertions raised by the instant motion, and confirm that the design defect claims they are actually pursuing do not rely on the formulation of other drugs as a reasonable alternative design, or on theoretical, untested dosing regimens. Defendants fundamentally misrepresent Plaintiffs' design defect claims, which posit that the absence of an anti-Factor Xa assay and/or a reversal agent rendered Xarelto unreasonably dangerous under the LPLA.

## **INTRODUCTION**

Joseph Boudreaux, Jr., and Joseph Orr, Jr. (along with his three children, on behalf of his deceased wife and their deceased mother, Sharyn Orr), have sued Defendants for injuries sustained from Xarelto use on the grounds that Xarelto is "unreasonably dangerous" under the LPLA.[2]

---

[1] *See* Defendants' Joint Motion for Partial Summary Judgment on the Ground that Federal Law Preempts Plaintiffs' Dosing, Monitoring, and Other Design-Related Claims [Rec. Doc. 5109].

[2] A product is "unreasonably dangerous" under the LPLA if the product is unreasonably dangerous in at least one of the following: (1) construction or composition; (2) design; (3) lack of an adequate warning; or (4) non-conformity to an express warranty. La. Rev. Stat. § 9:2800.54(B).

Plaintiffs' claims fall under the design defect (§ 9:2800.56)[3] and inadequate warning (§ 9:2800.57) sections of the LPLA. Defendants have not challenged Plaintiffs' failure to warn claims as part of the present motion; thus, Plaintiffs will not address the failure to warn claim beyond dismissing Defendants' baseless assertion that Plaintiffs' claims related to Neoplastin PT involve dose adjustment or dose titration. They do not.

Plaintiffs' actual design defect claims address the fact that Xarelto is an unreasonably dangerous product because of two characteristics: once-daily dosing that requires a higher dose to maintain anticoagulant effect for twenty-four hours; and high variability in absorption between individuals. Defendants' design of Xarelto was defective before the product was approved by the Food and Drug Administration ("FDA") because an alternative design that was capable of preventing Plaintiffs' damages existed at that time. The alternative design was the development of an anti-Factor Xa assay that would allow the clinician to assess whether to individually tailor the Xarelto dose to appropriately balance the risk/benefit of the drug or to take patients at too high of a bleeding risk off the drug. The implementation of this design would have prevented Plaintiffs' injuries. In addition, Xarelto was defectively designed because it was not developed with a reversal agent. Although these claims are not addressed by Defendants' motion, Plaintiffs' claims meet all of the LPLA's design defect criteria.

Prior to addressing Defendants' arguments, it is important to understand how Plaintiffs' defective design and failure to warn claims fit together. Under the LPLA, Defendants had two

---

[3] Section 9:2800.56 of the LPLA provides: "A product is unreasonably dangerous in design if, at the time the product left its manufacturer's control: (1) There existed an alternative design for the product that was capable of preventing the claimant's damage; and (2) The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product. An adequate warning about a product shall be considered in evaluating the likelihood of damage when the manufacturer has used reasonable care to provide the adequate warning to users and handlers of the product."

opportunities to avoid liability for developing an unreasonably dangerous product. First, they could have designed Xarelto to avoid the unique dangers created by its once-daily dosing and high interpatient variability characteristics by means of the development of an anti-Factor Xa assay calibrated to Xarelto in the United States. They did not. Given that choice, Defendants were required to warn doctors of a readily-available test – Neoplastin PT – that would identify patients at an especially high bleeding risk. The anti-Factor Xa assay and Neoplastin PT tests are reliable and fully capable of identifying patients at a high bleeding risk. Contrary to what Defendants now claim, Neoplastin PT is accurate; Defendants used it as a surrogate to measure blood plasma concentration in the ROCKET trial.[4] Thus, for purposes of identifying patients at a high risk of bleeding – particularly due to the unavailability of an anti-Factor Xa assay in the United States – the warning should have instructed clinicians to measure Neoplastin PT.

Defendants' motion suggests that Plaintiffs' defective design claim is not viable because: (1) Plaintiffs cannot prove that an alternative design capable of preventing their injuries existed; (2) Plaintiffs cannot satisfy the risk/utility test of the LPLA; and (3) there is no claim under the LPLA for failure to adequately test. Each of these arguments will be addressed below and proven to be without merit.

