UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) | * | MDL 2592 |
| PRODUCTS LIABILITY LITIGATION | * | |
| | * | SECTION L |
| THIS DOCUMENT RELATES TO: | * | |
| | * | JUDGE ELDON E. FALLON |
| | * | MAG. JUDGE NORTH |
| | * | |
| *Joseph Orr, Jr., et al. v. Janssen et al.* | * | |
| *Case No. 2:15-cv-03708* | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

---

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' JOINT MOTION FOR
PARTIAL SUMMARY JUDGMENT BASED ON THE LEARNED INTERMEDIARY
DOCTRINE [REC. DOC. 5119]**

---

# FILED UNDER SEAL

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 2

LEGAL ARGUMENTS AND AUTHORITIES .................................................. 7

I.      Legal Standard ......................................................................................... 7

II.     More Than Sufficient Evidence Exists to Preclude Summary Judgment Under the
        Learned Intermediary Doctrine. .............................................................. 8

        A.      Plaintiffs Meet the First Prong of the Learned Intermediary Test by Showing the
                Inadequacy of Defendants' Instructions ...................................... 9

                1.      Defendants Misapply the First Prong of the Learned Intermediary Test.. 10

                2.      Defendants Failed to Adequately Instruct Physicians on Laboratory
                        Testing Available for Evaluating a Patient's Risk of Bleeding and
                        Exposure to Xarelto. ........................................................... 11

        B.      Plaintiffs Meet the Second Prong of the Learned Intermediary Test by
                Demonstrating that Defendants' Failure to Adequately Instruct Mrs. Orr's
                Physicians Caused Mrs. Orr's Tragic Outcome. ....................... 15

                1.      Defendants' Inadequate Instructions Prevented Mrs. Orr's Prescribing
                        Physician from Identifying Mrs. Orr's Heightened Bleeding Risk. ......... 16

                        a)      Defendants' Narrow Interpretation of the Evidentiary
                                Requirements for Causation Does Not Align with this Circuit's
                                Precedent ............................................................... 16

                        b)      Had Defendants Provided Adequate Instructions as to Laboratory
                                Testing, Dr. St. Martin Would Have Followed Such Instructions to
                                Evaluate Bleeding Risk and Would Have Altered Treatment for
                                Those Patients at Higher Risk. .............................. 17

                2.      Defendants' Inadequate Instructions Caused Mrs. Orr's Neurosurgeon to
                        Delay Treatment and Eliminated the Possibility of a Meaningful
                        Recovery. ........................................................................... 19

                        a)      Defendants Owed a Duty to Adequately Instruct Mrs. Orr's
                                Neurosurgeon ....................................................... 20

                        b)      Had Defendants Adequately Instructed Mrs. Orr's Neurosurgeon,
                                Mrs. Orr's Treatment Would Have Been Accelerated and Her
                                Death Would Have Been More Likely Avoided Than Not. ......... 21

        CONCLUSION .................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**

*Allgood v. GlaxoSmithKline, PLC*,
    No. 06-3506, 2008 WL 483574 (E.D. La. Feb. 20 2008) .................................................. 18

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ...................................................................................................... 7

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ...................................................................................................... 7

*Frischertz v. SmithKline Beecham Corp.*,
    No. 10-2125, 2012 WL 2952427 (E.D. La. July 19, 2012) ............................................ 17

*Georges v. Novartis Pharm. Corp.*,
    No. CV 06-05207, 2013 WL 5217198 (C.D. Cal. Apr. 4, 2013) ..................................... 21

*Harris v. Merck & Co., Inc.*,
    No. 12-1446, 2012 WL 5384720 (W.D. La. Nov. 1, 2012)............................................ 17

*Jenkins v. Bristol-Myers Squibb, et al.*,
    No. 14-2499, 2015 WL 501230 (E.D. La. Aug. 21, 2015)............................................. 15

*Mahaney ex rel. Estate of Kyle v. Novartis Pharm. Corp.*,
    835 F. Supp. 2d 299 (W.D. Ky. 2011) ........................................................................... 21

*McCarthy v. Danek Med., Inc.*,
    65 F. Supp. 2d 41 (E.D. La. 1999) ........................................................................... 8, 20

*McEwen v. Ortho Pharm. Corp.*,
    528 P.2d 522 (Ore. 1974) ............................................................................................. 21

*Mikell v. Hoffman-Laroche, Inc.*,
    649 So. 2d 75 (La.App. 1st Cir. 1994) ........................................................................... 21

*Patrick v. Tractor Supply Co.*,
    No. CV 16-10755, 2017 WL 396301 (E.D. La. Jan. 30, 2017) ...................................... 20

*Roberts v. Cardinal Servs.*,
    266 F.3d 368 (5th Cir. 2001) ......................................................................................... 7

*Stahl v. Novartis Pharm. Corp.*,
    283 F.3d 254 (5th Cir. 2002) .................................................................................. passim

*Stevens v. Novartis Pharm. Corp.*,
    247 P.3d 244 (Mont. 2010) ........................................................................................... 21

**Statutes**

Fed. R. Civ. P. 56(c). ........................................................................................................ 7
La. R.S. § 9:2800.53 ...................................................................................................... 8, 17

**Other Authorities**

Restatement (Third) of Tort: Product Liability § 6(b) (1997) ..................................... 13
Restatement (Third) of Torts: Product Liability § 6(d) (1997).................................... 13
Thomas C. Galligan, Jr., The Louisiana Products Liability Act: Making Sense of it All,
    49 La. L. Rev. 629 (1989)................................................................................................. 7

## TABLE OF EXHIBITS

Exhibit 1        Xarelto Label (January 2015).

Exhibit 2        Ochsner Medical Records Baptist Records for Sharyn Orr.

Exhibit 3        Deposition of Maurice St. Martin, M.D.

Exhibit 4        Medical Records of Dr. St. Martin for Sharyn Orr.

Exhibit 5        Deposition of Francisco Cruz, M.D.

Exhibit 6        Medical Records of Dr. Cruz for Sharyn Orr.

Exhibit 7        Medical Records of Dr. Cummings for Sharyn Orr.

Exhibit 8        Deposition of Joseph Orr, Jr.

Exhibit 9        Deposition of Cuong Bui, MD.

Exhibit 10       East Jefferson General Hospital EMS Documentation.

Exhibit 11       Deposition of Toby I. Gropen, M.D.

Exhibit 12       Deposition of Elizabeth B. Mahanna, M.D.

Exhibit 13       Kubitza, D., et al. *Safety, pharmacodynamics, and pharmacokinetics of single doses of BAY 59-7939, an oral, direct factor Xa inhibitor*. 78 Clin Pharmacol Ther. 412 (2005).

Exhibit 14       Mueck, W., et al. *Rivaroxaban Population Pharmacokinetic Analyses in Patients Treated for Acute Deep-Vein Thrombosis and Exposure Simulations in Patients with Atrial Fibrillation Treated for Stroke Prevention*. 50 Clin Pharmacokinet 10 (2011).

Exhibit 15       XARELTO_JANSSEN_24478012 Xarelto Coagulation Monitoring Parameters (May 11, 2016).