## FACTUAL BACKGROUND

To satisfy their evidentiary obligations, as well as to avoid unnecessary repetition, Plaintiffs incorporate by reference their response to Defendants' joint preemption motion, and their response to Defendant's *Daubert* motions touching on the same subject.[5]

---

[4] Neoplastin PT is a surrogate measure of blood plasma concentration because unlike an anti-Factor Xa assay, it does not directly measure concentration, but it can indirectly measure concentration. Neoplastin PT measures clotting time in seconds, but given the direct, linear correlation between Neoplastin PT and blood plasma concentration, concentration can be readily determined.

[5] *See* Plaintiffs' Response in Opposition to Defendants' Joint Motion for Partial Summary Judgment on the Ground that Federal Law Preempts Plaintiffs' Dosing, Monitoring, and Other Design-Related Claims [Rec. Doc. 5109]; and

**LEGAL STANDARD**

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party has set forth the basis for summary judgment, the burden then shifts to the non-moving party, who must go beyond mere allegations and offer specific facts showing there is a genuine issue of fact for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986), *citing* Fed. R. Civ. P. 56(e). In determining whether a genuine issue of fact exists, the Court must review the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986); *Johnson v. World Alliance Fin. Corp.*, 830 F.3d 192, 195 (5th Cir. 2016).

In deciding a motion for summary judgment, a genuine issue of material fact exists when the evidence is such that, viewing the record as a whole, a rational trier of fact could return a verdict for the non-moving party. *See Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435, 439 (5th Cir. 2011). However, the Court must "refrain from making credibility determinations or weighing the evidence." *Devon Enters., LLC v. Arlington Indep. Sch. Dist.,* 541 Fed. App'x 439, 441 (5th Cir. 2013), *quoting Equal Emp't Opportunity Comm'n v. WC&M Enters.*, 496 F. 3d 393, 398 (5th Cir. 2007). Ultimately, this Court's concern is to ascertain "whether there is a need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

Plaintiffs' Response in Opposition to Defendants' Joint *Daubert* Motions to Exclude Expert Opinions and Testimony Regarding (1) Unapproved Dosing and Monitoring Regimens [Rec. Doc. 5113] and (2) the Experts' 20-Second PT Cut-Off Guideline in the *Orr* and *Boudreaux* Cases [Record Doc. 5114].

4

## ARGUMENT

### I. Plaintiffs Have Proven That an Alternative Design of Xarelto Which Was Capable of Preventing Plaintiffs' Damages Existed.

Contrary to Defendants' arguments, Plaintiffs are not asserting that the alternative design of Xarelto was warfarin or some other New Oral Anticoagulant (NOAC). This false argument is based on "alternative facts;" it is fictitious. As stated above, the design defect claims that Plaintiffs are pursuing address the absence of an anti-Factor Xa assay and/or a reversal agent, which would have prevented Plaintiffs' injuries. The evidence of record confirms that Xarelto-specific anti-Factor Xa assays existed at the time of Xarelto's United States approval, are commercially available in Europe, and had been tested and were extensively relied upon by Defendants in many of the clinical studies before the FDA's approval of Xarelto.[6] Similarly, a reversal agent for Xarelto existed, and had been tested,[7] although it is not yet commercially available in the United States. Thus, Plaintiffs have satisfied the first condition of an LPLA design defect claim: the "existence" of an alternative design at the time Defendants sold Xarelto.[8,9]

---

[6] *See, e.g.*, Exhibit 1, Kubitza Article.

[7] *See* Exhibit 2, Antidote Working Draft. Indeed, the antidote was tested in a clinical trial and was shown to completely reverse the anticoagulant effect of Xarelto in a matter of minutes. *See* Exhibit 3, Siegal Article, at 1 ("Andexanet reversed the anticoagulant activity of…rivaroxaban in older healthy participants within minutes after administration and for the duration of infusion, without evidence of clinical toxic effects.")

[8] Under the LPLA, "existed" does not mean that the proposed alternative design had to be feasible; it means only that the proposed alternative design must have been at least "conceived at the time the product left the manufacturer's control." *Wilson v. Hobart Corp.*, No. 95-2279, 1996 WL 117502, at *3 (E.D. La. Mar. 15, 1999), *quoting* Kennedy, *A Primer on Louisiana Products Liability Act*, 49 La. L. Rev. 565, 596 (1989) ("'Existed' does not mean that the alternative design must have been manufactured and in actual use when the manufacturer distributed his product. Nor does it mean that that alternative design must have been feasible, i.e., could have been employed even if it was not, at that time. But 'existed' does mean that the alternative design must have at least been conceived at the time the product left its manufacturer's control, because one of the purposes of the first element of section 2800.56 … is to show that the manufacturer had a realistic choice as to design."); *see also Moyer v. Siemens Vai Servs., LLC*, No. 11-cv-3185, 2013 WL 3293668, at *9 (E.D. La. June 28, 2013) (same); *Johnson v. Transwood, Inc.*, No. 14-cv-102, 2016 WL 589875, at *5 (M.D. La. Feb. 11, 2016) (same).