Exhibit 16       Nakano Y., et al., *Clinical usefulness of measuring prothrombin time and soluble fibrin levels in Japanese patients with atrial fibrillation receiving rivaroxaban*. Journal of Cardiology 2015.

Exhibit 17       Lippi G., et al. *Urgent monitoring of direct oral anticoagulants in patients with atrial fibrillation: a tentative approach based on routine laboratory tests*. DOI 10.1007 Journal of Thrombosis and Thrombolysis. s11239-014-1082-5 (2014).

Exhibit 18       Canadian Xarelto Product Monograph Label.

Exhibit 19       Baglin, T., et al., E*ffects of routine coagulation screens and assessment of anticoagulant intensity in patients taking oral dabigatran or rivaroxaban: Guidance from the British Committee for Standards in Haematology*. 159 British Journal of Haematology 427 (2012).

Exhibit 20       Baglin, T., et al. *Measuring oral direct inhibitors of thrombin and factor Xa: a recommendation from the Subcommittee on Control of Anticoagulation of the Scientific*

*and Standardization Committee of the International Society on Thrombosis and Haemostasis*. 11 Journal of Thrombosis and Haemostasis 756 (2013).

Exhibit 21          Deposition of Henry Rinder, M.D.

Exhibit 22          Center for Drug Evaluation and Research, Application Number 202439Orig1s000, Summary Review, Deputy Division Director Decisional Memo, November 4, 2011.

Exhibit 23          Deposition of Kenneth Todd Moore.

Exhibit 24          Deposition of Andrea Derix, Ph.D.

Exhibit 25          Patel M., Peacock, Eikelboom, J., *Continuing Medical Education: Emergency Management of Bleeding With NOACs: Do We Need a Reversal Agent?*

Exhibit 26          Expert Report of Laura M. Plunkett, Ph.D., D.A.B.T.

Exhibit 27          Expert Report of Suzanne Parisian, M.D.

Exhibit 28          Expert Report of Robert Charles Gosselin.

Exhibit 29          Expert Report of Peter Liechty, M.D., FAANS, FACS.

Exhibit 30          Expert Report of William Franklin Peacock, IV, MD, FACEP.

## INTRODUCTION

Plaintiffs' failure to warn claim is based on the inadequate instructions provided by Defendants that failed to inform Mrs. Orr's physicians about laboratory tests capable of preventing and minimizing bleeding injuries. Defendants' motion ignores Louisiana law permitting inadequate instruction claims under the Louisiana Products Liability Act, and instead, mischaracterizes Plaintiffs' claim as a failure to warn of bleeding risk associated with Xarelto. This is not at issue here—the Xarelto label plainly states that Xarelto *causes* bleeding.[1]

Rather, the evidence demonstrates that Defendants have a duty to adequately instruct physicians as to laboratory testing available for (1) evaluating a patient's risk of bleeding on Xarelto and (2) assessing a patient's exposure to Xarelto, such as when emergency surgery is necessary. Defendants failed to provide these adequate instructions to Mrs. Orr's physicians, including her prescribing physician, Dr. Edward St. Martin, and her neurosurgeon, Dr. Cuong Bui. As a result, Defendants cannot claim that the Xarelto label is adequate as a matter of law nor can Defendants claim that summary judgment is proper given that Defendant's motion makes no mention of Dr. Bui.

Regardless, evidence concerning Dr. St. Martin and Dr. Bui, taken together or separately, is more than sufficient to meet summary judgment requirements under the learned intermediary doctrine. As shown below, the evidence shows that both doctors would have utilized laboratory testing had they been adequately instructed. In doing so, Dr. St. Martin would have identified Mrs. Orr as having a high bleeding risk on Xarelto and adjusted her treatment such that her injuries

---

[1] Exhibit # 1 at § 5.2 ("XARELTO … can **cause** serious or fatal bleeding.") (emphasis added).

would have been avoided.  Likewise, adequate instructions would have allowed Dr. Bui to quickly ascertain that Mrs. Orr was no longer acutely anticoagulated when she presented with her Xarelto-related brain hemorrhage.   As a result, Dr. Bui would have proceeded with Mrs. Orr's neurosurgical treatment much earlier, minimizing Mrs. Orr's injuries from her brain hemorrhage.

## BACKGROUND

Like many elderly individuals, Sharyn Orr suffered from various health issues, including diabetes, hypertension, chronic kidney disease, congestive heart failure, and nonvalvular atrial fibrillation.[2]  Mrs. Orr regularly visited physicians who treated and monitored these issues, including her cardiologist, Dr. St. Martin, who managed her atrial fibrillation.[3]  Concerned with the risks associated with Mrs. Orr's atrial fibrillation, Dr. St. Martin continued Mrs. Orr on Pradaxa, a direct oral anticoagulant prescribed to Mrs. Orr by her previous cardiologist.[4]  Dr. St. Martin switched Mrs. Orr to Xarelto in February of 2014 after Mrs. Orr reported multiple bouts of indigestion, a side effect of Pradaxa.[5]  Her prescribed dosage at the time was 20 mg, which Dr. St. Martin continued her on until August of 2014.[6]  Around this time, Dr. St. Martin observed a decline in Mrs. Orr's renal function.[7]  Specifically, Mrs. Orr's blood work showed that her creatinine clearance, which is a key indicator of renal function, had fallen below 50,[8] indicating Stage 3B

---

[2] Exhibit # 2 at SOrr-OBMC-MD-0000293.

[3] Exhibit # 3 at 96:14-22.

[4] Exhibit # 4 at SOrr-MEStMartinJr-000292.

[5] Exhibit # 3 at 161:24-162:11.

[6] Exhibit # 3 at 39:17-40:15, 129:22-130:10.

[7] Exhibit # 3 at 130:8-13.

[8] Exhibit # 2 at SOrr-OBMC-MD-000395 (calculated based on creatitine value and weight; see Exhibit # 2 at SOrr-OBMC-MD-001068).

moderate chronic kidney disease.[9]  Because Xarelto is metabolized primarily in the kidneys, a decline in renal function negatively impacts a patient's ability to process the drug.[10]  As such, per the Xarelto label, Dr. St. Martin switched Mrs. Orr to a renally adjusted dosage to 15mg.[11]

Mrs. Orr continued to regularly see Dr. St. Martin and her other physicians, including her nephrologist, Dr. Francisco Cruz, who treated Mrs. Orr for her chronic kidney disease.[12]  In October 2014, Mrs. Orr's blood work revealed that her creatinine clearance had fallen near 30,[13] indicating that Mrs. Orr's renal function had worsened to Stage 4 severe chronic kidney disease. Dr. Cruz confirmed this,[14] and by December 2014, Dr. Cruz had begun counseling Mrs. Orr on future options for dialysis.[15]

Also during this time, Mrs. Orr experienced difficulty controlling her hypertension.[16]  In prior years, Mrs. Orr had suffered bouts of uncontrolled hypertension, which her physicians managed with medication.  Mrs. Orr's physicians described her hypertension as having a "white coat" component, meaning that Mrs. Orr's elevated blood pressure readings, when taken at a physician's office, were unusually high because of anxiety she experienced in seeing her physicians.[17]  To ensure that her extremely high blood pressure readings were not the norm, Mrs.