[9] Defendants contend an alternative design must be "feasible." *See* Defendants' Memorandum of Law in Support of their Joint Motion for Summary Judgment as to Plaintiffs' Design-Defect Claims Under the Louisiana Product Liability Act ("Def. Mem."), at 17. This argument misinterprets both the express words of the statute and the jurisprudence interpreting it. A plaintiffs' burden is not to show that an alternative design capable of preventing the damage was "feasible." *See* cases cited *supra* note 8; *Sisk v. Sears, Roebuck & Co.*, 959 F. Supp. 337, 339 (E.D. La.

Contrary to what Defendants claim, Plaintiffs' proposals are not "hypothetical conceptual suggestions."[10] Instead, their proposed alternative designs are "reasonably specific" and not based on mere speculation.

As to whether anti-Factor Xa assays existed, consider that:

- Anti-Factor Xa assays were known to the Defendants long before Xarelto was marketed in the United States. For example, in 2005, Bayer's Dr. Kubitza published an article, which showed Xarelto anticoagulation activity was assessed by using anti-Factor Xa assays.[11]

- By 2011, Bayer's report to the European Medicines Agency ("EMA") stated that there were "appropriate assays currently marketed by two different diagnostic companies."[12] The report made it clear the anti-Factor Xa assays were approved and commercially available: "[A]nti-Factor Xa assay [has] now received CE mark certification and [is] commercially available."[13]

- Bayer's Canadian Monograph for Xarelto states that in certain circumstances, it may be desirable to assess the anticoagulant effect of rivaroxaban. The Monograph suggests that using anti-Factor Xa assays, with rivaroxaban-specific calibrators and controls, may be useful to inform clinical decisions in these circumstances.[14]

1996), *citing Lavespere v. Niagara Mach. and Tool Works, Inc.*, 910 F.2d 167, 179–81 (5th Cir. 1990). Rather, feasibility is an affirmative defense on which Defendants alone bear the burden of proof. *See* La. Rev. Stat. § 9:2800.59(A)(3) (emphasis added) ("Notwithstanding R.S. 9:2800.56, a manufacturer of a product shall not be liable for damage proximately caused by a characteristic of the product's design *if the manufacturer proves that*, at the time the product left his control … [t]he alternative design identified by the claimant under R.S. 9:2800.56(1) was not feasible, in light of then-existing reasonably available scientific and technological knowledge or then-existing economic practicality."). Here, Defendants' opening papers sought partial summary judgment only to dismiss Plaintiffs' claims, and not to affirmatively establish their defenses, so in their reply, they will be estopped from attempting to reinforce arguments or present new facts on matters pertaining to this affirmative defense.

[10] *See* Def. Mem. at 16.

[11] *See* Exhibit 1, Kubitza Article.

[12] *See* Exhibit 4, EMA Progress Report (11/08/11), at 6. This report covers developments between September 16, 2010 and September 15, 2011. *Id*.

[13] *See id.* at 12.

[14] Exhibit 5, Canadian Monograph, at 9-10, 30.

- Bayer employees have admitted the benefits and need for an anti-Factor Xa assay. For example, Andrea Derix, Ph.D., Bayer's Global Program Team Leader for Research and Development of Xarelto, testified that in certain situations, an anti-Factor Xa assay would be useful to indirectly measure Xarelto's plasma concentrations.[15]

Similarly, as to whether a reversal agent existed, consider that by the time the FDA approved Xarelto in 2011, Bayer had developed a reversal agent (BAY1110262), which "specifically binds to rivaroxaban and neutralizes riva activity on FXa by lowering the fraction of unbound riva in plasma … BAY1110262 potent[ial]ly reverses rivaroxaban effect in human plasma."[16]

It is irrefutable that both alternative designs have been proven to have existed at the time Xarelto was first sold in the United States. While Defendants may contend that these alternative designs were not commercially available in the United States, nor FDA approved, that is not the standard required by the LPLA. Indeed, in LPLA defective design cases involving alternative designs of pharmaceutical products, "*lack of FDA approval is not dispositive*."[17]

As to the second condition, Plaintiffs need not show that an alternative design would have prevented Plaintiffs' injury; rather, they need show only that an alternative design would have made the damages significantly less likely.[18] Section 9:2800.56(2) also permits consideration of whether an adequate warning would impact damages. To this point, Defendants cannot seriously dispute the safety benefits of a laboratory test to assess the bleeding risk of Xarelto patients. In fact, Bayer endorsed such tests with the EMA well before the sale of Xarelto in the United States:

---

[15] Exhibit 6, Derix Dep., at 289:19-290:09.