---

[9] Exhibit # 2 at SOrr-OBMC-MD-000236.

[10] *See* Exhibit # 1 at § 8.7.

[11] Exhibit # 3 at 129:22-130:10.

[12] Exhibit # 5 at 32:08-16.

[13] Exhibit # 6 at SOrr-FCruz-000060 (calculated using creatinine).

[14] Exhibit # 6 at SOrr-FCruz-000105-106.

[15] Exhibit # 5 at 85:18-87:13.

[16] *See* Exhibit # 4 at SOrr-MEStMartinJr-000271 (showing high blood pressure).

[17] *See, e.g.,* Exhibit # 6 at SOrr-FCruz-000129; Exhibit # 6 at SOrr-FCruz-000134.

Orr diligently tracked her blood pressure at home using a calibrated cuff.[18]  While these were occasionally high, they were never as high as those taken her physician's office. During Mrs. Orr's last visit with her nephrologist on April 16, 2015, Mrs. Orr's blood pressure was unusually high at 200/90, which Dr. Cruz treated by increasing her blood pressure medication.[19]

On April 24, 2015, Mrs. Orr suffered an intracranial hemorrhage.[20]  Symptoms of Mrs. Orr's hemorrhage began to manifest during an early evening dinner date with her husband at Ruth Chris Steakhouse in Metairie, Louisiana.[21]  These symptoms, which began at approximately 6:45 PM, initially included headache and vomiting but progressed to diarrhea, physical instability, and lethargy over the next few hours.[22]  Although Mrs. Orr normally took her daily dosage of Xarelto in the evening as prescribed, it is unknown whether she took her Xarelto on the evening of April 24, 2015.[23]  Even if Mrs. Orr had taken Xarelto as per her routine, it is most probable that Mrs. Orr expelled the drug during a vomiting episode.[24]

As Mrs. Orr's symptoms worsened, her husband, Joseph Orr Jr., asked one of his daughters, Kimberly DeAgano, to come to the Orr home.[25]  Together, Mr. Orr and Mrs. DeAgano made the decision to call EMS at approximately 9 PM.[26] After arriving at the Orr house, EMS evaluated

---

[18] Exhibit # 7 at SOrr-TulaneH-MD-000054-55.

[19] Exhibit # 6 at SOrr-FCruz-000101.

[20] Exhibit # 8 at 238:18-20.

[21] *Id*. at 241:20-242:05.

[22] *Id*. at 243:11-17, 250:13-21.

[23] *Id*. at 92:02-05, 267:15-268:15.

[24] Exhibit # 9 at 107:09-18.

[25] Exhibit # 8 at 246:05-17.

[26] *Id*.

Mrs. Orr, finding her systolic blood pressure to be 178.[27]  Ultimately, EMS transported Mrs. Orr

to Ochsner Baptist Hospital at which point her blood pressure spiked to 252/114.[28]  There, the

attending ER physician ordered laboratory tests and CT brain imaging.[29]

The CT scan revealed an intracranial hemorrhage likely originating from the brain's

ventricular space.[30]  As a result, the attending ER physician at Ochsner Baptist requested the

transfer of Mrs. Orr to Ochsner Main Campus for neurosurgical evaluation.[31]  Unlike Ochsner

Baptist, Ochsner Main Campus has a unit dedicated to neurocritical care and neurosurgery and is

a certified stroke center.[32]  In submitting the transfer request, the attending ER physician

highlighted Mrs. Orr's history of Xarelto use.[33]

Immediately after arriving at Ochsner Main Campus, physicians specializing in

neurocritical care and neurosurgery evaluated Mrs. Orr.  Neurosurgery concluded that Mrs. Orr

required urgent surgical intervention to alleviate pressure on her brain and remove pooled blood

from the ventricular space.[34] As such, Mrs. Orr's usage of Xarelto became a focus among her

assigned physicians.[35] Because Xarelto has no reversal agent, physicians must determine whether

a patient is still subject to its anticoagulant effects prior to surgical intervention.[36]  At the time of

---

[27] Exhibit # 10 at SOrr-EJGHEMS-000004-05.

[28] Exhibit # 2 at SOrr-OMC-MD-000008; Exhibit # 2 at SOrr-OMC-MD-002900.

[29] Exhibit # 2 at SOrr-OMC-MD-000463-464.

[30] *Id*.

[31] Exhibit # 2 at SOrr-OMC-MD-000483.

[32] Exhibit # 9 at 156:12-157:09.

[33] Exhibit # 2 at SOrr-OMC-MD-000483.

[34] Exhibit # 9 at 20:02-23:20.

[35] *Id.*; Exhibit #2 at SOrr-OMC-MD-000483; Exhibit # 2 SOrr-OMC-MD-000030.

[36] Exhibit # 9 at 20:02-23:20.

Mrs. Orr's surgery, her physicians were unaware that a widely available laboratory test, Prothrombin Time ("PT"), could be used to evaluate a her anticoagulant status and whether she had an anticoagulant in her blood.[37]

The Xarelto product label informs doctors like Ms. Orr's on-call neurosurgeon, Dr. Cuong Bui, that "[t]he anticoagulant effect of Xarelto cannot be monitored with standard laboratory testing nor readily reversed."[38]  The label goes on to instruct that "[i]f anticoagulation must be discontinued to reduce the risk of bleeding with surgical or other procedures, Xarelto should be stopped at least 24 hours before the procedure."[39]  Because Dr. Bui, was not informed by Defendants that Ms. Orr's PT result indicated it was safe to proceed to surgery, he delayed surgical treatment of Mrs. Orr for over 12 hours.[40]  Once "the Xarelto [] had a chance to clear," Dr. Bui performed double ventriculostomies at 1:30 PM on April 25, 2015, placing two external ventricular drains ("EVDs") into Mrs. Orr's brain.[41]  Had Dr. Bui known that Mrs. Orr was not anticoagulated, Dr. Bui would have performed the ventriculostomies much earlier.[42]

As a result of the delay, the blood in Mrs. Orr's ventricular space clotted and caused increasing edema and prolonged pressure to the surrounding brain.[43]  The clotted blood blocked the EVDs, and despite attempts to lyse the clots using targeted enzymes known as tissue

---

[37] Exhibit # 9 at 45:19-46:03; Exhibit # 11 at 121:24-123:12.

[38] Exhibit # 1 at § 5.7.

[39] Exhibit # 1 at § 2.6.

[40] Exhibit # 9 at 22:07-21.

[41] Exhibit # 2 at SOrr-OMC-MD-000030; Exhibit # 2 at SOrr-OMC-MD-002914-02915.

[42] Exhibit # 9 at 23:06-20.