[16] *See* Exhibit 2, Antidote Working Draft, at 3, 4.

[17] *Hunt v. McNeil Consumer Healthcare*, 297 F.R.D. 268, 274 (E.D. La. 2014) (emphasis added).

[18] *Wilson*, 1996 WL 117502, at *3; *Moyer*, 2013 WL 3293668, at *9.

> Testing of coagulation parameters during the administration of antithrombotic agents is a *common and accepted practice in clinical medicine*.... While routine monitoring [of Xarelto] may not be required, certain clinical situations exist when monitoring and measurement of their blood concentration as well as their pharmacodynamic effects would be desirable."[19]

Plainly, an anti-Factor Xa assay would allow treating doctors to tailor Xarelto to the individual needs of their patients.

As to Mrs. Orr, an anti-Factor Xa assay would have informed her surgeons of her precise coagulation status, confirming that she had no Xarelto on board and that surgical intervention could begin immediately. While Neoplastin PT could have informed doctors whether Mrs. Orr was anticoagulated, the anti-Factor Xa assay could have provided even more information, in the form of a precise measurement of her anticoagulation status, which would have weighed on the decision to perform prompt emergent surgery. Such an assay is capable of assessing *both* the high-end of exposure (i.e., excessive bleeding risk) and the low-end of exposure (i.e., whether there is sufficient drug on board to prevent thrombosis), and would have made Mrs. Orr's damages significantly less likely.[20] Similarly, the lack of a reversal agent also delayed her surgery and prevented mitigation of her damages.[21]

As to Mr. Boudreaux, if such a test had been available, his treating doctor could have appropriately dosed him or removed him from Xarelto therapy, given that Mr. Boudreaux would have been identified as high risk for a bleeding event. This is corroborated by Dr. Wong's

---

[19] *See* Exhibit 7, EMA Progress Report (03/26/09), at 4.

[20] *See* Exhibit 8, Liechty Report (*Orr*), at 12-13 (inability to assess Mrs. Orr's anticoagulation status delayed surgical intervention, which prevented a better surgical outcome); Exhibit 9, Cerri Report (*Orr*), at 5 (inability to assess Mrs. Orr's anticoagulation status prevented a better surgical outcome).

[21] *See* Exhibit 8, Liechty Report (*Orr*), at 12-13; Exhibit 9, Cerri Report (*Orr*), at 5.

testimony: "Yes, of course, I would want to know [about a rivaroxaban test that could identify high responders]."[22]

Causation is established if it is shown that an alternative design would have made the damages significantly less likely.[23] This has unquestionably been supported through the testimony of Plaintiff's experts and Mr. Boudreaux's and Mrs. Orr's prescribing and treating physicians. These facts were never addressed in Defendants' motion, and Defendants therefore should be precluded from refuting them in their reply. Even if Defendants would improperly present additional evidence in their reply, the testimony in this opposition would sufficiently establish genuine issues of material fact to preclude summary judgment.

## II. **<u>The LPLA's Risk/Utility Test is Easily Satisfied.</u>**

Under the LPLA, the determination of whether a defect is unreasonably dangerous is a question of fact for the factfinder.[24] Similarly, the existence of risk/utility is a question of fact, or of mixed fact and policy, to be determined by the jury based upon the evidence and circumstances presented by the particular case.[25] In terms of this case, the risk of a Xarelto patient having a bleed is significant,[26] and it could be significantly reduced by Plaintiffs' proposed alternative designs.[27]

[22] *See* Exhibit 10, Wong Dep., at 43:5-46:4.

[23] *Wilson*, 1996 WL 117502, at *3; *Moyer*, 2013 WL 3293668, at *9.

[24] *See Hines v. Remington Arms Co.*, 648 So. 2d 331, 335 (La. 1994); *Taylor v. American Laundry Mach., Inc*., 658 So. 2d 288, 292 (La. Ct. App. 1995).

[25] *Ellis v. Weasler Eng'g, Inc.,* 258 F.3d 326, 332 n.8 (5th Cir. 2001).