[43] Exhibit # 26 at 59:16-61:08.

plasminogen activators ("tPA"), the blood in Mrs. Orr's ventricular space did not breakdown.[44] As a result, Mrs. Orr's edema and brain compression worsened with the clotted blood likewise preventing circulation of cerebral spinal fluid to the brain.[45]  Because of these conditions, Mrs. Orr continued to decline, and her family implemented a do-not-resuscitate order.[46]  Mrs. Orr expired on May 4, 2015.[47]

## LEGAL ARGUMENTS AND AUTHORITIES

### I.     Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" show no genuine issue as to any material fact.[48]   In evaluating evidence to determine whether a factual controversy exists, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge [when] ruling on a motion for summary judgment."[49]  Instead, "the court must disregard all evidence favorable to the moving party that the jury is not required to believe and should give credence to the evidence favoring the non-moving party, as well as that evidence supporting the moving party that is uncontradicted and unimpeached."[50]     For summary judgment to be appropriate, the moving party must demonstrate that there is no genuine issue of material fact, and

---

[44] Exhibit # 9 at 29:20-24, 31:02-13.

[45] Exhibit # 26 at 59:16-61:08; Exhibit # 2 at SOrr-OMC-MD-000033-34.

[46] Exhibit #2 at SOrr-OMC-MD-000033-34.

[47] *Id*.

[48] Fed. R. Civ. P. 56(c).

[49] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[50] *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir. 2001).

that the movant is entitled to judgment in its favor as a matter of law.[51]  Ultimately, this Court's concern is to ascertain "whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[52]

## II.    More Than Sufficient Evidence Exists to Preclude Summary Judgment Under the Learned Intermediary Doctrine.

In product liability claims involving prescription drugs, Louisiana applies the "learned intermediary doctrine," which permits a drug manufacturer to discharge its duty to warn consumers by adequately warning physicians.  "The premise underlying a failure-to-warn claim in the learned intermediary context is that the patient is claiming that the manufacturer failed to adequately warn the **treating physician**."[53]   Thus, "[t]he obligation to the consumer is fulfilled when the prescribing or treating physician is informed of any potential side effects or risks from the drug's use so that they may intelligently decide on its use and advise the patient."[54]

Under the learned intermediary doctrine, a failure-to-warn claim requires that the plaintiff meet a two-pronged test:

> First, the plaintiff must show that the defendant failed to warn (or inadequately warned) the physician of a risk associated with the product that was not otherwise known to the physician.  Second, the plaintiff must show that this failure to warn the physician was both a cause in fact and the proximate cause of the plaintiff's injury.[55]

Here, Defendants claim that Plaintiffs have failed to raise any question of material fact as

---

[51] *Celotex Corp. v. Catrett*, 477 U.S. 317, 321–29 (1986).

[52] *Anderson*, 477 U.S. at 250.

[53] *Stahl v. Novartis Pharm. Corp.,* 283 F.3d 254, 268 (5th Cir. 2002) (original emphasis).

[54] *Id*. at 267, *quoting McCarthy v. Danek Med., Inc.*, 65 F. Supp. 2d 41, 413 (E.D. La. 1999).

[55] *Stahl,* 283 F.3d at 265-66.

to both prongs.   In doing so, Defendants ignore that, under the LPLA, the duty to warn encompasses a duty to provide adequate instruction for the safe use of a product.[56]   In the context of learned intermediary, this duty extends to any healthcare provider in the position to make the use of the product safe.   As described below, the evidence demonstrates that Defendants failed to provide Mrs. Orr's prescribing physician and her neurosurgeon adequate instructions as to available laboratory testing that would have prevented or minimized Mrs. Orr's injuries.

A.      **Plaintiffs Meet the First Prong of the Learned Intermediary Test by Showing the Inadequacy of Defendants' Instructions**

"[I]t is an accepted tenet in Louisiana products liability law that a manufacturer's duty to warn includes a duty to provide adequate instructions for safe use of a product."[57]   Indeed, the LPLA definition of an "adequate warning" encompasses "instructions" as well as "warnings."

> "Adequate warning" means a warning or **instruction** that would lead an ordinary reasonable user or handler of a product to contemplate the danger in using or handling the product and either to decline to use or handle the product or, if possible, **to use or handle the product in such a manner as to avoid the damage for which the claim is made**.[58]

In the case at bar, Defendants attempt to redefine Plaintiffs' claim as a failure to warn of risk of bleeding. Plaintiffs, however, do not contest that Xarelto *causes* bleeding as it is stated in the Xarelto label.[59]   Rather, Plaintiffs are alleging that Defendants failed to adequately instruct Mrs. Orr's physicians on the safe use of Xarelto—namely, as to available laboratory tests for evaluating a patient's risk of bleeding and exposure to Xarelto.   By improperly characterizing Plaintiffs' claim as a failure to warn of bleeding risk, Defendants apply the wrong legal analysis

---

[56] La. R.S. § 9:2800.53.

[57] *Stahl*, 283 F.3d at 269-70.

[58] La. R.S. § 9:2800.53 (emphasis added).

[59] Exhibit #1 at § 5.2 ("XARELTO … can **cause** serious or fatal bleeding.") (emphasis added).

and do not meet their summary judgment burden with respect to the failure to warn claim actually alleged by Plaintiffs, i.e. the inadequacy of the instructions provided to physicians in the Xarelto label.

### 1.    Defendants Misapply the First Prong of the Learned Intermediary Test.

In a warnings claim based on failure to adequately instruct, the focus is whether the label provides sufficient instruction so as to allow for the safe use of the drug—not whether the label discloses a risk of injury.[60]    The distinction between a warnings claim based on an inadequate instruction versus an inadequate warning of risk is significant as it impacts the type of analysis required under the first prong of the learned intermediary test.  Defendants' motion ignores this distinction, applying the incorrect analysis to Plaintiffs' warnings claim.

The analysis applied by Defendants pertains to a claim based on a failure to warn of injury risk, which looks at whether the label unambiguously warned of the risk of the plaintiff's injury and whether the prescribing physician's unequivocally understood the risk in prescribing the drug to the plaintiff.[61]   In a failure to adequately instruct claim, which is the claim brought by Plaintiffs, the analysis is different, focusing on whether the instruction permitted for the safe use of the drug. The Fifth Circuit explored the difference in *Stahl*, evaluating both claims in a product liability case involving the prescription drug Lamisil.[62] There, the plaintiff alleged that Novartis failed to adequately warn of Lamisil's risk of liver injuries and failed to instruct physicians on the need for

---

[60] *Stahl*, 283 F.3d at 270  ("There appears to be no compelling reason to exempt recommended medical monitoring schemes—which are, in essence, instructions for safe use of prescription drugs—from a drug manufacturer's duty to warn.").

[61] *Stahl,* 283 F.3d at 268.

[62] *Id*. at 264-72.

blood testing to monitor for injury symptoms.[63]  Recognizing that inadequate instruction claims are governed by a different standard, the Fifth Circuit explained that an adequate instruction must provide sufficient information to allow for the safe use of the drug.[64]

Consequently, the basis for Defendants' conclusion that the Xarelto label is adequate as a matter of law is flawed because Defendants limited their analysis to whether the Xarelto label warns of a bleeding risk.  As described below, the evidence demonstrates that the Xarelto label lacked an adequate instruction as to the availability of laboratory testing capable of evaluating the anticoagulant effect of Xarelto.   Such testing would have allowed for the safe use of Xarelto by instructing physicians to determine a patient's bleeding risk on Xarelto.