[26] *See, e.g.*, Exhibit 11, Leissinger Report, at 4 ("Thus, for every one million patients on Xarelto for atrial fibrillation, approximately 150,000 persons per year will have a clinically relevant bleeding event. On a global scale, and over multiple years, more than a million patients will experience a clinically relevant bleeding event as a direct result of their use of this medication"); Exhibit 12, Kessler Report, at 9 ("According to the Phase III pivotal clinical trial conducted by the sponsors, Xarelto was shown to result on 14.9 major or non-major clinically relevant bleeding events per 100 patient years."); Exhibit 13, Peacock Abstract (summarizing major bleeding events of patients taking Xarelto).

[27] Defendants' reliance on Dr. Maggio's testimony to suggest that patient safety would not be improved through measurements, *see* Def. Mem. at 27, is taken out of context. Contrary to Defendants' *reductio ad adsurdum* position, when read in context, Dr. Maggio steadfastly repeated his opinion that patient safety would likely be *improved* through rivaroxaban measurements. *See* Exhibit 14, Maggio Dep., at 17:7-21:23.

As to the first alternative design – the anti-Factor Xa assay – Defendants' own conduct is strong evidence that the burden of using this as a one-time screening test is minimal compared to the increased risk of a bleed without such a test. As set forth above, Defendants used an anti-Factor Xa assay to evaluate patients' bleeding risks in their own Xarelto clinical studies. Such assays are commercially available in Europe, and Defendants' Xarelto label in Canada specifically provides instructions for the safe use of anti-Factor Xa assays to assess patient exposure to Xarelto. Moreover, the cost of an anti-Factor Xa tests is minimal. Plaintiffs' expert Robert Gosselin specifically opined that anti-Factor Xa tests "are relatively inexpensive."[28]

The prescribing and/or treating physicians for both Mr. Boudreaux and Mrs. Orr testified that they would have wanted to know about an available screening test. Based on this testimony and the evidence set forth above, a jury reasonably could conclude that the utility of a one-time screening test, using an anti-Factor Xa assay, far outweighed the increased risk of bleeding on Xarelto without such a test.[29] The constellation of these facts readily creates contested issues of fact for the jury to determine liability under Section 9.2800.56 of the LPLA.[30]

As to the second alternative design – a reversal agent – in 2011, before Xarelto was sold in the United States, Bayer prepared a summary of its plan for a reversal agent.[31] Bayer already had tested the reversal agent, and it worked. Bayer's summary included a positive risk/benefit analysis for the reversal agent, noting no major safety signals. Additionally, Bayer found that there was an

---

[28] Exhibit 15, Gosselin Report, at 33.

[29] *See generally Krummel v. Bombardier Corp.*, 206 F.3d 548, 551-52 (5th Cir. 2000).

[30] Plaintiffs recognize that the LPLA provides the exclusive remedies to Louisiana plaintiffs, and that one Fifth Circuit panel has held that "there is no basis in the LPLA or case law" to assert a failure to test theory. *See Theriot v. Danek Med., Inc*., 168 F.3d 253, 256 (5th Cir. 1999). As with the other confected claims Defendants would prefer to defend, the failure to test theory is not being presented by Mr. Boudreaux or Mrs. Orr. Therefore, Defendants seek summary judgment on a moot point, and the Court should deny that aspect of the motion as moot. Of course, the holding of *Theriot* is limited to the LPLA, and has no bearing on claims of plaintiffs from outside of Louisiana.

[31] *See* Exhibit 2, Antidote Working Draft.

"unmet medical need" for a reversal agent because one to three percent of Xarelto patients would experience a life-threatening bleed. Bayer concluded that a reversal agent would result in a commercial advantage because physicians would have increased confidence in Xarelto, which would produce a 3.5% increase in Xarelto sales.[32] The need and utility of a reversal agent are demonstrated in Bayer's own documents and, specifically, in Mrs. Orr's case, where a reversal agent could have saved her life.[33]

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that this Court deny Defendants' motion.

Respectfully submitted,

Dated: February 27, 2017

*/s/ Leonard A. Davis*
Leonard A. Davis, Esq. (Bar No. 14190)
***HERMAN, HERMAN & KATZ, LLC***
820 O'Keefe Avenue
New Orleans, LA 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Email: ldavis@hhklawfirm.com

Gerald E. Meunier (Bar No. 9471)
***GAINSBURGH BENJAMIN DAVID MEUNIER & WARSHAUER, LLC***
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
Email: gmeunier@gainsben.com

***Plaintiffs' Liaison Counsel***

[32] *Id.* at 3, 7.

[33] *See* sources cited *supra* note 21.

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on February 27, 2017, the foregoing pleading and its supporting memorandum of law were filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre- Trial Order No. 17.

*<u>/s/ Leonard A. Davis</u>*
**LEONARD A. DAVIS**