>  **2.  Defendants Failed to Adequately Instruct Physicians on Laboratory Testing Available for Evaluating a Patient's Risk of Bleeding and Exposure to Xarelto.**

For over a decade, Defendants have known that a laboratory test measuring PT is capable of evaluating Xarelto exposure.[65]  In clinical trials used to obtain regulatory approval of Xarelto, scientists employed by Defendants found a positive linear relationship between PT (Neoplastin) and Xarelto concentration.[66]  Although Defendants have never disputed that higher concentrations

---

[63] *Id.* at 269.

[64] *Id.* at 271 ("[T]he warning must both lead the ordinary user or handler to contemplate the danger in using the product (the warning component) and to either use it safely (the instruction component) or decline to use it."), *quoting* Thomas C. Galligan, Jr., *The Louisiana Products Liability Act: Making Sense of it All*, 49 La. L. Rev. 629, 677 (1989)).

[65] PT is a general description of a blood test used to determine clotting time.  For the test, various reagents are used to measure the amount of time, in seconds, it takes the blood to clot.  The amount of time varies based on the reagent used.  In the testing of Xarelto by Defendants, it was proven that PT with Neoplastin was the most accurate reagent.  For this reason, PT (Neoplastin) is the reagent proposed by Plaintiff to be used to determine bleed risk at initiation of therapy or following a significant change in clinical status.  PT with Innovin as the reagent was also highly reliable— just not as reliable as Neoplastin.  However, PT with Innovin (or any other reagent), will still inform doctors whether a patient is anticoagulated.

[66] *See, e.g.*, Exhibit #13 at 420: "The availability of both pharmacodynamic and pharmacokinetic data for such a large number of patients enabled us to show a good correlation between these parameters, particularly between BAY 59-7939 concentrations and PT and factor Xa activity tests. Therefore tests such as PT may be used in future trials for monitoring, if necessary." *Id.*; Exhibit # 14 at 675, 682: "The slope of the plasma concentration-PT correlation graph

of Xarelto are associated with a significant risk of bleeding, Defendants assert that PT (Neoplastin) cannot be used to evaluate this bleeding risk.  This is contrary to Defendants' own literature on Xarelto,[67] additional clinical studies,[68] analysis published in peer-reviewed articles,[69] and recommendations by governmental and medical associations[70]—all of which confirm a correlation between bleeding risk and PT when measured using Neoplastin, a sensitive reagent capable of identifying high concentrations of Xarelto.

Based on this established correlation between PT (Neoplastin) and bleeding risk, Plaintiffs' experts have opined that testing of patients using Neoplastin PT at initiation of Xarelto or following a significant change in clinical status allows for safe use of the drug by allowing doctors to

---

reflected the sensitivity of the PT to increases in rivaroxaban exposure. The PT correlated in an almost linear fashion with rivaroxaban concentrations $\leq$ 500 mg/L, confirming that the PT could be used to assess exposure."

[67] *See* Exhibit # 15 at 1, 2-3:

- If assessment of rivaroxaban plasma concentrations is necessary, the PT was reported to be an appropriate coagulation test. The relationship between PT and rivaroxaban plasma concentration when Neoplastin Plus […] is used as the reagent is linear and closely correlated. …

-  In a human plasma study, STA Neoplastin Plus was found to be the most precise method for determination of rivaroxaban. …

- The higher cut-offs of rivaroxaban plasma concentrations correspond to values associated with a significant risk of bleeding.

[68] *See, e.g.*, Exhibit # 16 at 65:185: "[A] prolonged peak PT ($\geq$20 s) could indicate increased risk of bleeding, and both trough and peak SF levels were reduced relative to baseline. PT and SF are both valuable measures of coagulation status in patients receiving rivaroxaban, regardless of prior anticoagulant history."

[69] *See, e.g.*, Exhibit # 17: "[W]e have hence developed an algorithm based on first-line tests for urgent **screening of the anticoagulant effect of direct oral anticoagulants**, which entails activated partial thromboplastin time (aPTT) for dabigatran and **prothrombin time (PT) for rivaroxaban**… this strategy appears **suitable to reliably define** the thrombotic or **bleeding risk** in an urgent setting, contextually saving precious laboratory resources." *Id.* at 2 (emphasis added).

[70] *See, e.g.*, Exhibit # 18 at 10: "The prothrombin time (PT), measured in seconds, is influenced by XARELTO in a dose-dependent way with a close correlation to plasma concentration if the Neoplastin® reagent is used. In patients who are bleeding, measuring the PT using the Neoplastin® reagent may be useful to assist in determining an excess of anticoagulant activity."  *See also* Exhibit # 19 at 429; Exhibit # 20 at 759 ("A PT assay with a plain thromboplastin can be used to determine the relative intensity of anticoagulation caused by rivaroxaban, e.g. in an emergency or urgent clinical scenario.")

accurately assess whether a patient is at too high of a risk for bleeding.[71]  Indeed, the FDA reached

a similar conclusion, noting that Defendants chose not to "utilize" this information:

> The clinical pharmacology and clinical reviewers demonstrated that there is a linear correlation between rivaroxaban levels and prothrombin time (PT). They also demonstrated that there is also a correlation between PT and risk of bleeding. **This applicant has not chosen to utilize this information** … [I]nfrequent monitoring (perhaps at initiation and yearly thereafter) to assure appropriate dosing of drugs that prevent stroke and cause bleeding may improve outcomes and be acceptable to patients.[72]

Moreover, for emergency situations where urgent surgical intervention is required, such as with

Mrs. Orr's brain hemorrhage, there is agreement among certain employees of Defendants that

information on PT testing would be beneficial to physicians.  For example, the Scientific Director

of Cardiovascular Disease for Janssen Pharmaceuticals, Inc., Kenneth Todd Moore, testified that

using PT to evaluate exposure to Xarelto would be beneficial for patients requiring emergency

surgery:

> Q.    And that fact, that PT using the Neoplastin reagent, could be used as an indirect measurement of plasma concentrations of Xarelto, that was an important fact for the company to tell the FDA with respect to getting the drug approved, correct?
>
> A:    I don't know how important of a fact it was. It was just part of the profile of the drug itself.
> …
> Q.    It was certainly important for the company to be able to say that there was a method to -- that could be used clinically to evaluate the amount of drug in someone's system.
>
> A.    I believe in those rare circumstances where you would have a desire to understand if there is drug in your system, for example for compliance, if there is a patient that goes in for emergency surgery, it would be a benefit to have that information, yes.[73]

---

[71] *See, e.g.,* Exhibit # 21 at 206:10-208:02.

[72] Exhibit # 22 at 9 (emphasis added).

[73] Exhibit # 23 at 66:16-67:11; 68:1-12.

13

Similarly, the Xarelto Global Program Team Leader for Bayer Research & Development, Andrea

Derix, Ph.D., testified that PT testing would be useful in certain circumstances:

> Q.     And it's Bayer's position that in routine clinical practice, there is no need to
> monitor the anticoagulant effect of rivaroxaban.  But you say in certain
> exceptional circumstances, rivaroxaban levels with a calibrated assay may
> be useful, such as overdosage or emergency situations, correct?
>
> A.     That's correct.
>
> Q.     And you've suggested PT with a Neoplastin reagent or an anti-factor Xa
> assay, which is a way to indirectly measure drug concentration, correct?
>
> A.     These are given here as examples, yes.[74]

Notably, Defendants have even recommended using PT testing—regardless of the

reagent—in urgent care situations.  In a webinar sponsored by Bayer and provided to physicians

for continuing medical education ("CME") credit through November 2016, a Janssen thought

leader and defense expert in this litigation, William Peacock IV, MD, instructed physicians on

using PT to qualitatively assess a patient's level of Xarelto exposure in providing urgent medical

care.[75]  To quantitatively assess a patient's level of anticoagulation, the webinar noted that PT

Neoplastin would need to be used.[76]  The level of anticoagulation is important for assessing bleed

risk at initiation of Xarelto or following a significant change in clinical status, such as declining

renal function.  In determining whether a patient is anticoagulated for purposes of surgical

intervention, the use of any reagent—and particularly a reagent highly sensitive to Xarelto like

Innovin—is informative.

Despite this, Defendants chose not to include any instruction in the United States label for

---

[74] Exhibit # 24 at 289:19-290:09.

[75] Exhibit # 25 at 2-3.

[76] *Id.* at 2 (*see* slide titled "Coagulation Assays for Measuring NOAC Anticoagulation Level").

Xarelto about the capability of PT Neoplastin to evaluate a patient's risk of bleeding and exposure to Xarelto.  This instruction would have made Xarelto a safe product to use as demonstrated by the evidence described above and as confirmed by Plaintiffs' experts.[77] As such, more than sufficient evidence exists to raise a question of material fact as to the inadequacy of Defendants' instructions.

**B.    Plaintiffs Meet the Second Prong of the Learned Intermediary Test by Demonstrating that Defendants' Failure to Adequately Instruct Mrs. Orr's Physicians Caused Mrs. Orr's Tragic Outcome.**

Under the second prong of the learned intermediary test, the plaintiff must show that the defendant's failure to warn was the cause in fact and proximate cause of the plaintiff's injury.[78] Defendants argue that summary judgment is appropriate because Mrs. Orr's prescribing physician, Dr. St. Martin, testified he would not have changed his decision to prescribe Xarelto to Mrs. Orr. Defendants again mischaracterize Plaintiffs' position.  Plaintiffs are not claiming that Dr. St. Martin should have never prescribed Xarelto to Mrs. Orr.  Rather, Plaintiffs' assert that adequate instructions would have made Xarelto safe to use, such that Mrs. Orr's injuries would have been prevented or mitigated.

As explained below, Defendants incorrectly assume that the only way to establish causation is through evidence that Mrs. Orr's prescribing physician would have changed his decision to prescribe the drug had the physician received a stronger warning.  This is but one method to establish causation, it is not the exclusive means of doing so.  Under the learned intermediary doctrine, causation can also be established by showing that, if properly instructed, the plaintiff's

---

[77] *See, e.g.*, Exhibit # 26 at 7-8; Exhibit # 27 at 13; Exhibit # 28 at 31-33.

[78] *Jenkins v. Bristol-Myers Squibb, et al.*, No. 14-2499, 2015 WL 501230, at *3 (E.D. La. Aug. 21, 2015), *quoting Stahl*, 283 F.3d at 266.

physician would have acted differently such that the injury alleged by the plaintiff could be avoided. Here, the evidence demonstrates that two of Mrs. Orr's physicians—her prescribing physician and her neurosurgeon—would have followed Defendants' instructions and used PT Neoplastin, and had either doctor done so, Mrs. Orr's injuries would have been mitigated or prevented.

1.   **Defendants' Inadequate Instructions Prevented Mrs. Orr's Prescribing Physician from Identifying Mrs. Orr's Heightened Bleeding Risk.**

Defendants claim that Plaintiffs must demonstrate causation through evidence that Mrs. Orr's prescribing physician would have declined to use Xarelto had he received a stronger warning. Louisiana federal courts, however, are not so inflexible in their analysis of causation under the learned intermediary doctrine; instead, courts look at whether the physician's actions in response to an adequate warning would have mitigated or prevented the plaintiff's injuries. Here, sufficient evidence exists that Dr. St. Martin would have heeded an instruction in the Xarelto label to routinely monitor his patients using PT Neoplastin, and in doing so, Dr. St. Martin would modified his treatment for patients at a higher risk of bleeding, such as Mrs. Orr.

a)   **Defendants' Narrow Interpretation of the Evidentiary Requirements for Causation Does Not Align with this Circuit's Precedent**

In evaluating causation under the learned intermediary doctrine, Louisiana courts examine whether the plaintiff's physician would have acted differently in response to an adequate warning such as to avoid the plaintiff's injuries.[79]   The Fifth Circuit confirmed this less-restrictive approach

---

[79] *See Frischertz v. SmithKline Beecham Corp.*, No. 10-2125, 2012 WL 2952427, at *2-3 (E.D. La. July 19, 2012) (denying summary judgment where the prescriber testified that, although he still prescribed the drug, he would have disclosed the stronger warning to his patients and deferred to patients' wishes on whether to take the drug and the plaintiff averred she would have not taken the drug had she known of its risks); *Harris v. Merck & Co., Inc.*, No. 12-1446, 2012 WL 5384720, at *6 (W.D. La. Nov. 1, 2012) (denying a dismissal under Fed. R. Civ. P. 12(b)(6) based on allegations that the prescribing physician would have been deterred from prescribing an 80 milligram dose had an adequate warning of the dangers associated with that dose been provided).

in *Stahl*, holding that "to prevail on an inadequate instruction claim for a prescription drug, a plaintiff must demonstrate that the instructions provided did not enable the treating physician to 'use or handle the [drug] … in such a manner as to avoid the damage for which the claim is made.'"[80]

As such, the learned intermediary doctrine does not require specific proof that the prescribing physician would have changed his or her decision to prescribe the drug at issue. Rather, causation can be established upon a showing that: (1) the plaintiff's physician would have followed an adequate instruction, and (2) the instruction would have prevented or mitigated the plaintiff's injuries. Thus, contrary to Defendants' argument, Dr. St. Martin's testimony in which he stands by his decision to prescribe Xarelto to Mrs. Orr is not fatal to Plaintiffs' failure to warn claim.[81]

> **b)** **Had Defendants Provided Adequate Instructions as to Laboratory Testing, Dr. St. Martin Would Have Followed Such Instructions to Evaluate Bleeding Risk and Would Have Altered Treatment for Those Patients at Higher Risk.**

To raise a question of material fact as to causation, this Court recently noted that subjective testimony from the treating physician may be "supplement[ed] … with objective evidence of how a reasonable physician would have a responded to an adequate warning."[82] Here, the testimony of Dr. St. Martin, as supplemented by objective evidence, provides more than sufficient evidence to

---

[80] *Stahl*, 283 F.3d at 271, *quoting* La. R.S. § 9:2800.53(9)).

[81] In their motion, Defendants cite as "on point" this Court's decision in *Allgood v. GlaxoSmithKline, PLC*, No. 06-3506, 2008 WL 483574 (E.D. La. Feb., 20 2008). This case is distinguishable as it involves a different kind warnings claim than that currently before the Court. *Id.* at 3-6. The plaintiffs in *Allgood* alleged that the defendant failed to warn of the risk of suicide associated with the prescription drug Paxil. *Id.* at 1-2. Here, Plaintiffs claim that Defendants failed to instruct physicians on the availability of PT testing to measure a patient's bleeding risk and Xarelto exposure, and had the instruction been provided to Mrs. Orr's prescribing physician and neurosurgeon, Mrs. Orr's injuries would have been prevented or mitigated. Thus, unlike *Allgood*, Plaintiffs' claim does not rest on whether Dr. St. Martin would have changed his prescribing decision.

[82] *Allgood*, 2008 WL 483574, at *6.

preclude summary judgment on causation.

Specifically, the evidence demonstrates that Dr. St. Martin was unaware of any laboratory tests capable of evaluating a patient's bleeding risk associated with Xarelto.  Dr. St. Martin would have used PT testing to evaluate bleeding risk if the usefulness of PT turned out to be supported by clinical studies,[83] or if the "FDA had thought it was a good idea."[84]  In fact, as shown above, clinical studies and the FDA have recognized using PT testing to monitor bleeding risk in patients on Xarelto.[85]  In addition, the evidence supports that if Dr. St. Martin had been adequately instructed, Dr. St. Martin would have monitored the bleeding risk of his patients on a regular basis, and would have altered the treatment of patients found to have a high bleeding risk.[86]

With respect to Mrs. Orr, in the months preceding her brain hemorrhage, Mrs. Orr's renal function had worsened to Stage 4 severe chronic kidney disease, and Mrs. Orr's nephrologist had begun to discuss dialysis options.[87] At this stage, Mrs. Orr's kidneys could not fully metabolize Xarelto.[88]  Indeed, patients with Stage 4 were not studied, and the 15mg dosing recommendation is based on modeling of clinical data from subjects with Stage 3 moderate kidney disease.[89]  As

---

[83] Exhibit #3 at 227:11-17. ("Q. If you knew that there was a way to monitor Xarelto levels in your patient and do it infrequently, was that something that you would suggest to them?  A.  I would have to see it studied and see all the data, but if it turned out to be a good thing to do, I would certainly suggest it.  Yes.")

[84] *Id*. at 197:05-14 ("It's something that I would want to know if the FDA had thought it was a good idea.  I put a lot of faith in what the FDA allows the drug -- how it allows it to be used.").

[85] *See supra* Section II(A)(2).

[86] Exhibit #3 at 225:13-226:12. ("If I was going to try something like that, I don't know why I would wait a year for the second piece of data.  I would say maybe initiation and then four to six weeks, and then if you were in the right ballpark, if you thought it was going to be stable, space it out.").

[87] Exhibit #9; Exhibit # 5 at 85:18-87:13.

[88] *See* Exhibit # 29 at 7-8; *see also* Exhibit #1 at § 8.7.

[89] *See* Exhibit #1 at § 8.7 ("Patients with CrCl 15 to 30 mL/min were not studied, but administration of XARELTO 15 mg once daily is also expected to result in serum concentrations of rivaroxaban similar to those in patients with normal renal function.").

such, Plaintiffs' expert neurosurgeon, Dr. Peter Liechty, believes that Mrs. Orr's severely depressed renal function caused her Xarelto concentration to significantly increase and extended the half-life of Xarelto in Mrs. Orr's system such that Mrs. Orr was excessively anticoagulated at the time of her brain hemorrhage.[90]  Consequently, had Mrs. Orr been tested using PT Neoplastin at any point in the months preceding her brain hemorrhage, the results would have revealed Mrs. Orr to be at high risk of bleeding. At such time, Dr. St. Martin would have adjusted Mrs. Orr's treatment thereby preventing Mrs. Orr's Xarelto-related brain hemorrhage. [91]  As such, the evidence pertaining to Dr. St. Martin is sufficient to demonstrate causation under the second prong of the learned intermediary test.

### 2. Defendants' Inadequate Instructions Caused Mrs. Orr's Neurosurgeon to Delay Treatment and Eliminated the Possibility of a Meaningful Recovery.

Defendants' duty to provide adequate instructions as to laboratory testing extended beyond Dr. St. Martin to include Mrs. Orr's neurosurgeon, Dr. Bui.  Because Defendants' motion does not address or even mention Dr. Bui, Defendants fail to meet their summary judgment burden to show there is no genuine issue of material fact as to causation.[92]  Nonetheless, the evidence demonstrates that in failing to adequately instruct Dr. Bui, Defendants deprived Dr. Bui of information that he would have used to accelerate Mrs. Orr's neurosurgical treatment and mitigate Mrs. Orr's injuries.

---

[90] Exhibit # 29 at 6-7.

[91] Exhibit #3 at 225:13-226:12 ("Q. And if you did the initial, after they got to steady-state, and you did the initial test and they were up in the 95th percentile, what would you do? … A. I would make an adjustment then.").

[92] *Patrick v. Tractor Supply Co.*, No. CV 16-10755, 2017 WL 396301, at *2 (E.D. La. Jan. 30, 2017) ("A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact.").

### a)   Defendants Owed a Duty to Adequately Instruct Mrs. Orr's Neurosurgeon

In Louisiana, "[t]he obligation to the consumer is fulfilled when the prescribing or treating physician is informed of any potential side effects or risks from the drug's use so that they may intelligently decide on its use and advise the patient."[93]   Accordingly, "[t]he treating physician's knowledge is thus the focus of the inquiry."[94]   In this context, the "treating physician" is not limited to the plaintiff's prescribing physician but extends to non-prescribing healthcare providers "who are in positions to act on such information so as to reduce or prevent injuries to patients."[95]

Applying this analysis to the matter at bar, Defendants' duty to provide adequate instructions extended to Mrs. Orr's treating physicians who could have reduced the risks associated with Xarelto.  This included Mrs. Orr's neurosurgeon, Dr. Bui, as his decision to delay Mrs. Orr's surgery was because of the risks associated with the uncertainty of Mrs. Orr's last dosage of Xarelto and therefore her anti-coagulation status—risks that, as described below, could have been avoided if Defendants had provided an instruction on PT testing.

---

[93] *McCarthy v. Danek Med., Inc.*, 65 F. Supp. 2d 410, 413 (E.D. La. 1999), *citing Mikell v. Hoffman-Laroche, Inc.*, 649 So. 2d 75, 79 (La. App. 1st Cir. 1994).

[94] *Stahl*, 283 F.3d at 280.

[95] Restatement (Third) of Torts: Product Liability § 6(d) (1997); *see also Stahl*, 283 F.3d at 267, 269-70, *citing* Restatement (Third) of Tort §§ 6(b), 6(d) (applying learned intermediary doctrine); *Georges v. Novartis Pharm. Corp.*, No. CV 06-05207, 2013 WL 5217198, at *9 (C.D. Cal. Apr. 4, 2013) (finding that dentist "may be in the class of learned intermediaries 'in a position to reduce the risks of harm' to whom Defendant owed a duty to warn"); *Mahaney ex rel. Estate of Kyle v. Novartis Pharm. Corp.*, 835 F. Supp. 2d 299, 307-308 (W.D. Ky. 2011) (extending learned intermediary status to plaintiff's non-prescribing physicians noting that "[i]t is impossible to read the learned intermediary rule through [defendant's] proposed lens given the interplay between multiple physicians, numerous procedures, and countless drugs to which cancer patients are subjected."); *Stevens v. Novartis Pharm. Corp.*, 247 P.3d 244, 260 (Mont. 2010) (describing scope of learned intermediary doctrine as applying to any healthcare professional responsible for making decisions regarding the patient's case); *McEwen v. Ortho Pharm. Corp.*, 528 P.2d 522, 529 (Ore. 1974) ("Although the ethical drug manufacturer's duty to warn has been discussed most often with reference to the prescribing physician, the [doctrine's] reasoning applies with equal force to the treating physician … [who] may be more likely to observe the actual symptoms of the drug's untoward consequences.").

> **b)** **Had Defendants Adequately Instructed Mrs. Orr's Neurosurgeon, Mrs. Orr's Treatment Would Have Been Accelerated and Her Death Would Have Been More Likely Avoided Than Not.**

The evidence demonstrates that Dr. Bui would have followed an adequate instruction concerning the utility of PT testing in evaluating a patient's Xarelto exposure, which would have allowed him to proceed with Mrs. Orr's ventriculostomies and EVD placement much earlier and mitigate Mrs. Orr's injuries. Specifically, the evidence shows that Dr. Bui was not aware of any laboratory tests capable of assessing a patient's Xarelto exposure,[96] and that Dr. Bui would have used such a laboratory test on Mrs. Orr instead of assuming that she had taken it a few hours before presenting at Ochsner.[97] As explained above, PT is a laboratory test capable of assessing a patient's Xarelto exposure. Indeed, Defendants' scientists and thought leaders recommended using PT testing for the exact situation confronted by Dr. Bui, i.e. whether to proceed with Mrs. Orr's urgent surgery.[98]

Because Mrs. Orr's PT test score was normal, she could not have ingested the drug hours before and her last dose was likely more than 24 hours earlier.[99] Had he known Mrs. Orr was not anticoagulated, Dr. Bui would have proceeded with Mrs. Orr's double ventriculostomies and

---

[96] Exhibit #16 at 106:21-107:02 ("So my general guestimate at that point in time was that I just had to assume that she had – since **there was no way for me to exactly test at that point in time whether Xarelto was still on board**, how much was still on board, I had to basically do a best clinical guess judgment...") (emphasis added); *see also id.* at 191:21-192:11.

[97] *Id.* at 188:18-25 ("As a surgeon who may have to intervene surgically for patients on various – or any type of anticoagulation, if I had the choice of having a test to be able to determine how impaired their coagulation pathway was or whether medication is still on board, I would certainly prefer to know and have that option, yes."); *see also id.* at 189:14-21; 232:02-22.

[98] *See supra* Section II(A)(2).

[99] *See* Exhibit # 30 ("Mr. Orr testified that he did not recall Mrs. Orr taking her Xarelto dose that evening. At 2316 hours, Mrs. Orr's PT was 11.4 [9.0 – 12.5] and INR 1.1 [0.8 to 1.2]. A PT of 11.4 is consistent with her having taken Xarelto for the last time on the evening of 4/23.")

21

placement of the EVDs much earlier.[100]  Despite the size of Mrs. Orr's hemorrhage, Dr. Bui believed there was potential for Mrs. Orr to recover when she initially presented at Ochsner Main Campus and that earlier treatment could have changed her outcome.[101]  Likewise, Plaintiffs' expert neurosurgeon, Dr. Peter Liechty, believes that Mrs. Orr would have had a substantial probability of a meaningful recovery had Dr. Bui been able to surgically intervene soon after arriving at Ochsner Main Campus.[102]  As such, the evidence pertaining to Dr. Bui is sufficient to demonstrate causation under the second prong of the learned intermediary test.

## CONCLUSION

Defendants fail to meet their burden in seeking partial summary judgment of Plaintiffs' failure to warn claim.  As detailed above, Plaintiffs have put forth evidence demonstrating the inadequacy of Defendants' instructions to physicians regarding available laboratory tests for evaluating a patient's risk of bleeding and exposure to Xarelto.  Further, the evidence shows that Mrs. Orr's prescribing physician, Dr. St. Martin, and her neurosurgeon, Dr. Bui, would have both utilized laboratory testing had they been adequately instructed, and in doing so, both doctors would have either prevented or mitigated Mrs. Orr's injuries.  As such, the evidence concerning Dr. St. Martin and Dr. Bui, whether taken together or separately, is sufficient to demonstrate causation. As such, genuine issues of material fact remain as to both prongs of the learned intermediary test and summary judgment is therefore precluded.

---

[100] Exhibit # 9 at 34:15-23 ("I think if she had not been on anticoagulation, I think the only thing I would have done differently would have – probably would have been place the ventricular catheters earlier upon admission rather than waiting to the next morning or the next day."); *see also id*. at 21:08-23:05.

[101] *Id*. at 119:01-07 ("I thought [Mrs. Orr's prognosis] was poor, but I thought that there was some potential, reasonable benefit of actually intervening and doing an invasive procedure, because from a neurosurgical perspective, I'm fairly conservative, so I don't -- I'm not so cavalier that I would do invasive procedure on anyone who hits the door."); *see also id*. at 38:14-39:21.

[102] Exhibit # 29 at 11.

Respectfully submitted,

Dated:  February 27, 2017

*/s/ Leonard A. Davis*
Leonard A. Davis, Esq. (Bar No. 14190)
***HERMAN, HERMAN & KATZ, LLC***
820 O'Keefe Avenue
New Orleans, LA  70113
PH: (504) 581-4892
FAX: (504) 561-6024
Email:  ldavis@hhklawfirm.com

Gerald E. Meunier (Bar No. 9471)
***GAINSBURGH BENJAMIN DAVID MEUNIER
& WARSHAUER, LLC***
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA  70163-2800
PH: (504) 522-2304
FAX: (504) 528-99\73
Email:  gmeunier@gainsben.com

***Plaintiffs' Liaison Counsel***

23

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on February 27, 2017, the foregoing pleading and its supporting memorandum of law were filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre- Trial Order No. 17.

*/s/ Leonard A. Davis*
**LEONARD A. DAVIS**

24